**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

IN RE: VALSARTAN PRODUCTS
LIABILITY LITIGATION                    CORRECTED COPY
                                        CIVIL ACTION NUMBER:

                                             19-2875
_____        Status Conference

     Mitchell H. Cohen United States Courthouse
     One John F. Gerry Plaza
     Camden, New Jersey 08101
     March 27, 2019

B E F O R E:          THE HONORABLE ROBERT B. KUGLER
                      SENIOR UNITED STATES DISTRICT JUDGE
                      MAGISTRATE JUDGE JOEL SCHNEIDER

A P P E A R A N C E S:


LEVIN PAPANTONIO
BY:  DANIEL NIGH, ESQUIRE
Attorneys for the Plaintiffs

GOLOMB & HONIK
BY:  RUBEN HONIK, ESQUIRE
ATTORNEYS FOR PLAINTIFF

MAZIE SLATER KATZ & FREEMAN
BY:  ADAM M. SLATER, ESQUIRE
ATTORNEYS FOR PLAINTIFF

ANDRES RIVERO, ESQUIRE
ATTORNEY FOR MSP RECOVERY CLAIMS SERIES, LLC

PENDLEY BAUDIN & COFFIN, LLP
BY:  CHRISTOPHER L. COFFIN, ESQUIRE
ATTORNEYS FOR PLAINTIFF

PRETI FLAHERTY BELIVEAU & PACHIOS, LLP
BY:  GREGORY P. HANSEL, ESQUIRE
ATTORNEYS FOR MAINE AUTOMOBILE DEALERS

```
 1   LOWEY DANNENBERG. PC
     BY: PETER D. ST. PHILLIP, JR., ESQUIRE
 2   ATTORNEYS FOR MAINE AUTOMOBILE DEALERS ASSOCIATION, INC.
     INSURANCE TRUST
 3
     DUANE MORRIS, LLP
 4   BY: SETH A. GOLDBERG, ESQUIRE
     ATTORNEYS FOR PRINSTON PHARMACEUTICALS
 5
     GREENBERG TRAURIG, LLP
 6   BY:  LORI G. COHEN, ESQUIRE
     ATTORNEYS FOR TEVA PHARMACEUTICALS, USA, INC.
 7
     PIETRAGALL GORDON ALFANO BOSICK & RASPANTI, LLP
 8   BY:  CLEM C. TRISCHLER, ESQUIRE
     ATTORNEYS FOR MYLAN PHARMACEUTICALS, INC.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Certified as true and correct as required by Title 28,
25   U.S.C., Section 753.
                     /S/ Carl J. Nami
```

*United States District Court*
*Camden, New Jersey*

1          (The following took place in open court)

2          THE DEPUTY COURT CLERK:  All rise.

3          THE COURT:  Good afternoon.  Have a seat.  Relax.

4    How is everybody doing?

5          (All responded good)

6          THE COURT:  Some of you, it's your first trip to

7    Camden and I assume for others, what was it Yogi Berra said by

8    deja vu all over again?

9          I'm Judge Kugler.  This is Judge Schneider and we'll be

10   managing this case, God willing.  It's an interesting case.  I

11   have a number of questions, but we have a number of things

12   that we want to talk to everybody about today and in

13   preparation for getting this thing organized and getting it

14   rolling.  I think you will find the court is very responsive

15   to your concerns and your needs.  There's Denise DePaul.

16   Stand up, Miss DePaul.  You need to know Denise DePaul.  She's

17   in our Clerk's Office.  She is the person who can straighten

18   out all your filing problems.  Okay?  That's what she does.

19   She's really good at it.  Two pieces of advice that she wanted

20   me to give you.  If you want get electronic filings, you have

21   to fill out the application to get electronic filings.  And if

22   you have any questions about that, you can ask her about how

23   to do that.  There's an application, you fill it out.

24   Normally it's restricted to members of the bar, but this is an

25   MDL case, so any lawyer can get on the electronic filing list.

1    When you file things, and Judge Schneider and I will have more

2    to say about filing things.  In order the make sure that we

3    know it's here, you need to file it both in the Master Case

4    and in any individual case that you happen to be involved in.

5    Again, Miss DePaul can explain this to you.  If you want to

6    stick around and talk to her when we're done today, please do

7    so.  Otherwise you can e-mail her or phone her and she will

8    straighten everything out for you.

9         All right.  We don't and I assume many of you don't

10   know a whole lot of basic facts about what's going on with

11   this contamination.  It would seem to us that one of the first

12   questions that you need focus on is how did this happen.  I

13   know there's some theories.  I don't know if the plaintiffs'

14   side has a consensus working hypothesis about how this

15   happened.  I know there are many regulatory agencies looking

16   at how this happened.  It's interesting that it took this long

17   to find out that these things were contaminated.  As I

18   understand the explanation from the FDA is they never got

19   around to testing it until rather recently, even though there

20   had been an application over two years ago to them because of

21   a change in the manufacturing process.  But I mean you'll

22   straighten all that out.  But I think you need to, everybody

23   needs to focus on how this happened.  I think there's lot of

24   questions about, lots, I don't even know how big a lot is.

25   I'm not sure how this product entered the United States.  I'm

1    not sure how all these peripheral defendants, you know, played

2    a role in any of this.  I'm not sure whether, whether all lots

3    were contaminated.  I'm not sure of the level of

4    contamination.  I'm not sure if there's a threshold of

00:17    5    contamination above which is a concern, below which nobody

6    seems to care.  These are all questions that you're going to

7    have to look into and get some answers.  And, of course,

8    there's the significance of the contamination question.

9    There's a number of people who claim I understand that they've

00:18    10    contracted cancer from taking this drug.  It's probably going

11    to be a heavy lift to prove that, but, you know, we'll see

12    what happens.  But I think that causation carries over into

13    the other cases that are pending because, you know, if the

14    contamination is not dangerous, then maybe you don't have such

00:18    15    a great argument that you should get your money back for

16    paying for it.  But these are all things that, you know, we

17    will hash out over time with this.  And I'll open it up to the

18    plaintiffs' side.

19         Is there a working hypothesis as to how this happened

00:18    20    at this point?  I mean it doesn't have to be.  I'm just

21    curious.  I don't know.

22         MR. NIGH:  Daniel Nigh from Levin Papantonio.  Your

23    Honor, what we, at this point, and I'm sure we're going to

24    find out additional information as we go throughout this

00:19    25    process but some of the press stories that we've seen, some

1  for the back story I've put together is that we believe that

2  the Solco Zhejiang Huahei API manufacturer, that they changed

3  the process in 2012 and how they went about making this

4  product.  Now they have a patent on this process that they

5  entered in 2011.  They started utilizing this manufacturing

6  process in 2012.  And what we don't know is when did that API

7  in China make its way into our pill forms in the U. S.  What

8  we've seen is the European agencies have come out and they

9  stated that they believe that API made it into their pills in

10  2012.  What we haven't seen is the FDA be definitive in their

11  language as to when it got here.  They said it's been here for

12  at least four years.  So that would put us back in 2015 and/or

13  2014.  But we don't know about 2012, 2013.  So, what we do,

14  some of the studies that have been or explanations that have

15  been published to date seem to suggest that this change in

16  this manufacturing process from Zhejiang Huahei when combining

17  the chemicals created a byproduct that's idiomatic that has

18  now made its way into the active ingredients for Zhejiang

19  Huahei's API.

20        Now I say that, we have a pretty good idea what

21  happened for Zhejiang Huahei's API, and we have a good idea of

22  the levels because the FDA has tested these pills and released

23  the results for many of these pills.  And so Zhejiang Huahei

24  distributed this pill Teva or the U. S. Manufacturers took

25  their API, put it into the pill form in the U.S. and those

1    would have billed U. S. Manufacturers will be Teva, Torrent

2    and Solco which is the U.S. subsidiary, the Chinese company

3    and Actavis, appears to be another of those.

4          So we have good information as to the amount of

00:21   5    contamination in the product and we believe that that

6    contamination is hundreds if not even thousands of times

7    higher than the threshold of the reasonably successful

8    threshold that IRC has set.  What we don't know is the other

9    API manufacturers.  We haven't seen a lot of data released for

00:21   10   those, like Mylan, Aurobindo and Camber.  What we can -- I

11   mean what we would suspect from some of what the FDA has come

12   out is that their level would have been tested and at the

13   least higher and than the reasonably acceptable threshold, but

14   we don't know by what degree.

00:21   15         THE COURT:  Is it your belief that all of the API was

16   contaminated when it was distributed?

17         MR. NIGH:  I believe that all of the API that's

18   coming from Zhejiang Huahei at least from what we're seeing

19   from the stories that are coming out in the press, it appears

00:22   20   that as of 2012 when they changed the manufacturing process at

21   Zhejiang Huahei, all of the API coming from Zhejiang Huahei

22   would be contaminated.

23         Now, there are pills in the U.S. that we don't have --

24   that are on a, what's called a not recall list, meaning we

00:22   25   suspect the FDA has tested them and that they're reasonably

| | |
|---|---|
| 1 | safe, but we suspect that they're not receiving API from |
| 2 | Zhejiang Huahei.  They're not receiving it from Mylan, they're |
| 3 | not receiving it from Aurobindo and they're not receiving it |
| 4 | from Hetero Labs which is the API for Camber.  We suspect |
| 00:22  5 | they're receiving it from somewhere else that doesn't have a |
| 6 | contamination problem or at least the FDA doesn't know about |
| 7 | it yet. |
| 8 | THE COURT:  Well, that's going to require some real |
| 9 | work. |
| 00:22  10 | MR. NIGH:  It will. |
| 11 | THE COURT:  With an army of people. |
| 12 | MR. NIGH:  It will. |
| 13 | THE COURT:  Okay. |
| 14 | MR. NIGH:  And that's why we have an army of people |
| 00:22  15 | here. |
| 16 | THE COURT:  No, I understand that and I appreciate |
| 17 | that. |
| 18 | MR. NIGH:  Thank you, your Honor. |
| 19 | THE COURT:  Okay.  And that I guess leads to the next |
| 00:23  20 | set of questions, is really the roles all of these companies |
| 21 | played in all this and whether any of these roles were |
| 22 | innocent, just passthroughs or whether any or were more |
| 23 | involved.  I mean I've had communications from retailers as |
| 24 | part of this meeting process and I can understand their |
| 00:23  25 | frustration that, you know, we really didn't do anything and |

1    we're just a, just a passthrough and we shouldn't be

2    defendants in this and all that.  And I'm sympathetic to that

3    and one of the things we're going to try to do early in this

4    case is find a method by which we can weed out people like

00:23    5    that who really aren't necessary for this.  You know, really

6    perhaps by asking the plaintiffs' counsel to consider a

7    dismissal without prejudice to these people just to get them

8    out of here for the time being, get them out of the way.

9    There's a lot of moving parts here as you appreciate and when

00:24    10    the train is coming down the tracks, to use an analogy, and I

11    don't want to get diverted to the side tracks, and

12    unfortunately these trains tend to run over some people, but

13    that's what's going to have to happen, as you all appreciate

14    it who have been through these kinds of cases.  It's going to

00:24    15    take a lot of work with a lot of people to get this going, but

16    I am sensitive to the applications of some of the defendants

17    and their clients and trust me, not today but at some point we

18    will try to work out some system to get the unnecessary people

19    out as defendants.  You know, I can understand maybe you'll

00:24    20    have to contribute some discovery in this case before then,

21    but we're going to work on things like that.

22        All right.  Now, the first thing obviously we have to

23    do is leadership roles.  The submission we got from the

24    plaintiffs had a suggestion as to what the plaintiffs agreed

00:25    25    on for leadership roles.  I'm not prepared today to enter an

1    Order on that.  I'd like the process to be a little more

2    transparent.  I'd like other people who want to serve in a

3    leadership role on the Plaintiffs' side to have an opportunity

4    to alert the court that they want to be considered.  So that's

5    probably something that we will make a decision on at the next

6    status conference.  We will be having monthly status

7    conferences, biweekly status conferences with Judge Schneider.

8    So what we want to do then is give other people who want to

9    participate in a leadership role, particularly those who are,

10   maybe haven't traditionally been part of leadership roles in

11   these kind of cases, give them an opportunity to be heard and

12   maybe participate in this.  But we will get to that at the

13   next conference, I promise you.

14        Now, there's a number of motions that are pending.  The

15   only one of which that concerns me at this point is the one on

16   personal jurisdiction.  The motion to quash the service by the

17   Chinese company.  It seems that there hasn't been proper

18   service on the Chinese company.  So I guess I'm going to ask

19   the defense side whether or not it's necessary for the

20   plaintiffs to serve their foreign defendants repeatedly or is

21   one legitimate service good enough to trigger this thing?

22        MR. GOLDBERG:  Your Honor, Seth Goldberg on behalf of

23   the Prinston defendants and Zhejiang Huahei Pharmaceuticals.

24   We filed that motion.  Among defense counsel we talked about

25   allocating a few of these issues.  Mr. Trischler who

1    represents Mylan, is going to talk about that service issue

2    specifically.

3          THE COURT:  Sure.  Mr. Trischler, thank you.

4          MR. TRISCHLER:  Good afternoon, your Honor.  May it

00:27    5    please the court, Clem Trischler for Mylan Pharmaceuticals.

6    We've had -- we had what I think are a productive conversation

7    and meeting with the plaintiffs' leadership group earlier

8    today and while the defendants have concerns and due process

9    issues with respect to service, particularly on the foreign

00:27    10    piece, we were open to a compromise.  What we had proposed was

11    that in lieu of requiring service pursuant to Hague on foreign

12    defendants, for each and every complaint filed.  What we had

13    proposed was that when we get to the master complaint stage

14    which I think is a concept that both sides had agreed upon,

00:28    15    that there would be service pursuant to Hague on the foreign

16    defendants of the master complaints and service pursuant to

17    Rule 4 on the domestic defendants of those master complaints

18    and then subsequent short form complaints could be served on

19    counsel pursuant to Rule 5.  The plaintiffs, I don't want to

00:28    20    pre -- to speak for the plaintiffs on their position.  They

21    propose some modification of that, but in essence what we were

22    talking about is we see three classes of cases here.  The

23    third party payer cases, the consumer Class Actions and the

24    personal injury cases.

00:28    25          So what we would be proposing is that the defendants be

|    |    |
|----|----|
| 1  | served properly with each class of case.  So three times.  One |
| 2  | for each group of cases. |
| 3  | THE COURT:  Well, that's a good segue into the number |
| 4  | of classes.  How about the medical monitoring claims that are |
| 5  | coming?  What class do you put them in or do you think they're |
| 6  | a separate class. |
| 7  | MR. TRISCHLER:  Well, at this point in time, I've not |
| 8  | seen any medical monitoring claims.  There's not been anyone |
| 9  | asserted against my client.  So I guess I would have to wait |
| 10 | and see what the plaintiffs propose.  Traditionally what I've |
| 11 | seen is that medical monitoring is a cause of action that |
| 12 | could be alleged as a count in the personal injury master |
| 13 | complaint as opposed to part of a separate complaint, but I |
| 14 | don't know that we have as a group formulated a motion on |
| 15 | that.  I'll defer to my colleagues.  But since we haven't seen |
| 16 | the complaints yet or haven't seen the claims yet and really |
| 17 | heard about them for the first time today at least from my |
| 18 | perspective, we've not formulated a position. |
| 19 | THE COURT:  Well, I mean I can understand your point |
| 20 | about it being part of the bodily injury claims, but it's also |
| 21 | a claim pure economic easily calculable numbers, as are the |
| 22 | consumer and the third party payer cases.  Interesting. |
| 23 | Who wants to speak about the, from the plaintiffs' |
| 24 | perspective about the number of classes?  Mr. Slater? |
| 25 | MR. SLATER:  Hello, your Honor.  Adam Slater for the |

00:28 (line 5)
00:29 (line 10)
00:29 (line 15)
00:29 (line 20)
00:30 (line 25)

1    record.  Hello, Judge.

2         You know, from our perspective, there's the economic

3    claims, there's the third party payers.  There's the

4    individual economic reimbursement claims.  Whether they'll be

5    pleaded in the same master complaint or not, that's something

6    we're talking about and we were very candid with the defense

7    and said we want to talk to them, and if we're going to do

8    something for efficiency, we want to make sure that we're all

9    on the same page and that we're not setting ourselves up for

10   issues on how we do sub-classes, etcetera.  So that's

11   something that's a practical concern.  But I don't think it's

12   going to be a problem because we're going to be transparent

13   and talk to the defense about that.

14        The medical monitoring, it could be a sub-count in the

15   master complaint for the personal injury claims or could be

16   separate.  We haven't made a decision on our end also.  But

17   again we're trying to be as efficient as we can and certainly

18   since that's a class claim, it probably really has to be, it

19   has to be on its own, whether it has to be with the other

20   economic claims or not.  You know there's issues of

21   certification and how clean it is.  So we want to make things

22   obviously as efficient as we can.  And I don't know if you

23   want me to address the service question.

24        THE COURT:  Yeah.  Where are you on the service

25   question?

1          MR. SLATER:  That was my complaint that we're --

2          THE COURT:  Right.

3          MR. SLATER:  We believe we're served properly on BHP

4   but I'm also trying to leapfrog forward where I think your

00:31  5   Honor is going with this which is how do we get going.  We

6   spoke with the defense and I've spoken with Mr. Goldberg

7   several times and suggested, you know, look maybe there's a

8   way to just get us into an accepted service situation without

9   you having to actually say you've accepted service if you

00:31  10  want.  We don't want to have actually to be served, but let's

11  get going so we can get you in this case and have you involved

12  in the discussions that are very important early on in terms

13  of the ESI protocols and the discovery as opposed to coming

14  late to the game.  They have their position and they'll

00:32  15  decide.  If the court would prefer that we serve under the

16  Hague, we certainly think one complaint being served is

17  adequate to bring a party into the case.

18          THE COURT:  Well, that's what --

19          MR. SLATER:  And, and I don't think that we would

00:32  20  need to take the time to get the full blown master complaint

21  prepared.  I think, my understanding is there are people in

22  this room who have already started the Hague process.  So many

23  of the defendants we believe at least one has already been

24  served internationally although there may be some questions

00:32  25  about adequacy that we heard during our meet and confer with

1    the defense.  So, you know, we'll be guided by the court's

2    preferences on what's most practical.  Certainly if we can

3    litigate the service of BHP or we could try and work our way

4    through it to try to get up and running as quickly as we can

00:32    5    in the most efficient way.  We're open to either one, but I

6    think they're actually asking for each of the master

7    complaints to be served separately and that's going to take

8    more time, and our view is that as long as a complaint has

9    been served or gets served, that's enough to bring them into

00:33    10    litigation, and then what we do in terms of other complaints,

11    that's just part of the pleading process and we shouldn't have

12    to take the time and wait to have that long to serve the

13    masters because it still be within the court.  The MDL puts

14    everything in front of them, in front of your Honor.  So we

00:33    15    would think that's the most efficient and maybe more of a

16    compromise.

17          THE COURT:  So, there seems to be a consensus that

18    there's going to be more than one master complaint.

19          MR. SLATER:  Absolutely.

00:33    20          THE COURT:  Okay.  Well, that's fine.  Can we -- go

21    ahead.

22          MR. TRISCHLER:  I was going to add, Judge, just to,

23    after our discussion this afternoon, we met again as a group.

24    We're willing to change our position on the service a little

00:33    25    bit in order to aid in the efficiencies that Mr. Slater was

00:33

1    talking about.  We had proposed master complaints would be

2    served in each category of cases.  Since it may take time to

3    get those master complaints prepared from the defendants'

4    perspective, we'll accept service of any complaint in any

5    category as being adequate for the foreign defendants.  So,

6    for instance, my client has a subsidiary in India, Mylan

7    Laboratories Limited.  We have been sued in third party payer

8    cases.  We have been sued in a Consumer Class Action case, we

9    have been sued in personal injury cases.  Our position is as a

00:34

10   group would be if Mylan Limited is served pursuant to Hague in

11   any personal injury case, they would then be in this MDL

12   proceeding for all the personal injury cases.  We would want,

13   once we're served in any Consumer Class Action, we would be in

14   this MDL and the Consumer Class Action cases.  So we don't

00:34

15   necessarily -- if we decide we don't necessarily have to wait

16   for the master complaint, but we do believe from a due process

17   perspective, that each of the defense ought to be entitled to

18   be properly served in each class of case so that they are on

19   notice of the claims that are being asserted against them.

00:35

20          THE COURT:  Well, far be it from me to ask that you

21   ask your client to give up their process rights and I would

22   never do that.  But if, to use your example, if you're served

23   successfully in a personal injury case that brings your client

24   before the court for all discovery purposes, correct?  So

00:35

25   what's to be gained at this point by requiring that they serve

        1    the other classes of complaints?  Your client's still going to

        2    have to participate in any everything that goes on here.

        3          MR. TRISCHLER:  I would agree, generally, your honor.

        4    I think the only thing to be gained again is some might say

00:35   5    it's form over substance.  I would say it's Constitutional Due

        6    Process.

        7          THE COURT:  And I respect that.

        8          MR. TRISCHLER:  That's really what we're standing on.

        9    I think it's only fair.  Technically as everyone knows, we

00:35  10    could insist on service of each and every complaint.  We're

       11    trying to effect a compromise that we think is reasonable in

       12    balancing the interest of all the parties, and I don't think

       13    requiring service of each class of cases on a party one time

       14    is a tremendous burden to ask when you weigh that against the

00:36  15    due process protections that any litigant in any court in this

       16    country is entitled to.

       17          THE COURT:  All right.  Well, perhaps you can keep

       18    talking with each other about this issue.  I mean I can see

       19    both sides.  I think I've expressed the way I see this.  On

00:36  20    the other hand, the defendants have Constitutional rights that

       21    need to be protected and we'll obviously protect them.  But

       22    continue to talk about that.  If it continues to be an issue,

       23    we will decide it at the next conference.

       24          Now -- yes, sir.

00:36  25          MR. HANSEL:  Your Honor, I'm Greg Hansel one of the

1   lawyers for the Maine Automobile Dealers Association Insurance

2   Trust.

3         THE COURT:  Yes.

4         MR. HANSEL:  My colleague, Peter St. Phillip.  And

5   just to further briefly respond to your Honor's question about

6   whether there should be separate tracks, MADA complaints.

7   MADA believes there should be a separate third party payer

8   track.

9         THE COURT:  No, I read your papers and I understand.

10         MR. HANSEL:  Thank you.

11         THE COURT:  There's a number of bigger overall

12   question here what we have and maybe you have.  There are

13   other -- I see in the media and elsewhere there are other

14   contaminants being talked about on some of these products?

15   There's other Sartans that are being talked about as being

16   contaminated?  They technically are not before us at the

17   moment.  I think, I think they probably should be ultimately

18   all here, unless, you know, you all object to that, that's

19   fine.  I think most -- I think the best way to do that is to

20   go back to the panel and ask that they be assigned as part of

21   this case.  And I was trying to think of a way to work on

22   that.  I guess, you know, we can enter a direct filing order

23   for those, too and then take them here but I think that kind

24   of offends the structure of the MDL.  So, I was just curious

25   as to whether or not there's any desire, I guess, on the

1    Plaintiffs' side or even defendants' side to get the other

2    Sartans and the other contaminants in among all this happy

3    time we're going to have.

4         MR. HONIK:  Your Honors, good afternoon.  My name is

5    Ruben Honik.  I'm with Golomb and Honik in Philadelphia.  Your

6    Honor is correct that the JPML Panel did not capture any of

7    the Sartan or any Geochemtin drugs except for Valsartan.  And

8    I think they did so purposely based on the arguments of

9    counsel.  And we would represent to the Panel that it was

10   uncertain what the degree of contamination and what the scope

11   of the market was with respect to Losartan and Irbesartan.

12   And for that reason at least for the moment the MDL that was

13   created only captured Valsartan.  With that said, I think we

14   share the court's view that if preliminary discovery reveals

15   that those drugs should adequately be in this litigation

16   because they're sufficiently contaminated and there's enough

17   of a market to make their presence in the case meaningful,

18   that the place they should be is here.  And there's a

19   mechanism for that.  There's actually a rule that allows a

20   petition back to the JPML to request that those drugs be

21   captured and there are many examples of that in MDL's have

22   been created were larger.

23        So our position at the moment is that it's premature to

24   do so, but we want to be very mindful of the mechanism that we

25   have available to bring them in.  And I think to a person we

1    agree that if they belong in the case factually, they should

2    certainly be before your Honors.

3         MAGISTRATE JUDGE SCHNEIDER:  Mr. Honik, some of the

4    complaints that have been filed already include those Sartans

5    in them, what we do with those.  And what I take from what

6    you're saying is that only Valsartan will be in the master

7    amended complaint.  But what do we do about the claims and the

8    other complaints?

9         MR. HONIK:  So I think that's an excellent question

10   and not to make the problem even larger, there are, in fact,

11   there were two standalone complaints that only sought relief

12   as to Losartan has now been voluntary dismissed.  Just as a

13   procedural matter, it was originally with Judge Wolfson and

14   then Judge Linares Sua Sponte sent it to this court.  It has

15   since been voluntarily dismissed.  However, there is another

16   standalone case having to do with Irbesartan and counsel who

17   has filed that is here.  They're part of the proposed

18   leadership that we proposed and I think that that should be

19   voluntarily dismissed, too, in preference to waiting to see

20   whether they properly belong.  That's point one.  Point Two,

21   to the extent that we're going to prepare a master complaint

22   in due course, 30 days, 45 days, plus or minus from today, I

23   don't think anything but Valsartan is going to be in there.

24   And I think at such time as discovery supports the inclusion

25   of one or both of those drugs?  We will make appropriate

1   application both to amend the master complaint and to file the

2   appropriate petition with the JPML in order to coral it.  But

3   I think to a person we agree that as this litigation currently

4   stands, on the basis of our current knowledge, those two

00:41    5   drugs, although highly suspect for contamination, aren't in a

6   position to be included.

7           MAGISTRATE JUDGE SCHNEIDER:  Is this other complaint

8   going to be dismissed?

9           MR. HONIK:  Well, I can't speak for the filer.  The

00:41    10   filer is in the room.

11          MAGISTRATE JUDGE SCHNEIDER:  Did you hear from the

12   horse's mouth?

13          MR. HONIK:  Yes, sir.

14          THE COURT:  We need to know your names when you come

00:42    15   up to talk, please.

16          MR. MARCHESE:  Yes, your Honor.  Joseph Marchese,

17   Bursor and Fisher.  I'm, I'm in line with everything that Mr.

18   Honik said.  We do have a case concerning Irbesartan that's

19   currently pending before Judge Wolfson.  We are communicating

00:42    20   with our client in that case right now.  We don't have a

21   definitive answer, but that is something that we are

22   discussing with our client and we would intend to, you know,

23   intend counsel the same, the same course of action, with the

24   voluntary dismissal that occurred with standalone Valsartan

00:42    25   case.

1         THE COURT:  Okay.  Great.  Thank you.

2         MR. GOLDBERG:  Your Honor, if I may on this point.

3    The Maine Auto case also has claims with respect to Losartan

4    and Irbesartan and that really raises an interesting issue

00:43    5    because some of the defendants here are only here because

6    they're manufacturers with respect to those drugs.  Is that

7    drug going to be excised from that complaint or is there going

8    to be, you know, what is going to happen with respect to that

9    complaint.  Is that going to be withdrawn?  Certainly the

00:43    10   defendants who are only here because of that would, I assume,

11   advocate for that kind of excising or withdrawal.  But I just

12   want to raise that so we can address that issue.

13        THE COURT:  Well, that's why we're here.

14        MR. ST. PHILLIP:  Peter St. Phillip from Lowey

00:43    15   Dannenberg.  Our complaint does include those other two

16   Sartans.  We are in the process of evaluating in connection

17   with an amendment whether it's needed to be included or not

18   included, whether it should be part of this MDL.  It's

19   something that we're considering with the client but those two

00:44    20   Sartans are also in our complaint.

21        THE COURT:  Well, we have to do something about that.

22   I guess perhaps we can sever them, if you insist on continuing

23   with those in this case, because the reference to us is on,

24   does not include those two drugs.  So, there's not much we can

00:44    25   do.

1    MR. ST. PHILLIPS:  No, we understand the Court's

2    preference, and we would make a determination with the client

3    and advise the Court by way of amended complaint or the next

4    conference.

5    THE COURT:  Let's have an answer by the next

6    conference from you and your, and your predecessor who spoke

7    just before you did.  Okay?

8    MR. ST. PHILLIP:  Thank you.

9    THE COURT:  All right, thank you.  Going back to

10   pleadings.  I think everybody is on board with the concept of

11   master complaints.  I prefer to let the two sides try to talk

12   about this over the next 30 days as to what they think would

13   be acceptable in a master amended complaint and if you can't

14   come to a conclusion, then we can certainly put that on the

15   agenda for the next meeting and resolve any issues you have

16   then.  But I'm very confident that you -- I mean you've been

17   through these a million times.  You can figure this out pretty

18   easily as to what needs to be said in an amended complaint.

19   Okay?

20   That brings up the question raised by the defendants is

21   that if there's going to be master amended complaint, do we

22   really need to file an answer.  I think not.  I can't imagine

23   why the plaintiffs would need an answer, other than a general

24   denial of these things, unless there's some specific reason

25   why defendants want to file an answer to these things.  I

00:44

00:44

00:45

00:45

00:45

1    can't think of any, but we'll just assume that they deny

2    everything.  Okay?  Go from there.

3         All right.  Motions.  There's another bunch of motions

4    pending and I'm not going to get to those because we're really

00:46    5    not going to entertain motions early in this process.  If

6    there are disputes that need to be resolved, the way we're

7    going to do them is we're going to put them on the agenda if

8    they can be worked out for the next conference and we will

9    deal with them here in the courtroom, if we have to.  But

00:46    10   we're not going to get bogged down in a lot of motion practice

11   at this time.  There will be obviously opportunities in the

12   future for various motions to be brought, but I don't want you

13   file a lot of papers in this case.  We can work most of these

14   things out with Judge Schneider and myself in the courtroom.

00:46    15        Now, ESI protocol.  We think that's crucial.  We think

16   you need to work a bit on that.  I know that the defendants

17   have some issues about this, and whether or not repositories

18   are necessary.  It's going to take some convincing to convince

19   me that they're not, but I think we prefer to let the two

00:47    20   sides work on that in the next 30 days and come up with any

21   proposal they have at the next conference and we can talk

22   further about that.  But that's got to be addressed and it's

23   got to be addressed very soon.  What I think we contemplate in

24   this case is that once we get the pleadings straightened out,

00:47    25   that there will be what we call fact sheets, similar to what

1    we call questionnaires that the plaintiffs will be required to

2    fill out in lieu of interrogatories.  It will be an automatic

3    process within an X number of days of filing of the short form

4    complaint that the plaintiffs will all have to submit the fact

00:48    5    sheet to their adversaries.  It will be self-executing, not

6    require a request by the defense side to get this information.

7    There are plenty of examples of those out there.  Again, we

8    expect both sides to work on what they're going to look like

9    and what both sides can agree the questions will be on this

00:48    10    fact sheet or questionnaires.  And once again if you can't, if

11    there's some disagreement on it, we will, we will weigh in on

12    it at a future status conference as to what we think is

13    necessary.

14        The question of deposition protocol I think is

00:49    15    premature.  And again we expect both sides to work on those

16    issues.  But we will be ready to resolve any disputes that you

17    can't resolve, if necessary.

18        Common Benefit Fund.  An order, we expect one from

19    plaintiffs' counsel of the leadership of that.  Once we get

00:49    20    the hierarchy established, I will approve that.  I think it's

21    necessary that there be a Common Benefit Fund here to get some

22    of these things done.  To get a core group of lawyers working

23    on the work that's going to benefit everybody.  But we

24    certainly will, once we get your leadership hierarchy in

00:49    25    place, we'll get that, we'll look it over and we'll talk to

1    you about that at a future conference.

2        Confidentiality Orders.  Again we expect both sides to

3    work on that together and we will resolve any issues involving

4    that.

00:50    5        Now, we think that there should be some universe of

6    core documents that the defendants need to provide to the

7    plaintiffs without request for production.  It would seem to

8    me and to us that things such as the communications of the

9    defendants had with the FDA or any other government regulatory

00:50    10    body, domestic or foreign.  I understand there's been a number

11    of foreign recalls in place in other countries, Europe, Korea,

12    and places like that.  That would seem to me and to us to be

13    core documents that need to be produced early on in this case

14    to get the plaintiffs started on what's going to be some

00:51    15    difficult work.  There are probably other core documents that

16    need to be produced but I'd like plaintiffs to think about it

17    and work with the defense counsel to come up with what they

18    think is a reasonable list of core documents that they should

19    get early, I mean really early in this case to get started on

00:51    20    what they need to do.  And again if there's a dispute, if you

21    can't resolve it, we will resolve it at the next conference in

22    this matter.  But I don't think there should be a lot of

23    dispute about some of these things.  The plaintiffs are going

24    to get anyway in discovery probably available from the FDA

00:51    25    anyhow if you want to get them that way.  But let's cut

1    through all that and let's get the defendants working to get

2    these documents together and get them to plaintiffs.  But

3    again the plaintiffs can work with the defendants as to what

4    else they might think are core documents in this case.

5            Status conferences.  We will have, I'm just going to

6    throw it out there.  The fourth Wednesday of every month at

7    1:30 p.m. here in this courtroom and that's for everybody.

8    But Judge Schneider will have a conference at 10 o'clock in

9    the morning of those days to talk to you about any discovery

10   issues that you have.  Judge Schneider, it's Judge Schneider's

11   practice, and I'm going to turn this over to him.  He'll tell

12   you about his practice of phone conferences.  Judge Schneider?

13           MAGISTRATE JUDGE SCHNEIDER:  On the fourth Wednesday,

14   the way we worked it in Benicar, it went relatively smoothly.

15   We have the general status conference at 1:30 p.m.  We meet in

16   the morning starting at 10 o'clock and go over, there's

17   discovery issues that I'll address in the afternoon and deal

18   with the sort the big picture issues on the case.  We'll ask

19   that a day or two before each conference, then there's a

20   plaintiff meet and confer and submit a letter informal,

21   listing the issues they want to address.  And so we'll meet

22   once a month in person, but two weeks after the in person

23   conference, we'll have a phone status conference, same thing a

24   day or two before, just list the issues you want to address.

25   If there's no issues, which was almost never the case in

1    Benicar, that's great.  We don't have to hold the call.  But

2    more often than not, there's an issue.  So, this way you'll be

3    in touch with the court at least once every two weeks and we

4    found that that's a good way to move the case along.  It may

00:54    5    be that we don't decide issues on the phone call or at the in

6    person conference, but we'll at least set a schedule for when

7    the issue is addressed.  And what we found in Benicar that was

8    helpful, is we don't want these discovery issues to linger.

9    You'll raise them, you'll raise them promptly.  We're not big

00:54    10    fans of motions because they just delay things with return a

11    date and what have you.  Usually we handle these issues on

12    letter briefs so we can get the issues decided more quickly.

13    And, you know, we hope to turn over the decision and order in

14    a rapid fashion so we can keep the case moving.  So that's

00:55    15    what we intend to do thing and unless there's no objection,

16    it's the fourth Wednesday of every month at 10 and one is in

17    person.  I would say the second Wednesday we can have a

18    conference call in the afternoon.  I think we did it at

19    four o'clock.  One, that's a good time because the lawyers are

00:55    20    usually done with their day by four, not always, but since

21    it's late in the day, that tends to lesson the amount the

22    lawyers talk on the phone about their disputes because they

23    want to get to happy hour.  So I'm a big fan of happy hour.

24    So anything we can do to shorten the time of those conference

00:55    25    calls, the better.  But the big thing is to just get us the

1    agenda not the day before, but, you know, by the close of

2    business at least one day before so we can prepare for the

3    conference call.  If we can decide the issue on the call,

4    we'll do it.  We'll do it on the record and then you can move

00:56    5    on.  And we found that's a very effective way of moving the

6    case along.  That's all I have to say.  And I do want to

7    congratulate Judge Kugler, despite the fact of his poor

8    performance in the NCAA Bracket.  He has not let it affect his

9    performance today.

00:56    10                        (Laughter)

11             MAGISTRATE JUDGE SCHNEIDER:  Kudos to you, Judge

12    Kugler.

13             THE COURT:  Thank you.  It's been a busy day, as you

14    saw earlier today.  Couple more things that I'm going to throw

00:56    15    out there.  Obviously Judge Schneider and I are going to be

16    talking to you early and often about settlement possibilities.

17    It's premature.  Now, we understand that.  There's a lot of

18    questions out there.  We don't even know if the defendants are

19    insured, if they're financially viable.  I mean those

00:56    20    questions have to be dealt with early on.  One suggestion

21    we're going to make when we talk to you seriously about

22    methods of settling the case, is we found this to be helpful

23    and I know other Judges have found this to be helpful and

24    there's to be separate settlement counsel for the two sides.

00:57    25    Separate from those who are actively litigating the case.  It

1    seems helpful to have lawyers who are sort of a little bit

2    removed from the war that's going on.  I don't suggest there

3    should be a war.  I mean you're all great lawyers and I'm sure

4    you'll get along and that's part of our job is to make sure

00:57    5    you're getting along and communicating with each other, and

6    we'll do our best.  But it's something I think you should

7    consider about having separate settlement counsel when we get

8    there.

9          Another thing I want to tell you and alert you to

00:57    10    before we open it up to things you want to say, is the only

11    thing we're going to try to do in this case is we're going to

12    try to collect a lot of data.  We have ways of doing that.

13    We're not set -- we, haven't set it up yet.  But that data can

14    be helpful to us in charting this case and where it's going

00:58    15    and what needs to be done.  And by data I mean, for instance,

16    the fact sheets that the plaintiffs are going to be filling

17    out, we're going to collect that data from you because you're

18    going to have -- we're going to try to have you use forms,

19    fill-in type forms that then can be sent to the court so we

00:58    20    don't have to re-enter that information.  We can just take it

21    off of what you've done.  We will have a confidential e-mail

22    address to send this stuff to you.  We will keep it

23    confidential and at the risk of jinxing anything the judiciary

24    has never been hacked, knock on wood.  So we will keep it all

00:59    25    confidential, but we can use it in just the court staff for

1    internal purposes to help track of where we are and get some

2    idea.  One of the problems that a Judge has in an MDL case is

3    just trying to figure out the universe of this thing.  It's

4    really hard.  And I know it's hard for the lawyers, too.  I

00:59    5    mean you know what your own cases are, but you don't have a

6    great sense of what else is going on out there.  This case is

7    particularly difficult we have because as we've discussed, we

8    have the classes of cases.  And so keeping track of what's

9    going on requires a little effort, but we have I think now and

00:59    10    we hadn't had it before the ability to collect internally and

11    massage this data to help us understand what's going on.  This

12    is going require a little bit of help for you to send us this

13    stuff in the form that we can use it, but we will talk to you

14    more about that in coming months how to do that.  But that's

01:00    15    what we hope to do in his chase.

16    Let's start with plaintiffs' side.  We're going to open

17    the floor up.  What else do you want to talk about and what

18    else can we consider and what else needs to be done do you

19    think in this case to get this thing moving?

01:00    20    MR. HONIK:  Your Honor, I don't want to put too fine

21    a point on this.  I think we all listened very carefully to

22    the most immediate assignments that the court has impressed

23    upon us.  How many different complaints are going to have.

24    How many tracks, will it include Losartan, will it include

01:00    25    Irbesartan.  These fundamental kind of questions, important as

1  they are, have largely been answered internally by the

2  proposed leadership structure.  And, so, there's kind of a

3  chicken and egg proposition here.  As soon as we understand

4  the structure that the court will approve, we'll be in a

5  position to respond forcefully to the court's suggestions

6  about the questions that you posed to us.  So, again without

7  putting too fine a point on it.  For us the starting point is

8  really having a green light for the proposed structure.  I

9  don't think I'm saying anything out of turn by saying that at

10 least all the plaintiffs in this room, we've conferred with

11 them for weeks, if not months at this point.  We've had

12 multiple internal meetings.  We've discussed all of the things

13 that the court has brought to our attention and we are poised

14 to be responsive, not only to the court but to the defendants

15 and the numerous meet and confers that we've had.  I echo Mr.

16 Trischler's observations that we had a very productive meeting

17 today.  I think we're close to having resolution on the

18 service issues and so forth, and I think as soon as the court

19 can give us a green light about the leadership structure, we

20 are in a position to address all of the matters that you

21 brought to our attention today.

22      The other thing that I just wanted to point out and

23 this was not the day to go into it in any significant or deep

24 way, unlike almost any other product.  The product here is

25 about as seriously regulated as any product could be.  And so

01:00
01:01
01:01
01:01
01:02

1    without getting into the weeds of it, the layers of

2    regulations and matters under the FDCA and the United States

3    Code that creates obligations on the part of the entire

4    distribution chain from the API manufacturer to the

01:02    5    manufacturer in the State to the re-packager, this is not like

6    any other distribution chain.  It's regulated in a very

7    serious way up and down.  And suffice it to say, it creates

8    obligations there.  We don't possess all the facts to know how

9    they've discharged those obligations.  And so to be sure

01:02    10    that's why many of the complaints that your Honors have seen

11    include many of these defendants.  And it's -- I don't

12    presuppose for a second that all of them may continue to

13    belong here.  That remains an open question.  We know it's for

14    us to demonstrate that to the court, but given the unusual and

01:03    15    highly complex regulatory scheme over a drug product, this is

16    a unique case.

17        THE COURT:  Let me respond to the last point you

18    make.  I don't doubt for a second your good faith, including

19    these defendants.  And you're absolutely right, it can be very

01:03    20    difficult to figure out what they did and what they told the

21    regulatory authorities.  I just want, I want to sensitize

22    people, and I'm not suggesting you're not.  But I want to

23    sensitize everybody to the issue of some of these peripheral

24    defendants who have been following us who shouldn't be here

01:03    25    and I don't want them to get dragged along in years of

1    litigation to find that out.  I just -- we need to work

2    together to find a way to get them out of here quickly once

3    you get the information you need about them.

4         Going back to leadership structure.  Please understand

01:04    5    that by me saying that I want to hear from others who might be

6    interested.  I am not doubting the integrity of any of you.

7    You're all great lawyers and I understand how much work you're

8    doing in putting this thing together and I look forward to

9    working with you.  But we're noticing a problem across the

01:04   10    country with leadership roles, particularly when it comes to

11    applications for fees, and it's generating a lot of

12    acrimonious litigation.  I think part of the problem may be

13    there's not enough transparency in the process of selecting

14    people.  And that's the only reason that I am suggesting that

01:04   15    we're going to hold off for a little bit in case anyone wants

16    to make an application to be part of this group, so that later

17    that we won't have to face any accusations that there was some

18    done deal behind closed doors that caused this to happen and

19    the people got shut out in the ability to participate in this

01:05   20    process.  I don't want to have to deal with that later on.

21    And I think I think we even saw it at the end of Benicar.  And

22    so we have some suggestions how to make that a more

23    transparent process.  If it helps, we think that when we're

24    deciding how many classes there ought to be in this, I mean

01:05   25    not in terms of the Class Action but, you know, groups grouped

01:05

1  together, I think the third party payers and the consumers are

2  pretty much aligned together and should be treated in the same

3  complaint.  I mean you may differ, you may all agree on

4  something different, but in reading the pleadings from the

5  third party payers and from the consumers, there are so many,

6  to me, so many issues that are similar that I think that they

7  should be considered together.

8      Any other plaintiffs want to speak about anything at

9  this point?  I mean Camden's a great place.  You'll have a lot

01:06

10  of fun.  Mr. Coffin can tell you, Mr. Slater can tell you how

11  much fun it is to be here.  It's beautiful, right?  Spring is

12  coming.

13      MR. COFFIN:  Beautiful.

14      THE COURT:  Beautiful.  Thank you.

01:06

15      MR. NIGH:  Your Honor, I'd like to just talk about

16  one housekeeping issue?

17      THE COURT:  Sure.

18      MR. NIGH:  The direct filing order?  We've met and

19  conferred with defendants on this direct filing order.  We've

01:06

20  gone back and forth on language.  I believe at this point, we

21  reached an agreement in principle.  They want to take it back

22  and make sure they can disseminate it to all their parties

23  first, but I'd like to be able to present this order.

24  Hopefully we can present it your Honors within a week?

01:06

25      THE COURT:  Sure.

1    MR. NIGH:  This is the one holdup from us being able

2  to file personal injury cases that we need to file.

3    THE COURT:  As soon as we get it and it's consented

4  to, we will enter it.

01:06    5    MR. NIGH:  Thank you.

6    MAGISTRATE JUDGE SCHNEIDER:  To answer that question

7  you don't have to reveal privileged information.  Can you give

8  us a sense of what's out there and what we can expect in terms

9  of the filing individual complaints?

01:07    10    MR. NIGH:  Yes, your Honor.  The Valsartan recall

11  from our understanding, that this is the largest Class One

12  recall ever in the U.S.  Now we've looked at a couple other

13  ones that might be comparing the numbers but lots of people

14  have been affected by it.  We've fielded a lot of those calls.

01:07    15  We've had conversations with many of the other counsel who

16  have fielded these calls and represent clients.  My best

17  estimate sitting here today is I expect that we will have

18  approximately 2000 personal injury cases on file in the next

19  two years.  Does that answer the question?

01:07    20    MAGISTRATE JUDGE SCHNEIDER:  That answers the

21  question.

22    (Laughter)

23    MAGISTRATE JUDGE SCHNEIDER:  In terms of Class

24  Actions, have we seen the ground swell and maybe there will be

01:07    25  an odd one or two files, but do you think we've seen what

1    we're going to see in terms of Class action?

2          MR. NIGH:  Yes.

3          MR. SLATER:  Yea, I mean I know there's at least one

4    other medical monitoring Class Action that's going to be filed

01:08    5    soon.  And there's potentially some other third party payers

6    that may file or want to become part of this litigation.  I'd

7    be very surprised if there aren't.  I, I won't get into the

8    issue of the individual cases, but I certainly expect medical

9    monitoring to be more cases and I would expect more third

01:08   10    party payers to want to be involved in this litigation.

11          MAGISTRATE JUDGE SCHNEIDER:  The medical monitoring

12    case files that they -- that was a one State medical

13    monitoring.  Do you anticipate anyone's going to file a

14    nation, a proposed nationwide class, medical monitoring class?

01:08   15          MR. SLATER:  I would expect that's going to be pled

16    in a complaint that's going to be filed in the next week or

17    so.  I have it on good authority.

18                    (Laughter)

19          THE COURT:  Who might the plaintiff's counsel be in

01:09   20    that case.

21          MR. SLATER:  That would be my associate Chris Gettus.

22    Introduce him to the court.

23          THE COURT:  Thank you.  We, we need the work.

24          MAGISTRATE JUDGE SCHNEIDER:  I don't know the answer

01:09   25    to this question.  We've never discussed it.  But if you want

1    to direct file order, does it make sense to get a short form

2    complaint in place before that -- I mean I've read the

3    complaints, they're essentially boiler plate, except for the

4    paragraph that talk about when they took the prescription and

01:09    5    the type of injury.  So does it make -- I don't know the

6    answer.  So I'm not suggesting one way or the other, but have

7    you thought about whether it makes sense to wait for the short

8    form complaints, start filing hundreds of thousands of cases.

9    MR. NIGH:  And I should be clear.  We don't expect to

01:09    10    be filing hundreds of thousands of cases in the next three

11    months.  What we do think is going to occur is that there are

12    20 to 40 cases where given their individual State law they

13    want to avoid any potential statute of limitations.

14    MAGISTRATE JUDGE SCHNEIDER:  Okay.  That makes a big

01:10    15    difference.

16    THE COURT:  Let's just discuss this for one second.

17    Let's be clear on these direct filing.  People obviously are

18    not waiving their venue rights.

19    MR. NIGH:  Right.

01:10    20    THE COURT:  By filing directly here.  That's

21    something that we get to the stage where, you know, we're done

22    with what we have to do and we have to send it back, then we

23    can worry about where they have to go at that point.  But

24    everybody understands that nobody's giving up any venue claims

01:10    25    or rights by direct filing here.  Okay?

```
 1        MR. NIGH:  Okay.

 2        THE COURT:  Oh, wait a minute.  On that point?  Go

 3   ahead.

 4        MR. COHEN:  Yes, may it please the Court and good

 5   afternoon, Judge.  It's Lori Cohen on behalf of the Teva

 6   defendants and also part of the Executive Committee.  Pleasure

 7   to be here in the court.

 8        Just on that point on Mr. Nigh, Mr. Slater and the team

 9   of us we're working on this issue on the direct filing.  We

10   also like, as Judge Schneider said, we had first thought it

11   might be helpful to have the short form complaint at the same

12   time?  We've kind of worked that out.  We could go either way

13   on that we're amenable to either approach.  But on the, on the

14   last point, we did also talk about making sure that the

15   complaints that they're filed for the short form complaint

16   later would be conformed to the short form complaint and also

17   we are including language in the Order that we're not waiving

18   anything venue rights when it comes out.  But I think we're

19   going to work all that language into what we provide to the

20   court.

21        THE COURT:  Okay.  Great.  Thank you.  Finally.  Go

22   ahead.

23        MR. HANSEL:  Greg Hansel for Maine Automobile

24   Dealers.  Just to add to what Mr. Slater said.  A number of

25   larger health insurers we've been in touch on this case.
```

1    They're actively monitoring what's happening.  Whether they've

2    been filing or taking a tolling or whatever else, haven't made

3    any determination on that.  It's possible there will be

4    additional, it's a possibility there will be additional third

5    party payers.

6           THE COURT:  I want to ask you about your client,

7    Maine.

8           MR. HANSEL:  Yes.

9           THE COURT:  Do you have any clue how much money they

10   paid out on these prescriptions over the years?  Just a rough

11   estimate.

12          MR. HENSEL:  Yes, your Honor.  I believe it's in the

13   tens of thousands of dollar range.

14          THE COURT:  Okay.

15          MR. HANSEL:  They have approximately 6000 insured

16   employees who are employed by Maine Auto Dealers under their,

17   their health plan.

18          THE COURT:  Thank you.  Does anybody have any idea

19   how many annual prescriptions in the United States are written

20   on this Valsartan?

21          MR. NIGH:  I do, your Honor.  In 2018 the data we

22   see, it's over three million.  What we're trying to figure out

23   is the, the market penetration of contaminated Valsartan.  We

24   believe at this point given the update of where the FDA is, we

25   believe it's over 50 percent.  So just in 2018 alone it would

*United States District Court*
*Camden, New Jersey*

1  be approximately 1.5 million users, not prescriptions, but 1.5

2  million users of contamination, contaminated Valsartan, if not

3  more.

4          MR. SLATER:  Maybe, your Honor, I could add to that.

01:12  5  I'm reading from a recent article in the New England Journal

6  of Medicine that states in part:  More than 61 million

7  prescriptions were written for Valsartan, Irbesartan or

8  Losartan in the United States in 2016.  I don't have the

9  breakdown of that, but our understanding is Valsartan it would

01:13  10  be the lion's share of that based on market shares, the

11  information we have available.

12          MAGISTRATE JUDGE SCHNEIDER:  Do you know how that

13  translates, how you translate the number of prescriptions to

14  dollars and cents?

01:13  15          MR. SLATER:  Yes.

16          MR. HONIK:  Yes.

17          MR. SLATER:  We asked the defense to provide us the

18  numbers as part of the core discovery.

19          MR. HONIK:  Your Honor, you've asked a terrific

01:13  20  question, and we have in the courtroom today lawyers who

21  represent the other TPP and just to give you some sense of

22  scale of what we're talking about here, I would invite Mr.

23  Rivero to come up here and address the court who has rather

24  hard data from the insurers that pay for these drugs so you

01:13  25  have a sense of what we're talking about here.

*United States District Court*
*Camden, New Jersey*

1     MAGISTRATE JUDGE SCHNEIDER:  Would you make sure that

2  people know we didn't plan this?

3               (Laughter)

4     MR. HONIK:  It's not a coordinated thing.

01:13     5     MR. RIVERO:  Judge, I can -- Judge, Schneider, Judge

6  Kugler, Andres Rivero for MSP Recovery.  We filed the initial

7  third party payer claim.  And, Judge Schneider, I can assure

8  you I didn't know that I'd get an opportunity to address the

9  court.  I'm glad to.  I'm very glad to.

01:14    10     Just on the numbers to give you some idea of scale.  We

11  only work with the data we have.  My client has assigned

12  claims from 3.4 million insureds that this is all represented

13  parties but we -- the three principal ones would be Summit

14  Care, Amblo and Connecticut Care.  They are not small

01:14    15  insurers.  So we have 3.4 million insureds.  Hundreds of

16  millions of claims of the -- in that 3.4 million pool, we have

17  73,311 persons who are Valsartan users.  Those 73,311 users,

18  their claims to us on Valsartan were worth more than

19  $91,000,000.  That's just to give you some scale.  That's

01:15    20  obviously not, you know, not the majority of this market, not

21  a plurality of this market, but it is a significant subset and

22  it gives you some idea of the scale of the number of people

23  who would be involved.

24     Just to comment, we too have been talking to large

01:15    25  insurers, not only Liberty, but one of the largest insurers

1  with whom my client has a pilot program.  They are too

2  monitoring this and may be interested in intervening.  I hope

3  that's helpful to the court.  Thank you.

4       THE COURT:  Any other plaintiffs also have any issue

01:15  5  they want to raise today?  If not, we'll turn to the

6  defendant.  Defense counsel have any other issues they want to

7  raise today?

8       MS. COHEN:  Yes, your Honor.  Good afternoon again.

9  Lori Cohen on behalf of the Teva Entities.  And I'm glad Mr.

01:15  10  Rivero stood up because I think that raises one of the issues

11  that we highlight today in the joint submission of the defense

12  position you may recall.  And that case was filed initially in

13  Miami coincidently where the JPML argument took place.  And at

14  the time we actually had filed a motion to dismiss that was

01:16  15  pending since the JPML Order transferring the cases to this

16  court came out.  That was administratively closed, but yet

17  we've sought and we've submitted in the papers that we'd like

18  to have that separately addressed perhaps?  I know we're still

19  waiting to see the plaintiffs' plan in terms of how many

01:16  20  master complaints, what they're going to look like.  Of

21  course, your honor, we'll meet and confer as we did today,

22  very productively I admit on what the complaints would be

23  like.  But we think this MSP case, the MSP recovery case that

24  Mr. Rivero just talked about is really a unique case.  It

01:16  25  doesn't fit within the Consumer Class cases.  It doesn't fit

 1   within the personal injury cases.  It doesn't fit within the

 2   Medical Monitoring and that's why we thought and I think also

 3   the Maine Auto Dealers' attorneys all through their filings

 4   also thought it was distinct from them and others.  So we sort

 5   of all think that it's a unique case, if you will.  And so

 6   we'd like to have that treated independently potentially.

 7            MAGISTRATE JUDGE SCHNEIDER:  Is it unique because

 8   there's an assignment?

 9            MS. COHEN:  Yes.

10            MAGISTRATE JUDGE SCHNEIDER:  In this case?  What is

11   the legal issue that you're concerned about?

12            MS. COHEN:  Well, one of the issues in our motion was

13   standing.  You know, there's some other issues but it's a lot

14   of ground in standing is the Constitutional due process issue

15   related to that as well.  So we did have a motion.  Now

16   admittedly they had not responded yet and it was

17   administratively closed, but we thought that that case could

18   be just kind of set aside and a briefing schedule with your

19   Honor's permission and we could address those issues and

20   figure out where that takes us potentially.  And I know that,

21   that the inclination is not to have a lot of motions, we hear

22   that loud and clear and we're going to wait and see what the

23   motion -- what the Master Complaints look like of course.  But

24   this is one that was briefed at least on our part we think

25   very sort of unique and discrete legal issues, and I think

1    that could be a guide going forward to later cases.  So I

2    don't think it would be just a waste of time or resources.  We

3    think it could set some good examples for precedent

4    potentially, if you allow, you know, that to be completely

01:18    5    briefed and heard.

6         MAGISTRATE JUDGE SCHNEIDER:  Could I ask you a

7    question that occurs to me?

8         MS. COHEN:  Yes.

9         MAGISTRATE JUDGE SCHNEIDER:  Even if MSP doesn't

01:18    10    pursue their case, wouldn't the underlying claims be subsumed

11    within the Maine Auto Class Action?

12         MS. COHEN:  And potentially that is correct.

13         MAGISTRATE JUDGE SCHNEIDER:  So what's gained by

14    dismissing MSP?

01:18    15         MS. COHEN:  Well, we would, of course, eliminate that

16    one complaint that's, that's already existing.  And although I

17    know it sounds like it's just a blip on the radar, if you

18    will, it was the initial case filed, it was a case that we

19    fully briefed and analyzed.  And again I think it would clean

01:18    20    things up in terms of efficiency to which -- and is key to

21    Judge Kugler, of course, he said was try to figure out the

22    universe?  We completely agree I think on both sides od the

23    courtroom.  We want to know under what care who's here, which

24    defendants, which claims.  And so we want to know what, you

01:19    25    know, what the master complaint's going to look like.  So I

1    think it would be helpful to sort of a, look if we're just

2    going to have a personal injury master complaint and a third

3    party complaint, but this is again I think on the side an

4    ancillary case if you will.  We thought it would be easy

01:19   5    enough to try and at least flush it out and see what the

6    motion would be, you know, how it would be decided.  That

7    would be our position on that, your honors.

8         THE COURT:  Well, we're aware of your standing

9    issues.  And they're legitimate issues, but we're not going to

01:19   10   tackle those issues and there's also class certification

11   issues that they're going to come up.  Important things like

12   that.  That's further down the road.  We'll deal with -- let's

13   get organized and get started and then we can at some point in

14   the future we can, if these are still pressing issues, I'm not

01:19   15   suggesting they are or aren't, but I think you're right, the

16   pleading may change some of your reaction to this.  In the

17   future we can set up briefing schedules for these kinds of

18   discrete issues, but not now.  Let's get organized.  Let's get

19   started first.  Okay?  We're not, we're not ignoring you.

01:20   20   We're just telling you later, please.

21        MS. COHEN:  I appreciate that.  Thank you.

22        THE COURT:  Anything else from the defense side?

23        MR. GOLDBERG:  No, your Honor.

24        THE COURT:  Anybody else want to be heard about

01:20   25   anything?  This is your opportunity.  You came all the way to

1    Camden.  It's a beautiful day.  Opening day tomorrow.  You

2    know, lots going on out there.  Okay.

3            MR. COFFIN:  Your Honor, Mr. Slater and myself and

4    the others in the Benicar litigation when we started out, I

01:20    5    believe your quote was that we should bring our own lunch and

6    for about three years the plaintiffs' side ate at the Subway,

7    and no one ever told us about Guido's until a kind marshal

8    today informed us about Guido's.  So for all of you who are

9    going to be here at least on a monthly basis, I encourage you

01:21    10    to escape Subway, go and eat at Guido's.  The Court's not

11    going to tell you about that.  I'm here to.

12            THE COURT:  Listen, you know, in the -- when we get

13    these patent lawyers in here in these patent trials, they

14    actually have stuff catered in.  And, you know, we can make

01:21    15    room for you if you want to have lunch catered in from -- you

16    know, there's some restaurants out there that will do, there

17    are some of the chain restaurants like Panera Bread will

18    deliver here.  People like that.  If you want to consider

19    doing that you can do that, too.  But Mr. Coffin is correct,

01:21    20    this is a food desert in Camden.  We schedule these things on

21    Wednesdays because it's usually a good time to fly in and out

22    of some place and we try to schedule these so you can get in

23    and out in one day.  But if you can't, I mean Philadelphia is

24    less than a mile away.  There's all kinds of great hotels and

01:22    25    restaurants in Philadelphia if you're not familiar with

1    Philadelphia.  And that's where most people stay when they

2    have trials and things, they stay in Philadelphia.  It's an

3    easy mass transit or cab or Uber ride to this court house from

4    center City Philadelphia.  But he's right.  Mr. Slater.

01:22    5         MR. SLATER:  Just one practical issue with myself and

6    Mr. Goldberg.  Is it okay if we deem that motion to quash

7    stayed until while we meet and confer we can address it at a

8    later time.  Is that fair?

9         THE COURT:  Right.

01:22   10         MR. SLATER:  Thank you.

11         THE COURT:  We'll deal with that.  All right.  Just

12   to recap.  There are certain things that we definitely want to

13   talk about thirty days from now at our next status conference.

14   The Leadership Committee will resolve that.  You're going to

01:22   15   get back to us on the Master Complaints the next.  Discovery

16   confidentiality orders.  The Common Benefit orders.  The core

17   document issue you're going to talk about and get back to us

18   before the next meeting.  And then you're going to let us know

19   about the other Sartans, what you're going to do about the

01:23   20   other Sartans in this case.  Okay?  Anything else differently

21   we're going to do the next time?  I think that hits all --

22         MAGISTRATE JUDGE SCHNEIDER:  Discovery confidential

23   order.  Carl, do you have that?

24         THE COURT:  All right.  Yup.  So what you need to do

01:23   25   is, well, I mean those of you who have been in this court

1    before will explain it all to you.  But in advance of the next

2    conference, you usually send -- it's usually a joint agenda as

3    to what you want to discuss.  If you can't agree on that, that

4    individual but we need it.  We can't get it midnight the night

01:23    5    before.  It's really hard to respond to a midnight filing.

6    But get us something in writing and we'll go from there.

7    Okay?  Thank you, everybody, and we will see you in a month.

8              (The matter was then concluded)

**$**

**$91,000,000** [1] - 43:19

**/**

**/S** [1] - 2:25

**0**

**08101** [1] - 1:8

**1**

**1.5** [2] - 42:1
**10** [3] - 28:8, 28:16, 29:16
**19-2875** [1] - 1:5
**1:30** [2] - 28:7, 28:15

**2**

**20** [1] - 39:12
**2000** [1] - 37:18
**2011** [1] - 7:5
**2012** [5] - 7:3, 7:6, 7:10, 7:13, 8:20
**2013** [1] - 7:13
**2014** [1] - 7:13
**2015** [1] - 7:12
**2016** [1] - 42:8
**2018** [2] - 41:21, 41:25
**2019** [1] - 1:8
**27** [1] - 1:8
**28** [1] - 2:24

**3**

**3.4** [3] - 43:12, 43:15, 43:16
**30** [3] - 21:22, 24:12, 25:20

**4**

**4** [1] - 12:17
**40** [1] - 39:12
**45** [1] - 21:22

**5**

**5** [1] - 12:19

**50** [1] - 41:25

**6**

**6000** [1] - 41:15
**61** [1] - 42:6

**7**

**73,311** [2] - 43:17
**753** [1] - 2:25

**A**

**ability** [2] - 32:10, 35:19
**able** [2] - 36:23, 37:1
**absolutely** [2] - 16:19, 34:19
**accept** [1] - 17:4
**acceptable** [2] - 8:13, 24:13
**accepted** [2] - 15:8, 15:9
**accusations** [1] - 35:17
**acrimonious** [1] - 35:12
**Actavis** [1] - 8:3
**ACTION** [1] - 1:4
**action** [2] - 13:11, 22:23, 38:1
**Action** [6] - 17:8, 17:13, 17:14, 35:25, 38:4, 46:11
**Actions** [2] - 12:23, 37:24
**active** [1] - 7:18
**actively** [2] - 30:25, 41:1
**ADAM** [1] - 1:17
**Adam** [1] - 13:25
**add** [3] - 16:22, 40:24, 42:4
**additional** [3] - 6:24, 41:4
**address** [11] - 14:23, 23:12, 28:17, 28:21, 28:24, 31:22, 33:20, 42:23, 43:8, 45:19, 49:7
**addressed** [4] - 25:22, 25:23, 29:7, 44:18
**adequacy** [1] - 15:25
**adequate** [2] - 15:17, 17:5
**adequately** [1] -

20:15
**administratively** [2] - 44:16, 45:17
**admit** [1] - 44:22
**admittedly** [1] - 45:16
**advance** [1] - 50:1
**adversaries** [1] - 26:5
**advice** [1] - 4:19
**advise** [1] - 24:3
**advocate** [1] - 23:11
**affect** [1] - 30:8
**affected** [1] - 37:14
**afternoon** [8] - 4:3, 12:4, 16:23, 20:4, 28:17, 29:18, 40:5, 44:8
**agencies** [2] - 5:15, 7:8
**agenda** [4] - 24:15, 25:7, 30:1, 50:2
**ago** [1] - 5:20
**agree** [7] - 18:3, 21:1, 22:3, 26:9, 36:3, 46:22, 50:3
**agreed** [2] - 10:24, 12:14
**agreement** [1] - 36:21
**ahead** [3] - 16:21, 40:3, 40:22
**aid** [1] - 16:25
**alert** [2] - 11:4, 31:9
**ALFANO** [1] - 2:7
**aligned** [1] - 36:2
**alleged** [1] - 13:12
**allocating** [1] - 11:25
**allow** [1] - 46:4
**allows** [1] - 20:19
**almost** [2] - 28:25, 33:24
**alone** [1] - 41:25
**Amblo** [1] - 43:14
**amenable** [1] - 40:13
**amend** [2] - 22:1
**amended** [5] - 21:7, 24:3, 24:13, 24:18, 24:21
**amendment** [1] - 23:17
**amount** [2] - 8:4, 29:21
**analogy** [1] - 10:10
**analyzed** [1] - 46:19
**ancillary** [1] - 47:4
**Andres** [1] - 43:6
**ANDRES** [1] - 1:19
**annual** [1] - 41:19

**answer** [9] - 22:21, 24:5, 24:22, 24:23, 24:25, 37:6, 37:19, 38:24, 39:6
**answered** [1] - 33:1
**answers** [2] - 6:7, 37:20
**anticipate** [1] - 38:13
**anyhow** [1] - 27:25
**anyway** [1] - 27:24
**API** [13] - 7:2, 7:6, 7:9, 7:19, 7:21, 7:25, 8:9, 8:15, 8:17, 8:21, 9:1, 9:4, 34:4
**application** [5] - 4:21, 4:23, 5:20, 22:1, 35:16
**applications** [2] - 10:16, 35:11
**appreciate** [4] - 9:16, 10:9, 10:13, 47:21
**approach** [1] - 40:13
**appropriate** [2] - 21:25, 22:2
**approve** [1] - 26:20, 33:4
**argument** [2] - 6:15, 44:13
**arguments** [1] - 20:8
**army** [2] - 9:11, 9:14
**article** [1] - 42:5
**aside** [1] - 45:18
**asserted** [2] - 13:9, 17:19
**assigned** [2] - 19:20, 43:11
**assignment** [1] - 45:8
**assignments** [1] - 32:22
**associate** [1] - 38:21
**Association** [1] - 19:1
**ASSOCIATION** [1] - 2:2
**assume** [4] - 4:7, 5:9, 23:10, 25:1
**assure** [1] - 43:7
**ate** [1] - 48:6
**attention** [2] - 33:13, 33:21
**ATTORNEY** [1] - 1:19
**Attorneys** [1] - 1:14
**attorneys** [1] - 45:3
**ATTORNEYS** [8] - 1:16, 1:18, 1:21, 1:23, 2:2, 2:4, 2:6, 2:8
**Aurobindo** [2] - 8:10, 9:3

**authorities** [1] - 34:21
**authority** [1] - 38:17
**Auto** [4] - 23:3, 41:16, 45:3, 46:11
**automatic** [1] - 26:2
**AUTOMOBILE** [2] - 1:23, 2:2
**Automobile** [2] - 19:1, 40:23
**available** [3] - 20:25, 27:24, 42:11
**avoid** [1] - 39:13
**aware** [1] - 47:8

**B**

**balancing** [1] - 18:12
**bar** [1] - 4:24
**based** [2] - 20:8, 42:10
**basic** [1] - 5:10
**basis** [2] - 22:4, 48:9
**BAUDIN** [1] - 1:20
**beautiful** [3] - 36:11, 36:14, 48:1
**Beautiful** [1] - 36:13
**become** [1] - 38:6
**behalf** [3] - 11:22, 40:5, 44:9
**behind** [1] - 35:18
**belief** [1] - 8:15
**believes** [1] - 19:7
**BELIVEAU** [1] - 1:22
**belong** [3] - 21:1, 21:20, 34:13
**below** [1] - 6:5
**Benefit** [3] - 26:18, 26:21, 49:16
**benefit** [1] - 26:23
**Benicar** [5] - 28:14, 29:1, 29:7, 35:21, 48:4
**Berra** [1] - 4:7
**best** [3] - 19:19, 31:6, 37:16
**better** [1] - 29:25
**BHP** [2] - 15:3, 16:3
**big** [6] - 5:24, 28:18, 29:9, 29:23, 29:25, 39:14
**bigger** [1] - 19:11
**billed** [1] - 8:1
**bit** [5] - 16:25, 25:16, 31:1, 32:12, 35:15
**biweekly** [1] - 11:7
**blip** [1] - 46:17
**blown** [1] - 15:20
**board** [1] - 24:10

**bodily** [1] - 13:20
**body** [1] - 27:10
**bogged** [1] - 25:10
**boiler** [1] - 39:3
**BOSICK** [1] - 2:7
**Bracket** [1] - 30:8
**Bread** [1] - 48:17
**breakdown** [1] - 42:9
**briefed** [3] - 45:24,
46:5, 46:19
**briefing** [2] - 45:18,
47:17
**briefly** [1] - 19:5
**briefs** [1] - 29:12
**bring** [4] - 15:17,
16:9, 20:25, 48:5
**brings** [2] - 17:23,
24:20
**brought** [3] - 25:12,
33:13, 33:21
**bunch** [1] - 25:3
**burden** [1] - 18:14
**Bursor** [1] - 22:17
**business** [1] - 30:2
**busy** [1] - 30:13
**BY** [9] - 1:13, 1:15,
1:17, 1:21, 1:23, 2:1,
2:4, 2:6, 2:8
**byproduct** [1] - 7:17

## C

**cab** [1] - 49:3
**calculable** [1] -
13:21
**Camber** [2] - 8:10,
9:4
**Camden** [4] - 1:8,
4:7, 48:1, 48:20
**Camden's** [1] - 36:9
**cancer** [1] - 6:10
**candid** [1] - 14:6
**capture** [1] - 20:6
**captured** [2] - 20:13,
20:21
**care** [2] - 6:6, 46:23
**Care** [2] - 43:14
**carefully** [1] - 32:21
**Carl** [2] - 2:25, 49:23
**carries** [1] - 6:12
**Case** [1] - 5:3
**case** [56] - 4:10,
4:25, 5:4, 10:4, 10:20,
13:1, 15:11, 15:17,
17:8, 17:11, 17:18,
17:23, 19:21, 20:17,
21:1, 21:16, 22:18,
22:20, 22:25, 23:3,
23:23, 25:13, 25:24,

27:13, 27:19, 28:4,
28:18, 28:25, 29:4,
29:14, 30:6, 30:22,
30:25, 31:11, 31:14,
32:2, 32:6, 32:19,
34:16, 35:15, 38:12,
38:20, 40:25, 44:12,
44:23, 44:24, 45:5,
45:10, 45:17, 46:10,
46:18, 47:4, 49:20
**cases** [27] - 6:13,
10:14, 11:11, 12:22,
12:23, 12:24, 13:2,
13:22, 17:2, 17:8,
17:9, 17:12, 17:14,
18:13, 32:5, 32:8,
37:2, 37:18, 38:8,
38:9, 39:8, 39:10,
39:12, 44:15, 44:25,
45:1, 46:1
**category** [2] - 17:2,
17:5
**catered** [2] - 48:14,
48:15
**causation** [1] - 6:12
**caused** [1] - 35:18
**center** [1] - 49:4
**cents** [1] - 42:14
**certain** [1] - 49:12
**certainly** [8] - 14:17,
15:16, 16:2, 21:2,
23:9, 24:14, 26:24,
38:8
**certification** [2] -
14:21, 47:10
**Certified** [1] - 2:24
**chain** [3] - 34:4,
34:6, 48:17
**change** [4] - 5:21,
7:15, 16:24, 47:16
**changed** [2] - 7:2,
8:20
**charting** [1] - 31:14
**chase** [1] - 32:15
**chemicals** [1] - 7:17
**chicken** [1] - 33:3
**China** [1] - 7:7
**Chinese** [3] - 8:2,
11:17, 11:18
**Chris** [1] - 38:21
**CHRISTOPHER** [1] -
1:21
**City** [1] - 49:4
**CIVIL** [1] - 1:4
**claim** [4] - 6:9, 13:21,
14:18, 43:7
**claims** [17] - 13:4,
13:8, 13:16, 13:20,
14:3, 14:4, 14:15,
14:20, 17:19, 21:7,

23:3, 39:24, 43:12,
43:16, 43:18, 46:10,
46:24
**CLAIMS** [1] - 1:19
**Class** [11] - 12:23,
17:8, 17:13, 17:14,
35:25, 37:11, 37:23,
38:1, 38:4, 44:25,
46:11
**class** [9] - 13:1, 13:5,
13:6, 14:18, 17:18,
18:13, 38:14, 47:10
**classes** [7] - 12:22,
13:4, 13:24, 14:10,
18:1, 32:8, 35:24
**clean** [2] - 14:21,
46:19
**clear** [3] - 39:9,
39:17, 45:22
**CLEM** [1] - 2:8
**Clem** [1] - 12:5
**CLERK** [1] - 4:2
**Clerk's** [1] - 4:17
**client** [11] - 13:9,
17:6, 17:21, 17:23,
22:20, 22:22, 23:19,
24:2, 41:6, 43:11,
44:1
**client's** [1] - 18:1
**clients** [2] - 10:17,
37:16
**close** [2] - 30:1,
33:17
**closed** [3] - 35:18,
44:16, 45:17
**clue** [1] - 41:9
**Code** [1] - 34:3
**COFFIN** [4] - 1:20,
1:21, 36:13, 48:3
**Coffin** [2] - 36:10,
48:19
**COHEN** [9] - 2:6,
40:4, 44:8, 45:9,
45:12, 46:8, 46:12,
46:15, 47:21
**Cohen** [3] - 1:7, 40:5,
44:9
**coincidently** [1] -
44:13
**colleague** [1] - 19:4
**colleagues** [1] -
13:15
**collect** [3] - 31:12,
31:17, 32:10
**combining** [1] - 7:16
**coming** [8] - 8:18,
8:19, 8:21, 10:10,
15:5, 15:13, 32:14,
36:12
**comment** [1] - 43:24

**Committee** [2] -
40:6, 49:14
**common** [1] - 26:18
**Common** [2] - 26:21,
49:16
**communicating** [2] -
22:19, 31:5
**communications** [2]
- 9:23, 27:8
**companies** [1] - 9:20
**company** [3] - 8:2,
11:17, 11:18
**comparing** [1] -
37:13
**complaint** [36] -
12:12, 12:13, 13:13,
14:5, 14:15, 15:1,
15:16, 15:20, 16:8,
16:18, 17:4, 17:16,
18:10, 21:7, 21:21,
22:1, 22:7, 23:7, 23:9,
23:15, 23:20, 24:3,
24:13, 24:18, 24:21,
26:4, 36:3, 38:16,
39:2, 40:11, 40:15,
40:16, 46:16, 47:2,
47:3
**complaint's** [1] -
46:25
**complaints** [22] -
12:16, 12:17, 12:18,
13:16, 16:7, 16:10,
17:1, 17:3, 18:1, 19:6,
21:4, 21:8, 21:11,
24:11, 32:23, 34:10,
37:9, 39:3, 39:8,
40:15, 44:20, 44:22
**Complaints** [2] -
45:23, 49:15
**completely** [2] -
46:4, 46:22
**complex** [1] - 34:15
**compromise** [3] -
12:10, 16:16, 18:11
**concept** [2] - 12:14,
24:10
**concern** [2] - 6:5,
14:11
**concerned** [1] -
45:11
**concerning** [1] -
22:18
**concerns** [3] - 4:15,
11:15, 12:8
**concluded** [1] - 50:8
**conclusion** [1] -
24:14
**confer** [4] - 15:25,
28:20, 44:21, 49:7
**conference** [21] -

11:6, 11:13, 18:23,
24:4, 24:6, 25:8,
25:21, 26:12, 27:1,
27:21, 28:8, 28:15,
28:19, 28:23, 29:6,
29:18, 29:24, 30:3,
49:13, 50:2
**Conference** [1] - 1:6
**conferences** [4] -
11:7, 28:5, 28:12
**conferred** [2] -
33:10, 36:19
**confers** [1] - 33:15
**confident** [1] - 24:16
**confidential** [4] -
31:21, 31:23, 31:25,
49:22
**confidentiality** [2] -
27:2, 49:16
**conformed** [1] -
40:16
**congratulate** [1] -
30:7
**Connecticut** [1] -
43:14
**connection** [1] -
23:16
**consensus** [2] -
5:14, 16:17
**consented** [1] - 37:3
**consider** [4] - 10:6,
31:7, 32:18, 48:18
**considered** [2] -
11:4, 36:7
**considering** [1] -
23:19
**Constitutional** [3] -
18:5, 18:20, 45:14
**consumer** [2] -
12:23, 13:22
**Consumer** [4] - 17:8,
17:13, 17:14, 44:25
**consumers** [2] -
36:1, 36:5
**contaminants** [2] -
19:14, 20:2
**contaminated** [8] -
5:17, 6:3, 8:16, 8:22,
19:16, 20:16, 41:23,
42:2
**contamination** [11] -
5:11, 6:4, 6:5, 6:8,
6:14, 8:5, 8:6, 9:6,
20:10, 22:5, 42:2
**contemplate** [1] -
25:23
**continue** [2] - 18:22,
34:12
**continues** [1] - 18:22
**continuing** [1] -

23:22
  contracted [1] - 6:10
  contribute [1] -
10:20
  conversation [1] -
12:6
  conversations [1] -
37:15
  convince [1] - 25:18
  convincing [1] -
25:18
  coordinated [1] -
43:4
  coral [1] - 22:2
  core [8] - 26:22,
27:6, 27:13, 27:15,
27:18, 28:4, 42:18,
49:16
  correct [5] - 2:24,
17:24, 20:6, 46:12,
48:19
  counsel [13] - 10:6,
11:24, 12:19, 20:9,
21:16, 22:23, 26:19,
27:17, 30:24, 31:7,
37:15, 38:19, 44:6
  count [2] - 13:12,
14:14
  countries [1] - 27:11
  country [2] - 18:16,
35:10
  couple [2] - 30:14,
37:12
  course [7] - 6:7,
21:22, 22:23, 44:21,
45:23, 46:15, 46:21
  court [27] - 4:1, 4:14,
11:4, 12:5, 15:15,
16:13, 17:24, 18:15,
21:14, 29:3, 31:19,
31:25, 32:22, 33:4,
33:13, 33:14, 33:18,
34:14, 38:22, 40:7,
40:20, 42:23, 43:9,
44:3, 44:16, 49:3,
49:25
  Court [2] - 24:3, 40:4
  COURT [54] - 1:1,
4:2, 4:3, 4:6, 8:15,
9:8, 9:11, 9:13, 9:16,
9:19, 12:3, 13:3,
13:19, 14:24, 15:2,
15:18, 16:17, 16:20,
17:20, 18:7, 18:17,
19:3, 19:9, 19:11,
22:14, 23:1, 23:13,
23:21, 24:5, 24:9,
30:13, 34:17, 36:14,
36:17, 36:25, 37:3,
38:19, 38:23, 39:16,

39:20, 40:2, 40:21,
41:6, 41:9, 41:14,
41:18, 44:4, 47:8,
47:22, 47:24, 48:12,
49:9, 49:11, 49:24
  court's [3] - 16:1,
20:14, 33:5
  Court's [2] - 24:1,
48:10
  Courthouse [1] - 1:7
  courtroom [5] - 25:9,
25:14, 28:7, 42:20,
46:23
  created [3] - 7:17,
20:13, 20:22
  creates [2] - 34:3,
34:7
  crucial [1] - 25:15
  curious [1] - 6:21,
19:24
  current [1] - 22:4
  cut [1] - 27:25

D

  dangerous [1] - 6:14
  DANIEL [1] - 1:13
  Daniel [1] - 6:22
  DANNENBERG [1] -
2:1
  Dannenberg [1] -
23:15
  data [9] - 8:9, 31:12,
31:13, 31:15, 31:17,
32:11, 41:21, 42:24,
43:11
  date [2] - 7:15, 29:11
  days [7] - 21:22,
24:12, 25:20, 26:3,
28:9, 49:13
  deal [6] - 25:9, 28:17,
35:18, 35:20, 47:12,
49:11
  DEALERS [1] - 1:23,
2:2
  Dealers [3] - 19:1,
40:24, 41:16
  Dealers' [1] - 45:3
  dealt [1] - 27:13
  decide [5] - 15:15,
17:15, 18:23, 29:5,
30:3
  decided [2] - 29:12,
47:6
  deciding [1] - 35:24
  decision [3] - 11:5,
14:16, 29:13
  deem [1] - 49:6
  deep [1] - 33:23

  defendant [1] - 44:6
  defendants [31] -
6:1, 10:2, 10:16,
10:19, 11:20, 11:23,
12:8, 12:12, 16:16,
12:17, 12:25, 15:23,
17:5, 18:20, 23:5,
23:10, 24:20, 24:25,
25:16, 27:6, 27:9,
28:1, 28:3, 30:18,
33:14, 34:11, 34:19,
34:24, 36:19, 40:6,
46:24
  defendants' [2] -
17:3, 20:1
  defense [12] - 11:19,
11:24, 14:6, 14:13,
15:6, 16:1, 17:17,
26:6, 27:17, 42:17,
44:11, 47:22
  Defense [1] - 44:6
  defer [1] - 13:15
  definitely [1] - 49:12
  definitive [2] - 7:10,
22:21
  degree [2] - 8:14,
20:10
  deja [1] - 4:8
  delay [1] - 29:10
  deliver [1] - 48:18
  demonstrate [1] -
34:14
  denial [1] - 24:24
  Denise [2] - 4:15,
4:16
  deny [1] - 25:1
  DePaul [4] - 4:15,
4:16, 5:5
  deposition [1] -
26:14
  DEPUTY [1] - 4:2
  desire [1] - 19:25
  despite [1] - 30:7
  dessert [1] - 48:20
  determination [2] -
24:2, 41:3
  differ [1] - 36:3
  difference [1] - 39:15
  different [2] - 32:23,
36:4
  differently [1] -
49:20
  difficult [3] - 27:15,
32:7, 34:20
  direct [7] - 19:22,
36:18, 36:19, 39:1,
39:17, 39:25, 40:9
  directly [1] - 39:20
  disagreement [1] -
26:11

  discharged [1] - 34:9
  discovery [12] -
10:20, 15:13, 17:24,
20:14, 21:24, 27:24,
28:9, 28:17, 29:8,
42:18, 49:15, 49:22
  discrete [2] - 45:25,
47:18
  discuss [2] - 39:16,
50:3
  discussed [3] - 32:7,
33:12, 38:25
  discussing [1] -
22:22
  discussion [1] -
16:23
  discussions [1] -
15:12
  dismiss [1] - 44:14
  dismissal [2] - 10:7,
22:24
  dismissed [4] -
21:12, 21:15, 21:19,
22:8
  dismissing [1] -
46:14
  dispute [1] - 27:20,
27:23
  disputes [3] - 25:6,
26:16, 29:22
  disseminate [1] -
36:22
  distinct [1] - 45:4
  distributed [2] -
7:24, 8:16
  distribution [2] -
34:4, 34:6
  DISTRICT [3] - 1:1,
1:1, 1:10
  diverted [1] - 10:11
  document [1] - 49:17
  documents [6] -
27:6, 27:13, 27:15,
27:18, 28:2, 28:4
  dollar [1] - 41:13
  dollars [1] - 42:14
  domestic [2] - 12:17,
27:10
  done [8] - 5:6, 26:22,
29:20, 31:15, 31:21,
32:18, 35:18, 39:21
  doors [1] - 35:18
  doubt [1] - 34:18
  doubting [1] - 35:6
  down [4] - 10:10,
25:10, 34:7, 47:12
  dragged [1] - 34:25
  drug [3] - 6:10, 23:7,
34:15
  drugs [8] - 20:7,

20:15, 20:20, 21:25,
22:5, 23:6, 23:24,
42:24
  DUANE [1] - 2:3
  Due [1] - 18:5
  due [2] - 12:8, 17:16,
18:15, 21:22, 45:14
  during [1] - 15:25

E

  e-mail [2] - 5:7,
31:21
  early [8] - 10:3,
15:12, 25:5, 27:13,
27:19, 30:16, 30:20
  easily [2] - 13:21,
24:18
  easy [2] - 47:4, 49:3
  eat [1] - 48:10
  echo [1] - 33:15
  economic [4] -
13:21, 14:2, 14:4,
14:20
  effect [1] - 18:11
  effective [1] - 30:5
  efficiencies [1] -
16:25
  efficiency [2] - 14:8,
46:20
  efficient [4] - 14:17,
14:22, 16:5, 16:15
  effort [1] - 32:9
  egg [1] - 33:3
  either [3] - 16:5,
40:12, 40:13
  electronic [3] - 4:20,
4:21, 4:25
  eliminate [1] - 46:15
  elsewhere [1] -
19:13
  employed [1] - 41:16
  employees [1] -
41:16
  encourage [1] - 48:9
  end [2] - 14:16,
35:21
  England [1] - 42:5
  enter [4] - 10:25,
19:22, 31:20, 37:4
  entered [2] - 5:25,
7:5
  entertain [1] - 25:5
  entire [1] - 34:3
  Entities [1] - 44:9
  entitled [2] - 17:17,
18:16
  escape [1] - 48:10
  ESI [2] - 15:13, 25:15

ESQUIRE [10] - 1:13, 1:15, 1:17, 1:19, 1:21, 1:23, 2:1, 2:4, 2:6, 2:8
**essence** [1] - 12:21
**essentially** [1] - 39:3
**established** [1] - 26:20
**estimate** [2] - 37:17, 41:11
**etcetera** [1] - 14:10
**Europe** [1] - 27:11
**European** [1] - 7:8
**evaluating** [1] - 23:16
**example** [1] - 17:22
**examples** [3] - 20:21, 26:7, 46:3
**excellent** [1] - 21:9
**except** [2] - 20:7, 39:3
**excised** [1] - 23:7
**excising** [1] - 23:11
**executing** [1] - 26:5
**Executive** [1] - 40:6
**existing** [1] - 46:16
**expect** [10] - 26:8, 26:15, 26:18, 27:2, 37:8, 37:17, 38:8, 38:9, 38:15, 39:9
**explain** [2] - 5:5, 50:1
**explanation** [1] - 5:18
**explanations** [1] - 7:14
**expressed** [1] - 18:19
**extent** [1] - 21:21

## F

**face** [1] - 35:17
**fact** [6] - 21:10, 25:25, 26:4, 26:10, 30:7, 31:16
**facts** [2] - 5:10, 34:8
**factually** [1] - 21:1
**fair** [2] - 18:9, 49:8
**faith** [1] - 34:18
**familiar** [1] - 48:25
**fan** [1] - 29:23
**fans** [1] - 29:10
**far** [1] - 17:20
**fashion** [1] - 29:14
**FDA** [9] - 5:18, 7:10, 7:22, 8:11, 8:25, 9:6, 27:9, 27:24, 41:24
**FDCA** [1] - 34:2
**fees** [1] - 35:11

**few** [1] - 11:25
**fielded** [2] - 37:14, 37:16
**figure** [6] - 24:17, 32:3, 34:20, 41:22, 45:20, 46:21
**file** [12] - 5:1, 5:3, 22:1, 24:22, 24:25, 25:13, 37:2, 37:18, 38:6, 38:13, 39:1
**filed** [11] - 11:24, 12:12, 21:4, 21:17, 38:4, 38:16, 40:15, 43:6, 44:12, 44:14, 46:18
**filer** [2] - 22:9, 22:10
**files** [2] - 37:25, 38:12
**filing** [16] - 4:18, 4:25, 5:2, 19:22, 26:3, 36:18, 36:19, 37:9, 39:8, 39:10, 39:17, 39:20, 39:25, 40:9, 41:2, 50:5
**filings** [3] - 4:20, 4:21, 45:3
**fill** [4] - 4:21, 4:23, 26:2, 31:19
**fill-in** [1] - 31:19
**filling** [1] - 31:16
**finally** [1] - 40:21
**financially** [1] - 30:19
**fine** [4] - 16:20, 19:19, 32:20, 33:7
**first** [7] - 4:6, 5:11, 10:22, 13:17, 36:23, 40:10, 47:19
**Fisher** [1] - 22:17
**fit** [3] - 44:25, 45:1
**FLAHERTY** [1] - 1:22
**floor** [1] - 32:17
**flush** [1] - 47:5
**fly** [1] - 48:21
**focus** [2] - 5:12, 5:23
**following** [2] - 4:1, 34:24
**food** [1] - 48:20
**FOR** [10] - 1:1, 1:16, 1:18, 1:19, 1:21, 1:23, 2:2, 2:4, 2:6, 2:8
**forcefully** [1] - 33:5
**foreign** [7] - 11:20, 12:9, 12:11, 12:15, 17:5, 27:10, 27:11
**form** [10] - 7:25, 12:18, 18:5, 26:3, 32:13, 39:1, 39:8, 40:11, 40:15, 40:16
**forms** [3] - 7:7,

31:18, 31:19
**formulated** [2] - 13:14, 13:18
**forth** [2] - 33:18, 36:20
**forward** [3] - 15:4, 35:8, 46:1
**four** [3] - 7:12, 29:19, 29:20
**fourth** [3] - 28:6, 28:13, 29:16
**FREEMAN** [1] - 1:17
**front** [2] - 16:14
**frustration** [1] - 9:25
**full** [1] - 15:20
**fully** [1] - 46:19
**fun** [2] - 36:10, 36:11
**Fund** [2] - 26:18, 26:21
**fundamental** [1] - 32:25
**future** [5] - 25:12, 26:12, 27:1, 47:14, 47:17

## G

**gained** [3] - 17:25, 18:4, 46:13
**game** [1] - 15:14
**general** [2] - 24:23, 28:15
**generally** [1] - 18:3
**generating** [1] - 35:11
**Geochemtin** [1] - 20:7
**Gerry** [1] - 1:7
**Gettus** [1] - 38:21
**given** [3] - 34:14, 39:12, 41:24
**glad** [3] - 43:9, 44:9
**God** [1] - 4:10
**Goldberg** [3] - 11:22, 15:6, 49:6
**GOLDBERG** [4] - 2:4, 11:22, 23:2, 47:23
**Golomb** [1] - 20:5
**GOLOMB** [1] - 1:15
**GORDON** [1] - 2:7
**government** [1] - 27:9
**great** [6] - 6:15, 23:1, 29:1, 31:3, 32:6, 35:7, 36:9, 40:21, 48:24
**green** [2] - 33:8, 33:19
**GREENBERG** [1] -

2:5
**Greg** [2] - 18:25, 40:23
**GREGORY** [1] - 1:23
**ground** [2] - 37:24, 45:14
**group** [7] - 12:7, 13:2, 13:14, 16:23, 17:10, 26:22, 35:16
**grouped** [1] - 35:25
**groups** [1] - 35:25
**guess** [6] - 9:19, 11:18, 13:9, 19:22, 19:25, 23:22
**guide** [1] - 46:1
**guided** [1] - 16:1
**Guido's** [3] - 48:7, 48:8, 48:10

## H

**hacked** [1] - 31:24
**Hague** [5] - 12:11, 12:15, 15:16, 15:22, 17:10
**hand** [1] - 18:20
**handle** [1] - 29:11
**HANSEL** [7] - 1:23, 18:25, 19:4, 19:10, 40:23, 41:8, 41:15
**Hansel** [2] - 18:25, 40:23
**happy** [3] - 20:2, 29:23
**hard** [4] - 32:4, 42:24, 50:5
**hash** [1] - 6:17
**health** [2] - 40:25, 41:17
**hear** [3] - 22:11, 35:5, 45:21
**heard** [5] - 11:11, 13:17, 15:25, 46:5, 47:24
**heavy** [1] - 6:11
**hello** [2] - 13:25, 14:1
**help** [3] - 32:1, 32:11, 32:12
**helpful** [8] - 29:8, 30:22, 30:23, 31:1, 31:14, 40:11, 44:3, 47:1
**helps** [1] - 35:23
**HENSEL** [1] - 41:12
**Hetero** [1] - 9:4
**hierarchy** [2] - 26:20, 26:24
**higher** [2] - 8:7, 8:13

**highlight** [1] - 44:11
**highly** [2] - 22:5, 34:15
**hits** [1] - 49:21
**hold** [2] - 29:1, 35:15
**holdup** [1] - 37:1
**HONIK** [10] - 1:15, 1:15, 20:4, 21:9, 22:9, 22:13, 32:20, 42:16, 42:19, 43:4
**Honik** [2] - 20:5, 21:3, 22:18
**Honor** [21] - 6:23, 9:18, 11:22, 12:4, 13:25, 15:5, 16:14, 18:25, 20:6, 22:16, 23:2, 32:20, 36:15, 37:10, 41:12, 41:21, 42:4, 42:19, 44:8, 47:23, 48:3
**honor** [2] - 18:3, 44:21
**Honor's** [2] - 19:5, 45:19
**HONORABLE** [1] - 1:9
**honors** [1] - 47:7
**Honors** [4] - 20:4, 21:2, 34:10, 36:24
**hope** [3] - 29:13, 32:15, 44:2
**hopefully** [1] - 36:24
**horse's** [1] - 22:12
**hotels** [1] - 48:24
**hour** [2] - 29:23
**house** [1] - 49:3
**housekeeping** [1] - 36:16
**Huahvi** [8] - 7:2, 7:16, 7:23, 8:18, 8:21, 9:2, 11:23
**Huahvi's** [2] - 7:18, 7:21
**hundreds** [4] - 8:6, 39:8, 39:10, 43:15
**hypothesis** [2] - 5:14, 6:19

## I

**idea** [6] - 7:20, 7:21, 32:2, 41:18, 43:10, 43:22
**ignoring** [1] - 47:19
**imagine** [1] - 24:22
**immediate** [1] - 32:22
**important** [3] - 15:12, 32:25, 47:11

**impressed** [1] - 32:22
**IN** [1] - 1:3
**INC** [3] - 2:2, 2:6, 2:8
**inclination** [1] - 45:21
**include** [6] - 21:4, 23:15, 23:24, 32:24, 34:11
**included** [3] - 22:6, 23:17, 23:18
**including** [2] - 34:18, 40:17
**inclusion** [1] - 21:24
**independently** [1] - 45:6
**India** [1] - 17:6
**Indioma** [1] - 7:17
**individual** [6] - 5:4, 14:4, 37:9, 38:8, 39:12, 50:4
**informal** [1] - 28:20
**information** [7] - 6:24, 8:4, 26:6, 31:20, 35:3, 37:7, 42:11
**informed** [1] - 48:8
**ingredients** [1] - 7:18
**initial** [2] - 43:6, 46:18
**injury** [13] - 12:24, 13:12, 13:20, 14:15, 17:9, 17:11, 17:12, 17:23, 37:2, 37:18, 39:5, 45:1, 47:2
**innocent** [1] - 9:22
**insist** [2] - 18:10, 23:22
**instance** [2] - 17:6, 31:15
**INSURANCE** [1] - 2:2
**Insurance** [1] - 19:1
**insured** [2] - 30:19, 41:15
**insureds** [2] - 43:12, 43:15
**insurers** [5] - 40:25, 42:24, 43:15, 43:25
**integrity** [1] - 35:6
**intend** [3] - 22:22, 22:23, 29:15
**interest** [1] - 18:12
**interested** [2] - 35:6, 44:2
**interesting** [4] - 4:10, 5:16, 13:22, 23:4
**internal** [2] - 32:1, 33:12

**internally** [2] - 32:10, 33:1
**internationally** [1] - 15:24
**interrogatories** [1] - 26:2
**intervening** [1] - 44:2
**introduce** [1] - 38:22
**invite** [1] - 42:22
**involved** [5] - 5:4, 9:23, 15:11, 38:10, 43:23
**involving** [1] - 27:3
**Irbesartan** [6] - 20:11, 21:16, 22:18, 23:4, 32:25, 42:7
**IRC** [1] - 8:8
**issue** [17] - 12:1, 18:18, 18:22, 23:4, 23:12, 29:2, 29:7, 30:3, 34:23, 36:16, 38:8, 40:9, 44:4, 45:11, 45:14, 49:5, 49:17
**issues** [32] - 11:25, 12:9, 14:10, 14:20, 24:15, 25:17, 26:16, 27:3, 28:10, 28:17, 28:18, 28:21, 28:24, 28:25, 29:5, 29:8, 29:11, 29:12, 33:18, 36:6, 44:6, 44:10, 45:12, 45:13, 45:19, 45:25, 47:9, 47:10, 47:11, 47:14, 47:18

**J**

**JERSEY** [1] - 1:1
**Jersey** [1] - 1:8
**jinxing** [1] - 31:23
**job** [1] - 31:4
**JOEL** [1] - 1:10
**John** [1] - 1:7
**joint** [2] - 44:11, 50:2
**Joseph** [1] - 22:16
**Journal** [1] - 42:5
**JPML** [5] - 20:6, 20:20, 22:2, 44:13, 44:15
**JR** [1] - 2:1
**judge** [2] - 28:10, 43:5
**JUDGE** [21] - 1:10, 1:10, 21:3, 22:7, 22:11, 28:13, 30:11, 37:6, 37:20, 37:23, 38:11, 38:24, 39:14,

42:12, 43:1, 45:7, 45:10, 46:6, 46:9, 46:13, 49:22
**Judge** [23] - 4:9, 5:1, 11:7, 14:1, 16:22, 21:13, 21:14, 22:19, 25:14, 28:8, 28:10, 28:12, 30:7, 30:11, 30:15, 32:2, 40:5, 40:10, 43:5, 43:7, 43:23
**Judges** [1] - 30:23
**judiciary** [1] - 31:23
**jurisdiction** [1] - 11:16

**K**

**KATZ** [1] - 1:17
**keep** [4] - 18:17, 29:14, 31:22, 31:24
**keeping** [1] - 32:8
**key** [1] - 46:20
**kind** [8] - 11:11, 19:23, 23:11, 32:25, 33:2, 40:12, 45:18, 48:7
**kinds** [3] - 10:14, 47:17, 48:24
**knock** [1] - 31:24
**knowledge** [1] - 22:4
**knows** [1] - 18:9
**Korea** [1] - 27:11
**Kudos** [1] - 30:11
**KUGLER** [1] - 1:9
**Kugler** [5] - 4:9, 30:7, 30:12, 43:6, 46:21

**L**

**Laboratories** [1] - 17:7
**Labs** [1] - 9:4
**language** [4] - 7:11, 36:20, 40:17, 40:19
**large** [1] - 43:24
**largely** [1] - 33:1
**larger** [3] - 20:22, 21:10, 40:25
**largest** [2] - 37:11, 43:25
**last** [2] - 34:17, 40:14
**late** [2] - 15:14, 29:21
**laughter** [1] - 38:18
**Laughter** [3] - 30:10, 37:22, 43:3
**law** [1] - 39:12

**lawyer** [1] - 4:25
**lawyers** [10] - 19:1, 26:22, 29:19, 29:22, 31:1, 31:3, 32:4, 35:7, 42:20, 48:13
**layers** [1] - 34:1
**Leadership** [1] - 49:14
**leadership** [13] - 10:23, 10:25, 11:3, 11:9, 11:10, 12:7, 21:18, 26:19, 26:24, 33:2, 33:19, 35:4, 35:10
**leads** [1] - 9:19
**leapfrog** [1] - 15:4
**least** [15] - 7:12, 8:13, 8:18, 9:6, 13:17, 15:23, 20:12, 29:3, 29:6, 30:2, 33:10, 38:3, 45:24, 47:5, 48:9
**legal** [2] - 45:11, 45:25
**legitimate** [2] - 11:21, 47:9
**less** [1] - 48:24
**lesson** [1] - 29:21
**letter** [2] - 28:20, 29:12
**level** [2] - 6:3, 8:12
**levels** [1] - 7:22
**LEVIN** [1] - 1:13
**Levin** [1] - 6:22
**LIABILITY** [1] - 1:4
**Liberty** [1] - 43:25
**lieu** [2] - 12:11, 26:2
**lift** [1] - 6:11
**light** [2] - 33:8, 33:19
**limitations** [1] - 39:13
**Limited** [2] - 17:7, 17:10
**Linares** [1] - 21:14
**line** [1] - 22:17
**linger** [1] - 29:8
**lion's** [1] - 42:10
**list** [4] - 4:25, 8:24, 27:18, 28:24
**listen** [1] - 48:12
**listened** [1] - 31:4
**listing** [1] - 28:21
**litigant** [1] - 18:15
**litigate** [1] - 16:3
**litigating** [1] - 30:25
**LITIGATION** [1] - 1:4
**litigation** [8] - 16:10, 20:15, 22:3, 35:1, 35:12, 38:6, 38:10, 48:4

**LLC** [1] - 1:19
**LLP** [5] - 1:20, 1:22, 2:3, 2:5, 2:7
**look** [9] - 6:7, 15:7, 26:8, 26:25, 35:8, 44:20, 45:23, 46:25, 47:1
**looked** [1] - 37:12
**looking** [1] - 5:15
**LORI** [1] - 2:6
**Lori** [2] - 40:5, 44:9
**Losartan** [5] - 20:11, 21:12, 23:3, 32:24, 42:8
**loud** [1] - 45:22
**Lowey** [1] - 23:14
**LOWEY** [1] - 2:1
**lunch** [2] - 48:5, 48:15

**M**

**MADA** [2] - 19:6, 19:7
**MAGISTRATE** [19] - 21:3, 22:7, 22:11, 28:13, 30:11, 37:6, 37:20, 37:23, 38:11, 38:24, 39:14, 42:12, 43:1, 45:7, 45:10, 46:6, 46:9, 46:13, 49:22
**mail** [2] - 5:7, 31:21
**Maine** [7] - 19:1, 23:3, 40:23, 41:7, 41:16, 45:3, 46:11
**MAINE** [2] - 1:23, 2:2
**majority** [1] - 43:20
**managing** [1] - 4:10
**manufacturer** [3] - 7:2, 34:4, 34:5
**manufacturers** [4] - 7:24, 8:1, 8:9, 23:6
**manufacturing** [4] - 5:21, 7:5, 7:16, 8:20
**March** [1] - 1:8
**MARCHESE** [1] - 22:16
**Marchese** [1] - 22:16
**market** [6] - 20:11, 20:17, 41:23, 42:10, 43:20, 43:21
**marshal** [1] - 48:7
**mass** [1] - 49:3
**massage** [1] - 32:11
**master** [21] - 12:13, 12:16, 12:17, 13:12, 14:5, 14:15, 15:20, 16:6, 16:18, 17:1,

17:3, 17:16, 21:6, 21:21, 22:1, 24:11, 24:13, 24:21, 44:20, 46:25, 47:2
**Master** [3] - 5:3, 45:23, 49:15
**masters** [1] - 16:13
**MATGISTRATE** [1] - 1:10
**matter** [3] - 21:13, 27:22, 50:8
**matters** [2] - 33:20, 34:2
**MAZIE** [1] - 1:17
**MDL** [8] - 4:25, 16:13, 17:11, 17:14, 19:24, 20:12, 23:18, 32:2
**MDL's** [1] - 20:21
**mean** [19] - 5:21, 6:20, 8:11, 9:23, 13:19, 18:18, 24:16, 27:19, 30:19, 31:3, 31:15, 32:5, 35:24, 36:3, 36:9, 38:3, 39:2, 48:23, 49:25
**meaning** [1] - 8:24
**meaningful** [1] - 20:17
**mechanism** [2] - 20:19, 20:24
**media** [1] - 19:13
**Medical** [1] - 45:2
**medical** [9] - 13:4, 13:8, 13:11, 14:14, 38:4, 38:8, 38:11, 38:12, 38:14
**Medicine** [1] - 42:6
**meet** [7] - 15:25, 28:15, 28:20, 28:21, 33:15, 44:21, 49:7
**meeting** [5] - 9:24, 12:7, 24:15, 33:16, 49:18
**meetings** [1] - 33:12
**members** [1] - 4:24
**met** [2] - 16:23, 36:18
**method** [1] - 10:4
**methods** [1] - 30:22
**Miami** [1] - 44:13
**midnight** [2] - 50:4, 50:5
**might** [6] - 18:4, 28:4, 35:5, 37:13, 38:19, 40:11
**mile** [1] - 48:24
**million** [8] - 24:17, 41:22, 42:1, 42:2, 42:6, 43:12, 43:15,

43:16
**millions** [1] - 43:16
**mindful** [1] - 20:24
**minus** [1] - 21:22
**minute** [1] - 40:2
**Miss** [2] - 4:16, 5:5
**Mitchell** [1] - 1:7
**modification** [1] - 12:21
**moment** [3] - 19:17, 20:12, 20:23
**money** [2] - 6:15, 41:9
**monitoring** [11] - 13:4, 13:8, 13:11, 14:14, 38:4, 38:9, 38:11, 38:13, 38:14, 41:1, 44:2
**Monitoring** [1] - 45:2
**month** [4] - 28:6, 28:22, 29:16, 50:7
**monthly** [2] - 11:6, 48:9
**months** [3] - 32:14, 33:11, 39:11
**morning** [2] - 28:9, 28:16
**MORRIS** [1] - 2:3
**most** [7] - 16:2, 16:5, 16:15, 19:19, 25:13, 32:22, 49:1
**motion** [10] - 11:16, 11:24, 13:14, 25:10, 44:14, 45:12, 45:15, 45:23, 47:6, 49:6
**motions** [7] - 11:14, 25:3, 25:5, 25:12, 29:10, 45:21
**mouth** [1] - 22:12
**move** [2] - 29:4, 30:4
**moving** [4] - 10:9, 29:14, 30:5, 32:19
**MR** [60] - 6:22, 8:17, 9:10, 9:12, 9:14, 9:18, 11:22, 12:4, 13:7, 13:25, 15:1, 15:3, 15:19, 16:19, 16:22, 18:3, 18:8, 18:25, 19:4, 19:10, 20:4, 21:9, 22:9, 22:13, 22:16, 23:2, 23:14, 24:1, 24:8, 32:20, 36:13, 36:15, 36:18, 37:1, 37:5, 37:10, 38:2, 38:3, 38:15, 38:21, 39:9, 39:19, 40:1, 40:4, 40:23, 41:8, 41:12, 41:15, 41:21, 42:4, 42:15, 42:16, 42:17, 42:19,

43:4, 43:5, 47:23, 48:3, 49:5, 49:10
**MS** [7] - 44:8, 45:9, 45:12, 46:8, 46:12, 46:15, 47:21
**MSP** [6] - 1:19, 43:6, 46:23, 46:9, 46:14
**multiple** [1] - 33:12
**MYLAN** [1] - 2:8
**Mylan** [6] - 8:10, 9:2, 12:1, 12:5, 17:6, 17:10

**N**

**name** [1] - 20:4
**names** [1] - 22:14
**Nami** [1] - 2:25
**nation** [1] - 38:14
**nationwide** [1] - 38:14
**NCAA** [1] - 30:8
**necessarily** [2] - 17:15
**necessary** [6] - 10:5, 11:19, 25:18, 26:13, 26:17, 26:21
**need** [21] - 4:16, 5:3, 5:12, 5:22, 15:20, 18:21, 22:14, 24:22, 24:23, 25:6, 25:16, 27:6, 27:13, 27:16, 27:20, 35:1, 35:3, 37:2, 38:23, 49:24, 50:4
**needed** [1] - 23:17
**needs** [5] - 4:15, 5:23, 24:18, 31:15, 32:18
**never** [5] - 5:18, 17:22, 28:25, 31:24, 38:25
**NEW** [1] - 1:1
**New** [2] - 1:8, 42:5
**next** [20] - 9:19, 11:5, 11:13, 18:23, 24:3, 24:5, 24:12, 24:15, 25:8, 25:20, 25:21, 27:21, 37:18, 38:16, 39:10, 49:13, 49:15, 49:18, 49:21, 50:1
**NIGH** [17] - 1:13, 6:22, 8:17, 9:10, 9:12, 9:14, 9:18, 36:15, 36:18, 37:1, 37:5, 37:10, 38:2, 39:9, 39:19, 40:1, 41:21
**Nigh** [2] - 6:22, 40:8
**night** [1] - 50:4

**nobody** [1] - 6:5
**nobody's** [1] - 39:24
**normally** [1] - 4:24
**notice** [1] - 17:19
**noticing** [1] - 35:9
**number** [12] - 4:11, 6:9, 11:14, 13:3, 13:24, 19:11, 26:3, 27:10, 40:24, 42:13, 43:22
**NUMBER** [1] - 1:4
**numbers** [4] - 13:21, 37:13, 42:18, 43:10
**numerous** [1] - 33:15

**O**

**o'clock** [3] - 28:8, 28:16, 29:19
**object** [1] - 19:18
**objection** [1] - 29:15
**obligations** [3] - 34:3, 34:8, 34:9
**observations** [1] - 33:16
**obviously** [7] - 10:22, 14:22, 18:21, 25:11, 30:15, 39:17, 43:20
**occur** [1] - 39:11
**occurred** [1] - 22:24
**occurs** [1] - 46:7
**od** [1] - 46:22
**odd** [1] - 37:25
**OF** [1] - 1:1
**offends** [1] - 19:24
**Office** [1] - 4:17
**often** [2] - 29:2, 30:16
**once** [8] - 17:13, 25:24, 26:10, 26:19, 26:24, 28:22, 29:3, 35:2
**One** [2] - 1:7, 37:11
**one** [35] - 5:11, 10:3, 11:15, 11:21, 13:11, 15:16, 15:23, 16:5, 16:18, 18:13, 18:25, 21:20, 21:25, 26:18, 29:16, 29:19, 30:2, 30:20, 32:2, 36:16, 37:1, 37:25, 38:3, 38:12, 39:6, 39:16, 43:25, 44:10, 45:12, 45:24, 46:16, 48:7, 48:23, 49:5
**ones** [2] - 37:13, 43:13

**open** [7] - 4:1, 6:17, 12:10, 16:5, 31:10, 32:16, 34:13
**Opening** [1] - 48:1
**opportunities** [1] - 25:11
**opportunity** [4] - 11:3, 11:11, 43:8, 47:25
**opposed** [2] - 13:13, 15:13
**order** [11] - 5:2, 16:25, 19:22, 22:2, 26:18, 29:13, 36:18, 36:19, 36:23, 39:1, 49:23
**Order** [3] - 11:1, 40:17, 44:15
**Orders** [1] - 27:2
**orders** [2] - 49:16
**organized** [3] - 4:13, 47:13, 47:18
**originally** [1] - 21:13
**otherwise** [1] - 5:7
**ought** [2] - 17:17, 35:24
**ourselves** [1] - 14:9
**overall** [1] - 19:11
**own** [3] - 14:19, 32:5, 48:5

**P**

**p.m** [2] - 28:7, 28:15
**PACHIOS** [1] - 1:22
**packager** [1] - 34:5
**page** [1] - 14:9
**paid** [1] - 41:10
**Panel** [2] - 20:6, 20:9
**panel** [1] - 19:20
**Panera** [1] - 48:17
**PAPANTONIO** [1] - 1:13
**Papantonio** [1] - 6:22
**papers** [3] - 19:9, 25:13, 44:17
**paragraph** [1] - 39:4
**part** [17] - 9:24, 11:10, 13:13, 13:20, 16:11, 19:20, 21:17, 23:18, 31:4, 34:3, 35:12, 35:16, 38:6, 40:6, 42:6, 42:18, 45:24
**participate** [4] - 11:9, 11:12, 18:12, 35:19
**particularly** [4] - 11:9, 12:9, 32:7,

35:10
**parties** [3] - 18:12, 36:22, 43:13
**parts** [1] - 10:9
**party** [14] - 12:23, 13:22, 14:3, 15:17, 17:7, 18:13, 19:7, 36:1, 36:5, 38:5, 38:10, 41:5, 43:7, 47:3
**passthrough** [1] - 10:1
**passthroughs** [1] - 9:22
**patent** [1] - 7:4
**patten** [2] - 48:13
**pay** [1] - 42:24
**payer** [5] - 12:23, 13:22, 17:7, 19:7, 43:7
**payers** [6] - 14:3, 36:1, 36:5, 38:5, 38:10, 41:5
**paying** [1] - 6:16
**PC** [1] - 2:1
**pending** [5] - 6:13, 11:14, 22:19, 25:4, 44:15
**PENDLEY** [1] - 1:20
**penetration** [1] - 41:23
**people** [20] - 6:9, 9:11, 9:14, 10:4, 10:7, 10:12, 10:15, 10:18, 11:2, 11:8, 15:21, 34:22, 35:14, 35:19, 37:13, 39:17, 43:2, 43:22, 48:18, 49:1
**percent** [1] - 41:25
**performance** [2] - 30:8, 30:9
**perhaps** [4] - 10:6, 18:17, 23:22, 44:18
**peripheral** [2] - 6:1, 34:23
**permission** [1] - 45:19
**person** [7] - 4:17, 20:25, 22:3, 28:22, 29:6, 29:17
**personal** [12] - 11:16, 12:24, 13:12, 14:15, 17:9, 17:11, 17:12, 17:23, 37:2, 37:18, 45:1, 47:2
**persons** [1] - 43:17
**perspective** [5] - 13:18, 13:24, 14:2, 17:4, 17:17
**PETER** [1] - 2:1

**Peter** [2] - 19:4, 23:14
**petition** [2] - 20:20, 22:2
**PHARMACEUTICALS** [3] - 2:4, 2:6, 2:8
**Pharmaceuticals** [2] - 11:23, 12:5
**Philadelphia** [6] - 20:5, 48:23, 48:25, 49:1, 49:2, 49:4
**Phillip** [2] - 19:4, 23:14
**PHILLIP** [3] - 2:1, 23:14, 24:8
**PHILLIPS** [1] - 24:1
**phone** [5] - 5:7, 28:12, 28:23, 29:5, 29:22
**picture** [1] - 28:18
**piece** [1] - 12:10
**pieces** [1] - 4:19
**PIETRAGALL** [1] - 2:7
**pill** [3] - 7:7, 7:24, 7:25
**pills** [4] - 7:9, 7:22, 7:23, 8:23
**pilot** [1] - 44:1
**place** [8] - 4:1, 20:18, 26:25, 27:11, 36:9, 39:2, 44:13, 48:22
**places** [1] - 27:12
**PLAINTIFF** [3] - 1:16, 1:18, 1:21
**plaintiff** [1] - 28:20
**plaintiff's** [1] - 38:19
**plaintiffs** [19] - 10:24, 11:20, 12:19, 12:20, 13:10, 24:23, 26:1, 26:4, 27:7, 27:14, 27:16, 27:23, 28:2, 28:3, 31:16, 33:10, 36:8, 44:4
**Plaintiffs** [1] - 1:14
**plaintiffs'** [9] - 5:13, 6:18, 10:6, 12:7, 13:23, 26:19, 32:16, 44:19, 48:6
**Plaintiffs'** [2] - 11:3, 20:1
**plan** [3] - 41:17, 43:2, 44:19
**plate** [1] - 39:3
**played** [2] - 6:1, 9:21
**Plaza** [1] - 1:7
**pleaded** [1] - 14:5
**pleading** [2] - 16:11, 47:16
**pleadings** [3] -

24:10, 25:24, 36:4
**pleasure** [1] - 40:6
**pled** [1] - 38:15
**plenty** [1] - 26:7
**plurality** [1] - 43:21
**plus** [1] - 21:22
**point** [24] - 6:20, 6:23, 10:17, 11:15, 13:17, 13:19, 17:25, 21:20, 23:2, 32:21, 33:7, 33:11, 33:22, 34:17, 36:9, 36:20, 39:23, 40:2, 40:8, 40:14, 41:24, 47:13
**poised** [1] - 33:13
**pool** [1] - 43:16
**poor** [1] - 30:7
**posed** [1] - 33:6
**position** [11] - 12:20, 13:18, 15:14, 16:24, 17:9, 20:23, 22:6, 33:5, 33:20, 44:12, 44:7
**possess** [1] - 34:8
**possibilities** [1] - 30:16
**possibility** [1] - 41:4
**possible** [1] - 41:3
**potential** [1] - 39:13
**potentially** [5] - 38:5, 45:6, 45:20, 46:4, 46:12
**practical** [3] - 14:11, 16:2, 49:5
**practice** [3] - 25:10, 28:11, 28:12
**pre** [1] - 12:20
**precedent** [1] - 46:3
**predecessor** [1] - 24:6
**prefer** [3] - 15:15, 24:11, 25:19
**preference** [2] - 21:19, 24:2
**preferences** [1] - 16:2
**prejudice** [1] - 10:7
**preliminary** [1] - 20:14
**premature** [3] - 20:23, 26:15, 30:17
**preparation** [1] - 4:13
**prepare** [2] - 21:21, 30:2
**prepared** [3] - 10:25, 15:21, 17:3
**prescription** [1] - 39:4
**prescriptions** [5] -

41:10, 41:19, 42:1, 42:7, 42:13
**presence** [1] - 20:17
**present** [2] - 36:23, 36:24
**press** [2] - 6:25, 8:19
**pressing** [1] - 47:14
**presuppose** [1] - 34:12
**PRETI** [1] - 1:22
**pretty** [3] - 7:20, 24:17, 36:2
**principal** [1] - 43:13
**principle** [1] - 36:21
**Prinston** [1] - 11:23
**PRINSTON** [1] - 2:4
**privileged** [1] - 37:7
**problem** [5] - 9:6, 14:12, 21:10, 35:9, 35:12
**problems** [2] - 4:18, 32:2
**procedural** [1] - 21:13
**proceeding** [1] - 17:12
**process** [22] - 5:21, 6:25, 7:3, 7:4, 7:6, 7:16, 8:20, 9:24, 11:1, 12:8, 15:22, 16:11, 17:16, 17:21, 18:15, 23:16, 25:5, 26:3, 35:13, 35:20, 35:23, 45:14
**Process** [1] - 18:6
**produced** [2] - 27:13, 27:16
**product** [7] - 5:25, 7:4, 8:5, 33:24, 33:25, 34:15
**production** [1] - 27:7
**productive** [2] - 12:6, 33:16
**productively** [1] - 44:22
**PRODUCTS** [1] - 1:3
**products** [1] - 19:14
**program** [1] - 44:1
**promise** [1] - 11:13
**promptly** [1] - 29:9
**proper** [1] - 11:17
**properly** [4] - 13:1, 15:3, 17:18, 21:20
**proposal** [1] - 25:21
**propose** [2] - 12:21, 13:10
**proposed** [8] - 12:10, 12:13, 17:1, 21:17, 21:18, 33:2, 33:8, 38:14

**proposing** [1] - 12:25
**proposition** [1] - 33:3
**protect** [1] - 18:21
**protected** [1] - 18:21
**protections** [1] - 18:15
**protocol** [2] - 25:15, 26:14
**protocols** [1] - 15:13
**prove** [1] - 6:11
**provide** [2] - 27:6, 40:19, 42:17
**published** [1] - 7:15
**pure** [1] - 13:21
**purposely** [1] - 20:8
**purposes** [2] - 17:24, 32:1
**pursuant** [5] - 12:11, 12:15, 12:16, 12:19, 17:10
**pursue** [1] - 46:10
**put** [7] - 7:1, 7:12, 7:25, 13:5, 24:14, 25:7, 32:20
**puts** [1] - 16:13
**putting** [2] - 33:7, 35:8

**Q**

**quash** [1] - 11:16, 49:6
**questionnaires** [2] - 26:1, 26:10
**questions** [12] - 4:11, 4:22, 5:12, 5:24, 6:6, 9:20, 15:24, 26:9, 30:18, 30:20, 32:25, 33:6
**quickly** [3] - 16:4, 29:12, 35:2
**quote** [1] - 48:5

**R**

**radar** [1] - 46:17
**raise** [5] - 23:12, 29:9, 44:5, 44:7
**raised** [1] - 24:20
**raises** [2] - 23:4, 44:10
**range** [1] - 41:13
**rapid** [1] - 29:14
**RASPANTI** [1] - 2:7
**rather** [2] - 5:19, 42:23

re [2] - 31:20, 34:5
RE [1] - 1:3
re-enter [1] - 31:20
re-packager [1] - 34:5
reached [1] - 36:21
reaction [1] - 47:16
read [2] - 19:9, 39:2
reading [2] - 36:4, 42:5
ready [1] - 26:16
real [1] - 9:8
really [16] - 4:19, 9:20, 9:25, 10:5, 13:16, 14:18, 18:8, 23:4, 24:22, 25:4, 27:19, 32:4, 33:8, 44:24, 50:5
reason [3] - 20:12, 24:24, 35:14
reasonable [2] - 18:11, 27:18
reasonably [3] - 8:7, 8:13, 8:25
recap [1] - 49:12
receiving [5] - 9:1, 9:2, 9:3, 9:5
recent [1] - 42:5
recently [1] - 5:19
record [2] - 14:1, 30:4
RECOVERY [1] - 1:19
recovery [1] - 44:23
Recovery [1] - 43:6
reference [1] - 23:23
regulated [2] - 33:25, 34:6
regulations [1] - 34:2
regulatory [4] - 5:15, 27:9, 34:15, 34:21
reimbursement [1] - 14:4
related [1] - 45:15
relatively [1] - 28:14
relax [1] - 4:3
released [2] - 7:22, 8:9
relief [1] - 21:11
remains [1] - 34:13
removed [1] - 31:2
repeatedly [1] - 11:20
repositories [1] - 25:17
represent [3] - 20:9, 37:16, 42:21
represented [1] - 43:12

represents [1] - 12:1
request [3] - 20:20, 26:6, 27:7
require [1] - 9:8, 26:6, 32:12
required [2] - 2:24, 26:1
requires [1] - 32:9
requiring [3] - 12:11, 17:25, 18:13
resolution [1] - 33:17
resolve [7] - 24:15, 26:16, 26:17, 27:3, 27:21, 49:14
resolved [1] - 25:6
resources [1] - 46:2
respect [5] - 12:9, 18:7, 20:11, 23:3, 23:6, 23:8
respond [4] - 19:5, 33:5, 34:17, 50:5
responded [2] - 4:5, 45:16
responsive [2] - 4:14, 33:14
restaurants [3] - 48:16, 48:17, 48:25
restricted [1] - 4:24
results [1] - 7:23
retailers [1] - 9:23
return [1] - 29:10
reveal [1] - 37:7
reveals [1] - 20:14
ride [1] - 49:3
rights [5] - 17:21, 18:20, 39:18, 39:25, 40:18
rise [1] - 4:2
risk [1] - 31:23
Rivero [4] - 42:23, 43:6, 44:10, 44:24
RIVERO [2] - 1:19, 43:5
road [1] - 47:12
ROBERT [1] - 1:9
role [3] - 6:2, 11:3, 11:9
roles [6] - 9:20, 9:21, 10:23, 10:25, 11:10, 35:10
rolling [1] - 4:14
room [4] - 15:22, 22:10, 33:10, 48:15
rough [1] - 41:10
Ruben [1] - 20:5
RUBEN [1] - 1:15
Rule [2] - 12:17, 12:19
rule [1] - 20:19

run [1] - 10:12
running [1] - 16:4

**S**

safe [1] - 9:1
Sartan [1] - 20:7
Sartans [7] - 19:15, 20:2, 21:4, 23:16, 23:20, 49:19, 49:20
saw [2] - 30:14, 35:21
scale [4] - 42:22, 43:10, 43:19, 43:22
schedule [4] - 29:6, 45:18, 48:20, 48:22
schedules [1] - 47:17
scheme [1] - 34:15
Schneider [11] - 4:9, 5:1, 11:7, 25:14, 28:8, 28:10, 28:12, 30:15, 40:10, 43:5, 43:7
SCHNEIDER [20] - 1:10, 21:3, 22:7, 22:11, 28:13, 30:11, 37:6, 37:20, 37:23, 38:11, 38:24, 39:14, 42:12, 43:1, 45:7, 45:10, 46:6, 46:9, 46:13, 49:22
Schneider's [1] - 28:10
scope [1] - 20:10
seat [1] - 4:3
second [4] - 29:17, 34:12, 34:18, 39:16
Section [1] - 2:25
see [13] - 6:11, 12:22, 13:10, 18:18, 18:19, 19:13, 21:19, 38:1, 41:22, 44:19, 45:22, 47:5, 50:7
seeing [1] - 8:18
seem [4] - 5:11, 7:15, 27:7, 27:12
segue [1] - 13:3
selecting [1] - 35:13
self [1] - 26:5
self-executing [1] - 26:5
send [4] - 31:22, 32:12, 39:22, 50:2
SENIOR [1] - 1:10
sense [6] - 32:6, 37:8, 39:1, 39:7, 42:21, 42:25
sensitive [1] - 10:16
sensitize [2] - 34:21,

34:23
sent [2] - 21:14, 31:19
separate [8] - 13:6, 13:13, 14:16, 19:6, 19:7, 30:24, 30:25, 31:7
separately [2] - 16:7, 44:18
SERIES [1] - 1:19
serious [1] - 34:7
seriously [2] - 30:21, 33:25
serve [5] - 11:2, 11:20, 15:15, 16:12, 17:25
served [14] - 12:18, 13:1, 15:3, 15:10, 15:16, 15:24, 16:7, 16:9, 17:2, 17:10, 17:13, 17:18, 17:22
service [18] - 11:16, 11:18, 11:21, 12:1, 12:9, 12:11, 12:15, 12:16, 14:23, 14:24, 15:8, 15:9, 16:3, 16:24, 17:4, 18:10, 18:13, 33:18
set [8] - 8:8, 9:20, 29:6, 31:13, 45:18, 46:3, 47:17
SETH [1] - 2:4
Seth [1] - 11:22
setting [1] - 14:9
settlement [3] - 30:16, 30:24, 31:7
settling [1] - 30:22
sever [1] - 23:22
several [1] - 15:7
share [2] - 20:14, 42:10
shares [1] - 42:10
sheet [2] - 26:5, 26:10
sheets [2] - 25:25, 31:16
short [7] - 12:18, 26:3, 39:1, 39:7, 40:11, 40:15, 40:16
shorten [1] - 29:24
shut [1] - 35:19
side [12] - 5:14, 6:18, 10:11, 11:3, 11:19, 20:1, 26:6, 32:16, 47:3, 47:22, 48:6
sides [10] - 12:14, 18:19, 24:11, 25:20, 26:8, 26:9, 26:15, 27:2, 30:24, 46:22
significance [1] - 6:8

significant [2] - 33:23, 43:21
similar [2] - 25:25, 36:6
sitting [1] - 37:17
situation [1] - 15:8
SLATER [15] - 1:17, 1:17, 13:25, 15:1, 15:3, 15:19, 16:19, 38:3, 38:15, 38:21, 42:4, 42:15, 42:17, 49:5, 49:10
Slater [3] - 13:24, 13:25, 16:25, 36:10, 40:8, 40:24, 48:3, 49:4
small [1] - 43:14
smoothly [1] - 28:14
Solco [2] - 7:2, 8:2
somewhere [1] - 9:5
soon [5] - 25:23, 33:3, 33:18, 37:3, 38:5
sort [5] - 28:18, 31:1, 45:4, 45:25, 47:1
sought [2] - 21:11, 44:17
sounds [1] - 46:17
specific [1] - 24:24
specifically [1] - 12:2
spoken [1] - 15:6
Sponte [1] - 21:14
spring [1] - 36:11
St [2] - 19:4, 23:14
ST [4] - 2:1, 23:14, 24:1, 24:8
staff [1] - 31:25
stage [2] - 12:13, 39:21
stand [1] - 4:16
standalone [3] - 21:11, 21:16, 22:24
standing [4] - 18:8, 45:13, 45:14, 47:8
stands [1] - 22:4
start [2] - 32:16, 39:8
started [7] - 7:5, 15:22, 27:14, 27:19, 47:13, 47:19, 48:4
starting [2] - 28:16, 33:7
State [3] - 34:5, 38:12, 39:12
states [1] - 42:6
STATES [2] - 1:1, 1:10
States [5] - 1:7, 5:25, 34:2, 41:19, 42:8
status [8] - 11:6,

11:7, 26:12, 28:5, 28:15, 28:23, 49:13
**Status** [1] - 1:6
**statute** [1] - 39:13
**stay** [2] - 49:1, 49:2
**stayed** [1] - 49:7
**stick** [1] - 5:6
**still** [4] - 16:13, 18:1, 44:18, 47:14
**stood** [1] - 44:10
**stories** [2] - 6:25, 8:19
**story** [1] - 7:1
**straighten** [3] - 4:17, 5:8, 5:22
**straightened** [1] - 25:24
**structure** [6] - 19:24, 33:2, 33:4, 33:8, 33:19, 35:4
**studies** [1] - 7:14
**stuff** [3] - 31:22, 32:13, 48:14
**Sua** [1] - 21:14
**sub** [2] - 14:10, 14:14
**sub-classes** [1] - 14:10
**sub-count** [1] - 14:14
**submission** [2] - 10:23, 44:11
**submit** [2] - 26:4, 28:20
**submitted** [1] - 44:17
**subsequent** [1] - 12:18
**subset** [1] - 43:21
**subsidiary** [2] - 8:2, 17:6
**substance** [1] - 18:5
**subsumed** [1] - 46:10
**Subway** [2] - 48:6, 48:10
**successful** [1] - 8:7
**successfully** [1] - 17:23
**sued** [3] - 17:7, 17:8, 17:9
**suffice** [1] - 34:7
**sufficiently** [1] - 20:16
**suggest** [2] - 7:15, 31:2
**suggested** [1] - 15:7
**suggesting** [4] - 34:22, 35:14, 39:6, 47:15
**suggestion** [2] -

10:24, 30:20
**suggestions** [2] - 33:5, 35:22
**Summit** [1] - 43:13
**supports** [1] - 21:24
**surprised** [1] - 38:7
**suspect** [5] - 8:11, 8:25, 9:1, 9:4, 22:5
**swell** [1] - 37:24
**sympathetic** [1] - 10:2
**system** [1] - 10:18

# T

**tackle** [1] - 47:10
**team** [1] - 40:8
**technically** [2] - 18:9, 19:16
**tend** [1] - 10:12
**tends** [1] - 29:21
**tens** [1] - 41:13
**terms** [8] - 15:12, 16:10, 35:25, 37:8, 37:23, 38:1, 44:19, 46:20
**terrific** [1] - 42:19
**tested** [3] - 7:22, 8:12, 8:25
**testing** [1] - 5:19
**Teva** [4] - 7:24, 8:1, 40:5, 44:9
**TEVA** [1] - 2:6
**THE** [55] - 1:1, 1:9, 4:2, 4:3, 4:6, 8:15, 9:8, 9:11, 9:13, 9:16, 9:19, 12:3, 13:3, 13:19, 14:24, 15:2, 15:18, 16:17, 16:20, 17:20, 18:7, 18:17, 19:3, 19:9, 19:11, 22:14, 23:1, 23:13, 23:21, 24:5, 24:9, 30:13, 34:17, 36:14, 36:17, 36:25, 37:3, 38:19, 38:23, 39:16, 39:20, 40:2, 40:21, 41:6, 41:9, 41:14, 41:18, 44:4, 47:8, 47:22, 47:24, 48:12, 49:9, 49:11, 49:24
**theories** [1] - 5:13
**they've** [3] - 6:9, 34:9, 41:1
**third** [12] - 12:23, 13:22, 14:3, 17:7, 19:7, 36:1, 36:5, 38:5, 38:9, 41:4, 43:7, 47:2
**thirty** [1] - 49:13

**thousands** [4] - 8:6, 39:8, 39:10, 41:13
**three** [6] - 12:22, 13:1, 39:10, 41:22, 43:13, 48:6
**threshold** [4] - 6:4, 8:7, 8:8, 8:13
**throughout** [1] - 6:24
**throw** [2] - 28:6, 30:14
**Title** [1] - 2:24
**today** [18] - 4:12, 5:6, 10:17, 10:25, 12:8, 13:17, 21:22, 30:9, 30:14, 33:17, 33:21, 37:17, 42:20, 44:5, 44:7, 44:11, 44:21, 48:8
**together** [8] - 7:1, 27:3, 28:2, 35:2, 35:8, 36:1, 36:2, 36:7
**tolling** [1] - 41:2
**tomorrow** [1] - 48:1
**took** [5] - 4:1, 5:16, 7:24, 39:4, 44:13
**Torrent** [1] - 8:1
**touch** [2] - 29:3, 40:25
**TPP** [1] - 42:21
**track** [3] - 19:8, 32:1, 32:8
**tracks** [4] - 10:10, 10:11, 19:6, 32:24
**traditionally** [2] - 11:10, 13:10
**train** [1] - 10:10
**trains** [1] - 10:12
**transferring** [1] - 44:15
**transit** [1] - 49:3
**translate** [1] - 42:13
**translates** [1] - 42:13
**transparency** [1] - 35:13
**transparent** [3] - 11:2, 14:12, 35:23
**TRAURIG** [1] - 2:5
**treated** [2] - 36:2, 45:6
**tremendous** [1] - 18:14
**trials** [2] - 48:13, 49:2
**trigger** [1] - 11:21
**trip** [1] - 4:6
**Trischler** [3] - 11:25, 12:3, 12:5
**TRISCHLER** [6] - 2:8, 12:4, 13:7, 16:22, 18:3, 18:8

**Trischler's** [1] - 33:16
**true** [1] - 2:24
**trust** [1] - 10:17
**TRUST** [1] - 2:2
**Trust** [1] - 19:2
**try** [11] - 10:3, 10:18, 16:3, 16:4, 24:11, 31:11, 31:12, 31:18, 46:21, 47:5, 48:22
**trying** [6] - 14:17, 15:4, 18:11, 19:21, 32:3, 41:22
**turn** [4] - 28:11, 29:13, 33:9, 44:5
**Two** [1] - 21:20
**two** [16] - 4:19, 5:20, 21:11, 22:4, 23:15, 23:19, 23:24, 24:11, 25:19, 28:19, 28:22, 28:24, 29:3, 30:24, 37:19, 37:25
**type** [2] - 31:19, 39:5

# U

**U.S** [4] - 7:25, 8:2, 8:23, 37:12
**U.S.C** [1] - 2:25
**Uber** [1] - 49:3
**ultimately** [1] - 19:17
**uncertain** [1] - 20:10
**under** [4] - 15:15, 34:2, 41:16, 46:23
**underlying** [1] - 46:10
**unfortunately** [1] - 10:12
**unique** [5] - 34:16, 44:24, 45:5, 45:7, 45:25
**UNITED** [2] - 1:1, 1:10
**United** [5] - 1:7, 5:25, 34:2, 41:19, 42:8
**universe** [3] - 27:5, 32:3, 46:22
**unless** [3] - 19:18, 24:24, 29:15
**unlike** [1] - 33:24
**unnecessary** [1] - 10:18
**unusual** [1] - 34:14
**up** [19] - 4:16, 6:17, 14:9, 16:4, 17:21, 22:15, 24:20, 25:20, 27:17, 31:10, 31:13, 32:17, 34:7, 39:24, 42:23, 44:10, 46:20,

47:11, 47:17
**update** [1] - 41:24
**USA** [1] - 2:6
**users** [4] - 42:1, 42:2, 43:17
**utilizing** [1] - 7:5

# V

**Valsartan** [13] - 20:7, 20:13, 21:6, 21:23, 22:24, 37:10, 41:20, 41:23, 42:2, 42:7, 42:9, 43:17, 43:18
**VALSARTAN** [1] - 1:3
**various** [1] - 25:12
**venue** [1] - 39:18, 39:24, 40:18
**viable** [1] - 30:19
**view** [2] - 16:8, 20:14
**voluntarily** [2] - 21:15, 21:19
**voluntary** [2] - 21:12, 22:24
**vu** [1] - 4:8

# W

**wait** [6] - 13:9, 16:12, 17:15, 39:7, 40:2, 45:22
**waiting** [2] - 21:19, 44:19
**waiving** [1] - 39:18, 40:17
**wants** [2] - 13:23, 35:15
**war** [2] - 31:2, 31:3
**waste** [1] - 46:2
**ways** [1] - 31:12
**Wednesday** [4] - 28:6, 28:13, 29:16, 29:17
**Wednesdays** [1] - 48:21
**weed** [1] - 10:4
**weeds** [1] - 34:1
**week** [2] - 36:24, 38:16
**weeks** [3] - 28:22, 29:3, 33:11
**weigh** [2] - 18:14, 26:11
**whole** [1] - 5:10
**willing** [2] - 4:10, 16:24
**withdrawal** [1] -

23:11
  **withdrawn** [1] - 23:9
  **Wolfson** [2] - 21:13, 22:19
  **wood** [1] - 31:24
  **worry** [1] - 39:23
  **worth** [1] - 43:18
  **writing** [1] - 50:6
  **written** [2] - 41:19, 42:7

### Y

  **years** [6] - 5:20, 7:12, 34:25, 37:19, 41:10, 48:6
  **Yogi** [1] - 4:7
  **yup** [1] - 49:24

### Z

  **Zhejaing** [10] - 7:2, 7:16, 7:18, 7:21, 7:23, 8:18, 8:21, 9:2, 11:23