```
              UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY


IN RE:                        )    19-MD-2875(RBK-JS)
                              )
                              )    Camden, NJ
VALSARTAN NDMA PRODUCTS       )    April 10, 2019
LIABILITY LITIGATION          )    4:05 p.m.


        TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
        BEFORE THE HONORABLE JOEL SCHNEIDER
            UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:           ADAM M. SLATER, ESQUIRE
                              MAZIE, SLATER, KATZ &
                              FREEMAN, LLC
                              103 Eisenhower Parkway
                              2nd Floor
                              Roseland, NJ 07068

                              RUBEN HONIK, ESQUIRE
                              GOLOMB & HONIK, PC
                              1835 Market Street
                              Suite 2900
                              Philadelphia, PA 19103

                              GEORGE A. BARTON, ESQUIRE
                              THE LAW OFFICES OF GEORGE A.
                              BARTON, PC
                              7227 Metcalf Avenue
                              Suite 301
                              Overland Park, KS 66204

                              GREG P. HANSEL, ESQUIRE
                              PRETI FLAHERTY
                              One City Center
                              Portland, ME 04101

                              DANIEL NIGH, ESQUIRE
                              LEVIN PAPANTONIO
                              316 South Baylen Street
                              Pensacola, FL 32502

                              PETER ST. PHILLIP, ESQUIRE
                              LOWEY DANNENBERG
                              44 South Broadway
                              Suite 100
                              White Plains, NY 10601
```

```
APPEARANCES: (cont.)


For the Defendants:                SETH A. GOLDBERG, ESQUIRE
                                   JESSICA A. PRISELAC, ESQUIRE
                                   ALAN KLEIN, ESQUIRE
                                   DUANE MORRIS, LLP
                                   30 South 17th Street
                                   Philadelphia, PA 19103

                                   LORI G. COHEN, ESQUIRE
                                   VICTORIA D. LOCKARD, ESQUIRE
                                   GREENBERG TRAURIG, LLP
                                   3333 Piedmont Road NE
                                   Suite 2500
                                   Atlanta, GA 30305

                                   CLEM C. TRISCHLER, ESQUIRE
                                   JASON M. REEFER, ESQUIRE
                                   PIETRAGALLO GORDON ALFANO
                                   BOSICK & RASPANTI, LLP
                                   One Oxford Centre
                                   38th Floor
                                   Pittsburgh, PA 15219

                                   RICHARD W. SMITH, ESQUIRE
                                   WILEY REIN, LLP
                                   1776 K Street NW
                                   Washington, DC 20006

                                   BRIAN RUBENSTEIN, ESQUIRE
                                   GREENBERG TRAURIG
                                   1717 Arch Street
                                   Suite 400
                                   Philadelphia, PA 19103


Audio Operator:                    SARAH ECKERT


Transcribed by:                    DIANA DOMAN TRANSCRIBING, LLC
                                   P.O. Box 129
                                   Gibbsboro, NJ 08026
                                   Office: (856) 435-7172
                                   Fax:    (856) 435-7124
                                   Email:  dianadoman@comcast.net



Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1                        I N D E X

 2

 3    COLLOQUY RE:                                         PAGE

 4    Background information                                 6

 5    Plaintiffs' leadership                                 8

 6    Filing of individual personal injury complaints       10

 7    Service on foreign defendants                          11

 8    Core discovery                                         28

 9    Plaintiffs' initial profile forms                      30

10    ESI protocol                                           31

11    Discovery confidentiality order                        32

12    Defendants' issues                                     40

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                              Colloquy                        4


1        (The following was heard via telephone conference at

2        4:05 p.m.)

3             THE COURT:  We're on the record, In Re: Valsartan

4   NDMA Products Liability Litigation, Docket No. 19-2875.

5             Can we have the names of counsel on the phone,

6   starting with plaintiffs.

7             MR. SLATER:  Hello, Your Honor.  Adam Slater on

8   behalf of the plaintiffs.

9             MR. HONIK:  Good afternoon, Your Honor.  Ruben Honik

10   on behalf of the plaintiff class.

11             MR. BARTON:  Good afternoon, Your Honor.  George

12   Barton on behalf of the plaintiffs.

13             THE COURT:  Defendants?

14             MR. HANSEL:  Good afternoon, Your Honor.  Greg

15   Hansel on behalf of Maine Auto Dealers, third-party payor

16   plaintiff.

17             THE COURT:  Okay.  So you're with the plaintiffs,

18   right?

19             MR. HANSEL:  Yes.

20             THE COURT:  Mr. -- I'm sorry, can I get the spelling

21   of your name?

22             MR. HANSEL:  It's Greg Hansel, H-A-N-S-E-L.

23             THE COURT:  Got it.

24             MR. HANSEL:  Thank you.

25             THE COURT:  Anyone else for plaintiff?

1           MR. SLATER:  Your Honor, I know that Daniel Nigh

2    will be calling in momentarily, but he's not on as yet.

3           THE COURT:  Okay.  Let's get defendants.

4           MR. GOLDBERG:  Good afternoon, Your Honor.  Seth

5    Goldberg from Duane Morris on behalf of the Prinston

6    defendants, and with me today are Jessica Priselac and Alan

7    Klein from my firm.

8           MS. COHEN:  Good afternoon, Your Honor.  This is

9    Lori Cohen with Greenberg Traurig on behalf of the Teva

10   defendants.

11          MR. TRISCHLER:  Good afternoon, Your Honor.  Clem

12   Trischler representing Mylan Pharmaceuticals.

13          MR. SMITH:  And, Your Honor, this is Richard Smith

14   with Wiley Rein representing Torrent.

15          THE COURT:  Is there anyone else on the phone who

16   has not yet entered their appearance?

17          MR. REEFER:  Judge, this is Jason Reefer, also

18   representing Mylan.

19          MS. LOCKARD:  Your Honor, Victoria Lockard from

20   Greenberg Traurig for Teva.

21          MR. RUBENSTEIN:  And, Your Honor, Brian Rubenstein

22   from Greenberg Traurig on behalf of Teva as well.

23          MR. ST. PHILLIP:  Your Honor, Peter St. Phillip for

24   Maine Auto Dealers Association for plaintiff.

25          THE COURT:  Is that everybody on the phone?

Colloquy                                    6

1          (No response)

2              THE COURT:  Terrific.  Thank you for your letters,

3     which have been received and reviewed.

4              We're going to hold these conference calls two weeks

5     after the in-person conference to help keep things on track,

6     to see if we can nip disputes in the bud, and to get ready for

7     the in-person conferences we hold on a monthly basis.

8              I'm delighted to see that the parties have done it

9     looks like a substantial amount of work to meet and confer on

10    issues.  Things are moving along.

11             You've probably seen the direct filing order that

12    you submitted has been entered.  You've seen Judge Kugler's

13    CMO number two.

14             There's some issues we're going to discuss that

15    Judge Kugler is going to have to decide, and that's fine, but

16    just airing the issues out I think helps the discussion and

17    helps move things along.  When it comes to discovery and some

18    scheduling issues, that's within my bailiwick and I'll decide

19    those, and that's generally how things go.

20             There's not always a bright, clear line between the

21    issues that I'm going to address and what should be addressed

22    by Judge Kugler.  I can only assure you that Judge Kugler and

23    I are in regular contact with each other about these issues.

24    I know his thoughts on most if not all of the issues, so I can

25    relay them to you.  But, obviously, I'm going to defer

1    ultimately to Judge Kugler if there's any questionable issue.

2              I think in terms of an agenda for this call, I think

3    in looking at the letters, I think we should proceed with the

4    order of issues that is in Mr. Slater's April 9 letter, and

5    then obviously we'll exhaust those issues and any other issues

6    the defendants, or anyone on the phone for that matter, wants

7    to address, we'll address.

8              Typically, we -- the way I work, not just in this

9    case, but in all my cases if you've been before me, I deal

10   with the plaintiffs' issues first, exhaust them.  When we're

11   done, deal with the defendant's issues.  And then open the

12   floor to any remaining issues anyone wants to address.

13             Some of the issues that, if not most of the issues

14   that the parties address in their letters, we're not going to

15   decide today.  But you'll have the benefit of our thoughts for

16   your continuing meet and confer discussions, and hopefully

17   most if not all of these issues, like the discovery

18   confidentiality order, will be resolved by the time we meet at

19   the end of the month.  Or if we have to, final decisions will

20   be made at that conference on that issue.

21             Some issues I think are going to take more time,

22   obviously, because they're more complicated, more complex,

23   like I don't think by the end of this month we're going to get

24   a final ESI protocol on the case.  Obviously, that's an

25   important issue.  A lot of information has to be digested.

1    But at least we keep the discussion going.

2              So with that background, let's start with

3    plaintiffs' letter.  The first issue is the plaintiffs'

4    leadership.  And I guess, Mr. Slater, hopefully have you been

5    able to work out with your brethren your executive, liaisons,

6    steering, what have you committees?

7              MR. SLATER:  Your Honor, with one exception, we

8    believe everything is worked out.  We're still -- and the

9    Maine Auto Dealer attorneys are on the phone.  We're not at a

10   point where we've reached full agreement with them.  And I'm

11   not sure how much detail you want us to go in, and we're

12   probably a little uncomfortable getting into too much detail

13   with the defense on the phone at the same time.  But with that

14   one exception, everything is worked out.

15             We've had a lot of law firms who contacted us, per

16   what Judge Kugler told us at the conference, if somebody wants

17   to be on the PST, they're -- they're getting a seat and

18   they're being included in our group.  And I think that that --

19   the Maine Auto Dealers is really the only open issue at this

20   point.

21             THE COURT:  Would it be helpful, but only with the

22   defendants' consent, if after we get through this joint agenda

23   and the defense counsel excuses themselves, if just

24   plaintiffs' counsel remain on the phone so that the only issue

25   we can discuss is the leadership organization of the

1    plaintiffs.  I understand your concern about sharing that with

2    the defendants.

3          Obviously, we wouldn't address the merits, but maybe

4    it would be helpful if I could give you the benefit of the

5    Court's thoughts on that issue, if the defense counsel would

6    have no objection after we get through the joint issues, if I

7    just talk to plaintiffs on the phone about the leadership

8    issue.

9          Defense counsel, what do you think?

10         MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  I

11   don't have an objection to that, and certainly any of my

12   defense colleagues could weigh in.  But from our standpoint,

13   it seems fine with us.

14         MS. COHEN:  And this is Lori Cohen on behalf of the

15   Teva defendants and I -- I, too, have no objection to that

16   limited focus on plaintiffs' leadership call after -- after we

17   get off.

18         THE COURT:  Okay.  We don't need to hear from all

19   defense counsel.  Why don't you just -- if anyone has an

20   objection, defendants, to me just talking to plaintiffs'

21   counsel about the organization of their leadership structure

22   and nothing else, if you have an objection -- does anyone have

23   an objection?

24      (No response)

25         THE COURT:  Okay.  Hearing silence, maybe Mr. Slater

Colloquy                                          10

1    and Maine, M-A-I-N-E counsel stay on the phone after

2    defendants hang up and let's see if we can get it hashed out.

3    Okay?

4              MR. SLATER:  Great.  Thank you.

5              THE COURT:  The direct -- the direct filing order, I

6    think that's moot, right, because that's been entered, right?

7              MR. SLATER:  Correct.

8              THE COURT:  So at this point, Mr. Slater, does your

9    group expect the direct filing of individual what I call

10   personal injury or bodily injury complaints, or are we going

11   to see any more class actions?

12             MR. SLATER:  From -- from what I've heard from

13   others, I think that there will certainly be personal injury

14   complaints starting to be filed, and there could be some other

15   class -- class action complaints filed.  I think that the

16   majority of what we'll see from this point forward will likely

17   be personal injury complaints.

18             THE COURT:  And I -- we saw your medical monitoring

19   complaint.  It was a nationwide complaint with possible sub

20   classes of each state.  Have you heard there's going to be any

21   more medical monitoring complaints or anything outside of the

22   categories that we've already seen?

23             MR. SLATER:  With regard to medical monitoring,

24   we're in touch with a few other law firms that were

25   considering filing, and they're either going to file or just

1    wait and incorporate what they want to do as part of the

2    master consolidated complaint process.

3              THE COURT:  Great.

4              MR. SLATER:  I don't anticipate any other categories

5    other than what we have -- you know, the four categories that

6    we've already seen so far.

7              THE COURT:  All right.  Next issue, service on

8    foreign defendants.  As I understand the issue, defendants are

9    requesting that at least one of the different categories of

10   complaints be served pursuant to the Hague on the foreign

11   defendants.  And is it the plaintiffs' position that, what,

12   service on the American companies is sufficient to bring in

13   the foreign companies, is that the issue?

14             MR. SLATER:  It's actually -- you got -- not the

15   first part, Judge.  The second part, and it might have been

16   confusing how we wrote the letter.  I apologize.

17             Starting with ZHP, because that's what we addressed

18   in the start of that heading, John Du (phonetic) is a director

19   of ZHP China, who happens also to be a high-level executive

20   for -- for the U.S. entities they own, but he was served in

21   his capacity as a director of ZHP China, and I think that we

22   have agreement that the two complaints that were served on him

23   is good service on ZHP China.  We -- we went New Jersey style

24   and we managed to get him one night.  And so as far as we're

25   concerned on ZHP China, that foreign entity has been served.

1          They were served with a personal injury complaint

2     and a class complaint on economics.  And from our perspective,

3     that is more than sufficient to bring them within this case,

4     and there's no need to serve them with any other complaint as

5     a service issue for the reason that we can easily just -- if

6     they say, well, you need to file another complaint covering

7     this issue or that issue, our response is, well, if we just

8     amended the existing complaint and added those allegations, we

9     wouldn't have to re-serve it under the Hague because we added

10    some new allegations, so let's just move forward now with ZHP;

11    they've been served.

12          And as to the other defendants, we believe that as

13    long as we serve one of the existing complaints through the

14    Hague, that that should be sufficient to bring them in front

15    of this Court, and that we shouldn't have to worry about

16    serving each type of complaint to bring them into the

17    jurisdiction of the Court.

18          THE COURT:  Before we hear from the defendants, I

19    think you said there are four categories.  Let's make sure

20    we're on the same page about what those categories are.

21          Is one the consumer economic claim?  Then there's

22    the bodily injury claim.  Then is the third-party payor a

23    separate category?

24          MR. SLATER:  If you want to slice and dice it, it

25    could be, but from our perspective it's an economic-based

1    claim.  So for purposes of our discussions, that and -- that

2    falls under the same heading as the consumer reimbursement

3    claims.  I mean either way they've been put on notice they

4    have to return money, et cetera.  That's the allegation.

5    So --

6             THE COURT:  Is there a fourth -- is the fourth

7    category medical monitoring?

8             MR. SLATER:  Again, if you were slicing and dicing.

9    But that's really a personal injury based/economic based.  It

10   really walks in both camps.

11            THE COURT:  Let me ask you this question before we

12   get to the defendants because it may help clarify the issue.

13   Do you know at the moment what proposed master complaints

14   plaintiffs are proposing to file?

15            MR. SLATER:  The final determination hasn't been

16   made on that, so it would be -- there's not a final decision

17   on that yet.

18            THE COURT:  Okay.

19            MR. HANSEL:  Your Honor, this is Greg Hansel for the

20   Maine Auto Dealers, third-party payor case.  As Adam Slater

21   said, the third-party payor case, it is an economic case, it's

22   a class case, and it's on behalf of a distinct group of

23   plaintiffs from the individual consumers.  There's a lot of

24   overlap, but there's some differences.  So we would just note

25   that it could be considered a separate category.

Colloquy                                14

1              But as far as the complaint goes, after the

2       leadership is established by the Court or by agreement or

3       both, I think, you know, the third-party payors may have a

4       separate master complaint, or they may do a combined master

5       complaint with the consumer economic group and possibly have,

6       you know, we're suggesting, separate counsel signing on behalf

7       of the third-party payors or a sub class of third-party

8       payors.

9              THE COURT:  Okay.  Mr. Goldberg, do you want to talk

10      for the defendants?

11             MR. GOLDBERG:  I will talk for ZHP, but I think Mr.

12      Trischler is going to raise other issues, the reason is

13      because ZHP sort of is in a different camp, having been served

14      by way of Mr. Du, who resides in New Jersey, and we have

15      agreed with plaintiffs that they have served ZHP in the

16      personal injury and consumer class action cases.

17             And, you know, for the purpose of the master

18      complaints or other categories of complaints, we will accept

19      service on behalf of ZHP.  But that really -- you know, the

20      ZHP issue is -- is really distinct from the other defendants,

21      some of whom have not been served at all, and I think Mr.

22      Trischler, on behalf of Mylan, will be talking to those

23      issues.

24             THE COURT:  Okay.  How many foreign defendants do we

25      have, besides ZHP and Mylan?

1            MR. TRISCHLER:  Your Honor, this is Clem Trischler.

2    Good afternoon.  What we -- what I can tell the Court, and I

3    can't give you a precise number, but if -- if we look at API

4    suppliers, Active Pharmaceutical Ingredient manufacturers that

5    are named in this case, CHP is one, Mylan Laboratories is

6    another.  There is a Hetero entity.  There's an Aurobindo

7    entity.  None of those, other than ZHP, that is in a unique

8    situation, have been served.  I'm not aware of any other API

9    manufacturers that are part of this consolidated litigation.

10           Now, if we get beyond the API manufacturers and

11   begin looking at finished dose manufacturers, I can't -- of

12   the 40 plus defendants, I can't tell you how many of those are

13   foreign entities that would need to be served.  But from the

14   defendants' perspective, what I can say is that I think the

15   issue of service is one of paramount importance because we're

16   -- we have been talking about meeting and conferring, and the

17   Court's interested in talking about discovery, and we're

18   contemplating entering discovery orders that are going to bind

19   parties that have never even been served and are not even at

20   this point participating in the litigation.

21           And so we would certainly like the service issue

22   addressed first, and I think what we proposed is a rather fair

23   compromise in whatever categories of cases that are going to

24   be part of this MDL.  The Court mentioned four, that's -- I've

25   actually seen it in litigations forming -- involving four

Colloquy                                                16

1    buckets of cases.

2            We believe those foreign defendants need to be

3    served for each class of complaint in accordance with

4    international law.  The plaintiffs' proposal seems to be,

5    well, if we serve them once in any case, that's good enough,

6    and I respectfully submit that that's not the case.

7            For instance, my client, Mylan Laboratories, is

8    named in a number of personal injury cases, one of them is a

9    case called Tack, T-A-C-K.  Let's assume hypothetically if the

10   plaintiffs' proposal were to be adopted, Mylan would be served

11   with the complaint in Tack and that would -- plaintiffs would

12   argue that that's good enough.

13           I submit, though, that when we start to get into

14   discovery, service in one class of cases does not create

15   jurisdiction over all claims, and it would simply be

16   inefficient to serve a defendant one time in one class of

17   cases where you don't have effect -- what I submit is

18   effective jurisdiction over that defendant.  And so if we want

19   to get all of the defendants properly before the Court, I

20   believe they need to be served with each category of

21   complaint, and that's what we've asked for.

22           THE COURT:  Mr. Trischler, let me ask you a question

23   or two.  The three companies, Mylan, Hetero, Aurobindo, do I

24   understand that they're all based in India?

25           MR. TRISCHLER:  That's certainly my understanding,

1    Your Honor.  Obviously, I'm only representing the Mylan

2    entities, but that's my understanding with the other two API

3    suppliers.

4            THE COURT:  Okay.  And let me -- let me just say --

5    let me understand what your position is.  At the moment, we

6    don't know how many different categories of cases we're

7    having, whether it's going to be two, three or four, or maybe

8    a different number.

9            Hypothetically, let's just say it's two, okay?  And

10   the first category is personal injury/bodily injury,

11   individual.  If Mylan or one of these other two foreign

12   companies -- let's say Mylan is served with one personal

13   injury case pursuant to the Hague in India.  Will it then

14   accept service for the 10 or 20 or 30 different complaints,

15   complaints naming the Mylan Laboratories India?

16           MR. TRISCHLER:  Under your hypothetical, Your Honor,

17   you're asking as to 20 or 30 other personal injury complaints?

18           THE COURT:  Yeah.  I mean if -- let me see if I can

19   maybe be clearer.  Hypothetically, there's a total of 20

20   personal injury complaints.  We know there's going to be more,

21   but let's just use 20.  Mylan India is served with one -- one

22   of the 20 complaints.  Will that satisfy service for the other

23   19?

24           MR. TRISCHLER:  Yes, that's -- that is the proposal

25   that we have made.

1        THE COURT:  All right.  That's what you're asking.

2   And the plaintiffs are saying, what, as long as any complaint

3   is served pursuant to the Hague, no matter what category it

4   falls in, that satisfies service for all different categories?

5   Is that the dispute?

6        MR. SLATER:  Yes, Your Honor.  And I think the

7   concept of all these different categories I think has taken on

8   sort of a -- sort of a false significance here, because again

9   let's -- let's take your hypothetical and serve -- and Mr.

10  Trischler's client is served with the Tack complaint, and then

11  a month later the plaintiff amends it and adds economic

12  reimbursement claims and all these other things, it wouldn't

13  have to be re-served.  They're in front of the court --

14       THE COURT:  Right.

15       MR. SLATER:  -- for whatever claims are brought.  So

16  I think, you know, this is kind of becoming -- it's getting a

17  false significance, I think, really is -- I don't think

18  there's any law that would support such an offering.

19       THE COURT:  But maybe -- this is an issue that's

20  ultimately going to be decided at the next in-person

21  conference.  I'm not going to decide this.  But it sounds like

22  we're making a mountain out of a molehill.

23       What I'm understanding is, ZHP is served, right?

24       MR. SLATER:  Yes.

25       THE COURT:  Okay.  So there's no dispute that Mylan,

Colloquy                                          19

1    Hetero, and Aurobindo haven't been served, India, the Indian

2    companies haven't been served yet.  So at a minimum,

3    plaintiffs have to serve these three companies pursuant to the

4    Hague, right?

5              MR. SLATER:  It appears that way now, --

6              THE COURT:  Okay.

7              MR. SLATER:  -- if we get them served in the U.S.,

8    but --

9              THE COURT:  Right.

10             MR. SLATER:  -- assuming they don't, yes, that's

11   true.

12             THE COURT:  So what's the difference if they have to

13   serve one, two, three, or four different complaints pursuant

14   to the Hague?  It's just a matter of paperwork, right?

15             MR. SLATER:  Well, I think some of them may already

16   be in the works and may be fairly far along.  So it may just

17   take a longer time and it's just more expenses and time.  I

18   mean that's all it is.

19             THE COURT:  Okay.  All right.  I -- let's defer that

20   issue.  I think I understand the issue.  I don't really think

21   it's a -- it's that significant of an issue, if in fact it's

22   conceded that the plaintiffs have to serve at least one

23   pursuant to the Hague on the Indian companies.  So I guess the

24   dust will clear by the next conference, but this is an issue

25   that will definitely be decided at the next conference.

1              Does anybody have a guesstimate, hypothetically, if

2    service starts today, how long it will take to serve properly,

3    pursuant to the Hague, in India?

4              MR. SLATER:  I don't have experience with India,

5    Your Honor.  I know generally people say anywhere from three

6    to nine months under Hague, usually closer to six to nine

7    months, unless someone wants to disagree with me, in any

8    country.  But that could vary.

9              MS. COHEN:  And -- and, Judge, this is Lori Cohen,

10   just -- just so I don't sit here quietly and let there be any

11   misconceptions.  We -- we represent Teva, as you've heard,

12   which is in a different category.  It's not the API, it's the

13   finished dose manufacturer.  We have an entity that's in

14   Israel and so it's -- you know, so it's not just India.  I

15   just wanted to make that clear.  So, you know, later you're

16   not wondering why I didn't speak up on that.

17             And again we sort of take -- take the same position

18   as -- as you've heard from, you know, from Mr. Trischler that

19   -- that we believe that the categories, you know, that they

20   have effective Hague service in each of the categories.  I

21   know that's going to be put off until the conference.

22             So I guess the only thing I would to the whole

23   discussion, for what it's worth, is, you know, we're trying to

24   reach a compromise here.  If we wanted to kind of stand on

25   ceremony, if you will, we probably would say, well, he must

1   serve each of the master complaints, once we figure out how

2   many they're going to be and what they are and who's in them.

3   And we're not going that far.  You know, we just want to have,

4   as I think you've heard, proper service and proper

5   considerations in each category.

6          THE COURT:  Let's -- let me -- let me focus on what

7   I think is a more important issue related to the service

8   issue, and maybe if we could get a resolution of that issue,

9   we can reach a compromise.

10          Defendants, let's -- let's -- I'm not picking on

11   anybody, let's take Mylan India, okay, Mr. Trischler?  But I'm

12   not picking on you.

13          MR. TRISCHLER:  Sure.

14          THE COURT:  Will it be Mylan Indian's -- India's

15   position that unless and until it is served pursuant to the

16   Hague, six months, seven months, eight months, nine months,

17   whenever, that it does not have to respond to discovery in the

18   case?

19          MR. TRISCHLER:  Your Honor, that's a -- that's a

20   very good and fair question, and it's -- it's part of the

21   reason for the preliminary discovery proposal that the

22   defendants put together.  And I can only answer this question

23   on behalf of Mylan, I can't answer it for other API suppliers

24   because, for instance, from my discussions with our colleagues

25   on the defense side, I know that Aurobindo India and Hetero

1    India are not even represented by counsel yet.  So we have had

2    no communication with them.  So I certainly can't speak to

3    what their position would be.

4            But we proposed, you know, as part of the -- the

5    preliminary discovery proposal that we would offer to produce

6    certain documents under protective order, including, for an

7    API supplier like Mylan Limited, the drug master file that

8    would include the processes and procedures pursuant to which

9    the API was produced, because the plaintiffs have indicated

10   what they're interested in knowing preliminarily is how -- how

11   did the impurities get into the drug.  The drug master file

12   will explain the process.  It will explain the testing and

13   quality control measures.  We -- we've offered to produce

14   that.

15           So speaking only upon behalf of my client, and

16   assuming it was pursuant to an order that was without waiving

17   (inaudible) objections, the jurisdiction and venue, what we've

18   indicated that we would do for Mylan Laboratories Limited is

19   we'd be willing to confer to (inaudible) in litigation to

20   produce that preliminary discovery while the issue of service

21   is being taken care of.  I -- I think that's a fair

22   compromise.  But, again, I can only offer that on behalf of my

23   client, not for other API manufacturers who are not even yet

24   represented.

25           THE COURT:  Well, let's see if we can get the

Colloquy                                23

1    question answered, Mr. Trischler, because I really think this

2    is important.  The Court has no interest, zero interest in

3    putting this case on ice for six, seven, eight, nine months,

4    okay?  I -- we're just going to have issues.  I'm just trying

5    to think this out.

6         I think a fair compromise would be this.  I've --

7    we'll get to the core document discussion in this call.  I'm

8    going to decide that issue.  I'm not going to decide it today,

9    I'm going to decide it when we meet.  But there's going to be

10   a fair compromise between what the defendants have offered and

11   what the plaintiffs have asked for.

12        I think what the plaintiffs have asked for is not

13   within the contemplation of what the Court envisioned, but on

14   the other hand, I think the defendants' voluntary -- what they

15   voluntarily agreed to produce is too narrow.  And I anticipate

16   that we'll roll up our sleeves and the Court will identify the

17   core documents to be produced.

18        So I guess the question is, Mr. Trischler, and if

19   you're not prepared to answer it, be prepared to answer it

20   when you're here in a couple weeks, will your client, Ms.

21   Cohen, will your client take the position that you don't have

22   to produce any documents until you're served pursuant to the

23   Hague?

24        MS. COHEN:  I'm happy -- I'm happy to jump in,

25   unless, Mr. Trischler, you want to jump in.  But to respond on

1    behalf of -- jumping to Israel as opposed to India here -- and

2    Teva.  We -- we have never, Judge, taken the position, and I

3    think we've made this clear in our meet and confers, that we

4    would hold off or hold in abeyance, you know, this "core

5    discovery," whatever that is, wherever that lands, that we

6    would hold off on producing that until service is effected,

7    you know, in all regards.  I think that, from our perspective,

8    again, it's a finished dose manufacturer.  So (inaudible) the

9    list you were talking about in the letter, we -- we could

10   produce that without the Israeli entity being served under the

11   Hague, if that answers your question.  So we're not going to -

12   -

13        THE COURT:  Yeah, but -- but I'm telling you right

14   now that the core documents is going to be broader than what

15   you proposed.  It's going to be narrower -- it's not going to

16   be as extensive as what plaintiff requests, but it's going to

17   be broader than what you propose.  It's going to be what the

18   Court envisioned:  identifiable, clearly relevant, non-

19   disputable, key documents.  That's what we want to get at,

20   right at the -- right at the crux.

21        MS. COHEN:  Yes.

22        THE COURT:  Because I think a fair compromise would

23   be that if the plaintiffs -- if the defendants would agree to

24   participate in discovery and this core discovery as the

25   service moves along, then plaintiffs bite the bullet and

 1    instead of serving one complaint pursuant to the Hague, serve

 2    two or three or four.  I think that would be a very fair

 3    compromise because that -- that gets the case rolling.  I

 4    don't see any material burden from serving one or two or three

 5    complaints pursuant to the Hague, and then everybody's due

 6    process and whatever concerns can be resolved.

 7            So why don't you chew on that and we'll -- we'll

 8    decide that at the next conference.  Okay?

 9            MS. COHEN:  Okay.

10            MR. GOLDBERG:  Your Honor, this is --

11            MS. COHEN:  Thank you, Your Honor.

12            MR. GOLDBERG:  Your Honor, this is Seth -- this is

13    Seth Goldberg.  I just -- I hate to interrupt everything, but

14    I wanted to let you know that I'm going to be excusing myself

15    from the call and Ms. Cohen and Mr. Trischler will be filling

16    in for me as necessary.

17            THE COURT:  So long, counsel.

18            MR. GOLDBERG:  Thank you.

19            MR. HONIK:  Judge Schneider, this -- this is Ruben

20    Honik.  I just wanted to apprise the Court of one quick fact

21    that was brought to my attention that touches upon the issues

22    we've just been talking about, and that is that the MSP class

23    rep, the TPP has -- has apprised me that Hague service was

24    effected on Teva in Israel and that that has already occurred.

25            THE COURT:  Good.  Then there's -- then the only

1    issue that has to be resolved is whether there's going to be

2    more than one service on Teva Israel, right?

3              MR. HONIK:  Yes.

4              MS. COHEN:  Right, Your Honor.

5              THE COURT:  Right.  And that will be resolved at the

6    -- when we get together in a couple weeks.  Either me or Judge

7    Kugler will finally decide that, probably Judge Kugler, when

8    we get together.

9              Okay.  So --

10             MR. SMITH:  If I may, Your Honor, this is Richard

11   Smith.  I think one reason that we're a bit hamstrung here on

12   the defense side is that there are some defendants who have

13   never been served at all and therefore, as you heard a moment

14   ago, do not have counsel, --

15             THE COURT:  Right.

16             MR. SMITH:  -- are not in the case, and so -- you

17   know, Aurobindo being one example, Hetero being another

18   example.  The lawyers who are on the call right now for the

19   defendants are all in situations where we have an

20   international defendant who has not been served or in some

21   instances, as you've just heard, have been served, and a U.S.

22   defendant who has been served.  And so we're here for that

23   U.S. defendant, and in some cases for both, and we, depending

24   on the scope of discovery, are able to respond to discovery

25   because we're here for a defendant.  But you will have some

1    other perhaps important defendants, such as Aurobindo or

2    Hetero, that although we have inquired what their position may

3    be, we have not been able to get an answer on the defense side

4    of -- of their position --

5                THE COURT:  Right.

6                MR. SMITH:  -- because they do not have counsel and

7    they're not in the case.  And so that -- that may still be an

8    issue two weeks from now when we're in front of you, and I

9    just wanted to flag it now so that we're all thinking about

10   that.  We certainly will be thinking about it on the defense

11   side over the next two weeks.

12               THE COURT:  I appreciate that, counsel.  It's a

13   point well taken.  But I think this is what I would relay to

14   Hetero, Aurobindo, and whoever else hasn't been served yet.

15   It's implausible to this Court that they don't know that they

16   were named in this MDL and that they're a party to these

17   complaints.  It's simply inconceivable that that's the case.

18               Their due process rights are obviously going to be

19   100 percent protected.  They have a right and they can do

20   whatever they want, but the fact of the matter is, this

21   litigation is proceeding; the train is leaving the station.

22               If these parties decide they want to wait for the

23   last possible moment to enter their appearance, they have that

24   right; they're welcome to do that.  But they are sophisticated

25   people and they know or should know that we're not holding up

1    the proceedings in this case waiting for them to decide to

2    enter their appearances.  So if they make a strategic decision

3    not to participate in the litigation or not to give their

4    input for their calls, the consequences are going to have to

5    fall on their shoulders.

6            But, obviously, clearly we're not going to do

7    anything to impact or prejudice their rights, except if they

8    don't know it, tell them to look at the docket and get the

9    transcript.  The train is leaving the station.  If they want

10   to hop on and get their input into how we do things, they have

11   that right.  But if they want to sit back and do nothing,

12   that's their right, wherever the consequences, chips may fall,

13   so be it.  That's all I have to say on that point, counsel.

14           So I think we've been through one, two, and three.

15   The service on the foreign defendants, we understand what the

16   issue is, and that issue is going to be finally resolved at

17   the next conference.

18           The next issue is the core discovery.  I've looked

19   at it.  I've looked at it in detail.  You know my general

20   thoughts.  I think the plaintiffs, rather than focusing on

21   what I envision as "core documents," served the Rule 34

22   document request.  That was not the purpose of this effort.

23           The purpose of this effort was to identify the

24   clearly relevant, relatively easily retrievable, discreet,

25   identifiable documents; the ANDA, the communications with the

1    FDA.

2           I read your medical monitoring complaint, Mr.

3    Slater.  You obviously -- or somebody obviously understands

4    the inspection process and what types of inspection reports,

5    et cetera, are prepared.  That is what the Court envisioned

6    that the defendant would produce, not something that it would

7    have to do an electronic -- a sophisticated electronic

8    protocol to search until we get the final protocol in place.

9           So I would just ask if you could work with the

10   defendants to narrow the scope of what you're asking for to

11   relatively easily retrievable, identifiable, key, non-

12   disputable, relevant, non-privileged documents that nobody can

13   have any legitimate question, should be produced in discovery.

14   I'm confident you can work that out.

15          At the moment, are you going to get the insurance

16   policy information in the case at some time?  Of course.  Rule

17   26 says you're entitled to it; you're going to get it.  Do you

18   really need that information this early in the case, rather

19   than focusing on what, you know, Judge Kugler identified as

20   the key documents?

21          An example is number six, "How and when you

22   discovered that the contamination of the Valsartan occurred

23   and the steps taken in response."

24          Probably that's a Rule 34 request, but it's hard to

25   say that it's core discovery because it will take so much

1    effort to identify and track down those documents.  So I would

2    just ask you, if you could sharpen your pencil a little bit,

3    plaintiffs, and get a revised list to defendants, meet and

4    confer, and we'll go over it at the next conference.

5              MR. SLATER:  Of course, Judge.  And just so you

6    know, I mean we served this on the defense and we had a meet

7    and confer on Monday, and I think that ultimately we needed

8    the Court's guidance because our approach was, tell us what

9    you are willing to give us, tell us what you dispute and why,

10   and let's negotiate through the disputed request so we can at

11   least know why you're saying this isn't core and what would be

12   the burden, but we weren't able to get engagement on that.

13   But hopefully now that we've had this discussion, we can get

14   some engagement.

15             And the second part of that, Your Honor, and maybe

16   you can give us some guidance is, we also said, look, is it

17   maybe that you'll want to stage some of this -- you know, this

18   discovery and maybe you can tell us, look, this might take a

19   little longer, and we said we're completely open to that also.

20             So, you know, we felt like we wanted to put on the

21   table what we're looking for and then get from the defense,

22   okay, we're agreeing to this, this is what's in dispute, let's

23   talk about how we narrow the dispute.

24             I think that's what you're saying, that's -- that's

25   what we are -- we're fully prepared to do and were prepared to

1    do Monday.

2         THE COURT:  Good.  Well, you can just tell by my

3    examples, insurance polices, litigation holes and hold harm --

4    and -- I'm sorry, litigation holes, communications with PBMs,

5    I mean you'll request those in Rule 34 document requests, but

6    agreements with wholesalers, do you really need that right

7    now?  Is that -- is what we're talking about with -- I don't

8    really think that's within our contemplation of what is

9    "core."

10        So, again, I think you have the benefit of the

11   Court's thoughts.  We're trying to reach a middle ground

12   between Rule 34 and Rule 26.  In no way, shape, or form does

13   this early production prejudice your right to make Rule 34

14   requests.  But we think it's important that you get these core

15   documents.  It'll -- it'll help guide your discovery in the

16   case so you don't go down a rabbit hole.  It'll help you

17   identify relevant custodians you want to use and so forth.

18        Okay.  That's the benefit of the Court's thoughts on

19   that issue.  So we'll discuss that at the next conference, the

20   core discovery, and we'll have a final direction on that.

21        Number five, plaintiffs' initial profile forms.

22   That's fine.  We're waiting for the Court's -- parties'

23   comments.  Hopefully we're hear further on that at the next

24   conference.

25        The ESI protocol.  Again, I think that is one of

1   those issues that is more involved and will take a lot of

2   discussion, and we'll get an update on that at the next

3   conference.

4        With regard to what you call a protective order,

5   what we call a discovery confidentiality order, I anticipate

6   that this order will be finally resolved at our next meeting.

7   It's hard for the Court to weigh in on the dispute.  I don't

8   know what the disputed terms are.

9        I think from reading the papers, this is a different

10  case than Benicar was.  It's more complicated because we have

11  different types of defendants who might be in competition with

12  each other, so there might be situations or there is likely to

13  be situations where one defendant doesn't want another

14  defendant to see certain of its documents.  We'll have to

15  account for that.

16       I've relayed to you my thoughts about

17  "confidentiality."  I think we're putting the cart before the

18  horse on that.  I'm very sensitive to the confidentiality

19  issue.

20       I remember when I practiced, how easy it was to

21  stamp documents confidential.  If the Court determines that

22  parties are over-designating documents confidential, there are

23  consequences for that.  And in all the years I've been doing

24  this, I've only had one issue, one legitimate issue in 12

25  years about confidentiality.

1          So in principle there should be a confidentiality

2   provision in the order parties can designate.  The rubber

3   meets the road when the Court has to decide whether or not a

4   confidentiality designation is appropriate or not.

5          If a document is confidential and it deserves to be

6   confidential, it will be -- the designation will be upheld;

7   medical records, personnel records, secret formulas, et

8   cetera.  But we all know just because a document is not

9   helpful to a party or a party might be embarrassed about, is

10  not a sufficient grounds for designating a document as

11  confidential.  So I'm not so worried about that issue.

12         With regard to using the Benicar order, again I

13  don't know the issues that the parties dispute, but it just

14  seems to me we have to account for the special circumstances

15  of this case.

16         In a perfect world, what the best of all

17  circumstances would be, to take the language from Benicar and

18  use that as a form, and defendants can add whatever they want,

19  this way the Court doesn't have to re-read language that it

20  already approved.  So we'll use Appendix S and just language

21  the parties dispute or want to use, and whatever the disputes

22  are, we'll resolve them at the next conference.  That's the

23  best I can say, counsel.

24         MR. SLATER:  Thank you, Judge.  And that's -- that's

25  the approach we've asked for, just so that we didn't have to

 1   -- that language that -- a lot of the basic language is the

 2   same between -- or similar between the two orders.  So we just

 3   wanted to start with what the Court has blessed and then --

 4   that helps us a lot.  I think we'll be able to look that up

 5   and --

 6             THE COURT:  Yeah.

 7             MR. SLATER:  -- modify the order now.

 8             THE COURT:  If there's no dispute about the <u>Benicar</u>

 9   language, use it, because we already approved it.  We don't

10   have to re-read it.  And identify the language in dispute and

11   we'll -- we'll get it resolved.

12             MS. COHEN:  And, Judge, this is -- this is Lori

13   Cohen again.  And our team has been kind of taking the lead on

14   (inaudible).  We definitely will -- we'll go back and

15   (inaudible).

16             As you can see from our submission, we've spent a

17   lot of time, you know, trying to facilitate the discussions

18   between all the different defendants.  You know, as you've

19   heard already and you know, there's many defendants, there's

20   many defendant groups.  You can imagine it's a lot of

21   (inaudible), no offense taken by anybody, I hope.

22             But, you know, we obviously sent out a protective

23   order draft that was based on the District of New Jersey, the

24   template protective order.  And so we didn't pull this out of

25   the air, we actually used one that was approved in your

1    district.  We had all the different defendants and their --

2    their in-house counsel (inaudible) and we've submitted that

3    before the last conference.

4              We really just wanted the plaintiffs to take the

5    time and look at our draft.  We did also incorporate the

6    Benicar information.  We didn't ignore that.  We looked at

7    that; we incorporated it where appropriate.

8              But as you said, this is a different situation, we

9    have different concerns.  And I think the plaintiffs have just

10   not been willing to look at the draft we sent them and instead

11   only want to go by Benicar.  So we tried to merge the district

12   template, the Benicar information, other MDLs, and input from

13   all the different defendants.  And I think what would really

14   move things along efficiently is if the plaintiffs would --

15   would look at our draft and take -- you know, take some time

16   with it, as opposed to us having to scrap it, start over and

17   go back to the drawing board with all the different defendants

18   here.

19             And I think in terms of the actual issues, I think

20   you've hit very, you know, (inaudible) key issue, which is the

21   different defendants, and that's why we want to have a two-

22   tiered, you know, confidentiality approach.  As you probably

23   saw, that wasn't practical or needed in Benicar.  So that's a

24   big issue.  Here I have to deal with (inaudible) no

25   inadvertent (inaudible) designation.

1          So there are a couple of key issues we've tried to

2     meet and confer.  And I think it would help a lot of

3     plaintiffs would kind of take a look at the draft we sent them

4     back before the last conference.

5          THE COURT:  That reminds me of -- let me -- I hate

6     to butt in, but let me just -- I don't want to lose this

7     thought.  I just wonder if you want to -- if you should build

8     into the order a 50 -- Federal Rule of Evidence 502(d) order,

9     which deals with the inadvertent production and waiver.

10    Frankly, I don't know why --

11         MR. SLATER:  It's in there, Judge.

12         THE COURT:  Okay.  If it's in there, that's fine.

13         MR. SLATER:  The Benicar order basically addressed

14    it because we had this exact issue raised when we -- when we

15    -- when we argued over the Benicar order.  So I think it

16    actually does address -- there's a section on inadvertent

17    production that says that they're protected and they can

18    redesignate or pull things back.  There's a whole process for

19    that.

20         UNIDENTIFIED COUNSEL:  The defendants' version also

21    has a provision on that as well.

22         THE COURT:  Listen, we've -- we approved -- we

23    approved the Benicar order, obviously.  Appendix S is approved

24    by the Court.  I probably entered a thousand of those orders.

25    So all that language is agreeable.  There's no dispute about

Colloquy                                                        37

1    that language.  So hopefully that language can be used and

2    then identify what's in dispute.

3                MR. NIGH:  Yes, Your Honor.  This is -- this is

4    Daniel Nigh.  I wanted to be fair to Ms. Cohen's point of view

5    and that is, we understand and we've reviewed that order in

6    detail.  We've reviewed that draft.  And basically the

7    position that we have tried to accomplish is to take whatever

8    the changes are that Ms. Cohen has proposed in her draft and

9    kind of identify those, and to identify those changes in the

10   draft proposal that we have that utilizes the language agreed

11   upon in Benicar.  So if there's anything that's missing, we

12   would just ask for the defendants to cite those as well.

13               THE COURT:  Yeah.  I think you're going to work this

14   out.  I don't think this is going to be a controversial issue,

15   and I think we're going to have so many more substantive

16   issues to deal with in the case, I think we'll get through the

17   DCO issue.

18               I think that takes us through, let me double check,

19   plaintiffs' agenda.  Plaintiff, did we miss any issues?

20               MR. SLATER:  We did not, Your Honor.  When we get to

21   the defense, there's something I'd like to just bring to the

22   Court's attention.  But I think as to plaintiffs' issues,

23   we've covered them.

24               THE COURT:  Okay.  Let's turn the floor over to the

25   defense.  I have your letter.  I'm not -- letters.  I'm not

1    really sure what issues you want to address now, so the floor

2    is yours.

3              MR. SLATER:  Your Honor, before we get into that, is

4    it okay if I just -- I think we have to get on the same page

5    process-wise for the future conferences with Your Honor.

6              THE COURT:  I made a note about that.  What -- what

7    do you -- I was going to ask who should be --

8              MR. SLATER: (Inaudible) meet and confer Monday as,

9    you know, we understand that Your Honor wants things be done

10   so we can talk through the issues and figure out what was --

11   what was in dispute or what was not so we can put our joint

12   agenda together for Your Honor.

13             During the call on Monday, we told the defense we

14   were preparing the joint agenda for today's conference and

15   we'd send it to them later or the following morning.  We sent

16   it Monday night, late in the night.

17             And then we got an email from the defense on Tuesday

18   that said thanks for sending that over with all of our

19   positions laid out in it, but we're going to be sending a

20   letter to the Court later today.  And we -- we said, well, we

21   don't understand, we said we were going to do a joint agenda.

22   And our -- basically the response was, well, this is what the

23   Court wants and this is our understanding of how the Court

24   wants it done, which was very confusing to us.

25             So we then said to the defense, okay, but can you

1    tell us if there's anything you're going to put in your letter
2    that's beyond what we discussed on Monday because we only
3    addressed what we discussed and if there's another issue, we'd
4    like to know so we can address it.  We didn't get a response.
5           We then got the defendants' letter late yesterday,
6    and we're somewhat chagrined that there was a bunch of
7    substantive briefing on a bunch of issues that were never
8    discussed, that we didn't know was going to come to the Court.
9           Now, we're confident that those issues aren't going
10   to really have much significance at this point.  We feel like
11   it was -- it was -- we're not that concerned.  But as we go
12   forward, we really felt like we should at least bring it to
13   Your Honor's attention so we can at least be on the same page,
14   to hopefully do these joint agendas where both sides know what
15   they're saying --
16              THE COURT:  Right.
17              MR. SLATER:  -- and both sides can address it --
18              THE COURT:  Right.
19              MR. SLATER:  -- and not have this type of situation
20   repeat.
21              THE COURT:  Well, what the Court envisioned in a
22   perfect world would be a concise, joint letter listing the
23   issues that the parties want to address and, you know, a very
24   brief summary of what their positions are.  If it's -- if it's
25   impractical for the parties to do that, then prepare the joint

1    agenda, propose the issue that are going to be discussed, and

2    then if each side feels it needs to submit a letter brief,

3    submit separate letter briefs, but only on the issues that

4    both parties are going to address so that everybody's on

5    notice of what's discussed.  That would be the first thing.

6           The second thing is, frankly, I didn't anticipate

7    this many people on this call.  That's fine, but maybe at the

8    next meeting we can find out who is going to be on these

9    calls.  I'll leave it at that.

10          UNIDENTIFIED COUNSEL:  That's understood.

11          THE COURT:  Okay.  Defendant, what issues do you

12   want to address?

13          MS. COHEN:  Judge, this is -- this is Lori Cohen

14   again.  Just to -- to respond to that, and we're obviously

15   happy now with that (inaudible) to address the next agenda the

16   way that it's been described and have it as containing one --

17   one, you know, letter, as you said, with each position.  We

18   just weren't certain of how to approach it this time and

19   that's what we said.  But I do think if you look at our

20   letter, we did follow the agenda items that we jointly sent to

21   you and albeit with some background admittedly.

22          THE COURT:  No problem.

23          MS. COHEN:  In part three of the letter, you'll see

24   the agenda items match perfectly and mirror exactly what the

25   parties sent in.

Colloquy                                    41

1          But I think going to the letter, and I'll, of
2    course, let others chime in.  You know, on the first -- on the
3    first issue, Judge, we obviously have already talked about the
4    core discovery issues, number one.  And I think that's been
5    addressed.
6          I think on the second issue, it talks about the
7    service issue on the foreign defendants.  We've talked about
8    the confidentiality order.  We'll obviously try to meet and
9    confer on that.
10         And the only other -- the only thing I would say is
11   that I do think that we'll be looking at the printed profile
12   forms and the ESI protocols.  We just got those, you know,
13   like less than two days ago.  We'll be looking at those and
14   sending comments.  You probably don't want to hear us talk now
15   until we have a chance to meet and confer.  So we'll do that.
16   And I don't know if anybody else on the -- on the defense side
17   has anything more to add.  But I do think we tracked the
18   agenda; we covered the same issues plaintiff did, so I don't
19   think we've gone beyond that, other than the background we
20   provided.
21         THE COURT:  Counsel, this is our first call; we're
22   just getting together.  I'm sure things are going to smooth
23   out, and I certainly have no reservations with the caliber of
24   counsel in this case, that there's going to be disagreements,
25   but we're going to proceed along professionally and everybody

Colloquy                                            42

 1    is going to be on an equal play and will get equal say and

 2    argument and brief, whatever they reasonably want.

 3         I would add one more thing.  There's one more thing

 4    I have to rely on you all for help on this.

 5         The way we worked it out was, when we get together

 6    at the end of the month, we schedule to meet with me at 10:00

 7    and to meet with Judge Kugler at 10:00.  Some months we're

 8    going to have a lot of issues to discuss, motions to address,

 9    and we'll need the time.  Some months maybe we won't need as

10    much time, and I don't want you all wasting your time.  So

11    I'll rely on you.  If you tell me, you know, a day or two

12    before when we're supposed to get together that, Judge, we

13    don't need four hours or three hours, why don't we get

14    together at 12 or 1 or 11, that's fine with me.  I'm going to

15    defer to you.  You know how as well as I do how much time is

16    needed.

17         The default setting is 10:00, but if you think we

18    reasonably and practically don't need that time, just let me

19    know and I'll move back the start time of our conference.

20    Okay?

21         UNIDENTIFIED COUNSEL:  That's great.  Thank you.

22         MS. COHEN:  Thank you.

23         THE COURT:  Okay.  For the good of the order, are

24    there any other issues to address?

25         UNIDENTIFIED COUNSEL:  No other issues.

Colloquy                                         43

1            THE COURT:  Great.  Hearing none, have a good day,

2    counsel.  We're adjourned.

3            MR. HANSEL:  Judge?

4            THE COURT:  Yeah.  Oh, we have to discuss that issue

5    with Maine.  Right.

6            MR. HANSEL:  I thought you decided you didn't want

7    to do it.

8            THE COURT:  No.  No, no, no, no.  So why don't

9    defense counsel hang up.  Right, right, right, right.

10           MS. COHEN:  Okay.  Thank you, Your Honor.

11           UNIDENTIFIED COUNSEL:  Goodbye.

12           THE COURT:  So is just -- is just plaintiffs'

13   counsel on the phone?

14           UNIDENTIFIED COUNSEL:  Yes.

15           MR. SLATER:  Hopefully.

16           THE COURT:  Can you guys -- oh, wait a minute.

17   Should this be on the record or off the record?

18           MR. SLATER:  Off the record, if possible.

19           THE COURT:  Off the record.  We're off the record.

20   We're adjourned.

21       (Court adjourned)

22                              * * * * *

23

24

25

44

1                      C E R T I F I C A T I O N

2

3            I, Roxanne Galanti, court approved transcriber,

4     certify that the foregoing is a correct transcript from the

5     official electronic sound recording of the proceedings in the

6     above-entitled matter.

7     _____        May 6, 2019

8     ROXANNE GALANTI

9     DIANA DOMAN TRANSCRIBING, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25