UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | ) | 19-MD-2875(RBK-JS) |
| | ) | |
| | ) | Camden, NJ |
| VALSARTAN NDMA PRODUCTS | ) | May 8, 2019 |
| LIABILITY LITIGATION | ) | 3:33 p.m. |

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:

ADAM M. SLATER, ESQUIRE
MAZIE, SLATER, KATZ & FREEMAN, LLC
103 Eisenhower Parkway
2nd Floor
Roseland, NJ 07068

RUBEN HONIK, ESQUIRE
DAVID J. STANOCH, ESQ.
GOLOMB & HONIK, PC
1835 Market Street
Suite 2900
Philadelphia, PA 19103

DANIEL NIGH, ESQUIRE
LEVIN PAPANTONIO
316 South Baylen Street
Pensacola, FL 32502

CONLEE WHITELEY, ESQ.
KENNER & WHITELEY
701 Camp Street
New Orleans, LA 70130

BEHRAM V. PAREKH, ESQ.
KIRTLAND & PACKARD, LLP
1638 Pacific Coast Hwy.
Redondo Beach, CA 90277

APPEARANCES: (cont.)

For the Plaintiffs: MIKAL C. WATTS, ESQ.
WATTS GUERA, LLP
4 Dominion Drive, Bldg. 3
Suite 100
San Antonio, TX 78257

For the Defendants: SETH A. GOLDBERG, ESQUIRE
JESSICA A. PRISELAC, ESQUIRE
ALAN KLEIN, ESQUIRE
DUANE MORRIS, LLP
30 South 17th Street
Philadelphia, PA 19103

LORI G. COHEN, ESQUIRE
VICTORIA D. LOCKARD, ESQUIRE
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305

CLEM C. TRISCHLER, ESQUIRE
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre
38th Floor
Pittsburgh, PA 15219

RICHARD W. SMITH, ESQUIRE
WILEY REIN, LLP
1776 K Street NW
Washington, DC 20006

BRIAN RUBENSTEIN, ESQUIRE
GREENBERG TRAURIG
1717 Arch Street
Suite 400
Philadelphia, PA 19103

Audio Operator: SARAH ECKERT

Transcribed by: DIANA DOMAN TRANSCRIBING, LLC
P.O. Box 129
Gibbsboro, NJ 08026
Office: (856) 435-7172
Fax: (856) 435-7124
Email: dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

I N D E X

| COLLOQUY RE: | PAGE |
|---|---|
| Foreign Service Issue | 4 |
| Streamlined Service Protocol | 5 |
| ESI Protocol | 7 |
| Stipulation of Dismissal | 10 |
| Profile Form/Fact Sheet | 13 |
| Discovery Confidentiality Order | 27 |
| Depository Issue | 28 |
| State Court Issue | 28 |

*Telephone speakers were at time unclear

(The following was heard via telephone conference at 3:33 p.m.)

THE COURT: ...yourselves for the record, so that if this transcript is transcribed the court reporter knows who's talking. Thank you for your agenda, I received it, reviewed it. I have it in front of me. Why don't we just go through the issues in the order in which they're mentioned

The first issue is the foreign service issue. In light of the agreement with I think one party, and Judge Kugler's order that was entered I think today or last night, I take it we now don't have any issues about what has to be served on the foreign defendants. Am I correct about that?

MR. HONIK: I believe that's correct, Your Honor. Ruben Honik.

THE COURT: So let me ask plaintiffs, I don't remember, refresh my recollection, did we set a deadline for the plaintiffs to file their three master complaints?

MR. HONIK: Ruben Honik, Your Honor. I think we proposed a time line when we were last together in Camden. I'm unaware, unless someone can -- can enlighten me that an order's been issued on that point. But we were contemplating a period of 60 days from when the leadership order was issued.

THE COURT: So let me -- the order you're referring to was CMO-6 that was entered on May 6.

MR. HONIK: That's correct, Your Honor.

THE COURT: So are you proposing to, just by way of estimation, filing it by, let's say July 8?

MR. HONIK: Yes.

THE COURT: Can you do it any earlier?

MR. HONIK: I think the answer is a qualified yes. I would feel more comfortable caucusing with leadership. But if by a little earlier or somewhat earlier Your Honor's thinking 45 days, I think that would be imminently achievable.

THE COURT: All right. How about June 17th, Mr. Honik. And if there's a -- if there's a problem, you let us know and there won't be any problem with an extension. This way we'll get it in before the start of the summer, after July 4 who knows who's going to be around. And if we get it on June 17 we can discuss it if we have to at the in-person conference at the end of June.

MR. HONIK: That's fine, Your Honor. I think that will work well.

THE COURT: Okay. And like everything else I talk about, Mr. Honik, if there's a good reason to extend the deadline, we'll do it. Okay?

MR. HONIK: I appreciate that.

THE COURT: Issue number two, streamlined service protocol. Is that an issue that we think can be resolved by the conference on May 29th?

MR. HONIK: Your Honor, it's Ruben Honik again. I

think to a considerable extent that's been resolved by the Court's ruling on service. Inasmuch as after the one complaint as to each foreign defendant is accomplished, I think the -- I don't have the order in front of me, but I think the Court created a opportunity for us to email subsequent complaints.

THE COURT: Well, I mean, has that -- I seem to recall in the past in another -- the other MDL we had, we had a protocol for doing that so there was no misunderstanding. Is that going to be set up here?

MR. NIGH: Your Honor, this is Daniel Nigh for the plaintiffs. We did have a protocol on Benicar where we, after we would file a lawsuit, we would send an email to each of the applicable defendants for that lawsuit. One suggestion that we're trying to work out and see if it's feasible is whether or not we can have a platform where we could upload the lawsuit and the defendants would have the ability to get the lawsuits from there.

So it would probably make a little bit more sense instead of having all these different plaintiffs across the nation trying to email 41 different defendants, if we had a central platform for it. That’s our proposal at this time.

THE COURT: Is that what we did in Benicar?

MR. NIGH: No. Because in Benicar we only had --

THE COURT: Right.

MR. NIGH: -- we had two defendants that we had to worry about --

THE COURT: Right.

MR. NIGH: -- for service.

THE COURT: Right.

MR. NIGH: So that was a lot easier to keep track of.

THE COURT: Right. Mr. Goldberg, are you in discussions with the plaintiffs about this? I suppose if there's going to be new bodily injury complaints, there ought to be a protocol for service.

MR. GOLDBERG: Yeah. We haven't yet started the discussion, but this is something I am confident we'll, you know, find agreement on, because it will just help everyone to have a efficient process here. So hopefully we can do that over the next few weeks and have this -- or have agreement on this by the end of the month.

THE COURT: Okay. So eventually an order will be entered and the parties still have to meet and confer on it, right?

MR. GOLDBERG: Yes.

MR. NIGH: Yes.

THE COURT: Good. ESI protocol. This is a substantive issue. Where do you get this -- we're going to leave the custodians and the search terms blank for the time

being? More elbow -- more work has to be done to get to the bottom of that, but I don't see any reason why these other issues can't be resolved and get an order entered, and address and decide any protocol issues at our meeting the morning of the 29th.

I know plaintiffs had a comment about meeting and conferring, but I take it from the defendants' letter and comments that they're on board with that, and it's just a matter of hooking up to get a time to talk about this. Am I right?

MR. SMITH: Richard Smith, Your Honor. I believe you are correct. We are looking at the times and dates to be able to meet and confer, but I don't see any issue there. And I honestly don't believe that we're very far apart in our protocols.

THE COURT: Okay. If there are any issues in dispute, what I need to see before we get together in person is I need to see the competing language that each side has, so that I can be prepared when get together, and if we have to argue the issue, I'll be prepared to know what the dispute is. Okay?

So the goal is to resolve the ESI protocol disputes by the end of the month if there are any. And if there are any, when you send in the agenda for the call, attach copies of the competing versions of the language that the parties are

disputing. Okay?

MR. SMITH: Okay, Your Honor.

THE COURT: I don't fully understand the comment about plaintiffs' "requests" for information related to ESI, but is that an issue that we should address on this call?

MR. SLATER: Maybe curbing (phonetic) that early, Judge. Adam Slater speaking. We sent a letter, along with our proposed ESI protocol, asking for information about how the documents are maintained and how the systems are set up, which helps us to anticipate what we're going to need in our document repository and how -- which platform, frankly, we're going to want to use.

I won’t get hyper specific now, but -- and that's the process we went through in the last MDL where we had asked for a 30(b)(6) deposition. Your Honor said no, you'd prefer us to meet and confer and ask the questions and get the information directly.

So we've proposed that to the defense to talk through these issues so that we can get as much of the information as we can, and I would propose to the extent we can't get information, or can't resolve an issue one way or the other, we should be able to put that in front of Your Honor at the next conference at the end of the month.

THE COURT: All right. That's fine. I'm not a big fan of discovery about discovery, so if you can avoid a

30(b)(6) deposition about these issues, and instead just talk informally over the phone, or over a conference room table, I think that would be wise and much more productive. But if there's a dispute, we'll deal with that at the end of the month. The defendant stipulate -- dismissal of stipulation, it sounds like the parties are working on that.

MR. SMITH: Your Honor, this is Richard Smith. We are working on that. The thought here was that there were, as you know, pretty much it had first originated with you and Judge Kugler. But there are 41 defendants here, many of whom are ancillary defendants, minor defendants along the distribution chain that do not have much of anything to do with this litigation and are in many instances, including in the instance of the ESI protocol, slowing us down toward resolution.

The plaintiffs appeared to recognize this, and when we were last in Camden the parties I think very helpfully were able to get together and talk generally about the concept of dismissing without prejudice probably the majority of defendants to really narrow this case down to the proper parties.

The theory was that -- that certain defendants who were say re-packagers, or distributors, or retailers would be dismissed without prejudice. On their way out, so to speak, they would provide some very limited documentation to the

plaintiffs. And we were anticipating receiving that proposal from the -- from the plaintiffs. When we received the proposal from the plaintiffs it -- it is concerning us, and we are trying to work it out, and we will have a meet and confer on this.

But it is concerning us that the proposal was a little bit backwards. It was styled as an application for dismissal, and the defendants -- the minor defendants would have to provide what they believed to be very wide-ranging, probing discovery at an early stage in an application so that they could petition for their dismissal, rather than being identified for what they are as minor defendants being allowed to be dismissed if they produced much more limited discovery.

None of these defendants are asking to be immune from discovery in -- in non-party discovery through hopefully foreign subpoenas. So it's not a matter of them trying to shield themselves from discovery. It's simply a matter of trying to get out of this case as efficiently as possible without having to go through the -- the long discovery process to do so.

I don't think we need to get into this much today, but those defendants have requested that I specifically mention that issue to you, because they are anticipating that issue coming up at the next in-person conference.

THE COURT: Mr. Smith --

MR. SLATER: Your Honor, Adam Slater for the plaintiffs. I don't think that's going to be an issue. Whatever title is put on it, you know, whether it has to be a stipulation or whatever it has to be called, we haven't had a chance to speak since we sent their -- since we sent this to the defense. So I would think that we can talk through it. But we -- you know, we obviously do want to get important information and not have to go chase people after they're let out of the case. And I think we provided for things like tolling.

And we also have to address, you know, what happens with avoiding future suits against them so something's on the docket so people considering suing them can see something, or at least if they do sue them, so the defense can say here's what's on the docket, so, you know, follow this procedure.

You know, you don't need to sue this party anymore, because, you know, we can't control what other people do but, but I would think that we'll be able to work through that pretty efficiently. I don't think there's going to be really any major sticking points for the next conference. Maybe a few small things.

THE COURT: Let me make one comment about what I read and give you an idea to chew on that I think is fair to both sides. I do think that these -- these tangential defendants shouldn't be required to produce Rule 26 discovery,

the full extent to get out of the case, but really the important stuff. And there's probably no disagreement about that.

I've never -- almost never had an instance where parties served answers where the party that received the answer says they're adequate. So the defendants don't want to be in a position where they're held up, from what I read, because the plaintiffs aren't satisfied with their answers and keep on asking for more information.

My suggestion would be that, if the defendant submits answers, if plaintiff challenges them and the parties can't agree, submit the answers to the Court and the Court will decide whether they're sufficient for dismissal purposes, and -- and issue a direction on it.

I think that satisfies plaintiff that they're going to get their answers, and I think that satisfies defendant that they're not going to be held hostage to keep on submitting supplements to the plaintiff.

So you can just chew on that idea.

Next issue is the profile form. Can you help me understand something? What's the difference between a profile form and a fact sheet? If there is a difference.

MR. NIGH: Your Honor, I'll speak to that. Our understanding is the difference between a profile form -- this is Daniel Nigh again -- our understanding between the

difference is the profile form is supposed to be analogous to, you know, like preliminary early discovery for on the plaintiffs' side. And so basically the intention is for this to be very basic information. Really we've agreed to provide information records confirming which Valsartan manufacturer these plaintiffs ingested, and the dates of usage.

And then it would also include information and records describing the plaintiffs' cancer diagnosis or bodily injury claims, and similar information like that for consumer class none (phonetic) cases, and also for their TPT claims. The difference that we see is that the plaintiff fact sheet would have all sorts of other information the defendants desire to have in there, such as, I suppose they would probably want to have risk factors. I think that is also the more appropriate stage for them to get an authorization and also for the defendants to verify. They usually ask for, you know, things like employment history, background, criminal history, you know, things like that we'll have to have a discussion with.

But really the plaintiff profile form is that basic information for us to be able to wrap our arms around the case and really understand what's on file.

THE COURT: Would the --

MS. COHEN: And, Judge -- I'm sorry.

THE COURT: I was just going to ask, would the fact

sheet duplicate the information in the profile form?

MS. COHEN: Judge, this is -- this Lori Cohen. I just wanted to let you know that I joined the call a little bit late and just wanted --

THE COURT: Okay.

MS. COHEN: -- to respond. But I'm happy to let Mr. Nigh respond first as well. I didn't mean to jump in there and talk over either of you.

MR. NIGH: In terms of -- of verifying, I think it's fine for the plaintiff fact sheet to duplicate the information, in that we -- we can have a program where we would already have that duplicated information filled in. And then the plaintiff -- if the plaintiffs going to personally verify, they can verify that information at the point of fact sheet stage.

THE COURT: The reason I ask is because at some time in the case, let's talk about, you know, what drug they used, okay? Obviously, critical information.

MR. NIGH: Right.

THE COURT: It just seems to me obvious that at some point defendants need to get that information under oath. Whether it's a 281746 or an affidavit. So at a minimum it has to be either under oath in the profile form or the fax sheet.

MR. NIGH: And, Your Honor, we -- we agree with that, and we would agree that it would be more appropriate to

do it at the point of fact sheet stage for the plaintiff under oath. If we did it at the point of profile stage, then we would then be asking the plaintiffs to, you know, sign multiple documents and, you know, look at -- and then I think the defendants also want a process where to adjudicate that.

They have multiple processes for -- I envision thousands of cases, you know, 2,000 cases is what we had suggested, I just think it's, you know, not sufficient to be doing that process multiple times on that number of cases.

MS. COHEN: And, Judge, this is Lori, again, I'm just going to jump in and respond the opposite, okay. So on this point as, you know, we obviously just received their -- the last of the three forms with their comments, so we're reviewing that and running them by the rest of our larger group to get a -- you know, the best conception we can.

But we'll be back with a specific response, but we did want to flag to you as we said our cause of two specific issues. And you're right that there's going to be some duplication, but this is really the corollary, if you will, of the core discovery the defendants are all, you know, having to produce now or work on. And so this is the plaintiffs' side of that, plaintiffs' version of that. And so we do think giving us limited information is important. I think we have agreement on that. But we also do believe that having (inaudible) verified is significant.

And I know that Mr. Nigh has said both at the (inaudible), I think it’s the first that there's thousands of cases. But the point be told, there's only about 40 cases perhaps right now, I may be off a number. So this is not a significant burden. And we think that the plaintiffs that are currently in the case, (inaudible) if you work on the defense side, they should be required to sign it. It shouldn’t be that big of a burden. They should be in touch with their clients anyway. So it's a very small, contained number. And we think that it's not an extreme burden to have them verify this information and have it be meaningful on their side.

And then the second issue, as we said in our report and probably through some advice from you, is we do think there should be some kind of show cause process. We don't think it's too burdensome. We don't think it's prejudicial in any way. We believe that plaintiffs (inaudible) simply they’re required note that two to 30 days of submitting the forms, if they fail to provide the documentation, that there should be a process for a show cause hearing.

It doesn't mean they won't be able to explain to the Court why there are deficiencies or there may be some exceptions, or who may want to meet and confer. We think these two basic steps, that is, verification and a show cause process, should not be, you know, disregarded and -- and should not be that burden, frankly.

THE COURT: What kind of documentation do you envision being produced with the profile form answer?

MS. COHEN: Well we have --

THE COURT: If any.

MS. COHEN: I mean -- I'm sorry?

THE COURT: If any.

MS. COHEN: Well we have asked --

UNIDENTIFIED COUNSEL: Your Honor, --

MS. COHEN: -- for an authorization that would have to go with them.

UNIDENTIFIED COUNSEL: Your Honor -- sorry, I didn't mean to interrupt Lori.

MS. COHEN: That's okay. That's okay. But we do -- we do think that there should be an authorization from somebody, and we've included those to -- for -- in order to allow us to collect this basic information. Again, as you -- as you know, Your Honor, you know, eventually with the fact sheets, there will be more verifica -- more authorizations and afford your best effort to discuss full medical history here, so it’s not only a small limited set of information. So we are going to need authorizations to -- to be able to gather that initial information as well.

THE COURT: Ms. Cohen, why -- Ms. Cohen, can you help me understand, why then don't you just dispense with the profile form and just go right to the fact sheets? Why --

MS. COHEN: Well --

THE COURT: Why do that?

MS. COHEN: -- that's a very good question, Your Honor. We'll be happy to come up with a fact sheet and get those person’s influence. I think, the plaintiffs' suggestion of how we could streamline things initially and, again, I think it goes with the idea of the concept of flow from the defense side. We’re not getting into full-blown merit discovery yet and we’re kind of (inaudible).

I know we've all -- we all have our marching orders there, and we know what we worked on there, we have the list. This is the plaintiffs' response, fellows, look, you don't need to have the full-blown (inaudible) so you don't need to have full, you know, records of all assets of their life history, we'll get to that later when we get to the "merits" of full-blown discovery.

But we're willing to work with you on getting a limited set of information, and that's where the constant profile form came about, because as a precursor to full merit discovery, if you will, --

UNIDENTIFIED COUNSEL: Your Honor, --

MS. COHEN: -- (inaudible). Yes, we would be happy to do a full fact sheet at a point. But I think the idea was to take it in stages.

THE COURT: Okay.

UNIDENTIFIED COUNSEL: And, Your Honor, the plaintiff profile form envisions the plaintiffs’ that are filing their lawsuits to provide the pharmacy records that establish the manufacturers, who took the drug and when they took it. And it also would provide information showing the injury that -- their cancer diagnosis.

So it's just that basic information that a plaintiff who’s vetting the case would have those records anyway, and those are the records that would be turned over with plaintiff profile form, which is why we also don't believe that it needs the plaintiff themselves to verify this form, they're going to get that later in the plaintiff fact sheet.

THE COURT: Let me ask you a question. Ms. Cohen, if we do this two-step process, how much of a time lapse would there be between all the plaintiffs completing a profile form, and then the plaintiffs having to fill out fact sheets? Or will the fact sheets only be if there's Bellwether cases?

MS. COHEN: Well, Judge, we really haven't discussed specifically the fact sheet process yet and what that would entail, and what would be required when. In other words whether we would start with just Bellwethers, or whether we would have all of them. So we really haven’t discussed that yet. We certainly can discuss that and come up with a plan again. I think this whole idea of even profile form, again, was to be the corollary of the core discovery.

Yet on the plaintiffs' side we get a sense of what is the universe, who's out there and what -- you know, what are the current cases, what are they asserting in terms of alleged injuries, what kind of cancer we see. What does it look like? It really goes to Judge Kugler's, one of his early comments in the first case (inaudible) conference when he said, you know, I know that causation is going to be an issue, figuring out who has what, or what type of cancer. I'm paraphrasing of course.

But this will give us a sense of, you know, what the alleged injuries are, or the book pharmacy records show, and not getting the full-blown, every primary care physician, every surgery, every job he's had.

THE COURT: Right.

MS. COHEN: So it is limited, and it could be core, you know, so we really haven't talked about as to what happens with the fact sheet, when will those be required. And of course that's going to be kind of our next step that we're going to have to work on together to figure that out.

THE COURT: Would -- Ms. Cohen, would these profile forms be directed only to the plaintiffs in one of the groups -- one of the master complaints the -- the bodily injury/personal injury complaints, as opposed to the medical monitoring, economic claims?

MS. COHEN: No, we've actually come up with the -- and I think we have agreement with the plaintiffs' group on

this. We have since I think the first time we talked about it, that we would want to have and need to have the profile form for personal injury cases as we said, the class representatives for the putative class action cases as in all states specific form for the third-party payer case.

And we envision three different forms, if you will.

THE COURT: Okay. And with regard to the medical monitoring and economic cases, they're going to be class actions. Would these profile forms only be directed to the named class representatives?

MS. COHEN: No. I think that this information also would cover the -- we would want that for anybody asserting a medical monitoring claim as well. But the way they're currently devised it would be to class representatives. The --

UNIDENTIFIED COUNSEL: Right.

MS. COHEN: -- the putative --

THE COURT: Okay.

MS. COHEN: So the putative -- the way I'm looking at the form now, the putative consumer class representative and plaintiff.

THE COURT: Okay. So what I'm --

MS. COHEN: And we --

THE COURT: -- I'm sorry. Go ahead.

MS. COHEN: Yes. We don’t view it as particularly burdensome given the small numbers right now.

THE COURT: Okay. So what I'm taking away from this conversation is, the profile forms will be finalized, they'll be answered in, you know, X amount of time. And then somewhere down the road after we get all these other issues behind us, we're going to turn to more detailed fact sheets?

MS. COHEN: Yes.

THE COURT: Okay. All right. Now I understand it a lot --

MS. COHEN: But -- but --

THE COURT: -- better.

MS. COHEN: Yeah. But, again, we -- we think that, of course, if plaintiff, you know, at this point, is, again, a small, contained number of cases, of course the plaintiffs under the appropriate rules have met with them, gathered information, done their due diligence because I know that they told us. And so we think that it shouldn't be that big a burden to obviously have their site (inaudible) even if they have to sign a second fact sheet, just signing two documents verifying it, you know, should be part of what they do anyway.

THE COURT: Okay.

MS. COHEN: And we do think it's -- it's certain --

THE COURT: I got you.

MS. COHEN: -- if certain plaintiffs don’t fill these out, we think there should be a mechanism.

THE COURT: Yes.

MS. COHEN: And, again, the response that is on the defense side, if somebody doesn't produce documents like they should, I'm sure there will be a mechanism, a motion to file. But we just want to have that ability on the plaintiffs' side as well.

THE COURT: Okay. We can -- if you can't resolve it amongst yourselves, I'll decide the issue about the verification at the next conference at the end of the month. With regard to what you're calling, Ms. Cohen, an order to show cause process, I -- I think that's a good idea, because we have to weed out if there's any people who don't belong in the case.

And what I would simply suggest you do is, it worked beautifully what we -- I don't know what we called it, frankly, but just take a look at what we did in Benicar, we gave them warnings, and two or three chances, and then if they ignored everything, they were out of the case. So you may just want to track what we did in that -- in that order, and it really worked beautifully.

MS. COHEN: You know, well, we’d be happy to take a look at that. I think what we prepared with that current draft is just have a consistent deadline, you know, to try and make it very streamlined.

THE COURT: Yes.

MS. COHEN: We'll have to look again at that and work with Mr. Nigh. We thought getting that should be helpful, and

it has been.

MS. SMITH: Excuse me. This is Joanna Smith, Judge Kugler's clerk. Just to clarify, I will note in that process it took three months from the time that the -- that information was provided in a profile or a fact sheet to an order show cause, and basically it was after the second month the defendants filed an order to show cause, and if the information that was required to show actual damages wasn't submitted by the plaintiffs, then at the end of their third month an order to show cause went out, and termination for prejudice was issued automatically.

But I think that defendants presented at the status conferences the -- a table or a listing for those plaintiffs whose documents were a month late, or two months late. And, therefore, you know, required the issuing of an order to show cause. Just to clarify.

MS. COHEN: Thank you. That's very helpful and consistent with how we're doing it with several other current MDLs right now. So I think we tried -- I think we've included something like that, and I do think it's important to have something like that in this. We'll -- we'll talk to Mr. Nigh again, and see if we can come to some agreement, or we'll present it to Your Honor.

THE COURT: Yes.

UNIDENTIFIED COUNSEL: And, Your Honor, I was very

familiar with the Benicar case, obviously, because we had hundreds of cases in that litigation and the process --

THE COURT: Who --

UNIDENTIFIED COUNSEL: -- I had no quarrels with the process at all. But I see a difference here, if we're, you know, forcing a two-step process and we're running through that process multiple times, it can get confusing. I've seen that in other MDLs. But there was a suggestion that -- that the plaintiffs should consider, and we may be amenable to, which is, if the plaintiffs are -- get -- if the plaintiff profile form is for all plaintiffs to verify and complete, but then the plaintiff fact sheet was, you know, only intended for the Bellwether plaintiffs to complete, you know, have running through that system twice for only the plaintiffs' Bellwethers, that would be much more amenable -- that could be a compromise that we discuss as well.

THE COURT: Okay. I mean, there's a lot of good ideas floating around. And I just want to add that, I know I was a big proponent in Benicar about giving plaintiffs more, rather than less time. I think 30 days to get everything done or your case is dismissed is just, practically speaking, not workable. Plus the Third Circuit in effect tells us that we have to give a plaintiff umpteen chances before we dismiss their case.

And I don't think in any of the cases that we

dismissed they came back and asked that they be reopened. So I think it's in everyone's interest, even though three months sounds like a lot, in real life practical terms it isn't. But we can chew on all of these -- all these issues and it sounds like we can get them resolved at the next -- next conference.

UNIDENTIFIED COUNSEL: Yes, Your Honor.

THE COURT: Next issue is --

MS. SMITH: Yes, Your Honor.

THE COURT: -- what we in New Jersey call a discovery confidentiality order, what everybody else calls a protective order. Again, I would -- if there's any disputes, send me the different language, the different versions that the parties are arguing about with the agenda for the next meeting. We'll get it entered. And the last thing in the world that I want to see is defendant holding up the production of relevant documents because a DCO hasn't been entered. And this is not a complicated issue, we should be able to finalize it by the next conference. But, again, if there's a dispute, just send the disputed language so the Court can be prepared to discuss it with you on the twenty-ninth.

It sounds like --

MS. COHEN: Judge, this is Lori. We'll be happy to do that.

THE COURT: It sounds like the depository issue is being discussed. I'm not sure there's anything we need to

address with it. And the State Court issue -- thank you very much for that information. I'll check with Judge Kugler whether he wants to reach out certainly to the New Jersey Judges.

They talked about consolidation of the two New Jersey cases, Runo and Orlowsky. Do you know which Judge got the case?

MR. GOLDBERG: Your Honor, this is Seth Goldberg. I don't think those cases have been consolidated yet. That's in the process. They've agreed to do that. But we don't have a Judge that those have been consolidated in front of yet. But I do think it's, you know, the known cases in particular, you know, we really need to be proactive and the Court can help us with this.

We've tried to get agreement with the other side that -- that those cases should not get ahead of the MDL. And interestingly Mr. Orlando, who's with -- Roger Orlando is plaintiffs' counsel in those cases is also on the steering committee for one of the committees for plaintiffs in the MDL.

I think it's personal injury cases. And, you know, we just don't want to be in a position where this case is getting out in front of the MDL, or somehow there's discovery that is different in these cases than in the MDL, that things are going to have to be duplicated.

So whether it's Judge Kugler reaching out to those

Judges, or we should be moving to stay those actions, you know, certainly would request the Court’s guidance or assistance in helping us with those two cases.

The Collins case, which we've also identified, that case has actually been the subject of a conditional transfer order. The plaintiffs have until Friday to object to that, it could require -- result and briefing at the JPML. But, you know, assuming they don't, that case should be in the MDL.

And then we've got one other cases that is pending now, it's pending in State Court in Illinois. And we are hoping to have that case removed to Federal Court, and then transferred. Right now there's not -- there's a motion pending, there's no discovery in that -- in that action, so that action isn't as much of a priority as the two New Jersey State Court cases.

And we don't want to have to file briefs in those cases. We don't want to have State Court Judges deciding motions to dismiss, if we don't have to. And certainly don't want to be producing discovery in those cases, so --

THE COURT: Is Mr. Orlando the --

MR. GOLDBERG: So we wanted to be explicit to the Court on that.

THE COURT: Is Mr. Orlando the plaintiffs’ counsel in both of those cases?

MR. GOLDBERG: Yes. He is.

THE COURT: Have you spoken with him? I mean, doesn't it make perfect sense to coordinate the State and the Federal cases?

MR. SLATER: Your Honor, Adam Slater. I don't -- I think that that's going to be done, I'm not sure why Mr. -- I mean, nothing happened in that case that would give any concern, I don't think, to Mr. Goldberg. You mentioned motions to dismiss. My understanding, Mr. Goldberg, that you had actually filed a motion to dismiss in one of those cases. So I would assume that, consistent with everything we're discussing, that motion will be withdrawn.

MR. GOLDBERG: Well, right. And it's in the -- you know, the other side is that we're going to file an amended complaint. But they have also served discovery in one of the cases so -- and we're not getting the kind of agreement that you would think we would get from them being that they are on the steering committee. I mean, this is -- we propose language in a stipulation that simply said, you know, this -- that discovery in that case would be no more or no less than the MDL, that discovery won't -- in that case won't happen -- will happen in lock-step with the MDL.

And they were not willing to make that agreement. So I hear you, Mr. Slater, but I'm not sure that what you're saying and what Mr. Orlando is trying to achieve are the same thing. If you want to intervene, that would be potentially

helpful, but we just don't see how these cases can get out in front of the MDL.

THE COURT: Mr. Goldberg, --

MR. SMITH: Seth, weren't you involved -- I'm sorry, Judge.

THE COURT: You can get involved. I'd welcome your participation, Mr. Slater. But what I was going to do, Mr. Goldberg, is I'm going to order Mr. Orlando to be in Court on the 29th, not his surrogate, but him personally. And if this issue is not worked out before then, we're going to work it out on the 29th.

MR. SLATER: That will work great, Judge. This is Adam Slater, again. And I just haven't been included in these communications. So now that we've had this call, and I think we're all on the same page that I should be involved, I think I can be very helpful in helping to expedite efficiency.

THE COURT: Good. That's welcome. That takes us to the agenda. I have one additional question, and then I'll open the floor. And it was directed to the plaintiffs. With all the information that's coming out, I'm sure everybody knows about it, is plaintiff's position about whether there's going to be other sartans in the master complaint still the same, that they're going to hold off and just wait to see how things develop, or have recent developments changed their mind?

MR. HONIK: Your Honor, Ruben Honik. It's a very

good question. And, candidly, I think if you took the temperature of everyone in leadership right now, the answer would be the same today as it was a week or two ago. That said, we've been very busy in preparing for today's conference, and the various pieces of it. It's a very high order of priority for us after today, and well before the 29th to confer, obviously to begin to craft the master complaints, the allegations that will be in it.

And, candidly, at that point to -- to make some definitive decisions about -- about the other sartans. I think that there's a substantial leaning that if we're to file our master complaints by the 17th of June, that it will remain a premature matter to include either losartan or irbesartan. But that's not to say that at some point thereafter that we may not make application to the JPML to expand the scope of the MDL so as to include them.

THE COURT: Would it make a difference if it's July -- I'm sorry -- June 17 or July 8th? Or July 15th?

MR. HONIK: You know, left to my own devices, I would say that's not a meaningful --

THE COURT: Right.

MR. HONIK: -- time difference. I think --

THE COURT: I don't disagree.

MR. HONIK: -- I think with some confidence that -- that when June 17th comes and goes, that the complexion of this

MDL, the scope of it, will not -- will not be enlarging to include those. I think if they are to be included, which I think is highly likely as to losartan, I think it's going to be some months further down the line.

THE COURT: Okay. We'll just -- you know, I just wanted to get the temperature of what's going on. Counsel, as far as the Court is concerned, that's all the issues we wanted to address. I want to open up the floor if there's any other issues anybody wants to address. Plaintiffs, anything else?

UNIDENTIFIED COUNSEL: Not that I can think of.

THE COURT: Defendant?

UNIDENTIFIED COUNSEL: Nothing that I can think of, Your Honor.

THE COURT: I got to ask your indulgence. The court reporter just wants to make sure that we got all the appearances so can -- I hate to do this, but can I just ask everybody to enter their appearance again? We'll start with the plaintiff.

MR. HONIK: Sure. Ruben Honik for plaintiffs, Your Honor.

MR. SLATER: Adam Slater for plaintiff.

MR. NIGH: This is Daniel Nigh for plaintiffs.

MS. WHITELEY: Conlee Whiteley for plaintiff.

MR. WATTS: Mikal Watts for plaintiff.

THE COURT: I didn't -- I'm sorry, I didn't hear that

last person.

MR. WATTS: Mikal Watts for plaintiff.

THE COURT: How about before you, Mr. Watts? Was there -- I thought there was a female voice.

MS. WHITELEY: Yes, Conlee Whiteley.

MS. GOLDENBERG: Yes, Your Honor, this is Marlene Goldenberg. Sorry, Conlee.

MS. WHITELEY: That's okay.

THE COURT: I heard Ms. Whiteley, I heard Ms. Goldenberg. Okay.

MR. PAREKH: Behram Parekh for plaintiff.

THE COURT: Okay. I think I'm missing one name. First name starts with an A?

MR. STANOCH: David Stanoch, Your Honor, for plaintiffs?

THE COURT: No. That wasn't it. Is there --

MR. SLATER: You probably heard Adam Slater, of course.

THE COURT: No, I have Adam Slater. It was right after Ms. Whiteley.

MR. PAREKH: You may have heard Behram Parekh.

THE COURT: No. It was --

MR. NIGH: Daniel Nigh.

THE COURT: I have Mr. Honik, Mr. Slater, Mr. Nigh, Ms. Whiteley, Ms. Goldenberg, Mr. Parekh, Mr. Watts, Mr.

Stanoch. Anyone else?

Okay. Nobody else. And for the defense?

MR. GOLDBERG: Seth Goldberg and Jessica Priselac for defendants.

MS. COHEN: Lori Cohen for defendant Teva.

MR. RUBENSTEIN: Brian --

MR. TRISCHLER: Clem Trischler.

MR. RUBENSTEIN: Sorry, Clem -- Brian Rubenstein for defendant Teva.

MR. SMITH: And Richard Smith.

THE COURT: And there was one other name I took, I'm sure I spelled it wrong, Pritslits (sic).

MR. GOLDBERG: Priselac.

THE COURT: Priselac.

MR. GOLDBERG: Jessica Priselac.

THE COURT: I got it. Okay. Sorry, Mr. Goldberg. Got it. Okay. There being no further issues, thank you very much, counsel. We're adjourned.

(Proceedings concluded at 4:20)

* * * * *

C E R T I F I C A T I O N

I, Josette Jones, court approved transcriber, certify that the foregoing is a correct transcript from the official digital audio recording of the proceedings in the above-entitled matter to the best of my ability.

Josette Jones Digitally signed by Josette Jones DN: cn=Josette Jones, o, ou, email=dianadoman@comcast.net, c=US Date: 2019.05.29 12:51:22 -04'00'

--------------------------- 05/29/2019

JOSETTE JONES DATE

DIANA DOMAN TRANSCRIBING, LLC