UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION

_____

CIVIL ACTION NUMBER:

1:19-md-02875-RBK-JS

STATUS CONFERENCE

Pages 1 - 61

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey  08101
Wednesday, June 26, 2019
Commencing at 10:15 a.m.

B E F O R E:          THE HONORABLE JOEL SCHNEIDER,
                     UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

LEVIN PAPANTONIO
BY:  DANIEL A. NIGH, ESQUIRE
316 S. Baylen, Suite 600
Pennsacola, Florida 32502
For the Plaintiff

GOLOMB & HONIK PC
BY:  RUBEN HONIK, ESQUIRE
     DAVID JOHN STANOCH, ESQUIRE
1835 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103
For the Plaintiff

KANNER & WHITELEY LLC
BY:  CONLEE S. WHITELEY, ESQ.
701 Camp Street
New Orleans, Louisiana 70130
For the Plaintiff

Karen Friedlander, Official Court Reporter
friedlanderreporter@gmail.com
(856) 756-0160

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

 1   **A P P E A R A N C E S: - CONTINUED**

 2       FARR LAW FIRM
         BY:  GEORGE T. WILLIAMSON, ESQUIRE
 3       99 Nesbit Street
         Punta Gorda, Florida 33950
 4       For the Plaintiff

 5       KIRTLAND & PACKARD LLP
         BY:  BEHRAM PAREKH, ESQUIRE
 6       1638 South Pacific Coast Highway
         Redondo Beach, California 90277
 7       For the Plaintiff

 8       DUANE MORRIS LLP
         BY:  SETH A. GOLDBERG, ESQ.
 9       30 S. 17th Street
         Philadelphia, Pennsylvania 19103
10       For the Defendant ZHP and the Joint Defense Group

11       HARDIN KUNDLA McKEON POLETTO & POLIFRONI, PC
         BY:  JANET LYNN POLETTO, ESQUIRE
12       673 Morris Avenue
         Springfield, New Jersey 07081-0730
13       For the Defendant Hetero USA, Inc.

14       GREENBERG TRAURIG LLP
         BY:  LORI G. COHEN, ESQ.
15       3333 Piedmont Road, NE, Suite 2500
         Atlanta, Georgia 30327
16       For the Defendant Teva and the Joint Defense Group

17       PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
         BY:  CLEM C. TRISCHLER, ESQUIRE
18       One Oxford Centre, 38th Floor
         Pittsburgh, Pennsylvania 15219
19       For the Defendant Mylan and the Joint Defense Group

20       GOLDENBERG LAW PLLC
         BY:  MARLENE J. GOLDENBERG, ESQUIRE
21       800 Lasalle Avenue
         Suite 2150
22       Minneapolis, Minnesota 55402
         For the Defendant

23

24

25

```
1    A P P E A R A N C E S: - CONTINUED

2         CIPRIANI & WERNER PC
          BY:  JESSICA MARGARET HEINZ, ESQUIRE
3         450 Sentry Parkway
          Blue Bell, Pennsylvania 19422
4         For the Defendant Aurobindo Pharma USA and
          Aurolife Pharma, LLC
5
          WILEY REIN LLP
6         BY:  RICHARD SMITH, ESQUIRE
          1776 K Street NW
7         Washington, DC 20006
          For the Defendant Torrent Pharma and the Joint
8         Defense Group

9         FARR LAW FIRM
          BY:  GEORGE T. WILLIAMSON, ESQUIRE
10        99 Nesbit Street
          Punta Gorda, Florida 33950
11        For the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE DEPUTY CLERK:  All rise.

 2            (OPEN COURT, June 26, 2019, 10:05 a.m.)

 3            THE COURT:  Good morning, everyone.  Please be

 4    seated.  We're on the record In Re:  Valsartan MDL, Docket No.

 5    19-2875.  Mr. Slater couldn't be here this morning.

 6            Let's just get the entries of appearance of just who

 7    the lead counsel is going to be speaking.

 8            MR. NIGH:  Daniel Nigh for plaintiffs.

 9            MR. HONIK:  Good morning, Your Honor, Ruben Honik for

10    plaintiff.

11            MS. WHITELEY:  Good morning, Your Honor, Conlee

12    Whiteley for plaintiff.

13            THE COURT:  And for the defendants.

14            MR. GOLDBERG:  Good morning, Your Honor, Seth

15    Goldberg on behalf of ZHP defendants and the joint defense

16    group.

17            MS. COHEN:  Good morning, Your Honor, Lori Cohen on

18    behalf of the Teva defendants and the joint defense group.

19            MR. SMITH:  Richard Smith on behalf of Torrent Pharma

20    Inc. and the joint defense group.

21            MR. TRISCHLER:  Good morning, Your Honor, Clem

22    Trischler from Mylan Pharmaceuticals and the joint defense

23    group.

24            THE COURT: Good morning.  Okay.  I have your agenda.

25    We will go through it.  I have a couple of issues I want to go
```

1    through before then.  Frankly, I don't anticipate this is

2    going to be a long conference.  Who knows.  I alerted Judge

3    Kugler, and when we're done with this conference, assuming

4    it's a reasonable hour, we'll just meet with Judge Kugler,

5    okay?

6              Just one housekeeping measure.  Mr. Goldberg, there's

7    a motion filed by your client.  Is that moot?

8              MR. GOLDBERG:  Yes, it is, Your Honor.

9              THE COURT:  Okay.  So we'll take that off the docket.

10             I tried to get my arms around the parties in the case

11   and who was served.  Maybe we can just get an update on that.

12   I thought -- I went through the master Complaints and I

13   thought plaintiffs did a good job trying to organize the

14   defendants.  Hope it's correct.

15             Let me just go through the API manufacturers, I think

16   there's four of them, see if there's any service issues.  ZHP,

17   they're served, right?

18             MR. GOLDBERG:  Correct, Your Honor.

19             THE COURT:  Mylan Laboratories Limited.  Are they

20   served?

21             MR. TRISCHLER:  No, Your Honor, they're in India,

22   still awaiting word on the one Hague service that the Court

23   required.  No issues with respect to service on the other

24   Mylan domestic entities.

25             THE COURT:  So Mylan N.V. and Mylan Pharmaceuticals,

1   Inc., have been served.

2          MR. TRISCHLER:  Correct.

3          THE COURT:  But not Mylan Laboratories Limited.

4          MR. TRISCHLER:  Correct.

5          THE COURT:  Okay.  So I'll check the docket.  Are

6   you, Mr.  Trischler, are you representing at the moment Mylan

7   Laboratories Limited?

8          MR. TRISCHLER:  I don't think I entered an appearance

9   for Mylan Laboratories Limited, and the docket will correct me

10  if I'm wrong.  I think the appearance was entered only for

11  Mylan Pharmaceuticals, Inc., but Mylan Laboratory -- the core

12  discovery that the Court has ordered Mylan Laboratories,

13  Incorporated we'll be participating in.

14         THE COURT:  Does anybody know the status of the

15  service on Mylan Laboratories Limited?

16         MR. NIGH:  Yeah, it's pending at the time.  We've

17  already given it to our vendor and they're trying to

18  effectuate the service through the Hague.

19         THE COURT:  All right.  I think I skipped Hetero.

20  Has Hetero Drugs Limited, the India corporation, have they

21  been served?

22         MS. POLETTO:  They have not, Your Honor.

23         THE COURT:  Ms. Poletto, am I correct that you've

24  entered your appearance for Hetero USA, Inc., and Camber --

25  no, just Hetero USA.

1          MS. POLETTO:  Just Hetero USA, Inc., Your Honor, yes.

2          THE COURT:  So same thing, Hetero Drugs Limited,

3    they're in the process --

4          MR. HONIK:  Yes.

5          THE COURT:  Is Hetero Drugs Limited serving responses

6    to the core discovery, the Indian company?

7          MS. POLETTO:  Not Hetero Drugs Limited.

8          THE COURT:  Okay.  And that's because they haven't

9    been served?

10          MS. POLETTO:  That's because they haven't been served

11    and I have no direct contact with them.

12          THE COURT:  Okay.  But obviously, if your client

13    Hetero USA, Inc. is in possession, control, or custody of the

14    responsive documents, they have to produce them.

15          MS. POLETTO:  Anything we have in our control and

16    custody we are producing, Your Honor, whether it's -- I

17    believe all of that relates to Hetero Labs LTD, not Drugs.

18    But if it's in our possession, we are, in fact, producing it,

19    Your Honor.

20          THE COURT:  Hetero Labs Limited, that's the Indian

21    company.

22          MS. POLETTO:  Correct.  There are two Indian

23    companies.

24          THE COURT:  That's right, Hetero Labs Limited, Hetero

25    Drugs Limited.

1          MS. POLETTO:  That's correct.

2          THE COURT:  They're both not served.

3          MS. POLETTO:  Correct.

4          THE COURT:  Okay.

5          MS. POLETTO:  Certainly would make my life easier if

6    they were, Your Honor.

7          THE COURT:  Okay.  All of us.

8          Okay.  So ZHP, Hetero, Mylan, Aurobindo.  Aurobindo

9    Pharma Limited, have they been served?

10         MS. HEINZ:  Hi, Your Honor, this is Jessica Heinz.  I

11   represent Aurobindo Pharma USA.  I don't represent Aurobindo

12   Pharma Limited.  I'm not aware of Aurobindo Pharma Limited

13   being served yet.

14         THE COURT:  Okay.  I'm sorry, could you repeat your

15   name, please?

16         MS. HEINZ:  Jessica Heinz.

17         THE COURT:  Ms. Heinz.  Okay.  You know, I could have

18   read it wrong, but I thought is Aurobindo Pharma Limited an

19   Indian company?

20         MS. HEINZ:  Correct.

21         THE COURT:  Okay.  And Aurobindo Pharma USA, Inc. is

22   a wholly owned subsidiary.

23         MS. HEINZ:  Correct.

24         THE COURT:  Okay.  And you also represent Aurolife

25   Pharma, LLC?

```
 1          MS. HEINZ:  Yes, Your Honor.

 2          THE COURT:  Is Aurobindo Pharma Limited, the Indian

 3   company, are they producing core discovery?

 4          MS. HEINZ:  I don't believe so, Your Honor.  They're

 5   not represented by counsel.  I have no contact with them.

 6          THE COURT:  Okay.  So two of the four API

 7   manufacturers haven't been served yet.  Hetero Labs Limited,

 8   an Indian company, related to that is Hetero Drugs Limited, an

 9   India company and Aurobindo Pharma Limited, an Indian company.

10   That's what my records show.

11          MR. TRISCHLER:  Actually, if I may, Your Honor, I

12   think it's three of the four have not been served.  Mylan

13   Laboratories Limited has not been served yet either.

14          THE COURT:  That's right, I take that back.

15          MR. TRISCHLER:  The only distinction is that my

16   client is participating in core discovery without waiving any

17   jurisdiction.

18          THE COURT:  You're correct, Mr.  Trischler, I'm

19   sorry.

20          MR. HONIK:  And, Your Honor, just to round it out,

21   are the two US Aurobindo entities producing any core

22   discovery?

23          THE COURT:  The two USA are Aurobindo Pharma USA,

24   Inc., and Aurolife Pharma, LLC.  I assume they're producing

25   what they have possession, custody, and control over.
```

1              MS. HEINZ:  They are, both of them are, yes.

2              THE COURT:  Of course.

3              MR. HONIK:  Thank you.

4              THE COURT:  Okay.  So it would be great if we could

5    get those foreign companies served so we can get them engaged

6    in this case.

7              Then we have the finished dose companies.  Ms. Cohen,

8    you represent Teva Pharmaceutical Industries Limited, Israeli

9    company?

10             MS. COHEN:  Yes, Your Honor.

11             THE COURT:  They have been served?

12             MS. COHEN:  They have, Your Honor.

13             THE COURT:  Okay, great.  Do you also represent the

14   other Teva Pharmaceuticals USA, Inc.?

15             MS. COHEN:  Yes.

16             THE COURT:  And again, I took this from plaintiff's

17   master complaint, Auro Pharma Malta Limited, are you

18   representing them?

19             MS. COHEN:  Yes, Your Honor, and they are the foreign

20   entity.  They have not yet been served.

21             THE COURT:  Okay.  And Actavis Pharma, Inc., do you

22   represent them?

23             MS. COHEN:  Yes, Your Honor, also -- they have been

24   served.

25             THE COURT:  And Actavis, is that a sub of Teva as

1  well, Actavis, LLC?

2          MS. COHEN:  Actavis, LLC has also been served and we

3  also represent them.

4          THE COURT:  Great.  Okay.  Then under finished dose

5  defendants, I have Torrent.  It looks like the Wiley Rein firm

6  represents Torrent Pharma, Inc., is that right?

7          MR. SMITH:  Yes, Your Honor.

8          THE COURT:  Okay.  Has Torrent Private Limited, an

9  Indian company, been served yet?

10          MR. SMITH:  No, Your Honor, Torrent Private Limited

11  has not been served and we have reached agreement with the

12  plaintiffs to dismiss that client -- or that defendant.  They

13  have nothing to do with the manufacture of Valsartan, in my

14  understanding.

15          THE COURT:  Great.

16          MR. SMITH:  The finished dose manufacturer in India

17  is another entity called Torrent Pharma Limited.

18          THE COURT:  Torrent Pharmaceuticals Limited --

19          MR. SMITH:  Yes, Your Honor.

20          THE COURT:  -- have they been served?

21          MR. SMITH:  They have not been served.  They are an

22  Indian manufacturer.  I have not entered an appearance on

23  their behalf, although we are, on behalf of Torrent

24  Pharmaceuticals, Inc., the USA entity that has been served,

25  participating in core discovery.

```
 1            THE COURT:  I'm sorry, Torrent Pharmaceuticals
 2   Limited, they are participating in core discovery?
 3            MR. SMITH:  So the limited entities are Indian
 4   entities.
 5            THE COURT:  Right.
 6            MR. SMITH:  Torrent Private Limited will be
 7   dismissed.
 8            THE COURT:  Torrent Pharma, Inc., the New Jersey
 9   company.
10            MR. SMITH:  Is served and is participating in core
11   discovery.
12            THE COURT:  Okay.  Well, I assume everybody that's
13   been served is participating in core discovery.
14            MR. SMITH:  Yes, Your Honor.
15            THE COURT:  And at the moment, I'm just not that
16   interested in the retail, repackager and relabeler defendants.
17            MS. HEINZ:  I just wanted to clarify, Your Honor,
18   Jessica Heinz again.  Aurolife Pharma is a finished dose
19   manufacturer.
20            THE COURT:  Okay.  I have them listed as an API
21   manufacturer.
22            MS. HEINZ:  They are.
23            THE COURT:  Are they both?
24            MS. HEINZ:  Aurobindo Pharma Limited is the API
25   manufacturer.  Aurolife Pharma is the finished dose
```

1    manufacturer.

2         THE COURT:  So we have a handle on who's been served

3    and who's not.  I know it's not -- I think, until July, that

4    all the core discovery has to served and I indicated we're

5    going to deal with all core discovery issues at the same time

6    rather than piecemeal.  So we'll either get to it at the end

7    of July or the August meeting.

8         So I tried to take stock of where we are in the case.

9    A fair amount of work has been done so far.  Just to

10   summarize, the Court has entered time and expense order, and

11   ordered a core discovery, the order regarding the leadership

12   structure, insurance employer request, three master Complaints

13   have been filed.  The Court recently entered the approved

14   electronic discovery protocol and service protocol, the

15   discovery protective order.  Confidentiality order will be

16   entered imminently.  So tell me what your thinking about where

17   we go from here in the case.

18        The material items that I have left in the immediate

19   near future are the fact sheets for plaintiff and defendant.

20   We're going to get the order regarding the dismissal of the

21   parties together.  Hopefully, we're going to wrap up core

22   discovery and the insurance issues.  Then what I'd like to do

23   and talk about is like what we did in Benicar is identify sort

24   of what we call the macro discovery issues, the discovery

25   issues that are going to be all encompassing and have a big

1    impact on the direction of where the parties go, and hopefully

2    the custodians and search terms that the defendants are going

3    to use for the ESI searches.  Am I missing anything?

4            MR. GOLDBERG:  Your Honor --

5            THE COURT:  And your motions to dismiss.

6            MR. GOLDBERG:  Thank you.

7            THE COURT:  That issue is going to be discussed in

8    detail with Judge Kugler today.  We're not going to discuss it

9    at this conference, but you can ask as many questions as you

10   want about the -- to your heart's content about the motions to

11   dismiss.  I know you're chomping at the bit.  So you can

12   address those with Judge Kugler.

13           Help me -- you know, to get to the meat and potatoes

14   of the case.  We've gotta get the ESI produced from the

15   defendants.  We'll get the plaintiffs' fact sheets, all the

16   authorizations, all the records, what have you.

17           Do we do that in the context when we're drafting the

18   fact sheets?  Are they going to be, in essence, plaintiffs'

19   document request directed to defendants?  I don't recall how

20   we did that in Benicar, if there were separate document

21   requests or if they were incorporated into the fact sheets.

22           MR. NIGH:  In Benicar, the defense fact sheets were

23   only asking the specific documents related to each specific

24   client.  So we didn't do an overview of all document requests

25   in the DFS, and I don't know if we ever actually had a

1    specific document request.  I think it was more controlled by

2    the ESI protocol and the terms and custodians that we felt --

3          MR. PAREKH:  Your Honor, this is Baren Parekh.  We

4    did actually do formal requests for production but they

5    essentially got supplanted by the agreed-upon custodians and

6    search terms, and so there was a formal response to the

7    request for productions, but there was never any motions

8    regarding the formal request for productions.

9          THE COURT:  What do you anticipate here?

10          MR. PAREKH:  We just spoke this morning very briefly

11   about doing the same thing that we did in Benicar, which

12   worked really well, which was a one- to two-day conference

13   with defendants, where we sat down, we discussed where data

14   was stored, who the potential custodians would be, went

15   through all the charts, you know, discussed search terms and

16   having people, from, you know, both sides and including the

17   ESI specialists on each side made it a lot easier to sit down

18   in one room and do that, and we propose the same thing, but

19   like I said, it was just this morning.

20          THE COURT:  It might be a little harder in this case

21   because there's different categories of defendants and there's

22   more than one defendant in each category, right?

23          MR. PAREKH:  It's definitely going to be harder and

24   my suggestion would be that we have meetings with categories

25   of defendants so that the finished drug manufacturers would

1  be, you know, one meeting, the API manufacturers would be a

2  different meeting.  And to the extent there's some overlap in

3  a single supply chain, you know, that could also be another

4  way of breaking it up.

5          THE COURT:  Okay.  I thought -- we thought that that

6  was one of the reasons we did the core discovery early because

7  once you got those documents, that would help you frame the

8  discovery you request in this case, it would give you a head

9  start on identifying the appropriate custodians.

10         So your meetings with the defendants would likely

11 take place after the core discovery is produced, right?

12         MR. PAREKH:  Correct, that would be the suggestion.

13         THE COURT:  Right.  So if we had a -- let's just

14 ballpark a time frame and maybe a target about where we're

15 headed in the case.  When -- let's see.  According to -- the

16 supplemental -- let's see.  The supplemental insurance

17 disclosures are due in mid-July.  I think, am I right, the

18 supplemental core discovery is the end of July?

19         MR. GOLDBERG:  Mid-July.

20         THE COURT:  Mid-July.  Okay.  So August to meet and

21 confer with the defendants about this?

22         MR. PAREKH:  We need to get a handle on the volume of

23 documents that's going to be produced in core discovery and

24 until we -- we're going to get a large number of them actually

25 this Friday, I believe, and then once we see the volume and

1    the type of documents and what's in there, we'll have a better

2    idea.  But I think targeting the end of August for a meeting

3    would make the most sense to give us enough time to actually

4    absorb what's in those documents.

5              MR. GOLDBERG:  Your Honor, it seems like we're

6    missing a step.  I mean, I think we would expect there to be

7    document requests served, Interrogatories served, based on --

8              THE COURT:  No Interrogatories.  We do the fact

9    sheets.

10              MR. GOLDBERG:  Okay, that's fine.  But document

11    requests served so that we can then have these discussions in

12    the context of those requests.

13              THE COURT:  What do you think, plaintiffs?  This is

14    important.  Now pretty soon we're going to be finished with

15    the organization, we're doing a great job getting all that

16    done.  Now this is the meat and potatoes of the case.  So what

17    do you think about that?

18              MR. PAREKH:  We think serving formal document

19    requests is fine.  We're happy to do that.  It was just sort

20    of saying what happened in Benicar was that they got served,

21    they got answered and then they got put aside.

22              THE COURT:  I'm sorry, say that again, they got

23    served --

24              MR. PAREKH:  There was a formal written response.

25              THE COURT:  Yeah, they object.

1        MR. PAREKH:  They objected and then -- but we never

2   looked at them again.  But I mean, I think in terms of

3   formality, that's fine and we're happy to do that.

4        MR. GOLDBERG:  Your Honor, I mean, I don't want to

5   bake into this process that this is a formality now because

6   the document requests, especially in light of the master

7   Complaints, you know, all of this is a process by which we're

8   funneling into the information that is relevant and

9   admissible.  We can't just say it's a formality.

10       THE COURT:  Relevant, not admissible.

11       MR. GOLDBERG:  Relevant, but eventually admissible.

12   But there may be real issues with documents that are being

13   requested.

14       THE COURT:  Absolutely.

15       MR. GOLDBERG:  We need to have a period by which we

16   assess those.  I don't think we should be scheduling ESI

17   meetings and custodian meetings, you know, for next month,

18   potentially, without having a sense of where we are in the

19   case from a scope standpoint, and document requests are going

20   to be pertinent to that question.

21       THE COURT:  Okay.  This is the way I work it.  I

22   think it's a waste of time to serve the document requests, you

23   object and say, by way of further answer, here are some

24   documents.  What I want to do is I want to get your

25   objections, we'll resolve all objections, and then you could

```
 1   respond on the merits, okay?

 2            So I don't think that's necessarily a bad idea to

 3   serve each of the defendants or, however you want to do it,

 4   category of defendants with formal document requests -- forget

 5   Interrogatories, we'll do fact sheets.  Give me a date.

 6            MR. PAREKH:  Mid-August, Your Honor.

 7            THE COURT:  It will take you that long to serve

 8   document requests?

 9            MR. PAREKH:  We haven't started the process, Your

10   Honor.

11            THE COURT:  Okay.  Let's say the end of July, okay?

12   You don't need that long to serve document requests.

13            MR. PAREKH:  We'll get it done.

14            THE COURT:  We're just talking document requests.

15            MR. GOLDBERG:  Yeah, I just think, respectfully, I

16   mean the idea of core discovery was that we would have a

17   framework even with that to make this a more useful exercise.

18   You know, I think that was --

19            MR. PAREKH:  That was my suggestion for mid-August

20   was that so we would have some amount of time to look at the

21   core discovery.

22            THE COURT:  Okay.  You convinced me.

23            How long do the defendants need just for objections?

24   Not answers, objections?  Because we're going to clean up all

25   the objections and then the defendants are going to produce
```

```
 1   documents.

 2            MR. GOLDBERG:  I'd say 45 days, Your Honor.

 3            THE COURT:  How about 30 days?  9-16.

 4            And then you have to -- wow, we're already in

 5   October, oh boy.  And then you have to meet and confer and

 6   then we'll resolve all document request objections by

 7   mid-October.

 8            MR. PAREKH:  Your Honor, I think it would be helpful

 9   to simultaneously, when meeting, we confer about the document

10   requests, also discussing custodians and search terms.

11            THE COURT:  A hundred percent.

12            MR. PAREKH:  They essentially go hand in hand.

13            THE COURT:  Absolutely.  And by then, hopefully, the

14   foreign defendants will have been served.

15            What I'd really like to do is I just would like as

16   soon as we get our arms around the issues, tee up again what I

17   call the macro issues.  I could be wrong, but I suspect

18   plaintiffs are going to request documents from every FDA-like

19   agency around the world communicating with defendants, and it

20   doesn't take a genius to predict that the defendants are going

21   to object to that disproportionality, burdensomeness, et

22   cetera, et cetera.  So I would consider that sort of a macro

23   issue.  The relevant time frame for the documents, I would

24   consider a macro issue.  The facilities, you know, those type

25   of really big picture issues, I really would like to tee those
```

 1    up as soon as we can get those identified, because we'll have

 2    briefing on those and argument on those, and the nuts and

 3    bolts type issues we'll deal with in October.

 4           So give some thought to that, because once we get

 5    those out of the way, that will really help move this process

 6    along.

 7           Okay.  So, we sort of have a general idea of where

 8    we're headed the next couple of months anyway.

 9           All right.  So let's get to the agenda.  We'll just

10    go through the issues.  The discovery confidentiality order,

11    it's going to be ordered.  The short form complaint, can you

12    update the status of that?

13           MS. GOLDENBERG:  Yes, Your Honor.  We had a

14    productive discussion with defense counsel earlier this week.

15    My understanding is that they're going to circle back with

16    their group and get back to us fairly soon, and I think we can

17    work through everything.  I also am cognizant of your order

18    that you wanted this done by today, so we are prepared to

19    address the issues, but otherwise, I think we're close.

20           THE COURT:  Let's let you meet and confer and we'll

21    push it back to the next conference call, which I think is

22    July 10, right.

23           MS. GOLDENBERG:  Sure.

24           THE COURT:  And we're just talking about short form

25    complaints for the personal injury complaints, right?

1          MS. GOLDENBERG:  Yes.

2          And sorry, Marlene Goldenberg.

3          THE COURT:  Do the plaintiffs have their arms around

4    what we can anticipate in terms of volume of individual

5    complaints?

6          MR. NIGH:  I had stated before at the first

7    conference that I expect 2,000 cases to be filed within two

8    years, and I still believe that's the expectation at this

9    time.

10         THE COURT:  It's no secret, Mr. Nigh, you read the

11   literature, you read the articles that come out almost every

12   day.  Right now, there's two chemicals in this case.  For a

13   while now there's been smattering about a third, recently I

14   saw something about a fourth.  Do plaintiffs anticipate

15   attempting to bring other alleged carcinogens into the case?

16         MR. NIGH:  In terms of the DMF carcinogen, that's a

17   troubling one for us.  We're still trying to wrap our arms

18   around that one.  It is a new carcinogen.  Frankly, the

19   Macleods would be the defendant that has the off-the-charts

20   contamination level.

21         THE COURT:  Who are they?

22         MR. NIGH:  They have not been sued because they

23   weren't indicated in terms of having high levels of NDMA or

24   NDEA.

25         THE COURT:  What are they?

```
 1          MR. NIGH:  What are they?

 2          THE COURT:  Is it an API company or first dose?

 3          MR. NIGH:  Yes.  It will be an API company and then

 4  it will also be a U.S. finisher that will be implicated in

 5  those.

 6          THE COURT:  They are a United States company?

 7          MR. NIGH:  We have to research that.  I don't recall

 8  who exactly it was.  They do have a Macleods U.S. finisher

 9  that would be the person that I've seen.  I've just seen the

10  numbers just recently that theirs are off the charts and we're

11  trying to get some details in terms of the testing, and it

12  does appear to be a batch issue.

13          So it will probably be a more widely implicated issue

14  and I suspect that we'll see defendants land in this case

15  because of that contamination as well.

16          THE COURT:  What about the other -- the third -- I

17  forgot.  I get the initials mixed up.  Do you know what I'm

18  talking about?

19          MR. NIGH:  I do.  That one is NMBA and that

20  contamination appears to be isolated to the Losartan cases,

21  from what I've seen thus far.  So that will be tagged along

22  with the Losartan/Irbesartan issue that we'll discuss later.

23          THE COURT:  Okay.  Will that result in additional

24  defendants in the case?

25          MR. NIGH:  Yes.  The Losartan and Irbesartan, there
```

1  are additional defendants where those defendants may have only

2  manufactured Losartan or Irbesartan and did not manufacture

3  Valsartan, or their Valsartan wasn't implicated in the

4  contamination previously.

5         THE COURT:  Hypothetically, if the MDL panel brings

6  the two new Sartans into the case, if that occurs, do you

7  anticipate amendments to the master Complaints, to name new

8  defendants?

9         MR. NIGH:  I think we haven't discussed that on our

10  side but in my view, I think we would have a master Complaint

11  for Losartan and Irbesartan.  I'm not sure if we'll amend it

12  or if we've decided we would do our own master Complaint for

13  those drugs.  Something we have to discuss.

14         THE COURT:  If the two new sartans come in and you

15  file -- if you file a separate master Complaint just for those

16  two drugs, I think we ought to talk about that, whether that

17  makes sense or not.

18         Will it just be against the defendants in the case or

19  will there be new defendants in the case?

20         MR. NIGH:  There are some new defendants in the

21  Losartan and Irbesartan cases.  And I should also inform the

22  Court that we're aware that there's also an Olmesartan, very

23  small recall, I haven't seen any cases yet, but there is an

24  Olmesartan recall as well.

25         THE COURT:  One of the things we never understood was

 1    when the FDA recalls a lot, how big -- it sounds like a crazy

 2    question.  How big is a lot?

 3            MR. HONIK:  It's a really good question.

 4            MR. NIGH:  Well, a lot of times the lot is only a

 5    thousand pills but oftentimes what we're seeing is, is that

 6    there are lots of lots when it's a lot recall.  So we will

 7    see -- for Losartan, there's a lot of lot recalls but when you

 8    add it all together, you're talking millions of pills that

 9    have been recalled.

10            MR. HONIK:  And that may be an excellent question to

11    ask the defendants who are talking to their folks.

12            THE COURT:  How big is a batch?

13            MR. NIGH:  Batches oftentimes have thousands of lots

14    and, you know, so I would be thinking a lot of times batches

15    are millions of pills, sometimes they could be hundreds of

16    thousands, but it's a range for batches.

17            THE COURT:  Do you understand yet why only specific,

18    quote unquote, lots of these drugs are recalled, rather than,

19    say, everything made during a certain time period or

20    everything coming out of this plant?

21            MR. NIGH:  Right.

22            THE COURT:  Do you understand why they go -- the FDA

23    is recalling by lot rather than by time or factory or

24    something like that?

25            MR. NIGH:  So for Zhejiang Huahai we recognize that

1    all the U.S. subsidiaries have recalled all lots, so I don't

2    think we have that question as much for that entity, and the

3    same thing for Hetero Labs.  But for the other ones where they

4    are lot recalls, that is our No. 1 question.  I mean, we've

5    been wondering that ourselves.

6         THE COURT:  Is it only based on actual test results,

7    rather than supposition that everything made during a certain

8    time period was contaminated?  Does anybody know.

9         MR. NIGH:  I don't think anybody knows.  But

10   expiration dates is another reminder, that if the expiration

11   date for that lot has already passed, such that a pharmacy

12   could no longer hand out new pills from that bottle, then our

13   other understanding is that that will also not be added into

14   the recall list.  So that there are also contaminated pills

15   that they will know are contaminated but are not on the recall

16   list because of the expiration date.

17        THE COURT:  You know, Mr. Goldberg, if the plaintiffs

18   could get answers to some of these questions, it would be

19   immense help to them to frame their discovery to only ask for

20   relevant information rather than fishing for everything.  Can

21   the defendants help us understand why only specific -- well,

22   how many drugs are in a lot or why only specific lots are

23   recalled and not everything during a certain time period, or

24   everything made in a particular factory?

25        MR. GOLDBERG:  Well, I mean, I don't know that

1    defendants would be opposed to having some discussions with

2    plaintiffs about some of these substantive issues, some of

3    these facts that maybe we don't even have the answers to, but

4    maybe some of it is really better left for discovery.  Some of

5    it may be objectionable and we shouldn't have to provide that

6    kind of information now.  But I think we would consider

7    looking at some requests.  I mean, it's sort of along the

8    lines of core discovery.

9            THE COURT:  Yeah, but the sorts of questions that

10   we're talking about are so basic.

11           MR. GOLDBERG:  Well, that's right, and when Your

12   Honor proposed core discovery, you may remember we got a

13   letter of 22 categories that asked for anything under the sun.

14   I think whenever --

15           THE COURT:  And we narrowed that, didn't we?

16           MR. GOLDBERG:  We did.  And so maybe we want to try

17   something like that again, and I think Your Honor would need

18   to instruct plaintiffs --

19           THE COURT:  Yeah, but we're moving into Rule 26

20   discovery.

21           MR. GOLDBERG:  Right.  So the question, I guess, is

22   how much of -- you know, what's the scope again?  Because it

23   seems like any time you sort of open the valve, you know, a

24   geyser comes out.  Are we --

25           THE COURT:  I don't know what you're talking about,

     1    Mr. Goldberg.  This is basic, basic, basic, basic information.

     2         MR. GOLDBERG:  And we haven't had the discussion.

     3    I'm sure we're happy to provide some categories.

     4         THE COURT:  How many drugs in a lot?

     5         MR. TRISCHLER:  Your Honor, I think the answer to

     6    that question, I think it varies from manufacturer to

     7    manufacturer.  That's been my experience.  I don't think

     8    there's a set number.  But to the Court's comment about

     9    helping the plaintiff get some answers to this, I think they

    10    will when they see the core discovery.

    11         THE COURT:  Right.

    12         MR. TRISCHLER:  We're producing and I know other

    13    defendants are as well, a great deal of materials starting

    14    tomorrow.  Much -- the recalls of drugs are not conducted in a

    15    vacuum, they have to be conducted in conjunction with the FDA.

    16    That was the case in -- for virtually everyone at this table

    17    and in this room, as far as their clients go.  And so the FDA

    18    correspondence that the Court has directed be produced is part

    19    of core discovery.  I think we'll answer some of these

    20    questions about why certain lots may have been involved and

    21    why others weren't.  I will tell the Court it's my

    22    understanding part of that -- I think there are two things

    23    that we'll end up finding out when the documents are looked

    24    at.

    25         No. 1 it is when the FDA became aware of the issue,

 1   the FDA conducted some independent testing of products.  The

 2   FDA actually developed what it called an innovative test to

 3   check for NDMA and NDEA, conducted some testing, notified

 4   manufacturers, asked manufacturers to conduct testing and

 5   report back results.  When those results that came back, I

 6   think -- and again, every manufacturer is going to be a little

 7   bit different.  Those results of that testing conducted

 8   pursuant to the new assay that FDA developed at their own

 9   laboratory may have driven some of the recalls.  If no

10   contaminants were found with any given lot, it would not be

11   subject to the recall.  If certain levels that were deemed

12   unacceptable based on the limits that FDA established after

13   the fact came in, there may have been recalls initiated.  And

14   also, some manufacturers were very proactive.  If they found

15   any that was in some lots, they recalled all that was subject

16   to periods of expiration.

17          So I think most companies were not worried about

18   trying to pull back lots that were -- that were already

19   expired that couldn't be issued that may be sitting on shelves

20   but couldn't be given to a patient and just looked at the

21   period of expiration.

22          So there's a number of different factors involved.  I

23   think a lot of that is going to be the answer to the core

24   discovery.  If questions remain, I think we're certainly open

25   to communicating with the plaintiffs to try and address that.

1        I know I don't want to deal with 300 requests for

2   production if we can get it down to a hundred by meeting and

3   conferring with them and talking about it.

4        So I think we're all open to that process.  But I do

5   think those questions are going to start to be answered, and I

6   know that speaking for many people on this side, that the

7   complete core production will not start tomorrow, but a good

8   bit of it will.

9        THE COURT:  I think you make a very valid point.

10  Let's wait for the core discovery, get it in their hands and

11  then see if it answers some of these questions.  If not,

12  again, I think it's in the defendants' best interest to

13  educate plaintiffs so they can frame their discovery.

14        Undoubtedly, one of the big questions in discovery is

15  going to be the relevant timeframe.  Maybe not everybody wants

16  to go back or should go back, I'm sorry, to 2012.  I'm very

17  sensitive to that issue.  If one of the defendants makes the

18  case that it's inappropriate to go back that far, you know,

19  we'll deal with it.

20        But I think it would be the defendant's burden to

21  show the plaintiffs why they shouldn't go back that far.  But

22  we'll -- again, to put a point on this, I think you're right,

23  I think we should wait until the core discovery is produced

24  and then see what the questions remain.

25        MR. TRISCHLER:  Your Honor, may I add one point that

```
 1    I --

 2            THE COURT:  Sure.

 3            MR. TRISCHLER:  -- just to make sure.  As it relates

 4    to the core discovery -- and I apologize for the plaintiffs

 5    because I did not have a chance to talk to them about this,

 6    but as far as the method for production, our repository is not

 7    yet up and running, there are still a few issues that we're

 8    ironing out.  So the plan for the core discovery was that

 9    defendants individually were going to send, by letter, to the

10    plaintiffs' leadership group a letter with an FTP link to

11    access the documents until we have the repository up and

12    running.  Once the repository is up and running, anything

13    produced pursuant to core discovery would be added to our

14    repository.  But that's not going to happen tomorrow.  So what

15    I suspect will happen tomorrow in July, is the plaintiffs'

16    leadership will be receiving letters from the defendants

17    indicating how they can access the documents pursuant to an

18    FTP link that each one of the responding defendants will be

19    sending.  Hopefully that's acceptable once the repository is

20    going.

21            THE COURT:  Work it out with plaintiffs.  I'm sure

22    you'll work it out.

23            MR. PAREKH:  We can figure that out, but it would be

24    helpful to have one point person that we can sort of touch

25    base with.
```

```
 1          MR. TRISCHLER:  Maybe we can talk between

 2   conferences.  Thanks.

 3          THE COURT:  Okay.  So we said we're going to talk

 4   about the short form complaint at the next conference call.

 5          The plaintiff -- the defendants' fact sheets to the

 6   plaintiffs, is that ripe for today or do you want to put that

 7   off?

 8          MS. COHEN:  Judge, Lori Cohen on behalf of defendants

 9   on the point of the plaintiffs' fact sheets.  So we have been

10   making progress.  We have been having productive discussions,

11   I think, per our last call-in conference.  We sent to the

12   plaintiffs a personal injury and a consumer class combined

13   fact sheet.  I think we said we were going to send it to them

14   on June 14th, which we did.  We also sent them our TPP,

15   plaintiffs' fact sheet on the 19th again, which we had talked

16   about doing.

17          THE COURT:  Right.

18          MS. COHEN:  So we sent those kind of one with two

19   combined, one with the TPP.  As of I guess yesterday before

20   7 o'clock we had not received specific response or red lines

21   yet.  I know we were still working on it, we were still

22   discussing it.  Admittedly, there's a lot to them, totally

23   understand that.  Last night we received for the first time

24   sort of unexpectedly, sort of a different version, not really

25   red lines on ours, but we received something that was, I
```

1    think, not the personal injury, but it was a consumer class

2    version, including economic loss and medical monitoring.  So

3    it seems like we've now missed in terms of what we've received

4    and we haven't even had a chance to talk because it came in at

5    7:00 p.m. last night.  So we clearly have to keep talking

6    because ours have not been responded to and we just got sort

7    of a different animal, if you will, last night, but I'm not

8    saying that all is lost.  I think we'll just have to roll up

9    our sleeves and see where we go on that.

10              THE COURT:  Okay.  We will put this on the agenda for

11   the next call.  But, Miss Cohen, we're sensitive to your

12   concern that this was at the top of your priority list.

13              MS. COHEN:  I worry about it every night.

14              THE COURT:  I hope hot.

15              MS. COHEN:  Not every night.  Some nights.

16              (Laughter.)

17              MS. COHEN:  We're eager to learn about their side of

18   the case as well, and I know everyone is working hard at that.

19   But I think our schedule we've suggested is, to talk about

20   with you on the 10th and then hopefully have them entered at

21   the new -- the next conference, if we can.

22              THE COURT:  That would be great.  So we'll talk about

23   it on the 10th and we'll target the end of July to get it

24   entered.

25              MS. COHEN:  That would be great.  Thank you, Your

1    Honor.  And I'll just -- I just want to jump back again, if I

2    can for a minute, on the short form complaint.  And there

3    again, we are going to continue to meet and confer on that.

4    The last agenda item, I didn't jump up quickly to respond to

5    that.  You know, we're still meeting and conferring.  I think

6    we continue to make progress.  We've had one conference call.

7    We have a couple of big issues, in terms of the framing of it

8    and I'm happy to, you know, wait until we have our call to

9    talk about it.  One is sort of the away the defendants are

10   presented in it.  So again, we can talk about it next time or

11   we can get into it a little bit today.  Whatever you prefer.

12            THE COURT:  Why don't we talk about it, because I'd

13   like to see it front of me, Ms. Cohen.  I think that would be

14   helpful.

15            MS. COHEN:  Okay.

16            THE COURT:  So if you can send me a working draft for

17   the July 10 call, I think it is.

18            MS. COHEN:  Okay.

19            THE COURT:  I think we'll save it for that.

20            MS. COHEN:  Okay.  Thank you, Your Honor.

21            THE COURT:  I'm a little confused about the status of

22   the plaintiffs' fact sheets to the defendants.

23            MR. STANOCH:  Good morning, Your Honor, David

24   Stanoch.  The status is as Ms. Cohen had said.  They had sent

25   us two proposed fact sheets.  One for TPP plaintiffs --

1      THE COURT:  Now this is -- you're talking about

2 defendant to plaintiff.  I'm talking plaintiff to defendant.

3      MS. GOLDENBERG:  Your Honor, we are in the process of

4 getting that drafted.  We're nearly done and we expect to have

5 it to defendants, I think, by tomorrow when your order said it

6 should be.

7      THE COURT:  All right.  That's great.  So we'll

8 probably discuss it the 10th, but maybe we'll get lucky and

9 we'll finalize it the end of July.

10      MS. GOLDENBERG:  I'm sure they'll have no objections,

11 it will be perfect.

12      (Laughter.)

13      MS. COHEN:  Now I'll start to worry about that every

14 night.

15      THE COURT:  You better get a life, Ms. Cohen.

16      (Laughter.)

17      MS. COHEN:  Clearly.

18      THE COURT:  Status of stipulated dismissal process.

19 That's an interesting issue.

20      MS. GOLDENBERG:  Richard and I have been talking.  He

21 sent us a draft.  We just got back to him with our thoughts on

22 it and it sounds like we are making progress, but have some

23 macro issues that we probably need to address.  I think we can

24 work those out without wasting your time today.  If something

25 else comes up, we can talk about it on the discovery phone

1    call.

2            THE COURT:  Fine.

3            MR. SMITH:  Your Honor, if I may, Richard Smith.

4    Just to put a finer point on it.  We have come to you several

5    times with the defendant stipulation, our dismissal

6    stipulation concept.

7            Originally, the plaintiffs propose a two-step -- I

8    guess three-step process.  There was a stipulation that was in

9    the air, that did not name any defendants, that just said,

10   this is the mechanism we'll use to dismiss peripheral

11   defendants without naming them.

12           Concept being, we get the stipulation in, then we

13   discuss which defendants would be included and named, and then

14   the third step was a tolling agreement that that particular

15   peripheral defendant would agree to with the plaintiffs'

16   executive committee, the steering committee on plaintiffs'

17   side.

18           And we toiled with that concept for awhile.  We also

19   had some discussions about which defendants might be named.

20   Toiled with that and brought some of those concerns to Your

21   Honor during hearings and telephone calls.  In our last draft

22   from the defense side, we combined all of those steps into one

23   and said what we'd like to do is just enter into a stipulation

24   that Your Honor would enter that would say, these are the

25   defendants who are deemed to be peripheral defendants who

1  would be dismissed.

2          THE COURT:  Rather than categories?

3          MR. SMITH:  Rather than categories, although I can

4  tell you that what we did on the defense side was say, okay,

5  here are all of the categories of defendants, we reserved the

6  API manufacturers, clearly, we reserved the finished dose

7  manufacturers, and said everyone else later in the

8  distribution chain should be dismissed and we named them all

9  by name in our draft of the stipulation.

10          Concept being that we would agree for purposes of the

11  stipulation, these are the defendants that both parties on the

12  front end think should be dismissed from the case because they

13  are peripheral without prejudice for the time being.

14          Your Honor would enter that stipulation and then we

15  would know exactly which defendants were included and which

16  defendants would be able to take advantage of this process of

17  some limited discovery in a tolling agreement, all of which

18  would be specified in the stipulation, and then it would be a

19  one-step entry of a stipulated order and then those defendants

20  could then produce to the extent they want to be dismissed out

21  of the case, they could produce the informations that was

22  agreed upon.

23          And as Your Honor invited us to do, to the extent

24  that there was some concern about whether the defendant had

25  satisfied its obligation to produce those documents, we would

1    have a meet and confer process with Your Honor where the

2    answer would be, yes, these documents were produced or no,

3    they weren't.

4            THE COURT:  Great.

5            MR. SMITH:  If they were, then the dismissal would

6    follow and there's not a qualitative assessment of the content

7    of the documents, but rather, did you pass the gate in

8    producing those documents.

9            So that was the -- that's the first issue that I

10   think is -- we're still wrestling with, is will we be naming

11   the particular defendants in the stipulation or will it be a

12   multistep process where all we're doing is entering a naked

13   stipulation without the list of defendants.  And that's

14   something that we will be wrestling with.  We've committed to

15   meeting and conferring very soon to wrestle with that issue.

16           But again, from the defense position, we believe that

17   everybody, everybody south of the finished dose manufacturer

18   should be part of this and should be removed from the case,

19   because the case is really focused on the API process, that

20   manufacturing process, what if anything went wrong in that

21   process, and from our perspective, the documentation that the

22   retailers and distributors and repackagers, relabelers, et

23   cetera, have, that's not instructive of what happened at the

24   API level.  And we're willing to put in the finished dose

25   manufacturers as part of that as well, clearly.

1      The second issue is which Valsartan drugs we're

2  talking about.  Are we talking about the recalled Valsartan

3  drugs?  Are we talking about -- said we would -- and this

4  is -- just to take a step back, this is relevant to which

5  documentation, what information we're going to be producing to

6  the plaintiffs in order to pass through that gate to get out.

7      We have comitted on the defense side to producing

8  information about source for where each defendant received the

9  source, so that the -- that chain of commerce can be built.

10  And also, to whom each defendant sold the Valsartan-containing

11  drugs outside of the retailers to individual consumers.  That

12  part was not -- not part of the suggestion.  So that that

13  whole stream of commerce can be built by the plaintiffs.  We

14  recognize that that's important.

15      But which Valsartan drugs are we talking about?  And

16  the defense position was we would start with the recalled

17  Valsartan drugs and then to the extent that a defendant knew

18  of contamination in some lot or batch or whatever now we want

19  to use of Valsartan-containing drugs, we would add that as

20  well.  So that was the second issue.  It was just the scope of

21  Valsartan.

22      Closely related to that was the type.  Our proposal

23  was because we're talking about the recall, we start with when

24  the recall occurred, which I believe was 2018 and go forward

25  to present with the Valsartan-containing drugs.  The proposal

1  from the plaintiffs was much broader than that, all the way

2  back to 2010.  We think there's some middle ground there that

3  we're willing to talk about with the plaintiffs, and that also

4  we will be something that we talk about this week.

5          And then finally was just the scope of the

6  production.  The -- the defense position, as I've said

7  already, is that this case is about the API manufacturing

8  process.  Closely related to that would be the finished dose

9  manufacturers.  But what happened further in the chain is

10  really a sideshow to the main case, which is about the API

11  manufacturers.  And certainly, if we are making the decision

12  that these peripheral defendants are peripheral and should be

13  dismissed for now from the case, then getting into a lot of

14  discovery from those peripheral defendants to us seems like an

15  inefficient use of time and resources.  Unless, to the extent

16  that their documents would assist the plaintiffs in making

17  their case or assist the other defendants in defending their

18  case around the API manufacturing process or the finished dose

19  manufacturing process which we don't believe would occur.  We

20  don't believe that anything that a Walmart or a CVS is going

21  to have is going to relate to that claim against the API

22  manufacturer or the finished dose manufacturer.  And so we

23  have been trying to narrow the scope of that production not

24  down to everything that may be relevant to a claim against

25  this peripheral defendant, but rather the items that would be

 1   relevant to the claim that the plaintiffs are going to go

 2   forward with, which is the claim against the API manufacturer.

 3        THE COURT:  How about a savings clause that says,

 4   this is what we agree on, but if the plaintiffs can show good

 5   cause, if you can't agree on it, come to the Court, that from

 6   this particular defendant, we need X, Y, Z.  Who knows, there

 7   might be a particular defendant for a particular reason that

 8   there's good -- one out of a hundred -- one out of 30

 9   defendants, who there's good cause to ask for more documents

10   or information.  Shouldn't plaintiffs have that right to,

11   instead of asking for that same information from 30 people, to

12   -- if you can't agree, come to the Court and say, we have good

13   cause to ask for X, Y, Z from this one defendant?

14        MR. SMITH:  I think Your Honor is reading from our

15   script.  That's exactly our position.  The gatekeeping

16   function for being able to be dismissed without prejudice from

17   the case does not need to have every potential document that

18   you could possibly ask for from every defendant --

19        THE COURT:  It's not Rule 26 discovery.

20        MR. SMITH:  Exactly.  But to the extent that there

21   are documents that later in the case there is good reason to

22   go to a particular dismissed defendant and say, we need these

23   defendants --

24        THE COURT:  Well, even before -- I was thinking of

25   even before dismissal, if there's good cause, they should get

1    it.  And shouldn't there also be a savings clause that says,

2    even if this defendant is in this category, there's good cause

3    why they have to stay in the case?  I don't know what the

4    reason.  Maybe there's something special in, pick a state,

5    Alabama, why they need a particular defendant.  I don't know.

6         But if there is good cause, shouldn't -- shouldn't

7    they have the right to say, I don't want to let this defendant

8    out?

9         MR. SMITH:  So I think all of that is -- those are

10   ideas that we will certainly talk about.  I think with respect

11   to which defendant, I think rather than say there's good cause

12   not to dismiss this defendant, we would just not have them in

13   the stipulation, because our proposal is to list all of the

14   defendants who are out, by virtue of the stipulation, rather

15   than say, here are the categories without telling the Court

16   who it is that we're talking about.  So there's a

17   particularized identification of the defendant.  We would

18   hope, again, that all of the defendants short of the finished

19   dose manufacturers would be included in that list, and that

20   was our proposal.  But to the extent there is a particular

21   defendant that the defendants say, now I see your list and we

22   don't agree with this one for a good reason, then we certainly

23   want to talk about that.

24        With respect to the documentation, again, our global

25   stipulation in our proposal, would be much narrower in terms

1  of the gatekeeping function of who is removed.  But to the

2  extent there's a particular defendant that the plaintiffs say

3  this particular defendant we think is more likely to have

4  documents of this nature and for this particular defendant, we

5  need a sidebar amendment to this stipulation.  I think we're

6  certainly willing to talk that through as well.

7      So those are just the highlight issues that we're

8  dealing with right now.  Again, I think I'm going to have a

9  broader group of defendants on my side maybe on just meet and

10  confers that we have thus far to get all of the decision

11  makers at the same table, and we've committed to talking

12  through these things over the next -- hopefully the next week

13  to get a meet and confer promptly --

14      THE COURT:  Can I ask, some of the macro parameters,

15  the dismissal will be without prejudice.

16      MR. SMITH:  Yes, Your Honor.

17      THE COURT:  That there will be some sort of

18  production before dismissal, and I know what they're going to

19  say after plaintiff has an opportunity to talk, because at the

20  end of the day, they want to make sure they get paid for their

21  damages, so they want to have a ripe -- right at the end of

22  the day to be able to go against these others parties somehow,

23  some way, possibly.

24      MR. SMITH:  So on that, we have made it without

25  prejudice, the dismissal without prejudice.  We have also

 1   proposed that there would be a tolling provision --

 2        THE COURT:  That's a good idea.

 3        MR. SMITH:  -- in the stipulation with regard to any

 4   plaintiff who has already filed suit.  There's an automatic

 5   toll at that point.  Then with respect to any new plaintiff

 6   who may decide to come in and file suit later, from the moment

 7   that they give notice that they would have sued one of these

 8   defendants who has been dismissed, then the tolling provision

 9   would apply.

10        THE COURT:  Would it apply to everyone or just that

11   one defendant?

12        MR. SMITH:  To any defendant that they say, I would

13   have sued this defendant but for this agreement, and let them

14   out.  In other words, if there are 2,000 personal injury

15   plaintiffs, at this point, their claims are running, their

16   statute of limitations are running.  They're not going to be

17   required to sue one of these defendants.  They would merely

18   say, I would have sued one of these defendants.  Small

19   difference in form.

20        So that we don't have them in the case and dismiss

21   them and go through all the procedural hurdles, we would be

22   willing to accept that if they say, I would have sued this

23   defendant on this date, on that date they automatically

24   receive the benefit of the toll.

25        THE COURT:  Am I right -- I'm not sure of the law on

1   this, but as to the two class action master Complaints, is my

2   understanding of the law correct that because a putative class

3   action complaint was filed, that tolls the statute of

4   limitations as to the individual putative class members?

5        MR. SMITH:  I believe there is law to that effect,

6   Your Honor.  But with respect to the personal injury actions,

7   that would be different.

8        THE COURT:  Plaintiff?

9        MS. GOLDENBERG:  Sure.

10       THE COURT:  I know you have to meet and confer on

11  this.

12       MS. GOLDENBERG:  We do, and I think, you know, we can

13  work through a lot of these issues.  But, you know, I did want

14  to make clear that the scope of document requests that we're

15  talking about right now, I think there's eight.  So, you know,

16  I just heard as Mr. Trischler alluded to, settling for a

17  hundred for someone who's going to stay in the case, I think,

18  you know, we're not talking anywhere near that number for the

19  defendants who may be able to take advantage of this

20  stipulation.

21       But I think one thing that's really important is

22  that, you know, it's difficult to classify every defendant

23  who's going to be getting the benefit of the stipulation, and

24  we wouldn't want to limit ourselves to that right now, because

25  if we had to give that list today without the benefit of core

1    discovery and understanding the role of lots of these

2    defendants, we're going to have people stay in this case that

3    maybe we don't need.  So I think it's for everyone's mutual

4    benefit to allow us some time to do this on a rolling basis.

5          There are some people we can talk about now, and we

6    discussed that earlier, but, you know, this stipulation is not

7    going to be something that can happen all at once, because we

8    need to learn what everyone did and, you know, we understand

9    that we have obligations when we're suing different defendants

10   and including them in a Complaint.  I mean, we actually have

11   actionable claims against everyone who has been sued right

12   now.

13         So to say that none of them belong here is a little

14   bit of a -- that's not totally correct.

15         With that said, we do understand that there are

16   people who are the main focus of our investigation and we do

17   intend to focus it that way.  And I think that we'll be able

18   to work through a lot of those issues.

19         When it comes to the scope of, you know, what drugs

20   we're talking about when documents need to be produced, you

21   know, we just heard today that certain batches of drugs

22   weren't recalled because they might have already been expired

23   or because maybe that batch hadn't been tested yet by the FDA

24   and so, you know, we're going to have to work through how we

25   define which groups of drugs or which lots are going to be

 1    subject to document productions for defendants.

 2           Our goal as plaintiffs is to avoid third-party

 3    subpoenas.  So we know that if we dismiss these defendants

 4    right now without prejudice, we could always serve a

 5    third-party subpoena and ask for the same documents later, but

 6    that's a more burdensome process and we'd really like to avoid

 7    that for our sake and we would like to be able provide the

 8    benefit to ease defendants of saying, this is, hopefully, the

 9    one time we need something from you and then we'll leave you

10    alone for a while and maybe forever, depending on how things

11    go.

12           So, you know, the goal is just to make sure that we

13    get what we need now so that we don't have to keep coming back

14    to them.

15           When it comes to the date range of 2010, you know,

16    again we're still trying to figure out when these companies

17    changed their manufacturing process.  We're only really aware

18    of the timing for Zhejiang Huahai at this time.  So, you know,

19    we might find that Aurobindo changed their process later, we

20    might find that it changed it earlier.

21           THE COURT:  Well, they didn't start until 2014 or

22    something like that.

23           MR. NIGH:  Yeah, I should just include there real

24    quick, we do have some knowledge and some understanding that

25    possibly Mylan and Aurobindo may have even -- their

1    contamination may have dated back as far as 2012.

2         THE COURT:  I've seen that reference, yeah.  I think

3    I also saw a reference that somebody didn't start until 2014

4    or 2015.

5         MR. NIGH:  Right.

6         THE COURT:  That's why the core discovery is so

7    important.

8         MS. GOLDENBERG:  Exactly.  So again, these are all

9    things that we're willing to talk about, but right now, we

10   have to cover ourselves without having the benefit of the

11   information to make all of those decisions.

12        With that said, I think that pretty much covers, you

13   know, where we're at right now.  We'll continue to talk and,

14   you know, we can seek the Court's guidance in a few weeks if

15   there are issues that we haven't been able to --

16        THE COURT:  That's fine.  I understand that.  This is

17   a tricky issue and I would just add one thing to that.  When

18   you discuss with Judge Kugler what he envisions in the future

19   about how the merits issues are eventually going to be

20   handled, that will also inform, I think -- be relevant to your

21   decision regarding the stipulation of these tangential

22   defendants.

23        MS. GOLDENBERG:  One last thing that might be helpful

24   to both sides when we're discussing this issue, is, you know,

25   we had both talked about the mechanism for what happens if we

 1   need to bring somebody back in at the end of the case.  If the

 2   Court has any guidance on the procedure that you had

 3   envisioned for doing that.

 4          THE COURT:  I think it ought to be as easy as

 5   possible.

 6          MS. GOLDENBERG:  Okay.

 7          THE COURT:  Because, let's face it, you're doing them

 8   a favor by letting them out so they don't have to come to

 9   these conferences and their clients can save money and the

10   efficiency of the litigation.  So it should not be a

11   burdensome process.

12          MS. GOLDENBERG:  We agree and I'll sit town.

13          MR. SMITH:  Just, Your Honor, just for additional

14   guidance on that last point, the two competing drafts, as of

15   right now, and we haven't talked about them, are our position,

16   which is that if the defendant -- if the plaintiffs want to

17   add a defendant -- re-add a defendant back in, then they would

18   notify Your Honor and the particular defendant so that we

19   could meet and confer about it and have a quick discussion

20   with Your Honor --

21          THE COURT:  That's fine.

22          MR. SMITH:  -- before that occurs.

23          The other proposal is that just on seven days notice

24   the plaintiffs would just be allowed to file and they're

25   automatically back in.

1          THE COURT:  Either one.

2          MR. SMITH:  From a defense position, we would prefer

3    to have a conversation with Your Honor just so that there is

4    the benefit of a disinterested party to have that discussion

5    to say before we let them in -- bring them back in, yes, this

6    is appropriate, or maybe have a better discussion about the

7    best mechanism to get wherever it is that the plaintiffs are

8    trying to get at that point.

9          THE COURT:  Either one is fine.

10         I don't have a problem with coming to the Court if

11   you can't agree, because if there's good cause, they're coming

12   back in.  If you need them, they're in.

13         You're the plaintiff.

14         Okay.  The coordination of going down the agenda,

15   coordination of non-MDL matters.  Let's discuss that with

16   Judge Kugler.  Inclusion of Losartan and the other sartans,

17   that's in the works.

18         MR. HONIK:  It is, Your Honor.  We have, in fact,

19   circulated internally a petition and at the appropriate time,

20   we'll share it with the defense.

21         THE COURT:  Great.  If you could just send a copy --

22   anything that's filed with the panel, just send the Court a

23   copy just so we're up to date on what's going on.

24         MR. HONIK:  Absolutely.

25         THE COURT:  Master Complaint, great, they were filed,

1    I read them.

2          Motions to dismiss, you can talk with Judge Kugler to

3    your heart's content in a few minutes about that.

4          Are there any other issues you want to talk about?

5    We'll exhaust our issues.  I'll update Judge Kugler on what's

6    -- what happened this morning and I anticipate we'll be down

7    in a few minutes.

8          So for the good of the order, plaintiff's, anything

9    else?

10         MR. NIGH:  Yeah, for the time and expense, we were

11   hoping for a couple of -- first off, we were hoping we could

12   get an extension while we just got our time sheet program up

13   and running.  We have a due date.  I want to say the due date

14   is July 15th.

15         THE COURT:  Just send us a letter and we'll take care

16   of it.

17         MR. NIGH:  Thank you.

18         THE COURT:  Just send us a letter.

19         Anything else?

20         MR. GOLDBERG:  I think that's it, Your Honor.

21         THE COURT:  Defendants?

22         MR. NIGH:  Nothing, Your Honor.

23         THE COURT:  So I think we're looking at -- through

24   the summer, we'll get all the organizational issues,

25   administrative issues, I think, wrapped up.  By the end of the

1    summer we should have the fact sheets done and served, and

2    then when we -- the document request, the objections, come the

3    fall, we'll resolve the macro issues, the individual issues,

4    then each side will produce the responses to the facts sheets

5    and ESI probably in the fall and, you know, I think that's a

6    good timeframe, depending upon what happens with the

7    discussion with Judge Kugler and the motions.

8            So why don't we take a break.  You can stay here for

9    the time being, and we'll be back -- I don't anticipate it

10   will take very long to come back down and meet again, okay?

11   Just give us a few minutes.

12           MS. COHEN:  We'll meet here, Your Honor?

13           THE COURT:  Yes.  Stay here, stay here.

14           THE DEPUTY CLERK:  All rise.

15           (11:12 a.m.)

16           - - - - - - - - - - - - - - - -

17   I certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20   */S/ Karen Friedlander, CRR, RMR*
     *Court Reporter/Transcriber*

21

22   *7/11/19*
     *Date*

23

24

25

**0**

**07081-0730** [1] - 2:12
**08101** [1] - 1:7

**1**

**1** [3] - 1:6, 26:4, 28:25
**10** [2] - 21:22, 34:17
**10:05** [1] - 4:2
**10:15** [1] - 1:8
**10th** [3] - 33:20, 33:23, 35:8
**11:12** [1] - 52:15
**14th** [1] - 32:14
**15219** [1] - 2:18
**15th** [1] - 51:14
**1638** [1] - 2:6
**1776** [1] - 3:6
**17th** [1] - 2:9
**1835** [1] - 1:16
**19-2875** [1] - 4:5
**19103** [2] - 1:17, 2:9
**19422** [1] - 3:3
**19th** [1] - 32:15
**1:19-md-02878-RBK-JS** [1] - 1:4

**2**

**2,000** [2] - 22:7, 44:14
**20006** [1] - 3:7
**2010** [2] - 40:2, 47:15
**2012** [2] - 30:16, 48:1
**2014** [2] - 47:21, 48:3
**2015** [1] - 48:4
**2018** [1] - 39:24
**2019** [2] - 1:8, 4:2
**2150** [1] - 2:21
**22** [1] - 27:13
**2500** [1] - 2:15
**26** [4] - 1:8, 4:2, 27:19, 41:19
**2900** [1] - 1:16

**3**

**30** [4] - 2:9, 20:3, 41:8, 41:11
**300** [1] - 30:1
**30327** [1] - 2:15
**316** [1] - 1:13
**32502** [1] - 1:13
**3333** [1] - 2:15
**33950** [2] - 2:3, 3:10
**38th** [1] - 2:18

**4**

**45** [1] - 20:2

**450** [1] - 3:3
**4th** [1] - 1:7

**5**

**52** [1] - 1:6
**55402** [1] - 2:22

**6**

**600** [1] - 1:13
**673** [1] - 2:12

**7**

**7** [1] - 32:20
**701** [1] - 1:19
**70130** [1] - 1:20
**756-0160** [1] - 1:24
**7:00** [1] - 33:5

**8**

**800** [1] - 2:21
**856** [1] - 1:24

**9**

**9-16** [1] - 20:3
**90277** [1] - 2:6
**99** [2] - 2:3, 3:10

**A**

**a.m** [3] - 1:8, 4:2, 52:15
**able** [7] - 37:16, 41:16, 43:22, 45:19, 46:17, 47:7, 48:15
**absolutely** [3] - 18:14, 20:13, 50:24
**absorb** [1] - 17:4
**accept** [1] - 44:22
**acceptable** [1] - 31:19
**access** [2] - 31:11, 31:17
**according** [1] - 16:15
**Actavis** [4] - 10:21, 10:25, 11:1, 11:2
**action** [2] - 45:1, 45:3
**ACTION** [1] - 1:3
**actionable** [1] - 46:11
**actions** [1] - 45:6
**actual** [1] - 26:6
**add** [6] - 25:8, 30:25, 39:19, 48:17, 49:17
**added** [2] - 26:13, 31:13
**additional** [3] - 23:23, 24:1, 49:13
**address** [4] - 14:12,

21:19, 29:25, 35:23
**administrative** [1] - 51:25
**admissible** [3] - 18:9, 18:10, 18:11
**admittedly** [1] - 32:22
**advantage** [2] - 37:16, 45:19
**agency** [1] - 20:19
**agenda** [5] - 4:24, 21:9, 33:10, 34:4, 50:14
**agree** [8] - 36:15, 37:10, 41:4, 41:5, 41:12, 42:22, 49:12, 50:11
**agreed** [2] - 15:5, 37:22
**agreed-upon** [1] - 15:5
**agreement** [4] - 11:11, 36:14, 37:17, 44:13
**aided** [1] - 1:25
**air** [1] - 36:9
**Alabama** [1] - 42:5
**alerted** [1] - 5:2
**ALFANO** [1] - 2:17
**alleged** [1] - 42:15
**allow** [1] - 46:4
**allowed** [1] - 49:24
**alluded** [1] - 45:16
**almost** [1] - 22:11
**alone** [1] - 47:10
**amend** [1] - 24:11
**amendment** [1] - 43:5
**amendments** [1] - 24:7
**amount** [2] - 13:9, 19:20
**animal** [1] - 33:7
**answer** [5] - 18:23, 28:5, 28:19, 29:23, 38:2
**answered** [2] - 17:21, 30:5
**answers** [5] - 19:24, 26:18, 27:3, 28:9, 30:11
**anticipate** [7] - 5:1, 15:9, 22:4, 22:14, 24:7, 51:6, 52:9
**anyway** [1] - 21:8
**API** [15] - 5:15, 9:6, 12:20, 12:24, 16:1, 23:2, 23:3, 37:6, 38:19, 38:24, 40:7, 40:10, 40:18, 40:21, 41:2
**apologize** [1] - 31:4
**appear** [1] - 23:12

**appearance** [5] - 4:6, 6:8, 6:10, 6:24, 11:22
**apply** [2] - 44:9, 44:10
**appropriate** [3] - 16:9, 50:6, 50:19
**approved** [1] - 13:13
**argument** [1] - 21:2
**arms** [4] - 5:10, 20:16, 22:3, 22:17
**articles** [1] - 22:11
**aside** [1] - 17:21
**assay** [1] - 29:8
**assess** [1] - 18:16
**assessment** [1] - 38:6
**assist** [2] - 40:16, 40:17
**assume** [2] - 9:24, 12:12
**assuming** [1] - 5:3
**Atlanta** [1] - 3:8
**attempting** [1] - 22:15
**August** [5] - 13:7, 16:20, 17:2, 19:6, 19:19
**Auro** [1] - 10:17
**Aurobindo** [15] - 3:4, 8:8, 8:11, 8:12, 8:18, 8:21, 9:2, 9:9, 9:21, 9:23, 12:24, 47:19, 47:25
**aurolife** [1] - 12:18
**Aurolife** [4] - 3:4, 8:24, 9:24, 12:25
**authorizations** [1] - 14:16
**automatic** [1] - 44:4
**automatically** [2] - 44:23, 49:25
**Avenue** [2] - 2:12, 2:21
**avoid** [2] - 47:2, 47:6
**awaiting** [1] - 5:22
**aware** [4] - 8:12, 24:22, 28:25, 47:17
**awhile** [1] - 36:18

**B**

**bad** [1] - 19:2
**bake** [1] - 18:5
**ballpark** [1] - 16:14
**Baren** [1] - 15:3
**base** [1] - 31:25
**based** [3] - 17:7, 26:6, 29:12
**basic** [5] - 27:10, 28:1
**basis** [1] - 46:4
**batch** [4] - 23:12, 25:12, 39:18, 46:23

**batches** [4] - 25:13, 25:14, 25:16, 46:21
**Baylen** [1] - 1:13
**Beach** [1] - 2:6
**became** [1] - 28:25
**behalf** [6] - 4:15, 4:18, 4:19, 11:23, 32:8
**BEHRAM** [1] - 2:5
**Bell** [1] - 3:3
**belong** [1] - 46:13
**benefit** [7] - 44:24, 45:23, 45:25, 46:4, 47:8, 48:10, 50:4
**Benicar** [5] - 13:23, 14:20, 14:22, 15:11, 17:20
**best** [2] - 30:12, 50:7
**better** [4] - 17:1, 27:4, 35:15, 50:6
**between** [1] - 32:1
**big** [7] - 13:25, 20:25, 25:1, 25:2, 25:12, 30:14, 34:7
**bit** [5] - 14:11, 29:7, 30:8, 34:11, 46:14
**Blue** [1] - 3:3
**bolts** [1] - 21:3
**BOSICK** [1] - 2:17
**bottle** [1] - 26:12
**boy** [1] - 20:5
**break** [1] - 52:8
**breaking** [1] - 16:4
**briefing** [1] - 21:2
**briefly** [1] - 15:10
**bring** [3] - 22:15, 49:1, 50:5
**brings** [1] - 24:5
**broader** [2] - 40:1, 43:9
**brought** [1] - 36:20
**Building** [1] - 1:6
**built** [2] - 39:9, 39:13
**burden** [1] - 30:20
**burdensome** [2] - 47:6, 49:11
**burdensomeness** [1] - 20:21
**BY** [13] - 1:12, 1:15, 1:19, 2:2, 2:5, 2:8, 2:11, 2:14, 2:17, 2:20, 3:2, 3:6, 3:9

**C**

**California** [1] - 2:6
**call-in** [1] - 32:11
**Camber** [1] - 6:24
**Camden** [1] - 1:7
**Camp** [1] - 1:19
**carcinogen** [2] -

22:16, 22:18
**carcinogens** [1] - 22:15
**care** [1] - 51:15
**case** [36] - 5:10, 10:6, 13:8, 13:17, 14:14, 15:20, 16:8, 16:15, 17:16, 18:19, 22:12, 22:15, 23:14, 23:24, 24:6, 24:18, 24:19, 28:16, 30:18, 33:18, 37:12, 37:21, 38:18, 38:19, 40:7, 40:10, 40:13, 40:17, 40:18, 41:17, 41:21, 42:3, 44:20, 45:17, 46:2, 49:1
**cases** [4] - 22:7, 23:20, 24:21, 24:23
**categories** [8] - 15:21, 15:24, 27:13, 28:3, 37:2, 37:3, 37:5, 42:15
**category** [3] - 15:22, 19:4, 42:2
**Centre** [1] - 2:18
**certain** [6] - 25:19, 26:7, 26:23, 28:20, 29:11, 46:21
**certainly** [6] - 8:5, 29:24, 40:11, 42:10, 42:22, 43:6
**cetera** [3] - 20:22, 38:23
**chain** [4] - 16:3, 37:8, 39:9, 40:9
**chance** [2] - 31:5, 33:4
**changed** [3] - 47:17, 47:19, 47:20
**charts** [3] - 15:15, 22:19, 23:10
**check** [2] - 6:5, 29:3
**chemicals** [1] - 22:12
**chomping** [1] - 14:11
**CIPRIANI** [1] - 3:2
**circle** [1] - 21:15
**circulated** [1] - 50:19
**CIVIL** [1] - 1:3
**claim** [4] - 40:21, 40:24, 41:1, 41:2
**claims** [2] - 44:15, 46:11
**clarify** [1] - 12:17
**class** [5] - 32:12, 33:1, 45:1, 45:2, 45:4
**classify** [1] - 45:22
**clause** [2] - 41:3, 42:1
**clean** [1] - 19:24
**clear** [1] - 45:14
**clearly** [4] - 33:5,

35:17, 37:6, 38:25
**Clem** [1] - 4:21
**CLEM** [1] - 2:17
**CLERK** [2] - 4:1, 52:14
**client** [5] - 5:7, 7:12, 9:16, 11:12, 14:24
**clients** [2] - 28:17, 49:9
**close** [1] - 21:19
**closely** [2] - 39:22, 40:8
**Coast** [1] - 2:6
**cognizant** [1] - 21:17
**Cohen** [8] - 1:6, 4:17, 10:7, 32:8, 33:11, 34:13, 34:24, 35:15
**COHEN** [20] - 2:14, 4:17, 10:10, 10:12, 10:15, 10:19, 10:23, 11:2, 32:8, 32:18, 33:13, 33:15, 33:17, 33:25, 34:15, 34:18, 34:20, 35:13, 35:17, 52:12
**combined** [3] - 32:12, 32:19, 36:22
**coming** [4] - 25:20, 47:13, 50:10, 50:11
**comitted** [1] - 39:7
**Commencing** [1] - 1:8
**comment** [1] - 28:8
**commerce** [2] - 39:9, 39:13
**committed** [2] - 38:14, 43:11
**committee** [1] - 36:16
**communicating** [2] - 20:19, 29:25
**companies** [5] - 7:23, 10:5, 10:7, 29:17, 47:16
**company** [13] - 7:6, 7:21, 8:19, 9:3, 9:8, 9:9, 10:9, 11:9, 12:9, 23:2, 23:3, 23:6
**competing** [1] - 49:14
**Complaint** [5] - 24:10, 24:12, 24:15, 46:10, 50:25
**complaint** [5] - 10:17, 21:11, 32:4, 34:2, 45:3
**Complaints** [5] - 5:12, 13:12, 18:7, 24:7, 45:1
**complaints** [3] - 21:25, 22:5
**complete** [1] - 30:7
**computer** [1] - 1:25
**computer-aided** [1] -

1:25
**concept** [4] - 36:6, 36:12, 36:18, 37:10
**concern** [2] - 33:12, 37:24
**concerns** [1] - 36:20
**conduct** [1] - 29:4
**conducted** [5] - 28:14, 28:15, 29:1, 29:3, 29:7
**confer** [9] - 16:21, 20:5, 20:9, 21:20, 34:3, 38:1, 43:13, 45:10, 49:19
**conference** [10] - 5:2, 5:3, 14:9, 15:12, 21:21, 22:7, 32:4, 32:11, 33:21, 34:6
**CONFERENCE** [1] - 1:5
**conferences** [2] - 32:2, 49:9
**conferring** [3] - 30:3, 34:5, 38:15
**confers** [1] - 43:10
**confidentiality** [1] - 13:15, 21:10
**confused** [1] - 34:21
**conjunction** [1] - 28:15
**CONLEE** [1] - 1:19
**Conlee** [1] - 4:11
**consider** [3] - 20:22, 20:24, 27:6
**consumer** [2] - 32:12, 33:1
**consumers** [1] - 39:11
**contact** [2] - 7:11, 9:5
**containing** [3] - 39:10, 39:19, 39:25
**contaminants** [1] - 29:10
**contaminated** [3] - 26:8, 26:14, 26:15
**contamination** [6] - 22:20, 23:15, 23:20, 24:4, 39:18, 48:1
**content** [3] - 14:10, 38:6, 51:3
**context** [2] - 14:17, 17:12
**continue** [3] - 34:3, 34:6, 48:13
**CONTINUED** [2] - 2:1, 3:1
**control** [3] - 7:13, 7:15, 9:25
**controlled** [1] - 15:1
**conversation** [1] - 50:3

**convinced** [1] - 19:22
**Cooper** [1] - 1:7
**coordination** [2] - 50:14, 50:15
**copy** [2] - 50:21, 50:23
**core** [32] - 6:11, 7:6, 9:3, 9:16, 9:21, 11:25, 12:2, 12:10, 12:13, 13:4, 13:5, 13:11, 13:21, 16:6, 16:11, 16:18, 16:23, 19:16, 19:21, 27:8, 27:12, 28:10, 28:19, 29:23, 30:7, 30:10, 30:23, 31:4, 31:8, 31:13, 45:25, 48:6
**corporation** [1] - 6:20
**correct** [15] - 5:14, 5:18, 6:2, 6:4, 6:9, 6:23, 7:22, 8:1, 8:3, 8:20, 8:23, 9:18, 16:12, 45:2, 46:14
**correspondence** [1] - 28:18
**counsel** [4] - 4:7, 9:5, 21:14
**couple** [4] - 4:25, 21:8, 34:7, 51:11
**course** [1] - 10:2
**Court** [1] - 1:23
**COURT** [2] - 1:1, 4:2
**Court's** [2] - 28:8, 48:14
**Courthouse** [1] - 1:6
**cover** [1] - 48:10
**covers** [1] - 48:12
**crazy** [1] - 25:1
**custodian** [1] - 18:17
**custodians** [6] - 14:2, 15:2, 15:5, 15:14, 16:9, 20:10
**custody** [3] - 7:13, 7:16, 9:25
**CVS** [1] - 40:20

**D**

**damages** [1] - 43:21
**Daniel** [1] - 4:8
**DANIEL** [1] - 1:12
**data** [1] - 15:13
**date** [9] - 19:5, 26:11, 26:16, 44:23, 47:15, 50:23, 51:13
**dated** [1] - 48:1
**dates** [1] - 26:10
**David** [1] - 34:23
**DAVID** [1] - 1:16
**days** [3] - 20:2, 20:3, 49:23

**DC** [1] - 3:7
**deal** [5] - 13:5, 21:3, 28:13, 30:1, 30:19
**dealing** [1] - 43:8
**decide** [1] - 44:6
**decided** [1] - 24:12
**decision** [3] - 40:11, 43:10, 48:21
**decisions** [1] - 48:11
**deemed** [2] - 29:11, 36:25
**defendant** [37] - 11:12, 11:19, 15:22, 22:19, 35:2, 36:5, 36:15, 37:24, 39:8, 39:10, 39:17, 40:25, 41:6, 41:7, 41:13, 41:18, 41:22, 42:2, 42:5, 42:7, 42:11, 42:12, 42:17, 42:21, 43:2, 43:3, 43:4, 44:11, 44:12, 44:13, 44:23, 45:22, 49:16, 49:17, 49:18
**Defendant** [8] - 2:10, 2:13, 2:16, 2:19, 2:22, 3:4, 3:7, 3:11
**defendant's** [1] - 30:20
**defendants** [73] - 4:13, 4:15, 4:18, 5:14, 11:5, 12:16, 14:2, 14:15, 14:19, 15:13, 15:21, 15:25, 16:10, 16:21, 19:3, 19:4, 19:23, 19:25, 20:14, 20:19, 20:20, 23:14, 23:24, 24:1, 24:8, 24:18, 24:19, 24:20, 25:11, 26:21, 27:1, 28:13, 30:17, 31:9, 31:16, 31:18, 32:8, 34:9, 34:22, 35:5, 36:9, 36:11, 36:13, 36:19, 36:25, 37:5, 37:11, 37:15, 37:16, 37:19, 38:11, 38:13, 40:12, 40:14, 40:17, 41:9, 41:23, 42:14, 42:18, 42:21, 43:9, 44:8, 44:17, 44:18, 45:19, 46:2, 46:9, 47:1, 47:3, 47:8, 48:22
**Defendants** [1] - 51:21
**defendants'** [2] - 30:12, 32:5
**defending** [1] - 40:17
**Defense** [4] - 2:10,

2:16, 2:19, 3:8
**defense** [14] - 4:15, 4:18, 4:20, 4:22, 14:22, 21:14, 36:22, 37:4, 38:16, 39:7, 39:16, 40:6, 50:2, 50:20
**define** [1] - 46:25
**definitely** [1] - 15:23
**DEPUTY** [2] - 4:1, 52:14
**detail** [1] - 14:8
**details** [1] - 23:11
**developed** [2] - 29:2, 29:8
**DFS** [1] - 14:25
**difference** [1] - 44:19
**different** [8] - 15:21, 16:2, 29:7, 29:22, 32:24, 33:7, 45:7, 46:9
**difficult** [1] - 45:22
**direct** [1] - 7:11
**directed** [2] - 14:19, 28:18
**direction** [1] - 14:1
**disclosures** [1] - 16:17
**discovery** [46] - 6:12, 7:6, 9:3, 9:16, 9:22, 11:25, 12:2, 12:11, 12:13, 13:4, 13:5, 13:11, 13:14, 13:15, 13:22, 13:24, 16:6, 16:8, 16:11, 16:18, 16:23, 19:16, 19:21, 21:10, 26:19, 27:4, 27:8, 27:12, 27:20, 28:10, 28:19, 29:24, 30:10, 30:13, 30:14, 30:23, 31:4, 31:8, 31:13, 35:25, 37:17, 40:14, 41:19, 46:1, 48:6
**discuss** [7] - 14:8, 23:22, 24:13, 35:8, 36:13, 48:18, 50:15
**discussed** [5] - 14:7, 15:13, 15:15, 24:9, 46:6
**discussing** [3] - 20:10, 32:22, 48:24
**discussion** [6] - 21:14, 28:2, 49:19, 50:4, 50:6, 52:7
**discussions** [4] - 17:11, 27:1, 32:10, 36:19
**disinterested** [1] - 50:4

**dismiss** [8] - 11:12, 14:5, 14:11, 36:10, 42:12, 44:20, 47:3, 51:2
**dismissal** [8] - 13:20, 35:18, 36:5, 38:5, 41:25, 43:15, 43:18, 43:25
**dismissed** [9] - 12:7, 37:1, 37:8, 37:12, 37:20, 40:13, 41:16, 41:22, 44:8
**disproportionality** [1] - 20:21
**distinction** [1] - 9:15
**distribution** [1] - 37:8
**distributors** [1] - 38:22
**DISTRICT** [2] - 1:1, 1:1
**DMF** [1] - 22:16
**Docket** [1] - 4:4
**docket** [3] - 5:9, 6:5, 6:9
**document** [20] - 14:19, 14:20, 14:24, 15:1, 17:7, 17:10, 17:18, 18:6, 18:19, 18:22, 19:4, 19:8, 19:12, 19:14, 20:6, 20:9, 41:17, 45:14, 47:1, 52:2
**documentation** [3] - 38:21, 39:5, 42:24
**documents** [24] - 7:14, 14:23, 16:7, 16:23, 17:1, 17:4, 18:12, 18:24, 20:1, 20:18, 20:23, 28:23, 31:11, 31:17, 37:25, 38:2, 38:7, 38:8, 40:16, 41:9, 41:21, 43:4, 46:20, 47:5
**domestic** [1] - 5:24
**done** [7] - 5:3, 13:9, 17:16, 19:13, 21:18, 35:4, 52:1
**dose** [13] - 10:7, 11:4, 11:16, 12:18, 12:25, 23:2, 37:6, 38:17, 38:24, 40:8, 40:18, 40:22, 42:19
**down** [7] - 15:13, 15:17, 30:2, 40:24, 50:14, 51:6, 52:10
**draft** [4] - 34:16, 35:21, 36:21, 37:9
**drafted** [1] - 35:4
**drafting** [1] - 14:17
**drafts** [1] - 49:14

**driven** [1] - 29:9
**drug** [1] - 15:25
**drugs** [16] - 24:13, 24:16, 25:18, 26:22, 28:4, 28:14, 39:1, 39:3, 39:11, 39:15, 39:17, 39:19, 39:25, 46:19, 46:21, 46:25
**Drugs** [7] - 6:20, 7:2, 7:5, 7:7, 7:17, 7:25, 9:8
**DUANE** [1] - 2:8
**due** [3] - 16:17, 51:13
**during** [4] - 25:19, 26:7, 26:23, 36:21

**E**

**eager** [1] - 33:17
**early** [1] - 16:6
**ease** [1] - 47:8
**easier** [2] - 8:5, 15:17
**easy** [1] - 49:4
**economic** [1] - 33:2
**educate** [1] - 30:13
**effect** [1] - 45:5
**effectuate** [1] - 6:18
**efficiency** [1] - 49:10
**eight** [1] - 45:15
**either** [4] - 9:13, 13:6, 50:1, 50:9
**electronic** [1] - 13:14
**employer** [1] - 13:12
**encompassing** [1] - 13:25
**end** [12] - 13:6, 16:18, 17:2, 19:11, 28:23, 33:23, 35:9, 37:12, 43:20, 43:21, 49:1, 51:25
**engaged** [1] - 10:5
**enter** [3] - 36:23, 36:24, 37:14
**entered** [9] - 6:8, 6:10, 6:24, 11:22, 13:10, 13:13, 13:16, 33:20, 33:24
**entering** [1] - 38:12
**entities** [4] - 5:24, 9:21, 12:3, 12:4
**entity** [4] - 10:20, 11:17, 11:24, 26:2
**entries** [1] - 4:6
**entry** [1] - 37:19
**envisioned** [1] - 49:3
**envisions** [1] - 48:18
**ESI** [6] - 14:3, 14:14, 15:2, 15:17, 18:16, 52:5
**especially** [1] - 18:6

**ESQ** [3] - 1:19, 2:8, 2:14
**ESQUIRE** [11] - 1:12, 1:15, 1:16, 2:2, 2:5, 2:11, 2:17, 2:20, 3:2, 3:6, 3:9
**essence** [1] - 14:18
**essentially** [2] - 15:5, 20:12
**established** [1] - 29:12
**et** [3] - 20:21, 20:22, 38:22
**eventually** [2] - 18:11, 48:19
**exactly** [5] - 23:8, 37:15, 41:15, 41:20, 48:8
**excellent** [1] - 25:10
**executive** [1] - 36:16
**exercise** [1] - 19:17
**exhaust** [1] - 51:5
**expect** [3] - 17:6, 22:7, 35:4
**expectation** [1] - 22:8
**expense** [2] - 13:10, 51:10
**experience** [1] - 28:7
**expiration** [5] - 26:10, 26:16, 29:16, 29:21
**expired** [2] - 29:19, 46:22
**extension** [1] - 51:12
**extent** [8] - 16:2, 37:20, 37:23, 39:17, 40:15, 41:20, 42:20, 43:2

**F**

**face** [1] - 49:7
**facilities** [1] - 20:24
**fact** [17] - 7:18, 13:19, 14:15, 14:18, 14:21, 14:22, 17:8, 19:5, 29:13, 32:5, 32:9, 32:13, 32:15, 34:22, 34:25, 50:18, 52:1
**factors** [1] - 29:22
**factory** [2] - 25:23, 26:24
**facts** [2] - 27:3, 52:4
**fair** [1] - 13:9
**fairly** [1] - 21:16
**fall** [2] - 52:3, 52:5
**far** [8] - 13:9, 23:21, 28:17, 30:18, 30:21, 31:6, 43:10, 48:1
**FARR** [2] - 2:2, 3:9
**favor** [1] - 49:8

**FDA** [11] - 20:18, 25:1, 25:22, 28:15, 28:17, 28:25, 29:1, 29:2, 29:8, 29:12, 46:23
**FDA-like** [1] - 20:18
**felt** [1] - 15:2
**few** [5] - 31:7, 48:14, 51:3, 51:7, 52:11
**figure** [2] - 31:23, 47:16
**file** [4] - 24:15, 44:6, 49:24
**filed** [7] - 5:7, 13:13, 22:7, 44:4, 45:3, 50:22, 50:25
**finalize** [1] - 35:9
**finally** [1] - 40:5
**fine** [7] - 17:10, 17:19, 18:3, 36:2, 48:16, 49:21, 50:9
**finer** [1] - 36:4
**finished** [14] - 10:7, 11:4, 11:16, 12:18, 12:25, 15:25, 17:14, 37:6, 38:17, 38:24, 40:8, 40:18, 40:22, 42:18
**finisher** [2] - 23:4, 23:8
**FIRM** [2] - 2:2, 3:9
**firm** [1] - 11:5
**first** [5] - 22:6, 23:2, 32:23, 38:9, 51:11
**fishing** [1] - 26:20
**Floor** [1] - 2:18
**Florida** [3] - 1:13, 2:3, 3:10
**focus** [2] - 46:16, 46:17
**focused** [1] - 38:19
**folks** [1] - 25:11
**follow** [1] - 38:6
**FOR** [1] - 1:1
**foreign** [3] - 10:5, 10:19, 20:14
**forever** [1] - 47:10
**forget** [1] - 19:4
**forgot** [1] - 23:17
**form** [5] - 21:11, 21:24, 32:4, 34:2, 44:19
**formal** [6] - 15:4, 15:6, 15:8, 17:18, 17:24, 19:4
**formality** [3] - 18:3, 18:5, 18:9
**forward** [2] - 39:24, 41:2
**four** [3] - 5:16, 9:6, 9:12

**fourth** [1] - 22:14
**frame** [5] - 16:7, 16:14, 20:23, 26:19, 30:13
**framework** [1] - 19:17
**framing** [1] - 34:7
**frankly** [2] - 5:1, 22:18
**Friday** [1] - 16:25
**Friedlander** [1] - 1:23
**friedlanderreporter @gmail.com** [1] - 1:23
**front** [2] - 34:13, 37:12
**FTP** [2] - 31:10, 31:18
**function** [2] - 41:16, 43:1
**funneling** [1] - 18:8
**future** [2] - 13:19, 48:18

### G

**gate** [2] - 38:7, 39:6
**gatekeeping** [2] - 41:15, 43:1
**general** [1] - 21:7
**genius** [1] - 20:20
**GEORGE** [2] - 2:2, 3:9
**Georgia** [1] - 2:15
**geyser** [1] - 27:24
**given** [3] - 6:17, 29:10, 29:20
**global** [1] - 42:24
**goal** [2] - 47:2, 47:12
**Goldberg** [4] - 4:15, 5:6, 26:17, 28:1
**GOLDBERG** [20] - 2:8, 4:14, 5:8, 5:18, 14:4, 14:6, 16:19, 17:5, 17:10, 18:4, 18:11, 18:15, 19:15, 20:2, 26:25, 27:11, 27:16, 27:21, 28:2, 51:20
**Goldenberg** [1] - 22:2
**GOLDENBERG** [14] - 2:20, 2:20, 21:13, 21:23, 22:1, 35:3, 35:10, 35:20, 45:9, 45:12, 48:8, 48:23, 49:6, 49:12
**GOLOMB** [1] - 1:15
**Gorda** [2] - 2:3, 3:10
**GORDON** [1] - 2:17
**gotta** [1] - 14:14
**great** [2] - 10:4, 10:13, 11:4, 11:15, 17:15, 28:13, 33:22, 33:25, 35:7, 38:4, 50:21, 50:25
**GREENBERG** [1] -

2:14
**ground** [1] - 40:2
**group** [7] - 4:16, 4:18, 4:20, 4:23, 21:16, 31:10, 43:9
**Group** [4] - 2:10, 2:16, 2:19, 3:8
**groups** [1] - 46:25
**guess** [3] - 27:21, 32:19, 36:8
**guidance** [3] - 48:14, 49:2, 49:14

### H

**Hague** [2] - 5:22, 6:18
**hand** [3] - 20:12, 26:12
**handle** [2] - 13:2, 16:22
**handled** [1] - 48:20
**hands** [1] - 30:10
**happy** [4] - 17:19, 18:3, 28:3, 34:8
**hard** [1] - 33:18
**harder** [2] - 15:20, 15:23
**HARDIN** [1] - 2:11
**head** [1] - 16:8
**headed** [2] - 16:15, 21:8
**heard** [2] - 45:16, 46:21
**hearings** [1] - 36:21
**heart's** [2] - 14:10, 51:3
**HEINZ** [11] - 3:2, 8:10, 8:16, 8:20, 8:23, 9:1, 9:4, 10:1, 12:17, 12:22, 12:24
**Heinz** [4] - 8:10, 8:16, 8:17, 12:18
**help** [5] - 14:13, 16:7, 21:5, 26:19, 26:21
**helpful** [4] - 20:8, 31:24, 34:14, 48:23
**helping** [1] - 28:9
**Hetero** [18] - 2:13, 6:19, 6:20, 6:24, 6:25, 7:1, 7:2, 7:5, 7:7, 7:13, 7:17, 7:20, 7:24, 8:8, 9:7, 9:8, 26:3
**hi** [1] - 8:10
**high** [1] - 22:23
**highlight** [1] - 43:7
**Highway** [1] - 2:6
**HONIK** [10] - 1:15, 1:15, 4:9, 7:4, 9:20, 10:3, 25:3, 25:10,

50:18, 50:24
**Honik** [1] - 4:9
**Honor** [61] - 4:9, 4:11, 4:14, 4:17, 4:21, 5:8, 5:18, 5:21, 6:22, 7:1, 7:16, 7:19, 8:6, 8:10, 9:1, 9:4, 9:11, 9:20, 10:10, 10:12, 10:19, 10:23, 11:7, 11:10, 11:19, 12:14, 12:17, 14:4, 15:3, 17:5, 18:4, 19:6, 19:10, 20:2, 20:8, 21:13, 27:12, 27:17, 28:5, 30:25, 34:1, 34:20, 34:23, 35:3, 36:3, 36:21, 36:24, 37:14, 37:23, 38:1, 41:14, 43:16, 45:6, 49:13, 49:18, 49:20, 50:3, 50:18, 51:20, 51:22, 52:12
**HONORABLE** [1] - 1:9
**hope** [3] - 5:14, 33:14, 42:18
**hopefully** [7] - 13:21, 14:1, 20:13, 31:19, 33:20, 43:12, 47:8
**hoping** [2] - 51:11
**hot** [1] - 33:14
**hour** [1] - 5:4
**housekeeping** [1] - 5:6
**Huahai** [2] - 25:25, 47:18
**hundred** [4] - 20:11, 30:2, 41:8, 45:17
**hundreds** [1] - 25:15
**hurdles** [1] - 44:21
**hypothetically** [1] - 24:5

### I

**idea** [5] - 17:2, 19:2, 19:16, 21:7, 44:2
**ideas** [1] - 42:10
**identification** [1] - 42:17
**identified** [1] - 21:1
**identify** [1] - 13:23
**identifying** [1] - 16:9
**immediate** [1] - 13:18
**immense** [1] - 26:19
**imminently** [1] - 13:16
**impact** [1] - 14:1
**implicated** [2] - 23:4, 23:13, 24:3
**important** [4] - 17:14, 39:14, 45:21, 48:7

**IN** [1] - 1:3
**inappropriate** [1] - 30:18
**Inc** [14] - 2:13, 4:20, 6:1, 6:11, 6:24, 7:1, 7:13, 8:21, 9:24, 10:14, 10:21, 11:6, 11:24, 12:8
**include** [1] - 47:23
**included** [3] - 36:13, 37:15, 42:19
**including** [3] - 15:16, 33:2, 46:10
**inclusion** [1] - 50:16
**incorporated** [1] - 14:21
**Incorporated** [1] - 6:13
**independent** [1] - 29:1
**India** [4] - 5:21, 6:20, 9:9, 11:16
**Indian** [10] - 7:6, 7:20, 7:22, 8:19, 9:2, 9:8, 9:9, 11:9, 11:22, 12:3
**indicated** [2] - 13:4, 22:23
**indicating** [1] - 31:17
**individual** [4] - 22:4, 39:11, 45:4, 52:3
**individually** [1] - 31:9
**Industries** [1] - 10:8
**inefficient** [1] - 40:15
**inform** [2] - 24:21, 48:20
**information** [9] - 18:8, 26:20, 27:6, 28:1, 39:5, 39:8, 41:10, 41:11, 48:11
**informations** [1] - 37:21
**initials** [1] - 23:17
**initiated** [1] - 29:13
**injury** [5] - 21:25, 32:12, 33:1, 44:14, 45:6
**innovative** [1] - 29:2
**instead** [1] - 41:11
**instruct** [1] - 27:18
**instructive** [1] - 38:23
**insurance** [3] - 13:12, 13:22, 16:16
**intend** [1] - 46:17
**interest** [1] - 30:12
**interested** [2] - 12:16
**interesting** [1] - 35:19
**internally** [1] - 50:19
**Interrogatories** [3] - 17:7, 17:8, 19:5
**investigation** [1] -

46:16
**invited** [1] - 37:23
**involved** [2] - 28:20, 29:22
**Irbesartan** [4] - 23:25, 24:2, 24:11, 24:21
**ironing** [1] - 31:8
**isolated** [1] - 23:20
**Israeli** [1] - 10:8
**issue** [15] - 14:7, 20:23, 20:24, 23:12, 23:13, 23:22, 28:25, 30:17, 35:19, 38:9, 38:15, 39:1, 39:20, 48:17, 48:24
**issued** [1] - 29:19
**issues** [29] - 4:25, 5:16, 5:23, 13:5, 13:22, 13:24, 13:25, 18:12, 20:16, 20:17, 20:25, 21:3, 21:10, 21:19, 27:2, 31:7, 34:7, 35:23, 43:7, 45:13, 46:18, 48:15, 48:19, 51:4, 51:5, 51:24, 51:25, 52:3
**item** [1] - 34:4
**items** [2] - 13:18, 40:25

### J

**JANET** [1] - 2:11
**JERSEY** [1] - 1:1
**Jersey** [3] - 1:7, 2:12, 12:8
**Jessica** [3] - 8:10, 8:16, 12:18
**JESSICA** [1] - 3:2
**job** [2] - 5:13, 17:15
**JOEL** [1] - 1:9
**JOHN** [1] - 1:16
**joint** [4] - 4:15, 4:18, 4:20, 4:22
**Joint** [4] - 2:10, 2:16, 2:19, 3:7
**JUDGE** [1] - 1:10
**Judge** [10] - 5:2, 5:4, 14:8, 14:12, 32:8, 48:18, 50:16, 51:2, 51:5, 52:7
**July** [13] - 13:3, 13:7, 16:17, 16:18, 16:19, 16:20, 19:11, 21:22, 31:15, 33:23, 34:17, 35:9, 51:14
**jump** [2] - 34:1, 34:4
**June** [3] - 1:8, 4:2, 32:14
**jurisdiction** [1] - 9:17

## K

**KANNER** [1] - 1:18
**Karen** [1] - 1:23
**keep** [2] - 33:5, 47:13
**kind** [2] - 27:6, 32:18
**KIRTLAND** [1] - 2:5
**knowledge** [1] - 47:24
**knows** [3] - 5:2, 26:9, 41:6
**Kugler** [9] - 5:3, 5:4, 14:8, 14:12, 48:18, 50:16, 51:2, 51:5, 52:7
**KUNDLA** [1] - 2:11

## L

**Laboratories** [7] - 5:19, 6:3, 6:7, 6:9, 6:12, 6:15, 9:13
**laboratory** [1] - 29:9
**Laboratory** [1] - 6:11
**Labs** [5] - 7:17, 7:20, 7:24, 9:7, 26:3
**land** [1] - 23:14
**large** [1] - 16:24
**Lasalle** [1] - 2:21
**last** [8] - 32:11, 32:23, 33:5, 33:7, 34:4, 36:21, 48:23, 49:14
**Laughter** [3] - 33:16, 35:12, 35:16
**law** [3] - 44:25, 45:2, 45:5
**LAW** [3] - 2:2, 2:20, 3:9
**lead** [1] - 4:7
**leadership** [3] - 13:11, 31:10, 31:16
**learn** [2] - 33:17, 46:8
**leave** [1] - 47:9
**left** [2] - 13:18, 27:4
**letter** [5] - 27:13, 31:9, 31:10, 51:15, 51:18
**letters** [1] - 31:16
**letting** [1] - 49:8
**level** [2] - 22:20, 38:24
**levels** [2] - 22:23, 29:11
**LEVIN** [1] - 1:12
**LIABILITY** [1] - 1:4
**life** [2] - 8:5, 35:15
**light** [1] - 18:6
**likely** [2] - 16:10, 43:3
**limit** [1] - 45:24
**limitations** [2] - 44:16, 45:4
**Limited** [30] - 5:19, 6:3, 6:7, 6:9, 6:15,

6:20, 7:2, 7:5, 7:7, 7:20, 7:24, 7:25, 8:9, 8:12, 8:18, 9:2, 9:7, 9:8, 9:9, 9:13, 10:8, 10:17, 11:8, 11:10, 11:17, 11:18, 12:2, 12:6, 12:24
**limited** [2] - 12:3, 37:17
**limits** [1] - 29:12
**lines** [3] - 27:8, 32:20, 32:25
**link** [2] - 31:10, 31:18
**list** [8] - 26:14, 26:16, 33:12, 38:13, 42:13, 42:19, 42:21, 45:25
**listed** [1] - 12:20
**literature** [1] - 22:11
**litigation** [1] - 49:10
**LITIGATION** [1] - 1:4
**LLC** [6] - 1:18, 3:4, 8:25, 9:24, 11:1, 11:2
**LLP** [5] - 2:5, 2:8, 2:14, 2:17, 3:5
**look** [1] - 19:20
**looked** [3] - 18:2, 28:23, 29:20
**looking** [2] - 27:7, 51:23
**looks** [1] - 11:5
**Lori** [2] - 4:17, 32:8
**LORI** [1] - 2:14
**Losartan** [7] - 23:20, 23:25, 24:2, 24:11, 24:21, 25:7, 50:16
**Losartan/Irbesartan** [1] - 23:22
**loss** [1] - 33:2
**lost** [1] - 33:8
**Louisiana** [1] - 1:20
**LTD** [1] - 7:17
**lucky** [1] - 35:8
**LYNN** [1] - 2:11

## M

**Macleods** [2] - 22:19, 23:8
**macro** [7] - 13:24, 20:17, 20:22, 20:24, 35:23, 43:14, 52:3
**MAGISTRATE** [1] - 1:10
**main** [2] - 40:10, 46:16
**makers** [1] - 43:11
**Malta** [1] - 10:17
**manufacture** [2] - 11:13, 24:2
**manufactured** [1] -

24:2
**manufacturer** [13] - 11:16, 11:22, 12:19, 12:21, 12:25, 13:1, 28:6, 28:7, 29:6, 38:17, 40:22, 41:2
**manufacturers** [13] - 5:15, 9:7, 15:25, 16:1, 29:4, 29:14, 37:6, 37:7, 38:25, 40:9, 40:11, 42:19
**manufacturing** [5] - 38:20, 40:7, 40:18, 40:19, 47:17
**MARGARET** [1] - 3:2
**Market** [1] - 1:16
**Marlene** [1] - 22:2
**MARLENE** [1] - 2:20
**master** [10] - 5:12, 10:17, 13:12, 18:6, 24:7, 24:10, 24:12, 24:15, 45:1, 50:25
**material** [1] - 13:18
**materials** [1] - 28:13
**matters** [1] - 50:15
**McKEON** [1] - 2:11
**MDL** [3] - 4:4, 24:5, 50:15
**mean** [8] - 17:6, 18:2, 18:4, 19:16, 26:4, 26:25, 27:7, 46:10
**measure** [1] - 5:6
**meat** [2] - 14:13, 17:16
**mechanical** [1] - 1:25
**mechanism** [3] - 36:10, 48:25, 50:7
**medical** [1] - 33:2
**meet** [12] - 5:4, 16:20, 20:5, 21:20, 34:3, 38:1, 43:9, 43:13, 45:10, 49:19, 52:10, 52:12
**meeting** [8] - 13:7, 16:1, 16:2, 17:2, 20:9, 30:2, 34:5, 38:15
**meetings** [4] - 15:24, 16:10, 18:17
**members** [1] - 45:4
**merely** [1] - 44:17
**merits** [2] - 19:1, 48:19
**method** [1] - 31:6
**mid** [6] - 16:17, 16:19, 16:20, 19:6, 19:19, 20:7
**mid-August** [2] - 19:6, 19:19
**mid-July** [3] - 16:17, 16:19, 16:20

**mid-October** [1] - 20:7
**middle** [1] - 40:2
**might** [7] - 15:20, 36:19, 41:7, 46:22, 47:19, 47:20, 48:23
**millions** [2] - 25:8, 25:15
**Minneapolis** [1] - 2:22
**Minnesota** [1] - 2:22
**minute** [1] - 34:2
**minutes** [3] - 51:3, 51:7, 52:11
**Miss** [1] - 33:11
**missed** [1] - 33:3
**missing** [2] - 14:3, 17:6
**Mitchell** [1] - 1:6
**mixed** [1] - 23:17
**moment** [3] - 6:6, 12:15, 44:6
**money** [1] - 49:9
**monitoring** [1] - 33:2
**month** [1] - 18:17
**months** [1] - 21:8
**moot** [1] - 5:7
**morning** [12] - 4:3, 4:5, 4:9, 4:11, 4:14, 4:17, 4:21, 4:24, 15:10, 15:19, 34:23, 51:6
**MORRIS** [1] - 2:8
**Morris** [1] - 2:12
**most** [2] - 17:3, 29:17
**motion** [1] - 5:7
**motions** [5] - 14:5, 14:10, 15:7, 51:2, 52:7
**move** [1] - 21:5
**moving** [1] - 27:19
**MR** [102] - 4:9, 4:9, 4:14, 4:19, 4:21, 5:8, 5:18, 5:21, 6:2, 6:4, 6:8, 6:16, 7:4, 9:11, 9:15, 9:20, 10:3, 11:7, 11:10, 11:16, 11:19, 11:21, 12:3, 12:6, 12:10, 12:14, 14:4, 14:6, 14:22, 15:3, 15:10, 15:23, 16:12, 16:19, 16:22, 17:5, 17:10, 17:18, 17:24, 18:1, 18:4, 18:11, 18:15, 19:6, 19:9, 19:13, 19:15, 19:19, 20:2, 20:8, 20:12, 22:6, 22:16, 22:22, 23:1, 23:3, 23:7, 23:19, 23:25, 24:9, 24:20, 25:3, 25:4, 25:10, 25:13,

25:21, 25:25, 26:9, 26:25, 27:11, 27:16, 27:21, 28:2, 28:5, 28:12, 30:25, 31:3, 31:23, 32:1, 34:23, 36:3, 37:3, 38:5, 41:14, 41:20, 42:9, 43:16, 43:24, 44:3, 44:12, 45:5, 47:23, 48:5, 49:13, 49:22, 50:2, 50:18, 50:24, 51:10, 51:17, 51:20, 51:22
**MS** [51] - 4:11, 4:17, 6:22, 7:1, 7:7, 7:10, 7:15, 7:22, 8:1, 8:3, 8:5, 8:10, 8:16, 8:20, 8:23, 9:1, 9:4, 10:1, 10:10, 10:12, 10:15, 10:19, 10:23, 11:2, 12:17, 12:22, 12:24, 21:13, 21:23, 22:1, 32:8, 32:18, 33:13, 33:15, 33:17, 33:25, 34:15, 34:18, 34:20, 35:3, 35:10, 35:13, 35:17, 35:20, 45:9, 45:12, 48:8, 48:23, 49:6, 49:12, 52:12
**multistep** [1] - 38:12
**mutual** [1] - 46:3
**Mylan** [16] - 2:19, 4:22, 5:19, 5:24, 5:25, 6:3, 6:6, 6:9, 6:11, 6:12, 6:15, 8:8, 9:12, 47:25

## N

**N.V** [1] - 5:25
**naked** [1] - 38:12
**name** [4] - 8:15, 24:7, 36:9, 37:9
**named** [3] - 36:13, 36:19, 37:8
**naming** [2] - 36:11, 38:10
**narrow** [1] - 40:23
**narrowed** [1] - 27:15
**narrower** [1] - 42:25
**nature** [1] - 43:4
**NDEA** [2] - 22:24, 29:3
**NDMA** [2] - 22:23, 29:3
**NE** [1] - 2:15
**near** [2] - 13:19, 45:18
**nearly** [1] - 35:4
**necessarily** [1] - 19:2
**need** [18] - 16:22, 18:15, 19:12, 19:23,

27:17, 35:23, 41:6,
41:17, 41:22, 42:5,
43:5, 46:3, 46:8,
46:20, 47:9, 47:13,
49:1, 50:12
**Nesbit** [2] - 2:3, 3:10
**never** [3] - 15:7, 18:1,
24:25
**new** [10] - 22:18, 24:6,
24:7, 24:14, 24:19,
24:20, 26:12, 29:8,
33:21, 44:5
**NEW** [1] - 1:1
**New** [4] - 1:7, 1:20,
2:12, 12:8
**next** [9] - 18:17, 21:8,
21:21, 32:4, 33:11,
33:21, 34:10, 43:12
**Nigh** [2] - 4:8, 22:10
**NIGH** [24] - 1:12, 4:8,
6:16, 14:22, 22:6,
22:16, 22:22, 23:1,
23:3, 23:7, 23:19,
23:25, 24:9, 24:20,
25:4, 25:13, 25:21,
25:25, 26:9, 47:23,
48:5, 51:10, 51:17,
51:22
**night** [6] - 32:23, 33:5,
33:7, 33:13, 33:15,
35:14
**nights** [1] - 33:15
**NMBA** [1] - 23:19
**non** [1] - 50:15
**non-MDL** [1] - 50:15
**none** [1] - 46:13
**nothing** [2] - 11:13,
51:22
**notice** [2] - 44:7,
49:23
**notified** [1] - 29:3
**notify** [1] - 49:18
**number** [4] - 16:24,
28:8, 29:22, 45:18
**NUMBER** [1] - 1:3
**numbers** [1] - 23:10
**nuts** [1] - 21:2
**NW** [1] - 3:6

## O

**o'clock** [1] - 32:20
**object** [3] - 17:25,
18:23, 20:21
**objected** [1] - 18:1
**objectionable** [1] -
27:5
**objections** [8] - 18:25,
19:23, 19:24, 19:25,
20:6, 35:10, 52:2

**obligation** [1] - 37:25
**obligations** [1] - 46:9
**obviously** [1] - 7:12
**occur** [1] - 40:19
**occurred** [1] - 39:24
**occurs** [2] - 24:6,
49:22
**October** [3] - 20:5,
20:7, 21:3
**OF** [1] - 1:1
**off-the-charts** [1] -
22:19
**Official** [1] - 1:23
**oftentimes** [2] - 25:5,
25:13
**Olmesartan** [2] -
24:22, 24:24
**once** [6] - 16:7, 16:25,
21:4, 31:12, 31:19,
46:7
**One** [1] - 2:18
**one** [37] - 5:6, 5:22,
15:12, 15:18, 15:22,
16:1, 16:6, 22:17,
22:18, 23:19, 24:25,
30:14, 30:17, 30:25,
31:18, 31:24, 32:18,
32:19, 34:6, 34:9,
34:25, 36:22, 37:19,
41:8, 41:13, 42:22,
44:7, 44:11, 44:17,
44:18, 45:21, 47:9,
48:17, 48:23, 50:1,
50:9
**one-step** [1] - 37:19
**ones** [1] - 26:3
**open** [3] - 27:23,
29:24, 30:4
**OPEN** [1] - 4:2
**opportunity** [1] -
43:19
**opposed** [1] - 27:1
**order** [11] - 13:10,
13:11, 13:15, 13:20,
21:10, 21:17, 35:5,
37:19, 39:6, 51:8
**ordered** [3] - 6:12,
13:11, 21:11
**organization** [1] -
17:15
**organizational** [1] -
51:24
**organize** [1] - 5:13
**originally** [1] - 36:7
**Orleans** [1] - 1:20
**otherwise** [1] - 21:19
**ought** [2] - 24:16, 49:4
**ourselves** [1] - 26:5,
45:24, 48:10
**outside** [1] - 39:11

**overlap** [1] - 16:2
**overview** [1] - 14:24
**own** [2] - 24:12, 29:8
**owned** [1] - 8:22
**Oxford** [1] - 2:18

## P

**p.m** [1] - 33:5
**Pacific** [1] - 2:6
**PACKARD** [1] - 2:5
**Pages** [1] - 1:6
**paid** [1] - 43:20
**panel** [2] - 24:5, 50:22
**PAPANTONIO** [1] -
1:12
**parameters** [1] - 43:14
**Parekh** [1] - 15:3
**PAREKH** [16] - 2:5,
15:3, 15:10, 15:23,
16:12, 16:22, 17:18,
17:24, 18:1, 19:6,
19:9, 19:13, 19:19,
20:8, 20:12, 31:23
**Parkway** [1] - 3:3
**part** [6] - 28:18, 28:22,
38:18, 38:25, 39:12
**participating** [6] -
6:13, 9:16, 11:25,
12:2, 12:10, 12:13
**particular** [13] - 26:24,
36:14, 38:11, 41:6,
41:7, 41:22, 42:5,
42:20, 43:2, 43:3,
43:4, 49:18
**particularized** [1] -
42:17
**parties** [5] - 5:10,
13:21, 14:1, 37:11,
43:22
**party** [3] - 47:2, 47:5,
50:4
**pass** [2] - 38:7, 39:6
**passed** [1] - 26:11
**patient** [1] - 29:20
**PC** [3] - 1:15, 2:11, 3:2
**pending** [1] - 6:16
**Pennsacola** [1] - 1:13
**Pennsylvania** [4] -
1:17, 2:9, 2:18, 3:3
**people** [6] - 15:16,
30:6, 41:11, 46:2,
46:5, 46:16
**per** [1] - 32:11
**percent** [1] - 20:11
**perfect** [1] - 35:11
**period** [5] - 18:15,
25:19, 26:8, 26:23,
29:21
**periods** [1] - 29:16

**peripheral** [8] - 36:10,
36:15, 36:25, 37:13,
40:12, 40:14, 40:25
**person** [2] - 23:9,
31:24
**personal** [5] - 21:25,
32:12, 33:1, 44:14,
45:6
**perspective** [1] -
38:21
**pertinent** [1] - 18:20
**petition** [1] - 50:19
**Pharma** [23] - 3:4, 3:4,
3:7, 4:19, 8:9, 8:11,
8:12, 8:18, 8:21,
8:25, 9:2, 9:9, 9:23,
9:24, 10:17, 10:21,
11:6, 11:17, 12:8,
12:18, 12:24, 12:25
**Pharmaceutical** [1] -
10:8
**Pharmaceuticals** [7] -
4:22, 5:25, 6:11,
10:14, 11:18, 11:24,
12:1
**pharmacy** [1] - 26:11
**Philadelphia** [2] -
1:17, 2:9
**phone** [1] - 35:25
**pick** [1] - 42:4
**picture** [1] - 20:25
**piecemeal** [1] - 13:6
**Piedmont** [1] - 2:15
**PIETRAGALLO** [1] -
2:17
**pills** [5] - 25:5, 25:8,
25:15, 26:12, 26:14
**Pittsburgh** [1] - 2:18
**place** [1] - 16:11
**Plaintiff** [5] - 1:14,
1:17, 1:20, 2:4, 2:7
**plaintiff** [12] - 4:10,
4:12, 13:19, 28:9,
32:5, 35:2, 43:19,
44:4, 44:5, 45:8,
50:13
**plaintiff's** [2] - 10:16,
51:8
**plaintiffs** [33] - 4:8,
5:13, 11:12, 17:13,
20:18, 22:3, 22:14,
26:17, 27:2, 27:18,
29:25, 30:13, 30:21,
31:4, 31:21, 32:6,
32:12, 34:25, 36:7,
39:6, 39:13, 40:1,
40:3, 40:16, 41:1,
41:4, 41:10, 43:2,
44:15, 47:2, 49:16,
49:24, 50:7

**plaintiffs'** [9] - 14:15,
14:18, 31:10, 31:15,
32:9, 32:15, 34:22,
36:15, 36:16
**plan** [1] - 31:8
**plant** [1] - 25:20
**PLLC** [1] - 2:20
**point** [10] - 30:9,
30:22, 30:25, 31:24,
32:9, 36:4, 44:5,
44:15, 49:14, 50:8
**Poletto** [1] - 6:23
**POLETTO** [11] - 2:11,
2:11, 6:22, 7:1, 7:7,
7:10, 7:15, 7:22, 8:1,
8:3, 8:5
**POLIFRONI** [1] - 2:11
**position** [6] - 38:16,
39:16, 40:6, 41:15,
49:15, 50:2
**possession** [3] - 7:13,
7:18, 9:25
**possible** [1] - 49:5
**possibly** [3] - 41:18,
43:23, 47:25
**potatoes** [2] - 14:13,
17:16
**potential** [2] - 15:14,
41:17
**potentially** [1] - 18:18
**predict** [1] - 20:20
**prefer** [2] - 34:11, 50:2
**prejudice** [6] - 37:13,
41:16, 43:15, 43:25,
47:4
**prepared** [1] - 21:18
**present** [1] - 39:25
**presented** [1] - 34:10
**pretty** [2] - 17:14,
48:12
**previously** [1] - 24:4
**priority** [1] - 33:12
**Private** [3] - 11:8,
11:10, 12:6
**proactive** [1] - 29:14
**problem** [1] - 50:10
**procedural** [1] - 44:21
**procedure** [1] - 49:2
**Proceedings** [1] -
1:25
**process** [22] - 7:3,
18:5, 18:7, 19:9,
21:5, 30:4, 35:3,
35:18, 36:8, 37:16,
38:1, 38:12, 38:19,
38:20, 38:21, 40:8,
40:18, 40:19, 47:6,
47:17, 47:19, 49:11
**produce** [6] - 7:14,
19:25, 37:20, 37:21,

37:25, 52:4
**produced** [9] - 1:25, 14:14, 16:11, 16:23, 28:18, 30:23, 31:13, 38:2, 46:20
**producing** [9] - 7:16, 7:18, 9:3, 9:21, 9:24, 28:12, 38:8, 39:5, 39:7
**production** [7] - 15:4, 30:2, 30:7, 31:6, 40:6, 40:23, 43:18
**productions** [3] - 15:7, 15:8, 47:1
**productive** [2] - 21:14, 32:10
**products** [1] - 29:1
**PRODUCTS** [1] - 1:3
**program** [1] - 51:12
**progress** [3] - 32:10, 34:6, 35:22
**promptly** [1] - 43:13
**proposal** [6] - 39:22, 39:25, 42:13, 42:20, 42:25, 49:23
**propose** [2] - 15:18, 36:7
**proposed** [3] - 27:12, 34:25, 44:1
**protective** [1] - 13:15
**protocol** [3] - 13:14, 15:2
**provide** [3] - 27:5, 28:3, 47:7
**provision** [2] - 44:1, 44:8
**pull** [1] - 29:18
**Punta** [2] - 2:3, 3:10
**purposes** [1] - 37:10
**pursuant** [3] - 29:8, 31:13, 31:17
**push** [1] - 21:21
**put** [6] - 17:21, 30:22, 32:6, 33:10, 36:4, 38:24
**putative** [2] - 45:2, 45:4

## Q

**qualitative** [1] - 38:6
**questions** [9] - 14:9, 26:18, 27:9, 28:20, 29:24, 30:5, 30:11, 30:14, 30:24
**quick** [2] - 47:24, 49:19
**quickly** [1] - 34:4
**quote** [1] - 25:18

## R

**range** [2] - 25:16, 47:15
**RASPANTI** [1] - 2:17
**rather** [11] - 13:6, 25:18, 25:23, 26:7, 26:20, 37:2, 37:3, 38:7, 40:25, 42:11, 42:14
**Re** [1] - 4:4
**RE** [1] - 1:3
**re** [1] - 49:17
**re-add** [1] - 49:17
**reached** [1] - 11:11
**read** [4] - 8:18, 22:10, 22:11, 51:1
**reading** [1] - 41:14
**real** [2] - 18:12, 47:23
**really** [13] - 15:12, 20:15, 20:25, 21:5, 25:3, 27:4, 32:24, 38:19, 40:10, 45:21, 47:6, 47:17
**reason** [4] - 41:7, 41:21, 42:4, 42:22
**reasonable** [1] - 5:4
**reasons** [1] - 16:6
**recalled** [8] - 25:9, 25:18, 26:1, 26:23, 29:15, 39:2, 39:16, 46:22
**recalling** [1] - 25:23
**receive** [1] - 44:24
**received** [5] - 32:20, 32:23, 32:25, 33:3, 39:8
**receiving** [1] - 31:16
**recently** [3] - 13:13, 22:13, 23:10
**recognize** [2] - 25:25, 39:14
**record** [1] - 4:4
**recorded** [1] - 1:25
**records** [2] - 9:10, 14:16
**red** [2] - 32:20, 32:25
**Redondo** [1] - 2:6
**reference** [2] - 48:2, 48:3
**regard** [1] - 44:3
**regarding** [4] - 13:11, 13:20, 15:8, 48:21
**REIN** [1] - 3:5
**Rein** [1] - 11:5
**relabeler** [1] - 12:16
**relabelers** [1] - 38:22
**relate** [1] - 40:21
**related** [4] - 9:8, 14:23, 39:22, 40:8

**relates** [2] - 7:17, 31:3
**relevant** [10] - 18:8, 18:10, 18:11, 20:23, 26:20, 30:15, 39:4, 40:24, 41:1, 48:20
**remain** [2] - 29:24, 30:24
**remember** [1] - 27:12
**reminder** [1] - 26:10
**removed** [2] - 38:18, 43:1
**repackager** [1] - 12:16
**repackagers** [1] - 38:22
**repeat** [1] - 8:14
**report** [1] - 29:5
**Reporter** [1] - 1:23
**repository** [5] - 31:6, 31:11, 31:12, 31:14, 31:19
**represent** [7] - 8:11, 8:24, 10:8, 10:13, 10:22, 11:3
**represented** [1] - 9:5
**representing** [2] - 6:6, 10:18
**represents** [1] - 11:6
**request** [9] - 13:12, 14:19, 15:1, 15:7, 15:8, 16:8, 20:6, 20:18, 52:2
**requested** [1] - 18:13
**requests** [18] - 14:21, 14:24, 15:4, 17:7, 17:11, 17:12, 17:19, 18:6, 18:19, 18:22, 19:4, 19:8, 19:12, 19:14, 20:10, 27:7, 30:1, 45:14
**required** [2] - 5:23, 44:17
**research** [1] - 23:7
**reserved** [2] - 37:5, 37:6
**resolve** [3] - 18:25, 20:6, 52:3
**resources** [1] - 40:15
**respect** [5] - 5:23, 42:10, 42:24, 44:5, 45:6
**respectfully** [1] - 19:15
**respond** [2] - 19:1, 34:4
**responded** [1] - 33:6
**responding** [1] - 31:18
**response** [3] - 15:6, 17:24, 32:20
**responses** [2] - 7:5,

52:4
**responsive** [1] - 7:14
**result** [1] - 23:23
**results** [4] - 26:6, 29:5, 29:7
**retail** [1] - 12:16
**retailers** [2] - 38:22, 39:11
**RICHARD** [1] - 3:6
**Richard** [3] - 4:19, 35:20, 36:3
**ripe** [2] - 32:6, 43:21
**rise** [2] - 4:1, 52:14
**Road** [1] - 2:15
**role** [1] - 46:1
**roll** [1] - 33:8
**rolling** [1] - 46:4
**room** [2] - 15:18, 28:17
**round** [1] - 9:20
**RUBEN** [1] - 1:15
**Ruben** [1] - 4:9
**Rule** [2] - 27:19, 41:19
**running** [6] - 31:7, 31:12, 44:15, 44:16, 51:13

## S

**sake** [1] - 47:7
**sartans** [2] - 24:14, 50:16
**Sartans** [1] - 24:6
**sat** [1] - 15:13
**satisfied** [1] - 37:25
**save** [2] - 34:19, 49:9
**savings** [2] - 41:3, 42:1
**saw** [2] - 22:14, 48:3
**schedule** [1] - 33:19
**scheduling** [1] - 18:16
**SCHNEIDER** [1] - 1:9
**scope** [7] - 18:19, 27:22, 39:20, 40:5, 40:23, 45:14, 46:19
**script** [1] - 41:15
**search** [4] - 14:2, 15:6, 15:15, 20:10
**searches** [1] - 14:3
**seated** [1] - 4:4
**second** [2] - 39:1, 39:20
**secret** [1] - 22:10
**see** [12] - 5:16, 16:15, 16:16, 16:25, 23:14, 25:7, 28:10, 30:11, 30:24, 33:9, 34:13, 42:21
**seeing** [1] - 25:5
**seek** [1] - 48:14

**send** [7] - 31:9, 32:13, 34:16, 50:21, 50:22, 51:15, 51:18
**sending** [1] - 31:19
**sense** [3] - 17:3, 18:18, 24:17
**sensitive** [2] - 30:17, 33:11
**sent** [5] - 32:11, 32:14, 32:18, 34:24, 35:21
**Sentry** [1] - 3:3
**separate** [2] - 14:20, 24:15
**serve** [5] - 18:22, 19:3, 19:7, 19:12, 47:4
**served** [34] - 5:11, 5:17, 5:20, 6:1, 6:21, 7:9, 7:10, 8:2, 8:9, 8:13, 9:7, 9:12, 9:13, 10:5, 10:11, 10:20, 10:24, 11:2, 11:9, 11:11, 11:20, 11:21, 11:24, 12:10, 12:13, 13:2, 13:4, 17:7, 17:11, 17:20, 17:23, 20:14, 52:1
**service** [6] - 5:16, 5:22, 5:23, 6:15, 6:18, 13:14
**serving** [2] - 7:5, 17:18
**set** [1] - 28:8
**SETH** [1] - 2:8
**Seth** [1] - 4:14
**settling** [1] - 45:16
**seven** [1] - 49:23
**several** [1] - 36:4
**share** [1] - 50:20
**sheet** [3] - 32:13, 32:15, 51:12
**sheets** [13] - 13:19, 14:15, 14:18, 14:21, 14:22, 17:9, 19:5, 32:5, 32:9, 34:22, 34:25, 52:1, 52:4
**shelves** [1] - 29:19
**short** [5] - 21:11, 21:24, 32:4, 34:2, 42:18
**show** [3] - 9:10, 30:21, 41:4
**side** [10] - 15:17, 24:10, 30:6, 33:17, 36:17, 36:22, 37:4, 39:7, 43:9, 52:4
**sidebar** [1] - 43:5
**sides** [2] - 15:16, 48:24
**sideshow** [1] - 40:10
**simultaneously** [1] -

20:9
single [1] - 16:3
sit [2] - 15:17, 49:12
sitting [1] - 29:19
skipped [1] - 6:19
Slater [1] - 4:5
sleeves [1] - 33:9
small [2] - 24:23, 44:18
smattering [1] - 22:13
Smith [2] - 4:19, 36:3
SMITH [25] - 3:6, 4:19, 11:7, 11:10, 11:16, 11:19, 11:21, 12:3, 12:6, 12:10, 12:14, 36:3, 37:3, 38:5, 41:14, 41:20, 42:9, 43:16, 43:24, 44:3, 44:12, 45:5, 49:13, 49:22, 50:2
sold [1] - 39:10
someone [1] - 45:17
sometimes [1] - 25:15
soon [5] - 17:14, 20:16, 21:1, 21:16, 38:15
sorry [6] - 8:14, 9:19, 12:1, 17:22, 22:2, 30:16
sort [12] - 13:23, 17:19, 20:22, 21:7, 27:7, 27:23, 31:24, 32:24, 33:6, 34:9, 43:17
sorts [1] - 27:9
sounds [2] - 25:1, 35:22
source [2] - 39:8, 39:9
South [1] - 2:6
south [1] - 38:17
speaking [2] - 4:7, 30:6
special [1] - 42:4
specialists [1] - 15:17
specific [7] - 14:23, 15:1, 15:17, 26:21, 26:22, 32:20
specified [1] - 37:18
Springfield [1] - 2:12
standpoint [1] - 18:19
Stanoch [1] - 34:24
STANOCH [2] - 1:16, 34:23
start [8] - 16:9, 30:5, 30:7, 35:13, 39:16, 39:23, 47:21, 48:3
started [1] - 19:9
starting [1] - 28:13
state [1] - 42:4
STATES [2] - 1:1, 1:10

States [1] - 23:6
status [5] - 6:14, 21:12, 34:21, 34:24, 35:18
STATUS [1] - 1:5
statute [2] - 44:16, 45:3
stay [6] - 42:3, 45:17, 46:2, 52:8, 52:13
steering [1] - 36:16
stenography [1] - 1:25
step [6] - 17:6, 36:7, 36:8, 36:14, 37:19, 39:4
steps [1] - 36:22
still [9] - 5:22, 22:8, 22:17, 31:7, 32:21, 34:5, 38:10, 47:16
stipulated [2] - 35:18, 37:19
stipulation [20] - 36:5, 36:6, 36:8, 36:12, 36:23, 37:9, 37:11, 37:14, 37:18, 38:11, 38:13, 42:13, 42:14, 42:25, 43:5, 44:3, 45:20, 45:23, 46:6, 48:21
stock [1] - 13:8
stored [1] - 15:14
stream [1] - 39:13
Street [6] - 1:16, 1:19, 2:3, 2:9, 3:6, 3:10
Streets [1] - 1:7
structure [1] - 13:12
sub [1] - 10:25
subject [3] - 29:11, 29:15, 47:1
subpoena [1] - 47:5
subpoenas [1] - 47:3
subsidiaries [1] - 26:1
subsidiary [1] - 8:22
substantive [1] - 27:2
sue [1] - 44:17
sued [6] - 22:22, 44:7, 44:13, 44:18, 44:22, 46:11
suggested [1] - 33:19
suggestion [4] - 15:24, 16:12, 19:19, 39:12
suing [1] - 46:9
suit [2] - 44:4, 44:6
Suite [4] - 1:13, 1:16, 2:15, 2:21
summarize [1] - 13:10
summer [2] - 51:24, 52:1
sun [1] - 27:13

supplanted [1] - 15:5
supplemental [3] - 16:16, 16:18
supply [1] - 16:3
supposition [1] - 26:7
suspect [3] - 20:17, 23:14, 31:15

T

table [2] - 28:16, 43:11
tagged [1] - 23:21
tangential [1] - 48:21
target [2] - 16:14, 33:23
targeting [1] - 17:2
tee [2] - 20:16, 20:25
telephone [1] - 36:21
terms [13] - 14:2, 15:2, 15:6, 15:15, 18:2, 20:10, 22:4, 22:16, 22:23, 23:11, 33:3, 34:7, 42:25
test [2] - 26:6, 29:2
tested [1] - 46:23
testing [5] - 23:11, 29:1, 29:3, 29:4, 29:7
Teva [5] - 2:16, 4:18, 10:8, 10:14, 10:25
THE [4] - 1:1, 1:9, 4:1, 52:14
The Court [152] - 4:3, 4:13, 4:24, 5:9, 5:19, 5:22, 5:25, 6:3, 6:5, 6:12, 6:14, 6:19, 6:23, 7:2, 7:5, 7:8, 7:12, 7:20, 7:24, 8:2, 8:4, 8:7, 8:14, 8:17, 8:21, 8:24, 9:2, 9:6, 9:14, 9:18, 9:23, 10:2, 10:4, 10:11, 10:13, 10:16, 10:21, 10:25, 11:4, 11:8, 11:15, 11:18, 11:20, 12:1, 12:5, 12:8, 12:12, 12:15, 12:20, 12:23, 13:2, 13:10, 13:13, 14:5, 14:7, 15:9, 15:20, 16:5, 16:13, 16:20, 17:8, 17:13, 17:22, 17:25, 18:10, 18:14, 18:21, 19:7, 19:11, 19:14, 19:22, 20:3, 20:11, 20:13, 21:20, 21:24, 22:3, 22:10, 22:21, 22:25, 23:2, 23:6, 23:16, 23:23, 24:5, 24:14, 24:21, 24:25,

25:12, 25:17, 25:22, 26:6, 26:17, 27:9, 27:15, 27:19, 27:25, 28:4, 28:11, 28:18, 28:21, 30:9, 31:2, 31:21, 32:3, 32:17, 33:10, 33:14, 33:22, 34:12, 34:16, 34:19, 34:21, 35:1, 35:7, 35:15, 35:18, 36:2, 37:2, 38:4, 41:3, 41:5, 41:12, 41:19, 41:24, 42:15, 43:14, 43:17, 44:2, 44:10, 44:25, 45:8, 45:10, 47:21, 48:2, 48:6, 48:16, 49:1, 49:4, 49:7, 49:21, 50:1, 50:9, 50:10, 50:21, 50:22, 50:25, 51:15, 51:18, 51:21, 51:23, 52:13
theirs [1] - 23:10
thinking [3] - 13:16, 25:14, 41:24
third [5] - 22:13, 23:16, 36:14, 47:2, 47:5
third-party [2] - 47:2, 47:5
thoughts [1] - 35:21
thousand [1] - 25:5
thousands [2] - 25:13, 25:16
three [3] - 9:12, 13:12, 36:8
three-step [1] - 36:8
timeframe [2] - 30:15, 52:6
timing [1] - 47:18
today [7] - 14:8, 21:18, 32:6, 34:11, 35:24, 45:25, 46:21
together [2] - 13:21, 25:8
toiled [2] - 36:18, 36:20
toll [2] - 44:5, 44:24
tolling [4] - 36:14, 37:17, 44:1, 44:8
tolls [1] - 45:3
tomorrow [5] - 28:14, 30:7, 31:14, 31:15, 35:5
took [1] - 10:16
top [1] - 33:12
Torrent [12] - 3:7, 4:19, 11:5, 11:6, 11:8, 11:10, 11:17, 11:18, 11:23, 12:1,

12:6, 12:8
totally [2] - 32:22, 46:14
touch [1] - 31:24
town [1] - 49:12
TPP [3] - 32:14, 32:19, 34:25
transcript [1] - 1:25
transcription [1] - 1:25
TRAURIG [1] - 2:14
tricky [1] - 48:17
tried [2] - 5:10, 13:8
TRISCHLER [13] - 2:17, 4:21, 5:21, 6:2, 6:4, 6:8, 9:11, 9:15, 28:5, 28:12, 30:25, 31:3, 32:1
Trischler [4] - 4:22, 6:6, 9:18, 45:16
troubling [1] - 22:17
try [2] - 27:16, 29:25
trying [8] - 5:13, 6:17, 22:17, 23:11, 29:18, 40:23, 47:16, 50:8
two [16] - 7:22, 9:6, 9:21, 9:23, 15:12, 22:7, 22:12, 24:6, 24:14, 24:16, 28:22, 32:18, 34:25, 36:7, 45:1, 49:14
two-day [1] - 15:12
two-step [1] - 36:7
type [4] - 17:1, 20:24, 21:3, 39:22

U

U.S [4] - 1:6, 23:4, 23:8, 26:1
unacceptable [1] - 29:12
under [2] - 11:4, 27:13
understood [1] - 24:25
undoubtedly [1] - 30:14
unexpectedly [1] - 32:24
United [1] - 23:6
UNITED [2] - 1:1, 1:10
unless [1] - 40:15
unquote [1] - 25:18
up [16] - 13:21, 16:4, 19:24, 20:16, 21:1, 23:17, 28:23, 31:7, 31:11, 31:12, 33:8, 34:4, 35:25, 50:23, 51:12, 51:25
update [3] - 5:11,

21:12, 51:5
**US** [1] - 9:21
**USA** [12] - 2:13, 3:4,
6:24, 6:25, 7:1, 7:13,
8:11, 8:21, 9:23,
10:14, 11:24
**useful** [1] - 19:17

**V**

**vacuum** [1] - 28:15
**valid** [1] - 30:9
**VALSARTAN** [1] - 1:3
**Valsartan** [12] - 4:4,
11:13, 24:3, 39:1,
39:2, 39:10, 39:15,
39:17, 39:19, 39:21,
39:25
**Valsartan-**
**containing** [3] -
39:10, 39:19, 39:25
**valve** [1] - 27:23
**varies** [1] - 28:6
**vendor** [1] - 6:17
**version** [2] - 32:24,
33:2
**view** [1] - 24:10
**virtually** [1] - 28:16
**virtue** [1] - 42:14
**volume** [3] - 16:22,
16:25, 22:4

**W**

**wait** [3] - 30:10, 30:23,
34:8
**waiving** [1] - 9:16
**Walmart** [1] - 40:20
**wants** [1] - 30:15
**Washington** [1] - 3:7
**waste** [1] - 18:22
**wasting** [1] - 35:24
**Wednesday** [1] - 1:8
**week** [3] - 21:14, 40:4,
43:12
**weeks** [1] - 48:14
**WERNER** [1] - 3:2
**WHITELEY** [3] - 1:18,
1:19, 4:11
**Whiteley** [1] - 4:12
**whole** [1] - 39:13
**wholly** [1] - 8:22
**widely** [1] - 23:13
**Wiley** [1] - 11:5
**WILEY** [1] - 3:5
**WILLIAMSON** [2] -
2:2, 3:9
**willing** [5] - 38:24,
40:3, 43:6, 44:22,
48:9

**wondering** [1] - 26:5
**word** [1] - 5:22
**words** [1] - 44:14
**works** [1] - 50:17
**world** [1] - 20:19
**worried** [1] - 29:17
**worry** [2] - 33:13,
35:13
**wow** [1] - 20:4
**wrap** [2] - 13:21, 22:17
**wrapped** [1] - 51:25
**wrestle** [1] - 38:15
**wrestling** [2] - 38:10,
38:14
**written** [1] - 17:24

**Y**

**years** [1] - 22:8
**yesterday** [1] - 32:19

**Z**

**Zhejiang** [2] - 25:25,
47:18
**ZHP** [4] - 2:10, 4:15,
5:16, 8:8