

Victoria Davis Lockard
Tel 678.553.2103
lockardv@gtlaw.com

August 21, 2019

**VIA ECF**
The Honorable Joel Schneider
United States Magistrate Judge
District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

      Re:    *In re Valsartan Products Liability Litigation,* U.S. District Court for the District of New Jersey; Case No. 1:19-md-02875-RBK-JS

Dear Judge Schneider:

      Pursuant to this Court's instruction during our discussion of the draft Plaintiff's Fact Sheets at the July 24, 2019 Case Management Conference, Defendants write to provide additional support for our request for litigation funding information within the proposed Plaintiff's Fact Sheets. Specifically, Defendants seek to obtain information about Plaintiffs' agreements and communications with any third-party funders of the litigation, including Plaintiffs' documents and communications relating to or concerning any litigation finance obtained in connection with this litigation, documents and communications regarding conferences, meetings or conventions attended with the purposes of seeking litigation finance, and documents and communications relating to agreements to finance this litigation.

      As discussed in detail below, the Court should permit the disclosure of information pertaining to Plaintiffs' third-party litigation financing because: (1) the information is relevant and not privileged; (2) failure to disclose this information can undermine and derail the MDL; and (3) a ruling in favor of disclosure would be consistent with the decisions of similarly situated state and federal courts who have recently addressed this issue.

      **I.**    **Information regarding Plaintiffs' third-party litigation funding is relevant and not privileged.**

      Whether Plaintiffs have obtained third-party funding represents a critical piece of information to which Defendants are entitled. The specifics concerning the financing of this case on Plaintiffs' side is relevant in several respects. First, among other minimum requirements, a plaintiff in federal court must have suffered an actual injury and must assert his or her own legal rights and interests and not those of third parties. *See generally, Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994). Should any of the Plaintiffs be receiving third-party financing for their claims, they may not be the real party in interest as to some or all of the claims alleged in this action and, thereby, lack standing. Third-party financing agreements implicitly mean a third-party has an interest in the outcome of the litigation, and it is therefore critical to ascertain the level of

The Honorable Joel Schneider
August 21, 2019
Page 2

control and authority exercised by the third party, or more fundamentally, whether the third party owns the rights to said action. *See Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. 16-453-RGA, 2018 U.S. Dist. LEXIS 21506, at *10 (D. Del. Feb. 9, 2018) (holding that communications and agreements between plaintiff and third-party funder are relevant and discoverable); *Cobra Int'l, Inc. v. BCNY Int'l, Inc.*, No. 05-61225-CIV, 2013 U.S. Dist. LEXIS 190268, at *12 (S.D. Fla. Nov. 4, 2013) (ordering the production of a litigation funding agreement to determine the ownership of a patent and therefore standing to bring the lawsuit). Documents pertaining to any third party's decision and agreement to finance Plaintiffs' litigation must be examined to determine if Plaintiffs are asserting their own rights in this litigation.

Second, the nature of *who* is funding the litigation and the structure of *how* the litigation is being funded bears on numerous topics. "Consistent with federal privilege law, fee-payment arrangements are relevant to credibility and bias, and discoverable." *Berger v. Seyfarth Shaw, LLP*, 2008 U.S. Dist. LEXIS 117105, at *3 (N.D. Cal. Oct. 14, 2008) (citing *Bryant v. Mattel*, 573 F. Supp. 2d 1254, 1274 (C.D. Cal. 2007). The Federal Rules of Civil Procedure Rule permit consideration of a party's resources for issues including the scope of discovery, the outcome of discovery cost-shifting, and the proper assessment of sanctions should a party engage in misconduct. Funding information also informs discussions of medical necessity and the reasonableness of plaintiffs' treatments. *See* Pretrial Order #215 (Motion to Modify Subpoena or for Protective Order of Nonparties Surgical Assistance and Blake Barber), *In re: American Medical Systems Inc. Pelvic Repair systems Product Liability Litigation*, MDL No. 2325, at 12-14 (S.D.W. Va. May 31, 2016) (finding that information sought by defendant's subpoenas to litigation funding companies were relevant to understanding the motivations behind plaintiffs decisions to pursue medical care, the financial motivations behind the entities' actions, and damages generally).

Finally, any contention by Plaintiffs that the information sought in this regard is privileged is inapposite. Even if any agreement between Plaintiffs and third-party funders contain terms and conditions regarding legal counsel in connection with this lawsuit, it is not enough to bring such documents within any privilege. *See United States v. Blackman*, 72 F.3d 1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the fee arrangement between attorney and client are not protected from disclosure by the attorney-client privilege."); *In re Semel*, 411 F.2d 195, 197 (3d Cir. 1967) (explaining that absent unusual circumstances, the conditions of an attorney's employment do not come within the privilege). "[T]he privilege does not extend to the general nature of the legal services a lawyer is retained to perform or to the terms and conditions of a lawyer's engagement." *Yancey v. Hooten*, 180 F.R.D. 203, 212-13 (D. Conn. 1998) (citing *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977) (noting that document revealing purpose for which law firm had been engaged and steps which the firm intended to take is not privileged)). The information and documents sought are likewise not protected by the work-product doctrine. *See Montgomery County v. Microvote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) (holding that a fee agreement does not come within the ambit of the work-product privilege).

**II.     Undisclosed interested non-parties can undermine and derail multi-district litigation.**

The Honorable Joel Schneider
August 21, 2019
Page 3

The recent history of mass tort multi-district litigation is littered with examples of undisclosed non-party involvement gone wrong to the detriment of: (1) the integrity of the legal process, (2) the resources available for meritorious claims, (3) the rights of defendants, and (4) public health. These examples counsel that it is easier to avoid such problems through early disclosure and continued transparency than it is to remedy them through enforcement after the fact.

For example, in silicone breast implant litigation in the 1990s, lawyers referred women to doctors for screening under fee arrangements contingent on the outcome of litigation, creating a potentially "huge conflict of interest." Gina Kolata & Barry Meier, *Implant Lawsuits Create a Medical Rush to Cash In*, NY TIMES (Sept. 18, 1995), http://www.nytimes.com/1995/09/18/us/doctors-lawyers-silicone-special-report-implantlawsuits-create-medical-rush.html. These arrangements gave doctors "a financial incentive to find illness" and to prescribe expensive, unnecessary, and in some cases permanently harmful tests and treatments in the hopes of recovering these costs upon settlement. *Id.* Thus, even this seemingly indirect, non-party interest in the litigation created the risk of compromising doctors' medical judgment, subjecting plaintiffs to dangerous treatment (and depriving them of appropriate care), and diverting settlement resources away from meritorious claims—ultimately the late discovery of these arrangements overwhelmed an initial settlement agreement and necessitated years of additional litigation. *Id.*; *see also* Barry Meier, *A Judge and a Deadline: The Breast Implant Case*, NY TIMES (Sept. 29, 1995), http://www.nytimes.com/1995/09/29/us/a-judge-and-a-deadline-the-breast-implant-case.html; Gina Kolata, *In Implant Case, Science and the Law Have Different Agendas*, NY TIMES (July 11, 1998), http://www.nytimes.com/1998/07/11/us/in-implant-case-science-and-the-law-have-differentagendas.html.

Similarly, in diet drug litigation in the early 2000s, lawyers set up "echo mills" to screen and diagnose heart valve defects in huge volumes of plaintiffs. *See* Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 SMU L. Rev. 1221, 1258–61 (2008). Some firms paid doctors on a contingency basis, providing up to $1,500 of "additional compensation" if a patient's claim was submitted for settlement payment. *In re Diet Drugs*, 236 F. Supp. 2d at 459 ("Thus, Dr. Mueller's remuneration depended on how he interpreted the echocardiogram and on what he stated on the form."); *see also United States v. Tai*, 750 F.3d 309, 312 n.6 (3d Cir. 2014) (noting payment of additional $900-$1000 "expert fee" for each diagnosis report approved for benefits). This gave the non-party doctors a financial stake in the litigation and "a financial incentive to reach a particular result," resulting in litigation and resolution of claims predicated on fraudulent diagnoses that were "beyond the bounds of medical reason." *In re Diet Drugs*, 236 F. Supp. 2d at 458-59 (lamenting that Settlement Trust's ability to "pay legitimate claims is being undercut by the tender of claims that have no reasonable medical basis.").

Such practices are not confined to medical providers themselves, however. Attorneys may also refer patients to non-party lenders or factoring companies who pay for surgeries or other care in exchange for direct liens (with exorbitant interest and return on investment) on the patients' lawsuits. See Alison Frankel & Jessica Dye, *The Lien Machine: New breed of investor profits by financing surgeries for desperate women patients*, REUTERS (Aug. 18, 2015), http://www.reuters.com/investigates/special-report/usa-litigation-mesh/. It is estimated that

The Honorable Joel Schneider
August 21, 2019
Page 4

lenders have invested as much as $100 million in diagnosis and treatment in mass torts cases. *Id.* And with a contingent stake in litigation where recovery is often linked to the severity of treatment, lenders have a financial incentive to encourage compensable diagnoses and expensive treatment options rather than objectively determining and providing the most appropriate care. *Id.* (noting that patients undergo mesh removal surgery in only about 50 percent of the cases, but those cases account for 90 percent of the overall value of the litigation).

In one mesh lawsuit example, a plaintiff was referred by her lawyer to a medical funding group to finance a procedure; the plaintiffs' insurer typically paid $6,000 for the procedure. *Id.* But under arrangements with the funding group, the doctor was paid $17,000 for the treatment and produced a bill for nearly $37,000 payable to the funding group, which ultimately claimed a settlement lien totaling more than $60,000. *Id.* Thus, the value of compensable medical expenses was inflated by more than 1,000%, with the additional cost—i.e., profit to the funders—taken from settlement funds, deserving claimants, the defendant, and finally the plaintiff herself. In another mesh case, a doctor saw a woman from out-of-state and scheduled her for her procedure the next day, but the woman's device had already been removed. She was subjected to the invasive surgery anyway. The medical funding company ultimately billed its lien at approximately $62,000. *See In re Boston Sci. Corp. Pelvic Repair Sys. Prod. Liab. Litig.,* MDL No. 2326, 2014 U.S. Dist. LEXIS 69068 (S.D.W. Va. May 14, 2014).

Just this year, the U.S. Attorney's Office for the Eastern District of New York brought federal charges against two individuals who ran funding companies which fraudulently misrepresented the risks of plaintiffs' transvaginal mesh implants, coordinated surgeries to remove said implants and inflate the value of the plaintiffs' lawsuits, and then purchased and resold the additional medical debts incurred by those same women. Press Release, Surgical Funding Facilitator and Physician Charged in Alleged Nationwide Scheme to Defraud Women in Connection with Transvaginal Mesh Litigation (May 24, 2019) (available at https://www.justice.gov/usao-edny/pr/surgical-funding-facilitator-and-physician-charged-alleged-nationwide-scheme-defraud). The Court and the parties cannot evaluate whether similar issues exist with respect to litigation funding arrangements in this MDL unless disclosure of such agreements is required.

Early, mandatory disclosure of these agreements in response to the Plaintiff's Fact Sheets will enable the parties to address and the Court to avoid percolating issues which could derail the efficient management and eventual resolution of this MDL.

### III. Courts and legislators lean toward mandating disclosure of third-party funding.

As the use of third-party litigation financing increases in the United States, courts and legislators increasingly lean toward transparency and mandatory disclosure of third-party litigation funding agreements in civil litigation. Indeed, courts have recognized the importance of the impact of these agreements and have already mandated some level of disclosure in class actions and MDLs. *See, e.g., In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 U.S. Dist. LEXIS 84819, at *45 (N.D. Ohio May 7, 2018) (ordering the disclosure of any third-party

The Honorable Joel Schneider
August 21, 2019
Page 5

contingent litigation financing agreements to the court in opioid litigation MDL); *Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, 2016 U.S. Dist. LEXIS 103594, at *6 (N.D. Cal. Aug. 5, 2016) (granting Chevron's motion to compel and ordering plaintiff to produce the litigation funding agreement to Chevron in class action).

Disclosure of the existence of third-party interests is especially important in a litigation such as this, where the financial stakes are high. In the *In re: Coloplast Corp. Pelvic Support Systems Products Liability Litigation* MDL pending before the Southern District of West Virginia, the court ordered the production of certain document by nonparties, including MedStar Funding. *See* Pretrial Order #47 (Stipulated Protective Order Regarding Nonparty Documents), *In re: Coloplast Corp. Pelvic Support Systems. Prod. Liab. Litig.*, MDL No. 2387 (S.D.W. Va. Jan. 27, 2014). MedStar Funding, now a part of Key Health, "funds thousands of medical accounts receivable each month from medical providers spanning the U.S. These providers offer services to injured victims on a lien or letter of protection basis as part of a personal injury claim. . . . Medical providers assign the personal injury accounts receivable to Key Health who then maintains the accounts until case resolution. Key Health communicates with the patient's attorney for payment of the incurred medical charges at settlement." *See* KEY HEALTH, http://keyhealth.net/Home/AboutUs. "These medical liens sometimes spiral to as much as 10 times what private insurers or government programs like Medicaid would pay for the same procedures." Frankel & Dye, *The Lien Machine*, *supra*. Ultimately, the mesh MDL Court ordered discovery of the medical receivables and lien-factoring companies more than once. Here, the cost associated with Plaintiffs' alleged cancer diagnoses lends itself to the same potential abuses.

The shifting tide toward disclosure of third-party litigation funding information in courts is coupled by a similar movement in the legislative realm. In January 2017, the Northern District of California updated its districtwide standing order to add language mandating third-party litigation financing disclosure in class actions. Amendments to federal rules also have been explored. The Advisory Committee on Civil Rules considered requiring automatic initial disclosure of third-party litigation financing agreements, but when the committee first addressed the issue at its October 2014 meeting, it noted that the field was evolving and chose not to act. The topic was again raised at the committee's April 2016 meeting and remains an open item on its agenda. Further, in early March 2017 the House of Representatives passed the proposed Fairness in Class Action Litigation Act of 2017 (H.R. 985) with a third-party litigation funding disclosure provision requiring the prompt disclosure to the court and parties in all class actions of any entity with "a contingent right to receive compensation from any settlement, judgment, or other relief obtained in the action." *See* H.R. 985. Most recently, the State of Wisconsin instituted a statutory provision requiring the disclosure of litigation funding arrangements without first requiring a discovery request. *See* Wis. Stat. Ann. § 804.01(2)(bg).

Here, requiring disclosure of information regarding Plaintiffs' third-party litigation financing would be consistent with numerous similarly situated state and federal courts and would follow the regulatory and legislative trend toward disclosure of such agreements.

We once again thank you for your time and careful consideration of this issue.

The Honorable Joel Schneider
August 21, 2019
Page 6

                                        Respectfully,

                                        /s/ Victoria Davis Lockard
                                        Victoria Davis Lockard, Esq.
                                        *Attorney for Teva Pharmaceuticals USA,*
                                        *Inc., Teva Pharmaceutical Industries Ltd.,*
                                        *Actavis LLC, and Actavis Pharma, Inc.*

Enclosures

cc:      Adam Slater, Esq. (*via email, for distribution to Plaintiffs' Counsel*)
           Daniel A. Nigh, Esq. (*via email*)
           Lori G. Cohen, Esq. (*via email*)
           Jessica Priselac, Esq. (*via email, for distribution to Defendants' Counsel*)
           Seth A. Goldberg, Esq. (*via email*)
           Richard Smith, Esq. (*via email*)
           Clem C. Trischler, Esq. (*via email*)