1          **UNITED STATES DISTRICT COURT**
          **FOR THE DISTRICT OF NEW JERSEY**
2
3   ————————————————————
                                       **CIVIL ACTION NUMBER:**
4   **IN RE:  VALSARTAN PRODUCTS**
    **LIABILITY LITIGATION**            **19-md-02875-RBK-JS**
5
    ————————————————————               **STATUS CONFERENCE**
6

7        Mitchell H. Cohen Building & U.S. Courthouse
         4th & Cooper Streets
8        Camden, New Jersey  08101
         August 14, 2019
9        Commencing at 2:09 p.m.

10
    **B E F O R E:**                 **THE HONORABLE JOEL SCHNEIDER,**
11                                   **UNITED STATES MAGISTRATE JUDGE**

12
    **A P P E A R A N C E S:**
13
         MAZIE SLATER KATZ & FREEMAN, LLC
14       BY:  ADAM M. SLATER, ESQUIRE
         103 Eisenhower Parkway
15       Roseland, New Jersey  07068
         For the Plaintiff
16
         GOLOMB & HONIK, P.C.
17       BY:  RUBEN HONIK, ESQUIRE
         1835 Market Street, Suite 2900
18       Philadelphia, Pennsylvania  19103
         For the Plaintiff
19
         KANNER & WHITELEY, LLC
20       BY:  CONLEE S. WHITELEY, ESQUIRE
         701 Camp Street
21       New Orleans, Louisiana  70130
         For the Plaintiff
22

23            Carol Farrell, Official Court Reporter
                    cfarrell.crr@gmail.com
24                     856-318-6100

25   Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.

 1    **A P P E A R A N C E S (Continued):**

 2

 3        KIRTLAND & PACKARD LLP
         BY:  BEHRAM V. PAREKH, ESQUIRE
 4        1638 South Pacific Coast Highway
         Redondo Beach, California  90277
 5        For the Plaintiff

 6        GOLDENBERG LAW, PLLC
         BY:  MARLENE J. GOLDENBERG, ESQUIRE
 7        800 Lasalle Avenue, Suite 2150
         Minneapolis, Minnesota  55402
 8        For the Plaintiff

 9        DUANE MORRIS LLP
         BY:  SETH A. GOLDBERG, ESQUIRE
10        BY:  BARBARA A. SCHWARTZ, ESQUIRE
         30 South 17th Street
11        Philadelphia, Pennsylvania  19103
         For the Defendants, Prinston Pharmaceuticals,
12        Solco Healthcare U.S. LLC, and
         Zhejiang Huahai Pharmaceuticals Ltd.

13        PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
         BY:  CLEM C. TRISCHLER, ESQUIRE
14        BY:  JASON M. REEFER, ESQUIRE
         One Oxford Centre, 38th Floor
15        Pittsburgh, Pennsylvania  15219
         For the Defendant, Mylan Pharmaceuticals Inc.
16
         GREENBERG TRAURIG LLP
17        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
         BY:  BRIAN H. RUBENSTEIN, ESQUIRE
18        BY:  STEVEN M. HARKINS, ESQUIRE
         3333 Piedmont Road, NE, Suite 2500
19        Atlanta, Georgia  30305
         For the Defendants, Teva Pharmaceutical Industries Ltd.,
20        Teva Pharmaceuticals USA, Inc., Actavis LLC,
         and Actavis Pharma, Inc.
21
         HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC
22        BY:  JANET LYNN POLETTO, ESQUIRE
         BY:  ROBERT ELMORE BLANTON, JR., ESQUIRE
23        673 Morris Avenue
         Springfield, New Jersey  07081
24        For the Defendant, Hetero USA Inc.

25

1    **A P P E A R A N C E S (Continued):**

2         CIPRIANI & WERNER, P.C.
          BY:  JESSICA M. HEINZ, ESQUIRE
3         450 Sentry Parkway
          Blue Bell, Pennsylvania  19422
4         For the Defendants, Aurolife Pharma LLC
          and Aurobindo Pharma USA, Inc.
5
          KIRKLAND & ELLIS LLP
6         BY:  ALEXIA R. BRANCATO, ESQUIRE
          601 Lexington Avenue
7         New York, New York  10022
          For the Defendants, Torrent Pharma Inc.
8         and Torrent Pharmaceuticals Ltd.

9         FALKENBERG IVES LLP
          BY:  MEGAN A. ZMICK, ESQUIRE
10        30 N. Lasalle Street, Suite 4020
          Chicago, IL  60602
11        For the Defendant, Humana Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   (PROCEEDINGS held in open court before The Honorable Joel

 2   Schneider, United States Magistrate Judge, at 2:09 p.m.)

 3            THE COURT:  Good afternoon, everyone.  Please be

 4   seated.  Welcome.

 5            We are on the record in the Valsartan matter, Docket

 6   Number 19-2875.

 7            I would just ask whoever is going to speak for the

 8   parties, if you could jut say your name so the court reporter

 9   knows who's talking.

10            I just want to let you know at approximately 3:00,

11   we'll have to take a short break for a short criminal

12   proceeding.  It just came in.  It won't take long, but it's

13   something we have to do.  But I didn't want to hold this up,

14   so we'll just get going.  Okay?

15            I have your letters.  I read your letters, of course.

16   If, as I predict correctly, you made some progress in the

17   morning when you met and conferred, and we'll talk about that.

18            Two general issues to talk about today:  The core

19   discovery disputes and the insurance disclosure disputes, but

20   before that, I just want to see if we can just address a

21   couple of housekeeping matters.

22            The service on the companies pursuant to the Hague,

23   is that done or close to being done?

24            MS. GOLDENBERG:  This is Marlene Goldenberg for the

25   plaintiffs.  And we, unfortunately, are still roughly in the
```

1  same place that we were last month.  When we contacted the

2  agencies about starting international process service, they

3  told us that their time estimate was close to a year for most

4  of the entities.  So, you know, they've -- the wheels are in

5  motion and things are going as quick as we can, but it gets a

6  bit out of our hands at this point.

7          THE COURT:  Which are the companies again that have

8  to be served?

9          MS. GOLDENBERG:  It's generally the four API

10 manufacturers, so it's the Aurobindo API, the Mylan API -- if

11 I'm getting any of this wrong, please someone correct me --

12 and I think --

13         MR. SLATER:  Hetero.

14         MS. GOLDENBERG:  Hetero, as well.

15         THE COURT:  So, I know we have ZHP is an API

16 manufacturer.  Are they the only API manufacturer who is in

17 the case now at the moment?

18         MR. SLATER:  Torrent is basically in.  We have an

19 agreement that we just have to formalize something, but they

20 have agreed to be in and they'll accept service.

21         THE COURT:  They are an API manufacturer?

22         MS. BRANCATO:  Your Honor, this is Alexia Brancato on

23 behalf of Torrent.

24         MR. SLATER:  Oh, I didn't realize you said API.  I

25 just thought we were talking about --

```
 1              THE COURT:  Yes, just talking about API.

 2              Is ZHP the only API manufacturer who is in the case?

 3              MS. GOLDENBERG:  Yes.

 4              MR. HONIK:  That's right.

 5              THE COURT:  Okay.  So it's out of your hands; you

 6  just have to wait for the authorities to do what they have to

 7  do?

 8              MS. GOLDENBERG:  Unfortunately, yes.

 9              THE COURT:  Okay.  Everything on track for the MDL

10  application in September?

11              MR. HONIK:  Yes.  We anticipate that will be on file

12  sometime next week.

13              THE COURT:  Okay.  And --

14              MR. HONIK:  Yes.

15              THE COURT:  So by now you probably know what you're

16  going to ask for.  You're going to ask for the addition of the

17  third chemical and all sartans; am I right about that?

18              MR. HONIK:  The last -- Judge, the last draft of it

19  that I saw just included losartan and irbesartan.  You raise a

20  good question about whether it should speak to the new

21  chemical.  We'll certainly --

22              THE COURT:  I thought we talked about this the last

23  time.

24              MR. HONIK:  I apologize.  I was not here at the last

25  case management conference, but we'll confer internally.
```

```
 1              THE COURT:  My recollection is -- the record will
 2    speak for itself -- that the application was going to be for
 3    all sartans and not just the two you mentioned.  Am I wrong
 4    about that?
 5              MR. SLATER:  That was the discussion, your Honor, to
 6    capture any contaminated sartans, any sartans with a
 7    contamination.
 8              THE COURT:  But I just want to know what's going to
 9    be presented to the panel.
10              MR. HONIK:  We'd like to style it in a way that
11    captures all contaminated sartans.
12              THE COURT:  Okay.  I spoke to Judge Kugler.  He's out
13    this week in Washington, saving us from terrorists.  He's
14    going to respond to the motion-to-dismiss letters next week,
15    he said, when he gets back.
16              My notes indicate the short-form complaint was due I
17    think today, so we'll get that and we'll enter that.  Am I
18    right about that?
19              MS. GOLDENBERG:  Yes, your Honor.  You have it in
20    your e-mail, I hope.  Otherwise, I'm happy to send it again.
21              THE COURT:  Today?
22              MS. GOLDENBERG:  I'm sorry?
23              THE COURT:  When was it sent?
24              MS. GOLDENBERG:  During -- or right before the last
25    hearing.  I'm happy -- I can send it again.
```

```
 1              THE COURT:  The final version?

 2              MS. GOLDENBERG:  Yes.  But, actually, in light of the

 3    order that you issued over lunch where you renumbered the case

 4    management orders, I was going to point out that it now needs

 5    to be CMO 12 anyway --

 6              THE COURT:  I'll change that.

 7              MS. GOLDENBERG:  -- so I'll resend it.

 8              THE COURT:  Okay.  Could you do me a favor, resend

 9    it?  I don't recollect seeing that.

10              MS. GOLDENBERG:  Not a problem, yes.

11              THE COURT:  That's why it hasn't been entered yet.

12              Okay.  And I know the defendants are concerned about

13    this.  Are we on track to finalize the plaintiffs' fact sheets

14    by the end of the month?

15              MS. LOCKARD:  Yes, your Honor.  Victoria Lockard for

16    Teva and the Executive Committee.  We are on track.  We

17    anticipate submitting a finalized version next week that

18    incorporates your Honor's rulings.

19              THE COURT:  Terrific.

20              MS. LOCKARD:  If we can get that entered and set the

21    clock running on the target date of August 28th, I think

22    that's what we anticipate.  And then it's just a matter of how

23    much time the plaintiffs would be allowed to respond.  At the

24    last conference, we proposed 30 days, and then there was some

25    discussion for a little longer.  Has your Honor come to any
```

1    conclusion on that?

2          THE COURT:  Well, I know 30 days is too short.  What

3    did we do in Benicar?  Was it 60 or 90 days?  I don't

4    remember.

5          MR. PAREKH:  Your Honor, for the initial set, it was

6    90, and then it was 60 going forward.  So for people who had

7    filed as of prior to the date the PFS was entered, they got 90

8    days to respond, and then anybody who filed after that point

9    had 60 days from, I believe, the initial service of the

10   complaint.

11         THE COURT:  Okay.  Do you have any objection to that?

12         MS. LOCKARD:  So, we have right now -- I don't know

13   how many plaintiffs there were pending at that time in the

14   Benicar MDL.  We have, I think, around 125 cases currently in

15   the MDL; not all of those are personal injury cases.  So,

16   given the -- which I believe is a smaller number, we would --

17   we would expect that that could be completed in 60 days in

18   this case, and then going forward 60 days as well, just

19   because I think we're at the outset of this litigation, and so

20   the numbers -- the short form, for example, hasn't been

21   entered, so we don't have a backlog of plaintiffs, you know,

22   500, 600 plaintiffs that this needs to be completed for.

23         THE COURT:  Let's go with the 90/60.  I don't think

24   the defendants are going to be prejudiced in any material

25   respect.  I'll dig out the Benicar order and basically enter

1   the same language that we entered there.  It worked well.  And

2   we'll probably also mirror the same order-to-show-cause

3   procedure we used which worked so well in Benicar, that

4   protects your interests, and we'll get the ball rolling on

5   plaintiffs' discovery.

6           MS. LOCKARD:  Okay.  We'll submit a proposed order

7   then, along with the plaintiff fact sheet, that incorporates

8   that procedural process for the show cause.

9           Now, with just one point of clarification.  So what

10  we're submitting in our -- certainly, will get entered -- is

11  the personal injury plaintiffs' fact sheets --

12          THE COURT:  Yes.

13          MS. LOCKARD:  -- so there are additional for medical

14  monitoring, consumer fraud plaintiffs, and the TPP plaintiffs,

15  which we need a little more time to --

16          THE COURT:  The class reps.

17          MS. LOCKARD:  -- finalize the reps.

18          THE COURT:  Just the class reps, right?

19          MS. LOCKARD:  Right.  So that will be a separate

20  submission.

21          THE COURT:  No problem.

22          MS. LOCKARD:  But we would like to get the personal

23  injury rolling.

24          THE COURT:  Yes, no problem.

25          MS. LOCKARD:  Thank you.

1           THE COURT:  Okay.  So you'll prepare the order, a

2   draft order that accompanies the fact sheet?

3           MS. LOCKARD:  Yes.

4           THE COURT:  Okay.  And I'm sure you'll run it by

5   plaintiffs, and if you just mirror Benicar, that's fine with

6   us.

7           MS. LOCKARD:  Understood.

8           THE COURT:  Okay.  I think those are the background

9   issues I wanted to cover.

10          So two general issues:  The core discovery and the

11  insurance disclosure.

12          And, as I see it, the core discovery is divided into

13  two parts, what I call the macro issues, the issues that apply

14  to all defendants, and then there may be issues specific to

15  particular defendants.  Why don't we deal with what I call the

16  macro issues, the issues, disputes, et cetera, that apply to

17  all the defendants.

18          Plaintiff, you raised the dispute.  We'll hear from

19  the defendants and we'll see if we can get it resolved.  I

20  have all the papers in front of me.

21          MR. SLATER:  Maybe the first thing to do would be to

22  confirm what we discussed before we came in, probably make

23  sense, right?

24          MR. GOLDBERG:  Sure.

25          MR. SLATER:  I'll try to recite it, if you want, and

1    you guys can correct me if I miss anything.

2              We had a good meeting today in the morning, your

3    Honor, here in the courtroom.  Thank you for letting us have

4    the courtroom.  It was very helpful.  And then we spoke a

5    little after lunch, based on the discussion.

6              So, I think we've reached agreement that -- and these

7    agreements apply to the core-discovery defendants -- the API

8    manufacturers, the finished dose manufacturers, correct?

9    That's the scope of what we're talking about, right?

10             THE COURT:  Can I just proceed for one moment?  I

11   tried to straighten out who belongs in which category.  For

12   the API manufacturers and suppliers, I have -- and I'm not

13   going to give the whole corporate name -- ZHP, Hetero, Mylan,

14   and Aurobindo.  Is there anyone else besides those four?

15             MR. SLATER:  I don't believe so.

16             THE COURT:  Okay.  For the finished product/dose

17   manufacturers, I have Teva and Torrent.  Did I miss anyone?

18             MS. HEINZ:  Yes.  Aurolife.

19             THE COURT:  Aurolife?

20             MS. HEINZ:  Aurolife Pharma LLC.

21             THE COURT:  Okay.  Is that with an A?

22             MS. HEINZ:  Yes.

23             THE COURT:  Okay.  Aurolife is a finished --

24             MS. HEINZ:  Jessica Heinz.  I apologize, your Honor.

25             THE COURT:  Okay.  They are in the finished dose

```
 1   category?
 2           MS. HEINZ:  They are a finished dose.
 3           MS. LOCKARD:  And, your Honor, Actavis is a related
 4   Teva entity, also finished dose.  I just want to make sure
 5   that's -- that's within the Teva umbrella.
 6           MS. GOLDENBERG:  If you want, your Honor, I've got a
 7   full list of everyone.
 8           THE COURT:  Why don't you give it to me?
 9           MS. GOLDENBERG:  Okay.
10           THE COURT:  Read it out.
11           MS. GOLDENBERG:  So the APIs you correctly
12   identified -- Aurobindo Pharma Limited, Hetero Drugs Limited,
13   Hetero Labs -- I'm sorry.  Hetero Drugs Limited is the API
14   manufacturer parent corporation.  The API manufacturer is
15   Hetero Labs Limited.  Mylan Laboratories Limited is an API.
16   ZHP Limited is a manufacturer -- is an API manufacturer, and
17   that's that group.
18           For finished dose manufacturers, we have Arrow Pharm
19   (Malta) Limited.
20           THE COURT:  Arrow Pharm?
21           MS. GOLDENBERG:  Yes.
22           THE COURT:  Is that different than Aurolife?
23           MS. GOLDENBERG:  It is.
24           Aurolife Pharma LLC is also a finished dose
25   manufacturer.  Hetero Labs Limited is a finished dose.  Mylan
```

1    Pharmaceuticals, Incorporated.  Teva Pharmaceutical -- I'm

2    sorry -- Teva Pharmaceutical Industries Limited.  Torrent

3    Pharmaceuticals Limited.  ZHP is both an API and a finished

4    dose manufacturer, so they fall into both categories.  And I

5    think that covers everyone of each.

6         THE COURT:  So some defendants in the corporate chain

7    might be in both categories?

8         MS. GOLDENBERG:  I believe ZHP is the only one that

9    falls into both, but yes.  Oh, and Hetero Labs.  Sorry.

10         THE COURT:  Have all the finished product defendants,

11   have they all been served?

12         MS. POLETTO:  Hetero Labs Limited has not.

13         THE COURT REPORTER:  I'm sorry.  Your name?

14         MS. POLETTO:  Janet Poletto.

15         THE COURT:  Are they a foreign company?

16         MS. POLETTO:  Yes, your Honor.

17         THE COURT:  Anyone else in the finished product

18   category?

19         MR. SLATER:  Now my comment on Torrent would be

20   relevant.  I think we have an agreement on it.  We're just

21   putting some fine touches on it.  But there is agreement that

22   there is not going to be a service issue as to them.  They

23   haven't been served yet, but there is no issue with that.

24         MS. LOCKARD:  And I believe Arrow (Malta) hasn't been

25   served yet either, but they're no longer an extant company, so

1  that they just don't exist anymore.

2          THE COURT:  Okay.  All right.  I think I interrupted

3  you, Mr. Slater, so the floor is yours.

4          MR. SLATER:  No problem.

5          So we have agreement, again, for I guess those two

6  groups of defendants that we just identified, because they're

7  the ones that are subject to the core discovery, that they

8  will each provide -- or to the extent that I guess we're going

9  to get a letter from all the defendants listing all of the API

10 and finished dose manufacturing facilities, so that we will

11 have those lists so we will be able to cross-reference them to

12 other discovery, know where everything --

13         THE COURT:  Could you be a little bit more specific?

14 Is it going to be just for valsartan or the all sartans or is

15 it different?

16         MR. SLATER:  The only discussion we had was revolving

17 around valsartan, and that's all that's been committed to by

18 the defendants.  I'm not in a position today to advocate for

19 anything beyond that.  You are.  I'm not.

20         THE COURT:  Okay.  It's the API manufacturing

21 facilities?

22         MR. SLATER:  The API manufacturing facilities and the

23 finished drug or finished dose manufacturing facilities.

24         THE COURT:  Okay.  So that would be -- clearly,

25 that's relevant.  That were involved with what?  The recalls?

```
 1   Or just made it at any time?

 2               MR. SLATER:  At any time, I think, and then, you

 3   know, I guess as we go through the case, we'll figure out

 4   which facilities are implicated.

 5               THE COURT:  They might be the same; they might not be

 6   the same?

 7               MR. SLATER:  Right.

 8               THE COURT:  Okay.  So do we have to go through the

 9   same exercise if the definition, scope of the case is modified

10   to include the other sartans or is it likely they're the same

11   facilities?

12               MR. SLATER:  I can't comment.  I don't know.  I'm

13   sure there is some overlap and probably some difference, but

14   the defense would know far better than we do.

15               THE COURT:  We'll cross that bridge when we come to

16   it, right?  Okay.

17               MR. SLATER:  So that was one agreement.

18               And the second one, again, as to the core discovery,

19   defendants have agreed that they will provide us corporate

20   organization information, and what we discussed was -- we

21   discussed corporate organization internal to the company, like

22   for example, take ZHP as the example.  Within the company,

23   although we didn't get into the details of that, probably have

24   to discuss more, and obviously that's going to be part of our

25   discovery requests anyway, our requests for documents, but the
```

1   more -- the more focused part of the conversation was we're

2   going to be given corporate organization between the

3   core-discovery defendants, the API and finished dose

4   manufacturers, and their affiliates that were involved with

5   the manufacture or sale or distribution of the valsartan, so

6   that we will know, at least at that level, who is who, who did

7   what.  And they're actually going to -- they have committed to

8   provide us what is the corporate relationship, for example, is

9   it a subsidiary, and what their role was in the valsartan

10  story.

11          THE COURT:  Terrific.

12          MR. SLATER:  Did they manufacture, did they

13  distribute, did they package, whatever they did, did they

14  sell, and we thought that was helpful.  And in that context,

15  they said we will get a list of all the ANDAs because they

16  will tell us who owns each of the ANDAs as they go through

17  that list of core-discovery defendants and their affiliates,

18  so that they will make sure all the ANDAs are accounted for.

19          THE COURT:  Which ANDAs?

20          MR. GOLDBERG:  Again, valsartan.

21          MR. SLATER:  For valsartan.  And we discussed this a

22  little bit.  I believe it was agreed, the various valsartan

23  drugs, not just valsartan.  There is valsartan, amlodipine,

24  hydrochlorothiazide.  There is a couple of different

25  formulations, but they all have a core of valsartan.

1          I think that's the -- that covers the agreements.

2    I'll leave it to the defense to put a fine point on it, if

3    necessary.

4          THE COURT:  Well, I think that's great because I

5    would definitely put all of that in the core category, and

6    that is going to be an immense help to plaintiffs to properly

7    frame their discovery, so that's perfect.

8          MR. SLATER:  Not to the parts we didn't agree to?

9          THE COURT:  (Laughs.)

10         MR. SLATER:  One of the general issues that we

11   discussed is -- and it was something that came from some of

12   the e-mails with the Court, and we have discussed it with the

13   defense, is to identify which defendants no production has

14   been made from and why, and that goes to the custody,

15   possession, control issue.  And from our discussions, it

16   appears that the two foreign defendants for which no

17   production has been made are Aurobindo and Hetero, and I guess

18   it's Hetero Labs Limited and Aurobindo -- I don't remember

19   what comes after Aurobindo, but it's the Indian Aurobindo

20   entity.  Those are the --

21         MS. GOLDENBERG:  Aurobindo Pharma Limited.

22         MR. SLATER:  Aurobindo Pharma Limited.

23         THE COURT:  These are the API manufacturers?

24         MR. SLATER:  Yes.  And Hetero is also, as we were

25   just discussing, also a finished dose manufacturer as well.

```
 1              And we discussed with counsel for the U.S. entities,
 2    who are here before the Court, for example, have you tried to
 3    get the documents from them; if somebody in your company were
 4    to send an e-mail and say, hey, send me the test results, can
 5    I take a look at them, would they do it?  The conversation
 6    didn't really advance very far, so we're -- I think that's
 7    really as far as we've gotten, that there is no production
 8    from those entities, and at this point I don't think there is
 9    any contemplation -- and, of course, correct me if I'm
10    wrong -- that there is any contemplation on the defense side
11    of making a production for them until they're served.
12              THE COURT:  Okay.  So let's just see if we got this
13    right, and I don't know the technical legal names of the
14    companies, but the foreign API manufacturers, Aurobindo,
15    Hetero, we know they haven't been served pursuant to the
16    Hague, but do they both have -- I don't know what to call
17    them -- American affiliates or American subsidiaries?
18              MR. SLATER:  Yes, and both are before this Court.
19              THE COURT:  Okay.  So the legal issue would be do the
20    American companies have "control" over the foreign companies'
21    documents such that they can request them and the Court can
22    order them to be produced?
23              MR. SLATER:  That's our understanding, your Honor.
24              THE COURT:  That's the legal issue.
25              So, we have, I guess, two choices.  You can pursue
```

1    that avenue against the American companies now or wait until

2    the foreign companies are served, and then they'll be subject

3    to court jurisdiction and we can order them to produce them.

4              Defendants, what's your position?

5              MS. POLETTO:  If I may, Your Honor, Janet Poletto for

6    Hetero U.S.A.

7              Our position is that we are really not in a position

8    to do any more than we have which, quite honestly, is quite

9    substantial.  We have made a substantial production of

10   everything that Hetero USA has in its possession that relate

11   to the ANDAs and any communications with the FDA, and there is

12   a lot of materials in there.  I believe it's close to 30,000

13   pages of documents that my client has incurred the expense of

14   doing.

15             It is not really accessible to us in any easy way to

16   go the next step that apparently the Court is asking.  So I

17   think it would be a burden to place on them during core

18   discovery.  They've got a lot of information in what we've

19   produced that I think would be very helpful to the plaintiffs,

20   and we've followed your Honor's order in doing that.  But we

21   don't believe we need to be put in a position of somehow being

22   forced to try and get this from an entity that we do not

23   represent, and that, yes, our company is an affiliate

24   subsidiary, but it's a very -- it has a very limited role in

25   what it does as the FDA liaison.  So we have really extended

1  ourselves significantly at this point.

2        THE COURT:  I don't know if the plaintiffs have had

3  sufficient time to look at all the documents yet, but the

4  documents you have received from Hetero, do they reflect

5  communications with the foreign entity and do you have any

6  sense at the moment whether the production evidences that at

7  least there is a colorable argument that Hetero has control

8  over the foreign entity?

9        MR. SLATER:  Well, there is certainly a colorable

10  argument because Hetero USA represents that it is the U.S.

11  representative of the foreign entity.  So the way these

12  companies work, they're probably -- they're talking all day

13  long, they're in touch with each other all day.  It would be

14  inconceivable that there is not a free flow of information

15  between the companies.  You know, counsel could correct me,

16  but it couldn't -- it's inconceivable that, especially where

17  the USA entity has documents that show they're actually in

18  business, they're actually operating, and, obviously, we need

19  what the foreign entity has, it would seem to us that in terms

20  of the standard, which your Honor actually cited in your --

21  you've cited previously in the court for us, it would seem to

22  us they have at least access to these documents and the

23  ability to obtain them, and I think that's ultimately probably

24  the question that would be the legal question.

25        We'd prefer it be done easily as opposed to, you

```
 1    know, there could always be a corporate rep deposition of

 2    somebody.  I mean, we're concerned if it takes a year,

 3    these -- you know, then we lag with those two parties, and

 4    then more discovery comes in later, it becomes somewhat

 5    staggered and it could become an issue at a later date.  We

 6    don't know what's going to come from them so --

 7             THE COURT:  Do you know -- again, I don't know if

 8    you've had sufficient time to look at the documents -- if

 9    there are any categories of core documents that Hetero hasn't

10    produced?  My guess is the ANDA has been produced, but,

11    obviously, the inspection reports are prepared and things of

12    that sort.

13             MR. PAREKH:  Your Honor, we have not seen any

14    inspection reports for Hetero India.  We have not seen

15    communications between Hetero USA and Hetero India, nor would

16    we expect to, given what was produced in core discovery.

17             We got some additional documents just last night that

18    we have managed to load this morning but have not had a chance

19    to review, so we don't know what's in that group.

20             But, in terms of the documents that we've seen so

21    far, the ANDAs do not appear to be complete.  They were

22    produced in a -- in a manner that doesn't appear to be the way

23    that the other defendants produced ANDAs in terms of they're

24    not a cohesive -- it's not, you know, ANDAs starting with

25    number one and going all the way down.  It appears to be bits
```

1   and pieces, and we can't piece it together to know whether or

2   not we have complete ANDAs.

3          THE COURT:  Counsel for Hetero, let me ask you a

4   question.

5          MS. POLETTO:  Yes, your Honor.

6          THE COURT:  We started out a few moments ago with

7   what the parties agreed to, and one of the agreements was that

8   the defendants that we're talking about are going to give a

9   list of all API manufacturing and finish facilities and a

10  corporate relationship between at least the key defendants.

11  Is your client going to do that?  The one you represent.

12         MS. POLETTO:  My client, Hetero USA, has agreed to do

13  that, yes.

14         THE COURT:  Okay.  So, in order to do that, won't you

15  need to get information from this company in India?

16         MS. POLETTO:  No.  My client, your Honor, has the

17  information, but it's in the documents that we've produced.

18  We have answers to those questions in the documents we've

19  produced, which we can tell the plaintiffs, it's in the

20  documents, but we can use those documents to make the

21  representations as to what those facilities are.  The

22  corporate relationships is -- it's my client's understanding

23  of those corporate relationships.

24         THE COURT REPORTER:  I'm sorry, I can't hear you.

25         MS. POLETTO:  I'm sorry.

1          And as far as the corporate organizations, you know,

2    that's in our corporate disclosures, and our client is aware

3    of that.

4          THE COURT:  Here is what I'm wrestling with, counsel.

5    I would consider giving plaintiffs the right to take a

6    30(b)(6) on these possession, custody, and control issues, the

7    nuclear option.  I don't want to do that.  I really don't want

8    to do that.  I think it just takes us down a rabbit hole, and

9    there's almost guaranteed to be disputes because it's such a

10   factual determination.  But, on the other hand, I don't want

11   to wait nine or ten or eleven months for plaintiffs to get

12   these core documents.  Been in other cases like this, and

13   clients make a strategic decision.  I don't know what the

14   facts are going to show.  I don't know what the eventual

15   ruling is.  But when you look at the benefit or burden, yes,

16   they're not served yet, but does it make sense from a

17   strategic point of view for the client to say I don't want to

18   risk some judge telling me that the American company has

19   control over the foreign company, and this and other

20   litigation for the rest of the century, we're going to have to

21   produce foreign documents.  Why not just produce them?  A lot

22   of companies do that.

23         MS. POLETTO:  Understood, your Honor.  This is a

24   different situation.  Perhaps a company that has different

25   relationships in other situations, I don't understand.  I

1  don't know specifically what you're referencing.  It's just --

2  it's not something that I can represent that we can do at this

3  point in time.

4         THE COURT:  What about Aurobindo?

5         MS. HEINZ:  Jessica Heinz on behalf of Aurobindo USA

6  and Aurolife LLC.

7         I might be stating the obvious here, but I think the

8  Court is in a very bad position, and I think it's partially

9  due to the fact that Hague service on these foreign companies

10 wasn't initiated when suit was first filed against them.  Had

11 it been back in January, I don't think we would even be

12 dealing with this situation right now, so I think that's

13 something that's important to note.

14        And I also want to talk about how the plaintiffs are

15 relying on -- I think they cited to a case that says the

16 District Court of New Jersey follows this practical ability

17 test when it comes to defining control, but from the case law

18 that I've seen, it looks like the Third Circuit applies a more

19 strict test in the case of, you know, Rule 34 discovery, which

20 is called the legal rights test which basically says that the

21 party has to have the legal right to obtain documents

22 requested upon demand.

23        And it's my understanding from my client, you know,

24 we're not just dealing with requests for documents owned by a

25 foreign entity.  This is a foreign party that we're talking

1   about, that they've chosen to bring into this litigation.  And

2   it's my understanding from my client that they can't get these

3   documents from them.  They won't give them to them.  So I

4   don't -- I mean, we can do discovery on discovery, but they're

5   going to find out that they're not going to give them to us.

6          THE COURT:  Do I take it Aurobindo has -- the U.S.

7   company, whatever its name is, has produced core discovery?

8          MS. HEINZ:  We have produced everything that we have,

9   yes, and I have produced from Aurolife as well.

10          THE COURT:  Is it too early for the plaintiffs to get

11   their arms around what categories of core documents are

12   missing?

13          MR. PAREKH:  With Aurobindo, actually, they did

14   produce full ANDAs, so that is different from the Hetero

15   issue, and that was very helpful.  We do also have FDA

16   communications from Aurobindo.  It's not -- we're not clear

17   what is missing because it's hard to know what we don't have,

18   but we do have more documents from Aurobindo than we do from

19   Hetero in terms of categories.

20          MS. HEINZ:  We have not turned over the DMF,

21   obviously, because --

22          THE COURT REPORTER:  Because?  I can't hear you.  I'm

23   sorry.

24          MS. HEINZ:  I'm sorry.  We did not turn over -- we

25   were asked what we didn't turn over.  We didn't turn over the

1    DMF.

2            MR. HONIK:  Your Honor, if I may, we would really

3    relish the opportunity to create a factual record.  I mean,

4    many of the things we've seen in the public domain really

5    support the idea that there is such control.

6            One only needs to go to Hetero's LinkedIn page, and

7    this is what they've written about themselves.  They write,

8    and I quote:  We have a significant presence in the

9    development and marketing of finished dosages, active

10   pharmaceutical ingredients, over-the-counter products.

11           It doesn't distinguish, it doesn't create a wall,

12   legal or otherwise, between their finished dose operations and

13   their API.  And it has struck us that that wall really doesn't

14   exist, and so we would really welcome the opportunity to

15   conduct discovery in order to create that record and present

16   it to the Court.

17           THE COURT:  What would you request?  A 30(b)(6)

18   deposition?

19           MR. HONIK:  Yes, your Honor.

20           THE COURT:  Well, I'm going to grant that request.

21   I'm going to draft an order.  I just want Hetero and Aurobindo

22   to know that the Court is doing this with the greatest of

23   reluctance because this opens a door I do not want to open.  I

24   don't think it helps us advance the ball in the case.  We go

25   off on a tangent.  Like I said, I have been in many other

1    cases where sophisticated clients weigh the risks and the

2    benefits of voluntarily producing documents without prejudice.

3    We can draft an order.  But, again, I don't know how the Court

4    is going to eventually rule on this, but the companies are

5    running the risk that there is going to be an adverse

6    decision, that may be forever binding in future cases, that

7    they have to produce foreign documents.  And that's -- some

8    companies don't want to risk that.  So, hopefully, they'll

9    change their minds, but if not, we'll do what we have to do.

10   We're not going to wait 10 or 11, 12 months to get these

11   critical documents.

12          So I'll draft an order and give you the right to

13   take, hopefully, limited discovery on the control issue, and

14   then we'll set a briefing schedule and decide the issue.

15          Okay.  Next issue?

16          MR. SLATER:  The next issue is, again, a global

17   issue.  Your Honor, I'm referring to your order of April 24,

18   2019, because this issue comes right from the language in the

19   order.

20          THE COURT:  This is the Core Discovery Order, right?

21          MR. SLATER:  Correct.

22          THE COURT:  I have it right here.

23          MR. SLATER:  Your Honor, in Paragraph 5 on Page 2,

24   your Honor directed the defendants to identify the Bates

25   numbers of the documents responsive to each category of

 1  documents listed in Paragraph 6 herein.  And the --

 2          THE COURT:  That's pretty self- -- I don't know how I

 3  can make it any clearer.

 4          MR. SLATER:  I could tell you how.

 5          THE COURT:  (Laughs.)

 6          MR. SLATER:  No, I'm kidding -- I'm being -- I'm

 7  kidding.

 8          Here is the dispute.  Within Paragraph 6, you have

 9  Section 3, and there is multiple categories.  There is

10  Category 1, 2, 3, 4, all the way through Category 5, 6.  And

11  what the defendants have done is they produced the documents

12  and said the communications with the FDA are in this range.

13  And we said, well, can you tell us where the documents are

14  that reflect each of the categories within there, 1 through 6,

15  and we were told we don't have to do that; you figure it out.

16          So we're asking that they provide us the Bates

17  ranges.  For example, I will give you an important one,

18  Section 3, efforts to contain, remove, or detect the

19  contamination, so that we know what they're relying on as

20  production of that information.  It would be helpful for us to

21  know what's been produced and what's not, as opposed to trying

22  to figure it out for ourselves.

23          Because one of our concerns is there may be no

24  documents responsive to Paragraph -- to Section 1 or Section

25  2, but there may be 3, 4, and 5, and we don't know what they

 1  have produced documents in response to, so we don't know if

 2  they answered all of these different sections, and we don't

 3  know what the documents correspond to.

 4          THE COURT:  Are we talking about a great volume of

 5  documents?

 6          MR. SLATER:  It's -- I can't given you the number of

 7  pages but it's -- it's somewhat significant.  I mean, the

 8  overall production so far, compared to what we're ultimately

 9  going to get, is very small, so we're not talking about a lot

10  of documents.  There is really no great burden to doing this.

11  Our view is it should have just been done in the beginning.

12  And one of the things we said is we just want to make sure of

13  what you've produced, what it's responsive to.  And then, for

14  example, with -- you know, testing is obviously a major focus

15  for us, and we need to know which documents, which pages

16  within there you're relying on as communication of test

17  results.  And we just don't have that, because, ultimately,

18  one of the things we don't have, and -- we had asked in the

19  meet and confer process, for example, can you tell us, A, a

20  list of all the tests that have been done.  We were told no,

21  we're not doing that, that's not what was ordered.  So then we

22  said, well, can you at least tell us if the FDA communications

23  that you've produced encompass all the testing that's been

24  done relevant to this case?  And we were told no, figure it

25  out from the documents, and we don't need to tell you that.

1   So it left us in a bind, saying we at least need to know what

2   you're saying you produced at this point so that when we do

3   the, obviously, the general discovery, we ask for all the

4   testing, we will be able to compare and see what's new because

5   we obviously don't want to reanalyze the same data.

6           MR. HONIK:  Your Honor, to give you a direct answer

7   to your question, the size of the haystack of Category 3

8   communications among all the defendants is about 10,000

9   documents.  10,000.  So you could see the dilemma of trying to

10  discern, within the 10,000 or so documents, which fall into

11  the six categories.  If it was 20 documents, we wouldn't make

12  this request, but that's a pretty big haystack.  Pages.  I

13  misspoke.  It's pages.

14          MR. GOLDBERG:  Your Honor, I mean, I think one thing

15  that all of the defendants did was identify -- when you look

16  at your discovery order, identify the documents, by Bates

17  range, by general category.  The focus here is on 6(a)(3) and

18  the subcategories.  And one of the challenges to doing this

19  the way they have asked is that within many of the documents

20  that have been produced, you are going to have --

21          THE COURT:  Multiple categories.

22          MR. GOLDBERG:  And I'm holding examples.

23          THE COURT:  I know.

24          MR. GOLDBERG:  Right?  And so we -- there is a, you

25  know, there is a challenge here when plaintiffs are requesting

1    information, they want information, you order us to produce

2    it, we produce it, we produce it quickly, we do what is, you

3    know, reasonable and efficient, and plaintiffs want more

4    guidance.  I mean, they do have to review the documents.

5              Now, we don't want to make the judgment calls.  It

6    shouldn't be on us to determine, okay, this document is going

7    to be listed as an ARB recall document and a communication

8    document and a testing document.  They're all there for us

9    to -- certainly, for us to go back now and re-review, even if

10    it's 10,000 pages or 20,000 or 30,000, is a significant

11    burden.  They have the information.  And, you know, we have

12    now told them we are going to provide them the lists that they

13    requested.  So, you know, given the lists and the general

14    categories of information, there really isn't a lot of

15    mystery.

16              THE COURT:  The Court's intent when it drafted this

17    order was for Category 1, 2, 3.  The Court did not envision

18    that Bates numbers would be -- in core discovery, would be

19    given for 6(a)(3).  So that's another way of saying

20    plaintiffs' request is denied, to require the defendants to

21    identify the Bates numbers specific to (3), (1) to (6).  I

22    assume they have identified the Bates numbers for (a), (1),

23    (2), and (3).

24              MR. GOLDBERG:  Correct, Your Honor.

25              THE COURT:  That was the Court's intent when it

1    drafted the order.

2            Next issue?

3            MR. PAREKH:  Your Honor --

4            THE COURT:  Next general issue.

5            MR. PAREKH:  The next general issue has to do with

6    the format of the ANDA productions.  And I mean, obviously,

7    there was -- whether it was -- we don't think there was any

8    intent on either side.  This was an ambiguity.  But it was our

9    understanding that ANDAs, under the ESI protocol, are what

10   would fall under the structured data provision of the ESI

11   protocol, which would have required a meet and confer as to

12   what format that they would be produced in.  And the reason

13   for that is that in the eCTD format, which is sent to the FDA,

14   there are structure files which allow you to click through and

15   find specific documents, know what was done through an index,

16   and be able to tell, you know, what went into what category.

17           The way the defendants produced those documents was

18   to break that structure and produce each of the files

19   individually.  The problem with that production is that at

20   that point we can't recreate that structure, and --

21           THE COURT:  Do you think the ANDA was produced in the

22   format it was in in the usual course of business?

23           MR. PAREKH:  They had to have because it's an FDA

24   requirement that it be produced in eCTD format --

25           THE COURT:  No, no.

1           MR. PAREKH:  Oh, produced to us?

2           THE COURT:  To you.

3           MR. PAREKH:  No, absolutely not.

4           THE COURT:  That's what I asked.

5           MR. PAREKH:  No, it was not produced to us in the way

6    it was kept in the ordinary course of business.

7           THE COURT:  So we'll hear from the defendants, but is

8    this just a matter of pushing a button and sending it out?  Do

9    you know -- we'll hear from the defendants -- will they have

10   to go to any extra burden or expense to produce it in this

11   format?

12          MR. PAREKH:  What they should be able to do is copy

13   the folder, as it was sent to the FDA, to either a hard drive

14   or some other, you know, form, just copy it, paste -- you

15   know, put it in there and produce it as a single Bates

16   numbered document in its eCTD format.  There should be no

17   additional burden other than making that --

18          THE COURT:  What's it called?  eCTD?

19          MR. PAREKH:  I'm sorry.  It's a lower case "e,"

20   capital "C," capital "T" as in Tom, capital "D" as in David.

21          THE COURT:  Can someone speak for the defendants?  Is

22   this just a matter of pressing a button and producing it?

23          MR. TRISCHLER:  Good afternoon, Your Honor.  Clem

24   Trischler.

25          Unfortunately, it's not, and if I could back up a

1    little bit.  This issue was addressed with the Court at our

2    June status conference.

3         THE COURT:  The ANDA?

4         MR. TRISCHLER:  Yes.  We specifically asked what

5    format the ANDA should be produced in, and what the plaintiffs

6    indicated on the record at that time was they wanted the ANDA

7    files produced in accordance with the ESI protocol.  No one

8    said at the plaintiffs' table at that point in time in June

9    these documents are submitted to the FDA using the eCTD

10   format, a format that the FDA has used for eight -- at least

11   eight years, as far as I know.  We want you to submit it the

12   same way.  No one ever said that.  And so we went to the cost

13   and expense of producing them in accordance with the ESI

14   protocol which included, your Honor, a review, it included

15   confidentiality designations to make those reviews, and we

16   didn't -- we were mindful of the Court's directive that it's

17   not going to sanction blanket confidentiality designations, so

18   that meant reviewing and making certain that a document was,

19   in fact, confidential.  We redacted private patient

20   information on bioequivalency studies, redacted patients'

21   names.

22        If we have to go back and reproduce the ANDA files

23   which each one -- in Mylan's case, we produced three ANDAs for

24   valsartan-containing medications, each one over 20,000 pages

25   in length.  If we have to go back and produce them now in

1    another format, giving them the same documentation that they

2    already have, we're going to have to do that same review over

3    again.  I've talked with -- I've checked with our vendor.  The

4    review process, the information that's been coded, will be

5    lost.  We have to do it over again.  That's a significant

6    expense, and I'm happy to represent to the Court that it's an

7    attorney expense that my client has already incurred.  It's

8    tens of thousands of dollars.

9         The plaintiffs, at our meet-and-confer session today,

10   understandably, they don't want to bear that expense, but my

11   client shouldn't have to bear the expense of doing it twice.

12        And so the reality of it is, your Honor, they have

13   the documents.  They have the documents in accordance -- in a

14   form that's in accordance with the ESI protocol that we all

15   negotiated and that we all agreed to.  And I wish it were as

16   simple as pressing a button.  If it were, I think it's one of

17   those issues that we could have resolved this morning, but

18   it's simply not, your Honor, and for that reason, we request

19   that the plaintiffs' proposal be rejected.  Where the ANDA

20   files have been produced in accordance with the protocol

21   negotiated by the parties, that ought to be enough.

22        MR. PAREKH:  Your Honor, we believe that, one, the

23   protocol talks about structured data being produced --

24        THE COURT:  I'm sorry.  What does "structured data"

25   mean?

1          MR. PAREKH:  Items that are kept in a structured

2     format, for example, in a database or in a form which is where

3     you have an index system which makes that underlying data

4     usable.  It's not just -- these aren't just Word documents

5     that were in a folder.  These were -- these were compiled in a

6     very specific tabular way with information that tells you

7     where things go, in what categories, which documents fit into

8     which categories, and how to access them.

9          THE COURT:  Is counsel correct that this was an issue

10    that was discussed at a prior conference?

11         MR. PAREKH:  It was not discussed directly.  The way

12    it was discussed was are you going to produce core discovery

13    in conformance with the ESI protocol or not?  They said they

14    were not.  We said no, we want it in conformance with the ESI

15    protocol.

16         THE COURT:  And I think I said --

17         MR. PAREKH:  And you said produce it in the format --

18         THE COURT:  With the ESI protocol.

19         MR. PAREKH:  And the issue is whether they considered

20    this structured data or whether they didn't, but they never

21    talked to us about it.

22         THE COURT:  But let me ask you a question.  You know,

23    you've been involved in these cases before.  You know about

24    ANDAs.  You knew or should have known that this was the format

25    that it was submitted to the FDA.  Why did you not request

1   defendants -- why did you not tell defendants, hey, this is

2   the format in which we want the ANDA production?

3           MR. PAREKH:  Because we've never gotten it in any

4   other format.  It didn't strike me -- honestly, that they

5   would produce it -- they would go to the trouble that they did

6   of breaking it apart and producing it in a unusable format.

7   It just -- it didn't strike me.  It seemed like -- we've

8   gotten it in eCTD format in every other litigation.  We

9   expected them to do -- if they were going to do something

10  else, to meet and confer with us, because that's the format in

11  which it's regularly kept.

12          As to Mr. Trischler's issue in terms of the burden

13  that they have gone to and the burden that they will have to

14  go to again, the only defendant that had any redactions on

15  their ANDA is Mylan.  And those redactions were limited to one

16  specific type of a file which contained patient information.

17          THE COURT:  Is that a discrete --

18          MR. PAREKH:  It's a discrete item --

19          THE COURT:  -- area that --

20          MR. PAREKH:  Yes.

21          THE COURT:  -- you'd expect someone who knows what

22  they're doing can segregate out?

23          MR. PAREKH:  Absolutely.  They should be able to

24  simply take that one folder of those documents and segregate

25  those out and say, we're not going to produce them because

1  they're redacted documents and you already have them.  We're

2  okay with that.  We don't have a problem with that.  No other

3  defendant that we have been able to tell has redacted any

4  portion of their ANDA file, and, therefore, we don't believe

5  that there is this huge additional burden --

6          THE COURT:  Were any of the ANDA productions -- was

7  there a privilege redaction?

8          MR. PAREKH:  There were no privilege redactions other

9  than the redactions for confidential patient information which

10 are technically, I guess, not privilege redactions.  The

11 confidentiality designations can be done on the entire eCTD --

12         THE COURT:  Of course.

13         MR. PAREKH:  -- as it was done.  There is no reason

14 why that can't be done.  So we don't believe that there is any

15 significant additional burden for them to produce it in eCTD

16 format.

17         Your Honor is absolutely right.  If I had thought of

18 it, I should have brought it up.  You're right.  But I didn't

19 because I've never seen it done --

20         THE COURT:  Is there any objection to designating the

21 entirety of the ANDA as confidential?  That's done in every

22 one of my patent cases.

23         MR. PAREKH:  No, there is no objection.

24         THE COURT:  So, Mr. Trischler, right back at you.

25 Counsel is saying, one, you don't have to do redactions again

1  because you don't even have to produce those documents again,

2  and he's representing that there were no privilege redactions

3  or assertions.  So what's the burden?

4        MR. TRISCHLER:  Well, your Honor, before I address

5  the burden, let me address the issue of what was discussed.

6  The discussion, and the record will speak for itself,

7  obviously, but I have a vivid recollection of our June

8  conference, and the discussion was not about how the core

9  discovery production was going to be produced.  We

10  specifically raised the issue of how plaintiffs wanted the

11  ANDAs produced, and this is what we were told to do, and we

12  did.  And the answer back from the plaintiffs was produce it

13  pursuant to the ESI protocol, and your Honor agreed.  And,

14  again, the record will speak for itself, but I don't feel like

15  I'm going out on a limb in making that representation to the

16  Court.

17        As to -- as to the issue of burden, I understand the

18  plaintiffs' suggestion now that the entire document can simply

19  be marked as confidential.  That's one thing.  I don't know,

20  and I'll confess I don't know the intricacies of the review

21  process all that well to say that it's a simple fact of

22  pulling out the pages -- identifying the pages and finding the

23  pages where there is patient information that we feel that

24  there is an obligation to redact that private information.  I

25  don't believe it to be that easy.  I know how much time it

```
 1    took us to conduct a review the first time.  And, in
 2    committing -- in fulfilling my fiduciary obligation to my
 3    client, I would be hesitant to produce 60,000 pages of
 4    documents without reviewing them and just taking someone's
 5    word for it that it's been done the right way.
 6             THE COURT:  Here's what I'm going to do.  I'm going
 7    to order, consistent with this Court's effort to take a
 8    practical view of the litigation and the issues, if plaintiff
 9    is representing that it's not in a usable format -- we're
10    talking about a critical document in the case -- it just makes
11    no sense.  I'm going to order that the ANDAs be produced in
12    this eCTD format -- you can meet and confer with the
13    plaintiffs if you want redactions, et cetera -- with this
14    proviso:  Defendants, if you believe it's necessary and
15    appropriate, you can make an application to the Court for
16    costs, the extra costs that you're going to incur because of
17    this new production.  Do it by motion.  If there is good
18    cause, the motion is going to be granted.  We'll hear from
19    plaintiffs.  And I think that's the fairest thing.  I don't
20    disagree that, in hindsight, plaintiff should have been more
21    specific, but I think, as a practical matter, to advance the
22    litigation, all documents, plaintiffs' and defendants', should
23    be produced in the usual format, and it just sounds to me like
24    it's just not a terribly complicated process.  ANDAs are
25    produced all the time in our patent cases.  There is a rule,
```

1    it has to be automatically produced, and there is never ever a

2    problem with privilege or such.  And to the extent that there

3    is any ambiguity, I'm saying you could mark one stamp

4    confidential, the whole ANDA is confidential.  Okay?

5            We're going to take a short break for this criminal

6    procedure.  It shouldn't take long.  And then we'll get right

7    back.

8            MR. SLATER:  You need us to move from counsel table,

9    right?

10            THE COURT:  Yes.

11            (A recess was taken from 3:04 p.m. to 3:42 p.m.)

12            THE COURT:  Counsel, you can come up.

13            Okay.  Ready, counsel?  We are back on the record.

14    Thank you for your indulgence.  Those criminal proceedings

15    come up unexpectedly and there is nothing we can do about the

16    interruption.

17            We dealt with -- in terms of disputes, we dealt with

18    the control document issue, the Bates number issue, the eCTD

19    issue.

20            Before we get onto any other disputes, the

21    information that the defendants agreed to give to the

22    plaintiffs, have you all agreed on a date when that's going to

23    be exchanged?

24            MR. GOLDBERG:  No, we did not.

25            THE COURT:  Do you want to agree on a date so we

```
 1   don't have a dispute in the future?  30 days?

 2            MR. GOLDBERG:  30 days is fine, your Honor.

 3            THE COURT:  Okay.  That's great.

 4            Okay.  Mr. Slater, any other generic, general macro

 5   disputes?

 6            MR. SLATER:  We do, and I'm going to -- our team is

 7   going to participate in that, defendant by defendant.

 8            THE COURT:  Wait a minute.  Are we dealing specific

 9   defendant now or are we done with what I call the macro

10   issues?

11            MR. SLATER:  Oh, there actually is one -- there is

12   one issue, you're correct.  Our agreement on the lists didn't

13   determine this one issue.

14            Your Honor, with regard to the productions, we have a

15   disagreement.  Again, it goes to the interpretation of your

16   Honor's order from April.  And the core discovery productions

17   per Paragraph 2 concerned the facilities that manufactured the

18   API used in valsartan or the facilities that manufactured the

19   finished products.  The defendants have taken the position

20   that the productions only relate to facilities where the API

21   was manufactured, despite the language of the order, so that's

22   an issue we need your Honor to resolve for us, as to whether

23   the productions are only from the API manufacturer facilities

24   or from both.

25            MR. TRISCHLER:  Your Honor, as part of -- Clem
```

1   Trischler again.  I apologize.

2           As part of core discovery, the defendants produced --

3   and we're talking about Subparagraph 5 of Paragraph 6(3) of

4   your Honor's April order.  The defendants produced

5   correspondence with the FDA regarding 483s, Establishment

6   Inspection Reports, CGMP reports and the like for the API

7   manufacturing facilities, and that was based on the plain

8   language of the Court's order which states that the production

9   is -- should be with respect to "any facility that

10  manufactured or supplied the API at issue."

11          What the plaintiffs have asked is that that be

12  expanded to include not just the API facilities, but any

13  facility that was responsible for the finished dose

14  manufacturing of the product.  We believe that's not core

15  discovery.  We believe it was not part of the order, and that

16  what the plaintiffs are asking for now simply was not directed

17  by the Court back in April which is the reason why it was not

18  provided.

19          THE COURT:  I think the defendants are right about

20  this one.  Paragraph 2 identified the defendants that were

21  subject to the order.  And Paragraph 6 in Sections (a) and (b)

22  identified the specific documents for the two categories that

23  have to be produced.  And unless 6(a)(3)(5) is listed in 6(b),

24  the finished product/dose manufacturer defendants don't have

25  to produce it.  And that appears to be the case, because, in

1    Paragraph 2, the Court referred specifically to 6(a)(3) and

2    didn't list the other subnumbers of 6(a).

3          MR. PAREKH:  So, just to be clear, the reason that we

4    brought this up is our interpretation of 6(b)(2), where it

5    referenced 6(a)(3), which is "Communications with the FDA,"

6    was that it's those sub- -- those categories of documents --

7          THE COURT:  That's right.

8          MR. PAREKH:  -- and, therefore, it didn't really make

9    sense where -- why would the finished product/dose

10   manufacturer have to produce communications regarding the API?

11   We simply thought that the Court was referring to those

12   categories but replacing "finished dose manufacturer" with the

13   "API manufacturer."

14         THE COURT:  I take back what I said.  I think I

15   misinterpreted my order because the "3" that you just referred

16   to is not in parentheses.  It's a general "3."  So since the

17   Court referred to the general "3," 6(a)(3), specifically, in

18   6(b), Mr. Trischler, tell me if I'm reading it wrong, but it

19   seems pretty apparent that the communications in 6(a)(3) have

20   to be produced by the finished product/dose manufacturer

21   defendants.  If you read it differently, I would like to hear

22   your argument.

23         MR. TRISCHLER:  I do read it differently, your Honor.

24   My interpretation of that, and I think what we discussed is

25   why the Court repeated for the finished dose manufacturers is

1  to try and address the issue of control.  If you remember, we

2  had a lot of discussion about producing documents if they were

3  in your control.  And so what 6(b)(3) is saying is that for a

4  finished dose manufacturer, if you have these documents within

5  your control, produce all the items in 6(a)(3), which include

6  483s for the facilities where the API is manufactured.  It

7  wasn't to expand it.

8         To give you an example, my client has a manufacturing

9  facility in West Virginia that produces a hundred different

10  products.  If there are warning letters that relate to all

11  those different products, that wasn't what we wanted to get

12  into with respect to core discovery.  What we wanted to get

13  into was the when, where, and how the problem with the API

14  arose, and so, as I interpreted the order, and as I recall our

15  discussions, what the Court was suggesting is we know that

16  there are some defendants that aren't in the case yet, we know

17  that there may be issues of control, so if we can't get to

18  the -- all the foreign API suppliers, if there are finished

19  dose suppliers in the United States that have control over

20  these documents, then those finished dose suppliers, under

21  6(b)(3), should produce the same categories of documents in

22  6(a)(3).  That's how I -- that's how I interpreted the order.

23  I believe that's how the defendants interpreted the order.

24  And I believe that interpretation to be entirely consistent

25  with our dialogue and our argument concerning what should be

1  included within core discovery, and, again, to interpret it

2  otherwise would lead to opening a Pandora's Box and requiring

3  production at this very, very early stage of litigation of all

4  things completely unrelated to what are the core issues in

5  this case.

6          THE COURT:  Doesn't 6(a)(3)(5) -- isn't that limited

7  to facilities that manufactured or supplied the APA at

8  issue -- API at issue?

9          MR. TRISCHLER:  Yes, that's what we're saying, yes.

10          THE COURT:  So you're saying 6(b) would only apply if

11  an API manufacturer and supplier defendant did not produce the

12  responsive documents?

13          MR. TRISCHLER:  Yes, because it says -- if I look at

14  6(b)(3), it says:  "To the extent not produced by another

15  responding" party, "the discovery listed in ... 6.a."

16          THE COURT:  And the only facilities that would be

17  subject to the production would be the facilities that

18  manufactured or supplied the API at issue, not the facilities

19  that made the finished product -- the finished product,

20  period.

21          MR. TRISCHLER:  Yes.  That's our interpretation of

22  the order, yes, sir.

23          THE COURT:  Mr. Slater, counsel, anything different?

24          MR. SLATER:  We just want to make sure we get it

25  right.

```
 1              THE COURT:  Yes.

 2              MR. SLATER:  And it may be that Paragraph 5 is a

 3    separate entity unto itself as compared to the other -- I'm

 4    talking about Subparagraph 5.

 5              Because, again, going to Paragraph 2 on the first

 6    page of your order, your Honor gave a blanket statement that

 7    this applies to -- shall produce core discovery concerning --

 8    not just -- it doesn't say concerning the defendants.  It

 9    says, "concerning the facilities that manufactured the API

10    used in Valsartan or the finished products at issue."  So the

11    order encompassed both categories of facilities.

12              Now, if Subparagraph (5) under 6(a)(3) is read by the

13    Court to be limited to the facilities that actually

14    manufactured or supplied the API, and it may even be that your

15    Honor wants to tell the defense, and we probably wouldn't have

16    an objection to that at the core discovery level, of limiting

17    it to Valsartan-specific reports, I don't think that anybody

18    would argue with that on our side because it's core discovery.

19    So if with regard to the manufacturing facilities or the -- of

20    either the API or the finished drug, everything else would

21    apply, but Sub (5) would apply just to the API manufacturing

22    facility, with regard to the Valsartan.  I mean, that we could

23    accept.

24              THE COURT:  This is an example of no good deed goes

25    unpunished.
```

```
1              MR. SLATER:  Never.

2              THE COURT:  The defendants, do I take it, only

3    produced for the API manufacturing facilities?

4              MR. TRISCHLER:  Yes.  Yes, sir.

5              THE COURT:  Okay.  Let's limit it to that.  In the

6    next two to three months, we're going to be dealing with a

7    document request, on a general basis, Rule 26 discovery, just

8    put this in your document request and you'll get it, you know,

9    reasonably soon, rather than making them go back -- if I rule

10   that way, to go back.  So I think that's a good, practical way

11   to deal with this.  For the time being, let's limit it to what

12   the defendants have produced, and in your document requests,

13   you could ask for whatever you want regarding the finished

14   product/dose manufacturer facilities that may be at issue in

15   this case.

16             MR. SLATER:  Understood.

17             MR. PAREKH:  Can we just get one clarification?

18   Which is that the finished dose manufacturers did produce all

19   of the remainder of 6(a)(3) with regard to the finished

20   product/dose manufacturing.  Because 5 is the only one that

21   limits it to the API manufacturing facility.  I just want

22   there to be no ambiguity because Mr. Trischler referred to

23   6(b)(3), which is -- and in the interpretation that

24   Mr. Trischler took, it would make 6(b)(2) redundant, so we

25   just want to make sure that the remainder of the items in
```

```
 1    6(a)(3) were produced.

 2            MR. TRISCHLER:  And, your Honor, what I would

 3    indicate in response to that is with respect to -- with

 4    respect to Mylan, the answer is yes, everything -- all

 5    communications within all the other categories have been

 6    produced, and with the proviso of those defendants

 7    providing -- there are some defendants providing core

 8    discovery.  As we know, we talked about Aurobindo, we talked

 9    about Hetero, that produced documents in their possession.

10    You know, subject to that proviso, I think the answer to your

11    question is yes.

12            MR. PAREKH:  Thank you.

13            THE COURT:  We're done with what I call the macro

14    issues?

15            (No response.)

16            THE COURT:  Okay.  Are we going to go to the

17    company-specific disputes now?

18            MR. SLATER:  Yes, your Honor.  And I think that as

19    far as ZHP goes, I think we've resolved -- I think we've

20    resolved the remaining issues.  There are certain documents

21    that ZHP is going to be providing us.  There is a supplemental

22    production of a design master file and -- a drug master file,

23    excuse me -- and I think there's two inspection reports that

24    are being provided as well, and I think we were told we would

25    have that all by next Friday, so that -- we appreciate that.
```

```
 1              And we just want to confirm one thing for the record.

 2   No production was made by ZHP.  What we were told was that

 3   Prinston and Solco, the subsidiaries of ZHP, produced

 4   documents, and that those documents are the same documents

 5   that ZHP would have produced.  Now, we just want to confirm or

 6   have defense counsel confirm for the record that anything ZHP

 7   has that would be responsive -- because that's obviously a

 8   very important API manufacturer in this case.  To the extent

 9   they had any documents or have any documents that would be

10   responsive to this order, they have all been produced through

11   their U.S. subsidiaries.  We just want to make sure there is

12   no ambiguity on that, for obvious reasons.

13              MR. GOLDBERG:  There is no ambiguity on that, your

14   Honor.  That's what we represented and that's what we did.

15              THE COURT:  Next?

16              MR. PAREKH:  So, we were able to resolve the

17   Aurobindo issue --

18              THE COURT:  Is that the next company --

19              MR. PAREKH:  That is the next company on the list,

20   your Honor.

21              I mean, other than the more general issue of whether

22   or not they have to produce the Indian company documents,

23   which we have already addressed.

24              THE COURT:  That's the control issue.

25              MR. PAREKH:  Control issue.
```

```
 1              As to the Torrent defendants, we were again able to
 2    resolve --
 3              THE COURT:  Okay.  Aurobindo is -- nothing to --
 4              MR. PAREKH:  No individual issues, your Honor.
 5              THE COURT:  Awesome.
 6              Next is Torrent.
 7              MR. PAREKH:  Torrent is the next one.  And this
 8    morning we were happy to be able to resolve the remainder of
 9    the Torrent issues.
10              THE COURT:  Let's keep it going.
11              MR. PAREKH:  The next one is the Teva defendants, and
12    Ms. Goldenberg will deal with that one.
13              MS. GOLDENBERG:  It's mostly good news for you, your
14    Honor, on the Teva defendants.
15              Let's start with issue Number 2.  On the ANDAs, I can
16    confirm for the record that they will be supplementing their
17    production and producing full copies of all ANDAs, both
18    approved and not approved.
19              As to issue Number 3, Teva is also going to be
20    supplementing its production, and I think they were going to
21    talk over lunch and determine what date they could do that by,
22    so I'll let them give you an update on that.
23              Issue number 4 was a global issue that we've already
24    addressed here.
25              MS. WHITELEY:  Can you identify the issues --
```

1          MR. SLATER:  Slow down.

2          MS. GOLDENBERG:  I'll be happy to.  Yes.

3          All right.  So issue Number 2 dealt with the full

4     production of ANDA files.  And, just to confirm for the

5     record, Teva will be supplementing their production to ensure

6     that we have full copies of all ANDA files, whether or not

7     they were ultimately approved.

8          THE COURT:  You said issue Number 2.  Are you

9     referring to Mr. Slater's August 6th letter?

10          MS. GOLDENBERG:  Oh, sorry.  I'm going off of

11     Mr. Goldberg's letter.

12          THE COURT:  Never mind.

13          MS. GOLDENBERG:  And it's on Page 9 of his letter,

14     just so we're all in the same spot.  I figured out where you

15     guys were going.

16          Okay.  Issue 3 in Mr. Goldberg's letter, also on Page

17     9, was a compilation of issues but, most notably, testing

18     information.  Teva has indicated that they will be

19     supplementing their responses and, again, I think they'll

20     provide the Court with the date on when they can do that by.

21     But we don't have any disputes remaining on that issue.

22          Issue Number 4 was a global issue that's already been

23     dealt with.  That was the 483s, the inspection reports, that

24     we have already discussed.

25          Issue Number 5, they have confirmed that they have

```
 1   provided us with the full customer list for both recalled and

 2   non-recalled batches, so that means we're left with issue one,

 3   so four out of five we were able to take care of.

 4        On issue one, there is a custodian whose name I'm

 5   going to try and pronounce correctly -- Constance Truemper,

 6   T-R-U-E-M-P-E-R.  What we noticed in the production was that

 7   the files that were produced seemed to have a parent e-mail

 8   associated with them and that parent e-mail was not included

 9   in the production.  It's our understanding that the reason

10   that they haven't produced this was because the document was

11   being sent from one person in-house to another person

12   in-house, and when I say in-house, not to an attorney, just

13   within the company.  This just seems like a nitpicky issue for

14   us.  If there is a cover e-mail, we think it should be

15   included.  We don't know what it says, but it certainly, in

16   theory, would talk about the document that was within the

17   scope of the core discovery.

18        THE COURT:  So is the argument that it's irrelevant,

19   privileged, or --

20        MS. LOCKARD:  Your Honor, Victoria Lockard.

21        The argument is that it's not within the scope of the

22   Core Discovery Order.  It is an internal e-mail.  I fully

23   anticipate this will be produced, as with the --

24        THE COURT:  One document we're talking about?

25        MS. LOCKARD:  No.  Right now I believe they
```

1  identified 52 cover e-mails.  These are e-mails from a person

2  at Teva who circulated to a distribution saying, here's the

3  submission to FDA, see attached.  I mean, it's --

4           THE COURT:  Why don't we just make this part of the

5  Rule 26 discovery.  It's not earth shattering and --

6           MS. GOLDENBERG:  We can live with that.

7           THE COURT:  We will deal with all those issues

8  together.

9           MS. LOCKARD:  Thank you.  That was our proposal as

10 well.

11          And I think I can represent we will be supplementing

12 our production with the ANDA files which we are collecting and

13 reviewing to make sure that, you know, to the extent we've

14 left anything out, that that has been included.

15          And then on the testing issue, so the concern there

16 is that there is testing that is ongoing, and it's just not

17 complete, the response hasn't been submitted to FDA yet, but

18 we've represented that we will supplement that once it is

19 complete.

20          THE COURT:  Good.

21          MS. LOCKARD:  Okay.  Thank you.

22          THE COURT:  Are the plaintiffs getting the

23 supplemental FDA correspondence that the Court ordered?  There

24 is an order that says without a request for production, you

25 have to get correspondence sent to the FDA.  Have you been

1    getting that?

2          MR. PAREKH:  We have not seen a supplemental

3    production that specifically references additional

4    correspondence from the original production date.  We don't

5    know if there is any at this point because it's such a short

6    time from the date the documents were produced to today.  But,

7    I mean, we would expect the defendants should be complying

8    with that.  We just -- we have not received any supplemental

9    productions of that type of document.

10          THE COURT:  That order just mirrors what's in the

11    patent rules because I would assume, I don't know, that there

12    is ongoing communications between the FDA and the defendants

13    about this issue.  So, rather than you making separate

14    document requests or relying on 26(e), which most people don't

15    pay attention to, unfortunately, just ordered it to be

16    produced, so in due course, you'll get it.

17          MR. TRISCHLER:  I can say, your Honor, on behalf of

18    the defendants, we're certainly aware of that order and

19    endeavor to comply with it.  I know that for my client, for

20    instance, there has been production of correspondence as

21    recently as June and July.

22          THE COURT:  Great.

23          MR. TRISCHLER:  Now, practically speaking, we don't

24    always -- I know there is a seven-day requirement.  We don't

25    always get them from our client as soon as things are sent,

 1  but we're certainly aware of the supplementation order and

 2  we'll comply with it without additional requests as soon as we

 3  learn of the correspondence.

 4          THE COURT:  Okay.  Who is next after Teva?

 5          MR. PAREKH:  Mylan is next, your Honor, and we have

 6  sort of one and a half topics left with Mylan.

 7          The main topic is whether Mylan needs to produce

 8  their ANDA, which was -- has not yet been approved by the FDA

 9  regarding valsartan.  And we understand defendants' position

10  is that it only relates to ones that are subject to the issue

11  underneath.  However, there is definitely, from what we've

12  been able to see publicly, as well as a few of the

13  correspondence that were produced regarding that ANDA, that

14  part of the reason why the FDA has not approved that ANDA has

15  to do with the contamination issue.  So, without seeing the

16  ANDA, we can't simply say, well, there is nothing in there

17  that would impact this case.

18          THE COURT:  So you want it -- even though it hasn't

19  been approved, you want it because?

20          MR. PAREKH:  Because there may be items that are

21  contained in that ANDA such as testing results or other, you

22  know, documents associated with that ANDA that reflect Mylan's

23  knowledge of the contamination issue or testing that was done

24  by Mylan regarding those issues.

25          THE COURT:  Is that type of -- I guess it's an

1   application not yet approved within the scope of the core

2   discovery?

3            MR. PAREKH:  The Core Discovery Order does not

4   distinguish between approved and unapproved applications.

5            THE COURT:  I think the Court's intent was approved

6   ANDA files.  If you want to make a request under Rule 26,

7   that's appropriate.  We'll see if there is an objection.  But

8   the Court's intent was just the approved ANDA files.

9            MR. PAREKH:  The reason why we believe that it's

10  relevant is because there were inspections of facilities at

11  Mylan.

12           THE COURT:  I'm not ruling whether it was relevant or

13  not.  I'm just saying it's not within what the Court intended

14  core discovery to be.  That's all.  So you have every right in

15  the world to ask for it under Rule 26, which we're going to

16  deal with in the next couple of months, and if Mylan objects,

17  we'll deal with the relevancy issue.

18           MR. PAREKH:  And then the other half of the -- the

19  half sort of dispute is that Mylan has produced a list of

20  customers, but only as to the specific recalled lots, and the

21  issue is we believe that that should be produced back to 2012.

22  There are no other defendants who have taken the position that

23  it only is effective as to recalled lots.  Mylan is the only

24  one with that position.

25           THE COURT:  Let me just take a look at the order real

1    quick.

2          MR. TRISCHLER:  Your Honor, I don't want to interrupt

3    your reading, but I don't think we have much of a disagreement

4    because what we -- what we agreed to do as part of our meet

5    and confer today is the Mylan defendants have already provided

6    a list of API customers; we've provided, as part of the core

7    discovery, a list of customers known to have received finished

8    dose products subject to the recall; and what we discussed

9    today was part of our concern with -- with respect to the

10   order is I'm not aware of a list per se that would identify

11   every customer going back to 2012, but what I indicated to the

12   plaintiff that we would -- plaintiffs that we would endeavor

13   to do is that I would go back to my client and try to identify

14   all known distributors from 2012 to present.  So we're willing

15   to work on that.  That's what we had talked about.  I thought

16   we had resolved -- agreed on that, but we wanted to put it on

17   the record.  That was sort of the one and a half items.  But

18   perhaps I'm misstating something.

19          MR. PAREKH:  No, I think you're correct.  It's just

20   my note did not reflect that.  But yes, that was the

21   agreement, and that is -- we put it on the record.  We're done

22   on that one.

23          THE COURT:  Good.

24          MR. PAREKH:  The next defendant is Hetero U.S.A.

25   They made a production last night.  We are hopeful that that

1    production resolves all issues, but because we haven't been

2    able to review it, that's the best representation that we can

3    make on that one.

4        THE COURT:  So you have leave to raise the issue with

5    the Court at a future conference since you didn't get the

6    documents on a timely basis.

7        MR. PAREKH:  Okay.  And I believe that concludes all

8    the individual defendants, your Honor.

9        THE COURT:  Are there any insurance issues?

10        MR. PAREKH:  Ms. Goldenberg is going to address

11   those, your Honor.

12        MS. GOLDENBERG:  I think most of this, your Honor, is

13   just going to be putting on the record that we have agreed to

14   a great deal, but I want to recap and make sure there are no

15   disagreements from the other side.

16        So, my understanding is that -- let's see -- Hetero

17   Labs has not produced an insurance policy.  Hetero USA,

18   however, has agreed to produce their insurance policy.  And we

19   have already discussed the reasons that Hetero Labs is not

20   willing to make productions at this point, because they

21   haven't been served.

22        Additionally, the -- let's see -- the Mylan entities

23   have sent complete insurance disclosures, so I think we're

24   good on that front.

25        ZHP has responded that they have no insurance, and

1  the Solco, Prinston, Huahai entities have sent complete

2  insurance productions.

3          The Teva, Aurobindo, and Torrent entities have all

4  produced insurance policies, and they informed us earlier

5  today that those productions were all complete, so I believe

6  that those are fine.  The only caveat is that they are

7  checking to find out if those are claims made policies,

8  because they only go back to 2017.  As long as we get

9  clarification on that issue, I don't think that we have a

10 problem, but for now, we're just waiting for them to check on

11 that issue and get back to us.

12         And I think if someone from defense can just provide

13 reassurance on the record that we do have all of the insurance

14 policies and that I have stated everything correctly, that

15 would be helpful, but I think I've got it all right.

16         MS. LOCKARD:  Just on behalf of Teva, I believe

17 that's accurately stated, that we've produced all of the

18 insurance policies.  We are checking to confirm our belief

19 that they are claims made, and if it's other than we believe,

20 we'll let Ms. Goldenberg know.

21         MS. GOLDENBERG:  Okay.  And I believe that all of the

22 entities, with the exception of Hetero, have produced

23 reservation of rights letters, to the extent that they have

24 received them.  And the defendants agreed earlier during our

25 meet and confer that if any of those arose in the future, that

```
 1   they would be willing to pass those along.

 2          THE COURT:  So you haven't received any disclaimer

 3   letters yet?

 4          MS. GOLDENBERG:  I don't think so.  So I guess that's

 5   a long way of saying that I think we're fine.

 6          THE COURT:  Okay.  So, as long as we're together, are

 7   there any other issues that we need to address?  We always

 8   start with the plaintiff, then we'll go to the defendant.

 9          MR. TRISCHLER:  Right.  I think we're going to talk

10   about the same thing.

11          MR. SLATER:  Yeah.  We've discussed, if the Court

12   will approve it, modifying the schedule for us to serve our

13   document requests.  In part, that's been necessary because the

14   documents are rolling in and we're still reviewing them, and

15   part of it is just the time of year.

16          THE COURT:  Just give me the dates.

17          MR. SLATER:  We would like to be able to serve our

18   document requests by the end of the month, August 30th.  And

19   then counsel told us in the hall they wanted to talk to your

20   Honor and float a different date to provide objections because

21   of their needs, and we don't have an objection to the date

22   that they suggested but --

23          THE COURT:  Let me get out my schedule.

24          MR. SLATER:  -- I just don't know if it's going to

25   run into the October 24 date.
```

1          THE COURT:  We'll work this out.

2          So the current date -- okay.  So plaintiff, we moved

3    that back 15 days.  When did defendants want to object?

4          MR. TRISCHLER:  Well, we had proposed 90 days.  And

5    plaintiffs did not commit --

6          THE COURT:  We're not talking about answers.  We're

7    just talking about objections, just objections.

8          MR. TRISCHLER:  I understand, your Honor.  What --

9    the position -- you know, without having seen the requests,

10   our concern was that when we get the requests, it's difficult

11   to formulate objections in a vacuum.  I believe we have to see

12   the documents, understand what our client has or doesn't have.

13   For instance, how do you formulate an objection to

14   burdensomeness until you talk to people and get information

15   about what's available?  So we certainly don't want to file

16   boilerplate objections.  That could be done in 30 days.  We're

17   hoping to do better than that.  And so --

18         THE COURT:  Let's make it 45 days.  Okay?  So that

19   takes us to October 15th.

20         MR. GOLDBERG:  Your Honor, if I may, I just want to

21   remind the Court that for some defendants, you're talking

22   about definitely four different sets of document requests

23   going to four different parties.  So, you know --

24         THE COURT:  Because you represent four companies?

25         MR. GOLDBERG:  Correct.  And so we're going to be

1  responding on behalf of ZHP, which the document requests will

2  look different, because they're going to be API focused and

3  they're going to be China focused.  We're going to have

4  Prinston, the distributor.  We're going to have a finished

5  dose manufacturer response.  We need to craft -- what we're

6  trying to do is avoid boilerplate objections to the extent we

7  can.

8          THE COURT:  Here is what I think you should do, just

9  like we always do.  45 days.  When we get closer to the

10  deadline, if there is good cause to extend the dates, you know

11  they're going to be extended.  If we start at 90 days, we're

12  going to be six months down the road.  So if there is good

13  cause, there is a good reason to extend the deadlines, we

14  will, but we're not talking about responses.  We're talking

15  about objections.

16          MR. GOLDBERG:  Right.  And what we want to do is be

17  able to provide objections that have meaning.

18          THE COURT:  Of course.

19          MR. GOLDBERG:  And so, avoiding the natural response,

20  which is, your Honor, this is just a boilerplate objection,

21  you should overrule it.

22          THE COURT:  You can do that in one week.

23          MR. GOLDBERG:  Right, of course we could do that.  So

24  we're really trying -- this is not going to be -- A, it's not

25  going to be a small number of document requests.  I guarantee

1    that you're talking, you know, if not around a hundred, more

2    than a hundred for each of these kinds of defendants.  Just

3    drafting alone is going to take time.  So ...

4         THE COURT:  Okay.  Document requests are due August

5    30.  Objections are due October 15th.  Then we'll give the

6    parties 45 days to meet and confer.  And then we'll have, I

7    guess, our conference in December sometime to resolve all

8    discovery disputes.  It will be set sometime in December,

9    which means that we will have to reschedule -- the current

10   date for the conference to address the disputes is October

11   23rd, so we'll move that back to December.  But if we keep on

12   extending all these deadlines, we'll never get done with this

13   case.  So, to me, this is always the most time-intensive

14   effort in the case, and once we get through the documents and

15   ESI, things usually go pretty smoothly, so I really want to

16   get through this.

17        So I'll draft an order summarizing what we discussed.

18   I hope Hetero and Aurobindo will reconsider their positions so

19   we don't have to get into the 30(b)(6) deps issue but, if not,

20   we'll do what we have to do.

21        Over the next couple of months, I guess we'll be

22   working on -- you'll be working on your objections.  We'll

23   finalize all the fact sheets.  The answers will start to be

24   rolling in.  Okay?

25        MR. SLATER:  There is only one other thing to just

1  touch base on, which we've discussed as well with counsel, and

2  we discussed it with the Court the last time we were here, I

3  believe.  We would like to start a meet-and-confer process

4  with the defense regarding custodians and search terms.  And I

5  think that we really need to start to get some dates on the

6  calendar in September to start to informally exchange -- you

7  know, the documents we have are so -- because they're core, we

8  don't really have a good visibility into who the people are

9  that are going to matter.  It just doesn't come from these

10 documents.  There is a few names on them, but those are really

11 the people who are just corresponding with the FDA, so we have

12 some regulatory names.  But we really need to start to have a

13 robust discussion and a frank off-the-record discussion, we

14 would suggest as we did in Benicar, regarding who are the

15 people that matter, what are the different departments, what

16 are they called, what are the documents referred to as, what

17 are we -- you know, what do we need so that we can start to

18 formulate the search terms and the custodian list so we can

19 get that teed up with the Court as well, you know, this fall.

20 So we just would like to just start to be able to meet and,

21 again, we would appreciate the opportunity, once we have some

22 exchange of -- on a preliminary and foundational level with

23 defense counsel, to -- again, to avoid a 30(b)(6) deposition,

24 as the Court had us do in Benicar, we were perfectly fine

25 doing it again, to sit down with knowledgeable witnesses from

1   the companies and talk --

2           THE COURT:  But they weren't taken in Benicar, were

3   they?

4           MR. SLATER:  No.  What I'm saying is we had asked for

5   it, and your Honor said no, no, you'll meet with them

6   informally, and it worked very well where they brought in

7   knowledgeable -- off-the-record conversations, but

8   knowledgeable corporate people who talked to us and told us

9   these are the people that matter, these are the departments,

10  here is how it worked --

11          THE COURT:  I think your discussion is a good one.

12  We're not going to wait -- we can't wait until December to get

13  the custodians and search terms.  We can't wait until the

14  ESI -- well, obviously, it has to be done before the ESI and

15  documents are produced.  But there is no way we're starting

16  this process in December to identify custodians and search

17  terms.  So what suggestions do you have, defendants, about how

18  to move this along?

19          MR. GOLDBERG:  I thought we had discussed this at the

20  last conference.  This very issue about interviews was raised.

21  What we had discussed was that defendants would put together a

22  proposed custodian list, that -- we actually didn't decide who

23  would put together a first list of search terms.  That we

24  didn't actually --

25          THE COURT:  Did you talk about timing?  I don't

 1    remember.

 2          MR. GOLDBERG:  No, we didn't talk about timing,

 3    except to say that we would -- that what happened in Benicar

 4    with respect to interviewing witnesses about this was

 5    something that happened at the end of a process.  We don't

 6    think it is the first step in the process.  And so what we

 7    thought would be something more along the lines that we would

 8    propose a list of custodians.  They now have enough discovery

 9    to react to it.  There can be some process there.  It may be

10    that we avoid burdening a person from coming to the court to

11    talk about these issues among the parties.  And that, you

12    know, that can be in September and October.  That can be as

13    we're dealing with the ESI.

14          I mean, I think -- in light of what we've done, I

15    think it would be fair to have them make a first list of ESI

16    search terms but -- and we can do the list of custodians and

17    go from there over the next, you know, four weeks, six weeks,

18    and see where we get to.

19          MR. SLATER:  We have no problem with defense counsel

20    sending us a first list of custodians and why they matter.  I

21    mean, I'm sure they can provide that to us, you know, fairly

22    quickly.  We can start to formulate a list of search terms,

23    but we don't have -- we have some documents but we don't have

24    a lot, so there is going to be -- there is a knowledge gap at

25    our end.  But what we don't want to ultimately do is --

1  because it's just not practical -- is have a back-and-forth

2  discussion between attorneys to get the information we need to

3  define the right custodians, et cetera, because it just -- you

4  need to be able to talk to somebody in the company and have

5  more of a transparent discussion.  Otherwise, we'll be in

6  December, as your Honor said, or January, and that's not what

7  anybody wants.  I mean, I don't think we're saying entirely a

8  different thing, but I think it has to be understood we're

9  going to be able to get this information directly from someone

10  from the company in informal, off-the-record discussions

11  because, again, we're bypassing the 30(b)(6) process.  Your

12  Honor made it very clear how you wanted to do this, and we're

13  perfectly fine with that, so we're not objecting to that.  But

14  we have to be able to talk to someone from the company

15  directly and be able to have a -- more of an organic

16  conversation where the person gives an answer -- oh, well,

17  what does that mean?  Oh, what about this?  And that's how we

18  learned what we needed to know.  And, again, we only had to

19  add, I think, one or two custodians in that other litigation,

20  towards the end, and it was just because certain documents

21  came out late in the process and one or two people became

22  relevant.

23         MR. GOLDBERG:  Just on the ESI protocol or on the

24  search terms, what we can do is when you give us your document

25  requests, we'll put out the first set of search terms since

```
 1   you don't have the kind of documents you think would give you

 2   that, we'll respond in connection with the document requests.

 3   That may be the best thing to do.  In terms of -- you know, we

 4   haven't crossed the bridge in this case yet whether 30(b)(6)

 5   depositions or informal interviews, that issue hasn't

 6   been handled --

 7           THE COURT:  No, it hasn't.

 8           MR. GOLDBERG:  I mean, we're trying to propose a

 9   process where we can hopefully avoid even getting to that

10   bridge.

11           THE COURT:  We may differ on this, but it seems to me

12   that a defendant should take the first cut at the custodians

13   and the plaintiffs should take the first cut at the search

14   terms.

15           MR. SLATER:  That's fine.

16           THE COURT:  Because you know what you're looking for.

17           MR. SLATER:  We have some idea.

18           And then, also, it may be helpful -- we're obviously

19   going to ask for a lot of different corporate organizational

20   charts in a formal way in the discovery requests.  It would be

21   helpful, when they provide us the proposed custodians, to

22   provide those work charts that they do have, or at least

23   something that lays out how the company --

24           THE COURT:  Internal, as opposed to what you have

25   agreed to exchange, sort of the corporate-wide organization?
```

```
 1              MR. SLATER:  Correct, correct.  And we are obviously
 2    going to formally request things, you know, like corporate
 3    organization of the company and then -- you know, in different
 4    departments, medical affairs or clinical affairs, you know,
 5    the different quality assurance departments, all the
 6    departments that we relate, but to the extent they have that
 7    information, it may not be something we have to wait for the
 8    discovery requests to be formalized before we get that.  We
 9    would just ask that they start giving that to us because,
10    again, then we can understand what is it that we're looking
11    for, what's the vocabulary of the different departments, and
12    then when we do finally get to the point of being able to have
13    a candid interaction, we can say, well, you know, what did
14    this department do?  Was testing done by this department?  Who
15    were the people in charge?  Who were doing the inspections?
16    Who were -- you know, who were crystallizing -- the obvious
17    questions, and we can at least understand the structure that
18    we're discussing.
19              THE COURT:  Let me ask you a question.  At least for
20    the moment, are we dealing with the two categories of
21    defendants that were identified in the Core Discovery Order?
22    We're not waiving any right to take discovery -- document
23    requests regarding the wholesalers, retailers, those people,
24    but are we focussing on those two categories, the API people
25    and the finished product people?
```

```
1              MR. SLATER:  I actually hadn't really thought about

2    that.  I thought we were doing everything.  But it makes

3    sense, it makes sense to start at that level --

4              THE COURT:  Yes.  I don't disagree.

5              MR. SLATER:  -- and then go to the next level.  And I

6    think what we're going to learn through this interaction over

7    the next several months is -- like one of the things we're

8    asking for, and we discussed out in the hall, is supply chain,

9    which we talked about earlier, and your Honor said, well, then

10   we're going to see from ZHP where did everything flow and what

11   are the different chains all the way down to somebody's --

12             THE COURT:  Aren't you going to get that?

13             MR. SLATER:  We're eventually going to get that, so

14   that help us as well to understand, and then we'll know what

15   we want to ask of each defendant, so we have no problem with

16   that.

17             THE COURT:  So what about, say, you -- what about if

18   you each exchange your first cut at a custodian and search

19   terms list September 15th, and then meet and confer, and we'll

20   see where we are on October 15th?

21             MR. SLATER:  That's acceptable to us, your Honor.

22             THE COURT:  Because doesn't it have to be finalized

23   by December?  Assuming in December we're going to resolve all

24   discovery disputes regarding the Rule 26 ESI and document

25   requests.  Then you'll have a set, give it to the client, say
```

```
 1   this is what we have to respond to.  That's the deadline for
 2   finalizing the custodian and search term list, right?  But it
 3   is a very labor intensive effort, so if we start in September,
 4   we should be done by December.
 5             MR. SLATER:  It's the only way we'll get it done.
 6   And I'll just put this over to the side.  We're talking about
 7   in the English language at this point.  Because, obviously,
 8   there is probably going to be a need at some point to deal
 9   with the Chinese language but --
10             THE COURT:  Absolutely.  I would think so.
11             MR. SLATER:  -- we can -- that's something we can
12   learn, hopefully, through the meet-and-confer process, to find
13   out what documents are kept in Chinese, what are in English,
14   et cetera, so we can figure out what it is we're asking for
15   and what we need, when we get to that point, in terms of
16   search terms in a foreign language.
17             THE COURT:  Defendants, can we live with that?
18             MR. GOLDBERG:  Yes, your Honor.
19             THE COURT:  September 16, I'll put this in the order,
20   defendants take the first cut at the custodians.  I guess it
21   would be for each of the responsive defendants.  Plaintiffs
22   take the first cut at search terms.  I guess it would be by
23   category, right?  And then 30 days or so to give comments,
24   meet and confer, and then we'll build in times to meet with
25   the Court, with the goal of getting it finalized in hopefully
```

```
 1   December, and then away you go.
 2           MR. GOLDBERG:  And this is at the API and finished
 3   dose level?
 4           THE COURT:  Yes, I think so.
 5           I have a feeling, hopefully, that when all of this is
 6   straightened out and the dust settles, you'll say, well, we
 7   need this category of documents from the distributor or
 8   wholesaler, and you may need one or two categories, but I
 9   would hope you wouldn't need an omnibus document request from
10   those sort of peripheral people.
11           MR. SLATER:  Yeah.  The only caveat -- you're right,
12   your Honor, with just one caveat.  We may need to come back to
13   your Honor if we have an issue with defense, which we hope we
14   won't.  There may be certain things we need from some of the
15   other categories of defendants that may relate to some of the
16   economic claims, pricing, some of the class issues --
17           THE COURT:  I agree with you.  I don't disagree with
18   you, but that's not a front burner issue right now.
19           MR. SLATER:  When that becomes -- when we start to
20   see those issues, we'll will talk to the defendants.
21           THE COURT:  No, I agree with you.  You'll need to do
22   your economic model and you'll seed sales and pricing
23   information, and that's when it will come into the forefront,
24   but we've got enough to do before we get there.
25           MR. SLATER:  And we're hopeful, frankly, that the
```

1    finished dose manufacturers will have most of that

2    information, if not all of that information, anyway.

3    Presumably, they know what the drugs are being sold for, but

4    there may be gaps.  So we'll seek it in the first instance,

5    obviously, from them.

6              THE COURT:  Okay.  Anything else, counsel?

7              MR. GOLDBERG:  Nothing from the defense, your Honor.

8              MR. SLATER:  Just one last thing.  The things that we

9    said there is going to be followup, certain -- I know

10   Mr. Goldberg gave us deadlines that he's going to produce

11   certain things, but just overall, just in terms of some of the

12   things that are being provided that we put on the record, I

13   thought maybe it would make sense just to say when will that

14   be produced by, just so it's not hanging out there.

15             THE COURT:  Well, everything you agreed -- you

16   started out by listing the three things you agreed on.  We

17   said that's going to be produced in 30 days.

18             MR. SLATER:  Right.

19             THE COURT:  And then the eCTD, I don't know how long

20   that takes, but we'll probably do 30 days.

21             MR. SLATER:  Frankly, your Honor, we're fine with an

22   outside of 30 days, if the defense is fine with it.

23             THE COURT:  Yes.

24             MR. SLATER:  Other than I think there was a couple

25   things that ZHP said they would give us within, you know,

1    about a week and a half, but other than that, as long as there

2    is some deadline, that's fine.

3              THE COURT:  Yes, if they agree to do it earlier, of

4    course we're not going to object to that.

5              You have the extension for the document requests and

6    the objections.  We talked about custodians and search terms.

7              I don't think we have a call for the end of August,

8    but if an issue comes up, we're available.

9              I think our next in-person meeting is the -- well,

10   the next in-person meeting is the end of September, but we'll

11   have a phone call, unless we need to meet in person, in mid

12   September.  And I hope everybody enjoys the rest of their

13   summer.

14             RESPONSE:  Thank you, your Honor.

15             (The proceedings concluded at 4:34 p.m.)

16             - - - - - - - - - - - - - - - -

17

18             I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21   */S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI*
     *Court Reporter/Transcriber*

22

23   *September 05, 2019*
         *Date*

24

25

*United States District Court*
*District of New Jersey*

## /

/S *[1]* - 76:21

## 0

05 *[1]* - 76:23
07068 *[1]* - 1:15
07081 *[1]* - 2:23
08101 *[1]* - 1:8

## 1

1 *[6]* - 29:10, 29:14, 29:24, 32:17, 32:21, 32:22
10 *[1]* - 28:10
10,000 *[4]* - 31:8, 31:9, 31:10, 32:10
10022 *[1]* - 3:7
103 *[1]* - 1:14
11 *[1]* - 28:10
12 *[2]* - 8:5, 28:10
125 *[1]* - 9:14
14 *[1]* - 1:8
15 *[1]* - 63:3
15219 *[1]* - 2:15
15th *[4]* - 63:19, 65:5, 72:19, 72:20
16 *[1]* - 73:19
1638 *[1]* - 2:3
17th *[1]* - 2:10
1835 *[1]* - 1:17
19-2875 *[1]* - 4:6
19-md-02875-RBK-JS *[1]* - 1:4
19103 *[2]* - 1:18, 2:10
19422 *[1]* - 3:3

## 2

2 *[12]* - 28:23, 29:10, 29:25, 32:17, 32:23, 43:17, 44:20, 45:1, 48:5, 52:15, 53:3, 53:8
20 *[1]* - 31:11
20,000 *[2]* - 32:10, 35:24
2012 *[3]* - 58:21, 59:11, 59:14
2017 *[1]* - 61:8
2019 *[3]* - 1:8, 28:18, 76:23
2150 *[1]* - 2:6
23rd *[1]* - 65:11
24 *[2]* - 28:17, 62:25
2500 *[1]* - 2:18
26 *[5]* - 49:7, 55:5, 58:6, 58:15, 72:24

26(e *[1]* - 56:14
28th *[1]* - 8:21
2900 *[1]* - 1:17
2:09 *[2]* - 1:9, 4:2

## 3

3 *[12]* - 29:9, 29:10, 29:18, 29:25, 31:7, 32:17, 32:21, 45:15, 45:16, 45:17, 52:19, 53:16
3) *[1]* - 32:23
30 *[12]* - 2:10, 3:10, 8:24, 9:2, 43:1, 43:2, 63:16, 65:5, 73:23, 75:17, 75:20, 75:22
30(b)(6) *[6]* - 24:6, 27:17, 65:19, 66:23, 69:11, 70:4
30,000 *[2]* - 20:12, 32:10
30305 *[1]* - 2:19
30th *[1]* - 62:18
3333 *[1]* - 2:18
34 *[1]* - 25:19
38th *[1]* - 2:14
3:00 *[1]* - 4:10
3:04 *[1]* - 42:11
3:42 *[1]* - 42:11

## 4

4 *[4]* - 29:10, 29:25, 52:23, 53:22
4020 *[1]* - 3:10
45 *[3]* - 63:18, 64:9, 65:6
450 *[1]* - 3:3
483s *[3]* - 44:5, 46:6, 53:23
4:34 *[1]* - 76:15
4th *[1]* - 1:7

## 5

5 *[10]* - 28:23, 29:10, 29:25, 44:3, 48:2, 48:4, 48:12, 48:21, 49:20, 53:25
500 *[1]* - 9:22
52 *[1]* - 55:1
55402 *[1]* - 2:7

## 6

6 *[5]* - 29:1, 29:8, 29:10, 29:14, 44:21
6(3 *[1]* - 44:3
6(a) *[1]* - 45:2
6(a)(3 *[9]* - 31:17,

45:1, 45:5, 45:17, 45:19, 46:5, 48:12, 49:19, 50:1
6(a)(3) *[2]* - 32:19, 46:22
6(a)(3)(5 *[2]* - 44:23, 47:6
6(b *[3]* - 44:23, 45:18, 47:10
6(b)(2 *[1]* - 45:4, 49:24
6(b)(3 *[4]* - 46:3, 46:21, 47:14, 49:23
6) *[1]* - 32:21
6.a *[1]* - 47:15
60 *[5]* - 9:3, 9:6, 9:9, 9:17, 9:18
60,000 *[1]* - 41:3
600 *[1]* - 9:22
601 *[1]* - 3:6
60602 *[1]* - 3:10
673 *[1]* - 2:23
6th *[1]* - 53:9

## 7

701 *[1]* - 1:20
70130 *[1]* - 1:21

## 8

800 *[1]* - 2:6
856-318-6100 *[1]* - 1:24

## 9

9 *[2]* - 53:13, 53:17
90 *[5]* - 9:3, 9:6, 9:7, 63:4, 64:11
90/60 *[1]* - 9:23
90277 *[1]* - 2:4

## A

ability *[2]* - 21:23, 25:16
able *[20]* - 15:11, 31:4, 33:16, 34:12, 38:23, 39:3, 51:16, 52:1, 52:8, 54:3, 57:12, 60:2, 62:17, 64:17, 66:20, 69:4, 69:9, 69:14, 69:15, 71:12
above-entitled *[1]* - 76:19
absolutely *[4]* - 34:3, 38:23, 39:17, 73:10
accept *[2]* - 5:20, 48:23
acceptable *[1]* - 72:21
access *[2]* - 21:22,

37:8
accessible *[1]* - 20:15
accompanies *[1]* - 11:2
accordance *[5]* - 35:7, 35:13, 36:13, 36:14, 36:20
accounted *[1]* - 17:18
accurately *[1]* - 61:17
Actavis *[3]* - 2:20, 2:20, 13:3
ACTION *[1]* - 1:3
active *[1]* - 27:9
ADAM *[1]* - 1:14
add *[1]* - 69:19
addition *[1]* - 6:16
additional *[7]* - 10:13, 22:17, 34:17, 39:5, 39:15, 56:3, 57:2
additionally *[1]* - 60:22
address *[7]* - 4:20, 40:4, 40:5, 46:1, 60:10, 62:7, 65:10
addressed *[3]* - 35:1, 51:23, 52:24
advance *[2]* - 19:6, 27:24, 41:21
adverse *[1]* - 28:5
advocate *[1]* - 15:18
affairs *[2]* - 71:4
affiliate *[1]* - 20:23
affiliates *[3]* - 17:4, 17:17, 19:17
afternoon *[2]* - 4:3, 34:23
agencies *[1]* - 5:2
ago *[1]* - 23:6
agree *[5]* - 18:8, 42:25, 74:17, 74:21, 76:3
agreed *[17]* - 5:20, 16:19, 17:22, 23:7, 23:12, 36:15, 40:13, 42:21, 42:22, 59:4, 59:16, 60:13, 60:18, 61:24, 70:25, 75:15, 75:16
agreement *[8]* - 5:19, 12:6, 14:20, 14:21, 15:5, 16:17, 43:12, 59:21
agreements *[3]* - 12:7, 18:1, 23:7
aided *[1]* - 76:19
ALEXIA *[1]* - 3:6
Alexia *[1]* - 5:22
ALFANO *[1]* - 2:13
allow *[1]* - 33:14
allowed *[1]* - 8:23

almost *[1]* - 24:9
alone *[1]* - 65:3
ambiguity *[5]* - 33:8, 42:3, 49:22, 51:12, 51:13
American *[5]* - 19:17, 19:20, 20:1, 24:18
amlodipine *[1]* - 17:23
ANDA *[25]* - 22:10, 33:6, 33:21, 35:3, 35:5, 35:6, 35:22, 36:19, 38:2, 38:15, 39:4, 39:6, 39:21, 42:4, 53:4, 53:6, 55:12, 57:8, 57:13, 57:14, 57:16, 57:21, 57:22, 58:6, 58:8
ANDAs *[17]* - 17:15, 17:16, 17:18, 17:19, 20:11, 22:21, 22:23, 22:24, 23:2, 26:14, 33:9, 35:23, 37:24, 40:11, 41:11, 41:24, 52:15, 52:17
answer *[3]* - 31:6, 40:12, 50:4, 50:10, 69:16
answered *[1]* - 30:2
answers *[3]* - 23:18, 63:6, 65:23
anticipate *[4]* - 6:11, 8:17, 8:22, 54:23
anyway *[3]* - 8:5, 16:25, 75:2
APA *[1]* - 47:7
apart *[1]* - 38:6
API *[49]* - 5:9, 5:10, 5:15, 5:16, 5:21, 5:24, 6:1, 6:2, 12:7, 12:12, 13:13, 13:14, 13:15, 13:16, 14:3, 15:9, 15:20, 15:22, 17:3, 18:23, 19:14, 23:9, 27:13, 43:18, 43:20, 43:23, 44:6, 44:10, 44:12, 45:10, 45:13, 46:6, 46:13, 46:18, 47:8, 47:11, 47:18, 48:9, 48:14, 48:20, 48:21, 49:3, 49:21, 51:8, 59:6, 64:2, 71:24, 74:2
APIs *[1]* - 13:11
apologize *[3]* - 6:24, 12:24, 44:1
apparent *[1]* - 45:19
appear *[2]* - 22:21, 22:22
application *[4]* - 6:10, 7:2, 41:15, 58:1

*applications* [1] - 58:4
*applies* [2] - 25:18, 48:7
*apply* [6] - 11:13, 11:16, 12:7, 47:10, 48:21
*appreciate* [2] - 50:25, 66:21
*appropriate* [2] - 41:15, 58:7
*approve* [1] - 62:12
*approved* [10] - 52:18, 53:7, 57:8, 57:14, 57:19, 58:1, 58:4, 58:5, 58:8
*April* [4] - 28:17, 43:16, 44:4, 44:17
*ARB* [1] - 32:7
*area* [1] - 38:19
*argue* [1] - 48:18
*argument* [6] - 21:7, 21:10, 45:22, 46:25, 54:18, 54:21
*arms* [1] - 26:11
*arose* [2] - 46:14, 61:25
*Arrow* [3] - 13:18, 13:20, 14:24
*assertions* [1] - 40:3
*associated* [2] - 54:8, 57:22
*assume* [2] - 32:22, 56:11
*assuming* [1] - 72:23
*assurance* [1] - 71:5
*Atlanta* [1] - 2:19
*attached* [1] - 55:3
*attention* [1] - 56:15
*attorney* [2] - 36:7, 54:12
*attorneys* [1] - 69:2
*August* [6] - 1:8, 8:21, 53:9, 62:18, 65:4, 76:7
*Aurobindo* [23] - 3:4, 5:10, 12:14, 13:12, 18:17, 18:18, 18:19, 18:21, 18:22, 19:14, 25:4, 25:5, 26:6, 26:13, 26:16, 26:18, 27:21, 50:8, 51:17, 52:3, 61:3, 65:18
*Aurolife* [9] - 3:4, 12:18, 12:19, 12:20, 12:23, 13:22, 13:24, 25:6, 26:9
*authorities* [1] - 6:6
*automatically* [1] - 42:1
*available* [2] - 63:15,

76:8
*Avenue* [3] - 2:6, 2:23, 3:6
*avenue* [1] - 20:1
*avoid* [4] - 64:6, 66:23, 68:10, 70:9
*avoiding* [1] - 64:19
*aware* [4] - 24:2, 56:18, 57:1, 59:10
*awesome* [1] - 52:5

**B**

*back-and-forth* [1] - 69:1
*background* [1] - 11:8
*backlog* [1] - 9:21
*bad* [1] - 25:8
*ball* [2] - 10:4, 27:24
*BARBARA* [1] - 2:9
*base* [1] - 66:1
*based* [2] - 12:5, 44:7
*basis* [2] - 49:7, 60:6
*batches* [1] - 54:2
*Bates* [8] - 28:24, 29:16, 31:16, 32:18, 32:21, 32:22, 34:15, 42:18
*Beach* [1] - 2:4
*bear* [2] - 36:10, 36:11
*became* [1] - 69:21
*become* [1] - 22:5
*becomes* [2] - 22:4, 74:19
*beginning* [1] - 30:11
*behalf* [5] - 5:23, 25:5, 56:17, 61:16, 64:1
*BEHRAM* [1] - 2:3
*belief* [1] - 61:18
*Bell* [1] - 3:3
*belongs* [1] - 12:11
*benefit* [1] - 24:15
*benefits* [1] - 28:2
*Benicar* [9] - 9:3, 9:14, 9:25, 10:3, 11:5, 66:14, 66:24, 67:2, 68:3
*best* [2] - 60:2, 70:3
*better* [2] - 16:14, 63:17
*between* [8] - 17:2, 21:15, 22:15, 23:10, 27:12, 56:12, 58:4, 69:2
*beyond* [1] - 15:19
*big* [1] - 31:12
*bind* [1] - 31:1
*binding* [1] - 28:6
*bioequivalency* [1] - 35:20

*bit* [4] - 5:6, 15:13, 17:22, 35:1
*bits* [1] - 22:25
*blanket* [2] - 35:17, 48:6
*BLANTON* [1] - 2:22
*Blue* [1] - 3:3
*boilerplate* [3] - 63:16, 64:6, 64:20
*BOSICK* [1] - 2:13
*Box* [1] - 47:2
*BRANCATO* [2] - 3:6, 5:22
*Brancato* [1] - 5:22
*break* [3] - 4:11, 33:18, 42:5
*breaking* [1] - 38:6
*BRIAN* [1] - 2:17
*bridge* [3] - 16:15, 70:4, 70:10
*briefing* [1] - 28:14
*bring* [1] - 26:1
*brought* [3] - 39:18, 45:4, 67:6
*build* [1] - 73:24
*Building* [1] - 1:7
*burden* [13] - 20:17, 24:15, 30:10, 32:11, 34:10, 34:17, 38:12, 38:13, 39:5, 39:15, 40:3, 40:5, 40:17
*burdening* [1] - 68:10
*burdensomeness* [1] - 63:14
*burner* [1] - 74:18
*business* [3] - 21:18, 33:22, 34:6
*button* [3] - 34:8, 34:22, 36:16
*BY* [17] - 1:14, 1:17, 1:20, 2:3, 2:6, 2:9, 2:9, 2:13, 2:14, 2:17, 2:17, 2:18, 2:22, 2:22, 3:2, 3:6, 3:9
*bypassing* [1] - 69:11

**C**

*calendar* [1] - 66:6
*California* [1] - 2:4
*Camden* [1] - 1:8
*Camp* [1] - 1:20
*candid* [1] - 71:13
*capital* [3] - 34:20
*capture* [1] - 7:6
*captures* [1] - 7:11
*care* [1] - 54:3
*Carol* [2] - 1:23, 76:21
*case* [24] - 5:17, 6:2, 6:25, 8:3, 9:18, 16:3,

16:9, 25:15, 25:17, 25:19, 27:24, 30:24, 34:19, 35:23, 41:10, 44:25, 46:16, 47:5, 49:15, 51:8, 57:17, 65:13, 65:14, 70:4
*cases* [8] - 9:14, 9:15, 24:12, 28:1, 28:6, 37:23, 39:22, 41:25
*categories* [22] - 14:4, 14:7, 22:9, 26:11, 26:19, 29:9, 29:14, 31:11, 31:21, 32:14, 37:7, 37:8, 44:22, 45:6, 45:12, 46:21, 48:11, 50:5, 71:20, 71:24, 74:8, 74:15
*Category* [4] - 29:10, 31:7, 32:17
*category* [9] - 12:11, 13:1, 14:18, 18:5, 28:25, 31:17, 33:16, 73:23, 74:7
*caveat* [2] - 61:6, 74:11, 74:12
*Centre* [1] - 2:14
*century* [1] - 24:20
*certain* [6] - 35:18, 50:20, 69:20, 74:14, 75:9, 75:11
*certainly* [8] - 6:21, 10:10, 21:9, 32:9, 54:15, 56:18, 57:1, 63:15
*certify* [1] - 76:18
*cetera* [4] - 11:16, 41:13, 69:3, 73:14
*cfarrell.crr@gmail. com* [1] - 1:23
*CGMP* [1] - 44:6
*chain* [2] - 14:6, 72:8
*chains* [1] - 72:11
*challenge* [1] - 31:25
*challenges* [1] - 31:18
*chance* [1] - 22:22
*change* [2] - 8:6, 28:9
*charge* [1] - 71:15
*charts* [2] - 70:20, 70:22
*check* [1] - 61:10
*checked* [1] - 36:3
*checking* [2] - 61:7, 61:18
*chemical* [2] - 6:17, 6:21
*Chicago* [1] - 3:10
*China* [1] - 64:3
*Chinese* [2] - 73:9, 73:13
*choices* [1] - 19:25

*chosen* [1] - 26:1
*CIPRIANI* [1] - 3:2
*Circuit* [1] - 25:18
*circulated* [1] - 55:2
*cited* [3] - 21:20, 21:21, 25:15
*CIVIL* [1] - 1:3
*claims* [2] - 61:7, 61:19, 74:16
*clarification* [3] - 10:9, 49:17, 61:9
*class* [3] - 10:16, 10:18, 74:16
*clear* [3] - 26:16, 45:3, 69:12
*clearer* [1] - 29:3
*clearly* [1] - 15:24
*CLEM* [1] - 2:13
*Clem* [2] - 34:23, 43:25
*click* [1] - 33:14
*client* [17] - 20:13, 23:11, 23:12, 23:16, 24:2, 24:17, 25:23, 26:2, 36:7, 36:11, 41:3, 46:8, 56:19, 56:25, 59:13, 63:12, 72:25
*client's* [1] - 23:22
*clients* [2] - 24:13, 28:1
*clinical* [1] - 71:4
*clock* [1] - 8:21
*close* [3] - 4:23, 5:3, 20:12
*closer* [1] - 64:9
*CMO* [1] - 8:5
*Coast* [1] - 2:3
*coded* [1] - 36:4
*Cohen* [1] - 1:7
*cohesive* [1] - 22:24
*collecting* [1] - 55:12
*colorable* [2] - 21:7, 21:9
*coming* [1] - 68:10
*Commencing* [1] - 1:9
*comment* [2] - 14:19, 16:12
*comments* [1] - 73:23
*commit* [1] - 63:5
*committed* [2] - 15:17, 17:7
*Committee* [1] - 8:16
*committing* [1] - 41:2
*communication* [2] - 30:16, 32:7
*communications* [11] - 20:11, 21:5, 22:15, 26:16, 29:12, 30:22, 31:8, 45:10, 45:19,

50:5, 56:12
**Communications** [1] - 45:5
**companies** [14] - 4:22, 5:7, 19:14, 19:20, 20:1, 20:2, 21:12, 21:15, 24:22, 25:9, 28:4, 28:8, 63:24, 67:1
**companies'** [1] - 19:20
**company** [21] - 14:15, 14:25, 16:21, 16:22, 19:3, 20:23, 23:15, 24:18, 24:19, 24:24, 26:7, 50:17, 51:18, 51:19, 51:22, 54:13, 69:4, 69:10, 69:14, 70:23, 71:3
**company-specific** [1] - 50:17
**compare** [1] - 31:4
**compared** [2] - 30:8, 48:3
**compilation** [1] - 53:17
**compiled** [1] - 37:5
**complaint** [2] - 7:16, 9:10
**complete** [7] - 22:21, 23:2, 55:17, 55:19, 60:23, 61:1, 61:5
**completed** [2] - 9:17, 9:22
**completely** [1] - 47:4
**complicated** [1] - 41:24
**comply** [2] - 56:19, 57:2
**complying** [1] - 56:7
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concern** [3] - 55:15, 59:9, 63:10
**concerned** [3] - 8:12, 22:2, 43:17
**concerning** [4] - 46:25, 48:7, 48:8, 48:9
**concerns** [1] - 29:23
**concluded** [1] - 76:15
**concludes** [1] - 60:7
**conclusion** [1] - 9:1
**conduct** [2] - 27:15, 41:1
**confer** [13] - 6:25, 30:19, 33:11, 36:9, 38:10, 41:12, 59:5, 61:25, 65:6, 66:3,

72:19, 73:12, 73:24
**CONFERENCE** [1] - 1:5
**conference** [9] - 6:25, 8:24, 35:2, 37:10, 40:8, 60:5, 65:7, 65:10, 67:20
**conferred** [1] - 4:17
**confess** [1] - 40:20
**confidential** [6] - 33:19, 39:9, 39:21, 40:19, 42:4
**confidentiality** [3] - 35:15, 35:17, 39:11
**confirm** [7] - 11:22, 51:1, 51:5, 51:6, 52:16, 53:4, 61:18
**confirmed** [1] - 53:25
**conformance** [2] - 37:13, 37:14
**CONLEA** [1] - 1:20
**connection** [1] - 70:2
**consider** [1] - 24:5
**considered** [1] - 37:19
**consistent** [2] - 41:7, 46:24
**Constance** [1] - 54:5
**consumer** [1] - 10:14
**contacted** [1] - 5:1
**contain** [1] - 29:18
**contained** [2] - 38:16, 57:21
**containing** [1] - 35:24
**contaminated** [2] - 7:6, 7:11
**contamination** [4] - 7:7, 29:19, 57:15, 57:23
**contemplation** [2] - 19:9, 19:10
**context** [1] - 17:14
**Continued** [2] - 2:1, 3:1
**control** [16] - 18:15, 19:20, 21:7, 24:6, 24:19, 25:17, 27:5, 28:13, 42:18, 46:1, 46:3, 46:5, 46:17, 46:19, 51:24, 51:25
**conversation** [3] - 17:1, 19:5, 69:16
**conversations** [1] - 67:7
**Cooper** [1] - 1:7
**copies** [2] - 52:17, 53:6
**copy** [2] - 34:12, 34:14
**Core** [4] - 28:20, 54:22, 58:3, 71:21
**core** [34] - 4:18, 11:10,

11:12, 12:7, 15:7, 16:18, 17:3, 17:17, 17:25, 18:5, 20:17, 22:9, 22:16, 24:12, 26:7, 26:11, 32:18, 37:12, 40:8, 43:16, 44:2, 44:14, 46:12, 47:1, 47:4, 48:7, 48:16, 48:18, 50:7, 54:17, 58:1, 58:14, 59:6, 66:7
**core-discovery** [3] - 12:7, 17:3, 17:17
**corporate** [16] - 12:13, 14:6, 16:19, 16:21, 17:2, 17:8, 22:1, 23:10, 23:22, 23:23, 24:1, 24:2, 67:8, 70:19, 70:25, 71:2
**corporate-wide** [1] - 70:25
**corporation** [1] - 13:14
**correct** [14] - 5:11, 12:1, 12:8, 19:9, 21:15, 28:21, 32:24, 37:9, 43:12, 59:19, 63:25, 71:1, 76:18
**correctly** [4] - 4:16, 13:11, 54:5, 61:14
**correspond** [1] - 30:3
**correspondence** [7] - 44:5, 53:23, 55:25, 56:4, 56:20, 57:3, 57:13
**corresponding** [1] - 66:11
**cost** [1] - 35:12
**costs** [2] - 41:16
**counsel** [16] - 19:1, 21:15, 23:3, 24:4, 37:9, 39:25, 42:8, 42:12, 42:13, 47:23, 51:6, 62:19, 66:1, 66:23, 68:19, 75:6
**counter** [1] - 27:10
**couple** [5] - 4:21, 17:24, 58:16, 65:21, 75:24
**course** [9] - 4:15, 19:9, 33:22, 34:6, 39:12, 56:16, 64:18, 64:23, 76:4
**COURT** [184] - 1:1, 4:3, 5:7, 5:15, 5:21, 6:1, 6:5, 6:9, 6:13, 6:15, 6:22, 7:1, 7:8, 7:12, 7:21, 7:23, 8:1, 8:6, 8:8, 8:11, 8:19, 9:2, 9:11, 9:23,

10:12, 10:16, 10:18, 10:21, 10:24, 11:1, 11:4, 11:8, 12:10, 12:16, 12:19, 12:21, 12:23, 12:25, 13:8, 13:10, 13:20, 13:22, 14:6, 14:10, 14:13, 14:15, 14:17, 15:2, 15:13, 15:20, 15:24, 16:5, 16:8, 16:15, 17:11, 17:19, 18:4, 18:9, 18:23, 19:12, 19:19, 19:24, 21:2, 22:7, 23:3, 23:6, 23:14, 23:24, 24:4, 25:4, 26:6, 26:10, 26:22, 27:17, 27:20, 28:20, 28:22, 29:2, 29:5, 30:4, 31:21, 31:23, 32:16, 32:25, 33:4, 33:21, 33:25, 34:2, 34:4, 34:7, 34:18, 34:21, 35:3, 36:24, 37:9, 37:16, 37:18, 37:22, 38:17, 38:19, 38:21, 39:6, 39:12, 39:20, 39:24, 41:6, 42:10, 42:12, 42:25, 43:3, 43:8, 44:19, 45:7, 45:14, 47:6, 47:10, 47:16, 47:23, 48:1, 48:24, 49:2, 49:5, 50:13, 50:16, 51:15, 51:18, 51:24, 52:3, 52:5, 52:10, 53:8, 53:12, 54:18, 54:24, 55:4, 55:7, 55:20, 55:22, 56:10, 56:22, 57:4, 57:18, 57:25, 58:5, 58:12, 58:25, 59:23, 60:4, 60:9, 62:2, 62:6, 62:16, 62:23, 63:1, 63:6, 63:18, 63:24, 64:8, 64:18, 64:22, 65:4, 67:2, 67:11, 67:25, 70:7, 70:11, 70:16, 70:24, 71:19, 72:4, 72:12, 72:17, 72:22, 73:10, 73:17, 73:19, 74:4, 74:17, 74:21, 75:6, 75:15, 75:19, 75:23, 76:3
**court** [5] - 4:1, 4:8, 20:3, 21:21, 68:10
**Court** [34] - 1:23, 18:12, 19:2, 19:18, 19:21, 20:16, 25:8, 25:16, 27:16, 27:22, 28:3, 32:17, 35:1,

36:6, 40:16, 41:15, 44:17, 45:1, 45:11, 45:17, 45:25, 46:15, 48:13, 53:20, 55:23, 58:13, 60:5, 62:11, 63:21, 66:2, 66:19, 66:24, 73:25, 76:21
**Court's** [7] - 32:16, 32:25, 35:16, 41:7, 44:8, 58:5, 58:8
**Courthouse** [1] - 1:7
**courtroom** [2] - 12:3, 12:4
**cover** [3] - 11:9, 54:14, 55:1
**covers** [2] - 14:5, 18:1
**craft** [1] - 64:5
**CRC** [1] - 76:21
**CRCR** [1] - 76:21
**create** [3] - 27:3, 27:11, 27:15
**CRI** [1] - 76:21
**criminal** [3] - 4:11, 42:5, 42:14
**critical** [2] - 28:11, 41:10
**cross** [2] - 15:11, 16:15
**cross-reference** [1] - 15:11
**crossed** [1] - 70:4
**CRR** [1] - 76:21
**crystallizing** [1] - 71:16
**current** [2] - 63:2, 65:9
**custodian** [5] - 54:4, 66:18, 67:22, 72:18, 73:2
**custodians** [12] - 66:4, 67:13, 67:16, 68:8, 68:16, 68:20, 69:3, 69:19, 70:12, 70:21, 73:20, 76:6
**custody** [2] - 18:14, 24:6
**customer** [2] - 54:1, 59:11
**customers** [3] - 58:20, 59:6, 59:7
**cut** [5] - 70:12, 70:13, 72:18, 73:20, 73:22

---

**D**

**data** [6] - 31:5, 33:10, 36:23, 36:24, 37:3, 37:20
**database** [1] - 37:2
**date** [14] - 8:21, 9:7, 22:5, 42:22, 42:25,

52:21, 53:20, 56:4, 56:6, 62:20, 62:21, 62:25, 63:2, 65:10
**Date** [1] - 76:23
**dates** [3] - 62:16, 64:10, 66:5
**David** [1] - 34:20
**DAVIS** [1] - 2:17
**days** [20] - 8:24, 9:2, 9:3, 9:8, 9:9, 9:17, 9:18, 43:1, 43:2, 63:3, 63:4, 63:16, 63:18, 64:9, 64:11, 65:6, 73:23, 75:17, 75:20, 75:22
**deadline** [3] - 64:10, 73:1, 76:2
**deadlines** [3] - 64:13, 65:12, 75:10
**deal** [8] - 11:15, 49:11, 52:12, 55:7, 58:16, 58:17, 60:14, 73:8
**dealing** [6] - 25:12, 25:24, 43:8, 49:6, 68:13, 71:20
**dealt** [4] - 42:17, 53:3, 53:23
**December** [10] - 65:7, 65:8, 65:11, 67:12, 67:16, 69:6, 72:23, 73:4, 74:1
**decide** [2] - 28:14, 67:22
**decision** [2] - 24:13, 28:6
**deed** [1] - 48:24
**Defendant** [3] - 2:15, 2:24, 3:11
**defendant** [10] - 38:14, 39:3, 43:7, 43:9, 47:11, 59:24, 62:8, 70:12, 72:15
**defendants** [69] - 8:12, 9:24, 11:14, 11:15, 11:17, 11:19, 12:7, 14:6, 14:10, 15:6, 15:9, 15:18, 16:19, 17:3, 17:17, 18:13, 18:16, 20:4, 22:23, 23:8, 23:10, 28:24, 29:11, 31:8, 31:15, 32:20, 33:17, 34:7, 34:9, 34:21, 38:1, 41:14, 42:21, 43:19, 44:2, 44:4, 44:19, 44:20, 44:24, 45:21, 46:16, 46:23, 48:8, 49:2, 49:12, 50:6, 50:7, 52:1, 52:11, 52:14, 56:7,

56:12, 56:18, 58:22, 59:5, 60:8, 61:24, 63:3, 63:21, 65:2, 67:17, 67:21, 71:21, 73:17, 73:20, 73:21, 74:15, 74:20
**Defendants** [4] - 2:11, 2:19, 3:4, 3:7
**defendants'** [2] - 41:22, 57:9
**defense** [13] - 16:14, 18:2, 18:13, 19:10, 48:15, 51:6, 61:12, 66:4, 66:23, 68:19, 74:13, 75:7, 75:22
**define** [1] - 6:9
**defining** [1] - 25:17
**definitely** [3] - 18:5, 57:11, 63:22
**definition** [1] - 16:9
**demand** [1] - 25:22
**denied** [1] - 32:20
**department** [2] - 71:14
**departments** [6] - 66:15, 67:9, 71:4, 71:5, 71:6, 71:11
**deposition** [3] - 22:1, 27:18, 66:23
**depositions** [1] - 70:5
**deps** [1] - 65:19
**design** [1] - 50:22
**designating** [1] - 39:20
**designations** [3] - 35:15, 35:17, 39:11
**despite** [1] - 43:21
**details** [1] - 16:23
**detect** [1] - 29:18
**determination** [1] - 24:10
**determine** [3] - 32:6, 43:13, 52:21
**development** [1] - 27:9
**dialogue** [1] - 46:25
**differ** [1] - 70:11
**difference** [1] - 16:13
**different** [21] - 13:22, 15:15, 17:24, 24:24, 26:14, 30:2, 46:9, 46:11, 47:23, 62:20, 63:22, 63:23, 64:2, 66:15, 69:8, 70:19, 71:3, 71:5, 71:11, 72:11
**differently** [2] - 45:21, 45:23
**difficult** [1] - 63:10
**dig** [1] - 9:25

**dilemma** [1] - 31:9
**direct** [1] - 31:6
**directed** [2] - 28:24, 44:16
**directive** [1] - 35:16
**directly** [3] - 37:11, 69:9, 69:15
**disagree** [3] - 41:20, 72:4, 74:17
**disagreement** [2] - 43:15, 59:3
**disagreements** [1] - 60:15
**discern** [1] - 31:10
**disclaimer** [1] - 62:2
**disclosure** [2] - 4:19, 11:11
**disclosures** [2] - 24:2, 60:23
**Discovery** [4] - 28:20, 54:22, 58:3, 71:21
**discovery** [48] - 4:19, 10:5, 11:10, 11:12, 12:7, 15:7, 15:12, 16:18, 16:25, 17:3, 17:17, 18:7, 20:18, 22:4, 22:16, 25:19, 26:4, 26:7, 27:15, 28:13, 31:3, 31:16, 32:18, 37:12, 40:9, 43:16, 44:2, 44:15, 46:12, 47:1, 47:15, 48:7, 48:16, 48:18, 49:7, 50:8, 54:17, 55:5, 58:2, 58:14, 59:7, 65:8, 68:8, 70:20, 71:8, 71:22, 72:24
**discrete** [2] - 38:17, 38:18
**discuss** [1] - 16:24
**discussed** [22] - 11:22, 16:20, 16:21, 17:21, 18:11, 18:12, 19:1, 37:10, 37:11, 37:12, 40:5, 45:24, 53:24, 59:8, 60:19, 62:11, 65:17, 66:1, 66:2, 67:19, 67:21, 72:8
**discussing** [2] - 18:25, 71:18
**discussion** [12] - 7:5, 8:25, 12:5, 15:16, 40:6, 40:8, 46:2, 66:13, 67:11, 69:2, 69:5
**discussions** [3] - 18:15, 46:15, 69:10
**dismiss** [1] - 7:14

**dispute** [4] - 11:18, 29:8, 43:1, 58:19
**disputes** [12] - 4:19, 11:16, 24:9, 42:17, 42:20, 43:5, 50:17, 53:21, 65:8, 65:10, 72:24
**distinguish** [2] - 27:11, 58:4
**distribute** [1] - 17:13
**distribution** [2] - 17:5, 55:2
**distributor** [2] - 64:4, 74:7
**distributors** [1] - 59:14
**District** [1] - 25:16
**DISTRICT** [2] - 1:1, 1:1
**divided** [1] - 11:12
**DMF** [2] - 26:20, 27:1
**Docket** [1] - 4:5
**document** [29] - 32:6, 32:7, 32:8, 34:16, 35:18, 40:18, 41:10, 42:18, 49:7, 49:8, 49:12, 54:10, 54:16, 54:24, 56:9, 56:14, 62:13, 62:18, 63:22, 64:1, 64:25, 65:4, 69:24, 70:2, 71:22, 72:24, 74:9, 76:5
**documentation** [1] - 36:1
**documents** [85] - 16:25, 19:3, 19:21, 20:13, 21:3, 21:4, 21:17, 21:22, 22:8, 22:9, 22:17, 22:20, 23:17, 23:18, 23:20, 24:12, 24:21, 25:21, 25:24, 26:3, 26:11, 26:18, 28:2, 28:7, 28:11, 28:25, 29:1, 29:11, 29:13, 29:24, 30:1, 30:3, 30:5, 30:10, 30:15, 30:25, 31:9, 31:10, 31:11, 31:16, 31:19, 32:4, 33:15, 33:17, 35:9, 36:13, 37:4, 37:7, 38:24, 39:1, 40:1, 41:4, 41:22, 44:22, 45:6, 46:2, 46:4, 46:20, 46:21, 47:12, 50:9, 50:20, 51:4, 51:9, 51:22, 56:6, 57:22, 60:6, 62:14, 63:12, 65:14, 66:7, 66:10, 66:16, 67:15,

68:23, 69:20, 70:1, 73:13, 74:7
**dollars** [1] - 36:8
**domain** [1] - 27:4
**done** [25] - 4:23, 21:25, 29:11, 30:11, 30:20, 30:24, 33:15, 39:11, 39:13, 39:14, 39:19, 39:21, 41:5, 43:9, 50:13, 57:23, 59:21, 63:16, 65:12, 67:14, 68:14, 71:14, 73:4, 73:5
**door** [1] - 27:23
**dosages** [1] - 27:9
**dose** [24] - 12:8, 12:25, 13:2, 13:4, 13:18, 13:24, 13:25, 14:4, 15:10, 15:23, 17:3, 18:25, 27:12, 44:13, 45:12, 45:25, 46:4, 46:19, 46:20, 49:18, 59:8, 64:5, 74:3, 75:1
**down** [6] - 22:25, 24:8, 53:1, 64:12, 66:25, 72:11
**draft** [6] - 6:18, 11:2, 27:21, 28:3, 28:12, 65:17
**drafted** [2] - 32:16, 33:1
**drafting** [1] - 65:3
**drive** [1] - 34:13
**drug** [3] - 15:23, 48:20, 50:22
**drugs** [2] - 17:23, 75:3
**Drugs** [2] - 13:12, 13:13
**DUANE** [1] - 2:8
**due** [5] - 7:16, 25:9, 56:16, 65:4, 65:5
**during** [3] - 7:24, 20:17, 61:24
**dust** [1] - 74:6

---

## E

**e-mail** [6] - 7:20, 19:4, 54:7, 54:8, 54:14, 54:22
**e-mails** [3] - 18:12, 55:1
**early** [2] - 26:10, 47:3
**earth** [1] - 55:5
**easily** [1] - 21:25
**easy** [2] - 20:15, 40:25
**economic** [2] - 74:16, 74:22
**eCTD** [11] - 33:13,

33:24, 34:16, 34:18, 35:9, 38:8, 39:11, 39:15, 41:12, 42:18, 75:19

**effective** [1] - 58:23
**efficient** [1] - 32:3
**effort** [3] - 41:7, 65:14, 73:3
**efforts** [1] - 29:18
**eight** [2] - 35:10, 35:11
**Eisenhower** [1] - 1:14
**either** [4] - 14:25, 33:8, 34:13, 48:20
**eleven** [1] - 24:11
**ELLIS** [1] - 3:5
**ELMORE** [1] - 2:22
**encompass** [1] - 30:23
**encompassed** [1] - 48:11
**end** [7] - 8:14, 62:18, 68:5, 68:25, 69:20, 76:7, 76:10
**endeavor** [2] - 56:19, 59:12
**English** [2] - 73:7, 73:13
**enjoys** [1] - 76:12
**ensure** [1] - 53:5
**enter** [2] - 7:17, 9:25
**entered** [6] - 8:11, 8:20, 9:7, 9:21, 10:1, 10:10
**entire** [2] - 39:11, 40:18
**entirely** [2] - 46:24, 69:7
**entirety** [1] - 39:21
**entities** [7] - 5:4, 19:1, 19:8, 60:22, 61:1, 61:3, 61:22
**entitled** [1] - 76:19
**entity** [10] - 13:4, 18:20, 20:22, 21:5, 21:8, 21:11, 21:17, 21:19, 25:25, 48:3
**envision** [1] - 32:17
**ESI** [16] - 33:9, 33:10, 35:7, 35:13, 36:14, 37:13, 37:14, 37:18, 40:13, 65:15, 67:14, 68:13, 68:15, 69:23, 72:24
**especially** [1] - 21:16
**ESQUIRE** [17] - 1:14, 1:17, 1:20, 2:3, 2:6, 2:9, 2:9, 2:13, 2:14, 2:17, 2:17, 2:18, 2:22, 2:22, 3:2, 3:6,

3:9
**Establishment** [1] - 44:5
**estimate** [1] - 5:3
**et** [4] - 11:16, 41:13, 69:3, 73:14
**eventual** [1] - 24:14
**eventually** [2] - 28:4, 72:13
**evidences** [1] - 21:6
**exchange** [11] - 9:20, 16:22, 17:8, 19:2, 29:17, 30:14, 30:19, 37:2, 46:8, 48:24
**examples** [1] - 31:22
**except** [1] - 68:3
**exception** [1] - 61:22
**exchange** [4] - 66:6, 66:22, 70:25, 72:18
**exchanged** [1] - 42:23
**excuse** [1] - 50:23
**Executive** [1] - 8:16
**exercise** [1] - 16:9
**exist** [2] - 15:1, 27:14
**expand** [1] - 46:7
**expanded** [1] - 44:12
**expect** [4] - 9:17, 22:16, 38:21, 56:7
**expected** [1] - 38:9
**expense** [7] - 20:13, 34:10, 35:13, 36:6, 36:7, 36:10, 36:11
**extant** [1] - 14:25
**extend** [2] - 64:10, 64:13
**extended** [2] - 20:25, 64:11
**extending** [1] - 65:12
**extension** [1] - 76:5
**extent** [8] - 15:8, 42:2, 47:14, 51:8, 55:13, 61:23, 64:6, 71:6
**extra** [2] - 34:10, 41:16

## F

**facilities** [26] - 15:10, 15:21, 15:22, 15:23, 16:4, 16:11, 23:9, 23:21, 43:17, 43:18, 43:20, 43:23, 44:7, 44:12, 46:6, 47:7, 47:16, 47:17, 47:18, 48:9, 48:11, 48:13, 48:19, 49:3, 49:14, 58:10
**facility** [5] - 44:9, 44:13, 46:9, 48:22, 49:21

**fact** [8] - 8:13, 10:7, 10:11, 11:2, 25:9, 35:19, 40:21, 65:23
**facts** [1] - 24:14
**factual** [2] - 24:10, 27:3
**fair** [1] - 68:15
**fairest** [1] - 41:19
**fairly** [1] - 68:21
**FALKENBERG** [1] - 3:9
**fall** [4] - 14:4, 31:10, 33:10, 66:19
**falls** [1] - 14:9
**far** [8] - 16:14, 19:6, 19:7, 22:21, 24:1, 30:8, 35:11, 50:19
**Farrell** [1] - 1:23, 76:21
**favor** [1] - 8:8
**FCRR** [1] - 76:21
**FDA** [21] - 20:11, 20:25, 26:15, 29:12, 30:22, 33:13, 33:23, 34:13, 35:9, 35:10, 37:25, 44:5, 45:5, 55:3, 55:17, 55:23, 55:25, 56:12, 57:8, 57:14, 66:11
**few** [3] - 23:6, 57:12, 66:10
**fiduciary** [1] - 41:2
**figure** [5] - 16:3, 29:15, 29:22, 30:24, 73:14
**figured** [1] - 53:14
**file** [6] - 6:11, 38:16, 39:4, 50:22, 63:15
**filed** [3] - 9:7, 9:8, 25:10
**files** [11] - 33:14, 33:18, 35:7, 35:22, 36:20, 53:4, 53:6, 54:7, 55:12, 58:6, 58:8
**final** [1] - 8:1
**finalize** [3] - 8:13, 10:17, 65:23
**finalized** [3] - 8:17, 72:22, 73:25
**finalizing** [1] - 73:2
**finally** [1] - 71:12
**fine** [12] - 11:5, 14:21, 18:2, 43:2, 61:6, 62:5, 66:24, 69:13, 70:15, 75:21, 75:22, 76:2
**finish** [1] - 23:9
**finished** [41] - 12:8, 12:16, 12:23, 12:25,

13:2, 13:4, 13:18, 13:24, 13:25, 14:3, 14:10, 14:17, 15:10, 15:23, 17:3, 18:25, 27:9, 27:12, 43:19, 44:13, 44:24, 45:9, 45:12, 45:20, 45:25, 46:4, 46:18, 46:20, 47:19, 48:10, 48:20, 49:13, 49:18, 49:19, 59:7, 64:4, 71:25, 74:2, 75:1
**first** [15] - 11:21, 25:10, 41:1, 48:5, 67:23, 68:6, 68:15, 68:20, 69:25, 70:12, 70:13, 72:18, 73:20, 73:22, 75:4
**fit** [1] - 37:7
**five** [1] - 54:3
**float** [1] - 62:20
**floor** [1] - 15:3
**Floor** [1] - 2:14
**flow** [2] - 21:14, 72:10
**focus** [2] - 30:14, 31:17
**focused** [3] - 17:1, 64:2, 64:3
**focussing** [1] - 71:24
**folder** [3] - 34:13, 37:5, 38:24
**followed** [1] - 20:20
**follows** [1] - 25:16
**followup** [1] - 75:9
**FOR** [1] - 1:1
**forced** [1] - 20:22
**forefront** [1] - 74:23
**foregoing** [1] - 76:18
**foreign** [17] - 14:15, 18:16, 19:14, 19:20, 20:2, 21:5, 21:8, 21:11, 21:19, 24:19, 24:21, 25:9, 25:25, 28:7, 46:18, 73:16
**forever** [1] - 28:6
**form** [5] - 7:16, 9:20, 34:14, 36:14, 37:2
**formal** [1] - 70:20
**formalize** [1] - 5:19
**formalized** [1] - 71:8
**formally** [1] - 71:2
**format** [23] - 33:6, 33:12, 33:13, 33:22, 33:24, 34:11, 34:16, 35:5, 35:10, 36:1, 37:2, 37:17, 37:24, 38:2, 38:4, 38:6, 38:8, 38:10, 39:16, 41:9, 41:12, 41:23
**formulate** [4] - 63:11,

63:13, 66:18, 68:22
**formulations** [1] - 17:25
**forth** [1] - 69:1
**forward** [2] - 9:6, 9:18
**foundational** [1] - 66:22
**four** [7] - 5:9, 12:14, 54:3, 63:22, 63:23, 63:24, 68:17
**frame** [1] - 18:7
**frank** [1] - 66:13
**frankly** [2] - 74:25, 75:21
**fraud** [1] - 10:14
**free** [1] - 21:14
**FREEMAN** [1] - 1:13
**Friday** [1] - 50:25
**front** [3] - 11:20, 60:24, 74:18
**fulfilling** [1] - 41:2
**full** [6] - 13:7, 26:14, 52:17, 53:3, 53:6, 54:1
**fully** [1] - 54:22
**future** [4] - 28:6, 43:1, 60:5, 61:25

## G

**gap** [1] - 68:24
**gaps** [1] - 75:4
**general** [13] - 4:18, 11:10, 18:10, 31:3, 31:17, 32:13, 33:4, 33:5, 43:4, 45:16, 45:17, 49:7, 51:21
**generally** [1] - 5:9
**generic** [1] - 43:4
**Georgia** [1] - 2:19
**given** [6] - 9:16, 17:2, 22:16, 30:6, 32:13, 32:19
**global** [3] - 28:16, 52:23, 53:22
**goal** [1] - 73:25
**Goldberg** [1] - 75:10
**GOLDBERG** [22] - 2:9, 11:24, 17:20, 31:14, 31:22, 31:24, 32:24, 42:24, 43:2, 51:13, 63:20, 63:25, 64:16, 64:19, 64:23, 67:19, 68:2, 69:23, 70:8, 73:18, 74:2, 75:7
**Goldberg's** [2] - 53:11, 53:16
**Goldenberg** [4] - 4:24, 52:12, 60:10, 61:20
**GOLDENBERG** [28] -

2:5, 2:6, 4:24, 5:9, 5:14, 6:3, 6:8, 7:19, 7:22, 7:24, 8:2, 8:7, 8:10, 13:6, 13:9, 13:11, 13:21, 13:23, 14:8, 18:21, 52:13, 53:2, 53:10, 53:13, 55:6, 60:12, 61:21, 62:4
**GOLOMB** [1] - 1:16
**GORDON** [1] - 2:13
grant [1] - 27:20
granted [1] - 41:18
great [5] - 18:4, 30:4, 30:10, 43:3, 60:14
**Great** [1] - 56:22
greatest [1] - 27:22
**GREENBERG** [1] - 2:16
group [2] - 13:17, 22:19
groups [1] - 15:6
guarantee [1] - 64:25
guaranteed [1] - 24:9
guess [13] - 15:5, 15:8, 16:3, 18:17, 19:25, 22:10, 39:10, 57:25, 62:4, 65:7, 65:21, 73:20, 73:22
guidance [1] - 32:4
guys [2] - 12:1, 53:15

**H**

**Hague** [3] - 4:22, 19:16, 25:9
half [5] - 57:6, 58:18, 58:19, 59:17, 76:1
hall [2] - 62:19, 72:8
hand [1] - 24:10
handled [1] - 70:6
hands [2] - 5:6, 6:5
hanging [1] - 75:14
happy [5] - 7:20, 7:25, 36:6, 52:8, 53:2
hard [2] - 26:17, 34:13
**HARDIN** [1] - 2:21
**HARKINS** [1] - 2:18
haystack [2] - 31:7, 31:12
**Healthcare** [1] - 2:11
hear [7] - 11:18, 23:24, 26:22, 34:7, 34:9, 41:18, 45:21
hearing [1] - 7:25
**Heinz** [2] - 12:24, 25:5
**HEINZ** [10] - 3:2, 12:18, 12:20, 12:22, 12:24, 13:2, 25:5, 26:8, 26:20, 26:24

held [1] - 4:1
help [2] - 18:6, 72:14
helpful [8] - 12:4, 17:14, 20:19, 26:15, 29:20, 61:15, 70:18, 70:21
helps [1] - 27:24
herein [1] - 29:1
hesitant [1] - 41:3
**Hetero** [36] - 2:24, 5:13, 5:14, 12:13, 13:12, 13:13, 13:15, 13:25, 14:9, 14:12, 18:17, 18:18, 18:24, 19:15, 20:6, 20:10, 21:4, 21:7, 21:10, 22:9, 22:14, 22:15, 23:3, 23:12, 26:14, 26:19, 27:21, 50:9, 59:24, 60:16, 60:17, 60:19, 61:22, 65:18
**Hetero's** [1] - 27:6
**Highway** [1] - 2:3
hindsight [1] - 41:20
hold [1] - 4:13
holding [1] - 31:22
hole [1] - 24:8
honestly [2] - 20:8, 38:4
**HONIK** [11] - 1:16, 1:17, 6:4, 6:11, 6:14, 6:18, 6:24, 7:10, 27:2, 27:19, 31:6
**Honor** [70] - 5:22, 7:5, 7:19, 8:15, 8:25, 9:5, 12:3, 12:24, 13:3, 13:6, 14:16, 19:23, 20:5, 21:20, 22:13, 23:5, 23:16, 24:23, 27:2, 27:19, 28:17, 28:23, 28:24, 31:6, 31:14, 32:24, 33:3, 34:23, 35:14, 36:12, 36:18, 36:22, 39:17, 40:4, 40:13, 43:2, 43:14, 43:22, 43:25, 45:23, 48:6, 48:15, 50:2, 50:18, 51:14, 51:20, 52:4, 52:14, 54:20, 56:17, 57:5, 59:2, 60:8, 60:11, 60:12, 62:20, 63:8, 63:20, 64:20, 67:5, 69:6, 69:12, 72:9, 72:10, 73:18, 74:12, 74:13, 75:7, 75:21, 76:14
**Honor's** [4] - 8:18, 20:20, 43:16, 44:4
**Honorable** [1] - 4:1

**HONORABLE** [1] - 1:10
hope [5] - 7:20, 65:18, 74:9, 74:13, 76:12
hopeful [2] - 59:25, 74:25
hopefully [6] - 28:8, 28:13, 70:9, 73:12, 73:25, 74:5
hoping [1] - 63:17
house [3] - 54:11, 54:12
housekeeping [1] - 4:21
**Huahai** [2] - 2:12, 61:1
huge [1] - 39:5
**Humana** [1] - 3:11
hundred [3] - 46:9, 65:1, 65:2
hydrochlorothiazide [1] - 17:24

**I**

idea [2] - 27:5, 70:17
identified [7] - 13:12, 15:6, 32:22, 44:20, 44:22, 55:1, 71:21
identify [9] - 18:13, 28:24, 31:15, 31:16, 32:21, 52:25, 59:10, 59:13, 67:16
identifying [1] - 40:22
**IL** [1] - 3:10
immense [1] - 18:6
impact [1] - 57:17
implicated [1] - 16:4
important [3] - 25:13, 29:17, 51:8
**IN** [1] - 1:4
in-house [3] - 54:11, 54:12
in-person [2] - 76:9, 76:10
**Inc** [7] - 2:15, 2:20, 2:20, 2:24, 3:4, 3:7, 3:11
include [3] - 16:10, 44:12, 46:5
included [7] - 6:19, 35:14, 47:1, 54:8, 54:15, 55:14
inconceivable [2] - 21:14, 21:16
**Incorporated** [1] - 14:1
incorporates [2] - 8:18, 10:7
incur [1] - 41:16
incurred [2] - 20:13,

36:7
index [2] - 33:15, 37:3
**India** [3] - 22:14, 22:15, 23:15
**Indian** [2] - 18:19, 51:22
indicate [2] - 7:16, 50:3
indicated [3] - 35:6, 53:18, 59:11
individual [2] - 52:4, 60:8
individually [1] - 33:19
indulgence [1] - 42:14
**Industries** [2] - 2:19, 14:2
informal [2] - 69:10, 70:5
informally [2] - 66:6, 67:6
information [26] - 16:20, 20:18, 21:14, 23:15, 23:17, 29:20, 32:1, 32:11, 32:14, 35:20, 36:4, 37:6, 38:16, 39:9, 40:23, 40:24, 42:21, 53:18, 63:14, 69:2, 69:9, 71:7, 74:23, 75:2
informed [1] - 61:4
ingredients [1] - 27:10
initial [2] - 9:5, 9:9
initiated [1] - 25:10
injury [3] - 9:15, 10:11, 10:23
inspection [4] - 22:11, 22:14, 50:23, 53:23
**Inspection** [1] - 44:6
inspections [2] - 58:10, 71:15
instance [3] - 56:20, 63:13, 75:4
insurance [11] - 4:19, 11:11, 60:9, 60:17, 60:18, 60:23, 60:25, 61:2, 61:4, 61:13, 61:18
intended [1] - 58:13
intensive [2] - 65:13, 73:3
intent [5] - 32:16, 32:25, 33:8, 58:5, 58:8
interaction [2] - 71:13, 72:6
interests [1] - 10:4
internal [3] - 16:21, 54:22, 70:24
internally [1] - 6:25

**international** [1] - 5:2
interpret [1] - 47:1
interpretation [6] - 43:15, 45:4, 45:24, 46:24, 47:21, 49:23
interpreted [3] - 46:14, 46:22, 46:23
interrupt [1] - 59:2
interrupted [1] - 15:2
interruption [1] - 42:16
interviewing [1] - 68:4
interviews [2] - 67:20, 70:5
intricacies [1] - 40:20
involved [3] - 15:25, 17:4, 37:23
**irbesartan** [1] - 6:19
irrelevant [1] - 54:18
issue [70] - 14:22, 14:23, 18:15, 19:19, 19:24, 22:5, 26:15, 28:13, 28:14, 28:15, 28:16, 28:17, 28:18, 33:2, 33:4, 33:5, 35:1, 37:9, 37:19, 38:12, 40:5, 40:10, 40:17, 42:18, 42:19, 43:12, 43:13, 43:22, 44:10, 46:1, 47:8, 47:18, 48:10, 49:14, 51:17, 51:21, 51:24, 51:25, 52:15, 52:19, 52:23, 53:3, 53:8, 53:16, 53:21, 53:22, 53:25, 54:2, 54:4, 54:13, 55:15, 56:13, 57:10, 57:15, 57:23, 58:17, 58:21, 60:4, 61:9, 61:11, 65:19, 67:20, 70:5, 74:13, 74:18, 76:8
issued [1] - 8:3
issues [29] - 4:18, 11:9, 11:10, 11:13, 11:14, 11:16, 18:10, 24:6, 36:17, 41:8, 43:10, 46:17, 47:4, 50:14, 50:20, 52:4, 52:9, 52:25, 53:17, 55:7, 57:24, 60:1, 60:9, 62:7, 68:11, 74:16, 74:20
item [1] - 38:18
items [5] - 37:1, 46:5, 49:25, 57:20, 59:17
itself [4] - 7:2, 40:6, 40:14, 48:3
**IVES** [1] - 3:9

## J

**JANET** [1] - 2:22
**Janet** [2] - 14:14, 20:5
**January** [2] - 25:11, 69:6
**JASON** [1] - 2:14
**JERSEY** [1] - 1:1
**Jersey** [4] - 1:8, 1:15, 2:23, 25:16
**JESSICA** [1] - 3:2
**Jessica** [2] - 12:24, 25:5
**JOEL** [1] - 1:10
**Joel** [1] - 4:1
**JR** [1] - 2:22
**Judge** [3] - 4:2, 6:18, 7:12
**judge** [1] - 24:18
**JUDGE** [1] - 1:11
**judgment** [1] - 32:5
**July** [1] - 56:21
**June** [4] - 35:2, 35:8, 40:7, 56:21
**jurisdiction** [1] - 20:3
**jut** [1] - 4:8

## K

**KANNER** [1] - 1:19
**KATZ** [1] - 1:13
**keep** [2] - 52:10, 65:11
**kept** [4] - 34:6, 37:1, 38:11, 73:13
**key** [1] - 23:10
**kidding** [2] - 29:6, 29:7
**kind** [1] - 70:1
**kinds** [1] - 65:2
**KIRKLAND** [1] - 3:5
**KIRTLAND** [1] - 2:2
**knowledge** [2] - 57:23, 68:24
**knowledgeable** [3] - 66:25, 67:7, 67:8
**known** [3] - 37:24, 59:7, 59:14
**knows** [2] - 4:9, 38:21
**Kugler** [1] - 7:12
**KUNDLA** [1] - 2:21

## L

**labor** [1] - 73:3
**Laboratories** [1] - 13:15
**Labs** [8] - 13:13, 13:15, 13:25, 14:9, 14:12, 18:18, 60:17, 60:19

**lag** [1] - 22:3
**language** [7] - 10:1, 28:18, 43:21, 44:8, 73:7, 73:9, 73:16
**Lasalle** [2] - 2:6, 3:10
**last** [12] - 5:1, 6:18, 6:22, 6:24, 7:24, 8:24, 22:17, 59:25, 66:2, 67:20, 75:8
**late** [1] - 69:21
**Laughs** [2] - 18:9, 29:5
**law** [1] - 25:17
**LAW** [1] - 2:5
**lays** [1] - 70:23
**lead** [1] - 47:2
**learn** [3] - 57:3, 72:6, 73:12
**learned** [1] - 69:18
**least** [10] - 17:6, 21:7, 21:22, 23:10, 30:22, 31:1, 35:10, 70:22, 71:17, 71:19
**leave** [2] - 18:2, 60:4
**left** [4] - 31:1, 54:2, 55:14, 57:6
**legal** [7] - 19:13, 19:19, 19:24, 21:24, 25:20, 25:21, 27:12
**length** [1] - 35:25
**letter** [5] - 15:9, 53:9, 53:11, 53:13, 53:16
**letters** [6] - 4:15, 7:14, 46:10, 61:23, 62:3
**letting** [1] - 12:3
**level** [6] - 17:6, 48:16, 66:22, 72:3, 72:5, 74:3
**Lexington** [1] - 3:6
**LIABILITY** [1] - 1:4
**liaison** [1] - 20:25
**light** [2] - 8:2, 68:14
**likely** [1] - 16:10
**limb** [1] - 40:15
**limit** [2] - 49:5, 49:11
**Limited** [14] - 13:12, 13:13, 13:15, 13:16, 13:19, 13:25, 14:2, 14:3, 14:12, 18:18, 18:21, 18:22
**limited** [5] - 20:24, 28:13, 38:15, 47:6, 48:13
**limiting** [1] - 48:16
**limits** [1] - 49:21
**lines** [1] - 68:7
**LinkedIn** [1] - 27:6
**list** [22] - 13:7, 17:15, 17:17, 23:9, 30:20, 45:2, 51:19, 54:1,

58:19, 59:6, 59:7, 59:10, 66:18, 67:22, 67:23, 68:8, 68:15, 68:16, 68:20, 68:22, 72:19, 73:2
**listed** [4] - 29:1, 32:7, 44:23, 47:15
**listing** [2] - 15:9, 75:16
**lists** [4] - 15:11, 32:12, 32:13, 43:12
**litigation** [8] - 9:19, 24:20, 26:1, 38:8, 41:8, 41:22, 47:3, 69:19
**LITIGATION** [1] - 1:4
**live** [2] - 55:6, 73:17
**LLC** [8] - 1:13, 1:19, 2:11, 2:20, 3:4, 12:20, 13:24, 25:6
**LLP** [6] - 2:2, 2:8, 2:13, 2:16, 3:5, 3:9
**load** [1] - 22:18
**Lockard** [2] - 8:15, 54:20
**LOCKARD** [19] - 2:17, 8:15, 8:20, 9:12, 10:6, 10:13, 10:17, 10:19, 10:22, 10:25, 11:3, 11:7, 13:3, 14:24, 54:20, 54:25, 55:9, 55:21, 61:16
**look** [8] - 19:5, 21:3, 22:8, 24:15, 31:15, 47:13, 58:25, 64:2
**looking** [2] - 70:16, 71:10
**looks** [1] - 25:18
**losartan** [1] - 6:19
**lost** [1] - 36:5
**Louisiana** [1] - 1:21
**lower** [1] - 34:19
**Ltd** [3] - 2:12, 2:19, 3:8
**lunch** [3] - 8:3, 12:5, 52:21
**LYNN** [1] - 2:22

## M

**macro** [5] - 11:13, 11:16, 43:4, 43:9, 50:13
**MAGISTRATE** [1] - 1:11
**Magistrate** [1] - 4:2
**mail** [6] - 7:20, 19:4, 54:7, 54:8, 54:14, 54:22
**mails** [3] - 18:12, 55:1

**main** [1] - 57:7
**major** [1] - 30:14
**Malta** [2] - 13:19, 14:24
**managed** [1] - 22:18
**management** [2] - 6:25, 8:4
**manner** [1] - 22:22
**manufacture** [2] - 17:5, 17:12
**manufactured** [9] - 43:17, 43:18, 43:21, 44:10, 46:6, 47:7, 47:18, 48:9, 48:14
**manufacturer** [22] - 5:16, 5:21, 6:2, 13:14, 13:16, 13:25, 14:4, 18:25, 43:23, 44:24, 45:10, 45:12, 45:13, 45:20, 46:4, 47:11, 49:14, 51:8, 64:5
**manufacturers** [12] - 5:10, 12:8, 12:12, 12:17, 13:18, 17:4, 18:23, 19:14, 45:25, 49:18, 75:1
**manufacturing** [13] - 15:10, 15:20, 15:22, 15:23, 23:9, 44:7, 44:14, 46:8, 48:19, 48:21, 49:3, 49:20, 49:21
**mark** [1] - 42:3
**marked** [1] - 40:19
**Market** [1] - 1:17
**marketing** [1] - 27:9
**Marlene** [1] - 4:24
**MARLENE** [1] - 2:6
**master** [2] - 50:22
**material** [1] - 9:24
**materials** [1] - 20:12
**matter** [10] - 4:5, 8:22, 34:8, 34:22, 41:21, 66:9, 66:15, 67:9, 68:20, 76:19
**matters** [1] - 4:21
**MAZIE** [1] - 1:13
**MCKEON** [1] - 2:21
**MDL** [3] - 6:9, 9:14, 9:15
**mean** [17] - 22:2, 26:4, 27:3, 30:7, 31:14, 32:4, 33:6, 36:25, 48:22, 51:21, 55:3, 56:7, 68:14, 68:21, 69:7, 69:17, 70:8
**meaning** [1] - 64:17
**means** [2] - 54:2, 65:9
**meant** [1] - 35:18

**mechanical** [1] - 1:25
**medical** [2] - 10:13, 71:4
**medications** [1] - 35:24
**meet** [16] - 30:19, 33:11, 36:9, 38:10, 41:12, 59:4, 61:25, 65:6, 66:3, 66:20, 67:5, 72:19, 73:12, 73:24, 76:11
**meet-and-confer** [3] - 36:9, 66:3, 73:12
**meeting** [3] - 12:2, 76:9, 76:10
**MEGAN** [1] - 3:9
**mentioned** [1] - 7:3
**met** [1] - 4:17
**mid** [1] - 76:11
**might** [4] - 14:7, 16:5, 25:7
**mind** [1] - 53:12
**mindful** [1] - 35:16
**minds** [1] - 28:9
**Minneapolis** [1] - 2:7
**Minnesota** [1] - 2:7
**minute** [1] - 43:8
**mirror** [2] - 10:2, 11:5
**mirrors** [1] - 56:10
**misinterpreted** [1] - 45:15
**miss** [2] - 12:1, 12:17
**missing** [2] - 26:12, 26:17
**misspoke** [1] - 31:13
**misstating** [1] - 59:18
**Mitchell** [1] - 1:7
**model** [1] - 74:22
**modified** [1] - 16:9
**modifying** [1] - 62:12
**moment** [4] - 5:17, 12:10, 21:6, 71:20
**moments** [1] - 23:6
**monitoring** [1] - 10:14
**month** [3] - 5:1, 8:14, 62:18
**months** [7] - 24:11, 28:10, 49:6, 58:16, 64:12, 65:21, 72:7
**morning** [4] - 4:17, 12:2, 22:18, 36:17, 52:8
**Morris** [1] - 2:23
**MORRIS** [1] - 2:8
**most** [6] - 5:3, 53:17, 56:14, 60:12, 65:13, 75:1
**mostly** [1] - 52:13
**motion** [4] - 5:5, 7:14, 41:17, 41:18

**motion-to-dismiss** [1] - 7:14
**move** [3] - 42:8, 65:11, 67:18
**moved** [1] - 63:2
**MR** [150] - 5:13, 5:18, 5:24, 6:4, 6:11, 6:14, 6:18, 6:24, 7:5, 7:10, 9:5, 11:21, 11:24, 11:25, 12:15, 14:19, 15:4, 15:16, 15:22, 16:2, 16:7, 16:12, 16:17, 17:12, 17:20, 17:21, 18:8, 18:10, 18:22, 18:24, 19:18, 19:23, 21:9, 22:13, 26:13, 27:2, 27:19, 28:16, 28:21, 28:23, 29:4, 29:6, 30:6, 31:6, 31:14, 31:22, 31:24, 32:24, 33:3, 33:5, 33:23, 34:1, 34:3, 34:5, 34:12, 34:19, 34:23, 35:4, 36:22, 37:1, 37:11, 37:17, 37:19, 38:3, 38:18, 38:20, 38:23, 39:8, 39:13, 39:23, 40:4, 42:8, 42:24, 43:2, 43:6, 43:11, 43:25, 45:3, 45:8, 45:23, 47:9, 47:13, 47:21, 47:24, 48:2, 49:1, 49:4, 49:16, 49:17, 50:2, 50:12, 50:18, 51:13, 51:16, 51:19, 51:25, 52:4, 52:7, 52:11, 53:1, 56:2, 56:17, 56:23, 57:5, 57:20, 58:3, 58:9, 58:18, 59:2, 59:19, 59:24, 60:7, 60:10, 62:9, 62:11, 62:17, 62:24, 63:4, 63:8, 63:20, 63:25, 64:16, 64:19, 64:23, 65:25, 67:4, 67:19, 68:2, 68:19, 69:23, 70:8, 70:15, 70:17, 71:1, 72:1, 72:5, 72:13, 72:21, 73:5, 73:11, 73:18, 74:2, 74:11, 74:19, 74:25, 75:7, 75:8, 75:18, 75:21, 75:24
**MS** [64] - 4:24, 5:9, 5:14, 5:22, 6:3, 6:8, 7:19, 7:22, 7:24, 8:2, 8:7, 8:10, 8:15, 8:20, 9:12, 10:6, 10:13, 10:17, 10:19, 10:22,

10:25, 11:3, 11:7, 12:18, 12:20, 12:22, 12:24, 13:2, 13:3, 13:6, 13:9, 13:11, 13:21, 13:23, 14:8, 14:12, 14:14, 14:16, 14:24, 18:21, 20:5, 23:5, 23:12, 23:16, 23:25, 24:23, 25:5, 26:8, 26:20, 26:24, 52:13, 52:25, 53:2, 53:10, 53:13, 54:20, 54:25, 55:6, 55:9, 55:21, 60:12, 61:16, 61:21, 62:4
**multiple** [2] - 29:9, 31:21
**Mylan** [17] - 2:15, 5:10, 12:13, 13:15, 13:25, 38:15, 50:4, 57:5, 57:6, 57:7, 57:24, 58:11, 58:16, 58:19, 58:23, 59:5, 60:22
**Mylan's** [2] - 35:23, 57:22
**mystery** [1] - 32:15

## N

**name** [5] - 4:8, 12:13, 14:13, 26:7, 54:4
**names** [4] - 19:13, 35:21, 66:10, 66:12
**natural** [1] - 64:19
**NE** [1] - 2:18
**necessary** [3] - 18:3, 41:14, 62:13
**need** [25] - 10:15, 20:21, 21:18, 23:15, 30:15, 30:25, 31:1, 42:8, 43:22, 62:7, 64:5, 66:5, 66:12, 66:17, 69:2, 69:4, 73:8, 73:15, 74:7, 74:8, 74:9, 74:12, 74:14, 74:21, 76:11
**needed** [1] - 69:18
**needs** [5] - 8:4, 9:22, 27:6, 57:7, 62:21
**negotiated** [2] - 36:15, 36:21
**never** [7] - 37:20, 38:3, 39:19, 42:1, 49:1, 53:12, 65:12
**new** [3] - 6:20, 31:4, 41:17
**NEW** [1] - 1:1
**New** [7] - 1:8, 1:15, 1:21, 2:23, 3:7,

25:16
**news** [1] - 52:13
**next** [27] - 6:12, 7:14, 8:17, 20:16, 28:15, 28:16, 33:2, 33:4, 33:5, 49:6, 50:25, 51:15, 51:18, 51:19, 52:6, 52:7, 52:11, 57:4, 57:5, 58:16, 59:24, 65:21, 68:17, 72:5, 72:7, 76:9, 76:10
**night** [2] - 22:17, 59:25
**nine** [1] - 24:11
**nitpicky** [1] - 54:13
**NJ** [1] - 76:21
**NJ-CRCR** [1] - 76:21
**non** [1] - 54:2
**non-recalled** [1] - 54:2
**notably** [1] - 53:17
**note** [2] - 25:13, 59:20
**notes** [1] - 7:16
**nothing** [4] - 42:15, 52:3, 57:16, 75:7
**noticed** [1] - 54:6
**nuclear** [1] - 24:7
**NUMBER** [1] - 1:3
**Number** [7] - 4:6, 52:15, 52:19, 53:3, 53:8, 53:22, 53:25
**number** [6] - 9:16, 22:25, 30:6, 42:18, 52:23, 64:25
**numbered** [1] - 34:16
**numbers** [5] - 9:20, 28:25, 32:18, 32:21, 32:22

## O

**object** [2] - 63:3, 76:4
**objecting** [1] - 69:13
**objection** [8] - 9:11, 39:20, 39:23, 48:16, 58:7, 62:21, 63:13, 64:20
**objections** [11] - 62:20, 63:7, 63:11, 63:16, 64:6, 64:15, 64:17, 65:5, 65:22, 76:6
**objects** [1] - 58:16
**obligation** [2] - 40:24, 41:2
**obtain** [2] - 21:23, 25:21
**obvious** [3] - 25:7, 51:12, 71:16
**obviously** [15] - 16:24,

21:18, 22:11, 26:21, 30:14, 31:3, 31:5, 33:6, 40:7, 51:7, 67:14, 70:18, 71:1, 73:7, 75:5
**October** [6] - 62:25, 63:19, 65:5, 65:10, 68:12, 72:20
**OF** [1] - 1:1
**off-the-record** [3] - 66:13, 67:7, 69:10
**Official** [1] - 1:23
**omnibus** [1] - 74:9
**once** [3] - 55:18, 65:14, 66:21
**one** [56] - 10:9, 12:10, 14:8, 16:17, 16:18, 18:10, 22:25, 23:7, 23:11, 27:6, 29:17, 29:23, 30:12, 30:18, 31:14, 31:18, 35:7, 35:12, 35:23, 35:24, 36:16, 36:22, 38:15, 38:24, 39:22, 39:25, 40:19, 42:3, 43:11, 43:12, 43:13, 44:20, 49:17, 49:20, 51:1, 52:7, 52:11, 52:12, 54:2, 54:4, 54:11, 54:24, 57:6, 58:24, 59:17, 59:22, 60:3, 64:22, 65:25, 67:11, 69:19, 69:21, 72:7, 74:8, 74:12, 75:8
**One** [1] - 2:14
**ones** [2] - 15:7, 57:10
**ongoing** [2] - 55:16, 56:12
**open** [2] - 4:1, 27:23
**opening** [1] - 47:2
**opens** [1] - 27:23
**operating** [1] - 21:18
**operations** [1] - 27:12
**opportunity** [3] - 27:3, 27:14, 66:21
**opposed** [3] - 21:25, 29:21, 70:24
**option** [1] - 24:7
**order** [44] - 8:3, 9:25, 10:2, 10:6, 11:1, 11:2, 19:22, 20:3, 20:20, 23:14, 27:15, 27:21, 28:3, 28:12, 28:17, 28:19, 31:16, 32:1, 32:17, 33:1, 41:7, 41:11, 43:16, 43:21, 44:4, 44:8, 44:15, 44:21, 45:15, 46:14, 46:22, 46:23, 47:22, 48:6, 48:11,

51:10, 55:24, 56:10, 56:18, 57:1, 58:25, 59:10, 65:17, 73:19
**Order** [4] - 28:20, 54:22, 58:3, 71:21
**order-to-show-cause** [1] - 10:2
**ordered** [3] - 30:21, 55:23, 56:15
**orders** [1] - 8:4
**ordinary** [1] - 34:6
**organic** [1] - 69:15
**organization** [5] - 16:20, 16:21, 17:2, 70:25, 71:3
**organizational** [1] - 70:19
**organizations** [1] - 24:1
**original** [1] - 56:4
**Orleans** [1] - 1:21
**otherwise** [4] - 7:20, 27:12, 47:2, 69:5
**ought** [1] - 36:21
**ourselves** [2] - 21:1, 29:22
**outset** [1] - 9:19
**outside** [1] - 55:22
**over-the-counter** [1] - 27:10
**overall** [2] - 30:8, 75:11
**overlap** [1] - 16:13
**overrule** [1] - 64:21
**owned** [1] - 25:24
**owns** [1] - 17:16
**Oxford** [1] - 2:14

## P

**P.C** [2] - 1:16, 3:2
**p.m** [5] - 1:9, 4:2, 42:11, 76:15
**Pacific** [1] - 2:3
**package** [1] - 17:13
**PACKARD** [1] - 2:2
**page** [2] - 27:6, 48:6
**Page** [3] - 28:23, 53:13, 53:16
**pages** [11] - 20:13, 30:7, 30:15, 31:12, 31:13, 32:10, 35:24, 40:22, 40:23, 41:3
**Pandora's** [1] - 47:2
**panel** [1] - 7:9
**papers** [1] - 11:20
**Paragraph** [11] - 28:23, 29:1, 29:8, 29:24, 43:17, 44:3, 44:20, 44:21, 45:1,

48:2, 48:5
**PAREKH** [44] - 2:3, 9:5, 22:13, 26:13, 33:3, 33:5, 33:23, 34:1, 34:3, 34:5, 34:12, 34:19, 36:22, 37:1, 37:11, 37:17, 37:19, 38:3, 38:18, 38:20, 38:23, 39:8, 39:13, 39:23, 45:3, 45:8, 49:17, 50:12, 51:16, 51:19, 51:25, 52:4, 52:7, 52:11, 56:2, 57:5, 57:20, 58:3, 58:9, 58:18, 59:19, 59:24, 60:7, 60:10
**parent** [3] - 13:14, 54:7, 54:8
**parentheses** [1] - 45:16
**Parkway** [2] - 1:14, 3:3
**part** [12] - 16:24, 17:1, 43:25, 44:2, 44:15, 55:4, 57:14, 59:4, 59:6, 59:9, 62:13, 62:15
**partially** [1] - 25:8
**participate** [1] - 43:7
**particular** [1] - 11:15
**parties** [7] - 4:8, 22:3, 23:7, 36:21, 63:23, 65:6, 68:11
**parts** [2] - 11:13, 18:8
**party** [3] - 25:21, 25:25, 47:15
**pass** [1] - 62:1
**paste** [1] - 34:14
**patent** [3] - 39:22, 41:25, 56:11
**patient** [4] - 35:19, 38:16, 39:9, 40:23
**patients'** [1] - 35:20
**pay** [1] - 56:15
**PC** [1] - 2:21
**pending** [1] - 9:13
**Pennsylvania** [4] - 1:18, 2:10, 2:15, 3:3
**people** [9] - 9:6, 56:14, 63:14, 66:8, 66:11, 66:15, 67:8, 67:9, 69:21, 71:15, 71:23, 71:24, 71:25, 74:10
**per** [2] - 43:17, 59:10
**perfect** [1] - 18:7
**perfectly** [2] - 66:24, 69:13
**perhaps** [1] - 24:24,

59:18
**period** [1] - 47:20
**peripheral** [1] - 74:10
**person** [8] - 54:11, 55:1, 68:10, 69:16, 76:9, 76:10, 76:11
**personal** [3] - 9:15, 10:11, 10:22
**PFS** [1] - 9:7
**Pharm** [2] - 13:18, 13:20
**Pharma** [9] - 2:20, 3:4, 3:4, 3:7, 12:20, 13:12, 13:24, 18:21, 18:22
**pharmaceutical** [1] - 27:10
**Pharmaceutical** [3] - 2:19, 14:1, 14:2
**Pharmaceuticals** [7] - 2:11, 2:12, 2:15, 2:20, 3:8, 14:1, 14:3
**Philadelphia** [2] - 1:18, 2:10
**phone** [1] - 76:11
**piece** [1] - 23:1
**pieces** [1] - 23:1
**Piedmont** [1] - 2:18
**PIETRAGALLO** [1] - 2:13
**Pittsburgh** [1] - 2:15
**place** [2] - 5:1, 20:17
**plain** [1] - 44:7
**plaintiff** [7] - 10:7, 11:18, 41:8, 41:20, 59:12, 62:8, 63:2
**Plaintiff** [5] - 1:15, 1:18, 1:21, 2:4, 2:7
**plaintiffs** [32] - 4:25, 8:23, 9:13, 9:21, 9:22, 10:14, 11:5, 18:6, 20:19, 21:2, 23:19, 24:5, 24:11, 25:14, 26:10, 31:25, 32:3, 35:5, 36:9, 40:10, 40:12, 41:13, 41:19, 42:22, 44:11, 44:16, 55:22, 59:12, 63:5, 70:13, 73:21
**plaintiffs'** [8] - 8:13, 10:5, 10:11, 32:20, 35:8, 36:19, 40:18, 41:22
**PLLC** [1] - 2:5
**point** [18] - 5:6, 8:4, 9:8, 10:9, 18:2, 19:8, 21:1, 24:17, 25:3, 31:2, 33:20, 35:8, 56:5, 60:20, 71:12, 73:7, 73:8, 73:15

**POLETTO** [11] - 2:21, 2:22, 14:12, 14:14, 14:16, 20:5, 23:5, 23:12, 23:16, 23:25, 24:23
**Poletto** [2] - 14:14, 20:5
**policies** [4] - 61:4, 61:7, 61:14, 61:18
**policy** [2] - 60:17, 60:18
**POLIFRONI** [1] - 2:21
**portion** [1] - 39:4
**position** [11] - 15:18, 20:4, 20:7, 20:21, 25:8, 43:19, 57:9, 58:22, 58:24, 63:9
**positions** [1] - 65:18
**possession** [4] - 18:15, 20:10, 24:6, 50:9
**practical** [5] - 25:16, 41:8, 41:21, 49:10, 69:1
**practically** [1] - 56:23
**predict** [1] - 4:16
**prefer** [1] - 21:25
**prejudice** [1] - 28:2
**prejudiced** [1] - 9:24
**preliminary** [1] - 66:22
**prepare** [1] - 11:1
**prepared** [1] - 22:11
**presence** [1] - 27:8
**present** [2] - 27:15, 59:14
**presented** [1] - 7:9
**pressing** [2] - 34:22, 36:16
**presumably** [1] - 75:3
**pretty** [4] - 29:2, 31:12, 45:19, 65:15
**previously** [1] - 21:21
**pricing** [2] - 74:16, 74:22
**Prinston** [4] - 2:11, 51:3, 61:1, 64:4
**private** [2] - 35:19, 40:24
**privilege** [5] - 39:7, 39:8, 39:10, 40:2, 42:2
**privileged** [1] - 54:19
**problem** [11] - 8:10, 10:21, 10:24, 15:4, 33:19, 39:2, 42:2, 46:13, 61:10, 68:19, 72:15
**procedural** [1] - 10:8
**procedure** [2] - 10:3, 42:6

**proceed** [1] - 12:10
**proceeding** [1] - 4:12
**Proceedings** [1] - 1:25
**proceedings** [3] - 42:14, 76:15, 76:19
**PROCEEDINGS** [1] - 4:1
**process** [15] - 5:2, 10:8, 30:19, 36:4, 40:21, 41:24, 66:3, 67:16, 68:5, 68:6, 68:9, 69:11, 69:21, 70:9, 73:12
**produce** [31] - 20:3, 24:21, 26:14, 28:7, 32:1, 32:2, 33:18, 34:10, 34:15, 35:25, 37:12, 37:17, 38:5, 38:25, 39:15, 40:1, 40:12, 41:3, 44:25, 45:10, 46:5, 46:21, 47:11, 48:7, 49:18, 51:22, 57:7, 60:18, 75:10
**produced** [65] - 1:25, 19:22, 20:19, 22:10, 22:16, 22:22, 22:23, 23:17, 23:19, 26:7, 26:8, 26:9, 29:11, 29:21, 30:1, 30:13, 30:23, 31:2, 31:20, 33:12, 33:17, 33:21, 33:24, 34:1, 34:5, 35:5, 35:7, 35:23, 36:20, 36:23, 40:9, 40:11, 41:11, 41:23, 41:25, 42:1, 44:2, 44:4, 44:23, 45:20, 47:14, 49:3, 49:12, 50:1, 50:6, 50:9, 51:3, 51:5, 51:10, 54:7, 54:10, 54:23, 56:6, 56:16, 57:13, 58:19, 58:21, 60:17, 61:4, 61:17, 61:22, 67:15, 75:14, 75:17
**produces** [1] - 46:9
**producing** [6] - 28:2, 34:22, 35:13, 38:6, 46:2, 52:17
**product** [6] - 14:10, 14:17, 44:14, 47:19, 71:25
**product/dose** [6] - 12:16, 44:24, 45:9, 45:20, 49:14, 49:20
**production** [30] - 18:13, 18:17, 19:7, 19:11, 20:9, 21:6,

29:20, 30:8, 33:19, 38:2, 40:9, 41:17, 44:8, 47:3, 47:17, 50:22, 51:2, 52:17, 52:20, 53:4, 53:5, 54:6, 54:9, 55:12, 55:24, 56:3, 56:4, 56:20, 59:25, 60:1
**productions** [10] - 33:6, 39:6, 43:14, 43:16, 43:20, 43:23, 56:9, 60:20, 61:2, 61:5
**products** [6] - 27:10, 43:19, 46:10, 46:11, 48:10, 59:8
**PRODUCTS** [1] - 1:4
**progress** [1] - 4:16
**pronounce** [1] - 54:5
**properly** [1] - 18:6
**proposal** [2] - 36:19, 55:9
**propose** [2] - 68:8, 70:8
**proposed** [5] - 8:24, 10:6, 63:4, 67:22, 70:21
**protects** [1] - 10:4
**protocol** [12] - 33:9, 33:11, 35:7, 35:14, 36:14, 36:20, 36:23, 37:13, 37:15, 37:18, 40:13, 69:23
**provide** [12] - 15:8, 16:19, 17:8, 29:16, 32:12, 53:20, 61:12, 62:20, 64:17, 68:21, 70:21, 70:22
**provided** [6] - 44:18, 50:24, 54:1, 59:5, 59:6, 75:12
**providing** [3] - 50:7, 50:21
**provision** [1] - 33:10
**proviso** [3] - 41:14, 50:6, 50:10
**public** [1] - 27:4
**publicly** [1] - 57:12
**pulling** [1] - 40:22
**pursuant** [3] - 4:22, 19:15, 40:13
**pursue** [1] - 19:25
**pushing** [1] - 34:8
**put** [13] - 18:2, 18:5, 20:21, 34:15, 49:8, 59:16, 59:21, 67:21, 67:23, 69:25, 73:6, 73:19, 75:12
**putting** [2] - 14:21, 60:13

## Q

**quality** [1] - 71:5
**questions** [2] - 23:18, 71:17
**quick** [2] - 5:5, 59:1
**quickly** [2] - 32:2, 68:22
**quite** [2] - 20:8
**quote** [1] - 27:8

## R

**rabbit** [1] - 24:8
**raise** [2] - 6:19, 60:4
**raised** [3] - 11:18, 40:10, 67:20
**range** [2] - 29:12, 31:17
**ranges** [1] - 29:17
**RASPANTI** [1] - 2:13
**rather** [2] - 49:9, 56:13
**RDR** [1] - 76:21
**RE** [1] - 1:4
**re** [1] - 32:9
**re-review** [1] - 32:9
**reached** [1] - 12:6
**react** [1] - 68:9
**read** [5] - 4:15, 13:10, 45:21, 45:23, 48:12
**reading** [2] - 45:18, 59:3
**ready** [1] - 42:13
**real** [1] - 58:25
**reality** [1] - 36:12
**realize** [1] - 5:24
**really** [20] - 19:6, 19:7, 20:7, 20:15, 20:25, 24:7, 27:2, 27:4, 27:13, 27:14, 30:10, 32:14, 45:8, 64:24, 65:15, 66:5, 66:8, 66:10, 66:12, 72:1
**reanalyze** [1] - 31:5
**reason** [9] - 33:12, 36:18, 39:13, 44:17, 45:3, 54:9, 57:14, 58:9, 64:13
**reasonable** [1] - 32:3
**reasonably** [1] - 49:9
**reasons** [2] - 51:12, 60:19
**reassurance** [1] - 61:13
**recalled** [4] - 54:1, 54:2, 58:20, 58:23
**recap** [1] - 60:14
**received** [5] - 21:4, 56:8, 59:7, 61:24, 62:2

**recently** [1] - 56:21
**recess** [1] - 42:11
**recite** [1] - 11:25
**recollect** [1] - 8:9
**recollection** [2] - 7:1, 40:7
**reconsider** [1] - 65:18
**record** [21] - 4:5, 7:1, 27:3, 27:15, 35:6, 40:6, 40:14, 42:13, 51:1, 51:6, 52:16, 53:5, 59:17, 59:21, 61:3, 61:13, 66:13, 67:7, 69:10, 75:12, 76:19
**recorded** [1] - 1:25
**recreate** [1] - 33:20
**redact** [1] - 40:24
**redacted** [4] - 35:19, 35:20, 39:1, 39:3
**redaction** [1] - 39:7
**redactions** [8] - 38:14, 38:15, 39:8, 39:9, 39:10, 39:25, 40:2, 41:13
**Redondo** [1] - 2:4
**redundant** [1] - 49:24
**REEFER** [1] - 2:14
**reference** [1] - 15:11
**referenced** [1] - 45:5
**references** [1] - 56:3
**referencing** [1] - 25:1
**referred** [5] - 45:1, 45:15, 45:17, 49:22, 66:16
**referring** [3] - 28:17, 45:11, 53:9
**reflect** [4] - 21:4, 29:14, 57:22, 59:20
**regard** [4] - 43:14, 48:19, 48:22, 49:19
**regarding** [10] - 44:5, 45:10, 49:13, 57:9, 57:13, 57:24, 66:4, 66:14, 71:23, 72:24
**regularly** [1] - 38:11
**regulatory** [1] - 66:12
**rejected** [1] - 36:19
**relate** [5] - 20:10, 43:20, 46:10, 71:6, 74:15
**related** [1] - 13:3
**relates** [1] - 57:10
**relationship** [2] - 17:8, 23:10
**relationships** [3] - 23:22, 23:23, 24:25
**relevancy** [1] - 58:17
**relevant** [6] - 14:20, 15:25, 30:24, 58:10,

58:12, 69:22
**relish** [1] - 27:3
**reluctance** [1] - 27:23
**relying** [4] - 25:15, 29:19, 30:16, 56:14
**remainder** [4] - 49:19, 49:25, 52:8
**remaining** [2] - 50:20, 53:21
**remember** [4] - 9:4, 18:18, 46:1, 68:1
**remind** [1] - 63:21
**remove** [1] - 29:18
**renumbered** [1] - 8:3
**rep** [1] - 22:1
**repeated** [1] - 45:25
**replacing** [1] - 45:12
**reporter** [1] - 4:8
**Reporter** [1] - 1:23
**REPORTER** [3] - 14:13, 23:24, 26:22
**Reporter/ Transcriber** [1] - 76:21
**Reports** [1] - 44:6
**reports** [6] - 22:11, 22:14, 44:6, 48:17, 50:23, 53:23
**represent** [6] - 20:23, 23:11, 25:2, 36:6, 55:11, 63:24
**representation** [2] - 40:15, 60:2
**representations** [1] - 23:21
**representative** [1] - 21:11
**represented** [2] - 51:14, 55:18
**representing** [2] - 40:2, 41:9
**represents** [1] - 21:10
**reproduce** [1] - 35:22
**reps** [3] - 10:16, 10:17, 10:18
**request** [13] - 19:21, 27:17, 27:20, 31:12, 32:20, 36:18, 37:25, 49:7, 49:8, 55:24, 58:6, 71:2, 74:9
**requested** [2] - 25:22, 32:13
**requesting** [1] - 31:25
**requests** [21] - 16:25, 25:24, 49:12, 56:14, 57:2, 62:13, 62:18, 63:9, 63:10, 63:22, 64:1, 64:25, 65:4, 69:25, 70:2, 70:20, 71:8, 71:23, 72:25,

76:5
**require** [1] - 32:20
**required** [1] - 33:11
**requirement** [2] - 33:24, 56:24
**requiring** [1] - 47:2
**reschedule** [1] - 65:9
**resend** [2] - 8:7, 8:8
**reservation** [1] - 61:23
**resolve** [6] - 43:22, 51:16, 52:2, 52:8, 65:7, 72:23
**resolved** [5] - 11:19, 36:17, 50:19, 50:20, 59:16
**resolves** [1] - 60:1
**respect** [7] - 9:25, 44:9, 46:12, 50:3, 50:4, 59:9, 68:4
**respond** [5] - 7:14, 8:23, 9:8, 70:2, 73:1
**responded** [1] - 60:25
**responding** [2] - 47:15, 64:1
**RESPONSE** [1] - 76:14
**response** [6] - 30:1, 50:3, 50:15, 55:17, 64:5, 64:19
**responses** [2] - 53:19, 64:14
**responsible** [1] - 44:13
**responsive** [7] - 28:25, 29:24, 30:13, 47:12, 51:7, 51:10, 73:21
**rest** [2] - 24:20, 76:12
**results** [3] - 19:4, 30:17, 57:21
**retailers** [1] - 71:23
**review** [9] - 22:19, 32:4, 32:9, 35:14, 36:2, 36:4, 40:20, 41:1, 60:2
**reviewing** [4] - 35:18, 41:4, 55:13, 62:14
**reviews** [1] - 35:15
**revolving** [1] - 15:16
**rights** [2] - 25:20, 61:23
**risk** [3] - 24:18, 28:5, 28:8
**risks** [1] - 28:1
**RMR** [1] - 76:21
**Road** [1] - 2:18
**road** [1] - 64:12
**ROBERT** [1] - 2:22
**robust** [1] - 66:13
**role** [2] - 17:9, 20:24

**rolling** [4] - 10:4, 10:23, 62:14, 65:24
**Roseland** [1] - 1:15
**roughly** [1] - 4:25
**RUBEN** [1] - 1:17
**RUBENSTEIN** [1] - 2:17
**rule** [3] - 28:4, 41:25, 49:9
**Rule** [6] - 25:19, 49:7, 55:5, 58:6, 58:15, 72:24
**rules** [1] - 56:11
**ruling** [2] - 24:15, 58:12
**rulings** [1] - 8:18
**run** [2] - 11:4, 62:25
**running** [2] - 8:21, 28:5

## S

**sale** [1] - 17:5
**sales** [1] - 74:22
**sanction** [1] - 35:17
**sartans** [7] - 6:17, 7:3, 7:6, 7:11, 15:14, 16:10
**saving** [1] - 7:13
**saw** [1] - 6:19
**schedule** [3] - 28:14, 62:12, 62:23
**Schneider** [1] - 4:2
**SCHNEIDER** [1] - 1:10
**SCHWARTZ** [5] - 2:9
**scope** [5] - 12:9, 16:9, 54:17, 54:21, 58:1
**se** [1] - 59:10
**search** [15] - 66:4, 66:18, 67:13, 67:16, 67:23, 68:16, 68:22, 69:24, 69:25, 70:13, 72:18, 73:2, 73:16, 73:22, 76:6
**seated** [1] - 4:4
**second** [1] - 16:18
**Section** [4] - 29:9, 29:18, 29:24
**Sections** [1] - 44:21
**sections** [1] - 30:2
**see** [16] - 4:20, 11:12, 11:19, 19:12, 31:4, 31:9, 55:3, 57:12, 58:7, 60:16, 60:22, 63:11, 68:18, 72:10, 72:20, 74:20
**seed** [1] - 74:22
**seeing** [2] - 8:9, 57:15
**seek** [1] - 75:4
**seem** [2] - 21:19,

21:21
**segregate** [2] - 38:22, 38:24
**self** [1] - 29:2
**sell** [1] - 17:14
**send** [4] - 7:20, 7:25, 19:4
**sending** [2] - 34:8, 68:20
**sense** [8] - 11:23, 21:6, 24:16, 41:11, 45:9, 72:3, 75:13
**sent** [8] - 7:23, 33:13, 34:13, 54:11, 55:25, 56:25, 60:23, 61:1
**Sentry** [1] - 3:3
**separate** [3] - 10:19, 48:3, 56:13
**September** [9] - 6:10, 66:6, 68:12, 72:19, 73:3, 73:19, 76:10, 76:12, 76:23
**serve** [2] - 62:12, 62:17
**served** [9] - 5:8, 14:11, 14:23, 14:25, 19:11, 19:15, 20:2, 24:16, 60:21
**service** [6] - 4:22, 5:2, 5:20, 9:9, 14:22, 25:9
**session** [1] - 36:9
**set** [6] - 8:20, 9:5, 28:14, 65:8, 69:25, 72:25
**SETH** [1] - 2:9
**sets** [1] - 63:22
**settles** [1] - 74:6
**seven** [1] - 56:24
**seven-day** [1] - 56:24
**several** [1] - 72:7
**shall** [1] - 48:7
**shattering** [1] - 55:5
**sheet** [2] - 10:7, 11:22
**sheets** [3] - 8:13, 10:11, 65:23
**short** [7] - 4:11, 7:16, 9:2, 9:20, 42:5, 56:5
**short-form** [1] - 7:16
**show** [4] - 10:2, 10:8, 21:17, 24:14
**side** [5] - 19:10, 33:8, 48:18, 60:15, 73:6
**significant** [5] - 27:8, 30:7, 32:10, 36:5, 39:15
**significantly** [1] - 21:1
**simple** [2] - 36:16, 40:21
**simply** [6] - 36:18,

38:24, 40:18, 44:16, 45:11, 57:16
**single** [1] - 34:15
**sit** [1] - 66:25
**situation** [2] - 24:24, 25:12
**situations** [1] - 24:25
**six** [3] - 31:11, 64:12, 68:17
**size** [1] - 31:7
**Slater** [3] - 15:3, 43:4, 47:23
**SLATER** [63] - 1:13, 1:14, 5:13, 5:18, 5:24, 7:5, 11:21, 11:25, 12:15, 14:19, 15:4, 15:16, 15:22, 16:2, 16:7, 16:12, 16:17, 17:12, 17:21, 18:8, 18:10, 18:22, 18:24, 19:18, 19:23, 21:9, 28:16, 28:21, 28:23, 29:4, 29:6, 30:6, 42:8, 43:6, 43:11, 47:24, 48:2, 49:1, 49:16, 50:18, 53:1, 62:11, 62:17, 62:24, 65:25, 67:4, 68:19, 70:15, 70:17, 71:1, 72:1, 72:5, 72:13, 72:21, 73:5, 73:11, 74:11, 74:19, 74:25, 75:8, 75:18, 75:21, 75:24
**Slater's** [1] - 53:9
**Slow** [1] - 53:1
**small** [2] - 30:9, 64:25
**smaller** [1] - 9:16
**smoothly** [1] - 65:15
**Solco** [3] - 2:11, 51:3, 61:1
**sold** [1] - 75:3
**someone** [6] - 5:11, 34:21, 38:21, 61:12, 69:9, 69:14
**sometime** [3] - 6:12, 65:7, 65:8
**somewhat** [2] - 22:4, 30:7
**soon** [3] - 49:9, 56:25, 57:2
**sophisticated** [1] - 28:1
**sorry** [12] - 7:22, 13:13, 14:2, 14:9, 14:13, 23:24, 23:25, 26:23, 26:24, 34:19, 36:24, 53:10
**sort** [6] - 22:12, 57:6, 58:19, 59:17, 70:25,

74:10
**sounds** [1] - 41:23
**South** [2] - 2:3, 2:10
**speaking** [1] - 56:23
**specific** [12] - 11:14, 15:13, 32:21, 33:15, 37:6, 38:16, 41:21, 43:8, 44:22, 48:17, 50:17, 58:20
**specifically** [6] - 25:1, 35:4, 40:10, 45:1, 45:17, 56:3
**spot** [1] - 53:14
**Springfield** [1] - 2:23
**stage** [1] - 47:3
**staggered** [1] - 22:5
**stamp** [1] - 42:3
**standard** [1] - 21:20
**start** [15] - 52:15, 62:8, 64:11, 65:23, 66:3, 66:5, 66:6, 66:12, 66:17, 66:20, 68:22, 71:9, 72:3, 73:3, 74:19
**started** [2] - 23:6, 75:16
**starting** [3] - 5:2, 22:24, 67:15
**statement** [1] - 48:6
**states** [1] - 44:8
**States** [2] - 4:2, 46:19
**STATES** [2] - 1:1, 1:11
**stating** [1] - 25:7
**STATUS** [1] - 1:5
**status** [1] - 35:2
**stenography** [1] - 1:25
**step** [2] - 20:16, 68:6
**STEVEN** [1] - 2:18
**still** [2] - 4:25, 62:14
**story** [1] - 17:10
**straighten** [1] - 12:11
**straightened** [1] - 74:6
**strategic** [2] - 24:13, 24:17
**Street** [4] - 1:17, 1:20, 2:10, 3:10
**Streets** [1] - 1:7
**strict** [1] - 25:19
**strike** [2] - 38:4, 38:7
**struck** [1] - 27:13
**structure** [4] - 33:14, 33:18, 33:20, 71:17
**structured** [5] - 33:10, 36:23, 36:24, 37:1, 37:20
**studies** [1] - 35:20
**style** [1] - 7:10
**Sub** [1] - 48:21

**sub** [1] - 45:6
**subcategories** [1] - 31:18
**subject** [7] - 15:7, 20:2, 44:21, 47:17, 50:10, 57:10, 59:8
**submission** [2] - 10:20, 55:3
**submit** [2] - 10:6, 35:11
**submitted** [3] - 35:9, 37:25, 55:17
**submitting** [2] - 8:17, 10:10
**subnumbers** [1] - 45:2
**Subparagraph** [3] - 44:3, 48:4, 48:12
**subsidiaries** [3] - 19:17, 51:3, 51:11
**subsidiary** [2] - 17:9, 20:24
**substantial** [2] - 20:9
**sufficient** [2] - 21:3, 22:8
**suggest** [1] - 66:14
**suggested** [1] - 62:22
**suggesting** [1] - 46:15
**suggestion** [1] - 40:18
**suggestions** [1] - 67:17
**suit** [1] - 25:10
**Suite** [4] - 1:17, 2:6, 2:18, 3:10
**summarizing** [1] - 65:17
**summer** [1] - 76:13
**supplement** [1] - 55:18
**supplemental** [4] - 50:21, 55:23, 56:2, 56:8
**supplementation** [1] - 57:1
**supplementing** [5] - 52:16, 52:20, 53:5, 53:19, 55:11
**supplied** [4] - 44:10, 47:7, 47:18, 48:14
**supplier** [1] - 47:11
**suppliers** [4] - 12:12, 46:18, 46:19, 46:20
**supply** [1] - 72:8
**support** [1] - 27:5
**system** [1] - 37:3

**T**

**T-R-U-E-M-P-E-R** [1] - 54:6

**table** [2] - 35:8, 42:8
**tabular** [1] - 37:6
**talks** [1] - 36:23
**tangent** [1] - 27:25
**target** [1] - 8:21
**team** [1] - 43:6
**technical** [1] - 19:13
**technically** [1] - 39:10
**teed** [1] - 66:19
**ten** [1] - 24:11
**tens** [1] - 36:8
**term** [1] - 73:2
**terms** [3] - 21:19, 22:20, 22:23, 26:19, 38:12, 42:17, 66:4, 66:18, 67:13, 67:17, 67:23, 68:16, 68:22, 69:24, 69:25, 70:3, 70:14, 72:19, 73:15, 73:16, 73:22, 75:11, 76:6
**terribly** [1] - 41:24
**terrific** [1] - 8:19
**Terrific** [1] - 17:11
**terrorists** [1] - 7:13
**test** [5] - 19:4, 25:17, 25:19, 25:20, 30:16
**testing** [10] - 30:14, 30:23, 31:4, 32:8, 53:17, 55:15, 55:16, 57:21, 57:23, 71:14
**tests** [1] - 30:20
**Teva** [17] - 2:19, 2:20, 8:16, 12:17, 13:4, 13:5, 14:1, 14:2, 52:11, 52:14, 52:19, 53:5, 53:18, 55:2, 57:4, 61:3, 61:16
**THE** [185] - 1:1, 1:10, 4:3, 5:7, 5:15, 5:21, 6:1, 6:5, 6:9, 6:13, 6:15, 6:22, 7:1, 7:8, 7:12, 7:21, 7:23, 8:1, 8:6, 8:8, 8:11, 8:19, 9:2, 9:11, 9:23, 10:12, 10:16, 10:18, 10:21, 10:24, 11:1, 11:4, 11:8, 12:10, 12:16, 12:19, 12:21, 12:23, 12:25, 13:8, 13:10, 13:20, 13:22, 14:6, 14:10, 14:13, 14:15, 14:17, 15:2, 15:13, 15:20, 15:24, 16:5, 16:8, 16:15, 17:11, 17:19, 18:4, 18:9, 18:23, 19:12, 19:19, 19:24, 21:2, 22:7, 23:3, 23:6, 23:14, 23:24, 24:4,

25:4, 26:6, 26:10, 26:22, 27:17, 27:20, 28:20, 28:22, 29:2, 29:5, 30:4, 31:21, 31:23, 32:16, 32:25, 33:4, 33:21, 33:25, 34:2, 34:4, 34:7, 34:18, 34:21, 35:3, 36:24, 37:9, 37:16, 37:18, 37:22, 38:17, 38:19, 38:21, 39:6, 39:12, 39:20, 39:24, 41:6, 42:10, 42:12, 42:25, 43:3, 43:8, 44:19, 45:7, 45:14, 47:6, 47:10, 47:16, 47:23, 48:1, 48:24, 49:2, 49:5, 50:13, 50:16, 51:15, 51:18, 51:24, 52:3, 52:5, 52:10, 53:8, 53:12, 54:18, 54:24, 55:4, 55:7, 55:20, 55:22, 56:10, 56:22, 57:4, 57:18, 57:25, 58:5, 58:12, 58:25, 59:23, 60:4, 60:9, 62:2, 62:6, 62:16, 62:23, 63:1, 63:6, 63:18, 63:24, 64:8, 64:18, 64:22, 65:4, 67:2, 67:11, 67:25, 70:7, 70:11, 70:16, 70:24, 71:19, 72:4, 72:12, 72:17, 72:22, 73:10, 73:17, 73:19, 74:4, 74:17, 74:21, 75:6, 75:15, 75:19, 75:23, 76:3

**themselves** [1] - 27:7
**theory** [1] - 54:16
**therefore** [2] - 39:4, 45:8
**they've** [4] - 5:4, 20:18, 26:1, 27:7
**third** [1] - 6:17
**Third** [1] - 25:18
**thousands** [1] - 36:8
**three** [3] - 35:23, 49:6, 75:16
**time-intensive** [1] - 65:13
**timely** [1] - 60:6
**timing** [2] - 67:25, 68:2
**today** [10] - 4:18, 7:17, 7:21, 12:2, 15:18, 36:9, 56:6, 59:5, 59:9, 61:5
**together** [5] - 23:1,

55:8, 62:6, 67:21, 67:23
**Tom** [1] - 34:20
**took** [2] - 41:1, 49:24
**topic** [1] - 57:7
**topics** [1] - 57:6
**Torrent** [12] - 3:7, 3:8, 5:18, 5:23, 12:17, 14:2, 14:19, 52:1, 52:6, 52:7, 52:9, 61:3
**touch** [2] - 21:13, 66:1
**touches** [1] - 14:21
**towards** [1] - 69:20
**TPP** [1] - 10:14
**track** [3] - 6:9, 8:13, 8:16
**transcript** [2] - 1:25, 76:18
**transcription** [1] - 1:25
**transparent** [1] - 69:5
**TRAURIG** [1] - 2:16
**tried** [2] - 12:11, 19:2
**Trischler** [6] - 34:24, 39:24, 44:1, 45:18, 49:22, 49:24
**TRISCHLER** [17] - 2:13, 34:23, 35:4, 40:4, 43:25, 45:23, 47:9, 47:13, 47:21, 49:4, 50:2, 56:17, 56:23, 59:2, 62:9, 63:4, 63:8
**Trischler's** [1] - 38:12
**trouble** [1] - 38:5
**Truemper** [1] - 54:5
**try** [5] - 11:25, 20:22, 46:1, 54:5, 59:13
**trying** [5] - 29:21, 31:9, 64:6, 64:24, 70:8
**turn** [3] - 26:24, 26:25
**turned** [1] - 26:20
**twice** [1] - 36:11
**two** [16] - 4:18, 7:3, 11:10, 11:13, 15:5, 18:16, 19:25, 22:3, 44:22, 49:6, 50:23, 69:19, 69:21, 71:20, 71:24, 74:8
**type** [3] - 38:16, 56:9, 57:25

## U

**U.S** [6] - 1:7, 2:11, 19:1, 21:10, 26:6, 51:11
**U.S.A** [2] - 20:6, 59:24

**ultimately** [5] - 21:23, 30:8, 30:17, 53:7, 68:25
**umbrella** [1] - 13:5
**unapproved** [1] - 58:4
**under** [6] - 33:9, 33:10, 46:20, 48:12, 58:6, 58:15
**underlying** [1] - 37:3
**underneath** [1] - 57:11
**understandably** [1] - 36:10
**understood** [4] - 11:7, 24:23, 49:16, 69:8
**unexpectedly** [1] - 42:15
**unfortunately** [4] - 4:25, 6:8, 34:25, 56:15
**United** [2] - 4:2, 46:19
**UNITED** [2] - 1:1, 1:11
**unless** [2] - 44:23, 76:11
**unpunished** [1] - 48:25
**unrelated** [1] - 47:4
**unto** [1] - 48:3
**unusable** [1] - 38:6
**up** [8] - 4:13, 34:25, 39:18, 42:12, 42:15, 45:4, 66:19, 76:8
**update** [1] - 52:22
**USA** [10] - 2:20, 2:24, 3:4, 20:10, 21:10, 21:17, 22:15, 23:12, 25:5, 60:17
**usable** [2] - 37:4, 41:9
**usual** [2] - 33:22, 41:23

## V

**vacuum** [1] - 63:11
**valsartan** [13] - 15:14, 15:17, 17:5, 17:9, 17:20, 17:21, 17:22, 17:23, 17:25, 35:24, 43:18, 57:9
**Valsartan** [4] - 4:5, 48:10, 48:17, 48:22
**VALSARTAN** [1] - 1:4
**valsartan-containing** [1] - 35:24
**Valsartan-specific** [1] - 48:17
**various** [1] - 17:22
**vendor** [1] - 36:3
**version** [2] - 8:1, 8:17
**VICTORIA** [1] - 2:17

**Victoria** [2] - 8:15, 54:20
**view** [3] - 24:17, 30:11, 41:8
**Virginia** [1] - 46:9
**visibility** [1] - 66:8
**vivid** [1] - 40:7
**vocabulary** [1] - 71:11
**volume** [1] - 30:4
**voluntarily** [1] - 28:2

## W

**wait** [9] - 6:6, 20:1, 24:11, 28:10, 43:8, 67:12, 67:13, 71:7
**waiting** [1] - 61:10
**waiving** [1] - 71:22
**wall** [2] - 27:11, 27:13
**wants** [2] - 48:15, 69:7
**warning** [1] - 46:10
**Washington** [1] - 7:13
**week** [6] - 6:12, 7:13, 7:14, 8:17, 64:22, 76:1
**weeks** [2] - 68:17
**weigh** [1] - 28:1
**welcome** [2] - 4:4, 27:14
**WERNER** [1] - 3:2
**West** [1] - 46:9
**wheels** [1] - 5:4
**WHITELEY** [3] - 1:19, 1:20, 52:25
**whole** [2] - 12:13, 42:4
**wholesaler** [1] - 74:8
**wholesalers** [1] - 71:23
**wide** [1] - 70:25
**willing** [3] - 59:14, 60:20, 62:1
**wish** [1] - 36:15
**witnesses** [2] - 66:25, 68:4
**word** [1] - 41:5
**Word** [1] - 37:4
**world** [1] - 58:15
**wrestling** [1] - 24:4
**write** [1] - 27:7
**written** [1] - 27:7

## Y

**year** [3] - 5:3, 22:2, 62:15
**years** [1] - 35:11
**York** [2] - 3:7

## Z

**Zhejiang** [1] - 2:12
**ZHP** [17] - 5:15, 6:2, 12:13, 13:16, 14:3, 14:8, 16:22, 50:19, 50:21, 51:2, 51:3, 51:5, 51:6, 60:25, 64:1, 72:10, 75:25
**ZMICK** [1] - 3:9