UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
IN RE:                            )   Case No. 19-MD-2875-RBK-JS
                                  )
VALSARTAN PRODUCTS LIABILITY      )
LITIGATION                        )
                                  )   Camden, NJ
                                  )   September 25, 2019
---------------------------------)    10:10 a.m.
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        ADAM M. SLATER, ESQUIRE
                           MAZIE, SLATER, KATZ & FREEMAN, LLC
                           103 Eisenhower Parkway, 2nd Floor
                           Roseland, NJ  07068

                           BEHRAM V. PAREKH, ESQUIRE
                           KIRTLAND & PACKARD, LLP
                           1638 South Pacific Coast Highway
                           Redondo Beach, CA  90277

                           DANIEL A. NIGH, ESQUIRE
                           COUNSEL NOT ADMITTED TO
                           USDCNJ BAR
                           LEVIN PAPANTONIO
                           316 S. Baylen, Suite 600
                           Pensacola, FL  32502

                           RUBEN HONIK, ESQUIRE
                           GOLOMB & HONIK, PC
                           1835 Market Street, Suite 2900
                           Philadelphia, PA  19103

                           CONLEE S. WHITELEY, ESQUIRE
                           KANNER & WHITELEY, LLC
                           701 Camp Street
                           New Orleans, LA  70130

2

APPEARANCES: Continued

For the Defendants:          LORI G. COHEN, ESQUIRE
                             COUNSEL NOT ADMITTED TO
                             USDCNJ BAR
                             GREENBERG TRAURIG, LLP
                             3333 Piedmont Road, NE
                             Suite 2500
                             Atlanta, GA  30327

                             SETH A. GOLDBERG, ESQUIRE
                             DUANE MORRIS, LLP
                             30 South 17th Street
                             Philadelphia, PA  19103

                             JANET L. POLETTO, ESQUIRE
                             HARDIN, KUNDLA, MCKEON,
                             POLETTO & POLIFRONI, PC
                             673 Morris Avenue
                             P.O. Box 730
                             Springfield, NJ  07801

                             JESSICA M. HEINZ, ESQUIRE
                             CIPRIANI & WERNER, PC
                             450 Sentry Parkway
                             Blue Bell, PA  19422

                             CLEM C. TRISCHLER, ESQUIRE
                             COUNSEL NOT ADMITTED TO
                             USDCNJ BAR
                             PIETRAGALLO GORDON ALFANO
                             BOSICK & RASPANTI, LLP
                             One Oxford Centre
                             38th Floor
                             Pittsburgh, PA  15219


Audio Operator:              SARAH ECKERT


Transcribed by:              DIANA DOMAN TRANSCRIBING, LLC
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026
                             Office:  (856) 435-7172
                             Fax:     (856) 435-7124
                             Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
 1                          I N D E X

 2

 3   Re: Plaintiff fact sheets                        PAGE

 4     By Ms. Cohen                                      5

 5         Ruling by the Court                           7

 6     By Mr. Slater                                     9

 7   Re: Plaintiffs' redlines - medical monitoring

 8     By Ms. Cohen                            12, 14, 16

 9     By Mr. Slater                           13, 15, 19

10     By Mr. Stanoch                                   31

11   Re: Defendants' fact sheets

12     By Mr. Goldberg                             46, 48

13     By Mr. Slater                                    47

14   Re:  Dismissal of Peripheral Defendants           59

15   Re:  Search Terms & Custodians                    60

16   Re:  FDA updates                                  67

17   Re:  Hetero and Aurobindo                         71

18

19

20

21

22

23

24

25
```

1          (The following was heard in open court at 10:08 a.m.)

2          THE COURT:  Please be seated.  Welcome back to

3    Camden.  We're on the record in In Re: Valsartan MDL, Docket

4    Number 19-MD-2875.  For the record, why don't we just get the

5    entries of appearance for the leadership team and anyone else

6    who's going to talk today.  Just we don't have a court reporter

7    here, just state your name before you talk so the court

8    reporter knows who's talking.

9          MR. NIGH:  Good morning, Your Honor, Daniel Nigh for

10   the plaintiffs.

11         MR. SLATER:  Good morning, Your Honor, Adam Slater

12   for the plaintiffs.

13         MR. HONIK:  Good morning, Your Honor, Ruben Honik.

14   I'm also here with David Stanoch, who's likely to speak from my

15   office.

16         MS. WHITELY:  Good morning, Your Honor, Conlee

17   Whitely on behalf of plaintiffs.

18         MR. GOLDBERG:  Seth Goldberg on behalf of the

19   Prinston defendants and the defense group.

20         MR. TRISCHLER:  Good morning, Your Honor, Clem

21   Trischler on behalf of Mylan Pharmaceuticals and the defense

22   group.

23         MS. COHEN:  Good morning, Your Honor, Lori Cohen on

24   behalf of the defense group as well as the Teva defendants.

25         THE COURT:  So just so you know, Judge Kugler is on

1    trial, a criminal case, and he said he's going to stop his case

2    at 2:00 so we'll meet with Judge Kugler at 2:00 rather than

3    just sometimes I know we continue the proceeding if it's not

4    too long, but since he's in trial, we'll have to get together

5    at 2:00 after we adjourn today's proceeding.  I don't --

6    usually I start this by going over miscellaneous issues -- I

7    really don't have any miscellaneous issues to address.  I think

8    I'm up to date on what's going on.

9            So unless you disagree, why don't we just get right

10   into the agenda and deal with the issues that the parties have

11   raised, if that's okay with the parties.  I have all your

12   papers and I'm prepared to talk about them.  The first matter

13   on the agenda is plaintiff fact sheets.  Are we finished?

14           MS. COHEN:  No, Your Honor.  Lori Cohen.  I'm happy

15   to again -- can we give an update --

16           THE COURT:  Sure.

17           MS. COHEN:  -- on where we stand right now?  We're

18   getting closer, but we're not there yet.

19           THE COURT:  I thought we resolved everything at the

20   last hearing.

21           MS. COHEN:  Yes, so did we.  So let's -- so here's

22   where -- where I understand we're at, and I just talked to Mr.

23   Slater as well.  The personal injury -- excuse my voice, I

24   somehow lost it last night, but personal injury is actually --

25   we have agreed to.  That is finished.  Mr. Slater last night --

1          THE COURT:  I'm sorry, that's the one I meant.

2          MS. COHEN:  Yeah.

3          THE COURT:  I wanted to start with that one.

4          MS. COHEN:  Yes.  So --

5          THE COURT:  What's the consensus of the -- both sides

6    about whether we should enter that right away, get the trigger

7    going, or should we have them all entered at the same time?

8          MS. COHEN:  Yes, we --

9          UNIDENTIFIED DEFENSE COUNSEL:  Same time.

10         MS. COHEN:  Yes, yes to number one, Your Honor.  We

11   think that we should get going on the first one.  There's no

12   reason to hold back.  We have sent counsel last night an -- an

13   order -- an establishing order to show cause process that's

14   based on Benicar.  They can look at that.

15         We drafted it that it covered the personal injury,

16   plus the medical monitoring, plus the economic loss, but we can

17   take those out, we're still discussing them.  Also, there's a

18   TPP one which is lagging behind.  But we can certainly do it --

19   which should be entered, let's just get the personal injury one

20   going, no reason to hold it up.

21         THE COURT:  Is the personal injury start is -- is the

22   medical monitoring and I forgot the other one --

23         MS. COHEN:  Economic loss.

24         THE COURT:  -- ready?

25         MS. COHEN:  They're --

Colloquy                                            7

1          THE COURT:  Is that ready?

2          MS. COHEN:  They are -- we have some issues that we

3     believe -- we sent some redlines to last night and we received

4     plaintiffs' -- I think one of them at midnight last night and

5     one at 9:00 this morning, so I've been trying to quickly look

6     at their comments.  We think you ruled on most of the issues.

7     We're getting closer on those.  We can address them with Your

8     Honor.

9          But we do think that, you know, we're very eager on

10    the defense side to get the process started, and why not just

11    enter the first order and get the personal injury ones going.

12    I think I probably speak for everyone on the defense side that

13    -- that our clients are eager to get this going and there's no

14    reason to wait.

15         THE COURT:  Okay, I think you're right.  So ordered,

16    Mr. Slater.  Let's get the ball rolling.  So am I going to get

17    the order by Friday?

18         MS. COHEN:  Hopefully by this afternoon.  I gave a

19    hard copy to Mr. Slater, as well as an electronic copy.  He can

20    look at it and we can discuss it at lunch.  We can make it so

21    that it's just on personal injury, while we continue to talk

22    about the other three.

23         THE COURT:  No later than Friday, get me the order --

24         MS. COHEN:  Okay.

25         THE COURT:  -- and I hope it just mirrors exactly

1    Benicar.  It worked beautifully in Benicar.  All defendants'

2    interests we're protected.  They did a terrific job every week

3    of preparing lists of, you know, who owes what and it just

4    really worked beautifully so there's no reason to change it in

5    this case so --

6                MS. COHEN:  And I'm told -- I'm told it did mirror

7    Benicar 1, you know, word-for-word, and I'm sure Mr. Slater

8    will tell me if -- if my team misdirected me in any way.  I'm

9    sure they did not.

10               THE COURT:  Okay.  So we'll get -- the Court is going

11   to get the agreed upon order, or at least a draft order with

12   the parties' disagreements by Friday, we'll enter that and that

13   will pertain to the bodily injury.  What did we give the

14   plaintiffs -- what, 60 days?  I don't remember.

15               UNIDENTIFIED PLAINTIFF SPEAKER:  60 days I believe.

16               THE COURT:  Okay, great.  So what's the trigger, 60

17   days from the filing of the -- well, from the entry --

18               MS. COHEN:  And --

19               THE COURT:  -- of the order for future cases, filing

20   of the complaint?

21               MS. COHEN:  And I don't want to argue against my --

22   my own position of course, but I will say, I believe that what

23   Your Honor ruled what we put in the order is that the

24   plaintiffs had -- who already filed a short form complaint had

25   90 days from the entry of this order to complete the fact

Colloquy                                                    9

1   sheet.

2           THE COURT:  Okay.

3           MS. COHEN:  So that's --

4           THE COURT:  Fair enough.

5           MS. COHEN:  -- just being candid, you know, and

6   then --

7           THE COURT:  And then from here on out --

8           MS. COHEN:  -- in business that all other plaintiffs

9   shall complete the fact sheet 60 days after filing the short

10  form complaint.

11          THE COURT:  That's for new complaints.

12          MS. COHEN:  Yes.

13          THE COURT:  Fair enough.

14          MR. SLATER:  Adam Slater for plaintiff.  Just --

15  Judge, just to talk about the fact sheets real quick, we're

16  ready to argue the medical monitoring and the economic loss

17  right now.  There's no reason to hold them up.

18          THE COURT:  No --

19          MR. SLATER:  There's very few issues.

20          THE COURT:  -- I intend to do that.

21          MR. SLATER:  And then those should be able to be

22  entered along with the -- the personal injury one.  There's no

23  reason not to because they should be able to be -- we'll have

24  your rulings today so --

25          THE COURT:  Okay.

1          MR. SLATER:  -- and the TPP one is not this black box

2     that nobody can see into.  It's being reviewed.  We're going to

3     have comments back to them either by the end of tonight or

4     tomorrow and it's -- you know, and then we're ready to go very

5     quickly on that because it would seem to us that we should be

6     trying to do these at about the same time.

7          THE COURT:  Well, let's go through them and if it

8     means the order is going to be entered on Monday rather than

9     Friday, that doesn't make a material difference.  But let's be

10    clear, I was under the impression -- correct me if I'm wrong,

11    with regard to the bodily injury fact sheets, the separate

12    plaintiffs are going to fill them out.  With regard to the

13    medical monitoring, economic TPP, I thought just the named

14    class representatives were going to answer.

15         MR. SLATER:  Correct.

16         THE COURT:  So there can't be that many people --

17         MR. SLATER:  No, it's not.

18         THE COURT:  -- right?

19         MS. COHEN:  That's right, Your Honor, and again I'll

20    just say in my own defense as we go through this if I'm a

21    little slower than usual, we did just get the plaintiffs'

22    redlines at midnight and 9:00 so I'm looking at it on my iPad

23    with my notes so I'm just -- I may not be as fast like I

24    normally am.

25         THE COURT:  I haven't noticed.  Which one should we

1    do first?

2                MS. COHEN:  Probably the medical monitoring since

3    that came, you know, ten hours ago as opposed to one hour ago.

4                THE COURT:  I have it right in front of me.

5                MS. COHEN:  Okay.  So I -- I can comment on

6    plaintiffs' redlines.  I think that's the status.  They -- they

7    sent redlines to our version.  We had sent you a version last

8    night.  They then sent you a redline.  I'm now commenting on

9    the redline and what I would say is we will agree to everything

10   that they propose in redlines other than what I bring up

11   affirmatively.  Does that make sense?  So basically I'll just

12   comment on the ones to which we don't agree, and hopefully you

13   can back me up on -- on this.

14               THE COURT:  I have -- just so you know, I have -- I

15   printed out what I was sent last night.  I thought I just

16   received from plaintiff this morning the plaintiff fact sheet.

17   The copy that I have, at least the printout copy, doesn't have

18   a -- it's not redlined so --

19               MR. SLATER:  Whoever printed it might not have

20   activated the "track changes" possibly.

21               THE COURT:  Maybe.  But I'm still prepared to go over

22   all the issues with you.

23               MS. COHEN:  We can go over it and then try to come to

24   an agreement and then if one of us had missed something,

25   obviously we'll not try to do a "gotcha" on the other person.

Colloquy                                                          12

 1    We'll -- you know, obviously work through it.  But I think I --

 2    I think I can walk through and identify the redlines that they

 3    propose on medical monitoring to which we cannot agree and then

 4    see what Your Honor thinks.  To start with -- and I'm going to

 5    go to -- let's see, this would be in section I guess two,

 6    personal information and it's item (b), "other lawsuits."

 7                 THE COURT:  Page five?

 8                 MS. COHEN:  Yes, and that's the problem, my iPad

 9    doesn't show the page numbers, so I apologize for that.  But

10    let's see, they changed "Has plaintiff ever been a party to a

11    medical monitoring lawsuit or made a legal" -- they took out

12    the "made a legal claim of any type."  Again, we believe here

13    that -- that we are entitled to know all lawsuits, not just

14    medical monitoring.

15                 THE COURT:  This -- didn't this issue come up in the

16    other fact sheet?

17                 MS. COHEN:  It did in personal -- it did come up in

18    personal injury.

19                 THE COURT:  And what did we decide?

20                 MS. COHEN:  And Your Honor said personal injury, but

21    this legal -- this is medical monitoring, should at least cover

22    medical monitoring and personal injury, no?

23                 THE COURT:  Right, that was going to be my suggestion

24    -- Has plaintiff ever been a party to a lawsuit, that's very

25    broad.

1          MS. COHEN:  Hm-hmm.

2          THE COURT:  But if it's limited to a claim where

3   there's personal injuries or medical monitoring, I think that's

4   appropriate.

5          MS. COHEN:  Okay, so personal injury and or medical

6   monitoring.

7          THE COURT:  Okay.

8          MR. SLATER:  That's fine, Your Honor.  The only

9   caveat I would have to that is these are people who are talking

10  -- who are -- the class reps are bringing a case for potential

11  future injuries, so whether they had a personal injury lawsuit

12  in the past may not really be that important.  I'm not going to

13  argue against it too strongly.  It's going to be more important

14  in terms of a lot of the bulk in here.

15         THE COURT:  I think it could be important for class

16  certification issues because when the Court -- not me -- looks

17  at typicality, if someone has some serious medical problem,

18  that would increase the need for medical monitoring or

19  something of that sort.  I'm just making up a hypothetical, but

20  I think it is -- it is relevant to class certification issues.

21         MR. SLATER:  Yeah, I'm not going to over-argue that.

22  I think when we get into the -- into the nitty-gritty on the

23  medical conditions because that's going to be one of our real

24  disputes, I think we might have to have a little more

25  discussion about that because whether somebody is at high risk,

Colloquy                                                          14

 1    low risk, whatever, the monitoring protocols are going to be

 2    put in place for -- for everybody the same.

 3              THE COURT:  Okay, we'll deal with it but, you know,

 4    I'm -- when I was in practice I did a fair amount of class

 5    action medical monitoring work so I'm familiar with the -- with

 6    the case law and the requirements.  But let's continue.

 7              MS. COHEN:  Okay.  Do the ruling there is to have

 8    both personal injury and or medical monitoring?

 9              THE COURT:  Yes.

10              MS. COHEN:  And then the next issue that I will look

11    at related to the plaintiffs' redlines is it looks like at the

12    bottom of page six under "employment history," or is it page --

13    I guess it goes into page seven, and have the issues with the

14    -- so here, plaintiffs are deleting the broader language --

15    let's see --

16              MR. SLATER:  I think it's that we added the refining

17    language of that it's related to a cancer diagnosis.

18              MS. COHEN:  Right, exactly.

19              MR. SLATER:  So we --

20              MS. COHEN:  Here again I think --

21              THE COURT:  Help me here because I'm -- I have the --

22    we're at section (f) on page six.

23              MS. COHEN:  Section (f) so basically we -- the way we

24    had it, the plaintiffs have tried to restrict it just to

25    related to a cancer diagnosis under (a) --

1    THE COURT:  I don't -- I don't see that.  It says,

2    "Whether or not you are making a lost wage claim, please

3    respond to all questions" -- am I in the right place?

4    MR. SLATER:  No.  Under -- it's the -- the first

5    place you would look is section (1)(a) where it says, "Have you

6    left this job for a medical reason in the past five years" --

7    we inserted, "relating to a cancer diagnosis in the past five

8    years" so that we can focus on what the actual condition is

9    that's at issue in the case.

10    And that's -- and every -- and things were -- this is

11    not a personal injury case in the sense that somebody is

12    claiming they were harmed and now you're going to look at

13    alternative causes.

14    It doesn't matter if these people were working in a

15    benzene factory for 40 years if they don't have cancer, they

16    have a right -- they have a right to be monitored because

17    whether it increases your risk and works concurrently with

18    other potential causes as a contributing factor or whatever it

19    may be, this is a case where who don't have cancer due to

20    this --

21    THE COURT:  I know but I'm not talking about what --

22    the ultimate relief.  I'm thinking about class certification

23    issues.  Whether or not they worked in a benzene factory for

24    ten years is relevant, I think --

25    MR. SLATER:  Well, they're going to get that anyway.

Colloquy                                16

1    They're going to know that.

2              THE COURT:  -- for discovery purposes to class

3    certification.

4              MR. SLATER:  They will get that anyway.  The

5    employment history was not deleted from here.

6              THE COURT:  Okay.  So have them --

7              MR. SLATER:  It -- it's just whether they left the --

8    whether they left that job for a health reason, we thought it

9    made sense to limit it to due to cancer.

10             MS. COHEN:  And we disagree with that, Your Honor.

11   That's -- that's the issue.  Also, just to make clear, I did

12   skip over a similar issue in (d), the computer use.  Again,

13   apologies for that, but that was again the same issue where

14   they made it -- instead of "regarding your health" -- this is

15   on (d)(2) -- they put in there, "potential or confirmed cancer

16   diagnosis."

17             So again, we think in this situation, that it should

18   be broader and not just limited to cancer.  It should be -- it

19   should cover -- this is going back and I apologize, Your Honor,

20   I'll try to get more --

21             THE COURT:  See, I think one of the issues I'm

22   grappling with is the copy I have doesn't have the additions

23   you're talking about --

24             MS. COHEN:  Yeah, that they --

25             THE COURT:  -- so --

 1

 2                THE COURT:  -- so just --

 3                MS. COHEN:  -- that the plaintiffs made.  Do you

 4     have --

 5                THE COURT:  -- just tell me what --

 6                MS. COHEN:  Okay.

 7                THE COURT:  -- what the additions are.

 8                MS. COHEN:  So let me -- let me go back, let's go

 9     back to just do an order, if you don't mind, Your Honor, so

10     (d), computer use, (one) and then (two), they've struck out in

11     the (d)(2) where we had "regarding your health," and they

12     added, "regarding potential or confirmed cancer diagnosis," so

13     they --

14                THE COURT:  No, leave it "health."  Leave it

15     "health."

16                MS. COHEN:  And then --

17                THE COURT:  It's discovery.

18                MS. COHEN:  Yeah.  Thank you.  And then on -- then

19     going on to the next one, I got screwed up there already, but

20     on the employment history again under (f)(a) and (f)(1)(a) and

21     (f)(2) as well as (2) where it says, "if yes," again plaintiffs

22     have added for all of that "related to cancer diagnosis,

23     identify" --

24                THE COURT:  No, keep it as is.  It's discovery, it's

25     not burdensome, it's only five years, we're going to --

1    MS. COHEN:  Okay.  And this is going to be similar so

2    we may be able to work this out quickly, page -- I believe it's

3    page eight, but it's (h) --

4            MR. SLATER:  Well, the next one is, "Have you ever"

5    -- "Have you been out of work at any point for any condition

6    for" -- it goes back even further I think so --

7            MS. COHEN:  Which one are you on?  I'm sorry --

8            MR. SLATER:  -- the first one was limited to five

9    years but section two --

10           MS. COHEN:  Hm-hmm, I thought he ruled that that was

11   going to be about in general, not just cancer, that's the same

12   -- same issue there.

13           MR. SLATER:  The first one was limited to five years.

14   The second one was not limited to five years.

15           THE COURT:  Why don't you limit subsection (2) to

16   five years as well and keep it to health and not limited to

17   just cancer.

18           MS. COHEN:  Okay.

19           THE COURT:  You'll depose these people and you could

20   find out if there's anything else.

21           MS. COHEN:  Okay.  And then the same thing under --

22           THE COURT:  How many medical monitoring class reps

23   are there?

24           MR. SLATER:  I might have to look again.

25           MS. COHEN:  Yeah, I don't know offhand.

1          MR. SLATER:  I think it's give or take about five.

2          UNIDENTIFIED SPEAKER:  11.

3          MR. SLATER:  11?  That's why I said give or take.  I

4    don't have it in front of me, Judge.  I just don't remember the

5    exact number.

6          MS. COHEN:  So we'll make that whole section

7    consistent, cover more than just cancer, but make sure -- but

8    limited to the five years --

9          THE COURT:  Yes.

10         MS. COHEN:  -- and that's how we'll handle that.  And

11   under the "military service," I think it's going to be a

12   similar situation.  Here we had -- as you can see under (g)(1)

13   and (2), is related to your health and broad -- broadly, and

14   the plaintiffs have tried to narrow it to just cancer, the same

15   -- same --

16         THE COURT:  Leave it to health.

17         MS. COHEN:  Okay.  Now on "worker's compensation"

18   which is (h), it's going to be the same thing.  We had -- let's

19   see, we had it as, "Have you ever filed for worker's

20   compensation related to a claim of occupational expose to a

21   carcinogenic substance," and they changed and then offer,

22   "Social Security and or State or Federal disability benefits

23   for any reason," and they tried to narrow that to just cancer.

24         THE COURT:  Instead of carcinogenic substance?

25         MR. SLATER:  No, no, that's staying, that language,

1    because Your Honor ruled on that at the prior hearing.  It's we

2    wanted to in the -- in the personal injury version, the "Social

3    Security and or State or Federal disability benefits" is not

4    limited to any condition, we -- it's we didn't ask to limit it.

5    Here we're trying to limit it to a cancer diagnosis.

6              MS. COHEN:  And we would like it broader.

7              THE COURT:  The broader -- we agreed for the personal

8    injury, it's broader.

9              MS. COHEN:  Yes.

10             THE COURT:  Keep it consistent.

11             MS. COHEN:  Thank you.  And then the next -- the next

12    one we had an issue with which is, I believe, page 12, but I

13    need to find it on my iPad, and this is the "screening and

14    diagnostics" part.  "Screening and diagnostic," again, page 12

15    where it says, "procedures" -- are you there, Your Honor?

16             THE COURT:  Yes.

17             MS. COHEN:  Okay -- "procedures and or treatments"

18    part.

19             MR. SLATER:  Well, you skipped one.  You skipped

20    "life insurance."  If I'm going to lose, I want to lose across

21    the board.

22             MS. COHEN:  Thank you, I appreciate that.  If I had

23    seen that --

24             MR. SLATER:  It's section (I), Your Honor, it says

25    "life insurance."  "Within the last ten years, have you ever

1   been denied life insurance."

2            THE COURT:  Well, let's make it consistent.  You're

3   going down, Mr. Slater, you might as well go down on

4   everything.

5            MR. SLATER:  A hundred percent, a hundred percent.

6            MS. COHEN:  I appreciate --

7            THE COURT:  So keep it as is.

8            MS. COHEN:  I appreciate the support I'm getting.

9   Thank you.  Yes, "screening and diagnosis," now this is the

10   next one on page 12 and this is a section which is not taken

11   from the personal injury so this is somewhat new, and again,

12   we're asking for the treatments and medical monitoring the

13   class reps are undergoing as a result.  And I guess here the

14   plaintiff -- what we had here was, "Identify medical providers

15   providing treatment based on" -- we had -- "your use of

16   Valsartan" and, you know, and the different medications listed

17   there.  Plaintiffs want to change that to, "based on a

18   potential or confirmed cancer diagnosis," so we would like to

19   have that broader as we --

20            THE COURT:  No, no, no, no, Valsartan.  Keep it --

21   keep it as is.

22            MS. COHEN:  Right, well we have -- oh, keep it as is.

23   Okay.

24            THE COURT:  Yes.

25            MS. COHEN:  Okay.

1            THE COURT:  I don't know why you just don't say any

2    type of Valsartan, but it's up to you.

3            MS. COHEN:  Okay.

4            THE COURT:  I mean, do you think --

5            MS. COHEN:  We can change that to have any --

6            THE COURT:  No, I'm not suggesting what -- whatever

7    you think is appropriate, but --

8            MS. COHEN:  I think that's --

9            THE COURT:  -- do you think --

10           MS. COHEN:  I think that's a good change.

11           THE COURT:  Do you think a patient is going to know

12   the particular -- the type of Valsartan?

13           MS. COHEN:  I think -- I think that's a great

14   suggestion, we should change it to that.  The plaintiffs are

15   trying to make it just more narrow to cover just cancer

16   diagnosis so --

17           THE COURT:  No, you should know anything about

18   Valsartan.

19           MS. COHEN:  Okay.  And then we go on to --

20           THE COURT:  That's an easy one I think.

21           MS. COHEN:  -- let's see, so pages 13 through 17,

22   which is the "risk factor" section.  This is --

23           MR. SLATER:  What about the "medications prescribed"

24   section?  Let's just make sure we make a record.  Right under

25   what we just read, number one, received this under our

1    treatments.  And then on "medications prescribed," this goes to

2    medical diagnostic testing and screening procedures.  They want

3    everything for any condition for the last ten years, so our

4    position was to limit it to the relevant medical condition.

5              THE COURT:  Are we talking about (c)(1)(b)?

6              MR. SLATER:  Yes.

7              MS. COHEN:  Yes.

8         (Pause in proceedings)

9              THE COURT:  They're going to get the records --

10   medical records, right?

11             MS. COHEN:  And we can also maybe come up with a

12   middle ground that is cancer and or any, you know, Valsartan

13   treatment.

14             THE COURT:  It -- it seems pretty broad given that

15   you're going to get the medical records, and whatever is in the

16   medical records would be responsive to this question, wouldn't

17   it?

18             MS. COHEN:  Yes, but what if we -- what if we again

19   had a middle ground of and for any, you know, treatments for

20   which the Valsartan was prescribed or taken.

21             THE COURT:  Well, the answer would probably be no

22   because they want medical monitoring, right?  I mean, if it's

23   limited to Valsartan it's plainly relevant, but I think as it's

24   phrased, (c)(1)(b) is a little broad in this context because

25   it's medical monitoring plaintiffs, but the -- the bigger issue

1    for me would be the response to this question would be in the

2    medical records you're going to get.

3                MS. COHEN:  Yeah.  Again, how about please list the

4    medical -- medications prescribed," and I think we're okay with

5    the "with regard to a potential or confirmed cancer diagnosis,"

6    or the conditions for which, you know, you were taking

7    Valsartan -- we added that additional phrase?

8                THE COURT:  Any objection to that?

9                MR. SLATER:  I just don't know what that would be.  I

10   mean, if someone had blood pressure -- that they got their

11   blood pressure checked, I don't see how that really narrows

12   this in the medical monitoring context.

13               MS. COHEN:  That's what I was thinking off the cuff,

14   something like that.  We could --

15               THE COURT:  Wouldn't that be in the medical records

16   though?

17               MS. COHEN:  It would be, Your Honor.

18               THE COURT:  So why don't you make this as narrow as

19   possible, just limit it to cancer --

20               MS. COHEN:  Okay.  And I think it's --

21               THE COURT:  -- and then any -- any testing or

22   screening for cancer.

23               MR. SLATER:  And just like the 1961 New York Mets

24   now, I have one win.

25               MS. COHEN:  Well, I don't want to say this but I

 1    think that's why I skipped over that one that we weren't

 2    actually fighting over.  But I'll give you the win.

 3              THE COURT:  Throw him a bone --

 4              MS. COHEN:  I'll give him the win.

 5              THE COURT:  -- Ms. Cohen.

 6              MR. SLATER:  Just a couple bright spots just -- just

 7    to get through it, you know?  Come on.

 8              MS. COHEN:  Page 13 on the "risk factors," this is --

 9    you know, this is a large section, (d).  This is obviously

10    taken from your existing rulings that you've worked so hard on

11    already, we've discussed -- this is I think we basically

12    mirrored that and it came directly from the personal injury one

13    which has been well argued.

14              THE COURT:  These were all in the personal injury?

15              MS. COHEN:  Yeah.

16              THE COURT:  Coal industry was in the personal injury?

17              MS. COHEN:  Yeah, this is -- this is how it came out,

18    this -- this is how it was ruled, so we basically took this and

19    I think plaintiffs, you know, deleted this whole section but we

20    think it should mirror the personal injury one.

21              THE COURT:  So what's the objection if it's in the

22    personal injury?

23              MR. SLATER:  Yeah, part of it is -- is burden and

24    part of it is what does this then lead to in terms of the scope

25    of what they're looking at in this -- in this case.  I mean,

1    whether somebody worked in the coal industry, whether they

2    worked in this courthouse, whether they were -- it doesn't

3    matter because it's medical monitoring for people to determine

4    when they're going to -- if they're going to get cancer so they

5    have the support they need to get diagnosed --

6              THE COURT:  I think it's relevant --

7              MR. SLATER:  -- as quickly as possible.

8              THE COURT:  -- to class certification, I really do

9    because the typicality argument, the predominance argument.

10   This is my opinion, I'm not deciding the motion, but in terms

11   of whether or not medical monitoring is appropriate, I'm

12   predicting one of the arguments defendant is going to make is

13   that there is a predominance of individual issues and they have

14   to look at the medical condition of each person and the

15   exposure of each person and their medical history is relevant,

16   et cetera, et cetera.

17             MR. SLATER:  As long as we're not ruling today that

18   that is actually an argument that would prevail --

19             THE COURT:  No, of course not --

20             MR. SLATER:  Okay.

21             THE COURT:  -- because I'm not deciding the motion

22   but --

23             MR. SLATER:  Because we have serious issues with

24   that --

25             THE COURT:  -- for discovery purposes --

1          MR. SLATER:  -- for obvious reasons.

2          THE COURT:  -- I think it's relevant to class

3    certification --

4          MS. COHEN:  And it would --

5          THE COURT:  -- so it stays in, especially since it

6    was in the personal injury fact sheet.

7          MS. COHEN:  Right, and we just mirrored that exactly

8    so I think that should stay in here.

9          THE COURT:  You slipped one by me, Ms. Cohen, because

10   I didn't know the coal industry was in it, but if it's in it,

11   keep it in.

12         MS. COHEN:  I'm going to give Ms. Lockard credit for

13   that.

14         MR. SLATER:  No, we agreed to that actually.  Isn't

15   that one of the ones we agreed to --

16         MS. COHEN:  Okay --

17         MR. SLATER:  -- ultimately?

18         MS. COHEN:  -- so we don't get that one.

19         MR. SLATER:  We agreed to that, we agreed to

20   glyphosate, we agreed to solar radiation, we agreed to perineal

21   applied talcum powder --

22         THE COURT:  That's right, and kryptonite too, right?

23         MR. SLATER:  -- we agreed to all of the products that

24   they apparently think cause cancer in all the other MDLs around

25   the country, we agreed to all those that they inserted

1    themselves, for the record.

2              MS. COHEN:  I have no comment.  I'm only protecting

3    my client in this case here.  So let's see -- document -- I

4    think -- I think the next section I believe is then we get to

5    the --

6              MR. SLATER:  I think we're on the document demands

7    now.

8              MS. COHEN:  Yeah.

9              MR. SLATER:  Yeah, I think the -- the things that I

10   was -- a lot of my redlines are probably going to be rejected

11   now.

12             THE COURT:  Page 19?

13             MS. COHEN:  I think what about the -- let me just

14   make sure on the "medication" section there, but that's -- I

15   assume it would be -- remain in.

16             MR. SLATER:  I think we took out documents reflecting

17   the purchase price of replacement -- replacement medications,

18             MS. COHEN: You said -- you told --

19             MR. SLATER:  -- because I wouldn't see how that would

20   have any relevance to a medical monitoring claim.

21             MS. COHEN:  Yeah, I just want to make sure on the --

22   on the section that the -- it looks like the plaintiffs also

23   had scratched out page 17, I just want to make sure that is in,

24   because that was important under medications one by Your

25   Honor's ruling.

1              THE COURT:  Yes.

2              MS. COHEN:  Okay.  So then we do get to the documents

3    one and -- right, on the -- on the Roman Numeral (6)(a)(4)(a),

4    they inserted "based on cancer diagnosis," so I assume under

5    your other rulings --

6              THE COURT:  Make it consistent.

7              MS. COHEN:  -- that should come out?

8              THE COURT:  Yes.

9              MS. COHEN:  And let's see --

10             MR. SLATER:  Yeah, I understand that to the extent

11   that I -- that we redlined it that way, that Your Honor has

12   ruled on those.

13             MS. COHEN:  So all of those will just --

14             MR. SLATER:  Anyone where I -- where we tried to

15   limit it except for the one that -- our one win, we just want

16   to hold on to that one win.  We don't want to be win-less.

17             MS. COHEN:  And on (2) we'll change to, you know, any

18   and all Valsartan as opposed to the specific names where you

19   redlined that.  See that one, Adam?

20             MR. SLATER:  I don't know, which one are you on?

21             MS. COHEN:  That is -- let's see, (b) under "relevant

22   document demands," (b)(2), again, that's just by his prior

23   ruling, how we're handling that.

24             MR. SLATER:  Correct.

25             MS. COHEN:  Okay.

Colloquy                                    30

 1                MR. SLATER:   Correct.

 2                MS. COHEN:   And the same with (3), and then I guess

 3    number (8) is really the one you were talking about which is

 4    the --

 5                THE COURT:   Purchase price is not relevant to medical

 6    monitoring, so take purchase price out.

 7                MS. COHEN:   And I guess just -- I'm looking at the

 8    notes here that I guess the -- the thought here was this

 9    medical monitoring plaintiffs are claiming an increased cost in

10    medical care and that's part of their claim.

11                THE COURT:   Take it out.   It's not part of it, right.

12                MS. COHEN:   So that -- I think with that we can get

13    that turned around pretty quickly.

14                THE COURT:   Let's see where we are after we get

15    through all of them, and if it's feasible to agree on a

16    reasonably quick date for all of them except the third-party

17    payers, I think it makes sense --

18                MS. COHEN:   To get the three of them.

19                THE COURT:   -- but let's wait until we get through

20    them.

21                MR. SLATER:   There's one last thing and it's just in

22    the -- the lead-in, the first sentence, you just have to add

23    something in that it's to be completed by each plaintiff that's

24    filed a medical monitoring class action lawsuit as a named

25    plaintiff, we just have to -- I didn't see that last night.

1          MS. COHEN:  Is that a -- you're just saying that now

2     or it's in there -- it was in there --

3          MR. SLATER:  It's not in there.

4          MS. COHEN:  Okay, just -- if you send me the

5     language, I'll put it in there and I think that -- that's fine.

6          MR. SLATER:  So that takes us to the economic loss

7     one and I think -- I think Mr. Stanoch is going to argue that

8     for us, somebody who can count.

9          THE COURT:  You don't have a high bar to do better

10    than Mr. Slater.

11         MR. STANOCH:  Thank you, Your Honor, I hope it's

12    surpasses him.

13         MR. SLATER:  Yeah, I know that's -- that's a loaded

14    compliment or prediction.

15         MR. STANOCH:  Your Honor, while Ms. Cohen is pulling

16    up that one, I think if you have a copy, I think we can maybe

17    start with part six which is the document demands and

18    authorizations.

19         THE COURT:  Page?  Oh, it's not numbered but I have

20    it.

21         MR. STANOCH:  It's not numbered, Roman part six,

22    document demands -- are you there, Judge?

23         THE COURT:  Got it.

24         MR. STANOCH:  And it's really about the

25    authorizations and the authorizations, Your Honor, the

1    defendants are asking for healthcare authorizations, so for any

2    healthcare provider with an economic loss case, an insurance

3    record.  And our position, Your Honor, is the only records

4    relevant here in an economic loss case potentially are pharmacy

5    records and insurance pharmacy records because the only injury

6    here is economic -- did you buy their Valsartan, and what did

7    you pay for it.

8          They don't need to know who -- who prescribed it,

9    why, et cetera.  In fact, this authorization is so invasive it

10   doesn't even limit it to Valsartan.

11         It says "give me an author -- a blank authorization

12   for any healthcare provider you have."  So if they broke their

13   leg ten years ago, if they went to a psychiatrist, I -- Your

14   Honor, I think even the prescriber, it doesn't matter if it

15   says I prescribed Valsartan.  That's great.  I don't have a

16   claim unless I can show he received it or purchase records

17   showing I paid money.

18         So we would ask, Your Honor, that the authorizations

19   be limited to pharmacy record authorization and insurance

20   pharmacy benefit records basically showing the insurer paid

21   part of the price of the drug, and that the doctor requests be

22   conformed the same way.  For example, there's -- there's

23   document request two, all medical records.

24         THE COURT:  These are the individual plaintiffs who

25   spent money out of pocket for Valsartan --

1          MR. STANOCH:  Correct, Your Honor.

2          THE COURT:  -- so for example, if they had a co-pay,

3    they would pay the co-pay, or if they were uninsured, they

4    would pay for the whole prescription.

5          MR. STANOCH:  Correct, Your Honor.

6          THE COURT:  Okay.  So you want -- you want the

7    underlying medical records?

8          UNIDENTIFIED SPEAKER:  Yes, Your Honor, and the

9    reason being it goes -- it goes to the issue of whether the

10   plaintiffs received the benefit of their bargain.  They're

11   taking -- they were prescribed Valsartan presumably for a -- a

12   health of cardiac condition.  Did the medication work?  Did it

13   control their blood pressure?  Did they have any heart issues

14   while they were taking the medication?

15         It goes directly -- the claim is essentially in these

16   economic loss cases that the plaintiffs -- what they received

17   is worthless and so we need the medical records in order to

18   evaluate whether or not the medication did what it was supposed

19   to do, was it effective, and so it goes -- it goes to the core

20   issue in the economic loss cases and so that's why we want

21   authorizations for the medical records and that's the nature of

22   the request.

23         THE COURT:  The document request says "for each

24   healthcare provider identified in this fact sheet," so there's

25   a question that relates to what providers they have to

1    identify, what question is that.  For example, if they went to

2    see an orthopedist for a broken leg, you don't need that,

3    right?

4              UNIDENTIFIED SPEAKER:  I would tend to agree with

5    that.  I think at least -- at least for the fact sheet --

6    whether depositions lead elsewhere, but I think at least for

7    the fact sheet what we're talking about is medical records

8    relating to the conditions for which the patient was prescribed

9    Valsartan or a Valsartan-containing medication.

10             THE COURT:  So where in this question do they ask for

11   the identity of providers?

12             UNIDENTIFIED SPEAKER:  Your Honor, if I may, I was

13   going to mention that.  They don't, which is I think a drafting

14   error and indicative of why this is overly broad.

15             THE COURT:  Well, I have to agree with defendants on

16   this one with regard to the treaters for the -- I'll call it

17   high blood pressure because I read the -- the Third Circuit

18   case and they talked about, you know, the issues that are

19   relevant to whether or not there's standing/injury, and if I

20   remember the decision right, whether the drug was effective or

21   not was relevant to that consideration, so I think they made a

22   valid argument.

23             At least for discovery purposes, they're entitled to

24   know the treatment for the condition, i.e., high blood

25   pressure.  Now, they don't need to know about if their appendix

1    is taken out or they have a broken leg or something like that.

2    But if they're seeing a GP who prescribes Valsartan or a heart

3    doctor who prescribes Valsartan, I think that's relevant for

4    discovery purposes.  So I would say if you could limit -- limit

5    it just to the condition for which Valsartan was prescribed,

6    it's relevant for discovery purposes.

7            UNIDENTIFIED SPEAKER:  And if there's -- and if there

8    is a drafting error, and there very well may be, Your Honor, in

9    terms of the predicate question of who prescribed Valsartan and

10   what medical condition were you taking it for, and identify

11   physicians and healthcare providers who have provided treatment

12   for that condition, we can -- we can add that and then limit

13   the authorization to those --

14           THE COURT:  Yes --

15           UNIDENTIFIED SPEAKER:  -- I think we're fine with

16   that.

17           THE COURT:  I think we're on the same page.  We're

18   not -- we don't need to know about their OB/GYN or things like

19   that, whoever -- you know, whoever was --

20           MR. SLATER:  It's there, by the way --

21           THE COURT:  -- whoever was treating them.

22           MR. SLATER:  -- section (4), it's section (4)(a) who

23   prescribed medications for treatment of hypertension, so you

24   have the list and the reason for the prescription, so that it

25   checks back to that so that's covered.  Yeah, if you accept our

1    redline which I think now it's based on that ruling, it would

2    be treatment of hypertension.

3                UNIDENTIFIED SPEAKER:  Roman numeral four.

4                MR. SLATER:  Unless you -- or you want to limit it to

5    Valsartan for the treatment of any condition so that it's

6    anything that they were prescribed Valsartan for.

7                UNIDENTIFIED SPEAKER:  I was helping out on this one

8    issue so I'm not intimately familiar with the machinations of

9    the back-and-forth on the fact sheets, but, you know, I'll

10   simply say on the record, Your Honor, I think we're on the same

11   page as far as the --

12               THE COURT:  I do too.

13               UNIDENTIFIED SPEAKER:  -- the scope of the

14   authorizations --

15               THE COURT:  I do too.

16               UNIDENTIFIED SPEAKER:  -- it should be executed by

17   the economic loss plaintiffs and we'll work to tailor the

18   language to --

19               THE COURT:  Right.

20               UNIDENTIFIED SPEAKER:  -- to match that.

21               THE COURT:  I think we know where we're going to wind

22   up.

23               MS. COHEN:  We'll also add patient numbers obviously

24   because I think that's -- that's been an issue here, but I see

25   that on page four, we'll just make that medications and

1    treaters on that part.  I did find it here.

2          THE COURT:  How many economic loss plaintiffs are

3    there?

4          UNIDENTIFIED SPEAKER:  Between 17 and 43 currently.

5          MS. COHEN:  So that -- I guess looking at the -- and

6    I don't know, Your Honor, if you received these, they came in

7    this morning so I'm just looking at them.

8          THE COURT:  Oh, are we -- is that the only issue on

9    the economic loss?

10          MS. COHEN:  No.  No, Your Honor, that's -- so I'm now

11    going back, he jumped to the document requests of course, I now

12    have it pulled up from this morning.

13          THE COURT:  Okay.  Why don't we go in order.

14          MS. COHEN:  They sent this at 8:59 so I don't know if

15    you received it but --

16          UNIDENTIFIED SPEAKER:  Well, Ms. Cohen, you cut me

17    off in the email where I sent this to you last month so we're

18    all at a disadvantage.

19          THE COURT:  Let's just proceed with the fact sheet.

20          MS. COHEN:  So let's see, I'm looking at their --

21    they added some language in the first paragraph and I think

22    that's probably fine.  They added something in the first

23    paragraph and again, I don't know if you see that, Your Honor,

24    but just some -- some (inaudible) language, I think that's

25    probably fine.  They have in -- let's see, the other lawsuits

1    again are under -- this would be other lawsuits that they're

2    limiting it to class action lawsuits.

3              THE COURT:  Let me see what page we're on --

4              MS. COHEN:  Yeah.

5              THE COURT:  -- or what section.

6              MS. COHEN:  The section there that they redlined

7    is --

8              UNIDENTIFIED SPEAKER:  (2)(b).

9              MS. COHEN:  Yeah, (2)(b) --

10             THE COURT:  (2)(b).

11             MS. COHEN:  -- we had, "Has plaintiff ever been a

12   party to a lawsuit or made a legal claim."  As you know, we've

13   now talked about this in personal injury, we talked about this

14   in the other one, and here they said has plaintiff ever been a

15   named party --

16             THE COURT:  No --

17             MS. COHEN:  -- to class action --

18             THE COURT:  -- why don't we make it consistent with

19   the other ones.

20             MS. COHEN:  Okay, personal injury or -- or medical

21   monitoring -- personal -- personal injury and or economic loss?

22             THE COURT:  And you can add as a -- or as a class

23   representative, I think that's relevant, whether they were a

24   class representative in another case.  If it's not there, you

25   could add that to the other one.  That's -- I think that's

1    clearly relevant to --

2              MR. SLATER:  No objection.

3              MS. COHEN:  Yes.

4              THE COURT:  -- to whether the named plaintiff is

5    appropriate.

6              MS. COHEN:  And then -- let's see, their next -- the

7    next change comes under "claim information."  This would be

8    part three.  They have a comment on the side.  Our question is

9    under hypertension relevant history, when were you first

10   diagnosed, if discontinued how did you manage -- their comment

11   is, "We request a proffer by the defendants why this is

12   pertinent in an economic loss case."

13             THE COURT:  When were you first diagnosed with

14   hypertension?

15             UNIDENTIFIED SPEAKER:  And Your Honor might have

16   gotten at this already in terms of the authorizations.  Our

17   position, Your Honor, is you purchased the drug, you purchased

18   the drug, we're trying to get the money back.  If I purchased a

19   dishwasher and it cleaned bowls but not the dishes, it doesn't

20   matter.  If I purchased the drug Valsartan for hypertension or

21   if I used it for some other condition, it doesn't matter.

22             MS. COHEN:  It's the same argument that -- that was

23   argued, I think it goes to whether it worked for (inaudible).

24             THE COURT:  Keep it in.  It's so --

25             MS. COHEN:  Your Honor, next -- I think their next --

1    again, their next comment now goes -- it's very similar.  Under

2    "for medications," same thing, they're asking for a proffer.

3    So it seems like that should just go on the -- the same as Your

4    Honor -- should stay in?

5              THE COURT:  Let's just make it consistent.

6              UNIDENTIFIED SPEAKER:  Well, Your Honor, I think with

7    this one, you said it with the document request, this should be

8    about the medical condition for which the Valsartan was

9    prescribed.  Because as written, this is telling me all

10   prescription medications you took for treatment of medical

11   conditions in the last ten years so if you got Valsartan for

12   hypertension, tell me other drugs you took for hypertension I

13   think is what your --

14             MR. SLATER:  This is the one that he already ruled

15   on.

16             THE COURT:  Let's -- okay hold on, let's take --

17   let's see where we are.  We're on medications, part four,

18   right?

19             MR. SLATER:  This is what you ruled on before when we

20   said we agreed that we had an understanding of what you wanted.

21   That was the question that I was referring back to and I think

22   Ms. Cohen said she understood and we were on the same page.

23             MS. COHEN:  Yes, and but there was another aspect of

24   -- of I think the -- the redlines we got this morning were they

25   said we request a proffer so I'm just responding to that saying

1    I think we've addressed that already and this should stay in

2    with the change in terms of how we're describing the condition.

3                UNIDENTIFIED SPEAKER:  Agreed.

4                THE COURT:  Okay, and as long as it's consistent.

5                MS. COHEN:  Agreed with everyone?

6                UNIDENTIFIED SPEAKER:  Yes.

7                MR. SLATER:  We agree with your hypothetical

8    language.

9                MS. COHEN:  And I think that that probably covers it.

10   I think with those rulings, I think we know how to revise it.

11               THE COURT:  Okay.  So I think it makes sense since

12   one is finalized, the personal injury.  And these two, it's

13   just a matter of wordsmithing it.  What -- pick a date when

14   it's reasonable to submit these three concurrently to the Court

15   with an order.  I mean, if it's -- if it's Monday or Tuesday I

16   don't care.  A day or two isn't going to make a difference, but

17   I think it makes so much sense to if we can put three of these

18   in the same order rather than one, for an extra day or two,

19   it's -- for consistency purposes, it's worth it.  So you tell

20   me the date when these three can be submitted to the Court with

21   an order.

22               MS. COHEN:  I think we can get these turned around

23   and get them to plaintiffs, you know, by Friday, and we're

24   waiting for their comments on the order.

25               THE COURT:  So how about Tuesday?

1        MS. COHEN:  Yeah.

2        THE COURT:  Okay, Tuesday is the --

3        MS. COHEN:  1st.

4        THE COURT:  Tuesday is October 1, right?

5        MS. COHEN:  Yes.

6        THE COURT:  Okay.  So we'll say October 1 to get

7    the --

8        MR. SLATER:  Judge, Monday is going to be a tough day

9    because it's -- Monday and Tuesday, just because it's the

10   holiday I think, right?

11       THE COURT:  Okay, Wednesday then -- Jewish holiday, I

12   don't want to interfere with that so Wednesday, October 2nd,

13   we're going to get the final economic loss plaintiff fact

14   sheet, medical monitoring class plaintiff fact sheet, and

15   plaintiff fact sheet for individual personal injury cases.  I

16   guess the title of the economic loss plaintiffs fact sheet

17   should include economic loss class plaintiffs fact sheet.

18       UNIDENTIFIED SPEAKER:  Consumer class plaintiff,

19   Judge.

20       THE COURT:  Yes.  And then we'll get that on

21   Wednesday.  If it's not entered on Wednesday, it will be

22   entered on Thursday and I think that's terrific, we'll be

23   consistent with those three.

24       MR. SLATER:  And I can update, Your Honor, TPP one,

25   I'm told by our TPP experts in the room that there's maybe one

1    new issue that we hadn't seen before.  It looks very -- if we

2    can get a meet and confer with the defense by the end of the

3    week --

4                THE COURT:  Terrific.

5                MR. SLATER:  -- we think we should be able to -- if

6    you can tell us who the people are and we'll have our group, we

7    should be able to probably knock that out.

8                UNIDENTIFIED DEFENSE SPEAKER:  Exactly.

9                THE COURT:  Okay, great.  Do you want to go over this

10   today or do you want to just let you meet and confer on it?

11               MS. COHEN:  I think meet and confer because we have

12   not seen any of their redlines yet --

13               THE COURT:  Fine.

14               MS. COHEN:  -- so I also think it would be helpful if

15   you could maybe send us your redlines before we get on the

16   call.

17               MR. SLATER:  Absolutely.

18               THE COURT:  So, Ms. Cohen, let's point towards the

19   next phone call to get it finalized and then that will be

20   great.

21               MS. COHEN:  Thank you, Your Honor.

22               THE COURT:  How many third-party payer class

23   plaintiffs are there?

24               MS. COHEN:  Well, I think there were two lawsuits,

25   right?

 1          MR. SLATER:  Correct, there's two.

 2          THE COURT:  Okay, so we're through the first item on

 3   the agenda.  The second item is defendant fact sheets.

 4          UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, we

 5   provided those to plaintiffs last week and we haven't heard

 6   back on the comments to those so we'll work through them with

 7   the comments.

 8          THE COURT:  Plaintiffs, can we hear from you on that?

 9          MR. SLATER:  We'll get back to them.  I would say

10   before the end of the week we'll have our redline.  If not by

11   tomorrow, it will be by Friday.

12          THE COURT:  Okay.  Well, the ball is in your court.

13   The sooner you get your comments to them, the sooner the Court

14   can address any disputes and get it entered.  At the end of the

15   day when the fact sheet is done, who is going to answer them?

16   Which class of defendants, if not everyone?

17          UNIDENTIFIED SPEAKER:  Your Honor, we -- consistent

18   with how discovery has been going to this point, we have

19   provided defendant fact sheets for the API manufacturers and

20   the finished dose manufacturers.

21          THE COURT:  Well remember, we only directed the core

22   discovery to those two lead defendants.  Now, I don't know if

23   plaintiffs want fact sheets directed to the other defendants.

24          UNIDENTIFIED SPEAKER:  Your Honor, at this point,

25   just if I may just on that issue, the discovery requests that

1    we have, the document requests, they're also only directed at

2    the API and finished dose manufacturers.  If we're going to

3    have a peripheral defendants dismissal which -- which is now

4    finalized as to the repackagers and had other I think -- some

5    of the pharmacy --

6              THE COURT:  After that's done.

7              UNIDENTIFIED SPEAKER:  Yeah.

8              THE COURT:  Okay, let's assume we work that out, the

9    order is entered, peripheral defendants are dismissed without

10   prejudice.  Who is left in the case?

11             UNIDENTIFIED SPEAKER:  The API manufacturers,

12   finished dose manufacturers and large retail -- what they have

13   referred to as "major pharmacies."

14             THE COURT:  Okay.  So from the -- directed to the

15   plaintiffs, the fact sheets you're currently working on are

16   directed to the two sets of defendants, but that doesn't --

17   that's a subset of all the defendants who will be left in the

18   case.  Do you want to direct fact sheets to the other

19   defendants?

20             MR. SLATER:  We do.  There's large retailers and

21   there's actually some distributors as well that are large

22   distributors so we're going to want to have them answer as

23   well.

24             THE COURT:  All right.  So would that be a separate

25   fact sheet?

```
 1              MR. SLATER:  We intend to put it on one and then it
 2    would just say you answer the parts that apply to you.
 3              MR. GOLDBERG:  Your Honor, we already -- we already
 4    dealt with that issue --
 5              THE COURT:  No, no, no, no, no, Mr. Goldberg, let's
 6    -- let's cut this short.  Core discovery was only directed to
 7    the two sets of defendants.  There was never a ruling that
 8    discovery directed to the other defendants who remained in the
 9    case was off limits.
10              MR. GOLDBERG:  Oh, I agree.
11              THE COURT:  Okay.
12              MR. GOLDBERG:  No, no, what I meant was the -- the
13    defendant fact sheet was first proposed by plaintiffs in June,
14    and it was one document that had 20 or 30 questions and didn't
15    delineate as to the supply chain.  In August, Your Honor ruled
16    that no, there needs to be a different fact sheet for each
17    level of the supply chain --
18              THE COURT:  Or at least a different section.
19              MR. GOLDBERG:  Correct, right, one that -- that broke
20    it out, which is what we did.  So we sent it back to them with
21    API and finished dose, we did not include other levels of the
22    supply chain because when we met with Your Honor in August, it
23    seemed clear to us at a minimum that discovery as to retailers
24    was somewhere down the line because their information was not
25    pertinent to this point in time in the litigation.
```

 1          THE COURT:  Mr. Slater, why don't we do this.  From

 2    the plaintiffs' perspective, clearly the most important

 3    discovery is the two sets of defendants.  Get that finalized,

 4    get that to the Court, I'll enter the order and

 5    contemporaneously work on a separate fact sheet for the

 6    distributors --

 7          MR. SLATER:  It's --

 8          THE COURT:  -- repackers who are left in the case.

 9          MR. SLATER:  Yeah, we can -- it won't really be

10    workable.  I mean, what we -- what I think would be better,

11    they -- they sent -- what they basically did was they deleted

12    -- they just redlined out giant chunks of it and then

13    reorganized it the way they wanted it to look.  We have their

14    input but we -- but honestly, Judge, it's going to make sense

15    for all of the different defendants to be --

16          THE COURT:  All right --

17          MR. SLATER:  -- responding to one --

18          THE COURT:  -- I'll defer to you, but --

19          MR. SLATER:  It's not going to be --

20          THE COURT:  -- so they're going to be included, Mr.

21    -- Mr. Goldberg.  They're not all -- the Court never intended

22    that all discovery would be off limits to the other classes of

23    defendants.  We only agreed initially to direct core discovery

24    to the two "target" sets of defendants.

25          MR. GOLDBERG:  I understand, Your Honor, I -- I just

1    think it's -- consistent with where we are today, we've got 122

2    document requests focused at the API and finished dose

3    manufacturers who are working on a custodian list with respect

4    to those levels of the supply chains and that -- that -- we

5    just thought that was the Court's intent, was to have the

6    retailer portion of this which really goes to prescriptions, be

7    at a later point in time.

8         THE COURT:  I asked them if they want separate or

9    one, they said one.  I know that's going to delay things, but

10   that's more a problem for the plaintiffs than the defendants,

11   right?  So the -- if that's what the plaintiffs want to do,

12   let's do it that way, okay?  All right, so the ball is in the

13   plaintiffs' court on that one.

14        UNIDENTIFIED SPEAKER:  Your Honor, if I can -- if I

15   can describe the purpose of plaintiffs' fact sheet, set the

16   factual basis for it to understand why we need them all in one

17   document.

18        The idea of the defendants' fact sheet is it's the

19   response to plaintiff fact sheet which is for each individual

20   case.  In order to understand the story of the defendants' fact

21   sheet for that specific client, we have to ask the pharmacies

22   involved because the pharmacies are the only people often

23   times, our understanding, the people who have the lot and batch

24   number dating back -- far backwards, they have to provide that

25   information.  Also on the defendants' fact sheet, we need to be

1    able to understand the whole picture from API manufacturers on

2    down to pharmacies and John Smith actually received each of

3    those pills.

4             That's where we're going to need the people in the

5    chain to be responding, so that we can understand for John

6    Smith, what -- what are the various issues.  And the APIs hold

7    the information on a lot of those issues, but they can't

8    respond individually to that client unless they see the batch

9    and lot number response on that information.

10            That's why we're asking for the documents.  There's

11   also a history of the solvent being examined and issues with

12   the solvent, right, even before you get to the API

13   manufacturers.  In order to be able to understand that

14   information, we've got to know the lot and batch numbers

15   connected on up to the solvent issue.

16            THE COURT:  Would the two sets of main defendants

17   have the lot and batch number?

18            MR. GOLDBERG:  They were -- I do not believe they are

19   going to know John Smith's lot and batch number.

20            THE COURT:  No, but they'll identify the lot and

21   batch numbers that either are contaminated or may be

22   contaminated?

23            MR. SLATER:  Yes.

24            MR. GOLDBERG:  Yes.

25            THE COURT:  Yes.  And then with that information, the

1    pharmacies or distributors would be able to follow the chain,

2    right?

3             UNIDENTIFIED SPEAKER:  (Inaudible).

4             THE COURT:  So doesn't that caution in favor of

5    separate fact sheets because -- okay, hypothetically, if it's

6    one fact sheet due in 90 or 60 days, the distributors are going

7    to say I can't answer this question until I have the lot and

8    batch number, that's what they can assert.

9             But if we do the lead defendants first and a couple

10   of weeks later finalize the repackagers, wouldn't -- by the

11   time they have the duty to answer, won't they have the lot and

12   batch numbers from their answers?

13            UNIDENTIFIED SPEAKER:  No, because it's backwards,

14   they need to start with the pharmacies in order to address the

15   information that they know on the contamination of those

16   individual pills --

17            THE COURT:  Okay.

18            UNIDENTIFIED SPEAKER:  -- so it would go pharmacy

19   first on back.

20            MR. SLATER:  Also, it would be served at the same

21   time.  They would have to communicate with one another before

22   they serve the response because it would be served in a

23   particular case so all the information would be there so they

24   could interact prior to serving them.

25            THE COURT:  How many -- no one has answered this

Colloquy                                                    51

1    question, how many pills or drugs are in a "lot," because I --

2    the FDA has recalled a lot or a batch.  How many are in a lot

3    or a batch?

4         UNIDENTIFIED PLAINTIFF COUNSEL:  The only thing that

5    I have heard and that's -- that's a case where we have limited

6    information.  I can see the FDA recall and I can see that

7    there's some lots that say 1,000 pills, but I don't know that

8    it's always 1,000 pills in the lot.

9         THE COURT:  Do you know, defendants, how many are in

10   a lot?

11        UNIDENTIFIED DEFENSE COUNSEL:  I don't know, Your

12   Honor.

13        UNIDENTIFIED DEFENSE COUNSEL:  The FDA actually

14   defines what is a batch and what is a lot, but they are loose

15   definitions as I -- a batch is essentially a defined segment of

16   a -- of a product unit that can be traced to a given time of

17   manufacturing lot to be part of what is essentially part of a

18   batch.

19        Those definitions as I said are rather loose and

20   vague, and I think -- at least this is just my personal

21   understanding, Your Honor, is that what -- what constitutes a

22   batch may differ from manufacturer to manufacturer in terms of

23   size and quantity and so forth.  I don't think there's any

24   accepted industry standard or FDA regulation that governs

25   that's going to say a batch is 1,000 pills or 10,000 pills.  I

1    think it differs from manufacturer to manufacturer based on

2    their practice.  That's my personal understanding.  But I tend

3    to think it's correct.

4              MR. SLATER:  That's why we have this issue on the

5    agenda, so it makes sense to talk about it now, that whatever

6    the descriptors are that the defendants used, whether it's

7    lots, batches, packages, groups -- whatever they call them,

8    we've asked for definitive "lot and batch information" are

9    going back to the beginning of every contaminated or

10   potentially contaminated -- whatever they want to call them.

11             And right up -- because there's going to be a lot of

12   batches -- I'm going to call them lots or batches, I don't know

13   what they are either -- that were contaminated because they

14   were used up so they're going to need to go back and they're

15   going to need to roll their sleeves up so that as you see, even

16   though counsel has no idea, everybody and the Court are going

17   to need to have a foundational knowledge base so that anybody

18   can look at what lot or batch or whatever you want to call it

19   -- ND -- NDC (phonetic) codes, all this and triangulate all

20   this.

21             And okay, this plaintiff falls into this and that's

22   -- and we know that's a contaminated batch or that's disputed

23   or that's clearly not contaminated, whatever it is so we know

24   where everybody sits, and there has to be something where

25   there's just absolutely no room for ambiguity.

Colloquy                                                    53

 1           I think it's a very important foundational issue that
 2    it -- it touches on a bunch of things.  And -- and the other
 3    thing it touches on as
 4    -- as you hear that the language is an issue, part of it we
 5    need is these meet and confers and we'll get to that.  But this
 6    ties into that as well because terminology is so important.
 7           THE COURT:  The issue about the lot and batch, isn't
 8    that covered in the fact sheets?
 9           MR. SLATER:  Well it is, but we've used terminology
10    that we're familiar with, but part of what we're going to need
11    to do is have a candid conversation and say how is this
12    described internally, what is it -- how is it referred to, et
13    cetera, for so many reasons, for search terms, et cetera.
14    Okay, I just wanted to make sure I -- I flagged it.
15           UNIDENTIFIED SPEAKER:  Your Honor, one thing I just
16    want to get clarity -- produce a lot and batch information is
17    one thing.  What -- what I -- in terms of the timing, the
18    plaintiff fact sheet is required and plaintiffs are required to
19    identify to the extent they can --
20           THE COURT:  Yes.
21           UNIDENTIFIED SPEAKER:  -- in their C codes lots and
22    batches which are on their bottle.  And the defense fact sheet
23    asked us to identify the lot and batch as to a specific
24    patient, which -- which it ties back to the plaintiff fact
25    sheet.

1    MR. SLATER:  And my response to that would be (a),

2    this is the time to get defendant information of everything, of

3    the universe of the pills that these manufacturers manufactured

4    overseas and allowed to be contaminated and sold under very

5    disturbing circumstances.

6        Other plaintiffs are going to file cases six months,

7    a year, whatever -- we're not going to then go back and they're

8    going to keep extending their lot and batch matrix every time a

9    plaintiff files, number one.

10        Number two, we have class actions so it covers

11    everything, so the entire playing field is -- is at issue in

12    our class actions anyway, so that's our response to that.

13        UNIDENTIFIED SPEAKER:  Well, and the other part is

14    there's a breakdown of the individual plaintiff.  Not every

15    plaintiff has, you know, 150 pill bottles.  They'll have maybe

16    the last four or five pill bottles at best.  We're talking

17    about plaintiffs who have had emanated history we think all the

18    way back to 2012.

19        THE COURT:  I'm not quite sure what we're arguing

20    about.

21        UNIDENTIFIED SPEAKER:  The lot and batch number.

22        THE COURT: It's unquestionably relevant to identify

23    what lot and batches were or may have been contaminated.

24        UNIDENTIFIED SPEAKER:  Right.

25        THE COURT:  It's -- that identification is not going

1    to just be limited to the specific lot and batches that

2    plaintiffs identify.  There can't be an issue about that.  I

3    mean, it's basic.

4              UNIDENTIFIED DEFENSE COUNSEL:  It is, Your Honor, and

5    you made the point that I was about to make and either I'm not

6    sure what the argument is or we're certainly way ahead of

7    ourselves as far as the ball being in the plaintiffs' court on

8    getting back to us on the defendants' fact sheet.

9              But the reality of it is -- and I just want to make

10   this point clear, the lot and batch information that the

11   plaintiffs keep asking for, it's in with the hundreds,

12   thousands of pages of documents that were produced in core

13   discovery.  I know with respect to my clients, they wanted to

14   take a look.

15             If the information has been provided, it is in FDA

16   correspondence outlining what lots and batches were found to

17   have impurities at levels that the FDA now deems unacceptable.

18   It's there, they have it.

19             The problem that they're getting into is an issue of

20   product identification that they have as far as their burden of

21   proof that we're not going to be able to ultimately supply to

22   them.  That's a reality.  We can tell them -- we can tell them

23   what batches we made, when we made it and who we sold it to.

24             THE COURT:  Right.

25             UNIDENTIFIED DEFENSE COUNSEL:  But we're not going to

1    be able to tell them that this particular plaintiff used that.

2              THE COURT:  I can't --

3              UNIDENTIFIED DEFENSE COUNSEL:  That's their job.

4              THE COURT:  I can't believe there's a dispute about

5    that.

6              UNIDENTIFIED DEFENSE COUNSEL:  I can't believe there

7    is either --

8              THE COURT:  I don't think --

9              UNIDENTIFIED DEFENSE COUNSEL:  -- and it sounds like

10   that's what I'm hearing.

11             THE COURT:  -- there is a dispute.  I don't think

12   that's what they're arguing.

13             UNIDENTIFIED DEFENSE COUNSEL:  That's what I'm

14   hearing.

15             THE COURT:  I think what they're arguing is the only

16   lot and batches that the defendants are going to identify are

17   those the plaintiff specifically identify, and I said no, Rule

18   26 discovery, we're going to -- they're entitled to take

19   discovery to identify every lot and batch that was contaminated

20   or may have been contaminated, and it's somebody's job to prove

21   that the particular plaintiff took one of -- a pill from one of

22   those batches.

23        (Transcriber change)

24             UNIDENTIFIED DEFENSE COUNSEL:  We are on the same

25   page, Your Honor.  And what I'm adding to that --

1          THE COURT:  So I don't think the plaintiffs dispute

2     that.

3          UNIDENTIFIED DEFENSE COUNSEL:  And what I'm adding to

4     that is they already have much of that information.

5          THE COURT:  Well, we'll see.  We'll see.  I mean

6     we're just -- I mean, I don't know what's in the core

7     discovery, but everyone seems to think this manufacturing --

8     not everyone -- people -- some people think that some

9     manufacturing change led to this contamination.

10          For discovery purposes, I don't even know if

11     plaintiffs have scratched the surface on that issue yet.  When

12     did it happen?  Where did it happen?  How long did it go on?

13     Et cetera, et cetera.  I assume that's going to be a gigantic

14     part of discovery on the case.  Right?  Wouldn't you think so?

15          UNIDENTIFIED DEFENSE COUNSEL:  It could very well be.

16          THE COURT:  I don't think there's a doubt about that.

17     That's what -- that's the core of the case.

18          UNIDENTIFIED DEFENSE COUNSEL:  Just to clarify on the

19     issue of why -- where this came up.  I think it just -- it's an

20     overhang from the first iteration of the defendant fact sheet,

21     which put on the defendants identifying the specific lot and

22     batch that a plaintiff took based on the plaintiff fact sheet,

23     and I think we're all clear that that's not something

24     defendants can use.

25          UNIDENTIFIED PLAINTIFF COUNSEL:  To address that, I

1    disagree with that wholeheartedly.  Defendants have an

2    obligation.  Each defending pharmacies have an obligation to

3    issue recall letters to our client.

4              THE COURT:  He's talking about his client.

5              UNIDENTIFIED COUNSEL:  His client.  But that's why we

6    have to have the pharmacy names though.

7              THE COURT:  Right.  I mean a factory in China --

8              UNIDENTIFIED COUNSEL:  Yes.

9              THE COURT:  -- can't tell you if your client took a

10   particular drug from X batch.

11             UNIDENTIFIED COUNSEL:  I agree.

12             THE COURT:  But maybe one of the pharmacies can.

13             UNIDENTIFIED COUNSEL:  Yes.

14             THE COURT:  Okay.  So I think where we left this is,

15   the ball is in plaintiff's court on defendant fact sheets.

16   That plaintiff have chosen to submit one fact sheet that's

17   going to be answered by all the remaining defendants in the

18   case.  And the sooner we meet and confer with the plaintiffs

19   about that, the sooner it will be finalized and entered.  And

20   their duty go respond will be triggered.

21             I would like to see that sooner rather than later, so

22   we could get the case off the ground.  But the ball is in your

23   court.  And I assume you want to do the same thing.  So,

24   hopefully, if we don't get this resolved by the phone call in

25   two weeks, let's set a target for absolutely finalizing it for

 1   the next in-person meeting.

 2          UNIDENTIFIED PLAINTIFF COUNSEL:  And, Judge, just one

 3   logistical issue on this that I don't want to get lost here.

 4   What I'm talking about in terms of definitive foundational --

 5   excuse me -- definitive foundational lot and batch information

 6   is not a fact sheet issue, it's a -- it's a macro production

 7   that the defendants need to make are separate and apart from

 8   the DFS, from our perspective.

 9          THE COURT:  We're going to get to that issue today.

10          UNIDENTIFIED PLAINTIFF COUNSEL:  Okay.

11          THE COURT:  We're going to get to that issue this

12   morning.  Okay.  Defendant fact sheet, I think we have a game

13   plan going forward.  I'm going down the agenda.  Dismissal of

14   peripheral defendants.

15          It sounds like you're working on it and the order's

16   going to be submitted to the Court.

17          So --

18          MS. GOLDENBERG:  Yes, Your Honor I believe it's done.

19   We should have it to you very shortly.

20          THE COURT:  Okay.

21          MS. GOLDENBERG:  Marlene  Goldenberg.  I'm sorry,

22   Your Honor.

23          THE COURT:  Okay.  So whenever you get it done, just

24   get it to me and it will be entered, and I congratulate the

25   parties for -- for helping the Court streamline the case so we

 1    can get to the crux of it.

 2           All right.  Search terms and custodians.  Okay.  Let

 3    me just give you the Court's perspective on this.  This is, if

 4    not the most important issue for discovery purposes, definitely

 5    up there.  Okay?  We have given -- the Court has given the

 6    parties a lot of leeway on this issue.  We've targeted December

 7    11 I think to resolve all discovery disputes, all search terms

 8    and custodian issues.  That date is locked in stone.

 9           That date will not be extended, because the longer we

10    wait to finalize the search terms and conditions, the longer

11    this discovery process is going to drag out.  So whatever you

12    have to do to get the disputes teed up before the December 11,

13    do it.  And if it's not, we'll -- whatever the record is at

14    that point we're going to enter.

15           I don't want to take wind out of your sails, Mr.

16    Slater and Mr. Goldberg, the Court, if the parties won't do it

17    voluntarily, the Court is going to order the defendants to meet

18    informally with the plaintiffs.

19           We did it in Benicar.  It was a tremendous,

20    tremendous time and cost savings.  This is in the defendants'

21    best interest.  The alternative is to take 30(b)(6) depositions

22    and drag out the case, and drag out people, and spend a lot of

23    money.

24           And that does no one any good.  So if you don't -- if

25    the defendants don't agree to it, we're going to order

1    individual meetings with all the defendants to meet informally

2    off the record, 408, however you want to privilege this

3    information, so that you can give plaintiffs the information

4    they need to meaningfully define their search terms and

5    custodians.

6              That is in the defendants best interests.  And Judge

7    Kugler and I are in lock-step on this issue, you're going to

8    hear it from him this afternoon.  It's the best way to get this

9    case going, Mr. Goldberg.

10             MR. GOLDBERG:  Your Honor --

11             THE COURT:  I don't mean to take wind out of your

12   sails.

13             MR. GOLDBERG:  Respect the Court's -- I respect the

14   Court's view.  The question really is is -- at what point in

15   time does that need to happen?  I mean, if we can resolve these

16   issues, shouldn't we have the chance before we burden

17   individuals --

18             THE COURT:  No.

19             MR. GOLDBERG:  -- before we incur costs?  Are

20   plaintiffs going to have to share those costs?  Because you're

21   talking about witnesses potentially in China, India, all over

22   the globe.  And why should we jump to that without even having

23   met and conferred one time?  We --

24             THE COURT:  Mr. Goldberg, here's the reason.  Because

25   the plaintiffs don't have enough information to make a

1    meaningful submission to you of search terms and custodians to

2    you.  That's why they have to submit 443 terms to you, because

3    they don't have enough information to set the parameters of

4    what they want.

5              MR. GOLDBERG:  I -- I think we understood the

6    defendants have already incurred extensive costs to produce

7    200,000 pages of documents, all of which was provided to the

8    FDA.  So the Federal Drug -- Food and Drug Administration can

9    conduct its investigation.  All of the key witnesses are in

10   those documents.  That was the point.

11             All of the people who have been communicating with

12   the FDA on this issue, all of the people involved in the

13   recall, in identifying the contamination, in testing it are in

14   those documents.

15             If plaintiffs spent the time reviewing those

16   documents, maybe -- maybe  they realize that the custodian list

17   we provided is sufficient, maybe they have a few additional

18   names.  But that was the purpose of the core discovery, not to

19   sub -- we could have done this months ago then and saved the

20   cost.

21             But, Your Honor, the suggestion --

22             THE COURT:  Mr. Goldberg, time out.  The Court's

23   order is going to provide that if you don't -- I'm telling you,

24   so we can cut this discussion short.  If the defendants won't

25   agree to do it voluntarily, the Court is going to order it.

1    The alternative is 30(b)(6) depositions, and discovery

2    disputes, and fights, and spending money that we -- and time

3    that we don't need to.

4              This is in the defendants' best interest.

5              MR. GOLDBERG:   The question really is the timing.

6    Are we going to have the opportunity to spend some time trying

7    to do this the way every other case in Federal Court is done,

8    with meet and confers, because this process is not in the

9    Rules, the process that is being proposed.

10             That we do something that's proposed under the Rules,

11   which is meet and confer, determine if we can find some common

12   ground.  Determine where we can't find common ground, and have

13   -- if there are going to be interviews or those issues.

14             But there should be a period to try and work through

15   some of these issues, otherwise you are absolutely changing the

16   way practice is done in every MDL.  Because this will be the

17   standard.  We're going to just go right to the formal

18   interviews, which are not under the Rules.

19             Cut to the chase, plaintiffs can do whatever they

20   want.  And the 443 search terms is not because they're not

21   sophisticated lawyers who can't figure it out.  It's because

22   they want to have the broadest possible discovery.  That search

23   term list will only grow if they meet with people.

24             So the -- the -- if the Court is absolutely decided

25   on this issue, it should at least provide the parties an

1    opportunity to resolve these issues, so you're not burdening

2    individual witnesses who are scattered around the globe on

3    these issues.

4            And do it between now and December 11th.

5            THE COURT:  Mr. Goldberg, with due respect, I think

6    you're naive if you think that the plaintiffs aren't going to

7    review the documents that have already been produced.  And I

8    think you're naive if you think there's not going to be meet

9    and confer sessions before you meet in person with a

10   representative of your client who's knowledgeable about these

11   issues.

12           I can tell you from ex -- yes, maybe they don't do

13   this in other cases, maybe.  But I know that having been in

14   prac -- having been in your shoes hundreds of times, hundreds

15   when I was in practice, I know how to do things, and we know

16   how things work.

17           We did this in Benicar.  It saved an enormous,

18   enormous amount of time and money.  Now this is a little bit

19   harder case, because we're not dealing with one or two

20   defendants, admittedly.  But we -- it allows -- as I see it,

21   the plaintiffs are talking to you with one hand behind their

22   back.

23           They don't know answers to basic questions.  Well

24   maybe they do, but I'm not aware of it.  Where were these

25   factories?  How many different factories were they?  When did -

1    - people can't even tell how many pills are in a lot or in a

2    batch.  This is basic information that, instead of them taking

3    a deposition, they could sit down in my jury room across the

4    table, informally, privileged, confidential and get this

5    information.

6              Isn't that a much easier way to do things then to go

7    through this whole rigamarole of dispute letters, and orders,

8    and opinions, and 30(b)(6) depositions?

9              MR. GOLDBERG:  Absolutely it may be, but it's the

10   question of timing, because you're doing this -- what's the

11   purpose of the 122 document requests?  We're going to produce

12   all this information.  At the same time you're going to

13   interview witnesses about the information?  It's duplicative.

14   It's redundant.  And the timing is not the right timing.

15             Because they can get all of that -- and they've

16   requested all the information you have -- you just identified.

17             THE COURT:  Okay.  Let's move on.  So according to my

18   chronology, the first draft of the search terms and the

19   custodians was produced on what, September 16?  And then the

20   deadline to exchange comments is October 15, that's what I have

21   down.

22             UNIDENTIFIED PLAINTIFF COUNSEL:  There is just one

23   tweak to that.  We -- plaintiffs served our search terms per

24   the order of September 16.  The defendants have an extension.

25   They served their custodian lists Monday night, the

 1    twenty-third, at night.

 2              THE COURT:  And then I have -- well October 15 or

 3    thereabouts the parties will have exchanged comments about

 4    custodian, search terms, and document requests.  Right?

 5              So then you have until October 15th, until a couple

 6    of days before December 11 to meet and confer, hopefully meet

 7    with knowledgeable people and try and work this out.  And

 8    whatever you can't work out, gets presented to the Court to be

 9    resolved on December 11th or thereabouts.

10              That's what the plan is.  Okay?  The terms of the

11    order whether you meet -- it makes sense to meet and confer

12    before you have these personal meetings, but undoubtedly

13    they're going to be necessary to give plaintiffs the

14    information they need to narrow and focus their document

15    requests.

16              And I say it, I'll say it again, this is all in the

17    defendants' interest.  Because when we get to December 11, and

18    plaintiffs have all the information they need to focus their

19    document requests, and if they don't do it, it's going to be

20    denied.  But if they come to Court on December 11 and say,

21    well, we don't have the basic information we need, Judge,

22    that's why we have to give these broad requests, because their

23    people won't sit down with us, that argument may carry some

24    weight.

25              Okay.  So that takes care of four and five on the

1    agenda.  Number six requests for definitive log batch

2    information.  Have we covered that?

3              UNIDENTIFIED PLAINTIFF COUNSEL:  I believe so, Your

4    Honor.

5              THE COURT:  Okay.  Number seven, FDA updates.

6    Plaintiff said they haven't received any.  Defendants say they

7    produced it.  So is there a dispute here?

8              MR. PAREKH:  Your Honor, Behram Parekh on behalf of

9    plaintiff.  So we have a question as to whether or not they're

10   actually producing everything, and that question arises

11   because, for example, on the FDA's website is a FOIA request

12   that was made by Duane Morris, we're assuming on behalf of

13   their client.

14             That actual FOIA request has never been produced to

15   us.  So we don't know -- I mean, we don't know what they're

16   actually communicating, but this is just one example where we

17   can tell that there's a document that's missing.

18             It also looks like the FDA continues to have recalls,

19   continues to have communications.  Those communications aren't

20   being produced to us, and we're assuming that the FDA is not

21   just doing this, you know, blindly without talking to

22   defendants.

23             Can we tell exactly what's missing?  No.  But the

24   fact that we've gotten so little seems to indicate that they're

25   not complying with the seven-day requirement for producing

1    communications.

2            THE COURT:  Anyone want to state from defendants'

3    perspective as to this?

4            MR. GOLDBERG:  Your Honor, I mean, I think we

5    provided our statement in the letter, we are producing the

6    information if it was a FOIA request and it didn't come from a

7    party.  But the communications, we've provided letters to

8    plaintiffs on July 1st, 2019, August 23rd, 2019, August 28th,

9    2019.

10           The defendants are very clear about their obligation,

11   and are working to satisfy the obligation.  There's no

12   indication, other than an assumption.  But of course that's --

13   that's part of -- that's part of the issue here is, you know,

14   we're under an obligation, you know defendant is going to flout

15   Your Honor's order.  And the information has been provided.

16           THE COURT:  Does anyone know offhand in what order

17   the FDA issue was memorialized?  I want to take a look at that

18   order.

19       (Pause)

20           MR. GOLDBERG:  Perhaps document number 88 is what --

21   document number 88 was the Court's core discovery order.

22           THE COURT:  Okay.  I've got it.  Thank you, Mr.

23   Goldberg.  Seven days after it sends to the FDA or receive the

24   FDA -- from the FDA a communication, the responding defendants

25   shall serve plaintiffs with a copy of the responsive

1   communication.

2           It's questionable whether a FOIA request is

3   responsive.  I'm not saying it is or it isn't.  But it's not

4   entirely clear that a FOIA request is within the scope of the

5   Court's order.  I can tell you that that wasn't the intent of

6   the order to deal with FOIA requests.

7           The intent of the order was to deal with the recall.

8   So if Duane Morris or attorneys send letters to the FDA

9   regarding the recall, that has to be produced.  Or the company

10  itself presumably sends letters, emails, that has to be

11  produced.  I don't think it was the contemplation of the Court

12  to include FOIA's in that order, although there is an order

13  earlier in the case where I think the Court ordered plaintiffs

14  to produce to defendants documents obtained from a FOIA.

15          At the time I suppose we didn't think of putting the

16  same obligation on the defendants.

17          MR. PAREKH:  So we have to put that in the order from

18  today's conference.

19          THE COURT:  I think that makes sense.

20          UNIDENTIFIED PLAINTIFF COUNSEL:  Your Honor --

21          MR. GOLDBERG:  And, Your Honor, I would just ask that

22  the order be reciprocal in the sense that we certainly have an

23  obligation as the Court's ordered to supplement FDA

24  correspondence in seven days from receipt.

25          And that the plaintiffs are to have an obligation

1    within seven days of receipt of documents in response to a FOIA

2    request, to supplement whatever they receive from the

3    Government.

4              THE COURT:   Oh, no question.   It's all right there --

5    that order is already in place.   Plaintiffs have been ordered

6    to produce responses to FOIA.

7              MR. GOLDBERG:   Right.   And I think they produced what

8    they had at that time.   I'm only saying that if they received

9    information since then, within seven days of receipt, just that

10   we have the obligation, plaintiffs should have a similar

11   obligation.

12             MR. PAREKH:   Your Honor, we agree, and we have -- and

13   we have actually supplemented the one FOIA response that we've

14   received.   So we have been doing that.   I -- I understand that

15   whether or not the FOIA request -- the FOIA request was sent to

16   the FDA.   So it's a communication from Duane Morris to the FDA.

17             But I understand that there's a question as to

18   whether or not that really falls.   But another indication is

19   you know the recent Aurbindo and Lantech warning letters that

20   went out from the FDA.   We don't have those, we don't a

21   response to those.

22             THE COURT:   What I'm going to do is, I'm going to put

23   in the order I'm just going to remind the parties of their

24   obligations.   I'm getting representations from the defendants

25   that they did it -- I'm reminding the defendants that they have

1    an obligation to do it.

2              I assume very competent counsel we have in this case,

3    right after this conference is going to go back to their client

4    to make sure they have everything.  And I wouldn't be surprised

5    in the next few days if you get a supplement.

6              That's really the best I can do.  We have to rely on

7    -- on extremely competent counsel to do what they're supposed

8    to do.  And unless someone proves me wrong, that's what I'm

9    going to continue to do.  So that will take care of the FDA

10   issue.

11             Number eight, request for informal meetings.  I've

12   talked about that.  I hope the Court doesn't have to order it.

13   But if they don't occur, the Court's going to order it.  And

14   like I said, Judge Kugler and I discuss this in detail and

15   we're in lock-step on this issue.  And no one is going to

16   convince us otherwise that it's not in the best interest of the

17   defendants that this occur.

18             Number nine, Hetero and Aurobindo.  I continue to

19   hope that Hetero and Aurobindo change their positions.  I think

20   we're being distracted by these 30(b)(6) depositions.  But,

21   unfortunately, they're necessary.  But if that's the position

22   they take that they're not going to produce documents from

23   overseas, we have to find out if there's a duty to produce it.

24             So I understand the schedule.  But I continue to hope

25   that that issue is eventually going to be moot.  The loose

 1    scheduling of October, November and December conferences, why

 2    don't we hold that for when we're together with Judge Kugler.

 3    I understand you have your mass tort conference.  It looks like

 4    a lot of you are going to be there, well but more on the

 5    plaintiffs' side.  It sounds like you're going to fly solo, Ms.

 6    Cohen, at that conference.

 7              I didn't see a whole lot of defense counsel at that

 8    conference.

 9              MS. COHEN:  Yeah, I'm trying to represent the -- the

10    defense team.

11              THE COURT:  Right.  But I really don't see a big

12    problem with rescheduling.  And why don't we deal with that

13    this afternoon with Judge Kugler.  And the JPL motion to expand

14    the MDL, we'll just have to wait to see what happens.  I saw

15    there was another Losartan recall yesterday, and I just don't

16    know how it's not going to be part of this case, but we'll see.

17              Okay.  That's the agenda items.  Is there anything

18    else we think we need to address before we adjourn until 2:00?

19              UNIDENTIFIED PLAINTIFF COUNSEL:  Just to come back to

20    the corporate rep deps on that possession, control, custody

21    issue.  In the event that the defendants don't decide to just

22    provide the information and move forward, I think that it would

23    be helpful, Your Honor, if we know that we're going to get the

24    names of who's going to be produced and schedule those

25    depositions like in the next few days to week, because

1    otherwise if we wait until the meet and confer advances, we'll

2    be in mid to late October, with a deadline of November 8th to

3    take depositions.

4              THE COURT:  Anyone want to speak for the two

5    companies that are at issue?

6              MS. POLETTO:  Janet Poletto from McKeon and Poletto,

7    Your Honor, for Hetero USA.  I am learning probably today or

8    tomorrow whether or not Hetero USA will be in a position to

9    produce the documents from India.  They may have a

10   communication line in place now.  I can confirm that.  Once I

11   know that I will let Adam know one way or the other.  And then

12   we can talk about if it's delayed, we can't do it, where to go

13   from there.

14             MR. SLATER: Fair enough.  Thank you.

15             THE COURT:  And --

16             MS. HEINZ: Good afternoon, Your Honor.  This is

17   Jessica Heinz for Aurolife.  Good morning, I guess.  We have no

18   problem with letting them know in a couple of weeks who will be

19   designating, that's fine with us.  I think that takes us to the

20   same date that we agreed to produce our objections.

21             THE COURT:  Okay.  Why don't we say in two weeks the

22   two parties will identify who the deponent or deponents are,

23   and the parties have to provide a firm date for the deposition.

24   And if they can't agree on a date, the Court will reluctantly

25   set it itself.  But I don't want to do that.

Colloquy                                          74

1          And I continue to hope, because I think it's in your

2     clients' best interest, to avoid these depositions so we can

3     get -- we're talking about core discovery, one way or the other

4     it's going to have to be produced at some time.  Why not just

5     produce it and avoid this discovery?

6                   MS. POLETTO:  We understand, Your Honor.

7                   THE COURT:  But if your client wants to fight it,

8     it's fine.

9                   MS. POLETTO:  I will let you guys know if anything

10    changes.

11                  THE COURT: Thank you very much, Counsel.

12                  UNIDENTIFIED PLAINTIFF COUNSEL:  Your Honor, at the

13    risk of inflaming a touchy subject, but because you've made it

14    so clear the importance of December 11th as the date for all of

15    us.  Might there be a suggestion that since all counsel are

16    here, everyone owns a cell phone.  That we at least put some

17    number of dates in the hopper?

18                  THE COURT:  We'll adjourn right now and you can stay

19    here as long as you want and agree on it.  I think that's a

20    great idea to schedule things 30, 60, 90 days ahead, because

21    then you know it will get done.

22                  UNIDENTIFIED PLAINTIFF COUNSEL:  Right.

23                  THE COURT:   Everyone's on notice, but that's --

24    that's going to be an important date, because, let's face it,

25    substantively between -- substantively between August and

Colloquy                                                                    75

1    December, what's happening in the case?

2              Not a whole lot.  You're working on -- we're working

3    on the background documents, we're working on the fact sheets.

4    We're working on search terms.  No discovery's being produced,

5    no depositions are being taken.  That's why I think December is

6    such an important date.

7              Because we've got to get the case off the ground.

8    Okay?  But stay here.  I think it's a great idea.  Lock in the

9    dates, and if you want them memorialized in the Court order I'm

10   happy to do that.

11             UNIDENTIFIED PLAINTIFF COUNSEL:  Thank you.

12             THE COURT:  Okay.  So for the good of the order, any

13   other issues?  Judge Kugler's not going to be in the best mood

14   this afternoon.  Eagles lost, Phillies lost a double-header.

15   That's why I'm in such a good mood.

16             We're adjourned.  I'll see you 2:00 in Judge Kugler's

17   courtroom.

18             THE CLERK:  All rise.

19        (Proceedings concluded at 11:39 a.m.)

20                          *  *  *  *  *

21

22

23

24

25

1                      C E R T I F I C A T I O N

2              We, Diane Gallagher and Josette Jones, court approved

3      transcribers, certify that the foregoing is a correct transcript

4      from the official digital audio recording of the proceedings in

5      the above-entitled matter.

6

7      ----------------------------          -------------------

8      DIANE GALLAGHER                        DATE

9

10     ----------------------------

11     JOSETTE JONES

12     DIANA DOMAN TRANSCRIBING, LLC

13

14

15

16

17

18

19

20

21

22

23

24