# EXHIBIT A

**Goldberg, Seth A.**

| | |
|---|---|
| **From:** | Christopher Geddis <CGeddis@mazieslater.com> |
| **Sent:** | Friday, November 29, 2019 3:49 PM |
| **To:** | Goldberg, Seth A.; Priselac, Jessica |
| **Cc:** | valpec@kirtlandpackard.com |
| **Subject:** | Plaintiffs' Amended RFPDs |
| **Attachments:** | 2019.11.29 Amended RFPDs to Mfrs Clean.pdf; 2019.11.29 Amended RFPDs to Mfrs Redline.pdf |

Counsel,

Attached is Plaintiffs' amended document requests to the API and Finished Dose Manufacturers, intended to address discussions during the meet and confers, objections, and the Court's rulings on the Macro issues. We have included a clean version as well as a redlined one showing the changes. Please advise if there are any requests you still believe to be objectionable, and in order to streamline the briefing, please advise if there is no objection to any of the requests.

Best,
Chris

Christopher J. Geddis
Associate Attorney
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, New Jersey  07068
(973) 228-9898
cgeddis@mazieslater.com
www.mazieslater.com



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or Mazie Slater Katz & Freeman, LLC (Tel: 973-228-9898) immediately and delete this message, along with any attachments, from your computer. Thank you.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: VALSARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

**Formatted Table**

**PLAINTIFFS' FIRST AMENDED SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL API AND FINISHED-DOSE MANUFACTURING DEFENDANTS**

**TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 34 and Local Civil Rule 34.1, Plaintiffs propound the following amended discovery requests upon each defendant:

## TABLE OF CONTENTS

*DOCUMENTS TO BE PRODUCED:* .......................................................................... 5

   I.   Corporate Organization ........................................................................ 5

   II.   Relevant Custodians ............................................................................ 5

   III.   Policies and Procedures ...................................................................... 5

   IV.   Agreements........................................................................................ 6

   V.   Intra-Defendant Communications ...................................................... 6

   VI.   ANDA and DMF ................................................................................ 7

   VII.   Litigation and Document Preservation ............................................... 7

   VIII.   Manufacturing .................................................................................. 7

   IX.   Bioequivalence .................................................................................. 9

   X.   Testing .............................................................................................. 9

   XI.   Nitrosamines and Contamination ..................................................... 10

   XII.   Regulatory Correspondence and Documents...................................... 11

   XIII.   Complaints and Recalls ................................................................... 13

   XIV.   Warranties and Statements ............................................................... 14

   XV.   Sale and Distribution ...................................................................... 15

   XVI.   Identification of Purchasers.............................................................. 15

   XVII.   Sales and Pricing ............................................................................ 16

   XVIII.   Available Data Sources ................................................................... 19

   XIX.   Defendant-Specific Requests............................................................ 19

## DEFINITIONS:

**"Active Pharmaceutical Ingredient" ("API")** ~~means~~ is defined as any substance ~~or mixture of substances~~that is intended ~~to be used in the manufacture of~~for incorporation into a ~~finished~~ drug product and ~~that, when used in the production of a drug, becomes an active ingredient in the drug product. Such substances are~~is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure ~~and~~or any function of the body. Active pharmaceutical ingredient does not include intermediates used in the synthesis of the substance." 21 C.F.R. § 207.1; see also 21 C.F.R. § 314.3.

**"API Manufacturer"** is defined as any entity that manufactures the active pharmaceutical ~~ingredients (APIs)~~ingredient (API) for valsartan.

**"Finished Dose Manufacturer"** includes any entity that manufactures valsartan in a finished dosage form that is engaged in manufacturing, preparing, propagating, compounding, processing, packaging, repackaging, or labeling of valsartan. The term "finished dose manufacturer" also includes entities who hold ANDAs.

**"Communication(s)"** means the transmittal of information, in the form of facts, ideas, inquiries, documents or otherwise, and includes all transmissions of information received or transmitted by you, including correspondence, regardless of whether you are an author or addressee of such transmittal.

**"Documents"** includes, without limitations, any written, printed, typed, photostatic, photographic, recorded or otherwise reproduced or reproducible communication or representation, whether comprised of letters, words, numbers, pictures, sound or symbols, or any combination thereof, whether intended for internal use, dissemination to outside entities, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created that have any nonconforming notes or other markings. Without limiting the generality of the foregoing, the term "Document" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, summaries, statistical statements, financial statements, presentations, work papers, accounts, invoices, purchase orders, ledgers, journals, book of accounts, local records, reports and/ or summaries of investigation, trade letters, press releases, comparisons, books, calendars, calendar entries or invitations, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meeting, or other communications of any type, including inter-office and intra office communication, questionnaires, surveys, charts, graph, photographs, recordings, tapes, back-up tapes, discs, data cells, printouts, all other data compilations from which information can be obtained (translated, if necessary, into usable form), and any preliminary versions, drafts or revisions of any of the foregoing and shall also include electronic communications, whether maintained presently in the normal course of business or available in back-up or legacy data formats, wherever found or maintained, including all servers, hard drives, thumb drives, palms, blackberries, cell phones, laptops and firewalls. Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any and every means. "Documents" also includes the content of any applicable computer database.

**Relevant Time Period:** Unless otherwise specified, the relevant time period applicable to all requests is ~~January 1, 2010 to the present~~the time period specified by the Court.

> Formatted: Justified

**"Regulatory and Regulatory Authority"** refers to United States and foreign regulatory agencies.

> Formatted: Justified

**"TPP"** refers to Third Party Payors, including health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plants, third party payers, and any other health benefit provider in the United States of America and its territories.

> Formatted: Justified

**"Valsartan"** means any drug with valsartan as an active ingredient ~~and also includes~~, including the API for valsartan on its own, as well as all finished drug formulations of valsartan~~, including any valsartan containing drug~~.

**"You," "your"** or **"defendant"** shall be used interchangeably and refers to the parties to which these requests are directed.

## DOCUMENTS TO BE PRODUCED

### I. CORPORATE ORGANIZATION

1. Produce organizational charts setting forth the corporate organization for each named defendant, from January 2010 to the present as follows:
   a. General corporate organizational charts for each defendant, including any affiliated entities involved in the manufacture, testing, distribution, or sale of valsartan;
   b. Medical affairs/clinical affairs department, or the equivalent;
   c. Quality assurance department, or the equivalent;
   d. Manufacturing department, including any departments involved in the manufacturing process for valsartan;
   e. Procurement Department;
   f. Sales department;
   g. Marketing department;
   h. Research and development department;
   i. Department(s) responsible for designing, funding, or supervising clinical trials (including all Phase I, II, III, and IV);
   j. Regulatory department;
   k. Department responsible for epidemiology and/or statistical analysis;
   l. ~~Professional~~Department responsible for providing professional education ~~department~~to physicians;
   m. Department(s) responsible for establishing or maintaining relationships involving valsartan, with any other defendant named in this MDL.
2. ~~From 2010 to the present, produce~~Produce organizational charts or similar documents ~~sufficient to demonstrate~~setting forth:
   a. All corporate officers;
   b. All members of the Board of Directors;
   c. All persons or entities which own or owned 5% or more of defendant's common stock~~; and,~~.
3. To the extent you conduct business relating to the manufacture, distribution, or marketing of valsartan with any other defendant in the above-captioned MDL, produce documents ~~sufficient~~ including but not limited to ~~demonstrate~~contracts and payment records demonstrating the nature, extent, and length of this business relationship.

### II. RELEVANT CUSTODIANS

4. Produce documents ~~sufficient to identify~~identifying the corporate employees or third parties responsible for or involved in the (1) manufacture, (2) testing, (3) ~~purity and contamination, (4)~~quality assurance, (54) risk assessment, (65) medical and clinical assessments, (6) regulatory activities, (7) ~~safety, (8)~~communications with regulatory agencies, (9) ~~formulation, (10)~~8) production, (119) distribution, (1210) packaging, (13) ~~evaluation, (14)~~11) sale, (1512) marketing, and (1613) communications with private individuals or entities, with regard to valsartan, and/or the ingredients thereof.

### III. POLICIES AND PROCEDURES

5. Produce ~~all documents setting forth~~ all draft and final versions of policies, procedures, standard operating procedures, or protocols for or relevant to the (1) manufacture, (2) testing, (3) ~~purity and contamination, (4)~~ quality assurance, (5~~4~~) risk assessment, (6~~5~~) medical and clinical assessments, (6) regulatory activities, (7) ~~safety, (8)~~ communications with regulatory agencies, ~~(9) formulation, (10)~~ (8) production, (11~~9~~) distribution, (12~~10~~) packaging, ~~(13) evaluation, (14)~~ (11) sale, (15~~12~~) marketing, and (16~~13~~) communications with private individuals or entities, with regard to valsartan, and/or the ingredients thereof. In addition, provide all indexes or lists of the requested documents.

## IV. AGREEMENTS

Formatted: Font color: Auto
Formatted: Font: Garamond, Font color: Text 1
Formatted: Indent: Left: 0"

~~For the following requests, the relevant time period should begin on the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.~~

6. Produce all formal and informal agreements, contracts, or licenses that the answering defendant is a party to, with regard to (1) manufacture, (2) testing, (3) ~~purity and contamination, (4)~~ quality assurance, (5~~4~~) risk assessment, (6~~5~~) medical and clinical assessments, (6) regulatory activities, (7) ~~safety, (8)~~ communications with regulatory agencies, ~~(9) formulation, (10),~~ (8) production, (11~~9~~) distribution, (12~~10~~) packaging, ~~(13) evaluation, (14)~~ (11) sale, (15~~12~~) marketing, (16~~13~~) communications with private individuals or entities, and (17~~14~~) procurement of components or ingredients, with regard to valsartan and/or its ingredients.

7. Produce all ~~documentation, including~~ agreements, draft agreements, memoranda, and ~~physician~~payment or expense ~~reports, relating, referring~~records, with regard to ~~or embodying~~ any attempt by defendant to retain, engage or otherwise provide financial support or item of value to any person with regard to proposed or actual scientific or medical study of valsartan~~, from January 1, 2010 to the present.~~

8. Produce all ~~documents relating, referring to or embodying~~documentation of any ~~discussions, negotiations or contracts~~agreements to engage any third party to represent your interests before the FDA or any regulatory authority, ~~or any Committee or subcommittee thereof, in regard to valsartan, including, but not limited to, retainer agreements or consultant agreements~~with regard to valsartan.

9. Produce all ~~documents relating, referring to or~~documentation of any agreements embodying the retention of persons in any medical or scientific discipline to study, assess or analyze the safety, purity, or contamination of valsartan ~~by~~for or on behalf of any defendant~~, whether retained directly by defendant or otherwise.~~

## V. INTRA-DEFENDANT COMMUNICATIONS

10. All communications between any of the defendants related to, (1) manufacture, (2) testing, (3) ~~purity and contamination, (4)~~ quality assurance, (5~~4~~) risk assessment, (6~~5~~) medical and clinical assessments, (6) regulatory activities, (7) ~~safety, (8)~~ communications with regulatory agencies, ~~(9) formulation, (10),~~ (8) production, (11~~9~~) distribution, (12~~10~~) packaging, ~~(13) evaluation, (14)~~ (11) sale, (15~~12~~) marketing, ~~and (16~~(13) communications with private individuals or entities,

and (14) procurement of components or ingredients, with regard to valsartan and/or ~~the~~its ingredients ~~thereof.~~

## VI. ANDA AND DMF

11. To the extent any ANDA file for ~~any~~ valsartan was not produced in whole or in part during Core Discovery, produce the entire file, whether or not ultimately approved, ~~beginning from the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.~~

12. Produce all correspondence with the FDA concerning any ANDA for valsartan, whether or not ultimately approved, ~~beginning from the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest~~including prior to the relevant time period set by the Court [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

13. Produce all documents containing the list of ingredients in valsartan, which were provided to any regulatory authority, beginning from the date you first began development of the process for manufacturing the API for valsartan, ~~first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest~~ [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request]. .

14. Produce all documents relating to New Drug Applications filed by you relating to valsartan, beginning from the date you first began development of the process for manufacturing the API for valsartan, ~~first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.~~ [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

15. Produce all complete drug master files for valsartan, to the extent not produced to date. [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

## VII. LITIGATION AND DOCUMENT PRESERVATION

16. Produce all document retention or destruction policies ~~in effect from January 1, 2010 to the present.~~

17. Produce documents sufficient to show the name, case caption, attorney, and/or status of any lawsuit filed against you relating to valsartan contamination.

18. Produce all documents upon which Defendant relies to support each and every affirmative defense asserted in the Answer or which you may assert.

## VIII. MANUFACTURING

~~For the following requests, the relevant time period should begin on the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.~~

> **Formatted:** Left

> **Formatted:** Font color: Auto

19. Produce all documents with regard to the manufacturing process for the active pharmaceutical ingredient in valsartan, including any modifications thereto.

20. Produce all documents with regard to the machines, materials, and substances (including but not limited to new or recycled solvents, tainted or contaminated solvents) utilized in the manufacturing process for the active pharmaceutical ingredient in valsartan, including specifications, manuals, material safety data sheets, machine settings and calibrations, and any modifications thereto.

21. Produce all documents (including photographs or video) with regard to any testing or inspections of the machines, materials, and substances utilized in the manufacturing process for the active pharmaceutical ingredient in valsartan.

22. Produce all documents setting forth the manufacturing/fabrication/production process for the finished drug formulation of valsartan sold by you or any of your affiliated entities~~;~~, including any quality assurance and testing, and any modifications thereto.

23. Produce all documents identifying any patented device, machine, or technology utilized in the ~~manufacture or testing of valsartan.~~ testing of valsartan for unknown peaks, impurities (elemental or otherwise), and residual solvents in either the valsartan API or the finished dose versions of your VCDs

24. Produce all documents relating to ~~all~~ the filing of any patents ~~filed~~ by you or employees and/or agents associated with you ~~to,~~ with any foreign regulatory body regarding ~~any~~ the manufacturing ~~processes associated with the creation or manufacturing of~~ process for valsartan~~, including all supporting~~.

~~24. Produce~~ documents ~~and/or correspondence associated with the filing of those patents.~~

25. ~~Produce documents which evidence~~ sufficient to show the name, address, and role of any third party which supplied you with valsartan or any ingredient, material, or component used in the manufacture of valsartan, and any evaluation or testing thereof.

26. Produce all certificates of analysis or similar documents concerning analysis of the purity or contents of valsartan, ~~or~~ and documents and communications concerning the same.

27. Produce ~~complete~~ documentation setting forth (1) each lot, batch, or other production quantity of valsartan manufactured, purchased, or sold by defendant (including discarded or recalled lots or batches), (2) the dates of manufacture/production for each, (3) the solvent(s) (including residual or reused solvents) utilized in the manufacture of each, and (4) any information you had or have with regard to potential risks of the use of any solvent utilized including residual or reused solvents.

28. Produce ~~all documents relating to~~ documentation of all scientific journal articles submitted to any academic or scientific publication, written or drafted in whole, or in part, by your employees or scientists or third parties who received funding or other forms of compensation from you, regarding the manufacturing of valsartan, including ~~any~~ the final version, any drafts, edits, and peer reviewed feedback~~, as well as all communications regarding any possible submission, acceptance or rejection of those journal articles~~.

29. All ~~documents and~~ communications and documents exchanged between you and any third party~~, outside consultant, university, or individual scientist~~ regarding the manufacturing process associated with the creation of valsartan, including but not limited to the ~~tetrazole ring formation process. These documents should include requests to study the manufacturing process used to create valsartan, exchange of data regarding the manufacturing process used to create valsartan, requests to draft academic journal articles regarding the manufacturing process used to create valsartan, and all documents sufficient to show the payments made and/or contracts between you and those third parties.~~ use of solvents, the tetrazole ring formation process, testing, and contamination issues.

IX. **BIOEQUIVALENCE**

For the following requests, the relevant time period should begin on the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.

30. All documents regarding documentation of the bioequivalence of any valsartan sold or manufactured (in whole or in part) by you to the Reference Listed Drug ("RLD"), including but not limited to, testing, correspondence communications with the FDA, communications with customers, suppliers, or other third parties, and certifications of bioequivalence.

31. All documents and communications regarding marketing materials referencing the equivalence bioequivalence of any valsartan sold or manufactured (in whole, distributed, or in part) marketed by you to their RLD, including all marketing materials regarding the equivalence of your products with the RLD.

32. All documents and communications regarding the identification by any person or entity of any valsartan manufactured, utilized, or sold by or to you as not being bioequivalent to the RLD.

33. All documents and communications relevant to valsartan entries in the FDA's "Orange Book."

34. All documents and communications regarding Documentation of any patent litigation between you and either the Brand Manufacturer of the RLD regarding valsartan, or other generic companies which had filed an ANDA application for a valsartan product including all filings, briefings, exhibits, citizen petitions, and/or correspondence with the FDA or another regulatory agency.

X. **TESTING**

For the following requests, the relevant time period should begin on the date you first began development of the process for manufacturing the API for valsartan, first submitted an ANDA or DMF to the FDA, or January 1, 2010, whichever is earliest.

35. Produce all documents setting forth the planning, occurrence, or addressing the results of any testing (including chromatography) of valsartan that had the potential to directly or indirectly identify impurities or contamination.

36. Produce all documentation with regard to the first test that indicated impurity or contamination of valsartan that was potentially due to a nitrosamine, whether or not identified as nitrosamine contamination at the time.

37. Produce all documentation with regard to each notification to defendant of impurity or contamination of valsartan that was, or potentially was, due to a nitrosamine, including the full documentation of the testing and analysis that led to the identification of the actual or potential whether or not identified as nitrosamine contamination at the time. In connection with this request, separately identify the first such notification.

38. Produce all documents or communications with regard to the actual or attempted detection of impurities or contaminants in valsartan or any component or ingredient thereof, including chromatographs, and intermediate testing.

~~39.~~38.    Produce all documents with regard to evaluation by an employee of defendant or a third party, ~~of~~with regard to the health risks of valsartan contamination as limited by the Court's Order.

~~40.~~39.    Produce documentation of all ~~documents relating, referring to or embodying~~ studies ~~on~~of the ~~safety,~~ ingredients, impurities, and actual or potential contamination, of valsartan conducted by any third parties, including, but not limited to, those conducted by Contract Research Organizations (CRO), educational institutions, publicly or independently funded groups, competitors, trade groups or associations, regulatory entities, irrespective of whether such studies were conducted at the direction of Defendant.

~~41.~~40.    Produce ~~all documents concerning~~ documentation of any ~~receipt, discussion, studies, report or~~ analysis ~~or review of clinical experience reports for valsartan, including, but not limited to, formally submitted adverse reaction reports, communications (whether written or oral), case reports, published clinical experience reports, or any other such report~~ made known to Defendant ~~concerning valsartan, including, but not limited to: 1)~~with regard to the relationship between the use of contaminated valsartan and potential or confirmed injuries; ~~b) investigator reported events identified~~and the review of same by ~~patient number and relevant records; and c)~~ any employee or consultant ~~who reviewed and/or adjudicated such events for causation~~of Defendant.

~~42.~~41.    ~~As to~~Provide documentation of the results of any clinical or animal study regarding valsartan conducted with potentially contaminated valsartan during the relevant time period, whether or not sponsored by, financed by, undertaken by, or suggested by Defendant, ~~provide all documents concerning said study, including, but not limited to,~~ and any internal analysis ~~and conclusions, engagement letters, contracts, agreements with investigators, agreements with study locations, protocols, status reports, raw data, summary of findings, internal memoranda, drafts of reports, final reports, manuscripts, submissions to publishers, submissions to any regulatory authority.~~thereof.

~~43.~~42.    Produce ~~all documents relating, referring to or embodying~~documentation of any epidemiology studies or analyses known to defendant regarding valsartan, including but not limited to, any provided to or received from any regulatory authority, ~~SAS data sets, combined analysis or pooled analysis whether or not published in medical literature or submitted to any regulatory authority, study hypotheses, test protocols, data compilations, summaries of results, drafts of reports, final reports, published or unpublished articles or studies, presentations and poster sessions, compensation, engagement of investigators, investigators' brochures, and internal memoranda.~~together with the underlying data including for example SAS data sets, and any internal analysis thereof.

~~44.~~43.    Produce ~~documents sufficient to show~~ complete documentation of (a) all testing relevant to determination of purity, bioequivalence, or contamination, prior to any recall, of valsartan you manufactured or sourced, (b) all testing, relevant to determination of purity, bioequivalence, or contamination,, after any recall, of valsartan you manufactured or sourced, (c) the results of the foregoing testing; (d) any such testing that was considered but not performed before or after any recall, including the reason(s) why such testing was not performed, and (e) to the extent any lot, batch, or other production quantity was not tested for impurities, bioequivalence or contamination, complete documentation with regard to the reason(s) why no such testing was performed.

**XI.    NITROSAMINES AND CONTAMINATION**

45.44.     Produce complete documentation identifying each lot, batch, or other production quantity of valsartan, and whether and how or why: (a) each was(a) confirmed to be contaminated and the quantification of the contamination; (b) each was assumed to have been contaminated and the quantification of the contamination; (c) each was confirmed not to be contaminated; (d) each was assumed not to be contaminated, and (e) each was not confirmed or assumed to be contaminated.

46.45.     Produce all documents with regard tocomplete documentation of any testing for any nitrosamine compound, including but not limited to NDMA, NDEA, NMBA, and any other nitrosamine or carcinogenic contaminant that has been directly or indirectly tested for and/or identified in valsartan, or any other API or finished drug manufactured, formulated, distributed, or sold by the answering defendant, as limited by the Court's Order.

47.46.     Produce all documents evidencingcomplete documentation of any testing or research conducted by you or a third party on your behalf to determine the existence or amountquantification of contamination in any valsartan API or finished drug formulation. .

48.47.     Produce all documents and communicationscomplete documentation with regard to the analysis of health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance, conducted by you or any third party on your behalf.

49.48.     Produce all studies, data, or other scientific or medical information reviewed or considered by any employee or third party on your behalf with regard to the health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance.

50.49.     Produce all formal or informal reports or complaints by or to Defendant or any other person or entity to your knowledge, with regard to valsartan contamination.

51.    Produce every document relating, referring to or embodying any opinion by a physician, or a scientist, or a medical or scientific expert, given after the first notification of potential nitrosamine contamination of valsartan, regarding the safety or efficacy of valsartan including, but not limited to internal documents, reports prepared in legal proceedings, opinions expressed in depositions or trial, reports submitted to scientific journals, opinions expressed at medical conferences and opinions provided as testimony, reports or statements to the FDA or any regulatory authority, or any advisory committee thereof.

**50.** Produce all documents known to you, embodying any analysis or opinion by any person or entity, regarding the potential health risks of nitrosamine contamination of valsartan.

## XII.    REGULATORY CORRESPONDENCE AND DOCUMENTS

52.51.     Produce all regulatory documentation and communications with regard to contamination or recalls of valsartan, as limited by the Court's Order.

53.52.     Produce all regulatory documentation and communications with regard to any aspect ofthe use of solvents, tetrazole ring formation, and potential impurities or contamination in connection with the manufacturing process for valsartan.

54.53.     Produce transcripts, notes, memoranda, or other documentation of any hearings or other proceedings or meetings which took place at or with any regulatory agency relating to the actual and/or potential contamination or recall of valsartan.

55.54.     Produce all documents with regard to any FDA Advisory Panel meetings regarding valsartan contamination, including but not limited to:
a.    All documents relating or referring to any communications between Defendant (or any agent or consultant of Defendant), and the FDA or any Advisory Panel Member;

b. All documents relating to or referring to any financial contributions or other items of value provided by Defendant to Panel Members or their institutions/organizations; and

c. All documents relating, referring to or embodying minutes of meetings, agendas, dossiers, submissions, test summaries, internal memoranda regarding strategies and issues, Questions and Answers, scheduling, or any other documents concerning the Advisory Panel, submissions thereto, or the topic(s) discussed.

56.55.　　Produce all Establishment Inspection Reports (including foreign regulatory equivalents of Establishment Inspection Reports) and related documentation (including photographs or video) concerning your facilities or the facilities of any other defendant relating to valsartan or any equipment or systems used in the manufacture, fabrication, packaging, distribution, or sale of valsartan.

57.56.　　Produce all documents relating, referring to or embodying all inspection reports (including 483s, detention reports, and warning letters), or consent decrees, including foreign regulatory equivalents) which pertain in any way to valsartan contamination or any facility in which contaminated valsartan was manufactured, marketed, distributed or otherwise stored.

58.57.　　Produce complete documentation regarding any CAPAs (Corrective and Preventative Actions) relating to the manufacture of valsartan, including documentation showing what caused the CAPA to be opened and/or closed.

59.58.　　Produce all documentation, and related communications, of any complaints or third party communications to or from any regulatory agency with regard to actual or potential valsartan contamination.

60.59.　　Produce all documentation, including source files, for any MAUDE or other adverse event reports submitted to any regulatory agency with regard to valsartan contamination, and any related communications.

61.60.　　Produce complete files for all formal or informal adverse event reports and/or MedWatch reports concerning valsartan, including: a) causation analyses, b) summaries (including, but not limited to, computerized data), analysis or interpretations of any such adverse event report(s) (including any post-marketing submissions); and c) documents which discuss or refer to any adverse event report, or any summary, analysis or interpretation thereof, as limited by the Court's Order.

62.61.　　Produce all databases maintained by you concerning both domestic and international formal and informal adverse event reports and/or MedWatch reports, including the underlying medical information and raw data maintained by you, with regard to contaminated valsartan and as limited by the Court's Order.

63.62.　　Produce all filings with the Securities and Exchange Commission (SEC), addressing any issues related to the sale of contaminated valsartan, including Forms 10-K, 10-Q, 8-K, and proxy statement (Schedule 14A), whether such filings are tentative, final, definitive, or supplemental.

64.63.　　Produce complete documentation of any communications with any state regulatory or health authorities regarding valsartan ingredients, purity, bioequivalence, contamination, or pricing.

65.64.　　Produce all documents and communications concerning complete documentation with respectregard to valsartan, allDefendant's efforts to comply with Current Good Manufacturing Practices (cGMPs), and any actions or inactions that did not meet or might not have met cGMPs, including, but not limited to, documents sufficient to show any cGMP consultants retained as a result of regulatory inspection, reports by any cGMP consultants

retained and provided to the FDA, and responses to FDA 483s and Warning Letters regarding cGMP compliance.

## XIII.  COMPLAINTS AND RECALLS

66.65.    Produce all documents and communicationscomplete documentation with regard to any consideration or implementation of a recall due to contamination of valsartan.

67.66.    Produce all draft recall notices with regard to contamination of valsartan.

68.67.    Produce all final recall notices with regard to contamination of valsartan.

69.68.    Produce all documents andsetting forth or addressing any communications relating to or directly with any customer or consumer relating to the recall (or non-recall) of valsartan due to contamination.

70.69.    Produce all documents and communications relating tocommunications directly with physicians relating to the recall (or non-recall) of valsartan due to contamination.

71.70.    Produce all documents and communications with any person or entity from or to which, or from which, you purchased or sold valsartan, with regard to valsartan contamination.

72.71.    Produce all documents and communications with regard to the scope of any recall considered or implemented with regard to valsartan contamination.

73.72.    Produce all documents and communications with regard to any complaint or concern raised by any person or entity relating to the quality or purity, bioequivalence, or contamination of valsartan.

74.73.    Produce all documents or communications concerning any actual or potential import or export alerts relating to valsartan contamination.

75.74.    Produce all documents and communications concerning any buybacks or refunds that you paid to any purchasers of valsartan in the United States from January 1, 2010related to the present, including but not limited to retail pharmacies, direct purchasers, wholesale distributors, and TPPsvalsartan contamination.

76.75.    Produce all documents and communications (and drafts) to or from Defendant regarding recall of valsartan, provided to consumers, physicians, and TPPs related to valsartan contamination, including lists sufficient to show all persons or entities who received communications notifying them of the recall, the contents of all communications contained in the letters notifying persons of the recall, documentation tracking all correspondence and communications related to the recall, all drafts of letters or other communications created to notify consumers of the recall.

77.76.    Produce all documents relating, referring to or embodying the hiring or retention by any Defendant or by any other person or entity acting on any defendant's behalf, of any public relations firm or any law firm specializing in drug regulatory practices to participate in, orchestrate, organize or otherwise direct any evaluation of recall discussions for valsartan and produce all documents regarding said engagement, including, but not limited to, questions and answers, talk papers, scripts for telephone calls, creation of special advisory or consulting boards, gestures to demonstrate concern for victims, donations to causes important to victims, retention of scientific or medical researchers, advisors or experts and other such public relations strategies.documents sufficient to identify any person or entity retained by Defendant with regard to the recall of valsartan due to nitrosamine contamination.

78.77.    **Note: this request is only directed to API manufacturer defendants and FDA liaison defendants.** Produce all documents setting forth or with regard to, or communications with, Novartis concerning valsartan, including but not limited to, documents

impurity, bioequivalence, or ~~communications relating to testing or evaluation of valsartan,~~ contamination~~, impurities, recalls, pre-commercial negotiations, contracts (including all draft contracts), product specifications, testing specifications, complaints, responses to complaints, investigations, meeting notes, presentations, and communications with any regulatory authority~~.

## XIV.  WARRANTIES AND STATEMENTS

~~79.~~78.      Produce all versions of defendant's labeling, <u>package inserts, patient leaflets, and medication guides</u> for valsartan <u>in the United States</u>, together with a chart of the approval dates and in use dates for all versions that were utilized in the sale and marketing of valsartan.

~~80.~~79.      ~~Documents sufficient to show~~<u>Produce</u> all ~~(past~~<u>statements regarding purity, bioequivalence,</u> and ~~present) labels and packaging materials, including all associated documentation and disclosures~~<u>contamination</u> provided to medical professionals, purchasers, including TPPs, consumers, wholesale distributors, retail pharmacies, and other direct and indirect purchasers of valsartan, for each NDC, Batch Number, and Lot Number of valsartan sold in the United States ~~from January 1, 2010 to the present, including copies and drafts of all such materials, and documents sufficient to show the time period during which each exemplar was in use~~<u>during the relevant time period</u>.

~~81.~~80.      All advertisements, and sales and marketing ~~material~~<u>materials</u> for valsartan~~utilized from January 1, 2010 to the present,~~ and charts setting forth the approval date~~;~~ <u>and</u> in use dates, ~~and medium (i.e. website, sales document, marketing brochure).~~<u>for each.</u>

~~82. Produce final and draft versions of all documents provided to consumers upon purchase of valsartan, (i.e. package inserts, patient brochures.~~

~~83.~~81.      Produce all communications between you and any medical <u>professional or medical</u> association concerning any adverse health effects that may or may not ~~or~~be associated with valsartan <u>contamination</u>.

~~84. Produce documentation of any discussion or submission between Defendant and any medical association concerning any adverse events reported to be associated, regardless of causality, with valsartan..~~

~~85.~~82.      Produce all communications with financial analysts or investors concerning the role of valsartan in your financial or business prospects, including but not limited to any transcripts, presentations or documents concerning any analyst conference call, or business briefing.

~~86.~~83.      Produce all ~~documents and~~communications ~~evidencing questions from and responses to~~<u>with</u> healthcare providers regarding the ~~safety, quality~~<u>purity, bioequivalence, or</u>, recall status, ~~or purity~~ of valsartan ~~from June 1, 2018 to the present~~.

~~87.~~84.      Produce all ~~documents reflecting~~public statements ~~made~~<u>(and drafts) issued</u> by ~~you~~<u>Defendant</u> regarding valsartan ~~quality,~~ purity, <u>bioequivalence, or</u> contamination~~, safety, or manufacturing process, including but not limited to drafts and final versions of annual reports, press releases, and investor presentations~~<u>valsartan</u>.

~~88. Produce all documents reflecting any communication between you and any consumers, medical professionals, healthcare insurers, PBMs, wholesale distributors, retail pharmacies, investors, analysts, or the media regarding valsartan.~~

~~89. Produce all documents with regard to any policy, procedure, or marketing strategy you used to market, advertise, promote, and/or sell valsartan from January 1, 2010 to the present.~~

~~90.~~85.      ~~Produce all documents and~~<u>Produce all</u> communications with the Centers for Disease Control (CDC), National Institutes of Health, World Health Organization, U.S. Drug

Enforcement Agency, U.S. Department of Justice, ~~or~~ U.S. Attorney General, any regulatory agency, or any state agency, relating to valsartan contamination.

~~91.~~86.      Produce all documents relating to ~~the~~any investigative subpoenas and subsequent investigation from the United States Department of Justice, United States ~~Senate~~Congress, and/or any other federal or state entity, relating to valsartan contamination~~, including, but not limited to, the information requested and produced by defendant, as well as communications between the defendant and the federal or state entity which served the subpoenas and/or conducted the investigation~~.

~~92.~~87.      Produce all documents relating to, referring to or embodying any discussion or submission between defendant and any state government regulatory agency or any state medical society concerning ~~valsartan, including agreements related to~~reimbursement for valsartan purchases.

## XV.   SALE AND DISTRIBUTION

~~93.~~88.      Produce complete documentation setting forth and/or demonstrating the complete supply and distribution chain for valsartan purchased, sold, or distributed by you, from the manufacture of the API through the final sale to the consumer.

~~94.~~89.      Produce all documents relating to the sale and distribution of valsartan that reflect NDC, batch number, and lot number.

~~95.~~90.      Produce documents sufficient to show all sales of valsartan to wholesalers, distributers, retailers, and consumers, including the total net sales, total number of pills and/or units sold, unit price, unit cost, profit margin, and market share by state or territory.

~~96.~~91.      Produce all documentation relating to the due diligence performed (or meant to be performed) in selecting an API or finished dose manufacturer from which you purchased valsartan, including but not limited to policies and standard operating procedures.

~~97.~~92.      Produce all ~~documents and~~communications received from any API manufacturer or finished dose manufacturer with regard to the manufacturing process, ~~ingredients, quality,~~ purity, bioequivalence or contamination relating to valsartan.

~~98.~~93.      ~~Produce all documents relating to your~~Produce complete documentation of the basis for Defendant's decision to purchase valsartan from any API or finished dose manufacturer, including documents you reviewed or relied on to make those decisions.

## XVI.   IDENTIFICATION OF PURCHASERS

~~99.~~94.      Produce documents sufficient to identify all persons and entities (including consumers and TPP entities) who purchased, reimbursed, or paid or otherwise compensated you for valsartan you manufactured, sold or distributed in the United States.  If available, produce documents sufficient to show these individuals' or entities' names, last known mailing addresses and email addresses, last known telephone numbers, date(s) of ~~purchase, NDC Code(s), Batch Number(s), and Lot Numbers.

~~100.~~95.      Produce all ~~documents and~~ communications between or among you and any named plaintiff, including consumers and/or TPP entities, including but not limited to MSP Recovery Services (including its assignors, Summacare, Emblem, and Connecticare) and Maine Automobile Dealers Association, with regard to the sale of valsartan.

**XVII. SALES AND PRICING**

~~101.~~96.    Produce complete documentation demonstrating all ~~documents relating to~~ valsartan sales you made in the United States to any purchaser (including, but not limited to, wholesalers, distributors, retailers and retail consumers), including documents that reflect total gross sales, total net sales, total number of units sold, unit price (gross and net), unit cost, cost of goods sold, profit margin, NDC, batch number, and lot number, on an annual basis, by, defendant, state, territory or the District of Colombia.

~~102.~~97.    Produce all documents and communications ~~relating to~~indicating your market share for valsartan, or competition for market share for valsartan, in the United States including, but not limited to, regularly updated forecasts, life cycle forecasts, internal tracking documents, product launch plans, market share audits, and documents analyzing IQVIA or IMS data.

~~103.~~98.    All documents and communications relating to negotiations over price and terms of sale or distribution between any defendant and any purchaser or re-seller of valsartan, including, but not limited to, requests for proposals ("RFPs") for chain pharmacies and/or wholesalers, full line bids, product offers related to VCDs, presentations regarding bids or proposals, and portfolio management programs.

~~104.~~99.    Produce all documents and communications relating to any agreements or arrangements between you and any TPP entity (or any person acting on behalf of a TPP entity) that did, could, or may affect the quantity or price of valsartan purchased (including e.g., ~~rebate agreements~~rebate agreements provided to pharmacy benefit managers ("PBMs"), purchasing agreements with PBMs, shelf stock adjustments and/or credits provided to PBMs, etc.).

~~105.~~100.    Produce ~~all documents relating to~~complete documentation of any arrangements between you and any other ~~person~~wholesaler or ~~entity~~chain pharmacy that did, could, or may affect the quantity or price of valsartan purchased, including but not limited to rebate agreements, volume incentives, pride reduction offers, profit splits arrangements, shelf stock adjustments, new product launch generic conversation programs, and all reimbursements and/or penalties paid as a result of recalls.

~~106.~~101.    Documents ~~sufficient to identify~~identifying all retailers and/or sellers (including but not limited to, retail pharmacies, mail order pharmacies) who have offered valsartan for sale in the United States and territories from January 1, 2010 to the present, including but not limited to the name, location, and sales volume for each such retailer, as well as the relevant NDC, Batch Numbers, and Lot Numbers for each seller or retailer, where available.

~~107.~~102.    ~~For each month from January 1, 2010 to the present, produce all documents relating to~~Produce complete documentation of your actual and projected valsartan sales, including:

   a.   List price;
   b.   Average marginal price;
   c.   Average wholesale price;
   d.   Wholesale acquisition cost;
   e.   Direct price;
   f.   Average discount off of wholesale price or wholesale acquisition cost;
   g.   Price under Medicare program;
   h.   Price under Medicaid program;
   i.   Maximum allowable price;
   j.   Average manufacturing price (AMP) as defined by, and reported to, the Centers for Medicare and Medicaid Services;

Formatted: Pattern: Clear (White)

k. Best price, as defined by, and reported to, the Centers for Medicare and Medicaid Services;
l. Net revenue;
m. Gross sales;
n. Net sales;
o. Units;
p. Gross shipments;
q. All measures of margin, income, earnings, and profits;
r. Unit of volumes sold;
s. Unit of volumes sold net of returns;
t. Total product contribution;
u. All costs and expenses attributable to the product;
v. Sales and distribution cost;
w. Cost of goods sold;
x. Manufacturing costs;
y. Marketing, advertising, promotional, and sales expenses;
z. Depreciable and capital improvements;
aa. Regulatory compliance;
bb. Short-run average variable costs;
cc. Long-run average variable costs;
dd. Fixed costs;
ee. Materials cost;
ff. Labor cost;
gg. Marginal cost;
hh. Rebates, discounts, vouchers, or other product promotions, returns, or charge-backs; and
ii. Coupons or co-pay cards.

108.103.   Documents and communications sufficient to identifyidentifying every entity that purchased, reimbursed, or compensated you for valsartan from you from January 1, 2010 to the present.

109.104.   Produce all documents relating to contracts for the sale of valsartan from January 1, 2010 to the present, including (a) contracts with direct purchasers; (b) contracts that provide that the purchaser will take delivery of valsartan from another entity (such as a wholesaler); and (c) contracts concerning or regarding the payment of chargebacks.

110.105.   Produce complete documentation of the date, manufacturing source, quantity, and recipient of all samples of valsartan provided by defendantDefendant.

111.106.   Produce all electronic data in tab-delimited, comma-delimited, or semicolon-delimited ASCII flat text or similar electronic format from January 1, 2010 to the present sufficient to identify all sales of valsartan to purchasers in transaction-by-transaction format, as follows:
a. All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) number of units returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) product description, (xii) product form, (xiii) strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such

customer information being provided for both the bill-to and ship-to customer), and (xix) the customer's parent company (if the data identifies a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like).

b. All data concerning chargebacks, rebates, discounts, and other consideration given or accrued relating to valsartan, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm corporation, or other business entity whom you paid, or on whose behalf you accrued, the chargeback, rebate, discount and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which you paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or groups of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular product sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated.

c. All administrative fee transactions relating to valsartan, including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales concerning the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code;

d. For all other transaction types not reflected in (a) through (c) above, produce all documents relating to any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, whether created or maintained daily, monthly, quarterly, or at some other periodicity, with regard to valsartan.

e. The complete documentation for all items above (a though d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate product list, including NDC, SKU, UPC, product description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (1) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold and (2) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all data sets and calculations used to (1) determine accrued rebates and/or chargebacks and/or (2) periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms.

## XVIII. AVAILABLE DATA SOURCES

~~112.~~107.    Produce all documents relating to all IMS, Verispan, MediSpan, Scott-Levin, PriceCheck, ImpactRx, First DataBank, or other pharmaceutical industry data products purchased and or subscribed to or available to you regarding valsartan.

~~113.~~108.    Produce all data or reports generated by IMS, CMS, or Verispan, or any comparable third party person or entity (including, but not limited to, Medi-Span, ImpactRx, and First DataBank), in whatever format it was received, relating to the sale, prescription, marketing, promotion, or detailing of valsartan from date of launch to the present for valsartan, including:

    a.  IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

    b.  IMS National Sales Perspective data, including total units, extended units, total sales dollars, and price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

    c.  CMS national Health Expenditures and Drug Utilization data, including TRx, NRx, Medicaid percentage paid, extended units, retail sales dollars, and retail sales price, with regard to valsartan.

    d.  Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price, with regard to valsartan. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

~~114.~~109.    Produce all documents relating to any coupon or co-pay assistance you made available to consumers for valsartan.

## XIX.    DEFENDANT-SPECIFIC REQUESTS

### A.  To Mylan:

~~115.~~110.    Produce all documents, communications, and filings associated with Mylan's ANDA ~~20473~~204743. This includes but is not limited to the initial ANDA submission, subsequent amendments to the ANDA submission, correspondence from the FDA regarding that ANDA submission, responses to correspondence from the FDA regarding that ANDA submission, and any and all supporting documentation filed with the FDA, including bioequivalence information, manufacturing information, and testing regarding ANDA ~~20473~~204743.

~~116.~~111.    Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Nashik facility, including but not limited to the September 2016 inspection and resulting warning letter and November 2018 inspection and warning letter.

~~117.~~112.    Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Morgantown, WV facility, including but not limited to documents regarding inspections which occurred in November of 2016, March 2018, April 2018, resulting correspondence with the FDA regarding these inspections (including but not limited to, notes, presentations and documents created as a result of in person meetings with regulatory officials).

~~118.~~113.    Produce all due diligence documents associated with Mylan's acquisition of Matrix Pharmaceuticals.

~~119.~~114.    Produce all documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### B.  To Aurobindo:

~~120.~~115.    All documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### C.  To Teva:

~~121.~~116.    Produce all full and complete documents and document families previously produced in core discovery, including all documents previously withheld by Teva from the custodial file of Constance Truemper.

~~122.~~117.    Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Teva's finished dose manufacturing facilities, including but not limited to the Jerusalem Oral Solid Dose facility, and documents regarding a 2010 inspection which resulted in a warning letter from the FDA.

Dated: August 30, 2019

/s/ Adam Slater
Adam M. Slater
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel.: (973) 228-9898
aslater@mazieslater.com

Daniel Nigh
**Levin Papantonio**
316 South Baylen Street
Pensacola, FL 32502
Tel.: (850) 435-7013
dnigh@levinlaw.com

Ruben Honik
**Golomb & Honik, PC**
1835 Market Street
Suite 2900
Philadelphia, PA 19103
(215) 278-4449
rhonik@golumbhonik.com

Conlee Whitely
**Kanner & Whitely, LLC**
701 Camp Street
New Orleans, LA 70130
(504) 524-5777
c.whiteley@kanner-law.com

Formatted Table

**CERTIFICATE OF SERVICE**

I certify that on the 30th day of August 2019, I electronically transmitted the attached document to counsel of record for all API and Finished Dose Manufacturers via electronic mail.


*/s/ Adam M. Slater*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: VALSARTAN**<br>**PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler,<br>District Judge<br><br>Honorable Joel Schneider,<br>Magistrate Judge |

## PLAINTIFFS' FIRST AMENDED SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL API AND FINISHED-DOSE MANUFACTURING DEFENDANTS

### TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 34 and Local Civil Rule 34.1, Plaintiffs propound the following amended discovery requests upon each defendant:

# TABLE OF CONTENTS

*DOCUMENTS TO BE PRODUCED:* ..................................................................................... 5

I.    Corporate Organization ................................................................................... 5

II.   Relevant Custodians ......................................................................................... 5

III.  Policies and Procedures .................................................................................. 5

IV.   Agreements .......................................................................................................... 6

V.    Intra-Defendant Communications ............................................................. 6

VI.   ANDA and DMF ................................................................................................ 6

VII.  Litigation and Document Preservation .................................................. 7

VIII. Manufacturing ..................................................................................................... 7

IX.   Bioequivalence ................................................................................................... 8

X.    Testing ................................................................................................................... 8

XI.   Nitrosamines and Contamination .............................................................. 9

XII.  Regulatory Correspondence and Documents ...................................... 9

XIII. Complaints and Recalls ................................................................................ 10

XIV.  Warranties and Statements ......................................................................... 11

XV.   Sale and Distribution ...................................................................................... 12

XVI.  Identification of Purchasers ....................................................................... 12

XVII. Sales and Pricing ............................................................................................. 12

XVIII. Available Data Sources ................................................................................ 15

XIX.  Defendant-Specific Requests ...................................................................... 16

## DEFINITIONS:

**"Active Pharmaceutical Ingredient" ("API")** is defined as any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Active pharmaceutical ingredient does not include intermediates used in the synthesis of the substance." 21 C.F.R. § 207.1; see also 21 C.F.R. § 314.3.

**"API Manufacturer"** is defined as any entity that manufactures the active pharmaceutical ingredient (API) for valsartan.

**"Finished Dose Manufacturer"** includes any entity that manufactures valsartan in a finished dosage form that is engaged in manufacturing, preparing, propagating, compounding, processing, packaging, repackaging, or labeling of valsartan. The term "finished dose manufacturer" also includes entities who hold ANDAs.

**"Communication(s)"** means the transmittal of information, in the form of facts, ideas, inquiries, documents or otherwise, and includes all transmissions of information received or transmitted by you, including correspondence, regardless of whether you are an author or addressee of such transmittal.

**"Documents"** includes, without limitations, any written, printed, typed, photostatic, photographic, recorded or otherwise reproduced or reproducible communication or representation, whether comprised of letters, words, numbers, pictures, sound or symbols, or any combination thereof, whether intended for internal use, dissemination to outside entities, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created that have any nonconforming notes or other markings. Without limiting the generality of the foregoing, the term "Document" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, summaries, statistical statements, financial statements, presentations, work papers, accounts, invoices, purchase orders, ledgers, journals, book of accounts, local records, reports and/ or summaries of investigation, trade letters, press releases, comparisons, books, calendars, calendar entries or invitations, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meeting, or other communications of any type, including inter-office and intra office communication, questionnaires, surveys, charts, graph, photographs, recordings, tapes, back-up tapes, discs, data cells, printouts, all other data compilations from which information can be obtained (translated, if necessary, into usable form), and any preliminary versions, drafts or revisions of any of the foregoing and shall also include electronic communications, whether maintained presently in the normal course of business or available in back-up or legacy data formats, wherever found or maintained, including all servers, hard drives, thumb drives, palms, blackberries, cell phones, laptops and firewalls. Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any and every means. "Documents" also includes the content of any applicable computer database.

**Relevant Time Period:** Unless otherwise specified, the relevant time period applicable to all requests is the time period specified by the Court.

**"Regulatory and Regulatory Authority"** refers to United States and foreign regulatory agencies.

**"TPP"** refers to Third Party Payors, including health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plants, third party payers, and any other health benefit provider in the United States of America and its territories.

**"Valsartan"** means any drug with valsartan as an active ingredient, including the API for valsartan on its own, as well as all finished drug formulations of valsartan.

**"You," "your"** or **"defendant"** shall be used interchangeably and refers to the parties to which these requests are directed.

## DOCUMENTS TO BE PRODUCED

I. **CORPORATE ORGANIZATION**

1. Produce organizational charts setting forth the corporate organization for each named defendant, from January 2010 to the present as follows:
   a. General corporate organizational charts for each defendant, including any affiliated entities involved in the manufacture, testing, distribution, or sale of valsartan;
   b. Medical affairs/clinical affairs department, or the equivalent;
   c. Quality assurance department, or the equivalent;
   d. Manufacturing department, including any departments involved in the manufacturing process for valsartan;
   e. Procurement Department;
   f. Sales department;
   g. Marketing department;
   h. Research and development department;
   i. Department(s) responsible for designing, funding, or supervising clinical trials (including all Phase I, II, III, and IV);
   j. Regulatory department;
   k. Department responsible for epidemiology and/or statistical analysis;
   l. Department responsible for providing professional education to physicians;
   m. Department(s) responsible for establishing or maintaining relationships involving valsartan, with any other defendant named in this MDL.
2. Produce organizational charts or similar documents setting forth:
   a. All corporate officers;
   b. All members of the Board of Directors;
   c. All persons or entities which own or owned 5% or more of defendant's common stock.
3. To the extent you conduct business relating to the manufacture, distribution, or marketing of valsartan with any other defendant in the above-captioned MDL, produce documents, including but not limited to contracts and payment records demonstrating the nature, extent, and length of this business relationship.

II. **RELEVANT CUSTODIANS**

4. Produce documents identifying the corporate employees or third parties responsible for or involved in the (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, (8) production, (9) distribution, (10) packaging, (11) sale, (12) marketing, and (13) communications with private individuals or entities, with regard to valsartan, and/or the ingredients thereof.

III. **POLICIES AND PROCEDURES**

5. Produce all draft and final versions of policies, procedures, standard operating procedures, or protocols for or relevant to the (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, (8) production, (9) distribution, (10) packaging, (11) sale, (12)

marketing, and (13) communications with private individuals or entities, with regard to valsartan, and/or the ingredients thereof. In addition, provide all indexes or lists of the requested documents.

## IV.   AGREEMENTS

6.  Produce all formal and informal agreements, contracts, or licenses that the answering defendant is a party to, with regard to (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, , (8) production, (9) distribution, (10) packaging, (11) sale, (12) marketing, (13) communications with private individuals or entities, and (14) procurement of components or ingredients, with regard to valsartan and/or its ingredients.

7.  Produce all agreements, draft agreements, memoranda, and payment or expense records, with regard to any attempt by defendant to retain, engage or otherwise provide financial support or item of value to any person with regard to proposed or actual scientific or medical study of valsartan.

8.  Produce all documentation of any agreements to engage any third party to represent your interests before the FDA or any regulatory authority, with regard to valsartan.

9.  Produce all documentation of any agreements embodying the retention of persons in any medical or scientific discipline to study, assess or analyze the safety, purity, or contamination of valsartan for or on behalf of any defendant.

## V.   INTRA-DEFENDANT COMMUNICATIONS

10. All communications between any of the defendants related to. (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, , (8) production, (9) distribution, (10) packaging, (11) sale, (12) marketing, (13) communications with private individuals or entities, and (14) procurement of components or ingredients, with regard to valsartan and/or its ingredients.

## VI.   ANDA AND DMF

11. To the extent any ANDA file for valsartan was not produced in whole or in part during Core Discovery, produce the entire file, whether or not ultimately approved,

12. Produce all correspondence with the FDA concerning any ANDA for valsartan, whether or not ultimately approved, including prior to the relevant time period set by the Court [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

13. Produce all documents containing the list of ingredients in valsartan, which were provided to any regulatory authority, beginning from the date you first began development of the process for manufacturing the API for valsartan [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request]. .

14. Produce all documents relating to New Drug Applications filed by you relating to valsartan, beginning from the date you first began development of the process for manufacturing the API for valsartan [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

15. Produce all complete drug master files for valsartan, to the extent not produced to date. [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

## VII. LITIGATION AND DOCUMENT PRESERVATION

16. Produce all document retention or destruction policies.
17. Produce documents sufficient to show the name, case caption, attorney, and/or status of any lawsuit filed against you relating to valsartan contamination.
18. Produce all documents upon which Defendant relies to support each and every affirmative defense asserted in the Answer or which you may assert.

## VIII. MANUFACTURING

19. Produce all documents with regard to the manufacturing process for the active pharmaceutical ingredient in valsartan, including any modifications thereto.
20. Produce all documents with regard to the machines, materials, and substances (including but not limited to new or recycled solvents, tainted or contaminated solvents) utilized in the manufacturing process for the active pharmaceutical ingredient in valsartan, including specifications, manuals, material safety data sheets, machine settings and calibrations, and any modifications thereto.
21. Produce all documents (including photographs or video) with regard to any testing or inspections of the machines, materials, and substances utilized in the manufacturing process for the active pharmaceutical ingredient in valsartan.
22. Produce all documents setting forth the manufacturing/fabrication/production process for the finished drug formulation of valsartan sold by you or any of your affiliated entities, including any quality assurance and testing, and any modifications thereto.
23. Produce all documents identifying any patented device, machine, or technology utilized in the testing of valsartan for unknown peaks, impurities (elemental or otherwise), and residual solvents in either the valsartan API or the finished dose versions of your VCDs
24. Produce all documents relating to the filing of any patents by you or employees and/or agents associated with you, with any foreign regulatory body regarding the manufacturing process for valsartan.
25. Produce documentation sufficient to show the name, address, and role of any third party which supplied you with valsartan or any ingredient, material, or component used in the manufacture of valsartan, and any evaluation or testing thereof.
26. Produce all certificates of analysis or similar documents concerning analysis of the purity or contents of valsartan, and documents and communications concerning the same.
27. Produce documentation setting forth (1) each lot, batch, or other production quantity of valsartan manufactured, purchased, or sold by defendant (including discarded or recalled lots or batches), (2) the dates of manufacture/production for each, (3) the solvent(s) (including residual or reused solvents) utilized in the manufacture of each, and (4) any information you had or have with regard to potential risks of the use of any solvent utilized including residual or reused solvents.
28. Produce documentation of all scientific journal articles submitted to any academic or scientific publication, written or drafted in whole, or in part, by your employees or scientists or third parties who received funding or other forms of compensation from you, regarding the manufacturing of valsartan, including the final version, any drafts, edits, and peer reviewed feedback.

29. All communications and documents exchanged between you and any third party, regarding the manufacturing process associated with the creation of valsartan, including but not limited to the use of solvents, the tetrazole ring formation process, testing, and contamination issues.

## IX.    BIOEQUIVALENCE

30. All documentation of the bioequivalence of any valsartan sold or manufactured (in whole or in part) by you to the Reference Listed Drug ("RLD"), including but not limited to, testing, communications with the FDA, communications with customers, suppliers, or other third parties, and certifications of bioequivalence.

31. All marketing materials referencing the bioequivalence of valsartan manufactured, distributed, or marketed by you.

32. All documents and communications regarding the identification by any person or entity of any valsartan manufactured, utilized, or sold by or to you as not being bioequivalent to the RLD.

33. All documents and communications relevant to valsartan entries in the FDA's "Orange Book."

34. Documentation of any patent litigation between you and either the Brand Manufacturer of the RLD regarding valsartan, or other generic companies which had filed an ANDA application for a valsartan product.

## X.    TESTING

35. Produce all documents setting forth or addressing the results of any testing (including chromatography) of valsartan that had the potential to directly or indirectly identify impurities or contamination.

36. Produce all documentation with regard to the first test that indicated impurity or contamination of valsartan that was potentially due to a nitrosamine, whether or not identified as nitrosamine contamination at the time.

37. Produce all documentation with regard to each notification to defendant of impurity or contamination of valsartan that was, or potentially was, due to a nitrosamine, whether or not identified as nitrosamine contamination at the time. In connection with this request, separately identify the first such notification.

38. Produce all documents with regard to evaluation by an employee of defendant or a third party, with regard to the health risks of valsartan contamination as limited by the Court's Order.

39. Produce documentation of all studies of the ingredients, impurities, and actual or potential contamination, of valsartan conducted by any third parties, including, but not limited to, those conducted by Contract Research Organizations (CRO), educational institutions, publicly or independently funded groups, competitors, trade groups or associations, regulatory entities, irrespective of whether such studies were conducted at the direction of Defendant.

40. Produce documentation of any report or analysis made known to Defendant with regard to the relationship between the use of contaminated valsartan and potential or confirmed injuries; and the review of same by any employee or consultant of Defendant.

41. Provide documentation of the results of any clinical or animal study regarding valsartan conducted with potentially contaminated valsartan during the relevant time period, whether or not sponsored by, financed by, undertaken by, or suggested by Defendant, and any internal analysis thereof,

42. Produce documentation of any epidemiology studies or analyses known to defendant regarding valsartan, including but not limited to, any provided to or received from any

regulatory authority, together with the underlying data including for example SAS data sets, and any internal analysis thereof.

43. Produce complete documentation of (a) all testing relevant to determination of purity, bioequivalence, or contamination, prior to any recall, of valsartan you manufactured or sourced, (b) all testing relevant to determination of purity, bioequivalence, or contamination,, after any recall, of valsartan you manufactured or sourced, (c) the results of the foregoing testing; (d) any such testing that was considered but not performed before or after any recall, including the reason(s) why such testing was not performed, and (e) to the extent any lot, batch, or other production quantity was not tested for impurities, bioequivalence or contamination, complete documentation with regard to the reason(s) why no such testing was performed.

## XI.   NITROSAMINES AND CONTAMINATION

44. Produce complete documentation identifying each lot, batch, or other production quantity of valsartan, (a) confirmed to be contaminated and the quantification of the contamination; (b) assumed to have been contaminated and the quantification of the contamination; (c) confirmed not to be contaminated; (d) assumed not to be contaminated, and (e) confirmed or assumed to be contaminated.

45. Produce complete documentation of any testing for any nitrosamine compound, including but not limited to NDMA, NDEA, NMBA, and any other nitrosamine or carcinogenic contaminant in valsartan, or any other API or finished drug manufactured, formulated, distributed, or sold by the answering defendant, as limited by the Court's Order.

46. Produce complete documentation of any testing or research conducted by you or a third party on your behalf to determine the existence or quantification of contamination in any valsartan API or finished drug formulation.

47. Produce complete documentation with regard to the analysis of health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance, conducted by you or any third party on your behalf.

48. Produce all studies, data, or other scientific or medical information reviewed or considered by any employee or third party on your behalf with regard to the health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance.

49. Produce all formal or informal reports or complaints by or to Defendant or any other person or entity to your knowledge, with regard to valsartan contamination.

50. Produce all documents known to you, embodying any analysis or opinion by any person or entity, regarding the potential health risks of nitrosamine contamination of valsartan.

## XII.   REGULATORY CORRESPONDENCE AND DOCUMENTS

51. Produce all regulatory documentation and communications with regard to contamination or recalls of valsartan, as limited by the Court's Order.

52. Produce all regulatory documentation and communications with regard to the use of solvents, tetrazole ring formation, and potential impurities or contamination in connection with the manufacturing process for valsartan.

53. Produce transcripts, notes, memoranda, or other documentation of any hearings or other proceedings or meetings which took place at or with any regulatory agency relating to the actual and/or potential contamination or recall of valsartan.

54. Produce all documents with regard to any FDA Advisory Panel meetings regarding valsartan contamination.

55. Produce all Establishment Inspection Reports (including foreign regulatory equivalents of Establishment Inspection Reports) and related documentation (including photographs or video) concerning your facilities or the facilities of any other defendant used in the manufacture, fabrication, packaging, distribution, or sale of valsartan.

56. Produce all documents relating, referring to or embodying all inspection reports (including 483s, detention reports, and warning letters, or consent decrees, including foreign regulatory equivalents) which pertain in any way to valsartan contamination or any facility in which contaminated valsartan was manufactured.

57. Produce complete documentation regarding any CAPAs (Corrective and Preventative Actions) relating to the manufacture of valsartan, including documentation showing what caused the CAPA to be opened and/or closed.

58. Produce all documentation, and related communications, of any complaints or third party communications to or from any regulatory agency with regard to actual or potential valsartan contamination.

59. Produce all documentation, including source files, for any MAUDE or other adverse event reports submitted to any regulatory agency with regard to valsartan contamination, and any related communications.

60. Produce complete files for all formal or informal adverse event reports and/or MedWatch reports concerning valsartan, including: a) causation analyses, b) summaries (including, but not limited to, computerized data), analysis or interpretations of any such adverse event report(s) (including any post-marketing submissions); and c) documents which discuss or refer to any adverse event report, or any summary, analysis or interpretation thereof, as limited by the Court's Order.

61. Produce all databases maintained by you concerning both domestic and international formal and informal adverse event reports and/or MedWatch reports, including the underlying medical information and raw data maintained by you, with regard to contaminated valsartan and as limited by the Court's Order.

62. Produce all filings with the Securities and Exchange Commission (SEC), addressing the sale of contaminated valsartan, including Forms 10-K, 10-Q, 8-K, and proxy statement (Schedule 14A), whether such filings are tentative, final, definitive, or supplemental.

63. Produce complete documentation of any communications with any state regulatory or health authorities regarding valsartan purity, bioequivalence, contamination, or pricing.

64. Produce complete documentation with regard to Defendant's efforts to comply with Current Good Manufacturing Practices (cGMPs), and any actions or inactions that did not meet or might not have met cGMPs, including, but not limited to, documents sufficient to show any cGMP consultants retained as a result of regulatory inspection, reports by any cGMP consultants retained and provided to the FDA, and responses to FDA 483s and Warning Letters regarding cGMP compliance.

## XIII. COMPLAINTS AND RECALLS

65. Produce complete documentation with regard to any consideration or implementation of a recall due to contamination of valsartan.

66. Produce all draft recall notices with regard to contamination of valsartan.

67. Produce all final recall notices with regard to contamination of valsartan.

68. Produce all documents setting forth or addressing any communications with any customer or consumer relating to the recall (or non-recall) of valsartan due to contamination.

69. Produce all communications directly with physicians relating to the recall (or non-recall) of valsartan due to contamination.

70. Produce all communications with any person or entity to which, or from which, you purchased or sold valsartan, with regard to valsartan contamination.

71. Produce all documents and communications with regard to the scope of any recall considered or implemented with regard to valsartan contamination.

72. Produce all documents and communications with regard to any complaint or concern raised by any person or entity relating to the purity, bioequivalence, or contamination of valsartan.

73. Produce all documents or communications concerning any actual or potential import or export alerts relating to valsartan contamination.

74. Produce all documents and communications concerning any buybacks or refunds that you paid to any purchasers of valsartan in the United States related to valsartan contamination.

75. Produce all communications (and drafts) to or from Defendant regarding recall of valsartan related to valsartan contamination, including lists sufficient to show all persons or entities who received communications.

76. Produce documents sufficient to identify any person or entity retained by Defendant with regard to the recall of valsartan due to nitrosamine contamination.

77. **Note: this request is only directed to API manufacturer defendants and FDA liaison defendants.** Produce all documents setting forth or with regard to, communications with, Novartis concerning valsartan impurity, bioequivalence, or contamination.

## XIV. WARRANTIES AND STATEMENTS

78. Produce all versions of defendant's labeling, package inserts, patient leaflets, and medication guides for valsartan in the United States, together with a chart of the approval dates and in use dates for all versions that were utilized in the sale and marketing of valsartan.

79. Produce all statements regarding purity, bioequivalence, and contamination provided to medical professionals, purchasers including TPPs, consumers, wholesale distributors, retail pharmacies, and other direct and indirect purchasers of valsartan, for each NDC, Batch Number, and Lot Number of valsartan sold in the United States during the relevant time period.

80. All advertisements, and sales and marketing materials for valsartan, and charts setting forth the approval date and in use dates, for each.

81. Produce all communications between you and any medical professional or medical association concerning any adverse health effects that may or may not be associated with valsartan contamination.

82. Produce all communications with financial analysts or investors concerning the role of valsartan in your financial or business prospects, including but not limited to any transcripts, presentations or documents concerning any analyst conference call, or business briefing.

83. Produce all communications with healthcare providers regarding the purity, bioequivalence, or, recall status, of valsartan.

84. Produce all public statements (and drafts) issued by Defendant regarding valsartan purity, bioequivalence, or contamination of valsartan.

85. Produce all communications with the Centers for Disease Control (CDC), National Institutes of Health, World Health Organization, U.S. Drug Enforcement Agency, U.S. Department of

Justice, U.S. Attorney General, any regulatory agency, or any state agency, relating to valsartan contamination.

86. Produce all documents relating to any investigative subpoenas and subsequent investigation from the United States Department of Justice, United States Congress, and/or any other federal or state entity, relating to valsartan contamination.

87. Produce all documents relating to, referring to or embodying any discussion or submission between defendant and any state government regulatory agency or any state medical society concerning reimbursement for valsartan purchases.

## XV.   SALE AND DISTRIBUTION

88. Produce complete documentation setting forth and/or demonstrating the complete supply and distribution chain for valsartan purchased, sold, or distributed by you, from the manufacture of the API through the final sale to the consumer.

89. Produce all documents relating to the sale and distribution of valsartan that reflect NDC, batch number, and lot number.

90. Produce documents sufficient to show all sales of valsartan to wholesalers, distributers, retailers, and consumers, including the total net sales, total number of pills and/or units sold, unit price, unit cost, profit margin, and market share by state or territory.

91. Produce all documentation relating to the due diligence performed (or meant to be performed) in selecting an API or finished dose manufacturer from which you purchased valsartan, including but not limited to policies and standard operating procedures.

92. Produce all communications received from any API manufacturer or finished dose manufacturer with regard to the manufacturing process, purity, bioequivalence or contamination relating to valsartan.

93. Produce complete documentation of the basis for Defendant's decision to purchase valsartan from any API or finished dose manufacturer, including documents you reviewed or relied on to make those decisions.

## XVI.   IDENTIFICATION OF PURCHASERS

94. Produce documents sufficient to identify all persons and entities (including consumers and TPP entities) who purchased, reimbursed, or paid or otherwise compensated you for valsartan you manufactured, sold or distributed in the United States. If available, produce documents sufficient to show these individuals' or entities' names, last known mailing addresses and email addresses, last known telephone numbers, date(s) of purchase, NDC Code(s), Batch Number(s), and Lot Numbers.

95. Produce all communications between or among you and any named plaintiff, including consumers and/or TPP entities, including but not limited to MSP Recovery Services (including its assignors, Summacare, Emblem, and Connecticare) and Maine Automobile Dealers Association, with regard to the sale of valsartan.

## XVII.   SALES AND PRICING

96. Produce complete documentation demonstrating all valsartan sales you made in the United States to any purchaser (including, but not limited to, wholesalers, distributors, retailers and retail consumers), including documents that reflect total gross sales, total net sales, total number of units sold, unit price (gross and net), unit cost, cost of goods sold, profit margin,

NDC, batch number, and lot number, on an annual basis, by, defendant, state, territory or the District of Colombia.

97. Produce all documents and communications indicating your market share for valsartan, or competition for market share for valsartan, in the United States including, but not limited to, regularly updated forecasts, life cycle forecasts, internal tracking documents, product launch plans, market share audits, and documents analyzing IQVIA or IMS data .

98. All documents and communications relating to negotiations over price and terms of sale or distribution between any defendant and any purchaser or re-seller of valsartan including, but not limited to, requests for proposals ("RFPs) for chain pharmacies and/or wholesalers, full line bids, product offers related to VCDs, presentations regarding bids or proposals, and portfolio management programs.

99. Produce all documents and communications relating to any agreements or arrangements between you and any TPP entity (or any person acting on behalf of a TPP entity) that did, could, or may affect the quantity or price of valsartan purchased (including e.g., rebate agreements provided to pharmacy benefit managers ("PBMs"), purchasing agreements with PBMs, shelf stock adjustments and/or credits provided to PBMs, etc.).

100. Produce complete documentation of any arrangements between you and any other wholesaler or chain pharmacy that did, could, or may affect the quantity or price of valsartan purchased, including but not limited to rebate agreements, volume incentives, pride reduction offers, profit splits arrangements, shelf stock adjustments, new product launch generic conversation programs, and all reimbursements and/or penalties paid as a result of recalls.

101. Documents identifying all retailers and/or sellers (including but not limited to, retail pharmacies, mail order pharmacies) who have offered valsartan for sale in the United States and territories from January 1, 2010 to the present, including but not limited to the name, location, and sales volume for each such retailer, as well as the relevant NDC, Batch Numbers, and Lot Numbers for each seller or retailer, where available.

102. Produce complete documentation of your actual and projected valsartan sales, including:

    a. List price;
    b. Average marginal price;
    c. Average wholesale price;
    d. Wholesale acquisition cost;
    e. Direct price;
    f. Average discount off of wholesale price or wholesale acquisition cost;
    g. Price under Medicare program;
    h. Price under Medicaid program;
    i. Maximum allowable price;
    j. Average manufacturing price (AMP) as defined by, and reported to, the Centers for Medicare and Medicaid Services;
    k. Best price, as defined by, and reported to, the Centers for Medicare and Medicaid Services;
    l. Net revenue;
    m. Gross sales;
    n. Net sales;
    o. Units;
    p. Gross shipments;
    q. All measures of margin, income, earnings, and profits;
    r. Unit of volumes sold;

    s.  Unit of volumes sold net of returns;
    t.  Total product contribution;
    u.  All costs and expenses attributable to the product;
    v.  Sales and distribution cost;
    w.  Cost of goods sold;
    x.  Manufacturing costs;
    y.  Marketing, advertising, promotional, and sales expenses;
    z.  Depreciable and capital improvements;
    aa. Regulatory compliance;
    bb. Short-run average variable costs;
    cc. Long-run average variable costs;
    dd. Fixed costs;
    ee. Materials cost;
    ff.  Labor cost;
    gg. Marginal cost;
    hh. Rebates, discounts, vouchers, or other product promotions, returns, or charge-backs; and
    ii.  Coupons or co-pay cards.

103.      Documents identifying every entity that purchased, reimbursed, or compensated you for valsartan.

104.      Produce all contracts for the sale of valsartan, including (a) contracts with direct purchasers; (b) contracts that provide that the purchaser will take delivery of valsartan from another entity (such as a wholesaler); and (c) contracts concerning or regarding the payment of chargebacks.

105.      Produce complete documentation of the date, manufacturing source, quantity, and recipient of all samples of valsartan provided by Defendant.

106.      Produce all electronic data in tab-delimited, comma-delimited, or semicolon-delimited ASCII flat text or similar electronic format from January 1, 2010 to the present sufficient to identify all sales of valsartan to purchasers in transaction-by-transaction format, as follows:

    a.  All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) number of units returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) product description, (xii) product form, (xiii) strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to and ship-to customer), and (xix) the customer's parent company (if the data identifies a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like).

    b.  All data concerning chargebacks, rebates, discounts, and other consideration given or accrued relating to valsartan, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm corporation, or other business entity whom you paid, or on whose behalf you accrued, the chargeback, rebate, discount and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in

respect of which you paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or groups of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular product sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated.

c.  All administrative fee transactions relating to valsartan, including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales concerning the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code;

d.  For all other transaction types not reflected in (a) through (c) above, produce all documents relating to any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, whether created or maintained daily, monthly, quarterly, or at some other periodicity, with regard to valsartan.

e.  The complete documentation for all items above (a though d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate product list, including NDC, SKU, UPC, product description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (1) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold and (2) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all data sets and calculations used to (1) determine accrued rebates and/or chargebacks and/or (2) periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms.

## XVIII. AVAILABLE DATA SOURCES

107.    Produce all documents relating to all IMS, Verispan, MediSpan, Scott-Levin, PriceCheck, ImpactRx, First DataBank, or other pharmaceutical industry data products purchased and or subscribed to or available to you regarding valsartan.

108.    Produce all data or reports generated by IMS, CMS, or Verispan, or any comparable third party person or entity (including, but not limited to, Medi-Span, ImpactRx, and First DataBank), in whatever format it was received, relating to the sale, prescription, marketing, promotion, or detailing of valsartan from date of launch to the present for valsartan, including:

      a.   IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

      b.   IMS National Sales Perspective data, including total units, extended units, total sales dollars, and price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

      c.   CMS national Health Expenditures and Drug Utilization data, including TRx, NRx, Medicaid percentage paid, extended units, retail sales dollars, and retail sales price, with regard to valsartan.

      **d.**   Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price, with regard to valsartan. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

109.    Produce all documents relating to any coupon or co-pay assistance you made available to consumers for valsartan.

## XIX.  DEFENDANT-SPECIFIC REQUESTS

### A. To Mylan:

110.    Produce all documents, communications, and filings associated with Mylan's ANDA 204743. This includes but is not limited to the initial ANDA submission, subsequent amendments to the ANDA submission, correspondence from the FDA regarding that ANDA submission, responses to correspondence from the FDA regarding that ANDA submission, and any and all supporting documentation filed with the FDA, including bioequivalence information, manufacturing information, and testing regarding ANDA 204743.

111.    Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Nashik facility, including but not limited to the September 2016 inspection and resulting warning letter and November 2018 inspection and warning letter.

112.    Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Morgantown, WV facility, including but not limited to documents regarding inspections which occurred in November of 2016, March 2018, April 2018, resulting correspondence with the FDA regarding these inspections (including but not limited to, notes, presentations and documents created as a result of in person meetings with regulatory officials).

113.    Produce all due diligence documents associated with Mylan's acquisition of Matrix Pharmaceuticals.

114.    Produce all documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### B. To Aurobindo:

115.    All documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### C. To Teva:

116.     Produce all full and complete documents and document families previously produced in core discovery, including all documents previously withheld by Teva from the custodial file of Constance Truemper.

117.     Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Teva's finished dose manufacturing facilities, including but not limited to the Jerusalem Oral Solid Dose facility, and documents regarding a 2010 inspection which resulted in a warning letter from the FDA.

Dated: August 30, 2019

/s/ Adam Slater
Adam M. Slater
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel.: (973) 228-9898
aslater@mazieslater.com

Daniel Nigh
**Levin Papantonio**
316 South Baylen Street
Pensacola, FL 32502
Tel.: (850) 435-7013
dnigh@levinlaw.com

Ruben Honik
**Golomb & Honik, PC**
1835 Market Street
Suite 2900
Philadelphia, PA 19103
(215) 278-4449
rhonik@golumbhonik.com

Conlee Whitely
**Kanner & Whitely, LLC**
701 Camp Street
New Orleans, LA 70130
(504) 524-5777
c.whiteley@kanner-law.com

## CERTIFICATE OF SERVICE

I certify that on the 30th day of August 2019, I electronically transmitted the attached document to counsel of record for all API and Finished Dose Manufacturers via electronic mail.


*/s/ Adam M. Slater* _____