**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

CIVIL ACTION NUMBER:

19-md-02875-RBK-JS

IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION

STATUS CONFERENCE and
DISCOVERY CONFERENCE WITH
ORAL OPINION ON REDACTION
ISSUE AND RULINGS ON
PLAINTIFFS' DISCOVERY
DIRECTED TO THE API AND
FINISHED DOSE MANUFACTURING
DEFENDANTS

_____

        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey  08101
        December 11, 2019
        Commencing at 10:05 a.m.


**B E F O R E:**            **THE HONORABLE JOEL SCHNEIDER,**
                   **UNITED STATES MAGISTRATE JUDGE**


**A P P E A R A N C E S:**

        MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
        103 Eisenhower Parkway
        Roseland, New Jersey  07068
        For the Plaintiff

        GOLOMB & HONIK, P.C.
        BY:  RUBEN HONIK, ESQUIRE
            DAVID J. STANOCH, ESQUIRE
        1835 Market Street, Suite 2900
        Philadelphia, Pennsylvania  19103
        For the Plaintiff


        Carol Farrell, Official Court Reporter
            cfarrell.crr@gmail.com
                856-318-6100

    Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.

1    **A P P E A R A N C E S (Continued):**

2        KANNER & WHITELEY, LLC
         BY:  CONLEE S. WHITELEY, ESQUIRE
3             LAYNE HILTON, ESQUIRE
         701 Camp Street
4        New Orleans, Louisiana  70130
         For the Plaintiff
5
         KIRTLAND & PACKARD LLP
6        BY:  BEHRAM V. PAREKH, ESQUIRE
         1638 South Pacific Coast Highway
7        Redondo Beach, California  90277
         For the Plaintiff
8
         LEVIN PAPANTONIO
9        BY:  DANIEL A. NIGH, ESQUIRE
         316 S. Baylen, Suite 600
10       Pensacola, Florida  32502
         For the Plaintiff
11
         FARR LAW FIRM
12       BY:  GEORGE T. WILLIAMSON, ESQUIRE
         99 Nesbit Street
13       Punta Gorda, Florida  33590
         For the Plaintiff
14
         RIVERO MESTRE LLP
15       BY:  JORGE A. MESTRE, ESQUIRE
         2525 Ponde de Leon Boulevard, Suite 1000
16       Miami, Florida 33134
         For the Plaintiff
17
         DUANE MORRIS LLP
18       BY:  SETH A. GOLDBERG, ESQUIRE
              JOSEPH S. FERRETTI, ESQUIRE
19            REBECCA E. BAZAN, ESQUIRE
         30 South 17th Street
20       Philadelphia, Pennsylvania  19103
         For the Defendants, Prinston Pharmaceuticals,
21       Solco Healthcare U.S. LLC, and
         Zhejiang Huahai Pharmaceuticals Ltd.
22
         PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
23       BY:  CLEM C. TRISCHLER, ESQUIRE
              FRANK H. STOY, ESQUIRE
24       One Oxford Centre, 38th Floor
         Pittsburgh, Pennsylvania  15219
25       For the Defendant, Mylan Pharmaceuticals Inc.

*United States District Court*
*District of New Jersey*

```
 1   A P P E A R A N C E S (Continued):

 2        GREENBERG TRAURIG LLP
          BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
 3             BRIAN H. RUBENSTEIN, ESQUIRE
               STEVEN M. HARKINS, ESQUIRE
 4             DAVID E. SELLINGER, ESQUIRE
          3333 Piedmont Road, NE, Suite 2500
 5        Atlanta, Georgia  30305
          For the Defendants, Teva Pharmaceutical Industries Ltd.,
 6        Teva Pharmaceuticals USA, Inc., Actavis LLC,
          and Actavis Pharma, Inc.
 7
          HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC
 8        BY:  JANET LYNN POLETTO, ESQUIRE
               ROBERT E. BLANTON, JR., ESQUIRE
 9        673 Morris Avenue
          Springfield, New Jersey  07081
10        For the Defendant, Hetero USA Inc.

11        CIPRIANI & WERNER, P.C.
          BY:  JESSICA M. HEINZ, ESQUIRE
12        450 Sentry Parkway
          Blue Bell, Pennsylvania  19422
13        For the Defendants, Aurolife Pharma LLC
          and Aurobindo Pharma USA, Inc.
14
          KIRKLAND & ELLIS LLP
15        BY:  BRITTNEY NAGLE, ESQUIRE
          601 Lexington Avenue
16        New York, New York  10022
          For the Defendants, Torrent Pharma Inc.
17        and Torrent Pharmaceuticals Ltd.

18        FALKENBERG IVES LLP
          BY:  KIRSTIN B. IVES, ESQUIRE
19        30 N. Lasalle Street, Suite 4020
          Chicago, IL  60602
20        For the Defendants, Humana, Inc., and
          Humana Pharmacy, Inc.
21
          DRINKER BIDDLE & REATH LLP
22        BY:  MICHAEL C. ZOGBY, ESQUIRE
          600 Campus Drive
23        Florham Park, New Jersey  07932
          For the Defendant, Express Scripts
24

25
```

 1   **A P P E A R A N C E S (Continued):**

 2       BARNES & THORNBURG LLP
         BY:  SARAH JOHNSTON, ESQUIRE
 3       2029 Century Park East, Suite 300
         Los Angeles, CA  90067
 4       For the Defendant, CVS Pharmacy, Inc.

 5       ULMER & BERNE LLP
         BY:  JEFFREY D. GEOPPINGER, ESQUIRE
 6       600 Vine Street, Suite 2800
         Cincinnati, Ohio  45202
 7       For the Defendant, Amerisourcebergen Corporation

 8       NORTON ROSE FULBRIGHT US LLP
         BY:  ELLIE NORRIS, ESQUIRE
 9            DLESCI DAVIS, ESQUIRE
         2200 Rose Avenue, Suite 3600
10       Dallas, Texas  75201
         For the Defendant, McKesson Corporation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   (PROCEEDINGS held in open court before The Honorable Joel

 2   Schneider, United States Magistrate Judge, at 10:05 a.m.)

 3             THE DEPUTY CLERK:  All rise.

 4             THE COURT:  Good morning, everyone.  Please be

 5   seated.  Welcome back to Camden.

 6             We are on the record in *In Re:  Valsartan*.  19-2875

 7   is the docket number.

 8             Can we just have the entries of appearance of the

 9   lead counsel.

10             MR. NIGH:  Daniel Nigh for the plaintiffs.

11             MR. SLATER:  Good morning, Judge.  Adam Slater for

12   plaintiffs.

13             MR. HONIK:  Good morning, your Honor.  Ruben Honik,

14   plaintiffs.

15             MS. WHITELEY:  Good morning, your Honor.  Conlee

16   Whiteley for plaintiffs.

17             MR. GOLDBERG:  Good morning, your Honor.  Seth

18   Goldberg on behalf of the ZHP parties and the Joint Defense

19   Group.

20             MR. RUBENSTEIN:  Good morning, your Honor.  Brian

21   Rubenstein on behalf of the Teva defendants and the Joint

22   Defense Group.

23             MR. TRISCHLER:  Good morning, your Honor.  Clem

24   Trischler on behalf of Mylan Pharmaceuticals and the Defense

25   Group.

1        THE COURT:  So this was the conference that was

2   scheduled, I believe, in the August 26th order where we were

3   going to decide and address all discovery disputes.

4        The Court's goal, when we leave the conference today,

5   is to resolve all objections regarding the plaintiffs'

6   document requests and, in a matter days, to get a hard copy of

7   those documents requests.  The Court will order that they have

8   to be responded to without objections, we'll discuss when they

9   have to be responded to, as well as identify all of the

10  custodians and search terms for the API and finished dose

11  manufacturing defendants, and similar to what we did in

12  Benicar, we'll document that in a Court order so that there's

13  no misunderstanding or confusion about what's required.

14        I read all the parties' papers.  I understand there

15  are some miscellaneous issues.  I would have liked to avoid

16  the December 18th conference, like we discussed.  It does not

17  appear that to be the case, although I hope I'm wrong.  I'd be

18  delighted if we could resolve everything today.

19        What I plan for today -- and I'll, of course, address

20  any issue that defendants and plaintiffs, of course, want to

21  address -- is:  One, you'll get the Court's ruling on the

22  redaction issue that the Court raised; then we'll address

23  plaintiffs' document requests, and address all of the

24  objections, and hopefully get them resolved; then we'll do the

25  custodian issues; then we'll do the search-term issues; and

 1   then we'll open up the floor to whatever the parties want to

 2   talk about; and, hopefully, we'll leave today with some

 3   semblance of a schedule about when these documents are going

 4   to be produced -- rolling basis, substantial production, what

 5   have you.

 6          I read the parties' papers in detail.  I commend the

 7   parties for their what appears to be substantial recent

 8   efforts to meet and confer.  I am not of the mindset that just

 9   because there's disputes, it doesn't mean the parties didn't

10   engage in good-faith discussions.  I do believe that the

11   parties can have reasonable disputes, even if they exhaust

12   good-faith efforts to try and resolve their disputes, and

13   that's what we're here for.  We'll resolve those disputes.

14   But it's painfully obvious to the Court that a lot of time and

15   effort was spent on these issues, and I commend the parties

16   for that.  And, as I've said from the beginning, I believe

17   that this is the most labor-intensive part of the case, trying

18   to get the document production, ESI production underway, and

19   once we get through this, I think we should have smooth

20   sailing for the rest of the case.  But my experience tells me

21   this is the most problematic part of a complex case, dealing

22   with the ESI issues, especially in this case, dealing with

23   foreign language and foreign defendants.

24          So I want to start out by giving you the Court's

25   ruling on the redaction issue before the Court, and I'll

1    confirm the Court's ruling in an order to be entered.  So let

2    me give you the Court's oral opinion.

3         The redaction issue to be decided was raised by the

4    Court after it received the parties' recent letters addressing

5    the parties' macro discovery disputes.  After reading the

6    submissions, the Court asked the parties to brief the issue of

7    whether defendants' redactions of their core documents was

8    appropriate.  This oral opinion will serve as the Court's

9    ruling on the issue, to be confirmed in an order to be

10   entered.

11        By way of brief background, on April 29, 2019, the

12   Court identified what it denominated "core discovery" the API

13   and finished dose manufacturer defendants should produce.

14   "Core discovery" was defined as discovery that was:  One,

15   easily identifiable; two, unquestionably relevant and not

16   privileged; three, relatively simple to retrieve, and four,

17   discrete.  The purpose of the early production was to assist

18   the parties to identify the genuine issues in dispute and to

19   assist the parties to timely frame an acceptable ESI protocol.

20   The documents largely consisted of communications between

21   defendants and the FDA.

22        When produced, the documents were redacted by the

23   defendants for what they deemed to be irrelevant and

24   nonresponsive information.

25        Plaintiffs object and argue they should receive

1    complete or unredacted copies of defendants' core documents.

2          To assist the Court in its decision, the Court asked

3    the parties to identify 20 representative documents that the

4    Court would review in camera to decide if defendants'

5    redactions were appropriate.  Fortunately, the parties agreed

6    on 20 representative documents which were reviewed by the

7    Court in camera.

8          The Court rejects the notion that it is premature to

9    address this redaction issue.  The issue was raised by

10   plaintiffs in their letter briefs, and the Court will not

11   delay addressing a discovery dispute that has the potential of

12   hampering the efficient operation of the discovery process.

13         After reviewing the documents in camera, these are

14   the Court's general impressions:

15         (1) There were no redactions regarding valsartan.

16         (2) All redactions were to public documents that

17   plaintiffs could get themselves from the FDA.

18         (3) Some redactions prevented plaintiffs from fully

19   comprehending what was produced.

20         (4) Frankly, it does not appear to the Court that

21   "clearly relevant information" was redacted; however, the

22   Court is not prepared to rule that only irrelevant information

23   was redacted because it is not privy to the same information

24   plaintiffs have, and it does not know the ins and outs of

25   plaintiffs' theory of the case.

1            Given the interests at stake and largely based on its
2   in-camera review, and also on the fact that the Court's ruling
3   only applies to the discrete set of defendants' core
4   documents, the Court will order defendants to produce
5   unredacted copies of all core documents.  This includes
6   removal of the FDA's redactions in the documents if the
7   defendants have full and complete copies of those documents.
8            The Court's reasons for its ruling are as follows:
9            (1) The core documents we are talking about may be
10  the most important documents to be produced in the case.
11  Plaintiffs should make the determination for themselves
12  whether certain information in these critical documents is or
13  is not relevant.
14            (2) Since we are talking about FDA or publicly
15  accessible documents, plaintiffs have access to the documents
16  at issue.  It makes no sense to require plaintiffs to make an
17  independent request for documents already in defendants'
18  possession.
19            (3) When the Court ordered production of core
20  discovery, it did not contemplate they would be redacted.
21            (4) If the information that was redacted is genuinely
22  irrelevant, defendants will not be prejudiced.
23            It is unquestionably the case that some redactions
24  have to be removed because, otherwise, plaintiffs can't
25  understand the full context of the documents they received.

 1  The Court does not want to be bogged down in a

 2  document-by-document analysis of whether redactions are

 3  appropriate.

 4          To the extent defendants are concerned about

 5  producing HIPAA information, they are protected because the

 6  production is pursuant to Court order.

 7          Further, the Court assumes the documents at issue

 8  have been designated confidential pursuant to the DCO, the

 9  discovery confidentiality order.

10          Despite the fact the Court is ordering the production

11  of complete copies of defendants' core documents, the Court is

12  not -- repeat "not" -- ruling at this time that redactions of

13  defendants' other documents to be produced are off limits.

14  Redactions of genuinely irrelevant material is permitted, with

15  the proviso that they must be accompanied by an indication of

16  why the redactions are being made.  This doesn't have to be

17  done on a document-by-document basis, but can be done by

18  category.

19          The Court adds that if the redaction issue becomes a

20  problem in the future, the Court will revisit defendants'

21  permission to redact.  The Court assumes defendants will only

22  redact unquestionably irrelevant material and, in the Court's

23  words, "sharpen their pencil."

24          On the other hand, the Court assumes plaintiffs will

25  use good judgment if they make an application to challenge a

1  redaction.  If plaintiffs' applications are made without good

2  cause, the Court may bar challenges in the future.

3        For guidance on this redaction issue, the Court

4  refers the parties to the Special Master's R&R, adopted by

5  Magistrate Judge Goodman in *Communications LLC v.*

6  *Intellisphere*, 2017 Westlaw 3668391, District of New Jersey,

7  April 25th, 2017.  There the Special Master stated that "Only

8  the presence of unique circumstances should necessitate the

9  Court's involvement with redactions for nonrelevant

10 information."  The Special Master encouraged the parties to

11 meet and confer on any disputes and resolve the disputes

12 without bringing the issue to the attention of the Court.

13       The same instruction applies in this case.  It is

14 true that the Special Master in that case ruled that,

15 generally, redactions are not authorized; however, at this

16 time and under the present circumstances, this Court will not

17 go that far.  If, however, defendants' redactions are

18 unnecessary, excessive, or inappropriate, the Court will not

19 hesitate to bar all redactions.

20       That's the Court's ruling, counsel.

21       I think my order that I drafted puts a date of

22 production of January 31st.  I assume that gives the

23 defendants enough time to produce the documents, but if there

24 is a problem, just let me know.

25       You're looking at me, Mr. Goldberg, like you have a

1    question.

2        MR. GOLDBERG:  One thing to clarify about the FDA

3    documents that the Court has ordered --

4        THE COURT:  I know what you're going to say.  Here is

5    my position on that.  I may not have been as clear as I should

6    have been.

7        I understand that documents that the FDA sent to the

8    defendants may be redacted.  If the defendants don't have

9    complete copies, obviously, they do not have to produce

10   complete copies.  I understand that.  What I'm -- what I was

11   referring to is situations where a redaction may have been

12   made in the documents, but the defendants have complete copies

13   of the documents.  If the defendants have it, produce it.

14   But, obviously, if the redactions are made by the FDA and the

15   defendants don't have what's underneath the redactions,

16   clearly, they don't have to produce it.  If the plaintiffs

17   want that, they'll have to go to the FDA and do what they have

18   to do.  That's what I intended by the ruling.

19        MR. GOLDBERG:  (Nods head.)

20        THE COURT:  Okay.  So let's now turn to the documents

21   issue.

22        What the Court envisioned was to have a set of

23   document requests, attach them to an order, and say

24   these documents -- just akin to the fact sheets -- these have

25   been approved by the Court.  No objections.  This is when they

 1    have to be responded to.

 2            I have the red line that Mr. Goldberg was kind enough

 3    to send the Court.  Is that the last -- the version we should

 4    be working with?

 5            MR. SLATER:  I think it's the December 5, whatever --

 6    I think that was the last --

 7            THE COURT:  Mine is dated December 2nd.

 8            MR. SLATER:  Right, but it was the one we submitted,

 9    I think, with our briefs on the 5th.  We have not changed it

10    since then.

11            THE COURT:  Okay.  So why don't we just go through

12    them one by one, and if there is an issue, we'll address it,

13    decide it, the language will be cleaned up, and we'll get a

14    final version.

15            So a good place to start is number one.  Any

16    objections?  I will start with -- well, I guess we should go

17    to the defendants.

18            MR. SLATER:  No objections, your Honor.  Next one.

19            THE COURT:  Any objection to Number 1?

20            MS. NAGLE:  No objections, your Honor.

21            THE COURT REPORTER:  I'm sorry.  I can't hear you.

22            MS. NAGLE:  Brittney Nagle on behalf of defendants.

23            THE COURT:  Maybe she spoke too soon, Mr. Goldberg?

24            MR. GOLDBERG:  No, your Honor, I just want to

25    explain.  The way we -- because of all the document requests

1   and the way the parties have been working through this, there

2   have been plaintiffs' counsel that have handled certain --

3              THE COURT:  Good.

4              MR. GOLDBERG:  -- and certain defense counsel that

5   have handled it, so that's how we're planning to --

6              THE COURT:  No problem at all.

7              Okay.  Number two?  Defendants, we'll have to hear

8   from you, and if there is an objection, then we'll go to the

9   plaintiffs.

10              MS. NAGLE:  Your Honor, defendants have no objection

11   to Part A of Request 2, regarding executives.  But we have an

12   objection to Parts B and C or just C.

13              THE COURT:  Is there a problem -- I agree with you on

14   C.

15              MS. NAGLE:  Okay.

16              THE COURT:  I don't have a problem with C.

17              But is it really a burden or problem to identify who

18   is on the Board of Directors?

19              MS. NAGLE:  The only issue is we're not sure that all

20   have that historical information like out in charts.  We --

21              THE COURT REPORTER:  I'm sorry.  I'm having a very

22   difficult time hearing what you're saying.

23              MR. GOLDBERG:  I think the point on B is -- I think

24   defendants' position is to the extent they exist, then the

25   Board of Directors' names --

1          THE COURT:  No problem.

2          MR. GOLDBERG:  -- should be identified.

3          THE COURT:  That goes for everything.  So Number 2,

4    we'll strike subpart C, and leave A and B.

5          MR. SLATER:  Could I ask for one small modification,

6    your Honor?

7          THE COURT:  Sure.

8          MR. SLATER:  And just to clarify one thing for the

9    record.  We didn't only ask for organizational charts.  We

10   asked for similar documents.  We assume that the parties have

11   something that documents who their board members were, whether

12   it's an org chart or a list of Board of Directors.

13         THE COURT:  Wouldn't you just accept a list?

14         MR. SLATER:  Yeah, absolutely.

15         THE COURT:  Okay.  Fine.

16         MR. SLATER:  And the only thing on C is the one

17   narrow exception I would ask for is if an entity that is a

18   party to this case has ownership of another entity, for

19   example, we just want to know the full extent of the ownership

20   of, for example, Solco or Princeton or Huahai by ZHP --

21         THE COURT:  Request denied.

22         MR. SLATER:  Thank you.

23         THE COURT:  Let's concentrate on the relevant issues.

24         Number 3.

25         MS. NAGLE:  We have no issue with that.

1          THE COURT:  Number 4?

2          MS. NAGLE:  No issue.

3          THE COURT:  5?

4          MS. NAGLE:  No issue.

5          THE COURT:  Let's keep on going.  6?

6          MS. NAGLE:  No issue.

7          THE COURT:  7?

8          MS. NAGLE:  No issue.

9          THE COURT:  8?

10         MS. NAGLE:  No issue.

11         THE COURT:  9?

12         MS. NAGLE:  No issue.

13         THE COURT:  10?

14         MS. NAGLE:  No issue.

15         THE COURT:  We're done?  Are you 1 to 10?

16         MS. NAGLE:  Yes.

17         THE COURT:  Well, that's not bad.  That's 9 out of

18  10, no objection.  Maybe you should do the whole list.

19         MR. GOLDBERG:  She should be at this table.

20         THE COURT:  Who is 11?

21         MR. RUBENSTEIN:  That's me.

22         So, I think we have no objection, as long as it's for

23  ANDAs and DMFs for products that were sold in the United

24  States.

25         MS. HILTON:  Your Honor, Layne Hilton for the

1   plaintiffs.

2        We are asking for production of three, to our

3   knowledge, three additional regulatory files for unapproved,

4   tentatively approved, or withdrawn ANDAs, and two -- two ANDAs

5   and one DMF.

6        THE COURT:  I read that.  Request denied.  If it was

7   a standalone request and we didn't have 115 other requests,

8   your request might have some merit, but given the scope of

9   what we're talking about, I think what you're asking for is

10  such an insignificant addition to the mammoth amount of

11  information that's going to be produced in this case, so

12  that's why the Court rules like it is.

13       Number 12?

14       MR. RUBENSTEIN:  Again, I think the same goes for 11

15  through 15, as long as it's for products that were sold within

16  the United States, then I don't think we have any objections.

17  But I think to the extent they're asking for unapproved,

18  withdrawn, or other applications, then we do have the

19  objection, but I believe you just ruled on that.

20       THE COURT:  I did.

21       MR. RUBENSTEIN:  So, pending your ruling, then we

22  don't have any more objections.

23       THE COURT:  Okay.  So 11 through 15.

24       16?

25       MR. SLATER:  Your Honor, one question.

1            THE COURT:  Oh, I'm sorry.

2            MR. SLATER:  Should we modify those to put in that

3    language?  I understand the answer from them is going to be

4    "none," but should we modify the request to say "for products

5    sold in the United States" just so that we have the record

6    that --

7            THE COURT:  I think that would be helpful, yes.  Yes.

8            MR. SLATER:  Okay, thank you.

9            THE COURT:  Number 16?  Oh, document retention

10   policies.  This is an interesting issue.  You know, I don't

11   understand why this is not relevant, frankly.  I read the case

12   law that you all cited, but I don't think you need to show

13   spoliation to get a company's document retention policy.

14   They're going to ask -- they ask for relevant documents in the

15   case.  Maybe, maybe not, sometime in the future, they'll say

16   why wasn't this document produced because the document

17   retention program required that it still be in existence?  I

18   don't think it's a prerequisite to ask questions about a

19   company's retention program to have to show spoliation.  I

20   agree, they haven't shown it yet.  I ruled on that.  But they

21   have shown that there are questions about whether appropriate

22   and relevant records were destroyed.  That may not be

23   spoliation because at the time they were destroyed, they

24   didn't foresee litigation, at least on the present record, but

25   it just seems to me that it's obviously a relevant area of

1   discovery.  So the objection to 16 is overruled, and

2   defendants have to produce their retention or destruction

3   policy.  It just seems to me clear that that has to be

4   produced.  I was in practice for a long time, and that was

5   always the case, so that's my ruling on 16.  The objection is

6   overruled.

7             17?

8             MR. SLATER:  17 and 18 are withdrawn, your Honor, per

9   your indications to us --

10             THE COURT:  Good.

11             MR. SLATER:  -- previously.

12             THE COURT:  19?

13             MR. GOLDBERG:  Your Honor, 19 through 20 -- 29, all

14   cover manufacturing.  And we have pretty thorough -- you know,

15   a pretty thorough list of documents that we've agreed to

16   provide.  It's not -- I think there is not really a dispute.

17   I don't know how you want -- if you want me to read those into

18   the record or you want us to work with plaintiffs to create a

19   longer document request that calls these out?

20             THE COURT:  Well, I don't know how to handle this.  I

21   agree with defendants that, as framed, the documents are

22   overbroad.  They're not specific enough.  So I don't know how

23   to handle this, plaintiffs.  Do we go one by one?  Do we agree

24   that defendants are going to produce the categories that

25   they've listed in their letter?

 1            MR. SLATER:  I don't know that we can do that.  I

 2    think that -- I mean, we tried to narrow these requests based

 3    on the content of the meet and confers, and we tried to narrow

 4    it to what the parties had agreed to.  I have no problem with

 5    talking to the defense further and then --

 6            THE COURT:  No, today is the day.

 7            MR. SLATER:  No, I agree with you.  I agree.  Because

 8    if we defer it to talk more, we could end up here if

 9    there's an issue --

10            THE COURT:  No, no, no more talking.  We had since

11    August to talk.

12            MR. GOLDBERG:  Your Honor --

13            MR. SLATER:  I think we have to take our medicine

14    today.

15            MR. GOLDBERG:  I can read these fairly quickly.

16            THE COURT:  Is this from your letter, your December

17    10 letter?

18            MR. GOLDBERG:  Let me just see.  I have it in bullet

19    points.

20            MR. SLATER:  I think that was a little narrower than

21    what we're prepared to agree to.  I think it might not take

22    that long to go through these because --

23            MR. GOLDBERG:  I can read these and they can --

24            THE COURT:  Well, is it in your letter?  Because I

25    remember reading -- or it could be an attachment.  I remember

1   seeing a list of manufacturing-type documents that was --

2           MR. GOLDBERG:  That was a different -- that was a

3   letter prepared by Ms. Hilton, and then that led to further

4   discussion, and so we have an agreement based somewhat on that

5   letter.

6           THE COURT:  Page 4?

7           MR. SLATER:  Judge, I think it makes sense for us to

8   go request by --

9           MR. GOLDBERG:  Your Honor -- yeah, and I -- yeah.

10          MR. SLATER:  It makes sense to go request by --

11  because some of those listings, I think we should just get it

12  straight, make sure we're all on the same page, because it may

13  not impact some of the requests.  Some of the requests, they

14  may say yeah, we're going to give you that.

15          THE COURT:  Okay.

16          MR. SLATER:  Because ultimately your Honor wants to

17  attach a set to an order.

18          THE COURT:  Yes.

19          MR. SLATER:  So I don't think this will take that

20  long.

21          MR. GOLDBERG:  Why don't I read what I have and if --

22          THE COURT:  All right.  You start and then we'll go

23  to Mr. Slater.

24          MR. GOLDBERG:  Okay.  So --

25          MR. SLATER:  For Number 19?

1            MR. GOLDBERG:  For 19:  Documents regarding the

2    scale-up process from lab scale to commercial scale

3    manufacturing of valsartan API, including, but not limited to,

4    documentation of pilot-scale batches, documentation of

5    small-scale batches, research and development reports, and

6    product development reports; documents created and maintained

7    as part of the deliberation process in making a proposed

8    change to the valsartan manufacturing process, including, but

9    not limited to, critical change requests, risk assessments of

10   those proposed change requests, test method validations, and

11   deviation reports associated with those change requests;

12   documents related to the quality assurance measures in place

13   which guide the development of the valsartan manufacturing

14   process, including, but not limited to, quality agreements or

15   contracts with any labs used to conduct lab-scale studies of

16   valsartan API manufacturing, validation of software and

17   instruments used in testing lab-scale, pilot-scale, and

18   small-scale batches, and validation documents; documents

19   related to deviations in the manufacturing process of

20   valsartan API, including deviation investigation reports;

21   documents regarding OOS results, including, but not limited

22   to, lists of OOS investigations -- OOS being

23   out-of-specification -- related to valsartan, all OOS

24   investigation reports for chromatography, related to genotoxic

25   impurities, related to instrument errors, and related to lab

1   peaks; documents regarding corrective and preventative action

2   plans initiated over time related to the manufacturing of

3   valsartan API; validation documents provided or shown to FDA

4   during inspections; SOPs and/or management procedures for all

5   steps of the valsartan process development and manufacturing

6   operations, including deviations, stability studies, risk

7   management, change control, change management, returns,

8   reprocessing, chromatography, the keeping and maintaining of

9   reserve samples, API sampling, complaints, returned products

10   and recalls.

11          And then for finished dose:  Documents regarding open

12   DMF file documents received from the API manufacturers about

13   their products; documents related to the qualification of

14   vendors used to source raw materials, solvents, or provide

15   solvent recovery services, including questionnaires,

16   on-site audits -- any on-site audits conducted of the vendor's

17   facilities; SOPs and/or management procedures related to raw

18   materials and/or the maintenance of any equipment used in the

19   manufacturing of valsartan API, including cleaning recovered

20   solvents, raw materials and packaging materials, pest and

21   rodent control, water purification systems, raw material

22   sampling, and vendor selection and approval.

23          All of this for the -- for sale into the U.S. market,

24   and, of course, subject to the Court's macro discovery rule.

25          That's where we are in 19.

```
 1            THE COURT:  All right.  Between 19 and 29,
 2   Mr. Slater, is there anything else you want?  I mean, are
 3   there any other issues we should talk about that Mr. Goldberg
 4   didn't list in his categories?
 5            MR. SLATER:  If I could, I'd prefer not to just have
 6   to pick it out.  I would rather walk through item by item and
 7   just confirm with them because there may be certain things --
 8            THE COURT:  Okay.
 9            MR. SLATER:  -- but I will say in broad stroke, my
10   sense of the approach, if your Honor is okay with this and if
11   the defense is okay, is through the meet and confer process,
12   that list was created to give us what we thought would be a
13   fairly thorough overview of the process.  I mean, it covers,
14   we think, the most important things as we know them today and
15   as have been discussed openly in court; for example, what is
16   the overall process, what testing was done from the beginning,
17   how was the process developed, anything having to do with
18   solvents, reuse solvents, how they're used, how they're
19   tested, how they're --
20            THE COURT:  Agreed.
21            MR. SLATER:  So it sounds like -- and then there is a
22   broader reach to these documents, so our thought is, in
23   good -- to use the meet and confer process as intended, is to
24   say, okay, as to the overall manufacturing process, we're
25   willing to agree to that because that's the list that came
```

1  from the discussions, with the caveat that if, through the

2  review of the documents, it appears that there is something

3  that just didn't come up, not through any -- there's just a

4  lot that we're covering -- that we can talk about it and add

5  to that list if it's not covered by these overall categories,

6  just so that we have that caveat, because, to a certain

7  extent, all the lawyers are in a little bit of a vacuum

8  because we haven't all looked at the documents yet.  And then

9  I think, as a second step, if we can just briefly go through

10 the requests and just confirm whether or not -- if the defense

11 confirms yes, that's incorporated by those requests, and is

12 there anything missing, because there might be a few examples

13 of things that we might just have to pinpoint, that way, at

14 least we're on the same page when we walk out of here.

15          THE COURT:  All right.  Let's do it.

16          MR. SLATER:  Okay.

17          THE COURT:  But I've said this so many times before.

18 We're going to set the search terms, the custodians, the

19 document requests, but if there is good cause on either side

20 to either add or subtract from what we agree to and order, the

21 Court will entertain the application.  So if there is a

22 specific document or category of documents that are just

23 missed, and there is good cause to get it, you'll get it.

24          MR. SLATER:  Understood.  We always worry about the

25 diminishing window of good cause as time goes on but --

1          THE COURT:  Well, that's true.

2          MR. SLATER:  To just put it out there.

3          THE COURT:  That's true.

4          MR. SLATER:  But I think on these parameters, we're

5    comfortable, and if we can just run through these requests,

6    and I invite my team, if they see something that they think is

7    specific, and that may not have been mentioned -- I saw you

8    gave up trying to write the list.  I didn't even try.  But I

9    think that the people who actually were involved in the direct

10   discussions have said that sounds about right, so -- but I

11   think this will only take us about five minutes to run through

12   the rest of the requests.

13         THE COURT:  Let's do it.

14         MR. SLATER:  So that covers 19, what Mr. Goldberg

15   just went through.  That's really the catchall sort of request

16   on the API process.

17         Number 20, the part that -- and I ask Mr. Goldberg

18   just to tell me yes, that's -- what he just said is intended

19   to capture it.  These were some information that could relate,

20   for example, to the solvents that were purchased, did they get

21   from the supplier specifications, manuals or very important

22   material safety data sheets, that type of thing?  I think it's

23   encompassed by what he described because some of those

24   categories were very broad, but that's something we just want

25   to make sure.  If the supplier gave warnings or information,

```
 1   we want to make sure we capture that as to the important

 2   ingredients in the process.

 3          MR. GOLDBERG:  I don't think there is an objection.

 4          THE COURT:  So, just to clarify, when these requests

 5   for documents are redrafted, are you going to take

 6   Mr. Goldberg's list and just add them to the document

 7   requests?

 8          MR. SLATER:  I mean, I suppose one thing we could do

 9   is just get the page of the transcript and -- we could do

10   either one, you know.  We will have to refer to the

11   transcript.  Or, Mr. Goldberg, you know what?  You could send

12   is to us and we can put it in.  But my feeling was to actually

13   not do that, actually, is to just leave the request as is.

14   But we're on the record saying that, as a first blush, we're

15   defining what's going to be produced, so that's in the record,

16   and if there is something we don't get and they say, well, we

17   didn't list it, then we would to have meet and confer on it.

18          THE COURT:  So could you put, maybe in parentheses

19   after 19, as listed or described by defendants at the December

20   11, 2019 conference, so at least we know where to go to if

21   there is some issue with that?

22          MR. SLATER:  Yes.

23          THE COURT:  All right.  Number 20 --

24          MR. SLATER:  I think we just covered that.

25          THE COURT:  Okay.
```

1           MR. SLATER:  21, this is a question on testing, and

2    your Honor, I assume, saw the letter we sent in.  So it starts

3    to implicate the testing issue.  It doesn't sound like we have

4    a terribly giant divide on it.  I think the only divide on

5    testing is our ability to just make sure we know what testing

6    was done, the complete list, which your Honor ordered.  We

7    worked with what ZHP produced to us and you saw it and we

8    provided your Honor a list of testing, and they have to

9    confirm whether -- I think they're agreeing those tests would

10   be produced, but I won't say that for them.  So we're fine

11   with it.  I mean, certainly, we think this request encompasses

12   all the testing we've asked for.

13          I don't know if there is still an objection, but we

14   have to define what we're going to get, and I don't know if

15   there is still a dispute on it because what we're still just

16   asking for is the list because we appreciate them identifying

17   what they identified in the documents.  It got us ahead of

18   where we were.  But we also want to make sure we're just not

19   missing something, and, frankly, we want to make sure that

20   defense counsel also knows from their client this is the full

21   list.

22          We're not going to ask for a test to make sure a box

23   is watertight.  We're not going to ask for things that are

24   irrelevant.  We just want to make sure we can at least show

25   our experts, which we have in good faith done so far, the list

1    and just say is there anything you see here that you would say

2    we need to find out more about that?  That's really -- which

3    we have ordered previously, so, subject to that, we're -- I

4    don't think there is an objection to this request.  I'm

5    speaking for them --

6         THE COURT:  So, with regard to Number 21, I guess

7    that's the issue before the Court, right?  Is there an

8    objection to 21?

9         MR. SLATER:  Right.  And I guess -- I'm talking

10   through as if they're not objecting so --

11        THE COURT:  Well, we have to find out, don't we?

12        MR. GOLDBERG:  It sounds like what you're asking for

13   now, Adam, is that, again, defendants just generate a list of

14   all the tests, testing that we do.

15        MR. SLATER:  That's what was ordered, so, I mean, I

16   think that -- we just want to make sure we don't miss

17   something.  If there is something material that, for some

18   reason, we don't know about, that's just not going to help

19   anybody.  So that was -- it was already previously ordered, so

20   we think it should be done, just to make sure that we don't

21   miss something.

22        THE COURT:  Well, clearly, if it's ordered, it has to

23   be done.  But the issue before the Court is Number 21.  Is

24   there an objection to 21?  Is all you're asking for in 21 is

25   the list of the tests?

1        MR. SLATER:  No, we are asking for the documentation

2   of the testing and the results.

3        MR. GOLDBERG:  And this is where it gets -- I mean,

4   this is sort of where it gets far afield.  We -- I think we

5   generally agree that chromatography is the key type of test

6   here.  Mr. Slater's letter from yesterday identified, I think,

7   that was -- primarily, those are different types of

8   chromatography, and that's where their experts are going to be

9   focused.

10        So we have walked through, at least from ZHP's

11   standpoint, with plaintiffs, the information that demonstrates

12   the different kinds of tests we do, including all of that

13   chromotography.  That's how the letter was generated.  I

14   understand that other defendants have provided similar

15   information, pointing plaintiffs to the Bates numbers.

16        I don't think there is any dispute that we're going

17   to be producing chromatography -- that was in that list I just

18   gave you about 19 -- and all of the results relating to

19   chromatography.  And I think plaintiffs have very good lists

20   about 99 percent of all the other kinds of tests that we do --

21   water, appearance, solubility, whatever it is -- and, you

22   know, it seems that the likelihood that they're missing a test

23   is very low.

24        If their experts can say to us, we expected to see a

25   certain kind of test, or we -- or do you do this kind of test,

1  maybe that would be helpful because they have a list of about

2  99 percent of the testing we do.  And so --

3          THE COURT:  I'm not sure where we are, frankly.

4          MR. SLATER:  This is what I think, to try to recenter

5  it.

6          THE COURT:  Because I don't want to be back here

7  arguing about Number 21.  Let's resolve it now.

8          MR. SLATER:  I will try to recenter it.  And I think

9  part of the issue is that myself and Mr. Goldberg were

10 talking, and we're talking in the context of ZHP, but there is

11 multiple defendants.

12         THE COURT:  I understand.

13         MR. SLATER:  So ZHP gave us identification of testing

14 within their core discovery documents, and we have the

15 December 10 letter defining -- we wrote back to them, after

16 consulting with our experts on that, saying these are the

17 tests that are described in those documents that we need.  So

18 I would think that that list, if acceptable to the defendants,

19 would apply to all defendants.  But the other defendants,

20 we're just starting to get references to documents from them.

21 We got one last night.  We got one Monday.  So it's not on an

22 equal footing, all defendants, so that we have to remember

23 it's not just one defendant.

24         MR. GOLDBERG:  Yeah --

25         MR. SLATER:  There is a couple of other

 1   manufacturers.

 2          MR. GOLDBERG:  Well, I mean, I think that's a good

 3   point.  If that letter that you sent is representative of the

 4   kinds of testing that you really want to be produced and

 5   focused on, then let us talk about that, let's -- because I

 6   don't think the other defendants got that letter, unless it

 7   was attached to the brief.  I don't know if it was.  But that,

 8   again, is the different kinds of chromatography that could be

 9   at issue.

10          So, it seems to me that the question is:  Do all

11   defendants agree that, for that set of tests or some subset of

12   that long list, there is going to be a production?  And do

13   plaintiffs feel like they really need any other kind of

14   testing?  Because that's the chromatography testing that their

15   experts have now identified as being the key types of testing.

16          MR. SLATER:  I think I know where they are.  We need

17   the lists from all the defendants because we have to make --

18   we don't know that they all do the same tests.  And they may

19   have run a certain test three times in 2017, some part -- one

20   of the API's may have run that no one else did, that's not

21   normally done, that could be very significant.  So we just

22   need to know that and it's already been ordered.

23          Our letter of December 10 to ZHP, if they say, well,

24   we're not objecting to that and we're going to provide those,

25   and all parties will provide that type of testing or similar

1  testing, then at least we know they're not objecting to it and

2  they're giving it to us, but I would say that -- and we have

3  it in the brief.  Your Honor has our unredacted version of the

4  brief which mimics the letter and what we said we want.  So

5  all that was to show the Court is if they were objecting, we

6  wanted the Court to know these are right in the wheelhouse of

7  what they said is relevant.  But I think the requests should

8  be responded to and the list should be provided.

9          THE COURT:  I want to phrase Number 21 in a manner

10 that it's going to be Court ordered that has to be produced.

11 Now, right now it says, "any testing."  Too broad.  No good.

12 It has to be more specific.

13         MR. SLATER:  Well the problem is this:  We still

14 don't have -- if you wanted us to list all of the particular

15 tests, the problem is we don't have a list of what all the

16 parties did.

17         THE COURT:  So would it be testing -- does this get

18 into the macro issues that the Court decided?  Would it be

19 testing that would reveal the presence of nitrosamine --

20 however you pronounce it -- contamination?

21         MR. SLATER:  Well, it would be testing that goes

22 beyond that because there could be -- there are tests that

23 were not directed to identifying NDMA.  It was only after the

24 disclosure of this issue that they started to do tests where

25 they were looking for NDMA, for example.  Before that, there

1  were more generalized testing, from what we've seen so far,

2  mostly the different types of chromatogram, which would test

3  purity.  There is also separate testing for bioequivalency --

4          THE COURT:  But Number 21 has to be phrased in a

5  manner that the Court is going to order it.  That's what I'm

6  trying to get to.

7          MR. SLATER:  Well --

8          THE COURT:  And --

9          MR. SLATER:  Now about -- and I'll leave it subject

10 to my team -- testing capable of indicating impurity,

11 contamination, or lack of bioequivalence -- and what Layne is

12 pointing out is, there is really two types, there's testing of

13 what they manufactured, and there is also testing, frankly, of

14 the solvents before it's used in the process.

15         So, again, that's why I'm trying to be broad because,

16 for example, our experts have pointed out and we've told them

17 in our letter, certain of this testing was of the solvents or

18 the reused solvents, and we need to know those results from

19 each of the parties that manufactured, because they're not

20 going to say, oh, this is NDMA.  What they're going to show is

21 peaks that shouldn't be there, and that's why we need the full

22 scale of testing to show you were seeing this, and then, all

23 of a sudden, it looked like this.

24         THE COURT:  Well, we have --

25         MR. GOLDBERG:  Judge, we're now revisiting --

1              THE COURT:  I'm going in circles here.

2              MR. GOLDBERG:  I'm afraid what is about to happen is

3    a reconsideration of Decision 8 in the macro issue rulings.

4              The Court ordered that plaintiffs are entitled to

5    discovery regarding any tests that could identify the presence

6    of nitrosamine contamination; also, testing and results

7    regarding other carcinogens, general toxic impurities, or

8    residual solvents in the valsartan API and valsartan finished

9    dose is relevant.

10             And during that conference, your Honor was very

11   clear, there's not going to be testing about water and testing

12   about color.

13             THE COURT:  So that definition should be incorporated

14   somehow into Number 21.  That's what I was referring to.

15   So --

16             MR. HONIK:  Your Honor, the way to do that,

17   respectfully, might be -- the language currently reads:

18   "Produce all documents, including photographs or video, with

19   regard to any testing or inspections."  We can insert there,

20   "for purity and contamination consistent with," and then refer

21   to that language, simply refer to it.  And then it's further

22   qualified with, "of the machines, materials, substances

23   utilized in the manufacturing process."  So it captures that

24   ruling, and it confines the testing to testing related to

25   purity and contamination.

```
 1            MR. SLATER:  And bioequivalence.

 2            THE COURT:  Any objection?

 3            MR. GOLDBERG:  I do have an objection to the term

 4   "purity" because the Court used the phrase "toxic impurities."

 5   I'm not an expert, but I think there may be impurities that

 6   are not toxic, that could be tested for --

 7            THE COURT:  We're using the macro language.  So

 8   incorporate the macro language, no more, no less, into Number

 9   21.  That's --

10            MR. SLATER:  We'll do it.  I think one of the things

11   probably be helpful, your Honor, is when we draft this, before

12   the Court sees anything, we will send what we propose to

13   defense counsel, obviously, to make sure that we are both on

14   the same page before the Court would get it.

15            THE COURT:  Okay.  But I don't want to revisit the

16   macro issues.  Testing was one of the big categories that we

17   dealt with.  We spent a lot of time on it, and I don't want to

18   revisit it.

19            MR. SLATER:  Your Honor, there is the one issue on

20   the time period.  This is one of the categories of requests

21   where we feel that a narrow exception should be made because

22   the testing done from the beginning would show what the

23   chromatography looked like before they made changes in the

24   process, so our experts can then look and say, look, you had

25   this rating, and then you changed the process and, all of a
```

 1   sudden, this peak came up.  That's significant.  So we need to

 2   be able to go back to the beginning so we have the testing

 3   history.

 4           THE COURT:  No, I agree with you that, in concept,

 5   what you're saying is correct.  But if I recall correctly, if

 6   we're talking about ZHP, I think they go back to 2010 or

 7   20- --

 8           MR. SLATER:  2007 actually.

 9           THE COURT:  Okay, 2007.  So you'll get the tests

10   before the change and you'll get the tests after the change.

11   I don't see any reason why we have to change the relevant time

12   period.

13           MR. SLATER:  Because there were two changes.  There

14   is actually three -- I'm sorry.

15           MR. GOLDBERG:  The relevant time period for ZHP is

16   January 1st, 2010.  And --

17           THE COURT:  Whatever is in the order.

18           MR. GOLDBERG:  That is --

19           THE COURT:  Yes, that's what my recollection is.

20           MR. GOLDBERG:  -- Paragraph Number 9 in the macro

21   discovery issues sets the relevant time period.  And this very

22   argument was made in the context of the macro discovery

23   issues.  This -- plaintiffs made the very same argument three

24   weeks ago about manufacturing documents, testing documents,

25   the process before.  And remember, Judge, they had proposed

1  going back to 2007.  That was their macro discovery issue.

2  And the Court was very clear -- come back later, show cause as

3  to why you need something, and you'll get it.  But we're not

4  at that stage yet, and if the Court revisits the decision

5  today, three weeks after --

6          THE COURT:  I'm not revisiting that decision.

7          I recall -- I think it's the 2010 date, that's why I

8  say it.  But wasn't the key manufacturing change made after

9  2010, Mr. Slater?

10          MR. SLATER:  No.

11          MR. GOLDBERG:  Yes.

12          MR. SLATER:  No.  I'll tell you why.  Well, the

13  answer is a key change was made then, but there were two

14  manufacturing changes.  There was an original process, then

15  there was a change to -- I'm not going to go with the titles.

16  There was a second process which occurred before 2010, and we

17  have produced -- we have shown the Court, and it's in

18  documents that have been before the Court, in retrospect, they

19  have gone back and tested.  There was nitrosamines, there was

20  NDMA already showing up after the first manufacturing change

21  and before the third one.  The defense keeps talking about the

22  change that they made, the last one, but there was NDMA per

23  the testing they have produced before that change.

24          So what we need to -- when your Honor made your

25  ruling, you said, look, this is my broad ruling, but if there

1    are specific narrow categories where it makes sense, and this

2    is the time, frankly, this one makes so much sense because

3    when they had their first process, starting in '07, and

4    they're testing it and they're running it, they're getting

5    certain chromatography, peaks, you know, it's almost like a

6    vital sign sheet.

7            And then they switch to the second process, and it

8    changes.  And someone needs to ask, well, what's happening

9    here?

10            And then they get to their third process, and there's

11   changes, but they need to compare it to the second and the

12   original.  And for our experts, it's very important, because

13   there is no secret, part of our theory is when they made these

14   changes, they needed to foresee that these chemical reactions

15   could create nitrosamines.  And they -- and we're going to see

16   the documents to see if anybody was saying, hey, this is

17   something we have to be concerned about.  We have to look at

18   this.  Oh, these peaks are changing with the first

19   manufacturing change.  Why is that?

20            And when we have all the documents, we will be able

21   to put together a picture, from the beginning to the end, and

22   be able to, if we have to try this case, show the jury how

23   things changed over the years and say, well, if this was --

24   this was concerning.  If our experts say, you know what?

25   Someone needed to look at that because if you look back on it

 1   now, if they had done this and this afterwards, they would

 2   have seen it was nitrosamines, but they didn't do that, and

 3   that was 2009 or that was 2011 or it was 2012.  So if we don't

 4   have the entire sequence of testing, we can't do that, and we

 5   are severely prejudiced.

 6          MR. GOLDBERG:  Judge, this is -- this is exactly the

 7   argument that was made three weeks ago, and it was made as to

 8   every defendant, that there were things they needed before the

 9   relevant time period that your Honor had then set.  They did

10   this for every defendant -- Judge, we need to go back further.

11   We need to go back to 2005 as to Mylan, 2007 as to Torrent.

12   And the Court set relevant time periods because at some point

13   there has to be a limit.  We're talking about now nine years'

14   worth of data.  And the process issues that they're raising

15   are not the process issues that are -- that have resulted in

16   the recall, that have resulted in the NDMA, that are at issue.

17   And it seems that your Honor's ruling that they can come back

18   and ask for a specific document or type of document, here now

19   they're asking again to sort of blow it wide open without

20   specificity.  So if during the discovery they realize, well,

21   we really need to understand this part of the process

22   predating 2010, then that's an issue they can raise.  But

23   they're not raising that specific issue now.  Or if they get

24   in the ten years' worth of documents something that suggests,

25   you know, there is a reference to a deviation report from

1  2009; of course they're going to get that deviation report.

2  But to revisit the ruling now would require us to look at

3  everything else again.

4          MR. SLATER:  Let me make it easy.  The testing that

5  we identified in the letter from the documents they produced,

6  in the first instance, we would agree to those tests going

7  back to the beginning, and then we can see what we get and we

8  can see if we have to come back.  But without these tests, the

9  chromatography going back to the beginning, we can't do what

10  we need to do to prove our case because we have to be able to

11  show the history and show the different time points when they

12  missed what they should have been investigating further.  It

13  ties our hands on an important part of the proofs.

14          THE COURT:  When will you be alleging that ZHP's API

15  was contaminated with chemicals?

16          MR. SLATER:  Their documents show that it was

17  contaminated with NDMA going back even before the last process

18  change because they produced test results showing that.

19          THE COURT:  What year?

20          MR. SLATER:  2009, I believe.

21          THE COURT:  Okay.  So isn't the -- and the relevant

22  time period is 2010 that was defined in the order?

23          MR. SLATER:  Yeah.  I'm not sure what they're

24  concerned about because these are the tests that they have

25  told us are the most important tests.  So we're saying for

1   this stage, we'll agree as to these tests that we bulleted in

2   our letter and your Honor has it in the brief, let's go back

3   to the beginning with those tests.  If we need to ask for

4   something else, we'll be in the good cause shrinking window.

5          THE COURT:  But they're arguing about relevant time

6   period, not necessarily about the tests, right?

7          MR. SLATER:  Well, they've already agreed to produce

8   these tests.

9          THE COURT:  Right.

10          MR. SLATER:  The only question is do we get them

11   going back to the beginning, and I don't think there is any

12   burden to this and --

13          THE COURT:  The beginning is when?

14          MR. SLATER:  I believe they started the manufacturing

15   process in 2007.  But they have these tests.  What's the

16   burden for them to produce them?  And the prejudice to us

17   could be immense.

18          THE COURT:  So are we only talking about 2007 to 2010

19   for ZHP?

20          MR. SLATER:  Remember -- yeah, we're talking about

21   ZHP.  We want to go back to the beginning for these tests or

22   their compatriots with the other API manufacturers, but we

23   only have the context of the dates with ZHP.

24          MR. GOLDBERG:  In other words, your Honor, if you

25   rule on this, then they're going to ask the same thing of

1   Mylan and the same thing of Torrent, and this is a slippery

2   slope here.

3          THE COURT:  It is.

4          Would the earlier test results be encompassed within

5   the Court's macro discovery rulings?

6          MR. SLATER:  I believe that the macro discovery

7   ruling specific provided for narrow exceptions to be made as

8   needed.  That's what your Honor said.  This is a clear one.

9          Look, if they're worried about the other defendants,

10  we'll start with ZHP and then when we go through it -- but we

11  can't -- here is the thing.

12         THE COURT:  No, my question was this.  My Deputy is

13  getting a copy of the order.

14         Does the -- I don't recollect.  Does the macro

15  discovery order say you have to produce any document, anytime,

16  anywhere in the world that reveals this chemical

17  contamination?

18         MR. SLATER:  I don't believe so, because I don't

19  think it was phrased that way.  And I think this was one -- I

20  think your Honor -- obviously, I'm speaking for you, so you

21  can tell me, "You're all wet."

22         I thought that the intent was, from the order and

23  from the argument, look, this is the overall default time

24  periods.  But you acknowledged there may be certain narrow

25  issues where we need to go back further.  This is a critical

1    one, because, again, I'm not really sure why they're even

2    objecting.  They have the test results.  They can't throw them

3    in the garbage.  They have to maintain them.  They're not

4    allowed to destroy them.  So they have them.  And, again, it's

5    going to show the historical pattern of the results of what

6    they have told us are the most critical tests, and for

7    purposes of this ruling, we're agreeing to that, as of today,

8    that we will run with that, and if something else comes up, we

9    can come back.  But taking at face value what they have told

10    us, they have told us this is the testing that's necessary, so

11    we're taking that at face value in the context of what we're

12    asking for today.

13            THE COURT:  Bear with me.

14            MR. SLATER:  I mean, they're not telling you they

15    don't have them.  They're not telling you they can't find

16    them.  If they were to say that, that would be a real problem

17    for the company, to say we can't find test results.  So they

18    have them.

19            THE COURT:  So Paragraph 8 of the macro discovery

20    order, November 25th, 2019, says:  "Plaintiffs are entitled to

21    discovery regarding any tests that could identify the presence

22    of nitrosamine contamination.  Also, testing and results

23    regarding other carcinogens, genotoxic impurities, or residual

24    solvents in the valsartan API and valsartan is relevant."

25            So, the question is whether that language is limited

 1  by the relevant time period set forth in Paragraph 10, right?

 2          MR. SLATER:  I think that that's part of the

 3  question.  I think that the question after the semicolon is:

 4  If it were to be read that way, would it make sense in this

 5  narrow context to say no, this goes back to the beginning,

 6  because that plaintiffs need that and there is no burden to

 7  produce it.  I mean --

 8          THE COURT:  Mr. Goldberg, I don't remember

 9  specifically -- I remember, obviously, the discussion about

10  the relevant time period.  I don't remember ruling that this

11  issue of the testing results and the different changes to the

12  manufacturing process are off limits.  I don't remember that.

13  But I do remember, of course, setting the time period.

14          MR. GOLDBERG:  Well --

15          MR. SLATER:  I'm sorry.  Just so you know, what I'm

16  going to say, also, one of the things we're going to learn is

17  also when did they do these tests?  Maybe they didn't start

18  doing a certain test until 2009 or 2010, but we have to also

19  see what they were doing.

20          MR. GOLDBERG:  Your Honor, the language in Paragraph

21  10 is the language that gets them documents that would predate

22  the relevant time period.  You see, it says, "This designation

23  is without prejudice to plaintiffs' right to request older

24  specific documents or categories of documents upon a

25  showing" --

1          THE COURT:  Upon a showing of good cause.

2          MR. GOLDBERG:  And what I'm saying to your Honor is,

3    at least at this point, how could cause be different today

4    than it was three weeks ago?  And they're making the same

5    argument --

6          THE COURT:  No, no, no, no.  I don't think we argued

7    these tests --

8          MR. GOLDBERG:  Yes, they argued everything --

9    everything before 2010.

10          THE COURT:  And I denied that.

11          MR. GOLDBERG:  Right.

12          THE COURT:  I still deny it.

13          MR. GOLDBERG:  And subsumed in everything are these

14    tests.

15          THE COURT:  But we didn't specifically discuss these

16    tests, did we?  Because --

17          MR. GOLDBERG:  Yes.

18          THE COURT:  -- last time we were together, we didn't

19    know what tests.

20          MR. GOLDBERG:  Yes, we did.  We specifically

21    discussed chromatography, specifically.  And your Honor was

22    very clear, and plaintiffs are on the record, we generally

23    came to the understanding that chromatography is at issue, and

24    that was subsumed in the ruling.  And --

25          THE COURT:  Mr. Goldberg, plaintiffs are arguing,

1  rightly or wrongly -- I don't know who's right -- that there

2  may have been contamination in ZHP's API as early as 2007.

3  How then can I deny them the right to get testing results

4  going back that far?  How can I do that?

5          MR. GOLDBERG:  We haven't been presented with that

6  information.

7          MR. SLATER:  No, wait.  I said 2009, you produced it

8  to us.

9          MR. GOLDBERG:  Well, where is it?

10          MR. SLATER:  It's in your core discovery documents.

11          MR. GOLDBERG:  Where is it?

12          MR. SLATER:  I'm sorry.  Do you want me to whip it

13  out of my pocket right now?  Look, I have a team here that

14  will find the document in the next five minutes or so.

15          They produced the documents to us that showed testing

16  showing NDMA prior to the manufacturing change that they keep

17  pointing to.

18          THE COURT:  You want to go back to 2007 or --

19          MR. SLATER:  Yes.

20          THE COURT:  Why 2007 and not 2009?

21          MR. SLATER:  For a few reasons.  One, for the tests

22  that they've identified -- and I'm agreeing at this stage to

23  limit it to this group of tests that we bullet pointed based

24  on their representation this is the key core set of testing.

25  And based on consultation with our experts, which has only

1  happened in this last five days to six days, that this way we

2  can show, A, which tests did they do, because I don't know if

3  they all these testing going back to 2007, and there may

4  become an issue where they started to do a particular test

5  because they saw something and got concerned.  We need to see

6  that.

7          THE COURT:  So you think there is documentation or

8  evidence that contamination existed at least as early as

9  2009 --

10          MR. SLATER:  Yes, it's been produced.

11          THE COURT:  -- but you are pursuing and investigating

12  whether it went back to 2007?

13          MR. SLATER:  And most importantly, let me tell you

14  why.  Let's assume it wasn't.  Let's assume it started with

15  process Number 2.  The appearance of those chromatograms

16  before they made a change that then led to NDMA contamination

17  is critical in terms of notice to the people in that Quality

18  Assurance Department that they should have recognized we're

19  seeing different findings, and we know from the documents,

20  from what they were telling the FDA, they were explaining them

21  away as ghost peaks, that they -- and the documents that we've

22  seen show they did not adequately investigate those.  They

23  swept them under the rug and moved on.  And that's a big

24  issue, that they didn't follow up on those.

25          So let's assume it was clean from '07 to '09.  That

1  set of test results, that base set, is going to be put up in

2  front of the jury next to the results that start to show these

3  ghost peaks or artifacts, whatever you want to call them, and

4  where our experts are going to say, yeah, this was the NDMA

5  starting to show up, and they didn't do what they needed to

6  do.  All they had to do was these standard tests and they

7  would have seen this is what it is.  And so that's why we need

8  it, for those two reasons, your Honor.

9          THE COURT:  What's the letter you've waiving around?

10  What's the date of it?

11          MR. SLATER:  This is the Magna Carta -- no.

12          This is the letter we wrote to Mr. Goldberg, December

13  10, and the bullet points are in our brief to your Honor.

14          THE COURT:  And you list in that letter the tests

15  that you want, the limited tests that you want?

16          MR. SLATER:  Correct.  And the genesis of it, just so

17  it's very clear for your Honor and for the record, is instead

18  of giving us a list, what they did is they sent us a letter --

19  I'm talking about ZHP because that's who we're talking about

20  right now -- that said in the core documents, by Bates number,

21  these are where the tests are that matter.

22          We took that list, we took those documents, we went

23  to our experts, and they looked at it.  And, based on those

24  consultations, we picked out of those documents the list of

25  tests that they told us was relevant testing, and said this is

IN RE:  VALSARTAN STATUS/DISCOVERY CONFERENCE        51

 1  what we need, and it's in the brief that we submitted

 2  yesterday, and it's in my December 10 letter to counsel, which

 3  they have agreed to produce all of those testing results.

 4          THE COURT:  So tell me if this is the issue the Court

 5  has to decide:  Whether ZHP has to produce, going back to

 6  2007, the test results for the tests that are described in

 7  your December 10 letter?

 8          MR. SLATER:  Yes.

 9          THE COURT:  That's the issue.

10          MR. GOLDBERG:  With the caveat, your Honor, that they

11  sent us that list yesterday, and we have not had the

12  opportunity to even discuss whether all 15 of those kinds of

13  tests are capable -- are the tests at issue.  Yes, we have

14  discussed chromatography, and those kinds of tests are

15  chromatography tests.

16          THE COURT:  Are you representing, Mr. Slater, that

17  the list in the December 10 letter was prepared in

18  consultation with your expert?

19          MR. SLATER:  Absolutely.

20          THE COURT:  Okay.

21          MR. SLATER:  And I was involved in some of those

22  consultations personally.

23          THE COURT:  All right.  The Court finds -- I don't

24  have any choice on this issue.  If that's plaintiffs' theory

25  of the case, I have to find good cause for ZHP to produce back

1    to 2007, outside the defined relevant time, the test results

2    for the tests described in plaintiffs' December 10, 2019,

3    letter.  Somehow, you're going to have to incorporate that

4    into the document requests.

5              MR. SLATER:  We'll find a way.

6              THE COURT:  I mean, that's the kind of limited,

7    discrete good cause that we're looking for.  We're not

8    expanding the entire relevant time period for ZHP, but just

9    for this one specific category.  Yes, the Court recalls

10   extensive argument regarding relevant time period; but no, the

11   Court does not recall a specific argument regarding this test

12   result.  It just seems painfully obvious to the Court that

13   this has to be good cause if this is plaintiffs' theory of the

14   case, rightly or wrongly, they have a right to pursue it, and

15   the evidence will, you know, be what it is.

16             MR. GOLDBERG:  Your Honor, I'm not -- your Honor has

17   ruled, but the transcript -- Mr. Honik saying that, three

18   weeks ago.  It began process one, 2007, September.  That's

19   when they started to introduce the ingredient, the recipe to

20   their pills.  We have already seen it, albeit not a lot, but

21   we have already seen peaks from testing they have produced to

22   us that goes back to that time frame.  And your Honor then

23   ruled, notwithstanding that very language, that very argument,

24   on 2010.  Your Honor has ruled.  But ...

25             THE COURT:  Let's go on.  What's next?

1          MR. SLATER:  The next one is 22, and I will ask

2    Mr. Goldberg.  This is basically the same question as 19, but

3    it has to do with finished dosage formulation versus API.

4    We're willing to rely on the same list at this point in time,

5    so that it doesn't need to be changed.  We can put in the same

6    caveat that your Honor had told us for 19, to say as described

7    at today's conference, if that's acceptable to everybody.

8          MR. GOLDBERG:  The finished dose list, I actually

9    read something about finished dose.  It wasn't in that list --

10         MR. SLATER:  It was incorporated in the list.  I was

11   just going to use the same language as referenced, as part of

12   what you stated.  Is that okay?

13         MR. RUBENSTEIN:  At the macro discovery conference a

14   few weeks ago, you ruled that discovery into the finished dose

15   manufacturing process is not going to be nearly as extensive

16   as into the API.  I mean, we submit that the manufacturing

17   process for the finished dose is all contained in the ANDA,

18   and I don't know what more they need that's outside of the

19   ANDA for the finished dose.

20         THE COURT:  We're talking about test results, though.

21         MR. RUBENSTEIN:  No, not anymore.  At least --

22         THE COURT:  Is there anything in 22 that you want

23   that's not in the ANDA?

24         MR. SLATER:  Well, whatever they did after they

25   implemented the process -- did they do testing, did they do

1    analysis, did they have inspections, certificates of analysis,

2    those types of things, when they implemented, which would be

3    part of the manufacturing process, if they tested the -- if

4    they tested the drug for purity, et cetera.  It would be

5    things like risk assessments, if they did any; deviation

6    reports, if they did any; out-of-trend or out-of-spec reports,

7    if they did any; change requests, if they had them.  That's in

8    the manufacturing process.  So it's focussed on the specific

9    issue which is -- yes, essentially, it's the quality assurance

10   process that they implemented as -- in conjunction with the

11   manufacture of the finished doses.  We're not, again,

12   interested in seeing how they folded the boxes together, taped

13   the label on.

14          THE COURT:  It's hard to argue that's not relevant.

15          MR. RUBENSTEIN:  And your Honor ruled at the last

16   conference the testing of the incoming API, which we have

17   already agreed to produce; the testing of the finished dose

18   materials.  To the extend there are any changes, that would be

19   part of the FDA correspondence that goes along with the ANDA.

20   So, I mean, I think, in general, we're probably okay with the

21   list delineated by Mr. Goldberg.  But --

22          MR. SLATER:  And we're fine with that at this stage.

23          THE COURT:  Okay.  So you can work it out?

24          MR. SLATER:  I'm just going to put in the same

25   phrasing, unless -- and I will send it to them, if they have a

1   problem with it -- saying as discussed today.  And then I

2   think we know what we're looking for.  And if there is -- this

3   is the kind of thing I have to believe we can talk about as we

4   go through the document process.  If there is a gap or

5   something, I don't think we need to bug you probably too much

6   on something like this.

7              THE COURT:  Good.

8              MR. SLATER:  23, it was a request that was changed

9   per your Honor's communication to us to just request those

10  specific patents.

11             THE COURT:  Just the patents.

12             MR. SLATER:  If there are any.  There may only be a

13  few or none.

14             MR. RUBENSTEIN:  Your Honor, so patents on the

15  machinery?  I mean, that's -- I don't see how that's relevant.

16  I mean, they're going to get the testing results.

17             THE COURT:  No, just the process, right?  The

18  manufacturing process you're talking about.  You don't need

19  the patents on the machinery.

20             MR. RUBENSTEIN:  Well, this says patents for any

21  patented device, machine, or technology.

22             MR. SLATER:  We can drop the machine and the device.

23             THE COURT:  Just the patents for the manufacturing

24  process.

25             MR. RUBENSTEIN:  To the extent there are any.

1              THE COURT:  I'm sorry?

2              MR. RUBENSTEIN:  To the extent there are any, yes.

3              THE COURT:  Yes, of course.

4              MR. RUBENSTEIN:  And then 24 talks about foreign

5     patents, and I think your Honor ruled on the foreign

6     regulatory issue.

7              THE COURT:  Right.

8              MR. SLATER:  So 24 would be out?

9              THE COURT:  Yes.

10             Moving right along.

11             MR. SLATER:  25 is just so we can identify third

12    parties who were supplying the valsartan or what was used to

13    manufacture the valsartan, and, obviously, we're most

14    concerned with the solvents or reused solvents if they got any

15    from someone else.  Right.  Putting the supply chain of the

16    actual API going forward.

17             MR. RUBENSTEIN:  Okay.  I guess that's for API.  But

18    for finished dose, you know, any ingredient, material,

19    component, I mean, there is tons of inactive ingredients,

20    excipients, that go into manufacturing finished dose.  I don't

21    see how any of that is relevant.  I mean, you know, we can

22    provide the --

23             THE COURT:  You have to work out the language.  I

24    would assume you talked about this before we got here today.

25             MR. GOLDBERG:  We did, your Honor, and we really did

 1   come up with bullet pointed lists, and I'm afraid we're sort

 2   of muddying the waters a little bit now.

 3          MR. SLATER:  Yeah.  I think that -- we just care --

 4   as to a finished dose manufacturer, we just care where they

 5   got the API because they're not dealing with solvents --

 6          THE COURT:  Okay.  Just clean up the language.

 7          MR. GOLDBERG:  Yeah.  No, that's fine.

 8          MR. SLATER:  Okay.  But for the API manufacturers,

 9   obviously, they did incorporate, for example, solvents into

10   the process and other things, so it's more -- it's broader.

11          THE COURT:  26?

12          MR. SLATER:  I mean, this would seem to be a very

13   specific, narrow request.  They are certificates of analysis,

14   and we say similar documents, because someone may title it

15   differently, but this is just -- I think it's encompassed

16   probably already by Mr. Goldberg's overall representation, so

17   I wouldn't think anything is objectionable about it.

18          MR. GOLDBERG:  Well, I mean, it's not objectionable,

19   but it's subject to what we have discussed, because they may

20   come to some agreements that are narrower than what's written

21   here.

22          MR. SLATER:  Right, relevant period issues, I think

23   are what you're bringing up?

24          MR. GOLDBERG:  On this one, we talked specifically

25   about catalysts and solvents used in the tetrazole ring

1  formation process, as opposed to any solvent.

2          MR. SLATER:  That's fine.

3          THE COURT:  27?  We've got to hear from the

4  defendants.

5          MR. SLATER:  Yeah, sorry, your Honor.

6          MR. GOLDBERG:  There is no dispute as to this, your

7  Honor.

8          THE COURT:  28?

9          MR. SLATER:  Our understanding is there was no

10 dispute.

11         MR. GOLDBERG:  Correct.

12         THE COURT:  29?

13         MR. SLATER:  Same thing, our understanding is there

14 was no dispute.

15         MR. GOLDBERG:  Correct, your Honor.

16         THE COURT:  Okay.  30?

17         MR. GOLDBERG:  30, there is no -- is that you?

18         MR. TRISCHLER:  I think so.  Unless you want to keep

19 going, Seth.

20         MR. GOLDBERG:  No, I'm good.  Go for it.

21         MR. TRISCHLER:  Your Honor, under the bioequivalence

22 heading, I don't think there are any issues, except until we

23 get to 34, which relates to patent litigation.  Under the

24 heading -- well, if I can explain --

25         THE COURT:  No.  I mean, I'm going to go right to the

 1   plaintiff.

 2           MR. TRISCHLER:  Okay.

 3           THE COURT:  Come on, what do you want?

 4           MR. SLATER:  It's kind of hard to answer a

 5   question --

 6           THE COURT:  Well, request denied.

 7           MR. SLATER:  I feel like I'm at my dinner table with

 8   my --

 9           THE COURT:  Objection sustained.  34 is out.

10           MR. SLATER:  Got it.

11           THE COURT:  Good job, Mr. Trischler.

12           MR. TRISCHLER:  You've got to know when to shut up.

13           MR. SLATER:  I feel like I just crumbled on cross.

14           THE COURT:  35, the testing section.  We spent so

15   much time on 35 to 44.

16           MR. SLATER:  I think we covered it.  I think 35 is

17   covered and 36 is covered.

18           And just for your Honor's -- just to note it because

19   it's an issue that may come up in the litigation, 36 focussed

20   on the first test that they ever -- that they're aware of

21   because that's obviously important to us, to set that time,

22   and we think we know when that was.  We want to make sure that

23   that's documented.  That's why we pulled that out.

24           THE COURT:  All right.  37?

25           MR. GOLDBERG:  There is no -- none.

```
 1            THE COURT:  38?

 2            MR. SLATER:  Withdrawn.

 3            THE COURT:  Great.

 4            39?

 5            MR. GOLDBERG:  No objection.

 6            THE COURT:  40?

 7            MR. GOLDBERG:  There is no objection through 43.

 8            THE COURT:  Great.

 9            44?

10            MR. SLATER:  I think that's encompassed by our -- by

11   the rulings you've made.  Correct?

12            MR. GOLDBERG:  Yes, your Honor.

13            THE COURT:  45?

14            MR. GOLDBERG:  No objection, 45 through 51, I

15   believe.

16            THE COURT:  All right.  52?

17            MR. TRISCHLER:  Apparently, this is my turn, your

18   Honor.  Can I just turn it over to the plaintiffs?  That

19   seemed to work the last time.

20            MR. SLATER:  Don't go to the well too many times.

21            MR. TRISCHLER:  I think 52, as revised -- I think

22   most of our objections to this section dealt with scope as far

23   as foreign regulatory matters, and a lot of it was covered by

24   the macro discovery rulings.  So I think for 52, I don't think

25   there is any objection.  And if any of my colleagues disagree,
```

 1  or I say anything -- state our position incorrectly, please

 2  let me know.

 3          THE COURT:  53?

 4          MR. TRISCHLER:  Subject to -- I would propose for 53

 5  that it be -- it have the same -- I don't know if the Court is

 6  looking at the same amended list that I am, but it have the

 7  same language as 52, as limited by the Court's order.  I don't

 8  think there is any objection.

 9          MR. SLATER:  Does it say "as limited by the Court's

10  order"?  Oh, yeah --

11          MR. TRISCHLER:  On 52, it does, but not on 53.

12          MR. SLATER:  Your concern is just about the foreign

13  regulatory?

14          MR. TRISCHLER:  Just to make sure it's consistent

15  with -- because, as I understand it, the Court is going to

16  enter an order that we have to produce without objection, so I

17  want to make sure that --

18          MR. SLATER:  And I can represent to the Court that if

19  something is missed like that, we understand that every one of

20  these requests is as the Court has instructed, unless there is

21  an exception that we've worked out today or that we work out

22  later.  So I'll be happy to put that in, but we're not going

23  to later say, oh, that wasn't there, so give us everything --

24          MR. TRISCHLER:  I appreciate that.

25          MR. SLATER:  -- that was limited.

1            THE COURT:  54?

2            MR. TRISCHLER:  Same issue there, your Honor.  Again,

3    if -- I think, as per -- and it probably applies to almost all

4    of these, if we had -- if we amended the language to say as

5    per the Court's macro discovery order, I think we would be --

6    the defense would be fine with the rest of these.

7            THE COURT:  Instead of putting it in every request,

8    wouldn't it be wise in the general order that is going to be

9    entered requiring that these be responded to by X, just say

10   that all responses are subject to the macro discovery rulings,

11   except as otherwise stated from the transcript of December

12   11th?

13           MR. TRISCHLER:  I think that would be fine, your

14   Honor.

15           THE COURT:  Okay.  I will put that in the order.

16           MR. SLATER:  Understood.  And, again, we agree with

17   that.  We're not disputing that.

18           THE COURT:  55?

19           MR. TRISCHLER:  No objection, your Honor.

20           THE COURT:  56?

21           MR. TRISCHLER:  No objection.  I think that's been

22   covered by the macro order.

23           THE COURT:  Can we go 57 to 64?  Are there any

24   objections?

25           MR. TRISCHLER:  That's what I was looking for.

1          MR. SLATER:  None from the plaintiffs, your Honor.

2          THE COURT:  Yes, this is --

3          MR. TRISCHLER:  I don't think so, your Honor.  I

4    think we're fine up to 65.

5          THE COURT:  Yes, noncontroversial area.

6          Okay.  65?

7          MR. SLATER:  I don't think there is a dispute as to

8    that.

9          MR. TRISCHLER:  Yeah, I -- yes, I'm sorry.  I was

10   confused because the numbers have 64 and 65.  There is no

11   dispute as to 65, either, your Honor.

12         THE COURT:  66 is out, draft recall notices.

13         67?

14         MR. SLATER:  One second, your Honor.  66, should it

15   just be limited to implementation as opposed to consideration?

16         THE COURT:  I'm sorry?

17         MR. SLATER:  I think you skipped 66.  You went to 67,

18   I think.

19         THE COURT:  Okay.  Yes, the numbering may be off.  I

20   want to strike the request to produce draft recall notices.

21         MR. SLATER:  Can I indulge --

22         THE COURT:  You could indulge me.

23         MR. SLATER:  Or indulge myself, I guess.

24         THE COURT:  Indulge yourself.

25         MR. SLATER:  And I am going to use Benicar as an

1    example.  That case, it became very, very critical when the

2    time came to do a label change -- I'm analogizing,

3    obviously -- to do a label change when the FDA said you need

4    to change your label, Daiichi prepared a label, and then they

5    were ready to submit it to the FDA, but they got a label from

6    the FDA that was a weaker warning, and then if you remember,

7    the custodian you gave us late in the day overruled them at

8    midnight and said don't send ours in because the FDA's is

9    better.

10           So I would analogize that to this.  If they drafted a

11    recall notice that had certain information that would be a

12    potential admission where someone wrote and said this happened

13    because of this or something else happened, that didn't find

14    its way into correspondence with the FDA or didn't find

15    itself -- its way into an actual recall notice that was

16    issued, that could be very probative.

17           THE COURT:  Request denied.

18           MR. SLATER:  Thank you for your indulgence.

19           THE COURT:  Could have, should have, would have -- if

20    that was the standard for discovery, there would be no limits.

21           So, obviously, final recall notices have to be

22    produced.  I mean, that's easy.

23           So I think we're up to what, 68?

24           MR. SLATER:  68 should be okay, right?

25           MS. HEINZ:  Your Honor, this is Jessica Heinz for the

 1  defendants.

 2          We don't think -- in light of the Court's ruling on

 3  the macro discovery issues, we don't think there are any

 4  outstanding issues as to the rest of the requests in that

 5  section, which is -- I think it goes to 78.

 6          THE COURT:  68 to 77?

 7          MS. HEINZ:  Yes.

 8          THE COURT:  Can you do the rest of the requests?

 9          MR. SLATER:  Did we -- this might be against my own

10  interests, your Honor, but I think on 66, I just want to make

11  sure that you ruled that it's got to be just implementation of

12  a recall as opposed to consideration?

13          THE COURT:  Implementation.

14          MR. SLATER:  Okay.

15          THE COURT:  Okay.  78?  Labeling shouldn't be an

16  issue.

17          MS. HEINZ:  I think there were two in here that we

18  had an issue with.  It was the two requests directed -- or

19  seeking documents regarding investors.  I think counsel for

20  Teva wanted to speak about that.

21          THE COURT:  Oh, the investor statements?

22          MS. HEINZ:  Yeah.

23          THE COURT:  Objection sustained.

24          MR. SLATER:  So this is -- which number are we up to?

25          MS. HEINZ:  I can't recall which number this is.

```
 1            MR. SLATER:  Is it 85?  So 85 is out?  Is that the
 2   one you're talking about, Jessica?
 3            MR. RUBENSTEIN:  Yes, it's 85.
 4            MS. HEINZ:  I thought there were two --
 5            MR. RUBENSTEIN:  I think they already withdrew one of
 6   them.
 7            MS. HEINZ:  Oh, okay.  All right.
 8            As to the others --
 9            MR. SLATER:  Wait, what just happened?  Is 85 in or
10   out?
11            MR. RUBENSTEIN:  Out.
12            MR. SLATER:  Okay.  I just want to make sure I knew.
13   Because I just want to make sure that 85 is the one you were
14   talking about.
15            MS. HEINZ:  (Nods head.)
16            MR. RUBENSTEIN:  Yes.
17            MR. SLATER:  Thank you.
18            MS. HEINZ:  So I think the request in that section
19   goes from 79 to 92.  That was the only one, you know, that we
20   had an outstanding issue with.  We think the Court's rulings
21   on the macro issues resolved all the other issues we had on
22   that section.
23            THE COURT:  Can you come up front?  I'm only kidding.
24   I'm not serious.
25            But, oh, we're through 92?  Oh, that's great.
```

 1    Because I thought sale and distribution would -- oh, sales and

 2    pricing, that's the difficult area.

 3            So we're up to 93.

 4            MR. TRISCHLER:  And --

 5            MS. HEINZ:  Okay.  So for sales and distribution,

 6    that went from 93 to --

 7            THE COURT:  I think our numbering is off.

 8            MS. HEINZ:  -- 98?

 9            THE COURT:  The version I have is a little off so

10    that's why we might be a little different.

11            MR. SLATER:  Are you looking at the red line, your

12    Honor?

13            THE COURT:  Yes.

14            MR. SLATER:  Sometimes the numbering can be

15    confusing.  It's the sale and distribution section.

16            THE COURT:  Okay.  93 in the sale and distribution

17    section, is that at issue?

18            MS. HEINZ:  I don't think -- in light of the rulings

19    on the macro issues -- I feel like I sound like a broken

20    record here -- but I don't think we have any issue as to 93 to

21    95.

22            96 and 98 --

23            THE COURT:  We may be working from different

24    versions.  What number does sale and distribution stop on

25    yours?

 1              MR. SLATER:  98.

 2              MS. HEINZ:  It goes 93 to 98.

 3              THE COURT:  So, I have a different version of yours.

 4    But if there's no problems, that's great.  So what number --

 5              MS. HEINZ:  The only issues that I think -- I just

 6    wanted to raise one thing.

 7              Okay.  So, it looks like 96 on the copy that I have.

 8    Counsel, it's the request for "all documentation relating to

 9    the due diligence performed (or meant to be performed)," and

10    it's just that phrase.

11              MR. SLATER:  We'll agree to strike "or meant to be

12    performed" because we're going to get the protocols and the

13    procedures which will lay out what was supposed to be done

14    anyway, so we can agree to that.

15              THE COURT:  Good.

16              MS. HEINZ:  Could you maybe just be -- I mean, due

17    diligence is kind of vague to me.

18              MR. SLATER:  I mean, due diligence is --

19              MS. HEINZ:  I mean, it's a legal -- can you be more

20    specific?

21              MR. SLATER:  Being really -- efforts to be really

22    careful?

23              MS. HEINZ:  I mean, like, categories of documents?

24              MR. SLATER:  I don't understand.  I mean, we assumed

25    that due diligence is done, there is requirements to do due

1  diligence on what's being purchased.  Right?

2          MS. HEINZ:  We just think that term sounds a

3  little --

4          THE COURT:  Leave it in.

5          MS. HEINZ:  And then -- I think that was it in that

6  section.  We think the Court's rulings on the macro issues

7  resolved all the other issues through numbers -- the rest of

8  that section.

9          THE COURT:  Okay.  Does that take us to

10  identification of purchasers?

11          MS. HEINZ:  Yes.

12          THE COURT:  All right.  So mine starts at 94.  I'm

13  not sure what number yours starts at.  But are there any

14  issues with regard to this section?

15          MR. TRISCHLER:  Yes, your Honor.  And the

16  identification of purchaser section, there is two paragraphs.

17  The old numbering was 94, which I think your Honor is looking

18  at.

19          THE COURT:  That's what I have.

20          MR. TRISCHLER:  The new number is 99.  The old number

21  for the second paragraph, obviously, is 95, and the new

22  numbering is 100.

23          THE COURT:  Okay.

24          MR. TRISCHLER:  The issue that I wanted to raise in

25  this section is with respect to the second paragraph of that

```
 1   section, Number 100.  It's overly broad.  If you read it in
 2   context, the plaintiffs are asking for communications between
 3   and among you, and it starts off with named plaintiffs, which
 4   is obviously fine, but then it proceeds to expand to basically
 5   all consumers.
 6           MR. SLATER:  No, just plaintiff consumers.  Any
 7   plaintiff, including consumers or TPP entities.
 8           MR. TRISCHLER:  Well, but it doesn't identify the TPP
 9   entities.  That's the discussion.
10           MR. SLATER:  No, it does, right after that.  MSP and
11   Maine Auto Dealers.  It says any named plaintiff.  This is a
12   class request, just if there was any communications with the
13   named classes --
14           THE COURT:  That's what I was going to say.  It's not
15   200-some odd people who filed individual complaints.  It's
16   just the named class representatives in the three master
17   complaints.
18           MR. TRISCHLER:  That's -- with that limitation,
19   that's fine, your Honor.
20           THE COURT:  All right.
21           MR. TRISCHLER:  I was going to move on to the sales
22   and pricing.
23           THE COURT:  Okay.  This is -- I hope I'm wrong, but
24   it seems to me that this is the most problematic area of all
25   that we're dealing with.  So let's roll up our sleeves and get
```

1    it done.

2            MR. TRISCHLER:  Well, I think, you know, it

3    potentially may be, your Honor, but I think there has been

4    some dialogue that's taken place since your Honor's e-mail of

5    Saturday.  We had the meet and confer conference on Monday in

6    which the plaintiffs provided us with some ideas as to what

7    they thought they really needed to get started with the

8    discovery in this particular area.  We met collectively as a

9    group on Monday afternoon and again yesterday, and this

10   morning, just very briefly.  And, in fairness to the

11   plaintiffs, I'm sure they did not even have a chance to relay

12   what I talked to them about to the entire plaintiffs'

13   executive group, but we talked about proposals and ideas to

14   streamline this issue and hopefully resolve a good bit of it.

15           And, essentially, what we had talked about, and I'll

16   just put it on the record so that there is no

17   misunderstanding, if I may, is that, obviously, we, as a

18   defense group, believe that the discovery sought on the sales

19   and pricing issue is irrelevant, overly burdensome, and not

20   proportional.  But, setting aside all those objections for the

21   time being, we tried to talk about, you know, where might it

22   be relevant, and it seems to have some arguable relevance from

23   the plaintiffs' perspective on the issue of class

24   certification and damage modeling in the class cases.

25           And so, to sort of get started on this process, what

1  the plaintiffs indicated to us that they were looking for,

2  that would be helpful to them and necessary for them to

3  proceed with the case, would be information relating --

4  sufficient to identify customers to whom API and finished dose

5  products were sold; any unique identifiers for those

6  customers, whether it be lot numbers, batch numbers, NDC

7  numbers, whatever unique identifiers that might help track

8  where a product went; quantities sold and when those

9  quantities were sold; and pricing, to the extent -- and to the

10  extent applicable to each defendant, that might be gross

11  pricing and net pricing.

12        On the API side, for instance, we talked about you're

13  probably not getting into net pricing.  There is just a charge

14  to the finished dose manufacturer for the valsartan API, so

15  you're probably not going to get into net pricing information.

16  But lower down the chain, you might get into gross pricing and

17  net pricing information.

18        And so, as a concept, we thought about that, and on

19  the defense side, agreed to present to plaintiffs and suggest

20  to plaintiffs that what we could provide them -- and

21  recognizing that it might be different among the various

22  defendants, because there is a lot of different entities in

23  this case.  Not everyone's data management system is the same.

24  Not everyone's business practices are precisely the same.  So

25  how the data ends up being presented to the plaintiff might

1    differ as between ZHP and Teva and Mylan or any of the other

2    defendants.  But what we proposed to them is that, as a

3    compromise on all of these issues and requests, that we would

4    be willing to provide documentation sufficient to identify who

5    our customers are, both on the API and finished dose side; any

6    unique identifiers that are used to -- for those customers, to

7    help plaintiff track product from the finished dose

8    manufacturer to the end user.  I don't know if they will be

9    able to complete that chain, but if we have identifiers and

10    information to help with that, we'll provide it.  Information

11    regarding quantities sold and when to those customers; and, if

12    applicable, net pricing and gross prices charged for the API

13    and the finished dose.

14        And when we made the offer, we did so -- I'll state

15    it on the record, the same thing I told the plaintiffs this

16    morning -- that we would agree that that discovery that we

17    would provide would be without prejudice to the plaintiffs'

18    right to come back to each defendant, and there may be

19    questions about the data, there may be additional information

20    that we need to get to the class certification stage, and

21    their expert needs to -- more information, we're certainly

22    open to discussing it.

23        But, at this particular stage of the litigation,

24    recognizing, as I mentioned at the outset, the concerns that

25    we have with relevancy and proportionality and burden, it

1    seems to me that this is a fair compromise that I believe is

2    workable -- as always, the devil is in the detail.  But for a

3    starting point, your Honor, we thought that that was a

4    solution to break the log jam, to allow us to get started with

5    the discovery.  The liability issues obviously are paramount

6    in the majority of these cases, both personal injury and the

7    economic loss.  No reason to hold that up.  Let's get this

8    preliminary damage discovery started.  If there is more that

9    needs to be done, it can then be pursued on a

10   defendant-by-defendant basis.

11         MS. WHITELEY:  Your Honor, I believe this represents

12   our conversations.  And I guess one question we had for

13   Mr. Trischler which he was able to answer, but due to the

14   timing, we couldn't meet with the other defense counsel or

15   bring them into our conversation.  He represented that they

16   could probably get this information to us within about 60

17   days, which, given the holidays and everything, we thought

18   that would work for us and we would be able to work with our

19   experts and be responsive to him.

20         If there's a substantial difference in timing among

21   the other defendants, I think we would have an issue with that

22   because we do see this as a two-part process, at least.

23         THE COURT:  Mr. Goldberg?

24         MR. GOLDBERG:  Your Honor, I would just say for ZHP,

25   there is -- there is a holiday coming up in China.  It's a

 1   very significant holiday.  It's in February.  I think if we

 2   could have 90 days to do this, if your Honor is inclined to

 3   set a time period.

 4           THE COURT:  We'll work with it.  I think what you're

 5   proposing is very reasonable.  I've said it before.  I think

 6   this pricing information is relevant.  It's not only relevant

 7   to the liability issues on the economic loss claim, the

 8   third-party payer claim, given the Third Circuit's decision, I

 9   think it's also clearly relevant to class certification

10   issues, ascertainability, superiority, et cetera.

11           I think what you're proposing is reasonable, and I'm

12   definitely willing to bless it.  I would like it documented,

13   though.  Maybe you could take request 96 to -- whatever it

14   is -- whatever numbers they are, and take what Mr. Trischler

15   listed the defendants agreed to produce and list it as a

16   document request.

17           It's unquestionably clear this is without prejudice

18   to request more.  This is a very sticky issue, I think, but

19   it's important to liability, class certification, and also if

20   there ever reaches a point in this case where there is going

21   to be settlement discussions, this type of economic

22   information is clearly going to be relevant.

23           So the bottom line is, I think what you're proposing

24   is eminently reasonable.  Let's give the defendants 90 days

25   because there is a lot of work to do to produce the ESI.  This

1    is one of the most important issues in the case, so we'll stay

2    on top of it, and it will be blessed by the Court.  And I

3    commend you for working this temporary solution out.  That's a

4    very reasonable proposal, and it's a way to move forward in

5    the case.

6            MS. WHITELEY:  Your Honor, there is one other thing I

7    can add.  When we talked earlier, we also mentioned the issue

8    of rebates and any other offsets, and I believe what we're

9    going to do is try to work through that.  It may also be a

10   two-part stage, but we're going to try to see if -- discover

11   as much as we can through conversation and then production as

12   to that aspect, but I don't think the defendants are familiar

13   enough with the data themselves to even answer those

14   questions, so it's going to be a work in progress.  Is that

15   your understanding, Mr. Trischler?

16           MR. TRISCHLER:  Yes, I think that's a fair statement,

17   your Honor.

18           THE COURT:  No problem.

19           Sales and pricing, testing, if they're not the most

20   critical areas in the case, they're amongst the critical

21   areas.  So everything that's been discussed, like I said, is

22   eminently reasonable, and I just want to document it in an

23   order, and we'll go forward.

24           So the next area is available data sources.  Any

25   issues?

1          MR. RUBENSTEIN:  No, your Honor, subject to what the

2   defendants keep in the ordinary course of business.

3          THE COURT:  Of course.

4          And then defendants' specific requests, I think those

5   have all been worked out, right?

6          MR. RUBENSTEIN:  (Nods head.)

7          MR. SLATER:  It's our understanding there is no

8   objection to those, your Honor.

9          THE COURT:  Okay.  So --

10          MR. TRISCHLER:  Well, as to -- well, the first one is

11   Mylan.  I think Number 115, the Court just ruled on that

12   today, Adam.  That's the unapproved ANDA.  So 115 is out.

13          MR. SLATER:  Oh, right.

14          MR. TRISCHLER:  But otherwise -- otherwise, there is

15   no objection to the balance of those.

16          THE COURT:  Okay.  So let's task plaintiff, you're

17   going to redraft these, obviously send them to defendants.  It

18   looks like we're going to get together on December 18.  At the

19   end of this session, we'll see if we -- I would love to do it

20   by phone, save you a trip -- but let's get a version to me

21   before December 18.  If there is any objections, we'll resolve

22   it by phone or in person, December 18.  I would like to enter

23   an order before the end of the year, just like I said, these

24   have to be answered without objections, without prejudice to

25   ask for more, or to move to quash less.

1              Defendants, 90 days, starting from January 1?

2              MR. GOLDBERG:  Your Honor, there is just one issue,

3    and I should have mentioned it.

4              I don't think this kind of information would fall

5    within this, but there is a -- there is an additional

6    production requirement that we have under Chinese law --

7              THE COURT:  Right.

8              MR. GOLDBERG:  -- which is this State secret review

9    process.

10             THE COURT:  What does that mean?  Does it mean a lot

11   of billable hours for people --

12             MR. GOLDBERG:  For some law firm in China.

13             But it does mean that lawyers in China have to get

14   involved.  They have to help us determine -- and I don't -- my

15   understanding is there is going to be some categories of

16   documents that fall within State secrets.

17             THE COURT:  Can you send me a letter, what you want

18   after you get your arms around this?

19             MR. GOLDBERG:  We'll try to figure that out.

20             THE COURT:  I'll say 90 days, but I understand you

21   might have a problem.  If there is good cause, you'll get more

22   time.

23             MR. GOLDBERG:  Thank you, your Honor.

24             MR. TRISCHLER:  Your Honor, you made a statement

25   about 90 days, and I apologize, I was not sure what you meant

 1   by that.

 2          THE COURT:  To produce the responsive documents and

 3   ESI.

 4          MR. TRISCHLER:  For?

 5          THE COURT:  The document requests.

 6          MR. GOLDBERG:  I'm sorry.  I thought you were talking

 7   about the sales and pricing information.

 8          THE COURT:  No, no.  Well, I gave you 90 days for the

 9   sales and pricing.  You got that.

10          How much time do you need to -- they should already

11   be working on this.

12          MR. GOLDBERG:  Your Honor, this set of requests,

13   coupled with the number of custodians and the number of search

14   terms --

15          THE COURT:  So what are you collectively -- what are

16   you thinking?

17          MR. GOLDBERG:  I think we should revisit it, the

18   timing, after we resolve some of the other issues.

19          THE COURT:  Okay.  All right.  You know what we can

20   do?  It's going to be a rolling production, so there's

21   certainly going to be responsive documents --

22          MR. GOLDBERG:  Sure.

23          THE COURT:  -- that are easier to get than others.

24   But you're right, let's wait until after custodians and search

25   terms.

```
 1              So it's 11:47.  Why don't we take a ten-minute break,

 2   and then we'll go to custodians, and then we'll do search

 3   terms.  Okay?

 4              THE DEPUTY CLERK:  All rise.

 5              (A recess was taken at 11:48 a.m.)

 6              THE DEPUTY CLERK:  All rise.

 7              THE COURT:  Please be seated.

 8              (Pause)

 9              THE COURT:  I read your papers on the custodian

10   issue.  Is there any real dispute other than the number of

11   custodians for ZHP?

12              MR. SLATER:  Well, there is a dispute as to whether

13   or not we should be driven by a mathematical number or whether

14   we should be driven by what we need.  And you understand our

15   different approach to this --

16              THE COURT:  No, I --

17              MR. SLATER:  -- but if we just look at the numbers --

18              THE COURT:  Is that the only dispute left with regard

19   to custodians for ZHP?

20              MR. SLATER:  Yeah, I would define it as substance

21   versus a naked number.  We are actually arguing --

22              THE COURT:  Put ZHP aside.  Are there any other

23   disputes?

24              MR. SLATER:  No.  Oh, I'm sorry.  I was

25   misunderstanding, Judge.
```

 1            THE COURT:  That's what I meant.

 2            MR. SLATER:  They're like -- listen, okay, yes.

 3   There is no other issue.  Sorry.

 4            THE COURT:  You can translate for me then.

 5            MR. SLATER:  Apologize.

 6            THE COURT:  Okay.  We're discussing ZHP and the issue

 7   is, I think, ZHP says I want a limit of 50 custodians, and I

 8   think the plaintiffs say you want 123.

 9            MR. SLATER:  We're at 139, between all of the ZHP

10   entities, so they're not all just ZHP.  The ZHP total is 107,

11   and then there is Solco, Princeton, and the other

12   subsidiaries.

13            THE COURT:  So how do we resolve this?

14            MR. SLATER:  Oh, it's very easy.  We have presented

15   you a spread sheet.  We have provided justification for

16   anybody that is either disputed or as to which we have no

17   response, which I believe provides a prima facie good-faith

18   basis to include them as custodians.

19            Your Honor should know that there have been many

20   other people that have been on this list through the meet and

21   confer process who we have deleted based on what we believe to

22   be good-faith representations as to people either not having

23   involvement with valsartan or not being necessary, and we

24   have -- so the list is not what it originally was, and there

25   is a lot of names that are off or were not added.  But this is

1  what we believe to be a narrowly tailored list to the

2  information we have available, and the -- you know, we gave

3  you numbers in Benicar.  We're not even close to those

4  numbers.

5        I mean, in Benicar, we got 115 custodians from

6  Daiichi U.S. and 68 from Japan, so that's a far higher number

7  from that one entity, and then Forest was 47 custodians, so if

8  you analogize, if we're just going to talk the numbers to

9  start with their argument, we're far less than that, and in

10  what they have already told you multiple times is a far more

11  complicated case.  And, again, we provided justification for

12  each person.  We're not just asking for these people in a

13  vacuum.

14        THE COURT:  Was this list attached to the letter --

15  the December 10 letter?

16        MR. SLATER:  I believe so.  It should have been.  The

17  spreadsheet should have been submitted.  And you know what?  I

18  have an extra copy.

19        THE COURT:  Okay.

20        MR. SLATER:  I brought one for your Honor.  This is

21  exactly what I'm looking at.

22        THE COURT:  Yes, let me take that.

23        MR. SLATER:  It's not actually not in the tiny type.

24  It's actually a little larger.

25        THE COURT:  Oh, good.

1           MR. SLATER:  Is it okay if I approach?

2           THE COURT:  Please.

3           MR. SLATER:  (Complies.)

4           THE COURT:  So Mr. Du is going to be on the list.

5    That's -- that's not an issue.  He's on the list.  So let's

6    not talk about Mr. Du.

7           MR. GOLDBERG:  Your Honor, if you're inclined to go

8    down a list, then I'd like to hand something up.

9           THE COURT:  Sure.

10          MR. SLATER:  Is this something we have?

11          MR. GOLDBERG:  This is your list that you provided

12   yesterday, and we have a second column that provides the

13   objections that we've had that we've stated over and over and

14   over again, and would be happy to have your Honor review

15   those.

16          THE COURT:  "NA" is?

17          MR. GOLDBERG:  "NA" -- and, your Honor, what "NA" is,

18   so the first --

19          THE COURT:  No objection?

20          MR. GOLDBERG:  -- 42 are --

21          THE COURT:  Oh, that's great.

22          MR. GOLDBERG:  -- the agreed upon.

23          And while your Honor is looking at that, let me

24   provide your Honor with -- what -- those 42 agreements, those

25   are the ZHP-proposed custodians, and this is the

1  description --

2          MR. SLATER:  Could I ask a question?  Where is this

3  coming from?  We've never seen this before, right?

4          MR. GOLDBERG:  Yeah, you have seen it in every letter

5  that we've provided to you, and we have covered it in every

6  meet and confer.

7          THE COURT:  Talk to the Court, talk to the Court.

8          MR. SLATER:  I have a real problem, your Honor, with

9  them doing now what they should have done in the briefing to

10  the Court so we could have responded to it.

11          And the issue is this:  We've laid out

12  witness-by-witness descriptions of why they were necessary,

13  including where we couldn't get substantive information.  We

14  did everything we needed to do to brief this.  And, now, as I

15  was concerned it might happen, and, unfortunately, it's

16  happened now, counsel walks in and they want the Court to say,

17  well, okay, let me look at these substantive objections now

18  that were not documented in the papers witness by witness.  I

19  think that it's really -- you know, it's not a good practice

20  and it's a bit of a sandbag.

21          But I think if we go with the papers that were filed

22  with the Court before we walked in today, we have provided for

23  the Court substantive justification for each person that's

24  needed.  The number is very manageable.  It's far less than

25  what was ordered in the Benicar case from a defendant with a

 1    much more straightforward and simpler case.  And throughout

 2    this process, we did not get the type of information that

 3    would be needed, for example, to say, well, these are

 4    duplicative.  And we cited the case that showed the cases they

 5    had cited did not apply, because in that case, and that was

 6    the *Ramirez* case, the Court said, well, when you look at these

 7    other cases, for example, *Enslin,* the defense actually did

 8    custodial searches before they came in and proved that

 9    documents were duplicative.  That hasn't been done.  In fact,

10    they have told us they have never collected documents for

11    custodians, they've never run sample tests, they've never done

12    anything.

13            So we've made a good-faith showing as to these, and

14    on the record before the Court, before they walked in with

15    whatever this stuff is, which I don't have time to read and

16    learn right now because I've never seen it, we've made a

17    good-faith showing and they have not.

18            Their entire argument was you only need 50 people.

19    So I believe that's the issue that was set up for the Court in

20    the briefing.  Did we make a good-faith showing as to the

21    people we're asking for, and, if so, should that trump a

22    arbitrary, hey, just take 50 -- which I don't even know where

23    they come up with that number, because they've looked at

24    Benicar, the number was far higher, for a less complicated

25    case.

1           THE COURT:  Mr. Goldberg, on your chart, the column

2    "Plaintiffs' basis for inclusion," is that taken verbatim from

3    plaintiffs' chart where it says "explanation"?

4           MR. GOLDBERG:  Yes, your Honor.

5           THE COURT:  Then what is this?

6           MR. GOLDBERG:  Okay.  So, your Honor, what you have,

7    first of all -- and to call this sandbagging is really --

8           THE COURT:  Let's get to the merits.

9           MR. GOLDBERG:  Okay.  The defendants' objections,

10   okay, so if you look at Number 43 on this spreadsheet I gave

11   you, this is where we start with their proposed additions as

12   of yesterday.  And this is information -- name, the title, et

13   cetera.

14          Defendants' objections, we pulled this from the

15   letters that we provided to you or that we gave to them and we

16   attached to our brief.  So on November 14th we sent a letter,

17   November 22nd.  All of this information is in those letters.

18   We've identified to them how -- for instance, Number 43 is

19   duplicative and cumulative of Number 10, Number 11, and Number

20   12.  That's in our letters.  We've told them about

21   high-ranking officials.  We've told them, if you go down,

22   you'll see, we're just pulling from our letters to them the

23   basis of each objection as to the witnesses.

24          Now, it isn't correct that we're asking for a limit

25   of 50.  We proposed 42 custodians.  That's what this document

1   is.  These are the 42.  They cover every department at ZHP

2   that matters.  They cover Prinbury, Solco, Princeton, all of

3   the related entities.  They cover manufacturing, testing,

4   quality control, quality assurance, regulatory, sales.

5   They're -- have been identified by our client through numerous

6   conversations as the people with the most important,

7   meaningful -- meaningful involvement with valsartan in all of

8   these areas.  These 42 were in the subject of the interview

9   with Mr. Du.  He confirmed them.  It's important to note, your

10  Honor --

11          THE COURT:  Is Mr. Du on your 42 list?

12          MR. GOLDBERG:  Mr. Du is not -- well, Mr. Du -- we're

13  not opposed to Mr. Du --

14          THE COURT:  He is 43.

15          MR. GOLDBERG:  We're not opposed to him being

16  included.  Our job was to identify the people meaningfully

17  involved with valsartan in these areas.  We're not opposed, if

18  they want -- if they want to include him.  And that's why we

19  suggested, if they want to go up to 50, and they have eight

20  other or seven other people they want to choose, that's their

21  choice.  Okay?  But the law says, the standard is, that the

22  parties try to identify the people that are most involved.

23  And if you go back to their October 3rd letter, that's what

24  they were asking for -- primary responsibility, most

25  knowledgeable.  That's exactly the words in their letter.  And

1    that's what we did.  That's these people.

2           Importantly, your Honor, you ordered Mr. Du to be

3    here.  They went through all of the org charts.  They asked

4    him about these people.  They only asked him about six of the

5    people on the -- that remained from 43 to 140.  They only

6    asked about six of those people.  All of these people have

7    been identified either in core discovery or on the website or

8    on LinkedIn.  And what we have done is identify -- and you can

9    read each of the descriptions of these people.  And they're

10   undisputed, there is no dispute that these people are the

11   material people.  And what we suggest is that -- and mind you,

12   these 42 would be more than any other defendant.  Some of the

13   defendants are up to 25.  We've gone from 7 to 42.  If you go

14   to 50, we're probably double every defendant.

15          The point about Benicar is a little bit of a trap

16   because if your Honor wants to go there, Benicar -- your Honor

17   may not recall, but there was a decision your Honor wrote --

18   there were 64 million pages of documents produced in Benicar.

19   I don't know if the Court wants to encourage that kind of

20   volume here on a case that has a specific manufacturing issue,

21   especially where the 42 people we've identified will provide

22   all of the material information.  The people that they've

23   identified on this list are ancillary.  There is no question

24   that they're going to have some information about valsartan.

25   That's not the standard, though.  The standard is is it going

1    to be duplicative?

2            If I show you an org chart and I can say, okay, the

3    people they listed, the people above them are on our list --

4    they can show you documents where there are seven people

5    listed.  We've identified four of them and they want three

6    more.

7            There is a report, it has 18 people attended a

8    close-out report for the FDA.  We identified 10.  They want

9    the other eight.  That kind of duplication, that kind of

10   cumulativeness isn't warranted at this stage, especially

11   considering that when you're talking about the burden of

12   translating Chinese documents, the cost of a dollar per page

13   for some of these documents to be translated, the time of

14   State secret review -- the magnitude of 64 million pages, we

15   set this forth in our brief -- it would take five years, a

16   hundred lawyers five years to review that.

17           THE COURT:  Mr. Slater, is there any reason I can't

18   look at this document that Mr. Goldberg has given us, which

19   incorporates your comments, and decide whether it's

20   appropriate for each of the individuals to be included?  I'll

21   have your position, I'll have their position, and I can make

22   the call myself.

23           MR. SLATER:  Well, I mean, I would have liked to have

24   had that in advance, so that all of us that were involved,

25   including, for example, my associate, Chris Geddis, who

1  conducted the meet and confer yesterday on the most recent org

2  chart, could have actually looked at what they were saying

3  here to say, well, there's not right or this is what happened.

4  It would have been nice if we actually had that on the

5  schedule that we should have had, so we could know what they

6  were actually going to say to the Court.  That would have been

7  helpful.

8          I'll tell you a few other things.

9          What they're basically saying to you is we concede

10  that everybody the plaintiffs have listed had involvement with

11  valsartan at some level.  So we don't have somebody that's on

12  the outside.  When they said something had no involvement, we

13  took them off the list, and we said if later the person's name

14  pops up on a relevant document, we'll talk to you then.  We

15  took that at face value.  So this is a narrow list that they

16  are not saying that we have irrelevant people.

17          Let's use Jun Du as the bellwether to this.  They're

18  still looking to you and saying on their standard, Jun Du is

19  not a necessary custodian.  I am happy to take Jun Du as the

20  bellwether to this list because they have cemented their

21  position as the Jun Du example is the process that they

22  followed in analyzing every one of these.  And the Court knows

23  and everybody involved in this case knows that if that's the

24  test, the Jun Du test, they fail miserably and we get

25  everybody.

1          It's clear, they state that at the Jun Du meeting, we

2    didn't ask about somebody.  We asked about every single thing

3    we could, every single word on those papers.  Counsel said we

4    asked about the org charts.  We asked about the org charts

5    that were produced in Chinese the night before, and that then

6    during the meeting, we -- we were being told, well, this name

7    means this, that word means that.  And we said, well, who are

8    these people?  And the answer to a lot of the question was:

9    You'd have to ask someone else who worked in that department.

10   They could tell you specifically.

11         For example, there were people who were involved in

12   the testing and evaluation of testing in that department.  We

13   know from them they all had involved with valsartan at some

14   level.  He said, well, I can't tell you what tests this person

15   did or what tests that person did.  Okay?  So, and you look at

16   the *Ramirez* case, and the *Ramirez* case said if they want to

17   say that people are duplicative, then they need to have run

18   the testing across the documents to show we've proven that

19   there are no duplicative -- that all the documents are

20   duplicative.  We know that's never been done.  So there are

21   all of these gaps in their opposition.

22         And, again, what we've put in front of your Honor is

23   a narrowed list where they do not dispute that every person on

24   the list was involved with valsartan.

25         So I frankly don't think your Honor needs to retire

1  from this court, look at these lists, and make decisions

2  person by person because based on the law and based on what's

3  before you on the record, they are not disputing involvement,

4  they're not showing you a lack of involvement, and your Honor

5  has seen the discussions and you know how this is going.  We

6  can't have gaps on something as important as, for example, the

7  testing or the quality assurance, et cetera.

8          Counsel just listed you all of the entities that

9  we've named custodians for to the ZHP Group, and the number is

10  only 139.  However many documents that is going to elicit,

11  it's going to elicit.  The search terms are going to define

12  it, and if they think that certain witnesses are only going to

13  have a small number of documents, so there is no burden --

14  certainly, no appreciable burden, versus what the prejudice to

15  us is if an important document doesn't get captured because,

16  for example, this one custodian saw a test result and wrote in

17  a document or a memo, this is a concerning peak, I talked to

18  such and such and they don't want to test it, and we don't

19  capture that person, it's terrible.

20          There is another problem.  In the meet and confer, we

21  have been told, although we have no specificity on this, that

22  for many people, all their e-mails have been destroyed.  We

23  don't have specificity on when or why.  It will be helpful

24  when we see the document preservation policies to understand.

25  We don't have an answer of whether they had backup tapes.  So

1  when we know that witnesses' e-mails have been destroyed, it's

2  that much more important to have more witnesses because we're

3  losing the ability to capture things.  So we need to hope that

4  somebody has an e-mail in their records because if they went

5  and whitewashed the files of a bunch of people, especially

6  people going back in time, my gosh, that's a significant gap

7  in our knowledge base.

8        So, again, your Honor asked the question, obviously,

9  you know, you can look at what they have now put in front of

10 the Court for the first time at the 13th hour, but the record

11 demonstrates we need all of these custodians because there is

12 no showing we don't.

13       And I'm reading through what they put into the

14 defendants' objections section.  I'm looking at Number 47 on

15 their list, for example, because it just happens to be one I

16 looked at first:  Jun Du interview, plaintiffs could have

17 asked about this person.  Okay.  That can be swept aside.  We

18 asked about every person whose name came up, and there came a

19 point where we were told don't bother to ask; the answer is

20 going to be the same, as your Honor knows.

21       He reports to two people who are listed.  That's

22 good.  That means that he's in a lineup of people they agree

23 are relevant.

24       Then, his routine job function:  Not a decision

25 maker.  Quote, "involved in data review and other lab

1    management works for valsartan."  That sounds pretty

2    important.

3            Manages the physical and chemical group of testing

4    raw materials, supervises lab jobs, and reviews related data

5    and documents, does routine physical and chemical tests of raw

6    materials, generates and reviews raw material tests.  Doesn't

7    work with residual solvents, not involved in cleaning

8    machinery.  Okay.  There is enough there, this person is

9    obviously somebody we need.

10           I flipped through this and, obviously, I'm seeing it

11   for the first time.  The refrain is the same.  The people with

12   the most meaningful involvement -- your Honor knows well from

13   managing so many cases that -- they started with eight people.

14   Remember where we were in the beginning, your Honor.  They

15   walked in with eight people and looked you in the eye and

16   said, that's all they need.  Those are the only people that

17   matter.  The number is climbing as we scratch and claw to get

18   a little more information.  But we have never ever proposed

19   somebody to this Court where we couldn't make a showing they

20   were involved.  And, again, they're asking you to take it on

21   face value that someone doesn't matter or isn't as important.

22   We have to prove our case.  With an admission that e-mails

23   have been scrubbed, with all of the gaps in Jun Du's

24   knowledge?  With all of the things they haven't been able to

25   answer?  And I'm not doubting that they can't answer the

1  questions because I think there is a huge gap in communication

2  out of China, and I think it's going to be a continuing

3  problem throughout this litigation.  There is going to be a

4  reticence on the part of ZHP to provide information and

5  documents.  I think it's going to be an issue we're going to

6  face many times in this litigation.  I hope I'm wrong, but I

7  think that's an issue we're going to face, and I don't blame

8  it on the counsel.  I think it's going to just be a factor of

9  the type of litigation we're going to have here.

10       So I don't think -- of course, your Honor can look.

11  I don't think you need to.  I think on the record before this

12  Court, we have a good-faith list, covering five or six

13  companies, of a very manageable number of people based on

14  historical numbers in Benicar and other litigations.  We ask

15  that you order our custodial list to be utilized.

16       THE COURT:  Any last word on this, Mr. Goldberg?

17       MR. GOLDBERG:  Yes, your Honor.  I -- it is critical

18  that your Honor think about that Jun Du interview, okay?

19  Because the vast majority of the people on this list, they

20  plucked from documents in the core discovery.  So they walked

21  into that meeting on June -- on October 23rd, and they had the

22  opportunity to ask Mr. Du about all of the people that they

23  could identify in core discovery.  The documents that they've

24  used to compile their list, and I'll just hand one up, if you

25  don't mind.

1          They went through the reports, and there are

2     thousands and thousands of pages of testing and reports, and

3     at the beginning of each report are the people who author the

4     report and then review it, and then it goes up the line to who

5     approves it.  And there is no question, I mean, this is a

6     major company.  These -- some of these people are line

7     employees.  Some of these people are authoring the tests.

8     They're going to get the tests.  Your Honor determined that

9     they're going to get all of the tests.

10          What they did is they've taken multiple names from

11    the same document and said these are good custodians, simply

12    because they had some involvement in valsartan.  And that is

13    not the standard.  If that was the standard for litigation

14    against corporate clients, any line employee on a conveyor

15    belt or some other space in a factory would be a potential

16    custodian.  That can't be the standard, especially given the

17    cost of ESI, especially given the Court's schedule, especially

18    given the narrow issues in this case, and especially given

19    that they're gonna get the actual test reports.  In our view,

20    the approach is, it has to be a limit.

21          And courts set limits all the time.  The Federal

22    Rules set limits.  They don't say you can take as many

23    depositions as you want.  They don't say you can have as many

24    interrogatories as you want.  You have to set limits to have

25    some -- to have some efficiency.  That's the purpose of this

1  MDL.

2          Nothing is prohibiting them.  And we've said to them,

3  we proposed to them, if you come back, you look at a test and

4  you say, boy, we really need to ask this person why, when he

5  drafted this test, there is a number, or why did -- why did

6  he -- what did he think when he reviewed it?  I mean, the

7  reality is, lower-level people are reviewing tests about all

8  of the 30 products that val- -- that ZHP makes,

9  indiscriminately.  And the likelihood that any one of them

10 would remember a specific test that would provide meaningful

11 probative information about whether the test itself shows a

12 peak, that cannot be the standard.

13         But, more importantly, what Mr. Slater has proposed

14 is wrong.  These are line-level employees, lower-level

15 employees.  They may not have a lot of pertinent information

16 about valsartan, and so he may say that the burden of having

17 them produce information is low.  That's not true.  The same

18 search terms are going to be applied to their files.  They

19 work for every one of the drugs at ZHP, so their custodial

20 files could be huge.  So a term like "FDA" or whatever the

21 terms are being used that pertain to pharmaceuticals are going

22 to apply to their entire custodial file.  And the burden is

23 that we're going to have to look through and determine how

24 much of this stuff is not responsive.  And that is -- that's

25 going to take years.  And that's not -- and Benicar shows -- I

1    would ask you, Judge, how many of those 64 million pages did

2    the lawyers in Benicar look at?

3              MR. SLATER:  Every single one of them.

4              MR. GOLDBERG:  Every single one of them.  Okay.

5              THE COURT:  The question to ask is how many --

6              MR. GOLDBERG:  How many were relevant?

7              THE COURT:  -- were reviewed?  The right question

8    isn't how many they looked at but how many were relevant or

9    meaningful to the case.

10             MR. GOLDBERG:  Right.  That's the better question,

11   and that's the point.

12             There is no basis here to go down that road now.

13   Whether it's 50, maybe it's 60 -- maybe your Honor wants to

14   say take 60, choose another 17, that's -- whatever it is.  But

15   there has to be a limit.

16             THE COURT:  Here is what the Court is going to rule.

17   I have told you this before and I'll say it again.  I'm just

18   not a very good poker player.

19             In Benicar, the Court made hundreds, if not

20   thousands, of decisions.  And my friend from Benicar is in the

21   back.  And, of all the decisions the Court made in Benicar,

22   there is only one I regret, and I think that was too many

23   custodians were identified in Benicar.  And, of all the

24   decisions I made in that case, that's the only one I question.

25             Here's what the Court is going to do.  The standard,

1  obviously, is not anyone who touched valsartan is a relevant

2  custodian in the case.  We all know that.

3       Plaintiff, you get 50.  By the end of today, pick

4  your next 25 -- pick your best 25.  The rest, it would be 25

5  plus 39.  I'll look at the list, and I'll make the call

6  whether they should be included or not, and that will be the

7  final list for the first tranche of discovery.

8       I don't see how plaintiffs are prejudiced, in all

9  candor.  One, they're going to get a mammoth amount of

10 information; plus, it comes with the proviso that if there is

11 good cause for additional custodians -- and we did this in

12 Benicar, we added some, we subtracted some -- you'll get it.

13 And if it turns out there was a relevant custodian that we

14 missed, you'll get it.  If it turns out one of the custodians

15 that are listed shouldn't be on the list, too many irrelevant

16 hits, we'll take them off.  I don't know how to do it other

17 than to set a finite number in the first instance of

18 custodians, so there is going to be a number between 50 and

19 139.  It's going to be at least 75, so it will be somewhere

20 between 75 and 139.  And whatever 75 you don't pick, I'll make

21 the call.

22      So I would suggest you use the numbering on --

23 because your chart is not numbered, use the numbering on

24 Mr. Goldberg's chart, and if you could get that list to me by

25 the end of today, I'll get you rulings on the final list of

1    custodians by noon tomorrow, so we could put this to bed.

2              MR. SLATER:  So, if I understand, your Honor, it's --

3    I think they said they have agreed to 42, is that the number

4    they have agreed to?

5              MR. GOLDBERG:  Yes, that's the number.

6              THE COURT:  So take your 42 and then add -- 8 plus

7    25 -- 33.  That will give you 75.

8              MR. SLATER:  And then if we want more than 75, that

9    will be something for the Court to determine?

10             THE COURT:  I assume you're going to want more than

11   75 because there is, presumably, 139 listed on here.

12             MR. SLATER:  Yeah, we want 139.

13             THE COURT:  I know you want 139.

14             MR. SLATER:  I'm joking, I'm joking.  I get it.

15             THE COURT:  Well, there is 135 on here.

16             MR. SLATER:  Our total is 139 from all the entities.

17             THE COURT:  Then why does this list have 135?

18             MR. SLATER:  I don't know.  Maybe when it was

19   counted on our end -- one of us is wrong.

20             THE COURT:  I'll tell you what.  It will be 75 plus 1

21   because Mr. Du is a custodian.  You don't have to waste one of

22   your draft picks on Mr. Du.

23             MR. SLATER:  Okay.

24             MR. GOLDBERG:  Your Honor, why not just say 75, and

25   then later in the case, if there's cause to go above, we go

1  above?  Because how could there be material information, given

2  our 42, given another 33, that they're not going to get?

3         THE COURT:  Mr. Goldberg, a year from now, you're

4  going to look back on this and you're going to say, thank you,

5  Judge Schneider.  You know why?  Because it's cheaper and more

6  efficient for your client to do an overinclusive search one

7  time in the short term than for the Court to require your

8  client to go back and do two, three, four separate searches.

9  So you may not be happy with it now, but in the long term,

10 you're going to be happy because I'm saving your client money.

11        MR. GOLDBERG:  I don't disagree.  It's already

12 punitive.  It's already going to cost in the many millions of

13 dollars.  That's where the 42 witnesses -- the 42 custodians

14 were.  The jump to 75 is not incremental.  It's drastic.  To

15 go above 75, that just compounds an already drastic situation.

16        THE COURT:  So now I know the Court is comfortable

17 with its ruling because Mr. Slater is not happy with me under

18 his breath, and you're not happy with me under your breath, so

19 that means I hit it right in the midpoint.  Okay?

20        So by the end of today --

21        MR. SLATER:  I'm more unhappy than he is.  I just

22 know how to take it.

23        THE COURT:  By the end of today, get me your list.

24 You can do it by e-mail, Mr. Slater; obviously, copy

25 Mr. Goldberg.  And by noon tomorrow, you'll get your final

1   list.

2           MR. SLATER:  Can I ask -- I just want to place one

3   thing on the record and make the Court aware and just make

4   sure it's clear so there is no question later.  We're still

5   getting org charts from ZHP.  We're still getting information

6   about people.  So I just -- I just want it to be clear that

7   I'm astounded that defense counsel is upset when they

8   stonewalled us and --

9           THE COURT:  Does this advance the ball?  Let's focus

10  on the merits.

11          MR. SLATER:  I just want the Court to be aware and I

12  want the record to show we're still getting the names of

13  custodians today.  I understand the good cause standard.  I

14  just wanted to make sure that that was clear because we're

15  still waiting for a lot of information.

16          THE COURT:  Okay.  So, with regard -- like I said, I

17  wanted to put all of this in an order.  I know with regard to

18  the non-ZHP defendants, you've agreed on a number of

19  custodians, maybe it's 25, but you've only identified 16.

20  Somehow we're going to have to put that in an order.  I would

21  prefer that you identify the 25 so we could put it in the

22  order, but I want to wrap this up.  I want to tie it with a

23  bow.  I don't want to come back in January and deal with

24  custodian issues.  Today was the day that we were supposed to

25  resolve all of these issues.

1              MR. SLATER:  Can I suggest, only because there is a

2     bunch of people who are going to need to do that, and I think

3     it's exactly what your Honor should do, as we did in Benicar,

4     have a list that you attach to the order --

5              THE COURT:  That's what I'm going to do.  That's what

6     I plan to do.

7              MR. SLATER:  The only thing I would ask, and I think

8     it would make sense on all these, if we get a couple days,

9     only because a lot of people are going to travel now, they're

10    going to run out of court and get on planes, and we want to do

11    it the right way.  So if we could have till -- we're not

12    getting to the 18th -- another day or two, just to get you the

13    list.

14             THE COURT:  That would be okay.

15             MR. SLATER:  I just want to make sure --

16             THE COURT:  I would love to be in a position by the

17    18th --

18             MR. SLATER:  Yes.

19             THE COURT:  We'll be done, I'll have the list, I'll

20    have all the terms, the names.  I will attach them to an

21    order, so you can all enjoy your Christmas vacation.

22             MR. SLATER:  Thank you.

23             So can we also apply that to the extra -- at least

24    give us another day to get the list to the defense and to the

25    Court on the ZHP custodians?  Only because there is people

1    that are not here who I would want to have involved in that

2    discussion as to who we're selecting.  There is people that

3    are not here that just are important to that discussion.

4            THE COURT:  All right.  Today is Wednesday, so when

5    can I get your list?

6            MR. SLATER:  I would say by the end of tomorrow.

7            THE COURT:  Fine.

8            MR. SLATER:  By 5:00 tomorrow?

9            THE COURT:  Fine.

10           MR. SLATER:  Thank you.

11           MR. GOLDBERG:  Your Honor, I may have missed

12   something.  What list are you proposing to get to --

13           MR. SLATER:  I'm proposing our list of the 76 and

14   then anybody we want in addition --

15           THE COURT:  No, no, no.  It's just -- just give me

16   the 76.  I'm assuming you want everyone on this list.  There

17   will be 76 identified, and I'm going to decide whether you get

18   anyone else.

19           MR. SLATER:  Okay, now I understand.  Thank you.

20           So we'll get the list of 76 to your Honor by 5:00

21   tomorrow, and we'll also obviously give it to Mr. Goldberg as

22   well, and then -- now I understand how you're going to handle

23   it.  I didn't understand that before.  Thank you.  I'm sorry.

24           MR. GOLDBERG:  Your Honor, just one point.  If you're

25   going to be using this thing that I handed up to review, the

1    last ten entries were entries that were added by plaintiffs

2    last night, so we haven't had a chance to put our objections

3    in.  Because those ten custodians were only identified --

4            THE COURT:  Okay.  As long as I get it by close of

5    business tomorrow.

6            MR. GOLDBERG:  We'll send this to you with that

7    information filled in.

8            THE COURT:  I would just need those two pages then.

9    I don't need the whole reprint.

10           MR. GOLDBERG:  Yes.  Okay.

11           THE COURT:  All right.  So, with regard to these

12   custodian lists then, before next Wednesday, which is the

13   18th, I will get the final list of custodians for each of the

14   API and finished dose manufacturer defendants.  I'll get the

15   final version of the requests for documents.

16           Now let's go to the search terms.  I read your

17   proposal.  I think your proposal is eminently reasonable.  I

18   would like to put that in an order.  I don't know the exact

19   language you use, but test runs, et cetera, et cetera.  I

20   think it's eminently reasonable.  But there was one finite

21   category of disputes, right?

22           MR. PAREKH:  Correct, Your Honor.

23           THE COURT:  All right.  Let's deal with the disputes

24   regarding the search terms.  And could you help me point to

25   where in your letter I'm going to find that?

 1            MR. PAREKH:  It's in our letter on Page 11, Section

 2   B.

 3            THE COURT:  Got it.  Got it.  Remaining dispute as to

 4   CGMP terms.  And the specific items in dispute are those

 5   listed on Page 12?

 6            MR. PAREKH:  That's correct, Your Honor.

 7            THE COURT:  There are only seven items in dispute?

 8            MR. PAREKH:  There is seven items, and defendants

 9   characterize it as 17 terms because some of them are

10   essentially the same words but in different formats, so 7 or

11   17.

12            THE COURT:  Is that all we're arguing about?

13            MR. PAREKH:  That's all we have for you.  We worked

14   very, very, very hard to come up with the rest of this.

15            THE COURT:  Defendant, who is going to speak to this?

16            MR. TRISCHLER:  I will be happy to, your Honor.  I

17   don't know that anyone else is jumping out of their seat to do

18   it, so I'll be happy to.

19            THE COURT:  7/17 additional terms, that's what we're

20   arguing about?

21            MR. TRISCHLER:  Yes, sir.

22            THE COURT:  We're arguing about whether the term

23   "whistleblower" should be searched for or "bury" or "coverup"?

24            MR. TRISCHLER:  Yes.

25            THE COURT:  Is that not relevant to the case?

1          MR. TRISCHLER:  It's absolutely not relevant, your

2    Honor.  It has nothing to do with the issue of whether there

3    was an impurity in this medication --

4          THE COURT:  Agreed.  But isn't there enough smoke

5    signals out there that there might be a problem that some of

6    the defendants have not been doing what they're supposed to

7    with their document retention program?  Isn't there enough out

8    there on that?

9          MR. TRISCHLER:  No.  I don't -- frankly, your Honor,

10   there is nothing out there.

11         And what the plaintiffs have pointed to with respect

12   to some of the 483 documents that have been produced in core

13   discovery or that the plaintiffs have acquired through FOIA

14   requests are what might be perceived or referred to as

15   irregularities in data collection or data management.  There

16   are search terms to collect at.  We have search terms that

17   have been agreed upon regarding data integrity, data

18   reliability.  So if those -- if those issues exist, they will

19   be captured in the, I think, 483 search terms that the parties

20   have agreed to.

21         You know, to allow the plaintiffs to run amuck on a

22   conspiracy theory that, you know, all of these defendants were

23   trying to hide data and information regarding nitrosamines,

24   it's preposterous, and, you know, at some point, when we are

25   all producing millions and millions of documents, you've got

1    to draw a line.  And --

2            THE COURT:  I agree.  But if you look at these terms,

3    if it was a generic term -- I'm not a linguist, but if it was

4    a generic term that is likely to result in an excessive number

5    of hits, you'd have a great point.  But is it likely that a

6    search for "coverup" or "disaster" or "delete" or "bury" is

7    going to come up with -- again, I'm not a linguist, but is it

8    likely, applying common sense and what we know, that a search

9    using those terms is going to uncover an excessive number of

10   documents?

11           MR. TRISCHLER:  I would not expect it to, your Honor,

12   quite frankly --

13           THE COURT:  So what's the harm?  What's the harm?

14   Actually, it could help you because when they come back -- the

15   plaintiffs come back undoubtedly and say, we want to do a

16   search in the future using more search terms, you'll say,

17   Judge, we were here on December 11th and you gave them

18   everything they wanted, right?

19           MR. TRISCHLER:  The harm is the suggestion that the

20   defendants have engaged in a scheme to cover up or obfuscate

21   the truth with respect to nitrosamines in ARB medication.  It

22   didn't happen.  There is no validity to the suggestion.  In

23   fact, if anyone's paid attention to anything that's gone on in

24   the health community for the last two years, what regulatory

25   agencies around the world are starting to find out is that no

1  one appreciated, rightly or wrongly, the potential for

2  nitrosamine, trace amounts of nitrosamine impurities, to find

3  their way into medications.  That's why you're seeing recalls

4  of other products that have nothing to do with ARBs.  This

5  wasn't some coverup.

6         And I guess my objection to it, and on behalf of the

7  defendants, our objection to it is that we're going to chase

8  our tail on this wild theory that there was an attempt to

9  cover up data, when we've got more important things to do and

10 we've got bigger fish to try, and our attention should be

11 focussed on the liability issues and not a book that some

12 woman wrote that took potshots at the defendants, which are

13 some of the search terms that are in there.  It has nothing to

14 do with the issues in this case.

15         THE COURT:  But I recall seeing documents in this

16 case, FDA documents, which talked about -- these are my words,

17 not the FDA's documents -- that there were questions raised

18 about the -- destruction may not be a right word, but

19 discarding of documents, and I recall seeing documents in this

20 case about -- you know what I'm talking about.  You've seen

21 those documents.  So if this was an entirely speculative

22 venture, yeah, you have a point.  But there is a record in

23 this case that there is good cause for the plaintiffs to at

24 least inquire into this subject matter.  They're not pulling

25 this out of whole cloth.  They're relying on FDA documents.

1           So my ruling is that the defendants' objections are

2    overruled.  I don't think this is an area where we have to go

3    down -- all the way down a rabbit hole, but we'll see what

4    this custodial search turns up, and if there's nothing, so be

5    it.  But it certainly is not the focus of discovery in this

6    case.  But for the reason that I said, in fairness to the

7    plaintiffs, like I said, you're not pulling this out of whole

8    cloth.  There is a record that -- there is a reason to believe

9    issues of this type may have occurred.  So that's why the

10   objection is overruled.

11           MR. PAREKH:  Thank you, your Honor.

12           MR. FERRETTI:  Your Honor, my name is Joe Ferretti on

13   behalf the ZHP defendants.

14           I wanted to just go back for a moment to the

15   remaining search terms issues, the issues that have been

16   resolved.  Your Honor had mentioned that you would be putting

17   something into the order, and I wanted to ask a little bit

18   more about that.

19           THE COURT:  You're going to tell me about the Chinese

20   issue.

21           MR. FERRETTI:  Yes.

22           THE COURT:  Let's talk about that.

23           MR. FERRETTI:  Well, the reason is that the search

24   terms aren't going to be applied exactly --

25           THE COURT:  I know.

 1              MR. FERRETTI:  -- in the manner that's stated there,

 2    and I'm afraid that if it's put into an order, then we could

 3    have complications.  We need it to be more flexible so that we

 4    can work out the translation issues.

 5              THE COURT:  I forgot whose submission it was but

 6    there was a proposal about I think the defendants go first,

 7    and they suggest the Chinese translation, and then the

 8    plaintiffs would look at it, and then you'd meet and confer.

 9    Is that something you agreed on?

10              MR. FERRETTI:  Well, I think that we're still

11    discussing that.

12              THE COURT:  Well, we're going to decide it right now.

13    No more discussion.

14              MR. FERRETTI:  Well, we do have to consult with

15    our --

16              THE COURT:  Well, you had since August 26 to do that,

17    so we're going to decide it right now.  You had plenty of time

18    to do that.  That's why we're here today.  Let's decide it.

19              What do you want to do?  Is it like Japanese where

20    different people could look at the same English words and come

21    to different versions of how it should be translated?

22              MR. PAREKH:  There is definitely some of that

23    involved.  We did have a conversation just before this

24    conference, and the suggestion we made, given that they still

25    have to do some consultation, is instead of having everything

1  decided by the January 28th conference, have it decided by

2  February --

3          THE COURT:  What?  We're deciding it today.

4          MR. PAREKH:  No, no, no.  I meant the actual

5  translations.  Because neither -- until we have the search

6  terms in English done, we couldn't --

7          THE COURT:  Isn't that done today?

8          MR. PAREKH:  That's done.

9          THE COURT:  All right.  Finished.

10          MR. PAREKH:  So now what defendants are going to do

11  is go to their translator, and well as the internal company

12  people, and say, here are the English terms; what are the

13  equivalent Mandarin terms?

14          THE COURT:  Is that the language, Mandarin, we're

15  talking about?

16          MR. PAREKH:  Yes.

17          THE COURT:  Is that different than Chinese?  I don't

18  know.

19          MR. PAREKH:  It's the normal -- it's what most people

20  think of as Chinese.  It's the primary dialect.

21          THE COURT:  Okay.  So before next Wednesday, there is

22  going to be an agreed-upon list of search terms that's going

23  to be incorporated into an order, and then in the first

24  instance, defendant is going to propose the Mandarin

25  translations, right?

 1          MR. PAREKH:  Correct.

 2          THE COURT:  Give me a date for that.

 3          MR. FERRETTI:  Your Honor, we -- I'm not certain I

 4  can commit to a date.

 5          THE COURT:  Well, I will give you a date if you don't

 6  suggest a date.

 7          MR. FERRETTI:  I would say we can go with a date that

 8  was proposed in -- by plaintiffs of January 3rd, if --

 9          THE COURT:  I'll give you more time than that.  I

10  don't want you working over Christmas.

11          MR. FERRETTI:  I appreciate that, your Honor.

12          THE COURT:  How long will it take for plaintiffs to

13  turn around what you get from defendants?

14          MR. PAREKH:  At least two weeks, which is when we --

15  we gave -- this was a little aggressive, I will say, in terms

16  of our proposal.  We had gone -- we had said January 3rd and

17  January 13th.  But, given the volume of terms and the

18  technical nature --

19          MR. FERRETTI:  Your Honor, if I could give a little

20  bit more context about the complexity.  There are many terms

21  that have proximities, like within five -- one term within

22  five of another.  That doesn't work in simplified Chinese.

23  The term -- all of the characters are right next to each

24  other.  And so we have to figure out what good -- what strong,

25  like, alternatives would be to that, to avoid simply putting

1    an anvil on fire.

2              We also have to determine all of the different

3    variants where there are wild cards.  Many of the terms have

4    wild cards at the end or at the beginning, and we have to

5    determine all the different variants of what words are

6    actually being sought and then translate each one of those and

7    make each one of those a separate search term.  So it seems it

8    would take time for us to negotiate back and forth, and we'll

9    get started on that right away.

10             I think that we could probably have it entirely

11    resolved by the end of January, maybe mid-February.

12             THE COURT:  So defendants are going to be ordered to

13    propose the Mandarin translations by the 10th of January;

14    plaintiff respond by January 24; and we're going to finalize

15    the order on January 28.

16             You have to work this out.  There is no way the Court

17    can answer these rulings like you did in Benicar, where you

18    each gave me Japanese --

19             (Laughter.)

20             THE COURT:  You have to work this out.  You have to

21    work it out.  The only alternative is the Court hires a

22    translator and that will be the third person who decides it,

23    and you don't want that.  So you have to work this out.

24             MR. SLATER:  Can I make one request, your Honor?  I'm

25    hopeful this can be agreed to.  What would be exceedingly

1    helpful to us would be when they propose the search terms to

2    us, the Mandarin terms, that they provide to us exemplar

3    documents demonstrating those terms in use and context, so

4    we're not looking at a naked symbol and just having to decide

5    whether it works, but actual documents that they know they're

6    going to produce anyway, that actually show the terms in

7    context because that will be the most helpful to our

8    translators to actually be able to look at that.  There is no

9    prejudice because the documents would be produced anyway.

10   They're getting the terminology from their own documents.  I

11   think that will accelerate our ability to judge and evaluate

12   whether or not those terms are adequate.

13           MR. GOLDBERG:  Your Honor --

14           THE COURT:  I think you have to work this out amongst

15   yourselves.  I'm reluctant to order them to do that.  You have

16   to collaborate on this.  The Court cannot answer this question

17   for you.  There is no way the Court can determine which is the

18   right Mandarin translation.

19           MR. FERRETTI:  I have confidence we'll be able to

20   work it out, your Honor.

21           THE COURT:  And if there is a way that -- if they

22   want to see documents and it's not too burdensome, just see if

23   you could satisfy their concerns, but you have to work this

24   out yourselves.  Okay?  So that will be the direction.

25           I will put that in the order.  Defendants' proposal

1   by January 10; plaintiff responds by the 24th; no later than

2   the 28th, it has to be resolved to put in an order.

3           MR. FERRETTI:  Thank you, your Honor.

4           THE COURT:  Unfortunately.

5           So we said we would revisit time deadlines after we

6   resolved the requests for production, the custodians, and the

7   search terms.

8           So with regard to the FDA documents, the redactions,

9   that's January 31st, with the proviso, Mr. Goldberg, let us

10  know if there is a problem and we'll deal with that.  That's

11  the redaction issue.

12          I guess -- oh, the sales and pricing information.

13  What did we say?  90 days from January 1st?  So that would be

14  February, March, April 1.  April 21 is sales and pricing

15  documents.

16          So ZHP can't start their search for documents until

17  at least January 28th, but the other parties can.  So help me

18  help you, defendants, a date for the production or -- and it

19  will be on a rolling basis.

20          MR. TRISCHLER:  Your Honor, excuse me.  I anticipate

21  that the production is going to be exhaustive, based on the

22  search terms and the volume of the requests for production of

23  documents.  In order to compile documents from different

24  manufacturing facilities, you know, in India, in the United

25  States, and to review those documents and get them in a form

1    that's ready for production, I submit is going to be a

2    labor-intensive effort.  I would like 180 days in order to

3    complete the production.  I have no intention of trying to

4    hold up discovery.  I'm certainly willing to produce the

5    documents on a rolling basis as we get them and as they become

6    available, and I'm sure the other defendants would agree to

7    that as well.  But I'm always concerned about an order with a

8    drop-dead deadline to complete discovery.  I want to comply

9    with the Court's order, I want my client to be in compliance

10   with the order, and so 180 days is the period of time that I

11   would suggest.

12          MR. SLATER:  There was two things there.

13          Your Honor, I think ZHP is not at a complete loss.  I

14   mean, there is categories of documents that are not dependent

15   on the search terms.  That's the document requests.  So that,

16   obviously, can get right into motion.  You know, the document

17   requests are not custodial.

18          And one of the things that we were thinking is,

19   because it's obviously going to be a rolling production,

20   would -- we think it would be very helpful if we could at

21   least prioritize certain categories of documents and certain

22   custodians, based what we know now, to put up at the front of

23   their rolling production -- things like testing results and

24   some of the witnesses, custodians that they have represented

25   would be the most important people, for example.  We think

1  that would be very helpful to us because at least we can start

2  to get what would seem to be most critical earlier on, if that

3  would be okay.

4       THE COURT:  Is that something that the Court should

5  get involved in or should I let the parties meet and confer

6  about that?

7       MR. SLATER:  I think we should meet and confer, as

8  long as they would be agreeable to doing that.

9       And the other thing I would just say, and ZHP,

10 obviously, they can run the English search terms through their

11 documents because all of the documents aren't entirely in

12 Chinese anyway, but it can start.  But if they're open to

13 doing that, to doing the prioritization, then I don't think

14 you'll have to get involved unless there is some sort of a

15 dispute, which I wouldn't anticipate, because, for the most

16 part, we're going to adopt what they've told us is most

17 important to prioritize because there is no reason not to.

18 There may be a few exceptions but --

19      THE COURT:  So I will let you talk about that.

20      Mr. Trischler, if I was going to buy a new car and I

21 accepted the salesman's first offer, I would feel really

22 guilty.

23      So I'll say, instead of six months, five months, May

24 29th, 2020 -- but, with every order the Court enters, if there

25 is good cause, good reason, you'll get more time.

1          MR. TRISCHLER:  I'll accept that, your Honor, and

2    appreciate the Court providing that amount of time.

3          I'm also -- I think Mr. Slater's suggestion about

4    prioritizing custodians, if the plaintiffs want to tell us who

5    they would like us to start the searches for, we can produce

6    those first.  That seems eminently fair and reasonable to me.

7          And, in the spirit of holiday giving, I'm going to

8    ask for one more thing, since we're down to five months.  On

9    the Court's 483 production order for the -- that was entered

10   at the time of the last conference on the macro -- I think it

11   was at the time of the macro discovery hearing, that the

12   defendants would have to produce 483s and warning letters with

13   respect to finished dose facilities before it had been limited

14   to the API production facilities, I think the order provided

15   for production by December 31.  And I know with respect to my

16   client, with the holiday season and everything, if we could

17   have an additional -- I'll ask for 30, but if you want to chop

18   that down a bit to 20 or something, I'll take it.  But

19   December 31, with the holiday, is going to be tough for us.

20         THE COURT:  Let me get that order.  Do you have the

21   order there, what paragraph you're talking about,

22   Mr. Trischler?  That would help me, if we refer to the

23   specific paragraph.

24         MR. TRISCHLER:  It's Paragraph 6, your Honor, of the

25   document Number 303, the order of November 25.

IN RE:   VALSARTAN STATUS/DISCOVERY CONFERENCE     120

1          THE COURT:  So you want to change the date in

2    Paragraph 6 to January 31st from December 31st?

3          MR. TRISCHLER:  Yes, sir.

4          THE COURT:  Done.

5          MR. TRISCHLER:  And I think -- that's all I have,

6    your Honor, thank you.

7          MR. GOLDBERG:  Your Honor, I just wanted to address

8    the ZHP timing.  If the other defendants are going to start

9    whenever they start, and they'll have five months, assuming we

10   start February 1 or whatever that -- January 28th, then we'll

11   have five months from that?

12         THE COURT:  Yes.

13         MR. GOLDBERG:  Mr. Slater's suggestion about the

14   English search terms being applied, we'll look at that, but we

15   don't want to do two rounds of searching --

16         THE COURT:  And I agree with you.

17         MR. GOLDBERG:  So -- and, likewise, if you want -- if

18   plaintiffs' want to prioritize custodians, that would be

19   helpful.

20         THE COURT:  I think it makes sense.

21         Okay.  So it doesn't appear that we need to -- tell

22   me if I'm wrong.  It doesn't appear that we need to get

23   together in person on the 18th, does it?  Why don't we have a

24   phone call instead of an in-person meeting.  Is 10:00 on the

25   18th okay for everybody for a phone call?  By then, we'll get

1    the requests for documents, the custodians, the search terms.

2         Could you incorporate into a document that we can

3    incorporate into an order the protocol that you agreed on with

4    the search terms and the hits and all that?  And it can

5    only -- anyone can be on the call, but it will just be assumed

6    just lead counsel, and the only purpose would just be to dot

7    the I's and cross the T's.

8         Does anyone know -- we moved the January in-person

9    meeting to January 28th, right?  Is the phone call,

10   once-a-month phone call, is that January 15th?  Is that the

11   date?

12        MR. SLATER:  I mean, that's the midpoint, but it's

13   whatever your Honor wants.

14        THE COURT:  Okay.  Let's do January 15th at 4:00.

15   That will be just a phone call.

16        MR. PAREKH:  Your Honor, for the 10 a.m. call, if you

17   could possibly make it 11?

18        THE COURT:  Oh, okay.  Yes, because you're on the

19   coast?  11:00 is fine.  Yes.  Let's make it 11.

20        MR. PAREKH:  Thank you.

21        THE COURT:  So one of the things I was doing is I

22   like to look six months ahead and where we're going with the

23   case.

24        Plaintiffs' fact sheets are going to start to be

25   rolling in pretty soon, aren't they?

 1            MR. SLATER:  Yes.

 2            THE COURT:  Okay.  So, from the defendants'

 3    perspectives, when you get those fact sheets, is there any

 4    reason, within say the next six months, you can't take the

 5    plaintiffs' depositions?

 6            MR. TRISCHLER:  Within six months from the receipt of

 7    the fact sheets?

 8            THE COURT:  Yes.  We're not locking in the date

 9    today.  I'm just thinking what are we going to be doing the

10    next six months?  You're going to get these fact sheets, we're

11    going to be dealing with the defendants' ESI and document

12    production.  We're going to finalize in January the fact

13    sheets for the other defendants within the next couple of

14    months.  Defendants' fact sheets will be rolling in.  And I

15    just want to keep the momentum going in the case.

16            MR. TRISCHLER:  Speaking for myself, your Honor, I

17    would think, with the usual caveats, that assuming that the

18    fact sheets are complete, the medical records have been

19    produced and provided, yes, six months from the receipt of the

20    fact sheets should be doable.

21            MS. HILTON:  Your Honor, if I may, on the issue of

22    the plaintiff fact sheets, with respect to the consumer class

23    rep, third-party payor fact sheets, and the medical monitoring

24    class rep fact sheets, we actually would ask for a brief

25    exception, simply because it took some number of weeks to

 1   negotiate the authorizations that were necessary, to get those

 2   signed.  So I think -- and, similarly, the TPPs are also

 3   asking for, you know, a brief extension of probably a month

 4   for those fact sheets.  I think right now it's set for January

 5   3rd.

 6             THE COURT:  Do we have an actual date to answer them

 7   or was it something like X days after --

 8             MS. HILTON:  It was 90 days after the submission of

 9   the order, so, in using that timing, I think that landed us on

10   January 3rd for the medical monitoring and economic loss fact

11   sheets.  I think TPP may have been --

12             THE COURT:  So what would you suggest?  February 3rd,

13   all plaintiffs shall answer fact sheets?

14             MS. HILTON:  That works for the named plaintiffs.

15   For the TPPs, I'll let my colleague --

16             MR. MESTRE:  The TPP fact sheets were due a couple

17   weeks after, so if we could get an equivalent time, so maybe

18   the middle or end of February would be helpful.

19             THE COURT REPORTER:  May I have your name, please?

20             MR. MESTRE:  Jorge Mestre for --

21             THE COURT:  Okay.  So February 3rd is what?  Whose

22   fact sheets are going to be produced by February 3rd?

23             MS. HILTON:  Well, I'm only speaking for the economic

24   loss consumer reps and the medical monitoring representatives.

25   I don't know if --

```
 1              THE COURT:  So there's --

 2              MS. HILTON:  -- any personal injury.

 3              THE COURT:  So those are the two class actions,

 4    right?

 5              MS. HILTON:  Yes, your Honor.

 6              THE COURT:  And the personal injury -- counsel, are

 7    you talking about the personal injury?

 8              MR. MESTRE:  The third-party payor fact sheets.

 9              THE COURT:  I thought that was the economic loss.

10              MS. HILTON:  Well, we have three, right?  We have the

11    consumer, the individual consumer plaintiff reps; we have the

12    medical monitoring individual person fact sheets; and so those

13    were decided and ordered on the same day.  Several weeks

14    later, the TPP named reps agreed upon a fact sheet, which was

15    entered into the record, and then triggered the 90-day

16    timeline.  And so there is a staggering between the economic

17    loss plaintiffs, between the consumer and the TPP.

18              THE COURT:  So the consumer economic loss plaintiffs

19    class action and the medical monitoring plaintiffs class

20    action, you want till February 3rd?

21              MS. HILTON:  Yes, your Honor.

22              THE COURT:  And the TPP named plaintiffs class

23    action, you want till March 3rd?

24              MR. MESTRE:  If possible, your Honor.

25              THE COURT:  Done.
```

1          MR. NIGH:  Your Honor, for the personal injury, we do

2    want a little bit of an extension there.  Our due date is

3    hitting right at the Christmas time period.

4          THE COURT:  Yes, there are a lot of those.

5          MS. LOCKARD:  Well, there is some, your Honor, that

6    have already started rolling up.  So -- and this is the first

7    time we've heard about an extension for the plaintiffs.

8          MR. NIGH:  Some that are completed already.

9          MS. LOCKARD:  Right.  And we started receiving some,

10   fortunately.

11         MR. NIGH:  That's right.

12         MS. LOCKARD:  So what is the deadline that counsel

13   would be asking to move?

14         MR. NIGH:  Extended to January 15th.

15         MS. LOCKARD:  I mean, we don't have an objection if

16   it's that period of time.

17         MR. NIGH:  For those that would have been due before

18   that date, that they would be due by January 15th.  So,

19   there's some that are newly filed cases, and they would

20   obviously get 60 days from when they're newly filed.

21         THE COURT:  So all you have to do, when you start to

22   get those fact sheets rolling in, is just look at the record

23   from the Benicar case about how we handled the show-cause

24   procedure.  It really worked beautifully, and if we could just

25   do the same thing, that would be great.

 1          MS. LOCKARD:  Sure.  Your Honor, I think that's

 2    incorporated in one of the orders, and we've looked at the

 3    Benicar process, so we'll follow or let you know if there

 4    is --

 5          THE COURT:  Yes.  So we might actually have an

 6    application for the January 28th conference.  I don't know.

 7    There is probably a time to meet and confer.  I don't know.

 8    But probably no later than the February phone call.

 9          MS. LOCKARD:  Yes, I think that's right.

10          MR. PAREKH:  And the parties also have to meet and

11    confer as to what constitutes a core deficiency versus a

12    non-core --

13          THE COURT:  Right.

14          MR. PAREKH:  -- so we still have that process to go

15    through.

16          THE COURT:  Okay.  So in the first six months of the

17    next year, I think it will take us into the next phase of the

18    case, the actual production phase of the case.

19          I do think once we get the named plaintiffs in, just

20    to keep the momentum going, we can get the named plaintiffs

21    deposed, and then after -- or substantially -- when the

22    defendants are substantially complete with their ESI document

23    production, we'll start taking your depositions.  And then, of

24    course, you'll talk to Judge Kugler about what case he is

25    going to try and the class action certification issue and the

1    *Daubert* issues, et cetera.  Okay?

2          MR. PAREKH:  Your Honor, just to clarify, when you

3    say named plaintiffs, you mean the named plaintiffs in the

4    class case, not the individuals?

5          THE COURT:  Absolutely.  Absolutely, yes.

6          I think, if I remember right, Judge Kugler's idea was

7    to try the economic case first, because that encompasses all

8    relevant issues.  So I think that, unless he changes his mind,

9    that's what he has planned.  Okay?

10          Okay.  I know on this side of the table, you wanted

11    to talk to Judge Kugler about some Benicar issues, right?

12    Judge Kugler is in trial.  There is going to be a gap between

13    2 and 2:30 when he is available, so if you've got a few

14    minutes, if you could go get lunch and come back at 2,

15    somewhere in that window, we'll talk to Judge Kugler about the

16    common benefit issues from Benicar.  Nothing to do with this

17    case.  It's just we're at the tail end of Benicar, and just

18    some miscellaneous common benefit issues, and that will wrap

19    everything up.

20          So you can get a bite to eat and come back at 2,

21    sometime between 2 and 2:30, we can meet with Judge Kugler

22    about what he wants to do about those common benefit issues.

23          MR. SLATER:  So we're not having an afternoon

24    conference in valsartan with Judge Kugler?

25          THE COURT:  I don't see any issues we need to address

 1  with Judge Kugler about this case.  Does anybody see that?

 2          Okay.  So we'll talk on the phone next Wednesday -- I

 3  purposely scheduled everything to get all of this done before

 4  Christmas, so we wouldn't have to work over the Christmas

 5  holiday on search terms and custodians.  So we're all grateful

 6  for that.

 7          MR. PAREKH:  Your Honor, there is just one small

 8  outstanding issue which is defendants have promised us answers

 9  to questions -- to the ESI -- for the ESI meeting.  We sort of

10  stuck that on at the end of the brief.  Can we just get a date

11  by which they have to provide those answers?  Because right

12  now, it's just been sort of we will get them to you.

13          THE COURT:  I'm looking at you, Mr. Trischler.

14          MR. TRISCHLER:  Well, there were only four open

15  questions that we still owe Behram and his team, so I would

16  say that we could probably get answers to those --

17          THE COURT:  Before Christmas?

18          MR. TRISCHLER:  Sure.

19          THE COURT:  I think it's to everyone's advantage to

20  get all of this done before Christmas, so you don't have to

21  work on this over Christmas -- although I say Christmas.  I

22  meant the holiday season.

23          MR. TRISCHLER:  December 23.  I don't know where the

24  issues stand with the other defendants, so I don't want to

25  commit anyone else to that time frame.  But as to Mylan, we

1    can certainly get those open questions answered in that time

2    frame.

3            THE COURT:  Let's say hopefully get all the answers

4    before December 23rd.

5            MR. PAREKH:  Thank you, your Honor.

6            THE COURT:  I hope everyone has a great holiday.

7    Thank you for your time.  And I do sincerely commend you.

8    It's obvious that a lot of time and effort has been put into

9    this, and I think it's going to be worthwhile in the long

10    term.  I really do believe that this is the most

11    labor-intensive part of the case.  And once we get over this,

12    which we will by the end of January, it should be smooth

13    sailing for the rest of the case.  Thank you all.

14            THE DEPUTY CLERK:  All rise.

15            (The proceedings concluded at 1:19 p.m.)

16            - - - - - - - - - - - - - - - -

17

18            I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.

20

21    /S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI
     Court Reporter/Transcriber
22
     December 17, 2019
23        Date

24

25

**'**

**'07** [2] - 40:3, 49:25
**'09** [1] - 49:25

**/**

**/S** [1] - 129:21

**0**

**07068** [1] - 1:17
**07081** [1] - 3:9
**07932** [1] - 3:23
**08101** [1] - 1:10

**1**

**1** [8] - 9:15, 10:9,
14:19, 17:15, 78:1,
100:20, 116:14,
120:10
**10** [18] - 17:13, 17:15,
17:18, 21:17, 32:15,
33:23, 46:1, 46:21,
50:13, 51:2, 51:7,
51:17, 52:2, 82:15,
86:19, 89:8, 116:1,
121:16
**100** [2] - 69:22, 70:1
**1000** [1] - 2:15
**10022** [1] - 3:16
**103** [1] - 1:16
**107** [1] - 81:10
**10:00** [1] - 120:24
**10:05** [2] - 1:11, 5:2
**10th** [1] - 114:13
**11** [9] - 1:10, 17:20,
18:14, 18:23, 28:20,
86:19, 106:1,
121:17, 121:19
**115** [4] - 18:7, 77:11,
77:12, 82:5
**11:00** [1] - 121:19
**11:47** [1] - 80:1
**11:48** [1] - 80:5
**11th** [2] - 62:12,
108:17
**12** [3] - 18:13, 86:20,
106:5
**123** [1] - 81:8
**135** [2] - 100:15,
100:17
**139** [8] - 81:9, 92:10,
99:19, 99:20,
100:11, 100:12,
100:13, 100:16
**13th** [2] - 93:10,
113:17
**140** [1] - 88:5

**14th** [1] - 86:16
**15** [3] - 18:15, 18:23,
51:12
**15219** [1] - 2:24
**15th** [4] - 121:10,
121:14, 125:14,
125:18
**16** [5] - 18:24, 19:9,
20:1, 20:5, 102:19
**1638** [1] - 2:6
**17** [6] - 20:7, 20:8,
98:14, 106:9,
106:11, 129:22
**17th** [1] - 2:19
**18** [5] - 20:8, 77:18,
77:21, 77:22, 89:7
**180** [2] - 117:2, 117:10
**1835** [1] - 1:20
**18th** [6] - 6:16, 103:12,
103:17, 105:13,
120:23, 120:25
**19** [11] - 20:12, 20:13,
22:25, 23:1, 24:25,
25:1, 27:14, 28:19,
31:18, 53:2, 53:6
**19-2875** [1] - 5:6
**19-md-02875-RBK-
JS** [1] - 1:3
**19103** [2] - 1:20, 2:20
**19422** [1] - 3:12
**1:19** [1] - 129:15
**1st** [2] - 38:16, 116:13

**2**

**2** [9] - 9:16, 10:14,
15:11, 16:3, 49:15,
127:13, 127:14,
127:20, 127:21
**20** [7] - 9:3, 9:6, 20:13,
27:17, 28:23, 38:7,
119:18
**200-some** [1] - 70:15
**2005** [1] - 41:11
**2007** [14] - 38:8, 38:9,
39:1, 41:11, 43:15,
43:18, 48:2, 48:18,
48:20, 49:3, 49:12,
51:6, 52:1, 52:18
**2009** [7] - 41:3, 42:1,
42:20, 46:18, 48:7,
48:20, 49:9
**2010** [11] - 38:6,
38:16, 39:7, 39:9,
39:16, 41:22, 42:22,
43:18, 46:18, 47:9,
52:24
**2011** [1] - 41:3
**2012** [1] - 41:3
**2017** [3] - 12:6, 12:7,

33:19
**2019** [6] - 1:10, 8:11,
28:20, 45:20, 52:2,
129:22
**2020** [1] - 118:24
**2029** [1] - 4:3
**21** [12] - 29:1, 30:6,
30:8, 30:23, 30:24,
32:7, 34:9, 35:4,
36:14, 37:9, 116:14
**22** [2] - 53:1, 53:22
**2200** [1] - 4:9
**22nd** [1] - 86:17
**23** [2] - 55:8, 128:23
**23rd** [2] - 95:21, 129:4
**24** [3] - 56:4, 56:8,
114:14
**24th** [1] - 116:1
**25** [9] - 56:11, 88:13,
99:4, 100:7, 102:19,
102:21, 119:25
**2500** [1] - 3:4
**2525** [1] - 2:15
**25th** [2] - 12:7, 45:20
**26** [2] - 57:11, 111:16
**26th** [1] - 6:2
**27** [1] - 58:3
**28** [2] - 58:8, 114:15
**2800** [1] - 4:6
**28th** [6] - 112:1, 116:2,
116:17, 120:10,
121:9, 126:6
**29** [4] - 8:11, 20:13,
25:1, 58:12
**2900** [1] - 1:20
**29th** [1] - 118:24
**2:30** [2] - 127:13,
127:21
**2nd** [1] - 14:7

**3**

**3** [3] - 9:18, 10:19,
16:24
**30** [6] - 2:19, 3:19,
58:16, 58:17, 97:8,
119:17
**300** [1] - 4:3
**303** [1] - 119:25
**30305** [1] - 3:5
**31** [2] - 119:15, 119:19
**316** [1] - 2:9
**31st** [4] - 12:22, 116:9,
120:2
**32502** [1] - 2:10
**33** [2] - 100:7, 101:2
**33134** [1] - 2:16
**3333** [1] - 3:4
**33590** [1] - 2:13
**34** [2] - 58:23, 59:9

**35** [2] - 59:14, 59:15,
59:16
**36** [2] - 59:17, 59:19
**3600** [1] - 4:9
**3668391** [1] - 12:6
**37** [1] - 59:24
**38** [1] - 60:1
**38th** [1] - 2:24
**39** [2] - 60:4, 99:5
**3rd** [10] - 87:23, 113:8,
113:16, 123:5,
123:10, 123:12,
123:21, 123:22,
124:20, 124:23

**4**

**4** [4] - 9:20, 10:21,
17:1, 22:6
**40** [1] - 60:6
**4020** [1] - 3:19
**42** [14] - 83:20, 83:24,
86:25, 87:1, 87:8,
87:11, 88:12, 88:13,
88:21, 100:3, 100:6,
101:2, 101:13
**43** [5] - 60:7, 86:10,
86:18, 87:14, 88:5
**44** [2] - 59:15, 60:9
**45** [2] - 60:13, 60:14
**450** [1] - 3:12
**45202** [1] - 4:6
**47** [2] - 82:7, 93:14
**483** [3] - 107:12,
107:19, 119:9
**483s** [1] - 119:12
**4:00** [1] - 121:14
**4th** [1] - 1:9

**5**

**5** [2] - 14:5, 17:3
**50** [9] - 81:7, 85:18,
85:22, 86:25, 87:19,
88:14, 98:13, 99:3,
99:18
**51** [1] - 60:14
**52** [5] - 60:16, 60:21,
60:24, 61:7, 61:11
**53** [3] - 61:3, 61:4,
61:11
**54** [1] - 62:1
**55** [1] - 62:18
**56** [1] - 62:20
**57** [1] - 62:23
**5:00** [2] - 104:8,
104:20
**5th** [1] - 14:9

**6**

**6** [3] - 17:5, 119:24,
120:2
**60** [4] - 74:16, 98:13,
98:14, 125:20
**600** [3] - 2:9, 3:22, 4:6
**601** [1] - 3:15
**60602** [1] - 3:19
**64** [5] - 62:23, 63:10,
88:18, 89:14, 98:1
**65** [4] - 63:4, 63:6,
63:10, 63:11
**66** [4] - 63:12, 63:14,
63:17, 65:10
**67** [2] - 63:13, 63:17
**673** [1] - 3:9
**68** [4] - 64:23, 64:24,
65:6, 82:6

**7**

**7** [3] - 17:7, 88:13,
106:10
**7/17** [1] - 106:19
**701** [1] - 2:3
**70130** [1] - 2:4
**75** [10] - 99:19, 99:20,
100:7, 100:8,
100:11, 100:20,
100:24, 101:14,
101:15
**75201** [1] - 4:10
**76** [4] - 104:13,
104:16, 104:17,
104:20
**77** [1] - 65:6
**78** [2] - 65:5, 65:15
**79** [1] - 66:19

**8**

**8** [4] - 17:9, 36:3,
45:19, 100:6
**85** [5] - 66:1, 66:3,
66:9, 66:13
**856-318-6100** [1] -
1:24

**9**

**9** [3] - 17:11, 17:17,
38:20
**90** [8] - 75:2, 75:24,
78:1, 78:20, 78:25,
79:8, 116:13, 123:8
**90-day** [1] - 124:15
**90067** [1] - 4:3
**90277** [1] - 2:7
**92** [2] - 66:19, 66:25

**93** *[5]* - 67:3, 67:6, 67:16, 67:20, 68:2
**94** *[2]* - 69:12, 69:17
**95** *[2]* - 67:21, 69:21
**96** *[3]* - 67:22, 68:7, 75:13
**98** *[4]* - 67:8, 67:22, 68:1, 68:2
**99** *[4]* - 2:12, 31:20, 32:2, 69:20

## A

**a.m** *[4]* - 1:11, 5:2, 80:5, 121:16
**ability** *[3]* - 29:5, 93:3, 115:11
**able** *[10]* - 38:2, 40:20, 40:22, 42:10, 73:9, 74:13, 74:18, 94:24, 115:8, 115:19
**above-entitled** *[1]* - 129:19
**absolutely** *[5]* - 16:14, 51:19, 107:1, 127:5
**accelerate** *[1]* - 115:11
**accept** *[2]* - 16:13, 119:1
**acceptable** *[3]* - 8:19, 32:18, 53:7
**accepted** *[1]* - 118:21
**access** *[1]* - 10:15
**accessible** *[1]* - 10:15
**accompanied** *[1]* - 11:15
**acknowledged** *[1]* - 44:24
**acquired** *[1]* - 107:13
**Actavis** *[2]* - 3:6, 3:6
**action** *[5]* - 24:1, 124:19, 124:20, 124:23, 126:25
**ACTION** *[1]* - 1:2
**actions** *[1]* - 124:3
**actual** *[7]* - 56:16, 64:15, 96:19, 112:4, 115:5, 123:6, 126:18
**ADAM** *[1]* - 1:16
**Adam** *[3]* - 5:11, 30:13, 77:12
**add** *[5]* - 26:4, 26:20, 28:6, 76:7, 100:6
**added** *[3]* - 81:25, 99:12, 105:1
**addition** *[2]* - 18:10, 104:14
**additional** *[6]* - 18:3, 73:19, 78:5, 99:11, 106:19, 119:17

**additions** *[1]* - 86:11
**address** *[9]* - 6:3, 6:19, 6:21, 6:22, 6:23, 9:9, 14:12, 120:7, 127:25
**addressing** *[2]* - 8:4, 9:11
**adds** *[1]* - 11:19
**adequate** *[1]* - 115:12
**adequately** *[1]* - 49:22
**admission** *[2]* - 64:12, 94:22
**adopt** *[1]* - 118:16
**adopted** *[1]* - 12:4
**advance** *[2]* - 89:24, 102:9
**advantage** *[1]* - 128:19
**afield** *[1]* - 31:4
**afraid** *[3]* - 36:2, 57:1, 111:2
**afternoon** *[2]* - 71:9, 127:23
**afterwards** *[1]* - 41:1
**agencies** *[1]* - 108:25
**aggressive** *[1]* - 113:15
**ago** *[5]* - 38:24, 41:7, 47:4, 52:18, 53:14
**agree** *[22]* - 15:13, 19:20, 20:21, 20:23, 21:7, 21:21, 25:25, 26:20, 31:5, 33:11, 38:4, 42:6, 43:1, 62:16, 68:11, 68:14, 73:16, 93:22, 108:2, 117:6, 120:16
**agreeable** *[1]* - 118:8
**Agreed** *[1]* - 25:20
**agreed** *[20]* - 9:5, 20:15, 21:4, 43:7, 51:3, 54:17, 72:19, 75:15, 83:22, 100:3, 100:4, 102:18, 107:4, 107:17, 107:20, 111:9, 112:22, 114:25, 121:3, 124:14
**agreed-upon** *[1]* - 112:22
**agreeing** *[3]* - 29:9, 45:7, 48:22
**agreement** *[1]* - 22:4
**agreements** *[3]* - 23:14, 57:20, 83:24
**ahead** *[3]* - 29:17, 121:22
**aided** *[1]* - 1:25
**akin** *[1]* - 13:24
**albeit** *[1]* - 52:20

**ALFANO** *[1]* - 2:22
**alleging** *[1]* - 42:14
**allow** *[2]* - 74:4, 107:21
**allowed** *[1]* - 45:4
**almost** *[2]* - 40:5, 62:3
**alternative** *[1]* - 114:21
**alternatives** *[1]* - 113:25
**amended** *[2]* - 61:6, 62:4
**Amerisourcebergen** *[1]* - 4:7
**amount** *[3]* - 18:10, 99:9, 119:2
**amounts** *[1]* - 109:2
**amuck** *[1]* - 107:21
**analogize** *[2]* - 64:10, 82:8
**analogizing** *[1]* - 64:2
**analysis** *[4]* - 11:2, 54:1, 57:13
**analyzing** *[1]* - 90:22
**ancillary** *[1]* - 88:23
**AND** *[2]* - 1:6, 1:7
**ANDA** *[5]* - 53:17, 53:19, 53:23, 54:19, 77:12
**ANDAs** *[3]* - 17:23, 18:4
**Angeles** *[1]* - 4:3
**answer** *[14]* - 19:3, 39:13, 59:4, 74:13, 76:13, 91:8, 92:25, 93:19, 94:25, 114:17, 115:16, 123:6, 123:13
**answered** *[2]* - 77:24, 129:1
**answers** *[4]* - 128:8, 128:11, 128:16, 129:3
**anticipate** *[2]* - 116:20, 118:15
**anvil** *[1]* - 114:1
**anytime** *[1]* - 44:15
**anyway** *[4]* - 14:14, 115:6, 115:9, 118:12
**API** *[30]* - 1:7, 6:10, 8:12, 23:3, 23:16, 23:20, 24:3, 24:9, 24:12, 24:19, 27:16, 36:8, 42:14, 43:22, 45:24, 48:2, 53:3, 53:16, 54:16, 56:16, 56:17, 57:5, 57:8, 72:4, 72:12, 72:14, 73:5, 73:12, 105:14, 119:14

**API's** *[1]* - 33:20
**apologize** *[2]* - 78:25, 81:5
**appear** *[4]* - 6:17, 9:20, 120:21, 120:22
**appearance** *[3]* - 5:8, 31:21, 49:15
**applicable** *[2]* - 72:10, 73:12
**application** *[3]* - 11:25, 26:21, 126:6
**applications** *[2]* - 12:1, 18:18
**applied** *[3]* - 97:18, 110:24, 120:14
**applies** *[3]* - 10:3, 12:13, 62:3
**apply** *[4]* - 32:19, 85:5, 97:22, 103:23
**applying** *[1]* - 108:8
**appreciable** *[1]* - 92:14
**appreciate** *[4]* - 29:16, 61:24, 113:11, 119:2
**appreciated** *[1]* - 109:1
**approach** *[4]* - 25:10, 80:15, 83:1, 96:20
**appropriate** *[5]* - 8:8, 9:5, 11:3, 19:21, 89:20
**approval** *[1]* - 24:22
**approved** *[2]* - 13:25, 18:4
**approves** *[1]* - 96:5
**April** *[4]* - 8:11, 12:7, 116:14
**ARB** *[1]* - 108:21
**arbitrary** *[1]* - 85:22
**ARBs** *[1]* - 109:4
**area** *[7]* - 19:25, 63:5, 67:2, 70:24, 71:8, 76:24, 110:2
**areas** *[4]* - 76:20, 76:21, 87:8, 87:17
**arguable** *[1]* - 71:22
**argue** *[2]* - 8:25, 54:14
**argued** *[2]* - 47:6, 47:8
**arguing** *[7]* - 32:7, 43:5, 47:25, 80:21, 106:12, 106:20, 106:22
**argument** *[10]* - 38:22, 38:23, 41:7, 44:23, 47:5, 52:10, 52:11, 52:23, 82:9, 85:18
**arms** *[1]* - 78:18
**artifacts** *[1]* - 50:3
**ascertainability** *[1]* - 75:10

**aside** *[3]* - 71:20, 80:22, 93:17
**aspect** *[1]* - 76:12
**assessments** *[2]* - 23:9, 54:5
**assist** *[3]* - 8:17, 8:19, 9:2
**associate** *[1]* - 89:25
**associated** *[1]* - 23:11
**assume** *[8]* - 12:22, 16:10, 29:2, 49:14, 49:25, 56:24, 100:10
**assumed** *[2]* - 68:24, 121:5
**assumes** *[3]* - 11:7, 11:21, 11:24
**assuming** *[3]* - 104:16, 120:9, 122:17
**assurance** *[4]* - 23:12, 54:9, 87:4, 92:7
**Assurance** *[1]* - 49:18
**astounded** *[1]* - 102:7
**Atlanta** *[1]* - 3:5
**attach** *[4]* - 13:23, 22:17, 103:4, 103:20
**attached** *[3]* - 33:7, 82:14, 86:16
**attachment** *[1]* - 21:25
**attempt** *[1]* - 109:8
**attended** *[1]* - 89:7
**attention** *[3]* - 12:12, 108:23, 109:10
**audits** *[2]* - 24:16
**August** *[3]* - 6:2, 21:11, 111:16
**Aurobindo** *[1]* - 3:13
**Aurolife** *[1]* - 3:13
**author** *[1]* - 96:3
**authoring** *[1]* - 96:7
**authorizations** *[1]* - 123:1
**authorized** *[1]* - 12:15
**Auto** *[1]* - 70:11
**available** *[4]* - 76:24, 82:2, 117:6, 127:13
**Avenue** *[3]* - 3:9, 3:15, 4:9
**avoid** *[2]* - 6:15, 113:25
**aware** *[3]* - 59:20, 102:3, 102:11

## B

**background** *[1]* - 8:11
**backup** *[1]* - 92:25
**bad** *[1]* - 17:17
**balance** *[1]* - 77:15
**ball** *[1]* - 102:9

bar [2] - 12:2, 12:19
BARNES [1] - 4:2
base [2] - 50:1, 93:7
based [12] - 10:1,
  21:2, 22:4, 48:23,
  48:25, 50:23, 81:21,
  92:2, 95:13, 116:21,
  117:22
basis [9] - 7:4, 11:17,
  74:10, 81:18, 86:2,
  86:23, 98:12,
  116:19, 117:5
batch [1] - 72:6
batches [3] - 23:4,
  23:5, 23:18
Bates [2] - 31:15,
  50:20
Baylen [1] - 2:9
BAZAN [1] - 2:19
Beach [1] - 2:7
bear [1] - 45:13
beautifully [1] -
  125:24
became [1] - 64:1
become [2] - 49:4,
  117:5
becomes [1] - 11:19
bed [1] - 100:1
began [1] - 52:18
beginning [15] - 7:16,
  25:16, 37:22, 38:2,
  40:21, 42:7, 42:9,
  43:3, 43:11, 43:13,
  43:21, 46:5, 94:14,
  96:3, 114:4
behalf [6] - 5:18, 5:21,
  5:24, 14:22, 109:6,
  110:13
Behram [1] - 128:15
BEHRAM [1] - 2:6
Bell [1] - 3:12
bellwether [2] - 90:17,
  90:20
belt [1] - 96:15
benefit [3] - 127:16,
  127:18, 127:22
Benicar [24] - 6:12,
  63:25, 82:3, 82:5,
  84:25, 85:24, 88:15,
  88:16, 88:18, 95:14,
  97:25, 98:2, 98:19,
  98:20, 98:21, 98:23,
  99:12, 103:3,
  114:17, 125:23,
  126:3, 127:11,
  127:16, 127:17
BERNE [1] - 4:5
best [1] - 99:4
better [2] - 64:9, 98:10
between [11] - 8:20,

25:1, 70:2, 73:1,
  81:9, 99:18, 99:20,
  124:16, 124:17,
  127:12, 127:21
beyond [1] - 34:22
BIDDLE [1] - 3:21
big [2] - 37:16, 49:23
bigger [1] - 109:10
billable [1] - 78:11
bioequivalence [3] -
  35:11, 37:1, 58:21
bioequivalency [1] -
  35:3
bit [9] - 26:7, 57:2,
  71:14, 84:20, 88:15,
  110:17, 113:20,
  119:18, 125:2
bite [1] - 127:20
blame [1] - 95:7
BLANTON [1] - 3:8
bless [1] - 75:12
blessed [1] - 76:2
blow [1] - 41:19
Blue [1] - 3:12
blush [1] - 28:14
board [1] - 16:11
Board [3] - 15:18,
  15:25, 16:12
bogged [1] - 11:1
book [1] - 109:11
BOSICK [1] - 2:22
bother [1] - 93:19
bottom [1] - 75:23
Boulevard [2] - 2:15
bow [1] - 102:23
box [1] - 29:22
boxes [1] - 54:12
boy [1] - 97:4
break [2] - 74:4, 80:1
breath [2] - 101:18
BRIAN [1] - 3:3
Brian [1] - 5:20
brief [14] - 8:6, 8:11,
  33:7, 34:3, 34:4,
  43:2, 50:13, 51:1,
  84:14, 86:16, 89:15,
  122:24, 123:3,
  128:10
briefing [2] - 84:9,
  85:20
briefly [2] - 26:9,
  71:10
briefs [2] - 9:10, 14:9
bring [1] - 74:15
bringing [2] - 12:12,
  57:23
Brittney [1] - 14:22
BRITTNEY [1] - 3:15
broad [6] - 25:9,
  27:24, 34:11, 35:15,

39:25, 70:1
broader [2] - 25:22,
  57:10
broken [1] - 67:19
brought [1] - 82:20
bug [1] - 55:5
Building [1] - 1:9
bullet [4] - 21:18,
  48:23, 50:13, 57:1
bulleted [1] - 43:1
bunch [2] - 93:5,
  103:2
burden [10] - 15:17,
  43:12, 43:16, 46:6,
  73:25, 89:11, 92:13,
  92:14, 97:16, 97:22
burdensome [2] -
  71:19, 115:22
bury [2] - 106:23,
  108:6
business [3] - 72:24,
  77:2, 105:5
buy [1] - 118:20
BY [18] - 1:16, 1:19,
  2:2, 2:6, 2:9, 2:12,
  2:15, 2:18, 2:23, 3:2,
  3:8, 3:11, 3:15, 3:18,
  3:22, 4:2, 4:5, 4:8

C

CA [1] - 4:3
California [1] - 2:7
Camden [2] - 1:10, 5:5
camera [4] - 9:4, 9:7,
  9:13, 10:2
Camp [1] - 2:3
Campus [1] - 3:22
candor [1] - 99:9
cannot [2] - 97:12,
  115:16
capable [2] - 35:10,
  51:13
capture [4] - 27:19,
  28:1, 92:19, 93:3
captured [2] - 92:15,
  107:19
captures [1] - 36:23
car [1] - 118:20
carcinogens [2] -
  36:7, 45:23
cards [2] - 114:3,
  114:4
care [2] - 57:3, 57:4
careful [1] - 68:22
Carol [2] - 1:23,
  129:21
Carta [1] - 50:11
case [61] - 6:17, 7:17,
  7:20, 7:21, 7:22,

9:25, 10:10, 10:23,
  12:13, 12:14, 16:18,
  18:11, 19:11, 19:15,
  20:5, 40:22, 42:10,
  51:25, 52:14, 64:1,
  72:3, 72:23, 75:20,
  76:1, 76:5, 76:20,
  82:11, 84:25, 85:1,
  85:4, 85:5, 85:6,
  85:25, 88:20, 90:23,
  91:16, 94:22, 96:18,
  98:9, 98:24, 99:2,
  100:25, 106:25,
  109:14, 109:16,
  109:20, 109:23,
  110:6, 121:23,
  122:15, 125:23,
  126:18, 126:24,
  127:4, 127:7,
  127:17, 128:1,
  129:11, 129:13
cases [6] - 71:24,
  74:6, 85:4, 85:7,
  94:13, 125:19
catalysts [1] - 57:25
catchall [1] - 27:15
categories [12] -
  20:24, 25:4, 26:5,
  27:24, 37:16, 37:20,
  40:1, 46:24, 68:23,
  78:15, 117:14,
  117:21
category [4] - 11:18,
  26:22, 52:9, 105:21
caveat [4] - 26:1, 26:6,
  51:10, 53:6
caveats [1] - 122:17
cemented [1] - 90:20
Centre [1] - 2:24
Century [1] - 4:3
certain [16] - 10:12,
  15:2, 15:4, 25:7,
  26:6, 31:25, 33:19,
  35:17, 40:5, 44:24,
  46:18, 64:11, 92:12,
  113:3, 117:21
certainly [7] - 29:11,
  73:21, 79:21, 92:14,
  110:5, 117:4, 129:1
certificates [2] - 54:1,
  57:13
certification [5] -
  71:24, 73:20, 75:9,
  75:19, 126:25
certify [1] - 129:18
cetera [7] - 54:4,
  75:10, 86:13, 92:7,
  105:19, 127:1
cfarrell.crr@gmail.
  com [1] - 1:23

CGMP [1] - 106:4
chain [3] - 56:15,
  72:16, 73:9
challenge [1] - 11:25
challenges [1] - 12:2
chance [2] - 71:11,
  105:2
change [24] - 23:8,
  23:9, 23:10, 23:11,
  24:7, 38:10, 38:11,
  39:8, 39:13, 39:15,
  39:20, 39:22, 39:23,
  40:19, 42:18, 48:16,
  49:16, 54:7, 64:2,
  64:3, 64:4, 120:1
changed [5] - 14:9,
  37:25, 40:23, 53:5,
  55:8
changes [9] - 37:23,
  38:13, 39:14, 40:8,
  40:11, 40:14, 46:11,
  54:18, 127:8
changing [1] - 40:18
characterize [1] -
  106:9
characters [1] -
  113:23
charge [1] - 72:13
charged [1] - 73:12
chart [7] - 16:12, 86:1,
  86:3, 89:2, 90:2,
  99:23, 99:24
charts [6] - 15:20,
  16:9, 88:3, 91:4,
  102:5
chase [1] - 109:7
cheaper [1] - 101:5
chemical [4] - 40:14,
  44:16, 94:3, 94:5
chemicals [1] - 42:15
Chicago [1] - 3:19
China [4] - 74:25,
  78:12, 78:13, 95:2
Chinese [9] - 78:6,
  89:12, 91:5, 110:19,
  111:7, 112:17,
  112:20, 113:22,
  118:12
choice [2] - 51:24,
  87:21
choose [2] - 87:20,
  98:14
chop [1] - 119:17
Chris [1] - 89:25
Christmas [9] -
  103:21, 113:10,
  125:3, 128:4,
  128:17, 128:20,
  128:21
chromatogram [1] -

35:2
**chromatograms** [1] - 49:15
**chromatography** [15] - 23:24, 24:8, 31:5, 31:8, 31:17, 31:19, 33:8, 33:14, 37:23, 40:5, 42:9, 47:21, 47:23, 51:14, 51:15
**chromotography** [1] - 31:13
**Cincinnati** [1] - 4:6
**CIPRIANI** [1] - 3:11
**circles** [1] - 36:1
**Circuit's** [1] - 75:8
**circumstances** [2] - 12:8, 12:16
**cited** [3] - 19:12, 85:4, 85:5
**CIVIL** [1] - 1:2
**claim** [2] - 75:7, 75:8
**clarify** [4] - 13:2, 16:8, 28:4, 127:2
**class** [15] - 70:12, 70:16, 71:23, 71:24, 73:20, 75:9, 75:19, 122:22, 122:24, 124:3, 124:19, 124:22, 126:25, 127:4
**classes** [1] - 70:13
**claw** [1] - 94:17
**clean** [2] - 49:25, 57:6
**cleaned** [1] - 14:13
**cleaning** [2] - 24:19, 94:7
**clear** [12] - 13:5, 20:3, 36:11, 39:2, 44:8, 47:22, 50:17, 75:17, 91:1, 102:4, 102:6, 102:14
**clearly** [5] - 9:21, 13:16, 30:22, 75:9, 75:22
**CLEM** [1] - 2:23
**Clem** [1] - 5:23
**CLERK** [4] - 5:3, 80:4, 80:6, 129:14
**client** [7] - 29:20, 87:5, 101:6, 101:8, 101:10, 117:9, 119:16
**clients** [1] - 96:14
**climbing** [1] - 94:17
**close** [3] - 82:3, 89:8, 105:4
**close-out** [1] - 89:8
**cloth** [2] - 109:25, 110:8
**Coast** [1] - 2:6

**coast** [1] - 121:19
**Cohen** [1] - 1:9
**collaborate** [1] - 115:16
**colleague** [1] - 123:15
**colleagues** [1] - 60:25
**collect** [1] - 107:16
**collected** [1] - 85:10
**collection** [1] - 107:15
**collectively** [2] - 71:8, 79:15
**color** [1] - 36:12
**column** [2] - 83:12, 86:1
**comfortable** [2] - 27:5, 101:16
**coming** [2] - 74:25, 84:3
**Commencing** [1] - 1:11
**commend** [4] - 7:6, 7:15, 76:3, 129:7
**comments** [1] - 89:19
**commercial** [1] - 23:2
**commit** [2] - 113:4, 128:25
**common** [4] - 108:8, 127:16, 127:18, 127:22
**communication** [2] - 55:9, 95:1
**communications** [3] - 8:20, 70:2, 70:12
**Communications** [1] - 12:5
**community** [1] - 108:24
**companies** [1] - 95:13
**company** [3] - 45:17, 96:6, 112:11
**company's** [2] - 19:13, 19:19
**compare** [1] - 40:11
**compatriots** [1] - 43:22
**compile** [2] - 95:24, 116:23
**complaints** [3] - 24:9, 70:15, 70:17
**complete** [13] - 9:1, 10:7, 11:11, 13:9, 13:10, 13:12, 29:6, 73:9, 117:3, 117:8, 117:13, 122:18, 126:22
**completed** [1] - 125:8
**complex** [1] - 7:21
**complexity** [1] - 113:20
**compliance** [1] -

117:9
**complicated** [2] - 82:11, 85:24
**complications** [1] - 111:3
**complies** [1] - 83:3
**comply** [1] - 117:8
**component** [1] - 56:19
**compounds** [1] - 101:15
**comprehending** [1] - 9:19
**compromise** [2] - 73:3, 74:1
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concede** [1] - 90:9
**concentrate** [1] - 16:23
**concept** [2] - 38:4, 72:18
**concern** [1] - 61:12
**concerned** [7] - 11:4, 40:17, 42:24, 49:5, 56:14, 84:15, 117:7
**concerning** [2] - 40:24, 92:17
**concerns** [2] - 73:24, 115:23
**concluded** [1] - 129:15
**conduct** [1] - 23:15
**conducted** [2] - 24:16, 90:1
**confer** [15] - 7:8, 12:11, 25:11, 25:23, 28:17, 71:5, 81:21, 84:6, 90:1, 92:20, 111:8, 118:5, 118:7, 126:7, 126:11
**CONFERENCE** [2] - 1:4, 1:5
**conference** [14] - 6:1, 6:4, 6:16, 28:20, 36:10, 53:7, 53:13, 54:16, 71:5, 111:24, 112:1, 119:10, 126:6, 127:24
**confers** [1] - 21:3
**confidence** [1] - 115:19
**confidential** [1] - 11:8
**confidentiality** [1] - 11:9
**confines** [1] - 36:24
**confirm** [4] - 8:1, 25:7, 26:10, 29:9
**confirmed** [2] - 8:9, 87:9

**confirms** [1] - 26:11
**confused** [1] - 63:10
**confusing** [1] - 67:15
**confusion** [1] - 6:13
**conjunction** [1] - 54:10
**Conlee** [1] - 5:15
**CONLEE** [1] - 2:2
**consideration** [2] - 63:15, 65:12
**considering** [1] - 89:11
**consisted** [1] - 8:20
**consistent** [2] - 36:20, 61:14
**conspiracy** [1] - 107:22
**constitutes** [1] - 126:11
**consult** [1] - 111:14
**consultation** [3] - 48:25, 51:18, 111:25
**consultations** [2] - 50:24, 51:22
**consulting** [1] - 32:16
**consumer** [6] - 122:22, 123:24, 124:11, 124:17, 124:18
**consumers** [3] - 70:5, 70:6, 70:7
**contained** [1] - 53:17
**contaminated** [2] - 42:15, 42:17
**contamination** [10] - 34:20, 35:11, 36:6, 36:20, 36:25, 44:17, 45:22, 48:2, 49:8, 49:16
**contemplate** [1] - 10:20
**content** [1] - 21:3
**context** [10] - 10:25, 32:10, 38:22, 43:23, 45:11, 46:5, 70:2, 113:20, 115:3, 115:7
**Continued** [3] - 2:1, 3:1, 4:1
**continuing** [1] - 95:2
**contracts** [1] - 23:15
**control** [3] - 24:7, 24:21, 87:4
**conversation** [3] - 74:15, 76:11, 111:23
**conversations** [2] - 74:12, 87:6
**conveyor** [1] - 96:14
**Cooper** [1] - 1:9
**copies** [7] - 9:1, 10:5, 10:7, 11:11, 13:9,

13:10, 13:12
**copy** [5] - 6:6, 44:13, 68:7, 82:18, 101:24
**core** [19] - 8:7, 8:12, 8:14, 9:1, 10:3, 10:5, 10:9, 10:19, 11:11, 32:14, 48:10, 48:24, 50:20, 88:7, 95:20, 95:23, 107:12, 126:11, 126:12
**corporate** [1] - 96:14
**Corporation** [2] - 4:7, 4:10
**correct** [10] - 38:5, 50:16, 58:11, 58:15, 60:11, 86:24, 105:22, 106:6, 113:1, 129:18
**corrective** [1] - 24:1
**correctly** [1] - 38:5
**correspondence** [2] - 54:19, 64:14
**cost** [3] - 89:12, 96:17, 101:12
**counsel** [18] - 5:9, 12:20, 15:2, 15:4, 29:20, 37:13, 51:2, 65:19, 68:8, 74:14, 84:16, 91:3, 92:8, 95:8, 102:7, 121:6, 124:6, 125:12
**counted** [1] - 100:19
**couple** [4] - 32:25, 103:8, 122:13, 123:16
**coupled** [1] - 79:13
**course** [10] - 6:19, 6:20, 24:24, 42:1, 46:13, 56:3, 77:2, 77:3, 95:10, 126:24
**COURT** [321] - 1:1, 5:4, 6:1, 13:4, 13:20, 14:7, 14:11, 14:19, 14:21, 14:23, 15:3, 15:6, 15:13, 15:16, 15:21, 16:1, 16:3, 16:7, 16:13, 16:15, 16:21, 16:23, 17:1, 17:3, 17:5, 17:7, 17:9, 17:11, 17:13, 17:15, 17:17, 17:20, 18:6, 18:20, 18:23, 19:1, 19:7, 19:9, 20:10, 20:12, 20:20, 21:6, 21:10, 21:16, 21:24, 22:6, 22:15, 22:18, 22:22, 25:1, 25:8, 25:20, 26:15, 26:17, 27:1, 27:3, 27:13, 28:4, 28:18,

28:23, 28:25, 30:6,
30:11, 30:22, 32:3,
32:6, 32:12, 34:9,
34:17, 35:4, 35:8,
35:24, 36:1, 36:13,
37:2, 37:7, 37:15,
38:4, 38:9, 38:17,
38:19, 39:6, 42:14,
42:19, 42:21, 43:5,
43:9, 43:13, 43:18,
44:3, 44:12, 45:13,
45:19, 46:8, 47:1,
47:6, 47:10, 47:12,
47:15, 47:18, 47:25,
48:18, 48:20, 49:7,
49:11, 50:9, 50:14,
51:4, 51:9, 51:16,
51:20, 51:23, 52:6,
52:25, 53:20, 53:22,
54:14, 54:23, 55:7,
55:11, 55:17, 55:23,
56:1, 56:3, 56:7,
56:9, 56:23, 57:6,
57:11, 58:3, 58:8,
58:12, 58:16, 58:25,
59:3, 59:6, 59:9,
59:11, 59:14, 59:24,
60:1, 60:3, 60:6,
60:8, 60:13, 60:16,
61:3, 62:1, 62:7,
62:15, 62:18, 62:20,
62:23, 63:2, 63:5,
63:12, 63:16, 63:19,
63:22, 63:24, 64:17,
64:19, 65:6, 65:8,
65:13, 65:15, 65:21,
65:23, 66:23, 67:7,
67:9, 67:13, 67:16,
67:23, 68:3, 68:15,
69:4, 69:9, 69:12,
69:19, 69:23, 70:14,
70:20, 70:23, 74:23,
75:4, 76:18, 77:3,
77:9, 77:16, 78:7,
78:10, 78:17, 78:20,
79:2, 79:5, 79:8,
79:15, 79:19, 79:23,
80:7, 80:9, 80:16,
80:18, 80:22, 81:1,
81:4, 81:6, 81:13,
82:14, 82:19, 82:22,
82:25, 83:2, 83:4,
83:9, 83:16, 83:19,
83:21, 84:7, 86:1,
86:5, 86:8, 87:11,
87:14, 89:17, 95:16,
98:5, 98:7, 98:16,
100:6, 100:10,
100:13, 100:15,
100:17, 100:20,
101:3, 101:16,

101:23, 102:9,
102:16, 103:5,
103:14, 103:16,
103:19, 104:4,
104:7, 104:9,
104:15, 105:4,
105:8, 105:11,
105:23, 106:3,
106:7, 106:12,
106:15, 106:19,
106:22, 106:25,
107:4, 108:2,
108:13, 109:15,
110:19, 110:22,
110:25, 111:5,
111:12, 111:16,
112:3, 112:7, 112:9,
112:14, 112:17,
112:21, 113:2,
113:5, 113:9,
113:12, 114:12,
114:20, 115:14,
115:21, 116:4,
118:4, 118:19,
119:20, 120:1,
120:4, 120:12,
120:16, 120:20,
121:14, 121:18,
121:21, 122:2,
122:8, 123:6,
123:12, 123:19,
123:21, 124:1,
124:3, 124:6, 124:9,
124:18, 124:22,
124:25, 125:4,
125:21, 126:5,
126:13, 126:16,
127:5, 127:25,
128:13, 128:17,
128:19, 129:3, 129:6
**Court** [99] - 1:23, 6:7,
6:12, 6:22, 7:14,
7:25, 8:4, 8:6, 8:12,
9:2, 9:4, 9:7, 9:8,
9:10, 9:20, 9:22,
10:4, 10:19, 11:1,
11:6, 11:7, 11:10,
11:11, 11:19, 11:20,
11:21, 11:24, 12:2,
12:3, 12:12, 12:16,
12:18, 13:3, 13:22,
13:25, 14:3, 18:12,
26:21, 30:7, 30:23,
34:5, 34:6, 34:10,
34:13, 35:5, 36:4,
37:4, 37:12, 37:14,
39:2, 39:4, 39:17,
39:18, 41:12, 51:4,
51:23, 52:9, 52:11,
52:12, 61:5, 61:15,
61:18, 61:20, 76:2,

77:11, 84:7, 84:10,
84:16, 84:22, 84:23,
85:6, 85:14, 85:19,
88:19, 90:6, 90:22,
93:10, 94:19, 95:12,
98:16, 98:19, 98:21,
98:25, 100:9, 101:7,
101:16, 102:3,
102:11, 103:25,
114:16, 114:21,
115:16, 115:17,
118:4, 118:24,
119:2, 129:21
**court** [4] - 5:1, 25:15,
92:1, 103:10
**Court's** [23] - 6:4,
6:21, 7:24, 8:1, 8:2,
8:8, 9:14, 10:2, 10:8,
11:22, 12:9, 12:20,
24:24, 44:5, 61:7,
61:9, 62:5, 65:2,
66:20, 69:6, 96:17,
117:9, 119:9
**Courthouse** [1] - 1:9
**courts** [1] - 96:21
**cover** [6] - 20:14,
87:1, 87:2, 87:3,
108:20, 109:9
**covered** [8] - 26:5,
28:24, 59:16, 59:17,
60:23, 62:22, 84:5
**covering** [2] - 26:4,
95:12
**covers** [2] - 25:13,
27:14
**coverup** [3] - 106:23,
108:6, 109:5
**CRC** [1] - 129:21
**CRCR** [1] - 129:21
**create** [2] - 20:18,
40:15
**created** [2] - 23:6,
25:12
**CRI** [1] - 129:21
**critical** [10] - 10:12,
23:9, 44:25, 45:6,
49:17, 64:1, 76:20,
95:17, 118:2
**cross** [2] - 59:13,
121:7
**CRR** [1] - 129:21
**crumbled** [1] - 59:13
**cumulative** [1] - 86:19
**cumulativeness** [1] -
89:10
**custodial** [6] - 85:8,
95:15, 97:9, 97:22,
110:4, 117:17
**custodian** [11] - 6:25,
64:7, 80:9, 90:19,

92:16, 96:16, 99:2,
99:13, 100:21,
102:24, 105:12
**custodians** [35] - 6:10,
26:18, 79:13, 79:24,
80:2, 80:11, 80:19,
81:7, 81:18, 82:5,
82:7, 83:25, 85:11,
86:25, 92:9, 93:11,
96:11, 98:23, 99:11,
99:14, 99:18, 100:1,
101:13, 102:13,
102:19, 103:25,
105:3, 105:13,
116:6, 117:22,
117:24, 119:4,
120:18, 121:1, 128:5
**customers** [5] - 72:4,
72:6, 73:5, 73:6,
73:11
**CVS** [1] - 4:4

## D

**Daiichi** [2] - 64:4, 82:6
**Dallas** [1] - 4:10
**damage** [2] - 71:24,
74:8
**Daniel** [1] - 5:10
**DANIEL** [1] - 2:9
**data** [15] - 27:22,
41:14, 72:23, 72:25,
73:19, 76:13, 76:24,
93:25, 94:4, 107:15,
107:17, 107:23,
109:9
**date** [16] - 12:21, 39:7,
50:10, 113:2, 113:4,
113:5, 113:6, 113:7,
116:18, 120:1,
121:11, 122:8,
123:6, 125:2,
125:18, 128:10
**Date** [1] - 129:23
**dated** [1] - 14:7
**dates** [1] - 43:23
**Daubert** [1] - 127:1
**DAVID** [2] - 1:19, 3:4
**DAVIS** [2] - 3:2, 4:9
**days** [17] - 6:6, 49:1,
74:17, 75:2, 75:24,
78:1, 78:20, 78:25,
79:8, 103:8, 116:13,
117:2, 117:10,
123:7, 123:8, 125:20
**DCO** [1] - 11:8
**de** [1] - 2:15
**dead** [1] - 117:8
**deadline** [1] - 117:8,
125:12

**deadlines** [1] - 116:5
**deal** [3] - 102:23,
105:23, 116:10
**Dealers** [1] - 70:11
**dealing** [5] - 7:21,
7:22, 57:5, 70:25,
122:11
**dealt** [2] - 37:17, 60:22
**December** [25] - 1:10,
6:16, 14:5, 14:7,
21:16, 28:19, 32:15,
33:23, 50:12, 51:2,
51:7, 51:17, 52:2,
62:11, 77:18, 77:21,
77:22, 82:15,
108:17, 119:15,
119:19, 120:2,
128:23, 129:4,
129:22
**decide** [10] - 6:3, 9:4,
14:13, 51:5, 89:19,
104:17, 111:12,
111:17, 111:18,
115:4
**decided** [5] - 8:3,
34:18, 112:1, 124:13
**decides** [1] - 114:22
**deciding** [1] - 112:3
**decision** [6] - 9:2,
39:4, 39:6, 75:8,
88:17, 93:24
**Decision** [1] - 36:3
**decisions** [4] - 92:1,
98:20, 98:21, 98:24
**deemed** [1] - 8:23
**default** [1] - 44:23
**Defendant** [6] - 2:25,
3:10, 3:23, 4:4, 4:7,
4:10
**defendant** [12] -
32:23, 41:8, 41:10,
72:10, 73:18, 74:10,
84:25, 88:12, 88:14,
106:15, 112:24
**defendant-by-
defendant** [1] - 74:10
**DEFENDANTS** [1] -
1:8
**defendants** [70] -
5:21, 6:11, 6:20,
7:23, 8:13, 8:21,
8:23, 10:4, 10:7,
10:22, 11:4, 11:21,
12:23, 13:8, 13:12,
13:13, 13:15, 14:17,
14:22, 15:7, 15:10,
20:2, 20:21, 20:24,
28:19, 30:13, 31:14,
32:11, 32:18, 32:19,
32:22, 33:6, 33:11,

33:17, 44:9, 58:4, 65:1, 72:22, 73:2, 74:21, 75:15, 75:24, 76:12, 77:2, 77:17, 78:1, 88:13, 102:18, 105:14, 106:8, 107:6, 107:22, 108:20, 109:7, 109:12, 110:13, 111:6, 112:10, 113:13, 114:12, 116:18, 117:6, 119:12, 120:8, 122:13, 126:22, 128:8, 128:24

**Defendants** [5] - 2:20, 3:5, 3:13, 3:16, 3:20

**defendants'** [19] - 8:7, 9:1, 9:4, 10:3, 10:17, 11:11, 11:13, 11:20, 12:17, 15:24, 77:4, 86:9, 86:14, 93:14, 110:1, 115:25, 122:2, 122:11, 122:14

**defense** [14] - 15:4, 21:5, 25:11, 26:10, 29:20, 37:13, 39:21, 62:6, 71:18, 72:19, 74:14, 85:7, 102:7, 103:24

**Defense** [3] - 5:18, 5:22, 5:24

**defer** [1] - 21:8

**deficiency** [1] - 126:11

**define** [3] - 29:14, 80:20, 92:11

**defined** [3] - 8:14, 42:22, 52:1

**defining** [2] - 28:15, 32:15

**definitely** [2] - 75:12, 111:22

**definition** [1] - 36:13

**delay** [1] - 9:11

**delete** [1] - 108:6

**deleted** [1] - 81:21

**deliberation** [1] - 23:7

**delighted** [1] - 6:18

**delineated** [1] - 54:21

**demonstrates** [2] - 31:11, 93:11

**demonstrating** [1] - 115:3

**denied** [5] - 16:21, 18:6, 47:10, 59:6, 64:17

**denominated** [1] - 8:12

**deny** [2] - 47:12, 48:3

**department** [3] - 87:1, 91:9, 91:12

**Department** [1] - 49:18

**dependent** [1] - 117:14

**deposed** [1] - 126:21

**depositions** [3] - 96:23, 122:5, 126:23

**DEPUTY** [4] - 5:3, 80:4, 80:6, 129:14

**Deputy** [1] - 44:12

**described** [6] - 27:23, 28:19, 32:17, 51:6, 52:2, 53:6

**description** [1] - 84:1

**descriptions** [2] - 84:12, 88:9

**designated** [1] - 11:8

**designation** [1] - 46:22

**despite** [1] - 11:10

**destroy** [1] - 45:4

**destroyed** [4] - 19:22, 19:23, 92:22, 93:1

**destruction** [2] - 20:2, 109:18

**detail** [2] - 7:6, 74:2

**determination** [1] - 10:11

**determine** [6] - 78:14, 97:23, 100:9, 114:2, 114:5, 115:17

**determined** [1] - 96:8

**developed** [1] - 25:17

**development** [4] - 23:5, 23:6, 23:13, 24:5

**deviation** [5] - 23:11, 23:20, 41:25, 42:1, 54:5

**deviations** [2] - 23:19, 24:6

**device** [2] - 55:21, 55:22

**devil** [1] - 74:2

**dialect** [1] - 112:20

**dialogue** [1] - 71:4

**differ** [1] - 73:1

**difference** [1] - 74:20

**different** [22] - 22:2, 31:7, 31:12, 33:8, 35:2, 42:11, 46:11, 47:3, 49:19, 67:10, 67:23, 68:3, 72:21, 72:22, 80:15, 106:10, 111:20, 111:21, 112:17, 114:2, 114:5, 116:23

**differently** [1] - 57:15

**difficult** [2] - 15:22, 67:2

**diligence** [5] - 68:9, 68:17, 68:18, 68:25, 69:1

**diminishing** [1] - 26:25

**dinner** [1] - 59:7

**direct** [1] - 27:9

**directed** [2] - 34:23, 65:18

**DIRECTED** [1] - 1:7

**direction** [1] - 115:24

**Directors** [2] - 15:18, 16:12

**Directors'** [1] - 15:25

**disagree** [2] - 60:25, 101:11

**disaster** [1] - 108:6

**discarding** [1] - 109:19

**disclosure** [1] - 34:24

**discover** [1] - 76:10

**discovery** [44] - 6:3, 8:5, 8:12, 8:14, 9:11, 9:12, 10:20, 11:9, 20:1, 24:24, 32:14, 36:5, 38:21, 38:22, 39:1, 41:20, 44:5, 44:6, 44:15, 45:19, 45:21, 48:10, 53:13, 53:14, 60:24, 62:5, 62:10, 64:20, 65:3, 71:8, 71:18, 73:16, 74:5, 74:8, 88:7, 95:20, 95:23, 99:7, 107:13, 110:5, 117:4, 117:8, 119:11

**DISCOVERY** [2] - 1:5, 1:6

**discrete** [3] - 8:17, 10:3, 52:7

**discuss** [3] - 6:8, 47:15, 51:12

**discussed** [7] - 6:16, 25:15, 47:21, 51:14, 55:1, 57:19, 76:21

**discussing** [3] - 73:22, 81:6, 111:11

**discussion** [6] - 22:4, 46:9, 70:9, 104:2, 104:3, 111:13

**discussions** [5] - 7:10, 26:1, 27:10, 75:21, 92:5

**dispute** [19] - 8:18, 9:11, 20:16, 29:15, 31:16, 58:6, 58:10, 58:14, 63:7, 63:11,

80:10, 80:12, 80:18, 88:10, 91:23, 106:3, 106:4, 106:7, 118:15

**disputed** [1] - 81:16

**disputes** [11] - 6:3, 7:9, 7:11, 7:12, 7:13, 8:5, 12:11, 80:23, 105:21, 105:23

**disputing** [2] - 62:17, 92:3

**distribution** [5] - 67:1, 67:5, 67:15, 67:16, 67:24

**DISTRICT** [2] - 1:1, 1:1

**District** [1] - 12:6

**divide** [2] - 29:4

**DLESCI** [1] - 4:9

**DMF** [2] - 18:5, 24:12

**DMFs** [1] - 17:23

**doable** [1] - 122:20

**docket** [1] - 5:7

**document** [41] - 6:6, 6:12, 6:23, 7:18, 11:2, 11:17, 13:23, 14:25, 19:9, 19:13, 19:16, 20:19, 26:19, 26:22, 28:6, 41:18, 44:15, 48:14, 52:4, 55:4, 75:16, 76:22, 79:5, 86:25, 89:18, 90:14, 92:15, 92:17, 92:24, 96:11, 107:7, 117:15, 117:16, 119:25, 121:2, 122:11, 126:22

**document-by-document** [2] - 11:2, 11:17

**documentation** [6] - 23:4, 31:1, 49:7, 68:8, 73:4

**documented** [3] - 59:23, 75:12, 84:18

**documents** [124] - 6:7, 7:3, 8:7, 8:20, 8:22, 9:1, 9:3, 9:6, 9:13, 9:16, 10:4, 10:5, 10:6, 10:7, 10:9, 10:10, 10:12, 10:15, 10:17, 10:25, 11:7, 11:11, 11:13, 12:23, 13:3, 13:7, 13:12, 13:13, 13:20, 13:24, 16:10, 16:11, 19:14, 20:15, 20:21, 22:1, 23:1, 23:6, 23:12, 23:18, 23:21, 24:1, 24:3, 24:11, 24:12, 24:13, 25:22, 26:2,

26:8, 26:22, 28:5, 29:17, 32:14, 32:17, 32:20, 36:18, 38:24, 39:18, 40:16, 40:20, 41:24, 42:5, 42:16, 46:21, 46:24, 48:10, 48:15, 49:19, 49:21, 50:20, 50:22, 50:24, 57:14, 65:19, 68:23, 78:16, 79:2, 79:21, 85:9, 85:10, 88:18, 89:4, 89:12, 89:13, 91:18, 91:19, 92:10, 92:13, 94:5, 95:5, 95:20, 95:23, 105:15, 107:12, 107:25, 108:10, 109:15, 109:16, 109:17, 109:19, 109:21, 109:25, 115:3, 115:5, 115:9, 115:10, 115:22, 116:8, 116:15, 116:16, 116:23, 116:25, 117:5, 117:14, 117:21, 118:11, 121:1

**dollar** [1] - 89:12

**dollars** [1] - 101:13

**done** [28] - 11:17, 17:15, 25:16, 29:6, 29:25, 30:20, 30:23, 33:21, 37:22, 41:1, 68:13, 68:25, 71:1, 74:9, 84:9, 85:9, 85:11, 88:8, 91:20, 103:19, 112:6, 112:7, 112:8, 120:4, 124:25, 128:3, 128:20

**dosage** [1] - 53:3

**DOSE** [1] - 1:7

**dose** [20] - 6:10, 8:13, 24:11, 36:9, 53:8, 53:9, 53:14, 53:17, 53:19, 54:17, 56:18, 56:20, 57:4, 72:4, 72:14, 73:5, 73:7, 73:13, 105:14, 119:13

**doses** [1] - 54:11

**dot** [1] - 121:6

**double** [1] - 88:14

**doubting** [1] - 94:25

**down** [9] - 11:1, 72:16, 83:8, 86:21, 98:12, 110:3, 119:8, 119:18

**draft** [4] - 37:11, 63:12, 63:20, 100:22

**drafted** [3] - 12:21,

64:10, 97:5
**drastic** [2] - 101:14, 101:15
**draw** [1] - 108:1
**DRINKER** [1] - 3:21
**Drive** [1] - 3:22
**driven** [2] - 80:13, 80:14
**drop** [2] - 55:22, 117:8
**drop-dead** [1] - 117:8
**drug** [1] - 54:4
**drugs** [1] - 97:19
**Du** [19] - 83:4, 83:6, 87:9, 87:11, 87:12, 87:13, 88:2, 90:17, 90:18, 90:19, 90:21, 90:24, 91:1, 93:16, 95:18, 95:22, 100:21, 100:22
**Du's** [1] - 94:23
**DUANE** [1] - 2:17
**due** [10] - 68:9, 68:16, 68:18, 68:25, 74:13, 123:16, 125:2, 125:17, 125:18
**duplication** [1] - 89:9
**duplicative** [7] - 85:4, 85:9, 86:19, 89:1, 91:17, 91:19, 91:20
**during** [4] - 24:4, 36:10, 41:20, 91:6

**E**

**e-mail** [3] - 71:4, 93:4, 101:24
**e-mails** [3] - 92:22, 93:1, 94:22
**early** [3] - 8:17, 48:2, 49:8
**easier** [1] - 79:23
**easily** [1] - 8:15
**East** [1] - 4:3
**easy** [3] - 42:4, 64:22, 81:14
**eat** [1] - 127:20
**economic** [9] - 74:7, 75:7, 75:21, 123:10, 123:23, 124:9, 124:16, 124:18, 127:7
**efficiency** [1] - 96:25
**efficient** [2] - 9:12, 101:6
**effort** [3] - 7:15, 117:2, 129:8
**efforts** [3] - 7:8, 7:12, 68:21
**eight** [4] - 87:19, 89:9, 94:13, 94:15

**Eisenhower** [1] - 1:16
**either** [7] - 26:19, 26:20, 28:10, 63:11, 81:16, 81:22, 88:7
**elicit** [2] - 92:10, 92:11
**ELLIE** [1] - 4:8
**ELLIS** [1] - 3:14
**eminently** [5] - 75:24, 76:22, 105:17, 105:20, 119:6
**employee** [1] - 96:14
**employees** [3] - 96:7, 97:14, 97:15
**encompassed** [4] - 27:23, 44:4, 57:15, 60:10
**encompasses** [2] - 29:11, 127:7
**encourage** [1] - 88:19
**encouraged** [1] - 12:10
**end** [17] - 21:8, 40:21, 73:8, 77:19, 77:23, 99:3, 99:25, 100:19, 101:20, 101:23, 104:6, 114:4, 114:11, 123:18, 127:17, 128:10, 129:12
**ends** [1] - 72:25
**engage** [1] - 7:10
**engaged** [1] - 108:20
**English** [5] - 111:20, 112:6, 112:12, 118:10, 120:14
**enjoy** [1] - 103:21
**Enslin** [1] - 85:7
**enter** [2] - 61:16, 77:22
**entered** [5] - 8:1, 8:10, 62:9, 119:9, 124:15
**enters** [1] - 118:24
**entertain** [1] - 26:21
**entire** [5] - 41:4, 52:8, 71:12, 85:18, 97:22
**entirely** [3] - 109:21, 114:10, 118:11
**entities** [7] - 70:7, 70:9, 72:22, 81:10, 87:3, 92:8, 100:16
**entitled** [3] - 36:4, 45:20, 129:19
**entity** [3] - 16:17, 16:18, 82:7
**entries** [3] - 5:8, 105:1
**envisioned** [1] - 13:22
**equal** [1] - 32:22
**equipment** [1] - 24:18
**equivalent** [2] - 112:13, 123:17

**errors** [1] - 23:25
**ESI** [10] - 7:18, 7:22, 8:19, 75:25, 79:3, 96:17, 122:11, 126:22, 128:9
**especially** [8] - 7:22, 88:21, 89:10, 93:5, 96:16, 96:17, 96:18
**ESQUIRE** [28] - 1:16, 1:19, 1:19, 2:2, 2:3, 2:6, 2:9, 2:12, 2:15, 2:18, 2:18, 2:19, 2:23, 2:23, 3:2, 3:3, 3:3, 3:4, 3:8, 3:8, 3:11, 3:15, 3:18, 3:22, 4:2, 4:5, 4:8, 4:9
**essentially** [3] - 54:9, 71:15, 106:10
**et** [7] - 54:4, 75:10, 86:12, 92:7, 105:19, 127:1
**evaluate** [1] - 115:11
**evaluation** [1] - 91:12
**evidence** [2] - 49:8, 52:15
**exact** [1] - 105:18
**exactly** [5] - 41:6, 82:21, 87:25, 103:3, 110:24
**example** [17] - 16:19, 16:20, 25:15, 27:20, 34:25, 35:16, 57:9, 64:1, 85:3, 85:7, 89:25, 90:21, 91:11, 92:6, 92:16, 93:15, 117:25
**examples** [1] - 26:12
**exceedingly** [1] - 114:25
**except** [2] - 58:22, 62:11
**exception** [4] - 16:17, 37:21, 61:21, 122:25
**exceptions** [2] - 44:7, 118:18
**excessive** [3] - 12:18, 108:4, 108:9
**excipients** [1] - 56:20
**excuse** [1] - 116:20
**executive** [1] - 71:13
**executives** [1] - 15:11
**exemplar** [1] - 115:2
**exhaust** [1] - 7:11
**exhaustive** [1] - 116:21
**exist** [2] - 15:24, 107:18
**existed** [1] - 49:8
**existence** [1] - 19:17

**expand** [1] - 70:4
**expanding** [1] - 52:8
**expect** [1] - 108:11
**expected** [1] - 31:24
**experience** [1] - 7:20
**expert** [3] - 37:5, 51:18, 73:21
**experts** [13] - 29:25, 31:8, 31:24, 32:16, 33:15, 35:16, 37:24, 40:12, 40:24, 48:25, 50:4, 50:23, 74:19
**explain** [2] - 14:25, 58:24
**explaining** [1] - 49:20
**explanation** [1] - 86:3
**Express** [1] - 3:23
**extend** [1] - 54:18
**extended** [1] - 125:14
**extension** [3] - 123:3, 125:2, 125:7
**extensive** [2] - 52:10, 53:15
**extent** [9] - 11:4, 15:24, 16:19, 18:17, 26:7, 55:25, 56:2, 72:9, 72:10
**extra** [2] - 82:18, 103:23
**eye** [1] - 94:15

**F**

**face** [6] - 45:9, 45:11, 90:15, 94:21, 95:6, 95:7
**facie** [1] - 81:17
**facilities** [4] - 24:17, 116:24, 119:13, 119:14
**fact** [25] - 10:2, 11:10, 13:24, 85:9, 108:23, 121:24, 122:3, 122:7, 122:10, 122:12, 122:14, 122:18, 122:20, 122:22, 122:23, 122:24, 123:4, 123:10, 123:13, 123:16, 123:22, 124:8, 124:12, 124:14, 125:22
**factor** [1] - 95:8
**factory** [1] - 96:15
**fail** [1] - 90:24
**fair** [3] - 74:1, 76:16, 119:6
**fairly** [2] - 21:15, 25:13
**fairness** [2] - 71:10,

110:6
**faith** [9] - 7:10, 7:12, 29:25, 81:17, 81:22, 85:13, 85:17, 85:20, 95:12
**FALKENBERG** [1] - 3:18
**fall** [2] - 78:4, 78:16
**familiar** [1] - 76:12
**far** [11] - 12:17, 29:25, 31:4, 35:1, 48:4, 60:22, 82:6, 82:9, 82:10, 84:24, 85:24
**FARR** [1] - 2:11
**Farrell** [1] - 1:23, 129:21
**FCRR** [1] - 129:21
**FDA** [19] - 8:21, 9:17, 10:14, 13:2, 13:7, 13:14, 13:17, 24:3, 49:20, 54:19, 64:3, 64:5, 64:6, 64:14, 89:8, 97:20, 109:16, 109:25, 116:8
**FDA's** [3] - 10:6, 64:8, 109:17
**February** [11] - 75:1, 112:2, 114:11, 116:14, 120:10, 123:12, 123:18, 123:21, 123:22, 124:20, 126:8
**Federal** [1] - 96:21
**Ferretti** [1] - 110:12
**FERRETTI** [13] - 2:18, 110:12, 110:21, 110:23, 111:1, 111:10, 111:14, 113:3, 113:7, 113:11, 113:19, 115:19, 116:3
**few** [7] - 26:12, 48:21, 53:14, 55:13, 90:8, 118:18, 127:13
**figure** [2] - 78:19, 113:24
**file** [2] - 24:12, 97:22
**filed** [4] - 70:15, 84:21, 125:19, 125:20
**files** [4] - 18:3, 93:5, 97:18, 97:20
**filled** [1] - 105:7
**final** [7] - 14:14, 64:21, 99:7, 99:25, 101:25, 105:13, 105:15
**finalize** [1] - 114:14, 122:12
**findings** [1] - 49:19
**fine** [12] - 16:15, 29:10, 54:22, 57:7,

*58*:2, 62:6, 62:13, 63:4, 70:4, 70:19, 104:9, 121:19
**Fine** [1] - 104:7
**FINISHED** [1] - 1:7
**finished** [23] - 6:10, 8:13, 24:11, 36:8, 53:3, 53:8, 53:9, 53:14, 53:17, 53:19, 54:11, 54:17, 56:18, 56:20, 57:4, 72:4, 72:14, 73:5, 73:7, 73:13, 105:14, 112:9, 119:13
**finite** [2] - 99:17, 105:20
**fire** [1] - 114:1
**firm** [1] - 78:12
**FIRM** [1] - 2:11
**first** [21] - 28:14, 39:20, 40:3, 40:18, 42:6, 59:20, 77:10, 83:18, 86:7, 93:10, 93:16, 94:11, 99:7, 99:17, 111:6, 112:23, 118:21, 119:6, 125:6, 126:16, 127:7
**fish** [1] - 109:10
**five** [12] - 27:11, 48:14, 49:1, 89:15, 89:16, 95:12, 113:21, 113:22, 118:23, 119:8, 120:9, 120:11
**flexible** [1] - 111:3
**flipped** [1] - 94:10
**floor** [1] - 7:1
**Floor** [1] - 2:24
**Florham** [1] - 3:23
**Florida** [3] - 2:10, 2:13, 2:16
**focus** [2] - 102:9, 110:5
**focused** [2] - 31:9, 33:5
**focussed** [3] - 54:8, 59:19, 109:11
**FOIA** [1] - 107:13
**folded** [1] - 54:12
**follow** [2] - 49:24, 126:3
**followed** [1] - 90:22
**follows** [1] - 10:8
**footing** [1] - 32:22
**FOR** [1] - 1:1
**foregoing** [1] - 129:18
**foreign** [6] - 7:23, 56:4, 56:5, 60:23, 61:12

**foresee** [2] - 19:24, 40:14
**Forest** [1] - 82:7
**forgot** [1] - 111:5
**form** [1] - 116:25
**formation** [1] - 58:1
**formats** [1] - 106:10
**formulation** [1] - 53:3
**forth** [3] - 46:1, 89:15, 114:8
**fortunately** [1] - 9:5, 125:10
**forward** [3] - 56:16, 76:4, 76:23
**four** [4] - 8:16, 89:5, 101:8, 128:14
**frame** [4] - 8:19, 52:22, 128:25, 129:2
**framed** [1] - 20:21
**FRANK** [1] - 2:23
**Frankly** [1] - 9:20
**frankly** [8] - 19:11, 29:19, 32:3, 35:13, 40:2, 91:25, 107:9, 108:12
**FREEMAN** [1] - 1:15
**friend** [1] - 98:20
**front** [5] - 50:2, 66:23, 91:22, 93:9, 117:22
**FULBRIGHT** [1] - 4:8
**full** [5] - 10:7, 10:25, 16:19, 29:20, 35:21
**fully** [1] - 9:18
**function** [1] - 93:24
**future** [4] - 11:20, 12:2, 19:15, 108:16

## G

**gap** [4] - 55:4, 93:6, 95:1, 127:12
**gaps** [3] - 91:21, 92:6, 94:23
**garbage** [1] - 45:3
**Geddis** [1] - 89:25
**general** [4] - 9:14, 36:7, 54:20, 62:8
**generalized** [1] - 35:1
**generally** [3] - 12:15, 31:5, 47:22
**generate** [1] - 30:13
**generated** [1] - 31:13
**generates** [1] - 94:6
**generic** [2] - 108:3, 108:4
**genesis** [1] - 50:16
**genotoxic** [2] - 23:24, 45:23
**genuine** [1] - 8:18
**genuinely** [2] - 10:21,

11:14
**GEOPPINGER** [1] - 4:5
**GEORGE** [1] - 2:12
**Georgia** [1] - 3:5
**ghost** [2] - 49:21, 50:3
**giant** [1] - 29:4
**given** [13] - 10:1, 18:8, 74:17, 75:8, 89:18, 96:16, 96:17, 96:18, 101:1, 101:2, 111:24, 113:17
**goal** [1] - 6:4
**GOLDBERG** [97] - 2:18, 5:17, 13:2, 13:19, 14:24, 15:4, 15:23, 16:2, 17:19, 20:13, 21:12, 21:15, 21:18, 21:23, 22:2, 22:9, 22:21, 22:24, 23:1, 28:3, 30:12, 31:3, 32:24, 33:2, 35:25, 36:2, 37:3, 38:15, 38:18, 38:20, 39:11, 41:6, 43:24, 46:14, 46:20, 47:2, 47:8, 47:11, 47:13, 47:17, 47:20, 48:5, 48:9, 48:11, 51:10, 52:16, 53:8, 56:25, 57:7, 57:18, 57:24, 58:6, 58:11, 58:15, 58:17, 58:20, 59:25, 60:5, 60:7, 60:12, 60:14, 74:24, 78:2, 78:8, 78:12, 78:19, 78:23, 79:6, 79:12, 79:17, 79:22, 83:7, 83:11, 83:17, 83:20, 83:22, 84:4, 86:4, 86:6, 86:9, 87:12, 87:15, 95:17, 98:4, 98:6, 98:10, 100:5, 100:24, 101:11, 104:11, 104:24, 105:6, 105:10, 115:13, 120:7, 120:13, 120:17
**Goldberg** [22] - 5:18, 12:25, 14:2, 14:23, 25:3, 27:14, 27:17, 28:11, 32:9, 46:8, 47:25, 50:12, 53:2, 54:21, 74:23, 86:1, 89:18, 95:16, 101:3, 101:25, 104:21, 116:9
**Goldberg's** [3] - 28:6, 57:16, 99:24
**GOLOMB** [1] - 1:18

**gonna** [1] - 96:19
**good-faith** [8] - 7:10, 7:12, 81:17, 81:22, 85:13, 85:17, 85:20, 95:12
**Goodman** [1] - 12:5
**Gorda** [1] - 2:13
**GORDON** [1] - 2:22
**gosh** [1] - 93:6
**grateful** [1] - 128:5
**great** [8] - 60:3, 60:8, 66:25, 68:4, 83:21, 108:5, 125:25, 129:6
**GREENBERG** [1] - 3:2
**gross** [3] - 72:10, 72:16, 73:12
**group** [5] - 48:23, 71:9, 71:13, 71:18, 94:3
**Group** [4] - 5:19, 5:22, 5:25, 92:9
**guess** [8] - 14:16, 30:6, 30:9, 56:17, 63:23, 74:12, 109:6, 116:12
**guidance** [1] - 12:3
**guide** [1] - 23:13
**guilty** [1] - 118:22

## H

**hampering** [1] - 9:12
**hand** [3] - 11:24, 83:8, 95:24
**handed** [1] - 104:25
**handle** [3] - 20:20, 20:23, 104:22
**handled** [3] - 15:2, 15:5, 125:23
**hands** [1] - 42:13
**happy** [9] - 61:22, 83:14, 90:19, 101:9, 101:10, 101:17, 101:18, 106:16, 106:18
**hard** [4] - 6:6, 54:14, 59:4, 106:14
**HARDIN** [1] - 3:7
**HARKINS** [1] - 3:3
**harm** [3] - 108:13, 108:19
**head** [3] - 13:19, 66:15, 77:6
**heading** [2] - 58:22, 58:24
**health** [1] - 108:24
**Healthcare** [1] - 2:21
**hear** [3] - 14:21, 15:7, 58:3
**heard** [1] - 125:7

**hearing** [2] - 15:22, 119:11
**HEINZ** [21] - 3:11, 64:25, 65:7, 65:17, 65:22, 65:25, 66:4, 66:7, 66:15, 66:18, 67:5, 67:8, 67:18, 68:2, 68:5, 68:16, 68:19, 68:23, 69:2, 69:5, 69:11
**Heinz** [1] - 64:25
**held** [1] - 5:1
**help** [10] - 30:18, 72:7, 73:7, 73:10, 78:14, 105:24, 108:14, 116:17, 116:18, 119:22
**helpful** [1] - 19:7, 32:1, 37:11, 72:2, 90:7, 92:23, 115:1, 115:7, 117:20, 118:1, 120:19, 123:18
**hesitate** [1] - 12:19
**Hetero** [1] - 3:10
**hide** [1] - 107:23
**high** [1] - 86:21
**high-ranking** [1] - 86:21
**higher** [2] - 82:6, 85:24
**Highway** [1] - 2:6
**Hilton** [2] - 17:25, 22:3
**HILTON** [10] - 2:3, 17:25, 122:21, 123:8, 123:14, 123:23, 124:2, 124:5, 124:10, 124:21
**HIPAA** [1] - 11:5
**hires** [1] - 114:21
**historical** [3] - 15:20, 45:5, 95:14
**history** [2] - 38:3, 42:11
**hit** [1] - 101:19
**hits** [3] - 99:16, 108:5, 121:4
**hitting** [1] - 125:3
**hold** [2] - 74:7, 117:4
**hole** [1] - 110:3
**holiday** [8] - 74:25, 75:1, 119:7, 119:16, 119:19, 128:5, 128:22, 129:6
**holidays** [1] - 74:17
**HONIK** [4] - 1:18, 1:19, 5:13, 36:16
**Honik** [2] - 5:13, 52:17
**Honor** [148] - 5:13,

5:15, 5:17, 5:20,
5:23, 14:18, 14:20,
14:24, 15:10, 16:6,
17:25, 18:25, 20:8,
20:13, 21:12, 22:9,
22:16, 25:10, 29:2,
29:6, 29:8, 34:3,
36:10, 36:16, 37:11,
37:19, 39:24, 41:9,
43:2, 43:24, 44:8,
44:20, 46:20, 47:2,
47:21, 50:8, 50:13,
50:17, 51:10, 52:16,
52:22, 52:24, 53:6,
54:15, 55:14, 56:5,
56:25, 58:5, 58:7,
58:15, 58:21, 60:12,
60:18, 62:2, 62:14,
62:19, 63:1, 63:3,
63:11, 63:14, 64:25,
65:10, 67:12, 69:15,
69:17, 70:19, 71:3,
74:3, 74:11, 74:24,
75:2, 76:6, 76:17,
77:1, 77:8, 78:2,
78:23, 78:24, 79:12,
81:19, 82:20, 83:7,
83:14, 83:17, 83:23,
83:24, 84:8, 86:4,
86:6, 87:10, 88:2,
88:16, 88:17, 91:22,
91:25, 92:4, 93:8,
93:20, 94:12, 94:14,
95:10, 95:17, 95:18,
96:8, 98:13, 100:2,
100:24, 103:3,
104:11, 104:20,
104:24, 105:22,
106:6, 106:16,
107:2, 107:9,
108:11, 110:11,
110:12, 110:16,
113:3, 113:11,
113:19, 114:24,
115:13, 115:20,
116:3, 116:20,
117:13, 119:1,
119:24, 120:6,
120:7, 121:13,
121:16, 122:16,
122:21, 124:5,
124:21, 124:24,
125:1, 125:5, 126:1,
127:2, 128:7, 129:5
**Honor's** [4] - 41:17,
55:9, 59:18, 71:4
**HONORABLE** [1] -
1:12
**Honorable** [1] - 5:1
**hope** [5] - 6:17, 70:23,
93:3, 95:6, 129:6

**hopeful** [1] - 114:25
**hopefully** [4] - 6:24,
7:2, 71:14, 129:3
**hour** [1] - 93:10
**hours** [1] - 78:11
**Huahai** [2] - 2:21,
16:20
**huge** [2] - 95:1, 97:20
**Humana** [2] - 3:20,
3:20
**hundred** [1] - 89:16
**hundreds** [1] - 98:19

---

# I

**I's** [1] - 121:7
**idea** [1] - 127:6
**ideas** [2] - 71:6, 71:13
**identifiable** [1] - 8:15
**identification** [3] -
32:13, 69:10, 69:16
**identified** [18] - 8:12,
16:2, 29:17, 31:6,
33:15, 42:5, 48:22,
86:18, 87:5, 88:7,
88:21, 88:23, 89:5,
89:8, 98:23, 102:19,
104:17, 105:3
**identifiers** [4] - 72:5,
72:7, 73:6, 73:9
**identify** [15] - 6:9,
8:18, 9:3, 15:17,
36:5, 45:21, 56:11,
70:8, 72:4, 73:4,
87:16, 87:22, 88:8,
95:23, 102:21
**identifying** [2] - 29:16,
34:23
**IL** [1] - 3:19
**immense** [1] - 43:17
**impact** [1] - 22:13
**implementation** [3] -
63:15, 65:11, 65:13
**implemented** [3] -
53:25, 54:2, 54:10
**implicate** [1] - 29:3
**important** [21] - 10:10,
25:14, 27:21, 28:1,
40:12, 42:13, 42:25,
59:21, 75:19, 76:1,
87:6, 87:9, 92:6,
92:15, 93:2, 94:2,
94:21, 104:3, 109:9,
117:25, 118:17
**importantly** [3] -
49:13, 88:2, 97:13
**impressions** [1] - 9:14
**impurities** [6] - 23:25,
36:7, 37:4, 37:5,
45:23, 109:2

**impurity** [2] - 35:10,
107:3
**IN** [1] - 1:4
**in-camera** [1] - 10:2
**in-person** [2] - 120:24,
121:8
**inactive** [1] - 56:19
**inappropriate** [1] -
12:18
**Inc** [9] - 2:25, 3:6, 3:6,
3:10, 3:13, 3:16,
3:20, 3:20, 4:4
**inclined** [1] - 75:2,
83:7
**include** [2] - 81:18,
87:18
**included** [3] - 87:16,
89:20, 99:6
**includes** [1] - 10:5
**including** [13] - 23:3,
23:8, 23:14, 23:20,
23:21, 24:6, 24:15,
24:19, 31:12, 38:18,
70:7, 84:13, 89:25
**inclusion** [1] - 86:2
**incoming** [1] - 54:16
**incorporate** [5] - 37:8,
52:3, 57:9, 121:2,
121:3
**incorporated** [5] -
26:11, 36:13, 53:10,
112:23, 126:2
**incorporates** [1] -
89:19
**incorrectly** [1] - 61:1
**incremental** [1] -
101:14
**independent** [1] -
10:17
**India** [1] - 116:24
**indicated** [1] - 72:1
**indicating** [1] - 35:10
**indication** [1] - 11:15
**indications** [1] - 20:9
**indiscriminately** [1] -
97:9
**individual** [3] - 70:15,
124:11, 124:12
**individuals** [2] -
89:20, 127:4
**indulge** [4] - 63:21,
63:22, 63:23, 63:24
**indulgence** [1] - 64:18
**Industries** [1] - 3:5
**information** [47] -
8:24, 9:21, 9:22,
9:23, 10:12, 10:21,
11:5, 12:10, 15:20,
18:11, 27:19, 27:25,
31:11, 31:15, 48:6,

64:11, 72:3, 72:15,
72:17, 73:10, 73:19,
73:21, 74:16, 75:6,
75:22, 78:4, 79:7,
82:2, 84:13, 85:2,
86:12, 86:17, 88:22,
88:24, 94:18, 95:4,
97:11, 97:15, 97:17,
99:10, 101:1, 102:5,
102:15, 105:7,
107:23, 116:12
**ingredient** [2] - 52:19,
56:18
**ingredients** [2] - 28:2,
56:19
**initiated** [1] - 24:2
**injury** [5] - 74:6,
124:2, 124:6, 124:7,
125:1
**inquire** [1] - 109:24
**insert** [1] - 36:19
**insignificant** [1] -
18:10
**inspections** [3] - 24:4,
36:19, 54:1
**instance** [5] - 42:6,
72:12, 86:18, 99:17,
112:24
**instead** [5] - 50:17,
62:7, 111:25,
118:23, 120:24
**instructed** [1] - 61:20
**instruction** [1] - 12:13
**instrument** [1] - 23:25
**instruments** [1] -
23:17
**integrity** [1] - 107:17
**Intellisphere** [1] - 12:6
**intended** [3] - 13:18,
25:23, 27:18
**intensive** [3] - 7:17,
117:2, 129:11
**intent** [1] - 44:22
**intention** [1] - 117:3
**interested** [1] - 54:12
**interesting** [1] - 19:10
**interests** [2] - 10:1,
65:10
**internal** [1] - 112:11
**interrogatories** [1] -
96:24
**interview** [3] - 87:8,
93:16, 95:18
**introduce** [1] - 52:19
**investigate** [1] - 49:22
**investigating** [2] -
42:12, 49:11
**investigation** [2] -
23:20, 23:24
**investigations** [1] -

23:22
**investor** [1] - 65:21
**investors** [1] - 65:19
**invite** [1] - 27:6
**involved** [17] - 27:9,
51:21, 78:14, 87:17,
87:22, 89:24, 90:23,
91:11, 91:13, 91:24,
93:25, 94:7, 94:20,
104:1, 111:23,
118:5, 118:14
**involvement** [9] -
12:9, 81:23, 87:7,
90:10, 90:12, 92:3,
92:4, 94:12, 96:12
**irregularities** [1] -
107:15
**irrelevant** [9] - 8:23,
9:22, 10:22, 11:14,
11:22, 29:24, 71:19,
90:16, 99:15
**ISSUE** [1] - 1:6
**issue** [79] - 6:20, 6:22,
7:25, 8:3, 8:6, 8:9,
9:9, 10:16, 11:7,
11:19, 12:3, 12:12,
13:21, 14:12, 15:19,
16:25, 17:2, 17:4,
17:6, 17:8, 17:10,
17:12, 17:14, 19:10,
21:9, 28:21, 29:3,
30:7, 30:23, 32:9,
33:9, 34:24, 36:3,
37:19, 39:1, 41:16,
41:22, 41:23, 46:11,
47:23, 49:4, 49:24,
51:4, 51:9, 51:13,
51:24, 54:9, 56:6,
59:19, 62:2, 65:16,
65:18, 66:20, 67:17,
67:20, 69:24, 71:14,
71:19, 71:23, 74:21,
75:18, 76:7, 78:2,
80:10, 81:3, 81:6,
83:5, 84:11, 85:19,
88:20, 95:5, 95:7,
107:2, 110:20,
116:11, 122:21,
126:25, 128:8
**issued** [1] - 64:16
**issues** [51] - 6:15,
6:25, 7:15, 7:22,
8:18, 16:23, 25:3,
34:18, 37:16, 38:21,
38:23, 41:14, 41:15,
44:25, 57:22, 58:22,
65:3, 65:4, 66:21,
67:19, 68:5, 69:6,
69:7, 69:14, 73:3,
74:5, 75:7, 75:10,

76:1, 76:25, 79:18,
96:18, 102:24,
102:25, 107:18,
109:11, 109:14,
110:9, 110:15,
111:4, 127:1, 127:8,
127:11, 127:16,
127:18, 127:22,
127:25, 128:24
**item** [2] - 25:6
**items** [3] - 106:4,
106:7, 106:8
**itself** [2] - 64:15, 97:11
**IVES** [2] - 3:18, 3:18

## J

**jam** [1] - 74:4
**JANET** [1] - 3:8
**January** [29] - 12:22,
38:16, 78:1, 102:23,
112:1, 113:8,
113:16, 113:17,
114:11, 114:13,
114:14, 114:15,
116:1, 116:9,
116:13, 116:17,
120:2, 120:10,
121:8, 121:9,
121:10, 121:14,
122:12, 123:4,
123:10, 125:14,
125:18, 126:6,
129:12
**Japan** [1] - 82:6
**Japanese** [2] - 111:19,
114:18
**JEFFREY** [1] - 4:5
**JERSEY** [1] - 1:1
**Jersey** [5] - 1:10, 1:17,
3:9, 3:23, 12:6
**JESSICA** [1] - 3:11
**Jessica** [2] - 64:25,
66:2
**job** [3] - 59:11, 87:16,
93:24
**jobs** [1] - 94:4
**Joe** [1] - 110:12
**Joel** [1] - 5:1
**JOEL** [1] - 1:12
**JOHNSTON** [1] - 4:2
**Joint** [2] - 5:18, 5:21
**joking** [2] - 100:14
**JORGE** [1] - 2:15
**Jorge** [1] - 123:20
**JOSEPH** [1] - 2:18
**JR** [1] - 3:8
**Judge** [20] - 5:2, 5:11,
12:5, 22:7, 35:25,
38:25, 41:6, 41:10,

80:25, 98:1, 101:5,
108:17, 126:24,
127:6, 127:11,
127:12, 127:15,
127:21, 127:24,
128:1
**judge** [1] - 115:11
**JUDGE** [1] - 1:13
**judgment** [1] - 11:25
**jump** [1] - 101:14
**jumping** [1] - 106:17
**Jun** [9] - 90:17, 90:18,
90:19, 90:21, 90:24,
91:1, 93:16, 94:23,
95:18
**June** [1] - 95:21
**jury** [2] - 40:22, 50:2
**justification** [3] -
81:15, 82:11, 84:23

## K

**KANNER** [1] - 2:2
**KATZ** [1] - 1:15
**keep** [6] - 17:5, 48:16,
58:18, 77:2, 122:15,
126:20
**keeping** [1] - 24:8
**keeps** [1] - 39:21
**key** [5] - 31:5, 33:15,
39:8, 39:13, 48:24
**kidding** [1] - 66:23
**kind** [12] - 14:2, 31:25,
33:13, 52:6, 55:3,
59:4, 68:17, 78:4,
88:19, 89:9
**kinds** [6] - 31:12,
31:20, 33:4, 33:8,
51:12, 51:14
**KIRKLAND** [1] - 3:14
**KIRSTIN** [1] - 3:18
**KIRTLAND** [1] - 2:5
**knowledge** [3] - 18:3,
93:7, 94:24
**knowledgeable** [1] -
87:25
**knows** [5] - 29:20,
90:22, 90:23, 93:20,
94:12
**Kugler** [7] - 126:24,
127:11, 127:12,
127:15, 127:21,
127:24, 128:1
**Kugler's** [1] - 127:6
**KUNDLA** [1] - 3:7

## L

**lab** [6] - 23:2, 23:15,
23:17, 23:25, 93:25,

94:4
**lab-scale** [2] - 23:15,
23:17
**label** [6] - 54:13, 64:2,
64:3, 64:4, 64:5
**labeling** [1] - 65:15
**labor** [3] - 7:17, 117:2,
129:11
**labor-intensive** [3] -
7:17, 117:2, 129:11
**labs** [1] - 23:15
**lack** [2] - 35:11, 92:4
**laid** [1] - 84:11
**landed** [1] - 123:9
**language** [18] - 7:23,
14:13, 19:3, 36:17,
36:21, 37:7, 37:8,
45:25, 46:20, 46:21,
52:23, 53:11, 56:23,
57:6, 61:7, 62:4,
105:19, 112:14
**largely** [2] - 8:20, 10:1
**larger** [1] - 82:24
**Lasalle** [1] - 3:19
**last** [14] - 14:3, 14:6,
32:21, 39:22, 42:17,
47:18, 49:1, 54:15,
60:19, 95:16, 105:1,
105:2, 108:24,
119:10
**late** [1] - 64:7
**Laughter** [1] - 114:19
**law** [5] - 19:12, 78:6,
78:12, 87:21, 92:2
**LAW** [1] - 2:11
**lawyers** [4] - 26:7,
78:13, 89:16, 98:2
**lay** [1] - 68:13
**LAYNE** [1] - 2:3
**Layne** [2] - 17:25,
35:11
**lead** [2] - 5:9, 121:6
**learn** [2] - 46:16,
85:16
**least** [17] - 19:24,
26:14, 28:20, 29:24,
31:10, 34:1, 47:3,
49:8, 53:21, 74:22,
99:19, 103:23,
109:24, 113:14,
116:17, 117:21,
118:1
**leave** [6] - 6:4, 7:2,
16:4, 28:13, 35:9,
69:4
**led** [2] - 22:3, 49:16
**left** [1] - 80:18
**legal** [1] - 68:19
**Leon** [1] - 2:15
**less** [5] - 37:8, 77:25,

82:9, 84:24, 85:24
**letter** [35] - 9:10,
20:25, 21:16, 21:17,
21:24, 22:3, 22:5,
29:2, 31:6, 31:13,
32:15, 33:3, 33:6,
33:23, 34:4, 35:17,
42:5, 43:2, 50:9,
50:12, 50:14, 50:18,
51:2, 51:7, 51:17,
52:3, 78:17, 82:14,
82:15, 84:4, 86:16,
87:23, 87:25,
105:25, 106:1
**letters** [6] - 8:4, 86:15,
86:17, 86:20, 86:22,
119:12
**level** [5] - 90:11,
91:14, 97:7, 97:14
**LEVIN** [1] - 2:8
**Lexington** [1] - 3:15
**LIABILITY** [1] - 1:4
**liability** [4] - 74:5,
75:7, 75:19, 109:11
**light** [2] - 65:2, 67:18
**likelihood** [2] - 31:22,
97:9
**likely** [3] - 108:4,
108:5, 108:8
**likewise** [1] - 120:17
**limit** [6] - 41:13, 48:23,
81:7, 86:24, 96:20,
98:15
**limitation** [1] - 70:18
**limited** [12] - 23:3,
23:9, 23:14, 23:21,
45:25, 50:15, 52:6,
61:7, 61:9, 61:25,
63:15, 119:13
**limits** [6] - 11:13,
46:12, 64:20, 96:21,
96:22, 96:24
**line** [8] - 14:2, 67:11,
75:23, 96:4, 96:6,
96:14, 97:14, 108:1
**line-level** [1] - 97:14
**lineup** [1] - 93:22
**linguist** [2] - 108:3,
108:7
**LinkedIn** [1] - 88:8
**list** [79] - 16:12, 16:13,
17:18, 20:15, 22:1,
25:4, 25:12, 25:25,
26:5, 27:8, 28:6,
28:17, 29:6, 29:8,
29:16, 29:21, 29:25,
30:13, 30:25, 31:17,
32:1, 32:18, 33:12,
34:8, 34:14, 34:15,
50:14, 50:18, 50:22,

50:24, 51:11, 51:17,
53:4, 53:8, 53:9,
53:10, 54:21, 61:6,
75:15, 81:20, 81:24,
82:1, 82:14, 83:4,
83:5, 83:8, 83:11,
87:11, 88:23, 89:3,
90:13, 90:15, 90:20,
91:23, 91:24, 93:15,
95:12, 95:15, 95:19,
95:24, 99:5, 99:7,
99:15, 99:24, 99:25,
100:17, 101:23,
102:1, 103:4,
103:13, 103:19,
103:24, 104:5,
104:12, 104:13,
104:16, 104:20,
105:13, 112:22
**listed** [11] - 20:25,
28:19, 75:15, 89:3,
89:5, 90:10, 92:8,
93:21, 99:15,
100:11, 106:5
**listen** [1] - 81:2
**listings** [1] - 22:11
**lists** [6] - 23:22, 31:19,
33:17, 57:1, 92:1,
105:12
**LITIGATION** [1] - 1:4
**litigation** [8] - 19:24,
58:23, 59:19, 73:23,
95:3, 95:6, 95:9,
96:13
**litigations** [1] - 95:14
**LLC** [6] - 1:15, 2:2,
2:21, 3:6, 3:13, 12:5
**LLP** [11] - 2:5, 2:14,
2:17, 2:22, 3:2, 3:14,
3:18, 3:21, 4:2, 4:5,
4:8
**LOCKARD** [7] - 3:2,
125:5, 125:9,
125:12, 125:15,
126:1, 126:9
**locking** [1] - 122:8
**log** [1] - 74:4
**look** [31] - 37:24,
39:25, 40:17, 40:25,
42:2, 44:9, 44:23,
48:13, 80:17, 84:17,
85:6, 86:10, 89:18,
91:15, 92:1, 93:9,
95:10, 97:3, 97:23,
98:2, 99:5, 101:4,
108:2, 111:8,
111:20, 115:8,
120:14, 121:22,
125:22
**looked** [10] - 26:8,

35:23, 37:23, 50:23, 85:23, 90:2, 93:16, 94:15, 98:8, 126:2

**looking** [15] - 12:25, 34:25, 52:7, 55:2, 61:6, 62:25, 67:11, 69:17, 72:1, 82:21, 83:23, 90:18, 93:14, 115:4, 128:13

**looks** [2] - 68:7, 77:18

**Los** [1] - 4:3

**losing** [1] - 93:3

**loss** [8] - 74:7, 75:7, 117:13, 123:10, 123:24, 124:9, 124:17, 124:18

**Louisiana** [1] - 2:4

**love** [2] - 77:19, 103:16

**low** - 31:23, 97:17

**lower** [3] - 72:16, 97:7, 97:14

**lower-level** [1] - 97:7, 97:14

**Ltd** [3] - 2:21, 3:5, 3:17

**lunch** [1] - 127:14

**LYNN** [1] - 3:8

## M

**machine** [2] - 55:21, 55:22

**machinery** [3] - 55:15, 55:19, 94:8

**machines** [1] - 36:22

**macro** [25] - 8:5, 24:24, 34:18, 36:3, 37:7, 37:8, 37:16, 38:20, 38:22, 39:1, 44:5, 44:6, 44:14, 45:19, 53:13, 60:24, 62:5, 62:10, 62:22, 65:3, 66:21, 67:19, 69:6, 119:10, 119:11

**MAGISTRATE** [1] - 1:13

**Magistrate** [2] - 5:2, 12:5

**Magna** [1] - 50:11

**magnitude** [1] - 89:14

**mail** [3] - 71:4, 93:4, 101:24

**mails** [3] - 92:22, 93:1, 94:22

**Maine** [1] - 70:11

**maintain** [1] - 45:3

**maintained** [1] - 23:6

**maintaining** [1] - 24:8

**maintenance** [1] -

24:18

**major** [1] - 96:6

**majority** [2] - 74:6, 95:19

**maker** [1] - 93:25

**mammoth** [2] - 18:10, 99:9

**manageable** [2] - 84:24, 95:13

**management** [7] - 24:4, 24:7, 24:17, 72:23, 94:1, 107:15

**manages** [1] - 94:3

**managing** [1] - 94:13

**Mandarin** [6] - 112:13, 112:14, 112:24, 114:13, 115:2, 115:18

**manner** [3] - 34:9, 35:5, 111:1

**manuals** [1] - 27:21

**manufacture** [2] - 54:11, 56:13

**manufactured** [2] - 35:13, 35:19

**manufacturer** [5] - 8:13, 57:4, 72:14, 73:8, 105:14

**manufacturers** [4] - 24:12, 33:1, 43:22, 57:8

**manufacturing** [31] - 6:11, 20:14, 22:1, 23:3, 23:8, 23:13, 23:16, 23:19, 24:2, 24:5, 24:19, 25:24, 36:23, 38:24, 39:8, 39:14, 39:20, 40:19, 43:14, 46:12, 48:16, 53:15, 53:16, 54:3, 54:8, 55:18, 55:23, 56:20, 87:3, 88:20, 116:24

**MANUFACTURING** [1] - 1:7

**manufacturing-type** [1] - 22:1

**March** [2] - 116:14, 124:23

**market** [1] - 24:23

**Market** [1] - 1:20

**master** [1] - 70:16

**Master** [3] - 12:7, 12:10, 12:14

**Master's** [1] - 12:4

**material** [10] - 11:14, 11:22, 24:21, 27:22, 30:17, 56:18, 88:11, 88:22, 94:6, 101:1

**materials** [8] - 24:14,

24:18, 24:20, 36:22, 54:18, 94:4, 94:6

**mathematical** [1] - 80:13

**matter** [6] - 6:6, 50:21, 94:17, 94:21, 109:24, 129:19

**matters** [2] - 60:23, 87:2

**MAZIE** [1] - 1:15

**MCKEON** [1] - 3:7

**McKesson** [1] - 4:10

**MDL** [1] - 97:1

**mean** [38] - 7:9, 21:2, 25:2, 25:13, 28:8, 29:11, 30:15, 31:3, 33:2, 45:14, 46:7, 52:6, 53:16, 54:20, 55:15, 55:16, 56:19, 56:21, 57:12, 57:18, 58:25, 64:22, 68:16, 68:18, 68:19, 68:23, 68:24, 78:10, 78:13, 82:5, 89:23, 96:5, 97:6, 117:14, 121:12, 125:15, 127:3

**meaningful** [5] - 87:7, 94:12, 97:10, 98:9

**meaningfully** [1] - 87:16

**means** [4] - 91:7, 93:22, 101:19

**meant** [6] - 68:9, 68:11, 78:25, 81:1, 112:4, 128:22

**measures** [1] - 23:12

**mechanical** [1] - 1:25

**medical** [6] - 122:18, 122:23, 123:10, 123:24, 124:12, 124:19

**medication** [2] - 107:3, 108:21

**medications** [1] - 109:3

**medicine** [1] - 21:13

**meet** [18] - 7:8, 12:11, 21:3, 25:11, 25:23, 28:17, 71:5, 74:14, 81:20, 84:6, 90:1, 92:20, 111:8, 118:5, 118:7, 126:7, 126:10, 127:21

**meeting** [5] - 91:1, 91:6, 95:21, 120:24, 121:9, 128:9

**members** [1] - 16:11

**memo** [1] - 92:17

**mentioned** [5] - 27:7,

73:24, 76:7, 78:3, 110:16

**merit** [1] - 18:8

**merits** [2] - 86:8, 102:10

**MESTRE** [6] - 2:14, 2:15, 123:16, 123:20, 124:8, 124:24

**Mestre** [1] - 123:20

**met** [1] - 71:8

**method** [1] - 23:10

**Miami** [1] - 2:16

**MICHAEL** [1] - 3:22

**mid** [1] - 114:11

**mid-February** [1] - 114:11

**middle** [1] - 123:18

**midnight** [1] - 64:8

**midpoint** [2] - 101:19, 121:12

**might** [18] - 18:8, 21:21, 26:12, 26:13, 36:17, 65:9, 67:10, 71:21, 72:7, 72:10, 72:16, 72:21, 72:25, 78:21, 84:15, 107:5, 107:14, 126:5

**million** [3] - 88:18, 89:14, 98:1

**millions** [3] - 101:12, 107:25

**mimics** [1] - 34:4

**mind** [3] - 88:11, 95:25, 127:8

**mindset** [1] - 7:8

**mine** [2] - 14:7, 69:12

**minute** [1] - 80:1

**minutes** [2] - 27:11, 48:14, 127:14

**miscellaneous** [2] - 6:15, 127:18

**miserably** [1] - 90:24

**miss** [2] - 30:16, 30:21

**missed** [5] - 26:23, 42:12, 61:19, 99:14, 104:11

**missing** [3] - 26:12, 29:19, 31:22

**misunderstanding** [3] - 6:13, 71:17, 80:25

**Mitchell** [1] - 1:9

**modeling** [1] - 71:24

**modification** [1] - 16:5

**modify** [2] - 19:2, 19:4

**moment** [1] - 110:14

**momentum** [2] - 122:15, 126:20

**Monday** [3] - 32:21, 71:5, 71:9

**money** [1] - 101:10

**monitoring** [5] - 122:23, 123:10, 123:24, 124:12, 124:19

**month** [2] - 121:10, 123:3

**months** [12] - 118:23, 119:8, 120:9, 120:11, 121:22, 122:4, 122:6, 122:10, 122:14, 122:19, 126:16

**morning** [9] - 5:4, 5:11, 5:13, 5:15, 5:17, 5:20, 5:23, 71:10, 73:16

**MORRIS** [1] - 2:17

**Morris** [1] - 3:9

**most** [24] - 7:17, 7:21, 10:10, 25:14, 42:25, 45:6, 49:13, 56:13, 60:22, 70:24, 76:1, 76:19, 87:6, 87:22, 87:24, 90:1, 94:12, 112:19, 115:7, 117:25, 118:2, 118:15, 118:16, 129:10

**mostly** [1] - 35:2

**motion** [1] - 117:16

**move** [4] - 70:21, 76:4, 77:25, 125:13

**moved** [2] - 49:23, 121:8

**moving** [1] - 56:10

**MR** [390] - 5:10, 5:11, 5:13, 5:17, 5:20, 5:23, 13:2, 13:19, 14:5, 14:8, 14:18, 14:24, 15:4, 15:23, 16:2, 16:5, 16:8, 16:14, 16:16, 16:22, 17:19, 17:21, 18:14, 18:21, 18:25, 19:2, 19:8, 20:8, 20:11, 20:13, 21:1, 21:7, 21:12, 21:13, 21:15, 21:18, 21:20, 21:23, 22:2, 22:7, 22:9, 22:10, 22:16, 22:19, 22:21, 22:24, 22:25, 23:1, 25:5, 25:9, 25:21, 26:16, 26:24, 27:2, 27:4, 27:14, 28:3, 28:8, 28:22, 28:24, 29:1, 30:9, 30:12, 30:15, 31:1, 31:3, 32:4, 32:8, 32:13, 32:24, 32:25,

33:2, 33:16, 34:13, 34:21, 35:7, 35:9, 35:25, 36:2, 36:16, 37:1, 37:3, 37:10, 37:19, 38:8, 38:13, 38:15, 38:18, 38:20, 39:10, 39:11, 39:12, 41:6, 42:4, 42:16, 42:20, 42:23, 43:7, 43:10, 43:14, 43:20, 43:24, 44:6, 44:18, 45:14, 46:2, 46:14, 46:15, 46:20, 47:2, 47:8, 47:11, 47:13, 47:17, 47:20, 48:5, 48:7, 48:9, 48:10, 48:11, 48:12, 48:19, 48:21, 49:10, 49:13, 50:11, 50:16, 51:8, 51:10, 51:19, 51:21, 52:5, 52:16, 53:1, 53:8, 53:10, 53:13, 53:21, 53:24, 54:15, 54:22, 54:24, 55:8, 55:12, 55:14, 55:20, 55:22, 55:25, 56:2, 56:4, 56:8, 56:11, 56:17, 56:25, 57:3, 57:7, 57:8, 57:12, 57:18, 57:22, 57:24, 58:2, 58:5, 58:6, 58:9, 58:11, 58:13, 58:15, 58:17, 58:18, 58:20, 58:21, 59:2, 59:4, 59:7, 59:10, 59:12, 59:13, 59:16, 59:25, 60:2, 60:5, 60:7, 60:10, 60:12, 60:14, 60:17, 60:20, 60:21, 61:4, 61:9, 61:11, 61:12, 61:14, 61:18, 61:24, 61:25, 62:2, 62:13, 62:16, 62:19, 62:21, 62:25, 63:1, 63:3, 63:7, 63:9, 63:14, 63:17, 63:21, 63:23, 63:25, 64:18, 64:24, 65:9, 65:14, 65:24, 66:1, 66:3, 66:5, 66:9, 66:11, 66:12, 66:16, 66:17, 67:4, 67:11, 67:14, 68:1, 68:11, 68:18, 68:21, 68:24, 69:15, 69:20, 69:24, 70:6, 70:8, 70:10, 70:18, 70:21, 71:2, 74:24, 76:16, 77:1, 77:6, 77:7, 77:10, 77:13, 77:14, 78:2, 78:8, 78:12, 78:19,

78:23, 78:24, 79:4, 79:6, 79:12, 79:17, 79:22, 80:12, 80:17, 80:20, 80:24, 81:2, 81:5, 81:9, 81:14, 82:16, 82:20, 82:23, 83:1, 83:3, 83:7, 83:10, 83:11, 83:17, 83:20, 83:22, 84:2, 84:4, 84:8, 86:4, 86:6, 86:9, 87:12, 87:15, 89:23, 95:17, 98:3, 98:4, 98:6, 98:10, 100:2, 100:5, 100:8, 100:12, 100:14, 100:16, 100:18, 100:23, 100:24, 101:11, 101:21, 102:2, 102:11, 103:1, 103:7, 103:15, 103:18, 103:22, 104:6, 104:8, 104:10, 104:11, 104:13, 104:19, 104:24, 105:6, 105:10, 105:22, 106:1, 106:6, 106:8, 106:13, 106:16, 106:21, 106:24, 107:1, 107:9, 108:11, 108:19, 110:11, 110:12, 110:21, 110:23, 111:1, 111:10, 111:14, 111:22, 112:4, 112:8, 112:10, 112:16, 112:19, 113:1, 113:3, 113:7, 113:11, 113:14, 113:19, 114:24, 115:13, 115:19, 116:3, 116:20, 117:12, 118:7, 119:1, 119:24, 120:3, 120:5, 120:7, 120:13, 120:17, 121:12, 121:16, 121:20, 122:1, 122:6, 122:16, 123:16, 123:20, 124:8, 124:24, 125:1, 125:8, 125:11, 125:14, 125:17, 126:10, 126:14, 127:2, 127:23, 128:7, 128:14, 128:18, 128:23, 129:5
**MS** [52] - 5:15, 14:20,

14:22, 15:10, 15:15, 15:19, 16:25, 17:2, 17:4, 17:6, 17:8, 17:10, 17:12, 17:14, 17:16, 17:25, 64:25, 65:7, 65:17, 65:22, 65:25, 66:4, 66:7, 66:15, 66:18, 67:5, 67:8, 67:18, 68:2, 68:5, 68:16, 68:19, 68:23, 69:2, 69:5, 69:11, 74:11, 76:6, 122:21, 123:8, 123:14, 123:23, 124:2, 124:5, 124:10, 124:21, 125:5, 125:9, 125:12, 125:15, 126:1, 126:9
**MSP** [1] - 70:10
**muddying** [1] - 57:2
**multiple** [3] - 32:11, 82:10, 96:10
**must** [1] - 11:15
**Mylan** [7] - 2:25, 5:24, 41:11, 44:1, 73:1, 77:11, 128:25

### N

**NA** [3] - 83:16, 83:17
**Nagle** [1] - 14:22
**NAGLE** [15] - 3:15, 14:20, 14:22, 15:10, 15:15, 15:19, 16:25, 17:2, 17:4, 17:6, 17:8, 17:10, 17:12, 17:14, 17:16
**naked** [2] - 80:21, 115:4
**name** [6] - 86:12, 90:13, 91:6, 93:18, 110:12, 123:19
**named** [12] - 70:3, 70:11, 70:13, 70:16, 92:9, 123:14, 124:14, 124:22, 126:19, 126:20, 127:3
**names** [5] - 15:25, 81:25, 96:10, 102:12, 103:20
**narrow** [11] - 16:17, 21:2, 21:3, 37:21, 40:1, 44:7, 44:24, 46:5, 57:13, 90:15, 96:18
**narrowed** [1] - 91:23
**narrower** [2] - 21:20, 57:20
**narrowly** [1] - 82:1

**nature** [1] - 113:18
**NDC** [1] - 72:6
**NDMA** [10] - 34:23, 34:25, 35:20, 39:20, 39:22, 41:16, 42:17, 48:16, 49:16, 50:4
**NE** [1] - 3:4
**nearly** [1] - 53:15
**necessarily** [1] - 43:6
**necessary** [6] - 45:10, 72:2, 81:23, 84:12, 90:19, 123:1
**necessitate** [1] - 12:8
**need** [45] - 19:12, 30:2, 32:17, 33:13, 33:16, 33:22, 35:18, 35:21, 38:1, 39:3, 39:24, 40:11, 41:10, 41:11, 41:21, 42:10, 43:3, 44:25, 46:6, 49:5, 50:7, 51:1, 53:5, 53:18, 55:5, 55:18, 64:3, 73:20, 79:10, 80:14, 85:18, 91:17, 93:3, 93:11, 94:9, 94:16, 95:11, 97:4, 103:2, 105:8, 105:9, 111:3, 120:21, 120:22, 127:25
**needed** [9] - 40:14, 40:25, 41:8, 44:8, 50:5, 71:7, 84:14, 84:24, 85:3
**needs** [4] - 40:8, 73:21, 74:9, 91:25
**negotiate** [2] - 114:8, 123:1
**Nesbit** [1] - 2:12
**net** [5] - 72:11, 72:13, 72:15, 72:17, 73:12
**never** [7] - 84:3, 85:10, 85:11, 85:16, 91:20, 94:18
**NEW** [1] - 1:1
**new** [3] - 69:20, 69:21, 118:20
**New** [8] - 1:10, 1:17, 2:4, 3:9, 3:16, 3:23, 12:6
**newly** [2] - 125:19, 125:20
**next** [16] - 14:18, 48:14, 50:2, 52:25, 53:1, 76:24, 99:4, 105:12, 112:21, 113:23, 122:4, 122:10, 122:13, 126:17, 128:2
**nice** [1] - 90:4

**Nigh** [1] - 5:10
**NIGH** [7] - 2:9, 5:10, 125:1, 125:8, 125:11, 125:14, 125:17
**night** [3] - 32:21, 91:5, 105:2
**nine** [1] - 41:13
**nitrosamine** [5] - 34:19, 36:6, 45:22, 109:2
**nitrosamines** [5] - 39:19, 40:15, 41:2, 107:23, 108:21
**NJ** [1] - 129:21
**NJ-CRCR** [1] - 129:21
**non** [2] - 102:18, 126:12
**non-core** [1] - 126:12
**non-ZHP** [1] - 102:18
**noncontroversial** [1] - 63:5
**none** [4] - 19:4, 55:13, 59:25, 63:1
**nonrelevant** [1] - 12:9
**nonresponsive** [1] - 8:24
**noon** [2] - 100:1, 101:25
**normal** [1] - 112:19
**normally** [1] - 33:21
**NORRIS** [1] - 4:8
**NORTON** [1] - 4:8
**note** [2] - 59:18, 87:9
**nothing** [7] - 97:2, 107:2, 107:10, 109:4, 109:13, 110:4, 127:16
**notice** [3] - 49:17, 64:11, 64:15
**notices** [3] - 63:12, 63:20, 64:21
**notion** [1] - 9:8
**notwithstanding** [1] - 52:23
**November** [4] - 45:20, 86:16, 86:17, 119:25
**Number** [26] - 14:19, 16:3, 17:1, 18:13, 19:9, 22:25, 27:17, 28:23, 30:6, 30:23, 32:7, 34:9, 35:4, 36:14, 37:8, 38:20, 49:15, 70:1, 77:11, 86:10, 86:18, 86:19, 93:14, 119:25
**NUMBER** [1] - 1:2
**number** [34] - 5:7, 14:15, 15:7, 16:24, 50:20, 65:24, 65:25,

67:24, 68:4, 69:13, 69:20, 79:13, 80:10, 80:13, 80:21, 82:6, 84:24, 85:23, 85:24, 92:9, 92:13, 94:17, 95:13, 97:5, 99:17, 99:18, 100:3, 100:5, 102:18, 108:4, 108:9, 122:25
**numbered** [1] - 99:23
**numbering** [7] - 63:19, 67:7, 67:14, 69:17, 69:22, 99:22, 99:23
**numbers** [12] - 31:15, 63:10, 69:7, 72:6, 72:7, 75:14, 80:17, 82:3, 82:4, 82:8, 95:14
**numerous** [1] - 87:5

## O

**obfuscate** [1] - 108:20
**object** [1] - 8:25
**objecting** [5] - 30:10, 33:24, 34:1, 34:5, 45:2
**objection** [34] - 14:19, 15:8, 15:10, 15:12, 17:18, 17:22, 18:19, 20:1, 20:5, 28:3, 29:13, 30:4, 30:8, 30:24, 37:2, 37:3, 59:9, 60:5, 60:7, 60:14, 60:25, 61:8, 61:16, 62:19, 62:21, 65:23, 77:8, 77:15, 83:19, 86:23, 109:6, 109:7, 110:10, 125:15
**objectionable** [2] - 57:17, 57:18
**objections** [21] - 6:5, 6:8, 6:24, 13:25, 14:16, 14:18, 14:20, 18:16, 18:22, 60:22, 62:24, 71:20, 77:21, 77:24, 83:13, 84:17, 86:9, 86:14, 93:14, 105:2, 110:1
**obvious** [3] - 7:14, 52:12, 129:8
**obviously** [26] - 13:9, 13:14, 19:25, 37:13, 44:20, 46:9, 56:13, 57:9, 59:21, 64:3, 64:21, 69:21, 70:4, 71:17, 74:5, 77:17, 93:8, 94:9, 94:10, 99:1, 101:24,

104:21, 117:16, 117:19, 118:10, 125:20
**occurred** [2] - 39:16, 110:9
**October** [2] - 87:23, 95:21
**odd** [1] - 70:15
**OF** [1] - 1:1
**offer** [2] - 73:14, 118:21
**Official** [1] - 1:23
**officials** [1] - 86:21
**offsets** [1] - 76:8
**Ohio** [1] - 4:6
**old** [2] - 69:17, 69:20
**older** [1] - 46:23
**ON** [2] - 1:5, 1:6
**on-site** [2] - 24:16
**once** [4] - 7:19, 121:10, 126:19, 129:11
**once-a-month** [1] - 121:10
**one** [80] - 6:21, 8:14, 13:2, 14:8, 14:12, 14:15, 14:18, 16:5, 16:8, 16:16, 18:5, 18:25, 20:23, 28:8, 28:10, 32:21, 32:23, 33:19, 33:20, 37:10, 37:16, 37:19, 37:20, 39:21, 39:22, 40:2, 44:8, 44:19, 45:1, 46:16, 48:21, 52:9, 52:18, 53:1, 57:24, 61:19, 63:14, 66:2, 66:5, 66:13, 66:19, 68:6, 74:12, 76:1, 76:6, 77:10, 78:2, 82:7, 82:20, 90:22, 92:16, 93:15, 95:24, 97:9, 97:19, 98:3, 98:4, 98:22, 98:24, 99:9, 99:14, 100:19, 100:21, 101:6, 102:2, 104:24, 105:20, 109:1, 113:21, 114:6, 114:7, 114:24, 117:18, 119:8, 121:21, 126:2, 128:7
**One** [1] - 2:24
**OOS** [4] - 23:21, 23:22, 23:23
**open** [8] - 5:1, 7:1, 24:11, 41:19, 73:22, 118:12, 128:14, 129:1
**openly** [1] - 25:15

**operation** [1] - 9:12
**operations** [1] - 24:6
**OPINION** [1] - 1:5
**opinion** [2] - 8:2, 8:8
**opportunity** [2] - 51:12, 95:22
**opposed** [6] - 58:1, 63:15, 65:12, 87:13, 87:15, 87:17
**opposition** [1] - 91:21
**oral** [2] - 8:2, 8:8
**ORAL** [1] - 1:5
**order** [55] - 6:2, 6:7, 6:12, 8:1, 8:9, 10:4, 11:6, 11:9, 12:21, 13:23, 22:17, 26:20, 35:5, 38:17, 42:22, 44:13, 44:15, 44:22, 45:20, 61:7, 61:10, 61:16, 62:5, 62:8, 62:15, 62:22, 76:23, 77:23, 95:15, 102:17, 102:20, 102:22, 103:4, 103:21, 105:18, 110:17, 111:2, 112:23, 114:15, 115:15, 115:25, 116:2, 116:23, 117:2, 117:7, 117:9, 117:10, 118:24, 119:9, 119:14, 119:20, 119:21, 119:25, 121:3, 123:9
**ordered** [14] - 10:19, 13:3, 29:6, 30:3, 30:15, 30:19, 30:22, 33:22, 34:10, 36:4, 84:25, 88:2, 114:12, 124:13
**ordering** [1] - 11:10
**orders** [1] - 126:2
**ordinary** [1] - 77:2
**org** [7] - 16:12, 88:3, 89:2, 90:1, 91:4, 102:5
**organizational** [1] - 16:9
**original** [2] - 39:14, 40:12
**originally** [1] - 81:24
**Orleans** [1] - 2:6
**otherwise** [4] - 10:24, 62:11, 77:14
**out-of-spec** [1] - 54:6
**out-of-specification** [1] - 23:23
**out-of-trend** [1] - 54:6
**outs** [1] - 9:24
**outset** [1] - 73:24

**outside** [3] - 52:1, 53:18, 90:12
**outstanding** [3] - 65:4, 66:20, 128:8
**overall** [5] - 25:16, 25:24, 26:5, 44:23, 57:16
**overbroad** [1] - 20:22
**overinclusive** [1] - 101:6
**overly** [2] - 70:1, 71:19
**overruled** [5] - 20:1, 20:6, 64:7, 110:2, 110:10
**overview** [1] - 25:13
**owe** [1] - 128:15
**own** [2] - 65:9, 115:10
**ownership** [2] - 16:18, 16:19
**Oxford** [1] - 2:24

## P

**P.C** [2] - 1:18, 3:11
**p.m** [1] - 129:15
**Pacific** [1] - 2:6
**packaging** [1] - 24:20
**PACKARD** [1] - 2:5
**Page** [3] - 22:6, 106:1, 106:5
**page** [5] - 22:12, 26:14, 28:9, 37:14, 89:12
**pages** [5] - 88:18, 89:14, 96:2, 98:1, 105:8
**paid** [1] - 108:23
**painfully** [2] - 7:14, 52:12
**PAPANTONIO** [1] - 2:8
**papers** [6] - 6:14, 7:6, 80:9, 84:18, 84:21, 91:3
**Paragraph** [6] - 38:20, 45:19, 46:1, 46:20, 119:24, 120:2
**paragraph** [4] - 69:21, 69:25, 119:21, 119:23
**paragraphs** [1] - 69:16
**parameters** [1] - 27:4
**paramount** [1] - 74:5
**PAREKH** [22] - 2:6, 105:22, 106:1, 106:6, 106:8, 106:13, 110:11, 111:22, 112:4,

112:8, 112:10, 112:16, 112:19, 113:1, 113:14, 121:16, 121:20, 126:10, 126:14, 127:2, 128:7, 129:5
**parentheses** [1] - 28:18
**Park** [2] - 3:23, 4:3
**Parkway** [2] - 1:16, 3:12
**Part** [1] - 15:11
**part** [18] - 7:17, 7:21, 23:7, 27:17, 32:9, 33:19, 40:13, 41:21, 42:13, 46:2, 53:11, 54:3, 54:19, 74:22, 76:10, 95:4, 118:16, 129:11
**particular** [4] - 34:14, 49:4, 71:8, 73:23
**parties** [25] - 5:18, 7:1, 7:7, 7:9, 7:11, 7:15, 8:6, 8:18, 8:19, 9:3, 9:5, 12:4, 12:10, 15:1, 16:10, 21:4, 33:25, 34:16, 35:19, 56:12, 87:22, 107:19, 116:17, 118:5, 126:10
**parties'** [4] - 6:14, 7:6, 8:4, 8:5
**Parts** [1] - 15:12
**party** [4] - 16:18, 75:8, 122:23, 124:8
**patent** [1] - 58:23
**patented** [1] - 55:21
**patents** [7] - 55:10, 55:11, 55:14, 55:19, 55:20, 55:23, 56:5
**pattern** [1] - 45:5
**Pause** [1] - 80:8
**payer** [1] - 75:8
**payor** [2] - 122:23, 124:8
**PC** [1] - 3:7
**peak** [3] - 38:1, 92:17, 97:12
**peaks** [7] - 24:1, 35:21, 40:5, 40:18, 49:21, 50:3, 52:21
**pencil** [1] - 11:23
**pending** [1] - 18:21
**Pennsylvania** [4] - 1:20, 2:20, 2:24, 3:12
**Pensacola** [1] - 2:10
**people** [56] - 27:9, 49:17, 70:15, 78:11, 81:20, 81:22, 82:12,

85:18, 85:21, 87:6, 87:16, 87:20, 87:22, 88:1, 88:4, 88:5, 88:6, 88:9, 88:10, 88:11, 88:21, 88:22, 89:3, 89:4, 89:7, 90:16, 91:8, 91:11, 91:17, 92:22, 93:5, 93:6, 93:21, 93:22, 94:11, 94:13, 94:15, 94:16, 95:13, 95:19, 95:22, 96:3, 96:6, 96:7, 97:7, 102:6, 103:2, 103:9, 103:25, 104:2, 111:20, 112:12, 112:19, 117:25

**per** [6] - 20:8, 39:22, 55:9, 62:3, 62:5, 89:12

**perceived** [1] - 107:14

**percent** [2] - 31:20, 32:2

**performed** [3] - 68:9, 68:12

**period** [18] - 37:20, 38:12, 38:15, 38:21, 41:9, 42:22, 43:6, 46:1, 46:10, 46:13, 46:22, 52:8, 52:10, 57:22, 75:3, 117:10, 125:3, 125:16

**periods** [2] - 41:12, 44:24

**permission** [1] - 11:21

**permitted** [1] - 11:14

**person** [18] - 77:22, 82:12, 84:23, 91:14, 91:15, 91:23, 92:2, 92:19, 93:17, 93:18, 94:8, 97:4, 114:22, 120:23, 120:24, 121:8, 124:12

**person's** [1] - 90:13

**personal** [5] - 74:6, 124:2, 124:6, 124:7, 125:1

**personally** [1] - 51:22

**perspective** [1] - 71:23

**perspectives** [1] - 122:3

**pertain** [1] - 97:21

**pertinent** [1] - 97:15

**pest** [1] - 24:20

**Pharma** [4] - 3:6, 3:13, 3:13, 3:16

**Pharmaceutical** [1] - 3:5

**Pharmaceuticals** [6] -

2:20, 2:21, 2:25, 3:6, 3:17, 5:24

**pharmaceuticals** [1] - 97:21

**Pharmacy** [2] - 3:20, 4:4

**phase** [2] - 126:17, 126:18

**Philadelphia** [2] - 1:20, 2:20

**phone** [9] - 77:20, 77:22, 120:24, 120:25, 121:9, 121:10, 121:15, 126:8, 128:2

**photographs** [1] - 36:18

**phrase** [3] - 34:9, 37:4, 68:10

**phrased** [2] - 35:4, 44:19

**phrasing** [1] - 54:25

**physical** [2] - 94:3, 94:5

**pick** [4] - 25:6, 99:3, 99:4, 99:20

**picked** [1] - 50:24

**picks** [1] - 100:22

**picture** [1] - 40:21

**Piedmont** [1] - 3:4

**PIETRAGALLO** [1] - 2:22

**pills** [1] - 52:20

**pilot** [2] - 23:4, 23:17

**pilot-scale** [2] - 23:4, 23:17

**pinpoint** [1] - 26:13

**Pittsburgh** [1] - 2:24

**place** [4] - 14:15, 23:12, 71:4, 102:2

**plaintiff** [12] - 59:1, 70:6, 70:7, 70:11, 72:25, 73:7, 77:16, 99:3, 114:14, 116:1, 122:22, 124:11

**Plaintiff** [7] - 1:17, 1:21, 2:4, 2:7, 2:10, 2:13, 2:16

**plaintiffs** [66] - 5:10, 5:12, 5:14, 5:16, 6:20, 8:25, 9:10, 9:17, 9:18, 9:24, 10:11, 10:15, 10:16, 10:24, 11:24, 13:16, 15:9, 18:1, 20:18, 20:23, 31:11, 31:15, 31:19, 33:13, 36:4, 38:23, 45:20, 46:6, 47:22, 47:25, 60:18, 63:1, 70:2, 70:3,

71:6, 71:11, 72:1, 72:19, 72:20, 73:15, 81:8, 90:10, 93:16, 99:8, 105:1, 107:11, 107:13, 107:21, 108:15, 109:23, 110:7, 111:8, 113:8, 113:12, 119:4, 123:13, 123:14, 124:17, 124:18, 124:19, 124:22, 125:7, 126:19, 126:20, 127:3

**PLAINTIFFS'** [1] - 1:6

**Plaintiffs'** [1] - 86:2

**plaintiffs'** [16] - 6:5, 6:23, 9:25, 12:1, 15:2, 46:23, 51:24, 52:2, 52:13, 71:12, 71:23, 73:17, 86:3, 120:18, 121:24, 122:5

**plan** [2] - 6:19, 103:6

**planes** [1] - 103:10

**planned** [1] - 127:9

**planning** [1] - 15:5

**plans** [1] - 24:2

**player** [1] - 98:18

**plenty** [1] - 111:17

**plucked** [1] - 95:20

**plus** [4] - 99:5, 99:10, 100:6, 100:20

**pocket** [1] - 48:13

**point** [15] - 15:23, 33:3, 41:12, 47:3, 53:4, 74:3, 75:20, 88:15, 93:19, 98:11, 104:24, 105:24, 107:24, 108:5, 109:22

**pointed** [4] - 35:16, 48:23, 57:1, 107:11

**pointing** [3] - 31:15, 35:12, 48:17

**points** [3] - 21:19, 42:11, 50:13

**poker** [1] - 98:18

**POLETTO** [2] - 3:7, 3:8

**policies** [2] - 19:10, 92:24

**policy** [2] - 19:13, 20:3

**POLIFRONI** [1] - 3:7

**Ponde** [1] - 2:15

**pops** [1] - 90:14

**position** [7] - 13:5, 15:24, 61:1, 89:21, 90:21, 103:16

**possession** [1] - 10:18

**possible** [1] - 124:24

**possibly** [1] - 121:17

**potential** [4] - 9:11, 64:12, 96:15, 109:1

**potentially** [1] - 71:3

**potshots** [1] - 109:12

**practice** [2] - 20:4, 84:19

**practices** [1] - 72:24

**precisely** [1] - 72:24

**predate** [1] - 46:21

**predating** [1] - 41:22

**prefer** [2] - 25:5, 102:21

**prejudice** [7] - 43:16, 46:23, 73:17, 75:17, 77:24, 92:14, 115:9

**prejudiced** [3] - 10:22, 41:5, 99:8

**preliminary** [1] - 74:8

**premature** [1] - 9:8

**prepared** [5] - 9:22, 21:21, 22:3, 51:17, 64:4

**preposterous** [1] - 107:24

**prerequisite** [1] - 19:18

**presence** [4] - 12:8, 34:19, 36:5, 45:21

**present** [3] - 12:16, 19:24, 72:19

**presented** [3] - 48:5, 72:25, 81:14

**preservation** [1] - 92:24

**presumably** [1] - 100:11

**pretty** [4] - 20:14, 20:15, 94:1, 121:25

**preventative** [1] - 24:1

**prevented** [1] - 9:18

**previously** [3] - 20:11, 30:3, 30:19

**prices** [1] - 73:12

**pricing** [17] - 67:2, 70:22, 71:19, 72:9, 72:11, 72:13, 72:15, 72:16, 72:17, 73:12, 75:6, 76:19, 79:7, 79:9, 116:12, 116:14

**prima** [1] - 81:17

**primarily** [1] - 31:7

**primary** [2] - 87:24, 112:20

**Prinbury** [1] - 87:2

**Princeton** [3] - 16:20, 81:11, 87:2

**Prinston** [1] - 2:20

**prioritization** [1] -

118:13

**prioritize** [3] - 117:21, 118:17, 120:18

**prioritizing** [1] - 119:4

**privileged** [1] - 8:16

**privy** [1] - 9:23

**probative** [2] - 64:16, 97:11

**problem** [19] - 11:20, 12:24, 15:6, 15:13, 15:16, 15:17, 16:1, 21:4, 34:13, 34:15, 45:16, 55:1, 76:18, 78:21, 84:8, 92:20, 95:3, 107:5, 116:10

**problematic** [2] - 7:21, 70:24

**problems** [1] - 68:4

**procedure** [1] - 125:24

**procedures** [3] - 24:4, 24:17, 68:13

**proceed** [1] - 72:3

**PROCEEDINGS** [1] - 5:1

**Proceedings** [1] - 1:25

**proceedings** [2] - 129:15, 129:19

**proceeds** [1] - 70:4

**process** [53] - 9:12, 23:2, 23:7, 23:8, 23:14, 23:19, 24:5, 25:11, 25:13, 25:16, 25:17, 25:23, 25:24, 27:16, 28:2, 35:14, 36:23, 37:24, 37:25, 38:25, 39:14, 39:16, 40:3, 40:7, 40:10, 41:14, 41:15, 41:21, 42:17, 43:15, 46:12, 49:15, 52:18, 53:15, 53:17, 53:25, 54:3, 54:8, 54:10, 55:4, 55:17, 55:18, 55:24, 57:10, 58:1, 71:25, 74:22, 78:9, 81:21, 85:2, 90:21, 126:3, 126:14

**produce** [27] - 8:13, 10:4, 12:23, 13:9, 13:13, 13:16, 20:2, 20:24, 36:18, 43:7, 43:16, 44:15, 46:7, 51:3, 51:5, 51:25, 54:17, 61:16, 63:20, 75:15, 75:25, 79:2, 97:17, 115:6, 117:4, 119:5, 119:12

**produced** [29] - 1:25,

7:4, 8:22, 9:19,
10:10, 11:13, 18:11,
19:16, 20:4, 28:15,
29:7, 29:10, 33:4,
34:10, 39:17, 39:23,
42:5, 42:18, 48:7,
48:15, 49:10, 52:21,
64:22, 88:18, 91:5,
107:12, 115:9,
122:19, 123:22
**producing** [1] - 11:5,
31:17, 107:25
**product** [3] - 23:6,
72:8, 73:7
**production** [27] - 7:4,
7:18, 8:17, 10:19,
11:6, 11:10, 12:22,
18:2, 33:12, 76:11,
78:6, 79:20, 116:6,
116:18, 116:21,
116:22, 117:1,
117:3, 117:19,
117:23, 119:9,
119:14, 119:15,
122:12, 126:18,
126:23
**products** [8] - 17:23,
18:15, 19:4, 24:9,
24:13, 72:5, 97:8,
109:4
**PRODUCTS** [1] - 1:4
**program** [3] - 19:17,
19:19, 107:7
**progress** [1] - 76:14
**prohibiting** [1] - 97:2
**promised** [1] - 128:8
**pronounce** [1] - 34:20
**proofs** [1] - 42:13
**proportional** [1] -
71:20
**proportionality** [1] -
73:25
**proposal** [6] - 76:4,
105:17, 111:6,
113:16, 115:25
**proposals** [1] - 71:13
**propose** [5] - 37:12,
61:4, 112:24,
114:13, 115:1
**proposed** [11] - 23:7,
23:10, 38:25, 73:2,
83:25, 86:11, 86:25,
94:18, 97:3, 97:13,
113:8
**proposing** [5] - 75:5,
75:11, 75:23,
104:12, 104:13
**protected** [1] - 11:5
**protocol** [2] - 8:19,
121:3

**protocols** [1] - 68:12
**prove** [2] - 42:10,
94:22
**proved** [1] - 85:8
**proven** [1] - 91:18
**provide** [15] - 20:16,
24:14, 33:24, 33:25,
56:22, 72:20, 73:4,
73:10, 73:17, 83:24,
88:21, 95:4, 97:10,
115:2, 128:11
**provided** [14] - 24:3,
29:8, 31:14, 34:8,
44:7, 71:6, 81:15,
82:11, 83:11, 84:5,
84:22, 86:15,
119:14, 122:19
**provides** [2] - 81:17,
83:12
**providing** [1] - 119:2
**proviso** [1] - 11:15,
99:10, 116:9
**proximities** [1] -
113:21
**public** [1] - 9:16
**publicly** [1] - 10:14
**pulled** [2] - 59:23,
86:14
**pulling** [3] - 86:22,
109:24, 110:7
**punitive** [1] - 101:12
**Punta** [1] - 2:13
**purchased** [2] - 27:20,
69:1
**purchaser** [1] - 69:16
**purchasers** [1] - 69:10
**purification** [1] -
24:21
**purity** [5] - 35:3,
36:20, 36:25, 37:4,
54:4
**purpose** [3] - 8:17,
96:25, 121:6
**purposely** [1] - 128:3
**purposes** [1] - 45:7
**pursuant** [2] - 11:6,
11:8
**pursue** [1] - 52:14
**pursued** [1] - 74:9
**pursuing** [1] - 49:11
**put** [26] - 19:2, 27:2,
28:12, 28:18, 40:21,
50:1, 53:5, 54:24,
61:22, 62:15, 71:16,
80:22, 91:22, 93:9,
93:13, 100:1,
102:17, 102:20,
102:21, 105:2,
105:18, 111:2,
115:25, 116:2,

117:22, 129:8
**puts** [1] - 12:21
**putting** [4] - 56:15,
62:7, 110:16, 113:25

## Q

**qualification** [1] -
24:13
**qualified** [1] - 36:22
**quality** [6] - 23:12,
23:14, 54:9, 87:4,
92:7
**Quality** [1] - 49:17
**quantities** [3] - 72:8,
72:9, 73:11
**quash** [1] - 77:25
**questionnaires** [1] -
24:15
**questions** [9] - 19:18,
19:21, 73:19, 76:14,
95:1, 109:17, 128:9,
128:15, 129:1
**quickly** [1] - 21:15
**quite** [1] - 108:12
**quote** [1] - 93:25

## R

**R&R** [1] - 12:4
**rabbit** [1] - 110:3
**raise** [3] - 41:22, 68:6,
69:24
**raised** [4] - 6:22, 8:3,
9:9, 109:17
**raising** [2] - 41:14,
41:23
**Ramirez** [2] - 85:6,
91:16
**ranking** [1] - 86:21
**RASPANTI** [1] - 2:22
**rather** [1] - 25:6
**rating** [1] - 37:25
**raw** [7] - 24:14, 24:17,
24:20, 24:21, 94:4,
94:5, 94:6
**RDR** [1] - 129:21
**Re** [1] - 5:6
**RE** [1] - 1:4
**reach** [1] - 25:22
**reaches** [1] - 75:20
**reactions** [1] - 40:14
**read** [15] - 6:14, 7:6,
18:6, 19:11, 20:17,
21:15, 21:23, 22:21,
46:4, 53:9, 70:1,
80:9, 85:15, 88:9,
105:16
**reading** [3] - 8:5,
21:25, 93:13

**reads** [1] - 36:17
**ready** [2] - 64:5, 117:1
**real** [3] - 45:16, 80:10,
84:8
**reality** [1] - 97:7
**realize** [1] - 41:20
**really** [19] - 15:17,
20:16, 27:15, 30:2,
33:4, 33:13, 35:12,
41:21, 45:1, 56:25,
68:21, 71:7, 84:19,
86:7, 97:4, 118:21,
125:24, 129:10
**reason** [10] - 30:18,
38:11, 74:7, 89:17,
110:6, 110:8,
110:23, 118:17,
118:25, 122:4
**reasonable** [9] - 7:11,
75:5, 75:11, 75:24,
76:4, 76:22, 105:17,
105:20, 119:6
**reasons** [3] - 10:8,
48:21, 50:8
**REATH** [1] - 3:21
**rebates** [1] - 76:8
**REBECCA** [1] - 2:19
**receipt** [2] - 122:6,
122:19
**receive** [1] - 8:25
**received** [3] - 8:4,
10:25, 24:12
**receiving** [1] - 125:9
**recent** [3] - 7:7, 8:4,
90:1
**recenter** [2] - 32:4,
32:8
**recess** [1] - 80:5
**recipe** [1] - 52:19
**recognized** [1] - 49:18
**recognizing** [2] -
72:21, 73:24
**recollect** [1] - 44:14
**recollection** [1] -
38:19
**reconsideration** [1] -
36:3
**record** [23] - 5:6, 16:9,
19:5, 19:24, 20:18,
28:14, 28:15, 47:22,
50:17, 67:20, 71:16,
73:15, 85:14, 92:3,
93:10, 95:11, 102:3,
102:12, 109:22,
110:8, 124:15,
125:22, 129:19
**recorded** [1] - 1:25
**records** [3] - 19:22,
93:4, 122:18
**recovered** [1] - 24:19

**recovery** [1] - 24:15
**red** [1] - 14:2, 67:11
**redact** [2] - 11:21,
11:22
**redacted** [6] - 8:22,
9:21, 9:23, 10:20,
10:21, 13:8
**REDACTION** [1] - 1:5
**redaction** [9] - 6:22,
7:25, 8:3, 9:9, 11:19,
12:1, 12:3, 13:11,
116:11
**redactions** [18] - 8:7,
9:5, 9:15, 9:16, 9:18,
10:6, 10:23, 11:2,
11:12, 11:14, 11:16,
12:9, 12:15, 12:17,
12:19, 13:14, 13:15,
116:8
**Redondo** [1] - 2:7
**redraft** [1] - 77:17
**redrafted** [1] - 28:5
**refer** [4] - 28:10,
36:20, 36:21, 119:22
**reference** [1] - 41:25
**referenced** [1] - 53:11
**references** [1] - 32:20
**referred** [1] - 107:14
**referring** [2] - 13:11,
36:14
**refers** [1] - 12:4
**refrain** [1] - 94:11
**regard** [8] - 30:6,
36:19, 69:14, 80:18,
102:16, 102:17,
105:11, 116:8
**regarding** [18] - 6:5,
9:15, 15:11, 23:1,
23:21, 24:1, 24:11,
36:5, 36:7, 45:21,
45:23, 52:10, 52:11,
65:19, 73:11,
105:24, 107:17,
107:23
**regret** [1] - 98:22
**regulatory** [6] - 18:3,
56:6, 60:23, 61:13,
87:4, 108:24
**rejects** [1] - 9:8
**relate** [1] - 27:19
**related** [12] - 23:12,
23:19, 23:23, 23:24,
23:25, 24:2, 24:13,
24:17, 36:24, 87:3,
94:4
**relates** [1] - 58:23
**relating** [3] - 31:18,
68:8, 72:3
**relatively** [1] - 8:16
**relay** [1] - 71:11

*relevance* [1] - 71:22
*relevancy* [1] - 73:25
*relevant* [43] - 8:15,
9:21, 10:13, 16:23,
19:11, 19:14, 19:22,
19:25, 34:7, 36:9,
38:11, 38:15, 38:21,
41:9, 41:12, 42:21,
43:5, 45:24, 46:1,
46:10, 46:22, 50:25,
52:1, 52:8, 52:10,
54:14, 55:15, 56:21,
57:22, 71:22, 75:6,
75:9, 75:22, 90:14,
93:23, 98:6, 98:8,
99:1, 99:13, 106:25,
107:1, 127:8
*reliability* [1] - 107:18
*reluctant* [1] - 115:15
*rely* [1] - 53:4
*relying* [1] - 109:25
*remained* [1] - 88:5
*remaining* [2] - 106:3,
110:15
*remember* [14] -
21:25, 32:22, 38:25,
43:20, 46:8, 46:9,
46:10, 46:12, 46:13,
64:6, 94:14, 97:10,
127:6
*removal* [1] - 10:6
*removed* [1] - 10:24
*rep* [2] - 122:23,
122:24
*repeat* [1] - 11:12
*report* [6] - 41:25,
42:1, 89:7, 89:8,
96:3, 96:4
*REPORTER* [3] -
14:21, 15:21, 123:19
*Reporter* [1] - 1:23
*Reporter/*
*Transcriber* [1] -
129:21
*reports* [11] - 23:5,
23:6, 23:11, 23:20,
23:24, 54:6, 93:21,
96:1, 96:2, 96:19
*represent* [1] - 61:18
*representation* [2] -
48:24, 57:16
*representations* [1] -
81:22
*representative* [3] -
9:3, 9:6, 33:3
*representatives* [2] -
70:16, 123:24
*represented* [2] -
74:15, 117:24
*representing* [1] -

51:16
*represents* [1] - 74:11
*reprint* [1] - 105:9
*reprocessing* [1] -
24:8
*reps* [3] - 123:24,
124:11, 124:14
*request* [28] - 10:17,
16:21, 18:6, 18:7,
18:8, 19:4, 20:19,
22:8, 22:10, 27:15,
28:13, 29:11, 30:4,
46:23, 55:8, 55:9,
57:13, 59:6, 62:7,
63:20, 64:17, 66:18,
68:8, 70:12, 75:13,
75:16, 75:18, 114:24
*Request* [1] - 15:11
*requests* [38] - 6:6,
6:7, 6:23, 13:23,
14:25, 18:7, 21:2,
22:13, 23:9, 23:10,
23:11, 26:10, 26:11,
26:19, 27:5, 27:12,
28:4, 28:7, 34:7,
37:20, 52:4, 54:7,
61:20, 65:4, 65:8,
65:18, 73:3, 77:4,
79:5, 79:12, 105:15,
107:14, 116:6,
116:22, 117:15,
117:17, 121:1
*require* [3] - 10:16,
42:2, 101:7
*required* [2] - 6:13,
19:17
*requirement* [1] - 78:6
*requirements* [1] -
68:25
*requiring* [1] - 62:9
*research* [1] - 23:5
*reserve* [1] - 24:9
*residual* [2] - 36:8,
45:23, 94:7
*resolve* [1] - 6:5,
6:18, 7:12, 7:13,
12:11, 32:7, 71:14,
77:21, 79:18, 81:13,
102:25
*resolved* [7] - 6:24,
66:21, 69:7, 110:16,
114:11, 116:2, 116:6
*respect* [6] - 69:25,
107:11, 108:21,
119:13, 119:15,
122:22
*respectfully* [1] -
36:17
*respond* [1] - 114:14
*responded* [6] - 6:8,

6:9, 14:1, 34:8, 62:9,
84:10
*responds* [1] - 116:1
*response* [1] - 81:17
*responses* [1] - 62:10
*responsibility* [1] -
87:24
*responsive* [4] -
74:19, 79:2, 79:21,
97:24
*rest* [9] - 7:20, 27:12,
62:6, 65:4, 65:8,
69:7, 99:4, 106:14,
129:13
*result* [3] - 52:12,
92:16, 108:4
*resulted* [2] - 41:15,
41:16
*results* [21] - 23:21,
31:2, 31:18, 35:18,
36:6, 42:18, 44:4,
45:2, 45:5, 45:17,
45:22, 46:11, 48:3,
50:1, 50:2, 51:3,
51:6, 52:1, 53:20,
55:16, 117:23
*retention* [6] - 19:9,
19:13, 19:17, 19:19,
20:2, 107:7
*reticence* [1] - 95:4
*retire* [1] - 91:25
*retrieve* [1] - 8:16
*retrospect* [1] - 39:18
*returned* [1] - 24:9
*returns* [1] - 24:7
*reuse* [1] - 25:18
*reused* [2] - 35:18,
56:14
*reveal* [1] - 34:19
*reveals* [1] - 44:16
*review* [11] - 9:4, 10:2,
26:2, 78:8, 83:14,
89:14, 89:16, 93:25,
96:4, 104:25, 116:25
*reviewed* [3] - 9:6,
97:6, 98:7
*reviewing* [2] - 9:13,
97:7
*reviews* [2] - 94:4,
94:6
*revised* [1] - 60:21
*revisit* [6] - 11:20,
37:15, 37:18, 42:2,
79:17, 116:5
*revisiting* [2] - 35:25,
39:6
*revisits* [1] - 39:4
*rightly* [3] - 48:1,
52:14, 109:1
*ring* [1] - 57:25

*rise* [4] - 5:3, 80:4,
80:6, 129:14
*risk* [3] - 23:9, 24:6,
54:5
*RIVERO* [1] - 2:14
*RMR* [1] - 129:21
*road* [1] - 98:12
*Road* [1] - 3:4
*ROBERT* [1] - 3:8
*rodent* [1] - 24:21
*roll* [1] - 70:25
*rolling* [10] - 7:4,
79:20, 116:19,
117:5, 117:19,
117:23, 121:25,
122:14, 125:6,
125:22
*ROSE* [1] - 4:8
*Rose* [1] - 4:9
*Roseland* [1] - 1:17
*rounds* [1] - 120:15
*routine* [2] - 93:24,
94:5
*Ruben* [1] - 5:13
*RUBEN* [1] - 1:19
*RUBENSTEIN* [20] -
3:3, 5:20, 17:21,
18:14, 18:21, 53:13,
53:21, 54:15, 55:14,
55:20, 55:25, 56:2,
56:4, 56:17, 66:3,
66:5, 66:11, 66:16,
77:1, 77:6
*Rubenstein* [1] - 5:21
*rug* [1] - 49:23
*rule* [4] - 9:22, 24:24,
43:25, 98:16
*ruled* [11] - 12:14,
18:19, 19:20, 52:17,
52:23, 52:24, 53:14,
54:15, 56:5, 65:11,
77:11
*rules* [1] - 18:12
*Rules* [1] - 96:22
*ruling* [23] - 6:21, 7:25,
8:1, 8:9, 10:2, 10:8,
11:12, 12:20, 13:18,
18:21, 20:5, 36:24,
39:25, 41:17, 42:2,
44:7, 45:7, 46:10,
47:24, 65:2, 101:17,
110:1
*rulings* [10] - 36:3,
44:5, 60:11, 60:24,
62:10, 66:20, 67:18,
69:6, 99:25, 114:17
*RULINGS* [1] - 1:6
*run* [10] - 27:5, 27:11,
33:19, 33:20, 45:8,
85:11, 91:17,

103:10, 107:21,
118:10
*running* [1] - 40:4
*runs* [1] - 105:19

**S**

*safety* [1] - 27:22
*sailing* [1] - 7:20,
129:13
*sale* [5] - 24:23, 67:1,
67:15, 67:16, 67:24
*sales* [10] - 67:1, 67:5,
70:21, 71:18, 76:19,
79:7, 79:9, 87:4,
116:12, 116:14
*salesman's* [1] -
118:21
*sample* [1] - 85:11
*samples* [1] - 24:9
*sampling* [2] - 24:9,
24:22
*sandbag* [1] - 84:20
*sandbagging* [1] -
86:7
*SARAH* [1] - 4:2
*satisfy* [1] - 115:23
*Saturday* [1] - 71:5
*save* [1] - 77:20
*saving* [1] - 101:10
*saw* [5] - 27:7, 29:2,
29:7, 49:5, 92:16
*scale* [10] - 23:2, 23:4,
23:5, 23:15, 23:17,
23:18, 35:22
*scale-up* [1] - 23:2
*schedule* [3] - 7:3,
90:5, 96:17
*scheduled* [2] - 6:2,
128:3
*scheme* [1] - 108:20
*SCHNEIDER* [1] - 1:12
*Schneider* [2] - 5:2,
101:5
*scope* [2] - 18:8, 60:22
*scratch* [1] - 94:17
*Scripts* [1] - 3:23
*scrubbed* [1] - 94:23
*search* [35] - 6:10,
6:25, 26:18, 79:13,
79:24, 80:2, 92:11,
97:18, 101:6,
105:16, 105:24,
107:16, 107:19,
108:6, 108:8,
108:16, 109:13,
110:4, 110:15,
110:23, 112:5,
112:22, 114:7,
115:1, 116:7,

116:16, 116:22, 117:15, 118:10, 120:14, 121:1, 121:4, 128:5
**search-term** [1] - 6:25
**searched** [1] - 106:23
**searches** [2] - 101:8, 119:5
**searching** [1] - 120:15
**searchs** [1] - 85:8
**season** [2] - 119:16, 128:22
**seat** [1] - 106:17
**seated** [2] - 5:5, 80:7
**second** [8] - 26:9, 39:16, 40:7, 40:11, 63:14, 69:21, 69:25, 83:12
**secret** [3] - 40:13, 78:8, 89:14
**secrets** [1] - 78:16
**section** [14] - 59:14, 60:22, 65:5, 66:18, 66:22, 67:15, 67:17, 69:6, 69:8, 69:14, 69:16, 69:25, 70:1, 93:14
**Section** [1] - 106:1
**see** [25] - 21:18, 27:6, 30:1, 31:24, 38:11, 40:15, 40:16, 42:7, 42:8, 46:19, 46:22, 49:5, 55:15, 56:21, 74:22, 76:10, 77:19, 86:22, 92:24, 99:8, 110:3, 115:22, 127:25, 128:1
**seeing** [8] - 22:1, 35:22, 49:19, 54:12, 94:10, 109:3, 109:15, 109:19
**seeking** [1] - 65:19
**seem** [2] - 57:12, 118:2
**sees** [1] - 37:12
**selecting** [1] - 104:2
**selection** [1] - 24:22
**SELLINGER** [1] - 3:4
**semblance** [1] - 7:3
**semicolon** [1] - 46:3
**send** [8] - 14:3, 28:11, 37:12, 54:25, 64:8, 77:17, 78:17, 105:6
**sense** [10] - 10:16, 22:7, 22:10, 25:10, 40:1, 40:2, 46:4, 103:8, 108:8, 120:20
**sent** [6] - 13:7, 29:2, 33:3, 50:18, 51:11, 86:16

**Sentry** [1] - 3:12
**separate** [3] - 35:3, 101:8, 114:7
**September** [1] - 52:18
**sequence** [1] - 41:4
**serious** [1] - 66:24
**serve** [1] - 8:8
**services** [1] - 24:15
**session** [1] - 77:19
**set** [21] - 10:3, 13:22, 22:17, 26:18, 33:11, 41:9, 41:12, 46:1, 48:24, 50:1, 59:21, 75:3, 79:12, 85:19, 89:15, 96:21, 96:22, 96:24, 99:17, 123:4
**SETH** [1] - 2:18
**Seth** [2] - 5:17, 58:19
**sets** [1] - 38:21
**setting** [2] - 46:13, 71:20
**settlement** [1] - 75:21
**seven** [4] - 87:20, 89:4, 106:7, 106:8
**several** [1] - 124:13
**severely** [1] - 41:5
**shall** [1] - 123:13
**sharpen** [1] - 11:23
**sheet** [3] - 40:6, 81:15, 124:14
**sheets** [21] - 13:24, 27:22, 121:24, 122:3, 122:7, 122:10, 122:13, 122:14, 122:18, 122:20, 122:22, 122:23, 122:24, 123:4, 123:11, 123:13, 123:16, 123:22, 124:8, 124:12, 125:22
**short** [1] - 101:7
**show** [23] - 19:12, 19:19, 29:24, 34:5, 35:20, 35:22, 37:22, 39:2, 40:22, 42:11, 42:16, 45:5, 49:2, 49:22, 50:2, 50:5, 89:2, 89:4, 91:18, 102:12, 115:6, 125:23
**show-cause** [1] - 125:23
**showed** [2] - 48:15, 85:4
**showing** [11] - 39:20, 42:18, 46:25, 47:1, 48:16, 85:13, 85:17, 85:20, 92:4, 93:12, 94:19

**shown** [4] - 19:20, 19:21, 24:3, 39:17
**shows** [2] - 97:11, 97:25
**shrinking** [1] - 43:4
**shut** [1] - 59:12
**side** [5] - 26:19, 72:12, 72:19, 73:5, 127:10
**sign** [1] - 40:6
**signals** [1] - 107:5
**signed** [1] - 123:2
**significant** [4] - 33:21, 38:1, 75:1, 93:6
**similar** [5] - 6:11, 16:10, 31:14, 33:25, 57:14
**similarly** [1] - 123:2
**simple** [1] - 8:16
**simpler** [1] - 85:1
**simplified** [1] - 113:22
**simply** [4] - 36:21, 96:11, 113:25, 122:25
**sincerely** [1] - 129:7
**single** [4] - 91:2, 91:3, 98:3, 98:4
**site** [2] - 24:16
**situation** [1] - 101:15
**situations** [1] - 13:11
**six** [11] - 49:1, 88:4, 88:6, 95:12, 118:23, 121:22, 122:4, 122:6, 122:10, 122:19, 126:16
**skipped** [1] - 63:17
**Slater** [8] - 5:11, 22:23, 25:2, 39:9, 51:16, 97:13, 101:17, 101:24
**slater** [1] - 89:17
**SLATER** [184] - 1:15, 1:16, 5:11, 14:5, 14:8, 14:18, 16:5, 16:8, 16:14, 16:16, 16:22, 18:25, 19:2, 19:8, 20:8, 20:11, 21:1, 21:7, 21:13, 21:20, 22:7, 22:10, 22:16, 22:19, 22:25, 25:5, 25:9, 25:21, 26:16, 26:24, 27:2, 27:4, 27:14, 28:8, 28:22, 28:24, 29:1, 30:9, 30:15, 31:1, 32:4, 32:8, 32:13, 32:25, 33:16, 34:13, 34:21, 35:7, 35:9, 37:1, 37:10, 37:19, 38:8, 38:13, 39:10, 39:12, 42:4, 42:16,

**Slater's** [3] - 31:6, 119:3, 120:13
**sleeves** [1] - 70:25
**slippery** [1] - 44:1
**slope** [1] - 44:2
**small** [5] - 16:5, 23:5, 23:18, 92:13, 128:7
**small-scale** [2] - 23:5, 23:18
**smoke** [1] - 107:4
**smooth** [2] - 7:19, 129:12
**software** [1] - 23:16
**Solco** [4] - 2:21,

42:20, 42:23, 43:7, 43:10, 43:14, 43:20, 44:6, 44:18, 45:14, 46:2, 46:15, 48:7, 48:10, 48:12, 48:19, 48:21, 49:10, 49:13, 50:11, 50:16, 51:8, 51:19, 51:21, 52:5, 53:1, 53:10, 53:24, 54:22, 54:24, 55:8, 55:12, 55:22, 56:8, 56:11, 57:3, 57:8, 57:12, 57:22, 58:2, 58:5, 58:9, 58:13, 59:4, 59:7, 59:10, 59:13, 59:16, 60:2, 60:10, 60:20, 61:9, 61:12, 61:18, 61:25, 62:16, 63:1, 63:7, 63:14, 63:17, 63:21, 63:23, 63:25, 64:18, 64:24, 65:9, 65:14, 65:24, 66:1, 66:9, 66:12, 66:17, 67:11, 67:14, 68:1, 68:11, 68:18, 68:21, 68:24, 70:6, 70:10, 77:7, 77:13, 80:12, 80:17, 80:20, 80:24, 81:2, 81:5, 81:9, 81:14, 82:16, 82:20, 82:23, 83:1, 83:3, 83:10, 84:2, 84:8, 89:23, 98:3, 100:2, 100:8, 100:12, 100:14, 100:16, 100:18, 100:23, 101:21, 102:2, 102:11, 103:1, 103:7, 103:15, 103:18, 103:22, 104:6, 104:8, 104:10, 104:13, 104:19, 114:24, 117:12, 118:7, 121:12, 122:1, 127:23
**someone** [7] - 40:8, 40:25, 56:15, 57:14, 64:12, 91:9, 94:21
**sometime** [2] - 19:15, 127:21
**sometimes** [1] - 67:14
**somewhat** [1] - 22:4
**somewhere** [2] - 99:19, 127:15
**soon** [2] - 14:23, 121:25
**SOPs** [2] - 24:4, 24:17
**sorry** [14] - 14:21, 15:21, 19:1, 38:14, 46:15, 48:12, 56:1, 58:5, 63:9, 63:16, 79:6, 80:24, 81:3, 104:23
**sort** [8] - 27:15, 31:4, 41:19, 57:1, 71:25, 118:14, 128:9, 128:12
**sought** [2] - 71:18, 114:6
**sound** [2] - 29:3, 67:19
**sounds** [5] - 25:21, 27:10, 30:12, 69:2, 94:1
**source** [1] - 24:14
**sources** [1] - 76:24
**South** [2] - 2:6, 2:19
**space** [1] - 96:15
**speaking** [4] - 30:5, 44:20, 122:16, 123:23
**spec** [1] - 54:6
**Special** [4] - 12:4, 12:7, 12:10, 12:14
**specific** [20] - 20:22, 26:22, 27:7, 34:12, 40:1, 41:18, 41:23, 44:7, 46:24, 52:9, 52:11, 54:8, 55:10, 57:13, 68:20, 77:4,

16:20, 81:11, 87:2
**sold** [7] - 17:23, 18:15, 19:5, 72:5, 72:8, 72:9, 73:11
**solubility** [1] - 31:21
**solution** [2] - 74:4, 76:3
**solvent** [2] - 24:15, 58:1
**solvents** [16] - 24:14, 24:20, 25:18, 27:20, 35:14, 35:17, 35:18, 36:8, 45:24, 56:14, 57:5, 57:9, 57:25, 94:7

88:20, 97:10, 106:4,
119:23
**specifically** [6] - 46:9,
47:15, 47:20, 47:21,
57:24, 91:10
**specification** [1] -
23:23
**specifications** [1] -
27:21
**specificity** [3] - 41:20,
92:21, 92:23
**speculative** [1] -
109:21
**spent** [3] - 7:15,
37:17, 59:14
**spirit** [1] - 119:7
**spoliation** [3] - 19:13,
19:19, 19:23
**spread** [1] - 81:15
**spreadsheet** [2] -
82:17, 86:10
**Springfield** [1] - 3:9
**stability** [1] - 24:6
**stage** [8] - 39:4, 43:1,
48:22, 54:22, 73:20,
73:23, 76:10, 89:10
**staggering** [1] -
124:16
**stake** [1] - 10:1
**stand** [1] - 128:24
**standalone** [1] - 18:7
**standard** [12] - 50:6,
64:20, 87:21, 88:25,
90:18, 96:13, 96:16,
97:12, 98:25, 102:13
**standpoint** [1] - 31:11
**STANOCH** [1] - 1:19
**start** [19] - 7:24, 14:15,
14:16, 22:22, 44:10,
46:17, 50:2, 82:9,
86:11, 116:16,
118:1, 118:12,
119:5, 120:8, 120:9,
120:10, 121:24,
125:21, 126:23
**started** [13] - 34:24,
43:14, 49:4, 49:14,
52:19, 71:7, 71:25,
74:4, 74:8, 94:13,
114:9, 125:6, 125:9
**starting** [6] - 32:20,
40:3, 50:5, 74:3,
78:1, 108:25
**starts** [4] - 29:2,
69:12, 69:13, 70:3
**State** [3] - 78:8, 78:16,
89:14
**state** [3] - 61:1, 73:14,
91:1
**statement** [2] - 76:16,

78:24
**statements** [1] - 65:21
**STATES** [2] - 1:1, 1:13
**States** [5] - 5:2, 17:24,
18:16, 19:5, 116:25
**STATUS** [1] - 1:4
**stay** [1] - 76:1
**stenography** [1] -
1:25
**step** [1] - 26:9
**steps** [1] - 24:5
**STEVEN** [1] - 3:3
**sticky** [1] - 75:18
**still** [15] - 19:17,
29:13, 29:15, 34:13,
47:12, 90:18, 102:4,
102:5, 102:12,
102:15, 111:10,
111:24, 124:14,
128:15
**stonewalled** [1] -
102:8
**stop** [1] - 67:24
**STOY** [1] - 2:23
**straight** [1] - 22:12
**straightforward** [1] -
85:1
**streamline** [1] - 71:14
**Street** [6] - 1:20, 2:3,
2:12, 2:19, 3:19, 4:6
**Streets** [1] - 1:9
**strike** [3] - 16:4,
63:20, 68:11
**stroke** [1] - 25:9
**strong** [1] - 113:24
**stuck** [1] - 128:10
**studies** [2] - 23:15,
24:6
**stuff** [2] - 85:15, 97:24
**subject** [9] - 24:24,
30:3, 35:9, 57:19,
61:4, 62:10, 77:1,
87:8, 109:24
**submission** [2] -
111:5, 123:8
**submissions** [1] - 8:6
**submit** [3] - 53:16,
64:5, 117:1
**submitted** [3] - 14:8,
51:1, 82:17
**subpart** [1] - 16:4
**subset** [1] - 33:11
**subsidiaries** [1] -
81:12
**substance** [1] - 80:20
**substances** [1] -
36:22
**substantial** [3] - 7:4,
7:7, 74:20
**substantially** [2] -

126:21, 126:22
**substantive** [3] -
84:13, 84:17, 84:23
**subsumed** [2] - 47:13,
47:24
**subtract** [1] - 26:20
**subtracted** [1] - 99:12
**sudden** [2] - 35:23,
38:1
**sufficient** [2] - 72:4,
73:4
**suggest** [8] - 72:19,
88:11, 99:22, 103:1,
111:7, 113:6,
117:11, 123:12
**suggested** [1] - 87:19
**suggestion** [5] -
108:19, 108:22,
111:24, 119:3,
120:13
**suggests** [1] - 41:24
**Suite** [8] - 1:20, 2:9,
2:15, 3:4, 3:19, 4:3,
4:6, 4:9
**superiority** [1] - 75:10
**supervises** [1] - 94:4
**supplier** [2] - 27:21,
27:25
**supply** [1] - 56:15
**supplying** [1] - 56:12
**suppose** [1] - 28:8
**supposed** [2] - 68:13,
102:24, 107:6
**sustained** [2] - 59:9,
65:23
**swept** [2] - 49:23,
93:17
**switch** [1] - 40:7
**symbol** [1] - 115:4
**system** [1] - 72:23
**systems** [1] - 24:21

---

## T

**T's** [1] - 121:7
**table** [3] - 17:19, 59:7,
127:10
**tail** [2] - 109:8, 127:17
**tailored** [1] - 82:1
**talks** [1] - 56:4
**taped** [1] - 54:12
**tapes** [1] - 92:25
**task** [1] - 77:16
**team** [4] - 27:6, 35:10,
48:13, 128:15
**technical** [1] - 113:18
**technology** [1] - 55:21
**temporary** [1] - 76:3
**ten** [4] - 41:24, 80:1,
105:1, 105:3

**ten-minute** [1] - 80:1
**tentatively** [1] - 18:4
**term** [13] - 6:25, 37:3,
69:2, 97:20, 101:7,
101:9, 106:22,
108:3, 108:4,
113:21, 113:23,
114:7, 129:10
**terminology** [1] -
115:10
**terms** [45] - 6:10,
26:18, 49:17, 79:14,
79:25, 80:3, 92:11,
97:18, 97:21,
103:20, 105:16,
105:24, 106:4,
106:9, 106:19,
107:16, 107:19,
108:2, 108:9,
108:16, 109:13,
110:15, 110:24,
112:6, 112:12,
112:13, 112:22,
113:15, 113:17,
113:20, 114:3,
115:1, 115:2, 115:3,
115:6, 115:12,
116:7, 116:22,
117:15, 118:10,
120:14, 121:1,
121:4, 128:5
**terrible** [1] - 92:19
**terribly** [1] - 29:4
**test** [30] - 23:10,
29:22, 31:5, 31:22,
31:25, 33:19, 35:2,
42:18, 44:4, 45:2,
45:17, 46:18, 49:4,
50:1, 51:6, 52:1,
52:11, 53:20, 59:20,
90:24, 92:16, 92:18,
96:19, 97:3, 97:5,
97:10, 97:11, 105:19
**tested** [5] - 25:19,
37:6, 39:19, 54:3,
54:4
**testing** [67] - 23:17,
25:16, 29:1, 29:3,
29:5, 29:8, 29:12,
30:14, 31:2, 32:2,
32:13, 33:4, 33:14,
33:15, 33:25, 34:1,
34:11, 34:17, 34:19,
34:21, 35:1, 35:3,
35:10, 35:12, 35:13,
35:17, 35:22, 36:6,
36:11, 36:19, 36:24,
37:16, 37:22, 38:2,
38:24, 39:23, 40:4,
41:4, 42:4, 45:10,

45:22, 46:11, 48:3,
48:15, 48:24, 49:3,
50:25, 51:3, 52:21,
53:25, 54:16, 54:17,
55:16, 59:14, 76:19,
87:3, 91:12, 91:18,
92:7, 94:3, 96:2,
117:23
**tests** [54] - 29:9,
30:14, 30:25, 31:12,
31:20, 32:17, 33:11,
33:18, 34:15, 34:22,
34:24, 36:5, 38:9,
38:10, 42:6, 42:8,
42:24, 42:25, 43:1,
43:3, 43:6, 43:8,
43:15, 43:21, 45:6,
45:21, 46:17, 47:7,
47:14, 47:16, 47:19,
48:21, 48:23, 49:2,
50:6, 50:14, 50:15,
50:21, 50:25, 51:6,
51:13, 51:14, 51:15,
52:2, 85:11, 91:14,
91:15, 94:5, 94:6,
96:7, 96:8, 96:9,
97:7
**tetrazole** [1] - 57:25
**Teva** [5] - 3:5, 3:6,
5:21, 65:20, 73:1
**Texas** [1] - 4:10
**THE** [327] - 1:1, 1:7,
1:12, 5:3, 5:4, 6:1,
13:4, 13:20, 14:7,
14:11, 14:19, 14:21,
14:23, 15:3, 15:6,
15:13, 15:16, 15:21,
16:1, 16:3, 16:7,
16:13, 16:15, 16:21,
16:23, 17:1, 17:3,
17:5, 17:7, 17:9,
17:11, 17:13, 17:15,
17:17, 17:20, 18:6,
18:20, 18:23, 19:1,
19:7, 19:9, 20:10,
20:12, 20:20, 21:6,
21:10, 21:16, 21:24,
22:6, 22:15, 22:18,
22:22, 25:1, 25:8,
25:20, 26:15, 26:17,
27:1, 27:3, 27:13,
28:4, 28:18, 28:23,
28:25, 30:6, 30:11,
30:22, 32:3, 32:6,
32:12, 34:9, 34:17,
35:4, 35:8, 35:24,
36:1, 36:13, 37:2,
37:7, 37:15, 38:4,
38:9, 38:17, 38:19,
39:6, 42:14, 42:19,
42:21, 43:5, 43:9,

43:13, 43:18, 44:3,
44:12, 45:13, 45:19,
46:8, 47:1, 47:6,
47:10, 47:12, 47:15,
47:18, 47:25, 48:18,
48:20, 49:7, 49:11,
50:9, 50:14, 51:4,
51:9, 51:16, 51:20,
51:23, 52:6, 52:25,
53:20, 53:22, 54:14,
54:23, 55:7, 55:11,
55:17, 55:23, 56:1,
56:3, 56:7, 56:9,
56:23, 57:6, 57:11,
58:3, 58:8, 58:12,
58:16, 58:25, 59:3,
59:6, 59:9, 59:11,
59:14, 59:24, 60:1,
60:3, 60:6, 60:8,
60:13, 60:16, 61:3,
62:1, 62:7, 62:15,
62:18, 62:20, 62:23,
63:2, 63:5, 63:12,
63:16, 63:19, 63:22,
63:24, 64:17, 64:19,
65:6, 65:8, 65:13,
65:15, 65:21, 65:23,
66:23, 67:7, 67:9,
67:13, 67:16, 67:23,
68:3, 68:15, 69:4,
69:9, 69:12, 69:19,
69:23, 70:14, 70:20,
70:23, 74:23, 75:4,
76:18, 77:3, 77:9,
77:16, 78:7, 78:10,
78:17, 78:20, 79:2,
79:5, 79:8, 79:15,
79:19, 79:23, 80:4,
80:6, 80:7, 80:9,
80:16, 80:18, 80:22,
81:1, 81:4, 81:6,
81:13, 82:14, 82:19,
82:22, 82:25, 83:2,
83:4, 83:9, 83:16,
83:19, 83:21, 84:7,
86:1, 86:5, 86:8,
87:11, 87:14, 89:17,
95:16, 98:5, 98:7,
98:16, 100:6,
100:10, 100:13,
100:15, 100:17,
100:20, 101:3,
101:16, 101:23,
102:9, 102:16,
103:5, 103:14,
103:16, 103:19,
104:4, 104:7, 104:9,
104:15, 105:4,
105:8, 105:11,
105:23, 106:3,
106:7, 106:12,

106:15, 106:19,
106:22, 106:25,
107:4, 108:2,
108:13, 109:15,
110:19, 110:22,
110:25, 111:5,
111:12, 111:16,
112:3, 112:7, 112:9,
112:14, 112:17,
112:21, 113:2,
113:5, 113:9,
113:12, 114:12,
114:20, 115:14,
115:21, 116:4,
118:4, 118:19,
119:20, 120:1,
120:4, 120:12,
120:16, 120:20,
121:14, 121:18,
121:21, 122:2,
122:8, 123:6,
123:12, 123:19,
123:21, 124:1,
124:3, 124:6, 124:9,
124:18, 124:22,
124:25, 125:4,
125:21, 126:5,
126:13, 126:16,
127:5, 127:25,
128:13, 128:17,
128:19, 129:3,
129:6, 129:14
**themselves** [3] - 9:17,
10:11, 76:13
**theory** [6] - 9:25,
40:13, 51:24, 52:13,
107:22, 109:8
**they've** [10] - 20:25,
43:7, 48:22, 85:11,
85:23, 88:22, 95:23,
96:10, 118:16
**thinking** [3] - 79:16,
117:18, 122:9
**Third** [1] - 75:8
**third** [7] - 39:21,
40:10, 56:11, 75:8,
114:22, 122:23,
124:8
**third-party** [3] - 75:8,
122:23, 124:8
**THORNBURG** [1] - 4:2
**thorough** [3] - 20:14,
20:15, 25:13
**thousands** [3] - 96:2,
98:20
**three** [14] - 8:16, 18:2,
18:3, 33:19, 38:4,
38:23, 39:5, 41:7,
47:4, 52:17, 70:16,
89:5, 101:8, 124:10

**throughout** [2] - 85:1,
95:3
**throw** [1] - 45:2
**tie** [1] - 102:22
**ties** [1] - 42:13
**timeline** [1] - 124:16
**timely** [1] - 8:19
**timing** [5] - 74:14,
74:20, 79:18, 120:8,
123:9
**tiny** [1] - 82:23
**title** [2] - 57:14, 86:12
**titles** [1] - 39:15
**TO** [1] - 1:7
**today** [27] - 6:4, 6:18,
6:19, 7:2, 21:6,
21:14, 25:14, 39:5,
45:7, 45:12, 47:3,
55:1, 56:24, 61:21,
77:12, 84:22, 99:3,
99:25, 101:20,
101:23, 102:13,
102:24, 104:4,
111:18, 112:3,
112:7, 122:9
**today's** [1] - 53:7
**together** [5] - 40:21,
47:18, 54:12, 77:18,
120:23
**tomorrow** [6] - 100:1,
101:25, 104:6,
104:8, 104:21, 105:5
**tons** [1] - 56:19
**took** [6] - 50:22,
90:13, 90:15,
109:12, 122:25
**top** [1] - 76:2
**Torrent** [4] - 3:16,
3:17, 41:11, 44:1
**total** [2] - 81:10,
100:16
**touched** [1] - 99:1
**tough** [1] - 119:19
**toxic** [3] - 36:7, 37:4,
37:6
**TPP** [7] - 70:7, 70:8,
123:11, 123:16,
124:14, 124:17,
124:22
**TPPs** [2] - 123:2,
123:15
**trace** [1] - 109:2
**track** [2] - 72:7, 73:7
**tranche** [1] - 99:7
**transcript** [6] - 1:25,
28:9, 28:11, 52:17,
62:11, 129:18
**transcription** [1] -
1:25
**translate** [2] - 81:4,

114:6
**translated** [2] - 89:13,
111:21
**translating** [1] - 89:12
**translation** [3] - 111:4,
111:7, 115:18
**translations** [3] -
112:5, 112:25,
114:13
**translator** [2] -
112:11, 114:22
**translators** [1] - 115:8
**trap** [1] - 88:15
**TRAURIG** [1] - 3:2
**travel** [1] - 103:9
**trend** [1] - 54:6
**trial** [1] - 127:12
**tried** [3] - 21:2, 21:3,
71:21
**triggered** [1] - 124:15
**trip** [1] - 77:20
**Trischler** [8] - 5:24,
59:11, 74:13, 75:14,
76:15, 118:20,
119:22, 128:13
**TRISCHLER** [49] -
2:23, 5:23, 58:18,
58:21, 59:2, 59:12,
60:17, 60:21, 61:4,
61:11, 61:14, 61:24,
62:2, 62:13, 62:19,
62:21, 62:25, 63:3,
63:9, 67:4, 69:15,
69:20, 69:24, 70:8,
70:18, 70:21, 71:2,
76:16, 77:10, 77:14,
78:24, 79:4, 106:16,
106:21, 106:24,
107:1, 107:9,
108:11, 108:19,
116:20, 119:1,
119:24, 120:3,
120:5, 122:6,
122:16, 128:14,
128:18, 128:23
**true** [4] - 12:14, 27:1,
27:3, 97:17
**trump** [1] - 85:21
**truth** [1] - 108:21
**try** [12] - 7:12, 27:8,
32:4, 32:8, 40:22,
76:9, 76:10, 78:19,
87:22, 109:10,
126:25, 127:7
**trying** [6] - 7:17, 27:8,
35:6, 35:15, 107:23,
117:3
**turn** [4] - 13:20, 60:17,
60:18, 113:13
**turns** [3] - 99:13,

99:14, 110:4
**two** [23] - 8:15, 15:7,
18:4, 35:12, 38:13,
39:13, 50:8, 65:17,
65:18, 66:4, 69:16,
74:22, 76:10, 93:21,
101:8, 103:12,
105:8, 108:24,
113:14, 117:12,
120:15, 124:3
**two-part** [2] - 74:22,
76:10
**type** [10] - 22:1, 27:22,
31:5, 33:25, 41:18,
75:21, 82:23, 85:2,
95:9, 110:9
**types** [5] - 31:7, 33:15,
35:2, 35:12, 54:2

## U

**U.S** [4] - 1:9, 2:21,
24:23, 82:6
**ULMER** [1] - 4:5
**ultimately** [1] - 22:16
**unapproved** [3] -
18:3, 18:17, 77:12
**uncover** [1] - 108:9
**under** [7] - 12:16,
49:23, 58:21, 58:23,
78:6, 101:17, 101:18
**underneath** [1] -
13:15
**understood** [2] -
26:24, 62:16
**underway** [1] - 7:18
**undisputed** [1] - 88:10
**undoubtedly** [1] -
108:15
**unfortunately** [2] -
84:15, 116:4
**unhappy** [1] - 101:21
**unique** [4] - 12:8,
72:5, 72:7, 73:6
**United** [5] - 5:2, 17:23,
18:16, 19:5, 116:24
**UNITED** [2] - 1:1, 1:13
**unless** [6] - 33:6,
54:25, 58:18, 61:20,
118:14, 127:8
**unnecessary** [1] -
12:18
**unquestionably** [4] -
8:15, 10:23, 11:22,
75:17
**unredacted** [3] - 9:1,
10:5, 34:3
**up** [46] - 7:1, 14:13,
21:8, 23:2, 26:3,
27:8, 38:1, 39:20,

45:8, 49:24, 50:1,
50:5, 57:1, 57:6,
57:23, 59:12, 59:19,
63:4, 64:23, 65:24,
66:23, 67:3, 70:25,
72:25, 74:7, 74:25,
83:8, 85:19, 85:23,
87:19, 88:13, 90:14,
93:18, 95:24, 96:4,
102:22, 104:25,
106:14, 108:7,
108:20, 109:9,
110:4, 117:4,
117:22, 125:6,
127:19
**upset** [1] - 102:7
**US** [1] - 4:8
**USA** [3] - 3:6, 3:10,
3:13
**user** [1] - 73:8
**usual** [1] - 122:17
**utilized** [2] - 36:23,
95:15

## V

**vacation** [1] - 103:21
**vacuum** [2] - 26:7,
82:13
**vague** [1] - 68:17
**val** [1] - 97:8
**validation** [3] - 23:16,
23:18, 24:3
**validations** [1] - 23:10
**validity** [1] - 108:22
**VALSARTAN** [1] - 1:4
**valsartan** [30] - 5:6,
9:15, 23:3, 23:8,
23:13, 23:16, 23:20,
23:23, 24:3, 24:5,
24:19, 36:8, 45:24,
56:12, 56:13, 72:14,
81:23, 87:7, 87:17,
88:24, 90:11, 91:13,
91:24, 94:1, 96:12,
97:16, 99:1, 127:24
**value** [4] - 45:9, 45:11,
90:15, 94:21
**variants** [2] - 114:3,
114:5
**various** [1] - 72:21
**vast** [1] - 95:19
**vendor** [1] - 24:22
**vendor's** [1] - 24:16
**vendors** [1] - 24:14
**venture** [1] - 109:22
**verbatim** [1] - 86:2
**version** [7] - 14:3,
14:14, 34:3, 67:9,
68:3, 77:20, 105:15

**versions** [2] - 67:24,
111:21
**versus** [4] - 53:3,
80:21, 92:14, 126:11
**VICTORIA** [1] - 3:2
**video** [1] - 36:18
**view** [1] - 96:19
**Vine** [1] - 4:6
**vital** [1] - 40:6
**volume** [3] - 88:20,
113:17, 116:22

## W

**wait** [3] - 48:7, 66:9,
79:24
**waiting** [1] - 102:15
**waiving** [1] - 50:9
**walk** [2] - 25:6, 26:14
**walked** [5] - 31:10,
84:22, 85:14, 94:15,
95:20
**walks** [1] - 84:16
**wants** [6] - 22:16,
88:16, 88:19, 98:13,
121:13, 127:22
**warning** [2] - 64:6,
119:12
**warnings** [1] - 27:25
**warranted** [1] - 89:10
**waste** [1] - 100:21
**water** [3] - 24:21,
31:21, 36:11
**waters** [1] - 57:2
**watertight** [1] - 29:23
**weaker** [1] - 64:6
**website** [1] - 88:7
**Wednesday** [4] -
104:4, 105:12,
112:21, 128:2
**weeks** [10] - 38:24,
39:5, 41:7, 47:4,
52:18, 53:14,
113:14, 122:25,
123:17, 124:13
**welcome** [1] - 5:5
**WERNER** [1] - 3:11
**Westlaw** [1] - 12:6
**wet** [1] - 44:21
**wheelhouse** [1] - 34:6
**whip** [1] - 48:12
**whistleblower** [1] -
106:23
**WHITELEY** [5] - 2:2,
2:2, 5:15, 74:11,
76:6
**Whiteley** [1] - 5:16
**whitewashed** [1] -
93:5
**whole** [4] - 17:18,

105:9, 109:25, 110:7
**wide** [1] - 41:19
**wild** [3] - 109:8, 114:3,
114:4
**WILLIAMSON** -
2:12
**willing** [5] - 25:25,
53:4, 73:4, 75:12,
117:4
**window** [3] - 26:25,
43:4, 127:15
**wise** [1] - 62:8
**WITH** [1] - 1:5
**withdrawn** [4] - 18:4,
18:18, 20:8, 60:2
**withdrew** [1] - 66:5
**witness** [4] - 84:12,
84:18
**witness-by-witness**
[1] - 84:12
**witnesses** [5] - 86:23,
92:12, 93:2, 101:13,
117:24
**witnesses'** [1] - 93:1
**woman** [1] - 109:12
**word** [4] - 91:3, 91:7,
95:16, 109:18
**words** [7] - 11:23,
43:24, 87:25,
106:10, 109:16,
111:20, 114:5
**workable** [1] - 74:2
**works** [3] - 94:1,
115:5, 123:14
**world** [2] - 44:16,
108:25
**worried** [1] - 44:9
**worry** [1] - 26:24
**worth** [2] - 41:14,
41:24
**worthwhile** [1] - 129:9
**wrap** [2] - 102:22,
127:18
**write** [1] - 27:8
**written** [1] - 57:20
**wrongly** [3] - 48:1,
52:14, 109:1
**wrote** [6] - 32:15,
50:12, 64:12, 88:17,
92:16, 109:12

## Y

**year** [4] - 42:19, 77:23,
101:3, 126:17
**years** [5] - 40:23,
89:15, 89:16, 97:25,
108:24
**years'** [2] - 41:13,
41:24

**yesterday** [7] - 31:6,
51:2, 51:11, 71:9,
83:12, 86:12, 90:1
**York** [2] - 3:16
**yourself** [1] - 63:24
**yourselves** [2] -
115:15, 115:24

## Z

**Zhejiang** [1] - 2:21
**ZHP** [40] - 5:18, 16:20,
29:7, 32:10, 32:13,
33:23, 38:6, 38:15,
43:19, 43:21, 43:23,
44:10, 50:19, 51:5,
51:25, 52:8, 73:1,
74:24, 80:11, 80:19,
80:22, 81:6, 81:7,
81:9, 81:10, 83:25,
87:1, 92:9, 95:4,
97:8, 97:19, 102:5,
102:18, 103:25,
110:13, 116:16,
117:13, 118:9, 120:8
**ZHP's** [3] - 31:10,
42:14, 48:2
**ZHP-proposed** [1] -
83:25
**ZOGBY** [1] - 3:22