# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
IN RE:                          )    19-MD-2875(RBK-JS)
                                )
                                )    Camden, NJ
VALSARTAN NDMA PRODUCTS         )    January 15, 2020
LIABILITY LITIGATION            )    4:03 p.m.
```

TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:            ADAM M. SLATER, ESQUIRE
                               MAZIE, SLATER, KATZ &
                               FREEMAN, LLC
                               103 Eisenhower Parkway
                               2nd Floor
                               Roseland, NJ 07068

                               DANIEL NIGH, ESQUIRE
                               LEVIN PAPANTONIO
                               316 South Baylen Street
                               Pensacola, FL 32502

                               CONLEE S. WHITELEY, ESQ.
                               LAYNE HILTON, ESQUIRE
                               KANNER & WHITELEY, L.L.C.
                               701 Camp Street
                               New Orleans, Louisiana 70130

                               DAVID STANOCH, ESQUIRE
                               GOLOMB & HONIK, PC
                               1835 Market Street
                               Suite 2900
                               Philadelphia, PA 19103

                               BEHRAM PAREKH, ESQUIRE
                               KIRTLAND & PACKARD, LLP
                               1638 S. Pacific Coast Hwy.
                               Redondo Beach, CA 90277

                               GEORGE T. WILLIAMSON, ESQUIRE


For the Defendants:            SETH A. GOLDBERG, ESQUIRE
                               DUANE MORRIS, LLP
                               30 South 17th Street
                               Philadelphia, PA 19103

2

(Appearances continued)

<table>
<tr><td></td><td>VICTORIA D. LOCKARD, ESQUIRE<br>BRIAN RUBENSTEIN, ESQUIRE<br>GREENBERG TRAURIG, LLP<br>3333 Piedmont Road NE<br>Suite 2500<br>Atlanta, GA 30305</td></tr>
<tr><td>For Walmart:</td><td>DAVID SELLINGER, ESQUIRE<br>GREENBERG TRAURIG, LLP<br>500 Campus Drive<br>Suite 400<br>Florham Park, NJ 07932</td></tr>
<tr><td>For Aurobindo, USA:</td><td>JESSICA HEINZ, ESQUIRE</td></tr>
<tr><td>For Mylan Pharmaceuticals:</td><td>CLEM TRISCHLER, ESQUIRE<br>PIETRAGALLO GORDON ALFANO BOSICK<br>& RASPANTI, LLP<br>One Oxford Centre<br>301 Grant Street, 38th Floor<br>Pittsburgh, PA 15219</td></tr>
<tr><td>For CVS and Riteaid:</td><td>SARAH JOHNSON, ESQUIRE<br>KRISTEN RICHER, ESQUIRE</td></tr>
<tr><td>For AmerisourceBergan:</td><td>JEFFREY GOEPPINGER, ESQUIRE<br>ULMER & BERNE, LLP<br>600 Vine Street, # 2800<br>Cincinnati, OH 45202</td></tr>
<tr><td>For Legacy Pharmaceutical Packaging:</td><td>BRITTON ST. ONGE, ESQUIRE<br>POLINSELLI<br>100 S 4th Street, #100<br>St. Louis, MO 63102</td></tr>
<tr><td>For McCutchen:</td><td>ELLIE NORRIS, ESQUIRE</td></tr>
<tr><td>For Cardinal Health:</td><td>ANDREW KAPLAN, ESQUIRE</td></tr>
<tr><td>For Albertsons:</td><td>JONATHAN D. JANOW, ESQUIRE<br>BUCHANAN INGERSOLL & ROONEY, PC<br>1700 K Street, NW<br>#300<br>Washington, DC 20006</td></tr>
</table>

3

(Appearances continued)

```
For (phonetic) Scripts          MATTHEW KNEPPER, ESQUIRE
                                HUSCH BLACKWELL
                                190 Carondelet Plaza, Suite 600
                                St. Louis, MO 63105


Audio Operator:                 ECR


Transcribed by:                 DIANA DOMAN TRANSCRIBING, LLC
                                P.O. Box 129
                                Gibbsboro, NJ 08026
                                Office: (856) 435-7172
                                Fax:    (856) 435-7124
                                Email:  dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

4

1                          I N D E X

2

3    COLLOQUY RE:                                    PAGE

4    Legacy issues                                    9

5    Expansion of MDL                                11

6    Downstream defendant discovery                  19

7    Manufacturer defendant fact sheets              23

8    Recalled product issue                          30

9    MDL centrality                                  40

10   Plaintiff's motion for extension of time        43

11   Status of defendant's core discovery            44

12   Testing Issue                                   49

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The following was heard via telephone conference at

2        4:03 p.m.)

3             THE COURT:  This is Judge Schneider.  We're on the

4    record in the Valsartan MDL, Docket No. 19-2875.

5             Welcome back from the holiday.  And let's get the

6    names of people on the phone, starting with plaintiff.

7             MR. SLATER:  Good afternoon, Your Honor.  Adam Slater

8    for plaintiffs.

9             MS. WHITELEY:  Good afternoon, Your Honor.  This is

10   Conlee Whiteley on behalf of plaintiffs.

11            MR. STANOCH: David Stanoch for the plaintiffs.

12            MR. WILLIAMSON:  This is George Williamson on behalf

13   of the plaintiffs.

14            MR. PAREKH:  This is Behram Parekh on behalf of

15   plaintiffs.

16            MS. HILTON:  This is Layne Hilton on behalf of the

17   plaintiffs.

18            MR. NIGH:   This is Daniel Nigh on behalf of the

19   plaintiffs.

20            THE COURT:  Okay.  It sounds like that's the

21   plaintiff's team.  Who's on for the defendants?

22            MR. GOLDBERG:  Good afternoon, Your Honor.  This is

23   Seth Goldberg on behalf of the DHP parties, and the defendants.

24            MR. TRISCHLER:  Good afternoon, Your Honor.  Clem

25   Trischler for Mylan Pharmaceuticals.

1          MS. LOCKARD:  Victoria Lockard is here for TEVA, and

2  I believe Brian Rubenstein is on as well for TEVA.

3          MR. RUBENSTEIN:  Yes.  Good afternoon, Your Honor.

4  This is Brian on behalf of TEVA.

5          THE COURT:  Anyone else?

6          MS. JOHNSON:  Good afternoon, Your Honor.  This is

7  Sarah Johnson on behalf of the Pharmacy and Retailer

8  defendants, including CVS and RiteAid.

9          THE COURT:  Great.

10          MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

11  Because of some of the issues that are on the table today,

12  there are a few more lawyers on behalf of defendants on the

13  line.  A few representatives of wholesalers.

14          THE COURT:  No problem.

15          MR. GOLDBERG:  Wholesaler (inaudible) supply chain.

16  And counsel for Legacy to address the Legacy issue.  If you'd

17  like them to introduce themselves, they're -- they're on the

18  line as well.

19          THE COURT:  Okay.  Please -- please do.  Let's get

20  the name of everyone on the line.

21          MR. GOEPPINGER:  Good afternoon, Your Honor.  Jeff

22  Goeppinger on behalf of AmeriSourceBergan.

23          MR. ST. ONGE:  Britton St. Onge on behalf of Legacy

24  Pharmaceutical Packaging.

25          THE COURT:  Anyone else?  Okay.

Colloquy                                                          7

1           MR. GOLDBERG:  There are folks that, Your Honor --

2    Your Honor, there are, they probably don't know (inaudible) and

3    everybody else, you have to hit star one to unmute.

4           MS. NORRIS:  Thank you.

5           UNIDENTIFIED COUNSEL:  Good afternoon, Your Honor.

6           MS. NORRIS:  Thank you for that instruction.  This is

7    Ellie Norris and Alexi Davis (phonetic) on behalf of McCutchen

8    (phonetic).

9           THE COURT:  Well you might as have opened the

10   floodgates there, Mr. Goldberg.

11          MR. KAPLAN:  Good afternoon, Your Honor.  One more.

12   This is Andrew Kaplan on behalf of Cardinal Health.

13          MR. SELLINGER:  Good afternoon, Your Honor.  This is

14   David Sellinger on behalf of Walmart.

15          MR. JANOW:  Your Honor, this is Jonathan Janow on

16   behalf of Albertsons.

17          MR. KNEPPER:  Your Honor, Matthew Knepper on behalf

18   of Express Scripts.

19          MS. HEINZ:  And Jessica Heinz on behalf of Auribindo

20   USA and Auro..

21          MS. RICHER:  Good afternoon, Your Honor.  This is

22   Kristen Richer also on behalf of CVS and RiteAid.

23          THE COURT:  Okay.  Let me jump in here before we get

24   even more names.

25          I received the letters from plaintiff and defendant.

Colloquy                                                     8

1    Thank you very much.  We'll go down each of those issues and

2    discuss them, and any other issues the parties want to address.

3    Before we get into the issues in the letter, I just have one

4    question that perhaps someone can help me with.  Like me, you

5    probably got an order from the Judicial Panel, which had the

6    caption of the Invokana case and the Valsartan MDL's on it.

7           And I have to confess, I'm terribly confused by what

8    that order says and what it means as regards our case.  If

9    anyone on the phone knows what I'm talking about, the order,

10   and have an explanation of that order, what it means, boy, I

11   would appreciate some explanation.

12          MR. STANOCH:  Your Honor, this is David Stanoch for

13   plaintiffs.  Hearing nothing from all the esteemed colleagues.

14   I looked at this order very briefly, and I believe, and I may

15   be wrong, but I believe that was a case that was -- that

16   involved both Invokana and Valsartan.  And I believe the JP

17   have now severed the claims as to Valsartan and Invokana from

18   another, nd then transferred them accordingly.

19          I could be wrong, but that was my very quick read on

20   the phone when I'm coming back from a plane -- on a plane from

21   vacation.

22          MS. RICHER:  Yes, Your Honor.  This is Kristen

23   Richer.  I can confirm that that's correct.  I'm familiar with

24   that case in another context, and the complaint as original

25   filed identifies the (inaudible).  And they were severed

Colloquy                                                                9

1    (inaudible).

2              THE COURT:  So that order only concerns one case?

3              MR. STANOCH:  Yes.  Yes.

4              THE COURT:  Well thank you for the clarification.

5    That's helpful.  All right.  Let's now get to the issues in the

6    letters, and I think it's perfectly fine to go in the order

7    that is in the letter.  But maybe -- let me take the -- let me

8    just go out of order for one moment.

9              And let's discuss the Legacy issue, because I think

10   that's pretty straightforward.  You saw my order terminating

11   without prejudice the Legacy motion.  I spoke to Judge Kugler

12   about this.  He confirmed that all motions are stayed.  That's

13   why I entered my order.  Legacy, if you're on the phone, if you

14   want to make a special application to Judge Kugler about why

15   there's special circumstances, that Legacy is in such a unique

16   position that it should be permitted to file its motion at this

17   point, you could -- why don't you file an application with

18   Judge Kugler.

19             It will be put on the agenda for the conference at

20   the end of the week, and you could argue it before Judge

21   Kugler.  Your client hasn't been in the case apparently since

22   the beginning.  Judge Kugler made it absolutely clear that

23   there's going to come a time in this case where he hears the

24   parties' dispositive motions.

25             But as far as he's concerned, in terms of case

Colloquy                                    10

1   management, that time isn't ripe yet.  So that's why the motion

2   was terminated for Legacy, just like any dispositive motion

3   that's going to be filed.  But, again, to repeat, if you think

4   Legacy is in such a unique position, make an application to

5   Judge Kugler, it will be put on the agenda for the conference

6   at the end of the month, and you can argue it in person at that

7   time.

8           So does Legacy's counsel want to be heard on that?

9           MR. ST. ONGE:  No, I -- yes.  Thank you, Judge.  I

10  think that makes sense, and I understand that won't be the

11  actual motion, that's just an application for leave to file the

12  -- so I guess re-file the motion and have it heard.  Should I

13  make that application -- file that in the MDL and then

14  cross-file that original action as well?

15          And when would you like that to be filed by?

16          THE COURT:  I think that makes sense.  I don't think

17  you have to file a formal motion.  You could to it by letter

18  brief.  I would address it to Judge Kugler.  If you could copy

19  me on it, that would be helpful.  I'll make sure it gets on the

20  agenda for the conference at the end of the month.

21          In terms of when you should file it, I would do it as

22  soon as I can, counsel, so that Judge Kugler has time to

23  consider it.  And anybody that wants to be heard with regard to

24  that motion can chime in.

25          MR. ST. ONGE:  Just one quick second, Judge.  This is

Colloquy                                            11

1     Britton for Legacy again.  A letter brief, and that would be

2     filed on the Docket, though, correct?

3               THE COURT:  Yes.  Absolutely.

4               MR. ST. ONGE:  And would like me to send you a copy

5     -- okay.  You said a copy I wasn't sure what that meant.

6               THE COURT:  Well you're going to mail it to Judge

7     Kugler.  Mail a copy to me also.  Between your mailing and the

8     Docket, I won't miss it.

9               MR. ST. ONGE:  Okay.  Thank you, Judge.  I will do

10    that.

11              THE COURT:  All right.  So that takes care of the

12    Legacy issue.  The first issue in the letters is the expansion

13    of the MDL.  Let me -- let me -- I'll open it up for discussion

14    in a moment.  But let me just tell you what I'm thinking about

15    this.  I do agree that the expansion of the MDL raises some

16    really sticky issues about how to handle it.

17              I told Judge Kugler that I thought it's best that we

18    not decide any of those issues during this phone call, but will

19    put it on the agenda for the afternoon conference at the end of

20    the month when we meet with Judge Kugler.

21              Because I think some of these issues really have big

22    implications for how this case is going to proceed.  That being

23    said, with the understanding that we're not going to decide

24    anything on this phone call, I think it would be helpful to

25    have a discussion about what the issues are, and the different

Colloquy                                    12

1    positions of the parties, so that we can at least be alerted to

2    what's -- what's coming.

3              Plaintiff -- let me start with plaintiff.  Mr.

4    Slater, what are plaintiffs suggesting for how we incorporate

5    the two new sartan's into this case, given that, of course, the

6    master complaints only concern valsartan we've --  the document

7    requests and the search terms that we've been dealing with were

8    of course only directed to valsartan.

9              Have plaintiffs crystalized how they want to approach

10   this issue?

11             MR. SLATER:  Thank you, Judge.  I think that starting

12   with a couple of things that I think are the pressing issues

13   that we're certainly going to want to address, and I can talk

14   (inaudible).  One thing we need quickly (inaudible) direct

15   filing.  I just want to kind of put that out there and if

16   anybody on the phone (inaudible) everybody's attention because

17   people who just filed cases and we would like people

18   (inaudible) lack of ability to file (inaudible) pursuant to

19   victims who have filed if we can just tweak it a little to bit

20   to (inaudible) and Losartan cases to that, so that we don't

21   have people filing cases all over the country and having them

22   sent over.

23             THE COURT:  All right.  Let's -- let's deal with --

24             MR. SLATER:  (Inaudible).

25             THE COURT:  All right.  Let's deal with just that

1    issue.  Do the defendants have an objection to that?  To just

2    amending, or revising, or supplementing the existing direct

3    filing order to include the two new sartan's?  Because, if not,

4    I would just ask you to send me a form order, Mr. Slater, and

5    if Mr. -- if Judge Kugler's not in the office, I'll sign it.

6    So is there going to be any objection?

7            MS. LOCKARD:  Your Honor, it's Victoria Lockard here

8    from TEVA.  Since we all worked on the initial order for the

9    direct filing.  We can work with Mr. Slater on (inaudible).  I

10   don't think we'll have any objection, but I just want the

11   opportunity to canvas the rest of the defense group.  But --

12   and, you know, so far we haven't heard any objection to that

13   and we finally stated in the letter that was provided to the

14   Court.  So --

15           THE COURT:  Sounds great.

16           MS. LOCKARD:  We can handle it.

17           THE COURT:  Okay.  Sounds great to me.  Mr. Slater?

18           MR. SLATER:  (Inaudible).

19           THE COURT:  Just coordinate with counsel.  Send it to

20   the Court.  If Judge Kugler's not in the office at the time,

21   I'll sign it and get that done.  Okay.

22           MR. SLATER:  Thank you, Your Honor.  And just sort of

23   on Ms. Lockard's question.  I -- you know, if she could send it

24   over today, I'll (inaudible) look at the option by the end of

25   the week.  Because we're getting calls from people asking what

Colloquy                                14

1    to do.  So if she could do that quickly, I'll make sure.  All

2    right.  In terms of the overall litigation, Your Honor, I had a

3    good talk with Jeff the other day, with Mr. Goldberg the other

4    day, and I think we both were saying that we needed to talk to

5    our groups to figure out the details, and also get guidance

6    Your Honor and Judge Kugler about your thoughts.

7           But it certainly seems most efficient to try to use

8    the terms that have been negotiated and ruled on, to the extent

9    they have been, as much as possible for losartan and

10   irbesartan, and then figure out if there are any unique issues

11   that would cause those documents to be changed in any

12   particular way.

13          And I think everybody should be really thinking about

14   that and so on -- that -- we think though, we haven't all

15   talked on our side, but there's certainly a likelihood of new

16   master pleadings regarding the two drugs, and there may be some

17   others, we don't, on the plaintiffs' side, as to whether or not

18   they should be folded in together.

19          But I know the early discussion is that we can keep

20   this as clean as possible, should have master pleadings for

21   each of the drugs, so that the -- you know, it might -- a good

22   separation on the master pleading (inaudible).  As far as -- as

23   Your Honor said, we've done so much work on the discovery

24   requests that we feel that we should start with what we find,

25   and then we should figure out how those documents should be

Colloquy                                    15

1    amended, and then if that can't be worked out, obviously, bring

2    those specific issues to Your Honor.

3         And then there may be some that we're not aware of.

4    You know, there's some (inaudible) there may be some different

5    issues having to do with these drugs, and then the definitions

6    would have a terminology and things like that.  So, obviously,

7    the search terms would be prime examples, Your Honor.  And

8    obviously something that we'll have to go through and get done,

9    and especially the ones that are going to be specifically

10   patents that are involved with the irbesartan and losartan

11   issue.

12        So that's really our (inaudible) for the case here.

13   And we agree that we can continue to talk on our separate

14   sides, and then continue to talk between us now and before we

15   get to Court January 28th, so at least we can identify any

16   issue that might be, you know, primary type issues.

17        The other issue for the plaintiff is that we've

18   gotten a couple of inquiries from people who now have

19   irbesartan or losartan cases in advance.  What we intend to do

20   with the plaintiff's leadership structure, and we have told

21   them we thought what made the most sense was to address that

22   all at once, because there may be that one or two people have

23   reached out now, but there could be others that over the next

24   few weeks will (inaudible) case and want to be involved.

25        So I thought we could perhaps put something on the

Colloquy                                             16

1    Docket on ECF stating that if people are interested in joining

2    our leadership structure specific to those new drugs, that we

3    can talk to them and try to come up with what makes sense.

4    Some of our conditional PLT (phonetic) spots are certainly, you

5    know (inaudible) probably be a reasonable target for discussion

6    and probably the formation of a committee to focus on how we're

7    going to get up to speed with the new drugs.

8           I think that's a pretty good overview of where we are

9    on our side, unless anybody wants to (inaudible) that.

10          THE COURT:  Mr. Goldberg, it would be helpful to have

11   the 10,000 foot general thoughts if you know them of the

12   defendants.

13          MR. GOLDBERG: Sir, I can (inaudible) them.  You know,

14   I think we -- I think we are still trying to just get

15   everyone's input at all levels of the supply chain.  And Mr.

16   Slater's correct, we did have a, you know, productive

17   conversation.  And the parties have agreed to get together next

18   week to talk about these things.

19          I think as a -- as a general matter, you know, the

20   three drugs really do have differences in terms of, first, from

21   a factual standpoint in terms of manufacturing processes, et

22   cetera, from a regulatory profile.  I mean, he just said

23   recalls for valsartan are vastly different than the recalls for

24   irbesartan and losartan.  There are different defendants that

25   manufacture these drugs.

Colloquy                                    17

1          Some who manufacture valsartan don't manufacture

2    losartan and irbesartan.  So, you know, at a minimum it's going

3    to create some proportionality issues when you take valsartan,

4    which is the broadest of -- of recalls, and -- and if they

5    tried to transpose valsartan onto irbesartan and losartan.  So,

6    you know, those are things hopefully we can work out with

7    plaintiffs when they're talking about some of the discovery.

8          Obviously, we've spent a lot of time on specific

9    language in document requests.  Those kind of things, you know,

10   you don't think you'd want to revisit those kinds of things,

11   but it's more on some requests it's inapplicable because of the

12   differences in the drugs in some areas, you know, not worth

13   going down the road on in terms of irbesartan and losartan.

14         I think we are really trying to think through some

15   more of the -- of the bigger picture issues.  Why, or do you

16   put these drugs on different tracks?  Now is this -- is this a

17   time to think about whether, you know, there's a -- the Court

18   had talked about the economic loss claims.  You're maybe

19   proceeding, or with a personal injury claim, or there -- is

20   this a time to think about, one, should I take the one set of

21   claims going ahead of the other?

22         You know, if you want to proceed on valsartan and you

23   push the other -- the other cases and the other drugs, to use

24   Mr. Slater's phrase from the other day, to have those lag

25   behind.  Well that -- that may create some efficiencies, but it

Colloquy                                         18

1   also may create some inefficiencies at this point in time in

2   terms of collecting information.

3          These are things that I think we want to, you know,

4   these higher -- these higher level issues about management we

5   want to discuss with plaintiffs and -- and do think we'll be

6   able to come to the Court at the end of the month with some

7   good suggestions about them.

8          THE COURT:  That sounds very logical and sensical

9   (sic).  And I think you agree with me that these issues are so

10  important and so overreaching that we should give the parties

11  time to talk them out.  We're not going to decide anything

12  today.  And we'll put them on the agenda for the afternoon

13  conference at the end of the month.

14         But let me just make two general comments, and see if

15  you agree with them.  One is, Mr. Slater, I think your idea

16  about opening up leadership to have people who are

17  representative of this losartan and irbesartan issue, is an

18  excellent one.  I know Judge Kugler would encourage that, and I

19  think that's a great idea to make sure that leadership

20  structure of the group is representative of the entire group.

21         But the second general point I would make is, there's

22  pleading issues we have to deal with, and there's discovery

23  issues we have to deal with.  I think it makes sense to try and

24  deal with the pleading issues first.  Let's get them sorted out

25  and organized, and then, you know, we can deal with the

Colloquy                                    19

1    discovery issues with regard to these two new sartan's after we

2    get the other fact sheets and discovery requests out of the

3    way, which I hope we can do by the end of the month.

4              And then after we get that out of the way, revisit

5    the -- the two new sartan issues.  So I do think it makes sense

6    to separate the discussion when you talk about these issues

7    into case management, pleading issues, and separately deal with

8    the discovery issues, which I would put on the back burner for

9    now.

10             Okay.

11             UNIDENTIFIED COUNSEL:  Thanks, Judge.  We're

12   (inaudible).

13             THE COURT:  Okay.  So we'll -- we'll be prepared to

14   -- you'll discuss these issues, there's some very important

15   issues obviously.  And we'll discuss them the afternoon at the

16   end of the month conference.

17             Second issue on the letters is downstream defendant

18   discovery.  According to the chronology that I keep, our

19   expectation and hope by the conference on the twenty-eighth was

20   we were going to finalize all defendant fact sheets, and if

21   there were any issues regarding the non-manufacturing

22   defendants fact sheets, we were going to address them, brief

23   them, and decide them by the end of the month.

24             Where are we on the downstream defendant discovery

25   issues?

Colloquy                                    20

1          MS. WHITELEY:  Your Honor, this is Conlee Whiteley.

2     I can address the discovery request issues.  We've been having

3     meet and confers.  I think we've basically started (inaudible

4     4:28:21) towards the end of December on the 18th with Ms.

5     Johnson, and we had a follow up call with her.

6          We've made a good bit of progress there.  We've

7     exchanged -- we're all working on the short document, and we've

8     added a little bit of that, and we explained to her that we

9     needed to get some terminology confirmed with our expert.

10    And then turn it back around to her once we agree, or so that

11    the short form of those, the topics, the terminology.  And

12    we're going to put that back into our formal discovery request.

13         We are on a similar trajectory with the wholesaler

14    defendants, but just a little bit behind.  We had -- Mr. Slater

15    and Ms. Davis had a call on Christmas Eve to get the process

16    started.  We were going to have another call yesterday, but we

17    ended up -- we just received our draft from them of requests

18    for production that they believe that would be appropriate.

19    We're reviewing those.

20         We also last night reviewed some additional

21    information from Ms. Davis about scheduling, and other matters

22    which she wants to talk about in terms of discovery that she

23    wants from plaintiffs outside of the plaintiff fact sheet, and

24    scheduling for class certification, and other things like that.

25    So we have asked for a follow up call to discuss everything in

Colloquy                                                      21

1    the case.  Some of it may not need to be discussed right away,
2    but we'll get everybody caught up and work though those issues
3    on Friday.
4              MS. JOHNSON:  And --
5              THE COURT:  Go ahead --
6              MS. JOHNSON:  Your Honor, this is Sarah Johnson on
7    behalf of various retailer and pharmacy defendants.  And i go
8    to what Ms. Whiteley said regarding her efforts.  You know, as
9    you may recall, we had that conference by phone on the
10   eighteenth and there were some concerns that we were going to
11   be on a tight time line following the holidays.
12             So we're (inaudible 4:30:20) we got together and we
13   -- we did a lot a work over the holidays to go back to our
14   respective entities and figure out what we thought we could
15   reasonably provide in keeping with the Court's guidance at that
16   last conference.
17             And as Ms. Whiteley mentioned we prepared a draft
18   (inaudible 4:30:42), and then had a follow up conference about
19   those, and we're waiting for the edit.  So we're -- we are
20   mindful of the Court's --
21             THE COURT:  Target.
22             MS. JOHNSON:  -- schedule for -- for the -- yeah, for
23   the target to finalize and (inaudible 4:30:58) the end.  We're
24   continuing to talk, and next step, we'll see what plaintiffs
25   come back with on those requests.

1          THE COURT:  Okay.  So it sounds like with regard to

2     the retailer pharmacy parties we should be in a position to

3     address any disputes on the twenty-eighth.

4          MS. WHITELEY:  Yes, Your Honor.

5          MS. JOHNSON:  We're hopeful that that's where we're

6     going to be, Your Honor.

7          THE COURT:  Okay.  To give both sides peace of mind,

8     and I recall a reference in one of the letters to this, I

9     wholeheartedly agree that this set of requests is without

10    prejudice to serve another request in the future, or a

11    supplemental request.

12          This doesn't mean that this is the end of the road

13    with regard to discovery.  So if you're concerned, plaintiffs,

14    that if you don't get something included now you'll never get

15    it, that's not the case.  If you need something down the line,

16    you'll get it.  If it's relevant in the good cause you'll get

17    it.  So maybe that will help the parties if the -- to focus on,

18    you know, what they genuinely need at this point, because they

19    don't have to be concerned that they're waiving anything.

20          Do you think we'll be in a position to also address

21    the wholesaler defendants document requests by the

22    twenty-eighth?

23          MS. WHITELEY:  Your Honor, this is Conlee Whiteley

24    again.  I believe that we will be.  I'm hoping we'll make a

25    good bit of progress on Friday, and that is certainly our goal.

Colloquy                                    23

1          THE COURT:  Okay.  Great.  The third issue, I don't

2    really understand why this is on the agenda.  Manufacturer

3    defendant fact sheets.  So what group of defendants are we

4    talking about here?

5          MR. NIGH:  Your Honor, I can address -- this is

6    Daniel Nigh.  The fact sheets go to the specific case where we

7    just were discussing were the overall set of general discovery.

8    And so if you'll recall, we're completing individual plaintiff

9    fact sheets.  This is discovery aimed at understanding

10   defendant's information that they have for individual cases in

11   response to the fact sheets.

12          So it's the same type of thing we did in Benicar, so

13   we have plaintiff fact sheets and defendant fact sheets.

14   That's what we've been working on.  We had had a joint

15   (inaudible 4:33:29) fact sheet where everybody would, you know,

16   our hope was to have everybody in the supply chain work on it

17   together.  But with -- but with Your Honor's guidance we

18   understand that we're splitting that apart.  We have done that

19   to where it's (inaudible 4:33:51) that each person in the

20   chain, and my hope is to have it to where we can -- we can send

21   out the -- our draft by the end of the week, so that we can

22   have a discussion there and see whatever differences that we

23   have and adjust those at the end of the month.

24          THE COURT:  Mr. Nigh, I have to confess, I'm

25   confused.  I -- I don't know when -- we -- I mean all -- most

Colloquy                                    24

1    of the time up until now was on the API manufacturers and the

2    final product people.  Who are the plaintiffs referring to when

3    they talk about manufacturer defendant fact sheets?

4              I -- I don't understand.

5              MR. NIGH:  Well it shouldn't just be manufacturers'

6    fact sheets, it should really be called defense fact sheets.

7              THE COURT:  So I --

8              UNIDENTIFIED COUNSEL:  That goes to everybody in

9    (inaudible 4:34:49)

10             THE COURT:  So --

11             UNIDENTIFIED COUNSEL:  (inaudible 4:34:50) one

12   second?

13             THE COURT:  Yeah, I don't --

14             UNIDENTIFIED COUNSEL:  (Inaudible 4:34:52)

15   demonstrate it?  Judge, the way this came up I think was just

16   (inaudible 4:34:58) Mr. Goldberg (inaudible) and when we had

17   our call the other day, he told me he was going to put an issue

18   on the agenda which would -- to ask the Court to -- to not

19   require defense fact sheets to be completed by the

20   manufacturers (inaudible 4:35:13) API and finish those

21   manufacturers.  So the way it was presented to me is that those

22   -- that group of defendants did not want to do a defense fact

23   sheet, despite the fact that we've always understood them to be

24   done to identify things that would impact on the case

25   specifically identifying lot batches, whether the batch was

1    contaminated, at what level, et cetera.

2            Contact with the doctors involved in the care of the

3    plaintiff, et cetera.  Those types of issues.  And Mr. Goldberg

4    said they didn't think they should have to do a fact sheet

5    anymore in light of the general discovery.

6            THE COURT:  Oh.

7            UNIDENTIFIED COUNSEL:  That's my understanding of why

8    that was placed on the agenda today.  That (inaudible 4:35:55)

9    --

10           THE COURT:  Okay.  So we'll hear from Mr. Goldberg

11   right now.  But so I -- I guess what I'm understanding now --

12   now it's -- now it's clarified a little bit.  Is it defendants'

13   position that since they're responding to the requests for

14   production that they don't have to also respond to these fact

15   sheets?

16           MR. GOLDBERG:  Yeah, that's part of the position,

17   Your Honor.  And the fact sheet issue started really before the

18   Court spent, you know, he many months this fall going through

19   all of the document requests.

20           And (inaudible 4:36:40) document requests.  Now that

21   we have the (inaudible 4:36:43) that are, you know, Court

22   approved document requests that cover the waterfront with

23   respect to the kind of information that had previously been

24   proposed for the defendant (inaudible 4:36:56).  We -- we think

25   it's unnecessary to do.  So that's -- that's part of the -- the

Colloquy                          26

1    mediation hearing.  So we just wanted that clarification,

2    because the -- because we knew January 28th was coming up, and

3    there was this motion that defendant fact sheets needed to be

4    completed.

5         The second -- you know, the second issue is that the

6    kind of information that plaintiff might ask -- that might ask

7    our defendants to provide in a fact sheet, and, namely, it --

8    it really shouldn't be about the identification of a lot or

9    batch that a specific plaintiff might have -- the drug that a

10   specific plaintiff might have consumed came from.

11        That information is not in the possession, or not

12   able to be provided by the manufacturer defendant.  And so it

13   -- it -- that kind of request in a defendant fact sheet is

14   really unnecessary as to the manufacturer defendant.  And so

15   for those two reasons, we thought it made sense to just have

16   the clarity that at the manufacturer level of the supply chain,

17   a defendant fact sheet is not necessary.

18        THE COURT:  Is there -- well, I mean, it's clearly

19   the case, it's unquestionably the case that if there is going

20   to be a fact sheet for the defendants, it can't duplicate

21   what's in the request for production.  That makes no sense.  So

22   is there a circulating draft of whatever fact sheet the

23   plaintiffs want the manufacturer defendants to respond to?

24        MR. GOLDBERG:  You know, Your Honor, this is -- this

25   is Seth Goldberg.  Again, this -- there have been some drafts

Colloquy                                                    27

1    circulated.  And the last draft that we provided was back in

2    October before Your Honor really dug in on the document

3    requests.

4              THE COURT:  Right.

5              MR. GOLDBERG:  And at least with respect to the API

6    and (inaudible 4:39:11) manufacturers there are really only

7    three or four areas.  There's been produced the lot and batch

8    with respect to a specific plaintiff.  Produced the testing in

9    with respect to that lot and batch, and produced communications

10   with the plaintiff's physicians (inaudible 4:39:32).

11             And the first two are certainly covered by the

12   document request.  I'm not sure about physician communications,

13   I think they are covered by the document request.  And so every

14   one they've asked for is stuff we've already put into the

15   document request.

16             THE COURT:  Mr. Slater, wouldn't it make sense for

17   the -- now that the Court has ruled on the document requests,

18   and there can be no legitimate dispute that the fact sheets

19   shouldn't duplicate what the defendants, the manufacturing

20   defendants have to answer in the request for production,

21   wouldn't it make sense to go back to the draft and just clean

22   it up?

23             And if you think there's anything that's not covered

24   by the document requests, show it to the -- Mr. Goldberg and

25   his group, and then if there's disputes, we'll deal with it.

Colloquy                                    28

1    But I don't think it -- it's probably not wise to work from a

2    draft from October, since so much work has been done since

3    October that would moot out, according to Mr. Goldberg, all of

4    the proposed fact sheets.

5            MR. SLATER:  We agree.  And we'll (inaudible 4:41:03)

6    that what happened is, we have certain integrated defense fact

7    sheet for the defendants to pull out the parts that apply to

8    them, and then as we got into the document that they would

9    agreed to just push that issue to January, because, you know,

10   as you said, we're dealing with some other issues, let's just

11   take care of that next.

12           As Mr. Nigh says, we agreed fully with what he said.

13   We broke the fact sheet down and what (inaudible 4:41:30) going

14   to get them to the defendants by the end of the week.

15           THE COURT:  Okay.

16           MR. SLATER:  And I think once -- once if you actually

17   view them, that they'll see --

18           THE COURT:  Okay.

19           MR. SLATER:  -- that it's what we (inaudible 4:41:39)

20   agreed is narrowed to the plaintiffs.  So that we originally

21   had put this together with all these levels (inaudible

22   4:41:47), and any fact sheets can't alone identify whether a

23   plaintiff took a contaminated pill.

24           But when we take the information from the retailer

25   going backwards up the distribution chain from, you know, okay,

Colloquy                                    29

1    they took this NBC (phonetic) code, this is what the coding for

2    the retail level going back to the manufacturer, then the

3    manufacturer can say, okay, now we know that James Nick

4    (phonetic) took a pill that (inaudible 4:42:13) identification

5    number.  And we go back, we know that's a contaminated batch,

6    or the contamination level if there's (inaudible 4:42:20), so

7    there's information the manufacturers will need from these

8    downstream defendants in order to be able to put it together.

9         So there's going to be a work where we're getting the

10   information from one level, and go to the other level, and

11   ultimately be able to know our plaintiff-by-plaintiff level,

12   for example, in that individual cancer case which code they

13   took, going back up the chain to the manufacturer for that

14   specific lot or batch confirmed to be contaminated, et cetera.

15        And then the (inaudible 4:42:50)  physician

16   (inaudible) document.  So we're (inaudible 4:42:55), Your

17   Honor.  It's not just a duplicate document, it's a document to

18   make sure we have the specific information for a specific

19   plaintiff so that the specific facts are laid out connections.

20        THE COURT:  Okay.  So if I understand it right,

21   plaintiffs are going to serve by Friday a revised proposed fact

22   sheet.  Defendant manufacturers will look at that.  I hope

23   there's no objection, but I live in the real world.  And then

24   with regard to the disputes, we can address them on the

25   twenty-eighth.  Maybe we won't decide them, but we'll at least

Colloquy                                    30

1    address them on the twenty-eighth.

2              But until Mr. Goldberg and his group gets the revised

3    fact sheets, you know, it's pointless I think to talk about the

4    issue, because we don't know what it is that plaintiffs want.

5              UNIDENTIFIED COUNSEL:  We agree on (inaudible

6    4:43:58).

7              THE COURT:  All right.  So, Mr. Goldberg, you'll get

8    that revised, cleaned up -- my words, my words -- cleaned up

9    fact sheet.  By Friday you'll have time to discuss it and any

10   disputes, which presumably there will be, we'll discuss it on

11   the twenty-eighth.

12             MR. GOLDBERG:  Sounds good.

13             THE COURT:  All right.  That takes us to what's a

14   really interesting issue the recalled product issue.  Just to

15   put your mind at ease, we're not going to decide this issue

16   today.  There's too much involved, there's too much

17   consideration.  But I'm glad you raised it, because it's a big

18   issue.

19             It's a big enough issue, it seems to me that it

20   deserves a motion.  But here's the -- here's the concern,

21   problem, what have you, that I see.  Again, I'm not making any

22   ruling, but the odds that every single recalled pill has to be

23   preserved, at least commonsense wise, doesn't sound reasonable.

24             So there has to be an identification of some type of

25   representative group, or sample of recalled pills that are

Colloquy                                    31

1    preserved.  But even though we've been trying from the very

2    beginning in this case to find out the volumes involved, what

3    is a lot, what is batch, no one has been able to identify that

4    thus far.  So, I mean, does anyone have any idea if we're

5    talking about a thousand pills, a million pills, a hundred

6    million pills?

7              And doesn't that help frame the issue ultimately

8    about what has to be preserved, if anything?

9              MS. HILTON:  Your Honor, if I may?  Layne Hilton on

10   behalf of the plaintiffs.  Just to address Your Honor's first

11   point about the practicality of the defendants keeping or

12   preserving recalled pills.  They're actually the part of the

13   FDA recall efforts.  They're actually under FDA obligation for

14   every recalled pill they receive in their possession, they have

15   to quarantine it.

16             So they're already doing it, they're already keeping

17   the pills for (inaudible 4:46:47) for obvious issues under the

18   FDA.  And so all we're asking is that they don't then destroy

19   the pills, because they're already keeping them, they're

20   already quarantining them.  Defendants have indicated that they

21   are quarantining and keeping pursuant to a litigation hold.

22             THE COURT:  Right.

23             MS. HILTON:  Defendant Mylan has indicated that they

24   are quarantining product.  So in the sense that the pills are

25   already within their possession that they've received from

Colloquy                                    32

1    various customers or entities, they have to keep it right now.

2    And then they have to get affirmative authority from the FDA to

3    destroy it.

4            So plaintiffs are of the belief that our request to

5    preserve pills is actually, you know, (inaudible 4:47:32) is

6    already requiring them to do.

7            THE COURT:  Yeah, but that --

8            MS. HILTON:  -- they are (inaudible 4:47:37).

9            THE COURT:  Yeah, but I'm not sure that really is a

10   complete summary of the record, because -- we'll hear from Mr.

11   Goldberg, but Mr. Goldberg's letter says that they're mandated

12   in some instances to destroy pills.  And that was the basis of

13   their argument about the privacy and, you know, primary

14   jurisdiction, et cetera, et cetera.

15           What I'm thinking of, for example, suppose I said to

16   plaintiffs, plaintiffs file a motion about what you want, and

17   you're going to say, we want plaintiffs to quarantine and not

18   destroy every single recalled pill.  And I would say to

19   plaintiffs, what's the volume that we're talking about?  Where

20   are they located?  How are they stored?

21           I assume right now you can't give me the answer to

22   that question.

23           MS. HILTON:  No, Your Honor.  We can't.  I mean,

24   (inaudible 4:48:44) part of what our (inaudible 4:48:45) was

25   (inaudible).

Colloquy                                          33

1          THE COURT:  But don't we -- yeah, don't we need to

2    know that?  Don't we need to know that to frame an answer to

3    this question like what -- isn't what you want is a

4    representative sample of the recalled product?  You can't want

5    ten million pills, you want a representative sample, right?

6          And you can't get a representative sample unless you

7    know what universe is out there, right?  So doesn't it make

8    sense to try and find out what that universe is?

9          MS. HILTON:  Correct, Your Honor.  I think that's,

10   you know, sort of where we landed in our letter (inaudible

11   4:49:31).  Of course, our position is that -- that much of this

12   information as to who is keeping the -- the recalled product in

13   the event that it is a the third-party, you know, the volume,

14   whether product was already destroyed, when it was destroyed,

15   who destroyed it.

16         You know, we were just thinking that we were supposed

17   to receive that in core discovery.  We haven't.  To some extent

18   we received some documentation regarding the ongoing recalls

19   and -- and information about who was taking the pills, but we

20   don't -- there's a lot of it that, you know, we don't have.

21         We don't have any certificates of destruction,

22   destruction has already happened.  And so I think, you know,

23   where we've sort of landed is that we're going to at least

24   require prior to potentially briefing this this issue, we're

25   going to require some limited set of discovery to sort of

Colloquy                                    34

1    understand, as Your Honor said, that the scope of the universe

2    of what a (inaudible 4:50:26) so we can then, you know, better

3    identify what it is, you know, we really would like preserved.

4              THE COURT:  Mr. Goldberg, help us help you.  If -- if

5    the ultimate goal is to, and I'm not ruling, but, I mean,

6    commonsense tells me that not every last pill has to be

7    preserved, but a representative sample would have to be

8    preserved.  How can plaintiff go about identifying what a

9    representative sample is?

10             MR. GOLDBERG:  Your Honor, I think you're right about

11   the point that not every pill can be preserved.  Or I think

12   there's -- you know, there are cross-questions, there are

13   safety questions about, you know, a recalled drug getting back

14   into their supply.

15             You know, we -- we as a group talked about the

16   information that's been requested by plaintiffs.  And I think,

17   you know, by in large we can be comfortable providing that.  I

18   think the -- the issue therein is -- is, you know, the

19   situation is we've provided that information is one thing, but

20   the way this has been positioned is that, you know, to the

21   extent there are pills that have been destroyed pursuant to

22   communication from the FDA or a recall plan, that that is

23   somehow (inaudible 4:52:02) of evidence.

24             And now, you know, in our view that the manufacturers

25   who are following the directives of the FDA are not holding the

Colloquy                                      35

1    evidence.  And that's sort of, you know, getting to a sample

2    and making sure that there are samples available is -- is

3    potentially something that we could through -- through

4    production of this information (inaudible 4:52:31) that we can

5    do that.

6          There is the notion that there had been spoilation

7    has been, you know, that -- that raises a specter that, you

8    know, we don't think is warranted at this point.  And so that's

9    one of the reasons we haven't been able to reach an agreement

10   on this issue.

11         THE COURT:  Well isn't the -- doesn't the issue of

12   whether spoilation occurred in the past put the cart before the

13   horse?  I mean, we'll deal with that issue down the road.  But

14   I think what plaintiff is concerned about is destruction of

15   product in the future.

16         And if the Court ultimately has to decide that issue,

17   I don't see how it can decide that issue unless we know the

18   universe of what we're talking about.

19         MR. GOLDBERG:  Yeah, I think that's a -- I think

20   that's a fair point.  I mean, I think, you know, that there is

21   that question about what we do with drugs that are -- that, you

22   know, with the drugs that are still in the possession of the

23   manufacturers that have been, you know -- drugs that have been

24   returned upstream, so to speak, by the -- by the retailers and

25   wholesalers, or from consumers, what you do with that at this

Colloquy                                          36

1   point.

2            But -- but the notion, what has happened and has

3   happened pursuant to FDA directive, we're just concerned that

4   that that shouldn't be viewed as spoliation since we're doing

5   what the FDA has approved us to do.  And I don't know that, you

6   know, each defendant's going to be in a different place on

7   this.

8            But I agree with you that, you know, what we do going

9   forward is something that we can work with the plaintiffs on

10  and -- and, you know, possibly a good starting point are these

11  requests for information that they've put in the agenda

12  submission.

13           THE COURT:  So, Ms. Hilton, does it make sense to you

14  to continue your discussions with defendants to get your arms

15  around what presently exists?  And then, I mean, are you really

16  going to disagree with the notion that not every pill has to be

17  preserved, but what you're looking for is a representative

18  sampling?

19           MS. HILTON:  Yes, Your Honor.  I think we can work

20  with defendants on -- on sort of identifying a list of

21  discovery -- limited discovery on this issue.  And, you know,

22  without -- I don't want to speak out of turn, we can come to

23  some sort of agreement on -- on, you know, potentially a

24  representative universe of pills.

25           And so I think we can work with defendants.  I think

Colloquy                                          37

1    the issue is that, you know, right now we just are sort of

2    operating in a vacuum, and we don't have a lot of the documents

3    of what happened after defendants received the recalled product

4    and (inaudible 4:55:53).  So I think that, you know, (inaudible

5    4:55:57) to get more information about what then happened after

6    they received the recalled product as a third-party (inaudible

7    4:56:05) received the recalled product.  And then, you know, we

8    can come to some sort of hopefully agreeable conclusion on what

9    we want to be preserved.

10              THE COURT:  I don't think this has to be formal

11   interrogatories or document requests.  It seems to me that you

12   can get this information by informal discussions with, you

13   know, defense counsel over the phone.  And then at the

14   appropriate time, I'll say file your motion if you can't agree

15   on what has to be preserved.  We'll deal with the spoliation if

16   there is one down the road.

17              That's not the immediate thing.  I think the more

18   pressing issue is, going forward what has to be preserved.  So

19   why don't plaintiff continue their discussions with defendant

20   so that you have enough information, if there is a dispute and

21   you have to file a motion asking the Court to order the

22   defendants to preserve pills, you can talk intelligently about

23   what precisely is you're asking be preserved, because the Court

24   wants to know how much, where it is, what's this going to cost,

25   et cetera, et cetera.

Colloquy                                      38

1          MS. HILTON:  I think that sounds reasonable, Your

2     Honor.  One thing I'll just (inaudible 4:57:33).  Do you think

3     that we can -- we can perhaps get a lot of this information

4     informally from conversations with the defendant?  One thing I

5     think we actually probably would want, to the extent that the

6     FDA demanded destruction of pills that have already been

7     destroyed, those defendants would be required by the FDA to

8     create what they call the certificate of destruction.

9          And so I think if we had some, you know, (inaudible

10     4:58:01) of those certificates of destruction to the extent

11     they've said, I think that's something that would probably we

12     would be able to necessarily obtain during informal

13     discussions.

14          THE COURT:  Is there any objection, Mr. Goldberg, if

15     the Court orders the defendants to produce FDA certificates of

16     destruction regarding the recalled product?

17          MR. GOLDBERG:  Well I -- I was -- I was going to say

18     that plaintiffs, and I think I had said this before, plaintiffs

19     in their submission that identified a few areas of information

20     that they're seeking, and that is one of them.  Then, you know,

21     I think I had mentioned this -- I think generally we're

22     comfortable --

23          THE COURT:  Okay.  Great.

24          MR. GOLDBERG:  -- with plaintiff to provide this kind

25     of information.  But I'm not sure an order's necessary,

1    because, you know, we can do this on an informal basis.

2          THE COURT:  Okay.  Question.  Is it only recalled

3    product that was destroyed, or may be destroyed?  Or is it all

4    valsartan that was manufactured, say, from a particular time

5    period, or from a particular facility, even if it wasn't

6    specifically part of a recalled lot or batch?

7          MR. GOLDBERG:  Your Honor, I think this is likely

8    going to differ from defendant-to-defendant.  And I think some

9    of this information is going to be, you know, captured in what

10   we would provide to plaintiffs.  I mean, for some of the

11   defendants all of the -- all of the valsartan has been

12   recalled.  And I -- I don't have an answer from my own

13   defendant on that specific question, but it's something we can

14   try to get to the bottom of.

15         THE COURT:  So plaintiff wouldn't necessarily want

16   just -- it sounds to me, correct me if I'm wrong, Ms. Hilton,

17   but plaintiffs wouldn't necessarily want just certificates of

18   destruction of recalled product, they want certificates of

19   destruction of any valsartan product, say, after the

20   contamination was identified.  Am I wrong about that?

21         MS. HILTON:  No, you're not wrong, Your Honor.

22   That's correct.

23         THE COURT:  Okay.  So I think that's what Mr.

24   Goldberg said.  So we'll leave it where the parties are going

25   to talk about this information, because we're going to insist

Colloquy                                    40

1    that when and if the plaintiffs file their motion to preserve

2    these pills, that they have enough information, like I said, to

3    specifically identify what it is specifically they want.  And

4    through no fault of anybody right now, they don't have that

5    information.  Okay?

6        Next issue, nobody has an issue with this short form

7    complaints not properly filed with MDL centrality.  If we knew

8    what -- how we could help, we'll help.  This is in the

9    no-brainer category.  Nobody disagrees that this has to be

10   done.  Is there anything the Court can do to help?

11       UNIDENTIFIED COUNSEL:  Your Honor, we discussed this

12   the other day with Mr. Goldberg, and I think the fundamental

13   question we have and if it's (inaudible 5:01:57) not, you know,

14   focusing on something the Court's told us previously, then we

15   apologize.  We just need to know who is involved in this to

16   talk to them and figure out what the issue is, and then

17   (inaudible 5:02:12) go and figure out some sort of an order

18   that we (inaudible 5:02:15) from people that need extensions to

19   do something.

20       It's a large issue, it's not just one (inaudible

21   5:02:24).  Once we know, you know, identify who's involved and

22   what so we can talk to them in (inaudible 5:02:32) I think -- I

23   think that's the only way we can go.  I just know from my

24   perspective, and I just, again, apologize, I need to know who

25   we're talking to.

Colloquy                                    41

1           MR. GOLDBERG:  Your Honor, this is Jeff Goldberg.  We

2    had Exhibit D to Your Honor's submission.  And this issue came

3    up, and we discussed it on the record back in -- on November

4    6th.  And Your Honor asked for a list of all of the papers that

5    were improperly filed, and that you would issue an order

6    requiring those to be re-filed properly, or dismissed.

7           And so -- and you asked us to provide a list.  We

8    tried to do that with Exhibit D and think we've got everything.

9    So --

10          THE COURT:  We'll take care of it.

11          MR. GOLDBERG:  I think you could use that as a way to

12   reach out to --

13          THE COURT:  Yeah.

14          MR. GOLDBERG:  -- your colleagues on the plaintiffs

15   side.

16          UNIDENTIFIED COUNSEL:  Okay.

17          THE COURT:  Now --

18          UNIDENTIFIED COUNSEL:  That's fine.  I didn't realize

19   that it was attached.  I remember we spoke the other day.  You

20   were still trying to figure out the last (inaudible 5:03:41).

21   And neither of us could remember what happened, so I'm just

22   someway you figured it out and attached it.  No problem.

23          THE COURT:  Okay.

24          UNIDENTIFIED COUNSEL:  We'll address it tomorrow.

25          THE COURT:  And we'll take care of that order, Mr.

Colloquy                                42

1    Goldberg.  I -- I think you're right.  But what does -- I'm

2    looking at page three of Exhibit D.  What is the list of

3    plaintiffs who failed to file a timely short form complaint?

4            Do we have to do anything with regard to that?

5            UNIDENTIFIED COUNSEL:  This is the same thing.  I was

6    just waiting for who was involved, and then, you know, reach

7    out to them --

8            THE COURT:  Oh, I see.

9            UNIDENTIFIED COUNSEL:  -- (inaudible 5:04:24) at

10   least can be done.

11           THE COURT:  You mean -- oh, they filed a long form

12   complaint, but not a short form complaint?

13           UNIDENTIFIED COUNSEL:  Correct.

14           THE COURT:  Okay.  Fair enough.  We'll take care --

15           MR. NIGH:  Your Honor, this is Daniel Nigh.  If I

16   could interject just briefly.  We had this kind of issue in

17   Benicar.  They're actually called improvidently filed cases.

18   Or improvident -- there was a terminology for this.  All we did

19   was we put them, just like the deficiencies of the PFX, we

20   would list them each month in a Court agenda, and if it was

21   listed in there twice, then -- then that would open up an order

22   to show cause (inaudible 5:05:01) you started, and it's just

23   the same process.

24           It sounds like that would be effective for this same

25   issue as well.  That's something we can talk about --

Colloquy                                          43

1          THE COURT:  Okay.

2          MR. NIGH:  -- but that would probably (inaudible

3     5:05:11) part of the issue.

4          THE COURT:  Well I'll tell you what, Mr. Nigh, I'll -

5     - I'll issue this order, and if it's ignored then we'll go to

6     the order to show cause procedure for this --

7          MR. NIGH:  Okay.

8          THE COURT:  -- issue.  Okay?

9          MR. NIGH:  Sounds good.

10         THE COURT:  Okay.  That should take care of that.  I

11    think these people just need to be woken up.  Plaintiffs motion

12    for extension of time.  It's just an issue that it's like a bad

13    toothache, it just won't go away.  There's like 25 or 30

14    motions on the Docket.  Probably they don't need to be there.

15    By inclination, if it can't be worked out was to order the firm

16    to appear at the end of the month and find out why -- why they

17    had to file 30 motions when nobody else filed them.

18         So --

19         UNIDENTIFIED COUNSEL:  I was going to ask you, Mr.

20    Goldberg, has he -- the parties have been contacting defense

21    counsel to ask for a consent, or are we just filing motions?

22         MR. GOLDBERG:  I don't think anyone on the defense

23    side has been contacted (inaudible 5:06:23).

24         THE COURT:  They came in as one -- they came in as

25    one fell swoop.  And after that barrage, we haven't seen any.

Colloquy                                    44

1    So I'm going to order Mr. Golden to be here at the end of the

2    month.  Hopefully, we'll get a letter saying the issue's worked

3    out, get rid of all the motions, terminate them, so he doesn't

4    have to come to Camden to explain what's going on.

5              UNIDENTIFIED COUNSEL:  Yeah.

6              THE COURT:  Number seven.  Status of defendant's

7    ongoing core discovery.  Plaintiffs, do you want to talk about

8    this?

9              MS. HILTON:  Sure, Your Honor.  Layne Hilton on

10   behalf of the plaintiff.  I think our issue here is, you know,

11   in essence two-fold.  The first issue is that plaintiff has

12   identified that some defendants have appointed third-parties to

13   be registered U.S. agents and -- and to communicate with the

14   FDA on behalf of the company.

15             And we have confirmed that, (a) we're not receiving

16   communications of course on (inaudible 5:07:29).  And, (b) I

17   think we sort want some clarity as to whether we're going to

18   have to subpoena those third-party entities, or whether

19   defendants are going to producing those communications and

20   correspondence's pursuant to the Court's core discovery order.

21             And I think that for the second issue was that in the

22   context of our, for an investigation into the (inaudible

23   5:07:51) issue, we realize that we were likely missing some

24   correspondence with the FDA regarding the recall as it related

25   to the destruction of pills, specifically the fact that we

Colloquy                                    45

1   didn't have any certificates of destruction, et cetera, et

2   cetera.

3        And we are of the belief that those communications

4   and correspondence's were to be provided to us on an ongoing

5   basis pursuant to the Court's order.

6        THE COURT:  I guess we ought to clarify.  And I

7   looked at the order, it was certainly the intent of the order

8   that it wouldn't just apply to the named defendants, but anyone

9   acting on their behalf.  Albeit it didn't say that in so many

10  words.

11       If the defendants are taking the position that if

12  they have a third-party agent who's corresponding on their

13  behalf to the FDA, or separate law firm that's corresponding

14  with the FDA, if that's not included within the scope of the

15  Court's order, I'll clarify the order to make it clear that

16  that's what the Court intended the order to mean.

17       The intent of the order is just -- these are public

18  documents going to the FDA.  The plaintiff is entitled to a

19  copy of them.  We do it in patent cases, and there's no reason

20  not to do it in this case.  So I -- I guess the question

21  presented to the defendants is, are they taking the position

22  that, say, for example, defendant X, Y, Z is not sending the

23  letter, but a third-party agent of X, Y, Z is sending the

24  letter that that doesn't have to be produced.

25       MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  I

Colloquy                                                 46

1    think -- I think it would be helpful if we could have the

2    opportunity to talk to the other defendants on that specific

3    question.  You know, I -- I know that at least with respect to

4    DH (inaudible 5:10:18) we have a consultant or two that are --

5    that -- that communicated with the FDA, I believe, and as

6    plaintiffs have pointed out, on one or two occasions Duane

7    Morris has communicated with the FDA.

8              I don't know that the defendants are taking the

9    position that that information isn't in their possession and

10   custody or control, or that they can't -- they are not going to

11   produce that information.  But I think it would be helpful -- I

12   do not have -- I can't make the representation on behalf of the

13   other defendants, and I don't know the -- the scope of this

14   information either.  The volume.

15             THE COURT:  Okay.  Well I would ask plaintiffs to

16   keep this issue on your radar screen.  It's a very, very

17   important issue in the case.  You're entitled to those FDA

18   communications.  They're public documents.  They're not

19   privileged.  And they're clearly relevant to the case.  So put

20   it on your radar screen, continue discussions with Mr. Goldberg

21   and defendants.

22             In terms of the timeliness of the production, I would

23   like -- the Court would like to be kept up-to-date on this.

24   You will know by the dates of the letters you receive and

25   emails you receive whether or not the production to plaintiffs

                                    Colloquy                          47

 1     is timely or not.

 2              If an email is dated today and you don't get a copy

 3     of it for six months, that's not in compliance with the Court

 4     order.  And I want to know about that, because the order says

 5     that the communications with the FDA have to be produced, I

 6     don't have the order in front of me, but I think it was, what,

 7     seven days, within seven days?

 8              UNIDENTIFIED COUNSEL:  Yes, Your Honor.

 9              THE COURT:  And if you get -- if you get letters and

10     emails that are months later, that's unacceptable.  So you're

11     in the best position to know whether the order is being

12     complied with with regard to the timeliness issue.  And

13     continue your discussions with the defendants about, you know,

14     this issue about third-party agency consultants.  Clearly,

15     unless the sky falls in, how can a defendant argue that it's a

16     document within the possession of its law firm, or its

17     consultant, or agent is not within it's care, custody or

18     control?

19              You know that -- on the face of it, that argument

20     makes no sense.  So it's an important issue, and I'm asking --

21     it's an important issue and I'm asking you to stay on top of it

22     and keep the Court updated, okay?

23              UNIDENTIFIED COUNSEL:  We will, Your Honor.

24              THE COURT:  If we have to -- if we have to issue

25     orders requiring productions every two weeks with the

Colloquy                                    48

1    representation there are no responsive documents, we'll do it.

2    I don't want to do it.  That's the last thing in the world I

3    want to do is create more work.  But this order has to be

4    complied with.  Okay?

5         The testing issue.  Let me cut to the chase, because

6    it's getting late.  Plaintiffs, I don't know why it's

7    unacceptable if the defendants give you the Bates numbers where

8    the tests are listed, why that's not acceptable to you.

9         In an answer to interrogatory, you can give the Bates

10   number of a document that has the responsive information.  It

11   doesn't sound like plaintiffs are -- defendants are doing a

12   document dump.  They're referring you to the specific documents

13   that have the information you want.

14        It seems to the Court that that should be enough,

15   that they don't have to then go to the effort of preparing a

16   separate list.  Is there something I'm missing, plaintiffs?

17        MR. STANOCH:  Your Honor, this is David Stanoch.

18   Briefly on this, Your Honor, the references are to the -- the

19   high level generic ANDA documents.  They have 30 pages here,

20   but one defendant only takes (inaudible 5:14:50) for another

21   defendant.  And we wanted them to identify the types and

22   purposes of the test.

23        So they're simply saying, here's the Bates number,

24   good luck.  That makes it very difficult.  And then when we get

25   to those pages if we think we found what we wanted, it's --

Colloquy                                    49

1    it's only the highest level for the ANDA.  For example, if you

2    do a chromatography test, you know, there's over a dozen types.

3    And there's at least two different machines that you can them

4    with, and there's two different detectors that you can have on

5    each machine.

6          And that's the detail that's going to move things

7    along for us and our expert, not looking at the most basic set

8    of high version of the ANDA file about what might be done

9    versus what the test they're actually doing and the specifics

10   of the machines and (inaudible 5:15:31) that they were using

11   for it.

12         THE COURT:  The defendants have represented that the

13   Bates numbers that they've given you identify the tests that

14   they do.  Are they not correct?

15         MR. STANOCH:  They are generic references to some

16   types of tests they do, such as absorbent, or condition, or

17   (inaudible 5:15:56).  And, you know, they're -- Judge, there

18   are 11 different types of chromatography tests at least.  There

19   are at least two different machines codes that you do

20   chromatography tests with.  There's at least two different

21   differentiator's you use for each machine.

22         That's the kind of detail that we believe we can't

23   find in there and that why this strictly having the list like

24   you ordered should cut through all this.

25         THE COURT:  Okay.  Why don't you then look through

Colloquy                                      50

1    the documents that the defendants identified.  And if you feel

2    that there's specifics that are missing, why don't you meet and

3    confer with the defendant about what you specifically need, and

4    then they'll respond to it.  Rather than requiring them to

5    prepare a whole separate list, which at least they say is

6    duplicative of what's in the documents.  Okay?

7                MR. STANOCH:  We'll do that, Your Honor.  Thank you.

8                THE COURT:  Okay.  The last issue in the letter was

9    the Legacy issue, which we dealt with.  But there was one issue

10   that I wanted to raise.  And this is sort of the Court's pet

11   peeve.  And we mentioned it before, these confidentiality

12   designations.  Plaintiff, I've said this before, and you hinted

13   at it in your letter.  If you believe that the designations

14   that the defendants make are improper, and it's important,

15   raise it with the Court.

16           Because that's unacceptable, it's just unacceptable

17   to just willy -- I'm not saying they're doing this, but it's

18   unacceptable to willy-nilly designate these documents.  In your

19   letter brief, you alluded to that.  If you think any of the

20   documents that you refer to in your letter brief don't deserve

21   a confidentiality designation, raise it for the next conference

22   at the end of the month.  Send me the documents to review in

23   camera, and I'll decide.

24           We're not going to have instances in this case where

25   there's over-designations, simply because that's the way people

Colloquy                                      51

1    usually do things.  If a document is confidential genuinely,

2    it's going to be confidential, it's going to be sealed.  But --

3    but just because a company doesn't want a document to be

4    circulated in the public, doesn't necessarily make it

5    confidential or sealable.

6            That's all I have to say about that issue.  Okay?  So

7    I leave it in plaintiffs' very capable hands whether they think

8    it's important enough to raise the issue with the Court.  And

9    if so, just put it on the agenda for the next conference.  So

10   that takes us through the letters.  For the good of the order,

11   are there any other issues that anybody else wants to raise?

12   I'll try and confirm whatever we've talked about in an order to

13   be timely entered.

14           Any other issues anybody wants to raise?

15           MR. GOLDBERG:  None from defendants, Your Honor.

16           MR. SLATER:  Nothing for the plaintiffs, Your Honor.

17   Thank you very much.

18           THE COURT:  Okay.  Hearing none, we're -- we'll have

19   the morning and afternoon meetings at the end of the month.

20   Judge Kugler will be here.  So at a minimum, we'll address with

21   him the -- the two sartan issues, and whatever else comes up.

22   Thank you, counsel.  Have a good day.  And we're adjourned.

23       (Proceedings concluded at 5:19 p.m. )

24                        * * * * *

25               C E R T I F I C A T I O N

1    I, Josette Jones, court approved transcriber, certify that the

2    foregoing is a correct transcript from the official digital

3    audio recording of the proceedings in the above-entitled

4    matter.

5

6    -----------------------------    -------------------

7    JOSETTE JONES                  DATE

8    DIANA DOMAN TRANSCRIBING, LLC