UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
IN RE:                          )    19-MD-2875(RBK-JS)
                                )
                                )    Camden, NJ
VALSARTAN NDMA PRODUCTS         )    January 15, 2020
LIABILITY LITIGATION            )    4:03 p.m.
```

TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

```
For the Plaintiffs              ADAM M. SLATER, ESQUIRE
For April Harper:               MAZIE, SLATER, KATZ &
                                FREEMAN, LLC
                                103 Eisenhower Parkway
                                2nd Floor
                                Roseland, NJ 07068

                                DANIEL NIGH, ESQUIRE
                                LEVIN PAPANTONIO
                                316 South Baylen Street
                                Pensacola, FL 32502

                                CONLEE S. WHITELEY, ESQ.
                                LAYNE HILTON, ESQUIRE
                                KANNER & WHITELEY, L.L.C.
                                701 Camp Street
                                New Orleans, Louisiana 70130

For Eric Erwin:                 DAVID STANOCH, ESQUIRE
                                GOLOMB & HONIK, PC
                                1835 Market Street
                                Suite 2900
                                Philadelphia, PA 19103

For Kevork Avedikian:           BEHRAM V. PAREKH, ESQUIRE
                                KIRTLAND & PACKARD, LLP
                                1638 S. Pacific Coast Hwy.
                                Redondo Beach, CA 90277

For Jerry Holland:              GEORGE T. WILLIAMSON, ESQUIRE
                                FARR LAW FIRM
                                99 Nesbit Street
                                Punta Gorda, Florida 33950

For the Defendants              SETH A. GOLDBERG, ESQUIRE
For Princeton Pharm, Inc.       DUANE MORRIS, LLP
     Walgreens                  30 South 17th Street
                                Philadelphia, PA 19103
```

2

(Appearances continued)

|  |  |
|--|--|
|  | VICTORIA D. LOCKARD, ESQUIRE<br>BRIAN RUBENSTEIN, ESQUIRE<br>GREENBERG TRAURIG, LLP<br>3333 Piedmont Road NE<br>Suite 2500<br>Atlanta, GA 30305 |
| For Walmart: | DAVID SELLINGER, ESQUIRE<br>GREENBERG TRAURIG, LLP<br>500 Campus Drive<br>Suite 400<br>Florham Park, NJ 07932 |
| For Aurobindo: | JESSICA M. HEINZ, ESQUIRE<br>CIPRIANI & WERNER, PC<br>450 Sentry Parkway<br>Blue Bell, PA 19422 |
| For Mylan Pharmaceuticals: | CLEM TRISCHLER, ESQUIRE<br>PIETRAGALLO GORDON ALFANO BOSICK<br>& RASPANTI, LLP<br>One Oxford Centre<br>301 Grant Street, 38th Floor<br>Pittsburgh, PA 15219 |
| For CVS and Rite Aid: | SARAH E. JOHNSTON, ESQUIRE<br>KRISTEN L. RICHER, ESQUIRE<br>BARNES & THORNBURG, LLP<br>2029 Century Park East<br>Suite 300<br>Los Angeles, CA 90067 |
| For AmerisourceBergan: | JEFFREY GOEPPINGER, ESQUIRE<br>ULMER & BERNE, LLP<br>600 Vine Street, # 2800<br>Cincinnati, OH 45202 |
| For Legacy Pharmaceutical Packaging: | BRITTON ST. ONGE, ESQUIRE<br>POLINSELLI<br>100 S 4th Street, #100<br>St. Louis, MO 63102 |
| For McKesson: | ELIZABETH NORRIS, ESQUIRE<br>D'LESI DAVIS, ESQUIRE<br>NORTON, ROSE & FULBRIGHT, US LLP<br>2200 Ross Avenue<br>Suite 3600<br>Dallas, TX 75201 |

(Appearances continued)

For Cardinal Health:          ANDREW D. KAPLAN, ESQUIRE


For Albertsons:               JONATHAN D. JANOW, ESQUIRE
                              BUCHANAN INGERSOLL & ROONEY, PC
                              1700 K Street, NW
                              #300
                              Washington, DC 20006

For (phonetic) Scripts        MATTHEW KNEPPER, ESQUIRE
                              HUSCH BLACKWELL
                              190 Carondelet Plaza, Suite 600
                              St. Louis, MO 63105

Audio Operator:               SARAH ECKERT

Transcribed by:               DIANA DOMAN TRANSCRIBING, LLC
                              P.O. Box 129
                              Gibbsboro, NJ 08026
                              Office: (856) 435-7172
                              Fax:    (856) 435-7124
                              Email:  dianadoman@comcast.net




Proceedings recorded by electronic sound recording; transcript produced by transcription service.

4

I N D E X

COLLOQUY RE:                                                    PAGE

Legacy issues                                                     9

Expansion of MDL                                                 11

Downstream defendant discovery                                  19

Manufacturer defendant fact sheets                              23

Recalled product issue                                          30

MDL centrality                                                  40

Plaintiff's motion for extension of time                       43

Status of defendant's core discovery                           44

Testing Issue                                                   49

1    (The following was heard via telephone conference at

2    4:03 p.m.)

3         THE COURT:  This is Judge Schneider.  We're on the

4    record in the Valsartan MDL, Docket No. 19-2875.

5         Welcome back from the holiday.  And let's get the

6    names of people on the phone, starting with plaintiff.

7         MR. SLATER:  Good afternoon, Your Honor.  Adam Slater

8    for plaintiffs.

9         MS. WHITELEY:  Good afternoon, Your Honor.  This is

10   Conlee Whiteley on behalf of plaintiffs.

11        MR. STANOCH: David Stanoch for the plaintiffs.

12        MR. WILLIAMSON:  This is George Williamson on behalf

13   of the plaintiffs.

14        MR. PAREKH:  This is Behram Parekh on behalf of

15   plaintiffs.

16        MS. HILTON:  This is Layne Hilton on behalf of the

17   plaintiffs.

18        MR. NIGH:   This is Daniel Nigh on behalf of the

19   plaintiffs.

20        THE COURT:  Okay.  It sounds like that's the

21   plaintiff's team.  Who's on for the defendants?

22        MR. GOLDBERG:  Good afternoon, Your Honor.  This is

23   Seth Goldberg on behalf of the DHP parties, and the defendants.

24        MR. TRISCHLER:  Good afternoon, Your Honor.  Clem

25   Trischler for Mylan Pharmaceuticals.

Colloquy                                                        6

1        MS. LOCKARD:  Victoria Lockard is here for TEVA, and

2   I believe Brian Rubenstein is on as well for TEVA.

3        MR. RUBENSTEIN:  Yes.  Good afternoon, Your Honor.

4   This is Brian on behalf of TEVA.

5        THE COURT:  Anyone else?

6        MS. JOHNSON:  Good afternoon, Your Honor.  This is

7   Sarah Johnson on behalf of the Pharmacy and Retailer

8   defendants, including CVS and Rite Aid.

9        THE COURT:  Great.

10       MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

11  Because of some of the issues that are on the table today,

12  there are a few more lawyers on behalf of defendants on the

13  line.  A few representatives of wholesalers.

14       THE COURT:  No problem.

15       MR. GOLDBERG:  Wholesaler (inaudible) supply chain.

16  And counsel for Legacy to address the Legacy issue.  If you'd

17  like them to introduce themselves, they're -- they're on the

18  line as well.

19       THE COURT:  Okay.  Please -- please do.  Let's get

20  the name of everyone on the line.

21       MR. GOEPPINGER:  Good afternoon, Your Honor.  Jeff

22  Goeppinger on behalf of AmeriSourceBergan.

23       MR. ST. ONGE:  Britton St. Onge on behalf of Legacy

24  Pharmaceutical Packaging.

25       THE COURT:  Anyone else?  Okay.

1          MR. GOLDBERG:  There are folks that, Your Honor --

2     Your Honor, there are, they probably don't know (inaudible) and

3     anybody else, you have to hit star one to unmute.

4          MS. NORRIS:  Thank you.

5          UNIDENTIFIED COUNSEL:  Good afternoon, Your Honor.

6          MS. NORRIS:  Thank you for that instruction.  This is

7     Ellie Norris and D'Lesi Davis on behalf of McKesson.

8          THE COURT:  Well you might as have opened the

9     floodgates there, Mr. Goldberg.

10         MR. KAPLAN:  Good afternoon, Your Honor.  One more.

11    This is Andrew Kaplan on behalf of Cardinal Health.

12         MR. SELLINGER:  Good afternoon, Your Honor.  This is

13    David Sellinger on behalf of Walmart.

14         MR. JANOW:  Your Honor, this is Jonathan Janow on

15    behalf of Albertsons.

16         MR. KNEPPER:  Your Honor, Matthew Knepper on behalf

17    of Express Scripts.

18         MS. HEINZ:  And Jessica Heinz on behalf of Aurobindo

19    USA and Auro.

20         MS. RICHER:  Good afternoon, Your Honor.  This is

21    Kristen Richer also on behalf of CVS and Rite Aid.

22         THE COURT:  Okay.  Let me jump in here before we get

23    even more names.

24         I received the letters from plaintiff and defendant.

25    Thank you very much.  We'll go down each of those issues and

1   discuss them, and any other issues the parties want to address.

2   Before we get into the issues in the letter, I just have one

3   question that perhaps someone can help me with.  Like me, you

4   probably got an order from the Judicial Panel, which had the

5   caption of the <u>Invokana</u> case and the Valsartan MDL's on it.

6           And I have to confess, I'm terribly confused by what

7   that order says and what it means as regards our case.  If

8   anyone on the phone knows what I'm talking about, the order,

9   and have an explanation of that order, what it means, boy, I

10  would appreciate some explanation.

11          MR. STANOCH:  Your Honor, this is David Stanoch for

12  plaintiffs.  Hearing nothing from all the esteemed colleagues.

13  I looked at this order very briefly, and I believe, and I may

14  be wrong, but I believe that was a case that was -- that

15  involved both Invokana and Valsartan.  And I believe the JP

16  have now severed the claims as to Valsartan and Invokana from

17  one another, and then transferred them accordingly.

18          I could be wrong, but that was my very quick read on

19  the phone when I'm coming back from a plane -- on a plane from

20  vacation.

21          MS. RICHER:  Yes, Your Honor.  This is Kristen

22  Richer.  I can confirm that that's correct.  I'm familiar with

23  that case in another context, and the complaint as originally

24  filed identifies those (inaudible).  And they were severed and

25  sent to their respective (inaudible).

Colloquy                                                                    9

1          THE COURT:  So that order only concerns one case?

2          MR. STANOCH:  Yes.  Yes.

3          THE COURT:  Well thank you for the clarification.

4    That's helpful.  All right.  Let's now get to the issues in the

5    letters, and I think it's perfectly fine to go in the order

6    that is in the letter.  But maybe -- let me take the -- let me

7    just go out of order for one moment.

8          And let's discuss the Legacy issue, because I think

9    that's pretty straightforward.  You saw my order terminating

10   without prejudice the Legacy motion.  I spoke to Judge Kugler

11   about this.  He confirmed that all motions are stayed.  That's

12   why I entered my order.  Legacy, if you're on the phone, if you

13   want to make a special application to Judge Kugler about why

14   there's special circumstances, that Legacy is in such a unique

15   position that it should be permitted to file its motion at this

16   point, you could -- why don't you file an application with

17   Judge Kugler.

18         It will be put on the agenda for the conference at

19   the end of the week, and you could argue it before Judge

20   Kugler.  Your client hasn't been in the case apparently since

21   the beginning.  Judge Kugler made it absolutely clear that

22   there's going to come a time in this case where he hears the

23   parties' dispositive motions.

24         But as far as he's concerned, in terms of case

25   management, that time isn't ripe yet.  So that's why the motion

1    was terminated for Legacy, just like any dispositive motion

2    that's going to be filed.  But, again, to repeat, if you think

3    Legacy is in such a unique position, make an application to

4    Judge Kugler, it will be put on the agenda for the conference

5    at the end of the month, and you can argue it in person at that

6    time.

7            So does Legacy's counsel want to be heard on that?

8            MR. ST. ONGE:  No, I -- yes.  Thank you, Judge.  I

9    think that makes sense, and I understand that won't be the

10   actual motion, that's just an application for leave to file the

11   -- so I guess re-file the motion and have it heard.  Should I

12   make that application -- file that in the MDL and then

13   cross-file that original action as well?

14           And when would you like that to be filed by?

15           THE COURT:  I think that makes sense.  I don't think

16   you have to file a formal motion.  You could to it by letter

17   brief.  I would address it to Judge Kugler.  If you could copy

18   me on it, that would be helpful.  I'll make sure it gets on the

19   agenda for the conference at the end of the month.

20           In terms of when you should file it, I would do it as

21   soon as I can, counsel, so that Judge Kugler has time to

22   consider it.  And anybody that wants to be heard with regard to

23   that motion can chime in.

24           MR. ST. ONGE:  Just one quick second, Judge.  This is

25   Britton for Legacy again.  A letter brief, and that would be

1    filed on the Docket, though, correct?

2              THE COURT:  Yes.  Absolutely.

3              MR. ST. ONGE:  And would like me to send you a copy

4    -- okay.  You said a copy I wasn't sure what that meant.

5              THE COURT:  Well you're going to mail it to Judge

6    Kugler.  Mail a copy to me also.  Between your mailing and the

7    Docket, I won't miss it.

8              MR. ST. ONGE:  Okay.  Thank you, Judge.  I will do

9    that.

10             THE COURT:  All right.  So that takes care of the

11   Legacy issue.  The first issue in the letters is the expansion

12   of the MDL.  Let me -- let me -- I'll open it up for discussion

13   in a moment.  But let me just tell you what I'm thinking about

14   this.  I do agree that the expansion of the MDL raises some

15   really sticky issues about how to handle it.

16             I told Judge Kugler that I thought it's best that we

17   not decide any of those issues during this phone call, but will

18   put it on the agenda for the afternoon conference at the end of

19   the month when we meet with Judge Kugler.

20             Because I think some of these issues really have big

21   implications for how this case is going to proceed.  That being

22   said, with the understanding that we're not going to decide

23   anything on this phone call, I think it would be helpful to

24   have a discussion about what the issues are, and the different

25   positions of the parties, so that we can at least be alerted to

1    what's -- what's coming.

2           Plaintiff -- let me start with plaintiff.  Mr.

3    Slater, what are plaintiffs suggesting for how we incorporate

4    the two new sartans into this case, given that, of course, the

5    master complaints only concern Valsartan.  We've -- the

6    document requests and the search terms that we've been dealing

7    with were of course only directed to Valsartan.

8           Have plaintiffs crystalized how they want to approach

9    this issue?

10          MR. SLATER:  Thank you, Judge.  I think that starting

11   with a couple of things that I think are the pressing issues

12   that we're certainly going to want to address, and I can talk

13   (inaudible) issues given the time.  One thing we need quickly

14   is a direct filing order.  I just want to kind of put that out

15   there and say to everybody on the phone, get everybody's

16   attention because people need to file cases and we want people

17   due to the lack of ability to file them pursuant to victims who

18   have filed.  If we can just tweak it a little to bit Irbesartan

19   and Losartan cases, so that we don't have people filing cases

20   all over the country and having them sent over.

21          THE COURT:  All right.  Let's -- let's deal with --

22          MR. SLATER: This is a priority.

23          THE COURT:  All right.  Let's deal with just that

24   issue.  Do the defendants have an objection to that?  To just

25   amending, or revising, or supplementing the existing direct

Colloquy                                             13

1    filing order to include the two new sartans?  Because, if not,

2    I would just ask you to send me a form order, Mr. Slater, and

3    if Mr. -- if Judge Kugler's not in the office, I'll sign it.

4    So is there going to be any objection?

5              MS. LOCKARD:  Your Honor, it's Victoria Lockard here

6    from TEVA.  Since we all worked on the initial order for the

7    direct filing, we can work with Mr. Slater on (inaudible).  I

8    don't think we'll have any objection, but I just want the

9    opportunity to canvas the rest of the defense group.  But --

10   and, you know, so far we haven't heard any objection to that

11   and we finally stated in the letter that was provided to the

12   Court.  So --

13             THE COURT:  Sounds great.

14             MS. LOCKARD:  We can handle it.

15             THE COURT:  Okay.  Sounds great to me.  Mr. Slater?

16             MR. SLATER:  That sounds reasonable.

17             THE COURT:  Just coordinate with counsel.  Send it to

18   the Court.  If Judge Kugler's not in the office at the time,

19   I'll sign it and get that done.  Okay.

20             MR. SLATER:  Thank you, Your Honor.  And just sort of

21   on Ms. Lockard's question.  I -- you know, if she could send it

22   over today, our hope is to submit an option by the end of the

23   week.  Because we're getting calls from people asking what to

24   do.  So if she could do that quickly, I'll make sure.  All

25   right.

1              In terms of the overall litigation, Your Honor, I had

2       a good talk with Jeff the other day, with Mr. Goldberg the

3       other day, and I think we both were saying that we needed to

4       talk to our groups to figure out the details, and also get

5       guidance Your Honor and Judge Kugler about your thoughts.

6              But it certainly seems most efficient to try to use

7       the claims that have been negotiated and ruled on, to the

8       extent they have been, as much as possible for Losartan and

9       Irbesartan, and then figure out if there are any unique issues

10      that would cause those documents to be changed in any

11      particular way.

12             And I think everybody should be really thinking about

13      that and so on -- that -- we think though, we haven't all

14      talked on our side, but there's certainly a likelihood of new

15      master pleadings regarding the two drugs, and there may be some

16      other viewpoint on the plaintiffs' side as to whether or not

17      they should be folded in together.

18             But I know the early discussion is that we can keep

19      this as clean as possible, should have master pleadings for

20      each of the drugs, so that the -- you know, it might -- a good

21      separation on the master pleading matter.  As far as -- as Your

22      Honor said, we've done so much work on the discovery requests

23      that we feel that we should start with what we find, and then

24      we should figure out how those documents should be amended, and

25      then if that can't be worked out, obviously, bring those

1    specific issues to Your Honor.

2              And then there may be some issues that we're not

3    aware of.  You know, there's some new parties, there may be

4    some different issues having to do with the sales, and there

5    may be different issues with having terminology and things like

6    that.  So, obviously, the search terms is a prime example as

7    Your Honor mentioned.  Something that you have to go through

8    and get them, and especially the ones that are going to be

9    specifically patents that are involved with the Irbesartan and

10   Losartan issue.

11             So that's really our 10,000 (inaudible) to it.  And

12   we agree that we can continue to talk on our separate sides,

13   and then continue to talk between us now and before we get to

14   court January 28th, so at least we can identify any issue that

15   might be, you know, primary type issues.

16             The other issue for the plaintiff is that we've

17   gotten a couple of inquiries from people who now have

18   Irbesartan or Losartan cases and have asked what we intend to

19   do with the plaintiff's leadership structure.  And we have told

20   them we thought what made the most sense was to address that

21   all at once, because there may be that one or two people have

22   reached out now, but there could be others that over the next

23   few weeks will file cases and want to be involved.

24             So I thought was to perhaps put something on the

25   Docket on ECF stating that if people are interested in joining

 1    our leadership structure specific to those new drugs, that we

 2    can talk to them and try to come up with what makes sense.

 3    Things like additional PLAINTIFF (phonetic) spots, certainly,

 4    you know, that could probably be a reasonable part of the

 5    discussion and probably the formation of a committee to focus

 6    on how we're going to get up to speed with the new drugs.

 7            I think that's a pretty good overview of where we are

 8    on our side, unless anybody wants to add to that.

 9            THE COURT:  Mr. Goldberg, it would be helpful to have

10    the 10,000 foot general thoughts if you know them of the

11    defendants.

12            MR. GOLDBERG: Sir, I can give you some of them.  You

13    know, I think we -- I think we are still trying to get

14    everyone's input at all levels of the supply chain.  And Mr.

15    Slater's correct, we did have a, you know, productive

16    conversation.  And the parties have agreed to get together next

17    week to talk about these things.

18            I think as a -- as a general matter, you know, the

19    three drugs really do have differences in terms of, first, from

20    a factual standpoint in terms of manufacturing processes, et

21    cetera, from a regulatory profile.  I mean, we see that the

22    recalls for Valsartan are vastly different than

23    the recalls for Irbesartan and Losartan.  There are different

24    defendants that manufacture these drugs.

25            Some who manufacture Valsartan don't manufacture

Colloquy                               17

1    Losartan and Irbesartan.  So, you know, at a minimum if we

2    create some proportionality issues when you take Valsartan,

3    which is the broadest of -- of recalls, and -- and simply try

4    to transpose Valsartan onto Irbesartan and Losartan.  So, you

5    know, those are things hopefully we can work out with

6    plaintiffs when they're talking about some of the discovery.

7           Obviously, we've spent a lot of time on specific

8    language in document requests.  Those kind of things, you know,

9    you don't think you'd want to revisit those kinds of things,

10   but it's more on some requests it's inapplicable because of the

11   differences in the drugs in some areas, you know, not worth

12   going down the road on in terms of Irbesartan and Losartan.

13          I think we are really trying to think through some

14   more of the -- of the bigger picture issues.  Why, you know,

15   do you put these drugs on different tracks?  Now is this -- is

16   this a time to think about whether, you know, there's a -- the

17   Court had talked about the economic loss claims.  You're maybe

18   proceeding, or with a personal injury claims, or there -- is

19   this a time to think about one set of case -- one set of claims

20   going ahead of the other?

21          You know, if you want to proceed on Valsartan and you

22   push the other -- the other cases and the other drugs, to use

23   Mr. Slater's phrase from the other day, to have those lag

24   behind, you know that may create some efficiencies, but it also

25   may create some inefficiencies at this point in time in terms

1      of collecting information.

2              These are things that I think we want to, you know,

3      these higher -- these higher level issues about management we

4      want to discuss with plaintiffs and do think we'll be able to

5      come to the Court at the end of the month with some good

6      suggestions about them.

7              THE COURT:  That sounds very logical and sensical

8      (sic).  And I think you agree with me that these issues are so

9      important and so overreaching that we should give the parties

10     time to talk them out.  We're not going to decide anything

11     today.  And we'll put them on the agenda for the afternoon

12     conference at the end of the month.

13             But let me just make two general comments, and see if

14     you agree with them.  One is, Mr. Slater, I think your idea

15     about opening up leadership to have people who are

16     representative of this Losartan and Irbesartan issue is an

17     excellent one.  I know Judge Kugler would encourage that, and I

18     think that's a great idea to make sure that leadership

19     structure of the group is representative of the entire group.

20             But the second general point I would make is, there's

21     pleading issues we have to deal with, and there's discovery

22     issues we have to deal with.  I think it makes sense to try and

23     deal with the pleading issues first.  Let's get them sorted out

24     and organized, and then, you know, we can deal with the

25     discovery issues with regard to these two new sartans after we

1    get the other fact sheets and discovery requests out of the

2    way, which I hope we can do by the end of the month.

3          And then after we get that out of the way, revisit

4    the -- the two new sartan issues.  So I do think it makes sense

5    to separate the discussion when you talk about these issues

6    into case management, pleading issues, and separately deal with

7    the discovery issues, which I would put on the back burner for

8    now.

9          Okay.

10         UNIDENTIFIED COUNSEL:  Thanks, Judge.  We're in lock

11   step with that.

12         THE COURT:  Okay.  So we'll -- we'll be prepared to

13   -- you'll discuss these issues, there's some very important

14   issues obviously.  And we'll discuss them the afternoon at the

15   end of the month conference.

16         Second issue on the letters is downstream defendant

17   discovery.  According to the chronology that I keep, our

18   expectation and hope by the conference on the twenty-eighth was

19   we were going to finalize all defendant fact sheets, and if

20   there were any issues regarding the non-manufacturing

21   defendants fact sheets, we were going to address them, brief

22   them, and decide them by the end of the month.

23         Where are we on the downstream defendant discovery

24   issues?

25         MS. WHITELEY:  Your Honor, this is Conlee Whiteley.

1    I can address the discovery request issues.  We've been having

2    meet and confers.  I think we've basically started off towards

3    the end of December on the 18th with Ms. Johnson, and we had a

4    follow up call with her.

5         We've made a good bit of progress there.  We've

6    exchanged -- we're all working on the short document, and we've

7    added a little bit of that, and we explained to her that we

8    needed to get some terminology confirmed with our expert.

9    And then turn it back around to her once we agree, or so that

10   the short form of those, the topics, the terminology.  And

11   we're going to put that back into our formal discovery request.

12        We are on a similar trajectory with the wholesaler

13   defendants, but just a little bit behind.  We had -- Mr. Slater

14   and Ms. Davis had a call on Christmas Eve to get the process

15   started.  We were going to have another call yesterday, but we

16   ended up -- we just received our draft from them of requests

17   for production that they believe that would be appropriate.

18   We're reviewing those.

19        We also last night reviewed some additional

20   information from Ms. Davis about scheduling, and other matters

21   which she wants to talk about in terms of discovery that she

22   wants from plaintiffs outside of the plaintiff fact sheet, and

23   scheduling for class certification, motions and other things

24   like that.  So we have asked for a follow up call to discuss

25   everything in the case.  Some of it may not need to be

1    discussed right away, but we'll get everybody caught up and

2    work though those issues on Friday.

3                MS. JOHNSON:  And --

4                THE COURT:  Go ahead --

5                MS. JOHNSON:  Your Honor, this is Sarah Johnson on

6    behalf of various retailer and pharmacy defendants.  And I go

7    to what Ms. Whiteley said regarding her efforts.  You know, as

8    you may recall, we had that conference by phone on the

9    eighteenth and there were some concerns that we were going to

10   be on a tight time line following the holidays.

11        So what we did we did, efforts collectively from

12   everybody's(inaudible), we got together and we -- we did a lot

13   a work over the holidays to go back to our respective entities

14   and figure out what we thought we could reasonably provide in

15   keeping with the Court's guidance at that last conference.

16        And as Ms. Whiteley mentioned we prepared a draft of

17   those requests (inaudible), and then had a follow up conference

18   about those, and we're waiting for the edit.  So we're -- we

19   are mindful of the Court's --

20                THE COURT:  Target.

21                MS. JOHNSON:  -- schedule for -- for the -- yeah, for

22   the target to finalizing these requests and we're continuing to

23   talk, and next step, we'll see what plaintiffs come back with

24   on those requests.

25                THE COURT:  Okay.  So it sounds like with regard to

Colloquy                                          22

1          the retailer pharmacy parties we should be in a position to

2          address any disputes on the twenty-eighth.

3                    MS. WHITELEY:  Yes, Your Honor.

4                    MS. JOHNSON:  We're hopeful that that's where we're

5          going to be, Your Honor.

6                    THE COURT:  Okay.  To give both sides peace of mind,

7          and I recall a reference in one of the letters to this, I

8          wholeheartedly agree that this set of requests is without

9          prejudice to serve another request in the future, or a

10         supplemental request.

11                   This doesn't mean that this is the end of the road

12         with regard to discovery.  So if you're concerned, plaintiffs,

13         that if you don't get something included now you'll never get

14         it, that's not the case.  If you need something down the line,

15         you'll get it.  If it's relevant in the good cause you'll get

16         it.  So maybe that will help the parties if the -- to focus on,

17         you know, what they genuinely need at this point, because they

18         don't have to be concerned that they're waiving anything.

19                   Do you think we'll be in a position to also address

20         the wholesaler defendants document requests by the

21         twenty-eighth?

22                   MS. WHITELEY:  Your Honor, this is Conlee Whiteley

23         again.  I believe that we will be.  I'm hoping we'll make a

24         good bit of progress on Friday, and that is certainly our goal.

25                   THE COURT:  Okay.  Great.  The third issue, I don't

1   really understand why this is on the agenda.  Manufacturer

2   defendant fact sheets.  So what group of defendants are we

3   talking about here?

4           MR. NIGH:  Your Honor, I can address -- this is

5   Daniel Nigh.  The fact sheets go to the specific case where we

6   just were discussing were the overall set of general discovery.

7   And so if you'll recall, we're completing individual plaintiff

8   fact sheets.  This is discovery aimed at understanding

9   defendant's information that they have for individual cases in

10  response to the fact sheets.

11          So it's the same type of thing we did in Benicar,

12  where we have plaintiff fact sheets and defendant fact sheets.

13  That's what we've been working on.  We had had a joint fact

14  sheet where everybody would, you know, our hope was to have

15  everybody in the supply chain work on it together.  But with --

16  but with Your Honor's guidance we understand that we're

17  splitting that apart.  We have done that to where it's to be

18  that each person in the chain, and my hope is to have it to

19  where we can -- we can send out the -- our draft by the end of

20  the week, so that we can have a discussion then and see

21  whatever differences that we have and adjust those at the end

22  of the month.

23          THE COURT:  Mr. Nigh, I have to confess, I'm

24  confused.  I -- I don't know when -- we -- I mean all -- most

25  of the time up until now was on the API manufacturers and the

1    final product people.  Who are the plaintiffs referring to when

2    they talk about manufacturer defendant fact sheets?

3           I -- I don't understand.

4           MR. NIGH:  Well it shouldn't just be manufacturers'

5    fact sheets, it should really be called defense fact sheets.

6           THE COURT:  So I --

7           MR. NIGH:  That goes to everybody in supply chain.

8           THE COURT:  So --

9           UNIDENTIFIED COUNSEL:  (Inaudible) one second?

10          THE COURT:  Yeah, I don't --

11          UNIDENTIFIED COUNSEL: In order to demonstrate it?

12   Judge, the way this came up I think we skipped -- leaped over

13   it.  And, Mr. Goldberg can correct me.  When we had our call

14   the other day, he told me he was going to put an issue on the

15   agenda which would -- to ask the Court to -- to not require

16   defense fact sheets to be completed by the manufacturers.  And,

17   I assume that means API and Finish Dose manufacturers.  So the

18   way it was presented to me is that those  -- that group of

19   defendants did not want to do a defense fact sheet, despite the

20   fact that we've always understood them to be done to identify

21   things that would impact on the case specifically, identifying

22   lots, batches, whether the batch was contaminated, at what

23   level, et cetera.

24          Contact with the doctors involved in the care of the

25   plaintiff, et cetera.  Those types of issues.  And Mr. Goldberg

1    said they didn't think they should have to do a fact sheet

2    anymore in light of the general discovery.

3                THE COURT:  Oh.

4                UNIDENTIFIED COUNSEL:  That's my understanding of why

5    that was placed on the agenda today.  That (inaudible) for

6    them, not from us.

7                THE COURT:  Okay.  So we'll hear from Mr. Goldberg

8    right now.  But so I -- I guess what I'm understanding now --

9    now it's -- now it's clarified a little bit.  Is it defendants'

10   position that since they're responding to the requests for

11   production that they don't have to also respond to these fact

12   sheets?

13               MR. GOLDBERG:  Yeah, that's part of the position,

14   Your Honor.  And the fact sheet issue started really before the

15   Court spent, you know, the many months this fall going through

16   all of the document requests.

17               And that issue got tabled while we worked on the

18   document requests.  Now that we have the Court -- the Court

19   approved document requests that cover the waterfront with

20   respect to the kind of information that had previously been

21   proposed for the defendant fact sheet, we -- we think it's

22   unnecessary to do.  So that's -- that's part of the -- the

23   mediation hearing.  So we just wanted that clarification,

24   because the -- because we knew January 28th was coming up, and

25   there was this motion that defendant fact sheets needed to be

1    completed.

2              The second -- you know, the second issue is that the

3    kind of information that plaintiffs might ask the manufacturer

4    defendants to provide in a fact sheet, and, namely, it -- it

5    really seems to be about the identification of a lot or batch

6    that a specific plaintiff might have -- the drug that a

7    specific plaintiff might have consumed came from.

8              That information is not in the possession, or not

9    able to be provided by the manufacturer defendant.  And so it

10   -- it -- that kind of request in a defendant fact sheet is

11   really unnecessary as to the manufacturer defendant.  And so

12   for those two reasons, we thought it made sense to just have

13   the clarity that at the manufacturer level of the supply chain,

14   a defendant fact sheet is not necessary.

15             THE COURT:  Is there -- well, I mean, it's clearly

16   the case, it's unquestionably the case that if there is going

17   to be a fact sheet for the defendants, it can't duplicate

18   what's in the request for production.  That makes no sense.  So

19   is there a circulating draft of whatever fact sheet the

20   plaintiffs want the manufacturer defendants to respond to?

21             MR. GOLDBERG:  You know, Your Honor, this is -- this

22   is Seth Goldberg.  Again, this -- there have been some drafts

23   circulated.  And the last draft that we provided was back in

24   October before Your Honor really dug in on the document

25   requests.

1          THE COURT:  Right.

2          MR. GOLDBERG:  And at least with respect to the API

3     and Finish Dose Manufacturers there are really only three or

4     four areas.  There's produce the lot and batch with respect to

5     a specific plaintiff.  Produce the testing with respect to that

6     lot and batch, and produce communications with the plaintiffs'

7     physicians.  We think you have that.

8          And the first two are certainly covered by the

9     document request.  I'm not sure about physician communications,

10    I think they are covered by the document request.  And so every

11    one they've asked for is stuff we've already put into the

12    document request.

13         THE COURT:  Mr. Slater, wouldn't it make sense for

14    the -- now that the Court has ruled on the document requests,

15    and there can be no legitimate dispute that the fact sheets

16    shouldn't duplicate what the defendants, the manufacturing

17    defendants have to answer in the request for production,

18    wouldn't it make sense to go back to the draft and just clean

19    it up?

20         And if you think there's anything that's not covered

21    by the document requests, show it to the -- Mr. Goldberg and

22    his group, and then if there's disputes, we'll deal with it.

23    But I don't think it -- it's probably not wise to work from a

24    draft from October, since so much work has been done since

25    October that would moot out, according to Mr. Goldberg, all of

1    the proposed fact sheets.

2               MR. SLATER:  We agree.  And what Mr. Nigh was saying

3    when he first got on is that what happened was we had served a

4    integrated defense fact sheet for the defendants to pull out

5    the parts that apply to them, and then as we got into the

6    document more or less, it was agreed to just push that issue to

7    January, because, you know, as you said, we're dealing with

8    some other issues, let's just take care of that next.

9               As Mr. Nigh says, we agreed fully with what you said.

10   We broke the fact sheet down and we're finishing them and going

11   to get them to the defendants by the end of the week.

12               THE COURT:  Okay.

13               MR. SLATER:  And I think once -- once if you actually

14   see them, then you'll see --

15               THE COURT:  Okay.

16               MR. SLATER:  -- that it won't be duplicative.  What

17   it will be is narrowed to the plaintiffs.  So that we

18   originally had put this together with all these levels because

19   the manufacturers can't alone identify whether a plaintiff took

20   a contaminated pill.

21               But when we take the information from the retailer

22   going backwards up the distribution chain from, you know, okay,

23   they took this NBC (phonetic) code, this is what the coding is

24   at the wholesale level going back to the manufacturer, then the

25   manufacturer can say, okay, now we know that James Smith took a

1    pill with these identification numbers.  And we go back, we

2    know that's a contaminated batch, or the contamination level is

3    this, et cetera, so there's information the manufacturers will

4    need from these downstream defendants in order to be able to

5    put it together.

6            So this is going to be a work where we're getting the

7    information from one level to go to the other level, and

8    ultimately be able to know on a plaintiff-by-plaintiff level,

9    for example, in an individual cancer case which code they took,

10   going back up the chain to the manufacturer for that specific

11   lot or batch confirmed to be contaminated, et cetera.

12           And then the obvious other issues of, for example,

13   physicians specific location, specific if they have documents.

14   So we're on the exact same pages, Your Honor.  It's not just a

15   duplicate document, it's a document to make sure we have the

16   specific information for a specific plaintiff so that the

17   specific facts are laid out directly.

18           THE COURT:  Okay.  So if I understand it right,

19   plaintiffs are going to serve by Friday a revised proposed fact

20   sheet.  Defendant manufacturers will look at that.  I hope

21   there's no objection, but I live in the real world.  And then

22   with regard to the disputes, we can address them on the

23   twenty-eighth.  Maybe we won't decide them, but we'll at least

24   address them on the twenty-eighth.

25           But until Mr. Goldberg and his group gets the revised

 1    fact sheets, you know, it's pointless I think to talk about the
 2    issue, because we don't know what it is that plaintiffs want.
 3                UNIDENTIFIED COUNSEL:  We agree on this (inaudible).
 4                THE COURT:  All right.  So, Mr. Goldberg, you'll get
 5    that revised, cleaned up -- my words, my words -- cleaned up
 6    fact sheet by Friday.  You'll have time to discuss it and any
 7    disputes, which presumably there will be, we'll discuss it on
 8    the twenty-eighth.
 9                MR. GOLDBERG:  Sounds fair.
10                THE COURT:  All right.  That takes us to what's a
11    really interesting issue the recalled product issue.  Just to
12    put your mind at ease, we're not going to decide this issue
13    today.  There's too much involved, there's too much
14    consideration.  But I'm glad you raised it, because it's a big
15    issue.
16                It's a big enough issue, it seems to me that it
17    deserves a motion.  But here's the -- here's the concern,
18    problem, what have you, that I see.  Again, I'm not making any
19    ruling, but the odds that every single recalled pill has to be
20    preserved, at least commonsense wise, doesn't sound reasonable.
21                So there has to be an identification of some type of
22    representative group, or sample of recalled pills that are
23    preserved.  But even though we've been trying from the very
24    beginning in this case to find out the volumes involved, what
25    is a lot, what is batch, no one has been able to identify that

1    thus far.  So, I mean, does anyone have any idea if we're

2    talking about a thousand pills, a million pills, a hundred

3    million pills?

4              And doesn't that help frame the issue ultimately

5    about what has to be preserved, if anything?

6              MS. HILTON:  Your Honor, if I may?  Layne Hilton on

7    behalf of the plaintiffs.  Just to address Your Honor's first

8    point about the practicality of the defendants keeping or

9    preserving recalled pills.  They're actually the part of the

10   FDA recall efforts.  They're actually under FDA obligation for

11   every recalled pill they receive in their possession, they have

12   to quarantine it.

13             So they're already doing it, they're already keeping

14   the pills for (inaudible) their obligations under the FDA.  And

15   so all we're asking is that they don't then destroy the pills

16   because they're already keeping them, they're already

17   quarantining them.  Defendants have indicated that they are

18   quarantining and keeping pursuant to a litigation hold.

19             THE COURT:  Right.

20             MS. HILTON:  Defendant Mylan has indicated that they

21   are quarantining products.  So in the sense that the pills are

22   already within their possession that they've received from

23   various customers or entities, they have to keep it right now.

24   And then they have to get affirmative authority from the FDA to

25   destroy it.

1          So, you know, plaintiffs are of the belief that our

2    request to preserve pills is actually, you know, sort of

3    subsumed by what the FDA is already requiring them to do.

4          THE COURT:  Yeah, but that --

5          MS. HILTON: And what they are --

6          THE COURT:  Yeah, but I'm not sure that really is a

7    complete summary of the record, because -- we'll hear from Mr.

8    Goldberg, but Mr. Goldberg's letter says that they're mandated

9    in some instances to destroy pills.  And that was the basis of

10   their argument about the primacy and, you know, primary

11   jurisdiction, et cetera, et cetera.

12         What I'm thinking of, for example, suppose I said to

13   plaintiffs, plaintiffs file a motion about what you want, and

14   you're going to say, we want plaintiffs to quarantine and not

15   destroy every single recalled pill.  And I would say to

16   plaintiffs, what's the volume that we're talking about?  Where

17   are they located?  How are they stored?

18         I assume right now you can't give me the answer to

19   that question.

20         MS. HILTON:  No, Your Honor.  We can't.  And, that's

21   sort of part of what our ask was, we need something limited --

22         THE COURT:  But don't we -- yeah, don't we need to

23   know that?  Don't we need to know that to frame an answer to

24   this question like what -- isn't what you want is a

25   representative sample of the recalled product?  You can't want

1    ten million pills, you want a representative sample, right?

2           And you can't get a representative sample unless you

3    know what universe is out there, right?  So doesn't it make

4    sense to try and find out what that universe is?

5           MS. HILTON:  Correct, Your Honor.  I think that's,

6    you know, sort of where we landed in our letter.  You know, we

7    asked for some.  Of course, our position is that -- that much

8    of this information as to who is keeping the -- the recalled

9    product in the event that it is a third-party, you know, the

10   volume, whether product was already destroyed, when it was

11   destroyed, who destroyed it, you know, we are in a position

12   that we were supposed to receive that in core discovery.  We

13   haven't.  To some extent we received some documentation

14   regarding the ongoing recalls and -- and information about who

15   was keeping the pills, but we don't -- there's a lot of it

16   that, you know, we don't have.

17          We don't have any certificates of destruction,

18   destruction has already happened.  And so I think, you know,

19   where we've sort of landed is that we're going to at least

20   require prior to potentially briefing this this issue, we're

21   going to require some limited set of discovery to sort of

22   understand, as Your Honor said, that the scope of the universe

23   of what a doctor, so we can then, you know, better identify

24   what it is, you know, we really would like preserved.

25          THE COURT:  Mr. Goldberg, help us help you.  If -- if

1    the ultimate goal is to, and I'm not ruling, but, I mean,

2    commonsense tells me that not every last pill has to be

3    preserved, but a representative sample would have to be

4    preserved.  How can plaintiff go about identifying what a

5    representative sample is?

6            MR. GOLDBERG:  Your Honor, I think you're right about

7    the point that not every pill can be preserved.  Or I think

8    there's -- you know, there are cross-questions, there are

9    safety questions about, you know, a recalled drug getting back

10   into their supply.

11           You know, we -- we as a group talked about the

12   information that's been requested by plaintiffs.  And I think,

13   you know, by and large we can be comfortable providing that.  I

14   think the -- the issue really is, you know, there are kind of

15   two issues.  Providing that information is one thing, but the

16   way this has been positioned is that, you know, to the extent

17   there are pills that have been destroyed pursuant to

18   communication from the FDA or a recall plan, that that is

19   somehow only option of evidence.

20           And now, you know, in our view that the manufacturers

21   who are following the directives of the FDA are not spoliating

22   evidence.  And that's sort of, you know, getting to a sample

23   and making sure that there are samples available is -- is

24   potentially something that we could through -- through

25   production of this information hopefully determine that we can

1    do that.

2              The notion that there has been spoilation has been,

3    you know, that -- that raises a specter that, you know, we

4    don't think is warranted at this point.  And so that's one of

5    the reasons we haven't been able to reach an agreement on this

6    issue.

7              THE COURT:  Well isn't the -- doesn't the issue of

8    whether spoilation occurred in the past put the cart before the

9    horse?  I mean, we'll deal with that issue down the road.  But

10   I think what plaintiff is concerned about is destruction of

11   product in the future.

12             And if the Court ultimately has to decide that issue,

13   I don't see how it can decide that issue unless we know the

14   universe of what we're talking about.

15             MR. GOLDBERG:  Yeah, I think that's a -- I think

16   that's a fair point.  I mean, I think, you know, that there is

17   that question about what we do with drugs that are -- that, you

18   know, with the drugs that are still in the possession of the

19   manufacturers that have been, you know -- drugs that have been

20   returned upstream, so to speak, by the -- by the retailers and

21   wholesalers, or from consumers, what you do with that at this

22   point.

23             But -- but the notion, what has happened and has

24   happened pursuant to FDA directive is we're just concerned that

25   that that shouldn't be viewed as spoilation since we're doing

1  what the FDA has approved us to do.  And I don't know that, you

2  know, each defendant's going to be in a different place on

3  this.

4        But I agree with you that, you know, what we do going

5  forward is something that we can work with the plaintiffs on

6  and -- and, you know, possibly a good starting point are these

7  requests for information that they've put in the agenda

8  submission.

9        THE COURT:  So, Ms. Hilton, does it make sense for

10  you to continue your discussions with defendants to get your

11  arms around what presently exists?  And then, I mean, are you

12  really going to disagree with the notion that not every pill

13  has to be preserved, but what you're looking for is a

14  representative sampling?

15        MS. HILTON:  Yes, Your Honor.  I think we can work

16  with defendants on -- on sort of identifying a list of

17  discovery -- limited discovery on this issue.  And, you know,

18  without -- I don't want to speak out of turn, I think we can

19  come to some sort of agreement on -- on, you know, potentially

20  a representative group of pills.

21        And so I think we can work with defendants.  I think

22  the issue is that, you know, right now we just are sort of

23  operating in a vacuum.  I think we don't have a lot of the

24  documents about what happened after defendants received the

25  recalled product.  We have some documents so I think that, you

 1   know, sort of my argument to get more information about what

 2   then happened after they received the recalled product from the

 3   third-party that utilized received the recalled product.  And

 4   then, you know, we can come to some sort of hopefully agreeable

 5   conclusion on what we want to be preserved.

 6         THE COURT:  I don't think this has to be formal

 7   interrogatories or document requests.  It seems to me that you

 8   can get this information by informal discussions with, you

 9   know, defense counsel over the phone.  And then at the

10   appropriate time, I'll say file your motion if you can't agree

11   on what has to be preserved.  We'll deal with the spoliation if

12   there is one down the road.

13         That's not the immediate thing.  I think the more

14   pressing issue is going forward what has to be preserved.  So

15   why don't plaintiff continue their discussions with defendant

16   so that you have enough information, if there is a dispute and

17   you have to file a motion asking the Court to order the

18   defendants to preserve pills, you can talk intelligently about

19   what precisely is you're asking be preserved, because the Court

20   wants to know how much, where it is, what's this going to cost,

21   et cetera, et cetera.

22         MS. HILTON:  I think that sounds reasonable, Your

23   Honor.  One thing I'll just (inaudible).  Do you think that we

24   can -- we can perhaps get a lot of this information informally

25   from conversations with the defendants?  One thing I think we

Colloquy                                                      38

1    actually probably would want, to the extent that the FDA

2    demanded destruction of pills and the pills have already been

3    destroyed, those defendants would be required by the FDA to

4    create something called the certificate of destruction.

5           And so I think if we had some very small direction of

6    those certificates of destruction to the extent they exist.  I

7    think that's something that would probably wouldn't be able to

8    necessarily obtain through informal discussions.

9           THE COURT:  Is there any objection, Mr. Goldberg, if

10   the Court orders the defendants to produce FDA certificates of

11   destruction regarding the recalled product?

12          MR. GOLDBERG:  Well I -- I wish I was going to say

13   that plaintiffs, and I think I had said this before, plaintiffs

14   in their submission have identified a few areas of information

15   that they're seeking, and that is one of them.  And, you know,

16   I think I had mentioned that yes, I think generally we're

17   comfortable --

18          THE COURT:  Okay.  Great.

19          MR. GOLDBERG:  -- with plaintiff to provide this kind

20   of information.  But I'm not sure an order's necessary,

21   because, you know, we can do this on an informal basis.

22          THE COURT:  Okay.  Question.  Is it only recalled

23   product that was destroyed, or may be destroyed?  Or is it all

24   Valsartan that was manufactured, say, from a particular time

25   period, or from a particular facility, even if it wasn't

1    specifically part of a recalled lot or batch?

2         MR. GOLDBERG:  Your Honor, I think this is likely

3    going to differ from defendant-to-defendant.  And I think some

4    of this information is going to be, you know, captured in what

5    we would provide to plaintiffs.  I think for some of the

6    defendants all of the -- all of the Valsartan has been

7    recalled.  And I -- I don't have an answer from my own

8    defendant on that specific question, but it's something we can

9    try to get to the bottom of.

10        THE COURT:  So plaintiff wouldn't necessarily want

11   just -- (background phone voice) -- it sounds to me, correct me

12   if I'm wrong, Ms. Hilton, but plaintiffs wouldn't necessarily

13   want just certificates of destruction of recalled product, they

14   want certificates of destruction of any Valsartan product, say,

15   after the contamination was identified.  Am I wrong about that?

16        MS. HILTON:  No, you're not wrong, Your Honor.

17   That's correct.

18        THE COURT:  Okay.  So I think that's what Mr.

19   Goldberg said.  So we'll leave it where the parties are going

20   to talk about this information, because we're going to insist

21   that when and if the plaintiffs file their motion to preserve

22   these pills, that they have enough information, like I said, to

23   specifically identify what it is specifically they want.  And

24   through no fault of anybody right now they don't have that

25   information.  Okay?

1          Next issue -- (background phone voice) -- nobody has

2     an issue with this short form complaints not properly filed

3     with MDL centrality.  If we knew what -- how we could help,

4     we'll help.  This is in the no-brainer category.  Nobody

5     disagrees that this has to be done.  Is there anything the

6     Court can do to help?

7          UNIDENTIFIED COUNSEL:  Your Honor, we discussed this

8     the other day, myself and Mr. Goldberg, and I think the

9     fundamental question we have, and if it's not, you know,

10    through us not  focusing on something the Court's told us

11    previously, then we apologize.  We just need to know who it is

12    involved in this to talk to them and figure out what the issue

13    is, and then I think that we can, you know, figure out some

14    sort of an order that would cover the entire issue both for

15    (inaudible) and people that need extensions to do something.

16         It's a large issue, it's not just one thing.  Once we

17    know, you know, identify who's involved and what -- then we can

18    talk to them and identify and narrow down he issue. I think --

19    I think that's the only way we can go.  I just know from my

20    perspective, and I just, again, apologize, I need to know who

21    we're talking to.

22         MR. GOLDBERG:  Your Honor, this is Jeff Goldberg.  We

23    had Exhibit D to our submission.  And this issue came up, and

24    we discussed it on the record back in -- on November 6th.  And

25    Your Honor asked for a list of all of the cases that were

1    improperly filed, and that you would issue an order requiring

2    those to be re-filed properly or dismissed.

3              And so -- and you asked us to provide a list.  We

4    tried to do that with Exhibit D and think we've got everything.

5    So --

6              THE COURT:  We'll take care of it.

7              MR. GOLDBERG:  I think you could use that as a way to

8    reach out to --

9              THE COURT:  Yeah.

10             MR. GOLDBERG:  -- your colleagues on the plaintiffs

11   side.

12             UNIDENTIFIED COUNSEL:  Okay.

13             THE COURT:  Now --

14             UNIDENTIFIED COUNSEL:  That's fine.  I didn't realize

15   that it was attached.  I know when we spoke the other day you

16   were still trying to figure out the list, so -- and neither of

17   us could remember what happened, so I guess some lawyer figured

18   it out and attached it.  No problem.

19             THE COURT:  Okay.

20             UNIDENTIFIED COUNSEL:  We'll address it tomorrow.

21             THE COURT:  And we'll take care of that order, Mr.

22   Goldberg.  I -- I think you're right.  But what does -- I'm

23   looking at page three of Exhibit D.  What is the list of

24   plaintiffs who failed to file a timely short form complaint?

25             Do we have to do anything with regard to that?

Colloquy                                                                    42

1        UNIDENTIFIED COUNSEL:  This is the same thing.  I was

2   just waiting to see who was involved, and then, you know, reach

3   out to them --

4        THE COURT:  Oh, I see.

5        UNIDENTIFIED COUNSEL:  -- and try to figure out what

6   needs to be done.

7        THE COURT:  You mean -- oh, they filed a long form

8   complaint, but not a short form complaint?

9        UNIDENTIFIED COUNSEL:  Correct.

10        THE COURT:  Okay.  Fair enough.  We'll take care --

11        MR. NIGH:  Your Honor, this is Daniel Nigh.  If I

12   could interject just briefly.  We had this kind of issue in

13   Benicar.  They're actually called improvidently filed cases.

14   Or improvident -- there was a terminology for this.  And what

15   we did was we put them just like the deficiencies of the PFS,

16   we would list them each month in a Court agenda, and if it was

17   listed in there twice, then -- then that would open up an order

18   to show cause.  And you start agenda, and it's just the same

19   process.

20        It sounds like that would be effective for this same

21   issue as well.  That's something we can talk about --

22        THE COURT:  Okay.

23        MR. NIGH:  -- but that would probably get to the

24   heart of the issue.

25        THE COURT:  Well I'll tell you what, Mr. Nigh, I'll

Colloquy                                      43

1    -- I'll issue this order, and if it's ignored then we'll go to

2    the order to show cause procedure for this --

3                MR. NIGH:  Okay.

4                THE COURT:  -- issue.  Okay?

5                MR. NIGH:  Sounds good.

6                THE COURT:  Okay.  That should take care of that.  I

7    think these people just need to be woken up.  Plaintiffs motion

8    for extension of time.  It's just an issue that it's like a bad

9    toothache, it just won't go away.  There's like 25 or 30

10   motions on the Docket.  Probably they don't need to be there.

11   By inclination, if it can't be worked out was to order the firm

12   to appear at the end of the month and find out why -- why they

13   had to file 30 motions when nobody else filed them.

14               So --

15               UNIDENTIFIED COUNSEL:  I was going to ask you, Mr.

16   Goldberg, has he -- the parties have been contacting defense

17   counsel to ask for a consent, or are we just filing motions?

18               MR. GOLDBERG:  I don't think anyone on the defense

19   side has been contacted by (inaudible).

20               THE COURT:  They came in as one -- they came in as

21   one fell swoop.  And after that barrage, we haven't seen any.

22   So I'm going to order Mr. Golden to be here at the end of the

23   month.  Hopefully, we'll get a letter saying the issue's worked

24   out, get rid of all the motions, terminate them, so he doesn't

25   have to come to Camden to explain what's going on.

1            UNIDENTIFIED COUNSEL:  Yeah.

2            THE COURT:  Number seven.  Status of defendant's

3    ongoing core discovery.  Plaintiffs, do you want to talk about

4    this?

5            MS. HILTON:  Sure, Your Honor.  Layne Hilton on

6    behalf of the plaintiff.  I think our issue here is, you know,

7    in essence two-fold.  The first issue is that plaintiff has

8    identified that some defendants have appointed third-parties to

9    be registered U.S. agents and -- and to communicate with the

10   FDA on behalf of the company.

11           And we have confirmed that, (a) we're not receiving

12   communications of course on (inaudible).  And, (b) I think we

13   sort want some clarity as to whether we're going to have to

14   subpoena those third-party entities, or whether defendants are

15   going to producing those communications and correspondences

16   pursuant to the Court's core discovery order.

17           And I think that for the second issue was that in the

18   context of our further investigation into the pill preservation

19   issue, we realize that we were likely missing some

20   correspondence with the FDA regarding the recall as it related

21   to the destruction of pills, specifically the fact that we

22   didn't have any certificates of destruction, et cetera, et

23   cetera.

24           And we are of the belief that those communications

25   and correspondences were to be provided to us on an ongoing

1    basis pursuant to the Court's order.

2            THE COURT:  I guess we ought to clarify.  And I

3    looked at the order, it was certainly the intent of the order

4    that it wouldn't just apply to the named defendants, but anyone

5    acting on their behalf.  Albeit it didn't say that in so many

6    words.

7            If the defendants are taking the position that if

8    they have a third-party agent who's corresponding on their

9    behalf to the FDA, or separate law firm that's corresponding

10   with the FDA, if that's not included within the scope of the

11   Court's order, I'll clarify the order to make it clear that

12   that's what the Court intended the order to mean.

13           The intent of the order is just -- these are public

14   documents going to the FDA.  The plaintiff is entitled to a

15   copy of them.  We do it in patent cases, and there's no reason

16   not to do it in this case.  So I -- I guess the question

17   presented to the defendants is, are they taking the position

18   that, say, for example, defendant X, Y, Z is not sending the

19   letter, but a third-party agent of X, Y, Z is sending the

20   letter that that doesn't have to be produced.

21           MR. GOLDBERG:  Your Honor, this is Seth Goldberg.  I

22   think -- I think it would be helpful if we could have the

23   opportunity to talk to the other defendants about this specific

24   question.  You know, I -- I know that at least with respect to

25   GHP we do have a consultant or two there that have communicated

Colloquy                                      46

 1    with the FDA, I believe.  And as plaintiffs have pointed out,

 2    on one or two occasions Duane Morris has communicated with the

 3    FDA.

 4              I don't know that the defendants are taking the

 5    position that that information isn't in their possession and

 6    custody or control, or that they can't -- they are not going to

 7    produce that information.  But I think it would be helpful -- I

 8    do not have -- I can't make the representation on behalf of the

 9    other defendants, and I don't know the -- the scope of this

10    information either.  The volume.

11              THE COURT:  Okay.  Well I would ask plaintiffs to

12    keep this issue on your radar screen.  It's a very, very

13    important issue in the case.  You're entitled to those FDA

14    communications.  They're public documents.  They're not

15    privileged.  And they're clearly relevant to the case.  So put

16    it on your radar screen, continue discussions with Mr. Goldberg

17    and defendants.

18              In terms of the timeliness of the production, I would

19    like -- the Court would like to be kept up-to-date on this.

20    You will know by the dates of the letters you receive and

21    emails you receive whether or not the production to plaintiffs

22    is timely or not.

23              If an email is dated today and you don't get a copy

24    of it for six months, that's not in compliance with the Court

25    order.  And I want to know about that, because the order says

 1    that the communications with the FDA have to be produced, I
 2    don't have the order in front of me, but I think it was, what,
 3    seven days, within seven days?
 4              UNIDENTIFIED COUNSEL:  Yes, Your Honor.
 5              THE COURT:  And if you get -- if you get letters and
 6    emails that are months later, that's unacceptable.  So you're
 7    in the best position to know whether the order is being
 8    complied with with regard to the timeliness issue.  And
 9    continue your discussions with the defendants about, you know,
10    this issue about third-party agency consultants.  Clearly,
11    unless the sky falls in, how can a defendant argue that it's a
12    document within the possession of its law firm, or its
13    consultant, or agent is not within it's care, custody or
14    control?
15              You know that -- on the face of it, that argument
16    makes no sense.  So it's an important issue, and I'm asking --
17    it's an important issue and I'm asking you to stay on top of it
18    and keep the Court updated, okay?
19              UNIDENTIFIED COUNSEL:  We will, Your Honor.
20              THE COURT:  If we have to -- if we have to issue
21    orders requiring productions every two weeks with the
22    representation there are no responsive documents, we'll do it.
23    I don't want to do it.  That's the last thing in the world I
24    want to do is create more work.  But this order has to be
25    complied with.  Okay?

Colloquy                                          48

1              The testing issue.  Let me cut to the chase, because

2       it's getting late.  Plaintiffs, I don't know why it's

3       unacceptable if the defendants give you the Bates numbers where

4       the tests are listed, why that's not acceptable to you.

5              In an answer to interrogatory, you can give the Bates

6       number of a document that has the responsive information.  It

7       doesn't sound like plaintiffs are -- defendants are doing a

8       document dump.  They're referring you to the specific documents

9       that have the information you want.

10             It seems to the Court that that should be enough,

11      that they don't have to then go to the effort of preparing a

12      separate list.  Is there something I'm missing, plaintiffs?

13             MR. STANOCH:  Your Honor, this is David Stanoch.

14      Briefly on this, Your Honor, the references are to the -- the

15      high level generic ANDA documents.  They have 30 pages here,

16      for one defendant, 40 pages here for another defendant.  And

17      you ordered them to identify the types and purposes of the

18      test.

19             So they're simply saying, here's the Bates number,

20      good luck.  That makes it very difficult.  And then when we get

21      to those pages if we think we found what we wanted, it's --

22      it's only the highest level for the ANDA.  For example, if

23      you're doing a chromatography test, you know, there's over a

24      dozen types.  And there's at least two different machines that

25      you can them with, and there's two different detectors that you

1    can have on each machine.

2          And that's the detail that's going to move things

3    along for us and our expert, not looking at the most basic set

4    of high version of the ANDA file about what might be done

5    versus what the test they're actually doing and the specifics

6    of the machines and tests that they were using for it.

7          THE COURT:  The defendants have represented that the

8    Bates numbers that they've given you identify the tests that

9    they do.  Are they not correct?

10          MR. STANOCH:  They are generic references to some

11    types of tests they do, such as absorbent, or condition, or

12    asset (phonetic).  And, you know, they're -- Judge, there are

13    11 different types of chromatography tests at least.  There are

14    at least two different machines codes that you do

15    chromatography tests with.  There's at least two different

16    differentiators you use per each machine.

17          That's the kind of detail that we believe we can't

18    find in there and why just strictly having the list like you

19    ordered should cut through all this.

20          THE COURT:  Okay.  Why don't you then look through

21    the documents that the defendants identified.  And if you feel

22    that there's specifics that are missing, why don't you meet and

23    confer with the defendant about what you specifically need, and

24    then they'll respond to it.  Rather than requiring them to

25    prepare a whole separate list, which at least they say is

1    duplicative of what's in the documents.  Okay?

2              MR. STANOCH:  We'll do that, Your Honor.  Thank you.

3              THE COURT:  Okay.  The last issue in the letter was

4    the Legacy issue, which we dealt with.  But there was one issue

5    that I wanted to raise.  And this is sort of the Court's pet

6    peeve.  And we mentioned it before, these confidentiality

7    designations.  Plaintiff, I've said this before, and you hinted

8    at it in your letter.  If you believe that the designations

9    that the defendants make are improper, and it's important,

10   raise it with the Court.

11             Because that's unacceptable, it's just unacceptable

12   to just willy -- I'm not saying they're doing this, but it's

13   unacceptable to willy-nilly designate these documents.  In your

14   letter brief, you alluded to that.  If you think any of the

15   documents that you refer to in your letter brief don't deserve

16   a confidentiality designation, raise it for the next conference

17   at the end of the month.  Send me the documents to review in

18   camera, and I'll decide.

19             We're not going to have instances in this case where

20   there's over-designations, simply because that's the way people

21   usually do things.  If a document is confidential genuinely,

22   it's going to be confidential, it's going to be sealed.  But --

23   but just because a company doesn't want a document to be

24   circulated in the public, doesn't necessarily make it

25   confidential or sealable.

1          That's all I have to say about that issue.  Okay?  So

2     I leave it in plaintiffs' very capable hands whether they think

3     it's important enough to raise the issue with the Court.  And

4     if so, just put it on the agenda for the next conference.  So

5     that takes us through the letters.  For the good of the order,

6     are there any other issues that anybody else wants to raise?

7     I'll try and confirm whatever we've talked about in an order to

8     be timely entered.

9          Any other issues anybody wants to raise?

10          MR. GOLDBERG:  None from defendants, Your Honor.

11          MR. SLATER:  Nothing for the plaintiffs, Your Honor.

12     Thank you very much.

13          THE COURT:  Okay.  Hearing none, we're -- we'll have

14     the morning and afternoon meetings at the end of the month.

15     Judge Kugler will be here.  So at a minimum, we'll address with

16     him the -- the two sartan issues, and whatever else comes up.

17     Thank you, counsel.  Have a good day.  And we're adjourned.

18          (Proceedings concluded at 5:19 p.m. )

19                         *  *  *  *  *

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Josette Jones, court approved transcriber, certify that the foregoing is a correct transcript from the official digital audio recording of the proceedings in the above-entitled matter to the best of my ability.


----------------------------                --------------------

JOSETTE JONES                               DATE

DIANA DOMAN TRANSCRIBING, LLC