UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE:                          )  19-MD-2875(RBK-JS)
                                )
   VALSARTAN NDMA PRODUCTS       )  Camden, New Jersey
   LIABILITY LITIGATION          )  January 28, 2020
                                )  10:04 a.m.


TRANSCRIPT OF IN-PERSON STATUS CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          ADAM M. SLATER, ESQUIRE
                            MAZIE, SLATER, KATZ & FREEMAN, LLC
                            103 Eisenhower Parkway
                            2nd Floor
                            Roseland, NJ 07068

For April Harper:          DANIEL NIGH, ESQUIRE
                            LEVIN PAPANTONIO
                            316 South Baylen Street
                            Pensacola, FL 32502

                            CONLEE S. WHITELEY, ESQ.
                            KANNER & WHITELEY, LLC
                            701 Camp Street
                            New Orleans, Louisiana 70130

                            RUBEN HONIK, ESQUIRE
                            GOLOMB & HONIK
                            1835 Market Street
                            Suite 2900
                            Philadelphia, PA 19103

For Defendants:            SETH A. GOLDBERG, ESQUIRE
                            DUANE MORRIS, LLP
                            30 South 17th Street
                            Philadelphia, PA 19103

For Mylan                  CLEM TRISCHLER, ESQUIRE
Pharmaceuticals:           PIETRAGALLO GORDON ALFANO BOSICK
                            & RASPANTI, LLP
                            One Oxford Centre
                            301 Grant Street, 38th Floor
                            Pittsburgh, PA 15219

2

(Appearances continued)

For Retailer and          SARAH E. JOHNSON, ESQUIRE
Pharmacy Defendants:      KRISTEN RICHER, ESQUIRE
                          BARNES & THORNBURG, LLC
                          2029 Century Park East
                          Suite 300
                          Los Angeles, California 90067

For Albertsons:           JONATHAN D. JANOW, ESQUIRE
                          BUCHANAN INGERSOLL & ROONEY, PC
                          1700 K Street, NW
                          #300
                          Washington, DC 20006


Audio Operator:           SARAH ECKERT

Transcribed by:           DIANA DOMAN TRANSCRIBING, LLC
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          Office:  (856) 435-7172
                          Fax:     (856) 435-7124
                          Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                        I N D E X

2    TOPICS DISCUSSED

3    Hague Convention Service                          5

4    Related State Cases Filed                        11

5    Expansion of MDL                                 14

6    Direct Filing Order                              30

7    Legacy Motion                                    56

8    Legacy Issue

9    No duplications                                  64

10   Fact sheet for manufacturers                     82

11   Show cause, short form complaint, fact sheets    95

12   Confidentiality designations                    101

13   Product preservation                            105

14   Core discovery                                  110

15   ESI update                                      113

16

17

18

19

20

21

22

23

24

25

Colloquy                                                                        4

1                              (Court in Session)

2                  THE COURT:  THE COURT:  Please be seated.  Welcome

3       back to Camden.  We're on the record in the Valsartan MDL,

4       Docket No. 19-2875.

5                  Why don't we start with the entries of appearance

6       for the leadership teams?

7                  MR. NIGH:  Good morning, Your Honor.  Daniel Nigh

8       for the plaintiffs.

9                  MR. SLATER:  Good morning, Your Honor.  Adam Slater

10      for plaintiffs.

11                 MR. HONIK:  Good morning, Your Honor.  Ruben Honik

12      for plaintiffs.

13                 MS. WHITELEY:  Good morning, Your Honor.  Conlee

14      Whiteley for plaintiffs.

15                 MR. MATSTERIC:  Good morning, Your Honor.  George

16      Matsteric (phonetic) for plaintiffs.

17                 MR. GOLDBERG:  Seth Goldberg on behalf of the ZHP

18      and the defendants.

19                 MR. RUBENSTEIN:  Good morning, Your Honor.  Brian

20      Rubenstein on behalf of the TEVA defendants and all

21      defendants.

22                 MR. TRISCHLER:  Good morning, Your Honor.  Clem

23      Trischler for Mylan Pharmaceuticals and the defendants.

24                 MR. JANOW:  Good morning, Your Honor.  Jon Janow on

25      behalf of Albertsons, and today on behalf of the objecting

1    defendants relating to the direct filing order.

2              MS. JOHNSON:  Good morning, Your Honor.  Sarah

3    Johnson on behalf of the retailer and pharmacy defendants.

4              MS. RICHER:  Good morning, Your Honor.  Kristen

5    Richer on behalf of retailer and pharmacy defendants.

6              THE COURT:  We have a meaty agenda today.  So let me

7    just tell you how I think the day is going to proceed.  Judge

8    Kugler is updated on all the issues.  And we're going to --

9    him and I are going to debrief after this conference.

10             We'll reconvene at 2:00.  Judge Kugler would like to

11   start by meeting just with the leadership teams in his jury

12   room.  And then we may or may not go on the record in the

13   afternoon.  A good deal of the issues that we have to discuss

14   I think are appropriate for decision by Judge Kugler, as I

15   mentioned.

16             But I would like to give him some background on the

17   issues before we all meet this afternoon.  We don't have a

18   Court reporter here today.  So if you're going to speak,

19   please state your name so that the transcriber knows who's

20   talking.

21             We can go down the agenda that the parties proposed,

22   which is fine.  I just have a couple of issues to get out of

23   the way, and maybe we'll take one issue out of order.  The

24   first issue has to do with apparently maybe two of the parties

25   were served pursuant to the Hague Convention, is that correct?

Colloquy                                                    6

1    Plaintiffs?

2               MS. WHITELEY:  Your Honor, I believe one of the

3    Mylan Indian entities we received confirmation that they were

4    served.  And then Hetero Drugs, the Indian entity was also

5    served.

6               THE COURT:  I don't know the time deadlines for

7    service under the Hague.  Do you know after service how long a

8    defendant has to respond to the complaint?

9               MS. WHITELEY:  Your Honor, at this moment in time

10   I'm not entirely sure.  I do know that Hetero Drugs was served

11   at some point in September or November -- September, October

12   or November.  But we only received confirmation last week.

13   And I think the triggering event may be when we received the

14   certificate.  I'm not sure if that's the triggering event, or

15   if it's the actual service.  But we can get that information.

16              THE COURT:  What is the name of the company that --

17   the complete name of the company that was served?

18              MS. WHITELEY:  I believe it's Hetero Drugs Limited.

19              THE COURT:  And you received notice when?

20              MS. WHITELEY:  Last week.

21              THE COURT:  Okay.  Is there anyone here who

22   represents Hetero?

23              MS. POLETTO:  I represent Hetero USA, Your Honor.

24   Janet Poletto.

25              THE COURT:  I know.

1              MS. POLETTO:  But I don't represent Hetero Drugs.

2              THE COURT:  Do you have any information for the

3     Hetero --

4              MS. POLETTO:  The only information I have is that I

5     understand they are working to get counsel in place, but that

6     has not been put in place as of this conference.

7              THE COURT:  Counsel, could you advise -- look at the

8     rules, I don't know the rules -- I'm talking to plaintiff's

9     counsel, advise the Court when Hetero Drugs Limited's response

10    to the complaint is due?  If they were served, they've known

11    about this case for months.

12             They're served.  We're going to hold their feet to

13    the fire.  If they don't answer in an appropriate amount of

14    time -- or respond, enter an appearance, what they have to do

15    -- what I think you have to do is, you know, under the Rules I

16    suppose you can default them.

17             But unlike the usual case, this is not an instance

18    where I want this party to linger out there.  I want to  make

19    sure that they respond within the time frames that are

20    required by the Rules.  So if you could let the Court know

21    when these parties have to respond pursuant to whatever the

22    Hague service rules are, I'd be most appreciative.

23             And Hetero USA, I would get the message to Hetero

24    Drugs Limited if you have communications with them that the

25    Court has every intent of holding their feet to the fire on

Colloquy                                                                    8

1    this.  And they've known about this case for umpteen months.

2    So let's get them in and do what we have to do to move this

3    case along.

4             So one entity is Hetero Drugs Limited, who's the

5    other entity that was served pursuant to the Hague?

6             MS. WHITELEY:  The other entity that was served was

7    the Mylan -- Mylan Labs Limited entity.

8             THE COURT:  Is that -- what is the official name, is

9    it labs or laboratories, do you know?

10             MS. WHITELEY:  It's Mylan Laboratories, Limited.

11             THE COURT:  Okay.  And when did you receive notice

12    that they were served?

13             MS. WHITELEY:  I believe we received notice that

14    they were served at the beginning of January.

15             THE COURT:  Okay.  So did you get notice a week or

16    so ago?

17             MS. WHITELEY:  That was -- a different firm served

18    Mylan Laboratory Limited.  We -- I believe that firm filed in

19    the individual case.  I think it was the Tack personal injury

20    case.  They filed a certificate when they received it to

21    inform the Court and to put it on the main Docket.

22             I just resubmitted it last, I believe Friday when I

23    filed the notice to the Court.  But, you know, my

24    understanding Mylan Laboratories Limited has been

25    participating in discovery.

Colloquy                                                        9

1          So that was, you know --

2          THE COURT:  Oh.  Okay.  Well, Mylan, let's get them

3     in.  And you'll let the Court know when they respond as well,

4     correct?

5          MS. WHITELEY:  Yes, Your Honor.

6          THE COURT:  Thank you.

7          MR. TRISCHLER:  Your Honor, I represent Mylan

8     Laboratories Limited.  And Mylan Lab -- Mylan has been

9     participating in core discovery, and has complied with the

10    core discovery orders of the Court.

11         THE COURT:  Terrific.

12         MR. TRISCHLER:  I'm not sure whether we've amended

13    our appearance.  We may have simply entered an appearance for

14    Mylan Pharmaceuticals, one of the United States based

15    entities.  So we may have to amend our notice of appearance to

16    reflect that we're appearing for Mylan Laboratories as well.

17         THE COURT:  That would be great.

18         MR. TRISCHLER:  But the discovery's been taken care

19    of and is underway with respect to the Indian entity.

20         THE COURT:  That's great.  How about Hetero?  I

21    forgot about Hetero.  Did they put the Hetero Drugs Limited,

22    did they participate in core discovery?

23         MS. WHITELEY:  No, Your Honor.  Although Hetero USA

24    did produce two drug master files that Hetero USA's ANDA

25    applications referred to probably three weeks ago.  But Hetero

1    Drugs and Hetero Labs -- the Indian Hetero entities have not

2    participated in core discovery at all.

3              So we only have received, and Ms. Poletto can

4    correct me if I'm wrong, we have only received that which was

5    in the control of Hetero USA, you know, because of their ANDA

6    applications.

7              MS. POLETTO:  Janet Poletto, again, Your Honor, for

8    Hetero USA.  That's correct.  We produced everything that

9    Hetero USA had in its possession for core discovery, and then

10   we had actually gotten the drug master files as requested by

11   the plaintiffs, and those have been produced.

12             THE COURT:  You can get the message to Hetero Drugs

13   Limited that they may want to start pulling together the core

14   discovery, because it won't be long --

15             MS. POLETTO:  Your Honor, we --

16             THE COURT:  -- before the Court orders them to

17   produce it by a date certain.  Unlike Mylan, they have every

18   right to, you know, stand on formality, but so does the Court.

19   And when they get in the case there, we're going to hold their

20   feet to the fire.

21             MS. POLETTO:  Through my channels, Your Honor,

22   they're not direct ones.  But through my channels, I have

23   tried to convey that message.

24             THE COURT:  Thank you, counsel.  The second issue

25   I'd just like to address is, we haven't heard much lately

Colloquy                                                    11

 1    about whether there's any related state cases filed in New

 2    Jersey or around the country.  And I'm just wondering if the

 3    parties could update the Court on that?

 4              UNIDENTIFIED PLAINTIFF COUNSEL:  I think it would

 5    have to more come from the defense.  From our perspective,

 6    there really have not been many -- I'm not aware of any

 7    additional filings in New Jersey, other than the few that have

 8    occurred so far.  And I'm not aware of any in other states

 9    that have been brought to our attention.

10              So I think the defense would have the best idea of

11    that.

12              MR. GOLDBERG:  Your Honor, I -- on behalf of ZHP,

13    I'm aware that there are four cases -- four or five cases in

14    New Jersey.

15              THE COURT:  And those apparently are under control.

16              MR. GOLDBERG:  They're under control.  I know there

17    are two cases, I believe in Illinois.

18              THE COURT:  Are those under control as well?

19              MR. GOLDBERG:  I don't -- I mean, I don't know, I

20    think they are for the time being.  I think -- I think there

21    are some efforts to get them into the MDL in light of the

22    Irbesartan and Losartan expansion.  But we can take an

23    inventory and report to the Court.

24              THE COURT:  Okay.  I just didn't know if there was a

25    swath of cases out there that we didn't know about.  But I'm

1    gratified that there aren't.

2                    MR. GOLDBERG:  I don't believe there are.

3                    THE COURT:  Especially in New Jersey.

4                    MR. GOLDBERG:  But we can let the Court know.

5                    THE COURT:  Terrific.  One of the issues I didn't

6    see mentioned in the agenda, and hopefully it's because

7    there's no issues involved in it.  Pursuant to -- here's my

8    notes.  Let me just look at my notes.

9                    One of the issues that was up for discussion today,

10   if there was any dispute, I think was regard to the

11   translations of the -- for the -- for ZHP purposes, is that

12   hopefully no disputes?

13                   UNIDENTIFIED PLAINTIFF COUNSEL:  They're correct,

14   Your Honor.  We have a couple of terms that we're still

15   working out, but we don't expect to need the Court's

16   intervention.

17                   THE COURT:  Terrific.  And just -- I'll tell you

18   what the Court -- the Court's notes reflect in terms of what's

19   due, what's coming up on the horizon.  My notes indicate that

20   plaintiffs' responses to fact sheets were due on January 15th.

21   Did those come in, defendants?  Am I right about that?

22                   UNIDENTIFIED DEFENSE COUNSEL:  Yeah, for the most

23   part, yes.

24                   THE COURT:  Great.

25                   UNIDENTIFIED DEFENSE COUNSEL:  We did get a bunch.

1    But we did not get some at all for some plaintiffs that had

2    fact sheets that were due.  So we did want to address this at

3    some point in the conference.  Do I do --

4              THE COURT:  Is that an order to show cause issue?

5              UNIDENTIFIED DEFENSE COUNSEL:  Yes.

6              THE COURT:  Okay.  It's not -- we're not dealing

7    with the adequacy of the fact sheets, we're dealing with, I

8    think I read plaintiffs who simply did not answer on time.

9              UNIDENTIFIED DEFENSE COUNSEL:  That's right.

10             THE COURT:  Okay.  Good.  We'll deal with that

11   later.

12             And then the end of the month I think, and tell me

13   if I'm right about this, the end of the month foreign

14   regulatory documents are due, I take it?  Akin to the

15   inspection reports, warning letters, 483, et cetera?

16             UNIDENTIFIED PLAINTIFF COUNSEL:  Yes, Your Honor.

17             THE COURT:  Okay.  Great.  February plaintiffs'

18   economic fact sheets due, medical monitoring.  March

19   plaintiffs' third-party payer fact sheets due.  April 1,

20   defendants to produce sales and pricing documents.  End of

21   May, that's the big production.

22             Defendants to produce responsive documents and ESI

23   end of June, ZHP.  That's what I have on my chronology.

24   Great.  Okay.  Why don't we go to the issues in the agenda.

25   First issue, expansion of the MDL and MDL management in light

1    of the Losartan and Irbesartan expansion.  This is an issue we

2    can discuss.  I think the final decision on this is going to

3    be made this afternoon when we meet with Judge Kugler, but it

4    would be helpful if I had a good understanding of what the

5    parties are suggesting.

6           Quite frankly, I'm not clear from reading

7    defendant's proposal, but that's why we're here.  I think the

8    consensus, as I understand the plaintiffs, is we're going to

9    forge ahead on Valsartan, which we're going to do, we're not

10   holding up Valsartan in any respect.

11          What is it you propose to do with the other two

12   sartans?

13          UNIDENTIFIED PLAINTIFF COUNSEL:  In the first

14   instance, as we discussed with Your Honor on the telephone

15   conference on the fifteenth, is to focus on the foundational

16   issues, pleading-type issues, master complaints.  And we first

17   need to get our organization as a plaintiff group amended, and

18   we've been in communication with attorneys that have said that

19   they have an interest in joining either the PSC or committees,

20   and I know some of them are here.

21          A few introduced themselves before the hearing.

22   We're hoping to have a few minutes between conferences to

23   speak to them.  And then probably set up a conference call

24   either later this week or early next week.  Finalize our

25   organization, and then at that point we can jump to master

Colloquy                                                            15

1   complaints, because we'll have committees put in place.  Get

2   those in place, and then I think at that point, as we

3   discussed with Your Honor, probably move to the foundational

4   discovery, and to try to utilize the Valsartan work that we've

5   done to the furthest extent possible.

6          You know, use that as a model.  Not re-litigate

7   issues that have already been litigated.  To the extent that

8   there may be a legitimate difference, we hope the meet and

9   confer process will identify those differences, and then we

10  can try to work with the defense to the extent, for example,

11  some requests may or may not apply, or may need to be

12  broadened or narrowed, whatever it is.

13         I would think that that's something that should be

14  able to be discussed, and then, you know, at some point get

15  those discovery requests in place.  But, you know, in terms of

16  timing, you know, we're talking probably several months to get

17  our organization in place, get our committees up and running,

18  get our master pleadings done, get those served, and then move

19  on to the next phase.

20         THE COURT:  Do you envision adding someone to the

21  PSC who's going to be the point person for the Losartan and

22  Irbesartan issues?

23         UNIDENTIFIED PLAINTIFF COUNSEL:  There are a few

24  firms that have expressed interest in becoming involved in

25  that.  I think one or two may not be members of the PSC now

1    and we're certainly discussing that with them, and that's

2    probably a reasonable thing to do if a firm is not part of our

3    PSC structure and wants to join for that purpose absolutely.

4    Plus there are a lot of firms that are already on our PSC and

5    executive committee who will be involved as well.

6          So that there's -- there's already -- there's

7    already skin in the game, as you might say.  And then we'll

8    form the committees, but the people who are focused on

9    Irbesartan and Losartan, we would think those will be the type

10   of people to have a more prominent positions on the

11   committees, because they have focused interest on those drugs.

12         And there's obviously going to be work to be done to

13   identify issues on them, so, yes.

14         THE COURT:  It would be good to have a point person

15   on that part of the case.  So we'll come back to plaintiffs.

16   I think defendants have a different view, don't they?  I

17   understand plaintiffs how they want to proceed.  They'll get

18   their internal organization, get a direct filing order, amend

19   the master complaint, and then work to clean up, in my words,

20   the Valsartan discovery and adapt it for the other sartans.  I

21   don't think that's what the defendants propose.

22         MR. GOLDBERG:  In some ways there's agreement at

23   least with respect to proceeding with Valsartan.  And I think

24   -- I think the defendants understand that we've made a lot of

25   progress with respect to working out some of the form

1    documents, the document request and then fact sheets with

2    respect to Valsartan.

3              THE COURT:  Right.

4              MR. GOLDBERG:  The -- and that -- that proceedings

5    with respect to Valsartan should proceed.

6              Plaintiffs today have now indicated they're looking

7    at a few months before Irbesartan and Losartan come on line,

8    so to speak, and what that's going to look like.  But our --

9    we are looking at this in terms of how you proceed with

10   Valsartan.

11             So Valsartan can go ahead, but is there a way that

12   Valsartan goes ahead that really is more efficient for the

13   MDL?  Because Valsartan is going to have, you know, decisions

14   with respect to Valsartan, discovery with respect to

15   Valsartan, are going to have affect with respect to Irbesartan

16   and Losartan.

17             THE COURT:  Yes.

18             MR. GOLDBERG:  You could have -- as counsel

19   conceded, there may be some streamlining with respect to the

20   scope of discovery.  But the material decisions about

21   Valsartan, whether in fact the impurities in Valsartan rose to

22   the level of a defect, it certainly had an affect on

23   Irbesartan and Losartan parameters.

24             So one of the things we're thinking about is, how do

25   you go ahead with Valsartan?  Class certification is another

1    issue.  You know, this case, unlike Benicar, has a significant

2    component that Benicar didn't, which is supply chain

3    participants in the dozens.

4            Two extra drugs, three different kinds of claims.

5    And as the Court is well-aware having been through it many

6    times, class certification is no small task.  But in this

7    case, it's going to be a monstrosity, to say the least,

8    because you're going to have to --

9            THE COURT:  What is going to be a monstrosity?

10           MR. GOLDBERG:  Class certification.  The specific

11   discovery --

12           THE COURT:  Can I stop you there for one second?

13           MR. GOLDBERG:  Yeah.

14           THE COURT:  One of the issues we're going to discuss

15   this afternoon with Judge Kugler, you're going to hear that if

16   and when the case comes to trial, the economic case is going

17   to go first.  You're going to hear that, we've said that

18   before.

19           One of the issues I discussed with Judge Kugler just

20   today and that's going to be discussed this afternoon is, to

21   try that case, do we need to decide class certification?

22   Should we decide class certification before we try that case?

23           MR. GOLDBERG:  So that's a great question.  And it's

24   the comment that -- that that's one of concerns that's sort of

25   motivating our looking at this now in light of the expansion

1    of Irbesartan and Losartan is the -- are the comments the

2    Court made in 2019 about proceeding ahead with the economic

3    loss case.

4           The defect-related issues can be tried potentially

5    through the personal injury cases.  And you could have

6    decisions on the merits as to whether there's a product

7    defect.  Whether the alleged impurities can cause the alleged

8    injury.  You can do all of that before you get to class

9    certification.

10          And when you're talking about a case of this size,

11   you're talking about three different drugs, you're talking

12   about these different kinds of claims, as the Court noted, the

13   personal injury cases have a different kind of public safety

14   concern than the economic cases.

15          Tracking those issues first will create a lot of

16   efficiency for the MDL.

17          THE COURT:  So are you suggesting that PI cases

18   start first?

19          MR. GOLDBERG:  That's what -- that's what we're

20   suggesting could have the most -- the most bang for the buck

21   from an efficiency standpoint, so to speak, because you're

22   going to address Irbesartan and Losartan issues.  You're going

23   to address issues that are pertinent to class certification.

24          Because you're going to -- you're going to, right

25   now, here's a good example, right now the class is defined as

1    four years worth of consumers who have paid for the drug,

2    whether it's recalled or not recalled.  We're going to get

3    information about the scope of the recall from Valsartan,

4    we're going to get information about timing, we're going to

5    get information about which defendants are in and which

6    defendants are out through that.

7          So there will be some decisions, some discovery

8    that's going to help influence class certification.  But one

9    of the things that the Court will do by proceeding with the

10   personal injury cases is save an awful lot of time and

11   aggravation, so to speak, getting bogged down in discovery,

12   going back and forth from wholesalers and retailers to the

13   class representatives.

14         The third-party payers have a significant discovery

15   obligation here.  To get to the core of generic pricing for

16   the class-wide damages model that they're going to have to do,

17   that's a burden plaintiffs are going to have to satisfy,

18   producing insurance policies, insurance plans, formularies

19   pricing with respect to drugs, alternate pricing.  We're going

20   to have to delve into the 50-state class issues.

21         We're going to have the delve into real questions of

22   ascertainability.  That's even assuming that the economic loss

23   claim survives.  Because at some point it's going to have to

24   be tested, right?  And so --

25         THE COURT:  On a motion.

1           MR. GOLDBERG:  On a motion.  Right.  And so, you

2      know, putting aside some of these issues for another day, so

3      that all of the economic discovery that would bear on pricing

4      issues, that would bear on class certification, that really

5      doesn't have to happen.  It's completely divorced from the

6      who, what, where, when and why of the defect.  And if the

7      defect proves to be something that rises to that level, then

8      that's going to help plaintiffs in their Irbesartan and

9      Losartan cases, and in their class certification case.

10          But if it doesn't, the parties have avoided three,

11     you know, two more drugs worth of discovery.  They're avoided

12     the morass of class certification.  So we think that that's an

13     efficient way to approach it.

14          THE COURT:  Isn't -- a hypothetical.  Is it true

15     that if we try the PI cases first, and let's say the

16     defendants are successful on whatever reason, does that

17     necessarily mean that the economic cases -- case goes away?

18     Doesn't the economic case stand on its own and it's not

19     necessarily dependent on the result of the PI case?

20          MR. GOLDBERG:  If the Court -- if the Court rules --

21     if there's a ruling that the product wasn't defective in the

22     PI case, then I'm not sure, but I'm --

23          THE COURT:  Will that be the issue in the PI case?

24     Or would the issue in the PI case be whether there's general

25     or specific causation?

1          MR. GOLDBERG:  Well I think there's both.

2          THE COURT:  So those two issues will be at issue in

3    the PI cases?

4          MR. GOLDBERG:  Yes.

5          THE COURT:  Let's say, hypothetically --

6    hypothetically, defendants hit a home run, no general

7    causation.  Does that mean the economic case goes away?

8          MR. GOLDBERG:  You could have -- I think you could

9    have a situation where the product is defective, but there's

10    no general causation.  And so, potentially, class action

11    plaintiffs could say, look, we're not claiming physical

12    injury, we're claiming the loss of value.

13          THE COURT:  So -- so even if the defendants are

14    successful on the PI cases -- if I'm wrong tell me, please --

15    it appears you acknowledge that the economic case is still

16    going to be there.

17          MR. GOLDBERG:  If there's a determination that

18    there's a defect, then the economic loss case might still be

19    there.

20          THE COURT:  But that won't be decided in the PI

21    case, will it?

22          MR. GOLDBERG:  Sure.  Sure.

23          THE COURT:  So get back to my hypo, suppose you hit

24    a home run, and either on a Daubert, or the jury says there's

25    no general causation.

Colloquy                                               23

1              MR. GOLDBERG:  Oh, I'm sorry.  Yes.  Yes.  A home

2     run --

3              THE COURT:  Does that mean there's no defect?

4              MR. GOLDBERG:  A home run --

5              THE COURT:  Well, no.  Does that necessarily mean

6     there's no economic claims?

7              MR. GOLDBERG:  Yes.  And I believe so.

8              THE COURT:  I have a feeling plaintiffs would

9     disagree with you.

10             MR. GOLDBERG:  On -- well they can explain why.  But

11    if the product isn't defective --

12             THE COURT:  No, that's -- the defect --

13             MR. GOLDBERG:  -- that's the home run.

14             THE COURT:  Well are you assuming that if there's no

15    general causation -- let's say there's -- there's a -- the

16    chemical is in the drug.  But the jury, or Judge Kugler

17    determines that there's no general causation.  But as a matter

18    of fact, the chemical is in the drug.  You're saying that

19    doesn't make the product defective?

20             MR. GOLDBERG:  If that doesn't rise to the level of

21    a defect that creates liability for warranty claims or the

22    manufacturing defect claims that plaintiffs have alleged, then

23    there would not be an econ -- that's the same -- the economic

24    loss claim is based on the same facts.

25             THE COURT:  I have a feeling -- maybe plaintiffs

1    would agree with you, but I don't necessarily think the

2    plaintiffs will agree that even if they can't establish that

3    there's no general causation, that that necessarily means they

4    can't pursue the economic claim.  Am I wrong plaintiffs?

5              UNIDENTIFIED PLAINTIFF COUNSEL:  No, you're correct,

6    Your Honor.  No we're still on planet earth.  We don't agree.

7              MR. GOLDBERG:  General causation is whether the drug

8    can cause the injury.

9              THE COURT:  Right.

10             MR. GOLDBERG:  The question of whether -- whether

11   the impurity can cause the injury.  The economic loss claim

12   actually alleges something different, which is that plaintiffs

13   simply didn't get value for their claim.  That -- for what

14   they paid for.  That's their claim on the economic loss claim.

15             We bought a drug that was -- that was advertised as

16   not -- or that was sold to us on the promise that it didn't

17   contain an impurity, and it did, so we didn't get the benefit

18   of our bargain.  That's their claim.

19             THE COURT:  So just so I'm clear, Mr. Goldberg, what

20   Judge Kugler is going to hear this afternoon is plaintiffs'

21   suggestion, proposal, what have you, that the PI claims be

22   teed up for trial before the economic claims?

23             UNIDENTIFIED PLAINTIFF COUNSEL:  Defendants.

24             THE COURT:  I'm sorry, defendants.  Correct.  Is

25   that what you're proposing?  Or suggesting?

1          MR. GOLDBERG:  Yeah, I think if there's -- if

2    there's a way to ensure that it creates efficiency, that's

3    what we're suggesting.

4          THE COURT:  And would it just -- and just on the

5    Valsartan --

6          MR. GOLDBERG:  Just on Valsartan.

7          THE COURT:  Okay.  All right.  And that's fine.  You

8    can, you know -- I just want to understand what your position

9    is.  Do plaintiffs have any thoughts on that, about how the

10   cases should be ordered?

11         UNIDENTIFIED PLAINTIFF COUNSEL:  Yeah, I mean, I

12   think that what -- we've always had the understanding from

13   very early in the litigation that Judge Kugler had a

14   preference to move forward with the economic part of the case

15   first.  That's always been the premise.

16         THE COURT:  That's right.

17         UNIDENTIFIED PLAINTIFF COUNSEL:  We -- our

18   experienced with Judge Kugler is when he makes his decision

19   like that, you follow through with it, so we've always

20   understood that was the way that we're going to proceed.

21         We disagree, without walking through it item-by-

22   item, with what Mr. Goldberg just said about some efficiency

23   with trying a personal injury case first, it's not more

24   efficient.  It doesn't help to give information to the

25   economic case that you would need for it, it would actually be

1    inefficient.

2            And Your Honor suggested something that we're going

3    to talk about this afternoon, which we have not heard before,

4    but that sounds, no surprise, innovative, and it's something

5    we're going to talk about during, you know, the interim, but

6    it -- I can certainly, speaking for myself it sounds like a

7    way to -- I mean, counsel just talked about the problems of

8    class certification for ten minutes.

9            And it sounds like a solution that would put that to

10   the back and actually try the merits of the claim for one or

11   more plaintiffs on the economic level, and you'd get the

12   answers to the information and probably be in a much better

13   position to address class certification.  I think that's what

14   I'm hearing.

15           So I don't -- I don't see any strong feelings

16   against that at our table.  We'll talk about it, because we

17   have to caucus.  But it sounds like a very efficient way to

18   approach a very complex litigation, so it makes sense.  And

19   it's not like it's the easy way out, there's still obviously a

20   great deal that we're going to have to prove.  We don't agree

21   with the characterization of our claims, we don't agree with

22   the idea that the defense has of how to proceed.

23           And I know Mr. Honik might want to address it as

24   well.

25           MR. HONIK:  Your Honor, there are two very good

1    reasons that we've embraced for months now the idea first

2    proposed by the Court to proceed with an economic class

3    determination or trial first.  Number one, your hypothetical

4    is right on the money.  Which is to say, if the defense were

5    to hit a home run, and there were found to be no general

6    causation, it does nothing to the economic claims.

7         Certainly the TPPs, insurance companies who paid for

8    this drug, consumers who have paid for this drug are sounding

9    a claim in warranty.  And today's not the day to go into the

10   depths of the legal argument, but the defect is really not the

11   way we look at the case.

12        The case economically occurs -- the injury occurs at

13   the point of sale.  You simply can't sell an adulterated drug

14   in America.  And there are lots and lots of reasons that we'll

15   present that will support and bolster that up and down the

16   distribution chain.  The harm is complete at that point.  And

17   -- and it doesn't really revolve around the tort concept of

18   defect, as I think Mr. Goldberg is compressing.

19        So what does that mean?  Under Rule 23, it doesn't

20   happen often, but courts are absolutely permitted to determine

21   a liability only class.  And the way we envision this

22   occurring in a highly efficient manner, is for us with in

23   confer with the Court to pick, for example, a test state, or

24   grouping of states that have, you know, clear warranty law on

25   whatever claims we're going to proceed under on the economic

1    basis, and then to try the issues that cover both the PI and

2    the economic cases.

3              What I mean by that is, was the drug contaminated?

4    How did it get contaminated?  How did it get into the stream

5    of commerce?  When those issues -- if those issues are decided

6    first, they're universal to all the cases.  So --

7              THE COURT:  I just want to understand --

8              MR. HONIK:  Sure.

9              THE COURT:  -- and you'll make this -- this question

10   before Judge Kugler this afternoon.  It sounds like you're

11   meshing PI issues and economic issues together, and picking

12   the -- the -- am I right?  Picking --

13             MR. HONIK:  Well I think there's overlap.

14             THE COURT:  -- the important issues --

15             MR. HONIK:  There's factual overlap.  The economic

16   cases are interested in how this contamination occurred and

17   the extent of the contamination.

18             THE COURT:  Right.

19             MR. HONIK:  So is the PI.

20             THE COURT:  No question about that.  That's what we

21   envision as to why we picked economic because there was so

22   much overlap.

23             MR. HONIK:  As did we.  And the longer we've sat

24   with it, the more it makes sense.  And we have to caucus

25   internally, but I don't know that there needs to be, as Mr.

Colloquy                                                    29

1    Goldberg referred to it, a monstrous cert brief submitted to

2    the Court, for the Court to have to unravel every aspect of

3    it.

4            Rule 23 really can work very nimbly.  You can -- you

5    can require us to identify what state or groupings of states

6    and what liability class we can present that will be the most

7    efficient across the waterfront to try.  And so we endorse

8    completely the idea of having economic cases go first, so that

9    we can present that, so that there's a significant overlap of

10   factual issues that will be determined that will impact

11   everything.

12           And for the reason the Court stated in its

13   hypothetical, doing the PI cases first, I mean, they're going

14   to focus undoubtedly on the causation issues, the scientific

15   causation issues in terms of the drug's ability to create the

16   cancers that are alleged here.  That's not going to impact the

17   economic case at all.

18           THE COURT:  I was just going to say that.  If we do

19   try the economic case first, we may not get into general and

20   specific causation, right?

21           MR. HONIK:  I can't imagine why we would.

22           THE COURT:  Well we would because the defendants are

23   going to raise it.

24           MR. HONIK:  Well --

25           THE COURT:  Okay.  I think over lunch you ought to

1    talk about that issue about whether or not -- what we're going

2    to talk about, you can make your proposal to go forward with

3    the PI cases, and then the issue that I can tell you was just

4    raised today and you discussed it for the first time, whether

5    we need, if we go froward with the economic case first,

6    whether we necessarily need or should do class cert before we

7    get to the trial on the merits.

8           That's an issue your groups ought to caucus on over

9    lunch, because it's an issue we'll address this afternoon with

10   Judge Kugler.  Okay.  I think I understand the plaintiffs'

11   position, and I think I understand now the defendants'

12   position.  There's agreement we're going ahead on Valsartan,

13   we're not slowing it up.

14          On the other sartan case, we may go forward on

15   parallel tracks.  Eventually they may catch up to Valsartan,

16   but we're not going to hold up Valsartan until the other two

17   sartans catch up.

18          So let's get to the direct filing order, and, again,

19   this is an issue Judge Kugler's going to decide this

20   afternoon, not me.  But I have to tell you, both of us are a

21   little confused by the paperwork we received, and I have all

22   the attachments, and I read them.  I don't really -- I don't

23   really understand the submissions and what the differences

24   are, why we can't just do a direct filing order without

25   prejudice to anybody.

1          So could you -- somebody, maybe it's you, can

2     explain what all this is about?

3          MR. JANOW:  Of course Your Honor.  And, again, it's

4     Jon Janow on behalf of Albertsons, and speaking on behalf of

5     the defendants, and specifically the objecting defendants.

6          THE COURT:  Okay.  Now Albertsons, are they -- what

7     category are they in?

8          MR. JANOW:  Albertsons is a grocery chain that has a

9     pharmacy resale component.

10         THE COURT:  So they would be, what, a retailer?

11         MR. JANOW:  Correct, Your Honor.

12         THE COURT:  Okay.  So I think the letter identified

13    who the "objectors" are, right?

14         MR. JANOW:  Correct, Your Honor.

15         THE COURT:  All right.  So let's just get some

16    background, before we hear your argument.  Albertsons was

17    named in how many cases?

18         MR. JANOW:  Albertsons is named in the monitoring

19    class action complaint.  It is named in a very limited number

20    of directly filed complaints.

21         THE COURT:  Valsartan?

22         MR. JANOW:  Only Valsartan, Your Honor.  We -- it's

23    -- to my knowledge, we have not been named in any of the

24    Irbesartan or Losartan cases.

25         THE COURT:  Okay.  So were you in the case when the

1    original direct filing order was entered?

2                MR. JANOW:  No, Your Honor.  The original direct

3    filing order was entered in early April of 2019.  Albertsons

4    was not served with the complaint in this case until, I

5    believe, late September, and we did not enter our appearance

6    in the case until sometime in the middle of October.  And I

7    could find the dates for you, but that's generally the time

8    line.

9                THE COURT:  Okay.  So the cases that Albertsons is

10   involved in, they weren't transferred here from the Panel,

11   they were direct filed here?

12               MR. JANOW:  Correct, Your Honor.  With one

13   exception.  There was -- I believe there was an initial --

14   there was one case that did name Albertsons that was

15   transferred by the MDL Panel to this Court.  Albertsons was

16   never served with that complaint, to my knowledge.  But in any

17   event, that case has been dismissed by the parties.

18               So it is no longer pending before this Court.

19               THE COURT:  Is Albertsons taking the position

20   there's no jurisdiction over it in New Jersey?

21               MR. JANOW:  Correct.  Our position, Your Honor, is

22   -- Albertsons' position with respect Albertsons specifically

23   is that this Court has no personal jurisdiction over it in any

24   case whatsoever.

25               THE COURT:  So let me ask you a question.  Suppose

1    the Court agrees with you, no jurisdiction over Albertsons.

2    Where would -- where is Albertsons a citizen of, what states?

3    Where is it incorporated, where is it's nerve center?

4               MR. JANOW:  Albertsons is headquartered in Idaho.

5               THE COURT:  Okay.  So what -- is it Albertsons'

6    position that plaintiff would have to file this case against

7    Albertsons in Idaho?

8               MR. JANOW:  I'm not sure that would be our

9    definitive position.  Our position would be that plaintiffs

10   have to file cases in jurisdictions where there's personal

11   jurisdiction both as to the plaintiff and the specific claims

12   the plaintiff is asserting as to Albertsons specifically as a

13   defendant.

14              THE COURT:  Okay.  Let's just take a hypothetical.

15   Let's say there's a plaintiff who bought Valsartan from

16   Albertsons in Idaho.

17              MR. JANOW:  Um-hum.

18              THE COURT:  Would that plaintiff then need to sue

19   Albertsons in Idaho state court if it wanted to pursue

20   Albertsons?

21              MR. JANOW:  So I don't know that it would -- that

22   that would be the only venue that it could sue Albertsons.

23   But certainly if a specific resident of Idaho purchased a drug

24   and could allege that they purchased it from Albertsons in

25   Idaho, that would likely be a -- a likely basis of

Colloquy                                                    34

1    jurisdiction in Idaho.

2              I mean, they could --

3              THE COURT:  Is there a --

4              MR. JANOW:  I'm sorry, Your Honor.  And they could

5    choose to file it, probably in state court, and then I think,

6    depending on the circumstances of the complaint, there would

7    be a determination as to whether Federal Court jurisdiction

8    would be appropriate in Idaho.

9              THE COURT:  Is there a state that Albertsons does

10   business in other than Idaho?

11             MR. JANOW:  Yes, Your Honor.  It's --

12             THE COURT:  It doesn't matter where it is.

13             MR. JANOW:  -- it does -- it does business in many

14   states.  Yes.

15             THE COURT:  Pick one.  It doesn't matter.

16             MR. JANOW:  Louisiana.

17             THE COURT:  Okay.  So let's say a Federal -- so the

18   Court agrees with your argument, the case is dismissed from

19   New Jersey.  The case is filed in Federal Court in Louisiana.

20   There's jurisdiction over Albertsons in Louisiana.  What

21   happens to that case?  Doesn't it go back to the Panel and

22   doesn't the Panel send it here?

23             So why are we going in this circle?

24             MR. JANOW:  Your Honor, I believe it -- that factual

25   circumstance could raise a possibility you suggest, which is

1    that --

2            THE COURT:  So why are we going through these

3    objections, if the case is going to wind up back here?

4            MR. JANOW:  And there's two points, Your Honor.  One

5    is that that's very much a hypothetical, at this point.  There

6    are very, very limited cases filed against Albertsons

7    currently.

8            And so we don't have --

9            THE COURT:  So what?  Take my hypothetical.

10   Louisiana Federal case filed against Albertsons, okay?  One

11   defendant, Valsartan, sued in Louisiana.  Okay?  I'm sorry,

12   one plaint -- no, they would sue everyone who's sitting here.

13   Wouldn't -- isn't it likely one of those -- isn't it likely

14   that judge is going to send the case to the Panel?  And isn't

15   the Panel going to send the case here?  So I guess the

16   question is, why are we going in that circle?

17           MR. JANOW:  I understand, Your Honor.  I'm not sure

18   that I think that automatically that would be the case.  If

19   the -- if a specific plaintiff names a whole host of

20   defendants in a particular court, let's say it's a state court

21   in Louisiana.  There would be a number of --

22           THE COURT:  State court would be different.

23           MR. JANOW:  Yeah.  State court would be different,

24   or Federal Court, Your Honor.  There would be a number of

25   steps that could -- that would be in the way and that could be

1    potentially be in the way that might limit the pathway that

2    Your Honor is describing, which is to go through the MDL

3    Panel.

4              THE COURT:  I understand state court cases, this

5    hypothetical, it's not removable.  So it stays in state court.

6    Can't do anything about it.  Federal Court, what's -- what's a

7    barrier to the case going in the circle to the Panel back

8    here?

9              MR. JANOW:  Right.  Your Honor, again, we're dealing

10   with a hypothetical, so I'm trying to work with that, without

11   having all the facts.  But I would suggest that there may be

12   personal jurisdiction issues, venue issues, or other issues

13   relating to any or all of the various defendants, and there's

14   very many of them.

15             They're located in different states, they have

16   different factual patterns.

17             THE COURT:  But if it goes to the Panel and the

18   Panel sends it here, you're back -- I don't understand.  I

19   guess I'm -- you're going to hear this this afternoon too.

20             MR. JANOW:  I understand.  And I'm prepared to

21   discuss it with Judge Kugler as well.  But my suggestion to

22   the Court is that, I understand that that may be a

23   possibility.  But that I don't believe that it's an automatic

24   eventuality.

25             And that -- and that there are multiple steps to the

Colloquy                                                    37

1    process, including parties, if they choose to, for example, if

2    there's only one case against my client in the whole country,

3    it may not be in my client's interest to -- to support

4    transfer.  And we may be able to argue that it should not be

5    transferred in that --

6            THE COURT:  Do you think if there's only one case

7    against your client, or two or three cases against your client

8    that this Court is not going to do something to make sure that

9    you're not caught up in this morass?

10           MR. JANOW:  Your Honor --

11           THE COURT:  That's what we're trying to do.  In

12   fact, did you read the order -- I forgot what it's called, but

13   one of the orders that we commended the parties for working on

14   was the stipulated ordering dismissal of parties and tolling

15   agreement, Docket Number 248, to let then tangential parties

16   have some breathing room.

17           Doesn't that give you some comfort, the objecting

18   parties, that if they're so tangential to the case and have

19   such a minimal contact, doesn't that order give them some

20   comfort?

21           MR. JANOW:  Well, Your Honor, respectfully no.  And

22   I'll explain.  For my client, Albertsons, we -- again, we

23   believe that there are no cases pending against Albertsons to

24   which there is any jurisdiction in any court.

25           And so we, you know, I understand that the Court

1    wants to keep parties that are rightfully in the case in the

2    case.  But to the extent there's no personal jurisdiction over

3    my client in any case, we would respectfully submit that we

4    shouldn't be here.

5            THE COURT:  I know.  But let me ask you this

6    question.  Just dealing with practicalities, and economics,

7    and I'm sure Albertsons is like every other client, they don't

8    want to spend unnecessary transaction costs.  And it's

9    perfectly understandable why they wouldn't want to be caught

10   up in this morass, if they have such a minimal contact with

11   Valsartan in sales.

12           But no matter how you cut the mustard, one way or

13   the other they're going to be subject to discovery, whether

14   it's here, or in Idaho, or Louisiana, because plaintiff needs

15   discovery from Albertsons to prove its case.

16           Wouldn't it make more sense, isn't it more

17   economical, isn't it more efficient to work with this Court to

18   protect your client's interests, produce the minimal

19   discovery, get out pursuant to this order, everything is

20   without prejudice to anybody.

21           MR. JANOW:  But, respectfully, Your Honor, I

22   understand that.  And we believe that -- that if there was

23   some pathway other than that.  For example, I mean, if the

24   plaintiffs wanted to stipulate to dismissal to my client,

25   certainly we would accept that.

Colloquy                                                    39

1        If there's -- you know, and we have no desire to

2   avoid appropriate discovery obligations where there's a basis

3   for jurisdiction for those obligations.

4        THE COURT:  Maybe over the break you may want to

5   look at that order, number 248.

6        MR. JANOW:  Okay.

7        THE COURT:  We are very, very sensitive to issues

8   that minimal contact parties, or parties who have minimal

9   contact with the case in terms of sales, what have you, don't

10  get bogged down in this litigation.

11       We're very, very sensitive to that.  That's why we

12  have that order.  You may want to look at that over the break

13  and see if that gives you some comfort, on top of all the

14  representations that plaintiff have given you, the Court will

15  give you any representation you want that anything you do is

16  without prejudice.  You're not waiving a jurisdictional

17  defense.

18       Anyway, I said my piece.  Let's get to -- let's to

19  the trying to understand what you're proposing with the direct

20  filing.

21       MR. JANOW:  Thank you, Your Honor.  And if I may

22  just respond to one brief point.  You know, we have looked

23  closely at that -- that order that you referenced.  You know,

24  we -- our -- our position is that, you know, if there's no

25  jurisdiction whatsoever, or a client that it should not just

Colloquy                                                        40

1    be sort of a dismissal with prejudice, and an agreement to

2    participate in discovery.

3              But that we should be dismissed from the case and,

4    you know, be able to tell the various components of the

5    company that -- that they're, you know, that there's no

6    litigation pending anymore, and management, et cetera.

7              THE COURT:  I would just ask you, if you would

8    indulge the Court, to think about the efficiencies and

9    economics.  And what is more efficient, to do it our way, or,

10   you know, to -- to get you out of the case and eventually

11   probably be back here, or if not be back here be before a

12   judge in a different state who has no knowledge whatsoever

13   about the case?

14             That's all I would ask you to consider.

15             MR. JANOW:  I understand, Your Honor.  And -- and if

16   I might raise two -- two related points.  The first is, I know

17   I've been speaking a lot about Albertsons here today.  I just

18   wanted to be able to reference the other types of defendants

19   that are objecting in the same way that Albertsons is.

20             And there's a large number of them.  There are

21   retailers and wholesalers as well.

22             THE COURT:  No problem.

23             MR. JANOW:  Understood, Your Honor.  Just a few

24   points of -- of sort of development.  First, for the various

25   retailers, my understanding is that for the vast majority of

Colloquy                                                41

1    retailers, each of them only has a very small number of cases

2    pending before the Court.

3            And so they may be similarly situated to Albertsons.

4    And then there are also wholesalers that have and surely those

5    who may fall into different categories that may have their own

6    unique issues as relates to this.  And so it may be more

7    complicated than Albertsons, although I'm obviously here and

8    can speak to my client.

9            THE COURT:  Could you just explain to the Court --

10   okay, you object to the direct filing order that we have for

11   Valsartan.  And then there's all these different proposals.  I

12   got to tell you, I'm confused.  Could you maybe explain what

13   your proposing?

14           MR. JANOW:  Yes, Your Honor.  I would be happy to

15   and we -- we proposed those -- we provided those to the Court

16   mindful of the Court's directive that we should come prepared

17   to discuss today, and we wanted to provide the Court a

18   potential mechanism forward, given the objecting defendants'

19   objections.

20           So let me go through the two proposals for you.

21   Well I should clarify.  There's one proposal and that's the

22   first one that was I hope --

23           THE COURT:  Exhibit?

24           MR. JANOW:  Exhibit B, I believe, Your Honor.  And

25   then there's a redline attached at Exhibit C, and that redline

 1   is --

 2            THE COURT:  Okay.  So let's deal with C.  Let's deal

 3   with the redline version, C.

 4            MR. JANOW:  Sure.

 5            THE COURT:  What is C?

 6            MR. JANOW:  So C, Your Honor, is a proposed

 7   superceding direct file order.  And it would replace and

 8   supercede CMO 3.

 9            THE COURT:  And how is this different than what we

10   have now?

11            MR. JANOW:  It -- what it does is it would -- it

12   provides -- a brief procedural background at the beginning.

13   And we did that both for the Court's convenience and because,

14   frankly, there are -- there are likely to be future defendants

15   who are not before this Court now that may be brought in in

16   Losartan and Irbesartan that we thought might benefit from an

17   explanation of the complex procedural history here, Your

18   Honor.

19            Certainly it took a lot of work to understand it

20   ourselves.  And then it essentially just, if you flip to, you

21   know, sections two and --

22            THE COURT:  Yeah, but this order -- this order

23   doesn't just apply to Losartan and Irbesartan, right?  You're

24   suggesting it encompasses all three drugs, right?

25            MR. JANOW:  Correct, Your Honor.  And the intention

1    there is to account for the numerous defendants like my client

2    that join this litigation far, far later than the order was

3    entered.

4            And so if you look at section two and section three,

5    there are essentially very few changes from the existing CMO

6    3, except that it provides the types of sort of additional

7    preservation of rights language that the plaintiffs and I

8    discussed yesterday.

9            And just in order to sort of beyond a shadow of a

10   doubt, you know, that all of the various defendants have so

11   preserved their rights and all of their arguments and

12   affirmative defenses in the case.  And I don't believe that

13   that type of language is -- is disputed by the parties, or

14   objected to by the plaintiffs, although they can certainly let

15   the Court know.

16           THE COURT:  Well what's the difference?

17           MR. JANOW:  The difference, Your Honor, is in

18   section four, if you flip to section four.  This order --

19           THE COURT:  Let me just get to it.

20           MR. JANOW:  Of course, Your Honor.

21           THE COURT:  Okay.  Section four on page seven.

22           MR. JANOW:  And --

23           THE COURT:  Oh, wait.  Okay.  Section four, on page

24   seven.

25           MR. JANOW:  Yes, Your Honor.  As you'll see the --

1    this section is intended to address the objecting defendants'

2    objections.  And essentially what it does is, what the order

3    does is it authorizes direct filing as to the parties that

4    stipulate to the filing.

5              THE COURT:  So basically you're saying no direct

6    filing against the objecting defendants.

7              MR. JANOW:  Correct, Your Honor.

8              THE COURT:  Okay.  That's the meat of it.

9              MR. JANOW:  That's the meat of the proposal, Your

10   Honor.  We object.

11             THE COURT:  Okay.  And then there's, what's Exhibit

12   D and E?

13             MR. JANOW:  So mindful of the plaintiffs express

14   desire and the Court's --

15             THE COURT:  Hold on let me just --

16             MR. JANOW:  Sure.

17             THE COURT:  -- I think I know the answer, but

18   plaintiffs  -- do plaintiffs object to Exhibit C?

19             UNIDENTIFIED PLAINTIFF COUNSEL:  There's some --

20   there's some things we need to talk about language-wise.

21             THE COURT:  Section four, that's the key.  Do

22   plaintiffs object to that?

23             UNIDENTIFIED PLAINTIFF COUNSEL:  If this is being

24   read to me that the order doesn't apply to all the defendants,

25   yes, we object to it.

1          THE COURT:  Okay.  I assumed that, I just wanted to

2     get that on the record.

3          UNIDENTIFIED PLAINTIFF COUNSEL:  Yeah.  And there's

4     one thing -- I'm not sure, I might have heard something,

5     Albertsons was named as we've just confirmed in the personal

6     injury and medical monitoring master complaints back when the

7     original direct filing order was entered.

8          I think -- you can correct me if I'm wrong, so I'm

9     not sure -- counsel seemed to say that they weren't in the

10    case when that was entered.  But they were.  So I'm not -- and

11    most of the defendants, if not all of them, CVS and a few

12    others, were already in the case that are now objecting when

13    they're already subject to the original order.

14         I mean, there's a lot of confusion here, but, I

15    mean, we -- our position you understand.

16         THE COURT:  Okay.  We'll deal with that.

17         MR. JANOW:  Your Honor, just to --

18         THE COURT:  Don't worry about that.  Let's just move

19    on.  What's Exhibit D and E?

20         MR. JANOW:  So, again, mindful of plaintiffs'

21    position as we discussed, plaintiffs' counsel and I discussed

22    yesterday in our meet and confer telephone conference.  And

23    mindful of the Court's desire to continue to move the

24    Valsartan case and the other cases forward as best it can, we

25    wanted to provide the Court with something else to consider.

Colloquy                                                    46

1    Although, to be clear, we are not proposing -- the

2    objecting defendants are not proposing this, for the very key

3    and important reason that we don't believe that the Court has

4    authority to enter this order under 28 U.S.C. 1407, or any

5    other section.

6         THE COURT:  So what happens, hypothetically, if the

7    Court does enter the order?  Over your objection, which is

8    clear.

9         MR. JANOW:  Understood.

10         THE COURT:  What happens?

11         MR. JANOW:  Well I would suggest, Your Honor, and as

12    we articulated in the submission, that the appropriate course

13    and the necessary course is then to allow the objecting

14    defendants and all the defendants, frankly, to move to dismiss

15    on personal jurisdiction grounds --

16         THE COURT:  Suppose the Court says no.  Then what?

17         MR. JANOW:  Well, Your Honor, if -- if the Court

18    enters the -- again enters an order over our objections and

19    declines to permit us at this point to move to dismiss on

20    personal jurisdiction grounds, you know, we would obviously

21    have to discuss with clients and evaluate whatever next step

22    options we would do.

23         I say that mindful that we of course will have no

24    desire, as we expressed in the submission, to disrupt the

25    proceedings in this Court and --

1          THE COURT:  What are the options though?  Are there

2     any options if the Court says no?

3          MR. JANOW:  Well, Your Honor, at some point the --

4     the personal jurisdiction issues must be decided by the Court.

5          THE COURT:  Correct.  No -- I don't think anyone's

6     going to disagree with that, and it's just a question of when.

7          MR. JANOW:  And they certainly I would suggest, Your

8     Honor, they certainly can't be tabled forever past motions to

9     dismiss for -- on substantive grounds on 12(b)(6) grounds.

10    They certainly can't go beyond summary judgment.  Certainly

11    can't go beyond class certification.

12          And, indeed, we cited to Your Honor in the

13    submission cases both from the Third Circuit and the Supreme

14    Court that direct that courts must take up personal

15    jurisdiction issues at the very beginning of a case.  And, in

16    fact, it was -- it is far superior to address those personal

17    jurisdiction issues before 12(b)(6) issues where possible.

18    And the Supreme Court has -- has stated in no uncertain terms

19    in the cases we cite in our submission that -- that where the

20    Court has -- is without jurisdiction over the -- over the

21    defendants without personal jurisdiction over the defendants,

22    the only role that the Court has is to determine that it is

23    without jurisdiction and dismiss the case.

24          And so we would submit, Your Honor, that it would be

25    error to defer the decision-making process on personal

1    jurisdiction at this time, particularly because there are

2    numerous defendants that believe there are serious

3    deficiencies, very serious deficiencies in the plaintiffs'

4    cases against them on jurisdictional grounds, on personal

5    jurisdiction grounds, venue grounds, and that we should be

6    afforded the opportunity to present those arguments promptly

7    so that the cases that -- sorry, the defendants that are

8    improperly before this Court can be dismissed.

9           And that the rest of the case can be so streamlined.

10   I mean, we suggest as the Court is considering case management

11   issues, that a very fundamental issue of case management is to

12   dismiss the parties to which the Court does not have

13   jurisdiction, to streamline the number of parties in the case

14   to those that should be involved, and those that should not be

15   involved, and that fundamentally helps manage a large case

16   like this.

17          And I should add that one of the issues in this case

18   developing its complexity is plaintiffs' own decision-making

19   and elections as to who they are suing, and how many, and the

20   different types of defendants they're suing.  These are

21   plaintiffs' elections.

22          And they have elected to sue upwards of, I believe I

23   read in a submission, upwards of 50 defendants?  Maybe it's

24   fewer than that, but in the dozens.  Various different types,

25   spread out all across the country, and across an entire --

1    well, you know, the majority -- a very large part of an

2    industry.

3            And so once you've taken on that level of

4    decision-making and pleading, the complexity necessarily

5    increases.  And that complexity was brought on by the

6    plaintiffs and the cases they've elected to file.

7            And so, respectfully, Your Honor -- respectfully, we

8    would submit that the only option -- the option for the Court

9    would be to -- if they Court wished to enter the order in the

10   form of Exhibit -- of Exhibit D, that it may do that, but it

11   should only do that if -- if it's promptly providing all of

12   the defendants an opportunity to move on the jurisdictional

13   grounds.

14           And, again, just for the sake of the record, we

15   don't propose -- we would object to the entry of Exhibit D,

16   because we do not believe the Court has the authority under 18

17   U.S.C. 1407 to enter that type of order over our objections.

18           THE COURT:  Do plaintiffs, apart from the issue of

19   -- apart from the condition subsequent that this order be

20   conditioned on giving them the right to immediately file their

21   motions, put that aside.  Is there any language -- any

22   objection of the plaintiffs to this Exhibit D order, because

23   it -- I just took a quick look at it, it appears all it does

24   is just preserve the objecting parties objections.

25           MR. SLATER:  Yeah.  When we're saying the Exhibit D

1    order, that's the redline you sent me with the --

2              THE COURT:  That's the redline version.

3              MR. SLATER:  -- with the language that you're

4    objecting, but there's stipulating defendants and

5    non-stipulating defendants?  That's --

6              MR. JANOW:  Correct.  And just to explain.  So D is

7    --

8              MR. SLATER:  I'm just making sure I have the right

9    --

10             MR. JANOW:  Exhibit D is the order, Exhibit E is the

11   redline.  That redline's the order against CMO number three.

12   And this is the order that we discussed yesterday that is the

13   alternate order that over our -- over the objecting

14   defendants' objections would, if the Court so chose, and

15   determined it had the authority to do so, would enter the

16   direct filing over our objections, but expressly preserve all

17   of our rights in every shape -- way, shape and form.

18             MR. SLATER:  The parts that matter, we have no issue

19   with.  There's some language that I could talk to counsel

20   with, there's a few words here and there that would need to be

21   fixed.  We don't think the preamble is needed, and it -- you

22   know, the history of the world part one we didn't think was

23   necessary in the preamble, because it sort of characterizes

24   the litigation, and who knows how that plays out.  I mean, but

25   the concept of it is we just want a direct file order.  And

Colloquy                                                        51

1    when counsel yesterday said we don't want a shadow of a doubt,

2    I said please put into the order there won't be a shadow of a

3    doubt that you're preserving your objections.  I mean, so --

4         THE COURT:  There is no doubt about that.

5         MR. SLATER:  No, of course not.

6         THE COURT:  From the Court's perspective, from

7    plaintiffs' perspective, there's no doubt about that.  Nothing

8    --

9         MR. SLATER:  It's an administrative vehicle.  I mean

10   -- I mean, what really is happening here is the defense sees

11   this as a way to essentially challenge the authority of the

12   JPML to send whole cases to an MDL judge.  I mean, that is

13   what's happening here today, and they're over-reading

14   Bristol-Myers case, which explicitly addressed Justice

15   Sotomayo's dissent where she said, how are we going to run

16   class actions?  How are we going to run these large

17   litigations?  What are you going to do, sever parts of the

18   case and try them over the country?  And the majority opinion

19   actually said, don't worry, that's a due process issue under

20   the Fourteenth Amendment, Bristol-Myers, because it was state

21   court.

22        This would be a Fifth Amendment issue, which would

23   be analyzed differently.  So, I mean, that's what's going on

24   here, I think.  Counsel can tell me if I'm wrong, maybe I'm

25   not sure what I'm talking about.  But there -- and they get

Colloquy                                                    52

1    nowhere with this.  I mean, so what they're saying is

2    Albertsons, which isn't like Joe Albertsons Pharmacy on Main

3    Street in Idaho, it's a massive store, it's a massive chain

4    that belongs in the litigation, because it sold a lot of

5    Losartan to a lot of people, is saying, you can't run the case

6    against us in New Jersey, even though the JPML sent it here,

7    you have to do it in a Federal Court somewhere else, so you

8    have to sever us out of this case, because obviously the case

9    proceeds, and then the MDL judge will have to coordinate with

10   the District Judge there, and that's how it's going to have to

11   be done.

12           I find it very hard to imagine that the Third

13   Circuit or Supreme Court would say, yeah, that's a good idea.

14   Or, yes, that's what _Bristol-Myers_ means.  But that's the

15   argument they want to make.  And we obviously think with some

16   tweaking the order would be fine.

17           If all this paranoid language needs to be in there,

18   it's fine.  We just want to be able to administratively get

19   cases here without having to burden clerks and the JPML

20   transferring cases.

21           MR. JANOW:  Your Honor, if I may just briefly

22   respond to the -- one of the points that Mr. Slater was

23   articulating.  The _Bristol-Myers_ case is a very important case

24   in terms of the evolution of personal jurisdiction

25   jurisprudence in the country.  And subsequent to _Bristol-Myers_

Colloquy                                                        53

1    Squibb, multiple courts across the country, including the

2    multiple judges in this District, have applied Bristol Myers

3    Squibb to class actions in Federal Court.

4              And I can point the Court to the Horowitz case, it's

5    Horowitz v. AT&T, that's at 28 U.S. District Lexis 69191.  It

6    says Judge Martinotti from April 2018.  Where the Court looked

7    at this precise issue and applied Bristol-Myers and the

8    directives from Bristol-Myers to cases -- class actions in

9    Federal Court.  Same with Judge Wolfson before she became

10   Chief Judge.

11             This is Chernus v. Logitech, this is an April of

12   2018 case as well.  The case cite is 2018 U.S. District Lexis

13   70784.  And the pin site is star 13 through 18.  And we cite

14   -- I believe we cited those cases in our submission to the

15   Court, Your Honor.

16             THE COURT:  I think I understand the objecting

17   parties' position.  I can talk intelligently about it.  You'll

18   address these to Judge Kugler this afternoon.  Here's what I

19   would ask.  Over the break, if you could meet and confer with

20   your objecting parties.  Is it better to do what you're

21   suggesting, send these cases all over the country, the

22   likelihood is pretty good you're going to wind up back here.

23   But even if not, you're going to be in front of some judge who

24   has no background in the case.

25             Would you rather that, or would you rather be here

Colloquy                                                                54

1  before a Court who's extremely sensitive to issues of parties

2  who only have a minimal role in the case?  We've already put

3  in place an order to get you out of the case.  We're trying to

4  phase discovery so you're not overburdened.  I would just ask

5  you to consider what is genuinely in the best interests of

6  your client.

7           With the proviso in neon -- in a neon sign that

8  says, without prejudice.  Yes, you'll be in New Jersey.  It's

9  not a bad place.  But some day you're going to be able to

10  raise your objections.  If I was in your client's shoes, I

11  would rather be here than in some jurisdiction that is not

12  going to be sensitive to your client's concerns.  Who's not

13  going to look out to protect your client's concerns.

14           But that's your choice.  That's your client's

15  choice.  So like I said, I understand the issue, you make your

16  argument this afternoon and we'll see what Judge Kugler rules.

17  Okay?

18           Yes, sir?

19           MR. GEOPPINGER:  Your Honor, may I be heard on one

20  point, Your Honor?

21           THE COURT:  Just identify your name and who you

22  represent.

23           MR. GEOPPINGER:  Jeff Geoppinger from

24  AmerisourceBergan.  One point --

25           THE COURT:  I'm sorry.  I didn't hear.

1           MR. GEOPPINGER:  Jeff Geoppinger from

2   AmerisourceBergan, Your Honor.

3           THE COURT:  AmerisourceBergan.  Okay.

4           MR. GEOPPINGER:  To your point about not involving

5   peripheral defendants in the morass of the litigation, Your

6   Honor.  And I appreciate the sensitivity of the Court to that

7   issue, because I consider my client a peripheral defendant in

8   this case.

9           THE COURT:  I have a feeling plaintiffs may not

10  agree.

11          MR. GEOPPINGER:  They may not agree, Your Honor.

12  But to my point, Your Honor --

13          THE COURT:  There's probably not a defendant out

14  there who doesn't think they're a peripheral defendant.

15          MR. GEOPPINGER:  Correct, Your Honor.  But whether I

16  am, or my client is, or my client is not, I would just offer

17  the Court, Your Honor, that a direct filing order is going to

18  do the exact opposite of keeping peripheral defendants out of

19  this litigation.

20          A direct filing order is going to allow plaintiffs

21  to come into this courtroom, as many have already done, to

22  peripheral defendants who are not subject to the direct filing

23  order that's in this case, and checked every box on a

24  complaint.

25          THE COURT:  There's Rule 11 concerns, though, isn't

1    there?

2                    MR. GEOPPINGER:  There should be.

3                    THE COURT:  Not should be, there is.

4                    MR. GEOPPINGER:  Yes.  There certainly should be.

5                    THE COURT:  There is.

6                    MR. GEOPPINGER:  Well those things certainly

7    shouldn't happen, Your Honor, but I think, and the Court is

8    very experienced with MDL's and many of the attorneys here are

9    as well, but that kind of thing does happen.  And there are

10    lots that check all the boxes.

11                    And a direct filing order, unfortunately, can

12    promote that kind of activity when it shouldn't have.

13                    THE COURT:  Thank you, counsel.  Next issue on the

14    agenda is the Legacy motion.  Is that really combined with the

15    direct filing order that we've been talking about?  Is

16    Legacy's counsel here?

17                    MR. ST. ONGE:  Yes, Judge.  Britton St. Onge on

18    behalf --

19                    THE COURT:  Is that the same issue basically?

20                    MR. ST. ONGE:  Largely, but we think that Legacy is

21    such a tiny player in this, there's only two cases --

22    involving Losartan involves Legacy that have been filed in

23    Federal Court.  And we think that our motion to dismiss ought

24    to be taken up, because they're such a small issue.  And

25    because the connections of the two cases they're actually --

1    absolutely has no connection between New Jersey and

2    plaintiffs' claims in those cases.

3              THE COURT:  So where is Legacy based?

4              MR. ST. ONGE:  In Missouri, Your Honor.

5              THE COURT:  Okay.  So you want the plaintiffs to

6    file a case against you in Missouri?

7              MR. ST. ONGE:  I'd prefer they not file it, but if

8    they file a case it should -- it would be general jurisdiction

9    there.

10             THE COURT:  Suppose they file it in Federal Court in

11   Missouri, hypothetically, okay.  And then it goes to the

12   Panel, and then aren't you back here?

13             MR. ST. ONGE:  It's possible.  But that Court would

14   have jurisdiction.  As it exists a direct file in the case

15   wouldn't have personal jurisdiction.

16             THE COURT:  What am I missing?  You're going to wind

17   up back here anyway, what am I missing?  Why are we going

18   through this?

19             MR. ST. ONGE:  Because it goes to the very power of

20   the Federal Court to hear a case before it.  And so it needs

21   to be filed in the jurisdiction where the court has the power

22   to adjudicate, even things short of the merits.

23        (Transcriber change)

24             THE COURT:  So Legacy -- hear me out -- I want to

25   understand Legacy's argument.  Legacy is not happy that

Colloquy                                                    58

1   there's a direct filing against it and it's wound -- winds up

2   in New Jersey preserving all of its defenses, but if the case

3   is re-filed in Missouri, it goes to the panel and it winds up

4   back here -- Legacy doesn't have a problem with that?

5           MR. ST. ONGE:  At that point, Legacy would not have

6   an objection to personal jurisdiction, but we think it would

7   have an argument for why it shouldn't be transferred down --

8   transferred back to the MDL Court, and so we -- they would

9   oppose -- oppose any transfer and if it ended up back here,

10  then that's how the chips would fall that way.

11          But at least it would not be subject to jurisdiction

12  in a Court like this without having gone through the case

13  being filed in the Court where it does have jurisdiction, and

14  it goes to the very power of the Court to -- to adjudicate the

15  merits and adjudicate matters and shorten (phonetic) the

16  merits, including discovery, Your Honor.

17          THE COURT:  Got it.  Thank you, counsel.

18          MR. ST. ONGE:  Thank you, Judge.

19          THE COURT:  Okay, well now let's go to a simple

20  issue like downstream discovery.  Non-manufacturing

21  defendants, I guess have we reached a consensus that we need a

22  representative to talk to for the wholesalers/distributors,

23  and then the retailers/dispensers, and if so, I hope -- do we

24  have those persons?  And let's get them on the defendant --

25  whatever we call them -- executive committee, what have you.

Colloquy                                                        59

1    Ms. Johnston, what do you think?

2              MS. JOHNSTON:   Well, Your Honor, you signed the

3    order that -- that appointed me to the Defense Executive

4    Committee on behalf of the retailers and pharmacies.  I can't

5    speak to whether there should be a representative for the

6    wholesalers.  Obviously they, you know, in a -- in a perfect

7    world, it's a -- it's a very nice thing to have.

8              But it is a lot of work for one person to do on

9    behalf of entities and, you know, speaking solely for the --

10   the retailers and pharmacies, while we're similarly situated,

11   we're not identical and so there's a lot that can be done in

12   terms of coordination, but I -- I will never have the ability

13   to speak for every of the dozen or so pharmacies who were

14   named.

15             THE COURT:   You would be a liaison.

16             MS. JOHNSTON:   Correct.

17             THE COURT:   I don't think the Court to expects you

18   to bind somebody else's client.

19             MS. JOHNSTON:   I understand.

20             THE COURT:   Let me hold that thought.  Wholesalers-

21   distributors.

22             MR. GEOPPINGER:   Good morning again, Your Honor,

23   Jeffrey Geoppinger --

24             THE COURT:   I think we have an appointee to the

25   executive committee.

Colloquy                                                          60

1             MR. GEOPPINGER:  Well -- well, Your Honor, so

2    there's -- there's three of us.  There's AmerisourceBergen,

3    there's Cardinal and there's McKesson, Your Honor, and

4    candidly, Your Honor, there's only three of us and we've been

5    working together, we've been working well and I think we've

6    been working well with the plaintiffs.

7             I don't think we've had any issues really.  But one

8    of the issues, Your Honor, is given our belief, given that

9    there's only three of us, given our status as peripheral

10   defendants whether our adversaries agree or not --

11            THE COURT:  It's a -- let me get the three --

12   Amerisource --

13            MR. GEOPPINGER:  Cardinal, McKesson.

14            THE COURT:  Got you.

15            MR. GEOPPINGER:  And in our -- our status, what we

16   believe to be in the litigation, candidly, Your Honor, the

17   cost of the effort that would be required to put one of us on

18   the executive committee and the burden that would fall on the

19   individual defendant in that case is not something either one

20   of the three of our clients are necessarily interested in or

21   have allowed us to sign up for at this point, and therefore

22   we've been working as a threesome and we've been doing a --

23   and we've been doing a good job and I think, Your Honor, that

24   the --

25            THE COURT:  Yeah, but that --

1        MR. GEOPPINGER:  -- the communication with the

2    plaintiffs --

3        THE COURT:  -- it makes it -- doesn't it make it so

4    much more difficult and cumbersome for the plaintiffs and more

5    importantly the Court to deal with three separate people --

6        MR. GEOPPINGER:  Your Honor, as to dealing with the

7    plaintiffs, again, I think candidly when we have (inaudible)

8    versus plaintiffs, a code word for the plaintiffs, my phone

9    call interrupted that.  There's three lawyers, three parties,

10   each one of us is represented.  If the plaintiffs need a point

11   person, I'm happy to volunteer for that.  They can call me

12   whenever they want, they can email me whenever they want --

13       THE COURT:  So can I get the correct spelling of

14   your name?

15       MR. GEOPPINGER:  Certainly.  It's -- it's G-E-O-P-P-

16   I-N-G-E-R, and I'm -- I'm happy, I've talked with my co-

17   counsel, I'm happy --

18       THE COURT:  With what firm, sir?

19       MR. GEOPPINGER:  Ulmer & Berne.

20       THE COURT:  How do you spell that?

21       MR. GEOPPINGER:  Ulmer, U-L-M-E-R and Berne, B-E-R-

22   N-E.

23       THE COURT:  And where is that based?

24       MR. GEOPPINGER:  Cincinnati, Ohio.

25       THE COURT:  Would it give you some comfort if the

1    Court's order provides that the members of your group, Ms.

2    Johnston, have to agree on some sort of cost sharing

3    arrangement?  Would that give you some comfort?

4              MR. GEOPPINGER:  Would that give my client some

5    comfort, Your Honor?  Yeah, that -- that -- certainly I have

6    to talk about it with my other -- with other counsel, but I

7    think that -- that could be an issue, Your Honor.

8              THE COURT:  Ms. Johnston, would that give you some

9    comfort?

10             MS. JOHNSTON:  Well, Your Honor, I think that the --

11   you know, anytime that sort of offer is made, then yes, it

12   would -- it would be -- it would be great.  I think that the

13   -- the real issue is that at the end of the day, there's not a

14   true way to avoid there being multiple people on a phone call

15   when you've got different entities that have different

16   interests, and so I think that you can get to 75, 80 percent

17   of what would be collectively good for the group, but I think

18   there are always going to be some -- some smaller nuances that

19   -- that require people to listen in and participate in meet

20   and confers on things like discovery.

21             THE COURT:  Maybe one of the reasons that things get

22   bogged down so much is because there's so many people at

23   meetings and phone calls.

24             MR. GEOPPINGER:  Your Honor, I would -- I would --

25   from the wholesalers' standpoint, I don't think things have

1    been -- been bogged down at all.

2              THE COURT:  Okay.  All right.  Okay.

3              MR. GEOPPINGER:  The three of us have been

4    very --

5              THE COURT:  I got it.

6              MR. GEOPPINGER:  -- available and able to do the

7    job.

8              THE COURT:  I think we going to appoint liaison,

9    counsel.  It just would make the case go so much more

10   efficiently and to protect you and your clients' interests,

11   I'll probably put something in there, there has to be some

12   sort of cost sharing arrangement.

13             MS. JOHNSTON:  And, Your Honor, just to speak to the

14   efficiency component of it, I think that, you know, the vast

15   majority of what happens in this litigation isn't in the

16   courtroom and it's not on the phone or -- or in person with

17   plaintiffs.

18             THE COURT:  True.

19             MS. JOHNSTON:  It's talking to each other and that

20   is something I think all of the -- the different tiers of

21   downstream defendants have done really well and I think that

22   it has contributed to a lot of efficiencies in the way that

23   we're handling discovery and -- and discussing those issues

24   with plaintiffs.

25             THE COURT:  Okay, so let's talk about a substantive

Colloquy                                    64

1    issue with regard to the non -- with regard to the -- the non-

2    manufacturing defendants.  Right off the bat, it's clear there

3    -- there's -- I can't believe that plaintiffs would disagree

4    with this, that there should be no duplication between the

5    fact sheets and the requests for production.  There can't be

6    any dispute about that, right?

7              MR. SLATER:  Right.  Your Honor, we don't disagree

8    with that.  The question is this; the request for production

9    provide overarching general discovery.  When there's a

10   particular plaintiff, what we need to be able to do is to be

11   able to make sure that both sides are in the same page as to

12   exactly -- for example, most of these -- the DFS's are

13   primarily focused on product ID in a specific case, I mean,

14   that's what we're talking about.

15             And the question Your Honor has to decide is the

16   defendants' position has basically been you'll take the

17   general documents that you'll get from the different

18   defendants, you'll put the puzzle together, you'll figure it

19   out, if you're right you're right, if you're wrong you're

20   wrong.

21             Our position is so you want us to then take

22   corporate rep depositions on specific cases of each level of

23   the supply chain, have everybody put people under oath and

24   spend all this money and time, as opposed to having one

25   document where a party says on the defense side, yes, I'm

Colloquy                                                                65

1  going to confirm this plaintiff took this drug, this drug was

2  contaminated, this drug was recalled, and this drug was sold

3  -- I'm starting at the top of the chain -- was sold this this

4  finished dose manufacturer, and then we figure out that it

5  went to this distributor so we have it nailed down, because

6  this is the issue we -- I raised with Your Honor and you said

7  this is going to be done through discovery.

8          When I asked Your Honor why don't we all get

9  together and figure all this out collectively and you said --

10 and -- and it was -- it was fine and said no, you're going to

11 do this through discovery so that's what the DFS primarily is

12 geared to, is the product ID.

13         What -- the push-back that I got yesterday, and that

14 was not with Ms. Johnston but it was with a different level

15 but I think the positions have been similar, I could be wrong,

16 was that's your burden.  And I said well, so you want us to

17 try product ID as part of a trial?

18         Like do you think that's what the Court wants us to

19 do, is not work this out on paper and figure out what the

20 person took and -- and nail it down?  And the answer was yeah,

21 that's your burden, figure it out.  And so that's really what

22 is going on in general so there's not actual duplication

23 because you take this overall mass of information and then you

24 boil it down for this plaintiff -- who's the plaintiff in a

25 case.

1              So that we don't have product ID issues that are

2      extant when we get to the point of preparing for trial or

3      doing an expert report or walking into the Court to put the

4      case on, that issue is a fundamental factual issue that should

5      be dealt with on a plaintiff-by-plaintiff basis so it's not

6      something that the Court then has to supervise or try the

7      issue on product ID and have summary judgment motions on which

8      group of pills the person took was contaminated or not, that

9      -- our understanding from what Your Honor told me early on in

10     litigation, that's -- that's what this process will be for and

11     it's more efficient to do it that way.

12             THE COURT:  Let me ask you this question before we

13     get into the nitty-gritty.  I'm a realist and I know we don't

14     live in a perfect world, but it would have been great if we

15     could finalize this today.  We're not going to finalize it

16     today.  Is -- are these issues ripe to decide or raise with

17     the Court, or do you need another 30 days to meet and confer

18     about these issues?

19             MR. SLATER:  As a realist --

20             MS. JOHNSTON:  Your Honor --

21             MR. SLATER:  -- I think the best thing that can

22     happen is -- and it might not even have to happen in this open

23     courtroom on the record, if we could talk to Your Honor and

24     understand where Your Honor sees it, for example, if you look

25     -- if -- if you agree with our position I think it helps us to

Colloquy                                                          67

1  get to the finish line very quickly.  If -- if the defense

2  position is that hey, figure it out for yourself and it will

3  be a crap shoot when you get to the end of the case whether

4  you've got product ID accurate, then we're going to know, okay

5  -- you know, I mean, I don't think that's practical or

6  reasonable.

7          But if -- if for example, if the defense would

8  understand, yes, you need to work with the plaintiffs on these

9  DFS's and give product ID in a particular case, I think that

10  we could probably get this done very quickly and -- and by the

11  next telephone conference, be done.

12          MS. JOHNSTON:  Your Honor, if I may briefly, I don't

13  think that that's a -- it's really a fair characterization of

14  -- of what defendants have been telling plaintiffs, and what

15  we've also represented to the Court is that we -- we don't

16  agree that we should provide certain information that gets

17  plaintiffs to product identification.

18          The issue is -- and this is one that -- that you may

19  recall we raised during the -- the telephone conference on

20  December 18th when we -- we spoke about the original set of

21  RPs that plaintiff served to all different levels of the

22  supply chain --

23          THE COURT:  But was this --

24          MS. JOHNSTON:  -- we --

25          THE COURT:  -- the phase one, phase two issue now?

1          MS. JOHNSTON:  No, Your Honor.  This is actually a

2    much more discreet issue, but it's a big-picture issue and

3    that's the -- the fact that we've been telling plaintiffs

4    since the beginning that the general business of pharmacies is

5    not to trace at the -- the batch or a lot level at the point

6    of sale.

7          And so we've had this discussion, we've now had this

8    discussion with plaintiffs' counsel multiple times and how we

9    -- and I'm going to paraphrase our -- our last conversation

10   with you, Your Honor, which was essentially that, you know,

11   the pharmacy is obviously their last touch-point before the

12   drug goes out the door and we understand that, and we also

13   know that there's certain information that provides a link in

14   the chain that gets back up to the manufacturers, and we get

15   that.

16         But following this discussion on December 18th where

17   Your Honor advised plaintiffs to think hard about what they

18   want, we also went back and thought hard about what we

19   reasonably could do -- if we can't trace to the specific pill

20   that goes to a customer or a consumer who comes into a

21   pharmacy, what can we provide.

22         So over the holidays we spent a lot of time talking

23   to our clients doing, you know, initial -- initial interviews

24   regarding data systems and where things are centrally located

25   and -- and so on, and we talked amongst ourselves and that's

1    the -- the coordination efforts that I mentioned, and we then

2    had a very frank, specific conversation with plaintiffs that

3    said we understand that you want this particular piece of

4    product ID, we can't provide that for you --

5                THE COURT:  Is there --

6                MS. JOHNSTON:  -- but here's what we can give you.

7                THE COURT:  Okay, let me ask you a question.

8                MS. JOHNSTON:  Sure.

9                THE COURT:  Is there a specific question that would

10   be representative of this issue that we can look at and have a

11   concrete example of what we're talking about?

12               MS. JOHNSTON:  So in the draft request for

13   production that the retailers and pharmacies sent on January

14   9th --

15               THE COURT:  So is that in this --

16               MS. JOHNSTON:  It is -- it is --

17               THE COURT:  What exhibit?

18               MS. JOHNSTON:  One second, Your Honor.

19        (Pause in proceedings)

20               MS. JOHNSTON:  Sorry, Your Honor.  That is Exhibit

21   F.        THE COURT:  Let me get it.

22        (Pause in proceedings)

23               THE COURT:  Okay.  What number, for example?

24               MS. JOHNSTON:  So these are again our -- I'll remind

25   Your Honor that these are the requests that the retailers and

Colloquy                                                    70

1   pharmacies actually prepared in advance of the meet and confer

2   for plaintiffs.  We sent these to plaintiffs and said this

3   will guide the conversation because this is what we have.

4           So I would say that the one and two, three and four

5   which are basically sourcing, tracking and distribution, and

6   those speak directly to exactly what Your Honor discussed

7   during the December 18th call which is what is the information

8   you can provide up and down the supply chain.

9           THE COURT:  So this is what defendant is proposing

10  it could answer.

11          MS. JOHNSTON:  That's correct, Your Honor.

12          THE COURT:  Which is the version that plaintiffs

13  want you to answer?  Is that G?

14          MS. JOHNSTON:  I think so.  Well, so I think -- so G

15  is actually the set that they sent us last Wednesday night and

16  I think H is the set that we got -- or I'm sorry, I is the set

17  that we got Friday night, so it's slightly less than --

18          THE COURT:  So should we look at I?

19          MS. JOHNSTON:  I think so.

20          THE COURT:  Okay.

21          MS. JOHNSTON:  But --

22          THE COURT:  Let me look at I.

23          MS. JOHNSTON:  And -- and I think just a point of

24  clarification, the -- the part of this position paper that we

25  put in front of the Court yesterday essentially said that

1    these are -- these are not issues that are ripe for ruling.

2    We just got the discovery Friday, we're still looking it over.

3              THE COURT:  That's fine.  I don't have any problem

4    with that --

5              MS. JOHNSTON:  I understand.

6              THE COURT:  -- but I'm looking at I, okay?  Number

7    one, "Documents sufficient to identify when and from whom you

8    purchase VCDs," no problem with that, right?

9              MS. JOHNSTON:  Well, I think that there are issues,

10   and again, subject to the --

11             THE COURT:  But they're entitled to know --

12             MS. JOHNSTON:  -- brand new set of discovery.

13             THE COURT:  -- who you bought Valsartan from, right?

14             MS. JOHNSTON:  Well, I think that we've got some

15   bigger relevance issues that we have to address which is how

16   is Valsartan defined, what is the time period they're looking

17   at, you know, we're --

18             THE COURT:  Fine.

19             MS. JOHNSTON:  -- we're going to have all those

20   things to discuss.

21             THE COURT:  You'll narrow it -- you'll work that

22   out, but that's a basic request -- who did you purchase from

23   and when.

24             MS. JOHNSTON:  Well, and -- and I agree, Your Honor,

25   that it is a fairly basic request.  The issue is that we had

1  this discussion multiple times where we'd said what is the

2  time period, what is Valsartan, who are the manufacturers, are

3  you

4  -- are you asking for every single pharmacy, most of whom are

5  named in just a handful of cases to turn over all of their

6  Valsartan --

7           THE COURT:  You'll work that out in meet and

8  confers, but isn't the big -- is the big issue, Ms. Johnston,

9  is the big issue if they ask you to identify who supplied the

10  Valsartan of Jane Doe, is that really the crux of the issue

11  that you're concerned about, rather than you providing all the

12  discovery and plaintiff has to do its homework, is that the --

13           MS. JOHNSTON:  I'm not sure I'm following the

14  question, Your Honor.

15           THE COURT:  Plaintiff Jane Doe --

16           MS. JOHNSTON:  Right.

17           THE COURT:  -- they give you a prescription.  Who

18  supplied this Valsartan and what's the batch and let number.

19  Do you object to that question?

20           MS. JOHNSTON:  I object on the grounds that we can't

21  provide the batch and lot number for Jane Doe.

22           THE COURT:  Okay, so is that -- is that the crux of

23  the dispute?

24           MS. JOHNSTON:  That is the crux of a dispute, and I

25  guess the -- the issue is that this is a lot of information

1    for us to try to resolve on our end and it's something that we

2    made very significant efforts to do and that's reflected in

3    the discovery that we proposed to plaintiffs.  It's not

4    because we were trying to hide the ball on certain issues but

5    during our -- our December 18th discovery conference the --

6    the argument for why the original request that -- that were

7    ultimately stricken, the reason that plaintiffs offered that

8    those were so over-broad was that they had a -- they had a

9    knowledge gap as to what we do.

10             THE COURT:  But now you have this Exhibit I.  Is --

11    do you think it would now be productive to meet and confer

12    about Exhibit I or -- because Mr. Slater is saying there are

13    some overarching issue that should be addressed before you get

14    down to discuss Exhibit I, what do you think?

15             MS. JOHNSTON:  So I think that to the extent there

16    is an issue that -- that Mr. Slater hasn't been -- doesn't

17    believe has been addressed, we can certainly address it.

18             THE COURT:  What is the -- what is the overarching

19    issue that you think would be helpful to advance the ball?

20             MR. SLATER:  I mean, I -- yeah, I mean I just --

21    what I was talking about was an overarching issue when you

22    asked about duplicative -- duplicative requests, and I thought

23    you were talking about as between the general requests for

24    production versus the DFS's.  That's where we started, so I

25    was explaining that it's not truly duplicative.

1          The issue that's being raised by counsel and -- and

2    Ms. Whitely is ready to go through the specific requests item-

3    by-item if necessary, was that from -- from our detailed call

4    with counsel, we were walking through what information you get

5    and how does it work for you to get a pill so we could

6    understand the terminology, et cetera.

7          And basically what we got is they have a

8    distribution center at the retailer-dispensary level and it

9    comes in from the wholesalers and they can tell us this is

10   what came in, okay, and then they can tell us this went out to

11   various pharmacies, and I'm talking brick and mortar at this

12   point putting aside online for a second.

13         I said okay, and then but what happens at the

14   pharmacy level?  We're not -- we don't want to -- it's not

15   that they can't tell us, it's they said it would be too

16   burdensome, they don't want to take the time or the money or

17   whatever it is to define what got sold from each pharmacy.

18         So we said well all right, look, we have to prove we

19   have an economic damages model here putting aside individual

20   plaintiff product ID for a second.  So we said well, would you

21   agree that everything that went out of your distribution

22   center was -- is -- that's the market?  And by the way, you

23   probably have to talk to the upstream wholesalers, finished

24   dose and API manufacturers because we're talking about

25   something that's going to impact everybody, and the answer was

Colloquy                                          75

1    no, we're not going to agree to that.

2          And we said well, how about a formula?  No, we can't

3    do that, you just -- we can -- we don't want to go to the

4    expense, and this was just litigated in the opioid litigation

5    as Your Honor might know -- and the Court -- and the Judge

6    said no, you've going to -- you're going to give dispensing

7    information.  They don't want to give that information at the

8    store level -- and I'm going store level again for the brick

9    and mortar examples, so that was one of the issues.

10          And what you're ultimately looking at here is on the

11   general request, which is what counsel is talking about now,

12   that's not really my -- the concern I raised in terms of an

13   individual product ID, that's the DFS level where we need to

14   be able to get product ID for particular plaintiffs.

15          THE COURT:  So should we be looking -- instead of

16   the RFPs, should we be looking at the DFS?

17          MR. SLATER:  We're going to have to do both.  We

18   just have to understand that there is not duplication because

19   one is general and one is a case-specific product ID question

20   for the most part.  I mean, what you're ultimately going to

21   look at -- remember, the way that we originally framed the

22   DFS's was every defendant involved in that particular case was

23   going to answer a section.

24          And it was going to start -- like the API

25   manufacturers and finished dose need information from the

1   retail level because they identified the pills differently as

2   you go up or downstream, so the information has to be looked

3   at from the retailer level -- okay, this is what we got from

4   the wholesaler, they match -- they match it.  Then the

5   wholesaler has to give the information, they match it up the

6   chain.  They said no, we don't want to do it as one DFS, what

7   they want is a series of black boxes and they don't want to

8   interconnect them themselves.

9          They want to give us the series of black boxes and

10  tell us to figure out how they fit together, which when we get

11  to actually trying a case is not efficient.  That's the DFS

12  level.  From what we're talking about now, we just need this

13  information on the general level of what did you buy, where

14  did you get it from, how is it identified so we can then work

15  to put it together to figure out how much of the market from

16  this manufacturer was contaminated, how much was went to this

17  pharmacy so we can start to figure out for a damages model

18  when we get to that point who's on the hook for what piece of

19  the pie.  Does that make sense?

20         THE COURT:  I'm trying to understand, Ms. Johnston,

21  what the issue is so if I need to address it, I can.  At least

22  as I understand from Mr. Slater, you'll work out the issues

23  with regard to the general requests for production.  The kinds

24  of issues you raise are legitimate, they need to be hammered

25  down.

1            MS. JOHNSTON:  I agree.

2            THE COURT:  Is it the DFS that --

3            MS. JOHNSTON:  No, Your Honor, I think that the --

4    the primary issue that -- that I've seen in here today to talk

5    about is time.  We just got this discovery.

6            THE COURT:  Well, you got it.

7            MS. JOHNSTON:  And I think that, you know, having --

8            THE COURT:  We'll --

9            MS. JOHNSTON:  -- the initial time to meet and

10   confer --

11           THE COURT:  We'll put it off for 30 days, okay?

12   Status report at the upcoming conference call, but we'll push

13   this decision finalizing this non-manufacturing defendant DFS

14   and fact -- DFS and RFV -- we'll put off finalizing it until

15   the end of next month's meeting --

16           MS. JOHNSTON:  Thank you, Your Honor, and --

17           THE COURT:  -- with a status report wherever you

18   are.            MS. JOHNSTON:  Sure.

19           THE COURT:  There might be issues that will help

20   advance the ball in -- in two or three weeks that we can deal

21   with.

22           MS. JOHNSTON:  And -- and just a -- a point of

23   clarification, Your Honor, I think that the original plan was

24   to have our meet and confers and to -- to see if we can hammer

25   out a final set of requests, a final DFS, and then aim for

Colloquy                                    78

1    briefing at the end of the month if there are still issues

2    that we need the Court's --

3              THE COURT:  Fine --

4              MS. JOHNSTON:  -- attention on.

5              THE COURT:  -- right, as well, but what I'm saying

6    is there might be issues that are ready to be addressed for

7    the conference call in two to three weeks that would help

8    advance the ball for the finalization at the end of the month,

9    you know, you can raise those as well.

10             MS. JOHNSTON:  I agree, Your Honor, thank you.

11             THE COURT:  Okay.

12             MS. WHITELY:  Your Honor --

13             THE COURT:  So we've agreed --

14             MS. WHITELY:  -- may I ask a question?

15             THE COURT:  -- to kick the can down the road.

16             MS. WHITELY:  I think it might be helpful -- so one

17   of the -- the issues with timing is we did have a call with

18   Ms. Johnston and several others and they provided us some

19   information.  One of that things that they told us is

20   different retailers keep different information, so some it was

21   -- it was understood from that call that some of the questions

22   they will just say this doesn't apply to me whereas a

23   different retailer will have information, so that question has

24   to stay in.

25             One of the efforts that we intended to make was to

Colloquy                                                    79

1    try to reduce the retailers' RFPs further after talking to the

2    wholesaler defendants to make sure if we know we can get it

3    there, we take it off of the plaintiff retailers.

4         And so we got a little sidetracked on the class

5    action issues with the wholesalers and I think that will be

6    addressed later in the afternoon and that will provide clarity

7    to us, but it might be helpful if we have a joint call with a

8    representative of the retailers and the wholesales and just

9    talk about where there's overlap and where there's gaps, and

10   we might -- can move this forward a little more quickly.

11        THE COURT:  You're going to be on that call, right?

12        MR. GEOPPINGER:  I got to do it again?  I'm sorry, I

13   -- I didn't hear what Ms. Whitely said exactly.

14        THE COURT:  To have a -- a call between the three of

15   you.

16        MR. GEOPPINGER:  On the discovery?

17        THE COURT:  On the discovery because there's overlap

18   between your group and Ms. Johnston's group.

19        MS. JOHNSTON:  And -- and, Your Honor, I think it's

20   a good idea --

21        THE COURT:  Can't disagree with that.

22        MS. JOHNSTON:  -- and certainly something we can do,

23   but I will say to Ms. Whitely's point that there are -- there

24   are differences among the various defendants.  They have

25   different information and they keep it different places.  So

Colloquy                                                    80

1    if there are specific questions, I do think that while this

2    can be something that is coordinated amongst the three of us

3    -- I know it's a sensitive issue, but I think there are going

4    to probably need to be more than three attorneys on that call.

5                THE COURT:  I'll leave it to you to address who

6    should be on the call --

7                MS. JOHNSTON:  Thank you, Your Honor.

8                THE COURT:  -- but I think it makes sense for the

9    plaintiff and the two non-manufacturing defendant groups to

10   talk because there is overlap and there might be efficiencies

11   that -- for both sides, both groups that may result from your

12   meet and confers.  Counsel?

13               MS. DAVIS:  Your Honor, D'Lesi Davis for McKesson, a

14   wholesaler.  Just for the record on something that may or may

15   not be just a housekeeping matter, I would note that the

16   wholesalers have not been named in or served with the economic

17   loss class action, but the RFPs as they currently exist define

18   the defendant manufacturers to whom the RFPs are directed to

19   be John Doe defendants whose names are not known.

20               So we raised this beginning on Christmas Eve with

21   the plaintiffs and there's been no action in that regard, and

22   so that's just an ongoing matter and to note for the record

23   that we are not appearing in the economic loss case on that.

24               THE COURT:  Thank you, counsel.

25               MS. DAVIS:  Thank you.

1            THE COURT:  Is there anything to address with that,

2    plaintiff?

3            MR. SLATER:  Go ahead.

4            MR. STANOCH:  Sure, Judge, David Stanoch.  Just

5    briefly on the point just raised about the substitution, at

6    the time the economic loss complaint was filed, we didn't have

7    enough records to show the distributors involvement.  We've

8    since gotten core discovery from manufacturers, we're prepared

9    to do that.

10           They -- all distributors are named defendants and

11   the other two -- the medical monitoring and personal injury

12   master complaints, if there's a formality here we need to do

13   to effectuate this for the economic loss complaint, we're

14   happy to do a joint motion to substitute the three named

15   distributor defendants for three John Doe defendants --

16           THE COURT:  Do we need a motion?  Can you do it

17   by --

18           UNIDENTIFIED PLAINTIFF COUNSEL:  No --

19           MR. STANOCH:  We're happy --

20           THE COURT:  -- stipulation or --

21           MR. STANOCH:  We're happy to --

22           THE COURT:  -- consent order?

23           MR. STANOCH:  -- do it by stipulation, Judge,

24   whatever you would prefer.

25           THE COURT:  That would be simpler if you could.

Colloquy                                          82

1            MR. STANOCH:  Absolutely, Judge.

2            MS. DAVIS:  We'll take them one at a time, Your

3    Honor --

4            THE COURT:  In concept, any disagreement?

5            MS. DAVIS:  We told them that we're not trying to

6    complicate things --

7            THE COURT:  Yeah.

8            MS. DAVIS:  -- we'll take it with that.  I don't

9    think there were factual allegations of wrongdoing against the

10   wholesalers in the economic loss class action.  They have not

11   come to us with a proposal, so we'll obviously look at and --

12   and talk to our clients about what to do when we hear from

13   them.

14           THE COURT:  Well, if you need to amend the caption

15   to add parties or amend the master complaint, let's do it by

16   stipulation or consent order.  I don't need a motion.

17           MR. STANOCH:  Understood, Judge.  We'll work it out

18   with them.

19           THE COURT:  The next issue on the agenda was fact

20   sheets for the manufacturers.  Is there any -- is there an

21   issue with that?

22           UNIDENTIFIED DEFENSE COUNSEL:   Your Honor, this

23   issue came up weeks ago on the call we had.  The -- the

24   plaintiffs had served a fact sheet for the manufacturer

25   defendants that is entirely duplicative --

1            THE COURT:  Oh, that's right.

2            UNIDENTIFIED DEFENSE COUNSEL:    -- of the

3    information requested.  This goes to the very same issue that

4    we just discussed --

5            THE COURT:  When --

6            UNIDENTIFIED DEFENSE COUNSEL:    -- you know --

7            THE COURT:  No duplication, there's -- there can't

8    be a dispute about that, so what's the issue?

9            MR. SLATER:  No, there's no duplications.  What I

10   just framed out for Your Honor is that they interpret

11   "duplication" -- when we asked for specific product ID in a

12   specific plaintiff's case, they are saying that's duplication

13   because somewhere in the giant haystack of documents, that

14   information can be discerned.

15           And I said to counsel, so you don't want to do it

16   through a DFS so you want us to take corporate rep deps where

17   we -- we have a witness under oath and we have to go --

18   somehow we have to get product ID --

19           THE COURT:  How can -- how can Mr. Goldberg's group

20   trace down to the plaintiff level what drugs they received?

21           MR. SLATER:  This is -- this is how it goes.  We

22   originally as Your Honor knows, proposed doing it on one sheet

23   where one level would answer, then it would go to the next

24   level, et cetera, so when serving different ones, so you just

25   stage it.

1    Once we get the retailer information and the

2    wholesaler information, we then pass that information on to

3    the finished dose and API manufacturers, and then they can

4    complete their fact sheet specific to that plaintiff -- the

5    specific drugs that plaintiff took meaning the specific pills.

6    The alternative was -- is we figure it out ourselves.  They

7    don't have any statement -- they don't say anything about it.

8    We would need depositions at that point --

9          THE COURT:  I'm sorry, Mr. Slater, I'm missing

10    the --

11          MR. SLATER:  -- and then it becomes a fact question.

12          THE COURT:  -- I'm missing the boat about what the

13    issue is.  They -- unless you're going to tell me something

14    that totally surprises me, how can a manufacturer say in India

15    or China know what a specific plaintiff took?  They can talk

16    about what their customers received and then --

17          MR. SLATER:  We provide --

18          THE COURT:  -- they have to go from there.

19          MR. SLATER:  Because we provide them the information

20    that we get from the downstream defendants.  When they give us

21    product ID for that particular plaintiff, the NDC codes, the

22    lots and batches as you go up the stream, we give that

23    information to them from which they say oh, this came from

24    this batch and this lot because they know what they sold.

25          So we provide them that information and then they

1  have -- and then they say oh, this came from this lot and then

2  they answer the questions -- you know, did you manufacture

3  these drugs?  Yes.  Were they contaminated?  Yes, specific to

4  that plaintiff and we have a -- and the questions -- there's

5  very few questions here.

6          THE COURT:  Is there a specific -- I mean, is this

7  in the exhibits that I received that we're talking -- what

8  these --

9          MR. SLATER:  I believe so.

10          THE COURT:  -- what these objections are?

11          MR. SLATER:  I think it is Exhibit -- let me see

12  what our letter says -- Exhibit 9 I believe.

13          THE COURT:  Exhibit 9 attached to plaintiffs?

14          UNIDENTIFIED PLAINTIFF COUNSEL:  Yes.

15          MR. SLATER:  Yes, Exhibit 9.

16          THE COURT:  So let's -- let's identify what exactly

17  we're -- is objected to.

18          MR. SLATER:  And you'll see, Your Honor, the

19  Valsartan -- "the affected drugs," which is the definition

20  throughout, that's the identified drugs that the plaintiff

21  took.  So when you see that language throughout this short

22  fact sheet, you'll see that that's what that means.  It's not

23  talking in general, it's talking for that plaintiff.

24      (Pause in proceedings)

25          THE COURT:  I'm having trouble identifying the fact

Colloquy                                    86

1    sheet -- oh, is it API manufacturer defendants' fact sheet, is

2    that what we're talking about?

3             MR. SLATER:  That's the one we're talking about,

4    Your Honor.

5             THE COURT:  Okay.  So, Mr. Goldberg, for example,

6    I'm not worried about the definitions, nobody reads them

7    anyway.  Give me an example of an objection.

8             MR. GOLDBERG:  Yeah, I mean, the issue here is that

9    if you look -- what -- what plaintiffs are proposing, you're

10   right, Your Honor, defendants in China and India, they have no

11   way of tracing their drug to a specific plaintiff.  What --

12   what plaintiffs are asking the defendants to do effectively is

13   if Ms. Johnston on behalf of the retailers in a specific case

14   can identify a lot or a batch or some information that we

15   needed the manufacturers don't have that somehow connects the

16   specific plaintiff to a drug, then the defendants would then

17   go through the documents that we've already produced to the

18   plaintiffs pursuant to Rule 34 and we would then make the

19   identification for plaintiffs.

20            THE COURT:  Okay.  So look at page 2A.  Is this an

21   example of what you're talking about?  Roman numeral II,

22   capital A.

23            MR. GOLDBERG:  Yes.

24            THE COURT:  Okay.  "Identify whether you

25   manufactured the API found in any affected drug."

Colloquy                                              87

1          MR. GOLDBERG:  Right.  And the affected drug is

2     defined in the document as "the specific drug the plaintiff

3     took."

4          THE COURT:  Is that the only information you get

5     though?  Suppose they give you a lot and batch --

6          MR. GOLDBERG:  Well, that's -- that's all part of

7     that.

8          THE COURT:  Can you -- with that information, can

9     you identify whether you made that?  Maybe that --

10          MR. GOLDBERG:  It --

11          THE COURT:  -- that's an easy one, but the question

12     is it contaminated, would be a harder one, wouldn't it?

13          MR. GOLDBERG:  Correct.  I mean, and -- and I don't

14     know -- what we don't know, what kind of information we would

15     get.  We -- we know the lots and batches we have, we know that

16     -- and they do too and they're getting every -- all the

17     information on all the lots and batches we made, they're

18     getting all the testing results.

19          They -- we've already disclosed what lots and

20     batches have been recalled, and so they will be able if -- if

21     they can do it based on the information they're getting to go

22     through the drugs and make the -- or go through the documents

23     and information and make that determination.

24          THE COURT:  Is that the crux of the issue, Mr.

25     Slater?

1          MR. SLATER:  Yeah, I mean, we're going to give them

2    the information that we get that identifies the drugs with the

3    information they can then take and confirm, yes we sold it,

4    yes it was contaminated, or no it was not contaminated or it

5    was recalled or not -- you know, the information we asked for

6    and they're going to commit to that.

7          It's very simple.  I mean, otherwise what we have as

8    I said is a series of black boxes, and they -- and, you know,

9    they act as if they're not all in the case.  They -- they're

10   all sitting here.  And so Mr. Goldberg is saying well, I don't

11   know what Ms. Johnston's client knows and what the distributor

12   knows, I'm saying I don't know any of that because -- and we

13   don't talk to each other.

14         So what we're saying is when the information comes

15   to us we should give it to them and it should be staged.  We

16   get the information from one group first, we hand it to them

17   and then we get definitive product ID with the definitive

18   information we need for a particular plaintiff so that case

19   can be developed.

20         UNIDENTIFIED PLAINTIFF COUNSEL:  Judge, maybe I can

21   concretize the problem in -- in this way.  This is a product

22   case, right?  The product is Valsartan.  If this were a car

23   case, when it rolls off of the GM line, it's got a VIN number,

24   right?  It's unique to the car and the product in question,

25   and now matter how many hands it goes down the distribution

Colloquy                                                                    89

1    chain, you -- well you're going to know what car it is.  We

2    don't have that here.

3         What we've been informed of is that in some or all

4    instances when it gets to the distributor and then downstream,

5    the lot and batch from which it came from the API or the

6    finished dose is unknown or not traced, it -- there's an NDC

7    code.

8         So our clients, when they go to the pharmacy, they

9    don't know what the lot and batch is, they know what an NDC

10   code is, and so we need to put the puzzle together and the

11   question is how most efficiently can we do it.

12        If we do it the way they want to do it which is

13   here's the haystack, you're going to get a pile of API stuff,

14   you're going to get a pile of this, you figure it out.  What

15   -- what Mr. Slater is saying, we're going to have to take

16   depositions and we're going to have to put these documents in

17   front of humans in every instance and put the puzzle together

18   that way.

19        What we're proposing we think is a much more

20   efficient way to figure out what the lot and batch was and by

21   definition if we know -- if we know the lot and batch, we know

22   which ones were subject to -- to recall.  That's the only way

23   we can put it together.  The question is how most efficiently

24   to do it.

25        THE COURT:  Let me ask you this question.

1    UNIDENTIFIED PLAINTIFF COUNSEL:  Yeah.

2    THE COURT:  Not the request for production, the fact

3    sheets, am I correct -- is my understanding correct that

4    they're directed to the individual plaintiffs?

5    UNIDENTIFIED PLAINTIFF COUNSEL:  Yes, as to the --

6    yes, correct.

7    THE COURT:  Are we only talking about the individual

8    plaintiffs in the three master complaints?

9    UNIDENTIFIED PLAINTIFF COUNSEL:  Well, I think

10   that's correct except --

11   MR. SLATER:  In personal injury plaintiffs.

12   UNIDENTIFIED PLAINTIFF COUNSEL:  Yes, that -- yes,

13   that's correct.

14   THE COURT:  And --

15   MR. SLATER:  No, and the personal injury

16   plaintiffs --

17   THE COURT:  Every personal --

18   MR. SLATER:  -- within the -- individual cases.

19   THE COURT:  -- injury plaintiff?

20   MR. SLATER:  Yes.  Now, if you want to -- if you

21   stage the case a certain way, then that can be deferred.  If

22   the case is staged the way Your Honor talked about it earlier

23   today, then that can be deferred for a period of time.

24   UNIDENTIFIED PLAINTIFF COUNSEL:  That's true.

25   MR. SLATER:  I mean, they can -- we can stage it.

1    We need what we need to do what we have to do --

2                    THE COURT:  Okay.

3                    MR. SLATER:  -- as we go.

4                    THE COURT:  Let me turn now to Mr. Goldberg.  With

5    regard to these questions, is -- is the issue we don't have

6    the information, or is the answer it would be too burdensome

7    for us to do it?

8                    MR. GOLDBERG:  Correct.  We're producing all of the

9    information.

10                   THE COURT:  But is this akin to an interrogatory?

11   Suppose they served a Rule 33 interrogatory asking the same

12   exact question, it's relevant.  Would you have to answer it?

13                   MR. GOLDBERG:  Well, I -- I mean, I -- we would have

14   an objection to it and we would --

15                   THE COURT:  On what grounds?

16                   MR. GOLDBERG:  On the grounds that it is burdensome

17   to require us -- this was the whole point of Rule 34, you're

18   asking -- we -- we've agreed now to produce all of the testing

19   information, all of the recall information, all of the

20   information related to the impurities, all of the regulatory

21   documents.

22                   That's what we're doing and we're giving it to them.

23   We -- we can't -- we can't connect a specific lot and batch to

24   a specific plaintiff.  We don't have that information.  If we

25   get that information at the same time they get that

Colloquy                                                                92

1    information, what they're asking Your Honor to do is make us

2    review the documents instead of them.  That's it.  That's all

3    that's happening so that for 2,000 or however many personal

4    injury plaintiffs, it's defendants who go through their

5    documents instead of plaintiffs.

6          THE COURT:  Suppose the Court says this.  In

7    concept, these particularized fact sheets only have to be

8    answered for the named plaintiffs in the master complaints --

9    we'll pick a number -- five representative PI cases, so maybe

10   that's a total of what, 20, 25?  Would that be a problem?

11         MR. GOLDBERG:  Obviously the -- the -- you're

12   creating a different set of circumstances in terms of burden.

13   It also wouldn't be any more burdensome for them and it's

14   their case.  It is their burden to satisfy.  Product

15   identification is an element of their claim.

16         THE COURT:  So I guess your answer, Mr. Slater, that

17   if the burden is equal, is your answer that it's just more

18   efficient to do it your way than their way?

19         MR. SLATER:  Well, it's not equal because they

20   ultimately are going to have to commit on paper to

21   specifically define what happened in that specific plaintiff's

22   case.  We're not as equipped to do it, and there's a burden of

23   uncertainty that will burden the litigation that this -- that

24   that's a burden that is not going to be good for the Court,

25   it's not going to be good for the plaintiffs or the

Colloquy                                                                  93

1    defendants.

2           I mean, literally if we take the scenario Your Honor

3    floated earlier and we have a class -- we have an economic

4    loss complaint with three plaintiffs go forward, their

5    proposal is that at trial, they want to have us put witnesses

6    on to establish product ID, they want to cross the witnesses,

7    so we'd have to put their witnesses on --

8           MR. GOLDBERG:  Judge --

9           MR. SLATER:  -- which means we'd have to depose them

10   in advance and put together the product ID.  And by the way,

11   in every product liability case, Mr. Honik said -- especially

12   mass torts like this, product ID is a systemized process that

13   is never this difficult.  It's automatic, it's something that

14   the defendants have to participate in actively and confirm

15   product ID in a case like this because it's not just product

16   ID and it's not just recall.

17          There's going to be a gray area of pills which are

18   potentially contaminated, and as I said very early on and I

19   have said many times, ultimately we're going to have to

20   understand before we walk into Court to try this case whether

21   or not a particular plaintiff's pills or what portion of what

22   they took were clearly contaminated and recalled, potentially

23   contaminated because they may have been used before the recall

24   went into effect for example, or definitely not contaminated

25   because that lot and batch has been tested by the defense and

1    by the plaintiffs and the FDA, and confirmed not to be

2    contaminated.

3            THE COURT:  I think I've got it.

4            MR. SLATER:  Thank you.

5            THE COURT:  But let me -- let me ask you this

6    question because I'm going to rule separately on this issue.

7    Once the Court rules on the issue, let's -- let's

8    hypothetically -- I'm not ruling now, but if the Court

9    requires defendant to answer it, do you still have to meet and

10   confer about the specific language in the fact sheets, or is

11   it all or nothing, or do we have to get this -- what I call a

12   "macro" issue decided first and then you'll role up your

13   sleeves and work on the specific language?  Mr. Goldberg, I

14   guess I should direct this to you.

15           MR. GOLDBERG:  Yeah, Your Honor, we -- we have

16   exchanged drafts and we would -- the last draft we would -- if

17   -- if the Court is going to require the defendants to do

18   something like --

19           THE COURT:  You still need to work on it?

20           MR. GOLDBERG:  Yes.

21           THE COURT:  Okay, fair enough.  Ms. Johnston, I

22   didn't mean to cut you off.

23           MS. JOHNSTON:  Yeah, Your Honor, I just wanted to --

24   to clarify again and I think this is a bigger issue because,

25   you know, it's one that we have tried to express for months

1    now, that this is not something that -- that, you know, batch

2    and lot and tracing to a particular consumer is very highly

3    unlikely and I feel like that is something that we've

4    requested that plaintiffs take in because I think that -- that

5    the way that pharmacies operate and the way that this

6    information is tracked is it falls under a very specific

7    statutory framework.

8         Pharmacies follow it in their course of business and

9    to now say that our burden is greater because the answer is

10   unsatisfying to them I feel like is what's stalling out a lot

11   of these conversations.

12        THE COURT:  Okay, got it.  Next issue, the show

13   cause process short form complaint and the fact sheets, that's

14   different than the adequacy of the answers.  Are there sill

15   issues, defendants, I hope not, where plaintiffs have not

16   filed their short form complaints or have not filed the fact

17   sheets that are due?

18        UNIDENTIFIED DEFENSE COUNSEL:  Yes, Your Honor,

19   there are.

20        THE COURT:  Oh, darn it.

21        UNIDENTIFIED DEFENSE COUNSEL:  So I guess back in

22   January we had submitted a letter that had an exhibit that had

23   I think it was about 90 or so short form complaints that were

24   either improperly filed or not filed at all.  I think that

25   that number is down to about 13, a combination of either not

1    filed properly or not filed at all, but here are --

2              THE COURT:  So 13 short form complaints are at

3    issue?

4              UNIDENTIFIED DEFENSE COUNSEL:  Approximately.

5              THE COURT:  Are they identified in the defendants'

6    letter?

7              UNIDENTIFIED DEFENSE COUNSEL:  They are identified

8    in I believe it's Exhibit P to defendants' letter.

9              THE COURT:  Exhibit P?  And is that -- plaintiffs,

10   is that just -- what, it slipped through the cracks?  Or why

11   can't we get these 13 to --

12             UNIDENTIFIED PLAINTIFF COUNSEL:  Your Honor, we

13   promptly communicated with all of the counsel who filed all

14   these many complaints the first time.  It's not as simple for

15   some of these administratively to talk with defendants about

16   what the issue was.  They said they were improperly filed, but

17   the issues were very varied for each firm.

18             I've been personally trying to walk through with all

19   the firms, and as Mr. Rubenstein noted, cut it down.  I'd ask

20   Your Honor for another -- a little more time, another week or

21   two with those -- those firms, they only have one or two cases

22   each.

23             THE COURT:  I'll enter an order, counsel --

24             MR. NIGH:  Your Honor --

25             UNIDENTIFIED PLAINTIFF COUNSEL:  Okay.

1          THE COURT:  -- making sure they get it done.

2          MR. NIGH:  -- we -- we had a process identified that

3    I think would have cut down -- it's the same process as the

4    PFS and they would list -- you would list each month --

5          THE COURT:  No, no, this is different --

6          MR. NIGH:  -- the improvidently filed cases.  We

7    have that even for cases -- these -- these issues came up

8    early on when people didn't file a short form complaint or if

9    somebody filed and then had improper jurisdiction, you know,

10   issues like that, that for under the listing of improvidently

11   filed cases and they follow the same --

12         THE COURT:  Can I ask you a question, Mr. Nigh?  The

13   -- the order that was entered and the show cause process that

14   we've implemented, I know that pertains to the fact sheets --

15         MR. NIGH:  Yeah.

16         THE COURT:  -- unquestionably, did that also file to

17   these short -- I -- my understanding, I could be wrong, that

18   that didn't also apply to the short form complaint issue.

19         MR. NIGH:  I believe it did and I believe it would

20   be under the listing of improvidently filed cases, so we would

21   have agendas each month that would list them, and if they were

22   listed twice under "improvidently filed cases" and there was

23   no explanation for it in court, then they would get the show

24   cause order.

25         THE COURT:  Okay, so there has to be two listings.

Colloquy                                                      98

1                    MR. NIGH:  Yes.

2                    THE COURT:  Okay, that's great.  That's -- that

3    would be my inclination.  I'd prefer not to issue the order to

4    show cause the first time this is raised, so these 13 people,

5    can you just tell them to get it right?

6                    MR. NIGH:  Absolutely, Your Honor, and I'll confer

7    with defendants further to understand the exact issue they

8    think they have because in some of these instances, these

9    lawyers tell me it looks good on their end, but we'll figure

10   it out.

11                   THE COURT:  Okay.

12                   UNIDENTIFIED PLAINTIFF COUNSEL:  And then, Your

13   Honor, I would just ask that we have a listing in the agenda

14   each month that says "improvidently filed cases" and they're

15   listed by name and counsel, because that's the other way that

16   they get notice.  So somehow -- somehow our liaison counsel

17   doesn't have direct contact with them, which can happen from

18   time to time, then it's listed in the agenda, so that's the

19   other way it noticed.

20                   THE COURT:  Yeah.  Okay.

21                   UNIDENTIFIED DEFENSE COUNSEL:  And, you know, for

22   the short form complaints, but then we had the issue of the

23   fact sheets where the January 15th deadline came and went and

24   we didn't --

25                   THE COURT:  How many of those are there?

1          UNIDENTIFIED DEFENSE COUNSEL:  I believe there's

2    about 20.

3          THE COURT:  Okay.  So --

4          UNIDENTIFIED DEFENSE COUNSEL:  So and we -- so we

5    sent a notice to them last Friday asking them to file a -- a

6    plaintiff fact sheet within seven days and --

7          THE COURT:  Are they also listed in Exhibit P?

8          UNIDENTIFIED DEFENSE COUNSEL:  They are not.

9          THE COURT:  Is there a list of them somewhere?

10         UNIDENTIFIED DEFENSE COUNSEL:  I don't believe that

11   there is, not in the --

12         THE COURT:  All right.  So --

13         UNIDENTIFIED DEFENSE COUNSEL:  -- submissions that

14   we've given.

15         THE COURT:  -- in the future, we've got to have that

16   list to trigger the show cause process, okay?  So maybe that

17   list will be reduced by the time of the next monthly meeting,

18   and then the -- where the order says they have to be listed

19   twice to issue the order to show cause.

20         UNIDENTIFIED DEFENSE COUNSEL:  So the -- the show

21   cause order actually doesn't address plaintiffs who just

22   simply failed to submit a fact sheet, it -- it addresses, you

23   know, not substantially complete or somehow deficient fact

24   sheets, it doesn't address --

25         THE COURT:  I would --

Colloquy                          100

1          UNIDENTIFIED DEFENSE COUNSEL:  -- failure to

2     actually submit one.

3          THE COURT:  I would assume that if they don't file

4     it at all, that would be subsumed within that definition.

5          UNIDENTIFIED DEFENSE COUNSEL:  Well, I mean, I think

6     it's just a little more egregious than -- you know, there's a

7     difference between, you know, submitting one that may have

8     some deficiencies on it but than just simply just ignoring the

9     process altogether.

10          THE COURT:  But then we don't have an order to show

11     cause procedure for those.

12          UNIDENTIFIED DEFENSE COUNSEL:  Well, that's -- we --

13     we ask that maybe we implement a different show cause --

14          THE COURT:  No, we're not going to do -- we're going

15     to do the same thing we did in Benicar.  The Court's direction

16     is if they don't answer, it's subsumed within the deficient

17     fact sheet --

18          UNIDENTIFIED COUNSEL:  And, Your Honor --

19          THE COURT:  -- let's do it that way and when you

20     list, you could list parties who have not filed at all and

21     parties whose answers are inadequate.

22          UNIDENTIFIED COUNSEL:  Okay.

23          THE COURT:  Let's do it that way.

24          UNIDENTIFIED COUNSEL:  Now and I would also ask that

25     those are in the file agenda as well --

Colloquy                                    101

1          THE COURT:  Yeah, absolutely.

2          UNIDENTIFIED COUNSEL:  -- case names --

3          THE COURT:  Yeah.  And look at one of the ones that

4    was in Benicar.  It just worked so smoothly.  The listed out,

5    get to the afternoon session with Judge Kugler, listed twice,

6    order to show cause, it just works very smoothly, okay?

7          UNIDENTIFIED COUNSEL:  Okay.  Thank you, Your Honor.

8          THE COURT:  Defendants' leadership structure, we

9    talked about that; plaintiffs' leadership structure, we talked

10   about that.  Confidentiality designations, you're meeting and

11   conferring on that?

12         MR. SLATER:  Your Honor, we will.  Just so you

13   understand why we did what we did --

14         THE COURT:  I understand -- representative, I think

15   that's a great idea.  This is a very important issue, this

16   confidentiality designation.  If a document deserves to be

17   designated, it's going to be designated, but over-designation

18   is not appropriate, especially in a case where there's such a

19   public health concern so hopefully you could work it out.

20         Am I wrong that if these particular documents are

21   subject to a FOIA, I don't understand how you can put a

22   confidentiality stamp on it -- am I -- am I wrong about that?

23         UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, they --

24   they could be subject to a FOIA request, but as we've seen,

25   the FDA could then go ahead and redact certain information, so

Colloquy                                    102

1    they're not just wholesale --

2              THE COURT:  Do they unilaterally redact it, or does

3    the CFR require that the defendant designate when it gives a

4    document to the FDA what is a trade secret?

5              UNIDENTIFIED DEFENSE COUNSEL:  I -- I'm not -- I

6    think that the --

7              THE COURT:  I would be surprised if the FDA

8    unilaterally decides what to redact and what not to redact

9    unless the defendant brings something to its attention.  Am I

10   wrong about that?

11             UNIDENTIFIED DEFENSE COUNSEL:  My -- my

12   understanding, that it was unilaterally redacted by the FDA.

13             MR. SLATER:  The FDA actually will redact things

14   sometimes that you could never subject to a -- a

15   confidentiality order in Court, and it's random so yes, if

16   something is subject to FOIA, it should be produced in its

17   entirety we believe.

18             But more important, when Your Honor told us on the

19   call -- you know what, you're -- you can't serve these letters

20   with this letter that -- you know, the documents that were

21   identified, you said send them to me, I want to look at them

22   right away, so we sent them.

23             And the -- the point -- I don't think a meet and

24   confer -- I mean, we're happy to talk, but it kicks the can

25   down the road for this reason.  So we gave you -- Your Honor

1    exemplars, so the point is if they say oh fine, we'll withdraw

2    the -- the confidentiality designations on these ten

3    documents, that doesn't help that there's thousands of

4    documents that are being over-designated.

5            THE COURT:  No, these are representative of the

6    different categories, and I would assume how the Court rules

7    on these is going to apply to those categories --

8            MR. SLATER:  We would assume that too, so we're not

9    sure where -- I mean, they're so -- we're happy to talk to

10    counsel but we're -- we're -- you know, we're very

11    confident --

12            THE COURT:  Let's brief it.

13            MR. SLATER:  -- that they need to be challenged.

14            THE COURT:  Who goes first?  I'm not sure who goes

15    first.

16            MR. SLATER:  I don't honestly think based on Your

17    Honor's experience that we really even need to brief them.

18            THE COURT:  No, I do think we need to brief this

19    issue.

20            MR. SLATER:  Okay.

21            THE COURT:  I do think we need to brief this issue.

22    Who goes first?

23            UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, I think

24    we can go first since the plaintiffs have identified these as

25    the documents that they think --

Colloquy                                                    104

1          THE COURT:  Okay.

2          UNIDENTIFIED DEFENSE COUNSEL:  -- are responsive

3    because I think you have to -- the Court's going to have to

4    look at this on a case-by-case basis.  I can speak to Mylan,

5    for instance.  There's one document for Mylan that the

6    plaintiffs identified as representative, and it was part of

7    the ANDA for which case law permits the confidentiality

8    designation.

9          Not to mention, if Your Honor recalls, we had to go

10   through the process and produce it twice in ECD format, the

11   second time at plaintiffs' request, and Your Honor said on the

12   record that we're going to designate the whole thing as

13   confidential so you don't have to worry about going through

14   and designating it a second time when you produce it.

15         So the representative document that's been produced

16   as a -- as a representation of over-designation by the -- by

17   the plaintiffs is a document that's part of the ANDA that the

18   case law supports as being confidential and which this Court

19   has already said is entitled to blanket confidentiality, so

20   I'm happy to -- to brief this.

21         THE COURT:  Hm-hmm.

22         UNIDENTIFIED DEFENSE COUNSEL:  I think we can go

23   first and -- and I think what the Court's going to find if you

24   -- you look carefully at each of these documents, we're all

25   mindful of the Court's admonition that we're not going to

Colloquy                                                    105

1    over-designate documents.  We took time not to do that, that

2    these designations I believe were largely --

3                THE COURT:  Okay.

4                UNIDENTIFIED DEFENSE COUNSEL:  -- proper and we can

5    show --

6                THE COURT:  February 10th, plaintiffs -- defendants,

7    brief this issue using the categories the plaintiff identified

8    as representative.  Plaintiffs, respond by February 17th, and

9    I'll put that in the order.  I do think it's an important

10   enough issue that it does have to be briefed.

11                Product preservation issues, another important

12   issue.  Is there any disagreement that plaintiffs need some

13   relevant background information before they decide whether to

14   tee up  this issue in a motion?  Defendants?

15                UNIDENTIFIED DEFENSE COUNSEL:  I'm not sure what --

16   what the motion would be.  We have at least -- I do know that

17   all of the defendants have looked at this issue and have

18   provided information to plaintiffs on the issue of recall, on

19   the issue of product preservation, and there's some -- each

20   defendant is at a different stage of dialogue.

21                THE COURT:  Well, plaintiffs are going to ask that

22   certain product be preserved.  We're not going to preserve

23   every pill that --

24                UNIDENTIFIED DEFENSE COUNSEL:  Yup.

25                THE COURT:  -- on first blush -- I'm not ruling but

Colloquy                                                        106

1    it just seems illogical so there has to be a representative

2    product preservation.  Plaintiffs are going to ask if they

3    can't agree with defendants on that, for a court order to that

4    effect.  If so, we'll need a motion.

5             UNIDENTIFIED COUNSEL:  And that -- I think that's

6    what we're working out and I think the parties are

7    communicating on those issues.

8             THE COURT:  Okay.  So we'll revisit this in a couple

9    of weeks at the phone call to see if you -- if you reach

10   agreement, great.  But if not, I'm going to ask plaintiffs to

11   file a motion.  Counsel?

12            MS. HILTON:  Layne Hilton for plaintiffs, Your

13   Honor.  I mean, there is one sort of pressing issue.  I think

14   we still don't have confirmation that product -- all product

15   that is currently in existence right now is being preserved

16   until a time at which we can brief it and make determinations

17   as to sampling.  I think we have assurances from Mylan, from

18   Teva and from Aurobindo that that product is being preserved.

19   I think Hetero is preserving product as of -- as of now.

20            We still don't have assurances that product is

21   currently being preserved in this interim time period until we

22   can make our sampling decisions from the -- we'll call them

23   the ZHP defendants including defendant Solco and defendant

24   Torrent.

25            THE COURT:  So if we lived in a perfect world, would

1    you want a court order saying until the Court addresses this

2    issue, the defendants are ordered not to destroy any recalled

3    product?

4              MS. HILTON:  Yes, Your Honor.

5              THE COURT:  Is there any objection to that order?

6              MR. SLATER:  And, Your Honor, not -- not limited to

7    recall, but at this point potentially contaminated, both in

8    the United States and outside the United States.

9              UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, without

10   having a great deal of thought to it, I think you -- what the

11   -- the blanket order that the Court's now contemplating or

12   suggesting it might enter, I think you run into issues with

13   the primary jurisdiction of the FDA.  I mean, these recalls

14   were all managed in conjunction with the FDA that decides how

15   -- how recalled product is to be handled, how it's to be

16   stored, how it -- in some instances, it's to be destroyed.

17             And I would worry at the outset when we've got an

18   MDL involving 50 different parties and all these parties

19   having different obligations to the FDA, about entering an

20   order and worrying about whether that order complies with the

21   regulatory requirements that have been imposed on various

22   defendants and so forth, I think for the most part it's a non-

23   issue.

24             For instance, as Ms. Hilton indicated, my client's

25   particular recall campaign involves returned product being

1    stored at a third-party vender site's (inaudible) cycle and

2    we've indicated that all that recalled product is being held

3    per the direction of the FDA and nothing's being destroyed.

4    But that's -- that's our recall campaign that was negotiated

5    and implemented and in coordination with the FDA.

6            That's not everyone's and so I think a blanket order

7    under the circumstances would be inappropriate and as I said,

8    creates some issues with primary jurisdiction with respect to

9    the regulatory body that at least would concern me at the

10   outset.

11           MR. SLATER:  Your Honor, I want to make very clear,

12   as far as we're concerned, there already is a preservation

13   order in place, this Court's case management order from the

14   very beginning of litigation.  So whatever we're doing is now

15   reiterating that every one of these parties has been under an

16   obligation under the -- the order of this Court to preserve

17   all evidence from the moment that order was issued, and

18   frankly, from the time that they thought litigation was

19   potential, they had litigation hold obligations.

20           So I don't -- I didn't want what I said before to be

21   misconstrued, as far as we're concerned, as soon they're on

22   litigation hold obligation, at the very least they had to

23   preserve everything and it may go back further.

24           We'll have to go into that issue if it becomes an

25   issue in this litigation because we have significant concerns

1   that significant amounts of product have been destroyed,

2   particularly not in the United States but -- or and or

3   repackaged and sold even though it was contaminated.

4           I mean, there's a lot we're going to need to learn

5   about what they did with this so I just wanted to be clear for

6   the record, they're already under an obligation legally

7   outside of this litigation and per the case management order.

8           UNIDENTIFIED DEFENSE COUNSEL:  Well --

9           THE COURT:  Let's address this --

10          UNIDENTIFIED DEFENSE COUNSEL:  Well, if the

11  plaintiffs think we're already under an obligation, then we

12  don't need another order.

13          THE COURT:  Let's address this issue this afternoon

14  in further detail, okay?  The request is plaintiffs want the

15  Court to enter another order -- let's address this this

16  afternoon.

17          MS. JOHNSTON:  And, Your Honor, just briefly for our

18  discussion while we're on a break, this is an issue that we've

19  -- we had stepped out of on the downstream and because it's

20  been focused on the manufacturers, but based on the order

21  that's being proposed, it does seem like it would happen

22  downstream of the patient, so I'd like some clarity on that

23  because obviously we have some -- we've got some concerns with

24  -- with the way that that would affect --

25          THE COURT:  We'll address --

Colloquy                                110

1          MS. JOHNSTON:  -- the pharmacy business.

2          THE COURT:  We'll address it this afternoon.  Next

3    issue on the agenda is core discovery and I guess that

4    encompasses the FDA correspondence --

5          UNIDENTIFIED PLAINTIFF COUNSEL:  Yes, Your Honor --

6          THE COURT:  -- issue?

7          UNIDENTIFIED PLAINTIFF COUNSEL:  -- and it

8    corresponded -- it refers to the -- the recall documents for

9    Part A.  Our understanding is that we received new productions

10   of documents last week, early this week, received other

11   production of documents on that I -- I suppose to be

12   correspondence last night.

13         I haven't had the opportunity to look at it, but I

14   think the second issue with respect to the ongoing obligation

15   to produce the correspondence pertains to again as we've

16   discussed in the telephonic conference two weeks ago, the --

17   the usage of third parties --

18         THE COURT:  Well, didn't the Court make that clear

19   in the last order?

20         UNIDENTIFIED PLAINTIFF COUNSEL:  We -- we -- you

21   did, Your Honor.  I think but part of our issue is that

22   because we don't understand the universe of may be

23   corresponding with the FDA, it is sort of difficult for

24   plaintiffs to police whether or not the correspondence is

25   actually being produced.  That is why we asked to get

                                  Colloquy                        111

1    affirmative representations from defendants on the identity of

2    all designated US agents who have been given authority to

3    correspond with the FDA on behalf of the manufacturers.

4              THE COURT:  If the defendants are doing what the

5    court order says and you're getting copies of these papers,

6    can't you identify from those copies who the agents are?

7              UNIDENTIFIED PLAINTIFF COUNSEL:  In some instances

8    we can, but then we haven't received any subsequent

9    correspondence so we have reason to believe that we haven't

10   received the correspondence that they've written.

11             Again, as -- as we identified in our letter, there's

12   a particular issue with a -- a good manufacturing practices

13   consultant who's a former FDA inspector who appears to be

14   communicating on his own from his own Comcast email address

15   without copying in copying in his ZHP employees and -- and,

16   you know, we received one email, we didn't receive any

17   metadata associated with that email.

18             We've made a request for that metadata and we still

19   haven't received it yet and -- and we have no assurances that

20   there are other emails in this consultant's Comcast email

21   address that are communications with the FDA on -- on behalf

22   of ZHP.

23             And so I think, you know, part of -- to assist us in

24   -- in sort of making sure that we're getting all the

25   correspondence we need, that's, you know, partly why we asked

Colloquy                                    112

1    for the affirmative representation, so then, you know, if

2    we're not getting anything or -- or it could even be a

3    representation if they had this consultant -- if they haven't

4    made communication, that's fine, but we -- we just really

5    don't understand the universe right now of -- of these third

6    parties.

7            THE COURT:  Is there an objection, defendants, to

8    providing the information plaintiffs request?

9            UNIDENTIFIED DEFENSE COUNSEL:  I don't -- there --

10   at least from ZHP's standpoint here's no objection to

11   identifying consultants that may be communicating with the FDA

12   on ZHP's behalf or on behalf of those defendants.  I don't

13   know, I haven't polled the other defendants on this issue, but

14   at least Ms. Hilton's comment were focused on ZHP.

15           THE COURT:  Okay.  I can't see why would there be an

16   objection.  Their names are going to be in the communications

17   that are produced anyway so I'll -- I'll include that in an

18   order.  Now, defendants, you want 14 days rather than seven

19   days, I'm not going to quibble about an extra seven days,

20   except that's what the rule provides.

21           We've been involved in umpteen patent cases

22   involving billions of dollars and no one has ever objected to

23   the seven or 14 days.  I don't know what is so unique about

24   this case that there has to be more time, but if you want more

25   time and it will assure compliance with the Court's order,

Colloquy                                113

1  that's fine.

2            But I have asked plaintiffs to stay on top of this

3  issue and keep the Court updated.  This is a very very

4  important issue that the plaintiffs get this relevant

5  communications on a timely basis so, plaintiff, continue to

6  advise the Court if there are issues with this production.

7            UNIDENTIFIED PLAINTIFF COUNSEL:  We will, Your

8  Honor.

9            THE COURT:  Yes, Mr. Goldberg?

10           MR. GOLDBERG:  Yeah, we've --

11           THE COURT:  You got the 14 days.

12           MR. GOLDBERG:  Yeah, I mean, I think the 14 days, at

13 least with respect to these FDA communications and --

14           THE COURT:  You got it.

15           MR. GOLDBERG:  -- and, you know, we're doing our

16 best to try to --

17           THE COURT:  You got it.

18           MR. GOLDBERG:  -- satisfy that.

19           THE COURT:  I think the last issue is the ESI

20 update.  Is there any material information to talk about?

21           UNIDENTIFIED PLAINTIFF COUNSEL:  Counsel for Mylan

22 requested an extension for a portion of this documents that

23 are due January 31st which we've agreed to, so we just wanted

24 to update the Court on that.  And then as to the remainder of

25 the search term documents, we've corresponded with both

1    counsel for ZHP and Mylan as to the status of their custodial

2    collection and production of search terms, but we -- it's

3    concerning because we have not heard from any of the other

4    defendants as to the status of their search and process in

5    narrowing or doing anything with the search terms, so we just

6    -- we just haven't heard from them.

7                THE COURT:  Are these the test searches?

8                UNIDENTIFIED PLAINTIFF COUNSEL:  Right.

9                THE COURT:  I don't -- can you refresh my

10   recollection?  What, did we put time deadlines in the order?

11               UNIDENTIFIED PLAINTIFF COUNSEL:  We did not, and but

12   we -- you know, we thought we were sort of working together on

13   these and so we thought it might be useful to have some time

14   to --

15               THE COURT:  What do you -- what do you propose?

16               UNIDENTIFIED PLAINTIFF COUNSEL:  I -- we think that

17   by the end of next month at the next status conference, we

18   should be able to -- we -- I mean they should be able to have

19   a finalized -- you know, if there -- if there are any disputes

20   with the search terms that they want to raise, they should

21   have raised them by then and if they haven't, then --

22               THE COURT:  Okay.

23               UNIDENTIFIED PLAINTIFF COUNSEL:  -- we think it

24   should be --

25               THE COURT:  Is there any objection to that, raise

1    any dispute by the end of --

2              UNIDENTIFIED PLAINTIFF COUNSEL:  Well, in time to

3    have them resolved by the -- the status conference, the next

4    status conference.

5              THE COURT:  Raise with the Court and the parties

6    will have to meet and confer before then.

7              UNIDENTIFIED PLAINTIFF COUNSEL:  Right.

8              THE COURT:  Fine.  Is that -- is that -- let's make

9    sure our calendars are -- is that meeting scheduled for

10   February -- what date is on your calendar, is it February

11   26th?

12             UNIDENTIFIED DEFENSE COUNSEL:  I think it's February

13   26, Your Honor,

14             THE COURT:  February 26.  And how about our

15   conference call?  Is that February 12?

16             UNIDENTIFIED DEFENSE COUNSEL:  Yes, Your Honor.

17             THE COURT:  Okay, great.  Okay, are there any other

18   issues to address this morning?  We have a pretty hardy agenda

19   for this afternoon.  At least when I met with Judge Kugler

20   this morning, he wanted to start out by meeting with

21   leadership counsel in the jury room.  We may or may not go on

22   the record, I'm not sure.

23             UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, just one

24   logistical point on that with that precise issue, I just

25   wanted to request that I be permitted to attend that

 1   conference in case Judge Kugler wanted to discuss the direct

 2   filing order in that -- in the context of that conversation.

 3            THE COURT:  Granted.

 4            UNIDENTIFIED DEFENSE COUNSEL:  Thank you.

 5            MR. ST. ONGE:  And, Your Honor, same request from

 6   Legacy.

 7            THE COURT:  Granted.  My friend back there?

 8            MR. GEOPPINGER:  I'm all right, Your Honor, thank

 9   you.

10            THE COURT:  You'll be there, right?

11            MS. DAVIS:  Your Honor, D'Lesi Davis for McKesson

12   will attend.

13            THE COURT:  For your three -- three groups?

14            MS. DAVIS:  With your permission.

15            THE COURT:  Are you going to be representative of

16   the three?

17            MS. DAVIS:  Well, I think on the -- on the issues,

18   perhaps.

19            THE COURT:  No, we don't want all three there, just

20   one of the three.

21            MS. DAVIS:  This relates to some of the class

22   certification questions that you had addressed early in the

23   proof hearing.

24            THE COURT:  Okay.  Can you -- for liaison purposes

25   for just today, can you represent you three?

 1            MS. DAVIS:  Will I have five minutes to talk to them

 2    right before I show up --

 3            THE COURT:  Talk to who?

 4            MS. DAVIS:  -- to confirm -- to talk to Cardinal and

 5    ABC --

 6            THE COURT:  Of course.

 7            MS. DAVIS:  Thank you, Your Honor.

 8            THE COURT:  Of course.

 9            MS. DAVIS:  I'll know when I get there --

10            UNIDENTIFIED DEFENSE COUNSEL:  And, Your Honor,

11    just --

12            THE COURT:  Ms. Johnston, you'll be there.

13            MS. JOHNSTON:  Wouldn't miss it.

14            UNIDENTIFIED DEFENSE COUNSEL:  Your Honor, just one

15    -- one small point for clarification.  You know, the objecting

16    defendants do hope for and anticipate whatever ruling might be

17    issued today be issued on the record.  So we're prepared to

18    discuss it off the record, but we obviously would prefer to --

19            THE COURT:  Make sure you make that point to Judge

20    Kugler, okay?

21            UNIDENTIFIED DEFENSE COUNSEL:  -- have that be down

22    the road.  Thank you, Your Honor.

23            THE COURT:  Okay, so enjoy your lunch.  We'll see

24    you in the jury room at 2:00.  We're adjourned.

25            COURTROOM DEPUTY:  All rise.

Colloquy                                          118

1          (Proceedings concluded, 12:27 p.m.)

2                          * * *

3              **C E R T I F I C A T I O N**

4

5              We, Josette Jones and Diane Gallagher, court

6    approved transcribers, certify that the foregoing is a correct

7    transcript from the official electronic sound recording of the

8    proceedings in the above-entitled matter.

9

10   _____

11   JOSETTE JONES

12

13   _____        _____

14   DIANE GALLAGHER                          DATE

15   DIANA DOMAN TRANSCRIBING, LLC

16

17

18

19

20

21

22

23

24