**MAZIE SLATER KATZ & FREEMAN, LLC**
COUNSELLORS AT LAW
103 Eisenhower Parkway
Roseland, NJ  07068
(973) 228-9898
Fax (973) 228-0303
www.mazieslater.com

| | |
|---|---|
| David A. Mazie* | Karen G. Kelsen° |
| Adam M. Slater*° | Cheryll A. Calderon |
| Eric D. Katz*° | David M. Estes |
| David M. Freeman | Adam M. Epstein° |
| Beth G. Baldinger | Michael R. Griffith° |
| Matthew R. Mendelsohn° | Matthew Tonzola |
| | Christopher J. Geddis |

*Certified by the Supreme Court of     °Member of N.J. & N.Y. Bars
New Jersey as a Civil Trial Attorney

April 13, 2020

**VIA CM/ECF**
Honorable Joel Schneider, U.S.M.J.
U.S. District Court for the District of New Jersey
Mitchell S. Cohen Building & US Courthouse
1 John F. Gerry Plaza, Courtroom 3C
4th and Cooper Streets
Camden, New Jersey 08101

   Re: *In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*, No. 1:19-md-02875-RBK-JS (D.N.J.)

Dear Judge Schneider:

  Pursuant to the Court's March 3, 2020 Order (ECF 388), per the modified scheduled approved by the Court on April 9, 2020, Plaintiffs respectfully submit this letter brief to address the "macro" discovery disputes as to Retail Pharmacy and Wholesaler Defendants listed in Defendants' February 25, 2020 letter (ECF 383).

  **I.** **Overview**

  It is without dispute that the claims in this case center on the physical sale of contaminated valsartan-containing drugs ("VCDs"). Who sold what, to whom, and for how much are simple yet vital questions that go to the core of each defendant's liability, and to damages. This is true for every defendant in this case, no matter the level of the distribution chain (manufacturer, wholesaler, retail pharmacy) at which each defendant operates.

  It bears emphasis that Retail Pharmacy and Wholesaler Defendants are not "tiny" mom-and-pop shops or so-called "peripheral" defendants who have been unfairly swept up in this litigation. These Defendants are not bit-player entities; half of them are in the top 20 of the

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 2

Fortune 50 companies, and all of them are in the Fortune 100.[1] These Defendants all sold substantial quantities of VCDs. Nor are Retail Pharmacy and Wholesaler Defendants mere bystanders in this litigation. They have primary liability for the contaminated VCDs that they sold and profited from; they had independent duties to assure the VCDs they sold were not contaminated; and their failures to discharge their duties resulted in significant damages to consumers and third-party payors ("TPPs") alike.

Additionally, these Defendants are in the unique position of possessing important information for product identification; namely, information helping to show which Manufacturer Defendants' VCDs made it into which plaintiffs' hands, on a micro and macro basis. As set forth in the Declaration of Plaintiff's expert (*see* Ex. A), entities operating at the wholesale and retail pharmacy levels of the pharmaceutical drug supply chain, such as the Retail Pharmacy and the Wholesaler Defendants, should maintain detailed data concerning: (i) the date a drug was purchased or sold, (ii) from whom a drug was purchased, or to whom it was sold, and at what prices, (iii) the quantities of a drug purchased or sold on a given date, (iv) a drug's NDC number, (v) a drug's expiration date, and (vi) a drug's lot or batch number. Ex. A at ¶¶ 11, 18, 26-50. This is important information for purposes of establishing the universe of worthless prescriptions, which bears directly upon class membership, and the damages flowing therefrom. *See* Ex. A at ¶¶ 13, 47. While Retail Pharmacy and Wholesaler Defendants have claimed in the meet and confer process that they do not possess *all* of the foregoing data, their own statements outside this litigation suggest otherwise. *See, e.g.*, Ex. A at ¶¶ 34-41. Nevertheless, even if these Defendants do not maintain *all* of the foregoing data (e.g., lot or batch number), they assuredly possess at least some of it (e.g., dates of purchase, quantities, prices, NDC numbers, expiration dates), *see id.*, which will allow Plaintiffs and the Court to apportion the sales of all worthless VCDs attributable to each Manufacturer, Wholesaler and Retail Pharmacy Defendant. These data exist and are available as to individuals and in the aggregate. *See, e.g.*, Ex. A at ¶ 25.

## II. Concise Overview of the Meet and Confer Process

Plaintiffs began this process in December 2019 by serving initial document requests to both Retail Pharmacy Defendants and Wholesaler Defendants that mirrored the Court-ordered document requests to the Manufacturer Defendants. In the ensuing months, Plaintiffs worked diligently to sharply limit their proposed first-round documents requests to Retail Pharmacy and Wholesaler Defendants. Plaintiffs' last turn of requests to Retail Pharmacy Defendants consist of a mere 21 requests. *See* Ex. B. Plaintiffs' last turn of requests to Wholesaler Defendants consist of 22 requests. *See* Ex. C. Several requests explicitly track requests drafted by

---

[1] Defendant Walmart is No. 1; UnitedHealth Group (which owns Defendant OptumRx) is No. 6; Defendant McKesson is No. 7; Defendant CVS Health is No. 8; Defendant AmerisourceBergen is No. 10; Defendant Cardinal Health is No. 16; and Defendant Kroger is No. 20. The remainder are in the Fortune 100; Defendant Albertsons is No. 52 (above the Walt Disney Co.); Humana (which owns Defendant Humana Pharmacy) is No. 56; and Cigna (which owns Defendant Express Scripts) is No. 65. *See* https://fortune.com/fortune500/2019/search/ (last accessed Mar. 10, 2020).

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 3

Defendants in their own proposals. With both groups of defendants, Plaintiffs have agreed to forego custodial discovery (i.e. email searches and electronic search terms), the most expensive and time-consuming collection efforts required in litigations of this magnitude, for now.[2] Accordingly, Plaintiffs have tightly focused their initial requests on very specific data and exemplar documents that are critical for class certification. *See generally* Exs. B & C.

Notably, last night, Plaintiffs had another in a series of productive meet and confers with Retail Pharmacy Defendants.[3] These parties were able to reach consensus on nearly all of the macro issues between them, save for one discussed *infra* Part III. And even as to this singular issue, the only lingering impasse relates to the *scope* of data to be produced, not *whether* the data will be produced at all. Plaintiffs and Retail Pharmacy Defendants plan to continue conferring to resolve this remaining issue prior to the next CMC.

Unfortunately, Plaintiffs have been unable to make equal progress with Wholesaler Defendants. As of yesterday, these defendants steadfastly stood on their macro-objections and refuse to produce any documents/data in response to multiple requests – including requests which are nearly identical to those on which Plaintiffs have reached agreement with Retail Pharmacy Defendants.

### III.  "Macro" Discovery Disputes with Retail Pharmacy Defendants

Plaintiffs and Retail Pharmacy Defendants have reached agreement on nearly all of the macro issues identified in their February 25, 2020 letter to the Court (ECF 383). That is, Retail Pharmacy Defendants agree that the definition of "Valsartan" should include all VCDs manufactured by an API and Finished Dose Manufacturer Defendant; that the relevant time period for Plaintiffs' requests should be January 1, 2012 through December 31, 2019; that purchase and sales data (e.g., dates of purchaser, quantities purchased, NDC number, identity of supplier, etc.) should be produced for upstream purchases and downstream sales; that pertinent portions of retention policies should be produced; and that redacted indemnity agreements that may apply in this litigation should be produced.[4]

---

[2] Retail Pharmacy and Wholesaler Defendants should be required to stipulate or otherwise factually commit to the positions they have taken during the meet and confer process in order to secure Plaintiffs' agreement to stagger and/or forego certain discovery at present by the date on which their discovery answers are due. For example, that they did not ever test the VCDs they received, and did not confirm purity or generic equivalence.

[3] The Retail Pharmacy Defendants are comprised of nine of the largest brick-and-mortar and online retail pharmacies: Walgreens, CVS Health, Rite Aid, Walmart, Kroger, Albertsons, Express Scripts, OptumRx, and Humana Pharmacy.

[4] Retail Pharmacy Defendants also identified valsartan returns as a macro issue vis-à-vis the Defendant Fact Sheet ("DFS") in their February 25 letter. *See* ECF 383 at 3. As the current briefing relates only to the Rule 34 document requests to Retail Pharmacy and Wholesaler Defendants, Plaintiffs believe it is premature to address this issue. Plaintiffs and Retail

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 4

The only remaining issue between Plaintiffs and Retail Pharmacy Defendants relates to the *scope* of the upstream and downstream pricing data to be produced. Even as to this, Retail Pharmacy Defendants have already agreed to produce pricing data (perhaps initially in sample form, to be discussed between the parties) showing how much *consumers* paid for VCDs. Thus, the only impasse is that Plaintiffs seek (i) data showing how much consumers *and TPPs* paid for VCDs, and (ii) cost data so Retail Pharmacy Defendants' ill-gotten profits can be calculated for damages purposes.

*Prices Paid By TPPs.* Plaintiffs appreciate that Retail Pharmacy Defendants are now willing to produce downstream pricing data (perhaps samples first, which the parties will further discuss as to an appropriate sample size) showing the prices consumers paid to Retail Pharmacy Defendants for VCDs. But this is only part of the total amount paid (and electronically captured) for a VCD at the point-of-sale. When insured consumers purchase drugs, they almost always pay only some portion of the purchase price (e.g., an out-of-pocket copay), while a TPP pays the remainder. To establish individual and aggregate damages, Plaintiffs need both amounts – the amounts paid by consumers *and* TPPs for any VCD. This is especially true to calculate Retail Pharmacy Defendants' ill-gotten gains, as discussed immediately below. Furthermore, because both amounts are captured in the data, there is no increased burden in producing this data to include this additional field. *See* Ex. A at ¶ 31.

*Necessity of Upstream Pricing Data (or Cost Data).* Retail Pharmacy Defendants have agreed to produce data showing prices paid by consumers for VCDs. Combined with data showing the prices paid by TPPs, these data collectively will show the gross amounts of money Retail Pharmacy Defendants made on sales of VCDs. But Plaintiffs also need to know how much Retail Pharmacy Defendants paid to acquire the VCDs they resold (e.g., cost data). The reason for this is plain: The Economic Loss Plaintiffs plead a variety of claims that permit disgorgement of ill-gotten gains (e.g., unjust enrichment). The *only* way Plaintiffs can calculate ill-gotten gains is by reference to what Retail Pharmacy Defendants' paid for, and what they made upon reselling, the VCDs traceable back to the Manufacturer Defendants. This is also why Plaintiffs need the amounts paid for VCDs by consumers *and* TPPs; Retail Pharmacy Defendants' ill-gotten gains are measured by how much they made in total, from all sources (consumer and TPP), from selling VCDs, not just the fraction attributable to consumers. Without these data, Plaintiffs will be unreasonably obstructed in their effort to properly model class-wide damages. *See, e.g.*, Ex. A at ¶¶ 13, 47. In addition, as noted previously in briefing about discovery to the Manufacturer Defendants, pricing data is relevant to motive, intent, and notice. *See, e.g.*, 12/5/19 Pls.' Ltr. (ECF 311) at 31-32, 35 (cheaper VCDs due to manufacturers' cutting corners is probative of motive, intent, and notice).

---

Pharmacy Defendants have agreed to continue to meet and confer on this issue in the context of the DFS.

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 5

### IV.     "Macro" Discovery Disputes with Wholesaler Defendants

The Wholesaler Defendants[5] essentially raised the same macro issues as the Retail Pharmacy Defendants in their February 25 letter to the Court.  *Compare* 2/25/20 Defs.' Ltr. (ECF 383) at 1-3 (Retail Pharmacy Defendants' list of macro issues), *with id.* at 3-9 (Wholesaler Defendants' list of macro issues).  As noted above, Plaintiffs have since reached agreement with Retail Pharmacy Defendants on all issues except as discussed *supra* Part III.  It is unclear why Wholesaler Defendants could not reach the same agreements with Plaintiffs (e.g., the Manufacturer and Retail Pharmacy Defendants all agree on something as simple as the definition of "Valsartan," but apparently Wholesaler Defendants do not).  Plaintiffs address each macro issue with Wholesaler Defendants below.

### A.     Definition of "Valsartan" and Discovery "Start Date"

These two issues are intertwined.  Plaintiffs' proposed definition of "Valsartan" includes all VCDs made by Manufacturer Defendants, whether recalled or not.  This is the same definition adopted in the requests to Manufacturer Defendants, and as of last night the same definition adopted by Retail Pharmacy Defendants.  Plaintiffs also seek documents/data back to January 1, 2012.  The first VCD was launched and sold in or about September of 2012, and providing a conservative start date of January 1, 2012 is intended to capture the transactions made in the months leading up to September, when they were preparing to have sufficient quantity on hand to sell by the launch date.[6]  Retail Pharmacy Defendants have agreed to a time period of January 1, 2012 through December 31, 2019.

Notably, only Wholesaler Defendants largely seek to limit their production to documents or data relating only to VCDs that were subject to recall beginning in the summer of 2018, on the basis of commercial sensitivity, relevance, proportionality, and burden.  *See* 2/25/20 Defs. Ltr. (ECF 383) at 3-4.  They also seek to limit the "start date" of discovery to the first recall notice in the summer of 2018.  *Id.*  Defendants' unilateral attempt to limit the scope of this litigation, inconsistent with the scope applicable to the other parties, must be rejected.

*First*, the Discovery Confidentiality Order obviates Wholesaler Defendants' purported concern over "commercial sensitivity." The Discovery Confidentiality Order allows for these documents to receive a heightened confidentiality designation, and both Manufacturer

---

[5] AmerisourceBergen, Cardinal Health, and McKesson comprise the Wholesalers Defendants. They collectively represent more than 90% of the wholesale drug market. *See, e.g.*, Master Personal Injury Compl. (ECF 122) at ¶ 127.

[6] Indeed, having quantity of generics shipped and ready to dispense by the launch date is a selling point Wholesalers make to Retail Pharmacies. AmerisourceBergen, as just one example, has a service called "First to Shelf" which provides for automatic shipping of an approximately two-week supply of generic product for launch.  The transactions required to have sufficient product for retail customers by a September 2012 launch date would necessarily occur *prior* to that launch date.

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 6

Defendants and the Third-Party Payor Plaintiffs have produced documents of equal (or even greater) commercial sensitivity (and individual plaintiffs have produced highly sensitive personal information) without issue.

*Second*, Wholesaler Defendants' relevance and proportionality objections lack merit. As this Court has observed multiple times, this litigation is not confined only to recalled VCDs. Rather, Plaintiffs allege that defendants' VCDs were contaminated for years prior to the first recall notice in mid-2018. The Court explicitly recognized this when it set the relevant time periods for Manufacturer Defendant discovery starting in 2010 (for ZHP), 2011 (for Mylan), 2012 (for Teva, Aurolife, and Aurobindo), and 2013 (for Torrent and Hetero). Plaintiffs seek damages based on the sale of all of Manufacturer Defendants' potentially contaminated VCDs. That universe includes pills that were ultimately sold by Wholesaler Defendants and Retail Pharmacy Defendants in the years prior to the first recall in 2018. It would be illogical, and unduly prejudicial to Plaintiffs, if Wholesaler Defendants were able lop off all discovery relating to the majority of the relevant time period.

Information dating back to 2012 about VCDs (including non-recalled VCDs) is very important for class certification. Because the claims against Manufacturer Defendants go back to at least 2012, Plaintiffs absolutely need data for a commensurate period from Wholesaler (and Retail Pharmacy) Defendants to be able to apportion the market share of each VCD, by each Defendant in the chain, over time. Furthermore, specific product identification, since 2012, is important for the personal injury cases as well. As elucidated by Plaintiffs' expert, it will be much more challenging to track qualifying VCD purchases without purchase and sales data from Wholesaler (and Retail Pharmacy) Defendants for the entire relevant period. *See, e.g.*, Ex. A at ¶¶ 13, 47. Similarly, Plaintiffs cannot fully model class-wide damages for 2012 forward without sales and purchase data about Retail Pharmacy and Wholesaler Defendants' purchases and sales.

*Finally*, Wholesaler Defendants' assertions of burden ring hollow. As an initial matter, to date, Wholesaler Defendants have not articulated any burden at all in spite of Plaintiffs' repeated requests which should have been part of the meet and confer process.[7] As discussed in Plaintiffs' expert's declaration, data kept by these entities is structured, and the efforts needed to query the data are a matter of creating the inputs, one of which would be date. *See, e.g.*, Ex. A at ¶¶ 31, 36, 46, 49. Furthermore, not every purported burden relieves a party of its discovery obligations; the burden must be undue. Defendants have wholly failed to meet this standard.

Wholesaler Defendants' worry about the "number of manufacturers" (*see* 2/25/20 Defs.' Ltr. (ECF 383) at 2) is overblown. While there may be many manufacturers of Valsartan API or

---

[7] Instead, Wholesalers expressed an intention to provide this information for the first time through declarations and exemplar documents filed with their response brief. *See* 2/26/20 Tr. at 18. Wholesalers apparently have something specific in mind as to burdensomeness but the issue cannot be narrowed without disclosure and discussion. If the current coronavirus situation makes it too difficult for any defendant to submit a client declaration, then at a minimum defense counsel should articulate in their forthcoming letter briefs or their own declarations what information their clients would attest to as to undue burden.

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 7

finished dose, there are only five Manufacturer Defendant groups in this case. The first of these manufacturers (Mylan) introduced their products for sale in the United States in 2012, with the others doing so thereafter. In view of this, Plaintiffs' document requests are self-limiting. Because the Wholesaler and Retail Pharmacy Defendants keep data in structured formats, if no data exists for those dates, then no data exists for those dates, and the data will begin when the first transaction was made. Further, if a Wholesaler Defendant only purchased and resold one Manufacturer Defendant's VCDs since 2012, then they need only produce data for that one manufacturer's VCDs (even if, e.g., the Wholesaler Defendant purchased and resold valsartan from multiple other non-defendant manufacturers). Thus, while not a single Wholesaler Defendant has yet to identify which Manufacturer Defendants' VCDs they purchased and resold (key information one would have expected to be disclosed in the meet and confer process by now), at most they would need to produce data for five manufacturers' VCDs. Additionally, Plaintiffs have specifically tailored their requests not to call for "all data," but rather only data "sufficient to show" the quantities, price, NDC, expiration date, seller/purchaser, and lot number for any VCDs traceable back to a Manufacturer Defendants.

### B. Upstream and Downstream Pricing

Wholesaler Defendants refuse to produce any data sufficient to show the prices they paid for VCDs, and in turn prices they charged for VCDs resold to retail pharmacies. Wholesaler Defendants object to producing these data on the basis of commercial sensitivity, overbreadth, relevance, and burden. None of these objections have merit.

*First*, again, the Discovery Confidentiality Order obviates any confidentiality concerns.

*Second*, as to overbreadth, Plaintiffs are not seeking, as Wholesaler Defendants wrongly assert, every single data point on every single valsartan pill purchased and resold by Wholesaler Defendants. *See* 2/25/20 Defs.' Ltr. at 4. As noted above, Plaintiffs only seek data concerning purchases and sales of Manufacturer Defendants' VCDs during the period of time for which those products were on the market. Wholesaler Defendants' related contention that Plaintiffs want "all of the paper packaging and/or labeling information" that accompanies a purchase or sale of VCDs (*see* 2/25/20 Defs. Ltr. at 4, 7) is equally incorrect. Plaintiffs have already told Wholesaler Defendants that they are willing to accept data "sufficient to show," as well as exemplar transactional documents (e.g., a representative set of invoices, etc.) and exemplar drug labeling documents (e.g., FDA-approved labeling, package inserts, medication guides, etc.). Indeed, Wholesaler Defendants' own iterations of the document requests they have drafted as representative of our discussions reference exemplars in several instances. Retail Pharmacy Defendants already agreed to this with Plaintiffs; there is no reason Wholesaler Defendants should not do the same.

*Third*, the prices Wholesalers Defendants paid for VCDs, and in turn the prices they charged for VCDs dispensed to consumers, is highly relevant. Wholesaler Defendants' bald assertion that Plaintiffs have already pleaded a damages model (*see* 2/25/20 Defs. Ltr. (ECF 383) at 5) makes no sense. A complaint does not confine a plaintiff's pre-discovery, pre-certification, pre-trial damages theories. Even if it did, the operative Master Economic Loss Class Action

Complaint (which will be amended on March 13, 2020 per the Court's Order (ECF 388, 3/3/20)), explicitly pleads multiple theories of recovery, including unjust enrichment or disgorgement of ill-gotten gains (*see, e.g.*, ECF 121 at ¶¶ 546-557). Simply put, nothing in the soon-to-be-superseded Amended Economic Loss Class Action Complaint unduly cabins Plaintiffs' forthcoming damages modeling.

*Fourth*, Wholesaler Defendants have not articulated any purported burden during the meet and confer process – let alone one that is "undue" – notwithstanding Plaintiffs' repeated invitations for them to do so. Plaintiffs have also stated multiple times that they would work with Wholesaler Defendants to accept pricing data "sufficient to show" (e.g., perhaps data aggregated by month, by supplier, by NDC number, etc.) to address any particularized burden concern. Indeed, Plaintiffs have agreed to similar approaches with every other category of defendant. It also is hardly novel for a defendant to produce pricing data in an economic damages case. Such production is routine in these types of cases, for the same reasons articulated here – including in cases involving Wholesaler Defendants themselves. *See, e.g.*, *Haseman v. Gerber Prod. Co.*, No. 17-cv-0093, 2018 WL 5651210, at *1-2 (E.D.N.Y. 2018) (ordering defendant to produce pricing data for product at issue); *In re Androgel Antitrust Litig. (II)*, No. 09-MD-2084, 2012 WL 12895205, at *1 (N.D. Ga. Mar. 29, 2012) (ordering absent class member wholesalers, including the same three Wholesaler Defendants here, AmerisourceBergen, Cardinal Health, and McKesson, to "produce all purchase and sales data on a drug by drug basis"); *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 25, 35 (D.D.C. 2007) (ordering drug wholesalers to produce "pricing and sales data" for four different drugs in same drug class, even though lawsuit was only about one of those drugs). Moreover, as the Court has repeatedly reminded these Wholesaler Defendants, their discovery obligations are broader than what they may think is narrowly encompassed by the direct claims against them; and the current and soon to be amended master complaint sets forth a significant array of direct claims against them in any event.

### C.   Document Retention Policies

This Court already ordered Manufacturer Defendants to produce document retention policies. *See* 12/23/19 Order (ECF 328) at 10 (Request No. 16) ("Produce all document retention or destruction policies"). Plaintiffs simply request the same from Wholesaler Defendants, but in an even more limited fashion. Plaintiffs have limited this request to retention or destruction policies (or sections thereof) pertinent to the other data and documents Wholesaler Defendants will be producing. *See* Ex. C at Req. No. 20.[8] These policies are probative of the data and documents these defendants claim that they should or should not possess. The Court already flagged this as a non-controversial request. *See* 2/26/20 Tr. at 11-12. Retail Pharmacy

---

[8] "20. Produce the final document/data retention or destruction policies, or sections thereof, if any, in effect during the time period from January 1, 2012 to December 31, 2019 and applicable to records of purchases and sales of VCDs, shipment documents accompanying purchases and sales of VCDs, product testing documents accompanying purchases and sales of VCDs, and VCD recall documents." The wording of this request was proposed by Wholesaler Defendants themselves.

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 9

Defendants have reached agreement on this with Plaintiffs and have agreed to produce pertinent policies or sections thereof. Wholesaler Defendants should produce the same.

### D. Indemnity Agreements

Plaintiffs straightforwardly seek any existing indemnity agreements from Wholesaler Defendants that may apply in this litigation. Far from this discovery being unnecessary or premature, *see* 2/25/20 Defs. Ltr. (ECF 383) at 8, it is crucial for Plaintiffs to understand now if other entities might have financial responsibility in this case for the potential liability of these parties (and to what extent they may be financially responsible), or might need to be added as proper parties. It is best to discover these matters and address any potential issues now. The opposition to this request is arguably frivolous. Indeed, Retail Pharmacy Defendants and Plaintiffs reached agreement on this last night; Wholesaler Defendants remain the only outlier here.

### E. Miscellaneous

Wholesaler Defendants' repeated protestations "that no amount of discovery will allow Plaintiffs to map the transfer of product" (*see* 2/25/20 (ECF 383) at 6) are completely unfounded. Wholesaler Defendants *admit* that they receive lot and batch numbers from manufacturers. *See* 2/25/20 Defs.' Ltr. (ECF 383) at 6 ("In most instances, Manufacturers are required to send Wholesalers the lot and batch information"). While these defendants go on to claim they 'have no knowledge of which subsequent purchaser receives which lots/batches' (*see id.*), this claim does not appears to be correct. As set forth in Plaintiffs' expert's declaration, Wholesaler Defendants require every drug product received from a manufacturer to have clearly indicated identifiers on it, including lot number. *See, e.g.*, Ex. A at ¶¶ 32, 39. Retail Pharmacy Defendants required lot information from wholesalers **as far back as 2005**. *See id.* at ¶ 41. These are but a few examples; were Wholesaler Defendants to produce the requested documents or data (even exemplars, which they refuse to do) the parties and the Court would have a better understanding of the available identifiers. This is the very essence of discovery. Wholesaler Defendants cannot wave it off with empty and incredulous claims that no amounts of discovery will have *any* value in identifying which VCDs wound up in which consumers' hands. This is especially true in light of the large-scale and comprehensive regulatory[9] scheme requiring participants in the drug supply chain to keep and maintain data to precisely do just that. *See, e.g.*, Ex. A at ¶¶ 10, 13-19, 32-36.

---

[9] Wholesaler Defendants cannot dispute that the legislative intent of the Drug Supply Chain Security Act ("DSCSA") was to create a regulatory framework obligating drug supply chain participants (such as themselves) to keep and maintain data sufficient to track product from the manufacturer to the consumer. *See, e.g.*, Ex. A at ¶¶ 14-15. Indeed, an impetus for the DSCSA was a deadly incident killing over 80 Americans involving a finished dose product which contained contaminated API manufactured in China. Ex. A at ¶ 16.

Hon. Joel Schneider, U.S.M.J.
April 13, 2020
Page 10

## V. Conclusion

The Court should resolve the macro disputes between Plaintiffs and Retail Pharmacy Defendants and Wholesaler Defendants as follows:

1. The relevant time period for discovery should be January 1, 2012 through December 31, 2019. (Retail Pharmacy Defendants have already agreed to this).

2. The relevant products should be all VCDs manufactured by Manufacturer Defendants, not just recalled VCDs. (Retail Pharmacy Defendants have already agreed to this).

3. Retail Pharmacy and Wholesaler Defendants should produce gross and net pricing data for upstream purchases and downstream sales of VCDs; the parties should meet and confer as to the exact format and content of the data (as was agreed between Plaintiffs and Manufacturer Defendants).

4. Wholesaler Defendants should produce retention or destruction policies (or sections thereof) pertinent to the categories of documents and data they will be producing. (Retail Pharmacy Defendants have already agreed to this).

5. Wholesaler Defendants should produce indemnity agreements potentially applicable to any claims pending in this MDL. (Retail Pharmacy Defendants have already agreed to this).

Plaintiffs are optimistic that they can agree with these defendants as to the wording of document requests after the Court provides guidance on the foregoing macro disputes, with any lingering disagreement to be resolved by the next telephonic CMC.

Respectfully,

ADAM M. SLATER

cc:   All Counsel (via CM/ECF)