# EXHIBIT "F"

Case 1:19-md-02875-RMB-SAK   Document 439-6   Filed 05/36/20   Page 2 of 21 PageID:
Case 1:19-md-02875-RBK-JS   Document 524-3   Filed 12/17/19   Page 1 of 20 PageID: 9290
6924

# Exhibit A

Case 1:19-md-02875-RMR-SAK   Document 439-6   Filed 05/06/20   Page 3 of 21 PageID:
Case 1:19-md-02875-RBK-JS   Document 314-9   Filed 12/17/19   Page 2 of 20 PageID: 9287
6925

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN<br>PRODUCTS LIABILITY LITIGATION<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler,<br>District Judge<br><br>Honorable Joel Schneider,<br>Magistrate Judge |

### PLAINTIFFS' SECOND AMENDED SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL API AND FINISHED-DOSE MANUFACTURING DEFENDANTS

### TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 34 and Local Civil Rule 34.1, and in accordance with the Court's rulings at oral argument on December 11, 2019 and in the Order filed on December 13, 2019, as well as the Court's Order on macro discovery issues filed on November 25, 2019, Plaintiffs propound the following second amended discovery requests upon each API and finished dose-manufacturing defendant:[1]

---

[1] Each request is to be interpreted consistent with the Court's oral rulings at the November 20, 2019 hearing on macro discovery issues; the Court's November 25, 2019 Order on macro discovery issues (Dkt. 303); the parties' representations as reflected in the record of the December 11, 2019 discovery hearing; and the Court's oral rulings at the December 11, 2019 discovery hearing.

# TABLE OF CONTENTS

*DOCUMENTS TO BE PRODUCED:*......................................................................................*5*

 I. Corporate Organization ............................................................. 5

 II. Relevant Custodians .................................................................. 5

 III. Policies and Procedures ............................................................. 5

 IV. Agreements ............................................................................... 6

 V. Intra-Defendant Communications ............................................. 6

 VI. ANDA and DMF ....................................................................... 6

 VII. Litigation and Document Preservation ..................................... 7

 VIII. Manufacturing .......................................................................... 7

 IX. Bioequivalence ......................................................................... 8

 X. Testing ...................................................................................... 8

 XI. Nitrosamines and Contamination ............................................. 9

 XII. Regulatory Correspondence and Documents .......................... 10

 XIII. Complaints and Recalls .......................................................... 11

 XIV. Warranties and Statements ..................................................... 12

 XV. Sale and Distribution .............................................................. 12

 XVI. Identification of Purchasers .................................................... 13

 XVII. Sales and Pricing .................................................................... 13

 XVIII. Available Data Sources .......................................................... 16

 XIX. Defendant-Specific Requests .................................................. 17

# DEFINITIONS:

**"Active Pharmaceutical Ingredient" ("API")** is defined as any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Active pharmaceutical ingredient does not include intermediates used in the synthesis of the substance." 21 C.F.R. § 207.1; see also 21 C.F.R. § 314.3.

**"API Manufacturer"** is defined as any entity that manufactures the active pharmaceutical ingredient (API) for valsartan.

**"Finished Dose Manufacturer"** includes any entity that manufactures valsartan in a finished dosage form that is engaged in manufacturing, preparing, propagating, compounding, processing, packaging, repackaging, or labeling of valsartan. The term "finished dose manufacturer" also includes entities who hold ANDAs.

**"Communication(s)"** means the transmittal of information, in the form of facts, ideas, inquiries, documents or otherwise, and includes all transmissions of information received or transmitted by you, including correspondence, regardless of whether you are an author or addressee of such transmittal.

**"Documents"** includes, without limitations, any written, printed, typed, photostatic, photographic, recorded or otherwise reproduced or reproducible communication or representation, whether comprised of letters, words, numbers, pictures, sound or symbols, or any combination thereof, whether intended for internal use, dissemination to outside entities, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created that have any nonconforming notes or other markings. Without limiting the generality of the foregoing, the term "Document" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, summaries, statistical statements, financial statements, presentations, work papers, accounts, invoices, purchase orders, ledgers, journals, book of accounts, local records, reports and/ or summaries of investigation, trade letters, press releases, comparisons, books, calendars, calendar entries or invitations, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meeting, or other communications of any type, including inter-office and intra office communication, questionnaires, surveys, charts, graph, photographs, recordings, tapes, back-up tapes, discs, data cells, printouts, all other data compilations from which information can be obtained (translated, if necessary, into usable form), and any preliminary versions, drafts or revisions of any of the foregoing and shall also include electronic communications, whether maintained presently in the normal course of business or available in back-up or legacy data formats, wherever found or maintained, including all servers, hard drives, thumb drives, palms, blackberries, cell phones, laptops and firewalls. Such reference to documents includes originals and copies, microfilms and transcripts made, recorded, produced or reproduced by any and every means. "Documents" also includes the content of any applicable computer database.

**Relevant Time Period:** Unless otherwise specified, the relevant time period applicable to all requests is the time period specified by the Court.

Case 1:19-md-02875-RMB-SAK Document 439-6 Filed 05/36/20 Page 6 of 21 PageID:
Case 1:19-md-02875-RBK-JS Document 2443-9 Filed 12/17/13 Page 5 of 20 PageID: 9290
6928

**"Regulatory and Regulatory Authority"** refers to United States and foreign regulatory agencies.

**"TPP"** refers to Third Party Payors, including health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third party payers, and any other health benefit provider in the United States of America and its territories.

**"Valsartan"** means any drug with valsartan as an active ingredient, including the API for valsartan on its own, as well as all finished drug formulations of valsartan.

**"You," "your"** or **"defendant"** shall be used interchangeably and refers to the parties to which these requests are directed.

Case 1:19-md-02875-RMR-SAK   Document 439-6   Filed 05/06/20   Page 7 of 21 PageID:
6929
Case 1:19-md-02875-RBK-JS   Document 224-39   Filed 12/17/19   Page 6 of 20 PageID: 9251

## DOCUMENTS TO BE PRODUCED

### I.   CORPORATE ORGANIZATION

1.  Produce organizational charts setting forth the corporate organization for each named defendant, from January 2010 to the present as follows:
    a.  General corporate organizational charts for each defendant, including any affiliated entities involved in the manufacture, testing, distribution, or sale of valsartan;
    b.  Medical affairs/clinical affairs department, or the equivalent;
    c.  Quality assurance department, or the equivalent;
    d.  Manufacturing department, including any departments involved in the manufacturing process for valsartan;
    e.  Procurement Department;
    f.  Sales department;
    g.  Marketing department;
    h.  Research and development department;
    i.  Department(s) responsible for designing, funding, or supervising clinical trials (including all Phase I, II, III, and IV);
    j.  Regulatory department;
    k.  Department responsible for epidemiology and/or statistical analysis;
    l.  Department responsible for providing professional education to physicians;
    m.  Department(s) responsible for establishing or maintaining relationships involving valsartan, with any other defendant named in this MDL.
2.  Produce organizational charts or similar documents setting forth:
    a.  All corporate officers;
    b.  All members of the Board of Directors;
3.  To the extent you conduct business relating to the manufacture, distribution, or marketing of valsartan with any other defendant in the above-captioned MDL, produce documents, including contracts, invoices, payment records, and communications, demonstrating the nature, extent, and length of this business relationship.

### II.   RELEVANT CUSTODIANS

4.   Produce documents identifying the corporate employees or retained third parties responsible for or involved in the (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, (8) distribution, (9) production, (10) packaging, (11)  sale, (12) marketing, and (13) communications with private individuals or entities regarding safety, bioequivalence, purity, contamination, and pricing, with regard to valsartan.

### III.   POLICIES AND PROCEDURES

5.  Produce all final versions of policies, procedures, standard operating procedures, or protocols for or relevant to the (1) manufacture, (2) testing, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments, (6) regulatory activities, (7) communications with regulatory agencies, (8) production, (9) distribution, (10) packaging, (11) sale, (12) marketing, and (13) communications with private individuals or entities, regarding safety,

bioequivalence, purity, contamination, and pricing, with regard to valsartan, and/or the ingredients thereof. In addition, provide all indexes or lists of the requested documents.

## IV. AGREEMENTS

6. Produce all agreements, contracts, or licenses that the answering defendant is a party to, with regard to (1) the manufacturing process, (2) testing for bioequivalence, purity, or contamination, (3) quality assurance, (4) risk assessment, (5) medical and clinical assessments of bioequivalence, purity, or contamination, (6) regulatory activities, (7) communications with regulatory agencies, , (8) production, (9) distribution, (10) packaging, (11) sale, (12) marketing, (13) communications with private individuals or entities, regarding safety, bioequivalence, purity, contamination, and pricing, and (14) procurement of components or ingredients, with regard to valsartan and/or its ingredients.

7. Produce all agreements, memoranda, and payment or expense records, with regard to any attempt by defendant to retain, engage or otherwise provide financial support or item of value to any person with regard to proposed or actual scientific or medical study of valsartan.

8. Produce all agreements to engage any third party to represent your interests before the FDA or any regulatory authority, with regard to valsartan.

9. Produce all agreements with regard to the retention of persons in any medical or scientific discipline to study, assess or analyze the safety, purity, or contamination of valsartan for or on behalf of any defendant.

## V. INTRA-DEFENDANT COMMUNICATIONS

10. All communications between or among any of the defendants with regard to. (1) the manufacturing process, (2) testing capable of indicating purity, bioequivalence, or contamination, (3) quality assurance related to purity, bioequivalence, or contamination, (4) risk assessment with regard to contamination or the use of solvents, (5) medical and clinical assessments of risks related to impurity or contamination, (6) communications with regulatory agencies regarding bioequivalence, purity, or contamination, (7) terms or conditions of distribution, (8) sale numbers, (9) pricing, and (10) procurement or use of solvents, with regard to valsartan.

## VI. ANDA AND DMF

11. To the extent any ANDA file for valsartan sold in the United States was not produced in whole or in part during Core Discovery, produce the entire file.

12. Produce all correspondence with the FDA concerning any ANDA for valsartan sold in the United States, whether or not ultimately approved, including prior to the relevant time period set by the Court.

13. Produce all documents containing the list of ingredients in valsartan sold in the United States, which were provided to any regulatory authority, beginning from the date you first began development of the process for manufacturing the API for valsartan sold in the United States [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request]. .

14. Produce all documents relating to New Drug Applications filed by you with regard to valsartan sold in the United States, beginning from the date you first began development of

the process for manufacturing the API for valsartan sold in the United States [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

15. Produce all complete drug master files for valsartan sold in the United States, to the extent not produced to date. [Plaintiffs seek an exception to the Court's general relevant time period ruling on this request].

## VII. LITIGATION AND DOCUMENT PRESERVATION

16. Produce all document retention or destruction policies.
17. [WITHDRAWN]
18. [WITHDRAWN]

## VIII. MANUFACTURING

19. Produce all documents with regard to the manufacturing process for the active pharmaceutical ingredient in valsartan, including any modifications thereto, as described and set forth on the record during the December 11, 2019 Court hearing.

20. Produce all documents with regard to the machines, materials, and substances (including but not limited to new or recycled solvents, tainted or contaminated solvents) utilized in the manufacturing process for the active pharmaceutical ingredient in valsartan, including specifications, manuals, material safety data sheets, machine settings and calibrations, and any modifications thereto, as described and set forth on the record during the December 11, 2019 Court hearing.

21. Produce all documents (including photographs or video) with regard to any testing or inspections of valsartan for purity or contamination consistent with the scope of relevant testing as set forth in ¶ 8 of the Court's ruling on macro discovery issues (Dkt. 303). As stated in the Court's November 25, 2019 Order, this includes tests showing unknown and unidentified testing peaks or general toxic impurities in valsartan API or valsartan, any test that could identify the presence of nitrosamine contamination, and testing and results regarding other carcinogens, general toxic impurities, or residual solvents in the valsartan API and valsartan. As ordered during the December 11 Court hearing, the relevant time period for ZHP's production of the testing listed in Plaintiffs' December 10, 2019 letter shall date back to the start of the implementation of the manufacturing process in 2007 for ZHP, and to the date on which the manufacturing process was first implemented for other API manufacturers.

22. Produce all documents setting forth the manufacturing/fabrication/production process for the finished drug formulation of valsartan sold by you or any of your affiliated entities, including any quality assurance and testing, and any modifications thereto, as described and set forth on the record during the December 11, 2019 Court hearing.

23. Produce the patent(s) for any patented manufacturing process for the valsartan API or the finished dose versions of your VCDs.

24. Deleted by Court Order.

25. Produce documentation demonstrating the name, address, and role of any third party which supplied you with valsartan or any ingredient, material, or component used in the manufacture of valsartan, and any evaluation or testing thereof. For finished dose manufacturers this request is limited to the supply to you of valsartan API.

26. Produce all certificates of analysis or similar documents concerning analysis of the purity or contents of valsartan, including the catalysts and solvents used in the tetrazole ring process, and documents and communications concerning the same.

27. Produce documentation identifying (1) each lot, batch, or other production quantity of valsartan manufactured, purchased, or sold by defendant (including discarded or recalled lots or batches), (2) the dates of manufacture for each, (3) the solvent(s) (including residual or reused solvents) utilized in the manufacture of each, and (4) any information you obtained with regard to potential risks of the use of any solvent utilized, including residual or reused solvents.

28. Produce documentation of all scientific journal articles submitted to any academic or scientific publication, written or drafted in whole, or in part, by your employees or scientists or third parties who received funding or other forms of compensation from you, regarding the manufacturing of valsartan, including the final version, any drafts, edits, and peer reviewed feedback.

29. All communications and documents exchanged between you and any third party, regarding the manufacturing process associated with the creation of valsartan, including but not limited to the use of solvents, the tetrazole ring formation process, testing, and contamination issues.

## IX.    BIOEQUIVALENCE

30. All documentation of the bioequivalence of any valsartan sold or manufactured (in whole or in part) by you to the Reference Listed Drug ("RLD"), including but not limited to, testing, communications with the FDA, communications with customers, suppliers, or other third parties, and certifications of bioequivalence.

31. All marketing materials referencing the bioequivalence of valsartan manufactured, distributed, or marketed by you.

32. All documents and communications regarding the identification by any person or entity of any valsartan manufactured, utilized, or sold by or to you as not being bioequivalent to the RLD.

33. All documents and communications relevant to valsartan entries in the FDA's "Orange Book."

34. Deleted by Court Order.

## X.    TESTING

35. Produce all documents setting forth or addressing the results of any testing (including chromatography) of valsartan that had the potential to directly or indirectly identify impurities or contamination.

36. Produce all documentation with regard to the first test that indicated impurity or contamination of valsartan that was potentially due to a nitrosamine, whether or not identified as nitrosamine contamination at the time.

37. Produce all documentation with regard to each notification to defendant of impurity or contamination of valsartan that was, or potentially was, due to a nitrosamine, whether or not identified as nitrosamine contamination at the time. In connection with this request, separately identify the first such notification.

38. [WITHDRAWN]

39. Produce all documents with regard to evaluation by an employee of defendant or a third party, with regard to the health risks of valsartan contamination as limited by the Court's Order.

40. Produce documentation of all studies of the ingredients, impurities, and actual or potential contamination, of valsartan conducted by any third parties, including, but not limited to, those conducted by Contract Research Organizations (CRO), educational institutions, publicly or independently funded groups, competitors, trade groups or associations, regulatory entities, irrespective of whether such studies were conducted at the direction of Defendant.

41. Produce documentation of any report or analysis made known to Defendant with regard to the relationship between the use of contaminated valsartan and potential or confirmed injuries; and the review of same by any employee or consultant of Defendant.

42. Provide documentation of the results of any clinical or animal study regarding valsartan conducted with potentially contaminated valsartan during the relevant time period, whether or not sponsored by, financed by, undertaken by, or suggested by Defendant, and any internal analysis thereof,

43. Produce documentation of any epidemiology studies or analyses known to defendant regarding valsartan, including but not limited to, any provided to or received from any regulatory authority, together with the underlying data including for example SAS data sets, and any internal analysis thereof.

44. Produce complete documentation of (a) all testing relevant to determination of purity, bioequivalence, or contamination, prior to any recall, of valsartan you manufactured or sourced, (b) all testing relevant to determination of purity, bioequivalence, or contamination,, after any recall, of valsartan you manufactured or sourced, (c) the results of the foregoing testing; (d) any such testing that was considered but not performed before or after any recall, including the reason(s) why such testing was not performed, and (e) to the extent any lot, batch, or other production quantity was not tested for impurities, bioequivalence or contamination, complete documentation with regard to the reason(s) why no such testing was performed.

## XI.   NITROSAMINES AND CONTAMINATION

45. Produce complete documentation identifying each lot, batch, or other production quantity of valsartan, (a) confirmed to be contaminated and the quantification of the contamination; (b) assumed to have been contaminated and the quantification of the contamination; (c) confirmed not to be contaminated; (d) assumed not to be contaminated, and (e) confirmed or assumed to be contaminated.

46. Produce complete documentation of any testing for any nitrosamine compound, including but not limited to NDMA, NDEA, NMBA, and any other nitrosamine or carcinogenic contaminant in valsartan, or any other API or finished drug manufactured, formulated, distributed, or sold by the answering defendant, as limited by the Court's Order.

47. Produce complete documentation of any testing or research conducted by you or a third party on your behalf to determine the existence or quantification of contamination in any valsartan API or finished drug formulation.

48. Produce complete documentation with regard to the analysis of health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance, conducted by you or any third party on your behalf.

49. Produce all studies, data, or other scientific or medical information reviewed or considered by any employee or third party on your behalf with regard to the health risks due to contamination of valsartan with any nitrosamine or other carcinogenic substance.

50. Produce all formal or informal reports or complaints by or to Defendant or any other person or entity to your knowledge, with regard to valsartan contamination.

51. Produce all documents known to you, embodying any analysis or opinion by any person or entity, regarding the potential health risks of nitrosamine contamination of valsartan.

## XII.   REGULATORY CORRESPONDENCE AND DOCUMENTS

52. Produce all regulatory documentation and communications with regard to contamination or recalls of valsartan, as limited by the Court's Order.

53. Produce all regulatory documentation and communications with regard to the use of solvents, tetrazole ring formation, and potential impurities or contamination in connection with the manufacturing process for valsartan, as limited by the Court's Order on macro discovery issues (Dkt. 303).

54. Produce transcripts, notes, memoranda, or other documentation of any hearings or other proceedings or meetings which took place at or with any regulatory agency relating to the actual and/or potential contamination or recall of valsartan, as limited by the Court's Order on macro discovery issues (Dkt. 303).

55. Produce all documents with regard to any FDA Advisory Panel meetings regarding valsartan contamination.

56. Produce all Establishment Inspection Reports (including foreign regulatory equivalents of Establishment Inspection Reports) and related documentation (including photographs or video) concerning your facilities or the facilities of any other defendant used in the manufacture, fabrication, packaging, distribution, or sale of valsartan, as limited by the Court's Order on macro discovery issues (Dkt. 303).

57. Produce all documents relating, referring to or embodying all inspection reports (including 483s, detention reports, and warning letters, or consent decrees, including foreign regulatory equivalents) which pertain in any way to valsartan contamination or any facility in which contaminated valsartan was manufactured, as limited by the Court's Order on macro discovery issues (Dkt. 303).

58. Produce complete documentation regarding any CAPAs (Corrective and Preventative Actions) relating to the manufacture of valsartan, including documentation showing what caused the CAPA to be opened and/or closed, as limited by the Court's Order on macro discovery issues (Dkt. 303).

59. Produce all documentation, and related communications, of any complaints or third party communications to or from any regulatory agency with regard to actual or potential valsartan contamination, as limited by the Court's Order on macro discovery issues (Dkt. 303).

60. Produce all documentation, including source files, for any MAUDE or other adverse event reports submitted to any regulatory agency with regard to cancer, or any injury potentially caused by valsartan contamination, and any related communications, as limited by the Court's Order on macro discovery issues (Dkt. 303).

61. Produce complete files for all formal or informal adverse event reports and/or MedWatch reports concerning cancer, or any injury potentially caused by valsartan contamination, including: a) causation analyses, b) summaries (including, but not limited to, computerized data), analysis or interpretations of any such adverse event report(s) (including any post-marketing submissions); and c) documents which discuss or refer to any adverse event

Case 1:19-md-02875-RMB-SAK   Document 439-6   Filed 05/26/20   Page 13 of 21
PageID: 6935
Case 1:19-md-02875-RBK-JS   Document 324-1   Filed 12/17/19   Page 12 of 20   PageID: 5297
PageID: 6935

report, or any summary, analysis or interpretation thereof, as limited by the Court's Order on macro discovery issues (Dkt. 303).

62. Produce all databases maintained by you concerning both domestic and international formal and informal adverse event reports and/or MedWatch reports, including the underlying medical information and raw data maintained by you, with regard to reports of cancer, or any injury potentially caused by contaminated valsartan, as limited by the Court's Order on macro discovery issues (Dkt. 303).

63. Produce all filings with the Securities and Exchange Commission (SEC), addressing the sale of contaminated valsartan, including Forms 10-K, 10-Q, 8-K, and proxy statement (Schedule 14A), whether such filings are tentative, final, definitive, or supplemental.

64. Produce complete documentation of any communications with any state regulatory or health authorities regarding valsartan purity, bioequivalence, contamination, or pricing, as limited by the Court's Order on macro discovery issues (Dkt. 303).

65. Produce complete documentation of Defendant's efforts to comply with Current Good Manufacturing Practices (cGMPs), and any actions or inactions that did not meet or might not have met cGMPs, with regard to the valsartan manufacturing process and use or reuse of solvents in the valsartan manufacturing process, including, but not limited to, documents identifying any cGMP consultants retained by Defendant, documents regarding cGMP compliance provided to the FDA, and responses to FDA 483s and Warning Letters regarding cGMP compliance, as limited by the Court's Order on macro discovery issues (Dkt. 303).

## XIII.  COMPLAINTS AND RECALLS

66. Produce complete documentation with regard to each implementation of a recall due to contamination of valsartan.

67. Deleted by Court Order.

68. Produce all final recall notices with regard to contamination of valsartan.

69. Produce all documents setting forth or addressing any communications with any customer or consumer relating to the recall (or non-recall) of valsartan due to contamination.

70. Produce all communications directly with physicians relating to the recall (or non-recall) of valsartan due to contamination.

71. Produce all communications with any person or entity to which, or from which, you purchased or sold valsartan, with regard to valsartan contamination.

72. Produce all documents and communications with regard to the scope of any recall considered or implemented with regard to valsartan contamination.

73. Produce all documents and communications with regard to any complaint or concern raised by any person or entity relating to the purity, bioequivalence, or contamination of valsartan.

74. Produce all documents or communications concerning any actual or potential import or export alerts relating to valsartan contamination.

75. Produce all documents and communications concerning any buybacks or refunds that you paid to any purchasers of valsartan in the United States related to valsartan contamination.

76. Produce all communications (and drafts) to or from Defendant regarding recall of valsartan related to valsartan contamination, including lists sufficient to show all persons or entities who received communications.

77. Produce documents sufficient to identify any person or entity retained by Defendant with regard to the recall of valsartan due to nitrosamine contamination.

78. **Note: this request is only directed to API manufacturer defendants and FDA liaison defendants.** Produce all documents setting forth or with regard to, communications with Novartis concerning valsartan impurity, bioequivalence, or contamination.

## XIV. WARRANTIES AND STATEMENTS

79. Produce all versions of defendant's labeling, package inserts, patient leaflets, and medication guides for valsartan in the United States, together with a chart of the approval dates and in use dates for all versions that were utilized in the sale and marketing of valsartan.
80. Produce all statements regarding purity, bioequivalence, and contamination provided to medical professionals, purchasers including TPPs, consumers, wholesale distributors, retail pharmacies, and other direct and indirect purchasers of valsartan, for each NDC, Batch Number, and Lot Number of valsartan sold in the United States during the relevant time period.
81. All advertisements, and sales and marketing materials for valsartan, and charts setting forth the approval date and in use dates, for each.
82. [WITHDRAWN]
83. Produce all communications between you and any medical professional or medical association concerning the risk of cancer, or any injury potentially associated with valsartan contamination.
84. [WITHDRAWN]
85. Deleted by Court Order.
86. Produce all communications with healthcare providers regarding the purity, bioequivalence, or, recall status, of valsartan.
87. Produce all public statements (and drafts) issued by Defendant regarding valsartan purity, bioequivalence, or contamination of valsartan.
88. [WITHDRAWN]
89. [WITHDRAWN]
90. Produce all communications with the Centers for Disease Control (CDC), National Institutes of Health, World Health Organization, U.S. Drug Enforcement Agency, U.S. Department of Justice,  U.S. Attorney General, any regulatory agency, or any state agency, relating to valsartan contamination.
91. Produce all documents relating to any investigative subpoenas and subsequent investigation from the United States Department of Justice, United States Congress, and/or any other federal or state entity, relating to valsartan contamination.
92. Produce all documents relating to, referring to or embodying any discussion or submission between defendant and any state government regulatory agency or any state medical society concerning reimbursement for valsartan purchases.

## XV. SALE AND DISTRIBUTION

93. Produce complete documentation setting forth and/or demonstrating the complete supply and distribution chain for valsartan purchased, sold, or distributed by you, from the manufacture of the API through the final sale to the consumer.
94. Produce all documents relating to the sale and distribution of valsartan that reflect NDC, batch number, and lot number.

Case 1:19-md-02875-RMB-SAK   Document 439-6   Filed 05/26/20   Page 15 of 21
PageID: 6937
Case 1:19-md-02875-RBK-JS   Document 329-1   Filed 12/17/19   Page 14 of 20 PageID: 5299

95. Produce documents sufficient to show all sales of valsartan to wholesalers, distributers, retailers, and consumers, including the total net sales, total number of pills and/or units sold, unit price, unit cost, profit margin, and market share by state or territory.

96. Produce all documentation relating to the due diligence performed in selecting an API or finished dose manufacturer from which you purchased valsartan, including but not limited to policies and standard operating procedures.

97. Produce all communications received from any API manufacturer or finished dose manufacturer with regard to the manufacturing process, purity, bioequivalence or contamination relating to valsartan.

98. Produce complete documentation of the basis for Defendant's decision to purchase valsartan from any API or finished dose manufacturer, including documents you reviewed or relied on to make those decisions.

## XVI.  IDENTIFICATION OF PURCHASERS

99. Produce documents sufficient to identify all persons and entities (including consumers and TPP entities) who purchased, reimbursed, or paid or otherwise compensated you for valsartan you manufactured, sold or distributed in the United States.  If available, produce documents sufficient to show these individuals' or entities' names, last known mailing addresses and email addresses, last known telephone numbers, date(s) of purchase, NDC Code(s), Batch Number(s), and Lot Numbers.

100. Produce all communications between or among you and any named plaintiff acting as a class representative, including the named consumer representatives and/or named TPP representatives, including but not limited to MSP Recovery Services (including its assignors, Summacare, Emblem, and Connecticare) and Maine Automobile Dealers Association, with regard to the sale of valsartan.

## XVII.  SALES AND PRICING

101. Produce complete documentation demonstrating all valsartan sales you made in the United States to any purchaser (including, but not limited to, wholesalers, distributors, retailers and retail consumers), including documents that reflect total gross sales, total net sales, total number of units sold, unit price (gross and net), unit cost, cost of goods sold, profit margin, NDC, batch number, and lot number, on an annual basis, by, defendant, state, territory or the District of Columbia.

102. Produce all documents and communications indicating your market share for valsartan, or competition for market share for valsartan, in the United States including, but not limited to, regularly updated forecasts, life cycle forecasts, internal tracking documents, product launch plans, market share audits, and documents analyzing IQVIA or IMS data .

103. All documents and communications relating to negotiations over price and terms of sale or distribution between any defendant and any purchaser or re-seller of valsartan including, but not limited to, requests for proposals ("RFPs") for chain pharmacies and/or wholesalers, full line bids, product offers related to VCDs, presentations regarding bids or proposals, and portfolio management programs.

104. Produce all documents and communications relating to any agreements or arrangements between you and any TPP entity (or any person acting on behalf of a TPP entity) that did, could, or may affect the quantity or price of valsartan purchased (including

e.g., rebate agreements provided to pharmacy benefit managers ("PBMs"), purchasing agreements with PBMs, shelf stock adjustments and/or credits provided to PBMs, etc.).

105.   Produce complete documentation of any arrangements between you and any other wholesaler or chain pharmacy that did, could, or may affect the quantity or price of valsartan purchased, including but not limited to rebate agreements, volume incentives, pride reduction offers, profit splits arrangements, shelf stock adjustments, new product launch generic conversation programs, and all reimbursements and/or penalties paid as a result of recalls.

106.   Documents identifying all retailers and/or sellers (including but not limited to, retail pharmacies, mail order pharmacies) who have offered valsartan for sale in the United States and territories from January 1, 2010 to the present, including but not limited to the name, location, and sales volume for each such retailer, as well as the relevant NDC, Batch Numbers, and Lot Numbers for each seller or retailer, where available.

107.   Produce documents or data sufficient to show (i) the customers to whom you sold valsartan API or valsartan finished dose, (ii) unique identifiers for product sold (e.g., lot number, batch number, NDC code, etc.), (iii) quantities of valsartan API or valsartan finished dose sold, (iv) dates of sale, and (v) net and gross price per sale.  The parties will meet and confer about the scope and form of data based on the particular data maintained by each Defendant. Plaintiffs note by way of example that the data which may satisfy this request includes but is not limited to:

   a.   List price;
   b.   Average marginal price;
   c.   Average wholesale price;
   d.   Wholesale acquisition cost;
   e.   Direct price;
   f.   Average discount off of wholesale price or wholesale acquisition cost;
   g.   Price under Medicare program;
   h.   Price under Medicaid program;
   i.   Maximum allowable price;
   j.   Average manufacturing price (AMP) as defined by, and reported to, the Centers for Medicare and Medicaid Services;
   k.   Best price, as defined by, and reported to, the Centers for Medicare and Medicaid Services;
   l.   Net revenue;
   m.   Gross sales;
   n.   Net sales;
   o.   Units;
   p.   Gross shipments;
   q.   All measures of margin, income, earnings, and profits;
   r.   Unit of volumes sold;
   s.   Unit of volumes sold net of returns;
   t.   Total product contribution;
   u.   All costs and expenses attributable to the product;
   v.   Sales and distribution cost;
   w.   Cost of goods sold;
   x.   Manufacturing costs;
   y.   Marketing, advertising, promotional, and sales expenses;
   z.   Depreciable and capital improvements;

Case 1:19-md-02875-RMB-SAK   Document 436-6   Filed 05/26/20   Page 17 of 21
Case 1:19-md-02875-RBK-JS   Document 329-1   Filed 12/17/19   Page 16 of 20 PageID: 5301
PageID: 6939

    aa. Regulatory compliance;
    bb. Short-run average variable costs;
    cc. Long-run average variable costs;
    dd. Fixed costs;
    ee. Materials cost;
    ff. Labor cost;
    gg. Marginal cost;
    hh. Rebates, discounts, vouchers, or other product promotions, returns, or charge-backs; and
    ii. Coupons or co-pay cards.

108. Documents identifying every entity that purchased, reimbursed, or compensated you for valsartan.

109. Produce all contracts for the sale of valsartan, including (a) contracts with direct purchasers; (b) contracts that provide that the purchaser will take delivery of valsartan from another entity (such as a wholesaler); and (c) contracts concerning or regarding the payment of chargebacks.

110. Produce complete documentation of the date, manufacturing source, quantity, and recipient of all samples of valsartan provided by Defendant.

111. Produce documents or data sufficient to show (i) the customers to whom you sold valsartan API or valsartan finished dose, (ii) unique identifiers for product sold (e.g., lot number, batch number, NDC code, etc.), (iii) quantities of valsartan API or valsartan finished dose sold, (iv) dates of sale, (v) net and gross price per sale. The parties will meet and confer about the scope and form of data, and Plaintiffs note by way of example that the data which may satisfy this request includes but is not limited to.

All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) number of units returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) product description, (xii) product form, (xiii) strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to and ship-to customer), and (xix) the customer's parent company (if the data identifies a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like).

All data concerning chargebacks, rebates, discounts, and other consideration given or accrued relating to valsartan, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm corporation, or other business entity whom you paid, or on whose behalf you accrued, the chargeback, rebate, discount and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which you paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or groups of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular product sold, by package size, SKU, UPC, NDC, and any and all other unique codes

Case 1:19-md-02875-RMB-SAK   Document #39-6   Filed 05/26/20   Page 18 of 21
Case 1:19-md-02875-RBK-JS   Document 328   Filed 12/17/19   Page 97 of 20   PageID: 5302
PageID: 6940

or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated.

All administrative fee transactions relating to valsartan, including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales concerning the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code;

For all other transaction types not reflected in (a) through (c) above, produce all documents relating to any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, whether created or maintained daily, monthly, quarterly, or at some other periodicity, with regard to valsartan.

The complete documentation for all items above (a though d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate product list, including NDC, SKU, UPC, product description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (1) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold and (2) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all data sets and calculations used to (1) determine accrued rebates and/or chargebacks and/or (2) periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms.

## XVIII. AVAILABLE DATA SOURCES

112.     Produce all documents relating to all IMS, Verispan, MediSpan, Scott-Levin, PriceCheck, ImpactRx, First DataBank, or other pharmaceutical industry data products purchased and or subscribed to or available to you regarding valsartan.

113.     Produce all data or reports generated by IMS, CMS, or Verispan, or any comparable third party person or entity (including, but not limited to, Medi-Span, ImpactRx, and First DataBank), in whatever format it was received, relating to the sale, prescription, marketing, promotion, or detailing of valsartan from date of launch to the present for valsartan, including:

    a.  IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price.  Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

b. IMS National Sales Perspective data, including total units, extended units, total sales dollars, and price. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

c. CMS national Health Expenditures and Drug Utilization data, including TRx, NRx, Medicaid percentage paid, extended units, retail sales dollars, and retail sales price, with regard to valsartan.

d. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price, with regard to valsartan. Preferably, the data should be broken out by manufacturer, product, form, strength, NDC, and channel.

114. Produce all documents relating to any coupon or co-pay assistance you made available to consumers for valsartan.

## XIX. DEFENDANT-SPECIFIC REQUESTS

### A. To Mylan:

115. Deleted by Court Order.

116. Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Nashik facility, including but not limited to the September 2016 inspection and resulting warning letter and November 2018 inspection and warning letter.

117. Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Mylan's Morgantown, WV facility, including but not limited to documents regarding inspections which occurred in November of 2016, March 2018, April 2018, resulting correspondence with the FDA regarding these inspections (including but not limited to, notes, presentations and documents created as a result of in person meetings with regulatory officials).

118. Produce due diligence documents addressing valsartan bioequivalence, purity, and contamination, associated with Mylan's acquisition of Matrix Pharmaceuticals.

119. Produce all documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### B. To Aurobindo:

120. All documents and communications regarding your contract with Lantech Pharmaceuticals for the recovery and further use of any and all solvents used in valsartan manufacturing.

### C. To Teva:

121. Produce all full and complete documents and document families previously produced in core discovery, including all documents previously withheld by Teva from the custodial file of Constance Truemper.

122. Produce all inspection documents, including any and all Form 483s, and EIRs, and correspondence from the FDA associated with Teva's finished dose manufacturing facilities,

Case 1:19-md-02875-RMB-SAK   Document 439-6   Filed 05/26/20   Page 20 of 21
PageID: 5304
Case 1:19-md-02875-RBK-JS   Document 324-1   Filed 12/17/19   Page 19 of 20 PageID:
6942

including but not limited to the Jerusalem Oral Solid Dose facility, and documents regarding a 2010 inspection which resulted in a warning letter from the FDA.

Dated: August 30, 2019

/s/ Adam Slater
Adam M. Slater
**Mazie Slater Katz & Freeman, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Tel.: (973) 228-9898
aslater@mazieslater.com

Daniel Nigh
**Levin Papantonio**
316 South Baylen Street
Pensacola, FL 32502
Tel.: (850) 435-7013
dnigh@levinlaw.com

Ruben Honik
**Golomb & Honik, PC**
1835 Market Street
Suite 2900
Philadelphia, PA 19103
(215) 278-4449
rhonik@golombhonik.com

Conlee Whitely
**Kanner & Whitely, LLC**
701 Camp Street
New Orleans, LA 70130
(504) 524-5777
c.whiteley@kanner-law.com

Case 1:19-md-02875-RMB-SAK   Document 439-6   Filed 05/26/20   Page 21 of 21
Case 1:19-md-02875-RBK-JS   Document 324-1   Filed 12/17/19   Page 20 of 20 PageID: 5305
PageID: 6943

## CERTIFICATE OF SERVICE

I certify that on the 30th day of August 2019, I electronically transmitted the attached document to counsel of record for all API and Finished Dose Manufacturers via electronic mail.


*/s/ Adam M. Slater*