UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| IN RE: | ) | 19-MD-2875(RBK-JS) |
| | ) | |
| | ) | Camden, NJ |
| VALSARTAN NDMA PRODUCTS | ) | October 16, 2019 |
| LIABILITY LITIGATION | ) | 10:45 a.m. |


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:                ADAM M. SLATER, ESQUIRE
                                   MAZIE, SLATER, KATZ &
                                   FREEMAN, LLC
                                   103 Eisenhower Parkway
                                   2nd Floor
                                   Roseland, NJ 07068


                                   DANIEL NIGH, ESQUIRE
                                   LEVIN PAPANTONIO
                                   316 South Baylen Street
                                   Pensacola, FL 32502


                                   RUBEN HONIK, ESQUIRE
                                   GOLOMB & HONIK, PC
                                   1835 Market Street
                                   Suite 2900
                                   Philadelphia, PA 19103


                                   CONLEE WHITELEY, ESQUIRE
                                   KANNER & WHITELEY, LLC
                                   701 Camp Street
                                   New Orleans, LA 70130


                                   ANDRES RIVERO, ESQUIRE
                                   RIVERO MESTRE
                                   525 Ponce de Leon Boulevard
                                   Suite 1000
                                   Miami, FL 33134


For the Defendants:                SETH A. GOLDBERG, ESQUIRE
                                   DUANE MORRIS, LLP
                                   30 South 17th Street
                                   Philadelphia, PA 19103

```
APPEARANCES: (cont.)


For the Defendants:              VICTORIA D. LOCKARD, ESQUIRE
                                 Terminus 200
                                 333 Piedmont Road NE
                                 Suite 2500
                                 Atlanta, GA 30305


Audio Operator:                  LAWRENCE MACSTRAVIC


Transcribed by:                  DIANA DOMAN TRANSCRIBING, LLC
                                 P.O. Box 129
                                 Gibbsboro, NJ 08026
                                 Office: (856) 435-7172
                                 Fax:    (856) 435-7124
                                 Email:  dianadoman@comcast.net



Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

1                          I N D E X

2

3    THE COURT:                                          PAGE

4    Discusses order of proceedings                        5

5    Search term lists                                     5

6    Macro discovery issues                                6

7

8    ARGUMENT RE: TPP FACT SHEET:                        PAGE

9    Ms. Lockard                                  7, 10, 17

10   Mr. Rivero                                        8, 15

11   The Court - Decision                                 18

12

13   ARGUMENT RE: DOCUMENT REQUEST #10:                  PAGE

14   Ms. Lockard                                          19

15   Mr. Rivero                                           20

16   The Court - Decision                                 22

17

18   ARGUMENT RE: DEFENDANTS' FACT SHEET:                PAGE

19   Mr. Goldberg                                         23

20   The Court - Decision                                 24

21

22   COLLOQUY RE:                                        PAGE

23   Aurobindo 30(b)(6) deposition                        26

24   Coordination of state court matters                  27

25

Colloquy                                    4

1    THE COURT:  We're on the record in In Re: Valsartan

2    MDL, Docket 19-2875.

3    Can lead counsel for each side just enter your

4    appearance for the record, and whoever speaks on the record,

5    if you could just state your name so the transcript can be

6    accurate.

7    MR. NIGH:  Daniel Nigh for plaintiffs.

8    MR. SLATER:  Good morning, Your Honor.  Adam Slater

9    on behalf of the plaintiffs.

10   MR. HONIK:  Good morning, Your Honor.  Ruben Honik,

11   Golomb & Honik, for the plaintiffs.

12   MS. WHITELEY:  Good morning, Your Honor.  Conlee

13   Whiteley, Canner & Whiteley, on behalf of the plaintiffs.

14   THE COURT:  Defendants?

15   MR. GOLDBERG:  Seth Goldberg on behalf of GHP and

16   the joint defense groups.

17   MS. LOCKARD:  Good morning, Your Honor.  Victoria

18   Lockard.  I'm here on behalf of the Teva defendants and the

19   defense -- joint defense groups.

20   THE COURT:  Just for the benefit of the group, we

21   were meeting downstairs informally to discuss some of the more

22   problematic issues in the case.  I thought it would be helpful

23   to talk informally off the record.  I hope we made progress,

24   but I'm not sure, to be honest with you.  But it is what it

25   is.

1          What we're going to do is, we're going to go through

2    the issues in the letters of the parties, address any issues

3    that you'd like.  We're going to take a break, come back at

4    2:00.  And in the interim, what we hope and expect is, the

5    parties can meet regarding the search term and custodian

6    issues, and then we'll see where we are after the break.

7          As far as this Court is concerned, I think we've

8    done a great job organizing the case, getting all the

9    administrative-type issues in order, and that phase of the

10   case looks like it's going to be wrapped up pretty soon.  But

11   now we're getting into the nuts and bolts of the case, and

12   it's this Court's feeling that if the search term and

13   custodian lists aren't the most important discovery items in

14   the case, they're certainly up there.  So that's why so much

15   time and effort I think needs to be dedicated to the custodian

16   and search term lists, and that's what we focused on

17   downstairs.

18          D-Day for those lists is December 11.  We're going

19   to finalize those lists at that conference, no matter where we

20   are.  You know my feeling about the lists.  I think it's in

21   defendants' best interest to be over-inclusive rather than

22   under-inclusive.  And if there's good cause to amend the lists

23   after we finalize them, whether by adding or subtracting names

24   and terms, we'll do it.

25          So why don't we put the custodian and -- and search

1   term issue aside for this morning and we'll do that last and

2   go through the issues in the parties' letters.  I have Mr. --

3   I have both letters in front of me.  I have Mr. Slater's

4   letter here, so we'll go through the issues:  ESI custodian,

5   ESI search terms.  We're going to save that for last.

6   Plaintiffs' April discovery letter.  I suppose that's wrapped

7   up in the custodian and search term issue, so we'll save that

8   for last.

9          Macro discovery issues.  This is what we'll do on

10   that topic.  No later than Monday, I'm ordering -- I'm going

11   to order the parties to give me their list of macro issues

12   they want to address.  Preferably it's a joint list, but it

13   doesn't have to be.  And then I'll enter an order identifying

14   the issues that are going to be briefed and addressed.

15          If I enter the order Tuesday, it will be two weeks

16   for the opening briefs, two weeks for the responding briefs.

17   We should be able to get a decision on those issues before or

18   at the November 20 meeting, which will be helpful for the

19   parties to prepare for the December 11 conference.

20          As I said downstairs, I think a great example of

21   what I consider a macro issue is the foreign regulatory

22   discovery; are the plaintiffs going to be limited to discovery

23   just related to the FDA or foreign regulatory bodies around

24   the world.  That's the type of issue we can brief and decide

25   up front.

Lockard - Argument                                              7

1          Another very good I think what I consider a macro

2    issue would be the relevant time frame for each of the key

3    defendants.  Let's get that teed up and decided so we can make

4    progress on the other aspects of the case.

5          So that order will be entered.  If I can get those

6    lists early enough on Monday, I'll enter the order on Monday.

7    But, if not, no later than Tuesday.

8          Next issue, TPP fact sheet.  Are there any issues to

9    address?

10         MS. LOCKARD:  Yes, Your Honor.  Victoria Lockard.

11   We have agreed on all but I think two.  We're down to two

12   issues now on the third parties' payer plan fact sheet, and we

13   circulated to the Court yesterday a highlighted version of the

14   current draft.

15         THE COURT:  Got it.

16         MS. LOCKARD:  There are -- the one issue I think

17   we're going to be able to resolve relates to the document

18   requests.  We had asked for documents related to alternative

19   hypertension medications, and I think we've agreed with

20   plaintiffs' counsel that we'll come up with a joint list and

21   which we should be able to resolve that.

22         For the two remaining issues, one pertains to who

23   needs to respond to the plaintiff fact sheet, and whether or

24   not all of the assignors need to respond or just the three

25   assignors who are listed in the master complaint.

Rivero - Argument                                          8

1              And so let me tell you what I mean by that.  So

2     there were three health care benefit assignors listed in the

3     TPP master complaint.  I think it's --

4              THE COURT:  Are they named class reps?

5              MS. LOCKARD:  The class rep is -- is not the -- it's

6     not the same as the assignors.

7              MR. RIVERO:  Judge, may I --

8              MS. LOCKARD:  Yeah.

9              MR. RIVERO:  I didn't want to interrupt.  If I can

10    explain.  Andres Rivero, Your Honor, for MSP series, which is

11    the class representative that we're talking about, the --the

12    lead class representative for the TPPs.

13             Judge, the -- as you may have heard at a prior

14    conference where we discussed it, MSP's business is to take

15    assignment of third party payer claims.  In this case, it has

16    named three of its assignors, SummaCare, ConnectiCare, and

17    Ambu. (7:43)  There are 62 other assignors from which it has

18    purchased claims.

19             THE COURT:  Are those the three biggest?

20             MR. RIVERO:  Those are -- those represent almost 62

21    percent of all the claims that we have, all the number of

22    members and by dollars.

23             THE COURT:  So --

24             MR. RIVERO:  So they're by far the three biggest.

25             THE COURT:  Okay.  So MSP is the named class rep.

Rivero - Argument                                          9

1      There's 62 assignors, three of which have been identified.

2      Are there any other named class reps besides MSP?

3              MR. RIVERO:  There is, Judge.  There is MADA, Maine

4      Auto Dealers Association represented by other counsel.  So our

5      TPP class reps in this case are MSP, which has assignments

6      from 65 entities, tens of thousands of members, tens of

7      millions of dollars, and there's also MADA, which has its own

8      members and claims.

9              To go to what was being represented -- referred to

10     by counsel, on this specific issue what we've said is, we'll

11     give you the names of all the assignors, 65 of them.  But

12     they're -- the three that we've named in the complaint with --

13     with just a very few number of representative examples,

14     represent both by dollars and by number of members

15     approximately 62 percent of the total amount.

16             So, Judge, even at that, even at 62 percent, we're

17     talking about tens of thousands of members and tens of

18     millions of dollars of claims.  For this purpose, Judge, we're

19     not doing a claims process, this -- by the way, the fact sheet

20     requires us to identify things like for each assignor, every

21     member.  You know, there's these three that has 62 percent.

22     Each member, the total cost to recipient, to member, total

23     cost to the insurer, to the assignor.  The kind of business

24     that the member was -- belonged to.

25             All this kind of data for tens of thousands of

1   people, we're going to supply the specific detail for 62

2   percent of all the people that would be our directly

3   represented claims.  Judge, I think for every legitimate

4   defense purpose, to have that information for tens of

5   thousands of people is adequate --

6           THE COURT:  So are you saying that you would

7   propose, and we'll hear from the defendants obviously, you

8   would propose that only MSP and MADA answer the fact sheet.

9   For MSP, they'll answer it for the three that make up 62

10  percent?  That's --

11          MR. RIVERO:  That's exactly --

12          THE COURT:  -- that's your position.

13          MR. RIVERO:  That's exactly right, Judge.

14          THE COURT:  And what about MADA, are they in a

15  similar position to you?

16          MR. RIVERO:  MADA -- no, MADA is direct -- has the

17  members directly simply answer for itself.  It'll -- it'll

18  answer --

19          THE COURT:  All right.  So let's hear from -- from

20  defendants.  And I guess what I would be most interested in

21  knowing is how much information do you need for class

22  certification purposes.

23          MS. LOCKARD:  Well, yes, and that's a fair question.

24  Now keep in mind that these 65 assignors, they have this

25  information for these assignors.  They have it.  They have it

1    available.

2              THE COURT:  What do you need it for at this stage of

3    the case?

4              MS. LOCKARD:  Because it is representative of the

5    class.  It is not the entire class.  It is representative of

6    the class.  And whereas they want to give us three assignors,

7    which only makes up roughly 61 percent, is what we were told

8    in the information, they have 100 percent of the information

9    for 65 of these.  They can essentially generate a report for

10   each of the members in these benefit plans to provide this

11   information.  It's not overwhelming.  It is helpful for class

12   certification purposes.

13             THE COURT:  Tell me how.  Tell me how it's -- how --

14   how and why you need it -- you need 100 percent for class

15   certification purposes as opposed to 61 or 62 percent.

16             MS. LOCKARD:  Well, we -- it's a very small

17   percentage of the overall class.  It's a very -- it's not 62

18   percent of the overall class, it's 62 percent of the

19   information they have.  It includes --

20             THE COURT:  Of one of the named class reps.

21             MS. LOCKARD:  For one -- for just one of the named

22   class reps, --

23             THE COURT:  Okay.

24             MS. LOCKARD:  -- not even MADA.

25             THE COURT:  Okay.  So help me understand why you

Lockard - Argument                                      12

1    need it.  There's two named class reps for this TPP class.

2    Apparently, we don't have an issue with MADA, so let's deal

3    with MSP.  You know, it's their burden to show they're an

4    adequate class rep, typicality, et cetera, et cetera.  Tell me

5    why you need 100 percent of the information from MSP as

6    opposed to 61 percent.

7              MS. LOCKARD:  Well, for one thing, we need that

8    information to evaluate standing.  In many of these cases that

9    are filed around the country by MSP, there is and has been a

10   finding that they lack standing to represent some of these

11   assignors.

12             THE COURT:  So if you got information for three

13   assignors, would that not be enough to address the standing

14   issue, or do you have to address each of the 62 assignments

15   for standing purposes?

16             MS. LOCKARD:  For standing to represent those three,

17   we do.  We need that information for standing, for them to

18   represent and -- and represent to the Court that they have

19   adequate assignments for those three, as well as the -- the

20   entire 65.  I mean that is an important threshold issue for

21   this class certification process.  And if they can't establish

22   that they even have an appropriate assignment for what is, you

23   know, they're saying 61 percent, we're talking about 49

24   percent of whom they say they represent.  They haven't --

25             THE COURT:  No, your math -- math is a little wrong.

1    39.

2           MS. LOCKARD:  Excuse me, I misspoke.  39 percent.

3    They can't even show us that they have standing --

4           THE COURT:  Counsel, sit down.  Let me hear from

5    defendant.

6           UNIDENTIFIED COUNSEL:  I'm sorry, Judge.

7           MS. LOCKARD:  You know, we need to evaluate the

8    information in terms of, you know, are -- is this claim

9    typical; you know, are they -- you know, is it a

10   representative, you know, subset of the entire class.  By just

11   looking at three, they said there were 65 total assignors,

12   they're offering us only three of 65, so I can't -- you know,

13   that's not significant enough for us to be able to tell if it

14   is a representative segment.  Three out of 65.

15          So they have the information; it's not burdensome.

16   You know, we're talking about responding on behalf of 65

17   assignors in this class action.  They have the information.

18   They've told us they have the information.  It's available and

19   -- and it is relevant for us in order to assess the class

20   certification issues.

21          THE COURT:  The fact sheet itself, it's going to be

22   answered by MSP, right?

23          MS. LOCKARD:  It is going to be answered by MSP and

24   MADA, but it contains information and documents that we have

25   requested with respect to each assignor.

1          THE COURT:  Okay.  And point me to where in this

2    fact sheet it would have a material impact on -- this --

3    whether it's three or 62 that -- assignors that have to --

4    information has to be provided for.  Which questions?

5          MS. LOCKARD:  Well, this -- I mean this requested

6    information related to the pricing and financial aspects of

7    the claim.  I'm not sure I understand the Court's question.

8    But, you know, for example the document demands talk about,

9    you know, how much did the -- the benefit providers or the

10   assignors pay for the drugs.  You know, what sort of discounts

11   or rebates would have been involved.  So, you know, just

12   evaluating three of 65 assignors doesn't give us the complete

13   picture in order to determine if MSP, the class rep, is an

14   adequate class rep.

15          UNIDENTIFIED COUNSEL:  Your Honor, if I may?

16          THE COURT:  Of course.

17          UNIDENTIFIED COUNSEL:  And I -- I have not been

18   involved in this issue, but if there are differences in many

19   of these assignments in terms of prices paid, discounts, et

20   cetera, if there are qualitative differences in how they are

21   administering the benefits, how they are paying for drugs,

22   then you may have ascertainability issues.  You may have a

23   problem with predominance because there may not be a cohesive

24   class.  There may be differences among the class members such

25   that they can't establish class certification.

1          It may also bear on whether they can even establish

2     a uniform model of damages.  And we would certainly need that

3     information to be able to say they can't.  And I think that's

4     the -- that's where we are with respect to the class

5     certification issues as to ascertainability, class

6     cohesiveness, and predominance.

7          THE COURT:  Counsel for MSP?

8          MR. RIVERO:  Judge, unfortunately, neither counsel

9     was involved in the good faith conference, so I think there's

10    a misunderstanding.  What we offered was specifically to give

11    the identities of all 65 assignors.  The one thing that's been

12    pointed out today that could go to class certification is the

13    standing question.

14         Now, Judge, without -- it's premature to debate it,

15    but the issue -- the standing issue, and I would like to put

16    this to rest, that's come up for MSP, and I represent them in

17    a number of class actions nationwide, is in the context of the

18    Medicare Secondary Payer Act.  That has absolutely nothing to

19    do with our standing here.  But nonetheless if they want to

20    see our assignments, I'll identify all 65.  If they want to

21    see 65 assignments, that's not an issue.  So we can put that

22    to rest.  That had not been raised in the good faith

23    conference, but we can supply the assignments.

24         What we're saying though is, as to the detail that's

25    called for in the TPP fact sheet -- and, Judge, it's really a

1    chart which I believe is at three --

2              THE COURT:  Is this -- is this the chart on page 4?

3              MR. RIVERO:  Yeah, it's section three, page 4,

4    Judge.

5              THE COURT:  Right.

6              MR. RIVERO:  As to that chart, there's nothing on

7    that chart that getting tens of thousands -- and it was broken

8    down and I -- by the way, we agreed on 98 percent of this TPP

9    fact sheet and I was personally on this good faith conference

10   on Tuesday when it was brought home.  So I'm very familiar.

11             This chart was broken down with one of the

12   colleagues for these counsel so that the member ID number

13   isn't part of the greater chart, because there's a recognition

14   that the member IDs would involve tens of thousands of

15   individuals and they didn't need all these categories.

16             So actually the way the chart was structured by

17   agreement with counsel entirely runs against what was just

18   argued.  If that were the case, what they're saying, that they

19   needed it by each member, then the member number would be in

20   the larger chart.  This (inaudible) question because that's

21   where the cost to recipient, cost to insurer factor comes in.

22             THE COURT:  Judge, what we're saying is, we'll

23   provide all 65 assignors' identities, provide the assignments.

24   But as to the breakdown for the tens and tens of thousands of

25   members, specifically on each person, to break all that down

1    -- and it's not as simple as it sounds.  We have a very good

2    data system, but this is going to take significant work.  For

3    those -- those that MSP has named as a representative example,

4    MSP is the class representative, they cover 62 percent of the

5    members, we would provide all the data, all the called for

6    information as to those.

7                THE COURT:  So question III(a)(1), you would provide

8    responsive information for these three that comprise 61 or 62

9    percent?

10               MR. RIVERO:  Yes, Judge.  And just by the way to

11   give an idea of the burdensomeness, of course, each category

12   there, which, you know, things like identifying the type of

13   business, something specifically requested from them, it

14   involves work separate from the kind of data that's normally

15   maintained.  So you have to go back now and find what type of

16   business each member belonged to.  It's not -- it's not just

17   push a button.

18               So, Judge, what I'm saying is, for -- I'm beating a

19   dead horse, but for class purposes, the standing they

20   specifically identified, we will address and we're providing

21   tens of thousands of individual members' information.

22               THE COURT:  Last word.

23               MS. LOCKARD:  Your Honor, they have to have -- as

24   you've said repeatedly, you know, they have to have some stake

25   in this.

1              THE COURT:  Skin in the game.

2              MS. LOCKARD:  Skin in the game.  They have this

3    information for 65 of their assignor clients.  And, you know,

4    if there are certain issues that are overly burdensome and --

5    and don't produce, you know, significant relevance, such as,

6    you know, we'll call them the type of business for the 65,

7    we're willing to yield here or there.  But by and large, we're

8    giving them a pass on, you know -- you know, 62 of their

9    assignors, which -- which they can readily produce this

10   information to us.

11             THE COURT:  The Court's ruling is that it agrees

12   with MSP.  For present purposes, MSP and MADA will answer the

13   TPP fact sheet; that MSP shall answer question III(a)(1) for

14   the three assignors who make up 61 or 62 percent of their

15   claim.  They shall provide the identities of all 65 assignors,

16   and if requested by defendants, give the assignments for all

17   65.

18             All of this is without prejudice, after the

19   defendants receive this responsive information, to make an

20   application to the Court for more fulsome information, if you

21   genuinely need it for class certification purposes.  If you

22   can make a case after you receive this information that you

23   legitimately need it because it's relevant to class

24   certification, you'll get it.  So we'll take it one step at a

25   time.

Lockard - Argument                                    19

1          MS. LOCKARD:  Okay.  I understand Your Honor's

2     ruling.  Thank you.

3          The only other issue I think we need to raise for

4     the Court relates to one of the document requests, and it's

5     actually -- I believe it's on page 11.  But it's document

6     request number nine.  Actually, document request number 10.

7     And we had requested all contracts between you, meaning the

8     assignors, and any pharmacy or pharmacy benefit manager

9     related to any actual or potential claims asserted by you in a

10    litigation.

11         So essentially what this is, is so the third party

12    payers' contract with these pharmacy benefit managers, the PP

13    -- PPNs, with respect to the drugs that are being provided

14    under the benefits plan.  And these agreements, as we

15    understand, would include things like rebates and discounts.

16    And that really contains the information that we need to put

17    together a true picture of the pricing that relates to the

18    drugs that were sold --

19         THE COURT:  I didn't -- I didn't -- maybe I'm

20    reading it wrong, I thought this request was getting at any

21    type of indemnification agreement between, you know, the

22    different entities.  Am I reading it wrong?

23         MS. LOCKARD:  That is not exactly what number 10 is

24    asking.  So number 10 is asking specifically for contracts

25    with pharmacy benefit managers.  So those are --

1           THE COURT:  But it says related to any actual or

2    potential claims asserted by you in this litigation.  That's

3    why my initial impression is you're asking for indemnification

4    agreements.

5           MS. LOCKARD:  Well, it's -- it's not indemnification

6    agreements.  It's related to, you know, the pharmacy benefit

7    managers will be managing the pharmacy benefits that are the

8    subject of the litigation, that are the subject of the clients

9    in the litigation.

10          THE COURT:  So let's -- let's take it with the

11   Court's prior ruling.  We have the three assignors.  Do you

12   just want the contracts between the three assignors and the

13   PBMs?

14          MS. LOCKARD:  At this point, given the Court's prior

15   ruling, yes.

16          THE COURT:  Any objection?

17          MR. RIVERO:  Judge, my -- we had a very good

18   discussion about this and it's a close question.  But here's

19   the issue, and -- and it comes down to this.  The discussion

20   with counsel was whether we put it under -- the entire

21   agreement under the highest level of protection we can have,

22   or whether -- our request was, and this -- this is the  --

23   these were the only two things we couldn't agree with from our

24   recent conversations.  Our ask was, would they allow us,

25   because all of our clients are competitors with each other as

1    to these PBM agreements, in other words, each one strikes its

2    own deals with its own ones, could we supply -- redact and

3    supply only those aspects of the contacts that deal with cost,

4    rebate, indemnity.  Anything that would affect the price,

5    would they take that.  Because I understood that was what

6    their desire was.

7              So my ask is simply, can I produce the contract

8    redacting out aspects that don't have to do with cost?

9              THE COURT:  Has the defendant objected to that?

10             MR. RIVERO:  They -- they said that they needed to

11   bring it to you.

12             THE COURT:  And suppose we classify these contracts

13   as attorney's eyes only, is there an objection?

14             MR. RIVERO:  Judge, that was -- look, it's a close

15   question and that would be my alternative, and I'm not saying

16   it's unacceptable, but we would prefer, because of commercial

17   sensitivity between our clients, our clients' assignors, to

18   have it, you know, totally not produced, et cetera.

19             THE COURT:  You don't want the 65 to see each

20   others.

21             MR. RIVERO:  Yeah.

22             THE COURT:  So how is that a problem if it's

23   attorney's eyes only?

24             MR. RIVERO:  Well, Judge, I'm not saying -- I'm just

25   saying -- I'm being ultra cautious and I'm not saying it's --

```
 1   it's unacceptable, Judge.

 2              THE COURT:  Can you live with that?

 3              MS. LOCKARD:  We can, and I think that was our

 4   proposal.

 5              THE COURT:  Okay.  So the question 10, the documents

 6   will be provided for the three assignors that have been or

 7   will be identified.  The documents shall be designated as, for

 8   the time being, attorney's eyes only and as always it's

 9   without prejudice.  If for some reason you want to make an

10   application, defendant, to reduce the level of

11   confidentiality, we'll -- we'll consider that issue.

12              MS. LOCKARD:  Sure.  Thank you.  Those are the only

13   issues on the fact sheet.

14              THE COURT:  Okay, great.  So within the next week or

15   so, you can get the final version to the Court and we'll enter

16   the order.

17              MS. LOCKARD:  Correct.  We can do that by Monday.

18              THE COURT:  Will that -- will that complete all the

19   fact sheets in the case?

20              MS. LOCKARD:  It does.

21              THE COURT:  Fantastic.

22              MS. LOCKARD:  At long last.

23              THE COURT:  Fantastic.

24              MS. LOCKARD:  Thank you.

25              THE COURT:  Okay.  Oh, no, it won't.  The defendant
```

 1  fact sheet, which is the next issue.  I guess the ball is in
 2  whose court?
 3          MR. GOLDBERG:  The ball is now in defendants' court.
 4  We received their revisions on Saturday and, you know, we'll
 5  all make an effort to evaluate their proposed changes and get
 6  back with them.
 7          THE COURT:  Okay.  So the next time we are scheduled
 8  to talk is November 6 on a phone call.  Is there a chance it
 9  will be finalized by then, realistically?
10          MR. GOLDBERG:  I don't know if it will be finalized,
11  but we'll certainly make some headway --
12          THE COURT:  All right.
13          MR. GOLDBERG:  -- on getting to some narrower
14  issues.
15          THE COURT:  All right.  No later than November 20.
16  We have to finalize this fact sheet; we've got to get it done.
17  Let's just get it out of the way.  Okay.
18          Is there -- so you're going to get back to
19  plaintiffs when, Mr. Goldberg?
20          MR. GOLDBERG:  We can -- we can try to get back to
21  them at some point in the next week so that we can get
22  something done before November 6th.
23          UNIDENTIFIED COUNSEL:  I would think that we should
24  be able to start talking in less than -- by the end of next
25  week, because then we're going to -- we're going to condense

Colloquy                                                    24

1   the time.

2              MR. GOLDBERG:  Well --

3              THE COURT:  So how about October 23rd, get back to

4   the plaintiffs.  That's a week from today.  By October 23rd,

5   defendants shall respond to plaintiffs' comments on the

6   proposed defendant fact sheet.  And we'll discuss it on the

7   November 6th call, but the absolute outside date to finalize

8   it is November 20.  And this way we'll get all the fact sheets

9   done and get that out of the way.

10             The document request responses, I guess you just got

11  that yesterday, plaintiffs.  All right.  So that will help I

12  think identify issues that you will want to raise in your

13  letter on Monday.  You have an idea of the defendants'

14  objections.  I'm hoping you did -- I haven't seen it, but I'm

15  hoping you didn't get, you know, boilerplate, it's too

16  burdensome, privilege, disproportional, et cetera, et cetera.

17             UNIDENTIFIED COUNSEL:  That's what we got.  We got

18  preliminary statements, general objections, which I don't

19  think either of those actually are authorized under any rules

20  I've ever seen.

21             THE COURT:  Didn't I say something about that Rule

22  26(g), you know, boilerplate objections are in violation of

23  Rule 26(g)?

24             UNIDENTIFIED COUNSEL:  I think so.

25             THE COURT:  We'll deal with that.  Completely

Colloquy                                          25

1    unacceptable.

2              UNIDENTIFIED COUNSEL:  And then I think --

3              THE COURT:  But I haven't seen them.  I don't know

4    if they're boilerplate or not, but if they're boilerplate and

5    there's, you know, a simple assertion that it's too burdensome

6    without supporting facts, no good.

7              UNIDENTIFIED COUNSEL:  From my -- my group, we've

8    been looking at these.  We have -- I don't think we found a

9    request that a defendant thought was not objectionable, which

10   could be on us.  I guess we'll find out.  But it's -- we're

11   hopeful that -- that there will be -- that --

12             THE COURT:  A fulsome meet and confer.

13             UNIDENTIFIED COUNSEL:  That we'll be able to cut to

14   some good, productive positions quickly, we hope.

15             THE COURT:  Okay.  Well, I'm sure the defendants

16   have read my numerous opinions on boilerplate objections and

17   burdensomeness objections without supporting facts.  And we

18   know rule amendments from, what, two, three years ago say that

19   if you're going to object on the grounds of privilege and say

20   we'll produce responsive documents, you have to identify

21   whether any documents are withheld on the grounds of

22   privilege.  The Court insists that privilege logs be produced.

23   So all I'm saying is, the Court and both sides have to comply

24   with the rules.  No more, no less.

25             Okay.  So we'll wait to hear from that and you have

Colloquy                                    26

1    that.

2             The 30(b)(6) deposition directed to Aurobindo.

3    Hopefully, we have good news on that?

4             UNIDENTIFIED COUNSEL:  Yes, Your Honor.  Our

5    understanding is that as to core discovery, there's no issue

6    anymore.  Whatever the foreign entity has that's responsive is

7    being produced.  We don't have the same comfort with regard to

8    the -- the document request that we were just talking about.

9             THE COURT:  That's a different issue.

10            UNIDENTIFIED COUNSEL:  It's a different issue and,

11   you know, we're satisfied that for the time being, we're

12   hopeful that they will come around on that or they'll get

13   served.  Although it looks like they're probably not going to

14   get served until early next year, from what I was told last

15   night because it apparently takes like 10 months or something

16   and the process started in April or May.  So we're -- we have

17   some concern, but for the time being, we're not -- we're not

18   going to with prejudice abdicate the right to take these

19   depositions, if -- if there's a problem with getting the

20   documents that we've just requested.

21            THE COURT:  Is Aurobindo here?

22            MS. HEINZ:  Yes, Your Honor.  Jessica Heinz.

23            THE COURT:  Kudos to you for working out the core

24   document issue.  With regard to the document requests, that's

25   a completely different issue.  We may have to wait for service

1    on that one.  But I'm glad to see we hopefully have put the

2    30(b)(6) issue aside for at least the moment.

3                  MS. HEINZ:  Thank you.

4                  THE COURT:  Thank you.  Okay.  Last issue before we

5    get to the search term custodians, coordination of state court

6    matters.  I thought that was taken are of.

7                  MR. GOLDBERG:  So there are a couple of different

8    issues and really it's in particular to New Jersey cases.  We

9    have three cases that are currently before Judge Happas, Reno

10   (phonetic), Orlowski (phonetic) and Robertson (phonetic), and

11   earlier in the summer I think Judge Kugler reached out to

12   Judge Happas --

13                 THE COURT:  Right.

14                 MR. GOLDBERG:  -- and she agreed that there would be

15   some --

16                 THE COURT:  Right.

17                 MR. GOLDBERG:  -- later coordination, and she put

18   those matters in abeyance.

19                 We are going to have a conference with her next

20   Wednesday, October 22nd -- next Tuesday.  And she's going to

21   ask the question, should we hold these matters in abeyance?

22   She had conditioned the abeyance on the possibility that the

23   plaintiffs in those cases would be applying for MCL in New

24   Jersey.

25                 They have not done that because there have been no

1    more New Jersey cases filed.  So she may be of the view that

2    those cases that are before her now are the cases that are

3    before her and, you know, she may be of the view that they

4    should start the proceedings in those cases.  We obviously --

5              THE COURT:  What can they do in those cases that we

6    -- we're not doing here?

7              MR. GOLDBERG:  Well, right.  I mean so -- so

8    obviously we think that should be something that should be

9    coordinated.

10             In addition, Mr. Slater is representing a plaintiff

11   in a case on Graham (phonetic).  That case is not -- has not

12   been consolidated with those other cases.  There is a

13   responsive pleading due in Graham --

14             THE COURT:  A different judge?

15             MR. GOLDBERG:  Not a different judge.

16             THE COURT:  Before Judge Happas?

17             MR. GOLDBERG:  Yes, I believe so.

18             MR. SLATER:  Judge, it's a -- it's a case that was

19   filed and it would be assigned to whichever judge is on the

20   wheel in Middlesex.  All of these cases went by the wheel to

21   individual judges.  Judge Happas is the presiding judge, so

22   that's why she was involved with this.

23             No answers have been filed to the case that I had

24   filed.  And I've told Mr. Goldberg, I'm not sure what the

25   concern is because whether Judge Happas decides -- and I

1    wasn't at the conference because my case wasn't even filed

2    then, but there was some reticence to -- just a consolidation,

3    you know, the normal consolidation rule, which I would think

4    would apply.

5              But I wasn't at the meeting, so I don't know why

6    that didn't happen.  I think it's because somebody might have

7    suggested an MCL application was imminent, which it wasn't.

8    But I've told Mr. Goldberg, I'm certainly not standing here

9    today and then going into Middlesex and saying I want

10   depositions in 30 days of this person and that person.  It

11   probably isn't good politically.  And then the other thing is,

12   I'm not doing that.

13             I've agreed to use the fact sheets that we come up

14   with here.  I've agreed to be bound by the discovery that we

15   take here.  So there's certainly no push from my perspective

16   to try to do something that's beyond what happens here.  There

17   was some agreement that was written up and was circulated with

18   the other lawyers.  I was very uncomfortable with that.  It

19   was -- that I would never sign, but it's not necessary.

20             So I'm not going to be -- my case isn't before any

21   judge yet because there's no responsive pleading.  It's not

22   joined yet.  But I can tell you the other firm I think is a

23   PSE member acting as local counsel, and I'm not sure what

24   their concern is, unless, you know, the courts in Middlesex

25   say we're going to start doing something.  But we're going to

Colloquy                                    30

1    abide by what this Court rules and we're going to agree to be

2    bound by the same discovery and the same fact sheets.

3            THE COURT:  I know when those issues come up with

4    these types of cases, we would normally consolidate the cases

5    for discovery and case management purposes only and not

6    consolidate it for trial.  I don't know if they do that in

7    state court.  It sounds -- it sounds to me, Mr. Goldberg, that

8    this is all going to be worked out.

9            MR. GOLDBERG:  Yeah, I think the issue is whether

10   Judge Happas decides that, you know, she has a different view

11   and wants to proceed in some way.  Certainly as we did before,

12   we would -- we would -- we wanted to raise this.

13           We wanted to remind the Court that we are going to

14   be before her next week, that the MCL that was supposed to be

15   filed wasn't, so Judge Happas may -- may have the question,

16   should I continue to hold these in abeyance or not; what's

17   going to happen with the MDL.

18           We'll certainly encourage her that these matters and

19   the Graham matter should be consolidated and we can enter some

20   kind of consolidation order.  We would certainly let her know

21   that there doesn't seem to be any opposition to that from the

22   MDL court.  But if there's some way to enter into some kind of

23   formal joint coordination order, or if Your Honor or Judge

24   Kugler wants to reach back out to Judge Happas in advance of

25   the meeting next week, we wanted to alert the Court.

1          THE COURT:  I appreciate that.  Let us -- you know

2    what, let us know if there's a problem.  I just can't conceive

3    that Judge Happas would go off on her own on cases of this

4    complexity.  And if there is a problem, I have no doubt that

5    Judge Kugler will pick up the phone and talk to Judge Happas.

6          MR. GOLDBERG:  Thank you.

7          THE COURT:  So let -- let us just know if there's a

8    problem.  I don't -- it doesn't sound like there will be.

9          MR. SLATER:  Your Honor, I have one question

10   actually that maybe Mr. Goldberg can answer.  I know that the

11   two Cook County cases are listed, too.  They probably have

12   more knowledge about what's happening in those cases than we

13   have.  We're just curious if there's any development in those

14   cases.

15         MR. GOLDBERG:  I -- you know, I don't know -- I

16   don't know the status.  I think both are right now being held

17   in -- I don't know if there's a formal abeyance order.

18   They're not proceeding at the moment.  But I can report back

19   to the Court on that, if Your Honor would like to.

20         THE COURT:  Let us know if there's a problem.

21         Is the MDL application on an agenda for the next

22   meeting?

23         UNIDENTIFIED COUNSEL:  Of the JPML?

24         THE COURT:  Yeah, JPML.  I'm sorry.

25         UNIDENTIFIED COUNSEL:  I haven't seen the list this

Colloquy                                              32

1    past week, but I think it's premature even at this hour to

2    know if it's going to be formally picked up in December.  The

3    JPML is likely to do so.  Whether it permits oral argument

4    remains to be seen.  But as we sit here today, unless David

5    tells me otherwise, I don't -- I don't think it's been picked

6    up one way or the other.

7              THE COURT:  Is there still a dispute about an

8    objection to the application?

9              UNIDENTIFIED COUNSEL:  I think there is an objection

10   of record, yes.

11             THE COURT:  Is it just to the definition that

12   plaintiff used or in concept to expanding the definition?

13             UNIDENTIFIED COUNSEL:  I think it's the latter, but

14   maybe Mr. Goldberg can address it.

15             MR. GOLDBERG:  Your Honor may -- may recall, and we

16   certainly put this in the material we submitted to the Court

17   in September, the JPML application that plaintiffs filed asks

18   for a number of different things by way of expansion.  It

19   asked to expand the MDL to include not just Losartan and

20   Irbesartan, of which there are only about 10 cases, but to

21   include all of the eight ARB drugs, even though none of the

22   other five are the subject of any recall.

23             So we -- we took issue with the five being added.

24   We also took issue with the Irbesartan and Losartan cases

25   being added because the numbers are really not materially

1    different today than it was back in January.  There were two

2    cases then and the JPML heard it, and there are only 10 cases

3    now.  So we -- we had to stay consistent with that view.  And

4    then on top of that, plaintiffs sough to expand the MDL for

5    all eight of these drugs as to any carcinogenic contaminant.

6    That's their phrase, any carcinogenic contaminant, when here

7    we're dealing with a few very specific impurities.  And so for

8    that reason, we also felt like it was reasonable to file an

9    objection.

10             THE COURT:  Thank you.  One other issue.  The

11   motions for extensions of time that came in from that Kentucky

12   counsel, hopefully that can be worked out without the Court

13   needing to address 30 or 35 or 40 motions for extensions of

14   time.  I -- I don't quite understand why it was necessary to

15   file those motions, but I just wonder if all that could be

16   worked out with a stipulation.

17             UNIDENTIFIED COUNSEL:  We can talk after we get done

18   here.  I mean I think it would probably be up to the defense

19   to enter into some sort of a stipulation.

20             THE COURT:  Wasn't it directed to -- was it directed

21   to just two parties?

22             UNIDENTIFIED COUNSEL:  I don't have it in front of

23   me, so I don't want to --

24             THE COURT:  Okay.

25             UNIDENTIFIED COUNSEL:  I don't want to make it up.

1      THE COURT:  You know what I'm talking about, Mr.

2  Goldberg?

3      MR. GOLDBERG:  I do, but we certainly will work this

4  out.

5      THE COURT:  Okay.  All right.  Last issue is the

6  custodian meet and confer process.  I think the Court's hope

7  was that over the next couple of hours there could be a meet

8  and confer process between the different defendants and the

9  plaintiffs.  And when we come back at 2:00, hopefully we'll

10  have a better idea of what the disputes are and how we can

11  foster a process to get this teed up in an efficient fashion.

12      If the Court can help, we're here.  We're here all

13  day.  And -- but I'm really looking to, you know, counsel to

14  help us help you.  What can we do to help foster this process?

15  Mr. Slater, if there are key discreet documents that would be

16  helpful to be produced, let us know.  If -- you know, we're

17  open to any ideas to move the process along.

18      I do think you ought to start discussing the

19  translation issue and not save it for the eleventh hour

20  because that looks like it's going to be a problematic issue

21  in the case.

22      So for the time being, for the good of the order,

23  are there any other issues or matters we should address?  From

24  plaintiffs?  I don't hear anything.  Defendants?  Okay.  We'll

25  adjourn and we'll come back at 2:00.

```
1            THE CLERK:  All rise.

2        (Court adjourned)

3                    * * * * *

4

5            C E R T I F I C A T I O N

6        I, Roxanne Galanti, court approved transcriber,

7    certify that the foregoing is a correct transcript from the

8    official electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11

12    _____        October 25, 2019

13    ROXANNE GALANTI

14    DIANA DOMAN TRANSCRIBING, LLC

15

16

17

18

19

20

21

22

23

24

25
```