# NORTON ROSE FULBRIGHT

Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas  75201-7932
United States

June 16, 2020

Direct line +1 214 855 8221
dlesli.davis@nortonrosefulbright.com

Tel +1 214 855 8000
Fax +1 214 855 8200
nortonrosefulbright.com

**VIA CM/ECF**
Honorable Joel Schneider, U.S.M.J.
U.S. District Court for the District of New Jersey
Mitchell S. Cohen Building & US Courthouse
1 John F. Gerry Plaza, Courtroom 3C
4th and Cooper Streets
Camden, New Jersey 08101

Re:    *In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*, No. 1:19-md-02875-RBK-JS (D.N.J.)

Dear Judge Schneider:

Pursuant to the Court's March 3, 2020 Order (ECF 388) and per the modified schedule approved by the Court on May 13, 2020, Wholesaler Defendants[1] ("Wholesalers") respectfully submit this letter brief ("Letter Brief") and supporting evidence to address the "macro" discovery disputes listed in Defendants' February 25, 2020 letter (ECF 383).

**Wholesaler RFPs Process and Draft RFPs:** Plaintiffs and Wholesalers have met and conferred to attempt to craft a set of Plaintiffs' Requests for Production ("RFPs") to Wholesalers that, at least topically, achieve the Court's directive to limit the current discovery to only the "most important information" and to "focus on what is genuinely needed and relevant at this stage of the case." Dec. 18, 2019 Email from Magistrate Judge Schneider to Counsel. Agreement in principle has been reached on the majority of RFPs.[2] However, some disputes remain,[3] so Wholesalers file this Letter Brief regarding the broad "macro" issues raised by the draft Wholesaler RFPs. Wholesalers agree that the active set of draft Wholesaler RFPs for the Court's consideration are those Plaintiffs filed as Docket No 413-3 ("the Draft RFPs").

---

[1] Wholesalers Defendants, collectively, are McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen.
[2] Practically speaking, Plaintiffs have not yet served any RFPs, and therefore, Wholesalers have not yet had the opportunity to object to formally-served RFPs. But "Macro Issues" – as identified by the parties – are to be decided by the Court in an effort to guide finalization of a formal set of RFPs. At the Court's instruction, Wholesalers attempt to present the broad issues raised by the Draft RFPs, but reserve the right to object to the actual RFPs served.
[3] Rather than focusing on the purported relevance of the documents they seek, Plaintiffs argue in their letter brief ("Pltf Ltr Brf") that Wholesalers should be required to produce certain documents because other Defendants have agreed to produce the same documents. Pltf Ltr Brf at 5 (ECF 413). Of course, the fact that the other Defendants have already agreed to provide the requested information to Plaintiffs is actually an argument *against* putting Wholesalers to the expense of a duplicative production. Additionally, Plaintiffs take pains to point out that Wholesalers are "not 'tiny' mom-and-pop shops" or "bit player entities," but instead that "all of them are in the Fortune 100." Pltf Ltr Brf at 1-2, 6 (ECF 413). As discussed in detail below, the financial size of Wholesalers is not relevant to the issues in the litigation and, therefore, not a proper basis to pursue document production.

**Plaintiffs' Objectionable Requests:** The four Draft RFPs that remain in dispute[4] seek the following objectionable information ("the Requested Information") (Draft RFPs, (ECF 413-3)):

**RFP 1**: Plaintiffs' Draft RFP 1 seeks a line listing with the *factual* details of *each individual* Wholesaler purchase of a VCD from each Defendant Manufacturer over an 8-year period ("Wholesaler Purchase Information"):

> For purchases of VCDs by you from Manufacturer Defendants during the time period from January 1, 2012 to December 31, 2019, produce documents sufficient to identify the dates of purchase, the quantities/units purchased, the NDC, batch and lot numbers, and expiration date (to the extent such information is maintained by you in the ordinary course of business and can be obtained following a reasonable search) for the VCDs purchased and the name of Manufacturer Defendant from whom the VCDs were purchased.

**RFP 3**: Plaintiffs' Draft RFP 3 seeks a line listing with the *factual* details of *each individual* Wholesaler sale of a VCD to a Defendant Retailer over an 8-year period ("Wholesaler Sale Information," with Wholesaler Purchase Information, collectively "Wholesaler Purchase/Sale Information"):

> For sales of VCDs by you to Retail Pharmacy Defendants during the time period from January 1, 2012 to December 30, 2019, documents sufficient to identify the quantities/units sold, the NDC, batch and lot numbers and expiration date (to the extent such information is maintained by you in the ordinary course of business and can be obtained following a reasonable search) and purchase name.

**RFP 2**: Plaintiffs' Draft RFP 2 is directed to the *financial* details of *each individual* Wholesaler purchase of a VCD from a Defendant Manufacturer over an 8-year period:

> The gross and net price paid by you for VCDs identified in Request No. 1.

**RFP 4**: Plaintiffs' Draft RFP 4 is directed to the *financial* details of *each individual* Wholesaler sale of a VCD to a Defendant Retailer over an 8-year period (collectively, with Draft RFP 2, "Wholesaler Profit Information"):

> The gross and net price paid by purchasers to you for VCD sales identified in Request No. 3.

**Wholesaler Objections**: In keeping with this Court's direction that Plaintiffs must focus on "genuinely relevant" information that is "genuinely needed at this stage of the case," Wholesalers object to the above Draft RFPs on the following grounds:

---

[4] Plaintiffs' Letter Brief asserts that certain items are in dispute that are not. Wholesalers do not dispute: (1) the definition of valsartan; (2) the discovery "start" date; (3) document retention policies (Draft RFPs No. 20 (ECF 413-3)); and (4) indemnification agreements (Draft RFPs No. 22 (ECF 413-3)). For clarity, Wholesalers will not object to these definitions, dates, or RFPs as stated in the Draft RFPs, with the one caveat that in their requested relief, Wholesalers ask that a more limited time period apply to discovery ordered as to them.

1. The Requested Information is **not relevant** to proof of Plaintiffs' claims;

2. To the extent Wholesalers have it, the Requested Information is not "genuinely needed" as it is **duplicative** of information to be produced by other Defendants;

3. The claims on which Plaintiffs base their need for the Requested Information **fail as a matter of law**;

4. The Requested Information is **highly proprietary** and constitutes **trade secrets** that cannot be preserved even by protective order; and

5. The Requests are **disproportionate** to the needs of the case and the Requested Information is **unduly burdensome** to produce.

**Evidence:** Wholesalers file herewith and incorporate as if set forth fully herein Exhibits A – F, declarations of Wholesaler employees, which demonstrate the information Wholesalers maintain, the availability and relevance of the Requested Information, and the disproportionality and burden to Wholesalers of the requested production:
   **Exhibit A:** McKesson DSCSA Declaration of Scott Mooney ("McK DSCSA Dec")
   **Exhibit B:** McKesson Purchase/Sale Information Declaration of Tara Abraham ("McK PSI Dec")
   **Exhibit C:** McKesson Profit Information Declaration of Brett Harrop ("McK Profit Dec")
   **Exhibit D:** Cardinal DSCSA Declaration of Douglas Redinger ("Card DSCSA Dec")
   **Exhibit E:** Cardinal Profit Information Declaration of Brian Renner ("Card Profit Dec")
   **Exhibit F:** AmerisourceBergen Declaration of Matthew Sample ("ABC Dec")

**Plaintiffs do not allege Wholesalers acted as anything but "Innocent Sellers":** In each of Plaintiffs' Master Complaints (Personal Injury Master Complaint ("PIC"), Medical Monitoring Class Action ("MMC") and Second Amended Consolidated Economic Loss Class Action ("ELC")), Plaintiffs do not allege that Wholesalers acted as anything but innocent, pass-through sellers of the VCDs with no knowledge prior to the 2018 Manufacturer recalls of any alleged defect.[5] PIC (ECF 122); MMC (ECF 123); ELC (ECF 398). "Innocent Seller" essentially means that a Wholesaler simply passes through product from Manufacturer to Retailer. It is not surprising, therefore, that Wholesaler documents are not relevant to the substantive issues in a case dealing with alleged contamination of an active pharmaceutical ingredient in India or China. Indeed, Plaintiffs allege Wholesalers *are* Innocent Sellers: Plaintiffs complain that Wholesalers failed to exercise any control over the manufacture, packaging or labeling of the VCDs. ELC ¶¶ 113, 233, 236, 253, 347, 411 (ECF 398). In this manner, Plaintiffs seek to impose on Wholesalers an entirely

---

[5] New Jersey's legislature in 1995 recognized the inequity of keeping in a case an innocent seller that merely distributed a product without knowledge of the alleged defect. As a result, the Legislature relieved innocent sellers of liability for all strict liability claims. N.J. Stat. Ann. § 2A:58C-9. This Act – and the parallel statutes in many other states (*see, e.g.*, Ala. Code §§ 6-5-501, 6-5-521 ; 18 Del. Code Ann. § 7001; Colo. Rev. Stat. § 13-21-402(2); Ga. Code Ann. § 51-1-11.1(b); Idaho Code § 6-1407; Ill. Ann. Stat., Ch. 735 § 5/2-621(a)-(c); Iowa Code § 613.18; Kan. Stat. Ann. § 60-3306; Ky. Rev. Stat. Ann. § 411.340; La. Rev. Stat. Ann. § 9:2800.52(5); Md. Code Ann. § 5-311; Minn. Stat. Ann. § 544.41; Miss. Code. Ann. § 11-1-63(h); Mo. Ann. Stat. § 537.762; Neb. Rev. Stat. § 25-21, 181; N.J. Stat. Ann. § 2A:58C-9; N.C. Gen. Stat. § 99B-2; N.D. Cent. Code §28-01.1-06.1; Ohio Rev. Code Ann. § 2307.78; S.D. Comp. L. § 20-9-9; Tenn. Code Ann. § 29-28-106; Tex. Civ. Prac. & Rem. Code Ann. § 82.003; Wash. Rev. Code Ann. § 7.72.040; Wash. Rev. Code Ann. § 7.72.040; Wis. Stat. Ann. §895.047(2)) – are an obvious death knell to Plaintiffs' claims based on strict liability, and, as discussed, *infra*, many of their other claims, including those masquerading as economic loss claims.

novel state-law duty Plaintiffs have themselves concocted. Those unrecognized, fabricated duties, such as the responsibility to test products for impurities or bioequivalence, directly contradict the federally-mandated drug supply chain regulations and are completely inconsistent with Wholesalers' status as Innocent Sellers. That state law protects Wholesalers as Innocent Sellers – yet Plaintiffs claim that Wholesalers are liable because they acted as Innocent Sellers – highlights the lack of legal soundness of their claims and the impropriety of their demand for information.

**The Requested Information is not relevant:** To support the four expansive discovery requests in dispute, Plaintiffs make only three arguments as to the "genuine relevance" of the Requested Information at this stage in the litigation – each of which are faulty. Plaintiffs make no other claims of relevance and any such arguments are therefore waived.[6]

As to Wholesaler Purchase/Sale Information, Plaintiffs argue that:

- *Wholesaler Purchase/Sale Information must contain lot-tracing information through to the Retailers.* Plaintiffs claim that the Purchase/Sale Information will reflect lot numbers of product sold by Wholesalers to Retailers. Pltf Ltr Brf Pgs. 2, 9 (ECF 413). **But Wholesalers do not track the lot numbers of their sales of product to Retailers.** Ex. A, McK DSCSA Dec ¶¶ 8, 34–35, 37–38, 46, 63–65; Ex. D, Card DSCSA Dec ¶¶ 3, 14–15; Ex. F, ABC Dec ¶¶ 2, 4, 13–14. In fact, Plaintiffs' own expert admits "it is true that primary wholesalers…lobbied for and ultimately received an exemption from the tracing requirements on the basis that the documentation and labeling requirements would be too onerous for them." Plaintiffs' Expert Declaration ("Pltf Exp Dec") ¶ 34 (ECF 413-1); *accord* DSCSA, 21 USCS § 360eee-1(c)(1)(A)(ii)(II). Thus, Plaintiffs' stated justification dies by their own expert's hand and by federal law. Though Wholesalers acknowledge Plaintiffs' desire to try to recreate the pharmaceutical supply chain for each VCD shipped, **no amount of Wholesaler discovery will allow Plaintiffs to map the transfer of product from Wholesalers into an individual Plaintiffs' hands.** Ex. A, McK DSCSA Dec ¶¶ 37, 61, 63–68; Ex. D, Card DSCSA Dec ¶¶ 3, 14–15; Ex. F, ABC Dec ¶¶ 4, 13–14. Wholesalers do not know, and there is no way for either Wholesalers or Plaintiffs to ascertain, which lot numbers went to which Defendant Retailer, let alone to an individual consumer. Ex. A, McK DSCSA Dec ¶¶ 37, 61, 63–68; Ex. D, Card DSCSA Dec ¶¶ 3, 14–15; Ex. F, ABC Dec ¶¶ 4, 13–14.

- *The Requested Purchase/Sale Information would provide "market share apportionment" information.* Plaintiffs and their expert make much of the calculations they could perform to arrive at Wholesaler VCD market share attributions, if only they

---

[6] On March 3, 2020, Magistrate Judge Schneider ordered Plaintiffs to serve their letter brief addressing the "macro" discovery disputes listed in Defendants' February 25, 2009 Letter (ECF 383). March 3, 3030 Order (ECF 388). As such, Plaintiffs were required to articulate the relevance and proportionality of the discovery in issue. Plaintiffs' April 13, 2020 Letter Brief and Plaintiffs' Expert Declaration, however, do not argue a theory of relevance beyond product tracing/lot numbers, market share apportionment and disgorgement of profits. *See In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018) (new issues and arguments cannot be raised in a reply brief that should have been raised in the initial brief because consideration of new issues raised for the first time in a reply brief would be prejudicial); *N.J. ex rel. Santiago v. Haig's Serv. Corp.*, No. 12-4797 (WJM), 2016 U.S. Dist. LEXIS 113188, at *21 n.5 (D.N.J. Aug. 24, 2016) ("A party may not raise a new argument in their reply brief, and axiomatically a new and undeveloped argument raised in a supplemental brief will not be considered.").

could gain access to Wholesaler Purchase/Sale Information. Pltf Ltr Brf Pg. 2, 6 (ECF 413); Pltf Exp Dec ¶¶ 13, 47 (ECF 413-1). In meetings, Plaintiffs have candidly stated that they seek market share information for their settlement ambitions. However, as the instant case is not an antitrust proceeding, it is fundamental that **market share is not relevant to any of the issues and should not support the imposition of disproportionate discovery.** *See Shackil v. Lederle Lab.*, 116 N.J. 155, 191 (N.J. 1989); *Namm v. Charles E. Frosst & Co., Inc.*, 178 N.J.Super. 19, 27 (App. Div. 1981).

As to Wholesaler Profit Information, Plaintiffs argue that:

- ***Wholesaler Profit Information would provide Plaintiffs with disgorgement of profits damage information.*** Despite twice amending their ELC, Plaintiffs and their expert concede that disgorgement as a remedy for unjust enrichment is the *only* pleaded claim to which Wholesaler Profit Information is arguably relevant. Pltf Ltr Brf, generally (ECF 413), Pltf Exp Dec ¶ 48 (413-1). Yet, **Plaintiffs fail to articulate any *fact* that would support the extraordinary remedy of disgorgement** or make the sought information relevant. ELC, generally (ECF 398). Further, as set forth more fully below, as a matter of law, disgorgement is not a remedy available to Plaintiffs' in their claims against Wholesalers. Finally, while Plaintiffs assert that Wholesaler Profit Information is "highly relevant," **Plaintiffs fail to articulate: 1) any connection between Wholesalers' Profit Information and any sort of damage model or calculation; and/or 2) any use whatsoever they would make of such information.** Pltf Ltr Brf Pg. 7 (ECF 413); Pltf Exp Dec, generally (ECF 413-1).

**Applicable legal principles:** Discovery, of course, may not be unfettered or used to conduct a fishing expedition in the hopes of finding some fact that supports the currently baseless allegations against Wholesalers.[7] To the contrary, a series of legal principles and balancing factor determine the permissible scope of discovery in a given matter:

**Choice of law:** Plaintiffs' various complaints at some point invoke the law of all 50 states, but Plaintiffs' letter brief does not address – or even acknowledge – the question of which law is applicable to the instant questions. In an effort to expedite the discussion before the Court, and because it is not feasible to do a 50 state survey in a discovery letter brief (and presumably the Court is not interested in such an exercise), we discuss New Jersey and federal law as an appropriate guidepost on relevance, claim viability, and discovery production obligations.

**Scope of discovery:** Under the Federal Rules of Civil Procedure ("the Rules"), trial courts have broad discretion to manage discovery matters, subject to review only for abuse of discretion. *Estate of Chance ex rel. Humphreys v. First Corr. Med., Inc.*, 329 Fed. Appx. 340, 342–43 (3d Cir. 2009). "Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is ***relevant to***

---

[7] A plaintiff may not use discovery to conduct a fishing expedition in hope that some fact supporting an allegation will be uncovered or to discover additional instances of wrongdoing beyond those already alleged. *Arena v. RiverSource Life Ins. Co.*, No. 2:16-cv-5063-JLL-SCM, 2017 WL 6513056, at *2 (D.N.J. Dec. 19, 2017); *Smith v. Lyons, Doughty, & Veldhuius, P.C.*, No. 07-5139, 2008 WL 2885887, at *5 (D.N.J. July 23, 2008). It is, in fact, an abuse of the judicial process to "bas[e] extensive discovery requests upon conclusory allegations in the hope of finding the necessary evidence" in support of a claim. *Munoz v. St. Maty-Corwin Hosp.*, 221 F.3d 1160, 1169 (10th Cir. 2000).

*any party's claim or defense and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis added).

**Information must be relevant and proportional:** "[T]he requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied." *Herbert v. Lando*, 441 U.S. 153, 177 (1979). Moreover, "[u]nder [the 2015 Amendments to] Rule 26, relevancy alone is not sufficient to obtain discovery. The requested discovery must also be proportional to the needs of the case." *Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co.*, No. 12-4934 (NLH/JS), 2017 WL 721105, at *2 (D.N.J. Feb. 23, 2017) (Schneider, M.J.) (citing *In re Bard IVC Filters Prod. Liab. Litig.*, 317 F.R.D. 562, 564 (D. Ariz. 2016)). The enforcement of the rule of proportionality is integral to the judicial mandate to "secure the just, speedy, and inexpensive determination" of the case. *Goodman v. Burlington Coat Factory Warehouse Corp.*, 292 F.R.D. 230, 233 (D.N.J. 2013) (Schneider, M.J.) (quoting Fed. R. Civ. P. 1.). As this Court stated in its September 18, 2019 Opinion and Order, information that is of marginal relevance to, and questionable benefit in resolving, the issues of the case should not be required for production. ECF 221 p. 10-11 (denying request for litigation funding information on proportionality grounds because it is "a 'side issue' that has nothing to do with addressing the key issues in the case such as what caused Defendants' valsartan contamination, whether the contamination caused any injuries, and whether Plaintiffs may recover under their theories of liability."). Furthermore, the fact that information may be obtained more easily from other sources weighs against a finding of proportionality. *The Sedona Conference Commentary on Proportionality in Electronic Discovery,* 18 Sedona Conf. J. 141 (2017) (hereinafter "*Sedona Commentary on Proportionality*") (Principle 2: "Discovery should focus on the needs of the case and generally be obtained from the most convenient, least burdensome and least expensive sources.").

**Discovery should not be unreasonably cumulative or duplicative:** Courts have the authority under Rule 26 to deny discovery requests for material that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2). The right to discovery is "not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999) (affirming district court's denial of unreasonably cumulative discovery request).

**Heightened protection for proprietary and trade secret pricing information:** Generally, confidential sales and pricing information can qualify as a trade secret. *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009); *see also Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 298–99 (N.J. 2001). The U.S. Supreme Court has held that trade secrets are property and thus are protected by the 5th Amendment Takings Clause. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–1004 (1984). Sales and pricing data is extremely valuable because of its confidentiality, and production would irreversibly destroy that value. *See id.* at 1011–12 ("The economic value of [trade secrets] lies in the competitive advantage over others that [their owner] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge."); *DTM Research, L.L.C. v.*

- 6 -

*AT&T Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (" 'proprietary aspect' of a trade secret flows, not from the knowledge itself, but from its secrecy. It is the secret aspect of the knowledge that provides value to the person having the knowledge."); *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 952 (10th Cir. 1978) ("ability to predict a competitor's bid with reasonable accuracy would give a distinct advantage to the possessor of that information.").

**The Purchase/Sale Information is not relevant and production would be disproportionate to the needs of the case:**

**The Purchase/Sale Information will not provide lot or product identification information:** Plaintiffs claim they need the Purchase/Sale Information to trace product from Wholesalers through to Defendant Retailers, preferably through the lot or batch information which they believe must exist in Wholesalers' files. Pltf Ltr Brf p. 1 (ECF 413). However, per the DSCSA's exclusive and preemptive product-tracing system that exempts Wholesalers from downstream lot tracing,[8] **Wholesalers do not create, provide, or retain records of where specific lots go via their downstream distribution to Retailer Defendants.**[9] Ex. A, McK DSCSA Dec ¶¶ 34–35, 37, 62–65; Ex. D, Card DSCSA Dec ¶¶ 3, 14–15; Ex. F, ABC Dec ¶¶ 2, 4, 13–14.

It is true that Manufacturers are required to send lot information when selling product to Wholesalers, but the law exempts Wholesalers, when they are included in the supply chain,[10] from tracing or passing on that lot information to Retailers**.**[11] DSCSA § 360eee-1(c)(1)(A)(ii)(II); Ex. A, McK DSCSA Dec ¶¶ 21–22, 27–29, 33–38, 43, 46, 62; Ex. D, Card DSCSA Dec ¶¶ 7–10, 12–13; Ex. F, ABC Dec ¶¶ 2–3. Thus, lot numbers are not passed along the entire supply chain, and Defendant Wholesalers do not know – nor is there information in Wholesalers' possession that would allow Wholesalers or Plaintiffs to determine – which lot numbers were sold to Defendant Retailers, let alone to which individual customer. Ex. A, McK DSCSA Dec ¶¶ 37, 61–68; Ex. D, Card DSCSA Dec ¶¶ 3, 14–15; Ex. F, ABC Dec ¶¶ 4, 13–14.

Plaintiffs' expert's suggestion that expiry dates of VCDs could be used to track where a VCD ended up through Wholesaler sales to Defendant Retailers also is incorrect. Pltf Exp Dec ¶ 40

---

[8] Plaintiffs' own expert acknowledges this Wholesaler Exemption from lot-level tracing: "it is true that primary wholesalers…lobbied for and ultimately received an exemption from the tracing requirements [including lot number] on the basis that the documentation and labeling requirements would be too onerous for them." Pltf Exp Dec ¶ 34 (ECF 413-1).

[9] Each Plaintiff's own pharmacy records will identify the Retailer involved in the sale and will reflect the NDC number of the drug received, which will allow Plaintiff to identify the Manufacturer. Nothing in Wholesalers' Sales/Purchase Information could do more than that. Ex. A, McK DSCSA Dec ¶¶ 37, 66–68; Ex. B, McK PSI Dec ¶¶ 31, 46; Ex. D, Card DSCSA Dec ¶¶ 3, 12–15; Ex. F, ABC Dec ¶¶ 4, 13–14.

[10] In many instances, Retailers purchase VCDs directly from Manufacturers, meaning Wholesalers will never have touched a given Plaintiff's VCD. The express lot number exemption in the DSCSA applies to Wholesalers such as Wholesaler Defendants who purchase directly from the manufacturer, from the exclusive distributor of the manufacturer, or from a repackager that purchased directly from the manufacturer. DSCSA § 360eee-1(c)(1)(A)(ii).

[11] Plaintiffs' expert references the Manufacturer lot number requirement to give the misimpression that lot information is available throughout the chain to the Retailer level. Pltf Exp Dec ¶¶ 8–10, 12 18, 32 (ECF 413-1). However, any time Plaintiffs' expert gets specific, he admits that lot number information from Wholesaler to Retailer does not exist and is not required to exist. Pltf Exp Dec ¶¶ 10 n.3, 34 (ECF 413-1).

(ECF 413-1). The DSCSA does not require tracking of expiry dates, and Wholesalers do not do so. Ex. F, ABC Dec ¶ 4; *see also* Ex. B, McK PSI Dec ¶¶ 31, 46. Beyond incorrect assumptions about lot numbers and expiry dates, Plaintiffs and their expert fail to offer to the Court any specific, actual use they could make of the eight years' worth of the other Requested Information. In contrast, Wholesalers have proven, with admissible evidence based on personal knowledge,[12] that there is no way to link sales shipments to Defendant Retailers by lot numbers or expiry dates. Ex. A, McK DSCSA Dec ¶¶ 37, 61–68; Ex. D, Card DSCSA Dec ¶¶ 3, 12–15; Ex. F, ABC Dec ¶¶ 4, 14. Plaintiffs have the burden to establish the relevance of their requests and to come forward with specific evidence of the actual use they would make of the data they seek. They have failed to do either, and they have failed to demonstrate any genuine need for the Purchase/Sale Information. Therefore, their request should be denied.

**Market share is an improper basis for production:** Plaintiffs' apparently attempt to avoid their burden to prove product identification and/or causation by claiming instead that they may substitute Wholesalers' respective shares of the market for actual proof. New Jersey law says no.[13] *Shackil*, 116 N.J. at 191; *Namm*, 178 N.J. Super. at 27; *Stanger v. APP Pharm., LLC*, No. 09-05166 (JAP), 2010 WL 4941451, at *2 (D.N.J. 2010). In fact, the New Jersey Supreme Court and lower courts have rejected this type of "market share liability" every time they have addressed the issue. *Shackil* 116 N.J. at 174; *Gannon v. Am. Home Prod., Inc.*, 211 N.J. 454, 464 (N.J. 2012); *Sholtis v. Am. Cyanamid Co.*, 238 N.J. Super. 8, 23 (App. Div. 1989); *Moreno v. Am. Home Prod., Inc.*, No. L-577-02, 2010 WL 4028605, at *5 (App. Div. July 12, 2010).

**Congress has also preempted use of state law to impose any burden on Wholesalers regarding product tracing:** The DSCSA has expressly preempted any State action to impose product tracing requirements (such as lot number) that are inconsistent with and/or more burdensome than the DSCSA and the Wholesaler Exemption therein. DSCSA § 360eee-4(a); Ex. A, McK DSCSA Dec ¶¶ 57–60. Plaintiffs' assertions that Wholesalers "should" or "must" possess information tracing lots into a Retailers' hands and their discovery pursuit of the Purchase/Sale Information as the means to that imagined lot tracing constitute use of the court system and state law to seek to impose such a prohibited burden and are preempted.

**Manufacturers and Retailers have already agreed to produce the Wholesaler Purchase/Sales Information:** Manufacturers and Retailers have already agreed to provide the very information Plaintiffs request from Wholesalers in Draft RFPs 1 and 3. Specifically, Defendant Manufacturers have agreed to produce line listings with the factual details of each sale of a VCD to each Defendant Wholesaler from 2012-2019 – *i.e.*, the same information sought by Draft RFP 1. Indeed, were Wholesalers made to produce that information,[14]

---

[12] Wholesalers' declarations are based on Wholesaler employees' personal knowledge and information obtained during the course of their job duties and responsibilities. Ex. A, McK DSCSA Dec ¶¶ 1–3; Ex. B, McK PSI Dec ¶¶ 1–3; Ex. C, McK Profit Dec ¶¶ 1–2; Ex. D, Card DSCSA Dec ¶ 1; Ex. E, Card Profit Dec ¶ 1; Ex. F, ABC Dec ¶ 1.

[13] In addition market share liability theory's conflict with applicable law, Plaintiffs' theory fails because they do not even attempt to account for the entire wholesale VCD market. Plaintiffs made no attempt to name all VCD Wholesalers, naming only the three largest Distributors.

[14] As noted above, Wholesalers receive lot information from Manufacturers but do not pass it down to Retailer Defendants. Ex. A, McK DSCSA Dec ¶¶ 33–38, 43, 46; Ex. D, Card DSCSA Dec ¶¶ 7–10, 12–13; Ex. F, ABC Dec ¶¶ 2–4, 13. That lot information comes to Wholesalers through documentation from Manufacturers; this is the very information which Manufacturers have agreed to produce. As a result, there is no justification to impose this

Plaintiffs would literally receive the same information twice: once from Manufacturers who sent it originally and once from Wholesalers who received it.[15]

On the downstream end, Defendant Retailers have also agreed to produce the factual details of each purchase of a VCD from each Defendant Wholesaler from 2012-2019 – *i.e.*, the same information sought by Draft RFP 3. Retailers' Macro Discovery Letter Brief ("The Retail Pharmacy Defendants agreed to produce, where available, centrally stored documents sufficient to identify, in brief: (1) the valsartan purchased by them from January 1, 2012 through the end of 2019. . .").

**Production of the Purchase/Sale Information would impose an undue burden:** Moreover, to require Wholesalers to compile the Purchase/Sale Information would impose an undue burden in terms of actual cost, time required, and personnel opportunity costs, as employees would be diverted from other tasks, while not providing meaningful case information. Ex. B, McK PSI Dec ¶ 47; Ex. F, ABC Dec ¶ 15. For example, the burden for McKesson to pull the Requested Information for just the *recalled* NDC numbers is substantial, never mind the cost involved to pull the information for all non-recalled VCD numbers sold over eight years. Specifically, it would take the employee able to run these reports 3 hours to query and pull a report reflecting purchase and sales of just one NDC number for one year. Ex. B, McK PSI Dec ¶¶ 14–29, 32–44, 47. The FDA website reflects 139 recalled VCDs. The cost to McKesson of this employee's time is $39.10 per hour. Ex. B, McK PSI Dec ¶ 47. Thus, the cost to produce the Purchase/Sale Information for just the *recalled* NDCs would be:

139 NDCs x 3 hours = 417 hours to generate 1-year reports for each recalled NDCs
417 hrs x 8 years requested = 3336 hours to generate 8-year reports for all recalled NDCs
$39.10/hour x 3336 hours = $130,437.60 to generate 8-year reports for all recalled NDCs

In sum, it would take this McKesson employee more than 83 40-hour work-weeks (1.5 years, if no vacation) and cost McKesson $130,437.60 just to run the *recalled* VCD NDC numbers. Once the non-recalled VCDs are included, the cost is significantly multiplied. For the reasons set forth above, the burden cannot be justified.

**Wholesaler Profit Information is not relevant to Plaintiffs' claims and production would be disproportionate to the needs of the case:**

**Plaintiffs have not demonstrated entitlement to Wholesaler Profit Information:** Plaintiffs fail to offer any reason *why* Wholesaler Profit Information is relevant to their claims – other than the sole justification that Wholesaler Profit Information reflects the profits they hope to disgorge from Wholesalers pursuant to their claim of unjust enrichment and the corresponding

---

burdensome, irrelevant, and duplicative discovery that will not "advance the ball" in any way. *Goodman*, 292 F.R.D. at 234; *Eisai, Inc. v. Sanofi-Aventis* U.S., LLC, No. 08-4168 (MLC), 2012 WL 1299379 (D.N.J. Apr. 16, 2012) (striking requests that sought material duplicative of information already produced and with marginal relevance).

[15] At minimum, Plaintiffs should be required to receive this information first from Manufacturers and Retailers and make a showing of need before seeking to turn Wholesalers' operations upside down for the same information. *See Sedona Commentary on Proportionality* at 157–158 (noting that "the court, or the parties on their own initiative, may find it appropriate to conduct discovery in phases, starting with discovery of clearly relevant information available from the most accessible and least expensive sources.").

remedy of disgorgement of profits. Only the ELC includes a claim of unjust enrichment, though all complaints list disgorgement as a remedy.[16] ELC ¶¶ 555–566 (ECF 398). Fatally, however, none of Plaintiffs Complaints allege any *factual wrongdoing by Wholesalers* that would support the extraordinary remedy of disgorgement.

**Plaintiffs and their expert articulate no specific need for or potential use of Wholesaler Profit Information:** Plaintiffs and their expert make no claim of need for, or potential use of, Wholesaler Profit Information. They provide no damage model that requires its use, and they devote not a single paragraph to its purported value to the litigation. Pltf Exp Dec ¶ 48 (ECF 413-1). Nor could they, as Wholesaler Profit Information has no bearing on Plaintiffs' alleged damages: medical expenses, the cost of medical monitoring, and the amounts spent by Plaintiffs, plus fees, less discounts, on VCDs.[17] The line listing of Requested Information over the course of eight years, as well as the price charged by a Wholesaler for each individual sale of a VCD over those eight years (and Wholesalers' profits, more generally), have no bearing whatsoever on the actual or statutory damages that Plaintiffs could even theoretically recover. Even if arguably relevant, given the barren state of the pleadings and the absence of support for Wholesaler Profit Information in the expert declaration, the request is, at a /minimum, premature.

**Manufacturers have already agreed to produce the portion of Wholesalers' Profit Information that exists:** Further, Manufacturers have *agreed* to produce line listings of their sales to Wholesalers, including the price charged. This is the same "gross price" information sought from Wholesalers in Draft RFP 2.

**Wholesalers do not keep in the ordinary course of business "net price" or profit information and creation would be unduly burdensome:** Wholesalers neither calculate nor maintain net pricing (profits) information on VCDs on either a product or individual transaction basis in the ordinary course of business. Ex. C, McK Profit Dec ¶¶ 6–8, 21; Ex. E, Card Profit Dec ¶¶ 2, 8–9, 12; Ex. F, ABC Dec ¶ 16;. Such reports would need to be created uniquely for this discovery.[18] Ex. C, McK Profit Dec ¶¶ 6–11, 21–23; Ex. E, Card Profit Dec

---

[16] Plaintiffs' PIC Prayer for Relief generally demands "restitution and disgorgement of profits," but it is unlinked to – and unrecoverable under – the claims pleaded. PIC p. 116 (ECF 122). The MMC contains neither a claim for unjust enrichment nor a demand for disgorgement. MMC (ECF 123). As a result, Wholesalers' discussion of the availability of disgorgement as a remedy – and the corresponding implications on the relevance of the discovery Plaintiffs seek – is to the PIC and ELC. Wholesalers nevertheless reserve and do not waive any objections to the MMC, including but not limited to the sufficiency of the pleadings and Plaintiffs' failure to allege claims on which relief can be granted, which will be briefed in forthcoming FRCP 12 motions.

[17] With the exception of disgorgement – which is a legally unavailable remedy with respect to Wholesalers, as discussed in detail *infra* page ____ – all of the documents Plaintiffs need to attempt to prove their claimed remedies are necessarily within the possession, custody and control of parties other than Wholesalers: PI and MM Plaintiffs have knowledge of their own actual and projected medical and monitoring expenses and pain and suffering, and Individual and TPP Plaintiffs have knowledge of their own out-of-pocket/payments for VCDs via copay or coverage

[18] Wholesalers should not be required to create new documents or information. *Wilson v. Wash. Metropolitan Area Trans. Auth.*, No. CV 05-2146 (GK)(AK), 2008 WL 11408470, at *2 (D.D.C. Mar. 4, 2008); *see Harlow v. Sprint Nextel Corp.*, No. 08-2222-KHV-DJW, 2013 WL 6185690, at *6 (D. Kan. Nov. 26, 2013) (denying motion to compel where responding party represented that a responsive data dictionary did not exist). In the context of productions of structured data, the parties "must consider the database as it is, not as it could be." *The Sedona Conference Database Principles Addressing the Preservation and Production of Databases and Database Information in Civil Litigation*, 15 Sedona Conf. J. 171, 193 (2014).

¶¶ 2, 9–10, 12. And even if the underlying information required for such calculations still exists and could be extracted and teased out of the mix of other factors that drive pricing on a customer level, the process to determine Wholesalers' profits for requested transactions would be highly burdensome. Ex. C, McK Profit Dec ¶¶ 9–11, 14–15, 18, 22–23; Ex. E, Card Profit Dec ¶¶ 3, 8–24; Ex. F, ABC Dec ¶¶ 17, 19–22. Plaintiffs have demanded eight years of data on individualized and constantly changing chargebacks, expenses, overhead, and taxes for each purchase and sale to and from the many Retailer and Manufacturer Defendants. *See, e.g.,* Ex. C, McK Profit Dec ¶¶ 10, 14–15, 18, 22–23; Ex. E, Card Profit Dec ¶¶ 5–11, 20–22, 24; Ex. F, ABC Dec ¶¶ 8–12, 17, 20–22.

- Compliance would require Wholesalers to identify, disinter, and export a staggering amount of uncoordinated contractual and transactional information in various formats from various locations in varying states of completeness and usability; to integrate and normalize these information streams in a customized database; and then to calculate and validate the demanded pricing. *See, e.g.,* Ex. E, Card Profit Dec ¶¶ 4–24.
- Such information – if it is even still in existence given the extended time period – would need to be individually sourced from a variety of active, archived, and legacy systems, some of which are decommissioned and whose administrators have long since departed the scene and are unavailable to aid in the process. *Id.* ¶¶ 8, 12–24.
- A veritable army of internal and external IT, programming, accounting, sales, business units, managerial, and consulting resources would be required to even try to calculate such information – with little likelihood of obtaining reliable figures. *Id.*

**Wholesaler Profit Information is proprietary and trade secret privileged:** As set forth specifically in the declarations filed herewith, Wholesaler Profit Information is proprietary to Wholesalers and constitutes trade secrets.[19] Ex. C, McK Profit Dec ¶¶ 12–13, 16–20, 24–25; Ex. E, Card Profit Dec ¶¶ 25–30; Ex. F, ABC Dec ¶¶ 18, 20–23. Plaintiffs have made no showing to justify production of such protected information.

**Plaintiffs provide no meaningful authority for their request:** Plaintiffs' out-of-pocket alleged damages in this case derive from prices paid for VCDs and/or medical treatment and monitoring, amounts on which Wholesalers' profits have no bearing. Glaringly absent from Plaintiffs' Letter Brief is on-point case law that would support their claim for the exceedingly confidential and proprietary Wholesaler Profit Information. Indeed, the entirety of Plaintiffs' Letter Brief cites only three inapposite cases. Two of the three cases are clearly inapplicable to the instant case; they involve antitrust claims that are based on claims of anticompetitive market share. *In re Androgel Antitrust Litigation (II)*, No. 1:09-MD-2084-TWT, 2012 WL 12895205, at *1 (N.D. Ga. Mar. 29, 2012) (antitrust); *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26, 35 (D.D.C. 2007) (antitrust). The third case, *Hasemann*, is a price inflation case, where the difference between wholesale and retail price was directly relevant to

---

[19] It is true that the financial documents produced by Manufacturers and Retailers will greatly overstate Wholesalers' profits, and that given the highly proprietary/trade secret nature of those figures, Wholesalers do not believe a protective order is sufficient to protect that information. Ex. C, McK Profit Dec ¶¶ 10–13, 16–20, 23–25; Ex. E, Card Profit Dec ¶¶ 28–30; Ex. F, ABC Dec ¶¶ 17–18, 20–23. However, if the Court will table ordering additional production of Wholesaler Profit Information, Wholesalers believe the disgorgement remedy will be dismissed on Rule 12 motions and the overstatement issue, at least, will be moot.

whether the product manufacturer acted inappropriately in pricing its product: "To the extent that Gerber's pricing is based on market competition, the retail and wholesale prices charged by Gerber's competitors are relevant to whether Gerber charged a premium for Good Start Gentle baby formula." *Hasemann v. Gerber Prod. Co.*, No. 2:17-CV-0093, 2018 WL 5651210, at *2 (E.D.N.Y Aug. 28, 2018) (unfair trade practices and false advertising). Unlike *Haseman*, the instant case involves Plaintiffs' out-of-pocket damages – from medical expenses to prices paid for VCDs, amounts on which Wholesalers' profits have no bearing.

**Plaintiffs lack the required privity for a disgorgement remedy:** Notwithstanding that the ELC lacks factual allegations sufficient to satisfy the pleading standard for an unjust enrichment cause of action, and that the PIC lacks a claim of unjust enrichment altogether, neither the PIC Plaintiffs nor the ELC Plaintiffs may assert an unjust enrichment cause of action – or be awarded a corollary disgorgement remedy – against Wholesalers as a matter of law.[20] New Jersey law requires privity for an unjust enrichment cause of action. *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 619–21 (S.D.N.Y. 2005) (dismissing unjust enrichment claim due to lack of privity, a necessary element of an unjust enrichment claim under New Jersey law); *In re: Cheerios Mktg. & Sales Practices Litig.*, No. 09-cv-2413, 2012 U.S. Dist. LEXIS 128325, at *36–38 (D.N.J. Sep. 10, 2012) (holding that disgorgement is not available (1) from "innocent recipients" or "inadvertent tortfeasors," (2) when a consumer purchases specific goods and receives those same specific goods, or (3) when unjust enrichment is not a viable theory). Wholesalers are simply middlemen who purchase from Manufacturers and sell to Retailers and are therefore not in privity with the PIC Plaintiffs, the ELC Consumer Plaintiffs, or the ELC TPP Plaintiffs. As a result, the ELC unjust enrichment claim, which must be dismissed, cannot justify a burdensome production.

**Disgorgement is not an available remedy for the causes of action in the PIC:** Wholesaler Profit Information is not relevant, because the related remedy is not available. The PIC's causes of action fall into three categories: (1) traditional product liability causes of action that are governed by the New Jersey Product Liability Act ("NJPLA"); (2) causes of action that are subsumed by the NJPLA; and (3) breach of express warranty, a cause of action explicitly permitted by the NJPLA that fails here. NJPLA, N.J. Stat. Ann. § 2A:58C-1(b)(3).

> Disgorgement is not available under the NJPLA: The vast majority of Plaintiffs' PIC claims are cognizable exclusively under the NJPLA. PIC Plaintiffs' claim for strict liability for manufacturing defects, design defects, and failure to warn ("Category 1") are traditional products liability claims that are governed by the NJPLA. *Mendez v. Shah*, 28 F. Supp. 3d 282, 296 (D.N.J. 2014). The vast majority of the PIC Plaintiffs' other claims – negligence, negligence per se, breach of implied warranty, fraud, negligent misrepresentation, and breach of consumer statutes ("Category 2") – are subsumed within the NJPLA; these PIC

---

[20] Wholesalers do not marshal or present all of their forthcoming 12(b)(6) arguments or authorities herein and ask this court to refrain from decisions on these issues until Wholesalers' 12(b)(6) motions and briefing are filed with this court for consideration and decision. Nonetheless, Wholesalers highlight some of the core problems with Plaintiffs' claims to demonstrate their impact on relevance determinations and to demonstrate that burdensome discovery should not be ordered from such tenuous allegations – or should at least be deferred until this court's rulings on the Rule 12(b) motions.

claims cannot be brought separately from or in addition to claims under the NJPLA.[21] *D'Apuzzo v. SmithKline Beecham Corp. (In re Avandia Mktg*.), No. 1871, 2013 U.S. Dist. LEXIS 148641, at *5–6 (E.D. Pa. Oct. 15, 2013), *aff'd, In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 588 F. App'x 171 (3d Cir. 2014). Since disgorgement is not an available remedy under the NJPLA, the PIC Plaintiffs cannot recover disgorgement for any Category 1 or 2 claims.

Disgorgement is not available under New Jersey's Uniform Commercial Code ("UCC"): The one claim that is not under or subsumed by the NJPLA and which may be brought separately from or in addition to the NJPLA causes of action is the claim for breach of express warranty. *Indian Brand Farms v. Novartis Crop Prot., Inc.*, 890 F. Supp. 2d 534, 539 (D.N.J. 2012) (the NJPLA governs any claim "for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty") (quoting NJPLA § 2A:58C-1(b)(3)). The PIC, however, fails to include any specific factual allegations whatsoever that would establish any express warranties made by Wholesalers. Moreover, the UCC does not permit recovery of disgorgement for breach of warranty claims. Instead, the UCC expressly provides that the proper measure of damages for breach of warranty is the benefit-of-the-bargain, *i.e.* the difference between the value of the goods accepted versus the value as warranted. New Jersey Uniform Commercial Code ("UCC") N.J. Stat. § 12A:2-714(2).[22] The UCC expressly provides the two equitable remedies that are allowed under the UCC – neither of which is disgorgement – and the specific situations in which those two equitable remedies may be recoverable under the UCC – neither of which are applicable here.[23] UCC § 12A:2-716. In short, the UCC expressly enumerates the permissible monetary and equitable remedies available for breach of warranty, and disgorgement is not one of those remedies. Since disgorgement is not available to the PIC Plaintiffs under the NJPLA or the UCC, Wholesaler Profit Information is not relevant to any claim or alleged damage asserted against Wholesalers in the PIC.

**Disgorgement is not an available remedy for the causes of action in the ELC:** Plaintiffs are not entitled to disgorgement under their remaining ELC claims either, as set forth below. Thus, Wholesaler Profit Information is not relevant, as the related remedy is not available.

Disgorgement is not available for causes of action subsumed by the NJPLA: The NJPLA created "one unified, statutorily defined theory of recovery for harm caused by a product[.]" *In re Lead Paint Litig.*, 191 N.J. 405, 436 (2007) (quoting William A. Dreier et al., New Jersey Products Liability & Toxic Torts Law § 1:2-1 (2007)); *accord Sinclair v. Merck & Co., Inc.*, 195 N.J. 51, 66, 948 A.2d 587, 596 (2008) ("The PLA represents a clear legislative intent that . . . the PLA is paramount when the underlying claim is one for harm

---

[21] The NJPLA's subsumption of these causes of action will be set forth more fully in Wholesaler Defendants' forthcoming FRCP 12 motion and briefing. Wholesaler Defendants mention them in brief here given their implications on the purported relevance of the Wholesaler Profit Information.

[22] In a proper case, any incidental and consequential damages under [Section 12A:2-715] may also be recovered. UCC § 12A:2-714(3). The UCC defines incidental and consequential damages, neither of which includes disgorgement. UCC § 12A:2-715(1)–(2).

[23] The only equitable remedies the UCC permits are special performance and/or replevin in certain circumstances. UCC § 12A:2-716.

caused by a product."). As a result, the NJPLA subsumes "virtually all possible causes of action" relating to product-caused harm. *In re Avandia Mktg.*, 2013 U.S. Dist. LEXIS 148641, at *5-7 (citations omitted), *aff'd,* 588 F. App'x 171 (3d Cir. 2014).

To determine whether the ELC's claims are, in fact, product liability actions exclusively governed by the NJPLA, this Court "must evaluate the essential nature of the claims represented and decide whether, at their core, Plaintiff's claims would traditionally be considered as products liability claims." *Indian Brand Farms*, 890 F. Supp. 2d at 544. New Jersey courts have routinely acknowledged that "the classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA." *Tawil v. Ill. Tool Works, Inc.*, No. 15-8747 (FLW) (LHG), 2016 U.S. Dist. LEXIS 105964, at *9 (D.N.J. Aug. 10, 2016) (quoting *In re Lead Paint Litig.*, 191 N.J. at 437). The whole of the ELC's substance is based on a bedrock of classic tort law duty allegations: Plaintiffs allege Defendants failed to warn consumers, doctors, and the FDA about the presence of dangerous, cancer-causing carcinogens in their VCDs and failed to make and/or distribute safe VCDs without this harmful chemical.[24] ELC ¶¶ 2, 312–334, 338, 353 (ECF 398); *see also Bailey v. Wyeth, Inc.*, 424 N.J. Super. 278, 330–333 (Super. Ct. 2008).

Plaintiffs' pleading of an "economic loss" case does not help them dodge the NJPLA. *See e.g., DeBenedetto v. Denny's, Inc.*, 421 N.J. Super. 312, 327 (Super. Ct. 2010). "Limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA. . . . Simply 'articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals' does not obviate the NJPLA's reach." *McDonough v. Bayer Healthcare, LLC,* No. 10-442, 2011 U.S. Dist. LEXIS 56511, at *8 (D.N.J. May 26, 2011) (quoting *Vercellono v. Gerber Prods. Co.*, Civ. No. 09-2350, 2010 U.S. Dist. LEXIS 9477, at *20 (D.N.J. Feb. 3, 2010)).

The District of New Jersey has recently encountered this very issue and determined, "regardless of how a claim is pleaded, where the core issue is the harmfulness of the product's chemicals, the claim must be pleaded as an NJPLA claim." *Id.* (citing *Crouch v. Johnson & Johnson*, Civ. No. 09-2905, 2010 WL 1530152, at *7 (D.N.J. April 15, 2010)). Therefore, most of Plaintiffs' ELC claims – namely, breach of implied warranty of merchantability and fitness, fraud, negligent misrepresentation/omission, violation of state consumer protection laws, negligence, and negligence per se – where the core issue is the harmfulness of the product's chemicals – are exclusively NJPLA claims – and New Jersey's Innocent Seller statute precludes *any* recovery from Wholesalers under the NJPLA, and certainly not the extraordinary remedy of disgorgement. *See* NJPLA § 2A:58C-9.

Disgorgement is not available for causes of action governed by the UCC: The few ELC claims that are not subsumed by the NJPLA – breach of express warranty and violation of the Magnuson-Moss Act – also do not permit Plaintiffs an award of disgorgement of

---

[24] Indeed, the very existence of the simultaneous PIC and MMC actions demonstrates that personal injury and/or risk are at the heart of the events made the basis of the ELC. Moreover, the classes defined in the ELC include Plaintiffs who allege they suffered physical injury and/or require medical monitoring.

- 14 -

profits. As explained above, the UCC explicitly provides the remedies properly recoverable under it, and disgorgement is not one of them. UCC §§ 12A:2-714(2), 715(1)–(2), 716. And since disgorgement is not a remedy available under the UCC, nor is it available under the Magnuson-Moss Act. *See Rose v. A & L Motors Sales*, 699 F. Supp. 75, 76 (W.D. Pa. 1988) (citing *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1069 (5th Cir. 1984)) ("Punitive damages are recoverable under the Act for breach of warranty only if they may be recovered in a breach of warranty action brought under the governing state law.").

Even if the Court were to reject the New Jersey case law holding that the ELC is, at its core and in substance, a manufacturing defect product liability action governed by the NJPLA, disgorgement is still unavailable – as in so doing the Court would have inherently concluded that Plaintiffs' ELC case sounds in contract[25] (and therefore is governed by the UCC). As discussed above, disgorgement is not available under the UCC or the Magnuson-Moss Act.

In sum, ***whether the ELC claims are governed by the NJPLA as sounding in tort or by the UCC as sounding in contract, Plaintiffs may not recover disgorgement as a matter of law.*** Therefore, Plaintiffs' demand for Wholesaler Profit Information is not relevant to any claim or damage asserted and should not be ordered produced.

**Requiring production of the vast Wholesaler Profit Information is disproportionate to the needs of the case:** The demand for Wholesaler Profit Information not only fails the Rule 26 relevance test, it also fails its proportionality test. *First,* even assuming, *arguendo*, some limited relevance, the significant and non-speculative **burden and expense** to Wholesalers of producing Profit Information outweighs any purported benefit to Plaintiffs**.** *See, e.g.,* Ex. C, McK Profit Dec ¶¶ 9–11, 22–23; Ex. E, Card Profit Dec ¶¶ 3, 9–13, 19–24; Ex. F, ABC Dec ¶ 17. In contrast to Wholesalers' concrete evidentiary showing of burden to create and collect the Profit Information sought, Plaintiffs have done nothing more than float legally defective theories and conclusory assertions of potential need. Their struggle to articulate a viable basis for imposing this burden on Wholesalers demonstrates the lack of justification for such discovery. *See Capetillo v. Primecare Med., Inc.*, No. 14-2715, 2016 WL 3551625, at *2 n.2 (E.D. Pa. June 28, 2016) (discovery request for medical complaints over 5-10 year period unduly burdensome and therefore limited to fractional time period and by subject matter because it triggered onerous manual review of database).

*Second,* production of this duplicative information from Wholesalers would not help in resolving the issues in this matter. *See Sedona Commentary on Proportionality*, cmt. 4.a at 162 ("court may limit discovery if the information sought, while relevant, is **not sufficiently important to warrant its production**. This issue often arises when discovery requests seek information that is duplicative, cumulative or not reasonably accessible."). Instead, the information would simply require reconciliation with other datasets, confounding the issues, increasing the work, and impeding the just, speedy, and efficient determination of the case.

---

[25] In this scenario, the Economic Loss Doctrine, which precludes recovery in tort for a party's failure to perform under a contract when the harm suffered consists only of the economic loss from the respective contract, would bar Plaintiffs' ELC claims for fraud, negligent misrepresentation/omission, negligence, and negligence per se.

*Third,* the discovery would **unnecessarily divert the resources of Wholesalers** – each a health care company. Wholesalers have committed to discovery of significant (but not unlimited) information to get Plaintiffs what is reasonable at this stage of the matter. The demanded pricing information will serve little purpose other than driving up these expenditures of human and monetary capital that are sorely needed for other purposes, particularly in the midst of an unprecedented global pandemic. *See Sedona Commentary on Proportionality*, cmt. 5.d at 172 (noting that "it may not be appropriate in some instances to require a party … to divert its personnel and other assets to discovery tasks at the expense of the party's intended purposes.") (citing *Major Tours, Inc. v. Colorel*, CIV. 05-3091 JBSJS, 2009 WL 3446761, at *4 (D.N.J. Oct. 20, 2009) (Schneider, M.J.), *aff'd,* 720 F. Supp. 2d 587 (D.N.J. 2010) (protecting NJ agency from production based on proportionality, where it already had spent significant sums on the matter and "[n]o party, including the State, has an unlimited litigation budget to pay for document production efforts that in all likelihood are of marginal benefit.").[26]

## RELIEF SOUGHT BY WHOLESALERS

**Deny all Draft RFPs in issue and issue a protective order:** Wholesalers submit that the totality of the circumstances, Plaintiffs' allegations, evidence before the Court, and arguments of counsel with regard to Plaintiffs' Draft RFPs 1-4 demonstrate that the Requests are improper and the Requested Information should not be ordered to be produced. The Court should strike Plaintiffs' Draft RFPs 1-4 and issue a protective order shielding Wholesalers from such Requests for the reasons set forth above.

**Alternatively, stay Draft RFPs 1-4 pending Rule 12 decisions:** Alternatively, Wholesalers request the Court stay the Draft RFPs at issue (1-4) and continue its ruling on those Requests until such time as the Court has ruled on the Rule 12 motions of Wholesalers and the other Defendants. Each of the factors weighs in favor of staying the discovery sought by the four Draft RFPs to which Wholesalers object. There is no prejudice to Plaintiffs, as all other discovery would proceed. As set forth in declarations, denial of the stay would impose a clear hardship that might be avoided altogether by the 12(b)(6) rulings.[27] The stay – pending 12(b)(6) rulings – would allow for

---

[26] The other 26(b)(1) factors do not argue in favor of discovery. Neither the size of a corporate defendant, nor the amount of claimed damages, justifies a highly burdensome, make-work information demand. *See* Fed. R. Civ. Proc. Advisory Cmt. Note, Rule 26 (Dec. 1, 2015) ("So too, consideration of the parties' resources does not … justify unlimited discovery requests addressed to a wealthy party."). Further, Plaintiffs here will not struggle with limited access to this information, as it will be produced by Retailers and Manufacturers. For the same reason, requiring Wholesalers to create the demanded information would not advance any important interest.

[27] Wholesalers herein reference Rule 12(b)(6) motions. Additionally, personal jurisdiction is "an essential element of the jurisdiction of a district court without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999). "A court without personal jurisdiction is powerless to take further action." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999). In the similar context of a pending transfer motion under 28 U.S.C. § 1404(a), the Third Circuit held that the district court should decide the motion before allowing merits discovery. *See McDonnell Douglas Corp. v. Polin*, 429 F.2d 30, 31 (3d Cir. 1970) (per curiam). Wholesalers have and do not waive objections to personal jurisdiction in this Court.

clarification of the claims in play and on which discovery is potentially available and there is no current trial date set.[28]

**Shift costs to Plaintiffs:** In light of Plaintiffs' allegations, the law, and counsel's argument, Wholesalers request that the Court order appropriate cost-shifting to Plaintiffs of any costs associated with any production ordered. Where the requested discovery is only of marginal relevance compared to the expense involved in production, courts utilize the Marginal Utility test to shift costs from the producing party to the requesting party.[29] *McPeek v. Ashcroft*, 202 F.R.D. 31, 34 (D.D.C. 2001). Additionally, given the complete absence of alleged facts supporting claims of Wholesaler wrongdoing, Wholesalers essentially appear in the case as third-party discovery targets requested to turn over eight years of expansive and sensitive company information. The Requested Information will not assist Plaintiffs to advance their case, even against the other Defendants. Consequently, Plaintiffs should bear the costs of any production ordered from Wholesalers.

Very truly yours,

*/s/ D'Lesli M. Davis*
D'Lesli M. Davis
Norton Rose Fulbright
Counsel for McKesson Corporation

*/s/ Elizabeth K. Norris*
Elizabeth K. Norris
Norton Rose Fulbright
Counsel for McKesson Corporation

*/s/ Jeffrey D. Geoppinger*
Jeffrey D. Geoppinger
Ulmer & Berne LLP
Counsel for AmerisourceBergen

*/s/ Andrew D. Kaplan*
Andrew D. Kaplan
Crowell & Moring LLP
Counsel for Cardinal Health, Inc.

---

[28] *Wholesalers do not propose staying all Wholesaler discovery*, just these four highly sensitive and irrelevant Requests. It is well-settled that trial judges have broad discretion in determining whether to stay discovery pending dispositive motions based on the good cause balancing test which weighs: (1) whether a stay would unduly prejudice or present clear tactical disadvantage to the non-moving party; (2) whether denial of stay would create a clear case of hardship or inequity for the moving party; (3) whether a stay would simplify the issues and the trial of the case; and (4) whether discovery is complete and/or a trial date has been set." *Akishev v. Kapustin*, 23 F.Supp. 3d 440, 446 (D.N.J. 2014); *see also* Fed. R. Civ. P. 26(c)(1); *Mann v. Brenner*, 375 F. App'x 232, 239 (3d Cir. 2010).

[29] Under Rule 26(c), a responding party may seek a protective order that specifies "the allocation of expenses" where the party would otherwise suffer "undue burden or expense."