# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

### DECLARATION OF ZACHARY MIKULAK

I, Zachary Mikulak, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1. I am authorized to provide this declaration on behalf of Walgreens Boots Alliance, Inc. ("Walgreens"), a Defendant in the above-captioned proceeding.

2. I have worked at Walgreens for fourteen (14) years and am employed as Senior Director, Generic Purchasing and Analytics. In that role, I oversee two teams: (1) category managers, who are responsible for Walgreens' interaction with the more than one hundred (100) generic manufacturers from whom Walgreens sources generic drugs; and (2) the analytics team, which is responsible for data reporting and analytics.

3. In my capacity as Senior Director, Generic Purchasing and Analytics, I am familiar with the competitive and commercial sensitivities associated with generic drug sourcing. Likewise, in that capacity, I have personal knowledge regarding the steps Walgreens takes to protect the confidential and proprietary financial data and information relating to sourcing pharmaceutical products.

4.      Walgreens is a national pharmacy. I understand that it is one of several retail pharmacy defendants in this multi-district litigation. Although the precise methods of sourcing generic drugs undoubtedly vary across retail pharmacies, in my capacity as Senior Director, Generic Purchasing and Analytics, my experience has shown me that the complexity of these transactions is not unique to Walgreens.

5.      Because of the complexity of sourcing generic drugs within a highly competitive environment, and for the reasons explained in this Declaration, the production of non-public cost information creates a significant burden upon and concern to Walgreens.

6.      The sourcing of generic drugs is more complicated than that of name-brand drugs. With a name-brand drug, there is typically only one manufacturer. In contrast, the FDA may approve multiple entities to manufacture and sell a particular generic drug in multiple different formulations. From a procurement standpoint, negotiating the cost of generic drugs is more complicated than for name brand drugs. The baseline cost for a name brand drug is generally the wholesale acquisition price, which is published and well known. For generic drugs, however, the cost depends on a multitude of factors, including, among others, the number of manufacturers in the market, the volume the pharmacy is purchasing, and the length of the contract. Pharmacies may and often do source generic drugs from multiple entities with varying contracts, negotiations, and pricing structures.

7.      Walgreens considers non-public information regarding the sourcing of generic drugs it sells to be one of its most—if not its most—commercially sensitive, highly confidential, and proprietary trade secrets. Generic drugs are dispensed in far greater proportion than name-brand drugs and therefore account for a substantial portion of prescription drug sales for

pharmacies.  This results in a highly competitive environment among retail pharmacy chains and across the various entities selling and sourcing generic drugs to those retail pharmacy chains.

8. Retail pharmacies compete with each other to source generic drugs, including to negotiate the most competitive pricing for these drugs with wholesalers and suppliers.  The viability of Walgreens's generic drug business, therefore, demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage that would be gained if competitors of Walgreens learned what Walgreens was paying for a particular drug.

9. Walgreens has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public cost information.  For example, within Walgreens, such information is housed within a password protected system, and access to it is restricted to certain authorized employees within particular groups and divisions.  To access the information, an employee needs a specific user ID and password, which is tracked on an audit log, so that Walgreens can monitor who accesses the information, and when.  External to Walgreens, any email sent containing such information is encrypted before leaving the company.  Walgreens' contracts with each manufacturer contain strict non-disclosure provisions, prohibiting the disclosure of confidential cost information outside of those two entities, even to the applicable intermediary wholesaler.  For example, Walgreens' wholesalers are aware of the indirect cost to Walgreens, but are not privy to any agreements Walgreens has with the manufacturers that may allow for chargebacks and similar reductions that lessen Walgreens' ultimate cost.

10. Walgreens has taken great care to ensure that competitors do not obtain access to or learn of its confidential financial data and cost information. Disclosure of sensitive and confidential financial data and cost information to the public and/or to other defendants who are

parties to this litigation would alter the competitive balance that allows the generic drug market to function efficiently. It could also limit and restrict Walgreen's ability to negotiate future sourcing contracts.

11. Given the tremendous commercial sensitivity of Walgreens' sourcing and financial data and the effort Walgreens has put into protecting it, Walgreens is highly concerned that a litigation protective order would be insufficient to protect it from inadvertent disclosure. Considering that many other defendants in this litigation are competitors of Walgreens (e.g., the other pharmacies) or are wholesaler/manufacturers that are not privy to the details of Walgreens' sourcing of its generic drugs, any improper disclosure of Walgreens' sourcing/cost information would have adverse financial consequences to Walgreens. If such information ended up in the hands of a competitor or of suppliers/wholesalers generally, it would be impossible to undo the damage to Walgreens' ability to obtain the most favorable pricing of generic drugs and to pass those cost savings on to Walgreens' customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 12, 2020 at Kenosha, Wisconsin.

_____
Zachary Mikulak