# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## <u>DECLARATION OF JOHN HOLDERMAN</u>

I, John Holderman, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of CVS Pharmacy, Inc. ("CVS"), a Defendant in the above-captioned proceeding.

2.      I have worked at CVS for nearly six years, and currently am employed as a Senior Director of Pharmacy Merchandising.  In my current role, I manage the CVS team responsible for administering CVS's generic medication sourcing contracts.

3.      In my capacity as a Senior Director of Pharmacy Merchandising, I am familiar with the competitive and commercial sensitivities associated with generic drug pricing. Likewise, in that capacity, I have personal knowledge regarding the steps CVS takes to safeguard confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products.

4.      I understand that the plaintiffs in this litigation have asked CVS to produce information regarding its sourcing and purchase of generic Valsartan from its suppliers, including the price it paid to each of its suppliers for this generic drug.  Because of the

1

complexity of sourcing and selling generic drugs within a highly competitive retail pharmacy environment, production of this information imposes a significant burden on CVS for the reasons explained in this Declaration.

5.     CVS is a national pharmacy that purchases and distributes both branded and generic drugs to its customers. Although the process of sourcing both branded and generic medications is incredibly complex, the pricing and selling of generic drugs is significantly more complicated than that of name-brand drugs. With a name-brand drug, there is typically only one manufacturer and, as a result, only one entity with whom CVS must negotiate the purchase price of the drug. Each of CVS's competitors also must purchase from the same name-brand manufacturer, such that there is less variability in the pricing of a given drug amongst entities and purchasers in the supply chain.

6.     In contrast, for generic drugs, CVS has the option of purchasing from numerous companies authorized to manufacture and sell generic drugs. Because of the many options for sourcing a given generic drug, and to ensure that its supply needs are met, CVS often sources generic drugs from multiple entities. It purchases some generic drugs directly from a manufacturer and purchases others indirectly through a wholesaler. Because of the competing suppliers in the generic drug market, and because CVS's own competitors are also simultaneously attempting to buy product from and negotiating the pricing of generic drugs with the same suppliers, the market for purchasing generic drugs is very complex, and pricing and supply options vary greatly.

7.     CVS therefore considers non-public information regarding the sourcing and pricing of generic drugs it sells to be one of its most—if not the most—commercially sensitive, highly confidential, and proprietary trade secrets. Generic drugs account for a significant portion

of CVS's prescription drug sales such that any disclosure of non-public pricing information could significantly affect the overall market for generic drugs and how CVS operates within that competitive market.

8.    CVS competes with other retailers to source and sell generic drugs, including to obtain the most competitive pricing for these drugs with wholesalers and manufacturers. If CVS's pricing agreements with its suppliers were disclosed publicly, or were to become known to CVS's competitors and other suppliers, such disclosure could affect the entire supply chain by reducing competition in the generic market place, which could lead to increased prices and a reduction in the availability of certain medications. CVS, specifically, could be hampered in its ability to negotiate and purchase crucial generic drugs at competitive prices.

9.    The profitability and function of CVS's generic drug business therefore demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage competitors would gain if they learned what CVS was paying for a particular drug.

10.    Given the significant concerns raised by the confidential nature of this information, CVS has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public pricing information. For example, though CVS employs approximately 300,000 people, it restricts access to its pricing agreements to a small group of employees on a need-to-know basis to ensure that confidential pricing information is not shared outside or within the company. Pricing agreements and confidential pricing information are stored in protected folders, or are otherwise protected by password restrictions, to help maintain the confidentiality of the data. Moreover, to the extent CVS's supply and pricing agreements must be shared with an individual outside of CVS, pricing information is carefully redacted from

3

the document to avoid disclosure. CVS also negotiates contractual protections with its suppliers to ensure the confidentiality of this information.

11. CVS has taken great care to ensure that its competitors and competing suppliers do not obtain access to or learn of its confidential financial data and pricing information. Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would threaten to alter the competitive balance that allows the generic drug market to function. It could also limit CVS's ability to negotiate future sales and sourcing contracts.

12. Given the significant effort CVS has put into protecting its sensitive financial and pricing data, CVS is very concerned that a litigation protective order would be insufficient to protect all parties involved from inadvertent disclosure of that data. If this information were to fall into the hands of any of CVS's competitors, or the numerous supply chain entities from which it purchases generic drugs, CVS's generic drug business could be irreparably harmed. Executed June _12_, 2020 at _Charlestown, Rhode Island_.

_____
John Holderman

4