# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| In re: Valsartan Products Liability Litigation | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF ERIN McCOY

I, Erin McCoy, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1. I am authorized to provide this declaration on behalf of CVS Pharmacy, Inc. ("CVS"), a Defendant in the above-captioned proceeding.

2. I have worked at CVS for 6 years and currently am employed as the Senior Director of Payer Relations. In my current role, I am responsible for coordinating CVS's negotiation of contract provisions for prescription drug reimbursements and pricing.

3. In my capacity as Senior Director of Payer Relations, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing. I also have personal knowledge regarding the steps CVS takes to safeguard confidential and proprietary financial data and information relating to the pricing of pharmaceutical products, including the generic versions of Valsartan at issue in this litigation.

4. I understand that Plaintiffs in this litigation are seeking production of information concerning the price that various entities paid or reimbursed CVS for generic Valsartan dispensed to customers. Because of the complex and highly competitive nature of the retail

1

pharmacy business, generally, and the retail pharmacy market for generic drugs, specifically, production of this information imposes a significant burden on CVS and risks significant harm to CVS's retail pharmacy business.

5. Generic drugs account for a substantial portion of CVS's prescription drug sales. CVS's pricing and selling of generic prescription drugs is the result of an incredibly complex process, which is affected both by the rates that CVS is able to negotiate in purchasing medications, and by the price CVS ultimately charges consumers or their health insurance plans for the prescriptions it dispenses. CVS considers non-public information regarding the sourcing and pricing of generic drugs it sells to be among its most commercially sensitive, highly confidential, and proprietary trade secrets.

6. The price that a pharmacy customer pays for a prescription fill is influenced by a number of factors, including whether that customer has health insurance. Rather than contract with retail pharmacies directly, many health insurance or prescription benefit plans rely on Pharmacy Benefit Managers (PBMs) to negotiate their reimbursement rates and structures. CVS negotiates with PBMs to determine the amount it is reimbursed for the cost of all or a portion of a customer's prescription fill. With the exception of certain specialty medications, which Valsartan is not, CVS does not negotiate reimbursement rates for drugs on a drug-by-drug basis. Rather, it negotiates the rate of reimbursement for all generic drugs—or all branded drugs— covered by a plan, as a whole. The result of these negotiations is that the health plan, through its PBM, has constructed a network of pharmacies to be included with clients' benefit plans, and has negotiated a complex pricing structure for each retail pharmacy within the network.

7. With respect to the reimbursements themselves, in general, it is the PBM, acting on behalf of the plan, that reimburses CVS for the cost of all or a portion of a customer's

2

prescription fill. Reimbursements generally are made in the aggregate, such that the actual reimbursement amount for a specific prescription fill varies by day, by network and by patient, depending on a number of factors that have nothing to do with the particular drug dispensed, other than whether the drug is generic or branded.

8. Retail pharmacies compete with each other to provide services to plans and to be considered "in network" for those plans. CVS does not necessarily receive the same reimbursement rate as other pharmacies in the same network. It negotiates its rates individually, and commits substantial effort to obtaining the most competitive rate available. Because of the competitive nature of the retail pharmacy business in the U.S., the reimbursement amount that CVS receives for each prescription is a closely guarded trade secret. Further, although reimbursement rates may change over time, rate structures often build off discussions from year to year, such that CVS considers both current and prior rate information to be highly confidential.

9. CVS has significant concerns that, if ordered to produce this highly confidential information regarding the amounts reimbursed for Valsartan, the other retail pharmacies named in this litigation could gain a significant competitive advantage over CVS. This would cause substantial harm to CVS, and could undermine its competitive position vis-à-vis the other pharmacies that also compete for reimbursement from the same entities.

10. Production of this information also risks substantial harm to CVS's ability to negotiate with the PBMs acting on behalf of health plans or insurers. CVS's retail pharmacy business depends on being able to negotiate competitive agreements for the dispensing of important prescription medications to consumers.

11. In light of the significant concerns raised by the confidential nature of this information, CVS has undertaken extensive steps to maintain the confidentiality of its financial data, including prescription drug reimbursement information.

12. For example, CVS limits access to this information to a small team of people with a need to know how much CVS is reimbursed for prescription drugs that it dispenses. Although CVS employs approximately 300,000 individuals, fewer than 50 employees have access to the folders and databases containing sensitive information regarding CVS's agreements regarding reimbursements for patient prescriptions. Access to the actual contracts that set forth the pricing components of these agreements is even more limited to ensure that these documents and the sensitive business information in them remains confidential. Moreover, the content of these agreements is subject to internal policies to limit verbal disclosure of the terms of these agreements within different departments of the company. CVS also negotiates contractual protections with all PBMs to ensure the confidentiality of this information outside CVS. The PBMs also view this information as highly confidential, and also insist that CVS to agree to strict confidentiality provisions that prohibit disclosure to third parties.

13. Given the significant effort CVS puts into protecting its sensitive reimbursement data, CVS is very concerned that a litigation protective order is insufficient to protect CVS from the inadvertent disclosure of this data. If this information were to fall into the hands of any of CVS's competitors, or even into the hands of the Third Party Payor plaintiffs in this litigation, CVS's business could be irreparably harmed.

Executed June 15, 2020 at Granville, Ohio.

_____
Erin McCoy

4