# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

### DECLARATION OF MICHAEL VIIRRE

I, Michael Viirre, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1. I am authorized to provide this declaration on behalf of Walmart Inc. (Walmart), a Defendant in the above-captioned proceeding.

2. I have worked at Walmart for seven (7) months and am employed as Senior Director of Specialty Pharmacy. My responsibilities include, but are not limited to, payer account management of specialty pharmacy networks and building out and managing Walmart's specialty prescriber relations sales team.

3. In my capacity as Senior Director of Specialty Pharmacy, I am familiar with the competitive and commercial sensitivities associated with drug pricing and reimbursement. Likewise, in that capacity, I have personal knowledge regarding the steps Walmart takes to safeguard confidential and proprietary financial data and information relating to the pricing of pharmaceutical products dispensed through its retail pharmacies, including the generic versions of Valsartan at issue in this litigation.

4. I understand that Plaintiffs in this litigation are seeking the production of information concerning the amount that Third-Party Payors (TPPs) and their clients paid or reimbursed Walmart for Valsartan dispensed to Walmart's pharmacy customers. TPPs include Pharmacy Benefit Managers (PBMs), Pharmacy Benefit Administrators (PBAs), and Direct To Employers (DTEs). When a customer has a TPP, the TPP reimburses the pharmacy directly for the cost of all or a portion of the cost of the prescription medication. The TPP is contractually obligated to do business with Walmart in a way that maintains the confidentially of pricing information, and such information is customarily safeguarded from disclosure to third parties by confidentiality provisions in those contracts.

5. There are many factors that contribute to how much a customer pays for medication. Some scenarios include: 1) the customer may pay cash for the medication (without insurance), in which case the price of the medication is driven by the pharmacy, 2) the customer may have pharmacy insurance, in which case the pharmacy has agreed to pricing with the TPP and the TPP is responsible for managing such pricing, including the customer's plan benefit design, 3) the TPP may utilize another TPP's relationship and pricing with the pharmacy, 4) the pricing arrangement between the TPP and the pharmacy may be an aggregate guarantee where the price of all drugs are constantly changing and the reimbursement between the pharmacy and the TPP is trued up over a period of time, 5) certain lines of business may have other pricing components taken at the point of sale or after the point of sale that would impact the price of a single drug (e.g., Direct Indirect Remuneration or performance-based networks), 6) the pharmacy network design (a number of pharmacies allowed to participate and provide prescription drug services) impacts pricing, and 7) the pricing mechanism agreed to by the pharmacy and the TPP (e.g., average wholesale price (AWP), wholesale acquisition cost (WAC),

Cost Plus, National Average Drug Acquisition Cost (NADAC), etc.) impacts the pricing of the drug.

6. In all the cases described above, the pricing for a dispensed medication which the pharmacy and the TPP negotiate and maintain is both complicated and extremely confidential. As I have noted above, Walmart's contracts with TPPs prevent the sharing of such confidential information.

7. Pricing must not be shared across competitors or with TPP plan sponsors. If either were to receive the confidential pricing details of their competitors, they would have a competitive advantage in the market and, potentially, could use that information to control the outcome of plan sponsor requests for proposals (RFPs), contract pricing negotiations, and future Walmart-TPP relationships. For example, PBMs construct networks of providers (pharmacies). If Walmart is in a network and another pharmacy learned of Walmart's pricing within that network, the competitor pharmacy could try to undercut Walmart's pricing, and ultimately cut Walmart out of the network. In this situation, the market would compress and the customers would not benefit, since their contribution to the cost of a drug is only a portion of its total cost.

8. Because of the complexity of pricing drugs within this highly competitive environment, the disclosure of non-public reimbursement information imposes a significant confidentiality risk on Walmart for the reasons explained in this Declaration.

9. Pharmacy reimbursement rates change constantly with each TPP and Walmart contracts with hundreds of TPPs for the drugs it dispenses to customers. Capturing meaningful drug transaction-level data would be extremely burdensome over any period of time and also would be very difficult, if not impossible, to interpret on a per prescription basis. Drug pricing

as between Walmart and its TPPs is most often evaluated and proceeds on an aggregate basis as opposed to a drug-specific or transaction-specific basis.

10. Walmart has made significant efforts to maintain the confidentiality of its pricing data, including non-public pricing information. For example, contracts relating to drug pricing are maintained in a password protected system to which only key Walmart employees are allowed access. Furthermore, the financial details of Walmart drug supplier contracts, as well as contracts and negotiations, including price, with PBMs, DTEs and other TPPs are maintained within a specific department and are not shared with other departments at Walmart.

11. Disclosure of extremely sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and offer customers the lowest prices available for generic medicines. For the reasons set forth above, the disclosure of such information would also impair Walmart's ability to negotiate future pharmacy provider agreements and sourcing contracts to obtain the lowest competitive cost for its prescription medications dispensed to its customers.

12. Given the great lengths, and associated expense, that Walmart has implemented to protect its sensitive financial and drug pricing data, Walmart is concerned that a protective order would be insufficient to protect against the inadvertent disclosure of this information. Considering every retailer defendant is a competitor of Walmart, any improper disclosure would cause irreparable harm; a harm that would be impossible to adequately remedy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May __, 2020 at Bentonville, Arkansas.
5/13/2020 | 09:21 CDT

Michael Viirre

5