# EXHIBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN<br>PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to All Actions | MDL No. 2875<br><br>Honorable Robert B. Kugler,<br>District Judge<br><br>Honorable Joel Schneider,<br>Magistrate Judge |

## DECLARATION OF TONY BRAUN

I, Tony Braun, hereby declare pursuant to 28 U.S.C. 1746 as follows:

1. I understand that Humana is currently named as a defendant in litigation regarding generic valsartan, losartan, and irbesartan products. I further understand that the plaintiffs are seeking to discover information regarding Humana's relationships with its suppliers of those products, including the prices paid for these products from 2012 to the present. I submit this declaration in order to explain why this information is extremely sensitive. Humana would suffer significant competitive harm if this information were to be disclosed.

2. I am currently employed as the Vice President of Pharmaceutical Contracting & Supply Chain at Humana Inc. In that role, I am responsible for the strategy development and management of Humana's growing multi-billion pharmaceutical contracting, purchasing, inventory planning and supply chain efforts supporting Humana's mail order, specialty and staff model pharmacies. I am responsible for both the generic and branded pharmaceutical supply chains.

3. I have served in this role since October 2017. Prior to that, I served for over 13 years as Humana's Director of Pharmaceutical Contracting & Purchasing. Therefore, I have over

15 years' experience in Humana's pharmaceutical purchasing efforts, including both generic pharmaceuticals and branded pharmaceuticals.

4. As a result of my experience, I am familiar with the competitive and commercial sensitivities of the pharmacy business. I am also familiar with the specific commercial sensitivities particular to generic drug pricing.

5. By way of example, I am familiar with the following issues:

   a. The generic drug market is much more competitive than the branded drug market. If a company develops a branded drug, and no generic versions exist, then the brand has a monopoly. Humana does not have a choice among competing manufacturers. By contrast, once multiple generic versions enter the market, Humana has several alternatives from which to choose. Physicians may permit Humana to substitute any FDA-approved generic for a prescribed branded drug. (The practice of generic substitution is governed by state law, and thus the particular rules can vary from state to state.)

   b. Humana and other pharmacies sometimes purchase drugs directly from manufacturers, and sometimes purchase drugs from distributors. Indeed, Humana has a choice regarding whether to purchase the same drug from the manufacturer or from one of several distributors.

6. It is important for Humana to protect information about drug pricing from drug distributors, competitors, and other suppliers. This includes both the present pricing, as well as pricing that was in effect in past years. Drug purchases are Humana Pharmacy, Inc.'s primary expense, making the pricing information of utmost importance to the company from a competitive standpoint.

a. Humana's supply contracts include express privacy and confidentiality terms. To disclose this information may be a breach of Humana's supply contracts.

b. Similarly, Humana often communicates to potential suppliers that it will not share this information, even if no contract results. To disclose this information would damage Humana's standing in the commercial community, and it would damage the trust relationships that Humana has built with its suppliers.

c. A supplier that learns a different supplier's pricing may manipulate the "total cost of ownership" in order to undercut the original supplier on price or inflate the price to a higher level than the supplier would have originally offered. As a result, Humana could be misled. The "total cost of ownership" refers to the end-to-end cost throughout the total product lifecycle. The risk is that a competing supplier may move more of the "total cost of ownership" to hidden areas in order to achieve a lower "sticker price."

d. Suppliers who know Humana's pricing may seek to sell to competing pharmacies at higher prices. Over the longer term, these suppliers may emerge as direct competitors themselves.

e. Humana's suppliers are likely also suppliers to Humana's competitors, including those who are co-defendants in this lawsuit. Therefore, any disclosure to a supplier creates a risk that information will be disclosed to competitors.

f. With respect to past pricing, Humana's contracts with suppliers often build on one another from year-to-year, making the past pricing information as commercially sensitive as the present day's information.

7. Based on these considerations, I believe Humana would suffer considerable harm to its competitive position if its supply chain and pricing information were disclosed to its suppliers and potential suppliers. This includes distributors such as McKesson, AmeriSourceBergen, and Cardinal Health. It also includes manufacturers such as Aurobindo, Teva, and Mylan. Further, I understand that these suppliers are defendants in this litigation.

8. It is also important for Humana to protect information about drug pricing from competing pharmacies, including those also named as defendants in this lawsuit.

    a. Competitors may leverage this information to engage in predatory pricing. For instance, the competitor may offer pharmacy services at a lower cost that they know Humana cannot match.

9. Based on these considerations, I believe Humana would suffer considerable harm to its competitive position of its supply chain and pricing information were disclosed to competing pharmacies.

10. I understand that several other large national pharmacy chains are also named as defendants in this litigation, such as Wal-Mart, Walgreens, Kroger, Albertsons, Rite-Aid, Express Scripts, and CVS. These companies are direct competitors of Humana Pharmacy. Based on my experience in the industry, I believe these companies likely regard their supply and pricing information the same way Humana regards its own information. That is to say, I believe they consider their information to be highly confidential. I believe they would not want Humana to learn their information.

11. Humana goes to great lengths to protect information about the pricing of its supply chain, including its generic drugs. For instance, Humana:

    a. maintains the confidential pricing information on a private electronic drive that is accessible only with valid login credentials for Humana employees directly involved in the pricing negotiation and contracting;

    b. limits the distribution of this pricing information to solely the Finance and Inventory Planning teams on a "need to know" basis;

    c. maintains strict privacy rules and regulations governing employee access and protocols;

    d. maintains stringent cybersecurity systems to ensure that the above protocols are followed.

12. I understand that courts sometimes enter protective orders that require counsel to protect the confidentiality of information. I do not believe that such an order would be sufficient in this case.

    a. I assume that the partners, associates, and support staff at the various law firms would make good-faith efforts to protect the confidentiality of Humana's information. Nevertheless, inadvertent disclosures happen.

    b. I understand that more than 100 attorneys have appeared in this case. If Humana's information is produced, presumably all of these many attorneys and their law firms would have access to it. At each firm, numerous individuals (partners, associates, support staff) would have access to Humana's information. The more individuals have access to the information, the greater risk of an inadvertent disclosure. For instance, a third party might overhear plaintiffs' counsel discussing the information. A third party might see one of Humana's documents over counsel's shoulder. Or

      one of Humana's documents (or a memo or email that references Humana's information) may simply be dropped in public.

c. Setting aside disclosure concerns, there is a risk that any lawyer who views Humana's information will retain that information in his or her mind. I assume that counsel will comply with a court order to destroy the information upon conclusion of the litigation. But it is extremely difficult to "unring the bell" once Humana's information is viewed. Of course, Humana expects its own counsel to guard vigilantly against any use of this information that might disadvantage Humana. But counsel who represent other parties do not have the same duties to Humana, and they cannot be expected to have the same care. Again, these concerns are exacerbated by the sheer number of individuals that would gain access to Humana's information.

d. Even if Humana's information is produced on an "Attorneys' Eyes Only" basis, or even if Humana's information is produced only to Plaintiffs, Humana's suppliers and competitors may discover the information if it is filed with the court or referenced in a court hearing.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true.

Dated: May 8, 2020                                          Signed: *Tony A. Brown*