# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF BRITT TURNER

I, Britt Turner, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1. I am authorized to provide this declaration on behalf of The Kroger Co., a Defendant in the above-captioned proceeding.

2. I have worked at Kroger for 34 years and am employed as Director of Pharmacy Procurement.

3. In my capacity as Director of Pharmacy Procurement, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing. Likewise, in that capacity, I have personal knowledge regarding the steps Kroger takes to safeguard confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products, including the generic versions of Valsartan at issue in this litigation.

4. I understand that Plaintiffs in this litigation are seeking production of information concerning the price that Third-Party Payors (TPPs) paid or reimbursed Kroger for Valsartan dispensed to customers.

5. The pricing and selling of drugs is complicated by the process by which the ultimate consumer pays for a prescription. Many consumers have health insurance plans or TPPs who reimburse a pharmacy directly for the cost of all or a portion of the cost of the prescription.

6. Rather than contract with suppliers directly to negotiate prescription costs, many TPPs use a pharmacy benefit manager, or PBM. The PBM negotiates with pharmaceutical manufacturers to obtain rebates for the cost of prescription drugs covered by the TPP's benefit plan, constructing a network of pharmacies to be included with clients' benefit plans, and negotiating pricing with retail pharmacies within the TPP's network.

7. When a PBM sets up a network of pharmacies to be included in a particular TPP's plan, it is driven by the TPP's needs and preferences. For example, some TPPs elect to include a narrow range of pharmacies, which may include chain, independent or mail pharmacies, because the PBM has contracted with those pharmacies to offer lower prices in exchange for filling a higher share of prescriptions. Other TPPs prefer to include a wider range of pharmacies, while still trying to reduce costs for TPPs and their beneficiaries/members.

8. Although several entities have both retail pharmacy operations and PBM operations, typically those entities will erect a strong firewall between the PBM arm and the retail pharmacy arm. This firewall prevents PBM employees from accessing the prices that retail pharmacies negotiate with other PBMs and prevents retail pharmacies from accessing the prices a PBM negotiates with other retail pharmacies. Because PBMs operate through a network of pharmacies across the United States, the retail pharmacy side of the business will represent only a small portion of the pharmacies in the PBM's network.

9. Because of the complexity of sourcing and selling generic drugs within a highly competitive environment, production of non-public reimbursement information imposes a significant burden on Kroger.

10. Although contracts and reimbursement rates may change over time, rate structures often build off discussions from year to year, so prior rate information remains highly confidential.

11. First, how much Kroger paid a wholesaler or manufacturer for a particular drug is highly confidential. There are several competitor retail pharmacies, some of which operate as PBMs, in this litigation. If a PBM knew how much Kroger paid for a particular drug, that competitor could gain an economic and competitive advantage over Kroger when negotiating reimbursement rates with the PBM or even when determining whether beneficiaries of a particular TPP may fill a prescription at Kroger and be considered in network.

12. Non-public information regarding the sourcing and pricing of generic drugs is among the most commercially sensitive of Kroger's trade secrets, given the highly competitive environment not only among retail pharmacy chains, but also the various entities selling and sourcing generic drugs to those retail pharmacy chains.

13. Second, how much a TPP reimburses Kroger for each prescription is another guarded trade secret. The contracts that Kroger has with various PBMs for various TPPs contain highly sensitive and confidential material.

14. For example, the retail pharmacy defendants compete with each other to provide services to TPPs, be considered "in network" for those TPPs, and receive the highest possible reimbursement rates from TPPs. Other retail pharmacy defendants could gain a significant competitive and economic advantage over Kroger if they learned what each TPP reimburses Kroger for dispensing a given drug.

15.     Further, because PBMs may negotiate different reimbursement rates for different pharmacies or different TPPs, disclosure of a TPP's reimbursement rate could fundamentally alter the way the PBMs operate.

16.     Kroger has made great efforts to maintain the confidentiality of its financial data, including non-public pricing information. For example, this data is stored on the Kroger network where only the few people on my team have access to it.

17.     Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and hinder Kroger's ability to negotiate future sales and sourcing contracts.

18.     Given the great lengths, and great expenses, that Kroger has gone to protect its sensitive financial and pricing data, Kroger is concerned that a protective order would be insufficient to protect all parties involved from inadvertent disclosure of the same. Considering nearly every defendant is a competitor in some way, any improper disclosure is likely to end up in the hands of a third party which would cause irreparable harm. In the event of such an occurrence, it would be impossible to undo the damage of such a disclosure.

_6/3/20_
Date

_Britt Turner_
Britt Turner