**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

3 ───────────────────────            CIVIL ACTION NUMBER:

IN RE:  VALSARTAN PRODUCTS
4 LIABILITY LITIGATION              1:19-md-02875-RBK-JS

5 ───────────────────────            STATUS CONFERENCE
                                    (Via telephone)
6

          Wednesday, June 24, 2020
7         Commencing at 10:00 a.m.

8 B E F O R E:               THE HONORABLE JOEL SCHNEIDER,
                             UNITED STATES MAGISTRATE JUDGE
9

A P P E A R A N C E S:
10

          MAZIE SLATER KATZ & FREEMAN, LLC
11        BY:  ADAM M. SLATER, ESQUIRE
          103 Eisenhower Parkway
12        Roseland, New Jersey 07068
          For the Plaintiff
13

          LEVIN PAPANTONIO
14        BY:  DANIEL A. NIGH, ESQUIRE
          316 S. Baylen, Suite 600
15        Pensacola, Florida 32502
          For the Plaintiff
16

          GOLOMB & HONIK PC
17        BY:  RUBEN HONIK, ESQUIRE
          1835 Market Street, Suite 2900
18        Philadelphia, Pennsylvania 19103
          For the Plaintiff
19

20        Karen Friedlander, Official Court Reporter
              friedlanderreporter@gmail.com
21                  (856) 756-0160

22        Proceedings recorded by mechanical stenography;
          transcript produced by computer-aided transcription.
23

24

25

```
1   A P P E A R A N C E S: - CONTINUED

2       KANNER & WHITELEY LLC
        BY:  CONLEE S. WHITELEY, ESQUIRE
3       701 Camp Street
        New Orleans, Louisiana 70130
4       For the Plaintiff

5       GOLDENBERG LAW PLLC
        BY:  MARLENE J. GOLDENBERG, ESQUIRE
6       800 Lasalle Avenue
        Suite 2150
7       Minneapolis, Minnesota 55402
        For the Plaintiff
8
        DUANE MORRIS LLP
9       BY:  SETH A. GOLDBERG, ESQUIRE
        30 S. 17th Street
10      Philadelphia, Pennsylvania 19103
        For the Defendant ZHP and the Joint Defense Group
11
        GREENBERG TRAURIG LLP
12      BY:  LORI G. COHEN, ESQUIRE
             VICTORIA DAVIS LOCKARD, ESQUIRE
13      3333 Piedmont Road, NE, Suite 2500
        Atlanta, Georgia 30305
14      For the Defendants, Teva Pharmaceutical Industries Ltd.,
        Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis
15      Pharma, Inc.

16      BARNES & THORNBURG LLP
        BY:  SARAH E. JOHNSTON, ESQUIRE
17      2029 Century Park East, Suite 300
        Los Angeles, CA 90067-2904
18      For the Defendant, CVS Health Co.

19      ULMER & BERNE LLP
        BY:  JEFFREY DANIEL GEOPPINGER
20      600 Vine Street
        Suite 2800
21      Cincinnati, OH 45202
        For the Defendant, AmerisourceBergen
22
        NORTON ROSE FULBRIGHT
23      BY:  D'LESLI M. DAVIS, ESQUIRE
        1301 Avenue of the Americas
24      New York, NY 10019-6022
        For the Wholesalers and McKesson individually
25
```

```
 1                (ALL PARTIES VIA TELEPHONE JUNE 24, 2020 10:06 A.M.)
 2                THE COURT:  We're on the record in the Valsartan MDL,
 3     Docket No. 19-2875.  There's lots of people on the phone, but
 4     why don't we get the entries of appearance for the lead
 5     counsel for both sides, plaintiffs and defendants, and if
 6     anyone else is going to talk, just introduce yourself before
 7     you speak.  So, let's start with the appearances of the
 8     plaintiff.
 9                MR. SLATER:  Good morning, Adam Slater for the
10     plaintiffs.
11                MR. NIGH:  This is Daniel Nigh for the plaintiffs.
12                MR. HONIK:  Good morning, Your Honor, Ruben Honik for
13     the plaintiffs.
14                MS. WHITELEY:  Good morning, Your Honor, Conlee
15     Whiteley for the plaintiffs.
16                THE COURT:  And for the defendants?
17                MR. GOLDBERG:  Good morning, Your Honor, this is Seth
18     Goldberg for the ZHP parties and the defendants.
19                MS. COHEN:  Good morning, Your Honor, this is Lori
20     Cohen on behalf of the Teva defendants.  Also Ms. Victoria
21     Lockard is on with us as well.
22                MS. LOCKARD:  Good morning.
23                MS. JOHNSTON:  This is Sarah Johnston for CVS
24     Pharmacy, Inc., and the retailer defendants.
25                MR. GEOPPINGER:  Good morning, Your Honor.  Jeff
```

1    Geoppinger, G-E-O-P-P-I-N-G-E-R, from AmerisourceBergen and

2    the wholesalers defendants.

3         THE COURT:  Okay.  I received your letters.  Thank

4    you very much.  We don't really have that heavy of agenda

5    today.

6         First thing I want to say is just want to again

7    commend the parties for the way they worked out the search

8    term issue.  I've been getting the orders from Mr. Goldberg.

9    Everything has been entered, I think, that we received.  If I

10   missed something, Mr. Goldberg, please let me know.  I

11   entered -- I signed this morning the one you sent me

12   yesterday.  I think, Mr. Goldberg, I've entered three

13   stipulations.  Are those all that you sent me?

14        MR. GOLDBERG:  I sent you Torrent's, Aurobindo,

15   Hetero, and ZHP.  I have to look at -- I'll look after this

16   call and send an e-mail if others -- if they haven't hit the

17   docket yet.

18        THE COURT:  Okay.  Yeah, you might just wait a little

19   while.  I signed one this morning.  I sent it to my deputy.

20   Those all sound familiar.  I said I thought I signed three.

21   Maybe I signed four.

22        But anyway, again, I just want to commend the

23   parties.  I'm glad you worked it out.  It's better that you

24   reached agreement than the Court imposes some order that one

25   of the parties might find unfair.  I just wish, like with the

1  sales and pricing issue we're going to discuss, I just wish

2  that we could instead of having all the argument and briefs

3  and conference calls about the issue and then working it out,

4  it would be nice if we lived in a perfect world, if the

5  parties could reach agreement on those issues and we could

6  enter orders without so much argument.  But I suppose that's

7  the nature of the beast.

8        But really, the -- I'll discuss any issues the

9  parties want to address, but the two issues it seems like we

10  have for today's agenda are just to touch base about this core

11  deficiency issue and then the sales and pricing documents.

12        Why don't we start with the core deficiency issue.  I

13  don't think I need to do anything today, but we ought to just

14  discuss how we're going to approach that, and I'm going to ask

15  Loretta to step in in a moment, she's Judge Kugler's permanent

16  law clerk and she handles that orders to show cause issue and

17  she worked on the *Benicar* case.

18        But when -- I looked at Exhibit A in your letter,

19  Mr. Goldberg, and I mean I don't think you're really expecting

20  the Court to get involved in issues about whether someone put

21  the date that they were diagnosed as obese or something not

22  terribly consequential to the case.  When we talk core

23  deficiencies, we're talking about, you know, plaintiffs who

24  don't answer the fact sheet or don't respond or don't submit

25  fact sheets, or there's some type of significant material

1    issue.

2         It looked to me like different people went through

3    plaintiff's fact sheet just like they do in answers to

4    interrogatories, and these are my words, "nitpicked" it for

5    everything that wasn't perfect.  But I don't really think

6    that's what this order to show cause process was designed to

7    address.  Hopefully, the counsel in the case can meet and

8    confer and talk about those types of issues, but when we talk

9    about an order to show cause, we're really talking about some

10   material, significant, substantial issue.  Is there a

11   different understanding on the defendants' part?

12        MS. LOCKARD:  Your Honor, it's Victoria Lockard, and

13   I intend to address this on behalf of the defendant.

14        First of all, you know, there were a number of

15   deficiencies that were not listed on this chart.  We've gone

16   through very carefully to try to identify things that are

17   consequential.  The underlying problem that we're having, and

18   I agree that some of this could be worked out and in instances

19   where the individual plaintiffs' attorney has reached out to

20   defendant, you know, provided an explanation, why there's a

21   difficulty in filling in certain gaps, we've worked with them,

22   we've taken them off the list.

23        The essential problem here is that we have dozens of

24   plaintiffs who are essentially ignoring the deficiency letters

25   we're sending.  We've listed some of these names since April,

1    May, now are June.  We've sent them deficiency letters.

2    They're not reaching out.  And Ms. Goldenberg and I have had

3    some meet and confers, you know, we're willing to work with

4    each other I think to try to bridge this.  But the concern is

5    that the individual plaintiffs' lawyers out there are simply

6    ignoring our effort.

7         If this were a normal, typical single plaintiff case,

8    we would send our letter, sure, we might do some nitpicking,

9    there would be a process, a meet and confer, a phone call, and

10   we'd work through this, we'd give a little improvised more

11   information.  That's not happening, and what they're telling

12   us is, oh, Your Honor, well, the plaintiffs' lawyers haven't

13   been able to find the right person because there's no contact

14   information on the letterhead.  These letters are going to

15   plaintiffs from names like Seth Goldberg, Clem Trischler,

16   Brian Rubenstein at Greenberg, people who are all on the

17   defendants' executive committee, who are on all the

18   transcripts.  Their information is on ECF and they're telling

19   us that for three months no one can locate Seth Goldberg to

20   initiate a phone call to address the deficiencies.  It's

21   unbelievable.

22        So we're at -- you know, our hands are tied.  We're

23   unable to get this resolved, we don't want to come to the

24   Court and argue over a date, you know, that somebody's

25   obesity, you know, started.  But we think the plaintiffs need

1    to do some work here.  They need to reach out, get these

2    resolved so that we can present a realistic list to the Court,

3    then have the Court issue the show cause order as was intended

4    by this process and then we'll come back in the July CMC and

5    we'll actually argue those that need to be argued.  That's our

6    position.

7            THE COURT:  All right.  Let me just ask you a

8    question or two and we'll hear from the plaintiff.

9            I'm assuming, and I could be wrong, that when a, I'll

10   call it a deficiency letter, is sent to the plaintiff, that

11   it's not signed by Mr. Goldberg or someone from the executive

12   committee.  Am I wrong about that?

13           MS. LOCKARD:  It is issued through the Centrality

14   system, and the defendants have divided these up because, you

15   know, certain cases are against certain defendants.  The

16   letters that are going out from Mr. Goldberg's firm have his

17   name on them with instructions to contact Mr. Goldberg.

18           THE COURT:  I'm just -- the reason why I ask the

19   question is because, again I could be wrong, I don't think

20   Mr. Goldberg is the person who's going to negotiate or meet

21   and confer directly with the plaintiffs' attorney about

22   whether they're missing a date or some oversight on an answer

23   to a fact sheet.  It's going to be someone in his firm who

24   does that.  If the plaintiffs' attorney knows who that person

25   is, and we'll hear from the plaintiffs, there's no excuse, and

1   I agree with you, that they don't respond to the letter.  But

2   do the plaintiffs know -- it's not going to be Mr. Goldberg

3   who's going to get a thousand phone calls about different fact

4   sheets, and who's going to sit on the phone and go over each

5   particular plaintiff.  It's someone in his firm, right?

6         So does the plaintiffs' counsel know who to talk to

7   about that issue?  And if they don't, they will, and

8   certainly, they have a duty to respond and we're going to talk

9   about a deadline to respond to that, because you're a hundred

10  percent right.

11        So why don't we hear what plaintiffs' position is.

12        MS. GOLDENBERG:  Your Honor, this is Marlene

13  Goldenberg on behalf of the plaintiffs.  I've been working

14  with Ms. Lockard on this issue and we did discuss the contact

15  problems that we've been having.  I can tell you that I

16  personally got a letter, and I believe it was from Megan

17  Grossman.  Because I'm on the PSB, I was able to look her

18  information up.  But if I wasn't on the PSB, there's no firm

19  even listed on these letters that we're getting.

20        But what we had originally done was gone into MDL

21  Centrality, we had fixed the problem knowing that defendants

22  get notifications when an amended plaintiff fact sheet is

23  listed, but apparently that didn't do anything for the

24  defendants, because I received e-mails from five different

25  plaintiffs' firms when we circulated this exhibit to them, who

1    all told me that they had fixed the issue, they had contacted

2    defense counsel and these cases still remained on the exhibit.

3         So I think the issue that we're running into is that

4    because this project on the defendants' side seems to have

5    been so separated between different firms, there just isn't

6    the coordination that needs to be happening on their side to

7    make sure that people are, one, reviewing the correspondence

8    from plaintiffs' counsel when it comes back in, and two,

9    taking these cases off the list when things happen.

10         But I wanted to return to Your Honor's point where

11    you talked about what constitutes a core deficiency.

12         It's our position that show cause orders shouldn't

13    just automatically be issued because defendants identify some

14    kind of a problem that they think is any kind of a deficiency.

15    Going back to your point, a core deficiency should be a

16    significant or material issue.  It shouldn't be the date that

17    somebody decided that they got constipation, it shouldn't be

18    any of the other examples that we included in our letters, and

19    we are more than happy to meet and confer with defense counsel

20    on what constitutes a core deficiency.  But we don't think

21    that a show cause order should be the first line of defense

22    here.  A show cause order shouldn't go out until it's been

23    determined either by the parties or with the Court's

24    assistance if necessary that, one, the deficiency exists, but

25    two, that it's also a core deficiency.  And if it is, the show

1    cause order can go out and the plaintiff can respond to that

2    and it can be decided with the following case management

3    conference.

4         But right now, I just don't think we are at that

5    point.  There are so many errors on this list that the defense

6    sent to us yesterday, and knowing that five different firms

7    were able to get back to us right away saying that not only

8    these, you know, are these deficiencies not core, but they

9    don't even exist anymore, I think we have some work to do, and

10   we're more than happy to work with defense counsel on this so

11   that when we are ready to present this issue, it's a much --

12   it's narrowed in scope so that we can actually talk about

13   concrete parts of the plaintiffs' fact sheet.

14        THE COURT:  Ms. Goldenberg, can you help me

15   understand mechanically how this works so when the fact sheets

16   are served, they're served to Centrality; is that right?

17        MS. GOLDENBERG:  That's right, Your Honor.  We would

18   log into Centrality, plug in all the information and when it's

19   all there, we hit the serve button.  On the defense side, they

20   have e-mail addresses programmed in and they get some

21   notification from BrownGreer saying that there is a fact sheet

22   ready for their review.

23        THE COURT:  So now defendant has the fact sheets --

24   and this is just hypothetical -- they find deficiencies in it.

25   What then happens?  What does the defense side do?

1      MS. GOLDENBERG:  So they -- the way they explained it

2  to me was they generate it or they have people on their side,

3  they've divided the plaintiffs up by firm and by defendants.

4  They would go back in, put a letter in through Centrality and

5  use Centrality to serve that letter sort of in the way that he

6  would use CM/ECF to serve something to the Court.

7      And so Centrality would then fire off an e-mail

8  through its own system, and if it's my client, for example, I

9  would get an e-mail from MBL Centrality saying, you have a

10  notification from the defendant, and that would be available

11  in my client's portal.

12      THE COURT:  So the first thing that we have to do, if

13  it hasn't already been done, is if that letter is presently

14  signed by Mr. Goldberg, he's not the person who's going to

15  talk with plaintiffs' counsel about the deficiency.

16      Does the e-mail or the letter that the plaintiff gets

17  to Centrality identify who the plaintiff should meet and

18  confer with?  And if not, isn't it essential that they know

19  who that person is?

20      MS. GOLDENBERG:  It does not and, yes, and to be fair

21  to defendants, we did talk about this issue on a

22  meet-and-confer call yesterday.  They had agreed to provide

23  the contact information on who plaintiff should be meeting and

24  conferring with up until, well, I guess through the present,

25  but we don't have it yet.  The plaintiffs don't have that

1  information.

2          THE COURT:  Okay.  So from here on out, we solved

3  that problem.

4          Now, you don't disagree, do you, that the plaintiffs

5  have a duty to respond within X amount of time to the

6  deficiency letter.  Maybe they won't work it out, but they

7  can't just sit and ignore it, correct?  That's not debatable,

8  right?

9          MS. GOLDENBERG:  No, and we're not fighting on that.

10          THE COURT:  So help me.  Under the present process,

11  do we have anything in place that says that once the plaintiff

12  receives a deficiency notice that identifies the contact

13  person for the defendant, they have X amount of time to reach

14  out to meet and confer, and if we don't have that, shouldn't

15  we put that in place?

16          MS. GOLDENBERG:  Yes, Your Honor, I believe that your

17  prior order discussed that, and Ms. Lockard can chime in if

18  she's got the order in front of her, but we, I think, had

19  given plaintiffs -- I hope I'm saying this right, I think it

20  was 30 days to respond to the letter.  If there was no

21  response or if the meet and confer was unsuccessful, the

22  defendants would be able to put the client's name on the list.

23  It would go to the Court and then we could have a debate about

24  whether that deficiency is core.  That part is not in the

25  order, I don't think, because we were debating that on the

 1    meet and confer yesterday.

 2            And then, you know, we would have the orders go out

 3    and then the following case management conference, my

 4    understanding is that in Benicar Judge Kugler likes to be the

 5    one making that decision.  If that's not the case here, we're

 6    certainly flexible, but then the following CMC, those issues

 7    would be decided.

 8            THE COURT:  So let's take the easy case.  Defendant

 9    says -- defendant sends the deficiency letter.  It notifies

10    the contact person, plaintiff doesn't respond in 30 days.

11            In the Court's view, that's a core deficiency, it

12    should go on the list.  No dispute about that, right?

13    Ms. Johnston?

14            MS. JOHNSTON:  Correct.

15            THE COURT:  Okay.  They say blow off the plaintiff, I

16    don't know, for whatever reason, that's a core deficiency.  No

17    debate about it.

18            Let's take the other situation, where the plaintiff

19    gets the letter, they meet and confer, and there's a genuine

20    dispute about whether it has to be supplemented, amended,

21    whatever, and whether there's a core issue.

22            Now, I could be wrong and, Loretta, help me here, but

23    I think what we did in *Benicar*, was we would address that

24    issue at the monthly conference, the end of the month, we

25    would address that issue in the morning, identify what's core

 1  and what's not core, and then when we get to the afternoon

 2  with Judge Kugler, identify the orders that show cause that

 3  should be entered.

 4          I'm suggesting that might be a way to address this,

 5  so we could move this along.

 6          Loretta, is that how we did it in Benicar?

 7          MS. SMITH:  It was.  Ms. Sharko of Drinker Biddle

 8  would confirm which plaintiffs' fact sheets were deficient

 9  after the morning discussion.  And if this was a second sheet

10  conference deficiency, then an order to show cause order would

11  go out the next day for return by the next conference, monthly

12  conference.  Yes, Judge.

13          MS. JOHNSTON:  We're fine with doing that here, Your

14  Honor.

15          THE COURT:  Okay.  So let's just make sure that we're

16  clear from here on out, and then I'm going to ask Loretta to

17  address sort of a format of how this should be presented.

18          From here on out, defendants are going to identify

19  the contact person.  The plaintiffs have 30 days to respond,

20  you know, to meet and confer, not by e-mail.  Pick up the

21  phone.  It can't -- it has to be done -- the parties have to

22  talk.

23          If there's no response in 30 days, unquestionably,

24  hundred percent goes on the core dispute, order to show cause

25  list, whatever.

1          If the parties talk and dispute whether or not a

2     particular issue is core or not, then we'll address it in the

3     morning conference at the end of the month.  That will be an

4     issue for the agenda for the morning conference and the Court

5     will either decide if it's core, then the order to show cause

6     is not going to be issued.  If it's noncore, the Court could

7     always say, it has to be supplemented within 20 days without

8     issuing an order to show cause, if it's not material,

9     significant, what have you.  All right?

10         MS. LOCKARD:  Your Honor, it's Victoria Lockard.  The

11    original order did not allow 30 days to respond to the

12    deficiency letter.  It allowed two weeks.

13         THE COURT:  If that's what the order says, then we'll

14    go with two weeks.  So plaintiff gets a letter, they have two

15    weeks to pick up the phone and call whoever the contact person

16    is.  All right?  So we have that procedure going forward.

17         Loretta, do you want to indicate to the defendants

18    the format in which you want this information submitted to

19    help you with these orders?

20         MS. SMITH:  Thank you, Judge.

21         I would just like to say, because I'm the one who

22    actually issues the show cause orders, it really helps if

23    either in your letter appended at the end of your monthly CMC

24    letter, or in the exhibit appended to your letter, you list

25    the plaintiffs' names and each CMC of the two that the

1    deficiency has appeared in, and then I do not have to go back

2    and figure out what and when the deficiency appeared.

3            You can, if you want, list the kind of deficiency,

4    but just the deficiency that -- just listing the CMC is just

5    fine with me, and then we can amend that exhibit or table in

6    your letter, depending on how the CMC determines whether the

7    deficiency is core or not.

8            So thank you, if you just give me the two month

9    dates, that will be -- that will really be helpful.

10            Thanks, Judge.

11            MS. GOLDENBERG:  Your Honor, this is Marlene

12    Goldenberg.  I just have two small points of clarification.  I

13    just wanted to make sure that we're continuing the procedure

14    that we had discussed at a prior CMC where the case will be

15    listed twice before an order to show cause goes out; is that

16    right?

17            THE COURT:  I think that's what the order says,

18    Ms. Goldenberg, and we're going to follow the order.  I don't

19    have it in front of me, so I don't have a thousand percent

20    certainty.  But if that's what's in the order, that, of

21    course, is what we're going to follow.

22            MS. GOLDENBERG:  Perfect.

23            MS. SMITH:  Judge, TMO 16 does say that there are two

24    CMCs at which the deficiency is noted.  After the second CMC

25    if the deficiency hasn't been cured by the second conference,

1    monthly conference, then an order to show cause is issued, and

2    the hearing date for that is the next monthly CMC.

3          MS. GOLDENBERG:  And then the other point of

4    clarification I just wanted to ask was we are of course happy

5    to pick up the phone if there are disputes, but if the

6    plaintiff simply fixes the issue and serves the plaintiff fact

7    sheet through Centrality, again, which would provide a

8    notification to defendants, I just wanted to make sure that

9    the Court doesn't have a problem with couching that as

10   compliance with responding to the letter.

11         MS. LOCKARD:  Your Honor, if I may respond to that.

12   So part of the concern, I think, is it's a technical issue

13   with plaintiff loading things in certain places of Centrality.

14   It's not appearing to us on the defendants' side.

15         In the last few days, we've had a team reach out to

16   us as well, to our firm -- this is Victoria Lockard for the

17   record, by the way, and we've been able to resolve some of

18   those.  I mean, for example, there was one where a plaintiff

19   had mistakenly submitted a medical monitoring fact sheet which

20   had issues, and so we were able to resolve that.  But if

21   plaintiffs think they've, you know, corrected an issue on

22   Centrality and they just sent us an e-mail that says they

23   stand corrected, and we don't agree, then that's not a proper

24   meet and confer.

25         I do think that, you know, we will take a look at

1    every one if we get contacted by e-mail, but if it's not

2    something that is obvious, we have to have that

3    meet-and-confer process.

4         And we agreed to provide a contact sheet to

5    Ms. Goldenberg to have, you know, this process happen and

6    smooth out these wrinkles.  We are very organized on the

7    defense side, we have a plaintiff fact sheet subcommittee.  We

8    communicate daily by e-mail, and so this is not something that

9    can't be, you know, managed.  But just to get an e-mail or

10   just to have a plaintiff correct something on Centrality and

11   then not reach out to confirm with us is not going to advance

12   this process.

13        THE COURT:  Plaintiff, do you think it would be

14   helpful, and you know the mechanics of how this works better

15   than me, but the hypothetical where the defendant sends the

16   deficiency letter, plaintiff says, okay, I'm going to

17   supplement my fact sheet, I'm going to file my supplement

18   through Centrality.  Would it be helpful in addition to just

19   sending something through Centrality, if the plaintiff's

20   lawyer also sends an e-mail to whoever sent -- a direct e-mail

21   to whoever sent that deficiency letter, to notify them that a

22   supplement has been filed on Centrality.  Because I don't know

23   if the plaintiff files that supplement on Centrality, is the

24   associate or partner, whatever, who's responsible for that

25   fact sheet getting specific notice that a supplement was

 1   filed?

 2         MS. GOLDENBERG:  It's supposed to -- well, so when we

 3   serve an amended plaintiff fact sheet, what it does is it

 4   actually sends a notification through e-mail to the defendant

 5   and so, you know, they're asking for e-mails, and that's

 6   exactly what this gives them.

 7         THE COURT:  Separate question, does the e-mail go to

 8   the person who sent the deficiency letter, or does it just go

 9   to Mr. Goldberg along with the thousands of other e-mails he

10   gets?

11         MS. GOLDENBERG:  You know, that's a setting that the

12   defendants have control over.  Each side has the ability to

13   work with BrownGreer and set up their accounts so that

14   notifications go to whatever e-mail address they want.

15         So if the defendants' PFS subcommittee wanted to

16   designate other e-mail addresses where they wanted those

17   notifications to go to, my understanding is they have the

18   power to do that.

19         MS. LOCKARD:  And we are able to get -- we are able

20   to get those notices, we do get those notices.

21         THE COURT:  Okay.

22         MS. LOCKARD:  The breakdown is not in getting the

23   notices, it's that if the plaintiffs don't properly upload

24   something or they don't address the issue but they think that

25   they have, that communication is not happening.

1    THE COURT:  That's why I wonder, if you don't think
2    it's helpful, then don't do it.  But when the plaintiff sends
3    the supplement to Centrality, they press the button.  I'm
4    positing, why shouldn't plaintiff also send a separate e-mail
5    to whoever's responsible for that plaintiff, to let them know
6    that something was filed on Centrality?
7         MR. SLATER:  Hello, Your Honor, it's Adam Slater.
8    Could I just make a suggestion?  Because I think there's an
9    easy fix to this.  Why don't we just say that we will -- when
10   a supplement is made on Centrality the defense can give us
11   one person with one e-mail address where the confirmations are
12   going to, and that person can farm it out to whoever they want
13   to farm it out to on their side.  So we just know we send it
14   to one person every time we make an update, it confirms it,
15   there's an e-mail that confirms it.  Wouldn't that -- I think
16   that would solve the problem.
17        THE COURT:  Sounds like a good idea to me.
18   Ms. Lockard, why don't you talk to the plaintiffs about that,
19   and that's an extra step that I think would address your
20   issue.  If a filing is improperly filed on Centrality, the
21   responsible defense lawyer will know it and can track it down.
22        But to address your specific issue, suppose a
23   supplement is filed and a defendant is not satisfied that the
24   deficiency has been satisfied, right?  That's what you're
25   positing.  Isn't the burden then on the defendant to contact

1  the plaintiff again?

2        MS. LOCKARD:  Your Honor, this is an example that

3  they -- this is a perfect example of what I'm talking about.

4  There's the *Holland* case, right.  So the plaintiff indicated

5  that he had uploaded the medical records to Centrality, the

6  defendants did not get the medical records because there was

7  an extra -- there's a separate step required on the Centrality

8  site that requires, you know, the records to be made available

9  to defendants.

10        So we're getting a notice perhaps that there's a

11  supplement that's been loaded but we're not getting the

12  records.  Plaintiff thinks he's uploaded the records.  We

13  don't get them.  If we sent the deficiency letter, it should

14  be on the plaintiffs -- it should be the plaintiffs' burden to

15  reach out to us.  We've raised a deficiency, they need to

16  respond.

17        You know, just submitting more stuff to Centrality

18  without truly addressing the issue with counsel doesn't seem

19  satisfactory.  It's not that much of a burden.  You know, we

20  have sent the deficiency letter with the right person to

21  contact.  We will make sure that happens.  There's no reason

22  the plaintiffs' lawyer on that side can't pick up the phone

23  and call that lawyer.

24        THE COURT:  You want the plaintiffs' lawyer to pick

25  up the phone and say, Mrs. X or Ms. X, we've filed the

1   supplement on Centrality, go look at it?

2         MS. LOCKARD:  I want the plaintiff --

3         THE COURT:  That's a waste of time.

4         So this is what you're going to do.  Let's bring this

5   to closure.  There's going to be a contact person that

6   defendant notifies.  Mr. Slater's suggestion is a good one.

7   Notice is going to go to one representative of the defendant

8   who will farm it out to the defense lawyer who's responsible.

9   If the defendant is not happy or satisfied with the

10  supplement, then it becomes their duty to pick up the phone

11  and call the plaintiffs' lawyer again, okay?  And that's the

12  order to show cause issue.

13        Let's now go to the sales and pricing issue.  Again,

14  we've said that we're going to finalize all disputes regarding

15  the sales and pricing issue at the July 29th conference.

16  There's going to be supplemental document productions between

17  now and then.

18        We agreed to see if there were any issues that would

19  help advance the ball discussing at this conference so we

20  don't have to wait a month to resolve the issue.  The general

21  impression I'm getting from the correspondence is it's déjà vu

22  all over again with the search terms issues.  The parties are

23  arguing back and forth about the issue, and why wait until

24  July 28th to work it out?  Why can't they just work out the

25  issues now?

1        Exemplar documents are certainly going to be helpful.

2    Plaintiffs are going to get them one way or another in the

3    case.  If they get them, they can talk more intelligently

4    about what they want and don't want.  They can all help

5    advance the ball.  So I think it's a good idea to give

6    exemplars to the plaintiff.

7        With regard to the wholesaler/retailer issues, I'm

8    aware that they haven't produced documents yet, but they take

9    the position that the macro issues have to be addressed first,

10   which they will be on July 6th, and they want to see what the

11   manufacturers produce, so I would love to advance the ball and

12   have them produce exemplars, but it's somewhat of a

13   sympathetic position.  So those are my general thoughts.

14       Mr. Slater, I don't know what to do here about this

15   issue.  Is there something you think we can do now that will

16   help advance the ball so we don't have to wait a month or two

17   to hash out these issues?

18       MR. SLATER:  And I'll hand off to a few other people

19   to get into more detail if they want to supplement what I say.

20   But I think this is an example of where we -- we're here now

21   and we're talking about July 29th, but this is a process

22   that's been going on, for example, there's been discussions

23   with the wholesalers going back to February.

24       And I'll start with them, because -- and I do

25   understand where you're coming from, that the macro issues are

1    still to be decided, but we've been asking them for exemplars

2    of what they got from the manufacturers and what they gave

3    downstream to the retailers.  What do the documents look like,

4    and most important, what's the type of information that is

5    documented there?  Because, for example, we needed that in

6    order to oppose their macro briefing.  We never got it.  It

7    would have really been helpful to us to actually see the

8    documents as opposed to have to just answer in a vacuum a lot

9    of arguments, and I think it would have been helpful to the

10   Court.

11          Our most recent call yesterday, the request was, why

12   don't you put in writing what you're looking for.  That was

13   what Ms. Whiteley was asked to do by counsel for the

14   wholesalers and it was really kind of like, we've been telling

15   you for months, now you want us to again write something and

16   put something in an e-mail.  It's sort of like a, you know,

17   remembering Muhammad Ali, it's almost like a rope-a-dope.

18   Like okay, we'll talk more, then we'll let you know what we

19   can do, then we'll ask you again to tell us what you want.

20          And our problem is that it's just been going on for

21   so long, and we would think it would be such an easy thing to

22   give us something that obviously we're entitled to, obviously

23   will help to give them information, and ultimately, I can't

24   imagine they think, regardless of how the macro issues are

25   decided, that they're not going to have to give us the types

1    of documents that they have used in their transaction anyway.

2         So we've already lost what we thought was going to be

3    the benefit in terms of the macro briefing, and we had to do

4    it largely in a vacuum, the opposition.

5         We're still working to a large extent in a vacuum and

6    so, you know, one of the things I suggest is, well, why don't

7    you just give us exemplars of whatever you got from the

8    manufacturers and whatever you gave downstream, and they said,

9    well, why don't you tell us which specific documents you want,

10   and our answer was, well, we don't know what you use because

11   we can't even get that answer.

12        And then Ms. Whiteley asked for, well, how about a

13   redacted invoice and they said, we'll go back to our clients

14   and see if they'll be willing to do that.

15        So, I just want to give you the flavor a little bit

16   of what we're up against and it's been, honestly, you know,

17   the meet-and-confer process has become, I would say it again,

18   sort of rope-a-dope thing, where we just don't really ever get

19   to a closure point.  And I think you can understand from the

20   tone of our letter that we have certain frustration because we

21   know that starting in a few weeks, the rubber is going to hit

22   the road and millions of pages of documents are going to start

23   getting dropped on us.  And these are all things that really

24   should have been handled already, so that we could have had

25   this basis and this foundation.

1          So what we're trying to do in defense as to what's

2    coming and to try to not to keep pushing issues down the line

3    that are really basic things, and if I transition to the

4    request of ZHP, we can keep talking, and it always sounds

5    good, well, we'll continue to meet and confer.  But the

6    questions we're asking are the types of questions that you

7    never bring to a court, and that's what a lot of this

8    meet-and-confer process and a lot of what Your Honor is having

9    presented to you is things that you probably have never seen

10   these types of disputes before because this stuff just happens

11   automatically, the parties say, sure, we'll tell you this,

12   we'll tell you that, we'll give you this information, we'll

13   tell you what types of systems we're using.

14          I mean, this is so basic that it shouldn't be that

15   we're going to get whatever the defense wants to give us while

16   we have to come and bother Your Honor.  And that's, again, the

17   source of our frustration and that's why we're trying to move

18   this along.  We'd like to get this out of the way as soon as

19   possible for when we all know the types of disputes and the

20   types of issues we're going to be dealing with going forward,

21   where we really have really heavy issues in the case coming

22   up, things like are the document productions compliant with

23   ESI protocol.  Why aren't custodian productions being made for

24   certain witnesses that we prioritized.  The motion to dismiss

25   briefing, the deposition protocol which we'll be sending to

1   the defense shortly, et cetera, et cetera.  So I'll leave it

2   to Ms. Whiteley and Mr. Stanoch if they want to add what I'm

3   saying.  But I think that's really the flavor of where we're

4   coming from.

5       One other thing before I'll hand off.  For example,

6   with the manufacturers with these issues with exemplars or

7   giving us information, you know, ultimately, they have to give

8   us everything that they exchanged anyway with the other

9   parties.  But when you flip back to the wholesalers and they

10  say, well, why don't we wait and see what the manufacturers

11  are giving, they're not allowed to withhold documents because

12  someone else is going to give information through a different

13  document that's kept in a different format from a different

14  defendant.  I mean, we have to ultimately be able to try to

15  fill all the gaps, and it's unlikely everyone is going to give

16  us identical information, which is why we have to take

17  discovery from each defendant.

18      So, again, I'll hand off to my colleagues, hopefully

19  that gave some good overview to where we are.

20      THE COURT:  Let me just add a comment.  This is like

21  the same dispute we're having with each of these general

22  categories we're dealing with, the search term issue, the

23  protocol issue, the orders to show cause, the parties argue,

24  argue, argue, the Court finally puts the hammer down, and two

25  days before the hearing to address the issue and decide the

1  issue, the parties work it out.  I don't know why we have to

2  go through that on every single issue.

3          Listen, sales and pricing discovery is plainly

4  relevant to the case.  There's going to be legitimate disputes

5  about what has to be produced, but that's a subset of clearly

6  relevant information, and if the plaintiffs don't get it

7  voluntarily, they're going to get it through a 30(b)(6) or a

8  witness deposition.

9          From my experience, having done this 26 years before

10 I've been on the bench, it's a lot easier to work it out than

11 to prepare and produce a 30(b)(6) witness to testify about

12 these issues.

13         Just like with the core documents, I think if

14 plaintiffs had the basic rudimentary information, it helps

15 them frame their request, it helps them narrow the request, it

16 helps the Court decide the proportionality issue.

17         So what I'm saying is, shouldn't there be a subset of

18 clearly relevant discoverable exemplar documents that the

19 defendants can get their arms around so they can fine tune

20 their request and we can avoid, you know, regular disputes

21 about these issues.

22         I think we should hear from the defendant before we

23 hear from Miss Conlee Whiteley and co-counsel.

24         Defendants, I mean the wholesalers and retailers,

25 clearly there's exemplar documents that are going to be

1    produced in the case sometime.  Why not produce the documents,

2    or examples, not the documents, examples of the documents now

3    so you can -- so the plaintiff can fine tune what they need.

4    How does that hurt the wholesalers and retailers?  How does it

5    hurt the defendants to produce the documents that are going to

6    be produced July 15th or sometime after that?

7             So defendants, let's hear from you.

8             MR. GEOPPINGER:  Good morning, Your Honor.  Jeff

9    Geoppinger for the wholesalers.  If Ms. Johnston permits, I'll

10   go first because our name was brought up.

11            Your Honor, the wholesalers don't think exemplars are

12   controversial and production of them is controversial, their

13   request for production of them in the draft set that are

14   appended to the macro discovery, as you alluded to, was the

15   plan, as far as we understood all along, to resolve those

16   issues and finalize the request.  The request for exemplars

17   are in there, documents will be proud in response to those

18   requests.

19            The issue, Your Honor, that I do have to take issue

20   with is the idea that this has been something that's been

21   discussed since February is not accurate.

22            THE COURT:  Let's not go forward with that.

23            MR. GEOPPINGER:  Okay.  So on June 10th we discussed

24   this issue with Ms. Whiteley.  She advised that Mylan had

25   produced an exemplar, and that she would provide us

1    correspondence about what exemplars they were looking for.  I

2    understood that to mean, like, what dates they wanted, what

3    years, maybe between which defendants.  Obviously, we could

4    produce an exemplar from my client to be one between Teva, one

5    between Mylan, one between ZHP -- I mean, my understanding is

6    there was going to be correspondence about what it was that

7    they were focusing on.  That did not come.  The letter was

8    filed on the 16th or 17th which raised this issue with the

9    Court.  We had a call, there was discussion that we should

10   meet and confer.  We met and conferred yesterday.

11          Again, I thought the meet-and-confer conference would

12   be about, you know, wholesaler defendants, this is the kind of

13   exemplar we're looking for, you know, not the documents.  The

14   wholesalers know what documents there are.  There's a bill of

15   lading, there's a T3 document, there's other documents.  But

16   some direction from the plaintiffs about who they wanted them

17   between, maybe even direction about what we got from the

18   manufacturers and we want you to produce sort of the

19   corresponding exemplar documents to sort of match up with, for

20   instance, what Mylan gave us.

21          You know, you don't have to take my word for it.  In

22   their own letter from the 16th, the plaintiffs noted that the

23   stuff that they got from Mylan on the exemplar was not what

24   they were looking for and they went back to them to clarify.

25          So the idea was -- the idea from the wholesalers

 1   isn't we aren't -- we're willing to work with them and produce

 2   these documents even ahead of the finalization of the RFPs,

 3   but my understanding was that we were going to get some

 4   direction about what it was they were looking for, and

 5   hopefully in writing, because that's usually the best way to

 6   get it.

 7          But yesterday I got mixed messages about whether we

 8   should just go pull something off the shelf and hand it to

 9   them and say here's the exemplar, or whether they're going to

10   provide any of that direction in terms of what they're looking

11   for.  If they just want us to pull something off the shelf and

12   put it together and it doesn't matter to them which, you know,

13   what manufacturer it's between or what retailer it's to, then

14   fine, we'll do that.  We will do that and work on that and get

15   that done by, you know, probably even before the RFPs are

16   finalized.  But if there's direction to be had, you know, we

17   thought we were going -- that was what I was -- understanding

18   we were going to get through our June 10th conference, through

19   the correspondence to the Court on the 16th, through their

20   conferences with the other manufacturer defendants who have

21   been producing exemplars.

22          So if there's direction to be had, we'll certainly,

23   you know, we certainly like to receive it.  If not, then so be

24   it, we'll start working on that promptly.

25          MS. DAVIS:  Judge, this is D'Lesli Davis on the macro

1   issues and I wonder if I might show the Court just through a

2   little bit of the lens of how this looks from the macro issues

3   for just a moment, I'll be brief.

4          But the structure of the RFPs as proposed by the

5   plaintiffs made a great deal of sense as they came down to

6   what we agreed to.  They wanted the detail of each sale and

7   purchase by wholesalers, they wanted the date, the quantity,

8   the cost, the whatnot.  And while we consider that to be

9   burdensome and duplicative as briefed to Your Honor, that at

10  least made sense, it was summary information that would come

11  out of our computer files, and we told them that lot and batch

12  and expiration data information is not included therein and we

13  don't know how they get to product ID from that.  And we gave

14  them an exemplar for that.

15         There are other requests for production of exemplars

16  of what I'm going to call shipping documents, and that has

17  been tabled.  We can call that source documents.  That doesn't

18  include lot and batch information there for retailers either,

19  but that has been on hold, and the other RFPs with regard to

20  recall information.  They want to see how we get this product

21  off the shelf.  That's also been tabled while we address the

22  macro issues related to the computer summary detail

23  information.

24         Today is the first day I'm hearing that they have

25  somehow been prejudiced in their ability to brief the macro

1    issues that they identified by our failure to produce

2    information that's an exemplar in a tabled non-macro issue

3    RFP.

4         So we're a little bit blindsided by that and we

5    object to an included assertion that the macro issues as

6    identified by the plaintiff are not currently sitting on your

7    desk and ready for hearing on July 6th.  As Mr. Geoppinger has

8    just said, we're happy to work with them on these other

9    exemplars.  That just has not been the focus and it certainly

10    hadn't been the subject of macro briefing.

11         MS. JOHNSTON:  Your Honor, this is Sarah Johnston for

12    the retailer defendants, if I can just jump in very briefly

13    before we turn to plaintiffs.  I think that the letter that we

14    saw yesterday and the one we saw last week highlights what has

15    been a fundamental problem with trying to negotiate the

16    discovery and really any issues with plaintiffs in this

17    litigation, and that is that there is not a -- there is not an

18    effort to articulate two things.  And that is what is it that

19    you want, and who is it that you want it from.  And I guess

20    the third point would be, and have you asked that group of

21    defendants that you want something from for that thing.  And

22    here, we see a letter where plaintiffs say that they spoke to

23    the wholesalers and retailers yesterday about exemplar

24    documents.

25         No. 1, I don't know what exemplar documents are.  We

1    talked about them in broad conceptual terms, but I don't know

2    what those documents are, and they've never been articulated.

3    And in terms of how we've discussed them, we've discussed them

4    in broad strokes a few weeks ago, but not since, and certainly

5    not yesterday.

6         So it's tough for us to respond to -- respond to this

7    idea that we should have produced documents a long time ago or

8    that we are in the process of discussing producing documents,

9    but we're not having those discussions.  So to get the letter

10   yesterday or last night that says, you know, we've had the

11   discussions with the retailers and we think that the retailers

12   should be producing these documents, No. 1, I don't know what

13   documents they're talking about, and No. 2, no, we haven't had

14   those discussions.  And so I think there needs to be a better

15   effort to articulate what it is that you want, who it is that

16   you want it from, and to truly confirm it, you'd actually have

17   those discussions with a peer of defendants that you're

18   seeking that information from.

19        THE COURT:  In fairness, I mean, no one can dispute

20   that the plaintiffs have to give you some sort of direction on

21   what they're looking for, but on the other hand, plaintiffs

22   don't know what the defendants have, so they can't say, well,

23   we want type X document or type Y document, because they don't

24   know yet what types of documents each of the parties keeps,

25   what format they're in.  All they can say is, listen, we're

1  trying to get at what price you paid for the drugs and

2  rebates, whatever, whatever.  I mean, how specific do you want

3  plaintiffs to be and how can they be as specific as you want

4  without them knowing precisely what document the defendants'

5  have and without taking, God forbid, a 30(b)(6) deposition on

6  this issue.

7       MS. JOHNSTON:  Certainly, Your Honor, I think the

8  subset to that would be making sure we're on the phone to have

9  that discussion, which for the retailers, we were not.

10      THE COURT:  Okay.

11      MR. SLATER:  From the wholesalers, you asked what

12 information as to the specific documents the wholesalers, you

13 know, with the understanding from the RFP about what they're

14 looking for can put those together.  But the issue I was under

15 the impression we were discussing is, you know, the plaintiff

16 certainly didn't know who the defendants are.  If they want

17 exemplars from between AmerisourceBergen and Teva;

18 AmerisourceBergen and Mylan; AmerisourceBergen and ZHP or one

19 of the three or two of the three, or something that matches

20 with something they've already gotten from one of the

21 manufacturers, that's the information and the direction that

22 they can provide us without, you know -- that can be provided

23 by the plaintiffs.  I understood that that's what they were

24 going to do.  But as I said, after yesterday, it's a mixed

25 message about whether that's coming or not or whether we

1  should just proceed to basically identify the exemplars

2  ourselves and hand over an exemplar and we'll go from there.

3        It appears that that's what Mylan did on their first

4  go around with an exemplar and the plaintiffs responded that

5  more needed to be done.  So we're trying to avoid a situation

6  like that.

7        MS. WHITELEY:  Your Honor, this is Conlee Whiteley.

8  If I may address at least a couple of the calls that we had on

9  the meet and confers.  We did start this process in February,

10 and I know you don't want to digress, but just for context,

11 what we were told then by the wholesalers is that it would be

12 more helpful for us to get the information from the

13 manufacturers because that would -- the manufacturers have the

14 duty to produce, they do not, and to the extent they're

15 willing to work with us, they would like to keep the

16 manufacturer's documents.  I then began that day working with

17 Mr. Trischler to try to do that.  I eventually got the

18 exemplars that we were hoping to get within a week in their

19 formal discovery production.

20       As it turns out, we got those exemplars, there was

21 some helpful information there, but they were not produced

22 within the time period of the class, and we wanted to have

23 something produced within the class period and something

24 produced at least for our first exemplar to be to one of the

25 wholesalers, not to CVS.

1          I pointed that out to Mr. Trischler.  He said that he

2    would work on getting me a new exemplar, which he did

3    yesterday.  It took some time to make it through the uploading

4    process and through the day, and I spoke to Mr. Geoppinger

5    just yesterday and I explained to him what was going on, I

6    gave him the status of that production.  I told him I would

7    ask Mr. Trischler for permission to produce it to him.  I did.

8    Mr. Trischler did give me that permission to produce it.  I

9    have it now in pdf form this morning, which I plan to send to

10   him.  That's how the call ended, so I'm not sure why we're

11   unclear on that specific issue.  I'm going to send that to him

12   and we're going to work further.  The frustration is that now

13   it's June and this is something we had hoped to accomplish in

14   late February or early March.

15          THE COURT:  Okay, so where does that leave us,

16   Ms. Whiteley at the moment, looking forward?

17          MS. WHITELEY:  Looking forward today, the Mylan

18   documents will be sent to the wholesaler defendants and I will

19   ask for permission from the other manufacturing defendants to

20   allow us to do the same for them, and then I'm going to work

21   with the wholesaler defendants through a meet-and-confer

22   process to try to match up exactly what they need.  They're

23   going to speak to their clients and I believe they've

24   represented that they can get us at least some information and

25   that they know what we want, but they do have to get

1    permission for some redacted information so that we could at

2    least get forms to see how the transaction goes forward even

3    if we don't have the actual price.  That is how we ended our

4    calls yesterday, and we intend to move forward with that today

5    and over the next few days.

6         THE COURT:  Is that acceptable to the wholesalers and

7    retailers and defendants?

8         MR. GEOPPINGER:  Your Honor, Mr. Geoppinger.

9    Certainly moving forward with the meet and confer is

10   acceptable, yes.  With respect to us knowing what they want, I

11   think we have to have that meet and confer to nail that down.

12   So -- and with respect to pricing data in these exemplars as

13   we discussed yesterday, the pricing issue is squarely what's

14   before the Court on July 6th.  So, you know, pending that

15   ruling, we would be redacting any pricing information from an

16   invoice that would be included in a, quote unquote, exemplar

17   document between whatever parties that the plaintiffs are

18   asking us to identify.

19        MR. SLATER:  Your Honor, it's Adam Slater, I

20   apologize.  I think there's a really important point that

21   Mr. Geoppinger just brought out that I think is an underlying

22   theme to everything that's going on, where he said we're only

23   arguing about the pricing.  We're not.  And the sales is very

24   important.  I think it's important to really put in front of

25   the Court now for Your Honor where a major, major macro issue

1    in this litigation is going.

2         As Your Honor has seen, I assume, in the briefs filed

3    by the retailers and wholesalers, they both advised the Court

4    that it will be impossible for the plaintiffs or anybody in

5    the world to do a product ID tracing from manufacturer of API

6    down to a patient or back up the chain.  Basically trying to

7    say, it's going to be impossible to do the type of

8    identification that we are seeking to do and which everybody

9    expects us to make a high priority in this case, both for

10   liability and damage modeling purposes.

11        So when counsel said, A, all we're talking about is

12   sales, that's only a half of it, and two, they're happy to

13   meet and confer more, I have to tell you I got concerned when

14   I heard that, and I think that it's important to say this.  I

15   think that our good faith and our good will has been, to a

16   certain extent, taken advantage of where we never imagined we

17   would be here in late June still talking about defining for

18   the defendants what we're looking for when we've been defining

19   it for months.

20        So, you know, Ms. Whiteley talked about the process

21   we want to follow.  I would like to talk about where we'd like

22   to get to, which is within a very short time, like two weeks

23   on the outside, and that seems like a long time considering

24   how clear it should be to the defendants what they need to

25   give us.  We want the outgoing and ingoing exemplars.  They

1  know what they use when they transact these -- when they sell

2  or purchase these drugs.  They know what the transactional

3  documents are.  They should be just giving those to us.

4          And then, when we get the documents on the larger

5  production, we'll be able to compare what's coming in against

6  these exemplars to see if the sets of documents are matching

7  up, we'll be able to test the analysis that's been given by

8  them and the assertions of what does or does not exist or

9  whether things could be tracked, because where we're going

10 with this, it's a very difficult what I'm going to call a

11 litigation shell game.  As you heard, the wholesalers say,

12 well, go get it from the manufacturers.  The manufacturers

13 say, well, here's something, go get it from the wholesalers.

14         You know what they've never done, Judge?  The

15 defendants have never on their side been ordered to talk among

16 themselves and make sure that what they give us they can all

17 agree, yes, this is the complete set that we'll show you how

18 the transactions are built, and the documents that fill those

19 transactions out.

20         From my perspective, that would be incredibly helpful

21 if the defendants had to actually talk to one another and stop

22 using us in this game of telephone where we never can get it

23 right.

24         If they had to talk to each other and say, we're

25 going to collectively tell you these are exemplars from all

1 transactional documents up -- down the chain all the way to

2 the consumer from the top of the chain, then at least we'll

3 have something that we can all agree is a complete set that

4 shows us what information was going down and who is getting it

5 and when they were getting it, and then when we start to take

6 depositions at least we'll have that information, and when we

7 look at the documents we get in the productions, we can

8 compare.

9         I don't know any other way to get us to the end

10 point, because I believe that if we continue to meet and

11 confer as we're talking about doing, this will never end.

12         THE COURT:  I'm not sure what to say --

13         MR. SLATER:  Mixed messages.

14         THE COURT:  -- what to say, but we're not going to

15 decide and issue an order today because we said, the Court

16 said that we're going to wrap up the sales and pricing issue

17 at the July 29th conference and we'll brief it and argue it

18 and dispose of it.

19         Mr. Slater, the parties just have to meet and confer,

20 they just have to.  This litigation is too big, too

21 complicated, too costly, that the parties can't work, not

22 every issue out, parties can disagree in good faith, but basic

23 issues, such as getting the plaintiffs unquestionably relevant

24 examples of supply-type documents.  They just have to be

25 produced.  I'm not sure what else the Court can say.

1          The parties are just going to have to roll up their

2   sleeves and work this out, just like they worked out the --

3          MR. SLATER:  And, Your Honor, I'm aware and I

4   understand the process is going to continue.  I really wanted

5   to place on the record what our fundamental concerns are and

6   where I'm concerned this is going.  So at least that's now

7   been placed on the record and laid out as we continue to talk.

8   I know that we're going to continue to talk, but I wanted to

9   make it very clear that I believe we're going to get to the

10  point, unfortunately, where what I just said may have to

11  become the procedural posture of what we're ruling on, but I

12  hope not.  But I wanted to get that out there because

13  ultimately, if the defense is telling us this is going to be

14  an impossible task, well, we're going to be heavy in the

15  30(b)(6) depositions to have to test that hypothesis.

16         THE COURT:  We'll see.  I read the affidavits of both

17  sides, so I'm familiar with the issues.

18         I'm not sure there's anything else to say on this

19  sales and pricing issue.  The parties just have to continue to

20  talk.  To the extent plaintiffs can specify what they need,

21  that's great.  They obviously don't know the exact type of

22  documents the defendants have, but wholesalers and retailers,

23  I don't want to wait until a month from now to roll up our

24  sleeves on this issue.  You should be working on it now.  So

25  that's all we have to say.  You can tell my frustration

1    because I feel a little bit like we're going in -- like you're

2    going in circles around this and we'll be back to the same

3    thing with the search term issue the day before July 29th, the

4    parties will work this out, and I hope we don't get to that.

5            Are there any other issues we need to address on this

6    call, counsel?  We're on for oral argument on July 6th.  If

7    you don't get a ruling that day, you'll certainly get it very,

8    very, very quickly.  And I spoke to Judge Kugler, he said he

9    didn't have anything in particular he needed to address with

10   the parties today.

11           Anything else for the good of the order?

12           Okay.  Nothing else, we're adjourned and good luck.

13           RESPONSE:  Thank you, Your Honor.

14           (11:13 a.m.)

15           - - - - - - - - - - - - - - - - -

16

17           I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20   */S/ Karen Friedlander, CRR, RMR*
     *Court Reporter/Transcriber*_____

21

22   *June 24, 2020*
     *Date*

23

24

25

## /

*/S* [1] - 44:20

## 0

*07068* [1] - 1:12

## 1

*1* [2] - 34:25, 35:12
*10019-6022* [1] - 2:24
*103* [1] - 1:11
*10:00* [1] - 1:7
*10:06* [1] - 3:1
*10th* [2] - 30:23, 32:18
*11:13* [1] - 44:14
*1301* [1] - 2:23
*15th* [1] - 30:6
*16* [1] - 17:23
*16th* [3] - 31:8, 31:22, 32:19
*17th* [2] - 2:9, 31:8
*1835* [1] - 1:17
*19-2875* [1] - 3:3
*19103* [2] - 1:18, 2:10
*1:19-md-02875-RBK-JS* [1] - 1:4

## 2

*2* [1] - 35:13
*20* [1] - 16:7
*2020* [3] - 1:6, 3:1, 44:22
*2029* [1] - 2:17
*2150* [1] - 2:6
*24* [3] - 1:6, 3:1, 44:22
*2500* [1] - 2:13
*26* [1] - 29:9
*2800* [1] - 2:20
*28th* [1] - 23:24
*2900* [1] - 1:17
*29th* [4] - 23:15, 24:21, 42:17, 44:3

## 3

*30* [6] - 2:9, 13:20, 14:10, 15:19, 15:23, 16:11
*30(b)(6)* [4] - 29:7, 29:11, 36:5, 43:15
*300* [1] - 2:17
*30305* [1] - 2:13
*316* [1] - 1:14
*32502* [1] - 1:15
*3333* [1] - 2:13

## 4

*45202* [1] - 2:21

## 5

*55402* [1] - 2:7

## 6

*600* [2] - 1:14, 2:20
*6th* [4] - 24:10, 34:7, 39:14, 44:6

## 7

*701* [1] - 2:3
*70130* [1] - 2:3
*756-0160* [1] - 1:21

## 8

*800* [1] - 2:6
*856* [1] - 1:21

## 9

*90067-2904* [1] - 2:17

## A

*a.m* [2] - 1:7, 44:14
*A.M* [1] - 3:1
*ability* [2] - 20:12, 33:25
*able* [11] - 7:13, 9:17, 11:7, 13:22, 18:17, 18:20, 20:19, 28:14, 41:5, 41:7
*above-entitled* [1] - 44:18
*acceptable* [2] - 39:6, 39:10
*accomplish* [1] - 38:13
*accounts* [1] - 20:13
*accurate* [1] - 30:21
*Actavis* [2] - 2:14
*ACTION* [1] - 1:3
*actual* [1] - 39:3
*Adam* [3] - 3:9, 21:7, 39:19
*ADAM* [1] - 1:11
*add* [2] - 28:2, 28:20
*addition* [1] - 19:18
*address* [19] - 5:9, 6:7, 6:13, 7:20, 14:23, 14:25, 15:4, 15:17, 16:2, 20:14, 20:24, 21:11, 21:19, 21:22, 28:25, 33:21, 37:8,

44:5, 44:9
*addressed* [1] - 24:9
*addresses* [2] - 11:20, 20:16
*addressing* [1] - 22:18
*adjourned* [1] - 44:12
*advance* [5] - 19:11, 23:19, 24:5, 24:11, 24:16
*advantage* [1] - 40:16
*advised* [2] - 30:24, 40:3
*affidavits* [1] - 43:16
*afternoon* [1] - 15:1
*agenda* [3] - 4:4, 5:10, 16:4
*ago* [2] - 35:4, 35:7
*agree* [5] - 6:18, 9:1, 18:23, 41:17, 42:3
*agreed* [4] - 12:22, 19:4, 23:18, 33:6
*agreement* [2] - 4:24, 5:5
*ahead* [1] - 32:2
*aided* [1] - 1:22
*Ali* [1] - 25:17
*ALL* [1] - 3:1
*allow* [2] - 16:11, 38:20
*allowed* [2] - 16:12, 28:11
*alluded* [1] - 30:14
*almost* [1] - 25:17
*amend* [1] - 17:5
*amended* [3] - 9:22, 14:20, 20:3
*Americas* [1] - 2:23
*AmerisourceBergen* [5] - 2:21, 4:1, 36:17, 36:18
*amount* [2] - 13:5, 13:13
*analysis* [1] - 41:7
*Angeles* [1] - 2:17
*answer* [5] - 5:24, 8:22, 25:8, 26:10, 26:11
*answers* [1] - 6:3
*anyway* [3] - 4:22, 26:1, 28:8
*API* [1] - 40:5
*apologize* [1] - 39:20
*appearance* [1] - 3:4
*appearances* [1] - 3:7
*appeared* [2] - 17:1, 17:2
*appearing* [1] - 18:14
*appended* [3] - 16:23, 16:24, 30:14
*approach* [1] - 5:14

*April* [1] - 6:25
*argue* [6] - 7:24, 8:5, 28:23, 28:24, 42:17
*argued* [1] - 8:5
*arguing* [2] - 23:23, 39:23
*argument* [3] - 5:2, 5:6, 44:6
*arguments* [1] - 25:9
*arms* [1] - 29:19
*articulate* [2] - 34:18, 35:15
*articulated* [1] - 35:2
*assertion* [1] - 34:5
*assertions* [1] - 41:8
*assistance* [1] - 10:24
*associate* [1] - 19:24
*assume* [1] - 40:2
*assuming* [1] - 8:9
*Atlanta* [1] - 2:13
*attorney* [3] - 6:19, 8:21, 8:24
*Aurobindo* [1] - 4:14
*automatically* [2] - 10:13, 27:11
*available* [2] - 12:10, 22:8
*Avenue* [2] - 2:6, 2:23
*avoid* [2] - 29:20, 37:5
*aware* [2] - 24:8, 43:3

## B

*ball* [4] - 23:19, 24:5, 24:11, 24:16
*BARNES* [1] - 2:16
*base* [1] - 5:10
*basic* [4] - 27:3, 27:14, 29:14, 42:22
*basis* [1] - 26:25
*batch* [2] - 33:11, 33:18
*Baylen* [1] - 1:14
*beast* [1] - 5:7
*become* [2] - 26:17, 43:11
*becomes* [1] - 23:10
*began* [1] - 37:16
*behalf* [3] - 3:20, 6:13, 9:13
*bench* [1] - 29:10
*benefit* [1] - 26:3
*Benicar* [4] - 5:17, 14:4, 14:23, 15:6
*BERNE* [1] - 2:19
*best* [1] - 32:5
*better* [3] - 4:23, 19:14, 35:14
*between* [10] - 10:5, 23:16, 31:3, 31:4,

31:5, 31:17, 32:13, 36:17, 39:17
*Biddle* [1] - 15:7
*big* [1] - 42:20
*bill* [1] - 31:14
*bit* [4] - 26:15, 33:2, 34:4, 44:1
*blindsided* [1] - 34:4
*blow* [1] - 14:15
*bother* [1] - 27:16
*breakdown* [1] - 20:22
*Brian* [1] - 7:16
*bridge* [1] - 7:4
*brief* [3] - 33:3, 33:25, 42:17
*briefed* [1] - 33:9
*briefing* [4] - 25:6, 26:3, 27:25, 34:10
*briefly* [1] - 34:12
*briefs* [2] - 5:2, 40:2
*bring* [2] - 23:4, 27:7
*broad* [2] - 35:1, 35:4
*brought* [2] - 30:10, 39:21
*BrownGreer* [2] - 11:21, 20:13
*built* [1] - 41:18
*burden* [3] - 21:25, 22:14, 22:19
*burdensome* [1] - 33:9
*button* [2] - 11:19, 21:3
*BY* [10] - 1:11, 1:14, 1:17, 2:2, 2:5, 2:9, 2:12, 2:16, 2:19, 2:23

## C

*CA* [1] - 2:17
*Camp* [1] - 2:3
*carefully* [1] - 6:16
*case* [15] - 5:17, 5:22, 6:7, 7:7, 11:2, 14:3, 14:5, 14:8, 17:14, 22:4, 24:3, 27:21, 29:4, 30:1, 40:9
*cases* [3] - 8:15, 10:2, 10:9
*categories* [1] - 28:22
*Centrality* [25] - 8:13, 9:21, 11:16, 11:18, 12:4, 12:5, 12:7, 12:9, 12:17, 18:7, 18:13, 18:22, 19:10, 19:18, 19:19, 19:22, 19:23, 21:3, 21:6, 21:10, 21:20, 22:5, 22:7, 22:17, 23:1

**Century** [1] - 2:17
**certain** [7] - 6:21, 8:15, 18:13, 26:20, 27:24, 40:16
**certainly** [10] - 9:8, 14:6, 24:1, 32:22, 32:23, 34:9, 35:4, 36:7, 36:16, 44:7
**Certainly** [1] - 39:9
**certainty** [1] - 17:20
**certify** [1] - 44:17
**cetera** - 28:1
**chain** [3] - 40:6, 42:1, 42:2
**chart** [1] - 6:15
**chime** [1] - 13:17
**cincinnati** [1] - 2:21
**circles** [1] - 44:2
**circulated** [1] - 9:25
**CIVIL** [1] - 1:3
**clarification** [2] - 17:12, 18:4
**clarify** [1] - 31:24
**class** [2] - 37:22, 37:23
**clear** [3] - 15:16, 40:24, 43:9
**clearly** [3] - 29:5, 29:18, 29:25
**Clem** [1] - 7:15
**clerk** [1] - 5:16
**client** [2] - 12:8, 31:4
**client's** [2] - 12:11, 13:22
**clients** [2] - 26:13, 38:23
**closure** [2] - 23:5, 26:19
**CM/ECF** [1] - 12:6
**CMC** [9] - 8:4, 14:6, 16:23, 16:25, 17:4, 17:6, 17:14, 17:24, 18:2
**CMCs** [1] - 17:24
**co** [1] - 29:23
**Co** [1] - 2:18
**co-counsel** [1] - 29:23
**COHEN** [2] - 2:12, 3:19
**Cohen** [1] - 3:20
**colleagues** [1] - 28:18
**collectively** [1] - 41:25
**coming** [6] - 24:25, 27:2, 27:21, 28:4, 36:25, 41:5
**Commencing** [1] - 1:7
**commend** [2] - 4:7, 4:22
**comment** [1] - 28:20
**committee** [2] - 7:17,

8:12
**communicate** [1] - 19:8
**communication** [1] - 20:25
**compare** [2] - 41:5, 42:8
**complete** [2] - 41:17, 42:3
**compliance** [1] - 18:10
**compliant** [1] - 27:22
**complicated** [1] - 42:21
**computer** [3] - 1:22, 33:11, 33:22
**computer-aided** [1] - 1:22
**conceptual** [1] - 35:1
**concern** [2] - 7:4, 18:12
**concerned** [2] - 40:13, 43:6
**concerns** [1] - 43:5
**concrete** [1] - 11:13
**confer** [24] - 6:8, 7:9, 8:21, 10:19, 12:18, 12:22, 13:14, 13:21, 14:1, 14:19, 15:20, 18:24, 19:3, 26:17, 27:5, 27:8, 31:10, 31:11, 38:21, 39:9, 39:11, 40:13, 42:11, 42:19
**CONFERENCE** [1] - 1:5
**conference** [16] - 5:3, 11:3, 14:3, 14:24, 15:10, 15:11, 15:12, 16:3, 16:4, 17:25, 18:1, 23:15, 23:19, 31:11, 32:18, 42:17
**conferences** [1] - 32:20
**conferred** [1] - 31:10
**conferring** [1] - 12:24
**confers** [2] - 7:3, 37:9
**confirm** [3] - 15:8, 19:11, 35:16
**confirmations** [1] - 21:11
**confirms** [2] - 21:14, 21:15
**CONLEE** [1] - 2:2
**Conlee** [3] - 3:14, 29:23, 37:7
**consequential** [2] - 5:22, 6:17
**consider** [1] - 33:8
**considering** [1] -

40:23
**constipation** [1] - 10:17
**constitutes** [2] - 10:11, 10:20
**consumer** [1] - 42:2
**contact** [12] - 7:13, 8:17, 9:14, 12:23, 13:12, 14:10, 15:19, 16:15, 19:4, 21:25, 22:21, 23:5
**contacted** [2] - 10:1, 19:1
**context** [1] - 37:10
**continue** [6] - 27:5, 42:10, 43:4, 43:7, 43:8, 43:19
**CONTINUED** [1] - 2:1
**continuing** [1] - 17:13
**control** [1] - 20:12
**controversial** [2] - 30:12
**coordination** [1] - 10:6
**core** [19] - 5:10, 5:12, 5:22, 10:11, 10:15, 10:20, 10:25, 11:8, 13:24, 14:11, 14:16, 14:21, 14:25, 15:1, 15:24, 16:2, 16:5, 17:7, 29:13
**correct** [4] - 13:7, 14:14, 19:10, 44:17
**corrected** [2] - 18:21, 18:23
**correspondence** [5] - 10:7, 23:21, 31:1, 31:6, 32:19
**corresponding** [1] - 31:19
**cost** [1] - 33:8
**costly** [1] - 42:21
**couching** [1] - 18:9
**counsel** [13] - 3:5, 6:7, 9:6, 10:2, 10:8, 10:19, 11:10, 12:15, 22:18, 25:13, 29:23, 40:11, 44:6
**couple** [1] - 37:8
**course** [2] - 17:21, 18:4
**court** [1] - 27:7
**Court** [2] - 1:20, 44:20
**COURT** [1] - 1:1
**Court's** [2] - 10:23, 14:11
**CRR** [1] - 44:20
**cured** [1] - 17:25
**custodian** [1] - 27:23
**CVS** [3] - 2:18, 3:23,

37:25

# D

**D'Lesli** [1] - 32:25
**D'LESLI** [1] - 2:23
**daily** [1] - 19:8
**damage** [1] - 40:10
**Daniel** [1] - 3:11
**DANIEL** [1] - 1:14, 2:19
**data** [2] - 33:12, 39:12
**Date** [1] - 44:22
**date** [6] - 5:21, 7:24, 8:22, 10:16, 18:2, 33:7
**dates** [2] - 17:9, 31:2
**DAVIS** [3] - 2:12, 2:23, 32:25
**Davis** [1] - 32:25
**days** [9] - 13:20, 14:10, 15:19, 15:23, 16:7, 16:11, 18:15, 28:25, 39:5
**deadline** [1] - 9:9
**deal** [1] - 33:5
**dealing** [2] - 27:20, 28:22
**debatable** [1] - 13:7
**debate** [2] - 13:23, 14:17
**debating** [1] - 13:25
**decide** [4] - 16:5, 28:25, 29:16, 42:15
**decided** [5] - 10:17, 11:2, 14:7, 25:1, 25:25
**decision** [1] - 14:5
**Defendant** [3] - 2:10, 2:18, 2:21
**defendant** [17] - 6:13, 6:20, 11:23, 12:10, 13:13, 14:8, 14:9, 19:15, 20:4, 21:23, 21:25, 23:6, 23:7, 23:9, 28:14, 28:17, 29:22
**defendants** [41] - 3:5, 3:16, 3:18, 3:20, 3:24, 4:2, 8:14, 8:15, 9:21, 9:24, 10:13, 12:3, 12:21, 13:22, 15:18, 16:17, 18:8, 20:12, 22:6, 22:9, 29:19, 29:24, 30:5, 30:7, 31:3, 31:12, 32:20, 34:12, 34:21, 35:17, 35:22, 36:16, 38:18, 38:19, 38:21, 39:7, 40:18, 40:24,

41:15, 41:21, 43:22
**Defendants** [1] - 2:14
**defendants'** [6] - 6:11, 7:17, 10:4, 18:14, 20:15, 36:4
**defense** [15] - 10:2, 10:19, 10:21, 11:5, 11:10, 11:19, 11:25, 19:7, 21:10, 21:21, 23:8, 27:1, 27:15, 28:1, 43:13
**Defense** [1] - 2:10
**deficiencies** [5] - 5:23, 6:15, 7:20, 11:8, 11:24
**deficiency** [34] - 5:11, 5:12, 6:24, 7:1, 8:10, 10:11, 10:14, 10:15, 10:20, 10:24, 10:25, 12:15, 13:6, 13:12, 13:24, 14:9, 14:11, 14:16, 15:10, 16:12, 17:1, 17:2, 17:3, 17:4, 17:7, 17:24, 17:25, 19:16, 19:21, 20:8, 21:24, 22:13, 22:15, 22:20
**deficient** [1] - 15:8
**defining** [2] - 40:17, 40:18
**deposition** [3] - 27:25, 29:8, 36:5
**depositions** [2] - 42:6, 43:15
**deputy** [1] - 4:19
**designate** [1] - 20:16
**designed** [1] - 6:6
**desk** [1] - 34:7
**detail** [3] - 24:19, 33:6, 33:22
**determined** [1] - 10:23
**determines** [1] - 17:6
**diagnosed** [1] - 5:21
**different** [9] - 6:2, 6:11, 9:3, 9:24, 10:5, 11:6, 28:12, 28:13
**difficult** [1] - 41:10
**difficulty** [1] - 6:21
**digress** [1] - 37:10
**direct** [1] - 19:20
**direction** [8] - 31:16, 31:17, 32:4, 32:10, 32:16, 32:22, 35:20, 36:21
**directly** [1] - 8:21
**disagree** [2] - 13:4, 42:22
**discoverable** [1] - 29:18
**discovery** [5] - 28:17,

29:3, 30:14, 34:16, 37:19

**discuss** [4] - 5:1, 5:8, 5:14, 9:14

**discussed** [7] - 13:17, 17:14, 30:21, 30:23, 35:3, 39:13

**discussing** [3] - 23:19, 35:8, 36:15

**discussion** [3] - 15:9, 31:9, 36:9

**discussions** [5] - 24:22, 35:9, 35:11, 35:14, 35:17

**dismiss** [1] - 27:24

**dispose** [1] - 42:18

**dispute** [6] - 14:12, 14:20, 15:24, 16:1, 28:21, 35:19

**disputes** [6] - 18:5, 23:14, 27:10, 27:19, 29:4, 29:20

**DISTRICT** [2] - 1:1, 1:1

**divided** [2] - 8:14, 12:3

**docket** [1] - 4:17

**Docket** [1] - 3:3

**document** [8] - 23:16, 27:22, 28:13, 31:15, 35:23, 36:4, 39:17

**documented** [1] - 25:5

**documents** [43] - 5:11, 24:1, 24:8, 25:3, 25:8, 26:1, 26:9, 26:22, 28:11, 29:13, 29:18, 29:25, 30:1, 30:2, 30:5, 30:17, 31:13, 31:14, 31:15, 31:19, 32:2, 33:16, 33:17, 34:24, 34:25, 35:2, 35:7, 35:8, 35:12, 35:13, 35:24, 36:12, 37:16, 38:18, 41:3, 41:4, 41:6, 41:18, 42:1, 42:7, 42:24, 43:22

**done** [7] - 9:20, 12:13, 15:21, 29:9, 32:15, 37:5, 41:14

**dope** [2] - 25:17, 26:18

**down** [8] - 21:21, 27:2, 28:24, 33:5, 39:11, 40:6, 42:1, 42:4

**downstream** [2] - 25:3, 26:8

**dozens** [1] - 6:23

**draft** [1] - 30:13

**Drinker** [1] - 15:7

**dropped** [1] - 26:23

**drugs** [2] - 36:1, 41:2

**DUANE** [1] - 2:8

**duplicative** [1] - 33:9

**duty** [4] - 9:8, 13:5, 23:10, 37:14

**déjà** [1] - 23:21

## E

**e-mail** [20] - 4:16, 11:20, 12:7, 12:9, 12:16, 15:20, 18:22, 19:1, 19:8, 19:9, 19:20, 20:4, 20:7, 20:14, 20:16, 21:4, 21:11, 21:15, 25:16

**e-mails** [3] - 9:24, 20:5, 20:9

**early** [1] - 38:14

**easier** [1] - 29:10

**East** [1] - 2:17

**easy** [3] - 14:8, 21:9, 25:21

**ECF** [1] - 7:18

**effort** [3] - 7:6, 34:18, 35:15

**Eisenhower** [1] - 1:11

**either** [4] - 10:23, 16:5, 16:23, 33:18

**end** [5] - 14:24, 16:3, 16:23, 42:9, 42:11

**ended** [2] - 38:10, 39:3

**enter** [1] - 5:6

**entered** [4] - 4:9, 4:11, 4:12, 15:3

**entitled** [2] - 25:22, 44:18

**entries** [1] - 3:4

**errors** [1] - 11:5

**ESI** [1] - 27:23

**ESQUIRE** [10] - 1:11, 1:14, 1:17, 2:2, 2:5, 2:9, 2:12, 2:12, 2:16, 2:23

**essential** [2] - 6:23, 12:18

**essentially** [1] - 6:24

**et** [2] - 28:1

**eventually** [1] - 37:17

**exact** [1] - 43:21

**exactly** [2] - 20:6, 38:22

**example** [8] - 12:8, 18:18, 22:2, 22:3, 24:20, 24:22, 25:5, 28:5

**examples** [4] - 10:18, 30:2, 42:24

**exchanged** [1] - 28:8

**excuse** [1] - 8:25

**executive** [2] - 7:17, 8:11

**exemplar** [18] - 24:1, 29:18, 29:25, 30:25, 31:4, 31:13, 31:19, 31:23, 32:9, 33:14, 34:2, 34:23, 34:25, 37:2, 37:4, 37:24, 38:2, 39:16

**exemplars** [19] - 24:6, 24:12, 25:1, 26:7, 28:6, 30:11, 30:16, 31:1, 32:21, 33:15, 34:9, 36:17, 37:1, 37:18, 37:20, 39:12, 40:25, 41:6, 41:25

**exhibit** [4] - 9:25, 10:2, 16:24, 17:5

**Exhibit** [1] - 5:18

**exist** [2] - 11:9, 41:8

**exists** [1] - 10:24

**expecting** [1] - 5:19

**expects** [1] - 40:9

**experience** [1] - 29:9

**expiration** [1] - 33:12

**explained** [2] - 12:1, 38:5

**explanation** [1] - 6:20

**extent** [4] - 26:5, 37:14, 40:16, 43:20

**extra** [2] - 21:19, 22:7

## F

**fact** [17] - 5:24, 5:25, 6:3, 8:23, 9:3, 9:22, 11:13, 11:15, 11:21, 11:23, 15:8, 18:6, 18:19, 19:7, 19:17, 19:25, 20:3

**failure** [1] - 34:1

**fair** [1] - 12:20

**fairness** [1] - 35:19

**faith** [2] - 40:15, 42:22

**familiar** [2] - 4:20, 43:17

**far** [1] - 30:15

**farm** [3] - 21:12, 21:13, 23:8

**February** [4] - 24:23, 30:21, 37:9, 38:14

**few** [5] - 18:15, 24:18, 26:21, 35:4, 39:5

**fighting** [1] - 13:9

**figure** [1] - 17:2

**file** [1] - 19:17

**filed** [8] - 19:22, 20:1, 21:6, 21:20, 21:23,

22:25, 31:8, 40:2

**files** [2] - 19:23, 33:11

**filing** [1] - 21:20

**fill** [2] - 28:15, 41:18

**filling** [1] - 6:21

**finalization** [1] - 32:2

**finalize** [2] - 23:14, 30:16

**finalized** [1] - 32:16

**finally** [1] - 28:24

**fine** [5] - 15:13, 17:5, 29:19, 30:3, 32:14

**fire** [1] - 12:7

**firm** [6] - 8:16, 8:23, 9:5, 9:18, 12:3, 18:16

**firms** [3] - 9:25, 10:5, 11:6

**first** [9] - 4:6, 6:14, 10:21, 12:12, 24:9, 30:10, 33:24, 37:3, 37:24

**five** [2] - 9:24, 11:6

**fix** [1] - 21:9

**fixed** [2] - 9:21, 10:1

**fixes** [1] - 18:6

**flavor** [2] - 26:15, 28:3

**flexible** [1] - 14:6

**flip** [1] - 28:9

**Florida** [1] - 1:15

**focus** [1] - 34:9

**focusing** [1] - 31:7

**follow** [3] - 17:18, 17:21, 40:21

**following** [3] - 11:2, 14:3, 14:6

**FOR** [1] - 1:1

**forbid** [1] - 36:5

**foregoing** [1] - 44:17

**form** [1] - 38:9

**formal** [1] - 37:19

**format** [4] - 15:17, 16:18, 28:13, 35:25

**forms** [1] - 39:2

**forth** [1] - 23:23

**forward** [8] - 16:16, 27:20, 30:22, 38:16, 38:17, 39:2, 39:4, 39:9

**foundation** [1] - 26:25

**four** [1] - 4:21

**frame** [1] - 29:15

**FREEMAN** [1] - 1:10

**Friedlander** [2] - 1:20, 44:20

**friedlanderreporter @gmail.com** [1] - 1:20

**front** [3] - 13:18, 17:19, 39:24

**frustration** [4] - 26:20, 27:17, 38:12, 43:25

**FULBRIGHT** [1] - 2:22

**fundamental** [2] - 34:15, 43:5

## G

**game** [2] - 41:11, 41:22

**gaps** [2] - 6:21, 28:15

**general** [3] - 23:20, 24:13, 28:21

**generate** [1] - 12:2

**genuine** [1] - 14:19

**Geoppinger** [6] - 4:1, 30:9, 34:7, 38:4, 39:8, 39:21

**GEOPPINGER** [6] - 2:19, 3:25, 4:1, 30:8, 30:23, 39:8

**Georgia** [1] - 2:13

**given** [2] - 13:19, 41:7

**glad** [1] - 4:23

**God** [1] - 36:5

**Goldberg** [13] - 3:18, 4:8, 4:10, 4:12, 5:19, 7:15, 7:19, 8:11, 8:17, 8:20, 9:2, 12:14, 20:9

**GOLDBERG** [3] - 2:9, 3:17, 4:14

**Goldberg's** [1] - 8:16

**GOLDENBERG** [13] - 2:5, 2:5, 9:12, 11:17, 12:1, 12:20, 13:9, 13:16, 17:11, 17:22, 18:3, 20:2, 20:11

**Goldenberg** [6] - 7:2, 9:13, 11:14, 17:12, 17:18, 19:5

**GOLOMB** [1] - 1:16

**great** [2] - 33:5, 43:21

**GREENBERG** [1] - 2:11

**Greenberg** [1] - 7:16

**Grossman** [1] - 9:17

**group** [1] - 34:20

**Group** [1] - 2:10

**guess** [2] - 12:24, 34:19

## H

**half** [1] - 40:12

**hammer** [1] - 28:24

**hand** [6] - 24:18, 28:5, 28:18, 32:8, 35:21, 37:2

**handled** [1] - 26:24

**handles** [1] - 5:16
**hands** [1] - 7:22
**happy** [6] - 10:19, 11:10, 18:4, 23:9, 34:8, 40:12
**hash** [1] - 24:17
**Health** [1] - 2:18
**hear** [6] - 8:8, 8:25, 9:11, 29:22, 29:23, 30:7
**heard** [2] - 40:14, 41:11
**hearing** [4] - 18:2, 28:25, 33:24, 34:7
**heavy** [3] - 4:4, 27:21, 43:14
**hello** [1] - 21:7
**help** [8] - 11:14, 13:10, 14:22, 16:19, 23:19, 24:4, 24:16, 25:23
**helpful** [10] - 17:9, 19:14, 19:18, 21:2, 24:1, 25:7, 25:9, 37:12, 37:21, 41:20
**helps** [4] - 16:22, 29:14, 29:15, 29:16
**Hetero** [1] - 4:15
**high** [1] - 40:9
**highlights** [1] - 34:14
**hit** [3] - 4:16, 11:19, 26:21
**hold** [1] - 33:19
**Holland** [1] - 22:4
**honestly** [1] - 26:16
**Honik** [1] - 3:12
**HONIK** [3] - 1:16, 1:17, 3:12
**Honor** [31] - 3:12, 3:14, 3:17, 3:19, 3:25, 6:12, 7:12, 9:12, 11:17, 13:16, 15:14, 16:10, 17:11, 18:11, 21:7, 22:2, 27:8, 27:16, 30:8, 30:11, 30:19, 33:9, 34:11, 36:7, 37:7, 39:8, 39:19, 39:25, 40:2, 43:3, 44:13
**Honor's** [1] - 10:10
**HONORABLE** [1] - 1:8
**hope** [3] - 13:19, 43:12, 44:4
**hoped** [1] - 38:13
**hopefully** [3] - 6:7, 28:18, 32:5
**hoping** [1] - 37:18
**hundred** [2] - 9:9, 15:24
**hurt** [2] - 30:4, 30:5
**hypothesis** [1] - 43:15

**hypothetical** [2] - 11:24, 19:15

**I**

**ID** [2] - 33:13, 40:5
**idea** [6] - 21:17, 24:5, 30:20, 31:25, 35:7
**identical** [1] - 28:16
**identification** [1] - 40:8
**identified** [2] - 34:1, 34:6
**identifies** [1] - 13:12
**identify** [8] - 6:16, 10:13, 12:17, 14:25, 15:2, 15:18, 37:1, 39:18
**ignore** [1] - 13:7
**ignoring** [2] - 6:24, 7:6
**imagine** [1] - 25:24
**imagined** [1] - 40:16
**important** [5] - 25:4, 39:20, 39:24, 40:14
**imposes** [1] - 4:24
**impossible** [3] - 40:4, 40:7, 43:14
**impression** [2] - 23:21, 36:15
**improperly** [1] - 21:20
**improvised** [1] - 7:10
**IN** [1] - 1:3
**Inc** [3] - 2:14, 2:15, 3:24
**include** [1] - 33:18
**included** [4] - 10:18, 33:12, 34:5, 39:16
**incredibly** [1] - 41:20
**indicate** [1] - 16:17
**indicated** [1] - 22:4
**individual** [2] - 6:19, 7:5
**individually** [1] - 2:24
**Industries** [1] - 2:14
**information** [32] - 7:11, 7:14, 7:18, 9:18, 11:18, 12:23, 13:1, 16:18, 25:4, 25:23, 27:12, 28:7, 28:12, 28:16, 29:6, 29:14, 33:10, 33:12, 33:18, 33:20, 33:23, 34:2, 35:18, 36:12, 36:21, 37:12, 37:21, 38:24, 39:1, 39:15, 42:4, 42:6
**ingoing** [1] - 40:25
**initiate** [1] - 7:20
**instance** [1] - 31:20
**instances** [1] - 6:18

**instead** [1] - 5:2
**instructions** [1] - 8:17
**intelligently** [1] - 24:3
**intend** [2] - 6:13, 39:4
**intended** [1] - 8:3
**interrogatories** [1] - 6:4
**introduce** [1] - 3:6
**invoice** [2] - 26:13, 39:16
**involved** [1] - 5:20
**issue** [56] - 4:8, 5:1, 5:3, 5:11, 5:12, 5:16, 6:1, 6:10, 8:3, 9:7, 9:14, 10:1, 10:3, 10:16, 11:11, 12:21, 14:21, 14:24, 14:25, 16:2, 16:4, 18:6, 18:12, 18:21, 20:24, 21:20, 21:22, 22:18, 23:12, 23:13, 23:15, 23:20, 23:23, 24:15, 28:22, 28:23, 28:25, 29:1, 29:2, 29:16, 30:19, 30:24, 31:8, 34:2, 36:6, 36:14, 38:11, 39:13, 39:25, 42:15, 42:16, 42:22, 43:19, 43:24, 44:3
**issued** [4] - 8:13, 10:13, 16:6, 18:1
**issues** [32] - 5:5, 5:8, 5:9, 5:20, 6:8, 14:6, 16:22, 18:20, 23:18, 23:22, 23:25, 24:7, 24:9, 24:17, 24:25, 25:24, 27:2, 27:20, 27:21, 28:6, 29:12, 29:21, 30:16, 33:1, 33:2, 33:22, 34:1, 34:5, 34:16, 42:23, 43:17, 44:5
**issuing** [1] - 16:8

**J**

**Jeff** [2] - 3:25, 30:8
**JEFFREY** [1] - 2:19
**JERSEY** [1] - 1:1
**Jersey** [1] - 1:12
**JOEL** [1] - 1:8
**Johnston** [4] - 3:23, 14:13, 30:9, 34:11
**JOHNSTON** [6] - 2:16, 3:23, 14:14, 15:13, 34:11, 36:7
**Joint** [1] - 2:10
**judge** [1] - 32:25
**JUDGE** [1] - 1:8
**Judge** [9] - 5:15, 14:4,

15:2, 15:12, 16:20, 17:10, 17:23, 41:14, 44:8
**July** [11] - 8:4, 23:15, 23:24, 24:10, 24:21, 30:6, 34:7, 39:14, 42:17, 44:3, 44:6
**jump** [1] - 34:12
**June** [7] - 1:6, 7:1, 30:23, 32:18, 38:13, 40:17, 44:22
**JUNE** [1] - 3:1

**K**

**KANNER** [1] - 2:2
**Karen** [2] - 1:20, 44:20
**KATZ** [1] - 1:10
**keep** [3] - 27:2, 27:4, 37:15
**keeps** [1] - 35:24
**kept** [1] - 28:13
**kind** [5] - 10:14, 17:3, 25:14, 31:12
**knowing** [4] - 9:21, 11:6, 36:4, 39:10
**knows** [1] - 8:24
**Kugler** [3] - 14:4, 15:2, 44:8
**Kugler's** [1] - 5:15

**L**

**lading** [1] - 31:15
**laid** [1] - 43:7
**large** [1] - 26:5
**largely** [1] - 26:4
**larger** [1] - 41:4
**Lasalle** [1] - 2:6
**last** [3] - 18:15, 34:14, 35:10
**late** [2] - 38:14, 40:17
**law** [1] - 5:16
**LAW** [1] - 2:5
**lawyer** [7] - 19:20, 21:21, 22:22, 22:23, 22:24, 23:8, 23:11
**lawyers** [2] - 7:5, 7:12
**lead** [1] - 3:4
**least** [3] - 10:31, 37:8, 37:24, 38:24, 39:2, 42:2, 42:6, 43:6
**leave** [2] - 28:1, 38:15
**legitimate** [1] - 29:4
**lens** [1] - 33:2
**letter** [12] - 5:18, 7:8, 8:10, 9:1, 9:16, 12:4, 12:5, 12:13, 12:16, 13:6, 13:20, 14:9, 14:19, 16:12, 16:14,

16:23, 16:24, 17:6, 18:10, 19:16, 19:21, 20:8, 22:13, 22:20, 26:20, 31:7, 31:22, 34:13, 34:22, 35:9
**letterhead** [1] - 7:14
**letters** [7] - 4:3, 6:24, 7:1, 7:14, 8:16, 9:19, 10:18
**LEVIN** [1] - 1:13
**liability** [1] - 40:10
**LIABILITY** [1] - 1:4
**line** [2] - 10:21, 27:2
**list** [9] - 6:22, 8:2, 10:9, 11:5, 13:22, 14:12, 15:25, 16:24, 17:3
**listed** [5] - 6:15, 6:25, 9:19, 9:23, 17:15
**listen** [2] - 29:3, 35:25
**listing** [1] - 17:4
**litigation** [4] - 34:17, 40:1, 41:11, 42:20
**LITIGATION** [1] - 1:4
**lived** [1] - 5:4
**LLC** [3] - 1:10, 2:2, 2:14
**LLP** [4] - 2:8, 2:11, 2:16, 2:19
**loaded** [1] - 22:11
**loading** [1] - 18:13
**locate** [1] - 7:19
**LOCKARD** [10] - 2:12, 3:22, 6:12, 8:13, 16:10, 18:11, 20:19, 20:22, 22:2, 23:2
**Lockard** [7] - 3:21, 6:12, 9:14, 13:17, 16:10, 18:16, 21:18
**log** [1] - 11:18
**look** [4] - 4:15, 9:17, 18:25, 23:1, 25:3, 42:7
**looked** [2] - 5:18, 6:2
**looking** [12] - 25:12, 31:1, 31:13, 31:24, 32:4, 32:10, 35:21, 36:14, 38:16, 38:17, 40:18
**looks** [1] - 33:2
**Loretta** [5] - 5:15, 14:22, 15:6, 15:16, 16:17
**LORI** [1] - 2:12
**Lori** [1] - 3:19
**Los** [1] - 2:17
**lost** [1] - 26:2
**Louisiana** [1] - 2:3
**love** [1] - 24:11
**Ltd** [1] - 2:14

*luck* [1] - 44:12

## M

*macro* [14] - 24:9, 24:25, 25:6, 25:24, 26:3, 30:14, 32:25, 33:2, 33:22, 33:25, 34:2, 34:5, 34:10, 39:25
*MAGISTRATE* [1] - 1:8
*mail* [20] - 4:16, 11:20, 12:7, 12:9, 12:16, 15:20, 18:22, 19:1, 19:8, 19:9, 19:20, 20:4, 20:7, 20:14, 20:16, 21:4, 21:11, 21:15, 25:16
*mails* [3] - 9:24, 20:5, 20:9
*major* [2] - 39:25
*managed* [1] - 19:9
*management* [2] - 11:2, 14:3
*manufacturer* [3] - 32:13, 32:20, 40:5
*manufacturer's* [1] - 37:16
*manufacturers* [11] - 24:11, 25:2, 26:8, 28:6, 28:10, 31:18, 36:21, 37:13, 41:12
*manufacturing* [1] - 38:19
*March* [1] - 38:14
*Market* [1] - 1:17
*Marlene* [2] - 9:12, 17:11
*MARLENE* [1] - 2:5
*match* [2] - 31:19, 38:22
*matches* [1] - 36:19
*matching* [1] - 41:6
*material* [4] - 5:25, 6:10, 10:16, 16:8
*matter* [2] - 32:12, 44:18
*MAZIE* [1] - 1:10
*MBL* [1] - 12:9
*McKesson* [1] - 2:24
*MDL* [2] - 3:2, 9:20
*mean* [9] - 5:19, 18:18, 27:14, 28:14, 29:24, 31:2, 31:5, 35:19, 36:2
*mechanical* [1] - 1:22
*mechanically* [1] - 11:15
*mechanics* [1] - 19:14

*medical* [3] - 18:19, 22:5, 22:6
*meet* [26] - 6:7, 7:3, 7:9, 8:20, 10:19, 12:17, 12:22, 13:14, 13:21, 14:1, 14:19, 15:20, 18:24, 19:3, 26:17, 27:5, 27:8, 31:10, 31:11, 37:9, 38:21, 39:9, 39:11, 40:13, 42:10, 42:19
*meet-and-confer* [6] - 12:22, 19:3, 26:17, 27:8, 31:11, 38:21
*meeting* [1] - 12:23
*Megan* [1] - 9:16
*message* [1] - 36:25
*messages* [2] - 32:7, 42:13
*met* [1] - 31:10
*might* [5] - 4:18, 4:25, 7:8, 15:4, 33:1
*millions* [1] - 26:22
*Minneapolis* [1] - 2:7
*Minnesota* [1] - 2:7
*Miss* [1] - 29:23
*missed* [1] - 4:10
*missing* [1] - 8:22
*mistakenly* [1] - 18:19
*mixed* [3] - 32:7, 36:24, 42:13
*modeling* [1] - 40:10
*moment* [3] - 5:15, 33:3, 38:16
*monitoring* [1] - 18:19
*month* [6] - 14:24, 16:3, 17:8, 23:20, 24:16, 43:23
*monthly* [5] - 14:24, 15:11, 16:23, 18:1, 18:2
*months* [3] - 7:19, 25:15, 40:19
*morning* [15] - 3:9, 3:12, 3:14, 3:17, 3:19, 3:22, 3:25, 4:11, 4:19, 14:25, 15:9, 16:3, 16:4, 30:8, 38:9
*MORRIS* [1] - 2:8
*most* [2] - 25:4, 25:11
*motion* [1] - 27:24
*move* [3] - 15:5, 27:17, 39:4
*moving* [1] - 39:9
*MR* [15] - 3:9, 3:11, 3:12, 3:17, 3:25, 4:14, 21:7, 24:18, 30:8, 30:23, 36:11, 39:8, 39:19, 42:13,

43:3
*MS* [33] - 3:14, 3:19, 3:22, 3:23, 6:12, 8:13, 9:12, 11:17, 12:1, 12:20, 13:9, 13:16, 14:14, 15:7, 15:13, 16:10, 16:20, 17:11, 17:22, 17:23, 18:3, 18:11, 20:2, 20:11, 20:19, 20:22, 22:2, 23:2, 32:25, 34:11, 36:7, 37:7, 38:17
*Muhammad* [1] - 25:17
*Mylan* [7] - 30:24, 31:5, 31:20, 31:23, 36:18, 37:3, 38:17

## N

*nail* [1] - 39:11
*name* [3] - 8:17, 13:22, 30:10
*names* [3] - 6:25, 7:15, 16:25
*narrow* [1] - 29:15
*narrowed* [1] - 11:12
*nature* [1] - 5:7
*NE* [1] - 2:13
*necessary* [1] - 10:24
*need* [10] - 5:13, 7:25, 8:1, 8:5, 22:15, 30:3, 38:22, 40:24, 43:20, 44:5
*needed* [3] - 25:5, 37:5, 44:9
*needs* [2] - 10:6, 35:14
*negotiate* [2] - 8:20, 34:15
*never* [9] - 25:6, 27:7, 27:9, 35:2, 40:16, 41:14, 41:15, 41:22, 42:11
*new* [1] - 38:2
*NEW* [1] - 1:1
*New* [3] - 1:12, 2:3, 2:24
*next* [4] - 15:11, 18:2, 39:5
*nice* [1] - 5:4
*Nigh* [1] - 3:11
*NIGH* [2] - 1:14, 3:11
*night* [1] - 35:10
*nitpicked* [1] - 6:4
*nitpicking* [1] - 7:8
*non* [1] - 34:2
*non-macro* [1] - 34:2
*noncore* [1] - 16:6
*normal* [1] - 7:7

*NORTON* [1] - 2:22
*noted* [2] - 17:24, 31:22
*nothing* [1] - 44:12
*notice* [4] - 13:12, 19:25, 22:10, 23:7
*notices* [3] - 20:20, 20:23
*notification* [4] - 11:21, 12:10, 18:8, 20:4
*notifications* [3] - 9:22, 20:14, 20:17
*notifies* [2] - 14:9, 23:6
*notify* [1] - 19:21
*NUMBER* [1] - 1:3
*number* [1] - 6:14
*NY* [1] - 2:24

## O

*obese* [1] - 5:21
*obesity* [1] - 7:25
*object* [1] - 34:5
*obvious* [1] - 19:2
*obviously* [4] - 25:22, 31:3, 43:21
*OF* [1] - 1:1
*Official* [1] - 1:20
*OH* [1] - 2:21
*once* [1] - 13:11
*one* [27] - 4:11, 4:19, 4:24, 7:19, 10:7, 10:24, 14:5, 16:21, 18:18, 19:1, 21:11, 21:14, 23:6, 23:7, 24:2, 26:6, 28:5, 31:4, 31:5, 34:14, 35:19, 36:18, 36:20, 37:24, 41:21
*oppose* [1] - 25:6
*opposed* [1] - 25:8
*opposition* [1] - 26:4
*oral* [1] - 44:6
*order* [26] - 4:24, 6:6, 6:9, 8:3, 10:21, 10:22, 11:1, 13:17, 13:18, 13:25, 15:10, 15:24, 16:5, 16:8, 16:11, 16:13, 17:15, 17:17, 17:18, 17:20, 18:1, 23:12, 25:6, 42:15, 44:11
*ordered* [1] - 41:15
*orders* [9] - 4:8, 5:6, 5:16, 10:12, 14:2, 15:2, 16:19, 16:22, 28:23
*organized* [1] - 19:6

*original* [1] - 16:11
*originally* [1] - 9:20
*Orleans* [1] - 2:3
*ought* [1] - 5:13
*ourselves* [1] - 37:2
*outgoing* [1] - 40:25
*outside* [1] - 40:23
*oversight* [1] - 8:22
*overview* [1] - 28:19
*own* [2] - 12:8, 31:22

## P

*pages* [1] - 26:22
*paid* [1] - 36:1
*PAPANTONIO* [1] - 1:13
*Park* [1] - 2:17
*Parkway* [1] - 1:11
*part* [3] - 6:11, 13:24, 18:12
*particular* [3] - 9:5, 16:2, 44:9
*parties* [23] - 3:18, 4:7, 4:23, 4:25, 5:5, 5:9, 10:23, 15:21, 16:1, 23:22, 27:11, 28:9, 28:23, 29:1, 35:24, 39:17, 42:19, 42:21, 42:22, 43:1, 43:19, 44:4, 44:10
*PARTIES* [1] - 3:1
*partner* [1] - 19:24
*parts* [1] - 11:13
*patient* [1] - 40:6
*PC* [1] - 1:16
*pdf* [1] - 38:9
*peer* [1] - 35:17
*pending* [1] - 39:14
*Pennsylvania* [2] - 1:18, 2:10
*Pensacola* [1] - 1:15
*people* [6] - 3:3, 6:2, 7:16, 10:7, 12:2, 24:18
*percent* [3] - 9:10, 15:24, 17:19
*perfect* [4] - 5:4, 6:5, 17:22, 22:3
*perhaps* [1] - 22:10
*period* [2] - 37:22, 37:23
*permanent* [1] - 5:15
*permission* [4] - 38:7, 38:8, 38:19, 39:1
*permits* [1] - 30:9
*person* [15] - 7:13, 8:20, 8:24, 12:14, 12:19, 13:13, 14:10, 15:19, 16:15, 20:8,

21:11, 21:12, 21:14, 22:20, 23:5
**personally** [1] - 9:16
**perspective** [1] - 41:20
**PFS** [1] - 20:15
**Pharma** [1] - 2:15
**Pharmaceutical** [1] - 2:14
**Pharmaceuticals** [1] - 2:14
**Pharmacy** [1] - 3:24
**Philadelphia** [2] - 1:18, 2:10
**phone** [12] - 3:3, 7:9, 7:20, 9:3, 9:4, 15:21, 16:15, 18:5, 22:22, 22:25, 23:10, 36:8
**pick** [6] - 15:20, 16:15, 18:5, 22:22, 22:24, 23:10
**Piedmont** [1] - 2:13
**place** [3] - 13:11, 13:15, 43:5
**placed** [1] - 43:7
**places** [1] - 18:13
**plainly** [1] - 29:3
**Plaintiff** [5] - 1:12, 1:15, 1:18, 2:4, 2:7
**plaintiff** [36] - 3:8, 7:7, 8:8, 8:10, 9:5, 9:22, 11:1, 12:16, 12:17, 12:23, 13:11, 14:10, 14:15, 14:18, 16:14, 18:6, 18:13, 18:18, 19:7, 19:10, 19:13, 19:16, 19:23, 20:3, 21:2, 21:4, 21:5, 22:1, 22:4, 22:12, 23:2, 24:6, 30:3, 34:6, 36:15
**plaintiff's** [2] - 6:3, 19:19
**plaintiffs** [39] - 3:5, 3:10, 3:11, 3:13, 3:15, 5:23, 6:24, 7:15, 7:25, 8:25, 9:2, 9:13, 12:3, 12:25, 13:4, 13:19, 15:19, 18:21, 20:23, 21:18, 22:14, 24:2, 29:6, 29:14, 31:16, 31:22, 33:5, 34:13, 34:16, 34:22, 35:20, 35:21, 36:3, 36:23, 37:4, 39:17, 40:4, 42:23, 43:20
**plaintiffs'** [17] - 6:19, 7:5, 7:12, 8:21, 8:24, 9:6, 9:11, 9:25, 10:8,

11:13, 12:15, 15:8, 16:25, 22:14, 22:22, 22:24, 23:11
**plan** [2] - 30:15, 38:9
**PLLC** [1] - 2:5
**plug** [1] - 11:18
**point** [9] - 10:10, 10:15, 11:5, 18:3, 26:19, 34:20, 39:20, 42:10, 43:10
**pointed** [1] - 38:1
**points** [1] - 17:12
**portal** [1] - 12:11
**positing** [2] - 21:4, 21:25
**position** [5] - 8:6, 9:11, 10:12, 24:9, 24:13
**possible** [1] - 27:19
**posture** [1] - 43:11
**power** [1] - 20:18
**precisely** [1] - 36:4
**prejudiced** [1] - 33:25
**prepare** [1] - 29:11
**present** [4] - 8:2, 11:11, 12:24, 13:10
**presented** [2] - 15:17, 27:9
**presently** [1] - 12:13
**press** [1] - 21:3
**price** [2] - 36:1, 39:3
**pricing** [11] - 5:1, 5:11, 23:13, 23:15, 29:3, 39:12, 39:13, 39:15, 39:23, 42:16, 43:19
**prioritized** [1] - 27:24
**priority** [1] - 40:9
**problem** [9] - 6:17, 6:23, 9:21, 10:14, 13:3, 18:9, 21:16, 25:20, 34:15
**problems** [1] - 9:15
**procedural** [1] - 43:11
**procedure** [2] - 16:16, 17:13
**proceed** [1] - 37:1
**Proceedings** [1] - 1:22
**proceedings** [1] - 44:18
**process** [16] - 6:6, 7:9, 8:4, 13:10, 19:3, 19:5, 19:12, 24:21, 26:17, 27:8, 35:8, 37:9, 38:4, 38:22, 40:20, 43:4
**produce** [12] - 24:11, 24:12, 29:11, 30:1, 30:5, 31:4, 31:18,

32:1, 34:1, 37:14, 38:7, 38:8
**produced** [11] - 1:22, 24:8, 29:5, 30:1, 30:6, 30:25, 35:7, 37:21, 37:23, 37:24, 42:25
**producing** [3] - 32:21, 35:8, 35:12
**product** [3] - 33:13, 33:20, 40:5
**production** [6] - 30:12, 30:13, 33:15, 37:19, 38:6, 41:5
**productions** [4] - 23:16, 27:22, 27:23, 42:7
**PRODUCTS** [1] - 1:3
**programmed** [1] - 11:20
**project** [1] - 10:4
**promptly** [1] - 32:24
**proper** [1] - 18:23
**properly** [1] - 20:23
**proportionality** [1] - 29:16
**proposed** [1] - 33:4
**protocol** [3] - 27:23, 27:25, 28:23
**proud** [1] - 30:17
**provide** [6] - 12:22, 18:7, 19:4, 30:25, 32:10, 36:22
**provided** [2] - 6:20, 36:22
**PSB** [2] - 9:17, 9:18
**pull** [2] - 32:8, 32:11
**purchase** [2] - 33:7, 41:2
**purposes** [1] - 40:10
**pushing** [1] - 27:2
**put** [9] - 5:20, 12:4, 13:15, 13:22, 25:12, 25:16, 32:12, 36:14, 39:24
**puts** [1] - 28:24

## Q

**quantity** [1] - 33:7
**questions** [2] - 27:6
**quickly** [1] - 44:8
**quote** [1] - 39:16

## R

**raised** [2] - 22:15, 31:8
**RE** [1] - 1:3
**reach** [6] - 5:5, 8:1,

13:13, 18:15, 19:11, 22:15
**reached** [2] - 4:24, 6:19
**reaching** [1] - 7:2
**read** [1] - 43:16
**ready** [3] - 11:11, 11:22, 34:7
**realistic** [1] - 8:2
**really** [19] - 4:4, 5:8, 5:19, 6:5, 6:9, 16:22, 17:9, 25:7, 25:14, 26:18, 26:23, 27:3, 27:21, 28:3, 34:16, 39:20, 39:24, 43:4
**reason** [3] - 8:18, 14:16, 22:21
**rebates** [1] - 36:2
**receive** [1] - 32:23
**received** [3] - 4:3, 4:9, 9:24
**receives** [1] - 13:12
**recent** [1] - 25:11
**record** [5] - 3:2, 18:17, 43:5, 43:7, 44:18
**recorded** [1] - 1:22
**records** [5] - 22:5, 22:6, 22:8, 22:12
**redacted** [2] - 26:13, 39:1
**redacting** [1] - 39:15
**regard** [2] - 24:7, 33:19
**regarding** [1] - 23:14
**regardless** [1] - 25:24
**regular** [1] - 29:20
**related** [1] - 33:22
**relevant** [4] - 29:4, 29:6, 29:18, 42:23
**remained** [1] - 10:2
**remembering** [1] - 25:17
**Reporter** [1] - 1:20
**Reporter/ Transcriber** [1] - 44:20
**representative** [1] - 23:7
**represented** [1] - 38:24
**request** [8] - 25:11, 27:4, 29:15, 29:20, 30:13, 30:16
**requests** [2] - 30:18, 33:15
**required** [1] - 22:7
**requires** [1] - 22:8
**resolve** [4] - 18:17, 18:20, 23:20, 30:15
**resolved** [2] - 7:23,

8:2
**respect** [2] - 39:10, 39:12
**respond** [14] - 5:24, 9:1, 9:8, 9:9, 11:1, 13:5, 13:20, 14:10, 15:19, 16:11, 18:11, 22:16, 35:6
**responded** [1] - 37:4
**responding** [1] - 18:10
**response** [3] - 13:21, 15:23, 30:17
**RESPONSE** [1] - 44:13
**responsible** [4] - 19:24, 21:5, 21:21, 23:8
**retailer** [3] - 3:24, 32:13, 34:12
**retailers** [11] - 25:3, 29:24, 30:4, 33:18, 34:23, 35:11, 36:9, 39:7, 40:3, 43:22
**return** [2] - 10:10, 15:11
**review** [1] - 11:22
**reviewing** [1] - 10:7
**RFP** [2] - 34:3, 36:13
**RFPs** [4] - 32:2, 32:15, 33:19
**RMR** [1] - 44:20
**road** [2] - 26:22
**Road** [1] - 2:13
**roll** [2] - 43:1, 43:23
**rope** [2] - 25:17, 26:18
**rope-a-dope** [2] - 25:17, 26:18
**ROSE** [1] - 2:22
**Roseland** [1] - 1:12
**rubber** [1] - 26:21
**Ruben** [1] - 3:12
**RUBEN** [1] - 1:17
**Rubenstein** [1] - 7:16
**Rubenstein** [1] - 7:16
**rudimentary** [1] - 29:14
**ruling** [3] - 39:15, 43:11, 44:7
**running** [1] - 10:3

## S

**sale** [1] - 33:6
**sales** [9] - 5:1, 5:11, 23:13, 23:15, 29:3, 39:23, 40:12, 42:16, 43:19
**SARAH** [1] - 2:16
**Sarah** [2] - 3:23, 34:11
**satisfactory** [1] -

*22:19*

**satisfied** [3] - 21:23, 21:24, 23:9

**saw** [2] - 34:14

**SCHNEIDER** [1] - 1:8

**scope** [1] - 11:12

**search** [4] - 4:7, 23:22, 28:22, 44:3

**second** [3] - 15:9, 17:24, 17:25

**see** [10] - 23:18, 24:10, 25:7, 26:14, 28:10, 33:20, 34:22, 39:2, 41:6, 43:16

**seeking** [2] - 35:18, 40:8

**seem** [1] - 22:18

**sell** [1] - 41:1

**send** [6] - 4:16, 7:8, 21:4, 21:13, 38:9, 38:11

**sending** [3] - 6:25, 19:19, 27:25

**sends** [5] - 14:9, 19:15, 19:20, 20:4, 21:2

**sense** [2] - 33:5, 33:10

**sent** [14] - 4:11, 4:13, 4:14, 4:19, 7:1, 8:10, 11:6, 18:22, 19:20, 19:21, 20:8, 22:13, 22:20, 38:18

**separate** [3] - 20:7, 21:4, 22:7

**separated** [1] - 10:5

**serve** [4] - 11:19, 12:5, 12:6, 20:3

**served** [2] - 11:16

**serves** [1] - 18:6

**set** [4] - 20:13, 30:13, 41:17, 42:3

**Seth** [3] - 3:17, 7:15, 7:19

**SETH** [1] - 2:9

**sets** [1] - 41:6

**setting** [1] - 20:11

**Sharko** [1] - 15:7

**sheet** [14] - 5:24, 6:3, 8:23, 9:22, 11:13, 11:21, 15:9, 18:7, 18:19, 19:4, 19:7, 19:17, 19:25, 20:3

**sheets** [5] - 5:25, 9:4, 11:15, 11:23, 15:8

**shelf** [3] - 32:8, 32:11, 33:21

**shell** [1] - 41:11

**shipping** [1] - 33:16

**short** [1] - 40:22

**shortly** [1] - 28:1

**show** [20] - 5:16, 6:6, 6:9, 8:3, 10:12, 10:21, 10:22, 10:25, 15:2, 15:10, 15:24, 16:5, 16:8, 16:22, 17:15, 18:1, 23:12, 28:23, 33:1, 41:17

**shows** [1] - 42:4

**side** [11] - 10:4, 10:6, 11:19, 11:25, 12:2, 18:14, 19:7, 20:12, 21:13, 22:22, 41:15

**sides** [2] - 3:5, 43:17

**signed** [6] - 4:11, 4:19, 4:20, 4:21, 8:11, 12:14

**significant** [4] - 5:25, 6:10, 10:16, 16:9

**simply** [2] - 7:5, 18:6

**single** [2] - 7:7, 29:2

**sit** [2] - 9:4, 13:7

**site** [1] - 22:8

**sitting** [1] - 34:6

**situation** [2] - 14:18, 37:5

**SLATER** [9] - 1:10, 1:11, 3:9, 21:7, 24:18, 36:11, 39:19, 42:13, 43:3

**Slater** [5] - 3:9, 21:7, 24:14, 39:19, 42:19

**Slater's** [1] - 23:6

**sleeves** [2] - 43:2, 43:24

**small** [1] - 17:12

**SMITH** [3] - 15:7, 16:20, 17:23

**smooth** [1] - 19:6

**solve** [1] - 21:16

**solved** [1] - 13:2

**someone** [5] - 5:20, 8:11, 8:23, 9:5, 28:12

**sometime** [2] - 30:1, 30:6

**somewhat** [1] - 24:12

**soon** [1] - 27:18

**sort** [7] - 12:5, 15:17, 25:16, 26:18, 31:18, 31:19, 35:20

**sound** [1] - 4:20

**sounds** [2] - 21:17, 27:4

**source** [2] - 27:17, 33:17

**specific** [7] - 19:25, 21:22, 26:9, 36:2, 36:3, 36:12, 38:11

**specify** [1] - 43:20

**squarely** [1] - 39:13

**stand** [1] - 18:23

**Stanoch** [1] - 28:2

**start** [7] - 3:7, 5:12, 24:24, 26:22, 32:24, 37:9, 42:5

**started** [1] - 7:25

**starting** [1] - 26:21

**STATES** [2] - 1:1, 1:8

**status** [1] - 38:6

**STATUS** [1] - 1:5

**stenography** [1] - 1:22

**step** [3] - 5:15, 21:19, 22:7

**still** [4] - 10:2, 25:1, 26:5, 40:17

**stipulations** [1] - 4:13

**stop** [1] - 41:21

**Street** [4] - 1:17, 2:3, 2:9, 2:20

**strokes** [1] - 35:4

**structure** [1] - 33:4

**stuff** [3] - 22:17, 27:10, 31:23

**subcommittee** [2] - 19:7, 20:15

**subject** [1] - 34:10

**submit** [1] - 5:24

**submitted** [2] - 16:18, 18:19

**submitting** [1] - 22:17

**subset** [3] - 29:5, 29:17, 36:8

**substantial** [1] - 6:10

**suggest** [1] - 26:6

**suggesting** [1] - 15:4

**suggestion** [2] - 21:8, 23:6

**suite** [1] - 2:20

**Suite** [5] - 1:14, 1:17, 2:6, 2:13, 2:17

**summary** [2] - 33:10, 33:22

**supplement** [12] - 19:17, 19:22, 19:23, 19:25, 21:3, 21:10, 21:23, 22:11, 23:1, 23:10, 24:19

**supplemental** [1] - 23:16

**supplemented** [2] - 14:20, 16:7

**supply** [1] - 42:24

**supply-type** [1] - 42:24

**suppose** [2] - 5:6, 21:22

**supposed** [1] - 20:2

**sympathetic** [1] - 24:13

**system** [2] - 8:14, 12:8

**systems** [1] - 27:13

## T

**T3** [1] - 31:15

**table** [1] - 17:5

**tabled** [3] - 33:17, 33:21, 34:2

**task** [1] - 43:14

**team** [1] - 18:15

**technical** [1] - 18:12

**telephone** [2] - 1:5, 41:22

**TELEPHONE** [1] - 3:1

**term** [3] - 4:8, 28:22, 44:3

**terms** [5] - 23:22, 26:3, 32:10, 35:1, 35:3

**terribly** [1] - 5:22

**test** [2] - 41:7, 43:15

**testify** [1] - 29:11

**Teva** [5] - 2:14, 2:14, 3:20, 31:4, 36:17

**THE** [2] - 1:1, 1:8

**The Court** [53] - 3:2, 3:16, 4:3, 4:18, 4:24, 5:20, 7:23, 8:2, 8:3, 8:7, 8:18, 11:14, 11:23, 12:6, 12:12, 13:2, 13:10, 13:23, 14:8, 14:15, 15:15, 16:4, 16:6, 16:13, 17:17, 18:9, 19:13, 20:7, 20:21, 21:1, 21:17, 22:24, 23:3, 25:9, 28:20, 28:24, 29:16, 30:22, 31:8, 32:19, 33:1, 35:19, 36:10, 38:15, 39:6, 39:14, 39:25, 40:3, 42:12, 42:14, 42:15, 42:25, 43:16

**theme** [1] - 39:22

**themselves** [1] - 41:16

**therein** [1] - 33:12

**they've** [6] - 12:3, 18:21, 35:2, 36:20, 38:23, 41:14

**thinks** [1] - 22:12

**third** [1] - 34:20

**THORNBURG** [1] - 2:16

**thoughts** [1] - 24:13

**thousand** [2] - 9:3, 17:19

**thousands** [1] - 20:9

**three** [5] - 4:12, 4:20, 7:19, 36:19

**tied** [1] - 7:22

**TMO** [1] - 17:23

**today** [7] - 4:5, 5:13, 33:24, 38:17, 39:4, 42:15, 44:10

**today's** [1] - 5:10

**together** [2] - 32:12, 36:14

**tone** [1] - 26:20

**took** [1] - 38:3

**top** [1] - 42:2

**Torrent's** [1] - 4:14

**touch** [1] - 5:10

**tough** [1] - 35:6

**tracing** [1] - 40:5

**track** [1] - 21:21

**tracked** [1] - 41:9

**transact** [1] - 41:1

**transaction** [2] - 26:1, 39:2

**transactional** [2] - 41:2, 42:1

**transactions** [2] - 41:18, 41:19

**transcript** [2] - 1:22, 44:17

**transcription** [1] - 1:22

**transcripts** [1] - 7:18

**transition** [1] - 27:3

**TRAURIG** [1] - 2:11

**Trischler** [5] - 7:15, 37:17, 38:1, 38:7, 38:8

**truly** [2] - 22:18, 35:16

**try** [6] - 6:16, 7:4, 27:2, 28:14, 37:17, 38:22

**trying** [6] - 27:1, 27:17, 34:15, 36:1, 37:5, 40:6

**tune** [2] - 29:19, 30:3

**turn** [1] - 34:13

**turns** [1] - 37:20

**twice** [1] - 17:15

**two** [17] - 5:9, 8:8, 10:8, 10:25, 16:12, 16:14, 16:25, 17:8, 17:12, 17:23, 24:16, 28:24, 34:18, 36:19, 40:12, 40:22

**type** [7] - 5:25, 25:4, 35:23, 40:7, 42:24, 43:21

**types** [8] - 6:8, 25:25, 27:6, 27:10, 27:13, 27:19, 27:20, 35:24

**typical** [1] - 7:7

## U

**ULMER** [1] - 2:19
**ultimately** [4] - 25:23, 28:7, 28:14, 43:13
**unable** [1] - 7:23
**unbelievable** [1] - 7:21
**unclear** [1] - 38:11
**under** [2] - 13:10, 36:14
**underlying** [2] - 6:17, 39:21
**understood** [3] - 30:15, 31:2, 36:23
**unfair** [1] - 4:25
**unfortunately** [1] - 43:10
**UNITED** [2] - 1:1, 1:8
**unlikely** [1] - 28:15
**unquestionably** [2] - 15:23, 42:23
**unquote** [1] - 39:16
**unsuccessful** [1] - 13:21
**up** [22] - 8:14, 9:18, 12:3, 12:24, 15:20, 16:15, 18:5, 20:13, 22:22, 22:25, 23:10, 26:16, 27:22, 30:10, 31:19, 38:22, 40:6, 41:7, 42:1, 42:16, 43:1, 43:23
**update** [1] - 21:14
**upload** [1] - 20:23
**uploaded** [2] - 22:5, 22:12
**uploading** [1] - 38:3
**USA** [1] - 2:14

## V

**vacuum** [3] - 25:8, 26:4, 26:5
**VALSARTAN** [1] - 1:3
**Valsartan** [1] - 3:2
**VIA** [1] - 3:1
**Via** [1] - 1:5
**VICTORIA** [1] - 2:12
**Victoria** [4] - 3:20, 6:12, 16:10, 18:16
**view** [1] - 14:11
**Vine** [1] - 2:20
**voluntarily** [1] - 29:7
**vu** [1] - 23:21

## W

**wait** [6] - 4:18, 23:20, 23:23, 24:16, 28:10,

43:23
**wants** [1] - 27:15
**waste** [1] - 23:3
**Wednesday** [1] - 1:6
**week** [2] - 34:14, 37:18
**weeks** [6] - 16:12, 16:14, 16:15, 26:21, 35:4, 40:22
**whatnot** [1] - 33:8
**WHITELEY** [5] - 2:2, 2:2, 3:14, 37:7, 38:17
**Whiteley** [9] - 3:15, 25:13, 26:12, 28:2, 29:23, 30:24, 37:7, 38:16, 40:20
**whoever's** [1] - 21:5
**wholesaler** [3] - 31:12, 38:18, 38:21
**wholesaler/retailer** [1] - 24:7
**wholesalers** [21] - 4:2, 24:23, 25:14, 28:9, 29:24, 30:4, 30:9, 30:11, 31:14, 31:25, 33:7, 34:23, 36:11, 36:12, 37:11, 37:25, 39:6, 40:3, 41:11, 41:13, 43:22
**Wholesalers** [1] - 2:24
**willing** [4] - 7:3, 26:14, 32:1, 37:15
**wish** [2] - 4:25, 5:1
**withhold** [1] - 28:11
**witness** [2] - 29:8, 29:11
**witnesses** [1] - 27:24
**wonder** [2] - 21:1, 33:1
**word** [1] - 31:21
**words** [1] - 6:4
**works** [2] - 11:15, 19:14
**world** [2] - 5:4, 40:5
**wrap** [1] - 42:16
**wrinkles** [1] - 19:6
**write** [1] - 25:15
**writing** [2] - 25:12, 32:5

## Y

**years** [2] - 29:9, 31:3
**yesterday** [16] - 4:12, 11:6, 12:22, 14:1, 25:11, 31:10, 32:7, 34:14, 34:23, 35:5, 35:10, 36:24, 38:3, 38:5, 39:4, 39:13

**York** [1] - 2:24
**yourself** [1] - 3:6

## Z

**ZHP** [6] - 2:10, 3:18, 4:15, 27:4, 31:5, 36:18