1    **UNITED STATES DISTRICT COURT**
     **FOR THE DISTRICT OF NEW JERSEY**

2    _____
                                       **CIVIL ACTION NUMBER:**
3
     **IN RE:  VALSARTAN PRODUCTS**    **19-md-02875-RBK-JS**
4    **LIABILITY LITIGATION**
                                       **TELEPHONIC ORAL ARGUMENT**
5    _____       **AND ORAL OPINION AND**
                                       **RULINGS ON MACRO DISCOVERY**
6                                      **DISPUTES BETWEEN PLAINTIFFS**
                                       **AND THE WHOLESALER AND**
7                                      **RETAILER/PHARMACY**
                                       **DEFENDANTS [DOCKET NOS.**
8                                      **413, 478, 479, 501, 503]**

9         Mitchell H. Cohen Building & U.S. Courthouse
          4th & Cooper Streets
10        Camden, New Jersey  08101
          July 06, 2020
11        Commencing at 1:30 p.m.

12   **B E F O R E:**              **THE HONORABLE JOEL SCHNEIDER,**
                                   **UNITED STATES MAGISTRATE JUDGE**
13

14   **A P P E A R A N C E S:**

15        MAZIE SLATER KATZ & FREEMAN, LLC
          BY:  ADAM M. SLATER, ESQUIRE
16        103 Eisenhower Parkway
          Roseland, New Jersey  07068
17        For the Plaintiffs

18        GOLOMB & HONIK, P.C.
          BY:  RUBEN HONIK, ESQUIRE
19        BY:  DAVID J. STANOCH, ESQUIRE
          1835 Market Street, Suite 2900
20        Philadelphia, Pennsylvania  19103
          For the Plaintiffs

21

22
               Carol Farrell, Official Court Reporter
23                  cfarrell.crr@gmail.com
                       856-318-6100
24

     Proceedings recorded by mechanical stenography; transcript
25        produced by computer-aided transcription.

 1  **A P P E A R A N C E S (Continued):**

 2

 3       KANNER & WHITELEY, LLC
         BY:  CONLEE S. WHITELEY, ESQUIRE
         701 Camp Street
 4       New Orleans, Louisiana  70130
         For the Plaintiffs

 5

 6       DUANE MORRIS LLP
         BY:  SETH A. GOLDBERG, ESQUIRE
 7       30 South 17th Street
         Philadelphia, Pennsylvania  19103
 8       For the Defendants, Walmart, Prinston
         Pharmaceuticals, Solco Healthcare U.S. LLC,
 9       and Zhejiang Huahai Pharmaceuticals Ltd.

10

11       BARNES & THORNBURG LLP
         BY:  SARAH JOHNSTON, ESQUIRE
         BY:  KRISTEN L. RICHER, ESQUIRE
12       2029 Century Park East, Suite 300
         Los Angeles, CA  90067
13       For the Retailer Defendants and CVS Pharmacy

14

15       NORTON ROSE FULBRIGHT US LLP
         BY:  D'LESLI M. DAVIS, ESQUIRE
         1301 Avenue of the Americas
16       New York, New York  10019
         For the Defendant, McKesson

17

18       ULMER & BERNE LLLP
         BY:  JEFFREY D. GEOPPINGER, ESQUIRE
19       600 Vine Street, Suite 2800
         Cincinnati, Ohio 45202
20       For the Defendant, AmerisourceBergen

21

22

23

24

25

*United States District Court*
*District of New Jersey*

1   (PROCEEDINGS held via teleconference before The Honorable Joel

2   Schneider, United States Magistrate Judge, at 1:30 p.m.)

3          THE COURT:  This is Judge Schneider.  We are on the

4   record in the Valsartan MDL, Docket Number 19-2875.

5          When I called in to this conference call, 40 people

6   apparently are on the line.  I don't think we need to get

7   appearances from everyone who is on the line unless they want

8   to, but, certainly, we should get appearances from leadership

9   counsel, from the parties, and whoever is going to speak

10  today.  And whoever is going to speak, as usual, please state

11  your name so the court reporter knows who's talking.

12         Start with plaintiffs.

13         MR. SLATER:  Hello, your Honor.  Adam Slater for

14  plaintiffs.

15         MR. HONIK:  Good afternoon, your Honor.  Ruben Honik

16  for plaintiffs.

17         MS. WHITELEY:  Good afternoon, your Honor.  Conlee

18  Whiteley for plaintiffs.

19         THE COURT:  Defendants?

20         MR. GEOPPINGER:  Good afternoon, your Honor.  Jeff

21  Geoppinger, G-E-O-P-P-I-N-G-E-R, for AmerisourceBergen.

22         MS. JOHNSTON:  And good afternoon, Your Honor.  Sarah

23  Johnston for the retailer defendants and CVS Pharmacy.

24         MS. DAVIS:  Your Honor, this is D'Lesli,

25  D-apostrophe-L-E-S-L-I, Davis, for McKesson, and speaking as

1    point today for the defendant wholesalers.

2         THE COURT:  Does anyone else want to put their

3    appearances on the record?

4         MR. GOLDBERG:  Your Honor, this is Seth Goldberg.

5    I'm on in my capacity as counsel for Walmart and, to the

6    extent necessary, I may speak on behalf of Walmart.

7         MR. STANOCH:  Judge, this is David Stanoch,

8    S-T-A-N-O-C-H.  I may speak at parts for plaintiffs.

9         MS. RICHER:  And, your Honor, this is Kristen Richer

10   with Barnes & Thornburg, also on behalf of the retailers and

11   CVS.  I may speak as to a few brief issues.

12        THE COURT:  Does anyone else want to put their

13   appearances on the record now?

14        (No response.)

15        THE COURT:  Thank you.

16        The Court has received all the parties' briefs and

17   has read them, as well as the accompanying exhibits and

18   declarations.  Before we get into the oral argument on the

19   discovery issues in dispute, there's just a couple of

20   background questions that I have that I just wanted to

21   clarify.

22        Attached to Mr. Slater's April 13th letter as

23   Exhibits B and C are the requests for production of documents

24   directed to the wholesaler group and the retailer/pharmacy

25   group.  Are those the documents that these discovery disputes

1  arise out of?

2       MR. STANOCH:  Your Honor, this is David Stanoch for

3  plaintiffs.

4       The answer to that is yes, they are.  There may have

5  been a few subsequent tweaks to the one with the retail

6  pharmacy defendants per meet-and-confer discussions, but for

7  purposes of today's call, I think the answer is yes, your

8  Honor can have Exhibits B and C in front of you, as necessary.

9       MS. DAVIS:  Your Honor, D'Lesli Davis for the

10 wholesalers.  That is correct, for wholesalers.

11      MS. JOHNSTON:  And yes, your Honor, for the retailer

12 defendants, Sarah Johnston.  I agree with Mr. Stanoch's

13 representation.  There have been some changes to some of the

14 language, but nothing that would affect the arguments today.

15      THE COURT:  So the issues that have been identified

16 in the letter briefs the Court received, it's the Court's

17 understanding that those are the only disputes that remain to

18 be decided before those requests for production are finalized.

19 Am I right?

20      MR. STANOCH:  That would be -- this is David Stanoch

21 again, your Honor.

22      That would be plaintiffs' position, yes.

23      MS. DAVIS:  Your Honor, D'Lesli Davis for the

24 wholesalers.

25      I believe that's correct; of course, assuming that

1    the draft that you're looking at is what comes from the

2    plaintiffs' ultimately, and with the note that the plaintiffs

3    are the ones who identified, you know, the issues that they

4    felt should be fought over as macro issues.

5            MS. JOHNSTON:  And, your Honor, Sarah Johnston for

6    the retailers.

7            We've been working to, as I said, clean up a few

8    remaining issues.  And the final set of requests will need to

9    be revised to reflect the Court's rulings today.

10           THE COURT:  All right.  So let me just put this in

11   perspective because I want to be clear on this.

12           With regard to the manufacturer defendants, we have

13   already entered a set of Court-approved document requests.  Am

14   I correct that the fact sheets to the manufacturers need to be

15   finalized?

16           MR. STANOCH:  Your Honor, David Stanoch again.

17           I believe that is correct, on both counts.

18           THE COURT:  With regard to the two groups we're

19   dealing with today, the wholesalers and the retailers -- when

20   I say retailers, that includes the pharmacies -- is my

21   understanding correct that the parties have either explicitly

22   or implicitly agreed that these groups of defendants are just

23   going to respond to the requests for production and not

24   separate fact sheets or am I wrong about that?

25           MR. STANOCH:  Your Honor, David Stanoch for

1    plaintiffs again.

2          I think that's not correct, your Honor.  I think it

3    is the intention for the document requests for both of these

4    downstream defendant groups to be finalized and responded to,

5    and then, in short order, the parties finalize the defendant

6    fact sheets for each group as well.

7          THE COURT:  What is the status of the discussion

8    regarding the fact sheets to be answered by these two groups

9    of defendants?  Because I recall entering an order saying that

10   we have this group answering first, then 60 days, another

11   group, and then 60 days, another group.  So what's the status

12   of the fact sheets directed to the wholesalers and retailers?

13         MR. STANOCH:  Your Honor, David Stanoch for

14   plaintiffs -- plaintiffs again.

15         I believe there has been some ongoing discussions

16   with the retail pharmacy defendants.  I think any discussions

17   are stalled or delayed, pending the ruling on these macro

18   issues with the wholesaler defendants.  But I think it is our

19   view that we want any fact sheet issues with both groups to be

20   teed up, I believe your Honor said, by the end of July, unless

21   I'm mistaken, so that those facts -- all the fact sheets can

22   be resolved by then.

23         THE COURT:  All right --

24         MS. JOHNSTON:  Your Honor, Sarah Johnston for the

25   retailers.

1          The discussion of the fact sheets was tabled at the

2    recommendation of plaintiffs while we were waiting on the

3    Court's decision on the macro issues.

4          So I think that the last set of revisions to the DFS

5    were sent to plaintiffs maybe six or eight weeks ago.  But we

6    have tabled those discussions, so we would need to pick those

7    back up, depending on how things go today.

8          THE COURT:  What is going to be addressed in the fact

9    sheets that is not going to be addressed in the requests for

10   production directed to these two groups?

11         MR. STANOCH:  Your Honor, David Stanoch.

12         I believe the requests we're talking about today are

13   sort of globally, litigation-wide, the documents and data the

14   plaintiffs are seeking, whereas the fact sheets to these

15   groups of defendants would be individual

16   plaintiff-specific-type questions, to the extent the data is

17   available, for those defendants to say, for example, which

18   particular valsartan products that individual plaintiffs might

19   have bought.

20         MS. JOHNSTON:  Your Honor, for the retailers.

21         This is primarily going to be records like dispensing

22   records for an individual plaintiff, at least on the pharmacy

23   side.

24         THE COURT:  And I think that will be affected by, I

25   think, the Court order where it indicated the number of

1  consumers whose records have to be searched.  Am I right about

2  that?

3          MR. STANOCH:  David Stanoch.

4          Yes, your Honor, I think that's correct.

5          THE COURT:  Okay.  Understood.

6          So if we decide these issues that we're going to be

7  presented with today in short order, these document requests

8  can be finalized, and shortly after that, we'll finalize the

9  fact sheets for these two groups, and once they're entered,

10 that will trigger 60 days to respond, 60 days to respond, 60

11 days to respond.

12         Just to tie the knot, finish the knot, what is the

13 status of the discussions of the fact sheets, finalizing the

14 fact sheets with the manufacturers?

15         MR. GOLDBERG:  Your Honor, this is Seth Goldberg, and

16 I'll jump in on behalf of ZHP at this point.

17         I do know that my colleague, Barbara Schwartz, has

18 been in discussions with Marlene Goldenberg, counsel for

19 plaintiffs, to get that finalized.  I expect it's close to

20 being done.

21         THE COURT:  Fair enough.

22         All right.  Turning to another --

23         MR. GOLDBERG:  Your Honor, before you go -- yeah, I'm

24 sorry.  This is Seth Goldberg again on behalf of Walmart.

25         And before you go on, I just wanted to clarify one

1  thing about what your Honor has said with respect to

2  finalizing the retailer document requests.

3          Walmart does have an issue with respect to two of

4  their requests, just two, and we're hoping to work through

5  that with plaintiffs and -- over the next week or two, and,

6  hopefully, can meet and confer with plaintiffs.  We have

7  invited plaintiffs to do that.  So I just want to be clear

8  that, at least for Walmart, there is a specific dispute as to

9  two requests.

10          THE COURT:  Mr. Goldberg, let me tell you the Court's

11  position because this was raised in one of Mr. Slater's

12  letters.  We are finalizing these requests for production

13  hopefully today, but no later than Thursday.

14          As far as the Court is concerned, the only disputes

15  remaining are those disputes in the letters that the Court

16  received.  The Court will not address any other issue other

17  than the issues that have been raised in the letters submitted

18  to the Court.  It was represented in those letters that those

19  were the only disputes remaining with regard to the requests

20  for production.

21          The Court is not going to address individual

22  objections by individual retailers and wholesalers.  They had

23  the opportunity to raise those issues.  The time has passed,

24  and the Court will only address the issues in the letters.

25  There is not going to be weeks of meet and confer on this.  I

1  expect to enter these requests for production either Thursday

2  or no later than Friday.

3      MR. GOLDBERG:  Yes, I understand.  I understand, your

4  Honor.  I don't mean to say there is an objection to the

5  requests as much as how Walmart envisions responding to two of

6  the requests, and that is an issue that we intend to meet and

7  confer with plaintiffs on.  And I don't want to derail this,

8  you know, your Honor getting to the macro issues, but maybe

9  it's something we can pick up after the macro issues.  But

10 there are two -- there are two requests that do create a

11 significant and demonstrable burden on Walmart, and Walmart

12 would like the opportunity to meet and confer with plaintiffs

13 about a potential compromise to alleviate that burden.

14     THE COURT:  If you could work it out with plaintiffs,

15 that's fine.  You have until Thursday.  I said what I said.

16 It was represented to the Court that the only remaining

17 disputes are those in the letters, and those are the only

18 issues the Court is going to address.

19     Let's get to the letters.  I'd like to start by just

20 framing the issues in dispute, and we'll deal with one issue

21 at a time.

22     The first issue that I would like to address is --

23 these are my words -- this tracing issue involving the

24 wholesaler defendants.  And I want to make sure before we get

25 into the argument that we all use a consistent terminology,

1    and we know what we're arguing about.

2           As I understand the issue, plaintiffs, in effect,

3    you're asking the wholesalers to produce, during the relevant

4    time period, all of the information that they receive from

5    their upstream supplier, whether it was a manufacturer or the

6    finished dose manufacturer, and then you're asking the

7    wholesalers to produce all information that was provided to

8    the pharmacies, or that documents for sales -- I said

9    pharmacy.  I meant retailers.  And that's the Court's

10   understanding of what this tracing dispute is.  Am I phrasing

11   it correctly?

12          MR. STANOCH:  Your Honor, David Stanoch for

13   plaintiffs.

14          Yes, I think that's a fair characterization.

15          MS. DAVIS:  Judge, this is D'Lesli Davis for the

16   wholesalers.

17          I think, generally speaking, as we've had our meet

18   and confers, that's correct.

19          The specific language of the request, though -- and

20   this goes to both upstream and downstream -- is documents

21   sufficient to identify date of purchase or sale, quantities of

22   purchase or sale, NDC number, lot number, and expiration date.

23   And then there are two caveats:  To the extent you maintain

24   that in your ordinary course of business, and to the extent it

25   can be collected by a reasonable search.  So maybe it's a

1  little narrower than what you say, and, of course, the

2  wholesalers would say that the course of business way that it

3  is maintained in a trustworthy manner -- and that could be

4  done by a search.  I'm not sure we're ready to concede it's

5  reasonable -- would be the output through that exemplar that

6  we showed you.  And that does not include lot or expiration

7  date information, certainly, all the way downstream to

8  retailer.

9        THE COURT:  I want to be clear on this because it

10 will work to avoid confusion and a dispute in the future.  If

11 plaintiff said give me all the information -- I'm trying to

12 phrase it so that there is no misunderstanding about what

13 we're talking about.

14        When the manufacturers supply the wholesalers, when

15 they sell the wholesalers' product, valsartan-containing drug,

16 plaintiffs want all the documents that will memorialize that

17 transaction.  Is that your understanding of what they want?

18        MS. DAVIS:  So, no, your Honor.  I think that they've

19 crafted their RFPs -- and you can look at that, Exhibit C, I

20 believe it is -- and see that they ask for exemplars of the

21 documents that would be sort of the shipping documents or

22 these documents that would actually show the types of

23 information -- the types of all information that you get

24 upstream, the types of all information you send downstream.

25        When we talk about RFP Number 1 and Number 3, which

1   are two of the four that are in dispute for the Court today,

2   we're just talking about documents sufficient to identify

3   quantity, units, NDC, batch, lot, and expiration date.

4           It is RFP Number 6 that they contemplate -- they knew

5   that would be burdensome, right, to go get all of the

6   underlying source documents.  So what they were trying to do

7   is say give us this detail of these key tracing elements, if

8   you have them in the ordinary course of business, that you can

9   get via a reasonable search, which would be a database search.

10  That's 1 and 3.  And then show us what those underlying

11  documents look like by producing an exemplar, and they say of

12  the manufacturer-included packaging and labeling and shipment

13  documents and similar information, and they do the same for

14  downstream, if that makes sense.

15          THE COURT:  So, for example, if a wholesaler makes a

16  purchase from a manufacturer, presumably -- I'm just surmising

17  now.  I don't have any personal knowledge -- there is an

18  invoice; there is a bill of lading; there's maybe -- I don't

19  know -- labeling information, packaging information.  Is it

20  your understanding that that is what is encompassed within

21  plaintiffs' requests?

22          MS. DAVIS:  That's Request 6 which is not before the

23  Court right now because they only want an exemplar of those

24  specific documents.  And we scrambled to try to get them this

25  week, since that sort of blew up last week, and had been

1 waiting, thought that would happen when the RFPs ultimately

2 got served.  We're trying to get the universe of that

3 correctly.  We're in the process of getting from each of the

4 wholesalers those exemplar documents that will ultimately be

5 responsive to 6 upstream, 8 downstream.

6          The RFPs 1 and 3 before you now are much more narrow.

7 They are documents sufficient to identify the details of the

8 purchases from upstream to the extent that they reflect date,

9 quantity, NDC number, lot, or expiration date, and documents

10 to -- sufficient to identify that same information for the

11 sales to the retailers, and only to the extent, you know, that

12 those can be collected by a reasonable search.

13          MR. STANOCH:  Your Honor, this is David Stanoch for

14 plaintiff.  May I address this?

15          THE COURT:  Sure.

16          MR. STANOCH:  Thank you.

17          I think it's important to know, Judge, that documents

18 sufficient to show I believe obviously would be that there is

19 new data showing that for all the transactions, and then, yes,

20 we'd have a few exemplars to show what the physical copies of

21 things look like, to back up the data.

22          If they don't have data to show what we're asking

23 for, then the documents sufficient to show might be something

24 else besides the incomplete data that they say they have and

25 haven't given to us yet.

1          I know this is akin to the argument we had with the

2     ZHP manufacturer defendant, your Honor, where we said give us,

3     you know, the full data for the full period for your sales.

4     They said they didn't have it for a majority of the time

5     period.  The only documents sufficient to show in that

6     instance, Judge, they said were hard copy invoices, and that's

7     what your Honor directed them to produce.

8          MS. DAVIS:  Judge, D'Lesli Davis.

9          It's a little bit different for wholesalers because

10    there is -- Congress has acted on what information, that is

11    tracing information, particularly lot information is the best

12    example, needs to be passed on.  And so this whole debate

13    arises out of plaintiffs' frustration that Congress has said,

14    A, wholesalers do not need to track product down to the

15    retailer; B, wholesalers do not track or trace down there; and

16    C, Congress has said any action inconsistent with that

17    wholesaler exemption on tracing downstream is preempted; and

18    any requirement that there be additional recordkeeping -- yes?

19         THE COURT:  Counsel, hold on.  You're getting into

20    argument now, which we'll get into.  I understand the

21    argument.  I just -- this is just background.  We're trying to

22    frame the issue.  And you'll have time to make your argument

23    about what the statute says and doesn't say.  But I'm just

24    trying to frame the issues to avoid a dispute in the future

25    because once the Court rules, I don't want to have another

```
 1    argument about what was encompassed within the request.
 2              MS. DAVIS:  Fair enough, your Honor.  And this is
 3    Ms. Davis.  Apologies for getting ahead of ourselves.
 4              But I think that on the face of the request, this is
 5    fairly simple and fairly standard language.  The plaintiffs
 6    came in and said we need you to do a reasonable search of your
 7    computer systems to get us line items, a summary of the line
 8    items of your purchases from the manufacturers, in these four
 9    or five datapoints, and the same thing for below.  And that's
10    what we're fighting about.
11              And then in their other requests that we're not
12    fighting about, they said get us an exemplar of each of the
13    underlying documents.
14              So it is the output of the computer systems
15    reasonable search, the ordinary course of business, kept to
16    reflect the items they seek for each of those purchases or
17    sales.
18              THE COURT:  In reviewing the declaration, one of the
19    types of documents that was mentioned was this T3 document.  I
20    think you know what I'm referring to.
21              MR. DAVIS:  Yes, your Honor.
22              THE COURT:  If the Court grants -- if the Court
23    grants plaintiffs' request, for example, would the T3 document
24    be produced?  Is it in the --
25              MS. DAVIS:  No.
```

```
 1              THE COURT:  -- scope?  No?

 2              MS. DAVIS:  No.  An exemplar of the T3s would be

 3      produced, but that would prove that from above, on the T3s,

 4      manufacturers to wholesalers contain lot information, and then

 5      wholesalers to retailers that exemplar will show do not

 6      contain lot information.  But an exemplar would prove what

 7      we're saying to be true about the fact that tracing doesn't go

 8      downstream.

 9              THE COURT:  And then plaintiff can do whatever they

10      want with the information that's provided on the T3 because

11      their consultant/expert seems to think that even without the

12      lot number, they can do some traceability, right?

13              MS. DAVIS:  I don't think I agree with --

14              THE COURT:  You may disagree with the expert, but

15      that's what the expert says, right?

16              MS. DAVIS:  Well, he can do whatever he wants to with

17      the exemplar of the T3, but there is not an issue before the

18      Court that we are being even asked to produce all T3s.  So we

19      would have -- so that would also be outside the scope.  In the

20      same way that you were talking to Mr. Goldberg, that would be

21      outside the scope of plaintiffs' failure to demand those or

22      ask for those and failure to brief them as macro issues.

23              THE COURT:  I know, but isn't plaintiff proceeding in

24      a prudent way by saying, okay, give us the data, give us

25      examples, we'll take a look at the examples, run it by our
```

 1    consultants to see if it's helpful or not, and then if it's

 2    helpful, are you going to be surprised if they come back and

 3    ask for all of it?

 4          MS. DAVIS:  Well, I am in light of the process that

 5    the Court has put in place.  Right?  Which is that these

 6    issues are to be teed up now.  I've never been aware that we

 7    were fighting a battle over whether we would have to produce

 8    all, you know, T3s.  Is that conceivable?  Yes.  I think in

 9    the last phone call, after they got our reply brief, I was

10    threatened with that and more.  But it's simply not how

11    this -- my understanding was that the process was going or the

12    issues that have been briefed for the Court.

13          THE COURT:  Well, I said what I said.  It seems to me

14    that plaintiff is proceeding in a very prudent fashion.

15    Before requiring -- asking the wholesalers to produce seven or

16    eight, nine years of T3s, for example, they want a sample, and

17    they'll determine for themselves if it's helpful or not.  And

18    if it's helpful, I'm not going to be surprised if plaintiffs

19    come back and say give us seven or eight, nine years of data.

20    Nor should the wholesalers be surprised.

21          MS. DAVIS:  Your Honor --

22          THE COURT:  But that issue is not before us now, so

23    we don't have to deal with it.

24          One of the questions I had is, you had mentioned,

25    counsel, that you're working on getting exemplars to the

1    plaintiffs.  Today is July 6th.  We've been arguing about this

2    for months.  Plaintiff has been asking for exemplars for

3    months.

4         MS. DAVIS:  But they haven't, your Honor.  They

5    haven't, your Honor.  This was an RFP, two RFPs that have been

6    on hold, pending our fight over the very specific issues that

7    are before you now.  It was only after receiving the reply

8    that they began to take the position that they have been

9    asking for exemplars for months.  They had decided that

10   putting that request for exemplars in a request for production

11   and waiting until they served that request for production was

12   the way they wanted to handle it.  And so once they started

13   jumping up and down about the exemplars, we scrambled to try

14   to do what we could with 4th of July here, and haven't been

15   able to get a full representation, but we were not aware that

16   they thought they needed exemplars earlier.  That was a on

17   hold, agreed to RFP.

18        THE COURT:  Okay.  One of the cases that was cited, I

19   think in the plaintiffs' papers, is *Androgel*, if I'm

20   pronouncing it right, antitrust litigation from the Northern

21   District of Georgia in 2012.  In that case, the Court ordered

22   the same wholesaler defendants that are at issue in this case

23   to produce all "purchase and sales data," "purchase and sales

24   data" regarding particular drugs.  Is that the same or

25   different than what plaintiffs are asking here?  The

1    production in that case, "purchase and sales data," is that

2    different than what plaintiffs are asking for here?

3            MS. DAVIS:  I'm not sure that I have enough detail

4    from that case to know the specifics of systems and particular

5    parameters, but the three cases that the plaintiffs cite for

6    authority that we must turn over sales and pricing information

7    are two antitrust cases and one competitive pricing case.  So

8    I understand the temptation to think of these things and these

9    sales and pricing data as something that just must be turned

10   over in big cases, but wholesalers reside in a different

11   place, and the relevance, which has never been articulated in

12   this particular case, where the real -- the image information

13   is, A, within the custody of the plaintiffs, and the very same

14   information that plaintiffs seek from this computer system is

15   being produced by the manufacturers and the retailers.  We

16   have got a real burden duplication issue as well.

17           THE COURT:  All right.  Let me -- I don't want to

18   conflate the two issues that we have to deal with with regard

19   to the wholesalers.

20           The what I call the plaintiffs' requests for tracing

21   discovery, is that different than purchase and sales data?

22           MS. DAVIS:  I don't think so.  The way we think of

23   it, and what I think you would call tracing information, and

24   the items that we believe the manufacturers are producing and

25   the retailers are producing, is this computer output of the

1   date and the detail of a purchase from a manufacturer, and

2   there is a component of that that has the gross price paid by

3   wholesalers, and downstream, the gross purchase price paid by

4   the retailers.  That would all be within the tracing, even

5   though there is pricing information in there.

6         The second category then is sort of the profit or net

7   price piece, which is not contained within that computer

8   system, and, in fact, does not exist.

9         THE COURT:  Mr. Stanoch, turning to you for a moment,

10  and maybe we could just get right to the point.  On this first

11  issue regarding the requests for tracing discovery, if the

12  Court grants plaintiffs' request, is what you're asking for

13  the Court to order that document requests 1 and 3 have to be

14  responded to?

15        MR. STANOCH:  Your Honor, David Stanoch.

16        Yes, 1 and 3 would need to be responded to, correct.

17        THE COURT:  And are requests 2 and 4 the second issue

18  that we're going to deal with after we get through with the

19  tracing issue?

20        MR. STANOCH:  Correct, your Honor.  2 and 4 are

21  simply the pricing aspect that would accompany the tracing

22  data, but we broke it up separately and that's the way it is

23  briefed.

24        THE COURT:  Okay.  So let's now get to the meat of

25  it.  Let's argue the discoverability of the information

1   requested in requests 1 and 3.  We'll deal with the tracing

2   issue first, and then we'll get to 2 and 4 after we're done

3   with this.  So this is -- well, let me start this way.

4           Defendant, can it be reasonably disputed that for

5   discovery purposes, it's a relevant issue for plaintiff to try

6   and find out the source that each of the plaintiffs -- where

7   they got their valsartan from, to trace it up the supply

8   train, just as a general matter?  Can it reasonably be

9   disputed that tracing information is relevant for discovery

10  purposes?

11          MS. DAVIS:  Yes, your Honor, it can, because it does

12  not, A, tend to prove or disprove an element of plaintiffs'

13  claims, what sale or purchase was touched by the wholesalers.

14          THE COURT:  I don't understand how you could make

15  that argument.  I'm just totally flabbergasted that you could

16  make that argument.  Here's why.

17          MS. DAVIS:  Here is the truth -- I'm sorry, your

18  Honor.

19          THE COURT:  Hold on, hold on.

20          Here's why.  If the manufacturers are going to admit

21  that every single piece or pill or tablet or dosage of

22  valsartan contained whatever contaminate they found in the

23  test, this would be very, very easy because then plaintiffs

24  wouldn't have to prove they took a contaminated pill.  I don't

25  think that's the position the defendants are taking.

1           They're taking the position, as I understand it, that

2    not every bit of valsartan was contaminated.  They're going to

3    start with only the recalled valsartan was contaminated.  What

4    does that mean?  That means that defendants are going to argue

5    that there was contaminated and uncontaminated valsartan on

6    the market.  Right?

7           MS. DAVIS:  Yes, your Honor.

8           THE COURT:  In order for a plaintiff to recover,

9    don't they have to show that they took the contaminated

10   valsartan?  And how can they prove that, unless they can trace

11   it?

12          MS. DAVIS:  So, your Honor, that is the stated,

13   argued relevance of the information.  The problem is is proven

14   by the evidence before you, the proven personal knowledge

15   evidence, not the speculation evidence from the plaintiff's

16   expert, but the proven, personal-knowledge-based evidence from

17   people within the companies is that there is no information

18   that the wholesalers maintain that will demonstrate which lots

19   went where downstream.  So what we have is whole- -- sorry --

20   manufacturers producing documentation that will show what lots

21   they sold to wholesalers.

22          THE COURT:  Right.

23          MS. DAVIS:  So you go to the next step.  Does

24   anything that the wholesalers have assist anyone in

25   determining what lot went where?  And the proof in the record

1    before you, Judge, is that the answer is no, and it's no

2    because Congress said that wholesalers don't have to slow down

3    the supply chain to take the time to enter that information

4    downstream.

5            So we come back to the relevance.  If the documents,

6    eight years of computer searches that will take the time and

7    the money that the declarations reflect to create, will not

8    assist the plaintiffs with the one reason they say they want

9    them, product tracing.  There is no relevance, and there is

10   not a record before you of relevance or proportionality or, to

11   the extent that we're in your *Major Tours* analysis, reasonable

12   accessibility and good cause.

13           And in response to the proof that the wholesalers

14   have put in front of the Court, what you get is simply from

15   the plaintiffs there can be little question this data is

16   highly relevant.  It's at the core of what needs to be

17   produced, it's fundamental, it's a basic obligation.  But when

18   the rubber hits the road, they just speculate, and they say

19   one of two things.  They say either the wholesalers are lying,

20   there is lot information there, or, heck, if you haven't kept

21   lot information -- and they say this in their papers but

22   they've literally said it in the meet and confers -- then

23   you're going to be punished.  You have to produce all this

24   stuff anyway.  Because even though we can't articulate and our

25   plaintiffs' expert fails to articulate one use we would make

1    of date information or quantity information or NDC

2    information, we should be able to look at that and we'll

3    figure it out later.  And that's the definition of a fishing

4    expedition.  Never mind that there is no wholesaler wrongdoing

5    alleged.  If this is simply to get to product identification,

6    apart from an assertion that wholesalers were at fault, it

7    doesn't get them there.  It's not relevant.  And if you find

8    that it's marginally relevant, it can't possibly be

9    proportional when the plaintiffs can't tell you exactly how

10   they're going to use it or what it will prove.

11          THE COURT:  Is it the wholesalers position that in

12   the absence of a lot number, it's impossible for the

13   plaintiffs to trace up the supply chain from the retailer to

14   the wholesaler, to the finished dose manufacturer, to the

15   manufacturer?

16          MS. DAVIS:  Yes.  And I think our declarations say

17   that literally.  We can't think of a way to do it, so the

18   burden is back to plaintiffs to tell us how they would do it,

19   and they haven't and they can't.

20          To get factual for just a minute, what happens is a

21   manufacturer manufactures a drug and they stick it -- I'm

22   generalizing here, but they stick it into two types of

23   bottles.  One is a bulk bottle.  It's got 500 pills in it,

24   it's got a thousand pills in it.  Another type of bottle is

25   the small.  Maybe it's got 30 or 90 pills in it.  So on those

1    pill bottles, they stamp the lot number -- and this will all
2    change in 2023 when all these systems will be speaking to each
3    other, but they can't right now.  They put a sticker on there
4    that has the lot and the expiration date on it, and put it on
5    that T3 and it comes down to the wholesaler.  The wholesaler
6    gets these on a pallet, a pallet of 25 500 bottles or 45 30
7    pill bottles.  They break up that pallet immediately, and they
8    put those pills at the distribution center on the shelves in a
9    way that you would take the, you know, the oldest out first.
10   They do not stop and enter manually into any of their
11   systems -- and Congress says this is exactly the way it should
12   be because they don't want to slow down the supply chain.
13   They don't take time and manually enter that into a system.
14        So then when the retailer orders some of these
15   bottles, take the 500 bottle, the wholesaler ships that down
16   to the retailer without lot information, without -- other than
17   what is on the bottle, right?  But that never gets input into
18   any sort of system so it's no longer traceable.  And then that
19   goes to a distribution center for the retailer, who sends it
20   somewhere, or if it went straight to that retailer, if it's a
21   bulk bottle, they take those 500 pills and start putting them
22   into those yellow 30-pill bottles.
23        So there are really two levels that we lose the
24   traceability.  We lose it when we get it from the
25   manufacturers, and then as things are disbursed further down

```
 1   the chain, they get lost there.  So the best place to find it
 2   is in the plaintiff's hands, with the bottle that he got.
 3          THE COURT:  Plaintiffs, I have and you have seen a
 4   declaration from plaintiffs' consultant that disagrees with
 5   the declarations that the three wholesalers have submitted.
 6   Plaintiffs' consultant says there are many ways to link a
 7   dispensed product to a lot besides the lot number.
 8   Plaintiffs' expert says that the wholesalers have more than
 9   enough information in their inventory systems to be used to do
10   the tracing and that the wholesalers are well poised to
11   identify how best to do this linking.  I can go on and on and
12   on.
13          I've read the affidavits, the declarations from the
14   affiants of the three wholesalers.  They say the exact
15   opposite.  They say it's impossible, that no such data exists,
16   and that -- exactly what you said, that without the lot
17   numbers, they can't do the tracing.
18          Now, you're asking the Court to accept as fact what
19   your affiants have stated in their affidavits.  What is the
20   Court to do if we have this contrary declaration?  If this
21   were a summary judgment, the summary judgment would be denied.
22   So what is the Court to do, if the plaintiffs have made their
23   case -- of course, the defendants disagree with them.  Why am
24   I bound to accept as gospel what the defendants' affiants say
25   when it's disputed by plaintiffs' consultant?
```

1          MS. DAVIS:  Because it's based on personal knowledge

2    of the recordkeeping of the wholesaler defendants, number one.

3          Number two, because the plaintiffs' expert is

4    speculating on its face -- on the face of the declaration.

5          And, number three, because the plaintiffs' expert

6    never does what I think the Court anticipated was his

7    obligation, and that is to say, well, if there is not lot

8    information, I would use X, and I would use it in this manner

9    to try to recreate some form of traceability.

10          So we say, on personal knowledge, we don't have lot

11    information.  He says, surely you have lot information

12    downstream, based on speculation.  He does not go another step

13    further and say, here's another way to get there.

14          And so when you have an expert, a consulting expert

15    that may have time in the industry but not time at

16    wholesalers, I don't think, and he is guessing what must be

17    there, and you have people with personal knowledge of the

18    systems and the data saying it's not there, and there is no

19    step further, no creation of a particular use of a particular

20    datapoint, I would submit, on summary judgment, that expert

21    wouldn't carry them --

22          MR. STANOCH:  Judge, I thought that question was

23    addressed to me, your Honor.  I'd like to --

24          THE COURT:  No, no, no, no.  Mr. Stanoch, I'll get to

25    you.

```
 1            MR. STANOCH:  Thank you, Judge.

 2            THE COURT:  Defendant, let me ask you another

 3   question.  Okay?

 4            MS. DAVIS:  Yes.

 5            THE COURT:  We know what happened with the discovery

 6   of the contamination.  We know there was some recalls.  So the

 7   FDA recalled a specific lot.  I don't have a number in front

 8   of me.  It could be any number.  Make up a number.  The FDA

 9   goes to McKesson, the FDA goes to AmerisourceBergen, the FDA

10   goes to Cardinal Health and says we know this lot number was

11   recalled.  Can you tell us if this lot number was in your

12   hands?  Are you saying that the wholesalers couldn't find out

13   that information?

14            MS. DAVIS:  No, but I'm saying it's not done the way

15   that people might guess that it's done.

16            The wholesalers, McKesson specifically -- I can speak

17   very particularly for McKesson -- does not track recalls by

18   lot number.  They use the NDC number.  So Teva's 90-pill

19   bottle of Valsartan Version 1 at this dosage has an NDC number

20   that's uniform and used by everybody.  So what happens when

21   there is a recall is McKesson sends out an alert to its

22   distribution centers and says, hey, this lot of this NDC

23   number is on recall, and then an employee goes and

24   individually hand inspects the area of the distribution center

25   where that NDC number sits, looking at the pill bottle stamp
```

1   the manufacturer put on it, to pull the suspect -- it's not

2   suspect, that's the wrong language -- but to pull the recalled

3   product out and put it in quarantine for reclamation.

4          THE COURT:  How about this question, hypothetical, of

5   course.  A prescription is filled at a pharmacy.  It doesn't

6   matter which one.  The consumer -- and on the label, it has

7   the NDC number and it has the lot number, on the label.  The

8   retailer provides the lot number.  They open the bottle, there

9   is a foreign object in the bottle.  The FDA comes in and says,

10  we got to take all of these lot numbers off of the market.

11  The FDA goes to the three wholesalers and says, here's the lot

12  number, take all of this off of your shelves.  Are you saying

13  that the wholesalers couldn't do that?

14         MS. DAVIS:  No, I'm saying they can do that, but they

15  would be guided by the NDC number.  So the contaminate is in

16  Teva NDC number -- Number 1, Lot Number A.  So that's going to

17  make that information from the FDA or from whomever, however

18  it comes to be recalled, if it's a manufacturer recall, it's

19  going to be sent out to the McKesson distribution centers by

20  NDC Number 1, Teva Number 1, go look on your shelves for Teva

21  Number 1, and then, when you're in the area of Teva Number 1,

22  check to see if we have any of this lot, and if we do, do

23  whatever you're instructed to do.

24         MR. JOHNSTON:  And, your Honor, Sarah Johnston, just

25  briefly, to correct something that was said just a moment ago.

```
1            The pill bottle that the consumer would have in his
2   or her hands would not have a lot number on it.  It would have
3   the NDC.  So the tracing that we're discussing is related to
4   the NDC.  But, by and large, that pill bottle from a pharmacy
5   is not going to have a lot number, you know --
6            THE COURT:  Well, Ms. Johnston, I have to
7   respectfully disagree with you because I just walked over to
8   my dresser to look at the bottles of the prescriptions I take
9   for my high blood pressure.  And the first one I picked up has
10  a lot number on it.
11           MS. JOHNSTON:  Well, your Honor, I understand that --
12           THE COURT:  And another one has a -- another one has
13  a batch number on it.
14           (Crosstalk.)
15           MS. JOHNSTON:  Which is why I qualified the response
16  to say that there are certain smaller pharmacy chains that
17  do -- that do print lot numbers or do maintain lot numbers,
18  but the -- and, again, this is not something -- an
19  issue that's --
20           THE COURT:  From CVS.
21           MS. JOHNSTON:  That's a surprise to me, your Honor,
22  and an experience that is not reflected in what -- what I've
23  recognized socially or experienced with my own client.  But I
24  appreciate that.
25           I wanted to jump in though, because it is and
```

1  continues to be an issue for the pharmacies that that -- while

2  I can't speak to your own personal experience, your Honor,

3  that's not something that is traced at the consumer level, and

4  that is what we have communicated to plaintiffs on numerous

5  occasions.

6      THE COURT:  Luckily for me -- luckily for you, I'm

7  sorry, you're not as old as me so you don't have to take these

8  prescription medicines yet.  Someday you might be that old.

9      But, anyway, Mr. Stanoch, I'm sure you're chomping at

10  the bit to say something.  Do you want to be heard?

11      MR. STANOCH:  Yes, your Honor.  Only briefly.  This

12  is David Stanoch, for the record.

13      Your Honor, one of your questions really hit the nail

14  on the head, that the information -- the traceability

15  information is obviously relevant.  And I've heard Ms. Davis

16  reference proof, that she was getting factual, talking about

17  evidence.

18      Judge, we're talking about the facts that I am

19  allowed to get to develop the record to get factual to argue

20  these things.  I don't have to accept Ms. Davis's

21  representations on this call about what does and does not

22  exist.  That's not how the litigation works.

23      I'm entitled to the information, in whatever form it

24  is, and then I can ask questions of her declarants about the

25  information to see what other information might be out there.

1    That -- there are a number of examples I can go into, of many,

2    your Honor.  I mean, Ms. Davis's declarant, Mr. Mooney, says

3    they don't have it, she says they don't have it.  We have

4    public information where he makes a statement that product

5    identifiers are important to recall is the quote -- recall a

6    portion of a batch made during some time frame of one day at

7    one plant, end quote.

8            The facts are necessary for us to get in the first

9    instance before we can even have these next questions.

10           And to say that our expert is speculating, our expert

11   cites publicly available information from these very

12   defendants and what they keep, and I can't have my -- it's

13   prejudicial to have my expert faulted for, quote, speculating,

14   when they won't give me a single fact or document or data that

15   we can actually look at.  Ms. Davis says, well, the expert --

16   it was incumbent on the expert to come up with the alternative

17   method now.  I don't even have the information from them that

18   I could give to my expert for him to go ahead and to look at.

19   We're three steps ahead of where Ms. Davis and these

20   defendants think we are, Judge.

21           THE COURT:  What do you say about counsel's

22   statement, as I understood it, that you didn't ask for

23   exemplars until, what, a day or two ago?

24           MR. STANOCH:  Your Honor, I'm not going to rehash

25   that from the other week.  We think it's clear we wanted

1  exemplars for awhile.  Of course, it's one of the specific

2  document requests in the set that we prepared.  That's the

3  formality of doing it.  We wanted exemplars or samples from

4  any of these defendants.  Not a single one of these

5  defendants, your Honor -- we served the draft request December

6  2019, seven months ago.  None of them have released any

7  documents to date.  No exemplars, no documents, no data.  We

8  have two lines of data that McKesson finally gave us that we

9  saw for the first time when they served their letter briefs

10 the other month.  That's it.

11       So the idea that we didn't want these exemplars or

12 data or samples or terminology, I will just say that I

13 disagree with that.  And, regardless, your Honor, they can

14 come to us to let us know the name of what all the fields and

15 data and forms are.  They never -- she's talking about T3

16 reports.  Judge, we never heard about that until the other

17 week.  We don't need to guess what forms or data or records

18 that they may have.

19       MS. JOHNSTON:  Judge --

20       MR. SLATER:  Your Honor, it's Adam Slater.

21       I just want to add one thing to what Mr. Stanoch said

22 before, and then defense counsel can respond, because I happen

23 to have in front of me an excerpt from the February 26, 2020,

24 transcript, on Page 15.  I don't have the pages enlarged

25 because the excerpt was e-mailed to me a moment ago.  But

1  there was a specific discussion about getting the exemplars

2  from the wholesalers and retailers.  And I'm quoting from your

3  Honor saying:  "I think that's a great idea to help advance

4  the ball to get exemplar documents, and I would encourage the

5  wholesalers and retailers to do that.  Experience shows that

6  if we can get these issues resolved once and for all early, it

7  saves so much time," et cetera.  So I just wanted to make it

8  clear that this wasn't something that was raised a week or two

9  ago.  I don't know how counsel can say that.  And I'm reading

10  from again the February 26, 2020, transcript at Page 15.  I'm

11  trying to leave this to Mr. Stanoch, but I thought it was

12  important to add that to the record.

13        THE COURT:  Am I correct, though, that there were

14  exemplars produced by the retailers?

15        MR. SLATER:  I will leave it to Mr. Stanoch to answer

16  that.

17        THE COURT:  Or at least they have agreed to produce

18  exemplars.

19        MR. SLATER:  There has been a lot of discussion about

20  what may or may not be produced, but in the long -- in the

21  months and months and months of going back and forth, we don't

22  have what we need, I think is the bottom line.  There may have

23  been something produced.  I will leave that to Mr. Stanoch to

24  respond.  I don't recall seeing anything, but it's possible.

25  But at this stage, to be in July, and not have a full set of

1    exemplars, is, you know, from our perspective, it's, you know,

2    obviously frustrating.

3        MS. DAVIS:  Judge, putting aside the -- this is

4    D'Lesli Davis.

5        Putting aside the exemplars for a moment, though, the

6    Court ordered that the plaintiffs had the burden to get an

7    expert -- who was going to have a hidden name and we weren't

8    going to be able to attack credentials or who he was, that was

9    going to be in camera -- but he had to carry the burden of

10   relevance and proportionality.  And now that they tried to do

11   that, and we responded with -- and it had to be an admissible

12   proof, and the judge instructed us you have to prove up your

13   burden too, and you have to counter this in admissible

14   evidence.  And now that we've done that, they say, oh, this is

15   crazy.  How can they expect us to put any of this proof forth

16   when we haven't even gotten to do discovery yet?  So this was

17   the process, this was the burden, this is the D-Day, and they

18   haven't created a sufficient record of relevance, not to --

19   and we haven't even talked about the burden stuff -- but of

20   literal relevance.  And if they needed more time or whatnot to

21   try to determine that, they could have requested it.  But they

22   wanted to go forward on July 6.  So arguing that they need

23   to -- you know, because you don't have this lot information,

24   because Congress says you don't have to have it, and that

25   claims based on that and recordkeeping claims based on that

1    are preempted, but now, hey, why do you expect us to know

2    anything till we start getting all this discovery, it puts the

3    Court's whole process on its head.  Of course, you wanted them

4    to come forward with proof of relevance.  Of course, we had to

5    counter that, and we did.

6            MR. STANOCH:  Your Honor, may I respond?

7            THE COURT:  Sure, go ahead, counsel.

8            MR. STANOCH:  Thank you, Judge.  This is David

9    Stanoch for plaintiffs.

10            Judge, I disagree with Ms. Davis's characterization

11    of why we need a declaration in the first place.  The point, I

12    believe, was your Honor wanted a declaration from our expert

13    for him to say that we needed the data and what types of data

14    probably exist.  We did that.  We were not required to

15    disclose his full methodology and put forth a full model

16    showing, from soup to nuts, *Daubert* proof, about how he's

17    going to do traceability.  I don't think the Judge

18    contemplated that.  I don't think it's specifically possible,

19    given the posture we were in.  And I'll just leave it at that.

20            THE COURT:  What I'd like to do now is, Defendant,

21    we've talked for awhile, we're still on this tracing issue.  I

22    want to give you an opportunity to argue whatever issues,

23    whatever point you want to make regarding why the Court should

24    deny the request to respond to requests for production 1 and

25    3, and then I'm going to give plaintiff a chance to respond,

1    and then we're going to move on to the next issue.

2            So, you've answered my questions, Defendant, and I

3    want to make sure you have a full and fair opportunity to make

4    whatever argument you want to make, to the extent it hasn't

5    been done, regarding what we've been calling this traceability

6    discovery should not be ordered.  So the floor is yours.

7            MS. DAVIS:  Thank you, your Honor.

8            I think what the back and forth has proven is that

9    the question here and now is whether there is a sufficient

10   record of relevance, proportionality, reasonable

11   accessibility, and good cause squarely within your Honor's

12   *Major Tours* analysis, to support the plaintiffs' just desire,

13   based on what we believe to be speculation from their expert,

14   to impose these two heavy discovery requests on the wholesaler

15   defendants.  And these are defendants that, despite three

16   tries from the plaintiff on the economic loss case, have

17   failed to assert even one claim of factual wrongdoing.  What

18   they assert is that the wholesalers failed to test the drugs.

19   What they don't allege is any fact to show that the

20   wholesalers knew there was a problem or put on any sort of

21   even constructive notice of a problem prior to the recall, any

22   statement wholesalers made about the drugs, any improper

23   dealings whatsoever about the drugs, and, frankly, you have to

24   get to Paragraph 411 of the economic -- of the third version

25   of the economic loss complaint to get to that allegation, or

1    to figure out that there's nothing there.  And why is that?

2    It's because of who the wholesalers are and what they do.

3    They're just middlemen in the drug supply chain.  They pass

4    through sealed containers from manufacturers to retailers.  So

5    what don't they do, right?  They don't manufacture it.  We

6    didn't manufacture any of the drugs taken by the plaintiffs,

7    and we didn't actually sell it to the plaintiffs.

8          So, second, we don't keep eight years' worth of

9    financial and sales data sitting around with regard to VCDs

10   only.

11         Third, the wholesalers do not track downstream lot

12   and expiration information that they receive from the

13   manufacturers.

14         And the only argument against the proof from all

15   three wholesalers that that information is not tracked

16   downstream is plaintiffs' expert and the plaintiffs' briefing

17   saying we just don't believe you.

18         Fourth, we've proven that the wholesalers do not know

19   of any way to trace, other than the lot information, which

20   lots and which product went to whom downstream.  And, in

21   response to that, there is no articulation of any method by

22   which the plaintiffs' expert could use any of the information

23   that is available and that your Honor's contemplating ordering

24   to get there.  So it would be futile.

25         What we also know is that Congress has acted in this

1    space, and has said that wholesalers, specifically, are not

2    required to include that lot number on the downstream sales

3    and are not required to trace that information.  It's called

4    the wholesaler exemption to the Drug Safety and Security Act,

5    and it's a thing, it's a real thing, and Congress has backed

6    it up with a preemption provision that says that the states

7    may not in any way impose any burden on wholesalers beyond the

8    tracing requirements and the tracing exemptions within the

9    DSCSA.  And that goes for the recordkeeping rules as well.

10    Nothing inconsistent with or more stringent than that.  That's

11    going to be preempted.

12            But what the plaintiffs have said is, well, we're

13    going to make you produce all this stuff because you chose not

14    to keep lot information.  And that is exactly the type of

15    punitive measure through a lawsuit that the Act is trying to

16    not have happen to wholesalers.  But that's what the

17    plaintiffs are asking you to do, to use your authority under

18    the law of the various 50 states to harass wholesalers on this

19    product tracing thing, when they are squarely within the area

20    that Congress anticipated and made, you know, provision for.

21    So, you know, they just speculate, they throw at the wall a

22    few ideas, they reference some things, that they don't even

23    attach in their reply brief.  And if it is true that lot and

24    expiration information is not traced downstream, and if it is

25    true that the record before you demonstrates no way that the

1    other information that is available would either tend to prove

2    or disprove product tracing, or could be used in some

3    machination by their expert to get to product tracing, then

4    it's simply not relevant.

5          So, if it's not relevant, what about the burden?

6    Well, we've proven up the hours that would be involved I think

7    is about 140 hours -- I'm sorry -- 140 NDC numbers that would

8    each take three hours per NDC number just to query for one

9    report.  And we did that calculation just on the recalled NDC

10    numbers and came up at 130,000.  Your Honor, this duplication

11    of effort issue is not minor when you begin talking about

12    burden and the proportionality and the good cause analyses

13    that your Honor is so familiar with.

14          The manufacturers have said, have agreed, they will

15    produce this very information that we're talking about.  The

16    manufacturers are going to prove the date of sales, to which

17    wholesaler, the quantity, the NDC number -- right? -- and the

18    gross sales price.  That is exactly what the plaintiffs are

19    seeking from wholesalers, just on the other end of those

20    transactions.

21          The retailers have agreed to produce the detail of

22    each of their purchases, which will say the date of the

23    purchase, the wholesaler purchased from, the quantity

24    purchased, and the gross purchase price.  That is exactly the

25    other RFP, RFP-III that they're seeking.  Exact duplication.

1    So no relevance, exact duplication, excessive cost to

2    wholesalers to begin pulling all these.  So where are we on

3    proportionality?  The importance of the issues at stake in the

4    litigation?  Yes, of course it's important, although that

5    leads to the second, the amount in controversy.

6            We've got a small amount of an inventory of

7    plaintiffs who've been personally injured, and we have

8    overwhelming evidence that with regard to the economic loss

9    case, these plaintiffs would have had to buy a replacement

10   drug, and they are not out dollars to the extent that they

11   claim to be.  So I would argue the amount in controversy is

12   not what the plaintiffs have represented it to be.

13           Parties' relative access to information, the

14   manufacturers and retailers not only have everything that the

15   plaintiffs are seeking, they've said they will produce it.

16           Parties' resources, I think it's clear that all of

17   the parties here have good resources, but I would note, in the

18   words of your Honor, no party has an unlimited litigation

19   budget to pay for document production efforts that, in all

20   likelihood, are of marginal benefit.  And, regardless of the

21   relevance argument, if this is going to reproduce what's being

22   produced by the manufacturers and the retailers, at a minimum,

23   why not wait to see if they get everything they need on that

24   front?

25           Importance of discovery in resolving the issues, I

1    think none.  If these documents do not assist in product

2    tracing, they do not assist in resolving the issues.

3          And whether the burden or expense of the proposed

4    discovery outweighs the likely benefit, I think we've

5    demonstrated the burden over the benefit, based on the prior

6    argument.

7          I would submit, your Honor, that we've also proven

8    that based on the work required to query the system to get

9    this information, the information is not reasonably

10   accessible.  And, as your Court knows, if we have proven that,

11   it's not sufficient for the plaintiffs to merely claim that

12   our estimates are exaggerated or inaccurate.  They needed to

13   come forward and present contrary estimates or affidavits on

14   that cost estimate, and they didn't do that.

15         If the Court is inclined to entertain that even

16   further, then we're at good cause.  And although the elements

17   are close to the proportionality, they're not exactly the

18   same.  So the specificity of request, they're pretty specific,

19   although I would note that there seems to be some lack of

20   clarity, based on the reply brief, as to exactly what NDC

21   numbers the plaintiffs want us to search.  We thought they

22   wanted us to search all NDC numbers of any VCD from any of

23   these defendant manufacturers.  They now make it sound like it

24   may be something less than that.

25         The quantity of information available from other more

1    easily accessed sources, that's exactly manufacturer and

2    retailer agreements.  Everything is already on the table.

3           The failure to produce relevant information likely to

4    have previously existed, I don't think that's an issue here.

5           The likelihood of finding new information if this

6    were ordered produced, I think it's zero with the

7    manufacturers and retailers agreeing to produce it.

8           Predictions as to import and usefulness, we've

9    already discussed that.

10          Importance of issues at stake, we've addressed that.

11          And the parties' resources, we've addressed.

12          So, you know, in sum, I know that the temptation is

13   to just view this purchase and sales information on data

14   production, it's just something that's de rigueur for a big

15   company in a big case, but it shouldn't be for whistleblowers.

16   Wouldn't matter if there were 40 middlemen.  If it doesn't

17   assist in product tracing, even the plaintiffs don't claim

18   that it's relevant.

19          And we're riding the line here with the DSCSA of

20   making some really bad law.  Can you imagine if wholesalers

21   were required to produce this type of data every time there is

22   a product liability suit, every time there is one of these

23   economic loss cases, every time there is a big MDL?

24          So we think on the record before you, Judge, they're

25   just not there on any of relevance, proportionality,

1    reasonable accessibility, or good cause.  Thank you.

2              THE COURT:  I just have one question, counsel, before

3    we turn it over to Mr. Stanoch.  I'm, of course, aware that

4    the wholesalers have argued that the production of the

5    requested information would be burdensome or unduly

6    burdensome.  Correct me if I'm wrong, but it's the first time

7    I heard, during this oral argument, that's the first time I

8    heard the wholesalers argue that the requested information was

9    not reasonably accessible.  Could you clarify that for me?

10   Can you point to where in the letter briefs that the Court

11   received there was an argument that the requested discovery

12   was not reasonably accessible?

13             MS. DAVIS:  So, your Honor, we did cite the *Major*

14   *Tours* opinion in the brief, but we didn't use the words

15   "reasonable accessibility," and part of that was because we

16   were waiting to see the reply, and if there was further

17   information or further discovery or what was going to happen

18   with regard to our cost estimates.  But what did happen was

19   they fell squarely within what the plaintiffs had done in

20   *Major Tours*, and they didn't attack that, other than to say we

21   think this is exaggerated, and at that point issues were sort

22   of joined, proof was frozen, and it became clear that we were

23   in, with the burden we had proved, a not reasonably accessible

24   scenario.

25             THE COURT:  Okay.  So, are you saying then it was

 1    implicit in the briefs, or is my understanding correct, it was

 2    not specifically mentioned?

 3         MS. DAVIS:  It was not specifically mentioned, your

 4    Honor.  The proof -- the proof required to demonstrate lack of

 5    reasonable accessibility on our part was put into play in our

 6    brief and with our evidence, but the words were not used.

 7         THE COURT:  Is there -- tell me if I'm wrong, but I

 8    understand the concepts of unduly burdensomeness and

 9    reasonably accessible to be a little bit different.  Do you

10    disagree with me?

11         MS. DAVIS:  No, I think they probably are, but when

12    you have the same facts that support the argument that, hey,

13    it's going to be really expensive to go get this information

14    out of our systems, with the evidence that also demonstrates

15    that it's going to take this many hours for somebody to query,

16    and these levels of queries that have to be done, and you've

17    seen in the declarations where, you know, you've got to do

18    repeat searches just to make sure the rows that come out aren't

19    over 400,000, and the computer freezes up, and you've got to

20    start again.  That sort of machinations then, I think on their

21    face, underwrote the legal conclusion that not only is it

22    burdensome but it's also, through one view, not reasonably

23    accessible.

24         THE COURT:  Fair enough.  Okay.  Thank you,

25    Defendant.

1           Well, Mr. Stanoch, you have the last word.

2           MR. STANOCH:  Thank you, Judge.  And I will try to be

3      concise because I believe our letters fully address everything

4      Ms. Davis has raised.  I'll just try to hit a few points and

5      answer any questions, Judge.

6           Number one, in Ms. Davis's long litany, I notice she

7      didn't mention anything about confidentiality, so I can only

8      assume that they now agree that the discovery confidentiality

9      order in this case is more than adequate to assuage --

10          MS. DAVIS:  Of course not.

11          MR. STANOCH:  -- the confidentiality concerns.

12          Well, and our position, Judge, is that obviously, the

13     DCO is adequate in this case, as it is in many, many, many

14     other cases.

15          In terms of DSCSA preemption, Judge, as we say in our

16     papers, that's neither here nor there.  We're not trying to

17     impose an obligation on these wholesaler defendants to keep

18     additional information.  We know what the statute says and the

19     regulations say.  We've read it.  But whatever they are

20     required to keep is not the same thing as what they do keep.

21          And, your Honor, we've shown, both with the

22     underlying facts we were able to find publicly available with

23     our expert in his declaration, plus additional facts that we

24     found publicly available from defendants' own websites,

25     showing that their customers can query these types of reports

1    and show lot numbers, in their words, subseconds.  So we've

2    put the available facts that we have in there as necessary.

3            In fact, we cite the Form 483 that was issued by the

4    FDA to McKesson because Losartan, one of the products in this

5    case, McKesson sold Losartan to Albertsons, both defendants

6    here, because Albertsons was complaining it didn't have lot

7    and expiration date on it.

8            So I think there is a lot of other evidence in the

9    letters that we cite, Judge, but we think that to the extent

10   you even need the evidence at this pre-discovery stage, there

11   is certainly enough in there to show that we are at least

12   entitled to understand what information does exist in these

13   defendants' records, whether or not that is more, the same, or

14   less than what the DSCSA requires.  We think we've shown the

15   likelihood of new information is very high, and that given

16   that these defendants' own customers can request this

17   information, require this information in these wholesalers'

18   own systems, there must be some -- there is information there

19   available, and it should be produced.

20           MS. DAVIS:  Judge, may I just address the McKesson

21   connect and the 483?

22           THE COURT:  Last word, counsel.

23           MS. DAVIS:  The McKesson connect is an outward facing

24   app for pharmacies, and it allows a pharmacy to go in and

25   search the last two years, so that would nicely line up with

the recalls.  We wanted to talk about two years, instead of

eight.  But allows them to search their purchases for McKesson

for the last two years, but lot and expiration information is

not in there unless the pharmacy itself puts it in there

because, obviously, we don't track that way.

The 483 warning letter relates to the specialized

area of suspect product which, in lay terms, means if product

comes through the wholesalers that, without opening the sealed

container, they should be able to eyeball and see that there

is a problem with, they need to capture that suspect product

and set it aside.  So that doesn't relate to being punished

for not tracking lot or expiration information.  It said, you

got a set of product that, from outside, you should have been

able to see there was no lot information on and you didn't set

it aside, something completely different.  Thank you.

THE COURT:  Thank you, counsel.

Okay.  We're going to move on to the second issue,

which involves requests for production 2 and 4 directed to the

wholesalers, and this might overlap a bit with the retailers'

dispute, as well, so I can understand if the retailers want to

weigh in.

I have a couple of questions for the plaintiff.  I

don't know who's going to address the issue for the plaintiff.

Is it you, Mr. Stanoch?

MR. STANOCH:  I believe so, your Honor.

1        THE COURT:  Okay.  With regard to whether this --
2  I'll call it the pricing data -- is relevant, is it
3  plaintiffs' position that the requested discovery is relevant
4  to their unjust enrichment claim and their disgorgement claim?
5        MR. STANOCH:  That's partially correct, yes.  We
6  think there is more to it, but yes.
7        THE COURT:  Okay.  Tell me.  What else is it relevant
8  to?
9        MR. STANOCH:  Your Honor, as we put in our reply
10  brief, we think restitution, disgorgement, are broad,
11  equitable remedies, always available in this Court's arsenal,
12  as well as under the law of many of the states that are
13  alleged in the master complaint.  So we think it should not be
14  cabined as sort of the unjust enrichment only method of
15  damages.  But, aside from damages in general, as we put in our
16  opening letter, you know, the price is paid by the
17  wholesalers, and, in turn, what they charge downstream are
18  relevant to motive, intent, and notice.  And there is -- it's
19  in the public filings and pleadings in this case of other
20  defendants in this case saying the pricing of some overseas
21  drug was suspicious, in fact, and if there is such a drastic
22  price differentiation between foreign overseas valsartan and
23  domestically made valsartan, that is a reason that, we could
24  certainly argue to the finder of fact, should have made it
25  known or reasonably should have known through investigation to

1   the downstream defendants that there was something amiss here,

2   and there must be a reason why.  And --

3        THE COURT:  So you mean in every case where a

4   consumer alleges that a product cost too much, they can get

5   this profit discovery because they want to show motive,

6   intent, and notice?

7        MR. STANOCH:  Well, no, your Honor.  I think here we

8   have --

9        THE COURT:  Is that -- that's what you're arguing,

10  isn't it?

11       MR. STANOCH:  I am arguing that it is a basis for the

12  discovery, yes, but I am not arguing it is a basis in every

13  single case where someone said the product was too expensive.

14       What we're saying here is that there is already in

15  the public record, in the pleadings and the complaints and

16  otherwise, statements by other defendants actually calling out

17  the pricing here and statements by other defendants saying

18  that they cut low prices on purpose, and there is enough

19  evidence to suggest that there is a reasonable basis --

20       THE COURT:  Oh, I see.

21       MR. STANOCH:  -- the situation that happened here.

22       THE COURT:  I see.  You're saying because the

23  purchasers got such a good deal and the prices were so cheap,

24  that they should have questioned whether there was a reason

25  why the prices were so cheap.  Is that what you're saying?

1        MR. STANOCH:  Correct, your Honor.

2        THE COURT:  Okay.  So if Walmart sells Tide detergent

3   $3 less than Shoprite, purchasers should be put on notice that

4   the Tide Walmart, by itself, is somehow defective compared to

5   the Tide that Shoprite sells?  Is that what you're saying?

6        MR. STANOCH:  No, your Honor.  No, I'd say if I'm a

7   distributor, and I'm buying valsartan from one person, I'm

8   making it up for $10 a bottle, and then -- someone who sells

9   in the U.S., and then someone from China comes to me and says

10  we'll sell it to you for 50 cents a bottle, I think the

11  magnitude of the delta is such that someone exercising

12  reasonable diligence would have to question that and do due

13  diligence to see what, if anything, might be the explanation.

14       THE COURT:  But isn't that why people -- listen, I'm

15  not an expert on manufacturing, but isn't that why so many

16  products are made in China, because maybe they don't pay a

17  minimum wage or have the environmental regulations?  So if

18  someone buys a cheaper T-shirt that's made in China, they

19  should question whether it's defective or not?  That's not

20  your strongest argument, counsel.

21       So we know you're arguing this pricing information is

22  relevant to damages, motive, intent, notice.  Anything else?

23       MR. STANOCH:  No, your Honor.  Those are the

24  principal reasons.

25       THE COURT:  Can you tell me -- and I have to

1    understand this because I think it's important -- how this

2    pricing requested discovery, if it is, is relevant to class

3    certification?

4           MR. STANOCH:  At the class certification stage, your

5    Honor, I'm sure you know, the plaintiffs will have to come

6    forth with a damages model showing that damages are

7    susceptible to classwide proof.  And that's usually done,

8    traditionally, with an expert modeling damages for a defendant

9    or group of defendants.  For that model to be put together, we

10   need all of the inputs -- what was bought, for how much, who

11   you sold it to, for how much.  The delta between those two

12   things are your ill-gotten gains, which we would say are class

13   damages.  Again, please don't hold me to it, because it's

14   premature at this stage, but speaking very generally, that is

15   the usual procedure.

16          THE COURT:  Do you have to produce an actual report

17   computing the numbers -- you being the plaintiff -- or does

18   the plaintiff have to say if I get this data, this is how I

19   would put together the damage model?

20          MR. STANOCH:  I think the defendants in the case will

21   argue that Third Circuit law requires plaintiffs to put

22   together the model and use the data to show how -- to run the

23   model, using the data.

24          THE COURT:  So if, hypothetically -- I'm not ruling

25   right now -- suppose the Court says no, we're got going to

1    give plaintiff this pricing data because the defendants have

2    argued it's irrelevant, burdensome, et cetera, et cetera.  Do

3    you think that the Court would then permit the defendant, who

4    has argued this information is not discoverable, that it's a

5    basis to deny certification?  In other words -- I didn't say

6    that as clearly as I should have.

7         Do you think it's reasonable or feasible or possible

8    that plaintiffs can rely on the fact that the -- I'm sorry --

9    defendants can rely on the fact that plaintiffs have not

10   produced a profit model, when the defendants refuse to produce

11   the profit discovery to the plaintiffs?

12        MR. STANOCH:  Unfortunately, your Honor, I believe it

13   would be an argument used by the defendants against us, and

14   they would probably say that it was plaintiffs' burden to show

15   every element as susceptible to classwide proof, including

16   damages, and that we did not get the information that we

17   sought, and that we do not find an adequate alternative to

18   that, shows that we cannot prove on the a classwide basis the

19   element of damages.  And that's why we say if they would agree

20   to waive or stipulate that they won't oppose class cert or

21   raise a defense at another point, then we can certainly think

22   about that and maybe we can have a compromise.  But, absent

23   that -- and we have floated this before, and not a single

24   defendant has agreed, and I'm not surprised.  But, absent

25   that, if we have no guarantee that the fact that we did not

1  get the information, even if your Honor says -- precluded us

2  from getting it, it's still our burden, and we have not

3  discharged our burden.  And that's a situation that we can't

4  have ourselves in, unfortunately.

5          THE COURT:  Question for you.

6          MR. STANOCH:  Yes, Judge.

7          THE COURT:  We read the cases that the plaintiff

8  cited where the Court has ordered the production of pricing

9  and profit information.  We're not dealing with the punitive

10 damage issue right now.  We're not dealing with an antitrust

11 case.  We're not dealing with a patent case.

12         Have you cited one case -- and, obviously, I'm not

13 deciding the merits of the claim.  This is not a Rule 12

14 context.  So, just to be clear, I'm not ruling on the merits.

15 Of course not.  But have you cited one case in the product

16 liability context where a Court has said that the plaintiffs

17 are entitled, in discovery, to this type of profit

18 information, pricing information?  One case?

19         MR. STANOCH:  I think, though we probably did not --

20 we certainly did cite it in our reply brief, cases that

21 allowed state law claims to go forward, as well as

22 certification of a New Jersey unjust enrichment class, and a

23 Minnesota Consumer Fraud Statute class, which was *Hudock*

24 *versus LG Electronics*, 220 Westlaw 1515233, and in that

25 opinion, the damages model put forth for unjust enrichment

1    relied on that information.

2         So, to your direct question, no, we did not

3    specifically cite a case on a discovery posture, but there was

4    certainly the cases saying, on certification, that that was

5    the proper damages and proper inputs to show any damages

6    model.

7         THE COURT:  Question for you.  Who is it -- we have

8    three master complaints.  Which set of plaintiffs are

9    asserting this disgorgement, unjust enrichment type claim?  Is

10   it all of them or one group or some combination?

11        MR. STANOCH:  I believe it's some combination, Judge.

12   It's certainly the master economic loss class action

13   complaint.  I believe, I don't have it in front of me, that

14   the short-form complaints for personal injury cases have a

15   check box for number of state law claims for that individual

16   plaintiff, and I believe it may include unjust enrichment,

17   though I do not have it in front of me, and I do not recall

18   either way whether the medical monitoring complaint had unjust

19   enrichment or not in it.

20        THE COURT:  Okay.  Hypothetical, again, I'm making

21   this up.  Suppose the case goes to trial, and the plaintiffs

22   win, and the jury says there has been $100 in profit.  Who

23   gets that money?

24        MR. STANOCH:  Would that be a economic loss case,

25   your Honor?

```
 1        THE COURT:  Let's assume it's the economic loss case.
 2   Why would those economic loss plaintiffs, the third-party
 3   payors, why would they get that profit?  They didn't -- it's
 4   not a damage to them, is it?
 5        MR. STANOCH:  It is -- the principles of disgorgement
 6   and restitution is so that a defendant does not benefit from
 7   it's own wrongdoing, and that the law under the various
 8   states, and I believe the federal law in terms of it being an
 9   equitable remedy valuable, is to deter that and to put it in
10   the hands of the next best, which are the plaintiffs, who
11   would have been harmed by the sale of the offended product.
12        THE COURT:  Okay.  Suppose I buy a toaster, the
13   toaster is defective, I'm injured, I go to trial, I win.  The
14   jury says the toaster is defective.  Am I entitled to the
15   profits that the manufacturer made on that toaster?
16        MR. STANOCH:  I would argue yes, Judge.  The *Hudock*
17   case with the New Jersey unjust enrichment class and the
18   Minnesota consumer protection class, that was a case by
19   consumers against LG Electronics, the appliance and television
20   manufacturer.  They weren't seeking Walmart or Best Buy's
21   ill-gotten gains.  That was ill-gotten gains by the
22   manufacturer, LG Electronics.
23        THE COURT:  Okay.  In this context, are you seeking
24   the "ill-gotten gains," the profits from the manufacturer?  In
25   the present context, where we're dealing with the wholesaler,
```

1    retailer issue.

2          MR. STANOCH:  Yes.

3          THE COURT:  So are plaintiffs totally missing the

4    mark then?  In every single product liability case that is

5    filed from here on out, if a plaintiff's attorney was doing

6    their job, they should seek disgorgement of profits, in

7    addition to personal injuries?

8          MR. STANOCH:  I can't speak, obviously, what other

9    lawyers should do in every future products liability case,

10   Judge, but we think the facts in this case will be sufficient

11   to show that the defendants in each of the steps with the

12   contaminated fraud is different than, say, a toaster with a

13   handle that didn't quite work or the heating coil didn't get

14   as hot as it said.

15         THE COURT:  Do I take it that plaintiffs are also

16   seeking this type of remedy from the manufacturers?

17         MR. STANOCH:  We are, yes, Judge.

18         THE COURT:  I know it's not an issue before the Court

19   now, but are there ongoing discussions with the manufacturers

20   about whether this type of what I call profit, sales type

21   information, is going to be produced?

22         MR. STANOCH:  Yes.  In fact, the pricing or cost

23   information was part of what the defendants did produce, and

24   your Honor will recall from a couple weeks ago, there were

25   talks with questions we had about one or two particular

1    defendants' data, and some of those questions related to how

2    they tracked the cost side, the profits, so to speak, on the

3    sales of valsartan, whether it was by customer or whether it

4    was through product levels, in other words, did we make five

5    cents a pill or did we make $500,000 for all sales to the

6    company.  So, regardless of the question of how it was kept

7    and maintained, it was data in some form, at least, I think

8    was produced by most, if not all, of the manufacturer

9    defendants by now.

10            THE COURT:  Another question for you.  You're seeking

11    the same type of data from the wholesalers, retailers that

12    you're seeking from the manufacturers in terms of the profit

13    type information.  Am I right about that?

14            MR. STANOCH:  Yes, Judge.

15            THE COURT:  All right.  Do the issues rise or fall

16    together?  In other words, hypothetically -- I'm not ruling

17    right now -- suppose the Court says no, you're not going to

18    get it or at least you're not going to get it now from the

19    wholesalers and the retailers.  Does that necessarily mean

20    that the same position has to be taken with regard to the

21    manufacturers or are the situations and claims different or

22    distinguishable?

23            MR. STANOCH:  I think it may be hard to distinguish

24    between them, Judge, and here's why.  If a given

25    manufacturer -- I don't want to pick names because I want to

1  be sure, but I know there is data from a manufacturer that

2  doesn't keep or said it doesn't keep data on its profits

3  selling per customer; it just says, you know, we sold X amount

4  of valsartan, 160 milligrams, we made X amount of dollars.

5  Right?  They can't tell us where the profits are coming from.

6          We would need the wholesaler defendants to tell us

7  what they paid so we can then figure out what the cost of the

8  drug was from the manufacturer down to the wholesaler, to know

9  what the profit was on the sale of the defendants in this

10 case, and so forth down the chain.

11         THE COURT:  Okay.  That's your argument that the

12 discovery you want from the wholesalers and retailers, for

13 that matter, is relevant to the damages recoverable from the

14 manufacturer?

15         MR. STANOCH:  Correct.

16         THE COURT:  The profit information, pricing

17 information from the manufacturer, is that also relevant to

18 damages and motive, intent, and notice?

19         MR. STANOCH:  It would be, yes, Judge.

20         THE COURT:  Any other reasons that it might be

21 relevant for the manufacturers that doesn't also apply to the

22 wholesalers and retailers?

23         MR. STANOCH:  I think it would be the same reasons

24 for each tier of defendant, Judge.

25         THE COURT:  Okay.  All right.  So I will let you have

1    the last word on this.  I want to turn the call over to the

2    wholesalers, and then we'll hear from the retailers, because

3    it might be the same issue.  I don't have any particular

4    questions for you, but I want to make sure you feel that you

5    have a full opportunity to present any argument you want as to

6    why the requested sales and pricing information shouldn't be

7    produced.

8            MS. DAVIS:  So, your Honor, D'Lesli Davis for the

9    wholesalers.

10           I'm confused because I thought I heard the

11   plaintiffs' counsel first say that, yes, the manufacturers

12   have all agreed to give us profit information, the

13   differential between their cost of goods sold and their sale

14   price.  And then he came back later and said, oh, but we need

15   this from the wholesalers too or we won't be able to figure

16   out the manufacturers' profit.  So I'm confused by that.  I

17   think his first position was the correct one, and there is not

18   a need for the wholesaler information to determine

19   manufacturer profits.

20           And then you had asked, your Honor, if there was a

21   way to differentiate this unjust enrichment/disgorgement of

22   profit claim as it exists towards the manufacturers versus the

23   downstream defendants, and, basically, because I know we want

24   everything from all of them, for all of their ill-gotten

25   gains, but there is a very simple way to distinguish them.

1   There are many factual allegations of wrongdoing against

2   manufacturers, starting with the failure to use good

3   manufacturing practices, and there is only one factual

4   allegation against the wholesalers, which is you didn't open

5   the sealed containers and test the product.

6          And, as your Honor is well aware, in addition to all

7   the things we have already discussed with the DSCSA, there are

8   innocent sealed -- innocent sellers sealed container statutes

9   all across the country that say if a wholesaler wants to be

10  insulated from liability, they should not open the container

11  or alter the drug.  That's how you get insulation, and that's

12  how you get a defense against liability.

13         So, the Court has been very practical in trying to

14  approach discovery issues and, from a practical standpoint,

15  the Court can very easily see here that when it comes to the

16  core plaintiffs' claims, in the personal injury action their

17  real damages are their personal injuries -- their medical

18  expenses, their pain and suffering, lost wages, et cetera --

19  and they have custody and control of all of that.

20         When it comes to the medical monitoring class action,

21  the damages are whatever it would be to monitor the class's

22  health on an ongoing basis.  They have access to however

23  they're going to figure out what that is.

24         And when it comes to the economic loss plaintiffs,

25  what they're saying is that each of the individual plaintiffs

 1    shouldn't have paid for this drug, and the individual

 2    plaintiffs know what they paid for that drug, and that too is

 3    within their custody.  So there is not any sort of -- well, I

 4    guess, let me back up.

 5            The plaintiffs didn't argue anything about choice of

 6    law to you.  They just randomly picked different cases that

 7    they thought were helpful.  But when we went forward with New

 8    Jersey laws or the home state law of the Court, and the

 9    plaintiffs' attorney, you know, they sort of flipped out

10    because there is some core fundamental truths about unjust

11    enrichment and disgorgement of profits that New Jersey has

12    recognized.  And the first is that, you know, it's limited to

13    allegations of conscious wrongdoing, of which there are zero

14    against the wholesalers in this case.  And that's not just the

15    District of New Jersey.  That's the Restatement (Third) of

16    Unjust Enrichment.  Plaintiffs haven't alleged conscious

17    wrongdoing, and there is no place in the country, probably,

18    that would allow a disgorgement of profits without a factual

19    claim of wrongdoing.

20            And the New Jersey law, again, is an exemplar.

21    There's two other instructive things about unjust

22    enrichment/disgorgement of profits, and that, of course, is

23    what they're arguing in their brief is the only thing that

24    really entitles them to this.  I think they make a side-wide

25    throw at, you know, Court has inherent power to do that.  But

the plaintiff must have conferred a direct benefit, that
plaintiff on this defendant.  Wholesalers are in the middle.
There is no direct benefit by any of these plaintiffs,
whichever complaint you want to look at, to these defendants.
And unjust enrichment is available really where there is even
equitable remedy, right, available where there is no other
relief available.  And if there is one thing that plaintiffs
have done, it is that they have invoked every other possible
type of relief available, both in tort, and then the UCC
damages too.

        So, from the practical standpoint here, the unjust
enrichment claim is not even factually pled as to wholesalers,
and without the facts there, when it's something this
sensitive, the proprietary information, the trade secret
nature has been proven up, and when the plaintiffs, after
three times, don't even fit their unjust enrichment
pleading -- which, by the way, is only in the economic loss
complaint -- into the four corners of the home state law,
there are reasons for that, of course.

        And so, at a minimum, we would submit that it would
be premature to jump into ordering this sort of sensitive
information, with the 12(b)(6) coming up, which is simply
going to argue that on the face of these pleadings, there are
no facts alleged, even taking all of the allegations made by
the plaintiff as true, that would support any sort of unjust

1    enrichment or disgorgement of profits for, you know,

2    ill-gotten gains, and that that cause of action is going to be

3    dismissed.

4            So, at a minimum, we would argue that this sort of --

5    these two discovery requests should be stayed.

6            Let me back up just a little bit, too, and point out

7    to the Court that each of these requests seek not only gross

8    prices, meaning wholesalers' gross prices, but the net prices.

9    Now, "net" is not defined.  And when we talk to the plaintiffs

10   in the meet and confer, all we hear about is sort of profits,

11   profits, profit.

12           And so, in addition to the demonstrated burden to

13   pull the gross price information, which we've already

14   discussed just with regard to recalled NDC numbers, we are

15   also talking when we talk about true profits or true net

16   price, even though it's undefined, we're talking about

17   creating something uniquely for discovery, something that does

18   not exist at the -- at the wholesaler companies currently

19   because they do not track their profits by

20   valsartan-containing drug or even by NDC number.  So to

21   extract the information that would be required to figure out

22   underlying costs and give a true representation of what would

23   be a profit figure or a net price, whether you're talking

24   about transportation, overhead, taxes, rebates, chargebacks,

25   whatever else, over eight years and the thousands of sales

1   that we're talking about, you know, we're talking about a

2   whole new burden here that is just really staggering when you

3   think of the different legacy systems involved, the

4   administrators that may have been there and left, and the

5   different functional areas, right, that would have to be

6   involved -- IT, accountants, sales, the business units, tax,

7   and then you probably have to go outside the company as well

8   to get some work done on that.

9         So it's hard to believe that it makes sense, based on

10  the face of the pleadings, at all.  Plaintiffs should be held

11  to their pleadings.  I mean, the wholesalers deserve some

12  protection when the plaintiffs don't allege wrongdoing, and

13  then come and seek this highly sensitive information.

14        But, at a minimum, your Honor, given the burden and

15  given the upcoming 12(b)(6)s, we would argue that not only

16  does it make sense to table that, at a minimum, but that there

17  is no real harm to the plaintiffs to do so.  If this were to

18  be held till, say, January, when there are rulings on

19  12(b)(6), the plaintiffs are still proceeding with all other

20  discovery as to wholesalers, they're still getting the profit

21  information from their target, all allegations of wrongdoing

22  which are the manufacturers, and there is still time before

23  any sort of trial or, I might add, class certification, so, to

24  catch up, if by some miracle the unjust enrichment or

25  disgorgement of profits survive as to the wholesaler

1    defendants.

2           We'll rely on -- to try to be concise, we'll rely on

3    everything else that we have in the brief, and, of course, are

4    happy to answer any questions, and are, of course, happy to

5    apply all of these factual details as proven up in the

6    declarations to the proportionality or good cause elements, as

7    well, if the Court is interested in that.  I think a lot of it

8    is repetitious and I think a lot of it is sort of

9    self-apparent from the argument that I just made, but I want

10   to make sure we don't miss anything that your Honor is

11   concerned about.

12          THE COURT:  Thank you, counsel.  You've been

13   comprehensive.

14          How about the retailers, do you want to weigh in on

15   this issue?  Because am I wrong that, in effect, it's the same

16   issue that the retailers are arguing about?

17          MS. JOHNSTON:  Yes, your Honor.  And I will be brief

18   and try not to repeat too much of what Ms. Davis said.  I

19   think that most of what she articulated is applicable to the

20   retailers in their role as a downstream --

21          THE COURT REPORTER:  I'm sorry.  Who's speaking?

22          MS. JOHNSTON:  I'm sorry.  This is Sarah Johnston.

23          THE COURT REPORTER:  Thank you.

24          MS. JOHNSTON:  Your Honor, I would say, you know,

25   first off, that the questions that you ask I think are the

1   right questions, and they're the questions that we have as

2   well, and to respond to those, I think it is telling that

3   there are no cases cited in plaintiffs' briefing that would be

4   applicable to a case like this, and we are talking about a

5   true product liability context in which there is no allegation

6   of wrongdoing as to these defendants.  Because the remedies

7   that plaintiffs are suggesting is the one that they are

8   pursuing, is not the remedies that they will be entitled to

9   once -- if and when this case ever gets to class certification

10  as to the downstream defendants.

11          Secondly, the same question you asked is one that

12  we've had, which is when we talked about this, quote, unquote,

13  damages model this information is so important for, it's very

14  unclear which plaintiffs we are talking about, and as to the

15  retailers, and for the purposes of working up the economic

16  loss class, we are only named as to the consumer class portion

17  of that, and so the question you raise about, you know, are

18  you entitled to the profits on a toaster is the same general

19  question that we've had.  If you truly are claiming that you

20  are damaged by virtue of purchasing this allegedly

21  contaminated drug, is your remedy truly the disgorgement of

22  profits or is it payment for the out-of-pocket expense?  And

23  we would argue that it's the latter, because that is what

24  makes sense in thinking conceptually about what the possible

25  damages would be.

1          Third, you asked, you know, is -- are the different

2     tiers of defendants interrelated, assuming that this is

3     something that -- that plaintiffs are ordered -- or that

4     defendants are ordered to produce to plaintiffs, and the

5     answer to that is no.  And I think that there is not a

6     conceivable way that profits as to the manufacturers for

7     purposes of this disgorgement argument would rely on the

8     profit of the downstream defendants, because they don't, and,

9     realistically, it's not -- it's not possible to conceive of

10    how a manufacturer couldn't determine what its profits were

11    without relying on a bunch of other entities in the supply

12    chain.  So I don't think that they are interrelated.  I

13    understand why plaintiff would want to argue that they are,

14    but the -- it does not make sense from a very common sense

15    perspective.

16         And then, finally, there is -- again, there is no

17    allegation of wrongdoing that would make this discussion one

18    that would be needed to have.  And so, I echo the same

19    questions.  And then I also can't overlook the fact that when

20    we're talking about this, in every discussion that we've had

21    thus far about, you know, this damages model, and why it is

22    that plaintiffs would need this information, the response is

23    always because we need it, because it's relevant.  And when

24    pressed further, it's never -- it's never clear, one, why it's

25    relevant, or, two, who it's relevant for, which makes it all

1   the more troubling that we've gone through this process and

2   obtained 14 declarations that explain explicitly to the Court

3   why there is such concern about having to produce it, and, in

4   response, all we hear is, well, we should get it because we

5   want it.

6           And then finally, as to Ms. Davis's last point, I

7   agree, the Rule 12 issue is -- is and has been on the horizon

8   and, you know, a number of the arguments that would be tied to

9   this issue of whether or not disgorgement of profits are even

10  available are directly tied to the issues that are going to be

11  briefed on Rule 12.  So the -- the idea of reaching this issue

12  before the Rule 12 briefings are considered by the Court I

13  think is a premature action, and while, you know, there are a

14  number of reasons to say that this is an inappropriate theory

15  of recovery, I think it also truly does highlight why this is

16  something that can't be taken up by the Court until Judge

17  Kugler has been able to review and reach a decision on this

18  issue at the time of the Rule 12.

19          THE COURT:  Thank you, counsel.

20          Plaintiffs, you have the last word.

21          MR. STANOCH:  Thank you, Judge.

22          We've said in our letter multiple times, I'm not sure

23  how many other ways we can say it, that to calculate

24  ill-gotten gains, it's what you sold something for, say 10

25  bucks, minus what it cost, say 4, your profits are 6.  Not

1    that I want it.  That's how the math is done.  That's what the

2    case law shows is done.

3              These are valid claims, your Honor.  These are valid

4    methods of recovery.  Plaintiffs will be prejudiced at class

5    cert and later eventually at trial.  They don't have the facts

6    necessary to show on a classwide basis method for calculating

7    damages under this theory.

8              They may argue, ultimately, that the theory might not

9    be -- might not be selected or might not carry the day at

10   trial, but that doesn't relieve me of my obligation as

11   plaintiff to come forward with the model supported by the

12   right data, and the only way to get the data is to get it from

13   these defendants.

14             And none of them have said that they would stipulate

15   not to oppose class cert on this basis, which we have invited

16   them to do, which means then the only alternative to that is

17   we have to seek the information.

18             THE COURT:  Thank you.

19             Defendants, one last question.  If the Court denies

20   the requested discovery, can defendants rely on plaintiffs'

21   failure to produce profit information as a basis to deny class

22   certification?  Ms. Davis, how about you?

23             (No response.)

24             THE COURT:  You're not at a loss for words, are you?

25   Ms. Davis, are you there?

1          MS. DAVIS:  Sorry, your Honor.  I was talking; I was

2     on mute.

3          So, to clarify, the Court's question is, if the

4     unjust enrichment claim were to survive 12(b)(6) against the

5     wholesalers on the current pleadings, and a denial of this

6     information continued beyond that point, what proposed

7     subclass would -- is anyone anticipating that the defendants

8     would come in and say, no, no, no, you don't have my profit

9     information?  The class certification at that point is going

10    to be, we have a class of these people who used contaminated

11    valsartan, and the fights that I'm envisioning are on

12    clarifying that it has been to be somebody that can prove

13    product identification and all these other damage issues that

14    we've talked about, but I don't understand the implications or

15    what is being suggested that inhibits a class argument or

16    class certification just based on disgorgement of profits.

17         THE COURT:  Ms. Johnston, do you want to weigh in?

18         MS. JOHNSTON:  Yes, your Honor.

19         I think that the argument we would make is really

20    that the idea that disgorgement of profits as a damages model

21    in the first place would be appropriate, and for all the

22    reasons we've discussed and mentioned in our briefing, we

23    don't think that that is, for a number of reasons.  But it's

24    also truly difficult for us to weigh that question without

25    plaintiffs having specifically articulated how this damage

1   model would even work as to the downstream defendants because

2   the remedy suggested by it is not an available remedy.

3            THE COURT:  Okay.  Thank you, counsel.

4            The record is closed on these discovery disputes.

5            What I'd like to do at this point, if I can ask your

6   indulgence, is if you have no objection, to take a short

7   break -- we've been at this for two hours -- reconvene at

8   4:00.  We can call back in.  And I'll read you the Court's

9   opinion and order into the record.  Will everyone be available

10  and, most importantly, Carol, are you available?

11           THE COURT REPORTER:  Yes, your Honor.

12           MS. DAVIS:  Yes, your Honor.

13           MR. SLATER:  Of course, Judge.

14           MR. STANOCH:  Yes, your Honor.

15           THE COURT:  So we'll adjourn for a little less than

16  30 minutes, reconvene at 4:00, and then you'll get the Court's

17  ruling.  We will see you in a few minutes, counsel.  Thank you

18  very much.

19           (A recess was taken from 3:35 p.m. to 4:00 p.m.)

20           THE COURT:  Okay.  We're back on the record in the

21  Valsartan matter.  This is Judge Schneider.

22           I'm going to read into the record the Court's oral

23  opinion regarding the macro discovery disputes involved with

24  the wholesaler and retailer defendants, to be confirmed in a

25  Court order to be entered.

1    This matter is before the Court on what the Court has

2  called macro discovery disputes between the plaintiffs and the

3  wholesaler and retailer/pharmacy groups of defendants.

4    The Court heard oral argument this date, July 6,

5  2020, via conference call.  As will be discussed in more

6  detail, the discovery disputes generally relate to plaintiffs'

7  requests for tracking, pricing, profit, and sales information

8  from the wholesalers and retailers.  This will serve as the

9  Court's oral opinion, to be confirmed in an Order to be

10 entered.

11    The parties are obviously familiar with the

12 background of this matter, so only a brief summary will be

13 provided.

14    This MDL involves the sale and consumption of

15 allegedly contaminated valsartan blood pressure prescription

16 medication.  Three general master complaints have been filed:

17 one, a proposed nationwide class action seeking economic

18 damages on behalf of third-party payors; two, a proposed

19 nationwide class action requesting medical monitoring relief;

20 and three, a master complaint alleging consumers contracted

21 various forms of cancer from ingesting valsartan contaminated

22 with cancer-causing chemicals.

23    In excess of 300 separate bodily injury complaints

24 have been filed to date, and recently approximately 30 new

25 complaints are being filed per month.

1        Plaintiffs have sued various groups of defendants in

2  the valsartan supply chain, starting with the foreign

3  manufacturers of the active pharmaceutical ingredient, then

4  proceeding to the finished dose manufacturers, then the

5  so-called downstream defendants, which are the wholesalers and

6  the retailers.

7        The API and finished dose manufacturer defendants

8  have been and will be collectively referred to as "the

9  manufacturing defendants."

10        The three wholesalers in the case are the major

11  wholesale players in the distribution chain who comprise the

12  majority of the wholesale market.  These wholesalers are

13  McKesson, Cardinal Health, and AmerisourceBergen.

14        The retail defendants are familiar names in the

15  business such as CVS, Rite Aid, Walgreens, Walmart, et cetera.

16        To date, the parties' discovery efforts have focused

17  on plaintiffs and the manufacturer defendants, and these

18  defendants are in the process of responding to requests for

19  production approved by the Court.

20        Since the discovery directed to the manufacturing

21  defendants is well underway, it is now time to turn to the

22  downstream defendants.  Although these defendants vigorously

23  deny any liability in the case, there is no doubt they possess

24  some relevant and discoverable information to which plaintiffs

25  are entitled.  To a large extent, plaintiffs and the

1    downstream defendants have been able to resolve their

2    disputes, which are reflected in the red-line version of

3    plaintiffs' proposed requests for production attached as

4    Exhibits B and C to plaintiffs' April 13, 2020, letter brief,

5    Docket Number 413.

6           The remaining disputes are the subject of this oral

7    opinion.

8           Insofar as the procedural history of the case is

9    concerned, until just recently, the Court has barred motions

10   to dismiss.  Nevertheless, defendants' motions to dismiss will

11   soon be filed and heard, to be followed in short order at an

12   unknown future date by motions for class certification.

13          In the meantime, discovery is proceeding and the

14   manufacturing defendants' ESI document production will be

15   completed in the fall, with fulsome rolling productions

16   between now and then.

17          The Court anticipates depositions will start in the

18   late fall, but no later than December or January.

19          Starting with the wholesaler defendants, the parties

20   dispute the extent of the upstream and downstream purchasing,

21   sales, and pricing discovery that must be produced.  As to the

22   wholesalers' purchases and sales, in general fashion,

23   plaintiffs want to know the details of the wholesalers'

24   purchases of valsartan-containing drugs from defendant

25   manufacturers from January 1, 2012, to December 31, 2019.

1    Plaintiffs want the same information for the same time period

2    for the wholesalers' sales to defendant retailers.

3            As to pricing, plaintiffs want the financial details

4    of each of the wholesalers' purchases and sales of

5    valsartan-containing drugs during the designated time period.

6            The Court will first address plaintiffs' request for

7    purchasing and sales discovery from the wholesaler defendants

8    which has been referred to as tracing discovery.  As to this

9    nonfinancial discovery, plaintiffs argue the discovery is

10   relevant to tracking the supply chain of the

11   valsartan-containing drugs plaintiffs consumed and/or paid

12   for.  Plaintiffs argue the discovery is critical to knowing,

13   in plaintiffs' words, who sold what and to whom.  Plaintiffs

14   maintain the requested discovery is helpful to showing which

15   manufacturer defendants' valsartan-containing drugs made it

16   into plaintiffs' hands and will enable plaintiffs to track

17   what valsartan the wholesaler defendants purchased and, in

18   turn, to whom they sold the valsartan.  The Court refers to

19   this as tracing or tracking discovery.

20           The wholesaler defendants object to plaintiffs'

21   request for tracking or tracing discovery on various grounds,

22   including the following:  one, the requested discovery is not

23   relevant; two, the requested discovery is not genuinely needed

24   since it is duplicative of discovery to be produced by other

25   defendants; three, the claims that plaintiffs need the

1  discovery for are futile; four, the requested discovery is

2  highly proprietary and trade secret; and five, the requested

3  discovery is disproportionate to the needs of the case and

4  unduly burdensome to produce.

5         The most important question the Court must decide in

6  this context regarding plaintiffs' request for purchasing and

7  sales discovery from the wholesaler defendants or, in the

8  Court's words, tracing discovery, is whether the requested

9  discovery is relevant.  If the answer is no, plaintiffs do not

10  get any.  If the answer is yes, the Court must address

11  defendants' other arguments for why the requested discovery

12  should not be produced.

13         Having considered the total record produced by the

14  parties, including the declaration submitted by plaintiffs'

15  data analytical consulting expert and the declarations

16  submitted by the three wholesaler defendants, the Court finds

17  that the requested discovery is plainly relevant to core

18  issues in the case.  It is unquestionably the case that a

19  critical issue in the litigation is and will be whether

20  plaintiffs consumed defendants' contaminated valsartan.  The

21  requested discovery asking for the details of the wholesalers'

22  purchases and sales of valsartan-containing drugs is relevant

23  to this issue.

24         The Court, of course, recognizes that the wholesalers

25  have made a strong prima facie case that they do not track

1    their sales to retailers by lot numbers and that this is not

2    required under the Drug Supply Chain and Security Act.

3    However, the Court rejects the notion that if the wholesalers

4    do not track sales by lot number, plaintiffs' requested

5    discovery is irrelevant.  The wholesalers ignore the fact that

6    plaintiffs and their expert argue that even without the lot

7    number, the wholesalers possess information relevant to

8    tracking their sales.  See generally the declaration submitted

9    by plaintiffs' expert consultant, Paragraphs 11, 29, 36, and

10   46.

11         For example, in Paragraph 46, plaintiffs' expert

12   concludes that given the extent of the data kept by the

13   wholesalers, the wholesalers are able to identify how best to

14   link their sales shipments to recalled lots.

15         See also Paragraph 29 where the expert states that

16   even without a lot number, there are, quote, unquote, many

17   ways to link a dispensed product to a lot.

18         In addition, in Paragraph 36, the expert states that

19   the wholesalers have more than enough information in their

20   inventory systems that could be used to associate lot numbers

21   with the wholesalers' sales.  Plaintiffs refer, for example,

22   to DSCSA shipment labels, the wholesalers' inventory control

23   systems, Advance Shipping Notices, T3 documents, and

24   expiration dates.

25         The Court notes that the wholesalers spent most of

1    their brief arguing that they are not required to track sales

2    by lot numbers.  However, as plaintiffs argue, and the Court

3    agrees, this does not mean the wholesaler defendants have no

4    helpful tracing data.  The wholesalers have the lot number

5    provided by the manufacturers.  They also know the NDC number,

6    the manufacturer's name, quantities, dosage, and perhaps the

7    expiration date.  Plaintiffs are entitled to see for

8    themselves if they can use this relevant data, combined with

9    the information from the wholesalers' sophisticated inventory

10   control systems, to trace plaintiffs' purchases.

11          The Court, of course, is not blind to the fact that

12   the wholesalers vigorously contest plaintiffs' conclusions.

13   Representative of the wholesalers' position is the declaration

14   of Scott Mooney from McKesson.  Apart from stating that the

15   wholesalers are not required to track by lot number, Mooney

16   concludes "no amount of discovery will allow plaintiffs to

17   trace lots from the wholesaler defendants to retailer

18   defendants and then into the individual plaintiff's hands."

19   Paragraph 61.

20          He also concludes there is no way to find out the

21   lots a specific retailer defendant received from a wholesaler.

22   Paragraph 64.

23          At this stage of the case, however, the Court is

24   not prepared to give conclusive binding effect to Mooney's

25   statements.  The wholesalers' conclusions have been disputed

1    by plaintiffs' qualified expert, and plaintiffs should have an

2    opportunity to test and question the wholesalers' conclusions.

3         In this regard, plaintiffs' reply brief persuasively

4    points out the wholesalers' representations concerning their

5    inventory control systems are not entirely consistent with the

6    averments in the wholesalers' declarations.  Plaintiffs are

7    entitled to know for themselves if the wholesalers' documents

8    will enable them to trace plaintiffs' purchases.  At this

9    stage of the case, plaintiffs are entitled to find out for

10   themselves if they can trace plaintiffs' purchases, with help

11   from the wholesalers' documents.  Plaintiffs are not now bound

12   to accept the wholesalers' conclusions at face value,

13   especially when they are contested by plaintiffs' expert.

14        Having found the requested tracing discovery is

15   relevant to core issues in the case, the Court can quickly

16   dispense with the wholesalers' other arguments for why

17   plaintiffs' discovery should be denied:

18        (1) While some of the discovery the wholesalers will

19   produce will overlap the manufacturers' and perhaps the

20   retailers' discovery, the discovery is not duplicative.  The

21   wholesalers undoubtedly have internal documents that the

22   manufacturers and retailers do not have, and vice versa.  In

23   order to assure plaintiffs have a complete production, the

24   wholesalers must produce their own documents and ESI, even if

25   there is some overlap with other groups of defendants'

1    documents and ESI.

2         (2) The wholesalers' futility arguments are

3    premature.  This Court's role is to decide if the requested

4    discovery is relevant to claims and defenses in the complaint

5    pursuant to Rule 26.  This Court's role is not to decide

6    defendants' motion to dismiss.  If the Court denied discovery

7    every time a defendant argued plaintiffs' claims were futile

8    or that its motion to dismiss would be granted, then no

9    discovery would be produced and cases would grind to a halt.

10   This is plainly unacceptable.

11        (3) As to defendants' arguments that the requested

12   discovery is highly proprietary and trade secret, this is not

13   a good ground to deny plaintiffs' relevant core discovery.

14   The wholesalers' concerns about protecting the distribution of

15   their confidential information are adequately addressed by the

16   provisions in the Discovery Confidentiality Order the parties

17   negotiated and the Court entered.

18        (4) As to the wholesalers' proportionality and unduly

19   burdensome argument, the Court finds that plaintiffs have not

20   satisfied their burden to bar the requested discovery on this

21   ground.  The requested tracing document discovery is relevant

22   to critical core issues in the case.  On the other hand, the

23   wholesalers have not made a persuasive case that the requested

24   discovery is unduly burdensome or not reasonably accessible.

25   Instead, the wholesalers merely present conclusory, general

1    statements that are not persuasive.

2           For example, Tara Abraham from McKesson says at

3    Paragraph 47 of her declaration that it will "take a large

4    amount of time at great expense" to respond to plaintiffs'

5    discovery.

6           Brett Harrop, H-A-R-R-O-P, from McKesson, says it

7    will be "burdensome, expensive, and time-consuming" to

8    generate the report plaintiffs want.  Paragraph 22.

9           Matthew Sample from AmerisourceBergen says, at

10   Paragraph 15 of his declaration, that it would require a

11   significant expenditure of time and effort and would be

12   extremely burdensome to respond to plaintiffs' discovery.

13          These types of general and conclusory statements do

14   not and will not serve to bar plaintiffs from obtaining

15   relevant core discovery.

16          One last point in this regard.  Tara Abraham from

17   McKesson avers it would be burdensome to respond to

18   plaintiffs' discovery since the company only has one person to

19   prepare a sales report from its BHP system.  This argument is,

20   and, if made in the future, will be soundly rejected.

21          All parties in the case must devote sufficient

22   resources to adequately and timely respond to legitimate

23   discovery requests.  The Court and litigants will not be held

24   hostage if a party unilaterally decides to slow walk

25   discovery.

1        The Court addressed the same issue in its decision in

2   *Constantino v. Atlantic City*, 152 F. Supp. 3d 311, District of

3   New Jersey 2015, where a police department argued it did not

4   have to produce relevant discovery because of limited

5   available staff to do photocopying.

6        The Court wrote in that case, "It is unacceptable for

7   a defendant to avoid legitimate discovery because it does not

8   devote reasonable resources to defending a case." *Id.* at page

9   328.

10       What the Court said in *Constantino* is equally

11  applicable here.

12       In addition, the Court rejects defendants' request

13  that plaintiffs share in the cost of producing the requested

14  discovery.  Far from being marginally relevant, as defendants'

15  argue, the requested tracing discovery goes to issues at the

16  heart of the case.  Apart from this, the requested discovery

17  is not unreasonable or unduly burdensome.  Thus, defendants'

18  request for cost sharing is denied.

19       The Court now turns to plaintiffs' request for sales

20  and cost data from the wholesalers.

21       Plaintiffs want to know the gross and net prices paid

22  for the valsartan the wholesalers bought and the gross and net

23  prices they sold the valsartan to downstream purchasers.

24  Plaintiffs argue this discovery is relevant to their

25  disgorgement and unjust enrichment claims.  They also argue

1  the discovery is relevant to motive and intent, which the

2  Court completely discounts.

3       The wholesalers argue the requested discovery is

4  irrelevant, would be unduly burdensome to produce, and

5  involves extremely confidential and trade secret information.

6       As to this discovery request, the Court declines to

7  decide at this time if the requested discovery is relevant

8  within the meaning of Rule 26.  Instead, the Court finds that

9  since the requested discovery is not relevant to a core issue

10 in the case, and the viability of plaintiffs' profit and

11 disgorgement claims will be decided when the Court rules on

12 defendants' motions to dismiss, there is no pressing need for

13 the wholesaler defendants to produce the requested sales and

14 profit information now.  From the beginning of the case, the

15 Court has said it wants the parties to focus on the core

16 issues.  For example, was defendants' valsartan contaminated?

17 With what?  How much?  When did this occur?  Did plaintiffs

18 ingest contaminated valsartan?  Plaintiffs' request for profit

19 and sales discovery, while ultimately may be important and

20 relevant, is not directed to these core issues.  The Court,

21 therefore, defers this discovery for a later time in the case.

22 The Court and parties can revisit plaintiffs' request after

23 defendants' motions to dismiss are decided.

24       Turning to the retailer defendants, it appears there

25 are two main points of contention:  One, these defendants

1    object to producing upstream cost data, i.e., what the

2    retailers paid for their valsartan; and two, certain

3    downstream pricing data, namely, what insurers paid to the

4    pharmacies for valsartan.

5         The retailer defendants argue the requested discovery

6    is not relevant to any valid claim against them and that the

7    burden of producing the discovery is disproportionate to its

8    importance.

9         Plaintiffs argue the requested cost discovery is

10   relevant to their disgorgement and unjust enrichment claims.

11   In addition, plaintiffs argue they need the requested

12   discovery to determine these defendants' profits.

13        As to the second issue in dispute, what the

14   third-party payors paid for valsartan, the retailers argue the

15   requested discovery is irrelevant, since the TPPs have not

16   asserted a claim against them, only the consumers.

17        In opposition, plaintiffs argue one filed case

18   asserts a claim by a TPP against the retailers and plaintiffs

19   may amend their master complaint.  Plaintiffs also argue they

20   need to know what the TPPs paid the retailer defendants in

21   order to know how much these defendants made in sales.

22   Plaintiffs argue they need to know how much the TPPs paid the

23   retailers in order to calculate the damages recoverable from

24   the other defendants.

25        As to this requested profit discovery, the Court

1   rules the same way it did when the discovery was requested

2   from the wholesalers.  To repeat, this discovery is not

3   directed to the core issues in the case and will be the

4   subject of defendants' motions to dismiss.  Thus, the Court

5   defers this discovery for a future date which, in all

6   likelihood, will be after defendants' motions to dismiss are

7   decided.

8         The Court notes that it sees absolutely no prejudice

9   to plaintiffs from the deferral of the ruling on the relevance

10  of the requested discovery.  At the appropriate time, the

11  Court can address the issue.  And, if genuinely needed,

12  whether to prove liability, class certification, or damages,

13  the Court will address the issue.  The Court is convinced that

14  the parties can better spend their time, and the more

15  productive use of the parties' time will be spent on focusing

16  on core issues rather than the disgorgement of profits and

17  unjust enrichment claims that will be the subject of motions

18  to dismiss to be decided.

19        In sum, therefore, the Court will grant plaintiffs'

20  request that the wholesalers have to respond to requests for

21  production 1 and 3.

22        The Court will deny without prejudice plaintiffs'

23  request that the wholesaler defendants respond to requests for

24  production 2 and 4.

25        As to the retailers, the Court's ruling is the same

1    as the Court ruled with regard to requests for production 2

2    and 4.

3            The Court's order will also state that the final

4    version of the wholesaler and retailer fact sheets shall be

5    served by Thursday.

6            The Court's order will provide that the wholesalers

7    and retailers have to respond within 30 days.

8            In addition, the Court will add to the order a

9    provision or provisions that was in the order that the Court

10   cited to from the *Androgel Antitrust Litigation*, 2012 Westlaw

11   12895205, Northern District of Georgia, March 29, 2012.  In

12   that case, the Court ordered the same three wholesalers to

13   produce all purchase and sales data regarding certain drugs,

14   essentially, the same or similar order to what this Court is

15   doing, with two additional provisions which will be included

16   in this order.

17           The wholesalers are ordered to provide a written

18   description of the data and data fields that they supply; and

19   the wholesaler defendants will be ordered to undertake

20   reasonable efforts to address the plaintiffs' reasonable

21   questions concerning the data that was -- that will be

22   produced.

23           Counsel, that completes the Court's oral opinion.  I

24   don't anticipate that an order will be entered today, but

25   you'll see the Court's order tomorrow or the day after.

1          While we're together, are there any other issues or

2    matters we need to address?

3          MS. JOHNSTON:  Yes, your Honor.  This is Sarah

4    Johnston for retailers.  I just wanted to clarify a couple

5    things I heard at the end of the oral order.

6          The first was that, as I heard it, I think you said

7    that the final versions of the fact sheets would be served by

8    Thursday, and I wanted to confirm if that was RFPs -- the Rule

9    34 requests and not the fact sheets.

10          THE COURT:  You're absolutely right, Ms. Johnston.  I

11    misspoke.  I was only referring to the requests for

12    production.

13          MS. JOHNSTON:  Okay.  And then, also, I wanted to

14    make sure that we were following the same process that was in

15    place for the manufacturing defendants, that is, when you say

16    serving those, are we filing those with the Court, with

17    service to follow to defendants, or did you have a different

18    process in mind?

19          THE COURT:  Serve them on the Court on Thursday.  I

20    will enter an order approving the requests for production,

21    indicating that they have to be answered within 30 days, with

22    no objection.  Just like we did with the manufacturers.

23          MS. JOHNSTON:  Sure.  And the -- oh, I'm sorry.  Go

24    ahead.

25          THE COURT:  The reason the wholesalers and retailers

 1  have 30 days to respond is because this discussion has gone on

 2  for, in the Court's view, respectfully, an unreasonable amount

 3  of time.  I think that this whole process could have been

 4  advanced by months if there was exemplar or sample documents

 5  produced.  They weren't produced.  The Court didn't order them

 6  to be produced, although that was defendants' preference.  So

 7  I'm not going to let that delay the progress of this case.

 8          We had a hiccup in the case, understandably, due to

 9  the virus, perfectly reasonable, we closed things down, but

10  it's time to start moving things, and that's why the Court is

11  going to insist that they be responded to within 30 days.

12          MS. JOHNSTON:  Understood, your Honor.

13          And because this is a general set of discovery, we

14  had always contemplated that there were going to need to be

15  individualized responses because certain data is kept by

16  certain retailers and not by others, and so we understand that

17  a written response clarifying what will ultimately be produced

18  is warranted.  But I do want to clarify that the Court is

19  contemplating a written response within 30 days and not a

20  full-scale document production.

21          THE COURT:  No, that's not correct.  The Court is

22  anticipating a written response and a document production.

23  The wholesalers and retailers have had these requests for

24  months.  They've been on notice of these requests.  They have

25  the resources to produce the documents.  30 days, response in

1  writing, no objections, with the responsive documents and ESI.

2      MS. JOHNSTON:  Your Honor, I want to clarify the

3  understanding in what we've discussed with plaintiffs has not

4  contemplated that documents would be produced within 30 days,

5  namely because we have repeated time and time again to

6  plaintiffs that unless we have a discovery vehicle to prompt

7  the collection, review, production of documents, it's not --

8  we don't have a timeline that is triggered by that.

9      I would propose that we can provide written responses

10 and, again, rolling collections -- or rolling productions as

11 soon as possible, but I don't think that it's -- it's feasible

12 for the retailers to complete their production, particularly

13 in light of the fact that, you know, while this has been a

14 process that's been ongoing for the last several months,

15 the -- the hiccup was a substantial business interruption for

16 many of the retailers and other downstream defendants, such

17 that the idea that we could get documents collected and

18 produced in such a short order is more difficult than it has

19 been in the past, and I would also say that, as the Court may

20 remember, the hearing on the macro discovery issues was

21 continued twice because of the difficulty with obtaining the

22 necessary evidence to support our arguments, in light of the

23 COVID pandemic, and so I would -- I would offer to the Court

24 that the same difficulties still exist with these companies,

25 and have existed for the last several months.  So, you know,

1  assuming the understanding that documents were to be collected

2  and produced while we were waiting for final discovery

3  documents, you know, understanding that to be the Court's

4  expectation, the reality is that the difficulty alone in

5  finding declarants in order to put the evidence before the

6  Court to support our macro briefing was a challenge in and of

7  itself, and I don't think that the process of collecting

8  documents either would have been easier during that period or

9  is frankly going to be any less of a challenge now.  So while

10 I think that we can move forward and begin the process of

11 getting these documents ready to produce, 30 days is going to

12 put nearly all, if not all, of the retailers in a pretty dire

13 position.

14         MS. DAVIS:  Your Honor, D'Lesli Davis for

15 wholesalers.

16         We would join in the retailers' concerns about that

17 and would request sort of a 60-day period, at least, to begin

18 what would be a good-faith rolling production.

19         THE COURT:  Counsel, the Court said what it said.

20 The order is going to state what the Court indicated, for the

21 reasons that the Court already stated.

22         Respectfully, the Court has been overindulgent in

23 accommodating interests in the case, pushed deadlines back.

24 It is what it is.

25         In the Court's view, your clients have been on notice

1    for months about what was at issue.  There was a small

2    smidgeon of information that was the subject of this macro

3    dispute.  There is no reason they couldn't have pulled

4    together whatever other information plaintiffs requested.

5    Your clients decided not to produce samples or exemplars which

6    would have advanced this process by months.  That was its

7    decision.  We'll live with it.

8            I have nothing to add to the Court's explanation.

9    The order is going to state 30 days to respond in writing and

10   produce the responsive documents, with no objection.

11           Anything else, counsel, we need to address?

12           MS. DAVIS:  Not from the wholesalers, your Honor.

13           THE COURT:  I thank everyone for your excellent

14   briefs and oral argument.

15           Like I said, I don't think you're going to get the

16   Court's order today, but, hopefully, you'll get it tomorrow,

17   and if not tomorrow, the day after.  But I'll look for the

18   final requests for production on Thursday, enter it, and then

19   we'll turn our attention to finishing the other issues we need

20   to finish.  We need to finish, I guess, the manufacturers'

21   fact sheets; we need to finish the fact sheets for the

22   wholesalers and retailers.  And then I think when we get that

23   out of the way, you can focus on producing your documents and

24   ESI, and then we'll turn to getting ready for the depositions

25   in the case.

1          For the people on my team who are on the phone, can I
2  ask you to call back to this number in ten minutes?  There are
3  certain issues I need to talk to you about.
4          Counsel, thank you very much.  I appreciate your
5  indulgence, this went pretty long, and we're adjourned.
6          (The proceedings concluded at 4:42 p.m.)
7          -  -  -  -  -  -  -  -  -  -  -  -  -  -  -
8
9          I certify that the foregoing is a correct transcript
10  from the record of proceedings in the above-entitled matter.
11
12  */S/ Carol Farrell, NJ-CRCR, FCRR, RDR, CRR, RMR, CRC, CRI*
   *Court Reporter/Transcriber*
13
14  *July 09, 2020*
       *Date*
15
16
17
18
19
20
21
22
23
24
25

**$**

**$10** [1] - 53:8
**$100** [1] - 57:22
**$500,000** [1] - 60:5

**/**

**/S** [1] - 95:12

**0**

**06** [1] - 1:10
**07068** [1] - 1:16
**08101** [1] - 1:10
**09** [1] - 95:14

**1**

**1** [16] - 13:25, 14:10, 15:6, 22:13, 22:16, 23:1, 30:19, 31:16, 31:20, 31:21, 38:24, 77:25, 82:18, 88:21
**10** [1] - 71:24
**10019** [1] - 2:16
**103** [1] - 1:16
**11** [1] - 80:9
**12** [5] - 56:13, 71:7, 71:11, 71:12, 71:18
**12(b)(6** [3] - 65:22, 67:19, 73:4
**12(b)(6)s** [1] - 67:15
**12895205** [1] - 89:11
**13** [1] - 77:4
**130,000** [1] - 42:10
**1301** [1] - 2:15
**13th** [1] - 4:22
**14** [1] - 71:2
**140** [2] - 42:7
**15** [3] - 35:24, 36:10, 84:10
**1515233** [1] - 56:24
**152** [1] - 85:2
**160** [1] - 61:4
**17th** [1] - 2:7
**1835** [1] - 1:19
**19-2875** [1] - 3:4
**19-md-02875-RBK-JS** [1] - 1:3
**19103** [2] - 1:20, 2:7
**1:30** [2] - 1:11, 3:2

**2**

**2** [7] - 22:17, 22:20, 23:2, 50:18, 83:2, 88:24, 89:1
**2012** [4] - 20:21, 77:25, 89:10, 89:11

**2015** [1] - 85:3
**2019** [2] - 35:6, 77:25
**2020** [6] - 1:10, 35:23, 36:10, 75:5, 77:4, 95:14
**2023** [1] - 27:2
**2029** [1] - 2:12
**22** [1] - 84:8
**220** [1] - 56:24
**25** [1] - 27:6
**26** [4] - 35:23, 36:10, 83:5, 86:8
**2800** [1] - 2:19
**29** [3] - 80:9, 80:15, 89:11
**2900** [1] - 1:19

**3**

**3** [10] - 13:25, 14:10, 15:6, 22:13, 22:16, 23:1, 38:25, 53:3, 83:11, 88:21
**30** [14] - 2:7, 26:25, 27:6, 74:16, 75:24, 89:7, 90:21, 91:1, 91:11, 91:19, 91:25, 92:4, 93:11, 94:9
**30-pill** [1] - 27:22
**300** [2] - 2:12, 75:23
**31** [1] - 77:25
**311** [1] - 85:2
**328** [1] - 85:9
**34** [1] - 90:9
**36** [2] - 80:9, 80:18
**3:35** [1] - 74:19
**3d** [1] - 85:2

**4**

**4** [8] - 22:17, 22:20, 23:2, 50:18, 71:25, 83:18, 88:24, 89:2
**40** [2] - 3:5, 45:16
**400,000** [1] - 47:19
**411** [1] - 39:24
**413** [2] - 1:8, 77:5
**45** [1] - 27:6
**45202** [1] - 2:19
**46** [2] - 80:10, 80:11
**47** [1] - 84:3
**478** [1] - 1:8
**479** [1] - 1:8
**483** [3] - 49:3, 49:21, 50:6
**4:00** [3] - 74:8, 74:16, 74:19
**4:42** [1] - 95:6
**4th** [2] - 1:9, 20:14

**5**

**50** [2] - 41:18, 53:10
**500** [4] - 26:23, 27:6, 27:15, 27:21
**501** [1] - 1:8
**503** [1] - 1:8

**6**

**6** [6] - 14:4, 14:22, 15:5, 37:22, 71:25, 75:4
**60** [5] - 7:10, 7:11, 9:10
**60-day** [1] - 93:17
**600** [1] - 2:19
**61** [1] - 81:19
**64** [1] - 81:22
**6th** [1] - 20:1

**7**

**701** [1] - 2:3
**70130** [1] - 2:4

**8**

**8** [1] - 15:5
**856-318-6100** [1] - 1:23

**9**

**90** [1] - 26:25
**90-pill** [1] - 30:18
**90067** [1] - 2:12

**A**

**able** [10] - 20:15, 26:2, 37:8, 48:22, 50:9, 50:14, 62:15, 71:17, 77:1, 80:13
**above-entitled** [1] - 95:10
**Abraham** [2] - 84:2, 84:16
**absence** [1] - 26:12
**absent** [2] - 55:22, 55:24
**absolutely** [2] - 88:8, 90:10
**accept** [4] - 28:18, 28:24, 33:20, 82:12
**access** [2] - 43:13, 63:22
**accessed** [1] - 45:1
**accessibility** [5] - 25:12, 39:11, 46:1, 46:15, 47:5

**accessible** [7] - 44:10, 46:9, 46:12, 46:23, 47:9, 47:23, 83:24
**accommodating** [1] - 93:23
**accompany** [1] - 22:21
**accompanying** [1] - 4:17
**accountants** [1] - 67:6
**Act** [3] - 41:4, 41:15, 80:2
**acted** [2] - 16:10, 40:25
**ACTION** [1] - 1:2
**action** [8] - 16:16, 57:12, 63:16, 63:20, 66:2, 71:13, 75:17, 75:19
**active** [1] - 76:3
**actual** [1] - 54:16
**Adam** [2] - 3:13, 35:20
**ADAM** [1] - 1:1
**add** [5] - 35:21, 36:12, 67:23, 89:8, 94:8
**addition** [7] - 59:7, 63:6, 66:12, 80:18, 85:12, 87:11, 89:8
**additional** [4] - 16:18, 48:18, 48:23, 89:15
**address** [16] - 10:16, 10:21, 10:24, 11:18, 11:22, 15:14, 48:3, 49:20, 50:23, 78:6, 79:10, 88:11, 88:13, 89:20, 90:2, 94:11
**addressed** [7] - 8:8, 8:9, 29:23, 45:10, 45:11, 83:15, 85:1
**adequate** [3] - 48:9, 48:13, 55:17
**adequately** [2] - 83:15, 84:22
**adjourn** [1] - 74:15
**adjourned** [1] - 95:5
**administrators** [1] - 67:4
**admissible** [2] - 37:11, 37:13
**admit** [1] - 23:20
**advance** [1] - 36:3
**Advance** [1] - 80:23
**advanced** [2] - 91:4, 94:6
**affect** [1] - 5:14
**affected** [1] - 8:24
**affiants** [3] - 28:14, 28:19, 28:24
**affidavits** [3] - 28:13, 28:19, 44:13

**afternoon** [4] - 3:15, 3:17, 3:20, 3:22
**ago** [7] - 8:5, 31:25, 34:23, 35:6, 35:25, 36:9, 59:24
**agree** [5] - 5:12, 18:13, 48:8, 55:19, 71:7
**agreed** [7] - 6:22, 20:17, 36:17, 42:14, 42:21, 55:24, 62:12
**agreeing** [1] - 45:7
**agreements** [1] - 45:2
**agrees** [1] - 81:3
**ahead** [5] - 17:3, 34:18, 34:19, 38:7, 90:24
**Aid** [1] - 76:15
**aided** [1] - 1:25
**akin** [1] - 16:1
**Albertsons** [2] - 49:5, 49:6
**alert** [1] - 30:21
**allegation** [4] - 39:25, 63:4, 69:5, 70:17
**allegations** [4] - 63:1, 64:13, 65:24, 67:21
**allege** [2] - 39:19, 67:12
**alleged** [4] - 26:5, 51:13, 64:16, 65:24
**allegedly** [2] - 69:20, 75:15
**alleges** [1] - 52:4
**alleging** [1] - 75:20
**alleviate** [1] - 11:13
**allow** [2] - 64:18, 81:16
**allowed** [2] - 33:19, 56:21
**allows** [2] - 49:24, 50:2
**alone** [1] - 93:4
**alter** [1] - 63:11
**alternative** [3] - 34:16, 55:17, 72:16
**amend** [1] - 87:19
**Americas** [1] - 2:15
**AmerisourceBergen** [5] - 2:20, 3:21, 30:9, 76:13, 84:9
**amiss** [1] - 52:1
**amount** [8] - 43:5, 43:6, 43:11, 61:3, 61:4, 81:16, 84:4, 91:2
**analyses** [1] - 42:12
**analysis** [2] - 25:11, 39:12
**analytical** [1] - 79:15

**AND** [4] - 1:5, 1:6
**Androgel** [2] - 20:19, 89:10
**Angeles** [1] - 2:12
**answer** [9] - 5:4, 5:7, 25:1, 36:15, 48:5, 68:4, 70:5, 79:9, 79:10
**answered** [3] - 7:8, 39:2, 90:21
**answering** [1] - 7:10
**anticipate** [1] - 89:24
**anticipated** [2] - 29:6, 41:20
**anticipates** [1] - 77:17
**anticipating** [2] - 73:7, 91:22
**antitrust** [3] - 20:20, 21:7, 56:10
**Antitrust** [1] - 89:10
**anyway** [2] - 25:24, 33:9
**apart** [3] - 26:6, 81:14, 85:16
**API** [1] - 76:7
**apologies** [1] - 17:3
**apostrophe** [1] - 3:25
**app** [1] - 49:24
**apparent** [1] - 68:9
**appearances** [4] - 3:7, 3:8, 4:3, 4:13
**appliance** [1] - 58:19
**applicable** [3] - 68:19, 69:4, 85:11
**apply** [2] - 61:21, 68:5
**appreciate** [2] - 32:24, 95:4
**approach** [1] - 63:14
**appropriate** [2] - 73:21, 88:10
**approved** [2] - 6:13, 76:19
**approving** [1] - 90:20
**April** [2] - 4:22, 77:4
**area** [4] - 30:24, 31:21, 41:19, 50:7
**areas** [1] - 67:5
**argue** [31] - 22:25, 24:4, 33:19, 38:22, 43:11, 46:8, 51:24, 54:21, 58:16, 64:5, 65:23, 66:4, 67:15, 69:23, 70:13, 72:8, 78:9, 78:12, 80:6, 81:2, 85:15, 85:24, 85:25, 86:3, 87:5, 87:9, 87:11, 87:14, 87:17, 87:19, 87:22
**argued** [6] - 24:13, 46:4, 55:2, 55:4,

83:7, 85:3
**arguing** [10] - 12:1, 20:1, 37:22, 52:9, 52:11, 52:12, 53:21, 64:23, 68:16, 81:1
**argument** [28] - 4:18, 11:25, 16:1, 16:20, 16:21, 16:22, 17:1, 23:15, 23:16, 39:4, 40:14, 43:21, 44:6, 46:7, 46:11, 47:12, 53:20, 55:13, 61:11, 62:5, 68:9, 70:7, 73:15, 73:19, 75:4, 83:19, 84:19, 94:14
**ARGUMENT** [1] - 1:4
**arguments** [7] - 5:14, 71:8, 79:11, 82:16, 83:2, 83:11, 92:22
**arise** [1] - 5:1
**arises** [1] - 16:13
**arsenal** [1] - 51:11
**articulate** [2] - 25:24, 25:25
**articulated** [3] - 21:11, 68:19, 73:25
**articulation** [1] - 40:21
**aside** [5] - 37:3, 37:5, 50:11, 50:15, 51:15
**aspect** [1] - 22:21
**assert** [2] - 39:17, 39:18
**asserted** [1] - 87:16
**asserting** [1] - 57:9
**assertion** [1] - 26:6
**asserts** [1] - 87:18
**assist** [5] - 24:24, 25:8, 44:1, 44:2, 45:17
**associate** [1] - 80:20
**assuage** [1] - 48:9
**assume** [2] - 48:8, 58:1
**assuming** [3] - 5:25, 70:2, 93:1
**assure** [1] - 82:23
**Atlantic** [1] - 85:2
**attach** [1] - 41:23
**attached** [4] - 4:22, 77:3
**attack** [2] - 37:8, 46:20
**attention** [1] - 94:19
**attorney** [2] - 59:5, 64:9
**authority** [2] - 21:6, 41:17
**available** [19] - 8:17, 34:11, 40:23, 42:1, 44:25, 48:22, 48:24, 49:2, 49:19, 51:11,

65:5, 65:6, 65:7, 65:9, 71:10, 74:2, 74:9, 74:10, 85:5
**Avenue** [1] - 2:15
**averments** [1] - 82:6
**avers** [1] - 84:17
**avoid** [3] - 13:10, 16:24, 85:7
**aware** [4] - 19:6, 20:15, 46:3, 63:6
**awhile** [2] - 35:1, 38:21

## B

**backed** [1] - 41:5
**background** [3] - 4:20, 16:21, 75:12
**bad** [1] - 45:20
**ball** [1] - 36:4
**bar** [2] - 83:20, 84:14
**Barbara** [1] - 9:17
**Barnes** [1] - 4:10
**BARNES** [1] - 2:10
**barred** [1] - 77:9
**based** [11] - 24:16, 29:1, 29:12, 37:25, 39:13, 44:5, 44:8, 44:20, 67:9, 73:16
**basic** [1] - 25:17
**basis** [9] - 52:11, 52:12, 52:19, 55:5, 55:18, 63:22, 72:6, 72:15, 72:21
**batch** [3] - 14:3, 32:13, 34:6
**battle** [1] - 19:7
**became** [1] - 46:22
**began** [1] - 20:8
**begin** [4] - 42:11, 43:2, 93:10, 93:17
**beginning** [1] - 86:14
**behalf** [5] - 4:6, 4:10, 9:16, 9:24, 75:18
**below** [1] - 17:9
**benefit** [6] - 43:20, 44:4, 44:5, 58:6, 65:1, 65:3
**BERNE** [1] - 2:18
**Best** [1] - 58:20
**best** [5] - 16:11, 28:1, 28:11, 58:10, 80:13
**better** [1] - 88:14
**between** [6] - 51:22, 54:11, 60:24, 62:13, 75:2, 77:16
**BETWEEN** [1] - 1:6
**beyond** [2] - 41:7, 73:6
**BHP** [1] - 84:19

**big** [4] - 21:10, 45:14, 45:15, 45:23
**bill** [1] - 14:18
**binding** [1] - 81:24
**bit** [6] - 16:9, 24:2, 33:10, 47:9, 50:19, 66:6
**blew** [1] - 14:25
**blind** [1] - 81:11
**blood** [2] - 32:9, 75:15
**bodily** [1] - 75:23
**bodily** [1] - 75:23
**bottle** [14] - 26:23, 26:24, 27:15, 27:17, 27:21, 28:2, 30:19, 30:25, 31:8, 31:9, 32:1, 32:4, 53:8, 53:10
**bottles** [7] - 26:23, 27:1, 27:6, 27:7, 27:15, 27:22, 32:8
**bottom** [1] - 36:22
**bought** [3] - 8:19, 54:10, 85:22
**bound** [2] - 28:24, 82:11
**box** [1] - 57:15
**break** [2] - 27:7, 74:7
**Brett** [1] - 84:6
**brief** [16] - 4:11, 18:22, 19:9, 41:23, 44:20, 46:14, 47:6, 51:10, 56:20, 64:23, 68:3, 68:17, 75:12, 77:4, 81:1, 82:3
**briefed** [3] - 19:12, 22:23, 71:11
**briefing** [4] - 40:16, 69:3, 73:22, 93:6
**briefings** [1] - 71:12
**briefly** [2] - 31:25, 33:11
**briefs** [6] - 4:16, 5:16, 35:9, 46:10, 47:1, 94:14
**broad** [1] - 51:10
**broke** [1] - 22:22
**bucks** [1] - 71:25
**budget** [1] - 43:19
**Building** [1] - 1:9
**bulk** [2] - 26:23, 27:21
**bunch** [1] - 70:11
**burden** [23] - 11:11, 11:13, 21:16, 26:18, 37:6, 37:9, 37:13, 37:17, 37:19, 41:7, 42:5, 42:12, 44:3, 44:5, 46:23, 55:14, 56:2, 56:3, 66:12, 67:2, 67:14, 83:20, 87:7

**burdensome** [13] - 14:5, 46:5, 46:6, 47:22, 55:2, 79:4, 83:19, 83:24, 84:7, 84:12, 84:17, 85:17, 86:4
**burdensomeness** [1] - 47:8
**business** [7] - 12:24, 13:2, 14:8, 17:15, 67:6, 76:15, 92:15
**buy** [2] - 43:9, 58:12
**Buy's** [1] - 58:20
**buying** [1] - 53:7
**buys** [1] - 53:18
**BY** [9] - 1:15, 1:18, 1:19, 2:3, 2:6, 2:11, 2:11, 2:15, 2:18

## C

**CA** [1] - 2:12
**cabined** [1] - 51:14
**calculate** [2] - 71:23, 87:23
**calculating** [1] - 72:6
**calculation** [1] - 42:9
**Camden** [1] - 1:10
**camera** [1] - 37:9
**Camp** [1] - 2:3
**cancer** [2] - 75:21, 75:22
**cancer-causing** [1] - 75:22
**cannot** [1] - 55:18
**capacity** [1] - 4:5
**capture** [1] - 50:10
**Cardinal** [2] - 30:10, 76:13
**Carol** [3] - 1:22, 74:10, 95:12
**carry** [3] - 29:21, 37:9, 72:9
**case** [63] - 20:21, 20:22, 21:1, 21:4, 21:7, 21:12, 28:23, 39:16, 43:9, 45:15, 48:9, 48:13, 49:9, 51:19, 51:20, 52:3, 52:13, 54:20, 56:11, 56:12, 56:15, 56:18, 57:3, 57:21, 57:24, 58:1, 58:17, 58:18, 59:4, 59:9, 59:10, 61:10, 64:14, 69:4, 69:9, 72:2, 76:10, 76:23, 77:8, 79:3, 79:18, 79:25, 81:23, 82:9, 82:15, 83:22, 83:23, 84:21, 85:6,

*85:8, 85:16, 86:10, 86:14, 86:21, 87:17, 88:3, 89:12, 91:7, 91:8, 93:23, 94:25*

**cases** [13] - 20:18, 21:5, 21:7, 21:10, 45:23, 48:14, 56:7, 56:20, 57:4, 57:14, 64:6, 69:3, 83:9

**catch** [1] - 67:24

**category** [1] - 22:6

**causing** [1] - 75:22

**caveats** [1] - 12:23

**center** [3] - 27:8, 27:19, 30:24

**centers** [2] - 30:22, 31:19

**cents** [2] - 53:10, 60:5

**Century** [1] - 2:12

**cert** [3] - 55:20, 72:5, 72:15

**certain** [6] - 32:16, 87:2, 89:13, 91:15, 91:16, 95:3

**certainly** [8] - 3:8, 13:7, 49:11, 51:24, 55:21, 56:20, 57:4, 57:12

**certification** [12] - 54:3, 54:4, 55:5, 56:22, 57:4, 67:23, 69:9, 72:22, 73:9, 73:16, 77:12, 88:12

**certify** [1] - 95:9

**cetera** [5] - 36:7, 55:2, 63:18, 76:15

**cfarrell.crr@gmail. com** [1] - 1:23

**chain** [10] - 25:3, 26:13, 27:12, 28:1, 40:3, 61:10, 70:12, 76:2, 76:11, 78:10

**Chain** [1] - 80:2

**chains** [1] - 32:16

**challenge** [2] - 93:6, 93:9

**chance** [1] - 38:25

**change** [1] - 27:2

**changes** [1] - 5:13

**characterization** [2] - 12:14, 38:10

**charge** [1] - 51:17

**chargebacks** [1] - 66:24

**cheap** [2] - 52:23, 52:25

**cheaper** [1] - 53:18

**check** [2] - 31:22, 57:15

**chemicals** [1] - 75:22

**China** [3] - 53:9, 53:16, 53:18

**choice** [1] - 64:5

**chomping** [1] - 33:9

**chose** [1] - 41:13

**Cincinnati** [1] - 2:19

**Circuit** [1] - 54:21

**cite** [6] - 21:5, 46:13, 49:3, 49:9, 56:20, 57:3

**cited** [6] - 20:18, 56:8, 56:12, 56:15, 69:3, 89:10

**cites** [1] - 34:11

**City** [1] - 85:2

**CIVIL** [1] - 1:2

**claim** [15] - 39:17, 43:11, 44:11, 45:17, 51:4, 56:13, 57:9, 62:22, 64:19, 65:12, 73:4, 87:6, 87:16, 87:18

**claiming** [1] - 69:19

**claims** [15] - 23:13, 37:25, 56:21, 57:15, 60:21, 63:16, 72:3, 78:25, 83:4, 83:7, 85:25, 86:11, 87:10, 88:17

**clarify** [7] - 4:21, 9:25, 46:9, 73:3, 90:4, 91:18, 92:2

**clarifying** [2] - 73:12, 91:17

**clarity** [1] - 44:20

**class** [25] - 54:2, 54:4, 54:12, 55:20, 56:22, 56:23, 57:12, 58:17, 58:18, 63:20, 67:23, 69:9, 69:16, 72:4, 72:15, 72:21, 73:9, 73:10, 73:15, 73:16, 75:17, 75:19, 77:12, 88:12

**class's** [1] - 63:21

**classwide** [4] - 54:7, 55:15, 55:18, 72:6

**clean** [1] - 6:7

**clear** [9] - 6:11, 10:7, 13:9, 34:25, 36:8, 43:16, 46:22, 56:14, 70:24

**clearly** [1] - 55:6

**client** [1] - 32:23

**clients** [2] - 93:25, 94:5

**close** [2] - 9:19, 44:17

**closed** [2] - 74:4, 91:9

**Cohen** [1] - 1:9

**coil** [1] - 59:13

**colleague** [1] - 9:17

**collected** [4] - 12:25, 15:12, 92:17, 93:1

**collecting** [1] - 93:7

**collection** [1] - 92:7

**collections** [1] - 92:10

**collectively** [1] - 76:8

**combination** [2] - 57:10, 57:11

**combined** [1] - 81:8

**coming** [2] - 61:5, 65:22

**Commencing** [1] - 1:11

**common** [1] - 70:14

**communicated** [1] - 33:4

**companies** [3] - 24:17, 66:18, 92:24

**company** [4] - 45:15, 60:6, 67:7, 84:18

**compared** [1] - 53:4

**competitive** [1] - 21:7

**complaining** [1] - 49:6

**complaint** [9] - 39:25, 51:13, 57:13, 57:18, 65:4, 65:18, 75:20, 83:4, 87:19

**complaints** [6] - 52:15, 57:8, 57:14, 75:16, 75:23, 75:25

**complete** [2] - 82:23, 92:12

**completed** [1] - 77:15

**completely** [2] - 50:15, 86:2

**completes** [1] - 89:23

**component** [1] - 22:2

**comprehensive** [1] - 68:13

**comprise** [1] - 76:11

**compromise** [2] - 11:13, 55:22

**computer** [8] - 1:25, 17:7, 17:14, 21:14, 21:25, 22:7, 25:6, 47:19

**computer-aided** [1] - 1:25

**computing** [1] - 54:17

**concede** [1] - 13:4

**conceivable** [2] - 19:8, 70:6

**conceive** [1] - 70:9

**concepts** [1] - 47:8

**conceptually** [1] - 69:24

**concern** [1] - 71:3

**concerned** [3] - 10:14, 68:11, 77:9

**concerning** [2] - 82:4, 89:21

**concerns** [3] - 48:11, 83:14, 93:16

**concise** [2] - 48:3, 68:2

**concluded** [1] - 95:6

**concludes** [3] - 80:12, 81:16, 81:20

**conclusion** [1] - 47:21

**conclusions** [4] - 81:12, 81:25, 82:2, 82:12

**conclusive** [1] - 81:24

**conclusory** [2] - 83:25, 84:13

**confer** [6] - 5:6, 10:6, 10:25, 11:7, 11:12, 66:10

**conference** [2] - 3:5, 75:5

**conferred** [1] - 65:1

**confers** [2] - 12:18, 25:22

**confidential** [2] - 83:15, 86:5

**confidentiality** [3] - 48:7, 48:8, 48:11

**Confidentiality** [1] - 83:16

**confirm** [1] - 90:8

**confirmed** [2] - 74:24, 75:9

**conflate** [1] - 21:18

**confused** [2] - 62:10, 62:16

**confusion** [1] - 13:10

**Congress** [9] - 16:10, 16:13, 16:16, 25:2, 27:11, 37:24, 40:25, 41:5, 41:20

**Conlee** [1] - 3:17

**CONLEE** [1] - 2:3

**connect** [2] - 49:21, 49:23

**conscious** [2] - 64:13, 64:16

**considered** [2] - 71:12, 79:13

**consistent** [2] - 11:25, 82:5

**Constantino** [2] - 85:2, 85:10

**constructive** [1] - 39:21

**consultant** [4] - 28:4, 28:6, 28:25, 80:9

**consultant/expert** [1] - 18:11

**consultants** [1] - 19:1

**consulting** [2] - 29:14, 79:15

**consumed** [2] - 78:11, 79:20

**consumer** [6] - 31:6, 32:1, 33:3, 52:4, 58:18, 69:16

**Consumer** [1] - 56:23

**consumers** [4] - 9:1, 58:19, 75:20, 87:16

**consuming** [1] - 84:7

**consumption** [1] - 75:14

**contain** [2] - 18:4, 18:6

**contained** [2] - 22:7, 23:22

**container** [3] - 50:9, 63:8, 63:10

**containers** [2] - 40:4, 63:5

**containing** [7] - 13:15, 66:20, 77:24, 78:5, 78:11, 78:15, 79:22

**contaminate** [2] - 23:22, 31:15

**contaminated** [13] - 23:24, 24:2, 24:3, 24:5, 24:9, 59:12, 69:21, 73:10, 75:15, 75:21, 79:20, 86:16, 86:18

**contamination** [1] - 30:6

**contemplate** [1] - 14:4

**contemplated** [3] - 38:18, 91:14, 92:4

**contemplating** [2] - 40:23, 91:19

**contention** [1] - 86:25

**contest** [1] - 81:12

**contested** [1] - 82:13

**context** [6] - 56:14, 56:16, 58:23, 58:25, 69:5, 79:6

**Continued** [1] - 2:1

**continued** [2] - 73:6, 92:21

**continues** [1] - 33:1

**contracted** [1] - 75:20

**contrary** [2] - 28:20, 44:13

**control** [4] - 63:19, 80:22, 81:10, 82:5

**controversy** [2] - 43:5, 43:11

**convinced** [1] - 88:13

**Cooper** [1] - 1:9

**copies** [1] - 15:20

**copy** [1] - 16:6

**core** [13] - 25:16, 63:16, 64:10, 79:17, 82:15, 83:13, 83:22, 84:15, 86:9, 86:15, 86:20, 88:3, 88:16
**corners** [1] - 65:18
**correct** [20] - 5:10, 5:25, 6:14, 6:17, 6:21, 7:2, 9:4, 12:18, 22:16, 22:20, 31:25, 36:13, 46:6, 47:1, 51:5, 53:1, 61:15, 62:17, 91:21, 95:9
**correctly** [2] - 12:11, 15:3
**cost** [14] - 43:1, 44:14, 46:18, 52:4, 59:22, 60:2, 61:7, 62:13, 71:25, 85:13, 85:18, 85:20, 87:1, 87:9
**costs** [1] - 66:22
**counsel** [21] - 3:9, 4:5, 9:18, 16:19, 19:25, 35:22, 36:9, 38:7, 46:2, 49:22, 50:16, 53:20, 62:11, 68:12, 71:19, 74:3, 74:17, 89:23, 93:19, 94:11, 95:4
**counsel's** [1] - 34:21
**counter** [2] - 37:13, 38:5
**country** [2] - 63:9, 64:17
**counts** [1] - 6:17
**couple** [4] - 4:19, 50:22, 59:24, 90:4
**course** [22] - 5:25, 12:24, 13:1, 13:2, 14:8, 17:15, 28:23, 31:5, 35:1, 38:3, 38:4, 43:4, 46:3, 48:10, 56:15, 64:22, 65:19, 68:3, 68:4, 74:13, 79:24, 81:11
**court** [1] - 3:11
**Court** [112] - 1:22, 4:16, 5:16, 6:13, 8:25, 10:14, 10:15, 10:16, 10:18, 10:21, 10:24, 11:16, 11:18, 14:1, 14:23, 16:25, 17:22, 18:18, 19:5, 19:12, 20:21, 22:12, 22:13, 25:14, 28:18, 28:20, 28:22, 29:6, 37:6, 38:23, 44:10, 44:15, 46:10, 54:25, 55:3, 56:8, 56:16, 59:18, 60:17, 63:13,

63:15, 64:8, 64:25, 66:7, 68:7, 71:2, 71:12, 71:16, 72:19, 74:25, 75:1, 75:4, 76:19, 77:9, 77:17, 78:6, 78:18, 79:5, 79:10, 79:16, 79:24, 80:3, 80:25, 81:2, 81:11, 81:23, 82:15, 83:6, 83:17, 83:19, 84:23, 85:1, 85:6, 85:10, 85:12, 85:19, 86:2, 86:6, 86:8, 86:11, 86:15, 86:20, 86:22, 87:25, 88:4, 88:8, 88:11, 88:13, 88:19, 88:22, 89:1, 89:8, 89:9, 89:12, 89:14, 90:16, 90:19, 91:5, 91:10, 91:18, 91:21, 92:19, 92:23, 93:6, 93:19, 93:20, 93:21, 93:22, 95:12
**COURT** [103] - 1:1, 3:3, 3:19, 4:2, 4:12, 4:15, 5:15, 6:10, 6:18, 7:7, 7:23, 8:8, 8:24, 9:5, 9:21, 10:10, 11:14, 13:9, 14:15, 15:15, 16:19, 17:18, 17:22, 18:1, 18:9, 18:14, 18:23, 19:13, 19:22, 20:18, 21:17, 22:9, 22:17, 22:24, 23:14, 23:19, 24:8, 24:22, 26:11, 28:3, 29:24, 30:2, 30:5, 31:4, 32:6, 32:12, 32:20, 33:6, 34:21, 36:13, 36:17, 38:7, 38:20, 46:2, 46:25, 47:7, 47:24, 49:22, 50:16, 51:1, 51:7, 52:3, 52:9, 52:20, 52:22, 53:2, 53:14, 53:25, 54:16, 54:24, 56:5, 56:7, 57:7, 57:20, 58:1, 58:12, 58:23, 59:3, 59:15, 59:18, 60:10, 60:15, 61:11, 61:16, 61:20, 61:25, 68:12, 68:21, 68:23, 71:19, 72:18, 72:24, 73:17, 74:3, 74:11, 74:15, 74:20, 90:10, 90:19, 90:25, 91:21, 93:19, 94:13
**Court's** [25] - 5:16, 6:9, 8:3, 10:10, 12:9, 38:3, 51:11, 73:3,

74:8, 74:16, 74:22, 75:9, 79:8, 83:3, 83:5, 88:25, 89:3, 89:6, 89:23, 89:25, 91:2, 93:3, 93:25, 94:8, 94:16
**Court-approved** [1] - 6:13
**Courthouse** [1] - 1:9
**COVID** [1] - 92:23
**crafted** [1] - 13:19
**crazy** [1] - 37:15
**CRC** [1] - 95:12
**CRCR** [1] - 95:12
**create** [2] - 11:10, 25:7
**created** [1] - 37:18
**creating** [1] - 66:17
**creation** [1] - 29:19
**credentials** [1] - 37:8
**CRI** [1] - 95:12
**critical** [3] - 78:12, 79:19, 83:22
**crosstalk** [1] - 32:14
**CRR** [1] - 95:12
**current** [1] - 73:5
**custody** [3] - 21:13, 63:19, 64:3
**customer** [2] - 60:3, 61:3
**customers** [2] - 48:25, 49:16
**cut** [1] - 52:18
**CVS** [5] - 2:13, 3:23, 4:11, 32:20, 76:15

# D

**D'Lesli** [8] - 3:24, 5:9, 5:23, 12:15, 16:8, 37:4, 62:8, 93:14
**D'LESLI** [1] - 2:15
**D-apostrophe-L-E-S-L-I** [1] - 3:25
**D-Day** [1] - 37:17
**damage** [5] - 54:19, 56:10, 58:4, 73:13, 73:25
**damaged** [1] - 69:20
**damages** [25] - 51:15, 53:22, 54:6, 54:8, 54:13, 55:16, 55:19, 56:25, 57:5, 61:13, 61:18, 63:17, 63:21, 65:10, 69:13, 69:25, 70:21, 72:7, 73:20, 75:18, 87:23, 88:12
**data** [53] - 8:13, 8:16, 15:19, 15:21, 15:22, 15:24, 16:3, 18:24, 19:19, 20:23, 20:24,

21:1, 21:9, 21:21, 22:22, 25:15, 28:15, 29:18, 34:14, 35:7, 35:8, 35:12, 35:15, 35:17, 38:13, 40:9, 45:13, 45:21, 51:2, 54:18, 54:22, 54:23, 55:1, 60:1, 60:7, 60:11, 61:1, 61:2, 72:12, 79:15, 80:12, 81:4, 81:8, 85:20, 87:1, 87:3, 89:13, 89:18, 89:21, 91:15
**database** [1] - 14:9
**datapoint** [1] - 29:20
**datapoints** [1] - 17:9
**Date** [1] - 95:14
**date** [19] - 12:21, 12:22, 13:7, 14:3, 15:8, 15:9, 22:1, 26:1, 27:4, 35:7, 42:16, 42:22, 49:7, 75:4, 75:24, 76:16, 77:12, 81:7, 88:5
**dates** [1] - 80:24
**Daubert** [1] - 38:16
**David** [13] - 4:7, 5:2, 5:20, 6:16, 6:25, 7:13, 8:11, 9:3, 12:12, 15:13, 22:15, 33:12, 38:8
**DAVID** [1] - 1:19
**DAVIS** [42] - 2:15, 3:24, 5:9, 5:23, 12:15, 13:18, 14:22, 16:8, 17:2, 17:21, 17:25, 18:2, 18:13, 18:16, 19:4, 19:21, 20:4, 21:3, 21:22, 23:11, 23:17, 24:7, 24:12, 24:23, 26:16, 29:1, 30:4, 30:14, 31:14, 37:3, 39:7, 46:13, 47:3, 47:11, 48:10, 49:20, 49:23, 62:8, 73:1, 74:12, 93:14, 94:12
**Davis** [16] - 3:25, 5:9, 5:23, 12:15, 16:8, 17:3, 33:15, 34:15, 34:19, 37:4, 48:4, 62:8, 68:18, 72:22, 72:25, 93:14
**Davis's** [5] - 33:20, 34:2, 38:10, 48:6, 71:6
**days** [14] - 7:10, 7:11, 9:10, 9:11, 89:7, 90:21, 91:1, 91:11, 91:19, 91:25, 92:4,

93:11, 94:9
**DCO** [1] - 48:13
**de** [1] - 45:14
**deadlines** [1] - 93:23
**deal** [6] - 11:20, 19:23, 21:18, 22:18, 23:1, 52:23
**dealing** [5] - 6:19, 56:9, 56:10, 56:11, 58:25
**dealings** [1] - 39:23
**debate** [1] - 16:12
**December** [3] - 35:5, 77:18, 77:25
**decide** [5] - 9:6, 79:5, 83:3, 83:5, 86:7
**decided** [7] - 5:18, 20:9, 86:11, 86:23, 88:7, 88:18, 94:5
**decides** [1] - 84:24
**deciding** [1] - 56:13
**decision** [4] - 8:3, 71:17, 85:1, 94:7
**declarant** [1] - 34:2
**declarants** [2] - 33:24, 93:5
**declaration** [12] - 17:18, 28:4, 28:20, 29:4, 38:11, 38:12, 48:23, 79:14, 80:8, 81:13, 84:3, 84:10
**declarations** [10] - 4:18, 25:7, 26:16, 28:5, 28:13, 47:17, 68:6, 71:2, 79:15, 82:6
**declines** [1] - 86:6
**defective** [4] - 53:4, 53:19, 58:13, 58:14
**defendant** [18] - 4:1, 7:4, 7:5, 16:2, 23:4, 30:2, 44:23, 54:8, 55:3, 55:24, 58:6, 61:24, 65:2, 77:24, 78:2, 81:21, 83:7, 85:7
**Defendant** [5] - 2:16, 2:20, 38:20, 39:2, 47:25
**Defendants** [2] - 2:8, 2:13
**defendants** [88] - 3:19, 3:23, 5:6, 5:12, 6:12, 6:22, 7:9, 7:16, 7:18, 8:15, 8:17, 11:24, 20:22, 23:25, 24:4, 28:23, 29:2, 34:12, 34:20, 35:4, 35:5, 39:15, 48:17, 49:5, 51:20, 52:1,

52:16, 52:17, 54:9,
54:20, 55:1, 55:9,
55:10, 55:13, 59:11,
59:23, 60:9, 61:6,
61:9, 62:23, 65:4,
68:1, 69:6, 69:10,
70:2, 70:4, 70:8,
72:13, 72:19, 72:20,
73:7, 74:1, 74:24,
75:3, 76:1, 76:5,
76:7, 76:9, 76:14,
76:17, 76:18, 76:21,
76:22, 77:1, 77:19,
78:7, 78:17, 78:20,
78:25, 79:7, 79:16,
81:3, 81:17, 81:18,
86:13, 86:24, 86:25,
87:5, 87:20, 87:21,
87:24, 88:23, 89:19,
90:15, 90:17, 92:16
**DEFENDANTS** [1] -
1:7
**defendants'** [23] -
28:24, 48:24, 49:13,
49:16, 60:1, 77:10,
77:14, 78:15, 79:11,
79:20, 82:25, 83:6,
83:11, 85:12, 85:14,
85:17, 86:12, 86:16,
86:23, 87:12, 88:4,
88:6, 91:6
**defending** [1] - 85:8
**defense** [3] - 35:22,
55:21, 63:12
**defenses** [1] - 83:4
**deferral** [1] - 88:9
**defers** [2] - 86:21,
88:5
**defined** [1] - 66:9
**definition** [1] - 26:3
**delay** [1] - 91:7
**delayed** [1] - 7:17
**delta** [2] - 53:11, 54:11
**demand** [1] - 18:21
**demonstrable** [1] -
11:11
**demonstrate** [2] -
24:18, 47:4
**demonstrated** [2] -
44:5, 66:12
**demonstrates** [2] -
41:25, 47:14
**denial** [1] - 73:5
**denied** [4] - 28:21,
82:17, 83:6, 85:18
**denies** [1] - 72:19
**deny** [6] - 38:24, 55:5,
72:21, 76:23, 83:13,
88:22
**department** [1] - 85:3

**depositions** [2] -
77:17, 94:24
**derail** [1] - 11:7
**description** [1] - 89:18
**deserve** [1] - 67:11
**designated** [1] - 78:5
**desire** [1] - 39:12
**despite** [1] - 39:15
**detail** [5] - 14:7, 21:3,
22:1, 42:21, 75:6
**details** [5] - 15:7, 68:5,
77:23, 78:3, 79:21
**deter** [1] - 58:9
**detergent** [1] - 53:2
**determine** [5] - 19:17,
37:21, 62:18, 70:10,
87:12
**determining** [1] -
24:25
**develop** [1] - 33:19
**devote** [2] - 84:21,
85:8
**DFS** [1] - 8:4
**different** [14] - 16:9,
20:25, 21:2, 21:10,
21:21, 47:9, 50:15,
59:12, 60:21, 64:6,
67:3, 67:5, 70:1,
90:17
**differential** [1] - 62:13
**differentiate** [1] -
62:21
**differentiation** [1] -
51:22
**difficult** [2] - 73:24,
92:18
**difficulties** [1] - 92:24
**difficulty** [2] - 92:21,
93:4
**diligence** [2] - 53:12,
53:13
**dire** [1] - 93:12
**direct** [3] - 57:2, 65:1,
65:3
**directed** [8] - 4:24,
7:12, 8:10, 16:7,
50:18, 76:20, 86:20,
88:3
**directly** [1] - 71:10
**disagree** [6] - 18:14,
28:23, 32:7, 35:13,
38:10, 47:10
**disagrees** [1] - 28:4
**disbursed** [1] - 27:25
**discharged** [1] - 56:3
**disclose** [1] - 38:15
**discounts** [1] - 86:2
**discoverability** [1] -
22:25
**discoverable** [2] -

55:4, 76:24
**Discovery** [1] - 83:16
**DISCOVERY** [1] - 1:5
**discovery** [106] - 4:19,
4:25, 21:21, 22:11,
23:5, 23:9, 30:5,
37:16, 38:2, 39:6,
39:14, 43:25, 44:4,
46:11, 46:17, 48:8,
49:10, 51:3, 52:5,
52:12, 54:2, 55:11,
56:17, 57:3, 61:12,
63:14, 66:5, 66:17,
67:20, 72:20, 74:4,
74:23, 75:2, 75:6,
76:16, 76:20, 77:13,
77:21, 78:7, 78:8,
78:9, 78:12, 78:14,
78:19, 78:21, 78:22,
78:23, 78:24, 79:1,
79:3, 79:7, 79:8,
79:9, 79:11, 79:17,
79:21, 80:5, 81:16,
82:14, 82:17, 82:18,
82:20, 83:4, 83:6,
83:9, 83:12, 83:13,
83:20, 83:21, 83:24,
84:5, 84:12, 84:15,
84:18, 84:23, 84:25,
85:4, 85:7, 85:14,
85:15, 85:16, 85:24,
86:1, 86:3, 86:6,
86:7, 86:9, 86:19,
86:21, 87:5, 87:7,
87:9, 87:12, 87:15,
87:25, 88:1, 88:2,
88:5, 88:10, 91:13,
92:6, 92:20, 93:2
**discussed** [6] - 45:9,
63:7, 66:14, 73:22,
75:5, 92:3
**discussing** [1] - 32:3
**discussion** [7] - 7:7,
8:1, 36:1, 36:19,
70:17, 70:20, 91:1
**discussions** [7] - 5:6,
7:15, 7:16, 8:6, 9:13,
9:18, 59:19
**disgorgement** [18] -
51:4, 51:10, 57:9,
58:5, 59:6, 64:11,
64:18, 66:1, 67:25,
69:21, 70:7, 71:9,
73:16, 73:20, 85:25,
86:11, 87:10, 88:16
**dismiss** [9] - 77:10,
83:6, 83:8, 86:12,
86:23, 88:4, 88:6,
88:18
**dismissed** [1] - 66:3

**dispense** [1] - 82:16
**dispensed** [2] - 28:7,
80:17
**dispensing** [1] - 8:21
**disproportionate** [2] -
79:3, 87:7
**disprove** [2] - 23:12,
42:2
**dispute** [11] - 4:19,
10:8, 11:20, 12:10,
13:10, 14:1, 16:24,
50:20, 77:20, 87:13,
94:3
**disputed** [4] - 23:4,
23:9, 28:25, 81:25
**disputes** [12] - 4:25,
5:17, 10:14, 10:15,
10:19, 11:17, 74:4,
74:23, 75:2, 75:6,
77:2, 77:6
**DISPUTES** [1] - 1:6
**distinguish** [2] -
60:23, 62:25
**distinguishable** [1] -
60:22
**distribution** [7] - 27:8,
27:19, 30:22, 30:24,
31:19, 76:11, 83:14
**distributor** [1] - 53:7
**District** [4] - 20:21,
64:15, 85:2, 89:11
**DISTRICT** [2] - 1:1,
1:1
**Docket** [2] - 3:4, 77:5
**DOCKET** [1] - 1:7
**document** [14] - 6:13,
7:3, 9:7, 10:2, 17:19,
17:23, 22:13, 34:14,
35:2, 43:19, 77:14,
83:21, 91:20, 91:22
**documentation** [1] -
24:20
**documents** [45] -
4:23, 4:25, 8:13,
12:8, 12:20, 13:16,
13:21, 13:22, 14:2,
14:6, 14:11, 14:13,
14:24, 15:4, 15:7,
15:9, 15:17, 15:23,
16:5, 17:13, 17:19,
25:5, 35:7, 36:4,
44:1, 80:23, 82:7,
82:11, 82:21, 82:24,
83:1, 91:4, 91:25,
92:1, 92:4, 92:7,
92:17, 93:1, 93:3,
93:8, 93:11, 94:10,
94:23
**dollars** [2] - 43:10,
61:4

**domestically** [1] -
51:23
**done** [14] - 9:20, 13:4,
30:12, 30:14, 30:15,
37:14, 39:5, 46:19,
47:16, 54:7, 65:8,
67:8, 72:1, 72:2
**dosage** [3] - 23:21,
30:19, 81:6
**dose** [4] - 12:6, 26:14,
76:4, 76:7
**doubt** [1] - 76:23
**down** [11] - 16:14,
16:15, 20:13, 25:2,
27:5, 27:12, 27:15,
27:25, 61:8, 61:10,
91:9
**downstream** [31] -
7:4, 12:20, 13:7,
13:24, 14:14, 15:5,
16:17, 18:8, 22:3,
24:19, 25:4, 29:12,
40:11, 40:16, 40:20,
41:2, 41:24, 51:17,
52:1, 62:23, 68:20,
69:10, 70:8, 74:1,
76:5, 76:22, 77:1,
77:20, 85:23, 87:3,
92:16
**draft** [2] - 6:1, 35:5
**drastic** [1] - 51:21
**dresser** [1] - 32:8
**Drug** [2] - 41:4, 80:2
**drug** [11] - 13:15,
26:21, 40:3, 43:10,
51:21, 61:8, 63:11,
64:1, 64:2, 66:20,
69:21
**drugs** [11] - 20:24,
39:18, 39:22, 39:23,
40:6, 77:24, 78:5,
78:11, 78:15, 79:22,
89:13
**DSCSA** [6] - 41:9,
45:19, 48:15, 49:14,
63:7, 80:22
**DUANE** [1] - 2:6
**due** [2] - 53:12, 91:8
**duplication** [4] -
21:16, 42:10, 42:25,
43:1
**duplicative** [2] -
78:24, 82:20
**during** [5] - 12:3, 34:6,
46:7, 78:5, 93:8

___

### E

**e-mailed** [1] - 35:25
**early** [1] - 36:6

**easier** [1] - 93:8
**easily** [2] - 45:1, 63:15
**East** [1] - 2:12
**easy** [1] - 23:23
**echo** [1] - 70:18
**economic** [13] - 39:16, 39:24, 39:25, 43:8, 45:23, 57:12, 57:24, 58:1, 58:2, 63:24, 65:17, 69:15, 75:17
**effect** [3] - 12:2, 68:15, 81:24
**effort** [2] - 42:11, 84:11
**efforts** [3] - 43:19, 76:16, 89:20
**eight** [7] - 8:5, 19:16, 19:19, 25:6, 40:8, 50:2, 66:25
**Eisenhower** [1] - 1:16
**either** [6] - 6:21, 11:1, 25:19, 42:1, 57:18, 93:8
**Electronics** [3] - 56:24, 58:19, 58:22
**element** [3] - 23:12, 55:15, 55:19
**elements** [3] - 14:7, 44:16, 68:6
**employee** [1] - 30:23
**enable** [2] - 78:16, 82:8
**encompassed** [2] - 14:20, 17:1
**encourage** [1] - 36:4
**end** [4] - 7:20, 34:7, 42:19, 90:5
**enlarged** [1] - 35:24
**enrichment** [18] - 51:4, 51:14, 56:22, 56:25, 57:9, 57:16, 57:19, 58:17, 64:11, 65:5, 65:12, 65:16, 66:1, 67:24, 73:4, 85:25, 87:10, 88:17
**Enrichment** [1] - 64:16
**enrichment/ disgorgement** [2] - 62:21, 64:22
**enter** [6] - 11:1, 25:3, 27:10, 27:13, 90:20, 94:18
**entered** [6] - 6:13, 9:9, 74:25, 75:10, 83:17, 89:24
**entering** [1] - 7:9
**entertain** [1] - 44:15
**entirely** [1] - 82:5
**entities** [1] - 70:11

**entitled** [11] - 33:23, 49:12, 56:17, 58:14, 69:8, 69:18, 76:25, 81:7, 82:7, 82:9, 95:10
**entitles** [1] - 64:24
**environmental** [1] - 53:17
**envisioning** [1] - 73:11
**envisions** [1] - 11:5
**equally** [1] - 85:10
**equitable** [3] - 51:11, 58:9, 65:6
**ESI** [5] - 77:14, 82:24, 83:1, 92:1, 94:24
**especially** [1] - 82:13
**ESQUIRE** [9] - 1:15, 1:18, 1:19, 2:3, 2:6, 2:11, 2:11, 2:15, 2:18
**essentially** [1] - 89:14
**estimate** [1] - 44:14
**estimates** [3] - 44:12, 44:13, 46:18
**et** [5] - 36:7, 55:2, 63:18, 76:15
**eventually** [1] - 72:5
**evidence** [14] - 24:14, 24:15, 24:16, 33:17, 37:14, 43:8, 47:6, 47:14, 49:8, 49:10, 52:19, 92:22, 93:5
**exact** [3] - 28:14, 42:25, 43:1
**exactly** [9] - 26:9, 27:11, 28:16, 41:14, 42:18, 42:24, 44:17, 44:20, 45:1
**exaggerated** [2] - 44:12, 46:21
**example** [9] - 8:17, 14:15, 16:12, 17:23, 19:16, 80:11, 80:21, 84:2, 86:16
**examples** [3] - 18:25, 34:1
**excellent** [1] - 94:13
**excerpt** [2] - 35:23, 35:25
**excess** [1] - 75:23
**excessive** [1] - 43:1
**exemplar** [12] - 13:5, 14:11, 14:23, 15:4, 17:12, 18:2, 18:5, 18:6, 18:17, 36:4, 64:20, 91:4
**exemplars** [19] - 13:20, 15:20, 19:25, 20:2, 20:9, 20:10,

20:13, 20:16, 34:23, 35:1, 35:3, 35:7, 35:11, 36:1, 36:14, 36:18, 37:1, 37:5, 94:5
**exemption** [2] - 16:17, 41:4
**exemptions** [1] - 41:8
**exercising** [1] - 53:11
**Exhibit** [1] - 13:19
**exhibits** [1] - 4:17
**Exhibits** [3] - 4:23, 5:8, 77:4
**exist** [6] - 22:8, 33:22, 38:14, 49:12, 66:18, 92:24
**existed** [2] - 45:4, 92:25
**exists** [2] - 28:15, 62:22
**expect** [4] - 9:19, 11:1, 37:15, 38:1
**expectation** [1] - 93:4
**expedition** [1] - 26:4
**expenditure** [1] - 84:11
**expense** [3] - 44:3, 69:22, 84:4
**expenses** [1] - 63:18
**expensive** [3] - 47:13, 52:13, 84:7
**experience** [3] - 32:22, 33:2, 36:5
**experienced** [1] - 32:23
**expert** [33] - 18:14, 18:15, 24:16, 25:25, 28:8, 29:3, 29:5, 29:14, 29:20, 34:10, 34:13, 34:15, 34:16, 34:18, 37:7, 38:12, 39:13, 40:16, 40:22, 42:3, 48:23, 53:15, 54:8, 79:15, 80:6, 80:9, 80:11, 80:15, 80:18, 82:1, 82:13
**expiration** [12] - 12:22, 13:6, 14:3, 15:9, 27:4, 40:12, 41:24, 49:7, 50:3, 50:12, 80:24, 81:7
**explain** [1] - 71:2
**explanation** [2] - 53:13, 94:8
**explicitly** [2] - 6:21, 71:2
**extent** [13] - 4:6, 8:16, 12:23, 12:24, 15:8, 15:11, 25:11, 39:4, 43:10, 49:9, 76:25,

77:20, 80:12
**extract** [1] - 66:21
**extremely** [2] - 84:12, 86:5
**eyeball** [1] - 50:9

**F**

**face** [7] - 17:4, 29:4, 47:21, 65:23, 67:10, 82:12
**facie** [1] - 79:25
**facing** [1] - 49:23
**fact** [34] - 6:14, 6:24, 7:6, 7:8, 7:12, 7:19, 7:21, 8:1, 8:8, 8:14, 9:9, 9:13, 9:14, 18:7, 22:8, 28:18, 34:14, 39:19, 49:3, 51:21, 51:24, 55:8, 55:9, 55:25, 59:22, 70:19, 80:5, 81:11, 89:4, 90:7, 90:9, 92:13, 94:21
**facts** [11] - 7:21, 33:18, 34:8, 47:12, 48:22, 48:23, 49:2, 59:10, 65:13, 65:24, 72:5
**factual** [8] - 26:20, 33:16, 33:19, 39:17, 63:1, 63:3, 64:18, 68:5
**factually** [1] - 65:12
**failed** [2] - 39:17, 39:18
**fails** [1] - 25:25
**failure** [5] - 18:21, 18:22, 45:3, 63:2, 72:21
**fair** [5] - 9:21, 12:14, 17:2, 39:3, 47:24
**fairly** [2] - 17:5
**faith** [1] - 93:18
**fall** [3] - 60:15, 77:15, 77:18
**familiar** [3] - 42:13, 75:11, 76:14
**far** [3] - 10:14, 70:21, 85:14
**Farrell** [2] - 1:22, 95:12
**fashion** [2] - 19:14, 77:22
**fault** [1] - 26:6
**faulted** [1] - 34:13
**FCRR** [1] - 95:12
**FDA** [8] - 30:7, 30:8, 30:9, 31:9, 31:11, 31:17, 49:4

**feasible** [2] - 55:7, 92:11
**February** [2] - 35:23, 36:10
**federal** [1] - 58:8
**fell** [1] - 46:19
**felt** [1] - 6:4
**few** [7] - 4:11, 5:5, 6:7, 15:20, 41:22, 48:4, 74:17
**fields** [2] - 35:14, 89:18
**fight** [1] - 20:6
**fighting** [3] - 17:10, 17:12, 19:7
**fights** [1] - 73:11
**figure** [7] - 26:3, 40:1, 61:7, 62:15, 63:23, 66:21, 66:23
**filed** [6] - 59:5, 75:16, 75:24, 75:25, 77:11, 87:17
**filing** [1] - 90:16
**filings** [1] - 51:19
**filled** [1] - 31:5
**final** [6] - 6:8, 89:3, 90:7, 93:2, 94:18
**finalize** [2] - 7:5, 9:8
**finalized** [5] - 5:18, 6:15, 7:4, 9:8, 9:19
**finalizing** [3] - 9:13, 10:2, 10:12
**finally** [3] - 35:8, 70:16, 71:6
**financial** [2] - 40:9, 78:3
**finder** [1] - 51:24
**fine** [1] - 11:15
**finish** [4] - 9:12, 94:20, 94:21
**finished** [4] - 12:6, 26:14, 76:4, 76:7
**finishing** [1] - 94:19
**first** [18] - 7:10, 11:22, 22:10, 23:2, 27:9, 32:9, 34:8, 35:9, 38:11, 46:6, 46:7, 62:11, 62:17, 64:12, 68:25, 73:21, 78:6, 90:6
**fishing** [1] - 26:3
**fit** [1] - 65:16
**five** [3] - 17:9, 60:4, 79:2
**flabbergasted** [1] - 23:15
**flipped** [1] - 64:9
**floated** [1] - 55:23
**floor** [1] - 39:6
**focus** [2] - 86:15,

94:23
**focused** [1] - 76:16
**focusing** [1] - 88:15
**follow** [1] - 90:17
**followed** [1] - 77:11
**following** [2] - 78:22, 90:14
**FOR** [1] - 1:1
**foregoing** [1] - 95:9
**foreign** [3] - 31:9, 51:22, 76:2
**Form** [1] - 49:3
**form** [4] - 29:9, 33:23, 57:14, 60:7
**formality** [1] - 35:3
**forms** [3] - 35:15, 35:17, 75:21
**forth** [7] - 36:21, 37:15, 38:15, 39:8, 54:6, 56:25, 61:10
**forward** [7] - 37:22, 38:4, 44:13, 56:21, 64:7, 72:11, 93:10
**fought** [1] - 6:4
**four** [4] - 14:1, 17:8, 65:18, 79:1
**fourth** [1] - 40:18
**frame** [3] - 16:22, 16:24, 34:6
**framing** [1] - 11:20
**frankly** [2] - 39:23, 93:9
**Fraud** [1] - 56:23
**fraud** [1] - 59:12
**FREEMAN** [1] - 1:15
**freezes** [1] - 47:19
**Friday** [1] - 11:2
**front** [7] - 5:8, 25:14, 30:7, 35:23, 43:24, 57:13, 57:17
**frozen** [1] - 46:22
**frustrating** [1] - 37:2
**frustration** [1] - 16:13
**FULBRIGHT** [1] - 2:14
**full** [9] - 16:3, 20:15, 36:25, 38:15, 39:3, 62:5, 91:20
**full-scale** [1] - 91:20
**fully** [1] - 48:3
**fulsome** [1] - 77:15
**functional** [1] - 67:5
**fundamental** [2] - 25:17, 64:10
**futile** [3] - 40:24, 79:1, 83:7
**futility** [1] - 83:2
**future** [6] - 13:10, 16:24, 59:9, 77:12, 84:20, 88:5

## G

**gains** [7] - 54:12, 58:21, 58:24, 62:25, 66:2, 71:24
**general** [8] - 23:8, 51:15, 69:18, 75:16, 77:22, 83:25, 84:13, 91:13
**generalizing** [1] - 26:22
**generally** [4] - 12:17, 54:14, 75:6, 80:8
**generate** [1] - 84:8
**genuinely** [2] - 78:23, 88:11
**Geoppinger** [1] - 3:21
**GEOPPINGER** [3] - 2:18, 3:20, 3:21
**Georgia** [2] - 20:21, 89:11
**given** [7] - 15:25, 38:19, 49:15, 60:24, 67:14, 67:15, 80:12
**globally** [1] - 8:13
**GOLDBERG** [5] - 2:6, 4:4, 9:15, 9:23, 11:3
**Goldberg** [5] - 4:4, 9:15, 9:24, 10:10, 18:20
**Goldenberg** [1] - 9:18
**GOLOMB** [1] - 1:18
**good-faith** [1] - 93:18
**goods** [1] - 62:13
**gospel** [1] - 28:24
**grant** [1] - 88:19
**granted** [1] - 83:8
**grants** [3] - 17:22, 17:23, 22:12
**great** [2] - 36:3, 84:4
**grind** [1] - 83:9
**gross** [9] - 22:2, 22:3, 42:18, 42:24, 66:7, 66:8, 66:13, 85:21, 85:22
**ground** [2] - 83:13, 83:21
**grounds** [1] - 78:21
**group** [8] - 4:24, 4:25, 7:6, 7:10, 7:11, 54:9, 57:10
**groups** [11] - 6:18, 6:22, 7:4, 7:8, 7:19, 8:10, 8:15, 9:9, 75:3, 76:1, 82:25
**guarantee** [1] - 55:25
**guess** [4] - 30:15, 35:17, 64:4, 94:20
**guessing** [1] - 29:16
**guided** [1] - 31:15

## H

**halt** [1] - 83:9
**hand** [2] - 30:24, 83:22
**handle** [2] - 20:12, 59:13
**hands** [6] - 28:2, 30:12, 32:2, 58:10, 78:16, 81:18
**happy** [2] - 68:4
**harass** [1] - 41:18
**hard** [3] - 16:6, 60:23, 67:9
**harm** [1] - 67:17
**harmed** [1] - 58:11
**Harrop** [1] - 84:6
**HARROP** [1] - 84:6
**head** [2] - 33:14, 38:3
**health** [1] - 63:22
**Health** [2] - 30:10, 76:13
**Healthcare** [1] - 2:8
**hear** [3] - 62:2, 66:10, 71:4
**heard** [10] - 33:10, 33:15, 35:16, 46:7, 46:8, 62:10, 75:4, 77:11, 90:5, 90:6
**hearing** [1] - 92:20
**heart** [1] - 85:16
**heating** [1] - 59:13
**heavy** [1] - 39:14
**heck** [1] - 15:20
**held** [4] - 3:1, 67:10, 67:18, 84:23
**hello** [1] - 3:13
**help** [2] - 36:3, 82:10
**helpful** [7] - 19:1, 19:2, 19:17, 19:18, 64:7, 78:14, 81:4
**hiccup** [2] - 91:8, 92:15
**hidden** [1] - 37:7
**high** [2] - 32:9, 49:15
**highlight** [1] - 71:15
**highly** [4] - 25:16, 67:13, 79:2, 83:12
**history** [1] - 77:8
**hit** [2] - 33:13, 48:4
**hits** [1] - 25:18
**hold** [6] - 16:19, 20:6, 20:17, 23:19, 54:13
**home** [2] - 64:8, 65:18
**HONIK** [3] - 1:18, 1:18, 3:15
**Honik** [1] - 3:15
**Honor** [97] - 3:13, 3:15, 3:17, 3:20, 3:22, 3:24, 4:4, 4:9,

5:2, 5:8, 5:9, 5:11, 5:21, 5:23, 6:5, 6:16, 6:25, 7:2, 7:13, 7:20, 7:24, 8:11, 8:20, 9:4, 9:15, 9:23, 10:1, 11:4, 11:8, 12:12, 13:18, 15:13, 16:2, 16:7, 17:2, 17:21, 19:21, 20:4, 20:5, 22:15, 22:20, 23:11, 23:18, 24:7, 24:12, 29:23, 31:24, 32:11, 32:21, 33:2, 33:11, 33:13, 34:2, 34:24, 35:5, 35:13, 35:20, 36:3, 38:6, 38:12, 39:7, 42:10, 42:13, 43:18, 44:7, 46:13, 47:4, 48:21, 50:25, 51:9, 52:7, 53:1, 53:6, 53:23, 54:5, 55:12, 56:1, 57:25, 59:24, 62:8, 62:20, 63:6, 67:14, 68:10, 68:17, 68:24, 72:3, 73:1, 73:18, 74:11, 74:12, 74:14, 90:3, 91:12, 92:2, 93:14, 94:12
**Honor's** [2] - 39:11, 40:23
**Honorable** [1] - 3:1
**HONORABLE** [1] - 1:12
**hopefully** [3] - 10:6, 10:13, 94:16
**hoping** [1] - 10:4
**horizon** [1] - 71:7
**hostage** [1] - 84:24
**hot** [1] - 59:14
**hours** [5] - 42:6, 42:7, 42:8, 47:15, 74:7
**Huahai** [1] - 2:9
**Hudock** [1] - 56:23, 58:16
**hypothetical** [2] - 31:4, 57:20
**hypothetically** [2] - 54:24, 60:16

## I

**i.e** [1] - 87:1
**Id** [1] - 85:8
**idea** [5] - 35:11, 36:3, 71:11, 73:20, 92:17
**ideas** [1] - 41:22
**identification** [2] - 26:5, 73:13
**identified** [2] - 5:15,

6:3
**identifiers** [1] - 34:5
**identify** [6] - 12:21, 14:2, 15:7, 15:10, 28:11, 80:13
**ignore** [1] - 80:5
**III** [1] - 42:25
**ill** [7] - 54:12, 58:21, 58:24, 62:24, 66:2, 71:24
**ill-gotten** [7] - 54:12, 58:21, 58:24, 62:24, 66:2, 71:24
**image** [1] - 21:12
**imagine** [1] - 45:20
**immediately** [1] - 27:7
**implications** [1] - 73:14
**implicit** [1] - 47:1
**implicitly** [1] - 6:22
**import** [1] - 45:8
**importance** [4] - 43:3, 43:25, 45:10, 87:8
**important** [8] - 15:17, 34:5, 36:12, 43:4, 54:1, 69:13, 79:5, 86:19
**importantly** [1] - 74:10
**impose** [3] - 39:14, 41:7, 48:17
**impossible** [2] - 26:12, 28:15
**improper** [1] - 39:22
**IN** [1] - 1:3
**inaccurate** [1] - 44:12
**inappropriate** [1] - 71:14
**inclined** [1] - 44:15
**include** [3] - 13:6, 41:2, 57:16
**included** [2] - 14:12, 89:15
**includes** [1] - 6:20
**including** [3] - 55:15, 78:22, 79:14
**incomplete** [1] - 15:24
**inconsistent** [2] - 16:16, 41:10
**incumbent** [1] - 34:16
**indicated** [2] - 8:25, 93:20
**indicating** [1] - 90:21
**individual** [9] - 8:15, 8:18, 8:22, 10:21, 10:22, 57:15, 63:25, 64:1, 81:18
**individualized** [1] - 91:15
**individually** [1] -

30:24
**indulgence** [2] - 74:6, 95:5
**industry** [1] - 29:15
**information** [116] - 12:4, 12:7, 13:7, 13:11, 13:23, 13:24, 14:13, 14:19, 15:10, 16:10, 16:11, 18:4, 18:6, 18:10, 21:6, 21:12, 21:14, 21:23, 22:5, 22:25, 23:9, 24:13, 24:17, 25:3, 25:20, 25:21, 26:1, 26:2, 27:16, 28:9, 29:8, 29:11, 30:13, 31:17, 33:14, 33:15, 33:23, 33:25, 34:4, 34:11, 34:17, 37:23, 40:12, 40:15, 40:19, 40:22, 41:3, 41:14, 41:24, 42:1, 42:15, 43:13, 44:9, 44:25, 45:3, 45:5, 45:13, 46:5, 46:8, 46:17, 47:13, 48:18, 49:12, 49:15, 49:17, 49:18, 50:3, 50:12, 50:14, 53:21, 55:4, 55:16, 56:1, 56:9, 56:18, 57:1, 59:21, 59:23, 60:13, 61:16, 61:17, 62:6, 62:12, 62:18, 65:14, 65:22, 66:13, 66:21, 67:13, 67:21, 69:13, 70:22, 72:17, 72:21, 73:6, 73:9, 75:7, 76:24, 78:1, 80:7, 80:19, 81:9, 83:15, 86:5, 86:14, 94:2, 94:4
**ingest** [1] - 86:18
**ingesting** [1] - 75:21
**ingredient** [1] - 76:3
**inherent** [1] - 64:25
**inhibits** [1] - 73:15
**injured** [1] - 43:7, 58:13
**injuries** [2] - 59:7, 63:17
**injury** [3] - 57:14, 63:16, 75:23
**innocent** [2] - 63:8
**input** [1] - 27:17
**inputs** [2] - 54:10, 57:5
**insist** [1] - 91:11
**insofar** [1] - 77:8
**inspects** [1] - 30:24
**instance** [1] - 16:6,

34:9
**instead** [3] - 50:1, 83:25, 86:8
**instructed** [2] - 31:23, 37:12
**instructive** [1] - 64:21
**insulated** [1] - 63:10
**insulation** [1] - 63:11
**insurers** [1] - 87:3
**intend** [1] - 11:6
**intent** [5] - 51:18, 52:6, 53:22, 61:18, 86:1
**intention** [1] - 7:3
**interested** [1] - 68:7
**interests** [1] - 93:23
**internal** [1] - 82:21
**interrelated** [2] - 70:2, 70:12
**interruption** [1] - 92:15
**inventory** [6] - 28:9, 43:6, 80:20, 80:22, 81:9, 82:5
**investigation** [1] - 51:25
**invited** [2] - 10:7, 72:15
**invoice** [1] - 14:18
**invoices** [1] - 16:6
**invoked** [1] - 65:8
**involved** [4] - 42:6, 67:3, 67:6, 74:23
**involves** [3] - 50:18, 75:14, 86:5
**involving** [1] - 11:23
**irrelevant** [4] - 55:2, 80:5, 86:4, 87:15
**issue** [43] - 10:3, 10:16, 11:6, 11:20, 11:22, 11:23, 12:2, 16:22, 18:17, 19:22, 20:22, 21:16, 22:11, 22:17, 22:19, 23:2, 23:5, 32:19, 33:1, 38:21, 39:1, 42:11, 45:4, 50:17, 50:23, 56:10, 59:1, 59:18, 62:3, 68:15, 68:16, 71:7, 71:9, 71:11, 71:18, 79:19, 79:23, 85:1, 86:9, 87:13, 88:11, 88:13, 94:1
**issued** [1] - 49:3
**issues** [46] - 4:11, 4:19, 5:15, 6:3, 6:4, 6:8, 7:18, 7:19, 8:3, 9:6, 10:17, 10:23, 10:24, 11:8, 11:9, 11:18, 11:20, 16:24,

18:22, 19:6, 19:12, 20:6, 21:18, 36:6, 38:22, 43:3, 43:25, 44:2, 45:10, 46:21, 60:15, 63:14, 71:10, 73:13, 79:18, 82:15, 83:22, 85:15, 86:16, 86:20, 88:3, 88:16, 90:1, 92:20, 94:19, 95:3
**IT** [1] - 67:6
**items** [4] - 17:7, 17:8, 17:16, 21:24
**itself** [3] - 50:4, 53:4, 93:7

## J

**January** [3] - 67:18, 77:18, 77:25
**Jeff** [1] - 3:20
**JEFFREY** [1] - 2:18
**JERSEY** [1] - 1:1
**Jersey** [9] - 1:10, 1:16, 56:22, 58:17, 64:8, 64:11, 64:15, 64:20, 85:3
**job** [1] - 59:6
**Joel** [1] - 3:1
**JOEL** [1] - 1:12
**Johnston** [10] - 3:23, 5:12, 6:5, 7:24, 31:24, 32:6, 68:22, 73:17, 90:4, 90:10
**JOHNSTON** [20] - 2:11, 3:22, 5:11, 6:5, 7:24, 8:20, 31:24, 32:11, 32:15, 32:21, 35:19, 68:17, 68:22, 68:24, 73:18, 90:3, 90:13, 90:23, 91:12, 92:2
**join** [1] - 93:16
**joined** [1] - 46:22
**JUDGE** [1] - 1:12
**Judge** [38] - 3:2, 3:3, 4:7, 12:15, 15:17, 16:6, 16:8, 25:1, 29:22, 30:1, 33:18, 34:20, 35:16, 35:19, 37:3, 38:8, 38:10, 38:17, 45:24, 48:2, 48:5, 48:12, 48:15, 49:9, 49:20, 56:6, 57:11, 58:16, 59:10, 59:17, 60:14, 60:24, 61:19, 61:24, 71:16, 71:21, 74:13, 74:21
**judge** [1] - 37:12
**judgment** [3] - 28:21,

29:20
**July** [8] - 1:10, 7:20, 20:1, 20:14, 36:25, 37:22, 75:4, 95:14
**jump** [3] - 9:16, 32:25, 65:21
**jumping** [1] - 20:13
**jury** [2] - 57:22, 58:14

## K

**KANNER** [1] - 2:2
**KATZ** [1] - 1:15
**keep** [8] - 34:12, 40:8, 41:14, 48:17, 48:20, 61:2
**kept** [5] - 17:15, 25:20, 60:6, 80:12, 91:15
**key** [1] - 14:7
**knot** [2] - 9:12
**knowing** [1] - 78:12
**knowledge** [6] - 14:17, 24:14, 24:16, 29:1, 29:10, 29:17
**known** [2] - 51:25
**knows** [2] - 3:11, 44:10
**KRISTEN** [1] - 2:11
**Kristen** [1] - 4:9
**Kugler** [1] - 71:17

## L

**label** [2] - 31:6, 31:7
**labeling** [2] - 14:12, 14:19
**labels** [1] - 80:22
**lack** [2] - 44:19, 47:4
**lading** [1] - 14:18
**language** [4] - 5:14, 12:19, 17:5, 31:2
**large** [3] - 32:4, 76:25, 84:3
**last** [14] - 8:4, 14:25, 19:9, 48:1, 49:22, 49:25, 50:3, 62:1, 71:6, 71:20, 72:19, 84:16, 92:14, 92:25
**late** [1] - 77:18
**latter** [1] - 69:23
**law** [13] - 41:18, 45:20, 51:12, 54:21, 56:21, 57:15, 58:7, 58:8, 64:6, 64:8, 64:20, 65:18, 72:2
**laws** [1] - 64:8
**lawsuit** [1] - 41:15
**lawyers** [1] - 59:9
**lay** [1] - 50:7
**leadership** [1] - 3:8

**leads** [1] - 43:5
**least** [7] - 8:22, 10:8, 36:17, 49:11, 60:7, 60:18, 93:17
**leave** [4] - 36:11, 36:15, 36:23, 38:19
**left** [1] - 67:4
**legacy** [1] - 67:3
**legal** [1] - 47:21
**legitimate** [2] - 84:22, 85:7
**less** [5] - 44:24, 49:14, 53:3, 74:15, 93:9
**letter** [8] - 4:22, 5:16, 35:9, 46:10, 50:6, 51:16, 71:22, 77:4
**letters** [9] - 10:12, 10:15, 10:17, 10:18, 10:24, 11:17, 11:19, 48:3, 49:9
**level** [1] - 33:3
**levels** [3] - 27:23, 47:16, 60:4
**LG** [3] - 56:24, 58:19, 58:22
**LIABILITY** [1] - 1:4
**liability** [9] - 45:22, 56:16, 59:4, 59:9, 63:10, 63:12, 69:5, 76:23, 88:12
**light** [3] - 19:4, 92:13, 92:22
**likelihood** [4] - 43:20, 45:5, 49:15, 88:6
**likely** [4] - 44:4, 45:3
**limited** [2] - 64:12, 85:4
**line** [8] - 3:6, 3:7, 17:7, 36:22, 45:19, 49:25, 77:2
**lines** [1] - 35:8
**link** [3] - 28:6, 80:14, 80:17
**linking** [1] - 28:11
**listen** [1] - 53:14
**litany** [1] - 48:6
**literal** [1] - 37:20
**literally** [2] - 25:22, 26:17
**litigants** [1] - 84:23
**litigation** [6] - 8:13, 20:20, 33:22, 43:4, 43:18, 79:19
**Litigation** [1] - 89:10
**LITIGATION** [1] - 1:4
**litigation-wide** [1] - 8:13
**live** [1] - 94:7
**LLC** [3] - 1:15, 2:2, 2:8
**LLLP** [1] - 2:18

**LLP** [3] - 2:6, 2:10, 2:14
**look** [11] - 13:19, 14:11, 15:21, 18:25, 26:2, 31:20, 32:8, 34:15, 34:18, 65:4, 94:17
**looking** [2] - 6:1, 30:25
**Los** [1] - 2:12
**Losartan** [2] - 49:4, 49:5
**lose** [2] - 27:23, 27:24
**loss** [12] - 39:16, 39:25, 43:8, 45:23, 57:12, 57:24, 58:1, 58:2, 63:24, 65:17, 69:16, 72:24
**lost** [2] - 28:1, 63:18
**Louisiana** [1] - 2:4
**low** [1] - 52:18
**Ltd** [1] - 2:9
**luckily** [2] - 33:6
**lying** [1] - 25:19

### M

**machination** [1] - 42:3
**machinations** [1] - 47:20
**MACRO** [1] - 1:5
**macro** [11] - 6:4, 7:17, 8:3, 11:8, 11:9, 18:22, 74:23, 75:2, 92:20, 93:6, 94:2
**Magistrate** [1] - 3:2
**MAGISTRATE** [1] - 1:12
**magnitude** [1] - 53:11
**mailed** [1] - 35:25
**main** [1] - 86:25
**maintain** [4] - 12:23, 24:18, 32:17, 78:14
**maintained** [2] - 13:3, 60:7
**major** [1] - 76:10
**Major** [4] - 25:11, 39:12, 46:13, 46:20
**majority** [2] - 16:4, 76:12
**manner** [2] - 13:3, 29:8
**manually** [2] - 27:10, 27:13
**manufacture** [2] - 40:5, 40:6
**manufacturer** [28] - 6:12, 12:5, 12:6, 14:12, 14:16, 16:2, 22:1, 26:14, 26:15,

26:21, 31:1, 31:18, 45:1, 58:15, 58:20, 58:22, 58:24, 60:8, 60:25, 61:1, 61:8, 61:14, 61:17, 62:19, 70:10, 76:7, 76:17, 78:15
**manufacturer's** [1] - 81:6
**manufacturer-included** [1] - 14:12
**manufacturers** [34] - 6:14, 9:14, 13:14, 17:8, 18:4, 21:15, 21:24, 23:20, 24:20, 27:25, 40:4, 40:13, 42:14, 42:16, 43:14, 43:22, 44:23, 45:7, 59:16, 59:19, 60:12, 60:21, 61:21, 62:11, 62:22, 63:2, 67:22, 70:6, 76:3, 76:4, 77:25, 81:5, 82:22, 90:22
**manufacturers'** [3] - 62:16, 82:19, 94:20
**manufactures** [1] - 26:21
**manufacturing** [6] - 53:15, 63:3, 76:9, 76:20, 77:14, 90:15
**March** [1] - 89:11
**marginal** [1] - 43:20
**marginally** [2] - 26:8, 85:14
**mark** [1] - 59:4
**market** [3] - 24:6, 31:10, 76:12
**Market** [1] - 1:19
**Marlene** [1] - 9:18
**master** [6] - 51:13, 57:8, 57:12, 75:16, 75:20, 87:19
**math** [1] - 72:1
**matter** [8] - 23:8, 31:6, 45:16, 61:13, 74:21, 75:1, 75:12, 95:10
**matters** [1] - 90:2
**Matthew** [1] - 84:9
**MAZIE** [1] - 1:15
**McKesson** [18] - 2:16, 3:25, 30:9, 30:16, 30:17, 30:21, 31:19, 35:8, 49:4, 49:5, 49:20, 49:23, 50:2, 76:13, 81:14, 84:2, 84:6, 84:17
**MDL** [3] - 3:4, 45:23, 75:14
**mean** [7] - 11:4, 24:4,

34:2, 52:3, 60:19, 67:11, 81:3
**meaning** [2] - 66:8, 86:8
**means** [3] - 24:4, 50:7, 72:16
**meant** [1] - 12:9
**meantime** [1] - 77:13
**measure** [1] - 41:15
**meat** [1] - 22:24
**mechanical** [1] - 1:24
**medical** [4] - 57:18, 63:17, 63:20, 75:19
**medication** [1] - 75:16
**medicines** [1] - 33:8
**meet** [8] - 5:6, 10:6, 10:25, 11:6, 11:12, 12:17, 25:22, 66:10
**meet-and-confer** [1] - 5:6
**memorialize** [1] - 13:16
**mention** [1] - 48:7
**mentioned** [5] - 17:19, 19:24, 47:2, 47:3, 73:22
**merely** [2] - 44:11, 83:25
**merits** [2] - 56:13, 56:14
**method** [4] - 34:17, 40:21, 51:14, 72:6
**methodology** [1] - 38:15
**methods** [1] - 72:4
**middle** [1] - 65:2
**middlemen** [2] - 40:3, 45:16
**might** [13] - 8:18, 15:23, 30:15, 33:8, 33:25, 50:19, 53:13, 61:20, 62:3, 67:23, 72:8, 72:9
**milligrams** [1] - 61:4
**mind** [2] - 26:4, 90:18
**minimum** [6] - 43:22, 53:17, 65:20, 66:4, 67:14, 67:16
**Minnesota** [2] - 56:23, 58:18
**minor** [1] - 42:11
**minus** [1] - 71:25
**minute** [1] - 26:20
**minutes** [3] - 74:16, 74:17, 95:2
**miracle** [1] - 67:24
**miss** [1] - 68:10
**missing** [1] - 59:3
**misspoke** [1] - 90:11
**mistaken** [1] - 7:21

**misunderstanding** [1] - 13:12
**Mitchell** [1] - 1:9
**model** [14] - 38:15, 54:6, 54:9, 54:19, 54:22, 54:23, 55:10, 56:25, 57:6, 69:13, 70:21, 72:11, 73:20, 74:1
**modeling** [1] - 54:8
**moment** [4] - 22:9, 31:25, 35:25, 37:5
**money** [2] - 25:7, 57:23
**monitor** [1] - 63:21
**monitoring** [3] - 57:18, 63:20, 75:19
**month** [2] - 35:10, 75:25
**months** [13] - 20:2, 20:3, 20:9, 35:6, 36:21, 91:4, 91:24, 92:14, 92:25, 94:1, 94:6
**Mooney** [3] - 34:2, 81:14, 81:15
**Mooney's** [1] - 81:24
**MORRIS** [1] - 2:6
**most** [5] - 60:8, 68:19, 74:10, 79:5, 80:25
**motion** [2] - 83:6, 83:8
**motions** [8] - 77:9, 77:10, 77:12, 86:12, 86:23, 88:4, 88:6, 88:17
**motive** [5] - 51:18, 52:5, 53:22, 61:18, 86:1
**move** [3] - 39:1, 50:17, 93:10
**moving** [1] - 91:10
**MR** [63] - 3:13, 3:15, 3:20, 4:4, 4:7, 5:2, 5:20, 6:16, 6:25, 7:13, 8:11, 9:3, 9:15, 9:23, 11:3, 12:12, 22:15, 22:20, 29:22, 30:1, 31:24, 33:11, 34:24, 35:20, 36:15, 36:19, 38:6, 38:8, 48:2, 48:11, 50:25, 51:5, 51:9, 52:7, 52:11, 52:21, 53:1, 53:6, 53:23, 54:4, 54:20, 55:12, 56:6, 56:19, 57:11, 57:24, 58:5, 58:16, 59:2, 59:8, 59:17, 59:22, 60:14, 60:23, 61:15,

61:19, 61:23, 71:21, 74:13, 74:14
**MS** [60] - 3:17, 3:22, 3:24, 4:9, 5:9, 5:11, 5:23, 6:5, 7:24, 8:20, 12:15, 13:18, 14:22, 16:8, 17:2, 17:25, 18:2, 18:13, 18:16, 19:4, 19:21, 20:4, 21:3, 21:22, 23:11, 23:17, 24:7, 24:12, 24:23, 26:16, 29:1, 30:4, 30:14, 31:14, 32:11, 32:15, 32:21, 35:19, 37:3, 39:7, 46:13, 47:3, 47:11, 48:10, 49:20, 49:23, 62:8, 68:17, 68:22, 68:24, 73:1, 73:18, 74:12, 90:3, 90:13, 90:23, 91:12, 92:2, 93:14, 94:12
**multiple** [1] - 71:22
**must** [11] - 21:6, 21:9, 29:16, 49:18, 52:2, 65:1, 77:21, 79:5, 79:10, 82:24, 84:21
**mute** [1] - 73:2

### N

**nail** [1] - 33:13
**name** [4] - 3:11, 35:14, 37:7, 81:6
**named** [1] - 69:16
**namely** [2] - 87:3, 92:5
**names** [2] - 60:25, 76:14
**narrow** [1] - 15:6
**narrower** [1] - 13:1
**nationwide** [2] - 75:17, 75:19
**nature** [1] - 65:15
**NDC** [23] - 12:22, 14:3, 15:9, 26:1, 30:18, 30:19, 30:22, 30:25, 31:7, 31:15, 31:16, 31:20, 32:3, 32:4, 42:7, 42:8, 42:9, 42:17, 44:20, 44:22, 66:14, 66:20, 81:5
**nearly** [1] - 93:12
**necessarily** [1] - 60:19
**necessary** [6] - 4:6, 5:8, 34:8, 49:2, 72:6, 92:22
**need** [32] - 3:6, 6:8, 6:14, 8:6, 16:14, 17:6, 22:16, 35:17, 36:22, 37:22, 38:11,

43:23, 49:10, 50:10, 54:10, 61:6, 62:14, 62:18, 70:22, 70:23, 78:25, 86:12, 87:11, 87:20, 87:22, 90:2, 91:14, 94:11, 94:19, 94:20, 94:21, 95:3

**needed** [7] - 20:16, 37:20, 38:13, 44:12, 70:18, 78:23, 88:11

**needs** [3] - 16:12, 25:16, 79:3

**negotiated** [1] - 83:17

**net** [7] - 22:6, 66:8, 66:9, 66:15, 66:23, 85:21, 85:22

**never** [9] - 19:6, 21:11, 26:4, 27:17, 29:6, 35:15, 35:16, 70:24

**nevertheless** [1] - 77:10

**new** [5] - 15:19, 45:5, 49:15, 67:2, 75:24

**NEW** [1] - 1:1

**New** [12] - 1:10, 1:16, 2:4, 2:16, 56:22, 58:17, 64:7, 64:11, 64:15, 64:20, 85:3

**next** [5] - 10:5, 24:23, 34:9, 39:1, 58:10

**nicely** [1] - 49:25

**nine** [2] - 19:16, 19:19

**NJ** [1] - 95:12

**NJ-CRCR** [1] - 95:12

**none** [3] - 35:6, 44:1, 72:14

**nonfinancial** [1] - 78:9

**Northern** [2] - 20:20, 89:11

**NORTON** [1] - 2:14

**NOS** [1] - 1:7

**note** [3] - 6:2, 43:17, 44:19

**notes** [2] - 80:25, 88:8

**nothing** [4] - 5:14, 40:1, 41:10, 94:8

**notice** [9] - 39:21, 48:6, 51:18, 52:6, 53:3, 53:22, 61:18, 91:24, 93:25

**Notices** [1] - 80:23

**notion** [1] - 80:3

**number** [48] - 8:25, 12:22, 15:9, 18:12, 26:12, 27:1, 28:7, 29:2, 29:3, 29:5, 30:7, 30:8, 30:10, 30:11, 30:18, 30:19, 30:23, 30:25, 31:7,

31:8, 31:12, 31:15, 31:16, 32:2, 32:5, 32:10, 32:13, 34:1, 41:2, 42:8, 42:17, 48:6, 57:15, 66:20, 71:8, 71:14, 73:23, 80:4, 80:7, 80:16, 81:4, 81:5, 81:15, 95:2

**Number** [11] - 3:4, 13:25, 14:4, 31:16, 31:20, 31:21, 77:5

**NUMBER** [1] - 1:2

**numbers** [14] - 28:17, 31:10, 32:17, 42:7, 42:10, 44:21, 44:22, 49:1, 54:17, 66:14, 80:1, 80:20, 81:2

**numerous** [1] - 33:4

**nuts** [1] - 38:16

### O

**object** [3] - 31:9, 78:20, 87:1

**objection** [4] - 11:4, 74:6, 90:22, 94:10

**objections** [2] - 10:22, 92:1

**obligation** [4] - 25:17, 29:7, 48:17, 72:10

**obtained** [1] - 71:2

**obtaining** [2] - 84:14, 92:21

**obviously** [8] - 15:18, 33:15, 37:2, 48:12, 50:5, 56:12, 59:8, 75:11

**occasions** [1] - 33:5

**occur** [1] - 86:17

**OF** [1] - 1:1

**offended** [1] - 58:11

**offer** [1] - 92:23

**Official** [1] - 1:22

**Ohio** [1] - 2:19

**old** [2] - 33:7, 33:8

**oldest** [1] - 27:9

**ON** [1] - 1:5

**once** [5] - 9:9, 16:25, 20:12, 36:6, 69:9

**one** [49] - 5:5, 9:25, 10:11, 11:20, 17:18, 19:24, 20:18, 21:7, 25:8, 25:19, 25:25, 26:23, 29:2, 31:6, 32:9, 32:12, 33:13, 34:6, 34:7, 35:1, 35:4, 35:21, 39:17, 42:8, 45:22, 46:2, 47:22, 48:6, 49:4,

53:7, 56:12, 56:15, 56:18, 57:10, 59:25, 62:17, 63:3, 65:7, 69:7, 69:11, 70:17, 70:24, 72:19, 75:17, 78:22, 84:16, 84:18, 87:17

**One** [1] - 86:25

**ones** [1] - 6:3

**ongoing** [4] - 7:15, 59:19, 63:22, 92:14

**open** [3] - 31:8, 63:4, 63:10

**opening** [2] - 50:8, 51:16

**OPINION** [1] - 1:5

**opinion** [7] - 46:14, 56:25, 74:9, 74:23, 75:9, 77:7, 89:23

**opportunity** [6] - 10:23, 11:12, 38:22, 39:3, 62:5, 82:2

**oppose** [2] - 55:20, 72:15

**opposite** [1] - 28:15

**opposition** [1] - 87:17

**oral** [9] - 4:18, 46:7, 74:22, 75:4, 75:9, 77:6, 89:23, 90:5, 94:14

**ORAL** [2] - 1:4, 1:5

**Order** [2] - 75:9, 83:16

**order** [29] - 7:5, 7:9, 8:25, 9:7, 22:13, 24:8, 48:9, 74:9, 74:25, 77:11, 82:23, 87:21, 87:23, 89:3, 89:6, 89:8, 89:9, 89:14, 89:16, 89:24, 89:25, 90:5, 90:20, 91:5, 92:18, 93:5, 93:20, 94:9, 94:16

**ordered** [10] - 20:21, 37:6, 39:6, 45:6, 56:8, 70:3, 70:4, 89:12, 89:17, 89:19

**ordering** [2] - 40:23, 65:21

**orders** [1] - 27:14

**ordinary** [3] - 12:24, 14:8, 17:15

**Orleans** [1] - 2:4

**otherwise** [1] - 52:16

**ourselves** [2] - 17:3, 56:4

**out-of-pocket** [1] - 69:22

**output** [3] - 13:5, 17:14, 21:25

**outside** [4] - 18:19,

18:21, 50:13, 67:7

**outward** [1] - 49:23

**outweighs** [1] - 44:4

**overhead** [1] - 66:24

**overindulgent** [1] - 93:22

**overlap** [3] - 50:19, 82:19, 82:25

**overlook** [1] - 70:19

**overseas** [2] - 51:20, 51:22

**overwhelming** [1] - 43:8

**own** [7] - 32:23, 33:2, 48:24, 49:16, 49:18, 58:7, 82:24

### P

**P.C** [1] - 1:18

**p.m** [5] - 1:11, 3:2, 74:19, 95:6

**packaging** [2] - 14:12, 14:19

**Page** [2] - 35:24, 36:10

**page** [1] - 85:8

**pages** [1] - 35:24

**paid** [13] - 22:2, 22:3, 51:16, 61:7, 64:1, 64:2, 78:11, 85:21, 87:2, 87:3, 87:14, 87:20, 87:22

**pain** [1] - 63:18

**pallet** [2] - 27:6, 27:7

**pandemic** [1] - 92:23

**papers** [3] - 20:19, 25:21, 48:16

**Paragraph** [9] - 39:24, 80:11, 80:15, 80:18, 81:19, 81:22, 84:3, 84:8, 84:10

**Paragraphs** [1] - 80:9

**parameters** [1] - 21:5

**Park** [1] - 2:12

**Parkway** [1] - 1:16

**part** [3] - 46:15, 47:5, 59:23

**partially** [1] - 51:5

**particular** [8] - 8:18, 20:24, 21:4, 21:12, 29:19, 59:25, 62:3

**particularly** [3] - 16:11, 30:17, 92:12

**parties** [12] - 3:9, 6:21, 7:5, 43:17, 75:11, 77:19, 79:14, 83:16, 84:21, 86:15, 86:22, 88:14

**parties'** [6] - 4:16,

43:13, 43:16, 45:11, 76:16, 88:15

**parts** [1] - 4:8

**party** [5] - 43:18, 58:2, 75:18, 84:24, 87:14

**pass** [1] - 40:3

**passed** [2] - 10:23, 16:12

**past** [1] - 92:19

**patent** [1] - 56:11

**pay** [2] - 43:19, 53:16

**payment** [1] - 69:22

**payors** [3] - 58:3, 75:18, 87:14

**pending** [2] - 7:17, 20:6

**Pennsylvania** [2] - 1:20, 2:7

**people** [7] - 3:5, 24:17, 29:17, 30:15, 53:14, 73:10, 95:1

**per** [4] - 5:6, 42:8, 61:3, 75:25

**perfectly** [1] - 91:9

**perhaps** [2] - 81:6, 82:19

**period** [7] - 12:4, 16:3, 16:5, 78:1, 78:5, 93:8, 93:17

**permit** [1] - 55:3

**person** [2] - 53:7, 84:18

**personal** [11] - 14:17, 24:14, 24:16, 29:1, 29:10, 29:17, 33:2, 57:14, 59:7, 63:16, 63:17

**personal-knowledge -based** [1] - 24:16

**personally** [1] - 43:7

**perspective** [3] - 6:11, 37:1, 70:15

**persuasive** [2] - 83:23, 84:1

**persuasively** [1] - 82:3

**pharmaceutical** [1] - 76:3

**Pharmaceuticals** [2] - 2:8, 2:9

**pharmacies** [5] - 6:20, 12:8, 33:1, 49:24, 87:4

**pharmacy** [9] - 5:6, 7:16, 8:22, 12:9, 31:5, 32:4, 32:16, 49:24, 50:4

**Pharmacy** [2] - 2:13, 3:23

**Philadelphia** [2] -

*1:20, 2:7*
**phone** *[2] - 19:9, 95:1*
**photocopying** *[1] - 85:5*
**phrase** *[1] - 13:12*
**phrasing** *[1] - 12:10*
**physical** *[1] - 15:20*
**pick** *[3] - 8:6, 11:9, 60:25*
**picked** *[2] - 32:9, 64:6*
**piece** *[2] - 22:7, 23:21*
**pill** *[8] - 23:21, 23:24, 27:1, 27:7, 30:25, 32:1, 32:4, 60:5*
**pills** *[5] - 26:23, 26:24, 26:25, 27:8, 27:21*
**place** *[7] - 19:5, 21:11, 28:1, 38:11, 64:17, 73:21, 90:15*
**plainly** *[2] - 79:17, 83:10*
**plaintiff** *[24] - 8:16, 8:22, 13:11, 15:14, 18:9, 18:23, 19:14, 20:2, 23:5, 24:8, 38:25, 39:16, 50:22, 50:23, 54:17, 54:18, 55:1, 56:7, 57:16, 65:1, 65:2, 65:25, 70:13, 72:11*
**plaintiff's** *[4] - 24:15, 28:2, 59:5, 81:18*
**plaintiff-specific-type** *[1] - 8:16*
**Plaintiffs** *[3] - 1:17, 1:20, 2:4*
**plaintiffs** *[133] - 3:12, 3:14, 3:16, 3:18, 4:8, 5:3, 6:2, 7:1, 7:14, 8:2, 8:5, 8:14, 8:18, 9:19, 10:5, 10:6, 10:7, 11:7, 11:12, 11:14, 12:2, 12:13, 13:16, 17:5, 19:18, 20:1, 20:25, 21:2, 21:5, 21:13, 21:14, 23:6, 23:23, 25:8, 25:15, 26:9, 26:13, 26:18, 28:3, 28:22, 33:4, 37:6, 38:9, 40:6, 40:7, 41:12, 41:17, 42:18, 43:7, 43:9, 43:12, 43:15, 44:11, 44:21, 45:17, 46:19, 54:5, 54:21, 55:8, 55:9, 55:11, 56:16, 57:8, 57:21, 58:2, 58:10, 59:3, 59:15, 63:24, 63:25, 64:2, 64:5, 64:16,*

*65:3, 65:7, 65:15, 66:9, 67:10, 67:12, 67:17, 67:19, 69:7, 69:14, 70:3, 70:4, 70:22, 71:20, 72:4, 73:25, 75:2, 76:1, 76:17, 76:24, 76:25, 77:23, 78:1, 78:3, 78:9, 78:11, 78:12, 78:13, 78:16, 78:25, 79:9, 79:20, 80:6, 80:21, 81:2, 81:7, 81:16, 82:1, 82:6, 82:9, 82:11, 82:23, 83:19, 84:8, 84:14, 85:13, 85:21, 85:24, 86:17, 87:9, 87:11, 87:17, 87:18, 87:19, 87:22, 88:9, 92:3, 92:6, 94:4*
**PLAINTIFFS** *[1] - 1:6*
**plaintiffs'** *[60] - 5:22, 6:2, 14:21, 16:13, 17:23, 18:21, 20:19, 21:20, 22:12, 23:12, 22:25, 28:4, 28:6, 28:8, 28:25, 29:3, 29:5, 39:12, 40:16, 40:22, 51:3, 55:14, 62:11, 63:16, 64:9, 69:3, 72:20, 75:6, 77:3, 77:4, 78:6, 78:13, 78:16, 78:20, 79:6, 79:14, 80:4, 80:9, 80:11, 81:10, 81:12, 82:1, 82:3, 82:8, 82:10, 82:13, 82:17, 83:7, 83:13, 84:4, 84:12, 84:18, 85:19, 86:10, 86:18, 86:22, 88:19, 88:22, 89:20*
**plant** *[1] - 34:7*
**play** *[1] - 47:5*
**players** *[1] - 76:11*
**pleading** *[1] - 65:17*
**pleadings** *[6] - 51:19, 52:15, 65:23, 67:10, 67:11, 73:5*
**pled** *[1] - 65:12*
**plus** *[1] - 48:23*
**pocket** *[1] - 69:22*
**point** *[14] - 4:1, 9:16, 22:10, 38:11, 38:23, 46:10, 46:21, 55:21, 66:6, 71:6, 73:6, 73:9, 74:5, 84:16*
**points** *[3] - 48:4, 82:4, 86:25*
**poised** *[1] - 28:10*

**police** *[1] - 85:3*
**portion** *[2] - 34:6, 69:16*
**position** *[7] - 5:22, 10:11, 20:8, 23:25, 24:1, 26:11, 48:12, 51:3, 60:20, 62:17, 81:13, 93:13*
**possess** *[2] - 76:23, 80:7*
**possible** *[7] - 36:24, 38:18, 55:7, 65:8, 69:24, 70:9, 92:11*
**possibly** *[1] - 26:8*
**posture** *[2] - 38:19, 57:3*
**potential** *[1] - 11:13*
**power** *[1] - 64:25*
**practical** *[3] - 63:13, 63:14, 65:11*
**practices** *[1] - 63:3*
**pre** *[1] - 49:10*
**pre-discovery** *[1] - 49:10*
**precluded** *[1] - 56:1*
**predictions** *[1] - 45:8*
**preempted** *[3] - 16:17, 38:1, 41:11*
**preemption** *[2] - 41:6, 48:15*
**preference** *[1] - 91:6*
**prejudice** *[2] - 88:8, 88:22*
**prejudiced** *[1] - 72:4*
**prejudicial** *[1] - 34:13*
**premature** *[4] - 54:14, 65:21, 71:13, 83:3*
**prepare** *[1] - 84:19*
**prepared** *[2] - 35:2, 81:24*
**prescription** *[3] - 31:5, 33:8, 75:15*
**prescriptions** *[1] - 32:8*
**present** *[4] - 44:13, 58:25, 62:5, 83:25*
**presented** *[1] - 9:7*
**pressed** *[1] - 70:24*
**pressing** *[1] - 86:12*
**pressure** *[2] - 32:9, 75:15*
**presumably** *[1] - 14:16*
**pretty** *[3] - 44:18, 93:12, 95:5*
**previously** *[1] - 45:4*
**price** *[11] - 22:2, 22:3, 22:7, 42:18, 42:24, 51:16, 51:22, 62:14, 66:13, 66:16, 66:23*

**prices** *[8] - 52:18, 52:23, 52:25, 66:8, 85:21, 85:23*
**pricing** *[20] - 21:6, 21:7, 21:9, 22:5, 22:21, 51:2, 51:20, 52:17, 53:21, 54:2, 55:1, 56:8, 56:18, 59:22, 61:16, 62:6, 75:7, 77:21, 78:3, 87:3*
**prima** *[1] - 79:25*
**primarily** *[1] - 8:21*
**principal** *[1] - 53:24*
**principles** *[1] - 58:5*
**Prinston** *[1] - 2:8*
**print** *[1] - 32:17*
**problem** *[4] - 24:13, 39:20, 39:21, 50:10*
**procedural** *[1] - 77:8*
**procedure** *[1] - 54:15*
**proceeding** *[5] - 18:23, 19:14, 67:19, 76:4, 77:13*
**proceedings** *[2] - 95:6, 95:10*
**PROCEEDINGS** *[1] - 3:1*
**Proceedings** *[1] - 1:24*
**process** *[14] - 15:3, 19:4, 19:11, 37:17, 38:3, 71:1, 76:18, 90:14, 90:18, 91:3, 92:14, 93:7, 93:10, 94:6*
**produce** *[33] - 12:3, 12:7, 16:7, 18:18, 19:7, 19:15, 20:23, 25:23, 36:17, 41:13, 42:15, 42:21, 43:15, 45:3, 45:7, 45:21, 54:16, 55:10, 59:23, 70:4, 71:3, 72:21, 79:4, 82:19, 82:24, 85:4, 86:4, 86:13, 89:13, 91:25, 93:11, 94:5, 94:10*
**produced** *[28] - 1:25, 17:24, 18:3, 21:15, 25:17, 36:14, 36:20, 36:23, 43:22, 45:6, 49:19, 55:10, 59:21, 60:8, 62:7, 77:21, 78:24, 79:12, 79:13, 83:9, 89:22, 91:5, 91:6, 91:17, 92:4, 92:18, 93:2*
**producing** *[8] - 14:11, 21:24, 21:25, 24:20,*

*85:13, 87:1, 87:7, 94:23*
**product** *[28] - 13:15, 16:14, 25:9, 26:5, 28:7, 31:3, 34:4, 40:20, 41:19, 42:2, 42:3, 44:1, 45:17, 45:22, 50:7, 50:10, 50:13, 52:4, 52:13, 56:15, 58:11, 59:4, 60:4, 63:5, 69:5, 73:13, 80:17*
**production** *[31] - 4:23, 5:18, 6:23, 8:10, 10:12, 10:20, 11:1, 20:10, 20:11, 21:1, 38:24, 43:19, 45:14, 46:4, 50:18, 56:8, 76:19, 77:3, 77:14, 82:23, 88:21, 88:24, 89:1, 90:12, 90:20, 91:20, 91:22, 92:7, 92:12, 93:18, 94:18*
**productions** *[2] - 77:15, 92:10*
**productive** *[1] - 88:15*
**products** *[4] - 8:18, 49:4, 53:16, 59:9*
**PRODUCTS** *[1] - 1:3*
**profit** *[26] - 22:6, 52:5, 55:10, 55:11, 56:9, 56:17, 57:22, 58:3, 59:20, 60:12, 61:9, 61:16, 62:12, 62:16, 62:22, 66:11, 66:23, 67:20, 70:8, 72:21, 73:8, 75:7, 86:10, 86:14, 86:18, 87:25*
**profits** *[26] - 58:15, 58:24, 59:6, 60:2, 61:2, 61:5, 62:19, 64:11, 64:18, 64:22, 66:1, 66:10, 66:11, 66:15, 66:19, 67:25, 69:18, 69:22, 70:6, 70:10, 71:9, 71:25, 73:16, 73:20, 87:12, 88:16*
**progress** *[1] - 91:7*
**prompt** *[1] - 92:6*
**pronouncing** *[1] - 20:20*
**proof** *[13] - 24:25, 25:13, 33:16, 37:12, 37:15, 38:4, 38:16, 40:14, 46:22, 47:4, 54:7, 55:15*
**proper** *[2] - 57:5*
**proportional** *[1] - 26:9*
**proportionality** *[9] -*

25:10, 37:10, 39:10, 42:12, 43:3, 44:17, 45:25, 68:6, 83:18
**propose** [1] - 92:9
**proposed** [5] - 44:3, 73:6, 75:17, 75:18, 77:3
**proprietary** [3] - 65:14, 79:2, 83:12
**protecting** [1] - 83:14
**protection** [2] - 58:18, 67:12
**prove** [12] - 18:3, 18:6, 23:12, 23:24, 24:10, 26:10, 37:12, 42:1, 42:16, 55:18, 73:12, 88:12
**proved** [1] - 46:23
**proven** [10] - 24:13, 24:14, 24:16, 39:8, 40:18, 42:6, 44:7, 44:10, 65:15, 68:5
**provide** [3] - 89:6, 89:17, 92:9
**provided** [4] - 12:7, 18:10, 75:13, 81:5
**provides** [1] - 31:8
**provision** [3] - 41:6, 41:20, 89:9
**provisions** [3] - 83:16, 89:9, 89:15
**prudent** [2] - 18:24, 19:14
**public** [3] - 34:4, 51:19, 52:15
**publicly** [3] - 34:11, 48:22, 48:24
**pull** [3] - 31:1, 31:2, 66:13
**pulled** [1] - 94:3
**pulling** [1] - 43:2
**punished** [2] - 25:23, 50:11
**punitive** [2] - 41:15, 56:9
**purchase** [14] - 12:21, 12:22, 14:16, 20:23, 21:1, 21:21, 22:1, 22:3, 23:13, 42:23, 42:24, 45:13, 89:13
**purchased** [3] - 42:23, 42:24, 78:17
**purchasers** [3] - 52:23, 53:3, 85:23
**purchases** [12] - 15:8, 17:8, 17:16, 42:22, 50:2, 77:22, 77:24, 78:4, 79:22, 81:10, 82:8, 82:10
**purchasing** [4] -

69:20, 77:20, 78:7, 79:6
**purpose** [1] - 52:18
**purposes** [5] - 5:7, 23:5, 23:10, 69:15, 70:7
**pursuant** [1] - 83:5
**pursuing** [1] - 69:8
**pushed** [1] - 93:23
**put** [25] - 4:2, 4:12, 6:10, 19:5, 25:14, 27:3, 27:4, 27:8, 31:1, 31:3, 37:15, 38:15, 39:20, 47:5, 49:2, 51:9, 51:15, 53:3, 54:9, 54:19, 54:21, 56:25, 58:9, 93:5, 93:12
**puts** [2] - 38:2, 50:4
**putting** [4] - 20:10, 27:21, 37:3, 37:5

### Q

**qualified** [2] - 32:15, 82:1
**quantities** [2] - 12:21, 81:6
**quantity** [6] - 14:3, 15:9, 26:1, 42:17, 42:23, 44:25
**quarantine** [1] - 31:3
**queries** [1] - 47:16
**query** [4] - 42:8, 44:8, 47:15, 48:25
**questioned** [1] - 52:24
**questions** [18] - 4:20, 8:16, 19:24, 33:13, 33:24, 34:9, 39:2, 48:5, 50:22, 59:25, 60:1, 62:4, 68:4, 68:25, 69:1, 70:19, 89:21
**quickly** [1] - 82:15
**quite** [1] - 59:13
**quote** [5] - 34:5, 34:7, 34:13, 69:12, 80:16
**quoting** [1] - 36:2

### R

**raise** [3] - 10:23, 55:21, 69:17
**raised** [4] - 10:11, 10:17, 36:8, 48:4
**randomly** [1] - 64:6
**rather** [1] - 88:16
**RDR** [1] - 95:12
**RE** [1] - 1:3
**reach** [1] - 71:17

**reaching** [1] - 71:11
**read** [6] - 4:17, 28:13, 48:19, 56:7, 74:8, 74:22
**reading** [1] - 36:9
**ready** [3] - 13:4, 93:11, 94:24
**real** [5] - 21:12, 21:16, 41:5, 63:17, 67:17
**realistically** [1] - 70:9
**reality** [1] - 93:4
**really** [8] - 27:23, 33:13, 45:20, 47:13, 64:24, 65:5, 67:2, 73:19
**reason** [6] - 25:8, 51:23, 52:2, 52:24, 90:25, 94:3
**reasonable** [18] - 12:25, 13:5, 14:9, 15:12, 17:6, 17:15, 25:11, 39:10, 46:1, 46:15, 47:5, 52:19, 53:12, 55:7, 85:8, 89:20, 91:9
**reasonably** [10] - 23:4, 23:8, 44:9, 46:9, 46:12, 46:23, 47:9, 47:22, 51:25, 83:24
**reasons** [8] - 53:24, 61:20, 61:23, 65:19, 71:14, 73:22, 73:23, 93:21
**rebates** [1] - 66:24
**recalled** [8] - 24:3, 30:7, 30:11, 31:2, 31:18, 42:9, 66:14, 80:14
**receive** [2] - 12:4, 40:12
**received** [5] - 4:16, 5:16, 10:16, 46:11, 81:21
**receiving** [1] - 20:7
**recently** [2] - 75:24, 77:9
**recess** [1] - 74:19
**reclamation** [1] - 31:3
**recognized** [2] - 32:23, 64:12
**recognizes** [1] - 79:24
**recommendation** [1] - 8:2
**reconvene** [2] - 74:7, 74:16
**record** [19] - 3:4, 4:3, 4:13, 24:25, 25:10, 33:12, 33:19, 36:12, 37:18, 39:10, 41:25, 45:24, 52:15, 74:4,

74:9, 74:20, 74:22, 79:13, 95:10
**recorded** [1] - 1:24
**recordkeeping** [4] - 16:18, 29:2, 37:25, 41:9
**records** [5] - 8:21, 8:22, 9:1, 35:17, 49:13
**recover** [1] - 24:8
**recoverable** [2] - 61:13, 87:23
**recovery** [2] - 71:15, 72:4
**recreate** [1] - 29:9
**red** [1] - 77:2
**red-line** [1] - 77:2
**refer** [1] - 80:21
**reference** [2] - 33:16, 41:22
**referred** [2] - 76:8, 78:8
**referring** [2] - 17:20, 90:11
**refers** [1] - 78:18
**reflect** [4] - 6:9, 15:8, 17:16, 25:7
**reflected** [2] - 32:22, 77:2
**refuse** [1] - 55:10
**regard** [13] - 6:12, 6:18, 10:19, 21:18, 40:9, 43:8, 46:18, 51:1, 60:20, 66:14, 82:3, 84:16, 89:1
**regarding** [8] - 7:8, 20:24, 22:11, 38:23, 39:5, 74:23, 79:6, 89:13
**regardless** [3] - 35:13, 43:20, 60:6
**regulations** [2] - 48:19, 53:17
**rehash** [1] - 34:24
**rejected** [1] - 84:20
**rejects** [2] - 80:3, 85:12
**relate** [2] - 50:11, 75:6
**related** [2] - 32:3, 60:1
**relates** [1] - 50:6
**relative** [1] - 43:13
**released** [1] - 35:6
**relevance** [14] - 21:11, 24:13, 25:5, 25:9, 25:10, 37:10, 37:18, 37:20, 38:4, 39:10, 43:1, 43:21, 45:25, 88:9
**relevant** [45] - 12:3, 23:5, 23:9, 25:16,

26:7, 26:8, 33:15, 42:4, 42:5, 45:3, 45:18, 51:2, 51:3, 51:7, 51:18, 53:22, 54:2, 61:13, 61:17, 61:21, 70:23, 70:25, 76:24, 78:10, 78:23, 79:9, 79:17, 79:22, 80:7, 81:8, 82:15, 83:4, 83:13, 83:21, 84:15, 85:4, 85:14, 85:24, 86:1, 86:7, 86:9, 86:20, 87:6, 87:10
**relied** [1] - 57:1
**relief** [3] - 65:7, 65:9, 75:19
**relieve** [1] - 72:10
**rely** [6] - 55:8, 55:9, 68:2, 70:7, 72:20
**relying** [1] - 70:11
**remain** [1] - 5:17
**remaining** [5] - 6:8, 10:15, 10:19, 11:16, 77:6
**remedies** [3] - 51:11, 69:6, 69:8
**remedy** [6] - 58:9, 59:16, 65:6, 69:21, 74:2
**remember** [1] - 92:20
**repeat** [3] - 47:18, 68:18, 88:2
**repeated** [1] - 92:5
**repetitious** [1] - 68:8
**replacement** [1] - 43:9
**reply** [8] - 19:9, 20:7, 41:23, 44:20, 46:16, 51:9, 56:20, 82:3
**report** [4] - 42:9, 54:16, 84:8, 84:19
**REPORTER** [3] - 68:21, 68:23, 74:11
**Reporter** [1] - 1:22
**reporter** [1] - 3:11
**Reporter/ Transcriber** [1] - 95:12
**reports** [2] - 35:16, 48:25
**representation** [3] - 5:13, 20:15, 66:22
**representations** [2] - 33:21, 82:4
**representative** [1] - 81:13
**represented** [3] - 10:18, 11:16, 43:12
**reproduce** [1] - 43:21
**request** [24] - 12:19,

17:1, 17:4, 17:23, 20:10, 20:11, 22:12, 35:5, 38:24, 44:18, 49:16, 78:6, 78:21, 79:6, 85:12, 85:18, 85:19, 86:6, 86:18, 86:22, 88:20, 88:23, 93:17

**Request** [1] - 14:22

**requested** [40] - 23:1, 37:21, 46:5, 46:8, 46:11, 51:3, 54:2, 62:6, 72:20, 78:14, 78:22, 78:23, 79:1, 79:2, 79:8, 79:11, 79:17, 79:21, 80:4, 82:14, 83:3, 83:11, 83:20, 83:21, 83:23, 85:13, 85:15, 85:16, 86:3, 86:7, 86:9, 86:13, 87:5, 87:9, 87:11, 87:15, 87:25, 88:1, 88:10, 94:4

**requesting** [1] - 75:19

**requests** [44] - 4:23, 5:18, 6:8, 6:13, 6:23, 7:3, 8:9, 8:12, 9:7, 10:2, 10:4, 10:9, 10:12, 10:19, 11:1, 11:5, 11:6, 11:10, 14:21, 17:11, 21:20, 22:11, 22:13, 22:17, 23:1, 35:2, 38:24, 39:14, 50:18, 66:5, 66:7, 75:7, 76:18, 77:3, 84:23, 88:20, 88:23, 89:1, 90:9, 90:11, 90:20, 91:23, 91:24, 94:18

**require** [2] - 49:17, 84:10

**required** [11] - 38:14, 41:2, 41:3, 44:8, 45:21, 47:4, 48:20, 66:21, 80:2, 81:1, 81:15

**requirement** [1] - 16:18

**requirements** [1] - 41:8

**requires** [2] - 49:14, 54:21

**requiring** [1] - 19:15

**reside** [1] - 21:10

**resolve** [1] - 77:1

**resolved** [2] - 7:22, 36:6

**resolving** [2] - 43:25, 44:2

**resources** [6] - 43:16,

43:17, 45:11, 84:22, 85:8, 91:25

**respect** [2] - 10:1, 10:3

**respectfully** [3] - 32:7, 91:2, 93:22

**respond** [19] - 6:23, 9:10, 9:11, 35:22, 36:24, 38:6, 38:24, 38:25, 69:2, 84:4, 84:12, 84:17, 84:22, 88:20, 88:23, 89:7, 91:1, 94:9

**responded** [5] - 7:4, 22:14, 22:16, 37:11, 91:11

**responding** [2] - 11:5, 76:18

**response** [11] - 4:14, 25:13, 32:15, 40:21, 70:22, 71:4, 72:23, 91:17, 91:19, 91:22, 91:25

**responses** [2] - 91:15, 92:9

**responsive** [3] - 15:5, 92:1, 94:10

**Restatement** [1] - 64:15

**restitution** [2] - 51:10, 58:6

**retail** [3] - 5:5, 7:16, 76:14

**retailer** [20] - 3:23, 5:11, 10:2, 13:8, 16:15, 26:13, 27:14, 27:16, 27:19, 27:20, 31:8, 45:2, 59:1, 74:24, 81:17, 81:21, 86:24, 87:5, 87:20, 89:4

**Retailer** [1] - 2:13

**RETAILER/ PHARMACY** [1] - 1:7

**retailer/pharmacy** [2] - 4:24, 75:3

**retailers** [51] - 4:10, 6:6, 6:19, 6:20, 7:12, 7:25, 8:20, 10:22, 12:9, 15:11, 18:5, 21:15, 21:25, 22:4, 36:2, 36:5, 36:14, 40:4, 42:21, 43:14, 43:22, 45:7, 50:20, 60:11, 60:19, 61:12, 61:22, 62:2, 68:14, 68:16, 68:20, 69:15, 75:8, 76:6, 78:2, 80:1, 82:22, 87:2, 87:14, 87:18, 87:23,

88:25, 89:7, 90:4, 90:25, 91:16, 91:23, 92:12, 92:16, 93:12, 94:22

**retailers'** [3] - 50:19, 82:20, 93:16

**review** [2] - 71:17, 92:7

**reviewing** [1] - 17:18

**revised** [1] - 6:9

**revisions** [1] - 8:4

**revisit** [1] - 86:22

**RFP** [6] - 13:25, 14:4, 20:5, 20:17, 42:25

**RFP-III** [1] - 42:25

**RFPs** [5] - 13:19, 15:1, 15:6, 20:5, 90:8

**Richer** [1] - 4:9

**RICHER** [2] - 2:11, 4:9

**riding** [1] - 45:19

**rigueur** [1] - 45:14

**rise** [1] - 60:15

**Rite** [1] - 76:15

**RMR** [1] - 95:12

**road** [1] - 25:18

**role** [3] - 68:20, 83:3, 83:5

**rolling** [4] - 77:15, 92:10, 93:18

**ROSE** [1] - 2:14

**Roseland** [1] - 1:16

**rows** [1] - 47:18

**rubber** [1] - 25:18

**Ruben** [1] - 3:15

**RUBEN** [1] - 1:18

**Rule** [8] - 56:13, 71:7, 71:11, 71:12, 71:18, 83:5, 86:8, 90:8

**ruled** [1] - 89:1

**rules** [4] - 16:25, 41:9, 86:11, 88:1

**ruling** [7] - 7:17, 54:24, 56:14, 60:16, 74:17, 88:9, 88:25

**RULINGS** [1] - 1:5

**rulings** [2] - 6:9, 67:18

**run** [2] - 18:25, 54:22

41:2, 42:16, 42:18, 45:13, 59:20, 60:3, 60:5, 62:6, 66:25, 67:6, 75:7, 77:21, 77:22, 78:2, 78:4, 78:7, 79:7, 79:22, 80:1, 80:4, 80:8, 80:14, 80:21, 81:1, 84:19, 85:19, 86:13, 86:19, 87:21, 89:13

**Sample** [1] - 19:16

**sample** [2] - 19:16, 91:4

**samples** [3] - 35:3, 35:12, 94:5

**SARAH** [2] - 2:11

**Sarah** [7] - 3:22, 5:12, 6:5, 7:24, 31:24, 68:22, 90:3

**satisfied** [1] - 83:20

**saves** [1] - 36:7

**saw** [1] - 35:9

**scale** [1] - 91:20

**scenario** [1] - 46:24

**SCHNEIDER** [1] - 1:12

**Schneider** [3] - 3:2, 3:3, 74:21

**Schwartz** [1] - 9:17

**scope** [3] - 18:1, 18:19, 18:21

**Scott** [1] - 81:14

**scrambled** [2] - 14:24, 20:13

**sealed** [5] - 40:4, 50:8, 63:5, 63:8

**search** [12] - 12:25, 13:4, 14:9, 15:12, 17:6, 17:15, 44:21, 44:22, 49:25, 50:2

**searched** [1] - 9:1

**searches** [1] - 25:6

**searchs** [1] - 47:18

**second** [6] - 22:6, 22:17, 40:8, 43:5, 50:17, 87:13

**secondly** [1] - 69:11

**secret** [4] - 65:14, 79:2, 83:12, 86:5

**Security** [2] - 41:4, 80:2

**see** [17] - 13:20, 19:1, 31:22, 33:25, 43:23, 46:16, 50:9, 50:14, 52:20, 52:22, 53:13, 63:15, 74:17, 80:8, 80:15, 81:7, 89:25

**seeing** [1] - 36:24

**seek** [6] - 17:16, 21:14, 59:6, 66:7, 67:13, 72:17

**seeking** [10] - 8:14, 42:19, 42:25, 43:15, 58:20, 58:23, 59:16, 60:10, 60:12, 75:17

**sees** [1] - 88:8

**selected** [1] - 72:9

**self** [1] - 68:9

**self-apparent** [1] - 68:9

**sell** [3] - 13:15, 40:7, 53:10

**sellers** [1] - 63:8

**selling** [1] - 61:3

**sells** [3] - 53:2, 53:5, 53:8

**send** [1] - 13:24

**sends** [2] - 27:19, 30:21

**sense** [6] - 14:14, 67:9, 67:16, 69:24, 70:14

**sensitive** [3] - 65:14, 65:21, 67:13

**sent** [2] - 8:5, 31:19

**separate** [2] - 6:24, 75:23

**separately** [1] - 22:22

**serve** [3] - 75:8, 84:14, 90:19

**served** [6] - 15:2, 20:11, 35:5, 35:9, 89:5, 90:7

**service** [1] - 90:17

**serving** [1] - 90:16

**set** [10] - 6:8, 6:13, 8:4, 35:2, 36:25, 50:11, 50:13, 50:14, 57:8, 91:13

**SETH** [1] - 2:6

**Seth** [3] - 4:4, 9:15, 9:24

**seven** [3] - 19:15, 19:19, 35:6

**several** [2] - 92:14, 92:25

**shall** [1] - 89:4

**share** [1] - 85:13

**sharing** [1] - 85:18

**sheet** [1] - 7:19

**sheets** [17] - 6:14, 6:24, 7:6, 7:8, 7:12, 7:21, 8:1, 8:9, 8:14, 9:9, 9:13, 9:14, 89:4, 90:7, 90:9, 94:21

**shelves** [3] - 27:8, 31:12, 31:20

**shipment** [2] - 14:12, 80:22

**shipments** [1] - 80:14

**shipping** [1] - 13:21

## S

**S-T-A-N-O-C-H** [1] - 4:8

**Safety** [1] - 41:4

**sale** [7] - 12:21, 12:22, 23:13, 58:11, 61:9, 62:13, 75:14

**sales** [41] - 12:8, 15:11, 16:3, 17:17, 20:23, 21:1, 21:6, 21:9, 21:21, 40:9,

**Shipping** [1] - 80:23
**ships** [1] - 27:15
**shirt** [1] - 53:18
**Shoprite** [2] - 53:3, 53:5
**short** [6] - 7:5, 9:7, 57:14, 74:6, 77:11, 92:18
**short-form** [1] - 57:14
**shortly** [1] - 9:8
**show** [19] - 13:22, 14:10, 15:18, 15:20, 15:22, 15:23, 16:5, 18:5, 24:9, 24:20, 39:19, 49:1, 49:11, 52:5, 54:22, 55:14, 57:5, 59:11, 72:6
**showed** [1] - 13:6
**showing** [5] - 15:19, 38:16, 48:25, 54:6, 78:14
**shown** [2] - 48:21, 49:14
**shows** [3] - 36:5, 55:18, 72:2
**side** [3] - 8:23, 60:2, 64:24
**side-wide** [1] - 64:24
**significant** [2] - 11:11, 84:11
**similar** [2] - 14:13, 89:14
**simple** [2] - 17:5, 62:25
**simply** [6] - 19:10, 22:21, 25:14, 26:5, 42:4, 65:22
**single** [6] - 23:21, 34:14, 35:4, 52:13, 55:23, 59:4
**sits** [1] - 30:25
**sitting** [1] - 40:9
**situation** [2] - 52:21, 56:3
**situations** [1] - 60:21
**six** [1] - 8:5
**Slater** [2] - 3:13, 35:20
**SLATER** [7] - 1:15, 1:15, 3:13, 35:20, 36:15, 36:19, 74:13
**Slater's** [2] - 4:22, 10:11
**slow** [3] - 25:2, 27:12, 84:24
**small** [3] - 26:25, 43:6, 94:1
**smaller** [1] - 32:16
**smidgeon** [1] - 94:2
**so-called** [1] - 76:5
**socially** [1] - 32:23

**Solco** [1] - 2:8
**sold** [9] - 24:21, 49:5, 54:11, 61:3, 62:13, 71:24, 78:13, 78:18, 85:23
**someday** [1] - 33:8
**someone** [5] - 52:13, 53:8, 53:9, 53:11, 53:18
**somewhere** [1] - 27:20
**soon** [2] - 77:11, 92:11
**sophisticated** [1] - 81:9
**sorry** [10] - 9:24, 23:17, 24:19, 33:7, 42:7, 55:8, 68:21, 68:22, 73:1, 90:23
**sort** [18] - 8:13, 13:21, 14:25, 22:6, 27:18, 39:20, 46:21, 47:20, 51:14, 64:3, 64:9, 65:21, 65:25, 66:4, 66:10, 67:23, 68:8, 93:17
**sought** [1] - 55:17
**sound** [1] - 44:23
**soundly** [1] - 84:20
**soup** [1] - 38:16
**source** [2] - 14:6, 23:6
**sources** [1] - 45:1
**South** [1] - 2:7
**space** [1] - 41:1
**speaking** [5] - 3:25, 12:17, 27:2, 54:14, 68:21
**specialized** [1] - 50:6
**specific** [10] - 8:16, 10:8, 12:19, 14:24, 20:6, 30:7, 35:1, 36:1, 44:18, 81:21
**specifically** [7] - 30:16, 38:18, 41:1, 47:2, 47:3, 57:3, 73:25
**specificity** [1] - 44:18
**specifics** [1] - 21:4
**speculate** [2] - 25:18, 41:21
**speculating** [3] - 29:4, 34:10, 34:13
**speculation** [3] - 24:15, 29:12, 39:13
**spend** [1] - 88:14
**spent** [2] - 80:25, 88:15
**squarely** [3] - 39:11, 41:19, 46:19
**staff** [1] - 85:5

**stage** [6] - 36:25, 49:10, 54:4, 54:14, 81:23, 82:9
**staggering** [1] - 67:2
**stake** [2] - 43:3, 45:10
**stalled** [1] - 7:17
**stamp** [2] - 27:1, 30:25
**standard** [1] - 17:5
**standpoint** [2] - 63:14, 65:11
**STANOCH** [51] - 1:19, 4:7, 5:2, 5:20, 6:16, 6:25, 7:13, 8:11, 9:3, 12:12, 15:13, 15:16, 22:15, 22:20, 29:22, 30:1, 33:11, 34:24, 38:6, 38:8, 48:2, 48:11, 50:25, 51:5, 51:9, 52:7, 52:11, 52:21, 53:1, 53:6, 53:23, 54:4, 54:20, 55:12, 56:6, 56:19, 57:11, 57:24, 58:5, 58:16, 59:2, 59:8, 59:17, 59:22, 60:14, 60:23, 61:15, 61:19, 61:23, 71:21, 74:14
**Stanoch** [23] - 4:7, 5:2, 5:20, 6:16, 6:25, 7:13, 8:11, 9:3, 12:12, 15:13, 22:9, 22:15, 29:24, 33:9, 33:12, 35:21, 36:11, 36:15, 36:23, 38:9, 46:3, 48:1, 50:24
**Stanoch's** [1] - 5:12
**start** [9] - 3:12, 11:19, 23:3, 24:3, 27:21, 38:2, 47:20, 77:17, 91:10
**started** [1] - 20:12
**starting** [3] - 63:2, 76:2, 77:19
**state** [8] - 3:10, 56:21, 57:15, 64:8, 65:18, 89:3, 93:20, 94:9
**statement** [3] - 34:4, 34:22, 39:22
**statements** [5] - 52:16, 52:17, 81:25, 84:1, 84:13
**States** [1] - 3:2
**states** [6] - 41:6, 41:18, 51:12, 58:8, 80:15, 80:18
**STATES** [2] - 1:1, 1:12
**stating** [1] - 81:14
**status** [3] - 7:7, 7:11, 9:13

**Statute** [1] - 56:23
**statute** [2] - 16:23, 48:18
**statutes** [1] - 63:8
**stayed** [1] - 66:5
**stenography** [1] - 1:24
**step** [3] - 24:23, 29:12, 29:19
**steps** [2] - 34:19, 59:11
**stick** [2] - 26:21, 26:22
**sticker** [1] - 27:3
**still** [8] - 38:21, 56:2, 67:19, 67:20, 67:22, 92:24
**stipulate** [2] - 55:20, 72:14
**stop** [1] - 27:10
**straight** [1] - 27:20
**Street** [4] - 1:19, 2:3, 2:7, 2:19
**Streets** [1] - 1:9
**stringent** [1] - 41:10
**strong** [1] - 79:25
**strongest** [1] - 53:20
**stuff** [3] - 25:24, 37:19, 41:13
**subclass** [1] - 73:7
**subject** [4] - 77:6, 88:4, 88:17, 94:2
**submit** [3] - 29:20, 44:7, 65:20
**submitted** [5] - 10:17, 28:5, 79:14, 79:16, 80:8
**subseconds** [1] - 49:1
**subsequent** [1] - 5:5
**substantial** [1] - 92:15
**sued** [1] - 76:1
**suffering** [1] - 63:18
**sufficient** [12] - 12:21, 14:2, 15:7, 15:10, 15:18, 15:23, 16:5, 37:18, 39:9, 44:11, 59:10, 84:21
**suggest** [1] - 52:19
**suggested** [2] - 73:15, 74:2
**suggesting** [1] - 69:7
**suit** [1] - 45:22
**Suite** [3] - 1:19, 2:12, 2:19
**sum** [2] - 45:12, 88:19
**summary** [5] - 17:7, 28:21, 29:20, 75:12
**Supp** [1] - 85:2
**supplier** [1] - 12:5
**Supply** [1] - 80:2
**supply** [10] - 13:14,

23:7, 25:3, 26:13, 27:12, 40:3, 70:11, 76:2, 78:10, 89:18
**support** [5] - 39:12, 47:12, 65:25, 92:22, 93:6
**supported** [1] - 72:11
**suppose** [4] - 54:25, 57:21, 58:12, 60:17
**surely** [1] - 29:11
**surmising** [1] - 14:16
**surprise** [1] - 32:21
**surprised** [4] - 19:2, 19:18, 19:20, 55:24
**survive** [2] - 67:25, 73:4
**susceptible** [2] - 54:7, 55:15
**suspect** [4] - 31:1, 31:2, 50:7, 50:10
**suspicious** [1] - 51:21
**system** [6] - 21:14, 22:8, 27:13, 27:18, 44:8, 84:19
**systems** [14] - 17:7, 17:14, 21:4, 27:2, 27:11, 28:9, 29:18, 47:14, 49:18, 67:3, 80:20, 80:23, 81:10, 82:5

## T

**T-shirt** [1] - 53:18
**T3** [7] - 17:19, 17:23, 18:10, 18:17, 27:5, 35:15, 80:23
**T3s** [5] - 18:2, 18:3, 18:18, 19:8, 19:16
**table** [2] - 45:2, 67:16
**tabled** [2] - 8:1, 8:6
**tablet** [1] - 23:21
**talks** [1] - 59:25
**Tara** [2] - 84:2, 84:16
**target** [1] - 67:21
**tax** [1] - 67:6
**taxes** [1] - 66:24
**team** [1] - 95:1
**teed** [2] - 7:20, 19:6
**teleconference** [1] - 3:1
**TELEPHONIC** [1] - 1:4
**television** [1] - 58:19
**temptation** [2] - 21:8, 45:12
**ten** [1] - 95:2
**tend** [2] - 23:12, 42:1
**terminology** [2] - 11:25, 35:12
**terms** [4] - 48:15,

50:7, 58:8, 60:12
**test** [4] - 23:23, 39:18, 63:5, 82:2
**Teva** [4] - 31:16, 31:20, 31:21
**Teva's** [1] - 30:18
**THE** [105] - 1:1, 1:6, 1:12, 3:3, 3:19, 4:2, 4:12, 4:15, 5:15, 6:10, 6:18, 7:7, 7:23, 8:8, 8:24, 9:5, 9:21, 10:10, 11:14, 13:9, 14:15, 15:15, 16:19, 17:18, 17:22, 18:1, 18:9, 18:14, 18:23, 19:13, 19:22, 20:18, 21:17, 22:9, 22:17, 22:24, 23:14, 23:19, 24:8, 24:22, 26:11, 28:3, 29:24, 30:2, 30:5, 31:4, 32:6, 32:12, 32:20, 33:6, 34:21, 36:13, 36:17, 38:7, 38:20, 46:2, 46:25, 47:7, 47:24, 49:22, 50:16, 51:1, 51:7, 52:3, 52:9, 52:20, 52:22, 53:2, 53:14, 53:25, 54:16, 54:24, 56:5, 56:7, 57:7, 57:20, 58:1, 58:12, 58:23, 59:3, 59:15, 59:18, 60:10, 60:15, 61:11, 61:16, 61:20, 61:25, 68:12, 68:21, 68:23, 71:19, 72:18, 72:24, 73:17, 74:3, 74:11, 74:15, 74:20, 90:10, 90:19, 90:25, 91:21, 93:19, 94:13
**themselves** [4] - 19:17, 81:8, 82:7, 82:10
**theory** [3] - 71:14, 72:7, 72:8
**therefore** [2] - 86:21, 88:19
**they've** [4] - 13:18, 25:22, 43:15, 91:24
**thinking** [1] - 69:24
**third** [6] - 39:24, 40:11, 58:2, 70:1, 75:18, 87:14
**Third** [2] - 54:21, 64:15
**third-party** [3] - 58:2, 75:18, 87:14
**Thornburg** [1] - 4:10
**THORNBURG** [1] -

2:10
**thousand** [1] - 26:24
**thousands** [1] - 66:25
**threatened** [1] - 19:10
**three** [17] - 21:5, 28:5, 28:14, 29:5, 31:11, 34:19, 39:15, 40:15, 42:8, 57:8, 65:16, 75:16, 75:20, 76:10, 78:25, 79:16, 89:12
**throw** [2] - 41:21, 64:25
**Thursday** [7] - 10:13, 11:1, 11:15, 89:5, 90:8, 90:19, 94:18
**Tide** [3] - 53:2, 53:4, 53:5
**tie** [1] - 9:12
**tied** [2] - 71:8, 71:10
**tier** [1] - 61:24
**tiers** [1] - 70:2
**time-consuming** [1] - 84:7
**timeline** [1] - 92:8
**timely** [1] - 84:22
**toaster** [6] - 58:12, 58:13, 58:14, 58:15, 59:12, 69:18
**today** [13] - 3:10, 4:1, 5:14, 6:9, 6:19, 8:7, 8:12, 9:7, 10:13, 14:1, 20:1, 89:24, 94:16
**today's** [1] - 5:7
**together** [6] - 54:9, 54:19, 54:22, 60:16, 90:1, 94:4
**tomorrow** [3] - 89:25, 94:16, 94:17
**took** [2] - 23:24, 24:9
**tort** [1] - 65:9
**total** [1] - 79:13
**totally** [2] - 23:15, 59:3
**touched** [1] - 23:13
**Tours** [4] - 25:11, 39:12, 46:14, 46:20
**towards** [1] - 62:22
**TPP** [1] - 87:18
**TPPs** [3] - 87:15, 87:20, 87:22
**trace** [10] - 16:15, 23:7, 24:10, 26:13, 40:19, 41:3, 81:10, 81:17, 82:8, 82:10
**traceability** [6] - 18:12, 27:24, 29:9, 33:14, 38:17, 39:5
**traceable** [1] - 27:18
**traced** [2] - 33:3,

41:24
**tracing** [34] - 11:23, 12:10, 14:7, 16:11, 16:17, 18:7, 21:20, 21:23, 22:4, 22:11, 22:19, 22:21, 23:1, 23:9, 25:9, 28:10, 28:17, 32:3, 38:21, 41:8, 41:19, 42:2, 42:3, 44:2, 45:17, 78:8, 78:19, 78:21, 79:8, 81:4, 82:14, 83:21, 85:15
**track** [11] - 16:14, 16:15, 30:17, 40:11, 50:5, 66:19, 78:16, 79:25, 80:4, 81:1, 81:15
**tracked** [2] - 40:15, 60:2
**tracking** [6] - 50:12, 75:7, 78:10, 78:19, 78:21, 80:8
**trade** [4] - 65:14, 79:2, 83:12, 86:5
**traditionally** [1] - 54:8
**train** [1] - 23:8
**transaction** [1] - 13:17
**transactions** [2] - 15:19, 42:20
**transcript** [4] - 1:24, 35:24, 36:10, 95:9
**transcription** [1] - 1:25
**transportation** [1] - 66:24
**trial** [5] - 57:21, 58:13, 67:23, 72:5, 72:10
**tried** [1] - 37:10
**tries** [1] - 39:16
**trigger** [1] - 9:10
**triggered** [1] - 92:8
**troubling** [1] - 71:1
**true** [8] - 18:7, 41:23, 41:25, 65:25, 66:15, 66:22, 69:5
**truly** [4] - 69:19, 69:21, 71:15, 73:24
**trustworthy** [1] - 13:3
**truth** [1] - 23:17
**truths** [1] - 64:10
**try** [9] - 14:24, 20:13, 23:5, 29:9, 37:21, 48:2, 48:4, 68:2, 68:18
**trying** [9] - 13:11, 14:6, 15:2, 16:21, 16:24, 36:11, 41:15, 48:16, 63:13
**turn** [8] - 21:6, 46:3,

51:17, 62:1, 76:21, 78:18, 94:19, 94:24
**turned** [1] - 21:9
**turning** [2] - 9:22, 22:9, 86:24
**turns** [1] - 85:19
**tweaks** [1] - 5:5
**twice** [1] - 92:21
**two** [38] - 6:18, 7:8, 8:10, 9:9, 10:3, 10:4, 10:5, 10:9, 11:5, 11:10, 12:23, 14:1, 20:5, 21:7, 21:18, 25:19, 26:22, 27:23, 29:3, 34:23, 35:8, 36:8, 39:14, 49:25, 50:1, 50:3, 54:11, 59:25, 64:21, 66:5, 70:25, 74:7, 75:18, 78:23, 86:25, 87:2, 89:15
**type** [12] - 8:16, 26:24, 41:14, 45:21, 56:17, 57:9, 59:16, 59:20, 60:11, 60:13, 65:9
**types** [8] - 13:22, 13:23, 13:24, 17:19, 26:22, 38:13, 48:25, 84:13

## U

**U.S** [3] - 1:9, 2:8, 53:9
**UCC** [1] - 65:9
**ULMER** [1] - 2:18
**ultimately** [6] - 6:2, 15:1, 15:4, 72:8, 86:19, 91:17
**unacceptable** [2] - 83:10, 85:6
**unclear** [1] - 69:14
**uncontaminated** [1] - 24:5
**undefined** [1] - 66:16
**under** [6] - 41:17, 51:12, 58:7, 72:7, 80:2
**underlying** [5] - 14:6, 14:10, 17:13, 48:22, 66:22
**understandably** [1] - 91:8
**understood** [3] - 9:5, 34:22, 91:12
**undertake** [1] - 89:19
**underway** [1] - 76:21
**underwrote** [1] - 47:21
**undoubtedly** [1] - 82:21

**unduly** [7] - 46:5, 47:8, 79:4, 83:18, 83:24, 85:17, 86:4
**unfortunately** [2] - 55:12, 56:4
**uniform** [1] - 30:20
**unilaterally** [1] - 84:24
**uniquely** [1] - 66:17
**United** [1] - 3:2
**UNITED** [2] - 1:1, 1:12
**units** [2] - 14:3, 67:6
**universe** [1] - 15:2
**unjust** [20] - 51:4, 51:14, 56:22, 56:25, 57:9, 57:16, 57:18, 58:17, 62:21, 64:10, 64:21, 65:5, 65:11, 65:16, 65:25, 67:24, 73:4, 85:25, 87:10, 88:17
**Unjust** [1] - 64:16
**unknown** [1] - 77:12
**unless** [5] - 3:7, 7:20, 24:10, 50:4, 92:6
**unlimited** [1] - 43:18
**unquestionably** [1] - 79:18
**unquote** [2] - 69:12, 80:16
**unreasonable** [2] - 85:17, 91:2
**up** [31] - 6:7, 7:20, 8:7, 11:9, 14:25, 15:21, 19:6, 20:13, 22:22, 23:7, 26:13, 27:7, 30:8, 32:9, 34:16, 37:12, 41:6, 42:6, 42:10, 47:19, 49:25, 53:8, 57:21, 64:4, 65:15, 65:22, 66:6, 67:24, 68:5, 69:15, 71:16
**upcoming** [1] - 67:15
**upstream** [7] - 12:5, 12:20, 13:24, 15:5, 15:8, 77:20, 87:1
**US** [1] - 2:14
**usefulness** [1] - 45:8
**usual** [2] - 3:10, 54:15

## V

**valid** [3] - 72:3, 87:6
**valsartan** [33] - 8:18, 13:15, 23:7, 23:22, 24:2, 24:3, 24:5, 24:10, 51:22, 51:23, 53:7, 60:3, 61:4, 66:20, 73:11, 75:15, 75:21, 76:2, 77:24,

78:5, 78:11, 78:15, 78:17, 78:18, 79:20, 79:22, 85:22, 85:23, 86:16, 86:18, 87:2, 87:4, 87:14
**Valsartan** [3] - 3:4, 30:19, 74:21
**VALSARTAN** [1] - 1:3
**valsartan-containing** [7] - 13:15, 66:20, 77:24, 78:5, 78:11, 78:15, 79:22
**valuable** [1] - 58:9
**value** [1] - 82:12
**various** [5] - 41:18, 58:7, 75:21, 76:1, 78:21
**VCD** [1] - 44:22
**VCDs** [1] - 40:9
**vehicle** [1] - 92:6
**versa** [1] - 82:22
**Version** [1] - 30:19
**version** [3] - 39:24, 77:2, 89:4
**versions** [1] - 90:7
**versus** [2] - 56:24, 62:22
**via** [3] - 3:1, 14:9, 75:5
**viability** [1] - 86:10
**vice** [1] - 82:22
**view** [5] - 7:19, 45:13, 47:22, 91:2, 93:25
**vigorously** [2] - 76:22, 81:12
**Vine** [1] - 2:19
**virtue** [1] - 69:20
**virus** [1] - 91:9

## W

**wage** [1] - 53:17
**wages** [1] - 63:18
**wait** [1] - 43:23
**waiting** [5] - 8:2, 15:1, 20:11, 46:16, 93:2
**waive** [1] - 55:20
**Walgreens** [1] - 76:15
**walk** [1] - 84:24
**walked** [1] - 32:7
**wall** [1] - 41:21
**Walmart** [13] - 2:8, 4:5, 4:6, 9:24, 10:3, 10:8, 11:5, 11:11, 53:2, 53:4, 58:20, 76:15
**wants** [3] - 18:16, 63:9, 86:15
**warning** [1] - 50:6
**warranted** [1] - 91:18
**ways** [3] - 28:6, 71:23,

80:17
**websites** [1] - 48:24
**week** [6] - 10:5, 14:25, 34:25, 35:17, 36:8
**weeks** [3] - 8:5, 10:25, 59:24
**weigh** [4] - 50:21, 68:14, 73:17, 73:24
**Westlaw** [2] - 56:24, 89:10
**whatnot** [1] - 37:20
**whatsoever** [1] - 39:23
**whereas** [1] - 8:14
**whichever** [1] - 65:4
**whistleblowers** [1] - 45:15
**Whiteley** [1] - 3:18
**WHITELEY** [3] - 2:2, 2:3, 3:17
**who've** [1] - 43:7
**whole** [5] - 16:12, 24:19, 38:3, 67:2, 91:3
**wholesale** [2] - 76:11, 76:12
**wholesaler** [39] - 4:24, 7:18, 11:24, 14:15, 16:17, 20:22, 26:4, 26:14, 27:5, 27:15, 29:2, 39:14, 41:4, 42:17, 42:23, 48:17, 58:25, 61:6, 61:8, 62:18, 63:9, 66:18, 67:25, 74:24, 75:3, 77:19, 78:7, 78:17, 78:20, 79:7, 79:16, 81:3, 81:17, 81:21, 86:13, 88:23, 89:4, 89:19
**WHOLESALER** [1] - 1:6
**wholesalers** [109] - 4:1, 5:10, 5:24, 6:19, 7:12, 10:22, 12:3, 12:7, 12:16, 13:2, 13:14, 15:4, 16:9, 16:14, 16:15, 18:4, 18:5, 19:15, 19:20, 21:10, 21:19, 22:3, 23:13, 24:18, 24:21, 24:24, 25:2, 25:13, 25:19, 26:6, 26:11, 28:5, 28:8, 28:10, 28:14, 29:16, 30:12, 30:16, 31:11, 31:13, 36:2, 36:5, 39:18, 39:20, 39:22, 40:2, 40:11, 40:15, 40:18, 41:1, 41:7, 41:16,

41:18, 42:19, 43:2, 45:20, 46:4, 46:8, 50:8, 50:19, 51:17, 60:11, 60:19, 61:12, 61:22, 62:2, 62:9, 62:15, 63:4, 64:14, 65:2, 65:12, 67:11, 67:20, 73:5, 75:8, 76:5, 76:10, 76:12, 79:24, 80:3, 80:5, 80:7, 80:13, 80:19, 80:25, 81:4, 81:12, 81:15, 82:18, 82:21, 82:24, 83:23, 83:25, 85:20, 85:22, 86:3, 88:2, 88:20, 89:6, 89:12, 89:17, 90:25, 91:23, 93:15, 94:12, 94:22
**wholesalers'** [23] - 13:15, 49:17, 66:8, 77:22, 77:23, 78:2, 78:4, 79:21, 80:21, 80:22, 81:9, 81:13, 81:25, 82:2, 82:4, 82:6, 82:7, 82:11, 82:12, 82:16, 83:2, 83:14, 83:18
**wide** [2] - 8:13, 64:24
**win** [2] - 57:22, 58:13
**word** [4] - 48:1, 49:22, 62:1, 71:20
**words** [11] - 11:23, 43:18, 46:14, 47:6, 49:1, 55:5, 60:4, 60:16, 72:24, 78:13, 79:8
**works** [1] - 33:22
**worth** [1] - 40:8
**writing** [2] - 92:1, 94:9
**written** [5] - 89:17, 91:17, 91:19, 91:22, 92:9
**wrongdoing** [11] - 26:4, 39:17, 58:7, 63:1, 64:13, 64:17, 64:19, 67:12, 67:21, 69:6, 70:17
**wrote** [1] - 85:6

## Y

**years** [7] - 19:16, 19:19, 25:6, 49:25, 50:1, 50:3, 66:25
**years'** [1] - 40:8
**yellow** [1] - 27:22
**York** [2] - 2:16

## Z

**zero** [2] - 45:6, 64:13
**Zhejiang** [1] - 2:9
**ZHP** [2] - 9:16, 16:2