# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |
| **This Document Relates to All Actions** | |

## COMPENDIUM OF UNREPORTED OR UNPUBLISHED AUTHORITIES CITED IN MANUFACTURER DEFENDANTS' COMPENDIUM OF CHARTS

# **TABLE OF CONTENTS**

**Cases**                                                                                                      **Tab**

*Am. Fed'n of State Cnty. & Mun. Emps. v. Ortho-McNeilJanssen Pharm., Inc.*, No. 2:08-cv-5904, 2010 WL 891150 (E.D. Pa. Mar. 11, 2010) ..................................................................................1

*Archer v. Holmes*, No. 1:17-cv-2051, 2018 WL 534475 (N.D. Ga. Jan. 23, 2018), *reconsideration denied*, No. 1:17-cv-2051, 2018 WL 3454899 (N.D. Ga. Apr. 9, 2018) .........................................................2

*Avila v. CNH Am., LLC*, No. 4:04-cv-3384, 2012 WL 13187721 (D. Neb. Aug. 30, 2012)..................................................................3

*Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509 (6th Cir. 2013) .............................4

*Banh v. Am. Honda Motor Co., Inc.*, No. 2:19-cv-5984, 2019 WL 8683361 (C.D. Cal. Dec. 17, 2019) .........................................................5

*Banks v. Nationwide Mut. Fire Ins. Co.,* No. 99AP-1413, 2000 WL 1742064 (Ohio Ct. App. Nov. 28, 2000) ..........................................6

*Benton v. Phillips Edison & Co., Ltd.,* No. 3:17-cv-630, 2017 WL 6273361 (E.D. Va. Dec. 8, 2017) .........................................................7

*Bostick v. St. Jude Med., Inc.*, No. 2:03-cv-2636, 2004 WL 3313614 (W.D. Tenn. Aug. 17, 2004)......................................................8

*Bowerman v. United Illuminating*, No. X04Cv 940115436S, 1998 WL 910271 (Conn. Super. Ct. Dec. 15, 1998) ...........................................9

*Brochu v. Foote Enters., Inc.*, 381 P.3d 596, 2012 WL 5991571 (Nev. 2012) ..................................................................................10

*Brown v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-cv-242, 2018 WL 10638396 (D.N.H. Dec. 6, 2018) ......................................11

*Bunn v. Navistar, Inc.*, 797 F. App'x 247 (6th Cir. 2020)......................................12

*Callegari v. Blendtec, Inc.*, No. 2:18-cv-308, 2018 WL 5808805 (D. Utah Nov. 6, 2018) .............................................................13

*Cmty. Spirit Bank v. Fid. Nat'l Title Ins. Co. of New York,* No. 3:09-
cv-430, 2009 WL 10688141 (N.D. Ala. June 22, 2009) ...................................14

*Daniele Int'l, Inc. v. Sabra Dipping Co., LLC*, No. 1:17-cv-499, 2018
WL 2744976 (D.R.I. June 7, 2018) .....................................................................15

*Easler v. Hoechst Celanese Corp.*, No. 7:14-cv-48, 2014 WL 3868022
(D.S.C. Aug. 5, 2014) ........................................................................................16

*Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-cv-194, 2020 WL
2218858 (D. Vt. May 7, 2020) ...........................................................................17

*Estes v. Lanx, Inc.*, No. 1:14-cv-52, 2015 WL 9462964 (N.D. Miss.
Dec. 23, 2015)...................................................................................................18

*Figueroa v. Ethicon, Inc.*, No. 2:19-cv-1188, 2020 WL 1434249
(D.N.M. Mar. 24, 2020)......................................................................................19

*In re Ford Tailgate Litig.*, No. 3:11-cv-2953, 2014 WL 1007066
(N.D. Cal. Mar. 12, 2014), *order corrected on denial of
reconsideration*, No. 3:11-cv-2953, 2014 WL 12649204 (N.D. Cal.
Apr. 15, 2014)...................................................................................................20

*In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372
(S.D.N.Y. 2017*), modified on reconsideration*, No. 1:14-mc-2543,
2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).........................................................21

*Genito L.P. v. Nat. Housing Bldg. Corp.* 50 Va. Cir. 71, 1999 WL
33722382 (Va. Cir. Ct. 1999) .............................................................................22

*Henderson v. Freightliner, LLC*, No. 1:02-cv-1301, 2005 WL 775929
(S.D. Ind. Mar. 24, 2005)...................................................................................23

*Hunt v. Am. Wood Preservers Inst.*, No. IP 02-0389, 2002 WL
34447541 (S.D. Ind. July 31, 2002).....................................................................24

*Hydronic Enters. v. Danal Jewelry Co.*, No. 81-4011, 1986 WL
213409 (R.I. Super. Ct. Dec. 22, 1986) ...............................................................25

*Javens v. G.E. Healthcare Inc.*, No. 1:18-cv-1030, 2020 WL 2783581
(D. Del. May 29, 2020)........................................................................................26

*Johnson v. Eli Lilly & Co.,* No. 1:14-cv-453, 2015 WL 1120009 (S.D. Ohio Mar. 12, 2015) .......................................................................27

*Kodger v. Zimmer Biomet Holdings, Inc.*, No. 1:17-cv-1350, 2017 WL 4348997 (N.D. Ohio Sept. 29, 2017)..................................................28

*Kury v. Abbott Labs., Inc.*, No. 3:11-cv-803, 2012 WL 124026 (D.N.J. Jan. 17, 2012)..........................................................................................29

*Lamb v. Graco Children's Prods., Inc.*, No. 4:11-cv-477, 2012 WL 12871963 (N.D. Fla. Jan. 24, 2012) ...................................................30

*Lugones v. Pete & Gerry's Organic, LLC*, --- F. Supp. 3d ---, 2020 WL 871521 (S.D.N.Y. Feb. 21, 2020)................................................31

*Mercantile Bank of Mich. v. CLMIA, LLC*, No. 316777, 2015 WL 630259 (Mich. Ct. App. Feb. 12, 2015)................................................32

*Naylor Farms, Inc. v. Anadarko OGC Co.*, No. 5:08-cv-668, 2011 WL 7267851 (W.D. Okla. June 15, 2011)................................................33

*Palmer v. CVS Health*, No. 1:17-cv-938, 2019 WL 6529163 (D. Md. Dec. 4, 2019)............................................................................................34

*Peace Software, Inc. v. Hawaiian Elec. Co., Inc.*, No. 1:09-cv-408, 2009 WL 3923350 (D. Haw. Nov. 17, 2009) .....................................35

*Philips v. Ford Motor Co.*, No. 5:14-cv-2989, 2015 WL 4111448 (N.D. Cal. July 7, 2015)..................................................................36

*Pixler v. Huff*, No. 3:11-cv-207, 2011 WL 5597327 (W.D. Ky. Nov. 17, 2011) ..............................................................................................37

*R.M. Harrison Mech. Corp. v. Decker Indus., Inc.*, No. CL08–193, 2008 WL 10669311 (Va. Cir. Ct. Aug. 28, 2008)................................38

*Regent at Town Ctr. Homeowners' Ass'n v. Oxbow Constr., LLC,* 419 P.3d 702, 2018 WL 2431690 (Nev. May 24, 2018) ..........................39

*Rosmer v. Pfizer, Inc.*, No. 9:99-cv-228018, 2001 WL 34010613 (D.S.C. Mar. 30, 2001) ......................................................................40

*Salley v. Heartland-Charleston of Hanahan, SC, LLC,* No. 2:10-cv-791, 2011 WL 2728051 (D.S.C. July 12, 2011) ...................................................41

*Sanford v. Ektelon/Prince Sports Grp., Inc.,* No. 8:97-cv-368, 1999 WL 33537914 (D. Neb. Nov. 5, 1999) ................................................42

*Sani-Pure Food Labs, LLC v. bioMerieux, Inc.,* No. 13-cv-6643, 2014 WL 6386803 (D.N.J. Nov. 13, 2014) ...........................................43

*Savett v. Whirlpool Corp.,* No. 1:12-cv-310, 2012 WL 3780451 (N.D. Ohio Aug. 31, 2012) ..................................................................44

*Schumacher v. Tyson Fresh Meats, Inc.,* No. 1:02-cv-1027, 2006 WL 7124778 (D.S.D. Apr. 10, 2006) .........................................................45

*Scott v. Durham*, No. 1:09-cv-348, 2011 WL 8969 (N.D. Ind. Jan. 3, 2011) ....................................................................................46

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 1:15-cv-6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ....................47

*Small v. Univ. Med. Ctr. of S. Nevada*, No. 2:13-cv-298, 2016 WL 4157309 (D. Nev. Aug. 3, 2016) .........................................................48

*Smith v. Merial Ltd.*, No. 2:10-cv-439, 2011 WL 2119100 (D.N.J. May 26, 2011) ..................................................................................49

*Stroderd v. Yamaha Motor Corp., U.S.A*, No. 04-cv-3040, 2011 WL 2119100 (E.D. La. Aug. 4, 2011) ......................................................50

*Sweezey v. C.R. Bard Inc.,* No. 3:19-cv-2172, 2020 WL 1237394 (N.D. Tex. Mar. 12, 2020) ..........................................................51

*Total Care Physicians, P.A. v. O'Hara,* No. 99c-11-201, 2002 WL 31667901 (Del. Super. Ctr. Oct. 29, 2002)........................................52

*United Golf, LLC v. Westlake Chem. Corp.*, No. 4:05-cv-495, 2006 WL 2807342 (N.D. Okla. 2006)..........................................................53

*Vind v. McGuire*, No. A13-0591, 2013 WL 6152312 (Minn. Ct. App. Nov. 25, 2013) ..................................................................54

*Ybarra v. Ameripro Funding, Inc.*, No. 1:17-cv-224, 2018 WL
2976126 (Tex. App. June 14, 2018), *review denied* (Nov. 9, 2018) ..................55

# TAB 1

American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re McNeil Consumer Healthcare, Marketing and Sales
Practices Litigation, E.D.Pa., July 15, 2011

2010 WL 891150
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

AMERICAN FEDERATION OF STATE COUNTY
AND MUNICIPAL EMPLOYEES, District Council
47 Health Andwelfare Fund, et al., Plaintiffs,

v.

ORTHO–McNEIL–JANSSEN
PHARMACEUTICALS, INC., et al., Defendants.

Civil Action No. 08–cv–5904.
|
March 11, 2010.

West KeySummary

1   Sales 👉 Parties entitled to notice

Buyer of pain medication patch failed to
notify seller of the alleged breach of warranty,
as required to support buyer's claim for
breach of implied and express warranty under
the Pennsylvania Uniform Commercial Code
(UCC). Although seller may have had notice that
its product was defective since it issued a recall
notice, the buyer did not notify the seller that the
transaction was claimed to involve a breach of
warranty. 13 Pa.C.S.A. § 2607(c)(1).

14 Cases that cite this headnote

**Attorneys and Law Firms**

William D. Marvin, Cohen Placitella & Roth, Philadelphia,
PA, for Plaintiffs.

Kathryn E. Deal, David J. Antczak, Edward M. Posner,
Drinker Biddle & Reath LLP, Philadelphia, PA, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

RUFE, District Judge.

**\*1** Plaintiff American Federation of State, County and
Municipal Employees, District Council 47 Health and
Welfare Funds, and Philadelphia Firefighters Union Local
No. 22 Health and Welfare Fund bring this action against
Defendants Ortho–McNeil–Janssen Pharmaceuticals, Inc.
("OMJ"), Sandoz, Inc., and ALZA Corporation ("ALZA"),
alleging violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law ("UTPCPL"), breach of
express and implied warranties, and unjust enrichment.
Before the Court is Defendants' Motion to Dismiss Plaintiffs'
Complaint. [1] For the reasons set forth below, the Motion will
be granted in part and denied in part.

[1]     Document No. 14.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Defendants OMJ and Sandoz, Inc. market and distribute the
fentanyl transdermal system patch ("fentanyl patch"), which
is a Schedule II narcotic, available only through a doctor's
prescription, designed to deliver a steady, controlled dosage
of a powerful medication that provides relief for severe and
chronic pain . [2] ALZA, an affiliate of OMJ, contracted with
OMJ and Sandoz to manufacture and supply fentanyl patches
throughout the United States . [3] OMJ distributes the patches
under the brand name Duragesic and Sandoz distributes the
patches under a generic equivalent. [4] The fentanyl patches are
available in a variety of dosage delivery rates (e.g., 12.5, 25,
50, 75 and 100 micrograms per hour ("mcg/hour")). [5]

[2]     Compl. [Document No. 1] ¶¶ 6–7, 16.

[3]     Id. ¶ 8.

[4]     Id.

[5]     Id.

On February 12, 2008, OMJ announced a recall of all 25 mcg/
hour Duragesic patches (and its generic equivalent) stamped
with expiration dates on or before December 2009. [6] The
official press release stated, in pertinent part, that:

6      *Id.* ¶ 19.

[The 25mcg/hr fentanyl transdermal system patches] being recalled may have a cut along one side of the drug reservoir within the patch. The result is possible release of fentanyl gel from the gel reservoir into the pouch in which the patch is packaged, exposing patients or caregivers directly to fentanyl gel. Fentanyl patches that are cut or damaged in any way should not be used. Exposure to fentanyl gel may lead to serious adverse events, including respiratory depression and possible overdose, which may be fatal....Anyone who has 25 mcg/hr ... fentanyl patches should check the box or foil pouch for the expiration date ... The recalled patches all have expiration dates on or before December 2009. The cut edge in affected patches can be seen upon opening the sealed foil pouch that holds the patch. Affected patches should not be handled directly. 7

7      Defs.' Mot. to Dismiss, Ex. A; *see also* Compl. ¶ 20.

Plaintiffs are health and welfare trust funds that provide medical coverage, including prescription drug coverage, to their members and their members' dependents. 8 Plaintiffs and other similarly situated third-party payors have paid for supplies of 25 mcg/hour fentanyl patches, which were later recalled by Defendants, on behalf of their qualified members. 9 As a result of the recall, Plaintiffs allege that they, and similarly situated third-party payors, paid or will pay expenses related to the purchase and reimbursement of 25 mcg/hour fentanyl patches that had to be discarded. 10

8      Compl.¶¶ 1–2.

9      *Id.* ¶ 21.

10     *Id.* ¶ 23.

 **\*2** On December 19, 2008, Plaintiffs filed the underlying class-action Complaint, alleging the following: COUNT I: Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); COUNT II: Breach of an Express Warranty under the Pennsylvania Uniform Commercial Code ("UCC"); COUNT III: Breach of an Implied Warranty; and COUNT IV: Rescission / Unjust Enrichment. On March 25, 2009, Defendants filed the instant Motion to Dismiss, asserting several grounds for dismissal of Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court has carefully reviewed Defendants' Motion, Plaintiffs' Response, 11 Defendants'

Reply, 12 and all accompanying materials, and this matter is now ready for disposition.

11     Document No. 15.

12     Document No. 19.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to move for dismissal of any claim wherein the district court lacks subject matter jurisdiction. 13 When considering a 12(b)(1) motion, the court "review [s] only whether the allegations on the face of the complaint, taken as true, allege sufficient facts to invoke the jurisdiction of the district court." 14 When subject matter jurisdiction is challenged under 12(b)(1), the plaintiff must bear the burden of persuasion. 15

13     FED. R. CIV. P. 12(b)(1) (West 2009 Revised).

14     *Licata v. U.S. Postal Serv.,* 33 F.3d 259, 260 (3d Cir.1994).

15     *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

In order for a plaintiff to have standing in federal court, the case or controversy presented by the plaintiff must be justiciable and establish an injury-in-fact. 16 To establish an injury-in-fact, a plaintiff must allege that: (1) defendant violated a legally protected interest that is concrete and particularized, and actual or imminent—not merely an injury that is "conjectural" or "hypothetical," (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is redressable by a remedy that federal courts are permitted to give. 17 If the complaint fails to satisfy these requirements, "a federal court does not have subject matter jurisdiction ... [and] the claim[s] must be dismissed." 18

16     See *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

17     See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

18     *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006).

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal for failure to state a claim upon

which relief can be granted. [19] Under 12(b)(6), the moving party "bears the burden of showing no claim has been stated." [20] The court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in a light most favorable to the non-moving party." [21] The United States Supreme Court clarified this standard in *Bell Atlantic Corporation v. Twombly,* explaining that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." [22] Instead, a plaintiff must allege facts that "raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." [23]

[19]   FED. R. CIV. P. 12(b)(6) (West 2009 Revised).

[20]   *Kehr Packages,* 926 F.2d at 1409.

[21]   *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989).

[22]   550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

[23]   *Id.* (citations omitted).

## III. DISCUSSION

### A. FRCP 12(b)(1)

**\*3**  Relying upon FRCP12(b)(1), Defendants assert that the Court lacks subject matter jurisdiction because Plaintiffs allegedly (1) failed to plead an injury-in-fact sufficient to satisfy Article III standing; (2) lack standing as a "person" under the UTPCPL; and (3) do not fall within the class of buyers or end-users that may recover for a breach of warranty under the Pennsylvania UCC. The Court will address each argument separately below.

### (i) Injury–In–Fact

Defendants argue that Plaintiffs' Complaint failed to allege that any of their members actually purchased defective fentanyl patches. Defendants assert that unless Plaintiffs pled that their members received patches that were actually defective, Plaintiffs' alleged injury is merely conjectural and hypothetical. Defendants further assert that "[p]ayment for a product that is recalled as a precautionary measure because it might have a defect is not the legal equivalent of payment for

a product that actually is defective ." [24] In effect, Defendants' arguments attempt to distinguish between patches that were actually defective (*e.g.,* patches that contained a cut on the gel reservoir) and patches that were subject to Defendants' product recall. The Court finds, however, that Defendants' recall notice made no such distinction. The recall notice warned that "[f]entanyl patches that are cut or damaged in any way should not be used," and that "[e]xposure to fentanyl gel may lead to serious adverse events, including respiratory depression and possible overdose, which may be fatal." [25] Plaintiffs pled that as a result of this warning and product recall, they "have paid or will pay expenses related to the purchase of and reimbursement for supplies of 25 mcg/hour fentanyl patches [previously purchased for their members, bearing the relevant expiration dates] that were unusable, worthless, and had to be discarded." [26] These facts, if accepted as true, plead an economic loss that is concrete, particular, and traceable to a defect resulting from Defendants' manufacturing and distribution process, and would permit a remedy if Plaintiffs are successful on the merits.

[24]   Defs.' Mot. at 8.

[25]   Defs.' Mot., Ex. A; *see also* Compl. ¶ 20.

[26]   Compl. ¶¶ 21, 23.

Additionally, Plaintiffs' claim, as pled, seeks monetary damages for the purchase price of the recalled fentanyl patches, an injury that directly impacts Plaintiffs, not just the consequential damages that their members may incur from exposure to the defective patches. [27] Claims for monetary damages generally satisfy the injury-in-fact threshold. [28] Based on the allegations pled in the Complaint, the Court finds that Plaintiffs have satisfied the injury-in-fact requirements necessary to establish Article III standing.

[27]   Compl. at 13–14; *see also* Pls.' Answer to Defs.' Mot. to Dismiss at 5.

[28]   *See Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286, 293 (3d Cir.2005).

### (ii) Standing Under the UTPCPL

Defendants argue, in the alternative, that Plaintiffs are not "persons" under the UTPCPL, and therefore do not have standing to sue, because "[t]hey do not themselves obtain or consume the fentanyl patches in question" nor were their purchases made for primarily "personal, family,

American Federation of State County and Municipal ... Not Reported in...

2010 WL 891150

or household purposes." [29] Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of "person." [30] Section 201–9.2(a) of the UTPCPL permits a private action for the recovery of damages for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act ...." [31] The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." [32] In addition, the "purpose" requirement of § 201–9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it. [33]

29      Defs.' Mot. at 10–11.

30      See *Commonwealth v. TAP Pharmaceutical Products, Inc.,* 885 A.2d 1127,1142–1143 (Pa.Commw.2005) (definition of "person" under § 9.2(a) includes third-party medical benefit payors); *See also Valley Forge Towers South Condominium v. Ron–Ike Foam Insulators, Inc.,* 393 Pa.Super. 339, 574 A.2d 339, 644–645 (Pa.Super.1990) ("associations" were explicitly included within the definition of "person" under § 202–2(2) and that even though the breach of warranty claim for defective roofing membranes affected the individual unit owners the association represented, the condominium association could assert a claim as a "person" under § 9.2(a)).

31      73 PA. STAT. § 201–9.2(a) (2010 Electronic Update).

32      *Id.* § 201–2(2).

33      See *TAP Pharm. Prods.,* 885 A.2d at 1142–1143; *See also Valley Forge Towers,* 574 A.2d at 649.

**\*4** Defendants, nonetheless, rely on *Balderston v. Medtronic Sofamor Danek, Inc.* to support their position. [34] In *Balderston,* the plaintiff-physician filed suit against a manufacturer of surgical screws, which were used on his patients during spinal fusion operations, claiming that the defendant misrepresented the FDA's approval status of the

screws. The plaintiff claimed that he had been misled as to the FDA's approval status, and was subsequently exposed to lawsuits. The district court, however, determined that the plaintiff's patients, not the plaintiff, had actually purchased the screws and therefore concluded that the plaintiff lacked standing. The district court further concluded that plaintiff could not qualify as a purchaser because any purchase he would have made was for business purposes, not for "personal, family, or household" use. [35] On appeal, the Third Circuit affirmed the district court's findings and noted that plaintiff unequivocally acknowledged that "purchase [of the surgical screw was] by the consumer, the patient ... [and that] neither plaintiff nor his practice [were] ever billed for the screw and [did] not pay for it." [36]

34      285 F.3d 238 (3d Cir.2002) (a surgeon filed a UTPCPL claim against the manufacturer of pedicle screws, which were used on his patients during various surgical procedures. The Third Circuit held the surgeon did not qualify as a "person" under the UTPCPL because his patients actually purchased the screws, and even if he had directly purchased the screws, the court reasoned that he purchased them primarily for business purposes).

35      *Id.* at 240.

36      *Id.* at 241.

The distinctions between the facts in *Balderston* and the facts as pled before this Court are clear. Whereas in *Balderston,* the plaintiff could in no way be considered a purchaser or even consumer of the goods at issue, Plaintiffs here actually paid for the fentanyl patches *on behalf* of their members for their members' personal, family or household use. [37] This places Plaintiffs in a far different relationship with Defendants that the distant or tangential relationship between the plaintiff and the defendant in *Balderston.* The facts here compel the conclusion that Plaintiffs allegations, as pled in the Complaint, strongly support the position that they have standing as purchasers under the UTPCPL. The Court finds that since Plaintiffs purchased the fentanyl patches on behalf of their members in their representative capacity, and those patches were purchased for the personal, family and household use of their members, Plaintiffs have properly asserted a claim under the UTPCPL. [38]

37      See Compl. ¶¶ 26, 35.

2010 WL 891150

38      *See* *TAP Pharm. Products,* 885 A.2d at 1142–1143 (distinguishing *Balderston* from the Commonwealth's third-party payor programs); *See also* *Valley Forge Towers,* 574 A.2d at 649.

#### (iii) Buyers Under Pennsylvania's UCC

As a third alternative argument for dismissal under FRCP 12(b)(1), Defendants assert that because "plaintiffs merely pay or reimburse some or all of the purchase price of the covered prescription medicines that their members buy and use," Plaintiffs, as third-party payors, do not qualify as "buyers" under Pennsylvania's UCC. [39] Defendants' argument, however, essentially takes a section of the UCC that *extends* warranty protections to relatives and persons in the same household as the buyer, and incorrectly suggests to this section somehow *limits* buyers to only "natural persons."

39      Defs. Mot. at 14–15.

Section 2103(a) of the UCC defines "buyer" as a "person who buys or contracts to buy goods." [40] Section 1201(b)(27) of the UCC defines "person" as "[a]ny individual; corporation; business trust; estate; trust; partnership; limited liability company; association; joint venture; government; governmental subdivision, agency or instrumentality, public corporation or other legal or commercial entity." [41] Contrary to Defendants' arguments, the definition of "person" under the UCC is not limited to a "natural person;" rather, the UCC uses a very broad definition, which includes corporations, trusts and business trusts. Therefore, the Court finds that Plaintiffs are in fact considered both "persons" and "buyers" under the UCC. Accordingly, each of Defendants' arguments offered to support its motion to dismiss the Complaint for a lack of subject matter jurisdiction are denied.

40      13 PA. CONS.STAT. § 2103(a) (2010 Electronic Update).

41      *Id.* § 1201(b)(27).

#### B. FRCP 12(b)(6)

**\*5**  Relying upon FRCP 12(b)(6), Defendants assert that the Court should dismiss Plaintiffs' Complaint because Plaintiffs failed to state a claim for which relief can be granted by not pleading that: (1) Defendants committed unfair or deceptive acts or practices under the UTPCPL; (2) Plaintiffs provided Defendants reasonable notification of the alleged breach of warranty as required by Title 13 of the Pennsylvania

Consolidated Statutes, Section 2607(c)(1); (3) a warranty was actually breached; (4) an express warranty extended to them as third-party medical benefit payors; and (5) Defendants actually received a benefit as required for a claim of unjust enrichment. The Court will address each argument separately below.

#### (i) The UTPCPL

Defendants argue that Plaintiffs' UTPCPL claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to: (1) identify, with particularity, a false or deceptive representation made by Defendants that was material to Plaintiffs' coverage decisions and (2) plead justifiable reliance on Defendants' alleged representations. In support of their first point, Defendants assert that in order for Plaintiffs to plead an unfair or deceptive act or practice under the UTPCPL, Plaintiffs must allege that the "defendants made a representation that their patches would invariably be free from defects." [42] The UTPCPL, however, defines unfair or deceptive acts or practices to include representations that "goods ... have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or representations "that goods ... are of a particular standard, quality, or grade ..., if they are of another." [43] Under both definitions, Plaintiffs allegations in the complaint, if taken as true, sufficiently plead an unfair or deceptive act committed by Defendants. The "unfair and deceptive" act alleged in Plaintiffs' Complaint is Defendants' representation that the recalled fentanyl patches would release the drug at a safe dosage rate. However, due to the defect and subsequent recall, the fentanyl patches could actually release the drug at a significantly higher and more dangerous dosage rate, which rendered the patches useless to Plaintiffs.

42      Defs.' Mot. at 12.

43      73 PA. STAT. § 201–2(4)(v), (vii).

As to their second point, Defendants assert that any alleged reliance by Plaintiffs that the fentanyl patches would be completely free from cuts or damage is not "justifiable," especially given that the fentanyl patches packaging included an insert disclaimer, which warned that broken or cut patches could lead to overdose or death. [44] Plaintiffs argue in opposition that the Complaint sufficiently pleads "the type of representations that fall into the traditional scope of consumer protection statutes—where a product seller

American Federation of State County and Municipal ... Not Reported in...
2010 WL 891150

promises one thing but delivers another." [45] Plaintiffs assert in the Complaint that Defendants represented to end-users, physicians and third-party payors that the fentanyl patches were designed to safely release the prescription drug at a rate of 25 mcg/hour. However, because of the manufacturing defect, the patches potentially released the drug at an excessive, possibly fatal, rate. Accordingly, the Court finds that Plaintiffs sufficiently alleged that Defendants committed unfair or deceptive acts or practices under the UTPCPL and Plaintiffs sufficiently pled justifiable reliance on the alleged unfair or deceptive acts in their Complaint.

44    Defs.' Mot. at 13.

45    Pls.' Answer at 11.

### (ii) Breach of Implied and Express Warranty Under Pennsylvania UCC

**\*6** Defendants argue that Plaintiffs' breach of express and implied warranty claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to allege in their Complaint that they notified Defendants of the breach of warranty. Under § 2607(c)(1) of the UCC, a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." [46] Defendants argue that "[t]he purpose of the notice requirement is to afford the seller a reasonable time within which to cure the breach or settle the claim." [47] Plaintiffs argue in opposition that Defendants cannot complain of a lack of notice for the breach of warranty, as it was Defendants themselves who first gave notice to the purchasers that the fentanyl patches were defective through the recall notice. According to Plaintiffs, "Defendants were already well aware of the breach and had an opportunity to make good." [48]

46    13 PA. CONS.STAT. § 2607(c)(1).

47    Defs.' Mot. at 16.

48    Pls.' Answer at 14.

Plaintiffs' argument, however, that notification under § 2607(c) is unnecessary because Defendants had actual or constructive knowledge of the breach, is not supported by the language of the UCC, its statutory purpose, or existing case law interpreting § 2607. Plaintiffs appear to confuse the term "notice" with "notify"—which the UCC explicitly distinguishes. Under UCC § 1202(a), a person has *notice* of a

fact when the person has actual knowledge of it, has received notification of it, or, from all of the facts and circumstances known to that person at the time in question, has reason to know it exists. [49] On the other hand, § 1202(d) defines *notify* to mean "give a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." [50]

49    13 PA. CONS.STAT. § 1202(a).

50    *Id.* § 1202(d).

The purpose of notification under § 2607(c)(1) is not intended to merely make the seller aware of the breach; rather, the notification must "inform [ ] the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." [51] Thus, the purpose of notification under § 2607(c) is to allow the seller an opportunity to resolve the dispute regarding an alleged breach before the buyer initiates a lawsuit. Therefore, even assuming that Defendants were aware that the fentanyl patches were defective, Defendants may not have been aware of Plaintiffs' intent to file a class action lawsuit, and were denied the opportunity to negotiate or settle this claim without judicial involvement. To "notify" under the UCC requires the affirmative act of notification, and Section 2607(c) (1) explicitly requires the buyer to "notify the seller of breach or be barred from any remedy." [52] Plaintiffs' "constructive notice" argument does not address whether Plaintiffs ever actually and affirmatively notified Defendants of the breach, as required by § 2607(c)(1), prior to initiating this litigation.

51    *Id.* § 2607 cmt. 4; *see also Beneficial Comm. Corp. v. Brueck,* 23 Pa. D. & C.3d 34, 37 (Pa.Ct.Comm.Pl.1982) ("Section 2607(c)'s requirement that the buyer notify the seller of the breach within a reasonable time after he discovers or should have discovered the breach gives the manufacturer the opportunity to cure the defect, settle the claim through negotiation, and gather information that may assist in defending the claim.").

52    *Id.* § 2607(c)(1).

**\*7** Additionally, the Third Circuit recently analyzed § 2607(c) of the UCC in *Vanalt Electrical Construction, Inc. v. Selco Manufacturing Corporation,* and concluded that

a "review of Pennsylvania precedent and other authorities interpreting the UCC indicates that the Pennsylvania Supreme Court would agree that a buyer must prove compliance with Section 2607 before recovering for a breach of contract or warranty involving nonconforming goods...."[53] Here, the Court must also treat the § 2607(c) reasonable notification requirement as a condition precedent to recovery, with Plaintiffs bearing the burden to prove that reasonable notification was given. As reasonable notification is a material element necessary to sustain recovery of a UCC breach of warranty claim, Plaintiffs were required to affirmatively allege that they reasonably notified Defendants.[54] Inasmuch as § 2607(c) bars a buyer's recovery absent the buyer providing reasonable notification of the breach, it follows that a buyer must also plead, at a minimum, in its Complaint, that it provided reasonable notification in order to state a viable claim for recovery.[55] Plaintiffs were not required to allege in the Complaint that the notification occurred in any substantial form (such as a letter or a formal demand), as the "reasonableness" of the notice is a factual matter left for the jury to resolve. However, Plaintiffs needed to allege, at a minimum, that they notified Defendants in some manner "or be barred from any remedy."[56] The Court finds that Plaintiffs failed to allege that they provided Defendants with notification as required by § 2607(c)(1) of the UCC. As such, the Court further finds that Plaintiffs' breach of express and implied warranty claims should be dismissed under FRCP 12(b)(6).

53   233 Fed. Appx. 105, 111 (3d Cir.2007) (held in a dispute over the sale of goods, the buyer must prove compliance with the notice requirement of Section 2607" and that "reasonable notification is a precondition to the buyer's recovery for breach", with the buyer bearing the burden to prove its requirements).

54   See Vanalt, 233 Fed. Appx. at 111; See also Twombly, 550 U.S. at 562 (quoting Car Carriers v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984) (a complaint " 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory' ").

55   Section 2607(c)(1) requires the buyer to "within a reasonable time after he discovers or should have discovered any breach notify the seller of the

breach or be barred from any recovery." 13 PA. CONS.STAT. § 2607(c)(1).

56   See Id.; see also Vanalt, 233 Fed. Appx. at 112.

**(iii) Unjust Enrichment**

Defendants also argue that Plaintiffs' unjust enrichment claim should be dismissed for failure to state a claim upon which relief can be granted. To satisfy the pleading requirements of unjust enrichment, the plaintiff must allege the following elements in its complaint: (1) a benefit conferred upon one party by another, (2) appreciation of the benefit by the recipient, and (3) acceptance and retention of the benefit under circumstances that would make it inequitable or unjust for the recipient to retain the benefit without payment of value.[57]

57   Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, 447 (3d Cir.2000).

Defendants offer two distinct arguments to defeat Plaintiffs' unjust enrichment claim. First Defendants assert that when an unjust enrichment claim is based upon tortious conduct, and the court dismisses the tort claims based upon the same conduct, the court must also dismiss the unjust enrichment claim as it "is essentially another way of stating a traditional tort claim."[58] The Court finds, however, that this argument is inconsequential and cannot constitute a basis for dismissal in this instance because the Court does not dismiss Plaintiffs' UTPCPL claim.

58   Defs.' Mot. at 19.

Second, Defendants assert that Plaintiffs, as third-party payors obligated to reimburse their members' prescription drug expenses, did not confer a "benefit" to Defendants in any way recognized under the law and that "any 'benefit' inured to [D]efendants was merely 'incidental' to [P]laintiffs' performance of their independent contractual obligations."[59] To support this argument, Defendants rely on Allegheny General Hospital v. Phillip Morris, Inc.[60] The facts of Allegheny General, however, are distinguishable: Allegheny General involved a hospital's expenses to treat tobacco-related illnesses caused by the patient's prolonged tobacco use. The hospital and tobacco companies had no preexisting relationship, and the hospital did not directly pay the tobacco companies for any products or services. Under such circumstances, the Third Circuit found that the benefit conferred to the tobacco companies was too incidental or

remote to establish a claim of unjust enrichment.[61] Here, however, as pled in the Complaint, Plaintiffs directly paid for or reimbursed the purchase costs of fentanyl patches on behalf their members. The benefit in this case is not remote or incidental; rather, the benefit (the amount paid by Plaintiffs to Defendants for defective fentanyl patches) is direct and measurable.

[59]    *Id.* at 20.

[60]    228 F.3d at 434, 446–448. (held a hospital's claim of unjust enrichment filed against certain tobacco companies was based on remote and indirect injuries, consequently the tobacco companies had no legal obligation to pay the non-paying patients' medical expenses, and whatever "incidental benefit" the tobacco companies received was insufficient to establish a claim of unjust enrichment).

[61]    *Id.*

**\*8** Plaintiffs' Complaint alleges that Defendants "reaped substantial profits from the sale of defective fentanyl patches," and that "Defendants' profits would have been reduced, but for their wrongful and unlawful conduct."[62] Otherwise stated, Plaintiffs pled that they conferred a monetary benefit to Defendants, that Defendants appreciated the benefit, and that the Defendants retained the benefit under inequitable circumstances. The Court finds that these factual allegations, if taken as true, sufficiently plead a claim of unjust enrichment. Accordingly, Defendants' arguments offered to support its motion to dismiss the Complaint for failure to state a claim upon which relief can be granted are denied as to Plaintiffs' unjust enrichment and UTPCPL claims

and granted as to Plaintiffs' breach of express and implied warranty claims.

[62]    Compl. ¶ 49.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Counts II and III for Plaintiffs' failure to plead reasonable notification as required by 13 Pa. Cons.Stat. § 2607(c) is hereby granted. Defendants' remaining general and specific grounds for dismissal under FRCP 12(b)(1) and 12(b)(6), particularly as to Counts I and IV, are hereby denied.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 11th day of March 2010, upon consideration of Defendants' Motion to Dismiss [docket entry No. 14]; Plaintiffs' Answer to Defendants' Motion to Dismiss [docket entry Nos. 15 and 16]; and Defendants' Reply [docket entry No. 19], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS I** and **IV** is **DENIED.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS II** and **III** is **GRANTED.** **Counts II** and **III** are hereby **DISMISSED.**

It is so **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 891150

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 17 of 520
PageID: 8938

Archer v. Holmes, Not Reported in Fed. Supp. (2018)
2018 WL 534475

2018 WL 534475
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Arsenio ARCHER, Plaintiff,
v.
London HOLMES p/k/a We Got
London on da Track, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-CV-2051-TWT
|
Signed 01/23/2018

**Attorneys and Law Firms**

Lauren R. McAlpin, Thomas E. Reynolds, Jr., Reynolds Law
Group, LLC, Atlanta, GA, for Plaintiff.

Brian Caplan, Reitler Kailas & Rosenblatt LLC, New York,
NY, Alan Stuckey Clarke, Harry Donival Dixon, III, Taylor
English Duma LLP, Eileen Elizabeth Hintz Rumfelt, Miller &
Martin, PLLC, Derek Mikal Wright, Derek M. Wright, LLC
Attorney at Law, Jordan Fishman, Hayden R. Pace, Stokes
Wagner, ALC, Atlanta, GA, Namisha D. Patel, Roy Hyrum
Maughan, Jr., The Maughan Law Firm, LLC, Baton Rouge,
LA, for Defendants.

**OPINION AND ORDER**

THOMAS W. THRASH, JR., United States District Judge

*1   This is a copyright infringement case. It is before
the Court on the Defendant London Holmes' Motion to
Dismiss [Doc. 20], and the Defendant Songs of YSL Music
Publishing's Motion to Dismiss [Doc. 24], to which other
Corporate Defendants have joined [Docs. 58, 65].[1] For
the following reasons, Holmes' Motion to Dismiss [20] is
GRANTED in part and DENIED in part, and the Corporate
Defendants' Motions to Dismiss [Docs. 24, 58, 65] are
GRANTED.

[1]    The Corporate Defendant TIG7 Publishing filed
a motion [Doc. 65] to join in Holmes' and
YSL's Motions to Dismiss. Meanwhile, the
following Corporate Defendants filed a separate
Motion to Dismiss [Doc. 58] that consists only
of a statement adopting Holmes' and YSL's

Motions to Dismiss in their entirety: Theory
Entertainment, LLC d/b/a 300 Entertainment,
BMG Rights Management (US) LLC d/b/a Gold
Songs, WEA International Inc., Warner-Tamerlane
Publishing Corp., Warner Music Group Corp.,
Atlantic Recording Corporation, Sony/ATV Music
Publishing LLC, EMI Blackwood Music Inc.,
Songs of Universal Inc., Universal Music Group,
Inc., and Grand Hustle, LLC.

**I. Background**

This dispute stems from the Defendant Holmes' alleged
refusal to give credit to or share profits with the Plaintiff
stemming from the Plaintiff's alleged co-authorship or
sole-authorship of twenty-nine different sound recordings.[2]
According to the Complaint, the Plaintiff, Arsenio Archer,
and Holmes began a professional relationship in June of
2014 as music producers, the goal of which was to co-author
and co-produce songs for music artists.[3] Archer agreed to
the relationship in reliance on Holmes' representation that
he would receive an equal share of any income generated
from sound recordings which he helped to produce.[4] During
the course of their working relationship, Archer exercised
"complete creative freedom" to alter the sound recordings and
produced "essential elements to complete each project."[5]

[2]    Compl. ¶ 6. The songs are: "Section" by 2 Chainz
feat. Lil Wayne; "Retaliation" by Boosie Badazz;
"Street Shit", "Don't You Change", "Kodak",
"Ride", "Black Lives Matter", "How You Feel",
and "Bullshit" by Dae Dae; "Good Girls" by Verse
Simmons; "I Don't Belong to You" by KeKe
Palmer; "About the Money" by T.I. feat. Young
Thug; "Peanut Butter Jelly" by T.I.; "730", "Tell
em", "Keep it Going", "Lifestyle", "Sho Me Love",
and "Take Kare" by Rich Gang; "Gold Bottles",
and "Hell you talkin bout" by Young Jeezy;
"Check", "Numbers", "Memo", "Digits", "Worth
It", "Tattoos", and "Again" by Young Thug; and
"Sneakin" by Drake feat. 21 Savage. Archer claims
that "How You Feel" and "Bullshit" were authored
solely by him. *Id.* at ¶¶ 56, 62. The remainder were
joint works between Archer and Holmes. *See, e.g.,*
*id.* at ¶ 60.

[3]    *Id.* at ¶ 33.

2018 WL 534475

[4]    *Id.* at ¶ 37.

[5]    *Id.* at ¶¶ 34-35.

At some point, Holmes began to claim sole production credits for both the works he created jointly with Archer and the works Archer claims he authored himself.[6] Holmes also began to make various licensing agreements with publishers, distributors, and record labels without obtaining Archer's consent to do so.[7] Meanwhile, Archer claims he has not been compensated or credited as an author or producer of the recordings.[8]

[6]    *Id.* at ¶ 39.

[7]    *Id.* at ¶¶ 40-41. Many of these third parties are joined as Defendants.

[8]    *Id.* at ¶ 44.

**\*2** Archer filed this action on June 5, 2017, against Holmes and the Corporate Defendants. In his original Complaint, Archer alleged eight counts in all. In Count I, he sought a declaratory judgment against all Defendants establishing his ownership rights in the sound recordings. In Count II, he sought an accounting of all income generated from the sound recordings. In Counts III and IV, Archer claimed copyright infringement against Holmes and the Corporate Defendants, respectively. In Count V, Archer claimed vicarious copyright infringement against the Corporate Defendants. In Count VI, he alleged violations of the Lanham Act. Lastly, Archer included a claim for fraud against Holmes in Count VII, and claims for unjust enrichment against all of the Defendants in Count VIII.

Since filing the Complaint, Archer has voluntarily dismissed Counts IV-VI against all Defendants, and partially dismissed Count III against Holmes. All that remains, therefore, are claims for declaratory judgment and accounting against all Defendants (Counts I-II), a claim for copyright infringement against Holmes for the two songs Archer claims he solely authored (Count III), one claim for fraud against Holmes (Count VII), and claims for unjust enrichment against all Defendants (Count VIII). Holmes now moves to dismiss the fraud and unjust enrichment claims against him. The Corporate Defendants,[9] meanwhile, move to dismiss Archer's unjust enrichment claims. The Court will address the claims against Holmes and the Corporate Defendants separately.

[9]    As mentioned above in note 1, a number of Defendants have joined YSL's motion to dismiss. Collectively, the Court refers to these as the "Corporate Defendants." Lest there be any confusion, however, it should be pointed out that there are a number of other corporate Defendants who have not moved to dismiss Archer's claims against them. This Order does not address those claims.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.[10] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."[11] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.[12] Generally, notice pleading is all that is required for a valid complaint.[13] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.[14]

[10]    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

[11]    *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007).

[12]    *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").

[13]    *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).

[14]    *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 19 of 520
PageID: 8940

Archer v. Holmes, Not Reported in Fed. Supp. (2018)
2018 WL 534475

## III. Discussion

### A. Claims against Holmes

Section 301(a) of the Copyright Act expressly preempts all legal or equitable rights that "are equivalent to any of the exclusive rights within the scope of copyright...."[15] The parties agree that the sound recordings at issue are governed by the Copyright Act. The only question is whether Archer's claims for fraud and unjust enrichment are "equivalent to" Archer's potential copyright claims.

[15] 17 U.S.C. § 301(a).

**\*3** Courts in this Circuit have said that state laws are not preempted if they require plaintiffs to prove additional elements over and above those necessary for copyright claims.[16] As the Eleventh Circuit has made clear, however, not just any extra element will do. Rather, only that extra element which "changes the nature of the action so that it is qualitatively different from a copyright infringement claim" will serve to prevent preemption.[17] Put another way, state law claims are equivalent to, and thus preempted by, copyright infringement claims unless they are substantively different from one another.

[16] See, e.g., Howard v. Sterchi, 725 F. Supp. 1572, 1578 (N.D. Ga. 1989).

[17] Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1549 (11th Cir. 1996) (quotations omitted) (emphasis in original).

Turning to the case at hand, though the fraud and copyright claims are based on similar facts—Holmes' licensing of the recordings without Archer's permission—the fraud claim requires proof that Holmes intentionally misled Archer via a false representation.[18] This false representation, similar to breach of duty in trade secrets cases, is an essential element of a fraud claim that is not present in a copyright claim.[19] Because the false representation of a material fact is not only a required element, but in truth the "gravamen" of a fraud claim, it adds the extra element that qualitatively distinguishes Archer's fraud claim from copyright infringement.[20] The fraud claim, therefore, is not preempted by the Copyright Act.

[18] O.C.G.A. § 51-6-2(a).

[19] See Bateman, 79 F.3d at 1549 ("[t]he defendant's breach of duty is the gravamen of such state secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying.") (quoting Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992)).

[20] Altai, 982 F.2d at 717. See also Maxient, LLC v. Symplicity Corp., 63 F. Supp. 3d 592, 598 (E.D. Va. 2014) (finding computer fraud claim not preempted for similar reasons).

But the same cannot be said for Archer's unjust enrichment claim. Under Georgia law, unjust enrichment applies where "there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."[21] These claims are generally regarded as equivalent to copyright claims and, therefore, preempted.[22] This is because, "under these quasi-contractual theories, the plaintiff need only prove that the defendant was unjustly enriched through the use of her idea or work."[23] The heart and soul of such a claim is the violation of the copyright.

[21] Clark v. Aaron's, Inc., 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (quotation omitted).

[22] See 1 Nimmer on Copyright § 1.01[B][1][g] (2017) ("a state law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence, pre-empted insofar as it applies to copyright subject matter.").

[23] Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 432 (2d Cir. 2012).

Using the facts of this case as an example, the gist of Archer's claim for unjust enrichment is that Holmes failed to pay him money he was owed as a co-owner in the works, and that Holmes should not be allowed to be unjustly enriched by his unauthorized use of the sound recordings. No other elements—like a breach of fiduciary duty, a false representation, or a breach of a promise in a contract—need to be proven other than Holmes' violation of Archer's rights as the owner of the copyright. This is no different from a copyright claim.

**\*4** The Plaintiff counters that while quasi-contract claims (e.g., unjust enrichment) may be preempted, contracts implied-in-fact are not necessarily preempted. Because he

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 20 of 520
PageID: 8941
Archer v. Holmes, Not Reported in Fed. Supp. (2018)
2018 WL 534475

alleged Holmes promised to pay him for his work in one paragraph of the Complaint,[24] the Plaintiff contends that Holmes breached a contractual promise and that because this is an element not present in a copyright claim, his claim should survive as a result. The Plaintiff is correct that there is a crucial distinction between quasi-contract claims and implied-in-fact contract claims. Whereas a quasi-contract is a "fictitious contract" created by courts to prevent injustice, a contract implied-in-fact is "a true contract that arises from the tacit agreement of the parties."[25] Claims based on quasi-contract are equitable claims, while claims based on contracts implied-in-fact are regular breach of contract claims. As discussed in the previous paragraph, quasi-contract claims—like unjust enrichment—are almost always preempted. Breach of contract claims, on the other hand, are not necessarily so if a plaintiff can show that rights separate from those he held as a copyright owner were violated.[26]

[24]    *See* Compl. ¶ 37.

[25]    1-1 Corbin on Contracts § 1.20 (2017).

[26]    *See, e.g., Forest Park Pictures*, 683 F.3d at 432 (finding breach of contract claim not preempted where there was a promise to pay for the use of the plaintiff's ideas); 5 Nimmer on Copyright § 19D.03[C][2] (arguing that implied-in-fact contract claims should not be preempted per se).

But while the Plaintiff certainly deserves credit for articulating this somewhat knotty distinction, the Court does not see how it is relevant here as the Plaintiff's Complaint never asserts a claim for breach of contract. The Plaintiff may not successfully argue in a response brief to a motion to dismiss that one throwaway allegation buried deep in the Complaint suddenly serves as the basis for an entirely new cause of action. But even if he could, this novel contract claim would still fail. While courts have found promises to pay contained in implied contracts sufficient to overcome preemption,[27] contract claims "which seek[ ] to enforce only rights that copyright law itself accords plaintiff" are preempted because a promise to do that which copyright law already requires does not contain the "extra element" required to prevent preemption.[28]

[27]    *See, e.g., Forest Park Pictures*, 683 F.3d at 432.

[28]    5 Nimmer on Copyright § 19D.03[C][2][b] (2017)

In this case, Holmes allegedly promised to "split the income generated from the sound recordings...."[29] He did not promise to pay Archer for his labor, to give Archer an interest in some unrelated asset, or to assign credit in any particular way. The only promise Holmes made was to pay Archer a co-owner's share of any income generated from works of which he was to be a co-owner. This "promise" is merely an acknowledgment of that which Archer would already enjoy as a co-owner or sole owner of the copyrights.[30] Any breach of this "promise" would also be a violation of the copyright, and vice-versa. The two claims are effectively the same. Thus, even if this Court read the Complaint broadly and graciously, any purported breach of contract claim on the facts contained in the Complaint would be preempted.

[29]    Compl. ¶ 37.

[30]    Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998) ("Joint authorship entitles the co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made.")

In addition to his preemption arguments, Holmes also argues that the fraud claim has not been sufficiently pleaded under Rule 9(b).[31] In particular, citing *Brazil v. Janssen Research & Development, LLC*, 2016 WL 4844442 at *1 (N.D. Ga. Mar. 24, 2016) (Murphy, J.), Holmes argues that the Complaint does not allege specific statements by the Defendant on which the Plaintiff relied. But the Complaint in this case is very different from the complaint at issue in Brazil. In that case, which had multiple defendants, the plaintiff merely stated that there were misrepresentations without specifying what those misrepresentations were or who said them. But here, the Complaint states that Holmes made representations, before their working relationship began, that Archer would receive an equal share of any royalties earned from any sound recordings they produced together.[32] The Plaintiff has provided the who, what, where, when, and how of the alleged fraud.[33] As such, the Defendant has received the requisite notice as to which of his actions were allegedly fraudulent. This satisfies the pleading requirements of Rule 9(b).[34] For these reasons, Holmes' motion to dismiss is granted as to the unjust enrichment claim, but denied regarding the fraud claim.

31    Fed. R. Civ. P. 9(b).

32    Compl. ¶ 37.

33    *Brazil*, 249 F. Supp. 3d at 1339 ("This means that to state an actionable claim for fraud, the plaintiff must state the who, what, when[,] where, and how.") (quoting *Jenkins v. BAC Loan Servicing LP, 822 F.Supp.2d 1369, 1380 (M.D. Ga. 2011)*).

34    *See Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F.Supp. 494, 505 (S.D.N.Y. 1992) ("Generally, to survive a Rule 9(b) motion, a plaintiff claiming fraud must apprise each defendant of the scope of his or her participation in the alleged fraud.").

### B. Unjust Enrichment Claims Against the Corporate Defendants

**\*5**  The Plaintiff's unjust enrichment claims against the Corporate Defendants also fail, albeit for different reasons. The Plaintiff alleges that when the Corporate Defendants signed licensing agreements with Holmes, they were unjustly enriched because they never paid the Plaintiff as a co-owner. [35]  The Plaintiff never alleges, however, that the Corporate Defendants negotiated with the Plaintiff or that they even knew he existed. In other words, there is no alleged relationship at all between the Corporate Defendants and the Plaintiff. Any benefits the Corporate Defendants received from the Plaintiff, therefore, were received indirectly through Holmes. But in Georgia, unjust enrichment claims lie only in those situations where a defendant has received a direct benefit from a plaintiff. [36]  Indeed, any other result would lead to widespread liability for record companies who deal in good faith with those who they believe are the true owners of copyrights. The unjust enrichment claim against the Corporate Defendants is inappropriate under Georgia law and is dismissed.

35    Compl. ¶ 161.

36    *See Peterson v. Aaron's, Inc.*, No. 1:14-CV-1919-TWT, 2015 WL 5479877, at \*2 (N.D. Ga. Sept. 16, 2015) (holding that indirect benefits are insufficient to sustain a claim for unjust enrichment); *In re White*, 559 B.R. 787, 807 (Bankr. N.D. Ga. 2016) ("... Georgia law does not support claims of unjust enrichment that arise from indirect benefits.").

### IV. Conclusion

For the reasons stated above, the Defendant Holmes' Motion to Dismiss [Doc. 20] is GRANTED in part and DENIED in part. Songs of YSL Music Publishing, et al.'s Motions to Dismiss [Doc. 24, 58, 65] are GRANTED.

SO ORDERED, this 23 day of January, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 534475

---

End of Document                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3454899

2018 WL 3454899
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Arsenio ARCHER, Plaintiff,
v.
London HOLMES p/k/a We Got
London on da Track, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-CV-2051-TWT
|
Signed 04/09/2018

**Attorneys and Law Firms**

Lauren R. McAlpin, Thomas E. Reynolds, Jr., Reynolds Law
Group, LLC, Atlanta, GA, for Plaintiff.

Brian Caplan, Reitler Kailas & Rosenblatt LLC, New York,
NY, Alan Stuckey Clarke, Harry Donival Dixon, III, Taylor
English Duma LLP, Derek Mikal Wright, Derek M. Wright,
LLC Attorney at Law, Von A. DuBose, DuBose Miller,
LLC, Atlanta, GA, Namisha D. Patel, Roy Hyrum Maughan,
Jr., The Maughan Law Firm, LLC, Baton Rouge, LA, for
Defendants.

**ORDER**

THOMAS W. THRASH, JR., United States District Judge

 *1  This is a copyright action. It is before the Court on
the Plaintiff's Motion for Reconsideration [Doc. 82]. Rule
59(e) of the Federal Rules of Civil Procedure authorizes
district courts upon motion to alter or amend a judgment.
See Fed. R. Civ. Proc. 59(e). "The decision to alter or amend
judgment is committed to the sound discretion of the district
judge and will not be overturned on appeal absent an abuse
of discretion." American Home Assurance Co. v. Glenn
Estess & Assocs., 763 F.2d 1237, 1238-39 (11th Cir. 1985)

(citing Commodity Futures Trading Comm'n v. American
Commodity Group Corp., 753 F.2d 862, 866 (11th Cir. 1984)
). The Federal Rules of Civil Procedure do not specifically
authorize motions for reconsideration. Nevertheless, such
motions are common in practice.

Local Rule 7.2 provides that motions for reconsideration are
not to be filed "as a matter of routine practice," but only when
"absolutely necessary." L.R. 7.2E. A party may move for
reconsideration only when one of the following has occurred:
"an intervening change in controlling law, the availability
of new evidence, [or] the need to correct clear error or
prevent manifest injustice." Godby v. Electrolux Corp., No.
1:93-CV-0353-ODE, 1994 WL 470220, at *1 (N.D. Ga.
May 25, 1994). Further, a party "may not employ a motion
for reconsideration as a vehicle to present new arguments
or evidence that should have been raised earlier, introduce
novel legal theories, or repackage familiar arguments to test
whether the Court will change its mind." Brogdon v. National
Healthcare Corp., 103 F. Supp. 2d 1322, 1338 (N.D. Ga.
2000); see also Godby, 1994 WL 470220, at *1 ("A motion
for reconsideration should not be used to reiterate arguments
that have previously been made ... '[It is an improper use of]
the motion to reconsider to ask the Court to rethink what the
Court [has] already thought through-rightly or wrongly.' ")
(quoting Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.,
99 F.R.D. 99, 101 (E.D. Va. 1983) ) (alterations in original);
In re Hollowell, 242 B.R. 541, 542-43 (Bankr. N.D. Ga.
1999) ("Motions for reconsideration should not be used to
relitigate issues already decided or as a substitute for appeal ...
Such motions also should not be used to raise arguments
which were or could have been raised before judgment was
issued."). The Motion for Reconsideration [Doc. 82] raises
nothing new and is DENIED.

SO ORDERED, this 9 day of April, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3454899

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

2012 WL 13187721
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Cindy AVILA, Individually and as
Personal Representative of the Estate
of Steven Avila, et al., Plaintiffs,

v.

CNH AMERICA, LLC, Individually and as
Successor-In-Interest to New Holland North
America, Inc., p/k/a Ford New Holland, Inc.;
Fiatallis North America, Inc.; Fiatallis North
America, LLC, p/k/a Fiatallis North America, Inc.;
Case New Holland, Inc., p/k/a CaseNewHolland
Inc., p/k/a Case International Corporation; CNH
Global, N.V., Individually and as Successor-
In-Interest to New Holland N.V., p/k/a N.H.
Geotech; and Unisys Corporation, Successor-In-
Interest to Sperry Rand Corporation, Successor-
In-Interest to Sperry Corporation, Defendants.

4:04CV3384
|
Signed 08/30/2012

**Attorneys and Law Firms**

Curt D. Marshall, Pro Hac Vice, Weitz, Luxenberg Law
Firm, New York, NY, James W. Vititoe, Masry, Vititoe Law
Firm, Westlake Village, CA, L. William Kelly, III, Kelly,
Schroeder Law Firm, Grand Island, NE, for Plaintiffs Cindy
Avila, Rose Bergholz, Frank Elliott, Virginia Elliott, Robert
Eversoll, Denny Fitzgerald, Julia Foote, Donald Jenkins,
Donnette Jenkins, Michelle Kohlhof, Anthony Martinez, Kris
Mleczko, Michael Nelson, Jody Roepke, Kerry Ressler-
Martinez, Patrick Ryan, Barbara Schorle, Cheri Schwieger,
Gordan Svoboda, William Tolle, Sherri Tolle, Roxana Webb,
Jack Wiese, Bruce Schorle, Charmaine Arp, Rocke Beason,
Thomas Brown, Lorinda Krance, Warren Edghill, Jeanette
Edghill, Joanie Guerrero, Robert Guerrero, Carol Heying,
Robert E. Lee, Byron M. Levinson, Suzanne Dowd, David
R. Bergholz, Jeffrey L. Bergholz, Jason P. Ressler, Ted
Rookstool, Donald A. Schwieger, Richard E. Willis, Keely
Nelson.

Curt D. Marshall, Pro Hac Vice, Weitz, Luxenberg Law
Firm, New York, NY, James W. Vititoe, Masry, Vititoe Law
Firm, Westlake Village, CA, for Plaintiffs Patricia Ann Pirnie,

Marlene Beason, Carol Marie Castleberry, Sandra Lawrey,
William Lawrey, Cecil Sonnenfelt, Letha Sonnenfelt, Jerrold
Tjaden, Linda Tjaden, Aaron Wobig.

Thomas J. Culhane, Erickson, Sederstrom Law Firm, Omaha,
NE, Thomas E. Dutton, Greenberg, Traurig Law Firm,
Chicago, IL, for Defendants CNH America, Case New
Holland, CNH Global.

Daniel W. Nelson, Pro Hac Vice, Melanie L. Katsur, Pro Hac
Vice, Gibson, Dunn Law Firm, Washington, DC, Michaela
A. Smith, Patrick E. Brookhouser, Jr., McGrath, North Law
Firm, Omaha, NE, for Defendant Unisys Corporation.

MEMORANDUM AND ORDER

Richard G. Kopf, Senior United States District Judge

**\*1** Five defendants [1] have filed a motion for partial
summary judgment (filing 431) that raises the issue of
whether Nebraska law will permit the recovery of damages
for future medical monitoring costs in connection with a cause
of action for private nuisance or trespass. [2] I have previously
held, in granting the defendants' motion for partial judgment
on the pleadings (filing 237) and dismissing "[a]ll personal
injury claims alleging negligence, negligent failure to warn,
and negligent infliction of emotional distress (counts one,
two, and three of the fourth amended complaint) brought
by ... eighteen plaintiffs, who claim only a need for future
medical monitoring [on behalf of twenty-one individuals],"
that "damages are an essential element of any negligence
cause of action brought under Nebraska law" and "Nebraska
law does not recognize a claim for medical monitoring when
no present physical injury is alleged." Memorandum and
Order entered on September 10, 2007 (filing 249) at 2. [3]
Consistent with this holding, I will now grant the defendants'
motion for partial summary judgment and dismiss additional
personal injury claims alleged in counts four and five of
the fifth amended complaint brought by the same eighteen
plaintiffs on behalf of the same twenty-one individuals who
do not have a present physical injury. [4]

| 1 | Fiatallis North America, Inc., is the only remaining defendant not to join in the motion. However, its successor, Fiatallis North America, LLC, is a movant. |
|---|---|

2
   The plaintiffs claim the defendants contaminated groundwater by improperly disposing of chemical wastes at an industrial facility in Grand Island, Nebraska.

3
   All proceedings in this matter were stayed after the plaintiffs appealed from a January 2009 judgment that dismissed all claims against Cargill, Incorporated. The appeal was voluntarily dismissed in May 2012, and Cargill is no longer a defendant.

4
   Six of these individuals do not claim any property damage either. As to these individuals, I will dismiss all claims alleged.

### I. Background

In accordance with the requirements of our local rules, the defendants have included a statement of material facts in their supporting brief. *See* NECivR 56.1(a). Because the statement is not controverted by the plaintiffs, the facts are deemed admitted. *See* NECivR 56.1(b)(1). The uncontroverted facts are these:

1. The Appendix to the Fifth Amended Complaint lists each Plaintiff's "currently manifested illness or other adverse physical effects, if any, as a result of their exposure." (Filing No. 207-2 ¶ 3 (emphasis added).)

2. The Appendix includes such alleged medical effects as: eye irritation, dry skin, throat irritation, insomnia and irritability. (Ex. 1 at 1-4.)

3. Eighteen Plaintiffs, asserting claims on behalf of 21 individuals [ (the "Medical Monitoring Plaintiffs") ], allege no physical effects, but instead assert only "the need for future medical monitoring." (*Id.*)

4. Of the 21 individuals who assert only the need for future medical monitoring, six do not assert a claim for property damage. (*Id.*)

  **\*2**  5. Cindy Avila, in her individual capacity, alleges no medical effects and claims only the need for future medical monitoring. She asserts no property damage claim. (*Id.* at 1)

6. Cindy Avila denies any claim of property damage in her supplemental damages disclosure. (Ex. 2 at 3.)

7. David Bergholz alleges no medical effects and claims only the need for future medical monitoring. He asserts no property damage claim. (Ex. 1 at 1.)

8. David Bergholz asserts no property damage claims in his supplemental damages disclosure. (Ex. 3 at 3.)

9. Jeffrey Bergholz, individually and as next friend of S.L.B. and S.R.B., minors, alleges no medical effects and claims only the need for future medical monitoring. He asserts no property damage claim, either individually or as next friend of S.L.B. and S.R.B. (Ex. 1 at 1.)

10. Jeffrey Bergholz, individually and as next friend of S.L.B. and S.R.B., asserts no property damage claims in his supplemental damages disclosure. (Ex. 4 at 2.)

11. Roxanna Webb alleges no medical effects and claims only the need for future medical monitoring. She asserts no property damage claim. (Ex. 1 at 3.)

12. Roxanna Webb asserts no property damage claims in her supplemental damages disclosure. (Ex. 5 at 2.)

13. Rose Bergholz alleges no medical effects and claims only the need for future medical monitoring. She asserts a property damage claim. (Ex. 1 at 1; Ex. 6 at 2-3.)

14. Warren Edghill alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 2; Ex. 7 at 4-5.)

15. Julia Foote alleges no medical effects and claims only the need for future medical monitoring. She asserts a property damage claim. (Ex. 1 at 2; Ex. 8 at 3-5.)

16. Joanie Guerrero, as next friend of B.C.G. and B.C.G., minors, alleges no medical effects and claims only the need for future medical monitoring. She asserts property damage claims on behalf of both minors. (Ex. 1 at 2; Ex. 9 at 3-5.)

17. Robert Guerrero alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 2; Ex. 9 at 3-5.)

18. Donald Jenkins alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 2; Ex. 10 at 4-5.)

19. Anthony Martinez alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 2; Ex. 11 at 4-5.)

Avila v. CNH America, LLC, Slip Copy (2012)

2012 WL 13187721

20. Kris Mleczko alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 2; Ex. 8 at 3-5.)

21. Jason Ressler alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 3; Ex. 12 at 2.)

22. Barbara Schorle alleges no medical effects and claims only the need for future medical monitoring. She asserts a property damage claim. (Ex. 1 at 3; Ex. 13 at 3.)

23. Bruce Schorle alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 3; Ex. 13 at 3.)

24. Cheri Schwieger alleges no medical effects and claims only the need for future medical monitoring. She asserts a property damage claim. (Ex. 1 at 3; Ex. 14 at 3-4.)

**\*3** 25. Gordon Svoboda alleges no medical effects and claims only the need for future medical monitoring. He asserts a property damage claim. (Ex. 1 at 3; Ex. 15 at 3-4.)

26. Sherri Tolle alleges no medical effects and claims only the need for future medical monitoring. She asserts a property damage claim. (Ex. 1 at 3; Ex. 16 at 3-5.)

27. The Medical Monitoring Plaintiffs have resisted discovery of their medical records on the ground that, as of January 30, 2009, they do not allege any personal injury. (Ex. 17.)

28. The Medical Monitoring Plaintiffs have no present physical injury. (Exs. 1–17.)

29. The Medical Monitoring Plaintiffs have no personal injury damages. (Exs. 1–17.)

(Filing 432 at 4-7)

## II. Discussion

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There being no dispute that the twenty-one

Medical Monitoring Plaintiffs have not manifested any health problems as a result of their alleged exposure to toxins, the only question to be answered is whether, as a matter of law, they might be able to recover damages for the cost of medical monitoring to detect future health problems. [5]

[5]    The same question was presented by the defendants' motion for partial judgment on the pleadings (filing 237), but "[t]he defendants restricted the scope of the motion in their reply brief by arguing only that "the three negligence counts should be dismissed with prejudice." (Filing 246, at 13, 14.) Thus, I [did] not consider[ ] whether these plaintiffs might be entitled to recover future medical monitoring costs by alleging claims for private nuisance (count four) and trespass (count five)." Memorandum and Order entered on September 10, 2007 (filing 249) at 3, n. 4.

In *Trimble v. ASARCO, Inc.*, 83 F. Supp. 2d 1034 (D. Neb. 1999), *aff'd*, 232 F.3d 946 (8th Cir. 2000), *abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005), property owners sought to bring a class action against an alleged polluter under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and also asserted state-law tort claims for trespass, nuisance, negligence, strict liability, unjust enrichment, and medical monitoring. District Judge Thomas M. Shanahan dismissed the case after finding that the plaintiffs did not have a private cause of action under CERCLA and did not meet the jurisdictional amount-in-controversy requirement for bringing state-law tort claims in federal court under 28 U.S.C. § 1332. As damages, the plaintiffs claimed property remediation costs plus future medical monitoring costs, but Judge Shanahan stated that "the plaintiffs have cited no authority, and the court has found none, which would suggest that Nebraska law recognizes either a cause of action for medical monitoring or a remedy involving the creation of a medical monitoring fund." *Id.*, 83 F.Supp.2d at 1041. He found it "improbable that the Nebraska courts would judicially fashion such a right or remedy." *Id.* On appeal, the Eight Circuit agreed, stating:

**\*4** Plaintiffs still have not cited any Nebraska authority for the proposition that damages may be awarded for future medical monitoring costs in the absence of a present physical injury.

*Avila v. CNH America, LLC*, Slip Copy (2012)

2012 WL 13187721

> Thus, our recognition of such a cause
> of action would, in effect, expand
> substantive liability under Nebraska
> law. Under the circumstances, it would
> be both imprudent and improper for
> us to allow plaintiffs to pursue their
> medical monitoring claim.

*Id.*, 232 F.3d at 963.

The plaintiffs attempt to distinguish *Trimble* because they
are not asserting a separate "medical monitoring claim"
but instead are contending that "the reasonable cost of
future medical monitoring medically necessary as a result
of the defendants' tortious conduct is properly characterized
as an item of damages[.]" (Filing 465 at 8) They then
argue, relying on Restatement (Second) of Torts, that private
nuisance and trespass claims do not require proof of a present
physical injury before future medical monitoring costs may
be recovered as damages.

The Nebraska Supreme Court has adopted the law of nuisance
as articulated in the Restatement. *See Bargmann v. Soll
Oil Co.*, 574 N.W.2d 478, 486 (Neb. 1998). Under the
Restatement, "[i]f one is entitled to a judgment for harm to
land resulting from a past invasion ..., the damages include
compensation for ... discomfort and annoyance to him as an
occupant." Rest. 2d Torts § 929 (1979). The commentary
states that an occupant "is also allowed to recover for his
own serious sickness or other substantial bodily harm," *id.*
(comment e), but there is no suggestion in § 929 that future
medical monitoring costs may be recovered in the absence of
a present physical injury. Cases cited by the plaintiffs also fail
to support this proposition. [6]

[6]    The plaintiffs contend that § 929 "has been
routinely applied to allow 'injury' from a nuisance
to include bodily harm or the threat thereof. *Ayers
v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287
(1987) (citing Restatement (Second) of Torts § 929
to conclude that quality of life damages represent
compensation for losses associated with damage
to property); *Rust v. Guinn*, 429 N.E.2d 299,
303-04 (Ind. Ct. App. 1981) (citing Restatement
(Second) of Torts § 929 to find that jury may
consider 'injury to health' in assessing the damages
from nuisance); *Miller v. Carnation Company*, 39

Colo. App. 1, 564 P.2d 127 (1977) (distinguishing
between plaintiff's proprietary loss, i.e., loss of use
and enjoyment of land, and personal losses, i.e.,
annoyance, discomfort, and inconvenience, to hold
that an occupant-owner may recover both under
the Restatement (Second) of Torts § 29, comment
e)." (Filing 465 at 10-11) In *Ayers*, the New Jersey
Supreme Court referred to § 929 to explain that the
inconvenience of having no running water on the
plaintiffs' properties was the sort of "quality of life
damage" that is compensable under nuisance law.
525 A.2d at 293-94. In *Rust*, an Indiana appellate
court upheld an award of damages to plaintiffs who
complained of vomiting, gagging, nausea and a
burning sensation in their eyes, holding that these
were actual injuries. 429 N.E.2d at 304-05. In
*Miller*, a Colorado appellate court upheld a jury
award for the annoyance and discomfort associated
with harassment by flies and rodents. 564 P.2d at
129.

The Nebraska Supreme Court also follows the Restatement
(Second) of Torts with regard to trespass law. *See Lambert
v. Holmberg*, 712 N.W.2d 268, 273 (Neb. 2006). Under the
Restatement, "[a] trespass on land subjects the trespasser to
liability for physical harm [7] to the possessor of the land at
the time of the trespass ...." Rest. 2d Torts § 162 (1965).
Again, this language merely authorizes recovery of damages
for existing bodily harm.

[7]    "The words 'physical harm' are used to denote
physical impairment of the human body, or of
tangible property, which is to say land or chattels.
Where the harm is impairment of the body, it is
called 'bodily harm,' as to which see § 15." Rest. 2d
Torts § 7, comment e (1965). "Bodily harm is any
physical impairment of the condition of another's
body, or physical pain or illness." Rest. 2d Torts §
15 (1965).

**\*5** The personal injury claims alleged by or on behalf
of the twenty-one Medical Monitoring Plaintiffs in count
four (private nuisance) and count five (trespass) of the fifth
amended complaint, as against the moving defendants, will
be dismissed with prejudice because it is undisputed they
have "no present physical injury ... [and] no personal injury
damages." *See* paragraphs 28 and 29 of the defendants'
statement of material facts (filing 432 at 7). Six of these
Medical Monitoring Plaintiffs (Cindy Avila, in her individual
capacity; David Bergholz; Jeffrey Bergholz, individually and

as next friend of S.L.B. and S.R.B.; and Roxanna Webb) also do not claim any property damage. *See* paragraphs 4-12 of the defendants' statement of material facts (filing 432 at 5-6). Thus, all claims alleged by or on behalf of these six individuals, as against the moving defendants, will be dismissed with prejudice. [8] However, no final judgment will be entered at this time. *See Clark v. Baka*, 593 F.3d 712, 715 (8th Cir. 2010) (interlocutory appeals under Rule 54(b) are "generally disfavored").

[8]   In the previous memorandum and order, I indicated that "[p]roperty damage negligence claims also alleged by thirteen of these plaintiffs are not subject to the defendant's [Rule 12(c) ] motion and will not be dismissed." Memorandum and Order entered on September 10, 2007 (filing 249 at 2, n. 3). Because it is now undisputed that six of the Medical Monitoring Plaintiffs do not claim any property damage, their negligence claims will be dismissed entirely.

### III. Conclusion

As before, I conclude that Nebraska tort law does not permit the cost of future medical monitoring to be recovered as damages by an individual who has no present physical injury. Accordingly,

IT IS ORDERED that:

1.  The defendants' motion for partial summary judgment (filing 431) is granted, as follows:

    a.  All claims brought by the following four plaintiffs on behalf of six individuals who claim only a need for future medical monitoring and no property damage, as alleged in counts one through five of the fifth amended complaint (filing 282) against the defendants Unisys Corporation, CNH America LLC, Case New Holland, Inc., CNH Global N.V., and Fiatallis North America LLC f/k/a Fiatallis North America, Inc., are dismissed with prejudice:

        (1) Cindy Avila;

        (2) David R. Bergholz;

        (3) Jeffrey L. Bergholz, individually and as next friend of S.L.B. and S.R.B., minors; and

        (4) Roxana Webb.

    b.  All personal injury claims alleging private nuisance and trespass (counts four and five of the fifth amended complaint (filing 282)) brought by the following fourteen plaintiffs, on behalf of fifteen individuals who claim only a need for future medical monitoring, are dismissed with prejudice as against the defendants Unisys Corporation, CNH America LLC, Case New Holland, Inc., CNH Global N.V., and Fiatallis North America LLC f/k/a Fiatallis North America, Inc.:

        (1) Rose Bergholz;

        (2) Warren Edghill;

        (3) Julia Foote;

        (4) Joanie Guerrero, as next friend of B.C.G. and B.C.G., minors, but not in her individual capacity;

        (5) Robert Guerrero;

        (6) Donald Jenkins;

        (7) Anthony Martinez;

        (8) Kris Mleczko;

        (9) Jason P. Ressler;

        (10) Barbara Schorle;

        (11) Bruce Schorle;

        (12) Cheri Schwieger;

        (13) Gordon Svoboda; and

        (14) Sherri Tolle.

        Any property damage claims alleged by these fourteen plaintiffs are not dismissed.

    c.  No claims are dismissed as against the defendant Fiatallis North America, Inc.

2.  This order does not constitute a final judgment under Federal Rule of Civil Procedure 54(b).

**All Citations**

Slip Copy, 2012 WL 13187721

Avila v. CNH America, LLC, Slip Copy (2012)

2012 WL 13187721

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 4

Baker v. Chevron U.S.A. Inc., 533 Fed.Appx. 509 (2013)

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Penn, LLC v. Prosper Business Development Corp.,
6th Cir.(Ohio), December 12, 2014

533 Fed.Appx. 509
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Carolyn BAKER; Daniel Brockman,
et al., Plaintiffs–Appellants,
v.
CHEVRON U.S.A. INC.; Chevron Texaco
Corporation; Chevron Pipeline, Inc.; Chevron
Energy Solutions LP; Chevron Energy Solutions
Management LLC; Chevron Environmental
Management Company; Chevron Environmental
Services Company, Defendants–Appellees.

Nos. 11–4369, 12–3995.
|
Aug. 2, 2013.

**Synopsis**

**Background:** Residents living near crude oil refinery that
leaked toxic chemical plume allegedly contaminating their
property brought action against refinery operator for property
damages and medical monitoring damages. Operator moved
for summary judgment. The United States District Court for
the Southern District of Ohio, 2011 WL 3652249, Sandra S.
Beckwith, J., granted the motion. Residents appealed.

**Holdings:** The Court of Appeals, Griffin, Circuit Judge, held
that:

[1] expert testimony regarding causation of disease was
unreliable;

[2] residents did not have a property interest in the water;

[3] there was no evidence that soil vapors were harmful to
humans;

[4] medical monitoring of residents was not warranted; and

[5] sanctions against residents' counsel were warranted.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (10)

[1]  **Federal Civil Procedure** 🔑 **Failure to
respond; sanctions**

Expert witness report that was an untimely
disclosed report intended to supplement a
deficient expert opinion and reopen *Daubert*
testimony was inadmissible.

3 Cases that cite this headnote

[2]  **Evidence** 🔑 **Medical testimony**

**Evidence** 🔑 **Experiments and results thereof**

Under the *Daubert* test for determining
admissibility of expert testimony, expert
witness's opinion that cumulative benzene
exposure caused blood diseases in residents
living over ground water allegedly contaminated
by plume of toxic chemicals leaked from crude
oil refinery was unreliable, where expert relied
on studies with much higher levels of benzene
exposure than residents were exposed to, studies
offered no consistent support of exposure
causing increased risk of blood disease, and
expert did not attempt to eliminate alternative
competing causes.

7 Cases that cite this headnote

[3]  **Water Law** 🔑 **Pollution**

Under Ohio law, residents living near crude oil
refinery who were not using the groundwater
beneath their land when it was allegedly
contaminated by a plume of toxic chemicals
leaked from the refinery that allegedly made the
water undrinkable for approximately 500 years

did not have a property interest in that water such that toxic plume was not an unreasonable interference with their property rights.

**[4]    Trespass** 🔑 **Injury to property**
**Water Law** 🔑 **Pollution**

Under Ohio law, mere detection of toxic soil vapors did not constitute damage to property that would give rise to a claim for indirect trespass into the subsurface of properties of residents living near a crude oil refinery that leaked a plume of toxic chemicals that allegedly contaminated the soil and groundwater beneath the residents' homes.

5 Cases that cite this headnote

**[5]    Water Law** 🔑 **Evidence**

Under Ohio law, evidence of two completed subsurface pathways for two hydrocarbons at two monitoring wells was insufficient to establish actual damages to all 61 residences near crude oil refinery, as required to give rise to a claim for indirect interference with owners' subsurface property rights by presence of toxic chemical plume that allegedly leaked from the refinery; owners were required to offer evidence of contamination on each of their 61 properties since actual damages were required to prove indirect interference, and residents did not bring class action against refinery that would allow for common proof of damages.

2 Cases that cite this headnote

**[6]    Evidence** 🔑 **Cause and effect**

Under *Daubert* test for determining admissibility of expert testimony, expert's testimony that presence of toxic chemicals in soil vapors could only have originated from plume of toxic chemicals leaked from crude oil refinery into local groundwater supply was unreliable, where expert's field was not soil vapor, and expert failed to conduct a soil vapor pathway analysis.

11 Cases that cite this headnote

**[7]    Water Law** 🔑 **Pollution**

Under Ohio law, allegations by some residents living near crude oil refinery of interference with the use and enjoyment of their properties due to a chemical plume that leaked from the refinery and allegedly contaminated the groundwater and soil under their homes, causing them to be unable to enter their basements or forcing them to abandon home improvement plans, were either de minimis or irrational such that they were not substantial, as required to be compensable under a theory of indirect interference with subsurface rights.

**[8]    Water Law** 🔑 **Pollution**

There was no evidence that soil vapors that were allegedly contaminated from toxic chemical plume that leaked from crude oil refinery into groundwater supply were harmful to humans such that residents living near the refinery experienced substantial physical damage that would give rise under Ohio law to a claim for invasion of subsurface property rights under a theory of indirect trespass.

4 Cases that cite this headnote

**[9]    Damages** 🔑 **Medical treatment and care of person injured**

Medical monitoring of residents living near crude oil refinery that leaked a plume of toxic chemicals that allegedly contaminated the groundwater and soil under residents' properties was not warranted, where residents did not identify the diseases the chemicals in the plume allegedly caused, there was no individualized proof that each of the 118 residents were exposed to chemicals from the plume in sufficient quantities to cause an increased risk of disease, and community-wide cancer study did not conclude that the higher than expected number of cases was due to the plume.

**[10]    Federal Civil Procedure** 🔑 **Particular types of cases in general**

Rule 11 sanctions were warranted against counsel for residents who lived near crude oil refinery alleging that a plume of leaked toxic chemicals from the refinery contaminated their groundwater and soil, where counsel asked for the medical monitoring of all 118 residents knowing that they did not have individualized exposure data, or a present, rather than merely potential, increased risk in certain diseases, and continued to litigate the medical monitoring claim while knowing that it was meritless. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

2 Cases that cite this headnote

**\*510** On Appeal from the United States District Court for the Southern District of Ohio.

**\*511** BEFORE: GRIFFIN and KETHLEDGE, Circuit Judges; and ZATKOFF, District Judge. \*

\*      The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

**Opinion**

GRIFFIN, Circuit Judge.

This case arises from defendant Chevron's activities at its crude oil refinery near the Village of Hooven in Hamilton County, Ohio. [1] Chevron acknowledges that from 1931 to 1986, the refinery was the source of considerable environmental contamination, including hazardous air emissions and a cumulative release of approximately eight million gallons of gasoline that gravitated through the soil and formed a plume atop the groundwater under the refinery. By 1996, the plume had migrated under a portion of the Village of Hooven.

[1]      Although plaintiffs named seven different Chevron entities as defendants, there appears to be no reason to distinguish between each of the separate entities because the parties collectively refer to all defendants throughout their briefs simply as "Chevron." We follow suit.

Plaintiffs are approximately 200 former and current neighbors of the refinery who allege claims for damages arising out of the refinery's air emissions, the groundwater plume, and the "soil vapors" arising from the plume that escape to the surface. Plaintiffs fall into three distinct categories: (1) individuals who claim personal injury because of the air emissions; (2) individuals who seek medical monitoring damages because their exposure to the plume and its soil vapors has given them an increased risk of contracting a serious disease; and (3) individuals who claim property damage because of the plume and its soil vapors.

The district court bifurcated the personal injury plaintiffs from the property damage plaintiffs and selected bellwether plaintiffs from each group to determine the viability of each category of claims. After excluding two of plaintiffs' experts opinions as unreliable, the district court granted summary judgment to Chevron on all claims. The district court also granted Chevron's motion for Rule 11 sanctions, ordering plaintiffs' counsel to pay Chevron $250,000 in defense costs because their positions regarding the legal and evidentiary basis for medical monitoring damages were objectively unreasonable. Plaintiffs appealed the orders excluding their experts and granting summary judgment to Chevron; plaintiffs' counsel appealed the order granting Rule 11 sanctions to Chevron. For the reasons that follow, we affirm.

I.

A.

The Village of Hooven lies in the western part of Hamilton County, Ohio. State Route 128 demarcates Hooven's eastern boundary. From approximately 1930 to 1985, Gulf Oil Company ("Gulf") operated a petroleum refinery next to Hooven, just across State Route 128. The refinery produced gasoline, diesel fuel, jet fuel, heating oil, sulphur, and asphalt. The southwestern corner of the refinery's property line abuts the northeastern corner of Hooven. The refinery sits in the flood plain of the Great Miami River, which establishes the eastern boundary of the refinery. Chevron purchased the refinery from Gulf in 1985 and closed it in 1986. Chevron acknowledges that while the refinery was operational, various hydrocarbon compounds escaped from refinery equipment into the air as "fugitive emissions."

In 1985, gasoline appeared to be seeping from the riverbank inside the refinery **\*512** property line into the Great Miami River. It was later determined that gasoline and diesel fuel, which had been leaked or spilled at the refinery over the years, had gravitated through the soil and entered the groundwater under the refinery. In total, about eight million gallons of fuel leaked into the groundwater. The fuel settled on top of the groundwater, creating a light, non-aqueous phase liquid ("LNAPL") plume. Over time, the plume migrated from the refinery's boundaries and entered at least the eastern subterranean area of Hooven. The plume under the eastern portion of Hooven is at a depth of anywhere from fifty to seventy feet below the surface. The principal chemical of concern in the plume is benzene, which is a known carcinogen in sufficient doses. Benzene also originates from vehicle exhaust, cigarette smoke, and is present in common household products, such as glue and paint.

As the level of the groundwater rises, so does the LNAPL plume floating atop the water. When the groundwater falls, a "smear zone" of LNAPL-saturated soil is left behind. When the water table does not encompass the smear zone, constituents from the plume remaining in the soil may volatize into "soil vapors" which could potentially reach the surface, depending on, among other things, the chemical properties of the particular constituent, the depth of the smear zone, and the porosity of the soil. Under the right conditions, however, the soil vapors may biodegrade naturally.

Soon after Chevron discovered the seeping gasoline in 1985, it notified the Ohio Environmental Protection Agency and began the process of installing groundwater monitoring and recovery wells throughout the refinery to capture the contamination. Later, in 1993, Chevron and the United States Environmental Protection Agency ("U.S. EPA") entered into a consent order which governs the remediation of the refinery site. Pursuant to the order, a number of monitoring wells were installed to assist in determining the footprint of the plume, as well as provide a means to conduct soil vapor testing. These efforts led Chevron to discover that the plume had migrated under Hooven in 1997.

In 1999, to mitigate the risk of soil vapor intrusion from the plume, Chevron installed a horizontal soil vapor extraction ("HSVE") system in Hooven. The HSVE is a vacuum-type system comprised of three horizontal extraction pipes located underneath Hooven's main roadways that intercepts soil vapors from the plume and sends them to a thermal oxidation unit for incineration.

In 2006, the U.S. EPA reviewed Chevron's monitoring well sampling data and concluded that "there are no exposure pathways from Chevron's contamination to the community residents, and that Chevron's contamination does not pose any current human health risks to the residents or workers in the community." An "exposure pathway" or "completed pathway" is a pathway by which soil vapors from the plume can reach the surface and enter a building. The existence of a completed pathway generally requires: (1) the observation that a particular chemical is present at all soil depths and in the subject building's indoor air; (2) confirmation that the specific chemical is present at concentrations above background levels; and (3) confirmation that the measured concentrations did not come from nonplume sources.

Also in 2006, using the same Chevron sampling data as did the U.S. EPA, the Ohio Department of Health ("ODH") prepared its own health risk analysis. The ODH found an "indeterminate public health hazard" and requested additional sampling under a "wors[t] case scenario." **\*513** To accommodate the ODH's request, the U.S. EPA went into Hooven in 2008 and 2009 and collected several quarters of sub-slab and indoor vapor samples under what it deemed a "worst case scenario," that is, when the HSVE was turned off and when Chevron was engaged in high-grade groundwater pumping which would lower the water table and expand the smear zone.

The ODH drew two conclusions from its "worst case scenario" study. First, "[t]he levels of vapor-phase petroleum hydrocarbons detected in the indoor air of area residences and the Hooven Elementary School during the [U.S. EPA] quarterly sampling did not pose a public health hazard to residents, students or staff." Second, a completed pathway for isopentane and trimethylpentane at concentrations above screening levels could be found in the subsurface near two monitoring wells in the eastern portion of Hooven. Regarding this second conclusion, however, the ODH noted that, although those hydrocarbons were detected in the *subsurface,* there was no health risk because the *indoor air* concentrations of those chemicals "did not increase to above levels of concern," even under "worst case scenario" conditions. The ODH also observed that when Chevron reactivated the HSVE, the vapor levels quickly and significantly decreased.

The ODH also released an ecological study titled "Cancer Incidence Among Residents of Hooven, Hamilton County, Ohio, 1996–2003." The ODH designed the study to compare

the incidence of cancer among Hooven's 164 residents with national background rates. The study found "significantly higher than expected numbers of cancer cases for the 25 observed cancers combined and cancers of the female breast; lung and bronchus; and bladder." The study concluded, however, that the "types of cancer diagnosed among Hooven residents differ with respect to risk factors, latency, course of disease and probability of survival. For this reason, it is not likely a specific point source of exposure or single risk factor is playing a role in the increased cancer burden." The ODH later supplemented its study with data from 2004 to 2007, reporting seven additional cancer cases. In this update, the ODH reaffirmed its earlier conclusion that "it is not likely that a common risk factor is contributing to the development of these cancers."

The 200 plus individual plaintiffs in this case, former and current neighbors of the refinery, assert a litany of personal injury and property damage claims against Chevron under Ohio state law. For case management purposes, the matter was bifurcated between personal injury plaintiffs and property damage plaintiffs. The district court also allowed the parties to select bellwether plaintiffs for each trial group. The parties vigorously litigated whether the refinery damaged each category of plaintiffs. In four separate opinions, the district court rejected all claims. A summary of each of these rulings is necessary for the issues raised on appeal. We start with the bellwether property damage plaintiffs.

B.

Of the sixty-one individual plaintiffs advancing property damage claims, there are fifteen bellwether plaintiffs. These plaintiffs, whose properties were directly above the plume, alleged property damage resulting from the plume's contamination of the subsurface and groundwater, and the soil vapors emanating from the plume that reach the surface. In support of these claims, plaintiffs offered, inter alia, the expert opinion of Philip Bedient, Ph.D. Dr. Bedient broadly opined that the "[p]roperties **\*514** and residents of Hooven have been adversely impacted" by the plume. He also stated that soil vapors from the plume were "the only way to explain" the presence of benzene, toluene, xylene, and ethyl benzene in the shallow subsurface soils in and around Hooven.

Chevron filed a motion to exclude Dr. Bedient's opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and a

motion for summary judgment. The district court granted Chevron's motions, holding that "the record fails to show that the hydrocarbon plume caused any damage to Plaintiffs' property or interfered with their property rights or with the use and enjoyment of their properties." The court first determined that:

> [N]one of the bellwether Plaintiffs have demonstrated that the plume actually interferes with their use of the subsurface. Plaintiffs do not use the groundwater for any purpose. Plaintiffs' water supply does not come from ground wells; rather, they have a municipal water source. Plaintiffs have not indicated that the plume has caused them to abandon any particularized and non-speculative plans which require drilling or excavation on their properties.

(Footnote omitted.)

The court next excluded Dr. Bedient's opinions because he admitted he was not a soil vapor expert and, even if he was, his opinions were unreliable, vague, and conclusory because he did not perform any analysis to determine whether there is a completed soil vapor pathway from the plume to the surface. The court went on to conclude that plaintiffs' remaining evidence of soil vapor intrusion—Chevron's *theoretical* model of completed soil vapor pathways and plaintiffs' deposition testimony of gasoline odors in their homes and around their properties—was insufficient to create a genuine issue of material fact on whether soil vapors from the plume caused compensable property damage. All bellwether property damage plaintiffs appealed.

C.

The district court next addressed the bellwether claims of the personal injury plaintiffs. Of the 200 plus plaintiffs in this case, only seven claimed personal injury from being exposed to benzene contained in the refinery's "fugitive emissions." Of those seven, the parties selected four as bellwether plaintiffs. These plaintiffs, and their respective injuries, are as follows: Mary Etta Greener–Brown, Hodgkin's

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 36 of 520
PageID: 8957

disease and breast cancer; Carol Lipscomb, monoclonal gammopathy/multiple myeloma; Jean Runck, monoclonal gammopathy/multiple myeloma; and Michelle Schrader, acute myelogenous leukemia ("AML").

Plaintiffs offered three expert witnesses to prove that the refinery's airborne benzene emissions caused their injuries. First, Dr. Cheremisinoff, a chemical engineer, calculated a total gross amount of benzene released from the refinery through emissions. Second, Dr. Rosenfeld, using Dr. Cheremisinoff's calculations, created an air flow model to calculate the cumulative dose of benzene to which each plaintiff was exposed, a number expressed in micrograms. Dr. Garabrant, Chevron's expert, converted Dr. Rosenfeld's microgram figures into the more conventional expression of parts per million per years ("ppm-years"). Finally, Dr. Dahlgren, using Dr. Rosenfeld's dose estimates, opined in his First Report and untimely Second Report (filed in response to Chevron's motion to strike the First Report) that each plaintiff's dose of benzene was sufficient to cause her specific illness.

**\*515** Chevron filed a motion to exclude Dr. Dahlgren's causation opinions under *Daubert* and a motion for summary judgment. Chevron based its motion for summary judgment on the asserted inadmissibility of Dr. Dahlgren's opinion. Plaintiffs responded by submitting Dr. Dahlgren's Third Report, a forty-nine page affidavit which purportedly clarified his first two reports. The district court held a hearing at which Dr. Dahlgren testified. After the hearing, as a result of additional motion practice, plaintiffs obtained discovery of some 270 documents that Chevron wrongly identified as privileged. With leave of court, Dr. Dahlgren prepared a Fourth Report limited to the issues raised in the newly discovered evidence, and the parties filed supplemental memoranda on Dr. Dahlgren's new opinion.

In a forty-seven page order, the district court held that Dr. Dahlgren's causation opinions were not reliable under *Daubert* and therefore inadmissible. The court first determined that Dr. Dahlgren's First Report failed to comply with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because it did not provide the "how and why" of his opinion that each plaintiff's cumulative benzene exposure caused her specific illness. The court explained:

> Dr. Dahlgren's [First Report] on these Plaintiffs consists almost entirely

of a recitation of their family and medical histories. Each report concludes with a brief "discussion" which apparently sets forth Dr. Dahlgren's opinion that the Plaintiff's illness was caused by her exposure to benzene. Then, attached to each report is an "Appendix on benzene toxicity," which is essentially a bibliography and summary of a number of articles and medical studies on illnesses purportedly caused by benzene. With one exception, however, Dr. Dahlgren never explains in his report how the bibliography supports his conclusion that a Plaintiff's cumulative benzene exposure was sufficient to cause her disease.

The "one exception" noted by the district court was Dr. Dahlgren's opinion regarding plaintiff Michelle Schrader, where he cited a 1948 report issued by the American Petroleum Institute which states that there is no safe level of exposure to benzene. The court concluded, however, that Dr. Dahlgren's "no safe level" opinion was not a reliable causation theory under *Daubert,* noting that "the one-hit theory could not be established because it would be just as likely that ambient benzene was the cause of Plaintiffs' illnesses."

The court next determined that the Second Report—submitted nearly two months after the expert report deadline and without leave of court—contained the same fatal flaw as the First Report: Dr. Dahlgren made no effort to tether his causation theory to the medical literature attached to his report.

As for the Third Report, the district court observed that it "is arguably the only report from Dr. Dahlgren which complies with the requirements of Rule 26(a)(2)[ (B) ] and yet Plaintiffs provided no justification for providing this report five months late." The court concluded that there was nothing in the Third Report that could not have been included in the First Report and, therefore, the Third Report must be excluded as an improper attempt to correct the weaknesses of Dr. Dahlgren's opinions that Chevron identified in its *Daubert* motion. The court further determined that submitting the specifics of the expert's opinion on the dispositive issue in the case more

than five months late was not harmless error. Because of these defects, the district court **516** did not consider Dr. Dahlgren's Third Report.

The district court then addressed Dr. Dahlgren's Fourth Report. Interestingly, the additional discovery that plaintiffs obtained on the documents that Chevron had wrongly claimed as privileged showed that the refinery's benzene emissions were actually thirty percent *lower* than initially believed. Nevertheless, Dr. Dahlgren maintained his original causation opinion and raised for the first time the issue of short-term exposure. On this new issue, he opined that plaintiffs' peak exposures to benzene in excess of regulatory levels were worse than lower levels of exposure for a longer period of time. Dr. Dahlgren also stated that in 1977, plaintiffs, and all Hooven residents, should have been wearing air respirators when benzene emissions exceeded regulatory levels near the refinery's fence line with Hooven. Additionally, Dr. Dahlgren cited nine medical studies in support of his Fourth Report.

The district court rejected the Fourth Report as unreliable. The court found that Dr. Dahlgren's opinions were inadmissible to the extent he was relying on regulations on short-term benzene exposures. Citing *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 252–53 (6th Cir.2001), the court explained that the mere fact that plaintiffs were exposed to benzene in excess of regulatory limits was insufficient to establish causation in a tort case. The court also found the discussion of short-term benzene exposures in 1977 wholly irrelevant because Dr. Dahlgren failed to account for the fact that "not only did none of the Plaintiffs live near the refinery fence line in 1977, none of the Plaintiffs even lived in Hooven in 1977." The court then exhaustively analyzed the medical studies Dr. Dahlgren offered in support of his opinion, ultimately concluding that "none of these studies supports an opinion that benzene can cause the illnesses from which Plaintiffs suffer at the extremely low doses or exposures experienced in this case." Having excluded Dr. Dahlgren's opinions —plaintiffs' only evidence of causation—the district court granted Chevron's motion for summary judgment. Greener–Brown, Schrader, and Lipscomb appealed; Runck did not.

### D.

The remaining property damage plaintiffs attempted to meet the district court's criticism of the bellwether claims with new expert opinions from Matthew Hagemann, a former U.S. EPA geologist, Dr. Cheremisinoff, and Dr. Bedient. Although Mr. Hagemann agreed with Chevron's assessment of the size of the smear zone, he broadly concluded that the plume and its soil vapors could be found "in Hooven." Dr. Cheremisinoff similarly opined, in nonspecific fashion, that soil vapors intruded into basements and crawl spaces of the buildings "in Hooven." Dr. Bedient disagreed with Mr. Hagemann over the size of the smear zone, stating that the smear zone boundaries had been "misrepresented" and that further sampling was necessary "to determine the full extent of the hydrocarbon contamination."

Chevron moved for summary judgment; the district court granted the motion. Adopting Mr. Hagemann's opinion on the size of the smear zone, the court held that all property owners who were not above the smear zone, or within 100 feet of its edges, [2] had no property damage claims as a matter of law. As for the claims involving **517** the remaining properties, the court summarized its reasons for rejecting those claims as follows:

[2]     The district court adopted the 100–foot limit based on U.S. EPA guidance regarding the methodology of detecting soil vapors.

Plaintiff[s'] claims fail because none of them pointed the [c]ourt to specific evidence that his or her property had experienced [soil] vapor intrusion. Instead, as alluded to earlier, Plaintiffs have approached this case as if the Village of Hooven is the real party-in-interest in this case. But Hooven is not a plaintiff in this case and proof that there was a completed pathway for vapor intrusion "in Hooven" does not suffice—to take one example—to prove that there was or is a completed pathway at 113 Ohio Avenue. Plaintiffs' proof of vapor intrusion is simply at too general a level to create a triable issue of fact on this issue.
(Emphasis removed.)   All property damage plaintiffs appealed.

### E.

One hundred eighteen plaintiffs requested medical monitoring damages because their alleged exposure to the plume and its soil vapors put them at an "increased risk" of contracting a number of serious diseases. Plaintiffs submitted a medical monitoring plan from Dr. Lockey designed to "balance increased health risks of contracting injuries or diseases associated with the involuntary environmental contamination of the soil and ground water of Hooven

by Chevron hazardous chemicals and help mitigate individual and community distress related to health outcome uncertainties." After reviewing Dr. Lockey's plan, the district court ordered plaintiffs to show cause why their claims should not be dismissed in light of *Hirsch v. CSX Transp., Inc.,* 656 F.3d 359 (6th Cir.2011), a case in which this court addressed the evidentiary requirements for medical monitoring damages under Ohio law.

After considering the parties' briefing, the district court dismissed all claims for medical monitoring damages with prejudice. The court offered three reasons for its ruling. First, plaintiffs failed to specifically identify any disease or illness that they might have an increased risk of contracting because of the plume and its soil vapors. Second, plaintiffs failed to show "not only that he or she was exposed to a specific chemical, but also to quantify the exposure, i.e., provide a dose, in some way that it can be reliably determined that he or she has a significantly increased risk of contracting some disease or medical condition." And third, Dr. Lockey's plan was not designed to address any disease that might be caused by the chemicals in the plume; rather, it was a general wellness plan that supposedly would offset the deleterious health effects that may or may not have been caused by the plume. The district court also commented that "[a]s was the case with the property damage Plaintiffs, the medical monitoring Plaintiffs have apparently treated this lawsuit as a class action. It is not, however." All medical monitoring plaintiffs appealed.

### F.

After all property damage claims and bellwether personal injury claims were adjudicated, but while the claims for medical monitoring damages were pending, Chevron filed a motion for Rule 11 sanctions against plaintiffs' counsel. Chevron argued that it was entitled to defense costs and attorney's fees relating to those pending claims because plaintiffs' counsel continued to prosecute these claims after conceding at a discovery conference that they had no causation evidence under the standards set by the district court.

The district court granted Chevron's Rule 11 motion about two months after it **\*518** dismissed the claims for medical monitoring damages, holding that:

Plaintiffs' counsel took objectively unreasonable positions with respect to both the facts and the law and persisted in maintaining the medical monitoring claims despite the absence of legal and factual support for the claims. These two problems are intertwined in this case. It may be that counsel's unreasonable view of the law influenced the manner in which they attempted to develop evidentiary support for these claims. Counsel's conduct, nevertheless, was unreasonable.

The court identified the "most serious" problem with counsel's conduct in further detail: "Because it was so well-established ... that a toxic tort claimant needed proof of specification causation, i.e., dose, counsel's complete failure to adduce proof of dose had to be the product of a deliberate decision and cannot be blamed on inadvertence or on a reasonable misinterpretation of the case law." The court subsequently awarded Chevron $250,000. Plaintiffs' counsel appealed.

### II.

It is undisputed that the LNAPL plume under a portion of Hooven originates from Chevron's refinery and that fugitive emissions escaped from the refinery while it was operational. It is fiercely disputed whether these environmental hazards have caused any cognizable personal injury or property damage. On appeal, the parties have abandoned the bellwether distinctions used below and have organized their arguments around the three categories of plaintiffs: (1) those claiming personal injury damages from airborne benzene emissions; (2) those claiming property damage; and (3) those claiming medical monitoring damages. We address each category in the order presented after reciting the applicable standards of review.

We review a district court's decision on a motion for summary judgment de novo. *Savage v. Gee,* 665 F.3d 732, 737 (6th Cir.2012). "The question on summary judgment is whether the moving party has demonstrated that the evidence available

to the court establishes no genuine issue of material fact such that it is entitled to a judgment as a matter of law." *Dobrowski v. Jay Dee Contractors, Inc.,* 571 F.3d 551, 554 (6th Cir.2009) (citing Fed.R.Civ.P. 56(c)). In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmoving party. *Id.* "A mere scintilla of evidence is insufficient to create a material question of fact and defeat a motion for summary judgment; 'there must be evidence on which the jury could reasonably find for the [non-movant].' " *CareToLive v. FDA,* 631 F.3d 336, 340 (6th Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"We 'review the exclusion of expert testimony for abuse of discretion, even when the exclusion results in the entry of summary judgment for the opposing party.' " *Pluck v. BP Oil Pipeline Co.,* 640 F.3d 671, 676 (6th Cir.2011) (quoting *Meridia Prods. Liab. Litig. v. Abbott Labs.,* 447 F.3d 861, 868 (6th Cir.2006)). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.,* 588 F.3d 908, 915 (6th Cir.2009) (citation and internal quotation marks omitted). Consequently, "we will not substitute our own judgment for that of the district court and will reverse an evidentiary decision only where we are left with a definite and firm conviction that [the district court] committed **\*519** a clear error of judgment." *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 528 (6th Cir.2008) (alteration in original) (citation and internal quotation marks omitted).

### III.

#### A.

Starting with the category of plaintiffs claiming personal injury damages from airborne benzene emissions, the parties here dispute whether the district court properly excluded Dr. Dahlgren's expert opinion. Resolution of this issue controls whether the district court properly granted summary judgment to Chevron because Dr. Dahlgren's opinion is plaintiffs' only evidence of causation. And although whether Dr. Dahlgren was properly excluded is outcome determinative, we nevertheless review the district court's decision under the abuse of discretion standard. *See Newell Rubbermaid, Inc. v. Raymond Corp.,* 676 F.3d 521, 532 (6th Cir.2012); *Pluck,* 640 F.3d at 676.

Plaintiffs argue that the district court erred because it did not "take into consideration the full record presented" in excluding Dr. Dahlgren. Plaintiffs claim that the court ignored his *Daubert* hearing testimony, a slideshow that he prepared but did not present at that hearing,[3] and a CD containing numerous benzene-related scientific studies that he gave the court during the *Daubert* hearing. Plaintiffs also criticize the district court for rejecting a number of studies that Dr. Dahlgren relied on in his Fourth Report because those studies did not contain statistically significant findings.[4]

[3]    Plaintiffs' counsel apparently gave the district court a printed copy of Dr. Dahlgren's slideshow during the *Daubert* hearing.

[4]    "A study that is statistically significant has results that are unlikely to be the result of random error[.]" *Matrixx Initiatives, Inc. v. Siracusano,* ––– U.S. ––––, 131 S.Ct. 1309, 1319 n. 6, 179 L.Ed.2d 398 (2011) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 354 (2d ed. 2000)).

Chevron responds by first noting that plaintiffs do not specifically challenge the court's rulings that the First and Second Reports failed to comply with Rule 26(a)(2)(B) or that the Third Report was procedurally improper. Chevron next asserts that the district court was not required to consider Dr. Dahlgren's testimony, his slideshow, or CD of studies because those materials related to his *Third Report,* which the court correctly rejected as a prejudicially late, transparent effort to reopen an opinion after its weaknesses had been exposed. Finally, Chevron provides five reasons why Dr. Dahlgren's causation opinion in the Fourth Report lacks a reliable scientific foundation: (1) He never identified the dose of benzene from short-term bursts that he opined was causally related to plaintiffs' blood diseases; (2) he failed to proffer any specific information relating to the short-term benzene bursts each plaintiff allegedly received; (3) he did not cite any scientific literature establishing that short-term benzene exposure, of any intensity, was capable of causing plaintiffs' injuries; (4) he relied on results of studies that contained statistically insignificant results; and (5) the Fourth Report did not reflect any differential diagnosis or other accepted scientific methodology for ruling out non-benzene explanations for plaintiffs' diseases.

Chevron's arguments are well-taken, and we cannot conclude that the district court made a clearly erroneous assessment of either Dr. Dahlgren's opinion or the studies on which he

relied. Plaintiffs do not create a jury question on causation simply because Dr. Dahlgren opined that **\*520** the refinery's airborne benzene emissions caused plaintiffs' diseases. It is the district court's duty to ensure that all expert opinion evidence "rests on a reliable foundation." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. Federal Rule of Evidence 702 assigns the district courts a "gatekeeping role" in screening the reliability of expert testimony. *Id.*; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "It is broadly accepted that the district court has considerable leeway in making these sorts of determinations." *Davison v. Cole Sewell Corp.,* 231 Fed.Appx. 444, 448 (6th Cir.2007) (internal quotation marks and brackets omitted).

In this case, the methodical analysis in the district court's forty-seven page order shows that it fully embraced its gatekeeper role and carefully considered, but ultimately rejected, the alleged scientific foundation of Dr. Dahlgren's expert opinion. First, we agree with Chevron that plaintiffs do not argue that the court abused its discretion by excluding the First and Second Reports for failing to comply with the requirements in Rule 26(a)(2)(B). These reports are therefore not considered in our analysis.

 **[1]**    Second, the court acted within its discretion when it refused to consider Dr. Dahlgren's Third Report and the information offered in support of that report. "We have recognized that '[d]istrict courts have broad discretion to exclude untimely disclosed expert-witness testimony,' particularly when these reports serve as a 'transparent attempt to reopen' the *Daubert* inquiry after the weaknesses in the expert's prior testimony have been revealed." *Pluck,* 640 F.3d at 681 (quoting *Pride v. BIC Corp.,* 218 F.3d 566, 578–79 (6th Cir.2000)). Other than vaguely objecting to the "procedural fairness" of the district court's ruling, plaintiffs do not specifically challenge the court's conclusion that the untimely Third Report was an obvious attempt to bolster a deficient opinion. Indeed, at the *Daubert* hearing, plaintiffs' counsel all but admitted it intentionally held back on the "how and why" of Dr. Dahlgren's initial opinions because, according to counsel, it was purportedly "unknown" how the district court would have liked that information presented.

 **[2]**    Third, the court exhaustively reviewed the medical studies that Dr. Dahlgren offered in the Fourth Report to support his opinion that a cumulative benzene exposure of 3.1 ppm-years can cause Hodgkin's disease (Brown); that 0.12 ppm-years can cause AML (Schrader); or that 2.2 ppm-years can cause multiple myeloma (Lipscomb). The court's primary

criticism was that the subjects of the cited studies generally had much higher exposures to benzene than the plaintiffs, and thus, "there [was] simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Based on a review of the district court's comprehensive analysis, we cannot say that its rejection of these studies was clearly erroneous. Relatedly, the district court acted within its discretion when it discounted studies that contained statistically insignificant results. *See Pluck,* 640 F.3d at 680 (affirming the district court's exclusion of expert evidence because, inter alia, the expert relied on studies containing statistically insignificant results).

Fourth, the court noted that there was no consistent support in the studies that benzene exposure significantly increases the risk of developing plaintiffs' various diseases. And although it is medically accepted that benzene exposure can cause AML, the court also observed that Dr. Dahlgren did not cite any study finding that a cumulative exposure of .12 ppm- **\*521** years (Schrader) significantly increases the risk of developing AML.

Finally, plaintiffs offer no response to Chevron's argument that the Fourth Report does not contain any differential diagnosis or other accepted scientific methodology for ruling out non-benzene explanations for plaintiffs' diseases. We have held previously that the absence of a differential diagnosis is fatal to the admissibility of an expert's opinion regarding disease causation in cases involving hazardous substances. *See Pluck,* 640 F.3d at 678–80; *Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 674–76 (6th Cir.2010). After reviewing this record, we are not left with a definite and firm conviction that the district court committed a clear error of judgment by excluding Dr. Dahlgren's expert opinion. Accordingly, we affirm the grant of summary judgment in favor of Chevron.

## B.

Turning now to the category of plaintiffs who claim property damage, the parties dispute the legal thresholds of evidence necessary to establish two different types of property damage claims—groundwater damage and indirect subsurface trespass—under Ohio law. They also dispute whether the district court properly excluded Dr. Bedient's expert opinion. We start with the disagreements over the property damage claims.

 **[3]**   First, plaintiffs claim that they have a viable groundwater damage claim under *McNamara v. Rittman,* 107 Ohio St.3d 243, 838 N.E.2d 640 (2005), because the plume has unreasonably interfered with their groundwater rights. *McNamara* held that "[a] property owner has a potential cause of action against anyone who unreasonably interferes with his property right in groundwater." *Id.* at 644. Plaintiffs argue that Chevron has unreasonably interfered with their groundwater rights because (1) the plume has made the groundwater undrinkable for some 500 years, and (2) Hooven is subject to a village-wide groundwater zoning use restriction because of the plume. Chevron responds that *McNamara* is distinguishable because it addresses harm to groundwater resources that homeowners were *actually using* at the time of the defendant's alleged interference.

We agree with Chevron that plaintiffs have no groundwater claim under *McNamara.* An Ohio landowner has a property right in groundwater only to the extent he actually uses that water; he has no property interest in that water simply because it resides beneath his land. *See Wood v. Am. Aggregates Corp.,* 67 Ohio App.3d 41, 585 N.E.2d 970, 972 (1990) ("One does not acquire title to underground water but rather a right to use a reasonable amount so long as neighboring landowners are not unduly prejudiced."). Thus, under Ohio law, the property interest in groundwater is use-based, not title-based. *See Smith v. Summit Cnty.,* 131 Ohio App.3d 35, 721 N.E.2d 482, 486 (1998) ("No landowner in Ohio ... has ever held title to ground water."). And here, it is undisputed that plaintiffs never used or planned to use the groundwater. Accordingly, Chevron did not "unreasonably interfere" with the plaintiffs' use of the groundwater under *McNamara.*

 **[4]**   Second, plaintiffs challenge the district court's holding that they had presented insufficient evidence that the plume and its soil vapors indirectly trespassed into the subsurface of their properties. The claim at issue here—an indirect subsurface trespass claim—was first recognized by the Ohio courts in *Chance v. B.P. Chemicals, Inc.,* 77 Ohio St.3d 17, 670 N.E.2d 985 (1996). In *Chance,* BP had a permit from **\*522** the State of Ohio and the EPA to dispose of hazardous waste by injecting it into wells drilled to a depth of some 2,600 feet below the ground surface. *Id.* at 986–87, 989. There, the injectate mixed with the groundwater and migrated in some instances to nearly five miles away from BP's property. *Id.* at 987. Plaintiff landowners brought claims against BP for, inter alia, trespass on the grounds that the injectate contaminated the groundwater beneath their properties. *Id.* at 986.

The Ohio Supreme Court held that plaintiffs had not demonstrated an unlawful entry on their properties by BP. First, the court defined the limited nature of plaintiffs' subsurface property rights, finding that "subsurface rights in their properties include the right to exclude invasions of the subsurface property that actually interfere with [their] reasonable and foreseeable use of the subsurface." *Id.* at 992. Second, the court explained "[e]ven assuming that the injectate had laterally migrated to be in an offending concentration under some of the [plaintiffs'] properties, we find that some type of physical damages or interference with use must have been demonstrated for [plaintiffs] to recover for a trespass." *Id.* at 993. The court further held that absent physical damage to, or interference with their properties, the plaintiffs could not recover damages for loss in value of their properties resulting from the stigma from the public perception that their properties were contaminated. *Id.* In the end, given the limited nature of the plaintiffs' subsurface rights, and no proof of "physical damage" to the subsurface, the court determined that, as a matter of law, plaintiffs had not shown unlawful entry. *Id.* at 993–94.

In *Lueke v. Union Oil Co. of Cal.,* No. OT–00–008, 2000 WL 1545077 (Ohio Ct.App. Oct. 20, 2000) (unpublished), the Ohio Court of Appeals interpreted and applied *Chance.* Faced with a plaintiff advancing an indirect trespass claim for damages to a groundwater well that had been contaminated with gasoline from a nearby leaky underground storage tank, the court stated: "In cases of indirect trespass, damages are not presumed, and actual damages in the form of physical damages or interference with use must be shown before the person suing for trespass can prevail. Furthermore, the damages must be substantial." *Lueke,* 2000 WL 1545077 at *7 (internal quotation marks and citations omitted). The appellate court affirmed the trial court's ruling that the plaintiff had not suffered a substantial or unreasonable interference with the use and enjoyment of the property because the defendant quickly remedied the problem by installing carbon filters to the plaintiff's water system. *Id.* at *8.

In this case, plaintiffs claim that the district court wrongly required them to establish "physical damage" under *Chance* with proof that the soil vapors from the plume were found on their properties at concentrations that were harmful to humans. They argue that the "physical damage" prong of an indirect trespass claim is satisfied upon the "mere detection of constituents" on the property, without regard to whether they are harmful. They argue that the presence of Chevron's

Baker v. Chevron U.S.A. Inc., 533 Fed.Appx. 509 (2013)

contamination on plaintiffs' properties ranging from above background to regulatory health threat levels is sufficient injury to meet the property damage requirements of *Chance*. Chevron responds that the "mere detection" of constituents is insufficient to constitute the physical property damage under *Chance*.

We agree with Chevron that plaintiffs have to show something more than the "mere detection" of soil vapors on their properties to establish the physical damage prong of an indirect trespass claim. **\*523** Under *Chance*, plaintiffs must produce evidence showing that (1) the plume or its soil vapors have invaded their property, and (2) that invasion has caused either substantial physical damage to the land or substantial interference with their reasonable and foreseeable use of the land. These elements are plainly apparent in *Chance* because, as the court explained, even if it assumed that BP's injectate invaded the plaintiffs' properties, the plaintiffs were still required to show that the invasion physically damaged the property or interfered with their use and enjoyment of the property. *Chance,* 670 N.E.2d at 993; *see also Rini v. Dyer,* No. 07CA3180, 2008 WL 3824790, \*5 (Ohio Ct.App. Aug.13, 2008) (unpublished) (" '[W]here property owners are relying on a theory of "indirect" trespass, there is no presumption of damages.' ") (quoting 88 Ohio Jur.3d Trespass § 19; *Ramirez v. Akzo Nobel Coatings, Inc.,* 153 Ohio App.3d 115, 791 N.E.2d 1031, 1034 n. 2 (2003).

Plaintiffs unpersuasively criticize *Lueke* for adding the "substantial" qualifier to the second element. In *Merino v. Salem Hunting Club,* No. 07 CO 16, 2008 WL 5124549 (Ohio Ct.App. Dec. 4, 2008), plaintiffs explain, the court held that "if the plaintiff proves the elements of trespass, he has a right to nominal damages without proof of actual damages." *Id.* at \*7. *Merino* does not help plaintiffs because it is plainly distinguishable from *Lueke*: *Merino* involved a direct trespass claim based on stray bullets entering the plaintiff's property from a nearby shooting club; *Lueke* involved an indirect subsurface trespass claim based on contaminant seepage. Moreover, in support of the "substantial" qualifier, the *Lueke* court cited the indirect trespass cases of *Williams v. Oeder,* 103 Ohio App.3d 333, 659 N.E.2d 379, 383 (1995) ("The trial court did not err in instructing the jury that appellees were culpable in trespass for causing dust or dirt to fall on appellants' property only if the jury concluded that appellants had established 'substantial damages.' ") and *Brown v. Scioto Cty. Bd. of Commrs.,* 87 Ohio App.3d 704, 622 N.E.2d 1153, 1161–62 (1993) (acknowledging that the modern view of indirect trespass liability requires "substantial actual damage"

to the property). *See Lueke,* 2000 WL 1545077 at \*7. Having identified the essential elements of an indirect trespass claim under Ohio law, we now examine whether plaintiffs' proofs create a genuine issue of material fact on both elements, starting with the first.

**[5]**    Because this is not a class action, the district court correctly required plaintiffs to offer sufficient evidence showing the presence of subsurface contamination or soil vapors originating *from the plume* on each and every property involved in this case. *See Brown,* 622 N.E.2d at 1161 (noting that there cannot be a trespass unless some substance has entered the land itself). Plaintiffs claim this is reversible error because it essentially amounts to a requirement that they install a monitoring well on every property in Hooven. We do not agree that the district court required this exacting level of specificity. Instead, it required something more than the speculative proof offered that Chevron's soil vapors were vaguely present "in Hooven." Plaintiffs' best evidence of soil vapor intrusion-completed subsurface pathways for two hydrocarbons at two monitoring wells under the ODH's "worst case scenario" conditions—was simply insufficient to justify a trial for the sixty-one property damage plaintiffs in this case.

**[6]**    This leads us to the question of whether the district court abused its discretion by excluding Dr. Bedient's opinion that the mere presence of benzene, toluene, xylene, and ethyl benzene in varying concentrations in the soils of Hooven could **\*524** *only* have originated from the plume. It did not. Dr. Bedient is not a soil vapor expert, and he did not complete any vapor pathway analyses. Likewise, Dr. Cheremisinoff did not undertake such an analysis. These evidentiary deficiencies mean that plaintiffs have failed to create a genuine issue of material fact regarding whether the plume and its soil vapors invaded their properties.

**[7]**    Even assuming arguendo that they had, plaintiffs cannot genuinely dispute whether that invasion caused *substantial* physical damage or *substantial* interference with use and enjoyment. Regarding the latter, plaintiffs claim that the odor of gasoline on and near their properties has caused substantial use interference because plaintiffs have abandoned various home improvement plans and refused to enter their basements. The district court correctly rejected this argument because the alleged interference, based on a thorough review of plaintiffs' depositions, was either *de minimis* or irrational and, therefore, not compensable. *See Banford v. Aldrich Chem. Co., Inc.,* 126 Ohio St.3d 210, 932

Baker v. Chevron U.S.A. Inc., 533 Fed.Appx. 509 (2013)

N.E.2d 313, 319 (2010) ("Fear and emotional harm alone are insufficient for damages for annoyance and discomfort.").

[8]    As for "substantial physical damage," it appears the district court interpreted this element to mean that plaintiffs must demonstrate that the soil vapors found on the properties were harmful to humans. Plaintiffs' proofs on this matter are insufficient to create a genuine issue of material fact. Their experts, Mr. Hagemann and Dr. Cheremisinoff—neither of which are medical doctors or health experts—simply adopted ODH's early position that the health risk from the plume was "indeterminate." And notably, the ODH later concluded, after conducting its "worst case scenario" sampling, that the concentrations of vapor-phase petroleum hydrocarbons detected in the indoor air of area residences and at the Hooven Elementary School "did not pose a public health hazard to residents, students or staff." Further, plaintiffs' best evidence of a cancer risk—the EPA's 2005 letters to certain property owners that sub-slab hydrocarbons posed an increased cancer risk of "8.0E–5" (that is eight additional cases of cancer above the background cancer incidence rate) for every 100,000 individuals living in the basement for 24 hours, 365 days per year, for 70 years—is insufficient to establish a substantial injury to the property because there is no evidence that any Hooven resident will live under such circumstances. Accordingly, we affirm the grant of summary judgment in favor of Chevron on the property damage claims.

C.

As for the final category of plaintiffs, the parties agree that in order to justify medical monitoring damages under Ohio law, plaintiffs must demonstrate that they have been exposed to the plume and its soil vapors and that this exposure has proximately resulted in a substantially "increased risk" of contracting a serious disease to the extent that a reasonable physician would order a medical monitoring program. The parties disagree, however, on whether plaintiffs' evidence creates a genuine issue of material fact on that question. We conclude it does not. [5]

[5]    We apply the summary judgment standard of review to this category of claims because we construe the district court's order of dismissal with prejudice as an order granting summary judgment to Chevron sua sponte. Although the district court did not expressly invoke Rule 56(f)

in its order to show cause why these claims should not be dismissed, it followed the notice procedures contemplated therein and considered the evidence of record in reaching its decision. Additionally, we note that the parties treat this order on appeal as if it were one granting summary judgment to Chevron.

*525    As this court explained in Hirsch, in accordance with Day v. NLO, 851 F.Supp. 869 (S.D.Ohio 1994) and Wilson v. Brush Wellman, Inc., 103 Ohio St.3d 538, 817 N.E.2d 59 (2004), "medical monitoring" is a remedy for being presently injured with an "increased risk of—and corresponding cost of screening for—certain diseases that ... are more likely to occur as a result of [a defendant's tortious conduct]." Hirsch, 656 F.3d at 363. And because "not every increased risk of disease warrants increased medical scrutiny[,]" plaintiffs must offer "evidence that a reasonable physician would order medical monitoring for them." Id.

[9]    The claim for medical monitoring damages fails most acutely in this case because plaintiffs lack individualized exposure data. "[I]t is well-settled that the mere existence of a toxin in the environment is insufficient to establish causation without proof that the level of exposure could cause the plaintiff's symptoms[,]" the symptom being, in this case, a substantially "increased risk" of contracting a number of serious diseases. Pluck, 640 F.3d at 679; see also McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1242 (11th Cir.2005) (stating that causation "requires not simply proof of exposure to the substance, but proof of enough exposure to cause the plaintiff's specific illness"). Plaintiffs' medical expert, Dr. Lockey, admitted that he did not determine what exposure level to what chemical caused an increased risk of what disease in each plaintiff. Without reliable, individualized proof that each of the 118 plaintiffs were exposed to contaminants sufficient to cause an increased risk of a specified disease, there is no evidence that a reasonable physician would order medical monitoring because that doctor would have no idea which disease he would be screening for or treating. Hirsch, 656 F.3d at 363; see also Ball v. Union Carbide Corp., 385 F.3d 713, 728 (6th Cir.2004) ("[Medical monitoring damages are] necessarily proportional to [a plaintiff's] exposure to toxic emissions or waste.").

Furthermore, Dr. Lockey drafted his plan "without regard to conditions potentially related to environmental contaminant exposure." (Emphasis added.) Such a plan undeniably fails to satisfy the legal standard that plaintiffs must meet to prove they are entitled to medical monitoring, which is that

Baker v. Chevron U.S.A. Inc., 533 Fed.Appx. 509 (2013)

"monitoring must be directed toward the disease for which the tort victim is at risk, and will only include procedures which are medically prudent in light of that risk as opposed to measures aimed at general health." *Day,* 851 F.Supp. at 881.

In sum, plaintiffs have not identified a specific chemical from the plume that can cause a serious latent disease; they prepared no estimate of each plaintiff's exposure to that specific chemical; and they have no idea whether they face an increased health risk from the alleged exposure. The district court rightfully observed that these evidentiary deficiencies mean that the claims for medical monitoring damages fail as a matter of law.

Plaintiffs cannot escape this conclusion by offering the ODH's cancer study incidence report as a substitute for individualized exposure data. *See Gates v. Rohm and Haas Co.,* 655 F.3d 255, 266 (3rd Cir.2011) ("Averages or community-wide estimations would not be probative of any individual's [medical monitoring] claim because any one class member may have an exposure level well above or below the average."). Although this report, an ecological cancer study, found "significantly **526** higher than expected number of cancer cases," it ultimately concluded that "it is not likely a specific point source of exposure or single risk factor is playing a role in the increased cancer burden." Most importantly, it did not find that the plume or its soil vapors were the reasons for the increased cancer rate in Hooven: "Information regarding the history of chemical and environmental exposures ... is not available to determine possible causes of each case of cancer." Even plaintiffs acknowledge the equivocal nature of the report: "Although courts do view ecological studies as useful for establishing associations, they are relatively weak for establishing a conclusive or definitive causal relationship between exposure and the disease in question."

Finally, we agree with the district court that *Hirsch* compels dismissal. In *Hirsch,* this court determined that the plaintiffs were not entitled to medical monitoring damages because they were unable to meet their burden of establishing an increased risk of disease. *Hirsch,* 656 F.3d at 363–64. *Hirsch* involved a derailment of a train carrying hazardous materials, leading to a serious fire and the spread of hazardous dioxins into the plaintiffs' neighborhood. *Id.* at 361. The *Hirsch* plaintiffs presented only speculative individualized exposure data— they sampled dioxin levels at homes in the area and used modeling to predict who in the community had been exposed to dioxins at concentrations above the U.S. EPA action level.

*Id.* Plaintiffs here have no individualized exposure data. The *Hirsch* plaintiffs established only a legally insignificant increased risk, a one-in-one-million increased risk of cancer. *Id.* at 364. Plaintiffs here have no evidence of a legally significant increased risk. The *Hirsch* plaintiffs failed to establish that a reasonable physician would order medical monitoring for such a *de minimis* risk of future harm. *Id.* Plaintiffs here have produced a physician who crafted a medical monitoring plan "without regard" to individualized exposure data. Thus, the district court correctly recognized that plaintiffs' proofs in this case compare less favorably to those of the plaintiffs in *Hirsch.* Accordingly, we affirm the dismissal of the claims for medical monitoring damages.

IV.

In the sanctions appeal, plaintiffs' counsel and Chevron dispute whether the district court abused its discretion in imposing Rule 11 sanctions. "We review a district court's decision to impose sanctions under Rule 11 for abuse of discretion[,]" *DiPonio Const. Co., Inc. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9,* 687 F.3d 744, 752 (6th Cir.2012), and apply this deferential standard of review to "all aspects of a district court's Rule 11 determination." *Runfola & Assoc., Inc. v. Spectrum Reporting II, Inc.,* 88 F.3d 368, 372 (6th Cir.1996) (per curiam) (citation and internal quotation marks omitted).

Rule 11 permits sanctions if "a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Merritt v. Int'l Ass'n of Machinists and Aerospace Workers,* 613 F.3d 609, 626 (6th Cir.2010) (citation and internal quotation marks omitted). "Rule 11 sanctions are warranted if the attorney's conduct was unreasonable under the circumstances." *Andretti v. Borla Performance Indus., Inc.,* 426 F.3d 824, 833 (6th Cir.2005). Additionally, "it is important to review the grant of sanctions in **527** the context of the litigation history of th[e] action." *Merritt,* 613 F.3d at 627.

[10]    Plaintiffs' counsel argue that they did nothing more than zealously advocate for the medical monitoring plaintiffs. Counsel also argues that the district court sanctioned them with the benefit of hindsight and punished them for preserving their clients' appellate rights, rather than

voluntarily dismissing their claims. Chevron responds that counsel unreasonably interpreted the elements of the medical monitoring remedy, misrepresented their exposure evidence, and submitted a flawed medical monitoring plan.

The parties' positions reflect a fundamental disagreement over the quantity and quality of exposure evidence needed to justify medical monitoring damages under Ohio law. This disagreement has infected the entire case and how it was litigated. Under the circumstances of this case, however, we conclude that the district court did not abuse its discretion in holding that plaintiffs' attorneys were objectively unreasonable in maintaining that (1) they need not show individualized exposure data to obtain medical monitoring, and (2) plaintiffs need only show a *potential* "increased risk" of contracting a serious disease, as opposed to a *present* "increased risk," in order to be entitled to medical monitoring.

Even in this appeal, plaintiffs' attorneys continue to assert that "to justify medical monitoring, all the Plaintiffs needed to do in this case was prove the elements of one of the underlying torts pled in their complaint (negligence, nuisance, trespass and fraud)—nothing more and nothing less." This statement of the law is patently unreasonable. Claims for medical monitoring damages must be supported with individualized exposure data that justifies the cost of a defendant funding such a program. *Hirsch,* 656 F.3d at 363; *see also In re Welding Fume Prods. Liability Litig.,* 245 F.R.D. 279, 292 (N.D.Ohio 2007) (medical monitoring plaintiffs must offer proof that an exposure to a defendant's toxic substance caused an increased risk of serious disease); *Day,* 851 F.Supp. at 881 (plaintiffs must show by "expert medical testimony that they have increased risk of disease which would warrant a reasonable physician to order monitoring"). Counsels' position that medical monitoring is reasonable and appropriate *without* individualized exposure data has absolutely no support in the case law. And we do not consider their insistence otherwise a "good faith" argument to reverse, extend, or modify existing case law.

Counsels' position that Chevron should provide medical monitoring to plaintiffs, who only have a *potential* of suffering an "increased risk" of disease, but no *present* "increased risk," is likewise objectively unreasonable. Quite obviously, they are advancing claims that are not ripe in an attempt to collect damages for nonexistent harm. *Hirsch* suggests that a medical monitoring remedy potentially exists for plaintiffs who are presently injured with an "increased risk," not for those who might suffer the potential injury of an

"increased risk." *See Hirsch,* 656 F.3d at 363. Contrary to their repeated assertions otherwise, counsel cannot seek medical monitoring damages for clients who have yet to suffer an "increased risk" of contracting a serious disease. The district court did not abuse its discretion by sanctioning counsel for continually perpetuating such an "irrational" view of medical monitoring law, especially after counsel frankly admitted to the district court they had no causation proofs under the district court's standards.

Moreover, we do not agree with counsel that the district court imposed sanctions with the "benefit of hindsight." While the **\*528** court awarded sanctions only after reviewing Dr. Lockey's plan and this court issued *Hirsch,* it obtained no "benefit of hindsight" from that review because counsel conceded at a discovery conference—more than a year earlier—that they could not prove their medical monitoring claims by the causation standards required by the district court, which *Hirsch* did not alter. Thus, the court did not sanction counsel for litigating claims that were ultimately found to be without merit; rather, it sanctioned them for continuing to litigate claims that were admittedly meritless.

Finally, we are not persuaded that the district court punished counsel with sanctions because their clients wanted to preserve their appeal rights, rather than voluntarily dismiss their claims. After counsel admitted they had no causation proofs, the court suggested a *Raceway* dismissal [6] so that counsel could challenge the court's legal rulings on appeal; the parties agreed. Later, however, counsel reneged because they wanted to dismiss the claims for medical monitoring *and* the non-bellwether property damage claims, whereas Chevron wanted to adhere to the compromise struck on the record and dismiss *only* the medical monitoring claims. In light of counsels' admission regarding their lack of evidence, Chevron subsequently sent counsel a Rule 11 safe-harbor letter advising counsel to voluntarily dismiss or face the possibility of paying defense costs for the medical monitoring claims going forward. Counsel refused to dismiss, believing that they were ethically obligated to preserve the medical monitoring plaintiffs' appellate rights. Counsel was mistaken.

[6]    In *Raceway Properties v. Emprise Corporation,* the district court entered an interlocutory order in a private antitrust case that made it impossible for the plaintiffs to prevail. 613 F.2d 656 (6th Cir.1980) (per curiam). The plaintiffs requested, and the district court entered, a formal order of dismissal with prejudice that would permit a challenge of the

order on appeal. This court subsequently affirmed that it had appellate jurisdiction over the matter because the plaintiffs' "solicitation of the formal dismissal was designed only to expedite review of an order which had in effect dismissed appellants' complaint." *Id.* at 657; *see also Libbey–Owens– Ford Co. v. Blue Cross and Blue Shield Mut. of Ohio,* 982 F.2d 1031, 1034 (6th Cir.1993) (describing the *Raceway* dismissal).

Rule 11 sanctions are appropriate when an attorney refuses to dismiss a claim after becoming aware that it lacks merit. *See Merritt,* 613 F.3d at 627 ("Rule 11 imposes a continual obligation on attorneys to refrain from pursing meritless or frivolous claims at any stage of the proceedings....") (citation and internal quotation marks omitted); *Runfola,* 88 F.3d at 373 (affirming Rule 11 sanctions against counsel who failed to dismiss the action after becoming aware of their inability to assert any evidence in support of their claims). Given the history of this case, the district court did not commit a

clear error of judgment by sanctioning counsel for continuing to litigate meritless claims. Further, counsel's false dilemma argument—either dismiss and lose appeal rights or litigate and pay costs—is unpersuasive. The district court offered counsel a *Raceway* dismissal that would have allowed counsel to promptly challenge the district court's rulings in this court. Despite this offer, counsel refused to dismiss only the claims of the medical monitoring plaintiffs and continued litigating under the specter of Rule 11 at their own peril.

V.

For these reasons, we affirm the judgment of the district court.

**All Citations**

533 Fed.Appx. 509

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

2019 WL 8683361
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Jimmy BANH et al.

v.

AMERICAN HONDA MOTOR COMPANY, INC.

Case No. 2:19-cv-05984-RGK-AS
|
Filed 12/17/2019

**Attorneys and Law Firms**

Christopher Pitoun, Hagens Berman Sobol Shapiro LLP, Pasadena, CA, Jeffrey S. Goldenberg, Pro Hac Vice, Todd B. Naylor, Pro Hac Vice, Cincinnati, OH, John C. Weisensell, Pro Hac Vice, Niekamp Weisensell Mutersbaugh and Mastrantonio LLP, Akron, OH, Sean R. Matt, Pro Hac Vice, Steve W. Berman, Pro Hac Vice, Catherine Y. N. Gannon, Pro Hac Vice, Hagens Berman Sobol Shapiro LLP, Seattle, WA, for Jimmy Banh et al.

Andrew J. Chinsky, Pro Hac Vice, King and Spalding LLP, Chicago, IL, John Christopher Mitchell, King and Spalding LLP, San Francisco, CA, Livia M. Kiser, Michael Brian Shortnacy, King and Spalding LLP, Los Angeles, CA, for American Honda Motor Company, Inc.

**Proceedings: (IN CHAMBERS)**
**Order Re: Motion to Dismiss (DE 53)**

The Honorable R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE

# I. INTRODUCTION

**\*1** On July 11, 2019, Plaintiffs filed this putative class action against Defendant American Honda Motor Co., Inc. ("Honda" or "Defendant"). On September 27, 2019, Plaintiffs filed a First Amended Complaint ("FAC"). The named Plaintiffs are individuals who purchased or leased a 2019 or 2020 Acura RDX vehicle (the "Vehicle" or "Vehicles") manufactured by Honda. These Plaintiffs span sixteen different states: Arizona, California, Florida, Georgia, Illinois, Massachusetts, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, and Virginia.

Plaintiffs seek to represent a class of all individuals and entities nationwide who purchased or leased the Vehicle (the "Proposed Nationwide Class"). Plaintiffs also seek certification of sixteen state-specific classes (the "Proposed State-Specific Classes"). Plaintiffs bring the following claims on behalf of the Proposed Nationwide Class: (1) breach of express warranty, Magnuson-Moss Warranty Act ("MMWA") (15 U.S.C. §§ 2301, et seq.); (2) breach of implied warranty, MMWA (15 U.S.C. §§ 2301, et seq.); (3) violations of the California Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750, et seq.); (4) violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.); (5) fraud by concealment; and (6) breach of implied warranty of merchantability (Cal. Com. Code § 2314). Plaintiffs also bring numerous state-law consumer protection and breach of warranty claims on behalf of the Proposed State-Specific Classes.

Presently before the Court is Defendant's Motion to Dismiss Plaintiffs' FAC for lack of subject matter jurisdiction and for failure to state a claim. For the following reasons, the Court **GRANTS in part** Defendant's Motion.

# II. FACTUAL BACKGROUND

The FAC generally alleges the following:

Honda is a California corporation headquartered in Torrance, California. Honda is "responsible for the manufacture, development, distribution, marketing, sales, and servicing of Acura brand automobiles." (FAC ¶ 244, ECF No. 48.) [1] The named Plaintiffs are individuals who purchased or leased the Vehicle.

[1] Defendant contends that it does not design or manufacture the Vehicles.

## A. The Infotainment System Defect

Plaintiffs allege that "the Vehicles contain a defect that causes many of the Vehicles' features associated with the infotainment system (e.g., the navigation system, audio system, backup camera, Bluetooth, Apple CarPlay) to malfunction." (Id. ¶ 5.) This defect poses a safety risk because when the infotainment system malfunctions, the driver becomes distracted. (Id. ¶ 6.) The defect can also cause safety-related systems such as the backup camera to fail. (Id. ¶ 5.)

Defendant has known (or should have known) about the issues with the infotainment system based on (1) pre-release design, manufacturing, and testing data; (2) warranty claims data; (3) consumer complaints made directly to Defendant, collected by the National Highway Transportation Safety Administration ("NHTSA"), and/or posted on public online forums; (4) testing done in response to those complaints; (5) aggregate data and complaints from authorized dealers; and (6) other sources. (*Id.* ¶ 7.) But "Defendant failed to disclose and actively concealed the Vehicles' infotainment system defect from the public, and continues to manufacture, distribute, and sell the Vehicles without disclosing the defect." (*Id.*)

**\*2** Honda administers a New Vehicle Limited Warranty ("NVLW") for the Vehicles. Under the NVLW, "Honda is required to repair or replace any part that is defective in material or workmanship under normal use." (*Id.* ¶ 8.) (internal quotation marks omitted). The infotainment systems are defective in material or workmanship under normal use. However, Honda has not repaired or replaced the infotainment system. "Instead, Honda tells Vehicle owners to wait for a forthcoming 'software update' to fix the infotainment problems, or alternatively simply replaces defective parts with equally defective parts, thereby leaving consumers caught in a cycle of use, malfunction, and replacement. In fact, Honda's authorized dealerships are routinely discouraging Vehicle owners from bringing their Vehicles to the dealership because there is nothing the dealership can do to repair the defect." (*Id.* ¶ 9.)

### B. The Android Auto Feature

"[T]he Vehicles were originally scheduled to launch with both Android Auto and Apple CarPlay connectivity as standard features." (*Id.* ¶ 10.) Indeed, before the Vehicles launched, Honda distributed promotional materials to dealers touting the Vehicles' Android Auto compatibility. (*Id.*) Dealers, in turn, shared this information with consumers. (*Id.*) But when the Vehicles went on sale in 2018, they came equipped with only Apple CarPlay. (*Id.*) "Defendant both directly and indirectly through its authorized dealers promised, and continues to promise, prospective buyers that Android Auto would be made available to all Vehicle owners through a software update 'soon'." (*Id.*) However, this feature has still not been implemented. (*Id.*)

### III. JUDICIAL STANDARD

To survive a motion under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff alleges enough facts to permit a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff need not provide "detailed factual allegations" but must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When ruling on a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court must also "construe the pleadings in the light most favorable to the nonmoving party." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

### IV. DISCUSSION

Defendant argues that: (1) Plaintiffs' MMWA claims should be dismissed under Rule 12(b)(1); (2) the non-California Plaintiffs' cannot pursue California law claims; (3) Plaintiffs' state-law consumer protection act and fraudulent concealment claims should be dismissed under Rules 9(b) and 12(b)(6); (4) Plaintiffs' state-law breach of warranty claims should be dismissed under Rule 12(b)(6); and (5) the Florida unjust enrichment claim should be dismissed under Rule 12(b)(6). The Court addresses each argument in turn.

### A. Magnuson-Moss Warranty Act Claims

To bring a class action under the MMWA, the complaint must list at least one hundred named plaintiffs. 15 U.S.C. § 2310(d)(3). Defendant argues that because the Complaint here lists less than one hundred named Plaintiffs, the Court lacks subject matter jurisdiction over Plaintiffs' MMWA claims. Plaintiffs, on the other hand, assert that the Court has subject matter jurisdiction over Plaintiffs' MMWA claim pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).

**\*3** Many courts have held that a plaintiff need not meet the MMWA's class-action pleading requirements if they can establish subject matter jurisdiction under CAFA. *See, e.g.,*

*Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013); *Keegan v. Am. Honda Motor Corp.*, 838 F. Supp. 2d 929, 954–55 (C.D. Cal. 2012). "Because the MMWA predates CAFA, these courts found that 'CAFA effectively supercedes the MMWA's more stringent jurisdictional requirements.' " *Conti v. American Honda Motor Co., Inc.*, —— WL ——, No. 2:19-cv-02160-CJC-GJS, at *7 (C.D. Cal. Oct. 17, 2019) (quoting *Kuns*, 543 F. App'x at 574). "The Ninth Circuit[, however,] has not squarely addressed this question." *Id.* As explained in *Conti*,

> In *Birdsong v. Apple, Inc.*, a MMWA class action where the pleading requirements may not have been met, the court explained in a footnote, "[t]he parties do not dispute that the district court had subject matter jurisdiction over the class action. We agree." 590 F.3d 955, 957 n.1 (9th Cir. 2009). After *Birdsong*, courts in the Ninth Circuit—including this Court—generally followed suit. *See, e.g., Keegan*, 838 F. Supp. 2d at 954-55. However, in at least three recent decisions, this Court changed course and found that "MMWA's requirement to name one hundred plaintiffs must be met independently of CAFA's jurisdictional standard." *Floyd v. Am. Honda Motor Co.*, 2018 WL 6118582, at *3 (C.D. Cal. June 13, 2018) (Wilson, J.); *MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) (Guilford, J.); *Cadena v. Am. Honda Motor Co.*, 2019 WL 3059931, at *11 (C.D. Cal. May 29, 2019) (Fitzgerald, J.). A[s] one decision explains, "CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties—doesn't fill in the gaps for missing substantive requirements of a federal law." *MacDougall*, 2017 WL 8236359, at *4. The Court agrees and finds that Plaintiffs must satisfy MMWA's class-action pleading requirements.

The Court agrees with the rationale set forth in *Conti, Floyd, MacDougall*, and *Cadena* and finds that Plaintiffs must satisfy the MMWA's pleading requirements. Accordingly, because Plaintiffs fail to do so, the Court dismisses Plaintiffs' MMWA claims.

### B. Extraterritoriality and Choice of Law Rules

Defendant next argues that the non-California Plaintiffs are barred from bringing California state-law claims on behalf of themselves and the Proposed Nationwide Class because they purchased their vehicles outside of California.

Defendant is correct that "[t]he default presumption is that the California legislature did not intend for its statutes to have force or operation beyond the state's boundaries." *TRC & Assocs. v. NuScience Corp.*, No. 2:13-CV-6903-ODW CWX, 2013 WL 6073004, at *5 (C.D. Cal. Nov. 18, 2013). "Nevertheless, state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *Id.* (internal quotation marks omitted). To determine whether sufficient wrongful conduct occurred in California, the court considers (1) where the defendant does business, (2) whether the defendant's principal offices are located in California, (3) where class members are located, and (4) the location from which advertising and other promotional literature decisions were made. *Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810, at *3 (N.D. Cal. June 28, 2017) (quoting *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011)).

**\*4** Here, Plaintiffs allege that (1) Honda does business in California; (2) Honda's headquarters are located in California; (3) one of the named Plaintiffs (Banh) purchased his vehicle in California; and (4) "[t]he decisions regarding the marketing and sale of the infotainment system, and decisions regarding the disclosure or non-disclosure of the defect were in whole or substantial part made by Defendant in California and were purposefully emanated by Defendant in California." (FAC ¶ 244.) Based on these allegations, the Court finds that Plaintiffs have alleged that sufficient wrongful conduct occurred in California such that the presumption against extraterritoriality does not apply. *See Gerstle*, 2017 WL 2797810, at *4.

Defendant also argues that California's choice-of-law rules preclude the non-California Plaintiffs from invoking California law, and asks the Court to apply the conflict-of-law test set forth in *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012). But "[a] detailed choice-of-law analysis is a fact-heavy analysis and is generally inappropriate on a motion to dismiss where the parties have not yet developed a factual record." *Gerstle*, 2017 WL 2797810, at *4 (citing *Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564, 572 (N.D. Cal. 2013)). Here, as in *Gerstle*, "the Court has no factual record to use in deciding which state has a greater interest in applying its laws. While *Mazza* will...be relevant to the decision whether to certify any proposed class or sub-class, at this early stage of the litigation, 'it would be premature to speculate about whether the difference in various states' consumer protection laws are material in this case.' " *Id.* (quoting *Clancy*, 308 F.R.D. at 572). Accordingly, the Court declines to dismiss the non-California Plaintiffs'

California law claims on choice-of-law grounds at this early stage. *See id.*

### C. **Fraud Claims**

Plaintiffs bring fraud claims under sixteen different states' consumer protection statutes, on two different theories (fraudulent misrepresentation and fraudulent omission). Plaintiffs also bring fraudulent concealment claims under California, New York, and Florida law. Because each of these claims is "grounded in fraud," the heightened pleading requirement of Rule 9(b) apply. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (holding that the complaint as a whole must satisfy 9(b) where each claim is "grounded in fraud"). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

#### *1. Whether Plaintiffs Sufficiently Allege a Fraudulent Misrepresentation Claim*

Defendant contends that Plaintiffs have failed to sufficiently allege a fraudulent misrepresentation claims because Plaintiffs have not identified any affirmative misrepresentations made by Honda. Plaintiffs concede that their fraud claims are "primarily omissions-based." (Opp. at 6, ECF No. 55.) However, Plaintiffs argue that ten Plaintiffs [2] allege actionable misrepresentations regarding the Vehicle's compatibility with Android Auto.

[2]
    Bilbrey (Arizona), Banh (California), Samaha, (Illinois), Chisari (New Jersey), Lawrence (North Carolina), Kleehamer (Ohio), Denaro (Pennsylvania), Pryor (Tennessee), Subbarao (Texas), and Faden (Virginia).

#### *a. Whether Plaintiffs Allege an Actionable Misrepresentation*

The misrepresentations pointed to by Plaintiffs consist primarily of statements to the effect that Android Auto would be released "soon." One plaintiff, for instance, alleges that while at the dealership, a salesman told her that Android Auto would be available "soon" via a new software update. (Chisari ¶ 95.) Another alleges that while visiting Acura.com, he read

that Android Auto was "coming soon" to the 2019 RDX. (Banh ¶ 25.)

**\*5** "The law is well established that actionable misrepresentations must pertain to past or existing material facts. Statements or predictions regarding future events are deemed to be mere opinions which are not actionable." *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (2014) (citations omitted); *Hinesly v. Oakshade Town Center*, 135 Cal. App. 4th 289, 295 (2005) ("[T]he general rules [are] that an action for fraud must be based on a statement of fact, not opinion, and that statements as to the future actions by some third party are deemed nonactionable opinions.").

Here, the misrepresentations at issue amount only to predictions regarding future actions by third parties. Accordingly, as to Plaintiff Banh (California) and Plaintiff Chisari (New Jersey), the Court agrees that the allegations of the FAC are insufficient to support a fraud claim on a fraudulent misrepresentation theory. *See Fram v. Memory Enterprises, LLC*, No. CV 177172 MWFJPRX, 2018 WL 6016967, at \*4 (C.D. Cal. June 13, 2018).[3]

[3]
    Plaintiff Chisari also alleges that she reviewed information on Honda's website regarding Android Auto. But, as noted by Defendant, under New Jersey law a plaintiff "cannot simply reference a statement on a website without providing the date when the statement was made or at what point (if ever) Plaintiff was exposed to that statement." *Glass v. BMW of N. Am., LLC*, No. 10–5259 (ES), 2011 WL 6887721, \*8 (D.N.J. 2011). Plaintiff Chisari has therefore not alleged an actionable misrepresentation by Honda.

Accordingly, the California and New Jersey state-law fraudulent misrepresentation claims are dismissed with leave to amend.[4]

[4]
    Defendant does not cite authority from other jurisdictions on this issue. Accordingly, the Court does not consider whether the alleged misrepresentations are sufficient under other state laws.

#### *b. Whether Misrepresentations Made by Dealers Can Be Imputed to Honda*

All ten Plaintiffs noted above allege that Honda dealers made misrepresentations regarding Android Auto. Defendant argues that these dealer statements cannot be imputed to Honda because dealers are not agents of Honda.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 64 (9th Cir. 1973) (quoting another source). The scope of an agency relationship is a factual issue for the jury to resolve. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 956 (N.D. Cal. 2014).

Here, the parties appear to agree that a dealer is not an agent of an automobile manufacturer merely by virtue of being a dealer. Indeed, at the pleading stage, a plaintiff seeking to establish agency must generally "allege *some* factual predicate (even though generalized rather than evidentiary in nature) to create the inference of agency." *Azimi v. Ford Motor Co.*, 977 F. Supp. 847, 851 (N.D. Ill. 1996) (emphasis added and internal quotation marks omitted). For example, in *Bryde*, a California district court held that an agency relationship had been plausibly alleged where Plaintiffs asserted that (1) they bought their vehicles to GM's dealers when they had problems with their airbag lights and sensors, (2) they contacted GM and its agents for repairs concerning the alleged airbag defect, and (3) GM issued technical service bulletins to its dealers, instructing how to deal with airbag light and sensor issues. *Bryde v. Gen. Motors*, LLC, No. 16-CV-02421-WHO, 2016 WL 6804584, at *16 (N.D. Cal. Nov. 17, 2016). Similarly, in *Baranco*, another California district court held that agency had been sufficiently alleged where (1) Ford issued a technical service bulletin instructing dealers how to repair the alleged defect, (2) Ford's warranty directed vehicle owners to present their vehicles to dealers for repairs, and (3) Ford required dealers to submit detailed data regarding repairs. *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 975 (N.D. Cal. 2018).

 **\*6** In their Opposition, Plaintiffs aver that the FAC pleads "sufficient facts to infer an agency relationship: they allege...that Honda has instructed its dealerships how to respond to complaints about the defect (and to perform specific tasks on customers' units) (¶¶ 9, 51), and has released software updates through its dealers (¶¶ 9, 80)." (Opp. at 16.) But a review of the cited paragraphs of the FAC does not support this conclusion. (*See* FAC ¶¶ 9, 51, 80.) Paragraph 9 of the FAC, for example, merely alleges that "Honda tells

Vehicle owners to wait for a forthcoming 'software update' to fix the infotainment problems" and that "Honda's authorized dealerships are routinely discouraging Vehicle owners from bringing their Vehicles to the dealership because there is nothing the dealership can do to repair the defect." (*Id.* ¶ 9.) It does *not* allege that it is at the direction of Honda that dealerships discourage Vehicle owners from bringing their cars in.

The allegations of the FAC do not support a plausible inference that Honda dealers are Honda's agents. Unlike *Bryde* and *Baranco*, where plaintiffs alleged that the manufacturer sent dealers instructions on how to repair the alleged defect, here the FAC contains no such allegations. Therefore, Plaintiffs Bilbrey (Arizona), Kleehamer (Ohio), and Subbarao (Texas)'s fraudulent misrepresentation claims are dismissed without prejudice, as these Plaintiffs allege only that *dealers* made misrepresentations to them regarding Android Auto.

The remaining Plaintiffs—Samaha (Illinois), Lawrence (North Carolina), Denaro (Pennsylvania), Pryor (Tennessee), and Faden (Virginia)—each allege at least one direct line of communication with Honda: they reviewed information on Honda's website, (Samaha ¶ 56; Pryor ¶ 186); reviewed information on Honda's Twitter account, (Lawrence ¶ 139; Faden ¶ 212); or directly contacted Honda, (Denaro ¶ 175), before purchasing their Vehicles. Accordingly, these claims survive the Motion to Dismiss.

In sum, all of Plaintiffs' fraud claims—to the extent they are brought on an affirmative misrepresentation theory—are dismissed with leave to amend except for those of: Samaha (Illinois), Lawrence (North Carolina), Denaro (Pennsylvania), Pryor (Tennessee), and Faden (Virginia).

### *2. Whether Plaintiffs Allege Fraudulent Omissions*

Plaintiffs' fraud claims are also brought on an omission-based theory. To state a claim for a fraudulent omission, the plaintiff must generally allege that: (1) the defendant concealed or suppressed a material fact, (2) the defendant was under a duty to disclose that fact to the plaintiff, (3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff was unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff sustained

damage. *SCC Acquisitions Inc. v. Cent. Pac. Bank*, 207 Cal. App. 4th 859, 864 (2012).

### a. Knowledge of the Defect

Defendant first argues that Plaintiffs' fraudulent omission claims should be dismissed because the FAC does not sufficiently allege Defendant's pre-sale knowledge of the defect.

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P 9(b). "The Ninth Circuit's decision in *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), explains the degree of specificity to which a plaintiff must allege regarding a defendant's actual knowledge of a product defect in fraud claims." *Barrera v. Samsung Elecs. Am., Inc.*, No. SACV1800481CJCPJWX, 2019 WL 1950295, at *4 (C.D. Cal. Feb. 27, 2019). Under *Wilson*, a plaintiff must allege "how the defendant obtained knowledge of a specific defect prior to the plaintiff's purchase[.]" *Id.* Conclusory statements are not enough. *Id.* However, "the 'amassed weight' of consumer complaints may be sufficient along with other indications that the defendant had knowledge of the defect." *Id.*

 **\*7** The Court finds that Plaintiffs have adequately alleged that Honda had pre-sale knowledge of the alleged defect with the Vehicle's infotainment system. The FAC alleges that Honda learned about the defect through (1) pre-release design, manufacturing, and testing data; (2) warranty claims data; (3) consumer complaints made directly to Defendant, collected by the NHTSA, and/or posted on public online forums; (4) testing done in response to those complaints; (5) aggregate data and complaints from authorized dealers; (6) and other sources. (FAC ¶ 7.) Plaintiffs also allege that in March 2019, Acura's public relations manager publicly acknowledged that "radio and GPS woes are both known issues with the RDX." (*Id.* ¶ 282.) These allegations, taken together, lead to a plausible inference that Honda had knowledge of the defect before Plaintiffs purchased then Vehicles. *See Conti* at * 10–11. The Court therefore declines to dismiss Plaintiffs' fraudulent omission claims on this basis.

### b. Specificity and Causation

Defendant next argues that Plaintiffs fail to allege sufficient details regarding Defendant's alleged omissions.

Generally, "[a]llegations of fraud must meet the heightened pleading standards of Rule 9(b), which requires 'specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.' " *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)). However, when "a plaintiff is alleging a failure to act instead of an affirmative act," it is often the case that "the plaintiff cannot point out the specific moment when the defendant failed to act." *Id.* A plaintiff proceeding on such a theory may therefore succeed without providing the "same level of specificity required by a normal fraud claim." *Falk v. General Motors Corporation*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007).

At the outset, Plaintiffs challenge Defendant's reliance on *Eisen v. Porsche Cars N. Am., Inc.*, 2012 WL 841019, at *3 (C.D. Cal. Feb. 22, 2012) and its holding that a plaintiff must "describe the content of the omission and where the omitted information should or could have been revealed as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." (Mot. at 17, ECF No. 53) (quoting *Eisen*, 2012 WL 841019, at *3*.) Plaintiffs correctly observe that "when presented with omission-based fraud claims like those alleged here, '[v]irtually every court' has rejected *Eisen* and the case from which the above quoted requirements derive...in favor of a more practical 'who, what, when, where' test." (Opp. at 9) (citations omitted).

Here, all but three Plaintiffs[5] allege that they reviewed information on Acura's website or Honda promotional materials before purchasing the Vehicle. These allegations —although not a model of specificity—provide sufficient detail about how and where the alleged omissions occurred to survive the Motion to Dismiss. Plaintiffs have also properly alleged causation and reliance by asserting that had the omitted information been disclosed, they would have behaved differently. *See Conti* at *13.

---

[5]    Ortiz (Nevada), Bartholomew (North Carolina), and Kleehamer (Ohio).

As for Plaintiffs Ortiz, Bartholomew, and Kleehamer, the Court finds that the allegations are insufficient to support a fraudulent omission claim. Each of these claims relies exclusively on the alleged actions and inactions of dealers. *See Conti* at *11. As set forth above, Plaintiff has not alleged facts which would plausibly support an agency relationship. Accordingly, the Court dismisses Ortiz (Nevada), Bartholomew (North Carolina), and Kleehamer (Ohio)'s fraudulent omission claims with leave to amend.

In sum. Plaintiffs' Ortiz (Nevada), Bartholomew (North Carolina), and Kleehamer (Ohio)'s fraudulent omission claims are dismissed with leave to amend. All of Plaintiffs' remaining omissions-based fraud claims survive the Motion to Dismiss.

### 3. *Plaintiffs' Concealment Claims*

**\*8** Plaintiffs bring concealment claims under California, New York, and Florida law. The elements of a concealment claim are essentially the same as the elements of a fraudulent omission claim. *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 998 (N.D. Cal. 2013).

Defendant argues that in the absence of allegations establishing that Honda was aware of the alleged defect at the time Plaintiffs purchased their Vehicles, Honda could not have affirmatively concealed or suppressed any facts regarding the defect. Defendant also argues that the FAC fails to allege facts showing an affirmative act by Honda to suppress or obscure information in the public domain. The Court disagrees. Plaintiffs have sufficiently alleged that Honda was aware of the alleged defect at the time of purchase, (*see, e.g.*, FAC ¶¶ 7, 28) and that Honda suppressed information about those defects by, for instance, replacing components in the Vehicles with parts that were equally as defective (*see, e.g., id.* ¶¶ 297–98.). *See Falk*, 496 F. Supp. 2d at 1097. Accordingly, the Court declines to dismiss Plaintiffs' concealment claims on this basis.

Defendant also asserts that Florida Plaintiff Goldman's concealment claim is barred by the products liability economic loss rule, which prohibits "a party from suing in tort for purely economic losses to a product or object provided to another for consideration[.]" *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1197 (S.D. Fla. 2017). Plaintiffs do not provide any response to this argument in their Opposition.

In *Tiara*, the Florida Supreme Court explained that "[t]he products liability economic loss rule developed to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided by warranty law." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 403 (Fla. 2013). Relying on *Tiara*, several Florida district courts have "held that the economic loss rule bars claims for negligent misrepresentation and fraudulent concealment in products liability cases." *Koski*, 347 F. Supp. 3d at 1197. Indeed, as one court put it, "[t]o hold otherwise would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, such a purchaser could assert claims for negligent and fraudulent concealment regarding the defect to avoid the economic loss rule." *Burns v. Winnebago Indus., Inc.*, No. 8:13-CV-1427-T-24, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013)

Here, the allegations supporting Florida Plaintiff's fraudulent concealment claim are substantially the same as those supporting all of his claims. *See Koski*, 347 F. Supp. 3d at 1198. Accordingly, the Court finds that the products liability economic loss rule applies. The Court therefore dismisses Florida Plaintiff Goldman's fraudulent concealment claim.

### 4. *Plaintiffs' Massachusetts, Nevada, Texas, and Virginia State Law Claims*

Defendant asserts that Plaintiffs' consumer protection claims under Massachusetts, Nevada, Texas, and Virginia law fail because Plaintiffs fail to plead that Honda knowingly failed to disclose a concealed fact at the time Plaintiffs relied on Honda's statement or omission in the purchase of their vehicle. As set forth above, the Court finds that Plaintiffs have sufficiently pled Honda's knowledge of the defect. The Court therefore declines to dismiss on this basis.

### 5. *Plaintiffs' Tennessee and Georgia Consumer Protection Claims*

**\*9** Finally, Defendant argues that Plaintiffs' Tennessee and Georgia law consumer protections should be dismissed because the relevant statutes bar class action claims. But the Court need not address this argument, as it is premature in a motion to dismiss for failure to state a claim and can be properly addressed at the class certification stage. *See, e.g.,*

*Falk v. Nissan N. Am., Inc.*, No. 17-cv-04871-HSG, 2018 WL 2234303, at *7 (N.D. Cal. May 16, 2018); *Conti* at n.4.

**D. Express Warranty**

Defendant also moves to dismiss Plaintiffs' breach of express warranty claims.

The FAC alleges that Honda expressly warranted in its NVLW that it "will repair or replace any part that is defective in *material or workmanship* under normal use" and that "all repairs/replacements made under this warranty are free of charge." (FAC ¶ 8) (emphasis added). Plaintiffs assert that Defendant breached this warranty because the defective infotainment systems were present in the Vehicles at the time of sale.

Defendant does not dispute the existence of a binding warranty. Instead, Defendant argues that (1) Plaintiffs' breach of express warranty claims fail because the NVLW is a "material or workmanship" warranty that covers only manufacturing defects, not design defects; and (2) in any event, Plaintiffs do not adequately allege breach because Plaintiffs did not provide Honda a reasonable opportunity to fix the Vehicles. The Court addresses each argument in turn.

*1. Defective in Material or Workmanship*

Defendant cites several authorities for the proposition that a "material or workmanship" warranty covers only manufacturing defects. At the outset, Plaintiffs claim that Defendant's Motion should be denied as to all states other than California, Illinois, New Jersey, and New York because Defendant fails to provide any authority suggesting that "material or workmanship" warranties exclude design defects in those jurisdictions. In its Reply, Defendant does not respond to this argument. Accordingly, the Court agrees with Plaintiffs that Defendant has not established as a matter of Arizona, Florida, Georgia, Massachusetts, Nevada, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Texas, or Virginia law that material and workmanship warranties such as the NVLW exclude design defects.

As for California, Illinois, New Jersey, and New York law, Plaintiffs emphasize that the FAC refers repeatedly to alleged defects "in material or workmanship," rather than design. (*See* Opp. at 19.) Plaintiffs essentially urge the Court to adopt the reasoning set forth in *Conti*, in which the court declined

to dismiss plaintiffs' express warranty claims as improper design defect claims. *See Conti* at *15. There, plaintiffs alleged "that the infotainment systems were defective in manufacture, assembly, material, and/or workmanship." *Id.* In support, plaintiffs offered "specific allegations about the symptoms of the defect." *Id.* The *Conti* court held these allegations were sufficient to survive the motion to dismiss.

Here, the Court agrees with Plaintiffs that the allegations of the FAC are sufficient to survive the Motion. Here, as in *Conti*, Plaintiffs allege that the infotainment systems are defective "in material or workmanship," that the "manufacturing and/or assembly defect existed at the time these Class Vehicles containing the infotainment system left the hands of Honda," and that Honda breached its warranty by failing to repair the "Vehicles' materials and workmanship defects." (Opp. at 19.) In support, Plaintiffs offer specific allegations about the symptoms of the defect. Accordingly, the Court declines to dismiss the express warranty claims on this basis.

*2. Opportunity to Repair*

**\*10** Defendant next argues that Plaintiffs' express warranty claims should be dismissed because the FAC fails to allege that Honda refused or failed to repair the purported defect. *See Gertz v. Toyota Motor Corp.*, No. CV 10-1089 PSG VBKX, 2011 WL 3681647, at *2 (C.D. Cal. Aug. 22, 2011) ("[I]n the context of automobile warranties, courts have held that an express warranty is not considered breached unless and until the defendant refuses or fails to repair.") According to Defendant, Plaintiffs have either (1) given Honda no chance to repair; (2) received assistance or interim fixes; or (3) been told that a software update is forthcoming.

The Court finds that the following Plaintiffs have not stated a claim for breach of express warranty: Banh (California); Samaha (Illinois); Quinlan (Illinois); Lawrence (North Carolina); Kleehamer (Ohio); and Faden (Virginia). These Plaintiffs allege that the Vehicle's infotainment system is defective. However, none of these Plaintiffs ever asked Honda or a dealership to address this issue. Their breach of express warranty claims are therefore dismissed without prejudice. The remaining Plaintiffs properly allege an opportunity to repair.

*3. Notice*

"The U.C.C. provides that a buyer of goods 'must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.' " *In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 799 (N.D. Ill. 2016) (citing UCC § 2-607.18). Many courts "have applied this U.C.C. provision to require that a plaintiff give the defendant reasonable pre-suit notice before asserting a breach of warranty claim in court." *Id.*

Defendant asserts that the California, Illinois, Florida, Nevada, New Jersey, New York, North Carolina, Oregon, Pennsylvania, and Virginia Plaintiffs' express and implied warranty claims must be dismissed for lack of pre-suit notice. (Reply at 12, ECF No. 55.) However, Defendant concedes that New Jersey, New York, and Pennsylvania courts are split as to whether pre-suit notice is a condition precedent to filing suit for breach of warranty. The parties appear to agree that *some* pre-suit notice is required under California, Illinois, Florida, Nevada, North Carolina, Oregon, and Virginia law. Accordingly, the Court considers only whether notice is sufficient under these states' laws.

### a. California Plaintiff

Under California law, a plaintiff must provide pre-suit notice to bring a breach of warranty claim. Cal. Com. Code § 2607(3)(A). Generally, such notice is not required where a breach of warranty claim is brought "by injured consumers against manufacturers with whom they have not dealt." *Park-Kim v. Daikin Indus., Ltd*, No. 215CV09523CASKKX, 2016 WL 5958251, at *20 (C.D. Cal. Aug. 3, 2016) (quoting another source). But this exception does not apply where, as here, the plaintiffs allege that they had direct dealings with the manufacturer and its authorized retailers. *Id.*; *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 817 (N.D. Cal. 2014).

Here, Plaintiff Banh alleges that he purchased the Vehicle in September 2018 and that he began experiencing problems with the infotainment system within days of owning the Vehicle. Plaintiff Banh also alleges that he sent a statutory notice letter on July 10, 2019. The Court cannot say that this delay is "unreasonable per se, such that the claim should be dismissed at the pleading stage." *AI-Daiwa, Ltd. v. Apparent, Inc.*, No. 13-CV-04156-VC, 2014 WL 4063146, at *2 (N.D. Cal. Aug. 15, 2014). Accordingly, the Court declines to dismiss California Plaintiff's breach of warranty claims for lack of notice.

### b. Illinois Plaintiffs

**\*11** Illinois law requires a buyer alleging a breach of warranty to "notify the seller of the breach within a reasonable time after he discovers it or else he is barred from any remedy." *Hedges v. Earth, Inc.*, No. 14 C 9858, 2015 WL 1843029, at *1 (N.D. Ill. Apr. 21, 2015) (internal quotations omitted); 810 ILCS 5/2–607(3)(a). The notice must let "the seller know that the particular transaction is still troublesome and must be watched." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 589 (Ill. 1996) (internal quotations omitted). "Pre-suit notice is an essential element of a breach of warranty claim, and the absence of such notice results in dismissal." *Hedges*, 2015 WL 1843029, at *1.

Under Illinois law, direct notice is not required where the seller has actual knowledge of the defect. *Id.* at *2. This "actual knowledge" exception applies only "where the manufacturer is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Id.* (quoting another source). It does not apply simply because "a manufacturer is aware of problems with a particular product line[.]" *Id.*

Here, neither Plaintiff Samaha nor Plaintiff Quinlan allege that they ever notified Honda of the alleged defect with the infotainment system. Accordingly, the Court finds that the Illinois Plaintiffs' breach of warranty claims must be dismissed with leave to amend.

### c. Florida Plaintiff

Florida law also requires reasonable pre-suit notice to assert a breach of warranty claim. Fla. Stat. § 672.607; *see Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1340 (S.D. Fla. 2011) (dismissing breach of warranty claim where plaintiff did not allege that he notified defendants of the alleged breach).

Plaintiff Goldman alleges that he purchased the Vehicle in September 2018 and began experiencing issues with the infotainment system within weeks of the purchase. Plaintiff Goldman also alleges that he called Acura's corporate office in February 2019 to inquire as to when a software update was to be released to fix the problem.

At this early stage of the proceedings, Plaintiff Goldman's allegations suffice to establish notice. If this case proceeds, Plaintiff Goldman will have the burden of proving that he provided notice as required by state law.

### d. Nevada Plaintiff

Under Nevada law, reasonable pre-suit notice of a breach of warranty claim is required. Nev. Rev. Stat. Ann. § 104.2607.

Here, although Plaintiff Ortiz alleges she called Honda about the issues she was experiencing with the infotainment system, she does not allege when this took place. To sufficiently allege pre-suit notice, Plaintiff must allege facts from which the Court can plausibly infer that notice was given "within a reasonable time." *Id.* Because Plaintiff Ortiz has not done so, her breach of warranty claims are dismissed with leave to amend.

### e. North Carolina Plaintiffs

Reasonable pre-suit notice of a breach of warranty claim is required under North Carolina law. N.C. Gen. Stat. Ann. § 25-2-607; *Maybank v. S. S. Kresge Co.*, 302 N.C. 129, 133 (1981) ("seasonable notification is a condition precedent to the plaintiff-buyer's recovery").

Plaintiff Bartholomew alleges that he leased the Vehicle in September 2018, began experiencing issues with the infotainment system within days, and called Honda directly through its toll-free number. Plaintiff Lawrence alleges that he leased the Vehicle in October 2018 and began experiencing issues with the infotainment system "shortly" thereafter.

As with Plaintiff Ortiz, Plaintiff Bartholomew fails to allege *when* he notified Honda of the issues with the infotainment system. Plaintiff Lawrence does not even allege that he contacted Honda about the issue. Accordingly, the Court dismisses both Plaintiffs' breach of warranty claims with leave to amend.

### f. Oregon Plaintiffs

**\*12** Reasonable pre-suit notice of a breach of warranty claim is also required under Oregon law. Or. Rev. Stat. Ann. § 72.6070.

Plaintiff M. Klein alleges that he contacted Acura's customer service department at least three times about the infotainment system. Plaintiff B. Klein alleges that he has taken his Vehicle to the dealership "repeatedly."

The Court finds that Plaintiffs M. Klein and B. Klein fail to adequately allege pre-suit notice. Plaintiff M. Klein does not allege when he contacted Acura's customer service department. Plaintiff B. Klein does not allege that he ever contacted Honda about the issue. Accordingly, the Court dismisses both Plaintiffs' breach of warranty claims with leave to amend.

### g. Virginia Plaintiffs

Finally, pre-suit notice is also required under Virginia law. Va. Code Ann. § 8.2-607.

Plaintiffs Faden and Hines both allege that they purchased the Vehicle in February 2019 and began experiencing problems with the infotainment system within days. Plaintiff Hines also alleges that he contacted Honda on many occasions about the defect.

Plaintiff Gratton alleges she purchased the Vehicle in May 2019, began experiencing problems with the infotainment system the day she drove it home, took the Vehicle to a dealership in mid-June 2019, and called Acura service representatives approximately two-dozen times seeking a solution to the defect.

The Court finds that Plaintiffs Faden, Hines, and Gratton have not sufficiently alleged pre-suit notice. Plaintiff Faden does not allege that he ever contacted Honda about the issues with the infotainment system. Plaintiffs Hines and Gratton allege that they contacted Honda, but do not allege when such communications occurred. Accordingly, the Court dismisses Plaintiffs Faden, Hines, and Gratton's breach of warranty claims with leave to amend.

In sum, the Illinois, Nevada, North Carolina, Oregon, and Virginia law Plaintiffs' breach of express and implied warranty claims are dismissed with leave to amend for failure to adequately allege pre-suit notice.

### E. Implied Warranty

### 1. *Merchantability*

Defendant argues that Plaintiffs' implied warranty of merchantability claims should be dismissed for failure to allege unmerchantability.

To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." UCC § 2-314(2) (c). Honda acknowledges that states may impose different standards of merchantability but asserts that "Plaintiffs' allegations flunk even the most lenient standard." (Mot. at 23.)

Accepting Plaintiffs' well-pleaded allegations as true, the Court finds that the implied warranty of merchantability claims survive the Motion to Dismiss. "Some of the alleged problems with the infotainment system are relatively harmless... Others, however, could pose safety and reliability issues."[6] *Conti* at 19. "Based on these allegations, the Court finds that the risks posed by the alleged defects cannot be discredited in a Rule 12(b)(6) motion." *Id.*; *see MyFord Touch*, 46 F. Supp. 3d at 981.

[6]       For example, Plaintiffs allege that the infotainment system defect causes the Vehicle's GPS operation to malfunction.

### 2. *Privity*

**\*13**  Defendant next argues that the Arizona, California, Florida, Illinois, Nevada, New York, Oregon, Tennessee, Texas, and Virginia Plaintiffs' implied warranty claims fail for lack of vertical privity, given that Plaintiffs purchased the Vehicles from independent Honda dealers—not Honda itself.

The Court has already dismissed multiple Plaintiffs' breach of warranty claims for failure to sufficiently allege pre-suit notice. Accordingly, in the interest of efficiency, and given the lack of briefing on this issue, the Court declines to address Defendant's privity argument at this time. Should Plaintiffs file an amended complaint, they may address any deficiencies raised by Defendant with respect to privity.

### F. **Unjust Enrichment (Florida Law)**

Finally, Defendant argues that Florida Plaintiff's unjust enrichment claim must be dismissed because Florida law

bars unjust enrichment claims where an express contract governs the subject matter of the dispute. (*See* Mot. at 25 ("Here, Florida Plaintiff specifically alleges the existence of an express warranty governing his rights—in fact, he sues under that warranty... As a result, the unjust enrichment claim must be dismissed with prejudice.").) Plaintiffs counter that Florida Plaintiff is permitted to plead unjust enrichment in the alternative. Plaintiffs also aver that until an express contract is proven, dismissal is premature.

The Court agrees with Defendant that Florida Plaintiff's unjust enrichment claim must be dismissed. "As an equitable remedy, an unjust enrichment claim *cannot* be maintained where a plaintiff has an adequate remedy at law. Here, because there is an express warranty governing Plaintiff[s'] rights, [the] unjust enrichment claim must fail." *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, No. 14-20107-CIV, 2014 WL 1745050, at *8 (S.D. Fla. Apr. 30, 2014) (emphasis added and internal citation omitted). This is particularly true where, as here, Defendant concedes that an express contract exists. (*See* Reply at 15); *see ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566 (S.D. Fla. 1997) (holding "that *because Defendant denies the existence of an express contract*, the Plaintiff has properly presented the claim for unjust enrichment.") (emphasis added). The Court therefore dismisses Florida Plaintiff's unjust enrichment claim.

### V. **CONCLUSION**

For the foregoing reasons, the Court **GRANTS in part** Defendant's Motion. All dismissals are without prejudice, except for (1) the dismissal of Plaintiff's MMWA claims; (2) the dismissal of Florida Plaintiff's fraudulent concealment claim; (3) the dismissal of Florida Plaintiff's unjust enrichment claim. Plaintiffs must file an amended complaint within **28 calendar days** of this Order's issuance. In addition to the "clean" version of the Second Amended Complaint, such a filing shall also include a "redlined" version clearly indicating all changes.

| Proposed Class | Claims | Disposition |
|---|---|---|
| Nationwide | MMWA Express Warranty | GRANT |
| | MMWA Implied Warranty | GRANT |
| | CLRA (CA) | GRANT – misrepresentation |
| | | DENY – omission |
| | Unfair Competition (CA) | DENY |
| | Fraud by Concealment (CA) | DENY |
| | Implied Warranty of Merchantability (CA) | DENY |
| California (Banh) | CLRA | GRANT – misrepresentation |
| | | DENY – omission |
| | Unfair Competition | DENY |

Banh v. American Honda Motor Company, Inc., Slip Copy (2019)
2019 WL 8683361

| State | Claim | Ruling |
|---|---|---|
| | Fraud by Concealment | DENY |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | DENY |
| Arizona (Bilbrey) | AZ Consumer Fraud Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| Florida (Goldman) | FL Deceptive and Unfair Trade Practices Act | GRANT – misrepresentation / DENY – omission |
| | Fraudulent Concealment | GRANT |
| | Express Warranty | DENY |
| | Implied Warranty | DENY |
| | Unjust Enrichment | GRANT |
| Georgia (Peoples) | GA Fair Business Practices Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| Illinois (Samaha, Quinlan) | IL Consumer Fraud and Deceptive Practices Act | DENY as to Plaintiff Samaha – misrepresentation / GRANT as to Plaintiff Quinlan – misrepresentation / DENY – omission |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | GRANT |
| Massachusetts (Hanna) | MA Consumer Protection Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| Nevada (Ortiz) | NV Deceptive Trade Practices Act | GRANT – misrepresentation / GRANT – omission |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | GRANT |
| New Jersey (Chisari) | NJ Consumer Fraud Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| New York | NY General Business Law § 349 | GRANT – misrepresentation |

| State | Claim | Ruling |
|---|---|---|
| (Bruner, Jahsman) | | DENY – omission |
| | Fraudulent Concealment | DENY |
| | Express Warranty | DENY |
| | Implied Warranty | DENY |
| North Carolina (Bartholomew, Lawrence) | NC Unfair and Deceptive Trade Practices Act | DENY (Lawrence) / GRANT (Bartholomew) |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | GRANT |
| Ohio (Kleehamer) | OH Consumer Sales Practices Act | GRANT |
| | Express Warranty | GRANT |
| | Implied Warranty in Tort | DENY |
| Oregon (M. Klein, B. Klein) | OR Unlawful Trade Practices Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | GRANT |
| Pennsylvania (Denaro) | PA Unfair Trade Practices and Consumer Protection Law | DENY – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| Tennessee (Pryor) | TN Consumer Protection Act | DENY – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty of Merchantability | DENY |
| Texas (Subbarao, Allan) | TX Deceptive Trade Practices Act | GRANT – misrepresentation / DENY – omission |
| | Express Warranty | DENY |
| | Implied Warranty | DENY |
| Virginia (Faden, Hines, Gratton) | VA Consumer Protection Act | DENY (Faden) – misrepresentation / GRANT (Hines, Gratton) – misrepresentation / DENY – omission |
| | Express Warranty | GRANT |
| | Implied Warranty of Merchantability | GRANT |

**\*14  IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 8683361

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

2000 WL 1742064

2000 WL 1742064
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Tenth
District, Franklin County.

Leigh BANKS, Plaintiff-Appellant,
v.
NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, Defendant-Appellee.

No. 99AP-1413.
|
Nov. 28, 2000.

Appeal from the Franklin County Court of Common Pleas.

**Attorneys and Law Firms**

Murdock & Goldenberg, L.P.A., and John C. Murdock; Hagens Berman, L.L.P., Steve W. Berman, Sean R. Matt and Christopher A. O'Hara, for appellant.

Bricker & Eckler, L.L.P., Randolph C. Wiseman and Stephen C. Gray; Swartz, Campbell & Detweiler, and Curtis P. Cheyney, III; Post & Schell, P.C., and Michael R. Nelson, for appellee.

OPINION

BRYANT.

 **\*1** Plaintiff-appellant, Leigh Banks, appeals from a judgment of the Franklin County Court of Common Pleas granting the motion to dismiss of defendant-appellee, Nationwide Mutual Fire Insurance Company ("Nationwide") pursuant to Civ. R. 12(B)(6). Plaintiff assigns the following errors:

I. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT.

II. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM FOR FRAUD.

III. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM FOR VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING.

IV. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT REQUIRING THE CREATION OF A CONSTRUCTIVE TRUST.

For the reasons set forth below, we affirm in part and reverse in part, finding that although the trial court properly dismissed part of plaintiff's complaint against Nationwide, plaintiff sufficiently stated a claim for relief against Nationwide on other grounds. See O'Brien v. University Community Tenants Union (1975), 42 Ohio St .2d 242; and Slife v. Kundtz (1990), 40 Ohio App.2d 179.

According to plaintiff's complaint, plaintiff entered into an insurance contract with Nationwide for the repair of her vehicle in the event of collision. Plaintiff alleged her insured motor vehicle was damaged in an accident, she took her vehicle to the manufacturer's dealership, and she received a repair estimate of $4,597. She asserts Nationwide insisted she obtain a bid from Wreck Tech, which provided an estimate of $3,679. According to plaintiff, Wreck Tech explained on its estimate form that twelve of the forty-two replacement parts would be "supplied by a supplier other than the original equipment manufacturer." (Complaint, par. 27.) Such parts are commonly referred to as non-OEM parts, and in plaintiff's estimate included exterior crash parts: bumpers, grills, radiator supports, fenders and hood. Plaintiff alleges she complained about the use of non-OEM parts and the amount of the estimate, but Nationwide refused to pay for OEM parts and gave her a check based on the estimate issued by Wreck Tech. Plaintiff does not allege that any non-OEM parts were installed on her vehicle. Rather, plaintiff asserts the Nationwide check, based on the estimate issued by Wreck Tech, was insufficient to provide the promised level of repairs.

The parties agree on the text of the insurance policy and endorsements. Under "Coverages," below the heading "Insuring Agreements," the insurer agreed:

> B. COLLISION. To pay for any direct and accidental damage including glass breakage to the described automobile and its equipment, other than trailers, caused

by collision or upset of such automobile,
less the deductible amount * * *.

Under the "Limits of Liability" heading, under "Conditions,"
the insurance policy stated:

> The limit of the Company's liability for
> loss is the actual cash value of the
> automobile or its damaged parts at time
> of loss. The Company may pay any loss
> or repair or replace the automobile or
> its damaged parts, or may return stolen
> property * * *.

 **\*2**  The parties further agree that the policy includes the
following amendatory Endorsement 2276A, which states in
pertinent part:
B. Collision. To pay for any direct and accidental damage
including glass breakage to the described automobile and its
equipment, other than trailers, caused by collision or upset of
such automobile, less the deductible amount * * *.

* * *

5. LIMITS OF LIABILITY

Coverages A and B

The limit of the Company's liability for loss is the actual
cash value of the automobile or its damaged parts at time of
loss. The Company *may pay any loss or repair or replace
the described automobile or its damaged parts with parts
furnished either by original equipment manufacturers or non-
original equipment manufacturers.* The Company may return
stolen property * * *. In addition to payment of the loss,
necessary and reasonable towing and storage will be paid
to protect the automobile from further damage. (Emphasis
added.)

Two contentions are at the heart of plaintiff's complaint.
Initially, plaintiff asserts that Nationwide breached its contract
by requiring repair shops to use non-OEM parts to repair
damaged vehicles. Similarly, plaintiff claims a breach of

contract when Nationwide paid reimbursement for losses
directly to the insured by calculating the payment based on
non-OEM parts.

Secondly, plaintiff asserts that, regardless of whether the
contract permits the insurer to provide non-OEM parts,
Nationwide nonetheless had an obligation to provide
replacement parts that were materially equivalent to that
of the damaged parts. Plaintiff contends that Nationwide
breached that duty when it provided non-OEM parts of
materially inadequate and inferior quality. In that regard,
plaintiff concedes she is not arguing that non-OEM parts
are inherently deficient. Rather, she asserts that the non-
OEM parts "used by Nationwide" were materially inadequate,
inferior, and/or defective.

Pursuant to the above-quoted language of the insurance
policy, the contracting parties plainly agreed to the use of
non-OEM parts to repair damaged vehicles. The contract
unambiguously states that Nationwide may satisfy its
obligations to repair vehicles by providing parts made
by manufacturers other than the original manufacturer.
Moreover, the specific, limiting language regarding non-
OEM parts does not conflict with the more general language
regarding the insurer's obligation to repair damaged vehicles
in the event of a collision. Rather, the amendatory language
permitting the use of non-OEM parts defines and describes
the insurer's obligation to repair. Thus, plaintiff cannot
reasonably argue that the insurer had an obligation to provide
OEM parts exclusively.

Given the plain and unambiguous language in the contract
regarding the type of parts that may be used for repairs,
plaintiff did not state a claim for breach of contract when she
alleged that Nationwide required the use of, or premised its
repair estimates on, non-OEM parts. We therefore affirm the
trial court's conclusion that plaintiff failed to state a claim for
breach of contract based solely on the practice of requiring
the use of non-OEM parts for the repair of vehicles, or paying
the cost of non-OEM parts.

 **\*3**  Nonetheless, even though Nationwide had the right to
provide non-OEM parts in meeting its obligation to repair,
the contract included an implied agreement that, regardless
of who manufactured the parts, the replacement parts would
be comparable to OEM parts in design, make and quality. In
other words, although Nationwide had the contractual right to
provide non-OEM parts, it did not have the contractual right
to provide defective parts or parts that were substandard as

2000 WL 1742064

compared to non-OEM parts that are comparable in design, make and quality to OEM parts ("allowable non-OEM parts") to the parts that were damaged.

This implied term of the contract flows from Nationwide's obligation of good faith and fair dealing. When an insurer promises to provide repair parts for a vehicle, the insured may reasonably expect that the replacement parts will be comparable to the parts to be replaced. See, generally, *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272; *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552. Thus, any insurer engaged in the practice of providing non-OEM parts which were materially substandard or defective, as compared to allowable non-OEM parts, would be in violation of its contract. We note that to determine whether the non-OEM parts were substandard or defective, the comparison is to allowable non-OEM parts, not OEM parts.

Here, plaintiff has alleged that: (1) Nationwide engaged in the practice of providing materially inferior, inadequate and/or defective parts, (2) the amount of the check was based on the cost of materially inferior, inadequate, and/or defective parts, and (3) the check provided by Nationwide did not meet its contractual obligation to repair plaintiff's vehicle. Given those allegations, the trial court improperly concluded that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. The trial court thus erred in dismissing that part of the complaint in which plaintiff alleged that the payment plaintiff received was insufficient due to a calculation based on substandard or defective non-OEM parts as compared to allowable non-OEM parts.

Regarding Nationwide's obligation to pay for repairs, the parties vigorously dispute the nature and extent of the insurer's promise to repair damaged vehicles, raising several specific issues including the following: (1) whether Nationwide promised to restore vehicles to their pre-loss condition, (2) whether Nationwide promised to restore vehicles to their pre-loss actual cash value, (3) whether Nationwide promised to compensate owners for diminution in value following a collision, and (4) whether Ohio Adm.Code 3901-1-54 is applicable to a determination of the contract rights or otherwise applicable to the claims stated by plaintiff, issues discussed in cases such as *Morrison v. Allstate Indemnity* (Sept. 9, 1999), U.S. Dist.Ct. (M.D.Fla.) Case No. 98-377-CIVJ-20C, and *Avery v. State Farm Mutual Auto. Ins. Co.* (Oct 8, 1999), Ill. Cir. Ct. (Williamson Co.) Case No. 97-L-114.

**\*4** The trial court, however, addressed none of those issues, given its dismissal of the complaint based on the amendatory endorsement permitting use of non-OEM parts. Because the complaint states a claim for breach of contract to the extent noted above, the trial court will have the opportunity to address the issues in the first instance in the context of the proceedings on remand.

Accordingly, plaintiff's first assignment of error is sustained in part and overruled in part.

Plaintiff's second assignment of error asserts the trial court erred in dismissing her claim of fraud. The Supreme Court of Ohio has identified six elements that must be proven to establish a claim of fraud: (1) a representation or, where there is a duty to disclose, concealment of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Burr v. Stark Co. Bd. of Cmmrs.* (1986), 23 Ohio St.3d 69.

As with her contract claim, plaintiff's fraud claim appears to have two distinct aspects. Initially, plaintiff alleges that, by promising to restore vehicles to pre-accident condition and then offering non-OEM parts as a regular practice, Nationwide defrauds its customers because non-OEM parts cannot restore a vehicle to pre-accident condition. Given Nationwide's disclosure that non-OEM parts could be used for repairs, coupled with Wreck Tech's disclosure that replacement parts would include non-OEM parts, plaintiff cannot state a claim for fraud based solely on the fact that Nationwide provided or offered to provide non-OEM parts for her vehicle repair: plaintiff cannot reasonably argue that she was justified in relying on general language about repairs to the exclusion of specific and unambiguous language stating the insurer's option to provide non-OEM parts. To the contrary, plaintiff had every reason to expect that the insurer would supply non-OEM parts. Moreover, plaintiff stated at oral argument that she was not alleging that non-OEM parts are necessarily deficient *per se.* As a result, plaintiff's allegation that Nationwide committed fraud by calculating her reimbursement check based on non-OEM parts does not state a claim.

Plaintiff, however, also alleged that Nationwide engaged in a widespread practice of promising to provide a certain level of repair and then insisting that, after sustaining losses, policyholders accept parts Nationwide knew to be materially substandard or defective. According to plaintiff's complaint, Nationwide intended from the inception of the contractual relationship to provide substandard or defective non-OEM parts, as compared to allowable non-OEM parts, but concealed that intention from plaintiff, causing her to enter into or remain in her insurance contract with Nationwide in the reasonable expectation and in reliance on the representation that, following a collision, her vehicle would be repaired with parts of materially equivalent quality and performance, whether OEM or non-OEM.

**\*5** Reduced to its essence, plaintiff's complaint asserts: (1) Nationwide deliberately made promises that it never intended to keep, thereby inducing plaintiff to pay insurance premiums, and (2) plaintiff, relying on those representations, suffered a covered loss but Nationwide followed through on its scheme to deny the promised level of repairs that plaintiff reasonably expected from the contract language.

Given those allegations, plaintiff's complaint sufficiently states a claim for fraud. Nonetheless, the allegations regarding representations in advertising materials, including the website, cannot support plaintiff's claim of fraud. Plaintiff never alleged she saw the advertising materials or visited the website. Thus, even if those materials exist as alleged, plaintiff has failed to allege any reliance on them.

Accordingly, plaintiff's second assignment of error is sustained in part and overruled in part.

Plaintiff's third assignment of error focuses on the duty of good faith and fair dealing. Ohio courts have held that the duty of good faith and fair dealing gives rise to a cause of action in tort separate from a claim sounding in contract. *Hoskins, supra.* See, also, *Zoppo, supra.* Here, as noted, plaintiff has alleged deliberate concealment and intent to deprive plaintiff of benefits promised to her under the contract. Regardless of whether she can prove them, the allegations state a claim for bad faith in the processing of her insurance claim, sufficient to withstand a motion under Civ.R. 12(B)(6). While most of the reported decisions focus on a complete refusal to pay a claim rather than an alleged insufficient payment of the claim, insurers nevertheless have a duty to act in good faith in the processing of a claim, and a violation of that duty is actionable. Plaintiff's third assignment of error is sustained.

In her fourth assignment of error, plaintiff contends the trial court erred in dismissing her claim for unjust enrichment. The doctrine of unjust enrichment provides an equitable remedy, under which the court implies a promise to pay a reasonable amount for services rendered where a party has conferred a benefit on another without receiving just compensation for his or her services. Thus, under the theory of *quantum meruit,* a party may recover compensation in the absence of a contract where an unjust enrichment would result if the recipient were permitted to retain the benefit without paying for it. *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged* (1984), 15 Ohio St.3d 44; *Fox & Associates Co. v. Purdon* (1989), 44 Ohio St.3d 69.

Under these equitable principles, a contract is implied as a legal fiction under a theory of quasi-contract, which does not rest on the written intent between the parties but is imposed to prevent injustice. *Paugh, supra,* at 46. Where, however, a written contract between the parties addresses the matter in dispute, the contract governs the parties' performance, unless the contract is void due to illegality, fraud, or otherwise cannot govern the relationship. Generally, where damages are available for breach of contract or in tort, the party cannot also invoke the equitable remedy for unjust enrichment. Rather, if no remedy is available in contract or tort, then the equitable remedy in unjust enrichment may be afforded to prevent injustice. See, generally, *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 55; *Norton v. Gallon* (1989), 60 Ohio App.3d 109, certiorari denied (1990), 48 Ohio St.3d 711; *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250; *Sammarco v. Anthem Ins. Cos.* (1998), 131 Ohio App.3d 544, 557. In addition, although the remedy of restitution for unjust enrichment has been applied under some circumstances in the absence of any quasi-contractual relationship, such as where the case involves a compensation-paying relationship imposed by statute, those circumstances are not present here. *Cf. Liberty Mut. Ins. Co. v. Indus. Comm.* (1988), 40 Ohio St.3d 109. Rather, here the parties had a written agreement governing the insurer's obligation to repair damaged vehicles. In addition, plaintiff has stated a claim in tort. The law, therefore, need not imply a debt at equity to provide a remedy. Indeed, under plaintiff's theory, almost every alleged consumer fraud would be actionable as "unjust enrichment," and, likewise, a broad array of contract violations would be actionable as "unjust enrichment." Because it is unnecessary and unwise to broaden this equitable doctrine to provide a remedy in circumstances where remedies at law, in contract and tort,

2000 WL 1742064

provide an adequate remedy, we overrule plaintiff's fourth assignment of error.

**\*6** Having sustained in part and overruled in part plaintiff's first and second assignments of error, sustained plaintiff's third assignment of error, and overruled her fourth assignment of error, the judgment of the trial court is affirmed in part and reversed in part, and remanded to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part and reversed in part; case remanded.*

TYACK and PETREE, JJ., concur.

**All Citations**

Not Reported in N.E.2d, 2000 WL 1742064

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

2017 WL 6273361
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia.

Evelyn BENTON, Plaintiff,

v.

PHILLIPS EDISON & CO., LTD., Defendant.

Civil Action No. 3:17cv630–HEH
|
Filed 12/08/2017

**Attorneys and Law Firms**

Evelyn Benton, Henrico, VA, pro se.

Matthew Yanovitch, Spotts Fain PC, Richmond, VA, for
Defendant.

## MEMORANDUM OPINION

### (Granting Motion to Dismiss & Denying Motion for Leave to File Second Amended Complaint)

Henry E. Hudson, United States District Judge

**\*1** Evelyn Benton ("Plaintiff"), acting *pro se*, brought this
action against Phillips Edison & Co., Ltd. ("Defendant")
alleging that Defendant breached the terms of Plaintiff's
commercial lease, violated the Federal Trade Commission
Act, and violated various provisions of the Virginia Code.
This matter is before the Court on Defendant's Motion to
Dismiss Under Rule 12(b)(6) [1] (ECF No. 7), filed on October
20, 2017, and Plaintiff's Motion for Leave to File Second
Amended Complaint ("Pl. Mot.," ECF No. 12), filed on
October 27, 2017. Although Plaintiff did not file either a
response to the Motion to Dismiss or a reply in support of her
Motion for Leave to File Second Amended Complaint, the
Court finds that the facts and legal contentions are adequately
presented in the materials before it, and oral argument would
not aid in the decisional process. E.D. Va. Local Civ. R.
7(J). For the reasons stated herein, Defendant's Motion to
Dismiss will be granted, and Plaintiff's Motion for Leave to
File Second Amended Complaint will be denied.

[1]    Defendant included an appropriate Roseboro
       Notice with its Motion, as required by Local Civil

Rule 7(K) and the Fourth Circuit's decision in
Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

## I. BACKGROUND

As required by Rule 12(b)(6) of the Federal Rules of
Civil Procedure, the Court assumes Plaintiff's well-pleaded
allegations to be true and views all facts in the light most
favorable to her. *T.G. Slater & Son v. Donald P. & Patricia
A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing
*Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.
1993)). Legal conclusions, however, enjoy no such deference.
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Generally, the district court does not consider extrinsic
materials when evaluating a complaint under Rule 12(b)(6).
The court may, however, consider "documents incorporated
into the complaint by reference," *Tellabs, Inc. v. Makor
Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), as well
as documents attached to a motion to dismiss, so long as
they are integral to or explicitly relied upon in the complaint,
and the authenticity of such documents is not disputed.
*United States ex rel. Oberg v. Pa. Higher Educ. Assistance
Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Philips v. Pitt
Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). In
this case, the lease Plaintiff executed with Ashland Junction,
L.C., the lease-amendment documents, and the notification
Plaintiff received from Defendant telling her that her lease
was ending ("Termination Notice") are all incorporated into
the Complaint by reference, and they are additionally attached
to both the Motion to Dismiss and Plaintiff's proposed Second
Amended Complaint. Neither party disputes the authenticity
of these documents, and so the Court will consider them for
purposes of resolving the motions before it.

Viewed through this lens, the facts are as follows.

In 2012, Plaintiff entered into a lease with Ashland
Junction, L.C., to rent commercial space in Ashland Junction
Shopping Center in Ashland, Virginia ("Lease"). (ECF
Nos. 8–1, 12–1.) Plaintiff and Ashland Junction, L.C.
executed three subsequent lease renewal amendments ("Lease
Amendments") in 2013, 2014, and 2015. (ECF Nos. 8–2, 8–
3, 8–4, 12–3, 12–4, 12–5.) The Third Lease Amendment,
executed in 2015, extended the term of the Lease through
August 31, 2017. (ECF Nos. 8–4, 12–5.)

**\*2** At the time the original Lease was executed, Ashland
Junction, L.C. was registered as a Virginia limited liability

company. In February of 2016, Ashland Junction L.C. domesticated in the state of Delaware and changed its name to Ashland Junction, LLC. The new entity, Ashland Junction LLC, assumed all the rights and obligations of Ashland Junction L.C., including all rights and obligations assigned to the Landlord in Plaintiff's Lease. (*See* Termination Notice, ECF No. 12–8 (referring to Ashland Junction, LLC as successor-in-interest to Ashland Junction, L.C.).)

On August 22, 2017, in its capacity as the property management agent for Ashland Junction LLC, Defendant sent Plaintiff a Termination Notice reminding her that the Lease was set to expire on August 31, 2017. (*Id.*) The Termination Notice also provided that, pursuant to the Lease's 30–day notice requirement, the effective date of lease-termination would be September 21, 2017. (*Id.*)

Plaintiff filed the instant action on September 19, 2017, alleging that Defendant's behavior and practices violated the terms of the lease, Virginia Code §§ 55–248.31, 55–222, and 54.1–2106.1, as well as the Federal Trade Commission Act. On September 22, 2017, before Defendant was served with process, Plaintiff filed an Amended Complaint. Defendant filed its Motion to Dismiss with *Roseboro* Notice on October 20, 2017. Plaintiff then filed her Motion for Leave to File Second Amended Complaint on October 27, 2017, and Defendant filed its opposition thereto on November 7, 2017.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one

that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater*, 385 F.3d at 841 (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Additionally, "[a] document filed *pro se* is 'to be liberally construed.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976)). To that end, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* (citation and internal quotation marks omitted). Moreover, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(d). At the same time, courts recognize that a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (Posner, J.) (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007); *Orthmann v. Apple River Campground*, 757 F.2d 909, 915 (7th Cir. 1985); *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)); *see also Dolgaleva v. Va. Beach City Pub. Sch.*, 364 Fed.Appx. 820, 827 (4th Cir. 2010).

### B. Motion for Leave to File Second Amended Complaint

**\*3** When a plaintiff may not file an amended pleading as a matter of right, "the disposition of a motion to amend is within the sound discretion of the district court." *Davis v. Virginia Commonwealth Univ.*, 180 F.3d 626, 628 (4th Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178 (1962)). Pursuant to Fed. R. Civ. P. 15(a)(2), "[t]he court should freely give leave [to amend pleadings] when justice so requires." "Motions to amend are typically granted in the absence of an improper motive, such as undue delay, bad faith, or repeated failure to cure a deficiency by amendments previously allowed." *Harless v. CSX Hotels, Inc.*, 389 F.3d 444, 447 (4th Cir. 2004). A lack of prejudice to the nonmoving party, alone, ordinarily warrants granting leave to amend. *Ward Elec. Serv., Inc. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir. 1987). However, if the amendment would be futile such that it fails to satisfy federal pleading requirements and would not survive a motion to dismiss, then a court may deny leave to amend. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (citation omitted).

Benton v. Philips Edison & Co., Ltd., Not Reported in Fed. Supp. (2017)
20WL 1 7 42L664W

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 69 of 520
PageID: 8990

## III. DISCUSSION

Taking the facts in Plaintiff's Amended Complaint as true, the Court finds that she has failed to state a claim for relief. The Court further finds that Plaintiff's proposed Second Amended Complaint would not survive a subsequent motion to dismiss and therefore leave to amend is not warranted.

### A. Motion to Dismiss

Plaintiff's Amended Complaint can be read as presenting four counts: Defendant violated the Lease (Count One) and *Virginia Code § 55–222* (Count Two) by only giving Plaintiff thirty days' notice regarding the termination of her lease; Defendant violated *Virginia Code § 55–248.31* "by non-compliance with its rental agreement" (Count Three); and Defendant violated the Federal Trade Commission Act ("FTCA") by operating as a managing agent for Ashland Junction, L.C./LLC without a license issued by the Department of Professional and Occupational Regulation ("DPOR") or Certificate of Authority issued by the State Corporation Commission ("SCC") (Count Four). As discussed below, however, the facts and the Lease documents, construed as liberally as possible, show that Plaintiff has not raised any viable legal claims. [2]

[2]    Because the Court finds that Plaintiff fails to state a claim upon which relief may be granted, it need not address the legality and/or suitability of the various forms of relief sought in the Amended Complaint.

Defendant argues that Plaintiff has failed to state a claim on Counts One through Three because Defendant is neither the Landlord referenced in the Lease nor a party to the Lease or its Amendments. (Mem. Supp. Mot. Dismiss 7, ECF No. 8; Lease & Lease Amendments, ECF Nos. 8–1, 8–2, 8–3, 8–4.) Instead, all of Defendant's allegedly unlawful actions pertaining to the termination of Plaintiff's lease were performed in its capacity as property management agent for the landlord, Ashland Junction L.C./LLC. (Termination Notice, ECF No. 12–8.) The law is clear that a fully disclosed agent who acts on behalf of their principal cannot be held personally liable for such conduct. *Duncan v. Peninger*, 624 F.2d 486, 490 (4th Cir. 1980) (citing *Restatement (Second) of Agency § 320* & Comment a (1958)); *Inova Health Sys. Servs. v. Bainbridge*, 2011 Va. LEXIS 255 *3–4 (Va. Oct. 21, 2011) (citing *Richmond Union Passenger Ry, Co. v. New York & Sea Beach Ry. Co.*, 95 Va. 386, 395 (1897)). In the

Amended Complaint, Plaintiff herself alleges that Defendant is the "Management Agent" and/or "Managing Agent" "for the Landlord ...." (Am. Compl. 2, ECF No. 4.) The Court finds that, by doing so, Plaintiff has effectively pled herself out of court on her claim for breach of contract and the accompanying claims for violation of the Virginia Code. *See Atkins*, 631 F.3d at 588; *Dolgaleva, 364 Fed.Appx. at 827.*

**\*4** Regarding Count Four, Plaintiff's claim that Defendant has violated the FTCA, the Court finds that Plaintiff lacks a private right of action under the Act. The Fourth Circuit has explicitly recognized that "the substantive prohibitions of [the FTCA] [are] 'inextricably intertwined with provisions defining the powers and duties of a specialized administrative body charged with its enforcement,' " and, as a result, "courts have declined to imply any private right of action [in the FTCA] and have relied upon the regulatory scheme to police the industry." *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 675 (4th Cir. 1986) (quoting *Holloway v. Bristol–Myers Corp.*, 485 F.2d 986, 988–989 (D.C. Cir. 1973)). Accordingly, this Court follows the Fourth Circuit and numerous other circuit courts in finding that Plaintiff has no legal claim against Defendant under the FTCA.

Because Plaintiff has pled facts that show she cannot recover from Defendant for the alleged breach of contract or violations of the Virginia Code, and because she has no right to relief under the FTCA, the Amended Complaint must be dismissed.

### B. Motion for Leave to File Second Amended Complaint

Facing Defendant's Motion to Dismiss, Plaintiff attempted to cure the deficiencies of her Amended Complaint by filing the Motion for Leave to File Second Amended Complaint. In the proposed Second Amended Complaint, which was incorporated into Plaintiff's Motion, Plaintiff seeks to add Phillips Edison Limited Partnership, Phillips Edison & Company, Inc., [3] and Ashland Junction, L.C. [4] as defendants. (*See* Pl. Mot. 1, ECF No. 12.) Plaintiff additionally reframes her claims and asserts what the Court liberally construes as nine counts: (1) breach of the Lease; (2) violation of *Virginia Code § 55–222*; (3) violation of *Virginia Code § 54.1–2105.2*; (4) fraud in the factum and fraud in the inducement, under Virginia law; (5) violation of the FTCA; (6) violation of federal criminal fraud statutes, *18 U.S.C. §§ 1341, 1343*; (7) violation of the Age Discrimination in Employment Act ("ADEA"), *28 U.S.C. § 621, et seq.*; (8) tortious interference with a business expectancy under Virginia law; and (9)

Benton v. Phillips Edison & Co., Ltd., Not Reported in Fed. Supp. (2017)
2017 WL 7 7 42L664W

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 70 of 520
PageID: 8991

violation of § 3631 of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

3    When appropriate, the Court will adopt Plaintiff's collective label "PECO" to refer to Phillips Edison & Co., Ltd. (the original Defendant), Phillips Edison & Company, Inc., and Phillips Edison Limited Partnership.

4    Despite explicitly adding Ashland Junction, L.C. as a defendant, Plaintiff does not name the entity in any of her claims. Plaintiff does, however, refer to Ashland Junction, LLC in her claim for "Termination of the Lease by an Entity Not a Party to the Lease," which the Court construes in part as Count One: breach of the lease. (Pl. Mot. 7–8.) Because Ashland Junction, LLC is the successor in interest to Ashland Junction, L.C., and because the Court must construe *pro se* complaints "to do justice," *see* Fed. R. Civ. P. 8(d), the Court will consider Ashland Junction, LLC to be a named Defendant for purposes of analyzing Plaintiff's Motion for Leave to File Second Amended Complaint.

1. Counts Two, Three, Five, Six, Seven, & Nine

As a preliminary matter, the Court notes that Count Two of the proposed Second Amended Complaint is identical to Count Two of the Amended Complaint, and as a result the Court can summarily dispose of that Count as unable to survive a motion to dismiss. *See supra* discussion at Part III.A. The Court can also dispose of Counts Three, Five, Six, Seven, and Nine because these claims are founded on inapplicable law and/or laws that do not provide for private, civil relief. Plaintiff's claims that the PECO Defendants violated Virginia Code § 54.1–2105.2 (Count Three), the FTCA (Count Five), and federal criminal fraud statutes (Count Six) all fail for lack of a private right of action.[5] The claim that the PECO Defendants violated the Age Discrimination in Employment Act (Count Seven) necessarily fails because the statute only applies to discrimination in the context of an employment relationship, and nowhere in the Amended Complaint or the proposed Second Amended Complaint does Plaintiff allege that she was an employee of any of the Defendants. Finally, Plaintiff's attempted claim of housing discrimination (Count Nine) is not viable because the Fair Housing Act only governs residential properties, not commercial spaces such as the leased property that is the subject of the present dispute.

Accordingly, amendment would be futile as to each of these proposed counts.

5    Virginia Code § 54.1–2105.2 provides solely for regulatory enforcement by the Virginia Real Estate Board, the FTCA provides for regulatory enforcement by the Federal Trade Commission (*see supra* Part III.A), and federal criminal law is reserved for the Department of Justice to prosecute.

2. Count One

**\*5** Plaintiff's claim that Ashland Junction, LLC[6] breached the Lease (Count One) would similarly not survive a motion to dismiss. To the extent that Plaintiff alleges that Ashland Junction, LLC, is not a party to the Lease and therefore had no authority to terminate it, her argument fails as contrary to both law and the text of the Termination Notice, which explicitly designates Ashland Junction, LLC as successor-in-interest to Ashland Junction, L.C, the original "Landlord". (ECF 12–8.) Additionally, Plaintiff's assertion that the Lease was breached because she was only given ten days' notice of termination fails to state a claim because it is contradicted by the facts as alleged and the text of the incorporated Lease documents.

6    *See supra* note 4.

Plaintiff received the Termination Notice on August 21, 2017. (Pl. Mot. 8.) The Notice provided Plaintiff a full 30 days before the termination would become effective on September 21, 2017. (*Id.*) By doing so, Ashland Junction, LLC actually allowed Plaintiff to continue renting the premises beyond the date on which the Third Lease Amendment would have naturally expired: August 31, 2017. (*Id.*; Third Lease Am., ECF No. 12–5.) Moreover, although Plaintiff relies on Paragraph 26 of the Lease to claim that she should have been relocated rather than have her lease terminated, Plaintiff misconstrues the text of the Lease. Paragraph 26 states explicitly that, in the event it wished to relocate the Tenant (Plaintiff), the "Landlord *may*, upon ninety (90) days' prior written notice" do so. (Lease at 5, ECF No. 12–1 (emphasis added).) The word "may" imparts no legal obligation; rather, it creates an option for the Landlord. Accordingly, even if Paragraph 26 was applicable to Plaintiff's lease-termination scenario, Ashland Junction, LLC, could not be held liable for failing to exercise this option.

For these reasons, the Court finds that Plaintiff has failed to state a claim for breach of contract against Ashland Junction, LLC, the successor-in-interest to the only other party to the

Lease. To the extent that Plaintiff attempts to state a claim for breach of contract against the PECO defendants as well, such claim fails for the reasons discussed in the Court's analysis of the Motion to Dismiss.

### 3. Count Four

In Count Four, Plaintiff alleges that the PECO Defendants committed fraud by misrepresenting their status as authorized to transact business in the Commonwealth of Virginia, despite allegedly lacking any such certificate of authority or registration. (Pl. Mot. at 9–10.) Specifically, Plaintiff asserts that this constituted fraud in the factum and fraud in the inducement. Under Virginia law, the elements of common law fraud are: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance thereon by the party misled, and (6) resulting damage to the party misled." *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014). A claim of fraud in the factum requires a showing of fraud in the execution of a negotiated instrument itself, for example where the instrument was misread to the signor or the signor was presented a document other than that which she believed herself to be signing. *Sager v. W. T. Rawleigh Co.*, 153 Va. 514, 526–27 (1929). Finally, to state a claim for fraud in the inducement, a plaintiff must show that misrepresentations were made, which were "positive statements of fact, made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into the contract." *Brame v. Guarantee Finance Co., Inc.*, 139 Va. 394, 124 S.E. 477 (1924).

Other than alleging that the PECO Defendants' actions constituted fraud in the factum, Plaintiff has made no allegation that fraud occurred in the execution of the Lease, such that the document she ultimately signed was not what she believed it to be. Plaintiff has therefore not stated a claim for fraud in the factum. Similarly, Plaintiff has not alleged any facts to show that the PECO Defendants positively represented to her that they were registered with the SCC, or that Plaintiff relied upon any such statements when she negotiated the Lease and its Amendments. For this reason, Plaintiff has failed to state a claim for fraud in the inducement or common law fraud in general.

### 4. Count Eight

**\*6**  Plaintiff's last proposed claim is that "Phillips Edison & Company constructive[ly] denied Plaintiff other empty properties." (Pl. Mot. at 12.) The Court construes this as a claim for tortious interference with a business expectancy (Count Eight). In support of her claim, Plaintiff presents excerpts of what appears to be a failed negotiation for alternative rental space, occurring two days after Plaintiff received the Termination Notice. (*Id.* at 12–13.)

As established by the Virginia Supreme Court, the elements of tortious interference with a business expectancy are as follows: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Commercial Bus. Sys. v. Halifax Corp.*, 253 Va. 292, 300 (1997) (quoting *Glass v. Glass*, 228 Va. 39, 51–52 (1984)).

The facts alleged in the Complaint and the excerpted e-mail exchange fail to demonstrate that Plaintiff had a business expectancy in continuing to lease space from the PECO Defendants after the expiration of the Third Lease Amendment. Additionally, the facts presented are insufficient to show that the PECO Defendants engaged in intentional misconduct by refusing to offer Plaintiff the lease-rates and/or discounts she sought. As a result, Plaintiff has failed to state a claim on this Count as well.

For all the foregoing reasons, the Court finds that granting Plaintiff leave to amend her Amended Complaint would be futile because none of the claims in the proposed Second Amended Complaint would survive a successive motion to dismiss. Therefore, Plaintiff's Motion for Leave to File Second Amended Complaint will be denied.

### IV. CONCLUSION

In sum, the Court finds that Plaintiff has failed to state a claim upon which relief may be granted in the Amended Complaint. The Court further finds that granting Plaintiff leave to file the proposed Second Amended Complaint would be futile, as the claims stated therein are similarly deficient as a matter of law. Accordingly, the Motion to Dismiss (ECF No. 7) will be granted, the Motion for Leave to File Second Amended Complaint (ECF No. 12) will be denied, and the action will be dismissed.

Benton v. Philips Edison & Co., Ltd., Not Reported in Fed. Supp. (2017)
2017 WL 6273361

An appropriate Order will accompany this Memorandum Opinion.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6273361

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Bostick v. St. Jude Medical, Inc., Not Reported in F.Supp.2d (2004)
2001 WL 8898591

KeyCite Yellow Flag - Negative Treatment
Distinguished by Herrera v. LCS Financial Services Corp., N.D.Cal., June 1, 2011

2004 WL 3313614
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee, Western Division.

James BOSTICK and Bobby H. Thrasher, Plaintiffs,
v.
ST. JUDE MEDICAL, INC., and St.
Jude Medical S.C., Inc., Defendants.

No. 03-2626 BV.
|
Aug. 17, 2004.

**Attorneys and Law Firms**

Carroll C. Johnson, III, Law Offices of Carroll C. Johnson, Paul Berry Cooper, III, Deal, Cooper, & Holton, PLLC, Memphis, TN, for Plaintiff.

DeWitt M. Shy, Jr., J. Brook Latham, Melissa A. Maravich, Burch Porter & Johnson, Memphis, TN, James C. Martin, Steven M. Kohn, Reed Smith, LLP, Oakland, CA, for Defendant.

REPORT AND RECOMMENDATION ON
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

VESCOVO, Magistrate J.

**\*1** This action involves a product liability claim against defendants St. Jude Medical, Inc., and St. Jude Medical S.C., Inc. (collectively "St. Jude"). Before the court is the March 31, 2004 motion of the plaintiffs, James Bostick and Bobby Thrasher, seeking a determination, pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, that this action may be maintained as a class action on behalf of the following class:

> All persons in the United States and its territories who have had a coronary artery bypass graft procedure utilizing the St. Jude Medical Symmetry Bypass System Aortic Connector Device, designed, manufactured and marketed by

Defendant, St. Jude Medical, Inc. and/or St. Jude Medical S.C., Inc.

Or, in the alternative:

> All persons who have had a coronary artery bypass graft procedure utilizing the St. Jude Symmetry Bypass System Aortic Connector Device, designed, manufactured and marketed by Defendant, St. Jude Medical, Inc. and/or St. Jude Medical S.C., in the state of Tennessee.

The plaintiffs also seek an order confirming that James Bostick and Bobby Thrasher may serve as the representative plaintiffs and may be represented by the law firm of Deal, Cooper & Holton, PLLC, 296 Washington Avenue, Memphis, TN 38103. The motion was referred to the United States Magistrate Judge for report and recommendation. The magistrate judge held oral argument on August 3, 2004. Present at the hearing were Carroll Johnson for plaintiffs and DeWitt Shy and James Martin for St. Jude. Based on the briefs submitted by the parties, argument of counsel, and the record as a whole, it is recommended that the plaintiffs' motion for class certification be denied.

I. PROPOSED FINDINGS OF FACT

St. Jude Medical is a cardiac device manufacturer based in St. Paul, Minnesota. (Defs.' Mem. of Law in Opp'n to Class Certification at 4.) St. Jude manufactures pacemakers, prosthetic heart valves, and cardiac repair devices. One of their cardiac products is the St. Jude Medical Symmetry Aortic Connector ("aortic connector"). (*Id.* at 5.) St. Jude began developing, designing, manufacturing, marketing, and selling the aortic connector in 2001. (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 1.)

The aortic connector is a small, star-shaped mechanical anastomosis device made of Nitinol that was designed for use by cardiac surgeons during surgery. (*Id.*) Coronary artery bypass graft surgery ("CABG") is designed to improve blood

flow through coronary arteries to the heart muscle. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Class Certification at 2.) During bypass surgery, the surgeon removes a portion of a blood vessel from the patient's leg, arm, or chest and uses the vessel as a conduit to bypass or detour an obstructed coronary artery. (*Id.* at 3.) Most often, surgeons use the saphenous vein from the leg as the bypass vessel. (*Id.*) The aortic connector is used to attach the saphenous vein graft to the aortic surface without sutures or the need for cross clamping or side biting of the aorta during CABG. (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 1.)

**\*2** Prior to the aortic connector's placement on the market, St. Jude submitted to the Food and Drug Administration ("FDA") a "pre-market notification" for the aortic connector claiming the device was a "substantially equivalent device" as contemplated in the Medical Device Amendment at 21 U.S.C. § 301 et seq.[1] The aortic connector received § 510(k) approval by the FDA on May 21, 2001. (*Id.* at 7.)

[1]     Pursuant to the Medical Device Act of 1976, amended in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-95, a medical device covered under the statute may be marketed pursuant to a pre-market approval, or pursuant to a section 501(k) finding of "substantial equivalence." 21 U.S.C.A. § 360c(i).

The plaintiffs allege that St. Jude received adverse event reports from the medical community regarding complications associated with the aortic connector as early as August 2001. (*Id.*) The adverse reports describe a significantly higher incidence of complications in the form of restenosis and occlusion at the connector sites resulting in the need for re-operation using traditional hand-sewn techniques or other devices. (*Id.* at 2.) The first reported death associated with the aortic connector was on August 14, 2001. (*Id.*) The plaintiffs assert that since that date, multiple deaths associated with the aortic connector have been reported on the FDA's adverse events database. (*Id.*)

In addition to adverse reports, the plaintiffs also assert that a study conducted by Dr. G. Phillip Schoettle, a thoracic and cardiovascular surgeon in Memphis, on patients who had undergone bypass surgery using the aortic connector "revealed an 80 percent rate of occlusion or stenosis, uniformly occurring at the connector site" on patients having a repeat cardiac catheterization after the bypass surgery. (*Id.* at 8; *id.,* Ex. 1.) Dr. Schoettle's research indicated that in

traditional bypass surgery using hand-sewn grafts, there were roughly the same number of repeat cardiac catheterizations performed but with only a 15 to 20 percent rate of occlusion and stenosis. (*Id.*)

The plaintiffs also rely on minutes obtained from a FDA Circulatory System Devices Advisory panel meeting during which Ulwe Klima, a professor of cardiac surgery at Hanover Medical School for Cardiac Surgery, stated that follow-up angiography six months after bypass surgery on ten patients revealed six patients with occlusions and one with highly significant stenosis. (*Id.* at 9.) Klima further stated "angiographic follow-up at six months after surgery 'was sufficient to detect a real, real problem at the site of the anastomosis, even though these patients were asymptomatic. This is a very clear message as I say that even though you have an asymptomatic patient, you might have a significant problem at the site of the anastomosis.' " (*Id.*)

In addition to the independent studies presented to the court, the plaintiffs also submitted the affidavit of Dr. H. Frank Martin, Jr., a cardiologist who is board certified in cardiovascular disease and internal medicine.[2] Dr. Martin is not a cardiac surgeon, but asserts that he is familiar with techniques used during CABG and performs follow up care to CABG patients. (Martin Supp. Aff. at 1.) Dr. Martin opines, based upon his own personal knowledge and a review of Thrasher's and Bostick's medical records, that the implantation of St. Jude's aortic connector results in a "significantly increased risk of developing re-stenosis or occlusion of the bypass graft ... as opposed to traditional bypass surgery using sutures." (Martin Aff. at 2.) Dr. Martin states in his opinion that the "re-stenosis and occlusion associated with use of this device is uniformly located at the connector site and is causally related to use of the connector." (*Id.*)

[2]     St. Jude has filed motions to strike both Dr. Martin's initial affidavit and his supplemental affidavit. At the time of the hearing, the plaintiffs had not responded to St. Jude's motion to strike Dr. Martin's supplemental affidavit and the time for response had not lapsed. Therefore, for the purposes of this report, the court will assume Dr. Martin's affidavit is admissible without deciding it is so, and the motions to strike will be addressed by separate order.

**\*3** Dr. Martin indicates that the increased risk associated with the aortic connector can be attributed to the material from which the device is made and the procedure in which the bypass graft must be installed. (*Id.*) He suggests that all persons who have undergone a bypass surgery in which the aortic connector was used are in "need of immediate testing and medical monitoring to determine the extent of any compromise of the bypass graft because of the significantly increased risk of developing re-stenosis or occlusion associated with this device." (*Id.*) According to Dr. Martin, a cardiac catheterization is the "preferred procedure to determine the extent of bypass graft compromise." (*Id.*)

The plaintiffs contend that St. Jude's device has led to "severe and disabling medical conditions resulting from collapse and scarring of the graft as a result of the implanted aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 2.) The plaintiffs assert that it is undisputed that over 40,000 [3] aortic connectors have been implanted in persons worldwide, including at least 300 implantations in Tennessee. (*Id.* at 3, 18.) They contend that those patients receiving the implanted device "suffer a significantly increased risk of developing severe and life threatening compromise of the aortic/venous bypass graft" and is at "risk of occlusion and/or stenosis." (*Id.* at 10.) The plaintiffs assert that the condition has "necessitated removal of the aortic connector in numerous patients, and severe harm to others who must now be monitored for further signs and symptoms of potentially fatal arterial bypass graft compromise." (*Id.* at 2.)

[3]    In the class action complaint, the plaintiffs aver that over 50,000 aortic connectors have been implanted in persons worldwide. (Compl. at 6.) The discrepancy between 40,000 and 50,000 has little impact on the court's analysis of Rule 23(a)'s numerosity requirement.

The amended complaint alleges negligence, strict product liability failure to warn, strict product liability, negligence, breach of implied and express warranties, and unjust enrichment. On March 31, 2004, the plaintiffs filed a motion for class certification with this court. The plaintiffs assert that their nationwide class, or in the alternative, Tennessee class is comprised of two sub-classes:
Class I consists of all people in the United States and its territories who have had a coronary artery bypass graft procedure utilizing the St. Jude Medical Symmetry Bypass System Aortic Connector Device, or in the alternative all such

people who received the device in the State of Tennessee, *except* those whose injuries have resulted in their death or serious injury resulting in the removal of the device.

Class II consists of all people in the U.S. or the State of Tennessee who received the aortic connector, or in the alternative all such people who received the device in the State of Tennessee, and who have sustained presently compensable physical injuries due to the aortic connector, including, without limitation, injuries requiring the removal of the aortic connector and injuries resulting in serious damages and/or death.

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 4-5.) As a remedy for Class I ("medical monitoring class"), the plaintiffs seek access to a "coordinated program of medical monitoring services" to include diagnostic testing and preventative screening care along with an approved epidemiological study and review of the results of the monitoring. (*Id.* at 4.) The plaintiffs suggest that medical monitoring could take place in the form of a cardiac catheterization, MRI, CT scan, stress test, and/or echocardiogram. They contend that the court should create and control a trust fund to provide for necessary medical monitoring and research. [4] (*Id.*) For Class II ("personal injury class"), the plaintiffs seek damages for personal injury, and if applicable, wrongful death and survival damages. (*Id.* at 5.)

[4]    The plaintiffs assert that a medical monitoring program must include:
locating and notifying the class members of the defects and the potential medical harm; the creation of a registry and a baseline database of Class members; the funding for periodic monitoring and assessment of the Class members; the researching, gathering and forwarding of epidemiological and treatment/diagnostic modality information to Class members' treating physicians and other health care providers; the researching and assessment of the injuries or complications which are or may result from the subject products' defects, including the recognition and assessment of risks of explant versus no-explant alternatives; providing medical treatment to remove the aortic connectors in those individuals who exhibit bypass graft compromise as a result of implantation of the device; the research and development and implementation of

Bostick v. St. Jude Medical, Inc., Not Reported in F.Supp.2d (2004)
2001 WL 8898591

appropriate psychological and emotion support and
treatment programs for Class members and their
spouses.
(Pls.' Mem. of Law in Supp. of Mot. for Class
Certification at 11.)

**\*4** Plaintiff James Bostick is a seventy-seven year old
resident of Shelby County, Tennessee who seeks to represent
Class I and II. Bostick underwent triple bypass surgery
performed by Dr. Phillip Schoettle on August 27, 2002 in
which the St. Jude aortic connectors were implanted. (*Id.*
at 12; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class
Certification at 8.) In November 2002, Bostick experienced
a sudden onset of intense chest pain. (Opp'n at 8.) He
subsequently underwent a heart catheterization, stress tests,
and an angioplasty performed on November 15, 2002. (*Id.*
at 9.) Bostick contends that he has experienced medical
problems due to his initial bypass surgery and describes
feeling tension, a nagging pain in his chest and a general lack
of comfort in doing many of the things he previously did.
(Pls.' at 12; Opp'n at 9.)) Nevertheless, Bostick has not had
the aortic connectors removed and is purported to represent
the class of presently asymptomatic bypass patients. Bostick
seeks compensatory and other damages for medical expenses
and pain and suffering. He does not, however, seek lost wages
or loss of consortium damages.

Plaintiff Bobby Thrasher is a sixty-one year old resident of
Alcorn County, Mississippi who seeks to represent Class
II. Thrasher underwent bypass surgery performed by Dr.
Schoettle on May 2, 2002 during which an aortic connector
was implanted. Thrasher alleges that he began experiencing
problems in October, 2002. (*Id.*) He continued to experience
burning and pressure in his chest into November and
December of 2002. (*Id.* at 13.) A cardiac catheterization
revealed blockage, and on January 16, 2003, Thrasher
underwent another bypass surgery to remove the aortic
connector as a result of occlusion at the connector sites. (*Id.*
at 13, 29.) Thrasher seeks compensatory and other damages
for medical expenses, pain and suffering, wage loss, reduced
earning capacity and loss of consortium type injuries.

At the August 3, 2004 evidentiary hearing, plaintiffs' counsel
presented his argument for class certification first. During his
opening remarks, counsel acknowledged that the variations
in state law for the claims asserted in the complaint would make
the certification of a nationwide class difficult but indicated
nevertheless that plaintiffs were not abandoning that request.
He then proceeded to address the certification of a Tennessee
class almost exclusively and presented no information on how

a nationwide class action for either Class I or Class II could be
maintained. Furthermore, plaintiffs' counsel failed to outline
how variations in state law could be managed on a nationwide
basis and did not address choice-of-law considerations.

## II. PROPOSED CONCLUSIONS OF LAW

The defendants argue that courts in every circuit and the
Supreme Court have denied certification of personal injury,
product liability actions like this one because the requirements
of Rule 23 could not be met. Essentially, the defendant's
primary argument against certification is that there are too
many individualized legal and factual circumstances in this
case, which would make class treatment futile.

### A. *Framework of Federal Rule of Civil Procedure 23*
**\*5** Within the framework of Federal Rule of Civil Procedure
23, the district court has broad discretion in determining
whether an action should be certified as a class action. *Craft
v. Vanderbilt Univ.,* 174 F.R.D. 396, 401 (M.D.Tenn.1996)
(citing *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188,
1197 (6th Cir.1988)). That being said, district courts are
required to conduct a "rigorous analysis" into whether
the federal rule's prerequisites for a class action are met
before certifying a class, *"especially"* in products liability
cases involving drug or medical products that require FDA
approval. *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1078-79,
1089 (6th Cir.1996) (emphasis in original).

Rule 23 provides a two-part test for class certification and
the burden of proof is on the plaintiff to establish that the
lawsuit is maintainable as a class action. *Id.* at 1079. First, a
plaintiff seeking class certification must meet the threshold
requirements of Rule 23(a) of the Federal Rules of Civil
Procedure. The plaintiff must show that

> (1) the class is so numerous that joinder
> of all members is impracticable, (2) there
> are questions of law or fact common to
> the class, (3) the claims or defenses of
> the representative parties are typical of
> the claims or defenses of the class, and
> (4) the representative parties will fairly
> and adequately protect the interests of the
> class.

FED. R. CIV. P. 23(a). After establishing those requirements, the plaintiff must satisfy one of the three subsections of Rule 23(b) that determine whether a class action is maintainable.

### 1. *Rule 23(a)*

#### a. *Impracticable Joinder of All Members*

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The impracticability of joinder for class action purposes is not determined by employing a strict numerical test. *In re Am. Med. Sys., Inc.,* 75 F.3d at 1079. "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (citations omitted).

Here, the plaintiffs contend that the class members are so numerous and geographically diverse that joinder of all members is impracticable. St. Jude does not dispute that both proposed classes meet the numerosity requirement of Rule 23(a)(1). Accordingly, the requirement for numerosity as to both classes is satisfied by the fact over 40,000 aortic connectors have been implanted worldwide and approximately 300 in Tennessee.

#### b. *Questions of Law and Fact Common to the Class*

This requirement is ordinarily referred to as the commonality test. The commonality test "is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1080 (quoting Newberg & Alba Conte, *Newberg on Class Actions,* § 3.10, at 3-50 (3d ed.1992)). Nevertheless, "the prerequisites of commonality and typicality will normally be hard to satisfy" in a products liability case. *In re Temple,* 851 F.2d 1269, 1273 n. 7 (11th Cir.1988) (cited in *In re Am. Med. Sys. Inc.,* 75 F.3d at 1089).

**\*6** The plaintiffs contend that in this case, all class members seek to resolve the legal issue of whether a product was defective and caused plaintiffs harm. [5] In turn, St. Jude argues that there are no common legal issues and no common factual issues from which the commonality requirement can be satisfied. As for common legal questions, St. Jude contends that the court must undertake a choice-of-law analysis to determine which state law applies to the claims of each class member. With state law differences on issues such as strict product, negligence, and medical monitoring, St. Jude asserts that there will not be any legal issues common to the class as a whole.

[5]  The plaintiffs assert that the questions of law and fact common to Class I and II include:

(a) whether the subject aortic connector designed, developed, manufactured, distributed, fabricated, supplied, advertised, promoted and/or sold by St. Jude has a defect or defects;

(b) the nature of said defect(s);

(c) whether the aortic connector causes an increased risk of occlusion at the connector sites;

(d) whether St. Jude conducted testing on the aortic connectors to the extent reasonably necessary to determine its safety prior to selling and/or distributing it;

(e) whether said testing was adequate and responsible;

(f) whether St. Jude accurately reported its test results;

(g) whether St. Jude failed to disclose to the FDA information known to it and relevant to the aortic connector's safety and efficacy;

(h) whether the warnings, if any, given by St. Jude were reasonable in light of what it knew or should have known;

(i) whether St. Jude's failure to give adequate and timely warnings of the dangers of the aortic connector constitutes negligence per se;

(j) whether consumers who were implanted with the aortic connector are at an increased risk of developing serious adverse health effects including respiratory failure, heart attacks, and death;

(k) whether monitoring and testing procedures which make early detection and treatment of the serious adverse health effects caused by occlusion at the connector sites are possible and beneficial;

(l) whether medical monitoring and an epidemiological program is appropriate and necessary;

(m) whether St. Jude designed and manufactured aortic connectors that were dangerously defective because they had a tendency to cause occlusion at the connector sites which could lead to serious adverse health effects including respiratory failure, heart attacks and death;

(n) whether St. Jude concealed adverse information regarding the testing and safety of the aortic connectors used during their bypass surgeries;

(o) what steps, if any, St. Jude took to cure or mitigate the defects in the aortic connectors after it knew of the defects and of the injuries and risks associated with their use;

(p) whether St. Jude is strictly liable to those injured by their defective aortic connectors;

(q) whether St. Jude acted negligently towards Plaintiffs and members of the classes;

(r) whether Plaintiffs and others similarly situated need and would benefit from a notice and registry program, a medical surveillance program, and/or medical research program designed to address the substantially increased risk of harm that St. Jude's defective products have put them in;

(s) whether Class II Plaintiffs have suffered injury and/or death as a result of the implanted St. Jude aortic connector.

(Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 20-22.)

As for common factual issues, St. Jude contends that any claim of commonality is overshadowed by individual variations in the factual circumstances of each class member. St. Jude points to differences in class members' individual case histories and the fact that complications with the device could be due to surgical error. St. Jude notes that in a failure-to-warn case, each plaintiff's surgeon would be required to testify to determine what oral and written statements were made by St. Jude to the physician, and what he in turn told the patient. *See In re Am. Med. Sys., Inc.,* 27 F.3d at 1081.

c. *Typicality of Claims and Defenses of the Representative Parties as Compared to the Class*

Rule 23(a)(3)'s typicality requirement requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class,

> and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re Am. Med. Sys., Inc.,* 75 F.3d at 1082 (6th Cir.1996) (quoting 1 *Newberg, supra,* § 3.13, at 3-76). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* The plaintiff "whose claim is typical will ordinarily establish the defendants' liability to the entire class by proving his or her individual claim." ALBA CONTE & HERBERT B. NEWBERG, 6 NEWBERG ON CLASS ACTIONS § 18:8, at 29 (4th ed.2002).

The named plaintiffs contend that their claims are typical because each representative plaintiff's claim arises from the same course of events as other members of each class, apparently referring to, without explicitly stating, bypass surgery and implantation of the aortic connector. The plaintiffs argue that their claims "involve specific actions taken by St. Jude which affect each class member, including the marketing of thousands of aortic connectors each of which had the same dangerous defect." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 24.) Bostick and Thrasher assert that the relief they seek is exactly the same as the relief sought by absent class members and that each individual claim will rely on the same evidence proving St. Jude's wrongful conduct. (*Id.*) Moreover, the plaintiffs argue that St. Jude's defenses will be the same. (*Id.* at 26.)

**\*7** St. Jude contends that are "numerous aspects" of the representative class members' claims that establish the absence of typicality. (Opp'n at 24.) In support of its argument, St. Jude directs the court's attention to the case of *In re Baycol Products Litig.,* 218 F.R.D. 197, 205 (D.Minn.2003), where a district court in Minnesota rejected plaintiff's argument that their claims were typical merely because they involved a single product and the same purported conduct. *Cf. In re Paxil Litigation,* 212 F.R.D. 539, 550 (C.D.Cal.2003) ("In focusing its typicality argument almost exclusively on the fact that there is a single defendant [ ], a single drug [ ], and a single

2001 WL 8898591

set of alleged misleading statements nationwide, Plaintiffs misconstrue the typicality requirement.") The court went on to recognize the existence of issues such as "injury, causation, the learned intermediary defense, and comparative fault" would require the presentation of individualized evidence. *Id.* Furthermore, the court noted that "[b]ecause the theories asserted by this putative class are based on what Defendants' knew at the time Baycol was prescribed, and whether Defendants acted reasonably based on such knowledge, the claims of the named representatives are not typical of the class." *Id.* at 205-06; *see also.*

Applying the rationale of *In re Baycol Products Litigation* to the facts at hand, St. Jude argues that the plaintiffs claims are not typical of the classes they seek to represent. First, St. Jude contends that the plaintiffs allege breach of warranty, which may require in some states that plaintiffs present proof that they relied on statements made regarding the product. However, Thrasher and Bostick cannot recall whether they were informed Dr. Schoettle would be using St. Jude's aortic connector during bypass surgery or not. Thus, St. Jude argues that the plaintiffs are not typical of class members who were informed of the use of aortic connectors. (Opp'n at 24.)

Furthermore, St. Jude asserts that plaintiff Bostick's claims are not typical of the thousands of other patients who received an aortic connector and have experienced no trouble with the device. It contends that other aspects of Thrasher's and Bostick's medical and family histories are unique, which present substantial proof problems that may not be shared by all class members. St. Jude also argues that the plaintiffs' damage claims are not typical of the class and notes that Class II includes aortic connector recipients with claims for wrongful death and survival while the plaintiffs themselves are alive and well. *But see Alpern v. UtiliCorp. United Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) ("The fact that damage calculations might differ slightly for [different plaintiffs] is a minor matter in comparison with the fundamental similarities.") *See also In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271, 288-89 (S.D.Ohio 1997) ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action.").

d. *Adequacy of Representation*
**\*8** The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This rule has two requirements. First, "the representative must have

common interests with unnamed members of the class." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1083. Second, "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.* The adequate representation requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.*

In addition to their arguments for typicality, the plaintiffs contend that Thrasher and Bostick possess all of the qualities of adequate class representatives. They assert that each named plaintiff meets the definition of his respective class and is willing to represent others similarly situated. Thrasher and Bostick have responded to St. Jude's discovery requests and the disclosure requirements of the federal rules. Moreover, both plaintiffs have attended and participated in a class representative deposition. The plaintiffs argue that no facts suggest that Bostick and Thrasher have any conflict or other interest antagonistic to the vigorous pursuit of class claims against St. Jude on behalf of the entire class. Finally, Bostick and Thrasher propose that they have retained experienced and qualified counsel to vigorously represent the interests of the proposed classes.

St. Jude does not challenge the adequacy and qualifications of plaintiffs' counsel; however, St. Jude does challenge Bostick's and Thrasher's suitability as class representatives on the same grounds upon which it opposed the representative plaintiffs' satisfaction of the typicality requirement.

2. *Rule 23(b)*
Even if the prerequisites of Rule 23(a) are met, the plaintiff also has the burden of meeting one of the three criteria listed in 23(b). A class action will be maintained only if one of the criteria of Rule 23(b) is satisfied. In this case, the plaintiffs seek certification under all three provisions of Rule 23(b). They first seek to certify both classes under Rule 23(b)(3), which permits certification where plaintiffs can show that common questions predominate and that a class action is the superior method to adjudicate the controversy. Plaintiffs also seek to certify Class I, the medical monitoring class, under Rule 23(b) 2), which permits injunctive relief, if plaintiffs can show that St. Jude acted or refused to act on grounds generally applicable to the class. Finally, plaintiffs seek certification of Class I under Rule 23(b)(1)(A), which provides for class certification when separate actions would create a risk of inconsistent or varying adjudications that would establish

incompatible standards of conduct for the party opposing the class. [6]

[6]    The plaintiffs did not seek class certification under Rule 23(b)(1) in their complaint. They raise this argument only in their motion for class certification, and plaintiffs' counsel indicated at the hearing that the plaintiffs primarily sought certification of the medical monitoring class under the second and third subsections of Rule 23(b).

a. *Certification of Medical Monitoring Class under Rule 23(b)(1) and (b)(2)*

**\*9** St. Jude challenges certification of Class I under Rules 23(b)(1) and (b)(2) on four grounds. First, St. Jude contends that plaintiffs in Class I do not have constitutional standing to bring a medical monitoring claim. Second, St. Jude argues that medical monitoring is not an injunctive remedy and is therefore unavailable under Rule 23(b)(2). Third, St. Jude asserts that the medical monitoring class is not sufficiently cohesive. Finally, St. Jude claims that certification under Rule 23(b)(1) is inappropriate because there is no risk of inconsistent judgments.

Rule 23(b)(1)(A) provides for class certification when separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class. The plaintiffs contend that medical monitoring relief must be uniform to be effective. In response, St. Jude argues that any risk of divergent results from multiple cases exists only because the individual issues surrounding each class members claims will dictate each class member's prospective entitlement to medical monitoring. Therefore, St. Jude contends that class certification is inappropriate as a altogether.

Rule 23(b)(2) provides that plaintiffs may be eligible for relief when the party opposing certification has acted or refused to act on grounds generally applicable to the class. FED. R. CIV. P. 23(b)(2). The rule permits class actions in which the plaintiffs seek damages, but only in those cases where the *primary* relief sought is injunctive or declaratory. *Alexander v. Aero Lodge No. 735,* 565 F.2d 1364, 1372 (6th Cir.1977) (emphasis in original). Unlike Rule 23(b)(3), Rule 23(b)(2) has no requirement of superiority or predominance. *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.,* MDL No. 01-1396, 2004 U.S. Dist. LEXIS 14 at 14 n. 7 (D.Minn. Jan. 5, 2004). However, the rule does include "an implicit 'cohesiveness' requirement, which precludes

certification when individual issues abound." *Thompson v. Am. Tobacco Co.,* 189 F.R.D. 544, 577 (D.Minn.1999) (citing *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 143 (3d. Cir.1998) (relying on the cohesiveness requirement enunciated by the Supreme Court in *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

Here, Bostick and Thrasher seek medical monitoring relief consisting of a "supervised trust, funded by St. Jude, that would provide to the class the medical procedures and diagnostic tests recommended to uncover the likely conditions resulting from the implantation of an aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 37.) The plaintiffs' assert that the monitoring program they seek would not provide compensation for any personal injuries that patients have suffered or might suffer. (*Id.* at 37-38.) Furthermore, the plaintiffs contend that the tests and procedures they propose are "not routinely performed as part of a routine follow-up of a patient who has received a bypass surgery." (*Id.* at 38.)

**\*10** St. Jude contends that Class I may not be certified under this subsection of Rule 23(b) because plaintiffs do not seek equitable relief. St. Jude claims that because the proposed medical monitoring trust fund would be paid for by St. Jude, the medical monitoring claim is equivalent to one for money damages. There is a Tennessee case holding otherwise. In *Craft v. Vanderbilt Univ.,* 174 F.R.D. 396, 406-07 (M.D.Tenn.1996), the court held that an action for court-supervised medical monitoring could qualify as injunctive relief under Rule 23(b)(2). *See also In re St. Jude Med., Inc. Heart Valves,* 2003 WL 1589527 (D.Minn., March 27, 2003); *Day v. NLO, Inc.,* 144 F.R.D. 330, 336 (S.D.Ohio 1992) (holding that a medical monitoring program could constitute injunctive relief as required by Rule 23(b)(2)). *But see Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1195-96 (9th Cir.2001) (addressing *Craft* decision and citing other cases where the equitable nature of medical monitoring was at issue). The key query is whether the plaintiffs can demonstrate that the "primary relief they are seeking is injunctive or declaratory" as opposed to a request for what is essentially monetary relief. *Kurczi,* 160 F.R.D. at 672.

b. *Predominance of Common Issues Versus Individual Issues under Rule 23(b)(3) for Classes I and II*

The plaintiffs argue that both classes can be certified under Rule 23(b)(3). This rule has two requirements: (1) that common questions of law or fact predominate over any questions affecting only individual class members and (2)

that a class action is superior to other available methods of adjudicating the controversy. FED. R. CIV. P. 23(b)(3). This rule parallels Rule 23(a)(2) in that both subdivisions require that common issues exist, but 23(b)(3)'s predominance test goes further by insuring that the common issues predominate over individual issues. *In re Am. Med. Sys., Inc.* 75 F.R.D. at 1084.

St. Jude argues that certification under Rule 23(b)(3) is not appropriate because there are too many factual and legal differences among the class members, thereby destroying predominance. Furthermore, St. Jude contends that a class action would not be a superior method of adjudicating either class's allegations because of the inherent difficulties in dealing with the laws of many states.

"[A] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual issues." *Weinberg v. Insituform Tech.,* No. 93-2742, 1995 WL 368002, at *7 (W.D.Tenn. April 7, 1995) (Gibbons, C.J.). "Predominance is usually decided on the question of liability, so that if the liability issue is common to the class, common questions are held to predominate over individual ones." *Id.*

The plaintiffs contend that the controlling issues of whether aortic connectors are defective, and whether St. Jude was negligent in failing to adequately test the product before placing in the stream of commerce "plainly predominate over any individual issues in this case." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 33.) The plaintiffs also argue that as to Class I, there are no legally relevant individual issues at all because Dr. Frank Martin contends that anyone with an aortic connector is injured by the aortic connector's presence in them alone and thus requires monitoring. (Pls.' at 33.) The plaintiffs do not address the fact that all class members claims will not be governed under the law of a single jurisdiction. Various jurisdictions have rejected class certification where the applicable states' laws vary and preclude a finding that common issues predominate. *In re Am. Med. Sys., Inc.,* 75 F.3d at 1085.

**\*11**  "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of settling the controversy...." Wright, 7 *Federal Practice & Procedure,* § 1780 at 562. Rule 23(b)(3) identifies

four factors which should be examined by the court to determine whether class treatment would be fair and efficient: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3)(A)-(D). In analyzing superiority, the court primarily considers "the difficulties likely to be encountered in the management of a class action." FED. R. CIV. P. 23(b)(3). Here, the main factor affecting superiority involves application of state law to plaintiff's claims. Even if common questions of law exist, the application of multiple state laws may render the case unmanageable as a class action. *See Telectronics,* 172 F.R.D. at 290-91.

Bostick and Thrasher claim that variations in state law should not bar this class action and assert that "[i]f the elements of the cause of action are the same and legal standards on significant issues are substantially similar the state laws can be grouped for purposes of class certification." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 34 (citing *Telectronics,* 172 F.R.D. at 292).)

**B.** *Certification of a Nationwide Class*
After a careful review of the record, argument presented at the hearing, and the briefs submitted to the court, it is clear that the plaintiffs have not carried their burden of establishing that this medical product liability action is maintainable or manageable as a nationwide class under either prong of Rule 23. Turning first to the threshold requirements of Rule 23(a), the plaintiffs have not presented any argument or evidence to the court as to how choice of law considerations and variations in state law can be reconciled with the requirements of commonality, typicality, and adequate representation of a nationwide medical monitoring or personal injury class.

Before the court can determine, for instance, whether the commonality requirement of Rule 23(a)(2) is satisfied, the court must undertake a choice of law analysis to determine

what state's law applies to the claims of each class member. *See In re Am. Med. Sys., Inc.* 75 F.3d 1069, 1085 (6th Cir.). In diversity cases, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, Tennessee's choice of law rules will apply to this case. Tennessee follows the approach of the *Restatement (Second) of Conflicts of Laws* and "provides that the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." *Hattaway v. McKinley,* 830 S.W.2d 53, 59 (Tenn.1992). The plaintiffs have averred that approximately 40,000 patients in all fifty states have received the aortic connector in bypass surgeries. Therefore, the possibility exists that the laws of all fifty states could apply to the rights and liabilities of the parties.

 **\*12** With state law differences on issues such as strict product liability, negligence, medical monitoring, and the availability of affirmative defenses, such as comparative fault and the learned intermediary doctrine, this court finds it difficult to see a common legal standard applicable to all class members, and the plaintiffs have not provided the court with any analysis on the issue. At most, the plaintiffs have listed generic "common questions" that can be characterized as "common" at the most superficial level. For instance, the plaintiffs include within their list of common questions issues such as whether St. Jude is strictly liable, whether St. Jude is negligent, and whether a medical monitoring program is appropriate and necessary. Because a choice of law analysis will be required to determine the law to be applied to the claims of each class member, the law that applies to these questions necessarily will differ as to each class member. Even the basic question of whether St. Jude's aortic connectors are defective will depend on the application of the laws of all fifty states and perhaps upon facts particular to each individual plaintiff.

The plaintiffs, both in their briefs and during oral argument, merely gloss over the choice of law issues. They give the court general assurances that any issues arising out of state law variations will be overcome. They have not submitted to the court a plan as to how the differences in state law could be managed. Without more, the plaintiffs have failed to meet their burden of proof under Rule 23 and have not illustrated that a common question of law exists, much less predominates as required under Rule 23(b)(3). *See Chin v. Chrysler Corp.,* 182 F.R.D. 448, 453 (D.N.J.1998) (finding that the plaintiff failed to meet its burden to "credibly demonstrate, through

an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles' "); *In re Am. Med. Sys., Inc.,* 75 F.3d at 1079, 1085. For this reason and for others that will be discussed below in the court's analysis of the certification of a Tennessee class, this court does not recommend the certification of Class I or II on a nationwide basis.

C. *Certification of a Tennessee Class Action*
In the alternative to a nationwide class, the plaintiffs seek certification of a Tennesseee class action with two subclasses limited to patients who received the aortic connector in Tennessee. St. Jude asserts, however, that limiting the classes to Tennessee will not solve the problem plaintiffs face with state law variations because patients receiving the bypass in Tennessee may reside elsewhere, which would necessitate a choice of law analysis for the claims of each Tennessee class member. As this court stated above in the court's choice of law analysis for a nationwide class, there is a presumption in Tennessee that the law of the location of the injury controls. Under the plaintiffs' theory of this case, the location of the alleged injury is the place where the patients were implanted with the aortic connector and that place would be Tennessee under the plaintiffs' alternative class definition. In light of the place-of-injury presumption, this court submits that narrowing the medical monitoring class and personal injury class to Tennessee would in fact remove the overwhelming choice-of-law issues facing a nationwide class. The plaintiffs have asserted, without challenge by St. Jude, that at least 300 aortic connectors have been implanted in the state of Tennessee. That figure, as opposed to the 40,000 possible nationwide class members, would be manageable even if the court had to determine if another state had a more significant relationship to the plaintiffs' claims. Thus, there are common issues of law in a Tennessee class, and there is no dispute as to the numerosity requirement. Accordingly, the court must analyze the two Tennessee classes in more detail to determine whether the other requirements of Rule 23 are satisfied.

1. *Class I-The Medical Monitoring Class*
 **\*13** At the outset, the court must address whether Class I has standing to bring an action for medical monitoring because standing is a requirement of Article III. *Sutton v. St. Jude Med., Inc.,* 292 F.Supp.2d 1005, 1007 (W.D.Tenn.2003) (citations omitted) ("Standing must be determined at the outset of litigation, as failure of a plaintiff to show standing deprives the federal courts of jurisdiction to hear the case."); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591,

612-13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints....").

The burden is on the plaintiff to prove standing. Standing consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the defendant's conduct of which the plaintiff complains; and (3) it must be likely that the injury will be redressed by a favorable decision. *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The "injury in fact must be actual or imminent, not conjectural or hypothetical." *Id.* Furthermore, in a class action, "the named plaintiff must allege an individual personal injury in order to seek relief on behalf of himself, or herself, or any other member of a class." *Id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). When analyzing standing at the class certification stage, the court assumes the truth of facts alleged by the plaintiff. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The plaintiffs have stated in support of their motion for class certification that "[t]here can be no confusion as to who belongs to Class I. Quite simply, Class I includes every U.S. or Tennessee patient who still has an aortic connector." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 12.) At the hearing, plaintiffs' counsel repeatedly referred to Class I as the class encompassing those patients who have been implanted with the aortic connector but are asymptomatic or without injury. After the hearing, however, the plaintiffs filed a Supplemental Statement Regarding Oral Argument on Motion for Class Certification that indicated that Class I also includes patients like Bostick who have allegedly suffered injury related to the aortic connector. (*See* Pls.' Supplemental Statement Regarding Oral Argument at 1.) Thus, proposed Class I includes not only those people who have allegedly been injured but also patients who have experienced no trouble whatsoever with the implantation of the connector.

In addition to proposed class members who allege injury in fact, the plaintiffs argue that all members of Class I have been injured merely by the aortic connector's presence in their bodies. The plaintiffs cite the opinion of Dr. Martin, the study conducted by Dr. Schoettle, and statements made by Dr. Klima as support for their assertion. (*See* Pls.' Mem. of Law in Supp. of Motion for Class Certification at 33.) The argument plaintiffs make here is basically the same argument made by

the plaintiff in *Sutton v. St. Jude Medical, Inc.,* 292 F.Supp.2d 1005, 1007 (W.D.Tenn.2003).

**\*14** In *Sutton,* the plaintiff represented a class of individuals who had had an aortic connector implanted in their bodies. *Id.* While some patients included in the class had actually incurred physical injuries, the plaintiff had not suffered any physical injury or medical consequences from implantation of the aortic connector. *Id.* Nevertheless, the plaintiff argued that he and similarly situated class members suffered an increased risk of physical complications by merely having the device. *Id.* The issue confronted by the District Court of Western Tennessee in *Sutton* was "whether [plaintiff's] increased risk of complications constitutes an 'injury in fact' sufficient to confer standing." *Id.* The court noted that the issue was one of first impression in Tennessee. *Id.* After analyzing cases outside the Sixth Circuit, including a case specifically relied upon by Bostick and Thrasher in the present case, [7] the *Sutton* court held that the plaintiff's increased risk of harm did not meet the "constitutional requirement that an injury be neither 'conjectural' nor 'hypothetical' " because the plaintiff had not presented any evidence of increased risks or complications among aortic connector recipients or any specific incidents of harm. *Id.* at 1008. Consequently, the court found that the plaintiff was unable to demonstrate standing and the court was without jurisdiction to hear the case. *Id.*

[7]     The plaintiffs rely on an unreported medical device products liability case currently pending in the District of Minnesota in support of their increased risk of harm argument. In *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.,* No. MDL 01-1396 JRTFLN, 2003 WL 1589527 at \*11-12 (D.Minn. March 27, 2003), a district court found that a class of patients who had heart valve implants, but who had not suffered any injurious side effects as a result, had an increased risk of harm constituting injury in fact. That medical monitoring class, however, was later limited to patients from fifteen states in which medical monitoring is recognized as a stand-alone cause of action, without proof of injury. In *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.,* No. MDL 01-1396 JRTFLN, 2004 U.S. Dist. LEXIS 149 at \*17 (D.Minn. Jan. 5, 2004). Tennessee was originally included as a state recognizing such a claim but was withdrawn from the class in a later order. *See* In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab.

2001 WL 8898591

*Litig.,* No. MDL 01-1396 JRTFLN, 2004 U.S. Dist. LEXIS 13965 at *15-16 (D.Minn. July 15, 2004). Accordingly, this case no longer supports Bostick's and Thrasher's increased risk of harm argument because Tennessee was specifically excluded from the medical monitoring class.

Here, Bostick and Thrasher are essentially making the same "increased risk of harm" argument. Unlike the plaintiff in *Sutton,* however, Bostick and Thrasher have presented what they contend is evidence of an increased risk of harm associated with the aortic connector by way of a study performed by Dr. Schoettle, comments made by Dr. Klima, and an affidavit filed by Dr. Martin. The evidence presented, however, does not demonstrate to a reasonable medical certainty that the aortic connector, in and of itself, increases the risk of physical complications. *See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1204-05 (6th Cir.1988).

In light of the court's ruling in *Sutton,* this court finds that the asymptomatic members of Class I lack standing to bring an action for medical monitoring under the laws of Tennessee. Moreover, not only have the plaintiffs failed to demonstrate that asymptomatic Class I members have standing, they have not presented to the court any case law from Tennessee supporting their assertion that Tennessee recognizes an action for medical monitoring in the absence of a present injury. In fact, a review of the applicable case law reveals that Tennessee does require a present injury. *See In re St. Jude Med., Inc., Silzone Heart Valves Prods. Liab. Litig.,* MDL No. 01-1396(JRT/FLN), 2004 U.S. Dist. LEXIS 13965 at *12 n. 3 (July 15, 2004) (noting that Tennessee requires present injury for medical monitoring claims); *Jones v. Brush Wellman, Inc.,* No. 1:00 CV 0777, 2000 WL 33727733 at *8 (N.D.Ohio, Sept.13, 2000) ("No Tennessee cases support a cause of action for medical monitoring in the absence of a present injury."); *Potts v. Celotex Corp.,* 796 S.W.2d 678, 681 (Tenn.1990). Because there can be no showing that each class member has been injured, this court recommends that a medical monitoring class not be certified because the class is overly broad and lacks standing.

**\*15** The court also recommends that Class I not be certified on the grounds that plaintiff Bostick is not an adequate class representative as required by Rule 23(a)(4). Bostick is said to represent Class I and Class II because he still has an aortic connector and has been injured, although not injured enough to require the removal of the device. However, Bostick does not represent those members of Class I that are asymptomatic because he alleges he has been injured. An adequate class

representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 594-95, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see In re Baycol Prods. Litig.,* 218 F.R.D. 197, 210-11 (D.Minn.2003) ("Given the nature of a medical monitoring claim, the Court is not convinced that the named representatives will adequately represent the interests of those class members who have not suffered any injury as a result of taking Baycol...."). As a patient who allegedly has been injured by the implantation of the aortic connector, Bostick cannot adequately represent the portion of Class I that has experienced no problem whatsoever with the device.

The fact that Bostick has been injured also affects his satisfaction of the typicality requirement of Rule 23(a)(3). *See Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996) (no typicality where class representative alleges different injuries from those suffered by other class members).

As the definition for Class I stands, an undetermined portion of the class has not established standing to bring an action for medical monitoring because they lack an injury-in-fact as required under Tennessee law, and they are not adequately represented by plaintiff Bostick who has allegedly sustained an injury. In addition, Bostick claims are not typical of the other members of the medical monitoring class. While the court has the discretion to redefine the class, it is recommended that the court decline to exercise that discretion. Accordingly, it is recommended that the plaintiffs' motion to certify a Tennessee medical monitoring class be denied.

### 2. *Class II-The Personal Injury Class*

In addition to its argument that the plaintiffs cannot satisfy the requirements of Rule 23 for a personal injury Tennessee class, St. Jude contends that the definition of Class II, which is limited to patients who have "sustained presently compensable physical injuries due to the aortic connecter," is an improper definition because "it purports to identify the class member by reference to the ultimate question in this case-whether either plaintiff or any individual they purport to represent has a 'presently compensable injury due to the aortic connector.' " (Opp'n at 26.) The court need not conduct a detailed evaluation of the requirements of Rule 23(a) and 23(b) and an analysis of whether those requirements are met in this instance, because the court agrees with St. Jude's argument that the definition of Class II is an improper definition.

Bostick v. St. Jude Medical, Inc., Not Reported in F.Supp.2d (2004)
2001 WL 8898591

**\*16** "Although not specifically mentioned in Rule 23(a), a class must be sufficiently definite in order to warrant certification." *Hagen v. Winnemuca,* 108 F.R.D. 61, 63 (D.Nev.1985). An inquiry into the merits of the case should not be required of the court in its determination of whether a person is a member of a class. *Id.* at 63-64; *accord Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403 (E.D.Pa.1995) (rejecting class defined to include all those who "received unsolicited facsimile advertisements" because determination of class membership wold require a "mini-hearing on the merits" as to the central issue of liability); *Dunn v. Midwest Buslines, Inc.,* 94 F.R.D. 170, 172 (E.D.Ark.1982) (finding class definition "vague[ ] and ambigu [ous]" where class definition depended on an initial determination by the court that the each potential class member experienced discrimination); *see also Telectronics Pacing Sys., Inc.,* 172 F.R.D. at 282 ("While the Court must probe behind the pleadings in order to determine if class certification is proper, it is inappropriate for the Court to examine the merits of the claim in doing so."). The ascertainability of class member is important so a court can decide "who will receive notice, who will share in any recovery, and who will be bound by the judgment." *Van Nest v. Midland Nat'l Life Ins. Co.,* 199 F.R.D. 448, 451 (D.R.I.2001). The requirement of ascertainability "is not satisfied when the class is defined simply as consisting of all persons who may have been injured by some generically described wrongful conduct allegedly engaged in by a defendant." *Id.*

This appears to be exactly what the plaintiffs have done in this case in their definition of Class II. To establish who belongs in the personal injury class, the court would have to conduct "mini-trials on the merits" to determine the patients who have "sustained presently compensable physical injuries due to the aortic connector." The fact that the aortic connector caused injury to each bypass patient would have to be established before class notice could be issued.

Furthermore, the court would have the daunting task of determining whether the injury caused by the aortic connector is "presently compensable" for over 300 patients receiving the device in Tennessee. As St. Jude has indicated to the court, such a determination "would involve all the diverse issues of liability, causation, etc. that these claims present" and would essentially require the adjudication of every potential class member's individual claim. (Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Certification at 27.) Because the members of Class II are not presently ascertainable without an adjudication of the merits of their claim, it is recommended that the court decline class certification of a Tennessee personal injury class as Class II is presently defined. Therefore, this court finds it unnecessary to complete further analysis of class certification pursuant to Federal Rule of Procedure 23.

CONCLUSION

**\*17** Accordingly, for the reasons stated herein, it is recommended that the plaintiffs' motion for certification of a nationwide class, a Tennessee medical monitoring class, and a Tennessee personal injury class be denied.

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3313614

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

KeyCite Yellow Flag - Negative Treatment
Distinguished by Bell v. 3M Company, D.Colo., September 25, 2018

1998 WL 910271

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Connecticut.

Thomas BOWERMAN, et al.,

v.

UNITED ILLUMINATING, et al.

No. X04CV 940115436S.
|
Dec. 15, 1998.

Memorandum of Decision on Defendants'
Motion for Summary Judgment

KOLETSKY.

**\*1** In fifteen separate lawsuits, approximately one hundred
and nine plaintiffs filed personal injury actions against the
defendants, United Illuminating Company (UI), ABB C-E
Services, Inc. (ABB), New England Abatement Resources,
Inc. (NEAR) and Allwaste Asbestos Abatement, Inc.
(Allwaste), for their alleged exposure to asbestos while
working at the Harbor Station Power Plant located in
Bridgeport, Connecticut. The five plaintiffs in the case of
*Bowerman, et al v. United Illuminating, et al.*, No. X04-
CV-94-0115436-S, and the five plaintiffs in the case of
*Goodall, et. al. v. United Illuminating, et al.,* No. X04-
CV-95-0115437-S, are the "test plaintiffs" for purposes of the
defendants' motion for summary judgment.

The critical issue in this matter is whether the plaintiffs,
who claim exposure to asbestos, can maintain an action in
negligence absent the manifestation of symptoms of any
asbestos-related disease.

In 1993, the plaintiffs worked at the Bridgeport Harbor
Station as boilermakers, steamfitters, welders, plumbers or
pipefitters. During the same period of time, an asbestos
abatement project was undertaken at this UI facility. UI
contracted with ABB, NEAR and Allwaste for repairs
and asbestos removal. The plaintiffs claim that, because of the
actions of these defendants, they were exposed to asbestos
and suffered injuries as a result thereof.

The amended complaint states three causes of action against
each defendant: negligence; reckless and wanton misconduct;
and intentional misconduct. The plaintiffs allege that, as a
result of the defendants' conduct, they incurred the following
injuries:

1. scarring of their lung tissue caused by inhalation of asbestos
dust and fibers;

2. permanent implantation of [carcinogenic] asbestos fibers
in plaintiffs' lungs;

3. an increased risk of developing lung cancer, mesothelioma,
and other asbestos-related diseases; and

4. a present fear, apprehension and anxiety about developing
asbestos-related diseases including cancer.

It is also claimed that they will incur future medical
expenses relating to continuing medical surveillance to
monitor whether plaintiffs' exposure causes health problems.

For the purposes of this summary judgment motion only, the
plaintiffs and the defendant submitted a Joint Statement of
Undisputed Facts dated April 17, 1998. In that document, the
parties agreed to a number of facts, including the following:

> Asbestos abatement at the Harbor Station
> project was conducted from October 2,
> 1993 until November 25, 1993. The ten
> plaintiffs have not manifested physical
> symptoms of an injury, illness or disease
> that could be asbestos-related. Six of the
> ten plaintiffs have not been diagnosed
> with an injury, illness or disease that
> could be asbestos-related.

One plaintiff was diagnosed with bibasiliar fibrosis in 1990.
Plaintiffs' medical expert reported this plaintiff revealed no
evidence of an asbestos-related disease.

**\*2** One plaintiff was diagnosed with a restrictive ventilatory
defect, with borderline diffusing capacity, in 1994. Plaintiffs
medical expert reported this plaintiff revealed no evidence of
an asbestos-related disease.

1998 WL 910271, 23 Conn. L. Rptr. 589

Two of the plaintiffs have been diagnosed with an injury, illness or disease that could be asbestos-related. One plaintiff was diagnosed with pleural thickening on the right and obstructive pulmonary impairment. The other plaintiff was diagnosed with 0/1 ILO reading and bilateral circumscribed pleural thickening.

None of the four plaintiffs referenced in the previous three paragraphs have had a doctor causally connect their conditions to asbestos exposure at Harbor Station. No plaintiff has undergone a lung tissue biopsy, received a medical diagnosis of lung tissue scarring as a result of his presence at Harbor Station or has received any treatment for asbestos-related injury, illness or disease. With the exception of one plaintiff, plaintiffs' claims for emotional distress arise solely from the fear of a future asbestos-related illness or disease.

The defendants filed a motion for summary judgment, with separate appendix, affidavits and exhibits, on May 1, 1998, seeking judgment on all counts of the plaintiffs' amended complaint, on the following grounds: 1) plaintiffs do not allege an actionable harm; 2) plaintiffs cannot prove to a reasonable degree of medical certainty that the defendants proximately caused their alleged injuries; 3) plaintiffs cannot recover for an increased risk of a future injury because they did not suffer a present injury; and 4) plaintiffs' claims of emotional distress are objectively unreasonable. The plaintiffs filed a memorandum in opposition, with accompanying attachments, affidavits and exhibits, on July 20, 1998. Thereafter, the defendants filed a reply to the plaintiffs' objection to the defendants' motion for summary judgment on August 10, 1998, and the plaintiffs filed a response to the defendants' reply, with accompanying affidavits, on August 21, 1998.

"Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ... Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact ... a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citations omitted; internal quotation marks omitted.) *Home Ins. Co. v. Aetna Life & Casualty Co.,* 235 Conn. 185, 202-03, 663 A.2d 1001 (1995). "A 'material' fact has been defined adequately and simply as a fact which will make a difference in the result of the case." *Catz v. Rubenstein,* 201 Conn. 39, 48, 513 A.2d 98 (1986).

**\*3** To successfully maintain an action in negligence, a plaintiff must demonstrate: 1) that the defendant has acted in a tortious manner; 2) that the plaintiff has sustained *actual injury* as a result of the defendant's actions; and 3) that the plaintiff knows of the causal connection between the defendant's tortious conduct and the resulting injury to the plaintiff." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603 (2nd Cir.1996); *Dennis v. ICL, Inc.,* 957 F.Supp. 376, 379 (D.Conn.1997). Regardless of any breach of a standard of care by a defendant, a *compensable injury* must occur in order for an action in negligence to survive. *Barrett v. Danbury Hospital,* 232 Conn. 242, 252-53, 654 A.2d 748 (1995). The initial question, therefore, is whether the scarring of lung tissue and implantation of asbestos fibers in the lungs due to asbestos exposure, as alleged in the plaintiffs' amended complaint, are compensable injuries as a matter of law. The plaintiffs claim that, although there are currently no physical symptoms of an asbestos-related disease, the inhalation of asbestos fibers caused a biological-physical harm to the lung tissue which has not yet manifested itself. There are no Connecticut cases addressing this precise issue.

An injury occurs when a party suffers some form of actionable harm, although the harm need not have reached its fullest manifestation for a cause of action to accrue. *Burns v. Hartford Hospital,* 192 Conn. 451, 460, 472 A.2d 1257 (1984). "Actionable harm occurs when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury." *Champagne v. Rabestos-Manhattan, Inc.,* 212 Conn. 509, 521, 562 A.2d 1100 (1989).

As to what constitutes an "injury" or "harm," section 7 of the Restatement of Torts, Second, provides the following definitions:
The word "injury" ... denote[s] the invasion of any legally protected interest of another.

1998 WL 910271, 23 Conn. L. Rptr. 589

The word "harm" ... denote[s] the existence of loss or detriment in fact of any kind to a person resulting from any cause.

The words "physical harm" ... denote the physical impairment of the human body ...

In the "Comment" section of the Restatement, it is noted that "harm" implies "a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing. Physical changes or alterations may be either beneficial, detrimental or of no consequence to a person. In so far as physical changes have a detrimental effect on a person, that person suffers harm."

Although no Connecticut courts have had the occasion to rule upon the issue of whether or not the scarring of lung tissue and the implantation of fibers in the lungs due to asbestos exposure constitute a detrimental physical harm, there are decisions in other jurisdictions concluding asymptomatic plaintiffs have no actionable claims under such circumstances.

**\*4** In *Eagle-Picher Industries, Inc., v. Liberty Mutual Insurance,* 682 F.2d 12, 18, (1st Cir.1982), the court noted that even when asbestos fiber becomes embedded in the lungs and the scarring process has begun, disabling disease or death is by no means inevitable. For this reason, many courts fail to recognize a viable claim until after some physical manifestation of an asbestos-related disease. In *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1102 (5th Cir.1973), for example, after remarking that a worker's present condition is the biological product of many years of exposure to asbestos dust, the court noted that "courts have consistently held that the cause of action does not accrue until the effects of such exposures manifest themselves."

The District Court in Hawaii was even more specific when it concluded that "the mere presence of asbestos fibers, pleural thickening or pleural plaques in the lung unaccompanied by an objectively verifiable functional impairment" is not an injury sufficient to support a claim for damages. In *In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563, 1567 (D.Hawaii 1990). Similarly, in *Simmons v. Pacor, Inc.,* 543 Pa. 664, 674 A.2d 232, 239 (Pa.1996), the Pennsylvania Supreme Court held that asymptomatic pleural thickening is not a compensable injury which gives rise to a cause of action. The court went on to say that the plaintiffs are

not precluded, however, from subsequently commencing an action for an asbestos-related injury when symptoms develop and physiological impairment begins.

Plaintiffs' argument in the present case that, although asymptomatic, the plaintiffs have suffered some type of "pathological harm" due to their inhalation of asbestos, is an argument which has failed in the following cases. *In Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 942 (3rd Cir.1985), the court held that *"subclinical* injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law." (Emphasis added.) In *Bernier v. Raymark Industries, Inc.,* 516 A.2d 534, 543 (Me.1986), the court concluded that subclinical injury is not an actionable injury under tort law "even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues ..." See also *Anchor Packing v. Grimshaw,* 115 Md.App. 134, 692 A.2d 5, 17 (Md.App.1997), wherein the court held that "cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone" does not constitute a legally compensable injury.

Another line of cases denying relief for exposure without the manifestation of physical injuries involves claims brought pursuant to the Federal Employers' Liability Act (FELA). Although not controlling precedent in this case, those cases hold that actional injury under FELA does not exist until the accumulated effect of the inhalation of or exposure to deleterious substances manifests itself as a physical injury. *Metro-North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997); *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); *Amendola v. Kansas City Southern Railway Co.,* 699 F.Supp. 1401 (W.D.Mo.1988). "The words 'physical impact' do not encompass every form of 'physical contact.' And, in particular, they do not include a contact that amounts to no more than an exposure ..." *Metro-North Commuter Railroad Co. v. Buckley, supra,* 2118.

**\*5** There are other cases, however, in which the courts have concluded that whether such injuries as those alleged by the plaintiffs in the present case are actionable injuries is a question of fact rather than a matter of law. In *Bryson v. Pillsbury Co.,* 573 N.W.2d 718 (Minn.App.1998), the court held that the trier of fact should determine whether asymptomatic chromosome damage constituted a legally compensable present injury. The New Jersey Supreme Court,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 91 of 520
PageID: 9012
Bowerman v. United Illuminating, Not Reported in A.2d (1998)
1998 WL 910271, 23 Conn. L. Rptr. 589

in *Caterinicchio v. Pittsburgh Corning Corp.* 605 A.2d 1092 (N.J.1992), concluded that the question was factual and remained within the province of the trier of fact because the plaintiffs' medical experts and the defendants' medical experts disagreed on the critical issue whether the plaintiffs' pleural thickening and pleural plaques constituted a physical injury.

In another case, claiming damages based upon exposure to contaminated air and drinking water, the District Court in Minnesota stated: "[T]his Court cannot rule as a matter of law that plaintiffs' alleged injuries are not 'real' simply because they are subcellular. The effect of volatile organic compounds on the human body is a subtle, complex matter. It is for the trier of fact, aided by expert testimony, to determine whether plaintiffs have sufficient present harm." *Werlein v. United States,* 746 F.Supp. 887, 901 (D.Minn.1990). A Third Circuit decision, decided under Pennsylvania law, similarly concluded that with respect to asbestos-related pleural thickening, substantial medical disagreement over the classification of such a "condition" prevented the court from declaring it to be an injury as a matter of law. "This question is factual and remains within the province of the trier of fact." *Howell v. Celotex Corp.,* 904 F.2d 5 (3rd Cir.1990).

This court is persuaded that the better line of reasoning warrants the conclusion that whether or not the scarring of lung tissue and implantation of asbestos fibers in the lungs constitute a compensable legal harm is an issue of fact if there is evidence showing such conditions to be detrimental and if there is evidence showing the existence of such conditions in the plaintiffs. Although the plaintiffs contend that their expert, Dr. Cullen, opined that a biological-physical harm occurs to the lung tissue almost immediately after the inhalation of asbestos fibers, an examination of his affidavits does not reveal any such statement. The nearest approximation appears to be the statement in paragraph 6 of his letter to Attorney Shafner dated July 9, 1998, wherein he says:

> There is ample evidence that asbestos is ingested by certain cells within the respiratory tract and other organs which, in turn, leads those cells to incite an inflammatory response in their vicinity. Within the lung tissue, it is most likely that the inflammatory response itself initiates and promotes carcinogenesis in the epithelial cells, eventually leading to ... lung cancer ... In any event, I think that the best evidence at the present

time suggests that within the lung, the most important aspect of carcinogenesis relates to inflammation and in the pleura, probably direct interaction and tumor initiation via genetic change.

**\*6** Dr. Cullen, at paragraph 12 of his letter, addresses pleural changes.

Individuals who have asbestos-related pleural changes have, as a group, clearly experienced substantial asbestos exposure which is the basis for such pleural changes. In general, as a group, they are also reasonably older since it takes approximately 20 years from first exposure for the appearance of asbestos-related pleural changes. Having said that, in most epidemiologic studies which have looked at the question, individuals with pleural changes compared to co-workers without such pleural changes, appear to have a higher risk of developing asbestos-related malignancy. The basis for this is uncertain and may relate to the fact that as a group they have had more exposure to asbestos or may relate to the fact that as a group they have more evident biological responsiveness to asbestos than that group which has been exposed but has shown no pleural response. In any event, it is not that the pleural plaques are, themselves, are [sic] pre-malignant or auger malignancy, but only that they serve as a good marker for previous exposure and/or biologic responsiveness and, therefore, help us select a group which probably has a somewhat higher risk of developing lung cancer and/or mesothelioma than others who appear comparable in other ways.

The Court holds that Dr. Cullen's statements, taken as a whole, do not characterize the conditions alleged in plaintiffs' amended complaint as detrimental physical harms or state that those conditions constitute "bodily changes" as commented upon in the Restatement of Torts, Second.

Even if the Court were to conclude that Dr. Cullen's remarks are sufficient to establish that such conditions are detrimental and constitute an actionable harm, nothing has been submitted to demonstrate that these particular plaintiffs suffer from either of the alleged conditions. Simply stated, the plaintiffs have failed to put this matter in issue.

At oral argument on this motion for summary judgment, plaintiffs' counsel contended that it is a reasonable inference

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 92 of 520
PageID: 9013
Bowerman v. United Illuminating, Not Reported in A.2d (1998)
1998 WL 910271, 23 Conn. L. Rptr. 589

that some of the plaintiffs have asbestos fibers in their lungs. In addition, it is claimed that the opinions of Dr. Cullen expressed in his letters dated July 9, 1998 and August 18, 1998, support the plaintiffs' claims that they are reasonably certain to have suffered a harm due to their inhalation of asbestos and that these opinions are based upon reasonable medical probability rather than mere speculation or conjecture. The court disagrees.

The letters of Dr. Cullen speak generally to risks of exposure to asbestos. Nowhere can the statement be found that these plaintiffs suffered scarring of the lung tissue and permanent implantation of asbestos fibers in their lungs as a result of their inhalation of asbestos at the Harbor Station. What he does say, at paragraph 11 of his letter dated July 9, 1998, is that he believes "it would be fair to say that even at the low levels postulated under the limited exposure assumption, there could be some biologic response to asbestos exposure in the men at the harbor station. I do not believe that his [sic] could be ascertained by any known clinical testing, including lung biopsy, in view of the fact that the changes are likely to be relatively slight compared to the normal variation seen in industrial workers who have been exposed to a wide variety of air pollutants and toxins over a working career."

**\*7** Not only does this statement fail to rise above the level of "speculation and conjecture," but the plaintiffs' medical expert has even concluded that there is no way to demonstrate that these plaintiffs suffer from the conditions alleged in the amended complaint. His letter dated August 18, 1998, does nothing to further the plaintiffs' claims. He does give an opinion with respect to medical monitoring for these plaintiffs: "I have recommended medical monitoring of asbestos-exposed individuals at intervals appropriate to their level of exposure as I have for all asbestos-exposed individuals." His recommendation, therefore, is that medical monitoring is needed for anyone exposed to asbestos. He does not say that these particular plaintiffs require monitoring because of the biologic harms already incurred as a result of their exposure at the UI facility.

In addition to Dr. Cullen's affidavits, the individual plaintiffs have submitted affidavits in support of their objection to the defendants' motion for summary judgment. One of the affidavits (Affidavit of Samuel Ray) contains the statement: "I have trouble breathing from time to time, and I believe it is related to the asbestos exposure I have had throughout my 29-year career as a boilermaker." This subjective statement, without any medical documentation to

support it, is insufficient to demonstrate that this symptom actually resulted from this plaintiff's claimed exposure to asbestos at the Harbor Station. It does not rise to the level of establishing a genuine issue of material fact as to whether the plaintiff's alleged asbestos exposure is the cause of his current shortness of breath. "The medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness ..." *Aspiazu v. Orgera,* 205 Conn. 623, 631, 535 A.2d 338 (1987).

No causal connection has been shown between the inhalation of asbestos and the "harm" alleged to have been suffered by these plaintiffs. At the outset, one must show the fact of "damage." *Simon v. New Haven Board & Carton Co., Inc.,* 516 F.2d 303, 306 (2nd Cir.1975). Further, the plaintiffs must demonstrate that the defendants' actions were the proximate cause of the plaintiffs' injuries. *Fleming v. Garnett,* 231 Conn. 77, 85, 646 A.2d 1308 (1994). Proximate cause establishes a reasonable connection between the acts or omissions of the defendants and the harm suffered by the plaintiffs. *Stewart v. Federated Dept. Stores, Inc.* 234 Conn. 597, 662 A.2d 753 (1995).

"To be entitled to damages a plaintiff must establish a causal relation between the injury and the physical condition which he claims resulted from it ... This causal connection must rest upon more than surmise or conjecture ... A trier is not concerned with possibilities but with reasonable probabilities ... [The causal relationship between an injury and its later physical effects may be established] by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (Citations omitted.) *Aspiazu v. Orgera,* 205 Conn. 623, 630-31, 535 A.2d 338 (1987); *Struckman v. Burns,* 205 Conn. 542, 554, 534 A.2d 888 (1987); *Budney v. Zalot,* 168 Conn. 388, 388-89, 362 A.2d 861 (1975). "Any expert opinion that describes a 'condition' as possible or merely fifty-fifty is based on pure speculation." *Aspiazu v. Orgera, supra,* 632.

**\*8** The plaintiffs have failed to meet the requisite standard of reasonable medical probability. Not only have they failed in demonstrating that these plaintiffs have lung scarring and implantation of asbestos fibers in their lungs, they have also failed to establish any connection between the defendants' alleged conduct and the harm they claim resulted from it. The plaintiffs "failed to prove the injur[ies], and therefore could

Bowerman v. United Illuminating, Not Reported in A.2d (1998)
1998 WL 910271, 23 Conn. L. Rptr. 589

not prove causation." *LaBieniec v. Baker,* 11 Conn.App. 199, 208, 526 A.2d 1341 (1987).

The plaintiffs' amended complaint also alleges that as a result of the defendants' conduct, the plaintiffs suffer an increased risk of developing lung cancer, mesothelioma, and other asbestos-related diseases.

"[I]n a tort action, a plaintiff who has established a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm is entitled to compensation to the extent that the future harm is likely to occur." *Petriello v. Kalman,* 215 Conn. 377, 397-98, 576 A.2d 474 (1990). A plaintiff is not burdened with proving the occurrence of the claimed future event is more likely than not, when it is a present risk rather than a future event for which damages are sought. *Id.,* 396, 576 A.2d 474. "[A] plaintiff may recover for the fear of future medical treatment and disability, as distinguished from a recovery for the future disability itself, even if there is only a possibility that such future treatment or disability will take place." *Goodmaster v. Houser,* 225 Conn. 637, 645, 625 A.2d 1366 (1993).

The plaintiffs fail in their claims for increased risk of future harm for the simple reason that they have failed to establish that they personally have suffered present injuries. Without a present injury, under the *Petriello* rationale, there can be no claim for an increased risk of future harm. Even if it is assumed that the scarring of lung tissue and implantation of asbestos fibers in the lungs are compensable present injuries, there is nothing to indicate these plaintiffs have suffered these injuries as a result of actions of the defendant.

The plaintiffs' cause is not furthered by the claim that many of the individual plaintiffs had previous exposure to asbestos and therefore face a higher risk for the development of asbestos-related diseases. Such an argument cannot prevail without the existence of a present injury. Furthermore, such a claim may actually preclude the establishment of proximate cause if a plaintiff's exposure in the present case was minimal in comparison to his total exposure to asbestos over his work life.

In the plaintiffs' amended complaint, it is alleged that their injuries include "a present fear, apprehension and anxiety about developing asbestos-related diseases including cancer" as a result of the negligent and intentional actions of the defendants. The parties' briefs make reference to the negligent and intentional infliction of emotional distress.

**\*9** It is important to note at the outset that the claims of emotional distress have not been pleaded as separate causes of action. To support an action for negligent infliction of emotional distress, a plaintiff has "the burden of pleading and establishing that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Morris v. Hartford Courant Co.,* 200 Conn. 676, 683, 513 A.2d 66 (1986). There are no such allegations made in the plaintiffs' amended complaint.

To sufficiently plead a cause of action for intentional infliction of emotional distress, it must be alleged: 1) that the defendant intended to inflict emotional distress, or that he knew or should have known that emotional distress was a likely result of the defendant's conduct; 2) that the conduct was extreme and outrageous; 3) that the defendant's conduct was the cause of the plaintiff's distress; and 4) that the emotional distress sustained by the plaintiff was severe. *DeLaurentis v. New Haven,* 220 Conn. 225, 266-67, 597 A.2d 807 (1991); *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). There are no such allegations in the plaintiffs' amended complaint.

For this reason, the emotional distress alleged to have been suffered by the plaintiffs must be treated as a claim for damages resulting from the alleged negligent and intentional conduct of the defendants. The emotional distress would be the fear of contracting an asbestos-related disease in the future as a result of past exposure to asbestos.

Because the plaintiffs failed to show that they have suffered any present injuries, a claim for emotional distress in this case could only survive if mere exposure to asbestos entitles a claimant to emotional distress damages. There are no Connecticut cases directly on point. The case of *Barrett v. Danbury Hospital,* 232 Conn. 242, 654 A.2d 748 (1995), however, does involve a claim for compensation based upon the plaintiff's fear of contracting a blood-borne disease as the result of the alleged negligent actions of the defendant. The plaintiff had been placed on a stretcher in the defendant's emergency room and came in contact with the blood from a prior patient because of a torn vinyl pad which covered the stretcher. The defendants moved for summary judgment and the court granted the motion.

Our Supreme Court affirmed the trial court's decision, noting that the "trial court did not grant the motion for summary judgment on the basis of a finding that there was no

1998 WL 910271, 23 Conn. L. Rptr. 589

negligence on the part of the defendants. The trial court determined that, regardless of any breach of the standard of care by the defendants, a compensable injury did not result.... [E]ven if the applicable standard had been violated, the plaintiffs' alleged injuries were not compensable as a matter of law." *Id.*, 252-53, 654 A.2d 748.

 **\*10**  The plaintiffs' claim that the fear arises from an increased risk of future asbestos-related diseases cannot succeed for the reasons previously discussed, i.e., the plaintiffs have made no showing of present injuries and therefore cannot prevail on a claim for an increased risk of related injuries. *Goodmaster v. Houser,* 225 Conn. 637, 625 A.2d 1366 (1993); *Petriello v. Kalman,* 215 Conn. 377, 576 A.2d 474 (1990).[1] For these reasons, the plaintiffs' claims of emotional distress are not viable.

[1]
>
> With respect to the one plaintiff who actually has received treatment for emotional problems, there was no evidence submitted indicating an issue of fact as to a causal connection between the alleged actions of the defendants and the plaintiff's emotional distress.

Counsel for the plaintiffs conceded at oral argument that the claim for medical monitoring expenses does not stand alone. Recovery for such expenses would only be allowable if these plaintiffs have sustained actionable injuries. The court, having ruled that the plaintiffs have furnished no evidence showing the existence of such injuries, concludes that the claim for future medical expenses relating to continuing medical surveillance must fail.[2]

[2]
>
> Although the plaintiffs' expert, Dr. Cullen, recommended medical monitoring for these plaintiffs in his letter dated August 18, 1998, he indicated he recommends such monitoring "for all asbestos-exposed individuals." He does not say these particular plaintiffs require monitoring because of the biologic harms already incurred as a result of exposure to asbestos.

The plaintiffs cite the case of *Doe v. Stamford,* 241 Conn. 692, 699 A.2d 52 (1997), in support of their claim for medical monitoring expenses. In *Doe v. Stamford,* the plaintiff police officer sought compensation for past and future unpaid medical testing and treatment under the Workers' Compensation Act (act) for injuries related to HIV exposure and tuberculosis. Our Supreme Court concluded that the

plaintiff's exposure to an infectious disease constitutes a compensable "injury" under the act. The Court noted that the exposures were sustained in incidents that arose out of and occurred in the course of his employment. Further, the Court stressed the *humanitarian and remedial purposes of the Workers' Compensation Act*. For this reason, the court finds the *Doe v. Stamford* case inapposite to the case at bar.

These plaintiffs are not without a remedy. If and when symptoms of an asbestos-related disease manifest themselves, they can bring a cause of action for their injuries.

Prior to the enactment of General Statutes Sections 52-577a and 52-577c, the statute of limitations applicable to a cause of action based upon a claim of negligent exposure to a substance such as asbestos was Section 52-584. That provision reads, in relevant part, as follows:

Limitation of action for injury to person or property
No action to recover damages for injury to the person ... caused by negligence, or by reckless or wanton misconduct, ... shall be brought but within two years from the date when the *injury* is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of ... (Emphasis added.)

A number of courts have construed the word "injury" in cases in which defendants have moved to dismiss plaintiffs' claims for failure to bring them within the time permitted by the statute. In those cases, the courts held that a cause of action does not accrue until the plaintiff suffers an "actionable harm." The "actionable harm" that would be the "injury" under Connecticut law occurs when the plaintiff discovers or should discover, in the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused that injury. *Durrett v. Leading Edge Products, Inc.,* 965 F.Supp. 280 (D.Conn.1997). A breach of duty by a defendant, and a causal connection between that defendant's breach of duty and the resulting harm to the plaintiff, are the essential elements of a negligence cause of action. They are, therefore, necessary ingredients for actionable harm which will result in the accrual of the action for limitation purposes. *Catz v. Rubenstein,* 201 Conn. 39, 513 A.2d 98 (1986).

 **\*11**  Sections 52-577a and 52-577c were subsequently enacted by the legislature and are now the operative statutes for asbestos claims based upon product liability and personal

1998 WL 910271, 23 Conn. L. Rptr. 589

injury caused by exposure. A plaintiff instituting a product liability claim against a product seller must bring suit within "three years from the date when the *injury,* death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered ..." (Emphasis added.) Subsection (e) of Section 52-577a further provides, with respect to asbestos, that "no such action for personal injury ... may be brought by the claimant later than thirty years from the date of last contact with or exposure to asbestos." Again, "injury" has been construed to be first sustained, for purposes of Connecticut's statute of limitations, when the party suffers some of actionable harm. *Durrett, supra,* 283. In *Champagne v. Raybestos-Manhattan, Inc.,* 212 Conn. 509, 526-27, 562 A.2d 1100 (1989), the actionable harm occurred when the asbestos-related disease became symptomatic.

In the present case, the applicable statute of limitations is section 52-577c. That provision reads, in relevant part, as follows:

*Limitation of action for damages caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant*

(b) Notwithstanding the provisions of sections 52-577 and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment may be brought but within two years from the date when the *injury* or damage complained of is discovered or in the exercise of reasonable care should have been discovered. (Emphasis added.)

A cause of action accrues when the "injury" is discovered or should have been discovered, not from the date of the exposure. In construing the term "injury" in Section 52-577c, it is reasonable to conclude it would be given the same judicial interpretation applied to the term "injury" in General Statutes Sections 52-584 and 52-577a. [3]

[3]     A superior court decision, *Woodford v. Heritage Village,* 1994 WL 632464 (Conn.Super.), held that the two-year limitation period under this statute begins to run on the date the claimant discovered or should have discovered the injury, not the date the alleged negligent action of the defendant occurred. In *Woodford,* the plaintiff had been sprayed in the face with a pesticide, but nothing was submitted to show the injuries manifested immediately after her exposure to the pesticide.

Upon manifestation of symptoms causally related to exposure to asbestos, the two-year limitation period under Section 52-577c would begin to run, i.e., a cause of action for actionable injuries accrues at that point in time. If these plaintiffs do manifest symptoms of an asbestos-related disease, they are not without a remedy under the law.

As previously noted, plaintiffs' amended complaint alleges negligence; reckless and wanton misconduct; and intentional misconduct. The negligence claims against the defendants cannot survive this motion for summary judgment because the plaintiffs have failed to show that they have suffered actionable injuries or a causal connection between the alleged actions of the defendants and harm suffered by the plaintiffs. The causes of action based in reckless and wanton misconduct and intentional misconduct must fail for the same reasons. A legal or proximate causal connection between the conduct of a defendant and the resulting injury to the plaintiff is a necessary element of causes of action in recklessness. *Boehm v. Kish,* 201 Conn. 385, 390, 517 A.2d 624 (1986).

 **\*12** Because there has been no showing that these plaintiffs have suffered compensable harm, there can be no cause of action regardless of whether such conduct could be classified as negligent, reckless or intentional. A breach of a standard of care is immaterial if there are no compensable injuries. *Barrett v. Danbury Hospital,* 232 Conn. 242, 252-53, 654 A.2d 748 (1995). Additionally, "[n]o matter how negligent a party may be, if his act bears no causal relation to the injury, it is not actionable." *Esposito v. Schiff,* 38 Conn.App. 726, 730, 662 A.2d 1337 (1995); *LaBieniec v. Baker,* 11 Conn.App. 199, 206, 526 A.2d 1341 (1987).

"A plaintiff cannot transform a negligence count into a count for willful and wanton misconduct merely by appending a string of adjectives to allegations that clearly sound in negligence." *Brown v. Branford,* 12 Conn.App. 106, 110, 529 A.2d 743 (1987). "[Recklessness] is more than negligence, more than gross negligence. (Citation omitted.) ... Willful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. (Citation omitted.) Its characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. (Citations omitted.) Not only the action producing the injury but the resulting injury also must be intentional." *Dubay v. Irish,* 207 Conn. 518, 532-33, 542 A.2d 711 (1988). Whether conduct amounts to willful, wanton and

1998 WL 910271, 23 Conn. L. Rptr. 589

reckless misconduct becomes strictly a matter of law when the mind of a fair and reasonable man could reach but one conclusion. *Id.*, footnote 10, 534, 542 A.2d 711.

A review of the plaintiffs' amended complaint reveals essentially the same allegations of misconduct for all three causes of action. The court finds that the conduct alleged does not rise to the level of reckless and wanton misconduct or intentional misconduct.

The court finds that the plaintiffs have failed to state a cause of action in negligence, reckless and wanton misconduct or intentional misconduct. The plaintiffs have not established the existence of a material fact that is in issue. Accordingly, the defendants' motion for summary judgment is granted.

**All Citations**

Not Reported in A.2d, 1998 WL 910271, 23 Conn. L. Rptr. 589

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

128 Nev. 884
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

Michael BROCHU and Gabriela
Brochu, Husband and Wife, Appellants,
v.
FOOTE ENTERPRISES, INC. d/b/a Foote
Brothers Construction, Respondent.
Michael Brochu and Gabriela Brochu,
Husband and Wife, Appellants,
v.
Foote Enterprises, Inc. d/b/a Foote
Brothers Construction, Respondent.

Nos. 55963, 56086.
|
Nov. 29, 2012.

**Synopsis**
**Background:** Homeowners brought action against contractor
alleging various tort, contract, and construction defect-
based claims after house experienced significant movement
and damage following contractor's work on crawlspace.
The District Court, Washoe County, Robert H. Perry, J.,
entered judgment in favor of contractor and awarded costs.
Homeowners appealed.

**Holdings:** The Supreme Court held that:

[1] substantial evidence supported the district court's
conclusion that any alleged negligence by contractor, who
performed repair work in home's crawlspace, did not cause
the homeowners' damages;

[2] substantial evidence supported the district court's
determination that any negligence per se on the part of
contractor in failing to obtain permit before cutting post
supports in home's crawlspace did not cause the homeowners'
damages;

[3] substantial evidence supported the district court's
conclusion that the homeowner' comparative negligence
precluded recovery;

[4] substantial evidence supported the district court's rejection
of the homeowners' negligent misrepresentation claim against
contractor;

[5] contractor did not breach contract;

[6] substantial evidence supported the district court's rejection
of the homeowners' construction defect claim; and

[7] district court abused its discretion in awarding costs to
prevailing contractor for package delivery services, outside
reproduction, lodging, air travel, parking, taxi services, and
rental car expenses.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (12)

[1]    **Negligence**    ☞    Liabilities relating to
construction, demolition and repair
Substantial evidence supported the district
court's conclusion that any alleged negligence by
contractor, who performed repair work in home's
crawlspace, did not cause the homeowners'
damages from movement of home, because the
presence of expanding soils, together with the
homeowners' knowing disregard of these soils,
caused the homeowners' damages; homeowner
admitted at trial that he was aware of and did not
investigate the risks posed by these soils prior to
closing on home.

[2]    **Negligence**    ☞    Liabilities relating to
construction, demolition and repair
Substantial evidence supported the district
court's determination that any negligence per se
on the part of contractor in failing to obtain
permit before cutting post supports in home's
crawlspace did not cause the homeowners'
damages from movement of home, which would
have arisen regardless of the application for or
issuance of a permit, where the movement was
caused by the soil problem underneath the home.

381 P.3d 596, 2012 WL 5991571

**[3]    Negligence** 🔑 Contractors

Contractor did not engage in willful misconduct in failing to obtain permit prior to performing repair work in home's crawlspace for purposes of comparative negligence claim; contractor did not obtain a building permit because, in doing past jobs, the building department assured him that a permit was not required to eliminate earth-to-wood contact on the support posts in crawlspaces, and he did not investigate or analyze structural problems in the home's crawlspace because the homeowners already had a home inspection performed and he was not hired to do so. West's NRSA 41.141.

**[4]    Negligence** 🔑 Liabilities relating to construction, demolition, and repair

Substantial evidence supported the district court's conclusion that the homeowners' comparative negligence precluded recovery under their negligence and negligence per se claims against contractor who performed work on home's crawlspace; evidence indicated that homeowner despite having read the home inspector's report and the seller's disclosure form noting the expansive soils under the house, did no further investigation about the dangers posed by the soils.

**[5]    Fraud** 🔑 Reliance on Representations and Inducement to Act

**Fraud** 🔑 Injury and causation

Substantial evidence supported the district court's rejection of the homeowners' negligent misrepresentation claim against contractor; homeowners' damages from expansive soils under home did not arise from a reasonable reliance on contractor's representations.

2 Cases that cite this headnote

**[6]    Contracts** 🔑 Buildings and Other Works

**Contracts** 🔑 Acts or Omissions Constituting Breach in General

Contractor who was hired to remedy a termite problem in home's crawlspace did not breach contract or the implied covenant of good faith and fair dealing when home suffered damage due to movement of expansive soils; the contract did not include language that required contractor to investigate or correct the house's support structure.

8 Cases that cite this headnote

**[7]    Negligence** 🔑 Liabilities relating to construction, demolition and repair

**Negligence** 🔑 Liabilities relating to construction, demolition and repair

Substantial evidence supported the district court's rejection of the homeowners' construction defect claim against contractor; evidence indicated that damage to home by expansive soils was not caused by contractor but rather was due to homeowners' own negligence in failing to take action regarding dangers posed to home's support system by soil. West's NRSA 40.615, 40.640.

**[8]    Costs** 🔑 Time for application

District court did not abuse its discretion in refusing to consider any costs other than those appearing within contractor's original memorandum of costs, where contractor's supplemental memoranda were untimely filed. West's NRSA 18.110(1).

**[9]    Costs** 🔑 Evidence as to items

District court did not abuse its discretion in awarding prevailing contractor's costs for filing, e-filing, depositions of opposing party experts, audio and visual equipment, court reporting services, and witness fees; given the court's general knowledge of ordinarily incurred costs and familiarity with the actual proceedings, contractor's memorandum and affidavit provided a sufficient basis upon which the court could determine the actual and reasonable nature of these costs. West's NRSA 18.005.

**[10]**    **Costs**   👈   Evidence as to items

District court abused its discretion in awarding costs to prevailing contractor for package delivery services, outside reproduction, lodging, air travel, parking, taxi services, and rental car expenses because the reasonable value of these costs required documentation beyond the contractor's memorandum and accompanying affidavit. West's NRSA 18.005.

**[11]**    **Costs**   👈   Service of process

District court did not abuse its discretion in awarding prevailing contractor a reasonable cost for the process server. West's NRSA 18.005(7).

**[12]**    **Costs**   👈   Experts

District court did not abuse its discretion in awarding the statutory allowance of $1,500 for prevailing contractor's expert witness fees because contractor incurred the cost but failed to justify a greater amount by submitting only his memorandum and affidavit. West's NRSA 18.005(5).

**Attorneys and Law Firms**

Robert L. Eisenberg, Settlement Judge

Richard G. Hill, Chartered

Prince & Keating, LLP

*ORDER AFFIRMING IN PART,*
*REVERSING IN PART. AND REMANDING*

**\*1** These are consolidated appeals from a district court judgment in a tort, contract, and constructional defect action and from a post-judgment order awarding costs. Second Judicial District Court, Washoe County; Robert H. Perry, Judge.

Appellants Michael and Gabriela Brochu entered into a purchase agreement for a house which had an expedited closing period for tax purposes. Better Homes Inspections (BHI) inspected the house and developed a written report, which informed the Brochus that the house's support system was inadequate. BHI recommended that the Brochus consult a licensed contractor or structural engineer. From a disclosure form executed by the sellers of the house, the Brochus also had notice of expansive soils under the house's support system. After conferring with a handyman and deciding not to hire a structural engineer, the Brochus hired Raymond Foote, a licensed contractor of Foote Enterprises, Inc. (Foote), to work on a portion of the house's crawlspace that did not encompass all of the areas affected by the expansive soils. Without acquiring a permit, Foote performed the work. A few months later, the house experienced significant movement and damage.

The Brochus brought various tort, contract, and construction defect-based claims against Foote. After a bench trial, the district court entered a judgment rejecting all the claims. Then, the district court entered a post-judgment order awarding costs to Foote. The award was based upon a memorandum of costs and an affidavit attesting that the costs were actual and reasonable. The Brochus appeal this judgment and post-judgment order. The primary issues on appeal are whether (1) substantial evidence supports the district court's rejection of the Brochus' negligence and negligence per se claims, (2) substantial evidence supports the district court's rejection of the Brochus' negligent misrepresentation claim, (3) substantial evidence supports the district court's rejection of the Brochus' contract-based claims, (4) substantial evidence supports the district court's rejection of the Brochus' constructional defect claim, and (5) the district court abused its discretion in awarding costs to Foote.

For the reasons set forth below, we affirm the district court's judgment on the tort, contract, and constructional defect claims. We reverse in part and affirm in part the post-judgment order awarding costs. As the parties are familiar with the facts of this case, we do not recount them further except as necessary for our disposition.

*Substantial evidence supports the district court's rejection of the Brochus' negligence and negligence per se claims*
The Brochus argue that the district court should have ruled in their favor on their negligence and negligence per se claims, contending that the evidence showed that Foote breached its duty of care, Foote committed negligence per se by not

Brochu v. Foote Enterprises, Inc., 128 Nev. 884 (2012)
381 P.3d 596, 2012 WL 5991571

obtaining a building permit before repairing the crawlspace, and the district court improperly determined that comparative negligence barred their negligence-based claims.

*Substantial evidence supports the rejection of the negligence claims*

**\*2** Liability under a theory of negligence, or comparative negligence, is a question of fact. *Anderson v. Baltrusaitis,* 113 Nev. 963, 965–67, 944 P.2d 876, 879 (2007). Findings of fact and "fact-based conclusions of law ... will not be disturbed if supported by substantial evidence." *Manwill v. Clark County,* 123 Nev. 238, 241, 162 P.3d 876, 879 (2007); *see also Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005). "Substantial evidence is evidence that a reasonable person could accept as adequately supporting a conclusion." *Id.* at 241 n. 4, 120 P.3d 1164, 162 P.3d at 879 n. 4.

To succeed on a negligence claim, one must show a duty of care, a breach of that duty, actual and proximate causation, and damages. *Klasch v. Walgreen Co.,* 127 Nev. ——, ——, 264 P.3d 1155, 1158 (2011). Causation requires actual and proximate cause. *Dow Chemical Co. v. Mahlum,* 114 Nev. 1468, 1481, 970 P.2d 98, 107 (1998), *overruled in part on other grounds by GES, Inc. v. Corbitt,* 117 Nev. 265, 271, 21 P.3d 11, 15 (2001). To show actual cause, "the [plaintiff must] prove that, but for the [defendant's wrongdoing], [the plaintiffs damages] would not have occurred." *Id.* "[P]roximate cause[ ] is essentially a policy consideration that limits a defendant's liability to foreseeable consequences that have a reasonably close connection with both the defendant's conduct and the harm which that conduct created." *Id* .

*Substantial evidence reveals a lack of causation between Foote's actions and the Brochus' damages, supporting the district court's rejection of the negligence claim*

**[1]** Here, the evidence supported the determination that factors beyond Foote's control caused the Brochus' damages. Testimony at trial showed that soils under the house were expanding and damaging its support structure and that the perimeter supports had contact with these soils. Even if Foote repaired all of the supports in the crawlspace, the house still would have experienced significant movement. Michael Brochu admitted at trial that, before closing on the house, he became aware of and did not investigate the risks posed by these soils. Hence, the district court could reasonably find that (1) the Brochus would have incurred their damages regardless of Foote's actions, (2) the expansive

soils beneath the house and the Brochus' decision not to investigate the soils before closing on the home proximately caused the damages, and (3) the Brochus' extensive damages were not a reasonably foreseeable consequence of the repairs Foote performed. Therefore, we conclude that substantial evidence supports the district court's conclusion that any alleged negligence by Foote did not cause the Brochus' damages, because the presence of expanding soils, together with the Brochus' knowing disregard of these soils, caused the Brochus' damages.

*Substantial evidence revealing a lack of causation between Foote's actions and the Brochus' damages supports the rejection of the negligence per se claim*

**\*3** **[2]** To prevail under a negligence per se claim, a plaintiff must prove that (1) he or she belongs to a class of persons that a statute is intended to protect, (2) the plaintiff's injuries are the type the statute is intended to prevent, (3) the defendant violated the statute, (4) the violation was the legal cause of the plaintiff's injury, and (5) the plaintiff suffered damages. *Anderson v. Baltrusaitis,* 113 Nev. 963, 965, 944 P.2d 797, 799 (1997). The violation of a building code provision adopted by a local ordinance may support a negligence per se claim. *Vega v. Eastern Courtyard Assocs.,* 117 Nev. 436, 440, 24 P.3d 219, 221 (2001).

Here, the negligence per se claim in this case implicates the 2003 International Residential Code (IRC), which is part of the Reno Municipal Code. IRC section R105.1 provides that "[a]ny owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish, or change the occupancy of a building or structure, ... or to cause any such work to be done, shall first make application to the building official and obtain the required permit." IRC section R105.2.2 states that a permit is not required for "ordinary repairs to structures," but "the removal or cutting of any structural beam or load bearing support" is not an ordinary repair.

Regardless of whether Foote's failure to obtain a permit for cutting and removing posts supports a negligence per se claim, the lack of causation between Foote's actions and the Brochus' damages precludes Foote's liability under such a claim.

Any IRC violation did not cause the Brochus' damages. The Brochus argue that if Foote had applied for a permit, information revealed about the expansive soils would have dissuaded them from purchasing the house. This argument lacks merit because the Brochus were aware of

the soil problem and closed escrow anyway. In light of the Brochus' blatant disregard of the problem with the soil, their decision not to hire a structural engineer, and their desire to quickly close escrow, the district court properly found that the Brochus would have incurred the damages even if Foote applied for a permit. Accordingly, we conclude that substantial evidence supports the district court's determination that any negligence per se on the part of Foote did not cause the Brochus' damages, which would have arisen regardless of the application for or issuance of a permit.

*Substantial evidence reveals the Brochus' comparative negligence*

The Brochus argue that the district court incorrectly determined that, even if Foote was negligent, their comparative negligence barred their recovery because (1) Foote acted willfully, such that comparative negligence was not a viable defense; (2) Foote's lack of a permit created a presumption of willful misconduct under NRS 624.3011(2), which Foote failed to rebut; and (3) substantial evidence does not reveal that their actions were causally connected to the harm they incurred.

*Foote did not engage in willful misconduct*

 **\*4**  Under NRS 41.141, a plaintiff may recover damages for negligence if "his or her comparative negligence is not greater than that of the defendant." *Woosley v. State Farm Ins. Co.,* 117 Nev. 182, 189–90, 18 P.3d 317, 322 (2001). A plaintiff's "mere negligence ... will not constitute a defense to [a defendant's] wanton or willful misconduct." *Davies v. Butler,* 95 Nev. 763, 771, 602 P.2d 605, 610 (1979). "Wil[l]ful or wanton misconduct is intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton or reckless disregard of the possible results." *Id.* at 769, 602 P.2d at 609 (emphasis omitted). Under NRS 624.3011(2), "[i]f a contractor performs construction without obtaining any necessary building permit, there is a rebuttable presumption that the contractor willfully and deliberately violated the building laws."

 **[3]**  Here, testimony revealed that Foote did not obtain a building permit because, in doing past jobs, the building department assured Foote that a permit was not required to eliminate earth-to-wood contact on the support posts in crawlspaces. Foote did not investigate or analyze structural problems in the house's crawlspace because the Brochus already had a home inspection performed and Foote was not hired to do so. Thus, viewing this testimony in the

light most favorable to Foote, the evidence does not suggest willfulness. *See Yamaha Motor Co. v. Arnoult,* 114 Nev. 233, 238, 955 P.2d 661, 664 (1998) ( "This court is not at liberty to weigh the evidence anew, and where conflicting evidence exists, all favorable inferences must be drawn towards the prevailing party."). The testimony also rebutted NRS 624.3011(2)'s presumption of willfulness. Hence, we conclude that substantial evidence supports the district court's finding that Foote did not engage in willful misconduct.

*The Brochus' own negligence caused their damages*

 **[4]**  "Comparative negligence applies only to conduct that proximately contributes to an injury's causation, and not to subsequent acts that merely aggravate the injury or its consequences." *Shuette v. Beazer Homes Holdings Corp.,* 121 Nev. 837, 859, 124 P.3d 530, 546 (2005). "Thus, '[t]he plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm.' " *Id.* (quoting Restatement (Second) of Torts § 465(1) (1965)). In the constructional defect context, when a homeowner plays "a role in planning and construction ... the extent of the comparative negligence defense may be expanded to include the owner's participation in either the planning or construction and whether such participation caused any damage." *Skender v. Brunsonbuilt Constr. & Dev. Co.,* 122 Nev. 1430, 1437, 148 P.3d 710, 715–16 (2006).

Here, there was ample evidence of the Brochus' sophistication regarding real estate transactions, knowing disregard of the house's problems, and desire to close quickly on the house despite those problems. Michael Brochu testified that he was formerly a licensed real estate agent and had engaged in numerous real estate transactions. He testified that he had purchased 15 to 20 properties in Nevada, owned 11 rental properties, and repaired plumbing, roofing, framing, concrete, and crawlspace issues on those properties. He also testified that he knew about the house's structural issues before closing on the house and that he needed to close escrow on the house quickly to avoid tax liabilities. Despite having read the BHI report and the seller's disclosure form noting the expansive soils under the house, he did no further investigation about the dangers posed by the soils. Given this evidence, the district court could reasonably find that the Brochus knew of the structural issues and closed on the house anyway, thereby directly and substantially causing their own damages. Thus, we conclude that substantial evidence supports the district court's conclusion that the Brochus' comparative negligence precluded recovery under their negligence and negligence per se claims, since the evidence substantially revealed that

381 P.3d 596, 2012 WL 5991571

Foote did not engage in willful misconduct and the Brochus'
negligence caused their damages.

*Substantial evidence supports the district court's rejection of
the Brochus' negligent misrepresentation claim*

 **\*5**  **[5]**  The Brochus argue that the district court erred
when it rejected their negligent misrepresentation claim. This
court has described the tort of negligent misrepresentation as
follows:

> "One who, in the course of his
> business, profession or employment ...
> supplies false information for the
> guidance of others in their business
> transactions, is subject to liability
> for pecuniary loss caused to them
> by their justifiable reliance upon the
> information, if he fails to exercise
> reasonable care or competence in
> obtaining or communicating the
> information."

*Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 449, 956 P.2d 1382,
1387 (1998) (quoting Restatement (Second) of Torts § 552(1)
(1965)). "[P]roof of reliance" is required to prevail on a claim
for negligent misrepresentation. *Bill Stremmel Mtrs. v. First
Nat'l Bank,* 94 Nev. 131, 134, 575 P.2d 938, 940 (1978)).

The evidence established that the Brochus knew of the various
issues with the house and closed escrow despite those issues.
Hence, the district court could logically find that the Brochus'
decision to close escrow did not arise from any reasonable
reliance on Foote's representations. We therefore conclude
that substantial evidence supports the district court's rejection
of the Brochus' negligent misrepresentation claim by showing
that the Brochus' damages did not arise from a reasonable
reliance on Foote's representations.

*Substantial evidence supports the district court's rejection of
the Brochus' contract-based claims*

The Brochus contend that the district court should have ruled
in their favor on their breach of contract and breach of the
implied covenant of good faith and fair dealing claims.

Whether a contract was breached is a question of fact, and
the district court's decision on the issue must be upheld unless
clearly erroneous and not supported by substantial evidence.
*Sheehan & Sheehan v. Nelson Malley & Co.,* 121 Nev. 481,
486, 117 P.3d 219, 223 (2005).

To prove a breach of contract, the plaintiff must show an
existing valid agreement with the defendant, the defendant's
material breach, and damages. *See Saini v. International
Game Technology,* 434 F.Supp.2d 913, 919–20 (D.Nev.2006);
*see also Bernard v. Rockhill Dev. Co.,* 103 Nev. 132, 135,
734 P.2d 1238, 1240 (1987). "[A]ll contracts impose upon the
parties an implied covenant of good faith and fair dealing,
which prohibits arbitrary or unfair acts by one party that work
to the disadvantage of the other." *Nelson v. Heer,* 123 Nev.
217, 226, 163 P.3d 420, 427 (2007).

 **[6]**  Here, the evidence does not evince a material breach of
the contract or a breach of the implied covenant of good faith
and fair dealing but revealed a contract in which Foote agreed
to perform a limited amount of work, unrelated to the support
or stabilization of the home, within a limited area of the house.
The contract and the testimony of Raymond Foote, Michael
Brochu, and Mock revealed that the purpose of Foote's work
was to remedy a termite issue and eliminate earth-to-wood
contact on three or four posts within a specific section of the
house's crawlspace. The contract did not include language
that required Foote to investigate or correct the house's
support structure. The limited scope of Foote's contractual
obligation rebuts the Brochus' argument that Foote breached
the covenant of good faith and fair dealing by not disclosing or
diagnosing the house's structural issues. The services agreed
upon did not impose on Foote a duty to disclose or diagnose
the house's structural issues. Hence, the district court could
rationally find that Foote did not act arbitrarily or unfairly to
the Brochus' disadvantage.

 **\*6**  Consequently, we conclude that substantial evidence
supports the district court's rejection of the Brochus' contract-
based claims.[1]

[1]  In asserting the merits of their contract-based
claims, the Brochus cite to authorities outside of
this jurisdiction that provide for a contractor's
implied warranty to disclose the defects that he
or she knows, or reasonably should have known,
when working on a project. *See Lewis v. Anchorage
Asphalt Paving Co.,* 535 P.2d 1188, 1195 (Alaska
1975); *Three Way, Inc. v. Burton Enterprises,*

Brochu v. Foote Enterprises, Inc., 128 Nev. 884 (2012)

381 P.3d 596, 2012 WL 5991571

*Inc.,* 177 P.3d 219, 227–28 (Wyo.2008). However, these authorities also reveal that the scope of this warranty is limited by the scope of services contracted for. *See Lewis,* 535 P.2d at 1196 ("The scope of these warranties, however, is directly related to the scope of the duties and obligations imposed on the parties by their contract."); *Three Way, Inc.,* 177 P.3d at 227–28 (articulating the warranty to disclose defects in relationship to how those defects undermine the work contracted for). Here, any potential warranty to disclose defects was limited by the scope of this contract. The contract limited Foote's services and the area of the home that was worked upon. Hence, the contract did not implicate the discovery or disclosure of the house's structural defects. Accordingly, we maintain that substantial evidence supports the district court's finding that the scope of Foote's work was unrelated to correcting structural issues of the house, such that it did not err in determining that Foote lacked a duty to disclose or diagnose the house's structural issues.

*Substantial evidence supports the district court's rejection of the Brochus' NRS 40.615 constructional defect claim*

[7]   The Brochus contend that the district court should have ruled in their favor on their NRS 40.615 constructional defect claim.

NRS 40.615 defines constructional defect as

a defect in the design, construction, manufacture, repair or landscaping of a new residence, [or] of an alteration of or addition to an existing residence, ...

1. Which is done in violation of law, including, without limitation, in violation of local codes or ordinances;

2. Which proximately causes physical damage to the residence, an appurtenance or the real property to which the residence or appurtenance is affixed;

3. Which is not completed in a good and workmanlike manner in accordance with the generally accepted standard of care in the industry for that type of design, construction, manufacture, repair or landscaping; or

4. Which presents an unreasonable risk of injury to a person or property.

NRS 40.640 provides that "[i]n a claim to recover damages resulting from a constructional defect, a contractor ... is not liable for any damages caused by ... [t]he acts or omissions of a person other than the contractor or the contractor's agent, employee or subcontractor." (Emphasis added.)

Here, the evidence supports the district court's determination that Foote did not cause the Brochus' damages, but rather the Brochus caused their own damages. Though it did not specifically cite NRS 40.640 in its judgment, the district court correctly applied the concept contained therein in concluding that the Brochus failed to prove Foote's liability under NRS 40.615. Accordingly, we conclude that substantial evidence supports the district court's rejection of the Brochus' NRS 40.615 construction defect claim by revealing that the Brochus' acts proximately caused their damages.

*The district court did not abuse its discretion in awarding costs that it could not discern as actually incurred and reasonable from the memorandum and affidavit*

The Brochus assert that the district court abused its discretion in awarding costs to Foote because Foote failed to provide sufficient supporting documentation beyond the memorandum of costs and affidavit.

We review the district court's award of costs for an abuse of discretion. *Village Builders 96 v. U.S. Laboratories,* 121 Nev. 261, 276, 112 P.3d 1082, 1092 (2005).

*The district court did not abuse its discretion in only considering costs appearing within Foote's timely filed memo*

To recover costs, the prevailing party must file the statutorily required memorandum of costs within five days after the entry of judgment. NRS 18.110(1).

[8]   Here, the district court appropriately refused to consider any costs other than those appearing in Foote's original memorandum of costs. Although Foote submitted the original memorandum within five days of the judgment, and subsequently submitted two untimely filed supplemental memoranda with documentation regarding costs in its response to a motion to retax, the five-day time limit in NRS 18.110(1) allowed the district court to reject the two untimely filed supplemental memoranda. Thus, we conclude that the district court did not abuse its discretion in refusing to consider any costs other than those appearing within Foote's original memorandum of costs.

Brochu v. Foote Enterprises, Inc., 128 Nev. 884 (2012)
381 P.3d 596, 2012 WL 5991571

*The district court did not abuse its discretion in awarding costs that it could discern as actually incurred and reasonable from the memorandum and affidavit*

**\*7** A prevailing party is entitled to recover litigation costs in certain cases. NRS 18.020. Costs include: (1) fees for witnesses, depositions, and expert witnesses; (2) expenses for service of papers, photocopies, long distance phone calls, and postage; (3) travel and lodging expenses arising from depositions or discovery; and (4) any "reasonable and necessary" expenses arising from the action. NRS 18.005(2), (4), (5), (7), (12)-(15), (17). In order to recover costs, the prevailing party must provide "a memorandum of the items of the costs in the action or proceeding, which ... must be verified by ... the party's attorney ..., stating that to the best of his or her knowledge and belief the items are correct, and that the costs have been necessarily incurred in the action or proceeding." NRS 18.110(1).

These costs must be "actual and reasonable, 'rather than a reasonable estimate or calculation of such costs.' " *Bobby Berosini, Ltd. v. PETA,* 114 Nev. 1348, 1352, 971 P.2d 383, 385–86 (1998) (quoting *Gibellini v. Klindt,* 110 Nev. 1201, 1206, 885 P.2d 540, 543 (1994)).

Demonstrating that a cost was actually incurred often requires documentation. *See Village Builders,* 121 Nev. at 277–28, 112 P.3d at 1093 ("[D]ocumentation is precisely what is required under Nevada law to ensure that the costs awarded are only those costs actually incurred."); *Gibellini,* 110 Nev. at 1205–06, 885 P.2d at 543 (reversing part of an order awarding costs not documented to be actual and remanding for a determination of actual costs incurred).

The district court has discretion to determine if an actually incurred cost was reasonable. *Village Builders,* 121 Nev. at 278, 112 P.3d at 1093. Determining necessity and reasonableness *may* require detailed documents, such as itemizations. *See Berosini,* 114 Nev. at 1353, 971 P.2d at 386 (determining that a prevailing party was not entitled to costs for photocopies, long distance phone calls, and juror fees where the party failed to give documentation or itemizations necessary to determine reasonableness and necessity). But specific documentation alone does not always suffice to show a cost to be reasonable or necessary. *See id.* at 1352–53, 971 P.2d at 386 (concluding that the submission of itemized costs for investigative fees did not justify the recovery of such costs, because the itemization did not reveal reasonableness or necessity); *see also Gilman v. State. Bd. of Vet. Med.*

*Exam'rs,* 120 Nev. 263, 273–74, 89 P.3d 1000, 1007 (2004) (determining that the itemization of investigative fees alone did not suffice to show reasonableness or necessity). Hence, the nature, extent, and specificity of the documentation required to prove an actual and reasonable cost depends upon the court's ability to make this finding from the circumstances and the materials presented by the prevailing party.

Here, the question is whether Foote's original memorandum of costs, and the affidavit in which counsel declared the costs to be actual and reasonable, were sufficient to allow the district court to determine if the costs were actual and reasonable.

*The district court did not abuse its discretion in awarding ordinarily incurred and reasonable costs*

**\*8**  **[9]**    The district court did not abuse its discretion in awarding costs for filing, e-filing, depositions of opposing party experts, audio and visual equipment, court reporting services, and witness fees. Given the court's general knowledge of ordinarily incurred costs and familiarity with the actual proceedings, Foote's memorandum and affidavit provided a sufficient basis upon which the court could determine the actual and reasonable nature of these costs.

As standard fees, the district court did not need additional documentation to determine that the filing fees were actual and reasonable.

Foote's memorandum and affidavit, although rather generic in nature, were adequate for the district court to discern that the costs for deposing the plaintiffs' experts, court reporting services, renting audio and visual equipment, and engaging the services of a mediator were actual and reasonable. It is well known that a party deposes the opposing party's expert witnesses and that experts charge for their time during deposition. Since the Brochus had two expert witnesses testify at trial, the district court could deduce that Foote actually incurred the costs for deposing them. These costs appeared reasonable and necessary in a trial that required expert testimony. The district court thus correctly determined that the costs related to court reporting services were reasonable. Similarly, expenses for audio and visual equipment used during trial to present certain evidence can readily be deemed reasonable with little other explanation. Finally, the record reveals that the parties used mediation services, thereby actually incurring this cost. The record suggests that the district court assessed and determined that the amounts for those costs were reasonable. Hence, the court appropriately

Brochu v. Foote Enterprises, Inc., 128 Nev. 884 (2012)

381 P.3d 596, 2012 WL 5991571

awarded these costs without needing documentation beyond the memorandum and affidavit.

Foote's original memorandum and affidavit provided enough information to determine that the $30 witness fees were reasonable, and thus the district court appropriately awarded these fees. Given the reasonable amount attributed to these witness fees, the district court appropriately awarded a reasonable cost of $30 for Kirby Fischer's witness fees as well.

Accordingly, we conclude that the district court did not abuse its discretion in awarding costs for filing, e-filing, depositions of opposing party experts, audio and visual equipment, court reporting services, mediation services, and witness fees because Foote's memorandum and affidavit adequately supported the district court's determination that Foote actually and reasonably incurred these costs.

*The district court abused its discretion in awarding costs that required more documentation*

**[10]**   Here, the reasonableness of the costs attributed to UPS services, outside reproductions, lodging, air travel, parking, taxi services, rental car fees, long distance phone calls, postage, and photocopies depended upon the circumstances, such as the time, nature, extent, and value of such services. Determining such circumstances required additional documentation beyond the memorandum and affidavit. Hence, we conclude that the district court abused its discretion in awarding costs for UPS services, outside reproduction, lodging, air travel, parking, taxi services, and rental car expenses, and that it appropriately denied the costs for long distance phone calls, postage, and photocopies, because the reasonable value of these costs required documentation beyond the memorandum and accompanying affidavit.

*The district court did not abuse its discretion in awarding a reasonable cost for the process server*

***9   [11]**   NRS 18.005(7) provides that a district court can award costs for "[t]he fee of any sheriff or licensed process server for the delivery or service of any summons or subpoena used in the action, unless the court determines that the service was not necessary."

Here, the district court appropriately awarded Foote a lesser amount than it requested for a process server. In doing so, the district court implied that such costs were necessary costs under NRS 18.005(7). The district court awarded this lesser amount upon finding that Foote's requested cost exceeded the

standard fee charged within the community. Consequently, it awarded an amount based on the typical rate for a process server in that community, thereby reducing the award to $50.00 for each of the ten subpoenas served. [2]   Accordingly, we conclude that the district court did not abuse its discretion in awarding a reasonable cost for the necessarily incurred expenses of the process server.

[2]   When determining reasonable attorney fees, courts often reference community standards, also referred to as market rates. *See Gaskill v. Gordon,* 160 F.3d 361, 363 (7th Cir.1998) ("When a fee is set by a court ..., the object is to set it at a level that will approximate what the market would set."). Hence, the use of this principle in determining the reasonableness of costs was similarly appropriate.

*The district court did not abuse its discretion in determining a reasonable award for expert witness fees*

NRS 18.005(5) provides that costs can be awarded for:

> Reasonable fees of not more than five expert witnesses in an amount of not more than $1,500 for each witness, unless the court allows a larger fee after determining that the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee.

**[12]**   Here, the memorandum and affidavit offered enough information for the district court to determine that Foote incurred the expert witness fees, but failed to justify the amount Foote requested. Since this case required review and presentation of complicated issues, Foote necessarily sought the assistance of an expert. But the amount paid to the expert exceeded the statutory allowance of $1,500. Since Foote did not submit additional documentation to support an award exceeding the statutory allowance, the district court appropriately reduced the award to $1,500. Thus, we conclude that the district court did not abuse its discretion in awarding the statutory allowance of $1,500 for Foote's expert witness fees because Foote incurred the cost but failed to justify a greater amount by submitting only the memorandum and affidavit.

*Calculation of costs*

On remand, the district court is directed to recalculate the award of costs, consistent with this order.

For the foregoing reasons, [3] we

[3]   We have considered the Brochus' remaining arguments and conclude that they are without merit.

ORDER the judgment of the district court AFFIRMED (Docket No. 55963) and ORDER the post-judgment order awarding costs AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter for further proceedings consistent with this order. (Docket No. 56086).

**All Citations**

128 Nev. 884, 381 P.3d 596 (Table), 2012 WL 5991571

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

2018 WL 10638396
Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Hampshire.

Kevin BROWN, et al.

v.

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., et al.

Civil No. 16-cv-242-JL
|
Signed 12/06/2018

**Attorneys and Law Firms**

John A. Yanchunis, Morgan and Moran Complex Litigation Group, Tampa, FL, Kevin Scott Hannon, Hannon Law Firm LLC, Denver, CO, Paul M. DeCarolis, Gottesman & Hollis PA, Nashua, NH, Finis E. Williams, III, Williams Law Office, Concord, NH, for Kevin Brown, et al.

Bruce W. Felmly, Jeremy T. Walker, McLane Middleton, Manchester, NH, Douglas E. Fleming, III, Pro Hac Vice, Lincoln D. Wilson, Pro Hac Vice, Mark Cheffo, Pro Hac Vice, Paul A. LaFata, Rachel B. Passaretti Wu, Pro Hac Vice, Sheila L. Birnbaum, Pro Hac Vice, Bert L. Wolff, Pro Hac Vice, Emily L. Van Tuyl, Pro Hac Vice, Marina Schwarz, Pro Hac Vice, Dechert LLP, New York, NY, Nicholas F. Casolaro, Cleveland Waters & Bass PA, Concord, NH, Stefanie A. Tubbs, Pro Hac Vice, Dechert LLP, Philadelphia, PA, for Saint-Gobain Performance Plastics Corp., et al.

**ORDER ON MOTION FOR STAY**

Joseph N. Laplante, United States District Judge

**\*1** The plaintiffs in this proposed class action move for a stay of the court's order that they produce a limited selection of their medical records on or before December 7, 2018. They do so because, despite representing that they would make that production during a telephone conference on November 21, 2018, they have now petitioned the First Circuit Court of Appeals for a writ of mandamus, arguing that this court exceeded its authority in ordering that production. [1]

[1]     See Petition (doc. no. 160-1).

Because the court recognizes the importance of the privilege that the plaintiffs have asserted in this case, it grants the plaintiffs' motion. At the same time, plaintiffs' counsel's actions before this court have raised some concerns and the court makes the following observations.

**Background.** Plaintiffs have raised a "medical monitoring" claim -- that is, they seek to have defendants pay for medical monitoring for potential complications arising from exposure to chemicals released by Saint-Gobain's manufacturing plant. Neither New Hampshire's legislature nor its Supreme Court has recognized medical monitoring as a cause of action or an available form of relief. As the court has informed the parties on several occasions, it is inclined to certify a question to the New Hampshire Supreme Court concerning the availability of a medical monitoring claim and its elements. This court has, however, consistently indicated its inclination to certify that question on a more developed factual record and in connection with summary judgment.

Plaintiffs seek certification before they produce any medical records. They do so because, depending on how New Hampshire formulates the elements of any medical monitoring claims it may recognize, the plaintiffs' medical records may not be at issue in this case. And if the records are not at issue, the privilege would protect them from production. See Desclos v. S. New Hampshire Med. Ctr., 153 N.H. 607, 611 (2006).

In the meantime, both the court and the parties have some guidance as to what elements New Hampshire may recognize. For example, the plaintiffs moved for class certification and the court ordered production of medical records relying on the elements of a medical monitoring claim as outlined by the Hillsborough County Superior Court in Hermens v. Textiles Coated Inc., No. 216-2017-cv-524, -525, slip. op. at 9-12 (N.H. Super. Ct., Hillsborough Cnty. N. March 16, 2018) (Brown, J.) (citing Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424, 432-33 (W. Va. 1999)). Under that conception of the medical monitoring claim, the plaintiffs have put their records at issue. [2] Like every court that had addressed a motion to compel medical records in a medical monitoring case as of the date of its order, this court ordered their production under an appropriate protective order. [3]

[2]     Order of Oct. 10, 2018 (doc. no. 143) at 3-5.

**Brown v. Saint-Gobain Performance Plastics Corp., Slip Copy (2018)**

2018 WL 10638396

[3]    Id. at 5.

Again, the court takes no issue with the plaintiffs' assertion of privilege and, accordingly, grants the present motion in part. It does, however, take issue with plaintiffs' counsel's approach to this discovery dispute, which has now been pending for almost five months, since July 13, 2018, and has, as a result, significantly delayed this litigation.

**\*2  Plaintiffs' representations.** The defendants requested a broad range of the plaintiffs' medical records as related to the plaintiffs' claims for medical monitoring. [4]  The court denied the plaintiffs' request for a protective order, but ordered a limited production -- specifically, the records of each plaintiff's primary physician for the period between January 2000 and the present, the plaintiffs' workers' compensation records (if any), and identification (but not records) of other medical providers, medications, and employment history. [5] By agreement of the parties, the plaintiffs were to produce those records by November 16, 2018. [6]

[4]    See Mot. for Protective Order Appendix A (doc. no. 125-2) at 4.

[5]    Order of Oct. 10, 2018 (doc. no. 143) at 6.

[6]    Proposed Discovery Plan (doc. no. 145) at 1 (characterizing discovery deadline as an "[a]greed [u]pon" date); Order of Nov. 5, 2018 (doc. no. 150) at 4 (adopting the parties' agreed-upon deadline).

The plaintiffs never moved for reconsideration of that order. Nor did they inform the court or the defendants that they would not or could not comply with that order. Without any pre-deadline explanation to either the court or defense counsel, they simply failed to comply.

On a telephone conference requested the next week by the defendants, the plaintiffs explained that they had unilaterally disregarded the deadline because (1) an agreed-to protective order had not entered until November 19, though the parties had filed it on November 6; [7] (2) certain of the plaintiffs had moved for reconsideration of the court's latest scheduling order, which adopted the plaintiffs' proposed schedule in large part, seeking earlier certification of the question to the New Hampshire Supreme Court; [8] and (3) one plaintiff refused to produce certain medical records related to a traumatic injury, even to his or her counsel. [9] None of these issues warranted unilateral disregard of the court's order.

If any of them prevented the plaintiffs from making their production, they ought to have raised the issue and sought relief.

[7]    Tr. of Nov. 21 Telephone Conf. (doc. no. 158) at 12.

[8]    Id.

[9]    Id. at 13-14.

Most importantly, however, plaintiffs' counsel gave no indication during that telephone conference that the plaintiffs would do anything but comply with the court's order with respect to the remaining medical records. Indeed, they agreed to the December 7 production date, which afforded them a full week after they estimated the records would be available. [10] Plaintiffs' counsel represented that they were "not going to hold off until December 7th. The situation we work out is to produce the records. If they came earlier and we're going to produce them, we'll produce them." [11] They never indicated during the call that the plaintiffs either (1) contested the court's authority to order production or (2) would seek further review of that order, as they have now done.

[10]    Id. at 41-45.

[11]    Id. at 45.

**Hermens elements.** In moving for class certification, the plaintiffs relied on the elements of the medical monitoring claim adopted by Judge Brown in Hermens. [12] The court, likewise, relied on those elements in concluding that the plaintiffs put their medical records at issue in this action. [13] In seeking a protective order against production of those records, the plaintiffs invoked a different set of elements -- those adopted by the Supreme Courts of Pennsylvania in Redland Soccer Club v. Dep't of the Army, 696 A.2d 137, 145-46 (Pa. 1997) and Nevada in Sadler v. PacifiCare of Nev., Inc., 340 P.3d 1264, 1265-66 (Nev. 2014).

[12]    Memo. in Supp. of Mot. for Class Cert. (doc. no. 121-1) at 31; Plaintiffs' Class Cert. Ex. 34 (doc. no. 122-34).

[13]    Order of Oct. 10, 2018 (doc. no. 143) at 3-5.

**\*3**  While the plaintiffs' medical records may not be at issue in a medical monitoring claim in those states, which require the plaintiffs to "demonstrate that the medical monitoring at issue is something greater than would be recommended as a

matter of general health care for the public at large," Sadler, 340 P.3d at 1271, courts relying on the elements set forth by the Superior Court in Hermens have ordered production of those records, see Ballard v. Union Carbide Corp., No. 2:11-CV-00366, 2012 WL 2089511, at *4 (S.D. W. Va. June 8, 2012). In this case, the plaintiffs moved for class certification based on the Hermens elements. This court, accordingly, concluded that the plaintiffs have put their medical records at issue and ordered their production. [14] And, further, it allowed that the parties will be afforded an opportunity to conduct additional discovery as necessary if the New Hampshire Supreme Court adopts different elements. [15]

[14]    Order of Oct. 10, 2018 (doc. no. 143) at 4-5.

[15]    See Order of Nov. 29, 2018 (doc. no. 157) at 2-3.

Though the plaintiffs will have an opportunity to argue that New Hampshire ought to adopt different elements, if it adopts the claim at all, to the extent that they seek class certification based on the elements set forth in Hermens, they are subject to discovery based on those same elements.

**Conclusion.** On balance, the relevant factors, see Hilton v. Braunskill, 481 U.S. 770, 776 (1987), may weigh against further delaying this litigation over a five-month-old discovery dispute in which this court has now twice ordered the production of documents without any request for reconsideration from the plaintiffs. In light of the privilege-related issues raised by the plaintiffs, however, the court GRANTS their motion to stay their production deadline pending resolution of the plaintiffs' petition. [16] If the Court of Appeals denies the plaintiffs' petition, plaintiffs shall produce the ordered records within **72 hours** of that order. Plaintiffs should not anticipate any further continuances of that deadline.

[16]    Document no. 159.

The court further recognizes that this stay may impact the defendants' ability to comply with their upcoming expert- and class-certification-related deadlines, and will entertain appropriate requests for relief as those deadlines approach.

**SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 10638396

---

# TAB 12

797 Fed.Appx. 247
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

James A. BUNN, dba Bunn
Trucking, Plaintiff-Appellant,

v.

NAVISTAR, INC., dba International
Used Truck Center, Defendant-Appellee.

No. 19-5406
|
FILED January 07, 2020

**Synopsis**
**Background:** Owner of trucking business brought a products liability action against manufacturer of heavy-duty trucks asserting breach of express and implied warranties of merchantability, intentional misrepresentation, and violations of the Tennessee Consumer Protection Act (TCPA), after second-hand trucks purchased from manufacturer's dealership required extensive repair. Manufacturer removed action to federal court on the basis of diversity jurisdiction. The United States District Court for the Middle District of Tennessee, Eli J. Richardson, J., 2019 WL 333552 and 2019 WL 1233849, granted manufacturer's motion to dismiss for failure to state a claim and denied owner's motion to alter or amend judgment. Owner appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:

[1] under Tennessee law, owner failed to plausibly allege that manufacturer was notified of its alleged breach of express and implied warranties, as required by breach of warranty statute, and

[2] district court did not abuse its discretion by denying owner's motion to alter or amend judgment on TCPA claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim; Motion to Alter or Amend Judgment.

West Headnotes (3)

**[1]    Sales**    Particular actions and claims

Under Tennessee law, owner of trucking company was required to plead facts giving rise to a plausible inference that manufacturer of heavy-duty trucks was notified of its breach of express and implied warranties of merchantability, as required by breach of warranty statute, in order for his products liability action to survive manufacturer's motion to dismiss. Tenn. Code Ann. § 47-2-607(3).

**[2]    Sales**    Mode and Sufficiency of Notice

Under Tennessee law, owner of trucking company failed to plausibly allege that manufacturer of heavy-duty trucks was notified of its alleged breach of express and implied warranties of merchantability when owner notified it that second-hand trucks he purchased were in need of repair, as required to state a claim under breach of warranty statute; written warranty evidenced parties' shared understanding that repair might have been necessary at some point, and owner's notice to manufacturer did not claim a breach and open the way for settlement through negotiation. Tenn. Code Ann. § 47-2-607(3).

**[3]    Federal Civil Procedure**    Grounds and objections

District court did not abuse its discretion by denying owner of trucking business's motion to alter or amend judgment, which dismissed his Tennessee Consumer Protection Act (TCPA) claim against manufacturer of heavy-duty trucks, based on his trial counsel's misunderstanding of the Federal Rules; owner's trial counsel mistakenly believed that a case management conference was required prior to filing a motion to amend the complaint on the TCPA claim,

and trial counsel's misunderstanding was not the type of "manifest injustice" at which a motion to alter or amend judgment could be directed. Tenn. Code Ann. § 47-18-101 et seq.; Fed. R. Civ. P. 59(e).

**\*248** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

**Attorneys and Law Firms**

Terry Andrew Fann, Steven Chase Fann, Waldron, Fann & Parsley, Murfreesboro, TN, for Plaintiff - Appellant

Jeffrey S. Patterson, Senior Litigation Attorney, Hatline, Dacus, Barger & Dreyer, Dallas, TX, Paul J. Krog, Leader, Bulso & Nolan, Nashville, TN, for Defendant - Appellee

Before: CLAY, STRANCH, and MURPHY, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Plaintiff Bunn Trucking appeals the dismissal of his breach of express warranty and breach of implied warranty of merchantability claims against Defendant Navistar in this products-liability lawsuit. Plaintiff also appeals the denial of his Rule 59(e) motion to alter or amend the district court's judgment. For the reasons set forth below, we **AFFIRM** the decisions of the district court.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a sole proprietor doing business as Bunn Trucking. Defendant Navistar is a manufacturer of heavy-duty trucks. On June 13, 2018, Plaintiff, represented by counsel, initiated this products-liability action against Defendant in Tennessee state court, alleging the following facts.

On April 19, 2017, Plaintiff purchased two second-hand trucks from Defendant's dealership. One truck had 183,864 miles on it at the time of purchase ("Truck 1"), and the other truck had 141,229 miles on it at **\*249** the time of

purchase ("Truck 2"). Plaintiff purchased a written warranty for each truck, with each warranty covering the respective truck for 24 months or 200,000 miles. At the time of the purchase, Defendant's agents warranted that the trucks were free from defects and in perfect working order. Defendant assured Plaintiff that the trucks were suitable to perform the duties for which they were manufactured. Upon purchasing the written warranty, Defendant assured Plaintiff that Navistar technicians would be readily available to make any necessary repairs. However, shortly after making the purchase, Plaintiff began to experience numerous shortcomings with both trucks. For example, within three months of purchase, Truck 1 required a complete engine replacement and was out of service for two weeks. After the engine was replaced, Truck 1 continued to have problems and, since the date of purchase, was out of service for a total of nine months. Within four months of purchase, Truck 2 required a complete engine replacement. After the engine was replaced, Truck 2 continued to have problems and, since the date of purchase, was out of service for a total of eight months.

According to Plaintiff, the issues with the trucks included "(a) repeated instances of check engine lights illuminating; (b) fuel pump failure; (c) sensor 'shortage' issues; (d) 'knocking' in the engine requiring replacement; (e) excessive 'smoke' and hissing of the engine requiring replacement; (f) gasket replacement; (g) clogged hoses; (h) A/C blower and compressor failure; (i) complete engine failure; (j) other failures that prevented the Trucks from operating as warranted." R. 1-1, Pg. ID 9. Plaintiff alleged that he "repeatedly notified Defendant of the defects related to the trucks, but Defendants [sic] failed to make repairs sufficient to correct the defects." *Id.* at Pg. ID 10. Due to Defendant's inability or unwillingness to obtain necessary parts, Plaintiff experienced extensive delays for several months in getting the trucks repaired. Plaintiff lost a "substantial amount of income" due to the trucks' unreliability and the downtime required for repairs. *Id.* at Pg. ID 9. Specifically, Plaintiff lost contracts with his client, Kochlogistics, worth approximately $133,645.00 between April 22, 2017 and June 1, 2018. Plaintiff stated that "[u]pon information and belief, Defendant became aware trucks sold to Plaintiff were inadequate for public distribution." *Id.* at Pg. ID 10.

### B. Procedural History

In construing his own complaint in his favor, Plaintiff asserted the following causes of action: (1) breach of express warranty; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4)

intentional misrepresentation (fraud); and (5) two counts of violating the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(b)(7).

Defendant removed the action to federal court on the basis of diversity jurisdiction. Defendant then moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. First, Defendant argued that Plaintiff's claims for breach of express and implied warranties should be dismissed because Plaintiff failed to allege that the trucks were defective at the time they were delivered and for failure to provide pre-suit notice of the breach, as required by Tennessee law. Next, Defendant argued that Plaintiff's fraud claim should be dismissed under the economic loss doctrine and because Plaintiff failed to comply with the heightened pleading requirements of Rule 9(b). Defendant then argued that Plaintiff's first **250** TCPA count should be dismissed because the TCPA provision that Defendant allegedly violated only applies to "goods" that are obtained for use by an individual "primarily for personal, family, or household purposes," a category which clearly did not encompass the heavy-duty trucks used in Plaintiff's business. R. 8, Pg. ID 47–48 (quoting Tenn. Code. Ann. § 47-18-103(8)). Lastly, Defendant moved to dismiss Plaintiff's second TCPA count for failure to comply with the heightened pleading requirements of Rule 9(b).

In his response to Defendant's motion to dismiss, Plaintiff conceded that the economic loss doctrine barred his intentional misrepresentation claim and "aver[red] that Paragraph Nos. 38-43 of the Complaint should be stricken." R. 12, Pg. ID 168. Plaintiff also conceded that his first TCPA claim was inapplicable to the action and "aver[red] that Paragraph 45(a) of the Complaint should be stricken." *Id.* With regards to his second TCPA claim, Plaintiff stated that, "[a]s it pertains to the Plaintiff's allegations contained in Paragraph 45(b) of the Complaint, Plaintiff will be filing a Motion to Amend pursuant to Federal Rule of Civil Procedure 15(a)(2) for the purpose of pleading, with sufficient particularity, Defendant's violation of the Tennessee Consumer Protection Act as set forth in Paragraph 45(b) of the Complaint." *Id.* at Pg. ID 169. In addition, Plaintiff clarified that he was not suing on the basis of the written warranty that he had purchased from Defendant, but rather on the basis of statements allegedly made by Defendant's agents at the time of purchase.

Plaintiff did not at any time amend his complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1). *See* Fed. R. Civ. P. 15(a)(1). And, Plaintiff did not at any time obtain Defendant's written consent to amend his complaint or otherwise file a motion seeking leave of the court to amend the complaint in order to bolster his second TCPA claim. *See* Fed. R. Civ. P. 15(a)(2).

On January 25, 2019, the district court entered a judgment granting Defendant's motion to dismiss in its entirety. The district court reasoned that Plaintiff's breach of express warranty and breach of implied warranty of merchantability claims should be dismissed because Plaintiff failed to plausibly allege that Defendant's alleged warranties were false at the time they were made. The district court dismissed Plaintiff's implied warranty of fitness for a particular purpose claim, finding that "Plaintiff's stated 'particular purpose' is really an ordinary purpose—using heavy-duty trucks for a commercial trucking business—and not a particular purpose capable of supporting his claim." R. 28, Pg. ID 234. Lastly, the court dismissed Plaintiff's second TCPA claim, finding that in the "approximately eight months after Plaintiff's response was filed ... Plaintiff has not filed a motion to amend the TCPA claim," and the claim, as pleaded in the original complaint, did not plausibly allege any basis on which relief could be granted. *Id.* at Pg. ID 236.

Following the district court's dismissal, Plaintiff filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). Plaintiff's ground for moving to reopen the judgment was Plaintiff's counsel's mistaken impression that a complaint could not be amended prior to the initial case management conference. After Defendant filed a response to Plaintiff's motion, the district court entered an order denying Plaintiff's Rule 59(e) motion on March 15, 2019. The district court found Plaintiff's argument "nonsensical" because nothing in either the Federal Rules or Local Rules impairs Plaintiff's ability to amend his complaint as **251** of right or seek leave to do so prior to the initial case management conference. R. 35, Pg. ID 261–62.

On April 9, 2019, Plaintiff filed a notice of appeal as to the district court's order denying his Rule 59(e) motion. On April 15, 2019, Plaintiff filed a timely Amended Notice of Appeal clarifying that he appeals both the district court's January 25, 2019 judgment dismissing the action, and the district court's March 15, 2019 order denying his Rule 59(e) motion.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss. *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017). In doing so, we may affirm the district court's decision on any ground that is supported by the record. *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010). A motion to dismiss is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also* Fed. R. Civ. P. 8(a)(2). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* To evaluate a complaint's sufficiency, courts in this circuit follow three steps. "First, the court must accept all of the plaintiff's factual allegations as true.... Second, the court must draw all reasonable inferences in the plaintiff's favor.... And third, the court must take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (citations omitted).

## III. ANALYSIS

### A. Implied Warranty of Fitness for a Particular Purpose & Plaintiff's First TCPA Claim

As a preliminary matter, Plaintiff does not challenge the district court's dismissal of his implied warranty of fitness for a particular purpose claim or the dismissal of his first TCPA claim (*i.e.*, that alleged in Paragraph 45(a) of the complaint) in his briefs before this Court. And, Plaintiff's counsel acknowledged at oral argument that Plaintiff is not appealing the dismissal of his implied warranty of fitness for a particular purpose claim. Therefore, we consider those arguments waived and we affirm the district court's dismissal of those claims. *See, e.g.*, *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("[Plaintiff's] failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal.").

### B. Breach of Express Warranty & the Implied Warranty of Merchantability

Plaintiff contends that the district court erred by dismissing its breach of express warranty and breach of implied warranty of merchantability claims under Rule 12(b)(6). The elements for breach of express warranty in Tennessee are: "(1) the seller made an affirmation of fact intending to induce the buyer to purchase the goods; (2) the buyer was, in fact, induced by the seller's acts; and (3) the affirmation **\*252** of fact was false regardless of the seller's knowledge of the falsity or intention to create a warranty." *Jones v. WFM-Wo, Inc.*, 265 F. Supp. 3d 775, 781 (M.D. Tenn. 2017) (quoting *Smith v. TimberPro Inc.*, No. W2016-00757-COA-R3-CV, 2017 WL 943317, at \*3 (Tenn. Ct. App. Mar. 9, 2017)); *see also* Tenn. Code Ann. § 47-2-313. To make out a claim for breach of the implied warranty of merchantability, a plaintiff must show that the seller is a merchant with respect to goods of that kind and that the goods were not fit for the ordinary purposes for which such goods are used at the time they were delivered. *Dan Stern Homes, Inc. v. Designer Floors & Homes, Inc.*, No. M2008-00065-COA-R3-CV, 2009 WL 1910955, at \*4 (Tenn. Ct. App. June 30, 2009) (citing Tenn. Code Ann. § 47-2-314). The implied warranty of merchantability applies to second-hand goods. *See* Tenn. Code Ann. § 47-2-314, cmt. 3; *see also* *Patton v. McHone*, 822 S.W.2d 608, 616 (Tenn. Ct. App. 1991). The district court dismissed both of Plaintiff's warranty claims, finding that Plaintiff failed to plausibly allege that the warranties were false at the time they were made or that the trucks were not fit for ordinary use at the time they were delivered. We now affirm the district court's decision, although on different grounds. *See, e.g.*, *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 477.

In the court below, Defendant moved to dismiss, in part, on the ground that Plaintiff failed to adequately plead notice as required by Tennessee Code Annotated § 47-2-607(3). Section 47-2-607(3) of the Tennessee Code is Tennessee's version of section 2-607(3) of the Uniform Commercial Code. It provides in part that "[w]here a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Tenn. Code Ann. § 47-2-607(3). Similarly, the damages provision for breach of warranty provides that "[w]here the buyer has accepted goods and *given notification* (§ 47-2-607(3)) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."

Tenn. Code Ann. § 47-2-714 (emphasis added). According to Tennessee courts, "[n]otification pursuant to Tenn. Code Ann. § 47-2-607 is an essential ingredient for an action for damages." *Carmichael & Carmichael, Inc. v. Nicholstone Companies, Inc.*, No. 01-A-01-9104-CV00148, 1992 WL 172404, at *6 (Tenn. Ct. App. July 24, 1992). "The purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011); *see also* Tenn. Code Ann. § 47-2-607(3), cmt. 4.

In determining whether Plaintiff's claims should be dismissed for failure to comply with § 47-2-607(3), this Court must answer two questions. First, was Plaintiff required to plead notice in his complaint (that is, was he required to plead facts that would plausibly satisfy § 47-2-607's notice requirement)? And, if so, what type of notice was required under the statute? Was it enough for Plaintiff to allege that he notified Defendant of the various defects with the trucks, or was he required to notify Defendant that those defects, in Plaintiff's view, amounted to a breach of warranty?

 **[1]**  We answer the first question in the affirmative based solely on Plaintiff's litigation conduct. Plaintiff has never argued, either to this Court or to the district court, that his warranty claims are not subject to the Tennessee notice statute. In fact, **\*253** Plaintiff concedes in his briefs before this Court that his claims are governed by § 47-2-607(3). And, Plaintiff conceded at oral argument that his complaint was required to contain an adequate inference of notice pursuant to § 47-2-607(3). In other words, Plaintiff has never argued that failure to satisfy § 47-2-607(3) should be raised as an affirmative defense, and instead concedes that satisfaction of the statute is a condition precedent to suit in Tennessee. Therefore, although some state courts have treated similar notice requirements as affirmative defenses rather than elements of the claim that must be pled, *compare, e.g.*, *Reid v. Eckerds Drugs, Inc.*, 40 N.C.App. 476, 253 S.E.2d 344, 347, 350 (1979) (affirmative defense), *with, e.g.*, *Stamper Black Hills Gold Jewelry, Inc. v. Souther*, 414 N.W.2d 601, 604 (N.D. 1987) (element), we find that Plaintiff has forfeited any such argument in this case. [1] Thus, for purposes of this appeal and in line with Plaintiff's litigation conduct, we conclude that Plaintiff was required to plead facts giving rise to a plausible inference of notice in compliance with § 47-2-607(3).

1    While Tennessee courts have yet to resolve this question, other courts interpreting Tennessee law have dismissed warranty claims for failure to adequately plead notice under Tenn. Code Ann. § 47-2-607(3). *See, e.g.*, *Siriano v. Goodman Mfg. Co.*, No. 2:14-cv-1131, 2015 WL 12748033, at *7–8 (S.D. Ohio Aug. 18, 2015); *Rysewyk v. Sears Holdings Corp.*, No. 15-cv-4519, 2015 WL 9259886, at *4 (N.D. Ill. Dec. 18, 2015); *see also* *Alvarez v. Chevron Corp.*, 656 F.3d 925, 931–32 (9th Cir. 2011) ("The district court properly dismissed these common law claims because Plaintiffs failed to provide Defendants with reasonable notice.") (applying Cal. Com. Code § 2607(3)(A)). In any event, we do not decide in this case whether Tennessee courts would consider notice as a condition precedent to suit because Plaintiff has forfeited any argument to the contrary.

 **[2]**  Next, we must determine whether Plaintiff's allegations in his complaint satisfy that requirement. For the reasons that follow, we find that they do not. Plaintiff argues that he sufficiently pled notice, either because the complaint itself constituted sufficient notice according to the Middle District of Tennessee's holding in a personal-injury case, *Smith v. Pfizer*, 688 F. Supp. 2d 735 (M.D. Tenn. 2010), or because his "allegations of major repairs ... satisfy the requirement under Tennessee law regarding notice." Appellant Br. at 16. We find each of these arguments unavailing.

In *Smith v. Pfizer*, the district court held that "a personal injury plaintiff can give notice by filing suit" and, thus, does not have to allege any pre-suit notification of breach to satisfy § 47-2-607(3). 688 F. Supp. 2d at 750. However, the court expressly distinguished commercial cases: "As envisioned by Tenn. Code Ann. § 47-2-607(3)(a), a seller of goods with timely notice that they are nonconforming may inspect the goods ... and then cure the defects or preserve evidence that no breach occurred." *Id.* at 750–51 (quoting *Duffy Tool & Stamping v. Bosch Auto. Motor Sys. Corp.*, No. M1997-00144-COA-R3-CV, 2000 WL 122225, at *3 (Tenn. Ct. App. Feb. 1, 2000)). But, the court stated, "notice serves a different purpose in personal injury cases." *Id.* at 751. Unlike in a commercial case, opportunity to cure in a personal injury case has no significance "because the defect has already caused the harm and the seller can do nothing to remedy the situation that has already occurred." *Id.* (quoting Lary Lawrence, 6 Lawrence's Anderson on the Uniform Commercial Code § 2–607:7 (3d. ed. 2009)). This is

a commercial case, and under current Tennessee law, *Pfizer* is thus inapplicable.

**\*254** Next, we must determine whether Plaintiff's allegations that he notified Defendant of the defects is sufficient to plausibly allege that he put Defendant on notice of an alleged breach under § 47-2-607(3). This is a more difficult question. Plaintiff argues that this Court should adopt a relaxed view of how Tennessee courts would interpret § 47-2-607(3)'s notice requirement. In Plaintiff's view, his allegation that he told Defendant about certain defects with the trucks was enough to adequately plead notice under § 47-2-607(3). In response, Defendant asks this Court to find that Tennessee courts would adhere to the traditional, stricter reading of notice statutes such as § 47-2-607(3) whereby it is not enough for a buyer to notify a seller simply of problems with a good; instead, the buyer must notify the seller that, in the buyer's view, the problems rise to the level of a breach. Defendant points out this Court has historically adhered to the stricter view when interpreting analogous notice statutes. For example, in a line of cases including *Running Springs Associates v. Masonite Corp.*, we analyzed Ohio's identical notice statute. 680 F.2d 469 (6th Cir. 1982). In concluding that the statute requires notice that the problems with the goods rise to the level of breach, rather than mere notice of the defect, this Court cited with approval the oft-quoted language from Judge Learned Hand:

> The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*Id.* at 469–70 (quoting *Am. Mfg. Co. v. U.S. Shipping Board E. F. Corp.*, 7 F.2d 565, 566 (2d Cir. 1925)). Relying on this language, we held that Ohio's identical notice statute requires a buyer to put a seller on notice that "it was considered to be

in breach" and not simply that the buyer "was experiencing difficulties with the goods." *Id.* at 470 (quoting *K & M Joint Venture v. Smith Int'l, Inc.*, 669 F.2d 1106, 1113 (6th Cir. 1982)); *accord Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 825 (6th Cir. 1978). *But see Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624, 638 (1989) (rejecting the strict reading of the Ohio notice statute in favor of the more relaxed view).

Tennessee courts have not recently spoken to this issue. And, although Tennessee may eventually articulate a different interpretation of its notice statute, at this time, we think it appropriate to assume that Tennessee courts would adhere to the traditional view that plaintiffs must allege that they provided notice of a breach (*i.e.*, that the defendant will be asked to meet a claim for damages) in commercial cases such as this. That interpretation is supported by the plain language of the statute. *See* Tenn. Code Ann. § 47-2-607(3) ("Where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller *of breach* or be barred from any remedy." (emphasis added)). Our view is further informed by early Tennessee case law.

In *Wildman Manufacturing Co. v. Davenport Hosiery Mills*, 147 Tenn. 551, 249 S.W. 984 (1923), the Supreme Court of Tennessee considered what type of notice was required under the notice provision of **\*255** the Uniform Sales Act of 1919 (the predecessor of UCC § 2-607).[2] The defendant-seller in *Wildman* had consistently failed to deliver machines on time to the buyer. *Id.* at 987. The buyer, in turn, repeatedly sent letters notifying the seller of the problems with the delivery delays, but did not notify the seller of its intention to make a claim for damages. *Id.* at 988–91. After reviewing several cases holding that the buyer is required to put the seller on notice of a breach under the Uniform Sales Act (*i.e.*, to put the seller on notice that the buyer intends to seek a claim for damages), the Tennessee Supreme Court found that many of the buyer's letters to the seller in *Wildman* did not constitute sufficient notice under the Act. *Id.* at 993. For example, regarding the buyer's first letter to the seller, the court stated that "[w]hile this letter is full of complaints, and refers to the broken promises of the [seller], we see nothing here indicating an intention to claim damages for breach of contract." *Id.* at 989. The court adopted the chancellor's view that "a claim for damages, and not merely a complaint or announcement of trouble, was necessary" under the Act. *Id.* at 992. That is, the Tennessee Supreme Court held that it wasn't until the buyer

put the seller on notice that it intended to make a claim for damages that the notice provision of the Act was satisfied. *Id.* at 993.

2      The relevant provision of the Uniform Sales Act required that "if, after acceptance of the goods, the buyer fail[s] to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor." *Wildman*, 249 S.W. at 986 (quoting Uniform Sales Act, § 49 (1919).)

*Wildman*'s holding aligns with our holding in *Running Springs*, and with the traditional view and the plain language of the notice statutes. Moreover, this interpretation is especially applicable in this case where Plaintiff purchased a written warranty, which evidenced the parties' shared understanding that the second-hand trucks may need repairs at some point. Because Plaintiff and Navistar mutually anticipated that the trucks may need repairs at some point, it seems particularly unlikely that Plaintiff's request for repairs would put Navistar on notice that the transaction is claimed to involve a breach under § 47-2-607(3). *Cf.* Tenn. Code Ann. § 47-2-607, cmt. 4 ("The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.").

For these reasons, we find that Plaintiff was required to plead that he put Navistar on notice that the transaction was "claimed to involve a breach, and thus open[ ] the way for normal settlement through negotiation" under current Tennessee law. *Id.* Because Plaintiff's complaint does not contain such allegations, the district court properly dismissed the breach of express warranty and breach of implied warranty of merchantability claims for failure to state a claim under Rule 12(b)(6). [3]

3      In the district court and on appeal, Defendant further argues that Plaintiff's express warranty claim should be dismissed because Plaintiff failed to plausibly allege that Defendant made any affirmations of fact beyond mere puffery. Navistar also argues that Plaintiff failed to plausibly allege facts from which the district court could infer causation and damages for each of his warranty claims. The district court declined to reach the

merits of Defendant's causation and damages arguments because of other grounds for granting Navistar's motion to dismiss. Because we find that Plaintiff's claims were insufficiently pled with regards to notice, we likewise do not address these issues.

**\*256 C. Plaintiff's Rule 59(e) Motion**

"We generally review a denial of a motion to alter or amend the judgment under Rule 59(e) for abuse of discretion." *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007) (quoting *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 554 (6th Cir. 1998)). However, if the district court's denial of a Rule 59(e) motion is based on erroneous legal doctrine, then this Court employs a *de novo* standard of review. *Id.* In the present case, the district court did not base its denial of Plaintiff's Rule 59(e) motion on an erroneous legal doctrine such that *de novo* review would apply, and Plaintiff concedes on appeal that this Court should review the district court's decision for abuse of discretion.

"In this circuit, a district court may alter a judgment under Rule 59 based on (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 551–52 (6th Cir. 2012) (citing *Leisure Caviar, LLC v. United States Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010)). This standard vests "considerable discretion" in the district court. *Leisure Caviar*, 616 F.3d at 615. When deciding whether to grant a Rule 59(e) motion, a district court must consider the "interest of protecting the finality of judgments and the expeditious termination of litigation." *Id.* at 615–16 (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). Otherwise, "plaintiffs could use the court as a sounding board to discover holes in their arguments, then 'reopen the case by amending their complaint to take account of the court's decision.' " *Id.* at 616 (quoting *James v. Watt*, 716 F.2d 71, 78 (1st Cir. 1983)). Therefore, unlike in the context of Federal Rule of Civil Procedure 15(a), "[a] claimant who seeks to amend a complaint *after* losing the case must provide a compelling explanation to the district court for granting the motion." *Id.* at 617. With this standard in mind, we find that the district court did not abuse its discretion by denying Plaintiff's Rule 59(e) motion to alter or amend the judgment. We address two preliminary issues.

[3]   First, Plaintiff moved to alter the district court's judgment only as to his second TCPA claim, which was originally

pleaded in Paragraph 45(b) of his complaint. Accordingly, the district court limited its analysis to whether it should alter its dismissal of Plaintiff's second TCPA claim only. On appeal, Plaintiff does not challenge the district court's interpretation of his Rule 59(e) motion as applying only to his second TCPA claim. Therefore, we confine our review of Plaintiff's Rule 59(e) motion to his second TCPA claim as well.

Next, Plaintiff appears to argue that this Court should remand to the district court to provide Plaintiff an opportunity to amend his TCPA claim pursuant to Federal Rule of Civil Procedure 15(a)(2), regardless of this Court's review of Plaintiff's Rule 59(e) motion. This argument is without merit. First, Plaintiff's counsel acknowledges in his brief that "[i]t is undisputed that the Plaintiff's Complaint, as written, may not contain sufficient allegations to state a plausible claim for relief as to the *service-related* cause of action presented in Paragraph 45(b). An amendment would be required to survive the Defendant's Motion to Dismiss as it relates to this cause of action." Br. for Appellant at 37. Plaintiff then proceeds to argue why such an amendment should be allowed under Federal Rule of Civil Procedure 15(a)(2), arguing in particular that there would be no undue delay or undue prejudice to Defendant.

Plaintiff's argument misses the mark because Plaintiff never filed a motion to amend his complaint either as of right or **\*257** with leave of court in the district court. In his response in opposition to Defendant's motion to dismiss, Plaintiff stated "[a]s it pertains to the Plaintiff's allegations contained in Paragraph 45(b) of the Complaint, Plaintiff will be filing a Motion to Amend pursuant to Federal Rule of Procedure 15(a)(2) for the purpose of pleading, with sufficient particularity, Defendant's violation of the Tennessee Consumer Protection Act as set forth in Paragraph 45(b) of the Complaint." R. 12, Pg. ID 169. In the same response, Plaintiff requested that "as it pertains to the allegations set forth in Paragraph 45(b), Plaintiff be permitted to Amend the Complaint *upon proper motion* pursuant to Federal Rule of Civil Procedure 15(a)(2)." *Id.* (emphasis added). But, Plaintiff never filed a proper motion to amend his complaint, and this Court has repeatedly held that "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought ... does not constitute a motion within the contemplation of Rule 15(a)." *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 486 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004), *abrogated on other grounds*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011)). For example, in *Kuyat v. BioMimetic*

*Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014), we found that "[b]oth because the plaintiffs did not present an adequate motion and because they did not attach a copy of their amended complaint, the district court did not abuse its discretion in refusing to allow the plaintiffs to amend their complaint based on the final sentence of the plaintiffs' memorandum in opposition." Therefore, the district court did not abuse its discretion in this case by failing to rule on a motion that was never before it. To the extent that we consider remanding the case to provide Plaintiff with an opportunity to amend his second TCPA claim, we do so by reviewing the district court's denial of Plaintiff's Rule 59(e) motion only, rather than on any alleged failure of the district court to grant leave to amend under Rule 15. For the reasons that follow, we find that the district court did not abuse its discretion by denying Plaintiff's Rule 59(e) motion.

In his Rule 59(e) motion, Plaintiff sought to reopen the district court's judgment on his TCPA claim because of Plaintiff's counsel's mistaken impression "that a case management conference was required prior to filing his motion to amend." R. 31, Pg. ID 242. Plaintiff argued that Plaintiff's counsel misunderstood when he was able to seek leave to amend the complaint under the Local Rules and the Federal Rules of Civil Procedure. The district court correctly found that Plaintiff's counsel's misunderstanding of the procedural rules did not satisfy any of the requisite conditions for granting a Rule 59(e) motion. The court stated:

> Plaintiff's argument is nonsensical. The Federal Rules of Civil of Procedure do not state that a party must wait to seek leave to amend a complaint until an initial case management conference. In fact, they allow just the opposite. Under Rule 15(a)(1)(B), a party may amend its pleading "as a matter of course if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Therefore, Plaintiff did not even need to seek leave but instead could have directly responded to Defendant's motion to dismiss with an amended complaint. In addition, under Rule 15(a)(2), a party can amend its pleading with the opposing party's written consent or the court's leave. Rule 15(a)(2) does not say that a party must wait until after an initial case **\*258** management conference to move for such relief. Nothing in the Local Rules impairs Plaintiff's right to amend his complaint or seek leave to do so before the initial case management conference. Nor could it. "[L]ocal rules may not displace the Federal Rules

of Civil Procedure." *Wilson v. City of Zanesville*, 954 F.2d 349, 352 (6th Cir. 1992).

R. 35, Pg. ID 261–62. The district court concluded that "[b]ecause Plaintiff—through a proper understanding of the Federal Rules of Civil Procedure—could have easily avoided the outcome in this case ... a manifest injustice has not occurred." *Id.* at Pg. ID 262.

We agree with the district court. Trial counsel's misunderstanding of the Federal Rules is not the type of "manifest injustice" at which Rule 59(e) is directed. This Court has repeatedly held that trial counsel's strategic mistakes do not justify reopening a judgment. *See, e.g.*, *Michigan Flyer LLC v. Wayne Cty. Airport Auth.*, 860 F.3d 425, 431 (6th Cir. 2017); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999); *see also Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018) ("[M]anifest injustice 'does not exist where ... a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered.' ") (citation omitted). These holdings appropriately apply to counsel's misunderstanding of the Federal Rules where the language of the Rules was plain. *See* Fed. R. Civ. P. 15(a)(1) ("A party may amend its pleading once as a matter of course within ... 21 days after service of a motion under Rule 12(b), (e), or (f)...."). Therefore, we hold that the district court did not abuse its discretion by denying Plaintiff's Rule 59(e) motion to alter or amend the judgment on his TCPA claim based on his trial counsel's misunderstanding of the Federal Rules.

### IV. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's judgment granting Defendant's motion to dismiss, and **AFFIRM** the district court's order denying Plaintiff's Rule 59(e) motion to alter or amend the judgment as to his TCPA claim.

### All Citations

797 Fed.Appx. 247, 100 UCC Rep.Serv.2d 1301

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 123 of 520
PageID: 9044
Callegari v. Blendtec, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5808805

2018 WL 5808805
Only the Westlaw citation is currently available.
United States District Court, D. Utah.

Alejandro CALLEGARI, Individually and on
Behalf of All Others Similarly Situated, Plaintiff,

v.

BLENDTEC, INC., Defendant.

Case No. 2:18-cv-308-DB
|
Signed 11/06/2018

**Attorneys and Law Firms**

Bonner C. Walsh, Walsh PLLC, Grangeville, ID, Jon V. Harper, M. Denise Dalton, Harper Law PLC, Salt Lake City, UT, Jon M. Herskowitz, Baron & Herskowitz, Miami, FL, for Plaintiff.

Milo Steven Marsden, Kristen E. Olsen, Dorsey & Whitney LLP, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER

Dee Benson, United States District Judge

**\*1** Before the court is Defendant's Motion to Dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 17.) The Motion has been fully briefed by the parties, and the court has considered the facts and arguments set forth in those filings. Pursuant to civil rule 7-1(f) of the United States District Court for the District of Utah Rules of Practice, the Court elects to determine the motion on the basis of the written memoranda and finds that oral argument would not be helpful or necessary. DUCivR 7-1(f).

## FACTS

The court, as it must, accepts all well-pleaded factual allegations in the Complaint as true for purposes of Defendant's motion. *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009).

Defendant Blendtec, Inc. ("Blendtec") sells a series of blenders, which it markets under its Blendtec trademark. (Complaint, Dkt. No. 2, ¶ 2.) On its website, marketing materials, and product packaging, Blendtec makes representations about the "horsepower"—or "HP"—of its blenders. (*Id.* ¶¶ 3-4.) Blendtec claims the horsepower of each blender falls between 3.0 and 3.8 HP. (*Id.* ¶ 3.)

Prior to filing the Complaint, Plaintiff retained electrical and mechanical engineers to conduct power tests on Blendtec's blenders in their laboratories. (*Id.* ¶ 22.) None of the blenders tested by Plaintiff's consultants exceeded more than 25% of the power output claimed by Blendtec. (*Id.* ¶ 23.)

The named Plaintiff, Mr. Callegari, purchased a "Blendtec Classic 475 120v Blender" "online" in July of 2017. (*Id.* ¶ 10.) Mr. Callegari relied on Blendtec's horsepower representations when making the purchase. (*Id.*) Upon using the blender, Mr. Callegari believed, based on his observations, that the blender was under-powered as compared to the horsepower claims made by Blendtec. (*Id.*) Had Mr. Callegari known that the blender was not as powerful as advertised, he would not have purchased it, or would not have paid as much for it as he did. (*Id.*)

Plaintiff brought this suit on behalf of himself and similarly-situated purchasers of Blendtec blenders. (*Id.* ¶ 1.) In his first cause of action, Plaintiff alleged that Blendtec misrepresented the "performance characteristics," "standard", and "grade" of its blenders, in violation of the Utah Consumer Sales Practices Act ("UCSPA"). (*Id.* ¶¶ 38-47.) In his second cause of action, Plaintiff alleged that Blendtec's horsepower representations were express warranties, which Blendtec breached pursuant to U.C.A. §§ 70A-2-313 and 70A-2A-210. (*Id.* ¶¶ 48-53.) In his third cause of action, Plaintiff alleged that Blendtec's blenders did not conform to the representations on their packaging, thus breaching the implied warranty of merchantability pursuant to U.C.A. §§ 70A-2-314 and 70A-2A-212. (*Id.* ¶¶ 54-61.) In his fourth cause of action, Plaintiff alleged a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., premised on Blendtec's breach of express written warranties. (*Id.* ¶¶ 62-68.) In his fifth and sixth causes of action, Plaintiff alleged a breach of express and implied warranty, presumably pursuant to common law principles. (*Id.* ¶¶ 69-76.)

## DISCUSSION

**\*2** "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial,

2018 WL 5808805

but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). Under Rule 12(b)(6), the court must accept all well-pleaded allegations in the Amended Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) ).

The Court must limit its consideration to the four corners of the Complaint, and any documents attached thereto, and any external documents that are referenced in the Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Plausibility, in the context of a motion to dismiss, constitutes facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In most civil actions, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). However, where a UCSPA claim "arises out of allegations of deception, false misrepresentations and omissions," it is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Jackson v. Philip Morris Inc.*, 46 F.Supp.2d 1217, 1222 (D. Utah 1998). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud, and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Wood v. World Wide Ass'n of Specialty Programs and Schools, Inc.*, 2007 WL 1295994, at *1 (D. Utah April 30, 2007).

*First Cause of Action: Violation of UCSPA*
Defendant first seeks to dismiss Plaintiff's claim for damages under the UCSPA, arguing that the claim does not meet the statutory requirements for pleading a class action for damages

under the statute and that Plaintiff has failed to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). (Dkt. No. 17.)

1. UCSPA Class Action Pleading Requirements

The UCSPA states that a consumer may bring a class action for damages only under limited circumstances. Plaintiff relies on the provision of the UCSPA allowing class action claims for damages "caused by an act or practice specified as violating this chapter by a rule adopted by the enforcing authority under Subsection 13-11-8(2) before the consumer transactions on which the action is based ...." Utah Code Ann. § 13-11-19(4)(a). Plaintiff asserts that the rule "adopted by the enforcing authority under Subsection13-11-8(2)" relevant here is found in the Utah Administrative Code R152-11-3. (Dkt. No. 18.) That Rule, entitled "Bait Advertising/ Unavailability of Goods," reads as follows:

   *3 B. It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to offer to sell consumer commodities when the offer is not a bona fide effort to sell the advertised consumer commodities. An offer is not bona fide if:

   (1) A supplier uses a statement or illustration in any advertisement which would create in the mind of a reasonable consumer a false impression of the grade, quality, quantity, make, value, model, year, size, color, usability, or origin of the consumer commodities offered or which otherwise misrepresents the consumer commodities in such a manner that, on subsequent disclosure or discovery of the true facts, the consumer is diverted from the advertised consumer commodities to other consumer commodities. An offer is not bona fide, even though the true facts are made known to the consumer before he views the advertised consumer commodities, if the first contact or interview is secured by deception.

UAC R152-11-3.

Plaintiff did not include any reference to R152-11-3 in his Complaint. Plaintiff alleged that he was offered a "powerfully advanced" blender with a horsepower between 3.0 and 3.8 HP, but that when he tested the blender, it fell far short of the horsepower claims on the product's packaging and Blendtec's website. (Compl. ¶ 3.) Plaintiff also alleged that Defendant misrepresented the "performance characteristics", "standard", and "grade" of its blenders. (*Id.* ¶ 45.) However,

Callegari v. Blendtec, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 5808805

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 125 of 520
PageID: 9046

Plaintiff did not allege that he was diverted from the product advertised by Blendtec to some other product. He only stated that he would not have purchased the product, or would have paid less for it, had he known that the blender was not as powerful as advertised. (*Id.* ¶ 10.)

R152-11-3 is a prohibition against bait and switch advertising tactics. It is labeled as such, and it requires that a consumer be "diverted from the advertised consumer commodities to other consumer commodities" for a seller's conduct to violate the rule. Plaintiff did not allege bait and switch tactics in his Complaint, nor does he provide any additional facts in his briefing to show that a bait and switch occurred. Plaintiff alleged false advertising, which he believes caused damages to a class of consumers. But the facts alleged by Plaintiff do not constitute the bait and switch advertising tactics prohibited by R152-11-3.

Plaintiff has also failed to plead or provide to the court any other applicable rule that Blendtec may have violated. Accordingly, Plaintiff has failed to plead damages "caused by an act or practice specified as violating this chapter by a rule adopted by the enforcing authority" required to bring a class action for damages under the UCSPA. Plaintiff has not alleged or relied upon any of the other limited circumstances allowing a plaintiff to bring a class action for damages under the UCSPA. Thus, Plaintiff has not met the requirements for pleading a class action for damages under the UCSPA.

Having so decided, the court must now determine whether the class action pleading requirements of the UCSPA are preempted by Rule 23 of the Federal Rules of Civil Procedure. In *Shady Grove Orthopedic Assoc., P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), the Supreme Court issued a plurality opinion addressing the applicability of a federal rule in a diversity suit where a potentially conflicting state rule exists. The two-step analysis set forth by the concurrence requires the court to first determine "whether the scope of the federal rule is 'sufficiently broad' to 'control the issue' before the court, 'thereby leaving no room for the operation' of seemingly conflicting state law." *Shady Grove*, 559 U.S. at 421, 130 S.Ct. 1431. "When conducting this analysis, the Federal Rules should be given their plain meaning." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162-63 (10th Cir. 2017). The court must "consider whether the rule can reasonably be interpreted to avoid [abridging, enlarging, or modifying a state substantive right]." *Shady Grove*, 559 U.S. at 422-23, 130 S.Ct. 1431. "There is a conflict only if there

is a 'direct collision' between federal and state law—one that is 'unavoidable.'" *Racher*, 871 F.3d 1163 (citations omitted). "If the state and federal rules 'can exist side by side, ... each controlling its own intended sphere of coverage,' there is no conflict." *Id.*

**\*4** Here, the court finds no conflict between Federal Rule of Civil Procedure 23 and Utah Code Ann. § 13-11-19(4)(a). The language of Rule 23 may be read to be permissive: "a class action *may* be maintained...." Fed. R. Civ Proc. 23 (emphasis added); *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prods. Liab. Litig.*, 288 F.Supp.3d 1087, 1254-55 (D.N.M. 2017). Rule 23 does not explicitly set forth exclusive procedural requirements for maintaining a class action. Accordingly, in light of the court's directive to avoid collision where possible, Rule 23 and § 13-11-19(4)(a) are not in direct conflict and may be enforced side by side.

Having found no direct conflict between the state and federal rules, the court need not proceed under the *Shady Grove* analysis and must instead proceed under the doctrine set forth in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See Racher*, 871 F.3d at 1163. "In diversity cases, the *Erie* doctrine instructs that federal courts must apply state substantive law and federal procedural law." *Id. at 1162*. To determine whether a state law is substantive or procedural, the court "must decide whether applying the law will significantly affect the outcome of the litigation." *Id. at 1164*. A substantive state law "bears on a State-created right vitally and not merely formally or negligibly," or "intimately affect[s] recovery or non-recovery." *Id.* Even "applicable burdens, defenses, and limitations" may be substantive where "state law creates a cause of action [and] defines the scope of that cause of action." *Id. at 1164-65*.

Here, the court finds that pleading a violation of a rule as described in the UCSPA in order to maintain a class action for damages is substantive law under the *Erie* doctrine. Allowing class actions for damages to proceed without first requiring a showing that the alleged misconduct was "an act or practice specified as violating [the UCSPA] by a rule adopted by the enforcing authority" would dramatically expand the scope of class actions allowed under the UCSPA. In many cases, the availability of a class action mechanism significantly affects recovery or non-recovery as a practical matter. Furthermore, the state legislature specifically set forth the rights and remedies available under the UCSPA and the limited circumstances under which a class action for damages would be allowed. "Failing to enforce such

2018 WL 5808805

attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts, contrary to *Erie*'s command. The result would be an 'inequitable administration' of the law." *Racher*, 871 F.3d at 1165 (citations omitted).

Because the requirement that a plaintiff allege "an act or practice specified as violating [the UCSPA] by a rule adopted by the enforcing authority" is a substantive state law, it must be enforced in this case in order to avoid inequitable administration of the law. Accordingly, Plaintiff's class action claim for damages under the UCSPA is dismissed for failure to plead "an act or practice specified as violating [the UCSPA] by a rule adopted by the enforcing authority."

### 2. Rule 9(a) Pleading Requirements

Even assuming that Plaintiff could satisfy the UCSPA requirements for pleading a class action for damages, Plaintiff's UCSPA claims would nevertheless fail for failure to comply with Federal Rule of Civil Procedure 9(b). When a Complaint "alleges the kind of misrepresentations, omissions, or other deceptions covered by the term 'fraud' in its broadest dimension," it must satisfy the heightened pleading requirements of Rule 9(b). *Williams v. State Farm Ins. Co.*, 656 P.2d 966, 972 (Utah 1982); *see also Goodwin v. Hole No. 4, LLC*, No. 2:06-cv-00679, 2006 U.S. Dist. LEXIS 86157 at *24, 2006 WL 3327990 at *7 (D. Utah Nov. 15, 2006)(Cassell, P.) ("Allegations of deception under the UCSPA fall within Rule 9(b)'s requirement of pleading with particularity."). Plaintiff here alleges that Defendant deceived consumers by making misrepresentations on packaging and on its website about the horsepower of its blenders. His pleading must, therefore, meet the heightened pleading standard of Rule 9(b).

**\*5** Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud, and must set forth the time, place, and contents of the false representation, the identity of the party making the representations and the consequences thereof." *Wood v. World Wide Ass'n of Specialty Programs and Schools, Inc.*, 2007 WL 1295994, at *1 (D. Utah April 30, 2007) (Stewart, J.) (internal quotation marks omitted).

Here, Plaintiff alleged that Blendtec made representations that the "horsepower"—or "HP"—of its blenders fell between 3.0 and 3.8 HP, on "its product packaging, in its point of sale and marketing materials, and on Blendtec's website." (*Id.* ¶¶ 3-4.) Plaintiff also alleged that those horsepower representations were false, based on his testing of "Blendtec's Blenders." (*Id.* ¶ 6.) The named Plaintiff, Mr. Callegari, purchased a " 'Blendtec Classic 475 120v Blender' online" in July of 2017. (*Id.* ¶ 10.) Plaintiff alleged that "the product packaging of each and every Blendtec Blender" includes "specific 'Peak HP' claims" and that Mr. Callegari "relied on the representations on the Blender's packaging and on Blendtec's website about the Blender's horsepower" when making his blender purchase. (*Id.* ¶¶ 10, 15.) Plaintiff further alleged that "[h]ad Mr. Callegari known that the horsepower representations were false and that the Blender was not as powerful as advertised and represented, he would not have purchased the Blender or paid as much as he did for it." (*Id.*)

The Complaint did not identify where Mr. Callegari purchased his blender (other than that it was an "online" purchase) or where he observed the allegedly false statements prior to the purchase (only that "each and every" blender package contained horsepower representations). Plaintiff also failed to allege any specific misrepresentations made about the blender Mr. Callegari purchased—the Blendtec Classic 475 120v Blender. Although the Complaint included photographs of the packaging of some Blendtec blenders, they are devoid of any specific reference to the Blendtec Classic 475 120v Blender. (*See id.* ¶ 15.) Dates and times of the allegedly misleading statements at issue are also absent from the Complaint—other than the inclusion of a general allegation that Mr. Callegari purchased his blender "in July of 2017." (*Id.* ¶ 10.)

Plaintiff's broad assertions regarding the packaging and advertisements of Defendant's products generally are insufficient to satisfy Rule 9(b). The Complaint did not specifically set forth the "who, what, when, where and how" of Mr. Callegari's purchase, or of any specific blender. Rather, Plaintiff made general statements regarding Defendant's advertising practices with respect to all of its blenders. Such generalizations are insufficient to satisfy the heightened pleading standards of Rule 9. Accordingly, even assuming that Plaintiff could satisfy the class action pleading requirements of the UCSPA, his UCSPA claim is properly dismissed for failure to satisfy Rule 9(b).

## Second and Third Causes of Action: Breach of Warranty under the Utah UCC

Defendant next seeks to dismiss Plaintiff's Breach of Express and Implied Warranty Claims under the Utah Uniform Commercial Code ("Utah UCC") for failure to comply with the notice requirements of the statute. (Dkt. No. 17 at 10-12.) The Utah UCC provides that "[w]here a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Utah Code Ann. § 70A-2-607(3)(a). Thus, "a buyer's ability to recover damages for a seller's breach, when the goods have been accepted, is limited by the notification requirements of § 70A–2–607(3)." *Salt Lake City Corp. v. Kasler Corp.*, 855 F.Supp. 1560, 1567 (D. Utah 1994); *c.f. Mawhinney v. Jensen*, 120 Utah 142, 154, 232 P.2d 769, 776 (Utah 1951) ("timely notice is a vital condition precedent to an action for breach of warranty.").

 **\*6**  The Complaint made no mention of § 70A-2-607. Plaintiff argues, however, that the notice requirements have been satisfied because "Blendtec had both actual knowledge of the falsity of its horsepower representations and had, at a minimum, reason to know that its horsepower claims were greatly inflated." (Dkt. No. 18 at 10-11.) Plaintiff has provided no case law to support his position that knowledge of the falsity of statements is sufficient to satisfy the notice requirements of § 70A-2-607.

Rather, in support of this argument, Plaintiff cites to Utah Code Ann. § 70A-1a-202, which states that "a person has 'notice' of a fact if the person (a) has actual knowledge of it; (b) has received a notice or notification of it; or (c) from all the facts and circumstances known to the person at the time in question, has reasons to know that it exists." While Plaintiff has correctly identified a general statement of law regarding notice in the state of Utah, the more specific language of § 70A-2-607 precludes its application. Section 70A-2-607 requires that "*the buyer* must ... notify the seller of breach or be barred from any remedy." Utah Code Ann. § 70A-2-607(3)(a) (emphasis added). Section 70A-2-607 places an affirmative burden on a would-be plaintiff prior to his filing suit, rather than merely requiring that a defendant be on notice of a breach.

Plaintiff has not alleged that he gave Defendant notice of the alleged breach of express or implied warranty. Accordingly, Plaintiff's claims for breach of express and implied warranty under the Utah UCC are dismissed for failure to comply with the notice requirements of Utah Code Ann. § 70A-2-607(3)(a).

## Fifth and Sixth Causes of Action: Breach of Express and Implied Warranty

Defendant next moves to dismiss Plaintiff's fifth and sixth causes of action for breach of common law express and implied warranties. The Utah UCC was enacted to "simplify, clarify, and modernize the law governing commercial transactions" as well as to "make uniform the law among the various jurisdictions." Utah Code Ann. § 70A-1a-103. Principles of law or equity in place prior to its enactment remain intact "unless displaced by the particular provisions" of the Utah UCC. *Id.* The Utah UCC specifically addresses express and implied warranties. *See* Utah Code Ann. §§ 70A-2-313; 70A-2A-210; 70A-2-314; 70A-2A-212. Plaintiff has not provided the court with any basis or support upon which to find that those particular provisions do not displace any prior common law claims for breach of express or implied warranty that might otherwise apply here. Accordingly, the court finds that the common law breach of warranty claims pled by Plaintiff are barred by the Utah UCC.

## Fourth Cause of Action: Breach of Warranty under the Magnuson-Moss Warranty Act

Finally, Plaintiff's fourth cause of action is a claim of breach of warranty pursuant to the Magnuson-Moss Warranty Act ("MMWA"). Plaintiff concedes that this claim is dependent upon a valid state law warranty claim. *See Spence v. Basic Research*, No. 2:16-CV-925-CW, 2018 WL 1997310, at *5 (D. Utah Apr. 27, 2018). Because the court has dismissed Plaintiff's breach of warranty claims, Plaintiff's MMWA must be dismissed as well.

## CONCLUSION

For the reasons articulated in this Memorandum Decision and Order, Defendant's Motion to Dismiss is hereby GRANTED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5808805

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 129 of 520
PageID: 9050
Community Spirit Bank v. Fidelity National Title Insurance... Not Reported in Fed....
2009 WL 10688141

2009 WL 10688141
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Northwestern Division.

COMMUNITY SPIRIT BANK, Plaintiff,

v.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK and
Prince Brothers, Inc., Defendants.

Civil Action No. CV-09-S-430-NW
|
Signed 06/22/2009

**Attorneys and Law Firms**

Jeffrey L. Bowling, Bedford Rogers & Bowling PC,
Russellville, AL, for Plaintiff.

James A. Bradford, Marcus R. Chatterton, Balch & Bingham
LLP, Birmingham, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

DUDLEY H. BOWEN, United States District Judge Sitting
by Designation

 **\*1**  Plaintiff, Community Spirit Bank, commenced this
action in the Circuit Court of Franklin County, Alabama, on
January 26, 2009, asserting claims of breach of contract and
unjust enrichment. [1] Plaintiff named Fidelity National Title
Insurance Company of New York ("Fidelity") and Prince
Brothers, Inc. ("Prince Brothers") as defendants in the case.
Fidelity removed the action to this court on March 4, 2009,
based solely on its allegation that diversity jurisdiction exists
in the federal court. [2] In the notice of removal, Fidelity
asserted that Prince Brothers, which is a resident of the State
of Alabama, was fraudulently joined as a defendant.

[1]      See doc. no. 1 (Notice of removal), Ex. 1
(Complaint).

[2]      Id.

Plaintiff filed a motion to remand this action to state court
on April 3, 2009, contesting Fidelity's assertion that Prince
Brothers was fraudulently joined. [3]

[3]      See doc. no. 5.

## I. STANDARD OF REVIEW

Federal district courts are " 'empowered to hear only those
cases within the judicial power of the United States as defined
by Article III of the Constitution,' and which have been
entrusted to them by a jurisdictional grant authorized by
Congress." University of South Alabama v. The American
Tobacco Co., 168 F.3d 405, 409 (11th Cir. 1999) (quoting
Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994)); see
also, e.g., Morrison v. Allstate Indemnity Co., 228 F.3d 1255,
1260-61 (11th Cir. 2000) ("Federal courts have limited subject
matter jurisdiction, or in other words, they have the power
to decide only certain types of cases.") (citing University of
South Alabama, 168 F.3d at 409-10). Accordingly, removal
statutes must be construed narrowly, and "all uncertainties
as to removal jurisdiction are to be resolved in favor of
remand." Russell Corp. v. American Home Assurance Co.,
264 F.3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor
Insurance Co., 31 F.3d 1092, 1095 (11th Cir. 1994)).

## II. BACKGROUND

At the time of the incidents giving rise to this lawsuit, plaintiff
was a state bank with its principal place of business in Red
Bay, Alabama. [4] Fidelity was a title insurance company with
its primary place of business in New York. [5] Prince Brothers
was an authorized agent of Fidelity with its principal place of
business in Russellville, Alabama. [6]

[4]      See doc. no. 1 (Notice of removal), Ex. 1
(Complaint), at 1, ¶ 1.

[5]      Id., Ex. 1 at 1, ¶ 2.

[6]      Id., Ex. 1 at 1, ¶ 3.

Plaintiff alleges that in or around July 1998, it requested
that Prince Brothers issue a title insurance policy to insure
a first mortgage lien on certain real property in Franklin
County, Alabama, that would secure a construction loan it
planned to issue. [7] Plaintiff characterizes Prince Brothers
as an authorized agent for Fidelity and asserts that Prince
Brothers, acting as an agent for Fidelity, subsequently issued
a commitment for title insurance. [8] Plaintiff further alleges

Community Spirit Bank v. Fidelity National Title Insurance..., Not Reported in Fed....

2009 WL 10688141

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 130 of 520
PageID: 9051

that "[a]t the closing of the construction loan, Prince Brothers, Inc., was paid a premium for the Commitment, whereupon Prince Brothers, Inc., as an agent for Fidelity National, issued its title insurance policy...."[9]

[7]  *Id.*, Ex. 1 at 2, ¶ 2.

[8]  *Id.*

[9]  *Id.*, Ex. 1 at 4, ¶ 14.

**\*2**  This action arises from plaintiff's claims that Prince Brothers and Fidelity breached the title insurance policy and received unjust enrichment from their alleged failure to defend plaintiff in a prior lawsuit related to the real property covered by the title insurance policy.

### III. DISCUSSION

Jurisdiction under 28 U.S.C. § 1332 requires "complete diversity"—the citizenship of every plaintiff must be diverse from the citizenship of every defendant. *See, e.g., Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1564 (11th Cir. 1994) (citing *Strawbridge v. Curtiss*, 3 Cranch (7 U.S.) 267, 2 L.Ed. 435 (1806)); *Henderson v. Washington Nat. Ins. Co.*, 454 F.3d 1278, 1281 (11th Cir. 2006) ("When a defendant removes a case to federal court on diversity grounds, a court must remand the matter back to state court if any of the properly joined parties in interest are citizens of the state in which the suit was filed."). An action may nevertheless be removable if the joinder of non-diverse parties is deemed to have been "fraudulent": *i.e.*, for the purpose of defeating federal jurisdiction. *See, e.g., Wilson v. Republic Iron and Steel Co.*, 257 U.S. 92, 97 (1921) (holding that a diverse defendant's "right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy").

The filing of a frivolous or other illegitimate claim against a non-diverse defendant is characterized as "fraudulent joinder," and a district court may disregard the citizenship of such defendants. *See Florence v. Crescent Resources, LLC*, 484 F.3d 1293, 1297 (11th Cir. 2007) ("if a defendant shows that 'there is no possibility the plaintiff can establish a cause of action against the resident defendant,' then the plaintiff is said to have fraudulently joined the non-diverse defendant.") (quoting *Henderson*, 454 F.3d at 1281). The doctrine of fraudulent joinder thus is an exception to the requirement that parties must be completely diverse, and provides that

an action may be removed from state court, despite a lack of complete diversity of citizenship among the parties, if the plaintiff's joinder of a non-diverse party was fraudulent. *See, e.g., Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

Traditionally, courts have deemed a joinder to be "fraudulent" in two situations: "The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant.... The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts." *Triggs*, 154 F.3d at 1287; *see also, e.g., Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1380 (11th Cir. 1998) ("In a removal case alleging fraudulent joinder, the removing party has the burden of proving either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court.") (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997)). The Eleventh Circuit also has identified a third type of fraudulent joinder: when "a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant." *Triggs*, 154 F.3d at 1287 (citing *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *overruled on other grounds by Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000)).

**\*3**  Fidelity relies only on the first ground to support its allegation of fraudulent joinder: *i.e.*, that there is no possibility plaintiffs can establish a cause of action against the resident defendant, Prince Brothers. Under this standard,

"[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir. 1983), *superceded by statute on other grounds as stated in Wilson v. General Motors Corp.*, 888 F.2d 779 (11th Cir. 1989). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." *Triggs*, 154 F.3d at 1287 (emphasis in original).

*Tillman v. R.J. Reynolds Tobacco*, 253 F.3d 1302, 1305 (11th Cir. 2001) (*per curiam*) (emphasis in original) (affirming district court's dismissal of five individual defendants who

had employed by R.J. Reynolds in the promotion, advertising, and sale of cigarettes within Alabama as fraudulently joined for purpose of defeating diversity jurisdiction).

The burden of proving fraudulent joinder rests with the removing defendant. *See Crowe*, 113 F.3d at 1538. The claim must be supported by clear and convincing evidence. *Parks v. New York Times*, 308 F.2d 474, 478 (5th Cir. 1962). [10] When determining whether a defendant has been fraudulently joined, the court must examine the plaintiff's pleadings on the date the notice of removal was filed, [11] although it also may consider affidavits and deposition testimony submitted by the parties. *See, e.g., Pacheco de Perez*, 139 F.3d at 1380. However, "the jurisdictional inquiry 'must not subsume substantive determination.' ... When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Crowe*, 113 F.3d at 1538 (citing *B, Inc. v. Miller Brewing Co.*, 663 F.2d 545, 548-49 (5th Cir. Unit A 1981)). Further, as with a Rule 56 motion for summary judgment, courts must evaluate all the evidence in the light most favorable to the plaintiff—the party opposing removal —resolving any uncertainties about the applicable laws in the plaintiff's favor. *See Pacheco de Perez*, 139 F.3d at 1380.

[10]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[11]   As in all other issues concerning removal, "[j]urisdictional facts are assessed on the basis of plaintiff's complaint *as of the time of removal.*" *Burns v. Windsor Insurance Co.*, 31 F.3d 1092, 1097 n.13 (11th Cir. 1994) (emphasis in original) (citations omitted); *see also, e.g., Coker*, 709 F.2d at 1440 ("Removability should be determined 'according to the plaintiff's pleading at the time of the petition for removal.' ") (citations omitted); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989) (same).

It follows from the foregoing propositions that a defendant's burden when seeking to establish fraudulent joinder is a heavy one: "[w]here a plaintiff states *even a colorable claim* against the resident defendant, joinder is proper and the case should be remanded to state court." *Id.* (emphasis supplied) (citing

*Crowe*, 113 F.3d at 1538); *see also Florence*, 484 F.3d at 1299 ("if there is any possibility that the state law might impose liability on a resident defendant under the circumstances alleged in the complaint, the federal court cannot find that joinder of the resident defendant was fraudulent, and remand is necessary.").

**\*4**  Applying the foregoing principles, this court concludes that plaintiff fails to state possible causes of action for breach of contract and unjust enrichment against non-diverse defendant Prince Brothers.

## A. Breach of Contract

In order to state a claim for breach of contract under Alabama law, plaintiff must establish the " '(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.' " *Ex parte Jackson County Bd. of Educ.*, 4 So. 3d 1099, 1103 (Ala. 2008) (quoting *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105-06 (Ala. 2002)). Plaintiff and Fidelity agree that Alabama law does not impose contract obligations upon an agent who contracts on behalf of a disclosed principal. Stated another way, Alabama law is well established that if an agent successfully binds a principal in contract, the agent is not liable unless there is a clear intention to add or impose his personal liability. *See Ricwil, Inc. v. S.L. Pappas & Co.*, 599 So. 2d 1126, 1129 (Ala. 1992) (" 'The general rule in Alabama concerning liability of an agent for the breach of contract entered on behalf of a disclosed principal is that the agent binds either the principal or himself to the contract, but not both.' ") (quoting *Shirley v. Lin*, 548 So. 2d 1329, 1333 (Ala. 1989)); *Sealy v. McElroy*, 288 Ala. 93, 104, 257 So. 2d 340, 350 (1972) ("An agent is presumed to intend to bind his principal only and to incur no personal liability and unless an intention to substitute or superadd his personal liability for or to that of his principal is clearly shown, he will not be bound in his individual capacity.").

Here, plaintiff argues that a state court could find that Prince Brothers was a party to the subject title insurance policy because the title commitment was countersigned by Larry Prince of Prince Brothers as an "Authorized Signature" and all of the documents contain the corporate seals of both Prince Brothers and Fidelity. Plaintiff contends that "[t]here is no indication that Prince Brothers is signing in a mere agency capacity" for Fidelity. [12] This argument fails because in its complaint plaintiff alleges that "Prince Brothers, Inc., as an agent for Fidelity National, issued its title insurance policy,"

Community Spirit Bank v. Fidelity National Title Insurance..., Not Reported in Fed....
2009 WL 10688141

and under Alabama law an agent need not intentionally opt out of its agency capacity to avoid personal liability.[13] *See Mobile Ins., Inc. v. Smith*, 441 So. 2d 894, 897 (Ala. 1983) (" 'Where a complaint declares on a contract as made with the plaintiff by one of the defendants as the agent of another defendant, it states no cause of action against the agent defendant.' ") (quoting *Gillis v. White*, 214 Ala. 22, 106 So. 166 (1925)). Likewise, the insurance policy does not indicate that Prince Brothers intended to substitute its personal liability for that of Fidelity.

[12]    Doc. no. 5 at 3.

[13]    In its complaint, plaintiff identified Prince Brothers as Fidelity's "authorized agent" more than seven times. *See e.g.*, doc. no. 1, Ex. 1 at 1-2 ("Fidelity National does business through its authorized agent in Franklin County, Alabama") and ("Prince Brothers, Inc. acted as an authorized agent for Fidelity National.")

## B. Unjust Enrichment

**\*5**  Plaintiff also contends that its claim of unjust enrichment states a viable cause of action against Prince Brothers. Plaintiff asserts that it is universal procedure in the title insurance industry for the issuing agent to retain a substantial portion of the title insurance premium paid by the insured owner or mortgagee, and that because no costs, attorneys' fees, or expenses were paid on behalf of plaintiff in defending its title in a prior lawsuit, Prince Brothers was unjustly enriched by its retention of a portion of the premium.

This court concludes that plaintiff fails to state a possible cause of action for unjust enrichment against Prince Brothers because under Alabama law unjust enrichment is an equitable remedy available only when no remedy at law exists and, in this case, plaintiff has a legal remedy under its breach of contract claim against Fidelity. The Alabama Supreme Court has described unjust enrichment as " 'an old *equitable* remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.' " *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003) (quoting *Battles v. Atchison*, 545 So. 2d 814, 815 (Ala. Civ. App. 1989) (emphasis original)). As an equitable remedy, unjust enrichment is available only where there is no adequate remedy at law. *See Northern Assur. Co. of America v. Bayside Marine Const., Inc.*, No. 08-222-KD-B, 2009 WL 151023, at

\*4 (S.D. Ala. Jan. 20, 2009) ("Alabama law makes clear that unjust enrichment is an equitable remedy only to be invoked where there is no available remedy at law.") (citing *Mantiply v. Mantiply*, 951 So. 2d 638, 654-55 (Ala. 2006) (" '[w]hen an express contract exists, an argument based on a *quantum meruit* recovery in regard to an implied contract fails.' ") (quoting *Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 921 (Ala. 2002)); *Teleprompter of Mobile, Inc. v. Bayou Cable TV*, 428 So. 2d 17, 20 (Ala. 1983) ("an injunction, like any other equitable remedy, will only issue where there is no adequate remedy at law" (citing *Watts v. Victory*, 333 So. 2d 560 (Ala. 1976))); *American Family Care, Inc. v. Irwin*, 571 So. 2d 1053, 1061 (Ala. 1990) ("Equity is a system of remedies that evolved to redress wrongs that were not recognized by or adequately righted by the common law.").

Because plaintiff's claim of unjust enrichment against Prince Brothers arises from an alleged breach of the title insurance policy (failure to defend), an adequate remedy at law for damages exists under plaintiff's breach of contract claims against Fidelity. *See Northern Assurance Co. of America*, No. 08-222-KD-B, 2009 WL 151023, at \*4-5 (holding that unjust enrichment claims based on plaintiff's receipt of benefits of the insurance premiums were precluded because an adequate remedy at law for damages existed under claims of breach of contract and bad faith denial of coverage); *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1278 (M.D. Ala. 2007) (dismissing an unjust enrichment claim because plaintiff had an adequate remedy at law for damages under a theory of breach of contract).

## IV. CONCLUSION

In summary, this court finds that plaintiff has failed to bring a possible cause of action against non-diverse defendant Prince Brothers under the circumstances alleged in its complaint. Accordingly, Prince Brothers was fraudulently joined and, all claims against it are DISMISSED with prejudice. Plaintiff's motion to remand is DENIED.

DONE this 22nd day of June, 2009.

## All Citations

Not Reported in Fed. Supp., 2009 WL 10688141

2009 WL 10688141

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

2018 WL 2744976
Only the Westlaw citation is currently available.
United States District Court, D. Rhode Island.

DANIELE INTERNATIONAL, INC., Plaintiff,

v.

SABRA DIPPING COMPANY, LLC, Defendant.

C.A. No. 17−499 WES
|
Signed 06/07/2018

**Attorneys and Law Firms**

Brenna Anatone Force, Richard R. Beretta, Jr., Geoffrey W. Millsom, Adler Pollock & Sheehan PC, Providence, RI, for Plaintiff.

Luana DiSarra Scavone, Litchfield Cavo, LLP, Lynnfield, MA, Samuel A. Kennedy-Smith, Audrey L. Bradley, Litchfield Cavo, LLP, Providence, RI, Nicholas J. Parolisi, Jr., Pro Hac Vice, Litchfiled Cavo, LLP, Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge

I. Introduction
 **\*1** Plaintiff Daniele International, Inc. ("Plaintiff" or "Daniele") contracted with Defendant Sabra Dipping Company, LLC ("Defendant" or "Sabra") for Sabra to provide hummus to be included in Daniele's Sabra Party Platter Select ("party platter"). The deal went bad because the hummus went bad (it was allegedly infested with Listeria, which tainted the entire platter). As a result, Daniele brings a multi-count state-law Complaint (ECF No. 1); Sabra moves to dismiss (ECF No. 10) Daniele's claims for strict products liability (Count III), common law indemnification (Count VII), tortious interference with contractual relations (Count VIII), tortious interference with business expectancy (Count IX), and negligent misrepresentation (Count X).

In a hearing on April 4, 2018, the Court denied Sabra's Motion with respect to Count VII, dismissed Counts VIII and IX, and took under advisement Counts III and X. This Memorandum and Order addresses Counts III and X.

II. Background [1]
[1]    Because this is a motion to dismiss and the Court "assume[s] the truth of all well-pleaded facts and indulge[s] all reasonable inferences therefrom that fit the Plaintiff's stated theory of liability," Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002), this section describes the facts as Daniele alleges them.

Since 1945, Daniele has produced and distributed premium gourmet specialty foods, "buil[ding] a reputation for quality." (Pl.'s Compl. ("Compl.") ¶¶ 6, 9, ECF No. 1.) This quality was called into doubt when Sabra allegedly provided Listeria-infested hummus to be included in Daniele's party platter. (Id. ¶¶ 29–30.)

In 2016, Daniele and Sabra agreed that Sabra would provide Daniele packages of hummus to be incorporated into its party platter, which Daniele packaged and distributed. (Id. ¶ 11.) In connection with the parties' agreement, Sabra effectuated a Product Guaranty and Indemnification Agreement, through which it promised to provide untainted products fit for their forecasted purpose. (Id. ¶¶ 12–13.) Moreover, with respect to any potential product recalls, Sabra promised to accept back any faulty products for a full refund. (Id. ¶ 14.)

In October 2016, the United States Food and Drug Administration ("FDA") inspected Sabra's manufacturing facility in Colonial Heights, Virginia. (Id. ¶ 23.) This inspection revealed that the facility was contaminated by the presence of Listeria monocytogenes, a substance harmful to humans if ingested. (Id. ¶ 24.) On November 19, 2016, the FDA directed that Sabra recall various hummus products manufactured before November 8, 2016, in light of the presence of Listeria; on November 23, 2016, the FDA's directive ("2016 Recall") was updated to include the party platter. (Id. ¶¶ 29–30.) The November 23 update recalled the entire party platter due to the risk that the Listeria-infested hummus may have cross-contaminated the other party-platter products. (Id. ¶ 30.) The 2016 Recall was extensively publicized by national media outlets – outlets that also assigned Daniele a role in the Listeria outbreak. (Id. ¶¶ 30–32.)

 **\*2** Daniele contends that it has lost a considerable investment (more than $750,000) in preparing for the party platter "production line" – money that it would not have spent, and equipment that it would not have purchased, but for the party platter's production. (Id. ¶¶ 16–20.) For instance,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 136 of 520
PageID: 9057
Daniele International, Inc. v. Sabra Dipping Company, LLC, Not Reported in Fed. Supp....

Daniele purchased two meat-slicing machines, which were only useful in producing the party platter. (Id. ¶ 17.) In addition, because of the 2016 Recall, Daniele was faced with substantial expenses including back charges from retailers who had received party platters and returned them. (Id. ¶ 33.) Sabra's recalled hummus also forced Daniele to discontinue making its party platters altogether, which, in turn, left Daniele with substantial inventory that it had no use for, as well as twenty employees that it had to let go. (Id. ¶¶ 34–36.)

## III. Legal Standard

In assessing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "the district court must 'accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, limns facts sufficient to justify recovery on any cognizable theory.' " Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998)). To overcome a motion to dismiss, a complaint must possess "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## IV. Discussion

Sabra moves to dismiss Daniele's strict-products liability (Count III) and negligent-misrepresentation (Count X) claims. While Sabra's argument may have merit, it is too early to tell.

Sabra's principal attack on both of Daniele's claims is grounded in the "economic-loss doctrine." Under Rhode Island law, this doctrine provides that, "a plaintiff is precluded from recovering purely economic losses in a negligence cause of action." Boston Inv. Property #1 State v. E.W. Burman, Inc., 658 A.2d 515, 517 (R.I. 1995). Notably, the Rhode Island Supreme Court has not answered whether it would apply that doctrine to claims sounding in either strict-products liability or negligent misrepresentation. But as this Court has said before, "it is simply too early in the litigation cycle to determine whether the economic loss doctrine precludes Plaintiff's claim[s,]" and the Court need not venture a guess

on how the Rhode Island Supreme Court would opine. See Lang Pharma Nutrition, Inc. v. Aenova Holding Gmbh, No. 16–371 S, 2017 WL 3327572, at *4 (D.R.I. Aug. 3, 2017); see also Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Health Corp., 221 F. Supp. 3d 227, 237–38 (D.R.I. 2016). "The bottom line is that ... the economic loss doctrine does not bar [Plaintiff's] claims at this stage. It may well come out in discovery that the only basis for the claims is in contract, in which case this could be revisited at summary judgment." Sheet Metal Workers, 221 F. Supp. 3d at 238.

Although too early to tell, it is possible that the economic-loss doctrine is inapposite to the strict-products-liability claim because, as Daniele argues, that doctrine only prohibits economic losses for harm to the defective product itself; here, Daniele alleges, the infested hummus tainted other contents of the party platter (i.e., meats and cheeses). But it is premature to test Sabra's response that "both the hummus and the meats and cheeses are component parts of a single product – the Party Platter." (Def.'s Reply 1–2, ECF No. 15.); see, e.g., Starline Windows Inc. v. Quanex Bldg. Prods. Corp., No. 3:15–cv–01282, 2016 WL 3144060, at *3 (S.D. Cal. June 6, 2016) ("[T]he issue of whether a component part is distinct from the larger product is a fact intensive inquiry inappropriate for resolution on a motion to dismiss."); Digby Adler Grp., LLC v. Mercedes–Benz U.S.A., LLC, No. 14–cv–02349–TEH, 2015 WL 1548872, at *8 (N.D. Cal. Apr. 7, 2015) ("[A]t this early stage of the proceedings, the Court will not bar Plaintiff's claim under the economic loss rule absent sufficient factual development."); KB Home v. Superior Court, 5 Cal. Rptr. 3d 587, 597 (Cal. Ct. App. 2003) ("Resolution of [determining what the product at issue is], however, should be left to the trier of fact." (citations and quotations omitted.) ). Accordingly, Sabra's arguments for dismissal must be denied.

## V. Conclusion

*3 For the reasons outlined above, Sabra's Motion (ECF No. 10) is DENIED with respect to Counts III and X.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 2744976

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

2014 WL 3868022
Only the Westlaw citation is currently available.
United States District Court, D. South
Carolina, Spartanburg Division.

Jay EASLER, individually and as class
representative of others similarly situated, Plaintiff,

v.

HOECHST CELANESE CORPORATION, HNA
Holdings, Inc., CNA Holdings, Inc., Hercules,
Inc., Ashland, Inc., Hystron Fibers, Inc., Messer
Greishiem, Inc., Arteva Specialties S.a.r.l. d/b/
a "KoSo," Johns Manville Corporation, INVISTA
S.a.r.l. d/b/a "Invista," Teijin Monofilament U.S.,
Inc., Teijin Holdings USA, Inc., Auriga Polymers
Inc., Indorama Ventures USA, Inc., Defendants.

Civil Action No. 7:14–00048–TMC.
|
Signed Aug. 5, 2014.

**Attorneys and Law Firms**

Richard A. Harpootlian, Richard A. Harpootlian Law Office,
Graham Lee Newman, Chappell Smith and Arden, Herbert W.
Louthian, Herbert W. Louthian, Jr., Louthian and Louthian,
Columbia, SC, for Plaintiff.

Brian Thomas Stansbury, Akerman LLP, Washington, DC,
Scott Andrew McMillin, Kirkland and Ellis LLP, Stephen
Andrew Swedlow, Quinn Emanuel Urquhart and Sullivan,
Chicago, IL, Weston Adams, III, McAngus Goudelock and
Courie, Newman Jackson Smith, Wendy Wilkie Parker,
Nelson Mullins Riley and Scarborough, Columbia, SC,
Grenville Delorme Morgan, Jr., Mcangus Goudelock and
Courie, Greenville, SC, Benjamin A. Johnson, Robinson
Bradshaw and Hinson, Rock Hill, SC, Christopher David
Smith, Thompson and Knight LLP, Austin, TX, Jonathan
Burton Shoebotham, Ricky Anthony Raven, Thompson and
Knight LLP, Houston, TX, Kevin A. Dunlap, Parker Poe
Adams and Bernstein, Spartanburg, SC, Steven D. Weber,
Parker Poe Adams and Bernstein, Charlotte, NC, G. Mark
Phillips, Nelson Mullins Riley and Scarborough, Ben A.
Hagood, Jr., Moore and Van Allen, Charleston, SC, for
Defendants.

**ORDER**

TIMOTHY M. CAIN, District Judge.

**\*1** The plaintiff, Jay Easler ("Easler"), brought this suit
against the above named defendants for violations of the
Resource Conservation and Recovery Act ("RCRA"), 42
U.S.C. § 6972, private nuisance, public nuisance, and
negligence. Before the court are several motions to dismiss.
(ECF Nos. 18, 20, 21, 22, 23, 24.) The parties have fully
briefed these motions and the court does not see a need for oral
argument. *See* Local Civil Rule 7.08, DSC. For the reasons
that follow, the motions to dismiss are denied. [1]

[1]    This excludes Ashland, Inc.'s, motion to dismiss.
       In his omnibus response to the motions to dismiss,
       Easler stipulates to dismissing Ashland, Inc., as
       a defendant. (ECF No. 48, p. 26.) Accordingly,
       Ashland, Inc.'s, motion to dismiss (ECF No. 21) is
       now MOOT.

**I. BACKGROUND**

Easler lives in a small community in South Carolina's
upstate called Cannon's Campground. Cannon's Campground
is located close to several water sources, including the Pacolet
River, Cherokee Creek, and what the parties refer to as
"Polluted Creek," an unnamed tributary of the Pacolet River.
Just north of Cannon's Campground is an industrial site
that, according to the complaint, has been operational since
1966. Easler alleges that the defendants, Hoechst Celanese
Corporation, HNA Holdings, Inc., and CNA Holdings,
Inc. (collectively "Hoechst"); Hercules, Inc. ("Hercules");
Ashland, Inc. ("Ashland"); Hystron Fibers, Inc. ("Hystron");
Messer Greishiem, Inc.; Arteva Specialties S.a.r.l. d/b/a
"KoSo" ("Arteva"); Johns Manville Corporation ("Johns
Manville"); INVISTA S.a.r.l. d/b/a "Invista" ("Invista");
Teijin Monofilament U.S., Inc.; Teijin Holdings, USA, Inc.;
Auriga Polymers Inc. ("Auriga"); and Indorama Ventures
USA, Inc. ("Indorama"), are previous or current owners
or operators of the site or are otherwise responsible for
damages resulting from toxic waste entering surrounding
surface waters and the groundwater.

Based on the defendants' alleged responsibility for the
contamination, Easler has brought the following causes of

action on behalf of himself and the Cannon's Campground community [2] : (1) RCRA injunctive relief under § 6972, specifically (a) cessation of all activities contributing to the contamination of the groundwater and surface water in the Cannon's Campground community, (b) commencement of a comprehensive and diligent program of delineation and remediation of existing contamination, and (c) institution of community medical monitoring; and (2) state causes of action for (a) public nuisance, (b) private nuisance, and (c) negligence.

[2]     Easler brings this case as a proposed class action. As a motion for class certification is not yet before the court, the court will reserve judgment as to the class allegations in the complaint.

The majority of the defendants have moved to dismiss Easler's complaint, raising various grounds. [3] Hoechst has moved to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) and South Carolina Rule of Civil Procedure 12(b)(6). (ECF No. 18.) In its motion, Hoechst asserts that the court should dismiss (1) Easler's RCRA claims because (a) Easler has failed to properly plead imminent and substantial danger to health or the environment and (b) medical monitoring is not available as a remedy under RCRA and (2) Easler's state law claims because (a) Easler has not pled damages to or interference with his property and (b) those claims are barred by South Carolina's statute of limitations. Hoechst also raises a question as to Easler's standing to bring this suit and, specifically, whether he has suffered an injury in fact. Hercules, Invista, Arteva, Auriga, Indorama, and Johns Manville have joined in Hoechst's motion. (See ECF Nos. 20, 22, 23, 24.)

[3]     The docket reflects that Easler voluntarily dismissed Teijin Monofilament US, Inc., and Teijin Holdings USA, Inc., on January 27, 2014. (See ECF No. 6.) In addition, although both appear on Easler's list of defendants for service (ECF No. 4–1), the docket does not indicate that Hystron Fibers, Inc., or Messer Greishiem, Inc., has accepted service of the complaint or appeared in this case.

**\*2** In addition to joining in Hoechst's motion, Hercules and Johns Manville have asserted independent grounds for dismissal. Both Hercules and Johns Manville contend that Easler has not alleged enough facts regarding their conduct or contribution to the alleged contamination to state claims under

RCRA or state law. Johns Manville also asserts that Easler did not provide sufficient notice under 42 U.S.C. § 6972.

## II. LEGAL STANDARD

Under the federal rules, each pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim should be dismissed when the complaint fails to allege facts upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993). However, "the pleading standard ... demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, the rules require more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. at 678.

In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). And, for a claim to have facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

## III. DISCUSSION

A. Standing [4]

[4]     The court recognizes that the majority of cases cited in this section, if not all of them, were claims brought under the Clean Water Act's ("CWA") citizen suit provision, rather than under RCRA. However, like they have for the CWA's citizen suit provision, courts have interpreted the RCRA's provision for citizen enforcement to grant standing to the full extent allowed under Article III. See, e.g., Maine People's Alliance and Natural Res. Def. Council v. Mallinckrodt, Inc.,

471 F.3d 277, 283 (1st Cir.2006) ("Because there is nothing in RCRA's text or history that suggests a congressional intent to erect statutory standing barriers beyond those imposed by Article III of the Constitution ..., we focus on what is essential to establish Article III standing."). Thus, under either act, the court analyzes standing pursuant to Article III's requirements.

Before addressing the adequacy of Easler's complaint, the court must first determine whether Easler has standing to bring this suit. Article III of the Constitution restricts federal courts to the adjudication of cases and controversies. The standing doctrine upholds this restriction by "ensur[ing] that a plaintiff has a personal stake in the outcome of a dispute, and that judicial resolution of the dispute is appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 629 F.3d 287, 396 (4th Cir.2011) ( *"Gaston II"* ). Thus, "[t]o meet the constitutional requirement for standing, a plaintiff must prove that: 1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision." *Id.*

However, "[i]n the environmental litigation context, the standing requirements are not onerous." *American Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir.2003). Rather, "[i]f the plaintiff can show that his claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and adjudication of his rights." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 155 (4th Cir.2000) ("*Gaston I*").

 **\*3** Here, the defendants have voiced concerns about Easler's assertion of an injury in fact. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Further, "[t]he Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III requirements." *Gaston I,* 204 F.3d at 160; *see e.g., Babbitt v. United Farm Workers Nat'l Unions,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("one does not have to await the consummation of threatened injury to obtain preventative

relief. If the injury is certainly impending that is enough."); *Covington v. Jefferson Cnty.,* 358 F.3d 626, 638–39 (9th Cir.2004) (landowners who lived across from county landfill satisfied Article III injury-in-fact requirement by showing the risks RCRA sought to minimize threatened their enjoyment of life and security of home if landfill not operated as required by RCRA). Thus, "[c]itizens may ... rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Id.* at 163.

That is exactly what Easler has done here. While Easler's property itself has not yet tested positive for contamination, the complaint painstakingly details exactly the type of circumstantial evidence discussed in *Gaston I.* After describing the exact location of Easler's property in relation and proximity to the site, the complaint spends the next fifty-eight pages outlining the site's history of pollution, including the exact chemicals discharged and where those chemicals have been found in the surrounding area over the thirty-one years since the site has been operational. The clear presumption from the complaint's allegations is that over the years, the contamination from the site has migrated and continues to migrate toward Cannon's Campground and Easler's property. Further, the complaint alleges that the contamination has reached Polluted Creek, which directly abuts Easler's property, and that a monitoring well on land adjacent to Easler's tested positive for bedrock contamination. In addition, Easler alleges that, should the contamination reach his property, his well will be unusable and his property will diminish in value. In light of the circumstantial evidence presented, the court finds that Easler has shown an injury in fact fairly traceable to contamination from the site that could be redressed by granting the relief sought in this case.

B. *Statute of Limitations*
In addition to challenging Easler's standing, the defendants assert that his state law claims are barred by South Carolina's three year statute of limitations for injuries to person or property. *See* S.C.Code Ann. § 15–3–350(3), (5). "[A] motion to dismiss filed under Federal Rule of [Civil] Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.2007). However, a court may address a statute of limitations defense in a motion to dismiss "in the relatively rare circumstances where facts sufficient to rule on [the defense] are alleged in the

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 141 of 520
PageID: 9062
Easler v. Hoechst Celanese Corp., Not Reported in F.Supp.3d (2014)
2014 WL 3867022

complaint." *Id.* The defendants believe this is one of those rare occasions.

**\*4** In support of this argument, the defendants point specifically to paragraph 108 of the complaint. That paragraph alleges, in its entirety:

> The residents of the Cannon's Campground community were unaware of any of the details discussed in this notice until November 16, 2010. On that date, WSPA–TV reporter Chris Cato—an employee of the Spartanburg, South Carolina CBS affiliate—began airing a series of reports entitled "Shadow of Sickness" related to cancer rates in the community and the possible relation to pollution emanating from the Site. "Shadow of Sickness" was a five-part series that aired intermittently through May of 2011.

(Compl., ECF No. 1, p. 50, ¶ 108.) Thus, according to the defendants, if the residents of Cannons Campground, including Easler, became aware of the potential violations discussed in the complaint on November 6, 2010, then they had until November 6, 2013, to file a complaint and this complaint was not filed until January 7, 2014.

However, the court does not agree that the complaint presents all of the facts necessary to decide the defendants' statute of limitations defense. For instance, the complaint does not describe the content of each part of the series. And, the description it does give—that the series addressed cancer rates in the community—shows that the report did not directly relate to the claims at issue in this case. The complaint also does not state when or if Easler viewed the series or if the series should have informed him that pollution potentially threatened his property. In sum, despite defendants' assertion, stating that the "residents of the Cannon's Campground community were unaware of *any* of the details" in the complaint until November 16, 2010, is not equivalent to stating that on November 16, 2010, the residents of Cannon's Campground became aware of enough details alleged in the complaint to trigger the statute of limitations. Accordingly,

the court will not address the potential statute of limitations issue at this juncture.

### C. *RCRA Claims*

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). RCRA's primary purpose is to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.' " *Id.* (quoting 42 U.S.C. § 6902(b)). To help further that purpose, RCRA contains a citizen suit provision, which provides that "any person may commence a civil action on his own behalf ... against any person ..., including any past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed to or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

**\*5** The defendants raise two primary challenges to Easler's claims under RCRA: (1) that he has not properly pled an imminent and substantial danger to health or the environment and (2) that his claim for medical monitoring is not an available remedy under the RCRA.

#### 1. *Imminent and Substantial Danger to Health or the Environment*

The majority of courts that have addressed RCRA's imminent and substantial endangerment language have found that it creates a broad standard, "which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Dague v. City of Bulington,* 935 F.2d 1343, 1355 (2d Cir.1991) (emphasis in original); *see also Cordiano v. Metacon Gun Club, Inc. .,* 575 F.3d 199, 210 (2d Cir.2009) ("We have indicated that the 'imminent and substantial endangerment' standard is a broad one."); *Mallinckrodt,* 471 F.3d at 288 (noting that "at least four of our sister circuits have construed [§ 6972(a)(1)(B) ] expansively" and that "all four courts have emphasized the preeminence of the word 'may' in defining the degree of risk needed to support [§ 6972(a)(1)(B)'s] liability standard"). However, the plain language of

the act still requires a plaintiff to show an "imminent" and "substantial" "endangerment."

In its motion to dismiss, Hoechst collapses its standing argument into its assertion that Easler has not properly pled an imminent and substantial danger to health or the environment. Specifically, Hoechst avers that because Easler does not allege an injury in fact, he "does not have standing to assert a claim for imminent and substantial danger." (Hoechst Mot. to Dismiss, ECF No. 18–1, p. 10 .)

The court agrees that Article III's injury in fact requirement and RCRA's imminent and substantial danger standard rely on almost identical considerations. Much like an injury in fact for environmental plaintiffs, "a finding that an activity may present an imminent and substantial harm does not require actual harm." *Price v. U.S. Navy,* 39 F.3d 1011, 1019 (9th Cir.1994) (citing *United States v. Waste Indus., Inc.,* 734 F.2d 159 (4th Cir.1984)). Rather, "[t]he RCRA provision implies that there must be a threat which is present *now,* although the impact of the threat may not be felt until later. Also, endangerment must be substantial and serious, and there must be some necessity for the action." *Id.* (emphasis in original).

Thus, as the court has already found that the complaint sufficiently pleads a present threat of a serious harm to Easler and his property for standing purposes, it also finds that the complaint has presented sufficient evidence of an imminent and substantial danger to health or the environment to state a claim under RCRA.

### 2. *Medical Monitoring*

In addition, the defendants contend that Easler's claim for medical monitoring must fail because medical monitoring is not a recognized remedy under RCRA. Easler pleads his request for medical monitoring as a cause of action under RCRA for injunctive relief. Specifically, the complaint states: "Because of the long term exposure of the members of the community to numerous hazardous materials due to the actions of the defendants, it is necessary for the Court to establish a court-administered community medical monitoring program through which members of the proposed class may receive periodic health screening for illnesses caused by the hazardous materials identified within this complaint." (Compl., ECF No. 1, p. 86, ¶ 192.) The defendants contend that this cause of action is really a claim for future damages wrapped in equitable relief's clothing. The question for this court, then, is whether medical monitoring

is the type of remedial injunctive relief RCRA envisions.[5] After a review of relevant statutory and case law, the court concludes that, like many in law, it depends.

[5]     The court notes that if Easler intended to plead medical monitoring as a state law claim, this claim would fail because South Carolina has yet to recognize a cause of action for medical monitoring. *See Rosmer v. Pfizer, Inc.,* No. CIV. A. 9:99–2280–18RB, 2001 WL 34010613, *5 (D.S.C. March 30, 2001).

 **\*6**  The RCRA authorizes a court to "restrain any person who has contributed to or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), [or] to order such person to take such other action as may be necessary." 42 U.S.C. § 6972(a). Thus, "a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.,* one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.,* one that 'restrains' a responsible party from further violating RCRA." *Meghrig,* 516 U.S. at 485.

A number of courts have considered the appropriateness of ordering defendants to implement or support some sort of medical screening program in response to a release of environmental contaminants potentially harmful to human health. As the defendants note, the most relevant case here is *Werlein v. United States,* 746 F.Supp. 887 (D.Minn.1990), *vacated in part on other grounds, Werlein v. United States,* 793 F.Supp. 898 (D.Minn.1992). In *Werlein,* like here, the plaintiffs requested medical monitoring as a form of injunctive relief under RCRA. The proposed program required the defendants to pay a lump sum of cash into a fund, and that persons eligible for medical monitoring use that pot of cash to obtain reimbursement costs incurred as the result of medical screening examinations. The court made short work of the plaintiffs' claim, finding that "[p]ayment of cash by one party to reimburse other parties for costs incurred is not injunctive relief." *Id.* at 895.

In *Werlein,* the court also carefully distinguished the plaintiffs' proposed medical monitoring fund from one approved by the Northern District of California in *Barth v. Firestone Tire & Rubber Co.,* 661 F.Supp. 193 (N.D.Cal.1987). In the court's view, the two funds differed in their purpose and degree of necessity. *Barth* involved a group of plaintiffs exposed

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 143 of 520
PageID: 9064
Easler v. Hoechst Celanese Corp., Not Reported in F.Supp.2d (2014)
2014 WL 3881042

to benzene, a toxin about which not much was known at the time the case was filed, and the proposed fund "would provide for a Medical Monitoring Program which will gather and forward to treating physicians information relating to the diagnosis and treatment of diseases which may result from the plaintiff's exposure to toxins." *Barth,* 661 F.Supp. at 203. In response to the plaintiffs' reliance on *Barth,* the court in *Werlein* conceded that "[i]n a case where a number of persons are exposed to a toxin about which little is known, and it is necessary to gather and share information regarding diagnosis and treatment through screening, the Court would consider framing a medical monitoring and information sharing program as injunctive relief." *Werlein,* 746 F.Supp. at 895. But, because the consequences of exposure to the toxin at issue in *Werlein* were well-documented, the court reasoned that the proposed fund would merely screen for early signs of those consequences, and thus could not be authorized as injunctive relief under RCRA. *Id.*

 *7  After reviewing these cases and others, the Western District of New York concluded that "[a] court-administered fund which goes beyond payment of the costs of monitoring an individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease is injunctive in nature rather than 'predominantly money damages.' " *Gibbs v. E.I. DuPont de Nemours & Co., Inc.,* 876 F.Supp. 475, 481 (W.D.N.Y.1995).

The court finds that this view comports with RCRA's purpose and its grant of expansive equitable authority to the courts to carry out that purpose. *See U.S. v. Waste Indus., Inc.,* 734 F.2d 159, 163–66 (4th Cir.1984); *U.S. v. Price,* 688 F.2d 204, 210– 12 (3rd Cir.1982). However, in this order, the court finds only that Easler's claim for medical monitoring is not subject to summary dismissal. The court offers no opinion at this point in the litigation as to whether it will withstand future scrutiny or prove an appropriate remedy on the facts presented in the case of RCRA liability. [6]

[6]    In addition, the defendants assert that the Fourth Circuit has already resolved this issue by stating that "[a] claim for medical surveillance costs is simply a claim for future damages." *Ball v. Joy Techs., Inc.,* 958 F.2d 36, 39 (4th Cir.1991). Much like the program proposed in *Werlein,* the medical surveillance in *Ball* would have required the defendants to cover the costs of periodic medical examinations designed to monitor the plaintiffs' health and facilitate early detection of

disease caused by the plaintiffs' exposure to toxic chemicals. However, the primary question before the Fourth Circuit in *Ball* was whether, under West Virginia or Virginia common law, the plaintiffs could recover the reasonable value of future medical expenses where they failed to show any present, physical injury. Thus, the court does not find that *Ball* is dispositive of the relevant question in this case—whether medical monitoring can be a proper form of injunctive relief.

D. *State Law Claims*
In addition to his RCRA claims, Easler has brought three state law causes of action: (1) public nuisance, (2) private nuisance, and (3) negligence. The defendants have moved to dismiss all three causes of action because Easler has failed to allege any damage to or interference with his property.

"A nuisance is 'anything which works hurt, inconvenience, or damages; anything which essentially interferes with the enjoyment of life or property.' " *Strong v. Winn–Dixie Stores, Inc.,* 240 S.C. 244, 125 S.E.2d 628, 632 (S.C.1962) (quoting *State v. Columbia Water Power Co.,* 82 S.C. 181, 63 S.E. 884, 889 (S.C.1909)). In addition, "[a] private person may bring a private civil suit for a public nuisance only if he suffered a special injury to his real or personal property." *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n,* 407 S.C. 67, 753 S.E.2d 846, 852 (S.C.2014). "A special injury is 'individual or specific damage in addition to that suffered by the public' and must be 'of a special character, distinct and different from the injuries suffered by the public generally.' " *Id.* (internal citations omitted). And, to state a viable clam for negligence, a landowner must plead some damage to his property. *See Ravan v. Greenville Cnty.,* 315 S.C. 447, 434 S.E.2d 296, 307 (S.C.Ct.App.1993).

"A well-known principle of property law is that property consists of a bundle of rights." *Babb v. Lee Cnty. Landfill SC, LLC,* 405 S.C. 129, 747 S.E.2d 468, 474–75 (S.C.2013). For owners of land abutting a body of water, that bundle of rights includes a "special right[ ]," "distinct from those rights that may be enjoyed by the public at large," to make reasonable use of the water surrounding their property. *White's Mill Colony Inc. v. Williams,* 363 S.C. 117, 609 S.E.2d 811, 817 (S.C.Ct.App.2005). Further, a landowner's interest in use and enjoyment of his property includes an interest in being free "from discomfort and annoyance while using [his] lands." *Babb,* 747 S.E.2d at 473 (quoting Restatement (Second) of Torts § 821D (1979)). Damage to or interference with any of

these rights may constitute tort damages under a nuisance or negligence theory.

**\*8** The defendants assert that Easler has not successfully pled interference with his property rights because his complaint does not state specifically that he uses the stream next to or the groundwater under his property. In addition, relying on one sentence in one Fourth Circuit opinion, the defendants assert that Easler's state law claims cannot survive because he has not identified enough contamination on his property to rise to the level of toxicological concern. And, without any of these additional bases, the defendants claim Easler cannot rely on alleged diminution of property value.

The court finds these arguments unavailing, especially at the motion to dismiss stage. In deciding this motion, the court is tasked with evaluating the plausibility of Easler's claims, not their precise factual nature, and must construe the allegations and all reasonable inferences therefrom in a light favorable to Easler. With this in mind, the court finds that Easler has sufficiently pled that the surface and ground water next to and possibly under his property is sufficiently contaminated to plausibly interfere with his property rights.

In addition, the court does not find *In re Wildewood Litig.,* 52 F.3d 499 (4th Cir.1995), either controlling or persuasive at this point in the litigation. The court decided *In re Wildewood,* after a motion for summary judgment and the presentation of expert testimony on contamination and diminution of property value. As nuisance and negligence claims are both fact-intensive inquiries, the court is not convinced to discard these claims based on the somewhat similar facts of another case without further factual development of the record in this matter.

E. *Hercules*

In addition to joining in Hoechst's motion to dismiss, Hercules has moved separately for the court to dismiss all claims against it. Hercules asserts that Easler's RCRA claims fail as to Hercules because the complaint does not allege that Hercules has contributed to waste disposal on the site. Further, because the complaint does not allege wrongful conduct by Hercules, Easler's state law claims must fail. And, in particular, Easler's nuisance claims fail because the complaint does not allege that Hercules had control of the property at the time the alleged nuisance was created. In addition, Hercules contends that it cannot be subject to a mandatory injunction to cease activities or conduct remediation on a property it has not had any relation to in forty years.

According to the complaint, on September 30, 1965, Hercules sought permission to dispose of industrial wastewater from the site into the Pacolet River. Then, in 1966, Hercules constructed a dimethyl terephthalate ("DMT") production facility on the southeastern part of the property. On May 22, 1970, Hercules sold a portion of the site to Hystron Fibers, Inc. Sometime thereafter, but in the "early 1970s," American Hoechst Corporation purchased the site and constructed a fiber production area. In 1978, American Hoechst Corporation ceased all on-site DMT production and partially dismantled the DMT facility. On November 13, 2008, Ashland, Inc., acquired Hercules. Those are the only allegations in the complaint directly pertaining to Hercules.

**\*9** Thus, Hercules asserts that the complaint does not specify the when, where, what, or how of Hercules's contribution to hazardous waste at the site. The court disagrees. While the complaint does not contain additional allegations regarding Hercules itself, it does clearly allege that a portion of the contamination stemmed from Hercules's DMT plant, even after it was deactivated and partially disassembled. The court finds that these allegations are enough to sustain Easler's claims against Hercules at the motion to dismiss stage. In addition, having found that Easler has sufficiently pled that Hercules may have contributed to the disposal of waste at the site, the court finds that, if proven, the court would have authority under RCRA to enjoin Hercules in some way. The exact parameters or necessity of that injunction are not properly before the court at this time.

F. *Johns Manville*

Like Hercules, Johns Manville moves to dismiss Easler's claims against it on the grounds that the complaint does not tie any of Johns Manville's alleged conduct to any of the alleged wrongs. In addition, Johns Manville asserts that Easler is barred from bringing RCRA claims against it because he failed to provide sufficient notice under 42 U.S.C. § 6972 and 40 C.F.R. § 254.3.

With regard to Johns Manville, the complaint alleges that: (1) "[d]uring or about 2000, KoSa sold a portion of the Site to Johns Manville Corporation" and (2) "Johns Manville discharges wastewater into the Site's wastewater treatment plant to the present day." (Compl., ECF No. 1, ¶ 12.) In addition, while the complaint acknowledges that the site is subject to an NPDES permit and DHEC regulation, it also alleges multiple violations of the NPDES permit. In particular, the complaint alleges at least one violation

resulting directly from the wastewater treatment facility only three years after Johns Manville allegedly acquired a portion of the site from KoSa and began discharging its wastewater there. (*See* ECF No. 1, ¶¶ 89–90.) The court finds that the complaint alleges sufficient facts on which to base Easler's RCRA and state law claims against Johns Manville.

Likewise, the court finds that Easler's pre-suit notice satisfied the relevant statutory and regulatory conditions. Pursuant to 40 C.F.R. § 254.3, the notice

> shall include sufficient information to permit the recipient to identify ... the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 254.3(a). Here, Easler's pre-suit notice, just like the complaint, alleged that Johns Manville owned a portion of

the property and discharged wastewater there. Thus, it clearly alleged the conduct constituting the claimed violation. In addition, the notice alleges that the identified alleged conduct has taken place from 2000 to the present. And, although the notice did not attempt to connect each defendant to each contaminant, it did include a list of the contaminants on which Easler intended to base his suit. The court concludes that Easler's notice included sufficient information regarding the basis for his intent to sue Johns Manville.

## IV. CONCLUSION

**\*10** For the forgoing reasons, the defendants' motions to dismiss (ECF Nos. 18, 20, 21, 22, 23, 24) are DENIED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3868022

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 147 of 520
PageID: 9068
Ehlers v. Ben & Jerry's Homemade Inc., Slip Copy (2020)
2020 1 W22L8898

2020 WL 2218858
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

James EHLERS, on behalf of himself and
all others similarly situated, Plaintiff,

v.

BEN & JERRY'S HOMEMADE INC., and Conopco
Inc. d/b/a Unilever United States, Defendants.

Case No. 2:19-cv-00194
|
Signed 05/07/2020

**Attorneys and Law Firms**

Jay Shooster, Esq., Pro Hac Vice, Kim Richman, Esq., Pro Hac Vice, Richman Law Group, New York, NY, Joshua L. Simonds, Esq., The Burlington Law Practice, PLLC, Burlington, VT, for Plaintiff.

Buffy J. Mims, Esq., Pro Hac Vice, Shook, Hardy & Bacon L.L.P., Washington, DC, James P. Muehlberger, Esq., Pro Hac Vice, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Walter E. Judge, Jr., Esq., Downs Rachlin Martin PLLC, Burlington, VT, for Defendants.

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS**

Christina Reiss, District Judge

*1  Plaintiff James Ehlers brings this action on behalf of a proposed class of similarly situated individuals against Ben & Jerry's Homemade Inc., ("Ben & Jerry's") and Conopco Inc., d/b/a Unilever United States ("Unilever" and collectively, "Defendants") alleging that Defendants' statements on Ben & Jerry's ice cream cartons and website that Ben & Jerry's sources dairy products from "happy cows" on "Caring Dairy" farms are materially misleading. Plaintiff alleges three causes of action against Defendants: violation of the Vermont Consumer Protection Act ("VCPA"), 9 V.S.A. §§ 2451-2480g (Count I); breach of an express warranty (Count II); and unjust enrichment (Count III). In addition to compensatory damages, Plaintiff seeks injunctive relief.

Pending before the court is Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) filed on January 13,

2020, in which Defendants argue that the description of cows as "happy" is a nonactionable opinion statement; that the alleged misrepresentation on Ben & Jerry's website regarding Caring Dairy standards is not misleading or material; that Plaintiff fails to state plausible claims for breach of an express warranty or unjust enrichment; and that Plaintiff does not have standing to pursue injunctive relief on behalf of himself or the proposed class. (Doc. 9.) On February 12, 2020, Plaintiff filed an opposition. Defendants filed a reply on February 26, 2020, at which time the court took the pending motion under advisement.

Plaintiff is represented by Kim Richman, Esq., Jay Shooster, Esq., and Joshua L. Simonds, Esq. Defendants are represented by Walter E. Judge, Jr., Esq., James P. Muehlberger, Esq., and Buffy J. Mims, Esq.

**I. Allegations in the Complaint.**

Plaintiff is a resident of Winooski, Vermont who purchases a variety of Ben & Jerry's ice creams from a Shaw's supermarket in Colchester, Vermont. Ben & Jerry's is an ice cream manufacturer incorporated in Vermont with its principal place of business in Burlington, Vermont and is a wholly owned subsidiary of Unilever, which is a New York corporation with its principal place of business in Englewood Cliffs, New Jersey. Plaintiff alleges that the court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA") because the proposed class involves more than 100 members, because there is diversity of citizenship between Plaintiff and Unilever, and because the amount in controversy exceeds the sum of $5,000,000.

Ben & Jerry's was founded in 1978 in Burlington, Vermont by Ben Cohen and Jerry Greenfield. Plaintiff asserts that Ben & Jerry's rose to prominence in the 1980s and 1990s as a socially conscious, Vermont-based company which attracted consumers due to "the brand and all that it represented[.]" (Doc. 1 at 1, ¶ 2.) Plaintiff further alleges that Ben & Jerry's "reputation for being socially and environmentally conscious" was a "valuable and significant component of Unilever's acquisition of the brand[.]" Id. at 2, ¶ 4. Even though Mr. Cohen and Mr. Greenfield are no longer involved in the day-to-day management of Ben & Jerry's, Plaintiff asserts that Unilever "continues to capitalize" on Ben & Jerry's goodwill and reputation. Id. at 2, ¶ 6.

*2  Plaintiff alleges that in the "past several years," Unilever has breached consumers' trust by representing on Ben & Jerry's ice cream packaging and website that Ben & Jerry's

*Ehlers v. Ben & Jerry's Homemade Inc., Slip Copy (2020)*
2020 1 W22L8898

products are "sourced exclusively from 'happy cows' on Vermont dairies that participate in a special, humane 'Caring Dairy' program." *Id.* at 2, ¶ 7. This representation is allegedly material to consumers who choose to purchase Ben & Jerry's products and who view Ben & Jerry's as a socially conscious, independent Vermont company. In reality, however, Plaintiff asserts that only a percentage of the milk used in Ben & Jerry's products is sourced from the Caring Dairy program, while the remainder comes from mass-production dairy operations, purportedly "exactly what consumers who choose Ben & Jerry's Products would like to avoid." *Id.* at 2-3, ¶ 8.

Ben & Jerry's ice cream packaging, signage in its retail locations, and take-away cups "present the Products as made with milk produced by 'happy cows' " and feature cartoon images of happy cows in green fields under blue skies in order to depict "happy animals." *Id.* at 6, ¶ 25. Plaintiff asserts these representations are prominent on Ben & Jerry's packaging and therefore necessarily seen by consumers. The text on the back of Ben & Jerry's cartons of ice cream states in relevant part: "We strive to make the best possible ice cream in the best possible way. We source Non-GMO ingredients, Fairtrade cocoa & sugar, eggs from cage-free hens & milk & cream from happy cows. Learn more at benjerry.com." (Doc. 1 at 7, ¶ 25.)

The "benjerry.com" website to which the cartons direct consumers explains that "happy cows" are part of the Caring Dairy program, "a unique program that's helping farmers move toward more sustainable practices on the farm." *Id.* at 7, ¶ 27 (internal quotation marks and footnote omitted). Plaintiff alleges that these Caring Dairy representations are supported by assurances on the website which promote Ben & Jerry's "values-led sourcing" as well as its attempts to "reduce the environmental impact of our business." *Id.* at 7-8, ¶ 28 (internal quotation marks omitted). According to the "Caring Dairy" webpage, Caring Dairy "respects the farmer and their farmworkers, the planet and the cow[,]" *id.* at 9, ¶ 30 (internal quotation marks omitted), and further:

> provides our farmers a program for evaluating, implementing and continuously improving sustainable agricultural practices on their farms. Our belief is that the future of dairy farming is to build soil health that includes increased cover crops, alternative tilling practices, rotational

> crops and grazing techniques. We also believe that high quality animal care is fundamental to the success of a farm, a well-cared for cow will produce a higher quality milk. And of course the importance of labor that supports the entire farm, from the farmer to the farmworker.

*Id.* at 9, ¶ 31 (footnote omitted).

Plaintiff asserts that "[u]ntil recently, and during the class period, Unilever's Ben & Jerry's website—the address of which is displayed to explain the 'happy cows' representation —told consumers that the 'Caring Dairy' program is 'required for all farmers.' " *Id.* at 8, ¶ 29. At the time, a webpage titled "Caring Dairy Standards" stated:

> Basic standards for being a Caring Dairy farmer (required for all farmers)
>
> The basic standards are specific to Cow Care, Planet Stewardship, and the Farmer & Farm Worker. In order to be a Caring Dairy farmer, all these standards must be met. All farms will undergo a third[-]party verification by Where Food Comes From, to evaluate how each farm is meeting the required Standards. For a farm to be considered a Caring Dairy farm, they must meet the Basic Standards for participation. From there, farms can strive for Silver or Gold level recognition and receive[ ] a larger compensation for their achievement.

(Doc. 1 at 8, ¶ 29.) Plaintiff concedes that Unilever "appears to have removed this representation" after a non-profit organization filed a lawsuit against Ben & Jerry's in the District of Columbia Superior Court, alleging the phrase constituted a misrepresentation. *Id.*

 **\*3** Plaintiff alleges that Defendants' statements are "offered to explain the 'happy cows' of [Ben & Jerry's] Products' packaging" and are intended to project to consumers an "image of animal husbandry" that is more environmentally friendly than typical mass dairy production. *Id.* at 10, ¶ 34. Plaintiff asserts that when purchasing Ben & Jerry's products, he relied on these representations, as well as a "Caring Dairy" video on the website, which he understood to mean that the Ben & Jerry's ice cream he purchased was made with milk and cream "sourced exclusively from these 'happy cows' on 'Caring Dairy' farms." *Id.* at 4, ¶ 16.

In contrast to "what Unilever has told consumers," *id.* at 5, ¶ 24, Ben & Jerry's products are allegedly sourced from a mixture of Caring Dairy farms and mass-production facilities, including through a dairy cooperative in St. Albans, Vermont that has more than 360 members. As of January of 2017, Plaintiff alleges only ninety members, or less than twenty-five percent, were verified Caring Dairy farms. When processing the milk, St. Albans does not distinguish between the Caring Dairy farms and the mass-production facilities so that a "large percentage" of the milk and cream used in Ben & Jerry's products is thus allegedly sourced from the mass-production farms. *Id.* at 11, ¶ 40. Because the mass-production facilities allegedly employ "intensive cow confinement practices and extensive antibiotic use," Defendants' use of milk and cream from sources other than Caring Dairies allegedly constitutes a material omission. (Doc. 1 at 11, ¶ 41.)

Plaintiff further contends that Unilever knew that reasonable consumers relied on its representations and intended for consumers to purchase Ben & Jerry's products when they "might otherwise purchase a competing ice cream product," *id.* at 13, ¶ 50, and further knew consumers would pay more for products that were represented as socially responsible, thereby increasing the sales of Ben & Jerry's products while decreasing the sales of competitor products. Unilever has thus allegedly "profited enormously to the detriment of consumers from its falsely marketed products and its carefully orchestrated image for the Ben & Jerry's brand." *Id.* at ¶ 52.

According to the Complaint, Unilever "continues to conceal and suppress the true nature, identity, source, and method of production of the Ben & Jerry's Products." *Id.* at ¶ 54. As a result, Plaintiff argues that he and the proposed class will continue to suffer injury because they "can no longer rely on the truth and accuracy of Ben & Jerry's Products" and are "prevented from making a meaningful and informed choice" as they continue to purchase "deceptively labeled and packaged Products sold at prices above their true market value." *Id.* at 14, ¶ 57. Plaintiff requests "an injunction against Defendants' unlawful and deceptive acts and practices, and requiring that Defendants remove and refrain from making representations on the Ben & Jerry's Products' packaging or elsewhere that the milk and cream in the Products originates from 'happy cows' on 'Caring Dairy' farms[.]" *Id.* at 21, ¶ E.

## II. Whether the Court May Consider Documents External to the Complaint.

**\*4** Both parties cite to documents in their briefs that are neither cited in nor attached to the Complaint, including statements from sections of Ben & Jerry's website. In reviewing a complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court is generally limited to the facts "contained within the four corners of the complaint[.]" *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010). A court may, however, also review "any statements or documents incorporated in [the complaint] by reference[ ] and any document not incorporated but that is, nevertheless, integral to the complaint because the complaint relies heavily upon its terms and effect." *Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (citations and internal quotation marks omitted). To be "integral" to the Complaint, a plaintiff must "*rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (internal quotation marks omitted) (emphasis in original) (quoting *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006)).

The representations made in Ben & Jerry's website are integral to the Complaint and provide the factual basis for some of Plaintiff's claims. The Ben & Jerry's website, including documents linked therein, are thus properly before the court in adjudicating Defendants' motion to dismiss. *See id.* at 234 (holding district court properly determined parts of a website were integral to the complaint where the plaintiff "alleges injuries on the basis of the purchases made on Amazon, made possible only via clicking 'Place your order' on the Order Page") ; *Derbaremdiker v. Applebee's Int'l, Inc.*, 519 F. App'x 77, 78 (2d Cir. 2013) (considering sweepstakes rules on a website referenced on a receipt because the complaint referred to the rules).

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 150 of 520
PageID: 9071
Ehlers v. Ben & Jerry's Homemade Inc., Slip Copy (2020)
2020 1 W22L8898

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also " 'not bound to accept as true a legal conclusion couched as a factual allegation[.]' " *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

### B. Whether Plaintiff Plausibly Pleads a VCPA Claim (Count I).

Because this court sits in diversity, it applies Vermont's substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."). The VCPA prohibits "unfair or deceptive acts or practices in commerce[.]" 9 V.S.A. § 2453(a). To plead a plausible claim for relief under the VCPA, Plaintiff must allege that he " 'contract[ed] for goods or services in reliance upon false or fraudulent representations or practices prohibited by [§] 2453" or "sustain[ed] damages or injury as a result of any false or fraudulent representations or practices prohibited by [§] 2453[.]' " *Glassford v. Dufresne & Assocs., P.C.*, 2015 VT 77, ¶ 30, 199 Vt. 422, 438, 124 A.3d 822, 833 (quoting 9 V.S.A. § 2461(b)).

**\*5** A deceptive act or practice is: (1) "a representation, practice[,] or omission likely to mislead" a consumer; (2) that the consumer "interpreted ... reasonably under the circumstances"; and (3) that has "material" misleading effects which are " 'likely to affect [the consumer's] conduct or decision with regard to a product.' " *Vastano v. Killington Valley Real Estate*, 2007 VT 33, ¶ 8, 182 Vt. 550, 551, 929 A.2d 720, 722 (quoting *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 15, 177 Vt. 90, 97, 858 A.2d 238, 244). "Misrepresentations involving facts are actionable while those involving opinions are not." *Otis-Wisher v. Fletcher Allen Health Care, Inc.*, 951 F. Supp. 2d 592, 603 (D. Vt. 2013), *aff'd sub nom. Otis-Wisher v. Medtronic, Inc.*, 616 F. App'x 433 (2d Cir. 2015).

In support of his VCPA claim, Plaintiff alleges that Defendants have engaged in unfair and deceptive acts in commerce by "representing to consumers that the milk and cream in Ben & Jerry's Products is sourced exclusively from 'happy cows' on 'Caring Dairy' farms that meet specific and verifiable criteria" while omitting information about the percentage of milk that originates from mass-production dairy operations. (Doc. 1 at 18, ¶ 102.) Defendants seek dismissal of Plaintiff's VCPA claim for three reasons: (1) "happy cows" constitutes opinion rather than fact; (2) neither Ben & Jerry's ice cream cartons nor its website contains misleading statements regarding "happy cows" or "Caring Dairies"; and (3) a reasonable consumer would not consider the alleged misrepresentations to be material.

### 1. Whether Plaintiff Plausibly Pleads that the Alleged Misrepresentation Was Misleading.

Plaintiff does not contest that "happy cows" constitutes a non-actionable opinion and asserts that his "true claim" focuses on the website's representation that " 'Caring Dairy' standards are required of all farmers whose happy cows supply milk and cream for Ben & Jerry's Products." (Doc. 17 at 10-11) (internal quotation marks omitted). A statement is misleading under the VCPA if it is "likely to mislead a reasonable consumer." *Lofts Essex, LLC v. Strategis Floor & Décor Inc.*, 2019 VT 82, ¶ 32, 224 A.3d 116, 127; *see also Lang McLaughry Spera Real Estate, LLC v. Hinsdale*, 2011 VT 29, ¶ 34, 190 Vt. 1, 17, 35 A.3d 100, 111 ("[T]he standards for consumer fraud are objective to be judged from the standard of a reasonable consumer."). It is " 'well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer.' " *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020)[1] (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)). The Second Circuit has "repeatedly observed that 'in determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial.' " *Id.* at 501 (quoting *Geffner v. Coca-Cola Co.*, 928 F.3d 198, 200 (2d Cir. 2019)); *see also Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 8, 176 Vt. 465, 470, 853 A.2d 40, 44 (holding lower court properly instructed jury on how to determine "whether a representation is deceptive because [it] required the jury to consider the overall impression left by defendants' communications").

1

In *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020), the Second Circuit applied N.Y. Gen. Bus. L. §§ 349(a) and 350. Like the VCPA, New York law analyzes "deceptive acts" using a "reasonable consumer" standard. *Id.* (citation and internal quotation marks omitted).

**\*6** Plaintiff identifies the following heading on Ben & Jerry's website as the basis for his VCPA claim: "Basic standards for being a Caring Dairy farmer (required for all farmers)[.]" (Doc. 1 at 8, ¶ 29.) Read in a vacuum, a reasonable consumer might interpret this phrase to mean that Caring Dairy farmer standards apply to all farmers who supply Ben & Jerry's. It may also, however, be interpreted as applying to all farmers who seek to have their farms designated as a "Caring Dairy." The court need not resolve this conflict because the website as a whole makes it clear that the section, titled "Caring Dairy Standards[,]" sets forth the "basic" standards "to be considered a Caring Dairy farm" as well as the detailed eligibility requirements for "Silver" and "Gold" tier status. (Doc. 9-2 at 2.) A farm "that aspire[s] to achieve these [Silver and Gold] standards" is entitled to certain levels of compensation from Ben & Jerry's. *Id.* at 4. The website includes a chart of the 2016 Caring Dairy farms, noting there were a total of eighty-five "[p]articipating [f]arms[.]" *Id.* at 7. Nothing in the section that follows the phrase "required for all farmers" represents that Ben & Jerry's products are sourced exclusively from Caring Dairy farms.

By focusing on an alleged representation that Ben & Jerry's products are "sourced exclusively from 'happy cows' on Vermont dairies that participate in a special, humane 'Caring Dairy' program[,]" (Doc. 1 at 2, ¶ 7), Plaintiff bases his claim on a representation that is neither contained on Ben & Jerry's ice cream cartons nor on its website. *See Fink*, 714 F.3d at 742 ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss[.]"). In the absence of this actual statement, the court considers whether it is a reasonable interpretation of the statements that *do* appear on Ben & Jerry's products and website.

The ice cream carton label which Plaintiff asserts leads consumers to the alleged misrepresentation states that: "We strive to make the best possible ice cream in the best possible way. We source Non-GMO ingredients, Fairtrade cocoa & sugar, eggs from cage-free hens & milk & cream from happy cows. Learn more at benjerry.com." (Doc. 1 at 7, ¶ 25.) Plaintiff identifies no portion of the foregoing statement that is

false. The product labeling directs consumers to "[l]earn more at benjerry.com" rather than to the specific "Caring Dairy Standards" webpage identified by Plaintiff. *Id.*

The benjerry.com website, in turn, describes the Caring Dairy program as one that "participating farms" join "voluntarily[.]" (Doc. 9 at 13); *see also* Doc. 21-5 at 3 (noting "[f]arms join the Caring Dairy program voluntarily, and for their efforts they receive an additional premium on top of their regular milk price"). The "How We Make Ice Cream" webpage states that the St. Albans dairy cooperative is comprised of "hundreds of local farms" (Doc. 21-2 at 4), well in excess of the eighty-five Caring Dairy farms identified on the "Caring Dairy Standards" webpage. In addition, Ben & Jerry's Social and Environmental Assessment Reports ("SEARs") from 2011 through 2018, which are available by link from the Ben & Jerry's website's homepage, reveal that the number of participating Caring Dairy farms fluctuates each year.[2]

2

The 2014 SEAR Report further states: "From a volume perspective, Caring Dairy™ covers our global production needs but our intention is to have all dairy suppliers that Ben & Jerry's sources from operating under the Caring Dairy™ program in the not-too-distant future." (Doc. 9 at 14.)

While Plaintiff is correct that reasonable consumers should not be required to search through the website and SEARs to clarify a heading on a webpage, it is equally unreasonable for a consumer to interpret a single phrase in a single heading without reference to the contents of the section that immediately follow the heading. Context is crucial especially where, as here, Plaintiff cannot point to an actual misrepresentation, but instead relies exclusively on his interpretation of a phrase he characterizes as conveying the *impression* that all of Ben & Jerry's products are "sourced exclusively" from "Caring Dairies."[3]

3

*See Chufen Chen*, 954 F.3d 492 at 501 (noting "context is crucial to determine "whether a reasonable consumer would have been misled by a particular advertisement" and drawing on full television commercial to interpret the word "steak" used in commercials) (citation omitted); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 922-23 (N.D. Ill. 2017) (granting a motion to dismiss claims when consumers could determine the meaning of

2020 1 W22L8898

the phrase "100% Grated Parmesan Cheese" from reading an ingredients list on the label and noting "even if a statement on a package or advertisement might be ambiguous or unclear in isolation, 'the presence of a disclaimer or similar clarifying language may defeat a claim of deception' ") (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)).

**\*7** It is Plaintiff's burden to plausibly allege that the Ben & Jerry's ice cream carton or website contains a statement that "conveys more than one meaning to reasonable consumers and one of those meanings is false[.]" *Lofts Essex, LLC*, 2019 VT 82, at ¶ 34, 224 A.3d at 127 (quoting *Carter v. Gugliuzzi*, 716 A.2d 17, 23 (Vt. 1998)). "[A] representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012) (citation and internal quotation marks omitted). Because neither Ben & Jerry's products nor its website represents that its ingredients are "sourced exclusively" from Caring Dairy farms, Plaintiff's entire claim is grounded on a single phrase in a single heading on a multipage website which is neither false nor misleading when considered as a whole.

### 2. Whether Plaintiff Plausibly Pleads that the Alleged Misrepresentation Was Material.

Even if Plaintiff could identify a false or misleading statement, he has failed to adequately plead any misrepresentation is "material." A misrepresentation is material if it is "likely to affect the consumer's conduct or decision with regard to a product." *Greene*, 2004 VT 67, at ¶ 15, 177 Vt. at 97, 858 A.2d at 244 (citation omitted). Materiality is " 'generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision.' " *PH W. Dover Prop., LLC v. Lalancette Eng'rs*, 2015 VT 48, ¶ 11, 199 Vt. 1, 5, 120 A.3d 1135, 1138 (quoting *Vastano*, 2007 VT 33, at ¶ 9, 182 Vt. at 551, 929 A.2d at 722).

Plaintiff alleges that the misleading impression that all of Ben & Jerry's milk and cream is sourced exclusively from "happy cows" on "Caring Dairy" farms portrays "Ben & Jerry's Homemade Inc. as a socially conscious, independent Vermont company" (Doc. 1 at 3, ¶ 9) and "prompt[s] consumers to buy more Ben & Jerry's Products, and to pay more for them

than they otherwise would." *Id.* at 3, ¶ 10; *see also id.* at 5, ¶ 21. The Caring Dairy program, however, indisputably encourages the humane treatment of animals, and the Ben & Jerry's website discloses to consumers that participation in the program is voluntary. Nowhere on either Defendants' labeling or the website is the representation that Ben & Jerry's products are "sourced exclusively" from Caring Dairy farms.

Although Plaintiff argues that materiality is a question of fact which should not be resolved on a motion to dismiss unless the misrepresentations "are so obviously unimportant ... that reasonable minds could not differ on the question of their importance[,]" *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted), materiality is "a mixed question of law and fact" and is not "immune from analysis at the motion to dismiss stage. Where Plaintiff's allegations do not, as a matter of law, establish materiality, dismissal is appropriate." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); *see also ECA*, 553 F.3d at 202 (affirming dismissal of claims on motion to dismiss where plaintiffs did not plead disclosures were material); *Silberstein v. Aetna, Inc.*, 2015 WL 1424058, at \*12 (S.D.N.Y. Mar. 26, 2015) (dismissing claims on motion to dismiss where "the vast majority of Plaintiff's allegations are facially insufficient to state a claim because there is no plausible showing that the misstatements or omissions were material").

Accepting the facts pled in the Complaint as true, Plaintiff does not plausibly allege reasonable consumers would make their purchasing decisions exclusively based on a single phrase in a single webpage heading contained in a website that a consumer would need to access in advance of or contemporaneously with his or her purchasing decision. Because Plaintiff has failed to plausibly allege the essential elements of a VCPA claim, the court GRANTS Defendants' motion to dismiss Count I.

### C. Whether Plaintiff Plausibly Pleads a Claim for Breach of an Express Warranty (Count II).

**\*8** Defendants argue that Plaintiff fails to state a claim for breach of an express warranty because Plaintiff has not plausibly alleged a materially misleading factual representation. In addition, Defendants contend that Plaintiff has not plausibly pled that he timely notified Defendants of any breach or that reasonable consumers who purchased Ben

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 153 of 520
PageID: 9074
Ehlers v. Ben & Jerry's Homemade Inc., Slip Copy (2020)
2020 1 W22L8898

& Jerry's ice cream "failed to receive the benefit of their bargain." (Doc. 9 at 19.)

Under Vermont law, an express warranty is created under the following circumstances:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise[;] (b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description[;] [or] (c) [a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

9A V.S.A. § 2-313(1).

Defendants argue that the alleged misrepresentation is not an affirmation of fact or description of goods that could create an express warranty. The court agrees for the same reasons that it found Plaintiff's VCPA claim not plausible. Under Vermont law, the standard for evaluating the test for an express warranty is an objective one. *See* 9A V.S.A. § 2-313, cmt. 8 (stating to determine whether a warranty is created absent formal language such as "warrant" or "guarantee[,]" "the basic question remains the same: What statements of the seller have in the circumstances and in objective judgment become part of the basis of the bargain?"). "[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." 9A V.S.A. § 2-313(2).

In this case, Plaintiff alleges Defendants provided written "warranties that the milk and cream in the Ben & Jerry's Products originated exclusively from 'happy cows' on 'Caring Dairy' farms that me[t] verifiable criteria." (Doc. 1 at 20, ¶ 112.) Because that statement is neither contained on Ben & Jerry's labeling nor set forth on its website, it is not the "basis of the bargain" and no reasonable consumer would

believe that statement constitutes a written warranty as to the nature of the goods purchased. *See* 9A V.S.A. § 2-313(1).

Moreover, under Vermont law, "[w]here a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" 9A V.S.A. § 2-607(3)(a). Courts have found the failure to plead the condition precedent of notice of breach is grounds for dismissal. *See, e.g.*, *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 144 (E.D.N.Y. 2018) (dismissing breach of warranty claim where the complaint "makes no allegations and states no facts showing that notice was provided to defendant") (citation omitted); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) (dismissing warranty claim for failure to allege timely notice of breach under New York's notice statute, which is similar to Vermont's).

Plaintiff argues that his Complaint serves as notice of the breach of warranty and that timeliness must be determined by a jury. Although "[t]he timeliness of notice under 9A V.S.A. § 2-607(3)(a) is ordinarily a question of fact for the trier[,]" *Agway, Inc. v. Teitscheid*, 472 A.2d 1250, 1253 (Vt. 1984), allowing the Complaint to serve as notice of breach would deprive Defendants of the opportunity to cure their alleged defect or prepare a defense. For this reason, in at least one case, the Vermont Supreme Court has rejected the filing of a complaint as sufficient. *See, e.g.*, *Desilets Granite Co. v. Stone Equalizer Corp.*, 340 A.2d 65, 67 (Vt. 1975) (holding a complaint did not serve as notice of revocation of acceptance where it was filed at the same time as acceptance because "the principal policy behind the rejection notice requirement is to give the seller an opportunity to cure or permit him to assist in minimizing the buyer's losses"); *see also Agway*, 472 A.2d at 1252 (noting remedies for breach of contract and warranty are "predicated upon the notice required in 9A V.S.A. § 2-607(3)"); 18 Williston on Contracts 52:42 (4th ed. 2019) ("Generally, the fact that the buyer has filed an action seeking damages for the breach of warranty has not been regarded as tantamount to the statutory notice since it usually does not give the seller an advance opportunity to collect the evidence needed for a defense[.]").

**\*9** Even if Plaintiff could plausibly plead a material breach and notice, he has not and cannot plausibly plead that the products he purchased had no value because of the alleged breach of warranty. He must instead plead the difference between the value of the product as represented and the value of what he received. *See* 9A V.S.A. §

2-714(2) ("The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."). Without plausible allegations of causation and damages, his express warranty claim must fail. *See Centrella v. Ritz-Craft Corp. of Pa., Inc.*, 2017 WL 3720757, at *4 (D. Vt. June 28, 2017) ("[T]o establish a breach of both express and implied warranties, [plaintiffs] must prove proximate cause."); *Blodgett Supply Co. v. P.F. Jurgs & Co.*, 617 A.2d 123, 127 (Vt. 1992) ("Damages for breach of warranties by sellers of a business should be the 'loss of the bargain—the difference between the worth of the article as represented and that as actually delivered.' ") (quoting *Coleco Indus., Inc. v. Berman*, 567 F.2d 569, 577 (3d Cir. 1977)).

Because Plaintiff fails to plausibly plead the essential elements of a breach of express warranty claim, the court GRANTS Defendants' motion to dismiss Count II.

### D. Whether Plaintiff Plausibly Pleads a Claim for Unjust Enrichment (Count III).

Defendants seek dismissal of Plaintiff's unjust enrichment claim because Plaintiff has an adequate remedy at law and fails to state a claim for which relief may be granted. Plaintiff counters that he may plead in the alternative pursuant to Fed. R. Civ. P. 8(d) that he is entitled to recover on his equitable unjust enrichment claim "to whatever extent that [he] is not fully compensated by recovery at law." (Doc. 17 at 24.)

To state a claim for unjust enrichment under Vermont law, Plaintiff must allege that " '(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value.' " *Kellogg v. Shushereba*, 2013 VT 76, ¶ 31, 194 Vt. 446, 463, 82 A.3d 1121, 1133 (quoting *Ctr. v. Mad River Corp.*, 561 A.2d 90, 93 (Vt. 1989)). As an equitable remedy, an unjust enrichment claim lies only when "there is not an adequate remedy at law on the very subject in question." *Wynkoop v. Stratthaus*, 2016 VT 5, ¶ 50, 201 Vt. 158, 183-84, 136 A.3d 1180, 1196 (Eaton, J., concurring); *see also Moreau v. Sylvester*, 2014 VT 31, ¶ 20, 196 Vt. 183, 193, 95 A.3d 416, 423 ("Equity will not afford relief where there is a plain, adequate, and complete remedy at law.") (citation and internal quotation marks omitted).

"To be adequate the legal remedy must be able to provide complete relief for the case before the court and must be equally convenient, beneficial, and effective." *Wynkoop*, 2016 VT 5, at ¶ 18, 201 Vt. at 170, 136 A.3d at 1187. As a result, an unjust enrichment claim is not available " 'where it simply duplicates, or replaces, a conventional contract or tort claim[.]' " *Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2019 WL 5081061, at *2 (D. Vt. Oct. 10, 2019) (alteration in original) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).

"In determining whether a quasi-contract should be implied under an equitable theory of unjust enrichment, the inquiry is whether, in light of the totality of the circumstances, equity and good conscience demand that the defendant return that which the plaintiff seeks to recover." *Brookside Mem'ls, Inc. v. Barre City*, 702 A.2d 47, 50 (Vt. 1997); *see also Wei Wang v. Shen Jianming*, 2019 WL 3254613, at *8 (D. Vt. July 19, 2019) ("Unjust enrichment is a quasi-contractual theory of liability, by which the law 'implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable.' ") (quoting *Brookside Mem'ls, Inc.*, 702 A.2d at 49).

**\*10** "[I]n the alternative to [his] contract-based claims" (Doc. 1 at 20, ¶ 118), Plaintiff alleges that Defendants have been unjustly enriched through the sale of Ben & Jerry's products "at the expense of Plaintiff Ehlers and the Class members" as the "intended, direct, and proximate result of Defendants' conduct[.]" *Id.* at 21, ¶ 119. Therefore, Plaintiff contends "it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received ... in light of the fact that the Ben & Jerry's Products they purchased were not what Unilever purported them to be." *Id.* at 21, ¶ 120. Because Plaintiff's unjust enrichment claim relies on the same alleged misrepresentations as his other claims, his claim is wholly duplicative. *See Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 338 (E.D.N.Y. 2018) (dismissing unjust enrichment claim premised on defendants' retention of "benefits and monies because the Products were not as represented" as duplicative where the claim was "no different from [the plaintiff's] claims for false advertising or fraudulent misrepresentation") (internal quotation marks omitted); *Elkind v. Revlon Consumer Prods. Corp.*, 2015 WL 2344134, at *14 (E.D.N.Y. May 14, 2015) (dismissing unjust enrichment claim for failure to demonstrate how it was "in any way distinct" from deceptive advertising, negligent and intentional misrepresentation, and breach of express warranty claims).

Fed. R. Civ. P. 8(d)(3)'s allowance for pleading in the alternative may, however, save Plaintiff's equitable claim in the event his actions at law are dismissed. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) ("[T]he plaintiff is at liberty to plead different theories, even if they are inconsistent with one another, and the court must accept each sufficiently pleaded theory at face value, without regard to its inconsistency with other parts of the complaint.") (citing Fed. R. Civ. P. 8(d)(3)). " '[T]he most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust.' " *DJ Painting, Inc. v. Baraw Enters., Inc.*, 776 A.2d 413, 417 (Vt. 2001) (quoting *Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc.*, 537 A.2d 994, 995 (Vt. 1987)). The unjustness inquiry "focuses on the value of the benefit actually conferred upon the defendant." *Id.* at 416 n.2 (quoting *In re Estate of Elliott*, 542 A.2d 282, 285-86 n.2 (Vt. 1988)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth.").

Here, Plaintiff's unjust enrichment claim is predicated on a single phrase in a single heading of a multipage website which does not contain the material misrepresentation Plaintiff cites as the basis of his claim. Although Plaintiff alleges that Unilever "knew and intended that consumers would pay more for products that were represented as humane and/or socially responsible, furthering Unilever's private interest of increasing sales of its Ben & Jerry's Products and decreasing the sales of products that are truthfully marketed by its competitors[,]" (Doc. 1 at 13, ¶ 51), and that "Unilever has profited enormously to the detriment of consumers from its falsely marketed products and its carefully orchestrated image for the Ben & Jerry's brand[,]" *id.* at ¶ 52, Plaintiff does not further claim that the Ben & Jerry's ice cream he purchased had no value, that it would be equitable to allow him to both keep the ice cream and obtain a return of its purchase price, or that Ben & Jerry's does not source at least some of its ingredients in a humane and socially responsible way.

Because Plaintiff does not plausibly plead that "defendant retained [a] benefit [conferred by Plaintiff] under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value[,]" *Kellogg*, 2013 VT 76, at ¶ 31, 194 Vt. at 463, 82 A.3d at 1133 (citation omitted), Defendants' motion to dismiss Plaintiff's unjust enrichment claim (Count III) is GRANTED.

**E. Whether Plaintiff Has Standing to Pursue Injunctive Relief.**

Defendants argue that Plaintiff lacks standing to pursue injunctive relief on behalf of himself or the proposed class because the phrase "happy cows" was removed from Ben & Jerry's ice cream cartons "many months ago[.]" (Doc. 9 at 23.) In addition, it appears undisputed that the heading on the Caring Dairy program webpage on Ben & Jerry's website has been revised.

**\*11**  To have standing to pursue injunctive relief, a plaintiff must "show that he 'has sustained or is immediately in danger of sustaining some direct injury' " as the result of the challenged conduct, and "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted). "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia*, 834 F.3d at 239 (citing *DeShawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344-45 (2d Cir. 1998)).

Defendants no longer use the term "happy cows" on Ben & Jerry's ice cream cartons, and Plaintiff alleges Unilever "appears to have removed" the website's reference to "required for all farmers" in the "Caring Dairy Standards" webpage heading. (Doc. 1 at 8, ¶ 29.) [4] As a result, any possibility of future deception of Plaintiff in a similar way to the harm alleged in the Complaint is non-existent. *See Nicosia*, 834 F.3d at 239 (holding plaintiff did not have standing for injunctive relief where the defendant ceased selling the product at issue).

[4]     The heading was revised to read "required for all farmers who participate in the program" in early 2019. (Doc. 9 at 8) (emphasis omitted).

Because Plaintiff does not have standing to pursue injunctive relief on his own behalf, he also cannot pursue injunctive relief on behalf of the proposed class. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("[N]amed plaintiffs who represent a class 'must allege and show that they personally have been injured[.]' ") (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *Nicosia*, 834 F.3d at 239 ("A plaintiff seeking to represent a class must personally have standing.").

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss Plaintiff's request for injunctive relief due to lack of standing.

**F. Whether to Grant Plaintiff Leave to Amend.**

Pursuant to Fed. R. Civ. P. 15(a), courts "should freely give leave" to amend a complaint "when justice so requires." However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.' " *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Plaintiff is hereby GRANTED leave to amend within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss Plaintiff's claims WITHOUT PREJUDICE. (Doc. 9.) Plaintiff is hereby GRANTED leave to amend within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 2218858

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

2015 WL 9462964
United States District Court, N.D. Mississippi,
Aberdeen Division.

Rocky ESTES Plaintiff

v.

LANX, INC., et al. Defendants

CAUSE NO.: 1:14CV052-SA-DAS
|
Signed December 23, 2015

**Attorneys and Law Firms**

Duncan L. Lott, Duncan Lott, Attorney, Booneville, MS, for
Plaintiff.

Adria H. Jetton, Bradley Witherspoon Smith, Baker Donelson
Bearman Caldwell & Berkowitz, PC, Jackson, MS, for
Defendant.

MEMORANDUM OPINION

Sharion Aycock, U.S. DISTRICT JUDGE

 **\*1**  Plaintiff filed this suit against Lanx, Inc., for
negligence, products liability for design defect, products
liability for manufacturing defect, breach of express and
implied warranties, fraudulent concealment, and negligent
misrepresentation. Defendant filed a Motion for Summary
Judgment [94] that no genuine disputes of material fact
exist as to those claims. After reviewing the record, motion,
response, rules, and authorities, the Court finds as follows:

*Factual and Procedural Background*

In 2011, Rocky Estes underwent spinal fusion surgery
wherein the Lanx Telluride Spinal Fixation System was
implanted to fuse his L5-S1 vertebrae. Within five months,
two pedicle screws fractured. A revision surgery was
performed on June 28, 2012, to remove the broken screws
and replace the Telluride Spinal Fixation System with new
orthopedic hardware.

Estes seeks compensation for injuries, pain and suffering,
and his extensive past and future medical treatment on the
basis that the pedicle screw was negligently designed or

manufactured, that Lanx breached warranties as to the pedicle
screws, and that Lanx failed to obtain FDA clearance for the
Telluride System.

Lanx filed a Motion for Summary Judgment on those claims.

*Summary Judgment Standard*

Summary judgment is warranted under Rule 56(a) of the
Federal Rules of Civil Procedure when the evidence reveals
no genuine dispute regarding any material fact and the
moving party is entitled to judgment as a matter of law.
The rule "mandates the entry of summary judgment, after
adequate time for discovery and upon motion, against a
party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial." *Celotex
Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.
Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial
responsibility of informing the district court of the basis for
its motion, and identifying those portions of [the record]
which it believes demonstrate the absence of a genuine
issue of material fact." *Id. at 323,* 106 S. Ct. 2548. The
nonmoving party must then "go beyond the pleadings" and
"set forth 'specific facts showing that there is a genuine issue
for trial.' " *Id. at 324,* 106 S. Ct. 2548 (citation omitted).
In reviewing the evidence, factual controversies are to be
resolved in favor of the nonmovant, "but only when ... both
parties have submitted evidence of contradictory facts." *Little
v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)
(en banc). Importantly, conclusory allegations, speculation,
unsubstantiated assertions, and legalistic arguments have
never constituted an adequate substitute for specific facts
showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick
James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002); *SEC v.
Recile,* 10 F.3d 1093, 1097 (5th Cir. 1997); *Little,* 37 F.3d at
1075.

*Discussion and Analysis*

Plaintiff's causes of action can be summarized into three
broader sub-categories: (1) claims concerning the specific
pedicle screw and/or spinal fixation system used in Estes'
2011 surgery; (2) claims regarding warranties allegedly made
by Lanx; and (3) claims that the Telluride Spinal Fixation

2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

System was improperly placed on the market for sale without proper FDA clearance.

(1) <u>Mississippi Products Liability Act and Negligence</u>

**\*2** As for the first category, claims centered around the specific medical device used on Estes, the Plaintiff pled these causes of action: negligence, defective design, and manufacturing defect. Lanx contends that Plaintiff cannot sustain a negligence action on the basis that the Mississippi Products Liability Act precludes common law negligence.

### a. _Design Defect under the MPLA_

Defendant contends Plaintiff's MPLA design defect claim should be dismissed as no feasible alternative design has been offered into evidence. Plaintiff failed to respond. The Mississippi Supreme Court has summarized the design defect elements under the MPLA as follows:

> The danger presented by the product's design was known or should have been known to the manufacturer [or seller] (i.e., the danger was foreseeable); (2) the product failed to function as expected (as a result of a design characteristic); (3) an alternative design existed that would not impair the product's usefulness or desirability; and (4) the alternative design would have to a reasonable probability prevented the harm.

_Phillips 66 Co._, 94 So. 3d at 1060 (quoting _Williams v. Bennett_, 921 So. 2d 1269, 1274 (Miss. 2006) (internal quotation marks omitted)). Plaintiff put forth no evidence as to an alternative design. Accordingly, the Court finds that no genuine issue of material fact has been produced as to Plaintiff's design defect claim and that claim is dismissed. _See Gilley v. Protective Life Ins. Co._, 17 F.3d 775, 781 n.13 (5th Cir. 1994) ("We have held that an argument is waived if the party fails to make the argument in response to summary judgment.").

### b. _Failure to Warn under the MPLA_

For a plaintiff to prevail on a failure-to-warn claim in Mississippi, he must prove by a preponderance of the evidence that at the time the product left the control of the manufacturer, designer, or seller:

> (i) ... The product was defective because it failed to contain adequate warnings or instructions ... ; and

> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

> (iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

MISS. CODE ANN. § 11-1-63(a)(i)(2), (ii) (iii). On such a claim, a plaintiff must also prove the following:

> (c)(i) ... [A]t the time the product left the control of the manufacturer, designer[,] or seller, the manufacturer, designer[,] or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition[; and]

> (ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device[,] or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug, device[,] or other product.

**\*3** MISS. CODE ANN. § 11-1-63(c).

Thus, "[a] manufacturer is liable under a failure-to-warn theory if the product 'failed to contain adequate warnings,' the inadequate warnings 'rendered the product unreasonably dangerous to the user or consumer,' and the inadequate warnings 'proximately caused the damages for which recovery is sought.'" _Union Carbide Corp. v. Nix, Jr._, 142 So. 3d 374, 385 (Miss. 2014). The Fifth Circuit in interpreting Mississippi law has stated:

*Estes v. Lanx, Inc., Not Reported in Fed. Supp. (2015)*

2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

Under the learned intermediary doctrine, which is codified in the Mississippi Products Liability Act, a manufacturer of a prescription drug has no duty to warn the end user of the drug's possible adverse effects. *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688 (Miss. 1988). The manufacturer's duty to warn runs only to the prescribing physician, who acts as an intermediary between the manufacturer and the patient. *Id.* The learned intermediary doctrine applies to medical devices as well as prescription drugs. *Moore v. Mem. Hosp. of Gulfport*, 825 So. 2d 658, 662 n.6 (Miss. 2002).

*Smith v. Johnson & Johnson, Inc.*, 483 Fed.Appx. 909, 913-14 (5th Cir. 2012) (per curiam). "In order to make out a case for failure to warn under the learned intermediary doctrine, the plaintiff must establish that the treating physician, or a reasonable physician in the treating physician's position, would not have used the product had he received an adequate warning." *Id.* at 914 (citing *Thomas v. Hoffman—LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992)).

Plaintiff alleges Lanx had a duty to inform the hospital and the attending physician that the Lanx Telluride Spinal Fixation System had not been cleared, or that a standalone 510(k) had not been submitted to the FDA, and that this failure caused his injuries. [1] In support of this claim, Plaintiff states that "Dr. Crosby has confirmed that had he known that Lanx Telluride Spinal Fixation System had not been cleared or that a standalone 510(k) had not been submitted to the FDA and the Telluride System had not been cleared by the FDA he would not have used the Telluride System in the surgical procedure he performed on Estes." No record citation is provided by Plaintiff, and no support is found therein, to substantiate this claim. Thus, Plaintiff has failed to put forth evidence that the treating physician would not have used this product had he known of the alleged lack of FDA clearance for the device or components of the product. Additionally, the treating physician did indicate in his deposition that he was aware of the risks of spinal fusion surgery and implantation

of fusion devices, including the possibility of device failure. Even knowing those risks, Dr. Crosby testified he still used the Lanx Telluride Spinal Fixation System. Plaintiff's failure to warn claim is dismissed.

[1]  Although the Amended Complaint [90] does not assert a failure to warn theory of liability under the MPLA, and the Court generally will not consider claims raised only in response to summary judgment, the Court analyzes them herein because dismissal of these claims is necessary after their consideration. *See Roberts v. Lubrizol Corp.*, 582 Fed.Appx. 455, 461 (5th Cir. 2014) (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *see also Green v. JP Morgan Chase Bank, N.A.*, 562 Fed.Appx. 238, 240 (5th Cir. 2014).

### c. *Manufacturing Defect under the MPLA*

**\*4** For a plaintiff to prevail on a manufacturing defect claim in Mississippi, he must prove by a preponderance of the evidence that at the time the product left the control of the manufacturer or designer:

(i) The product was defective because it deviated in a material way from the manufacturer's or designer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, ...; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

MISS. CODE ANN. § 11-1-63(a)(1)(i)-(iii).

"[M]anufacturing defect claims involve allegations not that the entire product line in question was defectively designed, but rather that the specific product purchased by the consumer was manufactured in a way which deviated from the design specifications." *Hickory Springs Mfg. Co. v. Star Pipe Prods., Ltd.*, 991 F. Supp. 2d 778, 782 (N.D. Miss. 2014).

"[A] product is not 'defective' under § 11-1-63(a)(i)(1) unless it is shown to be out of compliance with the manufacturer's specifications." *Cooper Tire & Rubber Co. v. Tuckier*, 826 So. 2d 679, 693 (Miss. 2002) (citing *Leverette v. Louisville*

Case 1:19-md-02875-RMB-SAK Document 520-7 Filed 07/17/20 Page 161 of 520
PageID: 9082
Estes v. Lanx, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

*Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (holding that expert's testimony that ladder had manufacturing defect was properly excluded in products liability action under Mississippi law where expert failed to assess whether ladder met manufacturer's specifications)).

Plaintiff's Amended Complaint suggests that the "Lanx Pedicle Screws were not made in accordance with the Defendants' [sic] specifications or performance standards." However, Plaintiff never states how the pedicle screws at issue deviated from the manufacturing specification. In fact, Plaintiff puts forth no manufacturing specifications at all. Plaintiff further contends that proof of malfunction creates a genuine issue of material fact as to a manufacturing defect under the MPLA. Moreover, Plaintiff alleges that Defendant spoliated the evidence by failing to collect or maintain the broken pedicle screws after their removal from the Plaintiff.

The Court finds that Plaintiff's assertion that proof of malfunction is enough to sustain a question of fact in manufacturing defect cases under the MPLA is erroneous. Plaintiff's citations on this issue include the converse of Plaintiff's contentions. *See Shelter Ins. Co. v. Mercedes-Benz USA, LLC*, 236 Fed.Appx. 45, 47-48 (5th Cir. 2007) (holding that evidence that only the battery malfunctioned, without proof of an actual deviation from manufacturer specifications, was not enough to prove an essential element of the plaintiff's claim); *Tuckier*, 826 So. 2d at 693 ("[A] product is not 'defective' under § 11-1-63(a)(i)(1) unless it is shown to be out of compliance with the manufacturer's specifications."). Accordingly, without evidence of any manufacturer specifications, Plaintiff has failed to put forth evidence as to an element of the manufacturing defect claim that he would have to prove at trial. Therefore, Lanx's motion for summary judgment as to this claim is granted.

### d. *Negligence*

**\*5** Plaintiff's Amended Complaint additionally alleges that Lanx breached its duty of reasonable care in that it negligently "designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold" the Lanx Telluride System and its component, the Lanx Pedicle Screw. Despite the allegations not being in his complaint, the Plaintiff, in response to Defendant's Motion for Summary Judgment asserts that Lanx was additionally negligent in releasing the Telluride Spinal Fixation System into commerce without proper FDA clearance.

The Mississippi Legislature amended the Mississippi Products Liability Act (MPLA) in 2014 to apply to "any action for damages caused by a product, *including, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty*" and details the requirements to find "[t]he manufacturer, *designer* or seller" liable in such actions. MS LEGIS 383 (2014), 2014 Miss. Laws Ch. 383 (H.B. 680) (amended text emphasized). This amendment seems to signal the Mississippi Legislature's intent for all claims brought for damage caused by a product to be analyzed under the MPLA. *See Little v. Smith & Nephew, Inc.*, No. 1:15-CV-028-GHD, 2015 U.S. Dist. Lexis 75666, \*12-13, 2015 WL 3651769 (N.D. Miss. June 11, 2015). However, that version of the MPLA went into "force from and after July 1, 2014." *See* 2014 Miss. Laws WL No. 48 (H.B. 680). "[I]f a statute is to apply 'effective from and after passage' it is not to apply to causes of action that have accrued prior to the passage of the statute." *Tie—Reace Hollingsworth ex rel McDonald v. City of Laurel*, 808 So. 2d 950, 954 (Miss. 2002). "A cause of action accrues only when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested, and the theory that an injury has to happen before a tort is considered complete." *Oaks v. Sellers*, 953 So. 2d 1077, 1081 (Miss. 2007) (internal quotation marks and citation omitted). Indisputably, this cause of action accrued prior to the 2014 amendments to the MPLA.

Under the previous version of the MPLA, a determination of whether a plaintiff's negligence claim can exist alongside his other MPLA claims requires this Court to navigate unsettled Mississippi law. The previous version of the MPLA states that it applies "in any action for damages caused by a product except for commercial damage to the product itself." *See* Laws 2004, 1st Ex. Sess., Ch. 1, § 3, eff. September 1, 2004, amended by Laws 2014, Ch. 383 (H.B. No. 680), § 1, eff. July 1, 2014. To date, the Mississippi Supreme Court has never clearly indicated whether negligence claims are abrogated by the MPLA, and as recently as 2012 declined to decide that issue. *See Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1063 (Miss. 2012) ("[G]iven that we have found that [the plaintiff] met his evidentiary burden under MPLA, it is unnecessary for this Court to reach the issue of whether [his] negligence claim was subsumed under MPLA ...."). In interpreting Mississippi law that same year, the Fifth Circuit stated that negligence claims can be brought alongside strict liability claims, but "a party may not disguise a products liability claim as a negligence claim to avoid dismissal." *Murray v. GM, L.L.C.*, 478 Fed.Appx. 175, 181 (5th Cir. 2012) (per curiam) (citing *McSwain v. Sunrise Med., Inc.*, 689 F. Supp. 2d 835, 844

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 162 of 520
PageID: 9083
Estes v. Lanx, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

(S.D. Miss. 2010)). *See McSwain*, 689 F. Supp. 2d at 846 (the plaintiff's "common law negligence claims fail because they are mere restatements of the claims brought under the MPLA, and ... are not supported by sufficient evidence"); *Murray v. GM, LLC*, No. 3:10-CV-188-HTW-LRA, 2011 U.S. Dist. LEXIS 93845, 2011 WL 3684517, at *3 (S.D. Miss. Aug. 22, 2011) ("[W]hen a plaintiff's negligence claim cannot survive apart from his MPLA claim, regardless of how the plaintiff labels the claim ... the claim is governed by the MPLA."); *McKee v. Bowers Window & Door Co.*, 64 So. 3d 926, 940 (Miss. 2011) (the plaintiffs' "negligence claim fail[s] to present any new discussion or claim that does not relate back to the ... products liability claim")).

**\*6** With regard to specific claims, courts in Mississippi generally held that a negligence claim arising from defective design or failure to warn could not exist as a stand-alone claim because MPLA design defect claims and failure-to-warn claims necessarily required a negligence analysis. *See Hill v. Forest Labs., Inc.*, No. 2:06-CV-244-KS-MTP, 2014 U.S. Dist. LEXIS 78057, 2014 WL 2558756, at *2 (S.D. Miss. June 6, 2014) (the plaintiff's claim that defendant "negligently failed to warn of the alleged association between Lexapro and suicide" "was plainly a product liability claim within the scope of the MPLA"); *Hankins v. Ford Motor Co.*, No. 3:08-CV-639-CWR, 2011 U.S. Dist. LEXIS 143269, 2011 WL 6180410, at *4-5 (S.D. Miss. Dec. 13, 2011) (quoting *Palmer v. Volkswagen of America, Inc.*, 905 So. 2d 564, 599-600 (Miss. Ct. App. 2003) (internal quotation marks omitted) ("[W]hen a plaintiff claims defective design under the MPLA, a jury instruction on negligence is not necessary ... because the risk-utility test [in the MPLA] requires the jury to reach a conclusion about the manufacturer's conduct[;] the test is a version of Judge Learned Hand's negligence calculus. Therefore, ... a jury performing risk-utility analysis necessarily makes a negligence determination."); *McSwain*, 689 F. Supp. 2d at 846 ("The claim that [defendant] negligently failed to warn users of the danger of the chair without anti-tip tubes is a restatement of the failure to warn cause of action under the MPLA."); *Jowers v. BOC Group, Inc.*, No. 1:08-CV-036-KMO, 2009 U.S. Dist. LEXIS 53126, 2009 WL 995613, at *4 (S.D. Miss. Apr. 14, 2009) *aff'd in part, vacated in part on other grounds, and remanded sub nom.*, *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346 (5th Cir. 2010) ("[T]he greater weight of the somewhat-mixed authority holds that negligence-based claims of product defect [against a manufacturer] are abrogated by the MPLA."); *Lundy v. Conoco, Inc.*, No. 3:05-CV-477-WHB, 2006 U.S. Dist. LEXIS 82423, 2006 WL 3300397, at *2

(S.D. Miss. Nov. 10, 2006) ("The Court finds that the failure to warn/inadequate warnings claims, regardless of the fact that Plaintiffs labeled one claim 'products liability' and the other 'negligence', are both governed by the [MPLA]."); *Bennett v. Madakasira*, 821 So. 2d 794, 804 (Miss. 2002) ("Although a plaintiff in a prescription drug liability case may alternatively rely on strict liability and negligence principles, these principles merge into one inquiry; the adequacy of the defendant's warnings."); *Palmer*, 905 So. 2d at 600, *aff'd in part, rev'd in part on other grounds*, 904 So. 2d 1077 (Miss. 2005) ("[L]ike a claim of design defect, a claim of inadequate warnings under the MPLA requires the jury to perform negligence analysis in assessing liability. ... [Thus], the court need not present the jury with a separate negligence instruction on inadequate warnings."). Therefore, it is clear that under the prior version of the MPLA, purported negligence claims that merely restate the elements of defective design or failure-to-warn claims brought under the MPLA are subsumed by the MPLA.

However, Mississippi case law interpreting the previous version of the MPLA is unclear as to whether a negligence claim arising from a manufacturing defect can exist as a stand-alone negligence claim. *See Little*, No. 1:15-CV-028-GHD, 2015 U.S. Dist. Lexis 75666, at *12-13, 2015 WL 3651769. The Fifth Circuit has determined under Mississippi law that "[t]he risk-utility analysis [employed in defect design and failure-to-warn claims] applies to design defect cases, not manufacturing defect cases," thus hinting that a negligence claim premised on manufacturing defect might exist alongside an MPLA manufacturing defect claim. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999); *see also Joiner v. Genlyte Thomas Grp., L.L.C.*, No. 1:09-CV-00093-GHD, 2012 U.S. Dist. LEXIS 20966, 2012 WL 567201, at *4 (N.D. Miss. Feb. 21, 2012) (a negligence claim arising from manufacturing defect might exist alongside a separate MPLA manufacturing defect claim). *But see Deese v. Immunex Corp.*, No. 3:11-CV-373-DPJ-FKB, 2012 U.S. Dist. LEXIS 17342, 2012 WL 463722, at *5 (S.D. Miss. Feb. 13, 2012) ("It is unclear whether Mississippi law recognizes such a negligence claim separate and apart from the MPLA claims for negligent design or failure to warn.").

In addition to Plaintiff's manufacturing defect claim under the MPLA, Plaintiff's Amended Complaint could be liberally read to include a negligence action on the basis of manufacturing. Regardless of whether the MPLA subsumes that negligence action or not, the Court finds

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 163 of 520
PageID: 9084
Estes v. Lanx, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

there are no genuine disputes of material fact concerning any manufacturing negligence, so summary judgment is appropriate as to that claim.

Plaintiff claims that the purpose of the Telluride Spinal Fixation System being implanted was to stabilize the spinal section to allow boney fusion. According to Dr. Crosby, Plaintiff's treating physician, achieving boney fusion takes between six and twenty-four months. The pedicle screws at issue here severed at five months. Plaintiff contends that evidence of the screws' malfunction is enough to show a breach of Lanx's duty. However, Plaintiff fails to elaborate or put forth expert testimony as to any particular manufacturing negligence on the part of Lanx. Plaintiff's expert testified that he had no opinions as to the manufacturing process as it applied to the particular screws. In follow up at the deposition, however, Lanx's counsel acknowledges that because the screws were not available, any opinion as to their defective construction would be inappropriate. Plaintiff contends that Lanx spoliated the evidence because it failed to save the broken pedicle screws after their removal.

 *7 Spoliation is "[t]he intentional destruction, mutilation, alteration, or concealment of evidence." Black's Law Dictionary 1531 (9th ed. 2009). But "[a] party can only be sanctioned for destroying evidence that it had a duty to preserve, and such duty arises when 'the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006) (quoting *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). When spoliation is the result of a litigant's bad-faith actions, it gives rise to an adverse inference that the evidence was detrimental to the spoliating party's case. *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). "The party requesting an adverse inference must first show that the documents in question exist or existed and were within the control of the opposing party." *Jobe v. ATR Mktg., Inc.*, 189 F.3d 466, at *6 n.3 (5th Cir. 1999) (unpublished table decision) (citation omitted). "Moreover, a party seeking to obtain an adverse inference based on non-production or destruction of documents must show bad faith." *Id.* (citing *Vick*, 514 F.2d at 737 ("[T]he circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.")).

Dr. Fernandez performed the surgical removal of the Lanx Telluride System. Dr. Crosby and Allen Rasoul, a medical product distributor, were also present during the surgery. Rasoul distributed Lanx, as well as other medical devices, and was present at Estes' surgery to deliver the new system being implanted. Plaintiff contends because complaints regarding broken screws were most often reported by distributors, and not individual patients, Rasoul should have collected the broken screws and either returned them to Lanx, had the hospital maintain possession of them, or retrieve them for himself. It is undisputed, however, the screws were not recovered after surgery, and the screws were not destroyed by Lanx or Rasoul. Because Plaintiff has failed to put forth a genuine issue of material fact as to bad faith on the part of Lanx, no spoliation instruction is warranted. Without evidence or testimony regarding Lanx's alleged manufacturing negligence, Plaintiff has not put forth any genuine issues of material fact as to that claim.

Aside from the negligence claims subsumed by the MPLA and the negligence in manufacturing claim, Plaintiff also makes negligence claims based on the alleged failure of Lanx to secure the appropriate clearance from the FDA. However, Plaintiff has not adequately shown a genuine issue of material fact as to causation against Lanx for its alleged releasing the Telluride System into commerce without FDA approval. It is well established that causation is an essential element of a negligence claim. *See Weathersby Chevrolet Co., Inc. v. Redd Pest Control Co., Inc.*, 778 So. 2d 130, 133 (Miss. 2001). Plaintiff's own expert testified that connecting the Plaintiff's injury with the alleged failure to properly file with the FDA would be improper as it was too speculative. Accordingly, despite whether there was any duty to Plaintiff to achieve proper FDA clearance or breach of that duty by Lanx, the negligence claim for allegedly failing to obtain proper FDA authorization cannot succeed as there is no causative link between that alleged failure and Plaintiff's injuries. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's negligence claims identified is granted.

(2) Warranties

The second category of claims covers Plaintiff's breach of express warranty and breach of implied warranties. Defendant counters that because Lanx never made representations to Estes, that these causes of action are due to be dismissed.

 a. *Breach of Express Warranty*

For a plaintiff to prevail on a breach of express warranty claim in an action for damages caused by a product in Mississippi, he must prove by a preponderance of the evidence that at the

time the product left the control of the manufacturer, designer, or seller:

 **\*8** (i) ... The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

MISS. CODE ANN. § 11-1-63(a)(i)(4), (ii), (iii).

"[A]n express warranty is any affirmation of fact or promise which concerns the product and becomes part of the basis for the purchase of such a product. Fault does not need to be shown to establish a breach. The plaintiff need only show that the product did not live up to its warranty." *Scirocco*, 2015 U.S. Dist. LEXIS 66561, 2015 WL 2451225, at *4 (quoting *Forbes v. GMC*, 935 So. 2d 869, 876 (Miss. 2006) (quoting *Austin v. Will—Burt Co.*, 232 F. Supp. 2d 682, 687 (N.D. Miss. 2002), *aff'd*, 361 F.3d 862 (5th Cir. 2004) (internal quotation marks omitted)); *see also* MISS. CODE ANN. § 75-2-313(1) (a). The plaintiff must ultimately show that he relied on the alleged representation. *See* MISS. CODE ANN. § 11-1-63(a) (i)(4).

Plaintiff alleges the existence of an express warranty as follows:

> Defendant expressly warranted that the Lanx Telluride System and its component part of the Lanx Pedicle Screw were safe and fit for use by consumers and users including Plaintiff Rocky Estes for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended use.

In response to summary judgment, Plaintiff again spins his claim to reflect Lanx's alleged failure to get FDA clearance

for the Telluride System or its components. However, Plaintiff has failed to allege any express warranty that Lanx made to him regarding its 510(k) submission to the FDA, or even any specific claim made by Lanx to Plaintiff regarding the safety of the Telluride System or the pedicle screw associated therewith. Moreover, Plaintiff has produced no evidence or testimony creating a genuine issue of material fact that he relied on any representation by Lanx as to the safety or federal regulatory clearance. Accordingly, Defendant's Motion for Summary Judgment as to the breach of express warranty claim is granted.

b. *Breach of Implied Warranty of Merchantability*

To recover on a claim for breach of an implied warranty of merchantability, a plaintiff must demonstrate the following:

> (1) That a "merchant" sold "goods," and he was a merchant with respect to "goods of the kind" involved in the transaction, (2) which were not merchantable at the time of sale, and (3) injuries and damages to the plaintiff or his property, (4) caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of the injury.

*Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 834 (Miss. 2008) (citing MISS. CODE ANN. § 75-2-314). With respect to the last element, the Mississippi Supreme Court has noted that "though there may have been a breach of the warranty of merchantability, the seller has a right to attempt cure. An opportunity for the seller to cure is a reasonable requisite of a buyer's right of recovery." *Id.* at 834-35.

 **\*9** Defendant asserts that because Plaintiff never allowed Lanx the chance to cure the alleged defect that Plaintiff's implied warranty of merchantability claim fails. Plaintiff failed to respond to this specific allegation of Lanx. Because opportunity to cure is a "requisite" to the buyer's right of recovery, and there is no testimony or proof that Plaintiff attempted to contact or contacted Lanx when it was discovered that the pedicle screw was broken, Lanx was not given an opportunity to cure and that claim is dismissed.

Estes v. Lanx, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

c. *Breach of Implied Warranty of Fitness for a Particular Purpose*

To recover on a claim for breach of an implied warranty of fitness for a particular purpose under Mississippi law, a plaintiff is required to demonstrate the following;

> (1) the seller at the time of the contracting had reason to know the particular purpose for which the goods were required; (2) the reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods, and (3) the goods were unfit for the particular purpose.

*Watson Quality Ford, Inc.*, 999 So. 2d at 835 (quoting *Garner v. S & S Livestock Dealers, Inc.*, 248 So. 2d 783, 785 (Miss. 1971) (internal quotation marks omitted) (citing MISS. CODE ANN. § 75-2-315)). "[N]o claim for breach of the implied warranty of fitness for a particular purpose will lie when a product is to be used for its ordinary purpose." *Id.* (citing *Ford Motor Co. v. Fairley*, 398 So. 2d 216, 219 (Miss. 1981)).

Aside from the fact that there is no allegation that the pedicle screw or Lanx Telluride Spinal Fixation System was not used for its ordinary purpose, there is no proof or testimony that Plaintiff relied on Lanx, the seller, in selecting to use that product. In fact, Estes testified that he relied solely on his treating physician Dr. Crosby to make that decision. Accordingly, Defendant's request for summary judgment as to the implied warranty for fitness for a particular purpose is granted.

d. *Negligent Misrepresentation*

Numerous Mississippi district courts have held that the MPLA subsumes common law negligent misrepresentation claims based on a defective product. *See Austin*, 2013 U.S. Dist. LEXIS 137480, 2013 WL 5406589, at *8; *Gardley—Starks*, 917 F. Supp. 2d at 602; *McSwain*, 689 F. Supp. 2d at 844-45; *Lashley v. Pfizer, Inc.*, 877 F. Supp. 2d 466, 471 (S.D. Miss. 2012); *Murray*, No. 3:10-CV-188 HTW-LRA, 2011 U.S. Dist. LEXIS 93845, 2011 WL 3684517, at *3 (S.D. Miss. Aug. 22, 2011), aff'd, 478 Fed.Appx. 175

(5th Cir. 2012); *Walker v. George Koch Sons, Inc.*, 610 F. Supp. 2d 551, 562-63 (S.D. Miss. 2009). *See also Jowers*, 2009 U.S. Dist. LEXIS 53126, 2009 WL 995613, at *9 (discussing *R.J. Reynolds Tobacco Co. v. King*, 921 So. 2d 268 (Miss. 2005) (negligent misrepresentation claim may not be product liability claim if affirmative representations were made in addition to and separate from those in connection with a failure-to-warn claim)). Because Plaintiff in the case *sub judice* alleges that Defendant made representations with respect to the screw that mirror his allegations concerning the alleged representations in his failure-to-warn claim, the Court finds that his negligent misrepresentation claim is subsumed by the MPLA and must be dismissed.

(3) Claims as to the FDA

Plaintiff's factual basis for the final category of claims centers on Lanx's FDA clearance for either the pedicle screws used in the Telluride Spinal Fixation System, or the Telluride Spinal Fixation System itself. Plaintiff's fraudulent concealment cause of action alleges liability for the fraudulent concealment or misrepresentation that the Lanx Telluride System had been properly approved by the FDA.

**\*10** In a factually and legally similar case to this one, the United States Supreme Court in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-49, 121 S. Ct. 1012, 148 L. Ed. 2d 854 (2001), held that federal law preempts state-law causes of action claiming that a medical device manufacturer made fraudulent representations to the FDA. 531 U.S. at 353, 121 S. Ct. 1012. *Buckman* involved orthopedic bone screws that the FDA approved in an expedited process as "substantially equivalent" to devices already on the market. 531 U.S. at 346, 121 S. Ct. 1012. Plaintiffs who suffered injuries after implantation of the screws brought suit alleging that the manufacturer misled the FDA. Like here, they further alleged that the misrepresentations were a "but for" cause of their injuries because, absent the misrepresentations, the product would never have reached the market. 531 U.S. at 343, 121 S. Ct. 1012.

The Supreme Court rejected the novel cause of action because the state law claim would conflict with the FDA's authority to punish fraud on the agency. As noted by the Court:

> [T]he § 510(k) process sets forth a comprehensive scheme for determining whether an applicant has demonstrated that a product is substantially equivalent to a predicate device. Among other information, the applicant must submit to the FDA "proposed labels,

labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use," 21 CFR § 807.87(e) (2000), and a statement attesting to and explaining the similarities to and/or differences from similar devices (along with supporting data), see § 807.87(f ). The FDA is also empowered to require additional necessary information. See § 807.87(l). Admittedly, the § 510(k) process lacks the PMA review's rigor: The former requires only a showing of substantial equivalence to a predicate device, while the latter involves a time-consuming inquiry into the risks and efficacy of each device. Nevertheless, to achieve its limited purpose, the § 510(k) process imposes upon applicants a variety of requirements that are designed to enable the FDA to make its statutorily required judgment as to whether the device qualifies under this exception.

Accompanying these disclosure requirements are various provisions aimed at detecting, deterring, and punishing false statements made during this and related approval processes. The FDA is empowered to investigate suspected fraud, see 21 U.S.C. § 372; 21 CFR § 5.35 (2000), and citizens may report wrongdoing and petition the agency to take action, § 10.30. In addition to the general criminal proscription on making false statements to the Federal Government, 18 U.S.C. § 1001, (1994 ed., Supp. IV), the FDA may respond to fraud by seeking injunctive relief, 21 U.S.C. § 332, and civil penalties, 21 U.S.C. § 333(f)(1)(A); seizing the device, § 334(a)(2)(D); and pursuing criminal prosecutions, § 333(a). The FDA thus has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Agency.

Buckman, 531 U.S. at 348-49, 121 S. Ct. 1012. Indeed, the Court stated "that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration." 531 U.S. at 348, 121 S. Ct. 1012. Not only does federal law provide administrative tools to punish and deter fraud, but the agency's decision to employ those tools implicates its discretion and special competence. [2] Among the factors that make FDA enforcement "a somewhat delicate balance of statutory objectives," id., 121 S. Ct. 1012, are the need for administrative efficiency and the possibility that tort

liability based on inadequate disclosures would create "an incentive to submit a deluge of information," 531 U.S. at 351, 121 S. Ct. 1012. The Court concluded that authorizing tort liability for failure to comply with FDA disclosure requirements "would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." 531 U.S. at 353, 121 S. Ct. 1012; Lofton v. McNeil Consumer & Specialty Pharms., 672 F.3d 372, 375-76 (5th Cir. 2012).

2    The FDA has authority to investigate fraud, 21 U.S.C. § 372, consider citizen petitions, 21 C.F.R. § 10.30, and seek criminal and civil penalties particular to fraud-on-the-FDA, 21 U.S.C. § 332-33. Buckman, 531 U.S. at 349, 121 S. Ct. 1012.

**\*11** The parties have failed to brief whether federal regulatory law impliedly preempts Plaintiff's causes of action based on Lanx's submissions to the FDA. Accordingly, the parties are ORDERED to SHOW CAUSE as to whether these claims and others are or are not preempted. Show Cause Responses are due JANUARY 8, 2016.

*Conclusion*

Accordingly, the Defendant's Motion for Summary Judgment [94] is GRANTED IN PART. Plaintiff has failed to bring forth genuine issues of material fact as to the following claims: (1) all negligence claims; (2) all claims under the MPLA; and (3) all warranty claims.

The parties shall have until January 8, 2016, to show cause as to why FDA regulations do or do not impliedly preempt Plaintiff's claims regarding Lanx's failure to procure the appropriate 510(k) clearance from the FDA before introducing the Telluride System and/or pedicle screw into commerce.

SO ORDERED, this the 23rd day of December, 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9462964, Prod.Liab.Rep. (CCH) P 19,754

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

2020 WL 1434249
Only the Westlaw citation is currently available.
United States District Court, D. New Mexico.

Maria FIGUEROA, Plaintiff,

v.

ETHICON, INC., and Johnson
& Johnson, Defendants.

Case No. 2:19-cv-01188 KWR/KRS
|
Filed 03/24/2020

**Attorneys and Law Firms**

Dana Lizik, Pro Hac Vice, Johnson Law Group, Adam T.
Funk, Potts Law Firm, Houston, TX, for Plaintiff.

Anita Modak-Truran, Butler Snow, Nashville, TN, Timothy
C. Holm, Modrall, SPerling, Roehl, Harris & Sisk, P.A.,
Albuquerque, NM, for Defendants.

## MEMORANDUM OPINION AND ORDER

KEA W. RIGGS, UNITED STATES DISTRICT JUDGE

**\*1** THIS MATTER comes before the Court upon the
Defendants' Motion for partial dismissal, filed on January 23,
2020 **(Doc. 7)**. Having reviewed the parties' pleadings and
the applicable law, the Court finds that Defendants' motion
is well-taken in part and therefore is **GRANTED IN PART**
and **DENIED IN PART.** The strict liability and negligence
claims (Counts II and III) are dismissed with leave to amend.

## BACKGROUND

This case arises from the implantation of allegedly defective
pelvic mesh. On December 13, 2010 Plaintiff underwent
surgery to implant Defendant's pelvic mesh product to treat
her urinary incontinence. This pelvic mesh product was
designed, marketed and sold to treat this condition.

On December 22, 2016, Plaintiff underwent revision surgery
at Sandoval Regional Medical Center in Rio Rancho, New
Mexico. Plaintiff alleges she experienced significant mental
and physical pain and suffering, permanent injury and
physical deformity, and financial and economic loss.

Plaintiff alleges that contrary to Defendants' representations
and marketing, their pelvic mesh product has a high failure
and complication rate, fails to perform as intended, requires
frequent and debilitating re-operations and has caused severe
and irreversible injuries and damage. ¶ **25**.

Plaintiff filed this case asserting the following claims
against the Defendants: product liability – failure to warn
(Count I); strict liability (Count II); negligence (Count III);
negligent misrepresentation (Count IV); negligent infliction
of emotional distress (Count V); breach of express warranty
(Count VI); breach of implied warranty (Count VII); violation
of consumer protection laws (Count VIII); gross negligence
(Count IX); unjust enrichment (Count X); and punitive
damages (Count XI).

The Defendants moved for dismissal of Counts II, III,
V, VI, VII, VIII, IX and X. **Doc. 14**. Plaintiff agreed to
dismiss the following claims: Counts V, VI, VII, VIII, and
IX. Therefore, the following claims remain at issue in this
opinion: strict liability (Count II), negligence (Count III), and
unjust enrichment (Count X). This motion was fully briefed
on February 19, 2020 and is ready for decision.

## LEGAL STANDARD

Fed. Civ. P. Rule 8(a)(2) requires a complaint to set out "a
short and plain statement of the claim showing that the pleader
is entitled to relief." In reviewing a Fed. R. Civ. P. 12(b)
(6) motion to dismiss, "a court must accept as true all well-
pleaded facts, as distinguished from conclusory allegations,
and those facts must be viewed in the light most favorable
to the non-moving party." Moss v. Kopp, 559 F.3d 1155,
1159 (10th Cir. 2010). "To withstand a motion to dismiss, a
complaint must contain enough allegations of fact 'to state a
claim to relief that is plausible on its face.' " Ashcroft v. Iqbal,
556 U.S. 662, 678 (quoting Bell Atlantic Corp. v. Twombly,
550 U.S. 544, 570 (2007)). "A claim has facial plausibility
when the plaintiff pleads factual content that allows the
court to draw the reasonable inference that the defendant
is liable for the misconduct alleged." Id. Mere "labels and
conclusions" or "formulaic recitation[s] of the elements of a
cause of action" will not suffice. Twombly, 550 U.S. at 555.

**\*2** A claim has facial plausibility "when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct

2020 WL 1434249

alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## DISCUSSION

### I. Strict Liability and Negligence claims (Counts II and III).

Defendants argue that Plaintiff failed to assert sufficient factual allegations as to the strict liability (Count II) and Negligence (Count III) claims. The Court agrees.

It is unclear if Plaintiff states a design, manufacturing, or marketing defect strict liability claim. To state a strict products liability claim, Plaintiff must allege facts that could satisfy the following: "(i) the product was defective; (ii) the product was defective when it left the Defendants' hands and was substantially unchanged when it reached her; (iii) the product, because of the defect, was unreasonably dangerous to her; (iv) she suffered injury; and (v) the product's defective condition was [the] proximate cause [of her injuries]." *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1249 (D.N.M. 2019), *citing Armeanu v. Bridgestone/Firestone North Am. Tire, LLC*, 2006 WL 4060666, at *3 (D.N.M. 2006).

To assert a negligence claim Plaintiff must show the "existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d at 185-86. "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." *Id.* at ¶ 34. "It need not be the only cause, nor the last nor nearest cause." *Id.* "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." *Id.*

The complaint lack of factual allegations tailored specifically to Plaintiff. For example, Plaintiff does not identify the alleged defect in the mesh in her case nor her alleged injury, and it is therefore unclear how any defect caused any injury. *See, e.g., Mims v. Davol, Inc.*, No. 216CV00136MCAGBW, 2017 WL 3405559, at *5 (D.N.M. Mar. 22, 2017) (complaint

sufficient where Dr. Burton discovered product partially disintegrated and misshapen; disintegration indicated product was defective; and misshapenness caused several injuries, including bowel perforations, and caused plaintiff to undergo surgical interventions); *Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1250 (D.N.M. 2019) (complaint failed to sufficiently allege facts plausibly stating proximate causation element). Although Plaintiff indicated the injuries that have occurred in other cases, **Doc. 1-1 ¶ 34**, it is unclear what injuries Plaintiff suffered. Moreover, although the complaint alleges that the mesh failed in other cases, ¶ 21, it does not identify how the mesh was defective. For example, the complaint only alleges that she underwent revision surgery, but does not indicate why. It is unclear why the revision surgery was necessary. Similarly, it is also unclear how Defendants are alleged to have breached their duty of care.

\*3  As explained above, Plaintiff also failed to allege facts supporting the proximate causation element. Plaintiff does not allege any facts regarding a connection between her injuries and a defect in the Defendants' mesh.

To the extent Plaintiff alleges a manufacturing defect claim, she fails to allege that the mesh deviated from Defendants' design specifications.

The Court notes that in her response, Plaintiff does not identify any such well-pled factual allegations. Therefore, for the reasons stated by Defendants **(Docs. 8 and 16)** and above, the Court concludes that Plaintiff has failed to plead sufficient facts to state plausible strict liability and negligence claims.

### II. Unjust Enrichment (Count X).

To prevail on an unjust enrichment claim, "one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000–NMCA–051, ¶ 11. However, an unjust enrichment will fail if there is a "complete and adequate remedy at law." *Sims v. Sims*, 1996-NMSC-078, ¶ 28, 930 P.2d 153, 159 ("equity will not act if there is a complete and adequate remedy at law").

Defendants initially argue that this claim must be dismissed because there is an adequate remedy at law. However, Plaintiff may plead alternative, conflicting theories. Fed. R. Civ. P. 8(d)(2), (d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Therefore, it appears that Rule 8 allows alternative pleading of unjust

2020 WL 1434249

enrichment and legal claims. *See, e.g., In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1259 (D.N.M. 2017). It would be premature to dismiss the unjust enrichment claim and it is unclear at this time whether Plaintiff has an adequate remedy at law.

Defendants also argue that Plaintiff has not sufficiently alleged facts supporting the above elements. However, Plaintiff has alleged that (1) Defendants knew its products were defective or had a high failure rate, and (2) retaining the benefit would be unjust. Therefore, the Court concludes that Plaintiff has stated a plausible claim for unjust enrichment.

### III. Leave to Amend.

Plaintiff has requested leave to amend. At this stage in the case, amendment should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). The Court should grant leave to amend unless "it is 'patently obvious' that the plaintiff could not prevail on the facts alleged and allowing [her] an opportunity to amend [her] complaint would be futile." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), *quoted in Cohen v. Longshore*, 621 F.3d 1311, 1314–15 (10th Cir. 2010); *Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1131 (10th Cir. 1994) (court "should dismiss *with leave to amend* ... if it is at all possible that the party against whom the dismissal is directed can correct the defect in the pleading or state a claim for relief."), *quoted in Staats v. Cobb*, 455 F. App'x 816, 818 (10th Cir. 2011).

Here, the Court cannot conclude that amendment would be futile. For example, it appears possible for Plaintiff to state with specificity her injury, the alleged defect, and proximate causation.

**\*4** Therefore, Plaintiff may file an amended complaint as to the strict liability (Count II) and negligence (Count III) within **thirty (30) days** of the entry of this order.

### CONCLUSION

For the reasons stated above, the Court dismisses the strict liability and negligence claims (Counts II and III) with leave to amend. Plaintiff may file an amended complaint as noted below. The Court dismisses the following claims with prejudice, as Plaintiff does not oppose dismissal: negligent infliction of emotional distress (Count V), breach of warranty (Counts VI and VII), consumer protection act (Count VIII) and gross negligence (Count IX).

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Dismissal **(Doc. 7)** is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the strict liability and negligence claims (Counts II and III) are **DISMISSED WITH LEAVE TO AMEND.** Plaintiff may file an amended complaint within **thirty (30) days** of the entry of this order. If Plaintiff fails to timely amend, the Court may, upon motion of a party or *sua sponte*, dismiss Counts II and III with prejudice.

**IT IS FURTHER ORDERED** that the negligent infliction of emotional distress (Count V), breach of warranty (Counts VI and VII), consumer protection act (Count VIII) and gross negligence (Count IX) claims are **DISMISSED WITH PREJUDICE.**

**All Citations**

Slip Copy, 2020 WL 1434249

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

KeyCite Yellow Flag - Negative Treatment
Order Corrected on Denial of Reconsideration by In re Ford Tailgate
Litigation, N.D.Cal., April 15, 2014

2014 WL 1007066
United States District Court, N.D. California.
**San Francisco Division**

In re Ford Tailgate Litigation

Case No. 11–CV–2953–RS
|
Signed March 11, 2014
|
Filed March 12, 2014

**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT FORD MOTOR COMPANY'S
MOTION TO DISMISS PLAINTIFFS' SECOND
CONSOLIDATED AMENDED COMPLAINT**

Richard Seeborg, United States District Judge

**\*1** This putative class action involves thirty named
plaintiffs from twenty-five states who seek to represent a
nationwide class of millions of current and former owners or
lessees of Ford vehicles. Plaintiffs allege that due to faulty
manufacturing and/or design, the Ford vehicles at issue are
defective in that the appliqué panel on the rear liftgate of
the vehicles is prone to cracking, thereby posing a safety
hazard. The alleged defect is referred to here as the "Cracked
Tailgate Problem." None of the named plaintiffs alleges the
panel on his or her vehicle exhibited any cracking during
the vehicle's warranty period. Defendants now move for
partial dismissal of plaintiffs' Second Consolidated Amended
Complaint. For the following reasons, plaintiffs' express and
implied warranty claims arising under state law, as well as
other state tort claims are dismissed without leave to amend.
Plaintiffs' Magnuson Moss Warranty Act claim is dismissed
with leave to amend, as are the majority of plaintiffs' unjust
enrichment claims. The motion to dismiss is denied as to
certain of plaintiffs' consumer protection and deceptive trade
practices claims.

II. BACKGROUND

A. *Procedural History*

This case consolidates three separate lawsuits filed in
this district: *Nettleton v. Ford Motor Co.,* No. CV–11–
2953; *Gettman v. Ford Motor Co.,* No. CV–11–3133; and
*Perrone v. Ford Motor Co.,* No. CV–11–3832. Plaintiffs'
First Consolidated Amended Complaint added several named
Plaintiffs and sought certification of both a nationwide
class and twenty-five state subclasses. Ford answered the
complaint, and discovery commenced.

Plaintiffs filed their Second Consolidated Amended Class
Action Complaint (SCAC) on November 1, 2013, adding
two additional plaintiffs (one in New Jersey and one in
Florida). There are now a total of thirty named plaintiffs
representing twenty-five states.[1] The nationwide class is
defined as "[a]ll current and former owners or lessees of a
model 2002 through model 2005 Ford Explorer or Mercury
Mountaineer, or model 2003 through model 2005 Lincoln
Aviator, in the United States." (SCAC ¶ 294.) Plaintiffs assert
claims on behalf of themselves and a putative nationwide
class for violations of the Magnuson–Moss Warranty Act,
15 U.S.C. §§ 2301–2312. (*Id.* ¶¶ 10, 304–12.) Plaintiffs also
represent subclasses of current and former owners and lessees
who purchased the subject vehicles in one of the twenty-
five states in which the individual named plaintiffs reside.
(*Id.* ¶ 295(a)–(y)). Plaintiffs further allege state law claims,
including breach of express and implied warranties, breach
of implied warranty of merchantability, unjust enrichment,
violation of state consumer protection statutes, negligence,
and other state tort law claims. (*Id.* ¶¶ 313–876.) Ford now
moves to dismiss with prejudice fifty-seven of plaintiffs'
seventy-four claims under Fed.R.Civ.P. 12(b)(6).[2]

1    Alabama, California, Colorado, Connecticut,
     Florida, Georgia, Illinois, Indiana, Louisiana,
     Maryland, Massachusetts, Michigan, Mississippi,
     New Hampshire, New Jersey, New York,
     North Carolina, Ohio, Oklahoma, Pennsylvania,
     Tennessee, Texas, Virginia, Washington, and West
     Virginia

2    Ford's partial motion to dismiss comes three years
     after the filing of the first complaint relative to the
     Cracked Tailgate Problem, two and a half years
     after the complaints in this litigation were filed,
     and a full year and a half after Plaintiffs filed their
     Consolidated Amended Complaint setting forth
     their common allegations. Nevertheless, plaintiffs

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 173 of 520
PageID: 9094
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

do not argue that any portion of Ford's motion is precluded by its answer to the prior complaint.

B. *Factual Background* [3]

[3]      All factual allegations from the complaint are taken as true for purposes of this motion to dismiss.

**\*2**  In 2002, Ford redesigned its primary four-door sports utility vehicle model known then as the Ford Explorer/Mercury Mountaineer. The 2002 redesign served as the basis for the 2002 to 2005 model years for the Ford Explorer and Mercury Mountaineer vehicles and the 2003 to 2005 Lincoln Aviator. Thus, all the vehicles at issue are mechanically identical, share the same model chassis, and have materially identical liftgates and tailgates. Ford marketed, distributed, and warranted the Ford vehicles in the United States. During the calendar years 2002 through 2005, Ford sold at least 1,386,086 Ford Explorers, 174,243 Mercury Mountaineers, and 70,890 Lincoln Aviators in the United States, totaling approximately 1.6 million Ford vehicles at issue in this litigation.

Plaintiffs allege that Ford has been aware of the defect in the appliqué since the first car rolled off the assembly line in 2002. Among other reasons, they base that claim on allegations that the Cracked Tailgate Problem began occurring: (a) almost immediately after the first models of the Ford vehicles were sold; (b) in an identical position on the defective part (i.e., the lower panel on the tailgate); (c) with nearly identical resulting damage to the defective part (a vertical crack across the lower panel); (d) across all three brand models (i.e., Ford, Lincoln, and Mercury); and (e) to thousands of Ford vehicles throughout the United States. Ford thereafter issued several Technical Service Bulletins to its dealerships regarding the Cracked Tailgate Problem. These bulletins, issued between December of 2002 and November 2005, were circulated only to dealership service departments and not to vehicle owners or to the public.

The Cracked Tailgate Problem presents known safety hazards, according to plaintiffs. They claim that as a result of the defect, the liftglass window portion of the tailgate is more susceptible to breaking and shattering, which poses a risk of bodily harm. Plaintiffs aver that the appliqué may also detach and fly off while a vehicle is in operation, resulting in the known danger of vehiclerelated road debris.

Plaintiffs allege that Ford has actively concealed material information regarding this defect, thereby allowing the company to continue to sell and/or lease these vehicles to putative class members and to avoid the expense of the repair or redesign necessary to address properly the Cracked Tailgate Problem. As a result, plaintiffs aver, neither they nor the other putative class members could have discovered, even upon the reasonable exercise of diligence, that the Cracked Tailgate Problem was caused by a design or manufacturing flaw in the use of ABS or Xenoy for the tailgate.

III. LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Pleadings must be so construed so as to do justice." Fed.R.Civ.P. 8(e). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corporations,* 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir.1996).

IV. DISCUSSION

A. *Express and Implied Warranty Claims*

1. *Breach of Express Warranty*

**\*3**  Ford first argues that plaintiffs' express and implied warranty claims must be dismissed because none of the plaintiffs aver that the alleged defect (i.e., the cracked tailgate) manifested during the warranty period. Ford's New Vehicle Limited Warranty (NVLW) provides that "[d]uring the coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust, all parts on [the] vehicle that are defective in factory-supplied materials or workmanship." (Tew Decl., Ex. 1 at 5–6; Ex. 2 at 6–7.) [4] The

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 174 of 520
PageID: 9095
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

NVLW further provides that "coverage begins at the warranty start date and lasts for three years or 36,000 miles whichever occurs first" and "[t]he warranty period starts on the day [the buyer] take[s] delivery of [the] new vehicle or the day it is first put into service." (*Id.* at 2, 6–7.)

[4]    The warranties may be considered without converting this motion into a motion for summary judgment. *See Elias v. Hewlett–Packard Co.,* 903 F.Supp.2d 843, 850 n.1 (N.D.Cal.2012) (holding that court may consider contents of a manufacturer warranty on a Rule 12(b)(6) motion); *see also Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.") (internal citations omitted).

In response, plaintiffs counter that the alleged defect is not a cracked tailgate but rather a defective tailgate made from material prone to cracking. According to plaintiffs, this latent defect was present at the time of the purchase or lease, thus triggering Ford's obligations under its NVLW regardless of when the tailgates themselves cracked. In other words, according to plaintiffs, a cracked tailgate is simply a by-product of the defect and not the defect itself.

Ford persuasively argues that a majority of states have rejected similar latent defect claims, invoking cases from many—though not all [5]—of the states in which plaintiffs bring express warranty claims. Ford also points to a Ninth Circuit case recognizing that California has adopted this majority position: "The general rule is that an express warranty does not cover repairs made after the applicable time or mileage periods have elapsed." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir.2008) (quoting *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App.4th 824, 830, (2006)). *Clemens* goes on to criticize the position asserted by plaintiffs here, which the Ninth Circuit characterizes as one that "conflate[s] notions of express and implied warranty and pushe[s] the definition of "defect" to the breaking point." *Id.* The Ninth Circuit explains:

Every manufactured item is defective at the time of sale in the sense that it

will not last forever; the flip-side of this original sin is the product's useful life. If a manufacturer determines that useful life and warrants the product for a lesser period of time, we can hardly say that the warranty is implicated when the item fails after the warranty period expires. The product has performed as expressly warranted. Claims regarding other buyer expectations and the manufacturer's state of mind properly sound in fraud and implied warranty.

*Id.*

[5]    Defendants rely upon decisions on point in Connecticut, Maryland, Massachusetts, Mississippi, North Carolina, Oklahoma, Pennsylvania, Tennessee, and Virginia, but acknowledge they could not locate case law on point in Alabama, Indiana, New Hampshire, or West Virginia.

Plaintiffs offer only a single counter-example in which a federal court, applying Michigan and Tennessee state law, allowed the plaintiffs to proceed with an express warranty claim predicated on a latent defect theory. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069 (S.D.Ind.2001), *rev'd on other grounds,* 288 F.3d 1012 (7th Cir.2002). However, the plaintiffs in *Bridgestone/Firestone* alleged the defendants "expressly warrant[ed] the Tires and Explorers to be free of defects at the time of delivery." *Id.* at 1101. Plaintiffs make no such averment here; *Bridgestone/Firestone* is thus of little persuasive value. Indeed, as the Seventh Circuit noted on appeal, "most states would not entertain the sort of theory that plaintiffs press." 288 F.3d at 1017 (reversing the district court's class certification decision in that case on other grounds). In fact, the only Tennessee state court decision cited by either party rejected a similar latent defect argument. *Moulton v. Ford Motor Co.,* 13 UCC Rep. Serv. 55, 59, 1973 WL 21361 (Tenn.Ct.App. May 25, 1973).

**\*4** Defendants acknowledge they could not locate case law on point in Alabama, Indiana, New Hampshire, or West Virginia. Plaintiffs, however, make no argument as to why those states, which have also adopted the Uniform

In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

Commercial Code (U.C.C.), would reach any contrary result. Though mindful that the burden rests squarely with defendants to show that the facts as alleged fail to state even a plausible claim for relief, the absence of any contrary authority is persuasive. Plaintiffs' claims for breach of express warranty, must therefore be dismissed without leave to amend. [6]

[6]    Counts Two (Alabama), Twelve (Connecticut), Twenty–Three (Indiana), Thirty (Maryland), Thirty–Three (Massachusetts), Thirty–Seven (Mississippi), Forty (New Hampshire), Forty–Seven (North Carolina), Fifty–Four (Oklahoma) Fifty–Eight (Pennsylvania), Sixty Two (Tennessee), Sixty–Nine (Virginia), Seventy–Three (West Virginia).

*2. Implied Warranty Claims*

In addition to their express warranty claims, plaintiffs assert implied warranty claims in six states. [7] Ford counters that its NVLW expressly limits any implied warranties "to the time period covered by the written warranties." (Tew Decl., Ex. 1 at 4; Ex. 2 at 5.) The U.C.C., as adopted by each of the plaintiffs' states, permits sellers or manufacturers to limit expressly the duration of any implied warranties, as does the federal Magnuson–Moss Warranty Act. [8] Plaintiffs do not challenge Ford's ability to impose such a limit or the adequacy of this provision of the NVLW. Nor do they make any allegation that this particular provision was unconscionable. Instead, plaintiffs assert that the same latent defect theory discussed above makes this provision inapplicable as the vehicles were therefore not fit at the time of sale.

[7]    Colorado, Georgia, New Jersey, Oklahoma, Pennsylvania, and Texas.

[8]    See U.C.C. § 2–316(2); see also 15 U.S.C.A. § 2308(b) ( "implied warranties may be limited ... to the duration of a written warranty); Col.Rev.Stat. Ann. § 4–2–316; Tex. Bus. & Com.Code Ann. § 2.316; Ga.Code Ann. § 11–2–316; N.J. Stat. Ann. § 12A:2–316; Okla. Stat. Ann. tit. 12A, § 2–316; 13 Pa. Cons.Stat. Ann. §§ 2314–16.

While plaintiffs point to various state and federal decisions to suggest that an implied warranty claim may lie where a product is allegedly prone to defect at the time of sale even if the defect does not manifest, if at all, until after the close of the warranty period, none are persuasive. In fact, only one of those decisions concerns a state in which plaintiffs advance such a claim: *Hornberger v. Gen. Motors Corp.,* 929 F.Supp. 884, 887–88 (E.D.Pa.1996). [9] The district court in *Hornberger* found that the plaintiff did not receive any disclaimer of the implied warranty until after the sale was completed; thereby rendering the disclaimer invalid. Plaintiffs make no such allegation here, nor do they otherwise answer defendant's assertion that it explicitly limited all implied warranties to the duration of its express warranty as permitted by the law of each relevant state. In the absence of any allegation by plaintiffs that the durational limit here was unconscionable or otherwise invalid, plaintiffs implied warranties claims must be dismissed without leave to amend. [10]

[9]    Plaintiffs assert a related claim of tortious breach of warranty under Ohio state law, which is addressed below.

[10]    In the alternative, Ford argues the express and implied warranty claims in New Jersey, Connecticut and Maryland do not allege facts sufficient to satisfy the pre-suit notice requirement in those three states. In language adopted and incorporated into the commercial codes of each of these states, the Uniform Commercial Code, § 2–607(3) provides that a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." The SCAC, however, makes no averment that New Jersey plaintiffs Spencer Ware and Brian Martin ever notified Ford of the alleged defect. (SCAC ¶¶ 213–224.) Count Forty–Three (breach of implied warranty of merchantability under New Jersey law) is therefore also subject to dismissal for lack of pre-suit notice. Plaintiffs generally allege with respect to their Connecticut and Maryland warranty claims that "Ford has received sufficient and timely notice of the breaches of warranty. (SCAC ¶¶ 398, 529.) Plaintiffs also allege "[u]pon discovery the damage" to her vehicle, Maryland plaintiff Vivian Buchanan "requested that Ford repair the Cracked Tailgate Problem on her vehicle." (SCAC ¶ 183.) It is not necessary to determine whether general averments or a request to repair is sufficient as plaintiffs' express warranty claims in these states (Counts Twelve and Thirty) are otherwise

dismissed without leave to amend for the reasons
discussed above.

**\*5** Plaintiffs also assert a claim for tortious breach of
warranty under Ohio law, a form of action apparently intended
to provide a remedy to remote purchasers not covered
by written warranties due to the lack of privity. *Chemtrol
Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.,* 537 N.E.2d
624, 634 (Ohio 1989). As the *Chemtrol* court explained,
"Application of the doctrine of implied warranty in tort to
all products liability cases would render useless many, if not
all, of the Uniform Commercial Code provisions involving
products liability." *Id.* (internal quotations omitted). In this
case, the Ohio plaintiff, Diana Brunner, purchased her vehicle
from a Ford dealership and otherwise appears to be entitled
to the benefit of Ford's express NVLW and any implied
warranties not explicitly disclaimed therein. As such, Ford
argues and plaintiffs do not dispute that Brunner is not entitled
to relief under this hybrid tort remedy. In any case, Ohio
allows manufacturers to limit the duration of any implied
warranties. Ohio Rev.Code Ann. § 1302.29. The cases relied
upon by plaintiffs concern class certification and do not
establish any exception to the general rule discussed above.
County Forty–Nine is therefore dismissed without leave to
amend.

### 3. Magnuson–Moss Warranty Act

The Magnuson–Moss Warranty Act (MMWA) provides a
federal class action remedy for breach of an implied or
express warranty. 15 U.S.C. § 2310(d). "[C]laims under the
Magnuson—Moss Act stand or fall with [plaintiffs'] express
and implied warranty claims under state law. Therefore,
this court's disposition of the state law warranty claims
determines the disposition of the Magnuson—Moss Act
claims." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017,
1022 (9th Cir.2008). Those plaintiffs whose state law
warranty claims are herein dismissed therefore lack any basis
to assert claims under the Magnuson—Moss Act. Plaintiffs'
bare assertion that "any attempt by Defendants to limit the
express warranties in a manner that would exclude coverage
of the Ford Vehicles is unconscionable and any such effort
to disclaim, or otherwise limit, liability for the Ford Vehicles
is null and void," without more, is insufficient to show that
warranties should be treated as deceptive under the MMWA.
The Ninth Circuit has held that the same Ford NVLW at issue
in this litigation is not unconscionable. *See Smith v. Ford
Motor Co.,* 462 Fed.Appx. 660, 663 (9th Cir.2011).

Plaintiffs MMWA claim must also be dismissed as to those
plaintiffs in California, Florida, Illinois, Louisiana, Michigan,
New York, and Washington who do not allege any breach of
warranty claims under their respective state laws. Plaintiffs
argue they are "masters of their complaint [who] may choose
which claims to bring or not to bring." That may be true, but
without any allegations as to how plaintiffs in those states
have suffered a cognizable claim for breach of an implied or
express warranty under their states' laws when plaintiffs' other
express and implied warranty claims have failed, the SCAC
is insufficient to assert claims under the MMWA on their own
behalf or on behalf of others in those states. To the extent that
any of these deficiencies may be cured, Count One is therefore
dismissed with leave to amend.

### B. *Unjust Enrichment Claims*

Ford next moves to dismiss plaintiffs' unjust enrichment
claims. There is some debate as to whether a plaintiff
may allege a stand-alone claim for unjust enrichment
at all. California, among other jurisdictions, has rejected
independent unjust enrichment claims. *See Jogani v. Superior
Court,* 165 Cal.App.4th 901 (2008); *see also Baba v. Hewlett–
Packard Co.,* C 09–05946 RS, 2010 WL 2486353 (N.D. Cal.
June 16, 2010). Other states, like Florida, recognize such a
claim only where plaintiffs lack an adequate remedy at law.
*See Matthews v. Am. Honda Motor Co., Inc.,* 12–60630–CIV,
2012 WL 2520675 (S.D. Fla. June 6, 2012).

To the extent unjust enrichment is available as an independent
claim, and not merely a remedy, it will not stand where
the claim simply mirrors other statutory or tort claims.
Plaintiffs are, of course, entitled to plead alternative claims.
Fed.R.Civ.P. 8(d). However, "where the unjust enrichment
claim relies upon the same factual predicates as a plaintiff's
legal causes of action, it is not a true alternative theory of relief
but rather is duplicative of those legal causes of action." *Licul
v. Volkswagen Grp. of Am., Inc.,* 13–61686–CIV, 2013 WL
6328734 (S.D.Fla. Dec. 5, 2013); *see also In re Apple & AT &
T iPad Unlimited Data Plan Litig.,* 802 F.Supp.2d 1070, 1077
(N.D.Cal.2011) ("plaintiffs can not assert unjust enrichment
claims that are merely duplicative of statutory or tort claims").
As in those cases, plaintiffs do not distinguish the alleged
deception underlying their unjust enrichment claims from that
underlying their state tort claims. If plaintiffs claim they were
damaged as a result of consumer deception, the proper remedy
is under their respective state consumer protection statutes.
If plaintiffs claim Ford failed to perform under the terms
of its express warranty or implied warranty, the appropriate
remedy is under those claims for relief. Should plaintiffs

ultimately be unable to recover under either a contract or tort theory, it does not mean a legal remedy was unavailable (thereby justifying an equitable remedy of unjust enrichment), but only that their claim lacks merit. Defendant's motion to dismiss must therefore be granted as to plaintiffs' claims for unjust enrichment. [11] These claims are dismissed with leave to amend except for the California claim (Count Seven), as that state has specifically rejected such a claim in this context. *See Jogani,* 165 Cal.App.4th 901. [12]

[11]    Counts Three, Thirteen, Sixteen, Nineteen, Twenty–One, Twenty–Four, Thirty–One, Thirty–Four, Thirty–Eight, Forty–One, Forty–Five, Forty–Eight, Fifty, Fifty–Six, Sixty, Sixty–Three, Sixty–Seven, Seventy, and Seventy–Four.

[12]    The Florida claim (Count Sixteen) is also dismissed without leave to amend as to one of the two Florida plaintiffs as that claim is partially time-barred, for reasons discussed below.

## C. *Economic Loss Doctrine*

### 1. *Ohio Negligence Claim*

 **\*6** Like many jurisdictions, the Ohio Supreme Court has held that a plaintiff cannot recover in negligence for purely economic losses allegedly caused by a defective product when the only damage is to the product itself. *Inglis v. Am. Motors Corp.,* 209 N.E.2d 583, 588 (1965); *see E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 868–75 (1986). A more recent Ohio decision suggested in dicta that this rule applies only where the consumer was in privity with the manufacturer at the time of sale. *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.,* 537 N.E.2d 624 (Ohio 1989). "For an ordinary consumer, i.e., one not in privity of contract with the seller or manufacturer against whom recovery is sought, an action in negligence may be an appropriate remedy to protect the consumer's property interests." *Id.* at 631. The question presented in *Chemtrol* was whether a commercial buyer could recover economic loss in strict liability where the parties are in privity of contract, a question the Ohio court answered in the negative. *Id.* at 635. The Ohio state courts, however, continue to apply *Inglis* not *Chemtrol* in cases involving individual consumers. *See Potts v. Safeco Ins. Co.,* No.2009CA0083, 2010 WL 183 973 8, at \*2 (Ohio Ct.App. May 3, 2010) (affirming summary judgment for insurance company, agent, and agency against noncommercial plaintiffs' negligence action to recover economic losses); *Hundemer v. Partin,*

No. CA2007–01–006, 2007 WL 3054324, at \*5 (Ohio Ct.App. Oct. 22, 2007) (affirming dismissal of individual's negligence claim); *Lee v. Chrysler Corp.,* No.2004CA00164, 2005 WL 449762, at \*3 (Ohio Ct.App. Feb. 22, 2005) (affirming dismissal of consumer's negligence claim against the manufacturer for economic losses).

Plaintiffs rely on three recent decisions from the federal district court that applied *Chemtrol* to allow negligence claims where, as here, the parties are not in privity. *See, e.g., In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.,* 880 F.Supp.2d 801, 816, 871–73 (S.D.Ohio 2012); *Hale v. Enerco Grp., Inc.,* No. 1:10 CV 00867–DAP, 2011 U.S. Dist. LEXIS 781, at \*19–20 (N.D.Ohio Jan. 5, 2011) ("[I]n cases where the parties are not in privity of contract, [Ohio] courts apply a more relaxed rule, allowing individual consumers to bring negligence claims for solely economic injuries.") (quotation omitted); *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.,*684 F.Supp.2d 942, 951 (N.D.Ohio 2009) (same). None of these federal cases cite *Inglis* or discuss the continuing viability of that case. Because *Inglis* continues to be the rule in Ohio, defendant's motion to dismiss plaintiffs' Ohio negligence claim (Count Fifty–One) must be granted without leave to amend.

### 2. *North Carolina and Pennsylvania Consumer Protection Claims*

Ford next argues the economic loss rule bars plaintiffs consumer protection claims in North Carolina and Pennsylvania. As the law is not clear in either state, plaintiffs' claim cannot be dismissed at this stage as a matter of law.

Ford's argument that the economic loss rule should bar plaintiffs' claim under North Carolina's Unfair and Deceptive Trade Practice Act (UDTPA) rests on federal district court cases holding such claims should be barred. Neither party here points to any North Carolina cases directly addressing whether the economic loss rule precludes claims under the UDTPA. Plaintiffs rely on *Coley v. Champion Home Builders Co.,* 590 S.E.2d 20 (N.C.Ct.App.2004), which held that the plaintiffs sufficiently pleaded actual injury on the basis of a product defect that exposed them to the risk of personal injury and property damage, even though they did not seek damages beyond their replacement cost. *Coley* did not consider the economic loss rule, but neither does Ford point to any decisions from North Carolina precluding such claims. In the absence of such authority, it cannot be said at this juncture that plaintiffs' claims in Count Forty–Six are barred as a matter of law.

The same is true in Pennsylvania. In the absence of any binding authority from the Pennsylvania courts concerning the economic loss rule, the Third Circuit upheld the district court's dismissal of similar claims, predicting that the Pennsylvania courts would apply the economic loss doctrine to bar such claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Claims Law (UTPCPL). See *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 681 (3d Cir.2002). The Pennsylvania Supreme Court has yet to weigh in, but several Pennsylvania trial and intermediate appellate decisions have rejected the Third Circuit's analysis. In rejecting *Werwinski,* "[t]he [Pennsylvania] state courts explained that applying the economic loss doctrine to claims under the Pennsylvania Law would eviscerate the purpose of the statute and that the Pennsylvania legislature was fully aware of the doctrine when it enacted the Pennsylvania Law and thus did not intend for the doctrine to bar claims brought pursuant to the Law." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* No. 05 C 4742, 05 C 2623, 2009 WL 937256, at *9 (N.D.Ill. Apr. 6, 2009) (citations omitted); *see also Seward v. Certo,* No. 05–6363, 2006 WL 266150, at *2 (E.D.Pa. Feb. 2, 2006) ("Pennsylvania courts, noting that lower federal court holdings are not binding on state courts, have expressly disagreed with *Werwinski* 's holding and refused to apply the economic loss doctrine to UTPCPL claims.") (citations omitted). In light of this contradictory authority, plaintiffs' claim (Count Fifty–Seven) cannot be dismissed at this stage as a matter of law.

### 3. Colorado Strict Liability Claim

*7 In 2000, the Colorado Supreme Court adopted the economic loss doctrine, holding "that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1264 (Colo.2000). Although the claim at issue in *Town of Alma* was for negligence, the state court engaged in a broad review of the development of the economic loss rule in tort law. *Id.* at 1259–1264. The court concluded, "Consistent with this duty analysis, we now expressly adopt the economic loss rule. We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264. Consistent with *Town of Alma,* Ford's motion to dismiss is granted without leave to amend as to plaintiffs' strict liability claim (Count Nine).

### D. *Statute of Limitations*

#### 1. *Florida Deceptive and Unfair Trade Practices Act and Unjust Enrichment Claims*

Ford next moves to dismiss the claims of Florida plaintiffs Zane Dery and Lynne Benson brought under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count Fourteen) and for unjust enrichment (Count Sixteen). [13] Benson purchased a new 2005 Ford Explorer in 2006. Dery's claims are predicated on two different Ford vehicle purchases: a used 2003 Lincoln Aviator purchased in 2006 and a used 2005 Lincoln Aviator purchased in 2008. Ford does not argue Dery's FDUPTA and unjust enrichment claims predicated on the 2008 purchase are time barred. It does argue, however, that Benson's claims and Dery's claims as they relate to his 2006 purchase are barred by the four-year statute of limitations set forth in Fla. Stat. § 95.11(d)(f). *See McKissic v. Country Coach, Inc.,* No. 07–1488, 2008 WL 616093, at *4 (M.D.Fla. Mar. 3, 2008) (FDUTPA claim); *Swafford v. Schweitzer,* 906 So.2d 1194, 1195 (Fla.Dist.Ct.App.2005) (unjust enrichment claim).

[13]    Ford also moves to dismiss the Florida plaintiffs' negligence claim (Count Fifteen); plaintiffs do not oppose this motion.

Under Florida law, the statute of limitations applies from the time the action accrued; in this case, the date of purchase. *See S. Motor Co. of Dade Cnty. v. Doktorczyk,* 957 So.2d 1215, 1217 (Fla.Dist.Ct.App.2007) (holding that FDUTPA claim accrues at time vehicle was purchased); *Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.,* 938 So.2d 571, 577 (Fla.Dist.Ct.App.2006) (holding that unjust enrichment claim accrues when benefit is conferred). Time thus began to accrue in 2006 for both Benson and Dery, expiring sometime in 2010 for both claims and before this action was filed in 2011.

Plaintiffs argue incorrectly that the statute of limitations was tolled until plaintiffs discovered the defect according to the doctrine of fraudulent concealment. Florida's tolling statute, Fla. Stat. Ann. § 95.051, "specifically precludes application of any tolling provision not specifically provided therein." *Hearndon v. Graham,* 767 So.2d 1179, 1185 (Fla.2000) (holding delayed discovery may delay the time of accrual but does not toll the applicable statute of limitations). Fraudulent concealment is not listed in § 95.051 among the bases for tolling a statute of limitations. Plaintiffs do not assert delayed discovery here. *Cf. McKissic,* 2008 WL 616093, at *4 (holding that delayed discovery does not apply to FDUTPA

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 179 of 520
PageID: 9100
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

and/or unjust enrichment claims). Benson's claims under the FDUTPA (Count Fourteen) and for unjust enrichment (Count Sixteen) must therefore be dismissed without leave to amend, as must Dery's claims as to his 2003 model year vehicle.

### 2. California Legal Remedies Act (CLRA) Claim
A CLRA claim must "be commenced not more than three years from the date of the commission of such method, act, or practice." Cal. Civ.Code § 1783. Ford argues that plaintiff Sally Nettleton's CLRA claim is time-barred because she alleges she discovered the crack in the appliqué in February 2008 but did not file her Complaint until June 15, 2011.

**\*8** In response, plaintiffs claim that the delayed discovery rule applies as Nettleton's discovery of the crack did not constitute discovery of the alleged defect. "In order to invoke the discovery rule, the plaintiff must plead and prove facts showing: (a) lack of knowledge; (b) lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date); and (c) how and when he did actually discover the fraud or mistake." *Saaremets v. Whirlpool Corp.,* No. 09–2337, 2010 U.S. Dist. LEXIS 26165, at \*16 (E.D.Cal. Mar. 18, 2010) (citing *Gen. Bedding Corp. v. Echevarria,* 947 F.2d 1395, 1397 (9th Cir.1991)). Plaintiffs do not allege any facts to satisfy this third requirement.

Plaintiffs further argue the statute of limitations was tolled in December 2010 by the filing of a putative class action compliant in the Southern District of California that encompassed Nettleton's claims pursuant to *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974). The equitable tolling doctrine articulated in *American Pipe,* however, applies only to federal question claims and not to plaintiffs' state law claim under the CLRA. *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1025 (9th Cir.2008) (declining to apply the doctrine of cross jurisdictional tolling to a California state law claim).

In the alternative, plaintiffs allege the statute of limitations was tolled by virtue of the fraudulent concealment doctrine. To establish fraudulent concealment, a plaintiff must plead the following: "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Saaremets,* 2010 U.S. Dist. LEXIS 26165 at \*19–20 (quoting *Clemens,* 534 F.3d at 1024). Fraudulent concealment tolling must be pled with particularity under

Fed.R.Civ.P. 9(b). If, as plaintiffs allege, the crack discovered by Nettleton in 2008 is merely a symptom of the defect and not the defect itself, then plaintiffs do not plead the circumstances under which Nettleton became aware of the defect, making it impossible to determine what information was lacking in 2008 such that she possessed neither actual nor presumptive knowledge of facts sufficient to put her on notice as to the nature of her claim. On this basis, Count Five must therefore be dismissed with leave to amend.

### 3. Louisiana Redhibition Claim
The prescriptive period for Louisiana redhibition claims is one year from the date the buyer discovers the alleged defect, or four years from the date the product is delivered to the buyer, whichever is earlier. La. Civ.Code Art. 2534(A)(1). If the seller knows, or is presumed to know, of the existence of the alleged defect, the one-year discovery rule applies regardless of the delivery date. La. Civ.Code Art. 2534(B).

Louisiana Plaintiff Connie Samaha alleges she discovered the cracked appliqué for the first time in 2005 (compl.¶ 175), and then discovered a second crack in April 2011 (compl.¶ 176). Although the tolling period would have run in 2006 based on her discovery of the initial crack, plaintiffs argue Samaha's discovery of the crack in 2005 did not constitute discovery of the underlying defect. This is the same latent defect argument rejected in most jurisdictions, as discussed above, and plaintiffs do not point to any contrary authority from Louisiana. Samaha's redhibition claim (Count Twenty–Six) is therefore time-barred and must be dismissed without leave to amend.

### E. Statutory Fraud Claims In California, West Virginia, And Massachusetts
**\*9** Ford next moves to dismiss plaintiffs' statutory fraud claims in California (Count Five), Massachusetts (Count Thirty–Two), and West Virginia (Count Seventy–Two) because the SCAC does not adequately allege that plaintiffs provided the required pre-suit notice to Ford before filing the original complaints in these consolidated cases. Pre-suit notice is required by the law of each of these states. The CLRA mandates that "[t]hirty days or more prior to the commencement of an action for damages [under the CLRA], the consumer shall ... [n]otify the person alleged to have" violated the CLRA "of the particular alleged violations" and "[d]emand that the person correct, repair, replace, or otherwise rectify" the violations. Cal. Civ.Code § 1782(a). Similarly, the Massachusetts Consumer Protection

Act requires the plaintiff to allege and prove that the defendant was sent a demand letter thirty days prior to filing suit. Mass. Gen. Laws. ch. 93A, § 1; *see York v. Sullivan,* 338 N.E.2d 341, 346 (Mass.1975). Under the West Virginia Consumer Credit and Protection Act, the plaintiff must provide the defendant notice of the alleged violation of the WVCCPA in writing and by certified mail prior to filing suit. W. Va.Code Ann. § 46A–6–106(b).

In support of their Massachusetts and West Virginia claims, plaintiffs generally plead that notice was given to Ford. (SCAC ¶¶ 294, 542.) Nothing more is required at this stage. In Massachusetts, moreover, the failure of a buyer to notify the seller of a breach of warranty only permits a bar for recovery when there has been prejudice to the defendant—a factual determination. *See* M.G.L.A. c. 106, § 2–318; *Henrick,* 458 N.E.2d 773; *see also Baba v. Hewlett–Packard Co.,* C 09–05946 RS, 2010 WL 2486353 (N.D. Cal. June 16, 2010). Defendant's motion must therefore be denied as to Counts Thirty–Two and Seventy–Two.

Plaintiffs do not allege that notice was provided as to the California claim, arguing instead that notice is not required as plaintiffs do not seek compensatory relief, only restitution, declaratory relief, and injunctive relief. Cal. Civ.Code § 1782(d) expressly provides that "an action for injunctive relief" may be brought without pre-suit notice. Section 1782(a) specifies that the notice requirement applies to an "action for damages." There is some disagreement as to whether pre-suit notice is required when the only monetary relief sought is restitution. *Compare Cuevas v. United Brands Co., Inc.,* No. 11–991, 2012 WL 760403 (S.D.Cal. Mar. 8, 2012) (holding that a claim for disgorgement or restitution is a claim for damages) *with Util. Consumers' Action Network v. Sprint Solutions, Inc.,* No. 07–2231, 2008 WL 1946859 (S.D.Cal. Apr. 25, 2008) ("Prefiling notice is not required for a CLRA claim for restitution."). However, the statutory scheme when read as a whole favors defendants' interpretation. Section 1780, lists the available remedies for violations of the CLRA, including "actual damages," injunctive relief, and restitution. If the notice requirement in § 1782(a) pertaining to "an action for damages" is read narrowly to apply only to "actual damages," it would render the word "actual" in § 1780 redundant and ignore the Legislature's specific exemption of "injunctive relief" in § 1782(d). [14] Accordingly, plaintiffs' restitution claim under CLRA (Count Five) is dismissed with leave to amend if plaintiffs can allege that pre-filing notice was given.

[14]   *See Laster v. T–Mobile USA, Inc.,* No. 5–1167, 2008 WL 5216255 (S.D.Cal. Aug. 11, 2008) (reaching the same conclusion) *aff'd sub nom. Laster v. AT & T Mobility LLC,* 584 F.3d 849 (9th Cir.2009) rev'd on other grounds, 131 S.Ct. 1740 (2011).

**F. *Tennessee Consumer Protection Act Claim***
Finally, Ford moves to dismiss the putative class claim under the Tennessee Consumer Protection Act (TCPA). The Tennessee Supreme Court has held that the language of the TCPA is "unambiguous" that it applies only to claims brought individually. *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 309 (Tenn.2008). "[W]hether a state law displaces a federal rule 'turns on whether the state law actually is part of a State's framework of substantive rights or remedies.' " *Bearden v. Honeywell Int'l Inc.,* 2010 WL 3239285, at *9 (M.D.Tenn. Aug. 16, 2010) (citing *Shady Grove Ortho Assoc., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 418 (2010) (hereinafter *Shady Grove* )). *Bearden* held "that the class action limitation contained in the TCPA is so intertwined with that statute's rights and remedies that it functions to define the scope of the substantive rights.... Because the restriction is a part of Tennessee's framework of substantive rights and remedies, Rule 23 does not apply." *Id.* at *10. [15] *See also Tait v. BSH Home Appliances Corp.,* 2011 WL 1832941, at *8 (C.D.Cal. May 12, 2011) (following *Bearden* 's analysis and dismissing the class claim under the TCPA with prejudice); *In re Optical Disk Drive Antitrust Litig.,* 3:10–MD–2143 RS, 2012 WL 1366718 (N.D.Cal. Apr. 19, 2012) (similar). [16] Tennessee plaintiff Gary Buck's claim under the TCPA (County Sixty–One) must be dismissed to the extent that he asserts the TCPA claim on behalf of a class, with leave to amend.

[15]   *Thorogood v. Sears Roebuck and Co.,* 547 F.3d 742 (7th Cir.2008) does not hold otherwise. Although that decision noted in dicta that the Tennessee court's decision on state substantive law does not control federal procedure in a diversity case, the court went on to observe the defendant there was "on to something." *Id.* at 746. "Even though the plaintiff bases his claim, and that of any other Tennesseans who happen to be members of the class, on Tennessee law, he and they are seeking a breadth of relief that Tennessee does not offer them in its courts. Maybe that is a defect of Tennessee law. But the purpose of the diversity jurisdiction

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 181 of 520
PageID: 9102
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 1007066, 83 UCC Rep.Serv.2d 115

is to protect out-of-state residents against state judicial bias in favor of residents; it is not to expand the relief obtainable under state law." *Id.* (reversing class certification on other grounds).

16    The Ninth Circuit has not yet addressed *Shady Grove,* in which a fractured Court articulated contrasting approaches to determine whether a New York statute prohibiting class actions in particular suits precluded a federal district court sitting in diversity from entertaining a class action under Rule 23. District court decisions in this circuit have varied. *See, e.g. In re Hydroxycut Mktg. & Sales Practices Litig.,* No. 09–2087, 2014 WL 295302 (S.D.Cal. Jan. 27, 2014) (analyzing the fractured opinion in *Shady Grove* according to *Marks v. United States,* 430 U.S. 188, 193, (1977) and concluding that "Rule 23 governs Plaintiffs' claims, and Plaintiffs' claims are not subject to dismissal based on the state statutes prohibiting class actions").

## V. CONCLUSION

 **\*10** For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part.[17]

17    Plaintiffs do not oppose Ford's motion to dismiss Plaintiff Dery's, Benson's, Caunt's, and Hardee's negligence claims (Counts Fifteen, Thirty–Six, and Sixty–Six); Plaintiff Samaha's claims for violation of the Louisiana Unfair Trade Practices and Consumer Protection Act (Count Twenty–Five), breach of contract (Count Twenty–Seven), or unjust enrichment (Count Twenty–Eight); or Plaintiff Douglas's claim under the Oklahoma Deceptive Trade Practices Act (Count Fifty–Three). These claims are therefore dismissed with prejudice.

The following counts of the SCAC are hereby DISMISSED without leave to amend:

- *Breach of Express Warranty:* Counts Two, Twelve, Twenty–Three, Thirty, Thirty–Three, Thirty–Seven, Forty, Forty–Seven, Fifty–Four, Fifty–Eight, Sixty–Two, Sixty–Nine, and Seventy–Three;

- *Breach of Implied Warranty:* Counts Ten, Seventeen, Forty–Three, Fifty–Five, Fifty–Nine, and Sixty–Five;

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Counts Five, Fourteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only); Twenty–Five, and Fifty–Three;

- *Unjust Enrichment:* Count Seven, Sixteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only), and Twenty–Eight;

- *Tort Claims:* Counts Nine, Fifteen, Thirty–Six, Forty–Nine, Fifty–One, Sixty–Six; and

- *Other:* Counts Twenty–Six and Twenty–Seven.

The following counts of the SCAC are hereby DISMISSED with leave to amend:

- *Magnuson Moss Act Claim:* Count One;

- *Unjust Enrichment:* Counts Three, Thirteen, Sixteen (as to Plaintiff Dery's 2005 model year vehicle only), Nineteen, Twenty–One, Twenty–Four, Thirty–One, Thirty–Four, Thirty–Eight, Forty–One, Forty–Five, Forty–Eight, Fifty, Fifty–Six, Sixty, Sixty–Three, Sixty–Seven, Seventy, and Seventy–Four; and

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Fourteen (as to Plaintiff Dery's 2005 model year vehicle only), and Sixty–One.

Defendants' motion to dismiss is DENIED as to the following counts of the SCAC:

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Thirty–Two, Forty–Six, Fifty–Seven, and Seventy–Two.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 1007066, 83 UCC Rep.Serv.2d 115

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

In re Ford Tailgate Litigation, Not Reported in Fed. Supp. (2014)

2014 WL 12649204

2014 WL 12649204
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Francisco Division.

IN RE FORD TAILGATE LITIGATION

Case No. 11-CV-2953-RS
|
Signed 04/15/2014

ORDER GRANTING LEAVE TO FILE MOTION
FOR RECONSIDERATION, DENYING MOTION
FOR RECONSIDERATION, AMENDING
PRIOR ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS,
AND EXTENDING TIME TO AMEND

The Honorable Richard Seeborg, United States District Judge

*1 Pursuant to Civil Local Rule 7-9, plaintiffs request leave to file a motion for reconsideration of the prior order granting in part and denying in part defendants' motions to dismiss. (ECF No. 162.) Specifically, plaintiffs request reconsideration for failure to address plaintiffs' argument that Ford's express warranty was unconscionable and that equitable tolling should apply to the California plaintiff's Consumer Legal Remedies Act ("CLRA"). Plaintiffs also seek to correct certain scrivener's errors in the order. Because the order did not directly address these arguments, plaintiffs' application for leave to file is hereby granted. Plaintiffs' motion for reconsideration is, however, denied, except as to two corrections noted below to the March 12, 2014 order.

First, plaintiffs argue that the court's prior order failed to consider their allegations that Ford's express warranty was unconscionable. In their complaint, plaintiffs stated that "any attempt by Defendants to limit the express warranties in a manner that would exclude coverage of the Ford Vehicles in unconscionable" (¶ 309) and "any express limitation or negation of Ford's implied warranty, including any time limitation, is unconscionable, unreasonable, and unenforceable" (¶ 632). The former allegation was offered in support of Count One (violations of the federal Magnuson-Moss Act, 15 U.S.C. §§ 2301–12, based on Ford's written warranty). The latter allegation was offered in support of Count 43 (breach of the implied warranty of merchantability

on behalf of the putative New Jersey sub-class) and not in regard to plaintiffs' express warranty claims.

Although they may provide the framework of a complaint, legal conclusions are not accepted as true and "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Apart from these conclusory allegations that Ford's warranty was "unconscionable," plaintiffs offer no specific allegations as to how the durational limit of Ford's express warranty was either procedurally or substantively unconscionable.

Second, plaintiffs submit that the California plaintiffs' CLRA claim was dismissed on statute of limitations grounds without considering an alternative legal argument presented at oral argument regarding tolling. As the prior order stated, "The equitable tolling doctrine articulated in American Pipe, however, applies only to federal question claims and not to plaintiffs' state law claim under the CLRA. Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1025 (9th Cir. 2008) (declining to apply the doctrine of cross-jurisdictional tolling to a California state law claim)." See American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).

Although Clemens is clear that the federal tolling rule articulated in American Pipe does not apply to California state law claims, plaintiffs correctly note that a later Ninth Circuit decision, Hatfield v. Halifax PLC, 564 F.3d 1177 (2009), held that a separate California rule does permit equitable tolling of a CLRA claim where there is "(1) timely notice to the defendant in the filing of the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct by the plaintiff in filing the second claim." Hatfield, 564 F.3d at 1185 (citing Collier v. City of Pasadena, 191 Cal. Rptr. 681, 685 (1983)). It is not necessary to reach this argument, however, as plaintiff's CLRA claim was otherwise subject to dismissal with leave to amend for lack of pre-filing notice.

*2 Third, plaintiffs note two scrivener errors in the summation appearing on pages 19-20 of the March 12, 2014 order. Count Five (Nettleton's CLRA claim) was incorrectly listed among those counts dismissed without leave to amend. Count Five was dismissed based on a finding that "plaintiffs do not plead the circumstances under which Nettleton became aware of the defect." Plaintiffs will, therefore, have an opportunity to amend this claim. Second, Count Fourteen (violation of the Florida Deceptive and Unfair Trade Practices

In re Ford Tailgate Litigation, Not Reported in Fed. Supp., 2014...
2014 WL 12649204

Act) as it pertains to plaintiff Dery's 2005 vehicle was not the subject of Ford's motion to dismiss, as noted on page 14 of the Order.

As hereby corrected, the summation appearing on pages 19-20 of the March 12, 2014 order should read as follows:

"The following counts of the SCAC are hereby DISMISSED without leave to amend:

- Breach of Express Warranty: Counts Two, Twelve, Twenty-Three, Thirty, Thirty-Three, Thirty-Seven, Forty, Forty-Seven, Fifty-Four, Fifty-Eight, Sixty-Two, Sixty-Nine, and Seventy-Three;

- Breach of Implied Warranty: Counts Ten, Seventeen, Forty-Three, Fifty-Five, Fifty-Nine, and Sixty-Five;

- Violation of Consumer Protection/Deceptive Trade Practices Statutes: Counts Fourteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only); Twenty-Five, and Fifty-Three;

- Unjust Enrichment: Count Seven, Sixteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only), and Twenty-Eight;

- Tort Claims: Counts Nine, Fifteen, Thirty-Six, Forty-Nine, Fifty-One, Sixty-Six; and

- Other: Counts Twenty-Six and Twenty-Seven.

"The following counts of the SCAC are hereby DISMISSED with leave to amend:

- Magnuson Moss Act Claim: Count One;

- Unjust Enrichment: Counts Three, Thirteen, Sixteen (as to Plaintiff Dery's 2005 model year vehicle only), Nineteen, Twenty-One, Twenty-Four, Thirty-One, Thirty-Four, Thirty-Eight, Forty-One, Forty-Five, Forty-Eight, Fifty, Fifty-Six, Sixty, Sixty-Three, Sixty-Seven, Seventy, and Seventy-Four; and

- Violation of Consumer Protection/Deceptive Trade Practices Statutes: Counts Five and Sixty-One.

"Defendants' motion to dismiss is DENIED as to the following counts of the SCAC:

- Violation of Consumer Protection/Deceptive Trade Practices Statutes: Thirty-Two,

- "Forty-Six, Fifty-Seven, and Seventy-Two."

Finally, plaintiffs unopposed request for an extension of time to file the amended complaint and Ford's response thereto is granted. Plaintiffs' amended complaint is due 21 days from the date of this order, with Ford's response to the amended complaint to follow within 21 days thereafter.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12649204

---

End of Document
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 185 of 520
PageID: 9106
In re General Motors LLC Ignition Switch Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3443623

2017 WL 3443623
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: GENERAL MOTORS LLC
IGNITION SWITCH LITIGATION
This Document Relates To All Actions

14-MD-2543 (JMF)
|
14-MC-2543 (JMF)
|
Signed 08/09/2017

MEMORANDUM OPINION AND ORDER

JESSE M. FURMAN, United States District Judge

**[Regarding Plaintiffs' Motion for Reconsideration and/or Clarification of the Court's Order Dismissing the Claims of "Pre-Recall Plaintiffs"]**

 *1 In an Opinion and Order entered on June 30, 2017, familiarity with which is assumed, the Court granted in part and denied in part a partial motion to dismiss that Defendant General Motors LLC ("New GM") had filed with respect to the Plaintiffs' Fourth Amended Consolidated Complaint ("FACC") in this multidistrict litigation ("MDL"). *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2017 WL 2839154 (June 30, 2017). The Court's 129-page Opinion and Order addressed a multitude of complex issues, including one narrow but important one that the parties had addressed only briefly in their memoranda of law: Whether Plaintiffs who had sold, traded in, or returned their vehicles prior to the recalls of those vehicles that began in February 2014 ("Pre-Recall Plaintiffs") had valid claims for economic loss. The Court held that they did not, on the theory that a plaintiff who had resold her car before any recall was announced could not have suffered economic loss damages because "the then-unknown defect could not have affected the resale price." *Id.* at *10. [1] Plaintiffs now move for reconsideration of that one aspect of the Court's Opinion and Order. (Docket Nos. 4256 & 4257 ("Pls.' Mem.")). For the reasons stated below, Plaintiffs' motion is GRANTED.

[1]
Although irrelevant for present purposes, the Court ultimately granted the Pre-Recall Plaintiffs leave to amend on the ground that some of them might be able to "plead and prove damages in the form of out-of-pocket expenses and lost time"—for example, by alleging payment for defect-related repairs prior to disposing of a vehicle. *Id.*

Motions for reconsideration are governed by Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, which are meant to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Medisim Ltd. v. BestMed LLC*, No. 10-CV-2463 (SAS), 2012 WL 1450420, at *1 (S.D.N.Y. Apr. 23, 2012) (internal quotation marks omitted). "The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560 (S.D.N.Y. 2011) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). "It is well established that the rules permitting motions for reconsideration must be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the [C]ourt." *SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, No. 14-CV-2270 (JMF), 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) (internal quotation marks omitted). Ultimately, though, a district court "has broad discretion in determining whether to grant a motion [for reconsideration]." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).

 *2 In light of this stringent standard, New GM's argument that Plaintiffs' motion should be rejected as an improper attempt to relitigate an issue they lost has considerable force. (Docket No. 4328 ("New GM Opp'n"), at 1-4). After all, New GM explicitly sought to dismiss the claims of the Pre-Recall Plaintiffs for lack of damages (Docket No. 3578 ("New GM MTD Mem."), at 23), and Plaintiffs responded to that argument—albeit in a single sentence relegated to a footnote. (Docket No. 3661, at 24 n.17). Additionally, the Court is largely unpersuaded by Plaintiffs' arguments on the merits (as it was by the footnote in Plaintiffs' original memorandum of law). They contend, for instance, that there is an "inconsisten[cy]" between the Court's observation that any injury under the benefit-the-bargain theory occurred at the time of sale and its holding that Plaintiffs who disposed of their vehicles prior to New GM's recalls suffered no damages. (Docket No. 4344, at 8). But a plaintiff who is *injured* at one

In re General Motors LLC Ignition Switch Litigation, Not Reported in Fed. Supp. (2017)

2017 WL 3443623

point in time by a defendant's conduct does not necessarily suffer cognizable *damages* at that same time for purposes of an economic loss claim. Plaintiffs also assert that they "intend to prove, through expert testimony and otherwise, that the Pre-Recall Plaintiffs" did suffer damages. (Pls.' Mem. 5). But to the extent that something is an element of a claim (more on that in a moment), it does not suffice for a plaintiff to merely assert in conclusory fashion—let alone in a memorandum of law rather than the complaint itself—that the element could be, or will be, satisfied down the road; instead, a plaintiff must allege "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Most importantly, even now, Plaintiffs do not articulate a coherent theory of how a plaintiff who bought a vehicle with a concealed defect and sold the same vehicle before the defect was revealed can logically, if not legally, prove that he or she suffered damages. [2]

[2]     Upon reflection, the Court imagines that some Pre-Recall Plaintiffs could conceivably show that their cars manifested defects and that they disclosed those defects (or the fact that the vehicles had undergone repairs) to prospective buyers, causing a decrease in the resale value even though New GM had yet to announce the recalls. Notably, however, Plaintiffs do not raise that argument even in their reconsideration motion papers.

That said, Plaintiffs' motion prompted the Court to take a closer look at the different states' laws governing the legal claims at issue (something it obviously should have done in the first instance, even if the parties' briefing failed to point the way) and, upon reflection, the Court concludes that it was too hasty in holding that the Pre-Recall Plaintiffs' claims failed across the board. That is because, for purposes of at least *some* claims in *some* states, the law does not appear to require a plaintiff to allege damages in order to survive a motion to dismiss. *See, e.g.*, *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) (holding that under the Illinois consumer fraud act, a plaintiff need only allege (1) a deceptive act or practice by the defendant, (2) that the defendant intended the plaintiff to rely on that deception, and (3) that the deception occurred in the course of trade and commerce, even though common law fraud requires a plaintiff to plead damages); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1099 (S.D. Ind. 2001) (concluding that, under Michigan and Tennessee law, a breach of implied warranty claim has "no requirement

that [p]laintiffs demonstrate any injury to their person or property as a result of the breach, but only that they purchased an unmerchantable product"), *overruled on other grounds by In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002); *Grant v. Bridgestone Firestone Inc.*, 57 Pa. D. & C. 4th 72 (Pa. Com. Pl. 2002) (concluding that "ascertainable loss" under the Pennsylvania consumer protection statute is satisfied "[w]henever a consumer has received something other than what he bargained for," even where "damages are not easily quantified or where a claim has failed to quantify the damages suffered" (internal quotation marks omitted)). Similarly, for some claims in some states, the law appears to allow for the recovery of nominal damages "where a party has demonstrated liability but is unable to prove the amount of damages incurred." *Lima LS PLC v. PHL Variable Ins. Co.*, No. 12-CV-1122 (WWE), 2013 WL 3327038, at *10 (D. Conn. July 1, 2013) (Connecticut law). Where that is the case, a court cannot, in ruling on a motion to dismiss, "determine as a matter of law that [the] plaintiff's claim fails for lack of damages." *Id.*; *see also Iannuzzi v. Wash. Mut. Bank*, No. 07-CV-964 (JFB) (WDW), 2008 WL 3978189, at *11 n.8 (E.D.N.Y. Aug. 21, 2008) ("[T]he issue of the nature and scope of any damages to which plaintiffs may be entitled cannot be resolved at the motion to dismiss stage of the litigation.").

**\*3** This lax approach is by no means universal. *See, e.g.*, *Todorov v. Bank of Am., N.A.*, No. 14-CV-1028, 2014 WL 5465466, at *2 (N.D. Ill. Oct. 27, 2014) (dismissing a common law fraud claim under Illinois law for failure to "adequately allege damages," a necessary element of that claim); *House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, No. 13-CV-519 (RJS), 2014 WL 1383703, at *10-11 (S.D.N.Y. Mar. 31, 2014) (dismissing a breach of contract claim under New York law where the complaint merely "assert[ed], in conclusory fashion, that th[e] loss caused 'financial harm' " but "allege[d] no *facts* showing that [the plaintiff] bore any of the loss"); *Spacesaver Corp. v. Marvel Grp., Inc.*, 621 F. Supp. 2d 659, 662 (W.D. Wis. 2009) (noting that, to prevail under the Wisconsin consumer protection statute, a plaintiff must show a misrepresentation by the defendant that "materially caused a pecuniary loss"); *Johnson v. Jos. A. Bank Clothiers, Inc.*, No. 13-CV-756, 2014 WL 64318, at *9-10 (S.D. Ohio 2014) ("[T]hose facts do not sufficiently allege actual injury resulting from the violation" because, "[u]nder Ohio law, actual injury is independent of a [statutory] violation and both must be adequately alleged in a class action...."). But the point is that the Court painted with too broad a brush in holding that *all* claims of *all*

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 187 of 520
PageID: 9108
In re General Motors LLC Ignition Switch Litigation, Not Reported in Fed. Supp. (2017)
2017 WL 3443623

Pre-Recall Plaintiffs in *all* states fail as a matter of law (absent allegations of out-of-pocket costs or "lost time") because they cannot plausibly allege a theory of economic loss damages. *See In re Gen. Motors*, 2017 WL 2839154, at *10. Instead, the Court should have rejected New GM's argument for dismissal of the Pre-Recall Plaintiffs' claims for much the same reason that it rejected New GM's "categorical" argument for dismissal of Plaintiffs' "lost time" claims, and either examined New GM's argument on a state-by-state and claim-by-claim basis or deferred it to "another day—either in connection with motions for class certification or dispositive motions examining the laws of each applicable state." *Id.* at *8.

The question presented here, of course, is not whether the Court should have reached a different decision in its prior Opinion and Order. Instead, it is whether Plaintiffs should be granted reconsideration even though they failed to make the foregoing argument themselves in their original motion papers (and, to some extent, do not even make the argument in their reconsideration motion papers). In other circumstances, the Court would almost certainly answer that question in the negative. But given the unique circumstances presented in this MDL proceeding, the Court concludes that allowing its previous decision regarding the Pre-Recall Plaintiffs to stand would indeed result in a "manifest injustice." *Terra Sec. ASA Konkursbo*, 820 F. Supp. 2d at 560. The Court's decision on the validity of the Pre-Recall Plaintiffs' claims affects untold numbers of Plaintiffs, including many whose states were not at issue in New GM's last motion to dismiss and many who, for the reasons explained above, may well have valid claims under their applicable state law. Yet, no doubt due to the practical constraints of briefing scores of issues under the laws of eight different jurisdictions, the amount of attention devoted to the issue in the parties' initial briefs was inversely proportional to its importance. At bottom, the magnitude of this litigation, the number and complexity of the issues to be analyzed, and the parties' inadequate briefing of the issue addressed here persuade the Court that it is more important to get the issue right than it is to reject Plaintiffs' motion for reconsideration as a mere "second bite" at the proverbial apple. *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). Accordingly, Plaintiffs' motion for reconsideration is GRANTED.

In light of that conclusion, the Court must briefly address the claims of Pennsylvania Plaintiff Greg Theobald, which were previously dismissed in full (albeit with leave to amend to plead out-of-pocket or "lost time" damages, if any). *See*

*In re Gen. Motors*, 2017 WL 2839154, at *10.[3] Theobald owned a 2010 GMC Acadia, which he purchased new from a GMC dealership on June 3, 2010, and which was ultimately subject to the Side Airbag recall. (FACC ¶ 250). Theobald traded the vehicle into a car dealership in August 2013, prior to the recall announcement. (*Id.*). In its motion to dismiss, New GM challenged Theobald's claims on several grounds, only two of which need to be addressed here given the Court's holdings on Pennsylvania law in its prior Opinion and Order. *See In re Gen. Motors*, 2017 WL 2839154, at *32-40. First, New GM argued that Theobald's claims should be dismissed because his vehicle never manifested a Side Airbag defect. (New GM MTD Mem. 16-17 & n.10). But Theobald alleges that, after purchasing his new car, its "airbag service light sometimes came on" when he started his car (although it would "typically" turn off after restarting the car). (FACC ¶ 250). Theobald even inquired about the airbag service light at a New GM dealership, but was told merely that "the car computer did[ not] read the signals properly and he should just restart the car." (*Id.*). As the Court previously held, such allegations suffice, at least for now, to plead manifestation of a defect. *See In re Gen. Motors*, 2017 WL 2839154, at *49 n.30 (reaching the same conclusion under nearly identical facts because "[t]he airbag light coming on is precisely how the defect would manifest itself short of the airbags not deploying in an accident").

[3]     Texas Plaintiff Lisa McClellan also disposed of her vehicle prior to the recalls, but her claims survived the Court's prior decision because she had alleged out-of-pocket costs relating to defect-related repairs. *See id.* Thus, the Court does not address her claims here.

**\*4** Second, New GM challenged Theobald's claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1 *et seq.*, on the ground that he failed to allege that New GM knew about the Side Airbag defect in his model vehicle, a 2010 GMC Acadia, prior to his purchase of the car on June 3, 2010. (Docket No. 3578, at 41-42). It is true that the FACC does not contain specific allegations relating to the *2010* GMC Acadia. But it does allege that, from the company's inception, "New GM knew that a technical service bulletin had been issued" for the *2008-2009* GMC Acadia "instructing dealers to repair [the wiring defect]," and that, in late 2009, New GM extended a Customer Satisfaction bulletin for *2008* GMC Acadia models instructing dealers to "re-route or replace" certain wiring connectors. (FACC ¶¶ 740-41). Although close to the line, the

2017 WL 3443623

Court found similar allegations sufficient to allege knowledge at this stage of the proceedings. *See In re Gen. Motors*, 2017 WL 2839154, at *43 ("The case for New GM's knowledge of the Side Airbag defect prior to Liddy's vehicle purchase in May 2011 is a much closer call. But she alleges that, from its inception, New GM knew about problems in the wiring harness and other components of the airbag wiring dating back to 2008, in other vehicles and the 2009 model of the Saturn Aura XR, her vehicle. Although that barely alleges knowledge of a potential defect that was not disclosed to Liddy herself, it is—as the Court previously found with respect to similar allegations in the TACC—just enough to cross the Rule 9(b) line." (internal quotation marks and citations omitted)). The Court reaches the same conclusion as to Theobald's claim.

Accordingly, Plaintiffs' motion for reconsideration is GRANTED, and the Court's prior Opinion and Order is modified as reflected here. The Clerk of Court is directed to terminate Docket No. 4256.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3443623

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

Genito Glenn, L.P. v. National Housing Bldg. Corp., Not Reported in S.E.2d (1999)
50 Va. Cir. 71, 1999 WL 33722382

KeyCite Yellow Flag - Negative Treatment
Disagreed With by RML Corp. v. Lincoln Window Products, Inc., Va.Cir.Ct.,
December 3, 2004

50 Va. Cir. 71
Circuit Court of Virginia,
Virginia Beach.

GENITO GLENN, L.P.

v.

NATIONAL HOUSING BUILDING CORP. et al.

No. CL98–2847.
|
May 14, 1999.

**Opinion**

H. THOMAS PADRICK, JR., Judge.

**\*1** This matter is before the court on Defendants' demurrers to Plaintiff, Genito Glenn's ("Plaintiff's" or "Genito's") amended motion for judgment. Genito seeks recovery in excess often million dollars for damages allegedly sustained when certain fill material applied during the construction of its multi-family housing project expanded causing the foundations in the dwellings to crack. This swelling ultimately rendered the dwellings uninhabitable. As a consequence, the apartments will have to be demolished, the filler removed, and the project rebuilt.

Plaintiff seeks to impose its costs on several parties, beginning with the general contractor, Defendant National Housing Building Corp. ("NHBC"). Genito also filed suit against Defendant S.W. Rogers, Inc. ("Rogers"), the subcontractor responsible for the site development work, i.e., excavation, soil distribution, and the filling and grading of the project. In addition, Genito filed suit against Defendant Timmons, Inc. ("Timmons"), the firm responsible for developing the plans and site specifications, and Defendant Peter J. Fanara, a professional engineer employed by Timmons to perform the engineering work for the project. Finally, Genito named ReUse Technology, Inc., ("ReUse") and Cogentrix of Richmond, Inc., ("Cogentrix") as defendants in the action. ReUse markets and sells a product known as "Xtra Fill," the fill material which allegedly caused the damage described above. Xtra Fill is a trade marked, by-product of the coal combustion process known as "fly ash." If properly processed and applied, fly ash can apparently be used as fill material. However, if the ash is not properly processed, it can absorb

moisture for up to 800 days, resulting in severe swelling. Cogentrix supplied the fly ash to ReUse pursuant to a contract between the two parties, whereby ReUse agreed to remove the ash which it intended to resell as fill material.

Plaintiff alleges a host of theories in support of its amended motion for judgment. All of the defendants, except NHBC, filed demurrers attacking the respective counts which applied to them. In the interest of logic, the court has not necessarily addressed the various counts in the sequence in which they are raised in the amended motion for judgment.

Several of the Defendants have also filed cross-claims. I will address the demurrers to these cross-claims in Parts II and III of this opinion following my discussion of the issues raised in Genito's amended motion for judgment.

*Standard of Review*

In ruling on a demurrer, the court is required to view the facts in the light most favorable to the plaintiff to determine whether the pleading states a valid cause of action. *W.S. Carnes, Inc. v. Board of Supervisors of* Chesterfield County, 252 Va 377, 384 (1996). The only issue before the court is the legal sufficiency of the pleading. *Id.*

*Legal Analysis*

I. *Demurrers to Genito's Amended Motion for Judgment*

A. *Counts IV, VIII, IX, and XII (Negligence as to* Rogers, Timmons *and* Fanara, ReUse, *and* Cogentrix)

**\*2** In Counts IV, VIII, IX, and XII of its amended motion for judgment, Genito avers that Rogers, Timmons, Fanara, ReUse, and Cogentrix all negligently failed to perform certain duties in the various planning and construction stages of the project. (Amended MFJ ¶¶ 19, 23, 24, 27.) In each count, Genito also alleges that Defendants owed these duties to Plaintiff "separate and apart" from any contract. Defendants respond that Genito is merely attempting to transform its cause of action *ex contractu* into a negligence claim in order to circumvent the economic loss rule.

Simply put, the economic loss rule prevents a party from recovering economic damages in tort upon a theory of negligence absent privity of contract. *Blake Construction Co. v. Alley,* 233 Va. 31 (1987). Nowhere does Genito allege that

50 Va. Cir. 71, 1999 WL 33722382

it was in privity of contract with either Rogers, Timmons, Fanara, ReUse, or Cogentrix. Thus, the only issue is whether Genito's claims are for economic damages alone or whether they can be characterized as personal injury or property damages. See Va.Code § 8.01–223.

The leading cases is *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419 (1988). The dispute there arose when a homeowner contracted with a builder to construct a new home which was to include an indoor swimming pool. The builder in turn contracted with a designer, who agreed to draw up the plans for the project, and a pool contractor who agreed to build and install the pool. The homeowners alleged that the pool was built on fill rather than natural soils which caused the water pipes to break. The escaping water caused erosion under the pool and part of the foundation of the house, resulting in cracking in the foundation. *Id.* at 422. Contending that the losses were for damage to property, the homeowners sought damages in negligence from the architect and the pool contractor for the cost of repairing their home. *Id.* at 423.

The *Sensenbrenner* court, however, ruled that damages for diminution in value, measured by the cost of repair, were purely economic losses. *Id.* at 425. In analyzing the character of the loss, the court recognized that "when a product 'injures itself because one of its component parts is defective, a purely economic loss results to the owner for which no action in tort will lie." *Id.* at 424 (quoting *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858 (1986)). In defining the standard for judging the character of the loss, the court gave the following explanation.

> The controlling policy consideration underlying tort law is the safety of persons and property from losses resulting from injury. The controlling policy consideration underlying the law of contracts is the protection of expectations bargained for. If that distinction is kept in mind, the damages claimed in a particular case may more readily be classified between claims for injuries to persons and property on one hand and economic loss on the other.

**\*3** *Sensenbrenner,* 236 Va. at 425. Applying these principles, the court continued:

> The plaintiffs here allege nothing more than disappointed economic expectations. They contracted with a builder for the purchase of a package. That package included land, design services, and construction of a dwelling. The package also included a foundation for the dwelling, a pool, and a pool enclosure. The package is alleged to have been defective—one or more of its component parts was sufficiently substandard as to cause damage to other parts. The effect of the failure of the substandard parts to meet the bargained for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.

*Id.*

The principles set forth in *Sensenbrenner* likewise control the disposition of Counts IV, VIII, IX, and XII in this case. Genito contracted with NHBC for the construction of a multi-family housing project. In addition to the design and construction of the apartment dwellings, the project also called for certain site work to be done and for the application of suitable fill material. According to Genito's allegations, however, the Xtra Fill was substandard and did not meet its bargained for expectations regarding quality and suitability. As a result of the allegedly defective Xtra Fill, Genito alleges that the foundations of the dwellings cracked, making the dwellings unstable and ultimately uninhabitable. In an effort to retain its tax credits, Genito now seeks to recover the costs associated with removing the defective fly ash and rebuilding the project. This is precisely the problem encountered by the court in *Sensenbrenner.* The damages Genito claims are purely economic losses; as such, it is limited to seeking recovery for these losses from NHBC, with whom it was in privity of contract.

50 Va. Cir. 71, 1999 WL 33722382

The court therefore sustains Defendants' demurrers with respect to Counts IV, VIII, IX, and XII of Genito's amended motion for judgment and those counts are dismissed.

B. *Count III (Breach of Express and Implied Warranty as to NHBC, Rogers, ReUse, and Cogentrix)*

1. *Express Warranty Claims as to Rogers, ReUse, and Cogentrix*

In Count III of its Amended Motion for Judgment, Genito alleges various express and implied warranty claims against the several Defendants. The first three claims at issue are the express warranty claims against Rogers, ReUse, and Cogentrix. As against Rogers, Genito claims that "Rogers expressly warranted that its work, including materials used in the work, would be in accordance with the plans and specifications, that labor would be performed in a good and workmanlike manner ... and that its work would be free from defective materials and workmanship." (Amended MFJ ¶ 15.) As against ReUse, Genito avers that ReUse "expressly warranted that the fly ash provided for the project was approved by the Virginia Department of Transportation ("VDOT") and was safe and suitable as a fill material." (Amended MFJ ¶ 16.) Finally, as against Cogentrix, Plaintiff alleges that ReUse made express warranty claims about the fly ash on behalf of Cogentrix. (Amended MFJ ¶ 16.)

**\*4** In judging the validity of these claims, the court must first determine whether the contracts between NHBC and Rogers, between Rogers and ReUse, and between ReUse and Cogentrix were contracts primarily for the sale of goods or contracts for the provision of services. If the contracts were primarily for the provision of services, then the discussion in Part I(A) of this opinion applies, and the claims must be dismissed as to Rogers, ReUse, and Cogentrix because Genito cannot establish privity of contract. On the other hand, if the contracts were primarily for the sale of goods, then the court must confront Va.Code § 8.2–318, which provides in pertinent part:

Lack of privity between plaintiff and defendant shall be no defense to any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did

not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods[.]

Note, there is obviously a serious question whether the agreement between NHBC and Rogers can be classified as an agreement for the sale of goods (the agreements between Rogers and ReUse and between ReUse and Cogentrix would almost certainly be classified as contracts for the sale of goods). Nonetheless, the court has assumed that this is the case since Genito's claim against Rogers has no chance of recovery if the NHBC–Rogers agreement is classified as a contract for the provision of services. See Part I(A) *infra*. Note also, this assumption is consistent with the court's conclusion reached in Part II(C)(2) below.

The leading case discussing the effect of Va.Code § 8.2–318 on the privity requirement is *Beard Plumbing & Heating v. Thompson Plastics,* 254 Va. 240 (1997). There, the court held that § 8.2–318 does not abrogate the privity requirement in the context of an implied breach of warranty claim for consequential economic damages. *Id.* at 246. In arriving at its conclusion, the court found that another section of the U.C.C. § 8.2–715(2), trumped § 8.2–318. Section 8.2–715(2) provides in pertinent part:

Consequential damages resulting from a seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller *at the time of contracting* had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty.

(Emphasis added.) The court reasoned that the specific language "at the time of contracting" in § 8.2–715(2) prevailed over the more general provisions of § 8.2–318. Thus, the court held that the statute "requires a contract between the parties for the recovery of consequential

economic loss damages incurred as a result of a breach of warranty by the seller." *Beard,* 254 Va. at 245. However, it is important to recognize that *Beard* does not address the effect of the privity requirement in warranty cases involving *direct* economic damages. See *id.* at 244. Further, unlike § 8.2–715(2), Va.Code § 8.2–714, [1] which deals with direct damages for a seller's breach, does not contain any reference to a privity requirement. Applying an analysis similar to that used by the *Beard* court, this court concludes that a plaintiff can still recover direct economic damages in a warranty case regardless of privity of contract.

[1]     The text of Va.Code § 8.2–714 reads as follows:
"(1) Where the buyer has accepted goods and given notification (subsection (3) of § 8.2–607), he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
"(3) In a proper case, any incidental and consequential damages under the next section [§ 8.2–715] may also be recovered."

**\*5** The *Beard* case was admittedly decided in the context of a claim for economic damages resulting from a breach of an *implied* warranty of merchantability. But it is difficult to conceive that *Beard* could be read to permit a claim for economic damages in an express warranty case absent privity of contract. This is because § 8 .2–715(2) imposes a contract requirement in "any" case where a party seeks recovery of a consequential economic loss. See *Beard,* 254 Va. at 246. Thus, even assuming that the contracts between the parties were primarily for the sale of goods, Genito cannot maintain its claims for breach of express warranties insofar as it seeks recovery for consequential economic losses because it has not alleged privity of contract. Accordingly, this aspect of Count III is hereby dismissed. As explained above, however, there is no privity requirement for recovery of direct economic losses in warranty cases. Accordingly, Defendants' demurrers to this aspect of Count III are overruled. [2]

[2]     Counsel will observe that the court expresses no opinion as to the validity of any of the

warranty claims against NHBC since it did not file any demurrers to Plaintiffs amended motion for judgment.

### 2. Implied Warranty Claims as to Rogers, ReUse, and Cogentrix

In addition to its express warranty claims, Genito alleges in Count III that Rogers, ReUse, and Cogentrix "impliedly warranted that such fly ash was of good qualify, free from defects, and fit, safe, and suitable as a fill material for Genito's project." (Amended MFJ ¶ 17.) As with Genito's allegations for breach of express warranties, the court concludes that the disposition of these claims is governed by *Beard.* As discussed above, *Beard* specifically prevents a plaintiff from seeking recovery of consequential economic loss damages on an implied warranty claim absent privity of contract. Therefore, to the extent Genito seeks recovery of consequential economic losses, its implied warranty claims as to Rogers, ReUse, and Cogentrix must also be dismissed. However, Genito may still recover direct economic losses despite the fact that it was not in privity of contract with Rogers, ReUse, or Cogentrix.

### C. *Count v. (Indemnity as to Rogers)*

In addition to the claims discussed in Parts I(A) and I(B) of this opinion, Genito has also asserted an indemnity claim against Rogers. In its contract with NHBC, Rodgers agreed to indemnify and hold harmless NHBC and Genito "from and against claims, damages, losses, and expenses, arising out of or resulting from performance of the Work, to the extent caused in whole or in part by negligent acts or omissions of the Sub–Contractor, or anyone directly or indirectly employed or retained by the Sub–Contractor." (Amended MFJ ¶ 20.)

In response, Rogers raises two points. First, it argues that it had no written agreement with NHBC. Rogers points out that although it had tendered a draft agreement to NHBC, NHBC did not execute and return the draft to Rogers until after problems developed with the Xtra Fill. In ruling on a demurrer, however, this court is bound to view the facts in the light most favorable to the plaintiff. *W.S. Carries,* 252 Va. at 384. Since Genito has attached the purported agreement to its amended motion for judgment, this court must assume that NHBC and Rogers had in fact entered into a contract regardless of the truth of Rogers' claim.

**\*6** Second, Rogers argues Count V should be dismissed because the indemnity provision is void as against public

policy. In support of its contention, Rogers points to Va.Code
§ 11–4.1, which provides that:

> [a]ny provision contained in
> any contract relating to the
> construction ... of a building, structure
> or appurtenance thereto, including
> moving, demolition, and excavation
> connection therewith ... by which
> the contractor performing such work
> purports to indemnify or hold harmless
> *another party to the contract* against
> liability for damages arising out of
> bodily injury to persons or damage
> to property suffered in the course or
> performance of the contract, caused by
> or resulting solely from the negligence
> *of such other party* ... is against public
> policy and is void and unenforceable.

(Emphasis added.) The short answer to Rogers' argument is
that this section invalidates only those indemnity provisions
which run in favor of a party to the contract. It does not,
however, invalidate that portion of the agreement by which
Rogers agreed to indemnify Genito. Accordingly, Rogers'
demurrer to Count V is overruled.

### D. *Third–Party Beneficiary Claims (as against Rogers, Timmons and Fanara, ReUse, and Cogentrix)*

In an apparent effort to make an end run around the
privity requirement, Genito alleges that it is a third-party
beneficiary of those contracts to which it was not a party. *See*
Va.Code § 55–22. Genito further avers that "the parties to
such contracts clearly and definitely intended to confer the
benefits of such contracts on Genito...." (Amended MFJ § 9.)
Defendants counter by arguing that Genito's amended motion
for judgment does not allege sufficient facts to state a cause
of action.

Under Virginia law, a person who is not a party to a contract
may nonetheless sue upon the instrument if he can show that
he was a beneficiary of the promise. Va.Code § 55–22. It
is not enough, however, for the non-party to show that he
was merely an incidental beneficiary of the contract. *Valley
Landscape Co. v. Roland,* 218 Va. 257 (1977). Rather, the
non-party must demonstrate "that the parties to the contract

clearly and definitely intended to confer a benefit upon him."
*Id.* at 259 (quoting *Professional Realty v. Bender,* 216 Va. 737,
739(1976)).

In the *Valley* case, Old Dominion University ("ODU" or "the
University") filed an action against its general contractor
when the contractor failed to complete certain work on the
University's mall improvement project. 216 Va. at 258. The
contractor in turn sued the architect on the project, alleging
that it was a third-party beneficiary of ODU's agreement with
the architect. The contract between ODU and the architect
was never made a part of the record; and the only allegation
in the contractor's motion for judgment which addressed its
status as a third-party beneficiary read as follows: "4. That
certain provisions of [the architect's] contract with [ODU]
were for the benefit of the general contractor." *Id.* at 259. The
trial court granted the architect's demurrer and the Supreme
Court affirmed, holding that the ODU-architect contract
contained no provisions which were intended to directly
benefit the general contractor. *Id.* at 260. In reaching its
conclusion, the court acknowledged that the contractor might
benefit from the plans prepared by the architect. Nonetheless,
said the court, this "is an incidental benefit that accrues to the
contractor. But it is not the benefit that is primarily envisioned
by the architect and the owner." *Id.* at 261.

**\*7** The court reached the opposite conclusion in *Levine v.
Selective Ins. Co.,* 250 Va. 282 (1995). There, the owners
entered into an agreement with a contractor to build a
house on their property. Included within the agreement
was a provision requiring the contractor to purchase hazard
insurance to cover any losses associated with personal injury
or loss of materials. The contractor subsequently purchased
coverage from an insurance firm. When the construction
site was damaged and the insurance company refused to
pay, the owners filed a motion for judgment against the
insurer claiming their rights to the proceeds as third-party
beneficiaries. *Id.* at 284–85. In reversing the trial court's grant
of summary judgment in favor of the insurer, the court ruled
that the owners had pleaded sufficient facts in their motion
for judgment to establish a third-party beneficiary claim. *Id.*
at 286. The court noted that although the owners were not
named as the payees on the policy, "all parties expressly
understood that the beneficiaries of the policies were the
[owners]." Moreover, when the insurer decided to cover a
portion of the damage, the check was made payable to the
order of contractor and the owners. Finally, the owners in
*Levine* alleged that, at all times, the insurer had actual notice

that they were third-party beneficiaries under the agreement between the contractor and the insurer. *Id.*

Had Genito sought merely to rely on the factual allegations contained in its amended motion for judgment, this court would be constrained to hold that Genito has not stated a valid cause of action. Genito's amended motion contains the bare allegation that the parties to the other contracts "clearly and definitely intended to confer the benefits of such contracts on Genito...." This allegation simply restates the legal standard set forth in *Valley* and *Levine* and does not set forth any specific facts in support of Genito's claim.

However, this court must also consider the contracts attached to Genito's amended motion in determining whether it has stated a valid third-party beneficiary claim against any of the defendants. As set forth above, paragraph 14 of the NHBC–Rogers agreement contains an indemnity provision whereby Rogers agreed to "indemnify and hold harmless" NHBC and Genito "from and against all claims, damages, losses, and expenses arising out of or resulting from the performance of the Work, to the extent caused by the negligent acts or omissions of the Sub–Contractor...." (Amended MFJ Exhibit B.) By its express terms, this indemnity provision runs in favor of Genito. The agreement thus evidences a clear intent on behalf of NHBC and Rogers to benefit a person who was not a party to the contract. [3]

[3]    At oral argument, counsel for Rogers argued that the primary purpose of the indemnity provision was to allow NHBC to perform its contract with Genito. Thus, the argument runs, since Genito was only an incidental beneficiary of Rogers' promise, it is not entitled to sue thereon. In essence, counsel is asking this court to view the allegations in the light most favorable to Rogers. The court declines Rogers' invitation.

The NHBC–Timmons contract, on the other hand, is insufficient to support Genito's attempt to claim third-party beneficiary status. Aside from sundry captions throughout the contract which indicate that the document pertains to the Genito project, there is absolutely no indication on the face of the contract that the parties intended to benefit Genito. Rather, the language in the agreement specifies certain work that Timmons was obligated to perform; and as a return consideration, NHBC agreed to pay Timmons upon performance of its obligations.

**\*8** To be sure, Genito would have undoubtedly enjoyed the benefits of Timmons' work. But as in the *Valley* case, the benefits to Genito are merely incidental. The primary purpose behind the contract between NHBC and Timmons was to allow NHBC to farm out a particular portion of the project (i.e., the design and engineering work relating to the site development) to Timmons, which was better suited to perform the work. This is utterly different from the *Levine* case, where the principal purpose behind the agreement between the builder and the insurer was to relieve the owners from the risk of loss associated with damage to persons or materials on their property, and where all the parties "expressly understood" that the insurance was purchased for the benefit of the owners.

Genito cites *Ward v. Ernst & Young,* 246 Va. 317 (1993), for the proposition that this court is not limited to considering the four corners of the NHBC–Timmons contract in determining whether the parties clearly and definitely intended to confer a benefit upon Genito. The *Ward* case, however, was decided in the context of a motion to strike, where the court was bound to consider the *evidence* and the inferences reasonably deducible therefrom in the light most favorable to the non-moving party. *See id.* at 330. Here, the court is limited to considering the pleadings and any exhibits attached thereto in determining whether Genito has stated a valid third-party beneficiary claim. And there are no facts in Genito's amended motion or the NHBC–Timmons contract which suggest that the parties clearly intended to confer a benefit upon Genito.

Accordingly, with the exception of the third-party claim against Rogers, the court sustains Defendants' demurrers to this aspect of Genito's amended motion for judgment, and those matters are dismissed.

### E. Count VI (Constructive Fraud as to Rogers, Timmons, and Fanara) and Count VII (Actual and Constructive Fraud as to ReUse and Cogentrix)

#### 1. Count VI (Constructive Fraud as to Rogers, Timmons, and Fanara)

In another effort to circumvent the economic loss rule, Genito alleges in Count VI of its amended motion that "Rogers, Timmons, and Fanara represented by NHBC, knowing and intending that such representations reach and be relied on by Genito, that fly ash in general and Xtra Fill in particular was a safe, suitable, proper fill material." (Amended MFJ ¶ 21.) Genito further alleges that the representation was "false" and "material," was "made with the intention that NHBC and

50 Va. Cir. 71, 1999 WL 33722382

Genito rely upon it," and that Genito and NHBC in fact relied on the representations to their detriment.

As with its claims for negligence in Counts IV, VIII, DC, and XII, however, Genito's claims for constructive fraud are barred by the economic loss rule. Genito argues that the economic loss rule does not preclude its claims for constructive fraud and points to a footnote in the *Ward* case, wherein the court made the following statement:

> **\*9** These observations cannot fairly be interpreted to mean that economic losses are never recoverable in tort. The language employed here has its predicate in the tort alleged in the Association's *negligence* count; it does not purport to foreclose a right to recover an economic loss in other tort actions such as those for fraud, conspiracy to injure another in a trade, business, or profession, or tortious interference with contract.

*Id.* (emphasis in original).

The footnote in *Ward,* however, should not be interpreted to mean that all claims for fraud are permissible in spite of the economic loss rule. Tort actions for conspiracy to injure another in a trade or business and tortious interference with contract both require the claimant to prove the element of intent. *See Commercial Bus. Sys. v. BellSouth Servs.,* 249 Va. 39 (1995) (conspiracy tort requires that defendant acted intentionally, purposefully, and without legal justification); *Commercial Bus. Sys. v. Halifax,* 253 Va. 292 (1997) (tortious interference with business relations requires proof of intentional misconduct). Likewise, a claim for actual fraud requires proof that the defendant intended to mislead the claimant. *Evaluation Research Corp. v. Alequin,* 247 Va. 143 (1994). The essence of constructive fraud, on the other hand, is negligent misrepresentation. *See Mortarino v. Consultant Engineering Servs.,* 251 Va. 289 (1996). It requires neither a showing of malice nor an intent to deceive. *Id.* at 295. Thus, since constructive fraud is simply another species of negligence, it follows that the economic loss rule also forecloses Genito's claims in Count VI.

Yet, even if this court were to hold that the economic loss rule did not apply, Count VI of Genito's amended motion lacks the specific factual allegations necessary to assert a claim for constructive fraud. A party asserting a claim for actual fraud must establish the following elements by clear and convincing evidence: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled. *Evaluation Research Corp.,* 247 Va. at 148. As explained above, the difference between actual fraud and constructive fraud is in the element of intent. Whereas the former requires a showing that the misrepresentation was made with the intent to mislead, the latter merely requires the claimant to show that the misrepresentation is made innocently or negligently. *Id.* at 148. As with actual fraud, a claim for constructive fraud must be established by clear and convincing proof. *Id.* More importantly, Virginia courts have consistently emphasized that "[w]here fraud is relied on, the [pleading] must show specifically in what the fraud consists, so that the defendant may have the opportunity of shaping his defense accordingly...." *Mortarino,* 251 Va. at 295 (quoting *Ciarochi v. Ciarochi,* 194 Va. 313, 315 (1952)).

**\*10** Here, Genito's allegations in Count VI are too vague and conclusory to state a cause of action. Count VI fails to allege any of the circumstances relating to the fraud, including which officers and employees of Rogers or Timmons allegedly made the misleading statements, when the statements were made, or how the statements were communicated from either Rogers or Timmons to NHBC, and then to Genito. *See Tuscarora, Inc. v. B.V.A. Credit Corp.,* 218 Va. 849 (1978).

For both these reasons, the demurrers to Count VI are sustained, and leave to amend is denied.

### 2. *Count VII (Actual and Constructive Fraud as to ReUse)*

The court's conclusion in the previous section regarding the impact of the economic loss rule on the claims in Count VI applies with equal force here to bar Genito's claims against ReUse for constructive fraud. The allegations in Count VII of actual fraud, however, are more problematic. Here, Genito alleges that prior to contracting with Rogers to supply Xtra Fill for the project, A. Sidney Buford of ReUse made several specific misrepresentations to Rogers regarding the suitability of fly ash as fill material. Genito then goes on to allege that the representations were false, material, and were known by ReUse to be false when they were made, or alternatively, that ReUse made the statements without knowledge of their truth

50 Va. Cir. 71, 1999 WL 33722382

or falsity. Genito also avers that ReUse knew and intended that the statements would be communicated and relied on by NHBC and Genito. (Amended MFJ ¶ 22.)

Citing *Richmond Met. Auth. v. McDevitt Street Bovis, Inc.,* 256 Va. 553 (1998), ReUse argues that Genito may not recover for fraud based upon duties which existed solely by reason of a contractual relationship. In *McDevitt,* the Richmond Metropolitan Authority contracted with McDevitt to build a baseball stadium. In order to receive progress payments during the construction, the contractor submitted several sworn applications indicating that certain work had been completed. When the Authority discovered that the work had not in fact been performed, it filed suit against the contractor for actual and constructive fraud. *Id.* at 555–56. In affirming the trial court's dismissal of the claims, the court held that the duties and obligations required of the contractor were imposed by virtue of contract, not by tort law. *Id.* at 559. Thus, the court concluded that the Authority could not base its recovery on a cause of action for fraud. *Id.*

ReUse's reliance on *McDevitt,* however, is misplaced. Genito is not alleging that ReUse fraudulently breached any of the duties it owed to Rogers as a result of the contract of sale between the two parties. Such an allegation would clearly be demurrable under the facts of *McDevitt.* Rather, Genito is alleging that ReUse, through its misrepresentations, fraudulently induced Rogers to enter into a contract for the supply of defective fill material. The duty to refrain from making misrepresentations in an effort to procure a contract is a duty imposed by common law. This duty exists separate and independent of any of the duties imposed under the contract between Rogers and ReUse; and assuming Genito can establish a *prima facie* case, it is a ground for recovery of damages. *See George Robberecht Seafood, Inc. v. Maitland Bros. Co.,* 220 Va. 109, 111–12 (1979) (stating the elements for fraudulent inducement).

 **\*11** Of more pressing concern, though, is Genito's allegation that it relied on the representations made by ReUse employees. In order to establish a claim for fraud, "it is essential that the defrauded party demonstrates the right to reasonably rely upon the misrepresentation." *Metrocall of Delaware, Inc. v. Continental Cellular Corp.,* 246 Va. 365, 374 (1993). As explained above, Genito's claim against ReUse in Count VII is essentially one for fraudulent procurement of its contract with Rogers. Genito also alleges that the misrepresentations were communicated to NHBC and Genito. The problem, though, is that the decision to enter

into the agreement for the supply of fill material belonged to Rogers, not Genito. In other words, how could Genito have relied on the statements unless it had the right to take some sort of action (i.e., deciding whether to enter into the supply contract) which could have accrued to its detriment?

The contract between Genito and NHBC provides one possible answer.[4] The following language appears in Article 6.2.1 of the contract:

[4]     As noted previously, the contract was attached to Genito's amended motion for judgment.

Prior to the execution of any subcontract and the commencement of Work, [NHBC] shall submit to [Genito] and the Bank the names of each Subcontractor (including persons or entities who are to furnish materials or equipment fabricated to a special design) to whom [NHBC] proposed to subcontract any part of the Work, together with such information as [Genito], Architect, or the Bank may request with respect to the qualifications and ability of each such Subcontractor to perform the Work. *[NHBC] shall not subcontract any work to a Subcontractor with regard to which [NHBC] has received written notice of objection from [Genito] ....*

(Amended MFJ Exhibit A; emphasis added.) This provision clearly gives Genito the right to reject a proposed "Subcontractor" because of concerns about the subcontractor's "qualifications and ability." Moreover, if the phrase "qualifications and ability" is broadly construed, it is conceivable that Genito could have objected to NHBC's decision to enter into its subcontract with Rogers on grounds that Rogers intended to use fly ash as fill material. But Genito does not complain about NHBC's decision to enter into its subcontract with Rogers. Rather, the gravamen of Count VII is that ReUse fraudulently procured its contract with Rogers. And although Genito had the right to object to NHBC's decision to enter into a subcontract with Rogers, the agreement does not purport to give Genito veto power over the subcontractor's agreements with its sub-subcontractors (the position occupied by ReUse).[5] Absent the ability to object to Rogers' decision to purchase fly ash from ReUse, it is difficult to understand how Genito had the right to rely on ReUse's representations.

[5]     Pursuant to Article 6.1.1, the term "Subcontractor" means "a person or entity who has a direct contract with [NHBC] to perform any of the

50 Va. Cir. 71, 1999 WL 33722382

Work at the site ... The term Subcontractor *does not* include any separate contractor or his subcontractors." The term "Sub-subcontractor" means "a person or entity (other than the Contractor or a Subcontractor) who has a contract to perform any of the Work at the site." (Amended MFJ Exhibit A, ¶ 6.1.1.) (Emphasis added.)

As indicated above, Genito might be able to show reliance if it alleged either (1) that it would have refused to enter into the contract with NHBC, or (2) that it would have objected to NHBC's decision to enter into a subcontract with Rogers. In order to establish such a claim, though, Genito must allege specific facts relating to the purported fraud. Genito avers merely that the representations were communicated from ReUse to Rogers and then to NHBC and Genito and that Genito subsequently relied on the statements. The amended motion for judgment says nothing about the circumstances under which the statements were communicated from Rogers to NHBC and then to Genito, including the times and the individuals who allegedly relayed the information to Genito, and, most importantly, what action Genito took in reliance on the statements.

**\*12** Accordingly, Genito's claims against ReUse for actual and constructive fraud are hereby dismissed.

### 3. *Count VII (Actual and Constructive Fraud as to Cogentrix)*

In addition to its allegations against ReUse in Count VII of its amended motion, Genito also states that the "misrepresentations were made with the knowledge, approval, encouragement, and authority of Cogentrix of Richmond and were ratified by Cogentrix...." (Amended MFJ ¶ 22.) Genito's claims against Cogentrix for actual and constructive fraud, however, fare no better than its allegations against ReUse.

As discussed twice previously, the economic loss rule prohibits Genito from attempting to sidestep the privity requirement through a claim in constructive fraud. Moreover, apart from its allegation that Cogentrix ratified the misleading statements, Genito sets forth absolutely no facts to support either of its claims against Cogentrix. Genito's claims against Cogentrix for actual and constructive fraud are therefore dismissed.

### F. *Count X (Nuisance as to NHBC, Rogers, ReUse, Cogentrix, Timmons, and Fanara)*

In Count X of its amended motion for judgment, Genito alleges that Defendants created a nuisance on its property through "their various breaches, acts, and omissions" in applying the Xtra Fill. For their part, Defendants advance various arguments, all in an attempt to show that Genito has not properly pleaded a claim for nuisance.

A private nuisance is the using, or authorizing the use of, one's property, or of anything under one's control, so as to injuriously affect an owner or occupier of property (1) by diminishing the value of that property; (2) by continuously interfering with his power of control or enjoyment of that property; [or] (3) by causing material disturbance or annoyance to him in his use or occupation of that property." *Bowers v. Westvaco Corp.,* 244 Va. 139, 148 (1992) (quoting *Virginian Railway Co. v. London,* 114 Va. 334, 344–45 (1912)). Indeed, the term nuisance encompasses a broad range of conduct, including "everything that endangers life or health, or obstructs the reasonable and comfortable use of property." *National Energy Corp. v. O'Quinn,* 223 Va. 83 (1982).

Count X of Genito's amended motion, however, suffers from a more fundamental defect. Through artful pleading, Genito has attempted to transform what is essentially a breach of contract case into a tort action. *See McDevitt,* 256 Va. at 558–59. Although the Supreme Court has recognized that in certain instances a party can show both a breach of contract and a tortious breach of duty, "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Id.* at 558 (quoting *Foreign Mission Bd. v. Wade,* 242 Va. 234, 241 (1991)). In determining whether a cause of action sounds in contract or in tort, the *McDevitt* court enunciated the following standard:

> **\*13** If the cause of complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists), then the action is founded upon contract, and not upon tort. If, on the other hand,

Genito Glenn, L.P. v. National Housing Bldg. Corp., Not Reported in S.E.2d (1999)
50 Va. Cir. 71, 1999 WL 33722382

the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Id.* at 558.

Applying these principles to the facts in the instant case, it is clear that Genito's nuisance count should be dismissed. It is undoubtedly true that every landowner has a duty not to engage in activities that might interfere with his neighbors' use and enjoyment of their property. *See Bowers,* 244 Va. at 144. But the breach that Genito complains of grew not out of any general duty founded in the common law, but the duties specifically outlined in the sundry contracts among the various parties. Indeed, were it not for Genito's general contract with NHBC and NHBC's agreements with Rogers and Timmons, the fly ash never would have been deposited onto Genito's property in the first place. Accordingly, the court sustains Defendants' demurrers to Count X of Genito's amended motion for judgment, [6] and Count X is therefore dismissed.

[6]   Neither the discussion in this Part nor the discussion in Part I(G) applies to NHBC since it failed to file any demurrers to Genito's amended motion for judgment.

### G. *Count XI (Trespass as to NHBC, Rogers, ReUse, Cogentrix, Timmons, and Fanara)*

Finally, in Count XI, Genito charges that the application of the defective fill material was unauthorized and that the defendants who "participated in, approved, directed or encouraged" its application are therefore liable in trespass. (Amended MFJ ¶ 26.) Defendants respond that Count XI must be dismissed because their entry onto Genito's land was not "unauthorized."

The allegations in Count XI suffer from the same defect that plagues Count X. As with Count X, the breach that Genito complains of is a product of its contract with NHBC and of NHBC's agreements with its subcontractors. Were it not for the various contracts, Defendants would never have been authorized to deposit the fly ash onto Genito's property.

In any event, the contracts make it impossible for Genito to allege a cause of action in trespass. "A trespass is an unauthorized entry onto property which results in interference with the property owners' possessory interest therein." *Cooper v. Horn,* 248 Va. 417 (1994) (quoting 5 Richard R. Powell, *The Law of Real Property,* Para. 707 (Patrick J. Rohan, ed., 1994)). Even viewing the allegations in the light most favorable to Genito, it does not appear that there was any unauthorized entry. Indeed, Genito concedes on brief that it not only authorized Defendants to enter onto its property, but that it consented to the application of the Xtra Fill.

Genito nonetheless maintains that even if Defendants were initially authorized to enter onto its property to apply the fly ash, they exceeded the scope of their authority because of their negligent conduct and therefore became trespasses *ab initio.* It is true, of course, that a person who lawfully enters onto another's property may subsequently exceed the scope of his authority by his wrongful conduct, thereby making him a trespasser. *See McClannan v.. Chaplain,* 136 Va. 1 (1923). But this is altogether different from attempting to collect damages in trespass when the plaintiff has consented to the very actions alleged to constitute the wrongful conduct. *See Vicars v. First Va. Bank,* 250 Va. 103 (1995). Further, this court has not uncovered any cases which suggest that Genito may authorize Defendants to enter onto its property to apply the fly ash and then declare that prior entry to be a trespass when it subsequently discovers that the product did not perform as expected.

**\*14** Accordingly, the court sustains Defendants' demurrers to Count XI of Genito's amended motion for judgment, and it is dismissed.

### II. *Demurrers to NHBC's Amended Cross–Claims*

#### A. *Count II (Negligence of Timmons)*

Following Genito's filing of its amended motion for judgment, NHBC filed an amended cross-bill against Rogers, Timmons, and ReUse. In Count II of its amended pleading, NHBC alleges that pursuant to its contract with Timmons to provide the geotechnical engineering expertise on the project, Timmons was required to make recommendations for site grading, foundation design, and recommendations concerning the suitability of fly ash for use as structural fill material. (Amended Cross–Claim ¶¶ 9, 17.) Count II goes on to allege that Timmons negligently failed to inform NHBC that fly ash had the potential for swelling, failed to perform any swell tests on the fly ash it had approved for use on the

50 Va. Cir. 71, 1999 WL 33722382

project, and that these failures caused damage to NHBC's work. (Amended Cross–Claim ¶¶ 31–34.) Timmons responds that Count II is deficient as a matter of law because any duties it owed to NHBC arose out of the parties' contract rather than common law negligence principles.

As explained in Parts I(E) and (F), Virginia law generally forbids a claimant from attempting to transform a cause of action *ex contractu* into a tort claim where the duties between the parties arise solely by virtue of contract. *See McDevitt,* 256 Va. at 558. The rule is apparently different in cases involving economic damages where there is privity of contract; though, the Supreme Court has not explained why this should be so.

The court first addressed the issue in *Rotonda Condo. Owners Assoc. v. Rotonda Assoc.,* 238 Va. 85 (1989). The *Rotonda* case is important because there was arguably privity of contract between the parties and because the plaintiff, in addition to its contract claim, was seeking to recover purely economic damages based upon a negligence theory. *See id.* at 86–87. The court ultimately decided the *Rotonda* case based on principles of standing. Nonetheless, at the foot of its opinion, the court noted that the trial court had correctly dismissed the plaintiff's count for negligent repairs. Citing *Sensenbrenner,* the court stated that plaintiff's claims for "economic losses are not recoverable in tort; they are purely the result of disappointed economic expectations. The law of contracts provides the sole redress for such claims." *Rotonda,* 238 Va. at 90.

This language is consistent with the general rule set forth in the *McDevitt* case, and following *Rotonda,* several circuit courts interpreted it to mean that even where a party asserts privity of contract, the sole redress for economic damages is in the law of contracts. *See Pender Veterinary Clinic v. Patton, Harris, Rust & Assoc.,* 23 Va. Cir. 106 (Fairfax 1991) (Stevens, J.); *P & T Assoc v. Paciulli, Simmons and Assoc.,* 27 Va. Cir. 405 (Richmond 1992) (Johnson, J.). Yet, despite the relatively clear implication of its language in *Rotonda,* the court took the opposite view in a footnote in *Ward v. Ernst & Young,* 246 Va. 317 (1993). In *Ward,* there was no privity of contract between the parties, so the footnote is obviously dicta. Nonetheless, the court noted that a fair reading of the language in *Rotonda* meant that "when privity exits, economic losses may be recovered under a negligence theory." *Id.* at 326, n. 3.

**\*15**  It is difficult to understand how one might attempt to reconcile the footnote in *Ward* with the general rule set forth

in *McDevitt.* Yet, given the clarity of the court's statement in *Ward,* this court will overrule Timmons' demurrer and allow NHBC to proceed on both a contract and negligence theory.

### B. *Count III (Indemnity against Rogers)*
In Count III, of its amended cross-claim, NHBC avers that it entered into a contract with Rogers, whereby Rogers agreed to provide "the material and construction method to create the pads for the buildings which are the subject of [Genito's] amended motion for judgment." (Amended Cross–Claim ¶ 36.) In addition to the various other contractual duties which Rogers allegedly breached, the amended cross-claim also asserts that Rogers is liable in indemnification to NHBC. As outlined in Part I(c) above, Rogers agreed to indemnify and hold harmless NHBC "from and against all claims, damages, losses, and expenses arising out of or resulting from performance of the Work, to the extent caused in whole or in part by negligent acts or omissions of the Sub–Contractor, or anyone directly or indirectly employed or retained by the Sub–Contractor." Once again, Rogers insists that Va.Code § 11–4.1 renders the indemnity provision unenforceable.

Section 11–4.1 does no such thing. That section renders unenforceable only those agreements which attempt to force the sub-contractor to indemnify the contractor for damages arising solely from the negligence of the *contractor* or the *contractor's* agents or employees. Section 11–4.1, however, says nothing about an agreement whereby a sub-contractor agrees to indemnify a contractor for damages arising out of the *sub-contractor's* negligence or the *sub-contractor's* breach of contract.

The indemnification provision in the NHBC–Rogers contract clearly falls within the latter category of cases. Accordingly, Rogers' demurrer to Count III of NHBC's amended cross-claim is overruled.

### C. *Counts IV and V (Breach of Express and Implied Warranties against Rogers)*

#### 1. Breach of Express Warranties by Rogers
In Count IV, NHBC avers that Rogers expressly warranted that the fly ash was appropriate for use as structural fill material. NHBC further alleges that Rogers breached the express warranty because the fly ash had a high potential for swelling and therefore was not suitable for use as fill material. (Amended Cross–Claim ¶¶ 53–57 .) Rogers argues, however, that NHBC cannot claim any breach of express warranties

50 Va. Cir. 71, 1999 WL 33722382

because the contract was primarily for the provision of services and the U.C.C. only applies to contracts for the sale of goods.

It almost goes without saying that the U.C.C. applies only to contracts for the sale of goods, see Va.Code § 8.2–102, and that the implied warranties in Article 2 therefore apply only to contracts for the sale of goods. See Va.Code §§ 8.2–314, 8.2–315. But there is nothing in Virginia's U.C.C. which purports to limit a party's ability to give an express warranty simply because the contract is for services. In other words, the issue whether the contract was for the sale of goods or for the provision of services is irrelevant to NHBC's ability to collect damages from Rogers on an express warranty theory. Rogers' demurrer to Count IV is therefore overruled.

*2. Breach of Implied Warranty by Rogers*

**\*16** In a related argument, NHBC alleges that Rogers "impliedly warranted that the product supplied as structural fill was merchantable," and that because the fly ash was not suitable as fill material, Rogers therefore breached its implied warranty of merchantability. (Amended Cross–Claim ¶¶ 58–62.) Rogers counters with the same argument it raised with respect to NHBC's express warranty claims, to wit: NHBC cannot claim a breach of any implied warranty because the contract does not fall under the U.C.C.

Although there are no appellate decisions in Virginia which discuss the question of when a mixed contract is predominately for the sale of goods or services, the Fourth Circuit has addressed the issue on at least two occasions. In *Princess Cruises, Inc. v. General Elec. Co.,* 143 F.3d 828 (4th Cir.1998), *cert. den.* 119 S.Ct. 444 (1998), the court considered the question using the analysis set forth in the seminal case of *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974):

> The test for inclusion or exclusion is not whether they are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor

> incidentally involved (e.g., installation of a water heater in a bathroom).

*Princess Cruises,* 143 F.3d at 833. In determining the nature of the contract, courts have typically considered the following factors: (1) the language of the contract; (2) the nature of the business of the supplier; and (3) the intrinsic worth of the materials. *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456 (4th Cir.1983), *cert. den.,* 475 U.S. 1121 (1986).

The *Coakley* case is especially significant because it involved a construction contract where the contractor, a glass company, had agreed "to furnish and install aluminum and glass curtain wall and store front work" on the plaintiff's-owner's building. *Id.* at 457. The case is also instructive because it was decided in the context of the contractor's 12(b)(6) motion to dismiss. In *Coakley,* the owner filed a complaint alleging that the contractor had breached the implied warranties of merchantability and fitness for a particular purpose because the glass had undergone some discoloration. The contractor filed a motion to dismiss, arguing that the U.C.C. warranties did not apply because the contract was primarily for the rendition of services.

In holding that the trial court had incorrectly sustained the contractor's 12(b)(6) motion, the court observed that the agreement required the contractor to furnish the materials that would form the curtain wall and store front. This fact alone, said the court, "creates an uncertainty to be resolved only by a full factual presentation to determine whether the nature of [the contractor's] business was predominantly the provision of goods or the furnishing of services." *Id.* at 461. The court acknowledged that contractors are typically engaged in the provision of services but refused to impute such a generalization in determining the predominant purpose of the agreement at issue in that case. *Id.* Likewise, the court refused to consider the impact of the second and third factors until the trial court had held an evidentiary hearing. In reaching its conclusion, the *Coakley* court was also quick to point out that it could not find any case where the issue had been disposed of at the 12(b)(6) or demurrer stage. *Id.* at 460.

**\*17** Applying these principles here, the Court overrules Rogers' demurrer to Count V.

*D. Count VI (Negligence against Rogers)*

50 Va. Cir. 71, 1999 WL 33722382

In Count VI, NHBC avers that Rogers determined to use fly ash as filler for the project, that Rogers negligently failed to warn NHBC of the potential for swelling, and that NHBC suffered damages as a result. (Amended Cross–Claim ¶¶ 63–71.) Like Timmons, Rogers argues that any breaches that occurred grew out of duties which existed solely by virtue of the contract between the parties.

The validity of Count VI is controlled by the same principles discussed in Part n(A) above. As such, Rogers' demurrer to Count VI is overruled.

### E. *Count VII (Negligence of ReUse)*

In Count VII of its amended cross-claim, NHBC alleges that ReUse entered into a contract with Rogers to supply the Xtra–Fill, which was to be used as the structural fill material for the Genito project. NHBC further alleges that ReUse was negligent in the following respects: (1) it failed to warn NHBC and the other defendants that Xtra Fill had a potential for swelling; (2) it failed to give NHBC and the other defendants instruction on the proper methods for the application and testing of Xtra Fill; and (3) it negligently manufactured, mixed, and stored the fly ash resulting in damage to NHBC. (Amended Cross–Claim ¶¶ 72–81.) For its part, ReUse argues that *Sensenbrenner* prevents NHBC from attempting to recover economic damages in tort because the parties are not in privity of contract.

As explained in Part I(A) above, *Sensenbrenner* holds that "when a product 'injures *itself* because one of its component parts is defective, a purely economic loss results to the owner for which no action in tort will lie" absent privity of contract. 236 Va. at 424. (Emphasis added.) However, recovery in tort against parties not in privity with the purchaser of the product is available when it can be established that the negligence jeopardized the safety of persons or property "*other than the product itself.*" *Id.* at 424. (Emphasis added.) Applying these principles in Part I(A), this court held that *Sensenbrenner's* "package analysis" applied to dispose of Counts IV, VIII, IX, and XII of Genito's amended motion for judgment. This ruling was based on the fact that Genito contracted with NHBC for the purchase of a "package" development. Pursuant to the contract, this package development was to include, among other things, design and construction services, building materials, site development work, and the provision of suitable fill material. The fill material was thus one of the component parts of the package; and when it proved defective, it caused the "package," i.e., the apartment development, to injure *itself*. According to *Sensenbrenner,*

these are purely economic damages which Genito cannot recover absent privity of contract.

At first blush, this analysis would seem to apply to the NHBC's claim against ReUse. But the "package" involved in the NHBC–Rogers contract was different because the package did not include the apartment dwellings themselves. Under the NHBC–Rogers contract, Rogers agreed to provide a site excavation "package," which included, among other things, excavation, grading, the construction of building pads, and the provision of certain materials including the Xtra Fill. Yet, when the fly ash swelled, the damage was not confined to the NHBC–Rogers site development "package" *itself,* the swelling also injured the apartment dwellings. Thus, to the extent the fly ash caused damage to the dwellings, which were not part of the NHBC–Rogers contract package, these losses must be classified as property damages rather than economic losses. Accordingly, the absence of privity does not preclude NHBC's negligence claim against ReUse, and the demurrer is hereby overruled.

### F. *Counts XIII and IX (Breach of Express and Implied Warranties by ReUse)*

**\*18** In Counts XIII and IX, NHBC avers that ReUse made express and implied warranties that Xtra Fill was suitable for use as structural fill material and that ReUse breached these warranties because it provided fill that was highly susceptible to swelling. ReUse shoots back that the economic loss rule also prevents NHBC's breach of warranty claims and points to the *Beard Plumbing* case in support of its claim.

As discussed in Part I(B) above, Va.Code § 8.2–715(2) imposes a privity requirement in warranty cases where the claimant seeks recovery of consequential economic losses. *See Beard Plumbing,* 254 Va. at 246. Va.Code § 8.2–318, however, abrogates the privity requirement in cases where the claimant seeks recovery of direct economic damages, as long as the claimant "was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods." *See id.* at 245–46.

Accordingly, NHBC's warranty claims in Counts XIII and IX are dismissed insofar as they seek recovery of consequential economic losses. However, Counts XIII and IX are valid to the extent NHBC seeks recovery of direct economic losses, and Defendant's demurrer is overruled in this regard.

50 Va. Cir. 71, 1999 WL 33722382

III. *Demurrers to Timmons' Amended Cross–Claim and Fanara's CrossClaim*

In addition to the claims asserted against ReUse by Genito and NHBC, Timmons and Fanara have also filed cross-claims alleging constructive fraud against ReUse. The cross-claims both allege that before any work was done on the Genito project, ReUse employees represented to Timmons and Fanara that fly ash was suitable as structural fill material on construction projects. The cross-bills also allege that ReUse supplied engineering data and other literature which Timmons and Fanara relied on in giving their qualified approval to NHBC to use the fly ash as filler. Additionally, the cross-bills allege that the fly ash that was actually delivered to the Genito worksite was susceptible to swelling and was therefore different from the material which had been advertised. According to Timmons and Fanara, these recommendations regarding the suitability of fly ash were false and negligently made and resulted in the damage complained of in Genito's amended motion for judgment and in NHBC's amended cross-claim. Timmons and Fanara both pray for recovery against ReUse in the event they are found liable to Genito or NHBC. (Timmons Amended Cross–Claim ¶¶ 4–11; Fanara Cross–Claim ¶¶ 2–11.)

As outlined in Part (f)(E) of this memorandum, a party asserting a claim for actual fraud must establish the following elements by clear and convincing evidence: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled. *Evaluation Research Corp. v. Alequin,* 247 Va. 143 (1994). In this case, however, Timmons and Fanara are asserting claims for constructive fraud rather than actual fraud. As such, they need only show that the misrepresentations were made either innocently or negligently, though, their claims must still be established by clear and convincing evidence. *Id.* at 148.

**\*19** Assuming all the allegations in the two cross-claims are true, as this court must, Timmons and Fanara have properly alleged all the elements of a claim for negligent misrepresentation. Neither of the cross-claims allege which ReUse employees made the misrepresentations or the specific times that the communications were made. However, unlike Counts VI and VII in Genito's amended motion for judgment, the cross-claims here allege sufficient facts to give ReUse the opportunity to shape its defense. *See Mortarino v. Consultant Engineering Services, Inc.,* 251 Va. 289, 295 (1996).

ReUse counters by arguing that Timmons and Fanara are simply trying to create fraud claims out of disappointed economic expectations. ReUse once again points to the *McDevitt* case as support for its proposition and argues that both cross-claims should be dismissed.

ReUse's reliance on *McDevitt* is misplaced. As noted several times above, *McDevitt* simply prevents a plaintiff from attempting to transform a contract claim into a fraud case, where the breaches complained of are based on duties which exist solely by virtue of a contractual relationship between the parties. Here, there was no contractual relationship between the parties. Moreover, ReUse had an affirmative, noncontractual duty to avoid making misleading statements about its products which might cause consumers such as Timmons and Fanara to act to their detriment.

Accordingly, ReUse's demurrers to Timmons' and Fanara's cross-claims are overruled.

*Conclusion*

The court's rulings with respect to the validity of each count are detailed above. It is requested that Mr. Watkins submit a properly endorsed order consistent with the foregoing opinion. Upon entry of the order, Genito will have ten days to amend its motion for judgment with respect to the following claims: (1) its third-party beneficiary claims against Timmons, Fanara, ReUse, and Cogentrix; and (2) its claims for actual fraud against ReUse and Cogentrix. Otherwise, Genito's motion for leave to amend its pleadings is denied.

**All Citations**

Not Reported in S.E.2d, 50 Va. Cir. 71, 1999 WL 33722382

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 23

2005 WL 775929
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana, Indianapolis Division.

Ronald HENDERSON,
Christine Henderson, Plaintiffs,
v.
FREIGHTLINER, LLC, Daimlerchrysler
Corporation, Hendrickson Spring, the Boler
Company, Hendrickson Truck Suspension
Systems, BFS Diversified Products, LLC,
Firestone Industrial Products Co., Defendants.
Ronald HENDERSON and
Christine Henderson, Plaintiffs,
v.
FREIGHTLINER, LLC, Firestone Industrial
Products Co., BFS Diversified Products, LLC,
Hendrickson Truck Suspension Systems, the Boler
Company, and Hendrickson Spring, Defendants.

No. 1:02-CV-01301DFH-WTL.
|
March 24, 2005.

**Attorneys and Law Firms**

Christine Henderson, Pro Se, Portland, TX.

William E. Winingham, Wilson Kehoe & Winingham, Indianapolis, IN, for Plaintiffs.

Angela Pease Krahulik, Richard A. Smikle, Gretchen S. Hess, Jeremy A. Klotz, Ice Miller, George E. Purdy, Sarah Steele Riordan, Bose McKinney & Evans, Marc T. Quigley, Mark J.R. Merkle, Joshua D. Hague, Krieg DeVault, Indianapolis, IN, for Defendants.

ENTRY ON MOTIONS FOR SUMMARY
JUDGMENT AND RELATED MOTIONS

HAMILTON, J.

*1 Plaintiff Ronald Henderson is a diesel truck mechanic who was seriously injured when a component of the pressurized air suspension system of a Freightliner FL-106 truck burst while he was under the truck. In this diversity action, Henderson and his former wife Christine have sued the manufacturers of the truck and of several components of its suspension system under the Indiana Products Liability Act ("IPLA"). Plaintiffs have also sued for common law negligence and breach of implied warranties.

The defendants can be divided into three groups for purposes of the case. Freightliner, LLC manufactured the FL-106 truck. Firestone Industrial Products Company and BFS Diversified Products, LLC (together "Firestone") manufactured an allegedly defective air spring component of the truck's suspension system. Hendrickson Truck Suspension Systems, the Boler Company, and Hendrickson Spring (together "Hendrickson") manufactured an allegedly defective leaf spring that was part of the suspension. The defendants have moved separately for summary judgment on various grounds. They have also moved to strike the testimony of plaintiffs' expert witnesses and to strike plaintiffs' surreply brief. Plaintiffs have moved to strike a portion of Hendrickson's reply brief.

For the reasons discussed below, the court denies defendants' motions for summary judgment as to the core product liability claims. Plaintiffs' common law claims and breach of implied warranty claims are in effect superseded by or merged into their statutory product liability claims, so the case will proceed on only the statutory claims. Defendants' motions to strike or exclude plaintiffs' expert testimony are denied, except that Dr. Walson may not testify as to whether instructions about torque on the relevant U-bolts were confusing and defective. Plaintiffs' motion to strike the portion of Hendrickson's reply brief addressing the issue of privity is granted. All defendants' motions to strike plaintiffs' surreply briefs concerning the testimony of Timothy Couch are denied.

*Undisputed Facts*

In considering a motion for summary judgment, the court does not try to determine the credibility of conflicting evidence. Instead, the court must consider all evidence in the light reasonably most favorable to the non-moving parties, giving them the benefit of conflicts in the evidence and any favorable and reasonable inferences that could be drawn from the evidence. See *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Construing the evidence in that light, the court assumes the following facts are true for purposes of defendants' motions for summary judgment.

The FL-106 Freightliner in question went into service on July 15, 2000. On August 24, 2000, it was serviced in the state of Washington because the driver's side air suspension had failed after about 18,000 miles. The piston was missing and the air bag, a component of the air spring assembly, had a hole in it. Pl. Ev. Tab 14 (Resp. to Hendrickson). A new air bag and piston assembly was installed. Two days later, the owner brought the truck in for repairs to Stoops Freightliner-Quality Trailer, Inc. ("Stoops") in Indianapolis. The new air bag and piston assembly on the driver's side had failed.

**\*2** Richard Taylor was the Stoops mechanic assigned to repair the failed air spring. He did so by replacing the rubber air bag and piston assembly. After he finished, he noticed that the air spring he had repaired was still not quite vertical. He told his foreman of the problem. Because Taylor was at the end of his shift, he was not assigned the job of fixing the leaning air spring. Taylor Dep. 30, 39.

Plaintiff Ronald Henderson was also employed as a mechanic at Stoops. His shift began on the morning of August 27, 2000. He was assigned to repair the leaning air spring. Henderson Dep. 70, 72. Sometime after receiving the assignment, Henderson rolled under the FL-106 truck on his creeper, a low rolling platform used by mechanics to move around under vehicles. *Id.* at 79. He had not released the air in the air suspension system, so it remained pressurized when he rolled under the truck. *Id.* at 83. Also, the truck was loaded with freight when Henderson rolled under it. Barker Dep. 25.

Freightliner provides instructions for service of its trucks in a Business Class Trucks Service Manual ("Service Manual"). The Service Manual provides the following instructions for replacement of an air spring assembly:

Replacement:
1. Park the vehicle on a level surface. Shut down the engine. Set the parking brake and chock the front tires. Raise the vehicle frame and support it with safety stands to remove all weight from the air springs.

2. Disconnect the leveling valve and exhaust all air from the air springs.

Freightliner Ex. H at Ex. 6. Henderson was familiar with the warning and with the need to take these steps, including releasing the air from the system, before beginning to work on the suspension system. Henderson Dep. at 6.

While Henderson was beneath the truck, the air spring assembly exploded, resulting in his serious injuries. The focal point of the explosion was the plastic composite piston, also called a "pedestal." The piston is a component of the air spring assembly and is critical to the high pressure air suspension system.

The parties dispute whether Henderson rolled under the truck merely to diagnose or inspect the leaning air spring, or whether he had actually started to work on it. Henderson does not recall anything that occurred after he rolled under the truck. Henderson Dep. 82. After Henderson was taken to the hospital, a co-worker inspected the scene and found tools under the truck, including an impact gun, some sockets, and a wrench. Barker Dep. 20-21.

Mechanic Timothy Couch was assigned to replace the failed air spring assembly on the FL-106. Couch Dep. 18-19. He was the first mechanic to work on the truck since Henderson's injury. *Id.* at 18. Couch found a deep-well socket wedged between the truck's frame and the axle housing. The socket belonged to Henderson. Couch testified that mechanics put such sockets in that location to prevent the frame from lowering completely down onto the axle housing when the air is released from the suspension system. Having the frame supported in that way makes work on the air spring assembly easier. *Id.* at 32-33.

**\*3** Couch removed the failed air spring assembly that injured Henderson. Removing an air spring assembly requires the mechanic to loosen U-bolts that hold the truck's leaf springs in place. The leaf springs are integral to the truck's air suspension system. Proper alignment of a leaf spring is necessary for proper alignment of an air spring assembly.

The parties dispute whether the U-bolts securing the leaf spring were tight when Couch began to remove the failed air spring assembly, or whether Henderson had already loosened them. As explained in more detail below in the discussion of the misuse and incurred risk defenses, the court finds, applying the standard for a motion for summary judgment, that the evidence would allow a reasonable jury to find that Henderson had *not* loosened the U-bolts when the piston exploded. A reasonable jury could find that Henderson had not begun to service the truck at all, that he had rolled under the truck only to inspect the suspension system, and that he had placed the deep well socket on the frame so he would have extra working space after he bled the air out of the suspension.

Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2001)
2001 WL 881929

Couch installed an aluminum replacement piston as part of his repairs to the truck. At the time the truck was inspected for purposes of litigation, the truck had 200,000 miles on it. The original leaf spring remained intact and functional, as did the aluminum replacement piston.

The Freightliner FL-106 truck at issue had an auxiliary axle added to it, known as a "push axle" or a "tag axle." The axle had been added at some unknown date before Henderson's injury and was in place at the time of the injury. The axle was not manufactured, designed or installed by Freightliner. The extra axle did not drive the truck, but it helped handle additional weight. Other facts are noted below, applying the standard for a motion for summary judgment.

## Discussion

The multiple motions present numerous issues. The court begins by sorting out the legal grounds for recovery, then turns to the asserted defenses of misuse, incurred risk, and product alteration. The court then turns to the related issues of expert testimony and proof of defects.

### I. Legal Theories

The Indiana Products Liability Act ("IPLA") governs "all actions that are: (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind.Code § 34-20-1-1. This section was amended in 1995 and recodified in 1998 to apply to all product liability claims. See *Butler v. City of Peru,* 733 N.E.2d 912, 918 n. 2 (Ind.2000), citing Pub.L. No. 278-1995, § 1, 1995 Ind. Acts 4051; and Pub.L. No. 1-1998, § 15, 1998 Ind. Acts 125.

Plaintiffs have also asserted claims under the common law of negligence and claims for breach of an implied warranty of merchantability. The IPLA effectively supplants both the common law negligence claims and the breach of implied warranty claims. All of plaintiffs' claims in this case are brought by a user or consumer, against a manufacturer or sellers, for physical harm caused by a product. Plaintiffs' common law negligence claims and breach of implied warranty claims will therefore be treated as merged into the IPLA claims. The jury will be instructed only on the IPLA.[1]

Plaintiffs' motion to strike a portion of Hendrickson's reply brief raising a new issue (lack of privity) is hereby granted. Though this decision has little practical effect, it is still worth noting that a reply brief is not an appropriate occasion for offering an entirely new argument in favor of summary judgment. Hendrickson's suggestion that this tactic is acceptable because it had asserted lack of privity as an affirmative defense in its answer entirely misses the point. When a party moves for summary judgment on specified grounds, the opponent is entitled to respond to those grounds, and need not respond with argument and evidence on other theories that might have been raised but were not. See *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989). If courts do not enforce that limit, summary judgment practice will become more expensive and uncertain.

Freightliner's motion for summary judgment poses a similar problem, though there is no separate motion to strike. Freightliner's reply brief raises a new theory of alleged product misuse, asserting at pages 13-15 that Henderson misused the truck by driving it from one service bay to another. The court has simply disregarded that improper attempt to inject a new ground for summary judgment into the reply brief.

### II. The Incurred Risk and Misuse Defenses

**\*4** All defendants argue that they are entitled to summary judgment because Henderson misused the product, or incurred the risk of harm, by working on the truck's suspension system without first bleeding the air pressure from the system. Misuse of a product is the failure to use it in a reasonably expected manner. *Leon v. Caterpillar Industrial, Inc.,* 69 F.3d 1326, 1343 (7th Cir.1995). Indiana Code § 34-20-6-4 provides:

> It is a defense to an action under [the IPLA] that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party.

The misuse defense is not necessarily a complete defense but is an element of comparative fault. *Chapman v. Maytag Corp.,* 297 F.3d 682, 689 (7th Cir.2002). Misuse has been further defined as "use for a purpose or in a manner not foreseeable by the manufacturer." *Barnard v. Saturn Corp.,* 790 N.E.2d 1023, 1030 (Ind.App.2003) (citation omitted).

The incurred risk defense is closely related, at least under the circumstances here. To prevail on an incurred risk defense, the defendants must present sufficient evidence to convince a reasonable jury that Henderson had actual knowledge of the specific risk that he faced. *Ferguson v. Modern Farm Systems, Inc.,* 555 N.E.2d 1379, 1381 (Ind.App.1990). To prevail at summary judgment on this defense, the defendants would have to show that any reasonable jury would be required to find that Henderson had such knowledge. "Incurred risk involves a mental state of venturousness on the part of the actor and demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk." *Cole v. Lantis Corp.,* 714 N.E.2d 194, 200 (Ind.App.1999). Because incurred risk is also an element of comparative fault, defendants would need to show that any reasonable jury would have to find that Henderson's fault was greater than fifty percent. *Smock Materials Handling Co., Inc. v. Kerr,* 719 N.E.2d 396, 402 (Ind.App.1999).

The defendants rely on evidence that shows, they contend, that Henderson had loosened the U-bolts on the leaf spring while the suspension system was still pressurized. If Henderson had done that, it would have been very dangerous and directly contrary to product warnings.

Defendants are not entitled to summary judgment on the misuse and incurred risk defenses. The evidence on this record would easily allow a jury to find that Henderson had not begun working on a still pressurized air suspension system when the piston exploded. He was certainly preparing to work on the system. He had gathered some tools. He was underneath the truck looking at the suspension system. Perhaps most telling, a jury could find that he put the deep well socket on the truck frame so that he would have more room to work after bleeding the air from the system.

The defendants point to statements in Mr. Henderson's deposition testimony as evidence that he was aware of the specific risk posed by the air spring.

**\*5** Q Why do you want to get the air out of the system before you remove the components?

A So it won't explode.

Henderson Dep. 6. This evidence helps support plaintiffs' case. Henderson understood that it was dangerous to work on a pressurized suspension system. That understanding provides some evidence that weighs against the circumstantial evidence that defendants cite to argue that he began working while the system was still pressurized. Perhaps even more important is the fact that Henderson put his deep well socket in a position where it would be used to support the truck after he bled the air pressure from the system. That fact weighs in favor of an inference that he intended to bleed the air pressure before working on the system, and that he would not have begun working on the system while it was still pressurized. Henderson also gave additional testimony that would support a finding that he rolled under the truck not to service it but to inspect it.

Q Well, wouldn't you have let the air out of the system in this case involving your accident, August 27, 2000, as part of your process of servicing the air bag?

A No.

Q Why not?

A Because I would have visually inspected it first.

Henderson Dep. 83.

Defendants rely most heavily on a few passages in the deposition testimony of Timothy Couch, the mechanic who repaired the FL-106 after the explosion that injured Henderson. Defendants characterize Couch's deposition testimony on this latter point as unambiguous in their favor. The court does not agree.

At his deposition Couch was shown a repair order written by someone other than himself and summarizing work done on the FL-106.[2] On the repair order, an entry labeled "B" includes the following statement: "B. THE DRIVERS SIDE AIR BAG PER OWNER IS BUSTED CHECK AND REPAIR." Below that statement, also under entry B is this notation: "CK'D & FOUND THE PED ON LEFT REAR AIR BAG BROKE & DAMAGED BAG, U-BOLTS LOOSE & SPRING SHIFTED. R/R AIR BAG, SHIFTED AXLE BACK TO PROPER POSITION & TORQUED U-BOLTS." Pl. Ev. Tab 16 (Resp. to Hendrickson). Couch was asked what this entry meant. He responded: "The mechanic looked at the

Case 1:19-md-02875-RMB-SAK     Document 520-7     Filed 07/17/20     Page 209 of 520
PageID: 9130
Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2001)
2001 WL 881929

truck, basically found the pedestal damaged and broken, the U-bolts were not tight and the spring was not in position. Removed and replaced the air bag, shifted the axle back to the position that it should be in and retorqued the U-bolts." Couch Dep. 26. When asked if he was the mechanic who performed that work described in entry B, Couch responded that he was. *Id.*

2    On the repair order, "AIR BAG" refers to the flexible rubber housing around the air spring assembly piston. "PED" stands for "pedestal," which is another term for the plastic composite piston. "CK'D" stands for "checked." "R/R" stands for "removed and replaced." "Spring," as used in "Spring shifted," refers to the leaf spring.

Defendants characterize this evidence as follows:
In his deposition, Mr. Couch read through the work order for the repair of the air spring after Mr. Henderson's accident that stated, "U-bolts loose and spring shifted." Mr. Couch explained that the mechanic who worked on the truck "found the pedestal damaged and broken, the U-bolts were not tight and the spring was not in position." Mr. Couch testified under oath that *he* was the mechanic who performed that check and performed that work. Again Mr. Couch's testimony is significant because it is evidence that Plaintiff Ronald Henderson actually performed work on the truck by loosening the U-bolt while the system was pressurized.

*6    Firestone MSJ Reply Br. at 4.

From the court's review of the Stoops work order, it is not clear that the "B" entries that Couch read aloud and interpreted in his deposition even refer to the work he actually performed himself. Portions of Couch's testimony at page 26 of his deposition seem to correct his earlier statement that he had done the work on the "B" entries. The "B" entries start with the *owner's* complaint that the driver's side air bag was broken, and the entries then summarize the repair work. That seems to be the original work that Taylor did. The "C" entries start with the exploded piston that injured Henderson: "PEDESTAL ON AIR BAG JUST INSTALLED EXPLODED." See Pl. Ev. Tab 16 (Resp. to Hendrickson). After identifying the parts replaced as part of "C," including the air spring, piston, and air bag, the summary goes on to describe what appears to be the work actually performed by Couch after Henderson's injury: "CK'D & FOUND PEDESTAL ON AIR BAG JUST INSTALLED ON LINE B OF THIS REPAIR ORDER EXPLDED &

DAMAGED BAG. R/R AIR BAG." *Id.* There is no reference to loose U-bolts in that entry.

In any event, what is most striking about Couch's quoted deposition testimony is that defense counsel did not ask Couch directly whether he found the U-bolts loose when he began working on the FL-106 after Henderson was injured. Couch answered that question in an affidavit that plaintiffs have submitted in opposition to summary judgment. He noted that he was the first person to work on the truck after Henderson's accident. Couch continued: "When I began work on the truck, the left (driver's side) u-bolt on the drive axle was fully tight, not loosened in any way. I did not find anything that had been loosened. During the course of replacing the air spring assembly, I loosened the u-bolt with an impact wrench, moved the leaf spring to the extent I could toward the outward side (left side) of the truck by use of a port-o-power tool, then re-tightened the u-bolt." Couch Aff. ¶¶ 5-7.

That affidavit testimony is consistent with Couch's later deposition testimony that directly addressed the key issue. He was asked to describe his repair work:
Q You were discussing that there was some alignment issues. Can you describe for me kind of what you did to maybe correct the situation?

A Loosened the U-bolts on the left side spring and moved the air spring outward toward the outward side of the truck.

Couch Dep. at 41. This testimony clearly implies that the U-bolts were tight when he began working on the truck.

In their reply briefs, all defendants objected to the Couch affidavit, quoted above. They argued that the affidavit was an improper attempt to create a genuine issue of fact by recanting deposition testimony. The Seventh Circuit has often warned that a party cannot avoid summary judgment by attempting to submit an affidavit that recants or contradicts the affiant's prior deposition testimony. See, *e.g., Stinnett v. Iron Works Gym,* 301 F.3d 610, 614-15 (7th Cir.2002) (affirming summary judgment; district court has discretion to disregard affidavits that attempt to repair deposition testimony if no suitable explanation is offered, such as confusion, mistake, or lapse of memory); *Piscione v. Ernst & Young, LLP,* 171 F.3d 527, 532 (7th Cir.1999) (collecting cases); *Adelman-Tremblay v. Jewel Companies,* 859 F.2d 517, 521 (7th Cir.1988); (applying principle to deposition and affidavit of non-party witness); *Miller v. A.H. Robbins Co.,* 766 F.2d 1102, 1105 (7th Cir.1985).

**\*7** That rule does not come into play, however, unless the affiant's prior deposition testimony was clear and specific on the point. *E.g., Maldonado v. U.S. Bank,* 186 F.3d 759, 769 (7th Cir.1999) (affirming denial of motion to strike affidavit; opposing party "simply never asked about some of the evidence provided in [the] supplemental affidavit and its attachments," and many alleged discrepancies only clarified previous testimony); *Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1007 (7th Cir.1999) (reversing summary judgment: "where the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit"); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1314 n. 3 (7th Cir.1989); *see also Pries v. Honda Motor Co.,* 31 F.3d 543, 544-45 (7th Cir.1994) (reversing summary judgment in product liability case; plaintiff explained deposition testimony, and physical evidence supported her theory of defect).

The rule against submitting affidavits that contradict prior depositions does not apply to Couch's testimony, where defense counsel danced around the direct question. They obtained deposition testimony they could use to support their argument, but did not get a direct answer to the critical direct question: Were the U-bolts already loose when Couch began working on the truck? In such a case, it is entirely proper for a party opposing the motion for summary judgment to submit an affidavit from the witness stating clearly the answer to the critical question. See *Holland,* 883 F.2d at 1314 n.3 (reversing summary judgment where affidavit "presents no direct contradiction of any plain or unequivocal admission in her deposition.... Here, [plaintiff's] affidavit answers a question-a key question-that was never put to her squarely in the deposition").

Defendants' effort to discount Couch's affidavit is especially weak in this case because Couch's deposition testimony actually did directly address the critical question. As noted, at page 41 of his deposition testimony, Crouch testified that he loosened the U-bolts. Defendants are not entitled to summary judgment on the theory that Henderson misused the product or incurred the risk by working on the truck suspension system while it was still pressurized. The weight of the evidence appears to point in the opposite direction; in any event, the evidence certainly does not support defendants' view beyond a reasonable dispute. [3]

To support these defenses, defendants also cited deposition testimony from Bruce Barker, a co-worker who thought the U-bolts had been loose when Couch started working on the truck. Barker further testified, however, that he had only a sketchy memory on the point, and that the lawyers should ask Couch, who actually worked on the truck and made the repairs. See Barker Dep. at 32, 41. Barker's testimony does not entitle defendants to summary judgment.

After defendants filed their reply briefs, plaintiffs submitted surreply briefs that attached fresh copies of the Couch affidavit and argued that Couch had not contradicted his deposition testimony. All defendants then moved to strike the surreply briefs as late and unauthorized. In the court's view, the surreply briefs were late but otherwise proper. Defendants' original briefs had attempted to finesse the critical issue by ignoring Couch's testimony on the key question, and by relying on inference from some of their indirect questions to him. Plaintiffs properly responded with the Couch affidavit and other portions of his testimony. That response showed quite clearly that defendants' attempt to portray the evidence on this question as undisputed was groundless. In fact, those attempts undermined the credibility of the defense motions more broadly.

**\*8** Defendants then raised new arguments in their reply briefs attacking the Couch affidavit. Local Rule 56.1(d) allows a surreply brief in opposition to summary judgment where, among other situations, the moving party's reply brief "objects to the admissibility of the non-moving party's evidence." The court believes it is fair to treat the defendants' attacks on the Couch affidavit as an attack on its admissibility. It is only fair to allow plaintiffs to respond to that argument and to explain fully why the Couch affidavit was not an improper attempt to contradict deposition testimony. Defendants point out correctly that the plaintiffs' surreply briefs were late, by varying degrees, since defendants filed their reply briefs at different times. The court believes it is in the interests of justice to consider these reply briefs, and to excuse the late filing. See *Harmon v. OKI Systems,* 115 F.3d 477, 481 (7th Cir.1997) (affirming district court's decision to deny motion to strike brief and to excuse failure to comply strictly with local rules by party who sought and won summary judgment). All three defense motions to strike plaintiffs' surreply briefs are denied.

III. *Alteration*

Freightliner argues that the FL-106 truck was substantially altered by the addition of the auxiliary axle, also known as a push axle or tag axle. Freightliner's expert Paul Hynes testified in his affidavit that the addition of the auxiliary rear axle "increased the likelihood that a malfunction or failure of the suspension system or its component parts would occur." Freightliner argues that this substantial alteration was an unforeseeable intervening and proximate cause of Henderson's injuries. According to Freightliner, the presence of the auxiliary axle means that plaintiffs cannot establish the essential element of proximate cause, so that Freightliner is entitled to summary judgment as a matter of law.

The argument is not persuasive as a basis for summary judgment. The conclusory statement in Hynes' affidavit stops well short of claiming that the auxiliary axle actually contributed at all to the Henderson accident. "When a defendant manufacturer in a [products] liability case moves for summary judgment, it has the burden to show the uncontroverted nonexistence of at least one of the elements essential to plaintiff's case." *Wolfe v. Storks RMS Protecon, Inc.,* 683 N.E.2d 264, 267 (Ind.App.1997), citing *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1162 (Ind.App.1988). Freightliner has not established the "uncontroverted nonexistence" of proximate cause.

Proximate cause in a product defect action is established "if the injury caused by the product is a natural and probable consequence which was, or should have been, reasonably foreseen or anticipated in light of the attendant circumstances." *Montgomery Ward & Co. v. Gregg,* 554 N.E.2d 1145, 1156 (Ind.App.1990). In a product defect action, "substantial alteration of the product is relevant to the issue of proximate cause. *Leon v. Caterpillar Industrial, Inc.,* 69 F.3d 1326, 1339 (7th Cir.1995). The plaintiff bears the burden to show that the product reached him without substantial alteration. *Bishop v. Firestone Tire & Rubber Co.,* 814 F.2d 437, 443 (7th Cir.1987). Substantial alteration is "any change which increases the likelihood of a malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put." *Leon,* 69 F.3d at 1338, quoting *Schooley v. Ingersoll Rand, Inc.,* 631 N.E.2d 932, 938 (Ind.App.1994).

**\*9** The defendants here rely on *Wolfe, Leon,* and *Bishop* to argue that the plaintiffs cannot meet their burden of proof on proximate cause. However, all three cases involved critical facts missing from this case. In all three cases the alteration was a direct and undisputed cause of the injury, and

there was no evidence independent of the alteration that the product was defective when it left the control of the defendant manufacturer.

In *Leon,* a retailer had installed a new seat and a "dead man's switch" on a forklift. An injured employee sued the manufacturer for strict liability after the dead man's switch (designed to disengage the transmission when no one was sitting on the seat) failed and the employee was struck by the forklift. On the issue of strict liability, the Seventh Circuit upheld a district court's dismissal of the claim because the evidence was undisputed, indeed it was confirmed by the plaintiff's own expert, that the added seat and the added dead man's switch combined to cause the injury. 69 F.3d at 1332. Further, it was "undisputed that the forklift was not in a defective or in an unreasonably dangerous condition when it left [the manufacturer]." *Id.* at 1340. Here, there is no evidence that the auxiliary axle contributed to the injury at all. There certainly is not undisputed evidence that it did contribute to the injury. It is also disputed whether the FL-106 left Freightliner's control in a defective condition. Plaintiffs have raised issues of fact on these questions independent of the auxiliary axle.

Similarly, in *Wolfe,* the Indiana Court of Appeals affirmed summary judgment for the defendant manufacturer where a meat processing worker was injured after her clothing became entangled in a turning bolt which protruded from a hydraulic motor. In that case, the motor with the protruding bolt was a replacement motor, supplied by a supplier other than the defendant manufacturer of the original motor. The manufacturer's original motor did not have a protruding bolt. The court noted that "[i]t is a defense that *the cause* of the physical harm is a modification or alteration of the product ... *if* such modification or alteration *is the proximate cause* of physical harm where such modification or alteration is not reasonably expectable to the seller." 683 N.E.2d at 268 (emphasis added). The court observed that:

In the present case, Wolfe was injured when her smock became caught in a protruding, turning bolt which connected the coupler to the hydraulic motor. The original system provided by Stork had no coupler and no protruding bolts. Thus, *the undisputed, designated evidence reveals* that the dangerous instrumentality, the protruding, turning bolt, was introduced when the hydraulic motor was replaced. As noted above, there is no evidence of Stork's involvement in the replacement of the conveyor motor.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 212 of 520
PageID: 9133
Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2005)
2001 WL 881929

.... [W]e conclude, as a matter of law, that the replacement of the conveyor motor with the addition of the protruding, turning bolts, one of which *directly caused* Wolfe's injuries, constituted the *sole proximate cause* of Wolfe's injury which served to cut off any liability Stork may have had. Stork has established the uncontroverted nonexistence of the element of proximate cause.

**\*10** .... In the present case, Wolfe failed to establish that her injuries were proximately caused, even remotely, by Stork. As noted above, the replacement of the hydraulic motor with the protruding, turning bolts was the *sole proximate cause* of Wolfe's injuries.

*Id.* at 268-69 & n. 1 (emphasis added). Defendants seek to analogize the added auxiliary axle here to the added motor and protruding bolt in *Wolfe.* However, as the language of the Court of Appeals makes clear, the protruding bolt in that case, like the dead man's switch in *Leon,* was the undisputed sole and direct cause of the plaintiff's injury. That is simply not the case here.

Finally, in *Bishop,* the Seventh Circuit upheld a directed verdict in favor of a defendant tire manufacturer where the plaintiff was injured when a lock ring on a tire gave way under pressure while the plaintiff was inflating the tire. "The evidence presented was *uncontroverted that the lock ring which caused* Bishop's injuries had undergone a substantial change after it had left the manufacturer and prior to Bishop's accident, and thus Firestone was entitled to a directed verdict." 814 F.2d at 443 (emphasis added).

In each of those cases, the cause of the accident was shown, beyond reasonable dispute, to be the identified alteration. Freightliner argues: "Plaintiffs have failed to produce any evidence-as required-to establish that the addition of the [auxiliary] axle was not a superceding and intervening cause of Plaintiffs' alleged injuries." Freightliner MSJ Br. at 7. In fact, the plaintiffs have come forth with evidence from which a jury could infer that the leaf spring and air spring with which the truck left Freightliner's control were the sole causes of the injury. That evidence constitutes evidence that the auxiliary axle was not the cause at all. Freightliner has not come forward with evidence tending to show that the auxiliary axle contributed to this injury in any way. Hynes testified only vaguely that the alteration "increased the likelihood" that some unspecified "malfunction or failure of the suspension system or its component parts would occur." Hynes Aff. ¶ 13. In addition, plaintiffs have pointed to evidence from

Stoops employee Bruce Barker that the auxiliary axle was in place and was supporting part of the weight of the truck's load at the time of the accident. Barker Dep at 41-42, 44-45. That evidence tends to show that the auxiliary axle contributed nothing to the accident. Freightliner may make its substantial alteration argument to a jury. Its motion for summary judgment on this point is denied.

## IV. *Expert Testimony and Product Defects*
The Indiana Product Liability Act provides in part that:

> a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer ... is subject to liability for physical harm caused by that product to the user or consumer [if] that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition.

**\*11** Ind.Code § 34-20-2-1. Under the IPLA, plaintiffs must prove: (1) the product was "defective" and as a result "unreasonably dangerous"; (2) the defect existed at the time the product left the defendants' control; (3) the product was expected to and did reach the consumer without substantial alteration; (4) the plaintiff's injuries were proximately caused by the defect in the product. *Moss v. Crosman Corp.,* 136 F.3d 1169, 1171 (7th Cir.1998). Where the existence of a defect depends on matters beyond the common understanding of a lay juror, admissible expert testimony is required to sustain the plaintiff's burden of proof on the question. *Cansler v. Mills,* 765 N.E.2d 698, 706 (Ind.App.2002).

To meet that burden, plaintiffs rely on Dr. Robert Walson and David Zedonis. Dr. Walson has a Ph.D. in metallurgical engineering and teaches at Butler University. Plaintiffs offer Dr. Walson to testify about two principal conclusions: (1) that the Firestone air spring was defective due to voids and irregularities in the plastic composite material used to manufacture the piston; and (2) that the Firestone air spring was defective due to inadequate warnings on the air spring regarding the proper torque at which to tighten the nuts securing the air spring assembly to the leaf spring. Pl. Ev. Tab

12 at 6 (Resp. to Firestone). David Zedonis is an engineer who has often worked on litigated matters. He is expected to testify about three principal conclusions: (1) that the leaf spring manufactured by Hendrickson was defective due to improper dimensions, and that the improper dimensions contributed to the failure of the air spring assembly; (2) that the air spring assembly manufactured by Firestone was defective due to weaknesses in the plastic composite material used to manufacture the air spring's piston that exploded; and (3) that by incorporating these two defective components, the FL-106 truck manufactured by defendant Freightliner was itself defective. Pl. Ev. Tab 15 at 2 (Resp. to Firestone).

Defendants have moved to strike the testimony of Dr. Walson and Zedonis. Without their opinions, plaintiffs would have no expert testimony to support their claims of product defect, so that summary judgment would be mandated on all claims. Defendants argue that the testimony of Zedonis and Dr. Walson fails to meet the standards of Rule 702 of the Federal Rules of Evidence, as articulated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Federal Rule of Evidence 702 governs the admissibility of such testimony because it is premised on specialized engineering knowledge. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*12** The court's role in applying Rule 702 is to be a "gatekeeper." *Daubert,* 509 U.S. at 589. In its role as gatekeeper, the court must consider both the relevance and the reliability of the proffered evidence. *Kumho Tire,* 526 U.S. at 141.

### A. *Relevance of Both Experts' Opinions*

The relevance test asks whether the fact finder will be helped by the expert testimony either to understand the evidence or to determine a fact at issue in the case. In other words, the testimony must fit the issue in the case, and about which the expert is testifying. *E.g., Zarecki v. National R.R. Passenger Corp.,* 914 F.Supp. 1566, 1573 (N.D.Ill.1996). Dr. Walson's and Zedonis's opinions about the design and manufacture of the plastic composite piston, the leaf spring, the FL-106 truck and the circumstances of Henderson's injury are highly relevant and fit the issues in the case. The relevance prong of the *Daubert* analysis is easily satisfied with regard to both Dr. Walson and Zedonis.

There is one exception, however. The motion to strike Dr. Walson's testimony will be granted in part, with respect to his opinion that the instructions to mechanics about the torque to use on the U-bolts were confusing. Dr. Walson testified that the torque applied to the U-bolts did not cause the failure of the piston. Walson Dep. at 119. Accordingly, his opinion about the instructions does not address a relevant issue that the jury would need to evaluate.

### B. *Reliability of Dr. Walson's Testimony*

Firestone does not challenge Dr. Walson's qualifications, and the court is satisfied that Dr. Walson is qualified by both education and experience to give his proposed testimony. Dr. Walson holds a Ph.D. in metallurgical engineering, an M.S. in physics, and a B.S. in engineering physics. Pl. Ev. Tab 13 (Resp. to Firestone). He has over thirty years experience in mechanical engineering stress and materials failure analysis in academic and industry settings. *Id.* He has taught a seminar in automotive materials and design. *Id.* He has university-level teaching experience and design experience involving the composite plastic material at issue in this case. Walson Dep. 27-28, 32. Dr. Walson is president of a technical consulting company specializing in forensic engineering and failure analysis of products, systems, parts, and materials. Walson Dep. 44; Pl. Ev. Tab 13 (Resp. to Firestone).

Firestone contends that Dr. Walson's methods were not sound. It argues that "his opinions lack the requisite indicia of trustworthiness required by *Daubert.*" Firestone Br. on Mot. to Strike at 6. Specifically, Firestone argues that Dr. Walson did not "scientifically test his positions" and "can point to no peer review or outside analysis. In short, he goes

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 214 of 520
PageID: 9135
Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2001)
2001 WL 881929

from observation to conclusion and bypasses the scientific method." *Id.*

In *Kumho Tire,* the Supreme Court explained that the four factors most often cited from *Daubert*-testability, peer review, known or potential error rates and standard procedures, and degree of acceptance in relevant scientific community-were addressed to scientific testimony. The relevant inquiries for other types of expert testimony may be different. 526 U.S. at 149-51. The Court instructed district judges to focus on the central goal, which is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. As a result, "the *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered." *Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir.2004).

**\*13** Rigid adherence to the four *Daubert* factors for scientific evidence is not appropriate where, as with Dr. Walson, the expert is relying on his experience in the relevant field. The concept of peer-reviewed literature, for example, does not fit this case well. See *Kumho Tire,* 526 U.S. at 150-51 ("relevant reliability concerns may focus upon personal knowledge or experience.... It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist"); *United States v. Allen,* 269 F.3d 842, 846 (7th Cir.2001) (affirming district court's determination that DEA agent with substantial experience was qualified expert in field of narcotics trafficking and his opinion about weapons used in narcotics trafficking was therefore reliable and relevant), quoting Fed.R.Evid. 702 advisory committee note ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

Dr. Walson researched the suspension system, springs, composite plastics, rubber and metals involved in this case in reference materials published by the American Society of Metals International and the Society of Automotive Engineers. Walson Dep. 7-9. He reviewed the Freightliner maintenance manual for the FL-106 and also the maintenance history of the FL-106 at issue. *Id.* at 52-53. He visually inspected the truck and its suspension system, including the leaf spring and failed air spring assembly. *Id.* at 18. He examined the failed composite plastic components of the air

spring assembly at his office at Butler University using an optical microscope and a scanning electron microscope. *Id.* at 20. Dr. Walson testified to "many years" of experience using electron scanning microscope technology for engineering failure analysis in both academic and industry settings, and to fourteen years of teaching a course in the use of the scanning electron microscope at Butler University. *Id.* at 42-43. Dr. Walson also performed x-ray inspection of the failed plastic composite piston, and compared it to x-rays of the other pistons from the same truck, both plastic composite and aluminum. *Id.* at 24, lines 6-11; 97, lines 129-37. Dr. Walson testified to twenty years of experience in the use of x-ray technology in engineering failure analysis. *Id.* at 24, lines 12-16. He has taught university-level courses in engineering x-ray techniques. *Id.* at 25-26. He received training through and is a participating member of the American Society for Nondestructive Testing. *Id.* at 25. He has used x-ray technology in failure analysis approximately 200 times, 20 of which involved the failure of plastics, including automotive parts, and including the composite plastic at issue in this case. *Id.* at 27-28. Dr. Walson has performed failure analysis on failed heavy-duty trucks, including several involving the suspension system, though not an air suspension system. *Id.* at 57-58.

**\*14** Dr. Walson used the x-ray and electron microscopy technology to examine the failed air spring component and its non-failed counterparts to determine the origins and nature of the material failure. He testified at his deposition that these examinations revealed that the composite plastic piston contained voids or holes that its unbroken counterparts did not contain and that should not have been there. He was asked for the basis of his conclusion on this point.

> Based on my experience of looking at failed parts, when you have holes in them, that is weaker than if you don't have holes in them. And we do testing for students, that's what we do: We test parts. We drill holes and show them that when you have a hole ... it is weaker. So based on my training, experience, the part is going to be weaker with defects than if it didn't have defects.

Walson Dep. 82, lines 10-19. Dr. Walson also opined that the component materials of the composite plastic were not

bonded adequately and that this contributed to its failure. He was asked for the basis of this opinion.

> That would be years of experience in products where, when we made composites at John Deere, we wanted to make sure [adequate bonding] happened.... That you get a stronger part when the matrix is attached to the particles of glass or a reinforcing glass.

*Id.* at 87, lines 6-11. At another point, Dr. Walson testified:

> [B]ased on my experience, looking at broken parts, looking at composite parts, looking at literature, it is [an] established fact that defects reduce the strength and make the parts more susceptible to breakage.... The lack of bonding to glass to the matrix, this lack of uniform filling of the glass is a defect, yes.

*Id.* at 77, lines 8-17.

Dr. Walson's testimony about the failure of the piston is based, as he notes throughout his deposition, on his years of experience in materials failure analysis. This experience included the instruments, principles and methods of analysis that he applied to the alleged material failures in this case, and some of it involved the plastic composite material at issue in this case. Dr. Walson acquired his knowledge of the use of these instruments and methods of analysis from training at universities and professional engineering organizations and has taught them to science and engineering students as well as professional engineers. Pl. Ev. Tab 13 (Resp. to Firestone). The court is satisfied that the opinions of Dr. Walson concerning the failure of the piston are based on his knowledge and professional experience, that his knowledge and personal experience form a reliable basis for expert opinion in the engineering or materials failure fields, and that he applied his knowledge and experience reliably to the specific facts of this case.

Defendants contend that the Dr. Walson has engaged in circular reasoning: from the premise that the piston exploded, he has concluded that it must have been defective. The court does not interpret his testimony that way. The fact that a brand new piston exploded just hours after it was installed does not prove conclusively that the part was defective under the law. However, the fact is surely highly relevant in the analysis. The new piston exploded without even having been subjected to the forces and rigors of highway driving. The fact that this was the third piston on a new truck is also relevant. The first had failed after about 20,000 miles. The second failed after two days of driving. The fact that the aluminum fourth replacement piston was used without incident for 180,000 miles is also relevant. Dr. Walson did not merely conclude that a failed part must have been defective because it failed. He used his professional knowledge and experience to examine the remains of the failed part, to compare them to other parts that had not failed, and to provide a plausible explanation for its failure. The explanation is reliable enough to allow it to be presented at trial and tested through the more conventional means of challenging evidence, through cross-examination and presentation of contradictory evidence. See *Daubert,* 509 U.S. at 595-96.

C. *Reliability of Zedonis's Testimony*

***15** Both Firestone and Hendrickson have also challenged the qualifications and methodology of David Zedonis. Plaintiffs propose to have Zedonis testify (1) that the leaf spring manufactured by defendant Hendrickson was defective due to improper shape and dimensions; (2) that inherent weaknesses in the plastic composite material used to manufacture the air spring's piston constituted a design defect; and (3) that by incorporating these two defective components, the FL-106 truck manufactured by Freightliner was itself defective.

Zedonis is a registered professional engineer in Indiana. He is employed as a consulting engineer for an engineering consulting company called Forensic Services Group. Zedonis Dep. 8. He has a bachelor's degree and approximately twenty years experience in the field of mechanical engineering, including some experience in the areas of product design and testing, and including product design experience involving metals, plastics and composites. His principal area of specialty appears to be accident reconstruction. Pl. Ev. Tab 16 (Resp. to Firestone).

Zedonis's theory of the accident is that the leaf spring had dimensions that were different from those of a new leaf spring

to which he compared it. This difference, he contends, caused an abnormal misalignment of the air spring assembly, so that it leaned off of vertical and caused an abnormal load of pressure on the composite plastic piston. The inherent weakness of the piston caused it to burst under this abnormal load of pressure. Thus, Zedonis contends that the failure of the piston resulted from the combination of the defective leaf spring and a piston that was too weak. In support of these opinions, Zedonis noted that the new plastic piston on the driver's side exploded, while the plastic piston on the other (less seriously misaligned) side of the truck survived for at least 200,000 miles without failing. He also noted that the aluminum replacement piston functioned for 180,000 miles without bursting under the same misalignment conditions caused by the defective leaf spring, which had not been replaced.

The defendants contend that Zedonis is not qualified to testify because he has no training or experience in truck suspensions. Plaintiffs point out that Zedonis has testified as an expert in other cases involving truck suspensions. Pl. Resp. to Boler at 9. However, this court's gatekeeper responsibilities are not discharged by relying on other courts' exercise of that function. Zedonis has no apparent practical experience with truck suspension systems in general or air springs in particular. When asked if he had "ever heard of" leaning air springs or leaning air ride suspension issues prior to this case he responded: "Not that I recall." Zedonis Dep. 30. When asked if he considered himself an expert in air spring design he responded: "Not specifically." When asked if he considered himself an expert in air spring failure he responded: "Not specifically." *Id.* at 150.

 **\*16** On the other hand, Zedonis has extensive experience in mechanical engineering and failure analysis in general. Defendants can challenge Zedonis's qualifications as not on par with the qualifications of their own experts, but a witness may testify as an expert without a perfect match between qualifications and the specific issues in the case. See *Smith v. Ford Motor Co.,* 215 F.3d 713, 720 (7th Cir.2000) (reversing exclusion of plaintiffs' experts who had engineering qualifications even though neither was an expert in automotive design or engineering: "[E]xpert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact."); *Owens v. Amtrol, Inc.,* 94 F.Supp.2d 952, 954-55 (N.D.Ind.2000) (allowing expert testimony from engineer with experience with pressure vessels different from the water pressure vessel at issue in the case). Zedonis is qualified to assist the trier of

fact in determining "what happened, and why it happened and what's wrong." That is, he is qualified to describe how the leaf spring was different in size and shape from one made to the manufacturer's specifications; how this difference caused a misalignment that increased the pressure on the air spring; and how he concludes this increased pressure caused the plastic piston to burst. He is also qualified to opine as to the relative strength of the composite plastic material used to manufacture the piston. See *Smith,* 215 F.3d at 720.

The central question then becomes whether Zedonis applied reliable methods in arriving at his opinion of *what* happened-*i.e.,* the shape and dimensions of the leaf spring increasing the pressure on the air spring-to cause the plastic piston to burst, injuring Henderson. Zedonis examined the failed air spring assembly, which had been saved. He also inspected the truck on January 19, 2004, approximately three and a half years after the accident. The failed air spring had been replaced by that time, but the leaf spring had not been replaced. He examined the truck's overall suspension system, and removed and replaced both air springs. He examined the surviving plastic composite piston and the aluminum piston that was used to replace the one that burst. Pl. Ev. Tab 15 (Resp. to Firestone). He removed the driver's side leaf spring and measured its dimensions. For this task, Zedonis relied on a service bulletin created by Freightliner, the "Freightliner Airliner Suspension Air-Spring Bag Misalignment Troubleshooting Service Bulletin (32-40)," and fabricated a measuring tool ("span tool") pursuant to instructions provided in the bulletin. According to Zedonis's report:

> [D]imensional checks made on the removed [leaf] spring showed it was a deviated part per the bulletin. [Also], the position of the spring mounting hole location in the new spring to be installed would improve the centering condition of the air spring by approximately 3/4 of an inch. Use of the 16-inch span tool described in the bulletin showed that the hole of the old spring was off position (short) and that the new spring was satisfactory. This measured condition documents the Hendrickson spring as a defective part in the rear suspension. This part should be replaced according to the Freightliner Airliner Suspension Air-Spring Bag

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 217 of 520
PageID: 9138
Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2001)
2001 WL 881929

Misalignment Troubleshooting Service
Bulletin (32-40).

**\*17** *Id.* at 5.

Zedonis has described a method satisfactory to arrive at
the conclusion that the leaf spring at issue had dimensions
different from those specified by the manufacturer of the
truck. Zedonis has also linked the effects of the different
dimensions to the alignment of the suspension and to the
forces on the piston. He reported that the alignment of the
air spring improved when the new leaf spring was installed.
He further explained that "the air spring piston is an integral
part of the air spring assembly and the truck suspension. The
piston ... communicates the loading between the ... frame of
the truck, and the leaf spring that is attached to the axle." *Id.*
at 8. The "loading forces that are reacted into the base by
the misalignments, lean and tilt" of the air spring assembly
add to the load on the piston. *Id.* After describing how the
leaf spring caused misalignment, lean and tilt of the air spring
assembly, Zedonis observed that this misalignment places
"additional loads on the air spring pistons. This composite
piston is made of plastic and does not have an infinite strength.
There is no doubt that there is a limit to the tilt that the plastic
piston can withstand." *Id.* at 9. Zedonis further stated that
"The use of a composite piston in the suspension system of a
medium duty truck appears to me to be a poor choice given
the misalignment condition...." *Id.*

Zedonis did not conduct tests that would quantify his analysis
and measure the extra forces or replicate the circumstances
that led to failure of the piston. Such tests may not have
been possible. In reaching his conclusions, however, he
had the real-world experience of the other plastic piston,
which was not subject to the same misalignment, and of the
replacement aluminum piston, which was subject to the same
misalignment but did not fail in 180,000 miles, after a brand
new plastic piston had exploded while the truck was still in the
repair shop. Defendants also have not yet come forward with
tests showing that Zedonis's testimony cannot be reliable.

In *Daubert,* the Supreme Court reminded lower courts
that traditional methods of challenging weak evidence,
such as cross-examination and presentation of contradictory
evidence, would remain the principal methods. Along those
lines, it is worth noting that on the existing record, the defense
experts-apart from the theory that Henderson started working

on the suspension while it was still pressurized-do not provide
a satisfactory explanation for the explosion of a new piston.
Also, their testimony in this record does not show the use of
methods different from Dr. Walson's or Zedonis's. Tom Wirtz
is the director of product engineering for the company that
actually molded the plastic cylinder in question. He testified
in his affidavit, that he examined the failed piston, that he
"found it to be appropriately manufactured consistent with
its design," and that he found "no visible evidence of any
product failure due to any problem in the manufacture or
design" of the piston. Wirtz Aff. ¶ 17. The affidavit provides
no further explanation, nor any indication of further testing.
Similarly, Nathan Ware opined that the Hendrickson leaf
spring was not defective. He disagreed with Zedonis's theory
that misalignment caused by the leaf spring added to the loads
on the piston. Ware offered no specific explanation for the
explosion here other than the possibility that Henderson tried
to work on a pressurized suspension system. For the reasons
explained above, that theory is at least fairly debatable here.
There is considerable evidence to the contrary. If the jury
rejects that theory, plaintiffs' experts appear to offer the only
available explanation for the explosive failure of a brand new
piston while the truck was still in the shop. [4]

[4]     The court does not yet have access to all of the
        reports and testimony of the defense experts. These
        comments about defense expert theories are based
        on the current record on the pending motions.

**\*18**   Accordingly, the defense motions to strike plaintiffs'
expert testimony are denied except with respect to Dr.
Walson's opinion about whether torque instructions on the
air spring assembly were confusing and defective. The
testimony of Dr. Walson and Zedonis is sufficient to meet
plaintiffs' burden of showing the existence of product defects
that proximately caused Henderson's injuries. Defendants'
motions for summary judgment are denied to the extent they
are based on attempts to exclude the expert testimony.

*Conclusion*

For the reasons stated above, the court makes the following
rulings with respect to the various motions: Firestone's motion
to strike the expert testimony of Dr. Walson and Zedonis is
denied in its entirety with this exception: Dr. Walson may not
testify as to the supposed defects in instructions about torque
for the U-bolts. Hendrickson's motion to exclude the expert
testimony of Zedonis is denied. Firestone's, Hendrickson's

**Henderson v. Freightliner, LLC, Not Reported in F.Supp.2d (2005)**
2001 WL 881929

and Freightliner's motions for summary judgment are denied with the qualification that plaintiff's common law and breach of implied warranty claims are superseded by their statutory claims. The case will proceed to trial on the statutory product liability claims only. Plaintiffs' motion to strike the portion of Hendrickson's Reply Brief addressing the issue of privity is granted. All defendants' motions to strike plaintiff's surreply briefs concerning Couch's testimony are denied. The court will conduct a scheduling conference on Friday, April 22,

2005 at 4:30 p.m. in Room 330, Birch Bayh U.S. Courthouse, Indianapolis, Indiana, to set a new trial date and address other issues as needed.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 775929

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

2002 WL 34447541
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

Andrew HUNT, et al., Plaintiffs,

v.

AMERICAN WOOD PRESERVERS
INSTITUTE, et al., Defendants.

No. IP 02–0389–C–M/S.
|
July 31, 2002.

*ORDER*

LARRY J. McKINNEY, Chief District Judge.

**\*1** The Court GRANTS that portion of Defendant's, Universal Forest Products, Motion to Dismiss addressed to the Plaintiffs' medical monitoring claim, as such a claim is not cognizable in the State of Indiana.

The Court now orders the Plaintiffs to file an amended complaint on the additional counts, giving attention to the requirements of FRCP 8(a). The Court accepts Plaintiffs' declaration that they do not allege fraud against the Defendants.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 34447541

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 25

2 UCC Rep.Serv.2d 1537

1986 WL 213409 (R.I.Super.)
Superior Court of Rhode Island, Providence

HYDRONIC ENTERPRISES, INC.

v.

DANAL JEWELRY CO.

C.A. No. 81-4011
|
December 22, 1986

**Callaghan & Company's Headnote and Classification**

 **\*1537**  P2606.2, P2606.4(2)Acceptance of nonconforming
goods.

R.I.Super. Dec. 22, 1986

Where purchaser of gold solutions suspected nonconformities
in 1979, had solutions tested verifying nonconformity in
May 1980, but never notified plaintiff of any difficulties and
continued to order and use plaintiff's gold solutions, purchaser
retained the goods in spite of their nonconformity constituting
acceptance under § 2-606(1)(a), and was required to pay for
the goods at contract rate subject to its counterclaim for breach
of warranty.

**Callaghan & Company's Headnote and Classification**

P1204.4, P2607.2, P2607.15, P2607.22Reasonable time for
notice of nonconformity; effect of failure to timely notify.

R.I.Super. Dec. 22, 1986

Where both parties were merchants, and the buyer of gold
solutions suspected their nonconformity in 1979, confirmed
it by assay by May 1980, by mid-June seller's attorney was
aware of the problem, but seller himself was not notified
until August when he pressed suit for payment, notice was
not given within a reasonable time. Commercial standards
are applied to a merchant whereas retail consumers are held
to a less stringent standard. The minimum notice required
is such that the transaction is troublesome and must be
watched, and not only did plaintiff not receive notice until it
pressed defendant for its long overdue payment, but although
defendant's suspicions were confirmed in May it had persisted
in placing and using a unusually large and expensive order for
more gold solutions thereafter, despite the fact that it had other
suppliers. Since seller, not having received notice, had no
opportunity to make adjustments, to suggest opportunities for
cure, or to discover how a gold shortage could have occurred
in accordance with the policies of § 2-607(3)(a), defendant
was required to pay for the goods at contract rate even if it did
meet its burden of proving a breach.

 **\*1538**  UCC Sections Cited: § 1-204, § 2-606, § 2-607(3)
(a), (4), § 2-714(2).

**Opinion**

COCHRAN, J.

This matter is before the court on plaintiff's claim on
book account for goods sold and services rendered.
Defendant, Danal Jewelry Company, counterclaims for
breach of contract, breach of warranty, and fraud. Plaintiff,
Hydronic Enterprises, Inc., supplied gold plating solutions
to defendant for use in defendant's jewelry manufacturing
business. Plaintiff claims that defendant took possession
of gold solutions (goods), that defendant used the goods
in its manufacturing process, and that defendant did not
pay plaintiff the contract price for the goods. Defendant
counterclaims that the goods were not the 100% gold
solutions that plaintiff represented. This matter was heard by
the court sitting without a jury.

Mr. Allen Carr, president and majority stockholder of
Hydronic testified that Hydronic was in the business of
buying and selling scrap metal and furnishing the jewelry
plating industry with gold, silver, and rhodium solutions or
salts. Hydronic was a small company that employed Mr. Carr,
his daughter Kimberly Carr, and a part-time driver Mr. Walter
Jackson. Hydronic regularly supplied plating solutions for
approximately 7 or 8 years to Danal with Danal employees
ordering goods by telephone almost daily from Hydronic.
Payment terms for Danal were either within 10 days after
receipt of the goods or on a cash on delivery basis. Mr. Carr
stated that Danal had a running account with Hydronic and
that Danal was fairly regular with payments.

Plaintiff's Exhibit 1, Hydronic's record of the running balance
with Danal, shows that as of May 2, 1980, Danal's balance
was $30,164.49. Between May 2 and May 19, the balance
increased to $47,012.77. This figure is supported by some
of the invoices submitted as plaintiff's exhibit 5 A-N. Of
these invoices, A, B, C, and E are excluded for the following
reasons. With respect to A, B, and C, the balance as of May
2, 1980 includes a credit given for Danal's last payment in the
amount of $5,546.02. Plaintiff's Exhibit 1. Plaintiff's exhibits
5 A, B, and C are recorded and dated in the running balance
before this final credit was issued. Therefore, 5 A, B, and C
were already deducted from the running balance to arrive at
the $30,164.49 amount.

Invoice marked plaintiff's exhibit 5 E will not be included because it represents the receipt for the order invoiced on plaintiff's exhibit 5 F. They are both for the exact same amount and indicate the exact same goods ordered and received. Plaintiff's exhibit 5 D and F-N total $16,848.48. This amount equals the amount shown on the running balance between May 2, 1980 and May 21, 1980 for a total of $47,012.77.

 **\*1539** Then on May 19, 1980, Danal placed an unusually large order for a heavy gold bath. This order consisted of 79 ounces of gold solution, 100 pounds of acid salts, and 2 gallons of brightener totaling $39,001.72. This order was followed by two more orders, one for $1,344.44 and the final order by Danal for $16,520.70 on May 21 and 22, 1980 respectively. These orders are shown on 3 invoices that were introduced as plaintiff's exhibits 2, 3, and 4. These invoices are for exactly the same amounts as indicated on plaintiff's exhibit 1, the running balance. Danal's total balance owed including the heavy gold bath, was $103,879.63 as of May 22, 1980.

The evidence introduced at trial showed clearly that Hydronic never received any payment for the heavy gold bath or for the running balance owed by Danal. Mr. Carr stated that he attempted to discuss non-payment with Danal within two weeks after the heavy gold bath was delivered, but to no avail. Mr. Carr stated further that his next contact with anyone from Danal was in June, 1980 at a meeting at the law offices of Danal's attorneys. Mr. Carr testified that prior to that time no one from Danal told him there was anything wrong with the heavy gold bath. Both parties agree that the heavy gold bath, and all of the goods ordered in May, 1980, were used at some point by Danal in its jewelry manufacturing process.

Mr. John O'Neill, a lawyer who represented Mr. Carr and Hydronic with respect to the balance owed by Danal, testified that he requested that Danal pay for the gold or return it to Hydronic. On cross-examination, Mr. O'Neill stated that at a meeting at Danal in June, 1980 he was aware that the gold solution was not the 100% gold solution that it was purported to be.

Mr. Albert Colangelo testified for defendant. Mr. Colangelo was a partner in Danal. He stated that Danal manufactured costume jewelry using precious metals. He explained the plating process that Danal used wherein the gold solutions were plated onto jewelry pieces and then placed on racks. Hydronic was one of Danal's suppliers of gold solutions.

Mr. Colangelo testified that Danal became aware in late 1979 and early 1980 that it was having problems in its manufacturing process. As a result, various employees attempted to discover the source of Danal's problem.

Mr. David Kiley, chief financial officer and controller of Danal, testified that he also played a role in determining the source of Danal's manufacturing problem. As a result of his efforts, he stated that internal employee theft at Danal was ruled out.

 **\*1540** Mr. Colangelo, however, conceded on cross-examination that the results of Danal's assay tests of Hydronic's gold solutions were not given to Mr. Carr. Mr. Colangelo stated that the test results were given to his own lawyer. He stated further that no officer or employee of Danal ever told Mr. Carr of the test results. In addition, Mr. Colangelo stated that no one at Danal ever returned the solutions to Hydronic and that indeed the solutions were used by Danal in its manufacturing process.

. . . . . .

## II

The instant case involves a contract for the sale of goods. As such, these transactions are governed by the provisions of Article 2 of the Uniform Commercial Code (UCC) G.L. 1956 (1985 Reenactment) § 6A-2-101 et seq. The first question is whether the goods were in fact accepted by defendant (buyer). Section 2-606 states what constitutes acceptance:

"(1) Acceptance of goods occurs when the buyer

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) Fails to make an effective rejection (subsection (1) of § 6A-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(2) Acceptance of a part of any commercial unit is acceptance of that entire unit."

G.L. § 6A-2-606 <<UCC § 2-606>>.

Plaintiff contends that defendant accepted the goods according to § 2-606(1)(a); specifically, that Danal retained the goods in spite of their non-conformity. The evidence shows that Danal suspected that there were problems in its manufacturing process as early as 1979. Mr. Colangelo testified that Danal began testing Hydronic's gold solutions in late April, early May, 1980. Mr. Colangelo testified that Danal received these reports in May 1980 yet Danal continued to order and use Hydronic's gold solutions. This court finds therefore, that Danal **\*1541** retained the goods in spite of their non-conformity. According to G.L. § 2-606(1)(a), such actions constitute acceptance of the goods. [1]

Having determined that Danal accepted the goods, the court must consider the effect of acceptance under the UCC. The general rule is that the buyer must pay at the contract rate for any goods accepted. G.L. § 2-607(1). Plaintiff contends that the amount owed is $103,879.63. Danal's defense, however, is that this amount should not include the amount it owed on account and that its total balance is reduced by the amount equivalent to the alleged gold shortages. Thus, defendant states that it would owe $68,487.32.

First, this court has already determined that Danal's balance on account cannot be excluded as defendant suggests. See Part I supra. Second, this court cannot simply reduce the contract rate by an amount defendant chooses to represent as gold shortages. See e.g., Superior Wire & Paper Products, Ltd. v. Talcott Tool & Mach., Inc., 441 A.2d 43, 46 [31 UCC Rep Serv 101] (Conn. 1981). The UCC sets out a specific provision to measure damages in a breach of warranty claim in § 2-714(2). G.L. § 2-714(2). In the instant case, the goods were accepted, therefore, defendant must pay the contract rate. The defendant may assert its counterclaim for breach of warranty which it has done. The warranty issues will be discussed infra. This court finds therefore, plaintiff submitted sufficient competent evidence that the total amount of gold ordered pursuant to this contract for the sale of goods was $103,879.63. See plaintiff's exhibits 1, 2, 3, 4, and 5 D and F-N.

Plaintiff contends that it did not receive notice within a reasonable time after Danal discovered the breach. Plaintiff states that it is unnecessary to determine whether the goods were defective because defendant's failure to give notice within a reasonable time bars it from any remedy under § 2-607(3)(a). [2]

G.L. § 6A-2-607(3)(a) <<UCC § 2-607>>.

**\*1542** Plaintiff also argues that defendant's use of the goods with knowledge of the non-conformity operates as a waiver of the right to sue for breach.

The court will consider each of these contentions. First, it is important to point out that § 2-607(4) states that, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted." G.L. § 2-607(4). In warranty cases, the buyer must pay for the goods at the contract rate. If the buyer can meet its burden of proving a breach, the buyer may sue the seller for breach of warranty. In order to sue for breach of warranty the buyer must, however, give the seller reasonable notice of the breach. Whether notice was timely is a question of fact for the trier. Parillo v. Giroux Co., Inc., R.I., 426 A.2d 1313 (1981); R. Anderson, Uniform Commercial Code, § 2-607:11. The Official Comment to § 2-607 states that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched . . . The notification which saves the buyer's rights under this Article [Chapter] need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." G.L. § 6A-2-607 <<UCC § 2-607>> Comment 4. The question to resolve, therefore, is whether the buyer gave the seller reasonable notice of the breach.

Mr. Carr testified that from the time the heavy gold bath was put in at Danal on May 23, 1980 until the middle of June, no one from Danal told him of any defect in the goods. Mr. John O'Neill, Mr. Carr's lawyer, testified on cross-examination that he was aware at a meeting at Danal in June, 1980 that the goods were non-conforming. Mr. Carr testified also on cross-examination that he, Mr. O'Neill, one principal from Danal, two of Danal's attorneys, and Mr. John Babcock were all present at that meeting. The evidence shows that it was really through the attorneys in the instant case that notice was eventually communicated. Plaintiff's Exhibit 6, hereby admitted as a full exhibit, relevant to the issue of when notice was given by defendant, is a letter dated July 31, 1980 from defendant's attorney that states in part:

"At this juncture your client has had an opportunity to cause an assay to be made of material furnished to Danal and it is our understanding that the results are confirmatory of what Danal had already advised your client, viz, that the material

failed to conform with the representations of your client as to gold content."

Plaintiff's Exhibit 6.

This court finds that the testimony of Mr. O'Neill was credible that in June, 1980, he was aware that the heavy gold bath was nonconforming. **\*1543** Having determined that at the earliest, plaintiff received notice in June and at the latest in July, 1980, the issue is whether this notice was reasonable under § 2-607(3)(a). Section 2-607(3)(a) does not define a reasonable time. [3] Section 1-204 of the UCC sets out what a reasonable time is as follows:

"(2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." G.L. § 6A-1-204 << UCC § 1-204>>.

There is no set length of time that absolutely determines whether notice is reasonable. Commentators are in agreement, however, that what constitutes a reasonable time must be determined on the facts of individual cases and circumstances. [4]

In the instant case, the court finds that notice was not given within a reasonable time. The evidence put forth by both defendant and plaintiff shows that by mid-June, at least Mr. O'Neill was aware that the solutions were non-conforming. By the end of July to August, 1980, Mr. Carr clearly knew of the defect. The UCC Comment 4 to § 2-607 does distinguish between a merchant buyer and a retail consumer as to what constitutes a reasonable time. G.L. 6A-2-607 <<UCC § 2-607>> Comment 4. Commercial standards are applied to a merchant whereas retail consumers are held to a less stringent standard. Danal and Hydronic were both merchants. Thus, the parties will be held to a stricter standard with respect to what constitutes reasonable notice.

The minimum notice required is such that the transaction is troublesome and must be watched. G.L. § 2-607 Comment 4; Stelco Industries, Inc. v. Cohen, 438 A.2d 759, 761 [31 UCC Rep Serv 86] (Conn. 1980). Plaintiff contends that it did not receive notice until it pressed defendant for payment, approximately one month had passed until the meeting at Danal in mid-June. The court finds this testimony credible.

The policy behind the notice requirement was stated by White & Summers in this often quoted passage:

"One can identify at least three policies behind 2-607. The first and most important reason for requiring notice is to enable the seller to make adjustments or replacements or to suggest opportunities for cure to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer. . . . The second policy behind the notice **\*1544** requirement is to afford the seller an opportunity to arm himself for negotiation and litigation. . . . A final, and less important policy behind the notice requirement is to give the defendant that same kind of mind balm he gets from the statute of limitations. There is some value in allowing a seller, at some point, to close his books on goods sold in the past and to pass on to other things."

J. White & R. Summers, Uniform Commercial Code § 11-10 (2d ed. 1980).

Danal claims that it suspected since late 1979 or early 1980 that the Hydronic solutions were defective. Yet, Danal never once communicated this suspicion to anyone from Hydronic until it was long overdue for payment on the heavy gold bath. Defendant's suspicions were confirmed in May, 1980 yet it still persisted in placing and using an unusually large and expensive order for more gold solutions at the end of that same month. Even more disturbing is that Danal had more than one supplier of gold solutions; no explanation was offered as to why Danal did not go to another supplier. Defendant's response is that it trusted Hydronic because of their long business relationship. Danal's argument that it did not want to accuse Danal until it had "concrete corroborative data" missed the point under UCC law. The UCC requires simply that between merchants, the minimum notice required to the seller is that the transaction is troublesome. The court although sympathetic to defendant's consideration of the parties' business relationship, is hard-pressed to find that defendant complied with the reasonable notice requirement of the UCC.

Furthermore, given the policies behind the notice requirement of § 2-607(3)(a), the seller had no opportunity to make adjustments, to suggest opportunities for cure, or to discover how a gold shortage could have occurred.

The court finds that even if the buyer did meet its burden of proving a breach, that it did not provide the seller with reasonable notice of the breach. Defendant must, therefore, pay for the goods at the contract rate of $103,879.63. It is unnecessary for the court to consider whether defendant's use

of the goods with knowledge of the nonconformity operated
as a waiver of the right to sue for breach.

Counsel may submit an order in conformity with this decision.

**All Citations**

1986 WL 213409, 2 UCC Rep.Serv.2d 1537

## Footnotes

1 While plaintiff relies on § 2-606(1)(a) to assert that defendant accepted the goods, some jurisdictions allow for a buyer's use of the goods with knowledge of the non-conformity to constitute acceptance under § 2-606(1)(c) as an act inconsistent with the seller's ownership. See e.g., 67 A.L.R. 3d 363 Sections 2, 3.

2 Section 2-607(3)(a) sets out the notice requirement in the UCC with respect to breach after acceptance of the goods. This section states in pertinent part:

"(3) Where a tender has been accepted

(a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify seller of breach or be barred from any remedy. . . ."

3 See infra for a discussion of reasonableness under § 2-607(3)(a) and the accompanying Comment 4 to this section.

4 See J. White & R. Summers, Uniform Commercial Code, § 11-10 (2d ed. 1980); R. Anderson, Uniform Commercial Code, § 2-607:55 (3d ed. 1983); 93 A.L.R.3d 363, §§ 6-12.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

2020 WL 2783581
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Debra JAVENS, Plaintiff,
v.
GE HEALTHCARE INC. and General
Electric Company, Defendants.

Civil Action No. 18-1030-RGA-SRF
|
Signed 05/29/2020

**Attorneys and Law Firms**

Kyle John McGee, Michael J. Barry, Paige Jessica Alderson, Grant & Eisenhofer, P.A., Wilmington, DE, Todd A. Walburg, Pro Hac Vice, Stephanie S. Riley, Connolly Gallagher LLP, Newark, DE, for Plaintiff.

Jeremy A. Moseley, Pro Hac Vice, Michael L. O'Donnell, Pro Hac Vice, Bartholomew J. Dalton, Andrew Caulfield Dalton, Michael Caulfield Dalton, Dalton & Associates P.A., Wilmington, DE, for Defendants.

## REPORT AND RECOMMENDATION

Sherry R. Fallon, United States Magistrate Judge

### I. INTRODUCTION

**\*1** Presently before the court in this products liability action is the motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, filed by defendants GE Healthcare Inc. and General Electric Company (together, "Defendants").[1] (D.I. 45) For the following reasons, I recommend that the court GRANT Defendants' motion for judgment on the pleadings.

---

[1]    The briefing for the pending motion is as follows: Defendants' opening brief (D.I. 46), Plaintiff's answering brief (D.I. 48), Defendants' reply brief (D.I. 49), and Defendants' notices of supplemental authority (D.I. 54; D.I. 55).

### II. BACKGROUND[2]

[2]    The facts in this section are based upon allegations in the complaint, which the court accepts as

true for the purposes of the present motion for judgment on the pleadings. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). The court has not considered matters outside the pleadings in its Report and Recommendation. Therefore, Plaintiff's request to convert the motion for judgment on the pleadings to a motion for summary judgment based on Defendants' reliance on matters outside the pleadings is moot. (D.I. 48 at 18)

On May 3, 2018, plaintiff Debra Javens ("Plaintiff") filed this products liability action in the District of Massachusetts, alleging causes of action for: (1) strict liability for failure to warn, and (2) negligent failure to warn and negligent design and manufacturing of Defendants' gadolinium-based contrast agent, Omniscan. (D.I. 1) Pursuant to the parties' stipulation, the case was transferred to this court on July 12, 2018. (D.I. 13; D.I. 15-17) On October 19, 2018, Defendants filed their answer and affirmative defenses, including the affirmative defense of federal preemption. (D.I. 23 at ¶ 14) Defendants subsequently filed the pending motion for judgment on the pleadings on November 15, 2019. (D.I. 45)

Plaintiff alleges that she had normal kidney function until she underwent multiple magnetic resonance angiographies ("MRAs") and/or magnetic resonance imaging scans ("MRIs"). (D.I. 1 at ¶ 10) At the time of the procedures, Plaintiff was injected with a gadolinium-based contrast agent ("GBCA") called Omniscan,[3] which is manufactured and sold by Defendants. (*Id.* at ¶¶ 1, 10) Thereafter, Plaintiff developed Gadolinium Deposition Disease ("GDD"), exhibiting symptoms including cognitive impairment, burning skin sensation, heart palpitations, and pain throughout her body. (*Id.* at ¶ 10) According to Plaintiff, these symptoms are consistent with the toxic effects of retained gadolinium, which is a highly toxic heavy metal that does not occur naturally in the human body. (*Id.* at ¶¶ 11, 13)

---

[3]    A gadolinium-based contrast agent is injected intravenously to enhance the imaging in a diagnostic study such as an MRI. (D.I. 1 at ¶¶ 2, 10)

Plaintiff's complaint outlines a substantial amount of clinical data allegedly establishing a connection between GBCAs and the deposition and long-term retention of toxic gadolinium in organ tissues. (*Id.* at ¶¶ 14, 24, 27-40, 43) The FDA issued a public safety alert in July 2015 in response to a 2014 study by the Mayo Clinic which found gadolinium deposits in the brains of deceased individuals who had normal renal function

2020 1 W2L3873©

and had received multiple injections of GBCAs in the years prior to their deaths. (*Id.* at ¶¶ 39, 41) In September 2017, the FDA's medical advisory committee voted in favor of adding a warning on GBCA labels that gadolinium may be retained in some organs, even in patients with normal kidney function. (*Id.* at ¶ 42) Although Defendants corrected their label in 2012 to include contraindications for use in people with kidney disease or injury, the label does not contain a warning regarding the possibility of gadolinium retention in people with normal renal function. (*Id.* at ¶ 44)

### III. LEGAL STANDARD

**\*2** Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). When deciding a Rule 12(c) motion for judgment on the pleadings based on an allegation that the plaintiff has failed to state a claim, the motion is analyzed under the same standards that apply to a Rule 12(b)(6) motion. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010), *cert. denied*, 562 U.S. 1178 (2011).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Under this standard, the court must accept all well-pleaded factual allegations as true, and must draw all reasonable inferences in favor of the non-moving party. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). This determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### IV. DISCUSSION

#### A. Strict Liability

In support of the motion for judgment on the pleadings, Defendants contend that Plaintiff's cause of action for strict liability based on an alleged failure to warn fails as a matter of law because Pennsylvania, Delaware, and Massachusetts do not recognize strict liability claims in the context of prescription drugs. (D.I. 46 at 12) In response, Plaintiff offers to voluntarily dismiss her claim for product liability

based on a strict liability theory. (D.I. 48 at 3) Accordingly, I recommend that the court dismiss Count 1 of Plaintiff's complaint with prejudice.

#### B. Negligence

##### 1. Preemption of failure to warn claim

Plaintiff's complaint alleges that Defendants were negligent in their use of labels which failed to adequately warn consumers and health care providers of the risks of injury associated with GBCAs such as Omniscan:

> Defendants failed to exercise ordinary care in the labeling of gadolinium-based contrast agents (including Omniscan) and the labeling of MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents and failed to issue to consumers and their health care providers adequate warnings concerning the risks of serious bodily injury due to the use of gadolinium-based contrast agents (including Omniscan) and the MRI and MRA machines designed to be used in conjunction with gadolinium-based contrast agents.

(D.I. 1 at ¶ 54) In support of their motion for judgment on the pleadings, Defendants contend that these allegations for failure to warn are preempted by the labeling regulations of the Food and Drug Administration ("FDA"). (D.I. 46 at 13) In this context, the court must consider "whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1678 (2019).

Federal preemption occurs "when it is 'impossible for a private party to comply with both state and federal requirements.' " *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019) (quoting *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013)). In accordance with the federal Food, Drug, and Cosmetic Act ("FDCA"), the

2020 1 W2L3873©

Food and Drug Administration ("FDA") regulates the safety information included on the labels of prescription drugs marketed to consumers in the United States. *Id.* (citing 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 201.57(a) (2018)). Accordingly, state common law and state statutes requiring drug manufacturers to warn consumers of the associated risks of a drug are preempted by the FDCA when there is "clear evidence" that the FDA would not have approved the warning required by state law. *Id.*; *Wyeth v. Levine*, 555 U.S. 555, 571 (2009). In *Albrecht*, the United States Supreme Court defined "clear evidence" as "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." *Albrecht*, 139 S. Ct. at 1672.

**\*3** Under the FDCA, the FDA is responsible for ensuring that prescription drugs are "safe for use under the conditions prescribed, recommended, or suggested" in the drug's labeling, 21 U.S.C. § 355(d), and "a manufacturer may only change a drug label after the FDA approves a supplemental application," *Levine*, 555 U.S. at 568. Nonetheless, a state law failure-to-warn claim may survive a preemption challenge if the complaint alleges that new information became available to the drug manufacturer after the FDA's initial approval and the drug manufacturer sought to amend the label under the "changes being effected" or "CBE" regulation, 21 C.F.R. § 314.70(c)(6)(iii). *See Levine*, 555 U.S. at 568; *Bell v. Boehringer Ingelheim Pharms., Inc.*, 2018 WL 2447788, at \*6 (W.D. Pa. May 31, 2018). The CBE regulation allows drug manufacturers to make certain changes to drug labels without first obtaining FDA approval if the change is intended to "add or strengthen" a warning based on newly acquired information of a causal association between the drug and a risk of harm. *Albrecht*, 139 S. Ct. at 1673 (citing 21 C.F.R. § 314.70(c)(6)(iii)(A)). Because the CBE regulation permits drug manufacturers to change warning labels prior to FDA approval, drug manufacturers ordinarily will not be able to show an actual conflict between state and federal law that would make it impossible to comply with both, and the claim is not preempted. *Id.* at 1679; *see also Levine*, 555 U.S. at 568-72; *McGrath v. Bayer HealthCare Pharms., Inc.*, 393 F. Supp. 3d 161, 167 (E.D.N.Y. 2019).

According to Defendants, Plaintiff's failure to warn claim is preempted because the complaint fails to identify newly acquired information to correct the alleged labeling deficiency in accordance with the CBE regulation. (D.I. 46

at 16-17) The Code of Federal Regulations defines "newly acquired information" to include:

> data, analyses, or other information not previously submitted to the [FDA], which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data ... if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.

21 C.F.R. § 314.3(b). Thus, this requirement "accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments." *Levine*, 555 U.S. at 569. Newly acquired information must reasonably establish a causal association between the drug and a clinically significant adverse reaction. *McGrath*, 393 F. Supp. 3d at 167 (citing 21 C.F.R. § 201.57(c)(6)(i)); *see also Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 659 (S.D.N.Y. 2017). This is because "labeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to lose its significance." *Utts*, 251 F. Supp. 3d at 659 (internal citations and quotation marks omitted).

I recommend that the court grant Defendants' motion for judgment on the pleadings regarding Plaintiff's failure to warn claim because Plaintiff's complaint fails to identify any newly acquired information causally associated with a safety risk to patients. The complaint refers to numerous studies focusing on gadolinium retention in animals and humans with normal renal function, but these allegations do not identify any specific risks associated with the retention of gadolinium. (D.I. 1 at ¶¶ 27-32, 38-39, 43) In an analogous case assessing the sufficiency of the pleading, the *McGrath* court concluded that "allegations focus[ing] on gadolinium retention" in patients with normal renal function were insufficient to establish the requisite causal link to a "clinically significant adverse reaction" experienced by the plaintiff. *McGrath*, 393 F. Supp. 3d at 168-69 ("[I]t helps precious little to mount scientific minutiae on top of technical jargon if that information ultimately does not plead a plausible causal association between *Magnevist* and adverse effects,

like fibrosis."). Plaintiff's complaint indicates that the FDA's National Center for Toxicological Research team is currently "working on determining the exact consequences of these new findings" of gadolinium retention in patients with normal renal function. (D.I. 1 at ¶ 41) Consistent with *McGrath*, this allegation confirms that "the incidence of any *risks* associated with gadolinium retention is inconclusive." *McGrath*, 393 F. Supp. 3d at 168 (considering allegations regarding the same 2004 and 2013 studies cited at paragraphs 38 and 43 of Plaintiff's complaint in the instant litigation); *see also Sabol v. Bayer Healthcare Pharm., Inc.*, 2020 WL 705170, at *12 (S.D.N.Y. Feb. 12, 2020) (granting Rule 12(b)(6) motion to dismiss because complaint made "only conclusory allegations that gadolinium retention can cause the kind of debilitating symptoms [plaintiff] has suffered.").

**\*4** The complaint also alleges that numerous patients with normal renal function reported adverse reactions to the FDA after receiving injections with GBCAs. (D.I. 1 at ¶¶ 36-37) Under the federal regulations, such reports of adverse events may constitute newly acquired information. *See* 21 C.F.R. § 314.3(b). But the Supreme Court has cautioned that "the mere existence of reports of adverse events ... says nothing in and of itself about whether the drug is causing the adverse events." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Here, the complaint's allegations regarding symptomatic patients likewise fail to establish a causal association between the reported symptoms and the receipt of GBCA injections. *See Sabol*, 2020 WL 705170, at *13 ("[W]hile federal regulations define 'newly acquired information' to include items such as adverse event reports ... the CBE regulation still requires causation."). Likewise, the complaint does not establish a causal association between Plaintiff's use of Omniscan injections and her alleged symptoms of cognitive impairment, burning sensation on her skin, heart palpitations, and pain throughout her body. (D.I. 1 at ¶ 10) "The fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event." *Matrixx*, 563 U.S. at 44.

Because the complaint fails to identify studies or other evidence establishing the clinical consequences of gadolinium retention in patients with normal renal function, the requirements to invoke the CBE regulation are not met. *See McGrath*, 393 F. Supp. 3d at 169-70. Therefore, the court need not reach the analysis of whether Defendants have shown "clear evidence" that the FDA would not have approved a change to the drug's label. [4] *See id.* at 171 ("[B]ecause Bayer could not have amended the warning

under the CBE regulation, this Court need not even consider whether there is clear evidence the FDA would not have approved a change to Magnevist's label."); *Drescher v. Bracco Diagnostics, Inc.*, 2020 WL 699878, at *4 (D. Ariz. Jan. 31, 2020) (concluding that the clear evidence standard only applies if a label change is permitted under the CBE regulations).

[4]    The pleading in the instant case does not identify when Plaintiff was administered Omniscan in connection with any diagnostic imaging studies, beyond alleging that she discovered adverse effects in 2016. (D.I. 1 at ¶¶ 23-24) The parties do not dispute that, in 2018, the FDA issued a drug safety communication that contained the following pertinent language: "Gadolinium retention has not been directly linked to adverse health effects in patients with normal kidney function." (D.I. 46, Ex. A at 2) Plaintiff "offers no persuasive reason why the Court should ignore" the FDA's 2017 notice. *Sabol v. Bayer Healthcare Pharm., Inc.*, 2020 WL 705170, at *12 (S.D.N.Y. Feb. 12, 2020). Because the FDA found no causal connection between gadolinium retention and adverse health events in patients with normal renal function in 2018, there is no basis to suggest the FDA would have approved placement of a warning label stating otherwise at the time Plaintiff discovered her injury on or before 2016. *See Smith v. GE Healthcare, Inc.*, 2020 WL 1880787, at *7 (W.D. La. Mar. 31, 2020) ("The language of the [FDA's 2018] label change, specifically stating facts contrary to the warning sought by [the plaintiff], is clear evidence that the FDA would not have approved a label change which warned of such adverse effects."), *report and recommendation adopted by* 2020 WL 1875644 (W.D. La. Apr. 15, 2020); *Thomas v. Bracco Diagnostics, Inc.*, 2020 WL 1016273 (W.D. La. Feb. 27, 2020) (same), *report and recommendation adopted by* 2020 WL 1243389 (W.D. La. Mar. 13, 2020).

Plaintiff contends that, because preemption is an affirmative defense, Defendants should bear the initial burden of proof instead of improperly shifting the initial burden to Plaintiff to plead the existence of newly acquired information justifying the label change under the CBE regulation. (D.I. 48 at 4-5) The law is well-established that preemption is an affirmative defense on which the defendant bears the burden of proof, and the plaintiff need not anticipate affirmative defenses in

the pleadings. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (concluding there was no basis to impose a burden on the plaintiff to anticipate an affirmative defense). Nonetheless, a defendant may properly move for judgment on the pleadings based on the affirmative defense of preemption. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 561-62 (7th Cir. 2010)); *see also In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016) (recognizing that the "allocation of the burden of proof suggests that a motion under Rule 12(c) for judgment on the pleadings is a more appropriate procedural vehicle for dismissing cases on preemption grounds, instead of a motion under Rule 12(b)(6), except for cases in which preemption is manifest in the complaint itself."). Because the affirmative defense of federal preemption primarily raises a legal issue, it is properly considered at the pleading stage in the context of a Rule 12(c) motion. *See NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001).

 **\*5**  In the narrow context of failure to warn claims brought pursuant to the CBE regulation, numerous district courts have held that dismissal at the pleading stage is appropriate if the complaint fails to "present sufficient factual allegations to show that the manufacturer could unilaterally change its label in accordance with FDA regulations." *Sabol v. Bayer Healthcare Pharm., Inc.*, 2020 WL 705170, at \*6 (S.D.N.Y. Feb. 12, 2020) (citing *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 672 (S.D.N.Y. 2017)); *see also McGrath*, 393 F. Supp. 3d at 168; *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 828-30 (N.D. Cal. 2019). If this preliminary showing is not made, the court need not reach a determination of whether the defendant has shown clear evidence that the FDA would have rejected the proposed label change. *See McGrath*, 393 F. Supp. 3d at 168 ("[B]ecause Bayer could not have amended the warning under the CBE regulation, this Court need not even consider whether there is clear evidence the FDA would not have approved a change to Magnevist's label."); *Drescher v. Bracco Diagnostics, Inc.*, 2020 WL 699878, at \*4 (D. Ariz. Jan. 31, 2020) (concluding that the clear evidence standard only applies if a label change is permitted under the CBE regulations).

At least two Courts of Appeal have also held that the preemption determination may be properly resolved at the pleading stage. *See Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) (affirming the district court's dismissal of a failure-to-warn claim where the complaint contained insufficient factual allegations to show

the existence of newly acquired information); *In re Celexa & Lexapro Marketing & Sales Practices Litig.*, 779 F.3d 34, 38, 42-43 (1st Cir. 2015) (affirming district court's dismissal of failure-to-warn claim as preempted by FDA regulations). Applying Supreme Court case authorities, the Court of Appeals for the First Circuit determined that "a necessary step in defeating [the defendant's] preemption defense is to establish that the complaint alleges a labeling deficiency that [the defendant] could have corrected using the CBE regulation." *In re Celexa*, 779 F.3d at 41. The First Circuit affirmed dismissal of the complaint on preemption grounds after finding that the complaint challenged the accuracy and adequacy of studies which were known to the FDA at the time of approval. *Id.* at 38, 42-43. Similarly, the Court of Appeals for the Second Circuit upheld the dismissal of state law failure-to-warn claims as preempted when the "allegations ... d[id] not plausibly allege the existence of newly acquired information that could have justified Defendants' revising the [drug's] label through the CBE regulation." *Gibbons*, 919 F.3d at 708. Allegations regarding post-approval reports and studies showing serious hemorrhaging in patients using the drugs did not constitute newly acquired evidence because they did not "reveal[ ] risks of a different type or greater severity or frequency than previously included in submissions to the FDA." *Id.* (quoting 21 C.F.R. § 314.3(b)). Thus, the court may grant Defendants' Rule 12(c) motion without improperly shifting the burden from Defendants to Plaintiff on the issue of federal preemption.

Plaintiff alleges that the Supreme Court's decision in *Albrecht* superseded the Second Circuit's decision in *Gibbons* by requiring a showing of "clear evidence" by the defendant and declining to "explicitly or impliedly lay any burden at the feet of the plaintiff in the impossibility preemption inquiry." (D.I. 48 at 9-10) But the issue of newly acquired information was not before the Supreme Court in *Albrecht* because the drug manufacturer conceded that it could have changed the label under the CBE regulation: "Merck conceded that the FDA's CBE regulation would have permitted Merck to try to change the label to add a warning before 2010, but Merck asserted that the FDA would have rejected that attempt." *Albrecht*, 139 S. Ct. at 1675 (addressing preemption of failure-to-warn claims on summary judgment). In contrast, Defendants in this case allege that there is no scientific evidence that would have allowed them to strengthen the Omniscan labeling under the CBE regulation. (D.I. 49 at 4 n.1) Consistent with Defendants' position, the Supreme Court in *Albrecht* acknowledged that "manufacturers cannot propose a change that is not based on reasonable evidence" in accordance with

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 233 of 520
PageID: 9154
*Javens v. GE Healthcare Inc., Slip Copy (2020)*

2020 1 W2L3873©

21 C.F.R. § 314.70(c)(6)(iii)(A). *Albrecht*, 139 S. Ct. at 1679. Further confirming this point, courts have favorably applied *Gibbons* in decisions issued following the Supreme Court's decision in *Albrecht*. *See Holley v. Gilead Scis., Inc.*, 410 F. Supp. 3d 1096, 1107 (N.D. Cal. 2019); *McGrath*, 393 F. Supp. 3d at 168-69.

**\*6** For the foregoing reasons, I recommend that the court grant Defendants' motion for judgment on the pleadings as it pertains to Plaintiff's negligent failure-to-warn claim.

### 2. Preemption of design and manufacturing defect claim

Defendants also allege that Plaintiff's design and manufacturing defect claim is preempted because Defendants cannot alter Omniscan's FDA-approved design and manufacturing practices under the applicable federal regulations. (D.I. 46 at 18-19) In response, Plaintiff contends that its design defect claim is not preempted because it is not premised on a failure to warn theory. (D.I. 48 at 16) Instead, Plaintiff argues that the complaint pleads facts showing a safer alternative design to Omniscan already exists in Defendants' Clariscan product. (*Id.*)

I recommend that the court grant Defendants' motion for judgment on the pleadings with respect to Plaintiff's design and manufacturing defect claim. The law is well-established that, "[o]nce a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.' " *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 477 (2013) (quoting 21 C.F.R. § 314.70(b)(2)(i)). The complaint acknowledges that Omniscan was approved by the FDA. (D.I. 1 at ¶ 31) Even assuming the truth of the complaint's allegations regarding the greater safety of the macrocyclic contrast agents over linear contrast agents like Omniscan (*id.* at ¶¶ 26, 29), Defendants would need to obtain FDA approval of such a change to the manufacture of Omniscan, *see Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015) (holding that post-approval design defect claims are "clearly preempted by federal law").

To the extent that Plaintiff argues Defendants should have marketed their Clariscan macrocyclic product in lieu of the linear Omniscan contrast agent, the Supreme Court has rejected the " 'stop-selling' rationale as incompatible with

our pre-emption jurisprudence." *Bartlett*, 570 U.S. at 488. Specifically, "an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.*

### C. Conversion to Motion for Summary Judgment and Leave to Amend

I recommend that the court deny Plaintiff's alternative request to convert Defendants' motion for judgment on the pleadings into a motion for summary judgment. The discovery Plaintiff requests in connection with the motion goes to the "clear evidence" inquiry, and does not advance the issue of whether newly acquired information exists:

> (1) whether, in fact, GEHC ever attempted to include in its product labeling those warnings implicated by Plaintiff's state-law claim; (2) whether, in fact, GEHC ever requested that FDA permit such warnings; and (3) whether, in fact, FDA ever took any action—formal or otherwise—to block, forbid, or deny GEHC's request to give such warnings.

(D.I. 48 at 17) Therefore, the discovery requested by Plaintiff would not alter the outcome of the present motion.

**\*7** I further recommend that the court deny Plaintiff's request for leave to amend the complaint. The deadline for amended pleadings expired on May 24, 2019, and Plaintiff offers no support for her request for leave to amend to explain how the deficiencies identified by Defendants could be overcome. (D.I. 37 at ¶ 2; D.I. 48 at 2, 18) For the reasons previously stated, it is not apparent that additional discovery would remedy these deficiencies. Consequently, leave to amend would be futile. *See Smith v. GE Healthcare, Inc.*, 2020 WL 1880787, at *1, 5, 7 (W.D. La. Mar. 31, 2020) (recommending dismissal with prejudice of the plaintiff's design defect and failure-to-warn claims on the basis of preemption), *report and recommendation adopted by* 2020 WL 1875644 (W.D. La. Apr. 15, 2020).

### V. CONCLUSION

For the foregoing reasons, I recommend that the court GRANT Defendants' motion for judgment on the pleadings with prejudice. (D.I. 45)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de

novo review in the District Court. *See Sincavage v. Barnhart,* 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson,* 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

**All Citations**

Slip Copy, 2020 WL 2783581

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

2015 WL 1120009
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Western Division.

Brandy JOHNSON, Plaintiff,

v.

ELI LILLY AND COMPANY, Defendant.

No. 1:14cv453.
|
Filed March 12, 2015.

**Attorneys and Law Firms**

J. Pierre Tismo, Seth W. Schanher, Dyer, Garofalo, Mann
& Schultz, Dayton, OH, Joseph J. Zonies, Mark Premo-
Hopkins, Reilly Pozner LLP, Denver, CO, Christopher L.
Schnieders, Thomas P. Cartmell, Wagstaff & Cartmell, LLP,
Kansas City, MO, for Plaintiff.

John Charles Hansberry, Pepper Hamilton LLP, Pittsburgh,
PA, Martin Harry Lewis, Tucker Ellis & West LLP, Cleveland,
OH, Anthony Vale, Pepper Hamilton LLP, Philadelphia, PA,
for Defendant.

**OPINION & ORDER**

MICHAEL R. BARRETT, District Judge.

**\*1** This matter is before the Court upon Defendant's Motion
to Dismiss Four Counts of the Complaint and for an Order
Pursuant to Rule 9(b). (Doc. 8). Plaintiff filed a Response in
Opposition (Doc. 9) and Defendant filed a Reply (Doc. 13).

**I. BACKGROUND**

Plaintiff alleges that while she was pregnant, she took Prozac,
which is a prescription medication sold by Defendant Eli Lilly
and Company. Plaintiff claims Prozac caused her son to be
born with certain birth defects which led to his death when he
was less than one year old.

Defendant argues that Plaintiff's claims for breach of
warranty—implied warranty of fitness for particular purpose
(Count Five), breach of warranty—implied warranty of
merchantability (Count Six) and fraudulent misrepresentation
(Count Seven) are abrogated by Ohio's Product Liability Act

("OPLA"). Defendant also moves for an order pursuant to
Federal Rule of Civil Procedure 9(b) requiring Plaintiff to
plead with specificity the facts relating to her allegations of
fraudulent concealment, and if Count Seven is not dismissed,
the circumstances of the fraud alleged. Finally, Defendant
argues that Plaintiff's claim for defective manufacturing/
construction (Count One) fails to state a claim

Plaintiff agrees that her claims for breach of warranty
—implied warranty of fitness for particular purpose
(Count Five) and breach of warranty—implied warranty of
merchantability (Count Six) should be dismissed. (*See* Doc.
9, PAGEDID# 62, n. 2). However, Plaintiff disputes that
her claim for fraudulent misrepresentation (Count Seven)
falls within the scope of OPLA, and argues that it meets
the requirements of Rule 9(b). Plaintiff also argues that she
has adequately plead a claim for defective manufacturing/
construction (Count One).

**II. ANALYSIS**

**A. Standard of Review**

"[T]o survive a motion to dismiss, a complaint must contain
(1) 'enough facts to state a claim to relief that is plausible,' (2)
more than 'a formulaic recitation of a cause of action's
elements,' and (3) allegations that suggest a 'right to relief
above a speculative level.' " *Tackett v. M & G Polymers,
USA, LLC,* 561 F.3d 478, 488 (6th Cir.2009) (quoting *Bell
Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955,
167 L.Ed.2d 929 (2007)). "A claim has facial plausibility
when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662,
678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). However, the
factual allegations "must contain more than conclusions and
an unsubstantiated recitation of the necessary elements of a
claim." *McCormick v. Miami Univ.,* 693 F.3d 654, 658 (6th
Cir.2012).

Federal Rule of Civil Procedure 9(b) requires that "in alleging
fraud or mistake, a party must state with particularity the
circumstances constituting fraud or mistake." As one district
court has recently explained:

It is well-settled in the Sixth Circuit that circumstances
constituting fraud include "the time, place, and content of
the alleged misrepresentation" as well as the identity of
the individual making the representation. *United States v.
Ford Motor Co.,* 532 F.3d 496, 504 (6th Cir.2008) (internal

quotations omitted); *Sogevalor, SA v. Penn Central Corp.,* 771 F.Supp. 890, 893 (S.D.Ohio 1991) (citing *Michaels Bldg. Co. v. Ameritrust Co.,* N.A., 848 F.2d 674, 680 (6th Cir.1988)). The plaintiff must also allege "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Ford Motor,* 532 F.3d at 504.

**\*2** *MISC Berhard v. Advanced Polymer Coatings, Inc.,* No. 1:14 CV 1188, 2014 WL 5038001, at *2 (N.D.Ohio Oct.8, 2014).

### B. *Ohio Product Liability Act abrogation*

The OPLA applies to "recovery of compensatory damages based on a product liability claim," in addition to "[a]ny recovery of punitive or exemplary damages in connection with a product liability claim." Ohio Rev.Code § 2307.72(A) & (B). "The OPLA has been held to abrogate claims for strict products liability, negligent failure to warn, breach of express warranty, and breach of implied warranty." *Mitchell v. Proctor & Gamble,* No. 2:09–CV–426, 2010 WL 728222, at *3 (S.D.Ohio Mar.1, 2010) (and cases cited therein); *see also* Ohio Rev.Code § 2307.71(B) ("Sections 2307.71 to 2307.80 are intended to abrogate all common law product liability causes of action.).

However, "[c]laims of active misrepresentation (as opposed to failure to warn) in connection with a product are not abrogated by the OPLA." *Boroff v. Alza Corp.,* 685 F.Supp.2d 704, 711 (N.D.Ohio 2010) (citing *Hollar v. Philip Morris, Inc.,* 43 F.Supp .2d 794, 809 (N.D.Ohio 1998) (holding that claims of active misrepresentation implicate a broader "duty not to deceive" and are thus not product liability claims barred by the OPLA)); *see also Hogue v. Pfizer, Inc.,* 893 F.Supp.2d 914, 918 (S.D.Ohio 2012) (explaining that "the OPLA does not abrogate fraud claims which are based on a general duty not to actively deceive; however, the OPLA does abrogate fraud claims arising from a duty to warn.") (citing *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 348–49 (6th Cir.2000)).

Here, Plaintiff's claim for fraudulent misrepresentation is based upon a duty to warn. In her Complaint, Plaintiff alleges Defendant knew or should have known about the adverse side effects and risks of Prozac as early as 1987. (Doc. 1, ¶¶ 29–31). Plaintiff alleges that instead of disclosing these risks, Defendant "made consistent and repeated misrepresentations ... in its promotional materials and marketing documents," fraudulently proclaiming Prozac

"has no association with teratogenicity ... and is safe and effective for use during pregnancy and in woman of childbearing age." (*Id.,* ¶¶ 44, 104, 106). Plaintiff also alleges that Defendant "fraudulently omitted" information regarding "the risks of birth defects revealed in Lilly's animal studies on Prozac" breached its "duty to disclose material information" regarding Prozac. (*Id.,* ¶¶ 22, 29–31, 44, 103, 107–108).

These allegations show that Plaintiff's fraud claim is based on a theory of omission and concealment. *Accord Hogue,* 893 F.Supp.2d at 919 (explaining that "claims of fraud based upon fraudulent misrepresentation and concealment are preempted to the extent that they are predicated on a duty to issue additional or clearer warnings through advertising and promotion.") (quoting *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 349 (6th Cir.2000)). Therefore, the Court finds that Plaintiff's claim of fraudulent misrepresentation (Count Seven) falls within the scope of OPLA and is DISMISSED.

### C. *Defective manufacturing/construction*

**\*3** Defendant argues that Plaintiff has failed to state a claim for defective manufacturing/construction (Count One). Plaintiff's claim is brought pursuant to Ohio Revised Code § 2307.74, which provides:

> A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

Ohio Rev.Code § 2307.74. One court found the plaintiff adequately plead a claim under this section where the plaintiff alleged "specific problems with the product; namely, that test results showed the product was out of specification with regard to its primary compound, and that this was a deviation

from the product's intended characteristics." *Friedman v. Intervet Inc.,* No. 3:09CV2945, 2010 WL 2817257, at *3 (N.D.Ohio July 16, 2010).

Here, Plaintiff has merely alleged that the Prozac "was not made in accordance with" Defendant's "specifications or performance standards," and Defendant "sold and/or distributed Prozac in a condition that posed unreasonable risks from reasonably anticipated use." (Doc. 1, ¶¶ 57, 59(c)). Plaintiff argues that without discovery she cannot specify the manufacturing defect. However, this Court has previously rejected this argument. *See Frey v. Novartis Pharm. Corp.,* 642 F.Supp.2d 787, 792 (S.D.Ohio 2009) (finding that the plaintiffs failed to adequately plead claim under Ohio Rev.Code § 2307.74 even though the plaintiffs argued that "they cannot particularly allege that the scientific makeup of the drug is defective for a specific reason without conducting discovery, which requirement would exceed *Twombly's* plausibility standard."). Accordingly, the Court finds that Plaintiff has failed to state a claim under Ohio Revised Code § 2307.74 and therefore, that claim is DISMISSED.

## III. *CONCLUSION*

Based on the foregoing, Defendants' Motion to Dismiss (Doc. 8) is **GRANTED** as to Plaintiff's claim for claims for breach of warranty—implied warranty of fitness for particular purpose (Count Five), breach of warranty—implied warranty of merchantability (Count Six) and fraudulent misrepresentation (Count Seven) and claim for defective manufacturing/construction (Count One).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1120009

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 28

2017 WL 4348997
United States District Court, N.D. Ohio.

Donald KODGER Plaintiff,

v.

ZIMMER BIOMET HOLDINGS,
INC., et al., Defendants.

Case No. 1:17–cv–1350
|
Signed 09/29/2017

**Attorneys and Law Firms**

Donald O. Kodger, Brunswick, OH, Plaintiff.

Andrew L. Campbell, Pro Hac Vice, Eldin Hasic, Faegre
Baker Daniels, Indianapolis, IN, Stephen M. O'Bryan, Taft,
Stettinius & Hollister, Cleveland, OH, Ryan C. Edwards, Taft
Stettinius & Hollister, Cincinnati, OH, Defendants.

OPINION & ORDER

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE

OPINION & ORDER [Resolving Docs. 22, 29, 33, 35–1

**\*1**  This is a products liability case. Plaintiff Donald Kodger
suffered injuries after a bearing in his right knee implant
failed. Plaintiff now brings claims of negligence and strict
liability against the manufacturers of his knee implant,
Zimmer Biomet Holdings, Inc., Biomet Orthopedics LLC,
and Zimmer Biomet ("Biomet Defendants").

Defendants move to dismiss Plaintiff's complaint. [1] Plaintiff
opposes. [2] For the following reasons, the Court **DENIES**
Defendants' motion to dismiss, but **GRANTS** Plaintiff leave
to amend the complaint.

[1]      Doc. 22.

[2]      Doc. 29. Defendants replied. Doc. 33. Plaintiff filed
         a sur-reply. Doc. 35–1.

## I. BACKGROUND

### A. Plaintiff's Injuries

On March 31, 2008, Plaintiff Kodger received a right knee
Biomet Oxford Meniscal Unicompartmental Knee System
("Biomet knee implant"). [3] Three years later, Plaintiff began
experiencing severe pain in his right knee. [4] It was not until
June 2015 that X-rays revealed that a component in his
Biomet knee implant had collapsed. [5] Plaintiff alleges that
the bearing in his Biomet knee implant had collapsed into his
knee joint. [6] Plaintiff underwent surgery to obtain a full knee
replacement. [7]

[3]      Doc. 16–1 at ¶ 8.

[4]      Id. at ¶ 10.

[5]      Id. at ¶¶ 12–16.

[6]      Id. at ¶¶ 30–33, 47–50.

[7]      Id. at ¶¶ 18–19.

According to data in the Manufacturer and User Facility
Device Experience ("MAUDE") database, there were 26
total bearing failures for Biomet knee implants manufactured
between 2007 and 2008, around the time Plaintiff received
his Biomet knee implant. [8] That represents 23% of all bearing
failures in Biomet knee implants manufactured between 1999
and 2017. [9]

[8]      Id. at ¶¶ 32, 49.

[9]      Id.

### B. FDA Regulation of the Biomet Knee Implant

Defendants are the developers, manufacturers, and marketers
of the Biomet knee implant. [10]

[10]      Id. at ¶ 24.

Under the Food, Drug and Cosmetic Act (FDCA), [11] and the
Medical Device Amendments of 1976 (MDA), [12] all medical
devices, such as the Biomet knee implant, are subject to
Food and Drug Administration (FDA)-imposed regulations
concerning design, manufacture, labeling, marketing, and
sale.

[11]      21 U.S.C. § 301 et seq.

[12]      21 U.S.C. § 360c et seq.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 241 of 520
PageID: 9162
Kodger v. Zimmer Biomet Holdings, Inc., Not Reported in Fed. Supp. (2017)
2015 WL 9496, 5 Prod. Liab. Rep. (CCH) P 7r 20P52

The MDA imposes different levels of federal oversight depending on the medical device's risks. [13] As a Class III device, the Biomet knee implant is subject to the most stringent federal oversight. [14] The Biomet knee implant is a Class III device because "it cannot be established that a less stringent classification would provide reasonable assurance of safety and effectiveness." [15] It also received this classification because the Biomet knee implant is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" or "presents a potential unreasonable risk of illness or injury." [16]

[13]    § 360c(a)(1)(A)–(C).

[14]    Plaintiff does not specifically plead that the Biomet knee implant is a Class III device. *See* Doc. 16–1. However, the Court can take judicial notice of these facts from the FDA approval letter attached to Defendants' motion, *see* Doc. 13–1. Plaintiff incorporated it by reference in his complaint (Doc. 16–1 at ¶ 28). *See Armengau v. Cline*, 7 Fed.Appx. 336, 344 (6th Cir. 2001) ("If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.").

[15]    *Riegel v. Medtronic, Inc., 552 U.S. 312, 317 (2008)*.

[16]    § 360c(a)(1)(C)(ii).

*2  As a result, before the Biomet knee implant could enter the market, it had to go through the FDA's Premarket Approval (PMA) process. [17] To receive FDA approval, Defendants were required to submit information about their device's proposed design, manufacture, and labeling. [18] Based on these submissions and a comprehensive review, the FDA had to determine whether the Biomet knee implant was suitable for the market. The FDA grants PMA only if there is "reasonable assurance" of the device's "safety and effectiveness." [19]

[17]    21 U.S.C. § 360e.

[18]    *Id.*

[19]    § 360e(d). This "safety and effectiveness" determination involves a risk-benefit analysis; the FDA "weigh[hs] any probable benefit to health from

the use of the device against any probable risk of injury or illness from such use." § 360c(a)(2)(C).

On April 21, 2004, the FDA approved the Biomet knee implant for commercial distribution. [20]

[20]    Doc. 16–1 at ¶¶ 26–28.

Even though PMA was granted, as manufacturers of the Biomet knee implant, Defendants remain subject to FDA regulations. Among other requirements, manufacturers must follow FDA's Current Good Manufacturing Practice (CGMP) requirements. [21] "To comply with CGMP requirements, a device manufacturer must adopt a variety of procedures and controls relating to areas such as: (1) design control, (2) quality assurance, (3) manufacturing and processing, (4) process validation, (5) device inspection, and (6) corrective and preventive action." [22]

[21]    *Gelber v. Stryker Corp., 788 F.Supp.2d 145, 152 (S.D.N.Y. 2011)* (citing 21 U.S.C. § 360j(f) and 21 C.F.R. §§ 820 *et seq.*); *id.* § 820.1(c).

[22]    *Gelber, 788 F.Supp.2d at 152* (citing 21 C.F.R. §§ 820.1–.250).

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " [23] The plausibility requirement is not a "probability requirement." [24] Plaintiff need not try to prove his case in the complaint. But there must be "more than a sheer possibility that the defendant has acted unlawfully." [25]

[23]    *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (quoting *Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)*).

[24]    *Id.* (quoting *Bell Atlantic, 550 U.S. at 556*).

[25]    *Id.*

Federal Rule of Civil Procedure 8 provides the general pleading standard and only requires that a complaint "contain...a short and plain statement of the claim showing that the pleader is entitled to relief." [26] "Rule 8 marks a notable and generous departure from the hypertechnical,

2015 WL 9496, 5 Prod.Liab.Rep. (CCH) P 20,152

code-pleading regime of a prior era, but it does not unlock
the doors of discovery for a plaintiff armed with nothing
more than conclusions." [27] In deciding a motion to dismiss
under Rule 12(b)(6), "a court should assume the[ ] veracity"
of "well-pleaded factual allegations," but need not accept a
plaintiff's conclusory allegations as true. [28]

[26]    Fed. R. Civ. P. 8(a)(2).

[27]    *Iqbal*, 556 U.S. at 678–79 (citations omitted).

[28]    *Id.* at 679.

In resolving a motion to dismiss, the Court must confine its
review to the matters in the pleadings. [29] If the Court reviews
matters outside the pleadings, "the motion must be treated as
one for summary judgment under Rule 56." [30]

[29]    Fed. R. Civ. P. 12(d).

[30]    *Id.*

In their reply to Plaintiff's opposition, Defendants asked this
Court to convert their motion to dismiss into a motion for
summary judgment. [31] Defendants submitted a declaration
and two exhibits that are extrinsic to the pleadings. [32]
Because the Court has not given the parties prior notice of its
decision to do this conversion, the Court declines Defendants'
request. [33] Accordingly, in deciding this motion, this Court
excludes Defendants' materials extrinsic to the pleadings. [34]

[31]    *See* Doc. 33 at 3 n.5.

[32]    *See* Docs. 33–2; 34–1. These documents state
that Plaintiff's Biomet knee implant was not
manufactured in 2007 or 2008, as Plaintiff alleges
in his Complaint. *See* Doc. 34–1.

[33]    *See Armengau, 7 Fed.Appx. at 343* ("Because of
the risk of prejudicial surprise arising from the
court's treating a motion to dismiss as a motion
for summary judgment, Rule 12(b) further requires
notice and an opportunity to supplement the record
before the court enters summary judgment.").

[34]    The Court will also not take judicial notice
of Defendants' extrinsic materials because they
concern adjudicative facts. *See id.* at 344–
45 (finding that taking judicial notice of

"adjudicative facts" would "run afoul of Rule
12(b)'s admonition against considering matters
outside the pleadings").

## III. ANALYSIS

**\*3** In this products liability case, Plaintiff brings claims
of negligence and strict liability for manufacturing defects
associated with his Biomet knee implant. [35]

[35]    Plaintiff says he does not allege any failure to warn
claim. Doc. 29 at 2. We therefore do not consider
the claim.

In seeking dismissal, Defendants argue that Plaintiff Kodger's
claims must be dismissed because they are (1) federally
preempted and (2) abrogated by the Ohio Product Liability
Act (OPLA). [36] Defendants also argue that Plaintiff fails to
plead how Defendants' alleged federal regulation violations
caused his injuries. [37]

[36]    Doc. 22; Doc. 33.

[37]    Doc. 33 at 2–3.

The Court finds that the claims are not federally preempted
or abrogated by the OPLA. Plaintiff also sufficiently pleads
causation.

The Court, however, directs Plaintiff to file an amended
complaint to identify the specific OPLA provisions that form
his product liability claims. The Court therefore will allow
Plaintiff to amend his complaint to address the deficiency that
this Court here describes.

### A. Federal Preemption
The Court finds that Plaintiff's claims are neither expressly
nor impliedly preempted by federal law.

#### 1. *Express Preemption*
The MDA does not expressly preempt Plaintiff's product
liability claims.

In support for their motion to dismiss, Defendants argue
that Plaintiff's negligence and strict liability claims are
expressly preempted because Plaintiff's claims suggest that
Defendants should have "done something differently than

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 243 of 520
PageID: 9164
Kodger v. Zimmer Biomet Holdings, Inc., Not Reported in Fed. Supp. (2017)
2015 WL 9496, , Prod. Liab. Rep. (CCH) P 7 52

what was approved by the FDA." [38]  Defendants also argue that Plaintiff's claims are expressly preempted because they do not identify specific CGMP manufacturing requirements that the Defendants violated. [39]  Plaintiff asserts that his claims are not expressly preempted since they are based solely on federal regulation violations that he specifically identified. [40]

[38]    Doc. 22 at 9.

[39]    Doc. 33 at 4–5.

[40]    Doc. 29 at 5.

The MDA's express preemption clause, in relevant part, states that:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter. [41]

[41]    21 U.S.C. § 360k(a).

The Supreme Court in *Riegel v. Medtronic, Inc.* described a two-part test for determining whether a plaintiff's products liability claims are expressly federally preempted. [42]  First, the Court asks whether the federal government has established any requirements applicable to the medical device in question. [43]  If so, the Court next asks whether the state requirement at issue is related to safety and effectiveness and "different from, or in addition to," any federal requirements. [44]  If the answer is yes, the state law claim is federally preempted. [45]

[42]    552 U.S. at 321–22.

[43]    *Id.*

[44]    *Id.*

[45]    *Id.*

Under this test, most state common-law tort duties are expressly preempted. Nevertheless, the MDA provision "does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations." [46]  In such a case, the state claims are not preempted because the state duties run " 'parallel,' rather than add to, federal requirements." [47]

[46]    *Id.* at 330.

[47]    *Id.*

**\*4** The first *Riegel* prong is satisfied here. As a Class III device, the Biomet knee implant underwent a required PMA process and is thus subject to FDA regulations. [48]

[48]    *See id.* at 321–22.

The second prong, however, is not satisfied.

In *Howard v. Sulzer Orthopedics, Inc.*, the Sixth Circuit found that a plaintiff's negligence per se claim was not "different from, or in addition to" federal requirements, and was thus a parallel state law claim. [49]  There, the plaintiff alleged a breach of duty based on the violation of an FDA regulation that generally required manufacturers to keep medical devices oil-free. [50]  Without identifying the applicable state law, the court held that "a state may provide a damages remedy for violations of an identical [requirement as the FDA regulation]." [51]  The court also held that the plaintiff need not allege violations of device-specific federal regulations, in order to allege a parallel state law claim. [52]

[49]    382 Fed.Appx. 436, 441 (6th Cir. 2010).

[50]    *Id.*

[51]    *Id.*; *see also Bausch v. Stryker Corp.*, 630 F.3d 546, 555–58 (7th Cir. 2010) (citing to *Howard*, 382 F.App'x at 440) (finding that plaintiff's negligence and strict liability claims based on a manufacturing defect in her hip replacement system were parallel state law claims).

Kodger v. Zimmer Biomet Holdings, Inc., Not Reported in Fed. Supp. (2017)

2015 WL 9496, , 5 Prod. Liab. Rep. (CCH) ¶ 20152

52    *Howard*, 382 Fed.Appx. at 440 (reversing summary judgment on preemption grounds, as CGMP requirements relating generally to medical devices are "not so vague as to be incapable of enforcement"); *see also* *Bausch*, 630 F.3d at 555 ("Like the Sixth Circuit in *Howard*, we do not see a sound legal basis for defendants' proposal to distinguish between general requirements and 'concrete, device-specific' requirements."). Defendants' case citations do not persuasively demonstrate that allegations of general CGMP violations are insufficient to survive preemption. *See* Doc. 33 at 4–5. Unlike Plaintiff Kodger, plaintiffs in those cases did not identify specific CGMPs violated by the defendants. *See, e.g.*, *Warstler v. Medtronic, Inc., 238 F. Supp. 3d 978, 987-88 (N.D. Ohio 2017)*, *reconsideration denied*, No. 3:16CV00385, 2017 WL 3088037 (N.D. Ohio July 20, 2017); *Anthony v. Stryker Corp.*, No. 1:09–CV–2343, 2010 WL 1387790, at *3–5 (N.D. Ohio Mar. 31, 2010).

Here, safety and effectiveness are the core of Plaintiff's manufacturing defect claims. And like the *Howard* plaintiff, Plaintiff Kodger has alleged Defendants' violations of specific CGMP manufacturing requirements, even if those requirements are not specific to the Biomet knee implant itself. [53]

53    Plaintiff identifies Defendants' failure to (1) comply with design controls under 21 C.F.R. § 820.30; (2) adequately conduct the inspecting and verification activities required under 21 C.F.R. § 820.80; (3) establish appropriate procedures to ensure they could take necessary corrective and appropriate action required under 21 C.F.R. § 820.100; and (4) conduct appropriate investigations into adverse incident reports and returned device parts required under 21 C.F.R. § 820.198. Doc. 16–1 at ¶¶ 34, 51.

Because Plaintiff entirely bases Defendants' breach of duty on these CGMP violations, his claims do not "add to" federal requirements. They are therefore parallel state claims and are not expressly preempted by the MDA. [54]

54    Defendants' arguments that we should not follow the holding in *Howard* are unpersuasive. *See* Doc. 22 at 10; Doc. 33 at 9–10. Defendants' citation

to *Hafer v. Medtronic, Inc.* is not relevant because that case did not concern similar tort claims based on manufacturing defects. *See* 99 F. Supp. 3d 844, 853 (W.D. Tenn. 2015), *reconsideration denied* (June 17, 2015) (concerning tort claims based on off-label promotion that was within FDA's exclusive right to enforce). And unlike in other cases Defendants cite, Plaintiff here has alleged specific violations of federal regulations to survive this motion to dismiss, as well as causation (as explained later). *See* *Aaron v. Medtronic, Inc., 209 F. Supp. 3d 994, 1000–01 (S.D. Ohio 2016); Warstler*, 238 F. Supp. 3d at 987–88; *Anthony*, 2010 WL 1387790, at *3–5; *Potolicchio v. Medtronic, Inc.*, No. 1:15–CV–122, 2016 WL 3129186, at *4 (E.D. Tenn. June 2, 2016), *appeal dismissed* (Sept. 8, 2016); *Kitchen v. Biomet, Inc.*, No. CIV.A. 13–18–HRW, 2014 WL 694226, at *2, 5 (E.D. Ky. Feb. 21, 2014).

## 2. *Implied Preemption*

   *5    Plaintiff's claims are also not impliedly preempted.

Defendants argue that Plaintiff's claims are impliedly preempted because Plaintiff is usurping the FDA's responsibility to enforce FDA regulations. [55] Plaintiff mostly responds that his claims are based on common-law duties of care that exist independently of FDA regulations. [56]

55    Doc. 22 at 11–12.

56    Doc. 29 at 9–11.

State law claims can be impliedly preempted when they conflict with federal law and stand in the way of congressional objectives. [57]

57    *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001).

In *Buckman Co. v. Plaintiffs' Legal Comm.*, the Supreme Court found that plaintiff's state law fraud claims against a defendant medical device manufacturer were impliedly preempted. [58] There, the court reasoned that "[p]olicing fraud against federal agencies" was purely within the FDA's domain. [59] Thus, state law claims premised on such fraud was in conflict with federal law and stood in the way of congressional objectives for FDA regulations. [60]

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 245 of 520
PageID: 9166

Kodger v. Zimmer Biomet Holdings, Inc., Not Reported in Fed. Supp. (2017)

2015 WL 9496, , 5 Prod. Liab. Rep. (CCH) P 17,152

58    *Id.* at 349–50.

59    *Id.* at 347.

60    *Id.* at 349–50.

Unlike the plaintiff in *Buckman*, however, Plaintiff Kodger does not bring fraud claims. He brings manufacturing defect tort claims related to health and safety, which naturally fall under the state's historic police powers.[61] As a result, Plaintiff's claims are grounded on common-law duties of care, and exist independently from the FDA regulations. Moreover, such tort law claims do not conflict with the FDA's purpose – to ensure the safety and effectiveness of medical devices.[62]

61    *See id.* at 348; *see also Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 485 (1996)* ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens;" and finding that courts begin with the presumption that federal law does not preempt such traditional police powers).

62    *Buckman, 531 U.S. at 347–48*; *see also Bausch, 630 F.3d at 556–57.*

Thus, Plaintiff's claims are not impliedly preempted by the FDA regulatory scheme.

**B. OPLA Abrogation**

Defendants argue that Plaintiff's common-law negligence and strict liability claims are abrogated by the OPLA. They are not.

In Ohio, product liability claims are governed by the statutory scheme laid out in the OPLA.[63] The OPLA abrogates "all common law product liability claims or causes of action."[64] Product liability claims that are not brought under the OPLA must be dismissed.

63    *Ohio Rev. Code Ann. §§ 2307.71 et seq.*

64    *Ohio Rev. Code Ann. § 2307.71(B).*

Plaintiff does bring his claims under the OPLA. Plaintiff cites to OPLA provisions to state his claims for negligence[65] and strict liability,[66] as well as his entitlement to damages.[67]

65    Doc. 16–1 at ¶ 37 (citing to *Ohio Rev. Code. Ann. § 2307.75*).

66    *Id.* at ¶ 54 (citing to *Ohio Rev. Code. Ann. § 2307.75*).

67    *Id.* at ¶¶ 42, 59 (citing to *Ohio Rev. Code. Ann. § 2307.72*).

But the OPLA provisions Plaintiff cites relate to design defect claims[68] that are not obviously related to Plaintiff's manufacturing defect claims.[69] "Claims that are authorized by the OPLA should be pled with reference to the applicable provision of the OPLA."[70]

68    *See Ohio Rev. Code. Ann. § 2307.75.*

69    Doc. 29 at 2–3.

70    *Boroff v. Alza Corp., 685 F. Supp. 2d 704, 709 (N.D. Ohio 2010)* (quoting *Stratford v. SmithKline Beecham Corp.,* No. 2:07–CV–639, 2008 WL 2491965, at *5 (S.D. Ohio June 17, 2008)); *Tolliver v. Bristol–Myers Squibb Co.,* No. 1:12 CV 00754, 2012 WL 3074538, at *3 (N.D. Ohio July 30, 2012)* ("When bringing claims under the OPLA, plaintiffs should clarify which OPLA provision governs the claims in their complaint.").

**\*6** Thus, although the Court does not find Plaintiff's claims are abrogated by the OPLA,[71] it is unclear to the Court which OPLA provisions are applicable to Plaintiff's claims. The Court will therefore direct Plaintiff to amend his complaint to allege the precise basis for his OPLA claims.

71    *See Aaron, 209 F. Supp. 3d at 1011–12* (finding product liability claims abrogated by the OPLA only because there was "no citation to, or even mention of, the [OPLA] in any of the sections of the Omnibus Complaint outlining the claims against Defendants").

**C. Pleading Sufficiency**

Assuming that Plaintiff brings a manufacturing defect claim under the OPLA, Plaintiff has sufficiently plead causation.

To bring a products liability claim under the OPLA, Plaintiff must establish that the manufacturing defect was the proximate cause of his injuries.[72] Under the OPLA,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 246 of 520
PageID: 9167

Kodger v. Zimmer Biomet Holdings, Inc., Not Reported in Fed. Supp. (2017)
2015 WL 9496, , 5Prod. iLabRep(i CHH) 7r 20P152

proximate cause is established when Plaintiff's injuries are a "natural and probable consequence" of Defendants' wrongful conduct. [73]

[72]    Ohio Rev. Code Ann. § 2307.73.

[73]    See *Eastman v. Stanley Works, 907 N.E.2d 768, 780 (Ohio Ct. App. 2009)* (citation omitted).

Defendants are responsible for manufacturing the Biomet knee implant. Plaintiff alleged that 23% of bearing failures since 1999 occurred in Biomet knee implants manufactured in the short window between 2007 and 2008. According to Plaintiff's allegations, these manufacturing failures indicate Defendants' failure to abide by CGMP requirements.

Plaintiff alleges that his injuries likely resulted from Defendants' federal regulation violations because he received his Biomet knee implant in 2008, around the same time Defendants manufactured a large percentage of faulty bearings. The bearing in Plaintiff's Biomet knee implant also collapsed, causing Plaintiff to experience severe pain and undergo full knee replacement surgery.

Assumed as true, these alleged facts sufficiently plead that Plaintiff's injuries were a "natural and probable" consequence of Defendants' federal regulation violations.

## IV. CONCLUSION

For the following reasons, the Court **DENIES** Defendants' motion to dismiss but orders Plaintiff to file an amended complaint to precisely identify the applicable OPLA provisions for his negligence and strict liability claims. The Court therefore **GRANTS** Plaintiff leave to amend the complaint to address this deficiency.

IT IS SO ORDERED

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4348997, Prod.Liab.Rep. (CCH) P 20,172

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 248 of 520
PageID: 9169
Kury v. Abbott Laboratories, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 124026, 76 UCC Rep.Serv.2d 584

2012 WL 124026
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Candy KURY, on behalf of herself and
all others similarly situated, Plaintiff,
v.
ABBOTT LABORATORIES, INC. d/
b/a Abbott Sales, Marketing and
Distribution Co., et al., Defendants.

Civil Action No. 11–803 (FLW).
|
Jan. 17, 2012.

**Attorneys and Law Firms**

James Stuart Notis, Jennifer Sarnelli, Mark C. Gardy, Gardy
& Notis, Englewood Cliffs, NJ, William M. Audet, Audet &
Partners LLP, San Francisco, CA, for Plaintiff.

Peter C. Harvey, Patterson, Belknap, Webb & Tyler, LLP,
New York, NY, for Defendants.

**OPINION**

WOLFSON, District Judge.

 **\*1** Numerous class action suits have been filed around
the country against defendants, Abbott Laboratories, Inc.
d/b/a Abbott Sales, Marketing and Distribution Co. and
Abbott Laboratories d/b/a Abbott nutrition (collectively,
"Defendants"), relating to Defendants' September 2010 recall
of certain Similac-brand infant formula products. The recall
was precipitated by Defendants' discovery of common
warehouse beetles or beetle larvae in certain Similac powder
formulas. In this case, Plaintiff Candy Kury ("Plaintiff"), a
New Jersey resident, asserts claims involving fraud, product
liability and unjust enrichment against Defendants based
upon allegations that these infant formulas caused substantial
harm. In addition, Plaintiff seeks to represent a class
comprised of all New Jersey citizens who purchased Similac
products during an unspecified class period. In response to
these allegations, Defendants, in the instant matter, move to
dismiss the Complaint in its entirety for failure to state a
claim. For the reasons set forth herein, Plaintiffs' Complaint
is dismissed; in particular, Plaintiff's claims pursuant to the
New Jersey Consumer Fraud Act, breach of implied warranty,

fraudulent concealment and unjust enrichment are dismissed
with prejudice. Plaintiff's claim pursuant to the New Jersey
Products Liability Act and breach of express warranty are
dismissed without prejudice. In that regard, Plaintiff has
leave to amend the Complaint with respect to those claims
dismissed without prejudice within fifteen days from the date
of the Order accompanying this Opinion.

**BACKGROUND**

On a motion to dismiss, the Court reviews the Complaint
by taking its allegations as true. Defendants manufacture,
market, advertise, sell and distribute Similac brand infant
formula products [1], a leading brand "sold in grocery stores
and pharmacies throughout the United States, including in
New Jersey." Compl., ¶¶ 25, 26. According to Plaintiff,
Defendants specifically and extensively market Similac
products to parents as a product that "moms can count on for
trusted nutrition and the formula that's right for their babies."
*Id.* at ¶ 27. In that connection, the packaging of Similac
products promotes uses such as building "immune support,"
"strong bones," and "brain and eyes." *Id.* at ¶ 28. In addition,
Defendants' marketing materials claim that "[e]ach of the
formulas in [the Similac] line provides the balance of protein,
minerals, and other nutrients that helps give babies a strong
start in life. A baby's first year is so important, so count on
Similac for nutrition you can trust." *Id.*

[1]     According to Defendants, the Similac line consists
        of at least ten different products, each available in
        a variety of sizes.

In and around September 2010, during an internal quality
review, Defendants discovered that pieces of common
warehouse beetles or beetle larvae were present in certain
finished Similac products, which were manufactured in
a single facility. *Id.* at ¶¶ 30–31. Thereafter, Defendants
announced a voluntary recall of those products. In that
particular announcement, Defendants advised the public that
"the United States Food and Drug Administration ("FDA")
has determined that while the formula containing these
beetles poses no immediate health risk, there is a possibility
that infants who consume formula containing the beetles or
their larvae could experience symptoms of gastrointestinal
discomfort and refusal to eat as a result of small insect
parts irritating the GI tract." Compl., ¶ 31. Defendants'
recall encompassed all Similac powdered formula sold in
rectangular tubs, including certain Similac powder product

2012 WL 124026, 76 UCC Rep.Serv.2d 584

lines offered in plastic containers, and certain Similac powder product lines offered in sizes such as 8–ounce, 12.4–ounce and 12.9–ounce cans. *Id.* at ¶ 34.

**\*2** Plaintiff alleges that at an unspecified point in time, she purchased one or more unspecified Similac-brand products. *Id.* at ¶¶ 7, 39–40. Plaintiff further alleges that in purchasing the products, she "relied upon the misrepresentations made by Defendants about the quality and safety of Similac products, and that Similac products would not adversely affect her infant child's health." *Id.* at ¶ 39. Moreover, Plaintiff complains that Defendants "should have known that the failure to exercise proper safety standards and equipment management would have led to insects infiltrating Similac products, thereby creating formulas unsafe for infant consumption." *Id.* at ¶ 45.

Based upon these allegations, Plaintiff, in her Complaint, asserts five causes of action arising out of statutory violations and common law: (1) New Jersey's Consumer Fraud Act ("NJCFA"); (2) New Jersey Products Liability Act ("NJPLA"); (3) Breach of Express and Implied Warranty; (4) Fraudulent Concealment; and (5) Unjust Enrichment. Because of these violations, Plaintiff claims that she suffered injury in fact, a loss of money or property, the personal expenditure of time and resources and/or other forms of injury, damage, mental anguish, and/or physical pain and suffering. *See* Compl., ¶¶ 54, 64, 71.

## DISCUSSION

### I. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80(1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 550 U.S. at 561 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set

forth in a complaint "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 555).

**\*3** In affirming that *Twombly* standards apply to all motions to dismiss, the Supreme Court has further explained the principles. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948–49, 173 L.Ed.2d 868 (2009). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1949. Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009). Moreover, in deciding a motion to dismiss, the court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of plaintiff's claim. *Lum v. Bank of Am.,* 361 F.3d 217, 222 n. 3 (3d Cir.2004).

The Third Circuit recently reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *West Penn Allegheny Health System, Inc. v. UPMC,* 627 F.3d 85, 2010 WL 4840093, at \*8 (3d Cir.2010). This means that, "[f]or example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." *Id.* That said, the Rule 8 pleading standard is to be applied "with the same level of rigor in all civil actions." 627 F.3d 85, *Id.* at \*7 (quoting *Ashcroft,* 129 S.Ct. at 1953).

### II. PLA: Subsumption

At the outset, before the Court reviews the sufficiency of the allegations, it first resolves a legal question: whether Plaintiff's assertion of her NJFLA claim effectively subsumes

2012 WL 124026, 76 UCC Rep.Serv.2d 584

Plaintiff's other claims under the NJCFA, breach of implied warranty, fraudulent concealment and unjust enrichment. The Court answers in the affirmative.

The New Jersey Products Liability Act, N.J.S.A. 2A:58C–1, *et seq.,* was enacted "to limit the expansion of products-liability law" and "to limit the liability of manufacturers so as to balance[ ] the interests of the public and the individual with a view towards economic reality." *Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 47, 675 A.2d 620 (1996) (quotations and citations omitted). The NJPLA, therefore, "established the sole method to prosecute a product liability action[,]" and after its enactment, "only a single product liability action remains." *Tirrell v. Navistar Int'l, Inc.,* 248 N.J.Super. 390, 398–99, 591 A.2d 643 (App.Div.), *certif. denied,* 126 N.J. 390, 599 A.2d 166 (1991). In that regard, the Third Circuit has long ago proclaimed that the NJPLA "effectively creates an exclusive statutory cause of action for claims falling within its purview." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir.1991). Indeed, "the NJPLA generally subsumes common law product liability claims, thus establishing itself as the sole basis of relief under New Jersey law available to consumers injured by a defective product." *Id.; see In re Lead Paint Litig.,* 191 N.J. 405, 436, 924 A.2d 484 (2007) (the NJPLA accomplishes its liability-limiting function by creating "one unified, statutorily defined theory of recovery for harm caused by a product.").

*\*4  Generally, the NJPLA "encompass[es] virtually all possible causes of action relating to harms caused by consumer and other products," *In re Lead Paint,* 191 N.J. at 436–37, 924 A.2d 484, "except ... breach of an express warranty." N.J.S.A. 2A:58C–1b(3). Because of the breadth of the NJPLA, there is no question that New Jersey federal and state courts have consistently dismissed product liability claims based on common-law theories when the heart of those theories is the potential "harm caused by a product." *See, e.g., Port Auth. of N.Y. & N.J. v. Arcadian Corp.,* 189 F.3d 305, 313 (3d Cir.1999) (dismissing negligence claim, stating that "under New Jersey law negligence is no longer viable as a separate claim for harm caused by a product"); *Thomas v. Ford Motor Co.,* 70 F.Supp.2d 521, 528–29 (D.N.J.1999) (dismissing common-law claim for negligent manufacture); *Reiff v. Convergent Techs.,* 957 F.Supp. 573, 583 (D.N.J.1997) (dismissing negligence and breach of warranty claims); *McWilliams v. Yamaha Motor Corp. USA,* 780 F.Supp. 251, 262 (D.N.J.1991) (dismissing claims of negligence and breach of implied warranty), aff'd in part, rev'd in part on other grounds, 987 F.2d 200 (3d

Cir.1993); *Green v. Gen. Motors Corp.,* 310 N.J.Super. 507, 517, 709 A.2d 205 (App.Div.1998) (stating that "causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action" under the NJPLA).

Moreover, courts have also found that the NJPLA subsumes common law and statutory fraud claims so long as the harm alleged was caused by a product. *See Brown v. Philip Morris, Inc.,* 228 F.Supp.2d 506, 517 (D.N.J.2002) (fraud claim preempted by the NJPLA when defendant's alleged misrepresentations resulted in "harm caused by a product"); *Sinclair,* 195 N.J. at 66, 948 A.2d 587 (statutory consumer fraud claim subsumed by the NJPLA when the "[t]he heart of plaintiff's case [was] the potential harm caused by Merk's drug"); *McDarby v. Merck & Co.,* 401 N.J.Super. 10, 95–96, 949 A.2d 223 (App.Div.2008) (statutory consumer fraud claim subsumed by the NJPLA because "the gravamen of [the] claim was that Merk marketed Vioxx fully aware of its cardiovascular risk [and] made misrepresentations[ ] and ... omis[ssions]" in connection with its marketing). Indeed, this Court has previously, in *Lopienski v. Centocor, Inc.,* No. 07–4519, 2008 WL 2565065, at \*1 n. 2 (D.N.J. Jun.25, 2008), found that claims of negligence, breach of implied warranty, negligent and fraudulent misrepresentation, statutory consumer fraud and fraudulent concealment are subsumed by the NJPLA when the theory of a case is premised upon product liability.

Here, there is no doubt that Plaintiff's case is based on a product liability theory. In fact, in the first paragraph of the Complaint, Plaintiff characterizes this case as involving Defendants' manufacturing and selling of various defective Similac brand infant powder formulas. Compl., ¶ 1. Simply, the heart of Plaintiff's complaints is that her or her child's injuries—economic and non-economic alike—resulted from ingesting the allegedly defective Similac products that Defendants marketed and sold. Plaintiff, however, aruges that the causes of action, not involving the NJPLA or express warranty, are not subsumed by the NJPLA because in addition to "the type of damages [recoverable] under the [NJPLA]," such as personal injuries and emotional distress, "she is also seeking damages for the loss of the product itself," which are "specifically excluded [from recovery under] the [NJPLA]." Plaintiff's Opp. at p. 11. Significantly, Plaintiff implicitly acknowledges that each of her claims, which are not brought pursuant to the NJPLA or the breach of express warranty, are barred by the NJPLA, except to the extent those claims seek the lost value of the product itself.

**\*5** Nevertheless, even the claim of lost value in this case is not sufficiently distinguishable from the broad harm encompassed by the NJPLA. As the court has explained in *Felluer v. Tri–Union Seafoods, LLC,* No. 06–0688, 2010 U.S. Dist. LEXIS 36195, at \*15,2010 WL 1490927(D .N.J. Apr. 13, 2010), "[t]he fact that [a plaintiff] ... seeks economic damages to reimburse her for the cost of the product (in addition to personal injury damages) does not change the fact that this is, in essence, a product liabilities claim." The court, deriving its reasoning from the New Jersey appellate division decision in *McDarby,* went on to hold that because the NJPLA's definition of harm covers virtually any economic harm caused by the allegedly defective product, a plaintiff should not be permitted to bring separate claims under the NJPLA and NJCFA "as the [NJPLA] was intended to unify product liabilities causes of action into a single claim." *Id.* at \*15–16, 949 A.2d 223 (citing *McDarby,* 401 N.J.Super. at 277–78, 950 A.2d 231). Moreover, a plaintiff should not be able to benefit from provisions—providing treble damages and attorney's fees—contained in the NJCFA despite the fact that such provisions were intentionally excluded from the NJPLA. *See McDarby,* 401 N.J.Super. at 278, 950 A.2d 231. Indeed, this line of reasoning has been adopted by courts in this district. *See Arlandson v. Hartz Mountain Corp.,* No. 10–1050, 2011 WL 2112494, at \*11 (D.N.J. May 25, 2011) (dismissing claim for unjust enrichment where the complaint's "core issue" was the harmfulness of the defendant's product); *O'Donnell v. Kraft Foods, Inc.,* No. 09–4448, 2010 WL 1050139, at \*3 (D.N.J. Mar.18, 2010) (plaintiffs' claim of lost value for purchasing the hot dogs was preempted by NJPLA, because those products' lost value resulted from "the increased risk of cancer [plaintiffs] allege[d] arises from consumption of [the] product ..."); *Levinson v. Johnson & Johnson Consumer Cos.,* 2010 U.S. Dist. LEXIS 8654,2010 WL 421091(D.N.J. Feb. 1, 2010); *Smith v. Merial Ltd.,* No. 10–439, 2011 U.S. Dist. LEXIS 56461, at \*11–13,2011 WL 2119100(D.N.J. May 26, 2011) ("Plaintiffs attempt to classify their claims as non-product liability claims by alleging only economic damages related to the price of the product as opposed to damages related to the harm caused by the product. However, limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA." (citations and quotations omitted)).

Accordingly, based on the allegations here, any economic loss or non-economic loss-including the cost of purchasing the Similac products-Plaintiff allegedly suffered, resulted from her infant ingesting the powder formulas, which arises solely under product liability. *See Smith,* 2011 U.S. Dist. LEXIS 56461 at \*13,2011 WL 2119100 ("Though Plaintiffs assert contract, quasi-contract, and consumer fraud claims, the core issue underlying Plaintiffs' claims is that the chemicals in Frontline products are dangerous and caused physical damage to Plaintiffs' property, in the form of harm to their pets' health."). This type of harm falls squarely within the exclusive purview of the NJPLA and as such, Plaintiff's claims pursuant to the NJCFA, breach of implied warranty, fraudulent concealment and unjust enrichment are subsumed by the NJPLA. [2] Plaintiff's proper recourse is through the NJPLA and/or breach of express warranty, as explained below.

[2]    Plaintiff relies on *Shannon v. Howmedica Osteonics Corp.,* No. 09–4171, 2010 U.S. Dist. LEXIS 8621, at \*7,2010 WL 421096 (D.N.J. Feb. 1, 2010), for the proposition that her claims based upon the lost value of the Similac products are separate and distinct from her NJPLA claim. The Court does not find the analysis of that case persuasive as the *Shannon* court provided little reasoning for its holding. Plaintiff does not advance any other authorities to support her position. Nonetheless, even if lost value is an exception to NJPLA's purview, Plaintiff's claims relating to the loss value of the products may also be dismissed on the ground that Plaintiff was offered a refund for the recalled products. Indeed, Defendants announced in a public notice that they would provide a refund to any purchaser of Similac products that were the subject of the recall. While Plaintiff does not allege in the Complaint that she has received a refund, the mere tender of relief moots her claim for the purchase price of the Similac products. *See Gates v. City of Chicago,* 623 F.3d 389, 413 (7th Cir.2010); *see, e.g., Brown v. Abbott Labs., Inc.,* No. 10–6674, 2011 U.S. Dist. LEXIS 110175, at \*15–16,2011 WL 4496154 (N.D.Ill. Sep. 27, 2011); *Jovine v. Abbott Labs., Inc.,* 795 F.Supp.2d 1331 (S.D.Fla.2011); *Tosh–Surryhne v. Abbott Labs. Inc.,* No. 10–2603, 2011 U.S. Dist. LEXIS 110107, at \*10–11 (E.D.Cal. Sept. 26, 2011); *Jasper v. Abbott Labs., Inc.,* No. 11–229, 2011 U.S. Dist. LEXIS 73806, at \*18–19,2011 WL 2672519 (N.D.Ill. Jul. 8, 2011); *Bland v. Abbott*

2012 WL 124026, 76 UCC Rep.Serv.2d 584

*Labs.,* No. 11–430, 2012 U.S. Dist. LEXIS 1732, at *6,2012 WL 32577(W.D.Ky. Jan. 6, 2012).

## III. New Jersey's Products Liability Act

**\*6** To properly plead a cause of action under the NJPLA, a plaintiff must allege that the defendant manufactured the product, that a reasonably foreseeable user was injured, that the product was defective, that the defect existed when it left the defendant's control, and that the defect was the factual and proximate cause of the plaintiff's injury. *Myrlak v. Port Auth. of N.Y. and N.J.,* 157 N.J. 84, 97, 723 A.2d 45 (1999); *Coffman v. Keene Corp.,* 133 N.J. 581, 593, 628 A.2d 710 (1993); *Michalko v. Cooke Color & Chem. Corp.,* 91 N.J. 386, 394, 451 A.2d 179 (1982). Importantly, the New Jersey Supreme Court has advised that the NJPLA requires a physical injury. *Sinclair,* 195 N.J. at 64, 948 A.2d 587 (under the NJPLA, "the word 'injury' is surrounded by 'physical illness,' which explicitly requires something physical, and 'death,' which inherently is physical.").

In this case, Defendants challenge the sufficiency of Plaintiff's NJPLA claim based on Plaintiff's failure to plead any physical injury. The Court agrees; nothing in the allegations contained in the Complaint sets forth any physical injuries to Plaintiff or Plaintiff's infant child, who is not a party in this case.[3] Other than conclusory and vague allegations that Plaintiff suffered damages, mental anguish and pain and suffering, the extent of any physical damages suffered by Plaintiff or Plaintiff's infant child are contained in these allegations: "Defendants discovered that Similac-brand formulas had been contaminated and contained beetles and beetle larvae, which if consumed by infant children, *could* lead to serious health concerns, including gastrointestinal problems, diarrhea and the like." Compl., ¶ 1 (emphasis added). In that connection, Plaintiff alleges that "Defendants caused serious injury to Plaintiff and the putative Classes she seeks to represent." *Id.* at ¶ 3, 948 A.2d 587. These are clearly insufficient under the *Iqbal* standard to allege a physical injury, and as a result, Plaintiff's NJPLA claim is dismissed.[4]

[3]   Having reviewed Plaintiff's Complaint, the Court finds that there are no allegations that the Similac products Plaintiff purchased were subject to the September 2010 recall. As Plaintiff avers in her Complaint that only certain types of Similac products were recalled, Plaintiff fails to identify that the products she purchased were subject to the recall. Rather, Plaintiff merely alleges

that "Defendants misled Plaintiff into purchasing the unsafe Similac products," *see* Compl., ¶ 39, and that "Plaintiff and the members of the putative Classes would not have purchased the recalled Similac products had they known of their defective condition." These bare allegations are insufficient under the *Iqbal* standard. Indeed, Plaintiff recognizes this deficiency and requests that "if given the opportunity to amend the Complaint, Plaintiff would be able to show that she purchased products that should have been recalled .... " Plaintiff's Opp., pp. 8–9.

[4]   As a final note, Defendants ask the Court dismiss the Complaint in its entirety because Plaintiff's allegations of injury do not suggest that Plaintiff suffered any injury. However, because the Court has already dismissed Plaintiff's claims on various grounds set forth above, it need not consider this question in connection with the other causes of action.

## IV. Breach of Express Warranty

An express warranty claim is codified under N.J.S.A. 12A:2–313, which provides:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

2012 WL 124026, 76 UCC Rep.Serv.2d 584

*7  N.J.S.A. 12A:2–313; *Gupta v. Asha Enters., L.L.C.,* 422 N.J.Super. 136, 153 (App.Div.2011).

Here, Defendants argue that the Court should dismiss this claim for three reasons: (1) Plaintiff fails to allege that there was anything wrong with any unit of Similac she purchased; (2) all of Defendants' statements that Plaintiff pleads are actionable are either not actually alleged to be false or mere puffery; and (3) Plaintiff fails to plead that she provided the requisite pre-litigation notice of breach. Dispositive of the claim for breach of express warranty is Plaintiff's failure to provide a pre-litigation notice to Defendants regarding the alleged breach.

New Jersey has adopted the Uniform Commercial Code's ("UCC") notice requirement for an express warranty claim. *Luppino v. Mercedes–Benz USA, LLC,* No. 09–5582, 2011 U.S. Dist. LEXIS 65495, at *7,2011 WL 2470625 (D.N.J. Jun. 20, 2011); *Joc, Inc. v. Exxonmobil Oil Corp.,* No. 08–5344, 2010 WL 1380750, at *4 (D.N.J. Apr.1, 2010); *Slack v. Suburban Propane Partners, L.P.,* No. 10–2548, 2010 WL 5392845, at *4–5 (D.N.J. Dec.22, 2010). It provides: "Where a tender has been accepted ... the buyer must within a reasonable time after [s]he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.J.S.A. 12A:2–607(3)(a). Based upon the language, this statutory notice is a "condition precedent to filing any suit for breach of warranty." *Joc,* 2010 WL 1380750 at *4.

There is no dispute that Plaintiff has failed to plead that she provided the pre-litigation notice of breach. Indeed, Plaintiff has not disputed this fact in her opposition. More importantly, Plaintiff offers no excuse or explanation for her failure to do so. Accordingly, because Plaintiff has failed to allege that the condition precedent has been met—sending a pre-litigation notice—Plaintiff's express warranty claim necessarily fails. *See Luppino,* 2011 U.S. Dist. LEXIS 65495 at *7,2011 WL 2470625 ("At no time has any court in this district or in the state of New Jersey found that a buyer is not required to provide a direct seller with pre-suit notice in an action for express breach of warranty. Thus, Stern and Casiero's admission that they have failed to provide notice to Defendant proves fatal to their breach of express warranty claims."). However, since the Court cannot determine whether Plaintiff in fact sent a notice to Defendants, or whether Plaintiff is excused from sending a notice, this claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss. In sum, Plaintiff's claims pursuant to the NJCFA, breach of implied warranty, fraudulent concealment and unjust enrichment are dismissed as they are subsumed by NJPLA. Plaintiff's claim pursuant to the NJPLA and breach of express warranty are dismissed without prejudice. In that regard, Plaintiff has leave to amend the Complaint with respect to those claims dismissed without prejudice within fifteen days from the date of the Order accompanying this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 124026, 76 UCC Rep.Serv.2d 584

---

End of Document
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 30

2012 WL 12871963
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Tallahassee Division.

Margaret LAMB and Eileen M. Buser, etc., Plaintiffs,
v.
GRACO CHILDREN'S PRODUCTS INC.,
and Newell Rubbermaid, Inc., Defendants.

CASE NO. 4:11cv477-RH/WCS
|
Signed 01/24/2012

**Attorneys and Law Firms**

Catherine H. McElveen, Thomas Christopher Tuck,
Richardson Patrick Westbrook & Brickman LLC, Mount
Pleasant, SC, Raymond Douglas Gentile, Douthit Frets Rouse
etc. LLC, Leawood, KS, William H. Garvin, III, Garvin Law
Firm PA, Tallahassee, FL, for Plaintiffs.

Heidi Kern Oertle, Schiff Hardin LLP, Chicago, IL, for
Defendants.

**ORDER DISMISSING THE COMPLAINT**

Robert L. Hinkle, United States District Judge

 **\*1** This is a product-liability case. In their class-action
complaint, the two plaintiffs allege that they each bought a
"TurboBooster" child car seat that the defendants designed,
manufactured, and distributed. The plaintiffs allege that the
defendants warranted that the car seat conformed to federal
safety standards even though the defendants knew it did not.
The plaintiffs assert claims for breach of express warranty and
fraud—or, as they label it, fraudulent concealment; they do
not allege that their car seats were involved in a wreck or that
anyone suffered a bodily injury. The defendants have moved
to dismiss for lack of standing and failure to state a claim on
which relief can be granted. This order rejects the standing
contention but grants the motion to dismiss for failure to state
a claim. The basis for the dismissal is that the plaintiffs have
not alleged that they gave the defendants notice as required
for an express-warranty claim and have not alleged reliance
as required for a fraud claim. The order grants leave to amend
to cure the deficiencies.

I

The defendants first assert that because the car seats did
not malfunction or cause a bodily injury, each plaintiff
got what she bargained for—a car seat that performed to
expectations. The defendants thus say that the plaintiffs
suffered no legally cognizable injury and lack standing. The
assertion is incorrect.

The reason is this. A car seat that complies with federal safety
standards is worth more than one that does not. Or so the
plaintiffs claim and a reasonable juror might conclude. *Cf.*
*Smith v. WM. Wrigley Jr. Co.,* 663 F. Supp. 2d 1336, 1339-41
(S.D. Fla. 2009) (stating that a gum manufacturer's allegedly
false guarantee that its gum killed bad-breath germs increased
the product's price and served as a basis for a damages claim
under the Florida Deceptive and Unfair Trade Practices Act).
On this view the plaintiffs overpaid for the car seats.

This is the very gravamen of an express warranty claim under
Florida law. *See* Fla. Stat. § 672.714 (2011) ("The measure
of damages ... is the difference at the time and place of
acceptance between the value of the goods accepted and the
value they would have had if they had been as warranted.").
*See also* *Collins v. DaimlerChrysler Corp.,* 894 So. 2d 988,
990 (Fla. 5th DCA 2004) (stating a similar principle under
FDUTPA). The plaintiffs have standing.

II

The defendants next argue that the plaintiffs have failed to
state a claim for breach of express warranty. Under Florida
law, an express-warranty plaintiff must show: (1) a purchase
of goods; (2) an express warranty; (3) breach of the warranty;
(4) notice to the seller of the breach; and (5) injury as a result
of the breach. *See* *Jovine v. Abbott Labs., Inc.,* 795 F. Supp.
2d 1331, 1339-40 (S.D. Fla. 2011) (citing *Dunham-Bush, Inc.
v. Thermo-Air Serv., Inc.,* 351 So. 2d 351, 353 (Fla. 4th DCA
1977)). The defendants say that Florida law also requires
privity between the plaintiff and defendant.

The defendants say that the plaintiffs' complaint falls short
because it does not allege privity—indeed, the complaint
explicitly alleges that the plaintiffs are not in privity with the
defendants—and because it does not allege that the plaintiffs
gave the defendants notice of the breach.

Lamb v. Graco Children's Products Inc., Not Reported in Fed. Supp... (2012)
2012 WL 12871963

**\*2** It is unclear whether Florida law requires privity for an express-warranty claim of this kind. *See WM. Wrigley*, 663 F. Supp. 2d at 1341-1343 (discussing the unsettled law of express warranty in Florida and denying a motion to dismiss despite the lack of privity between the plaintiffs and the defendant); *see also* John W. Reis, *The Magic of Privity in Express Warranty Claims: A Plaintiff's Perspective*, 79 Fla. Bar J. 50 (2005).

It is clear, though, that a plaintiff must give notice of the claim. *See* Fla. Stat. § 672.607(3)(a) ("When a tender has been accepted the buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy"); *see also Jovine*, 795 F. Supp. 2d at 1340 (citing *Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So. 2d 1262, 1263 (Fla. 2d DCA 1980)). The plaintiffs have not alleged that they gave notice or even that they complied generally with conditions precedent. In the absence of such an allegation, the complaint fails to state an express-warranty claim on which relief can be granted.

In reaching this conclusion, I have not overlooked that the statute requires a buyer to notify "the seller" of a breach of express warranty; the statute does not speak of notice to the product's *manufacturer*. This is so because the statute assumes privity. But even if, as the plaintiffs assert, an express warranty claim can be brought in the absence of privity, a buyer who is *not* in privity surely has no *greater* right than a buyer who *is* in privity. To rule otherwise would stand the applicable law on its head. And the point of the notice requirement is to allow the warrantor an opportunity to cure the problem rather than defend a lawsuit. The reason for requiring notice applies to a manufacturer every bit as much as to a seller. In short, under Florida law, a buyer must give notice of a breach of an express warranty and, in the absence of notice, cannot recover.

### III

Finally, the defendants argue that the plaintiffs have failed to state a claim for fraud—or, as the plaintiffs put it, fraudulent concealment. To state a fraudulent-concealment claim, a plaintiff must allege: (1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known the material fact should be disclosed; (3) the defendant knew its concealment of or failure to disclose the material fact would induce the plaintiff to act; (4) the defendant had a duty

to disclose the material fact; (5) the plaintiff detrimentally relied on the misinformation; and (6) the plaintiff's reliance was reasonable. *See R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1068 (Fla. 1st DCA 2010); *Artec Group, Inc. v. Chugach Mgmt, Servs., Inc.*, 470 F. Supp. 2d 1353, 1356 (M.D. Fla. 2006). The defendants assert that they had no duty to disclose known defects and, even if they did, the plaintiffs have failed to plead reliance.

The parties' attention to a manufacturer's duty to disclose is curious. Although the plaintiffs refer to "fraudulent concealment," what they have alleged is that the defendants affirmatively *made* a false statement, not that the defendants *failed to make* a statement they were duty-bound to make. But either way, part of what the plaintiffs must show is reliance. The complaint does not allege that either plaintiff relied on the representation that the car seat complied with federal safety standards.

**\*3** The plaintiffs say that the court should draw the inference that the plaintiffs must have relied in deciding to purchase the car seats. But if a plaintiff cannot allege reliance under the strictures of Federal Rule of Civil Procedure 11, there is little basis for a court to infer it. A district court should grant a motion to dismiss unless "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L.Ed. 2d 868 (2009). This is not a situation in which the plaintiff lacks information needed to assert a claim; if a plaintiff relied, she surely knows it. Absent an affirmative allegation of reliance, the complaint fails to state a claim for fraud—or fraudulent concealment—on which relief can be granted.

### IV

For these reasons,

IT IS ORDERED:

The motion to dismiss, ECF No. 6-1, is GRANTED. The plaintiffs may file an amended complaint by February 7, 2012. SO ORDERED on January 24, 2012.

**All Citations**

Not Reported in Fed. Supp., 2012 WL 12871963

Lamb v. Graco Children's Products Inc., Not Reported in Fed. Supp. (2012)

2012 WL 12871963

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 31

2020 WL 871521
United States District Court, S.D. New York.

Michelle LUGONES; Tricia Rizzi; Marcus
Siezing; Claudia Vassallo; Denise Alvarado;
Minoee Modi; Isabelle Gray; Karine Sewell;
Anne Flournoy; and Sonja Romano, Plaintiffs,
v.
PETE AND GERRY'S ORGANIC, LLC and
Nellie's Free Range Eggs, Defendants.

19 Civ. 2097 (KPF)
|
Signed 02/21/2020

**Synopsis**
**Background:** Egg purchasers brought putative class action
against egg seller alleging that purchases were made based on
seller's advertisements indicating that hens were given ample
access to open spaces and that advertising concealed facts
that hens were kept in tightly constricted spaces with no real
access to the outdoors and hens were subject to numerous
husbandry practices that purchasers opposed. Seller filed
motions to dismiss for lack of personal jurisdiction and for
failure to state a claim.

**Holdings:** The District Court, Katherine Polk Failla, J., held
that:

[1] claims of purchasers who were not from New York were
not connected to New York;

[2] purchasers were not entitled to jurisdictional discovery
regarding court's lack of personal jurisdiction over non-New
York purchasers;

[3] purchasers failed to allege any actual intent to purchase
seller's eggs again;

[4] purchasers failed to allege they viewed seller's website
prior to purchasing eggs;

[5] purchasers' interpretation of egg seller's advertising was
unreasonable;

[6] purchasers plausibly alleged that they believed seller's
statement on egg containers; and

[7] purchasers plausibly alleged they reasonably relied on
seller's statements on egg containers regarding its hens' access
to the outdoors.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Lack of
Personal Jurisdiction; Motion to Dismiss for Failure to State
a Claim.

West Headnotes (50)

[1]    **Federal Courts**    🔑    Necessity of Objection;
       Power and Duty of Court

       A court facing challenges as to both its
       jurisdiction over a party and the sufficiency
       of any claims raised must first address the
       jurisdictional question.

[2]    **Federal Courts**    🔑    Presumptions and burden
       of proof

       On a motion to dismiss for lack of personal
       jurisdiction, the plaintiff bears the burden of
       showing that the court has jurisdiction over the
       defendant. Fed. R. Civ. P. 12(b)(2).

[3]    **Federal Courts**    🔑    Weight and sufficiency

       To survive a motion to dismiss for lack
       of personal jurisdiction, a plaintiff need
       only provide legally sufficient allegations of
       jurisdiction. Fed. R. Civ. P. 12(b)(2).

[4]    **Federal Courts**    🔑    Weight and sufficiency

       A plaintiff makes a showing of jurisdiction
       sufficient to survive a motion to dismiss for lack
       of personal jurisdiction through an averment of
       facts that, if credited by the ultimate trier of fact,
       would suffice to establish jurisdiction over the
       defendant. Fed. R. Civ. P. 12(b)(2).

Lugones v. Pete and Gerry's Organic, LLC, --- F.Supp.3d ---- (2020)
2020 WL 4727627, 707 833 UCC Rep.Serv.2d vd7

**[5]    Federal Courts** ⚖ **Presumptions and burden of proof**

On a motion to dismiss for lack of personal jurisdiction, the plaintiff's jurisdictional allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor. Fed. R. Civ. P. 12(b)(2).

**[6]    Federal Courts** ⚖ **Evidence; Affidavits**

**Federal Courts** ⚖ **Hearing**

On a motion to dismiss for lack of personal jurisdiction, where a court does not hold an evidentiary hearing on the jurisdictional question, it may, nevertheless, consider matters outside the pleadings. Fed. R. Civ. P. 12(b)(2).

**[7]    Process** ⚖ **Nature and necessity in general**

For a court to exercise personal jurisdiction, the plaintiff's service of process upon the defendant must have been procedurally proper.

**[8]    Federal Courts** ⚖ **How Established; Grounds**

**Federal Courts** ⚖ **Notice**

For a court to exercise personal jurisdiction, there must be a statutory basis for personal jurisdiction that renders a plaintiff's service of process effective.

**[9]    Constitutional Law** ⚖ **Personal jurisdiction in general**

For a court to exercise personal jurisdiction, the exercise of personal jurisdiction must comport with constitutional due process principles. U.S. Const. Amend. 5.

1 Cases that cite this headnote

**[10]    Constitutional Law** ⚖ **Non-residents in general**

In order to assure that personal jurisdiction comports with constitutional due process

principles, a court must determine both whether a nonresident defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant and whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice under the circumstances of the particular case. U.S. Const. Amend. 5.

2 Cases that cite this headnote

**[11]    Federal Courts** ⚖ **Purpose, intent, and foreseeability; purposeful availment**

**Federal Courts** ⚖ **Related contacts and activities; specific jurisdiction**

There are three conditions that must be met for the exercise of specific personal jurisdiction: (1) the defendant must have purposefully availed itself of the privileges of conducting activities within the forum State or have purposefully directed its conduct into the forum State, (2) the plaintiff's claims must arise out of or relate to the defendant's forum conduct, and (3) the exercise of jurisdiction must be reasonable under the circumstances.

**[12]    Federal Courts** ⚖ **Related contacts and activities; specific jurisdiction**

Where there is no connection between the forum and the underlying controversy, specific personal jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.

**[13]    Federal Courts** ⚖ **Fraud, racketeering, and deceptive practices**

Claims of egg purchasers who were not from New York were not connected to New York, and thus court lacked specific personal jurisdiction over non-New York purchasers in putative class action against egg seller alleging that purchases were made based on seller's allegedly false advertisements indicating that hens were given ample access to open spaces, where non-New York purchasers did not purchase eggs in New

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 261 of 520
PageID: 9182
Lugones v. Pete and Gerry's Organic, LLC, --- F.Supp.3d ---- (2020)
2020 WL 4677627, 707 833 UCC Rep.Serv.2d vd7

York and were not exposed to seller's marketing or advertising in New York.

**[14]    Federal Civil Procedure** 🔑 Jurisdictional discovery

Egg purchasers were not entitled to jurisdictional discovery regarding court's lack of personal jurisdiction over non-New York purchasers, for purposes of purchasers' putative class action against egg seller alleging that purchases were made based on seller's allegedly false advertisements indicating that hens were given ample access to open spaces; seller's contracting with a New York-based advertising agency for its marketing was insufficient to meet threshold showing required for jurisdictional discovery.

**[15]    Federal Civil Procedure** 🔑 Jurisdictional discovery

Whether to grant jurisdictional discovery when plaintiffs fail to make a prima facie showing of personal jurisdiction is within the court's discretion.

**[16]    Federal Civil Procedure** 🔑 Jurisdictional discovery

A federal court may order limited discovery to establish personal jurisdiction so long as plaintiff has made a threshold showing of jurisdiction and established that his jurisdictional position is not frivolous.

**[17]    Federal Civil Procedure** 🔑 Jurisdictional discovery

A defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction, as required for jurisdictional discovery.

**[18]    Federal Courts** 🔑 Dismissal or other disposition

A case is properly dismissed for lack of subject matter jurisdiction on a motion to dismiss when the district court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1).

**[19]    Federal Courts** 🔑 Pleadings and motions

A facial motion to dismiss for lack of subject matter jurisdiction is one based solely on the allegations of the complaint or the complaint and exhibits attached to it. Fed. R. Civ. P. 12(b)(1).

**[20]    Federal Courts** 🔑 Presumptions and burden of proof

A plaintiff opposing a facial motion to dismiss for lack of subject matter jurisdiction bears no evidentiary burden. Fed. R. Civ. P. 12(b)(1).

**[21]    Federal Courts** 🔑 Pleadings and motions

To resolve a facial motion to dismiss for lack of subject matter jurisdiction, a district court must determine whether the complaint and its exhibits allege facts that establish subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[22]    Federal Courts** 🔑 Pleadings and motions

To make determination whether the complaint and its exhibits allege facts that establish subject matter jurisdiction, as required to resolve a facial motion to dismiss for lack of subject matter jurisdiction, a court must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(1).

**[23]    Federal Courts** 🔑 Evidence; Affidavits

A defendant is permitted to make a fact-based motion to dismiss for lack of subject matter jurisdiction, proffering evidence beyond the complaint and its exhibits. Fed. R. Civ. P. 12(b)(1).

**[24]    Federal Courts**    Presumptions and burden of proof

In opposition to a fact-based motion to dismiss for lack of subject matter jurisdiction, a plaintiff must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing. Fed. R. Civ. P. 12(b)(1).

**[25]    Federal Courts**    Findings and conclusions

If a defendant supports a fact-based motion to dismiss for lack of subject matter jurisdiction with material and controverted extrinsic evidence, a district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[26]    Federal Courts**    Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Federal courts are courts of limited jurisdiction, and lack the power to disregard such limits as have been imposed by the Constitution or Congress.

**[27]    Federal Courts**    Case or Controversy Requirement

**Federal Courts**    Nature of dispute; concreteness

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies, thereby restricting the authority of federal courts to resolving the legal rights of litigants in actual controversies. U.S. Const. art. 3, § 2, cl. 1.

**[28]    Federal Civil Procedure**    In general; injury or interest

**Federal Civil Procedure**    Causation; redressability

**Federal Courts**    Case or Controversy Requirement

The cases and controversies requirement for standing places the burden on those who invoke the power of a federal court to demonstrate standing, which is a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. U.S. Const. art. 3, § 2, cl. 1.

**[29]    Federal Civil Procedure**    In general; injury or interest

In order to satisfy injury-in-fact requirement for standing, the plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

**[30]    Injunction**    Persons entitled to apply; standing

To establish standing to obtain prospective relief, a plaintiff must show a likelihood that he will be injured in the future. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[31]    Injunction**    Persons entitled to apply; standing

To establish standing to obtain prospective relief, either there must be a substantial risk that the future injury will occur, or the threatened injury must be certainly impending. U.S. Const. art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[32]    Injunction**    Persons entitled to apply; standing

To establish standing to obtain prospective relief, allegations of possible future injury are not sufficient, nor is past exposure to illegal conduct. U.S. Const. art. 3, § 2, cl. 1.

**[33]    Antitrust and Trade Regulation** 🔑 Private
entities or individuals

**Federal Civil Procedure** 🔑 Consumers,
purchasers, borrowers, and debtors

Egg purchasers failed to allege any actual
intent to purchase seller's eggs again, and thus
purchasers failed to establish a likelihood of
future injury sufficient to show standing to
pursue injunctive relief against purchaser in
putative class action alleging that purchases
were made based on seller's allegedly false
advertisements indicating that hens were given
ample access to open spaces. U.S. Const. art. 3,
§ 2, cl. 1.

2 Cases that cite this headnote

**[34]    Antitrust and Trade Regulation** 🔑 Nature
and Elements

**Antitrust and Trade
Regulation** 🔑 Advertising, marketing, and
promotion

Under New York law, in order to plead
a sufficient claim under sections governing
deceptive acts and false advertising, a plaintiff
must allege that the defendant: (1) engaged in
consumer-oriented conduct, (2) that the conduct
was materially misleading, and (3) that the
plaintiff suffered injury as a result of the
allegedly deceptive act or practice. N.Y. General
Business Law §§ 349, 350.

1 Cases that cite this headnote

**[35]    Antitrust and Trade
Regulation** 🔑 Advertising, marketing, and
promotion

Egg purchasers failed to allege they viewed
egg seller's website prior to purchasing eggs,
and thus purchasers failed to state claims for
deceptive acts and false advertising under New
York law based on statements on website in
purchasers' putative class action alleging that
purchases were made based on seller's allegedly
false advertisements indicating that hens were

given ample access to open spaces N.Y. General
Business Law §§ 349, 350.

**[36]    Antitrust and Trade
Regulation** 🔑 Advertising, marketing, and
promotion

Egg purchasers' interpretation of egg seller's
advertising stating that "WE LOVE OUR HENS,
YOU'LL LOVE OUR EGGS," "WE LOVE
OUR HENS," and "BETTER LIVES FOR
HENS MEAN BETTER EGGS FOR YOU," to
mean that seller's hens were free from numerous
husbandry practices that purchasers opposed was
unreasonable, and thus purchasers failed to state
claims for deceptive acts and false advertising
under New York law based on those statements
in purchasers' putative class action alleging that
purchases were made based on seller's allegedly
false advertisements indicating that hens were
given ample access to open spaces; statements
were puffery that did not provide any concrete
representations. N.Y. General Business Law §§
349, 350.

1 Cases that cite this headnote

**[37]    Antitrust and Trade Regulation** 🔑 Fraud;
deceit;  knowledge and intent

**Antitrust and Trade
Regulation** 🔑 Advertising, marketing, and
promotion

To establish that conduct is materially
misleading, as required to state claims for
deceptive acts and false advertising under New
York law, a plaintiff must demonstrate that a
reasonable consumer would likely be misled
by the alleged misrepresentation. N.Y. General
Business Law §§ 349, 350.

**[38]    Antitrust and Trade Regulation** 🔑 Fraud;
deceit;  knowledge and intent

**Antitrust and Trade
Regulation** 🔑 Advertising, marketing, and
promotion

When    determining    whether    a    plaintiff
demonstrated that a reasonable consumer would

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 264 of 520
PageID: 9185
Lugones v. Pete and Gerry's Organic, LLC, --- F.Supp.3d ---- (2020)
2020 1 4 W L 7627, 707 8 3 3 UO Re p C. S2r  v d7

likely be misled by an alleged misrepresentation, as required to state claims for deceptive acts and false advertising under New York law, courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole. N.Y. General Business Law §§ 349, 350.

1 Cases that cite this headnote

[39]    **Antitrust and Trade Regulation** 👈 Questions of law or fact

The reasonable consumer inquiry for claims for deceptive acts and false advertising under New York law is typically a question of fact and thus best decided at a stage in the proceeding later than the motion to dismiss stage. N.Y. General Business Law §§ 349, 350.

[40]    **Antitrust and Trade Regulation** 👈 Fraud; deceit; knowledge and intent

**Antitrust and Trade Regulation** 👈 Advertising, marketing, and promotion

Statements and practices that are mere puffery are not actionable, for purposes of claims for deceptive acts and false advertising under New York law, and courts can determine that a statement is puffery as a matter of law. N.Y. General Business Law §§ 349, 350.

1 Cases that cite this headnote

[41]    **Antitrust and Trade Regulation** 👈 Fraud; deceit; knowledge and intent

**Antitrust and Trade Regulation** 👈 Advertising, marketing, and promotion

For purposes of claims for deceptive acts and false advertising under New York law, "puffery" includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely. N.Y. General Business Law §§ 349, 350.

[42]    **Antitrust and Trade Regulation** 👈 Fraud; deceit; knowledge and intent

**Antitrust and Trade Regulation** 👈 Advertising, marketing, and promotion

For purposes of claims for deceptive acts and false advertising under New York law, "puffery" can include an exaggeration or overstatement expressed in broad, vague, and commendatory language, as distinguished from misdescriptions or false representations of specific characteristics of a product.

[43]    **Antitrust and Trade Regulation** 👈 Particular cases

Egg purchasers plausibly alleged that they believed egg seller's statement on egg containers that most "hens don't have it as good as" seller's hens, which can "peck, perch, and play on plenty of green grass" to mean that seller's hens had "space to move around both indoors and outdoors," which was far from alleged conditions for seller's hens, as required to state claims for deceptive acts and false advertising under New York law based on that statement in purchasers' putative class action alleging that purchases were made based on seller's allegedly false advertisements indicating that hens were given ample access to open spaces. N.Y. General Business Law §§ 349, 350.

[44]    **Fraud** 👈 Elements of Actual Fraud

Under New York law, fraud and fraudulent misrepresentation claims are identical.

[45]    **Fraud** 👈 Relations and means of knowledge of parties

Egg purchasers plausibly alleged they reasonably relied on egg seller's statements on egg containers regarding its hens' access to the outdoors, as required to state fraud and fraudulent misrepresentation claims under New York law in purchasers' putative class action alleging that purchases were made based on

seller's allegedly false advertisements indicating that hens were given ample access to open spaces; containers gave purchasers no reason to be on alert as to potential misrepresentations, and purchasers would have had no independent means of ascertaining the truth of seller's misrepresentations short of driving themselves to purchaser's facilities and sleuthing about the grounds for the truth.

**[46]**   **Fraud** 🔑 **Duty to Investigate**

**Fraud** 🔑 **Relations and means of knowledge of parties**

For purposes of fraud and fraudulent misrepresentation claims under New York law, although reasonable reliance is often a fact-intensive question, it is a condition which cannot be met where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means.

**[47]**   **Fraud** 🔑 **Duty to Investigate**

**Fraud** 🔑 **Relations and means of knowledge of parties**

To plead reasonable reliance for purposes of fraud and fraudulent misrepresentation claims under New York law, a plaintiff must show minimal diligence or care that negates its own recklessness unless matters are held to be peculiarly within defendant's knowledge and the plaintiff would have no independent means of ascertaining the truth.

**[48]**   **Sales** 🔑 **Notice as condition precedent**

Egg purchasers failed to provide any notice to egg seller of any breach of express warranty, and thus failed to state claim for breach of express warranty under New York law in purchasers' putative class action alleging that purchases were made based on seller's allegedly false advertisements indicating that hens were given ample access to open spaces. N.Y. Uniform Commercial Code § 2-607(3)(a).

**[49]**   **Sales** 🔑 **Breach and elements thereof in general**

Under New York law, breach of express warranty claims require: (1) a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with his immediate seller, (3) the breach of this warranty, and (4) injury to the buyer caused by the breach.

**[50]**   **Sales** 🔑 **Notice as condition precedent**

Under New York law, in order to assert a breach of express warranty claim, a buyer must provide the seller with timely notice of the alleged breach of warranty. N.Y. Uniform Commercial Code § 2-607(3)(a).

**Attorneys and Law Firms**

Asher Smith, Peta Foundation, Washington, DC, Jeanne-Marie Bates Christensen, Wigdor LLP, New York, NY, for Plaintiffs.

Nathan Reed Fennessy, Preti, Flaherty, Beliveau & Pachios, PLLP, Concord, NH, Peter T. Shapiro, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, for Defendants.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

**\*1**   Plaintiffs bring this action, on behalf of themselves and as proposed representatives of a putative class of similarly situated individuals, against Defendant Pete and Gerry's Organic, LLC. [1] Plaintiffs allege that they purchased Defendant's eggs, branded as Nellie's Free Range Eggs, based on Defendant's advertisements indicating that Defendant's hens are loved and are given ample access to open, green spaces in which they can peck, perch, and play. However, Plaintiffs allege that this advertising is a lie, and conceals the facts that (i) Defendant's hens are kept in tightly constricted spaces, with no real access to the outdoors, and (ii) the hens

are subject to numerous husbandry practices that Plaintiffs oppose, such as beak-cutting and culling. Plaintiffs bring a wide variety of state-law statutory claims relating to false and deceptive advertising, as well as claims for fraud, fraudulent misrepresentation, and breach of express warranty, and request damages and injunctive relief. Defendant moves, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), both to dismiss the claims brought by the non-New York plaintiffs and putative class members for lack of personal jurisdiction and to dismiss the complaint as a whole for failure to state a claim for relief. For the reasons set forth in the remainder of this Opinion, Defendant's motion to dismiss for lack of personal jurisdiction is granted in part and denied in part, and Defendant's motion to dismiss for failure to state a claim is granted in part and denied in part.

[1]  Although both Pete and Gerry's Organic, LLC and Nellie's Free Range Eggs are named as Defendants, Pete and Gerry's has represented that Nellie's Free Range Eggs is no more than a registered trademark and is therefore not a separate legal entity that can be sued. (Dkt. #18). Plaintiffs have not challenged Pete and Gerry's representation. Therefore, given the lack of any showing that Nellie's Free Range Eggs is an entity that can be sued, the Court dismisses it as a Defendant.

## BACKGROUND [2]

[2]  The facts contained in this Opinion are drawn principally from Plaintiff's Second Amended Class Action Complaint, which is the operative pleading in this case and is referred to in this Opinion as the "SAC." (Dkt. #29). The Court has also, in its consideration of Defendant's Rule 12(b)(2) motion, evaluated certain exhibits attached to the Declaration of Jeanne Christensen in Opposition to Defendants' Motion to Dismiss Under Rule 12(b)(2) (Dkt. #33), although the Court does not cite to them in this Opinion.
For ease of reference, the Court refers to the parties' briefing as follows: Defendant's opening brief as "Def. Br." (Dkt. #31); Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #32); and Defendant's reply brief as "Def. Reply" (Dkt. #34).

**A. Factual Background**

Plaintiffs are residents of New York, California, Massachusetts, Georgia, Maryland, and North Carolina. (SAC ¶¶ 16-24). Defendant is a limited liability company formed and headquartered in New Hampshire. (Id. at ¶ 25). Plaintiffs purchased Defendant's Nellie's Free Range Eggs in their respective states. (Id. at ¶¶ 16-24). In making their respective decisions to purchase the eggs, Plaintiffs relied on a combination of slogans, descriptions, and images on the Nellie's Free Range Eggs containers. (Id.). The slogans included such statements as: "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"; "WE LOVE OUR HENS"; "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"; and "OUTDOOR FORAGE." (Id.). The container also claimed that "[m]ost hens don't have it as good as Nellie's," because Nellie's hens "can peck, perch, and play on plenty of green grass." (Id.). Finally, the containers all included imagery highlighting young children playing with hens in an open field. (Id. at ¶ 46). Based on these slogans, statements, and images, Plaintiffs believed that Nellie's Free Range Eggs were "sourced from small farms providing all chickens with space to move around both indoors and outdoors, as well as freedom from chick culling, beak-cutting, calcium depletion[,] and sale to commercial slaughterhouses and live markets." (Id. at ¶ 16). Defendant's website, it is alleged, only reinforced these beliefs. (Id.).

 *2  Plaintiffs allege that Defendant's hens face a far different and grimmer reality than Defendant's advertising indicates. (SAC ¶¶ 7-8). In contrast to Defendant's idyllic images of happy hens in green pastures, Defendant's hens are instead crammed "into sheds up to 20,000 at a time ... prevent[ing] them from extending their wings, foraging or making their way to the outdoor space [Defendant] advertises so prominently." (Id. at ¶ 7). In addition, Defendant mutilates its hens' beaks. (Id. at ¶ 8). And once Defendant's hens have laid so many eggs that they are depleted of the calcium "needed to lay eggs strong enough to make it to market," Defendant "sells them to slaughterhouses and live markets that kill them." (Id.). Plaintiffs allege that if they had known the truth about Defendant's practices, they would not have paid premium prices for Defendant's eggs. (Id. at ¶¶ 16-24). Moreover, Plaintiffs "would only consider purchasing Nellie's eggs in the future if Defendant[ ] were to treat chickens in a manner consistent with [its] advertising." (Id. at ¶¶ 16-24).

**B. Procedural Background**

Plaintiffs initiated this action and filed their original Complaint on March 6, 2019. (Dkt. #1). Plaintiffs then amended their Complaint and added additional parties on

May 7, 2019, prior to Defendant responding. (Dkt. #10). On May 20, 2019, Defendant requested a conference to discuss its anticipated motion to dismiss (Dkt. #18), to which Plaintiffs responded on May 30, 2019 (Dkt. #22). The parties appeared before the Court for a pre-motion conference on June 27, 2019, at which the Court set both a date by which Plaintiffs could again amend their complaint and a briefing schedule for Defendant's motion to dismiss. (Minute Entry of June 27, 2019).

Plaintiffs filed their SAC on July 29, 2019. (Dkt. #29). The SAC alleged violations of New York General Business Law ("GBL") Sections 349 and 350; California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 to 17210; California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 to 17509; Maryland's Unfair or Deceptive Trade Practices Law, Md. Code Ann., Com. Law § 13-301; North Carolina's Unfair & Deceptive Trade Practices Law, N.C. Gen. Stat. § 75-1.1; Massachusetts's Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §§ 1 to 11; and Georgia's Fair Business Practices Act, Ga. Code Ann. §§ 10-1-390 to 10-1-408. (SAC ¶¶ 128-88). The SAC also alleged common-law claims for fraud, fraudulent representation, and breach of express warranty, without specifying any particular state statutes. (Id. at ¶¶ 189-208).

Defendant filed its motion to dismiss, with an accompanying memorandum of law, on September 16, 2019. (Dkt. #30, 31). Plaintiffs responded with an opposing memorandum and supporting declaration on October 25, 2019. (Dkt. #32, 33). Defendant filed its reply brief on November 8, 2019. (Dkt. #34).

## DISCUSSION

**A. The Court Grants in Part Defendant's Motion to Dismiss for Lack of Personal Jurisdiction**

### 1. Motions to Dismiss Under Rule 12(b)(2)

[1]   "A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 148 (E.D.N.Y. 2017) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)). Therefore, the Court will first address Defendant's motion to dismiss the claims of the named Plaintiffs and putative class members residing outside New York for lack of personal jurisdiction.

[2]   [3]   [4]   [5]   [6]   "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). To survive a motion to dismiss, a plaintiff need only provide "legally sufficient allegations of jurisdiction." *Id.* A plaintiff makes such a showing through "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 567 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Plaintiff's jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)). Where a court does not hold an evidentiary hearing on the jurisdictional question, it may, nevertheless, consider matters outside the pleadings. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).

*3 [7]   [8]   [9]   [10]   There are three requirements that must be met in order for a court to exercise personal jurisdiction: "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective.... Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). In order to assure that the last prong has been satisfied, a court must determine both "whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant and whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice under the circumstances of the particular case." *Johnson v. UBS AG*, 791 Fed.Appx. 240, 242 (2d Cir. 2019) (internal quotation marks omitted) (citing *Waldman*, 835 F.3d at 331).

[11]   [12]   "In analyzing the minimum contacts requirement, courts have distinguished between two bases for personal jurisdiction: specific jurisdiction and general jurisdiction." *Johnson*, 791 Fed.Appx. at 242. There are three conditions that must be met for the exercise of specific jurisdiction: (i) "the defendant must have purposefully availed itself of

the privileges of conducting activities within the forum State or have purposefully directed its conduct into the forum State," *U.S. Bank N.A. v. Bank of America N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Superior Court of California*, —— U.S. ——, 137 S. Ct. 1773, 1785, 198 L.Ed.2d 395 (2017)); (ii) "the plaintiff's claims must arise out of or relate to the defendant's forum conduct," *id.* (quoting *Bristol-Myers*, 137 S. Ct. at 1786); and (iii) "the exercise of jurisdiction must be reasonable under the circumstances," *id.* (quoting *Bristol-Myers*, 137 S. Ct. at 1786). Where there is no connection between the forum and the underlying controversy, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *See Bristol-Myers*, 137 S. Ct. at 1781 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 931, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011)).

### 2. The Court Lacks Specific Jurisdiction over the Non-New York Named Plaintiffs' Claims

[13] Defendant argues that the Court lacks personal jurisdiction over the claims asserted by any of the Plaintiffs or putative class members not residing in New York. (Def. Br. 19). Neither side claims that the Court has general jurisdiction over Defendant, a company based in New Hampshire. Moreover, Defendant does not contest that this Court can exercise specific jurisdiction over the claims of the New York-based Plaintiffs, which include Michelle Lugones, Tricia Rizzi, Marcus Siezing, Claudia Vassallo, and Anne Flournoy (hereinafter, the "New York Plaintiffs"). The relevant inquiry is whether the Court can exercise specific jurisdiction over the claims brought by Plaintiffs and putative class members who are not based in New York.

The Supreme Court's analysis in *Bristol-Myers* convinces the Court that it cannot exercise specific jurisdiction over the claims brought by the named Plaintiffs who lack ties to New York. In *Bristol-Myers*, a collection of California and non-California residents brought a mass tort claim regarding Plavix, a prescription drug, in California against Bristol-Myers Squibb, a non-California company. *See* 137 S. Ct. at 1777-78. The non-California plaintiffs did not allege that they either obtained Plavix in California or that they were injured by Plavix in California. *See id.* at 1778. The Supreme Court held that, under such circumstances, there could be no specific jurisdiction in California over the non-California plaintiffs' claims, given the lack of any connection between the forum and the claims. *See id.* at 1782.

**\*4** Similarly here, Plaintiffs Denise Alvarado, Minoee Modi, Isabelle Gray, Karine Sewell, and Sonja Romano do not allege any facts that connect their claims to New York. These non-New York Plaintiffs do not claim that they purchased Defendant's eggs in New York or that they were exposed to Defendant's marketing or advertising in New York. The SAC does allege that Defendant "market[s] and sell[s] thousands, if not millions, of eggs throughout New York and Manhattan on a daily basis" (SAC ¶ 13), but that merely shows that Defendant has established a connection to New York, and not that the non-New York Plaintiffs' claims arise out of or relate to that connection. Given the absence of any facts establishing a connection between the non-New York Plaintiffs' claims and the forum, *Bristol-Myers* must control here.

[14] [15] [16] [17] Plaintiffs argue that *Bristol-Myers* does not apply in this case because this is a putative class action in federal court, as opposed to a non-class action in state court. (*See* Pl. Opp. 23). Although there is disagreement as to whether and to what extent *Bristol-Myers* applies in the class action context, *see Bank v. CreditGuard of America*, No. 18 Civ. 1311 (PKC) (RLM), 2019 WL 1316966, at *12 n.11 (E.D.N.Y. Mar. 22, 2019), "[t]he overwhelming majority of federal courts have held that *Bristol-Myers* applies to claims brought by named plaintiffs in class actions," *Sloan v. General Motors LLC*, No. 16 Civ. 7244 (EMC), 2019 WL 6612221, at *9 (N.D. Cal. Dec. 5, 2019). Indeed, even *Suarez v. California Natural Living, Inc.*, on which Plaintiffs rely (*see* Pl. Opp. 23), notes that "[s]pecific jurisdiction in a class action arises from the named plaintiff's causes of action." No. 17 Civ. 9847 (VB), 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019) (emphasis in original). Plaintiffs have cited to no case, and certainly no case in the Second Circuit, that holds that *Bristol-Myers* does not apply to named plaintiffs' claims in a class action. The Court agrees with the weight of authority that *Bristol-Myers* controls, and dismisses the non-New York named Plaintiffs' claims. [3]

---

[3]     Plaintiffs argue that if the Court finds that it lacks personal jurisdiction over the non-New York named Plaintiffs, the Court should permit Plaintiffs to engage in jurisdictional discovery. (Pl. Opp. 24). "[W]hether to grant jurisdictional discovery when plaintiffs fail to make a *prima facie* showing of personal jurisdiction is within the court's discretion." *Williams v. Summit Marine, Inc.*, No. 18 Civ. 0216 (GLS) (ATB), 2019 WL 4142635, at *6 (N.D.N.Y. Aug. 30, 2019) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255

(2d Cir. 2007)). Indeed, a federal court may "order limited discovery to establish personal jurisdiction so long as plaintiff has made a threshold showing of jurisdiction and established that his jurisdictional position is not frivolous." *Newbro v. Freed*, No. 03 Civ. 10308 (PKC), 2004 WL 691392, at *3 (S.D.N.Y. Mar. 31, 2004). However, Plaintiffs here have made no threshold showing upon which the Court would be warranted in granting jurisdictional discovery. All that Plaintiffs point to is that Defendant has generally contracted with a New York-based advertising agency for its marketing. (*See* Pl. Opp. 24). But as the Supreme Court has made clear, "a defendant's relationship with a ... third party, standing alone, is an insufficient basis for jurisdiction." *See Walden v. Fiore*, 571 U.S. 277, 286, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). Plaintiffs' request for jurisdictional discovery is denied.

Additionally, Defendant asked, in the alternative to its Rule 12(b)(2) motion, that the Court transfer this action to the District of New Hampshire. (*See* Def. Br. 26). As the Court has dismissed the non-New York named Plaintiffs, the Court will not consider the alternative motion to transfer.

With that said, the Court will not at this stage in the litigation dismiss the claims of *potential* class members who may not reside in New York. At this point, any claims brought by the putative class are hypothetical, and the Court has no knowledge of who will be asserting such claims or what the bases for specific jurisdiction might be. The Court concludes that it is wiser to follow the course of its sister courts and defer any assessment of whether there is specific jurisdiction over the claims of putative non-New York class members until the class certification stage. *See Suarez*, 2019 WL 1046662, at *6 (finding that "the Court need not assess personal jurisdiction over plaintiff's putative out-of-state class action claims unless and until the Court decides a class comprising out-of-state class members merits classification"); *Gonzalez v. Costco Wholesale Corp.*, No. 16 Civ. 2590 (NGG) (JO), 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018) (deferring resolution of issue regarding out-of-state class members to class certification stage). Therefore, Defendant's motion to dismiss the claims of putative non-New York class members is denied without prejudice to renewal at the class certification stage.

## B. The Court Dismisses Plaintiffs' Claims for Injunctive Relief

### 1. Motions Under Rule 12(b)(1) [4]

[4]  Given that the personal jurisdiction issue was straightforward and presented no complex question of state law, this Court does not abuse its discretion by addressing that jurisdictional issue before addressing its subject matter jurisdiction over Plaintiffs' claims for injunctive relief. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

**\*5**  Defendant argues further that Plaintiffs [5] lack standing to seek injunctive relief. (Def. Br. 18-19). Although standing challenges have been brought under Rule 12(b)(6), "the proper procedural route is under Rule 12(b)(1)." *See All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). Therefore, the Court will analyze Defendant's argument as if it were made in a motion pursuant to Rule 12(b)(1).

[5]  From this point forward, "Plaintiffs" refers solely to the remaining New York Plaintiffs. Given the dismissal of the non-New York named Plaintiffs, only the New York Plaintiffs' claims remain relevant. *See Chufen Chen v. Dunkin' Brands, Inc.*, No. 17 Civ. 3808 (CBA) (RER), 2018 WL 9346682, at *8 (E.D.N.Y. Sept. 17, 2018) (finding that the court lacks jurisdiction over the state-law claims of unnamed putative class members where the corresponding named plaintiffs' claims have been dismissed). Specifically, the New York Plaintiffs have alleged violations of N.Y. Gen. Bus. Law §§ 349-50, as well as New York state-law claims sounding in fraud, fraudulent misrepresentation, and breach of express warranty.

[18]  Rule 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

[19]  [20]  [21]  [22]  The Second Circuit has identified two types of Rule 12(b)(1) motions: facial and fact-based. *See*

*Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[ ] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). And to make that determination, a court must accept the complaint's allegations as true "and draw[ ] all reasonable inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

[23]   [24]   [25]  "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc. v. Rep. of Peru*, 719 F. App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction"). "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotations omitted). If a defendant supports his fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic evidence," a "district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction." *Carter*, 822 F.3d at 57.

## 2. Plaintiffs Lack Standing to Pursue Injunctive Relief

*6   [26]   [27]   [28]  Federal courts are courts of limited jurisdiction, "and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 616 (2d Cir. 2019). Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' " thereby "restrict[ing] the authority of federal courts to resolving 'the legal rights of litigants in actual controversies.' " *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013) (internal quotation marks omitted)

(quoting *Valley Forge Christian College v. Americans for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). The "Cases and Controversies" requirement places the burden on "those who invoke the power of a federal court to demonstrate standing — a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013).

[29]   [30]   [31]   [32]  In order to satisfy the first prong of standing — that the plaintiff has suffered an "injury in fact" — the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Moreover, "[t]o establish standing to obtain prospective relief, a plaintiff 'must show a likelihood that he will be injured in the future.' " *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). Either there must be a "substantial risk" that the future injury will occur, or the threatened injury must be "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). " '[A]llegations of *possible* future injury' are not sufficient," *Amnesty Int'l*, 568 U.S. at 409, 133 S.Ct. 1138, nor is "past exposure to illegal conduct," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (internal brackets omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

[33]  Defendant argues that Plaintiffs cannot show that they are likely to suffer any future injury because they have alleged that they do not intend to purchase Nellie's Free Range Eggs unless Defendant changes its practices to mirror its advertising. (*See* Def. Br. 18-19; SAC ¶¶ 16-18, 24). Plaintiffs contend that this misstates the law, and point to *Petrosino v. Stearn's Prod., Inc.*, No. 16 Civ. 7735 (NSR), 2018 WL 1614349 (S.D.N.Y. Mar. 30, 2018), for support. (Pl. Opp. 22). It is indeed the case that the *Petrosino* court found that "a Plaintiff certainly has standing when they ... assert that they will purchase a product in the future if the ingredients are changed so that the product is not mislabeled." 2018 WL 1614349, at *5. However, a more thorough survey of authority in the Second Circuit suggests that *Petrosino* is an outlier in the Circuit's jurisprudence.

*See, e.g., Holve v. McCormick & Co., Inc.,* 334 F. Supp. 3d 535, 553 n.10 (W.D.N.Y. 2018) (collecting cases finding that conditional promises to purchase product if product is altered are insufficient to allege future injury). Indeed, the Second Circuit has held that where a plaintiff has failed to allege that he intends to use the offending product in the future, there is no likelihood of future harm. *See Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 239 (2d Cir. 2016). Plaintiffs have failed to allege any actual intent to purchase Nellie's Free Range Eggs again, and therefore they have not established a likelihood of future injury sufficient to show standing. Plaintiffs' claims for injunctive relief are dismissed. [6]

[6]     "Moreover, because Plaintiffs do not individually have standing to seek injunctive relief, they do not have standing to seek injunctive relief on behalf of a putative ... class." *O'Neill v. Standard Homeopathic Co.,* 346 F. Supp. 3d 511, 527 (S.D.N.Y. 2018) (internal quotation marks and brackets omitted) (quoting *Buonasera v. Honest Co., Inc.,* 208 F. Supp. 3d 555, 565 (S.D.N.Y. 2016)).

## C. The Court Grants in Part Defendant's Rule 12(b)(6) Motion

### 1. Motions to Dismiss Under Rule 12(b)(6)

**\*7** Having dismissed the non-New York named Plaintiffs' claims for lack of personal jurisdiction and the claims seeking injunctive relief for lack of standing, the Court now turns to whether the remaining Plaintiffs have stated a claim upon which relief can be granted. When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955)).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Plaintiffs Have Stated Claims Under GBL Sections 349 and 350

[34]    Plaintiffs have brought consumer protection claims under GBL §§ 349 and 350. (SAC §§ 128-41). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349," *Goshen v. Mutual Life Insurance Co. of New York,* 98 N.Y.2d 314, 324 n.1, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002), and therefore the Court will merge its analysis of the two claims. In order to plead a sufficient claim under either § 349 or § 350, "a plaintiff must allege that the defendant [i] engaged in consumer-oriented conduct; [ii] that the conduct was materially misleading; and [iii] that the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Weisblum v. Prophase Labs. Inc.,* 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015). Plaintiffs are not required to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) for their claims. *See Daniel v. Mondelez Int'l, Inc.,* 287 F. Supp. 3d 177, 186 (E.D.N.Y. 2018).

[35]    Defendant primarily argues that Plaintiffs have failed to plead that Defendant's conduct was materially misleading. (*See* Def. Br. 6, 11-12). Although Defendant challenges the materiality of virtually all statements that appear on its containers (*see id.* at 6-11), the universe of relevant alleged misrepresentations is considerably smaller. In order to plead a § 349 or § 350 claim successfully, Plaintiffs must allege that they saw the misleading statements of which they complain before they purchased or came into possession of Defendant's eggs. *See Tyman v. Pfizer, Inc.,* No. 16 Civ. 6941 (LTS) (BCM), 2017 WL 6988936, at \*24 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted,* No. 16 Civ. 6941 (LTS) (BCM), 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014). [7] Thus, Plaintiffs' claims can only be based on alleged statements and images that Plaintiffs claim to have viewed before they purchased the eggs. These include statements such as: "WE LOVE OUR

HENS, YOU'LL LOVE OUR EGGS"; "WE LOVE OUR HENS"; "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU"; "OUTDOOR FORAGE"; and images of young children playing with hens in green, open fields. (SAC ¶¶ 16-18, 24, 46). Plaintiffs' also allege that they relied on the following paragraph, which was printed on the container, prior to purchasing Defendant's eggs:

> **\*8 Most hens don't have it as good as Nellie's.** 9 out of 10 hens in the U.S. are kept in tiny cages at giant egg factories housing millions of birds. Sadly, even "cage-free" is now being used to describe hens that are crowded into large, stacked cages on factory farms, who never see the sun. Nellie's small family farms are all Certified Humane Free-Range. Our hens can peck, perch, and play on plenty of green grass.

(*Id.* at ¶ 46). Importantly, this also means that the alleged representations that Plaintiffs do not claim to have seen before purchasing the eggs are non-actionable. Plaintiffs allege that they checked Defendant's website, but they do not allege that they viewed it prior to purchasing Nellie's Free Range Eggs. (*See id.* at ¶ 16). Plaintiffs cannot show either that they relied on Defendant's website prior to purchasing the eggs or that the various statements on Defendant's website caused their injury, and therefore the only relevant alleged misrepresentations are those that were presented on the containers.

7    Section 350 requires a plaintiff to plead that they relied on a defendant's statements at the time of purchase, *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 288 (E.D.N.Y. 2009), but § 349 does not require reliance, *see Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015). Section 349 does, however, require that a plaintiff plead causation, *see Belfiore*, 94 F. Supp. 3d at 446, and thus the pleading requirements end up being much the same, *see Tyman v. Pfizer, Inc.*, No. 16 Civ. 6941 (LTS) (BCM), 2017 WL 6988936, at *24 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, No. 16 Civ. 6941

(LTS) (BCM), 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018).

**[36]** **[37]** **[38]** Much of the conduct that Plaintiffs allege to be materially misleading is non-actionable. "To establish that conduct is materially misleading, a plaintiff must demonstrate that a reasonable consumer would likely be misled by the alleged misrepresentation." *Sitt v. Nature's Bounty, Inc.*, No. 15 Civ. 4199 (MKB), 2016 WL 5372794, at *8 (E.D.N.Y. Sept. 26, 2016). "Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Delgado v. Ocwen Loan Servicing, LLC*, No. 13 Civ. 4427 (NGG) (RLM), 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014)). "The entire mosaic is viewed rather than each tile separately." *Id.* (internal quotation marks omitted) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06 Civ. 14245 (LTS) (MHD), 2007 WL 1138879, at *4 (S.D.N.Y. Apr. 16, 2007)).

**[39]** **[40]** **[41]** **[42]** The "reasonable consumer" inquiry is typically a question of fact, *see Sitt*, 2016 WL 5372794, at *8 (quoting *Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 295 (S.D.N.Y. 2015)), and thus best decided at a later stage in the proceeding. But "[s]tatements and practices that are mere puffery are not actionable," *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011), and "[c]ourts can determine that a statement is puffery as a matter of law," *Kommer v. Ford Motor Co.*, No. 17 Civ. 296 (LEK) (DJS), 2017 WL 3251598, at *3 (N.D.N.Y. July 28, 2017) (citing *Leonard v. Abbott Labs., Inc.*, No. 10 Civ. 4676 (ADS) (WDW), 2012 WL 764199, at *21 (E.D.N.Y. Mar. 5, 2012)). "Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely." *Id.* It can also include "an exaggeration or overstatement expressed in broad, vague, and commendatory language, as distinguished from misdescriptions or false representations of specific characteristics of a product." *Id.* (internal brackets omitted) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)).

**\*9** Defendant's advertising, "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS," or more simply, "WE LOVE OUR HENS," or even that "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU" are paradigmatic examples of puffery. Such statements "do not provide any concrete representations," *Fink*, 810 F. Supp. 2d at 644, but are instead "subjective claims about products, which

cannot be proven either true or false," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (internal brackets omitted) (citing *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)). Indeed, "[s]uch sales talk ... is considered to be offered and understood as an expression of the seller's opinion only.... The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific." *Id.* (quoting *Pennzoil Co.*, 987 F.2d at 945). Insofar as Plaintiffs interpreted such statements to mean that Defendant's hens were free "from chick culling, beak-cutting, calcium depletion[,] and sale to commercial slaughterhouses and live markets" (SAC ¶¶ 16-18, 24), such an interpretation was unreasonable. *See Kommer*, 2017 WL 3251598, at *3 (finding statement that car was "Built Ford-Tough" was puffery where plaintiff interpreted statement to mean that the car's door handles would work in below-freezing temperatures). Plaintiffs cannot make out cognizable claims under GBL §§ 349 and 350 based on such statements.

**[43]** Plaintiffs have, however, alleged a viable claim in regards to Defendant's statement that "[m]ost hens don't have it as good as Nellie's.... Our hens can peck, perch, and play on plenty of green grass." (*See* SAC ¶¶ 16-18, 24). Unlike Defendant's other statements, which make vague claims about love, this statement makes a factual claim — namely, that Defendant's hens have better lives than other hens because they have more access to the outdoors — upon which a reasonable consumer could rely. This statement is only reinforced by references to "OUTDOOR FORAGE" and images of hens frolicking in elysian pastures. (*See id.* at ¶ 46). In contrast to the cases on which Defendant relies, such as *Pizza Hut, Inc. v. Papa John's International, Inc.*, 227 F.3d 489 (5th Cir. 2000), and *Cablevision Systems Corp. v. Verizon New York, Inc.*, 119 F. Supp. 3d 39 (E.D.N.Y. 2015) (*see* Def. Br. 8), Defendant's statement provides enough specificity to elevate itself beyond puffery and into potential materiality, *see Cablevision*, 119 F. Supp. 3d at 53 (finding that a claim that Cablevision's data network was "better" than Verizon's was puffery when it lacked "more specificity").

Defendant argues that even if these statements are not puffery, they are still not materially misleading to a reasonable consumer. (*See* Def. Br. 11). As Defendant notes (*see id.* at 12), "plaintiffs must do more than plausibly allege that a 'label might conceivably be misunderstood by some few consumers.' " *Jessani v. Monini N. Am., Inc.*, 744 F. App'x 18, 19 (2d Cir. 2018) (summary order) (quoting *Ebner v. Fresh Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). Instead, "Plaintiffs must plausibly allege 'that a significant portion of the general

consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.' " *Id.*

There is significant authority supporting the idea that it is inappropriate for a court to decide whether a reasonable consumer could be misled at the Rule 12(b)(6) stage, *see, e.g.*, *Kacocha v. Nestle Purina Petcare Co.*, No. 15 Civ. 5489 (KMK), 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) (collecting cases), and the Court finds that authority persuasive here. In *Kacocha*, the court declined to find as a matter of law that a reasonable consumer would not be misled about the amount of bacon in the defendant's Beggin' Strips Original Bacon Flavor dog food due to the defendant's repeated references to bacon on the product's packaging and in its television commercials. *See* 2016 WL 4367991, at *15. Similarly, this Court cannot conclude as a matter of law that a significant portion of the general consuming public would not read Defendant's claims about its hens having plenty of green space to peck, perch, and play in — together with its verdant images and slogans of "OUTDOOR FORAGE" — and not believe that Defendant's hens have significant access to the outdoors. Plaintiffs have alleged that they believed this advertising to mean that Defendant's hens had "space to move around both indoors and outdoors" (SAC ¶¶ 16-18, 24), and that this portrait of a free range lifestyle is far from the cramped reality alleged in the SAC (*see id.* at ¶¶ 85-98). These allegations are all that is needed for Plaintiffs' § 349 and § 350 claims to survive a motion to dismiss.

### 3. Plaintiffs Have Stated Claims for Fraud and Fraudulent Misrepresentation

**\*10** **[44]** Plaintiffs have also brought common-law claims for fraud and fraudulent misrepresentation. (SAC ¶¶ 189-202). As this Court sits in diversity and the only remaining Plaintiffs are New York residents that allege conduct transpiring in New York, the Court applies New York's substantive law in analyzing Plaintiffs' common-law claims. *See Pal v. Sinclair*, 90 F. Supp. 2d 393, 397 (S.D.N.Y. 2000) (citing *Holm v. Shilensky*, 388 F.2d 54, 56 n.2 (2d Cir. 1968)). As a preliminary matter, the Court notes that under New York law, fraud and fraudulent misrepresentation claims are identical. *See Sprint Sols., Inc. v. Sam*, 206 F. Supp. 3d 755, 764 (E.D.N.Y. 2016). In order to establish either or both claims, Plaintiffs must allege: "[i] Defendant made a material false representation; [ii] Defendant intended to defraud Plaintiffs thereby; [iii] Plaintiffs reasonably relied on the representation; and [iv] Plaintiffs suffered damage as a result of such reliance." *Id.*

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 274 of 520
PageID: 9195
Lugones v. Pete and Gerry's Organic, LLC, --- F.Supp.3d ---- (2020)
2020 1 4 WL7627, 707 8 3 3  UCR ep C. S2r  vd7

Defendant begins by arguing that Plaintiffs have not alleged any material false representations. (*See* Def. Br. 15). As already determined above, while Defendant's statements regarding "love" and "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU" are non-actionable puffery, *see EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 276 (S.D.N.Y. 2004) (explaining that puffery does not amount to actionable misrepresentation in fraud claims), its statements and images concerning its hens' access to the outdoors are adequately alleged to be material and false. Defendant therefore cannot challenge these claims of misrepresentations as satisfying the first element of Plaintiffs' fraud claim.

[45]  [46]  [47] However, Defendant argues in the alternative that Plaintiffs have failed to plead that they "reasonably relied on the representation." (*See* Def. Br. 15). "[A]lthough reasonable reliance is often a 'fact-intensive' question, it 'is a condition which cannot be met where ... a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means.' " *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 166 (S.D.N.Y. 2014) (internal citation omitted) (quoting first *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 155, 905 N.Y.S.2d 118, 931 N.E.2d 87 (2010), and then quoting *Arfa v. Zamir*, 76 A.D.3d 56, 905 N.Y.S.2d 77, 79 (1st Dep't 2010)). "[A] plaintiff 'must show minimal diligence or care that negates its own recklessness,' " *id.* (internal quotation marks and brackets omitted) (quoting *Amusement Indus. Inc. v. Buchanan Ingersoll & Rooney, P.C.*, No. 11 Civ. 4416 (LAK), 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013)), unless "matters are held to be peculiarly within defendant's knowledge" and "the plaintiff would have 'no independent means of ascertaining the truth,' " *see id.* (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)).

Defendant seems to understand the "reasonable reliance" element to mean that Plaintiffs' interpretation of the alleged misrepresentations must have been reasonable. (*See* Def. Br. 16). But Defendant misperceives the law. As made clear above, the "reasonable reliance" element is focused on whether it was foolish or not for the plaintiff to believe the defendant's fraudulent statement. *See Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26 (2d Cir. 1997) ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused."). As an illustrative example, the plaintiffs in *Ward*

alleged that they purchased resume rewriting services based on "expert resume critiques" that the plaintiffs mistook to be bona fide critiques, as opposed to comments designed to induce purchasing the defendant's product. *See* 3 F. Supp. 3d at 165. The court found that there was no reasonable reliance because the resume critiques "were followed immediately in the same document by advertisements, which made it abundantly clear that, in offering the critiques, the defendant was attempting to sell its resume writing services." *See id.* at 166. There could be no reasonable reliance when plaintiffs were so on notice as to the defendant's misrepresentation. *See id.*

**\*11** Within this proper framing, it is clear that Plaintiffs have sufficiently alleged reasonable reliance. Unlike in *Ward*, Defendant's containers gave Plaintiffs no reason to be on alert as to potential misrepresentations. Moreover, Plaintiffs would have had no independent means of ascertaining the truth of Defendant's misrepresentations — short of driving themselves to Defendant's facilities and sleuthing about the grounds for the truth. Such an effort would go far beyond the "minimal diligence" required. *See id.* Therefore, on the basis of the same representations found actionable in their GBL §§ 349 and 350 claims, Plaintiffs have successfully alleged fraud and fraudulent misrepresentation under New York law.

### 4. Plaintiffs Have Failed to State a Breach of Express Warranty Claim

[48]  [49]  [50] Plaintiffs' final claim alleges that Defendant breached its express warranty by implying that its chickens are "loved, happy, healthy, and [live] low-stress lives on small farms in which they can freely roam," when in fact these affirmations are false. (SAC ¶¶ 204-05). "New York breach of express warranty claims require [i] a *material statement* amounting to a warranty; (ii) the buyer's *reliance* on this warranty as a basis for the contract with his immediate seller; (iii) the *breach* of this warranty; and (iv) injury to the buyer *caused* by the breach." *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 235 (E.D.N.Y. 2015) (quoting *Avola v. Louisiana-Pacific Corp.*, 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013)). However, in order to assert a breach of express warranty claim under New York law, "a buyer must provide the seller with timely notice of the alleged breach of warranty." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) (citing N.Y. U.C.C. § 2-607(3)(a)).

Defendant argues that Plaintiffs have not alleged that they provided any notice to Defendant, much less timely notice, and therefore dismissal is required. (*See* Def. Br. 18).

Plaintiffs respond to this potentially dispositive argument by claiming that the Complaint they filed in this action qualifies as sufficient notice. (*See* Pl. Opp. 21). For support, Plaintiffs cite to a single case, *Panda Capital Corp. v. Kopo Int'l, Inc.,* 242 A.D.2d 690, 662 N.Y.S.2d 584 (2d Dep't 1997). (*See id.*). [8] Insofar as Plaintiffs believe that *Panda Capital* stands for a broad rule that a filed complaint qualifies as sufficient and timely notice, Plaintiffs are mistaken. All that the *Panda Capital* court found was that where the plaintiff had both filed a complaint and an amended complaint and "had repeatedly made its objections to Kopo's pattern of deficient performance known ... it [was] at the very least an issue of fact as to whether reasonably timely notice of breach was given." *See* 662 N.Y.S.2d at 586-87. The Court does not believe that such an equivocal statement amounts to a binding rule that Plaintiffs' filed complaint, regardless of its temporal distance from the alleged breach of the warranty, satisfies N.Y. U.C.C. § 2-607(3)(a).

[8]   Plaintiffs also cite to *In re Hydroxycut Mktg. & Sales Practices Litig.*, 801 F. Supp. 2d 993 (S.D. Cal. 2011) (*see* Pl. Opp. 21), but that case is from outside New York and outside this Circuit and therefore has little persuasive authority in its analysis of New York law.

This belief is supported by the Court's inability to locate any authority, from either a New York State court or from within this Circuit, that relies on *Panda Capital* for such a broad rule. Indeed, *Mid Island LP v. Hess Corp.*, 983 N.Y.S.2d 204 (Table), 2013 WL 6421281 (Sup. Ct. Dec. 2, 2013), a New York state court case that cites to *Panda Capital, see id.* at *4, makes clear that "timely notice is a condition *precedent* to bringing an action for breach of warranty," *id.* (emphasis added). Lacking any more persuasive authority, the Court follows the lead of its sister courts and finds that Plaintiffs must allege some form of timely, pre-litigation notice. *See, e.g., Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 144 (E.D.N.Y. 2018) (finding that plaintiff failed to state a breach of warranty claim where the complaint made "no allegations and state[d] no facts showing that notice was provided to defendant"); *Singleton v. Fifth Generation, Inc.*, No. 15 Civ. 0474 (BKS) (TWD), 2016 WL 406295, at *12 (N.D.N.Y. Jan. 12, 2016) (same); *Quinn*, 958 F. Supp. 2d at 544 (same).

*12   Plaintiffs also contend that "notice is not required when a plaintiff is a retail customer of a product 'for human consumption, particularly those that are edible.' " (Pl. Opp.

21). However, even the case to which Plaintiffs cite notes that this exception to the notice requirement only seems to apply in circumstances where "a breach of a contract claim amounted to a tort claim in which the plaintiff suffered some personal injury." *See Tomasino v. Estee Lauder Cos., Inc.*, No. 13 Civ. 3692 (ERK) (RML), 2015 WL 4715017, at *4 (E.D.N.Y. Aug. 7, 2015). The *Colella* court similarly noted that this "exception appears to be exclusively applied where a party alleges physical, in addition to economic, injury." 348 F. Supp. 3d at 144. The Court agrees with its sister courts' analysis of the New York cases regarding this exception, and finds that it is inapplicable where, as here, Plaintiffs have not alleged any physical or personal injury as a result of Defendant's alleged breach. Plaintiffs' breach of express warranty claim must be dismissed for failure to provide timely notice.

In sum, the Court finds that Plaintiffs have stated claims for fraud and fraudulent misrepresentation and claims pursuant to GBL §§ 349 and 350 on the basis of Defendant's statements on its containers regarding its hens' access to the outdoors, and therefore denies Defendant's motion to dismiss as to those specific claims. However, the Court grants Defendant's motion to dismiss insofar as it relates to any representations made on Defendant's website, or to representations on its egg container involving love, or to the statement "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU," and grants Defendant's motion to dismiss as to the entirety of Plaintiffs' breach of express warranty claim. The Court likewise dismisses Plaintiffs' claims for injunctive relief for failure to allege standing, and dismisses the non-New York named Plaintiffs' claims for lack of personal jurisdiction. The Court denies Defendant's motion to dismiss for lack of personal jurisdiction insofar as it relates to non-New York putative class members.

## CONCLUSION

For the reasons set forth in this Opinion, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

Defendant Nellie's Free Range Eggs is dismissed from the case.

Defendant Pete and Gerry's Organic, LLC's motion is GRANTED with respect to all claims brought on behalf of the non-New York named Plaintiffs, and to Plaintiffs' claims for injunctive relief. Defendant's motion is further

GRANTED with respect to Plaintiffs' breach of express warranty claim and with respect to Plaintiffs' fraud, fraudulent misrepresentation, and GBL §§ 349 and 350 claims that rely on statements identified as non-actionable puffery in this Opinion.

Defendant's motion is DENIED with respect to claims that may be brought on behalf of non-New York putative class members at a later stage in this litigation. Defendant's motion is further DENIED with respect to the Plaintiff's fraud, fraudulent misrepresentation and GBL §§ 349 and 350 claims that rely on statements identified as actionable in this Opinion.

The Clerk of Court is directed to terminate the motion at docket entry 30. The Clerk of Court is further directed to dismiss Denise Alvarado, Minoee Modi, Isabelle Gray, Karine Sewell, and Sonja Romano as Plaintiffs in this action.

On or before **March 13, 2020**, Defendant shall file a responsive pleading.

On or before **March 23, 2020**, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2020 WL 871521, 101 UCC Rep.Serv.2d 341

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 32

2015 WL 630259
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

MERCANTILE BANK OF MICHIGAN, Plaintiff/
Counter–Defendant/Appellee/Cross–Appellant,
v.
CLMIA, LLC, Defendant/Third–Party Plaintiff/
Cross–Defendant/Appellant/Cross–Appellee,
and
Daniel B. Longman, Defendant/Third–
Party Plaintiff/Appellant/Cross–Appellee,
and
CLIA, Inc., Defendant,
and
Wells Fargo Bank, N.A., De fendant/
Counter-Plaintiff/Cross-Plaintiff/Appellee,
and
Wells Fargo Advisors, LLC, William Ockerlund, and
Michael Driver, Third–Party Defendants/Appellees,
and
Wachovia Bank and Wachovia Securities,
LLC, Third–Party Defendants.

Docket No. 316777.
|
Feb. 12, 2015.

Kent Circuit Court; LC No. 09–001639–CZ.

Before: BORRELLO, P.J., and SERVITTO and SHAPIRO,
JJ.

Opinion

PER CURIAM.

**\*1** CLMIA, LLC and Daniel B. Longman appeal as of right
the trial court's orders granting summary disposition in favor
of Wells Fargo Advisors, William Ockerlund, and Michael
Driver on CLMIA's third-party claims against them, denying
CLMIA's motion to dismiss Wells Fargo Bank's breach of
contract claim against it, and granting summary disposition in
favor of Mercantile Bank and against CLMIA and Longman

for breach of contract. Mercantile Bank cross-appeals as of
right from the trial court's order granting CLMIA's motion for
summary disposition in its favor as to Mercantile's equitable
claims against CLMIA. We affirm.

In 2006, Daniel Longman, owner of CLMIA, LLC (a marine
insurance agency) met William Ockerlund ("Ockerlund") and
Michael Driver ("Driver"), stockbrokers who were employed
by Wells Fargo Advisors, LLC (f/k/a Wachovia Securities,
LLC) and they advised and assisted him in obtaining
financing to purchase a marina in Florida. Longman obtained
the financing through the purchase of variable rate bond
securities in the amount of $6,150,000. In November 2006,
the bond sale took place with Mercantile Bank of Michigan
("Mercantile") providing a letter of credit in support of
the bonds and Longman signing a personal guarantee to
Mercantile.

Approximately one month after the sale of the variable
rate bonds, Driver recommended that CLMIA enter into an
interest rate swap agreement as a purported way to "fix" the
interest rate on the bonds. Acting upon this advice, CLMIA
executed a Master Swap Agreement with Wachovia Bank
(later known as Wells Fargo Bank and which shall hereafter
be referred to as "Wells Fargo") in December 2006. Under
the Master Swap Agreement, Mercantile was to act as a
credit support provider (defined in the swap agreement as
"each party to a Credit Support Document that provides or
is obligated to provide security, a guaranty or other credit
support for [CLMIA's] obligations under this Agreement,
including, without limitation, Mercantile Bank of Michigan")
for CLMIA in any swap transactions entered into by Wells
Fargo and CLMIA pursuant to the agreements. At the same
time, and unbeknownst to CLMIA, Mercantile also executed
a "Master Swap Participation Agreement" with Wells Fargo
obligating it to pay Wells Fargo any amounts that CLMIA
became required to pay under the swap transactions but failed
to pay.

Wells Fargo and CLMIA immediately entered into a swap
transaction under the terms of the Master Swap Agreement
and from December 2006 to June 2007 the swap transaction
resulted in monthly payments of approximately $1,000 from
Wells Fargo to CLMIA. The swap transaction was terminated
around June 2007, and CLMIA received a termination fee,
as required under the Master Swap Agreement, from Wells
Fargo. Driver then recommended that CLMIA enter into
another swap transaction with Wells Fargo in August of
2007 and CLMIA agreed. This transaction was not profitable

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 279 of 520
PageID: 9200
Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
2015 WL 1893502...

to CLMIA and resulted in CLMIA paying significant monthly amounts to Wells Fargo. In the spring of 2008, CLMIA indicated to Driver that it wanted to terminate the swap transaction and was advised that it could not do so without paying a significant termination fee to Wells Fargo. According to CLMIA, it still wanted to terminate the swap transaction and advised Driver of the same. In November 2008, Longman advised Wells Fargo that it would no longer be making the monthly swap transaction payments owed. Rather than terminate the contract, or accept CLMIA's termination, however, Wells Fargo accepted the monthly payments from Mercantile that CLMIA failed to make.

**\*2** Mercantile thereafter initiated this action against CLMIA and Longman seeking repayment of the monies it had paid to Wells Fargo under its Master Swap Participation Agreement on theories of subrogation, reimbursement, exoneration rights as guarantor and subrogee, and breach of guaranty. Mercantile further sought enforcement of its indemnification rights against CLMIA, and pursued claims of unjust enrichment and implied contract and sought a declaration that Mercantile is entitled to be subrogated to Wells Fargo's current and potential right to future payments.

On CLMIA and Longman's motion, the trial court granted summary disposition in favor of CLMIA with respect to the equitable relief sought in Mercantile's complaint (equitable subrogation, equitable indemnification, unjust enrichment, and implied contract) and further granted summary disposition in favor of Longman, but allowed Mercantile to amend its complaint. In its amended complaint, Mercantile claimed breach of contract, and sought declaratory relief regarding the breach of contract and the guaranty obligations of Longman.

CLMIA filed a third-party complaint against Wells Fargo, Wells Fargo Securities, LLC, Ockerlund, and Driver alleging fraud, fraudulent inducement, negligent misrepresentation, negligence per se, and breach of fiduciary duty. Wells Fargo filed a counter-complaint against Mercantile and a cross-claim against CLMIA. In its counter-complaint, Wells Fargo asserted that CLMIA did not make payments as it was supposed to under the Master Swap Agreement and swap transaction and that Wells Fargo terminated the agreement on August 24, 2010. Wells Fargo claimed that according to the participation agreement, Mercantile is obligated to pay CLMIA's termination amount to Wells Fargo, which is $624,656.46 and that it did not pay the same, thus breaching its contract with Wells Fargo. In its cross-claim against

CLMIA, Wells Fargo asserted that CLMIA's failure to pay the termination amount set forth in the Master Swap Agreement amounts to a breach of contract.

The trial court ultimately dismissed all of CLMIA's third-party claims against Wells Fargo, Wells Fargo Securities, LLC, Ockerlund, and Driver. The trial court further determined that the Master Swap Agreement was valid and enforceable, that an "event of default" under the definition set forth in Master Swap Agreement was CLMIA's nonpayment of the August 2010 monthly payment due under the relevant swap transaction and that August 24, 2010, was the early termination date of the Master Swap Agreement. The trial court also declared that when CLMIA and Longman failed to tender the amounts due after notified by Wells Fargo, Mercantile became obligated to pay the same. Upon payment by Mercantile of the swap liabilities, Wells Fargo would be obligated to assign to Mercantile all of its rights under the swap agreement. The trial court gave the parties 30 days upon which to agree to the actual amount of the swap liabilities owed.

**\*3** After extensive briefing concerning the swap transaction early termination fee calculation, the trial court entered an order setting forth the termination fee under the master swap agreement as $624,656.46 plus interest of $11,724.73 and ordering CLMIA to pay Wells Fargo the same. Under the order, if CLMIA did not pay the amount ordered, Mercantile was to pay the fees and Wells Fargo was to assign all of its rights under the swap to Mercantile. Mercantile was thereafter substituted for Wells Fargo given that Wells Fargo had assigned its rights under the Master Swap Agreement to it and Longman had executed an amended and restated guaranty in favor of Mercantile. The trial court thereafter entered a judgment in favor of Mercantile and against CLMIA and Longman, jointly and severally, in the amount of $624,656.46 plus $11,724.73 interest.

### CLMIA and Longman's Appeal

On appeal, CLMIA first argues that the trial court erred in granting summary disposition in favor of Ockerlund and Driver on CLMIA's third-party claims of fraud against them. We disagree.

We review de novo a trial court's decision on a motion for summary disposition. *Dressel v. Ameribank,* 468 Mich. 557, 561; 664 NW2d 151 (2003). A motion under MCR 2.116(C)

Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
2015 WL 8 9502W©

(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings alone. *Patterson v. Kleiman,* 447 Mich. 429, 432; 526 NW2d 879 (1994). All well-pleaded factual allegations are taken as true, as well as any reasonable inferences or conclusions that can be drawn from the allegations. *Peters v. Dep't of Corrections,* 215 Mich.App 485, 486; 546 NW2d 668 (1996). The motion should be granted only if the claims are so clearly unenforceable as a matter of law that no factual development could justify recovery. *Id.*

Pursuant to MCR 2.112(B)(1), "[i]n allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity." "Michigan's contract law recognizes several interrelated but distinct common-law doctrines—loosely aggregated under the rubric of 'fraud'—that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation." *Titan Ins. Co. v. Hyten,* 491 Mich. 555; 817 NW2d 562 (2012). These include, among others, fraudulent misrepresentation (actionable fraud), innocent misrepresentation, and silent fraud, all of which contain separate elements. *Id.* at 557. As a general rule, actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. *M & D, Inc. v. W.B. McConkey,* 231 Mich.App 22, 27; 585 NW2d 33 (1998). Further, an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact; future promises are contractual in nature and do not constitute actionable fraud. *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App 543, 554; 487 NW2d 499 (1992); *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336; 247 NW2d 813 (1976).

**\*4** In its third-party complaint, CLMIA asserted that "[a]fter Longman, on behalf of Charter lakes, executed the Master Swap Agreement and Schedule of Master Swap Agreement, Driver [and Ockerlund] made material representations to Longman regarding the referenced Swap Agreement. Driver [and Ockerlund] made these misrepresentations to Longman and Charter Lakes with knowledge that said representations were false, or were made with reckless disregard of the truthfulness of the statements." CLMIA further alleged that the representations "which are specified in the factual

circumstances pled above" were, in fact, false, and that Longman and CLMIA acted in reliance on the representations and were harmed as a result. The complaint contained a "factual allegations" sections indicating that Ockerlund and Driver acted as financial advisors to CLMIA. According to the complaint, Driver faxed Longman two pages of a Master Swap Agreement with Wells Fargo to sign and he did so, without receiving the remaining pages of the agreement until 18 months later. CLMIA alleged in the complaint that it entered into the Swap Agreement based solely on the advice of Driver and Ockerlund and on their representations that CLMIA would likely benefit from the agreement, that its risk of financial exposure was minimal, that it would only have to pay sums to the bank if CLMIA effected an early termination under the agreement, and that they would watch over the accounts and could unwind the agreement if CLMIA had to pay too much, when, in fact, none of the above were true.

As indicated by the trial court, CLMIA did not specify any particular statements that Ockerlund or Driver made *after* the Master Swap Agreement was entered into and upon which CLMIA relied. All identified statements were statements made prior to the execution of the swap agreement. Because CLMIA has set forth a separate claim for fraudulent inducement, that type of fraud is not at issue in the claims presented here and entitled simply "fraud." CLMIA's reference to an allegation in its complaint wherein it asserted that if Ockerlund and Driver had disclosed the actual terms and potential risk of entering into the swap agreement, CLMIA would not have entered into the swap agreement is relevant only to its fraudulent inducement claim. Similarly, CLMIA's reference to allegations in its complaint that Ockerlund and Driver were fiduciaries and thus CLMIA reasonably relied upon their representations is relevant only to its separately pleaded breach of fiduciary duty claims.

CLMIA must have pleaded all of the necessary elements of some type of fraud other than fraud in the inducement in these counts to survive summary disposition. CLMIA realizes as much, having predicated these fraud claims on statements made "[a]fter Longman, on behalf of Charter lakes, executed the Master Swap Agreement and Schedule of Master Swap Agreement ...." Yet, CLMIA's general allegations appear to relate solely to its entry into the Master Swap Agreement in the first place. As noted by the trial court, CLMIA could not have reasonably relied on statements made to it *after* the swap agreement was entered into when deciding whether to enter into the swap agreement in the first place. Lacking identification of any post-execution statements made

by Ockerlund and Driver in these counts, CLMIA has failed to establish that it acted in reliance on any such statements sufficient to meet element (5) of a fraudulent misrepresentation claim. *M & D, Inc.,* 231 Mich.App at 27.

**\*5** While CLMIA relates, in a single paragraph, that false representations were made after the Master Swap Agreement was executed and refers to statements produced and transcribed during discovery, third-party defendants' motion was based upon MCR 2.116(C)(8). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's complaint by the pleadings alone. *Patterson,* 447 Mich. at 432. Reference to anything produced during discovery is thus inappropriate and irrelevant. The trial court's ruling was based on the pleadings alone.

The trial court indicated that CLMIA's position appeared to be that third-party defendants were liable for silent fraud because they did not disclose at a July 2008 meeting that the prior misrepresentations created an automatic right to terminate the agreement and further failed to disclose that the agreement was "materially flawed." To prove silent fraud, the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure. *Lucas v. Awaad,* 299 Mich.App 345, 363–364; 830 NW2d 141(2013). "A plaintiff cannot merely prove that the defendant failed to disclose something; instead, a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive." *Id.* at 364 (internal quotation omitted). And, as with other types of fraud, silent fraud requires reasonable reliance by the defrauded party. See *UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich.App 486, 504; 579 NW2d 411 (1998).

Assuming, without deciding, that third-party defendants had a duty to disclose that they made prior misrepresentations to third-party plaintiffs and that such misrepresentations created a right to terminate the agreement, or that the agreement was flawed and was unenforceable, not only did third-party plaintiffs fail to specifically plead that they relied on these misrepresentations, but they cannot establish that they did. To prove that they relied on the misrepresentations, third-party plaintiffs would necessarily have to show that they did not terminate the agreement, i.e., that they continued with the agreement because they relied on third-party defendants withholding of information that third-party plaintiffs could terminate the agreement. According to third-party plaintiffs, however, at the July 2008 meeting and afterwards, they

indicated their intent to terminate the agreement to third-party defendants and Wells Fargo Bank. This termination was, according to third-party plaintiffs, simply not recognized by third-party defendants or Wells Fargo Bank. Thus reasonable reliance cannot be demonstrated.

Because CLMIA asserted in its third-party complaint that it was given only two pages of the Master Swap Agreement to sign, it could perhaps be claimed that CLMIA's fraud claims against Ockerlund and Driver were based upon fraud in the execution. Fraud in the execution occurs when a party does not know the contents of the instrument. *Stefanac v. Cranbrook Ed Community,* 435 Mich. 155, 165–166; 458 NW2d 56 (1990). This type of fraud occurs when the proponent of the instrument told the signatory thereof that the instrument really didn't mean what it clearly said, and that the signatory relied on this fraud to his detriment. *Paul v. Rotman,* 50 Mich.App 459, 463–464; 213 NW2d 588 (1973). All fraud requires that a plaintiff establish reasonable reliance on an alleged material misrepresentation. *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co,* 280 Mich.App 16, 39; 761 NW2d 151 (2008). And, "[t]here can be no fraud where a person has the means to determine that a representation is not true." *Nieves v. Bell Industries, Inc.,* 204 Mich.App 459, 464; 517 NW2d 235 (1994). "As this Court has explained, that general rule is only applied when the plaintiffs were either presented with the information and chose to ignore it or had some other indication that further inquiry was needed." *Alfieri v. Bertorelli,* 295 Mich.App 189, 195; 813 NW2d 772 (2012)(quotation and citation omitted).

**\*6** Here, the fact is that Longman signed an agreement for CLMIA allegedly without reading it or understanding the transaction. He had already received the financing that he sought for the marina through variable rate bonds. He did not have to agree to the interest rate swap agreement. Longman claims that he was faxed only the signature pages of the agreement to sign. However, the first signature page containing Longman's signature bears page number "18" at the bottom. The second signature page bears the page number "8" at the bottom. Clearly, then, these were lengthy documents. The length of the documents was an indication that further inquiry was needed. *Alfieri,* 295 Mich.App at 195. This Court has held that "a person who signs and executes an instrument without inquiring as to its contents cannot have the instrument set aside on the ground of ignorance of the contents." *Christensen v.. Christensen,* 126 Mich.App 640, 645; 337 NW2d 611, (1983). A related and equally settled principle of Michigan contract law is that "one who signs a

Case 1:19-md-02875-RBM-SAK Document 520-7 Filed 07/17/20 Page 282 of 520
PageID: 9203
*Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)*
201 WL 8 9502WC

contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms." *Shay v. Aldrich,* 487 Mich. 648, 680–681; 790 NW2d 629 (2010) (citation omitted). Moreover, while Longman claims to have received only the two signatory pages of the documents, the entire Master Swap Agreement was attached as an exhibit to CLMIA's appeal brief, was signed by Longman on December 1, 2006, and contains what appears to be facsimile stamps on the top of each page containing the name "CHARTER LAKES INSURANCE" as well as the date of "Dec–04–2006" and a time. This indicates that CLMIA did receive the entirety of the Master Swap Agreement. The trial court properly dismissed the fraud claims against Ockerlund and Driver.

Because the fraud claim against Wells Fargo Bank is based only upon its "review and ratification" of the misrepresentations by Ockerlund and Driver, a failure of the fraud claims against those third-party defendants requires a failure of the fraud claim against Wells Fargo Bank. The trial court thus properly dismissed this claim as well.

CLMIA and Longman next claim that the trial court erred in dismissing their negligent misrepresentation claim against Ockerlund, Driver, and Wells Fargo Advisors. We disagree.

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Unibar Maintenance Servs., Inc. v. Saigh,* 283 Mich.App 609, 621; 769 NW2d 911 (2009) (citations and quotation marks omitted). Our Supreme Court has defined "duty" as a "question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." *Brown v. Brown,* 478 Mich. 545, 552–553; 739 NW2d 313 (2007)(internal citation omitted). According to *Brown,* "duty" is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* Whether a duty exists depends on (1) the relationship of the parties, (2) the foreseeability of the harm, (3) the degree of certainty of injury, (4) the closeness of the connection between the conduct and the injury, (5) the moral blame attached to the conduct, (6) the policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. *Rakowski v. Sarb,* 269 Mich.App 619, 629; 713 NW2d 787 (2006).

*7 This negligent misrepresentation theory of relief is a means for holding a party liable for the negligent performance of a contract to third parties who are foreseeably injured by the negligent performance. See *Williams v. Polgar,* 391 Mich. 6, 20–23, 215 NW2d 149 (1974). Again, however, "[t]here can be no fraud where a person has the means to determine that a representation is not true," *Nieves,* 204 Mich.App at 464, such as "when the plaintiffs were either presented with the information and chose to ignore it or had some other indication that further inquiry was needed." *Alfieri,* 295 Mich.App at 195.

The trial court dismissed the negligent misrepresentation claims against Ockerlund, Driver, and Wells Fargo Advisors under MCR 2.116(C)(8) without analysis or explanation.

In their specific claim for negligent misrepresentation, CLMIA and Longman alleged that:

76. Wachovia Bank, Wachovia Securities, Ockerlund, and Driver made and/or adopted or ratified material misrepresentations regarding the referenced Swap Agreement before and after its execution to Longman and [CLMIA] with negligent disregard for the truthfulness of the statements.

77. These representations, which are specified in the factual circumstances plead above, are in fact false.

78. Longman acted in reliance on these material misrepresentations of fact when he executed the last page of the Master Swap Agreement and the Schedule to the Master Swap Agreement on behalf of Charter Lakes.

79. Charter Lakes, as a result of acting on the negligently made material misrepresentations of the Third-party Defendants, has incurred damages ....

In their factual allegations, CLMIA and Longman asserted that Driver and Ockerlund acted as their financial advisors, and represented that they could stabilize the rate of the variable rate bonds by way of a swap agreement. They further alleged that Ockerlund and Driver advised that Charter Lakes "would likely benefit from the contract and that the agreement did not impose an undue financial risk" and assured Longman that "Charter Lakes would not suffer significant losses under the Swap Agreement," indicating that, at most, Charter Lakes would have to pay around $2,000 per month and that Ockerlund and Driver would unwind the swap if it proved unbeneficial. CLMIA and Longman alleged that contrary to

the representations, the swap agreement did and has exposed Charter Lakes to significant financial risk (i.e., Charter Lakes' liability to Wachovia Bank). They also alleged that:

41. Ockerlund, Driver, and Wachovia Securities, as the fiduciaries for Charter Lakes, had an obligation to assure that the conditions required under the contract to enter into the Swap Agreement were complied with and failed to do so.

42. These provisions were material to Charter Lake's best interests and [third-party defendants] all acted in concert to deprive Charter Lakes of these protections in order to obtain its participation in the Swap Agreement.

*8 No party has directed this Court to authority indicating that a financial advisor who has no control over a client's money has a fiduciary duty to a client. Under New York law, (which the Master Swap Agreement states is to be applied, but which the parties often ignore), it has been held that professionals, such as investment advisors, who owe fiduciary duties to their clients may be subject to tort liability for failure to exercise reasonable care. *Bullmore v. Ernst & Young Cayman Is.,* 45 AD3d 461, 463 (1st Dept 2007). However, it appears that only a financial advisor with discretionary authority to manage a client's investment accounts owes a fiduciary duty to the client. See, *Brooks v. Key Trust Co. Natl Assn,* 26 AD3d 628, 630 (3d Dept 2006). There has been no such allegation here.

Even assuming that third-party defendants were acting in the official capacity of financial advisors when they spoke to CLMIA and Longman concerning the interest swap, and assuming, without deciding, that they could be deemed to owe a fiduciary duty to CLMIA and Longman, we must still examine the statements attributed to third-party defendants as misrepresentations to determine whether they were prepared without reasonable care and whether CLMIA and Longman justifiably relied on the same to their detriment.

CLMIA and Longman's allegations that Ockerlund and Driver's statements that Charter Lakes "would likely benefit from the contract and that the agreement did not impose an undue financial risk" are not actionable as they are expressions of opinion or salesman's talk in promoting a sale, i.e., puffery. Expressions of opinion are not false statements of independently verifiable facts. *Mable Cleary Trust v. Edward–Marlah Muzyl Trust,* 262 Mich.App 485, 502; 686 NW2d 770 (2004). An action for fraud cannot be predicated upon an expression of opinion or upon puffery. *Van Tassel*

*v. McDonald Corp.,* 159 Mich.App 745, 750; 407 NW2d 6 (1987); *High Tides, LLC v. DeMichele,* 88 AD 3d 954, 958; 931 N.Y.S.2d 3771 (2011). The statements likewise concerned future events. In general, an action for fraud cannot be based on the failure of future events to transpire as represented or predicted. See *Foreman v. Foreman,* 266 Mich.App 132, 143; 701 NW2d 167 (2005); *Marrero v. McDonnell Douglas Capital Corp.,* 200 Mich.App 438, 444; 505 NW2d 275 (1993); *Cerabono v. Price,* 7 AD3d 479, 480 (2nd Dept 2004) ("[t]he general rule is that fraud cannot be predicated upon statements that are promissory in nature at the time they are made and which relate to future actions or conduct").

The same holds true for statements that Charter Lakes would not suffer significant losses under the Master Swap Agreement. The alleged misrepresentation that third-party defendants would monitor interest rates and unwind the swap agreement if it appeared Charter Lakes would have to pay an interest rate differential and that, at most, Charter Lakes would have to pay around $2,000 per month, concerned future events and thus were not actionable. *Foreman,* 266 Mich.App at 143; *Marrero,* 200 Mich.App at 444.

*9 Additionally, CLMIA and Longman did not allege that any of the alleged misrepresentations were based upon on "information prepared without reasonable care" by third-party defendants. *Unibar Maintenance Servs, Inc.,* 283 Mich.App at 621. There is no assertion, for example, that third-party defendants had the means to determine whether the representations were true, any more than CLMIA and Longman did, and failed to undertake the proper determination as to the truth of their representations or that they did not, in fact, ascertain whether the representations were true when made. Some intervening circumstance could, after all, have made the perhaps once-true representations false (a change in the market, etc.).

Finally, as previously indicated, Longman signed the Master Swap Agreement for CLMIA, binding it to the terms, without reading it. Having only allegedly received two pages, one bearing a page "18" and one bearing a page "8", Longman was on notice that that the documents were lengthy and that was a clear indication that further inquiry was needed. *Alfieri,* 295 Mich.App at 195. CLMIA and Longman's reliance on *any* representations made by third-party defendants concerning the Agreement's terms, the risks it posed, etc ., when Longman did not read the Agreement and was aware that it was lengthy, vitiates a claim of reasonable reliance. This is particularly

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 284 of 520
PageID: 9205
Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
2015 WL 8949502

so, given that the Master Swap Agreement was between CLMIA and *Wells Fargo Bank*-not third-party defendants. Had CLMIA and Longman required further information concerning the Agreement's terms, the best provider of information, including a copy of the entirety of the Agreement they claimed they did not originally receive, would have been Wells Fargo Bank. The trial court properly dismissed the third-party claim of negligent misrepresentation.

CLMIA and Longman next assert that the trial court erred in finding that the swap agreement at issue was unrelated to a security and in dismissing CLMIA's claim for negligence per se based on violations of the Michigan Uniform Securities Act. We disagree.

A plaintiff may establish negligence per se by proving that a defendant violated a statutory duty. *McKinney v. Anderson,* 373 Mich. 414, 419; 129 NW2d 851 (1964). For a court to determine that a statutory violation amounted to negligence per se certain elements must exist. (1) The statute must be "intended to protect against the result of the violation," (2) the plaintiff must be "within the class intended to be protected by the statute," and (3) the statutory violation must be a proximate cause of the plaintiff's injury. *Klanseck v. Anderson Sales & Serv., Inc.,* 426 Mich. 78, 87; 393 NW2d 356 (1986).

In their claim of negligence per se against Ockerlund and Driver, CLMIA and Longman alleged that these third-party defendants were "investment advisors" as defined in the Michigan Uniform Securities Act ("MUSA") and that they violated MCL 451.502 [1] (now MCL 451.2501). CLMIA and Longman alleged that these statutory violations created a presumption of negligence per se. The trial court, however, opined that both the definition of investment advisor under MUSA and MCL 451.502 require the involvement of a security in the transaction and that the swap agreement is not a security such that the MUSA is inapplicable. We agree.

[1]   Repealed by P.A.2008, No. 551 § 702, Eff. October 1, 2009. At the time the trial court issued its opinion, on October 9, 2009, the new Michigan Uniform Securities Act had come into effect.

**\*10**  Under the MUSA, at MCL 451.2102a:

(e)  "Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation

and as a part of a regular business, issues or promulgates analyses or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation. The term does not include any of the following:

(*i* ) An investment adviser representative.

(*ii* ) A lawyer, accountant, engineer, or teacher whose performance of investment advice is solely incidental to the practice of the person's profession.

(*iii* ) A broker-dealer or its agents whose performance of investment advice is solely incidental to the conduct of business as a broker-dealer and that does not receive special compensation for the investment advice.

(*iv* ) A publisher of a bona fide newspaper, news magazine, or business or financial publication of general and regular circulation.

(*v* ) A federal covered investment adviser.

(*vi* ) A depository institution.

(*vii* ) Any other person that is excluded by the investment advisers act of 1940 from the definition of investment adviser.

(*viii* ) Any other person excluded by rule or order under this act.

(*ix* ) A finder registered as a broker-dealer under this act.

The former version of this rule (relied upon by the trial court) defined "investment adviser" at MCL 451.801(l) as "any person who, for consideration, engages in the business of advising others, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing, or selling securities, who, for consideration and as part of a regular business, issues or promulgates analyses or reports concerning securities, or who acts as a finder in conjunction with the offer, sale or purchase of a security...." Excluded from this definition is a "broker-dealer or registered agent acting on behalf of a broker-dealer whose performance of these services is solely incidental to the conduct of his or her business as a broker-dealer and who receives no special compensation for the services." MCL 451.801(l)(3).

Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
201WL 8 9502W©

MCL 451.502(a)(1) and (2) prohibited an investment advisor from employing a device, scheme, or artifice to defraud a client or prospective client or to engage in an act, practice, or course of business that operates or could operate as a fraud or deceit upon a client or prospective client. MCL 451.2501 represents the prior MCL 451.502 and provides:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, to directly or indirectly do any of the following:

**\*11** (a) Employ a device, scheme, or artifice to defraud.

(b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

MCL 451.2502 similarly provides:

(1) It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities, or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities, to do any of the following:

(a) Employ a device, scheme, or artifice to defraud another person.

(b) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

The MUSA currently defines security as follows:

(c) "Security" means a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; put, call, straddle, option, or privilege on a security, certificate of deposit, or group or index of securities, including an interest in or based on the value of

that put, call, straddle, option, or privilege on that security, certificate of deposit, or group or index of securities; put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; an investment in a viatical or life settlement agreement; or, in general, an interest or instrument commonly known as a "security"; or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the following apply to the term security:

(*i*) The term includes a contractual or quasi-contractual arrangement that meets all of the following:

(A) A person furnishes capital, other than services, to an issuer under the arrangement.

(B) A portion of the capital furnished under sub-subparagraph (A) is subjected to the risks of the issuer's enterprise.

(C) The furnishing of capital under sub-subparagraph (A) is induced by representations made by an issuer, promoter, or the issuer's or promoter's affiliates which give rise to a reasonable understanding that a valuable tangible benefit will accrue to the person furnishing the capital as a result of the operation of the enterprise.

(D) The person furnishing the capital under sub-subparagraph (A) does not intend to be actively involved in the management of the enterprise in a meaningful way.

**\*12** (E) At the time the capital is furnished, a promoter or its affiliates anticipate that financial gain may be realized as a result of the furnishing.

(*ii* ) The term includes both a certificated and an uncertificated security.

(*iii* ) The term does not include an insurance or endowment policy or annuity contract under which an insurance company promises to pay a fixed or variable sum of money either in a lump sum or periodically for life or other specified period.

(*iv* ) The term does not include an interest in a contributory or noncontributory pension or welfare plan subject to the employee retirement income security act of 1974.

(*v* ) The term includes an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the

investor. As used in this subparagraph, a "common enterprise" means an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party, or other investors.

(*vi* ) The term may include, as an investment contract, an interest in a limited partnership, a limited liability company, or a limited liability partnership. MCL 451.2102c

"Security" was previously defined, in part, at MCL 451.801(z) as:

> [A]ny note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security", or any certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

As noted by the trial court, all of the elements of negligence per se pleaded by third-party plaintiffs require, at their core, the involvement of a security. Clearly, the MUSA does not include a swap transaction of any kind in its definition of "security." The MUSA substantially tracks the language of the Uniform Securities Act (*People v. Dempster,* 396 Mich. 700, 704; 242 NW2d 381 (1976)), which is a model law authored in 1956 by the National Conference of Commissioners on Uniform State Laws, a group of state legislators, judges and legal scholars. *Bennett v. Durham,* 683 F 3d 734, 736 (CA 6 2012). The Uniform Securities Act similarly does not include the term "swap" in its definition of "security." See Unif Securities Act 2002 § 102(28). The Uniform Securities Act, in turn, "is borrowed substantially" from the Securities Act of 1933. *Bennett,* 683 F 3d 734 at 737.

This is notable because, the Securities Act of 1933, at 15 USC § 77b(a)(1) defines "security" as "any note, stock, treasury stock, security future, *security-based swap* ...." (emphasis added). Thus, it can be inferred that if a swap agreement of any kind were intended to be included within the meaning of a security, that specific term would have been included within the MUSA's (and the Uniform Security Act's) definition. Its conspicuous absence leads to the conclusion that a swap agreement was not intended to be considered a security for purposes of MUSA.

**\*13** That being the case, CLMIA and Longman's assertion that third-party defendants were liable for negligence per se because they violated MCL 451.2501 (the prior MCL 451.502) fails to state claim for which relief could be granted. That statute prohibits a person from engaging in certain acts "in connection with the offer, sale, or purchase of a security...." The swap agreement was not a security under the relevant definition and third-party defendants thus could not have violated this statute with respect to the swap agreement.

As pointed out by CLMIA, a bond falls within the MUSA's statutory definition of a security and the notional value in the swap agreement at issue was based upon the value of CLMIA's bonds. However, that does not mean that the swap agreement at issue was a "security based swap." New York law indicates that security-based swap agreements are "privately negotiated contracts that provide for the exchange of payments based on the value of the securities, and the transfer of the financial risks associated with changes in the value of the securities without the conveyance of any ownership interest." *Viking Global Equities, LP v. Porsche Automobil Holding,* 36 Misc.3d 1233 (2012)(r'vsed on other grounds). Under this definition, the payment exchange and the transfer of financial risk are associated with changes in the value of the security. While the notional value in this case was based on the bonds (i.e., security, according to CLMIA), the payment exchange was not based on the value of the bonds and there was no transfer of financial risk associated with a change in the value of the bonds. The bonds had already been issued in a separate transaction, any risk associated with the value in the bonds stayed with CLMIA, and even if CLMIA paid off the bonds in full, the swap agreement would remain in full force. In addition, the payment exchange was always based on the fixed rate set forth in the swap agreement. The variable rate was based on the LIBOR, which fluctuated, and was the only factor that changed the payment amount. This was thus not a security based swap.

CLMIA and Longman next claim that the trial court erroneously dismissed CLMIA's claims for fraudulent inducement and breach of fiduciary duty against Ockerlund, Driver, and Wells Fargo Advisors. We disagree.

"Fraud in the inducement ... addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct .... " *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App 365, 373, 532 NW2d 541 (1995). It arises where "the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 373.

To prove a claim of fraud in the inducement, a plaintiff must establish the following elements: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that [it] was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC,* 276 Mich.App 146, 161; 742 NW2d 409 (2007).

 **\*14**  Although not explicitly stated as such, Michigan caselaw appears to support the premise that a fraud in the inducement claim is applicable only to the parties to a contract. For example, when explaining why the economic loss doctrine does not apply to a fraudulent inducement claim, *Huron Tool and Engineering Co.,* 209 Mich.App at 372, stated, "[f]raud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by *the other party's* fraudulent behavior." (emphasis added).

New York caselaw, on the other hand, which is supposed to govern the Master Swap Agreement, supports a contrary conclusion. "A misrepresentation of a material fact which is collateral to the contract and serves as an inducement to enter into the contract is sufficient to sustain a cause of action sounding in fraud." *Selinger Enters., Inc. v. Cassuto,* 50 AD3d 766, 768 (2008); *WIT Holding Corp. v. Klein,* 282 A.D.2d 527, 528 (2001). This cause of action is not duplicative of a cause of action to recover damages for breach of contract

where the plaintiff sues individuals who were not parties to the contract, and seeks compensatory damages which are not recoverable for breach of contract. *Selinger Enters, Inc.* 50 AD3d at 768.

In any event, regardless of any representation made by Ockerlund or Driver, Longman signed the Master Swap Agreement and corresponding schedule. The Agreement provides, at paragraph 9.(a) that "This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." The schedule to the Master Swap Agreement further provides at part 5. (c)(i):

**Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Relevant Agreement that:

(1) *Non–Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into the Relevant Agreement and as to whether the Relevant Agreement is appropriate or proper for it based solely upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party or any of its affiliates (or its respective representatives) as investment advice or as a recommendation to enter into the Relevant Agreement, it being understood that information and explanations related to the terms and conditions of any Relevant Agreement will not be considered investment advice or a recommendation to enter into the Relevant Agreement. No communication (written or oral) received from the other party or any of its affiliates (or its respective representatives) will be deemed to be an assurance or guarantee as to the expected results of the Relevant Agreement.

 **\*15**  (2) *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Relevant Agreement based solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) or that of its own advisers. It is also capable of assuming, and assumes, the risks of the Relevant Agreement. It also understands that the terms under which any Transaction may be terminated early are set forth in

this Agreement (or in the relevant Confirmation), and any early termination of a Transaction other than pursuant to such terms is subject to mutual agreement of the parties confirmed in writing, the terms of which may require one party to pay an early termination fee to the other party based upon market conditions prevailing at the time of early termination.

(3) *Status of Parties.* The other party is not acting as a fiduciary for an adviser to it in respect of the Relevant Agreement, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or any of its affiliates) excludes the Relevant Agreement.

The above agreement was entered into between Wachovia Bank and CLMIA (through Longman). It is undisputed that Ockerlund and Driver were employed by Wachovia Securities, LLC at the time the agreement was entered into. In Wachovia Corporation's 2006 annual report submitted to the SEC, Wachovia Securities, LLC is identified as Wachovia Corporations "retail securities brokerage subsidiary." Wachovia Bank is identified as its "primary banking affiliate." Black's Law Dictionary (7th ed.) defines "affiliate" as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." "Affiliate" is also defined in section 14 of the Master Swap Agreement as "subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, 'control' of any entity or person means ownership of a majority of the voting power of the entity or person."

CLMIA and Longman, in fact, alleged in their complaint that Wachovia Securities was a "wholly owned subsidiary of Wachovia Bank ." Under any pertinent definition, Wachovia Securities was an affiliate of Wachovia Bank. And, CLMIA and Longman alleged that Ockerlund and Driver were employees or agents of Wachovia Securities. By signing the agreement, Longman expressly agreed, on behalf of CLMIA, that he was not "relying on any communication (written or oral) of [Wachovia Bank] or any of its affiliates (or its respective representatives) as investment advice or as a recommendation to enter into the Relevant Agreement ...."

**\*16** Because Longman affirmatively disclaimed that he acted under the advice of any affiliate of Wells Fargo

in entering into the agreement, his claims of fraudulent inducement and breach of fiduciary duty fail. "It is beyond cavil that one cannot sign a writing explicitly disclaiming reliance on representations not contained in a contract and later aver that the court should disregard such a disclaimer ... a claim for fraud is barred by the existence of a specific disclaimer and failure to exercise reasonable diligence." *Holzer v. Mondadori,* 40 Misc.3d; 980 N.Y. S2d 276 (2013).

Even absent the disclaimer, the statements attributed to Ockerlund and Driver and which CLMIA and Longman assert were false statements were, as previously indicated, expressions of opinion, puffery, and concerned future events. An action for fraud cannot be predicated on any of these. *Van Tassel,* 159 Mich.App at 750; *Foreman,* 266 Mich.App at 143; *Marrero,* 200 Mich.App at 444; *High Tides, LLC,* 88 AD 3d at 958.

The breach of fiduciary duty claim was also properly dismissed, even in the absence of the disclaimer. CLMIA and Longman contend that because third-party defendants were not parties to the Master Swap Agreement, Michigan law should apply to analysis of this issue. A fiduciary duty arises when the relationship between two parties is "of such character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith." *Portage Aluminum Co. v. Kentwood Nat'l Bank,* 106 Mich.App 290, 294; 307 NW2d 761 (1981); see also *The Meyer & Anna Prentis Foundation, Inc. v. Barbara Ann Karmanos Cancer Institute,* 266 Mich.App 39, 43; 698 NW2d 900 (2005). When a fiduciary relationship exists, the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship. *Id.* Examples of fiduciary relationships are attorneys to clients, doctors to patients, trustees to beneficiaries, and guardians to wards. *Portage,* 106 Mich.App at 294. Third-party plaintiffs have identified no Michigan law indicating that an investment advisor owes a fiduciary duty to a client.

And, if third-party defendants owed fiduciary duties to CLMIA and Longman, they failed to establish a material question of fact that third-party defendants breached these duties. CLMIA and Longman do not particularize how the recommendation to enter into the swap agreement constituted a deviation from the standard of care owed by an investment advisor. It cannot be ignored that Longman signed the Master Swap Agreement in December 2006 and that a swap transaction thereafter ensued from that date until July of 2007. CLMIA profited from the transaction due to prevailing

Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
2015 WL 8 9502W©

interest rates and made no complaint. That transaction was terminated and Wells Fargo paid him a termination fee. CLMIA then entered into *another* swap transaction in August 2007 with Wells Fargo and it was only when interest rates were unprofitable to it and CLMIA had to start paying Wells Fargo money on a monthly basis that Longman raised objections and questions to the Master Swap Agreement. The original Master Swap Agreement governed both transactions.

 **\*17**  In a November 27, 2007, recorded conversation with Driver, Longman stated that he had been watching interest rates and it did not look good. He said they were going to have to wait and it might turn around at the end of the year but if they "closed that position out" it would cost a lot of money. Longman stated that he thought the bond was going to go back up and when it did, he wanted to get out of the swap and that he just hoped they could get out of it with minimal losses. Longman, then, clearly understood the volatile nature of the market and the fact that there were risks involved. There is no indication that Driver did not act for the benefit of Longman in recommending the interest rate swap when he did, in 2006. The claims of breach of fiduciary duty were appropriately dismissed pursuant to MCR 2.116(C)(10).

CLMIA and Longman next argue that Wells Fargo waived its cross-claim against CLMIA for breach of contract when it elected to continue to behave as though no breach had occurred for a period of 21 months and that the trial court thus erred in denying CLMIA's motion to dismiss Wells Fargo's breach of contract claim against it. We disagree.

Wells Fargo's breach of contract claim against CLMIA was premised upon CLMIA's failure to pay an August 2010 payment and the resulting termination fee allegedly owed under the terms of the Master Swap Agreement. CLMIA, however, asserted that because it breached the contract in December 2008 when it stopped paying the monthly payments owed and Wells Fargo continued under the contract with Mercantile performing in CLMIA's stead and did not provide notice of the breach to CLMIA within 6 months of CLMIA's December 2008 breach, Wells Fargo waived its breach of contract claim against CLMIA. The Master Swap Agreement provides specific parameters of what will constitute a default, or breach, of the agreement. Section 5 of the Master Swap Agreement governs Events of Default and Termination Events, providing in relevant part as follows:

(a) **Events of Default.** The occurrence at any time with respect to a party or, if applicable, any Credit Support provider of such party or any Specified Entity of such

party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

From the above language, it is clear that a failure to pay a due payment does not, in and of itself, trigger a default event. Rather, the failure to pay, when due, *and* if not remedied within three days after notice of the failure to pay is given to the non-paying party gives rise to an event of default. "To interpret a contract, the reviewing court must confine itself to the four corners of the document and only consider extrinsic proof if the contract is ambiguous; if the contract is not ambiguous, it must be enforced according to the plain meaning of its terms." *Mid–State Industries, Ltd. v. State,* 986 N.Y. S2d 637, 639 (2014). Thus, contrary to CLMIA's assertion, its failure to pay in December 2008 and thereafter did not automatically constitute a recognizable breach of the swap agreement (i.e., default). While the failure to pay was technically a breach of its obligation under the Master Swap Agreement, under the relevant swap agreement language, Wells Fargo was not *required* to deem the non-payment by CLMIA in December 2008 (or thereafter) as a "default" unless and until it gave CLMIA notice of the default and three days to cure. It was not asserted that the above occurred.

 **\*18**  Additionally, an event of default does not automatically terminate the Master Swap Agreement and give rise to the imposition of the early termination fee (the non-payment of which upon Wells Fargo's breach of contract action was primarily based). Section 6. of the Master Swap Agreement, entitled "Early Termination" provides:

> (a) **Right to Terminate Following Event of Default.** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") *may,* but not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a

day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions .... (emphasis added).

Section 6(e)(i) of the swap agreement provides for a payment made on early termination in the event of default and the various calculation methods that may be employed to determine the amount of such payment.

The word "may" is treated as permissive, under its general and usual meaning. See, e.g., *Babcock v. Rose,* 169 Misc.2d 162, 168; 643 N.Y.S.2d 903 (1996). The non-defaulting party, in this case Wells Fargo Bank, "may" upon an event of default designate an early termination date, but it has no obligation to do so. Wells Fargo's continuation with the swap agreement, even after CLMIA discontinued making payments in December 2008 therefore provides no basis for CLMIA's claim that Wells Fargo Bank waived its breach of contract claim against it for failing to pay the termination fee. Wells Fargo was not limited under the Master Swap Agreement to wait, as it did, to declare an event of default when Mercantile discontinued paying the monthly fees and seek a termination fee from CLMIA after that time.

Moreover, while CLMIA asserts that Wells Fargo's claim should be precluded because it ignored CLMIA's December 2008 breach and continued performance of the Master Swap Agreement, CLMIA's assertion is incorrect. Wells Fargo could not have continued performance of the swap agreement because the only two participants in the agreement were Wells Fargo and CLMIA and CLMIA admittedly refused to participate in the agreement after December 2008. However, Wells Fargo and Mercantile had entered into a separate Master Swap Participation Agreement in December 2006. Under the terms of the participation agreement, Mercantile:

irrevocably and unconditionally agrees to pay on demand by Swap Bank, without counterclaim or setoff, a percentage share, as set forth on a Participation Supplement (the "Percentage Share") of all Swap Liabilities (as defined below). As used herein, "Swap Liabilities" means, without duplication, with respect to each Counterparty and each

Counterparty Transaction, (a) all amounts payable by such Counterparty to Swap Bank under Section 6(e) of the Counterparty Swap Agreement with respect to such Counterparty Transaction ... (c) all unpaid interest due from such Counterparty to Swap Bank in respect of such Counterparty Transaction, and (d) all other amounts owing by such Counterparty to Swap Bank in respect of such Counterparty Transaction....

**\*19** Under the above, Mercantile agreed to pay to Wells Fargo any amounts that CLMIA owed to Wells Fargo under the swap transaction. This included the monthly payments. Thus, Wells Fargo simply enforced its separate Master Swap Participation Agreement with Mercantile, who complied with its own agreement for a time.

In its argument, and its cases cited, CLMIA appears to confuse the principles of waiver and election of remedies. "The doctrines of waiver and election of remedies are complementary rather than competing common law contract principles. Under the doctrine of waiver, a party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for [its] benefit." *ESPN, Inc. v. Office of Com'r of Baseball,* 76 F Supp 2d 383, 389 (1999) (citation omitted). The swap agreement here required CLMIA to pay Wells Fargo a monthly amount based upon the floating and fixed interest rates. CLMIA refused to pay that amount, and Wells Fargo had a separate contract with Mercantile requiring it to pay any amounts CLMIA did not pay. Mercantile indicated that it would pay the monthly amounts due and Wells Fargo could, conceivably, waive the contractual provision in the swap agreement requiring CLMIA to pay the monthly amount.

And, as indicated in *ESPN, Inc. v. Office of Com'r of Baseball,* 76 F Supp 2d 383, 389 note 4 (1999), a party's waiver of a contract provision is not absolute. That is, a previously waived provision may be restored " 'by a reasonable notice demanding performance and stating that the contract will be rescinded if the notice is not complied with.' " quoting *Oleg Cassini, Inc. v. Couture Coordinates, Inc.,* 297 F Supp 821, 831 (1969). On August 13, 2010, Wells Fargo sent CLMIA a notice that it failed to make a payment as required under the transaction and that if it did not make the payment within

3 days, the failure to pay would become an event of default under the swap agreement. Thus it arguably restored any previously waived provision.

An election of remedies, on the other hand, is simply a choice among remedies by the party. "It is a decision by that party as to how it should proceed in the wake of the breaching party's nonperformance. In other words, an election is not a waiver of any rights under the contract but rather a choice between two inconsistent remedies for breach of the contract." *Id.* at 389.

Here, assuming that Wells Fargo treated CLMIA's December 2008 failure to pay as a breach or event of default, it would have to make a choice. It could send notice to CLMIA specifying the date of the event of default and designate an early termination date for the swap agreement, then calculate the termination fee. Then it would have elected termination and Wells Fargo could not continue to perform under the Master Swap Agreement or expect CLMIA's continued performance under the contract. It then could terminate the agreement and sue for damages stemming from a total breach. Alternatively, Wells Fargo could elect to continue the Master Swap Agreement despite CLMIA's December 2008 breach. In that case, it could not later decide to terminate the contract based upon the December 2008 breach, or treat the December 2008 breach as a default event. If we opt to look at this issue as an election of remedies issue, then Wells Fargo clearly chose the second option here. It did *not*, according to its pleadings or otherwise, base its breach of contract action on CLMIA's December 2008 non-payment. Wells Fargo specified that CLMIA breached the swap agreement by failing to make an August 2010 payment and failing to pay the swap agreement termination fee. The fact that the final judgment awarded Wells Fargo only the termination fee supports that Wells Fargo did not treat the December 2008 failure to pay as a breach or default. In either scenario, the trial court appropriately determined that Wells Fargo did not waive its breach of contract claim.

**\*20** CLMIA and Longman's final argument is two-fold. First, they argue that the trial court erred in granting summary judgment in favor of Mercantile because Mercantile had primary liability to pay the termination fee debt to Wells Fargo and, as such, could not hold a valid assignment of the debt from Wells Fargo. Second, CLMIA and Longman argue that because Wells Fargo held no personal guaranty from Longman, the trial court erred in imposing personal liability for the termination debt upon Longman.

Based on previous discussions of pertinent language in the Master Swap Agreement, an event of default did not occur until CLMIA failed to pay a monthly amount due as required and then after notice from Wells Fargo, did not cure within three business days. At that point, Wells Fargo could declare an event of default, terminate the contract, and calculate a termination fee. That is what happened here in August 2010. Once the termination fee was calculated, Wells Fargo had the right to collect that fee from CLMIA under the terms of the swap agreement. As the trial court ordered on April 5, 2012, the termination fee was $636,381.19 given its previously found early termination date of August 24, 2010, and that CLMIA was responsible for paying that termination fee to Wells Fargo. This was consistent with the language in the swap agreement.

The trial court also ordered in the April 5, 2012, order that if CLMIA failed to pay the termination fee to Wells Fargo then Mercantile would be obligated to pay the fee pursuant to the swap agreement. The swap agreement provides at section 4.

> **Receipts by Swap Bank: Remittances.** It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty Swap Agreement.* After execution of the assignment documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added)

The Participation Agreement defines "swap liabilities" as including "(a) all amounts payable by such Counterparty to Swap Bank under Section 6(e) of the Counterparty Swap Agreement with respect to such Counterparty Transaction" which is, in turn payments upon early termination of the swap agreement. Thus, the trial court's order is in conformance with the above contracts. The contracts clearly provide that CLMIA is liable for an early termination fee upon an event of default and an event of default was found to have occurred in August 2010. CLMIA does not dispute that it did not pay the early termination fee as ordered by the court. The Participation Agreement requires that Mercantile pay the

201WL 8 9502W0

termination fee if CLMIA does not and that, upon such payment, Wells Fargo must assign all of its rights and interest in the swap agreement to Mercantile upon its payment of the termination fee. Wells Fargo had the right to collect the termination fee from CLMIA. It thus assigned that right to Mercantile upon Mercantile's payment of the fee to Wells Fargo.

**\*21** Contrary to CLMIA's assertion, Mercantile was not primarily liable for the termination fee. That is, Mercantile did not have an independent obligation to pay the termination fee. Its obligation only arose out of CLMIA's failure to pay the same. It is true that Mercantile's obligation to pay the fee arose out of its separate Participation Agreement with Wells Fargo. But, this Participation Agreement was referenced within the swap agreement on several occasions. Where one writing references another instrument for additional contract terms, the two writings should be read together. *Forge v. Smith,* 458 Mich. 198, 207; 580 NW2d 876 (1998).

For example, at section 3(a)(v) each party represents to the other party that "[i]ts obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations .... " A "Credit Support Document" is defined in the schedule to the Master Swap Agreement as "each document which by its terms secures, guarantees or otherwise supports [CLMIA's] obligations under this Agreement ...." Likewise, Mercantile's participation in the swap agreement is specifically referenced. Section 5(a)(iii)(1) of the Master Swap Agreement defines one event of default as "[f]ailure by the party or any Credit Support provider of such party to comply with or perform any agreement or obligation to be complied with ...." A credit support provider is defined in the schedule to the swap agreement as "each party to a Credit Support Document that provides or is obligated to provide security, a guaranty or other credit support for [CLMIA's] obligations under this Agreement, including, without limitation, Mercantile Bank of Michigan." Moreover, from the above definitions, it is clear that Mercantile was acting as a surety or guarantor.

With respect to whether Longman's guaranty binds him to be liable for the judgment entered against CLMIA and in favor of Mercantile, Longman incorrectly focuses on the guaranty executed in conjunction with the swap agreement and whether this guaranty is assignable. However, on October 31, 2011, Longman executed a guaranty in favor of Mercantile. In the guaranty, Longman as guarantor "absolutely, unconditionally and irrevocably guarantees prompt payment when due ...

of (a) any and all existing future indebtedness, obligations and liabilities ... to [Mercantile] ... and (c) any "Judgment", as that term is defined in Paragraph 4 below...." Judgment is thereafter defined as "any order or judgment, whether a final judgment or not, awarding the Bank, either directly or indirectly, as an assignee or otherwise, any award of money, damages, interests, costs or attorneys' fees against [CLIA, CLMIA] or [Longman] in the lawsuit filed in Kent County Circuit Court, Michigan, captioned *Mercantile Bank of Michigan v. CLMIA, LLC et al,* Case No. 09–01639–CZ (the "Lawsuit"), or in any other proceeding that may be brought regarding the subject matter of the Lawsuit." Thus, Longman agreed to guarantee the prompt payment of any judgment rendered against CLMIA in the instant case.

### Mercantile's Cross–Appeal

**\*22** On cross-appeal, Mercantile contends the trial court erroneously accepted the factual allegation of CLMIA that an event of default under the Master Swap Agreement had occurred in granting CLMIA's motion for summary disposition concerning Mercantile's claims against it for equitable relief. We find that the trial court's ultimate conclusion did not necessarily hinge upon its erroneous conclusion that an event of default had occurred.

This Court has the discretion to grant equitable relief where a legal remedy is not available. *Tkachik v. Mandeville,* 487 Mich. 38, 45; 790 NW2d 260 (2010). As explained in *Tkachik:*

> A remedy at law, in order to preclude a suit in equity, must be complete and ample, and not doubtful and uncertain. Furthermore, to preclude a suit in equity, a remedy at law, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances. Equity jurisprudence molds its decrees to do justice amid all the vicissitudes and intricacies of life. While legislative action that provides an adequate remedy by statute precludes equitable relief, the *absence* of such action does not. This

is so because every equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate. Equity allows complete justice to be done in a case by adapting its judgments to the special circumstances of the case. *Id.* at 45–46 (internal citations and quotations omitted).

In its May 10, 2010, opinion and order, the trial court did act under the assumption (or accept CLMIA's assertion) that an event of default occurred in December 2008 when CLMIA discontinued its required payments to Wells Fargo. The trial court indicated that the Participation Agreement delineates Wells Fargo's responsibilities if an event of default occurs under the swap agreement and that Mercantile was aware of these responsibilities when presented with a "claimed event of default." The trial court opined that "[Wells Fargo] and Mercantile ... at their peril, chose to ignore the alleged default event" and that "Mercantile is contractually bound to pay only the amount of Swap Liabilities outstanding at the time of the event of default ...." under the Participation Agreement and that it further "cannot unilaterally increase its obligations and invoke equitable rights in light of unambiguous terms of the Agreements." The trial court did err in assuming or accepting that a default event did occur. Not only because this was a position advocated by the moving party, but also because as indicated previously, under the plain language of the Master Swap Agreement, the simple non-payment is not, by itself, a default event. Nevertheless, we will not reverse a lower court that reaches the right result for wrong reasons. *Taylor v. Laban,* 241 Mich.App 449, 458; 616 NW2d 229 (2000).

**\*23** The trial court correctly recognized that the Participation Agreement provided, at section 4:

**Receipts by Swap Bank: Remittances.** It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty*

*Swap Agreement.* After execution of the assignment documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added)

Because swap liabilities include any amounts owing by CLMIA to Wells Fargo, under the Swap Participation Agreement, Mercantile would be obligated to pay any monthly fee to Wells Fargo that CLMIA failed to pay. And, under the "Receipts by Swap Bank: Remittances" section of the Swap Participation Agreement upon payment of the very first monthly fee by Mercantile (i.e. swap liability), Wells Fargo was "obligated to assign to [Mercantile] all of [Wells Fargo's] rights and responsibilities under such Counterparty Swap Agreement."

While the trial court focused on the payment of the termination fee as the swap liability, it correctly noted that the payment of a swap liability by Mercantile entitled it to an assignment of rights by Wells Fargo. Mercantile thus had an adequate legal remedy, regardless of what the swap liability may have been. As such it was not entitled to equitable remedies.

Mercantile next argues that the trial court erred in interpreting the contractual provisions at issue and concluding that Mercantile's exclusive remedy was to terminate the underlying transaction. As set forth in section 4. of the Swap Participation:

It shall be Swap Bank's responsibility to terminate all Counterparty Transactions under the terms of a Counterparty Swap Agreement upon an Event of Default or a Termination Event thereunder. *Upon payment by Participant of the Percentage Share of all Swap Liabilities under a Counterparty Swap Agreement to Swap Bank, Swap Bank shall be obligated to assign to Participant all of Swap Bank's rights and responsibilities under such Counterparty Swap Agreement. After execution of the assignment*

documents between Participant and Swap Bank, Swap Bank shall have no further rights or responsibilities under the Counterparty Swap Agreement and it shall be solely the right of participant to enforce any and all assigned rights under the Counterparty Swap Agreement. (emphasis added).

Mercantile is correct that it could not refuse to make a monthly payment on demand from Wells Fargo. It is incorrect that it could elect to make monthly payments until it unilaterally deemed it prudent to discontinue said payments. Under the terms of the Participation Agreement, upon payment of "all other amounts owing by such Counterparty to Swap Bank in respect of such Counterparty Transaction, in each case (i) to the extent certified by Swap Bank (whether in its demand for payment or otherwise) as not having been paid by such Counterparty when due ...." Wells Fargo was to assign Mercantile all of its rights and responsibilities under the swap agreement. Mercantile cannot have it both ways. If a monthly payment falls within the definition of a swap liability, as this Court agrees that it does, then the above applies. There is nothing in the Participation Agreement to indicate that Mercantile gets to stop making payments when it chooses and thus force Wells Fargo to declare a default event when Mercantile feels it is appropriate. This would leave enforcement of the terms of the swap agreement and the potential damages for which CLMIA could be liable in the hands of a party outside of the contract signed only by CLMIA and Wells Fargo.

 *24 Finally, Mercantile contends that its equitable claims against CLMIA should not have been dismissed at the pleading stage, given that it has no remedy to recover the monthly payments it made to Wells Fargo in CLMIA's stead other than through its claims of equitable subrogation, unjust enrichment, and implied contract. We disagree.

Equitable subrogation "is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." *Auto–Owners Ins. Co. v. Amoco Prod Co.,* 468 Mich. 53, 59; 658 NW2d 460 (2003). "In order to be entitled to subrogation, a subrogee cannot voluntarily have made payment, but rather must have done so in order to fulfill a legal or equitable duty owed to the subrogor." *Ameriquest Mortgage Co. v. Alton,* 273 Mich.App 84, 95; 731 NW2d

99 (2006)(superseded by statute on other grounds as stated in *CitiMortgage, Inc. v. Mortgage Electronic Registration Systems, Inc.,* 295 Mich.App 72; 813 NW2d 332 (2011)).

Mercantile is not and would not be entitled to equitable subrogation from CLMIA because it did not make the monthly payments to Wells Fargo in order to fulfill a legal or equitable duty owed to CLMIA as the alleged subrogor. Once payment of a single swap liability was made by Mercantile under the Participation Agreement, then Wells Fargo had the obligation to assign all of its rights under the swap agreement to Mercantile. Mercantile did not ensure that it and Wells Fargo's Participation Agreement was adhered to immediately; that is a separate issue between those two parties, not raised on appeal.

Mercantile further argues that CLMIA was unjustly enriched by Mercantile's monthly payments to Wells Fargo or that it should be entitled to recover against CLMIA based on implied contract. To sustain an action for unjust enrichment, plaintiff must "establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of New York Mellon,* 300 Mich.App 9, 22–23; 831 NW2d 897 (2012).

Here, CLMIA did not receive a benefit from Mercantile.[2] First and foremost, CLMIA did not receive anything from Mercantile at all-Wells Fargo did. Second, Mercantile paid Wells Fargo a monthly fee that was purportedly due from CLMIA. However, Mercantile paid this fee for over a year. As indicated, had Mercantile paid the monthly fee one time, an event of default would have occurred and a termination fee would have been calculated. The hundreds of thousands of dollars in monthly fees that Mercantile ultimately paid and now seeks to collect from CLMIA would not have been owed to or paid to Wells Fargo by CLMIA-only a termination fee. Thus, the claim of unjust enrichment would fail in any event.

[2]   Mercantile paid funds to Wells Fargo pursuant to its Participation Agreement with Wells Fargo. Wells Fargo thus received the benefit of those payments. Mercantile paid nothing to CLMIA and CLMIA neither asked Mercantile to pay anything on its behalf to Wells Fargo nor arguably would have owed the monthly payments to Wells Fargo. Wells Fargo would not have otherwise received the monthly payments because CLMIA made it patently clear in November 2008 that it would

Mercantile Bank of Michigan v. CLMIA, LLC, Not Reported in N.W.2d (2015)
201 WL 8 9502W ©

no longer be making the monthly payments to Wells Fargo. The Wells Fargo–CLMIA Swap Agreement contained a termination provision for such an event. Had Mercantile not made more than one such payment, as it could have done under the terms of Participation Agreement, what ultimately occurred in 2010 when Mercantile did stop making the monthly payments to Wells Fargo would have happened much earlier and the default would have occurred in December 2008. Further, CLMIA is still liable for the termination fee, as it would have been in December 2008. CLMIA thus did not receive the benefit of Mercantile's voluntary monthly payments to Wells Fargo, which Mercantile now seeks to recoup through its unjust enrichment claim.

A contract will be implied only if no express contract between the same parties exists that covers the same subject matter.

*Morris Pumps v. Centerline Piping, Inc.,* 273 Mich.App 187, 194; 729 NW2d 898 (2006). Furthermore, an implied contract will be found only when there has been receipt of a benefit by one party from the other, and it would be inequitable for the party to retain such a benefit. *Id.* at 195. Again, Mercantile has not and cannot establish a benefit to CLMIA from Mercantile. Thus, no implied contract theory of recovery would succeed. In sum, Mercantile's equitable subrogation, unjust enrichment, and implied contract claims were properly dismissed.

**\*25** Affirmed.

**All Citations**

Not Reported in N.W.2d, 2015 WL 630259

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 33

2011 WL 7267851
Only the Westlaw citation is currently available.
United States District Court,
W.D. Oklahoma.

NAYLOR FARMS, INC., Plaintiff,

v.

ANADARKO OGC COMPANY, et al., Defendants.

No. CIV–08–668–R.
|
June 15, 2011.

**Attorneys and Law Firms**

Conner L. Helms, Darren R. Cook, Erin M. Moore, Gary
R. Underwood, Helms Underwood & Cook, Oklahoma City,
OK, for Plaintiff.

Dennis C. Cameron, M. Benjamin Singletary, Lisa T.
Silvestri, Gable & Gotwals, James C.T. Hardwick, Mark
Banner, Pamela S. Anderson, Hall Estill, Tulsa, OK, for
Defendants.

*ORDER*

DAVID L. RUSSELL, District Judge.

**\*1** Before the Court is Defendant QEP Energy Company's
motion for partial summary judgment on Plaintiff's claim for
unjust enrichment. [Doc. No. 151]. In support of its motion,
Defendant argues that it is entitled to summary judgment
on Plaintiff's class claim because it was never certified as a
class claim. Alternatively, Defendant argues that it is entitled
to summary judgment on Plaintiff's and the class members'
claim for unjust enrichment because the Plaintiffs have an
adequate remedy at law, because QEP has not received any
of the monies that Plaintiffs claim are owed, Plaintiffs are not
entitled to disgorgement because the amounts Plaintiffs seek
are not proceeds paid to or received by QEP, and that an award
of purported earnings or profits of QEP on any proceeds QEP
received that Plaintiffs claim should have been paid to royalty
owners is not an appropriate unjust enrichment remedy.

Plaintiffs in response maintain that the Court did certify unjust
enrichment as a class claim but point out that they have sought
clarification of the Court's certification Order. The Court has
now corrected its certification Order to include the unjust

enrichment claim as one of the claims it certified as a class
claim.

Plaintiffs argue that Defendant's motion on Plaintiffs' class
claim for unjust enrichment is premature because it has not
been determined whether Plaintiffs are entitled to recover on
the breach of contract claim. Plaintiffs assert that whether or
not they have an adequate remedy at law can be determined
only after it is determined whether Plaintiffs have obtained
full recovery on their breach of contract claim. Plaintiffs
also argue that they may pursue their unjust enrichment
claim as an alternate theory of recovery under Oklahoma
and Tenth Circuit law and that disgorgement, including
profits on moneys that should have been paid to Plaintiffs,
is an appropriate remedy. Plaintiffs further argue that QEP's
argument that it did not receive the proceeds Plaintiffs claim
are owed to them is disingenuous because QEP saved itself
money and benefitted itself by structuring its transaction with
DCP as a sale. Unjust enrichment, according to Plaintiffs,
encompasses "negative unjust enrichment" which permits
recovery of the money QEP saved.

Plaintiff is correct that a party may plead and may pursue
alternative theories of recovery, and sometimes may even
pursue both legal and equitable alternative claims, provided
that double recovery is not allowed. *See Burlington Northern
and Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1029–
30 (10th Cir.2007), citing *N.C. Corff Partnership, Ltd. v.
Oxy USA, Inc.,* 929 P.2d 288, 295 (Okla.Civ.App.1996);
F.R.Civ.P. 8(d)(2). However, it is equally true that to invoke
equity jurisdiction, it must be shown that no adequate
statutory or legal remedy is available. *Billingsley v. North,*
298 P.2d 418, 422 (Okla.1956). Thus, "where the plaintiff
has a plain, speedy and adequate remedy at law equity
will not intervene in his behalf." *Robertson v. Maney,*
196 Okla. 500, 166 P.2d 106, 108 (Okla.1946). Unjust
enrichment is a form of equitable relief that a court will
not ordinarily exercise its equitable jurisdiction to grant
where the plaintiff has an adequate remedy at law. *Harvell
v. Goodyear Tire & Rubber Co.,* 164 P.3d 1028, 1035
(Okla.2006); *Robinson v. Southerland,* 123 P.3d 35, 45
(Okla.Civ.App.2005), *cert. denied* (Okla.2005); *Hydro Turf,
Inc. v. International Fidelity Insurance Co.,* 91 P.3d 667,
673 (Okla.Civ.App.2004). Where an enforceable express
contract governs the parties' relationship, quasi-contractual
remedies such as unjust enrichment are not available. *See
Member Services Life Insurance Co. v. American National
Bank and Trust Co.,* 130 F.3d 950, 957–58 (10th Cir.1997);
*Edwards v. Farmers Insurance Co.,* 2009 WL 4506218 at

Naylor Farms, Inc. v. Anadarko OGC Co., Not Reported in F.Supp.2d (2011)
2011 WL 7267851

*4 (N.D.Okla. Nov. 24, 2009) (No. 08–CV 730–TCK–PTC) (only if Defendants convince the Court or jury that no contract existed at the time of the Plaintiff's loss is there the possibility of a need for a quasi-contractual remedy); *AG Equipment Co. v. AIG Life Insurance Company, Inc.,* 2009 WL 223106 at *8 (N.D.Okla. Jan. 28, 2009)(No. 07–CV–0556–CVE–PJC)(party may allege equitable claim as alternative to a contract—based claim but where it is clear that the parties' relationship is governed by a contract, i.e., when one or the other party will recover on its breach of contract claim, there is an adequate remedy at law and the plaintiff was entitled to summary judgment on the counterclaim for equitable relief). *See also Harvell v. Goodyear Tire & Rubber Company,* 164 P.3d at 1035 n .38 (citing cases from other jurisdictions holding that unjust enrichment claim fails if an express contract governing the parties' relationship exists). Where a party has an adequate remedy at law for breach of contract or negligence, regardless of whether the party actually recovers thereon, the party may not pursue a claim for unjust enrichment. *Robinson v. Southerland,* 123 P.3d at 45 (breach of contract claim available against plaintiff's attorneys); *Hydro Turf, Inc. v. International Fidelity Insurance Co,* 91 P.3d at 673 (because Hydro Turf had an adequate remedy available at law through its negligence claim, even though the summary judgment for it on that claim had to be reversed, it was unnecessary for trial court to invoke its equitable jurisdiction on the unjust enrichment claim and the trial court erred in awarding summary judgment to Hydro Turf on the unjust enrichment claim). The cases of *Burlington Northern and Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, and *N.C. Corff Partnership, Ltd. v. Oxy USA, Inc.,* 929 P.2d 288, on which Plaintiffs rely are distinguishable because in those cases there was no negligence claim or contract governing the parties relationship such that it could be determined as a matter of law that the plaintiff had an adequate remedy at law by virtue of a negligence or breach of contract claim.

*2 In this case it is undisputed that the Plaintiffs are lessors/ parties to oil and gas leases to some or all of which Defendant QEP is the lessee or successor lessee. [1] Such oil and gas leases are contracts and implied in each of them is the implied covenant to market, which includes the obligation of the lessee to put gas in marketable form. Plaintiffs' class claim

for unjust enrichment is based upon the same contentions that support their class claims for breach of contract and the claim included in the breach of contract claim for breach of the implied covenant to market. Thus, the claims of all class Plaintiffs having oil and gas leases to which Defendant QEP is a party either as lessee or successive lessee are governed by express contracts, they have an adequate remedy at law for breach of contract and their claims for unjust enrichment fail as a matter of law. Defendant QEP is entitled to summary judgment on such class Plaintiffs' claim for unjust enrichment. As to those class Plaintiffs having oil and gas leases to which Defendant QEP is not a party because it is not the lessee or successive lessee, the Court DENIES Defendant's motion as premature and declines to address the other issues raised by Defendant's motion for partial summary judgment.

[1]     As Plaintiffs point out, in Defendant's Response to Plaintiff's Motion for Partial Summary Judgment Regarding Fiduciary Duty [Doc. No. 120], Defendant QEP did not dispute the statement in Plaintiff's Motion for Partial Summary Judgment Regarding Fiduciary Duty [Doc. No. 116] that QEP was the lessee or successor lessee on all of the class Plaintiffs' oil and gas leases. *Compare* Doc. No. 116, Statement of Undisputed Facts at ¶ 2 with Doc. No. 120, Response to Plaintiff's Statement of Facts at ¶ 2. But with the current motion, Defendant QEP has submitted the Declaration of Michael Butcher (Exhibit "1" to Doc No. 151) in which he attests that in most of the class wells, working interest owners, not QEP, are the lessees or successor lessees. *Id.* at ¶ 4.

In accordance with the foregoing, Defendant QEP Energy Company's motion for partial summary judgment on Plaintiff's claim for unjust enrichment [Doc. 151 ] is GRANTED in part and DENIED in part as set out herein.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7267851

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 34

2019 WL 6529163
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Steven and Ellen PALMER, Individually and
on Behalf of All Others Similarly Situated

v.

CVS HEALTH and Nice-Pak Products, Inc.

Civil Action No. CCB 17-938
|
Signed 12/04/2019

**Attorneys and Law Firms**

Dana Whitehead McKee, Jessica Paulie Weber, Brown
Goldstein and Levy LLP, Baltimore, MD, Mark S. Reich, Pro
Hac Vice, Vincent M. Serra, Pro Hac Vice, Robbins Geller
Rudman and Dowd LLP, Melville, NY, for Steven Palmer,
Ellen Palmer.

Darryl Louis Tarver, DLA Piper LLP, Stephen Edward
Marshall, Brian J. Healy, Venable LLP, Baltimore, MD,
Dustin B. Rawlin, Pro Hac Vice, John Q. Lewis, Pro Hac Vice,
William H. Berglund, Pro Hac Vice, Karl A. Bekeny, Pro Hac
Vice, Tucker Ellis LLP, Cleveland, OH, for CVS Health,
Nice-Pak Products, Inc.

CLASS ACTION

**MEMORANDUM**

Catherine C. Blake, United States District Judge

**\*1** Steven and Ellen Palmer (the "Palmers") filed this
putative class action against CVS Health and Nice-
Pak Products, Inc. (the "defendants") alleging that they
misleadingly labeled their wipes as "flushable" when they
were not. Now pending are the defendants' motion for leave
to file amended answers and the defendants' motion for
judgment on the pleadings as to the Palmers' claims for
injunctive relief, negligent misrepresentation (as to Nice-
Pak), and breach of express warranty.[1] The motions have
been fully briefed and no oral argument is necessary. For
the reasons stated below, the court will grant the motion for
leave to file amended answers, and will grant in part and
deny without prejudice in part the motion for judgment on the
pleadings.

[1]    The Palmers also brought claims for violations
of the Maryland Consumer Protection Act §
13-301, for unjust enrichment, and for negligent
misrepresentation as to CVS. The defendants do
not seek to dismiss these claims.

**FACTS**

The Palmers began purchasing CVS Flushable Medicated
Wipes in 2012. (Corrected Compl. ¶ 68, ECF 21). CVS
Flushable Medicated Wipes, as well as CVS Flushable
Cleansing Wipes and CVS Flushable Ultra Soft Cleansing
Wipes, are manufactured by Nice-Pak. (*Id.* ¶¶ 2, 8). The
wipes were advertised as safe to flush down toilets, but
when the Palmers began flushing the wipes down their home
toilets, they experienced plumbing issues. (*Id.* ¶¶ 69, 72).
Around October 2014, their sewer system backed up, and
they employed professional plumbers to snake their home
plumbing. (*Id.* at 169). Upon snaking the plumbing, the
plumbers found still-intact flushable wipes products and
warned the Palmers that flushing these wipes "will destroy
your system." (*Id.*). After being advised to search online,
the Palmers saw several articles detailing the damage the
flushable wipes could cause. (*Id.*). A plumber had to return
at least one more time to clear the Palmers' pipes. (*Id.* ¶ 70).
The Palmers allege that many others faced similar "horror
stories" wherein the purportedly flushable wipes damaged
their plumbing, (*id.* ¶¶ 21–27), and also allege that flushable
wipes have caused problems in municipal sewer systems
across the country, (*id.* ¶¶ 38–61).

The Federal Trade Commission ("FTC") began investigating
Nice-Pak's flushable wipes, and entered into a consent
agreement with Nice-Pak in 2015.[2] (*Id.* ¶ 62). Under
that agreement, the FTC ordered Nice-Pak not to market
its wipes as flushable "unless the representation is non-
misleading, and, at the time the representation is made,
Respondent possesses and relies upon competent and reliable
evidence[.]" (FTC Decision and Order at 2, *In the Matter of
Nice-Pak Products*, ECF 177–4). The order is in effect until
October 30, 2035, or twenty years from the most recent date
the United States or the FTC files a complaint alleging a
violation of the order. (*Id.* at 5).

[2]    Although the agreement does not contain a date,
it appears that the Agreement Containing Consent
Order (ECF 177-3) was entered into on May 18,

2015. (*See* Corrected Compl. ¶ 62). It was then open for comments (*see* Letter from D. Clark to K. Schmid, ECF 177-2), and on October 30, 2015, the FTC issued the Final Decision and Order (ECF 177-4).

**\*2** The Palmers initially filed in the Eastern District of New York. On April 10, 2017, the case was transferred to this court. *Steven v. CVS Health & Nice-Pak Products, Inc.*, No. 15-CV-2928, 2017 WL 656767, at \*2 (E.D.N.Y. Feb. 17, 2017); Order, ECF 121 (case to be transferred April 10, 2017). On May 9, 2018, the court granted the parties' motion to stay,[3] pending decisions in the related cases *Kurtz v. Kimberly-Clark Corp. et. al.*, No. 14-cv-1142, and *Belfiore v. Proctor & Gamble Co.*, No. 14-cv-4090 (on appeal in the Second Circuit),[4] and *The Preserve at Connetquot Homeowners Assoc, Inc. v. Costco Wholesale Corp., et al.*, No. 17-cv-7050 (E.D.N.Y.). (ECF 164). On January 28, 2019, the document in *Preserve* dismissed the case without prejudice for lack of standing. (Status Report, ECF 165). *Preserve* is currently on appeal. (Status Report, ECF 170). On May 14, 2019, the Second Circuit issued a summary order in *Kurtz* and *Belfiore*, remanding the cases to the U.S. District Court for the Eastern District of New York for further proceedings on the Rule 23(b)(3) predominance requirement.[5] (*Id.* at 2). The stay in this case was lifted on June 25, 2019. (ECF 173).

[3]   This case previously had been stayed on May 30, 2017, pending the *Kurtz* and *Belfiore* decisions. (ECF 145).

[4]   *Kurtz* and *Belfiore* were heard by the Second Circuit in tandem.

[5]   On remand, the district court again concluded that the predominance requirement was met. *Kurtz v. Kimberly-Clark Corp.*, ⸺ Supp. 3d ⸺, 2019 WL 5483510, at \*12 (E.D.N.Y. Oct. 25, 2019).

### STANDARD OF REVIEW

Motion for leave to amend:

Leave to amend should be freely granted under Rule 15(a), and amendments are generally accepted absent futility, undue prejudice, or bad faith. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009) (explaining that leave to amend "should be denied only when the amendment would be

prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile").

Motion for judgment on the pleadings:

Motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are decided under the same standard as motions to dismiss under Rule 12(b)(6). *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim, However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments' " in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

### DISCUSSION

Leave to amend:

CVS and Nice-Pak seek to amend their answers to add the additional defenses of: lack of class action standing, primary jurisdiction, statute of limitations, speculative damages, failure to plead punitive damages, injunctive relief is moot, spoliation of evidence, compliance with federal and industry standards and, for Nice-Pak only, lack of privity.

**\*3** The court will grant the defendants' motion to amend. Although this case was filed in 2015 and transferred to this court in 2017, there has been no formal discovery because of the requested stays and the motion for judgment on the pleadings.[6] The Palmers have not shown that they relied on the affirmative defenses asserted in the answers in taking any action in this case, and have not shown that allowing

Palmer v. CVS Health, Slip Copy (2019)

2019 WL 6529163

the amendments would prejudice them. Although the Palmers cite to *Rangarajan v. Johns Hopkins Health System Corp.*, in that case, the court denied the plaintiff's motion to amend her complaint because the amendment "would inescapably lead to a second motion to dismiss and round of briefing which would further delay the start of any discovery" and "[t]he proposed amendment would fundamentally change the nature of Plaintiff's claims." No. WMN-12-1953, 2015 WL 1712270, at *3 (D. Md. April 14, 2015). Here, there is no showing that allowing the defendants to amend their answers would result in any additional briefing, delay discovery, or fundamentally change the nature of the case. [7]

[6]      Although there has been no formal discovery, it appears the defendants produced approximately 19,000 documents and 77,000 pages to the Palmers in January 2018 upon agreement of the parties. (ECF 193; ECF 194). Additionally, the parties filed a proposed discovery plan pending resolution of defendants' motion for judgment on the pleadings, which the court approved on September 13, 2019 (ECF 194), and a stipulated protocol for collection and production of electronically stored information and hard copy documents, which the court approved on September 17, 2019 (ECF 197).

[7]      The Palmers further argue that the defenses of spoliation of evidence, speculative damages, the failure to plead punitive damages, and failure to plead class action standing are not proper affirmative defenses and do not need to be pled in the answer. The court will permit the defendants to amend their answers to include these defenses, without deciding whether they are properly labeled as affirmative defenses. If they are not required to be pled in the answer, as the Palmers argue, then the Palmers "can claim no prejudice by the court's permitting amendment. In fact [the Palmers] benefit[ ] from the defendants' advance notice of their intent" to raise these defenses. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155–56 (4th Cir. 1995).

Standing for injunctive relief:

Plaintiffs seeking injunctive relief must show they are "in danger of being injured by the opposing party's conduct and that the danger is both 'real' and 'imminent.' " [8] *Gardner v. Montgomery Cnty. Teachers Fed. Credit Union*, 864 F. Supp. 2d 410, 421 (D. Md. 2012) (quoting *City of Los Angeles v.*

*Lyons*, 461 U.S. 95, 102 (1983)). Therefore, "[a] plaintiff has standing to sue for injunctive relief when there is a 'real or immediate threat' that the party will suffer an injury in the future." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (citation omitted). Relevant here, the Ninth Circuit has held that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling" if she plausibly alleges "that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to" or that "she might purchase the product in the future, despite the fact that it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

[8]      "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.' " *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) (citations omitted).

**\*4** The Palmers do not plausibly allege a likelihood of future injury. They do not allege that they want to or plan on purchasing the flushable wipes in the future. Rather, they allege that "after being advised by their plumbers not to flush anything down the toilet other than human waste and toilet paper, [they] stopped purchasing the CVS Flushable Medicated Wipes altogether." (Corrected Compl. ¶ 71). The complaint also alleges that the Palmers purchased the wipes because they were labeled as "flushable" and "would not have purchased the wipes had they not been labeled as such." (*Id.* ¶ 72). Therefore, the complaint does not contain any allegations of future injury, but instead implies that the Palmers do not plan on purchasing these wipes in the future.

The Palmers urge this court to follow the lead of other courts that have relaxed the future injury requirement in consumer protection cases. [9] *See Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 445 (E.D.N.Y. 2015) ("To hold otherwise would denigrate the New York consumer protection statute[.]"); *Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RMI), 2013 WL 7044866, at *15 n.23 (E.D.N.Y. July 18, 2013) ("This is the harm New York's and California's consumer protection statutes are designed to redress."). [10] These cases, however, are in contrast to

2019 WL 6529163

the opinions of several other courts, including the Second Circuit and a court in this circuit, that have held plaintiffs lack standing to seek injunctive relief when they do not sufficiently allege a likelihood of future harm. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (plaintiff did not have standing to seek an injunction relating to the sale of an appetite suppressant because he did not allege a likelihood of future harm); *Hassan v. Lenovo*, No. 5:18-CV-105-BO, 2019 WL 123002, at *6 (E.D.N.C. Jan. 7, 2019) [11] (plaintiff did not have standing to seek injunctive relief in a products liability action because "he does not allege that he intends to buy another Phab 2."). [12]

[9]     The Palmers also cite to two Fourth Circuit cases, but both required the plaintiffs to show a likelihood of future injury to obtain injunctive relief. *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (district court did not abuse its discretion by finding a likelihood of future injury when "PBM's reputation was, and potentially continues to be, damaged" as a result of a competitor sending mailers with false claims); *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 456 (4th Cir. 2017) (plaintiff sufficiently alleged a likelihood of future injury when he plausibly stated he would return to a location that was not compliant with the Americans with Disabilities Act).

[10]     *See also Koehler v. Litehouse, Inc.*, No. CV 12-04055 SI, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012). *Ries v. Az. Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012), also cited by the Palmers, found a likelihood of future injury when "the record is devoid of any grounds to discount plaintiffs' stated intent to purchase in the future." But here, the Palmers have not alleged any intent to purchase flushable wipes from CVS or Nice-Pak in the future.

[11]     Unreported decisions are cited for the soundness of their reasoning, not for any precedential value.

[12]     *See also Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 566 (S.D.N.Y. 2017) ("Courts that have permitted plaintiffs to seek injunctive relief under similar circumstances have done so for public policy reasons" but "they appear to confuse whether a plaintiff has Article III standing to sue in federal court with whether the purposes of

the state law would be furthered by permitting plaintiffs to seek injunctive relief," and noting that plaintiffs are still free to pursue their claims in state court); *see also Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 194 (D.D.C. 2013) (declining to conclude "that public policy requires plaintiffs to have standing here, notwithstanding the requirements of Article III" but instead finding the plaintiffs had sufficiently alleged a likelihood of future harm).

**\*5** Because the Palmers do not sufficiently allege a likelihood of future injury, the court will dismiss their request for injunctive relief. Accordingly, the court has no reason to consider the defendants' primary jurisdiction argument. [13]

[13]     The defendants also argue in their motion that "[t]o the extent Plaintiffs seek to represent a class of consumers who purchased the Cleansing Wipes or Ultra Soft Cleansing Wipes" the Palmers cannot do so because they only purchased the "CVS Flushable Medicated Wipes." (Defs.' Mot. for Judgment on the Pleadings at 15, ECF 177). The court declines to consider this argument until the Palmers actually seek to certify the class.

Negligent misrepresentation claim against Nice-Pak:
To establish a claim for negligent misrepresentation under Maryland law, a plaintiff must prove:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that the statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, took action in reliance on the statement, and (5) the plaintiff suffered damage proximately caused by the defendant's negligence.

*Swinson v. Lords Landing Village Condo.*, 360 Md. 462, 477 (2000). [14] "Where the failure to exercise due care

creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534–35 (1986). "[T]he rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages [is] to avoid liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 671 (2000) (internal quotation marks and citation omitted). To determine whether there is ah intimate nexus, courts should focus on the defendant's knowledge, that is, whether "the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did." *Select Exp., LLC v. Am. Trade Bindery, Inc.*, 178 Md. App. 607, 615 (2008) (citation omitted).

14        The parties do not dispute that Maryland law applies.

As an initial matter, it is not clear from the complaint whether Nice-Pak was responsible for the labeling of the CVS flushable wipes. Assuming they were, Nice-Pak had no interactions with the Palmers, making it difficult to find "contractual privity or its equivalent." Further, finding an intimate nexus between Nice-Pak and consumers of its flushable wipes could subject Nice-Pak to damages "in an indeterminate amount for an indeterminate time to an indeterminate class," which is what the intimate nexus requirement was meant to avoid. The court, however, declines to decide the issue now, without additional information about Nice-Pak's role in labeling the wipes. [15] Additionally, because a number of the Palmers' claims against Nice-Pak will proceed, the parties would have to engage in discovery related to negligent misrepresentation even if that specific claim were not in the case. Therefore, the court will deny without prejudice the defendants' motion for judgment on the pleadings as to the negligent misrepresentation claim against Nice-Pak.

15        Further, neither side proffered case law directly relevant to these specific factual circumstances.

Breach of express warranty claim against Nice-Pak:

**\*6** An express warranty is established by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the

bargain," or "[a]ny description of the goods which is made part of the basis of the bargain." Md. Code. Ann., Com. Law. § 2-313(1). To prevail on a claim for breach of express warranty under Maryland law, "a plaintiff is required to establish that 1) a warranty existed; 2) the product did not conform to the warranty, and 3) the breach proximately caused the injury or damage." *SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585, 589 (D. Md. 2002) (citation omitted).

"Privity of contract remains an essential ingredient ... in a breach of express warranty action not involving personal injury, because privity between the plaintiff and defendant is requisite to maintain a contract action unless the plaintiff is either a donee beneficiary or a creditor beneficiary." *Addressograph-Multigraph Corp. v. link*, 273 Md. 277, 280 (1974); *see also Wood Prods., Inc. v. CMI Corp.*, 651 F. Supp. 641, 649 (D. Md. 1986) ("Privity is ... required in an action for breach of express warranty ... in which only economic loss is claimed."); *H & M Co., Inc. v. Technical Heat Transfer Servs., Inc.*, No. TDC-14-1518, 2015 WL 1472000, at \*4 (D. Md. March 30, 2015) ("H & M's claim for breach of express warranty will be dismissed because privity is a required element for such a claim.").

The Palmers do not allege they were in privity with Nice-Pak, as it appears they bought the wipes from CVS and not from Nice-Pak. Nor do they allege that they were a donee beneficiary or creditor beneficiary of any contract entered into by Nice-Pak. *C.f. Lawley v. Northam*, No. ELH-10-1074, 2011 WL 6013279, at \*13 (D. Md. Dec. 1, 2011) (finding "a genuine dispute of material fact regarding the Lawleys' argument that they are third-party beneficiaries to the contract" with respect to their breach of warranty claim). Therefore, they have failed to allege privity, which is necessary for their breach of express warranty claim. [16] For these reasons, the court will dismiss the Palmers' breach of express warranty claim against Nice-Pak.

16        The Palmers cite to *Ault v. J.M. Smucker Co.*, but that case is inapposite because it relies on New York law, which apparently does not require privity in a breach of express warranty claim. No. 13 Civ. 3409(PAC), 2014 WL 1998235, at \*7 (S.D.N.Y. May 15, 2014) ("[P]rivity between Plaintiff and Defendant is not required"). The Palmers also cite to *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 475 (E.D.N.Y. 2013), which found a "special relationship between the parties" necessary for a negligent misrepresentation claim, but is not

Palmer v. CVS Health, Slip Copy (2019)

2019 WL 6529163

relevant to whether the Palmers can show privity on their express warranty claim.

Breach of express warranty claim against CVS:

Under Md. Code, Com. Law, § 2-607(3)(a), a buyer "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *See Frericks v. Gen. Motors Corp.*, 278 Md. 304, 310 (1976); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011) (involving a claim for breach of implied warranty). [17] Where such notice is not given, the buyer loses "the right of his remedy." *Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 17 (1974) (internal quotation marks omitted).

[17]    *Doll*, as well as *Lynx, Inc. v. Ordnance Products, Inc.* and *Lloyd v. General Motors Corp.*, *infra*, involve claims for breach of implied warranty, not for breach of express warranty. It does not appear, however, that § 2-607(3)(a)'s notice requirement applies differently to a claim for breach of implied warranty than it does to a claim for breach of express warranty. *See* § 2-607(3)(a) (referring to "any breach" without distinction between breaches of express or implied warranty); *Frericks*, 278 Md. at 306, 316 (1976) (analyzing claims for breach of express and implied warranty under the notice requirement); *see also Brown-High v. L'Oreal USA, Inc.*, No. GJH-17-276, 2017 WL 5952688, at *4 (D. Md. Nov. 29, 2017) (same).

*7 The Palmers appear to concede that they did not provide pre-suit notice to CVS; rather, they argue that the "pre-suit notice requirement is not served" here as the defendants had ample notice of the defect because of the "long history of consumer complaints and litigation on these issues." (Pls.' Opp'n to Defs.' Mot. for Judgment on the Pleadings at 22–23, ECF 186). "This kind of 'notice,' however, is not what the law requires." *Lloyd v. Gen. Motors Corp.*, 575 F. Supp. 2d 714, 723 (D. Md. 2008). The Palmers provide no Maryland case to support their argument that a court may disregard the pre-suit notice requirement when it is not served in a particular situation. [18] Therefore, the court will also

dismiss the Palmers' breach of express warranty claim against CVS. [19]

[18]    *Brown-High* looked to the intent of § 2-607 in finding it did not bar a remedy, but in different circumstances. 2017 WL 5952688, at *4. There, the buyer provided pre-suit notice to the manufacturer but not the seller. *Id.* The court looked to the rationale of § 2-607 to find that when "the manufacturer has been provided with sufficient pre-suit notice, the underlying policy of § 2-607 has been satisfied," and suit was permitted against the manufacturer. *Id.* Here, though, the Palmers did not provide pre-suit notice to the seller, CVS, or the manufacturer, Nice-Pak.

[19]    Courts have held that if a buyer fails to provide pre-suit notice to the seller, the buyer is also barred from maintaining a breach of warranty action against the manufacturer. *See Doll*, 814 F. Supp. 2d at 542 (citing *Lloyd*, 575 F. Supp. 2d at 723 ("It is only logical ... that a consumer's failure to observe [the pre-suit notice requirement] should provide the manufacturer with an affirmative defense.")). Therefore, aside from the lack of privity with Nice-Pak, Palmers' breach of express warranty claim against Nice-Pak also would fail for lack of pre-suit notice.

## CONCLUSION

For the reasons stated above, the court will grant the defendants' motion for judgment on the pleadings as to the Palmers' request for injunctive relief and their claim for breach of express warranty against CVS and Nice-Pak. The court will deny the motion without prejudice as to the Palmers' claim for negligent misrepresentation against Nice-Pak. The court also will grant the defendants' motion for leave to file amended answers. A separate order follows.

**All Citations**

Slip Copy, 2019 WL 6529163

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 35

2009 WL 3923350
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

PEACE SOFTWARE, INC., a
Delaware Corporation, Plaintiff,

v.

HAWAIIAN ELECTRIC COMPANY,
INC., a Hawaii Corporation, Defendant.

Civ. No. 09–00408 SOM /LEK.
|
Nov. 17, 2009.

West KeySummary

1    **Federal Civil Procedure**  🔑  Fraud, mistake
     and condition of mind

     Software company sufficiently pled a fraudulent
     inducement claim based on its allegation that
     electric company made a false statement in its
     request for proposals (RFP). Software company
     alleged that electric company's RFP contained
     a fraudulent statement that electric company
     was seeking bids for only commercially
     available software. Software company alleged
     that the statement was fraudulent because
     electric company had no intention of installing
     a commercially available consumer information
     system (CIS), and actually planned to install
     a custom-made CIS. Fed.Rules Civ.Proc.Rule
     9(b), 28 U.S.C.A.

     13 Cases that cite this headnote

**Attorneys and Law Firms**

Jeannette H. Castagnetti, Margery S. Bronster, Bronster
Hoshibata, Attorneys at Law, A Law Corporation, Sunny S.J.
Lee, Bronster Hoshibata, Honolulu, HI, Neal J. Stephens,
Stephen C. Neal, Cooley Godward Kronish, Palo Alto, CA,
for Plaintiff.

Glenn T. Melchinger, Alston Hunt Floyd & Ing, Honolulu,
HI, for Defendant.

*ORDER GRANTING IN PART, DENYING IN PART
DEFENDANT'S MOTION TO DISMISS AND
TO STRIKE PORTIONS OF THE COMPLAINT*

SUSAN OKI MOLLWAY, Chief District Judge.

I. *INTRODUCTION.*

 **\*1**  This case concerns the nature and scope of software
and services that Plaintiff Peace Software, Inc., was required
by contract to provide to Defendant Hawaiian Electric
Company, Inc. Peace alleges that, among other things, HECO
breached the contract. Before the court is HECO's motion
to dismiss Peace's fraudulent inducement and negligent
misrepresentation claims and to strike some of Peace's
allegations. The court grants a portion of HECO's motion by
limiting the fraudulent inducement claim to a single instance,
but denies the remainder of the motion.

II. *BACKGROUND.*

In 2004, HECO decided to upgrade and replace its consumer
information system ("CIS"). Compl. ¶¶ 2, 14 (Aug. 31, 2009).
HECO thought that a new CIS would improve, among other
things, its management of customer accounts, products, and
services. *Id.* ¶ 15.

HECO allegedly could have upgraded its CIS in one of four
ways. HECO could have outsourced the communications
expense to a third party, internally developed a new system
using custom-developed software, upgraded its current
system, or bought a commercially available prepackaged
system. *Id.* ¶ 16. Although HECO allegedly wanted to
internally develop a custom-tailored system, HECO decided
to buy a prepackaged system. *Id.* ¶ 17. Thus, in 2004 HECO
sought approval from the Hawaii Public Utilities Commission
("PUC") of its decision to buy a prepackaged system from an
outside vendor. *Id.* ¶¶ 2, 18–19. The PUC approved HECO's
plan in May 2005. Pl.'s Mem. Opp. Mot. Dismiss 2 (Oct. 29,
2009).

HECO then issued a request for proposals ("RFP") inviting
bids for the installation of a CIS for HECO. Compl. ¶ 2;
Def.'s Mem. Supp. Mot. Dismiss 1 (Oct. 5, 2009). HECO's
RFP allegedly described its requirements for the new CIS
and allegedly asked for bids from only companies that sold
prepackaged software. Compl. ¶ 23.

Peace says that it submitted a bid that, based on HECO's RFP, satisfied HECO's requirements. *Id.* ¶ 25. HECO accepted Peace's bid. *Id.* ¶ 29. On March 10, 2006, the parties entered into a contract, called an Implementation Services Agreement, in which Peace agreed to install a new CIS for HECO. *Id.* ¶ 31. They also entered into a software license agreement, and a "statement of work" that described the scope of the work to be performed by each party. *Id.* ¶¶ 32–33.

Peace began implementing the new CIS, but work on the CIS fell behind schedule and costs for the project exceeded what had been anticipated. Def.'s Mem. Supp. Mot. Dismiss 2. Peace alleges that the delays and increased costs resulted from HECO's desire for a custom-made CIS, something Peace could not implement for the agreed-upon price. Compl. ¶¶ 24–28. Peace alleges that HECO intentionally misled Peace into believing that Peace's prepackaged CIS would meet its needs. *Id.* ¶ 75. Peace says that it "became clear that HECO's demands far exceed [ed] the scope of work set forth in the Agreements." *Id.* ¶ 46.

 **\*2** Peace filed suit after negotiations between the parties over payment and the scope of work stalled. Among Peace's claims are Count II, alleging that HECO made intentional misrepresentations in HECO's PUC application, RFP, and contract negotiations and fraudulently induced Peace to install a CIS, and Count III, alleging that HECO was at least negligent in that regard. *Id.* ¶¶ 79–84.

HECO moves to dismiss Count II and Count III on the ground that Peace has failed to plead these counts with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. HECO also argues that certain allegations regarding compromise negotiations should be stricken as impertinent and immaterial under Rule 12(f) of the Federal Rules of Civil Procedure. For the reasons set forth below, the court grants HECO's motion in part and limits the scope of the fraudulent inducement claim, but the court denies the remainder of the motion.

III. *STANDARD OF REVIEW.*

A. *Rule 9(b).*
Usually, a party's pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). However, Rule 9(b) requires that, when fraud or mistake is alleged, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Rule 9(b)'s purposes are to provide defendants with adequate notice to allow them to defend against a charge, to protect those whose reputation would be harmed as a result of being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties, and society social and economic costs without some factual basis. *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009).

An allegation of fraud is sufficient if it "identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir.1993)(internal citations and quotations omitted). To sufficiently identify the circumstances that constitute fraud, a plaintiff must identify such facts as the times, dates, places, or other details of the alleged fraudulent activity. *Id.* A plaintiff must plead these evidentiary facts and must explain why the alleged conduct or statements are fraudulent. *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 n. 7 (9th Cir.1994). Allegations of fraud based on information and belief do not satisfy Rule 9(b); instead a plaintiff must state the factual basis for the belief. *Neubronner,* 6 F.3d at 672.

Fraud is sometimes not an essential element of every claim asserted by a plaintiff; only those allegations of a complaint that aver fraud are subject to Rule 9(b)'s heightened pleading standard. *Kearns,* 567 F.3d at 1124. The court should disregard averments of fraud that do not meet Rule 9(b)'s standard, and then determine whether the remaining allegations state a claim. *Id.*

 **\*3** When fraud is not an essential element of a claim, but a plaintiff alleges that a defendant engaged in a "unified course of fraudulent conduct" and relies on that course of conduct for the basis of that claim, the claim is grounded in fraud and the pleading as a whole must satisfy the particularity requirement of Rule 9(b). *Kearns,* 567 F.3d at 1125 (citing *Vess v. Ciba– Geigy Corp. USA,* 317 F.3d 1097, 1102–1105 (9th Cir.2003)). Of course, allegations of nonfraudulent conduct need only satisfy the ordinary pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure. *Vess,* 317 F.3d at 1103.

A court treats a motion to dismiss under Rule 9(b) like a motion to dismiss under Rule 12(b)(6):

> A motion to dismiss a complaint or claim "grounded in fraud" under

Peace Software, Inc. v. Hawaiian Elec. Co., Inc., Not Reported in F.Supp.2d (2009)
2009 WL 3923350

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 309 of 520
PageID: 9230

Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim. If insufficiently pled averments of fraud are disregarded, as they must be, in a complaint or claim grounded in fraud, there is effectively nothing left of the complaint. In that event, a motion to dismiss under Rule 12(b)(6) would obviously be granted. Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner.

*Vess,* 317 F.3d at 1107.

When a court exercises diversity jurisdiction, state substantive law determines the elements of the claims. "[W]hile a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule." *Kearns,* 567 F.3d at 1125 (internal citations and quotations omitted).

B. *Rule 12(f).*
Rule 12(f) of the Federal Rules of Civil Procedure provides that the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The court may act on its own, or on motion made by a party before responding to the pleading or within 20 days after being served with the pleading. Fed.R.Civ.P. 12(f)(1) and (2).

The function of a 12(f) motion is to avoid spending time and money litigating spurious issues by dispensing with those issues before trial. *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir.1983). This court has stated that the "rationale behind granting motions to strike is to avoid prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegation any unnecessary notoriety." *Wailua Assocs. v. Aetna Cas. & Sur. Co.,* 183 F.R.D. 550, 553 (D.Haw.1998). Grounds for a motion to strike

must be readily apparent from the face of the pleadings or from materials that may be judicially noticed. *Id.* at 554. A matter will not be stricken from a pleading unless it is clear that it can have no possible bearing on the subject matter of the litigation. *Id.*

**\*4** Immaterial matter is that which has no essential or important relationship to the claims or defenses pled. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed.2004). Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. *Aetna Cas. & Sur. Co.,* 183 F.R.D. at 553 (noting that an allegation is impertinent when it is irrelevant).

As a general rule, a motion to strike is disfavored because it is often used as a delaying tactic. *Hart v. Baca,* 204 F.R.D. 456, 457 (C.D.Cal.2001) (internal quotations omitted). A Rule 12(f) motion is primarily used to object to an insufficient defense. At least one court has noted that a Rule 12(f) motion is "neither an authorized nor proper way to obtain dismissal of a complaint or portions of a complaint." *Clement v. Am. Greetings Corp.,* 636 F.Supp. 1326, 1332 (S.D.Cal.1986).

IV. *ANALYSIS.*
The court first addresses HECO's contention that Peace did not sufficiently plead its fraudulent inducement and negligent misrepresentation claims. The court then addresses HECO's motion to strike some of the allegations.

*A. Peace Has Sufficiently Pled a Fraudulent Inducement Claim Based on its Allegation That HECO Made A False Statement in its RFP.*
Peace claims that HECO fraudulently induced Peace to agree to install a CIS for HECO. Peace alleges that HECO made false statements on three occasions. HECO argues that Peace fails to plead three false statements with the particularity required by Rule 9(b). This court agrees and limits Peace's claim of fraudulent inducement to a single instance.

To state a claim for fraudulent inducement, a plaintiff must allege (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to his or her damage. *Hawaii Cmty. Fed. Credit Union v. Keka,* 94 Hawaiʻi 213, 230, 11 P.3d 1, 18 (2000).

Peace Software, Inc. v. Hawaiian Elec. Co., Inc., Not Reported in F.Supp.2d (2009)
2009 WL 3923350

Peace alleges that HECO's RFP contains a fraudulent statement that HECO was seeking bids for only "commercially available software." Compl. ¶ 23. This allegation is sufficient to put HECO on notice that Peace is contending that HECO made a false statement in its RFP. *See Neubronner,* 6 F.3d at 671–2 (noting that a pleading alleging fraud is sufficient if defendants can prepare an adequate answer from the allegations). This allegation also gives the time, place, and content, or the "who, what, when, where, and how," of the alleged misconduct. *Kearns,* 567 F.3d at 1124 (internal quotations omitted). This allegedly false statement was included in one specific RFP released after May 2005, after HECO's application for a new CIS had been approved by the PUC. Peace alleges that the statement was fraudulent because HECO had no intention of installing a commercially available CIS, knowingly made a false statement, and actually planned to install a custom-made CIS. Compl. ¶¶ 23, 73. The allegations describing this particular conduct are sufficient to satisfy the heightened pleading requirements of Rule 9(b).

**\*5** By contrast, Peace's allegations that HECO made fraudulent statements in its PUC application and during contract negotiations do not satisfy Rule 9(b). *Id.* ¶ 76. These allegations do not state the time, place, and content of the alleged fraudulent statements. The Complaint does not include or refer to the actual language of the statements in the PUC application or state how any statement in the application was fraudulent. Additionally, there is no allegation as to when the application was submitted. While one might infer statements that Peace might be alleging were included in the application, Rule 9(b) requires more than an inference.

With regard to contract negotiations, there is similarly no allegation of when fraudulent statements were made, who made the statements, and what exactly was said that was fraudulent. These allegations of fraudulent activity fail to satisfy the heightened pleading standard of Rule 9(b). The court disregards these allegations, and the fraudulent inducement claim may proceed based only on the alleged fraud in the RFP. *See Kearns,* 567 F.3d at 1124.

HECO seeks dismissal of Peace's entire fraudulent inducement claim on the additional ground that some of Peace's allegations are made on "information and belief." Allegations made on information and belief do not satisfy the heightened pleading standard of Rule 9(b). *See Neubronner,* 6 F.3d at 672 (noting that as a general rule allegations of fraud based on information and belief do not satisfy Rule 9(b)). The court is unpersuaded.

To the extent any allegation made on "information and belief" does not aver fraud, it need not be pled with specificity under Rule 9(b). *Kearns,* 567 F.3d at 1124 ("To the extent a party does not aver fraud, the party's allegations need only satisfy the requirements of Rule 8(a)(2)."); *see also Vess,* 317 F.3d at 1104 ("To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments, however, serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a)."). And allegations of intent or knowledge on behalf of a defendant need only be generally alleged. *See* Fed.R.Civ.P. 9(b); *see also Neubronner,* 6 F.3d at 372 (noting that "allegations of fraud based on information and belief that do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge"). This court need not decide whether Peace's allegations "on information and belief" that HECO always intended to install a custom-made CIS, and that HECO's ultimate goal was to achieve the benefits of a custom-designed CIS, Compl. ¶¶ 2, 17, allege fraud. Even if the court reads these allegations as alleging fraud, Peace has other allegations that clearly aver fraud without stating that they are made on "information and belief." Compl. ¶¶ 72–78.

**\*6** The same could be said about the other "information and belief" allegations that HECO complains about. Peace alleges on "information and belief" that HECO made a misrepresentation to induce Peace into agreeing to produce a product for a fixed price. Comp. ¶ 24. Elsewhere, Peace alleges on "information and belief" that HECO materially and intentionally misled Peace into believing that HECO wanted a prepackaged CIS. Compl. ¶ 27. Even if the court disregards these allegations, Peace sufficiently pleads a fraudulent inducement claim with respect to the RFP, as Peace has equivalent allegations in the Complaint that do not state that they are made on "information and belief." Compl. ¶¶ 74–75.

This court limits Peace's fraudulent inducement claim to the assertion that HECO made fraudulent statements in the RFP. The claim may proceed on only that ground. *See Kearns,* 567 F.3d at 1124 ("Any averments which do not meet that standard should be disregarded, or stripped from the claim for failure to satisfy Rule 9(b).") (internal quotations omitted).

Peace Software, Inc. v. Hawaiian Elec. Co., Inc., Not Reported in F.Supp.2d (2009)

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 311 of 520
PageID: 9232

2009 WL 3923350

*B. HECO Does Not Establish that Peace's Negligent Misrepresentation Claim Is Subject to The Heightened Pleading Requirements of* Rule 9(b).

Peace alleges that the same conduct that forms the basis of Peace's fraudulent inducement claim supports a negligent misrepresentation claim. Peace asserts, "At the very least, HECO's misrepresentations and omissions of material fact were the result of HECO's failure to exercise reasonable care and competence." Compl. ¶ 80. In other words, Peace says that HECO performed negligently in submitting its application to the PUC, in drafting its RFP, and in negotiating the contract. HECO seeks dismissal of the negligent misrepresentation claim on the ground that it fails to meet the heightened pleading requirements of Rule 9(b). This court denies HECO's motion in this regard based on HECO's failure to establish that Rule 9(b) applies to this claim.

HECO cites *Neilson v. Union Bank of California,* 290 F.Supp.2d 1101, 1141 (C.D.Cal.2003), which states that it is "well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements." *See also Hutson v. American Home Mortgage Servicing, Inc.,* 2009 WL 3353312, at *14 (N.D.Cal. Oct.16, 2009) (quoting *Neilson).* But *Neilson* applied California's law of negligent misrepresentation and cited other decisions doing the same. It therefore appears to this court that the reference in *Neilson* is a reference to well-established federal pleading requirements for fraud and negligent misrepresentation claims brought under California law.

Under California law, to be a negligent misrepresentation, a statement must have been made "without reasonable grounds for believing it to be true" and "with intent to induce another's reliance." *Id.* at 1141. This means that, under California law, the elements of a claim for negligent misrepresentation are similar to the elements for fraud. *Firoozye v. Earthlink Network,* 153 F.Supp.2d 1115, 1128 (N.D.Cal.2001). Indeed, in California, negligent misrepresentation is a "form of deceit." *Neilson,* 290 F.Supp.2d at 1141 (internal citations and quotations omitted).

*7 A court sitting in diversity must apply the substantive law of the state in which it sits. Thus, this court looks to Hawaii law to determine the elements of Peace's negligent misrepresentation claim before determining whether the procedural requirements of Rule 9(b) apply.

HECO argues that Hawaii law mirrors California law in requiring an intent to induce reliance. The elements of a negligent misrepresentation claim under Hawaii law have been stated in various ways. In *Kohala Agric. v. Deloitte & Touche,* 86 Hawai'i 301, 304, 949 P.2d 141, 144 (Haw.App.1997), the Hawaii Intermediate Court of Appeals applied the elements of negligent misrepresentation set forth in section 552 of the Restatement (Second) of Torts. The ICA noted that section 552 required, among other things, that a plaintiff have relied on an alleged misrepresentation in a transaction that the alleged tortfeasor intended the misrepresentation to influence. *Id.,* 949 P.2d at 144.

The Hawaii Supreme Court subsequently held that, to state a claim for negligent misrepresentation under Hawaii law, a party must allege that (1) false information was supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information was supplied suffered a loss; and (3) the recipient relied on the misrepresentation. *Blair v. Ing,* 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001). In so stating, the Hawaii Supreme Court specifically referred to the ICA decision and to section 552, although it did not list an intent to influence as a numbered element.

HECO urges this court to rely not on *Blair* but on the more recent Hawaii Supreme Court decision in *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Limited Partnership,* 114 Hawai'i 201, 166 P.3d 961 (Haw.2007). *Laeroc* states that Hawaii "has adopted the Restatement (Second) of Torts § 552 addressing the tort of negligent misrepresentation," and then quotes section 552, including the "intent to influence" language that is not contained in the list of the elements of a negligent misrepresentation claim set forth in *Blair.* It is not at all clear that the Hawaii Supreme Court intended *Laeroc* to supersede *Blair* with respect to the elements of a negligent misrepresentation claim.

In a decision that is very nearly contemporaneous with *Laeroc,* the Hawaii Supreme Court quoted the three elements set forth in *Blair* as stating Hawaii's requirements for negligent misrepresentation. That nearly contemporaneous case, *Association of Apartment Owners of Newton Meadows v. Venture 15, Inc.,* 115 Hawai'i 232, 167 P.3d 225 (Haw.2007), was originally decided a month before *Laeroc* and corrected less than a month after *Laeroc* in connection with the denial of a reconsideration motion. The *Venture 15* decision thus issued in its final form after *Laeroc* did. *Venture 15* notes the similar reliance requirements under Hawaii

law for negligent misrepresentation and for intentional or fraudulent misrepresentation. But *Venture 15* strikingly includes for only intentional or fraudulent misrepresentation the requirement that false representations have been made "in contemplation of plaintiff's reliance upon these false representations." *Id.* at 263, 167 P.3d at 256. The absence of the "contemplation" or "intent" language from the description of the elements of a negligent misrepresentation claim gives this court pause in applying Rule 9(b).

**\*8** HECO does not explain why, given these Hawaii cases, this court should read a reference in *Laeroc* to section 552 as negating *Blair* and *Venture 15*. This is a burden that HECO has as the movant here, and HECO does not satisfy that burden.

Nor does HECO explain how its reading of *Laeroc* can be reconciled with *Honda v. Board of Trustees of the Employees' Retirement System,* 108 Hawai'i 212, 222, 118 P.3d 1155, 1165 (2005). *Honda* involved a claim by the wife of a deceased state civil service employee for retirement benefits. The Hawaii Supreme Court held that a retirement application form and pamphlet prepared by the defendant may have amounted to a negligent misrepresentation to the deceased employee that his wife would receive survivor benefits when he died, which was not in fact the case. *Id.* The employee appeared to have relied on this representation in selecting a retirement option that did not allow his spouse to receive retirement benefits. *Id.* In discussing the negligent misrepresentation claim, the court did not impose any requirement that the defendant have intended the employee to rely on a misrepresentation when choosing an option. Thus, the Hawaii Supreme Court does not appear to have been equating negligent misrepresentation with fraud.

Regardless of whether Hawaii does or does not require intent to induce reliance to establish negligent misrepresentation, HECO does not meet its burden of establishing that it does so require. This court accordingly does not apply Rule 9(b) to that claim.

Nor could Peace's negligent misrepresentation claim be said to be subject to Rule 9(b) because it is "grounded in fraud." While the Ninth Circuit has held that Rule 9(b) applies when a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis for a claim that does not have fraud as an essential element, *Kearns,* 567 F.3d at 1125, the present case involves no such allegation. This case involves related, but clearly separable, instances of alleged negligence. Therefore, the court again

rules that HECO does not meet its burden of establishing that the heightened pleading standard applies to Peace's negligent misrepresentation claim.

*B. The Court Declines To Strike Allegations In The Complaint That HECO Claims Contain Statements Made in Compromise Negotiations.*

HECO argues that allegations in paragraphs 41 to 44 of the Complaint must be stricken under Rule 12(f) of the Federal Rules of Civil Procedure. Those paragraphs allege that a third-party consultant, Accenture, was hired to review how implementation of the CIS was proceeding and to report on its status. Peace alleges that Accenture reported that HECO itself had caused many problems that led to delay in implementing the CIS. Compl. ¶¶ 41–45.

HECO argues that these allegations relate to compromise attempts and are therefore inadmissible under Rule 408 of the Federal Rules of Evidence. According to HECO, allegations inadmissible under the Federal Rules of Evidence are necessarily immaterial and impertinent and must be stricken under Rule 12(f) of the Federal Rules of Civil Procedure. HECO also says that these allegations should be stricken as violative of a nondisclosure agreement. On the present record, the court disagrees.

**\*9** Rule 408 provides that evidence of conduct or statements made in negotiations to compromise a claim are "not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Fed.R.Evid. 408(a)(2). However, as a general matter, allegations in a complaint are not evidence. Because the Federal Rules of Evidence deal with evidence offered at trial, not allegations in a complaint, HECO's contention that allegations must be stricken because they violate the Rules of Evidence is unpersuasive. It is, moreover, unclear from the face of the Complaint that these allegations concern compromise negotiations regarding a claim that trigger Rule 408. These discussions may have occurred before either party contemplated a claim against the other party. Finally, HECO does not establish that these allegations fall under Rule 408 as matters offered to prove liability for, invalidity of, or amount of a claim. Peace could conceivably offer these allegations for some other purpose.

HECO also contends that these allegations violate a nondisclosure agreement protecting proposal negotiations. Def.'s Mem. Supp. Mot. Dismiss 13. First, it is unclear that the allegations in the Complaint concern proposal negotiations.

2009 WL 3923350

Second, on a motion to strike a pleading, the court typically considers only the face of the pleading or matters that the court takes judicial notice of. *See Aetna Cas. & Sur. Co., 183 F.R.D. at 554.* The face of the Complaint does not show that Peace breached the nondisclosure agreement.

The court denies HECO's motion to strike allegations from the Complaint.

V. *CONCLUSION.*
The court denies HECO's motion to the extent it seeks to dismiss in its entirety Peace's fraudulent inducement claim, but the court limits that claim to the issue of representations in the RFP. The court denies the motion to dismiss insofar as it seeks dismissal of the negligent misrepresentation claim. Finally, the court denies Heco's motion to strike certain allegations, as HECO does not prove that the allegations are immaterial or impertinent under Rule 12(f) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3923350

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 36

Philips v. Ford Motor Company, Not Reported in F.Supp.3d (2015)
2015 WL 8 9111995

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Eason v. Roman Catholic Bishop of San Diego, S.D.Cal.,
October 7, 2019

2015 WL 4111448
Only the Westlaw citation is currently available.
United States District Court,
N.D. California,
San Jose Division.

William Philips et al., Plaintiffs,
v.
Ford Motor Company, Defendant.

Case No. 14–CV–02989–LHK
|
Signed 07/07/2015

**Attorneys and Law Firms**

Adam J. Levitt, John Ernst Tangren, Grant & Eisenhofer P.A.,
Chicago, IL, Mary Sikra Thomas, Justin S. Brooks, Grant &
Eisenhofer, P.A., Wilmington, DE, Nathan Bowen Atkinson,
Spilman Thomas and Battle, PLLC, Winston-Salem, NC,
Niall A. Paul, Spilman Thomas and Battle, PLLC, Charleston,
WV, Mark Philip Pifko, Roland K. Tellis, Baron & Budd, P.C.,
Encino, CA, for Plaintiffs.

Amir M. Nassihi, Andrew L. Chang, Michael Kevin
Underhill, Shook, Hardy & Bacon L.L.P., San Francisco, CA,
Dustin Alan Lane, Seipp Flick Hosley LLP, Coral Gables,
FL, Todd Andrew Croftchik, Seipp, Flick, Hosley LLP, Lake
Mary, FL, for Defendant.

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO DISMISS**

LUCY H. KOH, District Judge

**\*1** Plaintiffs William Philips ("Philips"), Jaime Goodman
("Goodman"), Allison Colburn and her son Ian Colburn
(collectively, "California Plaintiffs") have brought a putative
class action lawsuit against defendant Ford Motor Company
("Ford"), a Delaware corporation with its principal place
of business in Dearborn, Michigan. ECF No. 55, Second
Amended Complaint ("SAC") ¶¶ 1, 32–56. Before the Court
is Ford's Motion to Dismiss the SAC's California claims.[1]
ECF No. 58 ("Mot."). California Plaintiffs have opposed the

motion, ECF No. 63 ("Opp."), and Ford has replied, ECF No.
67 ("Reply").

[1]     In addition to California Plaintiffs, the SAC
        includes the same non-California Plaintiffs from
        the First Amended Complaint ("FAC"): Jason
        Wilkinson, Robert Morris, Victoria Jackson,
        Johnpaul Fournier, and Ryan and Rebecca Wolf
        (together, with California Plaintiffs, "Plaintiffs").
        See SAC ¶¶ 189–219. In light of the fact that
        the 108–page FAC contained fifty-one causes of
        action, including nationwide class claims and class
        claims brought under the specific laws of six
        different states, the Court decided to proceed by
        addressing the California claims first. See ECF
        No. 46; ECF No. 54 at 6, 9, 11–12, 37. To that
        end, the parties stipulated that "[a]lthough the SAC
        may contain both California and non-California
        claims," Ford's second motion to dismiss "shall
        address only Plaintiffs' California claims." ECF
        No. 51. Accordingly, the Court's order is limited
        to the four causes of action brought by California
        Plaintiffs in the SAC.

The Court finds this matter suitable for decision without
oral argument under Civil Local Rule 7–1(b) and hereby
VACATES the motion hearing set for July 9, 2015, at 1:30
p.m. The case management conference scheduled for that date
and time remains as set. Having considered the submissions
of the parties, the relevant law, and the record in this case,
the Court hereby GRANTS IN PART and DENIES IN PART
Ford's Motion to Dismiss.

**I. BACKGROUND**

**A. Factual Allegations**
California Plaintiffs are individuals seeking to represent
a class of statewide consumers who purchased or leased
Ford Fusion vehicles, model years 2010 through 2014,
or Ford Focus vehicles, model years 2012 through 2014
(the "Vehicles"),[2] which California Plaintiffs allege are
equipped with a defective Electronic Power Assisted Steering
("EPAS") system. SAC ¶ 1. The following chart summarizes
California Plaintiffs' alleged purchasing information:

[2]     The SAC specifies further that the "Vehicles
        include the following models: 2010–2014 Ford
        Fusion; 2010–2014 Ford Fusion Hybrid; 2013–

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 316 of 520
PageID: 9237
Philips v. Ford Motor Company, Not Reported in F.Supp.3d (2015)
201 WL 8 9111995

2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric." SAC ¶ 69.

| Plaintiff | Vehicle | Site of Purchase | Date of Purchase |
|---|---|---|---|
| Philips | 2011 Ford Fusion (used) | Salinas Valley Ford (California) | March 2012 |
| Goodman | 2011 Ford Fusion (new) | Future Ford of Clovis (California) | October 13, 2010 |
| Allison Colburn[3] | 2010 Ford Fusion (new) | Galpin Ford (California) | January 12, 2010 |

[**Editor's Note:** The preceding image contains the reference for footnote [3] ]

[3]    There is no allegation that Ian Colburn, Allison Colburn's son, purchased any of the Vehicles. *See* SAC ¶¶ 51–54. Rather, Ian Colburn was gifted the 2010 Ford Fusion by his mother. *Id.* ¶ 51.

*Id.* ¶¶ 32–54.

Power steering systems supplement the torque that the driver applies to the steering wheel, thus making it easier for the driver to turn the wheel. SAC ¶ 76. Ford's EPAS system replaces the traditional hydraulic-assist power steering pump and is comprised of a power steering control motor, electronic control unit, torque sensor, and steering wheel position sensor. *Id.* ¶ 2. California Plaintiffs allege, however, that Ford's EPAS system suffers from a "systemic defect" that "renders the system prone to sudden and premature failure during ordinary and foreseeable driving situations." *Id.* This defect, California Plaintiffs claim, causes drivers of the Vehicles to "experience significantly increased steering effort and an increased risk of losing control of their vehicles when the EPAS system fails" and "defaults to manual steering." *Id.* ¶¶ 3, 101.

**\*2**   In support of this claim, California Plaintiffs rely on three categories of evidence: (1) their own alleged experiences with EPAS failure, SAC ¶¶ 36, 43, 53; (2) the National Highway Traffic Safety Administration's ("NHTSA") investigation into the EPAS system of the Ford Explorer, a vehicle not at issue in this putative class action, *id.* ¶¶ 82–103; and (3) complaints to the NHTSA by Ford owners about power steering failures in the Vehicles, *id.* ¶¶ 104–32.

As to the first category, California Plaintiffs allege that the EPAS system in each of their Vehicles[4] has failed. None of them, however, alleges that any accident has taken place or that they have suffered any physical injury or any property damage as a result of an EPAS failure. Specifically, Philips says he "reviewed Ford's promotional materials and other information," and that he "would not have purchased his 2011 Ford Fusion, or would not have paid the purchase

price charged," if he had known of "the EPAS system defects and failures." SAC ¶ 34. Philips also says he experienced "intermittent problems with the steering system in his Fusion," which caused "difficulty steering." *Id.* ¶ 36. After lodging multiple complaints with Ford, Philips alleges he "was told that it would cost approximately $2,000 to fix the problem." *Id.* According to Philips, "Ford offered to pay 50%." *Id.*

[4]    California Plaintiffs do not allege that any of them purchased a Ford Focus.

Goodman, on the other hand, claims that prior to "purchasing her 2011 Ford Fusion," she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion." *Id.* ¶ 40. "The window sticker," Goodman says, "indicated that the vehicle she would purchase was equipped with power steering." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Goodman alleges she "would not have purchased her 2011 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 40–41. In addition, Goodman claims that "in 2014" she "began having intermittent problems with the steering system in her 2011 Ford Fusion and experienced difficulty steering." *Id.* ¶ 43. "The problems first occurred at low speeds," Goodman says, "when the steering would lock up while she was attempting to park." *Id.* After one attempt at repair, Goodman alleges that she experienced steering difficulties "while she was driving on the road, not just parking." *Id.* Ultimately, Goodman "took the vehicle to a Ford dealership and was told that it would cost $1,800 to fix the problem with the steering system." *Id.*

Prior to "purchasing her 2010 Ford Fusion," Allison Colburn claims that, just like Goodman, she "(a) viewed television advertisements concerning the vehicles; (b) viewed material concerning the Fusion on Ford's website; (c) reviewed the window sticker on the vehicle she would purchase; and (d) received and reviewed a brochure concerning the Fusion," and that "[t]he window sticker indicated that the vehicle she would purchase was equipped with power steering." SAC ¶ 47. Unlike Goodman, however, Allison Colburn alleges that the brochure she read "contained the same 'Drive smart' heading featured in the 'Technology Fact Sheets' available on Ford's website." *Id.* "Nowhere in these materials did Ford disclose the EPAS system defects and failures," and had Ford done so, Allison Colburn alleges she "would not have

201 WL 8 9111995

purchased her 2010 Ford Fusion, or would not have paid the purchase price charged." *Id.* ¶¶ 47–48. Notably, Allison Colburn does not allege she experienced any power steering failures. Instead, her son Ian Colburn alleges that "in October 2014," after his mother had given him the car, "the power steering in the 2010 Ford Fusion failed." *Id.* ¶¶ 51, 53. The Ford dealership in San Diego where Ian Colburn took the car for repairs "initially quoted the repair price as $1,756.95, but reduced the price to $990.19." *Id.* ¶ 54. Allison Colburn says she paid the $990.19 to fix the power steering. *Id.*

 **\*3** As to the second category of evidence, California Plaintiffs emphasize documents produced in connection with the NHTSA's Ford Explorer investigation, which began on June 19, 2012. SAC ¶ 83. In response to the NHTSA's request for information, Ford "produced a database containing 1,173 complaints" regarding loss of power steering, nine of which allegedly described "incidents that resulted in a crash." *Id.* ¶ 89. Ford also produced various internal e-mails which, California Plaintiffs allege, reveal that the Vehicles suffer from the same EPAS system defect as the Ford Explorer and that Ford knew about the defect yet never disclosed it to the public or otherwise took corrective action. *Id.* ¶¶ 90–98. According to California Plaintiffs, the NHTSA investigation found "fifteen accidents that were caused by a loss of power steering in the Explorer." *Id.* ¶ 99. However, the NHTSA's Office of Defects Investigation ("ODI"), which published a resume closing the Ford Explorer investigation, was more circumspect: "ODI identified 15 crashes with evidence indicating loss of power steering assist *may* have been a factor." ECF No. 22–4 ("ODI Resume") at 2 (emphasis added).[5] "All 15 crashes," the ODI Resume continued, "involved low-speed impacts ... resulting in minor vehicle damage or no damage," with only one reported incident of "minor injuries to the driver that did not require medical treatment." *Id.*

[5]     The Court GRANTS Ford's Request for Judicial Notice of the ODI Resume closing the NHTSA's investigation into the Ford Explorer's EPAS system. ECF No. 22–3. Because the SAC "necessarily relies" on this document, and because California Plaintiffs do not contest the document's authenticity or relevance, the Court considers it an appropriate subject for judicial notice under "the doctrine of incorporation by reference." *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1038 (9th Cir. 2010); *see also In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices &*

*Prods. Liab. Litig.,* 890 F.Supp.2d 1210, 1216 n.2 (C.D.Cal. 2011) (taking judicial notice of the "NHTSA's ODI resume closing its investigation into Model Year 2010 Prius braking performance").

As to the third category, California Plaintiffs provide a litany of testimonials by other Ford owners complaining to the NHTSA about alleged power steering failures in the Vehicles. SAC ¶¶ 104–32. The two dozen complaints California Plaintiffs detail in the SAC are, California Plaintiffs allege, a mere sampling of the hundreds of complaints the NHTSA has received concerning EPAS failures in the Vehicles. *See id.* ¶ 104. Only two of the examples cited by California Plaintiffs, however, involved accidents:

> On December 11, 2012, a vehicle owner reported a crash in a 2010 Ford Fusion. The Defective Vehicle lost power steering, traction control, and the ability to brake upon entering a freeway on ramp. To stop the vehicle and avoid endangering other drivers, the driver was "forced to crash into the concrete wall barrier on the driver's side of the ramp." The driver and one other individual were injured.
>
> ....
>
> On October 3, 2012, a vehicle owner reported a crash in a 2011 Ford Fusion. The steering wheel seized while the owner was driving at 35 MPH, causing her to crash into a curb. After the initial accident, the steering of the vehicle continued to fail. The vehicle was taken to a Ford dealer three times, and the dealer refused to help her because the failure could not be replicated. The vehicle owner notified Ford but Ford was unwilling to offer assistance.

*Id.* ¶¶ 110, 112. The most recent power steering failure cited by California Plaintiffs, mentioned for the first time in the SAC, took place on March 10, 2015, "very nearly" led to a collision, and left the driver "quite shaken." *Id.* ¶ 132.

Based on this evidence, California Plaintiffs allege that Ford fraudulently concealed[6] the claimed power steering defect: "Ford actively concealed, failed to disclose, and continues to fail to disclose to consumers of the Defective Vehicles that the uniformly designed EPAS system in the Defective Vehicles is prone to premature failure during ordinary and foreseeable driving situations." SAC ¶ 4. Despite press releases and web-based "promotional materials" touting "EPAS as a reliable and beneficial product," Ford, according to California Plaintiffs, knew "as early as 2010" that the EPAS system was "prone to sudden, premature failure," and yet took no remedial action. *Id.* ¶ 11. "Ford's omissions,"

Philips v. Ford Motor Company, Not Reported in F.Supp.3d (2015)
201WL 8 9111995

California Plaintiffs say, "are material to consumers because of the significant safety concerns presented as a result of the system's defects and premature failures." *Id.* ¶ 5. According to California Plaintiffs, "Ford's failure to disclose to consumers and the public at large the material fact that the EPAS system is prone to premature failure ... recklessly risked the safety of occupants of the Defective Vehicles and the public at large." *Id.* ¶ 6.

> 6    California Plaintiffs no longer allege fraud based on a theory of misrepresentation. *See* ECF No. 15 ("FAC") ¶¶ 7–8. California Plaintiffs instead rely solely on a theory of fraud by "omission[ ]," which they also call "fraudulent concealment." SAC ¶¶ 5, 35.

**\*4** In May 2011, and again in December 2012, Ford allegedly issued technical service bulletins indicating Ford's awareness of EPAS system failures in the Vehicles. SAC ¶¶ 13 (2012 Ford Focus), 19 (2013 Ford Fusion). California Plaintiffs claim that "Ford concealed the fact that the EPAS system is prone to sudden and premature failure from consumers so that the warranty period on the Defective Vehicles would expire before consumers become aware of the problem." *Id.* ¶ 24. [7] Had Ford disclosed the alleged defect, California Plaintiffs say they "would not have purchased ... those vehicles, or would have paid substantially less for the vehicles than they did." *Id.* ¶ 25.

> 7    The Vehicles were all covered by an express New Vehicle Limited Warranty ("NVLW"), which Ford has filed with the Court. *See* ECF No. 22–2 (containing Ford's NVLWs for 2010, 2011, 2012, and 2013). Because the SAC "necessarily relies" on these documents, and because California Plaintiffs do not contest the documents' authenticity or relevance, the Court considers them an appropriate subject for judicial notice under "the doctrine of incorporation by reference." *Coto Settlement,* 593 F.3d at 1038; *see Elias v. Hewlett–Packard Co.,* 903 F.Supp.2d 843, 850 n.1 (N.D.Cal. 2012). The NVLW covered the Vehicles for the first three years or 36,000 miles driven, whichever came first. *See, e.g.,* ECF No. 22–2 at 14.

### B. Procedural History
On June 27, 2014, Plaintiffs filed their initial Complaint in federal court. ECF No. 1. The Class Action Fairness Act

("CAFA"), 28 U.S.C. § 1332(d), is the asserted basis for this Court's subject matter jurisdiction. SAC ¶ 28.

On September 8, 2014, Plaintiffs filed their FAC containing fifty-one causes of action, including forty-nine claims specific to the laws of six states (California, Ohio, Michigan, Georgia, Illinois, and Arizona) and two nationwide claims based on the laws of forty-four additional states. *See* FAC ¶¶ 145–645. On October 24, 2014, Ford moved to dismiss the FAC. ECF No. 22. Concurrently with that motion, Ford filed a Request for Judicial Notice, ECF No. 22–3, which the Court has granted, *see supra* note 5. Plaintiffs opposed the motion on December 16, 2014, ECF No. 35, and Ford replied on January 16, 2015, ECF No. 36. At a hearing held on February 12, 2015, the Court granted Ford's Motion to Dismiss with leave to amend. ECF Nos. 46, 48.

In light of the unwieldy nature of the FAC, the parties stipulated at a February 18, 2015 case management conference to proceed with the California claims only for Ford's second round Motion to Dismiss. ECF No. 51. If any of the California claims survived the second round Motion to Dismiss, the parties would continue to litigate those claims to resolution before this Court. ECF No. 54 at 9. If, however, none of the California claims survived, then the Court would confer with the parties regarding how to proceed with the non-California claims, including possibly transferring the case to a more appropriate jurisdiction. *Id.*

With that understanding, California Plaintiffs filed the SAC on March 27, 2015. The SAC asserts four causes of action under California law: (1) violation of the unlawful and unfair prongs of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.,* SAC ¶¶ 141–49; (2) violation of the fraudulent prong of the UCL, *id.* ¶¶ 150–59; (3) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq., id.* ¶¶ 160–71; and (4) common law fraudulent concealment, *id.* ¶¶ 172–85. Notably, California Plaintiffs have abandoned their claims under the False Advertising Law ("FAL"), Cal. Civil Code § 17500, *et seq.,* and Song–Beverly Consumer Warranty Act, Cal. Civ.Code § 1790 *et seq. See* FAC ¶¶ 181–220.

**\*5** In the SAC, California Plaintiffs seek to represent the following statewide class of consumers:

All current and former owners and lessees of a Defective Vehicle (as defined herein) in California

SAC ¶ 133. Excluded from the class definitions are, inter alia, "any individuals who experienced physical injuries as a result of the defects at issue in this litigation." *Id.* ¶ 134.

On April 30, 2015, Ford filed the instant Motion to Dismiss. Mot. at 26. Pursuant to a stipulation approved by the Court, *see* ECF No. 60, California Plaintiffs opposed the motion on May 28, 2015, Opp. at 26. Ford replied on June 15, 2015. Reply at 16.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn,* 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the

truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn,* 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Rule 9(b) Pleading Requirements

Claims sounding in fraud are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b); *see Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy the heightened standard under Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotation marks omitted); *see also Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." (internal quotation marks omitted)). The plaintiff must also set forth "what is false or misleading about a statement, and why it is false." *Ebeid ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted).

### III. DISCUSSION

**\*6** Ford offers several bases in support of its Motion to Dismiss. First, Ford argues that California Plaintiffs have waived or abandoned various claims. Mot. at 7–9. Second, Ford contends that California Plaintiffs' claims are barred by the applicable statutes of limitations. *Id.* at 9–10. Third, Ford says that California Plaintiffs have failed to adequately plead their fraud-based claims. *Id.* at 11–21. Fourth, Ford argues that California Plaintiffs' CLRA claims must fail because they have failed to allege a "transaction" under the meaning of the statute. *Id.* at 21–23. Fifth, Ford contends that California Plaintiffs' equitable claims–i.e., UCL claims and

CLRA claims for injunctive relief–must be dismissed because California Plaintiffs have an adequate remedy at law. *Id.* at 23–24. Finally, Ford asks the Court to strike references to "nationwide" claims from the SAC. *Id.* at 25. For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Ford's Motion to Dismiss.

### A. Waived or Abandoned Claims

Ford first argues that California Plaintiffs have waived their warranty and FAL claims by failing to replead these claims in the SAC. Mot. at 7. The Court agrees. The warranty and FAL claims were dismissed with leave to amend, and California Plaintiffs have waived the claims by failing to replead them. *See Lacey v. Maricopa Cnty.,* 693 F.3d 896, 928 (9th Cir. 2012) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled."). Accordingly, California Plaintiffs are precluded from reasserting California warranty or FAL claims against Ford.

### B. Standing to Assert Claims for Vehicles Not Purchased

Ford argues that California Plaintiffs lack standing to assert claims based on Vehicles that California Plaintiffs did not purchase—i.e., the 2012–2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric. Specifically, Ford argues that California Plaintiffs fail to adequately allege facts showing substantial similarity between the EPAS systems in the 2010–11 Ford Fusions and those in the other Vehicles. Mot. at 7–8. For the reasons stated below, the Court finds that California Plaintiffs have adequately pleaded standing to assert claims against products they did not personally purchase. [8]

[8]    The Court's ruling is without prejudice to Ford later moving to dismiss for lack of standing should a sufficient factual record be developed showing that the products are not substantially similar.

Article III of the U.S. Constitution requires that a plaintiff plead and prove he or she has suffered sufficient injury to satisfy the "case and controversy" requirement. *See Clapper v. Amnesty Int'l,* 133 S.Ct. 1138, 1146 (2013) ("One element of the case-or-controversy requirement is that plaintiffs 'must establish that they have standing to sue.' " (quoting *Raines v.*

*Byrd,* 521 U.S. 811, 818 (1997))). The U.S. Supreme Court has further clarified that standing means a plaintiff must plead and prove (1) injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that this injury is fairly traceable to the challenged action of the defendant; and (3) that this injury is redressable by a favorable ruling from the court. *Monsanto Co. v. Geertson Seed Farms,* 130 S.Ct. 2743, 2752 (2010).

In food misbranding cases, courts in this district have held that "a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are *substantially similar.*" *E.g., Miller v. Ghirardelli Chocolate Co.,* 912 F.Supp.2d 861, 869 (N.D.Cal. 2012) (emphasis added). In this particular case, the Court finds that California Plaintiffs have adequately alleged that the supposedly defective EPAS system is substantially similar across the Vehicles. California Plaintiffs cite evidence in the form of internal communications between Ford employees where the power steering systems in different vehicles were commonly referred to as "the EPAS," without any indication that the EPAS system varied across vehicles. SAC ¶¶ 14–15. Specifically, a Product Development Engineer wrote that she "[t]alked to the tech below and this loss of assist [in the Explorer] would always occur in low speed parking lot maneuvers similar to the Focus issue." *Id.* ¶ 14. Later, an EPAS Steering Engineering employee wrote "Can you tell if the EPAS ribbon cable concern of the Fusion is linked to the Explorer[?] This concern I believe was resolved at the end of Nov. 2011 for the Fusion vehicle line." *Id.* ¶ 15. Plaintiffs contend that these emails show that Ford equated the Focus's EPAS system to the Ford Explorer EPAS system, and the Fusion's EPAS system to the Explorer EPAS system. At the motion to dismiss stage, the Court must "construe the pleadings in the light most favorable to the nonmoving party." *Manzarek,* 519 F.3d at 1031.

**\*7**  Moreover, California Plaintiffs allege repeatedly that the EPAS systems in all the vehicles are "uniform," *id.* ¶¶ 1, 4, 21–22, 69, 186, and that the steering defect manifested in similar manners across different models of vehicles, *id.* ¶¶ 107–29. As the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party" when ruling on a motion to dismiss, the Court finds these allegations sufficient in this case. *Manzarek,* 519 F.3d at 1031. In addition, California Plaintiff have only limited technical information available in the pre-discovery stage. *See Armstrong v. Davis,* 275 F.3d

201 WL 8 9111995

849, 867 (9th Cir. 2001) (holding that plaintiffs are not required to engage in hyper-technical inquiries during the pleading stage), *abrogated on other grounds as recognized by Nordstrom v. Ryan,* 762 F.3d 903 (9th Cir. 2014). The Court therefore finds that these allegations sufficiently establish substantial similarity between the purchased and unpurchased products. Accordingly, the Court DENIES Ford's Motion to Dismiss California Plaintiffs' claims as to the following models: 2012 2014 Ford Fusion; 2010–2014 Ford Fusion Hybrid; 2013–2014 Ford Fusion Energi; 2012–2014 Ford Focus; and 2012–2014 Ford Focus Electric.

### C. Statutes of Limitations

Ford next moves to dismiss California Plaintiffs' claims based on the applicable statutes of limitations. The UCL contains a statute of limitations that bars claims brought more than four years after the cause of action accrued. *See* Cal. Bus. & Prof.Code § 17208. The CLRA's limitations period is three years, *see* Cal. Civ.Code § 1783, as is common law fraud's, *see* Cal. Civ.Code § 338(d). Because this action was brought in June 2014, and the limitations periods began to run when the California Plaintiffs purchased their vehicles, all UCL, CLRA, and fraudulent concealment claims asserted by California Plaintiffs would be barred except for Philips's claims and Goodman's UCL claim. In the SAC, however, California Plaintiffs invoke the discovery rule, the doctrine of fraudulent concealment, and equitable estoppel in seeking to toll the limitations period for their claims. SAC ¶¶ 57–67. For the reasons stated below, the Court finds that California Plaintiffs' UCL, CLRA, and fraudulent concealment claims are not time-barred.

As an affirmative defense, the statute of limitations promotes diligent assertion of claims and ensures defendants "the opportunity to collect evidence while still fresh, and provide[s] repose and protection from dilatory suits once excess time has passed." *Aryeh v. Canon Bus. Solutions, Inc.,* 292 P.3d 871, 875 (Cal. 2013). Ordinarily, the statute of limitations runs from the occurrence of the last element essential to a plaintiff's claim—i.e., the "last element" accrual rule. *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032 (9th Cir. 2003) (internal citation omitted). To align the policy goals of the limitations defense with its actual application, courts and legislatures have over time developed certain exceptions to the "last element" rule, including the discovery rule and the doctrine of fraudulent concealment. *Aryeh,* 292 P.3d at 875. The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* Meanwhile, the doctrine of

fraudulent concealment "tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale." *Id.* The California Supreme Court has held that claims under the UCL are "governed by common law accrual rules," including the discovery rule. *Id.* at 878; *see Plumlee v. Pfizer, Inc.,* No. 13–CV–00414 LHK, 2014 WL 4275519, at *6 n.5 (N.D.Cal. Aug. 29, 2014). The discovery rule also applies to CLRA claims. *See Yumul v. Smart Balance, Inc.,* 733 F.Supp.2d 1117, 1131 (C.D.Cal. 2010). The doctrine of fraudulent concealment applies to claims under the UCL and the CLRA. *Id.*

Under the discovery rule, a claim accrues and the limitations period begins to run when a plaintiff has information of "circumstances to put [him] on *inquiry* or if [he] ha[s] *the opportunity to obtain knowledge* from sources open to [his] supervision." *Fox v. Ethicon Endo–Surgery, Inc.,* 110 P.3d 914, 917 (Cal. 2005). At that point, a plaintiff must conduct a reasonable investigation about the cause of his injury and is subsequently charged with the presumptive knowledge of the information that would have been revealed by such an investigation. *Fox,* 110 P.3d at 920. In order to rebut this presumption and toll the statute of limitations through the discovery rule, a plaintiff must plead facts showing (1) the "time and manner of discovery" and (2) the "inability to have made earlier discovery despite reasonable diligence" in investigating. *Id.* at 921. The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand a motion to dismiss. *Plumlee,* 2014 WL 4275519, at *8. If the discovery rule is invoked, the statute of limitations will be tolled until a reasonable investigation would have revealed the factual basis for that cause of action. *Fox,* 110 P.3d at 917.

**\*8** Even though Ford is correct that UCL and CLRA claims in consumer cases generally accrue on the date of purchase, California Plaintiffs here were not charged with a duty to reasonably investigate until the alleged steering defect manifested in their vehicles. *See Plumlee,* 2014 WL 4275519, at *7; *Fox,* 110 P.3d at 920 (plaintiffs are not charged with knowledge under the discovery rule until "information of circumstances to put [them] on inquiry or if they have the opportunity to obtain knowledge from sources open to [their] investigation." (citation omitted)). Prior to that point, California Plaintiffs had no reason to suspect wrongdoing, and there was no fact or circumstance to prompt an investigation. Only when the defect manifested in their vehicles in 2013 and 2014, *see* SAC ¶ 36 (defect in Philips' 2011 Ford Fusion manifested in "fall of 2013"); ¶ 43 (defect in Goodman's 2011 Ford Fusion manifested "in 2014"); ¶

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 322 of 520
PageID: 9243

53 (defect in Allison Colburn's 2010 Ford Fusion manifested "in October 2014"), were California Plaintiffs charged with a duty to investigate and presumptive knowledge of the defect. *Fox,* 110 P.3d at 920. The statute of limitations began to run at that point. *Id.* California Plaintiffs, thus, timely filed this action within the limitations periods.

Although Ford relies heavily on *Plumlee,* this reliance is misplaced because that case is distinguishable from the instant one. In *Plumlee,* the plaintiff bought a drug in 2005 and used it for three years. *Plumlee,* 2014 WL 4275519, at \*7. She then stopped using the drug due to its failure to improve her condition. *Id.* at \*7. At this point, the plaintiff was charged with a duty to investigate and the statute of limitations began to run, since the lack of improvement in her condition was the "circumstance[ ]" that should have caused a reasonable person to suspect wrongdoing. *Id.* at \*6. The plaintiff, however, waited for more than four years—beyond the statute of limitations period under the UCL—before bringing her claim. *Id.* at \*7. In attempting to invoke the discovery rule, the plaintiff in *Plumlee* failed to plead facts showing that she was unable to discover the cause of her injury despite her reasonable diligence within those four years. Therefore, the court held that Plumlee's UCL claim was time-barred. *Id.*

Here, in contrast to *Plumlee,* California Plaintiffs' vehicles performed as expected up until their cars' EPAS systems failed. "Plaintiffs are required to conduct a reasonable investigation *after* becoming aware of an injury," and not before. *Fox,* 110 P.3d at 920. Therefore, California Plaintiffs need not allege facts showing diligence prior to the manifestation of the defect, as there was no duty to investigate prior to that point. Because the statutes of limitation did not begin to run until 2013 and 2014, when the defect manifested, the action was timely filed within the statutory periods provided for the UCL, CLRA, and fraudulent concealment claims. The Court therefore DENIES Ford's Motion to Dismiss California Plaintiffs' claims on statute of limitations grounds.

**D. Fraudulent Omission Claims**

As California Plaintiffs have now abandoned their affirmative misrepresentation claims, the four claims in the SAC all concern fraudulent omissions regarding the EPAS system defect. *See* SAC ¶¶ 144–45 (UCL unfair or unlawful prong); ¶ 154 (UCL fraudulent prong); ¶¶ 162, 164 (CLRA); ¶ 174 (fraudulent concealment claim). Accordingly, the Court addresses the four claims together as the "fraudulent omission" claims.

To state a valid claim for a fraudulent omission, California Plaintiffs must allege the "omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App. 4th 824, 835 (2006). "California federal courts have generally interpreted *Daugherty* as holding that '[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue.' " *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1141 (9th Cir. 2012) (quoting *Oestreicher v. Alienware Corp.,* 322 Fed.Appx. 489, 493 (9th Cir. 2009)). In addition, "Plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss." *Id.* at 1145.

\*9 Ford makes three arguments in support of its Motion to Dismiss the fraudulent omission 16 claims: (1) California Plaintiffs fail to adequately allege Ford's knowledge of the EPAS system defect at the time of purchase; (2) Ford had no duty to disclose the EPAS system defect because it is not an unreasonable safety hazard; and (3) California Plaintiffs fail to adequately allege an omission. Ford also argues (4) that Philips's claims "necessarily fail" because his allegations in the SAC are materially indistinguishable from his allegations in the FAC; and (5) that Plaintiff Ian Colburn's claims fail for lack of reliance or injury. The Court addresses each argument in turn, and finds California Plaintiffs' (except for Ian Colburn's) allegations of fraudulent omission sufficient to survive a motion to dismiss for failure to state a claim.

**1. Ford's Knowledge**

Ford's first argument is that California Plaintiffs fail to allege that Ford knew of the EPAS system defect when California Plaintiffs purchased their vehicles. Mot. at 11; *Wilson,* 668 F.3d at 1145 ("[P]laintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss."). The first named plaintiff to purchase one of the Vehicles was Allison Colburn, who purchased her new 2010 Ford Fusion on January 12, 2010. SAC ¶ 46. Goodman purchased her 2011 Ford Fusion on October 13, 2010. *Id.* ¶ 38. Philips purchased his 2011 Ford Fusion in March 2012. *Id.* ¶ 33. Accordingly, California Plaintiffs must allege Ford's knowledge prior to January 12, 2010.

California Plaintiffs cite several sources of information supporting their allegation that "Ford has outwardly maintained its commitment to the flawed EPAS system even

though it has been aware that the EPAS system installed in the Defective Vehicles is prone to sudden, premature failure since *as early as 2010.*" *Id.* ¶¶ 11, 81 (emphasis added). Specifically, California Plaintiffs rely on a May 2011 technical service bulletin ("TSB") stating that "[s]ome 2012 Focus vehicles equipped with electric power assisted steering (EPAS) ... may exhibit a lack of power steering assist on vehicle start up." SAC ¶ 13. A second TSB was issued in December 2012, stating that "[s]ome 2013 Fusion vehicles built on or before 11/30/2012 may exhibit a loss of power steering assist." *Id.* ¶ 19. California Plaintiffs also cite internal communications among Ford employees, from June 6, 2011 and March 23, 2012. *Id.* ¶¶ 14–16; 91–94. California Plaintiffs further cite the June 2012 NHTSA investigation into the Ford Explorer vehicles as evidence of Ford's knowledge of EPAS system defects. *Id.* ¶ 83. Other internal Ford e-mails suggest Ford's awareness of the Explorer issues in January 2011. *Id.* ¶ 97. Next, California Plaintiffs cite "hundreds of complaints from owners and lessees about steering problems with the Fusion line." *Id.* ¶¶ 17, 104–32. Some of these complaints are dated from 2010, but most are dated from 2012–2014. *Id.*

Ford contends that these allegations are insufficient, especially to show Ford's knowledge in January 2010, the time of Allison Colburn's purchase. Mot. at 11–12. Although the Court agrees that California Plaintiffs have not proved Ford's knowledge, they need not do so at the pleading stage. Rather, California Plaintiffs need only have plausibly alleged that Ford knew about the EPAS system defects "since as early as 2010." SAC ¶ 11. The Court finds that California Plaintiffs have done so.

The May 2011 TSB, newly alleged in the SAC, is especially relevant. As other courts have recognized, it is reasonable to infer that "the TSBs ... were proceeded by an accretion of knowledge by Ford." *In re MyFord Touch Consumer Litig.,* 46 F.Supp.3d 936, 958 (N.D.Cal. 2014); *see Falco v. Nissan N. Am., Inc.,* No. CV 13–00686 DDP (MANx), 2013 WL 5575065, at *6–7 (C.D.Cal. Oct. 10, 2013) (stating that, where defendant issued the first of several TSBs in July 2007 and further did a redesign in 2006 or 2007, that "permit[s] plausible inferences that [defendant] was aware of the defect at the time they sold the vehicles in 2005 and 2006"); *see also MacDonald v. Ford Motor Co.,* 37 F.Supp.3d 1087, 1093 (N.D.Cal. 2014) (identifying "a number of facts" that support plaintiffs' knowledge allegations, including internal data, NHTSA complaints, and TSBs); *Decker v. Mazda Motor of Am., Inc.,* No. SACV 11–0873 AG MLGX, 2011 WL 5101705, at *5 (C.D.Cal. Oct. 24, 2011) (finding allegations

of internal data and TSBs issued within one of year of purchase sufficient to plead knowledge). Furthermore, "[o]ne could reasonably infer that the TSB was issued in response to consumer complaints that surfaced immediately after rollout. That there were such complaints is substantiated by the NHTSA complaints identified by Plaintiffs." *MyFord Touch,* 46 F.Supp.3d at 958. As the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," the Court finds these allegations sufficient at the motion to dismiss stage. *Manzarek,* 519 F.3d at 1031.

**\*10** The cases cited by Ford are distinguishable. For example, in *Wilson* the Ninth Circuit rejected allegations of the defendant's knowledge where the plaintiff relied solely on customer complaints, many of which were undated or post-dated the plaintiff's purchase. *See Wilson,* 668 F.3d at 1148 ("Plaintiffs have submitted fourteen consumer complaints, but the second amended complaint does not indicate where or how the complaints were made (*e.g.,* via HP's website). Twelve of those complaints are undated. The two complaints that are dated were made over two years after Plaintiffs purchased the Laptops."); *see also Williams v. Yamaha Motor Corp., U.S.A.,* No. CV 13–05066 BRO, 2015 WL 2375906, at *10 (C.D.Cal. Apr. 29, 2015) (rejecting knowledge allegations in part because plaintiffs "failed to allege even a single complaint that predates the sale of any first-generation motor."); *Callaghan v. BMW of N. Am., LLC,* No. 13–CV–04794–JD, 2014 WL 6629254, at *4 (N.D.Cal. Nov. 21, 2014) (rejecting knowledge based on post-purchase customer complaints). Other cases cited by Ford rejected the plaintiffs' allegations of knowledge where the plaintiff did not allege knowledge that the defect caused a safety hazard. *See, e.g., Marchante v. Sony Corp. of Am.,* No. 10CV795 JLS RBB, 2011 WL 6027602, at *4 (S.D.Cal. Dec. 5, 2011) ("[A]ll of Plaintiffs allegations regarding Sony's knowledge of the alleged defect pertain to Sony's knowledge that the defect causes excess heat that results in the deterioration of the television display, not that the defect poses any safety hazard.").

Here, California Plaintiffs' allegations, which include internal testing, dated internal communications, dated customer complaints, and dated TSBs, are sufficient to plausibly allege that Ford had knowledge of the EPAS system defect at the time California Plaintiffs purchased their vehicles. Indeed, other courts have allowed plaintiffs to proceed past the motion to dismiss on much thinner allegations. *See, e.g., Mui Ho v. Toyota Motor Corp.,* 931 F.Supp.2d 987, 998

(N.D.Cal. 2013) ("Plaintiffs claim that Defendants had non-public, internal data about the Class Vehicles' headlamp problems, including 'pre-release testing data, early consumer complaints about the defect to Defendants' dealers who are their agents for vehicle repairs, dealership repair orders, testing conducted in response to those complaints, and other internal sources.' "). Accordingly, the Court will not dismiss the fraudulent omission claims for failure to adequately allege Ford's knowledge.

### 2. Ford's Duty to Disclose

Ford's next argument is that Ford did not have a duty to disclose the EPAS system defect, and therefore California Plaintiffs cannot state a fraudulent omission claim under *Daugherty*. *See* 144 Cal.App. 4th at 835 (plaintiffs must allege the "omission of a fact the defendant was obliged to disclose."). California Plaintiffs argue that Ford was required to disclose the EPAS system defect because the defect constituted a material safety hazard. *Wilson*, 668 F.3d at 1141; *Smith v. Ford Motor Co.,* 749 F.Supp.2d 980, 987–88 (N.D.Cal. 2010). Ford argues that California Plaintiffs' allegations fail because the risk of EPAS system failure is at most a "safety hazard" and not an "*unreasonable* safety hazard." Mot. at 19 (emphasis in original); Reply at 12. Ford's argument is unconvincing. Whether the alleged defects are an unreasonable safety hazard is a question of fact, and based on the allegations in the SAC, the Court cannot say that California Plaintiffs' allegations in that regard are deficient as a matter of law.

In the SAC, California Plaintiffs allege that the EPAS system failure causes "increased risk of losing control of their vehicles when the EPAS system fails." SAC ¶ 3. California Plaintiffs also allege that "[w]hen the EPAS system fails while a Defective Vehicle is on the road and the driver's ability to turn the vehicle is greatly reduced, occupants of the Defective Vehicles, occupants of surrounding vehicles, and pedestrians are exposed to the risk of collisions and grave bodily harm." *Id.* ¶ 5. The SAC continues in this vein:

101. The marked increase in the difficulty of steering that arises when the EPAS system fails and the steering system in the Defective Vehicles defaults to manual steering creates an unreasonable safety risk (both in the Ford Explorer and in the Defective Vehicles).

**\*11** 102. Although failure of the EPAS system always compromises safety, this is particularly true when a vehicle

is traveling at high speeds or on unlevel terrain. The sudden shock of needing to immediately exert great effort to control the vehicle makes the Defective Vehicles extremely susceptible to accidents when the EPAS system fails.

103. The danger created by sudden and unexpected failure of the EPAS system is clear from complaints reported to NHTSA about loss of control as a result of failure of the EPAS system. Moreover, certain complaints made to NHTSA suggest that failure of the EPAS system also may disable the braking system. One West Virginia owner reported that she rolled down a hill into a wooded area after the EPAS of her vehicle failed. In addition to losing the ability to steer the vehicle, the braking system failed to engage and the owner "lost complete control of the vehicle."

SAC ¶¶ 101–03. As California Plaintiffs' allegations explain, even if the EPAS only failed "in low speed parking lot maneuvers," *id.* ¶ 14, such a failure could still amount to a material safety hazard.

California Plaintiffs also tie the steering incidents they experienced to the EPAS system's alleged defects. *See, e.g.,* SAC ¶ 80 (listing five alleged defects in the EPAS system and explaining how each could lead to failure). These allegations distinguish the instant case from *Wilson,* where the plaintiffs' claim was dismissed for failure to link the defect to the safety risk, and not, as Ford argues, *see* Mot. at 21, because a burning laptop is not a safety hazard, *see Wilson* at 1144–45 ("As Plaintiffs do not plead any facts indicating how the alleged design defect, *i.e.,* the loss of the connection between the power jack and the motherboard, causes the Laptops to burst into flames, the District Court did not err in finding that Plaintiffs failed to plausibly allege the existence of an unreasonable safety defect.").

Ford's attempt to further parse this argument in its Reply is just as unconvincing. Ford argues:

> the risk of injury posed by any vehicle defect would (all else being equal) be greatest when driving at high speed. But at high speed, a driver rarely if ever *needs* power-assisted steering; in fact, dramatic steering motions at high speed would likely pose a risk of injury themselves. Power-assisted steering is very helpful at low speeds, by contrast,

such as when trying to park, but the risk of injury is correspondingly low.

Reply at 12–13 (emphasis in original). Ford's argument is not persuasive at the motion to dismiss stage, as the materiality of Ford's alleged nondisclosure is a factual question for the jury to decide. *See, e.g., MyFord Touch,* 46 F.Supp.3d at 957 (materiality is generally a question of fact); *Blaue v. Kissinger,* 2006 WL 2092380, *9 n.6 (N.D.Ill. July 24, 2006)* ("[T]he question of whether a defendant's product is unreasonably dangerous for failure to incorporate certain safety devices is a question to be decided by a jury."). At the very least, it is plausible that a total failure in a vehicle's power steering—at high or low speeds—constitutes an unreasonable safety hazard. *See* SAC ¶¶ 101–03. Accordingly, the Court finds that, for purposes of a motion to dismiss, California Plaintiffs have alleged a material safety defect that Ford had a duty to disclose.

### 3. Ford's Alleged Omissions

 **\*12**  Ford argues that California Plaintiffs' fraudulent omissions claims do not meet Rule 9(b)'s pleading standard. In *Kearns,* the Ninth Circuit explained that "nondisclosure is a claim for misrepresentation in a cause of action for fraud, [which] (as any other fraud claim) must be pleaded with particularity under Rule 9(b)." 567 F.3d at 1127. In *Kearns,* the nondisclosure claims failed because they "were couched in general pleadings alleging Ford's intent to conceal from customers that [certified pre-owned] vehicles were essentially the same as ordinary used vehicles. Such general pleadings do not satisfy the heightened pleading requirements of Rule 9(b)." *Id.* Ford argues here that California Plaintiffs' claims fail for similar reasons. Mot. at 1213.

Ford relies in part on *Marolda v. Symantec Corp.,* 672 F.Supp.2d 992, 1002 (N.D.Cal. 2009), which required the plaintiff to identify "where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information." *Marolda* involved an alleged fraudulent omission within a particular advertisement produced by the defendant. The plaintiff there claimed to know about the advertisement but failed to produce or describe it to the court. *See id.* at 1001. As other courts have recognized, however, "the *Marolda* requirements are

not necessarily appropriate for all cases alleging a fraudulent omission." *Velasco v. Chrysler Grp. LLC,* No. CV 13–08080 DDP VBKX, 2014 WL 4187796, at \*4 (C.D.Cal. Aug. 22, 2014) (quoting *Overton v. Bird Brain, Inc.,* 2012 WL 909295 (C.D.Cal. Mar. 15, 2012). In *MacDonald,* moreover, the court found that the plaintiffs satisfied Rule 9(b):

> Plaintiffs adequately allege the "who what when and how," given the inherent limitations of an omission claim. In short, the "who" is Ford, the "what" is its knowledge of a defect, the "when" is prior to the sale of Class Vehicles, and the "where" is the various channels of information through which Ford sold Class Vehicles.

*MacDonald,* 37 F.Supp.3d at 1096.

This Court finds *MacDonald* more on point than *Marolda.* California Plaintiffs allege that Ford's "television advertisements concerning the vehicles," "material concerning the Fusion on Ford's website," "window sticker [s]," and "brochure concerning the Fusion" did not include relevant information about the EPAS system and its possible failures. SAC ¶ 40. Ford, not surprisingly, does not argue that it disclosed the EPAS system's alleged failures.

As Judge Pregerson recently explained, in applying the reasoning from *MacDonald* :

> Plaintiff has identified the "who" (Chrysler); the "what" (knowing about yet failing to disclose to customers, at the point of sale or otherwise, that the TIPM installed in Plaintiffs' vehicles was defective and posed a safety hazard); the "when" (from the time of the sale of the first Class Vehicle until the present day); and the "where" (the various channels through which Chrysler sold the vehicles, including the authorized dealers where Plaintiffs' [sic] purchased

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 326 of 520
PageID: 9247

their vehicles). The court therefore concludes that Plaintiffs' factual averments are sufficient to allow Chrysler to prepare an adequate answer from the allegations.

*Velasco,* 2014 WL 4187796, at *5 (citations omitted). The same analysis applies here: California Plaintiffs have identified the "who" (Ford); the "what" (knowing about yet failing to disclose to customers, at the point of sale or otherwise, that the EPAS system installed in California Plaintiffs vehicles was defective and posed a material safety hazard); the "when" (from the time of the sale of the first vehicle until the present day); and the "where" (the various channels through which Ford sold the vehicles, including the authorized dealers where California Plaintiffs' purchased their vehicles). Accordingly, the Court finds that California Plaintiffs have sufficiently alleged that Ford fraudulently omitted information about the EPAS system in the Vehicles. [9]

[9]    The Court's analysis applies to Allison Colburn, Goodman, and Philips. As explained in Part III.D.5 *infra,* Ian Colburn's claims fail for lack of reliance and lack of injury. Those omissions apply to all the named plaintiffs except, as explained below, Ian Colburn.

**\*13**  For all these reasons, the Court finds that California Plaintiffs have alleged a fraudulent omission and will not dismiss the SAC on that basis.

### 4. Plaintiff Philips's Allegations

Ford also argues that Philips's claims "necessarily fail" because his allegations in the SAC are materially indistinguishable from his allegations in the FAC. Mot. at 8–9. The Court does not find this argument persuasive. The Court's prior ruling focused on the inadequacy of Plaintiffs' affirmative misrepresentation allegations, which California Plaintiffs do not replead. ECF No. 48 at 9:1–23 (explaining that Plaintiffs' affirmative misrepresentation allegations were vague and conclusory). Considering that the only theory put forth in the SAC is a fraudulent omission theory, the Court finds the allegations relating to Philips sufficient to survive a motion to dismiss. The SAC adds specificity with regard to Ford's allegedly misleading marketing tactics and presents new allegations related to Ford's alleged knowledge of the

EPAS system defect. *See* SAC ¶¶ 9–10 (allegations relating to marketing materials); ¶¶ 81–132 (allegations relating to knowledge). Accordingly, the Court finds the allegations relating to Philips sufficient at this stage of the litigation.

### 5. Plaintiff Ian Colburn Fails to Allege Reliance or Injury

Ford moves to dismiss the fraudulent omission claims brought by Ian Colburn due to his failure to allege reliance and injury, which are required elements of his claims. For the reasons stated below, the Court finds that Ian Colburn fails to allege actual reliance or injury for all four of his claims and thus dismissed his claims with prejudice.

This Court held in *Bruton* that claims brought under the unlawful or unfair prong of the UCL, like claims brought under the UCL's fraud prong, must allege actual reliance and injury, especially if they are based on a defendant's misrepresentations. *See Bruton v. Berber Products Co.,* No. 12–CV–02412–LHK, 2014 WL 172111, at *6 (N.D.Cal. Jan. 15, 2014) (citing *in re Actimmune Mktg. Litig.,* 46 Cal.4th 298, 326 (2009) (holding that Proposition 64 imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong)); *see also* In re *Actimmune Mktg. Litig.,* No. 08–CV–2376, 2010 WL 3463491, at *8 (N.D.Cal. Sept. 1, 2010) (holding "that a plaintiff must plead 'actual reliance,' even if their [sic] claim arises under the unlawful or unfair prongs, so long as the pleadings assert a cause of action grounded in misrepresentation or deception"), *aff'd,* 464 Fed.Appx. 651 (9th Cir. 2011). Similarly, the CLRA also requires that a plaintiff plead reliance and injury. *See Durell v. Sharp Healthcare,* 193 Cal.App. 4th 1350, 1367 (2010); *Aron v. UHaul Co.,* 143 Cal.App. 4th 796, 802 (2006). Finally, a claim for fraudulent concealment under California law requires allegations of (1) knowing concealment or nondisclosure by the defendant (2) with the intent to defraud, which induces (3) actual reliance and (4) causes injury to the plaintiff. *625 3rd St. Assocs., L.P. v. Alliant Credit Union,* 623 F.Supp.2d 1040, 1050 (N.D.Cal. 2009) (citing *Hoey v. Sony Elecs., Inc.,* 515 F.Supp.2d 1099, 1104 (N.D.Cal. 2007)). It is clear from these cases that all four of Ian Colburn's claims require allegations of actual reliance and injury.

**\*14**  In the SAC, Ian Colburn alleges that he was given a 2010 Ford Fusion by his mother, Allison Colburn. The steering wheel in his vehicle allegedly failed, causing him

to take it to a Ford dealership for repairs. SAC ¶¶ 51–54. Nowhere in the SAC does Ian Colburn allege that he viewed any promotional material or received any representation from Ford with regards to his vehicle. As in *Bruton,* a plaintiff has no standing to assert claims based on statements he did not view. *Bruton,* 2014 WL 172111, at \*9 (citing *Kwikset v.Super. Ct.,* 51 Cal.4th 310, 326 (2011)). Because Ian Colburn does not allege that he viewed any statement from Ford before he came into possession of the vehicle, any fraudulent concealment that may have occurred could not have led to justifiable reliance on his part. What's more, Ian Colburn does not allege in the SAC that he suffered any injury. Because he fails to adequately plead actual reliance or injury with respect to each of his four claims, the Court GRANTS Ford's Motion to Dismiss all of Ian Colburn's claims.

The Court does so without leave to amend because the Court, in granting Ford's prior Motion to Dismiss, told Plaintiffs that they must identify "specific materials, like car window stickers and websites, that were reviewed by plaintiffs and contained material omissions" in order to survive a motion to dismiss. ECF No. 48 at 9:7–10:17. As Plaintiff Ian Colburn has made no such allegation despite being on notice, the Court finds that allowing further amendment would be futile. *See Chappel v. Lab. Corp. of Am.,* 232 F.3d 719, 725–26 (9th Cir. 2000) ("A district court acts within its discretion to deny leave to amend when amendment would be futile ....."); *see also Chodos v. West Publ'g Co.,* 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad." (internal quotation marks omitted)).

### E. CLRA Claim: Whether California Plaintiffs Allege a "Transaction"

The CLRA provides that a consumer who suffers damage "as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person." Cal. Civ.Code § 1780(a). Section 1770, in turn, lists certain methods, acts, or practices and declares that they are "unlawful" if "undertaken by any person in *a transaction* intended to result or which results in the sale or lease of goods or services to any consumer." *Id.* § 1770(a) (emphasis added). The statute defines "transaction" as "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id.* § 1761(e). Ford argues that although California Plaintiffs allege they purchased their

vehicles, "they do not allege this occurred in any 'transaction' with Ford or one of its agents." Mot. at 22.

The Court is not convinced. California Plaintiffs all allege that they purchased their vehicles directly from Ford dealerships. *See* SAC ¶ 33 (Philips purchased 2011 Ford Fusion from Salinas Valley Ford); ¶ 38 (Goodman purchased 2011 Ford Fusion from Future Ford of Clovis); ¶ 45 (Allison Colburn purchased 2010 Ford Fusion from Galpin Ford in Granada Hills). Allegations that vehicles were purchased from an authorized dealership are typically sufficient to state a claim against the vehicle manufacturer under the CLRA. *See, e.g., Chamberlan v. Ford Motor Co.,* No. C 03–2628 CW, 2003 WL 25751413, at \*8 (N.D.Cal. Aug. 6, 2003) (finding allegations that vehicles were purchased from "authorized dealerships acting as [Ford's] agents" sufficient to state a claim against Ford under the CLRA). Indeed, a plain reading of the CLRA does not require a direct transaction between a consumer and a manufacturer. Rather, the statute broadly defines transaction as "an agreement between a consumer and *another person.*" Cal. Civ.Code § 1761(e) (emphasis added). This broad definition is in keeping with the CLRA's command that the statute be "liberally construed and applied to promote its underlying purposes." *Id.* § 1760.

**\*15** It comes as no surprise, then, that the vast majority of courts to address the issue have rejected Ford's argument, holding instead that a plaintiff need not allege a direct transaction with the manufacturer. *See, e.g., Falco,* 2015 WL 1534800, at \*6 (finding that plaintiffs need not allege a "direct" transaction between a consumer and the manufacturer in order to properly plead a CLRA claim); *Rossi v. Whirlpool Corp.,* No. 2:12–cv–00125, 2013 WL 5781673, at \*10 (E.D.Cal. Oct. 25, 2013) (holding that plaintiffs adequately pled their CLRA claim because "where a manufacturer had exclusive knowledge of a defect and the consumer relied upon that defect, the CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer"); *Tietsworth v. Sears,* 720 F.Supp.2d 1123, 1140 (N.D.Cal. 2010) (rejecting defendants' argument that plaintiffs were required to allege a direct transaction to state a claim under the CLRA because "when a plaintiff can demonstrate that the manufacturer had exclusive knowledge of a defect and the consumer relied upon that defect, the CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer"); *Keilholtz v. Superior Fireplace Co.,* 2009 WL 839076, at \*3–4 (rejecting defendants' argument that a direct transaction must be alleged

to state a claim under the CLRA because defendants "fail to cite any authority to support the proposition that a CLRA claim can be asserted only against defendants who sell goods or services directly to consumers").

Ford's citations to the contrary are unpersuasive. In *Green v. Canidae Corp.,* No. CV 09–0486 GAF PLAX, 2009 WL 9421226, at *4 (C.D. Cal. June 9, 2009), the district court dismissed the plaintiffs' CLRA claim against a pet food manufacturer because "the legislation clearly contemplates consumer transactions between a consumer and a retail seller, and does not apply to commercial transactions between a retailer and its vendors to acquire a supply of goods for resale." Not only does the weight of the persuasive authority fall against *Green,* but *Green* 's analysis is itself cursory. *Green* concludes summarily that permitting consumers to directly sue the manufacturers would contradict the dual CLRA purposes of consumer protection and efficiency. But *Green* offers no reason for so concluding. On the contrary, it seems that preventing consumers from suing manufacturers under the CLRA would require them to resort to less consumer-friendly causes of action for breach of warranty or common law fraud. *See Gray v. BMW of N. Am., LLC,* No. 13–CV–3417–WJM–MF, 2014 WL 4723161, at *6 (D.N.J. Sept. 23, 2014) (rejecting *Green* for the same reasons). In addition, *Green* distinguished *Chamberlan* on grounds that, in *Chamberlan,* "the used car dealers were authorized dealerships acting as agents of Ford." 2009 WL 9421226, at *4. Here, as in *Chamberlan,* California Plaintiffs all allege that they purchased their vehicles from authorized Ford dealerships. *See* SAC ¶¶ 33, 38, 45

Ford's citations to *Cirulli v. Hyundai Motor Co.,* No. SACV 08–0854 AG, 2009 WL 4288367, at *4 (C.D.Cal. Nov. 9, 2009), and *Fulford v. Logitech, Inc.,* No. C–08–2041 MMC, 2008 WL 4914416, at *1 (N.D.Cal. Nov. 14, 2008), are even less persuasive. In *Cirulli,* the district court sustained the plaintiffs' CLRA claims against Hyundai Motor America ("HMA"), with whom plaintiffs had a warranty agreement, but dismissed their CLRA claims against Hyundai Motor Company ("HMC"), HMA's parent company, because there was "no comparable transaction" with HMC. 2009 WL 4288367, at *4. Here, by contrast, there is no dispute that California Plaintiffs all had a warranty agreement with Ford. *See* ECF No. 22 at 7 (Ford's first round Motion to Dismiss acknowledging that "[e]ach of the plaintiffs' cars was covered by an express 'bumper-to-bumper' warranty for the first three years or 36,000 miles driven"). Finally, in *Fulford,* the district court held, without analysis, that the plaintiff had

"failed to allege that Logitech engaged in such acts in the course of a transaction with him." 2008 WL 4914416, at *1. In *Fulford,* unlike here and in *Chamberlan,* the products purchased in *Fulford* were not from "authorized dealerships acting as agents" of the manufacturer defendants. *Id.* at *1 n.2 (ellipsis and internal quotation marks omitted). Because California Plaintiffs purchased their vehicles from authorized Ford dealers, the instant case is therefore far more like *Chamberlan* than it is like *Green* or *Fulford.*

*16 Accordingly, the Court DENIES Ford's Motion to Dismiss California Plaintiffs' CLRA claims for failure to allege a "transaction."

### F. Equitable Relief Claims: UCL Claims and CLRA Injunctive Relief

Ford next argues that the Court should dismiss California Plaintiffs' equitable claims—to wit, their UCL claims and CLRA claims for injunctive relief. Mot. at 23–24. The Court should do so, Ford says, because California Plaintiffs have an adequate remedy at law. *Id.* For the second time, the Court agrees. *See* ECF No. 48 at 10:22–11:17 (granting Ford's first round Motion to Dismiss Plaintiffs' equitable claims due to "an adequate remedy at law").

Apart from civil penalties, which are not at issue in this case, the UCL provides only the equitable remedies of restitution and injunctive relief. *See Kor. Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144 (2003); *Madrid v. Perot Sys. Corp.,* 130 Cal.App. 4th 440, 452 (2005). A plaintiff seeking equitable relief in California must establish that there is no adequate remedy at law available. *See Knox v. Phoenix Leasing, Inc.,* 29 Cal.App. 4th 1357, 1368 (1994). Statutory relief under the UCL "is subject to fundamental equitable principles, including inadequacy of the legal remedy." *Prudential Home Mortg. Co. v.Super. Ct.,* 66 Cal.App. 4th 1236, 1249 (1998).

As the UCL provides only equitable remedies, *see* SAC ¶¶ 149, 159 (seeking restitution), and California Plaintiffs have an adequate remedy at law in the form of their claim for fraudulent concealment, the Court dismisses California Plaintiffs' UCL claims. *See, e.g., Durkee v. Ford Motor Co.,* No. C 14–0617 PJH, 2014 WL 4352184, at *3 (N.D.Cal. Sept. 2, 2014) ("Because the UCL provides for only equitable remedies, and plaintiffs have an adequate remedy at law for the alleged Song–Beverly Act violation, plaintiff's UCL claim must be dismissed."); *Gardner v. Safeco Ins. Co. of Am.,* No. 14–CV–02024–JCS, 2014 WL 2568895, at *7

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 329 of 520
PageID: 9250

(N.D. Cal. June 6, 2014) (dismissing UCL claim where plaintiffs' "claims for breach of contract and breach of the implied covenant of good faith and fair dealing may provide an adequate remedy [at law]"); *Rhynes v. Stryker Corp.,* No. 10–5619 SC, 2011 WL 2149095, at *3–4 (N.D.Cal. May 31, 2011) (dismissing plaintiffs' UCL claims because their "products liability claims" afforded them "an adequate remedy at law to redress their alleged injuries"). California Plaintiffs do not attempt to distinguish any of these cases, nor do they argue that their claims for fraudulent concealment are an inadequate remedy at law. *See* Opp. at 21–22. Moreover, the cases cited by California Plaintiffs do not even address the issue. *See, e.g., MyFord Touch,* 46 F.Supp.3d at 952 (not addressing equitable relief). Although California Plaintiffs "must establish that there is no adequate remedy at law available," *Durkee,* 2014 WL 4352184, at *2, the SAC contains no allegation of inadequacy.

To the extent California Plaintiffs assert a claim for injunctive relief in addition to damages under the CLRA, *see* SAC ¶¶ 169–70 (discussing damages only), that too is dismissed for the same reasons, *see Durkee,* 2014 WL 4352184, at *3 (dismissing entire CLRA claim due to an adequate remedy at law where plaintiffs sought "only injunctive relief" under the CLRA). Again, California Plaintiffs provide no answer.

**\*17** As a result, the Court GRANTS Ford's Motion to Dismiss California Plaintiffs' UCL claims and CLRA claims for injunctive relief. The Court does so without leave to amend because the Court has previously dismissed Plaintiffs' equitable claims due to an adequate remedy at law. *See* ECF No. 48 at 10:22–11:17. The Court therefore finds that allowing further amendment would be futile. *See Chappel,* 232 F.3d at 725–26 ("A district court acts within its discretion to deny leave to amend when amendment would be futile ...."); *see also Chodos,* 292 F.3d at 1003 ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad." (internal quotation marks omitted)). However, as stated *supra* at Part III.D., California Plaintiffs may continue to assert their CLRA claims for damages.

**G. Request to Strike Nationwide Claims**

Lastly, Ford argues that the Court should strike the "nationwide" class claims that are repled in the SAC. Mot. at 25 (citing SAC at 39 n.7). Although the Court explained that Plaintiffs would need to add individuals with standing under the laws of each state in order to reassert Plaintiffs' nationwide claims, *see* ECF No. 48 at 12:3–13:7, the Court accepts Plaintiffs' representation that they have repled these claims in order to preserve tolling and to avoid a possible finding of waiver by an appellate court down the road, *see* SAC at 39 n.7. In light of Plaintiffs' representation, the Court finds it unnecessary to strike the requested matter from the SAC at the pleading stage. *See* Fed.R.Civ.P. 12(f). Accordingly, the Court hereby DENIES Ford's request to strike the nationwide claims from the SAC.

**IV. CONCLUSION**

For the foregoing reasons, the Court rules as follows:

- The Court GRANTS with prejudice Ford's Motion to Dismiss as to Plaintiff Ian Colburn;

- The Court DENIES Ford's Motion to Dismiss as to California Plaintiffs' claims for fraudulent concealment and CLRA claims for damages;

- The Court GRANTS with prejudice Ford's Motion to Dismiss as to California Plaintiffs' UCL claims and CLRA claims for injunctive relief; and

- The Court DENIES Ford's request to strike the nationwide claims from the SAC.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4111448

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government L orks.    1W

# TAB 37

2011 WL 5597327

2011 WL 5597327
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Roxann PIXLER, Plaintiff

v.

Anthony HUFF, et. al., Defendants.

Civil Action No. 3:11–CV–00207–JHM.
|
Nov. 17, 2011.

**Attorneys and Law Firms**

Gregory D. Simms, Gruner & Simms, PLLC, Steven R. Romines, Romines Weis & Young, PSC, Louisville, KY, for Plaintiff.

Judson B. Wagenseller, Louisville, KY, for Defendants.

***MEMORANDUM OPINION AND ORDER***

JOSEPH H. McKINLEY, JR., Chief Judge.

 **\*1** This matter is before the Court on Defendant Brian N. Sly's Motion to Dismiss [DN 10]; Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust's Motion for More Definite Statement [DN 12]; Defendant Thomas Bean's Motion to Dismiss [DN 30]; Defendant Huff Farm (Horsebranch) Inc.'s Motion to Dismiss [DN 34]; and Plaintiff Roxann Pixler's Motion to Strike [DN 33] and Motion for Extension of Time [DN 36]. Fully briefed, these matters are ripe for decision.

## I. BACKGROUND

This case centers around the creation and operation of Midwest Merger Management, LLC ("MMM"). In 2001, Plaintiff Roxann Pixler's husband, Danny Pixler, and Anthony Huff ("A.Huff") formed MMM. (Amend. Compl. at ¶ 18.) For reasons that are not entirely clear to the Court, Pixler and A. Huff placed their shares in the company in their respective wives' names. (*Id.*) On July 20, 2001, MMM filed its Articles of Organization, which listed two members, Plaintiff and

Sheri Huff ("S.Huff"). (*Id.* at ¶ 19.) It appears that MMM was run entirely by Pixler and A. Huff, and that Plaintiff had no involvement with the operations of the company. At some point, Michele Brown became the secretary and personal assistant to A. Huff and became involved in MMM. (*Id.* at ¶ 21.) In MMM's 2002 Annual Report, Brown was listed as a member or manager of MMM, along with Plaintiff and S. Huff. (*Id.* at ¶ 20.) When MMM was initially created, Brian N. Sly, a California business man, loaned the business approximately $3.9 million dollars. (*Id.* at ¶ 43.)

MMM was established as a "risk manager." (*Id.* at ¶ 23.) In this line of work, MMM would collect premiums and fees from clients and would in turn pay premiums to insurance carriers that provided workers' compensation insurance coverage. (*Id.* at ¶ 24.) MMM also provided consulting services to various entities. (*Id.* at ¶ 25.)

In 2004, MMM acquired Certified Services, Inc., which itself owned several subsidiaries. (*Id.* at ¶ 27.) Beginning in 2005, A. Huff established several companies including, Oxygen Unlimited, LLC; Oxygen II, LLC (later renamed River Falls Investments, LLC); O2 HR, LLC; O2 HR Safety & Claims, LLC (later renamed W. Anthony Huff, LLC and renamed again River Falls Equities, LLC); W.A. Huff, LLC; and SDH Realty, Inc. (*Id.* at ¶¶ 29–32, 41, 42.) Thomas Bean, helped A. Huff establish and manage River Falls Investments, LLC and River Falls Equities, LLC. (*Id.* at ¶ 44.) In her Amended Complaint, Plaintiff alleges that A. Huff used at least two of these entities, SDH Realty, Inc. and W.A. Huff, LLC, to funnel money from MMM for illegal purposes. (*Id.* at ¶¶ 41–42.)

In 2006, Plaintiff was told that her share in MMM was virtually worthless. (*Id.* at ¶ 35.) However, A. Huff expressed interest in purchasing her share and paid Plaintiff $170,000 as a partial buy-out. (*Id.*) Plaintiff eventually became suspicious of A. Huff and began to investigate the business dealings of MMM. She was able to obtain a copy of the MMM books in 2008 and discovered what she believed to be "accounting discrepancies that could not be reconciled." (*Id.* at ¶ 39.) Plaintiff filed suit against A. Huff and many other parties in April 2011.

## II. DISCUSSION

### A. Brian Sly

 **\*2** Defendant Sly has challenged Plaintiff's Complaint on a number of grounds. Defendant Sly has moved for dismissal

under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### i. Lack of Personal Jurisdiction

The Supreme Court has held that personal jurisdiction "is an essential element of the jurisdiction of a district ... court,' without which the court is 'powerless to proceed to an adjudication.' " *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584 (1999) (quoting *Emp'rs Reinsurance Corp. v. Bryant,* 299 U.S. 374, 382 (1937); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal quotation marks omitted). Furthermore, if a court "can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* 549 U.S. 422, 436 (2007). Accordingly, the Court will address its jurisdiction over the defendant before addressing the merits of Plaintiff's individual claims.

When addressing a motion to dismiss for lack of personal jurisdiction, "there is no statutory direction ..., [therefore,] the mode of its determination is left to the trial court." *Gibbs v. Buck,* 307 U.S. 66, 71–72 (1939). However,

> case law establishes a settled procedural scheme to guide trial courts in the exercise of this discretion. If it decides that the motion can be ruled on before trial, the court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). However the court handles the motion, the plaintiff always bears the burden of establishing that jurisdiction exists.

*Serras v. First Tennessee Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989). If the court determines the jurisdictional issue on written submissions only, the plaintiff "need only make a prima facie showing of jurisdiction." *Compuserve, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). When making such a determination without an evidentiary hearing, "the court must consider the pleadings and affidavits in a light most favorable to the plaintiff." *Id.* Furthermore, the court must "not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F .3d 883, 887 (6th Cir.2002).

In a diversity case, a federal court determines whether personal jurisdiction exists over a nonresident defendant by applying the law of the state in which it sits. *Third Nat'l Bank v. WEDGE Group Inc.,* 882 F.2d 1087, 1089 (6th Cir.1989). The Court applies a two-step inquiry to determine whether it may exercise personal jurisdiction over a non-resident defendant: "(1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." *Brunner v. Hampson,* 441 F.3d 457, 463 (6th Cir.2006). The district court's exercise of jurisdiction over an out-of-state defendant must be consistent with both the forum state's long-arm statute and the constitutional requirements of due process. *Id.; CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.2007); *Appriss Inc. v. Information Strategies, Inc.,* 2011 WL 3585890, at *2 (W.D.Ky. Aug. 16, 2011). Furthermore, "[p]ersonal jurisdiction must be established with respect to each cause of action." *Morris Aviation, LLC v. Diamond Aircraft Indus ., Inc.,* 730 F.Supp.2d 683, 694 (W.D.Ky.2010).

 **\*3** Until recently, the Kentucky long-arm statute, K.R.S. § 454.210, had been interpreted "to reach to the full constitutional limits of due process in entertaining jurisdiction over non-resident defendants." *Wilson v. Case,* 85 S.W.3d 589, 592 (Ky.2002). In *Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51 (Ky.2011), the Kentucky Supreme Court expressly overruled Wilson and held that the Kentucky long-arm statute does not extend to the full limit of due process and requires its own separate analysis. *Caesars,* 336 S.W.3d at 57.

Kentucky's long-arm statute requires a two-prong showing before a court can exercise personal jurisdiction over a non-resident. First, the court must find that a non-resident's conduct or activities fall within one of nine enumerated provisions in K.R.S. § 454.210. Only three of those provisions are applicable to the facts underlying the present motion against Defendant Sly; K.R.S. § 454.210(2)(a)(1), (3), and (4). [1] If this first prong is satisfied then the second prong requires the Court to determine if the plaintiff's claim arises from the defendant's actions. *See* K.R.S. § 454.210(2)(b) ("When jurisdiction over a person is based solely upon this section, only a claim arising from acts enumerated in this section may be asserted against him.") Accordingly,

"even when the defendant's conduct and activities fall within one of the enumerated categories, the plaintiff's claim still must 'arise' from that conduct or activity before long-arm jurisdiction exists." *Caesars,* 336 S.W.3d at 56. The court in *Caesars* conceded that "[t]he phrase 'arising from' may reasonably be subject to various interpretations." *Id.* at 58. In evaluating the meaning of that phrase, the Kentucky Supreme Court found that "[i]f there is a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction, then jurisdiction is properly exercised." *Id.* at 59. The court went on to say that "the analysis must necessarily be undertaken on a case by case basis" and that "[t]rial courts will ultimately have to depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction." *Id.*

1    The long-arm statute states in pertinent part that
       (2)(a) A court may exercise personal jurisdiction
       over a person who acts directly or by an agent,
       as to a claim arising from the person's:
       1.  Transacting   any   business   in   this
       Commonwealth;
       ...
       3. Causing tortious injury by an act or omission
       in this Commonwealth;
       4. Causing tortious injury in this Commonwealth
       by   an   act   or   omission   outside   this
       Commonwealth if he regularly does or solicits
       business, or engages in any other persistent
       course of conduct, or derives substantial revenue
       from goods used or consumed or services
       rendered   in   this   Commonwealth,   provided
       that   the   tortious   injury   occurring   in   this
       Commonwealth   arises   out   of   the   doing   or
       soliciting of business or a persistent course of
       conduct   or   derivation   of   substantial   revenue
       within the Commonwealth[.]
       K.R.S. § 454.210(2)(a).

In the instant case, Plaintiff has alleged two claims against Defendant Sly, breach of fiduciary duty and unjust enrichment. The following factual allegations related to Defendant Sly are contained within the Amended Complaint: (1) Defendant Brian Sly is a citizen of the State of California, (Amend.Compl.¶ 11); (2) Defendant Sly loaned approximately $3.9 million dollars to A. Huff, however, he was re-paid $5.3 million with funds from MMM, (*Id.* at ¶ 43); and (3) Plaintiff relied on representations of Sly that the company was being operated lawfully (*Id.* at ¶ 46). In support of Count III, Breach of Fiduciary Duty, Plaintiff alleges that

she reposed trust and confidence in Sly who therefore had a duty of utmost good faith, trust, confidence and candor to the Plaintiff, and that Sly breached that duty and caused damage to the Plaintiff. (*Id.* at ¶ 62–62.) In support of Count VI, Unjust Enrichment, Plaintiff alleges that Sly received benefits from the Plaintiff's participation in MMM for which the Plaintiff has not been adequately compensated, which benefits were to the detriment of Plaintiff. (*Id.* at ¶¶ 75–76.)

**\*4** Both Plaintiff and Defendant Sly have submitted two declarations, sworn to under penalty of perjury, in an attempt to demonstrate or dispel the notion that the Court has personal jurisdiction over Defendant Sly. While the Federal Rules of Civil Procedure specifically address the use of affidavits and declarations to support or oppose a motion for summary judgment, the Rules are silent regarding their use to support or oppose a motion to dismiss under Rule 12(b). Compare Fed.R.Civ.P. 56(c), *with* Fed.R.Civ.P. 12(b). "Because there are no specific procedures or rules governing evidentiary rulings in connection with a motion to dismiss, courts consistently look to Rule 56 for guidance." *Foshee v. Forethought Fed. Sav. Bank,* 2010 WL 2158454, at \*3 (W .D.Tenn. May 7, 2010); *see also Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 327 (6th Cir.1990) (finding that "[a]lthough the district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction, courts frequently look to Rule 56 for guidance in ruling upon evidentiary matters under 12(b)(1).").

Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c). The Court sees no reason why an affidavit or declaration submitted in connection with a motion to dismiss under Rule 12(b)(2) should be treated any differently. Therefore, to the extent any affidavit or declaration submitted by the parties is not based upon personal knowledge or contains inadmissible evidence, the Court will not consider such portions in determining the issue of personal jurisdiction. *See United Tech. Corp. v. Mazer,* 556 F.3d 1260, 1277 (11th Cir.2009) (finding that when a court is determining a Rule (12)(b)(2) motion to dismiss that it should "consider[ ] 'only those portions of the [affidavit] that set forth specific factual declarations within the affiant's personal knowledge.' "); *Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395, at \*5 (5th Cir.1995) (unpublished) (holding that "[h]earsay is not properly included in an affidavit" submitted with a Rule 12(b)(2) motion.).

In support of his motion to dismiss, Defendant Sly has submitted two sworn declarations wherein he states that he is a resident of California who has never lived, owned real property, owned any other assets or personal property, maintained any bank or other accounts, maintained any regular business activities, paid taxes, or maintained any employees, contractors or agents in the Commonwealth of Kentucky. (Sly's Decl. in Support of Mot. to Dismiss ¶¶ 2–3 [DN 10].) Defendant Sly further maintains that he never spoke to Plaintiff regarding business while either of them were in Kentucky, rather, all of his contacts with Plaintiff in Kentucky were of a social nature. (*Id.* at ¶¶ 4–7.)

**\*5** Sly does admit that he was in Kentucky to attend a regular business meeting involving Oxygen Unlimited II, LLC in May 2006, but that Plaintiff was not at that business meeting. (*Id.* at ¶ 5.) Sly further declares that he did, in fact, loan MMM approximately $3,924,808.00 in 2001, an action that he considered and executed from his California home. (Sly's Supp. Decl. ¶ 2 [DN 39].) Sly states that he has only received $2,708,029.03 as a return on his loan, and that he has lost approximately $1,216,779, which he does not expect to recover. (*Id.* at ¶¶ 4–5.) The payments that he did receive from MMM were all received by Sly at his home in California and deposited in his California bank accounts by him. (*Id.* at ¶ 4.) The last of these repayments was received in 2005. (*Id.*) Defendant Sly further states that he does not recall ever speaking with Plaintiff regarding MMM, until approximately 2009 when Plaintiff threatened to sue him. (*Id.* at ¶ 3.)

Plaintiff also filed two declarations opposing Defendant Sly's motion to dismiss. Plaintiff's declarations are prefaced with the statement that "[t]he following facts are within my own personal knowledge, and if called upon I could and would testify competently to these facts, except as to those matters stated herein upon information and belief, and as to those matter [sic] I have a good faith and reasonable basis to believe that they are true." (Pl.'s Decl. in Supp. Pl.'s Resp. to Def. Brian Sly's Mot. to Dismiss ¶ 2 [DN 23].) Plaintiff states that she was a partial owner of MMM beginning from its inception in 2001, and that she owned a significant portion of the company during the time relevant to her Complaint. (*Id.* at ¶ 5.) The remaining statements contained in her declaration are not made from personal knowledge but are made based on Plaintiff's "knowledge and belief." (*Id.* at ¶¶ 6–13.) Plaintiff states that it is her "knowledge and belief" that Defendant Sly has had "systematic and continuous" contacts with the state of Kentucky since 1990, (*Id.* at ¶ 6), including being a business

affiliate of A. Huff since the early 1990's, (*Id.* at ¶ 8.) Plaintiff also states that is her "knowledge and belief" that Defendant Sly invested at least $4,000,000 in MMM between 2001 and the present. (*Id.* at ¶ 10.)

In her Supplemental Declaration filed approximately six weeks after her initial declaration, Plaintiff again makes a number of statements based upon her "knowledge and belief." (*See* Pl.'s Decl. in Supp. Pl.'s Supp. Resp. to Def. Brian Sly's Mot. to Dismiss [DN 37].) In this second declaration, Plaintiff states that it is her "knowledge and belief" that Defendant Sly held and sold an "equity position" in MMM, back to MMM for over $15 million dollars in 2002. (*Id.* at ¶ 13.) Using the same "knowledge and belief" preface, Plaintiff further states that Defendant Sly was part of a large fraudulent scheme that included soliciting investments for MMM and Oxygen Unlimited, LLC, and agreeing to make large transfers of funds for "investment" purposes in these entities, which never resulted in business uses. (*See id.* at ¶¶ 9–15.) Plaintiff claims that Defendant A. Huff purposely acted to perpetrate fraud against MMM by engaging in circular accounting practices, that benefitted Defendant Sly, and that Defendant Sly was aware of such fraudulent practices. (*Id.* at ¶¶ 16–17, 22.)

**\*6** These "factual allegations" made by Plaintiff do not appear to be based upon personal knowledge, rather, they appear to be based upon conjecture, speculation, and belief. Although Plaintiff intentionally prefaced the majority of her statements with the phrase "knowledge and belief" instead of "information and belief," the use of such wording is insufficient to satisfy the requirement of personal knowledge. These statements made upon "knowledge and belief" stand in stark contrast to the other statements made by Plaintiff based upon personal knowledge, which do not contain such a preface. (*See e.g. id.* at 6.) Statements not made upon personal knowledge are not to be considered by courts in determining a motion for summary judgement under Rule 56 and such statements should not be considered in a motion to dismiss under Rule 12(b)(2). *See Totman v. Louisville Jefferson Cnty. Metro Gov't,* 391 F. App'x 454, 464 (6th Cir.2010) (finding that statements made to the best of a party's knowledge and belief go beyond personal knowledge and do not meet the evidentiary standard set forth in Rule 56); *Plaskolite, Inc. v. Zhejiang Taizhou Eagle Mach. Co., Ltd.,* 2008 WL 5190049, at \*5 (S.D.Ohio Dec. 9, 2008) (addressing a Rule 12(b)(2) motion to dismiss and refusing to consider portions of an affidavit based upon the belief of the affiant); *Doe I v. Al Maktoum,* 2008 WL 4965169, at \*5 (E.D.Ky. Nov.

18, 2008) (finding an affidavit based upon news stories and websites was not based upon personal knowledge and was insufficient to defeat a motion to dismiss under Rule 12(b)(2); *Neewra, Inc. v. Manakh Al Khaleeg Gen. Trading and Contracting Co.,* 2004 WL 1620874, at *2 n.3 (S.D.N.Y. July 20, 2004) (finding an affidavit based upon information and belief was not based upon personal knowledge and was not to be considered in the determination of the Rule 12(b)(2) motion to dismiss).

Disregarding those "factual assertions" made upon Plaintiff's knowledge and belief, the Court finds that there are few facts connecting Defendant Sly to the Commonwealth of Kentucky for purposes of Plaintiff's claims of breach of fiduciary duty and unjust enrichment. While the Court must draw all reasonable inferences in favor of Plaintiff, it need not disregard statements and facts made by the Defendant that are not contradicted. Plaintiff's claim for breach of fiduciary duty is premised upon Defendant Sly allegedly misrepresenting to her the legality of MMM's operation. Plaintiff has produced no evidence demonstrating when, where or how this misrepresentation was made. She has failed to produce evidence that it was made while either she or Defendant Sly was in the Commonwealth of Kentucky. Defendant Sly has submitted a declaration stating that he has never spoken to Plaintiff over the phone when either he or she was in the Commonwealth of Kentucky. (Def. Sly's Decl. ¶ 7.) He further states that the one time that he interacted with Plaintiff in Kentucky was in May 2006 when he saw her at a social function following a business meeting involving Oxygen Unlimited II, LLC. (*Id.* at ¶ 5.) Defendant Sly states that this contact with Plaintiff was purely a social one. [2]

[2]    Noticeably, Defendant Sly does not go so far in his declaration as to state that he has never discussed MMM with Plaintiff, only that such communication never took place while either of them was in the Commonwealth of Kentucky.

**\*7** Looking first to Plaintiff's breach of fiduciary duty claim, the Court can quickly eliminate K.R.S. § 454.210(2)(a)(3) and (4) as creating jurisdiction. Plaintiff has failed to demonstrate that the misrepresentation occurred in the Commonwealth, therefore jurisdiction cannot be found under subsection (2)(a)(3). As for subsection 2(a)(4), assuming that the misrepresentation in some way affected Plaintiff in Kentucky, the Court finds that Plaintiff has failed to demonstrate that Defendant Sly "regularly does or solicits business, or engages in any other persistent course of conduct,

or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth[.]" K.R.S. § 454.210(2)(a)(4). Furthermore, Plaintiff has not demonstrated that Defendant Sly's alleged misrepresentation arose "out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth." *Id.* Therefore, jurisdiction cannot be found under subsection (2)(a)(4).

Nor does K.R.S. § 454.210(2)(a)(1), transacting any business in the Commonwealth, provide the Court with the necessary jurisdiction. As the Kentucky Supreme Court only recently stated that Kentucky's long-arm statute must be analyzed separately from due process, there is little precedent by Kentucky courts analyzing the phrase "transacting any business" in K.R.S. § 454.210(2)(a)(1). Under Kentucky law, statutes are to be "liberally construed with a view to promote their objects and carry out the intent of the legislature...." K.R.S. § 446.080(1). Furthermore, "words and phrases are to 'be construed according to the common and approved usage of language' unless a word has a certain technical meaning." *Workforce Dev. Cabinet v. Gaines,* 276 S.W.3d 789, 792 (Ky.2008) (quoting K.R.S. § 446.080(4)).

The term "transact" is defined as "to carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement." Random House Unabridged Dictionary 2008 (2d ed.1993). In the instant case, the Amended Complaint alleges that Defendant Sly made a loan to A. Huff. (Amend.Compl.¶ 43.) Defendant Sly's Supplemental Declaration states that the loan was actually issued to MMM, a Kentucky corporate entity. (Def. Sly's Supp. Discl. ¶ 2.) Regardless of who initially received the funds, A. Huff or MMM, it is clear from the declarations that the money was intended to be a loan to MMM. Defendant Sly's declaration states that this decision and the actual transfer of funds took place from his home in California. Regardless of where the loan was considered or executed, Defendant Sly placed $3.9 million dollars into Kentucky corporation. The Court is satisfied that the loan at issue constitutes transacting business in the Commonwealth.

However, it is not enough that a defendant transact business in the Commonwealth, a plaintiff must also demonstrate that her claim arises from such a transaction. *See* K.R.S. § 454.210(2)(b); *Caesars,* 336 S.W.3d at 56. Plaintiff has not done so in the instant case. There are no factual allegations that support an inference that Defendant Sly's alleged breach of a fiduciary duty is connected to his transacting business by issuing MMM a loan. The Court is unable to find a reasonable nexus between

2011 WL 8895025

Defendant Sly's loan and the Plaintiff's claim. A fiduciary duty is not imposed upon a lender by the simple act of making a loan. Furthermore, there are no facts alleged that suggest that the misrepresentation that MMM was being operated lawfully is connected whatsoever to Defendant Sly's loan. Without facts demonstrating how her claim for breach of a fiduciary duty arises from Defendant Sly's making of a loan, the Court finds that personal jurisdiction over this claim cannot be exercised under K.R.S. § 454.210(2)(a)(1). Accordingly, the Court finds that Plaintiff has failed to demonstrate a prima facie case of personal jurisdiction over Defendant Sly for the breach of fiduciary duty claim.

 **\*8** Defendant Sly also challenges the Court's personal jurisdiction regarding Plaintiff's unjust enrichment claim. The Amended Complaint states that Defendant Sly made a loan of approximately $3.9 million dollars to Defendant A. Huff, but was repaid $5.3 million dollars from MMM. (Amend.Compl.¶ 43.) Thirty-two paragraphs later, the Complaint states in conclusory terms that the "Defendants [including Sly] received benefits from the Plaintiff's participation in 'MMM' for which the Plaintiff has not been adequately compensated." (*Id.* at ¶ 75.)

Plaintiff contends that the Court has jurisdiction over Defendant Sly for purposes of the unjust enrichment claim under the transacting business provision in K.R.S. § 454.210(2)(a)(1). As discussed above, Defendant Sly's loan to a Kentucky company through A. Huff, is sufficient at this prima facie stage to constitute transacting business in the Commonwealth. However, there still must be a reasonable and direct nexus between the claim that Defendant Sly was unjustly enriched and his loan to MMM. The Kentucky Supreme Court has found that the determination of this prong "will ultimately depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction." *Caesars,* 336 S.W.3d at 59. With these instructions in mind, the Court finds that there is a sufficient nexus for the Court to exercise personal jurisdiction under the Kentucky long-arm statute. While the Amended Complaint is rather bare, it appears that the unjust enrichment claim is directly related to the business Sly transacted in Kentucky. The Court finds that this demonstrates enough of a nexus between Plaintiff's claim of unjust enrichment and Defendant Sly's loan to exercise personal jurisdiction.

Having found that the Kentucky long-arm statute applies, the Court must also find that the exercise of personal jurisdiction conforms with due process. "The relevant inquiry is whether

the facts of the case demonstrate that the nonresident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.' " *Theunissen,* 935 F.2d 1454, 1459 (6th Cir.1991) (quoting *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945)). The Sixth Circuit has identified three criteria for determining whether specific in personam jurisdiction may be exercised.

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir.1968). *See also Theunissen,* 930 F.2d at 1460; *Franklin Roofing, Inc. v. Eagle Roofing and Sheet Metal, Inc.,* 61 S.W.3d 239, 240 (Ky.Ct.App.2001).

 **\*9** In order to determine whether personal jurisdiction over Defendant Sly would be appropriate in this forum, the Court must examine his contacts in terms of the three criteria outlined in *Mohasco.* "The three prong test is intended to be a framework for analysis and is not susceptible to mechanical application." *Info–Med, Inc. v. Nat'l Healthcare, Inc.,* 669 F.Supp. 793, 796 (citing *Welsh v. Gibbs,* 631 F.2d 436, 440 (6th Cir.1980)). "Furthermore, the first and second prongs may be considered as one due to their inter-relatedness." *Id.* These prongs may be satisfied if a substantial business contract is present. *Id.*

Jurisdiction is proper under the purposeful availment requirement where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). Moreover, the defendant's conduct and connection with the forum must be of a character that he or she should reasonably anticipate being haled into court there. *Id.* at 474. This purposeful availment

requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. *Id.* at 475.

"A defendant may be said to have purposefully availed himself of the benefits of the forum state if he has either 'deliberately' engaged in significant activities within a state or created 'continuing obligations' between himself and the citizens of a forum ." *Info–Med,* 669 F.Supp. at 796 (quoting *Burger King,* 471 U.S. at 475–76). "[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1300 (6th Cir.1989) (quoting *Burger King,* 471 U.S. at 473). "[J]urisdiction may not be avoided merely because the defendant did not physically enter the forum state, so long as a commercial actor's efforts are purposefully directed toward residents of another state." *Info– Med,* 669 F.Supp. at 796.

The first prong of the *Mohasco* test requires the Court to determine if Defendant Sly purposely availed himself of the privilege of acting within Kentucky. Taking all reasonable inferences in favor of Plaintiff, the Court finds that Defendant Sly reached out beyond the state of California and loaned $3.9 million dollars to a Kentucky company. This action created continuing obligations between himself and a Kentucky citizen. This was not a "random," "fortuitous," or "attenuated" contact, but was instead a purposefully direct and deliberate action on Defendant Sly's part. As such, Sly should have reasonably anticipated being haled into a Kentucky court in a matter related to that loan. *See McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223 (1957) (finding the issuance of a single life insurance policy by a non-resident was sufficient purposeful availment). As discussed above, the Court has already found that Plaintiff's claim for unjust enrichment arises from this contact, thus satisfying the second prong of the *Mohasco* test. As for the final prong, the Court finds that infusing nearly $4 million dollars into the state of Kentucky demonstrates sufficient effects within Kentucky to make the exercise of personal jurisdiction over Defendant Sly reasonable.

**\*10** The Court notes that its finding of personal jurisdiction is based only on Plaintiff's ability to demonstrate a prima facie case. The finding of personal jurisdiction at this stage of the litigation does not preclude Defendant Sly from raising the defense again at trial. *See Serras v. First Tenn. Bank*

*Nat'l Assoc.,* 875 F.2d 1212, 1214–15 (6th Cir.1989) ("A threshold determination that personal jurisdiction exists 'does not relieve [the plaintiff] ... at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.' ")

### ii. Failure to State a Claim

Having found that it has personal jurisdiction over Defendant Sly for purposes of the unjust enrichment claim, the Court will now address the merits of Plaintiff's claim. Defendant Sly contends that Plaintiff has failed to state a claim upon which relief can be granted, and has moved to dismiss this claim under Fed.R.Civ.P. 12(b)(6).

Upon a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff," *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (citation omitted), "accept all well-pled factual allegations as true[,]" *id.,* and determine whether the "complaint states a plausible claim for relief[,]" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Id.* at 1949, 1950. Instead, the allegations must " 'show [ ] that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

While the Court considered evidence outside of the pleadings, in the form of declarations, for purposes of Defendant Sly's Fed.R.Civ.P. 12(b)(2) challenge, such consideration was limited to that analysis, and does not convert this motion to dismiss into one for summary judgment. *See Wilson– Cook Med., Inc. v. Wilson,* 942 F.2d 247, 251–52 (4th Cir.1991) (finding that trial court's consideration of affidavits for purposes of 12(b)(2) motion did not convert a 12(b)(6) motion into one for summary judgment); *Kerns v. Caterpillar, Inc.,* 583 F.Supp.2d 885, 891 n.1 (M.D.Tenn.2008) (finding the consideration of external evidence in support of a 12(b)(2) motion does not require conversion to summary judgment). The Court will not consider such evidence for purposes of

*Pixler v. Huff,* Not Reported in F.Supp.2d (2011)

2011 WL 8895025

this analysis, but will instead look solely to the pleadings. *See Kerns,* 583 F.Supp.2d at 891, 895 (considering pleadings and affidavits for purposes of 12(b)(2) motion, but only considering pleadings for purposes of 12(b)(6) motion).

 **\*11** Defendant Sly contends that Plaintiff has failed to allege sufficient facts to establish a claim for unjust enrichment under Kentucky law. For a plaintiff to succeed on her unjust enrichment claim she must prove three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Guerin v. Fulkerson,* ——S.W.3d ——, 2011 WL 4633090, at \*3 (Ky.Ct.App. Oct. 7, 2011).

In application, Kentucky courts have consistently found that the first element not only requires a benefit be conferred upon the defendant, but also that the plaintiff be the party conferring that benefit. *See Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky.Ct.App.2009) (affirming trial court's dismissal of unjust enrichment claim because the court found that plaintiff did not confer a benefit upon the defendant or his property); *JP White, LLC v. Poe Co., LLC,* 2011 WL 1706751, at \*5 (Ky.Ct.App. May 6, 2011) (affirming directed verdict because plaintiff failed to demonstrate that it conferred a benefit on defendant); *Mattingly v. Primerica Life Ins. Co.,* 2007 WL 2792197, at \*7 (W.D.Ky. Sept. 21, 2007) (stating that the first element of an unjust enrichment claim requires "a benefit conferred on the defendant *by the plaintiff*." (emphasis added)); *see also* 66 Am.Jur.2d Restitution and Implied Contracts § 12 (2011) (Under the section titled "requirement of benefit at the expense of another," stating that "[a]n essential element in recovering under a theory of unjust enrichment is the receipt of a benefit by the defendant *from the plaintiff* that would be inequitable to retain without paying for its value." (emphasis added)).

In *Dixie Fuel Company v. Straight Creek, LLC,* 2011 WL 845828 (E.D.Ky. Mar. 8, 2011), the court conducted a detailed analysis of the first element in an unjust enrichment claim under Kentucky law. The court found that "[a]lthough not always expressly stated by courts, the requirement that the benefit be conferred on the defendant *by the claimant* seems to always be a requirement in practice." *Id.* at \*4. The court cited *Jones v. Sparks* and several other state and federal cases that analyzed the first prong as requiring that the plaintiff be the party who conferred the benefit. *See id.* (collecting cases). The *Dixie Fuel* court found that the term "confer" means "to bestow from or as if from a position of superiority or

to give[,]" and that the plaintiff had not bestowed or given anything to the defendant. *Id.* at \*5 (internal quotation marks omitted). Therefore, the court in *Dixie Fuel* dismissed the plaintiff's claim. Having reviewed those cases and sources, the Court agrees with the analysis in *Dixie Fuel* and finds that under Kentucky law, a claim for unjust enrichment requires that a plaintiff prove that she conferred a benefit upon the defendant.

 **\*12** In the instant case, the Court finds that Plaintiff has failed to allege sufficient facts to demonstrate that she is entitled to relief for a claim of unjust enrichment against Defendant Sly. The factual allegations established in the Amended Complaint are as follows: (1) Plaintiff held at least a 49% interest in MMM from its formation in July 2001 to 2006, when she was partially bought out, (Amend.Compl.¶¶ 22, 35); and (2) that Defendant Sly loaned $3.9 million dollars to A. Huff and was repaid $5.3 million dollars from MMM funds, (*Id.* at ¶ 43). Plaintiff then groups nine defendants together under Count VI, Unjust Enrichment, and states the following "the Defendants received benefits from the Plaintiff's participation in 'MMM' for which the Plaintiff has not been adequately compensated" and "the Defendants benefitted from Plaintiff's involvement in 'MMM', to the detriment of the Plaintiff." (*Id.* at ¶¶ 75–76.)

These factual allegations taken together fall far short of demonstrating that Plaintiff is entitled to relief for unjust enrichment from Defendant Sly. Formulaic recitation of the elements is not sufficient to state a claim, however, Plaintiff's pleadings fail to even properly state the necessary elements. Furthermore, there are insufficient facts demonstrating that Defendant Sly was conferred a benefit at the expense of Plaintiff, let alone that Plaintiff was the party who conferred that benefit. Plaintiff claims that Defendant Sly was repaid $5.3 million dollars in exchange for a loan made in the amount of $3.9 million dollars. There are no facts indicating when the loan was made, when it was repaid, or what the terms of the loan were that made repayment of $5 .3 million dollars unjust. Nor has Plaintiff pled facts indicating whether or how she was entitled to any of the funds that were repaid. These pleadings fail to demonstrate, in any meaningful way, that Defendant Sly was unjustly enriched by a benefit conferred by the Plaintiff. Accordingly, the Court finds that Plaintiff's claim for unjust enrichment fails to state a claim upon which relief can be granted. Therefore, the Court **GRANTS** Defendant Sly's Motion to Dismiss.

**B. Thomas Bean**

Plaintiff has alleged one claim of unjust enrichment against Defendant Bean. Defendant Bean has moved for dismissal of that claim under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**i. Personal Jurisdiction**

Because the Court is making the determination of personal jurisdiction on written submissions alone, Plaintiff's burden for demonstrating personal jurisdiction is only a prima facie showing. *Compuserve,* 89 F.3d at 1262. Plaintiff contends that Defendant Bean's actions in creating and managing two corporate entities in Kentucky sufficiently demonstrate that Defendant Bean transacted business in Kentucky, as required by K.R. S. § 454.210(2)(a)(1). In support of her argument, Plaintiff has submitted a declaration. However, much like the declaration submitted against Defendant Sly, Plaintiff's declaration against Defendant Bean consists mostly of statements made upon "knowledge and belief." As the Court has ruled above, such statements do not meet the threshold requirements of personal knowledge to be considered by the Court. *See supra* Part III.A.i; *Totman v. Louisville Jefferson Cnty. Metro Gov't,* 391 F. App'x 454, 464 (6th Cir.2010). Defendant Bean, in his Reply, discusses and references his own sworn declaration. However, the Court is unable to find any such declaration attached to the filing or in the Record.

**\*13** Therefore, the only information that the Court can use to analyze this issue are the pleadings within the Amended Complaint and the few statements contained in Plaintiff's sworn declaration that are made with sufficient personal knowledge. Considering that evidence and taking all inferences in favor of Plaintiff the Court finds that it does not have personal jurisdiction over Defendant Bean for purposes of Plaintiff's unjust enrichment claim. Plaintiff has alleged that Defendant Bean helped establish and manage two Kentucky corporate entities that operated in Kentucky. Assuming without deciding that this limited allegation is sufficient to demonstrate transacting business, the Court finds that Plaintiff has failed to demonstrate that there is a reasonable and direct nexus between this activity and her unjust enrichment claim.

The allegations found in the Amended Complaint against Defendant Bean are (1) that he acted with Defendant A. Huff to establish and manage River Falls Investment, LLC and River Falls Equities, LLC, (Amend.Compl.¶ 44); (2) that Defendant Bean received benefits from the Plaintiff's

participation in MMM for which the Plaintiff has not been adequately compensated (*Id.* at ¶ 75); and (3) that Defendant Bean benefitted from Plaintiff's involvement in MMM, to the detriment of Plaintiff, (*Id.* at ¶ 76). As for Plaintiff's declaration, the Court finds that the only allegation of any importance that is based upon sufficient personal knowledge is that Plaintiff owned a 50% interest in MMM during the times relevant to the Complaint. (*See* Plaintiff's Decl. Against Def. Bean ¶ 5 [DN 38].)

Those factual allegations are insufficient to demonstrate a reasonable nexus between a claim for unjust enrichment and Defendant Bean's status as a manager of two Kentucky corporate entities. Plaintiff argues that these companies were used to funnel money from MMM to Defendant Bean's personal use, however, such allegations are nowhere within the Amended Complaint. The Amended Complaint states that SDH Realty, Inc., and W.A. Huff, LLC were used to funnel money from MMM. (*See* Amend. Compl. ¶¶ 41–42.) Neither of those entities are or were ever named River Falls Investments, LLC or River Falls Equities, LLC.[3] Nor is Defendant Bean alleged to have been involved with those two entities. Quite simply, there are no allegations based upon personal knowledge contained either within the Amended Complaint or Plaintiff's sworn declaration that link Defendant Bean's management of River Falls Investments, LLC or River Falls Equities, LLC to Plaintiff's claim for unjust enrichment. The bare assertions that Plaintiff attempts to link together are insufficient to demonstrate that the Court has personal jurisdiction over Defendant Bean.

[3]    Plaintiff's Amended Complaint states that River Falls Equities, LLC was at one time titled W. Anthony Huff, LLC. (Amend.Compl.¶ 32 .) However, Plaintiff alleges that money was funneled through W.A. Huff, LLC, not through W. Anthony Huff, LLC. (*See* Amend. Compl. ¶ 42.) These are two separate entities.

**ii. Failure to State a Claim**

Notwithstanding the Court's lack of personal jurisdiction, the Court finds that the bare assertions contained within the Amended Complaint fail to state a claim upon which relief may be granted. As discussed above, a claim for unjust enrichment requires a plaintiff to demonstrate a "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Guerin*

*v. Fulkerson,* —— S.W.3d ——, 2011 WL 4633090, at *3 (Ky.Ct.App. Oct. 7, 2011).

**\*14** The factual allegations alleged against Defendant Bean are that he acted with Defendant A. Huff to establish and manage River Falls Investment, LLC and River Falls Equities, LLC and that he received benefits from Plaintiff's participation in MMM. These allegations do not demonstrate sufficient facts upon which the Court could find that Plaintiff is entitled to relief for unjust enrichment. Plaintiff's memorandum opposing Defendant Bean's motion attempts to lump Defendant Bean's actions together with allegations against Defendant A. Huff, and to then cite the portions of the Amended Complaint that speak of "Defendants" actions in a general manner. However, the Court is not persuaded by Plaintiff's attempt to piggy-back claims using Defendant A. Huff, or to use generalities to imply that every Defendant engaged in a specific action. Therefore, the Court finds that the Amended Complaint fails to state a claim upon which relief can be granted. Accordingly, the Court **GRANTS** Defendant Bean's Motion to Dismiss.

## C. Huff Farm (Horsebranch) Inc.

Defendant Huff Farm has moved to dismiss Plaintiff's claims of fraud and unjust enrichment. Defendant Huff Farm contends that Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted. Plaintiff's Amended Complaint contains the following allegations against Defendant Huff Farm: (1) Defendant Huff Farm made representations of material fact to Plaintiff with the knowledge that they were false and the intent that Plaintiff would rely upon them, which the Plaintiff reasonably did, (Amend.Compl.¶ 65); and (2) Defendant Huff Farm received benefits from the Plaintiff's participation in MMM for which the Plaintiff was not adequately compensated, which was to Plaintiff's detriment, (*Id.* at ¶¶ 75–76).

There are no factual allegations that describe Defendant Huff Farm's involvement in either of these claims. Rather Defendant Huff Farm is included in general recitations of claims against multiple defendants. As discussed above, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. Plaintiff's Amended Complaint is

woefully inadequate regarding allegations against Defendant Huff Farm and her claims cannot survive a motion to dismiss.

In her Response to Defendant Huff Farm's motion, as well as the other Defendants' motions, Plaintiff argues that the lack of factual content supporting her claims should not be fatal to her Amended Complaint because her claims fall within the exclusive control doctrine. In support of her argument, Plaintiff cites this Court's opinion in *Union Underwear Company, Inc v. Wilson,* 2005 WL 3307098 (W.D.Ky. Dec. 1, 2005). In *Union Underwear,* the Court found that

> **\*15** [A]n exception to the particularity requirement of Fed.R.Civ.P. 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *United States ex rel. Wilkins v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

*Id.* at *4 (quoting *Beard v. Worldwide Mortg. Corp.,* 354 F.Supp.2d 789, 799 (W.D.Tenn.2005). [4] In discussing the exclusive control exception to Fed.R.Civ.P. 9(b), the Sixth Circuit stated that it is "reluctant to amputate [a] plaintiff['s] claim as long as there is a reasonable basis upon which to make out a cause of action from the events narrated in the complaint." *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir.1988).

[4]
> It should be noted that this Court in *Union Underwear* found the exclusive control exception did not apply.

In the instant case, the Court finds that the exclusive control exception does not apply. This exception is intended to save a claim from dismissal under the heightened pleading standard of Rule 9(b). However, as discussed above, Plaintiff's fraud claim against Defendant Huff Farm does not even meet the initial pleading threshold of Rule 8(a). Plaintiff's claim of fraud against Defendant Huff Farm does not make out a cause of action, it simply uses generalities and a formulaic recitation of elements. There is no reasonable basis upon which to make out a cause of action from anything articulated in the Amended Complaint. There are no events narrated

in the Amended Complaint that indicate that there is a reasonable claim against Defendant Huff Farm. Furthermore, the Court finds that Plaintiff has failed to demonstrate that the information necessary to cure her claims is in the exclusive control of the Defendants.

The exclusive control exception was intended to save those claims that appear to have a reasonable basis, but lack the necessary factual support required by Rule 9(b). Plaintiff's fraud claim against Defendant Huff Farm is not such a claim. Therefore, the Court finds that the exclusive control exception does not apply in this case.

Considering the total lack of factual allegations against Defendant Huff Farm contained within the Amended Complaint and the bare formulaic assertion of the elements constituting her causes of action, the Court finds that Plaintiff's claims for fraud and unjust enrichment against Defendant Huff Farms fail to state claims upon which relief can be granted. Therefore, the Court **GRANTS** Defendant Huff Farm's Motion to Dismiss.

### D. Leave to Amend

In each of her responsive motions, Plaintiff requests that in lieu of the dismissal of her claims against Defendants Sly, Bean, and Huff Farm, that she be granted leave to amend her complaint. Under Fed.R.Civ.P. 15(a)(1)(B), a plaintiff may amend her pleading once as a matter of course within 21 days after service of a motion under Rule 12(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). However, a district court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman v. Davis, 371 U.S. 178, 182 (1962).

**\*16** In the instant case, the Court notes that Defendant Sly's Motion to Dismiss, based upon Rule 12(b) was filed on June 7, 2011. On June 24, 2011, Plaintiff Amended her Complaint as a matter of course, as permitted under Rule 15(a). However, rather than address the severe deficiencies in her Complaint, which were identified in Defendant Sly's motion to dismiss, Plaintiff made only minor changes in correctly identifying Defendant Huff Farm, LLC's principal place of business. Notwithstanding, the Court finds that

justice requires that Plaintiff be granted leave to amend her Amended Complaint one more time. As Plaintiff failed to tender a Second Amended Complaint to the Court in conjunction with her request, the Court orders her to submit a Second Amended Complaint **NO LATER THAN 20 DAYS** from the entry of this order.

### E. Motion for More Definite Statement

Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust have moved under Fed.R.Civ.P. 12(e) for a more definite statement. These Defendants contend that the Amended Complaint fails to comply with the pleading standards of Fed.R.Civ.P. 8(a), and that clarification is required so that they may assert good faith responses and mandatory affirmative defenses.

Rule 12(e) states that a motion for more definite statement is proper only if "a pleading to which a responsive pleading is allowed [ ] is so vague or ambiguous that the party cannot reasonably prepare a response." F.R.C.P. 12(e). A motion for a more definite statement must state the defects in the pleading and the details desired. Id. A party, however, may not use a Rule 12(e) motion as a substitute for discovery. Mitchell v. E–Z Way Towers, Inc., 269 F.2d 126, 132 (5th Cir.1959). Given the liberal pleading standard set forth in Rule 8, Rule 12(e) motions are disfavored. See id. At the same time, the Supreme Court has noted that "if a pleading fails to specify the allegations in a manner that provides sufficient notice," then a Rule 12(e) motion may be appropriate. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002).

The Court finds that the Amended Complaint is too vague on all counts for the Defendants to properly form a responsive pleading. The Defendants have identified the many defects contained within the Amended Complaint and the details desired so that they may formulate a worthwhile response. Therefore, the Court grants the Defendants' motion and orders Plaintiff to address the issues identified by these Defendants in her Second Amended Complaint, which is to be filed no later than 20 days from entry of this order.

### F. Motion to Strike

Plaintiff has moved to strike the Defendants Reply to Plaintiff's Response to Defendants' Motion for More Definite Statement. Fed.R.Civ.P. 12(f) provides that upon a motion made by a party, "[t]he court may strike from a pleading

any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Because striking a portion of a pleading is a drastic remedy, such motions are generally viewed with disfavor and are rarely granted." *Watkins & Son Pet Supplies v. Iams Co.,* 107 F.Supp.2d 883, 887 (S.D.Ohio 1999). "The application of this rule, which is in the discretion of the trial judge, should be resorted to only where the pleading contains such allegations that are obviously false and clearly injurious to a party to the action because of the kind of language used or that the allegations are unmistakably unrelated to the subject matter." *Pessin v. Keeneland Ass'n,* 45 F.R.D. 10, 13 (E.D.Ky.1968).

**\*17** Plaintiff contends that substantial portions of the Reply contain improper introduction of new arguments, evidence and issues by the Defendants and that the information is irrelevant and prejudicial. Defendants contend that the portions of the Reply identified by Plaintiff are relevant to rebut Plaintiff's argument that the exclusive control doctrine applies to this case and that Plaintiff has failed to demonstrate any prejudice. The Court agrees with Defendants that the information is relevant and that there is an insufficient showing of prejudice to strike the Reply. Therefore, Plaintiff's Motion to Strike is **DENIED.**

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Brian N. Sly's Motion to Dismiss [DN 10] is **GRANTED,** without prejudice.

**IT IS FURTHER ORDERED** that Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust's Motion for More Definite Statement [DN 12] is **GRANTED.**

**FURTHER** that Defendant Thomas Bean's Motion to Dismiss [DN 30] is **GRANTED,** without prejudice.

**FURTHER** that Defendant Huff Farm (Horsebranch) Inc.'s Motion to Dismiss [DN 34] is **GRANTED,** without prejudice.

**FURTHER** that Plaintiff Roxann Pixler's Motion to Strike [DN 33] is **DENIED.**

**FURTHER** that Plaintiff Roxann Pixler's Motion for Extension of Time [DN 36] is **GRANTED.**

**FURTHER** that Plaintiff file her Second Amended Complaint **NO LATER THAN 20 DAYS** from the entry of this Order.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5597327

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 38

R.M. Harrison Mechanical Corp. v. Decker Industries, Inc., Not Reported in S.E.2d (2008)
50 Va. Cir. 717, 911 WL 3 2188 CT22

75 Va. Cir. 404
Circuit Court of Virginia,
City of Hopewell.

R.M. HARRISON MECHANICAL CORP.
v.
DECKER INDUSTRIES, INC.,
and James River Cogeneration Co.

No. CL08−193.
|
Aug. 28, 2008.

**Opinion**

W. ALLAN SHARRETT, Judge.

**\*1** This memorandum opinion is in response to the complaint filed by R.M. Harrison Mechanical Corporation ("R.M.Harrison") and the subsequent demurrer filed by James River Cogeneration Company ("JRCC").

For the reasons that follow, the Court sustains the demurrer, with leave to amend.

I. *Summary of the Facts*

This is a dispute arising out of the construction of a coal-burning cogeneration facility in Hopewell, Virginia. JRCC, lessee of the premises, hired Decker Industries, Inc. ("Decker") to serve as the general contractor on the project. Decker, in turn, subcontracted with R.M. Harrison to perform millwright and steel fabrication services required on the project. On June 12, 2007, Decker and R.M. Harrison entered into a contract to complete work on a timely and material basis. R.M. Harrison subsequently began work on the project sometime in June 2007 and performed all work required of it under the contract. R.M. Harrison sent several invoices to Decker and made repeated demands for payment, totaling $24,850.96. Decker failed to pay. As a result, R.M. Harrison filed a complaint against (1) Decker for breach of contract, and (2) JRCC for quantum meruit/unjust enrichment. The relief requested is the same in both claims: judgment for $24,850.96. R.M. Harrison has obtained a default judgment against Decker, and JRCC filed the demurrer considered here.

II. *Questions Presented*

(1) Based on the facts pleaded, is there a valid claim for unjust enrichment/quantum meruit relief by plaintiff R.M. Harrison against JRCC, irrespective of any other issues such as adequate remedy at law and preexisting default judgment?

(2) Is the lack of contractual privity between R.M. Harrison and JRCC outcome determinative? In addition, does the express contract between R.M. Harrison and Decker have any bearing on the relationship between R.M. Harrison and JRCC?

(3) Does R.M. Harrison's failure to perfect a mechanic's lien preclude it from pursuing an unjust enrichment claim against JRCC? Is R.M. Harrison's equitable claim barred due to some other adequate legal remedy?

(4) Does R.M. Harrison's default judgment against Decker have any impact on R.M. Harrison's availability of recovery from JRCC?

III. *Short Answers*

(1) There is not a valid claim for unjust enrichment/ quantum meruit relief based on the facts pleaded because the circumstances do not give rise to a reasonable belief by R.M. Harrison that JRCC would ensure R.M. Harrison's compensation.

(2) Lack of contractual privity is not outcome determinative. Privity of contract is not necessary among a subcontractor-plaintiff and owner-defendant, provided that all elements of an unjust enrichment claim are met. Further, an express contract between R.M. Harrison and Decker has no bearing on the relationship between R.M. Harrison and JRCC.

(3) R. M. Harrison's failure to perfect a mechanic's lien does not preclude it from pursuing an unjust enrichment claim against JRCC. The demurrer stage is too early to address such factual considerations as whether an adequate remedy at law existed between the parties.

**\*2** (4) R. M. Harrison's default judgment against Decker does not have any impact on R.M. Harrison's ability to recover from JRCC, due to the provision for joint liability under the Code of Virginia.

R.M. Harrison Mechanical Corp. v. Decker Industries, Inc., Not Reported in S.E.2d (2008)
50 Va. Cir. 717, 911 WL 3 2188 ©T22

IV. *Discussion*

"[T]he function of a demurrer is to test only whether the challenged pleading states a cause of action upon which relief can be granted if all the allegations are admitted as true." *Faulknier v. Shafer,* 264 Va. 210, 214, 563 S.E.2d 755, 758 (2002).

A demurrer tests only the legal sufficiency of the claims stated in the pleading challenged. While a demurrer does not admit the correctness of the pleading's conclusions of law, it "admits the truth of all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred." Thus, the sole question to be decided by the trial court is whether the facts thus pleaded, implied, and fairly and justly inferred are legally sufficient to state a cause of action against the defendant.

*Thompson v. Skate America,* 261 Va. 121, 128, 540 S.E.2d 123, 126–27 (2001).

(1) *Validity of the Unjust Enrichment Claim Based on the Facts Pleaded, Irrespective of Other Issues*

Ordinarily, when one person renders services for another which are requested and accepted by him, the law creates an obligation, called an implied-in-law contract, on his part to pay a reasonable compensation, unless something in the relationship of the parties indicates otherwise. *Burke v. Gale,* 193 Va. 130, 67 S.E.2d 917, 919 (1951). The crux of a quantum meruit cause of action lies in the unjust enrichment of one party. *Kern v. Freed Co.,* 224 Va. 678, 299 S.E.2d 363, 363–64 (1983). Merely rendering services alone does not create a contract implied-in-law, nor is such a contract implied when one officiously confers benefits upon another. *Weitzel v. Brown–Neil Corp.,* 152 F.Supp. 540, 549 (N.D.W.Va.1957); *United States v. Lias,* 154 F.Supp. 955, 958 (N.D.W.Va.1957). Further, even though the defendant may have benefitted from the plaintiff's services, the latter cannot recover unless he can show sufficient additional facts that imply a promise to pay. *Mullins v.. Mingo Lime Co.,* 176 Va. 44, 10 S.E.2d 492, 494–95 (1940). *Unidyne Corp. v. Aerolineas Argentinas,* 590 F.Supp. 391, 397 (E.D.Va.1984), *quoted in Shen Valley Masonry, Inc. v.*

*S.P. Cahill & Associates, Inc.,* 52 Va. Cir. 484, 485 (City of Charlottesville, 2000).

"The law will imply a promise to pay for goods received. However, this implied or quasi-contract is based on equitable principles. It rests 'upon the doctrine that a. man shall not be allowed to enrich himself unjustly at the expense of another'." *Kern v. Freed Co.,* 224 Va. 680, 299 S.E.2d 363, 364–65 (1983) (citations omitted). "The quasi-contract is a plaintiff's remedy at law when the facts establish that a defendant has been unjustly enriched at the expense of the plaintiff, but where the facts fail to establish that the parties established any form of agreement." *Nossen v. Hoy,* 750 F.Supp. 740, 744 (E.D.Va.1990); *see also Hitachi Sys. Corp. v. webMethods, Inc.,* 60 Va. Cir. 79, 86 (Fairfax County, 2002).

***3** To establish a claim of unjust enrichment or quantum meruit, a claimant must satisfy three elements: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant *in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." Centex Constr. v. Acstar Ins. Co.,* 448 F.Supp.2d 697, 707 (E.D.Va.2006) (emphasis added).

The first two elements do not appear to be in dispute here. It seems clear that JRCC received the benefit of R.M. Harrison's work and that JRCC knew the benefit would be conferred upon it.

The third element has given rise to the most litigation. The following has become the test for satisfaction of the third element: "The primary inquiry is 'whether or not any circumstances had been shown which would reasonably have led the subcontractor to believe that anyone other than the general contractor ... and in particular, that the landowner would pay him for his labor and materials'." *Sherwin Williams Co. v. Buckingham Associates,* 20 Va. Cir. 83, 84 (Chesterfield County, 1990) (citing Annotation, Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover against Property Owner in Quasi–Contract, 62 A.L.R.3d 288, 294 (1975) (also cited in *Shen Valley Masonry, Inc. v. S.P. Cahill & Associates, Inc.,* 52 Va. Cir. 484, 486 (City of Charlottesville, 2000))).

There is support for this A.L.R. concept from the Supreme Court of Virginia. A plaintiff who brings suit because of some benefit bestowed on defendant, without adducing other facts to raise the implication of a promise to pay for such a benefit,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 346 of 520
PageID: 9267
R.M. Harrison Mechanical Corp. v. Decker Industries, Inc., Not Reported in S.E.2d (2008)
50 Va. Cir. 717, 911 WL 3 2188 CTT22

has no basis for recovery based on quantum meruit. *Mullins v. Mingo Lime & Lumber Co.,* 176 Va. 44, 51, 10 S.E.2d 492, 495 (1940). The circumstances of the acceptance or retention of the benefit must render it inequitable for the defendant not to compensate the plaintiff. "The liability to pay for the services is based on an implication of law that arises from the facts and circumstances presented, independent of agreement or presumed intention." *Po River Water & Sewer Co. v. Indian Acres Club of Thornburg, Inc.,* 255 Va. 108, 114–15, 495 S.E.2d 478, 482 (1998) (citations omitted).

Three cases are most applicable with regard to sustaining or overruling a demurrer based on satisfactory pleading of the third element. In *E.E. Lyons Constr. Co. v. TRM Dev. Corp. and Sizzler Restaurants Int'l, Inc.,* 25 Va. Cir. 352 (Fairfax County, 1991), SRI, the owner, contracted with TRM, the general contractor, to build a Sizzler restaurant. TRM then entered into a subcontract with E.E. Lyons. E.E. Lyons claimed it was never paid and brought suit against SRI under quantum meruit. To the *E.E. Lyons* court, the determinative factor in deciding whether to sustain SRI's demurrer was whether SRI as the owner had paid the general contractor for the services and materials provided, as the general contractor was the one in contractual privity with E.E. Lyons. *Id.* at 354.

> **\*4** If the owner has paid the general contractor, it is generally concluded that it would not be inequitable for the owner to retain the benefit of the services and materials for which he has paid. If the owner has not paid the general contractor, the Court's primary inquiry is whether any circumstances have been shown which would reasonably lead the subcontractor to believe that the landowner would pay him for his labor and materials. If such circumstances are shown, a promise on behalf of the owner to pay for the labor and materials provided by the subcontractor is generally implied.

*Id.* at 354–55.

E.E. Lyons alleged in its complaint that SRI, the owner, remained indebted to the general contractor and that SRI agreed to issue joint checks to the plaintiff-subcontractor and

the general contractor. Thus, the court held that the facts alleged in the complaint "set forth circumstances from which the subcontractor could reasonably have believed that the owner would pay him for his labor and materials." *Id.* at 355. Thus, the third element was met and the demurrer was overruled.

In *Sherwin Williams Co. v. Buckingham Associates,* 20 Va. Cir. 83 (Chesterfield County, 1990), the court was rather lenient in deciding that the facts and circumstances pleaded by the plaintiff-subcontractor were sufficient to meet the third element. Only a tenuous relationship between the parties was pleaded in the complaint:

> Buckingham Associates, through its contract with George W. Kane, Inc., and George W. Kane, Inc., through its subcontract with M.S. SABRA, and M.S. SABRA, through its purchase orders with Sherwin Williams, requested that Sherwin Williams furnish certain paint and associated products for incorporation into the Property, with the understanding that Sherwin Williams expected payment for this material. The paint and associated products supplied by Sherwin Williams to the Property enhanced its value, thereby resulting in substantial benefit to each of the defendants for which they have not paid Sherwin Williams.

*Id.* at 83–84.

Based on these facts as pleaded, the court overruled the demurrer, holding that "[t]he complaint sufficiently alleges a claim for quantum meruit. Inferences drawn from the alleged relationship among defendants adequately support an 'implied promise to pay'." *Id.* at 85.

Lastly, in *Shen Valley Masonry, Inc. v. S.P. Cahill & Associates, Inc.,* 52 Va. Cir. 484, 486 (City of Charlottesville, 2000), Shen Valley, as the subcontractor, sued the University of Virginia (UVA) as the owner on a claim of unjust enrichment arising out of masonry services for a student residence construction project. Cahill was the general

R.M. Harrison Mechanical Corp. v. Decker Industries, Inc., Not Reported in S.E.2d (2008)
50 Va. Cir. 717, 911 WL 3 2188 CT22

contractor. UVA was not a party to the subcontract between Cahill and Shen Valley, and the contract between UVA and Shen Valley made it clear that UVA only contracted with Cahill. The contract between the owner and the general contractor (*i.e.* UVA and Cahill) contained express language stating that nothing in the contract documents shall create any contractual ownership between UVA and any subcontractor, nor shall it create any obligation on UVA's part to pay for or to see to the payment of any money due to any subcontractor. *Id.* at 485–86. Shen Valley admitted that the contract between Cahill and UVA was incorporated by reference into the subcontract between Shen Valley and Cahill. *Id.* at 486. As a result, the court, in sustaining UVA's demurrer, concluded that "in no way could the terms of Cahill's contract with UVA nor the terms of Cahill's contract with Shen Valley reasonably have led Shen Valley to believe that anyone other than Cahill, and in particular that UVA. would pay them for labor or materials." *Id.*

**\*5** In the instant case, the third element has not been satisfied. Even if all facts pleaded in R.M. Harrison's complaint are assumed to be true, the facts are insufficient to support a claim of unjust enrichment. The circumstances as pleaded do not show that R.M. Harrison could reasonably have been led to believe that anyone other than Decker as the general contractor, and in particular that JRCC, would pay it for its labor and materials. *Shen Valley* is inapplicable, as no mention was made in the complaint of the terms of any contract between R.M. Harrison and Decker or Decker and JRCC regarding JRCC's responsibility for ensuring that R.M. Harrison was paid for its services. Unlike in *E.E. Lyons,* R.M. Harrison has pleaded no facts regarding whether JRCC has paid Decker. The *Sherwin Williams* court set a relatively low hurdle for R.M. Harrison to clear to be able to withstand a demurrer: however, the facts as pleaded by R.M. Harrison in its complaint are even less sufficient than those in the *Sherwin Williams* complaint.

R.M. Harrison's complaint states the following facts applicable to the circumstances of the work done and the relationship between R.M. Harrison. Decker, and JRCC:

5. JRCC hired Decker to serve as the general contractor on the Project.

6. Decker, in turn, hired R.M. Harrison to perform millwright and steel fabrication services required on the Portsmouth [sic] Project.

7. Decker and R.M. Harrison entered into a Contract dated June 12.2007. through one Purchase Order ... to complete work on a time and material basis ("R. M. Harrison/Decker Contract").

8. R. M. Harrison began work under the R.M. Harrison/Decker Contract on the Hopewell Project in or around June.2007.

9. R. M. Harrison performed all work as required by contract with Decker and requested payment for its work from Decker....

16. R. M. Harrison furnished Decker labor and materials pursuant to its specific instance and request, said labor and materials have been accepted by Decker, and R.M. Harrison has invoiced Decker in the total amount [of] $24,850.96....

20. Additionally and alternatively, JRCC has received a benefit for which it has paid no consideration. Upon information and belief, JRCC had knowledge of and/or appreciated the benefits conferred upon it and its property by R.M. Harrison and other services provided by R.M. Harrison *at defendants' request* [emphasis added], which was incorporated into, the Hopewell Property. JRCC has been unjustly enriched, and R.M. Harrison is entitled to be paid by JRCC for the value of its labor, materials, and other services.

The facts pleaded in the complaint, when assumed to be true, show that an express subcontract existed between R.M. Harrison and Decker; however, no contract existed between R.M. Harrison and JRCC. R.M. Harrison performed work as required in its contract with Decker. Decker accepted the labor and materials. The only fact alleged in the complaint which may give rise to a reasonable belief by R.M. Harrison that JRCC would be responsible for payment is in ¶ 20: JRCC had knowledge of and/or appreciated the benefits conferred upon the property by R.M. Harrison and other services provided by R.M. Harrison at *defendants'* request. The possessive plural of defendant is the only aspect that might show that JRCC specifically requested some work and/or materials of R.M. Harrison. Because insufficient circumstances have been shown which reasonably would have led R.M. Harrison to believe that anyone other than Decker, and in particular JRCC, would pay it for its labor and materials, the claim for unjust enrichment fails. Therefore, the demurrer is sustained with leave to amend.

**\*6** Because R.M. Harrison may indeed amend its complaint, the court

addresses below the other questions presented in the parties' pleadings.

### (2) *Lack of Contractual Privity; Existence of an Express Contract*

Privity of contract is not a requirement in a claim for unjust enrichment by a subcontractor against the owner; thus, R.M. Harrison's claim against JRCC cannot be barred for that reason alone. "Virginia law appears to follow the majority approach and will allow recovery on a quantum meruit claim by a subcontractor against an owner with whom he lacks contractual privity provided the essential elements of quasi-contract are established." *E.E. Lyons Constr. Co. v. TRM Dev. Corp.,* 25 Va. Cir. 352, 354 (Fairfax County, 1991) (citations omitted). "The lack of privity of contract between the provider of services and materials to real property and the owner of the real property is not a defense if the essential elements of an unjust enrichment claim are proven." *Sargis & Jones, Ltd. v. Moran Associates, Limited Partnership,* 27 Va. Cir. 57, 61 (Loudoun County, 1992); *see also Sherwin Williams Co. v. Buckingham Associates,* 20 Va. Cir. 83, 84 (Chesterfield County, 1990).

In fact, if an express contract did exist between the subcontractor and the owner, unjust enrichment would not be a valid cause of action, because the existing contract would control the parties' relations. "An express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter." *Southern Biscuit v. Lloyd,* 174 Va. 299, 311, 6 S.E.2d 601, 606 (1940), *cited in Hitachi Sys. Corp. v. webMethods, Inc.,* 60 Va. Cir. 79, 86 (Fairfax County, 2002). *Southern Biscuit* dealt with express contracts between the plaintiff and defendant in the case and did not address whether an implied contract can be imposed on one who was not a party to the express contract. *Elegant Homes of Va., Inc. v. Boberski,* 70 Va. Cir. 377, 378 (City of Charlottesville, 2006). Later in 2006, the Eastern District of Virginia also shed light on the issue of express contracts: "Virginia law provides no relief under a quantum meruit theory where a valid, express contract exists *between the parties." Centex Constr. v. Acstar Ins. Co.,* 448 F.Supp.2d 697, 707 (E.D.Va.2006) (emphasis added); *see also United Leasing Corp. v. Resource Bank,* 58 Va. Cir. 96, 103 (City of Richmond, 2002). Thus, it appears that an express contract between *other* parties involved in the

project has no bearing on the instant parties to a case who did not have an express contract.

The converse must also be true; that is, where there is no express contract between the parties to a quantum meruit claim, Virginia law does provide relief under a quantum meruit theory, provided the elements of such a claim are otherwise satisfied. "It is only in the absence of an express or of an enforceable contract between parties, that the law (whether at law or in equity) will, from circumstances, imply a contract between them." *Ellis & Meyers Lumber Co. v. Hubbard,* 123 Va. 481, 502, 96 S.E. 754, 760 (1918). Therefore, if R.M. Harrison meets the test for an unjust enrichment claim, its lack of contractual privity with JRCC has no bearing and may give rise to such equitable relief.

### (3) *Failure to Perfect a Mechanic's Lien; Existence of Other Adequate Remedies at Law*

**\*7** For a claim of unjust enrichment to stand, the plaintiff must have no adequate remedy at law against the demurring defendant. "The 'unjust' in 'unjust enrichment' refers to the lack of the plaintiff having an adequate remedy at law for any wrong *perpetrated on him by the defendant." Elegant Homes,* 70 Va. Cir. at 378 (quoting *Wright v. Cangiano,* 20 Cir. C15084 (Loudoun County, 1993)) (emphasis in original). If Decker was the party responsible for paying R.M. Harrison, then JRCC did not perpetrate any wrong on R.M. Harrison. The facts as pleaded are unclear and inadequate.

"At the demurrer stage, it is too early to determine whether there is an adequate remedy at law.... Factual matters that may bear on whether there is an adequate remedy at law are to be determined after the demurrer stage." *Id.* (citing *Faulknier v. Shafer,* 264 Va. 210, 216–17, 563 S.E.2d 755, 759 (2002)).

In *Connemara Corp. v. St. Andrews. L.L.C.,* 72 Va. Cir. 289 (Lancaster County, 2006), the court sustained a demurrer to a claim of unjust enrichment because Connemara had slept on its rights by failing to perfect a mechanic's lien. St. Andrews, as owner, contracted with Connemara, as general contractor, to do certain construction work on land purchased by St. Andrews on a secured line of credit from the Bank of Northumberland. Connemara filed a mechanic's lien against the property for its work but failed to perfect it. Subsequently, Connemara sued the Bank on a theory of unjust enrichment for the work it had done on the property on which the Bank had since foreclosed, and the Bank demurred. Without a perfected mechanic's lien against St. Andrews, the owner, Connemara had no security interest in the property. The Bank,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 349 of 520
PageID: 9270

R.M. Harrison Mechanical Corp. V. Decker Industries, Inc., Not Reported in S.E.2d (2008)
50 Va. Cir. 717, 911 WL 3 2188 (T22

however, had a valid security interest. The court stated that if it were to permit the case to go forward, *i.e.* overrule the Bank's demurrer, it effectively would be allowing a party "who has slept on his rights at law to proceed in equity against another party who has been diligent." *Id.* at 290. Thus, the demurrer was sustained. *Connemara* is distinguishable from the instant case in that *Connemara* was about security interests and priority of lienholders and the Bank did not appreciate any actual benefit from the construction work done by Connemara. Thus, while *Connemara* may appear to have been decided based on the plaintiff's adequate remedy at law which it let slip by, it is actually a different situation altogether.

**(4)** *Effect of Plaintiff's Default Judgment Against Decker*
R.M. Harrison's default judgment against Decker does not have any impact on R.M. Harrison's ability to recover from JRCC, due to the provision for joint liability under the Code of Virginia:

> A judgment against one of several joint wrongdoers shall not bar the prosecution of an action against any or all the others, but the injured party may bring separate actions against the wrongdoers and proceed to judgment in each.... [N]o bar shall arise as to any of them by reason of a judgment against another, or others, until the judgment has been satisfied.

**\*8** Va.Code Ann. § 8.01–443 (1950).

An injured party may bring separate suits against wrongdoers and proceed to judgment in each, and no bar arises as to any of them *until satisfaction is received. Fitzgerald v. Campbell,* 131 Va. 486, 490, 109 S.E. 308, 309 (1921). However, the plaintiff can only enforce one satisfaction for the same injury, and therefore must elect against which of the several wrongdoers he will proceed to execution of the judgment for satisfaction of his damages. *Id.* In applying the Code section above, the Circuit Court of Albemarle County stated that "in actions against joint contractual obligors as well as in actions against joint tortfeasors, judgments against different defendants may be entered at different times." *Hodges v. Perry,* 43 Va. Cir. 340, 344 (Albemarle County, 1997).

In the instant case, R.M. Harrison has suffered only one injury: it has not been paid for the labor and materials it provided. It is alleged that Decker and JRCC both may be to blame. As such, they should be treated as joint wrongdoers. Thus, under the Code and case law, R.M. Harrison as the injured party may bring separate suits against Decker and JRCC and proceed to judgment in each. Until R.M. Harrison seeks to enforce its judgment against Decker, it is free to pursue a judgment against JRCC.

## V. *Conclusion*

Based on the facts pleaded in the complaint, R.M. Harrison does not have a valid claim for unjust enrichment/quantum meruit relief. The circumstances alleged do not give rise to a reasonable belief by R.M. Harrison that JRCC would see to its compensation. Thus, the demurrer is sustained, with leave to amend. The other questions presented through the pleadings were addressed in anticipation of R.M. Harrison taking advantage of the leave to amend granted herein.

The fact that JRCC and R.M. Harrison are not in privity of contract has no bearing; likewise, neither does the fact that an express contract existed between Decker and JRCC or Decker and R.M. Harrison.

In addition, R.M. Harrison's failure to perfect a mechanic's lien does not preclude it from pursuing an unjust enrichment claim against JRCC. The demurrer stage is too early to address such factual considerations as whether an adequate remedy at law existed between the parties.

Lastly, R.M. Harrison's default judgment against Decker does not have any impact on R.M. Harrison's ability to recover from JRCC, due to the provision for joint liability under the Virginia Code. JRCC and Decker are allegedly joint wrongdoers, both contributing to the single injury to R.M. Harrison, that is, that it has not been paid for labor and materials provided.

The demurrer is sustained with leave to amend. It is so ordered. Endorsement of the order by counsel is waived pursuant to Rule 1:13.

**All Citations**

Not Reported in S.E.2d, 75 Va. Cir. 404, 2008 WL 10669311

R.M. Harrison Mechanical Corp. v. Decker Industries, Inc., Not Reported in S.E.2d (2008)

50 Va. Cir. 717, 911 WL  3 2188 © T 22

---

**End of Document**                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 39

419 P.3d 702 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

The REGENT AT TOWN CENTRE
HOMEOWNERS' ASSOCIATION, a
Nevada non-profit corporation, Appellant,
v.
OXBOW CONSTRUCTION, LLC, a Nevada
limited liability company, Respondent.
The Regent at Town Centre
Homeowners' Association, a Nevada
non-profit corporation, Appellant,
v.
Oxbow Construction, LLC, a Nevada
limited liability company, Respondent.

No. 69777, No. 70296
|
FILED MAY 24, 2018

**Attorneys and Law Firms**

Fenton Grant Mayfield Kaneda & Litt, LLP

Koeller Nebeker Carlson & Haluck, LLP/Las Vegas

*ORDER AFFIRMING IN PART,
REVERSING IN PART AND REMANDING*

**\*1** These are consolidated appeals from a district court grant of summary judgment and post-judgment award of costs in a construction defect action between a homeowners' association and the general contractor of the property. Eighth Judicial District Court, Clark County; Jerry A. Wiese, Judge.

Appellant, The Regent at Town Centre Homeowners' Association (Association), brought claims against respondent Oxbow Construction LLC for breach of express warranty, breach of implied warranty, and negligence relating to the construction of The Regent at Town Centre (Town Centre). Oxbow argued, and the district court agreed, that no warranties existed between Oxbow and the Association and that various agreements waived the Association's claims. As such, the district court granted summary judgment in favor of

Oxbow, and awarded Oxbow costs and expert witness fees. We reverse the district court's grant of summary judgment on the Association's negligence claim and the award of costs and expert fees, affirm summary judgment on the Association's breach of express warranty and breach of implied warranty claims, and remand for further proceedings consistent with this order.

We review a grant of summary judgment de novo. *Wood v. Safeway, Inc.,* 121 Nev. 724, 729, 131 P.3d 1026, 1029 (2005). Summary judgment is appropriate if the pleadings and other evidence on file, viewed in the light most favorable to the nonmoving party, demonstrate that no genuine issue of material fact remains in dispute and that the moving party is entitled to judgment as a matter of law. *Id.* Further, we review "questions of statutory interpretation, such as interpretation of NRS Chapter 40, de novo." *Westpark Owners' Ass'n v. Eighth Judicial Dist. Court,* 123 Nev. 349, 357, 167 P.3d 421, 426–27 (2007).

*Negligence*

The Association brought a negligence claim under NRS Chapter 40, which recognizes liability for general contractors who are responsible for construction defects in a new residence. *See* NRS 40.640. In *Oxbow Construction, LLC v. Eighth Judicial District Court,* 130 Nev., Adv. Op. 86, 335 P.3d 1234, 1242 (2014) (*Oxbow I* ), this court recognized that the Association can pursue a construction defect claim for negligence on behalf of itself and individual unit owners for "construction defects in limited common elements assigned to multiple units in a common building, [as long as] the building in question contains at least one unit that is a 'new residence.' "

However, under NRS 40.640(5), a construction defect claim is waived if the defect was disclosed prior to the owner's purchase of the property and "the disclosure was provided in language that is understandable and was written in underlined and boldfaced type with capital letters." A disclaimer that uses vague language or merely states "that certain defects 'may' exist and list[s] a number of potential defects" is not a valid disclosure. *Westpark Owners' Association,* 123 Nev. at 361 n.37, 167 P.3d at 429 n.37.

Here, there are three agreements that purport to disclaim Oxbow's liability and/or waive the Association's claim: (1) the purchase and sale agreement between El Capitan and Regent II; (2) the individual purchase and sale agreements between Regent II and individual unit owners; and (3)

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 353 of 520
PageID: 9274
Regent at Town Centre Homeowners' Association v. Oxbow..., 435 P.3d 702 (2018)
2018 WL 2431690

the Declaration of Covenants, Conditions, and Restrictions (CC&Rs) for Town Centre. The individual purchase agreements and the CC&Rs reference and incorporate the Swainston Report and its list of defects.

**\*2** We need not address whether the purchase and sale agreement between El Capitan and Regent II is binding on the Association, as it does not meet the requirements for waiver under NRS 40.640(5). The purchase and sale agreement between El Capitan and Regent II is in regular typeface, and uses general language rather than specifically disclosing any defects at Town Centre. Similarly, the individual purchase agreements between Regent II and the individual unit owners do not meet the content requirement of NRS 40.640(5). Although the individual purchase agreements purport to disclose the "Current Conditions of Property" that "may include, but are not limited to such conditions as" and then lists a variety of defects, this language is nearly identical to a disclaimer previously held insufficient under NRS Chapter 40, *See Westpark,* 123 Nev. at 361 n.37, 167 P.3d at 429 n.37 ("Here, the waivers did not disclose any constructional defects; they stated only that certain defects 'may' exist and listed a number of potential defects. This vague language was not sufficient to waive any claims pursuant to NRS Chapter 40."). Therefore, the purchase and sale agreement for Town Centre, as well as the individual unit owner's purchase agreements, [1] do not meet NRS 40.640(5)'s requirements and cannot waive the Association's negligence claim under NRS Chapter 40.

[1]     The disclaimer in the main text of the individual purchase agreements is invalid under NRS 40.640(5). However, the individual purchase agreements incorporate the Swainston Report through an addendum, which does adequately disclaim various defects at Town Centre. But, because the Association has represented that it is not bringing claims on behalf of individual unit owners for defects in individual units, the CC&Rs' incorporation of the Swainston Report is more applicable to the Association's claims in this case.

Conversely, the limitations in the CC&Rs for Town Centre do bind the Association. *See Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US ), LLC,* 282 P.3d 1217, 1221 (Cal. 2012) (holding that an arbitration clause in CC&Rs was binding on the homeowners' association, even though the association did not exist as an independent entity when the CC&Rs were drafted and recorded); *see*

*also* NRS 116.2105(2) ("The declaration may contain any other matters the declarant considers appropriate."). Oxbow, as a third-party beneficiary of the CC&Rs, has standing to enforce any waivers included in the CC&Rs. *See* 20 Am. Jur. 2d *Covenants, Conditions & Restrictions* § 46 (2015) ("[N]onparties to a transaction may nevertheless be the intended beneficiary of a covenant and thereby gain standing to enforce it.") (footnote omitted). And although the CC&Rs do not include a disclosure of specific defects, they do incorporate the Swainston Report by reference. *See PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1201 (2nd Cir. 1996) ("[A] paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.") (quoting *Jones v. Cunard S.S. Co.,* 263 N.Y.S. 769, 771 (App. Div. 1933) ).

El Capitan and Regent II enlisted the Swainston Consulting Group to do an analysis of Town Centre for construction defects, and Swainston issued a report concluding that there were various defects and violations at the property. The Swainston Report was issued prior to Regent II's purchase of Town Centre, and before the creation of the Association through the CC&Rs. The Swainston Report affirmatively concludes that there are various defects at Town Centre:

> The Regent at Town Cent[re] project was designed and constructed as an apartment project in general conformance with the standard of the industry that was in place at the time of original construction. Many technical deviations exist between the as-built condition and the requirements of the building codes and other applicable standards. While these deviations typically represent technical defects some of them are relatively minor in nature. Other deviations will require remedial measures and, as maintenance continues to be deferred, the impact of these deviations will increase accordingly.

(original in underlined typeface).

This conclusion, in conjunction with 21 pages detailing the defects at Town Centre in bold, all capital, underlined

2018 WL 2431690

typeface, distinguishes the Swainston Report from the conditional language that is inadequate under *Westpark,* and notified the Association that specific construction defects existed at Town Centre. Further, the Association's claims are for defects in the limited common areas of Town Centre, as opposed to claims regarding individual units on behalf of individual unit owners. Therefore, the general language in the Swainston Report—that the list includes defects common to the project as a whole—does not necessarily prevent disclosure of defects in limited common areas; that is, while a list of defects common to the project as a whole would not disclose defects in individual units, it may include defects in common elements or limited common elements. However, the actual overlap between the defects for which the Association brings claims and the disclaimers in the Swainston Report is not clear on the record or briefing before us.

**\*3** We reject Oxbow's contention, and the district court's determination, that the various agreements in this case provide a complete disclaimer for any negligence by Oxbow in the construction of Town Centre. NRS 40.640(5) provides for no such blanket disclaimer, but instead requires that each defect be disclosed in understandable language prior to the purchase of the new residence. The record requires further development to determine the specific defects in the limited common areas for which the Association brings its negligence claim. To the extent any of the alleged defects not mentioned in the Swainston Report is in a limited common area assigned to a new residence, summary judgment was not appropriate. Similarly, to the extent a defect listed in the Swainston Report was too vague or equivocal to disclose the particular defect, summary judgment was not appropriate on the Association's negligence claim for construction defect. On the record and briefing before us, we are unable to make such determinations.

As there is a genuine dispute of material fact as to whether the Swainston Report discloses each defect for which the Association makes a claim, we remand this case to the district court for further proceedings to determine the specific defects for which the Association brings claims, and which of those are waived by adequate disclosure in the Swainston Report.

*Expert witness fees*
The district court awarded $40,274.47 in litigation costs, plus $103,067 in expert witness fees, to Oxbow as the prevailing party below. As we reverse summary judgment on the Association's claim for negligence, we also reverse the award of costs and expert witness fees. *See Bayerische*

*Motoren Werke Aktiengesellschaft v. Roth,* 127 Nev. 122, 142, 252 P.3d 649, 662 (2011).

*Breach of express warranty*
The district court appropriately determined that there was no contractual privity between Oxbow and the Association that would create an express warranty. In addition, no express warranties were created or transferred under NRS Chapter 116.

NRS 116.4113 sets forth the ways in which an express warranty can be created between a seller and a purchaser, and then transferred to subsequent purchasers. *See* NRS 116.4113 ("Express warranties made by any seller to a purchaser of a unit, if relied upon by the purchaser, are created as follows...."). The plain language of NRS 116.4113 requires that the creation of an express warranty be made by a seller to a purchaser. *See Westpark,* 123 Nev. at 357, 167 P.3d at 427 ("When the language of a statute is unambiguous, the courts are not permitted to look beyond the statute itself when determining its meaning."). Because Oxbow was the general contractor of Town Centre, and never its seller, the district court correctly determined that no express warranties were created by Oxbow under NRS 116.4113.

The Association argues that, under NRS Chapter 116, an affiliate is responsible for the express warranties made by the declarant of a common-interest community, and, therefore, Oxbow is liable for express warranties made by El Capitan Associates to the Association. As support for this assertion, the Association cites to NRS 116.3104(2)(b). But this statutory provision does not support the Association's argument, because NRS 116.3104(2)(b) only holds affiliates jointly liable for a declarant's obligations if the affiliate succeeds in interest to the special declarant's rights. Here, the parties dispute whether and to what extent El Capitan and Oxbow have overlapping members and control of one another such that Oxbow is the affiliate of El Capitan, but it is undisputed that Oxbow did not succeed to any special declarant's rights involving Town Centre. As a result, NRS 116.3104(2)(b) will not extend liability to Oxbow for express warranties that were made by El Capitan in the development of Town Centre. We also reject the Association's general contention that the affiliate of a declarant is liable for express warranties made by the declarant under NRS Chapter 116. Therefore, the dispute regarding Oxbow's affiliate status is not material to the outcome of the claim for breach of express warranty, because the Association's interpretation of NRS Chapter 116 is incorrect as a matter of law. Accordingly,

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 355 of 520
PageID: 9276
Regent at Town Centre Homeowners' Association v Oxbow..., 419 P.3d 702 (2018)

2018 WL 2431690

we affirm summary judgment on the Association's claim for breach of express warranty.

*Breach of implied warranty*

**\*4**  The Association's breach of implied warranty claim fails for similar reasons. NRS 116.4114 provides that any declarant or dealer impliedly warrants that a residence will be free from construction defects. *See* NRS 116.033 (A dealer is "a person in the business of selling units for his or her own account"). But, again, Oxbow was the general contractor of Town Centre; Oxbow was never a dealer or declarant, and never succeeded to any special declarant rights. The district court also properly determined there was no privity of contract between the Association and Oxbow. *See Long v. Flanigan Warehouse Co. & Inland Ladder Co.,* 79 Nev. 241, 246, 382 P.2d 399, 402 (1963) ("Where the parties to the law suit are not the immediate buyer and seller the weight of authority is that such lack of contractual privity will bar recovery on an implied warranty theory.") As such, the Association has no viable theory of breach of implied warranty by Oxbow, and we therefore affirm summary judgment on the Association's breach of implied warranty claim.

*Summary judgment without further discovery*

We also reject the Association's argument that the district court exceeded its authority by granting summary judgment without further discovery, even though a previous judge determined that further discovery was needed to resolve Oxbow's affiliate status.

Generally, a district court judge's decision in a case becomes the "law of the case" and cannot be overruled by a coequal, successor judge. *See Sittner v. Big Horn Tar Sands & Oil, Inc.,* 692 P.2d 735, 736 (Utah 1984) ("[T]he doctrine of 'law of the case' has evolved to avoid the delays and difficulties that arise when one judge is presented with an issue identical to one which has already been passed upon by a coordinate judge in the same case"); *see also Messenger v. Anderson,* 225 U.S. 436, 444 (1912) (explaining that "law of the case" "merely expresses the practice of courts generally to refuse to reopen what has been decided"). Adherence to the law-of-the-case is a doctrine of self-restraint, however, and not a jurisdictional limitation. *See Moore v. City of Las Vegas,* 92 Nev. 402, 405,

551 P.2d 244, 246 (1976) (reviewing a judge's reconsideration of a prior judge's ruling in the same case for abuse of discretion); *Harvey's Wagon Wheel, Inc. v. MacSween,* 96 Nev. 215, 217–18, 606 P.2d 1095, 1096–97 (1980) (upholding a district court's grant of summary judgment after a previous denial of the same motion when the judge became more familiar with the case and was persuaded by newly cited authority). Thus, the holding in *Rohlfing v. Second Judicial District Court* is not applicable under these circumstances. 106 Nev. 902, 906, 803 P.2d 659, 662 (1990) ("The district courts of this state have equal and coextensive jurisdiction; therefore, the various district courts lack jurisdiction to review the acts of other district courts.").

Here, the Association initially moved for declaratory relief from Judge Earl on the issue of whether Oxbow and El Capitan had an affiliate/declarant relationship. Oxbow, on the other hand, moved for Judge Wiese to grant summary judgment. In granting summary judgment, Judge Wiese did not make a determination as to the affiliate/declarant relationship, but instead held that Oxbow is not responsible for warranties under the statutory scheme because it is not a seller. Thus, Judge Weise did not rule on the affiliate/declarant issue, which a previous judge had determined required further discovery, but instead viewed the issue in a different light. *See Sittner,* 692 P.2d at 736 (recognizing that a "second judge may reverse the first judge's ruling if the issues decided by the first judge are presented to the second judge in a 'different light' "). Therefore, the district court did not err in granting summary judgment, as the Association contends, on the basis that it exceeded its authority by considering Oxbow's motion for summary judgment.

**\*5**  We therefore,

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

**All Citations**

419 P.3d 702 (Table), 2018 WL 2431690

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    4

# TAB 40

Rosmer v. Pfizer, Inc., Not Reported in F.Supp.2d (2001)

2001 WL 34010613

2001 WL 34010613
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Beaufort Division.

David ROSMER, on behalf of himself
and as a class representative, Plaintiff,
v.
PFIZER, INC., Defendant.

No. CIV.A. 9:99–2280–18RB.
|
March 30, 2001.

**Attorneys and Law Firms**

Daniel Alvah Speights, Robert N Hill, Amanda G. Steinmeyer, Speights and Runyan, Hampton, Howard Hammer, Hammer Hammer Carrigg and Potterfield, Columbia, for David Rosmer, on behalf of himself and as class representative, plaintiff.

Michael Tucker Cole, Jane Thompson Davis, Jeanne M Lyles, Nelson Mullins Riley and Scarborough, Charleston, David Klingsberg, Bert L Slonim, Kaye Scholer Fierman Hays and Handler, New York, NY, for Pfizer Inc, defendant.

ORDER

NORTON, District J.

*1 Plaintiff's Motion for Conditional Class Certification for his medical monitoring claim is before me for resolution. Both Plaintiff and Defendant have briefed their positions. Thus, the matter is ripe for disposition.

This case concerns Plaintiff's allegations that he contracted hepatitis as a result of his use of oral Trovan, a prescription antibiotic designed by Defendant. Plaintiff's Complaint alleges that Defendant failed to adequately warn of the antibiotic's risk of liver toxicity and improperly designed the drug to be sold through retail pharmacies to a class of persons in non-limb and non-life threatening circumstances. Plaintiff further asserts that those who used the antibiotic have incurred and will incur the cost of obtaining periodic medical screening to diagnose and monitor their health. As a remedy, Plaintiff seeks, in part, that Defendant be ordered to contribute to a facility to be operated under court supervision to defray the costs of future medical monitoring services for the members of the putative class. Accordingly, Plaintiff asks the court to conditionally certify a Federal Rule of Civil Procedure 23(b)(2) class limited to Plaintiff's claim for injunctive relief in the form of a medical monitoring facility. Defendant opposes the motion.

Rule 23(a) sets forth the threshold requirements applicable to all class actions: 1) that the class is so large that joinder of all members is impracticable (known as the "numerosity" factor); 2) that there exists questions of law or fact common to the class (or "commonality"); 3) that the named party's claims or defenses are typical of the class ("typicality"); and 4) that the named representative will fairly and adequately protect the interests of the class ("adequacy"). Anchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997). In addition to satisfying the Rule 23(a) prerequisites, a party seeking class certification must also show that the action may be maintained under the provisions of Rule 23(b). Rule 23(b)(2) [1] permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Plaintiff, as the moving party, bears the burden of proving that the requirements of certification have been met. Windham v. American Brands, Inc., 565 F.2d 59, 65 n. 6 (4th Cir.1977). See also, In Re American Medical Systems, Inc., 75 F.3d 1069, 1079 (6th Cir.1996). Unless all of the foregoing have been satisfied, the court should not certify the class. In Re American Medical Systems, 75 F.3d at 1079.

[1]  As Plaintiff here has expressly limited his motion to Rule 23(b)(2), I shall not address the provisions under subsections (1) or (3).

In evaluating Plaintiff's motion, the court should accept the putative class representative's allegations as true but should also go beyond the pleadings to the extent necessary to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982). In other words, the court must give "serious consideration" to each factor before concluding that a particular requirement has been met, including looking beyond the pleadings where necessary. In re American Medical Systems, 75 F.3d at 1082. Here, the parties were permitted to engage in discovery on class issues and have supplied the court with portions of deposition testimony, as well as documentary evidence in support of their respective positions, all of which have been taken into consideration.

2001 WL 34010613

The ultimate decision as to whether class certification is appropriate, however, may not be based on an evaluation of the merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974). Rather, the court should also consider that under Rule 23(c)(1), class certification may be conditional (as is the request for certification here) and must be revisited as the litigation progresses to determine whether, in light of the emerging facts, Plaintiff continues to sustain his burden.

 **\*2** Prior to engaging in any analysis, however, the first step in the process is to define the nature of the class Plaintiff seeks to certify. Plaintiff identifies the class members as those persons whose use of Trovan was "not warranted" according to the FDA. Presumably, this means that the purported class would consist of those persons who were prescribed the drug during the time period in which Plaintiff contends Defendant failed to adequately warn of the risk of liver toxicity and when the drug was being sold through retail pharmacies to persons with non-limb and non-life threatening circumstances. It appears that Defendant first started marketing Trovan for sale in United States pharmacies in February of 1998. Thereafter, on June 9, 1999, the Food and Drug Administration (FDA) issued a Public Health Advisory finding that the drug should be reserved for use in patients with serious, life or limb threatening infections who receive their initial therapy in an in-patient care facility. On July 20, Defendant issued an "Important Drug Warning" notifying health care professionals of an increased drug warning consistent with the FDA assessment. Thus, the class should reasonably be structured around this February 1998 to July 1999 time period. (The actual parameters will, of course, remain a question of fact based on issues such as when the warnings were received and when it is reasonable to find that heath care professionals acted in accordance with the warnings.) The ultimate point for our purposes here is that the class is expected to address persons who were prescribed the drug during a finite time period. If Plaintiff is seeking a broader class, he does not set forth any argument supporting this assertion. In addition, I must assume that this class is meant to encompass all users of the medication within the United States, as Plaintiff makes no mention of limiting the class to South Carolinians or those who were prescribed or purchased the medication in this state. Therefore, my analysis will assume that the nationwide class Plaintiff seeks to have certified concerns a limited time period and involves not every person who consumed the drug but rather only those for whom its prescription was "not warranted."

Before moving on next to an evaluation of the individual factors to be proven to support class certification, it is perhaps best to discuss Plaintiff's chief complaint which overshadows the analysis of several of the elements. Plaintiff has cried foul concerning his perception that Defendant has switched horses midstream on some of the issues relevant to class certification on which it took an opposing view in seeking to maintain federal diversity jurisdiction. In defending against Plaintiff's motion to remand, Defendant put forth several factual assertions and legal arguments pertaining to the class claim, some of which were accepted by Judge Blatt in his July 6th Order denying Plaintiff's motion. Specifically, in order to support its assertion that the putative class member's claims should be aggregated in order to satisfy the amount-in-controversy, Judge Blatt adopted Defendant's assertions that the medical monitoring relief sought was injunctive in nature and that the class member's interest therein was a "common and undivided" one. Plaintiff argues that Defendant should be judicially estopped from changing its position on these issues.

 **\*3** "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall,* 92 F.3d 219, 223 (4th Cir.1996)(quoting *John S. Clark Co. v. Faggert & Frieden, P.C.,* 65 F.3d 26, 28–29 (4th Cir.1995)). Certain elements must be met before courts will apply judicial estoppel. *Id.* First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation and the position sought to be estopped must be one of fact rather than of law or legal theory. *Lowery,* 92 F.3d at 224. Next, the prior inconsistent position must have been accepted by the court as part of a final disposition. *Id.* Finally, the party must be found to have "intentionally misled the court to gain unfair advantage." *Id.* (quoting *Tenneco Chemicals, Inc. v. William T. Burnett & Co., Inc.,* 691 F.2d 658, 665 (4th Cir.1982)). Plaintiff does not begin to undertake this analysis; rather, Plaintiff proposes what is more akin to the "law of the case" doctrine, which applies to maintain a consistent ruling of law throughout subsequent stages in the same case. *United States v. Aramony,* 166 F.3d 655, 661 (4th Cir.1999). The law of the case doctrine is not an absolute bar but rather is a discretionary limit or rule of practice. *United States v. Carson,* 793 F.2d 1141, 1147 (10th Cir.1986). This is so because as a matter progresses the natural developments of continued discovery "often provide a much improved foundation for deciding the same issue." 18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE 2d:

2001 WL 34010613

Jurisdiction § 1478, at 794 (1981). Plaintiff has not provided any discussion of this doctrine either.

Nonetheless, a thorough analysis under either doctrine is unnecessary at this point because there is no need to disturb Judge Blatt's findings that the relief sought by the class is primarily injunctive in nature and that there can be found to exist a common, undivided interest among members of the putative class in a medical monitoring facility.[2] The parameters of "common" and "undivided" as found by Judge Blatt while examining jurisdiction, however, as compared to the more detailed analysis required now are different, even if some of the terminology is the same. Although the parties' earlier discourse touched upon some issues pertaining to the nature of the class, Judge Blatt was not undertaking the ultimate determination of whether class certification was proper. Rather, while considering the jurisdictional issues, Judge Blatt was, as a matter of course, required to assume that a class was properly certifiable. *See Gilman v. Wheat, First Securities, Inc.,* 896 F.Supp. 507, 509 (D.Md.1995) (cited in Plaintiff's Reply in Support of Motion to Remand at 4). His findings then cannot be said to be based on the merits of class certification any more than my decision here shall be based on an evaluation concerning the merits of the case, although I must consider facts which may touch on the merits.

[2]    The court nonetheless empathizes with Plaintiff's frustration with the seemingly suspect nature of a party proceeding with a quasi-factual position when it suits its desire to keep the case in the federal court's jurisdiction and then promoting the opposite claim when attempting to defeat class certification. Should I find that a legal position is being advanced in this manner, the law of the case doctrine would aid in preventing this inherent fraud upon the court. Plaintiff must be cautioned, however, that some of the positions he took in opposing jurisdiction are in some degree incongruous with his current position as well. Ultimately, the very nature of advocacy coupled with the limits of the language often result in such a seemly apparent conflict. Fundamentally, however, Judge Blatt's ultimate finding that federal jurisdiction in this matter is appropriate has had no impact on this court's decision with regard to class certification.

*4    In attempting to hold Defendant to its "previous position," Plaintiff paints with a too broad brush. A determination made at such an early stage should be

considered narrowly rather than liberally interpreted to encompass matters (both legal and factual) not actually before the court during its initial determination. Judge Blatt found a common, undivided interest; he did not make findings as to numerosity, typicality, adequacy or cohesiveness to the extent required under Rule 23(a) and (b). To hold otherwise at this stage would be to shirk this court's duty to give "serious consideration" to each factor before concluding that a particular requirement has been met. *In re American Medical Systems, Inc.,* 75 F.3d at 1082. Therefore, with this in mind, I will look now to the Rule 23(a) factors relevant to my decision.

Plaintiff must first demonstrate that the purported class is so large that joinder of all members is impracticable. Whether the numerosity prong is met depends on the court's practical judgment, given the facts of the particular case. *See General Tel. Co. of the Northwest, Inc. v. E.E.O.C.,* 446 U.S. 318, 330 (1980). Plaintiff need not state a number with specificity; a good faith estimate is ordinarily sufficient. 7A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE 2d § 1762, at 153. In the Fourth Circuit this requirement has been found to have been met with as few as 18 class members. *See Cypress v. Newport News General and Nonsectarian Hospital Ass'n,* 375 F.2d 648, 653 (4th Cir.1967).

Here, Plaintiff asserts that an estimated 2.5 million prescriptions were written for Trovan from the time Defendant began marketing the drug in the United States in February 1998 until the FDA limited the antibiotic's use in June of 1999. Of these, Plaintiff asserts approximately 140 cases of hepatic adverse events such as his have been documented. In addition, Plaintiff contends that around 300,000 prescriptions are currently written each month for the drug. Within this recitation of numbers, however, Plaintiff does not make any attempt to estimate how many of these prescriptions were written for persons whose use of the drug was "not warranted." Plaintiff maintains nonetheless that at least 2.5 million people were "potentially affected" during the pre-FDA warning time period and that this number is sufficient to meet the numerosity prong.

This assertion, however, is simply not adequate. As Defendant points out, the important number for our purposes here is the number of those who could have been injured by the challenged practices. *Holsey v. Armour & Co.,* 743 F.2d 199, 217 (4th Cir.1984). Thus while Plaintiff need not identify the number of persons whose injuries have been detected, he should provide a reasonable estimate of the

2001 WL 34010613

number of those who are believed to have been affected by the "challenged practices," or, in other words, received the medication under conditions in which it was "not warranted." After all, Plaintiff's Complaint cannot be read to say that the distribution of the medication was legally improper under any and all circumstances. Rather the claim is limited to those situations in which it was administered to persons with non-life and non-limb threatening infections or who were prescribed the drug without physician supervision. One who suffered an adverse effect after taking the drug for a life-threatening infection while under in-patient observation by his physician would not, presumably, be a member of the putative class as defined by the Complaint. Accordingly, as Plaintiff has supplied no information in this regard, I cannot find that he has sustained his burden concerning the numerosity factor. [3]

[3]    In addition, although each person whose use of the drug was "not warranted' may have a common, undivided interest in a medical monitoring facility, determining from the onset who would properly be included in that class presents major hurdles. As far as I can determine, some type of evidentiary hearing will be required in order to untangle the subjective issues as to whether each potential member of the class was threatened with a life or limb-threatening infection at the time of his prescription and whether he was being monitored by his physician in a manner consistent with the FDA's warnings. In the court's view, given Plaintiff's estimate that the class potentially involves 2.5 million people, this situation presents a logistical chimera for which Plaintiff has not provided a workable solution.

*5  In addition, Plaintiff has also failed to sustain his burden to demonstrate that he will adequately represent the class. In order to be an adequate class representative, a named plaintiff must not have claims which are antagonistic to or in conflict with those of the other class members and must have sufficient interest in the outcome of the case to ensure vigorous advocacy. *See Dhamer v. Bristol–Myers Squibb Co.,* 183 F.R.D. 520, 527 (N.D.Ill.1998). A fundamental flaw with Plaintiff proceeding to represent a medical monitoring class is the fact that South Carolina has not recognized a cause of action for medical monitoring. Plaintiff blithely waives off any challenge on this point by stating that to the extent variations exist in the state

laws concerning this claim they can be addressed with subclasses. Reply Brief at 14. Plaintiff, however, has failed to undertake the detailed analysis of the differences among the various jurisdictions to aid the court in determining what these subclasses might be. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 742 (5th Cir.1996) (finding that court erred in failing to consider state law variations and their effects on class concerns); *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (U.S.App.D.C.1986) (holding that nationwide class action movants must credibly demonstrate, through extensive analysis of state law variances, that class certification does not present insuperable obstacles.). *See also, Ball v. Joy Technologies,* 958 F.2d 36, 39 (4th Cir.1991) and *Bower v. Westinghouse Elec. Corp.,* 522 S.E.2d 424 (W.Va.1999)(illustrating the variations of the interpretation of the cause of action simply within the Fourth Circuit). I cannot simply rely on counsel's assurances that any problems on this point can be overcome. *See Castano,* 84 F.3d at 741.

Even if I were to reserve decision as to subclasses until a later time, however, the fundamental flaw with Plaintiff's representation of the class is the fact that Plaintiff could not himself be eligible for the recovery sought. As such, he cannot be said to have sufficient interest in the outcome; neither he nor any of his neighbors in South Carolina, for that matter, could benefit from the monitoring facility. Simply put, he has failed to demonstrate that he has a legal interest sufficient to proceed on this cause of action. Nor can Plaintiff cure this infirmity by arguing that his inadequacy is immaterial because the court can allow an alternate plaintiff to serve as the class representative. While a "different case would be presented if the District Court has certified a class and only later had it appeared that the named plaintiffs were not class members or were otherwise inappropriate class representatives," to even conditionally certify a class when the named party's inadequacies are apparent from the onset would constitute plain error. *Falcon,* 457 U.S. at 156; *East Texas Motor Freight,* 431 U.S. at 403.

Accordingly, IT IS ORDERED that Plaintiff's motion to certify a medical monitoring class be DENIED.

*6  AND IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 34010613

**Rosmer v. Pfizer, Inc., Not Reported in F.Supp.2d (2001)**

2001 WL 34010613

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 41

2011 WL 2728051
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Charleston Division.

Nathaniel SALLEY and Joseph Salley,
as Personal Representatives of the
Estate of Annie Salley, Plaintiffs,

v.

HEARTLAND–CHARLESTON OF HANAHAN,
SC, LLC, d/b/a Center–Charleston; HCR
Manorcare, Inc.; Manor Care, Inc.; Manor Care of
America, Inc.; HCR Manorcare Medical Services
of Florida, LLC; the Caryle Group, Defendants.

Civil No. 2:10–cv–00791.
|
July 12, 2011.

**Attorneys and Law Firms**

Dwayne M. Green, Ian S. Ford, Jonathan A. Wallace, Green Ford and Wallace, Charleston, SC, for Plaintiffs.

Brian Edward Johnson, Elloree A. Ganes, Molly Agnes Hood Craig, Robert H. Hood, Hood Law Firm, Charleston, SC, for Defendants.

**ORDER**

DAVID C. NORTON, Chief Judge.

 **\*1** This matter is before the court on defendants' motion for summary judgment. For the reasons set forth below, the court grants defendants' motion for summary judgment for all claims against Manor Care, Inc. and HCR ManorCare, Inc.. The court also grants summary judgment to Heartland–Charleston of Hanahan, SC, LLC ("Heartland") on plaintiffs' professional malpractice and negligence per se claims and their request for punitive damages but denies summary judgment on plaintiffs' breach of contract and alternative negligence claims. Plaintiffs have agreed to dismiss their breach of fiduciary duty claim and all claims against HCR ManorCare Medical Services of Florida, LLC.

## *I. PROCEDURAL BACKGROUND*

On February 19, 2010, plaintiffs, Nathaniel Salley and Joseph Salley, as the personal representatives of the estate of Annie Salley ("Mrs.Salley"), sued defendants in state court as a result of defendants' care for and the subsequent death of Mrs. Salley. Plaintiffs asserted the following causes of action: (1) negligence and negligence per se; (2) wrongful death; (3) survival right of action; (4) breach of fiduciary duty and misrepresentation; and (5) breach of contract. Defendants removed this case to federal court on March 29, 2010, based on diversity jurisdiction. This court dismissed all claims against The Carlyle Group for lack of personal jurisdiction on December 10, 2010.

## *II. FACTUAL ALLEGATIONS*

Mrs. Salley was a resident of Heartland nursing home from December 2, 2008 until January 1, 2009. Plaintiffs contend that upon admission, Heartland was informed that Mrs. Salley was a fall risk and that her physical condition required assistance in toileting. Heartland nurses' records also indicate that Mrs. Salley required "extensive assistance" in toileting. On December 11, 2008, she fell while alone in her restroom at Heartland. Defendants were supposed to assist Mrs. Salley with toileting, feeding, transferring, and with her mobility. On days both before and after Mrs. Salley's fall, Heartland Assisted Daily Living ("ADL") records fail to indicate that assistance was given to Mrs. Salley in some of these areas.

On January 25, 2009, Mrs. Salley was hospitalized at the Medical University of South Carolina ("MUSC"). She died of a subdural hematoma on February 1, 2009. MUSC neurologist Dr. Ian Johnson treated Mrs. Salley and believes that the subdural hematoma resulted from her fall at Heartland.

## *III. STANDARD OF REVIEW*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by pointing out that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant must then "make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmovant "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Evidence should be viewed in the light most favorable to the nonmoving party and all inferences drawn in its favor. *Id.* at 255. However, a mere "scintilla" of evidence will not preclude summary judgment. *Id.* at 252. Finally, under the recently promulgated amendments to Rule 56, the court need not consider any evidence that is not cited to by the parties.

### IV. DISCUSSION

#### A. Negligence Claims

**\*2** Plaintiffs have failed to provide sufficient evidence regarding the standard of care required to make out a professional negligence claim. *See David v. McLeod Reg. Med. Cntr.,* 367 S.C. 242, 626 S.E.2d 1, 3 (S.C.2006); *Jones v. Owings,* 318 S.C. 72, 456 S.E.2d 371, 374–75 (S.C.1995); *Pederson v. Gould,* 288 S.C. 141, 341 S.E.2d 633, 634 (S.C.1986). In South Carolina, a professional commits malpractice by failing to "exercis[e] that degree of skill and learning that is ordinarily possessed and exercised by members of the profession in good standing acting in the same or similar circumstances." *David,* 626 S.E.2d at 3. A plaintiff alleging malpractice must provide evidence showing "(1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners in the defendants' field ... under the same or similar circumstances, ... (2) that the defendants departed from the recognized and generally accepted standards," and (3) "that the defendants' departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages." *Id.* at 4. The South Carolina Supreme Court requires the establishment of both the first and second requirement by expert testimony "unless the subject matter lies within the ambit of common knowledge so that no special learning is required to evaluate the conduct of the defendants." *Id.*

Plaintiffs have failed to provide evidence of the first requirement and instead rest on an expert's bald assertion that the standard of care was breached, see Seignious Aff. ¶ 8, thus conflating the first and second requirement. Viewed in the light most favorable to plaintiffs, they have failed to

provide factual support for the requirements of a professional negligence claim, however, plaintiffs have supported their complaint with sufficient facts for their alternative negligence claims to survive.

In a negligence action, plaintiff must show: (1) defendant owed a duty of care to plaintiff; (2) defendant breached the duty by negligence act or omission; (3) defendant's breach was the actual and proximate cause of plaintiff's injury; and (4) plaintiff suffered an injury or damages. *Madison v. Babcock Cntr., Inc.,* 371 S.C. 123, 638 S.E.2d 650, 656 (S.C.2006) (finding that a private residential center owed a duty of care to a mentally retarded patient which included protecting her from harm). "Under South Carolina common law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Id.* There are, however, "five exceptions to this rule: (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant." *Id.* (citing *Faile v. S.C. Dept. of Juvenile Justice,* 350 S.C. 315, 566 S.E.2d 536, 546 (S.C.2002)). In *Madison,* the South Carolina Supreme Court also found that the Restatement Second of Torts § 323–24 established an applicable duty of care. As in *Madison,* Heartland's relationship with Mrs. Salley potentially falls under the first, third, fourth, and fifth exceptions to *Faile.*[1] *See id.* at 657. Furthermore, in *Flinn v. Crittenden,* the South Carolina Court of Appeals agreed with a Louisiana court finding that while "[a] nursing home is not the insurer of the safety of its patients," "[t]he nursing home does have a duty to provide a reasonable standard of care, taking into consideration the patient's mental and physical condition." 287 S.C. 427, 339 S.E.2d 138, 139 (S.C.Ct.App.1985).

[1]     Babcock Center had a special relationship with Appellant because she was a client with special needs and disabilities admitted for care and treatment at the center. Babcock Center voluntarily undertook the duty of supervising and caring for Appellant as provided in its contractual relationship with Department. Babcock Center allegedly acted negligently in creating the risk of injury to Appellant by not properly supervising her.... Furthermore, the center had a statutory duty to

exercise reasonable care in supervising Appellant. *Madison,* 638 S.E.2d at 657.

**\*3** Plaintiffs have sufficiently demonstrated that there is a genuine issue of material fact regarding whether there was a relationship sufficient to establish a general duty of care. At this stage of litigation, plaintiffs' evidence, viewed in the light most favorable to them, demonstrates that there is a genuine issue of material fact regarding whether defendants owed a duty of care to Mrs. Salley and whether they breached that duty. There are also genuine issues of material fact concerning causation based on defendants' records and the testimony of both doctors and nurses.

### B. Negligence Per Se

"Negligence per se is negligence arising from a defendant's violation of a statute." *Wogan v. Kunze,* 366 S.C. 583, 623 S.E.2d 107, 117–18 (S.C.Ct.App.2005). A statute must permit a private cause of action in order for plaintiffs to maintain a civil suit. "In determining whether a statute creates a private cause of action [in South Carolina], the main factor is legislative intent." *Doe v. Marion,* 373 S.C. 390, 645 S.E.2d 245, 248 (S.C.2007) (finding that the statute for reporting child abuse does not support a private cause of action for negligence per se against a doctor).

> The legislative intent to grant or withhold a private right of action for violation of a statute or the failure to perform a statutory duty is determined primarily from the language of the statute .... In this respect, the general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity is not subject to a construction establishing a civil liability. When a statute does not specifically create a private cause of action, one can be implied only if the legislation was enacted for the special benefit of a private party.

*Id.* (internal citations omitted).

"The search for the legislative intent [in South Carolina] comports with the standards used for testing federal rights of action as expressed by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)." *Williams– Garrett v. Murphy,* 106 F.Supp.2d 834, 842 (D.S.C.2000). Courts determining whether federal statutes grant a private cause of action "begin with the presumption that if a statute does not expressly create a private cause of action, one does not exist." *Ormet Corp. v. Oh. Power Co.,* 98 F.3d 799, 805 (4th Cir.1996). "By now, Congress is well aware of this presumption and how to provide private remedies." *Id.*

> Nonetheless, we may infer the existence of a private cause of action by applying the well settled test which requires that we determine (1) whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether implication of a private remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action sought is "one traditionally relegated to state law."

**\*4** *Id.* (quoting *Cort,* 422 U.S. at 78) (emphasis in original).

Most courts have found that the Federal Nursing Home Reform Act ("FNHRA"), 42 C.F.R. § 483. 10, does not confer a private cause of action. *See, e.g., James v. Bd. of Curators of the Univ. of Mo.,* No. 09–2066, 2011 WL 147910, at \*3 (E.D.Mo. Jan.18, 2011); *Duncan v. Johnson– Mathers Health Care, Inc.,* No. 09–0417, 2010 WL 3000718, at \*3 (E.D.Ky. July 28, 2010); *Brogdon v. Nat'l Healthcare Corp.,* 103 F.Supp.2d 1322, 1330 (N.D.Ga.2000); *Tinder v. Lewis Cnty. Nursing Home Dist.,* 207 F.Supp.2d 951, 957 (E.D.Mo.2001); *Grammer v. John J. Kane Reg. Cntrs.,* 570 F.3d 520, 531–32 (3d Cir.2009) (finding civil liability for 42 C.F.R. § 483 available through § 1983 suits but not independently). Other courts have found that the Medicare and Medicaid Act, of which the FNHRA is a part, does not authorize private causes of action against nursing homes. *See, e.g., Stewart v. Bernstein,* 769 F.2d 1088, 1092 (5th Cir.1985). This court joins the vast majority of the courts in finding that the language of the FNHRA fails to demonstrate an express or implicit legislative intent to create a private cause of action.

South Carolina courts have yet to find that either South Carolina code of law § 44–81–10 or § 40–33–5 permits a private cause of action. This court need not reach this question, however, as that even if a private cause of action were permitted, plaintiffs failed to allege any specific section

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 366 of 520
PageID: 9287
Salley v. Heartland-Charleston of Hanahan, SC, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 2328071

of either statute that was breached, how the breaches occurred, or how the breaches proximately caused Mrs. Salley's death. Plaintiffs insufficiently allege that defendants were negligent by "failing to perform the standards required by the Federal Nursing Home Reform Act and other federal and state statutes and regulations." Comp. ¶ 84(t). Plaintiffs did not further substantiate this allegation in their response to defendants' motion for summary judgment. Plaintiffs "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248. Rule 56 instructs that "[t]he court need consider only the cited materials." This court should not be required to guess which provisions plaintiffs allege defendants breached or how the elements of the cause of action might be made out. In the light most favorable to them, plaintiffs have failed to demonstrate that there is a genuine issue of material fact regarding any putative cause of action under §§ 44–81–10 and 40–33–5.

Plaintiffs' negligence per se claim under S.C. Reg. 61–7 also fails because the regulation does not provide for a private cause of action. No court has addressed whether this statute creates a private right of action. The regulation lacks any language indicating the legislature intended to authorize a private right of action. The statute was not "enacted for the special benefit of a private party," as Doe requires, rather, Reg. 61–7 is a licensing statute created to benefit the public in general. The regulation states its "Scope and Purpose" are for the "establishment of EMS program;" "general licensing, certification, inspection and training procedures;" "establishment of an Emergency Medical Service Council and duties of the Council;" and "Establishment of the Department of Health and Environmental Control authority for enforcement of these rules and regulations." Reg. 61–7 § 100.

**\*5** Section 1302(H) of the regulation states that

> [p]ursuant to section 44–61–160 of the S.C.Code, a person who intentionally fails to comply with reporting, confidentiality, or disclosure of requirements in this section is subject to civil penalty of not more than one hundred dollars for a violation the first time a person fails to comply and not

more than five thousand dollars for a subsequent violation.[2]

> [2]
> Plaintiffs do not appear to allege that defendants violated Reg. 61–7 by failing to comply with the regulation's requirements regarding reporting, confidentiality or disclosure.

The statute also provides administrative remedies for other breaches of the statute. *See, e.g.,* Reg. 61–17(401)(A). The South Carolina Supreme Court recognizes the "frequently stated principle of statutory construction ... that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Wogan,* 623 S.E.2d at 117 (citing *Northwest Airlines, Inc. v. Transp. Workers,* 451 U.S. 77, 94 n. 30, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)). Based on the foregoing, S.C. Reg. 61–7 does not create a private right of action.

The Omnibus Adult Protection Act, S.C.Code Ann. § 43–35–5, however, does permit a private cause of action. *See Williams–Garrett,* 106 F.Supp.2d at 842.[3] Again, plaintiffs do not cite which portion of the statute defendants breached, but the only portion apparently relevant to plaintiffs' complaint governs knowing and willful neglect of a vulnerable adult. § 43–35–85. Defendants moved for summary judgment on the negligence per se claims both on the grounds that private actions were not permitted by the statutes *and* that there were no genuine issue of material fact regarding breach of the statutes after the conclusion of discovery. Plaintiffs failed to cite to any specific claim under the Omnibus Adult Protection Act. Under Rule 56, the court is only required to consider cited evidence. The court also has found no evidence in the entire record which, viewed in the light most favorable to plaintiffs, demonstrates that Heartland employees knowingly and willfully neglected Mrs. Salley.

> [3]
> The South Carolina District Court in *Williams–Garrett* found that the preamble and additional provisions to the statute demonstrated that the legislature intended to permit private rights of action. The preamble states that one of the purposes of the act was "to provide civil and criminal penalties for abuse, neglect, and exploitation," and the statute permits the Attorney General to bring

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 367 of 520
PageID: 9288
Salley v. Heartland-Charleston of Hanahan, SC, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 2328071

a suit on behalf of the state "in addition to any private cause of action for violation of the statute." *See* S.C.Code Ann. §§ 43–35–5(9), 43–35–80. No South Carolina state court has addressed the statute.

**C. Breach of Contract**

Having thoroughly considered the parties' written and oral submissions on the breach of contract claim, the court holds that genuine issues of material fact exist regarding whether defendants breached their contract to provide "comprehensive health care around the clock by experienced professionals." Pl.s' Ex. 21. Plaintiffs' evidence could demonstrate that defendants failed to provide around the clock medical assistance based on the ADL record. Since defendants only argued that the breach of contract claim should be dismissed for lack of a contract for a specific result, defendants' motion for summary judgment as to the breach of contract claim is denied.

**D. Punitive Damages**

"Punitive damages can only be awarded where the plaintiff proves by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights." *Keane v. Lowcountry Pediatrics, P.A.,* 372 S.C. 136, 641 S.E.2d 53, 60 (S.C.Ct.App.2007); *Austin v. Specialty Transp. Serv.,* 358 S.C. 298, 594 S.E.2d 867, 875 (S.C.Ct.App.2004). Viewed in the light most favorable to plaintiffs, the evidence fails to support plaintiffs' contention that defendants' alleged misconduct was willful, wanton, or reckless of the plaintiffs' rights.

**E. Parent Companies**

**\*6** Plaintiffs have failed to point to any act or omission Heartland's parent companies committed, except through the normal practice of corporate governance of a subsidiary. *See, e.g., Johnson v. Ross,* No. 10–1046, 2011 WL 1042246, at \*6 (4th Cir. Mar.23, 2011). Piercing the corporate veil is only reluctantly allowed under South Carolina law. *Baker v. Equitable Leasing Corp.,* 275 S.C. 359, 271 S.E.2d 596, 600 (S.C.1980).

South Carolina courts analyzing piercing claims examine the following factors: (1) whether the corporation was grossly undercapitalized for the purposes of the corporate undertaking; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) insolvency of the debtor corporation; (5) siphoning of funds of the corporation by the dominate shareholder; (6) non-functioning of other officers

or directors; (7) absence of corporate records; and (8) the corporation serving as a façade for the operations of the dominant shareholder. *Hunting v. Elders,* 579 S.E.2d 803, 807 (S.C.Ct.App.2004). None of these factors are present in this case. Plaintiffs allege that Heartland did not pay rent because its parent companies own the property. Using a parent's property as if it were the subsidiary's may weigh in favor of piercing the corporate veil, however, as there is no evidence of undercapitalization or flaunting corporate formalities, this fact alone is insufficient to allow piercing. *See, e.g., Gateway I Grp., Inc. v. Park Ave. Physicians, P.C.,* 62 A.D.3d 141, 877 N.Y.S.2d 95 (N.Y.App.Div.2009); *Taber Partners, I v. Merit Builders, Inc. .,* 987 F.2d 57 (1st Cir.1993).

Demonstrating a subsidiary is merely the "alter ego" of the parent corporation by showing that the parent company controls the business decisions and actions of its subsidiary is one method of piercing the corporate veil. *Jones v. Enter. Leasing Co.-Se.,* 383 S.C. 259, 678 S.E.2d 819 (S.C.Ct.App.2009). While the evidence shows that Heartland's parent companies provided a starting point for plaintiffs' financial decisions, characterized as a skeleton or a floor plan, this alone fails to meet the standard for controlling business decisions or actions of a subsidiary required for piercing the corporate veil on an alter ego theory. Finally, plaintiffs have agreed to dismiss HCR ManorCare Medical Services of Florida, LLC as a defendant.

*V. CONCLUSION*

For the foregoing reasons, the court **GRANTS** defendants' motion for summary judgment regarding plaintiffs' negligence per se claims and request for punitive damages and all claims against Manor Care, Inc. and HCR ManorCare, Inc. and **DENIES** defendants' motion for summary judgment regarding the negligence and breach of contract claims. Furthermore, the court **FINDS AS MOOT** defendants' motion for summary judgment regarding HCR ManorCare Medical Services of Florida, LLC and the breach of fiduciary duty claim as that the parties have agreed to the dismissal of both.

**AND IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2728051

**Salley v. Heartland-Charleston of Hanahan, SC, LLC, Not Reported in F.Supp.2d (2011)**

2011 WL 2328071

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 42

2000 9 WLL3L502©

KeyCite Yellow Flag - Negative Treatment
Distinguished by Sherman v. Sunsong America, Inc., D.Neb., February 28, 2007

1999 WL 33537914
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Mark SANFORD and Vicki Sanford, Plaintiffs,

v.

EKTELON/PRINCE SPORTS GROUP, INC.,
and UVEX Winter Optical, Inc., Defendants.

No. 8:97CV368.
|
Nov. 5, 1999.

ORDER

BATAILLON, J.

## I. Introduction

**\*1** This matter is before the Court on cross motions for summary judgment (filings 127 and 142). The lawsuit in this case is a products liability action. The plaintiff Mark Sanford (hereinafter Sanford) was injured while playing racquetball on April 11, 1995. Sanford was struck by his opponent's racquet on the right lens of the protective racquetball eyewear. Sanford sustained permanent injuries to his right eye. Sanford has asked this court to strike all 18 of defendants' affirmative defenses. After the close of discovery, the fourteen affirmative defenses that remained subject to this motion include those numbered 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16 and 17. Defendants have asked this Court to grant summary judgment on Sanford's claims for loss of consortium, strict liability, negligence, breach of express and implied warranties, punitive damages, and claims under the Magnuson–Moss Act. 15 U.S.C. § 2301 et seq.

## II. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, which can be done by pointing to the lack of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323–25 (1986). Once the moving party has met its burden, the non-moving party must then set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When viewing the evidence, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

The trial court's "function at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial." Rayes v. Eggars, 838 F.Supp. 1372, 1377 (D.Neb.1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Eighth Circuit has recognized that primarily legal issues are amenable to summary disposition. See, e.g., Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir.1995); Mumford v. Godfried, 52 F.3d 756, 759 (8th Cir.1995); and Crain v. Board of Police Comm'r, 920 F.2d 1402, 1405–06 (8th Cir.1990).

## III. Arguments

A. Sanford's motion for summary judgment with respect to the fourteen affirmative defenses

Sanford contends that all eighteen (now fourteen) of the defendants' affirmative defenses should be decided as a matter of law and should not proceed to trial. However, Sanford offers no facts or significant argument in support of this motion. In fact, the majority of the issues discussed in Sanford's brief are unrelated to these remaining fourteen affirmative defenses. The moving party can meet its burden by showing a lack of evidence to support an essential element of the non-moving party's claim. Celotex, at 323–25. However, this does not imply that the moving party can make assertions without meeting its burden of proof. See Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (where the Court states: "Procedurally, the movant has the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue.") The Court finds that Sanford has not met his burden of proof with regard to the summary judgment.

Sanford v. Ektelon/Prince Sports Group, Inc., Not Reported in F.Supp.2d (1999)

2000 9 WLL3L502©

*2 Even though Sanford fails to adequately address these affirmative defenses as they relate to his motion for summary judgment, and on that basis alone this Court could deny the motion, the defendants in their brief in opposition to plaintiffs' motion clearly argue and support with references to the evidence, facts that create a material dispute for trial with regard to each affirmative defense.

Affirmative defenses numbered 2, 6, and 10 deal with unforeseeable conduct, intervening/superseding actions, and last clear chance to avoid the injury. Defendants allege that Sanford removed the adjustable head strap, contrary to the warnings; replaced the head strap; and was struck in the face by the act of a negligent third person. The Court finds that these facts as alleged by defendants create an issue of material fact to be decided at trial.

Affirmative defenses numbered 3, 4, 5, and 11 deal with misuse, modification, comparative negligence, and modification. The facts raised and alleged by defendants with regard to wearing head straps and replacing head straps create issues of material fact to be decided at trial.

Affirmative defenses numbered 7, 8, and 9 allege assumption of risk, implied consent, and obvious and necessary dangers of the sport. Mr. Sanford in his deposition testified that he understood the risks of racquetball. (Dep. pgs. 97–98, Evidence Index, 13). Consequently, the Court finds that there are material issues of fact with regard to these defenses that must be decided at trial.

Affirmative defenses numbered 12, 15, 16 and 17 all deal with whether Sanford's claims should be barred for failure to comply with provisions of the Magnuson–Moss Act, Neb.Rev.Stat. § 25–21, 181, and Neb.Rev.Stat. § 25–21, 182. Defendants claim that notice was not given, that no cause of action exists under the Magnuson–Moss Act, that evidence exists which shows the UVEX manufactured the Prism and Ektelon sold it, and that the evidence will show that the Prism was in conformity with the then existing state of the art technology for the eyewear. The Court deals with the Magnuson–Moss Act issues in Part "B" of this Memorandum and Order.

In summary, Sanford failed to meets his burden of proof in showing that there is no material issue of fact and that he is entitled to judgment as a matter of law. Consequently, Sanford's motion for summary judgment is denied. *Celotex*, 477 U.S. at 323–25.

B. Defendants' motion for summary judgment

1. Loss of consortium
Defendants argue that they are entitled to summary judgment on Sanford's loss of consortium claim. "Damages for loss of consortium represent compensation due to a wife who has been deprived of rights to which she is entitled by virtue of the marriage relationship, namely, her husband's affection, companionship, comfort, assistance, and particularly his conjugal society." *Anson v. Fletcher*, 220 N.W.2d 371 (Neb.1974). However, a review of the evidence offered in support of Sanford's opposition to defendants' motion supports a finding that a material fact exists for trial. In Mrs. Sanford's deposition, she states that she is fearful of him losing his income, is worried that he will lose vision in his eye, that Mr. Sanford gets double vision and has difficulty driving their children to evening activities, that they are unable to go to movies as much because of the double vision, and that they could no longer participate to the same extent in sports activities. (Deposition of Vicki Sanford at 6:11–15; 14:22–15:4; 17:9–19; and 17:20–18:21). This testimony creates a factual dispute for trial.

2. Strict liability, strict liability against Ektelon, breach of express warranty, breach of implied warranty, negligence
*3 Defendants claim that there exists no issues of material fact with regard to strict liability, strict liability against Ektelon, breach of express warranty, breach of implied warranty or negligence. All of these theories have a common nucleus of testimony, and therefore, they will be discussed together.

A premise argued by defendants with regard to all of these issues is that the testimony of Dr. Vinger and of Dr. Sokol is inadmissible. Subsequent to the defendants filing of the motion for summary judgment, this Court held a *Daubert* hearing with regard to the testimony of Dr. Vinger and Dr. Sokol. The hearing was conducted on July 19, 1999, and was continued with regard to Dr. Vinger and concluded on October 4, 1999. Following the July 19, 1999, hearing, I issued an order stating that Dr. Vinger could testify on all issues, except an additional hearing needed to be held on the issue of causation. (Filing 184). At the conclusion of the hearing conducted on October 4, 1999, I ruled that Dr. Vinger had provided sufficient scientific testimony for me to conclude that his testimony on causation would also be admissible at trial. I had previously ruled that Dr. Sokol would

2000 9 WLL3L502©

also be allowed to testify at trial, on the limited issue of the origin of the scuff mark on the eyewear. (Filing 184).

With regard to the strict liability claim, Sanford must prove:

(1) the product was in a defective condition when it was placed on the market and left the defendant's possession;

(2) the defect was the proximate or a proximately contributing cause of plaintiff's injury sustained while the product was being used in the way and for the general purpose for which it was designed and intended;

(3) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and

(4) plaintiff's damages were a direct and proximate result of the alleged defect.

*Delgado v. Inryco, Inc.,* 433 N.W.2d 179, 185 (Neb.1988). Defendants argue that the Prism is not defective. Whether the eyewear is a product in a defective condition that is unreasonably dangerous to Sanford is a question of fact. *See,* e.g., *Haag v. Bongers,* 589 N.W.2d 318 (Neb.1999). The deposition testimony of Dr. Vinger creates a question of fact that must be decided by the jury. In addition, Dr. Vinger contends that the Prism and the Astrospec are substantially the same glasses. (Deposition of Vinger 76:9–89:20, 97:20–, Deposition of Sokol, Plaintiffs' Evidence Exhibits 1, and 3 through 12). Sanford contends that the eyewear was tested by an independent lab, and the lab results show that the eyewear failed. (Plaintiffs' Exhibit 6) Even though defendants disagree with this assertion, the evidence clearly creates a material fact at issue in this lawsuit. It is an issue for trial.

With regard to the strict liability claim as it relates solely to Ektelon, defendants argue that Nebraska law allows a strict liability claim only against the manufacture of the Prism. Neb.Rev.Stat. § 25–21, 181 (Reissue 1989). Defendants are correct in this regard. However, Sanford contends that the defendants jointly tested, manufactured, labeled and distributed the Prism worn by Sanford. (*See* Deposition of Philip Johnson at 15:9–15; 60:20–23; and 67:11–70:22 and Deposition of Norman Peck, Plaintiff's Exhibit Tabs 3 through 12). This testimony creates a material fact to be decided at trial. If, however, the evidence at trial does not support Sanford's allegations in this regard, the defendants might very well be entitled to a dismissal on the strict liability claim against Ektelon. Neb.Rev.Stat. § 25–21, 181 (Reissue 1989).

**\*4** Defendants contend that there is no express warranty because the warranty did not say anything about a racquetball "racquet." The warranties only refer to reduction of eye injuries as it regards strikes by the "ball." Dr. Vinger testified in his deposition that the test conducted on the "ball" is the limiting test. If the ball impact passes the test, then the racquet will also pass the test. (Deposition of Dr. Vinger, 121–22–122:2). His testimony is sufficient at this time to create an issue of fact to be determined by the jury.

Defendants further contend that there is no evidence to support Sanford's claim of implied warranty of fitness for a particular purpose. In order for Sanford to establish a claim for implied warranty of fitness, he must establish that the Prism was inadequate for use in racquetball. *See Delgado,* 433 N.W.2d at 184. However, Dr. Vinger offered expert testimony in his deposition that could establish this claim. This expert testimony creates a factual dispute to be decided at trial.

Defendants contend that they are entitled to summary judgment on Sanford's claims of negligence. In order to establish a claim for negligence, Sanford must show that the Prism was manufactured, sold and distributed by the defendants; that the defendants failed to use reasonable care to see that the product was safe for the use for which it was made; and that the failure to use such reasonable care was the proximate cause of Sanford's injuries. *Morris v. Chrysler Corp.,* 303 N.W.2d 500, 503 (Neb.1981). Again, defendants rely on their belief that Dr. Vinger will not be allowed to testify. This Court's ruling that Dr. Vinger will be allowed to testify at trial obviates the argument. The evidence offered with regard to Dr. Vinger's deposition testimony, the test results, the letter in 1991, and the testimony of Dr. Sokol are sufficient to create a material fact with regard to summary judgment on the issue of negligence.

3. Punitive damages

Defendants contend that Nebraska law applies in this case, and thus punitive damages are impermissible. Neb. Const. Art. VII, Sec. 5; "Punitive, vindictive, or exemplary damages contravene Neb. Const. Art. VII, Sec. 5, and thus are not allowed in this jurisdiction." *Distinctive Printing and Packaging Co. v. Cox,* 443 N.W.2d 566, 574 (Neb.1989). Sanford argues that Nebraska law does not govern punitive damages issues in this case. Sanford advocates that New Jersey law, which allows punitive damages, should be applied. Sanford contends that New Jersey has a strong interest in allowing punitive damages. New Jersey Stat. 2A:58C–1 to 7; *Fischer v. Johns–Manville Corp.,* 103 N.J.

643, 656, 512 A.2d 466 (1986). As this is a diversity case, the Court must decide which law applies to the case. *Enron Corp. v. Lawyers Title Insurance Corp., 940 F.2d 307 (8th Cir.1991).* In that regard this Court must determine which state has the "most significant relationship to the occurrence with respect to the particular issue." Restatement, Conflict of Laws § 146 at fn. 19.

*\*5* In the case at hand the injury occurred at the Jewish Community Center in Omaha, Nebraska. Mark Sanford is a resident of Omaha, Nebraska. His wife Vicki Sanford is a resident of Omaha, Nebraska. Ektelon is a New Jersey corporation and UVEX is a Rhode Island corporation. The purchase of eyewear occurred in Boston. (Plaintiffs' Exhibit 21). The court in *Crossley v. Pacific Employers Insurance Co., 251 N.W.2d 383, 386 (Neb.1977),* analyzed an issue similar to the one in this case. The court in *Crossley* quotes the restatement:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless with respect to the particular issue, some other state has a more significant relationship. Comment d under [Restatement, Conflict of Laws 2d. § 146]. That section makes clear that in virtually all instances where the conduct and the injury occur in the same state, that state has the dominant interest in regulating that conduct and in determining whether it is tortious in character, and whether the interest affected is entitled to legal protection.

*Crossley,* at 386.

Based on the contacts with the State of Nebraska, coupled with the clear mandate that Nebraska does not permit, as a matter of law and public policy, punitive damages, the Court finds that defendants' motion for summary judgment as to punitive damages should be granted.

4. Magnuson–Moss Act

Sanford alleges claims under the Magnuson–Moss Act as set forth in 15 U.S.C. § 2301, *et seq.* in his Third Amended Complaint. This Act affords consumers a private cause of action for violations of the substantive provisions of the Act and for breach of a written or implied warranty. 15 U.S.C. § 2310(d)(1). The Act was adopted by Congress "to make warranties on consumer products more readily understandable and enforceable, and to provide the Federal Trade Commission (FTC) with means to better protect consumers." *Automobile Importers of America, Inc. v. State of Minnesota, 871 F.2d 717, 718 (8th Cir.1989)* (citing H.R.Rep. No. 1107, 93 rd Cong., 2 nd Sess., reprinted in 1974 U.S.Code and Cong. & Admin. News 7702).

Defendants argue that the Magnuson–Moss Act is not applicable under the facts of this case. First, defendants contend that the writings provided with the Prism are not warranties within the definitions of the Magnuson–Moss Act. Second, defendants state that the Magnuson–Moss Act does not apply to personal injury claims. *Hughes v. Segal Enterprises, Inc., 627 F.Supp. 1231, 1237 (W.D.Ark.1986); Boelens v. Redman Homes, Inc., 748 F.2d 1058, 1065 (5th Cir.1984);* (citing *Bush v. American Motor Sales Corp., 575 F.Supp. 1581, 1582 (D.Colo.1984); Washington v. Otasco, Inc., 603 F.Supp. 1295, 1296 (N.D.Miss.1985). See also, Santarelli v. BP America, 913 F.Supp. 324, 333 (M.D.Pa.1996); Schomber v. Jewel Companies, Inc., 614 F.Supp. 210, 214 (N.D.Ill.1985)* (Magnuson–Moss Act does not provide a federal cause of action for plaintiff's personal injury claims that are actually state law claims for breach of warranty). Third, defendants contend that Sanford has alleged no violations of the substantive parts of Sections 2308 and 2304 of the Magnuson–Moss Act; rather, defendants state that all claims by Sanford are based on pure state law breach of warranty claims. Fourth, defendants state that notice and opportunity to cure was not given pursuant to 15 U.S.C. § 2310(e) of the Magnuson–Moss Act of the alleged defect until after this suit was filed, and, therefore, Sanford's claims under Magnuson–Moss are barred. *Washington, 603 F.Supp. 1295, 1296.* Finally, defendants argue that Magnuson–Moss has a jurisdictional prerequisite of $50,000.00 which Sanford is unable to meet. 15 U.S.C. § 2310(d)(3)(B). Defendants state that the amount in controversy, exclusive of interests and costs, must be set forth in the complaint. Defendants contend that Sanford failed to set forth an amount in controversy in his Second Amended Complaint (now the Third Amended Complaint, Filing No. 154).

Sanford v. Ektelon/Prince Sports Group, Inc., Not Reported in F.Supp.2d (1999)
2000 9 WLL3L502©

**\*6** Sanford contends that the warranties involved in this case are covered by Magnuson–Moss. However, Sanford argues that the warranties are "purported" warranties that actually offer no protection. Sanford refers to the warranties as "bait and switch." Sanford argues that this type of warranty, one that disclaims the warranty, is exactly what the Magnuson–Moss Act is designed to protect against. The language in the warranties that is relevant to Sanford's argument states: "When worn properly, Ektelon eyewear is designed to reduce the possibility of serious eye injury to a player's eyes when struck in that region by a ball in the normal course of play." The warranties further state: "Even while properly wearing Ektelon eyewear, a player may still sustain a severe eye injury." Sanford in his brief states that *Boelens,* 748 F.2d 1058, stands for the proposition that language in disclaimers that negates the warranty is invalid under Magnuson–Moss.

The Court must first discern whether Sanford has met the jurisdictional requirement of $50,000 as set forth in the statute. 15 U.S.C. § 2310(d)(3). The statutory scheme requires that each individual claim must be $25.00 or more and that the entire amount in controversy must be at least $50,000.00. *See Rose v. A & L Motors Sales,* 699 F. Supp 75 (W.D.Pa.1988) (burden on plaintiff to demonstrate that she has met the $50,000.00 amount in controversy requirement). *See also, Barr v. General Motors Corp,* 80 F.R.D. 136, 140 (S.D.Ohio 1978). In *Barnette v. Chrysler Corp.,* 434 F.Supp. 1167, 1168 (D.Neb.1977), the plaintiff filed a Magnuson–Moss Warranty Act case, alleging that his automobile was defective. He prayed for relief in the amount of $7,000.00. The Court stated:

> While there is no express limitation that actions brought in federal court must be class actions, the requirement that a minimum of $50,000.00 be in controversy limits the availability of a federal forum for individual consumer actions. The claim before the Court now does not meet the minimum jurisdictional amount of $50,000.00 and, therefore, cannot be considered by this Court. An individual consumer action such as this would more appropriately be brought in state court.

*Barnette,* at 1.

The Court must also decide what categories of damages can be included in the $50,000.00 jurisdictional requirement.

I have already held that punitive damages are not allowable under Nebraska law. Because they are not recoverable under Nebraska law, they likewise are not recoverable under the Magnuson–Moss Act. *See Boelens,* 748 F.2d at 1065, 1068 (plaintiffs could not count claim for punitive damages toward satisfaction of amount due to fact that state law did not permit punitive damages); *Rose,* 699 F. Supp 75, 76; *Saval v. BL Ltd.,* 710 F.2d 1027, 1033 (4th Cir.1983); *Walsh v. Ford Motor Co.,* 627 F.Supp. 1519, 1520 (D.D.C.1986). Consequently, Sanford's claim for punitive damages cannot be considered in determining whether the $50,000.00 jurisdictional requirement has been met.

**\*7** Likewise, Sanford cannot claim that his attorney fees can be attributed to the $50,000.00 requirement. *Saval v. BL Ltd.,* 710 F.2d 1027, 1033.; *Ansari v. Bella Automotive Group, Inc.,* 145 F.3d 1270, 1271 (11th Cir.1998). The case law is clear in this regard.

The remaining category of damages is for Sanford's personal injuries. The Court must determine whether personal injury damages could be included as part of the $50,000.00. A leading case on this issue is *Boelens,* 748 F.2d 1058, wherein the court held that personal injury actions under breach of warranty claims are not cognizable under Magnuson–Moss. *Boelens,* at 1065. However, the court further noted that if an action was brought under the substantive provisions of the Act (§§ 2308 or 2304 of the Act) such claims would be cognizable under the Magnuson–Moss Act. *Boelens,* 748 F.2d at 1065–66. The Court also noted, however, that a personal injury action brought under the substantive provisions of the Act would occur under § 2310(d)(1) for "failure 'to comply with any obligation under this chapter," ' thus, it would not be a personal injury suit based on expressed or implied warranty. *Boelens,* 748 F.2d at 1065. See also *Gorman v. Saf–T–Mate, Inc.,* 513 F.Supp. 1028, 1033–35 (N.D.Ind.1981) (Congress intended to let personal injury cases remain the products of state law, unless a substantive provision of the Magnuson–Moss Act was violated); *Bush,* 575 F.Supp. 1581, 1582 (Magnuson–Moss Act does not create a federal cause of action for claims for personal injury for breach of warranty); *Hughes v. Segal Enterprises, Inc.,* 627 F.Supp. 1231, 1237 (W.D.Ark.1986); *Santareli v. BP America,* 913 F.Supp. 324, 333 (Magnuson–Moss does not create a private cause of action for personal injuries); *Washington v. Otas Co., Inc.,* 603 F.Supp. 1295, 1296 (N.D. Miss 1985) (same).

The Court wishes to note that a few courts have ruled that where diversity jurisdiction is established on other claims, the court can entertain claims for Magnuson–Moss violations that do not meet the jurisdictional requirements. *See,* e.g., *Wetzel v. American Motors Corp.,* 693 F.Supp. 246, 249–52 (E.D.Penn.1988); *Seybold v. Francis P. Dean, Inc.,* 628 F.Supp. 912, 915–17 (W.D.Pa.1986). However, this line of cases deals with economic and not personal injury cases and, therefore, is not dispositive of the issue. This Court finds that Sanford must show a specific substantive violation of Magnuson–Moss to support a claim for personal injuries.

The Court turns to the Third Amended Complaint and proffered evidence to determine whether a substantive claim has been made under the Magnuson–Moss Act. The Court has reviewed the Third Amended Complaint, Fourth Cause of Action, alleging violations of the Magnuson–Moss Act. This cause of action states, in its entirety:

### XLVI.

The allegations contained within paragraphs I–XLV of this Petition are incorporated into Plaintiffs' Fourth Cause of Action by this reference.

### XLVII.

**\*8** The breach of express warranties and implied warranties by Ektelon and UVEX are in violation of the Magnuson–Moss Act as set forth at 15 U.S.C. Section 2301 et seq. (1994).

### XLVIII.

Ektelon and UVEX failed to comply with its obligations under its written warranties and implied warranties.

### XLIX.

That within a reasonable time after Mr. Sanford discovered the breach of express and implied warranties, notice of the breach was given to Defendants UVEX and Ektelon. All allegations in the Third Amended Complaint are of a generic nature and appear to be state law claims for warranty violations. The Fourth Cause of Action alleges violations of the Magnuson–Moss Act. No violations of Sections 2308

(prohibiting disclaimer of implied warranties) or 2304(a) (prohibiting full warrantors from excluding or limiting consequential damages for breach of written or implied warranty unless exclusion or limitation conspicuously appears on the fact of the warranty) or 2304(a) (prohibiting full warrantors from limiting the duration of implied warranties) are specifically alleged. Sections 2304 and 2308 are the substantive provisions of the Magnuson–Moss Act, and nowhere are violations of the substantive provisions of the Magnuson–Moss Act specifically alleged in the Third Amended Complaint.

The Court has also reviewed the "Order on Final Pretrial Conference" (Filing No. 194) filed October 21, 1999, issued in this case by Magistrate Thomas Thalken. There is no specific mention in any of the causes of action alleging any substantive violations of any sections of the Magnuson–Moss Act. Again, there is only the generic reference to 15 U.S.C. § 2301 et seq. Nor are there any allegations in the Pretrial Order with reference to defendants' attempt to disclaim the alleged warranty, a claim that might indicate a substantive violation. Additionally, no evidence other than the warranty has been submitted to the Court that would support Sanford's claim set forth in his brief that the language in the warranty is intended to disclaim the warranty.

The Court finds that Sanford has failed to state a claim under the substantive provisions of the Magnuson–Moss Act and that his personal injury claims cannot be sustained under the Magnuson–Moss Act. On the basis of the foregoing findings, this Court finds that defendants' motion for summary judgement should be granted with regard to Sanford's claims under the Magnuson–Moss Act.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that Sanford's motion for summary judgment (filing 142) should be and hereby is denied.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants' motion for summary judgment (filing 127) should be and hereby is granted with respect to Sanford's claims for punitive damages and claims arising out of the Magnuson–Moss Act, and the motion for summary judgment is denied as to all other claims.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 33537914

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 43

2014 WL 6386803

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

SANI–PURE FOOD
LABORATORIES, LLC, Plaintiff,

v.

BIOMERIEUX, INC., Defendant.

Civil Action No. 13–6643 (ES).

|

Filed Nov. 13, 2014.

**Attorneys and Law Firms**

Richard A. Ragsdale, Davidson, Sochor, Ragsdale, & Cohen LLC, Skillman, NJ, for Plaintiff.

Wilson David Antoine, McCarter & English LLP, Newark, NJ, for Defendant.

**OPINION**

SALAS, District Judge.

**I. INTRODUCTION**

**\*1** Pending before this Court is Defendant bioMérieux, Inc.'s ("BMI") Motion to Dismiss. (D.E. No. 5). Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b), BMI moved to dismiss Counts I–VII of Plaintiff Sani–Pure Food Laboratories, LLC's ("Sani–Pure") complaint. (See D.E. No. 1–3, Plaintiff's Complaint ("Compl.")). The Court has jurisdiction under 28 U.S.C. § 1332(a). Having considered the parties' submissions in support of and in opposition to the instant motion, pursuant to Federal Rule of Civil Procedure 78(b), the Court decides the instant motion without oral argument. For the reasons set forth below, Defendant's motion is GRANTED.

**II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND** [1]

[1]     For the purpose of adjudicating motions filed pursuant to Fed.R.Civ.P. 12(b)(6), the Court is required to accept the factual allegations pled by Plaintiff as true. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir.2008). Therefore, the relevant facts presented herein are those gleaned from Plaintiff's Amended Complaint.

Sani–Pure is a commercial laboratory that performed lab tests on food, environmental samples, and pharmaceutical products for the purpose of determining the presence, or lack thereof, of bacteria and other contaminants. (Compl.¶ 1). In order for Sani–Pure's lab test results to be accepted by customers, the reagents (substance that causes chemical reactions), hardware and software systems employed in the testing process required approval by various government entities such as the Food and Drug Administration ("FDA"), the United States Department of Agriculture ("USDA"), the Environmental Protection Agency ("EPA") and American Public Health Association ("APHA"). (Compl.¶ 3).

In 2008, BMI offered to sell the Tempo system, an automated testing system using BMI's proprietary hardware, software and reagents, to Sani–Pure. (Compl.¶ 4). According to Sani–Pure, BMI's website, as well as a BMI sales representative, Bryan Demenna, represented to Sani–Pure that the Tempo system had received the required government approvals. (Compl.¶¶ 5, 6). Relying on BMI's representations, Sani–Pure agreed to purchase the Tempo system from BMI. (Compl.¶ 7).

Subsequently, Sani–Pure discovered that certain Tempo system applications were defective in that they had not received the necessary approvals from various government agencies. (Compl.¶ 8). Furthermore, Sani–Pure also discovered that the applications that were approved did not function on various samples for which they had government approval. (Id.). In October 2012, Sani–Pure sold its assets. The buyer, however, refused to purchase the Tempo system because of its defects and also declined to assume the purchase requirement contract that Sani–Pure had with BMI. (Compl.¶ 10).

On or about September 12, 2013, Sani–Pure filed suit in New Jersey Superior Court, Bergen County, against BMI alleging fraud, negligent misrepresentation, breach of the New Jersey Consumer Fraud Act, and breach of express and implied warranties. (Compl.¶¶ 14–19). On November 1, 2013, BMI removed the instant action. (D.E. No. 1, Notice of Removal). On November 22, 2013, BMI filed the instant motion to dismiss. (D.E. No. 5). On December 20, 2013, Sani–Pure filed its opposition. (D.E. No. 8). BMI did not file a reply. The instant motion is now ripe for adjudication.

**III. LEGAL STANDARD**

## A. Motion to Dismiss for Failure to Comply with Rule 9(b)

**\*2** Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement concerning allegations of fraud. *Mickens v. Ford Motor Co.,* 900 F.Supp.2d 427, 435 (D.N.J.2012). This heightened pleading requirement applies to New Jersey Consumer Fraud Act ("NJCFA") claims. *Id.*

Rule 9(b) requires that "a party must state with particularity the circumstances constituting the fraud or mistake." Fed.R.Civ.P. 9(b). The intended purpose of the heightened pleading requirement is to require the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which it is charged.' " *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 223–224 (3d Cir.2004)); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3d at 200. "Plaintiff must also allege who made the misrepresentation to whom and the general content of the misrepresentation." *Lum,* 361 F.3d at 224 (internal citation omitted); *Wiatt v. Winston & Strawn, LLP,* No. 10–6608, 2011 WL 2559567, at \*17 (D.N.J. June 27, 2011) ("Plaintiff must also allege who made the purported misrepresentation and what specific misrepresentations were made.").

In sum, the Third Circuit has advised that, "at a minimum, a plaintiff must support allegations of fraud with all the essential factual background that would accompany the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Prop. Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir.2002) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1422 (3d Cir.1997)).

## B. Motion to Dismiss for Failure to State a Claim: Rules 12(b)(6) & 8(a)

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts are required to accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

*Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Furthermore, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). In *Iqbal,* the Supreme Court established a two-step process for determining whether a complaint raises a right to relief above the speculative level. *Id.* First, a court must identify any conclusory allegations, as they are "not entitled to the assumption of truth." *Id.* Second, the court must consider if the assumption of truth attributed to the non-conclusory factual allegations plausibly suggests an entitlement of relief. *Id.* Determining whether the allegations are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

**\*3** Additionally, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to set forth "a short and plain statement of the claim showing that a pleader is entitled to relief." While the pleading requirement announced by Rule 8(a)(2) does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. The short and plain statement required by Rule 8(a)(2) must provide notice to the defendant of the nature of the plaintiff's claim and the basis for the claim. *See Twombly,* 550 U.S. at 545.

Finally, a district court deciding a motion to dismiss generally does not consider materials beyond the pleadings. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426. "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents." *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir.2010).

## IV. DISCUSSION

As an initial point, Sani–Pure requested that the Court convert the instant motion into one for summary judgment because "the motion incorporates substantial material that is not in the record." (*See* D.E. No. 8, Plaintiff's Opposition Brief ("Pl.Opp.Br.") at 1). The "substantial material" Sani–Pure refers to are the background facts that BMI provides in its moving brief that BMI admits are not germane to the disposition of the instant motion. (*See* D.E. No. 5–2, Brief in Support of Defendant's Motion to Dismiss ("Def.Mov.Br.") at 2). Additionally, Sani–Pure, proceeding as if the Court will convert the instant motion into one for summary judgment, has attached to its opposition brief a declaration by Ronald Schnitzer, a managing member of Sani–Pure. (*See* D.E. No.

Sani-Pure Food Laboratories, LLC v. bioMerieux, Inc., Not Reported in F.Supp.3d (2014)

2018 WL 4364603

8–1) ("Schnitzer Declaration"). In its opposition brief, Sani–Pure makes reference to facts contained in the Schnitzer Declaration—facts that are not in the complaint.

To be clear, this Court "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426; *Mayer,* 605 F.3d at 230. Consequently, the Court will not consider the facts contained in the Schnitzer Declaration that Plaintiff proffers in an attempt to cure the alleged deficiencies in its complaint. *See Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotations omitted). Neither will the Court consider the "background facts" contained in BMI's moving brief. The Court also declines to convert the instant motion to dismiss into a motion for summary judgment because the Schnitzer Declaration, attached to Sani–Pure's opposition brief, is not a document that is integral to, or explicitly relied upon in Sani–Pure's complaint. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (stating that a court can consider a document "integral to or explicitly relied upon in the complaint").

**A. Sani–Pure's Fraud Based Claims (Counts I–IV)**

**\*4** In moving to dismiss Count I (Fraud), Count II (Equitable Fraud), Count III (Negligent Misrepresentation), and Count IV (Breach of the New Jersey Consumer Fraud Act) of Sani–Pure's complaint, BMI argues that these claims, as pleaded, do not contain the specificity required by Federal Rule of Civil Procedure 9(b). (Def. Mov. Br. at 5). Specifically, BMI states that Sani–Pure's complaint "is devoid of the dates, time, and place of the alleged fraud, or even the alleged individual to whom the alleged misrepresentations were made." (*Id.* at 9).

In opposition, Sani–Pure does not point to any allegations in its complaint that satisfy the heightened Rule 9(b) pleading requirement. Instead, Sani–Pure refers to facts contained in the Schnitzer Declaration—facts that are not articulated in its complaint and therefore not to be considered by the Court. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426. Effectively conceding the deficiencies in its complaint, Sani–Pure requests: "[i]n the alternative, if the court limits the motion to the pleadings and grants the requested relief, [Sani–Pure] would request leave to file an amended complaint to cure the alleged deficiencies." (Pl. Opp. Br. at 1).

Having reviewed Sani–Pure's complaint, the factual averments and allegations that are relevant to the disposition of the instant motion are summarized below:

"BMI's online literature stated that the Tempo system had received all necessary government approvals to permit SP to perform testing for SP's food, environmental and pharmaceutical customers' applications." (Compl.¶ 5);

"BMI's sales representative, Bryan Demenna, also represented to SP that the Tempo system had received all necessary governmental approvals to permit SP to perform testing for SP's food, environmental and pharmaceutical customers' applications." (Compl.¶ 6);

"In reasonable reliance upon the foregoing representations, SP entered into various agreements to purchase the Tempo system hardware, software and reagents." (Compl.¶ 7);

"Contrary to BMI's representations, the Tempo system was defective and not as represented by BMI in material ways...." (Compl.¶ 8);

"BMI knew that the Tempo system had not received the regulatory approvals that BMI represented it had received and did not perform as represented." (Compl.¶ 9); and

"As a result of the fraudulent and negligent misrepresentations of BMI, and the defects of the Tempo system and many of its reagents, [Sani–Pure] was damaged in various ways...." (Compl.¶ 11).

*1. Fraud and Equitable Fraud (Counts I & II)*

The five elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367 (N.J.1997) (citing *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 N.J. 619, 432 A.2d 521, 524 (N.J.1981)). The only elemental distinction between common law fraud and equitable fraud is that equitable fraud does not require scienter. *Bonnco Petrol, Inc. v. Epstein,* 115 N.J. 599, 560 A.2d 655, 660 (N.J.1989) ( "The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud."). Claims of common law and equitable fraud are subject to the pleading requirement of Rule 9(b); therefore,

the "circumstances constituting fraud" must be pleaded with sufficient particularity. Fed.R.Civ.P. 9(b).

**\*5** In failing to identify whom BMI made the alleged misrepresentation to, and by not stating when the misrepresentations were made, Sani–Pure has failed to inject the necessary particularity required by Rule 9(b). As such, Sani–Pure's common law and equitable fraud claims are dismissed, *without prejudice.*

### 2. Negligent Misrepresentation (Count III)

To state a claim for negligent misrepresentation, a plaintiff must allege: (1) an incorrect statement; (2) that the statement was made negligently; (3) that the statement was justifiably relied upon; and (4) that economic damages were caused by reliance on the incorrect statement. *McClellan v. Feit,* 376 N.J.Super. 305, 870 A.2d 644, 650 (N.J.Super.Ct.App.Div.2005) (quoting *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 142–43 (N.J.1983)). Because Sani–Pure's claim for negligent misrepresentation sounds in fraud, it must meet the heightened pleading requirement of Rule 9(b). *See In re Suprema Specialties, Inc.,* 438 F.3d 256, 270 (3d Cir.2006) (noting that where "plaintiff grounds [his claims] in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply").

Sani–Pure's claim for negligent misrepresentation is subject to dismissal for the same reasons as its fraud claims—Sani-Pure's failure to state the time, place and the person to whom the alleged misrepresentations were made. Therefore, the Court dismisses Count III, *without prejudice.*

### 3. Breach of the New Jersey Consumer Fraud Act (Count IV)

To establish a claim under the NJCFA, Plaintiffs must plead "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss." *Prof'l Cleaning & Innovative Bldg. Servs. Inc. v. Kennedy Funding, Inc.,* 245 F. App'x 161, 165 (3d Cir.2007); *Glass v. BMW of N. Am.,* No. 10–5259, 2011 WL 6887721, at \*3 (D.N.J. Dec.29, 2011). "[T]he Act should be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454, 461 (N.J.1994).

Claims brought under the NJCFA are subject to the particularity requirements of Rule 9(b). *See F.D.I.C. v.*

*Bathgate,* 27 F.3d 850, 876–77 (3d Cir.1994) (affirming district court's application of Rule 9(b) to Consumer Fraud Act claim). Accordingly, Sani–Pure must plead each element of a NJCFA claim with the requisite specificity to "place the defendant on notice of the [unlawful] conduct for which it is charged." *See Frederico,* 507 F.3d at 200. The Third Circuit has described specificity as the "date, place or time of the fraud" or some "alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud." *Lum,* 361 F.3d at 224 (internal quotations and punctuation omitted). "Plaintiffs must also allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.*

Although Sani–Pure's allegations of misrepresentations by BMI regarding the Tempo system having obtained the necessary regulatory approvals were arguably sufficiently alleged, (*see* Compl. ¶ 6), Sani–Pure failed to state to whom the alleged misrepresentations were made. Therefore, Sani–Pure failed to adequately allege the first element of its NJCFA claim. Sani–Pure also failed to satisfy the temporal pleading requirement of Rule 9(b), as Sani–Pure does not provide a date or some other sufficiently precise time-frame as to when BMI made the alleged misrepresentations. Consequently, Sani–Pure has failed to state a viable NJCFA claim.[2] Accordingly, the Court dismisses Count IV, *without prejudice.*

[2]      In addition to Sani–Pure failing to adequately plead the unlawful conduct element with the particularity required by Rule 9(b), the Court is also not convinced that Sani–Pure has sufficiently pleaded the ascertainable loss element. However, the Court declines to discuss this element in detail because Sani–Pure's failure to adequately plead unlawful conduct is sufficient to warrant dismissal of the NJCFA claim.

### B. Sani–Pure's Breach of Express and Implied Warranties Claims (Counts V & VI)

**\*6** BMI has moved to dismiss Sani–Pure's breach of express and implied warranties claims, arguing that Sani–Pure failed to provide pre-suit notice to BMI of the alleged breach of warranty as required by North Carolina law, and that the alleged warranties at issue were disclaimed in the parties' 2011 Reagent Agreement. (Def. Mov. Br. at 10).[3]

Sani-Pure Food Laboratories, LLC v. bioMerieux, Inc., Not Reported in F.Supp.3d (2014)

2018 WL 4364603

3       The Court applies the substantive law of North
        Carolina with respect to Sani-Pure's breach of
        warranties claims because the Reagent Agreement,
        which contains a choice of law clause, states
        that the parties' agreement regarding the Tempo
        system is governed by the substantive law of North
        Carolina. (*See* D.E. No. 1–4, Ex. B, 2011 Reagent
        Agreement, ¶ 12).

In opposition, Sani–Pure contends there are factual issues
as to whether the warranty disclaimers were sufficiently
conspicuous to be enforceable. (Pl. Opp. Br. at 12).
Additionally, Sani–Pure counters BMI's "failure to provide
pre-suit notice" argument by referencing an e-mail in which
Sani–Pure notified "Sam" at BMI that "[t]he Tempo has
become almost unusable from a regulatory standpoint. Not
approved by APHA, EPA, FDA and nutraceuticals. I'm tired
of getting warning letters from regulators." (Pl. Opp. Br.
at 11). Sani–Pure acknowledges that it did not aver in its
complaint that it gave BMI pre-suit notice of the alleged
breach of warranties. (*Id.*).

Pursuant to North Carolina's version of the Uniform
Commercial Code, "[w]here a tender [of goods] has been
accepted[:] (a) the buyer must within a reasonable time
after he discovers or should have discovered any breach [of
warranties] notify the seller of breach or be barred from any
remedy ..." N.C. Gen.Stat. § 25–2–607(3). North Carolina
courts have interpreted § 25–2–607(3) as placing the burden
of pleading and proving "seasonable notification" on the
buyer. *Maybank v. S.S. Kresge Co.,* 302 N.C. 129, 273 S.E.2d
681, 683 (N.C.1981).

Sani–Pure admitted in its opposition brief, and a review
of the complaint confirms, that Sani–Pure failed to allege
that it provided BMI with notice of the alleged breach of
warranties prior to initiating the instant action. (Pl. Opp.

Br. at 11). Consequently, as a matter of law, Sani–Pure is
barred from recovery with respect to its breach of express and
implied warranties claims. *See* N.C. Gen.Stat. § 25–2–607(3).
Therefore, because the facts, as pled by Sani–Pure, fail to state
a claim for which relief can be granted, Count V and Count
VI of Sani–Pure's complaint are dismissed, *with prejudice.*

Sani–Pure's failure to plead seasonable notification of breach
of warranty is an independently sufficient ground to dismiss
Count V and Count VI; therefore, the Court need not address
BMI's disclaimer of warranty argument.

**V. CONCLUSION**

For the foregoing reasons, the Court **GRANTS,** *without
prejudice,* Defendant bioMérieux, Inc.'s motion to dismiss
Count I (Fraud), Count II (Equitable Fraud), Count III
(Negligent Misrepresentation), and Count IV (Breach of New
Jersey Consumer Fraud Act).

Count V (Breach of Express Warranties), Count VI (Breach of
Implied Warranties), and Count VII (Rescission) [4] of Sani–
Pure's complaint are hereby dismissed, *with prejudice.* An
Order shall accompany this Opinion.

4       Under North Carolina law, rescission is an
        equitable remedy, not an independent cause of
        action. *Wilson v. Wilson,* 261 N.C. 40, 134 S.E.2d
        240, 243 (N.C.1964) ("Rescission, an equitable
        remedy, is allowed to promote justice."). Sani–Pure
        does not oppose dismissal of Count VII. (Pl. Opp.
        Br. at 15).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6386803

---

# TAB 44

Savett v. Whirlpool Corp., Not Reported in F.Supp.2d (2012)
2012 WL 8950071

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Rossi v. Whirlpool Corp., E.D.Cal., October 25, 2013

2012 WL 3780451
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

Adam SAVETT, Plaintiff,
v.
WHIRLPOOL CORPORATION, et al., Defendant.

No. 12 CV 310.
|
Aug. 31, 2012.

**Attorneys and Law Firms**

Donna F. Solen, Whitfield Bryson & Mason, Gary E. Mason,
Mason Law Firm, Washington, DC, Laura Killian Mummert,
Goldman Scarlato & Karon, Wayne, PA, Jamie E. Weiss,
Complex Litigation Group, Highland Park, IL, Richard J.
Burke, Complex Litigation Group, St. Louis, MO, Daniel
R. Karon, Goldman, Scarlato & Karon, Cleveland, OH, for
Plaintiff.

Michael E. Smith, Gregory R. Farkas, Frantz Ward, Jeffrey
S. Dunlap, Ulmer & Berne, Cleveland,
OH, Galen D. Bellamy, Joel S. Neckers, Michael Timothy
Williams, Wheeler Trigg O'Donnell, Denver, CO, S. Stewart
Haskins, Zachary A. McEntyre, King & Spalding, Atlanta,
GA, for Defendant.

*Memorandum of Opinion and Order*

PATRICIA A. GAUGHAN, District Judge.

*INTRODUCTION*

**\*1** This matter is before the Court upon Defendant Home
Depot U.S.A., Inc.'s Motion to Dismiss Plaintiff's Amended
Complaint (Doc. 21). Also pending is Defendant Whirlpool
Corporation's Motion to Dismiss Plaintiff's Amended Class
Action Complaint (Doc. 23). This is a class action involving
the consumer sale of washing machines. For the reasons that
follow, the motions are GRANTED.

*FACTS*

For the purpose of ruling on defendants' motions, the facts in
the complaint are presumed true.

Plaintiff, Adam Savett, on behalf of himself and other
similarly situated individuals, brings this class action lawsuit
against defendants, Whirlpool Corporation (sometimes,
"Whirlpool") and Home Depot U.S.A., Inc. [1] (sometimes,
"Home Depot") alleging wrongdoing in connection with the
sale of washing machines.

[1] Plaintiff named Home Depot, Inc. as the defendant
in this matter. In its motion to dismiss, Home Depot
U.S.A., Inc. indicates that it is the properly named
defendant.

On November 28, 2009, plaintiff purchased a Maytag
Centennial MVWC6ESWW1 washing machine at a Home
Depot located in this District. The washing machine is
marketed as "ENERGY STAR" compliant. The price for the
washing machine was $299.00 plus tax, which according to
the complaint, includes a "substantial" price premium due to
its energy efficiency.

The ENERGY STAR program is a government-backed
program intended to identify and promote energy efficient
products. The program is jointly administered by the
Department of Energy ("DOE") and the Environmental
Protection Agency ("EPA"). According to the complaint, to
qualify for the ENERGY STAR program, a washing machine
must be "at least 37% more energy efficient than the minimum
energy efficiency standards mandated by federal law."

On September 8, 2010, Springboard Engineering laboratories
completed testing on the MVWC6ESWW1. The results
showed that the unit did not meet ENERGY STAR standards.
Thereafter, the DOE notified Whirlpool of the test results.
The DOE proceeded with additional testing. After testing four
additional units, the results again showed that the units do
not meet ENERGY STAR standards. The DOE again notified
Whirlpool of the results. On March 16, 2011, the DOE
referred the matter to the EPA for appropriate action. Plaintiff
does not allege what action, if any, the EPA undertook.

Plaintiff purports to bring this class action on behalf of
six different classes, including a "nationwide class," and
separate state-only classes for individuals residing in Ohio,
Illinois, Michigan, and Indiana. In addition, plaintiff purports
to assert a nationwide class seeking declaratory relief. In
addition to the model he purchased, plaintiff also seeks relief

Savett v. Whirlpool Corp., Not Reported in F.Supp.2d (2012)

2012 WL 3780451

for individuals purchasing model numbers MVWC6ESWW0 and MVWC7ESWW0. According to the complaint, these models are substantially similar to the model he purchased.

Plaintiff filed an amended complaint containing twelve claims for relief. Count one is a claim for violation of the Ohio Consumer Sales Practices Act, O.R.C. § 1345, et seq. Count two is a claim for violation of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01. Count three is a claim for unjust enrichment and count four is a claim for fraud. Count five is asserted against Home Depot only and is a claim for breach of contract. Count six alleges a violation of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301. Counts seven and eight allege breach of express warranty and breach of the implied warranty of merchantability, respectively. Counts one through eight are brought on behalf of the nationwide class or, alternatively, the Ohio-only class. Counts nine, ten, and eleven, assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, the Michigan Consumer Protection Act, and the Indiana Consumer Sales Act, respectively. These claims are each brought on behalf of the applicable state-only class. Count twelve seeks declaratory relief.

*2 Defendants separately move to dismiss the complaint and plaintiff opposes the motions.

## STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations of the complaint must be taken as true and construed liberally in favor of the plaintiff. Lawrence v. Chancery Court of Tenn., 188 F.3d 687, 691 (6th Cir.1999). Notice pleading requires only that the defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47. However, the complaint must set forth "more than the bare assertion of legal conclusions." Allard v. Weitzman (In Re DeLorean Motor Co.), 991 F.2d 1236, 1240 (6th Cir.1993). Legal conclusions and unwarranted factual inferences are not accepted as true, nor are mere conclusions afforded liberal Rule 12(b)(6) review. Fingers v. Jackson–Madison County General Hospital District, 101 F.3d 702 (6th Cir. Nov.21, 1996), unpublished. Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489–490 (6th Cir.1990).

In addition, a claimant must provide "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp.

v. Twombly, 550 U.S. 544, 569, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1955, 173 L.Ed.2d 868 (2009). Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'

Id. at 1949 (citations and quotations omitted). See also, Hensley Mfg. v. ProPride, Inc., 579 F.3d 603 (6th Cir.2009).

## ANALYSIS

1. Count one (Ohio Consumer Sales Practices Act)

A. Statute of limitations

Defendants argue that plaintiff's claim for damages is barred by the statute of limitations. According to defendants, a violation of the OCSPA must be brought within two years of the occurrence of the violation that is the subject of the suit. Defendants claim that with regard to damages suits, the discovery rule does not apply. According to defendants, plaintiff purchased the washer on November 28, 2009, and did not bring this lawsuit until February 8, 2012, more than two years later. In response, plaintiff argues that he can toll the statute of limitations because defendants "engaged in a continuous misrepresentation."

**\*3** Upon review, the Court finds that plaintiff's claim for damages is barred by the statute of limitations. O.R.C. § 1345.10(C) provides, "An action under sections 1345.01 to 1345.13 of the Revised Code may not be brought more than two years after the occurrence of the violation which is the subject of suit, or more than one year after the termination of proceedings by the attorney general with respect to the violation, whichever is later." The discovery rule does not apply to claims under the OCSPA. *See Rosenow v. Shutrump & Assocs.,* 163 Ohio App.3d 500, 839 N.E.2d 82, 86–87 (Ohio App.2005); *Sproles v. Simpson Fence Co.,* 99 Ohio App.3d 72, 649 N.E.2d 1297, 1302 (Ohio App.1994).

Here, plaintiff points out that the OCSPA applies to "an unfair or deceptive act or practice ... whether it occurs before, during, *or after* the transaction." O.R.C. § 1345.02(A). According to plaintiff, the use of the ENERGY STAR logo constituted a continuous misrepresentation, which tolls the statute of limitations. Plaintiff relies on *Hofstetter v. Fletcher,* 905 F.2d 897, 906 (6th Cir.1988). That case, however, is readily distinguishable. In *Hofstetter,* the defendant sold plaintiff a life insurance policy promising that it would reduce her tax liability to zero. He thereafter continued to provide tax services to plaintiff on an annual basis. The court held that the statute of limitations did not bar the claim because defendant continued to make assurances and provided "blatant improper advice," long after the sale of the original policy. Thus, because the plaintiff filed her lawsuit within two years of these unconscionable acts, the statute of limitations did not bar the claim. In this case, however, plaintiff does not allege any additional conduct subsequent to the sale of the washing machine. According to plaintiff, the mere continued use of the ENERGY STAR logo constitutes separate violations of the OCSPA. The Court rejects this argument. The thrust of plaintiff's claim is that defendants represented that the washing machine was ENERGY STAR compliant as evidenced by the logo. It is undisputed that this logo was present on the machine at the time of sale. Thus, the allegedly wrongful act occurred at the time of sale and because plaintiff does not allege further affirmative misconduct distinct from the initial misrepresentation, the statute of limitations began to run at that time.[2] Since plaintiff failed to file his complaint within two years of the sale, plaintiff is barred from recovering damages under the OCSPA.

[2]    The Court further rejects plaintiff's argument that the Court cannot consider this issue at this stage

in the litigation. Based on plaintiff's own express allegations, the claim is time-barred to the extent it seeks money damages.

B. Class claims
A claim may be asserted under the OCSPA on behalf of a class of consumers only:

> Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted [by the Ohio Attorney General] before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code....

**\*4** O.R.C. § 1345.09(B).

In *Marrone v. Philip Morris USA,* 110 Ohio St.3d 5, 850 N.E.2d 31 (2006), the Ohio Supreme Court held that a consumer may assert a class action claim under the CSPA only if the alleged violation "is substantially similar to an act or practice previously declared to be deceptive by one of the methods identified in" Ohio Revised Code § 1345.09(B).

Defendants argue that plaintiff cannot maintain an OCSPA claim on behalf of a class because plaintiff does not identify any rule or decision finding the conduct to be deceptive or unconscionable. In response, plaintiff identifies the following: the DOE correspondence, various judgment entries, O.A.C. § 109:4–3–10, and six court decisions. The Court will address each in turn.

With regard to the DOE correspondence, the Court agrees with defendants that the correspondence cannot serve as the basis for class action treatment under the OCSPA because it is neither a "rule adopted by the Ohio Attorney General," or a practice determined by an Ohio court to violate the OCSPA.

Savett v. Whirlpool Corp., Not Reported in F.Supp.2d (2012)
2012 WL 8950011

Further, the Court reviewed the "consent judgments" cited by plaintiff. Defendants argue that consent judgments do not satisfy the requirements of O.R.C. § 1345.09(B) because they are agreements reached between parties and not court findings. Plaintiff disputes this contention. Both parties cite law supporting their respective positions. This Court finds, however, that it need not reach the issue because the consent judgments are insufficient on other grounds. Two of the consent judgments (*State ex rel. Cordray v. The Dannon Company, Inc.* and *State ex rel. Dewine v. GlaxoSmithKline, LLC* ) postdate the purchase of the washing machine at issue in this case. The statute clearly indicates that the transaction must occur *"after* the decision containing the determination" is available for inspection. Accordingly, those consent judgments may not serve as the basis for allowing class claims to proceed. The third consent judgment, *i.e., State ex rel. Rogers v. Airborne Health, Inc.,* does not involve an act or practice "substantially similar" to the alleged misconduct in this case. Rather, the consent judgment resolved advertising pertaining to the medical efficacy of defendant's products.

The Court further finds that plaintiff's citation to O.A.C. § 109:4–3–10 is misplaced. The Supreme Court of Ohio expressly rejected this very argument in *Marrone. See, Marrone,* 110 Ohio St.3d at 10, 850 N.E.2d 31 (concluding that O.A.C. § 109:4–3–10 is not sufficient to put a reasonable person on notice of the prohibition against a specific act or practice).

Plaintiff further cites to six cases he believes constitute sufficient prior notice to satisfy 1345.09(B). None of those cases come close to satisfying the statutory requirement. As an initial matter, at least five of them involve different industries [3] . *See, Marrone,* 110 Ohio St.3d at 10, 850 N.E.2d 31. ("Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA."). The only case even arguably relevant is *Nessle v. Whirlpool Corporation,* 2008 WL 2967703 (N.D.Ohio July 25, 2008). *Nessle* involved the sale of refrigerator rated as "Gold," and plaintiff subsequently had problems with the ice making function of the refrigerator. Plaintiff's reliance on *Nessle* is misplaced, however, because the opinion cited resolves a motion to dismiss. Therefore, it does not constitute a determination by an Ohio court that a particular act or practice violates the OCSPA. [4]

[3]  *Sovel v. Richardson,* 1995 WL 678558 (Oh. Ct App. Nov. 15, 1995) (involving sale of used refrigerator and failing to address whether conduct is actionable); *Hoffer v. Cooper Wiring Devices, Inc.,* 2007 WL 1725317 (N.D.Ohio June 13, 2007) (involving electrical receptacles); *Delahunt v. Cyrodyne Technologies,* 241 F.Supp.2d 827 (S.D.Ohio 2003) (involving dietary supplements); *Howard v. Norman's Auto Sales,* 2003 WL 21267261 (involving the sale of defective automobile); *Brown v. Lyons,* 43 Ohio Misc. 14, 332 N.E.2d 380 (involving the sale and repair of used appliances).

[4]  Having so concluded, the Court need not reach defendants' alternative argument, *i.e.,* that determinations by federal courts sitting in Ohio do not satisfy O.R.C. § 1345.09(B) because they are not "Ohio courts."

**\*5**  Because plaintiff fails to satisfy O.R.C. § 1345.09(B)'s requirements, plaintiff may not maintain his OCSPA claim as a class action.

   C. Individual rescission claim

The Court now turns to whether plaintiff's individual claim for rescission is plead with the requisite degree of particularity. Defendants argue that plaintiff fails to satisfy Rule 9(b)'s particularity requirements because the complaint does not identify the date, time, and place he observed the logo. Nor does plaintiff separately inform each defendant of its own alleged wrongdoing. Rather, plaintiff groups the two together. In response, plaintiff argues that the complaint satisfies both Rule 8's notice pleading requirements, as well as Rule 9(b)'s heightened requirements.

Upon review, the Court finds that the complaint fails to allege an individual claim for rescission under the OCSPA. Defendants correctly note that there is a split among the courts in this district regarding the pleading standard applicable to claims asserted under the OCSPA. Nor has the Sixth Circuit addressed this issue. *See, Ferron v. Zoomego,* 276 Fed.Appx. 473 (6th Cir.2008) (declining to address whether Rule 9(b)'s heightened pleading requirements apply to claims asserted under the OCSPA). Upon review, however, the Court need not reach this issue in that the complaint fails to meet the less stringent notice pleading requirements set forth in Rule 8(a).

Savett v. Whirlpool Corp., Not Reported in F.Supp.2d (2012)
2012 WL 8950011

Defendants argue that plaintiff fails to allege that any misrepresentation impacted his decision to purchase the washer. In particular, plaintiff does not allege that he saw the logo or any advertisement, understood the significance of "ENERGY STAR," or that the logo impacted his decision to purchase the washer. In response, plaintiff argues that he need not so allege.

The Court finds that plaintiff's failure to allege that any connection between his decision to purchase the washer and either the ENERGY STAR logo or an advertisement is fatal to his claim. The court in *Lilly v. Hwelett–Packard Co.,* 2006 WL 1064063 (S.D.Ohio April 21, 2006) summarized the law as follows:

> Although the Court's research has not developed any Ohio cases directly addressing the issue of whether reliance is an element of a claim under § 1345.02, two unreported cases from the Sixth Circuit [ ] have taken divergent paths to reach a similar result. In *Temple v. Fleetwood Ent., Inc.,* 133 Fed.Appx. 254 (6th Cir.2005), the Court held that ..., the plaintiff must 'show a material misrepresentation, deceptive act or omission that impacted his decision to purchase the item at issue.' *Id.* at 266. Conversely, in *Butler v. Sterling, Inc.,* 2000 WL 353502 (6th Cir.2000), the Court stated that 'a showing of subjective reliance is probably not necessary to prove a violation of the OCSPA.' *Id.* at ——4. Nevertheless, the Court held [that] the plaintiff must establish that his or her damages were proximately caused by the defendant's conduct. *Id.* In other words, there must be a nexus between the defendant's conduct and the alleged injury.

**\*6** *Id.* at \*5.

Thus, "where the defendant is alleged to have made material misrepresentations or misstatements, there must be a cause and effect relationship between the defendant's acts and the plaintiff's injuries." *Id.* (finding that plaintiff failed to state a claim under the OCSPA where the complaint did not allege that plaintiff saw or was even aware of the alleged misrepresentations). *See also, In re Porsche Cars North America, Inc.,* —— F.Supp.2d ——, 2012 WL 2953651 (S.D.Ohio July 19, 2012) ("To bring an OCSPA claim premised on affirmative conduct, a plaintiff must allege that he "saw or was ... aware of the alleged misrepresentations at any time before or during the purchase...."). [5]

5  Plaintiff purports to cite to Ohio law on the issue of reliance. The cases plaintiff cites, however, do not address whether a plaintiff must allege the element of reliance. Rather, those cases address whether a class action can be certified without proof of actual reliance by each and every class member, or whether the evidence showed that reliance can be presumed.

Here, plaintiff fails to allege that he saw the ENERGY STAR logo or any advertisement at any point. Nor does he allege that he had any understanding of the meaning of the ENERGY STAR logo. Absent such allegations, the Court finds that plaintiff fails to state an individual claim for rescission under the OCSPA.

### 2. Count two (Ohio Deceptive Trade Practices Act)

Defendants move to dismiss count two on the grounds that the Ohio Deceptive Trade Practices Act does not apply to consumer transactions. Plaintiff concedes and dismisses this claim. Accordingly, count two is dismissed.

### 3. Count three (unjust enrichment)

Defendant Whirlpool argues that plaintiff fails to state a claim for unjust enrichment because he does not allege that he conferred a benefit on Whirlpool or that Whirlpool's conduct was unjust. Defendant further argues that the unjust enrichment claim fails *vis à vis* Whirlpool because Ohio law requires privity. In response, plaintiff claims that Ohio law does not require that plaintiff plead unjust conduct. Rather, plaintiff must simply allege that defendant's retention of the benefit is unjust. In addition, plaintiff argues that Ohio law does not require privity in order to succeed on an unjust enrichment claim.

Defendant Home Depot argues that plaintiff's unjust enrichment claim fails because plaintiff alleges that a contract exists between the parties. According to defendant, quasicontract theories fail in the face of express contracts. Defendant Home Depot also argues that plaintiff does not allege that it knew the washing machine was not ENERGY STAR compliant. In response, plaintiff argues that he is permitted to plead his theories in the alternative. Because defendant Home Depot denies the existence of a contract, the Court cannot dismiss plaintiff's unjust enrichment claim.

Where "a party retains money or a benefit that in equity or justice belongs to another," he will be liable for unjust

2012 WL 8950101

enrichment. *Eyerman v. Mary Kay Cosmetics, Inc.,* 967 F.2d 213, 222 (6th Cir.1992) (citing *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923 (Ohio 1938)). The elements of a claim for unjust enrichment include (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 465 N.E.2d 1298, 1302 (Ohio 1984) (citing *Hummel* ). Under this theory of recovery, "civil liability may be imposed where one party retains a benefit from another's labors." *Guardian Technology, Inc. v. Chelm Properties, Inc.,* 2002 WL 31087415 at *2 (Ohio App. 8th Dist. Sept. 19, 2002) (citing *Shaw v. J. Pollock & Co.,* 82 Ohio App.3d 656, 612 N.E.2d 1295 (Ohio App. 9th Dist.1992)).

 **\*7** Upon review, the Court finds that plaintiff fails to state a claim against defendant Whirlpool for unjust enrichment because plaintiff does not allege that he conferred a direct benefit on this defendant. Under Ohio law, indirect purchasers may not assert unjust enrichment claims against a defendant without establishing that the purchaser conferred a benefit on the defendant through an economic transaction. *See, Johnson v. Microsoft Corp.,* 106 Ohio St.3d 278, 834 N.E.2d 791, 799 (Ohio 2005) ("no economic transaction occurred between [plaintiff] and Microsoft, and, therefore, [plaintiff] cannot establish that Microsoft retained any benefit 'to which it is not justly entitled.' "). *See also, In re Whirlpool Corp. Front–Loading Washer Products Liability Litigation,* 684 F.Supp.2d 942, 952 (N.D.Ohio 2009) (noting that a "chain of sale" argument is contrary to Ohio law and, absent an allegation of a direct benefit, an unjust enrichment claim against a manufacturer cannot stand). [6] In this case, plaintiff expressly alleges that he purchased the washing machine from Home Depot (ECF 18 at ¶ 18). Notably absent is any allegation that plaintiff conferred a direct benefit on defendant Whirlpool. *See, e.g.,* ECF 18 at 70 ("plaintiff *ultimately* conferred a benefit upon Defendants."). Having failed to so allege, plaintiff's claim for unjust enrichment against defendant Whirlpool fails to state a claim for which relief may be granted.

[6]    Plaintiff relies on *Paikai v. General Motors Corp.,* 2009 WL 275761 (E.D.Cal. Feb.5, 2009) and *Randleman v. Fidelity National Title Ins. Co.,* 465 F.Supp.2d 812 (N.D.Ohio 2006). These cases attempt to distinguish the Ohio Supreme Court's holding in *Johnson* . The Court disagrees with

the distinctions and finds the reasoning in *In re Whirlpool* persuasive.

With regard to defendant Home Depot, the Court finds that an unjust enrichment claim fails because an express contract governs the parties' transaction. Although plaintiff did not oppose the dismissal of his contract claim, plaintiff alleges that an express contract exists between the parties. Moreover, common sense dictates that an ordinary consumer transaction (such as that described in the complaint) is governed by a contract. Because the dispute centers around whether defendant delivered what it promised, the existence of an express contract bars an unjust enrichment claim.

4. Count four (fraud)

Defendants argue that plaintiff fails to state a fraud claim with particularity. According to defendants, the complaint does not allege specific facts, including the date, time, and place plaintiff observed the ENERGY STAR logo. In the event plaintiff is attempting to assert a fraud by omission claim, he fails to assert facts supporting a theory that defendants had a duty to disclose. In response, plaintiff argues that his fraud claim is a "fraud by omission" claim. According to plaintiff, "fraud by omission" claims require less formalized pleading.

Upon review, the Court finds that plaintiff fails to state a fraud claim for which relief may be granted.

To prove a claim for common law fraud under Ohio law, a plaintiff must prove: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

 **\*8** A duty to disclose and corresponding liability for failure to disclose arises when: the party fails to exercise reasonable care to disclose a material fact *which may justifiably induce another party to act or refrain from acting,* and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343 (6th Cir.2000) (emphasis added) (citations and quotations omitted).

Here, plaintiff alleges that defendants' "failure to disclose that the falsely labeled washers were not energy efficient within the parameters established by federal law and the Energy Star program, [rendered] defendants' Energy Star logo untrue and misleading." In other words, it appears that plaintiff is claiming that upon learning of the government testing in which certain washers failed DOE testing, defendants owed plaintiff a duty of disclosure. [7] Plaintiff, however, fails to allege the necessary elements to support such a claim. Notably absent from the complaint is any allegation that plaintiff acted or refrained from acting as a result of defendants' subsequent failure to disclose the results of the DOE testing. Accordingly, plaintiff's fraud claim must be dismissed.

[7]     Plaintiff does not argue that defendants fraudulently placed the logo on the washers in the first place. Nor does it appear the allegations would support such a claim because plaintiff does not allege that defendants knew the washers were not ENERGY STAR compliant *at the time of sale.*

   5. Count five (breach of contract against Home Depot)
Plaintiff asserts a claim for breach of contract against defendant Home Depot only. Home Depot moves to dismiss the claim on the grounds that plaintiff failed to give Home Depot proper notice of his claim. In addition, Home Depot argues that the claim fails because plaintiff does not allege sufficient facts to establish the necessary elements of the claim. According to defendant, plaintiff does not identify what contract term defendant breached. Defendant claims that plaintiff does not allege that Home Depot agreed to sell plaintiff an ENERGY STAR compliant washing machine. As such, plaintiff fails to state a breach of contract claim for which relief may be granted.

Plaintiff does not respond to this argument. Although plaintiff argues that he did give Home Depot notice of his claims, he does not address in any fashion Home Depot's argument that plaintiff fails to properly allege a breach of contract claim. Accordingly, the motion is unopposed on this basis. Having opted not to oppose Home Depot's arguments, the Court finds that the claim must be dismissed.

   6. Count six (Magnuson–Moss Warranty Act)
The parties agree that the analysis regarding plaintiff's state law warranty claims applies with equal force to his claims under the Mangnuson–Moss Warranty Act. As set forth

below, the Court finds that plaintiff fails to state a claim for breach of warranty under state law. For these same reasons, plaintiff's Magnuson–Moss Warranty Act claims also fail.

   7. Count seven (breach of express warranty, O.R.C. § 1302.26)
Defendants argue that plaintiff fails to state a claim for breach of express warranty. Defendant Whirlpool argues that it provided a limited express written warranty, which contains no promises regarding the energy efficiency of the washer. Defendant Whirlpool argues that plaintiff fails to allege that this limited warranty was breached in any way. Plaintiff does not respond to this argument and the complaint does not appear to allege that defendant Whirlpool breached this warranty.

 *9  Both defendants argue that plaintiff fails to allege an express warranty apart from the limited express written warranty provided by defendant Whirlpool. According to defendants, plaintiff fails to identify any affirmation of fact or promise. Defendants argue that advertisements showing the ENERGY STAR logo are insufficient to create an express warranty. Home Depot also claims that its advertisements do not constitute express warranties. In response, plaintiff argues that the ENERGY STAR logo itself constitutes an express warranty. Plaintiff also claims that the advertisements are express warranties.

Defendants further argue that plaintiff's claim fails because he does not allege that he saw, heard, or received any such affirmation of fact or promise. Defendants claim that plaintiff does not allege that he saw any advertisement.

Pursuant to Ohio law, express warranties are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

O.R.C. § 1302.26

Upon review, the Court finds that plaintiff fails to allege the existence of an express warranty because use of the ENERGY STAR logo is not an "affirmation of fact or promise" as alleged in this case. As an initial matter neither the parties nor the Court uncovered any case in which a logo has ever been held to constitute an express warranty. Moreover, the logo itself contains no assertion of fact or promise. Unlike traditional express warranties where unambiguous promises or factual assertions are made, which are clearly understood on their own footing, any meaning conveyed by the logo requires independent knowledge.[8] In fact, plaintiff never expressly identifies a particular factual promise allegedly conveyed by the logo. For example, plaintiff alleges that "in order to qualify for the ENERGY STAR program, *most* washing machines must be at least 37% more energy efficient." (Compl.¶ 14) (emphasis added). On the other hand, plaintiff also alleges that "[t]he message conveyed by the ENERGY STAR logo is that the consumer can maximize his or her energy savings while helping to protect the environment." Yet, plaintiff does not allege that the washer he purchased wholly fails to provide some degree of energy savings. Thus, it is unclear what express factual assertion or promise plaintiff believes the logo conveys. At best, plaintiff claims that the logo conveys that the washer complied with unidentified and specific testing requirements established by the federal government for participation in the ENERGY STAR program. This Court disagrees that the logo conveys this specific promise. To the extent the logo could ever be considered as an express assertion of fact or promise, the most generous conclusion would simply be that the government approved the appliance for participation in the ENERGY STAR program. Yet, plaintiff does not allege that the government ever revoked defendants' right to use the ENERGY STAR logo.

[8]    Notably, plaintiff does not allege the he saw or understood any purported meaning of the logo.

 **\*10**  The Court further rejects plaintiff's argument that it sufficiently alleges that certain advertisements created express warranties. Regardless of whether advertisements give rise to warranties, plaintiff simply fails to make such allegations in this case. Plaintiff expressly references only one advertisement—an advertisement apparently appearing on Amazon.com on January 12, 2012. Although plaintiff alleges that "Whirlpool and its retail partners aggressively marketed the [washers] based on their ENERGY STAR rating," the advertisement that plaintiff cites does not implicate either

defendant. (ECF 18 at ¶ 16). Rather, the advertisement is expressly alleged to have come from Amazon. Moreover, the complaint alleges that the advertisement appeared on January 24, 2012. Similarly, the only allegation directed at Home Depot alleges that "Home Depot's advertisement of the [washers] also lists the ENERGY STAR rating as one of their features." (ECF 18 at ¶ 17). Other than a vague allegation that defendants "aggressively" advertised, or that some undisclosed Home Depot advertisement identified the ENERGY STAR logo, there is no reference to a particular advertisement that allegedly created an express warranty. Accordingly, even under notice pleading standards, the complaint fails to put defendants on notice of the warranty allegedly breached.

Having concluded that plaintiff fails to sufficiently allege an express warranty, the Court need not address whether plaintiff must rely on any such warranty in order to state a claim for relief.

### 8. Count eight (breach of implied warranty of merchantability, O.R.C. § 1302.27)

Defendants move to dismiss plaintiff's breach of implied warranty claim. Defendant Whirlpool argues that plaintiff lacks privity with Whirlpool and, as such, the claim fails. Defendant further argues that its express limited warranty modified the implied warranty of merchantability. In response, plaintiff argues that he was an intended third-party beneficiary to the contract between Home Depot and Whirlpool. As such, the lack of privity does not bar his claim against defendant Whirlpool. He further claims that the express limited warranty failed of its essential purpose. Therefore, it does not bar his implied warranty claim.

Upon review, the Court finds that plaintiff's claim against Whirlpool fails because plaintiff does not allege that he is in privity with this defendant. Ohio law requires privity in order to sustain a breach of implied warranty claim. *See, Curl v. Volkswagen of Am., Inc.,* 114 Ohio St.3d 266, 871 N.E.2d 1141 (Ohio 2007) ("longstanding Ohio jurisprudence provides that purchasers ... may assert a contract claim for breach of implied warranty only against parties with whom they are in privity. Having reviewed the authority in Ohio, as well as that of other jurisdictions, we see no compelling reason to stray from precedent"). Even assuming an Ohio court would allow an intended third-party beneficiary to bring an implied warranty claim directly against a manufacturer, plaintiff falls far short of alleging such a relationship. The only allegation plaintiff points to is a legal

Savett v. Whirlpool Corp., Not Reported in F.Supp.2d (2012)
2012 WL 8950011

conclusion, *i.e.,* "plaintiff and class members were intended—
not merely incidental—third-party beneficiaries...." (ECF 18
at ¶ 1140. Given the privity requirement, this bare allegation
is insufficient to allege a breach of implied warranty claim.
This is especially so in light of the common sense nature of
consumer transactions. Plaintiff expressly alleges that he went
to Home Depot and purchased his washing machine. Absent
some additional allegation regarding plaintiff's intended third-
party beneficiary status, the Court agrees with defendant
Whirlpool that the complaint alleges an ordinary downstream
consumer transaction. Accordingly, plaintiff fails to assert
a claim for breach of implied warranty against defendant
Whirlpool. Having so concluded, the Court need not address
whether Whirlpool's limited express warranty also bars the
claim.

**\*11** Both defendants argue that plaintiff's claim fails because
plaintiff does not allege that the washers failed of their
essential purpose. According to defendants, the essential
purpose of a washing machine is to wash clothes. Since
plaintiff does not allege that the washers fail in this regard,
plaintiff cannot sustain a breach of implied warranty of
merchantability. Plaintiff alleges that the essential purpose
of his washer was to "function properly as energy efficient
washing machines within the parameters established by
federal law and the ENERGY STAR program." (ECF 18 at
¶ 112). According to plaintiff, whether a products fails of its
essential purpose is a question of fact.

Upon review, the Court finds that plaintiff fails to state a claim
for breach of the implied warranty of merchantability. Under
Ohio law, an implied warranty of merchantability requires
that goods be fit for the *ordinary* purposes for which such
goods are used." O.R.C. § 1302.27. Here, the Court finds
that the ordinary purpose of a washing machine is to wash
and clean dirty clothes. *See, e.g., Montich v. Miele USA,
Inc., 2012 WL 1005329 (D.N.M. Mar. 27, 2012)* (noting that
ordinary purpose of washing machine is to wash and clean
dirty clothes); *Tietsworth v. Sears, Roebuck and Co., 2009
WL 3320486 (N.D.Cal. Oct.13, 2009)* (same). Plaintiff does
not allege that the washing machine fails to wash and clean
his clothes. Rather, he simply alleges that to do so requires
more energy and, therefore, additional costs. This allegation
is insufficient to state a claim for breach of the implied warranty
of merchantability. Accordingly, plaintiff's claim against both
defendants fails for this reason.

9. Counts nine through eleven (state statutory consumer
protection statute claims)

Counts nine, ten, and eleven, assert claims under the Illinois
Consumer Fraud and Deceptive Business Practices Act,
the Michigan Consumer Protection Act, and the Indiana
Consumer Sales Act, respectively. Plaintiff expressly asserts
these claims only against defendant Whirlpool. In addition,
the claims are brought on behalf of a class of individuals
residing in each particular state. Whirlpool argues that
plaintiff lacks standing to bring claims under other state's
statutes. Defendant claims that the Court should address this
issue now, as opposed to during the class certification process.
In response, plaintiff argues that defendant is confusing
Article III standing with Rule 23. According to plaintiff, many
courts allow the certification of multi-state or even nationwide
classes without requiring an individual class representative
from each state.

Upon review, the Court finds that it need not address this
issue. Having disposed of all of the claims plaintiff directly
asserts against Whirlpool, and because plaintiff does not
allege that his transaction with defendant involved any tie to
Illinois, Michigan, or Indiana, the Court finds that plaintiff
fails to state a claim under these statutes as well. Because
plaintiff has no individual claims in this case, he cannot
pursue claims on behalf of a class.

**\*12** Having so concluded, the Court need not reach
whether the claims fail for the additional reasons outlined by
defendant.

12. Count twelve (declaratory relief)
Having disposed of the substantive claims against defendant
Whirlpool, the Court finds that plaintiff's request for
declaratory relief, which is not an independent cause of
action, is not viable.

13. Standing regarding "other washer models"
Having disposed of all of the claims in this case, the Court
need not reach whether plaintiff has standing to assert claims
on behalf of purchasers of other washer models.

***CONCLUSION***
For the foregoing reasons, Defendant Home Depot U.S.A.,
Inc.'s Motion to Dismiss Plaintiff's Amended Complaint
(Doc. 21) is GRANTED. Defendant Whirlpool Corporation's
Motion to Dismiss Plaintiff's Amended Class Action
Complaint (Doc. 23) is also GRANTED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3780451

---

**End of Document**                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 45

Schumacher v. Tyson Fresh Meats, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 7124778

2006 WL 7124778
Only the Westlaw citation is currently available.
United States District Court, D.
South Dakota, Northern Division.

Herman SCHUMACHER, Michael P.
Callicrate, and Roger D. Koch, Plaintiffs,
v.
TYSON FRESH MEATS, INC., Cargill Meat
Solutions Corporation d/b/a Excel Corporation,
Swift Beef Company, and National Beef
Packing Company, L.L.C., Defendants.

No. CIV 02–1027.
|
April 10, 2006.

**Attorneys and Law Firms**

David F. Herr, Elizabeth J. Anderson, Elizabeth Snyder
Poeschl, James Duffy O'Connor, Kirk O. Kolbo, Matthew P.
Lewis, R. Christopher Sur, Maslon Edelman Borman Brand,
LLP, Minneapolis, MN, Reed A. Rasmussen, Siegel, Barnett
& Schutz, Aberdeen, SD, Stephen O. Broghammer, Thomas
M. White, White, Wulff & Smart, Omaha, NE, for Plaintiffs.

Kennith L. Gosch, Bantz, Gosch, Cremer, Peterson, Sommers
& Wager, Jack H. Hieb, Richardson, Groseclose, Wyly, Wise
& Sauck, Aberdeen, SD, Mark W. Ryan, Michael E. Lackey,
Jr., Mayer Brown LLP, Washington, DC, Christopher Wayne
Madsen, Thomas John Welk, Boyce Greenfield Pashby &
Welk, Sioux Falls, SD, Patrick E. Brookhouser, Jr., McGrath
North Mullin & Kratz, PC, Omaha, NE, Louis A. Huber,
III, Schlee Huber McMullen & Krause, Kansas City, MO,
Louis E. Fogel, Sherry A. Knutson, Susan A. Weber, William
H. Baumgartner, Jr., Sidley Austin LLP, Chicago, IL, for
Defendants.

ORDER

CHARLES B. KORNMANN, District Judge.

**INTRODUCTION**

*1  This matter was certified as a class action as to certain
claims under the Packers and Stockyards Act, 7 U.S.C. §§
181–229, and as to claims arising under the common law

theory of unjust enrichment on behalf of the following class
of plaintiffs:

> all persons or business associations
> that owned any interest in cattle that
> were intended for slaughter and who
> sold or permitted sale of such cattle
> (excluding culled dairy and beef cows
> and bulls) to defendants on the open
> spot cattle market, or on a basis
> affected by that market, between April
> 2, 2001, to and including May 11,
> 2001, but only as to sales made by
> South Dakota producers and producers
> in other states with laws of unjust
> enrichment identical to that which is
> the law in South Dakota.

In addition, the matter was certified as a class action with
a class as to claims arising under the common law theory
of unjust enrichment on behalf of the following class of
plaintiffs:

> all persons or business associations
> that owned any interest in cattle that
> were intended for slaughter and who
> sold or permitted sale of such cattle
> (excluding culled dairy and beef cows
> and bulls) to defendants on the open
> spot cattle market, or on a basis
> affected by that market, between April
> 2, 2001, to and including May 11,
> 2001, but only as to sales made by
> cattle producers in states with identical
> laws of unjust enrichment but not
> following the law of unjust enrichment
> under South Dakota law.

At the outset of this litigation, defendants contended that
class certification of the pendent state law claims for unjust
enrichment should be denied because these claims involve
varying state common law standards of liability. I held,
however, that the federal PSA claims and the common law
unjust enrichment claims are predicated on the same factual

2006 WL 7124778

allegations and, even if the law of different states might ultimately govern the common law claims, certification of the class for the whole action was appropriate.

I recognized that there are some differences between or among the states and suggested that sub-classes can be established, if necessary, to group residents of various states with identical common law requirements into sub-classes. I advised the parties that if an unjust enrichment class action turns out to be unmanageable, I will de-certify one or more sub-classes.

The defendants initially proposed 13 different unjust enrichment subclasses based upon differences in the common law applied in the 50 states. Defendants contend that the court would have to determine for 39,000 class members which states have the most significant relationship to the cattle transactions at issue. Defendants contend that such individualized issues would predominate, thus resulting in an unmanageable trial. Based upon the foregoing, defendants filed a motion for decertification of the unjust enrichment classes.

Plaintiffs initially proposed that the choice of law determination should be based upon the place where the cattle were slaughtered. Defendants have beef processing plants in only nine states. Plaintiffs contended that the law of those nine states would result in only two subclasses.

 *2  I advised the parties that the place of slaughter would not be considered for the purposes of determining the choice of law to be applied. I instead indicated that the choice of law inquiry would be determined by the place "where the deal is made."

Defendants' contend that questions concerning where the deal was made for all transactions at issue in this litigation predominate, that such questions of fact are not common to the class, and therefore class treatment of the unjust enrichment claims is not appropriate.

Plaintiffs contend that the place where the deal was made can be determined by the address to which the defendants sent the check to buy the cattle. Plaintiffs contend that 90% of the total unjust enrichment claims arise in only 12 states, requiring only two subclasses. Plaintiffs have withdrawn their request to have the remaining 3,600 claims arising in 27 other states certified.

**DECISION**

I have previously advised the parties, both informally and on the record that I intend to decertify the two classes dealing with common law claims for unjust enrichment. I have also promised that I would provide a written order to do so prior to any jury verdict.

This court has a continuing duty to assure that a class action continues to be certifiable under Fed.R.Civ.P. 23(a). *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1145 (8th Cir.1999); *Harvey v. City of Little Rock,* 787 F.2d 1223, 1227 (8th Cir.1987) *General Telephone Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). Decertification can occur at any time, including after trial on the merits. *See Roby v. St. Louis Southwestern Ry. Co.,* 775 F.2d 959, 961 (8th Cir.1985). Fed.R.Civ.P. 23(c)(1)(C) requires only that any order altering class certification be accomplished prior to final judgment.

The laws of the states require various elements to establish a claim of unjust enrichment, including one or more of the following:

■ plaintiff conferred a benefit on defendant [some jurisdictions refer to this element as "an enrichment" (and also require proof of "an impoverishment") or as "valuable materials were furnished"]

■ defendant appreciated, acknowledged, or consciously accepted the benefit

■ defendant retained the benefit under circumstances making it inequitable or unjust for defendant to retain the benefit without paying plaintiff for the value thereof [some jurisdictions refer to this element as "absence of justification"]

Defendants identified 15 other states that have legal elements identical to those of South Dakota's unjust enrichment elements: Alaska, Florida, Idaho, Iowa, Kansas, Maine, Minnesota, Nevada, North Carolina, Oregon, Ohio, Pennsylvania, Rhode Island, Tennessee, and Utah. Each of those states bars recovery where there has been an express contract. *See Ryken v. Blumer,* 307 N.W.2d 865, 868 (S.D.1981) (the theory of unjust enrichment is a quasi-contract theory which is not usually invoked when there is already a contract in existence between the parties). Defendants have identified a total of 45 states which bar

recovery for unjust enrichment where there has been an express contract between the parties. Defendants also contend that packers and cattle producers may enter into "deals" or contracts for the purchase and sale of cattle, thus exempting the transaction or transactions from being examined for violations of the Packers and Stockyards Act. I have rejected that legal argument and have ruled that, if the Act is violated, contracts or "deals" cannot nullify the violation or violations.

**\*3** Roughly half of the fifty states require knowledge on the part of the defendant that it was receiving a benefit.

Defendants have identified 39 states which bar recovery for unjust enrichment where there is an adequate remedy at law. If the plaintiff class prevails on their PSA claims, plaintiffs in those states would, of course, not be entitled to recover again under an unjust enrichment claim. It might be argued that all class plaintiffs had remedies at law available to them —they could have taken advantage of contract remedies once plaintiffs became aware that the USDA had erred in reporting the boxed beef values. However, by that time, it would be undisputed that most of the cattle sold during the class period had already been slaughtered. Rescission would not have been a viable contract remedy. There would have been nothing that could be offered to restore as is normally required of a party seeking to rescind.

Many of the fact issues are common to the class plaintiffs even though they may be subject to the common law of 50 different states.

Class treatment of the unjust enrichment claims would require this court to determine, applying choice of law principles, which law is to be applied. Jurisdiction over the unjust enrichment claims exists only based upon diversity. Where federal jurisdiction is premised on diversity of citizenship, "we look to the choice-of-law rules of the forum State to determine which law applies." *Ferrell v. West Bend Mut. Ins. Co.,* 393 F.3d 786, 794 (8th Cir.2006). "It is well-settled that South Dakota employs the most significant relationship test when determining choice of law questions." *Burhenn v. Dennis Supply Co.,* 2004 SD 91, ¶ 24, 685 N.W.2d 778, 784. Under the most significant relationship test, courts must take into account the following contacts to determine which state's law is applicable:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* (quoting The Restatement (Second) of Conflict of Laws § 145). District courts must "conduct a thorough conflicts-of-law analysis with respect to each plaintiff class member before applying" a particular state's law. *In re: St. June Medical, Inc. ., Silzone Heart Valve Products Liability Litigation,* 425 F.3d 1116, 1120 (8th Cir.2005).

Some class members sold their cattle in the same state as their residence. Some sold cattle in a neighboring state. Some cattle sales may not have occurred at the sale barn but instead over the telephone. I have concluded that determination of the state with the most significant contacts as to each class plaintiff's claim would swamp the common issues and defeat the requirement of predominance in this multi-state class action. The Rule 23(b)(3) element of "superiority" does not exist in this case as to the unjust enrichment claims. Class resolution of the unjust enrichment claims is not necessarily "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

**\*4** There are other reasons why the plaintiffs should not be allowed to proceed with the unjust enrichment claims as a class action. Allowing the unjust enrichment claims to be tried with the Packers and Stockyards Act claims would result in a trial that would be unmanageable. It would be impossible for any election of remedies to be made. We know, of course, that under the rules of pleading, a party may pursue alternative and inconsistent remedies as long as no double recovery is awarded. Even inconsistent factual assertions may be made. I find, however, that allowing plaintiffs to "ride two horses" in a class action would result in the action becoming unmanageable. In South Dakota and the vast majority of the states, an action to recover for unjust enrichment is in action in equity. *Himrich v. Carpenter,* 1997 SD 116, 569 N.W.2d 568, 573 (cited with approval in *Action Mechanical, Inc. v. Deadwood Historical Preser. Comm.,* 2002 SD 121, 652 N.W.2d 742). The distinction between actions at law and suits in equity has long been abolished but this applies only to the form of the action. It does not rule out the inherent substantive principles which underlie the two systems of procedure. The

2006 WL 7124778

principle of law that equity has jurisdiction in such cases only if the legal remedy is not full, adequate and complete remains "good law." Plaintiffs here have not plead any alleged inadequate remedy at law. In fact, they have plead that there is an adequate remedy at law, namely the private right of action under the Packers and Stockyards Act. I could not and would not permit any award for unjust enrichment to go to the jury in the absence of plaintiffs proving that they had no legal remedy at law which is full, adequate and complete. Of course, plaintiffs could not and would not even attempt to prove the same. It is also clear to the court that, as a matter of law, the Packers and Stockyards Act is an adequate remedy at law. It is a firmly established rule of law that a party cannot have an equitable remedy if an adequate legal remedy is available. *Weger v. Pennington County,* 534 N.W.2d 854 (S.D.1995). *See also Northwestern Pub. Serv. v. Union Carbide,* 236 F.Supp.2d 966 (D.S.D.2002).

Had I properly "thought through" these matters earlier, I would not have certified the unjust enrichment class or classes. I apologize to counsel and the parties for not having come to the correct answer much earlier.

The United States Court of Appeals for the Eighth Circuit has pointed out that the "trial of class actions is usually bifurcated into a liability phase and a remedial phase." *Craik v. Minnesota State University Bd.,* 731 F.2d 465, 470 (8th Cir.1984) (*citing International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 360–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977)). If plaintiffs recover for the class, we will have enough on our plates dealing with the remedies phase.

Now, therefore,

IT IS ORDERED:

**\*5** 1. Defendants' motion (Doc. 517) to decertify the unjust enrichment class is granted.

2. The unjust enrichment class is decertified.

3. Defendants shall cause notice of decertification to be served upon all class plaintiffs.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 7124778

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 46

2011 WL 8969
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana,
Fort Wayne Division.

James F. SCOTT, et al., Plaintiffs,

v.

Timothy S. DURHAM, et al., Defendants.

No. 1:09–CV–348–PPS–RBC.
|
Jan. 3, 2011.

**Attorneys and Law Firms**

C. Erik Chickedantz, Jeffrey P. Smith, Hawk Haynie Kammeyer & Chickedantz LLP, Fort Wayne, IN, James M. Lewis, Tuesley Hall Konopa LLP, South Bend, IN, for Plaintiffs.

Raymond Thomas Seach, Riley Bennett & Egloff LLP, Bradley J. Schulz, Richard R. Skiles, Skiles Detrude, Indianapolis, IN, for Defendants.

**OPINION AND ORDER**

PHILIP P. SIMON, Chief Judge.

 **\*1** This matter is before the Court on two motions to dismiss relating to third-party claims asserted by defendant Auburn Automotive Heritage, Inc. (the "Museum"). One motion was filed by third-party defendants Donald Lyons, Joan Lyons and the Donald Lyons Family Trust (for simplicity, I will refer to these entities collectively as "Lyons") [DE 144]; the other was filed by third-party defendants Mark Hyman and Hyman Properties, Inc. d/b/a Hyman Limited Classic Cars ("Hyman") [DE 145]. For the reasons discussed below, the Court **GRANTS** the motions to dismiss, albeit without prejudice to the Museum's ability to amend its claims against the moving parties.

**BACKGROUND**

Plaintiff James Scott sued several parties involved in the Museum's auction of a 1930 Duesenberg automobile, which Scott alleges was rigged, resulting in his paying

an artificially inflated price for the car [DE 1]. One of the defendants in Scott's original complaint is the Museum. The Museum responded by bringing the third-party actions described above. According to the Museum, defendant Timothy Durham, the car's original owner, initially consigned the Duesenberg to the Museum for the auction. [1] Subsequently, Hyman, acting as an agent for Donald Lyons, contacted Durham, who agreed to sell the car for $1 million, notwithstanding Durham's prior consignment agreement. By the terms of the Durham/Lyons scheme, Lyons agreed that Hyman would attend the auction on Lyons' behalf, and be the highest bidder on the car. But whatever the amount of that bid, Lyons would only be obligated to pay Durham $1 million for the car.

[1]     This and the following background facts are taken from the Museum's counterclaims, cross-claims and third-party claims [DE 128 at 49–53].

Hyman submitted a bidder registration form to the Museum in advance of the auction, which did not reveal anything about Lyons' purchase agreement with Durham. Hyman then attended the auction and bid on the car on behalf of Lyons. Once the bidding reached roughly $800,000, all bids were between Hyman and Scott. Scott was bidding via telephone. Hyman, however, backed out of the agreement to place the highest bid, leaving Scott as the highest bidder at $2.9 million. Scott paid this amount, along with an additional $232,000, to the Museum, for a total of $3,132,000. Pursuant to the illicit Durham/Lyons agreement, $1,000,000 of the sale proceeds went to Durham, and Lyons and Hyman each received $950,000.

At issue in the pending motions to dismiss are the Museum's claims against Lyons and Hyman for actual fraud (Count I), negligence (Count IV) and violation of the Indiana Crime Victims Relief Act ("CVRA"), IC § 34–24–3–1 (Count VI) [DE 128]. In support of its actual fraud count, the Museum alleges that Lyons and Hyman defrauded the Museum by failing to disclose their ownership interest in the car [DE 128, ¶¶ 39–44]. The Museum's negligence claim is based on its contention that the Indiana Administrative Code imposed on Lyons and Hyman a duty to disclose this ownership interest, which those parties breached [*Id.,* ¶¶ 60–63]. As for its CVRA claim, the Museum alleges that Lyons' and Hyman's actions caused the Museum to suffer pecuniary losses, through violations of Indiana's deception and criminal mischief statutes, thereby triggering the CVRA's remedies for such violations [*Id.,* ¶¶ 73–79].

Scott v. Durham, Not Reported in F.Supp.2d (2011)
2099 WL 1686

**\*2** Lyons and Hyman seek to dismiss these claims, pursuant to Rule 12(b)(6), essentially arguing that each claim requires the existence of a duty to disclose an ownership interest in the car, which they say the Museum cannot show.

## DISCUSSION

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court must take the facts alleged in the pleading as true and draw all reasonable inferences in favor of the pleader. The pleading must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and there is no need for detailed factual allegations. The statement, however, must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta v. Old Nat. Bancorp,* 499 F.3d 629, 633 (7th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

**I. Actual Fraud**

The failure of Lyons and Hyman to disclose an ownership interest in the car is the sole deceptive act supporting the Museum's fraud claim against those parties. The Museum, however, does not point to any special feature of its relationship with Lyons and Hyman that would give rise to a duty to disclose such information. In the absence of such a duty, the Museum's claims for actual fraud against these parties fail.

Under Indiana law, the elements of actual fraud are: "(i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) [which] was relied upon by the complaining party and (v) [which] proximately caused the complaining party injury." *Rice v. Strunk,* 670 N.E.2d 1280, 1289 (Ind.1996); *see also Kesling v. Kesling,* 546 F.Supp.2d 627, 638 (N.D.Ind.2008); *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind.1992).

These elements expressly require a misrepresentation. But Indiana law also recognizes that "the failure to disclose all material facts, by a party on whom the law imposes a duty to disclose, constitutes actionable fraud." *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1413–14 (7th Cir.1986) (quoting *Grow v. Indiana Retired Teachers Cmty.,* 149 Ind.App. 109, 271 N.E.2d 140, 145 (Ind.1971) (en banc)); *see also Kesling,* 546 F.Supp.2d at 639; *Indiana Bank & Trust Co. v. Perry,* 467 N.E.2d 428, 431 (Ind.Ct.App.1984) (omission is actionable where there is a duty to disclose).

But "where there is no duty to speak or disclose facts, silence will not constitute actionable fraud." *Monarch Beverage Co., Inc. v. Tyfield Importers, Inc.,* 823 F.2d 1187, 1191–92 (7th Cir.1987) (quoting *Barnd v. Borst,* 431 N.E.2d 161, 168 (Ind.Ct.App.1982)). Moreover, "the burden of showing a duty to speak is on the party alleging fraudulent concealment." *Id.*

**\*3** For purposes of actual fraud, a duty to disclose may arise by virtue of a fiduciary or confidential relationship. *See Kesling,* 546 F.Supp.2d at 641; *Grow,* 271 N.E.2d at 143; *Am. United Life Ins. Co. v. Douglas,* 808 N.E.2d 690, 701 (Ind.Ct.App.2004); *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1251 (Ind.Ct.App.1998). It may also arise in the context of a buyer-seller relationship. *See Kesling,* 546 F.Supp.2d at 638; *Am. United Life Ins.,* 808 N.E.2d at 701; *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind.Ct.App.1994).

The Museum does not allege that it stood in a fiduciary, confidential, or buyer-seller relationship with Lyons and Hyman. Instead, it argues that a duty to disclose arose here from: (1) the "superior knowledge" of Lyons and Hyman as to their ownership interest in the car; (2) those parties' partial disclosures to the Museum by means of Hyman's bidder registration form; and (3) Section 1–1–34(d) of the Indiana Administrative Code, which is an administrative regulation governing the operation of auction houses [DE 161 at 7–8]. None of these arguments, however, is persuasive.

**A. Superior Knowledge**

The Museum correctly observes that a duty to disclose can sometimes arise where one party enjoys a position of superiority over another by virtue of knowledge that only it possesses. But the cases that find a duty to disclose arising on this basis have done so in only narrow circumstances, and almost exclusively in the context of buyer-seller relationships. *See Kesling,* 546 F.Supp.2d at 638; *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind.Ct.App.1994); *but see Am. United Life Ins.,* 808 N.E.2d at 701 (recognizing a bank's duty to disclose

to an account holder) (citing *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1251 (Ind.Ct.App.1998)).

And even in a buyer-seller context, a duty to disclose does not necessarily arise. *See Am. Heritage Banco, Inc. v. Cranston,* 928 N.E.2d 239, 247 (Ind.Ct.App.2010) ("As a matter of course, every buyer/seller relationship likely involves a party who possesses at least some knowledge not possessed by the other, but that fact alone does not mean that one party enjoys a position of superiority over the other so as to create a special duty and a right of reliance.").

Cases that find a duty to disclose arising from one party's superior knowledge reason that the duty arises from the trust and reliance that one party must repose in the other. *See Am. Heritage Banco,* 928 N.E.2d at 247 (no duty to disclose in buyer-seller context because no evidence of right to rely); *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 324 (Ind.Ct.App.1991) (fraud occurs where the buyer relies on the seller's statements, and the seller has professed knowledge of their truth); *Peoples Trust and Sav. Bank v. Humphrey,* 451 N.E.2d 1104, 1111 (Ind.Ct.App.1983) ("concealment becomes fraud only when ... it appears that either one or each of the parties, in entering into the contract or other transaction expressly reposes a trust and confidence in the other") (quoting *McNair v. Public Sav. Ins. Co. of America,* 88 Ind.App. 386, 163 N.E. 290, 293 (Ind.Ct.App.1928)); *see also Wells,* 691 N.E.2d at 1251 ("A bank is inherently in a position superior to its checking account holders, who, in order to conduct their business, must depend on the bank to protect the account holder's funds").

**\*4** The Museum does not allege that it was required to place its trust and reliance on Hyman or Lyons. Nor does it characterize its relationship with those parties in a way that would permit an inference that the Museum had to a right to rely on and trust those parties, as a buyer sometimes does with a seller, or as an account holder does with a bank. And it is hard to see how the Museum could support such a characterization. After all, the Museum merely conducted the auction; it was not a bidder or potential purchaser.

Moreover, the Museum fails to point to any case law suggesting that Indiana courts would recognize a duty to disclose in the context of a bidder-auctioneer relationship. To be sure, the Museum insists that Lyons and Hyman were "far more than just 'attendees and bidders' at the Museum's auction" [DE 161 at 7]. But, without more, this provides no basis for finding that any superior knowledge of Lyons and Hyman gave rise to a duty to disclose here.

**B. Partial Disclosure**

The Museum next argues that, once Hyman submitted the bidder registration form, he created a partial misrepresentation which Lyons and Hyman had a duty to correct by disclosing an ownership interest in the car [DE 161 at 7–8]. This argument is a nonstarter for a number of reasons.

Indiana law does impose a duty to disclose in cases where it is necessary to correct a partial misrepresentation. *See Thompson v. Best,* 478 N.E.2d 79, 84 (Ind.Ct.App.1985); *see also Kesling,* 546 F.Supp.2d at 641–42. In *Thompson,* home sellers told a buyer about the home's sump pump and drainage tiles, as well as isolated water incidents, but failed to add that there was a consistent water problem. *Thompson,* 478 N.E.2d at 81. The buyer discovered the chronic water issues only after moving in. *Id.* In finding that the buyer had presented sufficient evidence of fraud to survive summary judgment, the court observed that "[a]s soon as [the sellers] introduced [the buyer] to the fact of the sump pump and the drainage tiles around the house, it was incumbent upon [the sellers] to *fully* declare any and all problems associated with their function." *Id.* at 84 (emphasis in original). In other words, once a seller tells part of the story, he assumes a duty to disclose the whole truth without concealing material facts. *Id.; see also Kesling,* 546 F.Supp.2d at 641–42; *Enservco, Inc. v. Indiana Securities Div.,* 623 N.E.2d 416, 426 (Ind.1993); *Am. United Life Ins.,* 808 N.E.2d at 702–3; *Indiana Bank & Trust Co. of Martinsville, Indiana v. Perry,* 467 N.E.2d 428, 431 (Ind.Ct.App.1984).

The Museum, however, provides no basis for concluding that Hyman's submission of the bidder registration form gave rise to a duty to disclose here. As with the cases that find a duty to disclose rooted in one party's "superior knowledge," cases that find a duty to correct a partial misrepresentation do so almost exclusively in the context of buyer-seller relationships, where one party must rely on the other's professed superior knowledge or expertise. *See Am. United Life Ins.,* 808 N.E.2d at 702–3 (buyer-seller); *Thompson,* 478 N.E.2d at 84 (same); *Indiana Bank & Trust Co. of Martinsville, Indiana,* 467 N.E.2d at 431 (same). But, as I mentioned earlier, the Museum does not allege that it stood in a buyer-seller relationship with Lyons and Hyman. Nor does it attempt to analogize its relationship with those parties to the buyer-seller context. And the Court is not aware of any Indiana authority that would support an extension of the duty to correct a partial

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 403 of 520
PageID: 9324
Scott v. Durham, Not Reported in F.Supp.2d (2011)
2099 WL 1686

misrepresentation from the buyer-seller context to the bidder-auctioneer context here.

 **\*5** What is more, I failed to see how the information disclosed on the bidder registration form, which appears to be the sole basis for the Museum's partial disclosure argument [DE 161 at 8], amounts to a partial misrepresentation. That form does not require the registering bidder to make *any* representations as to his or his principal's possible ownership interest in the items at auction [DE 128–2]. [2] Nor does the form reference the car at issue in this case, or any other property to be auctioned [*Id.*]. Indeed, in completing the form, the only information Hyman provided, and was required by the form to provide, was his name and address [*Id.*]. So even if there were a basis for extending the duty to correct a partial misrepresentation beyond the buyer-seller context, to the context here, the Museum's allegation that Lyons and Hyman created a partial misrepresentation is belied by the content of the bidder registration form, on which its partial disclosure argument relies.

[2]    By contrast, the consignment agreement that Durham completed when he consigned the car to auction provides that the "Seller/Owner warrants that [he] is the sole and only owner of [the car]" [DE 128, ¶ 26 & 128–3 at 3, ¶ 2].

### C. Section 1–1–34(d) of the Indiana Administrative Code
The Museum also fails to show how Section 1–1–34(d) of the Indiana Administrative Code could give rise to a duty to disclose here. In Indiana, auctions and auctioneers are governed by the Auctioneer and Auction Licensing Act. IC § 25–6.1–1–2. This Act governs the creation, membership and powers of the Indiana Auctioneer Commission, which is empowered to administer and enforce administrative regulations governing the operation of auction houses, of which Section 1–1–34(d) is an example. IC 25–6.1–2–5; 812 IAC § 1–1–34(d); *see also Polo Realty Inc. v. Kruse, Inc.,* No. 1:10–cv–144, 2010 WL 3038731, at \*5 (N.D.Ind. Aug.2, 2010). On its face, Section 1–1–34(d) appears to provide a remedy for a buyer who unwittingly bids against an undisclosed seller:

If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty

for such bidding is reserved, the buyer may at his option avoid the sale or take the property at the price of the last good faith bid prior to the completion of the sale.

812 IAC § 1–1–34(d).

This provision plainly exists to protect buyers—not auctioneers. Nothing in the plain language of this regulation imposes a duty on sellers to disclose anything to the auctioneer, including any ownership interest in property they intend to bid on. Nor does this regulation expressly prohibit sellers from bidding on property in which they have an ownership interest. On the contrary, it appears to contemplate that such bidding will sometimes occur. Moreover, I could not locate, nor did the Museum point to, any authority finding that Section 1–1–34(d) creates a duty to disclose, or any reference to any Indiana statute or regulation that recognizes such a duty.

\* \* \*

In sum, the Museum fails to establish a common law, statutory or other basis for finding that Lyons and Hyman had a duty to disclose an ownership interest in the car. In the absence of such a duty, the Museum's actual fraud count against those parties fails as a matter of law. *Cf. Kesling,* 546 F.Supp.2d at 643 (dismissing fraud claim based on failure to disclose because plaintiff lacked basis for duty to disclose); *Concordia Theological Seminary, Inc. v. Hendry,* No. 1:05–CV–285, 2005 WL 3005482, at \*3 (N.D.Ind. Nov. 9, 2005) (same).

### II. Negligence
 **\*6** The Museum's negligence claim is also based on the alleged failure of Lyons and Hyman to disclose an ownership interest in the car. The elements of a negligence claim under Indiana law are: "(1) a duty owed to plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) a compensable injury proximately caused by defendant's breach of duty." *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 635 (7th Cir.2007) (quoting *Bader v. Johnson,* 732 N.E.2d 1212, 1216–17 (Ind.2000)). "Absent a duty there can be no negligence or liability based upon the breach." *Kroger Co. v. Plonski,* 930 N.E.2d 1, 6 (Ind.2010).

Scott v. Durham, Not Reported in F.Supp.2d (2011)

2099 WL 1686

The duty element of the Museum's negligence claim appears to be based on the contention that Section 1–1–34(d) creates a duty to disclose [DE 161 at 9; DE 128, ¶¶ 61–62]. Lyons and Hyman argue that Section 1–1–34(d) cannot ground the Museum's negligence claim because the Museum is not included in the class of persons Section 1–1–34(d) is intended to protect [DE 164 at 3].

As I noted earlier, Section 1–1–34(d) provides a remedy for buyers who unwittingly bid against sellers. But nothing in that regulation provides a remedy for auctioneers. And, as I also mentioned earlier, Section 1–1–34(d) does not expressly create *any* duties, and certainly not a bidder's duty running in favor of an auctioneer.

In any event, there is another reason why that Section 1–1–34(d) cannot support the Museum's negligence claim. The simple fact of the matter is that Indiana courts do not recognize negligence actions based on duties prescribed by administrative regulations.

It is true that Indiana courts have a long history of recognizing that the violation of a *statutory* duty can ground a negligence action. *Kho v. Pennington,* 875 N.E.2d 208, 211 (Ind.2007) (collecting cases). Specifically, the "unexcused or unjustified violation of a duty prescribed by statute or ordinance constitutes negligence *per se* if the statute is intended to protect the class of persons in which the plaintiff is included and against the risk of the type of harm which has occurred as a result of its violation." *Vandenbosch v. Daily,* 785 N.E.2d 666, 669 (Ind.Ct.App.2003); *see also Hodge v. Nor–Cen, Inc.,* 527 N.E.2d 1157, 1160 (Ind.Ct.App.1988). Thus, for example, "a landlord may be liable to a tenant because of negligence which arises from the violation of a duty imposed by statute or ordinance." *Id.* at 1160.

But the same is not true of administrative regulations. Unlike statutory violations, the violation of an administrative regulation does not constitute negligence *per se. Beta Steel v. Rust,* 830 N.E.2d 62, 73–74 (Ind.Ct.App.2005); *Vandenbosch,* 785 N.E.2d at 670; *Hodge,* 527 N.E.2d at 1160 n. 3. Accordingly, Indiana courts have held that negligence claims fail as a matter of law where the duty element of the claim rests solely on an administrative regulation that the defendant allegedly violated. *See Vandenbosch,* 785 N.E.2d at 670 (landlord's violation of provision of the Indiana Administrative Code was not proper basis for imposing negligence liability because provision was not a statute or

ordinance); *Hodge,* 527 N.E.2d at 1160 n. 3 ("appellants' claim of negligence could not survive a motion for summary judgment if the duty element of their claim rested solely upon the existence of an applicable administrative regulation"); *see also Andrews v. Speedway SuperAmerica LLC,* No. 1:09–cv–1242, 2010 WL 2985938, at *5 (S.D.Ind. Jul.27, 2010) (dismissing negligence claim where duty element was based on provision of Indiana Administrative Code).

**\*7** Here, the Museum points to no basis for the duty element of its negligence claim other than the alleged violation of Section 1–1–34(d). Because this administrative regulation is not a sufficient basis for the duty element of the Museum's negligence claims against Lyons and Hyman, those claims fail as a matter of law.

### III. Indiana Crime Victims Relief Act

The Museum's claims against Lyons and Hyman under the CVRA fail because the Museum has not sufficiently alleged that it suffered a "pecuniary loss," as it must to recover under the CVRA.

The CVRA allows a plaintiff who "suffers a pecuniary loss as a result of a violation of IC 35–43" to "bring a civil cause of action against the person who caused the loss...." IC § 34–24–3–1; *see also Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct.App.1999). To establish a viable claim, "a plaintiff must show a violation of one of the specific code sections and that such violation caused the loss suffered by the plaintiff." *McLemore v. McLemore,* 827 N.E.2d 1135, 1144 (Ind.Ct.App.2005) (citing *Yoder Grain, Inc. v. Antalis,* 722 N.E.2d 840, 850 (Ind.Ct.App.2000)). The Museum's CVRA claim is based on Lyons' and Hyman's alleged violations of two provisions of Section 35–43 of the Indiana Code: the criminal mischief statute, IC § 35–43–1–2, and the deception statute, IC § 35–43–5–3 [DE 128, ¶¶ 73–79].

Lyons and Hyman argue that the Museum fails to state a claim under the CVRA because the alleged criminal violations are based on the same allegations underlying the Museum's already defective fraud claim [DE 146 at 8]. It is true that the Museum's only allegation against these parties is that they violated the criminal statutes by failing to disclose their ownership interest in the car on the bidder registration form [DE 128, ¶ 177], which is the same allegation underlying the Museum's defective fraud claim.

Moreover, the criminal mischief and deception statutes are both anti-fraud statutes. *See ABN Amro Mortg. Group,*

*Inc. v. Maximum Mortg., Inc.,* 429 F.Supp.2d 1031, 1042 (N.D.Ind.2006). And some district courts have dismissed CVRA claims where the alleged violations of the deception and criminal mischief statutes rest on defective common law fraud allegations. *See SMC Corp. v. Peoplesoft USA, Inc.,* No. 1:00–cv–1095, 2004 WL 2538641, at *6 (S.D.Ind. Oct.12, 2004) (dismissing CVRA claim because alleged deception statute violation was based on defective fraud claim); *see also F. McConnell & Sons, Inc. v. Target Data Systems, Inc.,* 84 F.Supp.2d 980, 987 (N.D.Ind.2000).

But the law is unclear on the issue of whether the Museum must meet the elements of common law fraud to state a claim under the criminal mischief and deception statutes. At least one Indiana court has chosen not to read the elements of common law fraud into other fraud crimes defined by statute. *See American Heritage Banco, Inc. v. McNaughton,* 879 N.E.2d 1110, 1117–18 (Ind.Ct.App.2008) ("The five elements of common law fraud are not found in the statute defining fraud on a financial institution.").

 **\*8** I need not resolve this issue because the Museum's CVRA claim fails for the separate reason that the Museum has not satisfied the "pecuniary loss" element of such claims. For the Museum to be entitled to recovery under the CVRA, it must show a "pecuniary loss" as a result of Lyons' and Hyman's alleged violations of the criminal mischief and deception statutes. IC § 34–24–3–1; *see also Opportunity Knocks, Inc. v. Maxwell,* 618 F.Supp.2d 920, 927 (N.D.Ind.2009); *Bridgeforth v. Thornton,* 847 N.E.2d 1015, 1028 (Ind.Ct.App.2006); *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assocs.,* 758 N.E.2d 931, 944 (Ind.Ct.App.2001). "A pecuniary loss has been described as a 'loss of money, or of something by which money, or something of money value may be acquired.' " *Opportunity Knocks,* 618 F.Supp.2d at 927 (quoting *American Leasing, Inc. v. Maple,* 406 N.E.2d 333, 335 (Ind.Ct.App.1980)); *see also Veach v. Sheeks,* 316 F.3d 690, 694 (7th Cir.2003).

The parties do not address the point, but the Museum has not alleged a pecuniary loss within the meaning of the CVRA. The only losses the Museum says Lyons and Hyman caused are expenses incurred in defending itself in this lawsuit, and

the amount of the claims that Scott and other parties have asserted against the Museum [DE 128 at 61]. These, however, are not "pecuniary losses" within the meaning of the CVRA.

The CVRA "does not allow for the consideration of attorney fees as part of the pecuniary losses required to entitle a party to recovery under the statute." *Bridgeforth,* 847 N.E.2d at 1030; *see also Harco,* 758 N.E.2d at 945. The same goes for costs of litigation. *Id.* Moreover, no judgment has been entered against the Museum in this litigation. So at this point in time, the Museum has not suffered any pecuniary loss. *Cf. Veach,* 316 F.3d at 694 (affirming dismissal of CVRA claim because plaintiff, who did not pay any of the judgment levied against him in smalls claims court, suffered losses of time and effort, but not money); *Harco,* 758 N.E.2d at 944 (reversing trial court's award under CVRA because, apart from attorneys' fees and costs of litigation, plaintiff failed to establish actual damages resulting from frivolous claim filed against it). Accordingly, the Museum's CVRA claim against Lyons and Hyman must be dismissed for failure to allege the pecuniary loss required for recovery under that statute.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion to dismiss filed by Donald Lyons, Joan Lyons and the Donald Lyons Family Trust [DE 144], and **GRANTS** the motion to dismiss filed by Mark Hyman and Hyman Properties, Inc. d/b/a Hyman Limited Classic Cars [DE 145]. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the following claims asserted by the Museum against those parties: Count I (actual fraud), Count IV (negligence) and Count VI (violation of the Indiana Crime Victims Relief Act) [DE 128]. The Museum is **GRANTED LEAVE TO AMEND** its pleadings within *30 days* of the date of entry of this Order to address the deficiencies outlined above.

 **\*9** **SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 8969

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 47

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592®©

🟡 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Staley v. Gilead Sciences, Inc., N.D.Cal., March 3, 2020

2018 WL 7197233
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SERGEANTS BENEVOLENT ASSOCIATION HEALTH & WELFARE FUND,
individually and on behalf of itself and
all others similarly situated, Plaintiff,

v.

ACTAVIS, PLC, and Forest Laboratories, LLC,
Merz Pharma GmbH & Co. KGaA, Merz GmbH &
Co. KGaA, Merz Pharmaceuticals GmbH, Amneal
Pharmaceuticals, LLC, Teva Pharmaceutical
Industries, Ltd., Barr Pharmaceuticals, Inc.,
Cobalt Laboratories, Inc., Upsher-Smith
Laboratories, Inc., Wockhardt Limited, Wockhardt
USA LLC, Sun Pharmaceuticals Industries,
Ltd., Dr. Reddy's Laboratories Ltd., and
Dr. Reddy's Laboratories Inc., Defendants.

15 Civ. 6549 (CM)
|
Signed 12/26/2018

**Attorneys and Law Firms**

Ankur Kapoor, Matthew L. Cantor, Ethan Edward Litwin, Constantine Cannon, LLP, Elizabeth S. Metcalf, Peter George Safirstein, Safirstein Metcalf LLP, New York, NY, Lori Ann Fanning, Pro Hac Vice, Marvin Alan Miller, Miller Law LLC, Chicago, IL, for Plaintiff.

Heather McDevitt, Kristen O'Shaughnessy, Martin Michael Toto, Jack Pace, William Harold Bave, III, Peter J. Carney, White & Case LLP, New York, NY, John Mark Gidley, White & Case LLP, Washington, DC, Kevin Charles Adam, White & Case LLP, Boston, MA, for Defendants Actavis, plc, Forest Laboratories, LLC.

Martin Michael Toto, White & Case LLP, New York, NY, for Defendant Merz Pharmaceuticals GmbH & Co. KGaA.

Jay Philip Lefkowitz, Alexandra Corbett Strang, Devora Whitman Allon, Kyla A. Jackson, Pro Hac Vice, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for

Defendants Amneal Pharmaceuticals, LLC, Upsher-Smith Laboratories, Inc.

Christopher T. Holding, Pro Hac Vice, Sarah K. Frederick, Goodwin Procter, LLP, Boston, MA, for Defendants Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals, Inc., Teva Pharmaceutical Industries Ltd.

Christopher T. Holding, Pro Hac Vice, Sarah K. Frederick, Pro Hac Vice, Goodwin Procter, LLP, Boston, MA, Jack Pace, Peter J. Carney, White & Case LLP, New York, NY, for Defendant Cobalt Laboratories, Inc.

Damon William Suden, William Alfred Escobar, David Reap, Kelley Drye & Warren LLP, New York, NY, for Defendants Wockhardt Limited, Wockhardt USA LLC.

Jay Philip Lefkowitz, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for Defendant Sun India Pharmaceuticals Industries, Ltd.

Eric Peter Stephens, Jones Day, New York, NY, Jonathan Bruce Berman, Pro Hac Vice, Jones Day, Washington, DC, for Defendants Dr. Reddy's Laboratories Ltd., Dr. Reddy's Laboratories, Inc.

Jay Philip Lefkowitz, Alexandra Corbett Strang, Devora Whitman Allon, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for Defendant Sun Pharmaceutical Industries Ltd.

Heather McDevitt, Kristen O'Shaughnessy, Martin Michael Toto, William Harold Bave, III, White & Case LLP, New York, NY, Kevin Charles Adam, White & Case LLP, Boston, MA, for Defendants Merz GmbH & Co. KGaA., Merz Pharmaceuticals GmbH, Merz Pharma GmbH & Co. KGaA.

Devora Whitman Allon, Kyla A. Jackson, Pro Hac Vice, Kirkland & Ellis LLP, New York, NY, for Defendant Sun Pharmaceuticals Industries, Ltd.

**ORDER**

McMahon, C.J.:

**\*1** The Complaint in this action, which was filed following an earlier civil enforcement action by the New York Attorney General, alleges a two-part scheme to prolong the monopoly of Defendant Forest Laboratories, LLC ("Forest"), over the blockbuster Alzheimer's drug memantine hydrochloride, or Namenda®. According to the Complaint, Forest and its

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 408 of 520
PageID: 9329

Sergeants Benevolent Association Health & Welfare Fund ..., Not Reported in Fed....

201WL 8 91592©©

patent licensor Merz[1] first entered into agreements with generic manufacturers to stay out of the market until the exclusivity period for Forest's existing, twice-a-day Namenda IR formulation had nearly expired ("pay for delay"). With this maneuver, Forest bought itself time to gain regulatory approval for a new, once-a-day Namenda XR formulation and to pull from the market the old, twice-a-day Namenda IR formulation (the "product hop" or "hard switch"). Although a preliminary injunction prevented Forest from withdrawing the old formulation, a successful switch would have effectively forestalled generic competition until the year 2029.

[1]    "Merz" refers to three entities, all named as Defendants in the Complaint: Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH.

Under the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977), indirect purchasers of products sold at supra-competitive prices lack standing to sue under federal antitrust statutes. However, under its later decision in *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989), indirect purchasers may still bring suit under state antitrust laws, if a state permits such claims. Therefore, it is common in private antitrust litigation for two groups of purchasers, direct and indirect, to file separate cases arising out of the same nucleus of operative fact, but to allege different causes of action—direct purchasers under federal law and indirect purchasers under state laws.

That is precisely what happened here. In a parallel "direct purchaser" case, drug wholesaler plaintiffs, which bought Namenda directly from Forest, brought a suit alleging five counts under the federal antitrust laws against Forest, Merz, and Forest's parent company Actavis, plc ("Actavis"). That case, captioned *In re Namenda Direct Purchaser Antitrust Litigation*, No. 15-cv-7488 (S.D.N.Y.), is currently pending before this Court. I refer to the drug wholesaler plaintiffs in that case as the Direct Purchaser Plaintiffs, or "DPPs," and I refer to that case as the "DP Action."

In the instant case, employee health plan Sergeants Benevolent Association Health & Welfare Fund, which purchased Namenda indirectly, separately brought a suit alleging 123 claims under state antitrust, consumer protection, and restitution laws.[2] This case, captioned *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc*, No. 15-cv-6549 (S.D.N.Y.), names Actavis,

Forest, Merz, and eight generic drug manufacturers[3] (the "Generic Defendants"), which were not named in the DP Action. I refer to the Plaintiff here, Sergeants Benevolent Association Health & Welfare Fund, as the Indirect Purchaser Plaintiff, or "IPP," and I refer to this case as the "IP Action."

[2]    The IPP's Complaint includes four counts, with dozens of state law claims under each count. I recognize that plaintiffs will sometimes style their complaints this way. Frankly, however, each of these state law claims should be its own cause of action, such that the IPP Complaint would properly contain 123 separate counts.

[3]    These are: Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal"); Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's").

 *2    The complaints in the DP and IP Actions were filed around the same time. The parties, with the exception of Merz, sought consolidated briefing on motions to dismiss, (Dkt No. 63), which was granted, (Dkt. No. 64). Merz eventually joined the consolidated briefing. (*See, e.g.*, Dkt. No. 85.)

Ruling on the motions to dismiss both the DPPs' and IPP's complaints, this Court held that most of the federal antitrust counts in the DPPs' complaint survived. *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc*, Nos. 15-cv-6549, 15-cv-7488, 2016 WL 4992690, at *16–*17 (S.D.N.Y. Sept. 13, 2016). In the interest of efficiently resolving common factual and legal issues, it then denied without prejudice the motions to dismiss the IPP complaint, and placed all 123 state law claims on its suspense calendar while the federal antitrust claims in the DP Action were pending. *Id.* at *17.

The DP Action proceeded through class certification and denial of Defendants' motion for summary judgment before the parties expressed interest in mediation. (*See* Dkt. No. 122.)[4] However, it was determined that mediation would be

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

successful only if the IP Action came off of the suspense calendar and the IPP came back into the proceedings. (*Id.*)

4    Unless otherwise noted, all references herein are to the docket in *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc,* No. 15-CV-6549 (S.D.N.Y.).

As a result, the IPP's 123 state law claims are presently before the Court on separate motions to dismiss by (1) Actavis, Forest, and Merz and (2) the Generic Defendants. The parties have also recently submitted supplemental briefing. (*See* Dkt. Nos. 129–33, 146, 149–56.)

For the reasons below, the motions to dismiss the IP Action are **GRANTED IN PART** and **DENIED IN PART.**

### Table of Contents

I. Overview of Claims and Jurisdiction...——

II. Factual Background...——
A. The Parties...——

B. The Regulatory Scheme...——

C. Drug Substitution Laws and Product Hopping...——

D. The Namenda Settlement Agreements...——

E. The "Hard Switch"...——

III. Procedural History...——

IV. Standard of Review...——

V. Count One: Monopolization Under the Laws of 27 States Against Actavis, Forest, and Merz...——
A. The IPP's Underlying Factual Allegations State a Claim for Monopolization...——

1. The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR...——

2. The IPP States a Claim for Monopolization Based on the Settlement Agreements...——

3. The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One...——

4. The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action...——

B. The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others...——

1. The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States...——

*2.* The IPP Fails to State a Claim for Monopolization in Three States That Follow *Illinois Brick* (Florida, Massachusetts, and Utah)...——

3. The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada)...——

4. The IPP Fails To State a Claim for Monopolization Under the Law of Kansas...——

C. In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States...——

*3  VI. Count Two: Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants...——
A. The IPP States a Claim for Conspiracy To Monopolize...——

B. Illinois...——

C. Oregon...——

D. In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States...——

VII. Count Three: Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants...——

Sergeants Benevolent Association Health & Welfare Fund., Not Reported in Fed....
201WL 8 91592©©

A. The IPP Adequately Pleads Its State Law Claims Under *Twombly* and *Iqbal*...——

B. The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b)...——

C. *Illinois Brick* Does Not Bar the IPP's Consumer Protection Claims...——

D. The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others...——

   1. Alabama...——

   2. Arizona...——

   3. California...——

   4. District of Columbia...——

   5. Florida...——

   6. Hawaii...——

   7. Idaho...——

   8. Illinois...——

   9. Kansas...——

   10. Maine...——

   11. Massachusetts...——

   12. Michigan...——

   13. Missouri...——

   14. Montana...——

   15. Nebraska...——

   16. Nevada...——

   17. New Hampshire...——

   18. New Mexico...——

   19. New York...——

   20. North Carolina...——

   21. Rhode Island...——

   22. Tennessee...——

   23. Utah...——

   24. Vermont...——

   25. West Virginia...——

E. In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States...——

VIII. Count Four: Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants...——
A. Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State...——

B. The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington)...——

C. Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming)...——

D. The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others...——

   1. Alabama...——

   2. Arizona...——

   3. California...——

   4. District of Columbia...——

   5. Florida...——

   6. Idaho...——

   7. Illinois...——

   8. Kansas...——

   9. Maine...——

   10. Massachusetts...——

   11. Michigan...——

   12. Mississippi...——

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 411 of 520
PageID: 9332
Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

13. New York...——

14. North Carolina...——

15. North Dakota...——

16. Rhode Island...——

17. Tennessee...——

18. Utah...——

19. Washington...——

20. West Virginia and Wisconsin...——

21. Wyoming...——

E. In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States...——

IX. Conclusion...——

**BACKGROUND**

**I. Overview of Claims and Jurisdiction**
This case, *Sergeants Benevolent Association Health & Welfare Fund v. Actavis,* No. 15-cv-6549 (S.D.N.Y.) (the "IP Action"), proceeds in parallel with the factually similar case, *In re Namenda Direct Purchaser Antitrust Litigation,* No. 15-cv-7488 (S.D.N.Y.) (the "DP Action").

Although this Court accepted these two cases on its docket as related cases pursuant to Local Rule 13, (*see* 15-cv-7488, entry of Oct. 6, 2015), and although this Court granted certain Defendants' motion for consolidated briefing on the motions to dismiss pursuant to its individual rules, (15-cv-6549, Dkt. No. 64), it never consolidated the cases under Federal Rule of Civil Procedure 42(a), nor joined the claims and parties under Federal Rules of Civil Procedure 18 and 19, respectively.

**\*4**  As a result, the IP Action proceeds as an entirely separate action composed solely of state law claims. The complaint in the IP Action alleges a total of 123 state law claims, under the laws of 44 states, aggregated as four "counts": (1) monopolization (27 state law claims); (2) conspiracy to monopolize (27 state law claims); (3) violation of consumer protection and unfair and deceptive trade practices statutes (25 state law claims); and (4) unjust enrichment (44 state law claims).

Since not a single federal interest is implicated in the IP Action, the Court exercises jurisdiction over these 123 state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). CAFA's prerequisites are met. The IPP's Consolidated Amended Complaint ("CAC") alleges that the aggregate amount in controversy exceeds $5,000,00.00. (CAC ¶ 31.) In addition, the IPP, a New York trust, is diverse from several of the Defendants, including Actavis, Merz, and the majority of the Generic Defendants. (CAC ¶¶ 15–29.)

**II. Factual Background**
The factual nucleus from which the IP Action arises has been described exhaustively in several published opinions, including those of Judge Sweet and the Second Circuit in the earlier civil enforcement action by the New York Attorney General, and those of this Court in the parallel DP Action.

The relevant opinions are: (i) *New York v. Actavis, plc,* No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) (*Namenda I*), in which the district court (Sweet, J.) preliminarily enjoined Actavis and Forest from withdrawing Namenda IR, the twice-a-day or "immediate release" formulation, from the market; (ii) *Schneiderman ex rel. New York v. Actavis plc,* 787 F.3d 638 (2d Cir. 2015) (*Namenda II*), in which the Second Circuit upheld the preliminary injunction granted in *Namenda I*; and (iii) three opinions from the private, follow-on litigation before this Court.

The first opinion, on which the Court granted consolidated briefing, denied Actavis, Forest, and Merz's motion to dismiss the DP Action; denied all Defendants' motions to dismiss the IP Action without prejudice; and placed the 123 state law claims in the IP Action on the Court's suspense calendar. *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, PLC,* Nos. 15-cv-7488, 15-cv-6549, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) (*Namenda III*).

The second opinion of this Court granted in part and denied in part the DPPs' motion for collateral estoppel and partial summary judgment against Actavis and Forest, on the basis of facts established about the product hop in *Namenda I* and *Namenda II. In re Namenda Direct Purchaser Antitrust Litig.,* No. 15-cv-7488, 2017 WL 4358244 (S.D.N.Y. May 23, 2017) (*Namenda IV*).

201WL 8 91592©©

The third opinion denied Actavis's and Forest's post-discovery motion for summary judgment and granted the DPPs' motion for class certification. *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S. DN.Y. 2018) (*Namenda V*).

In light of the detailed factual history discussed in these opinions, the Court provides only an abridged summary of the relevant facts here.

### A. The Parties

Defendant Forest Laboratories, LLC ("Forest") is a limited liability company incorporated in Delaware with offices in New York and New Jersey. *Namenda III,* 2016 WL 4992690, at *2. It is wholly owned by Defendant Actavis, plc ("Actavis"). [5] *Id.*; (CAC ¶ 16.) The IPP also describes Actavis as Forest's successor-in-interest. (*See* CAC ¶ 192.)

[5]     Allergan plc was formerly known as Actavis, plc. (*See In re Namenda Direct Purchaser Antitrust Litig.*, No 18-2421 (2d Cir.), Dkt. No. 1 at 2 (corporate disclosure statement).) This opinion uses "Actavis" throughout to reflect the fact that the IPP has not moved for a substitution of parties in the IP Action.

**\*5**  In 2000, Forest entered into a patent licensing and cooperation agreement with Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH (collectively, "Merz") [6] to develop a memantine hydrochloride-based drug for the treatment of moderate-to-severe forms of Alzheimer's disease. *Namenda III,* 2016 WL 4992690, at *2; *Namenda IV,* 2017 WL 4358244, at *2.

[6]     The DPPs subsequently dismissed all three Merz entities from the DP Action on April 20, 2017. (15-cv-7488, Dkt. No. 207.) They remain parties to the IP Action, however.

The resulting drug was launched in 2004 as a twice-daily immediate release formula ("Namenda IR"), generating $1.5 billion in annual sales for Forest in 2012 and 2013. *Namenda II,* 787 F.3d at 646–47.

Defendants Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal");

Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's") (collectively, the "Generic Defendants" and, together with Actavis, Forest, and Merz, the "Defendants") each developed generic formulations of Namenda IR and sought approval from the FDA to take these generic formulations to market. *Namenda III,* 2016 WL 4992690, at *2.

Plaintiff Sergeants Benevolent Association Health & Welfare Fund (the "IPP," or, where appropriate, the "Named Plaintiff") is a New York trust that provides prescription drug benefits for active and retired New York City Police Department sergeants and their dependents through its participant plans. *Id.*; (CAC ¶ 15). As a third-party payor of pharmaceutical claims for members of its plans, the IPP alleges that it was an indirect purchaser of branded Namenda IR during the relevant period. (CAC ¶ 15.) The IPP alleges that, beginning in April 14, 2010 and continuing through the present day (the "Class Period"), it indirectly purchased branded Namenda IR in 11 states [7] at prices higher than it would have otherwise paid absent Defendants' unlawful anticompetitive conduct. (*Id.* ¶¶ 15, 146)

[7]     The IPP does not, however, bring claims under the laws of all 11 states. (*Compare* CAC ¶ 15 *with* CAC ¶¶ 201, 207, 215, 226.)

The IPP also alleges that it purchased (*i.e.* paid for) branded Namenda XR indirectly during the Class Period, when it would otherwise have purchased low-cost, generic Namenda IR absent Defendants' unlawful competitive conduct. (*Id.* ¶ 202.)

### B. The Regulatory Scheme

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, governs the manufacture, sale, and marketing of prescription pharmaceuticals in the United States. *Namenda III,* 2016 WL 4992690, at *2. The FDCA requires a pharmaceutical company to submit a New Drug Application ("NDA") to the FDA before it can bring a new drug to market. *Id.*

The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585, was enacted to serve the "dual purposes of incentivizing innovation," by rewarding brand-name drug manufacturers for bringing new therapies to market, and

"lowering drug prices for consumers," by rewarding generic drug manufacturers who attempt to compete with costly branded drugs. *Id.* at *3.

**\*6** Rewards under the Hatch-Waxman Act take the form of granting an exclusive share of the prescription pharmaceutical market through one of two legal regimes: patents and exclusivities. *See Frequently Asked Questions on Patents and Exclusivity,* FDA (last updated May 2, 2018), https://www.fda.gov/drugs/developmentapprovalprocess/ucm079031.htm ("FAQs"). Patents are property interests granted by the U.S. Patent and Trademark Office ("PTO"), while exclusivities are statutory protections granted by the Food and Drug Administration ("FDA"). *See Namenda IV,* 2017 WL 4358244, at *3; *see also* FAQs at 1.

**Patents.** Manufacturers may claim patents for new drug compounds, drug products, and methods of use. *See In re Actos End-Payor Antitrust Litig.,* 848 F.3d 89, 94 (2d Cir. 2017) (*Actos II*). Patents vary in duration but typically last for twenty years. *See* FAQs at 2. During the lifetime of the patent, brand manufacturers are provided a legal monopoly on their invention, which can enable favorable price-setting. *Id.* at 1.

Patent protection is so valuable to pharmaceutical companies that entering the period following patent expiration is known as going off the "patent cliff." *Namenda III,* 2016 WL 4992690, at *3. In 2012, patent cliffs collectively caused the entire U.S. pharmaceutical market to shrink by 1%. Eric Sagonowsky, *Big Pharma faces $26.5B in losses this year as next big patent cliff looms, analyst says,* FiercePharma, Apr. 21, 2017, https://ww.fiercepharma.com/pharma/big-pharma-faces-26-5b-patent-loss-threats-year-analyst-says.

The Hatch-Waxman Act allows a brand-name drug manufacturer to extend any patent submitted as part of an NDA for an additional five years, to compensate for the time elapsed during the FDA's approval process. 35 U.S.C. § 156; *Namenda III,* 2016 WL 4992690, at *3.

**Exclusivity.** Both the FFDCA and the Hatch-Waxman Act also provide for statutory periods of "marketing exclusivity" in connection with the approval of certain NDAs. *Otsuka Pharm. Co., Ltd. v. Price,* 869 F.3d 987, 988 (D.C. Cir. 2017); *see also* FAQs at 3. "When a drug earns a period of exclusivity, the Food and Drug Administration must withhold approval of certain competing drugs," including generics, "if

various conditions are satisfied." *Otsuka Pharm.,* 869 F.3d at 988.

Not all NDAs will qualify for statutory exclusivities. For example, the FDA may grant exclusivities for, among other things, a new chemical entity (five years), 21 C.F.R. § 314.108; or an "orphan" drug intended to treat rare diseases (seven years), 21 C.F.R. § 316.31. *See* FAQs at 3. The FDA may also grant additional exclusivities later in the life of a drug, well after submission of the initial NDA. For instance, the FDA may grant a six-month period of exclusivity for studying the drug's efficacy in children ("pediatric exclusivity"). 21 U.S.C. § 355a; *Namenda II,* 787 F.3d at 644.

**Interaction.** To a degree, exclusivity interacts with patent protection. *See* FAQs at 4. For example, when a brand manufacturer submits an NDA to the FDA, it must list any patents that claim drugs, drug products, or methods of use that are the subject of that NDA. *See In re Actos End Payor Antitrust Litig.,* No. 13-cv-9244, 2015 WL 5610752, at *1 (S.D.N.Y. 2015) (*Actos I*). The FDA lists all existing patents and exclusivities in the "Orange Book." *Id.*; FAQs at 5.

Patent protection also interacts with exclusivity when a generic manufacturer seeks FDA approval to market a generic version of a branded drug that is still "on patent." Specifically, the Hatch-Waxman Act provides for a 180-day period of "patent challenge" exclusivity for the first generic manufacturer to file a certification with the FDA that contests the validity of the brand manufacturer's patent. *Namenda III,* 2016 WL 4992690, at *3; *see also* FAQs at 3. This period of exclusivity is valid against other generic manufacturers, although multiple filers may share the exclusivity period if they file on the same day. *See FTC v. Actavis, Inc.,* 570 U.S. 136, 174–75 (2013) (Roberts, J., dissenting) (citing 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb); FDA, Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day 4 (July 2003)). Patent challenge exclusivity is highly valuable, "possibly worth several hundred million dollars." *Actavis,* 570 U.S. at 144 (citing C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem,* 81 N.Y.U.L. Rev. 1553, 1579 (2006)).

**\*7** To win the 180-day period of patent challenge exclusivity, a generic manufacturer must file an Abbreviated New Drug Application ("ANDA") with the FDA, which relies on the NDA submitted by the brand manufacturer to show

the drug is safe and effective. *Actavis,* 570 U.S. at 142. As part of this process, a generic manufacturer must certify that the generic drug "has the same active ingredients as, and is biologically equivalent" to the brand drug. *Id.* (internal citations omitted). In addition, and critical to gaining the 180-day exclusivity period, the first-filer generic manufacturer must also certify that the brand name drug is patented, but that the patent is invalid or the generic will not infringe it, a so-called "Paragraph IV" certification. *Id.* at 143.

The Hatch-Waxman Act allows a brand manufacturer to treat the filing of a Paragraph IV certification as an infringing action and to sue the generic filer for patent infringement. *Id.* The filing of a patent infringement action triggers an automatic, 30-month stay on the FDA's approval of the generic manufacturer's ANDA. *Id.* During this time, however, the FDA may tentatively approve the ANDA, such that the generic drug is set for final approval and launch after the 30-month stay expires. *Namenda IV,* 2017 WL 4358244, at *4.

At this point, a generic manufacturer defending a patent infringement action based on its Paragraph IV certification has several options. First, it may defend the patent infringement action by arguing that the underlying patent is invalid or that its generic drug does not otherwise infringe the patent. If successful, a judgment in the infringement action results not only in the invalidation of the underlying patent or a finding of non-infringement but also entitles the generic manufacturer to the coveted 180-day exclusivity period. *See* Shashank Upadhye, *Generic Pharmaceutical Patent and FDA Law* §§ 28:9.50, 29:5 (2018–19 ed.).

Second, a generic manufacturer may launch its generic product "at risk," once it has gained FDA approval and the 30-month stay has expired, but while the litigation is ongoing. *Id.* § 32.

Third, the brand manufacturer and generic manufacturer may enter into a settlement agreement to resolve the litigation, which allows the generic manufacturer to extract certain concessions from the brand manufacturer ("reverse payments"). *See* Hemphill, *supra,* at 1568; *see also Actavis,* 570 U.S. at 140–41. Settlement agreements containing reverse payments may raise antitrust scrutiny if the payments flowing from the brand manufacturer to the generic manufacturer are "large and unjustified." *Actavis,* 570 U.S. at 158. Brand manufacturers are particularly incentivized to settle with first-filer generics because, under the Hatch-

Waxman Act, no later-filing generic is eligible for the 180-day period of patent challenge exclusivity, thereby minimizing such "Paragraph IV" challenges.

## C. Drug Substitution Laws and Product Hopping

Apart from the federal Hatch-Waxman Act, state law regimes also facilitate generic competition and the provision of cheaper prescription drugs to consumers by allowing, or in some cases requiring, pharmacists to fill a prescription for a branded drug with a "therapeutically equivalent" generic drug. *Namenda IV,* 2017 WL 4358244, at *4. States define therapeutic equivalence differently, but most use the comparatively strict definition adopted by the FDA. *Id.* at *4–*5. This definition only allows a pharmacist to substitute a generic drug if the FDA designates the generic as "AB-rated" in the Orange Book. *Namenda III,* 2016 WL 4992690, at *3.

As this Court has previously observed, "The requirement that substituted drugs meet therapeutic equivalence standards, although intended to protect patients, allows brand-name drug manufacturers to 'game the system' through a practice known as 'product hopping.' " *Namenda IV,* 2017 WL 4358244, at *5.

**\*8** In a product hop, a brand manufacturer re-patents a slightly different formulation of the drug shortly before any generic competitors are legally allowed to enter the market. *Namenda II,* 787 F.3d at 643 & n.2 (citing Alan Devlin, *Exclusionary Strategies in the Hatch-Waxman Context,* 2007 Mich. St. L. Rev. 631, 658 (2007)). At its core, product hopping is regulatory arbitrage—taking advantage of the comparatively forgiving "improvement" standard under the federal patent laws and the relatively strict "therapeutically equivalent" standard under state drug substitution laws. *See* Devlin, *supra,* at 657 n.139. Examples of product hops have included embedding the drug's active ingredient in a different inactive substrate, *In re Asacol Antitrust Litig.,* 323 F.R.D. 451, 462 (D. Mass. 2017) (*Asacol II*); introducing a tablet in place of a capsule, *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.,* 838 F.3d 421, 429 (3d Cir. 2016); or re-apportioning the "scoring" lines on a tablet that allow patients to break the pill into smaller dosages, *id.* at 429–30.

Once the re-formulated product is re-patented, but before generic versions of the old formulation can legally enter the market and gain a foothold through state drug substitution laws, a brand manufacturer may try to persuade physicians to prescribe their patients the new formulation (a "soft switch"). *Namenda II,* 787 F.3d at 648. In the alternative,

a brand manufacturer might withdraw the old formulation from the market altogether or severely restrict access, forcing physicians to adopt the new formulation in order to avoid interruptions to their patients' medication regimens ("hard switch"). *Id.*

A product hop raises antitrust scrutiny when it "coerces consumers and impedes competition." *Id.* at 652.

### D. The Namenda Settlement Agreements

After entering into the June 2000 patent licensing and cooperation agreement with Merz, in December 2002 Forest submitted an NDA to the FDA for 5 mg and 10 mg memantine hydrochloride tablets for the treatment of Alzheimer's disease. (CAC ¶ 63.) The drug was based on Patent No. 5,061,703 (the "'703 patent"), which was obtained in 1991 and was set to expire on April 11, 2010. (*Id.* ¶¶ 4, 64.)

In October 2003, the FDA approved Forest's NDA for Namenda IR tablets and listed the '703 patent in the Orange Book. (*Id.* ¶¶ 64–65.)

On October 16, 2007, at least fourteen generic manufacturers filed ANDAs with Paragraph IV certifications for AB-rated generic formulations of Namenda IR. (*Id.* ¶ 69.) Beginning in January 2008, Forest and Merz filed patent infringement lawsuits against these generic manufacturers, including the Generic Defendants, in the U.S. District Court for the District of Delaware. (*Id.* ¶¶ 70–71.) This triggered 30-month stays on these first-to-file ANDAs, which the IPP alleges would have begun to expire in April 2010. (*Id.* ¶ 72.)

Forest and Merz then obtained a patent extension on the '703 patent under the Hatch-Waxman Act. In March 2009, the '703 patent was extended for five years based on the duration of the FDA's approval process for the NDA. (*Id.* ¶ 67.)[8] This extended the '703 patent's expiration date from April 11, 2010 to April 11, 2015. (*Id.*)

[8]      It is not clear from the face of the IPP Complaint how Forest was able to obtain a five-year patent extension, the maximum permitted, when the FDA approval process for the Namenda IR NDA allegedly took only one year.

Between July 2009 and December 2009, while the 30-month ANDA stays were in effect, Forest and Merz entered into settlement agreements with the Generic Defendants. (*Id.* ¶ 75.) Pursuant to these settlement agreements, the Generic

Defendants agreed to delay market entry until as late as July 11, 2015. (*Id.* ¶ 76.)

All of the Generic Defendants received tentative approval of their ANDAs from the FDA between January 2010 and April 2010, and all had received final approval of their ANDAs by October 2011. (*Id.* ¶¶ 82–83.)

 **\*9** In 2014, Forest was granted an additional six months of pediatric exclusivity for Namenda IR based on studies of the drug's efficacy in children with autism. (*Id.* ¶ 68.) This tacked an additional six months of statutory market exclusivity for Namenda IR onto the end of the '703 patent protection period. (*Id.*)

### E. The "Hard Switch"

On August 21, 2009, "less than a month after it had announced the first wave of settlements with generics challenging the Namenda IR patent," Forest submitted an NDA for a once-a-day, extended release formulation of memantine hydrochloride, Namenda XR. (*Id.* ¶ 98.) The IPP alleges that the NDA did not demonstrate that Namenda XR was more efficacious than Namenda IR. (*Id.*)

The FDA approved the NDA for Namenda XR on June 21, 2010, but Forest did not launch the drug until June 2013. (*Id.* ¶¶ 99, 102.)

After the launch of Namenda XR, Forest used aggressive marketing to begin encouraging patients and physicians to switch from Namenda IR to Namenda XR. (*Id.* ¶ 105.) The IPP alleges that, when that "soft switch" strategy failed, Forest began implementing a strategy in February 2014 that involved discontinuing and/or severely limiting the distribution of Namenda IR. (*Id.* ¶¶ 95, 127–28.) This "hard switch" strategy included: (i) seeking to have the Centers for Medicare and Medicaid Services ("CMS") remove Namenda IR from its reference list; (ii) signing an exclusive distribution agreement with a mail-order only pharmacy; and (iii) requiring physicians to certify that it was medically necessary for patients to take Namenda IR rather than Namenda XR. (*Id.* ¶ 95.) Forest planned to discontinue retail sales of Namenda IR in January 2015. (*Id.*)

In September 2014, New York State filed a complaint against Actavis and Forest alleging violations of the federal Sherman Antitrust Act and New York's Donnelly Act on the basis of the hard switch, and seeking to preliminarily enjoin the

201WL 8 91592©©

defendants from withdrawing Namenda IR from the market. *Namenda II,* 787 F.3d at 649.

In December of 2014, the U.S. District Court for the Southern District of New York (Sweet, J.) entered an order preliminarily enjoining Actavis and Forest from withdrawing Namenda IR from retail shelves. *Namenda I,* 2014 WL 7015198, at *46. The Second Circuit upheld the injunction. *Namenda II,* 787 F.3d at 663.

The enforcement action was followed by several private, follow-on suits seeking treble damages under federal and state antitrust laws, which are described below.

### III. Procedural History
The IP Action was filed in August of 2015 as a putative class action on behalf of:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for branded Namenda IR 5 or 10 mg tablets, or Namenda XR capsules, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period from April 14, 2010 and continuing until the anticompetitive effects of Defendants' unlawful conduct ceases (the "Class Period").

(CAC ¶ 146.)

The DP Action was filed the following month. [9] Both the IP Action and the DP Action were placed on this Court's docket as related actions shortly thereafter. (*See* 15-cv-7488, entry of Oct. 6, 2015.)

[9]    Plaintiff Rochester Drug Co-Operative, Inc., also filed a complaint on behalf of direct purchasers that did not name the Generic Defendants. (15-CV-10083, Dkt. No. 1.) On January 26, 2016,

Plaintiffs JM Smith Corporation and Rochester Drug Co-Operative, Inc. stipulated to consolidating the cases. (15-cv-7488, Dkt. No. 65.)

 *10  Like the enforcement action, the private plaintiffs sought damages on the basis of the "hard switch," but they also alleged damages stemming from the settlement agreements entered into with generic manufacturers. (*See, e.g.,* CAC ¶¶ 84–86.)

Early in the litigation, this Court granted the parties' request for consolidated briefing on the motions to dismiss both the DP and IP Actions. (Dkt. No. 64.) [10] Thereafter, Actavis, Forest, and Merz submitted a single memorandum of law in support of their motion to dismiss the DP and IP Actions. (Dkt. No. 85 or "Forest Br.".) The Generic Defendants, who had not been named in the DP Action, submitted a separate memorandum of law in support of their motion to dismiss the IP Action. (Dkt. No. 81 or "Gen. Defs. Br.".)

[10]    As discussed, Merz did not join the motion for consolidated briefing, (Dkt. No. 63 at 2 n. 1), but later joined Actavis and Forest's brief, (Dkt. No. 85).

Roughly speaking, Actavis, Forest, and Merz's briefing challenged the sufficiency of the facts alleged in the DPPS' and IPP's Complaints as a whole, while the Generic Defendants' briefing challenged the IPP's ability to bring individual claims as a matter of state law. Each group of Defendants expressly adopted the arguments of the other group, to the extent applicable, in full.

In the IP Action, the IPP filed two separate memoranda of law in opposition to (i) Actavis, Forest, and Merz's motion and (ii) the Generic Defendants' motion. (Dkt. No. 87 or "IPP Resp. to Forest Br."; Dkt. No. 88 or "IPP Resp. to Gen. Defs. Br.".) Actavis, Forest, and Merz filed one reply, and the Generic Defendants filed another. (Dkt No. 90 or "Forest Reply"; Dkt. No. 89 or "Gen. Defs. Reply.")

On September 13, 2016, this Court issued an order (i) denying in part and granting in part Actavis, Forest, and Merz's motion to dismiss the DP Action; (ii) denying without prejudice Actavis, Forest, and Merz's and the Generic Defendants' motions to dismiss the IP Action; and (iii) placing the 123 state law claims from the IP Action on the Court's suspense calendar pending resolution of the federal antitrust claims in the DP Action. [11] *Namenda III,* 2016 WL 4992690, at *16–*17.

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201WL 8 91592©©

[11]     This Court had previously ordered that "the Indirect Purchaser Plaintiff's claims are *severed* and placed on the Court's suspense calendar." *Namenda III,* 2016 WL 49992690, at *17 (emphasis added). The use of the word "sever," however, did not connote that the cases had been consolidated under Rule 42(a) or joined for purposes of Rules 18 and 19.

The DP Action proceeded through discovery, summary judgment, and class certification. *See Namenda IV,* 2017 WL 4358244; *Namenda V,* 2018 WL 3970674. Defendants in the DP Action recently sought and were denied leave to appeal this Court's grant of class certification. (15-cv-7488, Dkt. No. 600.)

On September 10, 2018, after the parties to the DP Action expressed interest in mediation, this Court lifted its stay of the IP Action and referred the parties to Magistrate Judge Lehrburger for supervision of "such non-duplicative discovery as is necessary to get the parties to the IPP case up to speed[.]" (Dkt. No. 122 at 2.) The order of September 10, 2018 acknowledged that the 123 state law claims in the IP Action were the subject of a pending motion to dismiss and had yet to be addressed. (*Id.*)

 *11    Subsequently, Actavis, Forest, Merz, and the Generic Defendants filed renewed motions to dismiss the IP Action, along with supplemental briefing. (Dkt. No. 131-1 or "Gen. Defs. Suppl. Br."; Dkt. No. 133 or "Forest Suppl. Br."; Dkt. No. 152 or "IPP Resp. to Forest Suppl. Br."; Dkt. No. 158 or "IPP Resp. to Gen. Defs. Suppl. Br."; Dkt. No. 159 or "Forest Suppl. Reply"; and Dkt. No. 160 or "Gen. Defs. Suppl. Reply.") Defendants again divided the briefing, with Actavis, Forest, and Merz focusing on the sufficiency of the factual allegations regarding the underlying anticompetitive conduct, and the Generic Defendants briefing the requirements of each state's laws in detail.

Presently before the Court are the motions of (1) Actavis, Forest, and Merz and (2) the Generic Defendants to dismiss all 123 state law claims in the IP Action.

## DISCUSSION

## IV. Standard of Review
In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

Finally, a motion to dismiss must be supported by "information contained in the 'four corners' of the complaint." *Hayden v. Cty. of Nassau,* 180 F.3d 42, 54 (2d Cir. 1999). This principally includes facts alleged in the complaint and materials attached to or incorporated by reference into the complaint. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991). It also includes information of which the court takes judicial notice. *Id.*

## V. Count One: Monopolization Under the Laws of 27 States Against Actavis, Forest and Merz
The IPP first brings 27 separate state law claims grouped under the heading "Count One: Monopolization Under State Law." (CAC at 46.) These 27 state laws are all state antitrust or fair competition laws. (CAC ¶ 201.) The IPP asserts these claims against Actavis, Forest, and Merz, but not against the Generic Defendants. (CAC ¶ 201.)

Count One alleges unlawful monopolization based on two separate, anticompetitive acts: (i) the "hard switch" from Namenda IR to Namenda XR and (ii) the "pay to delay" settlement agreements with generic competitors. (CAC ¶¶ 193–96.)

The IPP alleges that both of these acts were part of an "overall scheme," (CAC ¶ 195), perpetuated to "maintain and extend [Forest's] monopoly power in the memantine hydrochloride market," (CAC ¶ 197). In turn, "Forest's unlawful anticompetitive scheme to prevent, delay, and or minimize the success of the introduction into the United States marketplace of any generic versions of Namenda IR enabled Forest to continue charging supra-competitive prices for memantine hydrochloride without a substantial loss of sales." (*Id.*)

The bulk of the parties' briefing is directed to this Count and to Count Two, for conspiracy to monopolize.

Actavis, Forest, and Merz bring a full arsenal of arguments to dismiss Count One, *viz.*:

- Judge Sweet's preliminary injunction in the earlier enforcement action prevented any "hard switch" from Namenda IR to Namenda XR from occurring, and in any case the IPP will be unable to offer any evidence that its plan participants or any member of the Class switched to Namenda XR as a result of the withdrawal announcement, (Forest Br. at 15–34);

**\*12** • The IPP has expressly disclaimed that it is relying on a theory of unlawful "reverse payments" under *Actavis, 570 U.S. at 158*, to show anticompetitive conduct with respect to the settlement agreements, and, even if the IPP were to rely on such a theory, it cannot plausibly allege that any of the reverse payments made pursuant to the agreements were improper, (Forest Br. at 34–60);

- The IPP's "injuries" caused by the settlement agreements are purely speculative, (Gen. Defs. Br. at 26);

- Because this Court previously dismissed the DPPs' claim for an "overarching scheme," and because the IPP has failed to plead any independently anticompetitive conduct with respect to either the hard switch or the settlement agreements, this Count must be dismissed, (Forest Br. at 60–62); and

- The antitrust laws of 26 states have limitations periods of five years or fewer making it "likely" that all of the state law claims asserted under Count One are time-barred, (*id.* at 65 n.42).

Actavis, Forest, Merz, and the Generic Defendants also argue for the dismissal of particular state law claims that are part of Count One, *viz.*:

- The IPP lacks Article III standing to assert claim in states where it has not made purchases and thereby suffered injury-in-fact, which are all but nine states, (Forest Br. at 65–66);

- *Illinois Brick* bars the IPP's claims in five states [12] that have not enacted so-called "*Illinois Brick* repealer statutes," (Gen. Defs. Suppl. Br. at 10–11);

- The IPP has failed to satisfy statutory requirements in four states that any plaintiff first notify the state's attorney general before filing a private damages suit, (Gen Defs. Suppl. Br. at 11–13); and

- Claims for unilateral monopolization are inactionable under the laws of three states, (Forest Br. at 82).

[12] Generic Defendants also argue that *Illinois Brick* bars the IPP's claims under two additional states —Illinois and Oregon—under Count One. (Gen. Defs. Suppl. Br. at 10–11.) However, the IPP Complaint does not allege Illinois and Oregon claims under Count One; instead, it alleges them only under Count Two. (*See* CAC ¶ 201.) This Court therefore addresses the Illinois and Oregon arguments in the portion of the opinion that discusses Count Two.

**A. The IPP's Underlying Factual Allegations State a Claim for Monopolization**

**1. The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR**

"Well-established case law makes clear that product redesign is anticompetitive when it coerces consumers and impedes competition." *Namenda II, 787 F.3d at 652*. While withdrawing an old product and substituting a new product does not constitute anticompetitive conduct *per se,* "when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive[.]" *Id. at 654* (internal citations omitted).

As part of Count One, the IPP alleges that the IPP "unlawfully switched the conversion of the memantine hydrochloride market from Namenda IR to Namenda XR" through a variety of anticompetitive measures, including "(i) publicizing to doctors, caregivers and the general public that the discontinuation of Namenda IR was imminent; (ii) significantly limiting or attempting to limit the distribution of Namenda IR; and (iii) requesting that CMS remove Namenda IR tablets from the 2015 Formulary Reference File," all while knowing that Namenda XR was neither safer nor more effective than Namenda IR. (CAC ¶ 195.)

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

**\*13**  In its original, consolidated briefing, Actavis, Forest, and Merz argued that both the DPPs and the IPP had failed to state claims for the hard switch because Judge Sweet's preliminary injunction in the earlier enforcement action, *Namenda I*, had prevented the withdrawal of Namenda IR and therefore any alleged exclusionary conduct from occurring. (Forest Br. at 15.) Defendants also argued that both the DPPs and the IPP had failed to allege injury in fact and to adequately plead antitrust injury resulting from the announcement that Forest was discontinuing Namenda IR. (*Id.* at 30.) Defendants have renewed these arguments in supplemental briefing. (Forest Suppl. Br. at 10.)

#### a) Actavis and Forest Are Collaterally Estopped From Arguing That the Anticompetitive Hard Switch Took Place

"Collateral estoppel, or issue preclusion, prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991). In order to establish that an issue was determined in a former adjudication, a party asserting collateral estoppel must establish four things: (1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was in fact actually decided in the prior proceeding; (3) there was full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue previously litigated and decided was necessary to support a valid and final judgment on the merits. *In re PCH Assocs.*, 949 F.2d 585, 593 (2d Cir. 1991).

After discovery in the parallel DP Action had closed, the DPPs sought partial summary judgment on the first count of their Complaint, which alleged that the Defendants' February 2014 announcement of the upcoming withdrawal of Namenda IR from the market constituted unlawful monopolization in violation of Section 2 of the Sherman Act. *Namenda IV,* 2017 WL 4358244, at *9.

In *Namenda IV*, this Court ruled, as against Actavis and Forest, that they were collaterally estopped from "relitigating the questions of (1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its

illegal conduct." 2017 WL 4358244, at *9–*16. However, this Court denied the DPPs' motion for collateral estoppel with respect to the issue of whether plaintiffs had suffered an antitrust injury, *i.e.*, been forced to switch from Namenda IR to Namenda XR as a result of Forest's withdrawal announcement. *Id.* at *16. [13]

[13]     Later, in *Namenda V,* this Court ultimately found that the DPPs, which were drug wholesalers, could rely on classwide economic models at trial to show that they had suffered antitrust injury. *Namenda V,* 331 F. Supp. 3d at 177. In addition, although the DPPs had originally moved for collateral estoppel on Count One against Actavis, Forest, and Merz, (15-cv-7488, Dkt. No. 134), the parties subsequently stipulated to the dismissal of Merz from the action, (15-cv-7488, Dkt. No. 207). In an accident of timing, therefore, Merz was dismissed after the parties had submitted briefing on the collateral estoppel motion but before this Court had ruled on that motion.

The IPP sought the same relief in connection with the IP Action, (Dkt. Nos. 112, 113), which the Court stayed, (Dkt. No. 120 at 1).

The stay has now been lifted, and the motion is ripe for decision.

The Court grants the motion. For the reasons discussed in *Namenda IV,* 2017 WL 4358244, at *9–*16, Actavis and Forest are collaterally estopped from relitigating the issues of "(1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its illegal conduct." *Id.* at *16. The same findings with respect to *Namenda I* and *II* that created estoppel in that case apply equally here.

**\*14**  By the same token, Actavis and Forest are not estopped from making arguments related to the IPP's injury. Their injury argument is addressed in subpart c), *infra*.

#### b) Even Though Merz Is Not Collaterally Estopped From Arguing That the Hard

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

### Switch Took Place, the IPP Nonetheless States
### a Claim That the Hard Switch Occurred

Merz, the only other party named in Count One, is not collaterally estopped from arguing that the IPP fails to state a claim against it because the product hop did not occur. (*See* Dkt. No. 116 at 1.)[14] Merz was not a party to the action in *Namenda I* or *Namenda II,* and the IPP did not move for collateral estoppel with respect to Merz in this action. (*See* Dkt. No. 113.)

[14]     Merz would also not be collaterally estopped from arguing that, under the facts alleged in the IPP Complaint, it had absolutely nothing to do with the hard switch. However, likely because Merz chose to be represented by the same counsel as Actavis and Forest, and likely because these parties chose to submit a consolidated brief in support of their motions to dismiss both the DPP and IPP Complaints, Merz never raised this argument separate and apart from Actavis and Forest. (*See* Forest Br. at 15–33.) The Court therefore does not address it.

Nonetheless, for the same reasons discussed in *Namenda III,* I find that the IPP has stated a plausible claim that the product hop occurred.

In *Namenda III,* I found it persuasive for purposes of the DPPs' federal claims that both the *Namenda I* and *Namenda II* courts had identified exclusionary conduct that occurred prior to the entry of the preliminary injunction. *See Namenda III,* 2016 WL 4992690, at *10–*11. As a result, I held that the DPPs had alleged an injury on the basis that "they were forced to pay for certain patients' memantine treatment at brand-name prices because these patients switched to Namenda XR *prior* to the entry of the injunction." *Namenda III,* 2016 WL 4992690, at *12 (emphasis in original). Plaintiffs' injury, the Court found, was that they were forced to pay for Namenda XR "*after* generic entry—when absent Defendants' anticompetitive conduct, their patients' prescriptions would have been filled by a far cheaper generic." *Id.* (emphasis in original). In other words, the DPPs had adequately pled that Forest's announcement discontinuing Namenda IR, as well as the tactics that accompanied the announcement, was sufficiently coercive.

The very same reasoning applies to the IPP Complaint. The IPP alleges it was injured because it was deprived of the opportunity to buy lower-priced generic Namenda IR and

forced to buy more expensive branded Namenda XR. (CAC ¶ 202.) Further, like the DPP Complaint, the IPP Complaint alleges that once patients switched their prescriptions as a result of the "hard switch" tactics, "reverse commuting" back to Namenda IR was highly unlikely. (*Id.* ¶ 126.) These allegations are substantively identical to those in the DPP Complaint, and they therefore survive a motion to dismiss for the same reasons articulated by this Court in *Namenda III.*

### c) The IPP Sufficiently Pleads That It Was
### Injured as a Result of the Hard Switch

According to Actavis, Forest, and Merz, the IPP has failed to allege a cognizable antitrust injury based on Forest's announcement that it was discontinuing the Namenda IR formulation, because the IPP will not be able to establish "antitrust injury," *i.e.,* that these tactics actually *caused* consumers to switch from Namenda IR to Namenda XR. (Forest Suppl. Br. at 10.)

**\*15**  "Antitrust injury" is a component of antitrust standing under federal law. "Unlike the United States government, which is authorized to sue anyone violating the antitrust laws, a private antitrust plaintiff must show 'standing' to sue" in a federal antitrust case. Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law,* § 3.01[A] (4th ed. 2018 suppl.). Among other standing requirements, a plaintiff must show that it has suffered "antitrust injury," which is "defined as the kind of injury that the antitrust laws were intended to prevent and 'flows from that which makes defendants' acts unlawful.' " *Id.* (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)).

Previously, with respect to the DP Action, this Court held that the DPPs would be required to show at the summary judgment stage that "patients switched to Namenda XR because of the announced withdrawal of Namenda IR ... prior to the injunction." *Namenda III,* 2016 WL 4992690, at *12. However, that holding related to the *wholesaler plaintiffs'* claims *under federal law,* which unquestionably requires that a private plaintiff demonstrate antitrust standing before he can proceed with his claim.

Here, however, the IPP alleges no claims under federal law. So that argument fails as a matter of law. To the extent Actavis, Forest, and Merz raise the federal requirement of "antitrust injury" as grounds for dismissal of the 27 state law claims in Count One, this argument is irrelevant.

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

Actavis, Forest, and Merz have not briefed whether each of the 27 *state laws* under which the IPP brings monopolization claims each contains a similar "antitrust injury" or "antitrust standing" requirement. (*See* Forest Suppl. Br. at 10–11.) *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), cited by Actavis, Forest, and Merz, is inapposite, not the least because it is a RICO case—with federal mail and wire fraud as the predicate acts—and not an indirect purchaser case based on state antitrust laws. *Id.* at 222. Therefore, I conclude that they have no basis to argue that the IPP has not sufficiently alleged injury under any of the 27 state law monopolization theories.

In supplemental briefing, Actavis, Forest, and Merz argue for the first time that the IPP Complaint does not plausibly allege any antitrust injury because the plaintiffs' expert in the DP Action "disclaimed any need to assess why patients switched to Namenda XR." (Forest Suppl. Br. at 10.) They highlight the fact that one of the DPPs' experts in that Action, Dr. Russell Lamb, calculated "aggregate overcharge damages" rather than "individualized analysis" for purposes of class certification. *Namenda V,* 2018 WL 3970674, at *10. In the DP Action, the Court found that this was sufficient to defeat Defendants' motion for summary judgment, because direct purchasers would have been indifferent to individual consumers' choices and instead would have paid attention to the market as a whole. *Id.* at *30.

The methodology used by the DPPs' expert—namely, evidence on a motion for summary judgment in the DP Action —is of no relevance in deciding whether the IPP has pleaded (not proven) a state antitrust violation. This argument is a red herring and entirely unpersuasive on a motion addressed to the pleadings.

## 2. The IPP States a Claim for Monopolization Based on the Settlement Agreements

As discussed, when a patent holder provides favorable terms to an alleged infringer as part of a settlement agreement, this is called a "reverse payment." *Actavis,* 570 U.S. at 141. The Supreme Court has held that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." *Id.* at 158. Reverse payments comprised of cash, nominally conferred as compensation for avoided litigation costs, are most suspect, but reverse payments may also provide value in the form of early entry

licenses, a period of exclusivity, or cash for avoided litigation costs. *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015) ("We do not believe *Actavis's* holding can be limited to reverse payments of cash."); *accord In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552 (1st Cir. 2016).

**\*16** As mentioned above, Count One for monopolization under the laws of 27 states alleges that, in addition to engaging in an anticompetitive hard switch, Actavis, Forest, and Merz "entered into unlawful agreements" with generic manufacturers "to settle patent infringement suits as part of an overall anticompetitive scheme." (CAC ¶¶ 193.)

Actavis, Forest, and Merz have moved to dismiss Count One on the ground that the IPP has failed to state a claim that the settlement agreements were, in and of themselves, unlawful. (Gen. Defs' Suppl. Br. at 3; Forest Suppl. Br, at 4.)

### a) The IPP Brings a Reverse Payments Case Under **Actavis**

Defendants first argue that the IPP actually disclaims reliance on a reverse payment theory under *Actavis,* 570 U.S. 136. (Gen. Defs. Suppl. Br. at 3; Forest Suppl. Br. at 4.) They support this argument with several quotations from the IPP's brief in opposition to their original motions to dismiss. (Gen. Defs. Suppl. Br. at 4; Forest Suppl. Br. at 4.) These include the following statements made by the IPP, among others: "Forest desperately tries to convert the [IPP]'s theory of its case into a reverse payment settlement case, which it is not." (IPP Resp. to Forest Br. at 25.) "The [IPP] has not pled any reverse payment agreement claims." (*Id.*)

However, despite this language, the IPP argues, in this very same brief, "Even under an Actavis analysis, the [IPP]'s Complaint survives. *See* Directs' Brief, which the [IPP] adopts and incorporates by reference." (*Id.* at 27.) Over several pages, the IPP then fleshes out a claim under *Actavis,* including that the early entry licenses should trigger scrutiny because the negotiated entry dates fell after expiration of the '703 patent and only three months before expiration of the pediatric exclusivity period, (*id.* at 27) and that the acceleration clauses in the settlement agreements, like most favored nation clauses, constitute reverse payments under *Actavis, (id.* at 29). In supplemental briefing, moreover, the IPP argued that the payments in the settlement agreements

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201 WL 8 91592©©

were unlawful because they exceeded expected litigation costs. (IPP Resp. to Forest Suppl. Br. at 10.)

So the pertinent question is: does the CAC allege facts that adequately plead a claim under *Actavis,* even if the IPP identified the proper legal theory only in the alternative?

### *b) The IPP States a Claim for Unlawful Reverse Payments in the Form of Early Entry Licenses, Cash Payments, and Unspecified Benefits*

Defendants argue—as they did in their original motion to dismiss—that early entry licenses are *per se* pro-competitive and do not constitute reverse payments in violation of the rule laid out in *Actavis.* (Forest Suppl. Br. at 6.) In particular, Defendants point out that the early entry licenses permitted the Generic Defendants to enter three months before the pediatric exclusivity period expired. (Gen. Defs. Suppl. Br. at 5.)

Defendants also argue that any monetary payments the Generic Defendants received as part of the settlement agreements constituted avoided litigation costs, as lawfully permitted by *Actavis.* (Forest Suppl. Br. at 6–7; Gen. Defs. Suppl. Br. at 5–7.)

Finally, they state that the IPP's allegations with respect to the reverse payments are bare and conclusory, and they therefore must be dismissed under *Twombly,* 550 U.S. at 557. (Forest Suppl. Br, at 6; Gen. Defs. Suppl. Br. at 6–7.)

 **\*17**  In *Namenda III,* this Court held that the DPPs had stated a claim against Actavis, Forest, and Merz based on the reverse settlement agreements with generic manufacturers. 2016 WL 4992690, at *15. As part of that decision, the Court said it could not determine as a matter of law that the settlement agreements were *not* anticompetitive simply because they allowed for entry prior to the end of exclusivity. *Id.* The Court distinguished *Actos I,* 2015 WL 5610752, at *13, which had found that certain early entry licenses did not constitute anticompetitive reverse payments, because the plaintiffs in that case had not alleged a two-step anticompetitive scheme involving a post-settlement product hop. *Id.*

This same reasoning is applicable to the instant motion. Defendants have not cited any new, controlling case law which holds that, as a matter of law, early entry licenses are immune from antitrust scrutiny. And as discussed

above, the opinions in *King Drug,* 791 F.3d at 403, and *Loestrin 24 Fe,* 814 F.3d at 552, suggest that no item of value that was transferred from plaintiff to defendant is immune from antitrust scrutiny as a matter of law. Rather, all benefits conferred as part of a settlement agreement are subject to antitrust review under the Rule of Reason. *See also* 2 William C. Holmes, *Intellectual Property and Antitrust Law* § 38:3 (Sept. 2018 update) (recent decisions on reverse payments "appear to favor a burden-shifting analysis keyed into the size of the reverse payment, proof of demonstrated anticompetitive effects, and the presence or absence of plausible justifications for the payment, with the trier balancing anticompetitive effects against procompetitive justifications").

Regarding the alleged cash payments for avoided litigation costs, the Court held in *Namenda III* that *Actavis* required courts to compare a given payment to estimated future litigation costs and to "consider whether a payment 'reflects traditional settlement considerations, such as avoided litigation costs or fair value for services' to determine if it was justified." 2016 WL 4992690, at *14 (internal quotation omitted). "These intrinsically fact-based determinations," the Court found, "cannot be made on a pre-answer motion to dismiss." *Id.* The Court also rejected Defendants' argument that the FTC had created a universal safe harbor for litigation costs up to $7 million. *Id.* at 29.

Actavis, Forest, and Merz now argue for the first time in supplemental briefing that "the FTC has subsequently extended the safe harbor to additional reverse payment consent orders." (Forest Suppl. Br. at 7). The Court has read these consent orders. They do exclude "compensation for saved future litigation expenses of up to $7 million." *See, e.g.*, Stip. Order at 3–4, *FTC v. Altergan,* No. 17-cv-312 (N.D. Cal. Jan. 23, 2017), ECF No. 4. But they do not announce a shift in FTC policy that would automatically immunize all payments under $7 million in all lawsuits and contexts from allegations of anticompetitive conduct under *Actavis.*

Finally, the Court disagrees with the Defendants that the IPP has not met its burden under *Twombly* with respect to the reverse payments simply because the Complaint does not estimate the value of the payments or anticipated litigation costs. (Gen. Defs. Suppl. Br. at 6.) The Complaint alleges that the Generic Defendants "very likely received something of value in exchange for the agreement to delay entry," (CAC ¶ 76) and no more is required at the motion to dismiss stage. Courts do not "require that the plaintiffs

provide precise figures and calculations at the pleading stage" because "very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis." *Loestrin*, 814 F.3d at 552; *see also In re Opana ER Antitrust Litigation*, 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016) ("precise valuation may require discovery").

### c) The IPP Sufficiently Alleges That It Was Injured as a Result of the Settlement Agreements.

**\*18**  Finally, Defendants argue that the IPP fails to adequately plead that the settlement agreements caused it antitrust injury. (Gen. Defs. Br. at 26.) The IPP's injuries are too speculative, they argue, because "Plaintiffs sole theory of harm ... is that consumers would have been able to purchase lower-price generic products earlier" had the litigation not settled. (*Id.*) Obviously, this would have lowered the amount the IPP would have to reimburse individual consumers who were beneficiaries under its plans.

The IPP alleges that, absent the unlawful settlement agreements, one of three events would have occurred that would have allowed for earlier entry of generic Namenda: (i) the generics would have prevailed in the patent litigation against Forest and Merz; (ii) the Generic Defendants would have launched "at risk" prior to the resolution of the patent litigation; or (iii) Forest and Merz would have settled the litigation legally with an earlier generic entry date. (CAC ¶ 81.)

The IPP's theory is similar to that of the DPPs, and in *Namenda III* this Court found that the DPPs had adequately alleged antitrust injury as a result of the settlement agreements. *Namenda III*, 2016 WL 4992690, at \*15.

Specifically, with respect to the first early entry scenario, this Court held that, while the DPPs had alleged no facts to suggest that Forest's and Merz's patent was invalid or that the Generic Defendants would have prevailed in litigation, this could be left to the summary judgment stage. *Id.* ("To survive a motion for summary judgment, [the DPPs] will have to substantiate these allegations with evidence suggesting that the settlement agreements did, in fact, delay generic entry and that the delay had the effect of allowing Forest to complete the hard switch."). There is no reason this Court should now find otherwise with respect to the CAC in the IP Action.

With respect to the second possible early entry scenario, an "at risk" launch, the IPP has alleged that the FDA tentatively approved the ANDAs of several of the generic companies in early 2010, (CAC ¶ 82, 83), and that an unusually large number of generic manufacturers (14) submitted ANDAs with Paragraph IV certifications for Namenda IR, as compared to other branded drugs, (*id.* ¶ 69). Defendants argue that this is insufficient to show that an "at risk" launch was anything more than speculative, particularly given the expense of "at risk" launches and the fact that the Delaware court had issued claim construction opinions in the patent litigation that were unfavorable to the generic manufacturers. (Forest Br. at 41–42.) Again, however, this Court heard these very same arguments in *Namenda III* and found that they were more appropriately determined after discovery at the summary judgment stage. 2016 WL 4992690, at \*15.

Finally, with respect to the third, "alternative settlement" theory, the IPP alleges that, in the absence of unlawful settlement agreements that caused the Generic Defendants to act against their self-interest when settling, earlier entry would have been possible. (CAC ¶ 84.) Defendants argue that this impermissibly second guesses an otherwise pro-competitive settlement. (Forest Br. at 44 ("Plaintiffs [*sic*] cannot premise an antitrust theory on the claim that they [*sic*] could imagine a different agreement that might have been *even more* procompetitive.") (emphasis in original).) Once again, however, the Court rejected this argument in *Namenda III*, 2016 WL 4992690, at \*15; and other courts have expressly recognized the viability of the "alternative settlement" theory in this type of litigation, *In re Androgel Antitrust Litig. (No. II)*, No. 09-md-2084, 2018 WL 2984873, at \*16 (N.D. Ga. June 14, 2018) (collecting cases).

**\*19**  This Court thus concludes that the IPP has stated a claim for monopolization on the basis of the settlement agreements.

### 3. The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One

Defendants next argue that the IPP fails to state a claim for an "anticompetitive scheme" under Count One. (Forest Suppl. Br. at 9.) Defendants argue that, because the IPP fails to state a claim for either an anticompetitive hard switch or for anticompetitive settlement agreements, it cannot use an "overarching scheme" claim to tie this conduct together. But since this Court has already found that the IPP does state a

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 424 of 520
PageID: 9345

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

claim on the basis of both the hard switch and the settlement agreements, this argument fails.

In addition, any ruling regarding the duplicative nature of the overarching scheme claim was confined to the DP Action. The DPPs had brought five claims, the first three of which alleged violations of Section 2 of the Sherman Act. (15-cv-7488, Dkt. No. 29 ¶¶ 237–65.) In the DPP Complaint, Count I was based on the hard switch, and Count III was based on the settlement agreements. (*Id.*) Count II alleged an "overarching scheme" based on the hard switch and settlement agreements. (*Id.*) Counts I through III were all asserted against Actavis, Forest, and Merz. (*Id.*) In *Namenda III*, this Court held that the "overarching scheme" claim was duplicative of the claims related to the product hop and the settlement agreements. 2016 WL 4992690, at *16.

The IPP Complaint is structured differently. It contains four Counts, the first two of which allege antitrust offenses under the laws of 27 states. (CAC ¶¶ 191–210.) As discussed earlier in this opinion, Count One alleges monopolization against Actavis, Forest, and Merz based on both the hard switch and the settlement agreements. (*Id.*) Count Two alleges a conspiracy to monopolize against all Defendants—Actavis, Forest, Merz, and the Generic Defendants—and bases these allegations on the settlement agreements but not on the hard switch. (*Id.*) Plainly, Counts One and Two are not duplicative because (i) they are asserted against different groups of defendants, and (ii) they are grounded in different conduct (conspiracy to monopolize being a separate theory from actual monopolization).

The Court therefore denies Actavis, Forest, and Merz's motion to dismiss Count One.

### 4. The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action

In their original brief in support of their motion to dismiss both the DP and IP Actions, Actavis, Forest, and Merz argued that the DPPs' claims were time-barred. (Forest Br. at 62–65.)

In *Namenda III*, this Court rejected Defendants' argument that the DPPs' claims based on the settlement agreements were time-barred because the DPP Complaint was filed more than five years after the last settlement agreement was executed. 2016 WL 4992690, at *16. Relying on *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295–96 (2d Cir. 1979),

it held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations periods"—but confined the damages period to four years before the filing of the DP Action based on the four-year statute of limitations in the Sherman Act. *Id.*

 **\*20**  The original brief's discussion of the statute of limitations and the IPP Complaint was limited to two footnotes. The first footnote urged the Court to limit the IPP's damages "to four years prior to the filing of the Complaint—August 19, 2011, as opposed to the damages period asserted by IPPs [*sic*] as of April 14, 2010." (*Id.* at 62 n.41.)

This I cannot do. As Defendants themselves have acknowledged, the limitations period for each state's antitrust law is not uniformly four years. (*See* App'x 2.) Moreover, the parties have not briefed whether *Berkey Photo*, 603 F.2d at 267–68, which considered the question of ongoing injury with respect to the Sherman Act, is applicable to antitrust claims brought under state law.

In their second footnote, Defendants argue: "[T]he antitrust laws of 26 states alleged by IPPs [*sic*], the consumer protection laws of 21 states alleged by IPPs [*sic*], and the unjust enrichment claims of 28 states alleged by the IPP have limitations periods of five years or less (*see* Appendices 2–4), making it likely that these claims are also time-barred." (*Id.* at 65 n.42.)[15]

[15]  The Generic Defendants adopt this argument in Actavis, Forest, and Merz's brief with their own footnote: "For the reasons set forth in Forest's motion to dismiss, Plaintiffs claims are also barred by the statute of limitations." (Gen. Defs. Br. at 50 n.27.) My holding above applies equally to the Generic Defendants.

"Likely" is not a standard that results in dismissal. This Court cannot make a sweeping inference about statutes of limitation for state antitrust laws on the basis of federal cases interpreting the Sherman Act. Nor will it independently undertake a review each state's requirements, armed with only a number in the cell of a table and without the movants' having briefed the issues. If the issue is important enough to movants, they can call relevant cases under relevant laws to the court's attention. I will not do Defendants' work for them.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 425 of 520
PageID: 9346

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

As a result, Actavis, Forest, and Merz's motion to dismiss—or, in the alternative, shorten—the Count One claims on statute of limitations grounds is denied without prejudice. However, as I will not immediately entertain a new motion, they will have to wait until discovery is over to make any renewed motion.

### B. The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others

I now turn to Defendants' arguments regarding the individual state law claims alleged under Count One.

### 1. The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States

Defendants argue that the IPP may bring class claims only under the laws of eleven states—Delaware, Florida, Georgia, [16] Kansas, Nevada, New Jersey, New York, Pennsylvania, [17] South Carolina, and Virginia—because, as the Named Plaintiff, the IPP "lack[s] standing to assert claims under the laws of the states in which they [*sic*] do not reside or in which they [*sic*] suffered no injury." (Forest Br. at 65–66; Gen. Defs. Br. at 32–33.)

[16]    The IPP Complaint does not allege any claim under Georgia law, under any of Counts One through Four, (CAC ¶¶ 191–231.)

[17]    The IPP Complaint does not allege any claim under Pennsylvania law, under any of Counts One through Four. (CAC ¶¶ 191–231.)

In supplemental briefing, however, Defendants concede that, pursuant to the Second Circuit's recent ruling in *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018), this is a "question of predominance under Rule 23(b)(3), not a question of standing under Article III." (Gen. Defs. Suppl. Br. at 9 (quoting *Langan*, 897 F.3d at 96).))

**\*21**  In *Langan*, which came before the Second Circuit on review of a grant of class certification, the Second Circuit denied Defendants' motion to de-certify the class and dismiss the case because the named plaintiff had not suffered injury-in-fact in each state where she asserted claims:

> [W]e write to make explicit what we previously assumed in *In re Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013): as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), *id.* at 126–27, not a question of 'adjudicatory competence' under Article III[.]

897 F.3d 88, 93 (2d Cir. 2018). Since *Langan*, a number of district court opinions have followed its reasoning to deny motions to dismiss state law claims on Article III standing grounds because the named plaintiff did not make in-state purchases and thereby suffer injury-in-fact in those states. *See, e.g., Daniel v. Tootsie Roll Indus., LLC*, No. 17-cv-7541, 2018 WL 3650015, at *5 (S.D.N.Y. Aug. 1, 2018) (applying *Langan* to hold that named plaintiffs had Article III standing to assert claims on behalf of "nonparty class members with claims subject to different state laws"); *Donnenfeld v. Petro, Inc.*, No. 17-cv-2310, 2018 WL 4356727, at *12 (E.D.N.Y. Sept. 12, 2018) (denying defendant's motion to dismiss state consumer protection claims in states in which the plaintiff did not reside); *Holve v. McCormick & Co., Inc.*, No. 16-cv-6702, 2018 WL 3861406, at *10 (W.D.N.Y. Aug. 14, 2018) (holding that named plaintiff had Article III standing to bring class claims under Maryland state law). Thus, the Court will not presently grant Defendants' motion to dismiss a broad swath of the IPP's state law claims for lack of Article III standing.

I write briefly to note that *Langan* gives rise to certain prudential concerns for CAFA class actions. It seems clear enough that Sergeants Benevolent cannot state a claim under the laws of at least some states whose laws are pleaded in its Complaint. Put otherwise, if there were no CAFA and the IPP brought a monopolization claim under the law of, say, Utah, that action would be dismissed on motion because the IPP could not state a claim under the relevant law. No state court would allow it to continue as a plaintiff on the theory that the proper time to deal with this question was at class certification. An entity that has no claim fails to state a claim

—not as a matter of Article III standing (the issue addressed in *Langan*) but under Rule 12(b)(6) or its state court equivalent. Yet a number of courts, purporting to follow *Langan*, have concluded that, because a class plaintiff who fails to state a claim under a particular state's law (*i.e.*, it cannot recover for the alleged violation of law for its own account) nonetheless has Article III standing, the issue of whether the plaintiff fails to state a claim should abide a decision on a motion for class certification.

This court does not read *Langan* any more broadly than it purports to reach. Nothing in *Langan*, as I read it, precludes a defendant from moving to dismiss a CAFA plaintiff's claims under a particular statute pursuant to Rule 12(b)(6), on the grounds that the plaintiff fails to state a claim for its own account—a question entirely different from whether it has constitutional standing. CAFA—which confers no substantive rights on any litigant, but simply permits certain cases that do not otherwise belong in a federal court to be brought here—cannot be read to enable plaintiffs to state claims when the laws of the several states specifically provide to the contrary. It is imperative that too much not be read into *Langan* since neither CAFA nor state consumer protection laws require counsel to compete with other advocates for the positions of class counsel and lead plaintiff, both of which create healthy incentives to find the best class representative(s) possible.

**\*22** For those courts that read *Langan* more broadly than I do, it is enough that a district court can conclude that a class plaintiff is not an appropriate class representative because he/it fails to state a claim at the class certification stage. But that comes at cost. A district court's inability to address these arguments at the motion to dismiss stage increases a plaintiff's leverage with respect to settlement negotiations, without any additional effort on its part.

So while I accept that *Langan* forecloses any argument that a CAFA plaintiff's claims should be dismissed on motion for lack of Article III standing, I decline to read it as foreclosing consideration of a properly made Rule 12(b)(6) motion at the motion to dismiss stage—a subject that the Court of Appeals nowhere addressed.

### 2. The IPP Fails to State a Claim for Monopolization in Three States That Follow *Illinois Brick* (Florida, Massachusetts, and Utah)

Defendants next argue that the IPP fails to state a claim under Rule 12(b)(6) under the antitrust laws of Florida, Massachusetts, Puerto Rico, Rhode Island, and Utah, because these states follow the rule of *Illinois Brick* and prohibit indirect purchaser actions. (Forest Br. at 66; Gen. Defs. Br. 35–36; Gen. Defs. Suppl. Br. at 10 n.4.) [18] They are correct about three of these states.

[18]    Defendants also argue that any states that have not expressly adopted or rejected *Illinois Brick* should be treated as barring indirect purchaser claims. (Gen. Defs. Br. at 36 n.16 (citing *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011)).) However, Defendants have not indicated which states these would be.

#### a) Florida

Count One of the IPP Complaint alleges a claim for monopolization under Fla. Stat. §§ 501.201, *et seq.* (CAC ¶ 201(d).) Actavis, Forest, and Merz argue that because the Florida Antitrust Act applies *Illinois Brick*, the IPP cannot recover as an indirect purchaser. (Forest Suppl. Br. at 10 n.4.)

I first note that the IPP incorrectly cites to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*, rather than the Florida Antitrust Act, *id.* §§ 542.15, *et seq.* I construe this as a typographical error but hold that Defendants are correct that the Florida Antitrust Act does not permit indirect purchaser recovery. "Florida adheres to the 'direct purchaser' rule enunciated in *Illinois Brick*." *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996).

The Court therefore **DISMISSES** the IPP's Florida Antitrust Act claim under Count One.

#### b) Massachusetts

Count One of the IPP Complaint alleges a claims for monopolization under Mass. Gen. Laws, ch. 93A. (CAC ¶ 201(i).) Defendants move to dismiss the Massachusetts law claim under Count One on the basis that Massachusetts follows *Illinois Brick*. (Gen. Defs. Suppl. Br. at 10 n.4 (citing *Ciardi v. Hoffman-La Roche, Ltd.*, 762 N.E.3d 303, 308 (Mass. 2002)).)

Again, I note that the IPP has incorrectly cited to chapter 93A, Massachusetts' consumer protection statute, rather than chapter 93, its antitrust statute. I again treat this as a typographical error, particularly since the IPP's conspiracy to monopolize claim is brought under chapter 93. I dismiss the claim anyway because *Ciardi* is squarely on point. Chapter 93 A (consumer protection) allows indirect purchaser claims; chapter 93 (antitrust) does not. "Because the Antitrust Act is to be construed federal harmony with judicial interpretations of comparable Federal antitrust statutes, the rule of law established in *Illinois Brick Co. v. Illinois ...* would apply with equal force to preclude claims brought under G.L. c. 93 by indirect purchasers in Massachusetts." *Ciardi*, 762 N.E.2d at 308; *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785, 2018 WL 3973153, at *32 n.20 (D. Kan. Aug. 20, 2018).

**\*23** The Court therefore **DISMISSES** the IPP's Massachusetts law claim under Count One.

### c) Puerto Rico

Count One of the IPP Complaint alleges a claim for monopolization under the Puerto Rico Antitrust Act ("PRAA"), 10 P.R. Laws §§ 263, *et seq.* (CAC ¶ 201(aa).) Defendants move to dismiss because, while Puerto Rico does not expressly prohibit suits by indirect purchasers, the PRAA is modeled after the Clayton Act, under which indirect purchasers lack standing pursuant to the Supreme Court's decision in *Illinois Brick*. (Forest Suppl. Br. at 10 n.4.) The IPP counters that the PRAA does not limit standing to direct purchasers. (IPP Resp. to Gen. Defs. Br. at 11–12 (citing *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010)).)

Again, the correct citation for the PRAA is 10 L.P.R.A. §§ 257, *et seq.*, as section 263 covers price discrimination, specifically. The monopolization offense is found at 10 L.P.R.A. § 260. I once again construe this as a typographical error.

The Court recognizes that many district courts in the continental United States have dismissed indirect purchaser claims under the PRAA for lack of standing, based on the idea that the PRAA is modeled on federal statutes that do not extend standing to indirect purchasers. *See, e.g., Opana ER*, 162 F.Supp.3d at 723 (collecting cases); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011).

Nonetheless, this Court finds that the U.S. District Court for the District of Puerto Rico has more faithfully interpreted the standing requirements of the PRAA, in light of how the Supreme Court of Puerto Rico reads that statute. *Rivera-Muniz*, 737 F. Supp. 2d at 61 (citing *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 520 (P.R. 1994)).

In *Pressure Vessels*, the Supreme Court of Puerto Rico interpreted the private damages section of the priva to hold that private remedies were available to any plaintiff who met the following conditions: (1) the person was harmed in his business or property (2) by reason of (3) actions prohibited by law. 137 D.P.R. at 518. The Supreme Court of Puerto Rico reasoned that, in order to satisfy this second prong, a plaintiff need only allege that "as a consequence of the legal violation, he has been injured." *Id.* at 520. Based on this interpretation of the PRAA in *Pressure Vessels*, the Court in *Rivera-Muniz* held, "Because Puerto Rico liberally construes its standing requirements in private antitrust cases, it is immaterial whether Plaintiffs are direct or indirect purchasers." *Rivera-Muniz*, 737 F. Supp. 2d at 61 (internal citation omitted).

Defendants' motion to dismiss this claim is, therefore, **DENIED**.

### d) Rhode Island

Count One of the IPP Complaint alleges a claim for monopolization under R.I. Gen. Laws §§ 6-36-1, *et seq.* (CAC ¶ 201(t).) Defendants move to dismiss this claim on the grounds that Rhode Island's *Illinois Brick* repealer statute went into effect on July 15, 2013. (Forest Suppl. Br, at 10 n.4.) Several federal district courts have held that the statute does not have retroactive application. *See, e.g., In re Effexor Antitrust Litig.*, No. 11-cv-5661, 2018 WL 4466050, at *16 (D.N.J. Sept. 18, 2018) (also analyzing general presumption against retroactive application in Rhode Island law); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D. Pa. 2014) (same).

**\*24** The Court agrees with Defendants and with the weight of federal case law and finds that the IPP cannot bring claims under Rhode Island's antitrust law for conduct occurring before July 15, 2013. As a result, the Court **DISMISSES IN PART** the Rhode Island law claim under Count One, to the extent it seeks damages prior to that date. *See Niaspan*,

42 F. Supp. 3d at 759 (restricting end payor plaintiffs from "recover[ing] for any overcharges incurred before the ... Rhode Island repealer statute took effect").

### e) Utah

Count One of the IPP Complaint alleges a claim for monopolization under Utah Code §§ 76-10-1301, *et seq.* [*sic*].[19] (CAC ¶ 201(w).) Defendants move to dismiss this claim on *Illinois Brick* grounds, arguing, "Indirect purchasers may only bring claims under the Utah Antitrust Act if they are citizens or residents of Utah." (Gen. Defs. Br. at 35–36 n.15 (citing Utah Code § 76-10-3109).)

[19]    Since this provision governs prostitution offenses, and since Count Two cites the Utah Antitrust Act at Utah Code §§ 76-10-3101, *et seq.*, (CAC ¶ 207(x)), the Court once again assumes this is a typographical error.

Despite Defendants' characterization, this is not in fact an *Illinois Brick* argument but instead an argument about the ability of the Named Plaintiff to state a claim under the Utah Antitrust Act pursuant to Federal Rule of Civil Procedure 12(b)(6). The statute reads, in relevant part: "A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant." Utah Code § 76-10-3109.

"The majority of courts that have been presented with this statute require at least one Utah citizen or resident be a named plaintiff." *Effexor*, 2018 WL 6003893, at *17 (collecting cases); *see also GEICO Corp. v. Autoliv, Inc.*, No. 16-13189, 2018 WL 5077767, at *27 (E.D. Mich. Aug. 30, 2018) (dismissing Utah antitrust claim with prejudice.)

Sergeants Benevolent, the sole Named Plaintiff in this case, has not alleged anywhere in the Complaint that it is a citizen or resident of Utah. Therefore, it fails to plead an element required to state a claim under the Utah Antitrust Act. The possibility that some beneficiary of the IPP may have retired to Utah is not enough, because none of the IPP's beneficiaries is a *named* plaintiff. Defendants' motion to dismiss the Utah monopolization claim under Count One pursuant to Rule 12(b)(6) is, therefore, **GRANTED**.

### 3. The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada)

In supplemental briefing, Defendants argue for the first time that the IPP's state antitrust claims under the laws of Arizona, Hawaii, and Nevada fail because the IPP has not alleged that it has complied with state law notice requirements. (Forest Suppl. Br. at 12; Gen. Defs. Suppl. Br. at 12–13.)

### a) Hawaii[20]

[20]    Although this Court would ordinarily proceed through the state law claims in alphabetical order, there exists much more fulsome case law regarding the pre-suit notice requirement under the Hawaii Antitrust Act than there does for any of the other states.

Count One of the IPP Complaint alleges an antitrust under Haw. Rev. Stat §§ 480, *et seq.* (CAC ¶ 201(e).) The Hawaii Antitrust Act reads, in relevant part: "A class action for claims for a violation of this chapter other than claims for unfair or deceptive acts or practices may be filed, and may be prosecuted on behalf of indirect purchasers by a person other than the attorney general as follows: (1) A filed copy of the complaint and all relevant supporting and exculpatory materials in possession of the proposed class representative or its counsel shall be served on the attorney general not later than seven days after filing of the complaint." Haw. Rev. Stat. § 480-13.3(a).

**\*25** Generic Defendants argue that notice of suit must be provided to the state's attorney general and that failure to do so requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing Haw. Rev. Stat. § 480-13.3).) The IPP responds that at least two courts have allowed plaintiffs to proceed under the Hawaii Antitrust Act, despite their failure to comply with pre-suit notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253–54 (D. Conn. 2015) (*Aggrenox I*); *In re Aftermarket Filters Antitrust Litig.*, No. 08-md-4883, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009)).)

The Court finds the cases cited by the IPP to be persuasive on the question of whether failure to comply with the statutory

201WL 8 91592©©

requirement is fatal to a claim under the Hawaii Antitrust Act. In *Aftermarket Filters*, 2009 WL 3754041, at \*6, the court held that the statutory scheme did not imply that dismissal was the proper remedy for failing to comply with the notification requirement. Moreover, defendants could not use the notification requirement "as a shield to avoid answering for alleged anti-competitive behavior." *Id.* The court in *Aggrenox I*, 94 F. Supp. 3d at 253–54, adopted this reasoning.

The case cited by Defendants, *In re Asacol Antitrust Litig.*, No. 15-cv-12370, 2016 WL 4083333, at \*14 n.14 (D. Mass. July 20, 2016) (*Asacol I*), is not persuasive. There, the court admitted that "[c]ourts are divided on whether Hawaii's statute necessitates dismissal" but dismissed the claim without looking specifically to Hawaii law. *Id.*

However, even if I were to find that the Hawaii statute required dismissal of the IPP's claim in Hawaii state court, I would find that Federal Rule of Civil Procedure 23 is comprehensive with respect to pre-filing requirements in federal court, as held by the United States Supreme Court in *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393 (2010). "The Second Circuit has not taken up the problem of the effect of *Shady Grove's* split opinions." *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at \*5 (D. Conn. Aug. 9, 2016) (*Aggrenox II*). According to Justice Scalia's plurality opinion, "the only test of a Rule's validity under the Rules Enabling Act is 'whether it regulates procedure,' " which the Court "found that Rule 23 did." *In re Trieligant Corp.*, 11 F. Supp. 3d 82, 116 (D. Conn. 2014). According to Justice Stevens' concurrence, if the state rule conflicts with Rule 23, the state rule will yield only if it is not "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 419–20 (Stevens, J., concurring).

I find that Hawaii's limitation on class actions is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23." *In re Restasis Antitrust Litig*, No. 18-md-2819, 2018 WL 5928143, at \*6 (E.D.N.Y. Nov. 13, 2018). It thus conflicts with the federal rule. *Id.* Under the plurality approach, therefore, the Hawaii Antitrust Act's notice provision would yield to Rule 23.

Moreover, a majority of federal courts have held that, pursuant to Justice Stevens' approach, the pre-suit notice requirement is not substantive. *See, e.g., Restasis*, 2018 WL 5928143, at \*6. *Aggrenox I*, 94 F. Supp. 3d at 254, is

particularly persuasive. There, the court reasoned that the plain language of the Hawaii statute itself "does not appear ... to create a substantive right to recovery that only 'vests' after some action or inaction of the state attorney general. Rather, it creates a right to 'bring an action based on unfair methods of competition' in section 480–2, without any reference to notice, and delineates procedural prerequisites for class actions under the chapter in section 480–13.3." *Id.* The court there also observed that defendants had not drawn the court's attention to any arguments, *e.g.*, from the legislative history, that would counsel a different reading. *Id.*

**\*26**  This Court agrees with the weight of federal case law, which holds the pre-suit notice provision in the Hawaii Antitrust Act would, first of all, not require dismissal of the suit in state court and that, even if it did, would not override Rule 23 to bar a claim in federal district court.

The Court therefore **DENIES** Defendants' motion to dismiss the Hawaii law claim under Count One.

### b) Arizona

Count One of the IPP Complaint alleges an antitrust claim under Ariz. Rev. Stat. §§ 44-1403, *et seq.* (CAC ¶ 201(a).) The Arizona Antitrust Act provides, in relevant part: "A person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general." Ariz. Rev. Stat. § 44-1415(a).

In supplemental briefing, Defendants argue that notice of suit must be provided to the state's attorney general when the complaint is filed, and that failure to comply with the notice provision is grounds for dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at \*10–\*11; *Asacol I*, 2016 WL 4083333, at \*14–\*15).) In response, the IPP cites *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017), where the district court allowed claims under Arizona's Antitrust Act to proceed, despite the plaintiffs' failure to comply with the statutory notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16.)

This Court does not see a meaningful distinction between the pre-suit notification requirement under the Hawaii Antitrust Act and that under the Arizona Antitrust Act, even if other

Case 1:19-md-02875-RMB-SAK   Document 520-7   Filed 07/17/20   Page 430 of 520
PageID: 9351

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

courts have found to the contrary. Moreover, in addition to requiring those filing complaints to notify the attorney general, the statute by its terms also obliges those *answering* complaints to notify the attorney general. It is hard to imagine that failure to comply with this requirement would necessitate dismissal.

The Court is not persuaded by the reasoning in *Effexor*, 2018 WL 4466050, at *10–*11, or in *Asacol I*, 2016 WL 4083333, at *14–*15, which found that there was no conflict between Rule 23 and the Arizona pre-filing requirement. Instead, this Court agrees with the court in *Restasis*, 2018 WL 5928143, at *6, which found that the United States Supreme Court had held in *Shady Grove* that Rule 23 is "not silent on the question of whether a particular claim is eligible for class treatment." *Restasis*, 2018 WL 5928143, at *6. Rule 23 contains its own limitations on those claims eligible for class treatment; "[t]herefore, a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23 conflicts with the federal rule." *Id.* Like Hawaii's statute, therefore, this Court could only find that this requirement was grounds for dismissal if it also found the requirement to be substantive.

For the reasons already discussed, however, because this Court finds that, Arizona's pre-suit notice requirement is purely procedural, Defendants' motion to dismiss the Arizona antitrust claim under Count One is **DENIED**.

### *c) Nevada*

Count One of the IPP Complaint alleges an antitrust claim under Nev. Rev. Stat. §§ 598A.060, *et seq.* (CAC ¶ 201(n).) The Generic Defendants argue that notice of suit must be provided to the state's attorney general or the claim cannot proceed. (Gen. Defs. Suppl. Br. at 12 (citing Nev. Rev. Stat. § 598A.210(3)).) The statute states, in relevant part: "Any person commencing an action for any violation of the provisions of this chapter shall, simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. § 598A.210(3).

**\*27** Defendants argue that failure to notify the attorney general requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at *10–*11; *Asacol I*, 2016 WL 4083333, at *14–*15).) In response, the IPP does not cite any cases that discuss Nevada law particularly, but instead argues generally that "pre-suit notice requirements are procedural

and, therefore, superseded by federal law." (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 346 (7th Cir. 1997)).)

Only scant federal case law interprets the Nevada Antitrust Act's statutory notice requirement in light of *Shady Grove*, and the Court is not aware of any Nevada cases that discuss whether the requirement is substantive or procedural in nature.

Again, however, the Court sees no meaningful difference between the text of Nevada's statute and that of Hawaii's. The Court remains unpersuaded by the reasoning of the two cases cited by Defendants, for the reasons discussed above.

As a result, Defendants' motion to dismiss the Nevada law claim under Count One is **DENIED**.

### 4. The IPP Fails To State a Claim for Monopolization Under the Law of Kansas

Defendants argue that the IPP may not maintain a claim for monopolization (as opposed to conspiracy to monopolize) under the laws of Kansas, New York, and Tennessee because those statutes do not permit recovery for unilateral anticompetitive conduct. (Forest Br. at 67.) [21] For example, commentators have observed that "Section 50-132 [of the Kansas Restraint of Trade Act] would not appear to extend to cases of unilateral monopolization." 6 Julian von Kalinowski, Peter Sullivan, & Maureen McGuirl, *Antitrust Laws and Trade Regulation* § 116.03 (2d ed. 2018); *see also Commonwealth Electrical Inspection Servs. v. Town of Clarence*, 6 A.D.3d 1185, 1186 (N.Y. App, Div. 2004) (New York's Donnelly Act does not create a cause of action for unilateral anticompetitive conduct); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (the Tennessee Trade Practices Act does not create a cause of action for unilateral monopolization).

[21]   Although Actavis, Forest, and Merz purport to seek dismissal of the IPP's monopolization claims at CAC ¶¶ 207(g), 207(p) and 207(w), those paragraph numbers actually correspond to Count Two of the IPP Complaint—conspiracy to monopolize—which is not unilateral conduct by definition. As it has several times throughout this opinion, the Court assumes that this is a

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

typographical error, and it treats the pleadings as if Actavis, Forest, and Merz instead move to dismiss the equivalent state law claims under Count One of the IPP Complaint.

But the IPP Complaint does not allege monopolization via unilateral action. It pleads "plead some sort of concerted action" in support of its non-conspiracy monopolization claims. (*See* Forest Br. at 67.) The most obvious example is the IPP's allegation, in support of Count One, that Forest and Merz "entered into unlawful agreements with the Generic [ ] Defendants." (CAC ¶ 193). That is by definition *not* unilateral action. The IPP Complaint also plausibly alleges that Forest's hard switch was executed with the participation of other parties; those parties may not have been named as defendants but they did not have to be. For example, Forest signed "an exclusive distribution contract in November, 2014 for Namenda IR with Foundation Care, a mail-order-only pharmacy." (CAC ¶ 95). Forest also "agreed to pay rebates to health plans to make sure they put Namenda XR on the same tier as Namenda IR so that members would not have an incentive to choose Namenda IR and patients did not have to pay higher co-payments for Namenda XR." (CAC ¶ 110). There is nothing unilateral about any of this. Unilateral conduct might include, in the pharmaceutical context: launching a false advertising campaign against a competitor; filing a sham petition with the FDA; filing a sham patent with the PTO; or initiating sham litigation against a competitor. None of that is alleged here.

**\*28** However, Actavis, Forest, and Merz also argue that, under the law of these three states, monopolization, absent conspiracy, is not a cognizable cause of action. Since Count Two alleges conspiracy to monopolize, in effect what Defendants argue is that Counts One and Two are necessarily duplicative insofar as they are raised under the law of these three states.

### a) Kansas

Defendants cite *In re Relafen Antitrust Litigation*, 221 F.R.D. 260, 283 (D. Mass. 2004), for the proposition that Kansas "prohibits combinations and conspiracies only" and move to dismiss on that basis. (Forest Br. at 67.) The IPP argues that it has pled concerted action in the form of the settlement agreements as the foundation for its Kansas law claim under Count One. (IPP Resp. to Gen. Defs. Br. at 14.)

The Kansas Restraint of Trade Act ("KRTA") provides, in relevant part, "No person, servant, agent or employee of any person doing business within the state of Kansas shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business[.]" Kan. Stat. § 50-132; *see also Good v. Dickinson*, 278 P. 730, 732 (Kan. 1929) (sale of business, although bilateral conduct, did not constitute trust or combination as required to allege monopolization). The Kansas Supreme Court has observed (albeit in dicta) that, when bringing a claim for monopolization, conspiracy is "legal requirement under Kansas antitrust law." *Bergstrom v. Noah*, 974 P.2d 520, 528 (Kan. 1999); *but see Bellinder v. Microsoft Corp.*, Nos. 00-c-0855, 00-C-00092, 99-cv-17089, 2001 WL 1397995, at *1 (Kan. Dist. Ct. Sept. 7, 2001) (certifying class action under Kan. Stat. § 50-132 where plaintiffs alleged that Microsoft "abused its monopoly power" but did not allege conspiracy). The weight of published, appellate case law in Kansas holds that the IPP may not proceed on a theory of monopolization unless accompanied by allegations of conspiracy.

Other federal district courts have agreed that monopolization, absent conspiracy, does not state a claim under the KRTA. *Relafen*, 221 F.R.D. at 283; *EpiPen*, 2018 WL 3973153, at *33.

Obviously, the IP's claim for conspiracy to monopolize is in Count Two, not Count One, and this court will dismiss duplicative counts, Defendants' motion to dismiss the Kansas claim under Count One is, therefore, **GRANTED**.

### b) New York

The Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination" that establishes a monopoly or restrains competition. N.Y. Gen. Bus. Law § 340(1). As the New York Court of Appeals has held, the term "arrangement" "must be interpreted as contemplating a reciprocal relationship of commitment between two or more legal or economic entities similar to but not embraced within the more exacting terms, 'contract', 'combination' or 'conspiracy'." *State v. Mobil Oil Corp.*, 344 N.E.2d 357, 359 (N.Y. 1976); *see also* Glob. Reins. *Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) ("An antitrust claim under the Donnelly Act ... must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market.")

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

In other words, a plaintiff must allege concerted action to bring a claim under the Donnelly Act, which the IPP does here. (*See supra.*) However, unlike the Kansas statute, there is no requirement that a plaintiff use the word "conspiracy" in order to state a claim.

**\*29** At least one other federal district court has refused to dismiss a Donnelly Act claim that alleged concerted action but not conspiracy. *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2660782, at \*3 n.15 (D.N.J. Mar. 10, 2008).

Defendants' motion to dismiss the New York claim under Count One is, therefore, **DENIED**.

#### c) Tennessee

Similar to the Donnelly Act, the Tennessee Trade Practices Act ("TTPA") declares unlawful "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition," as well as those "designed, or which tend to" control prices. Term. Code. § 47-25-101. The Supreme Court of Tennessee interprets the TTPA broadly. "Its broad and comprehensive provisions cover every conceivable case of an agreement or contract made to lessen or destroy competition and control prices." *Standard Oil Co. v. State*, 100 S.W. 705, 716 (Tenn. 1907). *See also Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005) (observing that "the language of Tennessee's antitrust statutes have not changed significantly since *Standard Oil*" and finding that the TTPA prohibits "agreements" and "arrangements" that affect competition).

Defendants cite no relevant law in support of the proposition that the TTPA requires a plaintiff to allege conspiracy.

Accordingly, Defendants' motion to dismiss the Tennessee claim under Count One is, therefore, **DENIED**.

#### C. In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States

In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of monopolization based upon both the hard switch and the settlement agreements.

The Court also finds that, as a matter of law, the IPP may pursue its Count One claims for monopolization under the laws of all states **except** Florida, Kansas, Massachusetts, and Utah. Those claims are hereby **DISMISSED**. The IPP's claim for monopolization under Rhode Island law is hereby **DISMISSED IN PART** to the extent it seeks damages for injuries occurring before July 15, 2013.

### VI. Count Two: Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants

Second, the IPP brings an additional 27 state law claims grouped under the heading "Count Two: Conspiracy to Monopolize Under State Law." (CAC at 52.) The claims under Count Two are, for the most part, identical to the 27 claims under Count One. (*Id.* ¶ 207.)

Count Two differs from Count One in three significant respects.

First, Count Two alleges conspiracy to monopolize rather than actual monopolization. "Defendants have intentionally and unlawfully conspired in order to allow Forest monopolize [*sic*] the market for memantine hydrochloride in violation" of state laws. (*Id.*)

Second, the IPP asserts claims for conspiracy to monopolize under Count Two against Actavis, Forest, Merz, *and the Generic Defendants*, who are not named in Count One. (*Id.* at 52.)

Third, whereas Count One alleges injuries to indirect purchasers stemming from both the hard switch and the settlement agreements, Count Two alleges injuries to indirect purchasers stemming from the settlement agreements only. (*Id.* ¶ 205.)

**\*30** Beyond that, there are extremely minor, and likely inadvertent, differences between the state law causes of action underlying Counts One and Two. For example, Count One alleges monopolization under the laws of Florida and New Hampshire but does not allege monopolization under the laws of Illinois or Oregon. (*Compare id.* ¶¶ 201, 207.) Count Two, by contrast, alleges conspiracy to monopolize under the laws of Illinois and Oregon but does not allege conspiracy to monopolize the laws of Florida and New Hampshire. (*Id.*) There are also several differences—again, probably typographical errors—in the citations to the state codes. (*See, e.g., id.* ¶¶ 201(i), 207(i).)

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 433 of 520
PageID: 9354

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

Defendants move to dismiss Count Two in all or large part for many of the same reasons as they did for Count One, including:

- The IPP has expressly disclaimed reliance on *Actavis*, 570 U.S. at 158, and, in any event, cannot prove that the agreements contained unlawful "reverse payments, (Forest Br. at 34–60);

- Any injuries the IPP alleges it suffered due to the settlement agreements is purely speculative, (*id.* at 40–46);

- The claims are "likely" time-barred by the applicable state statutes of limitations, (*id.* at 65 n.42).

- The IPP lacks Article III standing to assert claims in states where it has not made purchases and thereby suffered injury in fact, which are all but nine states, (*id.* at 65–66);

- *Illinois Brick* bars the IPP's claims in six states, (Gen. Defs. Suppl. Br. at 10–11); and

- The IPP has failed to satisfy pre-suit notice requirements in four states, (Gen. Defs. Suppl. Br. at 11–13).

For the reasons discussed in the preceding sections of this opinions, none of these arguments has merit, with the exception of the arguments that (i) Massachusetts bars indirect purchasers from recovering under its antitrust act; (ii) Utah bars indirect purchasers from recovering under its antitrust act unless they are citizens or residents of Utah; and (iii) Rhode Island barred indirect purchasers from recovering under its antitrust act until the amendments of July 15, 2013. Therefore, the Massachusetts and Utah claims under Count Two are hereby **DISMISSED**, and the Rhode Island claim under Count Two is hereby **DISMISSED IN PART**, to the extent it seeks damages for injuries occurring before July 15, 2013.

Defendants also raise a handful of arguments specific to Count Two, *viz.*:

- The IPP does not adequately allege a conspiracy because it pleads only parallel conduct without the necessary "plus factors" that would be indicative of agreement; (Gen. Defs. Br. at 20; Forest Br. at 60);

- The Illinois Antitrust Act grants a right to bring a class action to the Illinois attorney general only (Gen. Defs. Br. at 35 n.15); and

- Oregon adheres to the law of *Illinois Brick* and therefore precludes recovery for indirect purchasers, (Gen. Defs. Br. at 35).

As with Count One, the Court first analyzes the argument of general applicability, and then turns to the Illinois and Oregon arguments.

### A. The IPP States a Claim for Conspiracy To Monopolize

Defendants argue in their original briefing [22] that the IPP fails to allege a conspiracy, thereby necessitating dismissal of Count Two, because it has not pled sufficient "plus factors" to support an inference of conspiracy. (Forest Br. at 60; Gen. Defs. Br. at 20.)

[22]    By way of background, I note briefly that the Court did not previously have occasion to consider the conspiracy issue in the DP Action. The DP Action did not expressly assert conspiracy as a cause of action, (15-cv-7488, Dkt. No. 29 ¶¶ 237–65), and the DPPs later informed the Court that they had abandoned any "inter-generic conspiracy claim" raised under Count IV of their Complaint, *Namenda V*, 2018 WL 3970674, at *25.

**\*31**  This is, of course, an argument with respect to the elements of an antitrust conspiracy under *federal* law. Neither party has briefed the elements of conspiracy—let alone what is adequate at the motion to dismiss stage—under each state's law. However, both parties have apparently used federal antitrust law as a guidepost, and this Court does the same. The Court reminds the IPP that it will be required to show at the class certification stage that common legal issues with respect to the conspiracy elements of each state's law predominate over any individual issues.

Under the guideposts laid out by federal law, the IPP has pled sufficient circumstantial evidence to support a conspiracy to monopolize.

"[C]ourts have not given much attention to conspiracy to monopolize as a distinct antitrust offense," 2-16 Earl W. Kintner et al., *Federal Antitrust Law* § 16.39 (2017).

Nonetheless, "in deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2" of the Sherman Act. 2 von Kalinowski, Sullivan, & McGuirl, *supra*, § 26.02; *see also* Areeda & Hovenkamp, *supra*, § 41.01 [A]. "In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Put another way, "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).

Defendants argue principally that parallel contingent launch provisions, on their own, are insufficient to establish a conspiracy. (Gen. Defs. Suppl. Br. at 8 (citing *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 55 (1st Cir. 2016))). Indeed, some courts in this district have found that pleading only contingent launch provisions does not survive a motion to dismiss. *See Actos I*, 2015 WL 5610752, at *23. Moreover, it is true that when plaintiffs build their conspiracy cases on contingent launch clauses alone, they often fail at the summary judgment stage. *See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-cv-1797, 06-cv-1833, 06-cv-2768, 2014 WL 2813312, at *14 (E.D. Pa. June 23, 2014). Finally, the *Nexium* court found that, at trial, the absence of evidence other than contingent launch provisions entitled the defendants to judgment as a matter of law on the conspiracy claim. *Nexium*, 842 F.3d at 55.

However, this Court disagrees that more is presently required because, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment ... or a trial." *Anderson News*, 680 F.3d at 184 (internal citations omitted).

First, the IPP has met its burden to show parallel conduct, as it has alleged that the Generic Defendants entered into settlement agreements around the same time with Forest and Merz that contained the same pertinent provisions. (*See* IPP Resp. to Forest Br. at 36–37; *see also* CAC ¶ 76.) For example, Plaintiff alleges that the Generic Defendants entered

into the settlement agreements in July, September, October, and December of 2009. (CAC ¶ 75.) Plaintiff also alleges that each of these agreements contained acceleration clauses, which led to agreement not to launch any competing generic formulations until July 11, 2015. (CAC ¶¶ 76, 79.) Even at the summary judgment stage, for example, the *Nexium* court found it significant for inferring the existence of a conspiracy that each generic competitor "agreed to delay its market entry on the express condition that every other Generic Defendant do the same." *Nexium*, 842 F. Supp. 3d at 254. The Court will not ignore this potent allegation merely because other courts have found that, after discovery, additional support is required.

**\*32**  Second, the IPP adequately alleges "plus factors" that support an inference of conspiracy at the motion to dismiss stage. The IPP Complaint directly alleges that the settlements were "negotiated collectively" or in such a manner that each Generic Defendant was informed of the pertinent terms of the other agreements. (CAC ¶¶ 75, 77.) Such collective negotiations, if true, would certainly constitute circumstantial evidence of a conspiracy.

The IPP Complaint also adequately alleges behavior against interest, which, combined with allegations of parallel conduct, can be indicative of concerted rather than independent action. *See, e.g., Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000); *Apex Oil*, 822 F.2d at 254. Forest, Merz, and the Generic Defendants entered into the settlement agreements between July and December of 2009, which allowed for generic entry no earlier than July 11, 2015. (CAC ¶ 19–29.) The FDA's automatic, 30-month stays allegedly began to expire in April 2010. (CAC ¶ 72.) The FDA tentatively approved the generics' ANDAs in January and April of 2010. (CAC ¶ 82.) This translates to a delay of roughly five years in exchange for only three months' competition within the exclusivity period, which certainly states a claim against interest that is plausible on its face.

Finally, the presence of contingent launch clauses, which are analogous to "most favored nation" provisions, raises antitrust scrutiny, even if they may have certain procompetitive effects. *See*, e.g., *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 701 (S.D.N.Y. 2013).

The Court finds that the IPP states a claim for conspiracy to monopolize.

**B. Illinois**

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201WL 8 91592©©

Count Two (but not Count One) of the IPP Complaint alleges claims under the Illinois Antitrust Act ("IAA"), 740 Ill. Comp. Stat. 10/3, *et seq.* (CAC ¶ 207(e).) Defendants move to dismiss this claim because the statute states, in relevant part, "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. Comp. Stat. 10/7(2); (Forest Suppl. Br. at 10 n.4). *See also Gaebler v. KM. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996); *Bobrowicz v. City of Chicago*, 522 N.E.2d 663, 669 (Ill. App. Ct. 1988).

The IPP responds that the restriction "does nothing more than dictate the manner in which the procedural device of a class action can proceed" and does not apply in federal court pursuant to the Supreme Court's holding in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). (IPP Resp. to Gen. Defs. Br. at 8–10.)

Courts in this circuit have split as to whether the indirect purchaser class action bar in the IAA is procedural or substantive, under Justice Stevens' concurrence in *Shady Grove. Compare Dig. Music*, 812 F. Supp. 2d at 416, with *Aggrenox II*, 2016 WL 4204478, at *6. However, the Court agrees with those cases in this circuit that have treated the IAA as stating a procedural rule applicable in Illinois state courts, rather than a substantive rule applicable to federal courts sitting in diversity jurisdiction in New York.

First, the same paragraph of the statute begins by stating that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. 10/7(2). The statute therefore does not limit the substantive rights of an injured party in an individual action. *See Aggrenox II*, 2016 WL 4204478, at *6 ("[A]ny indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action.")

 *33 Moreover, were the IAA to prohibit class actions altogether, the statute would read no differently than the New York class actions bar at issue in *Shady Grove*—a fact observed by at least one other court in this circuit. *Aggrenox II*, 2016 WL 4204478, at *6 ("I cannot square Shady Grove's allowance of a Rule 23 class action despite New York's class-action bar with the dis allowance of a Rule 23 class action in the case of Illinois's class-action bar simply on the basis that Illinois's bar is narrower.").

Defendants' motion to dismiss the Illinois claim for conspiracy to monopolize under Count Two is **DENIED.**

### C. Oregon
Defendants argue that "the laws of Oregon bar recovery for at least part of the period for which Plaintiff seeks damages." (Gen. Defs. Br. at 35 (citing *Niaspan*, 42 F. Supp. 3d at 759).) The IPP responds that "[t]his is a non-issue" given that the class period begins after the enactment of Oregon's *Illinois Brick* repealer. (IPP Resp. to Gen. Defs. Br. at 13.)

Oregon's *Illinois Brick* repealer statute became effective on January 1, 2010. *See* Or. Rev. Stat. § 646.780; Laws 2009, c.304, § 1, eff. Jan. 1, 2010. The IPP has proposed a Class Period beginning April 14, 2010. (CAC ¶ 146.) There is therefore no *Illinois Brick* problem for purposes of this case.

Defendants' motion to dismiss the Oregon claim for conspiracy to monopolize under Count Two is **DENIED.**

### D. In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States
In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of conspiracy to monopolize.

The Court also finds that, as a matter of law, the IPP may pursue its Count Two claims for conspiracy to monopolize under the laws of all states **except** Massachusetts and Utah. Those claims are hereby **DISMISSED.** Moreover, the IPP's claim for conspiracy to monopolize under Rhode Island law is hereby **DISMISSED IN PART** to the extent that it seeks to recover for injuries incurred prior to July 15, 2013.

### VII. Count Three: Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants
The IPP Complaint next alleges an additional 25 state law claims grouped under the heading "Count Three: Consumer Protection and Unfair and Deceptive Trade Practices." (CAC at 56.) The IPP asserts this cause of action against all Defendants: Actavis, Forest, Merz, and the Generic Defendants. (*Id.*)

This cause of action alleges that "Defendants engaged in unfair competition or unfair acts or unconcionable [*sic*]

201 WL  8 91592©©

acts or practices in violation of state consumer protection statutes." (CAC ¶¶ 212.) Specifically, "There was a gross disparity between the price that [the IPP] and [Class] members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available." (*Id.* ¶ 213.) Count Three also alleges that the IPP and the Class "were deprived of the opportunity to purchase a generic version of Namenda IR 5 or 10 mg tablets and forced to pay higher prices for Namenda XR." (*Id.* ¶ 214.) Together, these allegations form the factual nucleus on which the 25 state law consumer protection claims are based.

As they have done with respect to Counts One and Two of the IPP Complaint, Defendants first advance several broad-based arguments aimed at dismissing Count Three of the IPP Complaint as a whole or in large part, *viz.*:

> **\*34**  • The claims are "likely" time-barred under the applicable statute of limitations (Forest Br. at 65 n.42);

> • The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Gen. Defs. Br. at 31);

> • The IPP must satisfy the pleading requirements of Fed. R. Civ P. 9(b) since state consumer protection claims are grounded in fraud, (Gen. Defs. Br. at 38);

> • In the alternative, IPP has failed to satisfy the Fed. R. Civ P. 8 pleading standard under *Twombly* and *Iqbal*, (*id.* at 37).

For the reasons already discussed, this Court denies the motion to dismiss the claims as "likely" time-barred. In addition, the Court has already held that it will not dismiss a broad swath of claims for lack of Article III standing, on the basis that the IPP did not suffer injury-in-fact in states where it did not make purchases. However, the Court must consider the other Rule 9(b) and Rule 8 arguments.

Defendants next make several separate state-specific arguments, *viz.*:

> • The IPP may not bring state consumer protection claims where the state follows *Illinois Brick*, (*id.*);

> • The IPP has failed to satisfy the pre-filing requirements under certain states' statutes, (Gen. Defs. Br. at 40; Gen. Defs. Suppl. Br. at 13);

> • Certain states require a showing of consumer deception, which the IPP does not and cannot allege, (Forest Br. at 67 n.47);

> • Some states require that the claim be based on a consumer transaction or conduct that is consumer-oriented, which the IPP does not plead, (Forest Br. at 67–68 n.48);

> • A subset of consumer protection statutes do not cover antitrust conduct, (Forest Br. at 68 n,49; Gen. Defs. Br. at 40);

> • Recovery is possible under certain consumer protection statutes only when the conduct complained of is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40, 41–42);

> • Certain state statutes confer a right of action only on consumers who are natural persons with regard to transactions made primarily for personal or household purposes, (Forest Br. at 68 n.51), or on consumers who are elderly or disabled, (Forest Br. at 68 n.52; Gen. Defs. Br. at 40); and

> • Some states' consumer protection laws prohibit nationwide class actions or prohibit class actions altogether, (Forest Br. at 68 n.53; Gen. Defs. Br. at 39, 41–42).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Three. The table in Appendix 3 of Actavis, Forest, and Merz's original brief provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 3.)

As this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then addresses each state law claim.

### A. The IPP Adequately Pleads Its State Law Claims Under *Twombly* and *Iqbal*

Defendants argue that the IPP does not properly plead its claim for violation of state consumer protection laws under Count Three because (i) it does not cite to specific provisions of the consumer protection statutes and (ii) it does not plead the elements of each state's law. (Gen. Defs. Br. at 37, 42.) Merely listing citations to the state codes, they argue, does not satisfy *Iqbal*, 556 U.S. at 678 (2009) or *Twombly,* 550 U.S. at 570.

**\*35**  The Court disagrees.

First, the IPP is not required to identify the particular sections of the code under which the claims are brought, as long as defendants are on notice of the theory plaintiffs are pursuing. *See, e.g., In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017) (denying defendants' motion to dismiss even though indirect purchasers did not specify the state code sections under which claims were brought).

Moreover, the factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint. *See In re Domestic Drywall Antitrust Litig.* No. 13-cv-2437, 2016 WL 3769680, at \*11 (E.D. Pa. July 13, 2016) ("To the extent Defendants' one-paragraph [*Twombly*] argument is an invitation for the Court to comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation."); *see also In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016) (in securities fraud case, complaint "as a whole" adequately pleaded specific statements made or authorized by specific defendants, actual reliance, and failure to comply with statutory requirements).

Finally, although state laws may vary to some degree in the elements that they require, the IPP has made an effort to limit its claims to state laws that share substantive foundational features—such as a right of action for "unfair," as opposed to "deceptive," trade practices. *See, e.g., Propranolol,* 249 F. Supp. 3d at 729 (finding that a high level of detail was "not necessary at the pleading stage because the 'elements of unjust enrichment are similar in every state.' ") (citing *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at \*18 (S.D.N.Y. Sept. 4, 2014)).

### B. The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b)

Defendants next argue that because "allegations of deceptive trade practices ... amount to allegations of fraud," the IPP must satisfy the heightened pleading standard of Rule 9(b)." (Gen. Defs. Br. at 38 (citing *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988)); Gen. Defs. Reply at 24.)

The IPP responds that it "has carefully limited its consumer fraud claims to the 'unfair methods' and 'unfair trade practices' prongs of the statutes." (IPP Resp. to Gen. Defs. Br. at 17.) (*See also* CAC ¶ 214 (alleging injury "as a direct and proximate result of Defendants' unfair competition, unfair or unconscionable acts and practices").) The IPP also responds that *NCC Sunday Inserts,* 692 F. Supp. at 330, was binding only with respect to the Connecticut Unfair Trade Practices Act, under which the IPP does not bring a claim. (*Id.* at 17.)

Courts regularly distinguish between state consumer protection claims that proceed under a theory of "deceptive practices" and those that proceed under a theory of "unfair practices." *See, e.g., In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1074 (S.D. Cal. 2017); *In re Auto. Parts Antitrust Litig. (Instrument Panel Clusters),* No. 12-md-2311, 2014 WL 2993753, at \*19 (E.D. Mich. July 3, 2014). This is consistent with the federal FTC Act, which allows recovery for "unfair" as well as "deceptive" acts or practices, 15 U.S.C. §§ 45(a)(1), 45(n), and on which "virtually every" state consumer protection law is based, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses,* 96 Harv. L. Rev. 1621, 1622 (1983).

**\*36**  As for *NCC Sunday Inserts,* that decision—which addresses a statute not at issue in this case, the Connecticut Unfair Trade Practices Act—does not hold that the heightened pleading standards of Rule 9(b) apply to allegations under state consumer protection laws. That case held only that, "To the extent that fraud is being alleged under the rubric 'deceptive trade practices,' Rule 9(b) governs the pleading procedures." *NCC Sunday Inserts,* 692 F. Supp. at 330.

The IPP does not allege anything under the rubric of "deceptive trade practices"—deliberately so. In the absence of any "developed argument or legal authority" for Defendants' argument that I must treat the CAC as alleging deception rather than unfair acts, the claims may proceed. *Dig Music,* 812 F. Supp. 2d at 408 n.10.

Defendants' motion to dismiss all Count Three claims on these grounds is, therefore, **DENIED.**

### C. *Illinois Brick* Does Not Bar the IPP's Consumer Protection Claims

Defendants argue—but do not cite any persuasive authority —that consumer protection claims brought by indirect purchasers are barred in all states that follow *Illinois Brick.*

(Gen. Defs. Br. at 31–34.) Instead, the cases they cite focus overwhelmingly on unjust enrichment claims brought by indirect purchasers. (*Id.*)

The Generic Defendants cite only one case in which a court dismissed a consumer protection act claim that was duplicative of a state antitrust claim; in that instance, however, the district court based its finding on a case from the Supreme Court of Illinois that specifically barred plaintiffs from invoking the Consumer Fraud Act to recover for conduct not covered by the Illinois Antitrust Act. *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009).

The Court **DENIES** without prejudice the Defendants' motion to dismiss the majority of claims under Count Three in one fell swoop. I will consider the *Illinois Brick* arguments to the extent that the Defendants have briefed them with respect to each state's law.

### D. The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others

I now turn to the arguments aimed at individual state law claims.

At this particular stage, the Court notes that it has been tasked with determining the intricacies of 25 states' consumer protection laws, in many cases with the benefit of very little briefing. For certain claims, Defendants' arguments for dismissal consists of little more than a footnote in their brief, which in many cases is a citation to either a single federal district court opinion in a similar, nationwide class of indirect purchasers, or a particular statutory provision, with little or no explanation of how state courts have interpreted this particular provision.

As is its duty, the Court has taken these arguments seriously. Nonetheless, the Court cautions that, to the extent this very limited briefing invites the Court to *sua sponte* "comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation." *Domestic Drywall*, 2016 WL 3769680, at *11. In other words, this Court responds to the arguments that are affirmatively raised in Defendants' briefing but does not undertake an independent assessment of arguments that are not pointed out by the Defendants—who are represented by able counsel.

Because of Defendants challenge each state's law on multiple grounds, this opinion proceeds state by state.

#### 1. Alabama

**\*37**  Generic Defendants move to dismiss the Alabama claim under Count Three because the IPP cites to Alabama's antitrust statute, Ala. Code § 8-10-3, rather than to its consumer protection statute, Ala. Code § 8-10-5. (Gen. Defs. Br. at 37 n.17.) As this Court has done throughout this opinion for the benefit of both the IPP and the Defendants, it takes the IPP at its word that this is a typographical error. (*See* IPP Resp. to Gen. Defs. Br. at 18 n.8.)

For the first time in supplemental briefing, Defendants argue that the IPP fails to satisfy the pre-filing notice requirement under Alabama's consumer protection statute. (Gen. Defs. Suppl. Br. at 13 (citing Ala. Code § 8-19-10(e)).) That provision states, in relevant part: "At least 15 days prior to the filing of any action under this section, a written demand for relief. shall be communicated to any prospective respondent by placing in the United States mail or otherwise." Ala. Code § 8-19-10(e).

It also states: "The demand requirements of this subsection shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section." *Id.*

Defendants have not argued that they maintain a place of business or keep assets within the state, and nothing in the CAC alleges that they so do. (*See* CAC ¶¶ 16–30.) Even if this Court were to determine that Defendants maintain a place of business or keep assets in the state, nothing in the statute suggests that notifying defendants is a prerequisite to suit or that an action that failed to comply with this provision would require dismissal in state court. Indeed, the relatively flexible notice provisions for out-of-state defendants suggests otherwise. Moreover, the tenor of the provision as a whole suggests that it operates much like a Rule 68 offer of judgment and is aimed at encouraging settlement.

*Effexor*, 2018 WL 4466050, cited by Defendants, did not analyze the language of the various notice provisions at issue or opine on their purpose. That case also did not examine whether, under the laws of each state, the proper remedy for

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 439 of 520
PageID: 9360

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

non-compliance with the notice remedy would be dismissal. Beyond *Effexor*, Defendants cite no case for the proposition that defendant notification requirements under these statutes would require dismissing the claim here.

Defendants' motion to dismiss the Alabama law claim under Count Three is **DENIED.**

### 2. Arizona

The IPP has withdrawn this claim. (IPP Resp. to Gen. Defs. Br. at 17 n.7.)

### 3. California

Defendants first argue that the California Unfair Competition Law ("CUCL") requires a showing of consumer deception. (Forest Br. at 67 n.47.) The IPP responds that it has limited its state consumer protection claims to the "unfair methods" and "unfair trade practices" prongs of state statutes. (IPP. Resp. to Gen. Defs. Br. at 17).

Here, the IPP has the better of the arguments. For purposes of CUCL, unfair practices include, among other things, "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Moreover, California's Supreme Court has held "that because the prohibitions on 'unlawful,' 'unfair' or 'fraudulent' practices are written in the disjunctive, each of those 'prongs' gives rise to a separate and distinct theory of liability." 1-16 Cheryl Lee Johnson (ed.), *California Antitrust and Unfair Competition Law* § 16.04 (revised ed. 2018) (citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527, 540 (Cal. 1999)); *see also* Podolsk v. First Healthcare Corp., 58 Cal. Rptr. 2d 89, 102 (Cal. Ct. App. 1996) (nursing home's practice of requiring relatives of patients on Medicare/Medicaid to sign guarantees could fall under "unlawful" prong of the CUCL, even if not deceptive). Therefore, the IPP is correct that it need not allege deceptive behavior to survive a motion to dismiss.

**\*38** Defendants next argue that the IPP must plead primarily intrastate conduct in order to allege a claim under the CUCL. (Forest Br, at 68 n.50.) The IPP responds that the Complaint alleges intrastate effects and that, as a matter of law, a nationwide antitrust class action satisfies "intrastate" pleading requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

The Court agrees that the IPP has pleaded intrastate effects in its Complaint, insofar as the IPP alleges both that it indirectly purchased Namenda in California, (CAC ¶ 15), and that hundreds of thousands of consumers nationwide, including, presumably, California residents, were affected, (*id.* ¶ 48).

The only case cited by Defendants is inapposite, as it discusses wholly extraterritorial application of the statute and says nothing about whether the conduct must occur "primarily" within the state. Meridian Project Sys., Inc. v. Hardin Const. Co., LLC, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005). In other cases, California courts have allowed class members who were either California residents or for whom the relevant transaction had occurred in state to bring claims under the CUCL. Norwest Mortg., Inc. v. Superior Court, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999) (class members who were either California residents or for whom the defendant had purchased insurance within California could bring claims).

Finally, Defendants argue that the IPP has not satisfied California's pre-filing notice requirement. (Gen. Defs. Br. at 41 (citing Cal. Bus & Prof. Code § 17209).) That provision reads: "If a violation of this chapter is alleged or the application or construction of this chapter is in issue in any proceeding *in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court,* each person filing any brief or petition with the court in that proceeding shall serve, within three days of filing with the court, a copy of that brief or petition on the Attorney General ... and on the district attorney of the county in which the lower court action or proceeding was originally filed." *Id.* (emphasis added). That provision, by its terms, applies only to appellate proceedings in state court. Since this is a diversity case in a federal district court, the statute does not apply.

As a result, the Court **DENIES** the Defendants' motion to dismiss the California claim under Count Three.

### 4. District of Columbia

Defendants argue that the IPP fails to state a claim under the D.C. Consumer Protection and Procedures Act ("DCCPPA") because it is not a "consumer" within the meaning of that statute. (Forest Br. at 67–68 n.48 (citing D.C. Code § 28-3905(k))).

201 WL 8 91592©©

The relevant provision of the DCCPPA states: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). "When used as a noun," a "consumer" means "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services, including as a co-obligor or surety, or does or would otherwise provide the economic demand for a trade practice." *Id.* § 28-3901(a)(2)(A). A "trade practice" means "any act ... [involving] ... a sale, lease or transfer, of consumer goods or services." *Id.* § 28-3901(a)(6). When used as an adjective, "consumer" relates to things "receive[d] and normally use[d] for personal, household or family purposes." *Id.* § 28-3901(a)(2)(B)(i).

**\*39** Sergeants Benevolent, the only Named Plaintiff in this Action, does not fit the definition of "consumer" under the plain language of the statute. Additionally, the D.C. Court of Appeals has clarified that "the CPPA was designed to police trade practices arising only out of consumer-merchant relationships, and does not apply to commercial dealings outside the consumer sphere." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (internal quotations omitted). "[T]he CPPA does not protect merchants in their commercial dealings with suppliers or other merchants." *Id.* at 83. For example, D.C. courts have held that a taxi driver's claims for coerced purchases of gasoline and other supplies against his taxi-owners association do not state a claim under the DCCPPA. *Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 (D.D.C. 1988). The relevant question is whether the plaintiff's activity is akin to that of a merchant. *Ford*, 908 A. 3d at 83.

In addition, "Courts overseeing multidistrict litigation as well as state courts in the District of Columbia have ... held that transactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the [DCCPPA] seeks to reach. Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the [DCCPPA] covers." *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-m-2508, 2015 WL 5166014, at \*30 (E.D. Tenn. 2015).

Sergeants Benevolent is not an "individual member of the consuming public." *Id.* Moreover, it is immaterial that Sergeants Benevolent pays for pharmaceuticals prescribed to its members, who do use them for "personal, family, or household purposes." D.C. Code § 28-3901(a)(2)(B)(i). As

other courts have held, "when an insurance plan makes a purchase, it does so, not for personal purposes, but for the plan's business purposes, *i.e.*, to fulfill its side of a contractual relationship with its members, who pay premiums for its coverage." *Restasis*, 2018 WL 5928143, at \*7 (collecting cases).

Because the IPP fails to state a claim under the DCCPPA under Rule 12(b)(6), the Court **GRANTS** Defendants' motion to dismiss.[23]

[23]     Defendants also argue that the DCCPPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19). However, because the Court dismisses the DCCPPA claim under Count Three for failure to state a claim based on a retail purchase for personal, family, or household purposes, it does not reach these arguments.

## 5. Florida

Defendants move to dismiss the claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") on the grounds that the IPP does not sufficiently allege intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20.) Relatedly, Defendants argue that a plaintiff may not use the FDUTPA to bring claims on behalf of a nationwide class. (Gen. Defs. Br. at 39 n.18.)

The cases cited by Defendants, however, say nothing about an intrastate conduct requirement and instead stand for the proposition that the FDUTPA covers only those individuals who live or make purchases in Florida. It is intrastate *injury*, not conduct, which implicates the FDUTPA.

For example, in *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So.2d 1037, 1040 (Fla. Dist. Ct. App. 2000), the court held that plaintiffs, a class of users, brokers, and servicers of Siemens/Oce ultra-high speed printers, possessed viable causes of action under FDUTPA only if they were also Florida consumers, and that they would not be entitled to recovery merely on the basis that Siemens/Oce had entered into certain anticompetitive agreements or otherwise engaged in unlawful conduct within the state of Florida. *Id.*

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201WL 8 91592©©

**\*40**  Likewise, the court in *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228 (S.D. Fla. 2002), held that a nationwide class of aircraft owners could not recover under the FDUTPA merely because the defendant's unlawful conduct had taken place within the state. *Id.* Instead, only Florida consumers could take advantage of the FDUTPA. *Id.*

Finally, *Coastal Physician Servs. of Broward Cty., Inc. v. Ortiz*, 764 So.2d 7, 8 (Fla. Dist. Ct. App. 1999), held that the FDUTPA was "for the protection of in-state consumers for either in-state or out-of-state debt collectors." *Id.*

The IPP alleges that it "indirectly purchased, paid and/or provided reimbursement for Namenda in ... Florida." (CAC ¶ 15.) Moreover, although the IPP brings the IP Action on behalf of a nationwide Class, it does not purport to enable all members of the Class to recover under the FDUTPA. For these reasons, Defendants' motion to dismiss the Florida claim under Count Three is **DENIED**.

### 6. Hawaii

Defendants argue that the Hawaii Unfair and Deceptive Acts or Trade Practices statute ("HUDAP") only "allow[s] suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes." (Forest Br. at 68 n.51). The statute reads, in relevant part: "No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." Haw. Rev. Stat. § 480-2(d). The preceding section of the statute defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Haw. Rev. Stat. § 480-1.

Sergeants Benevolent Association Health & Welfare Fund is not a natural person. It is a trust, incorporated in New York, which reimburses either pharmacies or its members for purchases of Namenda. Additionally, Sergeants Benevolent also does not pay for Namenda "primarily for personal, family, or household purposes," regardless of how its member insureds use Namenda. *See Restasis*, 2018 WL 5928143, at \*7. Therefore, it fails to state a claim under Rule 12(b)(6) with respect to the HUDAP.

Defendants' motion to dismiss the Hawaii law claim under Count Three is **GRANTED**.

### 7. Idaho

Defendants first argue that plaintiff has failed to plead deceptive conduct, as required by the Idaho Consumer Protection Act ("ICPA"). (Forest Br. at 67 n.47.) The IPP responds that the ICPA confers a right of action based on "unfair" conduct. (IPP Resp. to Gen. Defs. Br. at 17.) Defendants also argue that the ICPA makes unlawful only specific types of conduct, including misrepresentations, and does not include antitrust conduct. (Gen. Defs. Br. at 40 n.19 (citing Ida. Code § 48-603).) These arguments are treated together.

Like many state consumer protection laws, most of the conducted enumerated in the ICPA focuses on deceptive, fraudulent, or misleading practices. Idaho Code § 48-603. Nonetheless, there is no firm requirement that a plaintiff show deception since, for example, "engaging in any unconscionable method, act, or practice in the conduct of trade or commerce" is expressly contemplated by the Act. Ida. Code § 48-603(18); *id.* § 48-603C. Other courts have found that plaintiffs may state a claim for anticompetitive conduct, even if that conduct is not deceptive, under this prong of the ICPA. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004).

**\*41**  Moreover, the ICPA contains a harmonization provision with the federal FTC Act. Idaho Code § 48-604(1). And, the Supreme Court of Idaho has held that the ICPA must be "liberally construed to effect the legislative intent to deter deceptive *or unfair trade practices* and to provide relief for consumers exposed to proscribed practices." *In re W. Acceptance Corp., Inc.*, 788 P.2d 214, 216 (Ida. 1990) (emphasis added) (internal quotation omitted). The Court therefore denies Defendants' motion to dismiss the ICPA claim.

Defendants next argue that the ICPA requires that the underlying conduct involve a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68 n.48 (citing *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, 737 F. Supp. 2d 380, 409 (E.D. Pa. 2010)).)

In *Sheet Metal Workers*, the court referenced a state court decision, *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Ida. 2005), which examined the unconscionability provisions of the ICPA and found that they were "designed to prohibit unconscionable 'sales conduct' that is *directed at the consumer*." *Id.* (emphasis added). *Wasden*, however, hinged on two factors: whether the alleged price-fixing of sorbates, an antimicrobial food and animal feed additive, was "sales conduct" for purposes of the ICPA and whether the defendants had ever sold sorbates to consumers in Idaho. *Id.* at 430, 435.

Here, by contrast, the Defendants are alleged to have marketed and sold Namenda to consumers at inflated, anticompetitive prices by, among other things, restricting consumer access to generic versions of Namenda and announcing the withdrawal of the Namenda IR formulation directly to consumers. Thus, construing the allegations in the light most favorable to the Plaintiff, I find that the IPP has adequately alleged "consumer conduct" within the meaning of the statute. *See also New Motor Vehicles*, 350 F. Supp. 2d at 185 (upholding claim for antitrust conduct under ICPA).

Defendants' motion to dismiss is **DENIED**.

## 8. Illinois

Defendants first argue that plaintiffs must allege deception in order to state a claim under the Illinois Consumer Fraud Act ("ICFA"). (Forest Br. at 67 n.47.) *See also Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991) (plaintiff's "cause of action must stand or fall on whether defendants' conduct was deceptive") (citing *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990)). The IPP argues that it can plead its claim under the "unfairness" prong of the ICFA, which is separate from the "deception" prong. (IPP Resp. to Gen. Defs. Br. at 17.)

At bottom, it is unclear whether *Laughlin's* statement that the ICFA's "reach was to be limited to conduct that defrauds or deceives consumers or others" was intended to bar all future claims brought under its "unfairness" prong, or whether its holding was, instead, restricted to the price discrimination claims alleged in that particular case. 550 N.E.2d at 993. Subsequent cases in Illinois imply that "unfairness" has survived *Laughlin*: "[a] plaintiff may allege that conduct is unfair under the [I]CFA without alleging that the conduct is

deceptive." *Hill v. PS Illinois Tr.*, 856 N.E.2d 560, 568 (Ill. Ct. App. 2006). "A deceptive practices claim must meet Rule 9(b)'s heightened pleading standard, while an unfair practices claim need not because it is not based on fraud." *Wheeler v. Assurant Specialty Prop.*, 125 F. Supp. 3d 834, 842 (N.D. Ill. 2015). I will follow the lead of those Illinois courts and decline to dismiss the IPP's claim as a matter of law on these grounds.

**\*42** Second, Defendants argue that the ICFA is inapplicable to antitrust conduct. (Forest Br. at 68 n.49 (citing 815 Ill. Comp. Stat. 505/2; *Laughlin*, 550 N.E.2d at 993); Gen. Defs. Br. at 40 n.19.) The IPP responds that the ICFA "should be interpreted in the same manner and to the same extent as Section 5 of the FTC Act," which unquestionably includes conduct that violates the antitrust laws. (IPP Resp. to Gen. Defs. Br. at 26 (citing 815 Ill. Comp. Stat. 505/2).)

Again, this Court is not persuaded that *Laughlin* bars the current claims. *Laughlin* held that price discrimination, which was not actionable under the IAA, was similarly not actionable under the ICFA. 550 N.E.2d at 993 ("There is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism."); *accord Butler v. Jimmy John's Franchise, LLC*, No. 18-cv-0133, 2018 WL 3631577, at *8 (S.D. Ill. July 31, 2018) ("the Illinois Supreme Court has instructed that plaintiffs cannot use the [ICFA] to get around the fact that their theory does not fly under the [IAA].") As a result, *Laughlin* stands for the proposition that the ICFA is not a safety net that serves to catch residual anticompetitive behavior, although it does not speak to whether the ICFA countenances claims that are also actionable under the IAA.

A subsequent case, *Gaebler v. KM. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996), relied on *Laughlin* to bar claims for anticompetitive conduct that were brought pursuant to the ICFA *only*—presumably because plaintiffs had tried to skirt the IAA's prohibition on indirect purchaser class actions. *Id.* ("[C]lassic antitrust allegations dressed in Consumer Fraud Act clothing" did not state a claim). However, federal courts in Illinois and the Seventh Circuit have questioned whether *Gaebler*, which interprets *Laughlin* as preventing the ICFA from ever being a remedy for anticompetitive conduct, states the law too broadly. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1049 n.12 (N.D. Ill. 2007) (noting that no other Illinois appellate courts have interpreted *Laughlin* in this manner). And, consistent with both *Laughlin* and *Gaebler*, other federal courts have held that "[i]t remains possible ... that an unfair

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 443 of 520
PageID: 9364

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

practice might be covered by both the antitrust law and the Consumer Fraud Act," *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 831 (7th Cir. 2014). The Court finds these recent cases, as well as the lack of subsequent appellate case law in Illinois, persuasive on the question of whether *Gaebler* bars recovery for anticompetitive conduct under the ICFA.

Third, Defendants argue that the ICFA bars class actions. (Gen. Defs. Br. at 39, n.18; Forest Br. at 68, n.53). However, they fail to cite to any provision of the ICFA that does so. Instead, they cite to the IAA, which does not purport to apply to other statutes. 740 Ill. Comp. Stat. § 10/7(2) ("no person shall be authorized to maintain a class action ... for indirect purchasers asserting claims under *this Act*") (emphasis added). In the absence of any arguments, case law, or citations to the consumer fraud statute, the Court finds that this argument does not provide sufficient grounds for dismissing the ICFA claim.

Finally, Defendants argue that the ICFA requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing Ill. Comp. Stat. 505/10a(a)).) But that section reads, in relevant part, "Proof of a public injury, a pattern, or an effect on consumers and the public interest generally shall be required in order to state a cause of action under this Section *against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act.*" Ill. Comp. Stat 505/10a(a) (emphasis added). By its terms, the statute is inapplicable to the case at bar.

 **\*43** Defendants' motion to dismiss the Illinois claim under Count Three is **DENIED**.


### 9. Kansas

Defendants argue that the IPP has failed to allege consumer deception in satisfaction of the elements of the Kansas Consumer Protection Act ("KCPA"). (Forest Br. at 67 n.47.) The IPP responds generally that it brings its claims pursuant to the "unconscionable" prong of the state consumer protection laws. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants' interpretation of the statute. The KCPA is intended to "protect consumers from suppliers who commit deceptive and unconscionable

practices." Kan. Stat. § 50-623; *see also id.* §§ 50-626, 50-627. As with other state laws, the enumerated offenses under the statute focus overwhelmingly on deceptive or fraudulent acts. Unlike other states, however, Kansas courts have spoken more uniformly to the issue of whether the "unconscionability" prong of the statute also requires a showing of deception: "In order to render the contract between the parties unconscionable, there must be some element of deceptive bargaining conduct present as well as unequal bargaining power." *Cornelison v. Denison State Bank*, 315 P.3d 278 (Kan. Ct. App. 2014) (citing *Willman v. Ewen*, 230 Kan. 262, 266, 634 P.2d 1061 (1981)); *see also State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 272 Kan. 1313, 1321, 38 P.3d 707, 713 (2002) (same). And, unlike courts in, for example, Illinois, courts in Kansas have not affirmatively excused a plaintiff proceeding with a claim for unconscionability from satisfying the heightened pleading requirements for claims grounded in fraud. *Compare Wheeler, 125 F. Supp. 3d at 842, supra.*

Because the IPP cites no cases in support of its arguments, and cites one in support of Defendants', the KCPA claim is **DISMISSED**. [24]

[24]   Defendants also argue that the KCPA bars class actions (Gen. Defs. Br. at 39 n.18; Forest Br. at 68 n.53); that the statute requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented (Forest Br. at 67–68 n.48); that the statute is inapplicable to antitrust conduct (Gen. Defs. Br. at 40; Forest Br. at 68 n.49); and that the statute only allows suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes (Forest Br. at 68 n.51). However, because the Court dismisses the KCPA claim on the grounds that it is inapplicable to antitrust conduct, it does not reach these arguments.


### 10. Maine

Defendants argue that the Maine Unfair Trade Practices Act ("MUTPA") provides a cause of action only for persons who purchase goods "primarily for personal, family, or household purposes." (Forest Br. at 68 n.51.) The statute provides a remedy to, in relevant part "[a]ny person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby

201 WL  8 91592©©

suffers any loss of money or property, real or personal." Me.
Rev. Stat. tit. 5, § 213(1).

For the reasons discussed above, the Court finds that
Sergeants Benevolent, an insurer, has not purchased or paid
for Namenda "primarily for personal, family, or household
purposes." *See Restasis,* 2018 WL 5928143, at *7. It has paid
for the drug because it is an insurer and has a contractual duty
to reimburse its members for their purchases. Therefore, it
fails to state a claim under Rule 12(b)(6).

**\*44** Defendants' motion to dismiss is **GRANTED**. [25]

[25]    Defendants also argue that the MUTPA requires
       a showing of consumer deception. (Forest Br. at
       67 n.47.) However, because the Court dismisses
       the MUPTA claim on the grounds that Sergeants
       Benevolent has failed to state a claim based on
       purchases made "primarily for personal, family,
       or household purposes," it does not reach these
       arguments.

## 11. Massachusetts

In order to bring a claim under Massachusetts' state consumer
protection law, Defendants argue that the IPP must allege
primarily intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs.
Br. at 41 n.20.) Defendants do not cite any case law for this
proposition, although they do cite Mass. Laws ch. 93A, § 1,
which defines "trade" and "commerce" to include "trade or
commerce directly or indirectly affecting the people of this
commonwealth." *Id.* The IPP responds that the Complaint
alleges intrastate effects and that, as a matter of law, a
nationwide antitrust class action satisfies "intrastate" pleading
requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

On its own, the "affecting people of this commonwealth"
language does not persuade the Court that this claim should
be dismissed, particularly as the IPP has alleged sales of
Namenda IR and Namenda XR affecting consumers and third
party payors across the country, including in Massachusetts.

It is true that an earlier version of the Massachusetts statute
contained an exemption for defendants "of whose gross
revenue at least twenty per cent is derived from transactions
in interstate commerce," as well as for defendants who met
certain other criteria. *See Dodd v. Commercial Union Ins. Co.,*
365 N.E.2d 802, 808 (Mass. 1977). However, the statute no

longer carves out such defendants. Rather, the current version
of that provision now states, in relevant part, "For the purpose
of this section, the burden of proving exemptions from the
provisions of this chapter shall be upon the person claiming
the exemptions." Mass. Laws ch. 93A, § 3.

Next, Defendants argue that G.L. c. 93A does not allow for
class actions or indirect purchaser actions. Ciardi, 762 N.E.2d
at 314, is squarely on point: it holds that both class actions and
indirect purchaser actions are permitted under Massachusetts'
consumer protection law. *Id.*

Finally, Defendants argue in their supplemental briefing that
the IPP has not satisfied the pre-filing notice requirement
under chapter 93A. (Gen. Defs. Suppl. Br. at 13 (citing Mass.
Gen. Laws ch. 93A, § 9(3)).) Like Alabama's consumer
protection statute, the pre-suit notice provisions of chapter
93A do not apply if "the prospective respondent does not
maintain a place of business or does not keep assets within
the commonwealth." *Id.* Defendants do not argue, and nothing
in the CAC alleges, that they maintain a place of business or
keep assets in Massachusetts. (*See* CAC ¶¶ 16–30.) Moreover,
nothing in § 9(3) suggests that a Massachusetts court would
dismiss an action under Chapter 93A if a plaintiff failed to
comply with this provision. Like the Alabama statute, the
provision appears to operate like a Rule 68 offer of judgment,
capping damages for defendants who make settlement offers
in good faith.

**\*45** Defendants' motion to dismiss the Massachusetts law
claim under Count Three is **DENIED**.

## 12. Michigan

Defendants first argue that the IPP is required to allege
consumer deception to plead a claim under the Michigan
Consumer Protection Act ("MCPA"). (Forest Br. at 67 n.47.)
The IPP argues that it can base its claim on "unfair" practices.
(IPP Resp. to Gen. Defs. Br. at 17.)

The IPP is correct. "The MCPA is broader than common law
torts of fraud inasmuch as it prohibits 'not only 'deceptive'
business practices but also those which are 'unfair' and
'unconscionable.' ' " *Game On Ventures, Inc. v. Gen. RV Ctr.,
Inc.,* 587 F. Supp. 2d 831, 839 (E.D. Mich. 2008) (citing
*Mayhall v. A.H. Pond Co.,* 341 N.W.2d 268, 270 (Mich. Ct.
App. 1983)). The Court finds that the IPP has adequately
alleged conduct falling under § 445.903(z)—"Charging the

Case 1:19-md-02875-RMB-SAK Document 520-7 Filed 07/17/20 Page 445 of 520 PageID: 9366

Sergeants Benevolent Association Health & Welfare Fund... Not Reported in Fed....

201WL 8 91592©©

consumer a price that is grossly in excess of the price at which similar property or services are sold." (*Compare* CAC ¶ 213). Therefore, Defendants' first argument fails.

Defendant next argues that the IPP fails to plead a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing *Sheet Metal Workers,* 737 F. Supp. 2d at 412).) *Sheet Metal Workers,* however, dismissed the plaintiffs' MCPA claim in a sham patent litigation case because plaintiffs had not "alleged that [defendant] had an intent to deceive consumers and because their actions [did] not fall within any of the enumerated prohibited practices listed in section 445.901 [*sic*]." *Id.* The facts of *Sheet Metal Workers* are readily distinguishable, particularly as the IPP has adequately alleged "unfair" conduct under an enumerated provision of the statute.

Third, Defendants argue that the MCPA is inapplicable to antitrust conduct because it only applies to "specific types of conduct," such as misrepresentations. (Gen. Defs. Br. at 40 n.19 (citing Mich. Comp. Laws § 445.903); Forest Br. at 68 n.49.) The IPP opposes this argument on the basis that the MCPA is "modeled after the FTC Act and extend[s] to prohibit unfair methods of competition including monopolistic conduct." (IPP Resp. to Gen. Defs. Br. at 26.)

The IPP is correct. The MCPA does contain harmonization language: it enables injured persons to bring a class action caused by "a method, act, or practice in trade or commerce declared by a circuit court of appeals or the supreme court of the United States to be an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act." Mich. Compiled Laws § 445.911(3) (c). Moreover, federal courts have sustained causes of action under the MCPA for antitrust conduct. *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999).

Defendants' motion to dismiss is **DENIED.**

### 13. Missouri

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Missouri Merchandising Practices Act ("MMPA"). (Forest Br. at 67–68, n.48 (citing Mo. Rev. Stat. § 407.020(1)).)

The Court is not convinced that the provision of the MMPA cited by Defendants contains such a requirement. "The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice." Mo. Rev. Stat. § 407.020(1). "Trade or commerce," in turn, is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." *Id.* § 407.010(7).

**\*46** Because Defendants have cited no authority commensurate with the proposition that Missouri restricts recovery under the MMPA to consumer-oriented conduct not covered by the IPP Complaint, their motion to dismiss the Missouri claim under Count Three is **DENIED.**

### 14. Montana

Defendants argue that the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPCPA") only "allow[s] suits by consumers who are natural persons with regards [*sic*] to transactions made primarily for personal or household purposes." (Forest Br. at 68, n.51 (citing Mont. Stat. § 30-14-102).)

The MUTPCPA enables a "consumer" to bring an action for damages, Mont. Stat. § 30-14-133(1), and defines "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes," *id.* § 30-14-102(1).

As I have held with respect to other state laws containing this requirement, I find that Sergeants Benevolent has failed to state a claim under the MUTPCPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis,* 2018 WL 5928143, at \*7.

Defendants' motion to dismiss is, therefore, **GRANTED**. [26]

[26]     Defendants also argue that the MUTPCPA does not permit class actions. (Forest Br. at 68 n.53.) However, because the Court dismisses the

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 446 of 520
PageID: 9367

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

MUTPCPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

### 15. Nebraska

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Nebraska Consumer Protection Act ("NCPA"). (Forest Br. at 67–68 n.48 (citing Neb. Rev. Stat. § 59-1601).) As with their claim under Missouri law, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-oriented" conduct or that such conduct not covered by the IPP Complaint. Section 59-1601 of the NCPA is broad, with no indications that recovery is restricted to certain types of conduct: "person" is defined to include trusts," *id.* § 59-1601(1), and "trade and commerce" is defined to mean, in relevant part, "any commerce directly or indirectly affecting the people of the State of Nebraska," *id.* § 59-1601(2).

As a result, Defendants' motion to dismiss the Nebraska claim under Count Three is **DENIED.**

### 16. Nevada

Defendants argue that the Nevada Deceptive Trade Practices Act ("NDTPA") requires the IPP to allege deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it has limited its claims to the "unfair methods" and "unfair trade practices" prongs of the statute. (IPP Resp. to Gen. Defs. Br. at 17.)

The NDTPA enumerates deceptive trade practices at sections 598.015 through 598.025 of the statute. Section 598.0923 of the statute makes it a violation to "knowingly ... violate a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3). This Court adopts the reasoning in *Effexor,* 2018 WL 4466050, at *20, which found that a plaintiff could state a claim under this section of the NDTPA where the claims were "predicated on allegations of anticompetitive conduct, which are considered prohibited acts under Nev. Rev. Stat. § 598A.060." *Id.*

**\*47** Defendants next argue that the Nevada Deceptive Trade Practices Act ("NDTPA") confers a right of action only to elderly or disabled persons. (Gen. Defs. Br. at 40 (citing

Nev. Rev. Stat. § 598.0977); *see also* Forest Br. at 68 n. 52.) Because the IPP, "a New York trust, is not an elderly or disabled person located in Nevada," it cannot bring a claim. (Gen. Defs. Br. at 40.)

I agree with the IPP that private relief in the statute is not so limited. As the IPP persuasively argues, Nev. Rev. Stat. § 41.600 operates to provide a right of action to "any person who is a victim of consumer fraud." (IPP Resp. to Gen. Defs. Br. at 31 (citing Nev. Rev. Stat. § 41.600; *Southern Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099 (D. Nev. 2007)).) The statute defines "consumer fraud" to encompass acts that violate the NDTPA. *See* Nev. Rev. Stat. § 41.600(2)(e) (" 'consumer fraud' means ... a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive"). In *Southern Serv. Corp.*, 617 F. Supp. 2d at 1100, moreover, the U.S. District Court for the District of Nevada found that "person," as used in Nev. Rev. Stat. § 41.600, could include a corporate competitor, which indicates that private relief under the statute is not restricted to elderly or disabled persons. The fact that the law makes special provision for the elderly and disabled does not mean that others are not covered elsewhere in the statute.

Other federal district courts to examine this issue are in accord and have not restricted NDTPA claims to elderly or disabled plaintiffs. *DDAVP,* 903 F. Supp. 2d at 227; *Domestic Drywall,* 2016 WL 3769680, at *10.

Defendants' motion to dismiss the Nevada law claim under Count Three is DENIED.

### 17. New Hampshire

Defendants argue that the New Hampshire Consumer Protection Act ("NHCPA") only applies when the underlying conduct is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). Defendants cite to the provision of the statute that deems unlawful "any unfair method of competition ... in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2. The IPP alleges it has met this requirement, both with respect to its Complaint and as a matter of nationwide class action law. (IPP Resp. to Gen. Defs. Br. at 32.)

Without more, the Court is not persuaded that the "within this state" language in the statute requires dismissal of the claim. "[C]ourts interpreting New Hampshire's consumer protection

law disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.,* No. 12-cv-169, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013) (collecting cases). However, based on the language of the statute, this Court agrees with those cases that have held that sales of the offending goods into New Hampshire alleges sufficient intrastate conduct to satisfy the NHCPA. *DDAVP,* 903 F. Supp. 2d at 231.

Defendants' motion to dismiss the New Hampshire claim is, therefore, **DENIED**.

### 18. New Mexico

Defendants first argue that the New Mexico Unfair Practices Act ("NMUPA") requires plaintiffs to allege deceptive conduct. (Forest Br. at 67, n.47). The IPP says that the NMUPA also covers unfair or unconscionable conduct. (IPP Resp. to Gen. Defs. Br. at 17.)

**\*48** The IPP has the better reading of the NMUPA. In addition to deceptive conduct, the NMUPA also makes unlawful "unconscionable trade practices," which include those that "result[ ] in a gross disparity between the value received by a person and the price paid." N.M. Stat. § 57-12-2(E)(2); (*compare* CAC ¶ 213). Federal courts have permitted price-fixing claims, which typically do not require alleging deception, to proceed under this provision. *In re Lipitor Antitrust Litig.,* No. 12-cv-2389, 2018 WL 4006752, at *20 (D.N.J. Aug. 21, 2018); *Domestic Drywall,* 2016 WL 3769680, at *8. Although this is not a price-fixing case, the Court is persuaded by these cases that hold that a plaintiff need not allege consumer deception. In addition, and for the same reasons, the Court also rejects Defendants' argument that the NMUPA does not provide a remedy for antitrust conduct. (Forest Br. at 68, n.49; Gen. Defs. Br. at 40 n.19.)

Defendants next argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the NMUPA. (Forest Br. at 67–68 n.48 (citing N.M. Stat. §§ 57-12-2–3).)

As with their claim under Missouri and Nebraska law, however, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-oriented" conduct or that such conduct not

covered by the IPP Complaint. Section 57-12-3 of the NMUPA states: "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." Section 57-12-2, in turn, defines "trade or commerce" very broadly, including "the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value, including any trade or commerce directly or indirectly affecting the people of this state." N.M. Stat. § 57-12-2(C).

Defendants' motion to dismiss is **DENIED**.

### 19. New York

Defendants move to dismiss the IPP's claim under section 349 of New York's General Business Law ("NYGBL") for failure to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it is not required to plead deceptive conduct to recover under the statute and that allegations of "unfair" conduct suffice. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants. Section 349 of the NYGBL does not contain an "unfair" or "unconscionable" practices prong, and therefore a plaintiff must plead consumer fraud or deception in order to bring a claim. In addition, while antitrust conduct is actionable under section 349, plaintiffs still must allege deception to state a claim. *See Dig. Music,* 812 F. Supp. 2d at 410 (analyzing New York cases); *see also* 7 von Kalinowski, Sullivan, & McGuirl, *supra,* § 132.07. Even cases cited by the IPP hold that any plaintiff who brings a claim under section 349 must allege deceptive conduct in its Complaint. *See, e.g., In re Processed Egg Prods. Antitrust Litig.,* 851 F. Supp. 2d 867, 907 (E.D. Pa. 2012) (dismissing claim for failure to allege deception as the basis for injury) (citing *Stutman v. Chem. Bank,* 731 N.E.2d 608, 611–12 (N.Y. 2000)).

As a result, Defendants' motion to dismiss the New York claim is **GRANTED**. [27]

[27]    Defendants also argue that NYGBL § 349 requires a plaintiff to allege a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67-68 n.48), and that the statute covers only conduct that is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). However, because the Court dismisses the NYGBL § 349

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL 8 91592©©

claim for failure to plead deceptive or fraudulent conduct, it does not reach these arguments.

### 20. North Carolina

Defendants ask this Court to dismiss the IPP's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") because it has failed to allege conduct that is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 41 n.20 (both citing N.C. Gen. Stat. § 75-1.1).) However, nothing in the section of the statute cited by Defendants indicates that a claim may be brought pursuant to the NCUDTPA only if the conduct is "primarily intrastate." *See* N.C. Gen. Stat. § 75-1.1.

**\*49** Second, Defendants argue that the NCUDTPA only permits actions by natural persons with regard to transactions made primarily for personal or household purposes. (Forest Br. at 68 n.51 (citing N.C. Gen. Stat. 75.1-1).) Again, nothing in the cited section indicates that a claim would be restricted to natural persons or to transactions made primarily for personal or household purposes. In fact, "commerce" is expressly defined to "include[ ] all business activities, however denominated," and exempts only "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b).

Defendants' motion to dismiss is **DENIED**.

### 21. Rhode Island

Defendants argue that the Rhode Island Deceptive Trade Practices Act ("RIDTPA") limits relief to "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I. Gen. Laws § 6-13.1-5.2(a); (*see also* Forest Br. at 68 n.51).

As explained in previous sections, Sergeants Benevolent fails to state a claim under the RIDTPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis,* 2018 WL 5928143, at *7.

Defendants' motion to dismiss is, therefore, **GRANTED.**[28]

[28]    Defendants also argue that the RIDTPA requires a showing of consumer deception, (Forest Br, at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49). However, because the Court

dismisses the RIDTPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

### 22. Tennessee

Defendants argue that the TCPA is inapplicable to antitrust conduct. (Forest Br. at 68 n.49; Gen Defs. Br. at 40 n.19 (citing Tenn. Code § 47-18-104(b)).) There appears to be a split among Tennessee's intermediate courts with respect to this question. Some courts have held expressly that "the TCPA does not apply to anti-competitive conduct." *Bennett v. Visa U.S.A. Inc.,* 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006). Others have concluded that anticompetitive conduct is an "unfair" practice covered by the TCPA. *Blake v. Abbott Labs.,* No. 03A01-9509-cv-00307, 1996 WL 134947, at *5–*7 (Tenn. Ct. App. Mar. 27, 1996).

More recent decisions in Tennessee, including *Bennett,* have reasoned that, by not incorporating the "unfair methods of competition" language from the federal FTC Act into Tennessee's "little FTC" Act, the Tennessee legislature intended to prohibit recovery for anticompetitive conduct under the TCPA. *Bennett,* 198 S.W.3d at 754–55; *see also Sherwood v. Microsoft Corp.,* No. M2000-1850-COA-R9-CV, 2003 WL 21780975, at *31–*33 (Ten. Ct. App. July 31, 2003); *Duke v. Browning-Ferris Indus. of Tenn., Inc.,* No. W2005-146-COA-R3-CV, 2006 WL 1491547, at *8 (Tenn. Ct. App. May 31, 2006). Instead, the legislature intended that consumers injured by such conduct would have an exclusive remedy under the state antitrust statute, the Tennessee Trade Practices Act. *Sherwood,* 2003 WL 21780975, at *33. *Blake,* by comparison, did not analyze the legislative history of the TCPA or its incongruities with the federal FTC Act, instead relying on the statutory mandate that it be "liberally construed." 1996 WL 134947, at *6–*7.

Like other federal courts to review this issue, I find that the more recent opinions of the Tennessee Court of Appeals, such as *Bennett* and *Sherwood,* both persuasive in their own right, as well as indicative of how the Tennessee Supreme Court would likely rule on this question. *See Relafen,* 221 F.R.D. at 284; *In re Photochromic Lens Antitrust Litig.,* No, 10-md-2173, 2011 WL 4914997, at *4 & n.14 (Oct. 14, 2011).

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201WL  8 91592©©

**\*50**  Therefore, Defendants' motion to dismiss the Tennessee claim under Count Three is **GRANTED**. [29]

[29]   Defendants also argue that the TCPA requires a showing of consumer deception (Forest Br. at 67 n.47) and that the statute does not permit class actions (Forest Br. at 68 n.53; Gen. Defs. Br. 39 n.18.) However, because the Court dismisses the TCPA claim as inapplicable to antitrust conduct, it does not reach these arguments.

### 23. Utah

Defendants first argue that the Utah Consumer Sales Practices Act ("UCSPA") requires the IPP to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that a plaintiff may state a claim under the UCSPA for "unfair" acts or practices that are not inherently deceptive. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with the IPP. The UCSPA expressly allows a plaintiff to plead "unconscionable" conduct as the basis of its claim, and that this does not require a showing of fraud or deception. *See Utah Code § 13-11-5; see also New Motor Vehicles,* 350 F. Supp. 2d at 205; *Gallegos v. LVNV Funding LLC,* 169 F. Supp. 3d 1235, 1245 (D. Utah 2016) (considering separately claims for deceptive and unconscionable acts).

Defendants next argue that the UCSPA is inapplicable to antitrust conduct because anticompetitive conduct is not enumerated within the statute's list of "deceptive practices." (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19 (citing Utah Code § 13-11-4).) The IPP responds that the UCSPA contains a harmonization provision with the FTC Act, giving it a broad reach. (IPP Resp. to Gen. Defs. Br. at 26.)

First, the list of deceptive practices in the statute is not exclusive, by its own terms. Utah Code § 13-11-4(2). Second, Defendants cite to the "deceptive act or practice" provision of the UCSPA, whereas the IPP has stated that it brings all claims under Count Three pursuant to the "unfair" or "unconscionable" practices prongs of the relevant statutes. Here, the relevant provision is not section 13-11-4 but instead section 13-11-5. Finally, other federal district courts have found that allegations of anticompetitive conduct, when brought pursuant to the "unconscionability" provision of the UCSPA, can survive a motion to dismiss. *New Motor*

*Vehicles,* 350 F. Supp. 2d at 205; *Aftermarket. Filters,* 2009 WL 3754041, at \*9. Therefore, the Court declines to dismiss the UCSPA claim on this ground.

Defendants next move to dismiss the UCSPA claim because it applies only to natural persons making purchases for personal or household purposes. (Forest Br. at 68 n.51 (citing Utah Code §§ 13-11-3(2)(a), 13-11-19).)

The Court disagrees that the UCSPA clearly restricts recovery in this manner. Utah Code § 13-11-5 states, "An unconscionable act or practice by a supplier *in connection with a consumer transaction* violates this act, whether it occurs before, during, or after the transaction." *Id.* § 13-11-5 (emphasis added). Utah Code § 13-11-19, which provides a private cause of action, permits a "*consumer* who suffers loss as a result of a violation of this chapter" to recover actual damages. *Id.* § 13-11-19(2) (emphasis added). The statute defines "consumer transaction" in Section 13-11-3(2) but does not anywhere define "consumer," That subsection reads, in relevant part: " 'Consumer transaction' means a sale ... or other ... transfer or disposition of goods ..., to, *or apparently to,* a person for ... primarily personal, family, or household purposes." Utah Code § 13-11-3(2)(a) (emphasis added). "Person," moreover, expressly includes a "corporation, ... *trust,* partnership, association, ... or any other legal entity." *Id.* § 13-11-3(5) (emphasis added).

**\*51**  On its face, the definition of "consumer transaction" appears to contemplate sales of goods to—among other entities—corporations and trusts for their "personal," "family," or "household" purposes. This, of course, is possible only through an entity's members, employees or customers, which is consistent with the IPP's allegations in its Complaint.

The Court is not aware of any case law that would prohibit recovery by the IPP for failure to state a claim on the basis of these statutory provisions. The Court is aware of only one case, from the District of Utah, that purports to interpret "consumer" for purposes of subsection 13-11-19. Icon Health & Fitness, Inc. v. ConsumerAffairs.com, No. 16-cv-168, 2018 WL 1183372, at \*5 (D. Utah Mar. 6, 2018), *motion to certify appeal denied,* 2018 WL 2122855 (D. Utah May 8, 2018). The court in that case reasoned that the plaintiff, whose products were reviewed on Defendant's website, did not have a cause of action under the UCSPA because the plaintiff did "not allege or argue that it is a consumer harmed by Defendants' conduct." *Id.* The facts of the IP Action

are clearly distinguishable, however, because Sergeants Benevolent alleges that, through its own reimbursements or payments for branded Namenda, it grossly overpaid for the product relative to its value. (CAC ¶ 213.) In addition, at least one federal court has allowed a corporation, which that a competitor engaged in false consumer advertising in the course of consumer transactions, to recover under the UCSPA. *See Derma Pen, LLC v. 4EverYoung Ltd.*, No. 13-cv-00729, 2017 WL 2258362, at *15 (D. Utah May 22, 2017), *aff'd*, 736 F. App'x 741 (10th Cir. 2018).

In addition, unlike other consumer protection statutes reviewed by this Court, the UCSPA contemplates sales made both "to" and "apparently to" a person for personal, family, or household purposes. Utah Code § 13-11-3(2)(a). The Court is not aware of any Utah case that interprets this language, and the distinction is not clear from the legislative history. The "apparently to" language was inserted as part of S.B. 75, which expanded the definition of "consumer transaction" related to identity fraud. 2000 Utah Las Ch. 57 (West) (S.B. 75) (" 'Consumer transaction' ... *includ[es] the use or misuse of personal identifying information of any person in relation to a consumer transaction to, or apparently to,* a person for primarily personal, family, or household purposes."). Later, the identity fraud language was stripped from the definition, but the phrase "apparently to" was retained. 2004 Utah Laws Ch. 55 (H.B. 195). Construing the allegations in the Complaint in the light most favorable to the IPP, however, the Court finds that sales of Namenda were made either to or "apparently to" consumers primarily for their personal, family, or household purposes. Therefore, the Complaint states a claim.

Finally, Defendants argue that class actions are not permissible under the UCSPA. (Forest Br. at 68 n.53; Gen. Defs. Br. at 39 n.18 (citing Utah Code § 13-11-19(2)).) The UCSPA states, in relevant part: "A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages[.]" Utah Code § 13-11-19(2).

However, another paragraph of the same section permits a consumer to bring a class action for actual damages provided certain preconditions are satisfied. Utah Code § 13-11-19(4)(a); *see also Miller v. Basic Research, LLC,* 285 F.R.D. 647, 654–55 (D. Utah 2010). Specifically, class plaintiffs proceeding under the UCSPA must allege that the specific action was declared unlawful pursuant to an administrative rule, a court order, or (in limited cases) a consent judgment

before the consumer transactions on which the action was based occurred. *Id.*

**\*52** Courts that have examined the class action damages bar under the UCSPA have tended to defer the question of whether an action meets the statutory prerequisites until later stages of the case. *See, e.g., In re General Motors LLC Ignition Switch Litig.*, Nos. 14-md-2543, 14-mc-2543, 2018 WL 4351892, at *46 n.63 (S.D.N.Y. Sept. 12, 2018) ("The Court defers to another day whether the provision" that limits damages under the UCSPA "applies here."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, MDL No. 2672, 2018 WL 4777134, at *28–*29 (N.D. Cal. Oct. 3, 2018) ("The Court will not make these determinations at this stage.").

The Court agrees that this issue is more appropriately handled following discovery, when the parties can address (i) if the statutory prerequisites have been met with respect to the conduct and particular transactions alleged and, (ii) in the alternative, whether the need to make this individualized determination in Utah would defeat predominance.

Defendants' motion to dismiss the UCSPA claim is **DENIED**.

### 24. Vermont

Defendants move to dismiss the Vermont Consumer Protection Act ("VCPA") because it permits only claims brought by natural persons making purchases for personal or household purposes, (Forest Br. at 68 n.51 (citing Vt. Stat. tit 9 § 2461(b)).)

This cited provision restricts recovery to a "consumer." Vt. Stat. tit. 9 § 2461(b). "Consumer," in turn, is defined as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household ..., or a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for the use or benefit of his or her business or in connection with the operation of his or her business." Vt. Stat. tit. 9, § 2451a(a) (emphasis added).

As discussed in preceding sections, Sergeants Benevolent cannot state a claim under this statute by alleging that it reimbursed for Namenda on behalf of its insured members. *See Restasis,* 2018 WL 5928143, at *7. The language of the statute clearly restricts the term "consumer" to end users of the product.

Therefore, Defendants' motion to dismiss the VCPA claim is **GRANTED**.

### 25. West Virginia

Defendants argue for the first time in their supplemental briefing that the IPP's claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") must be dismissed because the IPP has not satisfied the statutory pre-filing notice requirement. (Gen. Defs. Suppl. Br. at 13 (citing W. Va. Code § 46-6-106(c))).) That provision reads, in relevant part: "[N]o action, counterclaim, cross-claim or third-party claim may be brought pursuant to the provisions of this section until the person has informed the seller or lessor in writing and by certified mail, return receipt requested, of the alleged violation and provided the seller or lessor twenty days from receipt of the notice of violation but ten days in the case a cause of action has already been filed to make a cure offer." W. Va. Code § 46-6-106(c).

Unlike the similar pre-suit notice requirement under the Hawaii Antitrust Act, the state court remedy for noncompliance with the WVCCPA's pre-filing notice requirement appears to be dismissal of the claim. *Harrison v. Porsche Cars North Am., Inc.,* No. 15-0381, 2016 WL 1455864, at *3 (W. Va. Apr. 12, 2016) (unpublished opinion) (dismissing claim for failure to comply with pre-suit notice provisions).

 **\*53** Because the notification requirement is an express precondition to filing suit, federal district courts sitting in diversity have also granted defendants' motions to dismiss when the plaintiffs have not complied with this provision. *Waters v. Electrolux Home Prods., Inc.,* 154 F. Supp. 3d 340, 354 (N.D. W. Va. 2015) (consumer class action); *Muffins v. Ethicon, Inc.,* No. 12-cv-2952, 2017 WL 319804, at *3 (S.D. W. Va. Jan. 20, 2017) (consumer class action); *McCoy v. Southern Energy Homes, Inc.,* No. 09-cv-1271, 2012 WL 1409533, at *13 (S.D. W. Va. Apr. 23, 2012); *Stanley v. Huntington Nat. Bank,* No. 11-cv-54, 2012 WL 254135, at *7 (N.D. W. Va. Jan. 27, 2012) (individual action). Other courts

have dismissed the claim without prejudice. *Processed Egg Prods.,* 851 F. Supp. 2d at 911.

To this Court's knowledge, no federal district court has examined the cure offer requirement in light of the Supreme Court's holding in *Shady Grove.* Certainly, the pre-suit cure offer requirement is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23," because it requires certain prerequisites to filing suit that Rule 23 does not. *Restasis,* 2018 WL 5928143, at *6. It therefore conflicts with the federal rule.

The question is therefore whether the cure offer requirement is "so bound up with the state-created right or remedy that it define the scope of that substantive right or remedy." *Id.* (citing *Shady Grove,* 559 U.S. at 419–20 (Stevens, J., concurring)).

This Court finds that it is. Under the statute, the cure offer, where accepted, tolls the applicable statute of limitations "for the period the effectuation of the cure offer is being performed." W. Va. Code § 46A-6-106(e). Moreover, where the accepted cure offer is performed, it constitutes a complete defense to the action. *Id.* § 46A-6-106(h). And, if a defendant accepts and performs a cure offer, and a plaintiff brings suit anyway, the defendant is entitled to attorneys' fees and costs for defending the action. *Id.* In other words, the cure offer creates substantive defenses and additional remedies under state law.

For this reason, the Court **GRANTS** Defendants' motion to dismiss the West Virginia claim under Count Three. [30]

[30]   Defendants also argue that the WVCCPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47); requires plaintiffs to plead a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67–68 n.48); and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19). However, because the Court dismisses the WVCCPA claim for failure to serve a cure offer on the Defendants prior to initiating the lawsuit, it does not reach these arguments.

### E. In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States

In sum, the Court finds that the IPP Complaint adequately pleads facts supporting its allegations of unfair trade practices against all Defendants. The Court also finds that, as a matter of law, the IPP may pursue its Count Three claims for consumer protection law violations under the laws of all states **except** Arizona (which claim was withdrawn by the IPP), the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia. Those claim are hereby **DISMISSED**.

## VIII. Count Four: Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants

 **\*54** Finally, the IPP Complaint alleges 44 state law claims grouped under the heading "Count Four: Unjust Enrichment." (CAC at 56.) The IPP asserts this cause of action against all Defendants: Forest, Actavis, Merz, and the Generic Defendants. (*Id.*)

This cause of action alleges that "Defendants have benefited from the overcharges" on Namenda IR and XR; that these benefits were "made possible by the unlawful and inequitable acts alleged" in the Complaint; that "Defendants' financial benefits are traceable to Plaintiff and End-Payor Class members' overpayments"; and that "Plaintiff and End-Payor Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges." (CAC ¶¶ 219–21.) Together, these allegations form the factual nucleus on which the 44 state unjust enrichment claims are based.

At the outset, the IPP notes that, "[t]o the extent required, this claim is pled in the alternative to other claims in this Complaint." (CAC ¶ 218.) The IPP maintains that "unjust enrichment is a separate cause of action" from both state antitrust and consumer protection laws, "which plaintiffs are allowed to plead in the alternative under Federal Rule of Civil Procedure 8—regardless of consistency and whether based on legal of [*sic*] equitable grounds." (IPP Resp. to Gen. Defs. Br. at 41.) The IPP also alleges that it has no adequately remedy at law. (CAC ¶ 230.)

As they have done with respect to Counts One, Two, and Three of the IPP Complaint, Defendants first make several broad-based arguments aimed at dismissing Count Four of the Complaint as a whole, including:

- The claims are "likely" time-barred under the applicable statute of limitations, (Forest Br. at 65 n.42);

- The IPP has failed to satisfy the Fed. R. Civ. P. 8 pleading standard under *Twombly* and *Iqbal*, (Gen. Defs. Br. at 42);

- The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Forest Br. at App'x 4);

- The IPP has not plausibly alleged that it conferred any benefit on the Generic Defendants, (Gen. Defs. Br. at 46);

- The IPP may not skirt the strictures *of Illinois Brick* by bringing indirect purchaser claims as equitable actions for unjust enrichment, (Gen. Defs. Br. at 34–36 nn. 12, 14; Forest Br. App'x 4); and

- Equitable claims cannot be used as a backstop where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws (Gen Defs. Br. at 43).

This Court has already addressed the first three of these arguments. For the same reasons discussed in preceding sections, the Court therefore denies Defendants' motions to dismiss on those grounds.

The Court addresses the remaining three arguments—related to conferral of a benefit, *Illinois Brick*, and equitable claims —in its discussion below.

As with Count Three, Defendants also make several separate, state-specific arguments aimed at dismissing the individual state law claims under Count Four, *viz.*:

- Certain states have no independent cause of action for unjust enrichment, (Gen. Defs. Br. at 44; Forest Br. at 70 n.55);

- Some states require the plaintiff to allege that the defendant received a direct benefit from it, (Gen. Defs. Br. at 44–45; Forest Br. at 77 n.57); and

- **\*55** • A subset of states require the plaintiff to allege privity with the defendant, (Gen. Defs. Br. at 47–48), or "something approaching privity," (Forest Br. at 70).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Four. The table in Appendix 4 of Actavis, Forest, and Merz's original brief

provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 4.)

Again, as this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then proceeds through each state claim, determining whether the relevant arguments raised warrant dismissal.

### A. Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State

Federal district courts generally recognize that "[t]he elements of unjust enrichment are similar in every state." *Lazarek v. Ambit Energy Holdings, LLC*, No. 15-cv-6361, 2017 WL 4344557, at *6 (W.D.N.Y. Sept. 29, 2017) (citing *Credit Default Swaps*, 2014 WL 4379112, at *18). Both *Lazarek* and *Credit Default Swaps* base their reasoning in large part on a law review article, which compared the elements of unjust enrichment in each state and, finding them to be similar, proposed that these state laws could be applied to antitrust claims. Daniel R. Karon, *Undoing the Otherwise Perfect Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409–10 & n.79 (2005).

That article summarized the elements of unjust enrichment as follows: "(1) [plaintiff] conferred a benefit upon the defendant, who had knowledge of the benefit; (2) [t]he defendant accepted and retained the conferred benefit; and (3) [u]nder the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it." *Id.* at 409.

Notably, the IPP adopts this same formulation in its brief. (IPP Resp. to Gen. Defs. Br. at 38.)

The Generic Defendants move to dismiss all of Count Four with respect to themselves — but not with respect to Actavis, Forest, and Merz—because "Plaintiff's Complaint does not plausibly allege that Plaintiff conferred even an indirect economic benefit ... on the Generic Defendants." (Gen. Defs. Br. at 46; Gen. Defs. Suppl. Br. at 17–18.) The IPP responds that the Generic Defendants received a benefit "in the nature of profits resulting from unlawful overcharges." (IPP Resp. to Gen. Defs. Br. at 39.)

Even by the IPP's own logic, however, the unlawful overcharges did not unjustly enrich the Generic Defendants, If

the benefit alleged is indeed "profits resulting from unlawful overcharges"—profits which could have come only from sales of branded Namenda IR and Namenda XR—then the CAC alleges no facts consistent with the claim that any benefit flowed from the IPP or the Class to the Generic Defendants.

In other words, nowhere has the IPP alleged that it or other members of the Class paid increased prices for *generic* versions of Namenda IR. Rather, the gravamen of the IPP Complaint is that it and other Class members paid increased prices for *branded* Namenda IR while generic Namenda IR was kept off of the market. All of these overcharge benefits flowed to Forest. [31]

> [31]   Again, most likely due to their decision to retain the same counsel and to submit a brief jointly with Forest, Actavis and Merz have not challenged the unjust enrichment claims under Count Four on the basis that no benefit from the overcharges on Namenda flowed to them, so the Court will not raise and address this argument *sua sponte*.

**\*56**   Indeed, according to the CAC, the only benefits conferred upon the Generic Defendants came from Forest and Merz—not from the IPP or class members—and came in the form of: (i) cash payments for avoided litigation costs; (ii) early entry licenses; and (iii) an acceleration clause that guaranteed entry no later than other generic manufacturers. The IPP has wholly failed to allege a connection between these benefits, which again are the only benefits to Generic Defendants mentioned in the CAC, and the loss suffered by the IPP and other Class members. (*See* CAC ¶ 221 ("Plaintiff and [IPP] Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, *to the economic detriment of Plaintiff and the End-Payor Class members*.").) [32]

> [32]   The *Restatement (Third) of Restitution and Unjust Enrichment* states, "While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." *Restatement (Third) of Restitution and Unjust Enrichment* § 1 (2011). The IPP presumably could have chosen to rely upon this theory to prosecute its claims of unjust enrichment.

However, the IPP has also stated expressly in its Complaint and in briefing that it conferred a benefit on Generic Defendants in the form of overcharges, so the Court does not reach this question.

The Court therefore **DISMISSES** all 44 state law claims under Count Four with respect to the Generic Defendants.

**B. The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington)**

The remaining Defendants next move to dismiss the claims for unjust enrichment under the laws of 20 states because allowing the IPP to pursue such claims would constitute an impermissible "end run" around the *Illinois Brick* prohibition on indirect purchaser actions. (Gen. Defs. Br. at 34–36 nn.12, 14; Forest Br. App'x 4.) [33]

[33]    Because Actavis, Forest, and Merz adopt the Generic Defendants' briefing in whole, this Court continues to refer to Generic Defendants' briefs, even though these defendants were dismissed from Count Four.

As an initial matter, these 20 states include Puerto Rico and Utah. As this Court has already determined when addressing the arguments brought against Count One, Puerto Rico and Utah allow indirect purchaser claims. Accordingly, the Court **DENIES** Defendants' motion to dismiss the Puerto Rico and Utah unjust enrichment claims.

Whether the remaining 18 state claims can be dismissed based on *Illinois Brick* depends on whether the claims stand on their own or simply reflect an alternative election of equitable remedies by the IPP. Courts in this circuit have observed that "unjust enrichment takes at least two forms:" autonomous and parasitic. *In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011). "Parasitic claims are where the unjust enrichment is based upon a predicate wrong, such as a tort, breach of contract or other wrongful conduct such as an antitrust violation." *Id.* (internal quotation omitted). "Conversely, unjust enrichment may provide an independent ground for restitution, and this is known as autonomous restitution." *Id.* (internal quotation omitted).

Logically, "Autonomous claims in an area regulated by an independent body of law are more problematic than

parasitic claims because the premise for such a claim must be that, even if the defendants' conduct is blameless under the substantive requirements of federal and state antitrust statutes and state consumer protection statutes, the plaintiffs nevertheless can still obtain restitution." *Id.* at 411–12. This becomes even trickier when the state legislature has expressed a policy preference restricting certain groups of plaintiffs from recovering.

**\*57**    The majority of courts in this circuit have followed the rule that indirect purchasers may not allege autonomous unjust enrichment claims if that state follows *Illinois Brick.* "It is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick.*" *Dig. Music*, 812 F. Supp. 2d at 412; *accord DDAVP*, 903 F. Supp. 2d at 232; *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) ("Certainly, if such plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate.").

This Court agrees with the logic of those decisions, which is respectful of states' own policy determinations about who may recover for anticompetitive conduct. It therefore **DISMISSES** the following ten autonomous unjust enrichment claims brought in states that follow the rule of *Illinois Brick*: Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington.

Defendants seek dismissal of claims in an additional eight states that follow *Illinois Brick* but for which the Complaint pleads a viable antitrust or consumer protection claim: Alabama, Idaho, Massachusetts, Minnesota, Missouri, New York, Rhode Island, and South Dakota. (Gen. Defs. Br. at 34–36.) By definition, these are parasitic claims rather than autonomous claims.

"As to parasitic claims premised on a violation of state law, these claims boil down to an election of remedies." *Dig. Music*, 812 F. Supp. 2d at 413. This turns on a case-by-case examination of whether each state's antitrust or consumer protection statute has "override[n]" or "limit[ed] ... the scope of restitutionary relief" that would normally be available to a plaintiff at equity. *Id.*

No party has briefed the extent to which each of these eight states' antitrust and consumer protection laws limits a

plaintiff's ability to recover in equity. Absent such argument or briefing, this Court will not undertake an independent assessment of whether and to what extent these each of these statutes restricts equitable recovery.

Therefore, Defendants' motion to dismiss these eight parasitic unjust enrichment claims is **DENIED**, without prejudice to consideration of the issue at a later date on proper briefing.

### C. Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming)

Defendants also argue that, in an antitrust case, claims for unjust enrichment cannot lie where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws. (Gen Defs. Br. at 43.) This is true regardless of whether those states follow *Illinois Brick*. On these grounds, they move to dismiss any autonomous unjust enrichment claims remaining, which would be those under the laws of Arkansas and Wyoming.

The IPP responds that recovery under a theory of autonomous enrichment is not contingent on statutory claims. (IPP Resp. to Gen. Defs. Br. at 39–40.)

The Court is aware of some cases that support Defendants' argument. For example, in *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, 737 F. Supp. 2d 380, 426 (E.D. Pa. 2010), the court applied the respect-for-state-policies rationale undergirding *Digital Music* and held that it would dismiss all autonomous unjust enrichment claims "unless plaintiffs have presented convincing caselaw establishing that a state recognizes unjust enrichment as an autonomous cause of action." *Id.* at 426; *accord Niaspan*, 42 F. Supp. 3d at 763.

 **\*58**  This Court finds, however, that such a determination inappropriately shifts the burden at the motion to dismiss stage to the nonmoving party—particularly in light of the fact that unjust enrichment claims can morph from parasitic to autonomous once a court determines that the predicate statutory claims do not survive. Rather than asking the plaintiff to shoulder the burden of these contingencies, the Court finds it is more appropriate at this stage that the parties moving to dismiss bear the burden of arguing that the state does not recognize an autonomous cause of action for unjust enrichment, as Defendants do here with respect to California, Illinois, and Mississippi, (*See* Forest Br. App'x 4.)

In the alternative, the party moving to dismiss may argue that the policy reasons barring recovery under the predicate statues are strong enough to require dismissing any autonomous unjust enrichment claim in that state. For example, at least one district court has held that it would "decline to allow autonomous restitution where recovery under state antitrust and consumer protection statutes is specifically prohibited." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 n.13 (E.D. Pa. 2010). The Court agrees that such an approach accords respect to states' own substantive policy determinations.

Here, however, the Court has not had occasion to determine whether recovery is "strictly prohibited" under the antitrust and consumer protection laws of Arkansas and Wyoming. This is because (i) the IPP did not allege antitrust or consumer protection claims in those states, and (ii) Defendants did not independently raise reasons why the IPP would be prohibited from recovering under the antitrust laws of Arkansas and Wyoming, beyond the fact that the IPP simply did not allege those claims in the first place. *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D. Cal. 2009) (defendants briefed policy reasons why plaintiffs could not recover under the antitrust laws and, therefore, by extension, the unjust enrichment laws, of Arkansas, Virginia, Montana, and Puerto Rico).

In sum, this Court agrees with the reasoning of *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 669* (E.D. Mich. 2000). That case reasoned that a federal policy requiring dismissal of all autonomous unjust enrichment claims in an antitrust case would both "fail[ ] to read Plaintiffs' complaint in the light most favorable to Plaintiffs and confuse[ ] Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws."

Therefore, the Court **DENIES** Defendants' motion to dismiss the claims under Arkansas and Wyoming law, without prejudice to consideration of the issue at a later date on proper briefing.

### D. The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others

The Court now turns to Defendants' state-specific arguments for dismissing the IPP's unjust enrichment claims under Count Four. (Gen. Defs. Br. at 44–50.)

Sergeants Benevolent Association Health & Welfare Fund., Not Reported in Fed....
201 WL 8 91592©©

### 1. Alabama

Defendants argue that the IPP cannot allege a claim for unjust enrichment in Alabama because to do so it must allege that it conferred a direct benefit on the Defendants. (Forest Br. at 70 n.57 (citing *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.*, No. 09-cv-192, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011)); Gen. Defs. Br. at 45 n.24 (same).)

The IPP responds that unjust enrichment does not require a direct benefit because it does not require privity. (IPP Resp. to Gen. Defs. Br. at 43.) The IPP also cites several federal district court cases that denied motions to dismiss based on the "direct benefit" requirement, none of which discuss that requirement in the context of Alabama law. (*Id.*)

**\*59**  "The essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Const. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (emphasis in original). The IPP Complaint plainly alleges that Defendants "hold" money, in the form of overcharges on Namenda IR and Namenda XR that "belongs to" the IPP or to other members of the Class. It is a foundational principle of antitrust law that overcharges are passed along the distribution chain to consumers.

The case cited by Defendants is distinguishable. In *Danny Lynn Electric & Plumbing*, 2011 WL 2893629, at *6, plaintiffs' payments of inflated fees to a company did not directly benefit individual employees of the company, whose annual bonuses were tied to that company's profits. *Id.* It could not be said, in other words, that the individuals "held" money, through their bonuses, that belonged to the fee payers. *Id.*

Defendants' motion to dismiss this claim is **DENIED.**

### 2. Arizona

Defendants argue that the claim for unjust enrichment under Arizona law should be dismissed because the IPP does not allege that it "directly" benefitted the Defendants. (Gen. Defs. Br. at 45 n.24 (citing *In re Refrigerant Compressors Antitrust*

*Litig.*, No. 09-MD-02042, 2013 WL 1431756, at *26 (E.D. Mich. Apr. 9, 2013)).)

Arizona law, however, does not appear to require that the plaintiff confer any benefit directly on the defendant. *See Murdoch-Bryant Const., Inc. v. Pearson*, 703 P.2d 1197, 1202–03 (Ariz. 1985). In that case, the court found that the excavation and site preparation subcontractor had conferred a benefit on a joint venture partner, even though that partner had signed the TV agreement with the prime contractor after the excavation and site preparation subcontractor's work had already been performed. *Id.*

Other federal district courts have also rejected the so-called "direct benefit" argument to hold that indirect purchasers may state a claim for unjust enrichment under Arizona law. *See In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1175–76 (N.D. Cal. 2015). Those courts reasoned, in part, that unjust enrichment in Arizona is a "flexible, equitable remedy," and "[a] benefit may be any type of advantage, including that which saves the recipient from any loss or expense." *Id.* The *Lidoderm* court found, accordingly, that indirect purchasers still stated a claim even though they had dealt directly with intermediaries in the chain of distribution, rather than defendants. *Id.*; *see also Flonase*, 692 F. Supp. 2d at 543.

Defendants' motion to dismiss this claim is **DENIED.**

### 3. California

Defendants argue that California has no independent cause of action for unjust enrichment. (Gen. Defs. Br. at 44.)

While some California courts have held that there is no independent recovery in unjust enrichment, others have simply restyled a claim for unjust enrichment as a claim sounding in quasi-contract, and still other courts have treated these claims in the ordinary course, analyzing its elements. 55 *Cal. Jur. 3d Restitution* § 2 (noting inconsistent treatment of unjust enrichment claims and collecting cases). For example, the Ninth Circuit recently held, in the same opinion, that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution,' " but later held that "[w]hen a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution.' " *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015).

**\*60** Because this Court apparently may construe the claim as one for quasi-contract, the Court **DENIES** Defendants' motion to dismiss.


### 4. District of Columbia

Defendants argue that the claim for unjust enrichment under the District of Columbia's law should be dismissed for the IPP's failure to allege that it conferred a direct benefit on the Defendants. (Gen. Defs. Br. at 45 n.24 (citing *Refrigerant Compressors*, 2013 WL 1431756, at \*26).)

The Court disagrees. *Refrigerant Compressors* relied on cases that did not analyze D.C. law. *See also Lidoderm*, 103 F. Supp. 3d at 1176 (finding Defendants' citation to *Refrigerant Compressors* "not helpful"). Defendants have cited no other case law requiring D.C. law to be so construed, and the Court is aware of none. *See id.* ("I find that in absence of cases arising under District of Columbia law that support defendants' proposed narrow definition of direct benefit, the claims under District of Columbia law can proceed.").

Defendants' motion to dismiss this claim is **DENIED.**


### 5. Florida

Defendants also that the claim for unjust enrichment under Florida law should be dismissed because the IPP must allege that it conferred a direct benefit on the Defendants. (Gen. Defs. Br. at 45, n.24 (citing *Century Senior Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011)).)

The Court agrees with the district court's thoughtful analysis in *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 928–29 (E.D. Pa. 2012), which upheld a claim for unjust enrichment under Florida law against the same challenge. That case surveyed several Florida cases and determined that while some Florida courts had not allowed plaintiffs to rely on the doctrine of unjust enrichment absent a direct benefit, other courts had allowed these claims to proceed. *Id.* For example, on a motion to dismiss, an appellate court overturned a trial court's dismissal of a medical services provider's unjust enrichment claim, which was based on uncompensated treatment of defendant HMO's members. *Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1199 (Fla.

Dist. Ct. App. 2006). Florida courts have also confirmed that recovery under quasi-contract is available "even where the parties had no dealings at all with each other." *Commerce P'ship 8098 L.P. v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997).

Therefore, at this stage, the Court **DENIES** Defendants' motion to dismiss.


### 6. Idaho

Defendants move to dismiss the claim for unjust enrichment under Idaho law because the IPP fails to allege privity (or "something approaching privity") and that the IPP conferred a direct benefit on Defendants. (Forest Br. at 70 nn.56–57; Gen. Defs. Br. at 45 n.24.) Defendants cite *Beco Const. Co., Inc. v. Bannock Paving Co., Inc.*, 797 P.2d 863, 867 (Ida. 1990).

The Court agrees and dismisses this claim as to all Defendants. First, the *Beco Construction* court rejected the plaintiff's contention that "the equitable principle of unjust enrichment does not require the plaintiff and the defendant to have any other relationship beyond the nexus that one party may not unjustly enrich itself at the expense of the other." *Id.*

**\*61** Second, other Idaho courts have similarly restricted recovery in the absence of a direct relationship. *See, e.g., Stevenson v. Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 842–44 (Ida. 2012) ("The Stevensons' argument, reduced to its essence, is that because they conferred a benefit upon Jefferson, and Jefferson conferred a benefit upon Windermere, they can cut out the middleman and directly recover from Windermere for unjust enrichment.... We are unwilling to expand the doctrine of unjust enrichment to the extent advocated by the Stevensons."); *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 336 P,3d 802, 806 (Ida. 2014) (summarizing cases).

Defendants' motion is **GRANTED.**


### 7. Illinois

Defendants argue that Illinois has no independent cause of action for unjust enrichment and that, in the alternative, the IPP has failed to allege privity with Defendants or conferral of a direct benefit on Defendants. (Gen. Defs. Br, at 44, 45 nn.22, 24.) Defendants also argue that the IPP has failed to allege a

Sergeants Benevolent Association Health & Welfare Fund... Not Reported in Fed....
201 WL 8 91592©©

duty owed to it by Defendants, which is required under Illinois law for recovery in unjust enrichment. (Gen. Defs. Br. at 48 n.26.)

First, Illinois appears to recognize an independent cause of action for unjust enrichment. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). However, it is also true that, recently, intermediate appellate courts have called this into question. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (noting apparent disagreement in Illinois law). This Court follows the controlling view of the Illinois Supreme Court and declines to dismiss the IPP's unjust enrichment claim under Illinois law.

A plaintiff in Illinois is likewise not required to allege privity or allege a direct benefit. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (listing *HPI Health Care* as a case that "concluded that the benefit received by a defendant need not be direct to establish an unjust enrichment claim").

Defendants cite *Cleary*, 656 F.3d at 517, to support their contention that defendants must receive a benefit from plaintiff in a "direct way." (Gen. Defs. Br. at 45.) However, *Cleary* was decided on the basis that the plaintiffs had not alleged *any* detriment that would make the defendants' retention of profits from cigarette sales unjust, since plaintiffs had not proven that they would have refrained from purchasing defendants' cigarettes even defendants had disclosed their true nature and risk. 656 F.3d at 519. Because the IPP has alleged a detriment here, in the form of overcharges, *Cleary* is inapposite.

Finally, Defendants cite *Martis v. Grinnell Mut. Reins. Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009), for the proposition that the IPP must allege a duty owed to it by Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 48 n.26.) Contrary to Defendants' argument, however, *Martis* dismissed plaintiff's claim because plaintiff's claim under the Illinois Consumer Fraud Act ("ICFA") had been dismissed; therefore, there was no underlying fraud count upon which the plaintiff could establish a duty in unjust enrichment. 905 N.E.2d at 928. Here, by contrast, the Court has found that the IPP has stated a claim under the ICFA.

**\*62** Therefore, Defendants' motion to dismiss the IPP's claim for unjust enrichment under Illinois law is **DENIED.**

### 8. Kansas

Defendants argue that the IPP fails to state a claim for unjust enrichment under Kansas law because it does not allege either (i) that the IPP and the Defendants are in privity or (ii) that the IPP conferred a direct benefit on Defendants. (Gen. Defs. Br. at 44, 45 nn.22, 24.)

Kansas does not require privity. "Our past cases establish that recovery under quasi-contract or unjust enrichment is not prohibited simply because the subcontractor and the owner of the property are not in privity. This conclusion is consistent with the theory of quasi-contract and unjust enrichment, which does not depend on privity." *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).

Other district courts have been similarly unable to find any authority for the proposition that plaintiffs in Kansas are required to allege a "direct benefit." *See Processed Egg Prods.*, 851 F. Supp. 2d at 930 (E.D. Pa. 2012); *Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1090 (S.D. Cal. 2017); *Lidoderm*, 103 F. Supp. 3d at 1177–78; *Auto. Parts Antitrust Litig. (Instrument Panel Clusters)*, 2014 WL 2993753, at \*30. In particular, this Court adopts the thoughtful analysis in *Processed Egg Prods.*, 851 F. Supp. 2d at 929–30, which summarized several Kansas cases that permitted plaintiffs to maintain unjust enrichment claims absent "direct" benefits.

Accordingly, Defendants' motion to dismiss this claim is **DENIED.**

### 9. Maine

Defendants argue that to plead a claim for unjust enrichment under Maine law, the IPP must allege that it conferred a benefit directly on the Defendants. (Gen, Defs. Br. at 45 n.24.)

The Defendants again cite *Refrigerant Compressors*, 2013 WL 1431756, at \*25, which dismissed a similar claim for unjust enrichment, albeit without any analysis of Maine's laws.

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201 WL 8 91592©©

Beyond *Refrigerant Compressors*, the Court is aware of one trial-level case from Maine purporting to condition recovery on a direct benefit. *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001). In that case, however, a prospective buyer claimed unjust enrichment against the owner of a piece of property, on the theory that the buyer's negotiations with a third-party developer had led to the owner's repudiating their original contract and entering into a higher-priced land sale contract with that developer. *Id.* The court there found that the prospective buyer had failed to allege that *any* cognizable benefit was conferred. *Id.*

At present, and in the absence of any additional briefing by Defendants on this issue, neither *Refrigerant Compressors* nor *Rivers* convinces the Court that Maine's unjust enrichment law requires a plaintiff to allege a direct benefit in order for its claim to survive a motion to dismiss. *See also TFT-LCD (Flat Panel)*, 2011 WL 4501223, at *11 (denying motion to dismiss claim under Maine's unjust enrichment law for failure to allege direct benefit).

Defendants' motion is **DENIED.**

### 10. Massachusetts

Defendants argue that Massachusetts law similarly requires that the IPP confer a direct benefit on Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which does not contain any analysis of Massachusetts law and does not cite to any cases containing analysis of Massachusetts law. 2013 WL 1431756, at *25.

 *63  Moreover, Massachusetts law does not appear to include such a requirement. *See, e.g., Meshna v. Scrivanos*, No. CIV.A. 2011 01849 BLS 1, 2012 WL 414476, at *4 (Mass. Super. Ct. Dec. 21, 2011) (plaintiff employees successfully pleaded unjust enrichment claim against restaurant owner on the basis that owner was unjustly enriched by tips that customers left for employees). *See also Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1091 (S.D. Cal. 2017) (noting absence of direct benefit rule in Massachusetts cases).

Defendants' motion to dismiss is **DENIED.**

### 11. Michigan

Defendants argue that Michigan law also requires the IPP to allege that it conferred a direct benefit on Defendants, again citing *Refrigerant Compressors*. (Gen. Defs. Br. at 45 n.24 (citing 2013 WL 1431756, at *25).) The IPP responds that other courts have sustained claims for unjust enrichment under Michigan law by indirect purchaser classes. (IPP Resp. to Gen. Defs. Br. at 43 (citing *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 706 (E.D. Pa. 2014)).)

This Court is persuaded that, under Michigan law—which strictly grounds a claim for unjust enrichment in quasi-contract—the relationship between the IPP and the Defendants is too attenuated to support a claim of unjust enrichment. *See A & M Supply Co. v. Microsoft Corp.* ("*A & M II*"), No. 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008) (requiring direct benefit). In *A & M I*, the Court of Appeals vacated and remanded the trial court's certification of a class of "individuals who purchased, leased, or licensed a copy of Windows 95 or Windows 98 from an entity other than Microsoft." *A & M Supply Co. v. Microsoft Corp.* ("*A & M I*"), 654 N.W.2d 572, 575 (Mich. Ct. App. 2002). In a later proceeding, *A & M II*, the Court of Appeals dismissed the unjust enrichment claims by indirect purchasers against Microsoft because there was no "direct contact" between the parties, nor any showing that "Microsoft received any direct payment or other benefit from those purchasers." 2008 WL 540883, at *2.

Although there may be limited exceptions to the "direct benefit" requirement where the plaintiff and defendant are directly in contact, *see Rammer Asphalt Paving Co. v. E. China Twp. Sch.*, 504 N.W.2d 635, 641 (Mich. 1993), the IPP has not alleged that either it or any Class members had direct contact with Actavis, Forest, or Merz. *See also Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 920 (Mich. Ct. App. 1980) ("The process of imposing a 'contract-in-law' to prevent unjust enrichment is an activity which courts should approach with some caution.").

Therefore, Defendant's motion to dismiss this claim is **GRANTED.**

### 12. Mississippi

Defendants cite *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007), for the proposition that unjust enrichment is not a separate cause of action in Mississippi.

After reading *Cole* and the case on which it relies, *Coleman v. Conseco, Inc.*, 238 F. Supp. 2d 804, 813 (S.D. Miss. 2002), the Court is not convinced that Mississippi courts have barred unjust enrichment as a separate cause of action. Although Mississippi courts discuss unjust enrichment as a "theory of recovery," this is not incompatible with its being considered a cause of action. *See Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987) ("The doctrine of unjust enrichment or recovery in quasi-contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another[.]") (citing *Hans v. Hans*, 482 So.2d 1117, 1122 (Miss. 1986)).

**\*64** Other federal courts have agreed. "Contrary to *Coleman* and its federal progeny ... there is a substantial body of Mississippi case law that treats unjust enrichment as a separate cause of action." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 193 (D. Me. 2010).

Defendants' motion to dismiss this claim is **DENIED.**

### 13. New York

Defendants argue that New York requires both privity and conferral of a direct benefit in order allege a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24; *id.* at 48; Forest Br. at 70 nn.56–57.) The privity argument is a non-starter. "[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment[.]" *Sperry v. Crompton Corp.*, 8 N.Y.3d 204 215, 863 N.E.2d 1012, 1018 (2007).

The New York Court of Appeals has announced a rule that the relationship between the parties may not be "too attenuated" in a claim for unjust enrichment. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 216, 863 N.E.2d 1012, 1018 (2007). In *Sperry*, for example, the Court of Appeals dismissed a claim by end purchasers of rubber products against manufacturers of processing chemicals that had allegedly been sold to the rubber product manufacturers at a markup. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 209, 863 N.E.2d 1012, 1013–14 (2007).

Later, the New York Court of Appeals dismissed on the same grounds a claim for unjust enrichment brought by a real estate broker, which had conducted due diligence on certain properties, against a rival brokerage firm, which had purchased those due diligence reports from the developer and eventually won the commission to sell the properties in the original broker's stead. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 519, 973 N.E.2d 743, 748 (2012). Over a dissent, the Court of Appeals held that "regardless of whether [the defendant rival firm] was a good-faith purchaser of the due diligence materials, the complaint fails to present a sufficient connection between [plaintiff and defendant] to form the basis of an unjust enrichment claim." *Id.*

However, wrongdoing can create the requisite relationship between benefactor and beneficiary. The First Department has synthesized the rule as follows: "a plaintiff must plead some relationship between the parties that could have caused reliance or inducement and ... the relationship cannot be too attenuated." *Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1, 4, 982 N.Y.S.2d 98, 100–01 (2014); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

In *Philips International Investments*, for example, the First Department denied a motion to dismiss an unjust enrichment claim against a group of limited partnerships that had swooped in to purchase viable properties in a real estate transaction—cutting plaintiff, who had done much of the development work, out of the deal—because they "knew of the alleged wrong being done to plaintiff and of their essential role in the allegedly wrongful scheme." *Philips Int'l Investments, LLC v. Pektor*, 117 A.D.3d 1, 8, 982 N.Y.S.2d 98, 103 (2014).

At this time, the Court cannot hold that the relationship between the IPP and the Defendants is too attenuated as matter of law, since the IPP has plausibly pled that Defendants derived an economic benefit from charging monopolistic and artificially inflated prices for Namenda, a direct and proximate result of Defendants' unlawful practices. *Cf. Duran v. Bautista*, 2015 N.Y. Slip Op. 50507(U), 19, 2015 WL 1567020, at \*18 (N.Y. Sup. 2015) ("It is against equity and good conscience to permit [the defendant] to retain the proceeds ... if the Class is able to prove the alleged fraudulent scheme.")

**\*65** Other district courts examining this requirement with respect to indirect purchaser class actions are in accord. *See*

201 WL 8 91592©©

*Processed Egg Prods.*, 851 F. Supp. 2d at 930; *DDAVP*, 903 F.Supp.2d at 234; *Suboxone, 64* F. Supp. 3d at 709–10.

The Court therefore **DENIES** Defendants' motion to dismiss the claim for unjust enrichment under New York law, without prejudice to renewal at a later date.

### 14. North Carolina

Defendants cite *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989), for the proposition that a plaintiff must allege that it conferred a direct benefit on a defendant. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.) The *Effler* court affirmed the trial court's entry of summary judgment in favor of defendant because the record did "not satisfy plaintiffs burden of showing that she conferred a benefit *directly* on defendant." *Effler*, 380 S.E.2d at 152 (emphasis added).

The North Carolina Supreme Court has defined the elements of the claim more broadly, without reference to a "direct" benefit: "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable." *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988).

Moreover, "cases decided after *Effler* have held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable*, No. 16 CVS 4393, 2017 WL 536361, at *5 (N.C. Super. Feb. 7, 2017) (collecting cases); *see also Bandy v. Gibson*, No. 16 CVS 456, 2017 WL 3207068, at *5 (N.C. Super. July 26, 2017) (same).

Generally, federal district courts that have recognized this split in North Carolina authority have not dismissed unjust enrichment claims on pre-answer motions. *Lidoderm*, 103 F. Supp. 3d at 1178 (citing other federal cases). In particular, the court in *Processed Egg Prods.*, 851 F. Supp. 2d at 931–32, found that the more expansive language of *Booe*, from the North Carolina Supreme Court, was more persuasive than the language of *Effler*, from the intermediate appellate court. *Id.* This Court agrees that, given both the divide in authority and the clear language of *Booe*, a case from the North Carolina Supreme Court, it cannot dismiss the claim on these grounds.

Therefore, the Court **DENIES** Defendants' motion to dismiss the North Carolina claim for unjust enrichment.

### 15. North Dakota

Defendants argue that unjust enrichment under North Dakota law requires the plaintiff to have conferred a direct benefit on the defendant, citing *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 680 N.W.2d 634, 642 (N.D. 2004) and *Relafen*, 225 F.R.D. at 28. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.)

In *Ritter*, defendant and plaintiffs worked on the same construction project; the defendant argued that the plaintiffs, which had not chosen to contract with it directly at the outset of the project, could not later sue it for unjust enrichment. 680 N.W.2d at 642 (citing *Apache Corp. v. MDU Res. Grp, Inc.*, 603 N.W.2d 891 (N.D. 1999)).

 ***66** *Apache*, however, does not stand for the proposition that, in North Dakota, unjust enrichment claims universally require a direct benefit. Rather, that case holds that, when parties involved in a single project do not all contract with one another, "[t]he separate contracts convey clearly the limited kinds of liability and exposure each party has in mind. .... Respect for that contract arrangement requires the courts to refuse restitution between the parties who did not contract with each other." *Apache*, 603 N.W.2d at 895 (citing Dan B. Dobbs, *Law of Remedies*, § 4.1(2), p. 372 (2d ed. 1993)). *Accord In re Auto. Parts (Fuel Senders) Antitrust Litig*, 29 F. Supp. 3d 982, 1025 (E.D. Mich. 2014) (declining to dismiss indirect purchasers' unjust enrichment claim under North Dakota law on the basis of *Apache*); *In re Auto. Parts (Bearings) Antitrust Litig.*, 50 F. Supp. 3d 836, 864–65 (E.D. Mich. 2014).

Moreover, North Dakota courts have upheld unjust enrichment claims even where no direct benefit was alleged. *See, e.g., Opp v. Matzke*, 559 N.W.2d 837, 840 (N.D. 1997) (well driller had stated claim for unjust enrichment against landowner even though she had not asked him to drill the well and did not reside on the property; since defendant "provide[d] her family a place to live on the property," she benefitted from the well).

Defendants' motion to dismiss the North Dakota claim is **DENIED.**

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....
201 WL 8 91592©©

### 16. Rhode Island

Defendants argue that Rhode Island law requires the IPP to allege that it conferred a direct benefit on Defendants. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which dismissed the Rhode Island unjust enrichment claim without any analysis of Rhode Island law. 2013 WL 1431756, at *25.

In Rhode Island, there are three elements of unjust enrichment. *R & B Elec. Co. v. Amco Const. Co.*, 471 A.2d 1351, 1355 (R.I. 1984). "First, a benefit must be conferred upon the defendant by the plaintiff. Second, there must be an appreciation by the defendant of such benefit. Finally, there must be an acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without paying the value thereof." *Id.* at 1356. None of these elements requires conferral of a direct benefit.

Moreover, "[t]he most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust," *Id.* Because the Rhode Island courts have not stated clearly that an action for unjust enrichment requires that the plaintiff have conferred a benefit on the defendant directly, and because Defendants have cited no case that so holds, the Court denies Defendants' motion to dismiss this claim on such grounds.

However, because the conduct underlying this claim is based on antitrust violations, and because Rhode Island did not recognize a cause of action for indirect purchasers under its antitrust statute until July 15, 2013, the Court **DISMISSES IN PART** this claim to the extent the IPP seeks to recover for injuries incurred before that date.

### 17. Tennessee

Defendants argue that a plaintiff in Tennessee must demonstrate either (i) that it "has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract" or (ii) that any attempt to exhaust these remedies would be futile, before it may recover in unjust enrichment. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525–26 (Tenn. 2005); (*see also* Gen. Defs. Br. at 46–47). Defendants further contend that the IPP's assertions at paragraphs 222–23 of its Complaint demonstrate that that the IPP intends to rely on a futility theory, but that,

under Tennessee law, "a bare allegation of futility is not enough." (Gen. Defs. Br. at 46–47).

 **\*67** *Freeman Indus.*, 172 S.W.3d at 526, held that, at the summary judgment stage, an affidavit from plaintiff's counsel averring that he was "unaware of any viable claims" against the party with which the plaintiff had been in privity, without any further factual basis, was insufficient to show that he was entitled to recover in unjust enrichment. *Id.*

The IP Action, however, is at the motion to dismiss stage, where plaintiff has adequately alleged that any claim against the pharmacies or distributors would be futile. (CAC ¶¶ 222–23.) It is thus easily distinguishable from *Freeman Industries*, and the IPP must be given the opportunity to prove up its futility argument after discovery is complete.

Defendants' motion to dismiss the Tennessee claim is **DENIED.**

### 18. Utah

Defendants argue that, under Utah law, a plaintiff must allege that it conferred a benefit directly on a defendant. (Gen. Defs. Br. at 45 n.24 (citing *Concrete Prods. Co. v. Salt Late Cty.*, 734 P.2d 910, 911–12 (Utah 1987)).)

In *Concrete Prods.*, 734 P.2d at 911, a concrete supplier delivered materials to a subcontractor hired for a public works project. *Id.* The supplier, which was never paid, unsuccessfully sued the subcontractor, and then turned around and attempted to sue the county government on the theory that the county had not required the general contractor to post a bond. *Id.* The court found that the subcontractor could not recover in unjust enrichment against the county because there was no benefit to the county whatsoever—"[i]nstead, [the county] will incur the expenses of cleaning and maintaining curbs and gutters with no resale value or intrinsic economic worth." *Id.* at 912. Although the *Concrete Products* court distinguished an earlier case, *Breitling Bros. Const. v. Utah Golden Spikers, Inc.*, 597 P.2d 869 (Utah 1979), by stating that "[n]o *direct* benefit, such as that demonstrated by the plaintiff in *Breitling*, is present here," *Concrete Prods.*, 734 P.2d at 911–12 (emphasis added), the use of the word "direct" in that case's dicta does not convince the Court that a plaintiff must allege a direct benefit as part of its *prima facie* case.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 463 of 520
PageID: 9384

Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL 8 91592©©

Other district courts have also found that Utah law does not require a direct benefit. *Processed Egg Prods.*, 851 F. Supp. 2d at 932–34; *Auto. Parts (Bearings)*, 50 F. Supp. 3d at 864–65; *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1092–93.

Defendants' motion to dismiss the Utah unjust enrichment claim is, therefore, **DENIED.**

### 19. Washington

Defendants claim that Washington unjust enrichment law requires plaintiffs to allege a direct benefit. (Gen Defs. Br. at 45 n.24 (citing *Keil v. Scholten*, No. 48051-1-I, 2002 WL 988562, at *5 (Wash. Ct. App. Feb. 4, 2002)) (unpublished opinion).)

In *Keil*, a group that had formed a joint venture to purchase a commercial real estate property sued a real estate broker for unjust enrichment, seeking recovery of two hundred thousand dollars he had earned as a commission from the sale proceeds. *Id.* at *4. But for the broker's fraud and misrepresentations concerning the sale, the group argued, it never would have paid the four hundred thousand dollars cash at closing from which the broker earned his fee. *Id.* at *5. The court found that the group could not recover the broker's commission on a theory of unjust enrichment because, pursuant to the sale documents, it was the property owner's obligation to pay the brokerage fee, not the group's. *Id.*

 **\*68** Similarly, in *State v. Am. Tobacco Co.*, No. 96-2-15056-SEA, 1996 WL 931316, at *8–9 (Superior Ct. Wash. Apr. 9, 1999), the court found that the State of Washington had not stated a claim for unjust enrichment against tobacco producers, because the benefit that the state alleged to have conferred, in the form of medical payments, was too attenuated. *Id.*

However, in *Chem. Bank v. Wash Pub. Power Supply Sys.*, 691 P.2d 254, 544 (Wash. 1984), the Supreme Court of Washington held that a group of bondholders, which had funded a nuclear power plant construction project that later went bankrupt, had provided a "benefit" to the projects' participants—municipal entities that had bargained for a share of the plants' power output—such that restitution was appropriate. *Id.* at 558. The court reasoned that "the Restatement's definition of benefit is quite broad;" that the bond revenues—although flowing through a third party—had been raised on the request of the participants; and that,

"[f]inally, it was for the participants' benefit that the plants were being built in the first place." *Id.*

This Court is not aware of any federal district court cases discussing the "direct benefit" requirement under Washington unjust enrichment law in the antitrust context. However, this Court concludes that it must follow the reasoning of the Washington Supreme Court in *Chemical Bank.* The IPP has alleged that unlawful overcharges for branded Namenda IR and Namenda XR flowed ultimately to Defendants, even though there were intermediaries in the chain of distribution. This is analogous to the bondholder financing that flowed to the participants in *Chemical Bank.* Moreover, it was on Defendants' account that higher prices for Namenda were passed through to the consumer.

Therefore, the Court **DENIES** Defendants' motion to dismiss.

### 20. West Virginia and Wisconsin

Defendants argue that a plaintiff must allege conferral of a direct benefit on a defendant in order to bring a claim for unjust enrichment in West Virginia and Wisconsin. (Gen. Defs. Br. at 45 n.24 (citing *Refrigerant Compressors*, 2013 WL 1431756, at 25–26)). *Refrigerant Compressors*, however, neither analyzes the law under either of these jurisdictions nor cites any case that does.

As a result, and in the absence of any additional briefing, Defendants' motion to dismiss these claims is **DENIED.**

### 21. Wyoming

Lastly, Defendants argue that the IPP has failed to allege that it conferred a direct benefit on Defendants, as required under Wyoming law. (Forest Br. at 70 n.57 (citing *Boyce v. Freeman*, 39 P.3d 1062, 1065–66 (Wyo. 2002)).) In *Boyce*, 39 P.3d at 1063, the plaintiff gave a pickup truck to an employee of the defendant because the employee told the plaintiff that the defendant would pay for the truck. *Id.* Plaintiff was never paid for the truck and brought an unjust enrichment claim against the defendant, alleging that the employee had used the truck on the job and, therefore, that the defendant-employer was unjustly enriched. *Id.* The Supreme Court of Wyoming found that because nothing in the record showed that the employer knew it was expected to pay for the truck, or that the employer induced the plaintiff to give the truck to its

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 464 of 520
PageID: 9385
Sergeants Benevolent Association Health & Welfare Fund..., Not Reported in Fed....

201 WL  8 91592 ©©

employee, "[w]e see no evidence leading us to conclude that ... good conscience requires [the defendant] to pay[.]" *Id.* at 1066. The opinion concluded, in part, that the employer had "received no *direct* benefit from this action." *Id.*

**\*69** In *Boyce*, the Supreme Court of Wyoming also described the elements of unjust enrichment as follows: "(1) Valuable services were rendered, or materials furnished, (2) *to the party to be charged*, (3) which services or materials were accepted, used and enjoyed by the party, and, (4) under such circumstances which reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched." *Id.* at 1065 (citing *Coones v. F.D.I.C.*, 894 P.2d 613, 617 (Wyo. 1995) (emphasis added).)

The Court finds that the *Boyce* opinion as a whole establishes that a plaintiff seeking to recover under a theory of unjust enrichment under Wyoming law must allege a direct benefit.

Other federal district courts sitting in diversity are in accord. *See, e.g.*, *Aftermarket. Filters*, 2010 WL 1416259, at *2–3.

Therefore, Defendants' motion to dismiss the Wyoming claim is **GRANTED.**

### E. In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States

In sum, the Court finds that the IPP Complaint has adequately pled facts supporting a claim for unjust enrichment against Actavis, Forest, and Merz only, The Court thus dismisses all claims under Count Four with respect to the Generic Defendants.

The Court also finds that, as a matter of law, the IPP may pursue its Count Four claims for unjust enrichment under the laws of all states **except** Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming. Those claim are hereby **DISMISSED.**

The Court also **DISMISSES IN PART** the IPP's claim under Rhode Island law, to the extent the IPP seeks recovery for injuries occurring prior to July 15, 2013.

### IX. Conclusion

In conclusion, the Court holds as follows:

With respect to Count One for monopolization, the claims under the laws of Florida, Kansas, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Two for conspiracy to monopolize, the claims under the laws of Illinois, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Three for consumer protection and unfair and deceptive trade practices, the claims under the laws of Arizona, the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia are **DISMISSED** in their entirety.

With respect to Count Four, unjust enrichment, all claims are **DISMISSED ONLY WITH RESPECT TO** the Generic Defendants. For the remaining Defendants, Actavis, Forest, and Merz, the claims under the laws of Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

The Clerk of Court is respectfully requested to remove Docket Number 133 from the Court's list of pending motions.

**\*70** Pursuant to this Court's memorandum endorsement at Docket Number 165, the Clerk of Court is also respectfully requested to remove Docket Number 150 from the Court's list of pending motions.

### All Citations

Not Reported in Fed. Supp., 2018 WL 7197233

201 WL 8 91592©©

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 48

2016 WL 4157309
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Daniel SMALL, et al., Plaintiffs,

v.

UNIVERSITY MEDICAL CENTER OF
SOUTHERN NEVADA, et al., Defendants.

Case No. 2:13–cv–00298–APG–PAL
|
Signed 08/03/2016

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS

(ECF No. 259)

ANDREW P. GORDON, UNITED STATES DISTRICT
JUDGE

 *1  Plaintiffs were hourly employees of University Medical
Center of Southern Nevada ("UMC"). They allege that UMC
implemented policies to limit their hourly pay below the
federal minimum wage and to prevent them from receiving
any overtime pay for hours worked in excess of 40 hours a
week. Plaintiffs bring a collective and class action against
UMC and John Espinoza, UMC's Chief Human Resources
Officer, under state and federal law. Defendants move to
dismiss for failure to state a claim upon which relief can
be granted. Because plaintiffs' allegations regarding overtime
pay are threadbare recitals of the elements of a cause of
action, I dismiss this claim with leave to amend. I also dismiss
plaintiffs' minimum-wage claim with leave to amend because
plaintiffs assert an equitable theory of recovery that is not
available to them because they have an adequate remedy at
law.

I. BACKGROUND
Plaintiffs Daniel Small, Carolyn Small, William Curtin,
David Cohen, Leanette Lawrence, and Louise Collard worked
at UMC as respiratory therapists, registered nurses, admitting
representatives, and electrocardiogram ("EKG") technicians.
ECF No. 256 at ¶¶ 5–16. They allege that they were paid on
an hourly basis, but UMC and Espinoza implemented polices
to limit their hourly compensation. See id. at ¶¶ 20–30. UMC

and Espinoza allegedly deducted 30 minutes of pay each day
for meal breaks whether or not breaks were taken, failed to
pay overtime when employees worked in excess of 40 hours
a week, and failed to keep records documenting the hours the
employees worked. Id.

Plaintiffs bring a collective action under section 16(b) of the
Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), for
UMC and Espinoza's alleged failure to pay overtime. See id. at
¶¶ 33, 54. They also bring a class action for unjust enrichment
for UMC and Espinoza's alleged policy of automatically
deducting 30 minutes of pay for meal breaks. See id. at ¶¶ 49,
65. UMC and Espinoza move to dismiss on several grounds.

II. ANALYSIS
A properly pleaded complaint must provide a "short and plain
statement of the claim showing that the pleader is entitled to
relief." Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly,
550 U.S. 544, 555 (2007). While Rule 8 does not require
detailed factual allegations, it demands more than "labels and
conclusions" or a "formulaic recitation of the elements of a
cause of action." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(citing Twombly, 550 U.S. at 555). "Factual allegations must
be enough to rise above the speculative level." Twombly, 550
U.S. at 555. To survive a motion to dismiss, a complaint
must "contain [ ] enough facts to state a claim to relief that
is plausible on its face." Iqbal, 556 U.S. at 696 (internal
quotation marks and citation omitted). I accept as true all well-
pleaded facts and construe them in the light most favorable to
the nonmoving party. Zadrozny v. Bank of N.Y. Mellon, 720
F.3d 1163, 1167 (9th Cir. 2013) (citations omitted).

A. Plaintiffs' FLSA Allegations Regarding Overtime
Pay are Dismissed Without Prejudice.
 *2  Defendants contend that plaintiffs' FLSA allegations
are inadequately pleaded under Landers v. Quality
Communications, Inc., 771 F.3d 638 (9th Cir. 2014), cert.
denied, 135 S. Ct. 1845 (2015). Plaintiffs respond that
dismissal is inappropriate because the parties have conducted
extensive discovery, defendants have been on notice of
plaintiffs' claims for three and a half years, Landers is
inapplicable because it was decided after plaintiffs' original
complaint was filed, and Landers is distinguishable because,
unlike Landers, one of plaintiffs' prior complaints survived a
motion to dismiss. [1]

[1] Plaintiffs also contend that the defendants' motion to dismiss is barred by Rule 12(g), which prohibits a defendant from raising a defense that was available but omitted from an earlier motion to dismiss. Because the operative complaint contains a newly named defendant who was not previously a party to this action, I decline to deem the defenses that are now asserted waived. *See Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1475 n.2 (9th Cir. 1988) (stating "courts have discretion to hear a second motion under Rule 12(b)(6) if the motion is not interposed for delay and the final disposition of the case will thereby be expedited.").

The FLSA sets a national minimum wage and requires overtime pay of one and a half times an employee's hourly wage for every hour worked over 40 years per week. *Landers*, 771 F.3d at 640; *see also* 29 U.S.C. § 206(a) (minimum wage); 29 U.S.C. § 207(a)(1) (overtime). In determining whether a plaintiff has stated a plausible claim under the FLSA, plaintiffs in the Ninth Circuit must do more than recite this statutory language. *Id.* at 644. At a minimum, a plaintiff must allege facts showing that he or she worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty hours during that week. *See id.* at 645–46.

Plaintiffs' allegations fall short of this standard. The complaint merely alleges that the defendants instituted "uniform policies and practices" that disregarded "the requirements of federal and state wage and hour laws" by "fail[ing] to pay overtime hours" when plaintiffs worked "more than forty (40) hours per week." ECF No. 256 at ¶¶ 32, 35, 36. This threadbare recitation does not allege, as *Landers* requires, that any particular plaintiff worked more than forty hours in a particular workweek without being compensated for their additional work.

Plaintiffs' assertion that *Landers* is distinguishable on the facts is incorrect. *Landers* establishes the level of specificity that is required for a plaintiff to state a plausible FLSA claim. This standard applies to every complaint and, under *Landers'* standard, it is irrelevant whether plaintiffs' pre-*Landers* complaint survived a different motion to dismiss. For the same reason, I am also unpersuaded that dismissal is inappropriate because plaintiffs have engaged in discovery and survived a prior motion to dismiss. When considering a motion to dismiss, my review is generally limited to the pleadings. *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984). Conducting discovery does not render a complaint plausible and surviving one motion to dismiss does not render plaintiffs immune from a subsequent motion.

Nor is it relevant that defendants have been on notice of plaintiffs' claims for three and a half years. *Twombly* and *Iqbal* require me to consider whether plaintiffs' complaint states a plausible claim, not whether plaintiffs' complaint put defendants on notice. I therefore dismiss plaintiffs' FLSA claims without prejudice.

### B. Plaintiffs' Unjust–Enrichment Claim is Dismissed Without Prejudice.

**\*3** Defendants also seek dismissal of plaintiffs' unjust enrichment claim, asserting that it is an equitable claim that is not available because plaintiffs have a remedy at law. Plaintiffs respond that defendants incorrectly rely on *Landers* for this assertion and that an unjust enrichment claim is appropriate under Rule 23.

"[U]njust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Mainor v. Nault*, 101 P.3d 308, 317 (Nev. 2004) (en banc), as corrected on denial of reh'g (Apr. 13, 2005). To state a claim for unjust enrichment, a plaintiff must show she conferred a benefit on the defendant, and the defendant appreciated, accepted, and retained the benefit under circumstances such that it would be inequitable for him to retain the benefit without paying for it. *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997). Nevada recognizes the general rule that an equitable claim, like unjust enrichment, is not available where the plaintiff has a full and adequate remedy at law. *In re Wal–Mart Wage & Hour Emp't Prac. Litig.*, 490 F. Supp. 2d 1091, 1125 (D. Nev. 2007) (citing *State v. Second Judicial Dist. Court in & for Washoe Cty.*, 241 P. 317, 322 (Nev. 1925)).

Plaintiffs' minimum-wage claim asserts that defendants instituted a policy of automatically deducting 30 minutes of pay for meal breaks, regardless of whether a break was actually taken. ECF No. 256 at ¶¶ 49, 65. Because federal law provides plaintiffs with a legal remedy for this claim (*see*, 29 U.S.C. §§ 206(a), 216(b), 216(e)(2)), their unjust-enrichment theory is improperly pleaded. Plaintiffs' contention that an unjust enrichment claim may be asserted under Rule 23 is irrelevant. Rule 23 is not a source of substantive rights and does not provide plaintiffs with a claim for relief. I therefore dismiss plaintiffs' unjust-enrichment claim without

prejudice and grant them leave to plead an appropriate theory of recovery if they can.

### C. Defendants' Remaining Arguments

Because I grant the defendants' motion to dismiss plaintiffs' two-count complaint, I decline to address defendants' remaining arguments in detail. I simply note that I cannot, as defendants request, dismiss plaintiffs' alter-ego or recordkeeping claims because none exists. The complaints' references to alter ego and recordkeeping failures are allegations, which may be stricken under Rule 12(f) but are not subject to dismissal under Rule 12(b)(6) as defendants contend.

I also find that defendants' concerns regarding standing and the scope of plaintiffs' proposed classes and subclasses are premature. Because plaintiffs have not plausibly alleged an injury or any theory of recovery, I cannot determine whether the named plaintiffs are appropriate representatives. *See Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) (discussing standing in the class-action context).

### III. CONCLUSION

IT IS THEREFORE ORDERED that defendants' motion to dismiss **(ECF No. 259) is GRANTED** and plaintiffs' FLSA and minimum-wage claims are dismissed without prejudice.

IT IS FURTHER ORDERED that plaintiffs may file an amended complaint within **21 days** of entry of this order.

### All Citations

Not Reported in Fed. Supp., 2016 WL 4157309

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 49

2011 WL 2119100
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Sandy SMITH and Kathleen Maxson,
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
MERIAL LIMITED, Defendant.

Civ. No. 10–439.
|
May 26, 2011.

**Attorneys and Law Firms**

Paul Diamond, Diamond Law Office, LLC, Fort Lee, NJ,
Gary S. Graifman, Kantrowitz, Goldhamer & Graifman,
Esqs., Montvale, NJ, Jeffrey W. Herrmann, Cohn, Lifland,
Pearlman, Herrmann & Knopf, LLC, Saddlebrook, NJ,
Michael Scott Green, Green & Pagano, LLP, East Brunswick,
NJ, for Plaintiffs.

**OPINION**

WILLIAM J. MARTINI, District Judge.

 **\*1**  This matter comes before the Court on Defendant Merial
Limited's ("Merial") motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6). There was no oral argument.
Fed.R.Civ.P. 78. For the reasons stated below, Defendant's
motion to dismiss is **GRANTED** in part and **DENIED** in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**
Plaintiffs' Amended Complaint ("Complaint") brings a
putative class action on behalf of themselves and other
purchasers and users of "spot on" flea and tick treatments
manufactured by Defendant. Defendant Merial manufactures
Frontline and Frontline Plus (together, "Frontline"), which are
flea and tick control pesticide products containing the active
ingredients finopril and methoprene. (Compl.¶ 4.) Frontline
is considered a "spot on" flea and tick treatment because the
pesticide is applied directly to one or more localized areas on
the body of the pet. (See Compl., Ex. D.)

On April 21, 2009, the Environmental Protection Agency
("EPA"), which regulates the safety of pesticides, issued a
press release, reporting a "recent sharp increase in the number
of incidents being reported from the use of spot-on pesticide
products for flea and tick control for pets." (Compl., Ex. D.)
In response, Merial issued a statement on April 22, 2009,
addressing the EPA's concern and concluding, "[p]et owners
can continue to trust FRONTLINE products for long-lasting
and effective flea and tick control." (Compl., Ex. E.) Merial
also issued a similar letter to veterinarians. (See Compl., Ex.
F.)

Plaintiffs allege that Frontline is unsafe because it caused
skin irritation and neurological problems for their pets.
(Compl.¶ 7.) Plaintiff Sandy Smith, a resident of Tennessee,
alleges that on or about 2007 she used Frontline on
her two dogs and noticed that after each application, the
dogs exhibited "seizure-like symptoms." (Compl.¶¶ 32–33.)
Plaintiff Kathleen Maxson, a resident of New Jersey, alleges
that on November 28, 2009, she purchased and treated her cat
once with Frontline, after which the cat "began to convulse
and died." (Compl.¶ ¶ 34–36.)

Plaintiffs, on behalf of themselves and other purchasers of
Defendant's products, bring the following causes of action:
(1) breach of express warranty (Count One); (2) breach
of implied warranty of merchantability (Count Two); (3)
unjust enrichment (Count Three); and (4) violation of the
New Jersey Consumer Fraud Act ("NJCFA") (Count Four).
Specifically, Plaintiffs seek economic damages based upon
the difference between the amount they paid for the product
and the diminished (or nonexistent) value of the product as a
result of it being unsafe to apply to their pets. [1]

---

[1]    In addition to this action, multiple putative class
       actions have been filed against various other "spot
       on" flea and tick treatment manufacturers in this
       Court. The Court has issued parallel opinions on
       the pending motions to dismiss in the following
       flea and tick treatment cases: *McDonough v.
       Bayer Healthcare,* Civ. No. 10–442; *Arlandson v.
       Hartz Mountain Corp.,* Civ. No. 10–1050; *Snyder
       v. Farnam Companies,* Civ. No. 10–1391; *and
       Johansson v. Central Garden and Pet Company,*
       Civ. No. 10–6372.

**II. DISCUSSION**

  **A. Motion to Dismiss Standard**
Federal Rule of Civil Procedure 12(b)(6) provides for the
dismissal of a complaint, in whole or in part, if the plaintiff

2099 WL 2993900

fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, [2] the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). Although a complaint need not contain detailed factual allegations, "a plaintiffs obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility ..." *Iqbal,* 129 S.Ct. at 1949 (2009).

[2]     This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

**\*2** In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick,* 502 F.3d 263 (3d Cir.2007). The court may also consider "undisputedly authentic documents] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents]." *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Coll. Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002).

**B. Choice of Law Principles**
Since Plaintiffs' claims are all based on state law, at the outset the Court must determine which law to apply to Plaintiffs' claims. New Jersey's choice of law rules apply, as a federal court sitting in diversity must apply the forum state's choice of

law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 383 U.S. 487, 496 (1941). New Jersey has adopted the "most significant relationship" test of the Restatement of Conflict of Laws. *P.V. v. Camp Jaycee,* 197 N.J. 132, 142–43, 962 A.2d 453 (2008). [3] This analysis, which must be performed on an issue-by-issue basis, is a two-step process. *Id.* at 143, 962 A.2d 453. The first step is to determine whether an actual conflict of law exists, for if no conflict exists, the law of the forum state applies. *Id.* Second, if a conflict does exist, the Court must determine which state has the "most significant relationship" to the claim, by "weighing] the factors set forth in the Restatement section corresponding to the plaintiffs cause of action." *Nikolin v. Samsung Elecs. Am., Inc.,* Civ. No. 10–1456, 2010 U.S. Dist. LEXIS 110942, at \*9, 2010 WL 4116997 (D.N.J. Oct.18, 2010).

[3]     Until the New Jersey Supreme Court's decision in *Camp Jaycee,* New Jersey used the "governmental interest" analysis. The "most significant relationship" test now used "embodies all of the elements of the governmental interest test plus a series of other factors deemed worthy of consideration." *Camp Jaycee,* 197 N.J. at 142 n. 4, 962 A.2d 453.

Plaintiffs argue that it is premature to conduct a proper choice of law analysis, as the Court does not yet have a full factual record. Due to the factual inquiry that may be necessary to properly weigh the Restatement factors, "it can be inappropriate or impossible for a court to conduct that analysis at the motion to dismiss stage when little or no discovery has taken place." *In re Samsung DLP Television Class Action Litigation,* Civ. No. 07–2141, 2009 WL 3584352, at \*3 (D.N.J. Oct. 27, 2009). However, "[s]ome choice of law issues may not require a full factual record and may be amenable to resolution on a motion to dismiss." *Harper v. LG Elecs. United States, Inc.,* 595 F.Supp.2d 486, 491 (D.N.J.2009). As such, courts in this Circuit have sometimes determined that the choice of law analysis in a putative class action can be done at the motion to dismiss stage. *See, e.g., Cooper v. Samsung Elecs. Am., Inc.,* 374 Fed. Appx. 250, 255 n. 5 (3d Cir.2010); *Warma Witter Kreisler, Inc. v. Samsung Electronics America, Inc.,* Civ. No. 08–5380, 2010 U.S. Dist. LEXIS 34584, at \*2, 2010 WL 1424014 (D.N.J. Apr. 8, 2010); *Knox v. Samsung Electronics America, Inc .,* Civ. No. 08–4308, 2009 U.S. Dist. LEXIS 53685, at \*2, 2009 WL 1810728 (D.N.J. June 25, 2009). Other times, however, Courts in this District have deferred the choice of law analysis until the class certification stage. *See Harper,*

Smith v. Merial Ltd., Not Reported in F.Supp.2d (2011)

2099 WL 2993900

595 F.Supp.2d at 490–91; *In re Samsung*, 2009 WL 3584352, at *3; *In re Mercedes–Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J.2009); *In re K–Dur Antitrust Litig.*, 338 F.Supp.2d 517, 541 (D.N.J.2004); *In re Hypodermic Products Antitrust Litig.*, Civ. No. 05–1602, 2007 U.S. Dist. LEXIS 47438, at *16, 2007 WL 1959225 (D.N.J. June 29, 2007).

**\*3** In order to decide whether choice of law analysis is appropriate at the motion to dismiss stage in this particular case, the Court will follow the guidance provided in *Harper,* and determine whether the choice of law issues "require a full factual record" or not. 595 F.Supp.2d at 491. Since choice of law analysis must be undertaken on an issue-by-issue basis, the Court will also determine whether or not to defer its choice of law decision on an issue-by-issue basis. The factual record available at this time may be full enough for certain choice of law determinations but not for others. Therefore, New Jersey's choice of law analysis will be addressed for each issue, and should the choice of law determination for that issue require a fuller factual record, the Court will defer its decision until such factual record is available.

### C. Counts Two, Three and Four—Breach of Implied Warranty, Unjust Enrichment and Violation of the NJCFA

Defendant argues that Plaintiffs' theories of breach of implied warranty, unjust enrichment, and consumer fraud are not independently actionable, as under New Jersey law, claims arising from harm caused by products can only be asserted under the NJPLA. Furthermore, Defendant contends that even if Tennessee law applies to Plaintiff Sandy Smith's claims, these claims would still be subsumed under the Tennessee Product Liability Act ("TPLA").

#### 1. Choice of Law

The choice of law analysis here is straight forward. First, under the applicable Restatement provision, the state where the injury occurs is presumed to govern, unless some other state can be shown to have a more significant relationship. Restatement (Second) of Conflict of Laws, § 147. Second, Plaintiffs themselves state in their opposition brief that "if Plaintiffs were actually asserting product liability claims, the NJPLA would apply only to the claims of New Jersey plaintiffs," as "the law of the state where the plaintiff was injured generally governs product liability claims." (Pls.' Opp. Br. at 9 n. 3.) While Plaintiffs may challenge whether the applicable product liability acts subsume their claims, they have not challenged the applicability of the law of the state

where the plaintiff was injured to product liability issues. Since Plaintiffs and Defendant are in agreement, there is no real choice of law issue present here, and the Court will apply the law of each Plaintiff's home state. [4]

[4]   Since the class has yet to be certified, only the law of each of the named Plaintiffs' home states will be addressed. *See Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 659 (3d Cir.1998) (stating that "[u]ntil the putative class is certified, the action is one between the [named plaintiffs] and the defendants. Accordingly, the First Amended Complaint must be evaluated as to these particular plaintiffs.")

#### 2. Subsumption of Counts Two, Three and Four Under the NJPLA and the TPLA

Since the product liability law of each Plaintiff's home state governs, the NJPLA applies to Plaintiff Kathy Maxson's claims. The NJPLA governs any "product liability action," which is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J. Stat. Ann. § 2A:58C–1(b)(3). "Harm" is defined in the statute as, "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J. Stat. Ann. § 2A:58C–1(b)(2). Thus, the Third Circuit has determined that the NJPLA "effectively creates an exclusive statutory cause of action for claims falling within its purview." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir.1991). If any of Plaintiff Kathy Maxson's claims constitute a "product liability claim," they will be subsumed under the NJPLA.

**\*4** Plaintiffs attempt to classify their claims as non-product liability claims by alleging only economic damages related to the price of the product as opposed to damages related to the harm caused by the product. However, "[limiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA." *Vercelleno v. Gerber Prods. Co.,* Civ. No. 09–2350, 2010 U.S. Dist. LEXIS 9477, at *20, 2010 WL 455388 (D.N.J. Feb. 3, 2010). The New Jersey Supreme Court has expressly held that "[t]he language of the PLA represents a clear legislative intent that ... the PLA is paramount when the underlying claim is one for harm caused

2099 WL 2993900

by a product." *Sinclair v. Merck & Co., Inc.,* 195 N.J. 51, 66, 948 A.2d 587 (N.J.2008). As such, regardless of how a claim is pleaded, where the *core issue* is the harmfulness of the product's chemicals, the claim must be pleaded as an NJPLA claim. *Crouch v. Johnson & Johnson,* Civ. No. 09–2905, 2010 WL 1530152, at *7 (D.N.J. Apr. 15, 2010).

Though Plaintiffs assert contract, quasi-contract, and consumer fraud claims, the core issue underlying Plaintiffs' claims is that the chemicals in Frontline products are dangerous and caused physical damage to Plaintiffs' property, in the form of harm to their pets' health. *See Harabes v. The Barkery, Inc.,* 348 N.J.Super. 366, 791 A.2d 1142, 1144 (N.J.Super. Ct. Law Div.2001) (classifying pets as personal property). This fits squarely within the NJPLA's definition of "harm" as "physical damage to property." N.J. Stat. Ann. § 2A:58C–1(b)(2)(a).

While Plaintiffs point to the New Jersey Appellate Division case *Wendling v. Pfizer, Inc.,* No. L–348–04, 2008 WL 833549 (N.J.App.Div. Mar. 31, 2008), to support their position, the facts of *Wendling* are distinguishable. In *Wendling,* the plaintiffs brought a claim under the NJCFA that a product claiming to control tapeworms in horses failed to do so, causing harm to the plaintiffs' horses from tapeworms that were insufficiently treated. The Appellate Division found that the plaintiffs' claim was not subsumed by the NJPLA because in *Wendling,* "it was not the product itself that caused the harm, but allegedly its misleading promotion." *Wendling,* 2008 WL 833549, at *8. Here, Plaintiffs are not alleging that Defendant's products failed to kill fleas and ticks, causing harm to Plaintiffs' pets because the fleas and ticks went untreated. Instead, Plaintiffs are alleging that the product is unusable as it harmed their pets in the process of successfully killing the fleas and ticks as promised. Simply "articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals" does not obviate the NJPLA's reach. *Vercelleno,* 2010 U.S. Dist. LEXIS 9477, at *20, 2010 WL 455388.[5] Therefore, Plaintiff Kathy Maxson's breach of implied warranty, unjust enrichment and consumer fraud claims are subsumed under the NJPLA, as "irrespective of the theory underlying the claim," the core issue in Plaintiffs' claims is "harm caused by a product." N.J. Stat. Ann. § 2A:58C–1(b)(3).

[5]    Plaintiffs attempt to distinguish *Vercelleno,* as well as various other cases finding subsumption by the NJPLA, based on reasoning provided in dicta in

another decision that the NJPLA does not subsume claims where a breach of express warranty has been alleged and an NJPLA claim has not. *See In re Ford Motor Co. E–350 Van Products,* Civ. No. 03–4558, 2008 U.S. Dist. LEXIS 73690, *48 n. 9, 2008 WL 4126264 (D.N.J. Sept. 3, 2008). This Court disagrees with this reasoning, as no such proposition stems from the NJPLA or from the New Jersey Supreme Court's instructive decision in *Sinclair v. Merck & Co., Inc.,* 195 N.J. 51, 948 A.2d 587 (N.J.2008). While the NJPLA does expressly exempt breach of express warranty claims, the presence or absence of either a breach of express warranty claim or an NJPLA claim does not affect the analysis of Plaintiffs' other claims.

**\*5**  Plaintiff Sandy Smith's breach of implied warranty, unjust enrichment and consumer fraud claims are similarly subsumed under the TPLA. The TPLA "includes all actions brought for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging, or labeling of any product." Tenn.Code Ann. § 29–28–102(6). The TPLA specifically includes in its purview claims for "breach of or failure to discharge a duty to warn or instruct," "breach of warranty, express or implied," and "any other substantive legal theory in tort or contract whatsoever." *Id.* The language of the TPLA is at least as broad, if not broader, than the NJPLA. Therefore, both Plaintiffs fail to state a claim in Counts Two, Three and Four, for these claims must instead be brought as products liability claims as mandated by the NJPLA and the TPLA. While these claims fail as pleaded, the Court is making no determination at this juncture as to whether Plaintiffs can successfully state a claim under the requisite product liability statutes. As such, the Court will dismiss these claims, but will allow Plaintiffs the opportunity to amend the Complaint to plead them as product liability causes of action instead.

### D. Count One—Breach of Express Warranty

Since claims for breach of express warranty are expressly preserved by the NJPLA, Count One is not subsumed.[6] Defendant contends that Count One still fails to state a claim, however, because Plaintiffs have failed to allege any express warranty that was breached. Even if the statements cited by Plaintiffs constitute express warranties that were breached, Defendant further argues that the Count still fails to claim that they were part of the "basis of the bargain" for the product.

*New Hope Pipe Liners, LLC v. Composites One, LCC,* Civ. No. 09–3222, 2009 U.S. Dist. LEXIS 111217, at *15, 2009 WL 4282644 (D.N.J. Nov. 25, 2009).

6      Defendant does not address the application of the TPLA to Plaintiff Sandy Smith's breach of express warranty claim, therefore the Court will presume for the time being that Count One is not subsumed as to either named Plaintiff.

**1. Choice of Law**

Under New Jersey's "most significant relationship" test, the first step is to determine whether or not there is a true conflict between the laws. If there is no conflict, the law of the forum state applies. Since there is no evident conflict between New Jersey and Tennessee breach of express warranty law, Defendant does not contest Plaintiff's contention that the law of the forum state, New Jersey, applies.[7] (Def.'s Reply Br. at 9 n. 6.)

7      The parties do not address the potential applicability of the law of Georgia, Defendant's principal place of business. Therefore, Georgia law will not be included in the choice of law analysis at this time. However, Defendant has expressly reserved its right to argue in future proceedings that another state's law applies. (Def.'s Reply Br. at 9 n. 6.)

**2. Breach of Express Warranty**

Under New Jersey law, in order to state a claim for breach of express warranty, Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description. *New Hope Pipe Liners,* 2009 U.S. Dist. LEXIS 111217, at *15; 2009 WL 4282644 N.J. Stat. Ann. § 12A:2–313. However, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.J. Stat. Ann. § 12A:2–313(2). Additionally, statements that are nothing more than mere puffery are not considered specific enough to create an express warranty. *In re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.,* Civ. No. 08–939, 2009 U.S. Dist. LEXIS 82833, at *48–49, 2009 WL 2940081 (D.N.J. Sept. 10, 2009) (dismissing a breach of warranty claim based on Defendant's statement that

HD DVD Players were for "Today, Tomorrow, and Beyond," since the statement is just "puffery"). Finally, courts have noted that "whether a given statement constitutes an express warranty is normally a question of fact for the jury." *In re Ford Motor Co. E–350 Van Prods. Liab. Litig.,* Civ. No. 03–4558, 2008 U.S. Dist. LEXIS 73690, at *13, 2008 WL 4126264 (D.N.J. Sept. 3, 2008); *see also Union Ink Co., Inc. v. AT & T Corp.,* 352 N.J.Super. 617, 645, 801 A.2d 361 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact.").

**\*6** Plaintiffs allege that Defendant made the following affirmations and promises:

(1) A statement on Merial's website that "Merial is committed to developing pharmaceuticals ... with the highest level of quality and safety." (Compl. ¶ 4; Ex. A.)

(2) A statement in a Frontline product insert under the heading, "PRECAUTIONARY STATEMENTS" and "HAZARDS TO DOMESTIC ANIMALS," which states, "[p]ets may experience some temporary irritation at the site of product application. If signs persist, or become more severe within a few days of application, consult a veterinarian immediately. If your pet has an unusual reaction to the initial application, consult a veterinarian before repeating treatment." (Compl. ¶ 8; Ex. B.)

(3) A press release by Merial stating that, "[although the EPA has stated that it has noted a 'sharp increase' in the number of reported adverse events associated with the use of spot-on flea and tick control products, our records do not indicate that this is the case for FRONTLINE." (Compl. ¶ 28; Ex. E.)

(4) A letter sent to veterinarians by Merial in the wake of the EPA's statements, stating that Frontline continues to offer the same "trusted, reliable protection." (Compl. ¶ 28; Ex. F.)[8]

8      Plaintiffs also rely on a statement that appears on "PetDrugs.com," a website hosted by a third-party vendor located in Canada. Since Plaintiffs do not allege that Merial was responsible for this statement, Merial cannot be held liable for the statement since it is by a third-party. Therefore, the PetDrugs.com statement will not be considered at this time.

Defendant alleges that these statements do not constitute express warranties under New Jersey law. The Court finds that, especially as to the statements made by Defendant in response to the EPA's April 21, 2009 press release, Plaintiffs' allegations identify specific affirmations or promises by Defendant that Frontline is safe to use on pets, and therefore survive a motion to dismiss. *See, e.g., Knipe v. Smithkline Beecham,* 583 F.Supp.2d 602, 625–626 (E.D.Pa.2008) (holding that Plaintiffs' showing that Defendant asserted in "various articles, conferences and journals presented to the medical community" that Paxil is safe and effective for children to use was sufficient for Plaintiffs' breach of express warranty claim to survive a motion for summary judgment). At the motion to dismiss stage, it is enough that Plaintiffs provide more than "bald assertions," and identify specific affirmations by Defendant that could be found to constitute an express warranty. *Compare In re Ford Motor Co. E–350 Van,* 2008 U.S. Dist. 73690, at *14–15, 2008 WL 4126264 (finding that an allegation that Ford described a van as a "15–passenger" van survived a motion to dismiss, as such a statement could constitute an "objective representation warranting the van's design and safety"), *and Taylor v. JVC Ams. Corp.,* Civ. No. 07–4059, 2008 U.S. Dist. LEXIS 43215, at *15–16, 2008 WL 2242451 (D .N.J. May 29, 2008) (allegation that television was sold as a "1080p" television but did not accept a 1080p signal found sufficient to survive motion to dismiss), *with Simmons v. Stryker Corp.,* Civ. No. 08–3451, 2008 U.S. Dist. LEXIS 93306, at *5, 2008 WL 4936982 (D.N.J. Nov. 17, 2008) (dismissing a claim that was "devoid of any 'factual matter' to support the existence of an express warranty"), *and Parker v. Howmedica Osteonics Corp.,* Civ. No. 07–2400, 2008 U.S. Dist. LEXIS 2570, at *21, 2008 WL 141628 (D.N.J. Jan. 14, 2008) (general references to "press releases" and "assurances of safety," as opposed to specific statements, cannot survive a motion to dismiss), *and Heisner v. Genzyme Corp.,* No. 08–C–593, 2008 U.S. Dist. LEXIS 60569, at *24–25, 2008 WL 2940811 (N.D.Ill., July 25, 2008) (claim dismissed where plaintiff failed to specify any particular affirmation or promise by defendant).

**\*7** Defendant further contends that even if Plaintiffs have properly pleaded express warranties, they have failed to plead the "basis of the bargain" element of a breach of express warranty. However, "[t]o establish a breach of an express warranty under N.J. Stat. § 12A:2–101, the plaintiff need not prove privity or traditional reliance." *Knipe,* 583 F.Supp.2d at 625. While some states require such elements, New Jersey's "basis of the bargain" requirement is much broader. Plaintiffs

must only show that the alleged express warranties "were of a kind which naturally would induce the purchase." *Elias v. Ungar's Food Prods., Inc.,* 252 F.R.D. 233, 239 (D.N.J.2008).

Defendant claims that the Third Circuit further requires that a plaintiff prove he or she has "read, seen, or heard the advertisements at issue" to satisfy the "basis of the bargain" requirement. *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 569 (3d Cir.1990). However, the *Cipollone* decision is narrower than Defendant's interpretation. First, the Court in *Cipollone* pointed out that this additional burden on the plaintiff would not apply where a "written warranty delivered to the purchaser in connection with a sale" was at issue. *Cipollone,* 893 F.2d at 567 n. 29. Here, one of the alleged warranties was included with the sale of the product, so that "there is no question that the plaintiff has knowledge that the alleged warranty exists." *Id.* Furthermore, the requirement established in *Cipollone* was in regard to what must be included in jury instructions at trial, not what must be pleaded to survive a motion to dismiss. *Id.* at 563–64. At this stage, it is sufficient that Plaintiff has pleaded alleged warranties that plausibly could have been the basis of the bargain. *See In re Ford Motor Co. E–350 Van,* 2008 U.S. Dist. LEXIS 73690, 2008 WL 4126264 (holding that whether an alleged warranty was the basis of the bargain cannot be resolved on a motion to dismiss).

### E. Preemption by FIFRA

Finally, Defendant contends that Plaintiffs' claims are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 ("FIFRA"), as Plaintiffs' claims for relief seek to alter Frontline's EPA-approved label and package insert. FIFRA provides a comprehensive scheme for regulating labels used on pesticides such as Frontline. When a pesticide manufacturer applies to the EPA for registration of a pesticide product, the manufacturer "must submit a proposed label to [the] EPA as well as certain supporting data." *Bates v. Dow Agrosciences L.L.C.,* 544 U.S. 431, 438, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (citing 7 U.S.C. § 136a). The EPA then determines what warnings or precautions must appear on the product's label, and notifies the manufacturer of its labeling decision. 7 U.S.C. § 136a(c). Under FIFRA, the EPA is essentially given full control to regulate labels used on pesticides. While state governments can regulate pesticide labeling in conjunction with the federal government, they are expressly prohibited from "imposing[] or continuing[] in effect any requirements for labeling or packaging in addition to or different from" those established by the federal government. 7 U.S.C. § 136v(b).

This includes "judge-made rules" in addition to statutes and regulations. *Bates,* 544 U.S. at 443. However, this preemption is limited in scope to judge-made requirements for "labeling or packaging," where said requirements are more than is required under FIFRA. *Id.* at 444.

 **\*8** The Supreme Court's decision in *Bates* instructs courts as to what types of claims are preempted by FIFRA. In *Bates,* the Supreme Court held that, "rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirement for labeling or packaging." 544 U.S. at 444 (finding that the petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty were not pre-empted). The Supreme Court further explained that "the proper inquiry calls for an examination of the elements of the common-law duty at issue," not an examination of the potential effects of imposing those common law requirements. *Id.* at 445. The Third Circuit, in examining Congress's purpose in passing FIFRA, additionally explains that Congress meant only to provide uniformity in labeling, and did not intend "to regulate sales literature generally and the legal obligations that can arise therefrom." *Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc.,* 617 F.3d 207, 217 (3d Cir.2010).

Plaintiffs' breach of express warranty claim is not preempted by FIFRA. As explained above, "rules that require manufacturers to ... honor their express warranties" are not preempted by FIFRA. *Bates,* 544 U.S. at 444. Furthermore, the Third Circuit has specifically held that FIFRA does not preempt claims based on breach of express warranty. *See Mortellite v. Novartis Crop Protection, Inc.,* 460 F.3d 483, 490 (3d Cir.2006) (holding that "FIFRA does not preempt claims based on theories of strict liability, negligent testing, and breach of express warranty"). Simply because success on a breach of express warranty claim may lead to a label change by Defendant does not mean the claim imposes a "requirement" within the meaning of FIFRA's preemption provision. *Id.* As such, Plaintiffs' breach of express warranty claim remains.

### III. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is **GRANTED** as to Counts Two, Three and Four, and Counts Two, Three and Four are **DISMISSED** as subsumed under the NJPLA and TPLA. Defendant's motion to dismiss as to Count One is **DENIED.** An Order follows this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2119100

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 50

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 479 of 520
PageID: 9400
Stroderd v. Yamaha Motor Corp., U.S.A., Not Reported in F.Supp.2d (2005)
2005 WL 2037419

KeyCite Yellow Flag - Negative Treatment
Disagreed With by C-Innovation, LLC v. Norddeutsche Seekabelewerke
GMBH, E.D.La., March 13, 2013

2005 WL 2037419
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

Daimon STRODERD and Joseph
Richard, Jr. on Behalf of Themselves
and all Others Similarly Situated
v.
YAMAHA MOTOR CORPORATION, U.S.A.

No. Civ.A. 04-3040.
|
Aug. 4, 2005.

**Attorneys and Law Firms**

Richard Collins Dalton, Dalton Law Firm, LLC, Lafayette,
LA, for Daimon Stroderd and Joseph Richard, Jr.

Eugene R. Groves, Edward D. Hughes, Taylor, Porter, Brooks
& Phillips, LLP, Baton Rouge, LA, David P. Murray, Jamie
R. Abrams, Willkie Farr & Gallagher LLP, Washington, DC,
Carrol L. Spell, Jr., Attorney at Law, Milton, LA, for Yamaha
Motor Corporation, U.S.A.

*ORDER AND REASONS*

FALLON, J.

**\*1** Before the Court is the motion of Defendant Yamaha
Motor Corporation, U.S.A. to dismiss with prejudice claims
filed against it by Plaintiffs Daimon Stroderd and Joseph
Richard, Jr. For the following reasons, Defendant's motion is
GRANTED in part and DENIED in part.

*I. BACKGROUND*

In October and November 2002, Plaintiffs Daimon Stroderd
and Joseph Richard, Jr. ("Plaintiffs") each purchased Yamaha
Road Star Warrior motorcycles for approximately $10,000.
On January 9, 2004, Defendant Yamaha Motor Corporation
U.S.A. ("Defendant") issued a "Safety Recall Notice" to
all owners of 2002 and 2003 Yamaha Road Star Warrior

motorcycles. Defendant intended to use the recall to repair
potential transmission failure in the motorcycles due to
excessive wear.

The recall instructed Yamaha Road Star Warrior owners to
stop using their motorcycles and to bring them in to an
authorized dealer for repair at Yamaha's expense. The recall
notice advised that the motorcycles would be kept in the repair
shop for at least two days. Plaintiffs allege that the repairs
took four to six months.

Plaintiffs filed suit in Louisiana state court on April 23,
2004 and sought class certification. Plaintiffs seek actual,
consequential, and incidental damages relating to the cost
of alternative transportation, loss of use, inconvenience,
and diminution of value due to the defect and delay in
repair. Plaintiffs base their complaint on four legal theories:
redhibition, breach of contract, negligent repair, and the
Louisiana Products Liability Act (hereinafter "LPLA" or "the
Act"). On November 8, 2004, Defendant removed the case to
this Court based upon diversity of citizenship.

*II. MOTION OF THE DEFENDANT
TO DISMISS PLAINTIFFS' CLAIMS*

On April 15, 2005, Defendant filed a motion to dismiss
all of the Plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)
(6). Defendant moves to dismiss Plaintiffs' negligent
repair and the breach of contract claims based on the
exclusivity provisions of the LPLA. Defendant moves to
dismiss Plaintiffs' redhibition claim, arguing that Louisiana
redhibition law requires a defect to have manifested itself.
Defendant also alleges that Plaintiffs' redhibition claim is
too speculative to survive a Rule 12(b)(6) motion. Defendant
moves to dismiss Plaintiffs' products liability claim, alleging
that Plaintiffs have failed to satisfy either prong of the two-
prong test required under Louisiana law. Finally, Defendant
contends that the National Traffic and Motor Vehicle Safety
Act ("Safety Act"), 49 U.S.C. § 30101 *et seq.,* bars Plaintiffs
from asserting causes of action arising from a motor vehicle
recall.

*III. LAW & ANALYSIS*

*A. Legal Standard for Motion to Dismiss*
The Federal Rules of Civil Procedure permit a defendant to
seek dismissal of a complaint based on the "failure to state a

claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a district court should construe the complaint liberally in favor of the plaintiff, assuming all factual allegations to be true. *See Leleux v. United States,* 178 F.3d 750, 754 (5th Cir.1999). Rule 12(b)(6) motions are viewed with disfavor and are rarely granted. *See id.* A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997)).

### B. Plaintiffs' Negligent Repair and Breach of Contract Claims

**\*2** Defendant moves to dismiss Plaintiffs' negligent repair and breach of contract claims. The core of Defendant's argument is that the LPLA subsumes all possible causes of action, with the exception of redhibition, against a manufacturer for damage caused by the manufacturer's products. The Court agrees with Defendant.

The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La.Rev.Stat.Ann. § 9:2800.52. "Damage" is defined as "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that [a redhibition cause of action] does not allow recovery for such damage or economic loss." La.Rev.Stat.Ann. § 9:2800.52(5). A "manufacturer" is defined as a "person or entity who is in the business of manufacturing a product for placement into trade or commerce." La.Rev.Stat.Ann. § 9:2800.53(1).

The drafters of the LPLA sought to strictly delimit possible bases of liability for manufacturers. Consideration and passage of the Act came on the heels of the Louisiana Supreme Court's 1986 decision in *Halphen v. Johns-Manville Sales Corp.,* 484 So.2d 110 (La.1986), which expanded manufacturer liability to include strict liability for injuries caused by an "unreasonably dangerous per se" product. *See* John Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 La.L.Rev. 565, 587 (1989) (hereinafter "Kennedy"). [1] The LPLA therefore set out four distinct and exclusive theories of liability. [2] The sole exception to the exclusivity provisions under the LPLA is redhibition, which the Act expressly preserved. *See* Kennedy at 580.

1    John Kennedy and Professor H. Alston Johnson III were the drafters of the LPLA. Kennedy at 565 n.a1.

2    Under the LPLA, a manufacturer is liable for damages caused by an unreasonably dangerous product. The four kinds of unreasonably dangerous product are: (1) in construction or composition; (2) in design; (3) because an adequate warning about the product has not been provided; and (4) because it does not conform to an express warranty of the manufacturer about the product. La.Rev.Stat.Ann. §§ 9:2800.55-58.

The plain language and legislative history of the LPLA demonstrate the legislature's intent to make the Act and Louisiana redhibition law the sole vehicles for a suit against a manufacturer for damages arising from a defective product. In *In re Air Bag Products Liability Litigation,* 7 F.Supp.2d 792 (E.D.La.1998), Judge Feldman held that plaintiffs, who brought "redhibition, breach of implied warranty of fitness for use, negligence per se ... and 'other contract-related' theories" against automobile manufacturers, were barred by the LPLA's exclusivity provisions from asserting all but their redhibition claims. *Id.* at 800. In *Jefferson v. Lead Industries Ass'n, Inc.,* 930 F.Supp. 241 (E.D.La.1996), Judge Vance held that plaintiffs, who alleged "negligence, fraud by misrepresentation, market share liability, breach of implied warranty of fitness and civil conspiracy" against lead paint manufacturers, had failed to state a claim because of the LPLA's exclusivity provisions. *Id.* at 244. The court expansively read the LPLA's exclusivity provisions to hold that "[a] plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability not set forth in the LPLA." *Id.* at 244-45 citing *Brown v. R.J. Reynolds Tobacco Co.,* 52 F.3d 524, 526 (5th Cir.1995). The Court finds the reasoning of these cases persuasive.

**\*3** Plaintiffs' claim of breach of contract of fitness for ordinary use fails for an independent reason as well: it is subsumed by Louisiana redhibition law. Plaintiffs contend that La. Civ.Code art. 2524 provides that a breach of contract of fitness for ordinary use claim is distinct from a redhibition claim. Article 2524 provides that a buyer has a cause of action against a seller if an item sold is not fit for the buyer's intended use. Article 2524's Revision Comments discuss the relationship of the breach of contract claims with Louisiana redhibition law. Comment (b) reads as follows:

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 481 of 520
PageID: 9402
Strodtoff v. Yamaha Motor Corp., U.S.A., Not Reported in F.Supp.2d (2005)
2005 WL 2037419

Under this Article when the thing sold is not fit for its ordinary use, even though it is free from redhibitory defects, the buyer may seek dissolution of the sale and damages, or just damages, under the general rules of conventional obligations. The buyer's action in such a case is one for breach of contract and not the action arising from the warranty against redhibitory defects.

In the present case, it is undisputed that the motorcycles at issue were not free from defects. Comment (b) implies that a breach of contract of fitness for ordinary use claim is only an independent cause of action when an item is free from redhibitory defects. This proposition has consistently been endorsed by the courts. *See, e.g., PPG Industries, Inc. v. Industrial Laminates Corp.,* 664 F.2d 1332, 1335 (5th Cir.1982) ("[C]ourts in Louisiana have held unequivocally that actions based on a breach of warranty against defects are to be brought in redhibition instead of as a breach of contract."). The Court therefore concludes that Plaintiffs' breach of contract of fitness for ordinary use action under La. Civ.Code art. 2524 is further precluded by their redhibition claim.

### C. Plaintiffs' Redhibition Claims

Defendant moves to dismiss Plaintiffs' redhibition claims as well. Defendant bases its motion on two arguments. First, Defendant alleges that a defect must have manifested itself for a redhibition claim to succeed. Second, Defendant alleges that the Plaintiffs' claim that the defect diminished the value of the motorcycles is too speculative to support the redhibition claim. The Court disagrees with the Defendant on both points.

Louisiana redhibition law provides two definitions of a redhibitory defect. The less stringent of the two definitions provides in pertinent part:

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed

that a buyer would still have bought it but for a lesser price.

La. Civ.Code art. 2520.

Defendant argues that courts have interpreted this clause to require a defect to have manifested itself. Defendant cites to a string of cases to support its contention that a manifested defect is a *prima facie* element of a redhibition claim. When read in context, each of these cases supports the opposite contention: that a plaintiff bears a minimal pleading burden in a redhibition claim. *See, e.g., Mid City Finance Co. v. Coleman,* 232 So.2d 918, 920 (La.App.1970) (characterizing the plaintiff's burden of proof as a showing of "unsatisfactory performance"); *Robinett v. Sears, Roebuck and Co.,* 485 So.2d 953, 954 (La.App.1986) (holding that a redhibitory defect exists if a product is not fit for its intended use). Plaintiffs cite to *In re Ford Motor Company Bronco II Products Liability Litigation,* 1995 WL 491155 (E.D.La.1995), in which plaintiffs sued on a sports-utility vehicle's propensity to roll over. The court held that although none of the plaintiffs had alleged that the vehicles had in fact rolled over, the mere propensity to do so was a sufficient allegation of a redhibitory defect.

**\*4** Defendant also overstates the Plaintiffs' burden of alleging harm. Defendant argues that "diminished value" is too speculative to support a redhibition claim, and that Plaintiffs are instead required to point to concrete harms that they have suffered. The broad language of La. Civ.Code art. 2520 undermines Defendant's argument. For a defect to be redhibitory, Plaintiffs need only allege that they would have purchased the motorcycles but for a lesser price. *See In re Ford Motor Company Bronco II,* 1995 WL 491155 at 9.

### D. Plaintiffs' LPLA Claims

Defendant moves to dismiss Plaintiffs' products liability claims under the LPLA. Defendant argues that Plaintiffs' claim fails to satisfy either of the necessary elements required by the LPLA. First, Defendant asserts that Plaintiffs' have failed to demonstrate that their damages were proximately caused by an unreasonably dangerous characteristic of the motorcycles. Second, Defendant asserts that Plaintiffs' damages did not arise from reasonably anticipated use of the motorcycles. The Court agrees with the Defendant on both points.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 482 of 520
PageID: 9403

A plaintiff bears a two-tiered burden in pleading a LPLA claim. The plaintiff must show that: "(1) his damages were proximately caused by a characteristic of the product that renders it unreasonably dangerous, and (2) his damages arose from a reasonably anticipated use of the product." *Kampen v. American Isuzu Motors, Inc.,* 157 F.3d 306, 309 (5th Cir.1998) citing La.Rev.Stat.Ann. § 9:2800.54(D). A product can be "unreasonably dangerous" in four ways: "(1) in construction or composition; (2) in design; (3) because of an inadequate warning; or, (4) because of nonconformity to an express warranty." *Kampen,* 157 F.3d at 309 citing La.Rev.Stat.Ann. § 9:2800.54(B).

In the present case, Plaintiffs can allege that their harms were caused either: (1) by the motorcycle's defect; or (2) by the tardiness of the recall. Both approaches are flawed. Under the first approach, Plaintiffs' damages (loss of use, *et cetera* ) were neither proximately caused by a characteristic of the product nor arose from a reasonably anticipated use of the product. The defect may have been a cause in fact of the Plaintiffs damages, but the damages themselves were proximately caused by the alleged delay in the return of the motorcycles to their owners. The damages also did not arise from reasonably anticipated use of the product; rather, the damages arose from *non*-use of the product. The second approach fails even more fundamentally: nothing about the recall's defect was unreasonably dangerous. [3]

[3] As discussed in the following section, an allegation that a recall was conducted improperly is likely preempted by the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.*

The legislative history of the LPLA and the jurisprudence of Louisiana courts with regard to products liability against manufacturers further undermine Plaintiffs' LPLA claim. As outlined in the section above, the legislative history of the LPLA demonstrates a legislative intent to clearly outline the elements of a products liability cause of action against a manufacturer. *See generally* Kennedy. Moreover, courts have demonstrated that actions involving a latent defect sound in redhibition rather than in products liability. *Compare In re Ford Motor Company Bronco II Products Liability Litigation,* 1995 WL 491155 (E.D.La.1995) (Sear, J.) (holding that plaintiffs, owners of sports-utility vehicle with propensity to roll over, had stated a claim in redhibition even though none of their vehicles had actually rolled over) *with Willett v. Baxter Intern., Inc.,* 929 F.2d 1094 (5th Cir.1991) (Wisdom, J.) (granting summary judgment to defendants in LPLA suit by

plaintiffs, recipients of heart valve transplants with a potential but unrealized defect).

*E. Safety Act's Preclusive Effect*

**\*5** Defendant moves to dismiss all of Plaintiffs' claims based on the preemptive effect of the Safety Act. Defendant argues that any state suit concerning the administration of a motor vehicle recall conflicts with the Safety Act and is precluded. The Court agrees that the Safety Act has some preemptive and preclusive effect, but holds that the preclusive effect does not apply to Plaintiffs' state redhibition claims.

The purpose of the Safety Act is to prescribe uniform motor vehicle safety standards. 49 U.S.C. § 30101. The Safety Act provides a detailed method of commencing, administering, and overseeing recalls if a motor vehicle fails to satisfy enumerated safety requirements. 49 U.S.C. §§ 30118-30120. The Safety Act provides remedies for owners of vehicles subject to recall and provides for an administrative procedure for interested parties to criticize or comment on the recall process. *Id.* The Safety Act expressly preempts conflicting state regulations, but preserves a manufacturer's common law liability. 49 U.S.C. § 30103.

The Safety Act's express savings clause undermines Defendant's argument that Plaintiffs' common law redhibition claim is precluded. Defendant relies on cases such as *Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), and *Lilly v. Ford Motor Co.,* 2002 WL 84603 (N.D.Ill.2002) in which courts held that a state action conflicted with the Safety Act. *Geier* and *Lilly,* however, were cases concerning state actions in direct conflict with the Safety Act. *Geier,* 529 U.S. at 874 ("[A] common law "no airbag" action like the one before us actually conflicts with ... FMVSS 208 [which] sets a minimum airbag standard."); *Lilly,* 2002 WL 84603 at 5 ("A nationwide court-ordered recall would conflict directly with and frustrate the Safety Act."). Instead, the Safety Act's express savings clause contemplates that manufacturers remain liable at common law as long as there is no direct conflict. *See Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (quoting *Geier,* 529 U.S. at 868 ("[The] saving clause assumes that there are some significant number of common-law liability cases to save and the language of the preemption provision permits a narrow reading that excludes common-law actions.")). *See also Martin v. Ford Motor Co.,* 914 F.Supp. 1449, 1454 (S.D.Tex.1996) citing *Perry v. Mercedes Benz of North America,* 957 F.2d 1257 (5th Cir.1995) ("[S]tate causes of action not falling afoul of [direct conflict] may

2005 WL 2037419

be brought against automobile manufacturers despite the enactment of the Safety Act and federal safety regulations.").

Plaintiffs' redhibition claim does not directly conflict with the principles underlying the Safety Act. The purpose of the Safety Act is to establish uniform guidelines for motor vehicle safety and to ensure that recalls are properly ordered and administered. A redhibition claim does not conflict or undermine either of those purposes. Instead, Plaintiffs' redhibition claim falls squarely within the savings clause anticipated by Congress in 49 U.S.C. § 30103(e).

### IV. CONCLUSION

**\*6** For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' negligent repair, breach of contract, and LPLA claims are GRANTED. Defendant's motion to dismiss Plaintiffs' redhibition claim is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 2037419

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 51

2020 WL 3247451

2020 WL 1237394
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Raymon J. SWEEZEY, IV

v.

C.R. BARD INCORPORATED et al.

CIVIL ACTION NO. 3:19-CV-2172-S
|
Signed 03/12/2020

**Attorneys and Law Firms**

Charla G. Aldous, Aldous Walker LLP, Kristi Elizabeth Wood, Ben C. Martin, Laura Jean Baughman, Martin Baughman PLLC, Thomas W. Arbon, Law Offices of Ben C. Martin, Dallas, TX, Julie L. Rhoades, Houston, TX, for Raymon J. Sweezey, IV.

Richard B. North, Jr., Pro Hac Vice, Brandee J. Kowalzyk, Pro Hac Vice, Elizabeth C. Helm, Matthew B. Lerner, Pro Hac Vice, Taylor Tapley Daly, Pro Hac Vice, Nelson Mullins Riley & Scarborough LLP, Atlanta, GA, James F. Rogers, Pro Hac Vice, Nelson Mullins Riley and Scarborough LLP, Columbia, SC, Jordan E. Jarreau, Melissa Dorman Matthews, Hartline Barger LLP, Dallas, TX, Matthew E. Brown, Pro Hac Vice, Nelson Mullins Riley & Scarborough LLP, Boston, MA, Philip M. Busman, Pro Hac Vice, Nelson Mullins Riley and Scarborough LLP, Washington, DC, for C.R. Bard Incorporated, Bard Peripheral Vascular Incorporated.

**MEMORANDUM OPINION AND ORDER**

KAREN GREN SCHOLER, UNITED STATES DISTRICT JUDGE

**\*1**  This Order addresses Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s (collectively, "Defendants") Motion for Summary Judgment [ECF No. 95]. For the following reasons, the Court grants in part and denies in part the Motion.

**I. BACKGROUND**

Plaintiff Raymon Sweezey ("Plaintiff") was treated with Defendants' Recovery Inferior Vena Cava Filter ("Filter") on June 28, 2008. Mot. 4. Sometime thereafter, Plaintiff's filter allegedly migrated and perforated his Inferior Vena Cava ("IVC"). *See id.; see also* Resp. in Opp. to Mot. for Summ. J. ("Resp.") 6. Plaintiff brings claims for Strict Products Liability – Information Defect (Failure to Warn) (Count II); Strict Products Liability – Design Defect (Count III); Negligence – Design (Count IV); Negligence – Failure to Warn (Count VII); Negligent Misrepresentation (Count VIII); Negligence Per Se (Count IX); Breach of Express Warranty (Count X); Fraudulent Misrepresentation (Count XII); and Fraudulent Concealment (Count XIII). [1] *See* ECF No. 1. Plaintiff also seeks punitive damages. *Id.* at 3.

[1]    Plaintiff withdrew his claims for Strict Products Liability – Manufacturing Defect (Count 1) and Negligence – Manufacture (Count V). This Order, therefore, does not address those claims.

Defendants filed the pending Motion on February 17, 2020, seeking summary judgment on all of Plaintiff's claims (including his claim for punitive damages). Mot. 1. For the following reasons, the Court grants the Motion with respect to Plaintiff's Negligence Per Se (Count IX) and Fraudulent Concealment (Count XIII) claims and denies the Motion as to the remaining claims.

**II. ANALYSIS**

**A. *Negligence Per Se (Count IX)***

"Negligence per se is a tort theory whereby courts use statutes or regulations to define the standard of reasonably prudent conduct." *Monk v. Wyeth Pharm., Inc.*, Civ. A. No. SA-16-CV-1273-XR, 2017 WL 2063008, at \*8 (W.D. Tex. May 11, 2017) (quoting *Hackett v. G.D. Searle & Co.*, 246 F. Supp. 2d 591, 594 (W.D. Tex. 2002)). " 'Texas courts ... refuse to recognize a cause of action for negligence per se based on violations of the [FDCA] and FDA regulations.' " *Id.* (quoting *Holland v. Hoffman-La Roche, Inc.*, No. 3-06-CV-1298-BD, 2007 WL 4042757, at \*3 (N.D. Tex. Nov. 15, 2007)); *see also Jackson v. Tae Jin Kim*, No. 2:02-CV-200, 2004 WL 6040969, at \*4 (E.D. Tex. Sept. 27, 2004) (citing *Baker v. Smith & Nephew Richards, Inc.*, No. 95-58737, 1999 WL 811334, at \*8 (Tex. Dist. June 7, 1999), *aff'd on other grounds sub. nom. McMahon v. Smith & Nephew Richards, Inc.*, No. 14-99-00616-CV, 2000 WL 991697 (Tex. App.—Houston

[14th Dist.] July 20, 2000, no pet.)). Plaintiff does not dispute that his negligence per se claim is based on Defendants' alleged violations of the FDCA and FDA regulations. *See* Resp. 50. Accordingly, the Court grants summary judgment as to Plaintiff's negligence per se claim.

### B. *Fraudulent Concealment (Count XIII)*

Under Texas law, "fraudulent concealment is not an independent cause of action, but is rather a tolling provision to prevent the defendant from relying upon a statute of limitations period as an affirmative defense." *Seismic Wells, LLC v. Matthews*, Civ. A. No. 5:15-CV-148-C, 2015 WL 11027778, at *4 (N.D. Tex. Sept. 11, 2015) (citing *Thompson v. Barnard*, 142 S.W.2d 238, 241 (Tex. Civ. App.—Waco 1940), *aff'd*, 158 S.W.2d 486 (Tex. 1942)). The Court, therefore, grants summary judgment as to Plaintiff's fraudulent concealment claim. Plaintiff has, however, preserved his right to assert fraudulent concealment as a defense to limitations at trial. *See Smith v. Palafox*, Civil No. EP-15-CV-00201-DB-RFC, 2016 WL 10515973, at *7 (W.D. Tex. Sept. 28, 2016) (citing *Nichols v. Smith*, 507 S.W.2d 518, 520 (Tex. 1974)).

### C. *Remaining Claims*

**\*2** With respect to the remaining claims, the Court finds that Plaintiff has established that there is a genuine issue of material fact so that a reasonable jury might return a verdict in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Therefore, the Court denies the Motion as to those claims.

### III. CONCLUSION

For the reasons discussed above, the Court grants the Motion as to Counts IX and XIII and denies the Motion as to all other Counts.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1237394

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 52

2002 WL 31667901
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

TOTAL CARE PHYSICIANS, P.A., and Total
Care Physicians, Glasgow, P .A., Plaintiffs,
v.
Kevin W. O'HARA, M.D., et al., Defendants.

No. Civ.A.99C-11-201-JRS.
|
Submitted July 12, 2002.
|
Decided Oct. 29, 2002.

**Attorneys and Law Firms**

Jeffrey S. Welch, and Garvan McDaniel, Welch & Associates,
P.A., Wilmington, DE, for Plaintiffs.

Charles M. Oberly, III, and Karen V. Sullivan, Oberly,
Jennings & Rhodunda, P.A., Wilmington, DE, for
Defendants.

MEMORANDUM OPINION

*DECISION AFTER NON-JURY TRIAL AND POST-
TRIAL MEMORANDA. VERDICT FOR PLAINTIFF
ON COUNT VI. JUDGMENT FOR DEFENDANTS
AS A MATTER OF LAW AS TO COUNTS I AND VII.*

SLIGHTS, J.

I. INTRODUCTION

**\*1** Plaintiff, Total Care Physicians, P.A. ("TCP"), initiated
this litigation against defendants, Kevin W. O'Hara,
M.D. ("O'Hara") and Millcreek Medical Associates P.A.
("Millcreek"), after O'Hara terminated his employment with
TCP to form Millcreek with another physician. TCP has
alleged that O'Hara wrongfully solicited TCP patients to
join him at his new medical practice. The Court previously
addressed this case on cross-motions for summary judgment
and, at the conclusion of that process, substantially pared

down the issues remaining for trial. [1]   Three counts of the
plaintiff's amended complaint survived summary judgment:
Count I-unjust enrichment; Count VI-misappropriation of
trade secrets; and Count VII-breach of fiduciary duty. [2]
The Court ordered bifurcation of the issues of liability and
damages. [3]

[1]   *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d
1043 (Del.Super.2001).

[2]   *Id.*

[3]   Prior to trial, the parties requested the Court
to clarify this order, specifically with respect to
causation, in the hopes that clarification might
assist the parties in their efforts to settle the case.
Specifically, the parties inquired whether the Court
was expecting to receive evidence in the first
phase of the trial on the issue of whether any
misappropriation of trade secrets that may have
occurred proximately caused damages to TCP. As
the issue was refined, the question evolved into
whether TCP would have to prove that each patient
who left TCP to join O'Hara at Millcreek did so as
a proximate result of the alleged misappropriation.
While the Court did provide the parties with some
advisory guidance with respect to this issue as
requested, ultimately the Court told the parties
that the causation issue would be addressed in the
second phase of the trial to the extent a second
phase was necessary.

The matter was tried to the Court over three days in June,
2002. At the conclusion of the trial, the Court requested the
parties to submit post-trial memoranda focusing on the
distinction between, on the one hand, a physician properly
*notifying* his patients of his departure from one medical
practice to join another practice in keeping with his ethical
responsibilities and, on the other hand, a physician improperly
*soliciting* patients of a medical practice to join him in a new
practice. The Court advised the parties that the notification-
versus-solicitation distinction likely would be at the heart of
the Court's decision on at least one of TCP's three claims for
relief.

As can be discerned below, the Court has determined that
O'Hara improperly solicited TCP patients to transfer their
care to Millcreek. The Court also has determined that O'Hara
identified the targets of his solicitation by utilizing TCP's

2002 1 WL8995©08

confidential and proprietary information. Consequently, the Court has concluded that O'Hara misappropriated TCP's trade secrets. Accordingly, the Court's verdict is in favor of TCP on Count VI of the complaint. As to Counts I and VII, the Court will enter judgment as a matter of law in favor of the defendants for the reasons stated below.

## II. FINDINGS OF FACT

A. O'Hara's Practice At TCP

O'Hara joined TCP in June of 1992. The letter agreement memorializing O'Hara's relationship with TCP, dated June 2, 1994 (the "letter agreement"), provided that O'Hara would "provide medical services for [TCP] as an independent contractor." [4] In the years that followed, O'Hara developed a large following of patients whom O'Hara considered to be his own. He would also, on occasion, treat individuals he considered to be patients of TCP or other individual TCP physicians.

[4]    (Pl.'s Ex. 1 at ¶ 1)

The letter agreement required TCP to offer O'Hara a "financial interest" in TCP no later than December 30, 1995. When O'Hara became convinced that no such offer would be forthcoming from TCP, he began to explore other opportunities in the Wilmington medical community. These explorations led O'Hara to Stuart Felzer, M.D. ("Felzer") who was looking for a physician to join his practice for the purpose of sharing an existing (and ever-growing) patient load. Felzer did not plan to add new patients to his practice. Nevertheless, O'Hara acknowledges that Felzer did not discourage him from bringing patients with him from TCP, and O'Hara's conduct after he struck a deal with Felzer suggests that he did not wish to leave patients behind when he left TCP.

B. O'Hara Leaves TCP

*2  O'Hara notified TCP of his intent to leave the practice by letter dated December 29, 1995. Near the end of March or beginning of April, 1996, O'Hara met briefly with Dr. Constantine Michell ("C.Michell"), a principal of TCP, to discuss O'Hara's impending departure from the practice. Both parties agree that during this brief encounter O'Hara and C. Michell discussed the need to notify O'Hara's patients that he was leaving TCP and to advise them where he was going.

That a discussion occurred and that it addressed generally the topic of patient notification are the only aspects of this key piece of the factual puzzle on which the parties agree. O'Hara recalls that C. Michell authorized him to notify his patients but did not specify the means or the content of such notification. According to O'Hara, this "blanket authorization" later was echoed by TCP's other principal, Dr. Theodore Michell ("T.Michell"). C. Michell testified that he gave O'Hara very specific instructions that the notification was to be provided orally when patients came to see O'Hara, and that the notification should be limited to: (i) the fact that O'Hara was leaving TCP; (ii) where he was going; and (iii) advising the patients that they may chose to follow O'Hara or remain at TCP. C. Michell believes that he specifically admonished O'Hara not to send a mass-mailed letter to patients.

The preponderance of the evidence supports O'Hara's recollection of this discussion. C. Michell readily acknowledged that O'Hara had a professional and ethical responsibility to notify his patients that he was leaving TCP and to advise them where he was going. This duty did not extend only to those patients who happened to see O'Hara in the office between April and June, 1996. [5] The duty to notify patients extended to all of O'Hara's patients, whether they were seen in the office or not. The limitations imposed upon O'Hara in C. Michell's rendition of his conversation with O'Hara would allow no means by which patients not seen by O'Hara in the office would be notified. This result would be contrary to the stated goal of both TCP and O'Hara that all of O'Hara's patients receive notification of O'Hara's move. The Court finds, as a matter of fact, that TCP authorized O'Hara to notify patients and did not restrict him with respect to the means by which the notification would occur.

[5]    Both parties agreed that O'Hara was authorized to
       begin notifying patients of his departure in April,
       1996. He left TCP at the end of June, 1996.

Having concluded that O'Hara was authorized by TCP to notify his patients of his departure from the practice, and that he was not restricted in the means by which he could effect this notification, the Court next must consider whether O'Hara was authorized to utilize TCP's records to obtain the information needed to contact the patients he did not see in the office. O'Hara acknowledges that he did not discuss this issue with anyone from TCP. Instead, he assumed that implicit in the authorization to notify patients was the authority to obtain patient identity and address information from TCP's

records. O'Hara utilized TCP's super bills, [6] insurance lists and medical records to compile a list of his patients and their addresses so that he could send a mass-mailed letter purportedly to advise patients of his departure from TCP and his new association with Felzer. O'Hara estimates that the letter went to as many as 900 patients.

[6]    A "super bill" is a written compilation of patient data, including the patient's identity, diagnosis, treatments, insurance and address information used by the practice internally to process requests for reimbursement for medical services from insurance carriers and government programs.

**\*3** TCP's general endorsement of O'Hara's authority to notify patients of his departure compels the conclusion that O'Hara was authorized to use TCP information to compile a list of patients (with addresses) to effect the notification. TCP acknowledges that it assumed no responsibility whatsoever for notifying O'Hara's patients; O'Hara was to perform whatever notification was to occur on his own. Under these circumstances, when TCP authorized O'Hara to notify patients, it implicitly authorized him to utilize the TCP information that was available to him to compile a list of his patients and their addresses. To conclude otherwise would be to conclude that TCP authorized O'Hara to notify all of his patients but forbade him from determining the identity and addresses of those patients. Nothing in the record suggests that TCP had resorted to this kind of gamesmanship in its dealings with O'Hara or with patients.

C. O'Hara's Mass-Mailed Letter to Patients
On June 17, 1996, O'Hara mailed the following letter to more than 900 of his TCP patients: [7]

[7]    The letter was dated June 1, 1996 but mailed on June 17. At trial, the parties disputed whether all 900 patients who received this letter were, in fact, O'Hara's patients. TCP contends that some of the 900 patients had never been treated by O'Hara and others had been treated by O'Hara on a limited basis on behalf of other physicians at TCP. TCP did not prove this contention by a preponderance of the evidence. The record was, at best, opaque with respect to this issue. The Court has determined that all of the patients who received O'Hara's letter had an interest in knowing that he was leaving TCP.

I am pleased to inform you that on July 1, 1996 I will be leaving Total Care Physicians to join Stuart Felzer in our new office listed above [the letterhead provided Felzer's office address]. Dr. Felzer is an excellent physician whom I have known since 1982.

You can feel confident that we will provide top quality healthcare for you and your family in our new location. We are board certified physicians who offer comprehensive and preventative care for patients starting from the age of six. Our office is conveniently located at the center of many health services, including on-site laboratory, radiology, physical therapy, and many additional medical services close by.

You are receiving this letter because either we have an established relationship and/or you have selected me as your primary care physician (PCP) with your insurance plan. In order for me to continue as your PCP at my new location, the insurers require that *you* notify them directly. You *will not automatically* be transferred with me.

Therefore, if you wish to retain me as your PCP, please contact your member services number listed below and inform them of your intentions *as soon as possible.* Please make sure to include all applicable family members. Failure to do so may result in problems with insurance coverage for office visits.

Also, Total Care Physicians will require a signed request in order to forward your records to my new office. Therefore, I have included a records request form for that purpose. Simply list all family members requesting transfer, sign the form, and mail it to the office where your records are filed.

I appreciate your taking the time to do these tasks now as this will make the transition much smoother for all of us.

    Sincerely,

    Kevin W. O'Hara, M.D. [8]

[8]    (Pl.'s Ex. 5)(emphasis in original).

O'Hara constructed this letter on his own; he did not seek input from Felzer or from legal counsel. And he did not clear the letter with TCP before sending it. According to TCP, between June 17 (the date the letter was mailed) and July 3, TCP received upwards of 500 requests for records

2002 1 WL8995©08

from patients who had received O'Hara's letter. On average, TCP fielded 15-20 calls per day from O'Hara's patients in the weeks following his departure. Needless to say, the transition, from TCP's perspective, was anything but smooth. O'Hara estimates that approximately 640 patients ultimately left TCP to join him in his new practice.

**\*4** The Court already has determined that TCP authorized O'Hara to *notify* his patients of his departure from the practice and of his new location. Thus, to the extent the letter simply notified patients as authorized by TCP, there can be no actionable claim based on the letter, even if its sending caused disruption at TCP. The question, then, prompted by the evidence is: did O'Hara's letter constitute an authorized *notification* of patients or an unauthorized *solicitation* of patients? The answer to this question is significant because if O'Hara utilized (appropriated) TCP's trade secret information to solicit TCP's patients without TCP's permission, then O'Hara may be liable for, among other claims, misappropriation of trade secrets. The resolution of this issue, and the implications flowing therefrom, implicate mixed questions of law and fact. The Court will address them below.

### III. CONCLUSIONS OF LAW

A. Misappropriation of Trade Secrets

In Delaware, the claim of misappropriation of trade secrets is a creature of statute. [9] The elements of the claim are well-settled: (1) a trade secret; (2) communicated by the plaintiff to the defendant; (3) pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) which the defendant improperly has used to the injury of the plaintiff. [10] The Court will address the proof with respect to these elements *seriatim*.

[9]    *See* DEL.CODE ANN. tit. 6, §§ 2001-2009 (1999).

[10]    *Total Care Physicians, P.A.,* 798 A.2d at 1053 (citation omitted).

1. The Existence and Communication of Trade Secrets

The Court already has determined that TCP's super bills constituted trade secrets and were entitled to the statutory protection from misappropriation codified in Delaware's Uniform Trade Secrets Act. [11] And the parties do not dispute that TCP "communicated" the trade secrets-the super bills-to

O'Hara by giving him unfettered access to them. [12] Nothing in the trial record suggests to the Court that its conclusions in this regard should be revisited.

[11]    *Id.* at 1053-54.

[12]    *Id.* at 1054.

2. Did O'Hara Understand That the Super Bills Were to Remain Secret?

O'Hara was not a rookie when he joined TCP. He had associated with at least one other medical practice prior to associating with TCP and had left that practice in a context which required him to adhere to restrictive covenants. He also was a savvy businessman, as recognized by the Court in its prior decision. [13] The manner in which he secured, copied, and later used the super bills reflects an understanding on his part that the information contained in those documents was valuable to TCP (and its physicians) and that it was not for public consumption. Finally, even though he did not sign the document, the record reflects that O'Hara was made aware of a revised contract TCP was asking its physicians to sign which expressly provided that all TCP documents were to be kept confidential. [14]

[13]    *Id.* at 1052 (noting that O'Hara negotiated a favorable contract with conditional restrictive covenants which were triggered only if TCP offered him an equity stake in the practice, and that he carefully conducted his activities in accordance with the contract to avoid its restrictive covenants).

[14]    (Pl.'s Ex. 4 at ¶ 18).

Based on the foregoing, the Court is satisfied that TCP proved by a preponderance of the evidence that O'Hara used the super bills with an implied (if not express) understanding that the information was to be kept secret and was to be utilized only in accordance with TCP's authorization.

3. Did O'Hara Improperly Use The Trade Secret Information?

**\*5**  " 'Misappropriation' shall mean ... [d]isclosure or use of a trade secret of another without express or implied consent by a person who, ... [a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [sic] was ... [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limits its use." [15] The success

of TCP's claim of misappropriation turns on whether O'Hara's use of the trade secret information was with or without TCP's "express or implied consent."

15  DEL.CODE ANN. tit. 6, § 2001(2)(b)(2)(B) (1999).

To reiterate, the Court has concluded, as a matter of fact, that TCP implicitly authorized O'Hara to utilize its trade secret information (super bills and other patient identifiers) for the purpose of notifying appropriate TCP patients that he was departing the practice and advising them of his new location. Even if TCP had not authorized O'Hara to notify patients (expressly or implicitly), the Court, for reasons discussed below, would conclude that applicable standards of professional ethics and Delaware public policy compelled O'Hara to notify his patients that he was leaving TCP and joining Millcreek. Accordingly, to the extent the June 1 letter simply notified patients, O'Hara's use of TCP's trade secrets to construct and/or mail the letter would not constitute a misappropriation of trade secrets. Such use either was expressly authorized by TCP, implicitly authorized by TCP, or mandated by governing rules of professional responsibility and Delaware public policy. 16

16  By no means should this conclusion be read as an endorsement of a patient's right of action against a physician for failure of the physician to notify the patient of his departure from a medical practice. This question is not before the Court. Nor has the Court concluded as a matter of law that all employees leaving an employer may utilize the employer's trade secret information to notify customers of their departure. The Court's holding in this case is limited to the factual scenario presented here: a physician with an existing patient base who departs one medical practice to join another.

The Court also has concluded, as a matter of fact, that TCP did not authorize O'Hara to solicit patients from TCP to his new practice at Millcreek. Thus, to the extent O'Hara used TCP's super bills to launch an unauthorized solicitation of TCP patients, the Court would be obliged to conclude that O'Hara misappropriated TCP's trade secrets. 17

17  DEL.CODE ANN. tit. 6, § 2001(2)(b)(2)(B) (1999).

To determine whether O'Hara's June 1, 1996 letter was a notification or solicitation, and to confirm that this distinction

is relevant in the context of a physician's responsibilities and proscriptions when departing a medical practice, the Court has sought direction from ethical standards of the American Medical Association ("AMA"), Delaware's public policy as embodied in its statutes, and analogous case law. 18

18  At the outset, the Court notes that O'Hara has never argued that he was authorized by TCP, or otherwise permitted, to solicit TCP patients to join him at Millcreek. Instead, he has argued that he was authorized by TCP to *notify* patients and that his letter to patients did nothing more than that. And, although he cites to AMA ethical standards and Delaware statutes in support of his argument that patient notification was mandated, O'Hara has not utilized this authority to justify the actual text of his June 1, 1996 letter to patients.

a. The AMA Code of Medical Ethics

The AMA begins its analysis of the physician's duty to patients when he departs one medical practice to join another with the fundamental (practically Hippocratic) recognition that "[t]he interest of the patient is paramount in the practice of medicine, and everything that can reasonably and lawfully be done to serve that interest must be done by all physicians who have served or are serving the patient." 19  In this regard, the AMA has determined that the best interests of the patient mandate that when a physician leaves a group practice, the physician's patients "must be notified that the physician is leaving the group." 20  "Patients of the physician must also be notified of the physician's new address and offered the opportunity to have their medical records forwarded to the departing physician at his or her new practice." 21  Finally, the AMA admonishes that "[i]f the responsibility for notifying patients falls to the departing physician rather than to the group, the group should not interfere with the discharge of these duties by withholding patient lists or other necessary information." 22

19  AMERICAN MEDICAL ASSOCIATION, CODE OF MEDICAL ETHICS § 7.01 (1994).

20  *Id.* at § 7.03.

21  *Id.*

22  *Id.*

**\*6** The AMA's Code of Medical Ethics provides meaningful guidance on at least two fronts. First, it confirms that the departing physician's ethical duty is to *"notify"*, not solicit, patients when he leaves a medical practice.[23] Second, it confirms that the practice from which the physician is departing has responsibilities along with the departing physician-the practice either notifies the appropriate patients of the departure of one of its physicians or it stands out of the way of the departing physician as he discharges his duty to notify.[24] Either way, it is understood that all patients of the departing physician will be notified and that it may be necessary to utilize patient lists or other confidential information to identify these patients and to facilitate the notification.

[23]    Notification, from the AMA's perspective, involves: (1) telling the patient the physician is leaving; (2) telling the patient where the physician is going; and (3) telling the patient that he may follow the physician if he so chooses. *Id.*

[24]    Here, the evidence clearly demonstrated that TCP did nothing to notify its patients of O'Hara's departure. The responsibility for doing so, therefore, fell to O'Hara.

At trial, both TCP and O'Hara recognized the mandate of patient notification as codified by the AMA. For its part, TCP contended that the AMA did not require TCP to permit O'Hara to notify his patients of his departure by a mass-mailed letter. The Court already has concluded that TCP's proffered alternative method of notification was, at best, unreasonable and, more likely, chimerical. The AMA supports the notion that all patients must be notified of the physician's departure, not just those patients who happen to see the physician in the office before he leaves the practice. For his part, O'Hara claims that he was motivated, at least partially, to prepare his June 1 letter by the mandate of the AMA's ethical standards. Yet, when pressed, he admitted that he had not referred to them when he actually constructed the letter. Thus, it appears that he was unaware that while the AMA required him to notify his patients of his departure, to advise them of his new location, and to provide a means by which they could transfer their records to the new practice if they wished to do so, it did not give him license to solicit their business.

    b. Delaware's Public Policy
Although at times expressed by our courts, Delaware's public policy most frequently is expressed in the voice

of our General Assembly. And, when it comes to a patient's right of access to healthcare, Delaware's General Assembly has spoken loud and clear. Delaware provides a right to healthcare to eligible citizens who are unable to pay for care,[25] rights to fair treatment from healthcare insurers,[26] and a highly regulated framework within which physicians are licensed, are required to obtain continuing medical education, and are subject to discipline.[27] The General Assembly also has recognized the importance of maintaining the continuity of care by protecting the physician-patient relationship. Not only has the physician-patient relationship been recognized to create a protected privilege,[28] it also is the source of Delaware's statute prohibiting restrictive covenants in physician "employment, partnership or corporate agreements."[29] Indeed, the synopsis to Senate Bill 294 recognizes that "[b]ecause patients establish relationships with their physicians and/or enter into courses of treatment with particular physicians, the patients should not be deprived of the services of the physician of their choice because of an economic contract entered into between two physicians."[30] It is not surprising, then, that one year after disallowing contracts that restrict a physician's right to provide medical services to his patients within the State, the General Assembly enacted a law which required physicians to notify their patients when they discontinue their practice within the State for any reason.[31]

[25]    DEL.CODE ANN. tit. 31, § 505 (1997).

[26]    DEL.CODE ANN. tit. 18, §§ 3301-3343, 3501-3566, 3401-3409, 4401-4420, 6301-6309, 6401-6408, and 7101-7109 (1999).

[27]    DEL.CODE ANN. tit. 24, § 1701 (1997).

[28]    *See Del. R. Evid. 503* (codifying the physician-patient privilege).

[29]    DEL.CODE ANN. tit. 6, § 2707 (1999).

[30]    S.B. 294, 132nd Gen. Assem., Reg. Sess. (synopsis)(Del.1983)(enacted as DEL.CODE ANN. tit. 6, § 2707).

[31]    DEL.CODE ANN. tit. 24, § 1761(a)(1997) (enacting H.B. 870, 132nd Gen. Assem., Reg. Sess. (Del.1984)).

 **\*7** It is against this statutory framework, in which the sanctity of the physician-patient relationship is embroidered in the fabric of Delaware's public policy, that the Court takes comfort in recognizing a physician's right to notify his patients when he departs one medical practice and joins another. Thus, as stated above, even if TCP had not expressly or implicitly authorized O'Hara to notify his patients of his departure, the Court would have sanctioned his notifications in any event as an act compelled by the spirit (if not the letter) of Delaware's statutory treatment of the physician-patient relationship. But nothing in Delaware's statutes or public policy encourages or authorizes a physician to solicit patients from one medical practice to another, particularly when he uses the protected trade secrets of the target medical practice to accomplish the inducement.

The Court is satisfied that the distinction it seeks to fashion between a proper notification of patients and an improper solicitation of patients is well-grounded in Delaware's public policy. Aside from confirming that the distinction is valid, however, Delaware statutory law offers nothing by way of interpretive guidance in determining whether O'Hara's letter notified patients or solicited them.

#### c. The Distinction Between Notification and Solicitation As Recognized in the Case Law

The parties have suggested that the propriety of a physician's conduct when communicating with patients regarding his departure from a medical practice raises questions of first impression in Delaware. This may be so, but at least one Delaware court has offered meaningful guidance. In *Dickinson Medical Group, P.A. v. Foote,*[32] Chancellor Brown addressed a medical practice's claim that a departing physician had misappropriated trade secrets by surreptitiously removing confidential patient records for use in starting a new practice. Like O'Hara, the departing physician (Foote) argued that she had a "professional responsibility" to notify patients that she was leaving the medical practice (Dickinson) to start her own practice. And, like O'Hara, Foote argued that she should be permitted to utilize Dickinson's patient lists to make contact with patients for whom she had provided care. The Court disagreed. Concluding that the patient lists were trade secrets,[33] the court enjoined Foote from utilizing the lists to make direct contact with Dickinson's patients.[34]

[32]    1984 Del. Ch. LEXIS 429, 1984 WL 8208 (Del. Ch.).

[33]    *Id.* at \*6-7.

[34]    *Id.* at \*7.

Chancellor Brown's holding reveals that he was concerned that Foote would solicit Dickinson's patients improperly and that Dickinson would be harmed irreparably as a result.[35] But the court also recognized that Dickinson's patients should be notified that Foote no longer was practicing with Dickinson and that they should be offered a choice of where to seek medical care. Accordingly, the court directed Dickinson to notify patients of Foote's departure and of her "professional whereabouts" and also to advise patients that they may continue to treat with Dickinson, follow Foote to her new practice, or seek a new physician of their choice.[36] While perhaps not directly addressed by Chancellor Brown in *Dickinson,* the distinction between notifying and soliciting patients was at least implicitly recognized by him as he "fashioned [the court's] remedy to fit the occasion."[37]

[35]    *Id.* at \*2-3("Dickinson seeks an order temporarily enjoining Dr. Foote from using the patient for purposes of [a] competing business solicitation....").

[36]    *Id.* at \*8.

[37]    *Id.*

 **\*8** Courts elsewhere have addressed the distinction more directly. For instance, when interpreting California's Uniform Trade Secrets Act, the United States Court of Appeals for the Ninth Circuit has held:

> The UTSA definition of "misappropriation" has been clarified by case law which establishes that the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition, and that the common law right to compete fairly and the right to announce a new business affiliation have survived the enactment of the UTSA. (citation omitted) However, misappropriation occurs if information from a customer data base is used to solicit customers.

**Total Care Physicians, P.A. v. O'Hara, Not Reported in A.2d (2002)**
2002 1 WL 8995©08

(citation omitted) Merely informing a former employer's customers of a change of employment, without more, is not solicitation. (citation omitted) [38]

[38]    *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir.1993).

Several other courts have drawn this distinction as well. [39]

[39]    *See e.g., Rao v. Verde,* 222 A.D.2d 569, 635 N.Y.S.2d 660, 661 (N.Y.Supr.1995)(deciding that physician may notify patients of departure but may not solicit); *Core v. Martin,* 543 So.2d 619, 622 (La.App.1989)(stating that veterinarian may announce his departure but may not solicit); *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 568 (Md.App.1978)(asserting that employee may notify customers of departure but may not solicit); *Crane Co. v. Dahle,* 576 P.2d 870, 872 (Utah 1978)(same); *Alder, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1184-86 (Pa.1978)(same).

The Supreme Court of California has referred to Black's Law Dictionary to define "solicit":

"Solicit" is defined as: 'To ask for the earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' (Black's Law Dictionary, 3d ed., p. 1639) 'It implies personal petition and importunity addressed to a particular individual to do some particular thing ...' (citation omitted) It means: "To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain." [40]

[40]    *Aetna Building Maintenance Co., Inc. v. West,* 39 Cal.2d 198, 246 P.2d 11, 15 (Cal.1952).

In a later decision of the California Court of Appeals, the court referred to *Aetna's* definition of "solicit" when considering the propriety of the following letter written by an insurance agent to customers of his former firm as he was departing the business:

After almost fifteen years as both an agent and policyholder, I have left [ACI] and am very pleased to announce the formation of an independent insurance agency. I shall continue to specialize in Credit Insurance but will now primarily be representing Fidelity and Deposit Company of Maryland, who [sic] is offering companies a very interesting alternative to the types of policies being written by both [ACI] and Continental. If you would like to learn more about the [F & D] policy, I will be happy to discuss it in detail with you when you are ready to review your ongoing credit insurance needs at renewal time. In the meantime, ACI will assign a new agent to your policy. If I can be of assistance to you during the transition period or answer any questions for you at any time, please do not hesitate to call me. I have really enjoyed our past association and hope we don't lose touch! [41]

[41]    *American Credit Indemnity Co. v. Sacks,* 213 Cal.App.3d 622, 625, 262 Cal.Rptr. 92 (Cal.App.1989).

After recognizing the agent's right to announce her departure from the firm to customers with whom she had conducted business, the court held that her letter to customers "went beyond an appropriate professional announcement and constituted a solicitation of the ACI customer list." [42] The court went on to explain how the "announcement letter" was transformed into an improper solicitation:

[42]    *Id.* at 633, 262 Cal.Rptr. 92.

**\*9**  Although the letter begins as an announcement of her departure from ACI and affiliation with F & D, it soon assumes a different tone. Sacks (the agent) informs ACI's customers of the interesting competitive alternative F &

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 496 of 520
PageID: 9417
Total Care Physicians, P.A. v. O'Hara, Not Reported in A.2d (2002)
2002 1 WL8995©08

D offers as compared to ACI's policies. She invites their inquiry about the F & D policy and indicates she would be happy to discuss it in detail when they are ready to renew. She personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies F & D can provide and for assistance during the agent transition period. Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business. Sacks, in a word, solicited. Therefore, as a matter of law, Sack's letter ... constituted a solicitation. [43]

[43]    *Id.* at 636, 262 Cal.Rptr. 92.

In contrast, a mass-mailed letter to customers of an accounting firm by a departing accountant which simply announced his departure and provided the name, address and telephone number of his new firm was deemed not to be an improper solicitation. [44] "Merely informing customers ... of a change of employment, without more, is not solicitation." [45] And, when approached by customers, the former employee may discuss transferring the customer's business to the new firm. [46]

[44]    *See Moss, Adams & Co. v. Shilling,* 179 Cal.App.3d 124, 127, 224 Cal.Rptr. 456 (Cal.App.1986).

[45]    *Aetna,* 246 P.2d at 15.

[46]    *See Hilb, Rogal & Hamilton Ins. Sevs. Of Orange County v. Robb,* 33 Cal.App. 4th 1812 (Cal.App.1995)(deciding that former employee did not misappropriate customer list and other client information by informing agency's clients of his change of employment and then complying with their instructions to move their accounts).

d. O'Hara's Letter Solicited TCP Patients

The Court has discerned the following guidance from the AMA standards, Delaware public policy and the case law: (1) a proper notification will supply the patient with information which will allow him to continue to receive care from the physician after he leaves a medical practice; (2) this information should include the fact that the physician is leaving a practice, the location of the new practice, and the means by which the patient can transfer his medical records from the old practice to the new practice if he so chooses; and (3) the notification should not include statements which will either encourage the patient to leave the physician's former practice or transfer care to the new practice-stated differently,

the physician should not "endeavor to obtain [the patient's] business." [47]

[47]    *Sacks,* 213 Cal.App.3d at 636, 262 Cal.Rptr. 92.

O'Hara's June 1 letter "endeavors to obtain [the] business" of TCP patients. Like the insurance agent in *Sacks,* O'Hara begins his letter with a proper announcement of his departure from TCP and relocation to Millcreek. This was authorized by TCP and mandated by governing rules of professional responsibility and Delaware public policy. Later in the letter, O'Hara advises patients how to transfer their records to Millcreek if they so choose. Again, this information is proper in that it does not encourage the transfer of care; it simply provides the means by which a transfer would occur if the patient elects to follow O'Hara to Millcreek. [48] But, like the agent in *Sacks,* O'Hara did not stop there. He goes on to tout the quality of care that will be offered at the new practice and the quality of the facilities in which the care will be rendered. This is solicitation. [49] Since TCP did not authorize O'Hara to utilize its trade secrets to solicit TCP patients, and the Court can see no other basis to sanction the solicitation, the Court must conclude that O'Hara misappropriated TCP's trade secrets.

[48]    *See* AMERICAN MEDICAL ASSOCIATION, *supra* note 19.

[49]    O'Hara has offered no justification for this portion of the letter and the Court can think of none other than to entice patients to leave TCP and join O'Hara at Millcreek.

e. TCP May Proceed To The Second Phase Of The Trial To Prove Its Damages

**\*10** The Court ordered bifurcation of the issues of liability and damages. Having concluded that misappropriation has occurred, the Court must look ahead to the next phase of these proceedings. Certainly, TCP may now endeavor to prove its damages. Yet the Court must confess that its vision of how the damages phase of the trial will unfold, or at least the framework in which it will proceed, is less than clear. The Court has determined that some portions of the June 1 letter were proper, others were not. Arguably, TCP would be required to prove that patients left TCP as a result of the solicitous portions of the letter, as opposed to those portions of the letter which properly announced O'Hara's departure from

the practice. [50]  The Court will expect the parties to address this issue in advance of the next phase of the trial.

[50]    *See Marsico v. Cole,* 1995 Del. Ch. LEXIS 78, at *25, 1995 WL 408877 (Del. Ch.) ("No reliable or credible evidence was presented as to the extent to which [the departing physician] has been enriched, if at all, by virtue of the misappropriation of trade secrets."); *Williams v. Riedman,* 339 S.C. 251, 529 S.E.2d 28 (S.C.App.2000)(noting that there was no evidence presented that clients' decision to transfer their business to defendant's new employer was the result of the solicitation on the part of the employee); *Western Electro-Plating Co. v. Henness,* 196 Cal.App.2d 564, 571-72, 16 Cal.Rptr. 691 (Cal.App.1961)(asserting that trial court should receive evidence that transfer of business to employee's new business was not the result of solicitation); *Dunsmore & Assoc., Ltd. v. D'Alessio,* 2000 Conn.Super. LEXIS 114, at *33, 2000 WL 124995 ("Actual loss in this context [a misappropriation claim] means the amount of money that the plaintiff lost from the defendant's misappropriation; it is measured by how much better off the plaintiff would have been but for the defendant's misappropriation.").

B. Unjust Enrichment

"The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy at law." [51]  In light of the Court's decision on TCP's misappropriation of trade secrets claim, the unjust enrichment claim may be disposed of as a matter of law. TCP has an adequate remedy at law: its claim for damages resulting from the misappropriation of its trade secrets. It need not invoke this Court's sense "of justice or equity and good conscience" to secure relief. [52]  When a plaintiff may avail itself of an adequate remedy at law, this Court will not hear a claim sounding in unjust enrichment. [53]  The Court will enter judgment for the defendants on TCP's unjust enrichment claim is dismissed as a matter of law. [54]

[51]    *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del.Ch.1999) (citations omitted).

[52]    *See Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988)("Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another ... against fundamental principles of justice or equity or good conscience.' ").

[53]    *See e.g., R.M. Williams Co., Inc. v. Frabizzio,* 1993 Del.Super. LEXIS 55, at *42-44, 1993 WL 54423 (Del.Super.) (dismissing unjust enrichment claim when remedy at law was available to the plaintiff).

[54]    At the conclusion of the trial, the Court suggested that the unjust enrichment claim would be displaced by the misappropriation of trade secrets claim. *Cf. Leucadia, Inc. v. Applied Extrusion Techs.,* 755 F.Supp. 635, 637 (D.Del.1991)(stating that the Uniform Trade Secrets Act "was intended to preserve a single tort cause of action under state law for misappropriation ... and ... to eliminate other tort causes of action founded on allegations of trade secret misappropriation")(citing DEL.CODE ANN. tit. 6, § 2007(a)(1999)). On reflection, the Court has determined that it is more accurate to say that the misappropriation of trade secrets claim affords TCP an adequate remedy at law which, in turn, disables its unjust enrichment claim. The unjust enrichment claim is not a tort-based claim and is not, therefore, subject to the statutory preemption addressed in *Leucadia.*

C. Breach of Fiduciary Duty

In its decision on the cross motions for summary judgment, the Court determined that O'Hara owed a fiduciary duty to TCP to protect TCP's trade secrets. [55]  This determination was made after reviewing an undisputed record with respect to the nature of the relationship between TCP and O'Hara as recounted in TCP's amended complaint. The Court also relied upon then Vice Chancellor Chandler's decision in *Marsico v. Cole* in which he concluded that an independent contractor physician owed "a duty of loyalty" to the medical practice in which he worked to "protect[ ] trade secrets or confidential, proprietary information." [56]

[55]    *Total Care Physicians, P.A.,* 798 A.2d at 1058.

[56]    *Id.* at 1059 (citing *Marsico,* 1995 Del. Ch. LEXIS 78, at *5-7), 1995 WL 408877.

Total Care Physicians, P.A. v. O'Hara, Not Reported in A.2d (2002)
2002 1 WL 8995&08

Unfortunately, at no time during the pendency of the cross motions for summary judgment did either of the parties advise the Court that the Court of Chancery had already addressed the breach of fiduciary claim when the case was pending there. Specifically, in connection with a motion to dismiss filed on behalf of all defendants, the Court of Chancery concluded that it lacked jurisdiction over the controversy because TCP had failed to plead a claim for breach of fiduciary duty. [57] By its order dismissing the case for lack of equitable jurisdiction, the Court of Chancery, in effect, dismissed the breach of fiduciary duty claim. This is the law of the case. Absent a finding by this Court that the Vice Chancellor's ruling was "clearly erroneous," the issue should not be re-litigated here. [58]

[57]    See *Total Care Physicians, P.A. v. O'Hara,* C.A. No. 16313-NC (Del. Ch. Nov. 8, 1999)(Tr. at 29)("I don't think that the allegation suffices to plead to the facts creating a special relationship between Dr. O'Hara and Total Care. In fact, I'd be quite troubled to recognize such a fiduciary obligation.").

[58]    See *Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

**\*11**  Although it is not clear whether the Court of Chancery considered *Marsico* in reaching its conclusion that a fiduciary duty could not exist under the circumstances presented here, the Court is not "left with the definite and firm conviction that a mistake has been committed." [59]  Reasonable minds could differ with respect to the nature and character of the parties' relationship. Accordingly, the Court will respect the law of the case. Judgment will be entered in favor of the defendants on Count VII as a matter of law.

[59]    *Berglund v. Horgan,* 1997 Del. Ch. LEXIS 153, at *12, 1997 WL 695568 (Del. Ch.) (defining "clearly erroneous").

IV. CONCLUSION

The Court has concluded that O'Hara misappropriated TCP's trade secrets by using them to conduct an unauthorized solicitation of TCP's patients. TCP may now attempt to prove its damages with respect to this claim. The Court also has determined that judgment should be entered as a matter of law in favor of the defendants as to Counts I and VII. The Prothonotary will enter these judgments on the docket forthwith.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2002 WL 31667901

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 53

2006 WL 2807342
Only the Westlake citation is currently available.
United States District Court,
N.D. Oklahoma.

UNITED GOLF, LLC, an Oklahoma corporation;
and Northeastern Irrigation & Landscape,
Inc., an Oklahoma corporation, Plaintiffs,
v.
WESTLAKE CHEMICAL CORPORATION, a
Delaware corporation; and North American Pipe
Corporation, a Delaware corporation, Defendants.

No. 05–CV–0495–CVE–PJC.
|
Aug. 15, 2006.

**Attorneys and Law Firms**

James Michael Love, Titus Hillis Reynolds Love Dickman &
McCalmon, Tulsa, OK, for Plaintiffs.

Cason Paul Carter, David Edward Keglovits, Erin K. Dailey,
Gable & Gotwals, Tulsa, OK, for Defendants.

***OPINION AND ORDER***

CLAIRE V. EAGAN, Chief Judge.

 **\*1**  Now before the Court is Defendants' Motion to Dismiss
and Brief in Support (Dkt.# 20). Defendants motion to dismiss
is a partial motion to dismiss alleging that: (1) plaintiffs have
no basis to assert a subrogation right under their contract with
the City of Tulsa ("the City"); and (2) plaintiffs' sole remedy
for alleged deficiencies with the pipes plaintiffs purchased is
provided by the Uniform Commercial Code ("UCC").


**I.**

Plaintiffs United Golf, LLC ("United Golf") and Northeastern
Irrigation & Landscape, Inc. ("Northeastern") allege that
they were awarded a contract by the City to install a
new sprinkler system at the Page Belcher Golf Course in
Tulsa, Oklahoma. United Golf was the general contractor
and Northeastern was retained as a subcontractor to perform
the installation. Plaintiffs purchased polyvinyl chloride
("PVC") pipes from a distributor, and plaintiffs allege that
the pipes were designed and manufactured by Westlake
Chemical Corporation ("Westlake") and North American
Pipe Corporation ("North American"). Sometime after the
pipes were installed, many of the pipes began to leak. The
leaks caused the sprinkler system to fail, resulting in too much
water in some places on the golf course and not enough water
in other places. Plaintiffs had to remove the pipes and replace
them with pipes from a different manufacturer.

When plaintiffs removed the pipes, they had to tear up
significant sections of sod to dig below the surface to access
the pipes. Under plaintiffs' contract with the City, they were
required to replace the pipes and pay for replacement of the
sod. Asserting subrogation rights under the contract, plaintiffs
sued North American and Westlake [1] for products liability,
breach of implied warranty, and negligence. [2] Plaintiffs allege
that defendants designed and manufactured defective pipes.
Plaintiffs also allege that defendants acted negligently by
designing defective pipes, causing damage to the golf course,
and failing to warn plaintiffs the pipes could leak. Defendants
argue that the economic loss rule recognized by the Oklahoma
Supreme Court bars plaintiffs' claims for manufacturers'
products liability and negligence. According to defendants,
plaintiffs may not seek recovery under a tort theory when the
only injury they complain of is damage to the subject product.
Plaintiffs claim that they have also pled damages for replacing
sod in order to access the damaged pipes, which is sufficient
to state a products liability claim for damage to other property.

[1]   Plaintiffs have filed a stipulation of dismissal with
prejudice of Westlake, leaving North American as
the sole defendant.

[2]   Plaintiffs have asserted several varieties of
products liability and negligence claims, including:
(1) products liability—design defect; (2) products
liability—manufacturing defect; (3) products
liability—failure to warn; (5) negligent damage to
property; (6) negligent design defect; (7) negligent
manufacturing; and (8) negligent failure to warn.


**II.**

When reviewing a motion to dismiss under Rule 12(b)(6),
the court must construe the allegations of the complaint as
true and view the allegations in the light most favorable to
the nonmoving party. *Moffett v. Halliburton Energy Services,
Inc.,* 291 F.3d 1227, 1231 (10th Cir.2002). A Rule 12(b)(6)

motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sutton v. Utah State School for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999).

### III.

**\*2** North American raises two primary arguments in its motion to dismiss. First, defendant argues that plaintiffs have failed to state a basis for equitable subrogation and may not pursue products liability or negligence claim for injuries to the City. Second, defendant argues that the economic loss rule prevents plaintiffs from proceeding with their claim for products liability and negligence, because their alleged injury is harm to the product itself and consequential economic damages.

### A.

Plaintiffs have based their right to bring claims against North American on an alleged right of equitable subrogation under their contract with the City. The Oklahoma Supreme Court has recognized the doctrine of equitable subrogation, but has provided few bright lines rules for its application. *Sexton v. Continental Cas. Co.,* 816 P.2d 1135, 816 P.2d 1135, 1138 (Okla.1991); *Republic Underwriters Ins. Co. v. Fire Ins. Exchange,* 655 P.2d 544, 546 (Okla.1982); *Lawyers' Title Guar. Fund v. Sanders,* 571 P.2d 454, 456 (Okla.1977); *Rice–Bell Partnership v. Capitol Indem. Corp.,* 8 P.3d 189, 192 (Okla.Civ.App.2000). Equitable subrogation is a purely equitable doctrine

> based on the relationship of the parties and equitable principles of establishing substantial justice, and it is broad enough to include every instance where one person who is not a mere volunteer, pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter.

*United States Fidelity and Guar. Co. v. Federated Rural Electric Ins. Corp.,* 37 P.3d 828, 831 (Okla.2001). North American argues that plaintiffs never received an assignment of rights from the City to pursue a subrogation claim and that it is not primarily answerable for any debt to the City.

The Court does not find that dismissal as a matter of law would be appropriate, because of the fluid and fact specific nature of equitable subrogation. Plaintiffs were not required to seek a formal assignment or transfer of rights from the City before alleging a right to equitable subrogation. "Equitable subrogation ... does not depend upon a contract but arises by implication in equity to prevent an injustice." *Id.* Plaintiffs have alleged a basis for equitable subrogation by stating that they entered a contract with the City and were required to pay for repairs due to defendants' defective pipes. Construing the facts in favor of plaintiffs, it is possible that plaintiffs incurred a debt to replace and reinstall pipes which defendants had a duty to guaranty under warranty. This satisfies the pleading requirements for equitable subrogation. The Court may not weigh the facts to determine if the equities will inevitably support plaintiffs' claims, because plaintiff has stated sufficient facts to allege an equitable right to recovery. The law does not clearly favor dismissal of plaintiffs' claims based on a failure to plead a right to equitable subrogation and defendants' motion to dismiss is denied on the issue of equitable subrogation.

### B.

**\*3** North American asserts that plaintiffs are barred from proceeding with products liability or negligence claims against it, because plaintiffs' exclusive remedy is provided by the UCC. Oklahoma recognizes the economic loss rule, which provides that a manufacturers' products liability claim is not available "for injury only to the product itself resulting in purely economic loss." *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649, 653 (Okla.1990). The reasoning of *Waggoner* applies to the full range of unintentional torts, precluding negligence or products liability claims when the UCC provides a comprehensive remedy for plaintiff's economic injury. *Id.* at 652–53. Plaintiffs respond that, in order to repair and reinstall the leaking pipes, they were required to remove sod from the golf course, and that they are seeking damages for something more than replacing the allegedly defective PVC pipes.

Oklahoma adopted the economic loss rule stated by the Supreme Court in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), where the Court held that a products liability claim was not available in admiralty cases when the only injury suffered by plaintiff was harm to the product itself. *Id.* at 874–75. In cases where the only harm is to the product, the underlying rationale for products liability claims —protecting the general public from accidental injury—is significantly weakened. *Id.* at 871. The Oklahoma Supreme Court adopted this rule in *Waggoner,* where the plaintiffs' only injury was to the mobile home they purchased from the defendant manufacturer. The *Waggoner* court stated:

> The facts of this case involve only economic loss and disappointment associated with manufacturer's unsuccessful attempts to remedy condensation within consumers' mobile home. No personal injury or damage to other property occurred. Damage was limited to the product itself. Therefore, any recovery must be based upon the contractual relationship, specifically the warranty provisions, express or implied.

*Id.* at 653. In cases where the plaintiff suffers economic injury only, the proper remedies are provided by the warranty provisions of the UCC.

The Oklahoma Supreme Court has amended the economic loss rule in two important ways. The economic loss rule does not apply in any case where the plaintiff is alleging a personal injury from using an allegedly defective and unreasonably dangerous product. *Dutsch v. Sea Ray Boats, Inc.,* 845 P.2d 187, 193–94 (Okla.1992) (plaintiff could collect damages for personal injury and damage to the product in a products liability action without bringing a separate breach of warranty claim to recover damages for economic loss). However, when plaintiff alleges an economic injury for damage to the product itself and for consequential damages, such as to ancillary equipment, clean-up, repair, and reinstallation costs, the economic loss rule applies. *Oklahoma Gas & Electric Co. v. McGraw–Edison Co.,* 834 P.2d 980, 982 (Okla.1992) ("damages to the product and consequential economic losses sounds in contract, not in manufacturers' products liability").

In order to resolve defendant's motion to dismiss, the Court must discuss the parameters of the economic loss rule as clarified in *Dutsch* and *Oklahoma Gas & Electric Co.*

**\*4** In *Dutsch,* a motor boat exploded, causing the boat owner personal injuries and destroying the boat. 845 P.2d at 188. The owner sued the manufacturer using a manufacturers' products liability theory and recovered damages for his personal injuries and property loss. The manufacturer appealed, claiming that *Waggoner* prevented the boat owner from recovering for property damage to the defective product. The Oklahoma Supreme Court held that the economic loss rule did not preclude recovery for damage to the product in cases where the plaintiff was personally injured or suffered damage to other property. *Id.* at 193. The court focused on the presence of a personal injury and distinguished *Waggoner* based on the lack of a personal injury to the plaintiff in *Waggoner.* The court found that it would not be consistent with the policy supporting manufacturers' products liability claims to require a plaintiff suffering a personal injury to bring two separate claims to recover for personal injuries and economic loss. *Id.* at 193–94.

In *Oklahoma Gas & Electric Company,* the Oklahoma Supreme Court was asked to answer a certified question from the Tenth Circuit, which was whether "a plaintiff in a manufacturers' products liability action [can] recover damages for injury to the allegedly defective product itself and consequential economic harm flowing from that injury." 834 P.2d at 981. The Oklahoma Supreme Court answered in the negative, finding that *Waggoner* prevented a plaintiff from using a tort claim to recover purely economic damages flowing from damage to a defective product. *Id.* In this case, the plaintiff purchased a three-phase power transformer designed by McGraw–Edison Company ("McGraw–Edison"). The transformer exploded, destroying the transformer and damaging equipment connected to the transformer. Plaintiff filed a products liability claim to recover "actual damages for injury to the allegedly defective transformer and ancillary equipment and consequential damages for clean-up, repair and reinstallation of the transformer, rental and handling of a temporary transformer and lost profits." *Id.* The Oklahoma Supreme Court found that this case was controlled by *Waggoner,* because there was no personal injury or damage to other property. In cases where the "buyer's economic expectations are adequately protected by the warranty provisions of the Uniform Commercial Code," no unintentional tort claim is available. *Id.* at 982.

However, the court did not define the terms "consequential damages" or "other property," leaving those questions open.

Plaintiffs do not dispute that they are seeking damages for "the repair and replacement of the sprinkler system and the replacement of damaged sod at the Page Belcher Golf Course." Plaintiffs claim that the damaged sod qualifies as "other property" under *Waggoner* and *Dutsch,* and that this case does not fall under the economic loss rule. To date, the Oklahoma Supreme Court has not clarified what was intended by the term "consequential damages" in *Oklahoma Gas & Electric Co.* However, the UCC does provide a definition:

> **\*5** (2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> (b) injury to person or property proximately resulting from any breach of warranty. Okla. Stat. tit. 12A, § 2–715. Subsection (b) is directly on point and provides strong evidence that the Oklahoma legislature intended claims such as plaintiffs' to be governed by the UCC instead of tort law. The UCC provides a remedy to a buyer for "all damages resulting from his breach if they arise from circumstances that the seller knew about or had reason to know about, even if he did not consciously assume the risk of such liability." *Atlan Indus., Inc. v. O.E.M., Inc.,* 555 F.Supp. 184, 190 (W.D.Okla.1983). The Oklahoma Supreme Court has focused on the foreseeability of damages to determine if the alleged harm qualifies as consequential damages under the UCC. *John A. Brown Co. v. Shelton,* 391 P.2d 259, 263–64 (Okla.1964). In *Perry v. Lawson Ford Tractor Co.,* 613 P.2d 458 (Okla.1980), a farmer sued a tractor manufacturer for crop losses because the manufacturer sold a defective tractor. The Oklahoma Supreme Court found the crop losses to be consequential damages, stating:

> The element of foreseeability circumscribes the outer limit of damages recoverable both ex contractu and ex delicto. It is risk reasonably to be anticipated from the breach of an obligation. Occurrence of crop loss while equipment designed and sold for use in harvesting remains disabled and repairs diligently made come too late for meaningful deployment of the machine in the field certainly is an event that flows naturally from the breach of implied warranty of fitness. It is a loss well within the contemplation, and hence within the sweep, of the warrantor's assumed liability.

*Id.* at 464 n. 13.

Plaintiffs' claim falls within the scope of the UCC and they can receive all of the damages they seek through their breach of warranty claim. *Moss v. Polyco, Inc.,* 522 P.2d 622, 625 (Okla.1974). This case falls squarely under *Oklahoma Gas & Electric Co.* It was foreseeable that the surface of the golf course would be damaged if North American sold plaintiffs defective pipes that had to be replaced. Plaintiffs did not incur any expense for the sod because they had an ownership interest in the sod. They had a contractual duty to the City to repair the sprinkler system and clean up the golf course after performing their required repairs to the defective pipes. In essence, the damage to the sod flowed from the breach of warranty and plaintiffs' interest in the sod arose from the breach of warranty. In *Oklahoma Gas & Electric Co.,* the injured plaintiff owned all of the damaged equipment, but as long as the damages sought were economic in nature and could be considered consequential to the breach of warranty, the plaintiff could not pursue a tort claim. In products liability cases for damage to other property, Oklahoma courts have allowed the claims because the defective product directly damaged other property owned by the plaintiff. *See Kimbrell v. Zenith Radio Corp.,* 555 P.2d 590 (1976) (defective wiring in television allegedly caused fire damage to plaintiff's home); *Canadian Public School Dist. No. 2 v. McGraw–Edison Mfg. Co.,* 634 P.2d 782, 786 (Okla.Civ.App.1981) (defendant's failure to keep pressure in gas lines caused plaintiff's school to burn down). Here, the damage to the sod is a foreseeable injury flowing from the alleged defects with the pipes, and this is not the type of "other property" products liability claim allowed by Oklahoma law.

**\*6** The present case is a classic breach of warranty case. Defendants sold plaintiffs PVC piping that allegedly did not meet the required specifications. Plaintiffs had to remove defendants' pipes and reinstall new pipes from a different manufacturer to satisfy their customer. Plaintiffs did not acquire the product as members of the general public, but instead, through a contract negotiated with defendants and its distributor. Incidentally, some sod on the golf course was damaged because plaintiffs had to dig up the pipes in order to reinstall new PVC pipes for the sprinkler system. Although there may be cases where products liability and breach of warranty theories provide parallel types of relief, this case is not one of them. The rationale for allowing a products liability claim in the present case is strained, because the primary

reason for adopting a manufacturers' products liability cause of action was to protect members of the general public from injuries caused by defective products. *Allenberg v. Bentley Hedges Travel Serv., Inc.,* 22 P.3d 223, 227 (Okla.2001) ("We recognized that manufacturers' products liability is founded upon public interest in human safety and that the rationale for adopting the rule is that the manufacturer of the product is responsible for the product reaching its market, and the manufacturer is best situated to provide protection against the risk of injuries caused by a defective product."); *Waggoner,* 808 P.2d at 652 ("[products liability] is independent of UCC warranty provisions because recovery under manufacturers' products liability arises from a duty to the public rather than from a contractual relationship"); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1362 (Okla.1974) ("The rationale for such a rule is founded upon public interest in human safety ..."). This is precisely the kind of case the Oklahoma

Supreme Court intended to fall under *Oklahoma Gas & Electric Co.,* because plaintiffs are adequately protected by UCC remedies and there is no risk of harm to the general public if plaintiffs are not allowed to pursue a products liability claim. The Court finds that plaintiffs' tort claims should be dismissed, because the UCC provides the exclusive remedy for the purely economic recovery sought by plaintiffs.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss and Brief in Support (Dkt.# 20) is **granted;** claims 1, 2, 3, 5, 6, 7, and 8 of plaintiff's First Amended Complaint (Dkt.# 13) are **dismissed.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2807342

# TAB 54

2013 WL 6152312
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED EXCEPT
AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.

Bruce VIND, et al., Appellants,

v.

Shane McGUIRE d/b/a The Gold Guys,
and Gold Guys MN, LLC, defendant
and third party plaintiff, Respondent,

v.

Kevin Weiss, et al., Third Party Defendants.

No. A13–0591.
|
Nov. 25, 2013.

**Synopsis**

**Background:** In separate conciliation-court actions, based
on allegations that registered precious-metals dealer violated
the precious-metals-holding statute, victims of jewelry thefts
were granted damages against dealer. Dealer appealed the
conciliation-court judgments to the district court, and in
district court, victims filed complaints for money damages.
The District Court, Hennepin County, consolidated the cases
and granted summary judgment to dealer. Victims appealed.

**Holdings:** The Court of Appeals, Stoneburner, J., held that:

[1] legislature has not authorized a private-attorney-general
action for alleged violations of the precious-metals-holding
statute, and

[2] victims could not pursue an action in negligence per se
against precious-metals dealer.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (3)

[1]    **Action**      Statutory Rights of Action

       **Antitrust and Trade Regulation**      Private
       **Entities or Individuals**

       Legislature has not authorized a private-
       attorney-general action for alleged violations of
       the precious-metals-holding statute. M.S.A. §§
       8.31, subds. 1, 3a, 325F.731-325F.744.

[2]    **Action**      Statutory Rights of Action

       **Antitrust and Trade Regulation**      Private
       **Entities or Individuals**

       Legislature plainly limited the attorney general's
       authority to bring a civil action to licensing
       issues regarding precious-metals dealer and
       invoked powers under statute, setting forth
       additional duties of attorney general, only for
       the purpose of pursuing such licensing actions,
       and thus, legislature did not contemplate a
       private-attorney-general action for an alleged
       violation of precious-metals statutes. M.S.A. §
       8.31, 325.744, 325F.731-325F.744.

[3]    **Negligence**      Violations of Statutes and
       **Other Regulations**

       Even if victims of jewelry thefts were within
       the intended protection of the precious-metals-
       holding statute and the harm suffered was of
       the type the statute was intended to prevent,
       because the legislature did not provide a private
       cause of action for violation of the statute,
       victims could not pursue an action in negligence
       per se against precious-metals dealer. M.S.A. §
       325F.731-325.744 .

Hennepin County District Court, File No. 27CV1210652.

**Attorneys and Law Firms**

Michael B. Lammers, Heimerl & Lammers, LLC, Minneapolis, MN, for appellants.

Richard A. Saliterman, Brett M. Larson, Saliterman & Siefferman, P.C., Minneapolis, MN, for respondents.

Considered and decided by STONEBURNER, Presiding Judge; HUDSON, Judge; and HOOTEN, Judge.

**UNPUBLISHED OPINION**

STONEBURNER, Judge.

**\*1** Appellants, victims of jewelry thefts, challenge summary judgment to respondents, precious-metal dealers, dismissing appellants' private-attorney-general claims for damages under Minn.Stat. § 8.31, subd. 3a (2012), and their negligence per se claims for violation of Minn.Stat. § 325F.736 (2012) (precious-metals-holding statute), which requires precious-metal dealers to retain secondhand items containing precious metal without alteration for a period of at least 14 days. Appellants argue that the district court erred by (1) concluding that respondents' compliance with a local ordinance, which provides an alternative to the holding period, precludes action under the precious-metals-holding statute and (2) holding, in the alternative, that appellants failed to meet the public-interest requirement to pursue a private-attorney-general action for violation of the statute. Because the legislature has not extended the right to bring a private-attorney-general action to claims for violation of the precious-metals-holding statute and has not provided a private cause of action for violations of the statute, the district court correctly concluded that appellants cannot pursue their private actions for violation of the statute. We affirm without deciding the validity of the ordinance challenged by appellants.

**FACTS**

The facts in this appeal are not in dispute. Respondents, The Gold Guys and Gold Guys MN, LLC (collectively, Gold Guys), are registered precious-metals dealers in Minnesota, operating a store in the Mall of America that is licensed by the City of Bloomington under a local ordinance. At all times relevant, Gold Guys has complied with the ordinance under which it is licensed.

In 2011, four rings, valued at $4,220 were stolen from the residence of appellants Bruce and Laura Vind and were sold to Gold Guys on the day they were stolen. In an unrelated transaction, jewelry stolen from appellant Alice Menchaca's residence, valued at $5,000, was sold to Gold Guys within one to three days of the theft. Gold Guys melted down or altered the Vinds' rings within 24 hours of purchasing them and melted down or altered Menchaca's jewelry within a week of purchasing it.

In separate conciliation-court actions, based on allegations that Gold Guys violated the precious-metals-holding statute, the Vinds and Menchaca were granted damages against Gold Guys. Gold Guys appealed the conciliation-court judgments to the district court. In district court, the Vinds and Menchaca filed complaints for money damages, invoking the private-attorney-general statute to argue that the ordinance relied on by Gold Guys is void, and that Gold Guys violated the required 14–day holding requirement in Minn.Stat. § 325F.736. They also alleged negligence per se for violating the holding duty imposed by the statute. The district court consolidated the cases.

Gold Guys moved for dismissal of both complaints or, in the alternative, summary judgment, arguing, in relevant part, that (1) there is no private-attorney-general action or direct tort action for an alleged violation of the precious-metals-holding statute and (2) its business is governed by the Bloomington City Code (ordinance), precluding any action against them based on violation of the state statute. The Vinds and Menchaca argued that, because the ordinance's waiver scheme effectively eliminates the state's *required* 14–day holding period altogether, the ordinance is less restrictive than the statute, is void as a result, and Gold Guys violated the precious-metals-holding statute.

**\*2** Because Gold Guys relied on material outside the pleadings, the district court treated the motion as a motion for summary judgment and granted summary judgment, concluding that: (1) the ordinance is more restrictive than the statute and is therefore valid, precluding any action against Gold Guys for violation of the precious-metals-holding statute and (2) because Gold Guys complied with the ordinance, as a matter of law, it did not violate any law and was not negligent. In the alternative, the district court concluded that the Vinds and Menchaca do not have standing to bring private-attorney-general actions because they failed demonstrate that their actions are in the public interest. This appeal followed.

## DECISION

### I. Standard of review

The district court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." *Minn. R. Civ. P. 56.03.* "When the material facts are not in dispute, we review the lower court's application of the law de novo." *In re Collier,* 726 N.W.2d 799, 803 (Minn.2007). "No deference is given to a lower court on questions of law." *Modrow v. JP Foodservice, Inc.,* 656 N.W.2d 389, 393 (Minn.2003). "Application of a statute to the undisputed facts of a case involves a question of law, and the district court's decision is not binding on this court." *Davies v. W. Publ'g Co.,* 622 N.W.2d 836, 841 (Minn.App.2001), *review denied* (Minn. May 29, 2001).

### II. There is no private-attorney-general action for violation of the precious-metals-holding statute.

[1]   Gold Guys' summary-judgment motion argued that there is no private-attorney-general action for an alleged violation of the precious-metals-holding statute. The district court did not address that argument, but concluded that, even if such an action is possible, the Vinds and Menchaca cannot pursue it because they failed to demonstrate that their lawsuits benefit the public at large. *See Ly v. Nystrom,* 615 N.W.2d 302, 314 (Minn.2000) (holding that the private-attorney-general statute "applies only to those claimants who demonstrate that their cause of action benefits the public"). Because we conclude that the legislature has not authorized a private-attorney-general action for alleged violations of the precious-metals-holding statute, we affirm the district court's ruling that the Vinds and Menchaca cannot pursue such an action.

*Minn.Stat. § 8.31, subd. 1 (2012),* contains a nonexclusive list of statutes, violations of which the attorney general is mandated to investigate. The list includes several sections of *Minn.Stat. §§ . 325F.001* to .991 (2012) (titled Consumer Protection: Products and Sales), but the list does not include any portion of *sections 325F.731–325F.744,* governing precious metals.

*\*3*   The private-attorney-general statute provides in relevant part:

In addition to the remedies otherwise provided by law, any person injured by a violation *of any of the laws referred to in subdivision 1* may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court.

*Minn.Stat. § 8.31, subd. 3a* (emphasis added).

In *Morris v. Am. Family Mut. Ins. Co.,* 386 N.W.2d 233, 236 (Minn.1986), the supreme court considered whether a private-attorney-general action applies to a statute that is not specifically referenced in *Minn.Stat. § 8.31, subd. 1,* if the non-referenced statute deals with an unlawful business practice. The statute involved in *Morris* was the Unfair Claims Practices Act, *Minn.Stat. § 72A.17 (1984),* relating to practices in the insurance business. The supreme court addressed the issue by analyzing whether the legislature contemplated that a statute not referenced in *section 8.31, subdivision 1,* was subject to the private-civil-action provision of *Minn.Stat. § 8.31, subd. 3a. Id.* The supreme court concluded that, because there was no "legislative intention to create a new cause of action in derogation of our common law[,] ... a private person does not have a cause of action for violation of the Unfair Claims Practices Act." *Id.* at 238.

[2]   A person who violates provisions of the precious-metals statute is guilty of a felony, punishable by up to three years in prison and/or a fine of not more than $40,000. *Minn.Stat. § 325F.743.* The Vinds and Menchaca nonetheless rely on Minn.Stat. § 325.744, to assert that the legislature also contemplated that the precious-metals statute is subject to civil action by the attorney general and, therefore, is subject to a private-attorney-general action for damages. But Minn.Stat. § 325.744 provides:

The attorney general or any county attorney may institute a civil action in the name of the state in the district court to revoke, deny or suspend

for a period of time the license [of a precious-metals dealer] on the ground that the licensee has violated a provision of [Minn.Stat. §§ 325F.731 to 325F.744]. *For this purpose,* the attorney general or county attorney shall be invested with the additional powers contained in section 8.31. It is no defense to the action that the state has adequate remedies at law.

(Emphasis added.) Because the legislature plainly limited the attorney general's authority to bring a civil action to licensing issues and invoked section 8.31 powers only for the purpose of pursuing such licensing actions, we find no merit in the Vinds and Menchaca's argument that this provision demonstrates that the legislature contemplated a private-attorney-general action for an alleged violation of any of the provisions of sections 325F.731–325F .744. *See Ly,* 615 N.W.2d at 313 (stating that "the sweep of the [private-attorney-general] statute can be no broader that the source of its authority that of the attorney general.").

## III. Claims for negligence-per-se action were properly dismissed.

**\*4** "Negligence per se substitutes a statutory standard of care for that of an ordinarily prudent person, so that violation of the statute is conclusive evidence of duty and breach." *Renswick v. Wenzel,* 819 N.W.2d 198, 206 (Minn.App.2012), *review denied* (Oct. 16, 2012). Whether a violation of a statute or ordinance constitutes negligence per se is generally determined by a two-part test:

It is well settled that breach of a statute gives rise to negligence per se if [1] *the persons harmed by that violation are within the intended protection of the statute* and [2] the *harm suffered is of the type the legislation was intended to prevent.* The statute or ordinance imposes a fixed duty of care, so its breach constitutes conclusive evidence of negligence.

*Alderman's Inc. v. Shanks,* 536 N.W.2d 4, 8 (Minn.1995) (quoting *Pac. Indemnity Co. v. Thompson–Yaeger, Inc.,* 260 N.W.2d 548, 588–59 (Minn.1977)). But a statute that provides a criminal penalty "does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Valtakis v. Putnam,* 504 N.W.2d 264, 266 (Minn.App.1993) (citing *Larson v. Dunn,* 460 N.W.2d 39, 47 n. 4 (Minn.1990)). And where no common-law duty existed before the statute was enacted, we are limited "to the explicit language and clear implication of the statute. *Id.* (citing *Bruegger v. Faribault Cnty. Sheriff's Dep't,* 497 N.W.2d 260, 262 (Minn.1993). "The principles of judicial restraint forbid us from creating new causes of action which the legislature has not expressed or implied." *Id.*

**[3]**    In this case, the legislature provided a criminal penalty for violation of the precious-metals statute and did not explicitly or implicitly create a private cause of action. Even if the Vinds and Menchaca are within the intended protection of the precious-metals-holding statute and the harm suffered is of the type the statute was intended to prevent, because the legislature did not provide a private cause of action for violation of the statute, the Vinds and Menchaca cannot pursue an action in negligence per se. The district court did not err in granting summary judgment to Gold Guys on claims asserting negligence per se.

## IV. The validity of the Bloomington ordinance, providing for waiver of the precious-metals-holding statute's required 14–day holding period, is not determined in this appeal.

Minn.Stat. § 325F.742 provides, in relevant part, that government subdivisions are not prohibited from regulating or licensing precious-metals dealers within their jurisdictions "in a manner more restrictive than [sections 325F.731–325F.744]." Both parties extensively briefed whether the provision in the Bloomington ordinance, which eliminates *any* holding period for secondhand items containing precious metals, provided that a dealer posts a specified bond and complies with recording and reporting requirements designed to aid law enforcement, is valid as more restrictive than the required 14–day holding period mandated by the precious-metals-holding statute. But because the unavailability of private causes of action for alleged damages is dispositive of the challenge by the Vinds and Menchaca to the district court's grant of summary judgment to Gold Guys, we do not reach the issue of the validity of the ordinance.

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 510 of 520
PageID: 9431

**\*5  Affirmed.**

**All Citations**

Not Reported in N.W.2d, 2013 WL 6152312

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 55

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 512 of 520
PageID: 9433

2018 WL 2976126
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Houston (1st Dist.).

Daniel YBARRA and Lisa Ybarra, Appellants

v.

AMERIPRO FUNDING, INC., U.S. Bank, N.A. as
Trustee for the Banc of America Funding 2005–
H Trust; Bank of America, N.A.; Nationstar
Mortgage, LLC; and Mortgage Electronic
Registration Systems, Inc. aka "MERS", Appellees

NO. 01–17–00224–CV
|
Opinion issued June 14, 2018

On Appeal from the 55th District Court, Harris County,
Texas, Trial Court Case No. 2014–64169

**Attorneys and Law Firms**

Jeffrey Craig Jackson, for Daniel Ybarra and Lisa Ybarra.

Connie Flores Jones, Kathryn Davis, for Bank of America.

Michael J. McKleroy Jr., Matthew Lindsey, Randal Burton
Clark, for Nationstar Mortgage, LLC and Mortgage
Electronic Registration Systems, Inc. aka "MERS" and U.S.
Bank, N.A. as trustee for the Banc of America Finding 2005–
H Trust.

Panel consists of Justices Bland, Lloyd, and Caughey.

**MEMORANDUM OPINION**

Jennifer Caughey, Justice

**\*1** This case involves a dispute over a home foreclosure.
After appellants Daniel and Lisa Ybarra defaulted on their
mortgage, they received a foreclosure notice. The Ybarras
then sued appellees Ameripro Funding, Inc.; U.S. Bank,
N.A. as Trustee for the Banc of America Funding 2005–H
Trust (the 2005–H Trust); Bank of America, N.A.; Nationstar
Mortgage, LLC; and Mortgage Electronic Registration
Systems, Inc. (MERS) (collectively appellees), asserting

various causes of action and disputing appellees' standing to
foreclose. Appellees sought summary judgment on all of the
Ybarras' claims, and the trial court ruled in appellees' favor.
The Ybarras appeal.

Because the trial court properly granted appellees summary
judgment, we affirm.

**Background**

In 2005, Daniel purchased a property and received a mortgage
loan of $526,476.[1] To evidence the loan, Daniel executed
a note promising to repay the loan amount plus interest. He
secured the loan with a deed of trust, which he and Lisa
executed. The note required Daniel to make regular monthly
payments beginning October 1, 2005 and continuing on the
first day of each month thereafter until September 1, 2035.
The deed of trust contemplated foreclosure if the Ybarras did
not comply with their obligations and failed to cure a default.

[1]    He also obtained a second loan, but that loan is not
       relevant to this lawsuit.

The deed of trust provided that Mortgage Electronic
Registration Systems (MERS) would serve as the deed's
beneficiary and the nominee for Lender and Lender's
successors and assigns.[2] The deed made clear that MERS's
assignee would become the deed's beneficiary: it stated that
MERS "and the successors and assigns of MERS" would be
the "beneficiary of this Security Instrument."

[2]    It lists the initial Lender as Ameripro Funding Inc.

Moreover, the deed made clear that MERS (and its assigns)
had the right to foreclose on and sell the Property: "if
necessary to comply with law or custom, MERS (as nominee
for Lender and Lender's successors and assigns) has the
right: to exercise any or all of those interests, including,
but not limited to, *the right to foreclose and sell the
Property*." (emphasis added). This deed of trust was recorded
on August 11, 2005 in the Official Records of Harris County,
Texas.

As time went by, MERS exercised its right to assign its
interest. Specifically, in 2012, MERS assigned its interest to
U.S. Bank, N.A. (successor trustee to Wachovia Bank, N.A.),
as Trustee for the 2005–H Trust. In the assignment, MERS

stated that it was granting, selling, assigning, transferring, and conveying:

> all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Mary Ann Hierman (listed as Assistant Secretary of MERS) signed and recorded the assignment.

In addition to the lender (and its nominee), the loan had a servicer. A "mortgage servicer" is "the last person to whom a mortgagor has been instructed by the current mortgagee to send payments for the debt secured by a security instrument." TEX. PROP. CODE § 51.0001(3). Bank of America, N.A. serviced the mortgage loan at issue at the time of the assignment, and it continued to do so until July 1, 2013, when Nationstar began servicing the loan.

**\*2** While Nationstar was servicing the loan, the Ybarras defaulted on their loan payments. After some back and forth, the Ybarras received a "Notice of Foreclosure Sale" notifying them that, on November 4, 2014, U.S. Bank (as Trustee for the 2005–H Trust) and Nationstar intended to sell their property. The Ybarras then sued appellees Ameripro, U.S. Bank (as Trustee for the 2005–H Trust), Bank of America, N.A., Nationstar, and MERS, seeking to enjoin the sale, disputing the appellees' standing to foreclose, and asserting numerous additional causes of action including claims for fraud, breach of contract, violations of section 12.002 of the Texas Civil Practice and Remedies Code, and negligence per se. [3]

[3]    The crux of the Ybarras' claims on appeal are directed at U.S. Bank (as Trustee for the 2005–H Trust); MERS, the predecessor in interest to U.S. Bank; and Nationstar acting on behalf of the 2005–H Trust. The Ybarras asserted additional claims in their petition on which the trial court granted summary judgment. Because the Ybarras have not challenged the trial court's ruling on those claims on appeal, we do not address them here.

Ameripro, U.S. Bank (as Trustee for the 2005–H Trust), Nationstar, and MERS filed a no-evidence and traditional summary judgment motion on the Ybarras' claims. Bank of America, N.A. also moved separately for summary judgment. The trial court granted both summary judgment motions and dismissed all of the Ybarras' claims.

### Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we uphold the trial court's judgment if any of the grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When reviewing a traditional summary judgment motion, we must determine whether the movant met its burden to establish that (1) no genuine issue of material fact exists, and (2) the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Provident Life and Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). To prevail on a no-evidence motion for summary judgment, the movant must establish that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App. —Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

### Discussion

The Ybarras argue that they raised a fact issue with regard to their claims that appellees (1) lacked standing to foreclose; (2) breached the parties' contract; (3) committed fraud; (4) violated section 12.002 of the Texas Civil Practice & Remedies Code (prohibiting the recording of fraudulent liens); and (5) committed negligence per se. We address

each of these points in turn and conclude that the trial court properly granted summary judgment on the Ybarras' claims.

### Standing to Foreclose

This case focuses in large part on the Ybarras' argument that appellees lacked standing to foreclose on the Ybarras' property. In particular, the Ybarras argue that none of the appellees had an enforceable interest in the Ybarras' property because the alleged transfers of interest in the property were invalid. Thus, they contend, the foreclosing parties lacked standing to foreclose. We disagree.

### A. Applicable Law

**\*3**  Chapter 51 of the Texas Property Code governs the type of foreclosure sale at issue here. *See* TEX. PROP. CODE § 51.002 (addressing non-judicial sale of real property under power of sale conferred by deed of trust or other contract lien); *see also Morlock, L.L.C. v. Nationstar Mortg., L.L.C.*, 447 S.W.3d 42, 47 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under Chapter 51, a "mortgagee" or "mortgage servicer" may conduct foreclosure proceedings. *See* TEX. PROP. CODE §§ 51.0001(3), (4); 51.002; 51.0025. [4]

[4]       "A mortgage servicer may administer the foreclosure of property under Section 51.002 on behalf of a mortgagee ...." TEX. PROP. CODE § 51.0025.

Relevant here, Chapter 51 defines "mortgagee" to include a beneficiary of the deed of trust as well as the last person to whom the deed was assigned of record. *See id.* § 51.0001(4). In particular, the statute defines "mortgagee" as "(A) the grantee, beneficiary, owner, or holder of a security instrument; (B) a book entry system; or (C) if the security interest has been assigned of record, the last person to whom the security interest has been assigned of record." *See id.*; *Nationstar*, 447 S.W.3d at 47. It defines "security instrument" as "a deed of trust, mortgage, or other contract lien on an interest in real property." *See* TEX. PROP. CODE § 51.0001(6).

When an assignee of the security interest tries to foreclose, the mortgagor has limited ability to prevent foreclosure by challenging the assignment. *Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015). Specifically, an obligor who is not a party to an assignment or a third-party beneficiary of the assignment cannot defend against

an assignee's efforts to enforce an obligation (here, through foreclosure) on a ground that renders the assignment merely voidable at the election of the assignor—rather than void. *See Morlock, L.L.C. v. Bank of N.Y.*, 448 S.W.3d 514, 517 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Ferguson*, 802 F.3d at 780; *Reinagel v. Deutsche Bank Nat'l Tr. Co.*, 735 F.3d 220, 225 (5th Cir. 2013). An obligor may defend, however, on an allegation that an assignment was void. *Reinagel*, 735 F.3d at 225.

This is because an attempted assignment that is merely "voidable" is valid and effective *unless and until* a party entitled to avoid it takes steps to disaffirm it. *Neese v. Lyon*, 479 S.W.3d 368, 378 (Tex. App.—Dallas 2015, no pet.) (emphasis added). Thus, an obligor who is not entitled to void an assignment cannot escape foreclosure by challenging the voidable assignment. *See Morlock*, 448 S.W.3d at 517. In contrast, an assignment that is void has no effect and does not bind any party. *See Abdullatif v. Choudhri*, ––– S.W.3d. –––, –––, No. 14-16-00116-CV, 2018 WL 1559995, at \*16 (Tex. App.—Houston [14th Dist.] Mar. 30, 2018, no pet. h.). Thus, a void assignment does not confer an interest on a purported assignee. *See Morlock*, 448 S.W.3d at 517.

### B. Analysis

The Ybarras make four allegations concerning appellees' standing. First, they contend that U.S. Bank (as Trustee for the 2005–H Trust) and its predecessor in interest, MERS, lacked standing to foreclose on their property because the assignment from MERS to the 2005–H Trust was void for noncompliance with the terms of the 2005–H Trust's Pooling Service Agreement (PSA). In other words, they contend that appellees were not properly assigned an interest, so they cannot qualify as mortgagees and foreclose on the home. Next, the Ybarras argue that U.S. Bank (as Trustee for the 2005–H Trust) lacked standing to foreclose because it did not own or hold the note (or relatedly, it did not show it paid value for the note); the assignment was the result of fraud and forgery; and the assignment was invalid for failing to identify for whom MERS acted in making the assignment.

#### 1. Alleged Noncompliance with Pooling Service Agreement

**\*4**  The Ybarras first argue that the purported assignment to U.S. Bank (as Trustee for the 2005–H Trust) was void because it violated the 2005–H Trust's Pooling Service Agreement (PSA). Specifically, they contend that the assignment did not go through the requisite chain of parties in the time-

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 515 of 520
PageID: 9436

Ybarra v. Ameripro Funding, Inc., Not Reported in S.W. Rptr. (2018)

2018 WL 8 295©12©

period provided for in the Trust's PSA. The Ybarras assert that the allegedly void assignment did not legally transfer any interest into the 2005–H Trust, so U.S. Bank (as Trustee for the 2005–H Trust), "the purported mortgagee," did "not have the requisite title, perfected security interest or standing to proceed in a foreclosure."

The problem with this argument is that the Ybarras may not avoid foreclosure through a claim that would render the assignment merely voidable, but not void. *Morlock,* 448 S.W.3d at 517; *Ferguson,* 802 F.3d at 781. At best, however, this PSA claim would render the assignment voidable.

To begin, Ybarras are not parties to the PSA; nor do they contend that they are third-party beneficiaries of the PSA. They also presented no evidence that the parties to the PSA intended to benefit them. *See Basic Cap. Mgmt., Inc. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 900 (Tex. 2011) (Texas law presumes "that parties contracted for themselves ... unless it 'clearly appears' that they intended a third party to benefit from the contract"). Accordingly, they may not enforce the PSA's terms. *See, e.g., South Tex. Water Auth. v. Lomas,* 223 S.W.3d 304, 306 (Tex. 2007) ("A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit."); *Morlock,* 448 S.W.3d at 517 ("[A]s a nonparty to the transaction, Morlock lacks standing to claim that the assignment from MILA to Countrywide was executed without authorization."); *see also Ferguson,* 802 F.3d at 781–82; *Reinagel,* 735 F.3d at 228.

Moreover, even if we were to assume that the assignment violated the PSA, the Ybarras would have shown only that the assignment was voidable—that one entitled to do so could sue for breach of the PSA. They have not shown that a purported breach of the PSA would render the assignment void.[5] *See, e.g., Morlock,* 448 S.W.3d at 517 (challenge that assignment was unauthorized or even procured by fraud would render assignment voidable not void; forgery, by contrast, voids the assignment); *Ferguson,* 802 F.3d at 781–82 ("[Mortgagors] posit that the assignment to BNY was void because it violated the Trust's PSA. Our decision in *Reinagel* directly defeats that argument under Texas law."); *see also Reinagel,* 735 F.3d at 228.

[5]    Even if the Ybarras had standing to enforce the PSA as intended third-party beneficiaries, their cause of action would be for breach of the PSA, and the assignment would still be voidable but not void.

*Ferguson v. Bank of New York Mellon Corp.,* 802 F.3d 777, 781 (5th Cir. 2015).

The Fifth Circuit has addressed this question under Texas law and has come to the same conclusion. For instance, in *Ferguson,* the Fifth Circuit explained that "home-loan borrowers—such as the Fergusons—had no standing under Texas law to enforce a PSA because they were neither parties to the PSA nor intended third-party beneficiaries under it." 802 F.3d at 782. The Court also stated, even if the borrowers had standing to enforce the PSA as intended third-party beneficiaries, their cause of action would be for breach of the PSA, and the assignment would thus be voidable but not void. *Id.* "Therefore, the borrowers lacked standing under Texas law to challenge the lender's efforts to foreclose on the ground that it violated the PSA." *Id.; see also Reinagel,* 735 F.3d at 228 (similar); *Sigaran v. U.S. Bank Nat'l Ass'n,* 560 F. App'x 410, 413 (5th Cir. 2014) (similar).

**\*5** Because potential noncompliance with the PSA would render the assignment merely voidable, the Ybarras cannot defeat foreclosure through their argument that the assignment violated the PSA. *Morlock,* 448 S.W.3d at 517; *Ferguson,* 802 F.3d at 781–82; *Reinagel,* 735 F.3d at 225.

### 2. Owner and Holder of the Note

Next, the Ybarras argue that U.S. Bank (as Trustee for the 2005–H Trust) lacked standing to foreclose because it was not the owner or holder of the note.

Our Court has previously rejected the Ybarras' argument. Our precedent holds that, in Texas, "a deed of trust may be enforced by the mortgagee, regardless of whether the mortgagee also holds the note." *Morlock,* 448 S.W.3d at 518 ("Since the Bank proved that it is the owner of the deed of trust, it established its interest in the property and right to foreclose as a matter of law regardless of whether it was also a holder or the owner of the note."). Our sister court is in accord. *See Nationstar,* 447 S.W.3d at 47 ("Morlock's allegation that Nationstar is not the owner or holder of the Note is irrelevant with respect to Nationstar's right to enforce the Deed of Trust through non-judicial foreclosure"); *see also Martins v. BAC Home Loans Servicing, L.P.,* 722 F.3d 249, 255 (5th Cir. 2013) (similar).

Here, too, MERS and its assigns (i.e., U.S. Bank as Trustee for the 2005 H–Trust) were entitled to foreclose based on the deed of trust. MERS–which was identified in the deed as its beneficiary–qualified as a mortgagee under Chapter 51. TEX.

Ybarra v. Ameripro Funding, Inc., Not Reported in S.W. Rptr. (2018)

Case 1:19-md-02875-RMB-SAK    Document 520-7    Filed 07/17/20    Page 516 of 520
PageID: 9437

201 WL 8 295©12©

PROP. CODE § 51.0001(4). Texas law and the deed granted MERS the ability to foreclose. The deed permitted MERS to assign its interests, and the assignment, in turn, assigned "all beneficial interest under that certain Deed of Trust ... and all rights accrued or to accrue under said Deed of Trust." The deed also made clear that MERS's assigns would be the deed's beneficiaries. Thus, through MERS's assignment, the 2005–H Trust (along with U.S. Bank, as Trustee for the 2005–H Trust) gained standing to foreclose. *See Morlock*, 448 S.W.3d at 518; *Nationstar*, 447 S.W.3d at 47. [6]

[6]  In light of our conclusion here, we need not address the Ybarras' additional arguments concerning the note, including its assertion that the 2005–H Trust failed to show it paid value for the note.

### 3. Fraud and Forgery

The Ybarras' fraud and forgery contentions are also unavailing. The Ybarras allege that the assignment from MERS to U.S. Bank was void because Mary Ann Hierman's signature on the assignment was invalid, so the assignment was the result of fraud and forgery. In support of this contention, the Ybarras assert that a review of different signatures of Mary Ann Hierman shows that some are identical but others are not. The Ybarras argue that this creates a genuine issue of material fact as to whether the 2012 Assignment was a forgery.

As an initial matter, to the extent the Ybarras claim is one for fraud rather than forgery, they cannot defeat foreclosure on this basis. Under Texas law, "[d]eeds procured by fraud are voidable only, not void." *Morlock*, 448 S.W.3d at 517 (quoting *Nobles v. Marcus,* 533 S.W.2d 923, 926 (Tex. 1976) ). [7] For the reasons explained above, the Ybarras cannot defeat foreclosure by arguing that the assignment was voidable, rather than void.

[7]  When someone without authorization signs a conveyance on behalf of a grantor, for instance, the fraud action to set aside the voidable assignment belongs to the grantor–not a third-party. *Morlock, L.L.C. v. Bank of N.Y.,* 448 S.W.3d 514, 517 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Nobles v. Marcus,* 533 S.W.2d 923, 926–27 (Tex. 1976) ).

**\*6** Nevertheless, "[a] forged deed is void." *Vazquez v. Deutsche Bank Nat'l Trust Co., N.A.*, 441 S.W.3d 783, 787–88 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Thus, if the assignment was forged–if it was signed by one who purported to act as another–the assignment would be void. *See Morlock*, 448 S.W.3d at 517.

The Ybarras have failed to make the necessary showing to defeat summary judgment on their forgery claim. They offered no evidence—just their unsubstantiated suspicion—that the assignment was forged. For example, they offered no testimony from Mary Ann Hierman, an expert, or any other person to support their contention that Hierman did not execute this assignment. They offered no evidence on whether she did or did not execute (or authorize the execution of) any document they reference. And they offered no evidence that someone else signed Hierman's name on this assignment, purporting to be her. Their mere unsubstantiated allegation that Hierman's signature may look different on distinct documents does not create a fact issue (or constitute some evidence) as to whether *this* assignment was forged. *See Worthing v. Deutsche Bank Nat'l Trust Co. for Agent Sec. Inc.*, 545 S.W.3d 127, 134–36 (Tex. App.—El Paso, no pet.) (rejecting mortgagors' claims that assignment of deed was forged and thus void where mortgagors failed to meet their burden of presenting evidence of forgery or explaining how submitted evidence supported forgery allegation); *see also Chance v. CitiMortgage, Inc.*, 395 S.W.3d 311, 315–16 (Tex. App.—Dallas 2013, no pet.) ("[M]ere speculation or conjecture regarding the authenticity of the signature cannot defeat competent summary judgment evidence."); *Reinagel*, 735 F.3d at 227 (Texas recognizes typed or stamped signatures—and presumably also scanned signatures—so long as they are rendered by or at the direction of the signer); *Rodriguez v. Bank of Am., N.A.*, No. SA-12-CV-00905-DAE, 2013 WL 1773670, at \*6 (W.D. Tex. Apr. 25, 2013) ("Even if Ms. Slee worked as part of a 'document mill' and had different signature variations, as long as MERS was aware of this and did not object to it, the assignment—though perhaps fraudulent—would not rise to the level of a forgery and thus would be voidable, not void.... Plaintiff's allegations that Ms. Slee merely lacked authority to sign on behalf of MERS would render the assignment merely voidable."), *aff'd*, 577 F. App'x 381 (5th Cir. 2014).

### 4. Identification

Finally, the Ybarras challenge the assignment from MERS to U.S. Bank (as Trustee for the 2005–H Trust) as "completely unclear" because it failed to identify "for whom MERS [was] acting i[n] its capacity as the 'nominee' for Ameripro or [Ameripro's] successors or assigns." The Ybarras have presented no evidence or authority–nor have we found any–to

201WL 8 295©12©

support their position that MERS's assignment here was void ab initio on this basis. [8]

[8]    Notably, the 2012 assignment of the deed of trust identifies Ameripro Funding, Inc. as the original lender.

Federal courts addressing similar arguments have rejected them. *See e.g.*, *Bynane v. Bank of N.Y. Mellon*, No. H-15-2901, 2015 WL 8764272 (S.D. Tex. Dec. 15, 2015) ("Plaintiff argues that because MERS held the Note only as a nominee, and because the Assignment does not identify for whom MERS was a nominee, Plaintiff has validly pleaded that the Assignment in this case is void *ab initio* for lack of the essential elements of a contract, that is two identifiable real parties in interest. Plaintiff's argument is without merit, factually and legally.") (internal citations omitted); *Morgan v. Gov't Nat'l Mortg. Ass'n*, No. H-15-1803, 2016 WL 3058301, at \*4 (S.D. Tex. May 31, 2016) ("[T]he deed of trust indicates that MERS could exercise the rights granted to the lender by the deed of trust. Morgan agreed to this when he signed the deed of trust. There was no need to identify the lender in the assignment.") (internal citations omitted). [9]

[9]    To the extent the Ybarras' claims are directed at Nationstar, Nationstar qualifies as a servicer under Chapter 51 and could foreclose on behalf of the mortgagee, U.S. Bank (for the 2005–H Trust). *See* TEX. PROP. CODE § 51.0025.

Breach of Contract

 **\*7**  The Ybarras argue in the alternative that they raised a genuine issue of fact on whether the appellees breached the deed of trust. We disagree.

**A. Applicable Law**

"The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 196 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ).

**B. Analysis**

The Ybarras argue the 2005–H Trust breached the deed of trust by relying "on an assignment that was void *ab initio* (the 2012 Assignment) and invalid endorsements, impairing their standing under both Texas statute and the Deed of Trust." The gravamen of the Ybarras' breach of contract claim thus hinges on their contentions that appellees lacked standing to foreclose and that the assignment was void. But we have already rejected these arguments. The Ybarras failed to raise a fact issue on this basis to support their breach of contract claim.

The Ybarras also argue that the 2005–H Trust breached the deed of trust because the deed required the foreclosing party to be a "lender," but, they contend, the 2005–H Trust was not a lender under its terms. The deed refutes that argument. The deed identified MERS and MERS's assigns as its beneficiary, and it provides that, as *nominee* for the lender and lender's successors and assigns, MERS (the predecessor in interest to U.S. Bank, which was Trustee for the 2005–H Trust) had the right to foreclose.

The trial court did not err in granting summary judgment on the Ybarras' breach of contract claim.

Fraud

The Ybarras next allege that the trial court erred in granting summary judgment on their fraud claim. It did not.

"A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

For their fraud claims to survive summary judgment, the Ybarras were required to put forth some evidence that the defendants knowingly or recklessly made a false misrepresentation. The Ybarras did not do so.

The alleged material misrepresentation the Ybarras identify was Nationstar's and the 2005–H Trust's purported representation that "they had title to the Property at the time

[they] filed the 2014 Notice of Sale" and "[t]his representation was aided by the 2012 Assignment previously filed by BANA." But the Ybarras produced no evidence that the appellees knowingly or recklessly misrepresented their rights in the Notice of Foreclosure Sale (or in or by the 2012 assignment).[10]

[10]    The Notice of Foreclosure Sale provides that "Nationstar Mortgage, LLC, is acting as Mortgage Servicer for the Mortgagee of the Note and Deed of Trust associated with the above-referenced loan." It further states that "Nationstar Mortgage, LLC, as Mortgage Servicer, is representing the Mortgagee ... Bank of America Funding Corporation Mortgage Pass–Through Certificates, Series 2005–H, U.S. Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association, as Trustee," and notes that MERS was the original mortgagee (as nominee for the lender, Ameripro Funding, Inc.).

**\*8** The trial court did not err in granting summary judgment on the Ybarras' breach of contract claim.

### Texas Civil Practice & Remedies Code § 12.002

We are likewise unpersuaded by the Ybarras' argument that they defeated summary judgment on their section 12.002 claim.

### A. Applicable Law
Section 12.002 of the Texas Civil Practice & Remedies Code provides that "[a] person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer: (A) physical injury; (B) financial injury; or (C) mental anguish or emotional distress.[11]

TEX. CIV. PRAC. & REM. CODE § 12.002(a).

[11]    "Court record" has the same meaning as assigned in section 37.01 of the Penal Code. TEX. CIV. PRAC. & REM. CODE § 12.001(1); *see* TEX. PENAL CODE § 37.01(1) (" 'Court record' means a decree, judgment, order, subpoena, warrant, minutes, or other document issued by a court."). " 'Lien' means a claim in property for the payment of a debt and includes a security interest." TEX. CIV. PRAC. & REM. CODE § 12.001(3).

### B. Analysis
The Ybarras argue that appellees violated Texas Civil Practice and Remedies Code section 12.002 because they recorded MERS's 2012 assignment of the deed of trust, knowing that it was fraudulent, with the intent that the assignment be given legal effect, and with the intent to cause the Ybarras financial injury.

Even if we were to assume without deciding that the assignment of the deed of trust fell within the definition of a "court record" or "lien" as those terms are defined in section 12.001, the Ybarras have not established the necessary elements of their claim. To begin, the Ybarras' theory is premised on their argument—which we already rejected— that the assignment was void. *See Ferguson*, 802 F.3d at 783 (rejecting a similar argument).

In any event, the Ybarras failed to present any evidence that the assignment was executed with the intent to cause them to suffer physical injury, financial injury, or mental anguish. *See Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 897 (Tex. App.—Dallas 2008, no pet.) (affirming grant of summary judgment on debtor's section 12.002 claim where record had no evidence that appellees intended to cause debtor financial injury); *see also Lassberg v. Bank of Am., N.A.*, 660 F. App'x 262, 268–69 (5th Cir. 2016) (affirming grant of summary judgment on mortgagor's section 12.002 claim when mortgagor provided no evidence of how assignment of deed of trust or appointment of substitute trustees were executed with intent to cause mortgagor injury).

Ybarra v. Ameripro Funding, Inc., Not Reported in S.W. Rptr. (2017)

201W.L 8 295©12©

The trial court did not err in granting appellees summary judgment on the Ybarras' section 12.002 claim.

Negligence Per Se

**\*9** Finally, the Ybarras argue that they raised a fact issue with regard to their negligence per se claim. They also argue that their claim is not time-barred.

**A. Applicable Law**

**1. Negligence Per Se**

"Negligence per se applies when the courts have determined that the violation of a particular statute is negligence as a matter of law." *Trevarthen v. U.S. Bank Nat'l Ass'n,* No. A-13-CA-154-SS, 2013 WL 12099974, at \*3 (W.D. Tex. Apr. 29, 2013), *aff'd, Trevarthen v. U.S. Bank Nat. Ass'n,* 551 F. App'x 148 (5th Cir. 2014) (citation omitted). To establish negligence per se, a plaintiff must prove that: (1) the defendant's act or omission is in violation of a statute or ordinance; (2) the injured person was within the class of persons which the ordinance was designed to protect; and (3) the defendant's act or omission proximately caused the injury. *Miranda v. TriStar Convenience Stores, Inc.,* No. 01-11-01073-CV, 2013 WL 3968337, at \*6 (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.) (mem. op.) (citing *Ambrosio v. Carter's Shooting Ctr., Inc.,* 20 S.W.3d 262, 265 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ).

**2. Texas Local Government Code § 192.007**
Chapter 192 of the Texas Local Government Code provides guidelines for "instruments to be recorded by counties." TEX. LOCAL GOV'T CODE §§ 192.001–007. Section 192.007(a) states that "[t]o release, transfer, assign, or take another action relating to an instrument that is filed, registered, or recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded." TEX. LOCAL GOV'T CODE § 192.007(a).

**B. Analysis**
In their petition, the Ybarras assert that appellees violated section 192.007 of the Texas Local Government Code "by failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or

caused to be filed, registered, or recorded in the deed records of Texas in the same manner as the original instrument was required to be filed, registered, or recorded." They contend that this alleged statutory violation constituted negligence per se.

Even if we were to assume a statutory violation (we make no such finding) and that the Ybarras' claim is not time-barred, the Ybarras present no authority supporting their contention that an alleged violation of section 192.007 would support a claim for negligence per se. *See Louisiana–Pac. Corp. v. Knighten,* 976 S.W.2d 674, 675 (Tex. 1998); *Burgess v. Bank of Am., N.A.,* Cv. No. 5:14-CV-00495-DAE, 2014 WL 5461803, at \*12 (W. D. Tex. Oct. 27, 2014) (plaintiff failed to state a claim for negligence per se based on alleged violation of section 192.007); *Trevarthen,* 2013 WL 12099974, at \*3 (rejecting negligence per se claim based on violation of section 192.007, concluding that statutory violation claim fails and "there is simply no indication" that this statute establishes "a specific standard of conduct different from the common-law standard of ordinary care"); *see also Williams v. Sadrudeen,* No. 01-98-00851-CV, 1999 WL 447606 (Tex. App.—Houston [1st Dist.] June 17, 1999, pet. denied) ("Not every violation of a statute or administrative rule forms a basis for negligence per se.").

**\*10** We cannot conclude that the trial court erred in granting appellees summary judgment on the Ybarras' negligence per se claim.

\* \* \*

Because we conclude the trial court properly granted appellees summary judgment on all of the Ybarras' claims, we overrule the Ybarras' issues on appeal. [12]

[12]    For the same reasons, Bank of America N.A. (the mortgage servicer before Nationstar) and Ameripro (the original lender) were entitled to summary judgment on the related claims against them.

**Conclusion**

We affirm the judgment of the trial court.

**All Citations**

Not Reported in S.W. Rptr., 2018 WL 2976126

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---