# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## COMPENDIUM OF UNREPORTED CASES CITED IN THE WHOLESALER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS AND COMPENDIUM OF CHARTS

| Tab | Unreported Case |
|-----|-----------------|
| 1 | *Avram v. Samsung Electronics America, Inc.*, <br> No. 2:11-6973, 2013 WL 3654090 (D.N.J. July 11, 2013) |
| 2 | *Barker v. Dicicco*, <br> 2002 Mich. App. LEXIS 2252, 2002 WL 31956978 (Mich. App. 2002) |
| 3 | *Bimbo Bakeries USA, Inc. v. Pinckney Molded Plastics, Inc.*, <br> No. 4:06-CV-180-A, 2007 WL 836874  (N.D. Tex. Mar. 20, 2007) |
| 4 | *Bland v. Abbott Labs., Inc.*, <br> No. 3:11-CV-430-H, 2012 WL 32577 (W.D. Ky. Jan. 6, 2012) |
| 5 | *Bono v. O'Connor*, <br> No. 15-6326 (FLW), 2016 U.S. Dist. LEXIS 185713 (D.N.J. Oct. 5, 2016) |
| 6 | *Bowman v. RAM Med., Inc.*, <br> No. I O-CV-4403 DMC MF, 2012 WL 1964452 (D.N.J. May 31, 2012) |
| 7 | *Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.)*, <br> Nos. MDL-1703, 05 C 4742, 05 C 2623, 2006 U.S. Dist. LEXIS 92169 (N.D. Ill. Dec. 18, 2006) |
| 8 | *In re: Cheerios Mktg. & Sales Practices Litig.*, <br> 2012 U.S. Dist. LEXIS 128325 (D.N.J. Sep. 10, 2012) |
| 9 | *Crosby v. Georgakopoulos*, <br> 2005 U.S. Dist. LEXIS 32238 (D.N.J. June 24, 2005) |
| 10 | *Fireworks Lady & Co., LLC v. Firstrans Int'l Co.*, <br> No. CV 18-10776-CJC (MRWx), 2019 U.S. Dist. LEXIS 209935 (C.D. Cal. Aug. 8, 2019) |
| 11 | *Gariety v. Thornton*, <br> No. 1:02-0344, 2006 U.S. Dist. LEXIS 114864 (S.D. W. Va. May 19, 2006) |
| 12 | *Greencort Condo. Ass'n v. Greencort Partners*, <br> No. 04045 JAN.TERM 2004, 2004 WL 1088758 (Pa. Com. Pl. Apr. 30, 2004) |
| 13 | *Henderson v. Hertz Corp.*, <br> No. A-3776-03, 2005 WL 4127090 (N.J. Super. Ct. App. Div. 2005) |

| Tab | Unreported Case |
| --- | --- |

14    *Hoffman v. Cogent Sols. Grp., LLC*,
     2013 U.S. Dist. LEXIS 176056 (D.N.J. 2013)

15    *Hoffman v. Nutraceutical Corp.*,
     No. CIV.A. 12-5803 ES, 2013 WL 2650611 (D.N.J. June 10, 2013)

16    *Kostyszyn v. Martuscelli*,
     No. CV N14C-08-010 PRW, 2015 WL 721291 (Del. Super. Ct. Feb. 18, 2015)

17    *Latraverse v. Kia Motors of Am., Inc.*,
     No. 10-6133 (RBK/AMD), 2011 WL 3273150 (D.N.J. July 27, 2011)

18    *McCamon-Hunt Ins. Agency, Inc. v. Med. Mut. of Ohio*,
     No. 07 MA 94, 2008 WL 4444631 (Ohio Ct. App. Sept. 26, 2008)

19    *In re: McNeil Consumer Healthcare, et al., Marketing and Sales Litig.*,
     MDL No. 2190, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854 (E.D. Pa.
     July 15, 2011)

20    *Nazari v. Kohler Co.*,
     No. 07-50188, 2008 U.S. App. LEXIS 21531 (5th Cir. Oct. 13, 2008)

21    *Ortiz v. McNeil-PPC, Inc.*,
     No. 07cv678-MMA(CAB), 2009 U.S. Dist. LEXIS 142628 (S.D. Cal. Mar. 6,
     2009)

22    *Pender v. Bank of Am., NA*,
     No. 3:05-CV-00238-GCM, 2016 U.S. Dist. LEXIS 34919 (W.D.N.C. Mar. 10,
     2016)

23    *Pfs Distribution Co. v. Raduechel*,
     No. 4-04-CV-10329, 2005 U.S. Dist. LEXIS 57648 (S.D. Iowa Aug. 30, 2005)

24    *Red Fox Future, LLC v. Holbrooks*,
     2014 NCBC 8, 68-69, 2014 NCBC LEXIS 8, 2014 WL 1213235

25    *Regent at Town Ctr. Homeowners' Ass'n v. Oxbow Constr., LLC*,
     419 P.3d 702, 2018 WL 2431690 (Nev. May 24, 2018)

| Tab | Unreported Case |
|-----|-----------------|
| 26 | *Ruiz v. Wintzell's Huntsville, L.L.C.*, No. 5:13-cv-02244-MHH, 2017 U.S. Dist. LEXIS 159547 (N.D. Ala. Sep. 28, 2017) |
| 27 | *Scansource, Inc. v. Datavision-Prologix, Inc., et al.*, No. Civ.A. 04-CV-4271, 2005 WL 974933 (E.D. Pa. Apr. 26, 2005) |
| 28 | *Sherfey v. Johnson & Johnson*, No. 12-4162, 2014 U.S. Dist. LEXIS 57735 (E.D. Pa. Apr. 25, 2014) |
| 29 | *Solo v. Bed Bath & Beyond, Inc.*, Civ. 06–1908(SRC), 2007 WL 1237825 (D.N.J. Apr. 26, 2007) |
| 30 | *Teater v. Pfizer, Inc.*, No. 3:05-cv-00604-HU, 2013 U.S. Dist. LEXIS 79629 (D. Or. May 13, 2013) |
| 31 | *Thomas v. Brown & Williamson Tobacco Corp.*, 2006 U.S. Dist. LEXIS 28261 (W.D. Mo. Apr. 28, 2006) |
| 32 | *Thompson v. Bayer Corp.*, No. 4:07CV00017 JMM, 2009 U.S. Dist. LEXIS 15190 (E.D. Ark. Feb. 12, 2009) |
| 33 | *Total Office Sols., Inc. v. Grimstad*, No. 18 CO 0014, 2019 WL 2721216 (Ohio Ct. App. June 27, 2019 |
| 34 | *White v. State Farm Mut. Auto. Ins. Co.*, No. A-94-405., 1995 Neb. App. LEXIS 284 (Ct. App. Sep. 5, 1995) |
| 35 | *Witriol v. Conexant Syst.*, 2006 WL 3511155 (D.N.J. Dec. 4, 2006) |
| 36 | *Wong v. Chan*, No. 11-P-867, 2012 WL 1557240 (Mass. App. Ct. 2012) |

# Tab 1

KeyCite Yellow Flag - Negative Treatment

Distinguished by Schwartz v. Vizio, Inc., C.D.Cal., May 23, 2017

2013 WL 3654090

United States District Court, D. New Jersey.

Lynne AVRAM, on behalf of herself and
all others similarly situated, Plaintiff,

v.

SAMSUNG ELECTRONICS
AMERICA, INC., et al., Defendants.

Margaret Lark, on behalf of herself and
all others similarly situated, Plaintiff,

v.

Samsung Electronics America,
Inc., et al., Defendants.

Civ. Nos. 2:11–6973(KM), 2:12–976(KM).
|
July 11, 2013.

**Attorneys and Law Firms**

Antonio Vozzolo, Christopher Marlborough, Faruqi & Faruqi, LLP, New York, NY, Caroline F. Bartlett, Carella Byrne, James E. Cecchi, Lindsey H. Taylor, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, Yitzchak Kopel, Bursor & Fisher PA, New York, NY, for Lynne Avram.

Benjamin F. Johns, Chimicles & Tikellis, LLP, Haverford, PA, for Margaret Lark.

James J. O'Hara, John Maloney, Joseph Christopher Brennan, Graham Curtin, P.A., Morristown, NJ, for Samsung Electronics America, Inc., et al.

**OPINION**

KEVIN McNULTY, District Judge.

**\*1** The Department of Energy (DOE) Energy Star program permits manufacturers of appliances, including refrigerators, to affix a label indicating that the appliance meets certain standards of energy efficiency. Such appliances, Plaintiffs allege, cost more to purchase, but supposedly save money in the long run by reducing electricity bills. Lynne Avram and Margaret Lark, putative class action plaintiffs in these consolidated actions, each bought refrigerator model RF26VAB, manufactured by Defendant Samsung Electronics America, Inc. ("Samsung"), from Defendant Lowe's Home Centers, Inc. ("Lowe's"). At the time of purchase, the refrigerators bore the Energy Star label. Sometime thereafter, however, DOE determined that this refrigerator model did not meet the Energy Star program's requirements. Avram and Lark allege that they therefore have not received what they paid for. They assert causes of action for breach of express warranty, breach of the implied warranty of merchantability, violation of the Magnuson–Moss Warranty Act, violation of the Maryland and New Jersey consumer fraud statutes, and unjust enrichment.

Now before the court are the motions of Samsung and Lowe's to dismiss each complaint. Defendants argue that the warranty claims are preempted by the Energy Policy and Conservation Act and that the Complaints' allegations are otherwise insufficient as a matter of law.

Samsung and Lowe's motions to dismiss are granted in part and denied in part. Specifically, I will dismiss (1) Avram's claim of breach of the implied warranty of merchantability against Samsung; (2) the claims of violation of the state consumer fraud statutes; and (3) the unjust enrichment causes of action against Samsung. The rest of the claims survive.

**I. BACKGROUND** [1]

[1]  The allegations of the Complaints have not yet been tested by any fact finder. This discussion, as it must, assumes their truth solely for the purpose of analyzing Defendant's Rule 12(b)(6) motion. *See* pp. 6–7, *infra.*

**A. The Energy Star Program**

The Energy Policy and Conservation Act of 1975 (the "ECPA"), 42 U.S.C. § 6291, *et seq.,* created an energy conservation program for major household appliances. (Avram Compl. ¶ 12 [Civ. No. 11–6973, Docket No. 1]; Lark Compl. ¶ 12 [Civ. No. 12–973, Docket No. 1] ). A few years later, the National Energy Conservation Policy Act of 1978 granted the United States Department of Energy ("DOE") the authority to establish minimum energy efficiency standards for, *inter alia,* home refrigerator-freezers. (Avram Compl. ¶ 12; Lark Compl. ¶ 12). Later, the National Appliance Energy Conservation Act of 1987 established minimum energy efficiency standards for refrigerator-freezers. (Avram Compl. ¶ 12; Lark Compl. ¶ 12).

The Energy Star program, enacted as part of the Energy Policy Act of 2005, is

> a voluntary program to identify and promote energy-efficient products and buildings in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards.

42 U.S.C. § 6294a. DOE and the Environmental Protection Agency ("EPA") jointly administer the program. *Id.* In general, to earn the Energy Star label, refrigerators and freezers must be at least 20% more energy efficient than the minimum mandated by federal law. (Avram Compl. ¶ 13; Lark Compl. ¶ 13).

**\*2** The Energy Star logo is an important marketing tool. It conveys a message that the purchaser can maximize his or her energy savings and help to protect the environment. (Avram Compl. ¶ 14; Lark Compl. ¶ 14). In essence, the consumer pays more to purchase an Energy Star-compliant appliance, but the appliance costs less to operate. (Avram Compl. ¶ 2; Lark Compl. ¶ 2).

### B. Avram's Refrigerator Purchase

Because Avram was concerned about the environment, when she shopped for a new refrigerator, she looked only at Energy Star models. (Avram Compl. ¶ 17). On June 26, 2009, Avram purchased her new refrigerator at a Lowe's retail store in Scottsdale, Arizona for $1,213.20 plus tax. (*Id.*). That purchase price included a substantial premium based on claims that the refrigerator was energy efficient and met the qualifications of Energy Star program. (*Id.*). Avram would not have purchased the refrigerator had she known it was not Energy Star-compliant. (*Id.*).

### C. Lark's Refrigerator Purchase

On November 1, 2009, Lark purchased the refrigerator at a Lowe's retail store in Maryland for about $2,100. (Lark Compl. ¶ 17; Lark Opp. at 2). That purchase price included a substantial premium based on claims that the refrigerator was energy efficient and met the qualifications of Energy Star program. (Lark Compl. ¶ 17).

### D. DOE Finds That the Refrigerators Do Not Meet the Energy Star Program's Requirements

On February 18, 2010, DOE alerted Samsung that its testing showed that the refrigerators did not meet the Energy Star efficiency requirements. (Avram Compl. ¶ 18; Lark Compl. ¶ 18). About three weeks later, on March 8, 2010, Samsung representatives met with DOE regarding the test results. (Avram Compl. ¶ 19; Lark Compl. ¶ 19). DOE permitted Samsung to submit its own test results. (Avram Compl. ¶¶ 19–20; Lark Compl. ¶¶ 19–20) In DOE's estimation, however, Samsung's testing failed to establish that the refrigerators met Energy Star standards. (Avram Compl. ¶ 20; Lark Compl. ¶ 20). On March 16, 2010, DOE sent Samsung a letter stating that the refrigerators had failed DOE tests for the Energy Star program and that Samsung had failed to rebut that conclusion. (Avram Compl. ¶ 21; Lark Compl. ¶ 21). DOE then referred the matter to EPA for appropriate action. (Avram Compl. ¶ 21; Lark Compl. ¶ 21). EPA and Samsung eventually entered into an informal, private agreement under which Samsung agreed to stop manufacturing or selling the refrigerators. (Avram Compl. ¶ 22).

As a result, Avram and Lark did not receive the benefit of the Energy Star bargain. They paid a price premium for what purported to be an Energy Star product but did not receive the energy savings they had paid for. (Avram Compl. ¶ 23; Lark Compl. ¶ 22).

### E. Avram and Lark File Class Action Complaints

On November 30, 2011, Avram filed a Complaint on behalf of herself and a class of similarly situated individuals. That Complaint alleges that Defendants' manufacture and sale of a refrigerator that falsely claimed to be Energy Star-compliant give rise to the following causes of action: breach of express warranty, breach of the implied warranty of merchantability, violations of Magnuson–Moss Warranty Act ("Magnuson–Moss") and the New Jersey Consumer Fraud Act ("NJCFA"), and unjust enrichment.

**\*3** On February 17, 2012, Lark filed a nearly identical class action complaint alleging the same causes of action, with one exception. Instead of a claim under the NJCFA, Lark's complaint alleges a violation of the Maryland Consumer Protection Act ("MCPA").

2013 WL 3654090, 81 UCC Rep.Serv.2d 48

On June 20, 2012, then-Magistrate Judge Shipp granted Lark's motion to consolidate the two cases. Subject matter jurisdiction over these consolidated actions is predicated on three grounds. Over the federal law claim, the Court has federal question jurisdiction. 28 U.S.C. § 1331. Over the related state law claims, the Court has supplemental jurisdiction. 28 U.S.C. §§ 1367. Finally, because the Complaint alleges that there are over 100 class members, the aggregate amount in controversy exceeds $5 million, and at least one class member is diverse from the defendants, [2] the Court has diversity jurisdiction under 28 U.S.C. § 1332(d). Venue is proper because Samsung resides in the District of New Jersey, the Defendants do business throughout the District, and a substantial part of the events giving rise to the Plaintiffs' claims took place in New Jersey. 28 U.S.C. § 1391.

[2]     Avram is a citizen of Arizona, Lark is a citizen of Maryland, Samsung is a Delaware corporation with a principal place of business in New Jersey, and Lowe's is incorporated and has its principal place of business in North Carolina.

Prior to the consolidation order and in lieu of filing an answer, Lowe's and Samsung each moved to dismiss each complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b) (6).

## II. LEGAL STANDARDS AND BACKGROUND

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party, ordinarily the defendant, bears the burden of showing that no claim has been stated. *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005). For purposes of a motion to dismiss, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (established "reasonable inferences" principle not undermined by intervening Supreme Court case law).

In recent years, the United States Supreme Court has elaborated on the standards that a court is to apply in analyzing a Rule 12(b) (6) motion to dismiss, particularly in light of the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide

the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus the factual allegations must be sufficient to raise a plaintiffs right to relief above a speculative level, demonstrating that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal,* 556 U.S. at 678.

**\*4**  The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement,* 643 F.3d 60, 70–73 (3d Cir.2011); *Santiago v. Warminster Twp.,* 629 F.3d 121, 129–30 (3d Cir.2010); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 209–211 (3d Cir.2009). The Court of Appeals recently summarized the three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state claim for relief. *See [Iqbal,* 556 U.S.] at 675; *Argueta,* 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

*Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir.2012).

Samsung and Lowe's assert that the state consumer protection law claims sound in fraud and therefore must be pleaded with additional particularity. *See* Section III.E, *infra.* For claims of fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement, over and above that of Rule 8(a). Specifically, it requires that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P.

2013 WL 3654090, 81 UCC Rep.Serv.2d 48

9(b). "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." *Id.* That heightened pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) (internal quotation and citation omitted).

In general, "[t]o satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* "Plaintiff must also allege who made the misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.,* 361 F.3d 217, 224 (3d Cir.2004) (internal citation omitted); *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006) ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (internal quotation and citation omitted)).

**\*5** [Plaintiffs] need not, however, plead the "date, place or time" of the fraud, so long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." The purpose of Rule 9(b) is to provide notice of the "precise misconduct" with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.

*Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (quoting *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 791 (3d Cir.1984) and citing *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir.1983)).

## III. DISCUSSION [3]

[3] Avram and Lark requested permission to file a surreply brief addressing new arguments and statements requiring correction that allegedly are to be found in the Defendants' reply briefs. This District's Local Rules require leave of the Court to file a surreply. *See* L.R. 7.1(d)(6). I find

that the Defendants' reply briefs do not raise new arguments or contain statements requiring correction. Therefore I do not authorize the filing of a surreply.

Samsung and Lowe's have filed similar motions to dismiss each count of Avram's and Lark's Complaints. I address each claim in turn, and include a choice-of-law analysis for the state law claims.

### A. Preemption of Avram's and Lark's Warranty Claims

Avram and Lark assert warranty-based claims under Magnuson–Moss, as well as state-law causes of action for breach of express warranty and breach of the implied warranty of merchantability. Samsung and Lowe's argue that these claims (the "Warranty Claims") are preempted by the ECPA, as amended by the National Appliance Energy Conservation Act ("NAECA"). Specifically, they cite 42 U.S.C. § 6297(g), which provides that any disclosure of energy use, cost, or efficiency "required to be made" pursuant to ECPA does not create an express or implied warranty. I find that the claims are not preempted because the Energy Star program is voluntary. Use of the Energy Star logo is permitted, not "required," by the ECPA.

#### a. *Preemption*

"Federal preemption doctrine provides Congress with the power to preempt state legislation if it so intends." *Treasurer of New Jersey v. U.S. Dep't of Treasury,* 684 F.3d 382, 406 (3d Cir.2012). Preemption comes in three varieties: "express preemption and two types of implied preemption, field preemption and conflict preemption." *Id.* (citing *Farina v. Nokia Inc.,* 625 F.3d 97, 115 (3d Cir.2010)). Express preemption exists "when a federal enactment contains language that is explicit about its preemptive effect." *Treasurer of New Jersey,* 684 F.3d at 406. Here, Section 6297 of NAECA contains an express preemption provision, so the issue of whether NAECA preempts the warranty claims in this case is squarely presented. *Medtronic, Inc. v. Lohr,* 518 U.S. 476, 484 (1996).

The Supreme Court has counseled courts considering a preemption issue to stick close to the text of the statute, while taking two presumptions into account.

First, the court must presume "that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic,*

Avram v. Samsung Electronics America, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 3654090, 81 UCC Rep.Serv.2d 48

518 U.S. at 485. "In all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* at 485 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Conversely, the presumption against preemption may not apply where Congress's statute applies to a field that "the States have not traditionally occupied." *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 347–48, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

**\*6** Second, the court must presume "that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting *Medtronic,* 518 U.S. at 485). And "Congress' intent is, of course, primarily discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Medtronic,* 518 U.S. at 485 (quotation marks and citations omitted).

Guided by these principles, I now analyze whether Avram's and Lark's state law warranty claims are preempted by the federal statutory regime.

i. *Analysis*

NAECA includes a warranty preemption provision, which states:

> Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating costs will not be exceeded under conditions of actual use.

42 U.S.C. § 6297(g).

Hewing to the text of the provision, as I must, I find that Avram's and Lark's claims are not preempted. The Energy Star

program is voluntary; the associated disclosures of energy efficiency are not "required to be made" by statute. 42 U.S.C. § 6294a(a) (Energy Star is "a *voluntary program* to identify and promote energy-efficient products ... in order to reduce energy consumption, improve energy security, and reduce pollution through *voluntary labeling* of, or other forms of communication about, products and buildings that meet the highest energy conservation standards.") (emphasis added). Had Congress intended to preempt warranty claims as to all such disclosures, it could simply have stated that "no disclosure *made under* the provisions of this part creates a warranty." But it did not; it limited the preemptive effect to disclosures *"required to be made"* under the statute. I cannot assume that Congress's insertion of the words "required to be" was accidental, or that the words themselves are superfluous and meaningless. [4] Indeed, I can imagine a reason for it: Congress may have wished to create a safe harbor for standardized efficiency disclosures that, like automobile mileage figures, are useful for comparative purposes even if they seldom reflect what happens when the product is in use. But be that as it may, the statutory wording is clear.

[4] Of course, if the statute contained nothing but mandatory disclosure provisions, those words could be dismissed as superfluous description. But it doesn't; it is a mix of mandatory and non-mandatory provisions.

Samsung and Lowe's argue that manufacturers *are* required to affix labels to their products disclosing their energy consumption, *see* 42 U.S.C. § 6296(a) ("Each manufacturer of a covered product [including refrigerators] ... *shall* provide a label which meets, and is displayed in accordance with, the requirements of such rule.") (emphasis added). Of course, an appliance's energy consumption figures will determine whether it is Energy Star-eligible. But although manufacturers are required to disclose those energy consumption figures, they are not required to participate in the Energy Star program or to affix the Energy Star logo to their products. *See* 42 U.S.C. § 6294a(a) (Energy Star is a "voluntary program" implemented through "voluntary labeling").

**\*7** Plaintiffs' claims are not based on the energy consumption disclosures, but rather on the Energy Star logo itself. [5] This circumstance factually distinguishes other decisions that have given effect to the warranty preemption provision of Section 6297. *See Jurgensen v. Felix Storch, Inc.,* Civ. No. 12–1201, 2012 WL 2354247, at \*1 (S.D.N.Y. June

14, 2012) (subsequent DOE testing determined that "Energy Guide labels to the Freezers ... "substantially understated their energy consumption."); *Gee v. Viking Range Corp.,* Civ. No. 4:07–87, 2008 WL 4416442, at *1 (N.D.Miss. Sept.24, 2008) (claims for breach of express warranty and implied warranty of merchantability based on defect in design and energy use greater than disclosed on the label). Those cases held that breach of warranty claims based on the products' failure to live up to the manufacturers' required disclosures of energy consumption figures were preempted by NAECA. Participation in the Energy Star Program, because it is not "required," does not trigger the preemption provision.

5   Certain of Plaintiffs' claims, it is true, could be read to include claims of inefficiency in operation, in addition to claims based on the inappropriateness of the Energy Star designation. I will not, however, dismiss valid claims that are arguably overbroad.

The statutory scheme is clear. A disclosure that is "required" by Congress does not create a warranty, but one (like Energy Star) that is optional may constitute an actionable warranty. A warranty claim based on such a voluntary, non-"required" disclosure is not preempted.

### B. Breach of Express Warranty

I find that the Complaints sufficiently allege that the Energy Star logo constitutes an express warranty, which defendants breached. Any disclaimer in the user manual's Limited Warranty is ineffective; at least, it cannot be presumed effective as a matter of law for purposes of a motion to dismiss.

#### a. Choice of Law

As to the state law claims, I must consider which state's law applies, and I must do so separately as to each plaintiff, each defendant, and each claim. *See Gray v. Bayer Corp.,* Civ. No. 08–4716, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011) (Linares, J.) ("While it might be desirable for the sake of efficiency to settle upon one state, such as New Jersey, and apply its law in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class member's case before certification.") (quoting *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 457 (D.N.J.1998)).

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton,* 475 F.3d 497, 499–500 (3d Cir.2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). New Jersey uses the most significant relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA),* 793 F.Supp.2d 696, 704 (D.N.J.2011) *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.,* 709 F.3d 202 (3d Cir.2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee,* 197 N.J. 132, 144, 962 A.2d 453, 460 (2008) ( "Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 717 (D.N.J.2011) (quoting *P.V.,* 197 N.J. at 143, 962 A.2d at 453).

**\*8**  If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. For contract actions, the applicable section is Restatement § 188. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

Under New Jersey law, to state a claim for breach of express warranty, "Plaintiffs must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Snyder,* 792 F.Supp.2d at 721 (citing N.J. Stat. Ann. § 12A:2–313) (other internal citation omitted). Arizona and North Carolina law are substantially similar. See Ariz.Rev.Stat. Ann. § 47–2313 (defining an express warranty as "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain."); N.C. Gen.Stat. Ann. § 25–2–313 (same).

The parties do not identify any significant distinction among these states' laws with respect to this issue. For the purposes of the pending motions, [6] with respect to a claim of breach of express warranty, no significant conflict exists between the laws of Arizona, North Carolina and New Jersey.

Accordingly, I will apply the law of the forum state, New Jersey. *See, e.g., Snyder,* 792 F.Supp.2d at 717.

6    "Applying the factors necessary to determine choice of law for a contract or quasi-contract claim" may be "a very fact-intensive inquiry," such that the analysis sometimes is more appropriate at the class certification stage. *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 721 (D.N.J.2011). Nevertheless, "[s]ome choice of law issues may not require a full factual record and may be amenable to resolution on a motion to dismiss." *Harper v. LG Electronics USA, Inc.,* 595 F.Supp.2d 486, 491 (D.N.J.2009). This is determined issue-by-issue. *Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 700 (D.N.J.2011). These Complaints, I find, contain allegations sufficient to permit a choice-of-law determination.

**b.** *Analysis*

Avram's and Lark's allegations are straightforward: The Energy Star logo was an affirmation that the product was Energy Star compliant; they purchased the refrigerators because of the logo; and the refrigerators did not, in fact, meet the Energy Star requirements. The parties dispute, however, whether the allegations establish the first two elements of a breach of express warranty: that the seller made an affirmation or promise about the product, and that it became the basis of the bargain.

**i.** *Energy Star Logo as an Affirmation or Promise*

"A statement can amount to a warranty, even if unintended to be such by the seller, 'if it could fairly be understood ... to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.' " *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 570 (7th Cir.1993) (applying New Jersey law and quoting *Gladden v. Cadillac Motor Car Div., General Motors Corp.,* 416 A.2d 394, 396, 83 N.J. 320 (1980)). "[W]hether a given statement constitutes an express warranty is normally a question of fact for the jury." *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 721–22 (D.N.J.2011); *see also Union Ink Co., Inc. v. AT & T Corp.,* 352 N.J.Super. 617, 645, 801 A.2d 361 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact.").

*\*9* Avram's and Lark's Complaints allege that refrigerators that carry the Energy Star logo meet the program's requirements of using 20% less energy than the minimum federal standard. (Avram Compl. ¶ 2; Lark Compl. ¶ 2). The refrigerators were sold with the logo, but subsequent DOE testing revealed that they did not meet Energy Star efficiency requirements. (Avram Compl. ¶ 1; Lark Compl. ¶ 1). The Complaints sufficiently allege that, by attaching the Energy Star label to the refrigerators, Samsung and Lowe's affirmed that the refrigerators qualified for the program. *See Taylor v. JVC Americas Corp.,* Civ. No. 07–4059, 2008 WL 2242451, at *5 (D.N.J. May 30, 2008) (warranty claim sufficiently pled by allegations that packaging said the product was a "1080p" television, but television did not accept a 1080p signal).

Defendants cite two cases in which courts held that the Energy Star logo did not support a claim of breach of express warranty. I find them distinguishable.

In *Savett v. Whirlpool Corp.,* Civ. No. 12–310, 2012 WL 3780451 (N.D.Oh. Aug. 31, 2012), the court simply found that the complaint simply failed to allege any particular statement or promise that the logo conveyed. *Id.* at *9. Here, by contrast, the Complaints allege that allege that Energy Star logo conveys that the refrigerator is at least 20% more energy efficient than the minimum federal standard. [7] *Rossi v. Whirlpool Corp.,* Civ. No. 12–125, 2013 WL 1312105 (E.D.Cal. Mar. 28, 2013) applies California law in a manner that does not square with cases from this District that apply New Jersey law. *See Hemy v. Perdue Farms, Inc.,* Civ. No. 11–888, 2013 WL 1338199, at *7, *10 (D.N.J. Mar. 31, 2013) (complaint sufficiently alleges that a "humanely raised" label would be understood by consumers to encompass the slaughtering process); *Taylor, supra,* 2008 WL 2242451 at *5.

7    Avram's and Lark have, in addition, asked the court to take judicial notice of DOE survey results that show that the majority of households understand and rely on Energy Star labels when making purchasing decisions. (*See* National Awareness of Energy Star for 2011: Analysis of CEE Household Survey, Ex. C to Request for Judicial Notice at ES–1 to ES–1 [Docket No. 37–4] ). Such information might provide further support of Plaintiffs' position, but is not necessary for purposes of this motion.

Applying New Jersey law, I find that the Complaints adequately allege that the Energy Star logo would be

understood by consumers as an affirmation of fact or a promise regarding the energy efficiency of the refrigerators.

### ii. *Basis of the Bargain*

"Under New Jersey law, a representation is presumed to be part of the basis of the bargain 'once the buyer has become aware of the affirmation of fact or promise' and can be rebutted by 'clear affirmative proof that the buyer knew that the affirmation of fact or promise was untrue.' " *Viking Yacht Co. v. Composites One LLC,* 496 F.Supp.2d 462, 469 (D.N.J.2007) (quoting *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 825 (3d Cir.1999) (other internal quotation omitted)).

Samsung and Lowe's contend that the Complaints fail to allege that the Energy Star logo was part of the basis of the bargain. Avram, however, alleges that she had decided to purchase only a refrigerator that sported the Energy Star label. (Avram Compl. ¶ 17). While Lark did not limit her search in the same way, one can reasonably infer from her complaint that she knew the Energy Star label was on the refrigerator, understood its meaning, and paid a higher price based on it. (*See, e.g.,* Lark Compl. ¶ 17 (Lark's purchase of the refrigerator "included a substantial price premium due to its supposed energy efficiency and ENERGY STAR® qualification.")). Defendants did not—indeed, at this procedural stage, probably could not—rebut the allegations by proving that Avram and Lark were not in fact misled. That is not to say that such a rebuttal could not eventually be made, but, at this stage, I find that Avram and Lark have stated a claim for breach of express warranty.

### iii. *Disclaimer via Samsung's Limited Warranty*

**\*10** Only one point remains: whether Samsung successfully disclaimed the warranty. Samsung and Lowe's argue that, by offering a Limited Warranty that expressly disclaims all others, Samsung effectively negated any warranty based on the Energy Star logo.

Both the UCC and New Jersey law allow manufacturers to limit their liability (other than for personal injury) through disclaimers. *Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 630, 695 A.2d 264, 269 (1997); *see* N.J. Stat. Ann. § 12A:2–316. Such a disclaimer must be so clear and conspicuous that a reasonable purchaser would notice it. *Gladden v. Cadillac Motor Car Div.,* 83 N.J. 320, 331, 416 A.2d 394, 400 (1980).

The refrigerator's manual states that "Energy star labeled this product could save your energy costs." [*sic* ] (User Manual at 2, Ex. A to O'Hara Dec. [Docket No. 6–2] ).[8] The Limited Warranty in the manual "covers manufacturing defects in materials and workmanship encountered in normal, noncommercial use of the product." (*Id.* at 42). The Limited Warranty contains an express disclaimer: "THERE ARE NO EXPRESS WARRANTIES OTHER THAN THOSE LISTED AND DESCRIBED ABOVE.... SAMSUNG SHALL NOT BE LIABLE FOR ... FAILURE TO REALIZE SAVINGS OR OTHER BENEFITS...." (*Id.* at 43).

[8]   The Limited Warranty is not referred to in either complaint and therefore would not ordinarily be considered as part of a motion to dismiss. I nevertheless consider it, but find it ineffective as a disclaimer.

"[U]nder U.C.C. § 2–316, a warranty disclaimer inconsistent with an express warranty is inoperative." *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 570 (7th Cir.1993) (citing N.J. Stat. Ann. § 12A:2–316); *Gladden,* 83 N.J. at 330, 416 A.2d at 399. Because I have found that the Energy Star logo constitutes an express warranty, this attempt to disclaim it would be ineffective.[9] I note, too, the potential for unfairness if an express warranty is displayed to the purchaser when he parts with his money at the store, but the disclaimer appears at page 42 of a manual sealed inside the product's packaging. At best, such an alleged disclaimer would present an issue of fact. Either way, the motion to dismiss must be denied.

[9]   The Limited Warranty covers parts and labor on the refrigerator generally for one year, and on the sealed refrigeration system for five years. (*Id.* at 42). I do not reach the issue of whether these claims, if brought under the Limited Warranty, would be untimely.

### C. Breach of the Implied Warranty of Merchantability

Samsung and Lowe's argue that the implied warranty of merchantability claims should be dismissed because neither complaint adequately alleges that the refrigerators failed in their "ordinary purpose," which is to keep food cold. Avram and Lark respond that this appliance was sold as a high-efficiency refrigerator with a more particular ordinary purpose: to keep food cold *in compliance with Energy Star efficiency standards.* As to each plaintiffs claim against each

defendant, I must determine I must first determine which state's law applies. I conclude that New Jersey law governs both plaintiffs' implied warranty claims against Lowe's, as well as Lark's claim against Samsung. Avram's claim against Samsung, however, is governed by Arizona law.

*1. Avram's implied warranty claim against Samsung*
Avram, a citizen of Arizona, asserts a state law implied warranty of merchantability claim against Samsung, a citizen of New Jersey, in a New Jersey federal court.

**\*11** I must first determine which law applies—New Jersey's or Arizona's. The first step is to see whether these two states' laws conflict. *P.V. v. Camp Jaycee,* 197 N.J. 132, 144, 962 A.2d 453, 460 (2008). They do. For an implied warranty of merchantability claim, Arizona requires contractual privity, but New Jersey does not. *Compare Flory v. Silvercrest Indus.,* 129 Ariz. 574, 579, 633 P.2d 383, 388 (1981) ("economic losses are not recoverable for breach of implied warranty in the absence of privity of contract") *with Spring Motors Distributors, Inc. v. Ford Motor Co.,* 98 N.J. 555, 582, 489 A.2d 660, 674 (1985) ("We conclude that the absence of privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer.") The conflict matters because Avram (who purchased the refrigerator from Lowe's) is not in privity with Samsung (the remote manufacturer of the refrigerator).

Having established that a conflict exists, the Court must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in Section 188 of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.,* 134 N.J. 96, 102, 629 A.2d 885, 888 (1993). Those factors are: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Spence–Parker v. Delaware River & Bay Auth.,* 656 F.Supp.2d 488, 498–99 (D.N.J.2009) (citing Restatement (Second) of Conflicts § 188(2)).

Those factors point to the conclusion that Arizona law applies to Avram's claim against Samsung. Avram shopped for, purchased, installed and used the refrigerator in Arizona, where she lives. Those facts imply that the first four factors favor Arizona. The last factor—the residence and place of incorporation of the parties—is more or less neutral, in that

one party is a citizen of Arizona, and the other of New Jersey (the co-plaintiff and co-defendant are located elsewhere). Accordingly, Arizona law will apply to Avram's claim of breach of the implied warranty of merchantability as against Samsung.

Avram's implied warranty claim against Samsung falls afoul of Arizona's requirement of privity of contract. *See Flory, supra.* Privity does not exist because Avram purchased her refrigerator from Lowe's, not Samsung. (Avram Compl. ¶ 17). Accordingly, her breach of warranty claim against Samsung, the remote manufacturer, must be dismissed. *See Haugland v. Winnebago Indus.,* 327 F.Supp.2d 1092, 1097 (D.Ariz.2004) (because "privity is absent in this case, Plaintiffs implied warranty of merchantability claims ... will be dismissed."); *Yee v. Nat'l Gypsum Co.,* Civ. No. 09–8189, 2010 WL 2572976, at \*2 (D.Ariz. June 22, 2010) (dismissing implied warranty claim against manufacturer because plaintiff "cannot [establish privity] because he bought the drywall not from [the manufacturer], but from Lowe's.").

*2. Lark's implied warranty claim against Samsung and both Plaintiffs' implied warranty claims against Lowe's*
**\*12** The remaining implied warranty of merchantability claims—Lark's claim against Samsung and both plaintiffs' claims against Lowe's—present "false conflicts." They are therefore governed by the law of the forum state, New Jersey.

Lark, a citizen of Maryland, sues Samsung, a citizen of New Jersey, for breach of the implied warranty of merchantability. For purposes of this claim, there is no significant difference between Maryland and New Jersey law. *Compare Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 755, 923 A.2d 971, 1013 (2007) ("In an action based on breach of warranty it is necessary for the plaintiff to show the existence of the warranty, the fact that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained."), *with Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 601 n. 8 (3d Cir.2012) ("To state a claim for breach of the implied warranty of merchantability, a plaintiff must allege (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." (internal citation and quotation omitted)). Accordingly, New Jersey law will govern Lark's claim against Samsung for breach of the

2013 WL 3654090, 81 UCC Rep.Serv.2d 48

implied warranty of merchantability. *See Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 717 (D.N.J.2011).

As to Avram's and Lark's implied warranty claims against Lowe's, North Carolina law is added to the mix; Lowe's is incorporated and has its principal place of business in North Carolina. Unlike New Jersey, but like Arizona, North Carolina requires privity. *Compare Spring Motors Distributors, Inc. v. Ford Motor Co.,* 98 N.J. 555, 582, 489 A.2d 660, 674 (1985) ("We conclude that the absence of privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer."), *and Ace Am. Ins. Co. v. Grand Banks Yachts, Ltd.,* 587 F.Supp.2d 697, 705 (D.Md.2008) ("Maryland has expressly abolished the requirement for contractual privity to sue for breach of the implied warranty of merchantability" (citing Md.Code Ann., Com. Law § 2–314(1)(b) ("Any previous requirement of privity is abolished as between the buyer and the seller in any action brought by the buyer."))), *with Kelly v. Georgia– Pac. LLC,* 671 F.Supp.2d 785, 796 (E.D.N.C.2009) ("Under North Carolina common law, privity of contract is generally required to assert an implied warranty claim.").

With respect to claims against Lowe's, however, this is a "false conflict," wherein "the laws of the two jurisdictions would produce the same result on the particular issue presented." *Williams v. Stone,* 109 F.3d 890, 893 (3d Cir.1997). Avram and Lark bought their refrigerators from Lowe's and are in privity with Lowe's; lack of privity is therefore a non-issue. Accordingly, I will disregard the nominal conflict with North Carolina law; New Jersey law will govern Avram's and Lark's claims against Lowe's for breach of the implied warranty of merchantability.

**\*13** "[T]he UCC, as adopted by New Jersey, specifically states that an implied warranty of merchantability ensures that goods sold are 'fit for the ordinary purposes for which such goods are used.' " *Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 706 (D.N.J.2011) (quoting N.J. Stat. Ann. § 12A:2–314(f)). It "does not impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Lieberson v. Johnson & Johnson Consumer Companies, Inc.,* 865 F.Supp.2d 529, 542 (D.N.J.2011) (internal quotations and citations omitted). Put a different way, "merchantability is defined as the product sold 'should be of the general kind described and reasonably fit for the *general* purpose for which it should have been sold.' " *Id.* (quoting *Adams v. Peter*

*Tramontin Motor Sales, Inc.,* 42 N.J.Super. 313, 321, 126 A.2d 358 (App.Div.1956) (emphasis added) (other internal quotation and citation omitted). Generally, a court will find a good to be unfit for its ordinary purpose "when [it] can identify one of three general types of defects: manufacturing defects, design defects, and failure to give the buyer proper instructions with respect to the goods." *Lieberson,* 865 F.Supp.2d at 542.

But what is the general, "ordinary purpose" of these refrigerators? Self-evidently, they are designed to keep perishables cold, and no one contends that they failed to do that. Avram and Lark, however, stress that these refrigerators were sold as high-efficiency appliances that would keep food cold in accordance with Energy Star efficiency standards. And they did allegedly fail to do that.

An impairment of the "ordinary purpose" of a product is one that is central to the product's value or function. *Compare Zabriskie Chevrolet, Inc. v. Smith,* 99 N.J.Super. 441, 450, 240 A.2d 195, 200 (Law Div.1968) (where the car the plaintiff purchased broke down less than a mile from the dealership, the car was "substantially defective" and in breach of the implied warranty of merchantability), *with Green v. Green Mountain Coffee Roasters, Inc.,* 279 F.R.D. 275, 283 (D.N.J.2011) (rejecting implied warranty of merchantability claim that a single-cup brewing system, although it brewed beverages, failed to brew precisely one cup), *and Lieberson,* 865 F.Supp.2d at 543 (finding no breach of the implied warranty of merchantability where soap and lotion did not help babies sleep, as advertised, because the soap was "clearly manufactured for the purpose of washing and moisturizing babies' skin" and it did do that).

Based on the allegations in the Complaints, I find that the Energy Star label puts the refrigerators closer to the car in *Zabriskie* than to the coffeemaker in *Green* or the soap in *Lieberson.* Soporific qualities and precise portion control do not, so far as I am aware, embody any settled consumer expectation as to baby soap or coffee makers. (Avram Compl. ¶ 1; Lark Compl. ¶ 1). An Energy Star sticker, by contrast, stands for a level of efficiency, defined in relation to statutory standards, for which consumers allegedly are willing to pay a premium. (Avram Compl. ¶ 2; Lark Compl. ¶ 2). The eventual presentation of evidence might or might not establish Plaintiffs' claim; I cannot say, however, that they have failed to state one.

**\*14** Accordingly, I dismiss Avram's claim of breach of the implied warranty of merchantability as against Samsung under Arizona law. The remaining implied warranty claims, analyzed under New Jersey law, meet federal pleading requirements and will not be dismissed.

### D. Magnuson–Moss Warranty Act Claims

Magnuson–Moss is "a remedial statute designed to protect the purchasers of consumer goods from deceptive warranty practices." *Miller v. Willow Creek Homes, Inc.,* 249 F.3d 629, 630 (7th Cir.2001) (citation omitted). It provides for a private right of action whenever when a purchaser is "damaged by the failure of a ... warrantor ... to comply with any obligation under [Magnuson–Moss], or under a written warranty ...." 15 U.S.C. § 2310(d)(1). Logically, "Magnuson–Moss claims based on breaches of express and implied warranties under state law depend upon those state law claims." *Cooper v. Samsung Elec. Am., Inc.,* Civ. No. 07–3853, 2008 WL 4513924, at \*6 (D.N.J. Sept. 30, 2008) (citing *In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,* 19 F.Supp.2d 263, 267 (D.N.J.1998)).

Samsung and Lowe's argue that Plaintiffs' Magnuson–Moss claims are based on invalid state-law warranty claims, and therefore should be dismissed. As discussed in Sections III.B and C, above, however, all but one of the state-law causes of action for breach of express and implied warranties are legally sufficient and they will not be dismissed. Consequently, the Magnuson–Moss claim survives as well.

In addition, the Magnuson–Moss claims meet federal pleading standards. A "written warranty" is:

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time ...

which ... becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6).

The allegations of the Complaint easily would support an inference that the refrigerators are consumer products and the Defendants are suppliers within the meaning of the statute. [10] As discussed in Section III.B, above, the Complaints adequately allege that the Energy Star logo constitutes a written affirmation of fact relating to the refrigerators' performance that became part of the basis of the bargain.

[10] "Consumer product" is defined as any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed). 15 U.S.C. § 2301(1). A "supplier" is any person engaged in the business of making a consumer product directly or indirectly available to consumers. 15 U.S.C. § 2301(4).

The Complaints state claims under Magnuson–Moss. Samsung and Lowe's motions to dismiss the Magnuson–Moss claims are denied.

### E. State Consumer Protection Statute Claims

a. *Avram's New Jersey Consumer Fraud Act Claim*
Avram brings a claim under the New Jersey Consumer Fraud Act against Samsung only. I find that the law of Arizona applies, and that the NJCFA claim must therefore be dismissed as a matter of law. [11]

[11] Should New Jersey law apply, Samsung argues, the NJCFA claim should be dismissed because it does not state an ascertainable loss nor are its allegations pleaded with particularity. Because I find that Arizona law applies, I do not reach those issues.

**\*15** Step one of the choice-of-law analysis requires the Court to determine if an actual conflict exists between New Jersey and Arizona law. As both parties acknowledge, there is a conflict. The Arizona Consumer Fraud Act (the "ACFA") (1) requires reliance, *Kuehn v. Stanley,* 208 Ariz. 124, 129, 91 P.3d 346, 351 (Ct.App.2004) ("An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information."); (2) has a one-year statute of limitations, *Cervantes v. Countrywide Home Loans, Inc.,* 656 F.3d 1034, 1045 (9th Cir.2011); (3) does not permit treble damages and (4) allows only the attorney general to collect attorneys' fees. *Ariz.Rev.Stat. Ann. § 44–1534.*

New Jersey, by contrast, (1) does not require reliance, *Lieberson v. Johnson & Johnson Consumer Companies, Inc.,* 865 F.Supp.2d 529, 538 (D.N.J.2011) (stating elements of NJCFA claim, which do not include reliance); (2) has a six-year statute of limitations, *Dilorio v. Structural Stone & Brick Co., Inc.,* 368 N.J.Super. 134, 142, 845 A.2d 658, 663 (App.Div.2004); (3) imposes treble damages and (4) provides for an award of attorneys' fees. N.J. Stat. Ann. § 56:8–19.

In short, the ACFA and the NJCFA conflict. Accordingly, I move to step two to see which state has the most significant relationship to the claim, using the factors outlined in the applicable subsection of Section 148 of the Restatement (Second) of Conflict of Laws. *Maniscalco v. Brother Int'l Corp. (USA),* 793 F.Supp.2d 696, 704 (D.N.J.2011) (citing *P.V. v. Camp Jaycee,* 197 N.J. 132, 143–44, 962 A.2d 453, 460 (2008).

The subsection of the Restatement that applies to this case is Section 148(2), [12] which states:

[12]     Restatement Section 148(1) states:
        (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
        I find that Section 148(1) does not apply, because the representations and the reliance did not both occur in any single state. Any representations were made in New Jersey, but received in Arizona, where Avram allegedly relied upon them. To the extent that that the applicability of Section 148(1) is suggested by *Agostino v. Quest Diagnostics, Inc.,* 256 F.R.D. 437 (D.N.J.2009), I find the case distinguishable. *See Maniscalco,* 793 F.Supp.2d 696, 707 (distinguishing *Agostino* because the *Agostino* defendant "intended the fraudulent bills be read by each plaintiff in his or her home state," while the facts in *Maniscalco* did "not concern the direct targeting of plaintiffs whose identities and

addresses [were] known."). There is no evidence that Samsung or Lowe's directly and knowingly targeted Avram or anyone else.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,

> (c) the place where the defendant made the representations,

> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2) (1971). Simple factor-counting is not the whole of the analysis, but it is a starting point. Four of the Section 148(2) factors favor the application of Arizona law, one favors New Jersey, and one is neutral. Specifically, the first two and last two favor Arizona law: in Arizona, Avram received the representations and acted in reliance on them in purchasing and using the refrigerator. The third factor—that Samsung made the representations in New Jersey—favors New Jersey law. The remaining factor—the residence, place of incorporation, and place of business of the parties—is evenly balanced. In sum, the 148(2) factors point to Arizona law.

**\*16** Courts are also admonished, however, not merely to count the 148(2) factors, but to weigh them in light of the principles stated in Section 6 of the Restatement. *Camp Jaycee,* 197 N.J. at 147, 962 A.2d at 463; *see also* Restatement § 148 cmt. B. Those policies are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6. "Reduced to their essence, the § 6 principles are: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee,* 197 N.J. at 147, 962 A.2d at 463.

Avram's Arizona residence weighs heavily in favor of that state's law. "The interests of interstate comity favor applying the law of a state where the injured party resides." *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 450 (D.N.J.2012) (citing *Fink v. Ricoh Corp.,* 365 N.J.Super. 520, 585, 839 A.2d 942 (Law Div.2003) (stating this factor "clearly require[s] application of the law of any potential claimant's state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies....")).

The second factor, the interests of the parties, looks to the law the parties reasonably expected would apply. *See Fu v. Fu,* 160 N.J. 108, 123, 733 A.2d 1133 (1999); *see also* Restatement § 6, comment g ("Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state."). It is given more weight in the context of a voluntary commercial transaction, like this one, in which the parties can be said to have "molded" their conduct, as opposed to, say, a personal-injury tort case. *See Agostino,* 256 F.R.D. at 463 ("the interests of the parties 'is of extreme importance in the field of contracts,' but it 'plays little or no part in a choice-of-law question in the field of torts.' " (quoting *Fu v. Fu,* 160 N.J. 108, 123, 733 A.2d 1133, 1141 (2009) (internal quotation omitted)). Avram purchased, took delivery of, and

used the refrigerator in Arizona, and Samsung surely knew its products would be sold there; the application of Arizona law defeats no legitimate expectation of either party. Conversely, I see no indication that Avram knew where Samsung was headquartered, or that she ever dreamed that her refrigerator purchase bore any relation to New Jersey or its laws.

**\*17** The third factor focuses on which law would further the "fundamental goals of tort law," which are deterrence and compensation. *Id.* Taken literally, this factor might imply that the more plaintiff-favorable law always wins. But the determination is more systematic and respectful of state policy judgments. True, NJCFA is probably more generous to plaintiffs and stern with manufacturers than the ACFA. But "[s]imply because New Jersey has struck a particular balance between consumer protection and the promotion of business within its borders does not suggest that its interest in deterrence should displace the policy goals of its fellow states. Those states have instead struck their own legislative balances, awarding compensation based on differing standards of, *inter alia,* intent, causation, reliance, and damages." *Gray v. Bayer Corp.,* Civ. No. 08–4716, 2011 WL 2975768, at \*5 (D.N.J. July 21, 2011). Avram had no contacts with New Jersey, but substantial ones with Arizona. She directly purchased the refrigerator from a third party with no ties to New Jersey. Application of ACFA would further Arizona's interest in compensating purchasers for harms they may have suffered. New Jersey's interest, however, in compensating out-of-state consumers is minimal, and the state's contacts with this litigation have come only because Samsung's headquarters happen to be located there. I thus see "little reason to conclude that New Jersey's deterrent interest with respect to one party should be elevated above" Arizona's. *See id.* In other words, this factor is at best neutral, but tends to lean in favor of Arizona.

The fourth factor is neutral. There is no indication that the interests of judicial administration favor either state.

Fifth, the states' competing interests also tilt to Arizona. "[E]very state has an interest in having its law applied to its resident claimants." *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 450 (internal quotation and citation omitted). Arizona, the state where the plaintiff "claimant" resides, and where the bulk of the contacts occurred, has the stronger interest in protecting its consumers from harm, regulating incursions by foreign corporations, and determining the scope of recovery for its citizens. *See id.* (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 422, 123 S.Ct.

1513, 155 L.Ed.2d 585 (2003) ("[E]ach State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders.")).

In short, I apply New Jersey conflicts law and find that the Restatement § 148(2) factors, interpreted in light of the policies stated in § 6, strongly point to the application of Arizona law. Other judges in this District, analyzing analogous cases, have come to a similar conclusion. *See, e.g., Agostino,* 256 F.R.D. at 463 (Chesler, J.); *Gray v. Bayer Corp.,* Civ. No. 08–4716, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011) (Linares, J.).

Avram, however, cites *In re Mercedes–Benz Tele Aid Contract Litigation,* 257 F.R.D. 46 (D.N.J.2009) (Debevoise, J.), which applied the NJCFA to a claim that a New Jersey corporation had made in-state misrepresentations affecting an out-of-state plaintiff. There, Judge Debevoise found that, under the circumstances, the actions emanating from New Jersey and this State's strong interest in regulating its corporations outweighed other, contrary factors. *See id.* at 64–70. The facts of *Mercedes–Benz* are distinguishable in my view. There, the defendant's extensive, possibly nefarious steps in New Jersey might have lent greater weight to this State's interest in regulating domestic corporations. *Id.* at 51–54, 66. More to the point, no subsequent case has followed *Mercedes–Benz,* and many have found that its reasoning went too far. *See, e.g., Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 449–50 (D.N.J.2012) (collecting criticism of, and distinguishing, *Mercedes–Benz,* and finding, "[b]ased on these facts and the weight of the precedent in this Circuit," that California law applied where "Plaintiff purchased the washing machine from a store in California, took delivery of the machine in California, used the machine at her home in California, and allegedly suffered injury in California."); *In re Vioxx Products Liab. Litig.,* 861 F.Supp.2d 756, 765 (E.D.La.2012) (declining to apply the NJCFA and stating "only one factor seems to weigh in favor of the application of New Jersey law. This was enough for the *Mercedes–Benz* court to apply New Jersey law to out-of-state litigants, but as noted above that opinion is an outlier. Under similar facts, many more cases have applied the consumer fraud law of plaintiffs home state."); *Gray v. Bayer Corp.,* 2011 WL at *6 ("While this Court agrees with the court in *Mercedes–Benz* that due consideration must be given to New Jersey's deterrent interest in enforcing the NJCFA, the Court concludes that, given the substantial contacts between Plaintiff's claims and the states where One–A–Day WeightSmart was purchased, to disregard the individual laws of those states in favor of a blanket application of New

Jersey law would ignore their strong compensatory interest in this matter and would threaten to upset the balance of our federal system. The Court thus follows the weight of authority counseling against the application of the NJCFA to out-of-state consumers."); *Moloney v. Microsoft Corp.,* No. 09–2047, 2011 WL 5864064, at *9, 2011 U.S. Dist. LEXIS 134841, at *28 (D.N.J. Nov. 21, 2011) ("This Court is similarly unsatisfied with the justifications provided in the *Mercedes–Benz* decision."); *Agostino v. Quest Diagnostics Inc.,* No. 04–4362, 2010 WL 5392688, *9, 2010 U.S. Dist. LEXIS 135310, *28 (D.N.J. Dec. 22, 2010) ("Parting ways, however, with Judge Debevoise's assessment in Mercedes, this Court does not consider that New Jersey's interest in deterring fraudulent conduct perpetrated by domestic companies necessarily trumps the interest of the victim's home state.").

**\*18** Like the judges in the cases cited above, I find that New Jersey has the less significant relationship with Avram's consumer fraud claim. "[A]ccepting all of the facts as pleaded by Plaintiffs as true, the factors weigh in favor of applying the law" of Arizona. *Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 709 (D.N.J.2011). Avram received and relied upon the Energy Star logo in Arizona, she purchased the refrigerator there, the refrigerator is located there, and performance of the contract occurred there. These factors outweigh the single fact that Samsung is located in New Jersey. *See, e.g., Maniscalco v. Brother Int'l Corp.,* 793 F.Supp.2d 696, 707 (D.N.J.2011) ("Moreover, even if I were to find that BIC had made a decision to conceal in New Jersey, such a finding would not alter my determination that California and South Carolina have the most significant relationship to Plaintiffs' fraud claims; indeed, as discussed above, a majority of the courts in this district have determined that unlawful conduct emanating from New Jersey does not necessarily supersede the numerous contacts a plaintiff had with his home state."); *Arlandson,* 792 F.Supp.2d at 709 ("The factual record is complete enough at this time to show that, accepting all of the facts as pleaded by Plaintiffs as true, the factors weigh in favor of applying the law of Plaintiffs' home states. Plaintiffs received and relied upon the alleged misrepresentations in their home states, the product is located in the Plaintiffs' home states, and the performance of the contract was rendered in Plaintiffs' home states. Balancing all these factors in favor of Plaintiffs' home states against the fact that Defendants' headquarters are located in New Jersey, the Court finds that the law of each Plaintiff's home state has the "most significant relationship" to Plaintiffs' consumer fraud action."); *Cooper v. Samsung Elecs. Am., Inc.,* 374

Fed. App'x 250, 255 (3d Cir.2010) (noting at the motion to dismiss stage that a consumer fraud claim bears the most significant relationship with the state in which the product was "marketed, purchased, and used"); *Nikolin v. Samsung Elecs. Am., Inc.,* Civ. No. 10–1456, 2010 WL 4116997, at *3 (D.N.J. Oct.18, 2010) (finding at the motion to dismiss stage that the law of each plaintiffs home state has the most significant relationship, as "mere allegations that the unlawful conduct emanated from New Jersey did not outweigh the substantial ties to plaintiffs' home states"); *In re Philips/ Magnavox TV Litig.,* Civ. No. 09–3072, 2010 WL 3522787, at *9–10 (D.N.J. Sept. 1, 2010) (analyzing the Section 148(2) factors at the motion to dismiss stage and finding that the law of each plaintiff's home state applies); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.,* Civ. No. 08–5380, 2010 WL 1424014, at *1–2 (D.N.J. Apr. 8, 2010) (finding at motion to dismiss stage that allegation that product was designed in New Jersey "does not outweigh other, more significant, ties" to plaintiffs home state).

**\*19** Accordingly, the applicable law is that of Arizona. Of necessity, then, Avram's claim under the New Jersey Consumer Fraud Act is dismissed.

### b. *Lark's MCPA Claim*

Samsung and Lowe's argue that Lark's MCPA cause of action must be dismissed because she does not allege reliance on any misrepresentation or actual loss.

### i. *Choice of Law*

The parties agree that Maryland law applies to Lark's claim. I concur. There is a conflict between the NJCFA and the MCPA:

> New Jersey's CFA does not require scienter as an element of proof with respect to affirmative acts by defendants, whereas the Maryland Consumer Protection Act (CPA) requires scienter. Further, actual conflicts exist regarding remedies. New Jersey's CFA entitles a successful claimant to treble damages plus attorney's fees and costs, whereas Maryland's CPA does not provide for treble damages and does not provide for mandatory attorney's fees, but allows for their award in the

court's discretion. It is thus abundantly clear that actual conflicts exist, thus requiring an analysis of the second prong.

> *Margulies v. Chase Manhattan Mortgage Corp.,* A–4087– 03T3, 2005 WL 2923580 (N.J.Super.Ct.App.Div. Nov.7, 2005) (internal citations omitted).

Under that second prong, I must determine which state has the more significant relationship to the consumer fraud issue by examining the Restatement (Second) of Conflict of Laws factors that apply to fraud actions, found in Section 148. *Maniscalco v. Brother Int'l Corp. (USA),* 793 F.Supp.2d 696, 704 (D.N.J.2011) *aff'd sub nom. Maniscalco v. Brother Int'l (USA) Corp.,* 709 F.3d 202 (3d Cir.2013) (quoting *P.V. v. Camp Jaycee,* 197 N.J. 132, 136, 962 A.2d 453 (2008)); *Agostino v. Quest Diagnostics,* 256 F.R.D. 437, 463–64 (D.N.J.2009). As with Avram, Section 148(1) does not apply because Lark's purchase and use of the refrigerator took place in Maryland, and the alleged false representations were made in New Jersey. Instead, I must look at the factors in Section 148(2).

On balance, these factors point to Maryland as having the most significant relationship to the claim at issue. The first two factors favor Maryland because Lark received and acted in reliance on the representation—the Energy Star logo—in Maryland. The last two factors also support Maryland because Lark purchased and used the refrigerator in Maryland. The third factor, the location where the representation was made, points to New Jersey. The fourth factor, the residence and place of incorporation and business of the parties, is balanced.

In these circumstances, ample case law establishes that the factors, both in number and weight, favor Maryland. *See Maniscalco,* 793 F.Supp.2d at 708 ("A majority of courts in this District have held that the mere fact that a company is headquartered in New Jersey will "not supersede the numerous contacts with the consumer's home state" for purposes of determining which state has the most significant relationship under Restatement § 148(2)."); *Cooper v. Samsung Electronics America, Inc.,* 374 Fed. App'x 250, 255 (3d Cir.2010) (upholding a District Court's refusal to apply the NJCFA where plaintiff, an Arizona resident, learned of, purchased and used a Samsung television in Arizona and where New Jersey's only connection to the matter was the fact that Samsung's headquarters were located

in New Jersey); *Nikolin v. Samsung Electronics America, Inc.,* Civ. No. 10–1456, 2010 WL 4116997, at *4 (D.N.J. Oct.18, 2010) (collecting cases and holding that even where a plaintiff has alleged that "unlawful conduct emanated from New Jersey," such contact does not "outweigh the substantial ties to plaintiffs home states based on other factors under § 148(2)."); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc,* Civ. No. 08–5380, 2010 WL 1424014, at *4 (D.N.J. Apr.8, 2010) (holding that an "allegation that [S]amsung designed the product's operation in New Jersey does not outweigh the other, more significant, ties to Illinois."); *Knox v. Samsung Electronics America, Inc.,* Civ. No. 08–4308, 2009 WL 1810728, at *4 (D.N.J. June 25, 2009) (applying Georgia's consumer fraud law where "the consumer contacts ... all occurred in Georgia" and noting that despite Samsung's headquarters and the alleged wrongdoing occurring in New Jersey, "it is not clear ... that New Jersey intended out-of-state consumers to engage in end runs around local law in order to avail themselves of collective and class remedies that those states deny."). I will apply the law of Maryland, the state with the more significant contacts.

ii. *Analysis*

**\*20** I therefore analyze Lark's claim against Lowe's under the Maryland Consumer Protection Act. The MCPA prohibits any "unfair or deceptive trade practice" in "[t]he sale ... of any consumer goods." Md.Code Ann., Com. Law § 13–303(1). The MCPA defines "unfair or deceptive" trade practices to include "false ... or misleading oral or written statement[s] ... or other representations ... [that have] the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13–301. Consumers "may bring an action to recover for injury or loss sustained ... as the result of" such a misrepresentation. *Id.* § 13–408(a).

A consumer bringing a private action under MCPA, § 13–408, must allege (1) an unfair or deceptive practice or misrepresentation that (2) was relied upon, and (3) caused actual injury. *See Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 143, 916 A.2d 257, 277 (2007); *Philip Morris Inc. v. Angeletti,* 358 Md. 689, 752 A.2d 200, 235 (2000). "A consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice." *Stewart v. Bierman,* 859 F.Supp.2d 754, 768–69 (D.Md.2012) (quoting *Bank of America v. Jill P. Mitchell Living Trust,* 822 F.Supp.2d 505, 532 (D.Md.2011)).

Lark's Complaint does not sufficiently allege that the Energy Star logo substantially induced her to purchase the refrigerator. It does not say, for instance, that she decided to purchase the refrigerator because of its Energy Star qualification. Nor does it allege more generally that she had limited her search to Energy Star-qualified refrigerators. She asserts that, absent the Energy Star logo, she would not have purchased the refrigerator "on the same terms." Because Lark's allegations of reliance are somewhat vague and conclusory, they "are not entitled to the assumption of truth." *Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir.2012). I find that Lark's MCPA claim is inadequately pleaded and I will dismiss it. [13]

[13] On the other hand, I reject Samsung and Lowe's argument that Lark failed to allege actual loss. "A complaint adequately pleads loss, for instance, when it points to some amount that it would 'take to remedy the loss [the plaintiff] incurred as a result of the respondents' alleged deceptive trade practices.' " *Jones v. Koons Auto., Inc.,* 752 F.Supp.2d 670, 684 (D.Md.2010) (quoting *Lloyd,* 397 Md. at 150, 916 A.2d 257). Here, Lark has alleged that she paid a premium for the refrigerator and paid higher electricity bills because the refrigerator was not Energy Star-compliant. This suffices to survive a motion to dismiss. *See Dwoskin v. Bank of Am., N.A.,* 850 F.Supp.2d 557, 570 (D.Md.2012) (holding that actual loss prong of MCPA claim was properly alleged by plaintiffs' claim that they "suffered damages from paying a higher interest rate than they otherwise would have been charged.").

**F. Unjust Enrichment**

Samsung and Lowe's have moved to dismiss Avram's and Lark's unjust enrichment claims because (1) unjust enrichment is superfluous based on the presence of other tort claims; (2) neither Avram nor Lark can allege that they expected to receive remuneration from Samsung or Lowe's; and (3) because Avram and Lark purchased the refrigerators from Lowe's, neither Plaintiff conferred a benefit directly on Samsung.

Unjust enrichment is a shared feature of many states' common law. For unjust enrichment claims, many courts have found that there is no actual conflict between different states' laws. See *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 58 (D.N.J.2009) (finding that any differences under the laws of the various states are "not material and do not create actual conflict"); *Agostino v. Quest Diagnostics*

*Inc.,* 256 F.R.D. 437, 464 (D.N.J.2009) (concluding that "there are no actual conflicts among the laws of unjust enrichment"); *Powers v. Lycoming Engines,* 245 F.R.D. 226, 231 (E.D.Pa.2007) (examining the unjust enrichment laws of the 50 states and concluding that, "[a]lthough there are numerous permutations of the elements of the cause of action in the various states, there are few real differences"). I see no significant conflicts between the unjust enrichment law of New Jersey, Arizona, North Carolina, and Maryland.[14] Therefore, I will apply New Jersey law.

[14]   "[T]o claim unjust enrichment" under New Jersey law, "a plaintiff must allege that (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 723–24 (D.N.J.2011).

"A claim of unjust enrichment under Arizona law has five elements: '(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law.' " *R. Prasad Indus. v. Flat Irons Envtl. Solutions Corp.,* Civ. No. 12–8261, 2013 WL 2217831, at *12 (D.Ariz. May 20, 2013) (quoting *Freeman v. Sorchych,* 226 Ariz. 242, 251, 245 P.3d 927, 936 (Ct.App.2011)); *see also Cooper v. Samsung Electronics Am., Inc.,* Civ. No. 07–3853, 2008 WL 4513924, at *9 (D.N.J. Sept. 30, 2008) (applying New Jersey law after finding no conflict between unjust enrichment law of Arizona and New Jersey).

"The Court of Appeals of Maryland has defined unjust enrichment as constituting three elements:

'1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

'3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.' " *Sensormatic Sec. Corp. v. Sensormatic Electronics Corp.,* 249 F.Supp.2d 703, 708 (D.Md.2003) (quoting *County Comm'rs v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000)).

North Carolina law provides that "[i]n order to state a claim for unjust enrichment, the plaintiffs allegations must set forth that a benefit was conferred on the defendant, that the defendant accepted the benefit, and that the benefit was not gratuitous." *Jackson v. Carolina Hardwood Co.,* 120 N.C.App. 870, 872, 463 S.E.2d 571, 573 (1995) (citing *Booe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)).

**\*21** Avram and Lark allege that they each conferred an benefit on Samsung and Lowe's by purchasing refrigerators that were not in fact Energy Star-compliant. (Avram Compl. ¶ 57; Lark Compl. ¶ 56). Samsung and Lowe's collected these revenues for what was advertised as an Energy Star-qualified refrigerator, when, in fact, the refrigerators did not meet Energy Star requirements. (Avram Compl. ¶ 58; Lark Compl. ¶ 57). As a result, Plaintiffs paid a price premium for a product that did not deliver promised energy savings. (Avram Compl. ¶ 58; Lark Compl. ¶ 57). I believe the Complaints adequately allege each element of an unjust enrichment claim, with one exception.

The requirement that a plaintiff must confer a benefit on the defendant "has been interpreted by New Jersey courts as a requirement that 'the plaintiff allege a sufficiently direct relationship with the defendant to support the claim.' " *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 724 (D.N.J.2011) (quoting *Nelson v. Xacta 3000 Inc.,* Civ. No. 08–5426, 2009 WL 4119176, at *3 (D.N.J. Nov.24, 2009) (citing *Maniscalco v. Brother Int'l Corp.,* 627 F.Supp.2d 494, 505–06 (D.N.J.2009))); *see also Cooper v. Samsung Elec.,* Civ. No. 07–3853, 2008 WL 4513924, at *10 (D.N.J. Sept. 29, 2008) (dismissing an unjust enrichment claim where consumer's purchase was through a retailer, as there was no relationship conferring any direct benefit on the manufacturer). "When consumers purchase a product from a third party, they confer a benefit on that third party, not on the manufacturer." *Snyder,* 792 F.Supp.2d at 724 (citing cases).

Avram and Lark purchased the refrigerators from Lowe's, not Samsung. Therefore, they did not confer a sufficiently direct benefit on Samsung. Accordingly, their unjust enrichment claims against Samsung must be dismissed.[15]

[15]   Avram and Lark note that a similar unjust enrichment claim in *Palmeri v. LG Electronics USA, Inc.,* another consumer products suit, was not dismissed. Civ. No. 07–5706, 2008 WL 2945985

(D.N.J. July 30, 2008). In that case, the defendants did not make, nor did the court address, the argument that the plaintiff-purchaser did not confer a benefit on the manufacturer, as opposed to the retailer, giving it little force here.

The claims against Lowe's, however, will remain. It is true that unjust enrichment often turns out to be superfluous in light of other causes of action-*i.e.,* that it is only a contractual breach or the commission of a tort that makes the enrichment "unjust." Nevertheless, to dismiss the claim on that basis would be premature at this point.[16] Lowe's motion to dismiss this count is denied.

[16]    I say "at this point" because a motion to dismiss is directed to plaintiffs pleading, and the unjust enrichment claim is pleaded in the alternative, as the federal rules permit. Fed.R.Civ.P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."). *See Palmieri,* 2008 WL 2945985 at *7 ("unjust enrichment is, by its nature, an alternative remedy to contract and tort remedies....It is inherent

in a claim for unjust enrichment that it is pled in the alternative to a claim for recovery on the contract.").

## IV. CONCLUSION

For the reasons stated above, Samsung and Lowe's Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART.** Specifically the Motions to Dismiss are

1.  **GRANTED** as to (1) Avram's cause of action against Samsung for breach of the implied warranty of merchantability; (2) Avram's and Lark's claims under the NJCFA and MCPA, respectively; and (3) Avram's and Lark's unjust enrichment claims against Samsung only.

2.  **DENIED** as to all remaining claims in both Complaints.

An appropriate order follows.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 3654090, 81 UCC Rep.Serv.2d 48

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 25 of 307
PageID: 9548

2002 WL 31956978
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Stephen D. BARKER and Kristina
A. Barker, Plaintiffs-Appellants,

v.

Dominic DICICCO and River Park Place
Development Company, Defendants-Appellees.

No. 234443.
|
Dec. 20, 2002.

Before: FITZGERALD, P.J., and WILDER and COOPER, JJ.


[UNPUBLISHED]

PER CURIAM.

 **\*1**  Plaintiffs appeal as of right the trial court's dismissal of their unjust enrichment claim. We affirm.

This claim arose from payments plaintiffs made on a property's first mortgage after a foreclosure and sale of that property by a second mortgagor. Plaintiff Stephen Barker purchased a parcel of commercial property in the city of Fenton in November 1990, through his company, Plaza One Eleven Limited Partnership (Plaza 111). To fund the purchase, Plaza 111 borrowed money from Franklin Bank and the Gerda H. Roth 1990 Trust. Plaza 111 delivered notes to its lenders, and both debts were secured with mortgages on the property. Plaintiffs personally guaranteed the note Plaza 111 delivered to Franklin Bank.

The trust's note was later assigned to B. Hunter Investments, Inc. (Hunter Investments), and when Plaza 111 defaulted, Hunter Investments foreclosed on the property. Hunter Investments purchased the property at the foreclosure sale and subsequently sold it to defendant Dominic DiCicco. Notwithstanding the property's foreclosure and subsequent sale, plaintiffs, through Plaza 111, continued to pay

installments on the Franklin Bank note. Plaintiffs then brought suit to recover the amount that they paid on the loan.

Plaintiffs initially claim that the trial court erred when it required them to present proof of coercion or mistake to recover on unjust enrichment grounds. We disagree. This presents a question of law that this Court reviews de novo. *GMC v. Dep't of Treasury,* 466 Mich. 231, 236; 644 NW2d 734 (2002).

Plaintiffs argue that unjust enrichment requires only a showing that: 1) one party has been enriched; and 2) between the parties, equity demands restitution. *Dumas v. Auto Club Ins Ass'n,* 437 Mich. 521, 546; 473 NW2d 652 (1991). While this is a correct statement of the law, this recitation merely reflects the general rule for all unjust enrichment claims. "A person who without mistake, coercion or request has unconditionally conferred a benefit on another is not entitled to restitution...." *In re McCallum Estate,* 153 Mich.App 328, 335; 395 NW2d 258 (1986), quoting Restatement Restitution, § 112, p 461. Thus, those who confer *unsolicited* benefits must show some form of inequitable manipulation before restitution is warranted. See *In re McCallum, supra* at 335. In the instant case, defendants did not solicit the payments that plaintiffs made under their obligation as guarantors. While the outcome in this case may seem inequitable on its face, the law in Michigan is clear. Accordingly, we find that the trial court properly required plaintiffs to show some form of mistake or coercion.

Plaintiffs next assert that the trial court erred when it found that defendant DiCicco was not bound by a deed that he received and filed, but failed to sign. After a careful review of the record, we find that plaintiffs have misstated the trial court's conclusions. While the trial court initially disagreed with plaintiffs, it later agreed during closing arguments that defendant's acceptance of the deed was binding.

 **\*2**  The law is clear that an individual who accepts and records a deed is bound by its terms. *Kollen v. Sooy,* 172 Mich. 214, 219; 137 NW 808 (1912). After listening to counsel quote the pertinent language from *Kollen,* the trial judge responded, "that's my understanding of the law, counsel." The trial court did not find that DiCicco was free of the obligations imposed by the deed. Rather, the trial court found that plaintiff failed to prove that those obligations included an assumption of the mortgage. Therefore, the assignment of error is misplaced.

2002 WL 31956978

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2002 WL 31956978

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

2007 WL 836874
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

BIMBO BAKERIES USA, INC., Plaintiff,

v.

PINCKNEY MOLDED PLASTICS,

INC., et al., Defendants.

No. 4:06-CV-180-A.
|
March 20, 2007.

**Attorneys and Law Firms**

Daniel W. Packard, Packard Packard & Lapray, Beaumont, TX, Matthew R. McCarley, Fort Worth, TX, for Plaintiff.

James Clark Gordon, Joseph Patrick Regan, Winstead Sechrest & Minick, Fort Worth, TX, for Defendants.

*MEMORANDUM OPINION and ORDER*

MCBRYDE, J.

 *1 Before the court for decision are the motion of plaintiff, Bimbo Bakeries USA, Inc., ("Bimbo") for summary judgment as to the counterclaims of defendant Pinckney Molded Plastics, Inc., ("PMP") and the motion of PMP for summary judgment as to the entire case. The court is granting Bimbo's motion and denying PMP's motion in part and granting it in part. [1]

[1]  As noted in the court's February 20, 2007, order, in deciding the motions for summary judgment the court is taking into account PMP's objections to Bimbo's summary judgment evidence contained in PMP's motion and brief in support filed on February 7, 2007.

I.

*Overview*

Bimbo, a large bakery, claims that the bakery goods containers, known as Universal Baskets ("UBs"), sold to it

by PMP breached the implied warranties of merchantability and fitness for a particular purpose. Bimbo seeks relief in the form of money damages. PMP claims that neither of these implied warranties applies and that, regardless, there was no breach. PMP filed counterclaims against Bimbo alleging breach of contract, unjust enrichment, fraud, and negligent misrepresentation. Bimbo contends that no contract of the kind claimed by PMP existed, that it did not engage in fraud or make any misrepresentations, and that it was not unjustly enriched.

II.

*Undisputed Facts*

The facts set forth below are undisputed in the summary judgment record: [2]

[2]  The undisputed facts section recites undisputed facts set forth in the parties' joint pretrial order filed March 19, 2007, as well as facts otherwise supported by the record.

As part of its baking operations, Bimbo utilizes plastic baskets that take baked goods from the production line to the final retail establishments for sale to the public. PMP is a manufacturer of plastic baskets and holds itself out as having over forty years of experience in manufacturing baskets and trays for the baking industry. In 2001, Bimbo asked PMP to design and manufacture a UB. Bimbo expected to achieve significant savings by use of the UBs because they would make automation possible and would allow Bimbo to replace most of its different-sized baskets with the UBs.

PMP designed the UB with "tabs" located on the bottom of the UB intended to fit into slots on the top of the lower basket when stacked. On or about December 4, 2001, Bimbo and PMP entered into the written agreement that obligated Bimbo to purchase 2.1 million UBs at a certain price that could fluctuate based on the price of raw materials. PMP agreed to pay for the freight for the first 2.1 million baskets sold. [3] There was no express agreement between the parties as to who would pay the freight after the first 2.1 million UBs were delivered. [4]

[3]  In a letter dated February 14, 2005, Don Verna, President of PMP, stated that "[i]n going through

2007 WL 836874

my files, I found the attached document. It clearly states that we would pay for the freight on the first 2,100,000 baskets." *See* App. to Pl.'s Mot. Summ. J. 2.

4    The parties dispute the meaning of the language "FOB our plant," contained in the written agreement, as it related to who would pay the freight. App. to Pl.'s Mot. Summ. J. 1.

In March 2002, Bimbo received its first shipment of the UBs. On September 1, 2004, Bimbo sent written notification to PMP that one of Bimbo's customers had complained that the tabs on the UBs were breaking, causing stacks of baskets to fall and creating a safety hazard for the people near the baskets. Bimbo installed an automatic basket stacker in October 2004, and shortly thereafter reported to PMP that the broken tabs were causing the stacks of loaded UBs to fall when stacked with the automatic stackers.

In October 2004, Rich Kruyer ("Kruyer"), one of PMP's design engineers, as well as other PMP employees, visited Bimbo to determine the nature of the tab breakage problem. On October 27, 2004, Kruyer submitted a written PowerPoint presentation, which included statements that if the tabs are broken, a basket may shift fore and aft, causing other features to disengage, which can permit a basket to collapse, and that this could explain a complaint about broken corners. Kruyer's presentation also described possible design changes to address the tab breakage problem. On April 16, 2005, PMP sent written correspondence to Bimbo stating that PMP had "analyzed returns over the past several months to determine if the UB breakage was in any way the result of product design" and that the "investigations found breakage to have resulted from circumstances other than product design." App. Pl.'s Resp. Def.'s Mot. Summ. J. at 83-84.

 **\*2** After several additional meetings and proposals, in September 2005 PMP modified the mold to strengthen the tabs. PMP made the first shipment of re-designed baskets to Bimbo in mid-November 2005. By that time, Bimbo had purchased approximately 2.8 million of the older-style UBs.

In 2005, Bimbo began to notice shortages of baskets in its operations. An inventory conducted in October 2005 revealed that Bimbo had 1,443,797 UBs on hand with the rest unaccounted for.

On November 29, 2005, PMP offered a program whereby the older-style UBs could be ground up and "re-shot" through a revised mold. The "re-shot" baskets would have the strengthened tab. The cost for this program would be $2.49 per basket plus $0.58 freight per basket. Bimbo did not accept this offer.

III.

*Summary Judgment Standard*

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson,* 477 U .S. at 256. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson,* 477 U.S. at 248, 256. To meet this burden, the nonmovant must "identify *specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994) (emphasis added). An issue is material only if its resolution could affect the outcome of the action. *Anderson,* 477 U.S. at 248. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons,* 746 F.2d 265, 269 (5th Cir.1984). " 'Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts ... are at issue, ... if the nonmoving party rests merely upon *conclusory allegations, improbable inferences, and unsupported speculation." ' Forsyth,* 19 F.3d at 1533 (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993) (emphasis added)).

2007 WL 836874

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 597. *See also Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

IV.

*PMP's Motion*

**\*3** Consistent with the discussions between the court and counsel, and the rulings announced, during the pretrial conference conducted in the above-captioned case on March 19, 2007, the court is granting PMP's motion as to Bimbo's claim that PMP breached an implied warranty of merchantability and as to Bimbo's claim for damages based on injuries suffered by third persons by reason of falling UBs, and is denying it in all other respects.

V.

*Bimbo's Motion*

A. *There is No Evidence of a Contract of the Kind Claimed by PMP*
PMP filed a counterclaim against Bimbo for breach of a contractual commitment by Bimbo to pay the freight for all baskets purchased after the initial 2.1 million. Bimbo argues, in its motion for summary judgment, that there never was a such contract. It is not in dispute that PMP agreed to pay the freight on the first 2.1 million baskets and that in January of 2005 Bimbo agreed to begin paying the freight on the baskets sold from that date forward. The issue is whether there is evidence that there was a contract for Bimbo to pay the freight from June 2004, when delivery of the 2.1 million UBs was completed, through January 2005.

The following elements are required for parties to form a binding contract: (1) an offer, (2) acceptance in complete agreement with the terms of the offer, (3) a meeting of the minds, (4) parties' consent to the terms, and (5) intent that the

contract be mutual and binding upon execution and delivery. *Buxani v. Nussbaum,* 940 S.W.2d 350, 352 (Tex.App.-San Antonio, 1997, no writ). For the contract to be enforceable, "the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms." *Weynand v. Weynand,* 990 S.W.2d 843, 846 (Tex.App.-Dallas, 1999, pet.denied). In evaluating whether there was in fact a meeting of the minds, the court relies on objective standards of what the parties said and did, rather than parties' alleged subjective states of mind. *Slade v. Phelps,* 446 S.W.2d 931, 933 (Tex.Civ.App.-Tyler, 1969, no writ).

In deciding whether there was evidence of a meeting of the minds, and thus a contract, for payment of freight during the disputed time period, the court looks objectively at what parties said and did. It is undisputed that Bimbo never agreed to pay the freight for any baskets until January 2005. Nevertheless, PMP argues that "ordinary rules of construction permit custom or usage evidence both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract." However, here, contrary intent did exist because the evidence is clear that Bimbo never intended to pay the freight. Thus, there was no meeting of the minds to form a contract for which the court could imply terms.

B. *There is No Evidence of Misrepresentation*
In Texas, the elements for a negligent misrepresentation claim are:

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

**\*4** *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (adopting section 552 of the Restatement

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 31 of 307
PageID: 9554

Bimbo Bakeries USA, Inc. v. Pinckney Molded Plastics, Inc., Not Reported in F.Supp.2d...

2007 WL 836874

(Second) of Torts). The type of false information required to prevail is a misstatement of *existing fact,* not a promise of future conduct. *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.], 1999, pet. denied). "A promise to act or not to act in the future cannot form the basis of a negligent misrepresentation claim." *Roof Systems, Inc. V. Johns Manville Corp.,* 130 S.W.3d 430, 439 (Tex.App.-Houston [14th Dist.], 2004, no pet.).

PMP argues that Bimbo made misrepresentations to PMP, namely, that if the UBs were "corrected" to fit Bimbo's specifications Bimbo would enter into a new long-term supply agreement with PMP. In its response, Bimbo maintains that the tort of negligent misrepresentation only applies to professionals who give advice to others in the course of their business, not to customers like Bimbo who are seeking to buy goods. Alternatively, Bimbo claims that no such representation was ever made, and, in the further alternative, that the alleged misrepresentation is the sort of future conduct that does not give rise to a negligent misrepresentation cause of action. Assuming, arguendo, that the alleged representation was made, the court agrees with Bimbo that it is the sort of "promise to act or not to act in the future" that "cannot form the basis of a negligent misrepresentation claim." *Roof Systems,* 130 S.W.3d at 439.[5]

[5]    Because the court finds that PMP's claim for negligent misrepresentation fails on other grounds, the court does not visit the issue of whether such a cause of action is applicable outside the context of a professional giving advice to others in the course of the business of the professional.

C. *There is No Evidence to Support the Fraud Counterclaim*
Under Texas law, fraud occurs when (1) a party (a) misrepresents a material fact, (b) knows the representation is false or makes it recklessly without any knowledge of its truth, and (c) makes the false representation with the intent that it should be acted on by the other party, and (2) the other party justifiably relies on the representation and suffers injury because of it. *Ernst & Young v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001). Under certain circumstances, the first element of fraud can be met if the party concealed or failed to disclose a material fact. *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.,* 414 F.3d 558, 566 (5th Cir.2005).

In Texas, "a failure to disclose information does not constitute fraud unless there is a duty to disclose the information."

*Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex.2001) (citing *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998)). Therefore, "silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford,* 48 S.W.3d at 755 (citing *SmithKline Beecham Corp. V. Doe,* 903 S.W.2d 347, 353 (Tex.1995); *Smith v. Nat'l Resort Cmtys., Inc.,* 585 S.W.2d 655, 658 (Tex.1979)). Whether such a duty exists is not a question of fact, but a matter of law. *See Bradford,* 48 S.W.3d at 755. While Texas courts of appeals have held that a duty to disclose "may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression," *id.,* the Texas Supreme Court has never affirmed such decisions, *see id.* In addition, the Court has explicitly declined to adopt section 551 of the Restatement (Second) of Torts, which recognizes a general duty to disclose facts in a commercial setting. *See id.* at 755-56 (stating that "[w]e have never adopted section 551"). Thus, it is unclear whether the Texas Supreme Court would recognize a duty to disclose absent a confidential or fiduciary relationship. *United Teacher,* 414 F.3d at 565-66.

**\*5** To determine a question of state law, federal courts look to final decisions of the state's highest court. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.,* 193 F.3d 340, 342 (5th Cir.1999). Although federal courts may look to intermediate appellate court opinions for guidance, such opinions are not controlling. *United Teacher,* 413 F.3d at 565-66 (citing *Matheny v. Glen Falls Ins. Co.,* 152 F.3d 348, 354 (5th Cir.1998)). If the question of law has not been decided by the state's highest court, the federal court must do its best to determine what the highest court of the state would decide. *Id.* at 566 (citing *St. Paul Fire,* 193 F.3d at 342)).

The Fifth Circuit's opinion in *United Teacher* is instructive:

> A reasonable jurist might well conclude, certainly after *Bradford,* that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship. This court has so held in *Coburn,*[6] the only Fifth Circuit case that discusses the relevant portion of *Bradford.* However, apart from *Coburn,* it would be fair to say

that courts after *Bradford* (including this court) have not gotten the message, but have instead continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship.

6    *Coburn Supply Co. v. Kohler Co.,* 342 F.3d 372, 377-78 (holding that a confidential or fiduciary relationship must exist before the duty to disclose will arise).

*Id.* at 566 (footnote added) (citing, for example, *Rimade Ltd. v. Hubbard Enterprises, Inc.,* 388 F.3d 138, 143 (5th Cir.2004); *Lewis v. Bank of Am. NA,* 347 F.3d 587 (5th Cir.2003)).

As the court stated in *United Teacher,* "[f]ortunately, we need not decide whether a duty to disclose exists in Texas absent a confidential or fiduciary relationship because even if such a duty did exist, [the] fraud claim would fail." 414 F.3d at 566. Assuming Bimbo had a duty to disclose, PMP's claim cannot survive the motion for summary judgment because there is no evidence that Bimbo breached this duty. The fact that PMP implied from Bimbo's actions that Bimbo planned to enter into a supply contract with PMP when in fact Bimbo was negotiating with another supplier does not constitute actionable fraud. The summary judgment evidence is that Bimbo informed PMP that it was "looking at other vendors." App. to Pl.'s Mot. Summ. J. 84. There is no evidence that Bimbo concealed or failed to disclose a material fact, thus PMP's fraud claim must fail and the court does not reach a decision as to the other elements of the claim.

D. *There is No Evidence of Unjust Enrichment*

The theory of unjust enrichment may apply when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 42; *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 891 (Tex.1998).

**\*6** Here, assuming Texas law recognizes unjust enrichment as an independent cause of action, Bimbo claims it is entitled to summary judgment because there is no evidence of fraud, duress, or undue advantage. Whether Bimbo received a "windfall" with respect to the UBs is a disputed question of fact, but such a benefit cannot constitute unjust enrichment absent some type of unlawful behavior. The court agrees that the summary judgment record is devoid of evidence of fraud, duress, or undue advantage.

VI.

*Order*

For the reasons discussed above, the court concludes that PMP's motion for summary judgment should be granted in part and denied in part, and Bimbo's motion for summary judgment should be granted. Therefore,

The court ORDERS that Bimbo's causes of action based on an implied warranty of merchantability and for damages related to injuries suffered by third persons because of falling UBs be, and are hereby, dismissed.

The court further ORDERS that all of PMP's claims and causes of action against Bimbo in the above-captioned action be, and are hereby, dismissed.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 836874

---

**End of Document**　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 4

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 34 of 307
PageID: 9557
Bland v. Abbott Laboratories, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 32577

2012 WL 32577
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
at Louisville.

Mikki BLAND and Caleb Bland, Individually and as
parents and next friends of J.B., a minor, Plaintiffs

v.

ABBOTT LABORATORIES, INC., Defendant.

Civil Action No. 3:11–CV–430–H.
|
Jan. 6, 2012.

**Attorneys and Law Firms**

Jasper D. Ward, Stuart Wade H. Yeoman, Jones Ward PLC, Louisville, KY, for Plaintiffs.

Charles M. Pritchett, Jr., Frost Brown Todd LLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

JOHN G. HEYBURN II, District Judge.

**\*1** Plaintiffs, Mikki and Caleb Bland and their child, J.B. (collectively the "Blands" or "Plaintiffs"), brought this action in Hardin Circuit Court against Abbott Laboratories, Inc. ("Abbott" or "Defendant"), alleging various tort and contract claims, as well as Kentucky statutory violations. The action arises from a recall of Abbott's infant formula product, Similac. Defendant removed the case to federal court based on diversity jurisdiction and now moves to dismiss the Blands' Complaint for failure to state a claim. Fed.R.Civ.P. 12(b)(6).

As discussed below, the Court will resolve some of the claims and set a conference to discuss others.

I.

In September 2010, Abbott voluntarily recalled millions of Similac units after discovering adult beetles and larvae in containers of finished product in its Sturgis, Michigan production facility. Concurrent with the recall, the U.S. Food and Drug Administration ("FDA") issued an alert that formula containing beetles "poses no long-term health problems" but "infants ... could experience gastrointestinal discomfort and refusal to eat." Def. Mot. to Dismiss Ex. B. For several months beginning in May 2009, the Blands fed J.B. Similac that was later subject to the recall. J.B. was consistently sick during this period, underwent surgery to correct a pyloric stenosis, and received a feeding tube to address his feeding aversion and failure to thrive. Doctors removed the tube in April 2010 and J.B. soon began drinking whole milk.

II.

At the motion-to-dismiss stage of litigation, the Court accepts as true all well-pleaded facts from the Complaint, construed in a light most favorable to the Plaintiffs. *Logsdon v. Hains,* 492 F .3d 334, 340 (6th Cir.2007). However, legal conclusions couched as facts are insufficient to withstand a 12(b)(6) motion. *Mezibov v. Allen,* 411 F.3d 712, 716 (6th Cir.2005). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The factual content must allow a reasonable inference of a defendant's liability under some legal theory. *Id.* at 556.

Several claims alleged in the Complaint clearly warrant dismissal. The Court will dismiss Count III (Intentional Misrepresentation), Count VII (Breach of Implied Warranty of Fitness for a Particular Purpose), Count VIII (Unjust Enrichment), and Count IX (Kentucky statutory violations). The Court also notes that Count X (Punitive Damages) is not a separate cause of action, but a remedy potentially available for another cause of action. *Toon v. City of Hopkinsville,* No. 5:09–CV–37, 2011 WL 1560590, at \*3 n. 6 (W.D. Ky. April 14, 2011) *(citing Salisbury v. Purdue Pharm., L.P.,* 166 F.Supp.2d 546, 548, n. 1 (E.D.Ky.2001)). The Court will issue an order as to the remaining counts after a conference with the parties.

II.

To state a claim for intentional misrepresentation under Kentucky law, Plaintiffs must allege Defendant made a false statement regarding a material fact, knew the statement was false, intended to deceive Plaintiffs, that Plaintiffs reasonably relied on upon the deception, and damages resulted. *Res–Care, Inc. v. Omega Healthcare Investors, Inc.,* 187 F.Supp.2d

714, 717 (W.D.Ky.2001). The Blands' allegations fail to meet this standard.

**\*2** First, Plaintiffs have not identified with the requisite particularity Abbott's statements constituting the misrepresentation. Fed.R.Civ.P. 9(b) (requiring greater particularity in pleading a claim of fraud); *see also U.S. ex. rel. Bledsoe v. Comty. Health Sys., Inc.,* 501 F.3d 493, 504 (6th Cir.2007). The Complaint alleges Abbott's "promotion, marketing, advertising, packaging, labeling, and other means" represented to the public that Similac was safe for consumption. Yet the only specific statements Plaintiffs note in their response brief concern nutritional content, not safety. Unappealing as the prospect may be, the fact that some Similac products may have contained beetle parts does not contradict a claim the product has "the balance of protein, minerals, and other nutrients that helps give babies a strong start in life."

Furthermore, even if the Blands could identify a particular false statement of material fact, it is implausible Plaintiffs relied on any such statement while Abbott knew it to be false. No allegations in the Complaint suggest Abbott knew of any problems with Similac before September 2010, months after Plaintiffs had stopped purchasing and feeding J.B. the product. To the contrary, the Complaint suggests Abbott discovered the problem in mid-September 2010, reported it to the FDA days later, and within a week issued the recall notice. The factual allegations are insufficient to state a claim for intentional misrepresentation.

### IV.

Plaintiffs' claim for breach of an implied warranty of fitness for a particular purpose fails because their use of Similac was not peculiar. Ky.Rev.Stat. Ann. § 355.2–315 (LexisNexis 2008). They used Similac for its ordinary purpose—feeding an infant. Insofar as Plaintiffs allege Similac was not fit for feeding their infant, their claim is for a breach of warranty of merchantability, not fitness for a particular purpose. Absent an allegation Plaintiffs had a particular purpose that Abbott would have reason to know, this claim must be dismissed. *Id.*

### V.

Plaintiffs fail to state a claim for unjust enrichment under Kentucky law, which requires pleading: "(1) [a] benefit

conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky.Ct.App.2009) *(citing Guarantee Electric Co. v. Big Rivers Electric Corp.,* 669 F.Supp. 1371, 1380–81 (W.D.Ky.1987)). As a claim in equity, recovering on an unjust enrichment theory ultimately "requires proof of bad faith by the defendant." *Jim Huff Realty, Inc. v. Tomlin Props., Ltd.,* No.2005–CA–002245–MR, 2007 WL 1452596, at \*3 (Ky.Ct.App. May 18, 2007); *see also Union Cent. Life Ins. Co. v. Glasscock,* 110 S.W.2d 681, 685 (Ky.1937) (rejecting unjust enrichment claim where party did not show bad faith or misrepresentation).

Plaintiffs have not alleged with particularity any act by Defendant done in bad faith that warrants a remedy in equity. Furthermore, the remedy Plaintiffs seek is a constructive trust representing the money they paid for the potentially tainted Similac. Defendant notes it already offered such a refund to Plaintiffs (and other Similac purchasers) and a refund is still available to Plaintiffs. [1] *See, e.g., Vuotto v. Abbott Labs., Inc.,* No. 10–C–7255, 2011 WL 3876923, at \*4 (N.D.Ill. Aug. 31, 2011)* (holding refund offer barred unjust enrichment claim). Plaintiffs' claim for unjust enrichment is dismissed.

[1]     "Plaintiffs could have participated in the refund program at any time, and may still do so now." Def. Reply Further Supp. Mot. Dismiss 6.

### VI.

**\*3** The Blands' claims based on Abbott's alleged violations of the Kentucky Consumer Protection Act ("KCPA"), Ky.Rev.Stat. Ch. 367 and the Kentucky Food, Drug, and Cosmetic Act ("KFDCA"), Ky.Rev.Stat. Ch. 217, must also be dismissed. The KCPA prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," where "unfair shall be construed to mean unconscionable." Ky.Rev.Stat. Ann. § 367.170 (LexisNexis 2008). Plaintiffs have not identified Abbott's conduct that constituted the KCPA violation. Rather, they reference all "above stated acts of Abbott" in the Complaint as "unfair, false, and misleading and/or deceptive acts and practices," leaving the Court to determine which, if any, of the many alleged actions described in the Complaint support a claim. The Court's review of the allegations has not revealed a viable claim.

Plaintiffs have not alleged facts creating the plausibility Defendant took any actions affecting Plaintiffs intentionally, knowingly, or in bad faith. Although it is possible Abbott knew about the presence of beetle parts in Similac while Plaintiff—presumably relying upon Abbott's statements in labels and advertisements—was still purchasing the product, the Complaint falls well short of demonstrating this scenario is plausible. *See Twombly,* 550 U.S. at 570. Absent Abbott's knowledge of any problem with its product, the Complaint fails to allege any conduct rising to the level of deception or unconscionableness. The KCPA claim is dismissed.

The KFDCA does not provide for a private right of action, nor does Ky.Rev.Stat. § 446.070 provide a universal private right of action for the violation of any Kentucky statute. Instead, § 446.070 "merely codifies the common law concept of negligence *per se,*" where a statute can provide the standard of care in a negligence action if "the plaintiff was in the class of persons which that statute was intended to protect." *Davidson v. Am. Freightways, Inc.,* 25 S.W.3d 94, 99–100 (Ky.2000) *(citing Hackney v. Fordson Coal Co.,* 19 S.W.2d 989 (Ky.1929)). Furthermore, "the injury suffered must be an event which the [statute] was designed to prevent," *Carman v. Dunaway Timber Co., Inc.,* 949 S.W.2d 569, 570 (Ky.1997), and a substantial factor causing the injury. *Britton v. Wooten,* 817 S.W.2d 443, 447 (Ky.1991). Thus, insofar as Plaintiffs have pled a KFDCA violation as a separate cause of action, the count must be dismissed.

The pleading also fails as a separate theory for Plaintiffs' negligence action because it does not identify a particular advertising or misbranding that violated the KFDCA. The statute prohibits dissemination of false advertising and the manufacture of misbranded foods. Ky.Rev.Stat. Ann. § 217.175. An advertisement is "deemed to be false if it is false or misleading in any particular" and a food is misbranded "[i]f its labeling is false or misleading in any particular." Ky.Rev.Stat. Ann. §§ 217.035 and 217.105. Plaintiffs' response brief points to an Abbott advertising claim that Similac gives babies a "strong start in life ." This statement is typical commercial puffery and the fact that some Similac may have had beetle parts in it does not render the statement false or misleading. Without a false or misleading advertisement or label, Plaintiff has not stated a claim for negligence per se based on a KFDCA violation.

VII.

**\*4** Mikki and Caleb Bland, the minor's parents, have asserted their own claim of damages for the alleged emotional distress suffered from feeding Similac to J.B. Kentucky follows the "impact rule," requiring a physical contact with the instrument of injury and mental distress damages directly resulting from that contact. *Steel Tech., Inc. v. Congleton,* 234 S.W.3d 920, 929 (Ky.2007) *(citing Deutsch v. Shein,* 597 S.W.2d 141, 145–46 (Ky.1980)). The emotional distress must be caused by the contact, not merely accompanied by the contact. *Id.* Here, any contact J.B.'s parents had with Similac did not cause their mental distress. Mikki and Caleb Bland's mental distress, if any, was caused by J.B.'s contact with Similac, not their own. If Plaintiffs' personal injury claims go forward, emotional distress damages will not be available for Mikki and Caleb Bland.

Defendant has also moved for summary judgment as to all personal injury claims on the grounds each one is barred by the applicable statute of limitations. Ky.Rev.Stat. Ann. § 413.140. The parties dispute whether the discovery rule would apply to these circumstances so that Plaintiffs' claims would not actually accrue until September, 2010, when Defendant recalled its product. *See, e.g., Fluke Corp. v. Lemaster,* 306 S.W.3d 55, 60 (Ky.2010) ("discovery rule is available ... where the fact of injury *or* offending instrumentality is not immediately evident") (emphasis added); *but see Asher v. Unarco Material Handling, Inc.,* 596 F.3d 313, 321–22 (6th Cir.2010) (finding discovery rule does not apply to non-latent injury).

It is unclear whether either the injury or the offending instrumentality here were immediately evident. Nevertheless, the Court is reviewing these arguments and will discuss them during the scheduled conference. Finally, the Court reserves judgment on Defendant's motion to dismiss Plaintiffs' negligence, strict liability, negligent misrepresentation, express warranty, and implied warranty of merchantability claims until after a conference with the parties.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss is SUSTAINED as to Counts III (Intentional Misrepresentation), VII (Breach of Implied Warranty for a Particular Purpose), VIII (Unjust Enrichment), IX (Kentucky Statutory Violations), and X (Punitive Damages) and those counts are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant's motion to dismiss the claims of Mikki and Caleb Bland for emotional distress damages are SUSTAINED and these claims are DISMISSED.

The Court will address Defendant's motion as to the remaining issues in a separate memorandum, and after a conference to be scheduled.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 32577

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 5

## *Bono v. O'Connor*

United States District Court for the District of New Jersey

October 5, 2016, Decided; October 5, 2016, Filed

Civ. Action No.: 15-6326(FLW)

**Reporter**

2016 U.S. Dist. LEXIS 185713 *

Bono v. O'Connor, et al.

**Prior History:** *Bono v. O'Connor, 2016 U.S. Dist. LEXIS 67191 (D.N.J., May 23, 2016)*

**Counsel:  [\*1]** For DAVID BONO, Derivatively on Behalf of ADVAXIS, INC., Plaintiff: MITCHELL RYAN AYES, LEAD ATTORNEY, CALLAHAN & FUSCO, LLC, EAST HANOVER, NJ.

For DANIEL J. O'CONNOR, DAVID J. MAURO, SAMIR KHLEIF, ROBERT G. PETIT, RONI A. APPEL, RICHARD J. BERMAN, THOMAS J. MCKEARN, JAMES P. PATTON, DAVID SIDRANSKY, SARA M. BONSTEIN, GREGORY T. MAYES, Defendants: CRAIG CARPENITO, LEAD ATTORNEY, ALSTON & BIRD LLP, NEW YORK, NY.

**Judges:** Freda L. Wolfson, United States District Judge.

**Opinion by:** Freda L. Wolfson

## Opinion

### LETTER ORDER

In May 2016, I issued an opinion resolving a motion to dismiss, filed by various defendant-directors and -officers of Advaxis, Inc. ("Defendants")[1], in this shareholder derivative lawsuit. *See Bono v. O'Connor, No.15-6326, 2016 U.S. Dist. LEXIS 67191 (D.N.J., May 23, 2016)*("May Opinion"). In particular, I dismissed an unjust enrichment claim against a subset of defendants that I categorized as the Recipient Defendants. In the present matter, Plaintiff David Bono ("Plaintiff") has moved for reconsideration of my decision dismissing that claim. The Recipient Defendants oppose the motion. For the following reasons, Plaintiff's motion is **DENIED**.

Because I write for the benefit of the parties, I will not extensively recount the facts of this case. Instead, the facts chronicled in the May Opinion **[\*2]** are incorporated in this Letter Order. Briefly, in the instant Complaint, Plaintiff asserted claims against Defendants for violations of *Section 14(a)* of the Securities Exchange Act of 1934 (the "Exchange Act") and *Rule 14a-9*, as well as Delaware state law claims for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These claims arise out of Plaintiff's

---

[1] These defendants include Daniel J. O'Connor, David J. Mauro, Samir Khleif, Robert G. Petit, Roni A. Appel, Richard J. Berman, Thomas J. McKearn, James P. Patton, David Sidransky, Sara M. Bonstein, and Gregory T. Mayes.

allegations that Defendants conspired to spring-load stock awards as part of an equity incentive plan. Relevant to the motion here, I dismissed the breach of fiduciary duty claim against the Recipient Defendants[2] based on a determination that Plaintiff failed to sufficiently allege that these defendants knew that stock awards were spring-loaded or participated in any wrongdoing. Consistent with that finding, I also dismissed Plaintiff's claim for unjust enrichment lodged against the Recipient Defendants. I reasoned that because Plaintiff's theory of liability for unjust enrichment is directly derived from his claim for breach of fiduciary duty, a finding of insufficient pleading as to the fiduciary claim necessarily compels the same finding as to the unjust enrichment claim. Plaintiff asks this Court to reconsider that ruling.

*Local Civil Rule 7.1(i)* governs **[*3]** motions for reconsideration and requires the moving party to "set[ ] forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked[.]" *L. Civ. R. 7.1(i)*. The burden on the moving party is quite high and reconsideration is granted very sparingly. To prevail on such a motion, the movant must demonstrate either: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)*.

Notably, a motion seeking reconsideration may not be used by a party to "restate arguments that the court has already considered." *Lawrence v. Emigrant Mortg. Co., Civ. No. 11-3569, 2012 U.S. Dist. LEXIS 150589, 2012 WL 5199228, *2 (D.N.J. Oct. 18, 2012)*. Nor may be such a motion be used "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior

---

[2] The Recipient Defendants are those officers and directors who received the stock awards, but were not part of the committee that approved and issued the equity incentive plan in the first instance. Therefore, the Recipient Defendants were not alleged to have "self-determined" their own compensation.

to the entry of judgment." *NL Indus., Inc. v. Comm. Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996)*. In other words, "[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." *Tishcio v. Bontex, Inc., 16 F.Supp.2d 511, 532 (D.N.J. 1998)* (internal citation omitted). Further, where a party merely has a difference of opinion with the court's decision, the issue should be raised through the normal appellate process; reconsideration is not the appropriate vehicle. *Dubler v. Hangsterfer's Laboratories, Civ. No. 09-5144, 2012 U.S. Dist. LEXIS 53847, 2012 WL 1332569, *2 (D.N.J. Apr. 17, 2012)* (citing *Bowers v. Nat'l Collegiate Athletic Ass'n, 130 F. Supp. 2d 610, 612 (D.N.J. 2001))*.

Plaintiff **[*4]** moves for reconsideration on that basis that my legal conclusion in the unjust enrichment context is at odds with "well-settled" Delaware law. Before I reach the merits of Plaintiff's arguments, I will comment first on the manner in which Plaintiff has previously presented his position to this Court. In Plaintiff's opposition brief to Defendants' motion to dismiss, he argued only that his unjust enrichment claim against the Recipient Defendants should survive because he had properly pled a breach of fiduciary against them. Plf's Opp. Br., p. In that regard, Plaintiff cited to *Weiss v. Swanson, 948 A.2d 433 (Del. Ch. 2008)* and *Ausikaitis ex rel. Masimo Corp. v. Kiani, 962 F. Supp. 2d 661 (D. Del. 2013)*. Indeed, these two decisions held, generally, that when a plaintiff properly pleads a breach of fiduciary claim, "if successful, may help a plaintiff prove a claim for unjust enrichment." *Ausikaitis, 962 F. Supp. 2d at 680*. Plaintiff made no other arguments.

Because I found that Plaintiff had insufficiently pled his breach of fiduciary claim against the Recipient Defendants, I determined, consistent with Defendants' position, that the unjust enrichment necessarily fails for the same reasons. In support of my conclusion, I cited *Calma v. Templeton, 114 A.3d 563, 591 (Del. Ch. 2015)*, which stands for the general proposition that "[a]t the pleadings stage,

an unjust enrichment claim that is entirely **[\*5]** duplicative of a breach of fiduciary duty claim— i.e., where both claims are premised on the same purported breach of fiduciary duty—is frequently treated "in the same manner when resolving a motion to dismiss." *Id.* (citing *Frank v. Elgamal, 2014 Del. Ch. LEXIS 37, 2014 WL 957550, at \*31 (Del. Ch. Mar. 10, 2014)*; *Dubroff v. Wren Holdings, LLC, 2011 Del. Ch. LEXIS 164, at \*11 (Del. Ch. Oct. 28, 2011)*; *Monroe County Employees' Retire. Sys. v. Carlson, 2010 Del. Ch. LEXIS 132, at \*1 (Del. Ch. June 7, 2010))*. In that regard, Plaintiff, in his opposition brief, appeared to have conceded that an unjust enrichment claim is "entirely duplicative" of a breach of fiduciary duty claim. *See* Plt.'s Opp. Br., p. 47 n.46 (citing *Caspian Select Credit Master Fund Ltd. v. Gohl, 2015 Del. Ch. LEXIS 246, 2015 WL 5718592, at \*16 (Del. Ch. Sept. 28, 2015))*.

Having made no other substantive arguments, Plaintiff, now, for the first time on this motion, claims that a defendant who receives and accepts an unlawful benefit is liable for unjust enrichment even when that defendant committed no wrong. Merits aside, a reconsideration motion is not a vehicle for Plaintiff to introduce legal arguments that should have been raised previously, particularly since the cases upon which Plaintiff rely on this motion have been decided long ago. *See Warren v. Fisher, 2013 U.S. Dist. LEXIS 178944, at \*12 (D.N.J. Dec. 20, 2013)*("[r]econsideration is not . . . an opportunity to present new legal arguments that were available but not advanced when the underlying motion was decided."). Plainly, Plaintiff attempts to re-litigate issues that he had an opportunity to fully address.

Nevertheless, I recognize that I have **[\*6]** an obligation to correct any clear error of law. On this basis, I will entertain Plaintiff's newly asserted legal arguments. Plaintiff's argument is straightforward: under Delaware law, unjust enrichment encompasses a defendant who receives and accepts an unlawful benefit even when that defendant retaining the benefit is not a wrongdoer

and even though he/she may have received it honestly in the first instance. In that connection, Plaintiff argues that because the Recipient Defendants are alleged to have received illegal stock awards, it is irrelevant whether these defendants had knowledge that the awards were spring-loaded. For support, Plaintiff cites *In re Tyson Foods, Inc. Consol. S'holder Litig., 919 A.2d 563 (Del. Ch. 2007)*, for this proposition. While *Tyson* indeed established such a principle, I do not find it persuasive or sound under Delaware law. *See Gruber v. Owens-Illinois, Inc., 899 F.2d 1366, 1369 (3d Cir. 1990)*(holding that intermediate state appellate court cases are useful but not binding evidence of what the state Supreme Court would decide). In holding that an innocent recipient of an illegal benefit can be held liable under the theory of unjust enrichment, the *Tyson* court's terse explanation in that regard was solely based on the Delaware Supreme Court's decision in *Schock v. Nash, 732 A.2d 217 (Del. 1999)*. However, *Schock* did not concern unjust **[\*7]** enrichment; rather, *Schock* discussed the concept of restitution. Contextually, the legal distinction between unjust enrichment and restitution is a fine one, but it nevertheless is significant. As the Delaware Supreme Court explained, "[r]estitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Id. at 232-33* (citations and internal quotations omitted). From that definition, the Court found that restitution — as a *remedy* or *relief* — could be equitably imposed on an innocent recipient who received an ill-gotten gain. *Id. at 233*.

On the other hand, unjust enrichment is a *cause of action* that, while it requires the unjust retention of a benefit to the loss of another, *see Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010)*, also requires "wrongdoing" on the part of the recipient. *Terr. of the U.S. V.I. v. Goldman, Sachs & Co., 937 A.2d 760, 796 n.161 (Del. Ch. 2007)*, aff'd, *956 A.2d 32, (Del. 2008)*. In my view, the *Tyson* Court

2016 U.S. Dist. LEXIS 185713, *7

blurred the line between restitution and unjust enrichment, and in doing so, conflated the two legal principles. Indeed, other chancery decisions in Delaware make it clear that "unjust enrichment requires an absence of justification for the transfer that **[\*8]** enriches one party and impoverishes the other," and that "requirement usually entails some type of wrongdoing . . . at the time of the transfer." *Id.* (finding that a passive shareholder who did not partake in any wrongdoing and received a dividend in good faith has not been unjustly enriched); *In re Lear Corp. S'holder Litig., 967 A.2d 640, 657, n. 73 (Del. Ch. 2008)*(finding that wrongdoing is required to establish unjust enrichment); *PharmAthene, Inc. v. SIGA Techs., Inc., 2011 Del. Ch. LEXIS 136, at \*99 (Del. Ch., Sept. 22, 2011)* (same); *see also, Palese v. Del. State Lottery Office, 2006 Del. Ch. LEXIS 126, at \*5 (Del. Ch. 2006)*, aff'd, *913 A.2d 570 (Del. 2006)*. Although I am called upon to interpret Delaware law, I note that my interpretation here is also consistent with this district's view of unjust enrichment. *See In re: Cheerios Mktg. & Sales Practices Litig., 2012 U.S. Dist. LEXIS 128325, at 36 (D.N.J. Sep. 10, 2012)* (finding that unjust enrichment is not a viable theory when there is no conscious wrongdoing (citing Restatement Third, Restitution and Unjust Enrichment, Vol. 1 § 3)); *see also SEC v. Teo, 746 F.3d 90, 107 (3d Cir. 2014)*.

Accordingly, I conclude that based on Delaware law, in order to properly state an unjust enrichment claim against the Recipient Defendants, Plaintiff must allege that these defendants themselves participated in some type of wrongdoing. Because no such allegations were presented in the Complaint, I find that no clear error of law exists for reconsideration purposes.[3] Accordingly, Plaintiff's motion is **DENIED**.

Sincerely,

/s/ Freda L. Wolfson

Freda L. Wolfson

U.S. District **[\*9]** Judge

_____

**End of Document**

_____

[3] I note that the breach of fiduciary claim against the Recipient Defendants is dismissed without prejudice. In the event that Plaintiff re-pleads that claim successfully, the unjust enrichment claim against the Recipient Defendants may be revived.

# Tab 6

2012 WL 1964452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Edna Diane BOWMAN and
Amy McHenry, Plaintiffs,
v.
RAM MEDICAL, INC., Amerimed Corp.,
Henry Schein, Inc., Marathon Medical
Corp., Medline Industries, MMS–A Medical
Supply Co., and Q–Med Corp., Defendants.

Civil Action No. 10–cv–4403 (DMC)(MF).
|
May 31, 2012.

**Attorneys and Law Firms**

Philip A. Tortoreti, Victoria Hwang-Murphy, Daniel R. Lapinski, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Plaintiffs.

Kenneth N. Laptook, Wolff & Samson, PA, West Orange, NJ, Karen E. Clarke, Proskauer Rose, LLP, Newark, NJ, Scott L. Haworth, Nora Coleman, Haworth Coleman & Gerstman, LLC, New York, NY, Stuart Mark Feinblatt, Sills Cummis Epstein & Gross, P.C., Newark, NJ, John C. Whipple, Arseneault, Whipple, Fassett & Azzarello, LLP, Chatham, NJ, Thomas McKay, III, John Philip Johnson, Cozen & O'Conner, Esqs., Cherry Hill, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Industries, MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55). Pursuant to FED.R.CIV.P. 78, which states that the court has the authority to provide for submitting and determining the motions on briefs without oral hearings, no oral argument was heard.

*I. BACKGROUND*

**A. Factual Background**

Defendants are in the business of marketing, distributing, selling, manufacturing or causing to be manufactured the surgical mesh at issue in this litigation. (Pl.'s Compl. ¶ 35, Aug. 26, 2010, ECF No. 1). Defendants, at all relevant times, allegedly sold surgical mesh as sterile, Food and Drug Administration ("FDA") approved, indicated for surgical use and Bard-manufactured. *Id.* at ¶ 36. Plaintiffs bring this action on behalf of themselves and putatively on behalf all other similarly situated persons "in the United States who had Defendants' counterfeit surgical mesh surgically implanted from September 1, 2007 until the present." (Pl.'s Compl. ¶ 26). The Complaint includes specific information about two Plaintiffs, Edna Diane Bowman and Amy McHenry. On December 1, 2009, Plaintiff Edna Diane Bowman underwent a surgical procedure at Lexington Medical Center in West Columbia, South Carolina ("LMC"), during which Defendants' counterfeit mesh was implanted in her body. *Id.* at ¶ 40. On February 23, 2010, Plaintiff Amy McHenry underwent a laparoscopic hernia repair procedure at LMC, during which Defendants' counterfeit mesh was implanted in her abdomen. *Id.* at ¶ 37. On July 19, 2010, Plaintiff Bowman received a letter from LMC informing her that the surgical mesh implanted during her surgery was "counterfeit surgical mesh." *Id.* at ¶ 51. On July 15, 2010, Plaintiff McHenry received a letter from LMC informing her of the same. *Id.* at ¶ 49.

Essentially, Plaintiffs claim that a counterfeit product was used during surgery without their consent or knowledge. However, Plaintiffs cite no physical injury or harm resulting. Plaintiffs state their claims in five counts including: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"), (2) unjust enrichment and common law restitution, (3) breach of express warranty, (4) breach of implied warranty of merchantability and (5) breach of implied warranty of fitness for a particular purpose. Plaintiffs contend the nature of the action involves false, misleading, inaccurate, deceptive and unconscionable commercial practices. (Pl.'s Compl. ¶ 1).

Plaintiffs explain that their belief was that the surgical mesh implanted was: (1) Bard-manufactured, (2) sterile, (3) approved for use by the FDA, and (4) indicated for surgical use. (Pl.'s Compl. ¶ 47). Plaintiffs claim that in the condition in which Defendants sold their counterfeit mesh, the mesh had zero value. *Id.* at ¶ 48. Further, Plaintiffs state that had they

known that Defendants' surgical mesh was not as represented, they would not have purchased, or agreed to purchase of the surgical mesh for use during the surgical procedures. *Id.* at ¶ 54. The only ascertainable loss Plaintiffs allege is the purchase price of a product they believed to be something else. *Id.* at ¶ 55. Plaintiffs vaguely state they "will incur [future] costs to repair the damages caused by Defendants' unlawful activity," but omit to further explain such "repairs." *Id.*

**\*2** Plaintiffs seek relief that includes: class certification; declarations that Defendants' unlawful actions violate the NJCFA, breach express and implied warranties of merchantability and implied warranties of fitness, and unjustly enrich Defendants; orders directing disgorgement of profits derived from unlawful practices, compelling Defendants to reimburse Plaintiffs in an amount equal to their ascertainable loss, and treble damages pursuant to N.J.S.A. 56:8–1 *et seq.;* restitution; and, attorney's fees. (Pl.'s Compl. ¶ 93).

### B. Procedural Background

This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Indus., MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). This Court *sua sponte* consolidated the *Calo Action* (Docket No. 11–cv–7381) with this matter on April 17, 2012.

Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55).[1] Plaintiff Irene Kirk Calo then filed a motion to voluntarily dismiss her action, without prejudice, on May 21, 2012 (ECF No. 58), which this Court **granted** (ECF No. 58) pursuant to FED. R. CIV. P. 41(a)(2).

[1]    Thereafter, Plaintiff Calo and C.R. Bard, Inc. stipulated to dismissal of Plaintiff's claims against C.R.Bard, Inc. with prejudice on May 29, 2012. Since Calo's motion for voluntary dismissal was granted on this day, this point is moot.

### II. STANDARD OF REVIEW

In deciding a motion to dismiss, the District Court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to [the Plaintiff]." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224. 228 (3d Cir.2008V The Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Instead, when their truth is assumed, those factual allegations "must be enough to raise a right to relief above a speculative level." *Twombly,* 550 U.S. at 555. Plaintiff's obligation "requires more than labels and conclusions." *Id.* at 545. To survive a motion to dismiss, the complaint must state a plausible claim, not merely conclusory statements deriving from assumptions or inferences. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

In reviewing a motion to dismiss, it is well-established that a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *M & M Stone Co. v. Pa.,* 388 Fed.Appx. 156, 162 (3d Cir.2010).

### III. DISCUSSION

#### A. STANDING

As an initial matter, this Court must discuss whether jurisdiction is founded in this case, given the requirements of Article III. Defendants say Plaintiffs lack standing because they state no injury in fact. (Def.'s Am. Mot. Dismiss 1, Sept. 30, 2011, ECF No. 51). Under Article III, federal judicial power is restricted to cases and controversies. *Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 273, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). The case-or-controversy requirement means that Plaintiff must establish standing. *Id.* Without standing, the federal court lacks subject matter jurisdiction and must dismiss the action. *Common Cause of Pa. v. Pa.,* 558 F.3d 249, 257 (3d Cir.2009). Article III standing requires adequate establishment of: 1) an injury in fact, 2) causation, and 3) redressability. *Sprint Commc'ns,* 554 U.S. at 273. An injury in fact involves a concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical, invasion of a legally protected interest. *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The causation element of standing requires a connection between the alleged injury in fact and the alleged conduct of the Defendant. Id The redressable element means that it is likely,

and not merely speculative, that the injury in fact would be remedied by the relief sought. *Id.*

**\*3** Defendants, in their motion to dismiss, explain how Plaintiffs fail to adequately establish the injury in fact element of standing:

> In the instant matter, [P]laintiffs summarily allege that they "will incur costs to repair the damages caused by [D]efendants' unlawful activity" [ (Pl.'s Compl. ¶¶ 55 and 64) (emphasis omitted) ] without any indication of when or why such costs might be incurred, and while explicitly excluding any allegations of personal injury, either present or future. [ (Pl.'s Compl. ¶ 10) ] ... Plaintiffs have not alleged present, manifest or even imminent damages, or any adverse consequences whatsoever. The allegations are purely subjective and hypothetical. (Def.'s Am. Mot. Dismiss 7).

Plaintiffs counter that the injury in fact is the cost of buying a product that they would not have bought, had facts that arose later been apparent at the time when they could have made a choice. (Pl.'s Opp'n 10, Mar. 28, 2011, ECF No. 37). In the same vein, Plaintiffs argue that they received something other than what was bargained for. *Id.*

Defendants supply strong argument showing that Plaintiffs fail to adequately establish that the instant scenario demonstrates injury in fact. On the spectrum of proof relevant to injury in fact, Plaintiffs' case presents more of an "abstract" notion of injury, rather than a harm that is "distinct and palpable." *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343; *and O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Indeed, it can be assumed from the complaint that Plaintiffs might not have even discovered that "counterfeit mesh" was implanted without the letter from LMC describing the situation as such. Though Plaintiffs cleverly oscillate between contract and tort theories in an attempt to show that a harm amounts to "injury in fact" as envisioned under the standards for Article III standing, their arguments fall short of concrete proof.

Thus, this Court lacks subject matter jurisdiction over Plaintiffs claim and must dismiss. Though no further analysis is required due to the lack of subject matter jurisdiction, this Court will engage in a brief analysis of each Count of the Complaint.

### B. Count I: Violation of the New Jersey Consumer Fraud Act ("NJCFA")

Plaintiffs argue that their NJCFA claims are distinct and sustainable based on an economic injury theory, given they paid a premium for a product based on Defendants' misrepresentations. *See Id.* at 9; *see also Medley v. Johnson & Johnson Consumer Cos., Inc.,* No. 10–cv–2291, 2011 WL 159674, at \*2 n. 2 (D.N.J. Jan.18, 2011) (DMC). Plaintiffs will not establish the elements required by the NJCFA based on the fact that their allegations are "founded in the principals of economic inequities, not tort ..." (Pl.'s Opp'n 5). A claim under the NJCFA requires proof of: 1) an unlawful practice as defined under the Act; 2) ascertainable loss of moneys or property; and 3) a causal relationship between Defendant's unlawful conduct and Plaintiff's ascertainable loss. N.J.S.A. 56:8–19 (1998).

**\*4** Plaintiffs state that Defendants' business practice of marketing, advertising and promoting counterfeit surgical mesh is "false, misleading, inaccurate and deceptive." (Pl.'s Compl. ¶ 58). However, Plaintiffs oppose Defendants' motion to dismiss with argument that focuses almost exclusively upon the heightened pleading requirement Defendants' suggest, and not at all upon the supplemental evidence that would buttress Plaintiff's otherwise conclusory claims. The NJCFA requires an unlawful practice such as an affirmative act, a knowing omission or a regulatory violation. *Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, \*2 (D.N.J. Jan.14, 2008) (citation omitted). Plaintiffs did not specifically allege any conduct that tends to amount to an "unlawful practice" under the NJCFA.

Otherwise fatal to Plaintiffs' claim is the failure of proof problem with the contention that they never received the benefit of the bargain or "paid for a product that was of no value." (Pl.'s Compl. ¶ 63). Such allegations do not satisfy the NJCFA's "ascertainable loss" requirement, without more. Though the "counterfeit surgical mesh" has a price tag, the "no value" concept of it, considering Plaintiffs do not assert any physical injury or otherwise, is abstract. Plaintiffs do not provide specific proofs of harm to support, or upon which this Court could infer a quantifiable loss. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 252, 872 A.2d 783 (2005); *see also, Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, at \*3 (D.N.J. Jan.14, 2008). Stating the expectation of a future loss, similarly fails to meet the requirement of the CFA, because it is too speculative. *Id.* This insurmountable problem is the same as that which precluded

Bowman v. RAM Medical, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1964452

Plaintiff from establishing injury in fact or standing purposes. Plaintiffs fail to state a claim under the NJCFA.

### C. Count II: Unjust Enrichment and Common Law Restitution

Plaintiffs may not sidestep Article III standing requirements by basing their claim in contract theory. Plaintiffs allege that they would not have purchased the product if it was not sterile, Bard-manufactured, FDA approved or indicated for surgical use. As such, Plaintiffs contend Defendants were unjustly enriched by their purchase and that they are therefore entitled to restitution. The parties point to a matter previously before this Court, *Koronthaly v. L'Oreal USA, Inc.,* No. 07–cv–5588, 2008 WL 2938045 (D.N.J. July 29, 2008), *aff'd,* 374 Fed.Appx. 257 (3d Cir.2010) (Plaintiff asserted lipstick products contained lead in far greater amounts than permitted in candy by the FDA). The Third Circuit reviewed a similar issue of whether a consumer could recover on the basis that she did not know what she was getting or would not have purchased the product had she known certain details about it. *Koronthaly,* 374 Fed.Appx. at 258. In a short opinion, the Court held that the purchases were not made pursuant to a contract and therefore Plaintiff had failed to prove that that which would have precluded her from buying the product had formed part of the basis of any bargain. *Id.* at 259. Plaintiff's claim failed because she did not demonstrate a concrete injury in fact, and it could not otherwise be sustained by artful pleading dependent upon contract theory. *Id.* Despite Plaintiffs' contentions that this case is distinguishable from *Koronthaly,* the fact that Plaintiffs did not actually receive the product they intended to purchase and paid for, does not affect Plaintiffs' failing contract claims. Rather, the Third Circuit guides that the focus is upon the harm, or in this case, the lack thereof, rather than the buyer's expectation.

### D. Count III: Breach of Express Warranty

**\*5** Plaintiffs fail to demonstrate specifically that they relied upon labeling or other expressions of promise that could have formed the "basis of the bargain." Plaintiffs frame their breach of express warranty claim almost identically to their breach of implied warranty claims. In other words, Plaintiffs submit no specific proof of promises that were expressed, whether they amounted to, as Plaintiffs suggest, assertions that the product was (1) Bard-manufactured, (2) sterile, (3) FDA

approved, (4) indicated for surgical use or otherwise. Rather, Plaintiffs frame their claims upon assumptions of promise and information that the surgical mesh used was counterfeit. Establishing an express warranty requires more substantial proof. Indeed, the Third Circuit held that breach of an express warranty sounds in breach of contract and, as such, Plaintiffs' claim foils for reasons similar to those described in the prior section. *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 484 (3d Cir.1965). This Court will not assume, even considering LMC's concession that the mesh was counterfeit, that these four expressions were specifically made and relied upon. Such a lack of specificity does not comport with the nature of the theories supporting consumer reliance upon an express warranty.

### E. Counts IV and V: Breach of Implied Warranty of Merchantability and Fitness for a Particular Purpose

Defendants convince this Court that, standing alone, the counterfeit nature of the surgical mesh "does not demonstrate that [Plaintiffs] or others could not use the product safely." (Pl.'s Opp'n 27). Plaintiffs do not supply any supporting facts, other than the counterfeit designation of the mesh, rendering the product valueless or unfit. Finally, Plaintiffs fail to assert any injury, and in fact disclaim any physical harm, resulting from the product. Plaintiffs again rely on the abstract concept of the mesh's "zero value" without proving specifically how the product failed. Plaintiffs further tail to show that the product is generally or otherwise unfit for the ordinary purpose which it was used. Rather, Plaintiffs declare that the surgical mesh continues to work for the purpose for which it was designed, to this day, despite any misrepresentations or omissions regarding the brand or otherwise. Plaintiffs can sustain neither a claim of breach of implied warranty of merchantability nor fitness for a particular purpose.

### IV. CONCLUSION

For the foregoing reasons, this Court hereby **grants** Defendants' motion to dismiss Plaintiff's complaint. An appropriate order, filed on this day, follows this opinion.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1964452

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 7

# *Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.)*

United States District Court for the Northern District of Illinois, Eastern Division

December 18, 2006, Decided

MDL-1703, No. 05 C 4742, No. 05 C 2623

**Reporter**

2006 U.S. Dist. LEXIS 92169 *

IN RE SEARS, ROEBUCK & CO. TOOLS MARKETING AND SALES PRACTICES LITIGATION; CHARLES CHATHAM et al., individually and on behalf of all others similarly situated, Plaintiffs, v. SEARS, ROEBUCK & CO., Defendant.

**Subsequent History:** Class certification denied by *Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.), 2007 U.S. Dist. LEXIS 89349 (N.D. Ill., Dec. 4, 2007)*

**Prior History:** *Santamarina v. Sears, 466 F.3d 570, 2006 U.S. App. LEXIS 25861 (7th Cir. Ill., 2006)*

**Counsel: [\*1]** For Sears, Roebuck & Co.: Francis A. Citera, John F. Gibbons, Greenberg Traurig, LLP, Chicago, IL.

For Tracy Hutson: Michael T. George, Michael T. George, P.C., St. Louis, MO.

For Jeffrey Greenfield: Aron David Robinson, LEAD ATTORNEY, Law Office of Aron D. Robinson, Chicago, IL; Lance A. Harke, Harke & Clasby LLP, Miami, FL.

For Charles Velez: Barbara J Hart, Goodkind, Labaton, Rudoff & Sucharow, New York, NY.

For Brenda Lifsey, Guillermo Garcia Santamarina, Chris Wilson: Donald R Pepperman, Blecher & Collins, Los Angeles, CA.

For Larry Steven Anderson, Jr.: Lawrence Wiley Schad, Schad, Diamond & Shedden, P.C., Chicago, IL.

For Charles Chatham: Thomas M Sobol, Hagens Berman Sobol Shapiro, Cambridge, MA.

For Tammy Cyr, Heather Pistorius: Jennifer Winter Sprengel, Miller Faucher and Cafferty, LLP, Chicago, IL.

**Judges:** John F. Grady, United States District Judge.

**Opinion by:** John F. Grady

# Opinion

## *MEMORANDUM OPINION*

Before the court is defendant's motion to dismiss

2006 U.S. Dist. LEXIS 92169, *1

plaintiffs' unjust enrichment claims brought pursuant to Illinois law in Count IV of the Second Amended Consolidated Class Action Complaint filed in *Chatham v. Sears, Roebuck & Co.,* 05 C 2623. **[*2]** For the reasons explained below, the motion is granted.

## BACKGROUND

In this putative class action, plaintiffs, who are citizens of several different states, claim that defendant Sears, Roebuck & Company ("Sears") deceptively advertised its proprietary line of "Craftsman" tools as manufactured exclusively in the United States ("Made in USA") when in fact many of the tools are foreign-made or contain significant foreign parts.

Plaintiffs' current complaint is titled "Second Amended Consolidated Class Action Complaint." In our Pretrial Order Number 6 of July 31, 2006, we dismissed Counts I and II of the complaint (which alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Deceptive Trade Practices Act) with prejudice as to all plaintiffs except William Beanblossom and John S. Bertrand. We dismissed Beanblossom and Bertrand's claims without prejudice for failure to allege fraud with particularity. (Since then, Bertrand voluntarily dismissed his claims; thus, Beanblossom is the only remaining Illinois plaintiff.) We also dismissed Count VII, the Magnuson-Moss claim, with prejudice as to all plaintiffs. And as to certain plaintiffs, **[*3]** we dismissed Count III, which is alleged in the alternative to Counts I and II and in which plaintiffs seek damages and/or injunctive relief under the consumer fraud and deceptive trade practices of all fifty states and the District of Columbia.

Other claims asserted by plaintiffs are Count IV, an unjust enrichment claim, and Count VI, a claim for

"equitable relief." [1] As to Count IV, we stated in our previous order: "It appears to the court that the claim most likely to involve an amount of money sufficient to support federal diversity jurisdiction in this case, either on an individual or a class basis, is plaintiffs' claim for unjust enrichment . . . . Defendant believes that there is no basis for the unjust enrichment claim, and a briefing of the issues regarding Count IV will be the next item of business in the litigation." (Pretrial Order Number 6 at 5.) We gave Sears leave to file a motion to dismiss Count IV and set a briefing schedule, instructing the parties to focus on the issues of what state's law applies to the unjust enrichment claims and whether a nexus must exist between the injury sustained by a plaintiff and the amount of recoverable disgorgement of defendant's **[*4]** profits. The motion to dismiss is now fully briefed.

## DISCUSSION

### A. *Choice of Law*

Our first inquiry is the choice-of-law question-- which state's (or states') law applies to plaintiffs' unjust enrichment claims. The parties do not agree on this issue. Even though plaintiffs are citizens of several different states, they all contend that Illinois law applies to their claims (evidently because they are seeking certification of a nationwide class). [2] Defendant, on the other hand, contends that the claims are governed by the laws of the various states where each plaintiff saw the advertising and purchased his or her tools. [3]

---

[1] The complaint does not contain a Count V.

[2] In the alternative, plaintiffs contend that the unjust enrichment laws of their home states or the states where they purchased Craftsman tools apply. (Second Amended Consolidated Class Action Complaint P 125.)

[3] We refer to these states for convenience as plaintiffs' "home states," even though at least one of the plaintiffs purchased some of her tools in a state where she does not reside.

Plaintiffs suggest that it is not necessary to engage in a choice-of-law analysis (implying that we should simply apply Illinois law) because

**[\*5]** The parties do agree that because Illinois is the forum state of this diversity case, we must consult the choice-of-law rules of Illinois to determine which state's substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); GATX Leasing Corp. v. National Union Fire Ins. Co., 64 F.3d 1112, 1114 (7th Cir. 1995).* The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases. [4] The Seventh Circuit has stated:

the unjust enrichment laws of the fifty states are "substantially identical." (Pls.' Opp'n to Def.'s Mot. at 10.) We are unpersuaded. Plaintiffs attach an exhibit that purports to be a fifty-state survey of unjust enrichment. However, it is merely a list of one-sentence statements of the elements of unjust enrichment drawn from a single case from each state. Plaintiffs do not engage in any sort of analysis of the nuances of unjust enrichment law or what must actually be proved in each state. It is clear just from our review of Illinois law that unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states. As discussed in *Clay v. American Tobacco Co., 188 F.R.D. 483, 501 (S.D. Ill. 1999)* (citations omitted): "[V]ariances exist in state common laws of unjust enrichment. The actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense."

[4] We recognize that Count IV is an unjust enrichment claim, not a tort claim. It is, however, an unjust enrichment claim that sounds in tort; it is based on alleged wrongful conduct, fraud. Under Illinois law, there are three distinct prongs of unjust enrichment: (1) where a benefit should have been given to plaintiff, but a third party mistakenly gave it to defendant instead; (2) where the defendant procured the benefit through some type of wrongful conduct; and (3) where plaintiff had a better claim to the benefit than the defendant for some other reason. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 545 N.E.2d 672, 679, 137 Ill. Dec. 19 (Ill. 1989).* Plaintiffs rely on the second prong. It makes more sense, therefore, to use tort terminology in the choice-of-law analysis.

The parties devote considerable attention to which section of the Restatement (Second) of Conflict of Laws has the greatest application to this case-- *§ 6* or *§ 221*--which is not worth belaboring. *Comment a to § 221* states explicitly that that section "applies to claims, which are based neither on contract nor on tort, to recover for unjust enrichment." Plaintiffs' claim is an unjust

The Illinois Supreme Court uses the "most significant relationship" test for choosing the appropriate law in tort cases. In practice, this means that "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." A court is to determine whether Illinois has the more significant relationship by examining the following factors: (1) the place of the injury, (2) the place where the injury-causing conduct occurred, (3) the domicile of the parties, and (4) the place where the relationship between the parties is centered. The Illinois courts also consider "the interests and public policies **[\*6]** of potentially concerned states . . . as they relate to the transaction in issue."

*Fredrick v. Simmons Airlines, Inc., 144 F.3d 500, 503-04 (7th Cir. 1998)* (citing *Esser v. McIntyre, 169 Ill. 2d 292, 661 N.E. 2d 1138, 1141, 214 Ill. Dec. 693 (Ill. 1996)* and *Jones v. State Farm Mut. Auto. Ins. Co., 289 Ill. App. 3d 903, 682 N.E.2d 238, 249, 224 Ill. Dec. 677 (Ill. App. Ct. 1997)).*

**[\*7]** The place of the injury here (or, in unjust enrichment terms, the place where plaintiffs allegedly "conferred" the benefit on defendant) is the plaintiffs' home states where they purchased Sears's tools. The place where the parties' relationship is centered is the plaintiffs' home states as well. Plaintiffs saw the allegedly misleading advertising in those states, and they purchased the tools (which were located there) in those states as well. Plaintiffs contend that the relationship is centered in Illinois because plaintiffs purchased the

enrichment claim that is based on tort. Thus, *§ 221* does not apply. But in any event, its substance is largely the same as the tort choice-of-law analysis outlined *infra*. For example, one of the elements of the choice-of-law analysis set forth in *§ 221* is "the place where the act conferring the benefit or enrichment was done," which is the same as "the place of the injury." Under both analyses, we examine the domicile of the parties and the place where the relationship between the parties was centered. And as for *§ 6*, which sets forth general principles of choice of law, we analyze the primary choice-of-law factors set forth in Illinois case law in the context of the underlying principles set forth in *§ 6*.

tools "by virtue of" Sears's nationwide advertisements, which were conceived of and sent from Illinois. (Pls.' Opp'n to Def.'s Mot. at 10.) This characterization rings hollow. The relationship arose from plaintiffs' purchases of Craftsman tools, which occurred in plaintiffs' home states. [5] *Cf. First Wisconsin Trust Co. v. Schroud, 916 F.2d 394, 399 (7th Cir. 1990)* (where unjust enrichment claim arose from the purchase of property in Indiana, relationship between the parties was centered in Indiana).

[*8] The "domicile of the parties" factor adds little to the mix; it is a wash. The plaintiffs are domiciled in their respective home states, and Sears, though not an Illinois corporation, is headquartered in Illinois. The last factor--the place where the injury-causing conduct occurred--seems to favor Illinois because that is where Sears is headquartered and where its advertising decision-making takes place.

Thus, for the unjust enrichment claims, the parties and underlying occurrences have more significant contacts with plaintiffs' home states than with Illinois. The most important factors in this case are the place of injury and the center of the parties' relationship, and both of those factors point to the plaintiffs' home states. Plaintiffs argue that, considering underlying choice-of-law policies, Illinois has a interest in "controlling the acts" of its corporate citizens. This may be true, but the plaintiffs' home states also have an interest in regulating business conduct that takes place within their borders. In addition, those states also have an interest in preventing and remedying unjust enrichment that occurs at the expense of their citizens.

After considering all of the [*9] relevant factors and the underlying choice-of-law principles, we conclude that the laws of each of the plaintiffs' home states apply to their unjust enrichment claims.

[6] Accordingly, the non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed with prejudice. The unjust enrichment claims that are brought under the unjust enrichment laws of the non-Illinois plaintiffs' home states or the states where they purchased their Craftsman tools survive.

## B. *Plaintiff Beanblossom's Unjust Enrichment Claim*

As noted *supra,* William Beanblossom is the only remaining Illinois plaintiff. Therefore, his unjust enrichment claim is the only one to which Illinois law applies. Sears moves to dismiss the claim [*10] pursuant to *Federal Rule of Civil Procedure 12(b)(6)*.

Sears maintains that Beanblossom's unjust enrichment claim fails because it is equitable in nature and plaintiff fails to allege that he has no adequate remedy at law. It is well settled that a party cannot seek equitable relief when he has an adequate legal remedy. *See, e.g., Crowley v. Golden Rule Ins. Co., 166 Ill. App. 3d 199, 519 N.E.2d 1191, 1192, 117 Ill. Dec. 24 (Ill. App. Ct. 1988)*. Unjust enrichment, however, is a legal claim. *See Partipilo v. Hallman, 156 Ill. App. 3d 806, 510 N.E.2d 8, 11, 109 Ill. Dec. 387 (Ill. App. Ct. 1987)*; *Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc., 135 F.3d 526, 527-28 (7th Cir. 1998)*. Its significant equitable aspects [7] have led to numerous confusing statements in case law that it is equitable in nature, but it is essentially an action at law. *Burns, 135 F.3d at 528*.

[*11] Sears asserts that Beanblossom "cannot state an unjust enrichment claim grounded in quasi-

---

[5] As mentioned *supra* note 3, the only exception is plaintiff Janett Foster, who is a citizen of Indiana but purchased tools in both Indiana and Kentucky.

---

[6] Thus, we need not address defendant's argument that application of Illinois law to the unjust enrichment claims would violate the *Commerce Clause of the United States Constitution* and the interests of comity.

[7] These equitable aspects are not implicated here because plaintiff's claim is based in tort and monetary recovery is sought.

contract because there is a 'real' contract that governs his relationship with Sears." (Def.'s Mem. in Support of Mot. at 9.) This argument is neither here nor there because plaintiffs' unjust enrichment claims are obviously not grounded in quasi-contract. Rather, as discussed *supra* note 4, they are grounded in tort--fraud, to be specific. [8]

[*12] Even if Beanblossom's claim is grounded in tort, Sears argues, it must be dismissed because he fails to state an independent claim for consumer fraud, common-law fraud, duress, or undue influence. Plaintiffs respond that they are not required to state a separate claim in order to state an unjust enrichment claim. Both plaintiffs and defendant cite cases that seem to support each of their positions.

We have engaged in an exhaustive review of the sometimes-bewildering realm of Illinois unjust enrichment law, and our conclusions are as follows. It is often expressed that in order to state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 545 N.E.2d 672, 679, 137 Ill. Dec. 19 (Ill. 1989)*. The law regarding whether a plaintiff must also show wrongdoing is initially confusing because there are

decisions that go both ways. *Compare, e.g., Stathis v. Geldermann, Inc., 295 Ill. App. 3d 844, 692 N.E.2d 798, 811, 229 Ill. Dec. 809 (Ill. App. Ct. 1998)* [*13] ("A cause of action based upon unjust enrichment does not require fault or illegality on the part of defendants.") *with Alliance Acceptance Co. v. Yale Ins. Agency, Inc., 271 Ill. App. 3d 483, 648 N.E.2d 971, 977, 208 Ill. Dec. 49 (Ill. App. Ct. 1995)* (recovery for unjust enrichment permitted only when there is "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence"). However, as is pointed out in an excellent Illinois Bar Journal article concerning the Illinois law of unjust enrichment, there is a way to reconcile the case law. *See* Ronald M. Lepinskas, *Unjust Enrichment Claims in Illinois: Applying a Venerable Doctrine-to Modern Disputes,* 91 Ill. B.J. 514, 517 (2003). We have explained *supra* note 4 that there are three prongs of unjust enrichment: a benefit mistakenly conferred, a benefit procured through wrongful conduct, and a benefit to which plaintiff has a better claim than the defendant for some other reason. Courts have not required proof of wrongful conduct where the factual allegations fall within the "mistakenly conferred" or "better claim" prongs, but they have required such proof of when the allegations fall within the "wrongful conduct" [*14] prong. So, while it is correct to say that unjust enrichment is its own claim that does not necessarily require the existence of an underlying claim, or a particular underlying claim, it is also correct to say that when a plaintiff brings an unjust enrichment claim that is based on wrongful conduct, plaintiff must plead and prove that conduct. *See Alliance, 648 N.E.2d at 977; Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 943 (7th Cir. 2001)*.

Here, plaintiffs allege in Count IV that "Sears has been unjustly enriched by virtue of its false, misleading advertising of Craftsman products." (Second Amended Consolidated Class Action Complaint P 128.) The "unlawful or improper conduct as defined by law," *Alliance, 648 N.E.2d at 977*, is fraudulent misrepresentation. Fraudulent conduct consists of a knowing misrepresentation

---

[8] Sears also contends in its reply brief that Beanblossom's claim is doomed by *Shaw v. Hyatt International Corp., 461 F.3d 899 (7th Cir. 2006)*, in which the Court of Appeals held that the plaintiff's consumer fraud and unjust enrichment claims failed because what plaintiff called "deception" or "consumer fraud"--charging more than the agreed-upon price for a hotel room--was simply Hyatt's failure to fulfill its contractual obligations. *461 F.3d at 901-02*. The Court stated that a "deceptive act or practice" involves more than the mere fact that a defendant promises to do something and then fails to do it. *Id. at 901*.

*Shaw* is distinguishable from the facts of the instant case. Plaintiffs complain that Sears induced them to buy Craftsman tools by misrepresenting the country of origin of the tools, not simply that Sears made a false promise of future conduct.

2006 U.S. Dist. LEXIS 92169, *14

made with the intent to deceive the plaintiff. *See People v. L & M Liquors, Inc., 37 Ill. App. 3d 117, 345 N.E.2d 817, 820 (Ill. App. Ct. 1976).*

*Federal Rule of Civil Procedure 9(b)* provides that in "all averments of fraud . . . the circumstances constituting fraud . . . shall be stated [*15] with particularity." In our Order of July 31, 2006, we dismissed Beanblossom's statutory fraud claims in the Second Amended Consolidated Class Action Complaint for failure to allege fraud with particularity because Beanblossom fails to allege where he saw the advertisements on which he based his belief that Craftsman tools were made in the United States. (He alleges broadly that he "heard advertisements for Craftsman products on the radio and saw advertisements for Craftsman products in magazines, newspapers, and on displays and banners in a Sears store," Second Amended Consolidated Class Action Complaint P 8.) We indicated that we would entertain a motion to file a third amended complaint, but Beanblossom has never presented such a motion. Therefore, there is no allegation of the requisite fraudulent conduct, and the unjust enrichment claim must also be dismissed. Like the dismissal of his statutory fraud claims, the dismissal of Beanblossom's unjust enrichment claim will be without prejudice.

**C.** *Disgorgement of Profits*

We asked the parties to brief the issue of whether, under Illinois law, a nexus must exist between the injury sustained by a plaintiff and the amount [*16] of recoverable disgorgement of defendant's profits. In view of our dismissal of all of the unjust enrichment claims brought pursuant to Illinois law, we need not address this issue at this juncture.

*CONCLUSION*

Defendant's motion to dismiss plaintiffs' unjust enrichment claims brought pursuant to Illinois law in Count IV of the Second Amended Consolidated Class Action Complaint filed in *Chatham v. Sears,*

*Roebuck & Co.,* 05 C 2623, is granted. The non-Illinois plaintiffs' unjust enrichment claims in Count IV that are brought "under the unjust enrichment laws of the state of Illinois" are dismissed with prejudice. Plaintiff William Beanblossom's unjust enrichment claim is dismissed without prejudice.

A status hearing is set for January 10, 2007, at 11:30 a.m. to discuss the next steps in this litigation.

DATE: December 18, 2006

John F. Grady, United States District Judge

End of Document

# Tab 8

## *In re: Cheerios Mktg. & Sales Practices Litig.*

United States District Court for the District of New Jersey

September 10, 2012, Decided; September 10, 2012, Filed

Civil Action No.: 09-cv-2413; MDL Docket No.: 2094 ALL CASES

**Reporter**
2012 U.S. Dist. LEXIS 128325 *; 2012 WL 3952069

IN RE: CHEERIOS MARKETING AND SALES
PRACTICES LITIGATION

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For EDWARD MYERS,
individually and on behalf of and all others
similarly situated, ELSA ACEVEDO, individually
and on behalf of and all others similarly situated,
Plaintiffs: JOE R. WHATLEY, LEAD
ATTORNEY, COUNSEL NOT ADMITTED TO
USDC-NJ BAR, WHATLEY KALLAS, LLC,
NEW YORK, NY; JOHN W. OLIVO, JR.,
MAUREEN VICTORIA ABBEY, LEAD
ATTORNEYS, HENINGER GARRISON DAVIS,
LLC, WESTFIELD, NJ.

For GENERAL MILLS, INC., a Delaware
corporation, Defendant: ANDREW JAMES
HUGHES, DAVID C. KISTLER, STEPHEN M.
ORLOFSKY, LEAD ATTORNEYS, BLANK
ROME LLP, PRINCETON, NJ.

**Judges:** PETER G. SHERIDAN, United States
District Judge.

**Opinion by:** PETER G. SHERIDAN

## Opinion

**MEMORANDUM AND ORDER**

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant
General Mills, Inc.'s ("Defendant") a motion for
summary judgment. More specifically, the issue is
whether the Plaintiffs have suffered any concrete or
particularized injury in order to have standing to
sue. See *Koronthaly v. L'Oreal USA, Inc., 374 Fed.
Appx. 257 (2010)*. On or about January 4, 2010,
Plaintiffs, consumers who purchased Cheerios® [1]
cereals produced and distributed by General Mills,
Inc., filed a consolidated amended class action
complaint (Amended Complaint). Plaintiffs allege
eight [*2] causes of action in the Amended
Complaint: (1) a violation of the Minnesota
Consumer Fraud Act; (2) a violation of the
Minnesota Unlawful Trade Practices Act; (3) a
violation of the Minnesota Deceptive Trade
Practices Act; (4) a violation of the Minnesota
False Statement in Advertising Act; (5) a violation
of state consumer protection laws; (6) breach of
express warranty; (7) breach of implied warranty of
merchantability and fitness for a particular purpose;
and (8) unjust enrichment.

---

[1] Although Cheerios® is a registered trademark of General Mills, in
this opinion the Court refrains from using the such marks for the
sake of convenience.

2012 U.S. Dist. LEXIS 128325, *2

About a year ago, the Court denied a motion to dismiss for failure to allege a cognizable harm or a reasonable means to measure damages, and instead ordered limited discovery. Limited discovery seemed reasonable based on counsel's oral representation that Plaintiffs could not show any injury since Plaintiffs did not know the cost of Cheerios upon which damages would be calculated; and other plaintiffs ate all of the Cheerios purchased for reasons unrelated to the claims brought in this case. As such, limited discovery focused on whether the Plaintiffs's **[*3]** could establish quantifiable damages. In addition, another issue arose as to the choice of law issue; i.e. whether Minnesota law (where General Mills is headquartered) should apply in this case. Pursuant to the discovery schedule, limited discovery consisting of interrogatories, document production and depositions was conducted. Upon completion of this discovery, General Mills filed a motion for summary judgment.

Facts

Plaintiffs are consumers of Cheerios who reside in California, New Jersey, and New York. Although each named Plaintiff can be associated with a particular state, the Amended Complaint is on behalf of all similarly situated individuals in the United States. Defendant, General Mills, a corporation organized and existing under the laws of the State of Delaware, maintains a principal place of business in Minnesota from where it markets, distributes, produces, and sells Cheerios throughout the United States [2].

This dispute revolves around Defendant's alleged misrepresentations regarding the health benefits of Cheerios. Plaintiffs contend that Defendant made "uniform representations concerning the health benefits of Cheerios [which] are false, misleading and likely to deceive the consuming public because they misrepresent Cheerios' ability to reduce cholesterol, reduce the risk of heart disease and certain forms of cancer." The most prevailing theme of the Amended Complaint was the representation concerning the alleged cholesterol-lowering benefits of Cheerios. For example, according to Plaintiffs, Defendant advertised that Cheerios could lower a person's cholesterol by 4% in six weeks.

What led to the filing of this case was a May 5, 2009 warning letter from the Food and Drug Administration (the "FDA letter") to General Mills. In the FDA Letter, the FDA reviewed the label and labeling of Cheerios® Toasted Whole Grain Oat Cereal. The FDA's review found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act)" and the applicable regulations. The FDA **[*5]** noted that General Mill's advertising practices improperly represented that Cheerios "was intended for use in lowering cholesterol, and therefore in preventing, mitigating, and treating the disease hypercholesterolemia which requires Cheerios to comply with drug regulations." That is, Cheerios' representation to consumers about lowering their cholesterol levels by a certain percentage constituted a pharmaceutical formulation which would subject Cheerios to regulatory approval as a drug. As a result of the FDA Letter, on May 19, 2009, six class action suits were filed in California, New York and New Jersey. Subsequently, the United States Judicial Panel on Multidistrict Litigation Committee consolidated the Plaintiff's actions into this multi-district litigation [3].

In addition to the present action, there is a separate FDA proceeding pending wherein the FDA is investigating the labeling of foods which advertise

---

[2] Plaintiffs identified ten brands of Cheerios at issue in this case: (1) original Cheerios, (2) Honey Nut Cheerios, MultiGrain Cheerios, (4) Banana Nut Cheerios, (5) Cheerios Crunch, (6) Berry Burst Cheerios, (7) Frosted Cheerios, (8) Apple Cinnamon Cheerios, (9) Fruity **[*4]** Cheerios, and (10) Yogurt Burst Cheerios. When referring to those brands collectively the Court uses the blanket term "Cheerios."

[3] One Plaintiff, Charity E. Huey, also filed a complaint in California (Case No. 09-5152), but was dismissed from the case for failure to respond to discovery.

specific health benefits such as Cheerios. As a result of the FDA Letter, Cheerios has changed its label in order to avoid **[*6]** the drug approval process.

Plaintiffs also allege that the "health benefits of Cheerios, as represented by General Mills in its marketing, advertising, packaging, labeling and other promotional materials, are a material factor in the promotion of Cheerios, and have led directly to increased product sales, but are misleading and deceptive."

The Amended Complaint provides several examples of the allegedly deceptive statements. In one nationwide advertisement, General Mills stated that by eating Cheerios, "You can Lower Your Cholesterol 4% in 6 weeks." The advertisement also stated that "a study showed that eating two 1 1/2 cup servings [4] daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol." Another example is that the main label on the Cheerios box (or the "Principal Display Panel" ("PDP")) features a "fanciful depiction of a heart that is approximately one-third of the PDP's total height," and the label states that Cheerios can lower cholesterol by "10% in one month." The label then states on the lower left-hand portion of the PDP that "Three grams of soluble fiber daily from whole grain oat foods, like Cheerios cereal, in **[*7]** a diet low in saturated fat and cholesterol, may reduce the risk of heart disease - a serving of Cheerios provides 1 gram per serving." On the back of the Cheerios package, the label features in large print the word "WOW!" followed by the question, "I can help lower my cholesterol 10% in one month?" Below that, the label reads:

A new study proves Cheerios' cereal plus a reduced calorie diet that is low in fat can help lower bad cholesterol about 10% in one month. The foods you eat or don't eat, along with your lifestyle habits can really make a difference in lowering your cholesterol. Just follow these daily steps for one month to help lower your cholesterol.

General Mills also represents in its advertising that it is the only cereal that reduces cholesterol. The box label noted: "Number of other leading cold cereals clinically proven to help lower cholesterol. 0."

The Amended Complaint also alleges similar statements appear on the General Mill's website:

Made with whole grain, Cheerios is the only ready-to-eat cereal clinically proven to lower cholesterol when eaten as part of a diet low in saturated fat and cholesterol."

"Our cereals can help lower your cholesterol! As part of a heart **[*8]** healthy diet, the soluble fiber in Cheerios, Honey Nut Cheerios, and Berry Burst Cheerios can help reduce your cholesterol."

"Eating Cheerios each day, as part of a diet low in saturated fat and cholesterol, can help lower your cholesterol, and that could help reduce your risk of heart disease."

"Including whole grain as part of a healthy diet may . . . [h]elp reduce the risk of certain types of cancers. Regular consumption of whole grains as part of, a low-fat diet reduces the risk for some cancers, especially cancers of the stomach and colon."

In the limited discovery conducted in advance of this motion, the five named Plaintiffs were deposed and a summary is provided below.

## Edward **[*9]** Myers

Mr. Myers is a resident of Hudson County, New Jersey. Mr. Myers stated at his deposition that prior to 2008, he often ate bacon, ham and eggs for

---

[4] According to the FDA, the claim of General Mills that eating 1 1/2 cup servings daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol "indicates that Cheerios is intended for use in lowering cholesterol, and therefore in preventing, mitigating, and treating the disease hypercholesterolemia." According to the FDA, the health benefits claimed by General Mills exceed those permitted for products that have not obtained FDA approval for marketing as a drug.

breakfast before he began consuming Cheerios once per week for breakfast. In 2008, he changed his diet due to his cholesterol count and his doctor's orders. (T. 67, 14-15 and T. 15, 6-20). From 2008 forward, he "ate a lot of oatmeal," and he "still [eats] at lot of oatmeal." (T 20, 12-14). He also ate Cheerios once per week. (T. 20, 6-9). Since Mr. Myers worked as a limousine driver, and as a result, he dined at restaurants frequently, (T. 21, 10) he ate breakfast at Tommy's Restaurant in Jersey City, (T. 20, 20-21), Di Casa Napoli in Union City, (T. 20, 23-24) and at the Lincoln Inn in Jersey City. (T 21, 2-4). Although Mr. Myers can not estimate how often he ate Cheerios at the restaurants, he recalls that he often ate Cheerios elsewhere on a regular basis including "a bowl of Cheerios and a banana" at his girlfriend's house in the evening. (T. 22, 4-15).

There was little testimony adduced as to whether Mr. Myers read the Cheerios box regarding the cholesterol-lowering benefit at either the restaurants or his girlfriend's house. In [*10] addition, Mr. Myers liked the crunchiness and convenience of eating Cheerios. (T. 62, 13-15 and T. 68, 8-21). Mr. Myers conceded that he ate the Cheerios not for any health benefit, but to keep "my belly . . . full." (T. 62, 19-23).

Mr. Myers ate Cheerios most of his life. He began buying Cheerios in 1980 (after a divorce) because the yellow box was recognizable. (T. 70, 1-6). He noted "I seen whatever was in there and take one, sometimes two." (T. 70, 7-10). At some point, other people bought Cheerios for Mr. Myers. As Mr. Myers noted "I got a cleaning lady come in and I used to always give them money. I would just write down want I needed and she would get it . . . Cheerios is what I put on it." (T. 70, 13-20). Hence, he did not know how much was paid or the size of the boxes purchased. When purchasing Cheerios, Mr. Myers would review the Cheerios box and he noted that the box "said if you use Cheerios, it will lower your cholesterol," but he never saw the media advertisement claiming that Cheerios would lower his cholesterol by a certain percentage. (T. 79, 5-10,

T. 79, 15-24).

More pertinent to the case, after a hospital stay in 2008 for cardiac problems, Mr. Myers' girlfriend mentioned [*11] the cholesterol-lowering benefit to him, and he began eating Cheerios from a box that had a red heart on the cover. (T. 82, 15 - T. 83, 7). On this Cheerios box, he read the front cover, but nothing on the back or side of the box. (T. 83, 11 - T. 84, 4). It is unclear whether it was Mr. Myers or his girlfriend who purchased the Cheerios; however, Mr. Myers could not recall the cost of the Cheerios, or whether the Cheerios that are in a box with a red heart on the box cost more than the boxes without the red heart. ( T. 84, 16-22 and T. 85, 2-5).

According to Mr. Myers, he ate Cheerios on the day of his deposition, and Mr. Myers did not discard the Cheerios after he learned of the FDA Letter. It appears that Mr. Myers was comfortable eating Cheerios before and after the FDA Letter for various reasons. Mr. Myers never visited the General Mills website.

Elsa Acevedo

Ms. Elsa Acevedo is a resident of Hudson County, New Jersey and she has been eating Cheerios for most of her life, including the day of her deposition. She testified that she suffers from high cholesterol and is under doctor's care for the condition. (T. 18, 9). Ms. Acevedo eats Cheerios because "they are very edible." (T. 18, [*12] 24). Ms. Acevedo saw a television commercial about Cheerios reducing cholesterol, and she began eating Cheerios more regularly. According to Ms. Acevedo, after viewing the commercial she "ran to the supermarket and bought a box" (T. 30, 15). She does not recall what she paid for the Cheerios at the Stop n Shop supermarket (T. 30, 18-21), nor did she save any receipts to verify her purchases. (T. 31, 10-13). Ms. Acevedo recalled that she purchased Cheerios because what "caught my eye was like lower your cholesterol." (T. 56, 17-19). Although she remembers the claim about the

2012 U.S. Dist. LEXIS 128325, *12

cholesterol-lowering benefit on the Cheerios box, Ms. Acevedo had no recollection about a more specific representation such as a reduction of cholesterol by "4 % in six weeks" or "10% percent in one month." (T. 60, 5-16). Like Mr. Myers, Ms. Acevedo ate Cheerios before, and continued to eat Cheerios after the FDA Letter was issued because "there are very edible." Ms. Acevedo never visited the General Mills website. (T. 92, 17-19).

Hobin Choi

Mr. Hobin Choi is a resident of Los Angeles, California. He has been eating Cheerios since he was a kid. (T. 18, 20-24). As an adult, he ate Cheerios because "it lowers cholesterol **[*13]** and . . . its just like the common fact . . . you always want to lower your cholesterol." (T. 22, 7-13). Mr. Choi understood that Cheerios might lower cholesterol since on "the box it said - right in blue . . . said something about lowering cholesterol or helps lower cholesterol" which was a "huge factor" in his decision to purchase Cheerios. He would eat Cheerios 3 to 5 times a day. (T. 58, 8-13). Mr. Choi noted that "it embedded in my head that whatever I eat [something] that is going to be healthier for me . . [it makes] me want to buy it obviously." (T. 23, 13-18). Mr. Choi has not eaten Cheerios since 2009, (T. 25, 16) and that last time he bought Cheerios it cost - "around three to five bucks" (T. 26, 7-8) which he characterized as a "guestimation." (T. 27, 18) and T. 31, 22-25). He has no receipts from his purchases of Cheerios. Mr. Choi has never viewed the General Mills website. (T. 35, 14-17).

Claire Theodore

Ms. Claire Theodore is a resident of Monmouth County, New Jersey, but she purchased Cheerios in California in 2008 and 2009 about eight times at Ralph's Store and the Pink Dot in Venice, California. (T. 21, 14 through T. 22, 8). Ms. Theodore has no receipts of purchase, **[*14]** but the

price she paid was within a "range depending on the size of a box between two something and four something a box. I would guess." (T. 69, 1-5). Ms. Theodore did not recall the size of the box she purchased, but testified it was "not the biggest one [but] one that is a little bigger . . . than a piece of paper." (T 69, 10-12).

Ms. Theodore read the advertisement on the Cheerios package. The Cheerios package stated: "three grams of soluble fiber daily from whole grain oat food like Cheerios in a diet low in saturated fat and cholesterol may reduce the risk of heart disease." There was nothing about the cholesterol-lowering benefits which enticed her to buy Cheerios because, as Ms. Theodore commented, "I was not trying to lower my Cholesterol." Rather, Ms. Theodore, who has two young children, was impressed with "the simple ingredient list especially the whole grain oats and it's a part of a healthy diet, low in sugar, whole grains . . . no chemical preservatives." (T. 76, 10-25). Ms. Theodore remembers seeing a box of Cheerios "with a big heart and the ten percent in a month on the front" and she was "surprised" by the claim (T. 79, 19-25), but this representation did not support **[*15]** her decision to buy Cheerios. (T. 80, 1-15).

Ms. Theodore may have accessed the Cheerios website in 2003. At that time, she was attempting to locate and purchase a container that could be used to carry Cheerios for her baby. (T. 130, 1-10). There is no testimony that Ms. Theodore read the choice of law clause on the website.

Jeffrey Stevens

Mr. Jeffrey Stevens is a resident of New York. He was under doctor's care for his high cholesterol (T. 24, 18 through T. 25, 12). Due to his high cholesterol count, Mr. Stevens ate Cheerios and shredded wheat for breakfast. (T. 67, 7-13). Mr. Stevens liked Cheerios more than shredded wheat because "its offered in various flavors" (T. 88, 16-17), and lowering his cholesterol was his primary

reason for eating it. (T. 88, 20-23). Mr. Stevens did not remember the size of the box he purchased, but recalled it cost "around $4.00" (T. 93, 18-23). Mr. Stevens acknowledged that when Cheerios were on sale at the supermarket, and he and his wife "were looking for those bargains." (T. 96, 4-5). He has no receipts from his purchases of Cheerios.

Mr. Stevens recollection of the Cheerios advertising is ambiguous. For example, when asked if he looked at information **[*16]** about Cheerios, Mr. Stevens answered "no". (T. 113, 10-14). Then he was asked about advertisements he saw, and he was "sure" he saw them, but did not "recall a specific thing." (T. 114, 20-22). On the other hand, Mr. Stevens noted "when you're listening to TV and they're telling you to eat Cheerios and it will lower your Cholesterol, yeah, that could have played a part in it;" but he could not remember any specific advertisement (T. 115, 7-12 and T. 115, 21-25). Mr. Stevens was questioned about the cholesterol-lowering representations on the Cheerios box and any statements associated with that representation, and he stated "the number 5% comes to mind, but I don't know if — I just recall something about 5%, but he did not recall when or where he saw 5% enumerated. (T. 121, 7-16). Mr. Stevens could not "remember" whether any of the boxes he purchased stated that eating Cheerios could "lower your cholesterol 4% in six weeks" (T. 148, 19 through T. 149, 7), nor did he recall the 10% in one month representation. (T. 153, 16-25). Mr. Stevens never looked at the General Mills website. (T. 118, 7-8).

The Plaintiffs also rely on the Declaration of David Elmore, Jr. Mr. Elmore specializes in **[*17]** forensic and investigative accounting, and reviewed some of the 600,000 pages of documents proffered by General Mills. The documents Mr. Elmore reviewed included "Cereal Benefits Association Tracking - Post Wave by MarketTools (2/2006), Heart Health Competitive Review (7/28/08) by General Mills and Symphony IRI retail sales data. Mr. Elmore determined from this data that the cost of Cheerios was about $2.52 per

unit (box) in 2006 after sales redemptions. This determination is somewhat consistent with the testimony of the Plaintiffs who indicated the cost to be from"three to five bucks" or "between two something to four something". Mr. Elmore's supplemental report notes that the cost of Cheerios rose by $.10 from 2006-2009 to the price of $3.06 (before sales redemption) while competitor's prices rose by $.05 to the price of $3.35 per box.

The report submitted by Mr. Elmore after his review of the documents provided by General Mills was an interim one, and to finalize it, Mr. Elmore indicated that more data was required. Mr. Elmore, in vague terms, opined that he could use more data to refine his findings. He stated:

> a. It is possible to calculate the average per unit retail price based **[*18]** on the Symphony IRI sales data for "yellow box" Cheerios;
> b. It is further possible to calculate the average per unit reported net sales price charged to retailers by General Mills, Inc.;
> c. Based on the "yellow box" Cheerios profitability data, the average operating profit per unit and per ounce can be calculated;
> d. With additional data any premium pricing charged by General Mills, Inc. for "yellow box" Cheerios over other competing brands could be calculated; and
> e. To the extent additional data becomes available regarding the value to consumers of the health benefits promised within the marketing campaign for "yellow box" Cheerios, it is possible that additional analyses could be performed.

## Law

The issues pending in this matter are the choice of law issue (i.e. should Minnesota law apply) and whether the Plaintiffs have suffered an injury or have sustained any measurable damages. The analysis is provided below.

Choice-of-Law

In MDL proceedings, the court often applies "the choice of law rules of the transferor courts." _In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 348 (D.N.J. 1997)_. The transferor courts here are California, New Jersey, and New York. When determining **[\*19]** choice of law issues, New Jersey courts apply a "most significant relationship" test; and New York and California courts apply a "government interest test." _In re Mercedes-Benz, Tele Aid Contract Litig., 257 F.R.D. 46, 57 (D.N.J. 2009)_.

Plaintiffs believe that Minnesota law should apply because General Mills agreed to same on its website. In addition, Minnesota is the headquarters for the corporation and as such General Mills performed numerous operations there. Namely, the operations listed by Plaintiffs are:

• Minnesota is the location of the marketing department for Cheerios. All of the individuals working within the marketing department for Cheerios, including the vice president of marketing for Cheerios who was the principal person responsible for approving the language contained on the labeling of Cheerios as well as in the advertisements, work out of General Mills' offices in Minnesota.

• Minnesota is the location of the research and development department which plays a role in the marketing and advertising of Cheerios as well as in the approval of language used on the labels of Cheerios. All of the individuals working within the research and development department work out of **[\*20]** General Mills offices in Minnesota.

• Minnesota is the location of the quality department which is responsible for reviewing the labeling of Cheerios before it is sent to the printer. All of the individuals working within the quality department work out of General Mills offices in Minnesota.

• Minnesota is the location of the legal department which is involved in reviewing and approving the language used on the Cheerios labels and in the advertisements for Cheerios.

• Minnesota is the location of the Bell Institute which was responsible for assisting General Mills with the science involved in their products, including Cheerios.

• Minnesota is the location of the scientists and nutritionists employed by the Bell Institute who consulted with General Mills on the content of the labeling and packaging of Cheerios.

• Minnesota is the location of where the marketing department, research and development department, legal department, the quality department and the Bell Institute all "collaborated" concerning the content of the language or the labeling for the Cheerios packaging as well as the language used in the advertising and marketing of Cheerios.

• Counsel for General Mills has even acknowledged **[\*21]** that the marketing of the Cheerios cereal at issue in Plaintiff's complaint emanated from decisions made at General Mills headquarters in Minnesota. General Mills made this same acknowledgment on a call with Judge Arpert on December 12, 2011 concerning the status of discovery.

• Minnesota is the location of focus groups, a form of "qualitative research" used by General Mills to assist it in its marketing of Cheerios.

• Minnesota is the location of the "brand development" agency, Schawk, which assisted General Mills with the packaging of the Cheerios boxes.

• Minnesota is listed on the packaging of Cheerios boxes as the "General Offices" for General Mills.

• Minnesota is the location of each of the 12 custodians identified by counsel for General Mills as having relevant information to topics related to Cheerios marketing and the science involved in Cheerios.

Contrary to Plaintiffs' contentions, General Mills argues that the law of each state where each Plaintiff resides should be used to determine the law to be applied. To General Mills, the location of purchase, and where the Plaintiffs were when each read the representations should control. General Mills discounts the website reference **[\*22]** to Minnesota law because none of the Plaintiffs viewed the choice of law provision on the website.

## A. "Most Significant Relationship" Test (New Jersey)

Under New Jersey's "most significant relationship" test, before engaging in any substantive choice-of-law analysis, a court first must determine whether there is an actual conflict among the laws of these states. *Agostino v. Quest Diagnostics, 256 F.R.D. 437, 461 (D.N.J. 2009)*. It is settled law that there are conflicts among the states' various consumer protection statutes. *See Elias v. Ungar's Food Products, Inc., 252 F.R.D. 233, 247 (D.N.J. 2008)*; *Fink v. Ricoh Corp., 365 N.J. Super. 520, 584, 839 A.2d 942 (Super. Ct. Law Div. 2003)*. Moreover, Plaintiffs do not dispute that there is an actual conflict among the consumer protection statutes of New Jersey, California, New York, and Minnesota. (*See* Dkt. No. 37 at 14-15; Dkt. No. 68 at 27-28).

Having resolved the threshold issue, the next step of New Jersey's "most significant relationship" test requires analysis under *section 148 of the Restatement (Second) Conflict of Laws* *See P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 962 A.2d 453, 460 (N.J. 2008)*; *Agostino v. Quest Diagnostics Inc., 256 F.R.D. 437, 462 (D.N.J. 2009)*. **[\*23]** In cases such as the one at bar, where "the plaintiff's action in reliance took place . . . in a state other than where the false representations were made," a court shall consider the following six factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Restatement (Second) Conflict of Laws § 148(b)*. In the instant matter, all of these factors militate in favor of applying the law of the jurisdictions from where class members reside except factor *(e)*, which applies equally to each party and is therefore a nullity. Plaintiffs argue that this situation is identical to *In re Mercedes-Benz Tele Aid Contract Litigation, 257 F.R.D. 46 (D.N.J. 2009)*, **[\*24]** where it was held New Jersey law applied to a multi-district litigation originating from six different states. (Opp'n Br. at 9-12, citing *Mercedes-Benz, 257 F.R.D. at 66-67*). This Court disagrees. First, the facts of *Mercedes-Benz* are slightly distinguishable. In *Mercedes-Benz*, Mercedes-Benz U.S.A., L.L.C., headquartered in New Jersey, actively offered and provided the underlying subscription service. *Mercedes-Benz, 257 F.R.D. at 51*. In the instant case, General Mills sold Cheerios to local retailers, and the local retailers resold Cheerios to Plaintiffs. Second, in *Mercedes-Benz*, the Court stressed the availability of treble damages under the NJCFA as evidence that New Jersey had the strongest interest in applying its own law. *Mercedes-Benz, 257 F.R.D. at 68*. In this case, there is no corresponding interest in applying Minnesota law. (*See* Opp'n Br. at 10 n.9 ("Minnesota does not allow treble damages . . .")). More specifically, Plaintiffs can not rely on any representations made by General Mills on their website because none of them had ever viewed it.

In sum, factors *(a)*, *(b)*, *(e)*, and *(f)* point to the

using the law of the states of purchase while only factor *(c)* points to using Minnesota **[*25]** law. The next step of the "most significant relationship" test requires the Court to examine these contacts in light of the principles stated in *Restatement (Second) Conflict of Laws § 6*. *See P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 147, 962 A.2d 453 (2008)*. "Reduced to their essence, the *§ 6* principles are: '(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states.'" *Id.* (quoting *Erny v. Estate of Merola, 171 N.J. 86, 792 A.2d 1208 (2002))*. Here, Minnesota has no interest in compensating out-of-state consumers. *Cf. Gray v. Bayer Corp., Civ. No. 08-4716, 2011 U.S. Dist. LEXIS 79498, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011)*. Moreover, Plaintiffs only transacted with local retailers and had no direct involvement with General Mills in Minnesota. Minnesota's only contacts with this litigation is by way of Defendant's headquarters. In contrast, Plaintiffs' respective home states have clear interests. The Court thus concludes that the "interests of interstate comity" and the "competing interests of the states" counsel in favor of applying the law of the various jurisdictions **[*26]** from which class members will be drawn. Thus in the instant matter, having analyzed the contacts under *§ 148* and in light of the principles stated in *§ 6* of the Reinstatement, the Court will apply state law. For example, New Jersey law will apply to the New Jersey Plaintiffs, Edward Myers and Elsa Acevedo.

## B. "Government Interest" Test (California & New York)

The "government interest" test requires the Court to first determine whether a conflict exists between the laws of the interested states. *In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 56 (D.N.J. 2009)*. If no conflict exists, the Court will apply the law of the forum state, in this case New Jersey. *Kearney v. Salomon Smith Barney, Inc., 39 Cal. 4th 95, 45 Cal. Rptr. 3d 730, 137 P.3d 914, 922 (2006)*; *Karaha Bodas Co., LLC v. Perushahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 85 (2d Cir. 2002)*. However, "if the court finds that there is a true conflict,"then the Court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Kearney, 137 P.3d at 922*; **[*27]** *see also Istim, Inc. v. Chem. Bank, 78 N.Y.2d 342, 581 N.E.2d 1042, 1044, 575 N.Y.S.2d 796 (1991)*. Importantly, "under the 'interests analysis' approach, the law of the jurisdiction having the greatest interest in the litigation will be applied and only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Istim, Inc. v. Chem. Bank, 78 N.Y.2d 342, 581 N.E.2d 1042, 1044, 575 N.Y.S.2d 796 (1991)*.

As explained above, a conflict exists between the consumer protection laws of Minnesota, California, and New York. (*See* Dkt. No. 37 at 14-15; Dkt. No. 68 at 27-28). Thus, the Court must "evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law." *Kearney, 137 P.3d at 922*. In the instant matter, discovery has confirmed that the New York and California Plaintiffs purchased Cheerios within their home states. Additionally, neither the California Plaintiffs nor the New York Plaintiffs read Defendant's website provision about conflicts of law during the relevant time period. Based on these facts, the Court has determined that each state's interest in applying their own consumer protection law to their own citizens **[*28]** outweighs any interest possessed by Minnesota. Thus the Court will apply New York law to the New York Plaintiff (Jeffrey Stevens) and California law to the California Plaintiffs (Claire Theodore and Hobin Choi). As such, the four counts concerning Minnesota statutes are dismissed.

## Standing to Sue

2012 U.S. Dist. LEXIS 128325, *28

Generally, to meet the constitutional requirement to sue, there must be concrete injury, as well as two other requirements. As Judge Roth enunciated:

> To prove constitutional standing, Koronthaly must demonstrate (1) an injury-in-fact that is actual or imminent and concrete and particularized, not conjectural or hypothetical, (2) that is fairly traceable to the defendant's challenged conduct, and (3) is likely to be redressed by a favorable judicial decision. *Summers v. Earth Island Inst., 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009)*

*Koronthaly v. L'Oreal USA, Inc., 374 Fed. Appx. 257 (2010)*. This motion concerns whether there is an injury-in-fact that is actual or imminent and concrete and particularized. The briefing of the parties often referred to the damages alleged by the Plaintiffs such as the return of the full purchase price, benefit of the bargain damages, and disgorgement **[*29]** of profits (Amended Complaint, paragraphs 73, 83, 89, and 138).

Plaintiffs May Not Recover Full Purchase Price Refunds.

Plaintiffs seek a full refund for all boxes of Cheerios that Plaintiffs purchased during the relevant time-frame. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs "would not have purchased Cheerios" but for Defendant's "deceptive practices." That assertion does not comport with the testimony of the Plaintiffs. Mr. Myers, Ms. Acevedo and Ms. Theodore testified that they still eat or purchase Cheerios today for various reasons including the ingredients (Ms. Theodore), and the taste (Mr. Myers and Ms. Acevedo) and convenience. See, *Romano v. Galaxy Toyota, 399 N.J. Super. 470, 483, 945 A.2d 49 (App. Div. 2008)*. Generally, "the 'out-of-pocket' theory applies when the purchase price of a misrepresented product [may be refunded] so long as . . . *the seller's misrepresentations rendered the product essentially*

worthless." *Mann v. TD Bank, N.A., 2010 U.S. Dist. LEXIS 112085, 2010 WL 4226526, at *5 (D.N.J. Oct. 20, 2010)* (citation omitted) (emphasis added).

Here, there is no indication that Defendant's misrepresentation "rendered the product essentially worthless." *Mann, 2010 U.S. Dist. LEXIS 112085, 2010 WL 4226526 at *5* **[*30]** (citation omitted). Ms. Acevedo and Mr. Myers purchased their Cheerios for crunchiness, taste, convenience and to keep ones "belly full" as well as to lower their cholesterol. Moreover, Ms. Theodore, like many mothers, selected Cheerios due to its healthy, simple ingredients for her children. The contention that these Plaintiffs would not have purchased Cheerios but for Defendant's misrepresentation seems tenuous especially since Mr. Myers and Ms. Acevedo still eat Cheerios today. Moreover, Ms. Theodore had no loss because she purchased Cheerios for the ingredients, hence she did not rely on the cholesterol-lowering benefit. See, *Mason, 774 F. Supp. 2d 699, 2011 WL 1204556 at *4*. As such, Plaintiffs fail to adequately allege that Plaintiffs are entitled to full purchase price refunds when they ate the Cheerios after learning of the FDA Letter, and are still eating them today for other reasons.

The Plaintiffs rely on *Lee v. Carter Reed, 203 N.J. 496, 4 A. 3d 561 (2010)*. In *Lee*, Plaintiffs had purchased a substance called Relacore which was manufactured by the defendant. Relacore was a weight reduction product that shrinks belly fat and decreases anxiety. The named plaintiff paid $120.00 for three bottles of Relacore. **[*31]** The representations of defendant Carter Reed about the benefits of Relacore were deceptive. In *Lee*, one of the issues was whether there was an ascertainable loss. The Supreme Court of New Jersey noted that a loss cannot be hypothetical or illusory, but is "an out-of-pocket loss, and/or replacement cost." *Id. at 576-77. See, Thiedemann v. Mercedes-Benz USA, 183 N.J. 234, 872 A. 2d 783 (2005)*. In *Lee*, the Court found the ascertainable loss to be "the purchase price of a bottle of broken promises" and the Court considered the cost of Relacore as an out-

of-pocket loss. *Lee, 4 A. 3d at 580*. The *Lee* case is distinguishable from this case. Unlike consumers of Cheerios, once the consumer knew of the deception, they immediately ceased using Relacore. The same is not true in this case - Mr. Myers and Ms. Acevedo still eat Cheerios; and Ms. Theodore never accepted any representation regarding lowering cholesterol (i.e. no broken promise to her). Hence, return of purchase price is beyond any loss sustained when the Cheerios were fully consumed for other reasons.

Plaintiffs May Not Receive "Benefit of the Bargain" Damages.

Plaintiffs alternatively seek the difference between what Plaintiffs paid for Cheerios and **[*32]** the price that Plaintiffs would have paid for Cheerios, if Defendant had not engaged in the alleged misrepresentation. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs would not have paid as much money for Cheerios but for "[Defendant's] deceptive practices." This theory of relief is equally flawed. Plaintiffs allege that they "paid money for a product that was of lesser value than what was represented." *Mason, 774 F. Supp. 2d 699, 2011 WL 1204556 at *4* (internal quotation marks and citation omitted); *see also Solo v. Bed Bath & Beyond, Inc., 2007 U.S. Dist. LEXIS 31088, 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007)* ("Plaintiff fails to specifically allege that what he did receive was of lesser value than what was promised, i.e., that the sheets he received were worth an amount of money less than the sheets he was promised . . . ."). The *Mason* analysis on this issue is instructive:

When plaintiffs purchased Diet Coke Plus, they received a beverage that contained the ingredients listed on its label. Plaintiffs have not explained how they experienced any out-of-pocket loss because of their purchases, or that the soda they bought was worth an amount of money less than the soda they consumed. At most, plaintiffs **[*33]** simply claim that their

expectations of the soda were disappointed. Dissatisfaction with a product, however, is not a quantifiable loss that can be remedied under the [New Jersey Consumer Fraud Act].

*Mason, 774 F. Supp. 2d 699, 2011 WL 1204556 at *4* (citations omitted).

Based on *Mason*, Plaintiffs do not adequately allege "benefit of the bargain" damages. As this Court has previously noted, the Amended Complaint "floats upon the FDA's letter and findings." (Transcript of September 1, 2010 Hearing, 15:11-12). Plaintiffs' allegations regarding "an apparent and somewhat arcane [alleged] violation of FDA food labeling regulations" does not show that Plaintiffs purchased boxes of Cheerios that did not contain the ingredients listed on the Cheerios boxes. *Mason, 774 F. Supp. 2d 699, 2011 WL 1204556 at *5, n.4*. Moreover, the Plaintiffs, except for Mr. Choi and Mr. Stevens, consumed all of the Cheerios purchased for various reasons such as convenience and crunchiness. Plaintiffs therefore fail to adequately allege that Plaintiffs suffered "benefit of the bargain" damages.

Plaintiffs generally rely on the case of *Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84, 99 (D.N.J. 2011)* to support their benefit of the bargain argument. In *Smajlaj*, **[*34]** one of the major issues was "whether the allegations . . . are sufficiently plead an 'ascertainable loss' as required for a claim under the New Jersey Consumer Fraud Act." *Id. at 84*. In *Smajlaj*, the Plaintiff's contention was that Campbell Soup advertised low sodium soup when in fact the low sodium soup contained the same amount of sodium as other regular Campbell soups. The cost of the low sodium soup was 20 to 80 cents higher than the regular soups. According to the District Court, the benefit of the bargain theory "requires nothing more than the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." *Id. at 99*. However, the district court noted that "a consumer has not experienced any injury if the consumer merely has some expectation

about a product that is not met." *Id. at 99-100.* "But if the consumer received a product that "was worth objectively less than what one could reasonably expect," then that type of defeated expectation is an injury." *Id.* See also *Koronthaly v. L'Oreal USA, Inc., 374 Fed. App'x 257, 259 (3d Cir. 2010).* In light of that background, the District Court in *Smajlaj* set forth the standard [*35] for finding a benefit of the bargain loss, as

A plaintiff alleging a benefit-of-the-bargain states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified.

*Smajlaj, 782 F. Supp. 2d at 99.* In applying the standard to this matter, the Plaintiffs do not objectively quantify their loss. For instance, Mr. Theodore can not meet part 1 of the aforementioned test because she did not rely on the cholesterol lowering representation. Mr. Myers and Ms. Acevedo can not meet part 2 of the test because they still eat Cheerios today; hence, the misrepresentation did not alter their selection of purchasing Cheerios. In addition, none of the plaintiffs estimated any loss amount, or a difference in price between a comparative produce and Cheerios. Plaintiffs therefore fail to adequately allege they suffered a benefit of the bargain loss.

Plaintiffs Are Not Entitled to Disgorgement of Profits.

Plaintiffs additionally seek to recover "equitable monetary relief as may be necessary to disgorge and/or restore monies received by Defendant as a result [*36] of Defendant's alleged deceptive conduct." (*See* Amended Complaint, Prayer, ¶ E). Like the two prior theories of relief, Plaintiffs' request for disgorgement of profits fails. "Liability to disgorge profits is ordinarily limited to cases of . . . conscious wrongdoing." Restatement Third, Restitution and Unjust Enrichment, Vol. 1 § 3, p.

22 (2011). Accordingly, disgorgement does not apply to "innocent recipients" or "inadvertant tortfeasors". *Id.* In this case, it was surprising for the FDA to assert that Cheerios must seek regulatory approval as a drug, in order to represent that Cheerios could lower cholesterol. Generally, the cholesterol-lowering representation may be true in a broad sense that whole wheat oats are more heart "friendly" than the ham and eggs Mr. Myers chose to eat previously. Parenthetically, the FDA will permit unqualified health claims based upon significant scientific agreement among experts. See, *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales., 701 F. Supp. 2d 356, 363 (EDNY 2010).* As such, Cheerios broad representation about lowering cholesterol does not appear to be a deliberate misrepresentation by a conscious wrongdoer as set forth by Plaintiffs.

Unjust [*37] enrichment is not a viable theory - and disgorgement is therefore not available - in circumstances in which a consumer purchases specific goods and receives those same specific goods. See *Adamson v. Ortho-McNeil Pharm., Inc., 463 F. Supp. 2d 496, 505 (D.N.J. 2006).* In order to obtain disgorgement of profits, a plaintiff must demonstrate that a defendant was unjustly enriched. *See generally, Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110, 922 A.2d 710 (2007).* An unjust enrichment cause of action arises where: (1) a defendant received a benefit from the plaintiff; and (2) the defendant's retention of such a benefit is inequitable. *United States v. Albinson, 2010 U.S. Dist. LEXIS 83644, 2010 WL 3258266, at *18 (D.N.J. Aug. 16, 2010)* (citation omitted). As mentioned, Plaintiffs fail to demonstrate that they purchased Cheerios for which they did not receive any value. Healthy ingredients, crunchiness, convenience and taste are value components. *Mason, 774 F. Supp. 699, 2011 WL 1204556 at *5, n.4.* As such, Plaintiffs have not set forth a viable unjust enrichment cause of action, and disgorgement of profits is not an appropriate remedy. See, *Koronthaly v. L'Oreal USA, 374 Fed. App'x 257, 259 (3d Cir. 2010)* (wherein a plaintiff lacked standing [*38] to sue). The

*Koronthaly* court stated "absent any allegation that she received a product that failed to work for its intended purpose or was worth objectively less . . . [plaintiff] has not demonstrated a concrete injury in fact" as to the lipstick she purchased. Similarly here, Plaintiffs Mr. Meyers, Ms. Acevedo and Ms. Theodore have not shown any concrete injury.

Equitable relief such as disgorgement is often ordered when no other form of relief will compensate for the injury. Often in class actions, the theory is that a class action will address a wrong which will otherwise not be remedied. Here, the FDA notified Cheerios of the over-aggressive labeling, and Cheerios has entered discussions with FDA representatives. As such, the wrong will be remedied in some fashion through regulatory intervention. As such, no other equitable relief is necessary since the representations have been addressed.

From reading the above, there is little discussion about Mr. Choi and Mr. Stevens. The class action claims must be dismissed for the following reason. *Fed. R. Civ. P. 23*. Generally, "the claims . . . of the representative parties are typical of the claims . . . of the class." *Fed. R. Civ. P. 23(a)(3)*. **[*39]** Here, Mr. Choi consumed Cheerios two or three times per day and stopped eating Cheerios when he learned of the FDA Letter. Mr. Stevens on the other hand had very little recollection about the content of the Cheerios advertisements, and, he may not be a credible complainant to represent a class due to his faulty memory. Although Mr. Choi and Mr. Stevens may have some injury, their cases can not be considered typical. The cases of Mr. Myers, Ms. Acevedo and Ms. Theodore show that many Cheerios consumers buy them for different reasons and General Mills should be allowed to litigate each claim on the factual differences. As such, the class allegations of Mr. Choi and Mr. Stevens are dismissed.

Order

This Court has reviewed all submissions and heard oral argument. For the reasons set forth in the above Memorandum,

IT IS on this 10th day of September, 2012,

ORDERED that Count 1 (Minnesota Consumer Fraud Act), Count 2 (Minnesota Unlawful Trade Practices Act), Count 3 (Minnesota Deceptive Trade Practices Act), and Count 4 (Minnesota False Statement in Advertising Act) are dismissed; and it is further

ORDERED that Defendant's motion for summary judgment is granted against Mr. Myers, Ms. Acevedo **[*40]** and Ms. Theodore; and it is further

ORDERED that Defendants motion for summary judgment is granted on all class action allegations of Mr. Jeffreys' and Mr. Choi's amended complaint.

*/s/ Peter G. Sheridan*

PETER G. SHERIDAN, U.S.D.J.

**End of Document**

# Tab 9

## *Crosby v. Georgakopoulos*

United States District Court for the District of New Jersey

June 24, 2005, Decided ; June 24, 2005, Filed

Civ. No. 03-5232 (WGB)

**Reporter**

2005 U.S. Dist. LEXIS 32238 *; 2005 WL 1514209

CLYNT CROSBY, Plaintiff, v. DEMETRIOS G. GEORGAKOPOULOS, DHS DISTRICT DIRECTOR, BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT - "BICE," WARDEN RALPH GREEN - HCCC, HUDSON COUNTY, KEEFE COMMISARY NETWORK SALES, ATTORNEY GENERAL JOHN ASHCROFT, Defendant(s).

**Notice:  [*1]**  NOT FOR PUBLICATION

**Subsequent History:** Motion denied by *Crosby v. Green, 2007 U.S. Dist. LEXIS 65334 (D.N.J., Sept. 5, 2007)*

**Counsel:** For CLYNT CROSBY, Plaintiff, Pro se, MIDDLESEX COUNTY ADULT CORRECTIONAL CENTER, NEW BRUNSWICK, NJ.

For DEMETRIOS G. GEORGAKOPOULOS, DHS District Director BICE, ATTY GEN. JOHN ASHCROFT, Defendants: ANTHONY J. LABRUNA, JR., US ATTORNEY'S OFFICE, NEWARK, NJ.

For WARDEN RALPH GREEN, H.C.C.C., HUDSON COUNTY CORRECTIONAL

CENTER, Defendants: CHARLES M. D'AMICO, OFFICE OF THE HUDSON COUNTY COUNSEL, JERSEY CITY, NJ.

For KEEFE COMMISSARY NETWORK SALES, Defendant: DAVID J. COONER, MCCARTER & ENGLISH, LLP, NEWARK, NJ; CHARLES M. D'AMICO, OFFICE OF THE HUDSON COUNTY COUNSEL, JERSEY CITY, NJ.

For HUDSON COUNTY, Defendant: MICHAEL L. DERMODY, OFFICE OF THE HUDSON COUNTY COUNSEL, JERSEY CITY, NJ.

**Judges:** BASSLER, SENIOR DISTRICT JUDGE.

**Opinion by:** William G. Bassler

## Opinion

*OPINION*

**BASSLER, SENIOR DISTRICT JUDGE:**

Plaintiff Clynt Crosby ("Crosby") is an immigration detainee at the Hudson County Correctional Center ("HCCC"). Crosby claims to be suffering from

various prison conditions including second-hand smoke, extreme cold, gang activity and unsanitary food trays in violation of his *Eighth Amendment* rights. He brings his action against both federal **[*2]** and state defendants in their official and individual capacities.

There are two pending motions in the above-titled action to dismiss Crosby's Amended Complaint. First, there is a motion to dismiss and/or for summary judgment brought by defendants Warden Ralph Green ("Warden Green") and Hudson County. Second, there is a motion to dismiss and/or for summary judgment brought by defendants Demetrios G. Georgakopoulos ("Georgakopoulos"), District Director of the Bureau of Immigration and Customs Enforcement, and John Ashcroft ("Ashcroft"), United States Attorney General.

This Court has subject matter jurisdiction under *42 U.S.C. § 1981*, *28 U.S.C. § 1331*, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L. Ed. 2d 619 (1971)*. Venue is proper under *28 U.S.C. § 1391(b),(e)*.

For the following reasons, the motion to dismiss by Georgakopoulos and Ashcroft, in their official and individual capacities, is **granted.** The motion to dismiss by Hudson County is **granted.** The motion to dismiss by Warden Green in his official capacity is granted. The **[*3]** motion to dismiss by Warden Green in his individual capacity on Crosby's claims of gang activity, poor air ventilation, unsanitary food trays, spoiled food, and high cost telephone calls is **granted.** The motion to dismiss by Warden Green in his individual capacity on Crosby's claims of second-hand smoke exposure and cold temperature is **denied.**

# I. BACKGROUND

Crosby, proceeding pro se, filed the initial Complaint against six defendants: (1) the Department of Homeland Security ("DHS"); (2)

Georgakopoulos; (3) Ashcroft; (4) Warden Green; (5) HCCC; and (6) Keefe Commisary Network, L.L.C. ("Keefe"). On December 9, 2003, this Court dismissed with prejudice all claims against the DHS and dismissed without prejudice all claims against Ashcroft and Georgakopoulos. In addition, the Court held that HCCC could not be sued for constitutional violations pursuant to *Monell v. Dept. of Social Services of New York City, 436 U.S. 658, 688-690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. Nevertheless, this Court allowed those claims against HCCC to survive by construing claims brought against HCCC as claims against Hudson County.

On January 29, 2004, Crosby filed an Amended Complaint. The defendants **[*4]** named in the Amended Complaint were: (1) Keefe; (2) Warden Green; (3) Hudson County; (4) Ashcroft; and (5) Georgakopoulos. Crosby alleged cruel and unusual punishment in violation of the *Eighth Amendment* by these defendants, including dirty and dangerous prison conditions and exposure to second-hand smoke. Keefe subsequently filed a motion to dismiss the Amended Complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*, which this Court granted on August 17, 2004. The United States Attorney, on behalf of Georgakopoulos and Ashcroft ("Federal Defendants"), moved to dismiss on August 17, 2004. Hudson County Counsel, on behalf of Warden Green and Hudson County ("State Defendants"), moved to dismiss on January 7, 2005.

# II. DISCUSSION

A. *Standard of Review*

*Federal Rule of Civil Procedure 12(b)(6)* allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted." In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. *Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30*

*L. Ed. 2d 652 (1972)*; [**5**] *United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992)*. The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*. Dismissal is not appropriate unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 215 (3d Cir. 2002)* (internal citations omitted). The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions." *Id.*

Typically courts only look to the face of the pleadings in considering motions made under *Rule 12(b)(6)*. However, courts may examine a "document integral to or explicitly relied upon in the complaint without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)* (internal citations omitted). [**6**]

B. *Constitutional Claims*

1. *Eighth Amendment* Standard

Plaintiff asserts that the prison conditions of the HCCC violate his *Eighth Amendment* protections against cruel and unusual punishment. *Section 1983* of the Civil Rights Act of 1871 provides "a federal remedy against any person who, acting under color of state law, deprives another of constitutional rights." *City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 258, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)*. In *Bivens,* the Supreme Court recognized an implied right of action for damages in federal court where a federal agent acting under color of federal authority deprived the plaintiff of constitutional rights. *403 U.S. at 397, 91 S.Ct. at 2005*. "A *Bivens* action . . . is the federal equivalent of the *§ 1983* cause of action against state actors." *Brown v. Philip Morris, 250 F.3d 789, 800 (3d Cir. 2001)*.

The *Eighth Amendment's* "*Cruel and Unusual Punishments Clause* was designed to protect those convicted of crimes . . . ." *Fuentes v. Wagner, 206 F.3d 335, 344 n.11 (3d Cir. 2000)* (quoting *Whitley v. Albers, 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L. Ed. 2d 251 (1986))*. Thus, [**7**] *Eighth Amendment* protections apply only after a formal adjudication of guilt. *Ingraham v. Wright, 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 1412 n.40, 51 L. Ed. 2d 711 (1977)*; *see also* *City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983)* (holding that *Eighth Amendment* has no application to a person who had not yet been convicted at the time he required medical care). Pre-trial detainees whose imprisonment did not result from the conviction of a crime cannot assert the *Eighth Amendment* in protecting their constitutional rights. *Hubbard v. Taylor, 399 F.3d 150, 164 (3d Cir. 2005)*.

Crosby is an immigration detainee. He is not confined at the HCCC as a result of the conviction of a crime. "As a person detained for deportation, plaintiff's status is equivalent to a pretrial detainee, whose constitutional claims are considered under the *due process clause* . . . instead of the *Eighth Amendment*." *Gonzalez-Cifuentes v. United States Dep't of Homeland Sec., 04-4855(WHW), 2005 U.S. Dist. LEXIS 33072, 2005 WL 1106562, at *6 (D.N.J. May 3, 2005)* (citing *Hubbard, 399 F.3d at 158*); *see also* *Despaigne v. Crolew, 89 F. Supp. 2d 582, 585 (E.D. Pa. 2000)* [**8**] (finding that an immigration detainee is analogous to a pre-trial detainee). Crosby, as a detainee who has not been convicted of any crime, may not assert an *Eighth Amendment* violation against defendants.

Considering Crosby's claims all rely on *Eighth Amendment* violations, the Court need not address their merits. Nevertheless, because a pro se plaintiff's complaint is construed more liberally, the Court will proceed to address Crosby's claims as though he asserted them properly under the *Due Process Clause of the Fifth Amendment* against Federal Defendants and under the *Due Process Clause of the Fourteenth Amendment* against State

2005 U.S. Dist. LEXIS 32238, *8

Defendants. Failing to plead claims under due process does no lasting damage. The Supreme Court has concluded that the rights of pre-trial detainees are "at least as great as the *Eighth Amendment* protections available to a convicted prisoner." *Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003)* (quoting *Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, at 244, 103 S. Ct. 2979, at 2983, 77 L. Ed. 2d 605*.) The Third Circuit Court of Appeals has recognized that "pretrial detainees are entitled to greater constitutional protection than that provided by **[*9]** the *Eighth Amendment*." *Hubbard, 399 F.3d at 167 n.23* (internal citations omitted).

2 . Due Process Standard

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process . . . the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L. Ed. 2d 447 (1979)*. To determine whether the conditions amount to punishment, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose." *Id. at 538, 99 S.Ct. at 1873*. The *Eighth Amendment* standard of "deliberate indifference" to inmate health and safety by prison officials does "seem to establish a floor of sorts" for the due process inquiry into Crosby's claims. *Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993)*. In evaluating a pre-trial detainee's claims, the Third Circuit Court of Appeals has "found no reason to apply a different standard than that set forth in *Estelle* (pertaining **[*10]** to prisoners' claims of inadequate medical care under the *Eighth Amendment*) . . . ." *Natale, 318 F.3d at 581* (citing *Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L. Ed. 2d 251 (1976)* (holding that the *Eighth Amendment* prohibits deliberate indifference to prisoners' serious medical needs)). "'Deliberate indifference is more than mere malpractice or negligence; it is a state of mind equivalent to

reckless disregard of a known risk of harm." *Gonzalez-Cifuentes, 2005 U.S. Dist. LEXIS 33072, 2005 WL 1106562, at *7* (citing *Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L. Ed. 2d 811 (1994))*.

C. *Claims Against State Defendants*

From Crosby's Amended Complaint, it appears that Crosby alleges the following claims against Warden Green: (1) exposure to second-hand smoke; (2) cold temperatures in cells and gym; (3) gang activity; (4) spoiled food; (5) poor air ventilation; (6) unsanitary food trays; and (7) high cost telephone calls. Am. Compl. 7-9. Crosby alleges that Warden Green, in his official and personal capacity, ignored Crosby's multiple grievances as well as the many problems in the prison. *Id.* at 8. Crosby further alleges **[*11]** that Hudson County is liable as the location where the violations occurred. *Id.* at 6.

1. *Eleventh Amendment* Immunity

The *Eleventh Amendment* bars Crosby from bringing suit against Warden Green in his official capacity. The *Eleventh Amendment* precludes federal jurisdiction over a state absent the state's consent to suit. *Seminole Tribe v. Florida, 517 U.S. 44, 54, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1997)*. State agencies and state officers who act on behalf of the state are also protected by *Eleventh Amendment* immunity. *Natural Resources Defense Council v. California DOT, 96 F.3d 420 (9th Cir. 1996)* (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 142-46, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993)* and *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984))*. "An official capacity suit 'is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." *Hafer v. Melo, 502 U.S. 21, 26, 112 S.Ct. 358, 362, 116 L. Ed. 2d 301 (1991)* (quoting *Will v. Mich. Dep't. of State Police, 491 U.S. 58, 71 109 S.Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989))*. Under *§ 1983*, state officials **[*12]** acting

2005 U.S. Dist. LEXIS 32238, *12

in their official capacities like Warden Green, are not "persons." *Id.* Therefore, the Court dismisses Warden Green in his official capacity from Crosby's action.

"Personal capacity suits on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Id. at 25, 112 S.Ct. at 362.* Since "state officials, sued in their individual capacities, are 'persons' within the meaning of *§ 1983,*" the *Eleventh Amendment* does not bar suit. *Id. at 31, 112 S.Ct. at 365.* Rather, "a supervisor may be personally liable under *§ 1983* if he or she participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel J.M.K. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).* Therefore, the *Eleventh Amendment* does not bar Crosby's suit against Warden Green in his individual capacity.

### 2. Qualified Immunity

Although not explicitly stated in the State Defendants' brief, it appears that the State Defendants bring a qualified immunity defense with respect to Warden Green's liability [*13] as the ultimate supervisor of the HCCC.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior.*" *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)* (internal citations omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence," but allegations must be made with "appropriate particularity." *Id.* Crosby alleges that Warden Green, by "failing to oversee or properly supervise officer [sic] under his charge, became personally involved in the wrongdoing." Am. Compl. 8. Therefore, to the extent that Crosby attempts to place liability on Warden Green on the basis of *respondeat superior* for the actions of his subordinates, Crosby's claims lack merit. The Court

dismisses all claims by Crosby against Warden Green solely as the supervisor of the officers who are personally involved in the action.

### 3. Claim of Second-Hand Smoke Exposure

A valid cause of action under the *Eighth Amendment* exists when an inmate alleges that prison officials have exposed the inmate to levels of environmental [*14] tobacco smoke ("ETS") that "pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney, 509 U.S. 25, 35 113 S.Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993).* Deliberate indifference by prison authorities is determined in light of prison officials' current attitudes and conduct. *Id.*

Crosby alleges that although the HCCC has a no smoking policy, the policy is continuously violated by both officers of the HCCC and inmates. In Crosby's Amended Complaint, he notes that "on an [sic] average . . . 34 of the 55 [inmates] are active smokers, from morning till night, in the cells, day room, constantly smoking." Am. Compl. 8. Crosby alleges the constant smoking causes risk of emphysema as well as "daily headaches, [for which] the only medical solution is Motrin . . . ." Am. Compl. 9, 14. Taking Crosby's allegations to be true, any smoking in the HCCC in violation of the no-smoking policy would be unreasonable and considered a form of punishment against pre-trial detainees. The Court cannot conceive of any legitimate government purpose in violating a facility policy, nor is it rationally related to the purpose of detaining inmates. There is also a factual dispute [*15] over whether Crosby filed a second-hand smoke grievance with Warden Green. Discovery may reveal relevant information as to whether Warden Green acted with deliberate indifference. In analyzing the merits of Crosby's claim, adoption of a smoking policy will "bear heavily on the inquiry into deliberate indifference." *Id.* At this juncture, it would be premature to grant dismissal of Crosby's ETS claim because discovery has not commenced.

The State Defendants point the Court to *Steading v.*

2005 U.S. Dist. LEXIS 32238, *15

*Thompson, 941 F.2d 498 (7th Cir. 1991),* which holds that prison authorities do not violate the *Eighth Amendment* by failing to provide a smoke-free environment. The State Defendants' reliance on *Steading* is misplaced. The prison in *Steading* did not have a smoke-free policy. *Id. at 499.* Absent any existing smoke-free policy, prison authorities who decide in favor of permitting smoking in their buildings do not violate the *Eighth Amendment. Id. at 500.* If indeed the prison officials at HCCC are ignoring Crosby's exposure to high levels of ETS in an environment where smoking is prohibited, Crosby states a valid claim for relief. [1] "It would **[*16]** be unreasonable for prison officials to believe that they were not violating the prisoners' *Eighth Amendment* rights . . . [where] 'plaintiff's allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from inter alia, under-enforcement of inadequate smoking rules, overcrowding of inmates, and poor ventilation." *Atkinson v. Taylor, 316 F.3d 257, 264 (3d Cir. 2003)* (quoting *Warren v. Keane, 196 F.3d 330, 333 (2d Cir. 1999)).* The Court denies the State Defendants' motion to dismiss Plaintiff's second-hand smoke inhalation claim.

**[*17]** 4. Claim of Cold Temperature

"Prisoners have a right under the *Eighth Amendment* to be free from extreme hot and cold temperatures." *Freeman v. Berge, 2003 U.S. Dist. LEXIS 26763, 2003 WL 23272395 at *12 (W.D.Wis. Dec. 17, 2003)* (internal citations omitted). "The same *Eighth Amendment* standard

---

[1] The State Defendants also argue that according to the Prison Litigation Reform Act, *42 U.S.C.A. § 1997e(a),* Crosby cannot bring suit until he has exhausted all his administrative remedies. The State Defendants maintain that Crosby never filed a grievance for second-hand smoke. The Court declines to convert this motion to dismiss into one for summary judgment by looking beyond the pleadings. Nevertheless, the Court observes that Crosby's Statement of Material Fact alleges that he did file a specific grievance for second-hand smoke, copies of which have been confiscated. These disputed facts would be sufficient to overcome summary judgment, particularly where, as here, the parties have yet to engage in discovery.

applies to cell temperatures as to other conditions of confinement: whether the temperatures subject the inmate to a substantial risk of serious harm." *Id.* In *Wilson v. Seiter, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L. Ed. 2d 271 (1991),* the Supreme Court noted,

> some conditions of confinement may establish an *Eighth Amendment* violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise - for example, a low cell temperature at night combined with a failure to issue blankets.

Crosby alleges the same combination of conditions as in the example provided by the Supreme Court in *Wilson.* Crosby states that there is no heat in the cells or the gym. Am. Compl. 7. Night temperatures are "sub-zero," and the officers refuse to provide extra blankets. **[*18]** *Id.* Moreover, Crosby alleges that the cold is causing the joints in his hand to swell. *Id.* at 13. This combination of allegations describing Crosby's deprivation of warmth potentially amount to punishment.

In terms of Warden Green's liability, a supervisor can be found personally involved in the deprivation of a plaintiff's rights when, "[a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong . . . ." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (internal citations omitted). Crosby filed a specific grievance regarding cold temperatures, addressed to Warden Green. Because Crosby alleges that Warden Green received notice of the cold temperatures and "failed to remedy the wrong," the Court denies Warden Green's motion to dismiss with respect to Crosby's cold temperature claim.

5. Claim of Gang Activity

Crosby alleges that Warden Green failed to protect inmates from known gang members who act violently against other inmates. Am. Compl. 7. He

makes general allegations that federal inmates constantly get into fights with gang members and that there has been no response to his grievances. [*19] *Id.* at 8. The State Defendants assert, and the Court agrees, that Crosby is only generally concerned about gang activity due to the fact that both prisoners and detainees are housed together. Crosby does not allege that he is under any specific threat from any other inmate or that Warden Green "participated in violating the plaintiff's rights, directed others to violate them" or "had knowledge of and acquiesced in his subordinates' violations" of failing to protect Crosby. *A.M. ex rel J.M.K., 372 F.3d at 586*. Based on such general allegations by Crosby, the Court cannot find Warden Green to be deliberately indifferent, objectively or subjectively, to any substantial risk of harm. Rather, "prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell, 441 U.S. at 547, 99 S.Ct. at 1878*. Because Crosby does not allege activity amounting to any sort of punishment against him, the Court dismisses Crosby's claim regarding gang activity.

6. Claims of Poor Air Ventilation, [*20] Unsanitary Food Trays, Spoiled Food, and High Cost Calls.

Crosby alleges various other prison conditions violations regarding poor air ventilation, the unsanitary use of food trays, spoiled food, and prohibitively high costs for telephone calls. The State Defendants properly direct the Court to *Marnin v. Pinto, 463 F.2d 583, 584 (3d Cir. 1972)*, in which the appellant made "blanket statements" alleging bad food and miserable living conditions. The Third Circuit Court of Appeals stated that "naked statements such as this do not ordinarily merit Federal court intervention." *Id.* Likewise, Crosby's claims are conclusory and do not merit a cause of action under *§ 1983*. The Court notes that, in evaluating prison conditions cases, "the *Eighth Amendment* is not a basis for broad prison reform . .

. Any needed prison reform is an executive and legislative responsibility." *Doty v. County of Lassen, 37 F.3d 540, 543 (9th Cir. 1994)* (internal quotes omitted). Crosby's claims are not sufficient to allege any form of punishment. Instead they appear to be incident to the governmental purpose of detainment. "The fact that harm is inflicted by governmental authority [*21] does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed." *Bell, 441 U.S. at 539 n.19, 99 S.Ct. at 1874 n.19*. Thus, the Court dismisses Crosby's claims with respect to poor air ventilation, the unsanitary use of food trays, spoiled food, and prohibitively high costs for telephone calls.

7. Hudson County's Liability

In *Monell,* the Supreme Court held that municipalities, such as Hudson County, may be held liable under *§ 1983*. *436 U.S. at 690, 98 S.Ct. at 2035*. Municipalities, however, cannot be held liable for *§ 1983* claims under a theory of *respondeat superior. Id. at 691, 98 S.Ct. at 2036*. "Instead, it is when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [local] government as an entity is responsible under *§ 1983*." *Id. at 694, 98 S.Ct. at 2037-38*. In order to hold Hudson County liable for any constitutional violations, "there must be an affirmative link between [*22] the policy and the particular violation alleged." *City of Oklahoma City v. Tuttle, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985)*.

Crosby merely alleges that Hudson County is where the "illegal/wrongful policies are made . . . ." Am. Compl. 6. He does not allege any specific policies implemented by Hudson County that are in violation of his rights. Because Crosby does not state an adequate claim against Hudson County, the Court dismisses Hudson County from Crosby's action.

## 8. Products Liability Claim

To the extent that any claims against Hudson County remain, the Court construes the remainder as claims brought under a theory of products liability. Counsel for Hudson County refers to this Court's August 17, 2004 Opinion dismissing Keefe to assert that Hudson County should be dismissed under the same products liability theory construed from Crosby's second-hand smoke allegations. The New Jersey Products Liability Act relieves "product sellers" from liability after filing an affidavit identifying the manufacturer of the product unless the seller (1) exercised significant control over the design, manufacture, packaging or labeling of the product; (2) knew or should [*23] have known about the product defect; or (3) created the product defect. *N.J.S.A. 2A:58C-9(a)-(b), (d)*. The Court agrees that Hudson County, which contracted with Keefe to sell products in the HCCC Commissary, is further removed than Keefe as a product seller. Hudson County is not a manufacturer of any sort, let alone a manufacturer of any products that cause harm from second-hand smoke. Thus, Hudson County cannot be held liable under the statute and is dismissed from any products liability claim on the same grounds as Keefe. (*See* Aug. 17, 2004 Op.)

## D. *Claims against Federal Defendants*

Crosby alleges that Georgakopoulos, in his official and individual capacity, failed to respond to Crosby's grievances and to secure a healthy environment for immigration detainees. Am. Compl. 12-13. Crosby further alleges that Ashcroft, in his official and individual capacity, is responsible for the actions of his subordinates and failed to properly inspect the facilities prior to approving them for use by immigration detainees. *Id.* at 14-15. The claims against the Federal Defendants in their official capacity are dismissed under the doctrine of sovereign immunity. [*24] The claims against the Federal Defendants in their individual capacity are dismissed under the doctrine of qualified immunity.

## 1. Sovereign Immunity

It is well-settled that in the absence of an express waiver of immunity by Congress, the United States, its agencies, or officers are immune from suit. *Dep't of Army v. Blue Fox, Inc. 525 U.S. 255, 260, 119 S.Ct. 687, 690, 142 L. Ed. 2d 718 (1999)*; *Beneficial Consumer Disc. Co. v. Poltonowicz, 47 F.3d 91, 93-94 (3d Cir. 1995)* (internal citations omitted). Therefore, when a federal agency's officer is named in an action, Congress must have consented to the action because the United States is the real party in the suit. *Terrill Manor Assocs. v. United States Dep't of Housing & Urban Dev., 496 F. Supp. 1118, 1121 n.5 (D.C.N.J. 1980)*. See *Hafer, 502 U.S. at 25, 112 S.Ct. at 361* ("real party in interest in an official-capacity suit is the governmental entity and not the named official"). "Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their role in the litigation." *Hafer, 502 U.S. at 25, 112 S.Ct. at 361*.

The Federal [*25] Tort Claims Act ("FTCA") partially waives sovereign immunity for injuries "caused by the negligent or wrongful act or omission of any employee of the Government, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *28 U.S.C. § 1346(b)*. This waiver, however, does not subject the United States to liability for constitutional tort claims. *FDIC v. Meyer, 510 U.S. 471, 478 114 S.Ct. 996, 1001, 127 L. Ed. 2d 308 (1994)*; *Biase v. Kaplan, 852 F. Supp. 268, 279 (D.N.J. 1994)*. Under the FTCA, the "law of the place where the act or omission occurred" is state law. *Id.* "By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a constitutional right." *Id.* In this case, Crosby has only sued for alleged violations of his constitutional right to be free from cruel and unusual punishment. Federal and not state law applies to this case.

Sovereign immunity is a jurisdictional issue. *Meyer*

2005 U.S. Dist. LEXIS 32238, *25

*510 U.S. at 475, 114 S.Ct. at 1000*. Because constitutional claims are not **[\*26]** cognizable under the FTCA, and the United States has not waived its sovereign immunity, this Court lacks jurisdiction to hear Crosby's claims against Federal Defendants. [2] The Court therefore dismisses Crosby's claims against Federal Defendants in their official capacity pursuant to *Fed. R. Civ. P. 12(b)(1)*.

**[\*27]** 2. Qualified Immunity

Sovereign immunity does not bar Plaintiff from bringing a constitutional tort claim against the Federal Defendants in their individual capacities. *Hines v. Irvington Counseling Ctr., 933 F. Supp. 382, 388 (D.N.J. 1996)*. Nevertheless, the Federal Defendants assert a valid qualified immunity defense. Government officials such as the Federal Defendants are generally shielded from liability for civil damages in their individual capacity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person should have known." *Smith v. Marasco, 318 F.3d 497, 510 (3d Cir. 2003)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))*.

Just as *respondeat superior* cannot be the basis of liability in a *§ 1983* action, *Givens v. Jones, 900 F.2d 1229, 1233 (8th Cir. 1990)*, "the Courts of Appeals have unanimously rejected the contention . . . that the doctrine of *respondeat superior* is available against a municipal entity under a *Bivens*-type action implied directly from the *Fourteenth Amendment*." *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105 L. Ed. 2d 598 (1989)* **[\*28]** (internal citations omitted).

Crosby's allegations demonstrate that he is attempting to hold the Federal Defendants liable for the actions of others in failing to respond to grievances. He explicitly alleges that Ashcroft "is responsible for the action [sic] of his subordinates." Am. Compl. 15. Moreover, Crosby claims that Georgakopoulos, "through the deliberate indifference of prison official [sic] to my rights failed to respond to my cries for help." *Id.* at 12. As the Federal Defendants point out, neither of them are directly responsible for, or in direct control of, the conditions at the HCCC, which is a Hudson County, New Jersey facility, contracted by the United States to hold immigration detainees. Crosby cannot hold the Federal Defendants responsible for the actions of officials within the HCCC because *Bivens* liability requires proof of direct personal responsibility. *See Pellegrino v. United States, 73 F.3d 934, 936 (9th Cir. 1996)*. Therefore, any claims by Crosby against the Federal Defendants under a theory of *respondeat superior* are dismissed.

Crosby's claims are similar to those of the plaintiff in *Rode v. Dellarciprete*. In *Rode,* **[\*29]** the plaintiff filed grievances with the Governor's office of administration and alleged that the Governor and Attorney General had personal knowledge because they had the power to review and approve agency regulations. *845 F.2d at 1208*. The Third Circuit Court of Appeals, however, dismissed plaintiff's claims against the Governor and Attorney General as insufficiently alleging personal involvement. *Id.* The Third Circuit Court of Appeals held that "the power to review and approve a departmental regulation for form and legality, however, does by no means charge the Governor and Attorney General with the duty to enforce that regulation." *Id.* Moreover, "a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor's office of

---

[2] Crosby's argument that his action is not a tort against the United States because the Federal Defendants' actions are "not one of discretion but mandated through the administrative process" is unfounded. The scope of the Federal Defendants' discretionary or administrative duties is irrelevant to whether sovereign immunity applies to them. There is a discretionary function exception to the waiver of sovereign immunity by the FTCA. *See 28 U.S.C. §2680(a)*. But whether or not the Federal Defendants' actions were discretionary, the FTCA does not apply to Crosby's constitutional tort claims. Crosby's reference to the Foreign Sovereign Immunities Act ("FSIA") in his reply brief is likewise irrelevant. The FSIA only applies to foreign states claiming immunity.

administration or to the Lieutenant Governor's office." *Id.* Likewise, although Crosby alleges that Ashcroft is responsible for ensuring that "all facilities are to standard . . . before approval for use is given," Am. Compl. 15, this power does not charge Ashcroft with the duty to enforce the regulation. Crosby's claim that Georgakopoulos' office **[*30]** failed to respond to Crosby's letters and complaint are insufficient to show that Georgakopoulos had actual knowledge of Crosby's complaints as well. Crosby's reply brief, which further elaborates on conditions at the HCCC, fails to support personal involvement by Federal Defendants. Thus, the Federal Defendants have not violated any recognized constitutional rights. The Supreme Court admonishes against permitting "insubstantial lawsuits" against high government officials to proceed to trial because they "undermine the effectiveness of government. . . ." *Harlow, 457 U.S. at 819 n.35 , 102 S.Ct. at 2739*. In light of such considerations, the Federal Defendants' qualified immunity defense stands, and the Court dismisses the claims against the Federal Defendants in their individual capacities.

E. *Request to Amend the Amended Complaint*

In Crosby's September 9, 2004 reply to Federal Defendants' motion to dismiss, Crosby requests leave to amend his Amended Complaint to include retaliatory conduct. The Court denies Crosby's request as deficient. Request to amend a complaint should be made through a proper motion and not within a reply brief.

F. *Motion and Demand for* **[*31]** *Jury Trial by Crosby*

Crosby also filed a "Motion and Demand for Jury Trial" on September 2, 2004, requesting the following: (1) a schedule to proceed to trial by jury pursuant to *Fed. R. Civ. P. 38(b)*; (2) issuance of a discovery plan pursuant to Fed. R. Civ. P. 26.1; (3) issuance of a scheduling order pursuant to *Fed. R. Civ. P. 16*; (4) default judgment against all defendants; (5) a temporary injunction voiding the Federal Defendants' contract with HCCC to house

immigration detainees; and (6) summary judgment pursuant to *Fed. R. Civ. P. 56.1*.

The Court denies Crosby's "Motion and Demand for Jury Trial." Crosby's request for issuance of a trial date, discovery plan, and scheduling order are premature. Magistrate Judge Madeline Cox Arleo will issue the proper scheduling orders in due time. Furthermore, there is no basis for default judgment against any defendants. All defendants have answered Crosby's Amended Complaint with dispositive motions. Crosby's request for a temporary injunction is likewise denied. Crosby has not provided sufficient information to weigh the immediate necessity of a temporary **[*32]** injunction. Crosby's request for summary judgment is also premature. Because discovery has not occurred yet and the Court has denied Warden Green's motion to dismiss for Crosby's claims of exposure to second-hand smoke and cold temperature, the request for summary judgment is denied.

## III. CONCLUSION

For the reasons stated above, Federal Defendants' motion to dismiss is **granted.** Hudson County's motion to dismiss is **granted.** In his official capacity, Warden Green's motion to dismiss is **granted.** In his individual capacity, Warden Green's motion to dismiss on Crosby's claims of gang activity, poor air ventilation, unsanitary food trays, spoiled food, and high cost telephone calls is **granted.** In his individual capacity. Warden Green's motion to dismiss on Crosby's claims of second-hand smoke exposure and cold temperature is **denied.**

The Court **denies** the various relief requested in Crosby's "Motion and Demand for Jury Trial."

An appropriate order follows.

*/s/ William G. Bassler*

William G. Bassler, U.S.S.D.J.

2005 U.S. Dist. LEXIS 32238, *32

DATED: June 24, 2005

## *ORDER*

This matter having come before the Court on the motions to dismiss and/or for summary **[*33]** judgment by defendants Bureau of Immigration and Customs Enforcement Director Demetrios G. Georgakopoulos ("Georgakopoulos") and Attorney General John Ashcroft ("Ashcroft"), the motion to dismiss and/or for summary judgment by defendants Warden Ralph Green ("Warden Green") and Hudson County, and the "Motion and Demand for Jury Trial" by plaintiff Clynt Crosby ("Crosby"); and

The Court having decided this matter without oral argument pursuant to *Fed. R. Civ. P. 78*; and

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is on this 24th day of June, 2005, hereby ORDERED that the motion to dismiss by Georgakopoulos and Ashcroft in their official and individual capacity is **GRANTED;**

IT IS FURTHER ORDERED that the motion to dismiss by Hudson County is **GRANTED;**

IT IS FURTHER ORDERED that the motion to dismiss by Warden Green is **GRANTED** with respect to the claims brought against him in his official capacity;

IT IS FURTHER ORDERED that the motion to dismiss by Warden Green is **GRANTED** with respect to the claims brought against him in his individual capacity and alleging gang activity, **[*34]** poor air ventilation, unsanitary food trays, spoiled food, and high cost telephone calls;

IT IS FURTHER ORDERED that the motion to dismiss by Warden Green is **DENIED** with respect to the claims brought against him in his individual capacity and alleging second-hand smoke and cold temperatures.

IT IS FURTHER ORDERED that Crosby's "Motion and Demand for Jury Trial'" is **DENIED.**

*/s/ William G. Bassler*

William G. Bassler, U.S.S.D.J.

**End of Document**

# Tab 10

## *Fireworks Lady & Co., LLC v. Firstrans Int'l Co.*

United States District Court for the Central District of California

August 8, 2019, Decided; August 8, 2019, Filed

Case No.: CV 18-10776-CJC (MRWx)

**Reporter**

2019 U.S. Dist. LEXIS 209935 *; 2019 WL 6448943

FIREWORKS LADY & CO., LLC, Plaintiff, v. FIRSTRANS INTERNATIONAL CO., HUA YANG TRANSPORTATION CO., and DING YAN ZHONG, Defendants.

**Counsel:  [*1]** For Fireworks Lady And Co., L.L.C., Plaintiff: Celeste Brustowicz, LEAD ATTORNEY, Cooper Law Firm, New Orleans, LA USA; Samuel Franklin Trussell, LEAD ATTORNEY, Samuel F Trussell APLC, Palm Desert, CA USA; Barry J Cooper, Jr, PRO HAC VICE, Cooper Law Firm LLC, New Orleans, LA USA; Donald Creadore, PRO HAC VICE, Creadore Law Firm PC, New York, NY USA.

For Firstrans International Company, Defendant: Diana M Feinstein, Gibson Dunn and Crutcher LLP, Los Angeles, CA USA; Joseph R Rose, Gibson Dunn and Crutcher LLP, San Francisco, CA USA; Joshua Lipton, PRO HAC VICE, Gibson Dunn and Crutcher LLP, Washington, DC USA; Richard Parker, Gibson Dunn and Crutcher LLP, Washington, DC USA.

**Judges:** CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CORMAC J. CARNEY

## Opinion

**ORDER GRANTING MOTION TO DISMISS [Dkt. 44]**

### I. INTRODUCTION

Plaintiff Fireworks Lady & Co., LLC ("Fireworks Lady") brings this putative class action against Defendants Firstrans International Co. ("Firstrans"), Hua Yang Transportation Co. ("Hua Yang"), and Ding Yan Zhong asserting claims arising under both federal antitrust law and state law. (Dkt. 41 [First Amended Complaint, hereinafter "FAC"].) Before the Court is Firstrans's motion to dismiss Plaintiff's **[*2]** First Amended Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Dkt. 44 [hereinafter "Mot."].) For the following reasons, the motion is **GRANTED**.[1]

### II. BACKGROUND

This lawsuit arises out of Defendants' alleged monopolization of the fireworks shipping business. Defendant Firstrans is allegedly an Indiana corporation that specializes in the shipping of fireworks from the People's Republic of China

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See Fed. R. Civ. P. 78*; **Local Rule 7-15**. Accordingly, the hearing set for August 12, 2019, at 1:30 p.m. is hereby vacated and off calendar.

("PRC") to the United States. (FAC ¶¶ 48, 71.) Defendant Hua Yang was allegedly an Indiana corporation that, after several name changes, became Firstrans in 2012. (*Id.* ¶¶ 51-53). Defendant Ding Yan Zhong is a citizen of the PRC and is allegedly the current president of Firstrans. (*Id.* ¶¶ 50, 55.)

Plaintiff, a Florida fireworks merchant, purchases fireworks from nonparty manufacturers located in the inland Hunan and Jiangxi provinces of the PRC. (Dkt. 52 [Opp'n] at 1.) According to the First Amended Complaint, the fireworks' journey from these manufacturers to Plaintiff's place of business occurs in two distinct stages. First, the fireworks are shipped from Hunan and Jiangxi provinces to Shanghai. (FAC ¶¶ 4-15.) Next, they are shipped from Shanghai to the United States. (*Id.* ¶ 16.) The PRC heavily regulates the transportation **[*3]** of fireworks and requires fireworks carriers to obtain special permits. (*Id.* ¶ 4.) According to Plaintiff, the Defendants hold one of only four permits that the PRC has issued to companies engaged in shipping fireworks from the inland provinces to Shanghai. (*Id.* ¶ 11.)

Plaintiff utilizes Defendants' shipping services to carry the fireworks it purchases from the nonparty manufacturers to its locations in the United States. (*Id.* ¶ 20.) Plaintiff's allegations arise out of this business relationship. Plaintiff asserts that Firstrans has violated federal antitrust laws in two ways. First, it alleges that Firstrans has established an unlawful tying arrangement by conditioning the shipment from the inland provinces to Shanghai on customers continuing to use their shipping services from Shanghai to the United States. (*Id.* ¶ 107.) This arrangement allegedly prevents Plaintiff from utilizing the services of other merchants who would otherwise be willing to ship Plaintiff's fireworks at lower costs. (*Id.* ¶ 20.) Next, Plaintiff alleges that Defendants have engaged in unlawful monopolization of inland transportation services. (*Id.* ¶ 121.) This monopolization allegedly allows Firstrans to charge **[*4]** inflated prices for their shipping services, causing injury to Plaintiff and

similarly situated buyers. (*Id.* ¶ 43.)

Plaintiff also brings several state law claims against Firstrans, including breach of contract, (*id.* ¶¶ 128-131), negligence, (*id.* ¶¶ 132-36), "piercing the corporate veil," (*id.* ¶¶ 137-152), civil conspiracy, (*id.* ¶¶ 153-156), *Florida's Deceptive Trade Practices Act* claims, (*id.* ¶¶ 157-160), and unjust enrichment, (*id.* ¶¶ 161-64).

## III. LEGAL STANDARD

A motion to dismiss under *Rule 12(b)(6)* tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997)*. *Rule 12(b)(6)* is read in conjunction with *Rule 8(a)*, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)(2)*. When evaluating a *Rule 12(b)(6)* motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party. *Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994)*. The district court may also consider additional facts in materials that the district court may take judicial notice, **[*5]** *Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994)*, as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)*, *overruled in part on other grounds by Galbraith v. Cty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002)*.

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *see also Bell Atl. Corp. v.*

2019 U.S. Dist. LEXIS 209935, *5

*Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (stating that while a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570.* In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995).*

## III. ANALYSIS

### A. Tying Claim (Count I)

Plaintiff's first claim alleges that Defendants violated *Section 1* of the Sherman Act by unlawfully tying the purchase of their "inland delivery services" to the purchase of their Shanghai-to-United States delivery services. [*6] (FAC ¶ 107.) According to Plaintiff, Defendants agree to ship fireworks from the inland provinces to Shanghai only after Plaintiff promises to use Defendant's services on the Shanghai-to-United States leg. (*Id.* ¶ 108.) Because Defendants allegedly provide the only viable shipping service from inland to Shanghai, Plaintiff has no choice but to do business with them for this leg of the journey and agree to the tying arrangement. (*Id.* ¶ 19.) Plaintiff alleges that by being forced to agree with Defendants, it cannot seek out the services of other carriers who would be willing to ship from Shanghai to the United States at a lower cost. (*Id.* ¶ 21.)

In a tying arrangement, a "seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)."

*Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 912 (9th Cir. 2008).* "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.* To establish *Section 1* liability based on a tying arrangement, a plaintiff must allege "(1) that the defendant tied together the sale of two distinct products or services, (2) [*7] that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product, and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Id. at 913* (quoting *Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1159 (9th Cir. 2003)).*

Firstrans argues that Plaintiff has failed to plead the first element of a tying arrangement: a tie between two distinct products or services. The Court agrees. To establish a tie between "distinct products or services," a plaintiff must allege facts that show "a sufficient demand for the purchase of the tied product separate from the tying product." *Rick-Mik Enters. Inc. v. Equilon Enters., LLC, 532 F.3d 963, 974 (9th Cir. 2008).* Plaintiff's First Amended Complaint, however, does not allege sufficient facts to establish two distinct services. It only alleges facts showing two separate segments of a single journey. Fireworks purchasers in the United States have no use for a service that delivers fireworks from the inland provinces to Shanghai without one that, in turn, ships those fireworks from Shanghai to the United States. *See Unigestion Holding, S.A. v. UPM Tech., Inc., 305 F. Supp. 3d 1134, 1150 (D. Or. 2018)* (rejecting claim that international phone termination services and transportation services were distinct products because Plaintiff did not "sufficiently allege[] that there is [*8] independent consumer demand for international call transportation services as a standalone product."). Contrary to Plaintiff's assertion, shipping fireworks from producers in the PRC to purchasers in the United States is a single service, not a tie between each of the different segments of that service. *See*

2019 U.S. Dist. LEXIS 209935, *8

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co., 2015 U.S. Dist. LEXIS 56504, 2015 WL 1969380, at \*4 (D.N.J. Apr. 29, 2015)* (holding that defendant's production of textbooks and delivery of those same textbooks were not distinct services and could not form the basis of a tying claim).

The Court previously dismissed Plaintiff's tying claim with leave to amend. (Dkt. 39.) Because Plaintiff has failed to cure the deficiencies in this claim despite being given an opportunity to do so, and because the Court does not believe that Plaintiff can cure the deficiencies, the Court finds that granting further leave to amend would be futile. Accordingly, Plaintiff's tying claim is **DISMISSED WITH PREJUDICE**.

## B. Monopolization Claim (Count II)

Plaintiff's second claim alleges that Defendants violated the *Section 2* of the Sherman Act "by monopolizing the market for inland transportation services from Hunan and Jiangxi provinces to Shanghai." (FAC ¶ 121.) To state a valid monopolization claim, Plaintiff must allege both (1) the **[\*9]** possession of monopoly power and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)* (quoting *United States v. Grinnell Corp., 384 U.S. 563, 571-72, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966))*. "The Supreme Court has consistently held that there must be 'predatory' conduct to attain or perpetuate a monopoly" for this second element to be met. *See Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 549 (9th Cir. 1991)* (refusing to impose *Section 2* liability on airline companies absent evidence of predatory conduct).

Plaintiff has failed to allege that Firstrans engaged in any such predatory conduct. Plaintiff's

monopolization claim centers around Sinotrans Hunan Co. ("Sinotrans"), an alleged state-owned enterprise that began offering the same shipping services as Firstrans sometime in 2018. According to Plaintiff, Sinotrans secured government permits which allowed it to participate in the shipment of fireworks and compete with Firstrans. (Dkt. 52 [Opp'n] at 6.) After a short period of time, however, "Sinotrans terminated service due to the fact that it was losing money." (FAC ¶ 126.) Though Plaintiff alleges that Sinotrans's exit was caused by "an exercise of monopoly powers by Defendants," (*id.*), it fails to allege any facts that **[\*10]** show Firstrans engaged in any specific predatory conduct designed to eliminate Sinotrans. Given that such conduct is required to state a valid monopolization claim, Firstrans's motion to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's monopolization claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

## C. State Law Claims (Counts III—VIII)

Plaintiff's first state law claim alleges breach of contract by Defendants. Plaintiff asserts that "Defendants have breached their agreed upon responsibilities and obligations causing Plaintiff to suffer damages." (*Id.* ¶ 130.) Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821, 124 Cal. Rptr. 3d 256, 250 P.3d 1115 (2011)*. "While it is unnecessary for a plaintiff to allege the terms of a contract with precision, the Court must be able to discern at least what material obligation of the contract the defendant allegedly breached." *Langan v. United Servs. Auto. Ass'n, 69 F. Supp. 3d 965, 979 (N.D. Cal. 2014)* (internal citations omitted).

Plaintiff's First Amended **[\*11]** Complaint fails to

meet this requirement because it does not offer evidence of any specific obligation that Firstrans allegedly breached. Instead, it alleges only that "Defendants have breached their agreed upon responsibilities and obligations causing Plaintiff to suffer damages." (FAC ¶ 130.) Plaintiff cannot validly state a breach of contract claim without pointing to a specific obligation or duty breached by Firstrans. Firstrans's motion to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's breach of contract claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

Plaintiff's next state law claim is under a negligence theory and stems from the alleged mishandling of two fireworks containers purchased by Plaintiff. The elements of negligence are duty, breach, causation, and damages. *See Burgess v. Superior Court, 2 Cal. 4th 1064, 1072, 9 Cal. Rptr. 2d 615, 831 P.2d 1197 (1992)*. According to Plaintiff, after it filed this action against Firstrans, Firstrans substituted another vendor to deliver one of Plaintiff's pending orders. (Dkt. 52 [Opp'n] at 13.) Plaintiff alleges that Firstrans acted negligently when it substituted this vendor without notifying Plaintiff [*12] because those fireworks were subsequently damaged. (*Id.*)

Plaintiff alleges no facts to indicate that defendant acted negligently in selecting the substitute vendor. Nor does Plaintiff allege any causal connection between Firstrans's selection of the new vendor and Plaintiff's alleged damages. Plaintiffs' boilerplate recitations of the elements of a negligence action are insufficient to state a claim. *See Twombly, 550 U.S. at 556-57*. Firstrans's motion to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's negligence claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

Plaintiff's next cause of action asks the Court to "pierce the corporate veil to obtain a court order as [sic] against individual defendant Mr. Ding." (FAC ¶ 126.) However, piercing the corporate veil is not an independent cause of action, but rather a procedural device that allows courts to disregard a corporate entity and hold individuals liable for the corporation's obligations. *See Hennessey's Tavern, Inc. v. Am. Air Filter Co., 204 Cal. App. 3d 1351, 1359, 251 Cal. Rptr. 859 (1988)*. Under California law, two conditions must be met before courts are permitted to invoke this doctrine. First, there must be "such a unity of interest [*13] and ownership between the corporation and its equitable owner" that separate personalities do not exist. *Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824 (2000)*. Next, "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Id.* Piercing the corporate veil is "an extreme remedy, sparingly used" by courts. *Id.*

Plaintiff has not alleged any facts to suggest that it is appropriate for the Court to pierce the corporate veil in this case. Plaintiff's sole allegation regarding this claim is that "Mr. Ding dominates and controls the corporate defendants Firstrans and Hua Yang." (FAC ¶ 138.) This allegation alone does not provide sufficient grounds for the application of the doctrine. Firstrans's motion to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's "piercing the corporate veil" claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

Plaintiff also brings a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), *Fla. Stat. Ann. § 501.201, et seq.* To state a claim under the FDUTPA, a plaintiff must allege (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Ct. App. 2006)*. A deceptive [*14] practice is "one that is likely to mislead consumers," whereas an unfair practice is

2019 U.S. Dist. LEXIS 209935, *14

"one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Tuckish v. Pompano Motor Co., 337 F. Supp. 2d 1313, 1320 (S.D. Fla. 2004)* (internal quotation marks and citations omitted). The FDUTPA can be violated in two ways: "(1) a per se violation premised on the violation of another law proscribing unfair or deceptive practice and (2) adopting an unfair or deceptive practice." *Hap v. Toll Jupiter Ltd. P'ship, 2009 U.S. Dist. LEXIS 5866, 2009 WL 187938, at *9 (S.D. Fla. Jan. 27, 2009)*.

Given that Plaintiff has failed to plead that Firstrans violated any law proscribing unfair or deceptive practices, the first approach is inapplicable here. Nor can Plaintiff rely on the second approach. Plaintiff's First Amended Complaint merely asserts, without support, that "[t]he acts described above . . . are both deceptive and unfair." (FAC ¶ 158.) Plaintiff fails to allege any specific actions taken by Firstrans that were deceptive or unfair. Again, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," cannot alone defeat a motion to dismiss. *See Iqbal, 556 U.S. at 678*. Firstrans's motion to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies **[*15]** in the First Amended Complaint could be cured by amendment, Plaintiff's FDUTPA claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

Plaintiff's next cause of action alleges that Firstrans engaged in a civil conspiracy. (FAC ¶¶ 153-56.) However, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11, 28 Cal. Rptr. 2d 475, 869 P.2d 454 (1994)*. To state a claim for civil conspiracy, a plaintiff must allege (1) the formation and operation of a conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage

resulting from such act or acts. *Younan v. Equifax, Inc., 111 Cal. App. 3d 498, 511 n.9, 169 Cal. Rptr. 478 (1980)*. A civil conspiracy "must be activated by the commission of an actual tort," *Applied Equip. Corp., 7 Cal. 4th at 511*, or other wrong, *Younan, 111 Cal. App. 3d at 511 n.9*.

Plaintiff's First Amended Complaint fails to allege that such a tort has been committed. Rather, Plaintiff's claims for civil conspiracy are entirely premised on Defendants' alleged antitrust violations. (FAC ¶ 154.) Because Plaintiffs failed to allege sufficient facts to establish such violations, there is no independent wrongful act on which to base their civil conspiracy claims. Firstrans's motion **[*16]** to dismiss with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's civil conspiracy claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

Plaintiff's final cause of action alleges that Firstrans has been unjustly enriched by the inflated prices it allegedly charges for the shipment of fireworks. (FAC ¶¶ 161-64.) Under California law, unjust enrichment is not an independent cause of action, but rather the theory "underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 762 (9th Cir. 2015)* (quoting 55 Cal. Jur. 3d Restitution § 2). A plaintiff seeks the return of that benefit typically in a quasi-contract cause of action. *Id.* Here, Plaintiff alleges that the prices it paid for shipping services unjustly conferred a benefit on Firstrans. (FAC ¶ 162.) However, Plaintiff alleges no facts to indicate that defendant received this benefit unjustly. Plaintiff does not allege how any benefit was obtained through "mistake, fraud, coercion, or request." *Astiana, 783 F.3d at 762* (internal quotations omitted). The bare allegation that Firstrans was unjustly enriched "as a result **[*17]** of [its] wrongful and illegal conduct" is insufficient to survive a motion to dismiss. *See Iqbal, 556 U.S. at 678*. Firstrans's motion to dismiss

with respect to this claim is **GRANTED**. Because it is unclear whether the deficiencies in the First Amended Complaint could be cured by amendment, Plaintiff's unjust enrichment claim is **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

## IV. CONCLUSION

For the foregoing reasons, Firstrans's motion is **GRANTED**. Plaintiff's tying claim is **DISMISSED WITH PREJUDICE**. The remainder of Plaintiff's claims are **DISMISSED WITH FOURTEEN DAYS' LEAVE TO AMEND**.

DATED: August 8, 2019

/s/ Cormac J. Carney

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

# **Tab 11**

*Gariety v. Thornton*

United States District Court for the Southern District of West Virginia

May 19, 2006, Decided; May 19, 2006, Filed

CIVIL ACTION NO. 1:02-0344; CIVIL ACTION NO. 2:99-1115; CIVIL ACTION NO. 2:99-0992

**Reporter**
2006 U.S. Dist. LEXIS 114864 *

DEBRA GARIETY, et al., Plaintiffs, v. GRANT THORNTON, LLP, et al., Defendants, and THOMAS ALLEN, Plaintiff, v. GRANT THORNTON, LLP, et al., Defendantsi and DEBRA GARIETY, et al., Plaintiffs, v. TERRY LEE CHURCH, et al., Defendants.

**Counsel:  [*1]** For Debra Gariety, Plaintiff (1:02-cv-00344): Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV; Sara D. Bookbinder, Sigmund S. Wissner-Gross, Sigmund S. Wissner-Gross, LEAD ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY.

For Bischoff Family Trust, Pamela Hanyzewski, John J. Cline, Thomas J. Shannon, Jr., as Trustee, Natural Parent and Guardian of, Crystal N. Shannon, SMV Holding Company, PLL, Vincent Paul, Charles Thornton, Individually, and as Trustee of, Charles Thornton, S.E.P, Fred L. Millner, Warren H. Hyde, Caryl Hyde, Teen Response, Inc., Elizabeth B. Sponseller, Michael J. Sponseller, Terry Overholser, and, Lawrence Corman, on behalf of themselves and all others similarly situated, Plaintiffs (1:02-cv-00344): Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV; Sara D. Bookbinder, Sigmund S. Wissner-Gross, LEAD ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY.

For Nancy Vorono, Defendant (1:02-cv-00344): David D. Johnson, III, Larry Andrew Winter, LEAD ATTORNEYS, WINTER JOHNSON & HILL, Charleston, WV.

For Ellen Turpin, Lora McKinney, Defendants [*2]  (1:02-cv-00344): Thomas W. Smith, LEAD ATTORNEY, OFFICE OF THE ATTORNEY GENERAL, State Capitol Complex, Charleston, WV.

For Vida Headrick, Defendant (1:02-cv-00344): Shawn P. George, LEAD ATTORNEY, GEORGE & LORENSEN, Charleston, WV.

Donna Dickerson, Defendant (1:02-cv-00344), Pro se, Kyle, WV.

Mary White, Defendant (1:02-cv-00344), Pro se, Welch, WV.

For Evelyn Herron, Jeanie Wimmer, Defendants (1:02-cv-00344): William B. Flanigan, LEAD ATTORNEY, SANDERS AUSTIN FLANIGAN & FLANIGAN, Princeton, WV.

For Virginia Burks, Defendant (1:02-cv-00344): Donald Lee Stennett, Jonathan B. Bompiani, LEAD ATTORNEYS, ROBINSON & McELWEE, Charleston, WV.

For Constance Evans, Defendant (1:02-cv-00344): Donald Lee Stennett, LEAD ATTORNEY,

Jonathan B. Bompiani, ROBINSON & McELWEE, Charleston, WV.

Rita Lassak, Defendant (1:02-cv-00344), Pro se, Elkhorn, WV.

For Debra Bailey, Defendant: David M. Kersey, LEAD ATTORNEY, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, Bluefield, WV; Jerry J. Cameron, LEAD ATTORNEY, BREWSTER MORHOUS CAMERON, Bluefield, WV.

For Susan Dalton, Defendant (1:02-cv-00344): David M. Kersey, Jerry J. Cameron, LEAD ATTORNEYS, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, [*3] Bluefield, WV.

For City National Bank, and, Defendant (1:02-cv-00344): Ancil G. Ramey, Kara Cunningham Williams, LEAD ATTORNEYS, STEPTOE & JOHNSON, Charleston, WV; John W. Alderman, III, LEAD ATTORNEY, CITY HOLDING COMPANY, Cross Lanes, WV.

For Debra Gariety, Plaintiff (2:99cv1115): Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV USA; Sara D. Bookbinder, Sigmund S. Wissner-Gross, LEAD ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY USA.

For as Trustee of, Bischoff Family Trust, Pamela Hanyzewki, John J. Cline, Thomas J. Shannon, Jr., as Trustee, Natural Parent and Guardian of, Crystal N. Shannon, Smv Holding Company, Pll, Vincent Paul, Charles Thornton, Individually, and as Trustee of, Charles Thornton, S.E.P, Fred L. Millner, Warren H. Hyde, Caryl Hyde, Teen Response, Inc., Elizabeth B. Sponseller, Michael J. Sponseller, Terry Overholser, and, Lawrence

Corman, on behalf of themselves and all others similarly situated, Plaintiffs (2:99cv1115): Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV USA; Sara D. Bookbinder, Sigmund S. Wissner-Gross, LEAD [*4] ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY USA.

For Nancy Vorono, Defendant (2:99cv1115): David D. Johnson, III, Larry Andrew Winter, LEAD ATTORNEYS, WINTER JOHNSON & HILL, Charleston, WV USA.

For Ellen Turpin, Lora Mckinney, Defendants (2:99cv1115): Thomas W. Smith, LEAD ATTORNEY, OFFICE OF THE ATTORNEY GENERAL, Charleston, WV USA.

For Vida Headrick, Defendant (2:99cv1115): Shawn P. George, LEAD ATTORNEY, GEORGE & LORENSEN, Charleston, WV USA.

Donna Dickerson, Defendant (2:99cv1115), Pro se, Kyle, WV USA.

Mary White, Defendant (2:99cv1115), Pro se, Welch, WV USA.

For Evelyn Herron, Jeanie Wimmer, Defendants (2:99cv1115): William B. Flanigan, LEAD ATTORNEY, SANDERS AUSTIN FLANIGAN & FLANIGAN, Princeton, WV USA.

For Virginia Burks, Constance Evans, Defendants (2:99cv1115): Donald Lee Stennett, Jonathan B. Bompiani, LEAD ATTORNEYS, ROBINSON & McELWEE, Charleston, WV USA.

Rita Lassak, Defendant (2:99cv1115), Pro se, Elkhorn, WV USA.

For Debra Bailey, Defendant (2:99cv1115): David M. Kersey, LEAD ATTORNEY, BREWSTER MORHOUS CAMERON, Caruth Moore Kersey & Stafford, Bluefield, WV USA; Jerry J. Cameron, LEAD ATTORNEY, BREWSTER MORHOUS CAMERON, Bluefield, WV USA.

For Susan Dalton, Defendant (2:99cv1115): [*5] David M. Kersey, Jerry J. Cameron, LEAD ATTORNEYS, BREWSTER MORHOUS CAMERON, Caruth Moore Kersey & Stafford, Bluefield, WV USA.

For Tammy Fisher, Defendant (2:99cv1115): Keith A. Jones, LEAD ATTORNEY, JONES LAW GROUP, Charleston, WV USA.

For City National Bank, and, Defendant (2:99cv1115): Ancil G. Ramey, Kara Cunningham Williams, LEAD ATTORNEYS, STEPTOE & JOHNSON, Charleston, WV USA; John W. Alderman, III, LEAD ATTORNEY, CITY HOLDING COMPANY, Cross Lanes, WV USA.

For United Bank, Inc., formerly United National Bank, Movant (2:99cv992): William W. Booker, LEAD ATTORNEY, KAY CASTO & CHANEY, Charleston, WV USA.

For Debra Gariety, Plaintiff (2:99cv992): Clifford J. Bond, Sara D. Bookbinder, Sigmund S. Wissner-Gross, LEAD ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY USA; Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV USA; as Trustee of Bischoff Family Trust.

For Horst O. Bischoff as Trustee of Bischoff Family Trust, Pamela Hanyzewki, John J. Cline, Thomas J. Shannon, Jr., as Trustee, Natural Parent and Guardian of, Crystal N. Shannon, Smv Holding Company, Pll, Vincent Paul, Charles Thornton, Individually and as Trustee [*6] of, Charles Thornton, S.E.P., Fred L. Millner, Warren H. Hyde, Caryl Hyde, Teen Response, Inc., Elizabeth B. Sponseller, Michael J. Sponseller, Terry Overholser, and, Lawrence Corman, on behalf of themselves and all others similarly situated, Plaintiffs (2:99cv992): Clifford J. Bond, Sara D. Bookbinder, Sigmund S. Wissner-Gross, LEAD ATTORNEYS, HELLER HOROWITZ & FEIT, New York, NY USA; Joshua I. Barrett, Rudolph L. DiTrapano, Sean P. McGinley, LEAD ATTORNEYS, DITRAPANO BARRETT & DIPIERO, Charleston, WV USA.

For Thomas Allen, Individually and on Behalf of All Others Similarly Situated, Consol Plaintiff (2:99cv992): Daniel B. Scotti, Janine L. Pollack, Samuel H. Rudman, Steven G. Schulman, LEAD ATTORNEYS, MILBERG WEISS BERSHAD HYNES & LERACH, New York, NY USA; L. Thomas Galloway, LEAD ATTORNEY, GALLOWAY & ASSOCIATES, Boulder, CO USA; Marc R. Stanley, LEAD ATTORNEY, STANLEY LAW GROUP, Dallas, TX USA; R. R. Fredeking, II, LEAD ATTORNEY, FREDEKING & FREDEKING, Huntington, WV USA; R. Bruce McNew, LEAD ATTORNEY, TAYLOR & MCNEW, Greenville, DE USA.

For Federal Deposit Insurance Corporation, Consol Plaintiff (2:99cv992): Brad A. Harman, Suzanne Rigby, Brad A. Harman, David Mullin, John G. Turner, [*7] III, Robert R. Bell, LEAD ATTORNEYS, MULLIN HOARD & BROWN, Amarillo, TX USA; John A. Davidovich, John A. Davidovich, John Wessling, LEAD ATTORNEYS, FEDERAL DEPOSIT INSURANCE CORPORATION, Washington, DC USA; Stephen M. Horn, LEAD ATTORNEY, UNITED STATES ATTORNEY'S OFFICE, Charleston, WV USA; Stephen M. Horn, LEAD ATTORNEY, UNITED STATES ATTORNEY'S OFFICE, Charleston, WV USA.

For Grant Thornton, Llp, Defendant (2:99cv992):
Andrew J. Morris, Craig Isenberg, LEAD
ATTORNEYS, MAYER BROWN ROWE &
MAW, Washington, DC USA; Eric M. James,
LEAD ATTORNEY, SPILMAN THOMAS &
BATTLE, Charleston, WV USA; James K. Tinney,
John H. Tinney, Kimberley R. Fields, LEAD
ATTORNEYS, THE TINNEY LAW FIRM,
Charleston, WV USA; Mark W. Ryan, LEAD
ATTORNEY, MAYER BROWN & PLATT,
Washington, DC USA; Stanley J. Parzen, LEAD
ATTORNEY, MAYER BROWN, Chicago, IL
USA.

For Michael Graham, Defendant (2:99cv992):
Michael Fisher, LEAD ATTORNEY, OFFUTT
FISHER & NORD, Charleston, WV USA; Michael
M. Fisher, LEAD ATTORNEY, JACKSON
KELLY, Charleston, WV USA.

For Billy Jean Cherry, Defendant (2:99cv992):
Edward D. McDevitt, Kenneth E. Webb, Jr., LEAD
ATTORNEYS, BOWLES RICE, Charleston, WV
USA; Nathan A. Hicks, Jr., LEAD ATTORNEY,
HICKS [*8] LAW OFFICE, Charleston, WV
USA.

For Terry Lee Church, J&J Construction Company,
Hermie Church, Defendants (2:99cv992): James M.
Cagle, LEAD ATTORNEY, Charleston, WV USA.

For Louis J. Pais, Michael F. Gibson, Andrew L.
Rago, Julian G. Budnick, Defendants (2:99cv992):
Michael W. Carey, LEAD ATTORNEY, CAREY
SCOTT DOUGLAS & KESSLER, Charleston, WV
USA.

For Gary Ellis, Defendant (2:99cv992): Benjamin
L. Bailey, Benjamin L. Bailey, Darren T. Olofson,
LEAD ATTORNEYS, BAILEY & GLASSER,
Charleston, WV USA.

For J&J Construction Company, Hermie Church,

Defendants (2:99cv992): James M. Cagle, LEAD
ATTORNEY, Charleston, WV USA.

For Diversified Capital Markets, Michael Patterson,
Defendants (2:99cv992): Paul D. Krepps, Paul D.
Kruper, LEAD ATTORNEYS, MARSHALL
DENNEHEY WARNER COLEMAN & GOGGIN,
Pittsburgh, PA USA.

For Michael Patterson, Inc., also known as, MPI
Financial, Defendant (2:99cv992): Paul D. Krepps,
LEAD ATTORNEY, MARSHALL DENNEHEY
WARNER COLEMAN & GOGGIN, Pittsburgh,
PA USA.

For Billie Jean Cherry, Consol Defendant
(2:99cv992): Edward D. McDevitt, LEAD
ATTORNEY, BOWLES RICE, Charleston, WV
USA.

For Marbil, Inc., Intervenor Defendants
(2:99cv992): James M. Cagle, LEAD
ATTORNEY, Charleston, WV USA. [*9]

For Michael Graham, Intervenor Defendant
(2:99cv992): Michael M. Fisher, LEAD
ATTORNEY, JACKSON KELLY, Charleston,
WV USA.

For Billy Jean Cherry, Intervenor Defendant
(2:99cv992): Edward D. McDevitt, Kenneth E.
Webb, Jr., LEAD ATTORNEYS, BOWLES RICE,
Charleston, WV USA.

For Louis J. Pais, Michael F. Gibson, Andrew L.
Rago, Julian G. Budnick, Daniel T. Halsey, Sunrise
Automotive Group, Inc., Intervenor Defendants
(2:99cv992): Michael W. Carey, LEAD
ATTORNEY, CAREY SCOTT DOUGLAS &
KESSLER, Charleston, WV USA.

For David Rapoff, Intervenor Defendant

(2:99cv992): Barry Short, Jeffrey B. Hunt, LEAD ATTORNEYS, LEWIS RICE & FINGERSH, St. Louis, MO USA; Mark W. Browning, LEAD ATTORNEY, SHUMAN MCCUSKEY & SLICER, Charleston, WV USA.

For Trustee H. Lynden Graham, Trustee (2:99cv992): Ann R. Starcher, LEAD ATTORNEY, LEWIS GLASSER CASEY & ROLLINS, Charleston, WV USA; John A. Rollins, Spencer D. Elliott, LEAD ATTORNEYS, LEWIS GLASSER, Charleston, WV USA.

For Hargrave Military Academy, a non-profit corporation, Interested Party (2:99cv992): Charles D. Dunbar, LEAD ATTORNEY, JACKSON KELLY, Charleston, WV USA; Dana F. Eddy, LEAD ATTORNEY, Charleston, WV USA.

For Waynesburg College, a non-profit corporation, [*10] Interested Party (2:99cv992): Dana F. Eddy, LEAD ATTORNEY, Charleston, WV USA.

For Michael Cherry, Interested Party (2:99cv992): Nathan A. Hicks, Jr., LEAD ATTORNEY, HICKS LAW OFFICE, Charleston, WV USA.

For Office of The Comptroller of The Currency, Interested Party (2:99cv992): Kasey Warner, LEAD ATTORNEY, U. S. ATTORNEY'S OFFICE, Charleston, WV USA; Stephen M. Horn, LEAD ATTORNEY, UNITED STATES ATTORNEY'S OFFICE, Charleston, WV USA; Yvette Rivera, LEAD ATTORNEY, OFFICE OF THE COMPTROLLER OF THE CURRENCY, Washington, DC USA.

For First Commerce of America, Interested Party (2:99cv992): Linda Robles, LEAD ATTORNEY, FIRST COMMERCE OF AMERICA, Lake Oswego, OR USA.

For Douglas C. Turpin, Interested Party (2:99cv992): William S. Winfrey, II, LEAD ATTORNEY, Princeton, WV USA.

For Vida Headrick, Interested Party (2:99cv992): Shawn P. George, LEAD ATTORNEY, GEORGE & LORENSEN, Charleston, WV USA.

For Susan Dalton, Interested Party (2:99cv992): Jerry J. Cameron, LEAD ATTORNEY, BREWSTER MORHOUS CAMERON, Caruth Moore Kersey & Stafford, Bluefield, WV USA.

For Quantum Capital Corporation, Nancy Vargo, Defendants (2:99cv992): John E. Lutz, Jr., LEAD ATTORNEY, RICCARDI & LUTZ, Charleston, WV USA.

For Nancy [*11] Vorono, and, Defendant (2:99cv992): David D. Johnson, III, Larry Andrew Winter, LEAD ATTORNEYS, WINTER JOHNSON & HILL, Charleston, WV USA.

For Ellen Turpin, Lora Mckinney, Defendants (2:99cv992): Thomas W. Smith, LEAD ATTORNEY, OFFICE OF THE ATTORNEY GENERAL, Charleston, WV USA.

For Gary Ellis, Cross Claimant (2:99cv992): Benjamin L. Bailey, Darren T. Olofson, LEAD ATTORNEYS, BAILEY & GLASSER, Charleston, WV USA.

For Terry Lee Church, Hermie Church, J&J Construction Company, Cross Defendants (2:99cv992): James M. Cagle, LEAD ATTORNEY, Charleston, WV USA.

For Billy Jean Cherry, Cross Defendant (2:99cv992): Edward D. McDevitt, Kenneth E. Webb, Jr., LEAD ATTORNEYS, BOWLES RICE, Charleston, WV USA; Nathan A. Hicks, Jr., LEAD

ATTORNEY, HICKS LAW OFFICE, Charleston, WV USA.

For Michael Graham, Cross Defendant (2:99cv992): Michael Fisher, LEAD ATTORNEY, OFFUTT FISHER & NORD, Charleston, WV USA; Michael M. Fisher, LEAD ATTORNEY, JACKSON KELLY, Charleston, WV USA.

For Estate of J. Knox Mcconnell, Cross Defendant (2:99cv992): Philip C. Petty, LEAD ATTORNEY, Elisabeth H. Rose, Timothy J. Padden, ROSE PADDEN & PETTY, Fairmont, WV USA.

For Diversified Capital Markets, Michael Patterson, Cross Defendants [*12] (2:99cv992): Paul D. Krepps, Paul D. Kruper, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Pittsburgh, PA USA.

For Michael Patterson, Inc., also known as, MPI Financial, Cross Defendant (2:99cv992): Paul D. Krepps, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Pittsburgh, PA USA.

For Quantum Capital Corporation, Nancy Vargo, Cross Defendants (2:99cv992): John E. Lutz, Jr., LEAD ATTORNEY, RICCARDI & LUTZ, Charleston, WV USA.

For Nancy Vorono, Cross Defendant (2:99cv992): David D. Johnson, III, Larry Andrew Winter, LEAD ATTORNEYS, WINTER JOHNSON & HILL, Charleston, WV USA.

For Grant Thornton, Llp, Third Party Plaintiff (2:99cv992): Andrew J. Morris, Craig Isenberg, LEAD ATTORNEYS, MAYER BROWN ROWE & MAW, Washington, DC USA; Eric M. James, LEAD ATTORNEY, SPILMAN THOMAS & BATTLE, Charleston, WV USA; James K. Tinney, John H. Tinney, Kimberley R. Fields, LEAD ATTORNEYS, THE TINNEY LAW FIRM,

Charleston, WV USA; Stanley J. Parzen, LEAD ATTORNEY, MAYER BROWN, Chicago, IL USA.

For Federal Deposit Insurance Corporation, in its capacity as Receiver for the First National Bank of Keystone, Third Party Defendant (2:99cv992): Brad A. Harman, Clint R. Latham, David Mullin, John M. Brown, LEAD ATTORNEYS, MULLIN [*13] HOARD & BROWN, Amarillo, TX USA; John A. Davidovich, John Wessling, Mary P. Davis, LEAD ATTORNEYS, FEDERAL DEPOSIT INSURANCE CORPORATION, Washington, DC USA; Stephen M. Horn, LEAD ATTORNEY, UNITED STATES ATTORNEY'S OFFICE, Charleston, WV USA.

For Terry Witt, Gregory Witt, David Witt, Scott Witt, Gary Witt, Dennis Witt, Movants (2:99cv992): Gregory S. Matney, LEAD ATTORNEY, CAMPBELL & MATNEY, Tazewell, VA USA.

**Judges:** David A. Faber, Chief United States District Judge.

**Opinion by:** David A. Faber

# Opinion

## MEMORANDUM OPINION

By Order entered March 31, 2006, the court GRANTED the motions for summary judgment filed by the following defendants with respect to the claims in <u>Gariety II:</u> 1) Jeanie Wimmer and Evelyn Herron (doc. # 188); 2) Vida Headrick (doc. # 213); and 3) Nancy Vorono (doc. # 229). In that

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 96 of 307
PageID: 9619
GEEl ÁМEÉEÁO아 EASOY OÚAFFI î Î î ÉÉFH

same Order, plaintiffs' motion for partial summary judgment (doc. # 197) was GRANTED in part and DENIED in part. Also, by Order entered that same day, the court GRANTED Nancy Vorono's motion for summary judgment (doc. # 1157) as to the claims in Gariety I. The reasons for that decision follow.

## I. Background

This case is but one of the many cases before this court arising out of the failure of the First National Bank of Keystone **[*14]** ("Keystone" or "the Bank").[1] In their Complaint, plaintiffs, a class of individuals purchasing Keystone stock which had originally been sold by the defendants, assert a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), _18 U.S.C. §§ 1961_, et seq., against Terry Lee Church, Billy Jean Cherry, Ellen Turpin, Lora McKinney, and Melissa Quizenbeury (the "RICO defendants"), See Complaint ¶¶ 111-22. The only claim pertaining to the numerous other defendants in the case (the "non-RICO defendants") is one for unjust enrichment.[2] Specifically, the unjust enrichment claim alleges that defendants, armed with knowledge of the fraud occurring at Keystone and/or other inside information concerning Keystone, dumped their shares of Keystone stock[3] and became unjustly enriched. See Complaint ¶¶

---

[1] On September 1, 1999, the Office of the Comptroller of the Currency ("OCC") found Keystone to be insolvent and closed the bank. Since the closing of Keystone, a number of former Keystone employees have been convicted of various federal crimes, including, but not limited to, obstruction of a bank examination, mail fraud, conspiracy to commit bank embezzlement and mail fraud, and insider trading.

[2] The Complaint also contains a claim against defendants City National Bank and United National Bank for a declaration by the court that plaintiffs are entitled to disgorgement or a constructive trust with respect to certain funds held by those banks, including funds contained in Vorono's IRA account. See Complaint ¶¶ 108-10.

[3] Keystone had in place an Employee Stock Ownership Plan ("ESOP"). The Bank, as part of its compensation plan, provided employees with stock based on a percentage of their salary. The exact percentage is disputed. The ESOP was terminated in 1995.

102-07.

## A. Defendants Billie Cherry, Melissa Quizenbeury, Rllen Turpin, and Lora McKinney

It is beyond dispute that all four of these defendants were involved in the criminal wrongdoing that led to the collapse of Keystone Bank. See, e.g., U.S. v. Cherry, 1:01CR92 (jury conviction on one count of conspiracy to commit bank embezzlement and fraud, four counts of bank fraud, and sixteen counts of money laundering **[*15]** on October 15, 2001); U.S. v. Quizenbeury, 1:01CR107 (pled guilty to manipulative and deceptive devices involving insider trading on May 21, 2001); U.S. v. Turpin, 1:01CR105 (pled guilty to obstructing the examination of a financial institution and aiding and abetting same on May 21, 2001); U.S. v. McKinney, 1:01CR106 (pled guilty to obstructing the examination of a financial institution and aiding and abetting same on May 21, 2001). None of these defendants has responded to plaintiffs' motion and, accordingly, plaintiffs' motion far summary judgment on Count I is granted as to these defendants.[4]

## B. Virginia Burks, Constance Evans, Susan Dalton, and Deborah Bailey

It is clear that there are a multitude of disputed material facts concerning plaintiffs' claims against these defendants and, accordingly, plaintiffs' motion as to them is denied.

## C. Jeanie Wimmer and Evelyn Herron

Defendants Jeanie Wimmer Mullins ("Wimmer") and Evelyn Herron started working for Keystone in 1984 at Keystone's Bradshaw branch, essentially managing that branch office. Although they were

---

[4] In the case of Quizenbeury, plaintiffs agreed to limit their recovery to the criminal restitution funds, These funds have already been disbursed to plaintiffs.

physically located outside of Keystone's main office, they maintained daily contact with the main office. Herron's duties at Keystone **[*16]** included working as a teller, ordering money for the bank, supervising vault reports, customer accounts, 100%' collateral loans and general maintenance. Herron also supervised Wimmer, whose duties were virtually identical to Herron's.

Wimmer and Herron, over a four-to five-year period, sold portions of their Keystone stock on three separate occasions. Around 1994-1995, Wimmer and Herron each sold 1,000 shares to Knox McConnell, President of Keystone Bank. On November 18, 1998, each woman authorized the sale of 500 shares of their stock. Finally, in May of 1999, both Wimmer and Herron sold an additional 500 shares of their stock after being solicited by a stockbroker. On this occasion, both women refused offers to sell larger amounts of their stock.

After this third sale of stock, the proceeds realized from the sale were deposited into accounts at Keystone Bank. At the time of the Bank's closure, Herron's IRA account had $176,000.00 in it and Wimmer had $210,000.00 on deposit with Keystone. Only the first $100,000.00 in each account was insured by the FDIC. Furthermore, at the time of the Bank's closure, Herron owned 3,571 shares of stock and Wimmer owned 2,906 shares.

Wimmer and Herron **[*17]** have both denied any knowledge of, or involvement in, the wrongdoing at Keystone. Their assertions on this point have been supported by other employees of the Bank. No one with knowledge of what was going on at the Bank has testified that Wimmer and Herron were involved in the criminal wrongdoing or that they were even aware that anything suspicious was happening.

### D. Vida Headrick

The undisputed facts are that Headrick was the lifelong friend of Billie Cherry and worked at the Bank on two occasions, once during the 1980s and again for approximately seven months in 1998.

During her second employment stint, she worked as Billie Cherry's secretary. Between September 1998 and April 1999, Headrick sold most or all of her stock, 3885 shares,[5] for $649,525.00. In the early 1990s, Headrick worked for Michael Graham during tax season.[6]

In what can only be deemed a last ditch effort to create a disputed issue of material fact regarding Headrick, plaintiffs' state: "In fact, Burks, during her deposition, stated that Cherry contacted Headrick and informed Headrick that she should sell her stock." Plaintiff's Memo at 64. Burks' actual testimony was as follows:

> A: . . . Nancy [Vorono] told me that she **[*18]** was going to give me the telephone number to Mr. Ingold after her stock was sold. I didn't have his telephone number or anything. But in the meantime Vida Headrick got his number and called him, and he wanted to know who had given his number to Vida.
> Q: So he called Nancy and asked Nancy if she had again [sic] Vida Headrick his number; is that what occurred?
> A: That's what I understood.
> Q: Then before you called Mr. Ingold, Ms. Vorono called you up to tell you that she had this additional conversation with Mr. Ingold; is that correct?
> A: She wanted to know who had given Vida's name to him, because she had only given my name and Connie's name to Mr. Ingold, and she wanted to know who gave Vida's name.
> Q: Did you check into that a little bit, do some

---

[5] Plaintiffs have made much ado concerning the issue of how Headrick acquired her stock. Headrick has testified that she earned most of it through the ESOP and that she purchased an additional 1,000 shares. Although plaintiffs have attempted to cast doubt on Headrick's assertions, they have failed to come forward with any evidence that proves otherwise.

[6] Apparently, because Graham had lost his accounting license, this fact is deemed "critical" by plaintiffs. Plaintiffs believe that fact somehow would necessarily have given Headrick access to inside information regarding the criminal wrongdoing at Keystone. The court finds this to be sheer speculation unsupported by any evidence of record.

investigation to find out what happened?

A: I didn't check into it. But it came to my attention that Debbie Shrader had all the information on her desk and Billie had gotten the information and called Vida. I don't know that. That was what was told to me.

Q: Your impression was that Billie Cherry contacted Vida Headrick to tell Vida Headrick who she should call, in terms of selling their stock; is that correct?

A: Yes.

Burks Depo. at 96-97. Even **[*19]** assuming that Burks' account -- which admittedly was not based on personal knowledge -- is true, the foregoing passage does not show that Billie Cherry told Headrick that "she should sell her stook" At best, it leaves the impression that Billie Cherry might have given Headrick the name of a broker who would se11 her stock.

E. <u>Nancy Vorono</u>

Suffice it to say that plaintiffs have taken great liberty in their recitation of the "facts" concerning Vorono. According to Vorono's Affidavit, filed in support of her motion for summary judgment, she was employed as the secretary for the late J. Knox McConnell, formerly the President of Keystone, for more than twenty years, Vorono retired in December of 1997, a couple of months after McConnell's death. Her duties at Keystone

included taking dictation for, and typing letters; initiating telephone calls at the direction of Mr, McConnell; making some bank deposits for Mr. McConnell; providing coffee and other refreshments for Mr. McConnell and his guests or visitors; maintaining the ledger which recorded the ownership and transfer of shares of stock in Keystone; and other miscellaneous clerical duties.

Vorono Aff. ¶ 2.

In trying to attack Vorono's assertions **[*20]** that she was nothing more than a clerical employee of the bank, plaintiffs make much of an incident where she was told by Terry Church that she was

being made a Vice President of the bank. Vorono explained this in her affidavit:

At one time during my employment at Keystone, I was told by Terry Church, much to my surprise, that I was being made a Vice President of the bank and would no longer need to "punch the time clock" at the beginning and end of the work day, as I had always done before. However, no action was ever taken to formalize my appointment as a Vice President of the bank; my salary did not change; my employment duties remained unchanged; I continued to function exclusively as a secretary, performing the duties referred to [previously]; and I at no time had the power or authority to supervise other employees, or to make any decisions affecting the policies, practices or procedures of Keystone. Later, I was told to resume "punching the time clock," and I continued to do so until my retirement in December, 1997.

Vorono Aff. ¶ 3.

As to the contentious relationship between McConnell and the OCC, Vorono stated:

During the course of my employment at Keystone, Mr. McConnell was almost **[*21]** continuously at odds with the bank regulators from the Office of the Comptroller of the Currency of the United States ("O.C.C."). I often heard him complain bitterly and loudly that the D.C.C. didn't understand the nature of the bank's business, and that the O.C.C. was treating the bank unfairly. Mr. McConnell often dictated letters for me to prepare to be sent to the O.C.C. complaining of the above matters, and complaining of the way in which the O.C.C. regulators dealt with him and with the bank . . . . Nonetheless, prior to my retirement from Keystone, and from that time until the bank was closed, I was never aware of any formal charge made, or disciplinary action taken, by the O.C.C. or any other body against Keystone. Although during my employment I often saw the O.C.C. auditors when they first

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 99 of 307
PageID: 9622
GEÎ ÄVE EÃOaˆ ëÄSÖY QÛ AÍFI ì Î Î Ê EÇF

arrived at Keystone for an audit, I did not deal with the auditors, did not observe their audit related activities, and did not know of the results of their audits.

Vorono Aff. ¶ 5.

Regarding the $20,000.00 bequest to Vorono in the forged McConnell will, Vorono has sworn that she did not know McConnell's signature was forged nor did she believe the bequest was "hush money." Vorono Aff. ¶ [*22] 11. Vorono contends that she believed the bequest was what she was told: a sum representing $1,000.00 for each of the twenty years she had served as McConnell's secretary, See id.

According to Vorono, and there is no evidence to suggest otherwise, after her retirement from the bank, she was not involved in any aspect of the transaction of the Bank's business. From December 17, 1997, until April of 1999, she did not return to Keystone, From December 17, 1997, until March of 1999, she had no communication with anyone at Keystone concerning the bank's business. Vorono Aff. ¶ 10. Vorono did attend a shareholders' meeting in March of 1999 but, according to her, nothing was said at that meeting "to suggest that the bank was in any financial or regulatory difficulty." Vorono Aff. ¶ 13.

In April 1999, Vorono decided to sell some of her Keystone stock and contacted Jack Ingold of E.E. Powell and Company. Ingold offered to buy all of Vorono's stock for the price of $205 per share. Vorono took Ingold up on his offer and sold all but 300 shares. Vorono Aff, ¶¶ 14-15.

Regarding her lack of knowledge of the wrongdoing occurring at Keystone which led to the failure of the bank, Vorono stated:

Prior to [*23] the closing of the bank, and prior to my sale of Keystone stock in April, 1999, I had no knowledge or belief that the bank was in financial or regulatory difficulty of any kind, no knowledge or belief that any fraudulent or illegal activity was ongoing at Keystone, and no knowledge or belief that the

bank might be closed. Prior to the closing of the bank, I was regularly aware of publicity in the news media reporting on the supposed financial success of Keystone and the prominence and respect of Keystone within the banking industry. I believed those reports.

Vorono Aff. ¶ 17.

There is no evidence in the record to counter Vorono's sworn assertions on any of these points.

## II. Legal Framework

*Summary Judgment Standard*

*Rule 56 of the Federal Rules of Civil Procedure* provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*. This burden can be met by showing that the nonmoving party has failed [*24] to prove an essential element of the nonmoving party's case for which the moving party will bear the burden of proof at trial. *Id. at 322*. If the moving party meets this burden, "there can be 'no genuine issue as to any material fact,, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id. at 323*.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at 250-51.* The opposing party must demonstrate that a triable issue of fact exists and may not rest upon mere allegations or denials. *Id. at 252.*

Defendants herein contend that there are no genuine issues of material **[*25]** fact in dispute and, therefore, summary judgment in their favor is warranted. Plaintiff, however, argues that there are genuine issues of material fact for the jury to decide.

## III. Analysis

### A. Unjust Enrichment

Plaintiffs argue that it is unnecessary for them to prove that defendants were involved in or even aware of the wrongdoing at Keystone in order to prevail on their claim of unjust enrichment. Stated simply, plaintiffs contend that even if defendants acted entirely without culpable conduct in selling their Keystone stock, -- i.e., were innocent beneficiaries -- it is nonetheless unfair that they be allowed to retain the proceeds received for that stock.

Concerning claims of unjust enrichment and constructive trusts, West Virginia's highest court has said:

A constructive trust is substantially an appropriate remedy against unjust enrichment. It is raised by equity in respect of property

which has been acquired by fraud, or where, although originally acquired without fraud, it is against equity that it should be retained by the person holding it . . . . Generally, any transaction may be the basis for creating a constructive trust where for any reason the defendant holds funds which **[*26]** in equity and good conscience should be possessed by the plaintiff.

*Annon v. Lucas, 155 W. Va. 368, 382 (1971)* (emphasis added). Plaintiffs hinge their argument on the last sentence of the foregoing passage to claim that the law of unjust enrichment reaches even totally innocent beneficiaries. However, plaintiffs have not directed the court to any West Virginia case which has interpreted the law of unjust enrichment so expansively. Furthermore, when one reads Annon in its entirety, it is clear that the court did not adopt plaintiffs' theory of unjust enrichment:

[W]henever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same. . . .

*Id., at 381-82.*

West Virginia cases decided post-Annon do not support plaintiffs' position either for they all suggest that there must be some wrongdoing on the part of the defendant **[*27]** before any enrichment can be deemed unjust. See, e.g., *Smith v. Smith, 180 W. Va. 203, 207 (1988)* ("[I]n order to prove unjust enrichment, it [i]s necessary to show fraud, duress, undue influence, mistake, breach of fiduciary duty, or wrongful disposition of property.") (internal quotations omitted); *Patterson v, Patterson, 167 W.*

*Va. 1, 10 (1981)* ("A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, or through breach of fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.") (quoting 5 Scott on Trusts § 404.2). *Patterson* goes on to say that "[i]t is apparent from the law of trusts that the purpose of a constructive trust is to redress unjust enrichment resulting from an equitable wrong." *Id. at 12*.

Other states have adopted the more expansive view of unjust enrichment proposed by plaintiffs. See, e.g., *Sun Life Assurance Co. of Canada v. Dunn, 134 F. Supp. 2d 827, 834 (S.D. Texas 2001)* (holding that under Texas law, "a court may impose **[*28]** a constructive trust on totally innocent beneficiaries of a wrongful act."); *Connecticut General Life Ins. Co. v. Merkel, 90 Wis. 2d 126, 131 (1979)* (noting that, under Wisconsin law, "[c]onstructive trusts have been imposed in cases where the person against whom the constructive trust was imposed was an innocent beneficiary and had engaged in no wrongdoing."). However, because West Virginia has not adopted this expansive view and because it is the job of this court to follow the existing law, not expand it, plaintiffs' argument on this point must fail.

As an aside, the court notes that even were it to accept plaintiffs' argument that the law of unjust enrichment reaches even persons who neither engage in wrongdoing nor are aware of it, plaintiffs still would not prevail. To invoke the law of restitution or unjust enrichment to impose a constructive trust upon property of another, it is necessary that it be shown that one party has been unjustly enriched. *Annan v. Lucas, 155 W. Va. 368, 382 (1971)*. No doubt defendants have been

enriched (to a certain point), but have they been <u>unjustly</u> enriched? Is it any less unjust for an employee, who has engaged in no wrongdoing, to find out that her retirement savings, consisting solely of stock earned through her ESOP, is nonexistent because the stocks are **[*29]** worthless? What about the case of Wimmer and Herron who sold their stock and then put the proceeds in the bank? Would it be unjust to make them liable for the amount of proceeds from their stock sales when a considerable amount of those proceeds were lost to them forever upon the bank's failure?

Having determined that West Virginia's law of unjust enrichment does not extend to innocent beneficiaries, the court must next determine whether defendants' conduct is such that they should be required to make restitution to plaintiffs. The simple answer to this question is "no." Plaintiffs have not come forward with any evidence that Wimmer, Herron, Headrick, or Vorono engaged in any wrongdoing related to Keystone's failure or that they were even aware that such wrongdoing was occurring. "It is a fundamental rule of the common law that no man shall be permitted to profit by his own wrong. . . ." *Id. at 384*. In this case, any wrongdoing is not attributable to defendants Wimmer, Herron, Headrick, and Vorono. Accordingly, because defendants did not obtain their stock and/or the proceeds from the sale of that stock through any "fraud, misrepresentations, concealments, . . . undue influence, duress, or through **[*30]** any other similar circumstances" on their part, the doctrine of unjust enrichment does not apply and restitution is not appropriate. *Id., at 382*.

B, Gariety I Claims Against Nancy Vorono

*1. Rule 10b-5*

Count I of the complaint alleges that Vorono violated Section 10b of the Exchange Act and *Rule 10b-5*. The essential elements of a *Rule 10b-5* claim

are "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999)*. Perhaps because they cannot shown that Vorono made a false statement or omission of material fact, plaintiffs also argue that she violated Section 10(b) by engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon purchasers of stock. To that end, plaintiffs contend that Vorono engaged in a "stock dumping scheme," Plaintiffs do not carry the day on either theory.

As to the first method of proving a violation of the Act, plaintiffs are required to show that they relied upon a misrepresentation or omission attributable to Vorono. See *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164, 180 (1994)*. Elaborating on this requirement, the United States Court of Appeals for the Fourth Circuit has stated in this very case:

> [defendant] properly notes that **[*31]** in order to rely on presumed reliance flowing from an application of the fraud-on-the-market theory, the plaintiffs must demonstrate, among other things, that the defendant made a public misrepresentation. It also notes that such a misrepresentation must be directly attributable to [defendant] and not to some other person, because liability under § 10(b) of the Securities Exchange Act and Rule 10b-5 does not include aiding and abetting liability. In Central Bank, the Supreme Court observed that aiding and abetting liability would, if recognized, permit plaintiffs to circumvent the reliance requirement because a defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions.

*Gariety v. Grant Thornton, LLP, 368 F.3d 356, 369 (4th Cir. 2004)* (internal citations and quotations omitted); see also *Glaser v. Enzo Biochem, Inc, 126*

*Fed. Appx. 593, 598-99 (4th Cir. 2005)* ("Following Central Bank, we have stated that a misrepresentation must be directly attributable to [the defendant] and not to some other person.") (internal citations and quotations omitted) (unpublished).

Even viewing the evidence in the light most favorable to plaintiffs, it is clear their claims must fail. Try as they might, they cannot show that Vorono was in possession of any material, adverse, non-public **[*32]** information when she sold her stock. There is no evidence that Vorono had any direct communication with the plaintiffs herein concerning Keystone stock and plaintiffs have not pointed to any specific false statement or omission attributable to her. Furthermore, even assuming that plaintiffs could point to a material false statement or omission on Ms. Vorono's part, their claim still must fail because of their inability to prove loss causation.

Plaintiffs also argue that Vorono violated the Act in that she employed devices, schemes and artifices to defraud, i.e., participated in a stock dumping scheme.

> Market manipulation comprises a class of conduct prohibited by Section 10(b), which typically involves practices such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting the market activity. A plaintiff asserting a market manipulation claim must allege direct participation in a scheme to manipulate the market for securities.

*Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004)* (internal citations and quotations omitted). Furthermore, a complaint alleging market manipulation must state what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, **[*33]** what effect the scheme had on the market for the securities at issue, and how plaintiffs were harmed by the manipulation. See *id. at 642-43*. Analyzing plaintiffs' claims

against the foregoing, it is clear that they fall woefully short of establishing a violation on the part of Voroho. Their allegations on this point are vague and conclusory and fail to point to any disputed issue of <u>material</u> fact sufficient to defeat summary judgment.[7]

2. *Insider Trading*

*15 U.S.C. § 78t-1(a)* provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

Vorono is entitled to summary judgment on this claim because, as discussed above, there is no evidence that she was in possession of material nonpublic information when she sold her stock. Furthermore, she is entitled **[*34]** to summary judgment because plaintiffs cannot satisfy the contemporaneity requirement. For example, almost all the plaintiffs purchased their stock before Vorono sold hers. <u>See</u>, e.g., *In re Microstrategy, Inc. Securities Litig., 115 F. Supp. 2d 620, 664 (E.D. Va. 2000)* (No liability for insider trading can attach for trades made by plaintiffs before insider engages in trading activity.); <u>see also</u> *In re Verifone, 784 F. Supp. 1471, 1489 (N.D. Cal. 1992)* (same). Plaintiff Elizabeth Sponseller purchased her stock almost one month after Vorono sold hers and, accordingly, there is no contemporaneous trade. See *In re Microstrategy, Inc. Securities Litig., 115 F. Supp. 2d 620, 664 (E.D. Va. 2000)* (no

contemporaneous trading where plaintiff purchased stock three days after defendant sold); *Backman v. Polaroid Corp., 540 F. Supp. 667, 671 (D. Mass. 1982)* (plaintiff who traded two and seven days after defendant's sale did not trade contemporaneously).

3. *Civil Conspiracy*

Count XII of the Complaint alleges that Vorono acted in concert with other defendants in preparing and/or disseminating false financial information as part of a common course of conduct designed to deceive the plaintiffs as to the true value of Keystone stock. The Complaint also alleges that Vorono and others "otherwise participat[ed] in such conspiracy" and "engag[ed] in a common course of conduct designed to deceive plaintiffs" and that these defendants "facilitat[ed] the dumping of . . . worthless Keystone stock **[*35]** . . . ."

Vorono is entitled to the entry of summary judgment as to this count because there is absolutely no evidence that she conspired with anyone else to disseminate "false financial information." Indeed, there is no evidence that Vorono even knew that any false financial information was being disseminated. Furthermore, the only "evidence" that plaintiffs' cite to support this claim is the fact that Virginia Burks and Constance Evans sold their stock through E.E. Powell after they learned that was who Vorono had used to sell her stock. This "evidence" does nothing to advance plaintiffs' conspiracy claims against Vorono.

IV. Conclusion

For the foregoing reasons, by Judgment Order dated March 31, 2006, the court:

> 1) GRANTED the motion for summary judgment filed by Jeanie Wimmer and Evelyn Herron in <u>Gariety II</u>;
>
> 2) GRANTED the motion for summary judgment filed by Vida Headrick in <u>Gariety II</u>;
>
> 3) GRANTED the motion for summary

---

[7] Because of the vague and conclusory manner in which plaintiffs presented their claims, it was very difficult for the court to point out all the deficiencies in their argument. Suffice it to say, plaintiffs' arguments on this Count fail on almost every front.

judgment filed by Nancy Vorono in <u>Gariety II</u>;

4) GRANTED the plaintiffs' motion for partial summary judgment on Count I as to defendants Billie Cherry, Melissa Quizenbeury, Ellen Turpin, and Lora McKinney. Plaintiffs' motion was DENIED in all other respects; and

5) GRANTED **[*36]** Nancy Vorono's motion for summary judgment as to the claims asserted against her in <u>Gariety I</u>.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

IT IS SO ORDERED this 19th day of May, 2006.

ENTER:

/s/ David A. Faber

David A. Faber

Chief Judge

---

**End of Document**

# Tab 12

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 106 of 307
PageID: 9629
Greencort Condominium Ass'n v. Greencort Partners, Not Reported in A.2d (2004)
2004 WL 1088758

2004 WL 1088758
Only the Westlaw citation is currently available.
Court of Common Pleas of
Pennsylvania, Philadelphia County.

GREENCORT CONDOMINIUM
ASSOCIATION, Plaintiff,
v.
GREENCORT PARTNERS, Christopher J.
Clark, R. Lamar Kilmore, Richard L. Cantore,
Jerome Miller, Paul E. Oberkircher, Charles G.
Roach, Robert Roach, John C. Snyder, Roberty J.
Tarlechy, Lentz, Cantor & Massey, Ltd, Historical
Properties, Inc., Fox & Roach, LP, Linda Schaal,
Kise, Straw & Kolodner, Inc., Defendants.

No. 04045 JAN.TERM 2004, CONTROL
021802, CONTROL 030742, CONTROL 021378.
|
April 30, 2004.

MEMORANDUM OPINION

COHEN, J.

**\*1** This matter arises from the sale of condominium units to individual unit owners. Plaintiff Greencort Condominium Association ("Plaintiff") instituted suit against numerous defendants including Kise, Straw & Kolonder, Inc. ("KSK") and Fox & Roach d/b/a Prudential Fox and Roach and Linda Schaal ("F & R"). Specifically, Plaintiff asserts claims against KSK for fraud, misrepresentation and nondisclosure (Count IX), conspiracy (Count XI) and violations under the Uniform Trade Practices Consumer Protection Law ("UTPCPL"). Plaintiff also asserts claims against F & R for fraud, misrepresentation and nondisclosure (Count X), conspiracy (Count XI) and the UTPCPL (Count XII). Presently before the court are two sets of Preliminary Objections filed respectively by defendants KSK and F & R. For the reasons set forth below, the court sustains the preliminary objections raised by the respective defendants and grants defendants' motion to strike the claim for attorneys' fees.

DISCUSSION

**A. KSK Preliminary Objections To Count X (Fraud) Are Sustained.**

Count X purports to state a claim for fraud and negligent misrepresentation with general and shifting averments of negligence and intentional misrepresentation. Pennsylvania Rule of Civil Procedure 1020 requires each cause of action and any special damage related thereto to be stated in separate counts containing a demand for relief. Pa. R. Civ. P. 1020. The court finds Count X to be inappropriate due to its failure to present separate causes of action in separate counts as required by Pa. R. Civ. P. 1020.

Count X not only fails to comply with Pa. R. Civ. P. 1020, but also fails to allege sufficient facts to state a claim for fraud and/or negligent misrepresentation. With respect to the fraud claim, the Rules require that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa. R. Civ. P. 1019(a). The Rules also require that averments of fraud or mistake shall be pleaded with particularity. Pa. R. Civ. P. 1019(b).

In order to maintain a cause of action for fraud, a plaintiff must allege the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Bortz v. Noon, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). Here, absent from the complaint are any allegations that KSK made any material misrepresentations of fact with fraudulent intent and knowledge to induce plaintiff to act to it's own detriment and that Plaintiff relied upon said misrepresentations.

Additionally, the complaint also fails to plead sufficient facts to state a claim for negligent misrepresentation. In order to state a claim for negligent misrepresentation, a plaintiff should allege (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. Kramer v. Dunn, 749 A.2d 984, 991 (Pa.Super.2000). As stated above, Plaintiff fails to allege misrepresentations of a material fact, which KSK knew or should have known, were false and that Plaintiff relied upon said misrepresentations to its detriment. Accordingly, the preliminary objections of defendant KSK are sustained. Plaintiff is granted leave to amend Count X

2004 WL 1088758

within twenty (twenty) days from the date of the Order entered contemporaneously with this Opinion.

**B. Defendant F & R's Preliminary Objections to Count IX (Fraud) are Sustained.**

**\*2** Similar to Count X, Count IX also purports to state a claim for fraud and negligent misrepresentation against defendant F & R. Notwithstanding, Plaintiff's failure to present separate causes of action in separate counts as required by Pa. R. Civ. P. 1020, Count IX also fails to plead the necessary facts to state causes of action for fraud and negligent misrepresentation against F & R.

With respect to the fraud claim, Plaintiff fails to allege fraudulent intent to mislead another to rely upon misrepresentations, justifiable reliance on the misrepresentations and resulting injury. Additionally, with respect to the negligent misrepresentation claim, the complaint also fails to allege sufficient facts to state a claim. Absent from the complaint are any allegations of harm suffered by Plaintiff arising from Plaintiff's reliance upon F & R's misrepresentation. Accordingly, the preliminary objections of defendant F & R are sustained. Plaintiff is granted leave to amend Count IX within twenty days from the date of the Order entered contemporaneously with this Opinion. [1]

[1]  In Count IX and X, since the court finds that the claims for fraud and negligent misrepresentation are factually insufficient, the court did not address whether Plaintiff's claim for fraud is barred by the gist of the action doctrine and whether the negligent misrepresentation claim is barred by the economic loss doctrine. The court cautions the parties to be mindful of these doctrines if an amended complaint is filed.

**C. Defendants' Preliminary Objection to Count XI (Conspiracy) is Sustained.**

Count XI alleges civil conspiracy against all defendants. To state a claim for conspiracy, plaintiff must allege: (1) a combination of two or more persons acting with a common purpose to do an unlawful act by unlawful means or for an unlawful purpose; (2) an overt act done in furtherance of the common purpose; and (3) actual legal damage. *Czech v. Gordon,* 2003 WL 22455078, \* 3 (2003) (Cohen, J.) (citing *Baker v. Rangos,* 229 Pa.Super. 333, 324 A.2d 498, 506 (1974)). Therefore, a complaint for conspiracy must allege

direct or circumstantial facts which demonstrate combination and intent.

Count XI of the complaint is insufficiently specific to satisfy the requirements of Pa. R. Civ. P. 1019(a). Plaintiff merely alleges bald conclusions without alleging facts of a combination or intent to conspire. Such allegations alone are insufficient to support a claim for conspiracy. Moreover, in order to state a claim for conspiracy, plaintiff must allege an unlawful act or an unlawful purpose. *Id.* Since the court sustained KSK and F & R's preliminary objections to Counts IX and X alleging fraud, the court must also sustain the preliminary objections to the conspiracy claims based on the failure to allege an unlawful act or unlawful purpose. Accordingly, defendants' preliminary objections to Count XI are sustained. In the event, Plaintiff is capable of setting forth sufficient facts to state a claim for conspiracy, Plaintiff is granted leave to amend Count XI within twenty (20) days from the date of the Order filed contemporaneously with this Opinion.

**D. Defendants' Preliminary Objections to Count XII (UTPCPL) Are Sustained.**

Count XII of the complaint purports to state a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa.C.S.A. § 201–1 et. seq. Without reaching the merits of defendants' contentions, the court finds that the UTPCPL claim must be dismissed since the Plaintiff lacks standing to raise said claim. The limited circumstances under which a private person may bring a claim under the UTPCPL are specifically set forth in Section 9.2(a), which provides in relevant part, that:

**\*3** Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declare unlawful by section 3 of the UTPCPL, may bring a private action to recover actual damages or one hundred dollars ($100.00), which ever is greater.

*Bowers v. T–Netix,* 837 A.2d 608, 613 (Pa.Cmwlth.2003) (citing 73 P.C. S.A. § 201–9.2(a)). This statute unambiguously permits only persons who have purchased or leased goods or services to sue. *Balderston v. Medtronic Sofamor Danek, Inc.,* 285 F.3d 238, 241 (3rd Cir.2002) (citing *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3rd Cir.1992)).

Here, Greencort Condominium Association is responsible for administering the affairs and interests of the unit owners of Greencort Condominium (Compl.¶ 2) and is not a purchaser as intended by the UTPCPL. Hence, it is statutorily precluded from bringing a private cause of action under the UTPCPL. See *Balderston v. Medtronic Sofamor Danek, Inc.,* 285 F.3d 238, 241 (3 rd Cir.2002) (citing *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3rd Cir.1992)). Accordingly, Count XII is dismissed since the court finds that the allegations within the complaint fail to establish Plaintiff's standing to bring a claim against defendants KSK and F & R pursuant to the UTPCPL. [2]

[2]   The defendants did not raise the issue of standing as it pertains to the UTPCPL. However, where a cause of action is created by statute and designates who may sue, the issue of standing becomes interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite to an action. *Bowers v. T–Netix,* 837 A.2d 608, 614 (Pa.Cmwlth.2003)(citing *Beverly Healthcare– Murrysville v. Dep't of Pub. Welfare,* 828 A.2d 491 (Pa.Cmwlth.2003). Accordingly, a court may raise the issue *sua sponte* . See *Grom v. Burgoon,* 448 Pa.Super. 616, 672 A.2d 823, 824 (Pa.Super.1996).

E. Defendants' Motion to Strike Plaintiff's Claim for Attorney's Fees Must Be Granted.

The *ad damnum* clause to Counts IX, X and XI contain a request for attorneys' fees. Under the "American Rule", a party may not recover attorneys' fees from its adversary absent an express statutory or contractual provision allowing for the recovery of such attorneys' fees. *Mosaica Academy Charter School v. Com.Dept. of Educ.,* 572 Pa. 191, 206–7, 813 A.2d 813, 822 (Pa.2002). Since Plaintiff has not identified any applicable contractual or statutory provision that permits it to recover attorneys' fees from defendants, plaintiffs request for such relief must be dismissed. [3]

[3]   The court recognizes that under the UTPCPL a plaintiff is entitled to attorney's fees; however such claim is moot since the court has dismissed the claim for lack of standing to sue.

CONCLUSION

For the foregoing reasons, the court sustains the respective Preliminary Objections of KSK and F & R and grants the Motion to Strike Attorneys' Fees as follows:

1. Defendants' Preliminary Objections to Counts IX, X and XI are Sustained. Plaintiff is Granted leave to amend said counts within twenty (20) days from the date of this Order.

2. Defendants' Preliminary Objection to Count XII is Sustained. Count XII is dismissed against Defendants Kise, Straw & Kolodner and Fox & Roach d/b/a Prudential Fox & Roach and Linda Schaal.

3. Defendants' Motion to Strike Plaintiff's Request for Attorneys Fees in Counts IX, X and XI is Granted.

4. Defendants' remaining Preliminary Objections are Moot.

ORDER

AND NOW, this 30 th day of April 2004, upon consideration of the Preliminary Objections of Defendants Kise, Straw & Kolodner, Inc. (Control Numbers 021802 and 030742) and Fox & Roach, L.P. d/b/a Prudential Fox & Roach and Linda Schaal (Control Number 0211378), all responses thereto, all matters of record and in accordance with the Memorandum Opinion entered contemporaneously herewith, it hereby is ORDERED and DECREED that

**\*4** 1. Defendants' Preliminary Objections to Counts IX (fraud), X (fraud) and XI (conspiracy) are Sustained. Plaintiff is granted leave to amend said counts within twenty (20) days from the date of this Order.

2. Defendants' Preliminary Objection to Count XII (UTPCPL) is Sustained. Count XII is dismissed against Defendants Kise, Straw & Kolodner and Fox & Roach d/b/a Prudential Fox & Roach and Linda Schaal.

3. Defendants' Motion to Strike Plaintiff's Request for Attorneys' Fees in Counts IX, X and XI is Granted.

4. Defendants' remaining Preliminary Objections are Moot.

**All Citations**

Not Reported in A.2d, 2004 WL 1088758

**Greencort Condominium Ass'n v. Greencort Partners, Not Reported in A.2d (2004)**

2004 WL 1088758

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 13

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re OnStar Contract Litigation, E.D.Mich., February 19, 2009

2005 WL 4127090
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Naomi R. HENDERSON, individually and on behalf
of all others similarly situated, Plaintiff-Appellant,

v.

The HERTZ CORPORATION,
Defendant-Respondent.

Argued Feb. 28, 2005.
|
Decided June 22, 2006.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, L-6937-03.

**Attorneys and Law Firms**

Bruce D. Greenberg argued the cause for appellant (Lite,
DePalma, Greenberg & Rivas, attorneys; Mr. Greenberg on
the brief, and Joseph N. Kravec, Jr. (Specter, Specter, Evans
& Manogue), of the Pennsylvania bar, admitted pro hac vice,
of counsel and on the brief).

Alan E. Kraus argued the cause for respondent (Latham &
Watkins, attorneys; Lisa Ann T. Ruggiero and Mr. Kraus, on
the brief).

Before Judges A.A. RODRÍGUEZ, CUFF and HOENS.

**Opinion**

PER CURIAM.

 **\*1** Plaintiff Naomi Henderson appeals from the January
29, 2004 order of the Law Division granting the motion of
defendant, The Hertz Corporation ("Hertz"), to dismiss her
complaint for failure to state a claim upon which relief may
be granted. We affirm.

For purposes of our review and in light of the procedural
posture of this appeal, we accept as true the facts set

forth in plaintiff's complaint. Hertz is a national car rental
company with its headquarters in New Jersey. At all times
relevant to this appeal, Hertz not only rented vehicles to
customers, but also offered for sale three different varieties
of insurance which could be purchased along with the cars
being rented. More particularly, defendant offered third-party
insurance known as Liability Insurance Supplement (LIS),
first-party insurance coverage known as Personal Accident
Insurance (PAI), and personal property or damage insurance
referred to as Personal Effects Coverage (PEC). Each type
of insurance coverage was underwritten by independent
insurance companies and only made available for sale by
Hertz.

According to the complaint, plaintiff rented a car from Hertz
at Newark Airport on January 12, 1998. In connection with
that rental, she purchased LIS coverage but chose not to
purchase PAI or PEC coverage. She returned the rental car
without incident, never having had to make a claim against
the LIS coverage. Plaintiff further alleges that at various times
between April 1988 and August 2003, she rented cars from
Hertz in states other than New Jersey and that she purchased
one or more of the insurance products in connection with
each of those other rentals. She concedes she never filed any
claims under the coverages provided by any of the insurance
products she purchased.

Plaintiff filed her complaint seeking to sue individually and
as the representative of a class of individuals who both
rented vehicles from Hertz and purchased one or more of the
insurance products from Hertz during the period from April
1988 through August 2003. The complaint alleges that Hertz
misrepresented, concealed or failed to disclose to plaintiff and
the other members of the class that it was not licensed or
registered to sell the insurance products that she and the class
members purchased. She asserts that she and other members
of the class are therefore entitled to damages from defendant
based upon six separate causes of action, namely, a violation
of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to
-20, common law fraud, illegal contract subject to rescission,
breach of the implied covenant of good faith and fair dealing,
negligent misrepresentation and unjust enrichment.

Defendant filed a motion to dismiss the complaint for failure
to state a claim, see R. 4:6-2(e), in lieu of answering the
complaint. That motion, in summary, asserted that plaintiff's
complaint failed to state a claim because it essentially
sought to create a private right of action arising from a
licensing requirement, which could only be enforced by the

2005 WL 4127090

Commissioner of the Department of Banking and Insurance ("the Commissioner"), because it sought to rescind a fully executed contract and because plaintiff could not demonstrate that she had suffered an ascertainable loss as required by the Consumer Fraud Act. On January 29, 2004, Judge Bernstein granted the Hertz motion, separately addressing the sufficiency of each of the complaint's causes of action as a part of his oral decision.

**\*2**  On appeal, plaintiff asserts that Judge Bernstein erred in dismissing the complaint for failure to state a claim. She argues that the complaint states a cause of action, cognizable within the Consumer Fraud Act, which is parallel to, but not coextensive with, the remedies that are available to the Department of Banking and Insurance to enforce the applicable insurance licensing statutes. In addition, she asserts that because she purchased a product that Hertz was not lawfully entitled to sell to her and which Hertz lacked the appropriate license to sell, she has suffered an ascertainable loss. In the alternative, she urges us to find that the factual allegations support relief based on her other causes of action. We disagree and we affirm.

We begin our analysis with an explanation of the relevant statutory and regulatory scheme governing insurance products and with an examination of the required elements of the Consumer Fraud Act. Since April 1988, the New Jersey Insurance Producer Licensing Act (IPLA), *N.J.S.A.* 17:22A-1 to -25, has required that an entity or person must be licensed in order to offer insurance for sale or receive a fee, commission or compensation for sales of insurance. *N.J.S.A.* 17:22A-3. Effective August 15, 2001, the Legislature repealed that statute, but replaced it with a revised enactment. *See* New Jersey Insurance Producer Licensing Act of 2001 (IPLA(2001)), *N.J.S.A.* 17:22A-26 to -48. The relevant language of the statute currently in force is similar to the requirements under IPLA.

As currently in force, IPLA(2001) provides that a "person shall not sell, solicit or negotiate insurance in this State unless the person is licensed for that line of authority in accordance with this act." *N.J.S.A.* 17:22A-29. In addition, IPLA(2001) specifically defines "person" to include both individuals and business entities. *Id.* at -28. Both IPLA and IPLA(2001) vest the Commissioner with authority for both issuance of licenses to sell insurance and enforcement of compliance with the statutes. *See* IPLA, *N.J.S.A.* 17:22A-4, -20; IPLA(2001), *N.J.S.A.* 17:22A-32, -33, -45.

Pursuant to IPLA, the Department of Banking and Insurance ("the Department") adopted regulations which plaintiff asserts require car rental companies, like Hertz, to register as limited insurance representatives for purposes of sales of insurance, such as the coverages Hertz offered. *See* 20 *N.J.R.* 904, 906-07, 909-10 (April 18, 1988). The regulations accomplish this result by defining car rental companies as sellers of "ticket insurance," *N.J.A.C.* 11:17-1.2, and by requiring sellers of ticket insurance to register in accordance with the Act. *N.J.A.C.* 11:17-2.2(a)(9)(iii). According to the complaint, Hertz did not register as required by IPLA or IPLA(2001) and therefore was not licensed to offer the insurance products that it made available in connection with its car rentals to plaintiff and the other class members from 1988 through 2003. [1]

[1]      Hertz does not concede that these regulations apply to its sales of these products. Rather, it asserts that the scope of the regulations is more narrow than plaintiff's complaint alleges. For purposes of this appeal, and in light of its procedural context, we accept plaintiff's assertions about the applicability of these regulations as true.

**\*3**  Plaintiff concedes that our Supreme Court has concluded that there is no private right of action under IPLA. *See Lemelledo v. Beneficial Management Corp. of Am.,* 150 *N.J.* 255, 272 (1997). She concedes that IPLA's licensing requirements can only be enforced by the Department, which it accomplishes through the imposition of fines and penalties. *Ibid.* She does not suggest that the analysis of the similar statutory scheme enacted by IPLA(2001) would yield a contrary result. She asserts, however, that the claims she has raised are cognizable causes of action within the Consumer Fraud Act, or sounding in common law fraud, illegal contract, breach of the covenant of good faith and fair dealing, negligence or unjust enrichment.

The Law Division judge found these arguments unconvincing. Addressing the first count of the complaint, in which plaintiff asserted that the contract for sale of the insurance products was illegal and subject to the equitable remedy of rescission, the judge concluded that although the contract was illegal under IPLA, the statute did not make the contract unenforceable. Moreover, he concluded that because the contract had been fully performed and plaintiff had received the full benefit of the insurance coverage for which she paid, rescission was not available as a remedy. With respect to the counts of the complaint seeking relief

pursuant to the Consumer Fraud Act or for common law fraud or misrepresentation, the judge noted that the sole basis for these allegations was Hertz's failure to register and become licensed. Because permitting that claim to proceed would be tantamount to asserting a private remedy under IPLA or IPLA(2001), he concluded it was barred. Furthermore, the judge found no other allegation in the complaint suggesting that Hertz misled plaintiff or that it engaged in any other deceptive practice such as, for example, leading her to believe that the purchase of the coverage was anything other than an option, or overcharging her for the coverage. As a result, the judge concluded that the complaint did not assert any fraud-based claim apart from the one resting on the violation of IPLA. The judge also dismissed the count in the complaint for breach of the covenant of good faith and fair dealing, concluding that this implied contract theory was unsupported by any of the factual allegations. Finally, the motion judge concluded that there could be no claim for unjust enrichment because plaintiff had received the benefit of her bargain.

On appeal, plaintiff asserts that the judge erred in dismissing the complaint for failure to state a claim. More specifically, she asserts that the allegations in the complaint suffice to support a cause of action pursuant to the Consumer Fraud Act which is parallel to the remedies that are available to the Commissioner as enforcement mechanisms for IPLA or IPLA(2001). In addition, she asserts that she has identified an ascertainable loss, a critical element to the Consumer Fraud Act analysis, arguing that she was damaged by purchasing a product that defendant was not lawfully entitled to sell to her and that she would not have purchased had she been aware that defendant lacked the appropriate license. In the alternative, she asserts that the judge erred in his analysis of the sufficiency of her other claims. In particular, she argues that he failed to consider that Hertz, by failing to advise her that it was not licensed to sell the LIS, PAI and PEC products, committed common law fraud and breached the covenant of good faith and fair dealing. Finally, she argues that Hertz has been unjustly enriched by being permitted to profit from the sale of these products in violation of IPLA and IPLA(2001).

**\*4** A motion for failure to state a claim requires the judge to search the pleading in depth and with liberality in order to determine whether a cause of action is suggested. *Printing Mart-Morristown v. Sharp Electronics Corp.,* 116 *N.J.* 739, 746 (1989). In addressing any motion to dismiss for failure to state a claim, the court must "accept as true all factual assertions in the complaint." *Smith v. SBC Communications, Inc.,* 178 *N.J.* 265, 268-69 (2004). Moreover, in doing so,

every reasonable inference to be drawn from the factual assertions must be accorded to the plaintiff. *Id.* at 282. We have specifically considered the effect of such a motion in the context of a Consumer Fraud Act complaint. *See New Jersey Citizen Action v. Schering-Plough Corp.,* 367 *N.J.Super.* 8, 13 (App.Div.), *certif. denied,* 178 *N.J.* 249 (2003). In particular, we have commented that a motion for failure to state a claim in the context of the Consumer Fraud Act should be approached "with hesitation." *Id.* at 13 (citing *Seidenberg v. Summit Bank,* 348 *N.J.Super.* 243, 249-50 (App.Div.2002)(other citations omitted)).

However indulgently the court is required to view the sufficiency of factual allegations in evaluating a motion to dismiss for failure to state a claim, the motion judge must nevertheless grant the motion if the complaint fails to articulate a legally sufficient basis entitling plaintiff to relief. *See Camden County Energy Recovery Assocs., L.P. v. New Jersey Department of Environmental Protection,* 320 *N.J.Super.* 59, 64 (App.Div.1999), *aff'd o.b* . 170 *N.J.* 246 (2001). As we have recently held, "[a] motion to dismiss a complaint under *R.* 4:6-2(e) for failure to state a claim upon which relief can be granted must be evaluated in light of the legal sufficiency of the facts alleged in the complaint." *Donato v. Moldow,* 374 *N.J.Super.* 475, 482 (App.Div.2005). Although a plaintiff need not prove the truth of the factual allegations in response to a motion to dismiss for failure to state a claim, it is plaintiff's duty to demonstrate allegations "which, if proven, would constitute a valid cause of action." *Sickles v. Cabot Corp.,* 379 *N.J.Super.* 100, 106 (App.Div.)(quoting *Leon v. Rite Aid Corp.,* 340 *N.J.Super.* 462, 472 (App.Div.2001)), *certif. denied,* 185 *N.J.* 297 (2005). With these indulgent standards of review in mind, we turn to the specific complaint and the arguments of the appellant.

Although there are six separate counts in the complaint, the central focus of plaintiff's appeal, and therefore the focus of our analysis, is on the Consumer Fraud Act, *N.J.S.A.* 56:8-1 to -20, and the related claims sounding in common law fraud and misrepresentation. We begin, therefore, by observing that the Consumer Fraud Act gives citizens a cause of action under certain conditions. As our Supreme Court has held, in order to state a claim under the Consumer Fraud Act, a plaintiff must allege each of three elements: (1) unlawful conduct by a defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between defendant's unlawful conduct and that ascertainable loss. *See Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 24 (1994). Based upon our review of the allegations in the complaint, we conclude, as did the motion

2005 WL 4127090

judge, that plaintiff has failed to state a claim consistent with these necessary requirements of the Consumer Fraud Act. In particular, her claim falls short because she cannot demonstrate that the unauthorized sale of insurance products is "unlawful conduct" as that concept is embodied in the Consumer Fraud Act and because she cannot demonstrate that she has suffered an ascertainable loss because of Hertz's conduct.

**\*5** We first conclude that plaintiff has failed to allege facts that would support relief under the Consumer Fraud Act because the nature of the misrepresentation or deceptive practice on which she bases her claim, namely, the sale of a product which Hertz was not authorized by license to sell, is not a legally cognizable claim. That is to say, IPLA and IPLA(2001) make plain that enforcement of the licensing provisions relating to the sale of insurance products is for the Commissioner. *See In re Commissioner of Insurance's March 24, 1992 Order,* 256 *N.J.Super.* 158, 176 (App.Div.1992), *aff'd,* 132 *N.J.* 209 (1993)("Implied remedies are unlikely to be intended by a Legislature that enacts a comprehensive legislative scheme including an integrated system of procedures for enforcement"); *Mizrahi v. Allstate Ins. Co.,* 276 *N.J.Super.* 112, 118 (Law Div.1994)(IPLA "seeks to compel compliance with its licensing requirements by permitting the Commissioner to impose substantial fines ... and to refuse to issue or renew a license for any statutory violation"). Our Supreme Court has specifically held that IPLA does not create a private right of action or a private remedy for an individual who purchases an insurance product from an unlicensed insurer. *See Lemelledo, supra,* 150 *N.J.* at 272. Nothing in IPLA(2001) would support a different conclusion as it relates to that legislative scheme.

Viewed against these precedents, plaintiff's claim must fail as a matter of law. A review of the complaint reveals that the only acts or practices plaintiff alleges give rise to her cause of action are that Hertz sold insurance without a license, that Hertz was required to be licensed and that Hertz's sale of insurance was either illegal or against public policy. None of these acts, however, falls outside the scope of IPLA or IPLA(2001); none can be the basis for a private remedy under the Consumer Fraud Act. None, by extension, can support a private remedy through any other misrepresentation-based theory.

Even were plaintiff to contend, and her complaint does not, that defendant should have revealed to her that it was an unlicensed seller of ticket insurance and that she would not

have purchased the products had she been aware of those facts, we would reach the same result. Because her factual assertions are, fundamentally, that Hertz violated IPLA or IPLA(2001) they cannot support relief under any of the theories in her complaint. It is significant to our analysis that plaintiff has defined the class of claimants to include only those who purchased insurance products from Hertz but who thereafter made no claims for coverage pursuant to those policies. She concedes that any Hertz customer who purchased one of the insurance products and who thereafter made a claim under those policies was compensated for their covered claims. That being the case, plaintiff has defined the class of persons she seeks to represent to include only those individuals who have no claim at all. That is to say, the very definition of the class demonstrates that the insurance Hertz sold was recognized as valid by the underwriters, notwithstanding the fact that Hertz had no license to sell it. By defining the class to exclude all individuals who purchased the insurance and made a claim for which they were compensated, plaintiff only asserts a cause of action which IPLA and IPLA(2001) have reserved to the Commissioner. In short, she seeks to create a private right of action to remedy the unlicensed sale.

**\*6** Nor does the holding of the Supreme Court in *Perez v. Rent-A-Center, Inc.,* 186 *N.J.* 188 (2006), or the analysis of the Law Division in *Artistic Lawn & Landscape Co. v. Smith,* 381 *N.J.Super.* 75 (Law Div.2005), both called to our attention by plaintiff while this matter was pending, *see R.* 2:6-11(d), support a different result. In *Perez,* the Court concluded that a claim amounting to a statutory violation could also form the basis for a Consumer Fraud Act claim. Its reasoning, however, rested on the conclusion that a rent-to-own contract was a retail installment contract, within the meaning of the Retail Installment Sales Act ("RISA"), *N.J.S.A.* 17:16C-1 to -61, and subject to that statute. Having reached that conclusion, the Court then relied on the rationale of *Lemelledo, supra,* 150 *N.J.* at 264-66, which had earlier concluded that a RISA violation could support a Consumer Fraud Act cause of action. *See Perez, supra,* 186 *N.J.* at 219-20.

The Court's reasoning in *Perez* does not undercut the Court's earlier conclusion in *Lemelledo* that an IPLA violation does not similarly give rise to a Consumer Fraud Act claim. *Lemelledo, supra,* 150 *N.J.* at 272. Indeed, the *Perez* Court pointed out that there is no suggestion that the remedy of the Consumer Fraud Act would conflict with the RISA enforcement scheme. In light of the fact that the Court in *Lemelledo* reached the contrary conclusion in its separate

analysis of the relationship between the Consumer Fraud Act and IPLA, based on the latter's lack of a private remedy, we find nothing in *Perez* that supports plaintiff's assertions. Indeed, the Court has not altered its conclusion that a conflict between the regulatory scheme and the asserted private remedy compels the latter to give way to the former.

Similarly, although the Law Division judge in *Artistic Lawn* concluded that a contractor who was not licensed to perform a lawn irrigation installation project could be subject to a Consumer Fraud Act claim, neither the court's analysis nor the statutory framework addressed in that decision supports a like conclusion here. Apart from the fact that the licensing framework addressed in *Artistic Lawn* is unlike IPLA or IPLA(2001), as the court there recognized, the full performance of the contract itself, regulations notwithstanding, might compel an alternate result. *See Artistic Lawn, supra,* 381 *N.J.Super.* at 87. Indeed, the Law Division judge in *Artistic Lawn* relied in part on our earlier expression of a similar concern, that is, the inherent unfairness of preventing a remedy to a contractor who has fully performed. *See Scibeck v. Longette,* 339 *N.J.Super.* 72, 82 (App.Div.2001). Even were we to conclude that plaintiff here had a potential private remedy, because Hertz fully performed, the concern we expressed in *Scibeck* would support the same conclusion here, precluding plaintiff from pursuing her claim. As we noted in *Scibeck,* plaintiff, having received the full benefit of the bargain of the insurance coverage that Hertz sold her, should not be permitted to "use the [Consumer Fraud] Act as a sword rather than a shield." *Ibid.* Having reviewed and considered each of these additional precedents cited for us by plaintiff, we discern no basis on which to conclude that the Law Division judge erred in deciding that she has failed to state a claim for relief pursuant to the Consumer Fraud Act.

 **\*7** Alternatively, we would affirm the motion judge's decision because plaintiff has failed to set forth facts that suffice to meet the ascertainable loss requirement of the Consumer Fraud Act. We need not describe this requirement or the history of the development of our understanding of it, *see Weinberg v. Sprint Corp.,* 173 *N.J.* 233, 251 (2002); *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 473 (1988), at great length, particularly in light of the recent guidance from our Supreme Court about the meaning of the term. *See Thiedemann v. Mercedes-Benz U.S.A., LLC,* 183 *N.J.* 234, 238 (2005). In *Thiedemann,* the Court reiterated that summary judgment on a Consumer Fraud Act claim is appropriate if a "plaintiff fails to produce evidence from

which a finder of fact could find or infer" that the plaintiff sustained an ascertainable loss. *Ibid.* Significant to our analysis of plaintiff's complaint against Hertz, the Court there defined the concept of ascertainable loss as a "quantifiable or otherwise measurable loss." *Ibid.* In analyzing and in attempting to define the ascertainable loss requirement, the Court observed that "[t]here is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in our statute." *Id.* at 248. In doing so, the Court echoed its earlier statement that "[w]e neither can ascribe a plain meaning to the term ascertainable loss, nor find legislative history that sheds direct light on those words." *See Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 11 (2004). Most significant to our analysis, in *Thiedemann,* the Court concluded that "[t]o give effect to the legislative language describing the requisite loss for private standing under the [Consumer Fraud Act], and to be consistent with *Weinberg,* a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann, supra,* 183 *N.J.* at 248.

As a further illustration of the meaning of "actual loss" the Court noted that "[i]n cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Ibid.* The Court stressed, however, that the "certainty implicit in the concept of an 'ascertainable' loss is that [such loss] is quantifiable or measurable." *Ibid.* The calculation does not need to be exact, and plaintiff need not experience any out-of-pocket loss. *Ibid.* Rather "an 'estimate of damages, calculated within a reasonable degree of certainty,' will" be sufficient to demonstrate an ascertainable loss. *Id.* at 249 (quoting *Cox, supra,* 138 *N.J.* at 22).

In the time since the Court decided *Thiedemann,* we have addressed several other issues related to the analysis of the concept of ascertainable loss. We have reiterated our earlier rejection of the "price-inflation" theory, *see Dabush v. Mercedes-Benz U.S.A., LLC,* 378 *N.J.Super.* 105, 123 (App.Div.) (citing *Citizen Action, supra,* 367 *N.J.Super.* at 16), *certif. denied,* 185 *N.J.* 265 (2005), and we have concluded that a plaintiff who relies only on hypothetical surmise about an automobile component without any out-of-pocket loss or evidence of its value cannot meet the *Thiedemann* test. *Id.* at 124. We have concluded that automobile repairs that would have been covered by warranties but which were voluntarily foregone in an effort

Case 1:19-md-02875-RMB-SAK   Document 522-3   Filed 07/17/20   Page 116 of 307
PageID: 9639
Henderson v. Hertz Corp, Not Reported in A.2d (2005)

2005 WL 4127090

to support a Consumer Fraud Claim Act also did not meet the ascertainable loss test. *See Perkins v. DaimlerChrysler Corp., 383 N.J.Super.* 99, 112 (App.Div.2006).

**\*8** We recognize that the Court in *Thiedemann* had the benefit of a more complete record than the one we here review. While the *Thiedemann* appeal followed a motion for summary judgment, based on a record more fully developed in discovery than the limited record before us in light of the procedural posture of this matter, we do not find that difference significant. We conclude, rather, as we did in *Perkins,* that the parameters of the *Thiedemann* test for ascertainable loss are such that they can be applied appropriately to this complaint in the context of a motion to dismiss for failure to state a claim. *See Perkins, supra,* 383 N.J.Super. at 111.

Applying even these more recent precedents to plaintiff's complaint, we reach the same conclusion as did Judge Bernstein. Although plaintiff purchased insurance products from an allegedly unlicensed seller, she must concede that, had she had the occasion to file a claim against that insurance coverage, it would not have been rejected on that ground. In fact, she got the benefit of her bargain because she was covered against the various perils as to which the insurance products applied each time she bought coverage. The mere fact that she did not need to file a claim against that insurance does not mean that she did not receive the coverage for which she bargained. It therefore cannot equate with an ascertainable loss as our Supreme Court has interpreted that term. Rather, it is only by defining the putative class so as to exclude every purchaser who made a claim and who realized the full benefit of the coverage as well that plaintiff attempts to demonstrate a loss. We decline to interpret the reach of the ascertainable loss requirement to include plaintiff, who only by fortuity, did not actually need the coverage she purchased. Indeed, it is in the nature of insurance that some people will buy it and not use its available coverages. To suggest that every purchaser of insurance who does not thereafter make a claim against the coverage has suffered an "actual" loss in the sense required under the Consumer Fraud Act is to stretch the concept well beyond its meaning and intendment as we understand it.

Henderson also argues that the Law Division judge erred in dismissing her claims based on theories of common law fraud, negligent misrepresentation, illegal contract (rescission), breach of the covenant of good faith and fair dealing and unjust enrichment. Although we find no merit in her assertion that the judge erred, we separately address each of these

theories. We begin by noting that the same factual allegations which plaintiff utilized to support her Consumer Fraud Act claim also give rise to each of the other claims.

We need only comment briefly on plaintiff's common law fraud and negligent misrepresentation claims. First, as Hertz points out, both of these claims are, in the context of the facts here, simply alternative articulations of a proposed private remedy, barred by IPLA and IPLA(2001), for Hertz's alleged failure to maintain a license or to advise plaintiff that it was not licensed. The result, therefore, of our analysis, can be no different from our decision on the Consumer Fraud Act claim. *See Crusco v. Oakland Care Center,* 305 N.J.Super. 605, 614-17 (App.Div.1997)(artful repleading of barred statutory claim insufficient to state a claim). Second, were we to examine the factual assertions in comparison to the elements of either of these causes of action, we would conclude that plaintiff's complaint fails to state a claim.

**\*9** The elements of common law fraud or misrepresentation are: (1) a false representation of fact; (2) made by defendant; (3) with knowledge that it is false; (4) with the intent to deceive plaintiff; (5) upon which representation plaintiff relies to his or her detriment; (6) sustaining a loss. *See Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624 (1981); *Louis Schlesinger Co. v. Wilson,* 22 N.J. 576, 585-86 (1956); *Fischetto Paper Mill Supply, Inc. v. Quigley Co., Inc.,* 3 N.J. 149, 152-53 (1949). As with our discussion of the Consumer Fraud Act's ascertainable loss requirement, plaintiff's inability to demonstrate that she suffered any loss as a result of Hertz's sale of insurance without a license is fatal to her claim. Moreover, as plaintiff does not assert and cannot demonstrate that she relied to her detriment on any statement, or omission, by Hertz, her claim cannot be sustained under either of these theories for this separate reason.

Similarly, plaintiff's illegal contract claim, on which she bases her demand for the equitable remedy of rescission, fails because the contract is fully executed. So articulated, the flaw in her reasoning is apparent, for the equitable remedy is not available after performance. *See County of Morris v. Fauver,* 153 N.J. 80, 97 (1998); *Intertech Assocs., Inc. v. City of Paterson,* 255 N.J.Super. 52, 59 (App.Div.1992)(quoting *Driscoll v. Burlington-Bristol Bridge Co.,* 28 N.J.Super. 1, 4 (App.Div.1953)). Even if by selling the insurance without a license, Hertz violated the law, the insurance coverage plaintiff bargained for was provided. Indeed, although the risk insured against did not occur during the rental period, plaintiff concedes that had it, she would have been covered, just as

2005 WL 4127090

those excluded from the putative class in fact were covered. Because her illegal contract claim seeks to rescind a contract for services after all obligations promised by Hertz have been performed, it fails as a matter of law.

We reject as well plaintiff's argument that Hertz breached the covenant of good faith and fair dealing. Judge Bernstein reasoned that because plaintiff received the full fruits of the contract of insurance, she could not prevail on this claim. On appeal, plaintiff urges us to conclude that the covenant of good faith and fair dealing required Hertz to affirmatively advise her that it was not licensed to sell the insurance coverage. We disagree. The essence of the covenant of good faith and fair dealing, implied in every contract, as defined by our Supreme Court, is that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Products, Inc.,* 69 *N.J.* 123, 129-30 (1976)(quotations omitted); *see Sons of Thunder v. Borden, Inc.,* 148 *N.J.* 396, 420 (1997). Even assuming that Hertz misrepresented whether it was licensed to sell the products, there are no allegations in the complaint that Hertz did anything to destroy or injure plaintiff's rights under the contracts of insurance. Because it is undisputed that the insurance policies sold by Hertz did provide the coverage as represented, plaintiff can have no claim for breach of the covenant of good faith and fair dealing.

**\*10** Finally, we agree with the motion judge that plaintiff's unjust enrichment claim also fails. Hertz performed its

obligations to plaintiff by providing her with a valid insurance contract as promised. *See Paley v. Baron Sav. and Loan Ass'n.,* 82 *N.J.Super.* 75, 84 (App.Div.), *certif. denied,* 41 *N.J.* 602 (1964). There can be no claim for the equitable remedy of unjust enrichment, therefore, because Hertz did not receive a benefit at plaintiff's expense. *See Assocs. Commercial Corp. v. Wallia,* 211 *N.J.Super.* 231, 243 (App.Div.1986). Rather, Hertz undeniably provided the insurance coverage even if it was not licensed to do so. Hertz therefore received only payment for that which it provided. In the absence of factual allegations that Hertz received a benefit that enriched it beyond its contractual rights, there can be no claim for damages pursuant to the unjust enrichment theory. *See Callano v. Oakwood Park Homes Corp.,* 91 *N.J. Super* . 105, 109 (App.Div.1966).

In summary, our review of the record compels us to conclude, as did Judge Bernstein, that the facts set forth in plaintiff's complaint fail as a matter of law to state claims for relief either within the Consumer Fraud Act, or for common law fraud, negligent misrepresentation, illegal contract, breach of the covenant of good faith and fair dealing or unjust enrichment.

Affirmed.

### All Citations

Not Reported in A.2d, 2005 WL 4127090

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 14

## *Hoffman v. Cogent Solutions Group, LLC*

United States District Court for the District of New Jersey

December 16, 2013, Decided; December 16, 2013, Filed

Civil Action No. 13-00079 (SDW) (MCA)

**Reporter**

2013 U.S. Dist. LEXIS 176056 *; 2013 WL 6623890

HAROLD M. HOFFMAN, individually and on behalf of those similarly situated, Plaintiff, vs. COGENT SOLUTIONS GROUP, LLC, Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** **[*1]** For HAROLD M. HOFFMAN, individually and on behalf of those similarly situated, Plaintiff: HAROLD M HOFFMAN, LEAD ATTORNEY, ENGLEWOOD, NJ.

For COGENT SOLUTIONS GROUP, LLC, Defendant: MICHAEL R. MCDONALD, LEAD ATTORNEY, JENNIFER MARINO THIBODAUX, GIBBONS, PC, NEWARK, NJ.

**Judges:** Susan D. Wigenton, United State District Judge.

**Opinion by:** Susan D. Wigenton

## Opinion

**WIGENTON**, District Judge.

Before the Court is Cogent Solutions Group, LLC's ("Defendant") Motion for Judgment on the Pleadings pursuant to *Federal Rule of Civil Procedure 12(c)*. This Court has jurisdiction pursuant to *28 U.S.C. §§ 1332* and *1332(d)*. Venue is proper under *28 U.S.C. § 1391*. This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to *Federal Rule of Civil Procedure 78*. For the reasons stated below, Defendant's Motion for Judgment on the Pleadings is **GRANTED.**

## FACTUAL HISTORY

Plaintiff Harold M. Hoffman ("Plaintiff"), an attorney from Bergen County, New Jersey, commenced this action on behalf of himself and similarly situated consumers alleging misrepresentation of the efficacy of Defendant's product, Baxyl Hyaluronan ("Baxyl").[1] (Compl. ¶ 1; see Compl. at Overview.) Baxyl is a dietary supplement containing **[*2]** 60 mg of Hyaluronic Acid which is allegedly beneficial for joint health and mobility. (Id. ¶¶ 6-9.) Hyaluronic Acid, the active ingredient in Baxyl, can be commercially created in two ways: (1) by extracting the substance from animal tissues, or (2) through bacterial fermentation. (Id. ¶ 7.) Plaintiff alleges that

---

[1] Plaintiff has previously filed numerous suits against several companies similarly alleging misrepresentation, fraud, and deceptive practices. See, e.g., *Hoffman v. Supplements Togo Mgmt., LLC, 419 N.J. Super. 596, 18 A.3d 210 (App. Div. 2011)*; *Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 963 A.2d 849 (App. Div. 2009)*; *Hoffman v. Asseenontv.Com, 404 N.J. Super. 415, 962 A.2d 532 (App. Div. 2009)*.

Hyaluronic Acid created through bacterial fermentation, as in the case of Baxyl, is of a lesser grade than when extracted from animal tissues. (Id.)

In September 2012, Plaintiff purchased Baxyl after he "was exposed to and read, saw and/or heard Defendant's advertising and marketing claims and promises with respect to [this] product." (Id. ¶ 1.) Plaintiff alleges that Defendant made false promises that Baxyl "delivered joint health and mobility in humans." (Id. ¶ 9.) Moreover, Plaintiff asserts that Defendant has no clinical evidence  [*3] to support its claim that "orally ingesting Hyaluronic Acid produced through biological fermentation, in a 60 mg liquid dose, can deliver any relief from osteoarthritis" or joint pain relief of any kind. (Id. ¶¶ 8, 11.) Accordingly, Plaintiff alleges that "Defendant misrepresented the efficacy and benefit of its product" and that consumers "made purchasing decisions . . . based upon Defendant's specific representations of product efficacy and benefit." (Id. ¶¶ 15-16.) Plaintiff further states that Defendant "affirmatively misrepresented and mislabeled its product." (Id. ¶ 17.)

**PROCEDURAL HISTORY**

On December 3, 2012, Plaintiff filed his Complaint in the Superior Court of New Jersey, Law Division in Bergen County alleging the following counts: (I-V) Violation of the New Jersey Consumer Fraud Act (CFA) based upon unconscionable commercial practice; deception; fraud; false pretense, false promise and/or misrepresentation; knowing concealment, suppression and/or omission of material facts with the intent that others rely upon such concealment, suppression and/or omission, in connection with the sale or advertisement of any merchandise; (VI) common law fraud; (VII) unjust enrichment; (VIII)  **[*4]** breach of express warranty; and (IX) breach of the implied warranty of merchantability and fitness for an intended purpose. (Compl. ¶¶ 31-70.) Defendant removed

the matter to this Court on January 3, 2013. (Dkt. No. 1.)

On March 21, 2013, Magistrate Judge Arleo issued an Order to Show Cause requiring Plaintiff to demonstrate why his case should not be dismissed and/or remanded. (Dkt. No. 9.) Judge Arleo denied Plaintiff's request for remand and ruled that this Court has subject matter jurisdiction over this action under the Class Action Fairness Act, *28 U.S.C. § 1332(d)* ("CAFA"). (See Dkts. 20-21; Def. Br. 2-3.) On August 9, 2013, Defendant filed an Answer and moved for judgment on the pleadings. (Dkt. Nos. 25-26.)

**LEGAL STANDARD**

*Motion for Judgment on the Pleadings*

"A motion to dismiss for failure to state a claim under *Rule 12(c)* is identical to one filed under *Rule 12(b)(6)*, except *Rule 12(c)* allows for the motion to be filed after the filing of an answer, while *Rule 12(b)(6)* allows for the motion to be made in lieu of an answer." *Wellness Pub. v. Barefoot, No. 02-3773, 2008 U.S. Dist. LEXIS 1514, 2008 WL 108889, at * 6 (D.N.J. Jan. 9, 2008)*; see also *Fed. R. Civ. P. 12(h)(2)(B)*. In either instance, a court is  **[*5]** to use the same standard in evaluating the motions. *Reinbold v. U.S. Post Office, 250 Fed. Appx. 465, 466 (3d Cir. 2007)* (citing *Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991))*.

The adequacy of pleadings is governed by *Fed. R. Civ. P. 8(a)(2)*, which requires that a complaint allege "a short and plain statement of the claim showing that the pleader is entitled to relief." This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly, 550*

2013 U.S. Dist. LEXIS 176056, *5

U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted); see also *Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)* (stating that *Rule 8* "requires a 'showing' rather than a blanket assertion of an entitlement to relief").

In considering a Motion to Dismiss under *Fed. R. Civ. P. 12(b)(6)*, the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips, 515 F.3d at 231* **[*6]** (quoting *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002))*. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (citing *Twombly, 550 U.S. at 555*). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by *Rule 8(a)(2)*. *Id. at 1950*.

According to the Supreme Court in Twombly, "[w]hile a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his[/her] 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *550 U.S. at 555* (internal citations omitted). The Third Circuit summarized the Twombly pleading standard as follows: "'stating . . . a claim requires a complaint with enough **[*7]** factual matter (taken as true) to suggest' the required element." *Phillips, 515 F.3d at 234* (quoting *Twombly, 550 U.S. at 556*).

In Fowler v. UPMC Shadyside, the Third Circuit directed district courts to conduct a two-part

analysis. *578 F.3d 203, 210 (3d Cir. 2009)*. First, the court must separate the factual elements from the legal conclusions. Id. The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id. at 210-11*. Second, the court must determine if "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. (quoting *Iqbal, 556 U.S. at 679*). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Id. (citing *Phillips, 515 F.3d at 234-35*.)

### Heightened Pleading Standard under *Fed. R. Civ. P. 9(b)* for Fraud Claims

*Fed. R. Civ. P. 9(b)* requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*. **[*8]** Plaintiffs "alleging fraud must state the circumstances of the alleged fraud[ulent act] with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Park v. M&T Bank Corp., No. 09-cv-02921, 2010 U.S. Dist. LEXIS 24905, 2010 WL 1032649, at *5 (D.N.J. Mar. 16, 2010)* (citing *Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004))*. Plaintiffs can satisfy this standard by alleging dates, times, places and other facts with precision. *Park, 2010 U.S. Dist. LEXIS 24905, 2010 WL 1032649, at *5*.

### DISCUSSION

### I. Defendant's Motion for Judgment on the Pleadings

2013 U.S. Dist. LEXIS 176056, *8

## A. Consumer Fraud Act (CFA) Claims (Counts I-V)

To state a cause of action under the CFA, plaintiff must allege: "(1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements—defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Parker v. Howmedica Osteonics Corp., No. 07-2400, 2008 U.S. Dist. LEXIS 2570, 2008 WL 141628, at *2 (D.N.J. Jan. 14, 2008)* (citing *New Jersey Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 842 A.2d 174, 176 (N.J. App. Div. 2003))*. Additionally, CFA claims must meet the heightened pleading requirement under *Fed R. Civ. P. 9(b)*.

The first element **[\*9]** of an unlawful practice "typically involves an affirmative act of fraud and can arise from an affirmative act, an omission, or a violation of an administrative regulation." *Adamson v. Ortho-McNeil Pharm., Inc., 463 F. Supp. 2d 496, 501 (D.N.J. 2006)*. "The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350, 366 (1997)*. Next, to properly plead an ascertainable loss, a plaintiff must allege facts showing "either an out-of-pocket loss or a demonstration of loss in value." *Dist. 1199P Health and Welfare Plan v. Janssen, L.P., 784 F. Supp. 2d 508, 530 (D.N.J. 2011)* (internal citations omitted). Finally, a plaintiff must show a causal nexus between the misrepresentation or concealment of the material fact by defendant and the loss suffered by any person. *Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 526 (D.N.J. 2008)*.

Here, this Court finds that Plaintiff fails to assert viable claims under the CFA. Plaintiff contends that Defendant misrepresented the efficacy of Baxyl. (Compl. at Overview; Pl. Opp. 12.) Specifically, the gravamen **[\*10]** of Plaintiff's Complaint is that Defendant failed to substantiate its claims of Baxyl's efficacy with reliable medical studies, clinical data, or scientific research. (See generally Compl.) Defendant points out—and Plaintiff does not dispute—that prior substantiation claims are not cognizable under the CFA. *Franulovic v. Coca Cola Co., 390 F. App'x 125, 128 (3d Cir. 2010)* (noting that "a New Jersey [CFA] claim cannot be premised on a prior substantiation theory of liability"). In carefully reviewing the Complaint and the parties' briefs, it is clear that Plaintiff's alleged CFA claims are based on a lack of substantiation theory of liability. See *Scheuerman v. Nestle Healthcare Nutrition, Inc., No. 10-3684, 2012 U.S. Dist. LEXIS 99397, 2012 WL 2916827, at *7 (D.N.J. July 17, 2012)* (granting summary judgment on CFA claims in finding that "the core allegations of fraud in the Complaint are clearly grounded in a prior substantiation theory of liability"). As lack of substantiation claims are not cognizable under the CFA, Plaintiff's claims are not viable.

Even if Plaintiff's claims were not based on lack of substantiation, they would otherwise fail because they are inadequately pled. Plaintiff claims that he purchased **[\*11]** Baxyl. (Compl. ¶ 4.) However, nowhere in the record is there any indication that Plaintiff actually ingested the product. Moreover, Plaintiff alleges that he suffered "out of pocket payment and expenditure" and "received . . . a product that was unable to deliver the benefits promised." (Id. ¶ 22.) However, Plaintiff failed to state how he received less than what was promised. Plaintiff merely states that Baxyl was supposed to "deliver specified health benefit[s] and joint support" and "cannot do so." (Id. ¶ 25.) Plaintiff's bare allegations fall short of establishing valid CFA claims; thus, they are dismissed.

## B. Common Law Fraud (Count VI)

To adequately plead a fraud claim under New Jersey law, a plaintiff must establish the following elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or

belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73, 876 A.2d 253 (2005)* (quoting *Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997)*); see also *Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981)*. **[*12]** Additionally, fraud claims must meet the requirements of *Fed R. Civ. P. 9(b)* which imposes a heightened pleading requirement with respect to allegations of fraud.

Here, Plaintiff fails to plead a viable fraud claim. Plaintiff asserts that Defendant "engaged in concealment, suppression and/or omission of material facts." (Compl. ¶ 48.) However, Plaintiff fails to identify with specificity the nature of the misrepresentations, when they were made, which representations he relied on, and how he relied on them. Furthermore, Plaintiff fails to sufficiently plead resulting damages based on Baxyl's alleged ineffectiveness. See *Hoffman v. Nutraceutical Corp., No. 12-5803, 2013 U.S. Dist. LEXIS 81559, 2013 WL 2650611, at *3 (D.N.J. June 10, 2013)* (dismissing fraud claim because "Plaintiff failed to identify the resulting damages"). Thus, Plaintiff's claim for common law fraud is dismissed.

## C. Unjust Enrichment (Count VII)

To establish a claim for unjust enrichment under New Jersey law, a plaintiff must allege that (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it, and (4) the plaintiff expected **[*13]** remuneration from defendant at the time he performed or conferred a benefit on defendant. *Jurista v. Amerinox Processing, Inc., 492 B.R. 707, 754 (D.N.J. 2013)*; *Alin v. Am. Honda Motor Co., Inc., No. 08-4825, 2010 U.S. Dist. LEXIS 32584, 2010 WL 1372308, at *14 (D.N.J. Mar. 31, 2010)*.

Here, Plaintiff fails to a state a claim for unjust enrichment against Defendant. Plaintiff alleges, <u>inter alia</u>, that Defendant is "indebted to class members for the sums paid by class members to Defendant for purchase of a misrepresented product." (Compl. ¶ 55.) Plaintiff seeks disgorgement of monies paid to Defendant. (Id. ¶ 56.) However, "[u]njust enrichment is not a viable theory—and disgorgement is therefore not available—in circumstances in which a consumer purchases specific goods and receives those same specific goods." *In re Cheerios Mktg. & Sales Practices Litig., No. 09-cv-2413, 2012 U.S. Dist. LEXIS 128325, 2012 WL 3952069, at *13 (D.N.J. Sept. 10, 2012)*. In this case, Plaintiff purchased and received Baxyl. Plaintiff does not allege that no value was received for its purchase of Baxyl. Moreover, as previously discussed, Plaintiff does not articulate how Baxyl failed to function as advertised, that he consumed and was thereby injured by the product, **[*14]** or why it was unjust for Defendant to retain the money paid for the product. Accordingly, Plaintiff's claim for unjust enrichment is dismissed.

## D. Claim for Breach of Express Warranty (Count VIII)

To establish a claim for breach of express warranty under New Jersey law, a plaintiff must allege: "(1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Snyder v. Farnam Companies, Inc., 792 F. Supp. 2d 712, 721 (D.N.J. 2011)* (citations omitted). However, the statute specifically notes that "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *N.J. Stat. Ann. § 12A:2-313(2)*. To recover damages for breach of express warranty, a plaintiff must establish that such damages were

reasonably foreseeable at the time that the contract was entered into. *Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 579-80, 489 A.2d 660 (1985)* (describing that damages for misrepresenting **[\*15]** products comes from "society's interest in the performance of promises").

Here, Plaintiff alleges that he entered into a contract with Defendant in September 2012 when he purchased Baxyl. (Compl. ¶ 59.) Plaintiff claims that the product "did not conform to Defendant's promises of joint health and mobility in humans." (Id. ¶¶ 60, 64.) Plaintiff seeks "monies [paid] to purchase a product that failed altogether to conform to Defendant's express promises and warranty." (Id. ¶ 65.)

This Court finds that Plaintiff's allegations fall woefully short of stating a claim for breach of express warranty. Plaintiff merely recites the elements required for a breach of express warranty claim. However, Plaintiff fails to set forth any specific facts relating to Baxyl or Defendant's actions. For instance, Plaintiff does not identify Defendant's misrepresentations, the existence of express warranties, or damages flowing from Defendant's alleged breach. Accordingly, Plaintiff's claim for breach of express warranty is dismissed.

## E. Claims for Breach of Implied Warranties of Merchantability and Fitness For An Intended Purpose (Count IX)

To state a claim for breach of the implied warranty of merchantability **[\*16]** under New Jersey law, a plaintiff must allege "(1) that a merchant sold goods, (2) which were not 'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were [] caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 600 n.8 (3d Cir. 2012)* (internal citations omitted). "If the buyer, expressly or by implication, makes known to the seller the particular purpose for which

the article is required and it appears that he has relied on the seller's skill or judgment, an implied warranty arises of reasonable fitness for that purpose." *Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 370, 161 A.2d 69 (1960)*. To establish a breach of either warranty, Plaintiffs "must show that the equipment they purchased from defendant was defective." *Crozier v. Johnson & Johnson Consumer Companies, Inc., 901 F. Supp. 2d 494, 509 (D.N.J. 2012)* (internal citation omitted). Specifically, a claim under either implied warranty "requires a showing regarding the product's functionality, not the advertisements that allegedly induced a customer to purchase it." *Crozier, 901 F. Supp. 2d at 509*.

In **[\*17]** the instant matter, Plaintiff fails to state a claim for either breach of implied warranty of merchantability or fitness for an intended purpose. Plaintiff alleges that Baxyl "failed to conform to Defendant's promises of efficacy to deliver joint health and mobility in humans . . . and was not fit for the ordinary purpose for which it was intended to be used." (Compl. ¶ 68.) However, Plaintiff does not demonstrate that how or why the product was defective. Furthermore, Plaintiff fails to identify any injuries or damages that were caused by Baxyl. See *Hoffman v. Nutraceutical Corp., No. 12-5803, 2013 U.S. Dist. LEXIS 81559, 2013 WL 2650611, at \*4 (D.N.J. June 10, 2013)* (dismissing breach of implied warranty claim for failure to "establish what damages resulted from the product containing [] lead"). Thus, Plaintiff's claims for breach of implied warranties of merchantability and fitness for a particular purpose fail.

## II. Remand Request

Although unnecessary to consider, it is noted that Plaintiff devoted much of his opposition brief requesting this Court to remand this case to state court.[2] This request is procedurally improper at this

---

[2] Pursuant to *28 U.S.C. § 1447(c)*, remand to state court is required where "it appears that the district court lacks subject matter

juncture and is otherwise meritless. First, no motion for remand was filed. Furthermore, **[*18]** Magistrate Judge Arleo previously denied Plaintiff's remand request and ruled that this Court has jurisdiction over the instant action under CAFA. Moreover, like the many courts that have considered Plaintiff's argument, this Court is not persuaded that Plaintiff unilaterally divested this Court of subject matter jurisdiction in having a "dual role" as class representative and class counsel. See *Kramer v. Scientific Control Corp., 534 F.2d 1085, 1090 (3d Cir. 1976)* (asserting that the class representative cannot also serve as class counsel); see also *Hoffman v. Nutraceutical Corp., No. 12-5803, 2013 U.S. Dist. LEXIS 32792, 2013 WL 885160 (D.N.J. Mar. 8, 2013)* (rejecting "Plaintiff's argument that his dual role as class representative and class counsel would prevent class certification" and noting that "there is no legal authority to support the proposition that a party's dual role in a matter should negate federal jurisdiction under CAFA"); *Hoffman v. Lumina Health Products, Inc., No. 13-04936, 2013 U.S. Dist. LEXIS 152822, 2013 WL 5773292, at *3 (D.N.J. Oct. 24, 2013)* (denying motion for remand and rejecting argument that dual role as class representative and class counsel divests federal court of jurisdiction). Thus, Plaintiff's request **[*19]** for remand is denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Judgment on the Pleadings is **GRANTED.**

/s/ Susan D. Wigenton, U.S.D.J.

---

End of Document

---

jurisdiction."

# Tab 15

2013 WL 2650611

2013 WL 2650611
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Harold M. HOFFMAN, individually and on
behalf of those similarly situated, Plaintiff,
v.
NUTRACEUTICAL CORP., Defendant.

Civil Action No. 12–5803 (ES).
|
June 10, 2013.

**Attorneys and Law Firms**

Harold M. Hoffman, Englewood, NJ, pro se.

Michael R. O'Donnell, Riker, Danzig, Scherer, Hyland, &
Perretti, PA, Morristown, NJ, for Defendant.

**OPINION**

SALAS, District Judge.

**I. INTRODUCTION**

 *1 Pending before this Court is Nutraceutical Corp.'s
("Defendant") Motion to Dismiss Harold M. Hoffman's
("Plaintiff") Complaint. (D.E. No. 10, Brief in Support of
Motion to Dismiss Plaintiff's Complaint ("Br.")). The motion
is unopposed. The Court has reviewed the submissions
and decides the motion without oral argument pursuant to
Fed.R.Civ.P. 78(b). For the following reasons, the Court
GRANTS the motion without prejudice.

**II. BACKGROUND**

On August 9, 2012, Plaintiff, individually and on behalf of
those similarly situated, filed a complaint against Defendant
in the Superior Court of New Jersey, Bergen County. (D.E.
No. 1, Complaint ("Compl.")). On September 14, 2012,
Defendant removed the state court case to this District (D.E.
No. 1, Notice of Removal ("Removal")). [1]

[1]     On September 21, 2012, Plaintiff filed a motion to
        remand to state court. (D.E. No. 4). The motion
        was denied by Judge Mannion via Report &
        Recommendation ("R & R") on January 24, 2013.

(D.E. No. 20). Plaintiff subsequently objected to
Judge Mannion's decision exercising jurisdiction
on January 27, 2013. (D.E. No. 21). Judge Salas
adopted Judge Mannion's R & R and overruled
Plaintiff's objection on March 8, 2013. (D.E. No.
25).

In the Complaint, Plaintiff alleges that Defendant advertised
KAL Glucosamine Chondroitin MSM (the "product") as
"pure, unadulterated and of the highest quality." (Compl.12).
Plaintiff claims that despite the express promise that "[n]o
ingredient other than those listed on the label have been added
to this product," Defendant's product was "contaminated
by 1.7 micrograms of lead per daily use." (Id. at 4).
Next, Plaintiff claims that he and other members of the
putative class relied on the express representations with
respect to purity of the product and made the purchase of
the product in reliance thereof. (Id. at 5–6). Accordingly,
Plaintiff argues that Defendant's conduct violates the
New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2, and
constitutes: an unconscionable commercial practice (Count I);
deception (Count II); fraud (Count III); false pretense, false
promise and/or misrepresentation (Count IV); and knowing
concealment, suppression and/or omission of material facts
(Count V). In addition, Plaintiff raises the following claims-
common-law fraud (Count VI); unjust enrichment (Count
VII); breach of express warranty (Count VIII); and breach of
implied warranty of merchantability (Count IX). (Compl.14–
18).

In response, Defendant moves to dismiss the above counts
pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiff does not
state any claim upon which relief may be granted. (Br.2).
Specifically, Plaintiff fails to "allege that he was injured by
the Product or the alleged lead therein, nor could he as he never
claims to have even used the Product." Nor does Plaintiff
"make any allegations regarding the Product's performance or
efficacy, again having never used the Product." (Id. at 5). [2]

[2]     Defendant also seeks to disqualify Plaintiff as class
        counsel. The Court need not address the issue in
        this Fed.R.Civ.P. 12(b) (6) motion.

**III. ANALYSIS**

**A. Legal Standard**

For a complaint to survive dismissal, it "must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.' " *Ashcroft v. Iqbal,*

2013 WL 2650611

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[;][t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

### B. Plaintiff's Consumer Fraud Act ("CFA") Claims (Counts I–V)

**\*2** Plaintiff claims that "[t]he product delivered by Defendant to [P]laintiff and members of the putative class misrepresented the safety, quality, constituent ingredients and purity of defendant's product. Indeed, the spoiled and contaminated product delivered by Defendant to consumers, lacked the purity and beneficial qualities promised by Defendant." (Compl.6). Defendant contends that Plaintiff's CFA claims must be dismissed because Plaintiff fails to show damages in connection thereto. (Br.15). The Court agrees.

To state a cause of action under the CFA, plaintiff must allege: "(1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements—defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Parker v. Howmedica Osteonics Corp.,* No. 07–02400, 2008 WL 141628, at \*2 (D.N.J. Jan.14, 2008) (citing *N.J. Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 842 A.2d 174, 176 (N.J.Super.Ct.App.Div.2003)).

First, plaintiff must allege an unlawful practice. An unlawful practice "typically involves an affirmative act of fraud and can arise from an affirmative act, an omission, or a violation of an administrative regulation." *Adamson v. Ortho–McNeil Pharm., Inc.,* 463 F.Supp.2d 496, 501 (D.N.J.2006). "[N]ot just 'any erroneous statement' will constitute a misrepresentation prohibited" under the CFA. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 607, 691 A.2d 350 (1997). "The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Id.*

Next, plaintiff must allege an ascertainable loss. Although the CFA does not define "ascertainable loss," courts have interpreted it as a "cognizable and calculable claim of loss due to the alleged CFA violation." *Solo v. Bed, Bath & Beyond, Inc.,* No. 06–1908, 2007 WL 1237825, at \*3 (D.N.J. Apr., 26, 2007) (citing *Thiedmann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 249, 872 A.2d 783 (2005)); *Hoffman v. Hampshire Labs., Inc.,* 405 405 N.J.Super. 105, 963 A.2d 849, 854 (N.J.Super.Ct.App.Div.2009). To properly plead an ascertainable loss, plaintiff must allege facts showing "either an out-of-pocket loss or a demonstration of loss in value." *Dist. 1199P Health and Welfare Plan v. Janssen, L.P.,* 784 F.Supp.2d 508, 530 (D.N.J.2011) (citing *Thiedmann,* 183 N.J. at 248, 872 A.2d 783). This requirement to show a demonstration of a loss in value includes a benefit-of-the-bargain theory that "requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised. *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 99 (D.N.J.2011); *Henderson v. Hertz Corp.,* No. 6937–03, 2005 WL 4127090, at \*7–8 (N.J.Super.Ct.App.Div.2005).

Finally, plaintiff must show a causal nexus between the misrepresentation or concealment of the material fact by defendant and the loss suffered by any person. *Dewey v. Volkswagen AG,* 558 F.Supp.2d 505, 526 (D.N.J.2008). Here, Plaintiff failed to make the necessary three-part showing under the CFA. Specifically, Plaintiff failed to show that Defendant's alleged CFA violation caused Plaintiff's "ascertainable loss." Plaintiff merely alleged that some of Defendant's product contained 1.7 micrograms of lead in it. Even under a benefit-of the-bargain theory of damages, Plaintiff failed to show that the alleged lead in Defendant's product caused the product to be worth less than was promised. Plaintiff failed to show that the product he used actually contained lead. Moreover, Plaintiff failed to establish that the presence of 1.7 micrograms of lead in the product constituted a misrepresentation that is contrary to the product being "pure, unadulterated and of the highest quality." [3] Because Plaintiff failed to make the requisite showing under the CFA, Plaintiff's CFA claims are dismissed.

[3]   On the contrary, Defendant notes that the recommended daily intake of lead is 75 micrograms, or 44 times the amount found in the product at issue. (Br.5).

### C. Plaintiff's Common Law Fraud Claim (Count VI)

Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)
2013 WL 2650611

**\*3** Plaintiff avers that "Defendant, in the advertisement, marketing and sale of the [product], deliberately and knowingly engaged in concealment, suppression and/or omission of material facts with the intent that others, including members of the plaintiff-class, rely upon same, and, upon information and belief, members of the class did justifiably rely upon same to their detriment." (Compl.14). Such conduct, according to Plaintiff, constitutes common-law fraud. (*Id.* at 15). Defendant disagrees and argues that Plaintiff's common-law fraud claim must be dismissed because Plaintiff "failed to sufficiently plead damages resulting from the alleged trace amount of lead in the [p]roduct." (Br.19).

To properly plead common-law fraud in New Jersey, plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997) (citing *Jewish Ctr. of Sussex Cnty. v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521 (1981)).

Here, Plaintiff failed to identify the resulting damages, a requisite showing to properly plead common law fraud. Significantly, Plaintiff does not even allege that the product that he personally purchased, and used, contained lead. Consequently, the Court dismisses Plaintiff's claim of common-law fraud.

### D. Plaintiff's Breach of Unjust Enrichment Claim (Count VII)

Plaintiff states that "as a result of [Defendant's] false and deceptive conduct ... [Defendant] became indebted to class members for the sums paid by class members ... for purchase of a misrepresented product." (Compl.16). And retention of said sums "without reimbursement, would result in the unlawful, unjust and inequitable enrichment." (*Id.*). Defendant disagrees and argues that because Plaintiff "failed to plead that the [p]roduct failed to function as advertised or that he was injured by the [p]roduct ... there was nothing unjust about [Defendant's] accepting and retaining money in exchange for delivering the [p]roduct to [Plaintiff]." (Br.20).

The doctrine of unjust enrichment "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Assocs. Comm. Corp. v. Wallia,* 211 N.J.Super. 231,

511 A.2d 709, 716 (N.J.Super.Ct.App.Div.1986) (citing *Callano v. Oakwood Park Homes Corp.,* 219 A.2d 232, 234 (N.J.Super.Ct.App.Div.1966)). To establish "unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

Here, Plaintiff's allegations fail to support the claim of unjust enrichment. Even accepting all allegations as true, there is nothing in the record to suggest that Defendant's retention of Plaintiff's money is unjust. Plaintiff received the benefit of the product that he paid for and Defendant received the benefit of payment for said product. As such, the doctrine of unjust enrichment is inapposite here. Accordingly, the Court dismisses Plaintiff's claim of unjust enrichment.

### E. Plaintiff's Breach of Express Warranty and Implied Warranty of Merchantability Claims (Counts VIII & IX)

**\*4** Plaintiff raises claims of breach of express and implied warranties. Specifically, Plaintiff alleges that he entered into a contract with Defendant for the purchase of the product, and in the contract, Defendant made express promises as to the purity of the product. (Compl.17). Additionally, Plaintiff claims that the implied warranty of merchantability was breached because the product "was not fit for the ordinary purpose for which it was intended to be used." (*Id.* at 19, 641 A.2d 519). Defendant disagrees and argues that the warranty claims must be dismissed because "Plaintiff alleges no specific lead level in his product, and no actual injury from using the [p]roduct." (Br.21).

Under New Jersey law, an express warranty is "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.J. STAT. ANN. § 12A:2–313(1)(a). "The plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient." *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 586, 489 A.2d 660 (1985). Proof of causation is also required, but "mere failure of promised performance is enough without proof of any defect." *Realmuto v. Straub Motors, Inc.,* 65 N.J. 336, 343, 322 A.2d 440 (1974). To recover damages for breach of express warranty, plaintiffs must establish that such damages were reasonably foreseeable at the time that the contract was entered into. *Spring Motors Distribs., Inc.,* 98 N.J. at 579–80, 489 A.2d 660

(describing that damages for misrepresenting products comes from "society's interest in the performance of promises").

An implied warranty "simply means that the thing sold is reasonably fit for the general purpose for which it is manufactured and sold." *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 370, 161 A.2d 69 (1960). To establish a breach of implied warranty, plaintiff must show "that the product was not reasonably fit for the ordinary purposes for which it was sold and such defect proximately caused injury to the ultimate consumer." *Hollinger v. Shoppers Paradise of New Jersey, Inc.,* 134 N.J.Super. 328, 340 A.2d 687, 692 (N.J.Super. Ct. Law Div.1975).

Here, Plaintiff fails to make the necessary showing of damages required for both a breach of express warranty claim and an implied warranty of merchantability claim. Plaintiff merely asserts that some of Defendant's product contained 1.7 micrograms of lead. As such, Plaintiff fails to establish what damages resulted from the product containing said lead. Consequently, Plaintiff's claims of breach of express and implied warranty are dismissed.

### IV. CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Dismiss without prejudice. An appropriate Order follows this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2650611

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 16

Kostyszyn v. Martuscelli, Not Reported in A.3d (2015)
2015 WL 721291

2015 WL 721291
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware,
**IN AND FOR NEW CASTLE COUNTY.**

Agnieszka Kostyszyn, and
Marek Kostyszyn, Plaintiffs,
v.
Gianmarco Martuscelli, Gilda Martuscelli, the
Estate of Brett J. Harris, Frozen Endeavors,
Inc., a Delaware Corporation, AJT, Inc., a
Delaware Corporation, Chesapeake Inn,
Inc., a Maryland Corporation, Defendants.

C.A. N14C–08–010 PRW
|
Submitted: December 8, 2014
|
Decided: February 18, 2015

*Upon Defendants' Motion to Dismiss Plaintiffs' Complaint*,
**GRANTED**.

**Attorneys and Law Firms**

Gregory D. Stewart, Esquire, Law Office of Gregory D.
Stewart, P.A., Wilmington, Delaware, Attorney for Plaintiff.

Brian M. Gottesman, Esquire (argued), Michael W.
McDermott, Esquire, Suzanne H. Holly, Esquire, Berger
Harris LLP, Wilmington, Delaware, Attorneys for
Defendants.

***MEMORANDUM OPINION AND ORDER***

WALLACE, J.

### I. INTRODUCTION

*1 Before the Court is Defendants Gianmarco Martuscelli,
Gilda Martuscelli, the Estate of Brett J. Harris, Frozen
Endeavors, Inc., AJT, Inc., and Chesapeake Inn, Inc.'s
(collectively the "Defendants") motion to dismiss. Plaintiffs
Agnieszka Kostyszyn and Marek Kostyszyn (together the
"Plaintiffs") currently own and operate Paciugo Gelato
and Café ("Paciugo"). They purchased the business from

Defendants and now allege that Defendants committed fraud
during its sale and have breached their duties under the
sale's agreement. Because the Plaintiffs have failed to meet
the required pleading standards for all claims, the Court
**GRANTS** the Defendants' motion to dismiss. [1]

[1]     At oral argument, Defendants argued that only
        Frozen Endeavors was properly named and all
        claims were improperly brought against the other
        defendants. Because Plaintiffs have failed in
        substance to file an adequate complaint, the Court
        need not determine who are the proper defendants
        to the action.

### II. FACTS AND PROCEDURAL BACKGROUND

In late 2011, Plaintiffs approached the owners of Paciugo
about the possibility of opening up a franchise. [2] Plaintiffs
met with Gianmarco Martuscelli ("Mr. Martuscelli"),
principal of Frozen Endeavors, Inc. ("Endeavors"), and B.J.
Harris (now deceased). [3] Messrs. Martuscelli and Harris
presented Plaintiffs with a profit statement for Paciugo
ranging from July 2010 to August 2011. [4] The profit
statement reflects a profit ("net with payroll") of $7,186.21
and details Paciugo's retail sales, catering sales, rent cost,
insurance cost, ingredient costs, royalties paid, and payroll for
those months. [5]

[2]     *See* Plf.'s Answering Br. at 1.

[3]     *See* Compl. at ¶ 14.

[4]     *See* Profit Statement, Ex. 1 to Compl.

[5]     *See id.*

On December 1, 2011, Plaintiffs purchased Paciugo
from Endeavors for $272,500, which they paid in three
installments. [6] The Martuscellis were not a party to the
Agreement of Sale ("Agreement"); only Plaintiffs and
Endeavors signed the contract. [7] The contract provided, in
part, that Mr. Martuscelli's other businesses, Chesapeake
Inn ("Chesapeake") and Canal Creamery & Sweet Shoppe
("Creamery"), and Mr. Martuscelli's parents' business, La
Casa Pasta, would continue purchasing gelato from Paciugo.
Section 5(d) of the agreement states:

Kostyszyn v. Martuscelli, Not Reported in A.3d (2015)
2015 WL 721291

> Seller shall continue to purchase gelato for Chesapeake Inn, Canal Creamery & Sweet Shoppe and La Casa Pasta for a period of ten years so long as Buyer does not breach its obligations under this Agreement or the companion note and security agreement or Buyer's lease with Christiana Mall, LLC. [8]

[6]    *See* Agreement of Sale ("Agreement"), Ex. 2 to Compl., at 1.

[7]    *See id.* at 11.

[8]    *See id.* at 3.

The present dispute arose when Paciugo's sales declined after Plaintiffs purchased the business. Plaintiffs claim that gelato sales to Chesapeake, La Casa Pasta, and the Creamery immediately dropped in 2012 to $18,475[9] and further declined in 2013 to $3,300.[10] The Creamery reportedly stopped purchasing altogether from Paciugo in April 2013 when Mr. Martuscelli, who held a three-year lease for the Creamery, sold his interest in the business prior to the termination of the lease.[11] In an email exchange with the Plaintiffs, Mr. Martuscelli explained he never owned but only had a lease on the Creamery, and that he sold his interest because the Creamery had been losing money for the preceding two years.[12] In that email, Mr. Martuscelli wrote:

> **\*2** I lost money at Paciugo and the Creamery but I tried to [sic] my best and it wasn't good enough. BJ and I sold Paciugo because we were both losing too much money (BJ lost all his savings and had nothing left). We sold you the business while still owing the bank over $70k in a loan that I just finished paying off this year. We didn't make any money from you or anything associated with Paciugo. We

> were absentee owners who couldn't afford to pay the bills any longer.[13]

After receiving that email, Plaintiffs commenced this suit in the Court of Chancery, alleging both equitable and legal claims. The Court of Chancery dismissed the Plaintiffs' equitable fraud claim with prejudice and dismissed the remaining legal claims without prejudice for lack of subject matter jurisdiction.[14] Plaintiffs now bring legal claims they enumerate as follows: (1) Breach of Contract; (2) Breach of Warranty; (3) Indemnification; (4) Fraud; (5) Negligent Misrepresentation; (6) Intentional Misrepresentation; and (7) Breach of Implied Covenant of Good Faith and Fair Dealing.[15]

[9]    *See* Compl. at ¶ 17.

[10]    *See id.* at ¶ 22.

[11]    *See* Def's. Mot. to Dismiss at 7.

[12]    Compl. at ¶¶ 21, 23.

[13]    *Id.* at ¶ 24.

[14]    *See Kostyszyn v. Martuscelli,* 2014 WL 3510676, at *7 (Del. Ch. July 14, 2014) (declining to engage clean up doctrine to address Plaintiffs' legal claims, but allowing Plaintiffs to transfer them to Superior Court).

[15]    *See* Compl. Plaintiffs also contend that Frozen Endeavors is a void entity and therefore lacks standing to move to dismiss. They cite no authority for that argument. Nonetheless, Frozen Endeavors filed a Certificate of Revival in 2014. That certificate retroactively validated all of Frozen Endeavors' actions taken during the time period the corporation was void. *See* DEL. CODE ANN. tit. 8, § 312(e) (2013) (reinstatement by Certificate of Revival "shall validate all contracts, acts, matters and things made, done and performed" by a corporation while its certificate of incorporation was forfeited or void).

### III. STANDARD OF REVIEW

Generally, a plaintiff must plead the facts with "reasonable conceivability" to survive a motion to dismiss.[16] When

2015 WL 721291

considering a motion to dismiss under Rule 12(b)(6), the Court will:

> (1) accept all well pleaded factual allegations as true; (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim; (3) draw all reasonable inferences in favor of the non-moving party; and (4) [not dismiss a claim] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances. [17]

The Court may dismiss a claim if a plaintiff fails to plead an element of that claim. [18]

[16]  *WP Devon Assocs. v. Hartstrings, LLC,* 2012 WL 3060513, at *3 (Del.Super. Ct. July 26, 2012) (citing *Cambium Ltd. v. Trilantic Capital Partners III L.P.,* 2012 WL 172844, at *1 (Del. Jan. 20, 2012)).

[17]  *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 27 A.3d 531, 535 (Del.2011) (stating standard for motions to dismiss).

[18]  *See Harris v. Dependable Used Cars, Inc.,* 1997 WL 358302, at *2–3 (Del.Super. Ct. March 20, 1997); *Wolstenholme v. Hygenic Exterminating Co., Inc.,* 1988 WL 77655, at *1–2 (Del.Super.Ct. July 5, 1988); *see also Zebroski v. Progressive Direct Ins. Co.,* 2014 WL 2156984, at *6 (Del. Ch. Apr. 30, 2014).

Under Rule 9(b), a plaintiff bringing a fraud or misrepresentation claim must plead it with particularity—a heightened pleading standard. [19] The plaintiff must plead:

> **\*3**  (1) a false representation, usually of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) [that] the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. [20]

The plaintiff must also state the "time, place, and contents of the fraud," as well as identify the person accused of committing the fraud. [21]

[19]  Super. Ct. Civ. R. 9(b); *Universal Capital Mgmt. Inc. v. Micco World, Inc.,* 2012 WL 1413598, at *2 (Del.Super.Ct. Feb. 1, 2012).

[20]  *Id.* (citing *Crowhorn v. Nationwide Mut. Ins. Co.,* 2001 WL 695542, at *4 (Del.Super. Ct. Apr. 26, 2001)).

[21]  *See id.* (listing elements of a fraud claim).

## IV. PARTIES' CONTENTIONS

After the Court of Chancery dismissed Plaintiffs' legal claims they filed suit in this Court alleging that Defendants falsely represented the catering revenue and financial condition of Paciugo, causing them to pay more for the business. [22] They further claim Defendants breached their obligations under the sales agreement by failing to have their businesses purchase gelato at the same rate they did prior to the Paciugo sale. [23]

[22]  *See* Compl. at ¶ 25.

[23]  *See id.* at ¶ 36.

Defendants move to dismiss Plaintiffs' Complaint in its entirety. Defendants argue that they have not breached their obligations under the Agreement. [24] Further, Defendants say, Plaintiffs have not specifically alleged which of Defendants' representations, made during the sale's negotiations, were false so as to provide the support required for the fraud, negligent misrepresentation, and intentional misrepresentation claims. [25]

[24]  *See* Def's. Mot. to Dismiss at 13.

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 135 of 307
PageID: 9658
Kostyszyn v. Martuscelli, Not Reported in A.3d (2015)
2015 WL 721291

25    *See id.* at 9.

## V. DISCUSSION

### A. The Agreement is governed by Maryland law.

The parties disagree as to whether Delaware or Maryland substantive law governs Plaintiffs' claims. The Agreement contains varied (and seemingly conflicting) choice of law provisions: Section 9(a) states that the agreement shall be enforced "to the fullest extent permissible under Maryland or Delaware law"; while the governing law provision in Section 9(i) says that the contract "will be governed by, and construed and enforced in accordance with, the laws of the state of Maryland." [26] The Court finds the latter to be the clearer expression of the parties' intended choice of "governing" law and to control here.

26    *See* Agreement, at 6.

Delaware courts "are bound to respect the chosen law of contracting parties, so long as that law has a material relationship to the transaction." [27] Maryland law has a material relationship to this contract because thereunder Plaintiffs sell (or sold) gelato to two Maryland businesses and the Agreement's negotiations, during which the alleged fraud or misrepresentation occurred, took place at the Chesapeake Inn in Maryland. [28] Because the Agreement explicitly designates the laws of Maryland as the governing law of the contract, this Court will apply Maryland substantive law.

27    *Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1046 (Del. Ch.2006).

28    *See* Compl. at ¶ 27 (stating Chesapeake Inn, a Maryland corporation with its principal place of business in Maryland, purchases gelato from Paciugo).

### B. Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing.

**\*4**  Maryland contract law recognizes an implied covenant of good faith and fair dealing. [29] It does not, however, recognize an independent cause of action for a breach of that implied covenant. [30] Because no cause of action exists

for the Plaintiffs' claim under the governing law of the contract, it must be dismissed. Defendants' motion is therefore **GRANTED** as to the breach of implied covenant of good faith and fair dealing claim.

29    *See Greenfield v. Heckenbach,* 797 A.2d 63, 81 (Md.Ct.Spec.App.2002) (citing *Keller v. A.O. Smith Harvestore Products, Inc.,* 819 P.2d 69, 73 (Colo.1991)) (recognizing implied covenant of good faith and fair dealing).

30    *See Baker v. Sun Co.,* 985 F.Supp. 609, 610 (D.Md.1997) (stating Maryland does not explicitly recognize an independent cause of action for the implied contractual duty of good faith and fair dealing); *Mt. Vernon Props., LLC. v. Branch Banking & Trust Co.,* 907 A.2d 373, 381 (Md.Ct.Spec.App.2006) ("[T]here is no independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing.").

### C. Plaintiffs fail to adequately allege breach of contract.

Plaintiffs brought three breach of contract claims: breach of contract, breach of warranty, and indemnification.

Even recognizing the low burden imposed to survive dismissal, [31] Plaintiffs' pleadings do not demonstrate how Defendants have breached the Agreement and how, on these breach claims, they, Plaintiffs, may recover under any reasonably conceivable set of circumstances susceptible of proof. The contract requires Defendants to purchase gelato for the Chesapeake Inn, Creamery, and La Casa Pasta for ten years. [32] Plaintiffs attempt to engraft to the Agreement a requirement that Defendants purchase gelato in the amounts reflected in the Profit Statement and refrain from purchasing competing products, such as ice cream. [33] But the Profit Statement is just that—an accounting of the business's profits for a certain period. There is neither an allegation nor evidence it was to be part of the Agreement.

31    *Doe v. Cahill,* 884 A.2d 451, 458 (Del.2005).

32    *See* Profit Statement.

33    *See* Compl. at ¶¶ 35–36.

2015 WL 721291

The contract does not specify any amount of gelato that must be purchased. Nor does the contract state that Defendants must continue to purchase gelato for a non-operating business or refrain from purchasing ice cream. Plaintiffs admit that the Chesapeake Inn and La Casa Pasta still purchase gelato from Paciugo, although in smaller amounts. [34] Plaintiffs also admit that Defendants bought gelato for the Creamery following the Paciugo sale. [35] Even drawing reasonable inferences in favor of the Plaintiffs, they could not recover for breach of contract under any reasonably conceivable set of circumstances because Plaintiffs admit that Defendants still purchase gelato according to the terms of the contract for the businesses that Defendants still operate. The Court need not "accept every strained interpretation of the allegations proposed by the [P]laintiff[s]." [36] Plaintiffs here have failed to plead facts supporting a finding of a breach of an obligation under the Agreement, which is, of course, an essential element of their breach of contract claim. [37] The claim must be dismissed.

[34]    See id. at ¶¶ 27, 35–36.

[35]    See id. at ¶ 17.

[36]    *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001).

[37]    See *VLIW Technology, LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del.2006) (listing essential elements for a breach of contract claim as (1) the existence of a contract, (2) the breach of an obligation imposed by the contract, and (3) damage to the plaintiff).

**\*5** In addition, the breach of warranty and indemnification claims must be dismissed. Plaintiffs complain that Defendants' alleged "improper accounting and other business practices resulting in an overstatement of profits and revenues substantially inflated revenue projections" constituted breaches of warranties in the contract. [38] Although the Court must accept all well-pleaded factual allegations as true, "allegations that are merely conclusory and lacking factual basis, [ ] will not survive a motion to dismiss." [39] Plaintiffs have pled no *facts* showing that Defendants utilized improper accounting practices. Nor have they pled facts showing how the profits or revenues were inflated. They simply allege that the sales in years following the sale of the franchise did not meet the same level as the sales in previous years. Absent the necessary specific allegations of fact for Plaintiffs' claims that

Defendants breached an express warranty in the contract, the breach of warranty and indemnification claims must also be dismissed. [40]

[38]    See Compl. at ¶ 44.

[39]    See *Brevet Capital Special Opportunities Fund, LP v. Fourth Third, LLC,* 2011 WL 3452821, at \*6 (Del.Super.Ct. Aug. 5, 2011) (quoting *Criden v. Steinberg,* 2000 WL 354390, at \*2 (Del. Ch. Mar. 23, 2000)).

[40]    *Lord v. Souder,* 748 A.2d 393, 398 (Del.2000) ("Where allegations are merely conclusory ... (*i.e.,* without specific allegations of fact to support them) they may be deemed insufficient to withstand a motion to dismiss.").

Defendants' motion is **GRANTED** as to the breach of contract, breach of warranty, and indemnification claims.

### D. Plaintiffs' fraud and intentional misrepresentation claims lack reference to a false statement made by Defendants.

A plaintiff must state the "time, place, and contents" of the fraud or misrepresentation alleged and allege that the defendant's representation was false to plead a claim with particularity as required by Rule 9(b). [41] In this case, Plaintiffs have merely stated that Defendants presented them with false financial information using improper accounting methods [42] without pleading adequate facts informing how the records were false. Plaintiffs do not specify the time, place, and contents of the alleged fraud as required. They instead generalize that "information regarding the financial condition, operating results, revenue, income and expenses" of the business was false. [43] Plaintiffs indicate neither how Defendants' accounting methods were improper nor how the one financial statement Plaintiffs relied on in purchasing the franchise was inaccurate. They have not specified any false statements made by Defendants nor that Defendants knew or believed their statements to be false. In short, Plaintiffs have failed to plead multiple elements of their fraud claims. Accordingly, the fraud and intentional misrepresentation claims must be dismissed.

41    See *Universal Capital Mgmt. Inc. v. Micco World, Inc.,* 2012 WL 1413598, at *2 (Del. Super. Ct. Feb. 1, 2012).

42    See Compl. at ¶¶ 53–56.

43    See *id.* at ¶ 55.

Defendants' motion is **GRANTED** as to fraud and intentional misrepresentation claims.

### E. Without an "intimate nexus," there can be no claim of negligent misrepresentation.

Maryland law requires a plaintiff alleging negligent misrepresentation to plead all the elements of fraud plus the existence of an "intimate nexus."[44] To show an intimate nexus, the plaintiff must demonstrate that the defendant owed the plaintiff a duty of care by showing contractual privity or its equivalent.[45] Plaintiffs have failed to plead the existence of an intimate nexus; there are no facts pled demonstrating that Defendants owed Plaintiffs a specific duty of care in this instance. As the Court of Chancery determined, the parties engaged in an arm's length transaction. Neither in Chancery, nor here, have Plaintiffs pled "the existence of a fiduciary, special, or confidential relationship between the parties."[46] In turn, they have failed to plead the existence of an "intimate nexus" as required under Maryland law.[47] Therefore, the negligent misrepresentation claim must be dismissed[48] and the Defendants' motion as to that claim is **GRANTED.**

44    See *Weisman v. Connors,* 540 A.2d 783, 792 (Md.1988) (defining "intimate nexus" as "contractual privity or its equivalent").

45    *Dwoskin v. Bank of Am., N.A.,* 850 F.Supp.2d 557, 571 (D.Md.2012) ("When dealing with claims of economic loss due to negligent misrepresentation, a plaintiff must prove the defendant owed a duty of care by demonstrating an intimate nexus ... demonstrated by showing contractual privity or its equivalent.").

46    *Kostyszyn v. Martuscelli,* 2014 WL 3510676, at *5 (Del. Ch. July 14, 2014).

47    *Gresi v. Atl. Gen. Hosp. Corp.,* 756 A.2d 548, 553–56 (Md.2000).

48    *See, e.g., In re Asbestos Litigation (Fluitt),* 2014 WL 600638 (Del.Super. Ct. Jan. 29, 2014) (complaint in asbestos matter, to which Florida substantive law applied, insufficient when it failed to state the essential elements of plaintiffs' claims, which Delaware's pleading standard requires, under Florida's applicable statute).

## VI. CONCLUSION

**\*6** While the missing required elements for each of the several claims may differ, Plaintiffs cannot, under the Complaint and its allegations as pled, recover under any reasonably conceivable set of circumstances susceptible to proof. The Defendant's Motion to Dismiss Plaintiffs' Complaint is **GRANTED**, and all of the Plaintiffs' claims are **DISMISSED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in A.3d, 2015 WL 721291

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    6

# Tab 17

2011 WL 3273150
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Sean LATRAVERSE, individually and on
behalf of all others similarly situated, Plaintiff,

v.

KIA MOTORS OF AMERICA, INC., Defendant.

Civil No. 10–6133 (RBK/AMD).
|
July 27, 2011.

**Attorneys and Law Firms**

Howard A. Gutman, Flanders, NJ, for Plaintiff.

Neal D. Walters, Michael Robert Carroll, Ballard, Spahr LLP,
Cherry Hill, NJ, for Defendant.

**OPINION**

KUGLER, District Judge.

**\*1** This is a proposed class action for breach of warranty
against Defendant Kia Motors of America [1] ("Kia") by
owners of automobiles with engine defects that Kia has
refused to repair. Before the Court is Defendant's Motion to
Dismiss pursuant to Federal Rule of Civil Procedure (b)(6).
For the following reasons, Defendant's Motion is **DENIED**
in part and **GRANTED** in part.

[1]     Defendant notes that its correct legal name is Kia
        Motors America, Inc. (Def.'s Notice of Removal 1).

**I. BACKGROUND**

Plaintiff is the owner of a 2004 Kia Rio ("the Rio"). (Compl.¶
1). The Rio is covered by a standard 10–year / 100,000 mile
warranty ("the Warranty"). [2] (Compl.¶ 4). Plaintiff alleges
that, on an unspecified date, the Rio experienced "engine
failure as a result of a defect." (Compl.¶ 5). As a result,
Plaintiff brought the vehicle to an authorized Kia dealer for
repair. (Compl.¶ 5). Kia refused to cover the cost of the repair.
(Compl.¶ 5). Plaintiff alleges that Kia breached the Warranty
by refusing to cover the repair. (Compl.¶ 5). Plaintiff claims
that because Kia refused to cover the repair, he could not

drive the Rio for a period of time, incurred costs for a rental
vehicle, and repaired the Rio's engine at his own expense.
(Compl.¶¶ 5–7). Further, Plaintiff alleges that "[r]ather than
acknowledge the problem, Kia has proceeded to deny and /
or conceal the problem and directed its dealers to provide
deceptive, false, or misleading explanations for the failure to
provide warranty coverage and reimbursement." (Compl.¶ 7).
Finally, the Complaint alleges that other 2004 Rio owners
have experienced similar engine problems and that Kia has
refused to perform the necessary engine repairs under the
Warranty. (Compl.¶¶ 5–6).

[2]     The Complaint contains no further allegations
        describing the Warranty, and Plaintiff did not attach
        a copy of the Warranty to the Complaint.

Plaintiff filed a class action complaint in the Superior
Court of New Jersey on October 4, 2010. The Complaint
alleges three causes of action: (1) "Breach of Express
Warranty;" (2) "Fraud and Violation of Consumer Fraud Act;"
and (3) "Violation of Magnuson–Moss Act" ("MMWA"). In
November 2010, Defendant removed the matter to this Court
pursuant to the Class Action Fairness Act of 2005, Pub.L.
No. 109–2, 119 Stat. 4 (codified in scattered sections of 28
U.S.C.). On December 15, 2010, Defendant moved to dismiss
the Complaint pursuant to Rule 12(b)(6).

**II. STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a court may
dismiss an action for failure to state a claim upon which relief
may be granted. With a motion to dismiss, "courts accept all
factual allegations as true, construe the complaint in the light
most favorable to the plaintiff, and determine whether, under
any reasonable reading of the complaint, the plaintiff may
be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d
203, 210 (3d Cir.2009) (internal quotations omitted). In other
words, a complaint survives a motion to dismiss if it contains
sufficient factual matter, accepted as true, to "state a claim to
relief that is plausible on its face." Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**\*2** In making that determination, a court must conduct a
two-part analysis. Ashcroft v. Iqbal, ––– U.S. ––––, ––– –
––––, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009);
Fowler, 578 F.3d at 210–11. First, a court must separate
factual allegations from legal conclusions. Iqbal, 129 S.Ct.
at 1949. "Threadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice." Id. Second, a court must determine whether the

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 140 of 307
PageID: 9663
Latraverse v. Kia Motors of America, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 3273150

factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. Determining plausibility is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." *Id.* A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. *See id.*

## III. DISCUSSION

### A. Plaintiff's Breach of Express Warranty Claim

Count I of the Complaint asserts a claim for "Breach of Express Warranty" under New Jersey law. Plaintiff alleges that Kia "provided an express warranty to plaintiff and members of the class," but that Kia "breached its express warrant[y] by failing to cover the cost of required repairs within the term[s] of the warranty." (Compl. Count I ¶ 2). Kia argues that the Complaint fails to state a cause of action because the Complaint fails to allege "the terms of the warranty, its scope, or whether it was still in effect at the time" of the engine failure, and Plaintiff did not attach a copy of the warranty to the Complaint. (Mot. to Dismiss 4).

To state a claim for breach of express warranty under New Jersey law, a plaintiff must allege: (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing from the breach; and (4) that the party stating the claim performed its own contractual obligations. *Frederico v. Home Depot,* 507 F.3d 188, 203 (3d Cir.2007) (citing *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367–368 (N.J.1997)). The plaintiff can assert the existence of an express contract by laying out its terms verbatim in the complaint, attaching a copy of the warranty, or pleading its existence according to its legal effect. *Pierce v. Montgomery Cnty. Opportunity Bd., Inc.,* 884 F.Supp. 965, 970 (E.D.Pa.1995) (quoting 5 Charles A. Wright, Arthur R. Miller, *Federal Practice and Procedure* § 1235 at 272–273 (1990)). Under the Federal Rules, a plaintiff is not required to include the contract with the complaint, or allege the specific provisions violated in the contract. *DeFebo v. Anderson Windows, Inc.,* No. 09–2993, 2009 WL 3150390, at *5 n. 2 (E.D.Pa. Sept.24, 2009); *Slim CD, Inc. v. Heartland Payment Sys., Inc.,* No. 06–2256, 2007 WL 2459349, at *8 (D.N.J. Aug.24, 2007); *see also Jones v. Select Portfolio Servicing, Inc.,* No. 08–973, 2008 U.S. Dist. LEXIS 33284, at *10, 2008 WL 1820935 (E.D.Pa. Apr. 23, 2008) ("A plaintiff is not required to attach the subject contract to the complaint."). Also, "the complaint does not need to resort to formulaic recitation of the elements of the alleged contract; rather, the complaint must allege facts sufficient to place the defendant

on notice of the contract claim in such a way that the defendant can reasonably respond." *Transp. Int'l Pool, Inc. v. Ross Stores, Inc.,* No. 06–1812, 2009 WL 1033601, at *3 (E.D.Pa. Apr.15, 2009) (interpreting pleading standard under *Twombly*).

**\*3** Here, the Complaint alleges all of the essential elements of a breach of express warranty claim. First, the Complaint alleges that Plaintiff and Kia agreed to a 10–year / 100,000 mile warranty. Thus, the Complaint alleges the existence of a contract between the parties. Second, the Complaint alleges that although the Warranty covered engine failure, Kia refused to repair the Rio's engine. Thus, the Complaint also alleges breach of the express warranty. Third, the Complaint alleges that Plaintiff suffered damages in the form of out-of-pocket costs for repairs and the cost of a rental vehicle. In addition, the Complaint alleges that Plaintiff could not use the Rio for a period of time. Finally, the Complaint alleges that Plaintiff performed required maintenance on the Rio and presented it for repair to an authorized dealer, thereby fulfilling Plaintiff's obligations under the Warranty.

Kia's argument that Plaintiff should have alleged the terms of the Warranty and its scope or attached a copy of the Warranty to the Complaint is unavailing. A plaintiff need not allege the specific terms of the warranty and its scope or attach a copy of the warranty to the Complaint to state a breach of warranty claim. *See Transp. Int'l,* 2009 WL 1033601 at *3; *Slim CD,* 2007 WL 2459349 at *8. Therefore, because Plaintiff has sufficiently pled breach of warranty under New Jersey law, Defendant's Motion to Dismiss is denied as to Count I of the Complaint.

### B. Plaintiff's Fraud and NJCFA Claims

Plaintiff alleges fraud and violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S. § 56:8–1 *et seq.* Specifically, the Complaint alleges that: "[Kia's conduct] constitutes an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression of a material fact with intent that plaintiff and members of the class upon [sic] such concealment suppression, or omission and otherwise violates applicable consumer fraud and deceptive practices statutes." (Compl. Count II ¶ 2). Kia argues that Plaintiff has not alleged facts sufficient to support a common-law fraud claim, or an NJCFA claim. (Def.'s Br. in Supp. of Mot. to Dismiss 5–7).

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 141 of 307
PageID: 9664
Latraverse v. Kia Motors of America, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 3273150

### 1. Common–Law Fraud

"Every fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. Of Sussex Cnty. v. Whale,* 86 N.J. 619, 432 A.2d 521, 524 (N.J.1981). "The elements for actionable fraud under New Jersey law are proof that the defendant made (1) a material misrepresentation of present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) and which resulted in reasonable reliance by plaintiff." *Lightning Lube, Inc., v. Witco Corp.,* 4 F.3d 1153, 1182 (3d Cir.1993) (citing *Whale,* 432 A.2d at 524).

In federal court, allegations of fraud are subject to the pleading requirements of *Federal Rule of Civil Procedure 9(b).* Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed.R.Civ.P.* 9(b). Pursuant to Rule 9(b), a plaintiff must plead the circumstances of the alleged fraud with particularity sufficient to put the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of Am.,* 361 F.3d 217, 223–24 (3d Cir.2004). A plaintiff may satisfy this requirement in two ways. *Id.* at 224. First, a plaintiff can meet the requirement "by pleading the date, place or time of the fraud." *Id.* Second, the plaintiff may use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (citing *Seville Indus. Mach. v. Southmost Mach.,* 742 F.2d 786, 791 (3d Cir.1984)). Rule 9(b)'s heightened pleading standard is meant "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville,* 742 F.2d at 791. At minimum, Rule 9(b) requires "that the plaintiff identify the speaker of allegedly fraudulent statements." *Klein v. Gen. Nutrition Co., Inc.,* 186 F.3d 338, 345 (3d Cir.1999).

**\*4** Here, Plaintiff has failed to specifically allege the elements of common-law fraud.[3] Plaintiff's fraud claim consists of the following allegation: "Kia has proceeded to deny and/or conceal the problem and directed its dealers to provide deceptive, false, or misleading explanations ...." " (Compl.¶ 7). The Complaint does not allege a material misrepresentation or reasonable reliance with particularity. First, Plaintiff does not allege that "the problem" or Kia's

misleading explanations are "material." *See Massachusetts Mut. Life Ins. Co. v. Manzo,* 234 N.J.Super. 266, 560 A.2d 1215, 1226 n. 7 (N.J.Super.App.Div.1989) (defining material as "[i]mportant; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form.") (quoting *Black's Law Dictionary* 880 (5th ed.1979)). Second, Plaintiff does not allege Kia's representatives intended to induce reliance or that he reasonably relied on Kia's alleged misrepresentations. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 746 (3d Cir.1996) ("[A] plaintiff claiming fraud must prove that it *detrimentally relied* on an intentionally misleading statement made by the defendant.") (citing *John Hancock Mutual Life Ins. Co. v. Cronin,* 139 N.J. Eq. 392, 51 A.2d 2, 4 (N.J.1947)) (emphasis added). Rather, the Complaint merely alleges that Kia "breached the standard express warranty and extended warranties." (Compl.¶ 7). Therefore, because Plaintiff fails to allege a material misrepresentation and reasonable reliance, Plaintiff's common law fraud claim is dismissed.

3    Plaintiff's claim may also be barred under the economic loss doctrine. Under New Jersey common law, a tort claim stemming from a breach of express warranty is subject to the economic loss doctrine. *See State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC,* 646 F.Supp.2d 668, 676 (D.N.J.2009). Generally, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995); *see Unifoil Corp. v. Cheque Printers & Encoders Ltd.,* 622 F.Supp. 268, 271 (D.N.J.1985) ("[T]he law of New Jersey ... prohibit[s] fraud claims when the fraud contemplated by the plaintiff ... does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself.") (internal quotations omitted). However, the New Jersey Supreme Court has never held that a fraud claim cannot be maintained if based on the same conduct that gives rise to a breach of contract claim. *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 144 (3d Cir.2001). Rather, New Jersey courts have not agreed on whether fraud claims are an exception to the economic loss doctrine. *Kirtley v. Wadekar,* No. 05–5383, 2006 WL 2482939, at \*4 (D.N.J. Aug.25, 2006). Moreover, the Third Circuit has "decline[d] to wade into this morass." *Vanguard Telecomm.*

*v. S. New England Tel.,* 900 F.2d 645, 654 (3d Cir.1990). However, because neither party has raised the issue and because Plaintiff's fraud claim fails for other reasons, the Court will not decide whether the economic loss doctrine bars Plaintiff's fraud claim.

### 2. Plaintiff's NJCFA Claim

The NJCFA "is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." *D'Ercole Sales, Inc. v. Fruehauf Corp.,* 206 N.J.Super. 11, 501 A.2d 990, 996 (N.J.Super.Ct.App.Div.1985), *cited with approval in, Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454, 461 (N.J.1994).* In order to survive a motion to dismiss, a plaintiff must allege that: (1) the defendant engaged in an unlawful practice; (2) the plaintiff suffered an ascertainable loss; and (3) there is a causal relationship between the unlawful conduct and the ascertainable loss. *Bosland v. Warnock Dodge, Inc.,* 964 A.2d 741, 557 (N.J.2009).

Also, in federal court, the plaintiff must satisfy the requirements of Rule 9(b), and plead NJCFA fraud claims with particularity. *Naporano Iron & Metal Co. v. Am. Crane Corp.,* 79 F.Supp.2d 494, 510 (D.N.J.1999). As with common law fraud, the plaintiff can satisfy the Rule 9 requirement by: (1) pleading the date, place or time of the fraud; or (2) otherwise injecting precision and some measure of substantiation in the allegations of fraud. *See Lum,* 361 F.3d at 224. The requirements of Rule 9(b) are satisfied where the plaintiff alleges the specific and precise instances of the defendant's fraudulent behavior under the NJCFA. *See, e.g., Alin v. Am. Honda Motor Co., Inc.,* No. 08–4825, 2010 WL 1372308, at *10 (D.N.J. March 31, 2010) (finding Rule 9(b) requirements met where plaintiff alleged car manufacturer knew of defect but concealed it, and plaintiff substantiated claim with specific instance of manufacturer's technician stating defect was common); *Strzakowlski v. Gen. Motors Corp.,* No. 04–4740, 2005 WL 2001912, at *6 (D.N.J. Aug.16, 2005) (finding Rule 9(b) requirements satisfied where plaintiff alleged defendant attempted to conceal engine defect, detailed defendant's specific conduct and omissions, and alleged the general dates of the fraud). However, the requirements of Rule 9(b) are not met where the plaintiff does not allege specific and precise factual details about the defendant's fraud under the NJCFA. *See Frederico,* 507 F.3d at 200 (holding Rule 9(b) requirements not met where plaintiff made only made generic references to defendant's alleged fraud in charging late fees, but did not identify specific

instance of fraud); *Rait v. Sears, Roebuck and Co.,* No. 08–2461, 2009 WL 250309, at *4 (D.N.J. Feb.3, 2009) (finding complaint alleging only that plaintiff had purchased product, that product was defective, and that defendant was aware of defective nature of product and did not reveal defect, did not inject sufficient precision into the allegations of fraud and lacked factual detail).

**\*5** Here, the Complaint fails to allege with particularity that Kia engaged in an unlawful practice.[4] The only allegations in the Complaint that can be construed as an unlawful practice are as follows:

4

> The NJCFA defines an unlawful practice as the following:
>
> > The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ....
>
> N.J. Stat. Ann. § 56:8–2.

Plaintiff and class members have been without the use of their vehicle and incurred costs for rental vehicles. Rather than acknowledge *the problem,* Kia has proceeded to deny and/or conceal *the problem* and directed its dealers to provide *deceptive, false, or misleading explanations* for the failure to provide warranty coverage and reimbursement. It has breached its standard express warranty and extended warranties.

(Compl.¶ 7) (emphasis added).[5] Those allegations are deficient for two reasons. First, the Complaint does not identify with particularity what "deceptive, false, or misleading explanations" that Kia instructed its dealers to give to its customers, or point to an example of a dealer who gave Plaintiff an allegedly false explanation.[6] Rule 9(b) requires that, at minimum, Plaintiff identify the speaker of the allegedly fraudulent explanations. *Klein,* 186 F.3d at 345. But, the Complaint does not specifically allege that Kia or an authorized dealer gave Plaintiff a

false explanation for refusing to repair the Rio. Therefore, because the Complaint fails to put Kia on notice of the specific conduct that gave rise to its NJCFA claim, the Complaint is deficient under Rule 9(b).

5    The Complaint also alleges the following:

> The conduct set forth herein constitutes an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, and the knowing concealment, suppression of a material fact with intent that plaintiff and members of the class upon [sic] such concealment, suppression, or omission and otherwise violates applicable consumer fraud and deceptive practices statutes.

> The Complaint recites the language of the NJCFA. But, "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, the Court disregards these allegations as legal conclusions. *See Iqbal,* 129 S.Ct. at 1949.

6    In the Reply Brief Plaintiff argues "[w]e do not have simple [sic] a failure to provide warranty coverage. Plaintiff had performed required maintenance yet the dealer at Kia's behest falsely stated he had not and used that false statement as a means to deny required warranty coverage." (Pl.'s Br. in Opp'n to Mot. to Dismiss 4–5). This additional information infuses Plaintiff's claim with greater specificity and particularity by alleging a concrete instance of potentially fraudulent behavior. However, on a motion to dismiss, the Court is "not permitted to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based," and may not consider facts contained in the reply brief not alleged in the Complaint. *In re Burlington Coat Factory Sec.'s Litig.,* 114 F.3d 1410, 1425 (3d Cir.1997). Therefore, the Court cannot consider the arguments in the Reply Brief in construing the Complaint.

Second, the Complaint does not allege with particularity "the problem" that Kia denied or concealed. Kia cannot determine, based upon these allegations alone, "the problem" to which Plaintiff refers. [7] *See Lum,* 361 F.3d 223–24 (holding a plaintiff must plead with sufficient specificity to put a

defendant on notice of the precise misconduct with which it is being charged). Therefore, the Complaint does not meet the pleading requirements of Rule 9, and Plaintiff's NJCFA claim is dismissed.

7    Even if the Court construes "the problem" as the breach of warranty and Kia's concealment thereof, which is not clear, the Complaint still would not meet the requirements of Rule 9(b). A breach of warranty is not unfair or unconscionable per se and is not alone an unlawful practice under the NJCFA. *Palmucci v. Brunswick Corp.,* 311 N.J.Super. 607, 710 A.2d 1045, 1049 (N.J.Super.App.Div.1998). Where the basis for a plaintiff's NJCFA claim is essentially a breach of warranty claim, the plaintiff *must show "substantial aggravating circumstances." Suber v. Chrysler Corp.,* 104 F.3d 578, 587 (3d Cir.1997); *D'Ercole,* 501 A.2d at 1001 (relating that because "unfairness inheres in every breach of contract," substantial aggravating circumstances must be present to justify the treble damages available under NJCFA) (quoting *United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985, 992 (4th Cir.1981)). The active and knowing concealment of a breach of warranty by a defendant is a substantial aggravating circumstance. *See Suber,* 104 F.3d at 587 (finding substantial aggravating circumstances pled where plaintiff alleged Chrysler representative verbally informed plaintiff about van's suspension problems but then lied on official report that van had no suspension problems because representative attempted to conceal breach of warranty); *Alin,* 2010 WL 1372308, at *8 (finding substantial aggravating circumstances where plaintiff pled Honda knew or should have known of vehicle defect, promised to repair defect as part of warranty knowing that it would not honor warranty, and affirmatively concealed defect to foil warranty); *Strzakowlski,* 2005 WL 2001912, at *5 (finding sufficient allegation of aggravating circumstances where defendant attempted to conceal engine defect in car by implementing repair procedure under guise of "customer satisfaction program" to hide defect until warranty expired); *Naporano,* 79 F.Supp.2d at 507 (holding aggravating circumstances may be present where defendant instructed plaintiff to stop using a product, after defendant recalled and then reissued the product, because defendant

downplayed and concealed breach of warranty). However, substantial aggravating circumstances must be alleged with particularity under Rule 9(b). *Rait,* 2009 WL 250309, at *4. Here, the Complaint does not allege with particularity how "the problem" was concealed, or what misleading statements Kia told its dealers to provide to their customers. Therefore, the Complaint does not meet the requirements of Rule 9(b).

## C. Plaintiff's Breach of Warranty Claim under the MMWA

"The Magnuson–Moss Act was promulgated to increase consumer rights and protections by imposing minimum standards for manufacturers' warranties and by providing various avenues for consumer redress." *Walsh v. Ford Motor Co.,* 627 F.Supp. 1519, 1522 (D.D.C.1986). Section 110(d) of the MMWA provides, in pertinent part, that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or *under a written warranty, implied warranty,* or service contract, may bring suit for damages and other legal and equitable relief ...." 15 U.S.C. § 2310(d) (emphasis added). State substantive law determines liability for Magnuson–Moss claims based on breaches of express and implied warranties. *Cooper v. Samsung Elec.'s Am., Inc.,* No. 07–3853, 2008 WL 4513924, at *6 (D.N.J. Sept.30, 2008).

Here, Plaintiff alleges that Defendant breached an express warranty. The Court has already found that Plaintiff's allegations that Kia breached an express warranty are legally sufficient under New Jersey law. [8] Thus, Kia's Motion to Dismiss is denied as to Plaintiff's MMWA claim.

[8]    Plaintiff's claim under the MMWA does not foreclose his state-law breach of warranty claim: "Nothing in [the MMWA] shall invalidate or restrict any right or remedy of any consumer under State law." 15 U.S.C. § 2311(b)(1).

## D. Amendment of the Complaint

**\*6** Local Civil Rule 7.1(f) mandates that "[u]pon filing of a motion for leave to file an amended complaint ... the moving party shall attach to the motion a copy of the proposed pleading or amendments ...." L. Civ. R. 7.1(f). The purpose of Rule 7.1(f) is to give the Court and the parties a chance to evaluate the sufficiency of the proposed amended pleading. *See P. Schoenfeld Asset Mgt. v. Cendant Corp.,* 142 F.Supp.2d 589, 622 (D.N.J.2001). Failure to comply with the Rule by not attaching a copy of the proposed amendment defeats the request for amendment. *Parker v. Howmedica Osteonics Corp.,* No. 07–2400, 2008 WL 141628, at *5 (D.N.J. Jan.14, 2008) ("[R]equesting leave to amend requires the party seeking leave to file a draft amended complaint ... and a failure to do so is fatal to a request for leave to amend.") (internal quotations omitted).

Here, Plaintiff argues that "[t]o the extent the complaint is not sufficiently specific, then the initial remedy would be to permit amendment." (Pl.'s Br. in Opp'n to Mot. to Dismiss 6). Construing this as a request for leave to amend the Complaint, Plaintiff has failed to comply with Rule 7.1(f). Plaintiff has not attached a copy of the proposed amended complaint. Failure to attach a copy of the proposed amended complaint is fatal to the request for leave to amend. *Parker,* 2008 WL 141628 at *5. Leave to amend is therefore **DENIED.**

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss is **DENIED** as to Counts I and III of the Complaint, and is **GRANTED** as to Count II of the Complaint. Plaintiff's motion for leave to amend is **DENIED.** An appropriate Order shall enter.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 3273150

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **Tab 18**

 Neutral

As of: July 14, 2020 6:40 PM Z

## *McCamon-Hunt Ins. Agency, Inc. v. Medical Mut. of Ohio*

Court of Appeals of Ohio, Seventh Appellate District, Mahoning County

September 26, 2008, Decided

CASE NO. 07 MA 94

**Reporter**

2008-Ohio-5142 *; 2008 Ohio App. LEXIS 4338 **; 2008 WL 4444631

McCAMON-HUNT INSURANCE AGENCY, INC., PLAINTIFF-APPELLANT, - VS - MEDICAL MUTUAL OF OHIO, DEFENDANT-APPELLEE.

**Prior History: [**1]** CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas Court, Case No. 00 CV 2350.

*McCamon-Hunt Ins. Agency, Inc. v. Medical Mut. of Ohio, 2003 Ohio 1221, 2003 Ohio App. LEXIS 1193 (Ohio Ct. App., Mahoning County, Mar. 11, 2003)*

**Disposition:** Affirmed.

## Case Summary

**Procedural Posture**
Plaintiff health insurance broker appealed the judgment of the Mahoning County Court of Common Pleas (Ohio), which granted summary judgment to defendant insurer on the broker's claims for breach of contract, unjust enrichment, and conversion. Under the parties' contract, the broker was to receive commissions based on health insurance premiums paid to the insurer by a county as long as the broker was the county's agent-of-record.

**Overview**
On appeal, the broker alleged that the insurer had breached its agreement to pay the broker commissions from the insurer's health insurance contract with the county. That contract stated that the broker would receive commissions as long as it was the county's agent-of-record. The county decided that the broker would no longer be its agent and the broker failed to introduce any evidence which would demonstrate that the county acted improperly when making this decision. Therefore, the broker was no longer the county's agent-of-record and was no longer entitled to commissions from the insurer. Furthermore, there was no evidence that the insurer acted in a way which would justify a claim for unjust enrichment. In addition, the group health insurance at issue was a type of health care plan authorized to be issued under *R.C. Chapter 1751* and there was no evidence that the plan failed to meet the statutory conditions of *R.C. 307.86*. Thus, there was no requirement that the county engage in a competitive bidding process in order to award the health insurance contract to the insurer. Therefore, the trial court properly granted summary judgment to the insurer.

**Outcome**
The judgment of the trial court granting summary judgment to the insurer was affirmed.

**Counsel:** For Plaintiff-Appellant: Attorney Stephen R. Garea, Youngstown, OH.

For Defendant-Appellee: Attorney Robert D. Kehoe,

2008-Ohio-5142, *2008-Ohio-5142; 2008 Ohio App. LEXIS 4338, **1

Attorney J. Brian Kennedy, Attorney Joseph J. Jerse, Kehoe & Associates, Cleveland, OH.

**Judges:** Hon. Mary DeGenaro, Hon. Gene Donofrio, Hon. Joseph J. Vukovich. Vukovich, J., concurring in judgment only with concurring opinion.

# Opinion

DeGenaro, P.J.

[*P1] This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Plaintiff-Appellant, McCamon-Hunt Insurance Agency, Inc., appeals the decision of the Mahoning County Court of Common Pleas that granted summary judgment to Defendant-Appellee, Medical Mutual of Ohio, on McCamon-Hunt's claims for breach of contract, unjust enrichment, and conversion. Under a contract with Medical Mutual, McCamon-Hunt was to receive commissions based on the health insurance premiums paid to Medical Mutual by the Mahoning County Board of Commissioners as long as McCamon-Hunt was the Commissioners' agent-of-record. McCamon-Hunt's claims are based largely on its argument that the Commissioners' [**2] improperly decided not to retain McCamon-Hunt as its health insurance broker when it entered into a new health insurance contract with Medical Mutual. However, McCamon-Hunt has failed to demonstrate a genuine issue of material fact regarding its claims. Accordingly, the trial court's decision is affirmed.

Facts

[*P2] On December 30, 1996, the Commissioners named McCamon-Hunt as its agent-of-record for the purpose of purchasing health insurance for its employees. As a result of McCamon-Hunt's efforts, the Commissioners entered into a health insurance contract with Medical Mutual which lasted from March 1, 1998, to February 28, 2000. Medical Mutual entered into a Single Case Agreement with McCamon-Hunt on March 1, 1998, which agreed to pay McCamon-Hunt a commission based on the premiums paid to Medical Mutual by the Commissioners. That agreement made some reference to "renewal dates of the contract," but stated that McCamon-Hunt was only entitled to the commissions as long as it was the Commissioners' "agent-of-record."

[*P3] The Commissioners began seeking bids for insurance coverage from March 1, 2000, through February 28, 2002. On December 21, 1999, McCamon-Hunt picked up a bid package from the [**3] Commissioners and gave it to Medical Mutual. One week later, on December 28, 1999, the Commissioners cancelled the first bidding process and sought new bids. McCamon-Hunt then supplied Medical Mutual with a new bid package. Medical Mutual submitted its bid on February 2, 2000. The bid award was not completed until after February 28, 2000, when the Commissioners' contract with Medical Mutual ended, so the two continued under the old contract on a month-to-month basis.

[*P4] The Commissioners awarded the bid to Medical Mutual on April 27, 2000, after negotiating with Medical Mutual for a better rate. The new contract for insurance coverage was from June 1, 2000 to February 28, 2002. Medical Mutual ceased paying commissions to McCamon-Hunt on June 1, 2000.

[*P5] In June 2000, the Mahoning County Administrator sent a letter to McCamon-Hunt, which indicated that the Commissioners had agreed to the contract, but decided not to name a broker for that contract. Shortly after that, Medical Mutual informed McCamon-Hunt that it would no longer be paying McCamon-Hunt any commissions and ceased paying those commissions.

[*P6] McCamon-Hunt did not file any action challenging the Commissioners' decision to no longer [**4] retain McCamon-Hunt as health insurance broker. Instead, it filed an action against Medical Mutual sounding in breach of contract, unjust enrichment, and conversion. Medical Mutual moved to dismiss that complaint pursuant to either *Civ.R. 12(B)(6)* or *Civ.R. 12(C)*. The trial court granted Medical Mutual's motion to dismiss for failure to state a claim.

[*P7] McCamon-Hunt appealed that decision to this court and it was reversed because the whole contract had not been attached to the complaint, which was a problem pursuant to *Civ.R. 10(D)* which is not a basis for relief under *Civ.R. 12(B)(6)*. The matter was remanded back to the trial court. Eventually, Medical Mutual moved for summary judgment, arguing that there were no issues of material fact and that McCamon-Hunt was not entitled to relief under any of its claims. The trial court granted that motion after McCamon-Hunt

2008-Ohio-5142, *2008-Ohio-5142; 2008 Ohio App. LEXIS 4338, **4

responded.

**[*P8]** McCamon-Hunt's sole assignment of error on appeal argues:

**[*P9]** "The trial court erred in granting summary judgment in favor of the Defendant-Appellant and by failing to grant summary judgment in favor of the Plaintiff-Appellee."

Standard of Review

**[*P10]** When reviewing a trial court's decision to grant summary judgment, an appellate **[**5]** court applies the same standard used by the trial court and, therefore, engages in a de novo review. *Parenti v. Goodyear Tire & Rubber Co. (1990), 66 Ohio App.3d 826, 829, 586 N.E.2d 1121.* Under *Civ.R. 56,* summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the non-movant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. *Doe v. Shaffer, 90 Ohio St. 3d 388, 390, 2000 Ohio 186, 738 N.E.2d 1243.* A fact is material when it affects the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc. (1999), 135 Ohio App.3d 301, 304, 733 N.E.2d 1186.*

**[*P11]** When moving for summary judgment, a party must produce some facts that suggest that a reasonable fact-finder could rule in their favor. *Brewer v. Cleveland Bd. of Edn. (1997), 122 Ohio App.3d 378, 386, 701 N.E.2d 1023.* "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element **[**6]** of the nonmoving party's claim." *Dresher v. Burt, 75 Ohio St. 3d 280, 296, 1996 Ohio 107, 662 N.E.2d 264.* The trial court's decision must be based upon "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action." *Civ.R. 56(C).* The nonmoving party has the reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. *Dresher at 293.*

Breach of Contract

**[*P12]** As we stated in our prior opinion in this case, McCamon-Hunt's claims are all predicated on its "belief that Medical Mutual breached its contract with McCamon-Hunt. The parties do not argue over the

existence of the contract, whether McCamon-Hunt performed the contract, or whether it suffered damages if Medical Mutual breached the contract. The only dispute is whether Medical Mutual breached the contract." *McCamon-Hunt Ins. Agency, Inc. v. Medical Mut. of Ohio, 7th Dist. No. 02 CA23, 2003 Ohio 1221 at P9.*

**[*P13]** Medical Mutual argues that McCamon-Hunt is no longer entitled to commissions because McCamon-Hunt is no longer agent of record for the Commissioners. Medical Mutual supports this **[**7]** claim by pointing to a June 19, 2000, letter from the Mahoning County Administrator to McCamon-Hunt, which provides as follows:

**[*P14]** "This letter is being written to advise you of the County's award for hospitalization from June 1, 2000 through March 2, 2002.

**[*P15]** "Because of the significant increase in the cost of the insurance, the Board awarded the bid and did not name any brokers.

**[*P16]** "We appreciate your prior service with the County and thank you for your continued interest in the future."

**[*P17]** This was followed by an August 8, 2000, letter to McCamon-Hunt from Medical Mutual confirming that Medical Mutual would no longer be paying commissions to McCamon-Hunt pursuant to the Commissioners' request.

**[*P18]** McCamon-Hunt argues that the Commissioners' actions did not properly terminate its agency relationship with the County and, therefore, McCamon-Hunt should still be recognized as agent of record under the contract. Medical Mutual both disputes this claim and argues that McCamon-Hunt should have challenged the Commissioners' conduct in a timely manner through an action for declaratory or injunctive relief against the Commissioners, rather than trying to challenge that conduct in this lawsuit.

**[*P19]** We have some **[**8]** sympathy with Medical Mutual's argument that McCamon-Hunt should be raising this argument in a lawsuit involving the Commissioners, but do not need to address that issue in this opinion since McCamon-Hunt has failed to demonstrate that the Commissioners acted improperly.

**[*P20]** McCamon-Hunt's argument in this regard is premised on its allegation that the Commissioners did

2008-Ohio-5142, *2008-Ohio-5142; 2008 Ohio App. LEXIS 4338, **8

not properly terminate their relationship with McCamon-Hunt. The letter from the County Administrator to McCamon-Hunt demonstrates that the Commissioners did, in fact, terminate that relationship. However, McCamon-Hunt has produced no evidence showing the manner in which the Commissioners arrived at their decision. It claims that there are no records demonstrating the Commissioners' reasoning, but has failed to back up this assertion by citing to any evidence, such as affidavits or depositions regarding their attempts to search the Commissioners' minutes.

[*P21] As stated above, the non-moving party has the reciprocal burden of specificity and must introduce evidence in order to meet this burden. *Dresher at 293.* Since McCamon-Hunt has not introduced any such evidence, we cannot address the merits of this argument.

[*P22] The evidence [**9] in the record shows that McCamon-Hunt was only contractually entitled to commissions from Medical Mutual as long as it was the Agent of Record for the Commissioners and that the Commissioners decided not to retain McCamon-Hunt as its Agent of Record. McCamon-Hunt admits that Medical Mutual paid it commissions up until the time that the Commissioners made this decision. Thus, McCamon-Hunt has failed to demonstrate that Medical Mutual breached its contract with McCamon-Hunt.

Miscellaneous Arguments

[*P23] McCamon-Hunt makes other arguments in its brief. For instance, McCamon-Hunt argues that the Commissioners improperly entered into the 2000 contract with Medical Mutual because it did not make that contract subject to the competitive bidding process and is, therefore, void. McCamon-Hunt bases this argument on a 1969 opinion from the Ohio Attorney General which interpreted a former version of *R.C. 307.86.* That former version of that statute governed competitive bidding and made no exception for group health insurance contracts.

[*P24] However, *R.C. 307.86* has been amended since 1969. It now makes an exception to the competitive bidding requirement for the purchase "of any form of an insurance policy [**10] or contract authorized to be issued under Title XXXIX of the Revised Code or any form of health care plan authorized to be issued under *Chapter 1751. of the Revised Code,* or any combination of such policies, contracts, or plans that the contracting authority is authorized to purchase" as long as certain

conditions are met. *R.C. 307.86(F).*

[*P25] The group health insurance at issue in this case was a type of health care plan authorized to be issued under *R.C. Chapter 1751* and there is no evidence that the plan failed to meet the statutory conditions. Thus, there was no requirement that the Commissioners engage in a competitive bidding process in order to award the health insurance contract to Medical Mutual.

[*P26] McCamon-Hunt also argues that there is a genuine issue regarding whether it is entitled to recover under a theory of unjust enrichment. A person is unjustly enriched if he profits or enriches himself inequitably at another's expense and such a person will be required to make restitution to the party suffering the loss. *Henkle v. Henkle (1991), 75 Ohio App.3d 732, 738, 600 N.E.2d 791.*

[*P27] A plaintiff must prove the following three things in order to recover under a theory of unjust enrichment: 1) the plaintiff [**11] conferred a benefit upon the defendant, 2) the defendant had knowledge of the benefit, and 3) circumstances render it unjust or inequitable to permit the defendant to retain the benefit without compensating the plaintiff. *Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183, 12 Ohio B. 246, 465 N.E.2d 1298.* The benefit conferred by the plaintiff must be in response to a fraud, misrepresentation, or bad faith on behalf of the defendant. *Natl. City Bank v. Fleming (1981), 2 Ohio App.3d 50, 58, 2 Ohio B. 57, 440 N.E.2d 590.* As this court has recently stated, this requirement ensures a tie of causation between the plaintiff's loss and the defendant's benefit. *HLC Trucking v. Harris, 7th Dist. No. 01 BA 37, 2003 Ohio 694, at P26.*

[*P28] In this case, McCamon-Hunt is claiming that Medical Mutual was unjustly enriched because McCamon-Hunt had prepared Medical Mutual's original bid in 2000, Medical Mutual was eventually awarded the contract, and McCamon-Hunt is not being compensated for its efforts. However, McCamon-Hunt has not pointed to any fraud, misrepresentation, or bad faith by Medical Mutual which prompted McCamon-Hunt to confer a benefit upon Medical Mutual.

[*P29] Furthermore, the record does not support such a conclusion. After McCamon-Hunt submitted [**12] a bid on Medical Mutual's behalf in 2000, the Commissioners decided to have the contract re-bid and negotiated a different agreement with Medical Mutual than that originally submitted by McCamon-Hunt on

2008-Ohio-5142, *2008-Ohio-5142; 2008 Ohio App. LEXIS 4338, **12

Medical Mutual's behalf. Nowhere in this fact pattern is there any wrongdoing by Medical Mutual which would support a finding of unjust enrichment. Thus, McCamon-Hunt's argument that the trial court erred when granting summary judgment on this claim is meritless.

[*P30]   Finally, McCamon-Hunt argues that Medical Mutual is liable for conversion because it has not paid McCamon-Hunt the commissions it earned pursuant to the contract between McCamon-Hunt and Medical Mutual. However, this argument is nothing more than treating a breach of contract claim as if it were a conversion claim.

[*P31]   Conversion is the "wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp. (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172*. In this case, the only reason why McCamon-Hunt is alleging that Medical Mutual is exercising dominion over McCamon-Hunt's property is that Medical Mutual is not paying [**13] McCamon-Hunt the commissions which McCamon-Hunt believes Medical Mutual is contractually obligated to pay McCamon-Hunt. Thus, McCamon-Hunt's conversion claim is really a breach of contract claim. For the reasons given above, the trial court properly granted summary judgment to Medical Mutual on McCamon-Hunt's breach of contract claim.

Conclusion

[*P32]   McCamon-Hunt alleges that Medical Mutual has breached its agreement to pay McCamon-Hunt commissions from Medical Mutual's health insurance contract with the Commissioners. That contract stated that McCamon-Hunt would receive commissions as long as it was the Commissioners' agent-of-record. The Commissioners decided that McCamon-Hunt would no longer be its agent and McCamon-Hunt has failed to introduce any evidence which would demonstrate that the Commissioners acted improperly when making this decision. Therefore, McCamon-Hunt was no longer the Commissioners' agent-of-record and was no longer entitled to commissions from Medical Mutual. Furthermore, there is no evidence that Medical Mutual acted in a way which would justify a claim for unjust enrichment.

[*P33]   Given these conclusions, the facts in the record, considered in the light most favorable [**14] to McCamon-Hunt, show that McCamon-Hunt is not entitled to the relief it seeks. Accordingly, McCamon-Hunt's sole assignment of error is meritless and the

judgment of the trial court granting summary judgment to Medical Mutual is affirmed. Donofrio, J., concurs in judgment and the reasoning stated in both the majority and concurring opinion.

Vukovich, J., concurring in judgment only with concurring opinion.

**Concur by:** Joseph J. Vukovich

# Concur

VUKOVICH, J., concurring in judgment only with concurring opinion:

[*P34]   Although I concur with certain holdings in the majority opinion, I refrain from concurring with its entirety. Among other things, I would not choose to bypass appellee's most convincing arguments. For instance, there are additional contractual terms to consider besides the bare "Agent of Record" phrase. More specifically, the contract provides that McCamon-Hunt was only entitled to commissions if it "remains the Agent of Record for the group, as recognized by both the group and the Company" and "upon acceptance" of the application submitted on the broker's behalf. There was a reciprocal right to terminate the agreement without cause upon thirty days notice. McCamon-Hunt admitted that the County could [**15] have chosen from any of the eleven brokers listed on the bid provided by Medical Mutual. McCamon-Hunt also recognized that the final policy differed from the one with which it was involved.

[*P35]   Furthermore, appellant presents multiple arguments about the Commissioners abusing their discretion and acting contrary to law. However, the County is not a party, and its behavior cannot be attributed to Medical Mutual. McCamon-Hunt does not dispute that the County refused to name a broker in its final policy with Medical Mutual. Rather, McCamon-Hunt claims that the Commissioners' acts or omissions in doing so were violative of the Commissioners' legal and contractual duties to the public and to McCamon-Hunt. Yet, McCamon-Hunt fails to establish how such claims are actionable against Medical Mutual alone, who cannot be expected to defend against claims that another party engaged in acts or omissions that allegedly harmed a broker. It is my opinion that the absence of the Board of County Commissioners as a

2008-Ohio-5142, *2008-Ohio-5142; 2008 Ohio App. LEXIS 4338, **15

party is dispositive of many of the arguments posited by McCamon-Hunt.

 [*P36]  For these reasons and certain additional reasons presented in the main opinion above, I agree that a genuine issue of material  [**16] fact as to a breach of contract by Medical Mutual has not been established. I thus concur in affirming the trial court's entry of summary judgment in favor of Medical Mutual.

---

**End of Document**

# **Tab 19**

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 153 of 307
PageID: 9676
In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

KeyCite Yellow Flag - Negative Treatment
Distinguished by Dana v. Hershey Company, N.D.Cal., March 29, 2016

2011 WL 2802854
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re McNEIL CONSUMER
HEALTHCARE, et al., MARKETING
AND SALES PRACTICES LITIGATION.
Applies to: All Actions.

MDL No. 2190.
|
July 15, 2011.

MEMORANDUM

McLAUGHLIN, District Judge.

**\*1** This putative class action represents a consolidation of individual cases filed in various courts throughout the United States, which have been transferred to this Court by the Judicial Panel on Multidistrict Litigation. The litigation arises out of purported quality control issues affecting over-the-counter healthcare products manufactured by Johnson & Johnson's ("J & J") consumer healthcare division, McNeil Consumer Healthcare ("McNeil").

The plaintiffs allege that J & J and McNeil, along with certain executives and board members (collectively, the "J & J Defendants"), as well as third-party contractors (the "Contractor Defendants"), engaged in a conspiracy to conceal systemic quality control problems and manufacturing defects that began at least as early as 2008, and which affected adult and children's medications, many of which were manufactured at McNeil's facility in Fort Washington, Pennsylvania. As a consequence of this scheme, the plaintiffs allegedly purchased McNeil products at higher prices than they were worth, based on their reliance on the J & J Defendants' reputation for safe and effective medications. In this action, the plaintiffs seek to recover their out-of-pocket payments for the products in question. The plaintiffs also seek damages for the alleged conspiracy to conceal the quality control problems that first came to light in 2010.

Both the J & J Defendants and the Contractor Defendants have filed motions to dismiss. The Court held oral argument on these motions on June 29, 2011. The Court will grant the motions and will dismiss the plaintiffs' claims in their entirety for lack of standing. The claims against the J & J Defendants will be dismissed without prejudice, and the Court will permit the plaintiffs to amend their complaint. The claims against the Contractor Defendants, however, will be dismissed with prejudice.

I. *Facts as Alleged in the Consolidated Amended Complaint* [1]

[1]
> In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded facts as true, and must construe the complaint in the light most favorable to the plaintiff, while disregarding any legal conclusions. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). The court must then determine whether the facts alleged are sufficient to show that the plaintiff has a "plausible claim for relief." *Fowler,* 578 F.3d at 210. If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, then the complaint has alleged, but it has not shown, that the pleader is entitled to relief. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2008).

As an initial matter, the Court notes that the allegations in the consolidated amended complaint ("CAC") are difficult to distill into a coherent summary. This is largely due to the fact that the plaintiffs' allegations relate to disparate and in some cases unrelated events, each of which implicates different sets of products manufactured by the J & J Defendants. [2] At no point in the CAC do the plaintiffs identify which particular products they purchased; instead, the plaintiffs use umbrella terms such as "Subject Products" and "Recalled Subject Products." With these issues in mind, the Court has done its best to piece together the plaintiffs' allegations below,

[2]
> In addition, the plaintiffs often refer to J & J, McNeil, and the individual defendants interchangeably.

A. *Background: April 30, 2010, FDA Report and Recall*
The twenty-seven named plaintiffs are individuals from sixteen states plus Ontario, Canada, who bring suit on behalf of themselves and a putative nationwide class [3]

of consumers who have purchased unspecified "Subject Products" manufactured by McNeil from at least December 2008 to the present. [4] The plaintiffs contend that these Subject Products were defective due to quality control problems in McNeil's manufacturing process. Although the quality control problems began at least as early as 2008, the plaintiffs did not become aware of such problems until April 30, 2010, when the Food and Drug Administration ("FDA") issued a report citing McNeil's Fort Washington facility for various deficiencies in its manufacturing process. CAC ¶¶ 5, 7.

[3]     The plaintiffs also purport to represent individuals from other countries, which the plaintiffs refer to as "Other Places," and which include Canada, the Dominican Republic, the United Arab Emirates, Fiji, Guam, Guatemala, Jamaica, Puerto Rico, Panama, Trinidad & Tobago, and Kuwait. CAC ¶ 1.

[4]     The plaintiffs refer to all drugs allegedly affected by quality control issues as the "Subject Products." The Subject Products include various forms of the following: Tylenol Infants' Drops, Tylenol Infants' Suspension, Tylenol Suspensions, Tylenol Plus Suspensions, Children's Tylenol Plus, Tylenol Meltaways, Tylenol, Motrin Infants' Drops, Motrin Suspensions, Motrin Cold Suspensions, Junior Strength Motrin, Motrin IB, Zyrtec Liquids in Bottles, Benadryl Allergy Liquids in Bottles, Children's Benadryl Fastmelt Tablets, Benadryl Allergy Tablets, Pepsid, Rolaids, Mylanta and Alternagel Liquid Products, Simply Sleep, and St. Joseph Aspirin. "Subject Products," Ex. A to CAC.

**\*2** In a report issued on April 30, 2010, the FDA listed twenty separate "observations" that had been made by FDA investigators based on inspections of McNeil's Fort Washington facility between April 19 and April 30, 2010. These observations related to a number of deficiencies in McNeil's manufacturing operations, including failures of production controls to ensure consistency in the strength, quality and purity of products; the use of contaminated raw materials, some of which contained gram-negative organisms; the manufacture of "super-potent batches" of certain products; the presence of foreign materials in some products; and a general lack of cleanliness and record keeping. CAC ¶¶ 195, 202–03; April 30, 2010, FDA Report, Ex. C to CAC.

On the evening of April 30, 2010, following the FDA report, McNeil announced a voluntary recall of a subset of the Subject Products identified above. The recall covered approximately forty types of children's and infants' products manufactured at the Fort Washington plant, and encompassed over 136 million bottles of products in total. The recall was issued only as to products bearing certain National Drug Codes, production dates and lot numbers. Throughout the CAC, the plaintiffs refer to the subset of Subject Products that were recalled on, and subsequent to, April 30, 2010, as the "Recalled Subject Products." [5] CAC ¶¶ 7, 9.

[5]     The "Recalled Subject Products" include various forms of Tylenol Infants' Drops, Children's Tylenol Suspensions, Children's Tylenol Plus Suspensions, Motrin Infants' Drops, Children's Motrin Suspensions, Children's Motrin Cold Suspensions, Children's Zyrtec Liquids in Bottles, and Children's Benadryl Allergy Liquids in Bottles. CAC ¶ 9.

In the wake of the recall announcement, McNeil shut down its manufacturing operations at the Fort Washington facility. In addition, the recall announcement triggered a congressional investigation that led to two hearings before Congress in 2010. CAC ¶¶ 7–9, 169–71, 173.

The plaintiffs allege that the J & J Defendants' recall was inadequate for multiple reasons, and has therefore not fully compensated the putative class members. First, although all of the Subjects Products identified in the CAC suffered from "serious problems," the J & J Defendants only recalled a subset of those products, which are identified in the CAC as the Recalled Subject Products. The plaintiffs have therefore paid inflated prices for defective products that have not been subject to any recall. [6] CAC ¶¶ 4, 7, 9, 232.

[6]     Based on the CAC and the representations made by plaintiffs' counsel at oral argument, it appears that the broader category of "Subject Products" includes products manufactured at additional locations apart from McNeil's Fort Washington facility.

Even with respect to the products that were subject to the April 30, 2010, recall (the Recalled Subject Products), the accompanying refund offer was substantively deficient and has not fully compensated the plaintiffs for several reasons. First, the recall announcement was deliberately delayed until the evening of Friday, April 30, 2010, so as to avoid substantial media attention. As a consequence, only a small

portion of consumers who purchased the Recalled Subject Products have learned about the recall, and an even smaller number have availed themselves of the refund offer. CAC ¶¶ 7–8.

Even those consumers who availed themselves of the refund offer were not adequately compensated. In the early stages, McNeil encouraged consumers to take "high value coupons" for future McNeil products instead of cash refunds. The coupons, however, have no present cash value, are not transferable, and are "worthless" because the McNeil Fort Washington plant has closed. The plaintiffs aver that "[s]ome members of the consumer Class in this case received such worthless coupons." CAC ¶ 16. The J & J Defendants later began offering consumers a "limited opportunity" to request a partial cash refund of their out-of-pocket payments. Both the coupons and cash refunds, however, were only offered to consumers who could satisfy the J & J Defendants' eligibility criteria. CAC ¶¶ 14–15, 18.

**\*3** In particular, to receive a cash refund or a coupon, consumers had to complete a web-based form that required the consumer to enter the specific product name, as well as its National Drug Code number, lot number and expiration date. The refund webpage contained no provisions for consumers who did not retain the product bottle, notwithstanding the J & J Defendants' instructions to discard products subject to the recall.[7] Therefore, consumers who used up or discarded the products cannot receive a coupon or cash refund. CAC ¶¶ 225–29, 233.

[7]  The J & J Defendants encouraged consumers, as a "precautionary measure," "not to administer unused Recalled Subject Drugs to children, and instead to dispose of said products by mixing them with materials such as kitten litter or coffee grounds and placing the products in a sealed bag. CAC ¶ 13.

Apart from these general allegations, the CAC does not aver that any named plaintiff attempted to avail himself of the refund offer and was not made whole. Instead, the plaintiffs rely on the experiences of non-plaintiff third-party consumers to illustrate specific examples of the refund offer's deficiencies. In particular, the plaintiffs cite to comments posted by consumers on an internet blog maintained by the J & J Defendants as part of the refund offer.[8] For example, a man named Evan D. Owen criticized the J & J Defendants for delaying the recall announcement until late in the evening on Friday, April 30. Mr. Owen also complained that the

operators handling the customer service lines were difficult to reach, and those who could be reached were "data collectors and coupon issuers." The plaintiffs aver that Mr. Owen's experience emphasizes the fact that the J & J Defendants were pushing coupons over cash refunds.[9] CAC ¶¶ 235–39.

[8]  The plaintiffs' allegations regarding third-party consumers are derived from 98 pages of documents relating to the refund offer that the J & J Defendants furnished to the plaintiffs after an initial status conference before the Court on December 13, 2010. The 98 pages largely consisted of printouts from the J & J Defendants' websites. None of the third-party consumers are named plaintiffs in this action. *See* CAC ¶¶ 234–35; Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n"), at 9.

[9]  The plaintiffs also cite to a document entitled "Recall Update: Change to Compensation Policy," an internal J & J document that directed customer service representatives, "[e]ffective immediately," to offer a check first and then a coupon. According to the plaintiffs, this only would have been necessary if the J & J Defendants had previously been pushing coupons instead of cash. CAC ¶ 244.

In addition, the plaintiffs cite to a blog poster named "Aaron L," to show that cash refunds, when offered, were inadequate. Aaron L. commented that he was having "issues" with the amount of his cash refund, based on the fact that he had "to destroy 6 various McNeil products and received a check for $10.00." CAC ¶ 241. The plaintiffs also append to their complaint a document dated May 13, 2010, signed by Peter Luther, McNeil's President, that was issued to healthcare providers. In the document, Mr. Luther explained that cash refunds were calculated based on the "average retail price" of the product in question. According to the plaintiffs, the average retail price did not include any applicable taxes. In addition, average retail prices have been inconsistent between internal McNeil documents. Therefore, any consumer who receives the average retail price is not made whole. CAC ¶¶ 58, 242–43.

In view of the foregoing allegations, the plaintiffs contend that the refund offer has failed to compensate them. The plaintiffs also allege that the quality control problems that first came to light on April 30, 2010, and that prompted the recall, had been ongoing at J & J and McNeil since at least 2008. These quality control issues, which affected at a minimum all Subject Products, were concealed as part of a conspiracy

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 156 of 307
PageID: 9679
In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

to avoid disclosure. The 2010 recall and the accompanying refund offer, which have failed to compensate consumers, are symptomatic of this scheme to conceal the truth and to minimize the consequences of the J & J Defendants' actions. The Court will turn to the conspiracy allegations below.

B. *Conspiracy Allegations*

**\*4** The plaintiffs' conspiracy allegations relate to events that largely occurred prior to the April 30, 2010, FDA report and the subsequent recall of children's and infants' medications. Taken together, the plaintiffs argue that these allegations reveal systemic quality control problems that were intentionally concealed by the defendants.

1. *Violations of State and Federal Laws*

The plaintiffs devote many allegations of the CAC to violations of state and federal laws by J & J and its various non-McNeil subsidiaries in recent years. The plaintiffs contend that these violations, which in several cases resulted in the imposition of criminal or civil fines, should have put the J & J Defendants on "heightened alert" for the conduct giving rise to this action. In brief, the plaintiffs' allegations relate to "kickback" arrangements, as well as schemes to promote the off-label use of prescription drugs. [10]

[10]
    The plaintiffs reference the following: (1) a kickback scheme between J & J and Omnicare covering certain prescription drugs; (2) a kickback scheme involving DePuy hip and knee replacement products; (3) a $6.15 million fine assessed against non-McNeil J & J subsidiaries for lack of transparency and/or product misbranding; and (4) the off-label promotion of Topamax, Risperdal, and Nactrecor prescription drugs. CAC ¶¶ 93–120.

The J & J Defendants argue in their motion to dismiss that these allegations are extraneous and should be stricken under Federal Rule of Civil Procedure 12(f) as immaterial and impertinent to the present action. The Court agrees that these allegations are irrelevant to the present suit, because they do not pertain to quality control problems in general, or the products at issue in this suit in particular. In addition, none of the allegations relate to McNeil Consumer Healthcare. The Court will therefore not go into additional detail with respect to these allegations. *See* CAC ¶¶ 93–120.

2. *Prior Quality Control Problems at J & J and McNeil*

The plaintiffs allege that J & J and McNeil's quality control has deteriorated since 2002, largely as a consequence of internal management decisions. Starting in 2002, McNeil began to lay off its experienced quality control staff and replace them with inexperienced contract workers. In 2007, William C. Weldon, the Chairman and CEO of J & J, made significant cuts to J & J's Corporate Compliance Group, which was charged with conducting "tough audits" and overseeing quality control at all of the J & J companies. In the same year, McNeil issued an internal memorandum that reflected its ongoing quality control problems, including a high percentage of operator errors in every work center. CAC ¶¶ 129, 136–37.

J & J and McNeil's quality control was also subject to FDA criticism on multiple occasions prior to April 30, 2010. In 2004, for instance, the FDA cited McNeil for bad sampling and poor record keeping. On January 11, 2006, the FDA issued an "Enforcement Report" citing problems with several of the same products that were again cited in the 2010 report. [11] For example, in the 2006 report, the FDA identified particulate matter in Children's Motrin Bubblegum Suspensions. This same observation appeared again in the 2010 report. Similarly, the 2006 report identified the presence of foreign substances in the Bubblegum and Cherry Blast Flavors of Tylenol Oral Suspensions. These two products were again cited in the 2010 report. Finally, the 2006 report identified Berry Flavor Children's Motrin Oral Suspension as being "sub-potent." In contrast, several products were cited in the 2010 report for being "super-potent." CAC ¶¶ 206–09.

[11]
    Several of the issues that were cited in the 2006 report had led the FDA to initiate a recall of certain products in 2005, before the report was released. CAC ¶¶ 207–09.

**\*5** The FDA has conducted a number of additional inspections at McNeil's facilities in both Fort Washington and Lancaster, Pennsylvania, and has found deficiencies with regard to McNeil's laboratory controls, equipment cleaning processes, and its investigations of identified problems. [12] In January 2010, the FDA issued McNeil a warning letter expressing concerns about McNeil's quality control and its failure to investigate quality problems. CAC ¶¶ 194–96.

[12]
    In February 2008 and June 2009, the FDA issued reports citing McNeil's Fort Washington facility

for inadequate investigations and for mishandling complaints. CAC ¶¶ 139–40.

### 3. *J & J and McNeil Product Recalls*

The plaintiffs allege that the J & J Defendants' quality control problems, as outlined above, have led to a number of product recalls. The manner in which the defendants have handled the recalls, in turn, evidences a conspiracy to conceal quality control problems. The plaintiffs focus in particular on a so-called "phantom recall" of Motrin IB and a subsequent public recall in July 2009.

The plaintiffs allege that in August 2008, McNeil distributed over 88,000 packages of defective Motrin IB. Three months later, McNeil discovered a dissolution problem with the drug, and sometime thereafter hired third-party contractors to perform a clandestine, or "phantom," recall. Pursuant to this "phantom recall," McNeil hired third-party contractors Inmar, Inc.,[13] and WIS International,[14] and instructed them to visit various retailers, act like normal customers, and purchase all of the Motrin IB off of the shelves. J & J's specific instructions to the third-party contractors were as follows:

[13]   The plaintiffs also allege that Inmar's subsidiaries, Carolina Supply Chain Services, LLC ("CSCS"), and Carolina Logistics Services, LLC ("CLS"), participated in the "phantom recall." CAC ¶¶ 64–65.

[14]   The plaintiffs allege that Inmar, Inc. hired WIS International as a subcontractor to assist with the "phantom recall." *See* CAC ¶ 66.

[Q]uickly enter each store, find ALL of the Motrin product described, make the purchase transaction, secure the receipt, and leave ... THERE MUST BE NO MENTION OF THIS BEING A RECALL OF THE PRODUCT! CAC ¶¶ 145–50.[15]

[15]   The plaintiffs do not allege a precise date when the "phantom recall" occurred, but instead imply in the CAC that the "phantom recall" occurred approximately eight months prior to the public recall. *See* CAC ¶ 153. At oral argument, however, the plaintiffs clarified that the "phantom recall" was part of a process that occurred over the course of several months, beginning with a "market assessment" in May 2009, and ending with the removal of products from shelves sometime

thereafter. *See* Tr. of Oral Arg. on June 29, 2011 ("Tr."), at 96–97. The Contractor Defendants, by contrast, contend that the "phantom recall" occurred in June 2009, a point which the plaintiffs have not disputed. *See* Contractor Defs.' Mot. at 5; Tr. at 16, 94.

The plaintiffs allege that McNeil subsequently misrepresented to the FDA that the third-party contractors were simply performing an audit in order to determine whether McNeil should initiate a formal recall. However, the FDA ultimately received a copy of the internal memo containing the instructions to the third-party contractors and confronted McNeil. Finally, on July 9, 2009, McNeil publicly recalled the affected Motrin IB. The "phantom recall" was ultimately a subject of the two hearings held before Congress in 2010. CAC ¶¶ 151–54.

The plaintiffs cite to additional recalls involving McNeil products spanning from the "phantom recall" in 2008 to a recall in December 2010. These recalls included, among others, a September 2009 recall of Tylenol products that had been contaminated with gram-negative bacteria. Prior to initiating the September 2009 recall, McNeil allegedly engaged third-party contractor Inmar, Inc., to conduct a "market assessment" to determine how much of the product remained on store shelves in July 2009. CAC ¶¶ 155–59.

In November and December of 2009, McNeil also recalled certain Tylenol pills manufactured at its Las Piedra, Puerto Rico facility. McNeil had received reports of musty, moldy odors emanating from said pills as early as 2008, but did not investigate for over a year. This recall was later expanded to other products, including Benadryl, Motrin, Rolaids, and other lots of Tylenol, in January, June, and July of 2010.[16] CAC ¶¶ 160–66.

[16]   The J & J Defendants recalled additional products after the April 30, 2010 recall. These recalls include: (1) an October 2010 recall of Tylenol caplets manufactured at McNeil's Fort Washington plant, due to musty odors; (2) a November 2010 recall of Benadryl tablets and Motrin caplets because of uncharacteristic consistencies and manufacturing problems; and (3) a December 2010 recall of Mylanta and AlternaGel liquid antacid because alcohol was not disclosed as an active ingredient on the packaging. CAC ¶¶ 184–91.

In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

4. *Allegations Regarding Individual Defendants*
 **\*6** The plaintiffs allege that certain individuals employed as executives and board members at J & J and McNeil were integrally involved in this conspiracy to conceal quality control issues.

For instance, the plaintiffs allege that William C. Weldon, the Chairman and CEO of J & J, had personal knowledge of the conditions at J & J's manufacturing facilities, including the Fort Washington facility. In addition, Mr. Weldon was "integrally involved in and responsible for" the decisions that led to deteriorating quality control at J & J. CAC ¶ 55. Apart from these general averments, the plaintiffs offer three specific allegations about Mr. Weldon. First, Mr. Weldon made significant cuts to J & J's "corporate compliance group" in 2007. Second, in the wake of several recalls in 2010, Mr. Weldon announced: "This is not a systemic problem at J & J." CAC ¶ 141. Approximately one week after this announcement, however, J & J issued two additional recalls. Finally, when testifying before Congress on September 30, 2010, Mr. Weldon admitted that McNeil had secretly performed a "phantom recall" of defective Motrin products, and admitted "McNeil should have handled things differently." Mr. Weldon also acknowledged that J & J had let the public down by not maintaining high quality standards, and accepted full responsibility. CAC ¶¶ 137, 141–42, 222–23.

The plaintiffs make the same general allegations of personal knowledge and involvement regarding Colleen Goggins, the former Worldwide Chairman of the J & J Consumer Health Segment, and Peter Luther, the President of McNeil. Apart from the general allegations noted above, the plaintiffs also aver that Colleen Goggins testified before Congress on May 27, 2010, and admitted that J & J and McNeil had "not lived up to [their] responsibility" in light of the April 30, 2010, recall. Ms. Goggins allegedly tried to minimize the severity of the recall, however, by claiming that there were no health risks related to the use of the recalled products. CAC ¶¶ 215–17.

With respect to Mr. Luther, the plaintiffs aver that the FDA met with senior J & J and McNeil officials on February 19, 2010, to discuss their concerns regarding J & J and McNeil's conduct. Mr. Luther was allegedly present at this meeting, and was therefore put on notice of the FDA's concerns. At the meeting, the FDA specifically raised its concerns about quality control issues, and the J & J Defendants' failure to report material information to the FDA in a timely manner. CAC ¶¶ 196, 198–200.

The plaintiffs also assert the same general allegations of personal knowledge and integral involvement against Rosemary Crane, a former Company Group Chairman at J & J, as well as Mary Sue Coleman, Ph.D.; Michael M.E. Johns, M.D.; Susan L. Lindquist, Ph.D.; and David Satcher, M.D., Ph.D., each of whom serves or served on the Board of Directors of J & J. No specific allegations regarding any of these defendants appear in the CAC. CAC ¶¶ 57, 59–62.

C. *Claims Asserted in the CAC*
 **\*7** Based on the foregoing allegations, the plaintiffs claim that they have paid inflated prices for McNeil products and have not been fully compensated. The plaintiffs do not claim that they suffered any physical injury; instead, their claims are based entirely on economic injuries. The allegations of specific economic injury pertaining to the named plaintiffs, however, are sparse. The plaintiffs do not allege which particular Subject Products or Recalled Subject Products they purchased. The plaintiffs also do not allege that they availed themselves of any refund offers, and were inadequately compensated thereby. Instead, the CAC sets forth identical allegations with respect to each of the twenty-seven named plaintiffs, as follows:

> [Name] is an individual and resident of [state] who, during the relevant time period, purchased a number of Subject Products, including some Recalled Subject Products. As a result, [Name], like other members of the Class (and/or possible Sub–Class of [State] consumers only), suffered damages from the unlawful scheme and conspiracy, and the concealment of the same by Defendants, which damages result from his out of pocket payments for Subject Products which were unsafe at the time of sale, were not of the same quality and condition as represented at the time of sale, and are now worthless as medicines. [Name] has not been reimbursed fully

for his out-of-pocket payments for Subject Products.

CAC ¶¶ 28–52.

The plaintiffs have named as defendants McNeil and J & J, as well as individual defendants William C. Weldon, Colleen Goggins, Rosemary Crane, Peter Luther, Mary Sue Coleman, Michael M.E. Johns, Susan L. Lindquist, and David Satcher (collectively, the "J & J Defendants"). The plaintiffs have also named as defendants the entities alleged to have performed "market assessments" and the "phantom recall": Inmar, Inc. and its subsidiaries, Carolina Supply Chain Services, LLC ("CSCS"), Carolina Logistics Services, LLC ("CLS"), as well as WIS International (collectively, the "Contractor Defendants").

Against all defendants, the plaintiffs assert claims for: violations of the consumer fraud laws of sixteen states (Count I);[17] violations of RICO (Count II); violations of the Magnuson–Moss Warranty Act (Count III); Negligence (Count VII); Negligent Misrepresentation/Fraud (Count VIII); Conspiracy, Concert of Action and Aiding and Abetting (Count IX); Unjust Enrichment (Count X); and Declaratory Relief (Count XI). Against the J & J Defendants, the plaintiffs also assert claims for Strict Products Liability—Manufacturing Defect (Count IV); Strict Products Liability—Failure to Warn (Count V); and Breach of Implied Warranties (Count VI).

[17]    The named plaintiffs represent a total of sixteen different states. If this case proceeds, the plaintiffs also intend to assert claims under all fifty states' consumer fraud laws.

## II. *Procedural Background*
This action represents a consolidation of individual cases filed in various courts throughout the country. On May 12, 2010, the case *Haviland v. McNeil Consumer Healthcare,* Civil No. 10–2195, was filed in this Court, asserting economic injuries against J & J and McNeil in light of the April 30, 2010, recall. Eight additional cases, also arising out of the April 30, 2010, recall, were filed in other courts, including the Northern District of Illinois and the Central District of California.[18] Each case asserted claims for economic injury only, with the exception of *Rivera v. Johnson & Johnson,* which also asserted claims for physical injury. On October 8,

2010, the Judicial Panel on Multidistrict Litigation transferred the above-referenced cases to this Court, where they and all future "tag-alongs" were consolidated into an MDL. Since that time, two "tag-along" cases have been transferred to this Court.[19]

[18]    Those cases include: *Roberson v. McNeil Consumer Healthcare,* Civil No. 10–5560 (N.D.Ill.); *Rivera v. Johnson & Johnson,* Civil No. 10–5579 (C.D.Cal.); *Nguyen v. McNeil Consumer Healthcare,* Civil No. 10–5580 (N.D.Ill); *Michaud v. McNeil Consumer Healthcare,* Civil No. 10–5587 (N.D.Ill.); *Smith v. McNeil Consumer Healthare,* Civil No. 10–5654 (N.D.Ill); *Burrell v. McNeil Consumer Healthcare,* Civil No. 10–5656 (N.D.Ill.); and *DeGroot v. McNeil Consumer Healthcare,* Civil No. 10–5657 (N.D.Ill.).

[19]    Specifically, *Coleman v. McNeil Consumer Healthcare,* Civil No. 10–6905 (S.D.Ohio) and *Harvey v. Johnson & Johnson,* Civil No. 11–2363 (E.D.Mo), were transferred to this Court. The CAC also added additional plaintiffs not included in the above cases.

**\*8**  The Court held an initial status conference with counsel on December 13, 2010. A consolidated amended complaint was filed on January 12, 2011, which named as additional defendants the Contractor Defendants. The plaintiffs also widened the scope of their claims to include events both before and after the April 30, 2010, recall.[20] Both groups of defendants filed motions to dismiss the CAC in its entirety on April 1, 2011. The plaintiffs filed an omnibus opposition on May 13, 2011. Both groups of defendants filed reply briefs on June 9, 2011. The Court held oral argument on June 29, 2011. The Court will now grant the motions to dismiss.

[20]    All claims for physical injury were omitted from the CAC. The plaintiffs seek damages for economic injury only.

## III. *Analysis of the Motions to Dismiss*
As a threshold matter, both groups of defendants argue that the named plaintiffs lack standing under Article III of the United States Constitution, and all of their claims must therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).[21]

In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

21     The defendants have also moved to dismiss the CAC on other grounds, including failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Specifically, the defendants argue that the named plaintiffs lack standing because they have not established any injury-in-fact. Although the plaintiffs allege in a conclusory fashion that they have not been fully reimbursed for their out-of-pocket expenses for the products in question, they do not allege what specific harm that they have suffered. With respect to the broad category of Subject Products, for instance, the plaintiffs allege only that the products suffered from "serious problems." The plaintiffs do not aver specifically what those problems were or how they were injured therefrom. As for the subset of products that were recalled after the April 30, 2010, FDA report (the Recalled Subject Products), the plaintiffs identify only hypothetical deficiencies with the refund offer, based on the experiences of non-plaintiffs. The defendants argue that there are no allegations that any named plaintiff attempted to but was unable to obtain a refund, or received a refund that was otherwise inadequate.

The Contractor Defendants additionally argue that the plaintiffs lack standing because they cannot show that the Contractor Defendants' conduct caused any injury to the plaintiffs. In particular, the Contractor Defendants are not alleged to have manufactured, distributed or promoted any Subject Products. Instead, the only allegations with respect to the Contractor Defendants are that they participated in the removal of Motrin IB from store shelves. According to the Contractor Defendants, the plaintiffs have not shown how this conduct led to any economic injuries.

The Court will begin its analysis with the threshold issue of Article III standing.

    A. *Article III Standing*
The doctrine of standing derives from Article III of the United States Constitution, which limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The "irreducible constitutional minimum" of standing requires that a plaintiff establish three elements in order to invoke federal jurisdiction. First, the plaintiff must have suffered an injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent. Second, the plaintiff must establish a causal connection between the injury and the conduct complained of. Third, the plaintiff must establish that it is

likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (U.S.1992) (citations omitted).

**\*9** Standing is ordinarily a threshold issue for any case. To that end, "a plaintiff must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The requirement that a named plaintiff have standing applies equally in the context of class actions. Therefore, "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). If no named plaintiffs establish standing, none may seek relief on behalf of other members of the class. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).[22]

22     A plaintiff must also establish standing on a claim-by-claim basis. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The Court need not conduct a claim-by-claim standing analysis at this time, however, because it concludes that the same pleading deficiencies plague each of the plaintiffs' claims. *See Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 139 n. 5 (3d Cir.2009).

The Court will begin by addressing the injury-in-fact prong, which constitutes the main dispute in this action. The Court will then turn to the causation prong, which the Contractor Defendants contend has not been satisfied. Neither group of defendants has addressed the third element of redressability.

    1. *Injury–in–Fact*
An injury-in-fact must be "distinct and palpable," not "abstract or conjectural or hypothetical." *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir.2005) (citations omitted). The injury must be particularized, which means that the injury must affect the plaintiff "in a personal and individual way." *Lujan,* 504 U.S. at 561 n. 1. This requirement ensures that a litigant has a personal stake in the litigation. *Danvers Motor Co.,* 432 F.3d at 291. Although injury-in-fact cannot be reduced to a simple formula, economic injury is a "paradigmatic" form of injury-in-fact, and a claim for damages generally supports standing. *Id.*

In addition, the injury-in-fact requirement is "very generous," requiring only that a plaintiff allege "some specific, 'identifiable trifle' of injury." *Danvers Motor Co.,* 432 F.3d at 294 (citations omitted). To survive a motion to dismiss for lack of standing, therefore, the plaintiffs must plead that they suffered some concrete form of harm. *Id.* at 292.

For purposes of this memorandum, the Court will analyze separately the broader category of Subject Products and the narrower category of Recalled Subject Products. This analytical structure corresponds with the allegations in the CAC, which distinguish between Subject Products and Recalled Subject Products and offer different factual averments with respect to each category.

    a. *Subject Products*
The Court concludes that the plaintiffs have not established injury-in-fact with respect to the Subject Products, because the CAC does not permit the Court to discern what, if any, harm the named plaintiffs have suffered. As an initial matter, the CAC is deficient insofar as the plaintiffs do not allege which particular products they purchased. Instead, each named plaintiff alleges that he or she "purchased Subject Products including some Recalled Subject Products." CAC ¶¶ 28–52. The Subject Products category, in turn, encompasses, "at a minimum," a list containing twenty-one different products, and at least seventy-four types of said products. At no point in the CAC do the plaintiffs identify a single product that they purchased from this large and indefinite list.

 **\*10** In addition, the plaintiffs do not allege how the unspecified Subject Products they purchased were defective.[23] Instead, the plaintiffs allege only that each Subject Product suffered from "serious problems." CAC ¶ 4. The "serious problems" are not elaborated upon, and could therefore reference any of the allegations in the CAC that the Court described in Part I of this memorandum. For instance, it is possible that the serious problems include the dissolution issues that affected certain lots of Motrin IB, which prompted a "phantom recall" and a subsequent public recall in July 2009. It is also possible that the serious problems include the numerous FDA warnings and recalls to which the plaintiffs cite in the CAC, or simply the general allegations of deteriorating quality control at J & J. Notably, several of the products that appear on the "Subject Products" list are not even alleged to have been recalled or subject to any FDA citations. Because the plaintiffs do not identify which

products were purchased, it is impossible to match the many incidents outlined in the CAC with the specific drugs that fall under the Subject Products category.

23    As noted, the Court will analyze separately the subset of Subject Products that were recalled after the April 30, 2010, FDA report (the Recalled Subject Products).

Even assuming that the "serious problems" identified above encompass the allegations of specific product recalls and FDA citations, the plaintiffs fail to allege any personal harm arising therefrom. This deficiency follows from the plaintiffs' failure to allege which particular products they purchased. For instance, the plaintiffs make numerous allegations about the "phantom recall" and the subsequent public recall of Motrin IB. The plaintiffs do not, however, allege that they purchased the affected lots of Motrin IB and were not made whole. The same logic applies to all of the remaining allegations in the CAC: the plaintiffs cite to approximately eleven recalls apart from the April 30, 2010, recall, and a handful of FDA reports, but do not allege how they were harmed by any of these incidents. Instead, the plaintiffs only allege, in general terms, that they "suffered damage" as a result of their "out of pocket payments for Subject Products" that were unsafe and not as represented, and that they have "not been reimbursed fully" for their out-of-pocket payments. CAC ¶¶ 28–52.

In view of these deficiencies, the Court concludes that the plaintiffs have not established injury-in-fact with respect to claims involving the Subject Products. Even if the Court were to read the allegations of "serious problems" generously, and assume that the plaintiffs have identified problems affecting certain Subject Products, the plaintiffs have not alleged that they, rather than non-plaintiff members of the class, have suffered injury as a result of said problems. Under Supreme Court case law, named plaintiffs must establish that they themselves have suffered injury. *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In the absence of particularized harm, the plaintiffs' injuries are abstract and hypothetical, rather than distinct and palpable. *See Danvers Motor Co.,* 432 F.3d at 291. Conclusory allegations that the plaintiffs have "not been reimbursed" are insufficient to show an invasion of a legally protected interest. *See id.* at 290–91.

 **\*11** The Court's analysis is consistent with the case law cited by the parties. For instance, the defendants cite to *Rivera v. Wyeth–Averst Laboratories,* 283 F.3d 315 (5th Cir.2002). In *Rivera,* the Fifth Circuit dismissed the claims of a putative

In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

class action brought against Wyeth, which sought damages for economic injuries arising out of a defective drug that caused liver failure in some patients. The Fifth Circuit concluded that the named plaintiffs had not established injury-in-fact, because the plaintiffs had failed to allege that the drugs were somehow defective as to them, or otherwise caused them specific injury. The plaintiffs' conclusory allegations of "economic injury" were never defined or elaborated upon. The Fifth Circuit explained that the plaintiffs could not prevail by establishing that Wyeth violated a legal duty owed to other consumers; instead, the injury must be personal. *Rivera,* 283 F.3d at 319–20.

Similarly, the defendants cite to *Whitson v. Bumbo,* 2009 U.S. Dist. LEXIS 32282, 2009 WL 1515597 (N.D.Cal. Apr. 15, 2009). In *Whitson,* the plaintiff brought a putative class action for economic injuries arising out of defective baby seats, which had caused injuries to non-plaintiff children. The plaintiff asserted economic injury based on an overpayment theory, as in the present case. The *Whitson* court concluded that the plaintiff lacked Article III standing, because she had not alleged that her own product manifested any defect or that she had suffered any specific injury. Instead, the only allegations of injury were "entirely conclusory statements" that the plaintiff "did not receive the benefit of [her] bargain," without elaboration as to how. The *Whitson* court held that the plaintiff could not rely on the injuries of non-parties to establish standing. *Whitson,* 2009 U.S. Dist. LEXIS at *15–18 & n. 4, 2009 WL 1515597.

These cases are consistent with the Court's reasoning in the present action. As in *Rivera* and *Whitson,* the plaintiffs in this case have not alleged that the Subject Products were defective as to them, or that the plaintiffs were otherwise injured. The plaintiffs assert in conclusory terms that they suffered out-of-pocket expenses and were not made whole, but do not make any specific allegations as to how. Therefore, their allegations of injury are based on harm that occurred to non-plaintiff third parties.

Finally, the plaintiffs were unable to cure their deficient allegations either in their opposition brief or at oral argument. The plaintiffs devote the majority of their opposition to arguing that they have standing with respect to the Recalled Subject Products. With respect to the broader category of Subject Products, which were afflicted by "serious problems," the plaintiffs echo the allegations from the CAC and contend that the products were "filthy, adulterated, contaminated and

sub-standard." Pls.' Opp'n at 5. On this basis, the plaintiffs argue:

> Plaintiffs' allegations of purchase of the J & J Defendants' "Subject Products" alone are sufficient to prove that they have suffered an injury in fact. Plaintiffs and the Class suffered actual economic loss via out-of-pocket payments for Subject Products which were not of the same quality and condition as represented at the time of sale and some of which were unsafe.

**\*12** Pls.' Opp'n at 15. As discussed above, such conclusory allegations cannot establish injury-in-fact. The Court will therefore dismiss the claims pertaining to the Subject Products for lack of standing.

  b. *Recalled Subject Products*
The plaintiffs' allegations are somewhat more detailed with respect to the Recalled Subject Products. In contrast to the general allegations of "serious problems" pertaining to the Subject Products, the plaintiffs allege tangible defects affecting the Recalled Subject Products. Specifically, the plaintiffs allege that all Recalled Subject Products manifested a defect in at least one of two respects: (1) they suffered from the problems identified in the April 30, 2010, FDA report; and/or (2) consumers were urged to stop using and dispose of the products as part of the recall announcement, thereby rendering the products useless. In addition, the plaintiffs allege specific deficiencies in the J & J Defendants' refund offer in an attempt to establish injury.

Notwithstanding these allegations, the Court concludes that the plaintiffs have failed to establish injury-in-fact with respect to the Recalled Subject Products. Although the Third Circuit has described the injury-in-fact requirement as "very generous," a plaintiff must still allege some form of specific injury, even if small, in order to survive a motion to dismiss for lack of standing. *See Danvers Motor Co.,* 432 F.3d at 292, 294. The plaintiffs do not meet this burden. First, as with the Subject Products, the plaintiffs do not identify which products they purchased, and instead allege that they "purchased Subject Products including some Recalled Subject Products." CAC ¶¶ 28–52. More fundamentally, however, the plaintiffs

In re McNeil Consumer Healthcare, Marketing and Sales... Not Reported in...
2011 WL 2802854

do not allege individualized injuries, but instead rely entirely on injuries suffered by non-plaintiff class members.

In order to establish injury, the plaintiffs allege a number of deficiencies in the J & J Defendants' refund offer. As described at length in Part I of this memorandum, the plaintiffs aver that: (1) the recall announcement was delayed, so as to minimize consumer awareness; (2) the J & J Defendants pushed "worthless" coupons over cash refunds; (3) consumers were required to furnish difficult-to-obtain information in order to obtain refunds, notwithstanding the J & J Defendants' instructions to dispose of unused products; and (4) cash refunds, when received, were inadequate and did not cover applicable taxes or disposal costs. As a consequence, the plaintiffs were not fully compensated for the Recalled Subject Products.

Further, in order to particularize these general allegations, the plaintiffs cite to the experiences of various non-plaintiff consumers. Two such individuals posted comments on the J & J Defendants' recall blog. As described above, a non-plaintiff named Evan D. Owen expressed his frustration both that the J & J Defendants delayed their recall announcement until the evening, and that the telephone lines were operated by "coupon issuers." A man named "Aaron L.," by contrast, complained about the amount of his cash refund.

*13 The plaintiffs also make several allegations with respect to unidentified class members. With regard to the "worthless" coupons, the plaintiffs allege that "[s]ome members of the Consumer class in this case received such worthless coupons." CAC ¶ 16. In addition, with respect to the cash refunds, the plaintiffs allege that "[s]uch refunds were not offered to all consumers in the Class." *Id.* ¶ 18.

None of these allegations are particularized to the named plaintiffs. For instance, although the plaintiffs allege that the recall announcement was delayed, no named plaintiff alleges that he or she was unaware of the recall as a consequence. Similarly, the plaintiffs allege that the defendants pushed "worthless" coupons over cash, but no named plaintiff alleges that he or she has received such a coupon; instead, the CAC alleges that "[s]ome members of the Consumer class" did. The same pleading deficiencies plague the allegations regarding cash refunds. The plaintiffs allege that cash refunds were contingent on strict eligibility criteria and did not fully compensate consumers for taxes and disposal costs. No named plaintiff, however, alleges that he or she attempted

to obtain a cash refund, and was either denied a refund or received a refund that was inadequate.

The plaintiffs have also failed to inject greater specificity into their allegations by way of their opposition brief or oral argument. Instead, the plaintiffs have repeated the same allegations that appear in the CAC. [24] Apart from general arguments about "class members," the only particular individuals whom the plaintiffs referenced in their opposition brief or at oral argument are the same two non-plaintiff consumers who posted on the J & J Defendants' recall blog. As a consequence, the plaintiffs have failed to establish that a single named plaintiff suffered any of the many injuries identified by the plaintiffs. [25]

[24]   In summary, the plaintiffs devote several pages to arguing that the recall announcement was deliberately delayed; that the J & J Defendants pushed coupons over cash; and that the criteria for obtaining coupons or cash refunds were vague and undefined. Pls.' Opp'n at 7–11.

[25]   On this point, the parties dispute the applicability of *In re Ford Motor Company Ignition Switch Products Liability Litigation,* 2001 WL 1266317 (D.N.J. Sept.30, 1997). In *Ford Motor,* the plaintiffs owned vehicles that were subject to a recall due to a potentially defective ignition switch. The plaintiffs, whose own vehicles had not manifested the defect, sued for economic damages. The Court dismissed the claims of those particular plaintiffs, noting that they had failed to allege any injury that might require compensation apart from the defendants' offer to replace the ignition switches. *Ford Motor,* 2011 WL at *5. To the extent that *Ford Motor* is relevant to this case, it is consistent with the Court's analysis. *Ford Motor* is illustrative of the requirement that plaintiffs allege some form of particularized injury. As in *Ford Motor,* the plaintiffs in this case have failed to show how they were inadequately compensated, either by the J & J Defendants' refund offer or otherwise.

The plaintiffs also argue that the mere purchase of the Recalled Subject Products, in and of itself, is sufficient to establish injury-in-fact. Specifically, the plaintiffs contend that their economic losses arose at the moment the J & J Defendants recalled the products in question and advised consumers not to use them. In support of this

argument, the plaintiffs rely on *American Federation of State County and Municipal Employees v. Ortho–McNeil–Janssen Pharmaceuticals, Inc.,* 2010 WL 891150 (E.D.Pa. Mar.11, 2010). In *American Federation,* the issue was whether plaintiffs had standing based on their purchase of fentanyl patches, all of which were recalled and had to be disposed of, but only some of which manifested the defect in question. *Id.* at *3. The Court concluded that the plaintiffs, who were health and welfare trust funds that had purchased the fentanyl patches for their members, had standing regardless of whether the defect manifested itself. The plaintiffs had standing because they "paid or will pay expenses related to the purchase of and reimbursement of ... fentanyl patches that had to be discarded." *Id.* at *4. The plaintiffs argue that in this case, they too "have paid or will pay expenses related to the purchase and replacement of Recalled Subject Products." Pls.' Opp'n at 18.

*\*14* The Court finds *American Federation* to be distinguishable from the present case. A reading of the case reveals that the claims in *American Federation* were based on more particularized allegations of harm than exist here. First, the plaintiffs were able to identify the precise products they had purchased: fentanyl patches in specific dosages. Second, the plaintiffs were able to identify the precise harm they had suffered or would suffer: reimbursement and repurchase expenses for the patches that were procured for members, and which had to be discarded. Third and finally, it does not appear that any refund program was established in *American Federation* by which the plaintiffs could have been made whole.

In the present case, by contrast, the plaintiffs do not identify which products they purchased, nor do they allege the precise manner in which they have been harmed. No plaintiff has alleged, for instance, that he has paid or will pay costs to replace a product that had to be discarded. Finally, no plaintiff alleges that any harm arising from the recall was not, or could not be, adequately resolved by the refund offer.[26]

[26]    The fact that the defendants offered a refund may not, in and of itself, defeat standing. Nonetheless, the plaintiffs must still show that the remedy offered by the defendants was somehow inadequate as to them. The plaintiffs' own case law makes this clear. *See, e.g., In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.,* 588 F.Supp.2d 1111, 1116 (C.D.Cal.2008) (holding plaintiffs' claims were not preempted by defendants' voluntary product

replacement program, provided plaintiffs could "prove that the voluntary remedy offered by the defendant was inadequate").

Additional cases cited by the defendants further undermine the plaintiffs' argument that the purchase of Recalled Subject Products alone establishes injury-in-fact. Specifically, these cases emphasize the importance of each named plaintiff's particular circumstances to the standing inquiry. For instance, several courts have held that individuals who consume defective products cannot sue for economic damages unless the products failed to work as intended. In the *Rivera* case discussed above, for example, the Fifth Circuit held that those plaintiffs who had consumed an allegedly defective drug could not establish economic injury, because the plaintiffs had not alleged that the products had been ineffective as to them; therefore, they received the benefit of the bargain. *Rivera,* 283 F.3d at 320.

Similarly, in *Myers–Armstrong v. Actavis Totowa, LLC,* 2009 WL 1082026 (N.D.Cal. April 22, 2009), a plaintiff sued for economic damages after consuming a product that was recalled due to contamination in the manufacturing process. The *Myers–Armstrong* court concluded that the plaintiff lacked standing because she had consumed the pills and obtained their benefit with no downside. The plaintiff was therefore in a different position from a consumer who had purchased but not consumed the defective product. *Myers–Armstrong,* 2009 WL at *4.

*Rivera* and *Myers–Armstrong* are not binding on this Court. Nonetheless, these cases illustrate the weaknesses in the plaintiffs' argument. Specifically, the cases reveal that plaintiffs who have purchased Recalled Subject Products are not in a monolithic category. Instead, it is possible that the plaintiffs who purchased Recalled Subject Products could have, for instance: (1) consumed the products and received the benefit of the bargain; (2) disposed of the products and failed to avail themselves of the refund offer; (3) disposed of the products and obtained an inadequate refund; or (4) disposed of the products and were made whole. Any of these scenarios is plausible based on the vague allegations of the CAC, and each would result in a different standing analysis. The mere purchase of Recalled Subject Products, therefore, cannot be sufficient to establish injury-in-fact.

*\*15* In view of the plaintiffs' failure to establish injury-in-fact, the Court will dismiss their claims for lack of standing.[27] The dismissal will be without prejudice as to the

In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...

2011 WL 2802854

claims against the J & J Defendants.[28] All claims against the Contractor Defendants will be dismissed with prejudice, however, because the Court concludes that the plaintiffs are unable to establish the second requirement of standing, causation. The Court turns to the causation requirement below.

[27]    Because the Court will dismiss the CAC for lack of standing, it need not address the defendants' other bases for dismissal.

[28]    Although the Court will dismiss the claims against the J & J Defendants without prejudice, the Court notes that it considered dismissing with prejudice all claims against the individuals who serve or served on J & J's Board of Directors. The CAC is devoid of any specific allegations regarding these individuals. Indeed, apart from being named as defendants, these individuals are never again mentioned in the CAC. At oral argument, plaintiffs' counsel was unable to provide additional information regarding the director defendants. Tr. at 98–100. Out of an abundance of caution, the Court will permit the plaintiffs to amend their allegations against the director defendants. The Court alerts counsel, however, that it considers the claims to be dismissible, and will likely reach the same conclusion if the director defendants are named in the amended complaint, absent more specific allegations.

The Court also expects more specific allegations regarding the executive defendants, Mr. Weldon, Ms. Goggins, Ms. Crane, and Mr. Luther. Although the CAC contains some specific allegations regarding these defendants, they are sparse. At oral argument, plaintiffs' counsel explained that the plaintiffs could provide additional information upon amendment. Tr. at 99–101. The Court expects to see such allegations if the executives are named as defendants in the amended complaint.

  2. *Causation*

In addition to injury-in-fact, Article III standing requires a causal relationship between the injury and the conduct complained of. *Winer Family Trust v. Queen,* 503 F.3d 319, 325 (3d Cir.2007) (citations omitted). To satisfy this causation requirement, the plaintiffs must establish that the injuries in question "fairly can be traced to the challenged

action" of a particular defendant, rather than to the action of an independent third party. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 137–38 (3d Cir.2009). This requirement is not as demanding as the proximate causation required under tort law. Instead, an indirect causal relationship may suffice, so long as there is a "substantial likelihood" that the defendant's conduct caused the plaintiffs' harm. *Pub. Interest Research Grp. v. Powell Duffryn Terminals,* 913 F.2d 64, 72 (3d Cir.1990).

The Contractor Defendants argue that the plaintiffs cannot establish the requisite causation between their putative injuries and the particular actions of the Contractor Defendants.[29] Specifically, the sole allegations regarding the Contractor Defendants pertain to the market assessment and "phantom recall" of Motrin IB in 2009. According to the Contractor Defendants, the plaintiffs have failed to show how this "phantom recall" was causally related to the sweeping injuries alleged in the CAC.

[29]    The J & J Defendants have not raised the issue of causation.

By contrast, the plaintiffs argue that the Contractor Defendants caused the injuries in question because, by conducting a "phantom recall," the Contractor Defendants helped the J & J Defendants to "unlawfully conceal[ ] the fact that the Subject Products ... were substandard and defective." Pls.' Opp'n at 21. This fraudulent concealment, in turn, caused injury to consumers who continued to pay inflated prices for defective Motrin IB. *Id.* In addition, had the Contractor Defendants not participated in the "phantom recall," the J & J Defendants "would have been forced to publicly disclose the defective nature of their Subject Products and would have issued a broader recall." *Id.* at 23.

The Court agrees that the plaintiffs have failed to establish causation. Assuming, *arguendo,* that certain named plaintiffs purchased the affected lots of Motrin IB, for purposes of the causation inquiry, such plaintiffs could have been injured at two different times: (1) prior to the "phantom recall"; or (2) during and after the "phantom recall," insofar as certain defective lots of Motrin IB were not captured by the recall and remained on store shelves.

**\*16** With respect to those plaintiffs who purchased Motrin IB prior to the "phantom recall," there are no allegations that the Contractor Defendants had any pre-existing relationship

In re McNeil Consumer Healthcare, Marketing and Sales..., Not Reported in...
2011 WL 2802854

with the J & J Defendants or the products in question. The Contractor Defendants are not alleged to have participated in the manufacture, distribution, or marketing of the defective Motrin IB. Instead, based on the CAC, the Contractor Defendants first became involved with the J & J Defendants when they were engaged to conduct the "phantom recall" of Motrin IB. It follows, therefore, that any injuries that occurred prior to the "phantom recall" cannot be "fairly traced" to the Contractor Defendants' conduct. *See Toll Bros.,* 555 F.3d at 137–38.

The plaintiffs have also failed to establish causation with respect to any named plaintiffs who purchased affected Motrin IB during or after the "phantom recall." The plaintiffs rely on a theory of "but for" causation, and contend that the J & J Defendants would have been forced to conduct an earlier and more complete public recall, but for the Contractor Defendants' participation in the "phantom recall." This argument, however, finds no support in the CAC.

First, there are no allegations that the Contractor Defendants participated in, or had influence over, the decision to conduct a "phantom recall," or decisions regarding the scope of said recall. Second, the plaintiffs have not alleged that the Contractor Defendants had any knowledge of the specific defects affecting Motrin IB, such that they would have or should have refused to conduct a "phantom recall." Finally, even if the Contractor Defendants had refused to conduct a "phantom recall," there is no basis for assuming that the J & J Defendants would have been unable to find other contractors to conduct the recall, or that the J & J Defendants otherwise would have foregone a "phantom recall" in favor of a public recall. The plaintiffs' theory of causation, therefore, hinges on the Contractor Defendants' possessing a degree of influence over the J & J Defendants that is not plausible based on the limited allegations in the CAC. Instead, the plaintiffs' injuries appear to be based on conduct more appropriately attributed to the J & J Defendants alone.

Focusing on the specific conduct attributable to the Contractor Defendants, the Court is left with allegations that the Contractor Defendants removed allegedly defective Motrin IB from store shelves. It is not clear how the plaintiffs could have been harmed by the removal of products that they contend were defective. Instead, each purportedly defective unit of Motrin IB that was removed from store shelves became unavailable for purchase by a consumer. It does not logically follow that the plaintiffs could have been injured by these actions.

The causal relationship is even more tenuous with respect to Subject Products apart from Motrin IB. The plaintiffs rely on the same theory of "but for" causation, contending that:

> **\*17** "but for" Contractor Defendants' actions in coordinating with J & J Defendants to remove only select Subject Products from select retail outlets, J & J would have been forced to make a full-blown, public recall and to properly inform consumers that their Subject Products were unsafe and defective.

Pls.' Opp'n at 22. Once again, this argument is unsupported by any allegations in the CAC. The plaintiffs have alleged no connection between the Contractor Defendants and any of the Subject Products. As was the case with Motrin IB, the plaintiffs have not alleged that the Contractor Defendants were responsible for the production, distribution, or marketing of the Subject Products. Furthermore, the plaintiffs have not alleged that the 2009 "phantom recall" involved any products apart from Motrin IB. It is therefore unclear how the Contractor Defendants' participation in the "phantom recall" could have influenced the J & J Defendants' decisions with respect to other Subject Products. [30]

[30] The plaintiffs append to their opposition brief a series of email communications involving WIS International, and ask that the Court take judicial notice thereof. In the emails, WIS employees discuss the possibility of performing a "potentially larger recall" for J & J in July 2009 involving Children's Tylenol. The WIS personnel also stated that WIS and Inmar would be performing a market assessment to determine the quantities of Tylenol remaining on store shelves. *See* June 30, 2009, Emails Attached to Congressional Letter, App. A to Pls.' Opp'n. These emails do not affect the Court's analysis. First, the plaintiffs have been unable to show, in the CAC, their opposition brief, or at oral argument, that an additional "phantom recall" ever took place. Furthermore, there is no plausible connection between a "market assessment" and the plaintiffs' purported injuries. The plaintiffs do not

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 167 of 307
PageID: 9690
In re McNeil Consumer Healthcare, Marketing and Sales... Not Reported in...
2011 WL 2802854

define the term "market assessment," or explain in any fashion how the Contractor Defendants, as part of this market assessment, could have influenced the J & J Defendants with respect to recall decisions.

The plaintiffs' case law also fails to support their argument. The plaintiffs cite to *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), in support of their "but for" theory of causation. In *Bennett,* the Fish and Wildlife Service (the "Service") issued an advisory "biological opinion," recommending that a federal bureau implement certain changes to avoid jeopardizing endangered species. The plaintiffs, who claimed injury based on these recommendations, brought suit against the Service after the bureau stated its intent to comply. The Supreme Court concluded that the plaintiffs' injuries were "fairly traceable" to the Service, because the Service's advisory opinion exerted a "powerful coercive effect" on the bureau that was "virtually determinative"; furthermore, the changes likely would not have been made absent the opinion. *Bennett,* 520 U.S. at 169–71. The plaintiffs contend that the Contractor Defendants exerted a similar coercive effect over the J & J Defendants in this case.

The Court disagrees that *Bennett* is applicable to this case, because the plaintiffs have failed to show that the Contractor Defendants exerted any influence over the J & J Defendants. In contrast, it appears that the J & J Defendants provided all direction to the Contractor Defendants with respect to their limited conduct. In the absence of any coercive relationship, *Bennett* cannot support the plaintiffs' claims.

Based on the foregoing, the Court concludes that the plaintiffs have failed to establish that their purported injuries are "fairly traceable" to the Contractor Defendants' conduct. The Court will therefore dismiss all claims against the Contractor Defendants for lack of standing. The dismissal will be with prejudice, because the Court concludes that the plaintiffs would be unable to establish causation upon amendment.

Specifically, at oral argument, the plaintiffs were unable to articulate any additional allegations that could be made against the Contractor Defendants. Although the plaintiffs expressed their belief that the scope of the Contractor Defendants' conduct extended beyond the "phantom recall," they lacked information in support of this claim. Tr. 36–37. Instead, the plaintiffs repeated allegations from the CAC that the Contractor Defendants undertook a second market assessment involving Children's Tylenol sometime around

July 2009, after the "phantom recall" of Motrin IB.[31] The plaintiffs suspect that, as part of this market assessment, the Contractor Defendants made certain recommendations to the J & J Defendants regarding whether to recall Children's Tylenol. The J & J Defendants, in turn, waited to recall the product until April 30, 2010, presumably on the basis of these recommendations. Tr. 39–41; 60–61. According to the plaintiffs, this reveals the Contractor Defendants' participation in the J & J Defendants' scheme.

[31]    *See* CAC ¶¶ 155–59. As noted above, the plaintiffs also attached as Exhibit A to their opposition brief a series of email communications from WIS employees discussing a market assessment with respect to Children's Tylenol.

**\*18** At oral argument, the plaintiffs were unable to provide any factual basis for the above-described argument. Instead, plaintiffs' counsel conceded that the plaintiffs had "very-limited information," but expected to obtain additional information to support their arguments in the course of discovery. Tr. 60–61. The Court cannot permit amendment on this basis. Under the applicable pleading standards, the Court is required to assess factual allegations as they appear on the face of the complaint, not based on how claims might be shaped by the course of discovery. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To that end, the allegations in the CAC, and as elaborated upon at oral argument, cannot plausibly establish causation. In view of the Court's conclusion that the plaintiffs cannot cure these deficiencies with amendment, the Court will dismiss all claims against the Contractor Defendants with prejudice.

The Court's decision to dismiss the claims against the Contractor Defendants with prejudice is reinforced by the plaintiffs' failure to satisfy the Federal Rule 12(b)(6) pleading standard, as set forth in *Twombly* and *Iqbal.* As described above, the CAC contains few allegations regarding the Contractor Defendants' specific conduct. Notwithstanding these limited allegations, the plaintiffs assert eight substantive causes of action against the Contractor Defendants, based on sweeping and indefinite claims of injury. In the majority of the plaintiffs' substantive claims, however, the CAC fails to distinguish between the J & J and Contractor Defendants, instead lumping both groups together under the term "defendants."

In re McNeil Consumer Healthcare, Marketing and Sales... Not Reported in...

2011 WL 2802854

As a consequence of the plaintiffs' failure to distinguish among defendants, it is nearly impossible for the Court to discern the factual underpinning of each claim. Indeed, several claims are facially inapplicable to the Contractor Defendants. For instance, the plaintiffs assert a negligence claim against the Contractor Defendants, contending that "[d]efendants owed Plaintiffs a duty to exercise reasonable care in the designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling" of the Subject Products.[32] CAC ¶ 502. Nowhere have the plaintiffs alleged, however, that the Contractor Defendants were engaged in any of these enumerated activities.

[32]　　The Contractor Defendants purportedly breached this duty by: (1) failing to use due care in performing the above activities; (2) failing to provide adequate warnings on product labels and packaging; (3) failing to incorporate reasonable safeguards into the manufacture and design of the products; and (4) failing to investigate complaints. CAC ¶ 504.

In addition, many of the plaintiffs' substantive claims are based on allegations of misrepresentations or omissions.[33] Nowhere in the CAC, however, do the plaintiffs identify any statements made by the Contractor Defendants that could constitute misrepresentations. Instead, the plaintiffs group together all defendants, contending, for instance, that the "[d]efendants made representations that the Subject Products contained the ingredients, concentrations, components, quality and condition as is identified on the label and/or packaging that accompanied the Subject Products." CAC ¶ 512. These claims are deficient insofar as the plaintiffs have not alleged that the Contractor Defendants made, or were in a position to make, any such representations.

[33]　　For instance, the plaintiffs assert nearly identical allegations with respect to each of their claims under state consumer fraud statutes, based on "[d]efendants' untrue, deceptive, and misleading misrepresentations and non-disclosure of material facts relating to the safety, efficacy and cost effectiveness of the Subject Products." *See, e.g.,* CAC ¶ 273. The plaintiffs make similar allegations in connection with their common law fraud and negligent misrepresentation claims. *See* CAC ¶¶ 508–19.

**\*19** Several of the plaintiffs' claims, such as common law fraud, can also be satisfied based on allegations of fraudulent omissions, rather than misrepresentations. Such claims, however, generally require plaintiffs to allege, among other elements, a duty to disclose.[34] In this case, the plaintiffs have failed to allege that the Contractor Defendants owed any duty of disclosure towards the plaintiffs.

[34]　　The Court does not attempt to undertake a state-by-state survey to determine the applicable causes of action at this time. Instead, the Court notes for purposes of this discussion that a sample of the state laws at issue in this case require a duty of disclosure in the context of fraudulent omissions. *See, e.g., Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n,* 192 F.3d 250 (2d Cir.1999); *Goodman v. Kennedy,* 18 Cal.3d 335, 134 Cal.Rptr. 375, 556 P.2d 737 (Cal.1976).

To the extent that several of the plaintiffs' substantive claims are subject to heightened pleading under Rule 9(b), these pleading deficiencies become more acute.[35] The Court of Appeals for the Third Circuit has held that Rule 9(b) requires plaintiffs to allege "the who, what, when, where, and how" of the events at issue. *In re Rockefeller Ctr. Props. Sec. Litig.,* 311 F.3d 198 (3d Cir.2002). The conclusory allegations identified above, which often refer to the Contractor Defendants interchangeably with the J & J Defendants, lack the requisite specificity to satisfy this heightened pleading standard.

[35]　　The parties dispute the application of Rule 9(b) to the allegations in the CAC, particularly in connection with claims brought under state consumer fraud statutes. There is no dispute, however, that at a minimum, Rule 9(b) applies to the plaintiffs' RICO and common law fraud claims.

Finally, the plaintiffs' RICO claim against the Contractor Defendants is independently dismissible because the plaintiffs cannot establish continuity of the alleged racketeering activity. RICO's continuity requirement is both a "closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Closed-ended continuity exists when the series of predicate acts extends over a substantial period of time. *Id.* at 242. Open-ended continuity

might be present where, even though the predicate acts are close in time, the acts themselves pose a specific threat of indefinite repetition or are part of an ongoing entity's regular way of doing business. *Id.* at 242–43.

The alleged offenses involving the Contractor Defendants conceivably spanned from early 2009 to around July 2009. Specifically, the Contractor Defendants were engaged by the J & J Defendants sometime in early 2009 to perform a market assessment and "phantom recall" of Motrin IB. At the latest, this "phantom recall" was completed by June 2009. The plaintiffs allege that the second market assessment, which involved Children's Tylenol, occurred in July 2009. CAC ¶ 157. At most, therefore, the plaintiffs have alleged conduct spanning over the course of several months, which is insufficient to establish closed-ended continuity. *See Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 611 (3d Cir.1991) (holding that twelve months is not sufficient to establish a closed-ended scheme). As the Court has already concluded, the plaintiffs cannot establish a connection between these discrete events and the J & J Defendants' subsequent product recalls.

Further, there is nothing about these acts that involves an inherent threat of repetition or any indication that the alleged offenses are a regular way of doing business for the Contractor Defendants. Instead, the allegations suggest that the Contractor Defendants' work was a short-term project that came to an end. As a consequence, the plaintiffs have not established open-ended continuity, and therefore their RICO claim is not cognizable. *See H.J. Inc.,* 492 U.S. at 242–43.

IV. *Conclusion*

 **\*20**  For the foregoing reasons, the Court will dismiss the CAC in its entirety for lack of standing. The dismissal will be without prejudice as to the claims against the J & J Defendants, and the Court will permit the plaintiffs to file an amended complaint within thirty days of this Memorandum and Order. The claims against the Contractor Defendants, however, will be dismissed with prejudice.

An appropriate order shall issue separately.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2802854

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 20

## *Nazari v. Kohler Co.*

United States Court of Appeals for the Fifth Circuit

October 13, 2008, Filed

No. 07-50188

**Reporter**

2008 U.S. App. LEXIS 21531 *; 2008 WL 4542850

AFSANEH NAZARI; ET AL, Plaintiffs HOME DEPOT, U.S.A, INC., Defendant - Cross Claimant - Appellee v. KOHLER CO., Defendant - Cross Defendant - Appellant

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [*1] Appeal from the United States United States District Court for the Western District of Texas. USDC No. 1:05-CV-00924-SS.

**Disposition:** AFFIRMED.

**Counsel:** For HOME DEPOT USA INC, Defendant - Cross Claimant - Appellee: Arthur Kittredge Smith, Law Offices of Arthur K Smith, Allen, TX.

For KOHLER CO, Defendant - Cross Defendant - Appellant: Levon G Hovnatanian, Bruce Edwin Ramage, Martin, Disiere, Jefferson & Wisdom, Houston, TX; Mark Dyer, Mark Dyer, Martin,

Disiere, Jefferson & Wisdom, Dallas, TX.

**Judges:** Before GARZA and DENNIS, Circuit Judges, and MILLS, * District Judge.

## Opinion

PER CURIAM: **

Kohler Co. ("Kohler") appeals from the district court's grant of summary judgment to Home Depot, U.S.A., Inc. ("Home Depot") on its cross-claim for indemnification. The district court ruled that Kohler has a duty under Texas law to indemnify Home Depot for injuries to a third party caused by a shower door display manufactured by Kohler. At issue in this case is whether the [*2] shower door display was placed in the stream of commerce such that Kohler qualifies as its "manufacturer" and Home Depot as a "seller," thereby triggering a duty of indemnity under *Tex. Civ. Prac. & Rem. Code § 82.002(a)*. We conclude the statute requires Kohler to indemnify Home Depot and therefore AFFIRM the judgment of the district court.

## I. BACKGROUND FACTS

---

* Chief Judge of the Northern District of Mississippi, sitting by designation.

** Pursuant to **5TH CIR. R. 47.5**, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in **5TH CIR. R. 47.5.4**.

2008 U.S. App. LEXIS 21531, *2

Afsaneh Nazari was allegedly injured at a Home Depot store located in Austin, Texas when a shower door display shattered as she opened it. Kohler Co. ("Kohler") manufactured the display. Ms. Nazari and her husband, Asgar Nazari, filed suit against Kohler and Home Depot in the district court raising, *inter alia,* two products liability claims, one sounding in strict liability and the other in negligence. Home Depot filed a cross-claim against Kohler for indemnification under *Tex. Civ. Prac. & Rem. Code § 82.002.* [1] The Nazaris eventually settled their claims and Kohler and Home Depot filed cross motions for summary judgment on the indemnification claim. The district court granted summary judgment in favor of Home Depot concluding that it was entitled to indemnification and awarded Home Depot $ 34,613.39 in defense costs. Kohler filed **[*3]** a timely notice of appeal.

## II. STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment *de novo. Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 325, 122 Fed. Appx. 734 (5th Cir. 2004).* A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Hockman, 407 F.3d at 325.* In reviewing the evidence, the court must therefore "refrain from making credibility determinations or weighing the evidence." *Turner*

_____

[1] Home Depot also sought attorneys' fees under *Tex. Civ. Prac. & Rem. Code § 38.001* and contribution under *Tex. Civ. Prac. & Rem. Code § 32.002.* The district court granted summary judgment in favor of Kohler on these claims, holding that neither statute applied. Home Depot does not appeal from this part of the district court's ruling.

*v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007).*

## III. [*4] ANALYSIS

*Section 82.002(a) of the Texas Civil Practice and Remedies Code* provides:

> [A] manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission such as negligently modifying or altering the product, for which the seller is independently liable.

As the Texas Supreme Court recently explained, this statute "was designed to remedy the fundamental unfairness inherent in a scheme that holds an innocent seller liable for defective products manufactured by another by requiring the manufacturer to indemnify the seller unless the seller is independently liable for negligence, intentional misconduct, or any other act or omission." *Owens & Minor, Inc. v. Ansell Healthcare Prods., Inc., 251 S.W.3d 481, 487 (Tex. 2008).*

By its plain terms, *§ 82.002* applies only to sellers and manufacturers. "Seller" is defined as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." *Tex. Civ. Prac. & Rem. Code § 82.001(3).* **[*5]** "Manufacturer" is defined as "a person who is a designer . . . of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce." *Tex. Civ. Prac. & Rem. Code § 82.001(4).* The sole issue is whether Home Depot and Kohler acted within these definitions of "seller" and "manufacturer" in respect to the shower door display so as to trigger Home Depot's statutory right to indemnification.

Kohler's central argument is that the district court

2008 U.S. App. LEXIS 21531, *5

erred in holding that Home Depot was entitled to indemnification because neither party ever intended to sell the shower door display. Thus, Kohler argues the product never entered the stream of commerce and, concomitantly, Home Depot and Kohler do not meet the statute's definitions of "manufacturer" and "seller." Likening the display to a "sample" product, the district court rejected this argument, reasoning that "[b]ecause Home Depot and Kohler both supplied the door display to the public with the expectation of profiting from future sales of that product, each placed the door into the 'stream of commerce' as that term is defined in the context of a products liability action."

The Texas Supreme **[*6]** Court recently set forth the principles of statutory construction under Texas law:

> Our focus when construing a statute is the intent of the Legislature. To give effect to the Legislature's intent, we rely on the plain and common meaning of the statute's words. It is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent.

*Owens, 251 S.W.3d at 483* (internal citations and quotations omitted).

Because the statute does not define "stream of commerce," we must rely on other sources of authority to determine the meaning of that phrase. Under Texas law, "[i]n construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the common law or former statutory provisions, including laws on the same or similar subjects[.]" *Tex. Gov't Code § 311.023(4).* Accordingly, we presume "that the Legislature acted with knowledge of the common law and court decisions" when it enacted the statute. *See Phillips v. Beaber, 995 S.W.2d 655, 658 (Tex. 1999)* (citing *McBride v. Clayton, 140 Tex. 71, 166 S.W.2d 125, 128 (Tex. 1942)).*

Texas courts have never decided whether installing **[*7]** a display product for in-store use constitutes placing that product in the stream of commerce. Thus, we are required to predict the Texas Supreme Court's determination of this novel issue. *Morin v. Moore, 309 F.3d 316, 324 (5th Cir. 2002)* ("In making an Erie determination, we are emphatically not permitted to do merely what we think best; we must do that which the Texas Supreme Court would deem best.").

Texas courts generally focus on the foreseeability of the product's *use* by the consuming public, not on the product's availability for purchase. *See Davis v. Gibson Prods. Co., 505 S.W.2d 682, 691 (Tex. Civ. App. -- San Antonio 1973, writ ref'd n.r.e.)* (applying strict liability because it was "clearly foreseeable" that a shopper would handle a machete on display). For that reason, the Texas Supreme Court has recognized that a product need not be sold in order to enter the stream of commerce. *See Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 376 (Tex. 1978)*; *see also Davis v. Gibson Prods. Co., 505 S.W.2d 682, 691 (Tex. Civ. App. -- San Antonio 1973, writ ref'd n.r.e.)* ("[I]t is clear that continuation of the flow of commerce does not require transfers of possession."). Instead, **[*8]** the product need only "be released *in some manner* to the consuming public." *Id.* (emphasis added); *see also Thate v. Tex. & Pac. Ry. Co., 595 S.W.2d 591, 598 (Tex. Civ App. -- Dallas 1980, writ dism'd)* ("Channels of commerce implies that a product is placed for use by or sale to the consuming public.").

Indeed, Texas courts have held manufacturers strictly liable for (1) placing *sample* products into the stream of commerce, noting that "[o]ne who delivers an advertising sample to another with the expectation of profiting therefrom through future sales is in the same position as one who sells the product," *McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 792 (Tex. 1967)*; (2) placing *display* products intended for sale into the stream of commerce even if the customer ultimately does not purchase the item, *Davis, 505 S.W.2d at 689-92*;

and (3) bailments that accompany the sale of a good or service. *New Tex. Auto Auction Servs., L.P. v. Gomez De Hernandez, 249 S.W.3d 400, 403 (Tex. 2008)* (citing *Armstrong, 570 S.W.3d at 377*). Thus, because Kohler manufactured -- and Home Depot exhibited -- the shower door display to be used by the consuming public for the commercial purpose of profiting **[*9]** from future sales of that very product, Kohler and Home Depot entered the shower door display into the stream of commerce sufficient to satisfy the respective definitions of manufacture and seller under the statute. This interpretation accords with the general purpose of the indemnification statute, *i.e.,* to avoid holding an innocent seller liable for a defective product manufactured by another. *Owens, 251 S.W.3d at 487*. Accordingly, the district court correctly determined that Home Depot is entitled to indemnification.

Kohler argues the Texas Supreme Court's decision in *Armstrong* requires a different result. In *Armstrong,* the decedent-employee was killed while driving a tractor-trailer in order to test tires manufactured by *Armstrong Rubber Co. 570 S.W.2d at 375*. As the employee drove the tractor-trailer, a defective tire blew and caused the vehicle to crash, killing the employee. *Id.* The employee worked for a contractor retained by Armstrong to test its tires, meaning the tires came directly from Armstrong. *Id.* Thus, the defective tire was new when received at the testing facility and had never previously been sold, although it "was of the same quality as tires manufactured by Armstrong **[*10]** and sold across the nation." *Id.* The employee's family filed suit, alleging Armstrong was strictly liable as the seller of a defective product. *See id. at 375-76*.

To determine liability, the Texas Supreme Court focused on whether the seller was "engaged in the business of selling products for use or consumption." *Id.* (citing *Restatement (Second) of Torts § 402A cmt. f* (1965)). The court first noted that "[a]lthough phrased in terms of sellers, it is not necessary that the defendant actually sell the product, but only that he be engaged in the business of introducing the product into channels of commerce." *Id.* The court concluded that Armstrong was not strictly liable because the tire was provided solely for the purpose of testing -- also, the accident occurred in a laboratory -- and thus, the tire "was never sold and, more importantly, never entered the stream of commerce." *Id. at 376*. The court recognized that tires of the same design and manufacture were "regularly sold by [the manufacturer] in regular channels of commerce," but concluded that the actual product causing the injury must somehow enter the stream of commerce and although it need not be sold, it "must be released in some **[*11]** manner to the consuming public." *Id.* In analyzing several out-of-state decisions in which strict liability was extended to bailments, the court distinguished those cases on the ground that each case concerned a bailment accompanying the sale of a good or service and thus, the product was placed into the stream of commerce. *Id. at 377*.

Unlike *Armstrong,* the instant case involves an allegedly defective product that was actually "released in some manner to the consuming public." The shower door display was intended for consumer use and did, in fact, reach the consuming public, albeit not through a sale. Indeed, the Texas Supreme Court recognized in *Armstrong* that a product need not be sold in order to enter the stream of commerce. Here, as the district court correctly recognized, Kohler manufactured -- and Home Depot displayed -- the shower door display with the expectation that it would be presented to the consuming public for the commercial purpose of profiting from future sales of that same product. This case therefore stands in contrast to *Armstrong,* where the manufacturer merely provided the defective product to its own contractor for testing.

Kohler also relies on *Culton v. Saks, Inc., Case No. H-04-3001, 2006 U.S. Dist. LEXIS 68923, 2006 WL 2729408 (S.D. Tex. Sept. 25, 2006),* **[*12]** in which the plaintiff was injured while riding an escalator at Saks Fifth Avenue ("Saks"). *2006 U.S. Dist. LEXIS*

2008 U.S. App. LEXIS 21531, *12

_68923, at *1_. The plaintiff filed suit, alleging Saks and Montgomery Kone to be liable as the respective operator and manufacturer of the escalator. _Id._ Saks sought indemnification under _Section 82.002_. The district court rejected Saks's claim for indemnification, reasoning that Saks does not engage in the business of releasing either its interest in or its control of the escalator to the consuming public. _2006 U.S. Dist. LEXIS 68923, at *8_. Instead, according to the district court, the fact that customers ride the escalator establishes only that it is an "incidental component of a larger business enterprise" and that, if anything, Saks is the consumer of the escalator, not the seller. _Id._ _Culton_ is inapposite here because the shower door display was presented for examination to customers and was certainly not an incidental component of a larger business enterprise. Instead, as the district court noted, the display was "intimately connected with the business of selling shower doors."

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to Home Depot on its indemnification claim.

AFFIRMED.

---

**End of Document**

# Tab 21

## *Ortiz v. McNeil-PPC, Inc.*

United States District Court for the Southern District of California

March 6, 2009, Decided; March 6, 2009, Filed

CASE NO. 07cv678-MMA(CAB); 08cv536-MMA(CAB)

**Reporter**

2009 U.S. Dist. LEXIS 142628 *

TERRI ORTIZ, et al, Plaintiffs, vs. MCNEIL-PPC, INC., Defendant.

**Counsel:** **[\*1]** For Adrian Alexander Ortiz-Flores, a minor, Terri Ortiz, as individual consumers, and on behalf of Adrian Alexander Ortiz-Flores, Chuck Tidwell, as an individual consumer and on behalf of William Tidwell, William Tidwell, a minor, Kristin Matthis, as an individual consumer and on behalf of Kendall Matthis, Kendall Matthis, a minor, Plaintiffs, (3:07cv678): Bevin Allen, LEAD ATTORNEY, Khorrami Boucher Sumner Sanguinetti, LLP, Los Angeles, CA USA; Harold M. Hewell, LEAD ATTORNEY, Hewell Law Firm, San Diego, CA USA; Paul D Stevens, Ryan J. Clarkson, LEAD ATTORNEY, Milstein Adelman & Kreger LLP, Santa Monica, CA USA.

For Jennifer Pointer, an Individual, and as next of friend of Michael Pointer, a Monor, Plaintiff, (3:07cv678): Bevin Allen, LEAD ATTORNEY, Khorrami Boucher Sumner Sanguinetti, LLP, Los Angeles, CA USA; Paul D Stevens, Ryan J. Clarkson, LEAD ATTORNEY, Milstein Adelman & Kreger LLP, Santa Monica, CA USA; Craig Lowell, Dennis G Pantazis, Wiggins Childs Quinn and Pantazis, Birmingham, AL USA; Harold M. Hewell, LEAD ATTORNEY, Hewell Law Firm, San Diego, CA USA; Jeff S. Daniel, Law Office of Jeff S. Daniel, PC, Birmingham, AL USA.

For Mcneil-Ppc, Inc., a New Jersey corporation, Defendant, **[\*2]** (3:07cv678): David J Noonan,

LEAD ATTORNEY, Noonan Lance Boyer & Banach LLP, San Diego, CA USA; Darrel Christopher Menthe, McGuireWoods LLP, Los Angeles, CA USA; Jia-Ming Shang, Sedgwick LLP, San Francisco, CA USA.

For Jennifer Pointer, an individual and as next friend of Michael Pointer, a minor, Plaintiff, (3:08cv536): Bevin Allen, LEAD ATTORNEY, Khorrami Boucher Sumner Sanguinetti, LLP, Los Angeles, CA USA; Harold M. Hewell, LEAD ATTORNEY, Hewell Law Firm, San Diego, CA USA.

For Mcneil Ppc, Inc, Defendant, (3:08cv536): David J Noonan, LEAD ATTORNEY, Noonan Lance Boyer & Banach LLP, San Diego, CA USA; Alan Daniel Mathis, Lee M Pope, LEAD ATTORNEY, Johnston Barton Proctor and Rose LLP, Birmingham, AL USA; James C Barton, Jr, LEAD ATTORNEY, Johnston Barton Proctor and Powell LLP, Birmingham, AL USA.

**Judges:** Hon. Michael M. Anello, United States District Judge.

**Opinion by:** Michael M. Anello

## Opinion

2009 U.S. Dist. LEXIS 142628, *2

## ORDER DENYING MOTION FOR CERTIFICATION OF CLASS ACTION

[Doc. No. 51]

Currently before the Court in the above-captioned matter is Plaintiffs' motion seeking certification of this case as a class action [Doc. No. 51]. Defendant McNeil-PPC, Inc. filed an opposition to the motion [Doc. No. 52], to which Plaintiffs replied [Doc. [*3] No. 54]. For the following reasons, the Court **DENIES** Plaintiffs' motion.

## BACKGROUND

On June 23, 2008, Plaintiffs Terri Ortiz, Chuck Tidwell, Kristin Matthis, and Jennifer Pointer, on behalf of themselves as individual consumers and on behalf of their minor children, filed a Consolidated Complaint for Equitable Relief and Damages ("complaint") against Defendant McNeil-PPC, Inc. ("McNeil") alleging the following claims: violations of California's Unfair Competition Law ("UCL"), _section 17200 et seq._ of California's Business and Professions Code; fraudulent concealment; breach of implied warranties of fitness for purpose and merchantability; unjust enrichment; negligence; strict product liability; and breach of express warranty [Doc. No. 44].

This action arises out of events related to the manufacture, production, and sale by McNeil of a "plaque detecting rinse" product, and the subsequent voluntary recall by McNeil of that product. Plaintiffs allege the following facts as the basis for their claims.[1] McNeil is a subsidiary of Johnson & Johnson, one of the world's largest manufacturers of health care products for consumers. In December 2006, Johnson & Johnson

acquired Pfizer Consumer Healthcare, and Listerine® [*4] Agent Cool BlueTM, as well as Listerine® Antiseptic, became brands and products of McNeil. McNeil marketed Listerine® Agent Cool BlueTM ("the product"), which tinted plaque on teeth a blue color, for use by children to promote better brushing habits and the importance of good dental hygiene. Plaintiffs allege that approximately 7.5 million bottles of the product were sold nationally, ranging in cost from $5 to $10 per bottle. On April 11, 2007, McNeil announced a voluntary recall of the product, resulting from McNeil's determination that the preservative system used in the product was inadequate to protect against the formation of certain microorganisms, potentially making the product a health risk for individuals with compromised immune systems. McNeil established a refund program to reimburse consumers the purchase price of the product. Plaintiffs claim that McNeil's recall of the product was not adequate, and the recall did not compensate consumers for any costs associated with personal injuries suffered by Plaintiffs and potential class members.

Based on these allegations, Plaintiffs contend that the design and manufacture of the product was negligent and/or defective, and McNeil [*5] failed to take adequate precautions to ensure the safety of the product. Plaintiffs represent themselves in this case as individual consumers who purchased the product. Three of the named plaintiffs represent their minor children as well, who allegedly suffered injury due to their use of the product, and incurred medical bills as a result. Plaintiffs claim that the product was rendered unusable and valueless by the April 11, 2007 recall of the product. Plaintiffs filed the instant motion under seal on July 25, 2008.[2] Plaintiffs seek certification of two separate nationwide classes in this case. First, they request that the Court certify a "Purchaser Class," defined as follows:

---

[1] All facts referenced herein are taken from the Consolidated Complaint filed June 23, 2008 [Doc. No. 44] unless otherwise indicated. _Blackie v. Barrack, 524 F.2d 891, 900-01 (9th Cir.1975)_ (when considering a motion for class certification the "court is bound to take the substantive allegations in the complaint as true.").

[2] The motion was filed under seal due to Plaintiffs' inclusion of material previously designated by the parties as "confidential" pursuant to the terms of the Protective Order entered in this case.

"All persons, who, on or after January 1, 2006, purchased the Product for personal, family, or household purposes, and not for resale, which was rendered unusable and valueless by the April 11, 2007 recall of such Product."

(*Complaint* ¶ 37.) Second, Plaintiffs seek certification of a "Personal Injury Common Issues Class," defined as follows:

All persons who, on or after January 1, 2006, consumed any of the Product and who assert or allege claims sounding in personal injury therefrom."

(*Id.*) McNeil vigorously opposes **[*6]** the motion, arguing that neither of the two purported classes meet the requirements of *Federal Rule of Civil Procedure 23* for certification of a class.

## DISCUSSION

### A. Legal Standards for Class Certification

According to *Federal Rule of Civil Procedure 23(a)*, a district court may certify a class so that representative parties may sue on behalf of all members only if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *FED. R. CIV. P. 23(a)*. These requirements are commonly referred to as numerosity, commonality, typicality, and adequate representation. *See, e.g., Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).*

In addition to demonstrating that the requirements of *Rule 23(a)* are met, a plaintiff must establish one or more of the requirements of *Rule 23(b)*, which are as follows: (1) there is a risk of prejudice from separate actions establishing incompatible

standards of conduct; (2) judgments in individual lawsuits would adversely affect the rights of other members of the class; (3) the party opposing the class has acted (or refused to act) in a manner applicable **[*7]** to the class generally, thereby making injunctive or declaratory relief appropriate with respect to the class as a whole; or (4) the questions of law or fact common to the class predominate over questions affecting the individual members and, on balance, a class action is superior to other methods available for adjudicating the controversy. *See Fed. R. Civ. P. 23(b)(1)-(3).*

"As the party seeking class certification, [plaintiff] bears the burden of demonstrating that she has met each of the four requirements of *Rule 23(a)* and at least one of the requirements of *Rule 23(b).*" *Zinser v. Accufix Research Inst., 253 F.3d 1180, 1186 (9th Cir. 2001)* (citing *Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992)).* In analyzing whether a plaintiff has met her burden to show that the above requirements are satisfied, a court must "analyze[] the allegations of the complaint and the other material before [the court] (material sufficient to form reasonable judgment on each [*Rule 23*] requirement)." *Blackie v. Barrack, 524 F.2d 891, 900-01 (9th Cir. 1975); see also Hanon, 976 F.2d at 509* (finding that the court may consider evidence to ascertain whether *Rule 23* has been met, even though the evidence relates to the merits); *Sepulveda v. Wal-Mart Stores, Inc., 237 F.R.D. 229, 233 (C.D. Cal. 2006)* ("[B]ecause 'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' a court must often look behind the pleadings 'to evaluate carefully the **[*8]** legitimacy of the named plaintiff's plea that he is a proper class representative under *Rule 23(a).*'") (quoting *Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)* (citations and internal quotation marks omitted)). A court should not conduct a hearing on the merits of the plaintiffs' claims when determining class certification, *see Valentino, 97 F.3d at 1232*, although the issue of certification "generally

2009 U.S. Dist. LEXIS 142628, *8

involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)*.

In summary, "notwithstanding its obligation to take the allegations in the complaint as true, the Court is at liberty to consider evidence which goes to the requirements of *Rule 23* even though the evidence may also relate to the underlying merits of the case." *In re Unioil Secs. Litig., 107 F.R.D. 615, 618 (C.D. Cal. 1985)*. A district court is granted "broad discretion" to determine whether the *Rule 23* requirements have been met. *Zinser, 253 F.3d at 1186*; *see also In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 461 (9th Cir. 2000)* ("The district court's decision certifying the class is subject to a very limited review and will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion.") (quotations omitted).

## B. Analysis

Plaintiffs seek class certification, arguing that both proposed classes meet all four requirements under *Rule 23(a)*, as well as the requirements of *Rule 23(b)(3)*. McNeil focuses **[*9]** its argument primarily on the requirements of *Rule 23(b)(3)*, asserting that common questions of fact and law do not predominate in either of the proposed classes. The Court agrees with McNeil that Plaintiffs do not satisfy the requirements of *Rule 23(b)(3)* with respect to either class, and focuses the following discussion accordingly.[3]

---

[3] Because satisfaction of the *Rule 23(a)* requirements for each class is not sufficient in and of itself to succeed on a motion for class certification, and the Court finds that neither of the proposed classes meets the additional requirements of *Rule 23(b)*, the Court declines to discuss at length whether Plaintiffs' satisfy all four of *Rule 23(a)*'s requirements. The Court presumes based on the materials before it on this motion that each class would satisfy the numerosity requirement; the Court acknowledges McNeil's argument that neither class satisfies the typicality requirement and adequate representative

Under *Rule 23(b)(3)*, the Court must find (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Fed. R. Civ. P. 23(b)(3)*. The matters pertinent to a finding under *Rule 23(b)(3)* include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action. *Id.*

## 1. Purchaser Class

Because Plaintiffs seek to certify a nationwide class of product purchasers to pursue the common **[*10]** law claim of unjust enrichment, the Court must consider foremost whether Plaintiffs meet their burden of showing how the Court should cope with variations in state law. Citing to the Restatement's definition of unjust enrichment, Plaintiffs submit that there is no significant conflict between California's law of unjust enrichment and other states' laws. Plaintiffs contend that there are a few nuanced variations in unjust enrichment law in the other states, but the policy and purpose are uniform. Plaintiffs cite to a variety of cases from various jurisdictions, but do not submit a nationwide review of the law of unjust enrichment.

The Ninth Circuit has counseled that "a district court considering certification of a nationwide class cannot simply rely on counsel's assurances of manageability. Put another way, the court cannot accept 'on faith' an assertion that variations in state laws relevant to the case do not exist or are

---

requirements, but finds that the commonality issues are by far the most important to its ruling on this motion and can be addressed within the *Rule 23(b)(3)* discussion.

insignificant; rather, the party seeking certification must affirmatively demonstrate the accuracy of the assertion." *Zinser v. Accufix Research Inst., 253 F.3d 1180, 1189 (9th Cir. 2001)* (citing *Castano v. Am. Tobacco Co., 84 F.3d 734, 742 (5th Cir. 1996))*; *see also In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 349 (D.N.J. 1997)* ("In a motion for class certification, plaintiffs bear the burden of providing an extensive analysis of state law variations **[*11]** to determine whether there are insuperable obstacles to class certification."). Here, Plaintiffs fail to overcome McNeil's arguments and review of relevant case law that the application of 51 different standards for each claim make this case inappropriate for class certification. As detailed below, the Court finds that the states' different approaches to, or elements of, unjust enrichment are significant. Accordingly, Plaintiffs have not shown that common questions predominate.

The California Court of Appeals recently restated that there is no cause of action for unjust enrichment in California:

"The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so. Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself. It is synonymous with restitution."

*Melchior v. New Line Prods., Inc. (2003) 106 Cal. App. 4th 779, 793, 131 Cal. Rptr. 2d 347* (quotations and citations omitted). Under an unjust enrichment theory, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct, *but the plaintiff has chosen not to sue in tort. McBride v. Boughton (2004) 123 Cal. App. 4th 379, 388, 20 Cal. Rptr. 3d 115*. Thus, **[*12]** in California, there is no separate cause of action for unjust enrichment, and a claim for restitution is inconsistent and incompatible with a related claim in tort. *Id.* This is not true in other states, where

unjust enrichment is considered a valid cause of action.

This dissimilarity immediately raises the related issue of what different states require in terms of proving a claim for unjust enrichment, depending upon whether it is considered a cause of action with individual elements to be met, or a theory of recovery, requiring proof of damages. By way of example, Montana, Illinois, and New Hampshire courts require a showing of misconduct or fault on the part of the defendant to recover under an unjust enrichment theory. "Unjust enrichment is an equitable doctrine wherein the plaintiff must show some element of misconduct or fault on the part of defendant, or that the defendant somehow took advantage of the plaintiff." *Randolph V. Peterson, Inc. v. J.R. Simplot Co., 239 Mont. 1, 778 P.2d 879, 883 (Mont. 1989)*(citing *Brown v. Thornton, 150 Mont. 150, 432 P.2d 386, 390 (Mont. 1967))*; *see also Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill App. 3d 1, 12, 812 N.E.2d 419, 285 Ill. Dec. 599 (Ill App. 1st Dist. 2004)* ("[I]njustice involves some form of improper conduct by the party to be charged."); *National Employment Service Corp. v. Olsten Staffing Service, Inc., 145 N.H. 158, 761 A.2d 401, 406-07 (N.H. 2000)* ("Because . . . Olsten did not act wrongfully . . ., the facts do not support a finding of unjust enrichment.")

Alabama, Texas, Minnesota, Nebraska, Colorado, Michigan, **[*13]** and Virginia courts require unconscionable conduct on the part of the defendant in order to make a claim for unjust enrichment. *Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala. 2006)*; *see also Burlington Northern R. Co. v. Southwestern Elec. Power Co., 925 S.W.2d 92, 97 (Tex. App. 1996)*; *ServiceMaster of St. Cloud v. GAB Business Services, Inc., 544 N.W.2d 302, 306 (Minn. 1996)*; *Haggard Drilling, Inc. v. Greene, 195 Neb. 136, 236 N.W.2d 841 (Neb. 1975)*; *DCB Const. Co., Inc. v. Central City Development Co., 965 P.2d 115, 117 (Colo. 1998)*; *Barker v. Dicicco, 2002 Mich. App. LEXIS 2252, 2002 WL 31956978, 1(Mich. App. 2002)*;

*Qualichem v. Xelera, Inc., 62 Va. Cir. 179, 2003 WL 23162331, 3 (Va. Cir.Ct. 2003)*.

The Court finds that there are material conflicts between the California laws of unjust enrichment and the laws of other states. The Court further finds that Plaintiffs have not met their burden to show that despite these differences, common questions predominate and any discrepancies in the law among the states would be manageable. Therefore, this Court declines to certify Plaintiffs' proposed nationwide Purchaser Class pursuant to *Rule 23(b)(3)*.

### 2. Personal Injury Common Issues Class

With respect to their proposed PICI Class, Plaintiffs propose that the Court sever and try questions common to the class - particularly with respect to strict product liability and negligence - and then try individual questions regarding causation and damages. McNeil argues that Plaintiffs may not base a nationwide class action on individual personal injury claims. McNeil asserts that under a strict products liability analysis for personal injury, each individual plaintiff must prove injury, causation, and damages, and that since Plaintiffs purport to bring a nationwide **[*14]** class action, these individual inquiries are multiplied by the differing state laws that may or may not apply.

The Court agrees with McNeil's assertion that individual factual issues are likely to predominate the disposition of PICI Class members' claims. For example, individual factual issues will predominate the determination of whether any alleged defects in the product proximately caused the putative class members' minor children's injuries. Other unique factors also will impact the causation analysis, such as each child's unique medical history. Additionally, individual issues will likely dominate the damages analysis of the negligence claim, again because determining whether the product caused the alleged harm to the children will require an inquiry into the child's medical history, age, etc.

Each PICI Class members' claims will be so unique that individualized factual determinations will likely control the litigation of this case.

In addition, the proposed class is also characterized by individualized legal determinations. The Court notes that, while the Ninth Circuit has declined to create a per se bar on class certifications in products liability litigation, *Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996)*, the court has **[*15]** stated on more than one occasion that difficulties of commonality and management are inherent in proposed products liability class actions. *See, e.g., Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180 (9th Cir. 2001)*. Also, because of the many differences in state laws, both fraud and warranty claims are difficult to maintain on a nationwide basis. *See Cole v. Gen. Motors Corp., 484 F.3d 717, 724-30 (5th Cir. 2007)* (discussing at length why warranty claims are inappropriate for class treatment); *Castano v. Am. Tabacco Co., 84 F.3d 734, 745 (5th Cir. 1996)* ("a fraud class action cannot be certified when individual reliance is an issue."). In light of the foregoing, the Court finds that the proposed PICI Class suffers from the same flaws under *Rule 23(b)(3)* as the proposed Purchaser Class, and the Court declines to certify Plaintiffs' proposed nationwide Personal Injury Common Issues Class.

### CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs fail to meet their burden of showing that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *FED. R. CIV. P. 23(b)(3)*. The Court **DENIES** Plaintiffs' Motion for Certification of Class Action [Doc. No. 51].

**IT IS SO ORDERED**.

DATED: March 6, 2009

/s/ Michael M. Anello

2009 U.S. Dist. LEXIS 142628, *15

Hon. Michael M. Anello

United States District Judge

---

**End of Document**

# Tab 22

## *Pender v. Bank of Am., NA*

United States District Court for the Western District of North Carolina, Charlotte Division

March 10, 2016, Decided; March 11, 2016, Filed

CIVIL ACTION NO. 3:05-CV-00238-GCM

**Reporter**

2016 U.S. Dist. LEXIS 34919 *; 61 Employee Benefits Cas. (BNA) 2643; 2016 WL 1057635

DAVID L. MCCORKLE WILLIAM L. PENDER, Plaintiffs, v. BANK OF AMERICA, NA PRICEWATERHOUSECOOPERS LLP THE BANK OF AMERICA PENSION PLAN THE BANK OF AMERICA 401(K) PLAN BANK OF AMERICA CORPORATION THE BANK OF AMERICA TRANSFERRED SAVINGS ACCOUNT PLAN BANK OF AMERICA CORPORATION CORPORATE BENEFITS COMMITTEE, Defendants.

**Subsequent History:** Motion denied by *Pender v. Bank of Am. Corp., 2016 U.S. Dist. LEXIS 145497 (W.D.N.C., Oct. 20, 2016)*

**Prior History:** *Pender v. Bank of Am. Corp., 788 F.3d 354, 2015 U.S. App. LEXIS 9512 (4th Cir. N.C., 2015)*

**Counsel:** **[*1]** For David L. McCorkle, William L. Pender, Plaintiffs: Eli Gottesdiener, LEAD ATTORNEY, Gottesdiener Law Firm, Brooklyn, NY; F. Lane Williamson, LEAD ATTORNEY, Tin Fulton Walker & Owen, Charlotte, NC; Thomas D. Garlitz, LEAD ATTORNEY, Thomas D. Garlitz, PLLC, Charlotte, NC.

For Bank of America Corporation, Bank of America, NA, The Bank of America Pension Plan, The Bank of America 401(K) Plan, Bank of

America Corporation Corporate Benefits Committee, Defendants: Anne E. Rea, LEAD ATTORNEY, Sidley, Austin et al - Chicago, Chicago, IL; Christopher K. Meyer, Steven J. Horowitz, LEAD ATTORNEYS, PRO HAC VICE, Sidley Austin, LLP, Chicago, IL; Erin E. Kelly, LEAD ATTORNEY, Sidley Austin LLP, Chicago, IL; Irving M. Brenner, LEAD ATTORNEY, McGuireWoods LLP, Charlotte, NC; Jeffrey R. Tone, William F. Conlon, LEAD ATTORNEYS, Sidley, Austin et al. - Chicago, Chicago, IL; Peter J. Covington, LEAD ATTORNEY, Helms, Mulliss & Wicker, PLLC, Charlotte, NC; J. Randal Wexler, PRO HAC VICE, Sidley Austin LLP, Chicago, IL.

For Pricewaterhousecoopers LLP, Defendant: Christopher K. Meyer, Steven J. Horowitz, LEAD ATTORNEYS, PRO HAC VICE, Sidley Austin, LLP, Chicago, IL; J. Randal Wexler, PRO HAC VICE, Sidley Austin **[*2]** LLP, Chicago, IL.

For The Bank of America Transferred Savings Account Plan, Defendant: Anne E. Rea, LEAD ATTORNEY, Sidley, Austin et al - Chicago, Chicago, IL; Christopher K. Meyer, Steven J. Horowitz, LEAD ATTORNEYS, PRO HAC VICE, Sidley Austin, LLP, Chicago, IL; Irving M. Brenner, LEAD ATTORNEY, McGuireWoods LLP, Charlotte, NC.

**Judges:** Graham C. Mullen, United States District Judge.

2016 U.S. Dist. LEXIS 34919, *2

**Opinion by:** Graham C. Mullen


# Opinion


## ORDER

**THIS MATTER** is before the Court on the parties' Memoranda regarding the Fourth Circuit's instructions in *Pender v. Bank of America Corp., 788 F.3d 354 (4th Cir. 2015)*. On December 3, 2015, this Court held a status conference and ordered the parties to submit briefing on this issue. (Doc. No. 336) On December 31, Defendants filed their Memorandum (Doc. No. 337), and on February 2, 2016, Plaintiffs filed their Response (Doc. No. 340). Defendants filed a Reply on February 22 (Doc. No. 342), and Plaintiffs sought leave the following day to file a Surreply (Doc. No. 343). The Court granted the Motion, and Plaintiffs made their filing. (Doc. No. 344) On February 26, Defendants sought leave to file a Response to Plaintiffs' Surreply (Doc. No. 345), which the Court again granted. Defendants filed their Response the same day (Doc. No. 346), and accordingly, this **[*3]** matter is now ripe for disposition. For the reasons set out in this Order, the Court finds that whether Defendants retained a profit must be determined in the aggregate. The Court will further order that a bench trial be commenced in order to resolve that issue.


## I. BACKGROUND

This matter arises out of the decision by NationsBank, a company that subsequently merged with Bank of America ("the Bank"), to allow its employees to transfer their 401(k) assets to a cash balance defined benefit plan ("the Pension Plan"). Because the decade-long procedural history in this case has been well documented elsewhere, the Court will recite only the facts relevant to the present proceeding. *See Pender v. Bank of America,* *2013 U.S. Dist. LEXIS 117118, 2013 WL 4495153, No. 3:05-cv-00238-GCM (W.D.N.C. Aug. 19, 2013)*; *see also Pender v. Bank of Am. Corp., 756 F. Supp. 2d 694, 696 (W.D.N.C. 2010)*, *aff'd sub nom. McCorkle v. Bank of Am. Corp., 688 F.3d 164 (4th Cir. 2012)*. The sole issue before the Court is how best to implement the instructions set out by the Fourth Circuit in its opinion reversing the grant of summary judgment in favor of Defendants and directing the court to conduct an accounting for profits. *Pender, 788 F.3d at 370*.

In its most recent opinion directed at an issue in this case, the Fourth Circuit considered whether the transfer of Plaintiffs' assets from a traditional 401(k) Plan to the Pension Plan entitled **[*4]** them to any monetary remedy. The critical question was whether or not the following difference between the two Plans violated ERISA:

> [Under] [t]he 401(k) Plan[,] participants' accounts reflected the *actual* gains and losses of their investment options. In other words, the money that 401(k) Plan participants directed to be invested in particular investment options was actually invested in those investment options, and 401(k) Plan participants' accounts reflected the investment options' net performance.
>
> By contrast, Pension Plan participants' accounts reflected the *hypothetical* gains and losses of their investment options. Although Pension Plan participants selected investment options, this investment was purely notional. . . . Instead, the Bank invested Pension Plan assets in investments of its choosing, periodically crediting each Pension Plan participant's account with the greater of (1) the hypothetical performance of the participant's selected investment option, or (2) the Transfer Guarantee.

*Pender, 788 F.3d at 358-59* (footnote omitted) (emphasis in original).

The Fourth Circuit held that the transfers

eliminated the separate account feature, which guarantees that participants funds are credited "with the actual [*5] gains and losses 'generated by funds contributed on the participant[s'] behalf.'" *Id. at 360* (alteration in original). The court also held that the separate account feature constituted an "accrued benefit" which the Bank was forbidden from decreasing by a Plan amendment under ERISA. *Id. at 363-64* (citing *ERISA § 204(g)(1)*).

Although it is undisputed that the separate account feature has since been restored, Plaintiffs argued that the temporary elimination of the separate account feature entitled them to monetary relief under one of three theories. First, they suggested that they were owed additional benefits pursuant to the terms of their Plans, under *ERISA § 502(a)(1)(B)*, which allows suits "by a participant or a beneficiary to recover benefits due to him under the terms of his plan" and "to enforce his rights under the terms of the plan." *Pender, 788 F.3d at 361* (emphasis omitted). Second, they claimed they were entitled to damages for breach of fiduciary duty, under *ERISA § 502(a)(2)*. *Pender, 788 F.3d at 362*. Finally, they argued that, if Defendants had "profited" from the temporary elimination of their separate account features, that they could recover those funds under *ERISA § 502(a)(3)*, which provides that "a plan beneficiary may obtain 'appropriate equitable relief' to redress 'any act or practice which violates'" [*6] certain ERISA provisions. *Pender, 788 F.3d at 363*.

The Fourth Circuit began by holding that the plain terms of the Pension Plan did *not* provide that Plaintiffs were entitled to additional benefits beyond what the Bank had already paid them. *Pender, 788 F.3d at 361*. The court next held that Plaintiffs, as a matter of law, could not sustain a claim for breach of fiduciary duty. *Id. at 363*. Accordingly, the panel turned to the only remaining avenue for relief, *ERISA § 502(a)(3)*, which provides that "a plan beneficiary may obtain 'appropriate equitable relief'" to correct certain ERISA violations. *Pender, 788 F.3d at 363*.

The court found that Plaintiffs were entitled to relief under *§ 502(a)(3)*. *Id. at 363*. Again, by eliminating the separate account feature, the Bank had violated ERISA. *Pender, 788 F.3d at 363-64* (citing *ERISA § 204(g)(1)*). Consequently, the only remaining question was whether Plaintiffs sought relief that was equitable in nature. *See id. at 364*. The court found that the requested remedy—which it described as "[a]n accounting for profits"—constituted equitable relief. *Id. at 364*. The court explained that an accounting for profits is "a restitutionary remedy based upon avoiding unjust enrichment," which "holds the defendant liable for his profits, not for damages." *Id. at 364-65*. Because this type of relief is quintessentially equitable, Plaintiffs could proceed with [*7] their claims under *§ 502(a)(3)*. *Id. at 367*.

Next, the Court addressed Defendants' argument that the case was moot because they had restored the separate account features of Plaintiffs' accounts and because Plaintiffs had suffered no monetary harm as a result of the temporary elimination.[1] *Id.*; *see also id. at 366* ("Requiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss. We reject that notion."). The panel explained, in a paragraph that the Court considers particularly instructive:

> The Bank rightly notes that its closing agreement with the IRS restored Plaintiffs' separate account feature. That restoration, however, did not moot the case. *Plaintiffs contend that the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS*. Defendants do not rebut this argument,

---

[1] In May 2008, the Bank and the IRS entered into a closing agreement, under which [*8] the Bank transferred the assets in the Pension Plan to a special-purpose 401(k) plan, made additional payments to eligible participants whose hypothetical investments had a low rate of return, and paid a $10 million fine to the IRS. *Pender, 788 F.3d at 360*.

noting only that there has been no discovery to this effect. *If an accounting ultimately shows that the Bank retained no profit, the case may well then become moot.*

*Id. at 368* (emphasis added).[2]

After addressing other issues that do not influence the present proceeding, the Fourth Circuit vacated this Court's grant of summary judgment and remanded for further proceedings without additional instructions on how the required accounting for profits should be calculated. *See id. at 370*.

## II. ANALYSIS

Defendants argue that the Fourth Circuit instructed this Court to determine whether, after the Bank had restored the separate account feature, made additional payments to Plan participants, and paid a $10 million fine to the IRS, it still retained additional profits. (Doc. No. 337, 342) Plaintiffs, by contrast, argue that the Court must calculate, as to each individual Plan participant, whether the Bank earned any profit using their specific assets. (Doc. No. 340, 344) This method of calculating profits would consider the Plan's overall rate of return during the months between the transfer date and each individual's retirement. Plaintiffs urge that the Bank owes certain class members, whose assets

___

[2] Indeed, it does seem as though Plaintiffs argued, at least in part, that Defendants retained a profit after the separate account feature was restored and the settlement payments fully allocated. (*See* Br. for Appellant at 54-55, *Pender, 788 F.3d 354 (4th Cir. 2015)* (No. 14-9011) ("The Bank generated $110 million-plus of gains (net of losses) investing participants' retirement savings. Plaintiffs are not asking the court to punish Defendants or force the Bank to increase benefits . . . . If the 'spread' is allocated to participants' accounts and then distributed as pension benefits, participants will be made whole -- and the Bank will be no worse-off than had it never implemented its illegal arbitrage strategy in the first place."); *cf.* Plaintiffs' Memorandum in Support of Class Certification at 9, Doc. No. 171 ("[T]he relief sought would be applied in a uniform fashion, to all participants and the 401(k) Plan as a whole, across-the-board without regard to the participants' individual circumstances **[*9]** or differences."))

earned more than they have received from the Bank to date, are owed the difference between prior payments (in the form of benefits plus any additional IRS settlement amounts) and what **[*10]** their assets in fact generated during the period in which they were held by the Bank. Having reviewed the Fourth Circuit's operative opinion, the sources cited therein, and the briefing submitted by the parties, the Court finds that the calculation proposed by the Bank is consistent with the Court of Appeals' instructions.

## A. The Fourth Circuit's instructions appear to contemplate calculation in the aggregate

The Fourth Circuit's opinion in *Pender* appears to instruct this Court to determine whether, after the separate account features were restored to Plaintiffs' accounts, the Bank nevertheless retained a profit. Most importantly, the panel explained the posture of the case in the following terms: "Plaintiffs contend that the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS." *Id. at 368*. The court further counseled that "[i]f an accounting ultimately shows that the Bank retained no profit, the case may well then become moot." *Id.* This language suggests that this Court's should examine the Bank's position after the separate account feature was restored and the settlement-mandated payments and fine were disbursed.

Plaintiffs **[*11]** posit the Fourth Circuit intended to say that the case might be moot as to some individual plaintiffs, who received more in benefits and other payments than their assets actually earned over the period they were entrusted to the Bank. (Plaintiffs' Memorandum at 7-8, Doc. No. 340) However, Plaintiffs can point to nothing in the panel's language to support such an interpretation— much less anything as explicit as the sentence specifically invoking the period "*after* [the Bank] restored the separate account feature and paid a $10 million dollar fine." *Pender, 788 F.3d at 368* (emphasis added); *see also id. at 359* ("[I]n the

aggregate and over time, [the account transfer] strategy could yield substantial gains for the Bank.").

Additionally, although Plaintiffs argue that many individual participants are entitled to additional benefits calculated by reference to their specific investment choices and retirement dates (Plaintiffs' Memorandum at 3, Doc. No. 340), it appears that the Fourth Circuit disagreed. Rather, the court found that Plaintiffs were *not* entitled to additional, individual benefits under the terms of the Plan. *Pender, 788 F.3d at 361-62*.[3] This result makes perfect sense. Not only are Courts forbidden from reforming the terms of a Plan to [*12] conform with ERISA, *see Pender, 788 F.3d at 362* (citing *CIGNA Corp. v. Amara, 563 U.S. 421, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2011))*, but it is also well-settled that participants in a defined benefit plan, such as the Pension Plan in this case, have no legal interest in the Plan's surplus, even when it is generated in part using their assets, *see, e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 440-41, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)* ("Since a decline in the value of a [defined benefit] plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus—even if it is partially attributable to the investment growth of their contributions."); *David v. Alphin, 704 F.3d 327, 338 (4th Cir. 2013)* ("[A] participant in a defined benefit pension plan has an interest in his fixed future payments only, not the assets of the pension fund." (citing *Hughes, 525 U.S. at 439-40*)). It would certainly be anomalous, then, to find that some members of the class here have a unique entitlement to the temporary surplus generated using their assets. The

Court can find no basis for finding that a subset of the Plaintiff class is equitably entitled to this type of special treatment, particularly where all members of the class suffered the same injury—the temporary loss of their separate account feature—and received all of their promised benefits.

The aggregate calculation approach is also consistent with the Fourth Circuit's directions that the Court should determine whether there has been "unjust enrichment" as a result of the Bank's elimination of the separate account feature. *Pender, 788 F.3d at 364*. "[T]he unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." *§Restatement (Third) of Restitution and Unjust Enrichment 51* (2011); *see also Pender, 788 F.3d at 366* (citing the same). An aggregate calculation accommodates both of these principles. It considers the net profit from Defendants' wrongful implementation of the transfer strategy, and it avoids imposing additional penalties on the Bank beyond what the equities strictly [*14] require.

Plaintiffs present the following argument in rebuttal. First, they say, this Court must begin with the proposition that the Bank engaged in "60,000 separate and distinct actual agreements with each Participant who elected to make a transfer." (Plaintiffs' Memorandum at 26, Doc. No. 340) Next, the Court must examine the profits or losses derived from each separate transaction. (*Id.*) Whether at the end of all the implicated transactions, the Bank had no profits is irrelevant, Plaintiffs argue, because this simply means Defendants spent the gains they acquired using some individuals' assets—a fact which is not typically permitted to offset disgorgement. (*Id.* at 22-24). In short, Plaintiffs ask the Court to define "profit" for the purposes of assessing unjust enrichment as "an immediate increase in the Pension Plan's assets." (*Id.* at 2)

---

[3] Specifically, Plaintiffs argue that the *Pender* opinion must be read [*13] to hold that they have "won the right via the equitable remedy of an accounting for profits, 'to enforce the plan not as written, but as it should be enforced under ERISA.'" (Plaintiffs' Memorandum at 3, Doc. No. 340 (quoting *Pender, 788 F.3d at 362*)). To the contrary, that concept is absent from *Pender* and the quoted portion of the opinion held only that Plaintiffs had no such right under *ERISA § 502(a)(1)(B)*.

The Court finds two problems with this position. First, nothing in the Fourth Circuit's opinion seems to support parsing the class in this manner.[4] Indeed, the panel appeared to agree with Defendants that none of the Plan participants had suffered financial injuries, *see Pender, 788 F.3d at 366-67*, which makes sense, because each has received the benefits to which he or she was entitled, *id. at 361-62*. Instead **[\*15]** of tying the remedy to an individual entitlement to varying amounts of funds, the court seems to have ordered that Plaintiffs, who all suffered the same "invasion of a legally protected interest" when their separate account features were temporarily eliminated, be apportioned a *pro rata* share of any overall profit attributable to the Bank's corresponding ability to engage in large-scale investment of the group's assets. Indeed, contrary to Plaintiffs' assertions, the Fourth Circuit broadly held that Plaintiffs have standing to seek disgorgement of profits—and it simply did not say, in any terms, that its holding was limited to a subclass of Plan participants. (Plaintiffs' Memorandum at 3, 8 n.2, Doc. No. 340)

Second, Plaintiffs have failed to proffer a way that the Court could reconcile the individualized calculation that they propose with the Fourth Circuit's instruction that the measure of profits be offset by the $10 million fine paid to the IRS. *Pender, 788 F.3d at 368* Plaintiffs assert that the Fourth Circuit's instruction is "dicta" that "command[s] absurd results" (Plaintiffs' Memorandum at 7, Doc. No. 340), but this Court cannot find itself so free to blatantly disregard

language that seems to have the sole purpose of guiding the proceedings on remand—particularly where the Circuit's instructions are otherwise somewhat limited. In sum, the Court finds that it should calculate whether the Bank retained a profit by looking at all of the transfer accounts in the aggregate.

## B. Plaintiffs' remaining arguments are unavailing

Plaintiffs assert several additional arguments in opposition to the Bank's proposed method of calculation. None are availing, **[\*17]** for reasons the Court will briefly address. First, Plaintiffs argue that Defendants' calculation method violates *ERISA § 3(34)*, because it "seeks to calculate [a participant's account] in part by reference to the investment performance of other participant[s'] contributions." (Plaintiffs' Memorandum at 15-16, Doc. No. 340) As an initial matter, this is incorrect. Defendants' method seeks to calculate a participant's account by the terms of the Plan, and to distribute any ultimate profits among all of the equally-injured class members. Moreover, Plaintiffs have proposed a calculation method that involves a similar conundrum to the one they attribute to Defendants. Plaintiffs ask this Court to consolidate all of the Plan participants assets for the purposes of calculating the rate of return attributable to each individual's assets for the period those assets were entrusted to the Bank. In fact they must, because there appears to be no other way to approximate individual assets' rate of return. (*See* Defendants' Memorandum at 3 ("During the time that the transferred assets were in the Pension Plan, they were not tracked on an individual participant-by-participant basis.")) Yet for purposes of determining **[\*18]** whether the Bank profited, Plaintiffs resist attempts to aggregate all of the Plan participants' assets. It appears to the Court, then, that Plaintiffs favor cumulative assessment of all participants' assets when it is convenient for them, but not when it has the potential to preclude recovery from the Bank.

---

[4] Plaintiffs make repeated reference to a section of the court's opinion that uses a hypothetical example of two employees, "Jack" who participates in a traditional 401(k) plan, and "Jill" who participates in the Pension Plan, which eliminates her separate account feature. (*See, e.g.*, Plaintiff's Memorandum at 7, Doc. No. 340 ("The Bank's reading is irreconcilable, for example, with *Pender*'s discussion of Jill . . . .")) But this paragraph appears in the facts section of the Circuit's **[\*16]** opinion and begins with the phrase "to illustrate by example." *Pender, 788 F.3d at 359-60*. Accordingly, the Court is persuaded that its purpose is to explain the facts of the case, and how it was possible for the Bank's transfer strategy to be profitable, rather than to influence the proceedings on remand.

Plaintiffs also argue that conducting the Bank's proffered calculation would violate *ERISA § 204(g)*, which provides that that "an ERISA-plan participant's 'accrued benefit' may not be decreased by an amendment of the plan' unless specifically provided for in ERISA or regulations promulgated pursuant to ERISA." *See Pender, 788 F.3d at 361*. Plaintiffs suggest that the Bank has somehow taken benefits owed to some class members and used them to pay benefits owed to others. Again, this misses the mark. Plaintiffs have already received all of the benefits to which they were entitled. *Pender, 788 F.3d at 361-62*. This means that the Bank's proposed method of calculation does not, to use Plaintiffs' analogy, "cut back McCorkle's benefit to help defray the cost of John's benefit." (Plaintiffs' Memorandum at 17, Doc. No. 340) Instead, both McCorkle and John have already received the benefits they are owed, and the question is whether the Bank nevertheless **[\*19]** derived profits from its overall transfer strategy that ought to equitably be disgorged and distributed among McCorkle, John, and the other members of the class.[5]

Finally, Plaintiffs suggest that the Bank's method of calculation ignores the *Pender* court's statement that a plaintiff need not identify a particular *res* still in the defendant's possession in order to recover under an accounting for profits theory. (Plaintiffs' Memorandum at 18-19 (citing *Pender, 788 F.3d at 364*)). However, it is readily apparent from the context of the cited statement that the panel was merely distinguishing an accounting for profits from a constructive **[\*20]** trust, rather than setting out the proper means of determining whether the Bank, as a result of its investment strategy, was unjustly enriched. *See Pender, 788 F.3d at 364*

("[An accounting for profits] is akin to a constructive trust, but lacks the requirement that plaintiffs 'identify a particular *res* containing the profits sought to be recovered.'" (quoting *Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 n. 2, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002))*. And in any event, there is no indication that the Bank's calculation would require this Court to determine whether the Bank retained any profits attributable to any one participant's enrollment in the Plan. Nor does it ask the Court to determine whether any profits remain today that are attributable to the scheme, which ended in 2008. Indeed, such requirements would undoubtedly go against the Fourth Circuit instructions. Thus, Plaintiffs' additional arguments do not undermine this Court's conclusion that the proper inquiry in light of the Fourth Circuit's instructions in *Pender* is whether "the Bank retained a profit, even after it restored the separate account feature to Plaintiffs and paid a $10 million fine to the IRS." *788 F.3d at 368*.

## III. CONCLUSION

For the foregoing reasons, the Court finds that its analysis of whether or not the Bank retained a profit must **[\*21]** be conducted in the aggregate.[6] The Court will hold a bench trial on the issue of whether, after it restored the separate account feature and paid a $10 million fine to the IRS, the Bank nevertheless profited from its transfer strategy. At that time, the parties may present any evidence, including expert testimony, relevant to that determination.

## IV. ORDER

**IT IS THEREFORE ORDERED THAT** the

---

[5] Plaintiffs' argument that the Bank's calculation violates the Plan document fails for the same reason, as does its argument that payments to other participants cannot be characterized as "losses." (*See* Plaintiffs' Memorandum at 17-18 (arguing that "the Plan document bars the Bank's attempt to charge Jill for John's benefit"); *id.* at 20 ("What the Bank suggests here is that if a plan's investment earnings are not sufficient to cover the cost of the benefits promised to A . . ., that constitutes a 'loss' which can be used to justify a reduction in the benefit owed to participant B . . . .")).

[6] Defendants argue that there is a disputed issue of whether the Bank's profits should be determined by reference to the transferred assets or the Pension Plan Trust as a whole. (Plaintiffs' Reply at 16-17, Doc. No. 342) Because this issue has not been substantially briefed, the Court will consider it at trial.

court will conduct a bench trial. IN ACCORDANCE WITH the Local Rules of the Western District of North Carolina and pursuant to *Rule 16 of the Federal Rules of Civil Procedure*, the undersigned enters the following Pretrial Order and Case Management Plan in this matter. **Note that this Order incorporates certain proposed changes to *Rule 16 of the Federal Rules of Civil Procedure* (See Section II.D.)**

# I. DISCOVERY

A. DISCOVERY GUIDELINES: The parties are instructed to retain no more than two (2) experts apiece. After those experts have prepared reports, each party will disclose both the reports and **[*22]** the documents or other materials that the experts relied on in forming an opinion to the other party. The only discovery that is permitted at this time is the exchange of this material and expert depositions. The parties will have thirty days from Defendants' submission of expert reports to make their experts available for depositions at a mutually convenient time. Reports from retained experts under *Rule 26(a)(2)* will be due:

from Defendants by **April 18, 2016**; and

from Plaintiffs by **May 17, 2016**.

B. THE MAINTENANCE OF DISCOVERY MATERIALS: Discovery materials are NOT to be filed. All counsel are advised to consult local rule 26.1 which provides that while depositions must still be served on all parties, they are no longer to be filed unless upon order of the Court. The parties are responsible for the preservation of any and all discovery materials they may generate.

C. VIDEO DEPOSITIONS: Video depositions will not be permitted. The Court will consider only live testimony from the parties' experts.

D. DISCOVERY COMPLETION: All discovery shall be completed by **July 18, 2016**. Counsel are directed to subpoena depositions sufficiently in

advance of the discovery completion deadline so as to comply with this Order. **[*23]** Discovery requests that schedule depositions after the discovery completion deadline are not enforceable except by order of the court for good cause shown. The parties may consent to extensions of the discovery completion deadline so long as any such extension expires not later than ten (10) days prior to scheduled trial time.

# II. MOTIONS

A. MOTIONS DEADLINE: Any motion regarding a discovery matter should be filed as soon as possible.

B. MOTIONS: When filing motions, counsel should comply with Local Rule 7.1.

C. MOTIONS HEARINGS: Hearings on motions ordinarily will be conducted only when the Rules require a hearing, or when the court determines that a hearing will assist the court. All motions requiring a hearing will be heard as soon as is practical. The Clerk will notify all parties as far in advance as possible of the date and time set for the hearing.

D. Prior to the filing of any motion relating to discovery, the movant must request a conference with the Court. This conference may be held telephonically or in chambers.

# III. TRIAL

The trial is scheduled for the **November 7, 2016** term and is expected to take **2-3 days**.

# IV. TRIAL PROCEDURES

A. COUNSEL'S FILINGS SIX WEEKS BEFORE TRIAL: **Six full weeks before [*24] the trial**, counsel for each party shall file with the Court:

(a) Memoranda to the Court stating their

2016 U.S. Dist. LEXIS 34919, *24

positions;

(b) Proposed Findings of Fact and Conclusions of Law;

The deadline indicated on the published trial calendar may not be extended for any reason. **Failure to comply with this deadline WILL result in sanctions**.

B. COUNSEL'S FILINGS TWO WEEKS BEFORE TRIAL: **Two full weeks before the trial**, counsel for each party shall file:

(a) A statement of the education, experience, and qualifications of each expert witness, unless the parties have stipulated to the qualifications of each expert witness;

(b) Stipulations concerning the authenticity of as many proposed exhibits as possible; and

(c) An exhibit list.

Four (4) courtesy copies of the above are to be provided to the courtroom deputy.

C. FORMAT FOR EXHIBIT LIST: In preparing the exhibit list, counsel separately shall identify and number each exhibit, shall arrange the list numerically by exhibit number, and shall place the following headings on the exhibit list:

Exhibit # Description Identified by Admitted

It is not necessary for counsel to make entries in either the "Identified by" column or the "Admitted" column. Counsel shall also provide **[*25]** an electronic copy of the exhibit list with the electronic exhibit files.

**VI. SANCTIONS**

Failure to comply with any of the provisions of this Order which causes added delay or expense to the Court may result in the imposition of sanctions.

**IT IS SO ORDERED**.

Signed: March 10, 2016

/s/ Graham C. Mullen

Graham C. Mullen

United States District Judge

---

**End of Document**

# **Tab 23**

# *Pfs Distrib. Co. v. Raduechel*

United States District Court for the Southern District of Iowa, Central Division

August 30, 2005, Decided; August 30, 2005, Filed

CIVIL NO. 4-04-CV-10329

**Reporter**

2005 U.S. Dist. LEXIS 57648 *

PFS DISTRIBUTION COMPANY and PILGRIM'S PRIDE CORPORATION OF DELAWARE, INC., Plaintiffs, vs. DARRELL RADUECHEL, BARRY SPAIN and D&B SOLUTIONS, INC., RICHARD R. DONOHUE, THEOBALD, DONOHUE & THOMPSON, P.C., MIDWEST ONE BANK & TRUST, STEVEN P. HICKS and JOHN POTHOVEN, Defendants.

**Counsel:  [*1]** For Pfs Distribution Company, Plaintiff: Ethan A Berghoff, Michael J Wagner, William Lynch Schaller, LEAD ATTORNEYS, BAKER & MCKENZIE, Chicago, IL USA; John Michael Murphy, LEAD ATTORNEY, BAKER & MCKENZIE, Chicago, IL USA; Michael W Thrall, LEAD ATTORNEY, NYEMASTER GOODE PC, Des Moines, IA USA; Peter Paul Tomczak, LEAD ATTORNEY, BAKER & MCKENZIE LLP, SutieChicago, IL USA.

For Pilgrim's Pride Corporation, Plaintiff: Ethan A Berghoff, Michael J Wagner, William Lynch Schaller, LEAD ATTORNEYS, BAKER & MCKENZIE, Chicago, IL USA; John Michael Murphy, LEAD ATTORNEY, BAKER & MCKENZIE, Chicago, IL USA; Michael W Thrall, LEAD ATTORNEY, NYEMASTER GOODE PC, Des Moines, IA USA.

For Darrell Raduechel, Barry Spain, D&B Solutions Inc, Defendants: Douglas A Fulton, LEAD ATTORNEY, BRICK GENTRY, P.C., West Des Moines, IA USA; Gordon R Fischer, LEAD ATTORNEY, COMMUNITY FOUNDATION OF GREATER DES MOINES, Des Moines, IA USA.

For Richard R Donohue, Defendant: David L Phipps, Megan M Antenucci, LEAD ATTORNEYS, Johannes (John) H. Moorlach, WHITFIELD & EDDY PLC (DSM), Des Moines, IA USA; Eric G Hoch, Glenn L Smith, FINLEY LAW FIRM, Des Moines, IA USA; Gretchen Witte Kraemer, ATTORNEY GENERAL OF IOWA, Hoover State **[*2]**  Office Bldg, Des Moines, IA USA.

For Theobald Dohohue & Thompson P C, Defendant: Glenn L Smith, LEAD ATTORNEY, Eric G Hoch, FINLEY LAW FIRM, Des Moines, IA USA.

For Midwestone Bank And Trust, Steven P Hicks, Defendants: Mark D Walz, LEAD ATTORNEY, DAVIS BROWN LAW FIRM (WDM), West Des Moines, IA USA; Stanley J Thompson, LEAD ATTORNEY, Scott D Mikkelsen, DAVIS BROWN LAW FIRM (DSM), Des Moines, IA USA; Heather Lee Palmer, IOWA DIVISION OF WORKERS COMPENSATION, Des Moines, IA USA.

For John Pothoven, Defendant: Mark D Walz, LEAD ATTORNEY, DAVIS BROWN LAW FIRM (WDM), West Des Moines, IA USA; Stanley J Thompson, LEAD ATTORNEY, DAVIS BROWN LAW FIRM (DSM), Des Moines, IA USA.

2005 U.S. Dist. LEXIS 57648, *2

**Judges:** RONALD E. LONGSTAFF, Chief United States District Judge.

**Opinion by:** RONALD E. LONGSTAFF

# Opinion

ORDER

THE COURT HAS BEFORE IT plaintiffs' April 5, 2005 motion to strike the affirmative defenses filed by defendants Richard R. Donohue ("Donohue") and Theobald, Donohue & Thompson, P.C. ("TD&T"). Defendant TD&T resisted the motion on April 19, 2005, with Donohue joining in this resistance on April 22, 2005. Plaintiffs filed a reply on April 28, 2005, and the motion is fully submitted.

I. BACKGROUND

The facts leading up to this action were set forth in [*3] detail in this Court's August 11, 2004 Order granting plaintiff's motion for a preliminary injunction, and will be repeated only as necessary to the resolution of the present motion. Subsequent to the Court's Injunction Order, on January 27, 2005, plaintiffs filed an amended complaint adding as defendants TD&T, an accounting firm, Donahue, who is a principal in that firm, and others. Plaintiffs' claims against TD&T and Donahue include civil conspiracy, unjust enrichment, misappropriation of plaintiff's trade secrets, and aiding and abetting the allegedly tortious conduct of co-defendants Darrell Raduechel, Barry Spain and D & B Solutions, Inc.

TD&T and Donahue each have asserted a comparative fault defense in their answers to the amended complaint, which were filed on March 15,

2005 and March 16, 2005, respectively.[1] Plaintiffs now move to strike these defendants' comparative fault defenses, arguing that comparative fault is a defense only to claims alleging negligence.

II. APPLICABLE LAW AND DISCUSSION

A. Law Governing Motions to Strike

As summarized by this Court in *United States v. Dico, 189 F.R.D. 536, 541 (S.D. Iowa 1999)*:

> *Rule 12(f) of the Federal Rules of Civil Procedure* provides in relevant part that "the court may order stricken from any pleading any insufficient defense . . . ." *Fed. R. Civ. P. 12(f)*. "An affirmative defense is insufficient if it is not recognized as a defense to the cause of action." *Kelley v. Thomas Solvent Co., 714 F. Supp. 1439, 1442 (W.D. Mich. 1989)*.
>
> Motions to strike are not favored by the courts. *See, e.g., Lunsford v. United States, 570 F.2d 221, 229 (8th Cir. 1977)*. "A motion to strike a defense will be denied if the defense is sufficient as a matter of law or if it fairly presents a question of law or fact which the court ought to hear." (Citing *Moore's Federal Practice § 12.21*, at 2437 (2d ed. 1975)). Nevertheless, a motion to strike should be granted if it "'may have the effect of making the trial of the action less complicated, or [it] may

---

[1] Paragraph1 of Donohue's Affirmative Defenses states, in relevant part: "The fault of all parties, if any, should be compared pursuant to Iowa Code § 668, and the Plaintiffs' recovery, if any, barred or reduced by Plaintiffs' fault." Donohue's Answer and Affirmative Defenses, ¶ 1.

The relevant portion of TD&T's Affirmative Defenses states:

> Further answering, Defendant affirmatively states that any damage which Plaintiffs may have suffered is the result of Plaintiffs' own acts or the acts of others and not the actions of Defendant and this Defendant is entitled [*4] to have its relative degree of fault, if any, compared to the relative degree of fault of those so as to reduce or eliminate this Defendant's liability to the Plaintiffs.

TD&T's Answer and Affirmative Defenses, ¶ 143.

have the effect of otherwise streamlining the ultimate resolution of the action.'" *Kelly*, 714 F. Supp. At 1442 (quoting *California v. United States, 512 F. Supp. 36, 38 (N.D. Cal. 1981))*.

B. Whether Comparative Fault Defense was Properly Pled

Iowa Code chapter 668, the Comparative Fault Act, provides a mechanism by which the factfinder can appropriately allocate fault to the various [*5] parties involved in a litigation.[2] The term "fault" is defined under the statute as:

> one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages.

*Iowa Code § 668.1*. The Iowa Supreme Court repeatedly has held that Chapter 668 is inapplicable to substantive claims based on fraud or intentional torts, for which negligence is not a defense. *See, e.g.*, *Tratchel v. Essex Group, Inc., 452 N.W.2d 171, 180-81 (Iowa 1990)*; *Slager v. HWA Corp., 435 N.W.2d 349, 354 (Iowa 1989)*.

As noted by plaintiffs, each of the claims pled against Donohue and TD&T — civil conspiracy, unjust enrichment, misappropriation of plaintiff's trade secrets, and aiding and abetting — depend upon a showing of knowing and/or *intentional* wrongdoing. For example, a claim for civil conspiracy requires proof of an agreement involving "some mutual mental action coupled with an *intent* to commit the act that causes injury."

*Ezzone v. Riccardi, 525 N.W.2d 388, 398 (Iowa 1994)* (internal citation omitted) (emphasis added). Similarly, [*6] to establish an aiding and abetting claim, "there must be a wrong to the primary party, *knowledge* of the wrong on the part of the aider, and *substantial assistance* by the aider in the achievement of the primary violation." *Id.* (internal citation omitted) (emphasis added).

Chapter 550 of the Iowa Code regulates trade secrets and provides six definitions of misappropriation.[3] Every definition requires an act *with knowledge*. Lastly, plaintiffs' unjust enrichment claim arises out of the intentional conduct alleged in the other claims against defendants. *See* Plaintiff Second Amended Complaint at ¶ 121; *see also* *205 Corp. v. Brandow, 517 N.W.2d 548 (Iowa 1994)* (allowing plaintiff to sue for unjust enrichment based on theories of misappropriation of trade secrets and inducement of breach of duty of loyalty). Because plaintiff must prove the underlying claims to recover for unjust enrichment, which themselves do not depend on negligence or recklessness, a comparative fault defense is improper.

Regardless of whether chapter 668 applies to the *substantive* claims against them, however, defendants note that its definition of "fault" also includes the failure to mitigate damages. As

---

[2] The parties do not dispute that Iowa substantive law applies generally to this action, for which jurisdiction is based on diversity of citizenship. *See, e.g.*, *Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)* (in diversity cases, "the law to be applied . . . is the law of the State" in which the district court sits).

[3] (a) Acquisition of a trade secret by a person who *knows* that the trade secret is acquired by improper means. (b) Disclosure or use of a trade secret by a person who *uses improper means* to acquire the trade secret. (c) Disclosure or use of a trade secret by a person who at the time of disclosure or use, *knows* that the trade secret is derived fromor through a personwho hadutilizedimpropermeans to acquire the trade secret. (d) Disclosure or use of a trade secret by a person who at the time of disclosure or use *knows* that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. (e) Disclosure or use of a trade secret by a person who at the time of disclosure or use *knows* that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use. (f) Disclosure or use of a trade secret by a person who, before a materialchange in the person's position, *knows* that the information is a trade secret and that the trade secret has been acquired by accident or mistake. *Iowa Code § 550.2(3)* (emphasis added).

2005 U.S. Dist. LEXIS 57648, *6

explained by the Iowa Supreme Court in *Coker v. Abell-Howe Co., 491 N.W.2d 143, 148 (Iowa 1992)*, the phrase [*7] "unreasonable failure to avoid an injury or to mitigate damages," as contained in *§ 668.1*, derives from the doctrine of unavoidable consequences. Under this doctrine, a party may not recover damages resulting from consequences the party "could reasonably have avoided." *Id. at 149*. The doctrine of avoidable consequences is separate and distinct from that of contributory negligence:

> "[C]ontributory negligence is negligence of the plaintiff *before* any damage, or any invasion of his rights, has occurred . . . . The rule of avoidable consequences comes into play *after* a legal wrong has occurred, but while some damage may still be averted, and bars recovery only for such damages.

*Id.* (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 458 (5th ed. 1984) (emphasis added). Accordingly, although chapter 668 may not be applicable as a defense to the parties' respective pre-*damage* conduct, it *is* in fact applicable to plaintiffs' *post*-damage conduct.

Plaintiffs' failure to mitigate damages following the combined defendants' allegedly tortious conduct is a proper issue for discovery. Defendant's motion must therefore be denied. *See, e.g., Lunsford, 570 F.2d at 229* ("A motion to strike a defense will be denied if the [*8] defense is sufficient as a matter of law or if it fairly presents a question of law or fact which the court ought to hear.").[4]

III. CONCLUSION

For the reasons outlined above, plaintiffs' motion to strike is denied.

IT IS ORDERED.

Dated this 30th day of August, 2005.

/s/ Ronald E. Longstaff

RONALD E. LONGSTAFF, Chief Judge

United States District Court

***

**End of Document**

---

[4] The Court notes that, as a practical matter, the defense will be addressed through a single instruction to the jury, modeled after Iowa Uniform Civil Jury Instruction 400.8. *But see Coker, 491 N.W.2d at 149* (finding that evidence presented at trial nevertheless insufficient to submit instruction on failure to mitigate damages).

# Tab 24

# *Red Fox Future, LLC v. Holbrooks*

North Carolina Superior Court, Polk County

March 24, 2014, Decided

11 CVS 108

**Reporter**

2014 NCBC 8 *; 2014 NCBC LEXIS 8 **; 2014 WL 1213235

RED FOX FUTURE, LLC and ANDREY MEDVEDEV, Plaintiffs, v. GENE S. HOLBROOKS, HOME REALTY CO. & INSURANCE AGENCY, INC., TONY JACKSON, and RED FOX PROPERTIES, LLC, Defendants.

**Subsequent History:** Costs and fees proceeding at, Motion denied by *Red Fox Future, LLC v. Holbrooks, 2014 NCBC LEXIS 43 (2014)*

**Counsel:** **[**1]** Patla, Straus, Robinson, & Moore P.A. by Richard S. Daniels for Plaintiffs Red Fox Future, LLC, and Andrey Medvedev.

Tuggle Duggins P.A. by Robert C. Cone for Defendants Gene S. Holbrooks and Home Realty Co. & Insurance Agency, Inc.

David Lloyd Law Office by David A. Lloyd for Defendants Tony Jackson and Red Fox Properties, LLC.

**Judges:** Murphy, Judge.

**Opinion by:** Murphy

## Opinion

ORDER AND OPINION

Murphy, Judge.

**[*1]** THIS MATTER is before the Court on Defendants Gene S. Holbrooks ("Holbrooks") and Home Realty Co. & Insurance Agency, Inc.'s ("Home Realty") (collectively, "Defendants") Motion for Summary Judgment pursuant to *Rule 56 of the North Carolina Rules of Civil Procedure* ("Motion I"); Plaintiffs Red Fox Future, LLC ("Future") and Andrey Medvedev's ("Medvedev") (collectively, "Plaintiffs") Motion for Partial Summary Judgment pursuant to *Rule 56 of the North Carolina Rules of Civil Procedure* ("Motion II"); and Defendants' Motion to Exclude or Limit the Testimony of John R. Markel, CPA ("Motion III") in the above-captioned case. Having considered the Motions, the briefs and exhibits filed in support and opposition to the Motions, and the arguments of counsel made at a hearing held on March 21, 2013, the Court hereby GRANTS **[**2]** Motion I, GRANTS in part and DENIES in part Motion II, and GRANTS Motion III.

I.

PROCEDURAL HISTORY

**[*2]** On April 15, 2011, Plaintiffs filed their Complaint in this action bringing claims against Holbrooks, Home Realty, Tony Jackson ("Jackson"), and Red Fox Properties, LLC ("Properties") for fraud, unfair and deceptive trade

practices, conversion, rescission, accounting, and recovery of assets and penalties related to a failed venture to purchase a country club and golf course.

**[\*3]** Subsequently, the case was designated a complex business case, and assigned to this Court on June 3, 2011.

**[\*4]** On July 1, 2011, Defendants filed their Answer and Counterclaims alleging causes of action against Plaintiffs for breach of contract, conversion/trespass to chattels, fraud, unfair and deceptive trade practices, breach of fiduciary duty, constructive fraud, unjust enrichment, accounting, and specific performance. On August 29, 2011, Jackson and Properties filed their Amended Answer and Counterclaims.

**[\*5]** Thereafter, on October 15, 2012, Defendants filed Motion I seeking summary judgment on all claims asserted against them in the Complaint. That same day, Plaintiffs filed Motion II seeking partial summary judgment **[\*\*3]** on all of Defendants' counterclaims against Medvedev and Defendants' counterclaims against Future for breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices, punitive damages, and specific performance. Plaintiffs also requested a cap on Defendants' recovery for any award in excess of $650,000.

**[\*6]** Simultaneously with Motion I, Defendants also filed a Motion III requesting the Court exclude the testimony of Plaintiffs' expert witness, John R. Markel, CPA ("Markel").

**[\*7]** The parties briefed all three Motions, and the Court held a hearing on March 21, 2013.

II.

FACTUAL BACKGROUND

**[\*8]** On a motion for summary judgment under *Rule 56 of the North Carolina Rules of Civil Procedure*, the Court does not make findings of fact to resolve an issue of material fact. "[S]ummary judgment presupposes that there are

no triable issues of material fact." *Hyde Ins. Agency v. Dixie Leasing, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975)*. Therefore, the Court recites only those material facts that the Court concludes are not disputed, and which justify entering judgment. *Id.*

**[\*9]** Holbrooks is the owner and president of Home Realty, a North Carolina corporation that develops real estate. (Holbrooks **[\*\*4]** Dep. 10:9-25, Apr. 10, 2012.) In 1992, Home Realty purchased Red Fox Country Club (the "Club"), which Holbrooks managed until 2009. (Holbrooks Dep. 14:23.)

**[\*10]** In 1992, Defendants hired Jackson to work at the Club, and thereafter, Jackson worked closely with Holbrooks. (Holbrooks Dep. 42:20-25.)

**[\*11]** During the summer of 2009, Jackson met Medvedev, a Russian businessman looking to settle in North Carolina. (Medvedev Dep. 104:20-21, Apr. 11, 2012.) Although Medvedev had no experience with the Club, Jackson and Medvedev agreed to pursue negotiations with Defendants to purchase the Club. To do so, Medvedev and Jackson formed Future, a South Carolina limited liability company. (Pls.' Opp. Mot. I Ex. 11.)

**[\*12]** On October 15, 2009, Jackson and Medvedev signed the Operating Agreement for Future. Pursuant to Article 5 of the Operating Agreement, in addition to becoming the initial managers of Future, Medvedev and Jackson also served as Chief Executive Officer and Chief Operating Officer, respectively. (Pls.' Opp. Mot. I Ex. 11 §§ 5.1, 5.3.) The Operating Agreement also provided that each member would make an initial capital contribution — Medvedev agreed to contribute $1,620,000 and Jackson agreed to contribute **[\*\*5]** $650,000. (Pls.' Opp. Mot. I Ex. 11 Ex. A.) By signing the Operating Agreement, Medvedev and Jackson also acknowledged that they were "capable of evaluating the merits and risks of investment in [Future] . . . [, understood] that investment in [Future] constitute[d] a speculative investment . . . [, and] had opportunity to seek the advice of [their] own independent legal

counsel . . . ." (Pls.' Opp. Mot. I Ex. 11 § 3.7(e) (emphasis removed).)

**[*13]**  The parties negotiated and agreed that Future would purchase the Club for $2,850,000, and that $650,000 of the purchase price would be financed by Defendants as a loan to Jackson. (Compl. Ex. A § 2.) As part of the deal, the $650,000 loan to Jackson would also serve as Jackson's initial capital contribution to Future. Although the loan was not secured, Jackson testified that he agreed to procure a $650,000 life insurance policy on his own life, payable to Home Realty in the event of his death. (Jackson Dep. 120:17-122:16, Apr. 11, 2012; Holbrooks Dep. 119:6-122:18.)

**[*14]**  On August 29, 2009, to memorialize their agreement, Defendants and Future entered into the Purchase Agreement (the "Agreement"). (Compl. Ex. A.) By the terms of the Agreement, Future **[**6]** committed to buy the Club and all associated property. The Agreement further provided that Jackson "delivered his Promissory Note to [Defendants] to evidence" the loan between them, and that "[t]he Promissory Note . . . will be free of all claims by the Club or [Future]." (Compl. Ex. A § 2.) At closing, the $650,000 loan to Jackson would be applied to the purchase price and the remaining $2,200,000 of the purchase price would become due. Prior to closing, however, Future agreed to make an earnest money deposit of $50,000, which the Agreement stipulated would be refundable if the parties did not close by October 15, 2009. If the parties did not close by that date, the Agreement provided that Future could extend the closing date until no later than December 10, 2009, upon payment of $100,000 as an additional nonrefundable deposit and the initial deposit of $50,000 would become nonrefundable. The Agreement further specified that, once Future paid the required deposit, Defendants could "do whatever [they chose]" with the money. (Compl. Ex. A § 5.) If Future opted to extend the closing date under this provision, then it would also take possession of the Club, receive all revenues from

the **[**7]** Club's operations, pay all operating expenses of the Club, and pay Defendants 5% annually on the remaining purchase price, less the nonrefundable deposits and the loan to Jackson.

**[*15]**  Medvedev argues that Jackson convinced him additional investors could be recruited to contribute the remaining $580,000 needed to close on the Club which would be combined with the $1,620,000 contributed by Medvedev and the $650,000 loan to Jackson. However, it appears that only one other investor agreed to invest in the project. And, without sufficient investors, Future failed to close on October 15, 2009, and instead, exercised its option to extend the closing date to December 10, 2009.

**[*16]**  As contemplated in the Agreement, Future thereafter took possession of the Club, began collecting its revenues, assumed the obligation to pay the operating expenses, and paid an additional $100,000 deposit to Defendants. Both the original $50,000 deposit and the new $100,000 deposit then became nonrefundable. (Compl. Ex. A § 5.)

**[*17]**  Despite the closing extension, Future struggled to generate any new investors or financing in time to close on the Club. As a result, Future requested an additional extension. Defendants agreed, **[**8]** and the parties executed the Addendum to the Agreement (the "Addendum"), which extended the closing date to April 1, 2010. (Compl. Ex. B.) As consideration, Future paid an additional $500,000 nonrefundable deposit to Defendants that would be credited to the balance of the purchase price at closing. Future would also continue to occupy and operate the Club. (Compl. Ex. B.)

**[*18]**  Despite this extension, Future again failed to close on April 1, 2010, but continued to occupy and run the Club. On May 10, 2010, Defendants sent a letter to Jackson, Future's registered agent, notifying Future of the breach and of Defendants' intention to terminate the Agreement and to retain all the nonrefundable deposits "as liquidated damages" (the "Termination Letter"). (Compl. Ex.

2014 NCBC 8, *18; 2014 NCBC LEXIS 8, **8

C.) Defendants also allege that Future neglected to pay all the Club's operating expenses while in possession.

[*19] Apparently, after the deal fell apart, Defendants allowed Jackson to continue operating the Club and began negotiating a new deal with Jackson to purchase the Club without Plaintiffs' involvement. (Holbrooks Dep. 52:5-25.) To facilitate the deal, Jackson formed Properties, a new limited liability company. (Jackson Dep. 90:8-25.) [**9] However, Defendants, Jackson, and Properties never consummated the new deal, and Defendants ultimately listed the Club for sale at a price of $2,200,000. (Pls.' Supp. Mot. II Ex. N.)

[*20] Plaintiffs argue that Defendants and Jackson defrauded Medvedev into investing in the project, and defrauded Future into entering the Agreement and Addendum and paying the nonrefundable deposits. Specifically, Plaintiffs allege that Defendants and Jackson misrepresented that Jackson had borrowed $650,000 from Defendants to be applied to the purchase of the Club when, in fact, Defendants never intended to loan Jackson the money. Plaintiffs argue that Defendants always intended the purchase price to be $2,200,000, not $2,850,000, and that Defendants and Jackson used the phantom loan to convince Plaintiffs to make investments in the project while also giving Jackson a stake in Future.

[*21] Defendants and Jackson refute these claims. And, in response, Defendants allege that Plaintiffs: (i) breached the Agreement by not closing on April 1, 2010; (ii) improperly retained proceeds from the unauthorized sale of some 60 golf carts and from an insurance payout after wind damage to property at the Club; (iii) incurred [**10] unnecessary expenses by leasing computer software and golf carts; and (iv) left certain vendors unpaid. In his deposition, Jackson testified under oath that he handled all the deposits and oversaw the sale of the golf carts. (Jackson Dep. 127:12-128:23, 134:25-135:2, 137:10-13.)

[*22] After Defendants took back possession of the Club, and the pleadings closed in this matter, it appears that one of the buildings on the property — the clubhouse — burned down in a fire.

III.

LEGAL STANDARD

[*23] "The purpose of summary judgment is to determine whether any issues of material fact exist, and if not, eliminate the necessity of a full trial where only questions of law are involved." *Strickland v. Lawrence, 176 N.C. App. 656, 661, 627 S.E.2d 301, 305 (2006)* (citing *Foster v. Winston-Salem Joint Venture, 303 N.C. 636, 641-42, 281 S.E.2d 36, 40 (1981))*. Thus, the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." *N.C. R. Civ. P. 56(c)*.

[*24] "The movant has the burden of establishing the [**11] absence of any triable issues of fact." *Strickland, 176 N.C. App. at 661, 627 S.E.2d at 305*. This burden can be met in one of two ways: "(1) 'by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense'; or (2) 'by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim.'" *Id.* (quoting *Dobson v. Harris, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000))*.

[*25] In ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. *See Wilmington Star-News v. New Hanover Reg'l Med. Ctr., 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997)* (citation omitted).

IV.

ANALYSIS

2014 NCBC 8, *25; 2014 NCBC LEXIS 8, **11

A.

MOTION I

1.

FRAUD (FUTURE AND MEDVEDEV)

[*26]  To succeed on a claim for fraud, Plaintiffs must prove the following:

(1) material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge of its falsity or in culpable ignorance of its truth; (4) that the misrepresentation was made with intention that it should be acted upon; (5) that the recipient of the misrepresentation reasonably [**12] relied upon it and acted upon it; and (6) that there resulted in damage to the injured party.

*Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999)* (quoting *Rosenthal v. Perkins, 42 N.C. App. 449, 451-52, 257 S.E.2d 63, 65 (1979))*.

[*27]  Furthermore, if the plaintiff could have discovered the truth upon inquiry, then he must show that "he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Id.* (citation omitted).

[*28]  Here, Plaintiffs argue that Defendants misrepresented their intent to loan Jackson $650,000 towards the purchase of the Club. Plaintiffs' theory is that Defendants and Jackson created this phantom loan to induce significant investments and deposits from Plaintiffs and provide Jackson a stake in Future, when in reality the actual purchase price for the Club was $2,200,000, not $2,850,000.

[*29]  The flaw in Plaintiffs' theory is that, even if this scheme proved to be true, the record reveals no injury resulting from these representations. Plaintiffs do not allege or put forward evidence that Plaintiffs would have been in anyway liable for the $650,000 if Defendants did not loan Jackson [**13] the money, nor do they argue that Defendants would not have closed on the deal if the loan fell through. Plaintiffs only contention is that the alleged misrepresentations caused them to make significant investments and deposits, which were lost when the deal did not close.

[*30]  However, Plaintiffs do not dispute that they negotiated and agreed to the $2,850,000 purchase price and the accompanying terms in the Agreement. Whether Defendants and Jackson intended the loan to be real or not is irrelevant. Indeed, even if Defendants simply discounted the purchase price by $650,000 as a gift to Jackson, the result would be the same — Plaintiffs would still get the benefit of $650,000 off the purchase price of the Club. This would remain the case even if Defendants loaned Jackson the money, but thereafter, Jackson failed to pay the loan or Defendants never collected the debt. In that scenario, Plaintiffs still get the benefit of the $650,000 paid towards the purchase of the Club. Any recourse on the loan would be between Defendants and Jackson, given that the parties agreed Plaintiffs would have no liability for the debt.

[*31]  The Court does not find anything in the record linking the representations [**14] regarding the loan to Jackson to Plaintiffs' ultimate loss. Based on the record, it appears that the sole cause of Plaintiffs' loss was the lack of sufficient investors to close on the deal. Therefore, the Court concludes that no issues of material fact remain as to whether the alleged misrepresentations caused any injury to Plaintiffs. As such, Plaintiffs' claim for fraud fails as a matter of law.

[*32]  Accordingly, the Court GRANTS Motion I as to Plaintiffs' claims for fraud, and DISMISSES these claims with prejudice.

2.

## UNFAIR AND DECEPTIVE TRADE PRACTICES (FUTURE AND MEDVEDEV)

[*33] "In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)*.

[*34] Plaintiffs based their claim for unfair and deceptive practices on the same facts as their fraud claim. Having concluded that there is no genuine issue of material fact as to whether Defendants' alleged acts proximately caused injury to Plaintiffs, the Court similarly concludes that [**15] Plaintiffs have failed to establish an essential element of their unfair trade practices claim. Accordingly, the Court GRANTS Motion I as to Plaintiffs' claims for unfair and deceptive trade practices, and DISMISSES these claims with prejudice.

3.

## RESCISSION (FUTURE)

[*35] Under its claim for rescission, Future seeks to rescind the Agreement based on unconscionability. "To find unconscionability there must be an absence of meaningful choice on [the] part of one of the parties together with contract terms which are unreasonably favorable to the other." *Martin v. Sheffer, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991)*. In other words, the party seeking to rescind an unconscionable contract must show both procedural and substantive unconscionability.

Procedural unconscionability involves 'bargaining naughtiness' in the formation of the contract, i.e., fraud, coercion, undue influence, misrepresentation, inadequate disclosure. Substantive unconscionability . . . involves the harsh, oppressive, and one-sided terms of a contract, i.e., inequality of the bargain. The inequality of the bargain, however, must be so manifest as to shock the judgment of a person of common sense, and . . . the terms [**16] . . . so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.

*Raper v. Oliver House, LLC, 180 N.C. App. 414, 420, 637 S.E.2d 551, 555 (2006)*.

[*36] To support its claim of procedural unconscionability, Future appears to allege fraudulent inducement, drawing on the same facts underlying the claim for fraud. The Court, however, dismissed Plaintiffs' claim for fraud given the lack of evidence linking the alleged misrepresentation to any injury suffered by Plaintiffs. Furthermore, the Court finds no other evidence in the record demonstrating that Future was in some way denied a meaningful choice in executing the Agreement. Nonetheless, even if Future could rely on the alleged misrepresentation to support procedural unconscionability, there is no evidence of a shocking inequality in the terms of the Agreement or the Addendum to support substantive unconscionability.

[*37] This was a bargained-for exchange with benefits and risks on both sides. Once the parties struggled to find investors, Future was free to withdraw from the Agreement and get the initial deposit back. However, Future chose to proceed and extend the closing [**17] date, not once but twice. And, in return, Future got possession of the Club and the benefit of the revenues produced by the Club's operation until Defendants ultimately terminated the deal. Simply because the deal ended badly for Future does not give the Court grounds to rescind the contract. "People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain." *Blaylock Grading Co., LLP v. Smith, 189 N.C. App. 508, 511, 658 S.E.2d 680, 682 (2008)*. Without any

2014 NCBC 8, *37; 2014 NCBC LEXIS 8, **17

evidence to support unconscionability, the Court concludes that no issues of fact remain on Future's claim for rescission.

**[\*38]** Accordingly, the Court GRANTS Motion I as to Future's claim for rescission, and DISMISSES this claim with prejudice.

4.

RECOVERY OF PENALTY (FUTURE)

**[\*39]** Under this claim, Future seeks to recover the nonrefundable deposits paid to Defendants pursuant to the Agreement and the Addendum. Specifically, Future argues that the deposits constitute unenforceable penalties under a liquidated damages analysis.

> *Liquidated damages* are a sum which a party to a contract agrees to pay or a deposit which he agrees to **[\*\*18]** forfeit, if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable or retainable . . . if the breach occurs. A *penalty* is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a *punishment*, the threat of which is designed to prevent the breach, or as *security* . . . to insure that the person injured shall collect his actual damages.

*Knutton v. Cofield, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968)* (quotation omitted and alteration original). While a liquidated damages provision may be enforceable, courts will not impose a penalty. *Id.*

**[\*40]** In this case, neither the Agreement nor the Addendum indicate that the nonrefundable deposits were in any way intended to be liquidated damages. The Agreement provides that the deposits became nonrefundable upon Future's exercise of its option to extend the closing, and that Defendants could

freely do whatever they chose with the money after that point, regardless of Future's performance. (Compl. Ex. A § 5.) Furthermore, the parties agreed **[\*\*19]** in the Addendum that the $500,000 nonrefundable deposit constituted consideration for the additional extension, not an estimated amount of damage that Future would forfeit if it failed to close. (Compl. Ex. B.) Nothing in the Agreement or the Addendum conditions Defendants' retention of the deposits on Future's breach nor restricts Defendants' ability to pursue other damages. A thorough review of the Agreement and the Addendum reveals that the nonrefundable deposits "did not serve as liquidated damages because it was not set out in the contract[s] as the amount agreed upon which would serve as liquidated damages." *Chris v. Epstein, 113 N.C. App. 751, 757, 440 S.E.2d 581, 585 (1994)*. Therefore, the Court need not engage in an analysis of whether the liquidated damages are unenforceable penalties because the contracts do not contain a provision for liquidated damages.[1] As a result, Future's claim for recovery of penalty fails as a matter of law.

**[\*41]** Accordingly, the Court hereby GRANTS Motion I as to Future's claim for recovery of penalty, and DISMISSES the claim with prejudice.

B.

MOTION II

1.

CAP ON RECOVERY

**[\*42]** In Motion II, Plaintiffs request summary

---

[1] This remains the case despite Defendants use of the term "liquidated damages" in the Termination Letter. In construing a contract, the Court looks to the four corners of the agreement to determine the intent of the parties at the moment of execution. **[\*\*20]** *Lane v. Scarborough, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973)*. Therefore, the Court is not swayed by the language in the Termination Letter, which was not part of either the Agreement or the Addendum and was sent months after execution.

judgment on all of Defendants' claims to the extent that Defendants seek recovery in excess of $650,000. Specifically, Plaintiffs argue that the nonrefundable deposits totaling $650,000 are the maximum amount that Defendants can recover because the deposits constituted either liquidated damages or unenforceable penalties under the Agreement and the Addendum. However, the Court has already determined that the provisions in the Agreement and the Addendum for nonrefundable deposits did not represent liquidated damages. As such, Plaintiffs' argument for a cap on damages fails for the same reasons. Therefore, the Court hereby DENIES Motion II as to Plaintiffs request for a cap on Defendants' recoverable damages.

2.

BREACH OF FIDUCIARY DUTY AND CONSTRUCTIVE [**21] FRAUD AGAINST FUTURE

[*43] Plaintiffs argue that they are entitled to summary judgment on Defendants' claims against Future for breach of fiduciary duty and constructive fraud because no fiduciary duty exists between Future and Defendants. The existence of a fiduciary relationship is an essential element of both a claim for breach of fiduciary duty and a claim for constructive fraud. *See Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001); Terry v. Terry, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981).*

Such a relationship has been broadly defined by [the North Carolina Supreme Court] as one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . ., [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'

*Dalton, 353 N.C. at 651-52, 548 S.E.2d at 707-08* (quoting *Abbitt v. Gregory, 201 N.C. 577, 598, 160*

*S.E. 896, 906 (1931))* (quotation omitted and alteration original).

[*44] "Although our courts have broadly defined [**22] fiduciary relationships, no such relationship arises absent the existence of dominion and control by one party over another." *Kaplan v. O.K. Techs., LLC, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009).* Thus, special circumstances must exist such that "one party figuratively holds all the cards . . . ." *Id. at 475, 675 S.E.2d at 138* (quoting *Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998)).* However, "[g]enerally, the existence of such a relationship is determined by specific facts and circumstances, and is thus a question of fact for the jury." *Stamm v. Salomon, 144 N.C. App. 672, 680, 551 S.E.2d 152, 158 (2001).*

[*45] Defendants argue that Future owed them a fiduciary duty by virtue of Future's possession of the Club. Indeed, it appears from the record that the Agreement entitled Future to possession of the Club and control of its operations upon the exercise of Future's option to extend the closing deadline, and that Future in fact operated the Club from October 2009 until May 2010. Arguably, this put Future in a position of domination and control because there was no guarantee that the deal would close. In that situation, the Club would be returned [**23] to Defendants in whatever condition Future left it. Thus, Defendants argue that they were at Future's mercy after entrusting Future with the operation of the Club.

[*46] On the other hand, as Future points out, this was the deal reached between the parties, and "a fiduciary relationship will not exist between parties in equal bargaining positions dealing at arm's length, even though they are mutually interdependent businesses." *Strickland v. Lawrence, 176 N.C. App. 656, 662, 627 S.E.2d 301, 306 (2006).* However, unlike the case in *Strickland*, it does not appear that Defendants maintained an active role in the day-to-day management of the Club during Future's time at the helm. As such, the

Court concludes that there are material questions of fact left to be resolved regarding the existence of a fiduciary relationship between Defendants and Future, and therefore, Defendants' claims for breach of fiduciary duty and constructive fraud against Future should survive at this stage.

[*47] Accordingly, the Court hereby DENIES Motion II as to Defendants' claims for breach of fiduciary duty and constructive fraud against Future.

3.

## UNFAIR AND DECEPTIVE PRACTICES AND PUNITIVE DAMAGES AGAINST FUTURE

[*48] Plaintiffs' [**24] sole basis for summary judgment on Defendants' claims for unfair and deceptive practices and punitive damages against Future rests on their theory that these claims should fall with the breach of fiduciary duty and constructive fraud claims.

[*49] Although Defendants partially base their unfair and deceptive practices and punitive damages claims on the underlying breach of fiduciary duty and constructive fraud, Defendants also rely on their claims for conversion, trespass to chattels, and fraud. Because Plaintiffs have not moved for summary judgment on the underlying claims for conversion, trespass to chattels, and fraud against Future, these claims survive and can support the claims for unfair and deceptive practices and punitive damages. *Bhatti v. Buckland, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991)* ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . ."); *N.C. GEN. STAT. § 1D-15* (2013) ("Punitive damages may be awarded . . . if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present . . . : (1) Fraud. (2) Malice. (3) Willful or wanton conduct.").

[*50] [**25] Furthermore, the Court concluded that some evidence exists to withstand summary

judgment on Defendants' breach of fiduciary duty and constructive fraud claims against Future. Therefore, the Court similarly concludes that Future is not entitled to summary judgment on the unfair and deceptive practices and punitive damages claims to the extent they are based on the underlying claims of breach of fiduciary duty and constructive fraud.

[*51] Accordingly, the Court hereby DENIES Motion II as to Defendants' claims against Future for unfair and deceptive practices and punitive damages.

4.

## SPECIFIC PERFORMANCE AGAINST FUTURE

[*52] Regarding specific performance, the North Carolina Supreme Court has stated:

> The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court. The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on his part or that he is ready, willing and able to perform.

*Munchak Corp. v. Caldwell, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981)* (internal quotation and citations omitted). Although specific performance is an extraordinary [**26] equitable remedy, "[w]here land is the subject matter of the parties' agreement, the vendor, like the purchaser, may seek specific performance without showing the inadequacy of a legal remedy." *Deans v. Layton, 89 N.C. App. 358, 371, 366 S.E.2d 560, 568 (1988)*.

[*53] Future argues that Defendants cannot seek specific performance of the Agreement and the Addendum because Defendants are not able to fully perform. Specifically, because the clubhouse burned down in a fire, Future argues that Defendants cannot uphold their end of the bargain under the Agreement, and therefore, Future should not be forced to perform either.

[*54]  "When the vendor's . . . estate is different from that which he agreed to convey, . . . it is plain that the contract cannot be specifically performed, according to its exact terms, at the suit of either party." *Sutton v. Davis, 143 N.C. 474, 480, 55 S.E. 844, 845 (1906)*. Nonetheless, a court in equity may still compel a conveyance, with pecuniary compensation to the purchaser for the deficiency, as long as the defects do not materially change the nature of the entire agreement. *Taylor v. Bailey, 49 N.C. App. 216, 220, 271 S.E.2d 296, 299 (1980)* (quotation and citation omitted);  [**27] *see also Nugent v. Beckham, 37 N.C. App. 557, 561, 246 S.E.2d 541, 545 (1978)*. This doctrine may apply with equal force in cases where the defect arises after the time of contract, such as when a fire destroys a building on the property. *See Sutton, 143 N.C. at 483-85, 55 S.E. at 846-47*.

[*55]  In *Sutton*, the North Carolina Supreme Court recited the general principle that, "when property is destroyed by fire, the loss will fall on him who is the owner at the time." *Id. at 483, 55 S.E. at 846*. And, where there is an absolute and binding contract for the sale of real estate, the purchaser will be considered the equitable owner of the property. *Id.* Thus, "if the premises are consumed by fire subsequently to the sale, . . . the loss will fall on the purchaser, who can neither make the deterioration a ground for refusing to accept a conveyance nor rely on it as a defense to an action brought for the purchase-money." *Id. at 484, 55 S.E. at 847*. Although the contract in *Sutton* had  [**28] not been completed, the court still found that the circumstances warranted applying the principle to grant specific performance where the purchaser had taken possession of the property and enjoyed the benefits of ownership.

[*56]  Here, there is no evidence indicating that Defendants are incapable of performing their obligations under the Agreement and the Addendum with the exception of the destroyed clubhouse. Further, Defendants concede that any insurance proceeds received after the fire could be accounted for as an offset to the purchase price.

Even though the contract has not been completed, the particular facts in this case, like in *Sutton*, leave the door open for the Court to grant specific performance to Defendants in its discretion. Therefore, the Court will not foreclose this avenue of recovery for Defendants' claim at this stage.

[*57]  Accordingly, the Court hereby DENIES Motion II as to Defendants' request for specific performance from Future.

5.

CLAIMS AGAINST MEDVEDEV

[*58]  Plaintiffs argue that summary judgment is appropriate on all of Defendants' counterclaims against Medvedev because Medvedev did not actively participate in the alleged acts and cannot be held personally liable for Future's  [**29] wrongs.

[*59]  As the name implies, one of the defining characteristics of a limited liability company is limited liability for its members from harm caused by the company. *See S.C. CODE ANN. § 33-44-303* (2013).[2] Thus, merely participating as a member or manager of a limited liability company will not suffice to hold the member personally liable for harm caused by the company. *16 Jade St., LLC v. R. Design Constr. Co., LLC, 398 S.C. 338, 346, 728 S.E.2d 448, 452 (2012)*; *see also Spaulding v. Honeywell Int'l, Inc., 184 N.C. App. 317, 322, 646 S.E.2d 645, 649 (2007)*. Nonetheless, a member of a limited liability company remains individually liable for his or her own torts, even though committed while acting on behalf of the company. *See 16 Jade St., LLC, 398 S.C. at 349, 728 S.E.2d at 454*; *see also White v. Collins Bldg., Inc., 209 N.C. App. 48, 51, 704 S.E.2d 307, 310 (2011)*. "In addition, a member of a limited liability company, like shareholders and directors of corporations, may be held individually liable for the company's

---

[2] Future was incorporated as a limited liability company under the laws of South Carolina. Thus, the Court will look to the Uniform Limited Liability Company Act, as enacted in South Carolina.

2014 NCBC 8, *59; 2014 NCBC LEXIS 8, **29

obligations through the doctrine of piercing the corporate veil." *Estate of Hurst v. Moorehead I, LLC, 748 S.E.2d 568, 573 (2013)*; *see also Drury Dev. Corp. v. Foundation Ins. Co., 380 S.C. 97, 668 S.E.2d 798 (2008)*.[3] **[\*\*30]** [4]

**[\*60]** "It is well recognized that courts will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or to achieve equity." *Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985)*; *see also Drury Dev. Corp., 380 S.C. at 101, 668 S.E.2d at 800*. To apply this doctrine, courts in both North Carolina and South Carolina require allegations and proof of various similar elements. *See Glenn, 313 N.C. at 454-55, 329 S.E.2d at 330-31*; *Sturkie v. Sifly, 280 S.C. 453, 457-59, 313 S.E.2d 316, 318 (Ct. App. 1984)*.

**[\*61]** Courts in North Carolina employ the "instrumentality rule" to pierce the corporate veil:

> The instrumentality rule allows for the corporate form to be disregarded if the corporation is so operated that it is a mere

instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State.

*Estate of Hurst, 748 S.E.2d at 573-74* (internal quotations and alterations omitted).

**[\*62]** To prevail under this theory, a party must allege and prove three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, . . . so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn, 313 N.C. at 454-55, 329 S.E.2d at 330* (quoting *B-W Acceptance Corp. v. Spencer, 268 N.C. 1, 9, 149 S.E.2d 570, 576 (1966))*.

**[\*63]** In considering whether to pierce the corporate veil, courts have looked to several factors including inadequate capitalization, non-compliance with corporate formalities, complete domination and control **[\*\*33]** of the corporation so that it has no independent identity, and excessive fragmentation of a single enterprise into separate corporations. *See Glenn, 313 N.C. at 455, 329 S.E.2d at 330-31*.

**[\*64]** In South Carolina, courts use a two-pronged test to determine whether the corporate entity should be disregarded.

> The first part of the test, an eight-factor analysis, looks to observance of the corporate formalities by the dominant shareholders. The

---

[3] Because Defendants would have the Court pierce the veil of a South Carolina limited liability company, the Court must consider choice of law implications. North Carolina courts have not resolved which state's law applies to determine whether to pierce the veil of an out-of-state company. *Strategic Outsourcing, Inc. v. Stacks, 176 N.C. App. 247, 252-53, 625 S.E.2d 800, 804 (2006)*. At least one federal court applying North Carolina law concluded that, if faced with the issue, the North Carolina Supreme Court "would adopt the internal affairs doctrine and apply the law of the state of incorporation." *Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F.Supp. 345, 349 (M.D.N.C. 1995)*. However, the issue remains unsettled. Because the Court would reach the same conclusion under the law of either North Carolina or South Carolina, the Court need not reach a determination on the choice of law issue at this stage.

[4] The Court notes that South Carolina has not expressly applied the doctrine of piercing the **[\*\*31]** corporate veil to limited liability companies. Although this adoption of corporate law seems likely, *see 16 Jade St., LLC, 398 S.C. at 348, 728 S.E.2d at 453* (reciting the courts' preference for applying corporate law principles to limited liability companies), the resolution of this issue would not change the outcome of this Motion.

2014 NCBC 8, *64; 2014 NCBC LEXIS 8, **33

second part requires that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals.

*Sturkie, 280 S.C. at 457-58, 313 S.E.2d at 318*.

[*65] Although Defendants appear to argue in their brief opposing Motion II that the Court should pierce Future's veil to hold Medvedev personally liable, no such theory appears anywhere in the Answer and Counterclaims. Indeed, Defendants failed to bring forth any allegations related to the elements of piercing the corporate veil or the factors courts consider under either state's law. As a result, it does not appear that Medvedev had an adequate opportunity to respond to these new allegations through the pleadings or discovery. If Defendants learned [**34] additional facts through discovery that supported piercing the corporate veil, they could have moved to amend their pleading to add this theory of individual liability. Courts liberally allow motions to amend for this very reason. However, Defendants never filed such a motion in this case. "[P]iercing the corporate veil is a drastic remedy and should be invoked only in an extreme case where necessary to serve the ends of justice." *Best Cartage, Inc. v. Stonewall Packaging, LLC, 727 S.E.2d 291, 300 (2012)* (internal quotations and citation omitted); *see also Drury Dev. Corp., 380 S.C. at 101, 668 S.E.2d at 800*. In light of the facts presented and the dearth of allegations to support piercing the corporate veil, the Court will not permit Defendants' claims against Medvedev to survive under this doctrine.[5]

---

[5] Defendants argue that Medvedev should be estopped from raising the veil of limited liability as a defense to the counterclaims against him because Medvedev alleged individual claims against Defendants in the Complaint. However, these claims arguably alleged individual harm to Medvedev rather than solely derivative harm through Future. Although the Court dismissed Medvedev's individual [**35] claims above, the Court does not conclude that Medvedev cast down the veil of limited liability simply by asserting claims against Defendants for damage incurred both to Future and to Medvedev individually.

[*66] Even though the doctrine of piercing the corporate veil may not apply, Medvedev could be held liable for any torts he committed personally. *See White, 209 N.C. App. at 51-53, 704 S.E.2d at 310-11* (reciting established law that a party is personally liable for torts in which he actively participated even though he was acting on behalf of the company). As such, each counterclaim must be addressed in turn.

[*67] First, as to the breach of contract and specific performance claims, it is not evident from the pleadings whether Defendants intended to assert these claims against Medvedev individually. However, the parties do not dispute that Medvedev was not a party to either the Agreement or the Addendum. Thus, Medvedev cannot be held individually liable for any breach thereof.[6]

[*68] Defendants' second [**36] counterclaim alleges conversion, trespass to chattels, fraud, and unfair and deceptive practices based on the retention of proceeds from the sale of certain golf carts and the insurance payout from wind damage. However, as Jackson testified in his deposition, Jackson handled the sale of the golf carts and dealt with all the deposits from the insurance payout. (Jackson Dep. 127:12-128:23, 134:25-135:2, 137:10-13, Apr. 11, 2012.) Indeed, Jackson testified that Medvedev only "reluctantly went along with [the sale of the golf carts]." (Jackson Dep. 128:16.) Nothing in the record refutes this division of responsibilities between Jackson and Medvedev in Future's operation, or indicates active participation by Medvedev in the alleged wrongdoing.

[*69] Similarly, as to the counterclaim for unjust enrichment, Defendants merely lump Medvedev in with Future as having committed the wrongful acts, but again fail to argue how and to what extent Medvedev personally participated in the specific

---

[6] The Court also notes that Defendants brought a counterclaim for accounting against Future. This relief is sought solely from Future rather than Medvedev individually, and thus, is not relevant here.

2014 NCBC 8, *69; 2014 NCBC LEXIS 8, **36

acts. Although the record arguably reveals knowledge of the alleged acts, Medvedev's passive awareness of Jackson and Future's actions hardly constitutes active participation. *See Oberlin Capital, LP v. Slavin, 147 N.C. App. 52, 57, 554 S.E.2d 840, 845 (2001)* [**37] (dismissing claims against directors where the complaint alleged generally that the directors were fully informed about the wrongdoing and participated in concealing it but did not allege active participation). Additionally, Defendants cannot rely simply on Medvedev's role as Future's Chief Executive Officer to support active participation. *See 16 Jade St., LLC, 398 S.C. at 345-48, 728 S.E.2d at 452-53* (concluding that the manager of a South Carolina limited liability company, like an officer of a corporation, cannot be held personally liable solely based on his role as a manager); *see also Spaulding, 184 N.C. App. at 322, 646 S.E.2d at 649* (stating that mere participation as a member, manager, director, or executive is insufficient to hold a member independently liable). In the absence of any evidence demonstrating Medvedev's active role in the allegedly tortious acts, the Court concludes that no issues of material fact remain as to Medvedev's personal liability for these counterclaims.[7]

[*70]    Regarding the third counterclaim, Defendants allege breach of fiduciary duty, constructive fraud, and unfair and deceptive acts against both Future and Medvedev. As discussed above, claims for breach of fiduciary duty and constructive fraud hinge on the existence of a fiduciary duty. *See Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)*. Here, it appears Defendants argue that Medvedev owed them a fiduciary duty based on his position as a member-manager of Future during the period of time that Defendants entrusted Future with the operation [**39] of the Club.

[*71]    However, generally, the duties and liabilities of managers and officers "run directly to the [company] and indirectly to its shareholders; they do not run to third parties . . . ." *Kaplan v. O.K. Techs., LLC, 196 N.C. App. 469, 476, 675 S.E.2d 133, 139 (2009)* (quoting *Oberlin Capital, LP, 147 N.C. App. at 57, 554 S.E.2d at 845*). Furthermore, the record fails to reveal any sort of confidence reposed personally in Medvedev outside of his position with Future. Given their personal history, Defendants dealt mostly with Jackson over the course of their relationship with Future. And, the only evidence of Medvedev's dominance over Defendants is his role as the Chief Executive Officer of Future, which confines his duties to Future rather than Defendants as third parties. Without more, the Court will not impose a fiduciary duty on Medvedev individually to hold him personally liable for breach of fiduciary duty, constructive fraud, or the related unfair and deceptive acts claim, and thus, these claims fail as a matter of law.

[*72]    Wherefore, the Court concludes that no genuine issues of material fact remain as to the counterclaims brought individually against Medvedev. Accordingly, the [**40] Court hereby GRANTS Motion II as to these claims, and DISMISSES all claims against Medvedev with prejudice.

C.

MOTION III

[*73]    Pursuant to *Rule 702 of the North Carolina Rules of Evidence*, "a witness qualified as an expert . . . may testify . . . in the form of an opinion, or

---

[7] Regarding the unjust enrichment claim, the Court also notes that the alleged benefits were conferred on Future not Medvedev. Defendants allege that Plaintiffs unjustly received the Club's revenue, [**38] the proceeds from the sale of golf carts, the proceeds from the insurance payout, and the benefit of goods and services provided by vendors that went unpaid. However, it does not appear in the record that any of these benefits flowed directly to Medvedev, rather all the various proceeds and revenue were deposited in Future's accounts. Thus, even if Medvedev had actively participated in the wrongdoing, Defendants' unjust enrichment claim would likely still fail. *See Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)* ("In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party.")

otherwise, if all of the following apply:"
   (1) The testimony is based upon sufficient facts or data.
   (2) The testimony is the product of reliable principles and methods.
   (3) The witness has applied the principles and methods reliably to the facts of the case.

*N.C. R. Evid. 702*.

**[\*74]** The North Carolina Supreme Court outlined "a three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004)* (citation omitted). Therefore, under the first inquiry, the Court must assess the reliability of the expert's proffered methodology to determine admissibility.

**[\*75]** Here, however, neither Plaintiffs nor their proffered expert, Markel, **[\*\*41]** put forward any clear methodology that Markel utilized in reaching his opinions. Plaintiffs argue that, because Markel was not asked to make any definitive calculations as to damages, no such methodology is required to assess the reliability of his testimony. The Court disagrees. To allow Markel to testify as an expert, the Court must have some objective methodology to examine for reliability. Otherwise, the parties would be free to elicit subjective views of the case from witnesses cloaked as experts.

**[\*76]** Furthermore, as to the opinions proffered by Markel, some methodology appears inherent in his conclusions. Specifically, Markel first opines that, because he could not find any uncertainties, the parties could have reasonably estimated damages resulting from breach at the time they entered into the contract. However, Markel never fully identifies in his opinion or in his deposition how he reached this determination. Upon direct questioning, Markel stated that he relied on a unique, personal checklist,

but never offers that checklist for review or clarifies what is on the list. (Markel Dep. 51:17-53:22, Aug. 17, 2012.)

**[\*77]** Markel's methodology becomes even murkier on the remaining opinions. **[\*\*42]** As to those opinions, Markel asserts that the reasonable damages estimate would have been much lower than $150,000, and that the deposits were clearly disproportionate to that amount, suggesting they were intended as a disincentive to breach or to insure that damages were covered. However, in his deposition, Markel admitted that he did not perform any calculation to reach the $150,000 amount. (Markel Dep. 148:16-24, Aug. 17, 2012.) Indeed, Markel continually stated that he relied solely on his experience to reach these conclusions, and could not refer to any specific methodology or practice other than background material.

**[\*78]** Given Markel's responses, it appears that he relied more on a subjective review of the case rather than any objective methodology. And if such an objective methodology was employed, Markel failed to identify that methodology for the Court and opposing counsel to review. Without any method of proof, the Court is left to speculate about Markel's reliability as an expert witness, which this Court is not inclined to do. Therefore, the Court concludes that Markel's expert testimony is not admissible.

**[\*79]** Accordingly, the Court hereby GRANTS Motion III.

V.

CONCLUSION

**[\*80]** Based on **[\*\*43]** the above, the Court hereby GRANTS Motion I, GRANTS in part and DENIES in part Motion II, and GRANTS Motion III. Wherefore, the Court DISMISSES with prejudice Future's claims against Defendants for fraud, unfair and deceptive practices, rescission, and recovery of penalty; Medvedev's claims against Defendants for fraud and unfair and deceptive acts;

2014 NCBC 8, *80; 2014 NCBC LEXIS 8, **43

and all of Defendants' counterclaims against Medvedev.

SO ORDERED, this the 24th day of March, 2014.

---

**End of Document**

# Tab 25

Regent at Town Centre Homeowners' Association v Oxbow..., 419 P.3d 702 (2018)

2018 WL 2431690

419 P.3d 702 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules
of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

The REGENT AT TOWN CENTRE
HOMEOWNERS' ASSOCIATION, a
Nevada non-profit corporation, Appellant,
v.
OXBOW CONSTRUCTION, LLC, a Nevada
limited liability company, Respondent.
The Regent at Town Centre
Homeowners' Association, a Nevada
non-profit corporation, Appellant,
v.
Oxbow Construction, LLC, a Nevada
limited liability company, Respondent.

No. 69777, No. 70296
|
FILED MAY 24, 2018

**Attorneys and Law Firms**

Fenton Grant Mayfield Kaneda & Litt, LLP

Koeller Nebeker Carlson & Haluck, LLP/Las Vegas

*ORDER AFFIRMING IN PART,
REVERSING IN PART AND REMANDING*

**\*1** These are consolidated appeals from a district court
grant of summary judgment and post-judgment award of
costs in a construction defect action between a homeowners'
association and the general contractor of the property. Eighth
Judicial District Court, Clark County; Jerry A. Wiese, Judge.

Appellant, The Regent at Town Centre Homeowners'
Association (Association), brought claims against respondent
Oxbow Construction LLC for breach of express warranty,
breach of implied warranty, and negligence relating to
the construction of The Regent at Town Centre (Town
Centre). Oxbow argued, and the district court agreed, that no
warranties existed between Oxbow and the Association and
that various agreements waived the Association's claims. As
such, the district court granted summary judgment in favor of

Oxbow, and awarded Oxbow costs and expert witness fees.
We reverse the district court's grant of summary judgment on
the Association's negligence claim and the award of costs and
expert fees, affirm summary judgment on the Association's
breach of express warranty and breach of implied warranty
claims, and remand for further proceedings consistent with
this order.

We review a grant of summary judgment de novo. *Wood
v. Safeway, Inc.,* 121 Nev. 724, 729, 131 P.3d 1026, 1029
(2005). Summary judgment is appropriate if the pleadings and
other evidence on file, viewed in the light most favorable to
the nonmoving party, demonstrate that no genuine issue of
material fact remains in dispute and that the moving party is
entitled to judgment as a matter of law. *Id.* Further, we review
"questions of statutory interpretation, such as interpretation of
NRS Chapter 40, de novo." *Westpark Owners' Ass'n v. Eighth
Judicial Dist. Court,* 123 Nev. 349, 357, 167 P.3d 421, 426–
27 (2007).

*Negligence*

The Association brought a negligence claim under NRS
Chapter 40, which recognizes liability for general contractors
who are responsible for construction defects in a new
residence. *See* NRS 40.640. In *Oxbow Construction, LLC v.
Eighth Judicial District Court,* 130 Nev., Adv. Op. 86, 335
P.3d 1234, 1242 (2014) (*Oxbow I* ), this court recognized that
the Association can pursue a construction defect claim for
negligence on behalf of itself and individual unit owners for
"construction defects in limited common elements assigned to
multiple units in a common building, [as long as] the building
in question contains at least one unit that is a 'new residence.'
"

However, under NRS 40.640(5), a construction defect claim
is waived if the defect was disclosed prior to the owner's
purchase of the property and "the disclosure was provided in
language that is understandable and was written in underlined
and boldfaced type with capital letters." A disclaimer that uses
vague language or merely states "that certain defects 'may'
exist and list[s] a number of potential defects" is not a valid
disclosure. *Westpark Owners' Association,* 123 Nev. at 361
n.37, 167 P.3d at 429 n.37.

Here, there are three agreements that purport to disclaim
Oxbow's liability and/or waive the Association's claim: (1)
the purchase and sale agreement between El Capitan and
Regent II; (2) the individual purchase and sale agreements
between Regent II and individual unit owners; and (3)

2018 WL 2431690

the Declaration of Covenants, Conditions, and Restrictions (CC&Rs) for Town Centre. The individual purchase agreements and the CC&Rs reference and incorporate the Swainston Report and its list of defects.

**\*2** We need not address whether the purchase and sale agreement between El Capitan and Regent II is binding on the Association, as it does not meet the requirements for waiver under NRS 40.640(5). The purchase and sale agreement between El Capitan and Regent II is in regular typeface, and uses general language rather than specifically disclosing any defects at Town Centre. Similarly, the individual purchase agreements between Regent II and the individual unit owners do not meet the content requirement of NRS 40.640(5). Although the individual purchase agreements purport to disclose the "Current Conditions of Property" that "may include, but are not limited to such conditions as" and then lists a variety of defects, this language is nearly identical to a disclaimer previously held insufficient under NRS Chapter 40, See Westpark, 123 Nev. at 361 n.37, 167 P.3d at 429 n.37 ("Here, the waivers did not disclose any constructional defects; they stated only that certain defects 'may' exist and listed a number of potential defects. This vague language was not sufficient to waive any claims pursuant to NRS Chapter 40."). Therefore, the purchase and sale agreement for Town Centre, as well as the individual unit owner's purchase agreements, [1] do not meet NRS 40.640(5)'s requirements and cannot waive the Association's negligence claim under NRS Chapter 40.

[1]   The disclaimer in the main text of the individual purchase agreements is invalid under NRS 40.640(5). However, the individual purchase agreements incorporate the Swainston Report through an addendum, which does adequately disclaim various defects at Town Centre. But, because the Association has represented that it is not bringing claims on behalf of individual unit owners for defects in individual units, the CC&Rs' incorporation of the Swainston Report is more applicable to the Association's claims in this case.

Conversely, the limitations in the CC&Rs for Town Centre do bind the Association. See Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US ), LLC, 282 P.3d 1217, 1221 (Cal. 2012) (holding that an arbitration clause in CC&Rs was binding on the homeowners' association, even though the association did not exist as an independent entity when the CC&Rs were drafted and recorded); see

also NRS 116.2105(2) ("The declaration may contain any other matters the declarant considers appropriate."). Oxbow, as a third-party beneficiary of the CC&Rs, has standing to enforce any waivers included in the CC&Rs. See 20 Am. Jur. 2d Covenants, Conditions & Restrictions § 46 (2015) ("[N]onparties to a transaction may nevertheless gain standing to enforce it.") (footnote omitted). And although the CC&Rs do not include a disclosure of specific defects, they do incorporate the Swainston Report by reference. See PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2nd Cir. 1996) ("[A] paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.") (quoting Jones v. Cunard S.S. Co., 263 N.Y.S. 769, 771 (App. Div. 1933) ).

El Capitan and Regent II enlisted the Swainston Consulting Group to do an analysis of Town Centre for construction defects, and Swainston issued a report concluding that there were various defects and violations at the property. The Swainston Report was issued prior to Regent II's purchase of Town Centre, and before the creation of the Association through the CC&Rs. The Swainston Report affirmatively concludes that there are various defects at Town Centre:

> The Regent at Town Cent[re] project was designed and constructed as an apartment project in general conformance with the standard of the industry that was in place at the time of original construction. Many technical deviations exist between the as-built condition and the requirements of the building codes and other applicable standards. While these deviations typically represent technical defects some of them are relatively minor in nature. Other deviations will require remedial measures and, as maintenance continues to be deferred, the impact of these deviations will increase accordingly.

(original in underlined typeface).

This conclusion, in conjunction with 21 pages detailing the defects at Town Centre in bold, all capital, underlined

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 218 of 307
PageID: 9741
Regent at Town Centre Homeowners' Association v. Oxbow..., 419 P.3d 702 (2018)

2018 WL 2431690

typeface, distinguishes the Swainston Report from the conditional language that is inadequate under *Westpark,* and notified the Association that specific construction defects existed at Town Centre. Further, the Association's claims are for defects in the limited common areas of Town Centre, as opposed to claims regarding individual units on behalf of individual unit owners. Therefore, the general language in the Swainston Report—that the list includes defects common to the project as a whole—does not necessarily prevent disclosure of defects in limited common areas; that is, while a list of defects common to the project as a whole would not disclose defects in individual units, it may include defects in common elements or limited common elements. However, the actual overlap between the defects for which the Association brings claims and the disclaimers in the Swainston Report is not clear on the record or briefing before us.

**\*3** We reject Oxbow's contention, and the district court's determination, that the various agreements in this case provide a complete disclaimer for any negligence by Oxbow in the construction of Town Centre. NRS 40.640(5) provides for no such blanket disclaimer, but instead requires that each defect be disclosed in understandable language prior to the purchase of the new residence. The record requires further development to determine the specific defects in the limited common areas for which the Association brings its negligence claim. To the extent any of the alleged defects not mentioned in the Swainston Report is in a limited common area assigned to a new residence, summary judgment was not appropriate. Similarly, to the extent a defect listed in the Swainston Report was too vague or equivocal to disclose the particular defect, summary judgment was not appropriate on the Association's negligence claim for construction defect. On the record and briefing before us, we are unable to make such determinations.

As there is a genuine dispute of material fact as to whether the Swainston Report discloses each defect for which the Association makes a claim, we remand this case to the district court for further proceedings to determine the specific defects for which the Association brings claims, and which of those are waived by adequate disclosure in the Swainston Report.

*Expert witness fees*
The district court awarded $40,274.47 in litigation costs, plus $103,067 in expert witness fees, to Oxbow as the prevailing party below. As we reverse summary judgment on the Association's claim for negligence, we also reverse the award of costs and expert witness fees. *See Bayerische*

*Motoren Werke Aktiengesellschaft v. Roth,* 127 Nev. 122, 142, 252 P.3d 649, 662 (2011).

*Breach of express warranty*
The district court appropriately determined that there was no contractual privity between Oxbow and the Association that would create an express warranty. In addition, no express warranties were created or transferred under NRS Chapter 116.

NRS 116.4113 sets forth the ways in which an express warranty can be created between a seller and a purchaser, and then transferred to subsequent purchasers. *See* NRS 116.4113 ("Express warranties made by any seller to a purchaser of a unit, if relied upon by the purchaser, are created as follows...."). The plain language of NRS 116.4113 requires that the creation of an express warranty be made by a seller to a purchaser. *See Westpark,* 123 Nev. at 357, 167 P.3d at 427 ("When the language of a statute is unambiguous, the courts are not permitted to look beyond the statute itself when determining its meaning."). Because Oxbow was the general contractor of Town Centre, and never its seller, the district court correctly determined that no express warranties were created by Oxbow under NRS 116.4113.

The Association argues that, under NRS Chapter 116, an affiliate is responsible for the express warranties made by the declarant of a common-interest community, and, therefore, Oxbow is liable for express warranties made by El Capitan Associates to the Association. As support for this assertion, the Association cites to NRS 116.3104(2)(b). But this statutory provision does not support the Association's argument, because NRS 116.3104(2)(b) only holds affiliates jointly liable for a declarant's obligations if the affiliate succeeds in interest to the special declarant's rights. Here, the parties dispute whether and to what extent El Capitan and Oxbow have overlapping members and control of one another such that Oxbow is the affiliate of El Capitan, but it is undisputed that Oxbow did not succeed to any special declarant's rights involving Town Centre. As a result, NRS 116.3104(2)(b) will not extend liability to Oxbow for express warranties that were made by El Capitan in the development of Town Centre. We also reject the Association's general contention that the affiliate of a declarant is liable for express warranties made by the declarant under NRS Chapter 116. Therefore, the dispute regarding Oxbow's affiliate status is not material to the outcome of the claim for breach of express warranty, because the Association's interpretation of NRS Chapter 116 is incorrect as a matter of law. Accordingly,

we affirm summary judgment on the Association's claim for breach of express warranty.

*Breach of implied warranty*

**\*4** The Association's breach of implied warranty claim fails for similar reasons. NRS 116.4114 provides that any declarant or dealer impliedly warrants that a residence will be free from construction defects. *See* NRS 116.033 (A dealer is "a person in the business of selling units for his or her own account"). But, again, Oxbow was the general contractor of Town Centre; Oxbow was never a dealer or declarant, and never succeeded to any special declarant rights. The district court also properly determined that there was no privity of contract between the Association and Oxbow. *See Long v. Flanigan Warehouse Co. & Inland Ladder Co., 79 Nev. 241, 246, 382 P.2d 399, 402 (1963)* ("Where the parties to the law suit are not the immediate buyer and seller the weight of authority is that such lack of contractual privity will bar recovery on an implied warranty theory.") As such, the Association has no viable theory of breach of implied warranty by Oxbow, and we therefore affirm summary judgment on the Association's breach of implied warranty claim.

*Summary judgment without further discovery*

We also reject the Association's argument that the district court exceeded its authority by granting summary judgment without further discovery, even though a previous judge determined that further discovery was needed to resolve Oxbow's affiliate status.

Generally, a district court judge's decision in a case becomes the "law of the case" and cannot be overruled by a coequal, successor judge. *See Sittner v. Big Horn Tar Sands & Oil, Inc., 692 P.2d 735, 736 (Utah 1984)* ("[T]he doctrine of 'law of the case' has evolved to avoid the delays and difficulties that arise when one judge is presented with an issue identical to one which has already been passed upon by a coordinate judge in the same case"); *see also Messenger v. Anderson, 225 U.S. 436, 444 (1912)* (explaining that "law of the case" "merely expresses the practice of courts generally to refuse to reopen what has been decided"). Adherence to the law-of-the-case is a doctrine of self-restraint, however, and not a jurisdictional limitation. *See Moore v. City of Las Vegas, 92 Nev. 402, 405,*

551 P.2d 244, 246 (1976) (reviewing a judge's reconsideration of a prior judge's ruling in the same case for abuse of discretion); *Harvey's Wagon Wheel, Inc. v. MacSween, 96 Nev. 215, 217–18, 606 P.2d 1095, 1096–97 (1980)* (upholding a district court's grant of summary judgment after a previous denial of the same motion when the judge became more familiar with the case and was persuaded by newly cited authority). Thus, the holding in *Rohlfing v. Second Judicial District Court* is not applicable under these circumstances. 106 Nev. 902, 906, 803 P.2d 659, 662 (1990) ("The district courts of this state have equal and coextensive jurisdiction; therefore, the various district courts lack jurisdiction to review the acts of other district courts.").

Here, the Association initially moved for declaratory relief from Judge Earl on the issue of whether Oxbow and El Capitan had an affiliate/declarant relationship. Oxbow, on the other hand, moved for Judge Wiese to grant summary judgment. In granting summary judgment, Judge Wiese did not make a determination as to the affiliate/declarant relationship, but instead held that Oxbow is not responsible for warranties under the statutory scheme because it is not a seller. Thus, Judge Weise did not rule on the affiliate/declarant issue, which a previous judge had determined required further discovery, but instead viewed the issue in a different light. *See Sittner, 692 P.2d at 736* (recognizing that a "second judge may reverse the first judge's ruling if the issues decided by the first judge are presented to the second judge in a 'different light' "). Therefore, the district court did not err in granting summary judgment, as the Association contends, on the basis that it exceeded its authority by considering Oxbow's motion for summary judgment.

**\*5** We therefore,

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

**All Citations**

419 P.3d 702 (Table), 2018 WL 2431690

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 26

## *Ruiz v. Wintzell's Huntsville, L.L.C.*

United States District Court for the Northern District of Alabama, Northeastern Division

September 28, 2017, Decided; September 28, 2017, Filed

Case No.: 5:13-cv-02244-MHH

**Reporter**

2017 U.S. Dist. LEXIS 159547 *; CCH Prod. Liab. Rep. P20,169

JOSE RUIZ & LOURDES RUIZ, Plaintiffs, v. WINTZELL'S HUNTSVILLE, L.L.C. A/K/A WINTZELL'S OYSTER HOUSE, et al., Defendants.

**Counsel:** [*1] For Jose Ruiz, Lourdes Ruiz, Plaintiffs: Bryan Henry Hoss, LEAD ATTORNEY, DAVIS & HOSS PC, Chattanooga, TN; Peter Comstock Ensign, LEAD ATTORNEY, ENSIGN LAW, Chattanooga, TN.

For Wintzell's Huntsville LLC, also known as, Wintzell's Oyster House, Wintzell's Franchise Company Inc, Price Foods Inc, Defendants: Robert M Ronnlund, LEAD ATTORNEY, SCOTT SULLIVAN STREETMAN & FOX PC, Birmingham, AL.

For Webb's Seafood Inc, Defendant: Matthew T Dukes, Robert V Wood, Jr, WILMER & LEE PA, Huntsville, AL.

**Judges:** MADELINE HUGHES HAIKALA, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MADELINE HUGHES HAIKALA

## Opinion

### MEMORANDUM OPINION

Plaintiff Jose Ruiz developed a severe infection after eating raw oysters at Wintzell's Oyster House, a restaurant owned and operated by Wintzell's Huntsville, LLC. Mr. Ruiz asserts claims for violation of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), breach of warranty, and negligence against Wintzell's Huntsville, LLC; franchisor Wintzell's Franchise Company, Inc.; oyster supplier Webb's Seafood, Inc. (WSI); and Price Foods, Inc., a company that Mr. Ruiz alleges provided management services to Wintzell's. (Doc. 118). Mr. Ruiz's wife, Lourdes Ruiz, asserts a claim against the defendants [*2] for loss of consortium. (Doc. 118).[1] Pursuant to *Federal Rule of Civil Procedure 56*, the defendants ask the Court to enter judgment in their favor on the plaintiffs' claims. (Docs. 137, 140, 142). For the reasons stated below, the Court grants the defendants' motions for summary judgment in part and denies the motions in part.

### I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the

---

[1] In their fourth amended complaint, Mr. and Mrs. Ruiz named as defendants Wintzell's Huntsville, LLC; Wintzell's Franchise Company, Inc.; Webb's Seafood, Inc.; Price Foods, Inc.; Miller Seafood, Inc.; and Misho's Oyster Company. (Doc. 118). The Court previously dismissed the plaintiffs' claims against Miller Seafood, Inc. and Misho's Oyster Company. (Docs. 129, 160).

2017 U.S. Dist. LEXIS 159547, *2

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Fed. R. Civ. P. 56(c)(1)(A)*. "The court need consider only the cited materials, but it may consider other materials in the record." *Fed. R. Civ. P. 56(c)(3)*. When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable **[*3]** inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015)*.

## II. FACTUAL BACKGROUND

On December 14, 2012 and December 15, 2012, Mr. Ruiz ate raw oysters at Wintzell's Oyster House in Huntsville, Alabama. (Doc. 150, p. 2; Doc. 150-7, p. 3; Doc. 166, p. 11). On December 16, 2012, Mr. Ruiz began experiencing nausea and diarrhea, and he had a fever. (Doc. 150, p. 2; Doc. 166, pp. 13-14). A few days later, Mr. Ruiz visited the emergency room because he was experiencing pain, discoloration, and swelling in his left leg. (Doc. 166, p. 16). Doctors suspected that Mr. Ruiz had a blood clot in his leg. An ultrasound provided no evidence to confirm the doctor's suspicions, so the doctors sent Mr. Ruiz home. (Doc. 166, p. 16). Early the next morning, when Mr. Ruiz "just could not take the pain anymore," he returned to the emergency room. (Doc. 166, p. 16).

Mr. Ruiz does not remember the events that took place after he arrived at the hospital because he "was in so much pain and [his doctors] gave [him] so much morphine." (Doc. 166, p. 17). When Mr.

Ruiz woke up, doctors informed him that he had been infected with *Vibrio vulnificus* bacteria, a type of bacteria commonly found in raw oysters. (Doc. 150, p. 2; Doc. **[*4]** 142, p. 2; Doc. 166, p. 17). Mr. Ruiz's doctors also told him that he was positive for Hepatitis C, a virus that causes liver disease. (Doc. 150, p. 2); *see Hepatitis C FAQs for the Public*, CENTERS FOR DISEASE CONTROL AND PREVENTION, *https://www.cdc.gov/hepatitis/hcv/cfaq/htm* (last visited August 4, 2017). When Mr. Ruiz ate oysters at Wintzell's, he did not know that he was positive for Hepatitis C; he was "under the impression that [he] was very healthy." (Doc. 150, p. 2; Doc. 166, p. 17).

*Vibrio vulnificus* infections generally cause no more than mild to moderate gastrointestinal symptoms, but individuals with compromised livers may experience more severe effects. *See Vibrio vulnificus Infections Associated with Eating Raw Oysters — Los Angeles, 1996*, CENTERS FOR DISEASE CONTROL AND PREVENTION, *https://www.cdc.gov/mmwr/preview/mmwrhtml/000 43142.htm* (last visited August 7, 2017). As a result of his liver disease, Mr. Ruiz suffered a severe *vibrio* infection, and doctors ultimately had to amputate his left leg to prevent the infection from spreading. (Doc. 150, pp. 2-3; Doc. 166, p. 17). According to Mr. Ruiz, it is a "miracle" that he is alive. (Doc. 166, p. 17).

The parties acknowledge that Mr. Ruiz's injuries stem from his consumption of raw oysters at Wintzell's, but the defendants **[*5]** contend that they are not liable for Mr. Ruiz's injuries. For its part, oyster supplier WSI argues that it may not be held liable for Mr. Ruiz's injuries because Mr. Ruiz cannot prove that WSI supplied the oysters that he consumed at Wintzell's on December 14 and 15. In the days leading up to Mr. Ruiz's dinner at Wintzell's, the restaurant received oysters from WSI and from a second source, Bon Secour Fisheries. On December 10, 2012, Wintzell's received 2,500 oysters from WSI and 1,000 oysters from Bon Secour Fisheries, Inc. (Doc. 137, p. 2;

Doc. 150, pp. 7-8, 24). On December 13, 2012, Wintzell's received another 2,500 oysters from WSI. (Doc. 150, p. 8).[2]

According to Wintzell's kitchen manager Charles Polk, when Wintzell's receives oyster deliveries, the driver of the delivery truck carries the boxes of oysters to Wintzell's main cooler. (Doc. 164, p. 54). The oysters remain in the cooler until they are ready to be shucked. (*See* Doc. 164, p. 58). Each box of oysters that Wintzell's receives has a harvest date and a use-by date. (Doc. 164, p. 47). To ensure that oysters with older harvest dates are used before oysters with more recent harvest dates, Wintzell's applies "use-first" [*6] stickers to the boxes with the older harvest dates. (Doc. 164, p. 95). The kitchen staff is trained to use boxes with use-first stickers on them before using boxes without use-first stickers. (*See* Doc. 164, pp. 95, 151). Mr. Polk testified that he was responsible for placing the use-first stickers on the boxes of oysters. (Doc. 164, p. 95). According to Mr. Polk, "[i]f a truck came in and we had boxes [of oysters] already there, the first thing that'll be done, use first would be on there before the new order came in." (Doc. 164, p. 96).

During a typical dinner service at Wintzell's, the oyster shucker arrives at the restaurant around 1:00 p.m. (Doc. 164, p. 65). The shucker removes a box of oysters from the cooler and brings the box to the shucking station outside the kitchen. (Doc. 164, pp. 58-59).[3] The oysters are kept on ice at the shucking station. (Doc. 164, pp. 63-64). When the shucker

has shucked 24 oysters, the shucker places the oysters on a cooled metal tray, wraps the tray in plastic, marks the date, and moves the oysters to the cooler, where the oysters remain until a customer orders them. (Doc. 164, pp. 63-64).

Mr. Polk does not know whether the oysters that Mr. Ruiz consumed [*7] on December 14, 2012 and December 15, 2012 came from Bon Secour or WSI. (Doc. 164, pp. 101-02). Although he is "pretty sure" based on "good training" that Wintzell's kitchen staff followed the use-first protocol in the days leading up to Mr. Ruiz's dinner on December 15, Mr. Polk stated that he has no personal knowledge of whether the staff in fact used boxes marked "use first" before using boxes with more recent harvest dates. (*See* Doc. 164, pp. 150-54). Mr. Polk testified that it is possible, though unlikely, that the oysters that Bon Secour delivered on December 10, 2012 still were in inventory on December 14, 2012 or December 15, 2012. (*See* Doc. 164, pp. 150-54).

Dr. Gary Rodrick, Mr. Ruiz's expert, has opined that it is extremely unlikely that Bon Secour oysters still were in Wintzell's inventory on December 15. Dr. Rodrick opines that WSI supplied the oysters that Mr. Ruiz consumed. (Doc. 150-4).[4] In addition, Dr. Rodrick opines that the oysters contained an unreasonably dangerous level of *Vibrio vulnificus*, that WSI contributed to the unreasonably dangerous level of *Vibrio vulnificus* in the oysters, and that Wintzell's was negligent in purchasing oysters from WSI. (Doc. 145, pp. [*8] 1-2; Doc. 150-4, pp. 4-5, 7). The Wintzell's defendants and WSI have filed motions to strike Dr. Rodrick's testimony. (Docs. 138, 139).

Mr. Ruiz also offers the expert opinion of public health sanitarian Roy Costa. (Doc. 150-5).[5] Mr.

---

[2] WSI did not sell the oysters directly to Wintzell's. WSI sold the oysters to Sysco Gulf Coast, Inc., and Sysco sold the oysters to Wintzell's. (Doc. 137, pp. 2, 4 n. 2; *see* Doc. 164, pp. 40-41). WSI does not dispute that it supplied the oysters that Sysco delivered to Wintzell's on December 10 and December 13, 2012. (*See* Doc. 137, p. 2). The Court dismissed the plaintiffs' claims against Sysco and Bon Secour. (Docs. 92, 100). The plaintiffs did not name either company as a defendant in their fourth amended complaint. (Doc. 118).

[3] According to Mr. Polk, sometimes the shucker will not have to retrieve the oysters from the cooler because Mr. Polk already will have put the oysters on ice at the shucking station in preparation for dinner service. (Doc. 164, pp. 63-64).

---

[4] Dr. Gary Rodrick is an Emeritus Professor at the University of Florida in the Department of Food Science and Human Nutrition. (Doc. 150-4, p. 1). Dr. Rodrick holds degrees in Biology and Zoology. (Doc. 150-4, p. 1). Dr. Rodrick's research focuses on *Vibrio vulnificus* in oysters. (Doc. 150-4, p. 1).

[5] Roy Costa is a registered public health sanitarian and consultant

2017 U.S. Dist. LEXIS 159547, *8

Costa opines that Wintzell's committed health code violations by failing to properly store and serve its raw oysters, which caused the *vibrio* bacteria in the oysters to multiply to unsafe levels. (Doc. 150-5, p. 4). Mr. Costa also is of the opinion that both Wintzell's Huntsville and Wintzell's Franchise Company were negligent in their selection of oyster suppliers, and that both entities are responsible for failing to introduce adequate employee training and procedures for handling raw oysters. (Doc. 150-5, p. 4). Wintzell's has filed a motion to strike Mr. Costa's testimony. (Doc. 139).

Wintzell's Huntsville, LLC is a franchisee of Wintzell's Franchise Company, Inc. (Doc. 163, pp. 26-29). Dana Price, operating member and 50% owner of Wintzell's Huntsville, LLC, testified that Wintzell's Franchise Company provided him "with operational procedures, systems, [and] menus. . . ." (Doc. 163, p. 29). According to Mr. Price, the restaurant's general **[*9]** manager was responsible for employee training, while Wintzell's Franchise Company provided training materials. (Doc. 163, pp. 31-32). Additionally, Wintzell's Franchise Company provided its franchisees with the menu warnings alerting customers to the dangers of eating raw meat and seafood. (Doc. 163, p. 35).[6]

Mr. Price employed Alan Renfroe in a managerial capacity at several of his restaurant locations including his Wintzell's Oyster House in Huntsville. (Doc 163, pp. 18-19, 24, 62). At Wintzell's Huntsville, Mr. Renfroe worked as the director of operations. He was responsible for overseeing matters relating to guest satisfaction and "proper [restaurant] procedures," although he spent only limited time at Wintzell's Huntsville during any given week. (Doc. 163, p. 61; Doc. 150-13, p.

9).

This broad overview of the facts provides a backdrop for the Court's analysis of the defendants' motions. Additional facts relevant to those motions are discussed below.

## III. DISCUSSION

### A. WSI's Motion for Summary Judgment

#### 1. **WSI's supply chain defense**

WSI argues that the Court should enter judgment in the company's favor on Mr. Ruiz's AEMLD, negligence, and breach of warranty claims because Mr. Ruiz cannot **[*10]** establish that WSI supplied the oysters that he consumed. WSI contends that the evidence is insufficient to enable jurors to find with mathematical certainty that the oysters that made Mr. Ruiz sick came from WSI rather than Wintzell's other supplier, Bon Secour. (Doc. 137, p. 2). WSI's argument fails because at the summary judgment stage, mathematical certainty is not the standard of evidentiary proof.

"The burden of proof is a substantive issue and is therefore controlled by state law in diversity cases." *Wynfield Inns v. Edward LeRoux Grp., Inc., 896 F.2d 483, 491 (11th Cir. 1990)*. "In all civil actions brought in any court of the State of Alabama, proof by substantial evidence shall be required to submit an issue of fact to the trier of the facts." *Ala. Code 1975 § 12-21-12*. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Fla., 547 So. 2d 870, 871 (Ala. 1989)*. Evidence can permit the inference that a fact exists even though it does not establish that fact's existence to a mathematical certainty. Where a plaintiff's evidence permits a reasonable juror to infer that a

---

with a specialty in food safety. (Doc. 150-5, pp. 6-7). He holds a B.S. in biological sciences and an M.S. in health services management. (Doc. 150-5, p. 6). He formerly was employed by the State of Florida in various regulatory and educational capacities relating to public health. (Doc. 150-5, p. 7).

[6] Dana Price also is the president and sole shareholder of Price Foods, Inc. (Doc. 163, pp. 12-13). Price Foods, Inc. owns several restaurants in Alabama. (Doc. 163, pp. 12-19).

material fact exists, then the Court should deny a defendant's motion for summary judgment. *See Fed. R. Civ. P. 56(a)*.

It is true, [*11] of course, that a jury's verdict may not be based on speculation. *See Ex Parte Harold L. Martin Distrib. Co., Inc., 769 So. 2d 313, 315 (Ala. 2000)*. The evidence concerning the source of the oysters that Mr. Ruiz consumed is sufficiently probative to enable jurors to reasonably infer that WSI supplied the oysters than made Mr. Ruiz ill. That evidence begins with raw numbers: between December 10 and December 14, Wintzell's oyster inventory consisted of 1,000 oysters from Bon Secour and 5,000 oysters from WSI. (Doc. 164, p. 82; Doc. 164-3, pp. 12-13). Thus, 80% of the oysters in Wintzell's inventory were WSI oysters.

Evidence concerning the timing of oyster deliveries and Wintzell's oyster usage policies also is important. Bon Secour delivered its 1,000 oysters to Wintzell's on December 10, 2012; Sysco delivered approximately 2,500 WSI oysters on the same date. On December 13, 2012, Sysco delivered another 25 boxes containing approximately 2,500 WSI oysters. (Doc. 164-3, p. 13).[7] Viewed in the light most favorable to Mr. Ruiz, the record contains evidence that Wintzell's staff routinely placed "use first" stickers on boxes of raw oysters already in inventory when another shipment arrived and that Wintzell's had a policy of shucking boxes so marked before boxes [*12] delivered later. (Doc. 136, pp. 40-42). As mentioned, based on Wintzell's "use first" policy, Wintzell's kitchen manager testified that it is unlikely that Bon Secour oysters remained in Wintzell's inventory on December 14 and 15. (Doc. 164, pp. 150-54). From all of this evidence jurors could reasonably infer that Wintzell's employees shucked and served the oysters that Bon Secour delivered on December 10 before Mr. Ruiz ate at the restaurant on December 15. That leaves only WSI oysters for Mr. Ruiz's consumption.

WSI argues that the amount of oysters in Wintzell's inventory on December 10, 2012 cannot be exactly quantified. (Doc. 137, p. 18). WSI also argues that Mr. Ruiz cannot prove definitively that Wintzell's employees followed the prescribed first-in, first-out procedure for raw oysters during the week in question. (Doc. 137, pp. 8-9). These objections are jury arguments about the weight of the evidence. At summary judgment the Court must draw reasonable inferences from the evidence in favor of Mr. Ruiz, and the raw numbers combined with the undisputed delivery dates and Wintzell's "use-first" policy produce reasonable inferences sufficient to create a jury question.

In addition [*13] to shipping records and Wintzell's internal policies, the plaintiffs rely on Dr. Rodrick's expert opinion that the oysters which Mr. Ruiz consumed on December 15 came from WSI. (Doc. 150-4, p. 4). To develop his opinion, Dr. Rodrick evaluated the harvest date tags from Wintzell's December 2012 oyster inventory and Wintzell's sales records and determined, based on his experience in the industry, that WSI supplied the oysters that made Mr. Ruiz sick. (Doc. 150-4, p. 4).

WSI challenges Dr. Rodrick's competence to give testimony regarding the origin or supply chain from which Wintzell's received the oysters consumed by Mr. Ruiz. (Doc. 138, p. 2). WSI asserts that Dr. Rodrick has no education or training qualifying him to render opinions on the subject of oyster origination. (Doc. 138, p. 2). WSI also argues that Dr. Rodrick's methods are not sufficiently reliable to pass muster under the *Daubert* standard. (Doc. 138, p. 6).

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals* assigned a gatekeeping role to the district court with respect to the admissibility of scientific expert testimony. *509*

---

[7] The only other December deliveries to which the parties point occurred on December 3 and December 6, 2012. Both appear to be WSI oysters delivered by Sysco, and they consisted of 2,000 oysters and 2,500 oysters respectively. (Doc. 164-3, pp. 10-11). Because both parties agree that oysters have a fourteen day shelf life from the time of harvest, the Court need not examine more remote deliveries. (Doc. 137, p. 5; Doc. 150, p. 48).

2017 U.S. Dist. LEXIS 159547, *13

U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). "The district judge has 'the task of ensuring that an expert's testimony both rests [*14] on a reliable foundation and is relevant to the task at hand.'" Chapman v. Proctor & Gamble Distrib., LLC, 766 F.3d 1296, 1306 (11th Cir. 2014) (quoting Daubert, 509 U.S. at 597). The Supreme Court later extended this gatekeeping role to cover admissibility determinations for all types of expert testimony including technical testimony based on "knowledge and experience of [the relevant] discipline." See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Exercising its gatekeeping role, the Court finds that Dr. Rodrick is qualified to offer an opinion about the source of the allegedly contaminated oysters, and his opinion is relevant and rests on a reliable foundation.

Dr. Rodrick is a biologist who focuses his research on food safety and seafood microbiology. (Doc. 138-1, pp. 1, 8). His CV indicates that he has received numerous grants to study pathogens in commercially important shellfish. (Doc. 138, p. 9). His publications include a script for an informational program on safety in purchasing and distributing shellfish as well as several abstracts on hazard analysis and critical control points (HACCP) assessments for shellfish distributors. (Doc. 138, pp. 12, 23-24). Dr. Rodrick teaches several courses devoted to the issue of food safety, and the discipline entails exploration of seafood distribution chains. (Doc. 145-1, p. 2). While [*15] the study of distribution chains may not be scientific in a technical sense, it is an area in which someone may gain expertise through personal knowledge and experience. Based on his background, the Court finds that Dr. Rodrick has sufficient experience with food safety and distribution, particularly with respect to shellfish, to give testimony on the source of the oysters that Wintzell's served on December 14 and 15, 2012.

In response to WSI's objection that Dr. Rodrick's methodology is not sufficiently reliable, the Court notes that government regulations seem to contemplate precisely the exercise that Dr. Rodrick used to trace the oysters in this case. Regulations mandate that the tags accompanying all oyster shipments must identify the date and location of the harvest, the identity of the harvester, and the identity of any packer or repacker. 21 C.F.R. § 1240.60(b), (c). Section 123.28 mandates that recipients of these shipments maintain records of the information required for the oyster tags. 21 C.F.R. § 123.28(c), (d).

An analysis of the harvest tags in conjunction with Wintzell's sales records and WSI's business records is something that Dr. Rodrick is capable of performing as a task incident to his work in food safety. Given the evidence [*16] recited above, there does not appear to be "too great an analytical gap between the data and the opinion proffered." Chapman, 766 F.3d at 1306-07 (internal quotations omitted). Thus, the Court finds that Dr. Rodrick has used a sufficiently reliable method applied to a sufficient body of evidence to offer an opinion about the oysters' origins. The Court, therefore, denies WSI's motion to strike Dr. Rodrick's testimony.

WSI argues that with or without Dr. Rodrick's opinions, the plaintiffs' supply chain evidence is not sufficient to create a question of fact under the Azalea Box standard. Turner v. Azalea Box Co., 508 So. 2d 253 (Ala. 1987).[8] The Court finds that the facts of Azalea Box are distinguishable from the facts in this case, so Azalea Box does not warrant summary judgment for WSI.

In Azalea Box, the origin of an allegedly defective wooden shipping pallet was unclear. The Coca-Cola distributor where the plaintiff worked received pallets from two suppliers, one of which was Azalea Box Company. Azalea Box, 508 So. 2d at 253-54. The distributor also traded pallets with other distributors and repaired some of the pallets

_____

[8] At oral argument, counsel for WSI referred to this decision as the Azalea Box decision. The Court uses WSI's short-form reference in this opinion.

2017 U.S. Dist. LEXIS 159547, *16

in the warehouse. *Azalea Box, 508 So. 2d at 254*. The parties agreed that the pallets were not distinctive in a way that would allow the pallets to be traced to one source or another. *Azalea Box, 508 So. 2d at 254*. The Court [*17] reviewed the four possible sources of the pallet that caused the plaintiff's injuries and concluded that:

> two things can be equally inferred: (1) Azalea Box manufactured and sold the subject pallet to Coca-Cola, or (2) Azalea Box did not manufacture and sell the subject pallet to Coca-Cola. Accordingly, to use this evidence to support Turner's contention that Azalea Box supplied the pallet in question to the exclusion of other sources is to engage in speculation and conjecture.

*Azalea Box, 508 So. 2d at 254*. Consequently, the Alabama Supreme Court affirmed summary judgment for Azalea Box on Turner's AEMLD claim, noting that "[w]hen evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, the evidence lacks probative value; and the evidence may not be used to support one inference over another because such use is mere conjecture and speculation." *Azalea Box, 508 So. 2d at 254*.

Central to the Alabama Supreme Court's holding in *Azalea Box* was its determination that the evidence equally supported two conflicting inferences. The facts presented here are unlike *Azalea Box* because, although the evidence can support more than one inference, the support for each inference is not equal. WSI notes that [*18] its oysters and those from Bon Secour are physically indistinguishable. (Doc. 137, p. 8). That may be true, but the factual analogies to *Azalea Box* end there. Unlike the pallets in *Azalea Box*, the oysters at issue here have only two possible sources: WSI or Bon Secour. (Doc. 137, pp. 7-8). The question is whether the plaintiffs' evidence indicates that the oysters which Wintzell's served on December 14 or 15 are more likely to have come from WSI than from Bon Secour. As discussed, the weight of the evidence, viewed most favorably to the plaintiffs, points to

WSI as the source of the contaminated oysters.

Only where the evidence "is without selective application" to a particular inference is an inference drawn from the evidence reduced to impermissible conjecture. *Vesta Fire Ins. Corp. v. Milam & Co. Constr., 901 So. 2d 84, 101 (Ala. 2004)* (internal quotations omitted). This description simply does not fit the plaintiffs' evidentiary showing concerning the source of the oysters that Mr. Ruiz consumed. A jury will have to decide whether WSI supplied the oysters.

## 2. Alabama's Innocent Seller Statute

Alternatively, WSI argues that Alabama's Innocent Seller Statute provides blanket immunity against all of the plaintiffs' claims. The Court disagrees.

The Innocent Seller [*19] Statute states, in relevant part:

> (b) No product liability action may be asserted or may be provided a claim for relief against any distributor, wholesaler, dealer, retailer, or seller of a product, or against an individual or business entity using a product in the production or delivery of its products or services (collectively referred to as the distributor) unless any of the following apply:
>
> > (1) The distributor is also the manufacturer or assembler of the final product and such act is causally related to the product's defective condition.
> >
> > (2) The distributor exercised substantial control over the design, testing, manufacture, packaging, or labeling of the product and such act is causally related to the product's condition.
> >
> > (3) The distributor altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought.
> >
> > (4) It is the intent of this subsection to protect distributors who are merely conduits of a product. This subsection is

not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, **[\*20]** or fraud.

*Ala. Code 1975 § 6-5-521*.

WSI begins its argument by noting, correctly, that the term "products liability" is broad enough to encompass all of the plaintiffs' claims for relief. (Doc. 137, p. 19). WSI continues by explaining that it "did not manufacture or assemble the oysters . . . WSI did not exercise any substantial control over the design, testing, manufacture, packaging, or labeling of the oysters . . . WSI did not alter or modify the oyster product that was consumed by Mr. Ruiz." (Doc. 137, pp. 13-14). Based on these assertions, WSI concludes that it is a "mere conduit" of the oysters, so that the company is entitled to the statute's protection. (Doc. 137, p. 24).

That the product in question is raw oysters makes the statute's application less straightforward.

A 'product liability action' means any action brought by a natural person for personal injury, death, or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, or labeling of a *manufactured product* when such action is based upon (1) negligence, (2) innocent or negligent misrepresentation, (3) the manufacturer's liability doctrine, **[\*21]** (4) the Alabama extended manufacturer's liability doctrine as it exists or is hereafter construed or modified, (5) breach of any implied warranty, or (6) breach of any oral express warranty and no other. A product liability action does not include an action for contribution or indemnity.

*Ala. Code § 6-5-521(a)* (emphasis added). As found in nature, an oyster is not a manufactured product. The question is whether an oyster becomes a manufactured product when it is harvested and packaged for sale. The plaintiffs contend that WSI

"processes" raw oysters by removing them from their original packaging, placing them on a conveyor belt, washing the oysters with a high power spray, repacking the oysters, and labeling them for sale. (Doc. 150, p. 46).

Assuming without deciding that raw oysters are manufactured products for purposes of the innocent seller statute, the Court finds as a matter of law that WSI does not qualify as a mere distributor or conduit. This conclusion is based both on the foregoing description of WSI's activities preparing the oysters for retail and from WSI's own citation to *21 C.F.R. § 123.28*. (Doc. 156, p. 7).[9] This regulation promulgated by the Food and Drug Administration is directed at processors of molluscan **[\*22]** shellfish. WSI acknowledges that this section of the regulation governs its conduct, and this lends weight to the conclusion that WSI does more than simply distribute a raw product; WSI processes harvested oysters to ready them for retail sale.

The purpose of Alabama's innocent seller statute, as described in *subsection (b)(4)*, is to protect distributors who are mere conduits of a product, presumably because they are not positioned to inspect for product defects already extant when the products come into the distributor's possession. *Ala. Code § 6-5-521(b)(4)*. By bringing oysters from sea to table, WSI occupies a position well-suited to limiting the number of dangerous products reaching end-consumers, a fact reflected by *§ 123.8*'s requirement that such processors maintain updated HACCP plans to reduce the risk of adulterated shellfish reaching the retail market. *21 C.F.R. § 123.8(a)(1)*; *see also Bissinger v. New Country Buffet, 2014 Tenn. App. LEXIS 331, 2014 WL 2568413, at \*10 (Tenn. Ct. App. Jun. 6, 2014)* (holding that the term "manufacturer" includes "processors" of raw shellfish). Therefore, the Court

---

[9] *21 C.F.R. § 123.3(k)(1)* defines processing as "[h]andling, storing, preparing, heading, eviscerating, shucking, freezing, changing into different market forms, manufacturing, preserving, packing, labeling, dockside unloading, or holding."

concludes that WSI is not a mere distributor or conduit within the meaning of *Ala. Code § 6-5-521(b)(4)*. To the extent that WSI's activities as a processor or WSI's independent negligence contributed to Mr. Ruiz's injury, the innocent seller statute will not bar liability.

### 3. Mr. Ruiz's claims [*23] for violation of the AEMLD and for breach of implied warranty of merchantability

The plaintiffs contend that WSI violated the Alabama Extended Manufacturer Liability Doctrine (AEMLD) and breached the implied warranty of merchantability when WSI supplied contaminated oysters to Winitzell's. The AEMLD "was modelled after the product liability concepts of *§ 402A of the Restatement (Second) of Torts* (1965), with one important difference: th[e Alabama Supreme] Court rejected the 'no-fault' concept of the Restatement." *Griggs v. Combe, Inc., 456 So. 2d 790, 791-92 (Ala. 1984)*. To establish a claim under the AEMLD, the plaintiff must show that "he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer." *Atkins v. American Motors Corp., 335 So. 2d 134, 141 (Ala. 1976)*.

Similarly, to prevail on a claim for breach of the implied warranty of merchantability, a plaintiff must show that the goods were unmerchantable or unfit for the ordinary purposes for which they ordinarily are used. See *Ala. Code 1975, § 7-2-314*. A warranty of merchantability for food products "is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Section 7-2-314(1)*. "When the entire purpose of the product is simply to be consumed . . . the fact that consumption [*24] is dangerous makes the product unmerchantable." *Houston v. Bayer Healthcare Pharms., Inc., 16 F. Supp. 3d 1341, 1347 (N.D. Ala. 2014)* (applying Alabama law).

"These two standards go hand-in-hand, at least as applied to food products, for it is apparent that a food product is defective or unreasonably dangerous if it is unmerchantable or unfit for human consumption." *Allen v. Delchamps, Inc., 624 So. 2d 1065, 1068 (Ala. 1993)* (internal quotations omitted). Thus, the Court analyzes these two claims together.

The plaintiffs claim that high levels of *Virbrio vulnificus* bacteria made the oysters that Mr. Ruiz consumed dangerously defective. (Doc. 150, p. 43). WSI argues that, as a matter of law, the presence of *vibrio* bacteria does not make raw oysters unreasonably dangerous because *Vibrio vulnificus* occurs in nature and is present in most Gulf Coast raw oysters.[10]

Alabama applies the "reasonable consumer expectations" test to determine whether a product is unreasonably dangerous. *Ex Parte Morrison's Cafeteria of Montgomery, Inc., 431 So. 2d 975, 978 (Ala. 1983)*. The Alabama Supreme Court has held that the reasonable expectations test is "compatible with both the AEMLD and the implied warranty of merchantability, because the terms 'defect,' 'unreasonably dangerous,' and 'merchantable' all focus on the expectations of the ordinary consumer, possessed of the ordinary knowledge common to the community." *Cain v. Sheraton Perimeter Park South Hotel, 592 So. 2d 218, 221 (Ala. 1991)* (internal quotations [*25] omitted). "The pivotal issue in the reasonableness test is what a consumer is reasonably justified to expect to find in food bought for human consumption." *Huprich v. Bitto, 667 So. 2d 685, 687-88 (Ala. 1995)*. The defendants emphasize that *vibrio* bacteria occur naturally in a large portion of oysters harvested on the Gulf Coast. (Doc. 142, pp. 8-10). While this is a relevant consideration, under the reasonable consumer expectations test, the simple fact that *vibrio* bacteria occur naturally does not establish that the risk which the bacteria pose when ingested is within the expectations of the reasonable consumer of oysters.

---

[10] Wintzell's echoes WSI's argument. The following analysis applies to both defendants.

2017 U.S. Dist. LEXIS 159547, *25

The parties have not cited and the Court has not located an opinion from an Alabama court addressing a case of *Vibrio vulnificus* poisoning. A review of decisions from other jurisdictions addressing cases of *vibrio* infection indicates a trend towards holding as a matter law that raw shellfish are neither defective nor unreasonably dangerous simply by virtue of containing *Vibrio vulnificus* bacteria. *See, e.g.,* *Simeon v. Doe, 618 So. 2d 848, 851 (La. 1993)*. The line of reasoning common to these cases is that: (i) *Vibrio vulnificus* occurs naturally in shellfish, (ii) consumers cannot reasonably expect raw shellfish to be free of naturally-occurring bacteria, and **[*26]** (iii) *vibrio* bacteria are not dangerous to the overwhelming majority of consumers. *See, e.g.,* *Bissinger, 2014 Tenn. App. LEXIS 331, 2014 WL 2568413, at *12*.

Nearly every court presented with this question has determined that *vibrio* is not only a natural danger associated with oysters, but one that is a widely-known, and therefore expected by most consumers.[11] But these decisions establish only that a plaintiff may not survive summary judgment simply by proving that *vibrio* bacteria were present in the raw shellfish he consumed. When a plaintiff can prove that the shellfish in question were unreasonably dangerous not because of the levels of *vibrio* occurring in nature, but because the defendant's handling of the shellfish caused dangerously high concentrations of *vibrio* bacteria

in the shellfish that a plaintiff consumed, then a plaintiff may avoid summary judgment. In the latter scenario, courts have reasoned that they "cannot hold as a matter of law that such [reasonable consumer] expectation extends to elevated risk levels engendered by the alleged negligence of [the defendants]." *Horan v. Dilbet, 2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856, at *11 (D.N.J. Aug. 26, 2015)* (quoting *Clime v. Dewey Beach, 831 F. Supp. 341, 350 (D. Del. 1993)* (internal quotation marks omitted).

On the record in this case a dispute of fact exists as to whether reasonable consumers expect high **[*27]** concentrations of these bacteria in raw shellfish caused by alleged mishandling of the product. The Court, therefore, denies WSI's motion for summary judgment on the plaintiffs' claims for violation of the AEMLD and for breach of implied warranty of merchantability.[12]

## 4. Mr. Ruiz's negligence claims against WSI

The plaintiffs present three theories of negligence against WSI. They contend that WSI was altering the harvest dates recorded on the oyster tags, making the oysters appear to have a longer shelf life. (Doc. 150, pp. 9, 40). They argue that WSI has no evidence of its compliance with regulations governing maximum storage temperatures for raw shellfish and that WSI, in failing to keep temperature records, violated FDA standards. (Doc. 150, pp. 8-9). Finally, the plaintiffs submit that

---

[11] *Ayala v. Bartolome*, is the only decision the Court could locate in which a plaintiff survived summary judgment alleging only that the presence of vibrio bacteria made shellfish dangerous and unmerchantable. *940 S.W. 2d 727 (Ct. App. Tex. 1997)*. The following courts have held that the presence of *Vibrio* bacteria alone is legally insufficient to create an issue of fact as to whether the shellfish in question were unreasonably dangerous or defective: *Horan v. Dilbet, Inc., 2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856 (D.N.J. Aug. 26, 2015)*; *Clime v. Dewey Beach Enterprises, Inc., 831 F. Supp. 341 (D. Del. 1993)*; *Bissinger, 2014 Tenn. App. LEXIS 331, 2014 WL 2568413*; *Bergeron v. Pacific Foods, Inc., 2011 Conn. Super. LEXIS 366, 2011 WL 1017872 (Conn. February 14, 2011)*; *Simeon, 618 So. 2d 848*; *Woeste v. Washington Platform Saloon & Rest., 163 Ohio App. 3d 70, 2005 Ohio 4694, 836 N.E. 2d 52 (Ohio Ct. App. 2005)*; *Edwards v. Hop Sin, Inc., 140 S.W. 3d 13, 16 (Ky. Ct. App. 2003)*.

[12] Although plaintiffs recite a claim for breach of implied warranty of fitness for a particular purpose in their response, they make no arguments addressing this cause of action. (Doc. 150, p. 6). If the plaintiffs maintain this claim, it is due to be dismissed for lack of evidence to support it. In the context of Wintzell's Oyster House, Mr. Ruiz's intended use of the raw oysters was their ordinary use. He has alleged no particular use for the oysters other than consumption, nor has he shown that any of the defendants were aware of a purpose which he might have had for the oysters other than consumption. Thus, plaintiffs fail to allege that Mr. Ruiz had a "particular purpose" within the meaning of *§ 7-2-315* of the Alabama Commercial Code. *See Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1100 (11th Cir. 1983)*.

2017 U.S. Dist. LEXIS 159547, *27

WSI was negligent in selecting Misho's Oysters as a supplier because Misho's has a history of violations of oysters handling standards. (Doc. 150, p. 47).

With respect to their first theory, plaintiffs rely primarily on deposition testimony given by WSI manager, Jessica Webb. In this deposition, counsel for the plaintiffs confronted Ms. Webb with sales records and bills of lading that reflect inconsistent [*28] harvest dates for oysters sold to Wintzell's. (Doc. 150-6 pp. 98-100, 121-24, 132-33). The plaintiffs' experts opine that the apparent alteration of harvest dates affects this case because the *vibrio* levels in raw oysters are increasing each day from the time of harvest. (Doc. 150, pp. 30-31).

Although altering the harvest dates could allow oysters to become hazardous for consumption, the plaintiffs do not allege that this is what occurred. Both parties agree that raw oysters have a fourteen-day window after harvest in which the oysters can be consumed safely. (Doc. 137, p. 5; Doc 150, p. 48). The plaintiffs do not allege that the oysters WSI sold were outside of this window, and — so far as the Court can tell — there is no evidence suggesting that WSI's oysters were beyond the fourteen-day window on December 15, the night when Mr. Ruiz became ill. According to the plaintiffs' response to the motion for summary judgment, the records kept by WSI conflict as to whether the oysters which WSI eventually sold to Wintzell's were harvested on December 7 or December 8, 2012. (Doc. 150, p. 48). Regardless, these oysters would have been within the 14-day window on December 15.

The plaintiffs argue [*29] that there were multiple inconsistencies in WSI's records concerning harvest dates in addition to the one singled out in their response. (Doc. 150, p. 30, fn. 23). Jessica Webb's deposition testimony reveals possible inconsistencies concerning oysters harvested on either December 2 or 3 of 2012. (Doc. 150-6, pp. 97-99, 132-33). Again, even if these oysters were sold to Mr. Ruiz, a fact which the plaintiffs do not

specifically allege, they also would have been just inside their expiration window on December 15. The presence of inaccuracy in WSI's business records may constitute regulatory violations, but the plaintiffs must introduce evidence connecting these violations to Mr. Ruiz's injury. The contention that *vibrio* grows over time sheds little light on the link between WSI's behavior and Mr. Ruiz's injury when the oysters were within their conceded shelf-life. To allow such a theory to succeed would come too close to holding the defendants liable simply because *vibrio* was present at some level in the raw oysters. Thus, the issue of inaccurate or altered tags does not itself appear to be causally connected to Mr. Ruiz's injury.

Next the plaintiffs contend that WSI negligently mishandled [*30] the raw oysters by exposing them to air temperatures that allowed *vibrio* bacteria to multiply. (Doc. 150, p. 47). This theory is burdened by the fact that the plaintiffs have no records of the temperatures at which WSI stored and shipped the oysters that were eventually sold to Wintzell's Huntsville. Contrary to the plaintiffs' suggestion, the absence of records does not by itself prove WSI's culpability, as the plaintiffs have the burden to come forward with evidence of temperature violations. The plaintiffs argue that their claims have been unfairly prejudiced by WSI's lack of recordkeeping, and they seek sanctions for the destruction of temperature records that they claim WSI was obligated to maintain. (Doc 151, pp. 4-5).

The power to impose sanctions to ensure the integrity of the discovery process is within the broad discretion of the district court. *See Flury v. Daimler Chrysler, Corp., 427 F.3d 939, 944 (11th Cir. 2005)*. The Court applies federal law to assess the merits of a motion for sanctions, though the Eleventh Circuit has indicated that this application may be informed by state law. *Flury, 427 F.3d at 944*. Alabama law defines spoliation as "an attempt by a party to suppress or destroy material evidence favorable to the party's adversary." *Wal—Mart Stores, Inc. v. Goodman, 789 So. 2d 166, 176 (Ala.*

2017 U.S. Dist. LEXIS 159547, *30

2000) (internal quotations [*31] omitted). While malice is not a requirement for the Court to impose sanctions, a showing that the defendant acted in bad faith is necessary. *Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997)*. Simple negligence resulting in the loss of evidence does not satisfy the requirement of bad faith. *Mann v. Taser Intern., Inc., 588 F.3d 1291, 1310 (11th Cir. 2009)*. Thus, the absence of the records, no matter how important to the plaintiffs' case, does not by itself create a presumption of bad faith. WSI is the non-movant for purposes of this motion, and the Court will therefore view the evidence in the light most favorable to the company.

The plaintiffs assert that WSI is culpable for destroying temperature records because, as a processor of raw shellfish, WSI has a statutory obligation to retain records relating to these products for two years. (Doc. 151, p. 2). WSI responds with its reading of the relevant statute which WSI contends requires retention of temperature records for only one year. The governing regulation reads in relevant part:

(b) Record retention.

(1) All records required by this part shall be retained at the processing facility or importer's place of business in the United States *for at least 1 year after the date they were prepared in the case of refrigerated products* and for at least 2 [*32] years after the date they were prepared in the case of frozen, preserved, or shelf-stable products.

(2) Records that relate to the general adequacy of equipment or processes being used by a processor, including the results of scientific studies and evaluations, shall be retained at the processing facility or the importer's place of business in the United States *for at least 2 years after their applicability to the product being produced at the facility.*

*21 C.F.R. § 123.9(b)* (emphasis added). The question is whether cooler temperature records relate to refrigerated products governed by *(b)(1)* or

whether they relate to the adequacy of a processor's processes as governed by *(b)(2)*. While a colorable argument can be made that cooler temperatures relate to the adequacy of processes used in preparing raw shellfish, a close reading of the regulation's language indicates that WSI has the better argument.

The quoted subsections appear to reference two different types of records. *Subsection (b)(1)* deals with records specific to food items which are then differentiated on the basis of whether the item to which the record relates is refrigerated or frozen. *Subsection (b)(2)* deals with records relating to broader, systemic concerns such as those reflected [*33] in a processor's HACCP plan. This broader concern is reflected by the types of records that are specifically mentioned in *subsection (b)(2)*, namely "the results of scientific studies and evaluations. . . ." *21 C.F.R. § 123.9(b)(2)*. The plaintiffs seek records of cooler temperatures concerning a particular product on particular dates. Such records seem too narrow in scope to be grouped with records of scientific studies evaluating the general adequacy of processes used at a given facility. The Court therefore determines that WSI's cooler temperature records are governed by *subsection (b)(1)*. As it is undisputed that raw oysters are refrigerated, not frozen, WSI is correct in its assertion that it was not statutorily required to retain temperature records for more than one year.

That WSI was not statutorily required to maintain the records for more than one year does not end the discussion if WSI had reason to know that this litigation was impending and was aware that the temperature records would be pertinent evidence. WSI indicates that the plaintiffs never sent them a request for production. (Doc. 158, p. 8). The plaintiffs do not directly refute this statement, but argue that they gave WSI notice of their claims on September 4, 2014. (Doc. [*34] 151, p. 2). In her deposition, Ms. Webb indicates that she disposes of records required by WSI's HACCP plan after one year. (Doc. 151-1, p. 34). As cooler temperature records relate to a critical control point for bacteria

growth, they would be covered by WSI's HACCP plan. Consequently WSI would have destroyed these records after a year. Given their limited shelf-life, oysters consumed on December 15 must have been processed in early December of 2012. By December of 2013, WSI, by company policy, could dispose of records relating to the refrigeration temperatures for oysters processed during the timeframe relevant to Mr. Ruiz's injury. Because WSI did not have notice of this case until September 2014, the Court cannot infer that WSI acted in bad faith in destroying the records. Therefore, the Court denies the plaintiffs' motion for sanctions.

Without temperature records, the plaintiffs have no other evidence supporting their theory that WSI mishandled the raw oysters sold to Wintzell's. Consequently, plaintiffs must rely on alternate theories of negligence.

Finally, the plaintiffs assert that WSI's selection of Misho's Oysters was a negligent act that contributed to Mr. Ruiz's *vibrio* [*35] infection. The Court treats this as an attempt to hold a principal liable for the acts of an independent contractor. "Under Alabama law, a principal is not liable for the torts of an independent contractor." *Atkinson v. Jeff Lindsey Communities, Inc., 2016 U.S. Dist. LEXIS 45104, 2016 WL 1312320, at *2 (M.D. Ala. Apr. 4, 2016)* (citing *Fuller v. Tractor & Equip. Co., Inc., 545 So. 2d 757 (Ala. 1989)*). An exception to this rule exists where the principal uses an independent contractor to accomplish a non-delegable duty. *See Gen. Fin. Corp v. Smith, 505 So. 2d 1045, 1047 (Ala. 1987)*. A duty is non-delegable where "the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions." *Bain v. Colbert Cty. Northwest Ala. Health Care Auth., 2017 Ala. LEXIS 9, 2017 WL 541912, at *13 (Ala. Feb. 10, 2017)* (emphasis and internal quotations omitted). For companies like WSI, which sell a product to the public which they know will be consumed raw, Alabama law imposes a duty to exercise "that same degree of care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table." *Hogue v. Logan's Roadhouse, Inc., 61 So. 3d 1077, 1081 (Ala. Ct. Civ. App. 2010)*. Therefore, WSI can be held liable for selecting Misho's if the plaintiffs' evidence indicates that Misho's breached the duty of care in a way that is causally related to Mr. Ruiz's injury.

To establish that Misho's was an unsafe harvester of oysters, the plaintiffs point to the report of Dr. Rodrick, who in turn relies on the testimony of Misho's owner, Michael Ivic, for direct knowledge of the practices in question. Dr. Rodrick cites Misho's practice of keeping oysters aboard boats or on docks without refrigeration during November and December 2012 when the local temperatures reached over 70 degrees Fahrenheit. (Doc. 150-4, pp. 5-6). The Court notes that the period when Misho's allegedly mishandled its oysters includes the timeframe during which the oysters which Mr. Ruiz consumed were harvested. Dr. Rodrick states that Misho's had no "accurate records as to temperature controls for its live raw oysters." (Doc. 150-4, p. 5). In addition, Dr. Rodrick is prepared to testify [*36] that "[a]t least 7 deaths have been attributed to Misho's oysters," as evidence that WSI should have been on notice of its harvester's alleged deficiencies. (Doc. 150-4, p. 5). Roy Costa relies on the same testimony from Mr. Ivic to conclude that WSI's failure to verify the safety of its suppliers' practices greatly increased Mr. Ruiz's risk of *vibrio* infection. (Doc. 150-5, p. 4).

WSI responds that its decision to purchase oysters from Misho's was in compliance with the only regulation governing the obligations of shellfish processors to ensure a safe supply chain: *21 C.F.R. § 123.28*. (Doc. 156, p. 7). This regulation requires that processors purchase only from dealers who have been licensed by the State approval processes and who have not been fishing in waters designated as closed by the Federal Government. *See 21 C.F.R. § 123.28(b)*, *(c)*. Plaintiffs do not allege that

2017 U.S. Dist. LEXIS 159547, *36

Misho's lacked this license, nor do they allege that Misho's was fishing in closed waters.

Despite WSI's apparent compliance with this regulation, issues of fact concerning its use of Misho's as an oyster supplier remain. "The general rule is that '[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable **[*37]** man would take additional precautions.'" *Stewart v. Hewlett Packard Co., 2012 U.S. Dist. LEXIS 169200, 2012 WL 6043642, at \*5 (N.D. Ala. Nov. 29, 2012)* (quoting *Rest. 2d Torts § 288C* (1965)); *see also Dunn v. Wixom Brothers, 493 So. 2d 1356, 1359 (Ala. 1986)* ("customary practices or standards do not furnish a conclusive test of negligence"). The prevalence of *vibrio* in Gulf Coast oysters and the bacteria's devastating health effects on certain segments of the population counsel that those in the business of bringing raw oysters to the public take great care in doing so. Consequently, WSI's compliance with applicable regulations, standing alone, does not negate an issue of fact. The plaintiffs have alleged facts which, taken as true for purposes of summary judgment, raise issues about whether WSI was or should have been on notice of practices by Misho's that appear to fall below the industry's normal standards of care. Thus, the Court denies WSI's motion for summary judgment on the plaintiffs' claim for negligent selection of a supplier.

## B. Price Foods, Inc.'s Motion for Summary Judgment

The plaintiffs allege that Price Foods failed to adequately train employees at Wintzell's Huntsville on the proper handling of raw oysters and that "this failure to properly train and to supervise constitutes negligence." (Doc. 150, p. 15). Price Foods is entitled to summary judgment on **[*38]** Mr. Ruiz's negligence claim because the record demonstrates that Price Foods is a legally distinct entity that does not own, operate, or control the Wintzell's Huntsville restaurant where Mr. Ruiz dined.

Price Foods owns and operates a Catfish Cabin restaurant and six Huddle House Restaurants within Alabama. (Doc. 90, p. 2). Price Foods does not own Wintzell's Huntsville. The plaintiffs attempt to hold Price Foods liable because Dana Price, who owns 50 percent of Wintzell's Huntsville, also owns 100 percent of Price Foods. (Doc. 90, pp. 1-2). The plaintiffs also point to the fact that Alan Renfroe, who is employed by Price Foods, also is employed by Mr. Price in a managerial capacity at Wintzell's Huntsville. (Doc. 163, pp. 19-21). The plaintiffs note that only Price Foods appears to have paid Mr. Renfroe for his work. (Doc. 150-11, pp. 31-32).

The overlap in management and ownership does not make Price Foods, a legally separate entity, liable for the negligent acts or omissions allegedly committed by Wintzell's Huntsville. "A corporation can act only through its servants, agents, or employees; but the acts of those servants, agents, or employees are not the acts of the corporation unless **[*39]** the servants, agents, or employees are acting for the corporation . . . ." *U.S. Fidelity & Guar. Co. v. Russo Corp., 628 So. 2d 486, 488 (Ala. 1993)*. The acts of an agent are attributable to the principal where the principal reserves a right to control the agent's performance and the agent acts within the scope of their agency or employment relationship. *See Hulbert v. State Farm Mut. Auto Ins. Co., 723 So. 2d 22, 24 (Ala. 1998)*; *U.S. Fidelity & Guar. Co., 628 So. 2d at 488*. Agents act within the scope of their employment or agency relationship when they perform acts for which they were hired or which they undertake for the principal's benefit. *Hulbert, 723 So. 2d at 24*. "[T]he party asserting [an agency relationship] has the burden of adducing substantial evidence to prove its existence." *Kennedy v. Western Sizzlin Corp., 857 So. 2d 71, 77 (Ala. 2003)*

Although the plaintiffs' evidence supports the conclusion that Mr. Renfroe is the agent of multiple principals, the plaintiffs have not demonstrated why the alleged negligence of Mr. Renfroe should be attributed to Price Foods, rather than to Wintzell's Huntsville alone. As the managing member of

Wintzell's Huntsville and the sole owner of Price Foods, Dana Price likely was the person exercising control over Mr. Renfroe, but it does not follow that Mr. Price was exercising that control on behalf of Price Foods. The plaintiffs have not provided evidence that Mr. Renfroe's management activities at Wintzell's Oyster **[\*40]** House were within the scope of his employment relationship with Price Foods. The plaintiffs' attempt to extend liability to Price Foods rests largely on the fact that Mr. Renfroe received his salary from Price Foods, not Wintzell's. Standing alone, the paycheck is not substantial evidence of an agency relationship connecting Mr. Renfroe's work at Wintzell's to his relationship with Price Foods. Consequently the Court grants summary judgment in favor of Price Foods on all of plaintiffs' claims against the company.

## C. Wintzell's Motion for Summary Judgment

### 1. Wintzell's innocent seller defense

The Wintzell's defendants also claim that Alabama's innocent seller statute entitles them to summary judgment because they are no more than retailers of a product prepared by parties further up the supply chain. (Doc. 142, pp. 5-7). Wintzell's Huntsville performs some tasks under the definition of the term "process" including handling, storing, and shucking raw oysters. (Doc. 163, p. 35).[13] The plaintiffs, however, do not appear to argue that Wintzell's Huntsville is a manufacturer or processor of shellfish. Instead, the plaintiffs argue that Wintzell's committed independent acts of negligence precluding **[\*41]** them from the statute's protection. (Doc. 150, p. 44).

The innocent seller statute "is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as

---

[13] *See* Footnote 9, *supra*.

independent acts of negligence, wantonness, warranty violations, or fraud." *Ala. Code 1975 § 6-5-521(b)(4)*. As discussed in detail below, the plaintiffs allege that the Wintzell's defendants committed acts of negligence unrelated to the product's design or manufacture and that these were causes of Mr. Ruiz's injury. Thus, to the extent the plaintiffs' evidence creates an issue of fact regarding Wintzell's alleged negligence, the innocent seller statute will not bar the plaintiffs' claims.[14]

### 2. Mr. Ruiz's negligence claims against Wintzell's Huntsville

The plaintiffs allege that several negligent acts and omissions by Wintzell's Huntsville caused *vibrio* bacteria in its oysters to multiply to unsafe levels, thereby causing Mr. Ruiz's infection. (Doc. 150, p. 12). They point to Wintzell's manner of storing and serving raw oysters as factors causally related to the gowth of *vibrio* bacteria. (Doc. 150, p. 12-13). Plaintiffs also contend that Wintzell's Huntsville choice of WSI and Misho's Oysters as suppliers of raw **[\*42]** oysters was negligent.[15] This argument is addressed below alongside the identical claim made against Wintzell's Franchise Co.

Under Alabama law, "to establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Hilyer v. Fortier, 227 So. 3d 13, 2017 Ala. LEXIS 1, 2017 WL 65346, at \*7 (Ala. Jan. 6, 2017)*. The particular duty that Alabama tort law imposes upon restaurant owners is as follows:

> The law requires that, in the selection of the food for his restaurant and in cooking it for his

---

[14] This analysis applies to both Wintzell's Huntsville, LLC and Wintzell's Franchise Company.

[15] In addition to their negligence claims against Wintzell's Huntsville, the plaintiffs assert AEMLD and breach of implied warranty of merchantability claims against this defendant. The Court addressed the latter claims as they pertain to WSI at pp. 21-25 above. The reasoning is the same with respect to Wintzell's.

customers, he shall exercise that same degree of care which a reasonably prudent man, skilled in the art of selecting and preparing food for human consumption, would be expected to exercise in the selection and preparation of food for his own private table.

*Hogue, 61 So. 3d at 1081*. The mere fact that a customer becomes ill after dining at a restaurant does not raise a presumption of negligence. Instead, the plaintiff must present evidence "from which a jury could at least infer that the restaurant failed to act with due care in the preparation of the plaintiff's food." *Hogue, 61 So. 3d at 1082*.

The plaintiffs' negligence claims rest on their theory that *vibrio*, while naturally present in most oysters, becomes unsafe to consumers at higher concentrations. **[*43]** (Doc. 150, p. 3). Thus, acts or omissions by a restaurant or supplier that allow *vibrio* to multiply increase the risk of serious infection and are a breach of the duty owed to the customer. (Doc. 150, p. 4). As evidence for this theory, plaintiffs point to the report of Dr. Rodrick in which he states that "*vibrio* below certain levels (estimated to be 60 organisms per gram) do not harm humans who ingest raw, live oysters. *Vibrio* at higher levels poses a health risk to all humans." (Doc. 150-4, p. 4). According to Dr. Rodrick, individuals with healthy livers and immune systems generally will respond with vomiting or diarrhea, but for those who have compromised livers or immune systems, *vibrio* poisoning is potentially fatal. (Doc. 150-4, p. 4).

Consistent with Dr. Rodrick's opinion, the plaintiffs point to affidavits by two of Mr. Ruiz's co-workers who dined with him at Wintzell's on December 15 and consumed the same raw oysters. Their testimony is that they began experiencing nausea, vomiting, and diarrhea the same evening that they ate oysters with Mr. Ruiz, and that these symptoms persisted for several days. (Doc. 150-3, p. 1, 3). Plaintiffs also note that Mr. Ruiz had consumed Wintzell's **[*44]** raw oysters on several occasions prior to December 2012 without any ill effect. (*See*

Doc. 150-2). Plaintiffs maintain that Mr. Ruiz's past ability to consume oysters without issue despite his undiagnosed liver problem indicates that there was something seriously wrong with the oysters that Wintzell's served on December 15. (Doc. 150, pp. 7, 20).

The plaintiffs identify several acts or omissions by Wintzell's and its employees that they claim contributed to the multiplication of *vibrio* in the oysters served to Mr. Ruiz. They cite to Wintzell's co-mingling of shellstock in violation of health regulations (Doc. 150, p. 9); they cite the fact that oysters were served to Mr. Ruiz on a plate instead of resting directly on top of drained ice as required by state law (Doc. 150, p. 12); they cite to recorded refrigeration temperatures above the prescribed temperature threshold (Doc. 150, p. 13); and they cite to Wintzell's failure to keep oyster harvest tags in chronological order (Doc. 150, p. 13).

Plaintiffs' expert, Roy Costa, offers his opinion that, at least with respect to the manner in which Wintzell's served and stored oysters, failure to abide by the requirements of state and federal **[*45]** regulations likely allowed *vibrio* bacteria to multiply to unsafe levels in the raw oysters that Wintzell's served. (Doc. 150-5, p. 4). Mr. Costa further opines that a higher concentration of *vibrio* bacteria in an oyster increases the likelihood of serious infection like the one suffered by Mr. Ruiz. (Doc. 150-5, pp. 2, 4). Mr. Costa relies on the affidavits of Mr. Ruiz's co-workers, Abner Deleon and Bayron Barrios, for information on Wintzell's method of serving oysters, and on the health inspection records to establish issues with Wintzell's refrigerated storage. (Doc. 150-5, p. 5; Doc. 150-3, pp. 2, 3).

Two courts have addressed theories of recovery virtually identical to the one plaintiffs offer here, in cases where the plaintiffs suffered severe *vibrio* infections after consuming raw shellfish. In *Clime v. Dewey Beach Enterprises*, the source of the *vibrio* bacteria was raw clams that the plaintiff consumed at the defendant's buffet. *831 F. Supp. at*

*342*. The plaintiff's injury was exacerbated by the fact that he had cirrhosis of the liver, making him more vulnerable to *vibrio* infection. *Clime, 831 F. Supp. at 342*. After the court dismissed claims premised on the theory that the presence of *vibrio* alone permitted recovery, the **[*46]** Court addressed the plaintiff's contention that the defendants had negligently contributed to *vibrio* multiplication in their raw clams. The plaintiff offered his personal observation and that of another patron that the defendant left raw clams in an unrefrigerated area as the clams were shucked and placed on the buffet. *Clime, 831 F. Supp. at 350*. Presented with this evidence, the District Court for the District of Delaware determined that summary judgment for the defendant was inappropriate. The district court noted that although "a consumer should reasonably expect a raw clam to pose some health risk, [the court] cannot hold as a matter of law that such expectation extends to elevated risk levels engendered by the alleged negligence of the [defendant restaurant]." *Clime, 831 F. Supp. at 350*.

The defendants in *Clime* complained, as do the defendants here, that "there [wa]s nothing in the evidentiary record to support the plaintiff's assertion that storage above approximately forty-five degrees [Fahrenheit] increases potential health risks to humans upon ingestion." *Clime, 831 F. Supp. at 344*; (Doc. 139, pp. 2-3, 8). But here, as in *Clime*, the defendant is incorrect for two reasons. The plaintiffs' experts have given testimony that industry practice is to keep raw **[*47]** shellfish refrigerated at or below 41 degrees Fahrenheit. (Doc. 150-5, pp. 2, 4; Doc. 139-1, p. 9). Equally relevant is the fact that the FDA and the State of Alabama require raw shellfish to be refrigerated at or below 45 degrees Fahrenheit. *See Ala. Admin. Code r. 420-3-18-.03(7)*.[16]

The plaintiffs submit records of health inspections at Wintzell's Huntsville which include citations for refrigerator temperatures as high as 47 degrees Fahrenheit, as well citations for inconspicuous or missing thermometers. (Doc. 150-17, pp. 2, 4, 5). One such inspection where a temperature violation was recorded occurred on December 6, 2012, just days prior to Mr. Ruiz's visit. While the refrigerator temperature violations are not all specific to oysters, that fact does not wholly negate the relevance of this evidence. *See Bissinger, 2014 Tenn. App. LEXIS 331, 2014 WL 2568413, at *16* ("We are not persuaded that proof should be limited to raw oysters. The restaurant's handling of other food products, especially those with requirements similar to oysters, is relevant to the issues."). Thus, the plaintiffs have submitted evidence establishing a standard of care, and evidence indicating that Wintzell's breached that standard. **[*48]** Although there is some disagreement between the plaintiffs' experts and the defendants' expert, Dr. Oliver, over the temperatures at which *vibrio* cease to multiply, resolution of that disagreement is an issue of fact for the jury. (*See* Doc. 142-3, p. 7; Doc. 150-4, p. 6; Doc. 150-5, pp. 2, 4).

In *Horan v. Dilbet, Inc.*, the district court for the District of New Jersey dealt with another instance of *vibrio* infection from raw clams. *2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856*. Like Mr. Ruiz, the plaintiff had an undiagnosed condition rendering her more susceptible to *vibrio* infection. *2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856, at *1-2*. The plaintiff in *Horan* presented evidence that the defendant restaurant had a record of health code violations including refrigerator temperatures in excess of those allowed by state law and unsanitary conditions on surfaces where employees prepared raw shellfish. *2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856, at *2, 5*. She claimed that these violations caused *vibrio* to multiply to dangerous levels in the raw clams which she ingested, and that the high concentration of bacteria

---

[16] Alabama state regulations define refrigeration as storage temperatures at or below 45 degrees Fahrenheit. **Ala. Admin. Code r. 420-3-18-.03(7)**. The Court also notes that, according to the National Shellfish Sanitation Program, the "FDA recommends that potentially hazardous food be held at 5° C (41° F) or below, and if large volumes are involved in processing, methods be employed to rapidly cool the product to an internal temperature of 5° C (41° F) within

four (4) hours." National Shellfish Sanitation Program, Guide for the Control of Molluscan Shellfish 174 (2011).

caused her infection. *2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856, at \*5*.

Faced with an identical theory and similar evidentiary showing to those in *Clime*, the district court reached the same conclusion, holding that the alleged, increased risk attributable to defendant's negligence **[\*49]** created a dispute of material fact notwithstanding the plaintiff's concession that *vibrio* can occur naturally at toxic levels. *2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856, at \*11*.

The plaintiffs here present both eyewitness evidence of Wintzell's negligence on December 15, 2012 and documentary evidence indicating possible negligence on other occasions. In addition, the plaintiffs presented evidence that other consumers were adversely affected by the same oysters on the same occasion. In light of the close parallels with the evidence deemed sufficient to survive summary judgment in *Clime* and *Horan*, the Court finds that the plaintiffs' evidence creates issues of fact that preclude summary judgment.

Defendants contend that it was not any growth in *vibrio* but Mr. Ruiz's then undiagnosed Hepatitis C which was the cause in fact of his injury, since most healthy persons are not affected by consuming *vibrio* in raw oysters. While it is undeniable that Mr. Ruiz's condition made him more vulnerable to *vibrio* infection, it does not follow that this was the sole cause of his injury. There is evidence in the record suggesting that *vibrio* can negatively affect otherwise healthy people. (Doc. 150-4, p. 3). Indeed there is evidence suggesting that *vibrio* **[\*50]** adversely affected otherwise healthy people in this very case. (Doc. 150-3, pp. 1, 3). Mr. Ruiz's Hepatitis C likely is why he suffered such severe consequences from ingesting *vibrio*, but it is also true that *vibrio* bacteria was a but-for cause of Mr. Ruiz's injuries. *See Dempsey v. Phelps, 700 So. 2d 1340, 1348 (Ala. 1997)* ("[A] defendant is responsible for the probable consequences of his actions, regardless of the preexisting condition of the plaintiff."). And the plaintiffs' evidence creates a genuine issue of fact as to whether the defendants

caused *vibrio* to multiply to toxic levels in the oysters they were selling to the public.

The Court notes that "[i]t is certainly 'reasonably foreseeable' that a person who suffers from an undiagnosed condition that unbeknownst to h[im] renders h[im] highly-susceptible to a *Vibrio* infection would nonetheless consume raw shellfish." *Horan, 2015 U.S. Dist. LEXIS 112734, 2015 WL 5054856 at \*11*. Testimony from the defendants' own expert reveals what a broad swath of the public can face serious health consequences as a result of *vibrio* infection. (*See* Doc. 142-3, pp. 4-5).[17] Therefore, Mr. Ruiz's underlying condition does not preclude an issue of material fact on the question of whether Wintzell's Huntsville's negligence was a cause of Mr. Ruiz's injury.

Generally, the question of proximate cause is a question of fact for a jury. *Cain, 592 So. 2d at 222*. The plaintiffs here have created issues of fact on whether acts or omissions by Wintzell's Huntsville caused *vibrio* to multiply in the oysters served to Mr. Ruiz and whether the increase in *vibrio* is what caused Mr. Ruiz's injury. Therefore, the Court denies the Wintzell's Huntsville's motion for summary judgment on the negligence claims.

### 3. Mr. Ruiz's negligence claims against Wintzell's Franchise Company

The plaintiffs argue that Wintzell's Franchise is liable for a failure to implement adequate procedures for storing raw shellfish and for properly cataloguing harvest tags. (Doc. 150, pp. 13-14). The plaintiffs also contend that Wintzell's Franchise was involved in the selection of oyster suppliers for its franchisees. The plaintiffs assert that the selection of WSI and Misho's Oysters by

---

[17] In Dr. Oliver's sworn statement, he notes that those vulnerable to severe *Vibrio vulnificus* **[\*51]** infections include persons with liver disease, persons with hemochromatosis, persons with diabetes, persons with stomach problems, persons with cancer, and persons with immune disorders. Dr. Oliver opines that "[m]any of the above persons in these risk groups may have no symptoms and may not know they are in a risk group." (Doc. 142-3, p. 5).

2017 U.S. Dist. LEXIS 159547, *51

both Wintzell's entities is another instance of actionable negligence. (Doc. 150, pp. 10, 14, 16).

The first of these theories is a form of vicarious liability. *See, e.g., Dolgencorp, LLC v. Spence, 224 So. 3d 173, 2016 Ala. LEXIS 115, 2016 WL 5817690 (Ala. Sept. 30, 2016).* To hold a third party vicariously liable for the acts of another, a plaintiff must show that an agency relationship exists between the tortfeasor and **[\*52]** the third party. *See Ware v. Timmons, 954 So. 2d 545, 549 (Ala. 2006).* The relationship between franchisor and franchisee is not necessarily an agency relationship. Where a plaintiff alleges that a franchisor is liable for the negligence of the franchisee, the plaintiff must show not only the existence of a franchise agreement, but also the fact that the franchisor "reserved a right of control over the manner of the alleged agent's performance." *Wood v. Shell Oil, 495 So. 2d 1034, 1036 (Ala.1986).* That the franchisor reserves a "right to supervise the alleged agent to determine if that person conforms to the performance required by a contract . . . does not, itself, establish control." *Kennedy, 857 So. 2d at 77* (internal quotations omitted).

Although the plaintiffs have offered the franchise agreement as an exhibit, they make no argument as to why Wintzell's Huntsville was the agent of Wintzell's Franchise. A review of the agreement indicates that Wintzell's Franchise made introductory training mandatory for franchise managers. (Doc. 150-24, p. 18). It also indicates that Wintzell's Franchise may make further training available to employees of the franchisee at a fee. (Doc. 150-24, pp. 16, 19). The agreement reserves to Wintzell's Franchise the right to review whether the franchisee is in compliance with **[\*53]** the terms of the franchise agreement, but the agreement has no language suggesting that Wintzell's Franchise exercises day-to-day control over the operations at any of their franchise locations.

Given that Wintzell's Franchise sells the right to operate oyster houses, the alleged lack of policies or procedures governing how the franchisees are to handle the raw form of this product is somewhat surprising. What is missing, however, is the necessary link of control that would allow a jury to attribute the actions of Wintzell's Huntsville to Wintzell's Franchise. The testimony of Dana Price indicates that the manager at Wintzell's Huntsville had the responsibility of training the restaurant's employees. (Doc. 163, pp. 31-32). Wintzell's Franchise was not in control of the operations at Wintzell's Huntsville, and thus Wintzell's Franchise owed no duty to Mr. Ruiz to ensure that employees at the Huntsville location were fully trained on handling raw oysters.

The plaintiffs' second claim alleging negligent selection of oyster suppliers implicates both Wintzell's Huntsville and Wintzell's Franchise. As with plaintiffs' identical claim against WSI, the Court treats this as an effort to impose **[\*54]** liability on the principal for acts of an independent contractor. *See* pp. 30-31 above. Therefore, the Wintzell's defendants can be held liable only if their independent contractor breached a non-delegable duty in a manner causally connected to Mr. Ruiz's injury. *See Atkinson, 2016 U.S. Dist. LEXIS 45104, 2016 WL 1312320, at \*2.*

The Wintzell's defendants argue that there is no evidence that they owe a duty to verify the practices of their food suppliers, but the Court has already noted that under Alabama law, the commercial seller of foods has a non-delegable duty to exercise the skill and care of a reasonably prudent person in selecting foods served to the public. *See Hogue, 61 So. 3d at 1081.* This duty plainly applies to Wintzell's Huntsville, and it applies to Wintzell's Franchise to the extent Wintzell's Franchise participates in the decision of which food suppliers its franchisee uses.

The franchise agreement contains language indicating that Wintzell's Franchise exercises control over the franchisee's selection of food vendors. Wintzell's Franchise provides a set of standards to which food vendors must conform, it provides a list of approved food vendors, and it

requires that franchisees request permission before purchasing items like food products from a non-approved [*55] vendor. (Doc. 150-24, pp. 12-13). The agreement indicates that Wintzell's Franchise has a proprietary set of criteria for vetting its vendors. (Doc. 150-24, p. 13). The deposition testimony of Mr. Price indicates that Wintzell's Huntsville purchased from WSI, through Sysco, because both companies were approved by Wintzell's Franchise. (Doc. 163, pp. 46-48).

Managers at both Wintzell's Huntsville and Wintzell's Franchise have testified that WSI was selected as an oyster supplier because of the company's ability to meet Wintzell's regular demand. (Doc. 150-5, p. 3; Doc. 150-15, p. 40). The plaintiffs cite this testimony as evidence of a lack of vetting by the Wintzell's defendants in their selection process. (Doc. 150, p. 10). But Wintzell's stated basis for selecting a supplier does not necessarily mean that they sacrificed quality and safety for profitability. More than statements of basic market considerations are necessary to create an inference of negligence.

Apart from the foregoing allegations, the plaintiffs rely upon the same facts that they use to sustain their negligent-selection claim against WSI. Dr. Rodrick indicates that WSI has had two deaths attributed to its oysters while [*56] seven deaths had been attributed to their harvester, Misho's Oysters. (Doc. 150-4, p. 5). The report does not indicate over what period of time these incidents were recorded, nor does any party present evidence informing the Court of whether this number of fatalities is in any way unusual or disproportionately large given the size of the suppliers' businesses. According to WSI, the company has been sued only once over a death related to its oysters. (Doc. 158, p. 8). There is no evidence in the record to counter Dr. Rodrick's report of seven deaths attributed to Misho's. Without further context for the evidence presented, the Court cannot determine whether the evidence of oyster-related deaths is probative of negligence.

The evidence indicating that a supplier mishandled oysters by exposing them to high temperatures relates exclusively to Misho's. (*See* Doc. 150-4, pp. 5-6; Doc. 150-5, p. 3). The Court has already held that this evidence creates an issue of fact as to whether WSI was negligent in selecting Misho's. *See* p. 31 above. That the evidence is adequate with respect to WSI does not mean that it is necessarily adequate to sustain the same claim against the Wintzell's defendants. [*57] Between the Wintzell's defendants and Misho's are two other entities: WSI and Sysco. Given WSI's proximity in the supply chain to Misho's, it is fair to conclude that WSI chooses to do business with Misho's and that verification of Misho's practices is plausibly a part of WSI's duty to consumers of oysters.

The same is not necessarily true for Wintzell's. The franchise agreement expressly mentions Sysco as an approved food supplier to Wintzell's. (Doc. 150-24, p. 12). The plaintiffs have not presented evidence that Sysco mishandled the oysters. Plaintiffs' response acknowledges that Sysco kept records verifying the temperatures at which they shipped and sold oysters to Wintzell's. (Doc. 150, p. 9, note 11, and p. 47, note 30). Plaintiffs provide no evidence demonstrating that either Wintzell's entity was involved in selecting Misho's as a harvester. Finally, despite the evidence of mishandling by Misho's, the plaintiffs present no evidence that Wintzell's was or should have been aware of these issues. Although a retailer must exercise care is selecting the foods they offer to the public, the plaintiffs have not presented substantial evidence that either Wintzell's defendant breached [*58] that duty in its selection of food suppliers. Accordingly, the Court grants summary judgment in favor of Wintzell's Franchise on the plaintiffs' claims.

## 4. Mr. Ruiz's claim for inadequate warning

The plaintiffs allege that both Wintzell's Huntsville and Wintzell's Franchise Company failed to adequately warn Mr. Ruiz of the dangers associated

2017 U.S. Dist. LEXIS 159547, *58

with consuming raw oysters. (Doc. 118, p. 6). Mr. Ruiz acknowledges that Wintzell's menu includes a warning regarding the dangers of raw shellfish consumption and that he read that warning. (Doc. 142-1, p. 4). But the plaintiffs contend that Wintzell's warning deviates materially from the warning recommended by WSI, which they concede to be adequate. (Doc. 150, pp. 11-12).

Alabama does not mandate a particular warning addressing the risks of consuming raw shellfish. (Doc. 142-3, p. 8). Generally, a duty to warn arises where the product is dangerous when put to its intended use. *Gurley v. Am. Honda Motor Co., Inc., 505 So. 2d 358, 361 (Ala. 1987).* Other states addressing the issue of *Vibrio vulnificus* in raw oysters have concluded that some warning is necessary for consumer safety. *See, e.g., Simeon, 618 So. 2d at 852 (La. 1993)* ("it is clear that there was a danger inherent in the normal use of the product not within the knowledge of an ordinary user [*59] . . . Given the magnitude of the possible harm, we believe a warning is particularly necessary."). Although some warning may be necessary, there is no requirement that it be the best possible warning; it "'need only be one that is reasonable under the circumstances. . . .'" *Borum v. Werner Co., 2012 U.S. Dist. LEXIS 78545, 2012 WL 2047678, at *15 (N.D. Ala. Jun. 6, 2012)* (quoting *Gurley, 505 So. 2d at 361*).

To create an issue of fact regarding the warning's adequacy, the plaintiffs rely on the report of Dr. Rodrick. Dr. Rodrick opines that the language of Wintzell's warning was too general, that it was in small, obscure type, and that it failed to alert persons at risk to the specific danger of *vibrio* in raw oysters. Dr. Rodrick asserts that a sufficient warning would likely have prevented Mr. Ruiz from eating raw oysters. (Doc. 150-4, p. 11).

The Court is not convinced that the differences between Wintzell's warning and the warning suggested by WSI render the former legally inadequate. Wintzell's warning reads as follows:
There may be a risk associated with consuming

undercooked meat and raw shellfish as may be the case other raw products. If you suffer from chronic illness of the liver, stomach or blood, or have other immune disorders, you should eat these products fully cooked.

(Doc. 150-16, p. 3). The **[*60]** warning recommended by WSI reads:
There is risk associated with consuming raw oysters. If you have chronic illness of the liver, stomach or blood or have immune disorders, you are at greater risk of serious illness from raw oysters, and should eat oysters fully cooked. If unsure of your risk, consult a physician.

(Doc. 150-4, p. 10).

There is, however, a more obvious reason for granting summary judgment to Wintzell's on this issue: the plaintiffs have not adduced evidence to support a causal connection between Wintzell's warning and Mr. Ruiz's injury. "To prevail on a failure-to-warn claim under Alabama law, a plaintiff must demonstrate a causal link between the allegedly inadequate warning and the injury." *Barnhill v. Teva Pharms. USA, Inc., 819 F. Supp. 2d 1254, 1261 (S.D. Ala. 2011)*. Although Dr. Rodrick states a conclusion on the issue of causation, his conclusion does not apply to the particulars of this case. During Mr. Ruiz's deposition, opposing counsel posed questions to Mr. Ruiz regarding Wintzell's warning, and Mr. Ruiz responded as follows:
Q. [] So if you had known you had a liver issue, you would have never eaten raw oysters?

A. If I knew they were going to be bad for me, there's no way I would touched them. It did not apply to me the print on the restaurant **[*61]** or the menu. I mean, I've seen them there, but it did not apply to me. . . .

. . .

Q. . . . there's a statement at the bottom of that menu about don't consume raw oysters or other raw and undercooked food if you have some type of liver issue?

2017 U.S. Dist. LEXIS 159547, *61

A. Yeah. Chronic illness or liver, stomach, yes. But, like I tell you, this did not apply me. I was healthy as far as I was concerned.

(Doc. 142-1, p. 4). This exchange indicates that no warning, however detailed or specific, would have prevented Mr. Ruiz from eating oysters because he was not aware of his latent vulnerability to bacteria commonly found in raw oysters. The plaintiffs reiterate this core set of facts — that Mr. Ruiz did not heed the warning because he was unaware of his liver condition — in their response to the defendants' motions for summary judgment. (Doc. 150, p. 18). Consequently, the Court finds that the plaintiffs have not introduced enough evidence to support an inference that an adequate warning would have prevented Mr. Ruiz's injuries. The Court grants Wintzell's motion for summary judgment on plaintiffs claim for failure to warn.

### D. Mrs. Ruiz's claim for loss of consortium

"A loss-of-consortium claim is derivative of the claims **[*62]** of the injured spouse." *See Flying J Fish Farm v. Peoples Bank of Greensboro, 12 So. 3d 1185, 1196 (Ala. 2008)*. Therefore, Mrs. Ruiz's loss-of-consortium claim fails only if all of Mr. Ruiz's claims fail. The Court has determined that several of Mr. Ruiz's claims survive summary judgment. Therefore, Mrs. Ruiz's claim for loss of consortium survives summary judgment as well.

### IV. CONCLUSION

Consistent with the preceding discussion, the Court grants summary judgment in favor of Price Foods and Wintzell's Franchise Company on all of the plaintiffs' claims. The Court grants summary judgment in favor of Wintzell's Huntsville, LLC on the plaintiffs' claim for failure to warn. The Court denies summary judgment to Wintzell's Huntsville, LLC and to WSI on the plaintiffs' claims for violation of the AEMLD, breach of implied warranty of merchantability, negligence, and loss of consortium.

**DONE** and **ORDERED** this September 28, 2017.

/s/ Madeline Hughes Haikala

**MADELINE HUGHES HAIKALA**

UNITED STATES DISTRICT JUDGE

**End of Document**

# Tab 27

2005 WL 974933
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

SCANSOURCE, INC.

v.

DATAVISION-PROLOGIX, INC., et al.

No. Civ.A. 04-CV-4271.
|
April 26, 2005.

**Attorneys and Law Firms**

Carl W. Hittinger, Philadelphia, PA, for Scansource, Inc.

Michele D. Hangley, Philadelphia, PA, for Datavision-Prologix, Inc., et al.

*MEMORANDUM & ORDER*

SURRICK, J.

**\*1** Presently before the Court are the Motions to Dismiss Plaintiff's Complaint of Defendant Paul J. Speese ("Speese") (Doc. No. 7) and Defendant Edward Barr ("Barr") (Doc. No. 8). For the following reasons, Defendants' Motions will be granted.

I. BACKGROUND

Plaintiff ScanSource, Inc. ("ScanSource") is a South Carolina corporation that distributes various specialty technologies, including automatic data capture and point-of-sale products. (Verified Compl. ¶¶ 6-7.) Defendant Datavision-Prologix, Inc. ("Datavision") is a Pennsylvania corporation that resold various ScanSource products. (*Id.* ¶¶ 12-13.) Defendant Speese was the President and Chief Executive Officer of Defendant Datavision. (*Id.* ¶ 15.) Defendant Barr was Datavision's Chief Financial Officer. (*Id.* ¶ 16.)

In February, 1995, ScanSource extended a line of credit to Datavision. (*Id.* ¶ 19.) During the summer of 2001, Datavision requested an increase of this credit line to $2,000,000. (*Id.* ¶ 20.) In exchange for the additional credit, Datavision entered into a Security Agreement ("Agreement") with ScanSource. (*Id.* ¶ 21.) Under the terms of this Agreement, Datavision agreed to: (1) provide ScanSource with audited financial statements within 120 days of the end of each fiscal year; (2) provide ScanSource with unaudited, quarterly financial statements within thirty (30) days of the end of each fiscal quarter; (3) provide ScanSource with a copy of the borrower base certificate that it sends to its primary lender, as well as appropriate accounts receivable and inventory data, on a monthly basis; and (4) maintain a tangible net worth of either at least $2,000,000 or the amount owed to ScanSource, whichever is greater. (*Id.* ¶ 22.)

Plaintiff alleges that Datavision did not comply with the terms of the Agreement and that Defendants made misrepresentations to ScanSource. Specifically, Plaintiff ScanSource avers that the Defendants misrepresented the value of their accounts receivable and inventory. (*Id.* ¶¶ 91-92, 98-99.) In March, 2004, Datavision reported in its Borrower's Certificate that it had a collateral base of $9,672,907 in accounts receivable and $8,093,793.41 of inventory. (*Id.* ¶ 40.) This certificate was signed by Defendant Speese (*id.* ¶ 42, Ex. D), and was provided to ScanSource on or about April 5, 2004. (*Id.* 43, Ex. D.) ScanSource avers that it "believed and justifiably relied upon these representations." (*Id.* ¶ 95.)

ScanSource filed the instant Complaint on September 9, 2004. (Doc. No. 1.) The Complaint contains four counts: Count I alleges breach of contract against Defendant Datavision only (Verified Compl. ¶¶ 74-82); Count II alleges breach of the implied covenant of good faith and fair dealing against Defendant Datavision only (*id.* ¶¶ 83-89); Count III alleges fraud against all Defendants (*id.* ¶¶ 90-96); and Count IV alleges negligent misrepresentation against all Defendants (*id.* ¶¶ 97-102). On December 13, 2004, ScanSource requested an entry of default against Datavision. (Doc. No. 13.) The default was entered by the Clerk the same day. Default judgment against Datavision in the amount of $1,480,932.34 was entered by the Court on March 2, 2005. (Doc. No. 16.)

**\*2** In their Motions to Dismiss, Defendants Speese and Barr seek dismissal of Count III charging them with fraud and Count IV charging them with negligent misrepresentation.

II. LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, we must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). The court may dismiss a complaint only if " 'it is

ScanSource, Inc. v. Datavision--Prologix, Inc., Not Reported in F.Supp.2d (2005)
2005 WL 974933

clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *H. J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). When considering a motion to dismiss, we need not credit a plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir.1997)).

## III. LEGAL ANALYSIS

### A. Count III-Plaintiff's Fraud Claim

To plead a cause of action for fraud under Pennsylvania law, a plaintiff must show: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to its truth or falsity; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. [1] *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994) (citing W. Page Keeton, Prosser & Keeton on Torts § 105 (5th ed.1984); *Restatement (Second) of Torts § 525 (1977)).

[1]
    In a diversity case such as this one, a district court must determine which state's substantive law will govern. To make this determination, we must apply the conflict of law rules of the forum state. *Kirschbaum v. WRGSB Assocs.,* 243 F.3d 145, 150 (3d Cir.2001). Pennsylvania's choice of law analysis incorporates elements of both the "government interest" and "significant relationship" tests. *Id.* at 151.

    Either Pennsylvania or South Carolina law applies to Plaintiff's fraud claim. The elements of fraud in Pennsylvania and South Carolina are very similar. *Compare Gibbs,* 647 A.2d at 889, *with Cheney Bros. v. Batesville Casket Co., Inc.,* 47 F.3d 111, 114-15 (4th Cir.1995), *and Florentine Corp., Inc. v. PEDA I, Inc.,* 287 S.C. 382, 339 S.E.2d 112, 114 (S.C.1985). Both states require justifiable reliance, which is what is at issue here. Under the circumstances, we will "presume that the law of the forum state shall apply." *Financial Software Sys., Inc. v. First Union Nat'l Bank,* Civ. A. No. 99-CV-623, 1999 U.S. Dist. LEXIS 19479, at *8 (E .D. Pa. Dec.

16, 1999); *see also Air Prods. & Chemicals, Inc. v. Eaton Metal Prods. Co.,* 272 F.Supp.2d 482, 490 n. 9 (E.D.Pa.2003); *Gallup, Inc. v. Talentpoint, Inc.,* Civ. A. No. 00-5523, 2001 U.S. Dist. LEXIS 18560, at *25 n. 3 (E.D.Pa. Nov. 15, 2001).

Defendants contend that Plaintiff has not pled fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Greater particularity in pleading is required whenever fraud is averred. Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The purpose of Rule 9(b) is " 'to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of Am.,* 361 F.3d 217, 223-24 (3d Cir.2004) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)).

Plaintiff argues that "Rule 9(b) does not require that the detrimental reliance element of a fraud claim be pleaded with particularity." (Doc. No. 14 at 12.) Plaintiff cites *Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Assocs.,* 39 F.Supp.2d 517, 534 (M.D.Pa.1999), and asserts that the issue of justifiable reliance should be decided by a jury, and that it is not readily susceptible of disposition through a motion to dismiss. (Doc. No. 14 at 15.) *Williams Controls* is inapposite. In *Williams Controls,* the Court did not deal with or discuss the pleading requirements of Rule 9(b) as they relate to justifiable reliance. Moreover, the clear weight of authority requires that the detrimental reliance element of a fraud claim be pleaded with particularity under Rule 9(b). *Gutman v. Howard Savings Bank,* 748 F.Supp. 254, 257 (D.N.J.1990); *see also Learning Works, Inc. v. Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir.1987) (stating "reliance must be pleaded with particularity" and dismissing fraud claim for failure to plead reliance with particularity); *Bank of Am. v. Lemgruber,* No. 02 Civ. 1041, 2005 U.S. Dist. LEXIS 61, at *77 (S.D.N.Y. Jan. 5, 2005) ("[J]ustifiable reliance must be pleaded with particularity pursuant to Federal Rule of Civil Procedure 9(b)."); *Amzak Corp. v. Reliant Energy, Inc.,* No. 03 C 0877, 2004 U.S. Dist. LEXIS 16514, at *16-17 (N.D.Ill. Aug. 19, 2004) ("To sufficiently plead reliance, plaintiffs would have to link one or more of the alleged misrepresentations with a specific act of reliance.").

Case 1:19-md-02875-RMB-SAK   Document 522-3   Filed 07/17/20   Page 246 of 307
PageID: 9769
ScanSource, Inc. v. Datavision--Prologix, Inc., Not Reported in F.Supp.2d (2005)
2005 WL 974933

**\*3** In support of its fraud claim, Plaintiff's Verified Complaint alleges that Defendants made false representations of fact on March 31, 2004, when they misrepresented the value of Datavision's accounts receivable and inventory. (Verified Compl. ¶¶ 91-92.) ScanSource also alleges that it "believed and justifiably relied upon" these asserted misrepresentations made by Defendants. (*Id.* ¶ 95.) However, Plaintiff offers no details whatsoever about the contours of this asserted justifiable reliance and it avers nothing regarding the decisions that it made as a result of Defendants' asserted misrepresentations. The Verified Complaint never avers that ScanSource took or declined to take action in reliance on Defendants' asserted misrepresentations, nor is there any suggestion in the Verified Complaint that any reliance on the part of ScanSource was justifiable. In Plaintiff's Response to Defendants' Motions to Dismiss, Plaintiff argues that "[d]iscovery will show that following the fraudulent misrepresentations of Datavision, Speese and Barr, ScanSource continued to extend substantial additional credit to Datavision in reliance thereon." (Doc. No. 14 at 15.) Given this unequivocal statement, Plaintiff presumably could have either included this assertion in its Verified Complaint or sought to amend it in an attempt to satisfy the pleading requirements of Rule 9(b). It did not.

"To survive a 9(b) motion, plaintiff must show that [it] acted upon the fraud or misrepresentation complained of." *Gutman,* 748 F.Supp. at 258. Because Plaintiff does not plead justifiable reliance with the particularity required by Rule 9(b), we are compelled to dismiss the Count III fraud claim against Defendants Speese and Barr.

B. Count IV-Plaintiff's Negligent Misrepresentation Claim

Defendants argue that Count IV alleging negligent misrepresentation should be dismissed under the economic loss doctrine. Pennsylvania courts exhibit "a 'lack of hospitality to tort liability for purely economic loss.' " [2] *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 (3d Cir.2002) (quoting *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 119 (3d Cir.1987)). As a result, Pennsylvania courts have fashioned the economic loss doctrine, which " 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.' " *Id.* at 671 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995)); *see also Brunson Communications, Inc. v. Arbitron, Inc.,* 266 F.Supp.2d 377, 383 (E.D.Pa.2003) ("[A] plaintiff cannot recover on a negligence theory for purely economic damages.") (citing *David Pflumm Paving & Excavating, Inc. v. Found. Servs. Co.,* 816 A.2d 1164, 1168 (Pa.Super.Ct.2003)).

2    South Carolina law also recognizes that the economic loss rule applies "in a commercial transaction governed by a contract where the alleged loss is purely economic and the cause of action is for mere negligent misrepresentation...." *Bishop Logging Co. v. John Deere Industrial Equip. Co.,* 317 S.C. 520, 455 S.E.2d 183, 189 (S.C.Ct.App.1995) (citing *S.C. Elec. & Gas Co. v. Westinghouse Elec. Co.,* 826 F.Supp. 1549 (D.S.C.1993)); *see also Laidlaw Envtl. Servs. v. Honeywell, Inc.,* 966 F.Supp. 1401, 1414-15 (D.S.C.1996). Since Pennsylvania and South Carolina both recognize the applicability of the economic loss doctrine, we will apply the law of Pennsylvania.

The economic loss doctrine applies to a plaintiff's negligent misrepresentation claim. *I & S Assocs. Trust v. LaSalle Nat'l Bank,* Civ. A. No. 99-4956, 2001 U.S. Dist. LEXIS 15225, at \*9-10 (E.D.Pa. Sept. 27, 2001) (citing *N. Am. Roofing & Sheet Metal Co., Inc. v. Bldg. & Constr. Trades Council of Phila. & Vicinity,* Civ. A. No. 99-2050, 2000 U.S. Dist. LEXIS 2040 (E.D.Pa. Feb.29, 2000)). In its Verified Complaint, Plaintiff alleges that Defendants made misrepresentations about certain financial data in breach of Datavision's Agreement with ScanSource regarding a line of credit for the sale of various specialty technologies. (Verified Compl. ¶¶ 98-99 (asserting that all Defendants negligently misrepresented the value of Datavision's accounts receivable and inventory).) This negligent misrepresentation claim seeks purely economic damages: (1) compensatory and consequential damages; (2) punitive damages; and (3) pre-judgment and post-judgment interest. [3] (Verified Compl. at 17.) Thus, absent an applicable exception to the economic loss doctrine, Plaintiff is barred from pursuing its negligent misrepresentation claim against Defendants Speese and Barr. *See I & S Assocs. Trust,* 2001 U.S. Dist. LEXIS 15225, at \*9 (concluding that "the economic loss doctrine bars a plaintiff from bringing a negligence action solely for economic losses absent physical injury or property damage") (citing *Ellenbogen v. PNC Bank,* 731 A.2d 175, 188 (Pa.Super.Ct.1999)).

3    The averments in this count arise from some of the same asserted misrepresentations which form

the basis of Plaintiff's breach of contract claim. (Verified Compl. ¶ 77 (Defendant Datavision breached its contract with Plaintiff, in part, when it "misrepresented the amount of both its inventory and its accounts receivable....").) In Plaintiff's breach of contract claim against Defendant Datavision, it also seeks similar economic damages: (1) compensatory and consequential damages; and (2) pre-judgment and post-judgment interest. (*Id.* at 13.)

**\*4** Under two narrow exceptions, a plaintiff may recover purely economic loss which resulted from a defendant's misrepresentation when: (1) the misrepresentation is intentionally false; or (2) the defendant is " 'in the business of supplying information for the guidance of others." ' *N. Am. Roofing & Sheet Metal Co., Inc.,* 2000 U.S. Dist. LEXIS 2040, at \*27 (quoting *Palco Linings, Inc. v. Pavex, Inc.,* 755 F.Supp. 1269, 1274 (M.D.Pa.1990)). The first exception deals with intentionally false misrepresentations and obviously has no application to the negligent misrepresentation alleged in Count IV. The second exception "is rigidly applied and narrowly construed to except only claims which explicitly involve suppliers of information for guidance of others in business transactions...." *Palco Linings, Inc.,* 755 F.Supp. at 1274; *see also id.* (explaining that exception only applies "to those *in the business* of selling information on which its customers rely upon in taking additional action" such as attorneys, surveyors, and inspectors of goods); *S.C. Elec. & Gas Co. v. Westinghouse Elec. Co.,* 826 F.Supp. 1549, 1557 (D.S.C.1993) ("Most courts which have rejected the economic loss rule in negligent misrepresentation cases have limited recovery to a misrepresentation in giving information by someone hired to advise.").

The second exception also does not apply to Plaintiff ScanSource's negligent misrepresentation claim against Defendants Speese and Barr. Defendant Datavision is not in the business of supplying information for the assistance of others. (*Id.* ¶¶ 11-13.) Rather, Datavision distributes automatic data capture and point-of-sale products, as well as other peripheral technologies. (*Id.* ¶ 11.) Because Datavision is not in the business of providing information for the guidance of others, its corporate officers cannot engage in conduct that falls within this second exception to the economic loss doctrine. *See LaSalle Bank Nat'l Assoc. v. Epstein,* No. 99 C 7820, 2001 U.S. Dist. LEXIS 12016, at \*30-31 (N.D.Ill. Aug. 15, 2001). Plaintiff may not pursue the negligent misrepresentation claim against Defendants Speese and Barr.

An appropriate Order follows.

### ORDER

AND NOW, this 26th day of April, 2005, upon consideration of the Motions to Dismiss Plaintiff's Complaint of Defendants Paul J. Speese and Edward Barr, and all papers submitted in support thereof and in opposition thereto, it is ORDERED as follows:

1. Defendant Paul J. Speese's Motion to Dismiss (Doc. No. 7) is GRANTED; and

2. Defendant Edward Barr's Motion to Dismiss (Doc. No. 8) is GRANTED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 974933

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 28

# *Sherfey v. Johnson & Johnson*

United States District Court for the Eastern District of Pennsylvania

April 25, 2014, Decided; April 25, 2014, Filed

CIVIL ACTION No. 12-4162

**Reporter**

2014 U.S. Dist. LEXIS 57735 *; 2014 WL 1663966

STACY SHERFEY, as an administrator of the estate of Tracen Sherfey, a minor, deceased, STACY SHERFEY, and NEIL SHERFEY, Plaintiffs, v. JOHNSON & JOHNSON, et al., Defendants.

**Prior History:** *Sherfey v. Johnson & Johnson, 2012 U.S. Dist. LEXIS 116283 (E.D. Pa., Aug. 17, 2012)*

**Counsel:** **[*1]** For STACY SHERFEY, AS THE ADMINISTRATOR OF THE ESTATE OF TRACEN SHERFEY, A MINOR, DECEASED, STACY SHERFEY, NEIL SHERFEY, H/W, INDIVIDUALLY IN THEIR OWN RIGHT, Plaintiffs: IRENE M MCLAFFERTY, LEAD ATTORNEY, PHILADELPHIA, PA; JOSEPH L. MESSA , JR., THOMAS N. SWEENEY, LEAD ATTORNEYS, MESSA & ASSOCIATES PC, PHILADELPHIA, PA.

For JOHNSON & JOHNSON, MCNEIL-PPC, INC., Defendants: MELISSA A GRAFF, LEAD ATTORNEY, DAVID F. ABERNETHY, MEREDITH NISSEN REINHARDT, DRINKER, BIDDLE & REATH LLP, PHILADELPHIA, PA; MICHAEL B. HEWES, LEAD ATTORNEY, PRO HAC VICE, BUTLER SNOW LLP, GULFPORT, MS; SARAH ELIZABETH MOCCALDI, LEAD ATTORNEY, PRO HAC VICE, BUTLER SNOW LLP, MEMPHIS, TN.

For JOHNSON & JOHNSON SALES & LOGISTICS COMPANY, LLC, Defendant: MELISSA A GRAFF, LEAD ATTORNEY, DAVID F. ABERNETHY, MEREDITH NISSEN REINHARDT, DRINKER, BIDDLE & REATH LLP, PHILADELPHIA, PA.

For WAL-MART STORES, INC., Defendant: DAVID F. ABERNETHY, MELISSA A GRAFF, MEREDITH NISSEN REINHARDT, DRINKER, BIDDLE & REATH LLP, PHILADELPHIA, PA.

For INMAR, INC., CAROLINA SUPPLY CHAIN SERVICES, LLC, CAROLINA LOGISTICS SERVICES, LLC, Defendants: CYRUS Y. CHUNG, MICHAEL L. KIDNEY, LEAD ATTORNEYS, HOGAN LOVELLS US LLP, WASHINGTON, DC; DAVID NEWMANN, **[*2]** LEAD ATTORNEY, STEPHEN A. LONEY , JR., HOGAN LOVELLS US LLP, PHILADELPHIA, PA.

**Judges:** ROBERT F. KELLY, Senior United States District Judge.

**Opinion by:** ROBERT F. KELLY

# Opinion

## MEMORANDUM

### ROBERT F. KELLY, Sr. J.

Presently before the Court is Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, LLC's (collectively, the "Inmar Defendants"), Motion to Dismiss the Complaint pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*, Plaintiffs, Stacy Sherfey, as the administrator of the Estate of Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil Sherfey's, (collectively, "Plaintiffs") Response, and the Inmar Defendants' Reply. For the reasons stated below, the Motion is granted.

### I. BACKGROUND [1]

Plaintiffs [2] filed the Complaint on June 27, 2012, against Johnson & Johnson ("J&J"), McNeil-PPC, Inc. ("McNeil"), Johnson & Johnson Sales & Logistics Company, LLC ("JJSLC") (collectively, the J&J Defendants"), Wal-Mart Stores, Inc., the Inmar Defendants [3], and individual [*3] executives and officers of McNeil in the Court of Common Pleas of Philadelphia County. Defendants removed this action to this Court based on diversity of citizenship and the inapplicability of the forum defendant rule set forth in *28 U.S.C. § 1441(b)(2)*. Plaintiffs filed a Motion to Remand, which we denied on January 29, 2014. See *Sherfey, 2014 U.S. Dist. LEXIS 10690, 2014 WL 715518, at *1*. We also dismissed from this action the individual

---

[1] A complete procedural and factual history of this case is set forth in this Court's prior Memorandum Opinion. See *Sherfey v. Johnson & Johnson, No. 12-4162, 2014 U.S. Dist. LEXIS 10690, 2014 WL 715518, at *1 (E.D. Pa. Jan. 29, 2014)*.

[2] Stacy Sherfey and Neil Sherfey, wife and husband, are residents of the State of Nevada. Compl. ¶ 29. They are the parents of Tracen Sherfey who is deceased. Id.

[3] Inmar is a North Carolina corporation with its principal place of business in North Carolina. Id. ¶ 42. CSCS and CLS are limited liability companies with principal places of business in North Carolina. Id. ¶¶ 43-44.

executive Defendants because they were fraudulently joined. Id. at 5-11.

Plaintiffs assert that their two-week-old son, Tracen Sherfey ("Tracen") died from ingesting defective and recalled Infants' Tylenol. In their Complaint, Plaintiffs allege that on February 16, 2009, Stacy Sherfey gave Tracen a recommended dose of Infants' Tylenol based on the suggestion of Tracen's doctor. Id. ¶ 103. The following morning, [*4] Stacy Sherfey gave Tracen another dose of Infants' Tylenol in accordance with the instructions on the package, and later this same day, gave Tracen another dose. Id. ¶¶ 104-105. Tracen began vomiting blood, and Stacy Sherfey took him to the local emergency room. Id. Tracen was later airlifted to Children's Primary Hospital in Salt Lake City, Utah. Id. ¶ 107. On February 19, 2009, Tracen died from acute liver failure. Id. ¶ 108. Plaintiffs assert the following causes of action against the Inmar Defendants:[4] (1) Count XVI- Violation of Nevada Consumer Protection Law; (2) Count XVII-Civil Conspiracy; (3) Count XVIII- Aiding and Abetting; and (4) Count XIX- Punitive Damages.

The Inmar Defendants filed the instant Motion to Dismiss on February 21, 2014. (Doc. No. 56.) Plaintiffs filed a Response on March 25, 2014, and the Inmar Defendants filed a Reply on April 10, 2014. (Doc. Nos. 60, 64.)

## II. DISCUSSION

### A. Standing

The concept of standing is an integral part of "the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Hagan v. United States, No. 01-5506, 2002 U.S. Dist. LEXIS 3504, 2002 WL 338882, at *4 (E.D. Pa. Mar. 1, 2002)* [*5] (citing *Simon v. Eastern KY*

---

[4] For purposes of this Motion, we list only the causes of action against the Inmar Defendants.

*Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)).* A motion to dismiss for want of standing implicates the court's subject matter jurisdiction, and is therefore appropriately brought under *Federal Rule of Civil Procedure 12(b)(1).* Id. (citing *Miller v. Hygrade Food Prods. Corp., 89 F. Supp. 2d 643, 646 (E.D. Pa. 2000)).* "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims and they must be dismissed." *Common Cause of PA v. Pennsylvania, 558 F.3d 249, 257 (3d Cir. 2009)* (citing *Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006)).*

The "irreducable constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).* First, the plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Id. (internal citations omitted). A particularized injury is one that affects the plaintiff in a personal and individual way. *Id. at 560 n.1.* Second, there must be a causal connection between the injury **[*6]** and the conduct complained of, which requires the injury to be "fairly . . . traceable to the challenged action of the defendant and not th[e] result [of] the independent action of some third party not before the court." *Id. at 560-61* (citing *Simon, 426 U.S. at 41-42*). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id. (citing *Simon, 426 U.S. at 38*). At all times, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id. at 561.* "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" Id. (quoting *Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31, 99 S. Ct. 1601, 60 L. Ed. 2d 66 (1979)).*

Here, the Inmar Defendants argue that the Complaint should be dismissed against them under *Rule 12(b)(1)* because Plaintiffs lack standing to assert claims against them. (Defs.' Mot. Dismiss at 8.) Specifically, they state that Plaintiffs "lack standing because no plausible causation theory makes their alleged injury traceable" to the Inmar Defendants. (Id.) Plaintiffs respond that "[w]ithout the clandestine assistance of the Inmar Defendants, **[*7]** J&J and McNeil could not have concealed for so long the manufacturing defects of its pediatric medicines." (Pls.' Resp. at 3.) Plaintiffs allege further that the "Inmar Defendants' implementation of the phantom recall of pediatric medicines permitted J&J and McNeil to further conceal from Plaintiffs that the later-recalled Infants' Tylenol, which killed Tracen Sherfey, was dangerous and defective." (Id.) Plaintiffs aver in their Complaint:

> To conceal from the public the defects in Infants' and Children's Tylenol products, the Defendants employed the services of Inmar and its subsidiaries Carolina Supply Chain Services and Carolina Logistics Services to implement a phantom recall and conduct "market assessments" to determine the risk that children faced by the defective medicines.
>
> At the direction of J&J, McNeil and their executives, Inmar, Carolina Supply Chain Services and Carolina Logistics Services analyzed J&J and McNeil's exposure by traveling to retail outlets across the United States to measure what defective medicines remained on the shelves.
>
> Inmar, Carolina Supply Chain Services and Carolina Logistics Services conducted the work clandestinely so that the FDA and the public would **[*8]** be unaware that the J&J and McNeil products were defective and dangerous.

Compl. ¶¶ 86-88.

The Inmar Defendants assert that two recent cases from this District decided by the Honorable Mary A. McLaughlin, *In re McNeil Comsumer Healthcare, et al., Marketing and Sales Litig., MDL No. 2190, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854, at *1 (E.D. Pa. July 15, 2011)* and *Moore v. Johnson & Johnson, No. 2:12-cv-00490-MAM,*

*2014 U.S. Dist. LEXIS 58815 (E.D. Pa. Feb. 4, 2014)*,[5] which dismissed them as parties based on similar allegations as those alleged in this action, support their position that Plaintiffs lack standing to bring the instant causes of action against them. We agree.

In re McNeil was a multi-district consolidated consumer class action, principally alleging that "quality control issues affect[ed] certain over-the-counter healthcare products manufactured by Johnson & Johnson's consumer healthcare division, McNeil Consumer Healthcare." *McNeil, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854 at * 1*. With respect to the Inmar Defendants, plaintiffs alleged that they participated in a June 2009 market **[*9]** removal which they termed a "phantom recall" of Motrin IB and a "market assessment" of non-Motrin products. Id. at 5. Plaintiffs argued that had the Inmar Defendants not participated in the phantom recall, J&J would have been forced to publicly disclose the defective nature of the products. *2011 U.S. Dist. LEXIS 76800, [WL] at * 15*. The Court dismissed the Inmar Defendants for lack of standing holding that plaintiffs failed to establish causation. Id. at 18. The Court stated:

> First, there are no allegations that the Contractor Defendants [6] participated in, or had influence over, the decision to conduct a "phantom recall," or discussions regarding the scope of said recall. Second, the plaintiffs have not alleged that the Contractor Defendants had any knowledge of the specific defects affecting Motrin IB, such that they would have or should have refused to conduct a "phantom recall." Finally, even if the Contractor Defendants had refused to conduct a "phantom recall," there is no basis for assuming that the J&J Defendants would have been unable to find other

contractors to conduct the recall, or that the J&J Defendants otherwise would have foregone a "phantom recall" in favor of a public recall. The plaintiffs' theory **[*10]** of causation, therefore, hinges on the Contractor Defendants' possessing a degree of influence over the J&J Defendants that is not plausible on the limited allegations in the CAC. Instead, the plaintiffs' injuries appear to be based on conduct more appropriately attributed to the J&J Defendants.

*2011 U.S. Dist. LEXIS 76800, at *16*.

In Moore v. Johnson & Johnson, the plaintiffs advanced similar allegations against the Inmar Defendants as those in In re McNeil. See Doc. No. 111 at 1-3. The difference was that the Moore complaint alleged personal injury and the In re McNeil complaint alleged economic harm. Id. at 3. In Moore, the plaintiffs averred that the Inmar Defendants' "acts allowed the J&J defendants to conceal the manufacturing defects of Children's Tylenol." Id. at 2-3. If the Contractor Defendants [Inmar Defendants] had not been involved, Katy Moore would not have purchased the Children's Tylenol that led to River Moore's death. The plaintiffs 'seek wrongful death and survival damages from [Inmar Defendants] for their role in hiding the dangers of the J&J Defendants' pediatric over-the **[*11]** counter drugs.'" Id. at 5. The Moore Court stated that the same analysis that applied in In re McNeil applied to Moore. Id, at 6. The Court, in dismissing the Inmar Defendants, found that the plaintiffs lacked standing because they could not establish causation. Id. The Court reasoned:

> The Complaint's only allegation is that the Contractor Defendants were hired to conduct a "market assessment." The Complaint does not allege that the Contractor Defendants knew or should have known that the products involved in the "market assessment" were defective or dangerous. There are no allegations that the Contractor Defendants had any influence over J&J's decision to conduct a market assessment, that the market assessment was wrongful in any

---

[5] This Order and decision rendered by Judge McLaughlin is not cited in Westlaw or Lexis at present. We, thus, will cite to it using its document number on the Court's docket.

[6] We note that in both In re McNeil and Moore, Judge McLaughlin refers to the Inmar Defendants as the "Contractor Defendants."

way, or that the market assessment influenced the way J&J and McNeil conducted the recall of the Children's Tylenol products.

Id. The Court further concluded that:

> The Complaint does not establish how the Contractor Defendants' performance of a market assessment to determine the amount of product on store shelves in July 2009 could have possibly caused Katy Moore to purchase defective Children's Tylenol or administer it to River Moore.

Id. at 6-7.

In the case **[*12]** before this Court, Plaintiffs assert in their Response that the Inmar Defendants's Motion is "based on the bizarre claim that Plaintiffs lack 'standing' to assert claims against them."[7] (Pls.' Resp. at 2.) We first note that this argument is puzzling because Judge McLaughlin adopted this exact same Article III standing analysis in dismissing the Inmar Defendants in In re McNeil and Moore. We also note that, while Plaintiffs attempt to distinguish In re McNeil from this present action in their Response, they make no attempt to distinguish Moore from the instant case.

Plaintiffs attempt to distinguish this action from In re McNeil by arguing that the "Inmar Defendants seek to equate this matter with a dismissed consumer fraud case where the putative class plaintiffs could not articulate an 'injury in fact.'" (Id. at 2.) Plaintiffs assert that In re McNeil involved "plaintiffs' standing and the sufficiency of

pleading of the economic harm." (Id.) Plaintiffs further claim that they have adequately pleaded the harms in this case since it involved the death of a two-week-old boy. (Id.) However, it is apparent from even a cursory reading of In re McNeil that, while the issue of "injury in fact" under Lujan's first prong was discussed, the Court clearly dismissed the Inmar Defendants for failure to establish Article III causation. The Court stated that:

> [t]he plaintiffs have failed to establish that their purported injuries are "fairly traceable" to the Contractor Defendants' conduct. The Court will therefore dismiss all claims against the Contractor Defendants for lack of standing. The dismissal will be with prejudice, because the Court concludes that **[*14]** the plaintiffs would be unable to establish causation upon amendment.

*In re McNeil, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854, at *18*.

In the instant action, there is no issue that the Plaintiffs suffered an "injury in fact." The issue before us, regarding standing, is clearly causation. See *Lujan, 504 U.S. at 560*. To satisfy this causation requirement, the plaintiffs must establish that the injuries in question "fairly can be traced to the challenged action" of a particular defendant, rather than to the action of an independent third party. *In re McNeil, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854, at *18* (quoting *Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990);see also Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 137-38 (3d Cir. 2009)*. "This requirement is not as demanding as the proximate causation required under tort law. Instead, an indirect causal relationship may suffice, so long as there is a 'substantial likelihood' that the defendant's conduct caused the plaintiffs' harm." Id. (citing *Pub. Interest Research Grp. v. Powell Duffryn Terminals, 913 F.2d 64, 72 (3d Cir. 1990)*.

Here, we agree with the holdings in *In re McNeil* and *Moore*, and find that the Complaint does not

---

[7] Plaintiffs also assert that the Inmar Defendants's Motion to Dismiss is "premised on the misrepresentation that the Inmar Defendants' phantom recall" activities were limited to Motrin products, not the Infants' Tylenol which killed Tracen Sherfey." (Pls.' Resp. at 1.) We disagree. The Inmar Defendants clearly rely on the Moore decision in seeking dismissal for lack of standing. As indicated above, Moore dealt with allegedly defective Children's Tylenol and generally discussed the alleged "phantom recall" of "Children's Tylenol products." (Doc. No. 111 at 6.) Thus, while the Inmar Defendants rely on In re McNeil and Moore, **[*13]** they do not rely on the premise that the Inmar Defendants' activities were limited to Motrin products.

support a "causal connection between the injury and the **[*15]** conduct complained of," and the death of Tracen is not "fairly . . . traceable to the challenged action[s]" of the Inmar Defendants. See _Lujan, 504 U.S. at 560-61_. The In re McNeil and Moore Courts determined that the plaintiffs' theory of causation hinged on the Inmar Defendants possessing a degree of influence over the J&J Defendants that was not plausible on the limited allegations in the complaints. See _In re McNeil, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854, at * 18_; Moore, Doc. 111 at 6. Likewise, in this case, Plaintiffs' Complaint does not establish that the Inmar Defendants had such influence over the J&J Defendants. In fact, there are no allegations in the Complaint that the Inmar Defendants had influence over the J&J Defendants decision to conduct a "phantom recall," and/or decisions regarding the scope of such a recall. The Complaint also does not allege that the Inmar Defendants had any knowledge of the specific defects affecting the Infants' Tylenol. See Id. at 16.

In addition, the Complaint fails to allege any facts to support a conclusion that the Inmar Defendants carried out "market assessments" of Infants' Tylenol. As in In re McNeil and Moore, Plaintiffs, here, fail to define the term "market **[*16]** assessment," or explain in any way how the Inmar Defendants, as part of this market assessment, could have influenced the J&J Defendants with respect to recall decisions. See _In re McNeil, 2011 U.S. Dist. LEXIS 76800, 2011 WL 2802854, at *17 n.30_; see also Moore, Doc. No. 111 at 4. Like Moore, we are of the opinion that the instant Complaint does not define "market assessments," and does not explain why such assessments were unlawful. Id. at 6-7.

Moreover, the Complaint fails to allege facts to support a conclusion that the Inmar Defendants even carried out a "phantom recall" of Infants' Tylenol and/or conducted a "market assessment" that caused or could have contributed to the cause of Tracen's death. The sole factual basis regarding the genesis of a phantom recall and/or a market assessment is an email communication from Peter Luther, President of McNeil ("Luther"), dated May 27, 2009. Comp. ¶¶ 92, 226. Specifically, Plaintiffs assert that in this email, Luther "ratified and approved the phantom/stealth recalls/unethical 'market assessments.'"[8] Compl. ¶ 226. However, it is alleged that Tracen consumed the defective product and died in February 2009.[9] Therefore, we agree with the Inmar Defendants that the alleged phantom **[*17]** recall post-dated Tracen's death, and, therefore, could not have caused it.[10] Accordingly, we dismiss all claims against the Inmar Defendants for lack of standing.

An appropriate Order follows.

## ORDER

**AND NOW,** this 25th day of April, 2014, upon consideration of Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, **[*18]** LLC's (collectively, the "Inmar Defendants"), Motion to Dismiss the Complaint (Doc. No. 56), Plaintiffs, Stacy Sherfey, as the administrator of the Estate of Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil

---

[8] The email stated:

Group,

    Where is the miss here? Given our current financial situation, I hope we're not going to really double our cost to do this. Let's make this happen ASAP.

    Thanks,

Compl. ¶ 226.

[9] It is notable that in Moore, Plaintiffs alleged that the "market assessment" conducted by the Inmar Defendants occurred in July 2009, or about six months after the death of Tracen. (Doc. No. 111 at 3.)

[10] In their Response, Plaintiffs spend much space asserting allegations of wrong-doings by J&J executives, including planning a secret recall of Infants' and Children's Tylenol products, and hiring the Inmar Defendants to implement a phantom recall. (Pls.' Resp. at 3-7.) However, as noted earlier, we dismissed these individual Defendants in our prior Memorandum Opinion as being fraudulently joined. See _Sherfey, No. 12-4162, 2014 U.S. Dist. LEXIS 10690, 2014 WL 715518, at *5-11_.

2014 U.S. Dist. LEXIS 57735, *18

Sherfey's, Response, and the Inmar Defendants'
Reply, it is hereby **ORDERED** that the Motion is
**GRANTED**.

Accordingly, it is **ORDERED** that Defendants,
Inmar Inc., Carolina Supply Chain Services, LLC,
and Carolina Logistics Services, LLC are
**DISMISSED** from this action.

BY THE COURT:

/s/ Robert F. Kelly

ROBERT F. KELLY

SENIOR JUDGE

---

**End of Document**

# Tab 29

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 257 of 307
PageID: 9780
Solo v. Bed Bath & Beyond, Inc., Not Reported in F.Supp.2d (2007)
2007 WL 1237825

KeyCite Yellow Flag - Negative Treatment
Distinguished by Hoffman v. Liquid Health Inc., D.N.J., July 2, 2014

2007 WL 1237825
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Joe SOLO, Plaintiff,
v.
BED BATH & BEYOND, INC., Defendant.

Civil No. 06–1908 (SRC).
|
April 26, 2007.

David Woodward, Heins Mills & Olson, P.L.C., Minneapolis, MN, Lisa J. Rodriguez, Trujillo, Rodriguez & Richards, LLP, Haddonfield, NJ, for Plaintiff.

**Attorneys and Law Firms**

Robert Alan White, Morgan, Lewis & Bockius, LLP, Princeton, NJ, for Defendant.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court on Defendant Bed Bath & Beyond, Inc.'s ("Defendant" or "BB & B") Motion to Dismiss Plaintiff's Amended Complaint [docket # 36]. Plaintiff Joe Solo ("Plaintiff" or "Solo") filed an opposition to this motion [docket # 39] and Defendant filed a reply [docket # 40]. For the reasons set forth below and for good cause shown, this Court grants Defendant's motion to dismiss and dismisses Plaintiff's Amended Complaint with prejudice.

**I. Factual and Procedural Background**
This class action arises out of alleged misrepresentations made by BB & B as to the thread count of bed sheets in the advertising, promotion, and packaging of those bed sheets. Specifically, Plaintiff claims that BB & B misrepresented the thread count in its multi-ply bed sheets by stating the number of threads in the warp and filling directions in one square inch of fabric instead of the number of yarns. Plaintiff alleges that BB & B's conduct violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1, et seq. ("CFA").

Plaintiff filed his first complaint on April 20, 2006. BB & B filed a motion to dismiss the complaint on the grounds that Plaintiff failed to plead the requisite elements of a CFA claim, and, in the alternative, that Plaintiff had failed to plead fraud with specificity as required by Federal Rule of Civil Procedure 9(b). The Court held oral argument on this motion on September 25, 2006. The Court found that Plaintiff's complaint did not set forth any facts indicating that Plaintiff purchased the sheets in question. Therefore, the Court concluded that Plaintiff lacked standing and dismissed the complaint without prejudice.

Plaintiff filed his amended class action complaint ("Amended Complaint") on November 3, 2006, again alleging that BB & B's misrepresentation of the thread count of bed linens sold by BB & B violates the CFA. The Amended Complaint states that Plaintiff purchased from Defendant, for $149.99, a multi-ply bed linen set. Am. Compl. at ¶ 14. He alleges that the sheet set was "advertised as a sateen stripe sheet set with a "1000 Thread Count," but that "[t]he sheets Plaintiff received ... had a thread count of only 492." *Id.*

On January 31, 2007, Defendant filed the present motion, moving to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

**II. Legal Standard**
On a motion to dismiss for failure to state a claim, brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384–85 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397–98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal

2007 WL 1237825

conclusions cast in the form of factual allegations. *See Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 n. 8 (3d Cir.1997). All reasonable inferences, however, must be drawn in the plaintiff's favor. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Moreover, the claimant must set forth sufficient information to outline the elements of his or her claims or to permit inferences to be drawn that the elements exist. *See* FED.R.CIV.P. 8(a)(2); *Conley,* 355 U.S. at 45–46. "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

### III. Analysis

The CFA was enacted by the New Jersey legislature in 1960 to address rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 245 (2005) (citing *Furst v. Einstein Moomjy, Inc.,* 182 N.J. 1, 11 (2004)). In 1971, the CFA was amended to authorize private actions by injured parties. *Gennari v. Weichart Co.,* 148 N.J. 582, 604 (N.J.1997). The amended CFA states: "Any person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act .... may bring an action or assert a counterclaim therefor in any court of competent jurisdiction." N.J.S.A. § 56:8–19. Significantly, the standard of proof in consumer-fraud actions by private plaintiffs is higher than the standard for the Attorney General's enforcement proceedings. Although the Attorney General need not prove that the victim was damaged by an unlawful practice, to warrant an award of treble damages a private plaintiff must show an "ascertainable loss ." *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 21 (1994).

To state a claim under the CFA, a private plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *N.J. Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 12–13 (N.J.Super.Ct.App.Div.2003) (citing *Cox,* 138 N.J. at 24). The unlawful practices prohibited by the CFA fall into three general categories: (1) affirmative acts; (2) knowing omissions; and (3) regulatory violations. *Cox,* 138 N.J. at 17. When, as here, the alleged consumer fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act. *Id.* at 17–18. There is

no reliance requirement for CFA liability; instead, the CFA establishes deceptive practices as actionable even if no person "has in fact been misled, deceived, or damaged thereby." *Union Ink Co. v. AT & T Wireless,* 352 N.J.Super. 617, 646 (N.J.Super.Ct.App.Div.2002); N.J.S.A. 56:8–2.

**\*3** Defendant BB & B argues that Plaintiff has failed to adequately plead each of the three elements of the a CFA claim and should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6). It appears that Plaintiff has adequately plead unlawful conduct by the Defendants—specifically that Defendant misrepresented, in its advertising and packaging, that the linens purchased by Plaintiff had thread counts of at least double their actual thread counts. However, as discussed below, the Court agrees with Defendant that Plaintiff has failed to adequately identify the ascertainable loss and the requisite causal nexus between the ascertainable loss and Plaintiff's unlawful conduct.

Under the CFA, a plaintiff must demonstrate an "ascertainable loss," defined as "a cognizable and calculable claim of loss due to the alleged CFA violation." *Thiedemann,* 183 N.J. at 249. Ascertainable loss includes more than a monetary loss, *Union Ink Co.,* 352 N.J.Super. at 646, and may occur "when a consumer receives less than what was promised." *Id.; see also Miller v. Am. Family Publishers,* 284 N.J.Super. 67, 90–91 (N.J. Ch.1995) ( "For their money, they received something less than and different from what they reasonably expected in view of defendant's presentations. This is all that is required to establish ascertainable loss."); *Talalai v. Cooper Tire & Rubber* Co., 360 N.J.Super. 547, 564 (N.J.Super. Ct. Law Div.2001) ("Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known.... When the product fails to measure up [to reasonable expectations based on the representations made], the consumer has been injured; he has suffered a loss. [H]e has lost the benefits of the product which he was led to believe he had purchased ." (citing *Hinchliffe v. Am. Motors Corp.,* 184 Conn. 607 (1981))). In cases involving alleged misrepresentations, as here, "either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle." *Thiedemann,* 183 N.J. at 248. Thus, as noted by Judge Sheridan, "if plaintiff was promised a bed sheet containing a certain thread count and received a lower thread count of lesser value, an ascertainable loss may be realized." *Zebersky v. Bed, Bath, & Beyond, Inc.,* No. 06–1735, 2006 WL 345993 at *2 (D.N.J. Nov. 29, 2006).

Solo v. Bed Bath & Beyond, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1237825

Here, Plaintiff has not made such allegations with sufficient specificity. At numerous points in the Amended Complaint, Plaintiff generally alleges that he and the members of the proposed class purchased multi-ply bed linens and that Defendant misrepresented the thread count of these multi-ply linens. *See* Am. Compl. at ¶¶ 4, 6, 17, 26, 29. Plaintiff alleges that he purchased a sheet set that was advertised as having "a '1000 Thread Count,' " but that the sheet set actually had a thread count "of only 492." *Id.* at ¶ 14. Plaintiff also broadly states that "Plaintiff and the proposed Class and Subclass Members have suffered an ascertainable loss in that they purchased linens that were of a lower quality and less valuable than the linens they were promised." *Id.* at ¶ 42. These broad and conclusory allegations are not sufficient to demonstrate an ascertainable loss. Under the CFA, Plaintiff is required to plead specific facts setting forth and defining the ascertainable loss suffered. *See, e.g., Cox,* 138 N.J. at 21 ("Traditionally, to demonstrate a loss, a victim must simply supply an estimate of damages, calculated within a reasonable degree of certainty."); *Dabush v. Mercedes–Benz USA, LLC,* 378 N.J.Super. 105, 116 (N.J.Super.Ct.App.Div.2005) ("The [CFA] does not provide for recovery for statutory damages where a plaintiff cannot show actual harm."). Plaintiff fails to specifically allege that what he did received was of lesser value than what was promised, i.e., that the sheets he received were worth an amount of money less than the sheets he was promised, or that he experienced a measurable out-of-pocket loss because of his purchase. Therefore, Plaintiff has failed to set forth either an out-of-pocket loss or a demonstration of loss in value sufficient to satisfy the ascertainable loss requirement. *See Theidemann,* 183 N.J. at 248 (The "certainty implicit in the concept of an 'ascertainable loss' is that [such loss] is quantifiable or measurable.").

**\*4** However, even were this Court to find that Plaintiff had adequately plead an ascertainable loss, the Plaintiff must also demonstrate that this ascertainable loss was suffered "as a result of" Defendant's unlawful conduct. N.J.S.A. § 56:8–19. Plaintiff has not done so. In order to satisfy this element, Plaintiff must show a "causal relationship between the unlawful practice and the 'ascertainable loss.' " *Miller,* 284 N.J.Super. at 76; *see also Thiedemann,* 183 N.J. at 246 (plaintiff must demonstrate "a loss attributable to conduct made unlawful by the CFA.").[1] The CFA does not require that the misrepresentation have been the sole cause of Plaintiff's damages, but merely that it be a cause. *See Zebersky,* 2006 WL 3454993 at \*4;

*Vacarello v. Mass. Mut. Life Ins. Co.,* 332 N.J.Super. 31, 48 (N.J.Super.Ct.App.Div.2000).

[1]  The New Jersey courts have distinguished this "causal connection" from element of traditional reliance required in fraud cases. *Dabush,* 378 N.J.Super. at 122; *Gennari,* 148 N.J. at 607– 608 (holding that reliance is not required in suits under the CFA because liability results from "misrepresentations whether any person has in fact been misled, decieved, or damaged thereby"). Therefore, Plaintiff need not demonstrate that he relied on Defendant's misrepresentations, only that there is a causal relationship between the alleged misrepresentations and his claimed damages.

In the Amended Complaint, Plaintiff states that "[a]s a result of Defendant's misleading statements and intentional omissions, Plaintiff and the proposed Class and Subclass members have suffered an ascertainable loss." Am. Compl. at ¶ 42; *see also* ¶ 50. Nowhere, however, does Plaintiff explain how this ascertainable loss is attributable to the unlawful conduct. Adequate explanations would include a statement by Plaintiff indicating that Plaintiff purchased the sheets in part because of the representation that the sheets were "1000 thread count," or, that Plaintiff would not have purchased the sheets had they been labeled with the actual thread count. *See, e.g., Gross v. Johnson & Johnson–Merck Consumer Pharm .,* 303 N.J.Super. 336, 346 (N.J.Super. Ct.App.Div..1997) (CFA class could only include persons who "saw the challenged advertisements" and "would not have purchased the Pepcid but for the challenged advertisements."); *Strzakowlski v. Gen'l Motors Corp.,* No. 04–4740, 2005 U.S. Dist. LEXIS, at \*25 (D.N.J. Aug. 16, 2005) (plaintiff adequately alleged CFA claim where plaintiff claimed that she would not have purchased her vehicle if GM had disclosed the defect at issue); *Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co., Inc.,* 384 N.J.Super. 275, 289 (N.J.Super.Ct.App.Div.2006) (plaintiff's allegations that Merck's fraud "induced P & T committees to place Vioxx on healthcare plans' formularies" demonstrated a sufficient causal connection between the alleged fraud and the ascertainable loss."). Plaintiff has not provided any such explanation of the connection between his alleged damages and the wrongful conduct of Defendants. As such, Plaintiff has failed to adequately plead the existence of a causal nexus between the alleged misrepresentations and his ascertainable loss, and his CFA claim and Amended Complaint must be dismissed.

Further, because Plaintiff has already been permitted to amend his complaint, and has failed to remedy the deficiencies present, the Court will dismiss the Amended Complaint with prejudice.

**IV. Conclusion**

**\*5** For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED,** Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE,** and this case shall be **CLOSED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1237825

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 30

## *Teater v. Pfizer, Inc.*

United States District Court for the District of Oregon, Portland Division

May 13, 2013, Decided; May 13, 2013, Filed

No. 3:05-cv-00604-HU

**Reporter**

2013 U.S. Dist. LEXIS 79629 *

TERESA E.A. TEATER, Plaintiff, v. PFIZER, INC., et al., Defendants.

**Subsequent History:** Adopted by, Motion granted by, Summary judgment granted by, Dismissed by *Teater v. Pfizer, Inc., 2013 U.S. Dist. LEXIS 79408 (D. Or., June 6, 2013)*

**Prior History:** *Teater v. Pfizer, Inc., 2012 U.S. Dist. LEXIS 122848 (D. Or., June 27, 2012)*

**Counsel:** [*1] For Plaintiff: Andrew M. Schpak, Edwin A. Harnden, BARRAN LIEBMAN LLP, Portland, OR.

For Defendants: Eric J. Neiman, David C. Campbell, WILLIAMS, KASTNER & GIBBS PLLC, Portland, OR; Mark S. Cheffo, Catherine B. Stevens, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, New York, NY.

**Judges:** Dennis J. Hubel, United States Magistrate Judge.

**Opinion by:** Dennis J. Hubel

## Opinion

### FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

In this pharmaceutical products liability case, Defendants Pfizer, Inc. ("Pfizer") and Warner-Lambert Company LLC ("Warner-Lambert") (collectively, "Defendants") move for summary judgment on all of Plaintiff Teresa Teater's ("Plaintiff") claims pursuant to *Federal Rule of Civil Procedure ("Rule") 56(c)*, and Plaintiff moves to enlarge the time within which to file expert designations. For the reasons that follow, Plaintiff's motion (ECF No. 99) to enlarge time to file expert designations should be GRANTED and Defendants' motion (ECF No. 84) for summary judgment should be GRANTED.

### Procedural Background

In early May 2005, Plaintiff brought this action pro se to recover damages for alleged personal injuries suffered as a result of her ingestion of Defendants' prescription drug Neurontin. In late October 2005, [*2] the Judicial Panel on Multidistrict Litigation issued a conditional transfer order transferring this case from the District of Oregon to the consolidated proceedings in the District of Massachusetts. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1629 (J.P.M.L. Oct. 24, 2005) (order for conditional transfer). Nearly six years

later, on May 6, 2011, the Multidistrict Panel issued a conditional remand which remanded Plaintiff's case to this Court. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1629 (J.P.M.L. May 6, 2011) (conditional remand order).

On June 21, 2011, the Court appointed pro bono counsel for Plaintiff, and subsequently granted Plaintiff leave to amend her complaint. Defendants moved to dismiss Plaintiff's amended complaint on March 7, 2012, and were partially successful. However, Plaintiff was given another opportunity to amend her complaint and she did so on November 8, 2012. In her second amended complaint, which the parties agree is presently the operative pleading, Plaintiff alleged claims for negligence, breach of warranty, strict liability, fraud, violation of Oregon's Unlawful Trade Practices Act ("UTPA"), *Or. Rev. Stat. § 646.605*, **[*3]** and unjust enrichment.

Plaintiff's counsel filed a motion to terminate their on-going pro bono representation on November 14, 2012, which was the Court imposed deadline for the parties to disclose all expert witnesses. Two days later, Defendants moved for summary judgment, arguing, inter alia, that Plaintiff failed to disclose an expert witness to testify as to causation. On February 5, 2013, the Court convened a telephone hearing on pro bono counsels' motion to withdraw. Defendants' counsel agreed to the Court conducting a sealed ex parte portion of the hearing. Plaintiff's counsel voiced concerns regarding continued representation of Plaintiff. The Court was also advised about a lack of funds to retain or depose experts. Ultimately, the motion to withdraw was denied after Plaintiff and her counsel agreed that a variant of the briefing scheme established in *State v. Balfour, 311 Or. 434, 814 P.2d 1069 (1991)*, could be employed at the summary judgment stage of this proceeding.

On February 6, 2013, Plaintiff's counsel obtained the expert discovery that occurred during the consolidated pretrial proceedings before Judge Patti Saris in the District of Massachusetts. Two days

later, on February **[*4]** 8, 2013, Plaintiff filed a motion to enlarge time to file expert designations pursuant to *Rule 6(b)*. In accordance with prior representations to the Court, Defendants responded to Plaintiff's motion to enlarge in their reply in further support of their motion for summary judgment, which was filed on March 28, 2013.

## Legal Standard

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995)*.

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id. at 324*. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory **[*5]** statements. *Hernandez v. Spacelabs Med., Inc., 343 F.3d 1107, 1112 (9th Cir. 2003)*. Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982)*. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976)*. Where different ultimate inferences

2013 U.S. Dist. LEXIS 79629, *5

may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co., 638 F.2d 136, 140 (9th Cir. 1981).* However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." *FED. R. CIV. P. 56(e).* The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Therefore, where "the record taken as a whole could **[*6]** not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal quotation marks omitted).

**Discussion**

## I. Plaintiff's Motion (ECF No. 99) to Enlarge Time

Pursuant to *Rule 6(b)*, Plaintiff moves the Court for an order enlarging the time for filing expert designations. Defendants oppose the request on the grounds that "Plaintiff failed to designate any experts on or before [the Court imposed] deadline, and instead, Plaintiff's counsel filed a motion to withdraw on November 14, 2012," not a motion for an extension of time. (Defs.' Reply at 3.) Thus, in Defendants' view, "Plaintiff's failure to meet her [November 14, 2012] expert deadline or timely seek an extension should not be excused, and thus, summary judgment is warranted." (*Id.*)

Under *Rule 6(b)(1)(B)*, "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." *Fed. R. Civ. P. 6(b)(1)(B).* In *Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253 (9th Cir. 2010),* **[*7]** the Ninth Circuit recognized that *Rule 6(b)(1),* "like all the

Federal Rules of Civil Procedure, is to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits." *Id. at 1258-59* (citation, internal quotation marks, and alterations omitted). While litigants will normally be granted an enlargement of time in the absence of bad faith or prejudice to the adverse party, "[e]ven when the extension is sought after the time limit has expired, the good cause standard is satisfied merely upon a showing of excusable neglect." *Cal. Trout v. F.E.R.C., 572 F.3d 1003, 1027 n.1 (9th Cir. 2009).*

In *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship., 507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993),* the Supreme Court stated: "Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute excusable neglect, it is clear that excusable neglect under *Rule 6(b)* is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Id. at 392* (internal quotation marks omitted). In determining whether neglect is excusable, courts consider four factors: "(1) the danger of prejudice to the opposing party; **[*8]** (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Bateman v. U.S. Postal Serv., 231 F.3d 1220, 1223-24 (9th Cir. 2000).*

As an initial matter, it makes little sense to refer to any action taken by Plaintiff's counsel in this proceeding as "excusable neglect." Indeed, pro bono counsel undertook near-Herculean efforts to provide Plaintiff with excellent representation: they took on a case outside of their normal practice area, spent over 500 hours of attorney time on this litigation, were amenable to the Court's somewhat unprecedented suggestion that they submit a variant of a *Balfour* brief in opposition to Defendants' motion for summary judgment, and flew to Nebraska to conduct a deposition. Despite encouragement from the Court to submit a motion for reimbursement of out-of-pocket expenses based

on their pro bono service in this proceeding, Plaintiff's counsel has not made any such request.

In terms of the merits of Plaintiff's motion to enlarge time, Defendants argue that, even if the Court excuses Plaintiff's failure to timely designate expert testimony, she still cannot create a genuine **[\*9]** issue of material fact with respect to specific causation. This is essentially Defendants' sole basis for arguing that they are entitled to summary judgment on all claims. Considering the apparent strength of Defendants' motion for summary judgment on its merits, and the fact that Plaintiff's counsel is attempting to introduce expert discovery through depositions that occurred during the consolidated pretrial proceedings before Judge Saris (which should come as no shock to Defendants), the Court can foresee little, if any, prejudice or negative impact on this proceeding. *Cf. Perez-Denison v. Kaiser Found. Health Plan of the Nw., 868 F. Supp. 2d 1065, 1079 (D. Or. 2012)* (making similar observations in granting motion to enlarge time under *Rule 6(b)*). Moreover, it can hardly be questioned that Plaintiff's counsel has acted in good faith. Accordingly, Plaintiff's motion to enlarge time to file expert designations should be granted, and the Court should consider testimony from Plaintiff's experts in addressing the merits of Defendants' motion for summary judgement.

## II. Defendants' Motion (ECF No. 84) for Summary Judgment

According to Defendants, the principal issue here is whether Plaintiff **[\*10]** has put forth sufficient evidence of specific causation to carry her ultimate burden of proof at trial on her claims for strict liability, negligence, breach of warranty, fraud, violation of the UTPA, and unjust enrichment.

**A. Plaintiff's Evidence**. In her opposition to Defendants' motion for summary judgment, Plaintiff relies, almost exclusively, on expert testimony that occurred during the consolidated proceedings in the District of Massachusetts. For example, Michael Trimble ("Trimble"), M.D., was deposed on August 4, 2011, and provided the following testimony:

> Q. Alright, sir. Then, after your study, did you form any opinions relative to Neurontin, and its effect on mood and behavior in patients who take Neurontin?
>
> A. Yes.
>
> Q. What is your general opinion?
>
> A. Neurontin is an agent that, because of its action on neurotransmitters -- those are the chemicals in the central nervous system -- in vulnerable people, will lead to changes of mood and behavior; and will lead, in certain cases to suicidal intentions, and suicidal acts, and completed suicides.

(Trimble Dep. 49:14-50:3, Aug. 4, 2011.) Similarly, during her deposition in mid-August 2011, Cheryl Blume ("Blume"), M.D., testified that **[\*11]** available data regarding use of Neurontin suggested a potential for self-harm and suicide-related events:

> Q. Did you see any signals?
>
> A. Well, I was asked, agin, to specifically look at signals that might reflect a personality characteristic that could lead to self harm as well as the various self-harm terms, yes. And the report is kind of repetitive in the various time frames, but I believe that there were signals evidenced after approval that would have suggested that there was a potential for self harm, suicide-related events.
>
> . . . .
>
> Q. Did you form any opinions with respect to whether the labeling or warnings contained in the Neurontin labels were adequate to inform doctors of the signals about which you were studying?
>
> . . . .
>
> [A.] Yes, I did form an opinion.
>
> Q. What opinions did you form?
>
> [A.] . . . I believe that . . . events occurred that made the . . . launch label obsolete and -- with respect to self-injurious events . . . [the] labeling needed to be modified over time to

2013 U.S. Dist. LEXIS 79629, *11

reflect the database -- reflect the knowledge of the company that there had been reported attempts or completed suicides in patients who were taking the product during the post-marketing periods.

(Blume Dep. 58:11-20, **[\*12]** Aug. 18, 2011.) Lastly, on October 19, 2011, David Franklin ("Franklin"), Ph.D., provided testimony regarding his experience working for Defendants and promoting off label use of Neurontin to physicians:

> Q. Tell us about that, please.
> A. I recorded a couple of . . . [group] voice mails.
> Q. And why did you do that?
> A. I was concerned . . . that the aggressiveness of the [group] voice mails were going to get us all in trouble.
> Q. In what way were they going to get you in trouble?
> A. That they were documenting and being very blatant about our promotion efforts . . . .
> Q. Promotion efforts in what regard?
> A. Off label.
> Q. Of what drug.
> A. Neurontin.

(Franklin Dep. 65:20-66:9, Oct. 19, 2011.)

**B. Strict Liability**. Plaintiff alleges a strict liability claim against Defendants based on their "fail[ure] to warn" her prescribing physician "about the potential adverse effects associated with Neurontin." (Second Am. Compl. ¶ 35.) As Judge Aiken explained in *Crosswhite v. Jumpking, Inc., 411 F. Supp. 2d 1228 (D. Or. 2006)*, "[i]n addition to presenting proof as to the condition of the defendant's product, the plaintiff in a strict liability case is required to establish that such condition proximately caused **[\*13]** his injuries or damages." *Id. at 1235* (quoting *Gilmour v. Norris Paint & Varnish Co., Inc., 52 Or. App. 179, 184, 627 P.2d 1288 (1981))*. When, as here, "the element of causation involves a complex medical question, as a matter of law, no rational juror can find that a plaintiff has established causation unless the plaintiff has presented *expert testimony* that there is

a reasonable medical probability that the [actions complained of] *caused the plaintiff's injuries."* *Bixby v. KBR, Inc., No. 3:09-CV-632-PK, 2012 U.S. Dist. LEXIS 124267, 2012 WL 3779097, at \*8 (D. Or. Aug. 31, 2012)* (quoting *Baughman v. Pina, 200 Or. App. 15, 18, 113 P.3d 459 (2005)* (emphasis added).

In this case, Plaintiff has not presented any expert testimony indicating that there is a reasonable medical probability that Defendants' actions caused *her* injuries. Indeed, Plaintiff's own prescribing healthcare providers seem to think otherwise. (Dingman Dep. 112:9-13, Nov. 5, 2012) ("Q. Do you recall any patient that you believed became suicidal as a result of using Neurontin? A. I had no experience with that, no. That didn't happen."); (Coler Dep. 128:3-5, Nov. 4, 2012) ("A. Well, they're saying that if you give somebody Neurontin, you're going to have an increased risk of suicide. **[\*14]** I don't really think that's true.") Plaintiff attempts to argue that her own deposition "testimony indicates that Neurontin caused [her] to attempt to commit suicide." (Pl.'s Opp'n at 7.) However, Plaintiff overlooks the fact that the *Baughman* rule prevents "jurors from speculating about causation in cases where that determination requires medical expertise beyond the knowledge and experience of an ordinary lay person." *Bixby, 2012 U.S. Dist. LEXIS 124267, 2012 WL 3779097, at \*8*. Accordingly, Defendants are entitled to summary judgment on Plaintiff's strict liability claim.

**C. Plaintiff's Remaining Claims**. Plaintiff also brings claims against Defendants for fraud, negligence, and violation of the UTPA — all of which require Plaintiff to demonstrate damages caused by Defendants' conduct — be it fraud, negligence, or a violation of the UTPA. *See Murphy v. Allstate Ins. Co., 251 Or. App. 316, 321, 284 P.3d 524 (2012)* (in order to recover on a claim for fraud, the plaintiff must prove causation); *Watson v. Meltzer, 247 Or. App. 558, 565, 270 P.3d 289 (2011)* (negligence action requires the plaintiff to "establish that but for the negligence of the

defendant, the plaintiff would not have suffered the harm that is the subject of the claim."); *Schmelzer v. Wells Fargo Home Mortg., No. CV-10-1445-HZ, 2011 U.S. Dist. LEXIS 134015, 2011 WL 5873058, at \*13 (D. Or. Nov. 21, 2011)* [**\*15**] ("to prevail on UTPA claim, plaintiff must show a violation of the UTPA, causation, and damage in the form of an ascertainable loss"). The same can be said about Plaintiff's breach of warranty claim, which is properly considered a products liability claim under *Oregon Revised Statute ("ORS") 30.900*.[1] *Cf. Phelps v. Wyeth, Inc., 857 F. Supp. 2d 1114, 1123 (D. Or. 2012)* (determining that the plaintiff's breach of warranty was properly considered a products liability claim based on the definition of a product liability civil action under *ORS 30.900*); *see McDowell v. Allied Bldg. Prods. Corp., 235 Or. App. 12, 22, 230 P.3d 552 (2010)* (determining that it was appropriate for the trial court to assess the admissibility of the "plaintiff's proof of causation" in a "complex product[s] liability case"). Again, because the element of causation presents a complex medical question, and because Plaintiff has failed to present sufficient evidence on this point, Defendants are entitled to summary judgment on Plaintiff's claims for fraud, negligence, violation of the UTPA, and breach of warranty.

Lastly, Plaintiff brings a claim for unjust enrichment against Defendants. In *Tupper v. Roan, 349 Or. 211, 243 P.3d 50 (2010)*, the Oregon Supreme Court explained that their "unjust enrichment cases speak of a range of circumstances that could [satisfy the element of wrongfulness that a claim for unjust enrichment requires], including mistake, *fraud*, coercion, undue influence, duress, taking advantage of weakness, and *violation of a*

duty imposed by a confidential or fiduciary relationship." *Id. at 223* (emphasis added). A review of Plaintiff's second amended complaint suggests that her unjust enrichment claim is most likely based on her claims for fraud and negligence. Since both of those claims fail on this record because of the lack of evidence of specific causation, the Court concludes that [**\*17**] Defendants are entitled to summary judgment on Plaintiff's unjust enrichment claim as well because no reasonable juror could conclude the element of wrongfulness has been established on this record.

## Conclusion

For the reasons stated, Plaintiff's motion (ECF No. 99) to enlarge time to file expert designations should be GRANTED and Defendants' motion (ECF No. 84) for summary judgment should be GRANTED.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **June 3, 2013**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **June 20, 2013**. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 13th day of May, 2013.

/s/ Dennis J. Hubel

Dennis J. Hubel

United States Magistrate Judge

---

[1] *ORS 30.900* provides that: [**\*16**] "[A] 'product liability civil action' means a civil action brought against a manufacturer, distributor, seller or lesser of a product for damages for personal injury . . . arising out of: (1) [a]ny design, inspection, testing, manufacturing or other defect in a product; (2) [a]ny failure to warn regarding a product; or (3) [a]ny failure to properly instruct in the use of a product." *Or. Rev. Stat. § 30.900*.

# Tab 31

# *Thomas v. Brown & Williamson Tobacco Corp.*

United States District Court for the Western District of Missouri, Western Division

April 28, 2006, Decided

No. 06-0223-CV-W-SOW

**Reporter**

2006 U.S. Dist. LEXIS 28261 *; 2006 WL 1194873

PATRICIA THOMAS, individually, and as Plaintiff ad litem for DONALD WILLIAM THOMAS, SR., Plaintiffs, vs. BROWN AND WILLIAMSON TOBACCO CORP., a Delaware Corporation, et al., Defendants.

**Counsel:** **[*1]** For Patricia Thomas, individually and as Plaintiff ad litem for Donald William Thomas, Sr., Plaintiff: Joseph P. Masterson, Patrick J. Berrigan, Watson & Dameron, Kansas City, MO; Russell S. Dameron, Watson & Dameron, LLP, Kansas City, MO.

For Brown & Williamson Holdings, Inc., formerly known as Brown & Williamson Tobacco Corporation, R J Reynolds Tobacco Company, Defendants: Bruce D. Ryder, Jason A. Wheeler, Thompson Coburn, LLP, St. Louis, MO; Christopher A. Kreiner, Womble Carlyle Sandridge & Rice, PLLC, Winston-Salem, NC; Jeffrey L. Furr, Womble, Caryle, Sandridge & Rice, Winston-Salem, NC; Ursula M. Henninger, Womble, Carlyle, Sandridge & Rice, Winston-Salem, NC.

For Philip Morris USA Inc, Defendant: AdoLisa Joan Anarado, Billy R. Randles, Noel C. Capps, Rebecca J. Schwartz, William A. Yoder, Shook, Hardy & Bacon, LLP, Kansas City, MO.

For MFA Petroleum Company, Barber & Sons Tobacco Co., Defendants: Bruce D. Ryder, Jason A. Wheeler, Thompson Coburn, LLP, St. Louis, MO.

**Judges:** SCOTT O. WRIGHT, Senior United States District Judge.

**Opinion by:** SCOTT O. WRIGHT

# Opinion

ORDER

Before the Court are Plaintiffs' Motion to Remand (Doc. # 19), defendants' response, and plaintiffs' **[*2]** reply. There are also other various motions pending, including defendants MFA Petroleum Company, Inc. and Barber & Sons Tobacco Co.'s motions to dismiss, a motion to dismiss on behalf of all defendants, and defendant Philip Morris USA, Inc.'s motion for summary judgment. These motions have not yet been fully briefed.

On April 4, 2006, recognizing that the motion to remand could be dispositive of the other motions, this Court stayed consideration of the pending motions to dismiss and summary judgment until after it had the chance to determine whether subject-matter jurisdiction exists. Subsequently, the parties fully briefed the remand issue. Having considered the parties' arguments, the Court now finds that it has subject-matter jurisdiction over this

2006 U.S. Dist. LEXIS 28261, *2

case and therefore plaintiffs' motion to remand this case back to the Circuit Court of Jackson County, Missouri is denied. Furthermore, given the Court's analysis and conclusion on the motion to remand, the Court grants the Missouri Defendants' motions to dismiss.

## I. Background

This case is a wrongful death action brought by plaintiffs against defendants Brown and Williamson Tobacco Corp., Philip Morris USA, Inc. (the "Defendants"), **[*3]** MFA Petroleum Company, Inc., and Barber & Sons Tobacco Co. (collectively referred to as the "Missouri Defendants"), for their alleged negligence, carelessness and recklessness in causing or contributing to cause the wrongful death of decedent Donald William Thomas, Sr. and the damages sustained by plaintiffs as a direct result thereof. The Defendants are cigarette manufacturers. Plaintiff states that he purchased many of the cigarettes he smoked at or from the Missouri Defendants. Missouri Defendant Barber & Sons is a wholesale distributor of cigarettes, and Missouri Defendant MFA Petroleum is a retail seller of cigarette products. This cause was originally brought in the Circuit Court of Jackson County, Missouri.

On March 15, 2006, the Defendants filed a Notice of Removal with this Court where they alleged diversity jurisdiction pursuant to *28 U.S.C. § 1441*. This Notice of Removal was predicated upon Defendants' showing that the non-diverse defendants named in the Petition (the Missouri Defendants), were fraudulently joined for the purpose of defeating federal diversity. Specifically, defendants allege that, in light of plaintiffs' allegations, the only potential **[*4]** basis of liability against the Missouri Defendants was their status as sellers in the stream of commerce. Defendants also attempt to show that the Missouri Innocent Seller statute precludes liability against a "defendant whose liability is based solely on his status as a

seller in the stream of commerce" when, as here, the produce manufacturer "is properly before the court." *Mo. Rev. Stat. § 537.762(1)-(2)* (2000). Therefore, Defendants allege that the Missouri Defendants should be ignored for the purposes of determining whether diversity jurisdiction exists, and when this is done, complete diversity exists among the remaining parties, and therefore, this Court has subject-matter jurisdiction.

Plaintiffs argue that this allegation lacks merit, as the Defendants fail to take into account plaintiffs' fraudulent concealment claims (Count III) against the Missouri Defendants which alone requires remand of this case back to the Circuit Court of Jackson County, Missouri.

## II. Standard

Cases filed in state court may be removed to federal court if the case would have been within the original jurisdiction of the federal courts. *28 U.S.C. § 1441*. If the federal **[*5]** court lacks subject matter jurisdiction over the case, the matter must be remanded back to state court. *28 U.S.C. § 1447(c)*. The burden of demonstrating removal jurisdiction falls upon the party seeking removal. *In re Bus. Men's Assurance Co., 992 F.2d 181, 183 (8th Cir. 1993)*.

The Court has recently been given clear guidance from the Eighth Circuit as to the considerations the district court should take into account when dealing with fraudulent-joinder. "A proper review should give paramount consideration to the reasonableness of the basis underlying the state claim." *Menz v. New Holland North America, Inc., et al., 440 F.3d 1002, 1004 (8th Cir. 2006)* (quoting *Filla v. Norfolk S. Ry., 336 F.3d 806, 810 (8th Cir. 2003))*. "Where applicable state precedent precludes the existence of a cause of action against a defendant, joinder is fraudulent." *Filla, 336 F.3d at 810*. It has also been recognized by the Eighth Circuit that it must be "clear under state law that the complaint does not state a cause of action against the non-

diverse defendant." *Iowa Public Service Co. v. Medicine Bow Coal Co., 556 F.2d 400, 406 (8th Cir. 1977).* **[\*6]** If there "exists no reasonable basis in fact and law supporting a claim against the resident defendants" joinder is fraudulent. *Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 871 (8th Cir. 2002).*

Plaintiffs' main argument is derived from language that appears in the <u>Filla</u> decision where the Eighth Circuit seemed to give considerable leeway to the district court, and lean towards favoring the state court to determine whether a basis exists under state law for a claim against the resident defendants, explaining that "the district court's task is limited to determining whether there is arguably a reasonable basis for predicting that the state law *might* impose liability based upon the facts involved." *Filla, 336 F.3d at 811* (emphasis added). Furthermore, plaintiffs assert additional authority from the Western District of Missouri that again focuses on a somewhat broad view of fraudulent-joinder analysis: "[i]f there is a possibility that the plaintiff has stated a cause of action [against the resident defendant], the joinder is not fraudulent, and the case should be remanded." *El Dorado Springs R-2 Sch. Dist. v. Moos, 264 F. Supp. 815, 818-19 (W.D. Mo. 1967)*; **[\*7]** *Spears v. Bayer Corp., 2004 U.S. Dist. LEXIS 29732, No. 03-1151-CV-W-GAF (W.D. Mo., March 19, 2004)*.

While it may seem from the above authority that the fraudulent-joinder standard is somewhat unclear, the Eighth Circuit recognized as much in its recent <u>Filla</u> decision: "within our own circuit, the fraudulent-joinder standard has been stated in varying ways." *Filla, 336 F.3d at 809-10*. Yet, the "common thread" guiding fraudulent-joinder review is "reason." *Id. at 810*.

## III. Discussion

The Court starts with the basic premise that federal courts are courts of limited jurisdiction. Congress has created specific instances in which this Court is required to exercise its proper authority and make a determination as to whether an exercise of its jurisdiction is proper. In this case, the Court is called upon to determine whether certain resident defendants were fraudulently joined. The Court determines that they were.

Under applicable state precedent, none of plaintiffs' causes of action against the Missouri Defendants can survive. Indeed, under the most liberal reading of a fraudulent-joinder standard from the Eighth Circuit, there is no cause of action. There seems to **[\*8]** this Court no doubt that there is not even arguably a case against the Missouri Defendants. The Missouri Innocent Seller statute would preclude any possibility of recovery.

Under the Missouri Innocent Seller statute "a defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim as provided in this section." *Mo. Rev. Stat. § 537.762(1)*. The statute further provides that "this section shall apply to any products liability claim in which another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claim." *§ 537.762(2)*. Recently, this statute has been held to be substantive, rather than a procedural device, and therefore this statute is applicable in federal court. See *Gramex Corp. v. Green Supply, Inc., 89 S.W.3d 432, (Mo. banc. 2002)*.

Under the applicable state law precedent that is available to this Court, the Missouri Defendants are not subject to suit under the Innocent Seller statute. A review of plaintiffs' Complaint in this case reveals that the Missouri Defendants' liability would be based upon the fact that **[\*9]** they are a seller in the stream of commerce of the allegedly defective product. Neither of the Missouri Defendants manufactured cigarettes. Plus, the remaining Defendants in this case stated in their Notice of Removal that, although they deny the substance of plaintiffs' allegations, plaintiff would

2006 U.S. Dist. LEXIS 28261, *9

be able to make a full recovery from the product manufacturers without contribution from the Missouri Defendants.

Plaintiffs vehemently argue that remand is required because plaintiffs have stated a viable claim for fraudulent concealment (Count III) against the Missouri Defendants. Under Missouri law, the "essence of a fraudulent concealment action is that a defendant, by his or her post-negligence conduct, affirmatively intends to conceal from plaintiff the fact that the plaintiff has a claim against the defendant." *Batek v. The Curators of the Univ. of Missouri, 920 S.W.2d 895, 900 (Mo. 1996)*. Plaintiffs have failed to plead their fraudulent concealment claim with the requisite particularity. There is no allegation that the Missouri Defendants knew of any defect in the cigarettes they sold and "affirmatively intended" to conceal these facts from the plaintiff. In fact, **[*10]** the Missouri Defendants' affidavits state otherwise. [1] Plaintiffs fail to point to any facts that reveal fraudulent concealment.

Therefore, the Innocent Seller statute would preclude recovery against the Missouri Defendants on all Counts. Complete diversity exists among the remaining parties and therefore this Court has diversity subject-matter jurisdiction pursuant to *28 U.S.C. § 1332*.

IV. Conclusion

Accordingly, based on the above, it is hereby

ORDERED that Plaintiffs' Motion to Remand (Doc. # 19) is denied. This Court has proper subject-matter jurisdiction over this case. It is further

ORDERED that Defendant MFA Petroleum Company's Motion to Dismiss (Doc. # 12) is

granted. It is further

ORDERED that Defendant Barber & Sons Tobacco Company's Motion to Dismiss **[*11]** (Doc. # 14) is granted. It is further

ORDERED that based on the Court's April 4, 2006 Order, plaintiffs shall file their responses to the pending Motion to Dismiss (Doc. # 16) within 15 days of the date of this Order and respond to the pending Motion for Summary Judgment (Doc. # 23) within 30 days of the date of this Order.

SCOTT O. WRIGHT

Senior United States District Judge

Dated: April 28, 2006

---

**End of Document**

---

[1] In determining the validity of plaintiffs' argument, the Court may consider the Petition, affidavits, and other relevant materials. *Reeb v. Wal-Mart Stores, Inc., 902 F. Supp. 185, 187-89 (E.D. Mo. 1995)*.

# Tab 32

# *Thompson v. Bayer Corp.*

United States District Court for the Eastern District of Arkansas, Western Division

February 12, 2009, Decided; February 12, 2009, Filed

4:07CV00017 JMM

**Reporter**

2009 U.S. Dist. LEXIS 15190 *; 2009 WL 362982

MYSTIC THOMPSON, Individually And On Behalf of All Others Similarly Situated, PLAINTIFF v. BAYER CORPORATION; BAYER HEALTHCARE, LLC, DEFENDANTS

**Subsequent History:** Class certification denied by *Thompson v. Bayer Corp., 2009 U.S. Dist. LEXIS 72011 (E.D. Ark., Aug. 6, 2009)*

**Counsel:** **[*1]** For Mystic Thompson, individually and on behalf of all others similarly situated, Plaintiff: Eric D. Wewers, LEAD ATTORNEY, Law Offices of Eric D. Wewers, Little Rock, AR; Jack Thomas Patterson, II, Jeremy Y. Hutchinson, LEAD ATTORNEYS, Patton, Roberts, McWilliams & Capshaw - Little Rock, Little Rock, AR; James Clark Wyly, Sean Fletcher Rommel, LEAD ATTORNEYS, Patton Roberts PLLC - Texarkana, Texarkana, TX; M. Darren O'Quinn, LEAD ATTORNEY, Law Offices of Darren O'Quinn, PLLC, Little Rock, AR.

For Bayer Corporation, Bayer HealthCare LLC, Defendants: Edwin L. Lowther, Jr., LEAD ATTORNEY, Gary D. Marts, Jr., Wright, Lindsey & Jennings - Little Rock, Little Rock, AR.

**Judges:** James M. Moody, United States District Judge.

**Opinion by:** James M. Moody

# Opinion

## ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Pending is the Plaintiff's Motion for Class Certification. The Defendants have responded and both parties have filed replies. The Court has also considered the parties' oral arguments presented during the hearing held on October 20, 2008. At the request of the Court, Plaintiff has provided proposed jury instructions for the trial of this case. Again, Defendants have responded and the Plaintiff has replied. For **[*2]** the reasons set forth below, the Motion is DENIED.

### I. Background

Plaintiff alleges that the Defendants engaged in a false marketing scheme with regard to their product, One-A-Day Weight Smart vitamins ("Weight Smart"). According to Plaintiff, the Defendants claimed that Weight Smart increased the metabolism of people as they age. This claim was based on an ingredient in Weight Smart called ECGC from the extract of green tea. Plaintiff contends that there was no reliable scientific evidence to substantiate the increased metabolism claim. In fact, on January 28, 1991 the Federal Trade Commission ("FTC") ordered the Defendants to stop making representations about the benefits of

2009 U.S. Dist. LEXIS 15190, *2

One-A-Day products unless Defendants possessed and relied upon competent and reliable scientific evidence to substantiate the representation. (Ex. 4 to Pl's Motion for Class Cert.) On January 3, 2007, the FTC filed suit against the Bayer Corporation for violation of the 1991 Order. The Complaint stated that on numerous occasions beginning in January 2003 Bayer disseminated advertising about the benefits of Weight Smart without possessing or relying upon competent and reliable evidence. *Id.* As a result, the Defendants **[\*3]** were fined $ 3.2 million by the FTC.

Plaintiff's cause of action on behalf of herself and the putative class rests on Defendants' alleged uniform false and misleading statements about Weight Smart. Plaintiff claims that the Defendants were unjustly enriched by the sale of Weight Smart. Plaintiff and the putative class members purchased the product which did not possess the qualities represented to the public and they are entitled to restitution, damages, and a permanent injunction enjoining Defendants from further wrongful conduct with regard to Weight Smart. (Third Amended Complaint).

Plaintiff seeks certification of the following multi-state class:

> All persons who purchased One-A-Day Weight Smart from December 1, 2003 up through January 4, 2007, the date Defendants entered the Consent Judgment with the FTC to stop all marketing claiming the pill enhanced metabolism and aided weight loss. Excluded from this Class are all officers, directors, and employees of the Defendants and its subsidiaries, along with any currently sitting Federal Judge or their staff in this case or potential appellate justice and any person within the third degree of consanguinity to the judge or justice. Further **[\*4]** excluded is any person claiming personal injury or damage beyond that specifically claimed in this motion.

In the alternative, Plaintiff seeks to certify a class action for the State of Arkansas for the injuries suffered by Arkansas citizens in the purchase of Weight Smart. *Id.*

## II. Choice of Law Analysis

Because Plaintiff seeks to certify a nationwide class to pursue a common law claim, the Court must first consider choice-of-law principles. Plaintiff urges the Court to look at *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)*("*Shutts*") and *Sun Oil Co. v. Wortman, 486 U.S. 717, 108 S. Ct. 2117, 100 L. Ed. 2d 743 (1988)*("*Wortman*") as authority for her argument that the law of Arkansas does not conflict with other states and is sufficient for use in a nationwide unjust enrichment class action. In *Shutts,* gas royalty owners filed suit against Phillips Petroleum Company ("Phillips") seeking interest payments on their suspended royalties which Phillips had possessed pending Commission approval of gas price increases. The suit was filed in Kansas. The Kansas court certified a class of 33,000 royalty owners who had royalties suspended by Phillips. Less than 1,000 class members resided in Kansas and less than 1% of the gas **[\*5]** leases involved were on Kansas land. However, the trial court applied Kansas law to the claims of all class members.

The United States Supreme Court found that the Kansas court erred by failing to conduct a conflict of law analysis. The Court stated:

> Kansas must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of Kansas law is not arbitrary or unfair. Given Kansas' lack of 'interest' in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.

*Shutts, 472 U.S. at 821-22* (quoting *Allstate Ins.*

*Co. v. Hague, 449 U.S. 302, 312-13, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981))*.

The facts of *Wortman* are similar and intertwined. In *Wortman,* gas royalty owners filed suit in Kansas seeking interest on suspended royalty payments. The Kansas court applied Kansas law to all claims even those related to leases in other states brought by citizens of other states. The United States Supreme Court vacated and remanded [**6**] *Wortman* for reconsideration in light of the Court's ruling in *Shutts.* On remand, the trial court held that the other states' substantive legal rules were consistent with those of Kansas. Thus, while applying the laws of the other states, the Court came to the same conclusion as it did under Kansas law. The Kansas Supreme Court affirmed.

On appeal to the U.S. Supreme Court, Sun Oil argued that the Kansas Supreme Court had "unconstitutionally distorted" Texas, Oklahoma, and Louisiana law and applied this distorted law in Wortman. *Wortman, 486 U.S. at 730*. In other words, Sun Oil argued that when the Kansas court went back and applied the substantive laws of those states, the court applied the laws incorrectly. The Supreme Court disagreed and explained:

> To constitute a violation of the *Full Faith and Credit Clause* or the *Due Process Clause*, it is not enough that a state court misconstrue the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention.

Plaintiff argues that this language from *Wortman* proves (1) that it is the Defendant's burden to show a conflict [**7**] of law exists and (2) it is not a conflict unless the law of the other State is "clearly established and has been brought to the court's attention." The Court disagrees. The *Wortman* analysis applies only when considering whether the court applied another State's law incorrectly. For example, this analysis would apply if this Court

were to apply Alabama law to some of the class claims and the Defendant appealed the Court's decision on the basis that the Court misconstrued Alabama law. Pursuant to *Wortman,* the Defendant would have to prove that the Court misapplied Alabama law so completely that the Court applied a "contradictory" law, that Alabama's law was clearly established, and that the parties had brought this to the Court's attention. The *Wortman* analysis does not apply to the instant case at this point in the litigation.

At this stage, the Court must determine under *Shutts* whether Arkansas has a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the Plaintiff's purported class, contacts 'creating state interest,' in order to ensure that the choice of Arkansas law is not arbitrary or unfair. The Court finds that Arkansas does not [**8**] have the requisite contacts with out-of-state members' claims.

The next step, therefore, is to determine whether Arkansas's law conflicts in any material way with any other law which could apply. There is, of course, no constitutional injury to out-of-state plaintiffs in applying Arkansas law unless Arkansas law is in conflict with the laws of the other states. *Shutts, 472 U.S. at 816 (1985)*.

Again, relying on *Shutts* and *Wortman,* Plaintiff submits that there is no conflict between the State of Arkansas's law of unjust enrichment and the laws of the other 50 states, including the District of Columbia. Plaintiff contends that there are a few nuanced variations in unjust enrichment law in the 50 states, but the policy and purpose are uniform. In support of her argument, Plaintiff has submitted a nationwide review of the law of unjust enrichment (Ex. G to the Motion for Class Cert.) and proposed jury instructions (Docket # 113).

In response, the Defendants have also submitted a nationwide review of the law of unjust enrichment. (Docket # 120) The Defendant contends that there are actual conflicts in this area of the law and, therefore, the Court should reject the application of

2009 U.S. Dist. LEXIS 15190, *8

unjust enrichment **[*9]** laws to a nationwide class as the Court did in *Shutts.*

Plaintiff claims that, in general, the elements of unjust enrichment are as follows:

1. Defendant must have received something of value;

2. Defendant, in good conscience, is not entitled to the benefit.

(Pl's Proposed Jury Inst. at p. 3). Plaintiff acknowledges, however, that there are three different approaches taken by the states to unjust enrichment claims:

    1) Restitution: those that follow a restitution approach where a plaintiff must show that a defendant accepted and used a benefit bestowed upon the defendant by the plaintiff, which benefit would be inequitable to retain;
    2) Restitution Plus: those that follow the restitution approach but also require that there be no adequate remedy at law;
    3) Wrongful Acts: those that require a plaintiff to show that the defendant benefitted from the plaintiff through fraud, duress, misconduct, wrongful acts or taking undue advantage.

*See* Pl.'s Ex. G. According to Plaintiff, the Restitution approach is followed by 37 states, the Restitution Plus approach is followed by seven states, and the Wrongful Acts approach is followed by six states.

After an extensive review of the law, the Court finds that **[*10]** the states' different approaches to, or elements of, unjust enrichment are significant. Some of the most troublesome differences are those recognized by the Plaintiff, *i.e.,* the disparity in proof required to prove an enrichment was "unjust or wrongful" and the requirement by some states that there be no adequate remedy at law. However, these are not the only conflicts that exist in this area of the law. There are other differences that the Plaintiff has not included in this list including, the direct and indirect benefit elements of unjust enrichment.

A. <u>Conflicts</u>

1. Wrongful Conduct

Courts in Arkansas do not require a tortious, illegal or fraudulent act by the defendant to prove unjust enrichment. *Frigillana v. Frigillana, 266 Ark. 296, 584 S.W.2d 30 (Ark. 1979).* "Unjust enrichment does not require a wrongful act by the party enriched. Even an innocent defendant is subject to an unjust enrichment claim brought by a more deserving party." Howard W. Brill, Law of Damages, § 31:2 (5th ed. 2004)(citing *Malone v. Hines, 36 Ark. App. 254, 822 S.W.2d 394 (Ark. App. 1992); Orsini v. Commercial National Bank, 6 Ark. App. 166, 639 S.W.2d 516 (Ark. App. 1982)).* In other words, Arkansas plaintiffs do not have to prove any misconduct on the part **[*11]** of the defendant in an unjust enrichment action.

In contrast, Montana courts require a showing of misconduct or fault on the part of the defendant to recover under an unjust enrichment theory. "Unjust enrichment is an equitable doctrine wherein the plaintiff must show some element of misconduct or fault on the part of defendant, or that the defendant somehow took advantage of the plaintiff." *Randolph V. Peterson, Inc. v. J.R. Simplot Co., 239 Mont. 1, 778 P.2d 879, 883 (Mont. 1989)*(citing *Brown v. Thornton, 150 Mont. 150, 432 P.2d 386, 390 (Mont. 1967)). See also Hayes Mechanical, Inc. v. First Industrial, L.P., 351 Ill App. 3d 1, 12, 812 N.E.2d 419, 285 Ill. Dec. 599 (Ill App. 1st Dist. 2004)*("[I]njustice involves some form of improper conduct by the party to be charged."); *National Employment Service Corp. v. Olsten Staffing Service, Inc., 145 N.H. 158, 761 A.2d 401, 406-07 (N.H. 2000)*("Because . . . Olsten did not act wrongfully . . ., the facts do not support a finding of unjust enrichment.")

Alabama courts have an even higher standard for defendant's conduct. Alabama courts require unconscionable conduct on the part of the defendant in order to make a claim for unjust

enrichment. The Alabama Supreme Court concluded that the retention of a benefit is unjust **[*12]** if "(1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched." *Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala. 2006)*(quoting *Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala. 2004))*(emphasis in original)). *See also Burlington Northern R. Co. v. Southwestern Elec. Power Co., 925 S.W.2d 92, 97 (Tex. App. 1996)*("Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."); *ServiceMaster of St. Cloud v. GAB Business Services, Inc., 544 N.W.2d 302, 306 (Minn. 1996)*("[I]t must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."); *Haggard Drilling, Inc. v. Greene, 195 Neb. 136, 236 N.W.2d 841 (Neb. 1975)*(fraud, misrepresentation, or other wrongful **[*13]** conduct required on the part of the defendant to prove unjust enrichment); *DCB Const. Co., Inc. v. Central City Development Co., 965 P.2d 115, 117 (Colo. 1998)*("[F]or the enrichment to the landlord to be unjust and therefore actionable, the contractor must show some improper, deceitful, or misleading conduct by the landlord."); *Barker v. Dicicco, 2002 Mich. App. LEXIS 2252, 2002 WL 31956978, 1(Mich. App. 2002)*("proof of coercion or mistake to recover on unjust enrichment grounds."); *Qualichem v. Xelera, Inc., 62 Va. Cir. 179, 2003 WL 23162331, 3 (Va. Cir.Ct. 2003)*("claims of unjust enrichment based on quasi-contract have been limited by the appellate courts of the Commonwealth to those arising from: money paid by mistake; failed consideration; money got through imposition; extortion; oppression; or any

other undue advantage taken of the claiming party's situation, where the advantage is contrary to laws made for the protection of persons under those circumstances."). The misconduct element of unjust enrichment in these states is in direct conflict with the unjust enrichment law of Arkansas.

2. Direct vs. Indirect Purchaser Requirements

In Arkansas, although the enrichment to the defendant must be at the expense of the plaintiff, **[*14]** the enrichment need not come *directly* from the plaintiff. The enrichment may come from a third party. *Smith v. Whitener, 42 Ark. App. 225, 856 S.W.2d 328, 330 (Ark. App. 1993)*(citing *Patton v. Brown-Moore Lumber Co., 173 Ark. 128, 292 S.W. 383 (1927))*. In North Dakota, however, the doctrine of unjust enrichment appears to apply only "if another 'has, without justification, obtained a benefit at the *direct expense* of the [plaintiff].'" *Apache Corp. v. MDU Resources Group, Inc., 1999 ND 247, 603 N.W.2d 891, 895 (N.D. 1999)*(quoting *Midland Diesel Serv. & Engine Co. v. Sivertson, 307 N.W. 2d 555, 557 (N.D. 1981))*. North Carolina courts also require a "direct benefit" to the defendant from the plaintiff as an element of unjust enrichment. *Effler v. Pyles, 94 N.C. App. 349, 380 S.E.2d 149 (N.C. App. 1989)*. *See Sperry v. Crompton Corp., 26 A.D.3d 488, 489, 810 N.Y.S.2d 498 (N.Y.A.D. 2 Dept. 2006)*("Because the plaintiff was not in privity with the defendants, the plaintiff cannot maintain an action against them to recover damages for unjust enrichment."); *Powers v. Lycoming Engines, 245 F.R.D. 226, 232 (E.D. Pa. 2007)*(noting that Florida, Idaho and Ohio preclude indirect purchasers from asserting claims for unjust enrichment).

The direct/indirect purchaser element is likely **[*15]** to be significant in this case since few, if any, of the plaintiffs purchased Weight Smart directly from Bayer. In other words, plaintiffs from Arkansas would not be required to prove that Bayer obtained a "direct benefit" from a plaintiff, while plaintiffs from other jurisdictions would be required to make such a showing.

### 3. Adequate Remedy at Law

In addition, some states do not allow an unjust enrichment claim to survive if there is an adequate remedy at law. *See Trustmark Ins. Co. v. Bank One, Arizone, N.A., 202 Ariz. 535, 48 P.3d 485 (Ariz. App. Div. 1 2002)*; *Ramona Manor Convalescent Hosp. v. Care Enters., 177 Cal. App. 3d 1120, 225 Cal. Rptr. 120 (Cal. App.4 Dist. 1986)*; *Porter v. Hu, 116 Haw. 42, 169 P.3d 994 (Haw. App. 2007)*; *Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377 (Del. Ch. 1999)*; *Mannos v. Moss, 143 Idaho 927, 155 P.3d 1166 (Idaho 2007)*; *Guinn v. Hoskins Chevrolet, 361 Ill. App. 3d 575, 836 N.E.2d 681, 296 Ill. Dec. 930 (Ill. App. 2005)*; *Kilpatrick v. Kilpatrick, 660 So.2d 182 (La. App. 1995)*; *Santagate v. Tower, 64 Mass. App. Ct. 324, 833 N.E. 2d 171 (Mass. App. 2005)*; *Servicemaster of St. Cloud v. GAB Business Servs., 544 N.W.2d 302, 305 (Minn. 1996)*; *Tolbert v. Southgate Timber Co., 943 So.2d 90 (Miss. App. 2006)*; *Bennett v. Crane, 220 Mo. App. 607, 289 S.W. 26 (Mo. App. 1926)*; *Featherstonhaugh v. Roemer, 279 A.D.2d 783, 719 N.Y.S.2d 612 (2001)*; **[*16]** *Schroeder v. Buchholz, 2001 ND 36, 622 N.W.2d 202 (N.D. 2001)*; *Harvell v. Goodyear Tire and Rubber Co., 2006 OK 24, 164 P.3d 1028 (Okla. 2006)*; *Am. Towers Owners Ass'n. Inc. v. CCI Mech., 930 P.2d 1182 (Utah 1996)*; *Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co., 139 Wn.2d 824, 991 P.2d 1126 (Wash. 2000)*. Arkansas does not have such a requirement

[V]ariances exist in state common laws of unjust enrichment. The actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense.

*Clay v. American Tobacco Co., 188 F.R.D. 483, 501 (S.D.Ill.1999)* (internal citation omitted). "[U]njust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone among the fifty states." *In re Sears, Roebuck & Co., 2006 U.S. Dist. LEXIS 92169, 2006 WL 3754823 at *1 n. 3 (N.D.Ill. 2006)*. For these **[*17]** reasons, the Court also finds there are material conflicts between the unjust enrichment law of Arkansas and the other states.

### III. Rule 23 Class Certification Standard

To be certified as a class, a plaintiff has the burden of showing that all of the requirements of *Rule 23(a)* are met. *Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994)*. *Rule 23(a)* provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if : (1) the class is so numerous that joinder of all members is impractical;" (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R.Civ. P. 23(a)*). These requirement are commonly referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

In addition to the requirements of *Rule 23(a)*, Plaintiff must also show that her claims fall within one of the categories of *Rule 23(b)*. Plaintiff seeks to certify her class under *Rule 23(b)(3)*, the so-called "common question" or "damages" **[*18]** class action. To certify a class action under *Rule 23(b)(3)*, the Court must find that: 1) common questions predominate over any questions affecting only individual members; and 2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. *Blades v. Monsanto Co., 400 F.3d 562, 568-569 (8th Cir.*

*2005)*(citing *Fed. R.Civ.P. 23(b)(3)*; *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615, 117 S. Ct. 2231, 138 L. Ed. 2d 689(1997))*. Although a rigorous *Rule 23* analysis must be conducted before certifying a class, district courts have broad discretion in determining a motion for class certification. *Spence v. Glock, Ges.m.b.H, 227 F.3d 308, 310 (5th Cir. 2000)*. The determination that Arkansas law cannot apply to the claims of the entire class "pervades every element of *FRCP 23*." *In re Prempro, 230 F.R.D. 555, 561 (E.D. Ark. 2005)*.

Because the Court finds it determinative, a discussion of the requirements of *Rule 23(b)(3)* is all that is necessary. The focus of *Rule 23(b)(3)* is that common issues predominate over individual issues and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. "To satisfy the 'predominance' [*19] standard, plaintiffs must show that [their claims] can be proven on a systematic, class-wide basis." *In re Prempro, 230 F.R.D. at 566* (quoting *Blades v. Monsanto Co., 400 F.3d 562, 569 (8th Cir. 2005)*. This requirement "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem, 521 U.S. at 623-24*. As explained in the discussion of conflicts of law, plaintiffs will be required to present different evidence to prove a prima facie case of unjust enrichment depending on their state of citizenship. Evidence regarding the Defendant's conduct, the direct or indirect benefit to the Defendant, and adequate remedies at law which may be available to the plaintiff cannot be presented on a systematic, class-wide basis.

In determining whether a class action is the superior method for adjudicating the claims before it, the Court must look at four factors: the class members' interest in individually controlling their separate actions; the extent and nature of existing litigation by class members concerning the same claims; the desirability of concentrating the litigation in the particular forum; and the likely

difficulties in the management of a [*20] class action. *Fed.R.Civ.R. 23(b)(3)*. Although Plaintiff insists that the management of this class action is possible, the difficulties in protecting the "integrity of the law of each state" overwhelms any judicial economy which might be attained. *In re Prempro, 230 F.R.D. at 563*.

After considering the variations in unjust enrichment laws, the Court finds that Plaintiff has failed to satisfy the superiority and predominance requirements of *Rule 23(b)(3)*. *Compare Clay v. American Tobacco Co., 188 F.R.D. 483, 501*("claim of unjust enrichment is packed with individual issues and would be unmanageable"); *In re American Medical Systems, Inc., 75 F.3d 1069, 1085 (6th Cir. 1996)*("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action."); *In re Conagra Peanut Butter Products* Liability, 251 F.R.D. 689 (N.D. Ga. 2008)("This morass is useful to establish not only the lack of uniformity of unjust enrichment claims across the country, but also the inferiority of class-wide resolution due to discerning the many differing [*21] legal standards."); *Siegel v. Shell Oil Co., 256 F.R.D. 580, 2008 U.S. Dist. LEXIS 72314, 2008 WL 4378399, 6 (N.D. Ill. 2008)*. Accordingly, the Court, in its discretion, denies Plaintiffs' Motion for Class Certification of a nationwide class.

IV. <u>Alternative Class Action</u>

In the alternative, Plaintiff states that if the nationwide class is not certified by the Court "a class action is appropriate for all states where Defendants failed to establish any conflict between the laws of those states and the State of Arkansas law of unjust enrichment is applicable." (Third Amended Complaint at p. 11). Plaintiff further contends that "a class action for the State of Arkansas is appropriate for the injuries suffered by Arkansas citizens in the purchase of One-A-Day WeightSmart." *Id.* Because the parties have focused

their energies on the motion for nationwide class certification, there has been little evidence or argument regarding an alternative class. The Court finds that the Plaintiff has failed to adequately brief the issues involved in certification of an alternative class. As an initial matter, the record does not include class definitions for any alternative class or any information regarding numerosity. Therefore, the motion for class **[*22]** certification of an alternative class is denied without prejudice to Plaintiff's right to re-file the motion. If Plaintiff intends to pursue an alternative class, the motion to certify must be filed with the Court within thirty (30) days.

V. <u>Conclusion</u>

In conclusion, Plaintiff's Motion for Class Certification (Docket # 81 and # 86) is DENIED as to the nationwide class. The motion for class certification of an alternative class is denied without prejudice to Plaintiff's right to re-file the motion. If Plaintiff intends to pursue an alternative class, the motion to certify must be filed with the Court within thirty (30) days.

IT IS SO ORDERED this 12th day of February 2009.

/s/ James M. Moody

James M. Moody

United States District Judge

# Tab 33

No *Shepard's* Signal™
As of: July 14, 2020 6:41 PM Z

## *Total Office Sols., Inc. v. Grimstad*

Court of Appeals of Ohio, Seventh Appellate District, Columbiana County

June 27, 2019, Decided

Case No. 18 CO 0014

**Reporter**
2019-Ohio-2638 *; 2019 Ohio App. LEXIS 2797 **; 2019 WL 2721216

TOTAL OFFICE SOLUTIONS, INC., Plaintiff-Appellee/ Cross-Appellant v. BOBBIE J. GRIMSTAD, TRUSTEE ET AL., Defendants and Cross-Claimants-Appellants/ Cross Appellees, v. BUDGER TOOL & DIE INC. ET AL., Defendants and Counter Claimants.

**Prior History: [**1]** Civil Appeal from the Court of Common Pleas of Columbiana County, Ohio. Case No. 2017 CV 14.

**Disposition:** Affirmed.

**Counsel:** Atty. Rick Brunner, and Atty. Patrick Quinn, Brunner Quin, Columbus, Ohio, for Plaintiff-Appellee/Cross Appellant.

Atty. Michael McGee, Harrington, Hoppe & Mitchell, Ltd., Warren, Ohio, for Defendants and Cross-Claimants-Appellants/Cross-Appellees.

**Judges:** BEFORE: David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges. Donofrio, J., concurs. Robb, J., concurs.

**Opinion by:** David A. D'Apolito

## Case Summary

### Overview
HOLDINGS: [1]-A trustee who entered into a land installment contract with an office supply company's customers was not unjustly enriched by her retention of office furniture after the customers defaulted on the land installment contract because both parties were made whole in that the office supply company received a judgment against the customers and the trustee received a judgment against the customers that would be reduced by the value of the office furniture.

### Outcome
Judgment affirmed.

## Opinion

**OPINION AND JUDGMENT ENTRY**

**D'APOLITO, J.**

**[*P1]** Appellant/Cross-Appellee Michael Grimstad, Trustee, Bobbie Jean Grimstad Trust, substituted on January 5, 2018 for Bobbie Jean Grimstad, Trustee UAD 10/8/2010 (collectively "Trustee"), appeals the judgment entry of the Columbiana Court of Common Pleas dismissing Trustee's cross-claim for indemnification against Budger Tool & Die, LLC ("Budger") and its President Ralph K. McClure ("McClure") based on the jurisdictional priority rule.

2019-Ohio-2638, *2019-Ohio-2638; 2019 Ohio App. LEXIS 2797, **1

Appellee/Cross-Appellant Total Office Solutions Inc. ("Total Office") appeals the entry of summary judgment in favor of Trustee on Total Office's unjust enrichment claim. Because we find that Trustee was not unjustly enriched, and, as a consequence, **[\*\*2]** Trustee's assignment of error regarding indemnification is moot, we affirm the judgment of the trial court, albeit on other grounds.

**FACTS AND PROCEDURAL HISTORY**

 **[\*P2]**  On April 17, 2015, McClure, personally and on behalf of Budger, entered into a land installment contract with Trustee for the property located at 12750 Salem-Warren Road in Salem, Ohio ("Rag Tool Building"). Budger made only one payment under the land installment contract. Section 10 of the land installment contract reads, in pertinent part, "In the event of forfeiture, [Trustee] shall retain all payments made under the agreement and possess all improvements placed on the Premises as restitution."

 **[\*P3]**  Invoices from Total Office, dated August 6, 2015 and signed by McClure, list office furniture and other materials with a value of $26,244.66 sold by Total Office to "Budger Machine" for delivery to the Rag Tool Building. The furniture and other materials include storage cabinets, file cabinets, laminate desks, office chairs, guest chairs, paint, outlet plates, ceiling tiles, base cove, chair rail and air diffusers. All of the furniture was free-standing.

 **[\*P4]**  According to Michael Stanley, President and Shareholder of Total Office, a representative **[\*\*3]** of Budger signed a proposal with a purchase order number, however the proposal was not produced in discovery. Stanley further averred that McClure agreed that Total Office would retain ownership of the office furniture until the invoices were paid in full. In the event that Budger could not fully compensate Total Office, McClure agreed that Total Office would be permitted to retrieve the office furniture from the Rag Tool Building.

 **[\*P5]**  Budger abandoned the Rag Tool Building in 2016. Trustee subsequently took possession of the premises including the office furniture. It is undisputed that McClure agreed to permit Total Office to retrieve the office furniture, and that Trustee did not allow Total Office to collect the furniture from the Rag Tool Building.

 **[\*P6]**  Total Office contends that Trustee used the office furniture as a pawn in her effort to collect the balance due on the land installment contract from Budger and

McClure, despite the fact that she was aware that the office furniture was Total Office's property. Total Office relied on an electronic mail chain between the parties and their counsel from August 18, 2016 to September 12, 2016 to establish that Budger and McClure's attorney, Len **[\*\*4]** Stauffenger, attempted to arrange a meeting with the parties at the Rag Tool Building to allow Total Office to retrieve the office furniture.

 **[\*P7]**  On September 12, 2016, Trustee filed a complaint against Budger and McClure in the Mahoning County Court of Common Pleas, Case No. 2016 CV 02447, for breach of the land installment contract, forfeiture, fraud, and to quiet title. Total Office was not a party in the Mahoning County action.

 **[\*P8]**  On December 14, 2016, counsel for Total Office sent correspondence to Trustee asserting that Total Office owned the office furniture and requesting an opportunity to retrieve it from the Rag Tool Building. The following day, Trustee responded that she would not permit Total Office to retrieve the office furniture unless Total Office provided a U.C.C. filing or a court order authorizing seizure of the office furniture.

 **[\*P9]**  On January 10, 2017, four months after the Mahoning County action was initiated, Total Office filed the complaint in this case against Trustee, Budger and McClure, alleging unjust enrichment, fraud, and joint and several liability. On February 24, 2017, Trustee filed cross-claims against Budger and McClure alleging breach of contract and fraud, **[\*\*5]** and for indemnification. Budger and McClure filed an answer to the cross-claims on March 9, 2017. On August 15, 2017, Budger and McClure filed an "amended answer and counterclaim," which was actually an amended answer to Trustee's cross-claims, and cross-claims against Trustee. Budger and McClure asserted cross-claims for conversion, indemnification, and replevin pursuant to *R.C. 2737.01*.

 **[\*P10]**  On November 30, 2017, Trustee filed a motion for summary judgment on the fraud, unjust enrichment, and joint and several liability claims asserted by Total Office. With respect to the unjust enrichment claim, Trustee argued that Total Office had not produced any evidence to establish its ownership of the office furniture. Trustee further argued that it was not unjustly enriched because section 10 of the land installment contract "provided for self-help remedial action taken by Trustee to partially recover unpaid balance of the purchase price [sic]." (11/30/17 Trustee MSJ, p. 6).

 **[\*P11]**  Total Office filed a cross-motion for summary

2019-Ohio-2638, *2019-Ohio-2638; 2019 Ohio App. LEXIS 2797, **5

judgment on its claims against Trustee, as well as a motion for summary judgment against Budger and McClure on December 26, 2017. Budger and McClure filed two motions for summary judgment on December **[**6]** 29, 2017. In the first motion for summary judgment, Budger and McClure argued that Trustee's cross-claims for breach of contract, fraud, and indemnification should be dismissed pursuant to the jurisdictional priority rule. In the second summary judgment motion, McClure argued that he was not personally liable for any of the claims asserted by Total Office against Budger.

**[\*P12]** On January 25, 2018, Trustee filed her motion for leave to file her response in opposition to Budger and McClure's motion for summary judgment. Trustee conceded that Mahoning County had jurisdiction over her cross-claims for breach of contract and fraud, but argued that her cross-claim for indemnification was properly before the Columbiana County trial court.

**[\*P13]** In a judgment entry dated May 2, 2018, the Columbiana County trial court entered summary judgment in favor of Total Office and against Budger and McClure jointly and severally in the amount of $35,428.78, plus interest at the statutory rate from January 10, 2017. The $35,428.78 amount was taken from Stanley's deposition testimony. Stanley corrected his deposition testimony by way of his December 20, 2017 affidavit, in which he attested that the actual amount owed **[**7]** is $26,244.68.

**[\*P14]** The trial court entered summary judgment in favor of Trustee on Total Office's fraud and unjust enrichment claims. With respect to the unjust enrichment claim, the trial court found that Total Office did not confer a benefit on Trustee, and that Trustee's contractual claim was superior to Total Office's equitable claim. The trial court further opined that the damages suffered by Total Office were due exclusively to the actions of Budger and McClure. Finally, the trial court summarily concluded Trustee's indemnification claim against Budger and McClure was barred by the jurisdictional priority rule.

**[\*P15]** Neither Trustee nor Budger and McClure moved for summary judgment on Budger and McClure's cross-claims against Trustee for conversion, replevin, and indemnification. Based on the record, Budger and McClure did not voluntarily dismiss their claims, which remain pending before the trial court. The judgment entry on appeal concludes:

It is the belief and intent of this Court that this

Decision and Judgment Entry constitutes a final judgment on all claims of all parties for the purposes of *Civ.R. 54(A)*. Even if less than all claims of all parties are adjudicated hereby, this Court finds there **[**8]** is no just reason for delay pursuant to *Civ.R. 54(B)*.

(5/2/2017 J.E., p. 14).

**[\*P16]** A bench trial was held in the Mahoning County action on March 26, 2018. On May 17, 2018, two weeks after the issuance of the judgment entry at issue in this appeal, judgment was entered in the Mahoning County action in favor of Trustee and against Budger and McClure in the amount of $165,545.14, plus interest at the statutory rate from September 12, 2016. (2016 CV 02447 - 5/17/18 J.E.) The final entry on the docket in the Mahoning County action is a judgment entry to appraise and provide credit toward the judgment for "equipment seized by [Trustee] in execution of judgment," (2016 CV 02447 - 6/22/18 J.E.), which appears to include the office furniture at issue in this appeal.

## STANDARD OF REVIEW

**[\*P17]** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in *Civ.R. 56(C)*. *Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105, 1996- Ohio 336, 671 N.E.2d 241 (1996)*. Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment **[**9]** as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc., 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977)*; *Hoyt, Inc. v. Gordon & Assocs., Inc., 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995)*. Whether a fact is "material" depends on the substantive law of the claim being litigated.

**[\*P18]** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt, 75 Ohio*

2019-Ohio-2638, *2019-Ohio-2638; 2019 Ohio App. LEXIS 2797, **9

*St.3d 280, 296, 1996- Ohio 107, 662 N.E.2d 264 (1996)*. If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id. at 293*. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs, 7th Dist. Belmont No. 18 BE 0005, 2018-Ohio-5402, ¶ 11*.

 **[*P19]** The evidentiary materials to support a motion for summary judgment are listed in *Civ.R. 56(C)* and include the pleadings, depositions, **[**10]** answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple, 50 Ohio St.2d at 327*.

## ANALYSIS

 **[*P20]** The assignments of error will be addressed out of order for the purpose of clarity.

## APPELLEE/CROSS-APPELLANT'S ASSIGNMENT OF ERROR

 **THE TRIAL COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO APPELLANT BOBBIE JEAN GRIMSTAD, TRUSTEE UAD 10/8/2010 AND DISMISSED TOTAL OFFICE SOLUTIONS INC.'S CLAIMS AGAINST IT**.

 **[*P21]** In Ohio, an unjust enrichment claim is quasi-contractual in nature. It is an obligation which arises by law to address an instance where a party is the recipient of benefits which that party is not equitably entitled to retain. *Hummel v. Hummel, 133 Ohio St. 520, 527, 14 N.E.2d 923 (1938)*. Unjust enrichment arises where no express contract exists, and any agreements are those implied by the actions of the parties. *Weiper v. W.A. Hill & Assocs., 104 Ohio App. 3d 250, 262, 661 N.E.2d 796 (1st Dist. 1995)*.

 **[*P22]** The only remedy available to a party in raising an unjust enrichment claim is restitution of the reasonable value of the benefit unjustly conferred. *St. Vincent Med. Ctr. v. Sader, 100 Ohio App.3d 379, 384, 654 N.E.2d 144 (6th Dist. 1995)*. The purpose of an unjust enrichment claim "is not to compensate the plaintiff for any loss or damage suffered by him but **[**11]** to compensate him for the benefit he has conferred on the defendant." *Johnson v. Microsoft Corp., 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 21 (2005)*, citing *Hughes v. Oberholtzer 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954)*.

 **[*P23]** The elements of an unjust enrichment claim are: (1) a benefit conferred by plaintiff upon defendant; (2) knowledge by defendant of the benefit; and (3) retention of the benefit by defendant in circumstances where retention without payment to plaintiff is unjust. *L & H Leasing Co. v. Dutton, 82 Ohio App.3d 528, 534, 612 N.E.2d 787 (3rd Dist. 1992)*. Further, the benefit conferred by the plaintiff must be in response to a fraud, misrepresentation, or bad faith on behalf of defendant. *McCamon-Hunt Ins. Agency, Inc. v. Medical Mut. of Ohio, 7th Dist. Mahoning No. 07 MA 94, 2008-Ohio-5142, ¶ 27*, citing *Natl. City Bank v. Fleming, 2 Ohio App.3d 50, 58, 2 Ohio B. 57, 440 N.E.2d 590 (8th Dist. 1981)*. This requirement ensures the existence of causation between the plaintiff's loss and the defendant's benefit. *Id.*, citing *HLC Trucking v. Harris, 7th Dist. Belmont No. 01 BA 37, 2003-Ohio-694, at ¶ 26*.

 **[*P24]** The trial court found that Total Office did not confer nor intend to confer a benefit on Trustee, but, instead, on Budger and McClure. The trial court opined:

 Any benefit to [Trustee] came indirectly and resulted only from the separate and independent contractual right of [Trustee] to regain and take control of the Premises.

 There is no evidence demonstrating a causal connection between the actions of [Trustee] in retaking possession of **[**12]** the Premises and the failure of [Budger and McClure] to pay Total Office. Their failure to pay is not somehow contingent upon the return of the office furniture and equipment to Total Office.
Finally, this Court is unable to find that the claimed equity of Total Office is superior to that of [Trustee]. A plaintiff must show that, under the circumstances, he or she has superior equity so that it would be unconscionable for the defendant to retain the benefits. As aforesaid, the predicament of Total Office is self-inflicted when compared to [Trustee]. Total Office failed to preserve or protect any future interest it might have in the office furniture or equipment once it was delivered to [Budger]. The equitable claim of Total Office to possession of the office furniture and equipment is outweighed by the legal and contractual right of [Trustee] to retake

2019-Ohio-2638, *2019-Ohio-2638; 2019 Ohio App. LEXIS 2797, **12

possession of the Premises and improvements upon default by [Budger and McClure]. Any enrichment to [Trustee] is therefore not unjust. (5/2/2018 J.E. p. 8-9.)

**[*P25]** Total Office argues that retention of the office furniture by Trustee without payment to Total Office was unjust. However, the involvement of Budger and McClure changes the analysis **[**13]** with respect to Total Office's equitable claim. Total Office received a judgment against Budger and McClure in the amount of $35,428.78. Trustee received a judgment in the amount of $165,545.14, plus interest at the statutory rate from September 12, 2016, against Budger and McClure, that will be reduced by the value of the office furniture. We held in *Filo v. Liberato, 7th Dist. Mahoning No. 11 MA 18, 2013-Ohio-1014, 987 N.E.2d 707*, that the existence of a separate judgment does not alter a subcontractor's ability to make an unjust enrichment claim, so long as he remains unpaid for any portion of the work performed and the owner retains the benefit of that work. *Id. at ¶ 37*. Because both parties were made whole, we find that Trustee was not unjustly enriched by her retention of the office furniture, and, as a consequence, Total Office's cross-assignment of error has no merit.

## APPELLANT/CROSS-APPELLEE'S ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED WHEN IT DISMISSES APPELLANT/CROSS-APPELLEE GRIMSTAD'S INDEMNIFICATION CROSS-CLAIM AGAINST CO-DEFENDANTS BUDGER AND MCCLURE.**

**[*P26]** Because we find that Trustee was not unjustly enriched by Total Office, we further find that Trustee's assignment of error based on his indemnification **[**14]** claim against Budger and Grimstad is moot.

## CONCLUSION

**[*P27]** In summary, we find that Total Office's cross-assignment of error is meritless, as Trustee was not unjustly enriched by Total Office. We further find that Trustee's assignment of error based on his indemnification claim is moot. Accordingly, the judgment of the trial court is affirmed albeit on other grounds.

Donofrio, J., concurs.

Robb, J., concurs.

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to *Rule 27 of the Rules of Appellate Procedure.* It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**

End of Document

# Tab 34

## *White v. State Farm Mut. Auto. Ins. Co.*

Nebraska Court of Appeals

September 5, 1995, Filed

No. A-94-405.

**Reporter**

1995 Neb. App. LEXIS 284 *; 1995 WL 521004

Earl J. White, on behalf of himself and all other persons similarly situated, Appellant and Cross-Appellee, v. State Farm Mutual Automobile Insurance Company, Appellee and Cross-Appellant.

**Notice:** **[\*1]** NOT DESIGNATED FOR PERMANENT PUBLICATION.

**Prior History:** Appeal from the District Court for Dawson County: Donald E. Rowlands II, Judge.

**Disposition:** AFFIRMED.

**Counsel:** Kent A. Schroeder, of Ross, Schroeder, Brauer & Romatzke, for appellant.

Martin J. Troshynski, of Kelley, Scritsmier & Byrne, P.C., for appellee.

**Judges:** Sievers, Chief Judge, and Hannon and Irwin, Judges. IRWIN, Judge, not participating in the decision.

## Opinion

PER CURIAM.

INTRODUCTION

Earl J. White brought this class action on behalf of himself and all residents of Nebraska who purchased underinsured motorist automobile insurance (UIM) from State Farm Mutual Automobile Insurance Company (State Farm) between January 1, 1987, and July 1, 1991. Plaintiff alleged that the UIM coverage he had purchased from State Farm was illusory and sought to recover the premiums paid for such coverage. The district court for Dawson County entered summary judgment for State Farm, from which plaintiff has appealed and State Farm has filed a cross-appeal. After oral argument in this case, a panel member recused himself. However, the parties thereafter entered into a written stipulation that the case be decided **[\*4]** by the remaining members of the panel.

We find that the district court correctly determined that the UIM coverage provided by State Farm to plaintiff was not illusory, and we affirm.

FACTS

In 1986, the Nebraska Legislature passed the Underinsured Motorist Insurance Coverage Act, which became law on January 1, 1987. See *Neb. Rev. Stat. §§ 60-571 through 60-582* (Reissue

1988). The act required UIM coverage in all automobile insurance policies issued for vehicles garaged in this state, unless the insured rejected UIM coverage in writing. The act required minimum split policy limits of $ 25,000 per person and $ 50,000 per accident, or a combined single limit of $ 100,000. Section 60-578 provided:

(1) The maximum liability of the insurer under the underinsured motorist coverage shall be the lesser of:

(a) The difference between the limit of underinsured motorist coverage and the amount paid to the insured by or for any person or organization which may be held legally liable for the bodily injury, sickness, disease, or death; or

(b) The amount of damages sustained but not recovered.

(2) In no event shall the liability of the insurer under such coverage be more than the limits **[*5]** of the underinsured motorist coverage provided.

In response to the act, State Farm submitted its proposed premium schedule regarding the UIM coverage to the Nebraska Department of Insurance. State Farm proposed a 6-month premium of $ 1 for UIM coverage at the $ 25,000/$ 50,000 policy limits. The record contains a letter from State Farm to the department stating that situations where State Farm would pay a claim under its minimum UIM coverage were "expected to occur infrequently." The department subsequently approved State Farm's proposed rates.

State Farm notified its insureds that State Farm was required to add the minimum UIM coverage to their policies unless the insureds rejected such coverage in writing or opted to purchase UIM coverage with higher policy limits. The notification was printed on the insureds' policy renewal statements and was further explained in an "explanatory insert" that was mailed with the renewal statements. The insert contained the following statement:

Please Note: If you carry the minimum

Coverage W [UIM] limits of $ 25,000/$ 50,000, there is little or no protection against underinsured drivers, because your Coverage W limits must be higher **[*6]** than the amount received from the at-fault driver and all Nebraska residents are required to carry at least $ 25,000/$ 50,000 liability limits.

The explanatory insert also contained a policy endorsement for the UIM coverage, which stated in part:

The most we pay will be the lesser of:

a. *the difference between the limit of liability of this coverage and the amount paid to the insured* by or for any person or organization who is or may be held legally liable for the bodily injury; or

b. the amount of damages sustained but not recovered.

(Emphasis supplied.) (Emphasis omitted.)

The UIM coverage mandated by the act and provided by State Farm is known as difference-in-limits coverage.

In his petition, plaintiff alleges that State Farm held itself out as offering to its insureds UIM coverage that was "excess coverage," but in reality, State Farm provided only difference-in-limits coverage. Plaintiff further alleges that the difference-in-limits coverage was illusory because it affords an insured with little or no coverage when purchased at the $ 25,000/$ 50,000 level. Plaintiff alleges four theories of recovery: breach of contract, negligent misrepresentation, **[*7]** unjust enrichment, and nondisclosure.

The record does not contain State Farm's answer to the petition, nor does it contain plaintiff's reply, although such documents were requested in plaintiff's praecipe for transcript. The transcript index prepared by the clerk of the district court indicates that these documents are "not in court file." The transcript does contain the motion for summary judgment filed by State Farm on November 17, 1993. After several hearings on the motion, the district court took the motion under

1995 Neb. App. LEXIS 284, *7

advisement, and on March 25, 1994, the court granted summary judgment for State Farm.

In a journal entry contained in the transcript, the district court found that State Farm's coverage was not illusory as a matter of law "because some claims were in fact submitted and benefits paid, and because the specific coverage was mandated by the Nebraska Legislature." The court further found that plaintiff's allegation that State Farm charged excessive rates was not properly before the district court, as plaintiff had not pursued his administrative remedies with regard to that issue. Plaintiff thereafter appealed to this court.

ASSIGNMENTS OF ERROR

Plaintiff claims that the [*8] district court erred in finding (1) that State Farm's coverage was not illusory, (2) that the Nebraska Department of Insurance has exclusive jurisdiction over claims of excessive premiums, (3) that plaintiff's actions for negligent misrepresentation and nondisclosure could not be maintained, and (4) that summary judgment should be granted to State Farm.

State Farm has filed a cross-appeal, claiming that the district court erred in failing to sustain its motion for summary judgment on the basis that plaintiff failed to adequately allege class status in his petition.

STANDARD OF REVIEW

[1,2] In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Lewis v. Board of Comrs. of Loup Cty., 247 Neb. 655, 529 N.W.2d 745 (1995)*; *Huntwork v. Voss, 247 Neb. 184, 525 N.W.2d 632 (1995)*. Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that [*9] may be drawn from those facts

and that the moving party is entitled to judgment as a matter of law. *Lewis, supra*; *Huntwork, supra.*

ANALYSIS

*Coverage Not Illusory.*

Plaintiff's claims are based upon the allegation that State Farm's UIM coverage was illusory. Plaintiff claims that State Farm purported to provide excess UIM coverage, but in fact only provided difference-in-limits UIM coverage.

The difference between excess coverage and difference-in-limits coverage may be stated as follows: Under excess UIM coverage, an insurer would pay the total amount of damages sustained by the insured less any payments made by the tort-feasor, up to the UIM policy limits. To illustrate, if an insured who carried $ 25,000 in UIM coverage sustained $ 40,000 in damages in an accident, but the tort-feasor paid only $ 25,000, the insured would be able to recover $ 15,000 under his UIM coverage.

Under difference-in-limits UIM coverage, the insurer pays only the amount that the insured's policy limits exceed the payments made to the insured by the tort-feasor. Thus, in the above illustration, the insured would not recover anything under his UIM coverage, because his $ 25,000 in coverage [*10] does not exceed the $ 25,000 paid by the tort-feasor.

Contrary to plaintiff's contentions, we find absolutely no evidence in the record showing that State Farm held itself out as providing excess UIM coverage. In fact, evidence in the record shows that State Farm informed its insureds that the UIM coverage that they were provided was difference-in-limits coverage. The policy language explaining State Farm's UIM coverage is attached to plaintiff's petition, and states:

The most we pay will be the *lesser* of:

a. *the difference between the limit of liability of*

*this coverage and the amount paid to the insured* by or for any person or organization who is or may be held legally liable for the bodily injury; or

b. the amount of damages sustained but not recovered.

(Emphasis supplied.) (Emphasis omitted.) This language nearly mirrors that of the act. Further, State Farm sent its insureds a notice that explained to the insureds that they would be afforded little or no coverage at the $ 25,000/$ 50,000 policy limits. Plaintiff's claim that State Farm purported to provide excess coverage is without merit.

Plaintiff also claims that the difference-in-limits coverage **[*11]** provided by State Farm was illusory because plaintiff was provided no coverage when he purchased the UIM coverage at the minimum policy limits. Illusory is said to be deceiving by false appearances or nominal, as distinguished from substantial. Black's Law Dictionary 748 (6th ed. 1990). An illusory promise is one containing words which form the promise that is conditioned on some fact or event which is wholly under the promisor's control. *Vickers Antone v. Vickers, 610 A.2d 120 (R.I. 1992)*. An illusory promise is one which, according to its own terms, makes the promisor's performance optional. *Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134 (6th. Cir. 1983)*.

Plaintiff argues that because all Nebraska residents are required to carry at least $ 25,000/$ 50,000 bodily injury liability insurance, plaintiff would never be able to recover under State Farm's UIM coverage because the coverage is reduced by the amount of damages paid by the tort-feasor. This argument fails, both in theory and in reality. For example, if more than two persons were injured in an accident and the proceeds from the tort-feasors' insurance had been exhausted on two of the injured persons, then State **[*12]** Farm's insured could be left without a recovery from the tort-feasor. In that case, State Farm would be obligated to pay its insured damages up to the UIM policy limits.

Moreover, the record demonstrates that State Farm had paid over $ 290,000 in claims under its minimum UIM coverage between 1987 and 1991. In fact, State Farm paid nearly $ 10,000 to an insured under the UIM provision in a policy held by plaintiff. Such payment belies the plaintiff's claim of illusory coverage.

While the situations where an insured would be able to collect under the minimum UIM coverage are limited, State Farm's policy provisions track the legislation which mandated the coverage. Additionally, State Farm sent to all of its insureds a document stating that there would be "little or no coverage" at the minimum UIM limits. The Legislature enacted the statutory provisions providing for what may often be limited coverage-- but limited coverage is not illusory--particularly when the charge is 17 cents per month. Finally, the insureds were provided with a written form giving them the option of increasing their UIM coverage or rejecting such coverage altogether. State Farm did not make an illusory promise, **[*13]** instead it provided the coverage mandated by the Legislature. Therefore, we conclude that the trial court correctly determined as a matter of law that State Farm's UIM coverage was not illusory, and we reject plaintiff's first assigned error.

*Jurisdiction Over Excessive Rate Determinations.*

In the petition, plaintiff sought to recover under the theory of unjust enrichment, alleging:

> Premium payments enriched State Farm unjustly because premiums were received for UIM coverage that was illusory and contrary to the underlying intended purpose of the "Motor Vehicle Safety Responsibility Act". The premium rates charged by the defendant for underinsured motorist insurance coverage were contrary to *Neb. Rev. Stat. § 44-1403* and as such were excessive and unearned. To this extent, Plaintiff and Class members paid for UIM coverage which was illusory and did not

exist, thereby unjustly enriching the defendant.

Plaintiff's unjust enrichment claim is based upon the allegation that State Farm's UIM coverage was illusory, which we have already rejected. However, plaintiff also alleges that the coverage was illusory because the rates charged were excessive and contrary to **[\*14]** *Neb. Rev. Stat. § 44-1403* (Reissue 1988). Section 44-1403(4) stated in part, "Rates shall not be excessive, inadequate or unfairly discriminatory."

[3] Undisputed facts in the record show that State Farm charged $ 2 annually or about 17 cents per month for $ 25,000/$ 50,000 UIM coverage between 1987 and 1991. These rates were submitted to and approved by the Nebraska Department of Insurance prior to January 1, 1987. During the years 1987 through 1991, State Farm collected a total of $ 1,627,254 in $ 25,000/$ 50,000 UIM premiums. As of the date of the trial, State Farm had paid out $ 291,000 in claims made under its $ 25,000/$ 50,000 difference-in-limits UIM coverage and had yet to settle nine claims made under this coverage. While these figures show that State Farm collected substantially more money in premiums than it paid out in claims, this fact alone does not establish a claim for unjust enrichment. Rather, fraud, misrepresentation, or other wrongful conduct must be alleged and proved in order to recover for unjust enrichment. See *McIntosh v. Borchers, 201 Neb. 35, 266 N.W.2d 200 (1978)*. There was no fraud. State Farm defined the coverage as the legislation directed, and **[\*15]** selling a product at a profit, even a substantial profit, is not per se wrongful conduct.

The district court found that plaintiff was required to exhaust his administrative remedies on the issues of excessiveness of rates and unjust enrichment by applying to the director of the Department of Insurance for a hearing on whether State Farm's UIM rates were excessive. Our conclusions that the coverage was not illusory, plus the absence of the predicates for an unjust enrichment claim, make analysis of the district court's rationale unnecessary.

[4] Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Anderson, 245 Neb. 237, 512 N.W.2d 367 (1994)*; *State v. Chronister, 3 Neb. App. 281, 526 N.W.2d 98 (1995)*. In the present case, the grant of summary judgment to State Farm on the unjust enrichment issue was correct, and we therefore find plaintiff's second assigned error to be without merit.

*Negligent Misrepresentation and Nondisclosure.*

In his third assigned error, plaintiff claims that **[\*16]** the trial court erred in finding that his actions for negligent misrepresentation and nondisclosure were unsupported by the evidence. We find that the record contains no evidence to support either of these two theories of recovery.

[5] In *Gibb v. Citicorp Mortgage, Inc., 246 Neb. 355, 518 N.W.2d 910 (1994)*, the Nebraska Supreme Court adopted the definition of "negligent misrepresentation" found in *Restatement (Second) of Torts § 552* (1977). *Section 552(1)* states:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Section 552* limits a negligent misrepresentation cause of action to cases where one party supplied the other with "false information." *Hawkins Constr. Co. v. Iron Workers Local #21, 3 Neb. App. 238, 525 N.W.2d 637 (1994)*. In the present case, there is no evidence whatsoever **[\*17]** in the record showing that State Farm supplied plaintiff with false information. In fact, the undisputed evidence

shows that State Farm was very forthright in telling its insureds about the limited coverage and protection provided if minimum UIM coverage were purchased. The trial court's grant of summary judgment on the issue of negligent misrepresentation was correct.

With regard to the nondisclosure claim, plaintiff states in his petition that State Farm

> was negligent in failing to disclose to the Plaintiff and the Class that in third-party-at-fault accidents, the Plaintiff and the Class were without UIM coverage for the initial $ 25,000 in damages or if they had been sold UIM with limits of $ 25,000/$ 50,000 there existed no UIM coverage whatsoever.

[6] In *Bank of Valley v. Mattson, 215 Neb. 596, 601-02, 339 N.W.2d 923, 927 (1983)*, the Nebraska Supreme Court quoted the Restatement, *supra*, § 551, "Liability for Nondisclosure," stating:

> "(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented **[*18]** the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
> "(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> "(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> "(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> "(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was

true or believed to be so; and
> "(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

> "(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or **[*19]** other objective circumstances, would reasonably expect a disclosure of those facts."

Assuming, without deciding, that State Farm owed plaintiff a duty of disclosure, we find that adequate disclosure was made in this case. As noted earlier, the policy language tracks the statutes which enacted the coverage. Moreover, State Farm notified its insureds that there would be little or no UIM coverage at the $ 25,000/$ 50,000 policy limits level. By citing the "little or no coverage" disclosure made by State Farm, we are not implying that it was necessary. Instead, we use this "extra" disclosure to add weight to our conclusion that a claim of "nondisclosure" rings rather hollow under these facts. The trial court correctly granted summary judgment to State Farm on this issue as well.

[7] In his final assigned error, plaintiff claims that "the trial court erred when it granted the defendant's motion for summary judgment since it disposed of genuine issues of fact." This assigned error appears to be a general statement encompassing all of the above assigned errors, and it is not discussed in plaintiff's brief apart from the above assigned errors, which we have already found lacking in **[*20]** merit. In the absence of plain error, an appellate court will not address issues that are not both assigned and analyzed in the brief of the party asserting the error. *Label Concepts v. Westendorf Plastics, 247 Neb. 560, 528 N.W.2d 335 (1995)*; *Manske v. Manske, 246 Neb. 314, 518 N.W.2d 144 (1994)*. We find no plain error and therefore reject

1995 Neb. App. LEXIS 284, *20

plaintiff's fourth assigned error.

*State Farm's Cross-Appeal.*

[8] Although State Farm was awarded summary judgment below, it has filed a cross-appeal. Such practice is permitted, as "a nonaggrieved party against whom an appeal is taken may cross-appeal." *Wrede v. Exchange Bank of Gibbon, 247 Neb. 907, 911, 531 N.W.2d 523, 527 (1995)*. In its cross-appeal, State Farm claims that the district court erred in refusing to grant State Farm's motion for summary judgment as to the class action allegations in plaintiff's petition.

[9] The record on appeal is barren of any objection from State Farm regarding the class allegations in plaintiff's petition. State Farm's answer is not in the record before us, and its motion for summary judgment makes absolutely no mention of an objection to class allegations. "It is incumbent upon the **[*21]** party appealing to present a record which supports the errors assigned; absent such a record, the decision of the lower court will generally be affirmed." *WBE Co. v. Papio-Missouri River Nat. Resources Dist., 247 Neb. 522, 525, 529 N.W.2d 21, 23 (1995)*. Accord *Terry v. Duff, 246 Neb. 524, 519 N.W.2d 550 (1994)*. Because there is no record showing that the trial court ruled on this issue, we conclude that this issue is not properly before this court. Accordingly, we reject State Farm's cross-appeal.

CONCLUSION

The record on appeal establishes that there were no material issues of fact in this case and that State Farm was entitled to judgment as a matter of law. We therefore affirm the district court's grant of summary judgment to State Farm.

AFFIRMED.

IRWIN, Judge, not participating in the decision.

# Tab 35

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 297 of 307
PageID: 9820
Witriol v. Conexant Systems, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 3511155

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Carmignac Gestion, S.A. v. Perrigo Company PLC, D.N.J.,
July 31, 2019

2006 WL 3511155
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Joseph WITRIOL, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
CONEXANT SYSTEMS, INC., Dwight
W. Decker, Armando Geday, Robert
McMullan, and Scott J. Blouin, Defendants.

Civil Action No. 04–6219 (SRC).
|
Dec. 4, 2006.

**Attorneys and Law Firms**

Janet Rita Bosi, Lite Depalma Greenberg & Rivas LLC,
Joseph J. DePalma, Lite DePalma Greenberg & Rivas LLC,
Newark, NJ, Peter S. Pearlman, Cohn Lifland Pearlman
Herrmann & Knopf LLP, Saddle Brook, NJ, Patrick Louis
Rocco, Gary S. Graifman Esq., Kantrowitz, Goldhamer
& Graifman, P.C., Chestnut Ridge, NY, James C. Shah,
Shepherd, Finkelman, Miller & Shah, LLC, Collingswood,
NJ, Andrew Robert Jacobs, Epstein, Fitzsimmons, Brown,
Gioia, Jacobs & Sprouls, PC, Chatham Township, NJ, for
Plaintiffs.

David M. Simon, pro se.

Gregory B. Reilly, Deborah A. Silodor, Lowenstein Sandler
PC, Roseland, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before this Court on the motion to
dismiss the Second Amended Class Action Complaint for
failure to state a claim upon which relief can be granted,
pursuant to FED.R.CIV.P. 12(b)(6), by Defendants Conexant
Systems, Inc., Dwight W. Decker, Armando Geday, Robert
McMullan, and Scott J. Blouin (collectively, "Defendants").

For the reasons set forth below, Defendants' motion to dismiss
is **GRANTED**.

**BACKGROUND**

This case stems from a dispute over alleged violations of
federal securities laws. Defendant Conexant Systems, Inc.
("Conexant") is a corporation organized under the laws
of Delaware; it produces electronics. Defendants Dwight
W. Decker, Armando Geday, Robert McMullan, and Scott
J. Blouin are present or former officers and directors of
Conexant. Plaintiffs are a class of purchasers of the publicly
traded stock of Conexant, purchased during the Class Period
(March 1, 2004 through November 4, 2004); on April 6, 2005,
this Court appointed Phillips Group as lead Plaintiff.

In brief, Plaintiffs' Second Amended Class Action Complaint
(the "SAC"), filed December 5, 2005, makes the following
factual allegations. Conexant acquired Globespan Virata, Inc.
on February 27, 2004 (the "Globespan Acquisition"). During
the Class Period, Defendants made false and misleading
statements that the integration of Conexant and Globespan
was proceeding successfully; Plaintiffs contend that the
integration of the two companies was very troubled. Also,
"[t]he Company failed to regularly assess[ ] its inventory
levels to ensure that the Company's inventories would
not exceed the foreseeable demand and continued to stuff
its distribution channels, which caused its revenues to be
artificially inflated ... to conceal the integration problems
afflicting Conexant." (SAC ¶ 81(f).) Plaintiffs refer to this as
the "channel-stuffing." (*See, e.g.,* SAC ¶ 81(h).)

Plaintiffs allege that Defendants engaged in a
fraudulent scheme to conceal these problems,
artificially inflating the stock price. When
the truth came out, the stock price dropped.

The Second Amended Class Action Complaint alleges three
causes of action: 1) Defendants engaged in securities fraud
in violation of § 10(b) of the Exchange Act and Rule 10b5;
2) the individual Defendants are subject to control person
liability under § 20(a) of the Exchange Act; and 3) Defendants
McMullan and Blouin violated § 18(a) of the Exchange Act
through their involvement in Conexant's SEC filings. On
February 6, 2006, Defendants filed the instant motion to
dismiss the SAC.

## ANALYSIS

### I. Governing Legal Standards

A. *Standard for a Rule 12(b)(6) Motion to Dismiss*
On a motion to dismiss for failure to state a claim, pursuant to FED.R.CIV.P. 12(b)(6), the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384–85 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397–98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Morse v. Lower Merion School District,* 132 F.3d 902, 906 n. 8 (3d Cir.1997). All reasonable inferences, however, must be drawn in the plaintiff's favor. *See Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). Moreover, the claimant must set forth sufficient information to outline the elements of his or her claims or to permit inferences to be drawn that the elements exist. *See* FED.R.CIV.P. 8(a)(2); *Conley,* 355 U.S. at 45–46. "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005).

The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." *New York v. Hill,* 528 U.S. 110, 118 (2000). Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002).

### II. Defendants' 12(b)(6) Motion to Dismiss

A. *The First Claim: Violation of § 10(b) and Rule 10b–5*
Defendants move to dismiss Plaintiffs' First Claim, for violation of § 10(b) of the Exchange Act and Rule 10b–5, on several grounds, including failure to adequately allege loss causation, and failure to plead fraud with particularity. Because this Court finds that Plaintiffs have failed to adequately plead scienter, it need not reach the remaining arguments for dismissal.[1]

> [1]
> This Court also has concerns that the fraud claims come perilously close to invalidity under the rule of *Craftmatic Sec. Litigation v. Kraftsow,* 890 F.2d 628, 639 (3d Cir.1989) ("allegations of failure to disclose mismanagement alone do not state a claim under federal securities law"). As noted, this Court need not reach this issue to rule on the motion to dismiss.

There are six basic elements that must be pled to state a claim of securities fraud in violation of § 10(b): (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–342 (2005).

The Third Circuit restated the requirements for pleading the element of scienter in a § 10(b) claim in *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276 (3d Cir.2006). The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[2] 15 U.S.C. § 78u–4(b)(2). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Suprema,* 438 F.3d at 276. Defendants contend that the allegations of scienter in the First Claim are insufficient under both of these two prongs.

> [2]
> The particularity requirement also derives support from FED.R.CIV.P. 9(b). *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999).

Case 1:19-md-02875-RMB-SAK   Document 522-3   Filed 07/17/20   Page 299 of 307
PageID: 9822
Witriol v. Conexant Systems, Inc., Not Reported in F.Supp.2d (2005)
2006 WL 3511155

**\*3** The Second Amended Complaint claims to address scienter in four sections. First, the SAC purports to address the scienter of the individual Defendants in ¶¶ 61–67. Despite the heading, "The Individual Defendants' Scienter," this section makes no particularized allegations about the mental state of the individual Defendants in regard to the false statements. Rather, the section only alleges with particularity some aspects of the compensation arrangements of the individual Defendants, asserting generally that they were motivated by financial gain to accomplish the merger and conceal its problems.

The SAC next details the false and misleading statements made during the class period, addressing scienter in two places, ¶¶ 81 and 90. In ¶ 81, Plaintiffs make broad, general allegations about the mental state of Defendants in reference to statements in the March 1, 2004 press release (¶¶ 74–75), the second quarter 2004 earnings release (¶¶ 76–77), the April 26, 2004 conference call (¶ 78), and the second quarter 2004 10–Q (¶¶ 79–80).[3] These allegations suffer from several defects. First, and most importantly, they do not state facts with particularity. Within ¶ 81, there are eight assertions. Not one of them makes a statement about a particular person or a particular event. Rather, they are all general and conclusory. They make general assertions covering four different events, without identifying specific statements made by specific people, or the particular circumstances associated with a particular statement. They provide only conclusions about the mental states of Defendants (e.g., "Defendants knew or recklessly disregarded the fact that there was too much overlap between Conexant's and Globespan's products ...", ¶ 81(e)). These vague and conclusory assertions do not meet the particularity requirement of the PSLRA.

[3]     The first sentence of ¶ 81 foreshadows the problem that follows: "The statements in paragraphs 74 through 80 were each false and misleading when made because they misrepresented and omitted material adverse facts ..." Although the use of "they" suggests an assertion about the people who made the misrepresentations, the antecedent for "they" appears to be the statements themselves, not the people who made them; ¶ 81 contains no allegations which address the mental state of any particular person making any particular statement.

Similarly, in ¶ 90, Plaintiffs make allegations about the mental state of Defendants in reference to statements in the July 6, 2004 earnings warning (¶¶ 82–83), the July 6, 2004

conference call (¶ 84), the third quarter 2004 earnings release (¶¶ 85–86), the July 29, 2004 conference call (¶ 87), the third quarter 2004 10–Q (¶ 88), and the September 30, 2004 press release (¶ 89). The seven assertions which follow are, again, general and conclusory; every statement made above about ¶ 81 applies equally here. These vague and conclusory allegations do not meet the particularity requirement of the PSLRA.

The fourth section of the SAC which purports to address scienter is comprised by ¶¶ 109–127. This section begins with general and conclusory allegations of scienter (¶¶ 109–111). Next (¶¶ 112–119), Plaintiffs again make detailed allegations about the individual Defendants' compensation arrangements.

The next part (¶¶ 120–124) purports to allege that the individual Defendants had actual knowledge of the fraud, based on the statements of confidential witnesses (referred to as "CW"), but nothing is alleged with the necessary particularity. In ¶ 120, Plaintiffs allege that "CW–1 stated that because of the integration problems, 'We weren't able to meet the commitment to our customers, which led to the loss of business.' " This does not state with particularity facts giving rise to a strong inference that a Defendant acted with the required state of mind; it does not speak to what a particular Defendant knew, or when.

**\*4** In ¶ 121, Plaintiffs allege that CW–2, CW–5,[4] and CW–6 described problems with the integration of the companies. Again, this does not state with particularity facts giving rise to a strong inference that a defendant acted with the necessary state of mind. Similarly, in ¶ 122, Plaintiffs allege that CW–3, CW–4, and CW–7 described channel-stuffing. Again, this does not state with particularity facts giving rise to a strong inference that a defendant acted with the necessary state of mind. To plead scienter, it is not sufficient to allege that the integration was problematic or that channel-stuffing occurred. The key issue is what the individual Defendants *knew* about the integration problems and the channel-stuffing, or whether these were so obvious that the Defendants must have been aware of them. None of the allegations of statements by the confidential witnesses, separately or as a whole, gives rise to a strong inference that any particular individual Defendant knew about the integration problems or the channel-stuffing, or that these were so obvious that Defendants must have been aware of them.

[4]     In ¶ 58, Plaintiffs state that CW–5 "said that there were obvious integration problems that far

exceeded what one would expect from a merger of this sort." This conclusory assertion of obviousness does not satisfy the PSLRA's requirement that Plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. Moreover, CW–5 is not even alleged to have stated that it was so generally obvious it must have been obvious to the individual Defendants. The statement alleges no more than that CW–5 found it obvious to himself or herself.

In ¶ 124, Plaintiffs make the conclusory assertion that the resignations of McMullan and Geday establish scienter. Geday's resignation on November 9, following the close of the class period, does not lead to a strong inference about his state of mind during the class period. Plaintiffs offer no explanation of how McMullan's resignation gives rise to an inference about his state of mind, nor does this Court find a connection apparent.

The following part of this section (¶¶ 125–127) asserts generally that the Globespan Acquisition was a "key business transaction" for Conexant, and that the individual Defendants were involved in making the company's public disclosures. Again, this does not state with particularity facts giving rise to a strong inference that a defendant acted with the necessary state of mind.

In their opposition, Plaintiffs contend that, viewed in its entirety, the SAC adequately alleges scienter. Examination of the Second Amended Complaint as a whole, however, does not lead to any conclusions that differ from those stated above in regard to the parts. Overall, Plaintiffs allege that the individual Defendants had a strong financial interest in completing the Globespan Acquisition and then in covering up the merger's problems. Confidential witnesses knew that there were integration problems and channel-stuffing. Distilled to its essence, Plaintiffs' position on scienter is that the individual Defendants must have known about the integration problems because the merger was so important to the company, and they were high-level management, involved in making particular public statements. As to the channel-stuffing, examining the SAC as a whole, there is no clear theory of scienter.[5]

[5]    Indeed, the channel-stuffing claim also appears to be inadequate under FED.R.CIV.P. 9(b). Rather than describing a fraud, the SAC simply alleges that managers instructed employees to "prematurely

ship" product at the end of each quarter. (SAC ¶ 57.) According to CW–4, excess inventory was sometimes sold to third-world countries. (*Id.*) According to CW–7, "Conexant would offer discounts to customers who agreed to accept products early." (SAC ¶ 60.) Exactly what is fraudulent about this conduct is nowhere described. Plaintiffs do not explain, nor does this Court perceive, how selling products to third-world countries and selling discounted products to customers who agree to accept them early constitute fraudulent or illicit conduct.

As to the integration problems, Plaintiffs' allegations of scienter do not go farther than to say "they must have known" because of their positions in the company. The Third Circuit rejected the "they must have known" theory in *Advanta:* "It is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts ... Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." 180 F.3d at 539 (citations omitted). This precisely characterizes Plaintiffs' allegations of scienter as a whole, and they are insufficient.

**\*5** Furthermore, Plaintiffs attempt to bolster this inadequate theory of scienter with theories of financial motivation which the Third Circuit has also rejected as insufficient. Plaintiffs allege that the individual Defendants were motivated to commit fraud so that they could "take advantage" of their new employment agreements with Conexant. (*See* SAC ¶¶ 113, 114, 119.) In *In re Digital Island Sec. Litig.,* 357 F.3d 322, 331 (3d Cir.2004), the Third Circuit found inadequate a similar theory about an employment agreement alleged to have induced fraud in the context of a merger: "Because Plaintiffs' allegations regarding the [defendant's] employment agreement do nothing to distinguish her motivations from those surrounding countless other mergers and acquisitions, the proposed amended Complaint fails to create a strong inference of scienter as required by the PSLRA." Moreover, the Third Circuit noted that it was in accord with the Second Circuit's holding in *Kalnit v. Eichler,* 264 F.3d 131, 140 (2d Cir.2001): "an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." Plaintiffs' allegations about the individual Defendants' employment agreements and

Witrol v. Conexant Systems, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 3511155

compensation arrangements similarly fail to distinguish their motivations from those typical of corporate officers in the context of mergers and acquisitions.

The conclusion that Plaintiffs have failed to meet the requirements of the PSLRA for pleading scienter is supported by examination of the SAC under the two prongs of the Third Circuit's "strong inference" formulation in *Suprema*. Plaintiffs contend that they have satisfied both prongs.

*1. The recklessness/conscious misbehavior prong*

Defendants argue that Plaintiffs have not adequately alleged facts that constitute strong circumstantial evidence that Defendants engaged in recklessness or conscious misbehavior. In response, Plaintiffs contend that they have done so.

The SAC does not contain strong circumstantial evidence that the individual Defendants engaged in conscious misbehavior when they prepared or made the public statements. As discussed above, Plaintiffs do not allege more than that the individual Defendants must have known by virtue of their positions. This cannot suffice as strong evidence of conscious misbehavior.

Nor have Plaintiffs presented strong circumstantial evidence of recklessness. "A reckless statement is a material misrepresentation or omission 'involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *GSC Partners CDO Fund v.. Washington,* 368 F.3d 228, 239 (3d Cir.2004) (quoting *Advanta,* 180 F.3d at 535). This formulation presents a test with two parts, both of which must be met: 1) the statement involves an extreme departure from the standards of ordinary care; and 2) the statement presents a danger of misleading buyers or sellers that is either known or obvious.

**\*6** Breaking down the *GSC* standard in this way, it is apparent that the SAC is insufficient. As to the first element, there is nothing in the SAC which alleges or even refers to a standard of ordinary care for management in preparing or making public statements, nor any allegations about the care the individual Defendants took, or failed to take, in the preparation and making of the statements. Aside from conclusory assertions of Defendants' recklessness, the SAC says nothing whatever about how the Defendants prepared the statements. The allegations of Defendants' reckless scienter have no particularity at all.

Similarly, the SAC does not address the second element, the danger of misleading buyers. As stated, the second requirement may be satisfied by alleging either that the defendant knew of the danger of misleading, or that the danger was so obvious that the defendant must have known about it. There are no allegations in the SAC on which this Court could base an inference about what any Defendant thought about the danger of misleading investors.

*2. The motive and opportunity prong*

Defendants argue that Plaintiffs have not adequately alleged facts that show that Defendants had both motive and opportunity to commit fraud. In response, Plaintiffs contend that they have done so.

As discussed above, while the SAC makes implications about Defendants' motives, it does not articulate a theory of motive and opportunity with any particularity. Plaintiffs' opposition brief does not help. In the brief, Plaintiffs rest their argument on the allegations that "Defendants used the Globespan Acquisition to renegotiate their respective employment agreements and reap substantial personal gains." (Pls.' Opp. Br. 42.) This appears to be the theory of motive and opportunity in its entirety, and it says nothing about fraud scienter. Moreover, as discussed above, the Third Circuit's observation in *Digital Island* applies here as well: company managers commonly reap substantial personal gains from mergers, and this says nothing about scienter for fraud. 357 F.3d at 331.

The SAC does not plead particular facts which give rise to a strong inference of fraud scienter, under either the *Suprema* recklessness/conscious misbehavior prong or the motive and opportunity prong. The First Claim fails to meet the requirements of the PSLRA for pleading the element of scienter. Plaintiffs' First Claim fails to state a valid claim for relief.

Plaintiffs have now been given two opportunities to amend the Complaint. Plaintiffs' opposition brief does not indicate that there is a possibility that Plaintiffs could augment their pleading of scienter so that the First Claim could withstand a

Case 1:19-md-02875-RMB-SAK    Document 522-3    Filed 07/17/20    Page 302 of 307
PageID: 9825
Witrol v. Conexant Systems, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 3511155

motion to dismiss. Nor does this Court perceive any potential for Plaintiffs to further amend the First Claim so as to satisfy the PSLRA's requirements for pleading scienter. Because amendment is futile, Defendants' motion to dismiss the First Claim will be granted, and the First Claim will be dismissed with prejudice.

### B. *The Second Claim: Violation of § 20(a)*

**\*7** Defendants move to dismiss Plaintiffs' Second Claim, for violation of § 20(a) of the Exchange Act, because there can be no violation of § 20(a) without an independent violation of the securities laws. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999) ("claims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act"). Because the Second Claim is derivative of the First Claim, and this Court has found that the First Claim fails to state a valid claim for relief, Defendants' motion to dismiss the Second Claim will be granted, and the Second Claim will be dismissed with prejudice.

### C. *The Third Claim: Violation of § 18(a)*

Defendants move to dismiss Plaintiffs' Third Claim, for violation of § 18(a) of the Exchange Act, for failure to plead fraud with particularity and failure to allege actual reliance. Defendants' argument is persuasive.

In *Suprema,* the Third Circuit examined the pleading adequacy of a § 18(a) claim in the context of a Rule 12(b)(6) motion to dismiss, holding that cursory allegations of reliance and general allegations of reliance are not sufficient:

> SSF Plaintiffs alleged cursorily that they "received, reviewed, actually read, and relied upon" various Form 10–Q filings and the 2000 and 2001 Form 10–K filings. For example, regarding the September 28, 2001, Form 10–K, they allege that they "obtained this document at or about the it [sic] was publicly filed with the SEC, and actually read and relied upon it in making their decisions to invest in Suprema common stock." App. at 367. SSF Plaintiffs failed, however, to plead facts probative of their actual reliance on any specific false statements contained in those filings. Given the lack of allegations to show the requisite causal nexus between their purchase of securities and specific statements contained in the SEC filings, we will affirm the District Court's dismissal of SSF Plaintiffs' Section 18 claims.

*Suprema,* 438 F.3d at 284.

Plaintiffs' Third Claim is insufficient in light of *Suprema:* the allegations of reliance are cursory and general, lacking the specificity that the Third Circuit requires to state a claim. The allegations of reliance in the Third Claim of the Second Amended Complaint are brief:

> 155. Plaintiff Sam Phillips and other members of the Class read and relied upon each of the Company's Class Period SEC filings, not knowing that they were false and misleading.
>
> ...
>
> 157. In connection with his purchases of Conexant stock, Plaintiff Sam Phillips and other class members specifically read and relied on the false and misleading statements regarding: [list of three subject areas of statements]. Plaintiff Sam Phillips' and the Class' reliance was reasonable.

These allegations fail to plead facts probative of actual reliance on specific false statements. In their briefs, the parties debate whether an omission may constitute a false statement. This misses the point. In ¶ 157, Plaintiffs allege reliance on false statements, but state only generalizations about the subject matter of the statements. No specific false statements are identified. Plaintiffs have pled no facts probative of their actual reliance on specific false statements contained in the filings. This is the kind of cursory pleading that the Third Circuit found insufficient in *Suprema.*

**\*8** Plaintiffs' Third Claim fails to state a valid claim for relief under § 18(a) of the Exchange Act, 15 U.S.C. § 78r(a). Defendants' motion to dismiss the Third Claim will be granted, and the Third Claim will be dismissed without prejudice.

### *CONCLUSION*

For the reasons stated above, this Court **GRANTS** Defendants' motion to dismiss the Second Amended Class Action Complaint for failure to state a claim upon which relief can be granted, pursuant to FED.R.CIV.P. 12(b)(6). The First Claim and the Second Claim of the Second Amended Class Action Complaint are **DISMISSED** with prejudice. The Third Claim of the Second Amended Class Action Complaint is **DISMISSED** without prejudice. As to the Third Claim only, Plaintiffs are granted leave to amend the Second

**Witriol v. Conexant Systems, Inc., Not Reported in F.Supp.2d (2006)**

2006 WL 3511155

Amended Class Action Complaint within 45 days of the filing of this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3511155

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 36



Positive
As of: July 16, 2020 3:06 AM Z

# *Wong v. Chan*

Appeals Court of Massachusetts

May 4, 2012, Entered

11-P-867

**Reporter**

2012 Mass. App. Unpub. LEXIS 574 *; 81 Mass. App. Ct. 1133; 966 N.E.2d 866; 2012 WL 1557240

LUCY WONG vs. JAMES KWOK L. CHAN.

**Notice:** DECISIONS ISSUED BY THE APPEALS COURT PURSUANT TO ITS *RULE 1:28* ARE PRIMARILY ADDRESSED TO THE PARTIES AND, THEREFORE, MAY NOT FULLY ADDRESS THE FACTS OF THE CASE OR THE PANEL'S DECISIONAL RATIONALE. MOREOVER, *RULE 1:28* DECISIONS ARE NOT CIRCULATED TO THE ENTIRE COURT AND, THEREFORE, REPRESENT ONLY THE VIEWS OF THE PANEL THAT DECIDED THE CASE. A SUMMARY DECISION PURSUANT TO *RULE 1:28*, ISSUED AFTER FEBRUARY 25, 2008, MAY BE CITED FOR ITS PERSUASIVE VALUE BUT, BECAUSE OF THE LIMITATIONS NOTED ABOVE, NOT AS BINDING PRECEDENT.

PUBLISHED IN TABLE FORMAT IN THE MASSACHUSETTS APPEALS COURT REPORTS.

PUBLISHED IN TABLE FORMAT IN THE NORTH EASTERN REPORTER.

**Subsequent History:** Review denied by *Wong v. Kwok Chan, 463 Mass. 1102, 972 N.E.2d 24, 2012 Mass. LEXIS 813 (2012)*

Related proceeding at *Wong v. Chan, 2014 Mass. Super. LEXIS 74 (Mass. Super. Ct., Apr. 9, 2014)*

**Disposition:** **[*1]** Judgment affirmed.

**Judges:** Kantrowitz, Wolohojian & Sullivan, JJ.

## Opinion

### MEMORANDUM AND ORDER PURSUANT TO *RULE 1:28*

The parties were romantically involved and lived together from 1990 until 2006, separating once in 1998. They never married, and separated permanently in 2006. For most of the time they were together, the plaintiff maintained the household and the couple's finances while the defendant worked outside the home. In 1999, the parties purchased property in Waltham. Following their final separation, the defendant filed in the Land Court a petition for partition and sale of the Waltham property. The plaintiff then filed a complaint in the Probate and Family Court seeking to recover her financial contribution to the relationship. The cases were consolidated in the Probate and Family Court. Following a bench trial, the probate judge awarded the parties equal interests in the Waltham property and in the accounts with Bank of America and Citizens Bank. The judge also declared that the defendant was entitled to the full value of his 401(k) and his IRA. The plaintiff has appealed, arguing that: (1) she is entitled to an equal share in the 401(k) and the IRA;[1] (2) the judge improperly awarded damages **[*2]** to the defendant; and (3) her motion to disqualify the defendant's counsel should have been allowed. We affirm. 1. Share of 401(k)

---

[1] We understand the plaintiff's argument to be that she should have received the equivalent **[*3]** of one-half of the value of the funds in these accounts, rather than that she was entitled to a distribution from them. We note that a distribution from the 401(k) is not possible unless it conforms with applicable Federal law, something that was not established or determined below or briefed on appeal.

2012 Mass. App. Unpub. LEXIS 574, *3

and IRA. Whether an account is a joint or individual asset is a question of fact. See *Desrosiers v. Germain, 12 Mass. App. Ct. 852, 856-857, 429 N.E.2d 385 (1981)*. The probate judge found that the defendant held the 401(k) and the IRA individually, a factual finding we must accept unless clearly erroneous. See *T.W. Nickerson, Inc. v. Fleet Natl. Bank, 456 Mass. 562, 569, 924 N.E.2d 696 (2010)*. The 401(k) and the IRA were held in the defendant's name; the plaintiff was only a beneficiary, in the event of the defendant's death. The plaintiff herself testified that the defendant held the accounts individually and that the parties had not discussed how the accounts were to be distributed in the event of their separation. The defendant similarly testified that the 401(k) was his alone and that he never had discussed their division with the plaintiff. On this record, we cannot say that the probate judge's finding that the 401(k) and the IRA were the property of the defendant alone was clearly erroneous.

The plaintiff argues that equitable principles entitle her to an equal share of the 401(k) and the IRA. We disagree. The plaintiff's claims for unjust enrichment, quantum meruit, and quasi contract are analogous. See *Salamon v. Terra, 394 Mass. 857, 859, 477 N.E.2d 1029 (1985)*. "A determination that a party would be unjustly enriched 'require[s], generally, . . . that [the] party [would] hold property under such circumstances that in equity and good conscience he ought not retain it.'" *Sutton v. Valois, 66 Mass. App. Ct. 258, 265, 846 N.E.2d 1171 (2006)*, quoting from *Stevens v. Nagel, 64 Mass. App. Ct. 136, 141, 831 N.E.2d 935 (2005)*. We look to the "reasonable expectations of the parties," ibid., quoting from *Community Builders, Inc. v. Indian Motorcycle Assocs., 44 Mass. App. Ct. 537, 560, 692 N.E.2d 964 (1998)*, to determine whether through some "significant wrongdoing" the defendant has acquired property that should belong to the plaintiff, *id. at 266*, **[*4]** quoting from *Barry v. Covich, 332 Mass. 338, 342, 124 N.E.2d 921 (1955)*.

The plaintiff did not show that the defendant obtained individual ownership of the 401(k) and the IRA through fraud, deceit, or other wrongdoing, and we discern no abuse of discretion in the judge's finding that the plaintiff had no reasonable expectation that she would receive half their value. See *Demoulas v. Demoulas, 428 Mass. 555, 589, 703 N.E.2d 1149 (1998)*. The plaintiff admitted she knew the accounts were individually owned and the parties had not discussed how they would be divided. Additionally, she did not contribute funds to either account. See *Sutton, 66 Mass. App. Ct. at 266-267* (not a windfall for defendant to retain sole interest in property

where plaintiff contributed no funds toward that asset).

2. Claim of improper damages. The probate judge found that the plaintiff was entitled to $98,475.50, which represented half the value of the parties' joint assets. The judge also found that the plaintiff already had removed $120,235 from the joint accounts. The judge, accordingly, ordered the plaintiff to repay the defendant $21,759.50. The plaintiff argues that this is an improper award of damages because the defendant did not make a **[*5]** claim for damages. We disagree. The order is not an award of damages, but rather an equitable setoff in the amount the plaintiff had withdrawn in excess of what she was owed. There was no error.

3. Motion to disqualify counsel. Finally, the plaintiff argues that her motion to disqualify the defendant's trial counsel should have been allowed because he previously had represented her in a personal injury suit.[2] To succeed on her motion, the plaintiff needed to show "(1) that an attorney-client relationship existed in the former legal representation, and (2) that the former and current representations are both adverse and substantially related." *Bays v. Theran, 418 Mass. 685, 691, 639 N.E.2d 720 (1994)*, quoting from Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv. L. Rev. 1244, 1318 (1981). See *Adoption of Erica, 426 Mass. 55, 61, 686 N.E.2d 967 (1997)*. We review the denial of a motion to disqualify counsel for abuse of discretion. *Steinert v. Steinert, 73 Mass. App. Ct. 287, 288, 897 N.E.2d 603 (2008)*.

Two matters are substantially related only "if the previous representation exposed counsel to confidential information that could be used against the client in the present litigation." *R & D Muller, Ltd. v. Fontaine's Auction Gallery, LLC, 74 Mass. App. Ct. 906, 907, 906 N.E.2d 356 (2009)*. The personal injury claim sought compensation for physical injuries resulting from an automobile accident in 1998. This case, heard almost ten years after the previous case settled, centers on the equitable division of the couple's property. Any information obtained during the personal injury litigation was unlikely to be useful against the plaintiff in this

_____

[2] **Massachusetts Rules of Professional Conduct 1.9(a)**, 426 Mass. 1342 (1998), provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the **[*6]** same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation."

2012 Mass. App. Unpub. LEXIS 574, *6

case. The plaintiff argues generally that the attorney had confidential information about her mental health and her relationship with the defendant; however, the record does not indicate that the attorney had such information or how it could be used against the plaintiff. Thus, we cannot say that the probate judge abused his discretion in denying the motion.

Judgment affirmed.

By  [*7] the Court (Kantrowitz, Wolohojian & Sullivan, JJ.),

Entered: May 4, 2012.

**End of Document**