# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## EXHIBIT E: True and Accurate Copies of Unpublished Judicial Opinions Referenced in the Pharmacy Defendants' Memorandum of Law

*/s/ Sarah E. Johnston*
Sarah E. Johnston
Kara Kapke
Kristen L. Richer
BARNES & THORNBURG LLP
2029 Century Park East
Suite 300
Los Angeles, CA 90067
(310) 284-3798
(310) 284-3894

*Counsel for CVS Pharmacy, Inc.*
(incorrectly named as CVS Health Corporation)

# TABLE OF CONTENTS

**Cases**                                                                                      **Tab / Page**

*Quesinberry v. Messerchmidt*,
No. 1:10-00769, 2010 WL 3489377 (S.D. W. Va. Sept. 1, 2010)........... 1 / E003

*Ealy v. Richardson-Merrell, Inc.*,
No. 83-3504, 1987 WL 159970 (D.D.C. Jan. 12, 1987) ......................... 2 / E006

*Herzog v. Arthocare Corp.*,
No. Civ. 02-76-P-C, 2003 WL 1785795 (D. Me. Mar. 21, 2003) ........... 3 / E010

*Lansdell v. Am. Home Prod. Corp.*,
No. Civ.A. CV99S2110NE, 1999 WL 33548541 (N.D. Ala. Oct.
26, 1999)............................................................................................ 4 / E027

*Ceballo v. Mac Tools, Inc.*,
No. 11-4634, 2011 WL 4736356 (D.N.J. Oct. 5, 2011)......................... 5 / E036

*Walters v. Carson*,
No. 11-6545, 2012 WL 6595732 (D.N.J. Dec. 17, 2012) ...................... 6 / E041

*Butera v. Honeywell Int'l*,
No. 18-13417, 2020 WL 64568 (D.N.J. Jan. 6, 2020) ........................... 7 / E045

*Giles v. Wal-mart Louisiana LLC*,
No. 16-2413, 2016 WL 2825778 (E.D. La. May 13, 2016) ................... 8 / E053

*In re Diet Drugs*,
No. MDL 1203, Civ.A. 03-20284, 2004 WL 1925010 (E.D. Pa.
Aug. 30, 2004) ................................................................................... 9 / E060

*In re Cheerios Mktg. & Sales Practices Litig.*,
No. 09-cv-2413, 2012 WL 3952069 (D.N.J. Sept. 10, 2012)............... 10 / E063

*Airhawk Int'l, LLC v. Ontel Prods. Corp.*,
No. 18-cv-00073, 2020 WL 2306440 (S.D. Cal. May 8, 2020) ............. 11/ E075

# **TAB 1**

E003

2010 WL 3489377
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia.

Tony R. QUESINBERRY, Plaintiff,

v.

Charles Wade MESSERSCHMIDT, individually
and d/b/a Tim's Transport, Defendant.

Civil Action No. 1:10–00769.
|
Sept. 1, 2010.

**Attorneys and Law Firms**

Harold B. Wolfe, III, Princeton, WV, William J. Akers, Akers
Law Office, Princeton, WV, for Plaintiff.

David M. Kersey, Brewster Morhous Cameron, Bluefield,
WV, J. Ross Newell, III, Timberlake Smith Thomas & Moses,
Staunton, VA, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

DAVID A. FABER, Senior District Judge.

 **\*1** Pending before the court is a motion filed by Tim's
Transport, Inc. to quash service of process. (Doc. # 4).
For reasons expressed more fully below, that motion is
**GRANTED.** [1]

According to the allegations in the Complaint, on or
about April 7, 2008, Tony R. Quesinberry was involved
in an automobile accident. Complaint ¶ I. Quesinberry
alleges defendant Charles Wade Messerschmidt, d/b/a Tim's
Transport, Inc., "negligently, carelessly, and recklessly
operated his vehicle" which struck the vehicle Quesinberry
was driving. *Id.* Quesinberry contends that he has suffered
serious and permanent injuries which have and will continue
to cause him "great physical and mental pain and suffering ."
*Id.* at ¶ IV.

On April 5, 2010, in the Circuit Court of Mercer County,
Quesinberry filed a negligence action against Messerschmidt,
in his individual capacity and d/b/a Tim's Transport, Inc.
Messerschmidt is the only defendant named in the Complaint.
On May 26, 2010, the case was removed to this court on the
basis of diversity of citizenship.

Even though not named as a defendant in the lawsuit, Tim's
Transport, Inc. was served with a Summons and Complaint.
Thereafter, on May 28, 2010, Tim's Transport filed the instant
motion to quash, arguing that the court should quash the
service of process upon it because Tim's Transport is not
named as a defendant. Plaintiff did not file a response to the
motion to quash but, rather, filed a motion asking the court
to stay its ruling on the motion to quash pending discovery.
(Doc. # 8).

According to Federal Rule of Civil Procedure 4(a)(1)(B), "[a]
summons must be directed to the defendant." Furthermore,
under Rule 10(a), "[e]very pleading must have a caption
with the court's name, a title, a file number, and a Rule
7(a) designation. The title of the complaint must name all
the parties...." *See also Allison v. Utah County Corp.,* 223
F.R.D. 638, 639 (D.Utah 2004). The rules governing the state
courts of West Virginia are identical on these points. *See* West
Virginia Rules of Civil Procedure 4(a) and 10(a). In addition,
"[c]ourts 'have consistently held that, where the complaint
names a defendant in the caption but contains no allegations
indicating how the defendant violated the law or injured the
plaintiff, a motion to dismiss the complaint in regard to that
defendant should be granted.' " *Allison,* 223 F.R .D. at 639
(quoting *Estate of Morris v. Dapolito,* 297 F.Supp.2d 680, 688
(S.D.N.Y.2004)).

In the instant case, Tim's Transport, Inc. is not named as a
defendant in either the caption or the body of the complaint.
For this reason, the court hereby **GRANTS** the motion to
quash. *See Allison,* F.R.D. at 639 ("Since Mr. Hall is not
named as a defendant in the complaint, the court will quash
service upon him ... Since the complaint fails to name Mr.
Hall as a defendant in the caption, does not name him in the
body of the complaint, and contains no allegations against
him whatsoever, the complaint should be dismissed as to
him."); *see also Londeree v. Crutchfield Corp.,* 68 F.Supp.2d
718, 721–22 (W.D.Va.1999) (holding that defendants who
were served with service of process but who were not named
in plaintiff's complaint were entitled to be dismissed from
lawsuit.). Given the court's ruling on the motion to quash, the
motion to stay is **DENIED.**

 **\*2** The Clerk is directed to send copies of this Memorandum
Opinion and Order to counsel of record and unrepresented
parties.

**IT IS SO ORDERED.**

Quesinberry v. Messerschmidt, Not Reported in F.Supp.2d (2010)

2010 WL 3489377

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3489377

---

Footnotes

1    Also pending is defendant's motion to schedule a hearing on the motion to quash. (Doc. # 20). Because the facts and legal contentions are adequately presented in the materials presently before the court and argument would not aid in the decisional process, that motion is **DENIED.**

---

**End of Document**                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

KeyCite Yellow Flag - Negative Treatment

Distinguished by Keffer v. Lorenz, D.C.Super., July 19, 2012

1987 WL 159970

United States District Court, District of Columbia.

Sekou EALY et al., Plaintiffs

v.

RICHARDSON–MERRELL, INC., et al., Defendants.

No. 83–3504.
|
Jan. 12, 1987.

**Opinion**

GREEN, District Judge:

**\*1** This matter is before the Court on defendant Foer, Inc.'s ("Foer") motion to dismiss all claims against Mellon Pharmacy for failure to state a claim upon which relief can be granted ("Defendant's Motion to Dismiss"); plaintiffs' opposition thereto, defendant's reply brief, and the entire record herein. For the reasons stated below, the Court grants defendant's motion to dismiss and thereby dismisses defendant Foer from this case.

Plaintiffs commenced this action, one of a number of similar products liability suits, on October 26, 1983, against the manufacturers and distributors of Bendectin, an antinausea drug prescribed to pregnant women. According to the complaint, Sekou Ealy, the infant plaintiff, allegedly suffers from birth defects as a result of his mother's ingestion of Bendectin which defendant Merrell Dow Pharmaceuticals, Inc. manufactures. Complaint ¶ 6, 10, 12. Furthermore, plaintiffs allege that defendant Foer, Inc., trading as Mellon Pharmacy, sold Bendectin to plaintiff Sandra Ealy in 1978, without performing the duties of a reasonably prudent pharmacy. Specifically, the complaint alleges that Foer

> had a duty and responsibility to advise the plaintiff, Sandra Ealy, of the therapeutic values and contents of Bendectin, including its hazards and adverse effects, and failed to do so, in violation of the duties imposed upon it of the reasonably prudent pharmacy within the District of Columbia as dictated by the common law of the

> District of Columbia, and had a further duty to warn Sandra Ealy and all others similarly situated that antihistamines and pharmaceuticals wherein active ingredients included antihistamines had been scientifically shown to be teratogens in animals and humans, thus causing birth defects in children.

Complaint ¶ 71. Plaintiffs also claim that Foer acted negligently when it failed to warn Sandra Ealy that the United States Food and Drug Administration required warnings against the use in pregnancy "as to all antihistamines ... when sold over the counter without a prescription." Complaint ¶ 72.

Plaintiffs also included a strict liability count in their complaint against Foer. In that count, plaintiffs allege that Sandra Ealy "purchased Bendectin in essentially the same condition as when it left the manufacturer's plant, and the said plaintiff used the product in the manner and for the purpose which The Mellon Pharmacy knew or should have known that it would be used." Complaint ¶ 79. Plaintiffs further claim that the Bendectin purchased by Sandra Ealy from Foer was "defective and unreasonably dangerous when sold by The Mellon Pharmacy" and, therefore, Foer is strictly liable for Sekou Ealy's injuries. Complaint ¶ 83.

Defendant Foer has now moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Foer asserts that "[t]here is no authority whatsoever that holds that, under District of Columbia law, a pharmacist is liable for failure to warn of alleged dangers associated with prescription drugs under either a negligence or strict liability theory." Defendant's Motion to Dismiss at 3. The Court agrees.

**\*2** Before proceeding any further, the Court notes that both parties agree that District of Columbia law controls this case. Sandra Ealy is alleged to be a resident of the District of Columbia, and the Bendectin was prescribed and the prescription filled in the District. Complaint ¶ 2, 3.

The issue before the Court is a narrow one. Plaintiffs do not allege that defendant Foer filled the prescription for Bendectin incorrectly. Instead, plaintiffs' position is that a pharmacist that correctly fills a prescription is liable under theories of negligence and strict liability for failing to warn consumers like Sandra Ealy of the "therapeutic values, contents and hazards of the use of drugs such as Bendectin which were

Case 1:19-md-02875-RMB-SAK   Document 523-6   Filed 07/17/20   Page 8 of 80 PageID: 9958

Ealy v. Richardson-Merrell, Inc., Not Reported in F.Supp. (1992)

1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

known to have antihistaminic properties when prescribed ... and said antihistaminic properties were known to be at least teratogenic in animals and suspected of being teratogenic in humans at the time" of purchase. Plaintiffs' Opposition to the Motion to Dismiss All Claims Against Mellon Pharmacy for Failure to State a Claim Upon Which Relief Can Be Granted ("Plaintiffs' Opposition") at 1–2.

Plaintiffs have failed to cite any cases in support of their position. Instead, they rely on sections 2–2002 [1] and 2–2003 of the D.C.Code to support their negligence claim. Plaintiffs' Opposition at 7–8. Section 2–2002 defines conduct in which individuals may only engage in the District of Columbia if they hold a valid license to practice pharmacy. D.C.Code § 2–2002 (1981 & Supp.1986). Section 2–2003 sets out the general prohibitions for persons who engage in the practice of pharmacy. D.C.Code § 2–2003 (1981 & Supp.1986). The Court notes that neither of these sections was enacted at the time the Mellon Pharmacy filled Mrs. Ealy's prescription nor was there an analogous statute in effect. The Court, therefore, finds that plaintiffs' reliance on sections 2–2002 and 2–2003 is misplaced.

"No District of Columbia court has ruled whether pharmacies have a common-law duty to warn customers of the risks associated with the prescription drugs they purchase." *Raynor v. Richardson–Merrell, Inc.,* 643 F.Supp. 238, 246 (D.D.C.1986). Moreover, the two courts in this federal district which have been presented with similar actions against pharmacies have been unwilling to impose a duty to warn on pharmacies. *See, e.g., id.* at 246–47; and *Carita Richardson v. Richardson–Merrell, Inc.,* Civil Action No. 83–3505 (June 9, 1986 Order granting motion to dismiss of defendants Peoples Drug Store, Inc. and Standard Drug Co., Inc.).

In *Raynor,* Judge Thomas Hogan turned to Maryland law for guidance on whether such a common-law duty to warn existed for pharmacists in that state. The *Raynor* decision discusses the holding in *Johnson v. Richardson–Merrell,* No. B–83–3814 (D.Md. June 1, 1984), a case involving the same facts as those found here. As noted by Judge Hogan, the *Johnson* case, like *Raynor* and the present case, involved

**\*3** no allegation that the pharmacy did any compounding or changed the drug in any way after receiving it from the manufacturer, nor [was] there an allegation that the

pharmacy substituted a different brand or a generic version for the brand prescribed, Bendectin. There is therefore no showing that the pharmacy exercised any independent discretion, skill or knowledge, in filling the prescription.

*Raynor,* 643 F.Supp. at 246. Based on these facts, and in light of sound policy and legal considerations, the courts in *Raynor* and *Johnson* decided not "to impose a duty to warn on pharmacies, reasoning that such a duty would, in effect, require a pharmacy to substitute its judgment for that of the prescribing physician." *Id.* This Court will follow suit.

It is the duty of the prescribing physician to warn the patient of any potential dangers associated with taking a particular drug. To hold otherwise would "only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability." *Jones v. Irvin,* 602 F.Supp. 399, 402. Moreover, "[t]o impose a duty to warn on the pharmacist ... would be to place the pharmacist between the physician who, having prescribed the drug presumably knows the patient's present condition as well as his or her complete medical history, and the patient." *Ramirez v. Richardson–Merrell, Inc.* [CCH PRODUCTS LIABILITY REPORTS ¶ 11,019], 628 F.Supp. 85, 88 (E.D.Pa.1986) (Bendectin litigation). This type of "interference in the patient-physician relationship can only do more harm than good." *Id.* Accordingly, the Court finds that defendant Foer did not have a duty to warn customers like plaintiffs of any alleged adverse effects from the ingestion of Benedictin.

Plaintiffs' strict liability claim also fails to provide a basis for a suit against Foer. "The District of Columbia has adopted the strict liability position of Section 402A of the Restatement (Second) of Torts, which makes a seller liable for marketing a defective, unreasonably dangerous product." *Raynor,* 643 F.Supp. at 247 (citing *Berman v. Watergate West, Inc.,* 391 A.2d 1351 (D.C.App.1978); *Cottom v. McGuire Funeral Service, Inc.* [CCH PRODUCTS LIABILITY REPORTS ¶ 6320], 262 A.2d 807 (D.C.App.1970)). As explained by the court in *Raynor,* "Comment *k* makes an exception to the strict liability rule for products such as drugs, which are unavoidably unsafe due to risks associated with and inherent in their use." *Id.* Under section 402A, a drug is neither defective nor unreasonably unsafe if it is prepared properly and *accompanied by adequate warnings* of the risks involved.

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 9 of 80 PageID: 9959

Ealy v. Richardson-Merrell, Inc., Not Reported in F.Supp. (1982)
1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

Since this Court has held that pharmacies in the District of Columbia do not have any common-law duty to warn when they merely dispense a prescription drug, the limited liability available under section 402A, Comment *k* does not attach to the instant case.

Furthermore, "[r]ecent [state court] cases have uniformly held that a pharmacist is not strictly liable under a products liability theory since he is not a retailer." *Jones,* 602 F.Supp. at 400 (citing *Murphy v. E.R. Squibb & Sons, Inc.* [CCH PRODUCTS LIABILITY REPORTS ¶ 10,141], 156 Cal.App.3d 589, 202 Cal.Rptr. 802 (1984); *Bichler v. Willing* [CCH PRODUCTS LIABILITY REPORTS ¶ 7978], 58 A.D.2d 331, 397 N.Y.S.2d 57 (1977); *Ullman v. Grant,* 114 Misc.2d 220, 450 N.Y.S.2d 955 (1982); *Batiste v. American Home Products Corp.* [CCH PRODUCTS LIABILITY REPORTS ¶ 7903], 32 N.C.App. 1, 231 S.E.2d 269 (1977)). "To hold a druggist strictly liable would be to make the druggist an insurer of the safety of the manufactured drug and would impose on the retail druggist the obligation to test, at its own expense, new drugs." *Ramirez,* 628 F.Supp. at 87. The imposition of such a duty would raise the costs to society, which needs and values the pharmaceutical products sold by druggists, to unduly high and prohibitive levels. Accordingly, the Court finds that a pharmacist should not be held strictly liable for injuries allegedly sustained as the result of the ingestion of certain drugs.

**\*4** In light of the foregoing conclusions, the Court dismisses plaintiffs' claims of negligence and strict liability against defendant Foer. An appropriate order is attached.

ORDER

Upon consideration of defendant Foer, Inc.'s motion to dismiss all claims against Mellon Pharmacy for failure to state a claim upon which relief can be granted ("Defendant's Motion to Dismiss"); plaintiff's opposition thereto; defendant's reply brief; for the reasons set forth in the accompanying memorandum, and the entire record herein, it is by the Court this 12th day of January 1987.

ORDERED that defendant's motion to dismiss is granted; and it is further

ORDERED that the complaint as to this defendant is dismissed with prejudice.

**All Citations**

Not Reported in F.Supp., 1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

Footnotes

1    Plaintiffs cite only to section 2–2003 in their opposition but included the definition of the term "practice of pharmacy" which is contained in section 2–2002. The court assumes, therefore, that plaintiffs base their position on both of these sections.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

2003 WL 1785795
Only the Westlaw citation is currently available.
United States District Court, D. Maine.

John HERZOG and Mary E. Herzog, Plaintiffs

v.

ARTHROCARE CORPORATION
and Surgi–Care, Inc., Defendants

No. Civ. 02–76–P–C.
|
March 21, 2003.

**Attorneys and Law Firms**

represented by Christopher D. Nyhan, David J. Ekelund, Jr., Evan M. Hansen, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Joel Hall Thompson, Zeldes, Needle & Cooper, Bridgeport, CT, Joseph W. Corrigan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Robert O. Newton, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Lead Attorney, Attorney to be Noticed, for John P Herzog, Plaintiff.

represented by Christopher D. Nyhan, David J. Ekelund, Jr., Evan M. Hansen, Joel Hall Thompson, Joseph W. Corrigan, Robert O. Newton, (See above for address), Lead Attorney, for Mary E Herzog, Plaintiff.

represented by Harold J. Friedman, Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME, Martha C. Gaythwaite, Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME, Lead Attorney, Attorney to be Noticed, for Arthrocare Corporation, Defendant.

represented by John Hubbard Rich, III, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Lead Attorney, Attorney to be Noticed, for Surgi–Care Inc, Defendant.

*PUBLIC VERSION* RECOMMENDED DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT and PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KRAVCHUK, Magistrate J.

**\*1** Plaintiffs John Herzog D.O., and Mary Herzog filed suit against ArthroCare Corporation, the manufacturer of a surgical implement called the AthroWand, and Surgi–Care, a regional marketer and distributor of the ArthroWand, for injuries Dr. Herzog allegedly sustained from a surgeon's use of an ArthroWand to debride or "sculpt" articular cartilage located on his right knee joint and for Mary Herzog's loss of consortium. The following dispositive motions are now pending, in order of filing date: (1) Surgi–Care's Motion for Summary Judgment; (2) Dr. and Mary Herzog's Motion for Partial Summary Judgment; and (3) ArthroCare's Amended Motion for Summary Judgment. I now recommend that the Court GRANT Defendants' Motions on all of the Plaintiffs' claims EXCEPT for those portions of Counts I, II, VI, IX, X and XIV, which rely on the theory of a defective product design or unfit product condition. I further recommend that the Court DENY Plaintiffs' Motion.

Facts

Plaintiffs John Herzog and Mary Herzog live in Grand Blanc, Michigan, but at all times relevant to the events underlying this lawsuit were residents of Maine. Defendant ArthroCare Corporation ("ArthroCare") is a corporation with its principal place of business in Sunnyvale, California. ArthroCare is in the business of manufacturing medical devices, including the device that is the subject of this litigation, a certain 3.0 millimeter 60° Bevel ArthroWand ("the Wand"). (Docket No. 35, ¶ 1.) [1] Defendant Surgi–Care, Inc. is an independent distributor of various medical devices for various manufacturers, including ArthroCare, and has its principal place of business in Waltham, Massachusetts. (*Id.*, ¶¶ 3, 4; *see also* Surgi–Care's "Answer to Plaintiffs' First Amended Complaint," ¶ 7.) [2]

Dr. Herzog alleges in this suit that the Wand used on him during a December 29, 1998 knee surgery, contrary to representations made by the Defendants in their marketing materials and product indications, produced sufficient heat to damage collateral tissue in his knee, causing "serious and permanent injury to his body, including past and future pain, suffering, mental and emotional stress, ... loss of enjoyment of life[,] ... significant medical and rehabilitative expenses[,] ... and ... future lost income and an impairment to his earning capacity." (First Amended Complaint, Docket No. 12, ¶¶ 1, 31–33.) His theories of liability sound mostly in tort–strict product liability, negligence, misrepresentation–but also include breach of the implied warranty of merchantability and unfair trade practices. Dr. Herzog's wife, Mary Herzog, pursues a tort claim for loss of consortium.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)

2003 WL 1785795

In March 1995, Dr. Herzog was involved in a skiing accident and injured his right knee. (Docket Nos. 44 & 69, ¶ 6.) As a result of this injury, Dr. Herzog underwent reconstructive surgery to his anterior cruciate ligament ("ACL") on May 10, 1995. (*Id.,* ¶ 8.) After the operation, Dr. Herzog experienced pain and instability in his knee during exercise, but was still able to tolerate physical activities such as running, snow skiing, windsurfing and waterskiing. (*Id.,* ¶ 9.) Dr. Herzog underwent a second ACL reconstructive surgery on December 15, 1995. (*Id.,* ¶ 10.) This surgery did not succeed in removing the pain and instability, but Dr. Herzog continued to be able to engage in the same physical activities as before. (*Id.,* ¶ 11.) In July 1998, Dr. Herzog "re-injured" his knee while water skiing. (*Id.,* ¶ 13.) Following that incident, Dr. Herzog stopped engaging in a number of physical activities he previously enjoyed, including windsurfing, rollerblading and waterskiing, but continued others, including running. (Docket No. 69, ¶ 22; Docket No. 70, ¶ 21.)[3]

**\*2** In December 1998, Dr. Herzog underwent an arthroscopic procedure, described by the parties as his third knee surgery. (*Id.,* ¶ 14 .) This procedure was performed by Dr. Douglas Brown, an orthopedic surgeon at Orthopedic Associates in Portland, who intended to do a thorough evaluation of the "apparently failed" ACL surgery and to "do what I could short of a redo reconstruction to sort of clean things up and make his knee feel better." (*Id.,* ¶ 19; Brown Depo. at 51–52.) At the time, Dr. Herzog was also employed with Orthopedic Associates as an orthopedic surgeon. From Dr. Herzog's perspective, the procedure was intended to "help increase peak performance in sports." (Docket No. 70, ¶ 18.) During the surgery, Dr. Brown observed significant preexisting osteoarthritis within the articular cartilage of Dr. Herzog's knee, which he identified as degenerative joint disease. (Docket No. 69, ¶ 20.) Dr. Brown classified the degree of cartilage degeneration as "Grade III" on a four-grade scale, where Grade I reflects minimal damage and Grade IV total or near-total destruction of the articular cartilage down to the bone. Grade III signifies "significant" damage. (Docket No. 44, ¶¶ 20, 44.) Specifically, Dr. Brown found, among other areas of damage, "modest sized" areas of degeneration in the medial femoral condyle and "a relatively mild grade III, middle of the road III" on the patella. (Brown Depo. at 131.) During this procedure, Dr. Brown utilized the Wand in some manner not specified by the parties in their summary judgment filings, presumably "to clean things up" in some manner. (Docket No. 35, ¶ 10.) The relative degree of Dr. Herzog's pain and activity level following this procedure

is not established by the parties' filings; to the extent they are suggested, the record citations are unsupportive.[4]

On June 3, 1999, Dr. Brown performed another surgery on Dr. Herzog's knee during which he repaired Dr. Herzog's ACL and also debrided articular cartilage located in certain areas of Dr. Herzog's knee with the aid of the Wand. (Docket No. 44, ¶¶ 25, 29, 30, 49.) Dr. Brown videotaped portions of this surgery and also documented the surgery with notes and photographs. (*Id.,* ¶¶ 26–28.) At his June 2002 deposition, Dr. Brown could not recall all of the areas of Dr. Herzog's knee on which he had used the Wand, but he was confident that he had used it on the medial femoral condyle, or MFC. In an operative record, Dr. Brown indicated that there was "shaving of articular cartilage–patella and MFC." (Docket No. 69, ¶ 29) However, Dr. Brown could not recall with certainty whether the debridement (shaving) he did on Dr. Herzog's patella was accomplished with the Wand or with a mechanical shaver. (Brown Depo. at 65–67.)

The Wand that Dr. Brown used on Dr. Herzog's knee was supplied to Orthopedic Associates by Surgi–Care. (Docket No. 35, ¶ 7.) When supplying the Wand to Orthopedic Associates, Surgi–Care also provided with the Wand the product inserts and statements authored and supplied by ArthroCare, including a videotape that ArthroCare created and disseminated to clinicians entitled "Procedures of the Knee, Articular Cartilage Sculpting." (*Id.,* ¶¶ 8, 12.) The record supports the finding that Dr. Brown viewed this video prior to using the Wand on Dr. Herzog's knee. (Docket No. 69, ¶ 35.) According to Dr. Brown, he applied the Wand in a manner generally consistent with ArthroCare's product indications, except that he attempted to use an even "lighter touch" than the "direct" touch suggested in ArthroCare's indications. (Docket No. 64, ¶¶ 27, 36; Brown Depo. at 104–105, 113–114; Docket No. 69, ¶ 35.)

**\*3** The primary factual dispute involves the degree of Dr. Brown's knowledge concerning the risk of using the Wand to debride the surface of articular cartilage on the knee. The parties' relevant statements of fact[5] refer the Court to Dr. Brown's deposition testimony at pages 13, 24–30, 36–37 and 95–102. It is easier to review this testimony directly than to contend with the parties' sometimes attenuated paraphrasings. What it reveals, when taken in the light most favorable to Dr. Herzog, is that Dr. Brown "gave a paper" in 1991 on the topic of *laser* usage during arthroscopy. (Brown Depo. at 13.) This fact does not support a finding that Dr. Brown had "specialized knowledge" of *radio frequency* ablaters such

as the Wand. Dr. Brown's testimony also revealed that Dr. Brown is a member of the Herodicus Society and attended its 1997 summer meeting in Sun Valley. (Brown Depo. at 24.) At the meeting, Dr. Brown attended an oral presentation on the use of radio frequency devices for chondroplasty, which he described as a "clinical applicability study" that was "in no means meant to be a scientific appraisal." (*Id.* at 25–26.) As Dr. Brown recollected, the substance of the presentation was that radio frequency devices "appear[ ] to make the articular surface look better when ... trying to smooth it than when you use a mechanical device. And it does not appear to cause any excessive damage to the articular surface much beyond what one sees visually...." (*Id.* at 27.) Following the presentation, those in attendance discussed "how deep does the damage go," and how the goal in using such a device is to "do better than a mechanical device" would. (*Id.* at 28.) Dr. Brown specifically recalled "several people whom I considered to be conservative voices in orthopedics saying I wouldn't use it because I don't think we know enough about it," and others saying "well, I don't think there is any real evidence that it's harmful either." (*Id.* at 28–29.) Dr. Brown further testified that over the next year or so, "it was just my general impression from talking to colleagues nationally and in my practice that there was a growing acceptance" of the use of the Wand to debride articular cartilage of the knee. "Not a unanimous acceptance, but a growing acceptance that this may be a good application for radio frequency." (*Id.* at 30.) Dr. Brown also read a peer reviewed article on the topic prior to the June 1999 operation, the findings of which he did not relate during his deposition. (*Id.* at 30.) Dr. Brown understood that, at lower settings, the Wand could be used without causing fluid at the surface of the articular cartilage to boil (reach 100° Celsius), but that at higher settings the Wand could cause surface temperatures capable of damaging collateral tissue. (*Id.* at 37.) [6] He also understood that application of the Wand to articular cartilage required a light touch, that it was "better to hold it a little adjacent to the tissue rather than directly on it." (*Id.* at 96.) Although Dr. Brown was willing to admit that use of the Wand to debride articular cartilage was an "off-label" and innovative approach, his understanding was that "one could use [the Wand] ... without causing injury to adjacent or collateral tissue." (*Id.* at 101–102.) Indeed, this understanding was reached, in part, based on ArthroCare's vido, "Procedures of the Knee, Articular Cartilage Sculpting," which not only depicts the Wand being applied to articular cartilage, but affirmatively indicates that the Wand is suitable for "sculpting" the articular cartilage of the knee. (*Id.* at 31, 102, 113–114; *see also* Gambarella Depo. Ex. 11.)

**\*4** According to Dr. Herzog, he experienced significantly increased amounts of pain in his knee after this procedure, which he had not previously experienced and which included pain when standing. (Docket No. 70, ¶¶ 21, 22.) This statement is supported by Dr. Herzog's own deposition testimony. Dr. Herzog also asserts that during the surgery [7] the Wand "caused additional injury or aggravated his existing diseased articular cartilage, thereby rapidly accelerating and causing complete loss of articular cartilage resulting in his current disabling injury." (*Id.*, ¶ 4.) However, the claim of "complete loss of articular cartilage" blows the underlying testimony out of proportion. The expert testimony the Herzogs cite for this proposition would, if admitted, support only a finding that Dr. Brown's application of the Wand to Dr. Herzog's knee resulted in a burn injury. (Minas Depo. at 75; Mayor Depo. at 182.) Dr. Herzog returned to work as an orthopedic surgeon following the June 1999 surgery and continued in that work until the summer of 2000. However, his productivity was notably reduced due to his inability to stand for any appreciable length of time. (*Id.*, ¶ 48.) As a consequence, Dr. Herzog has since decided to stop working as a full-time orthopedic surgeon. (*Id.*, ¶¶ 5–6.)

Subsequent to the June 1999 procedure in which Dr. Brown employed the Wand, four additional procedures have been performed on Dr. Herzog's right knee. On February 7, 2000, Dr. Thomas Gill performed a microfracture procedure, which involved drilling holes in the cartilage of Dr. Herzog's knee and was intended to increase the supply of blood to stimulate the growth of new cartilage. (Docket No. 44, ¶¶ 51, 52.) On September 27, 2000, Dr. Thomas Minas performed an arthroscopic knee surgery, during which he harvested some articular cartilage in order to grow additional cartilage in the lab for a subsequent transplant procedure. (*Id.*, ¶¶ 53, 59.) On December 4, 2000, Dr. Minas performed a further surgery to implant this cartilage. (*Id.*, ¶ 59.) On May 2, 2001, Dr. Minas performed his third procedure, a minimally invasive, evaluative arthroscopy, to evaluate Dr. Herzog's recovery from the transplant surgery. (*Id.*, ¶ 64.)

During the December 2000 surgery, Dr. Minas observed "tissue that was tan-colored on the back of the patellar lateral facet as well as on th[e] medial femoral condyle," the two areas on which Dr. Brown had "shaved" articular cartilage in June 1999. (Docket No. 70, ¶ 23.) Dr. Minas described this tissue as firm and as appearing the way articular cartilage looks when it is burned. (*Id .*, ¶ 24.) Based on his partial review of a video of Dr. Brown's surgery, Dr. Minas "felt that the area of burnt tissue was compatible with the application

of the radio frequency wand to that area." (*Id.,* ¶ 25.) Based on his observation of burned tissue in these locations, coupled with Dr. Herzog's complaints of "much worse symptoms after the wand was applied to his medial side," [8] Dr. Minas is prepared to opine that Dr. Herzog's knee was worsened as a result of thermal injury arising from application of the Wand. (*Id.,* ¶ 26.) [9] In addition to Dr. Minas, Dr. Herzog's summary judgment statements of fact rely on Dr. Andrew E. Rosenberg and Dr. Michael Brook Mayor. Their anticipated testimony is addressed in the discussion portion of this Recommended Decision, below.

Discussion

**\*5** There are two preliminary comments I would like to make before embarking on a point-by-point discussion of the issues raised in the parties' memoranda. The first concerns how much of a showing a summary judgment movant must make to place a particular legal claim in jeopardy. The second concerns the relationship the parties' numerous *Daubert* motions have to the disposition of the summary judgment motions.

The parties' summary judgment filings raise a significant concern about the nature of summary judgment practice in this District. Surgi–Care asserts in the opening paragraph of its Motion for Summary Judgment that "[t]here is no genuine issue of material fact with respect to any of [the Herzogs'] counts, and Surgi–Care is entitled to judgment as a matter of law on all of the claims that have been asserted against it." (Docket No. 34 at 1.) From there, Surgi–Care proceeds to brief the legal and factual issues as though the Herzogs' action concerns only the adequacy or inadequacy of ArthroCare's product inserts and marketing materials, without even attempting to articulate how its various arguments might relate to the particular elements of a defective design claim. Similarly, ArthroCare begins its principal memorandum with a slightly more emphatic statement that the Herzogs' products liability action is exclusively a failure to warn case. (Docket No. 43 at 1.) It then proceeds to brief the matter as though only a failure to warn theory is being pressed. Like Surgi–Care, ArthroCare never attempts to articulate how any of its arguments might relate to the elements of a defective design claim. For their part, the Herzogs respond simply that they "have made abundantly clear that the ArthroWand used upon [Dr. Herzog] was defective from the standpoint of its design as well ." (Docket No. 68 at 1.) They do not attempt to put forward the facts or articulate in their memoranda how the

facts come together to support a claim for defective design. [10] Thus, if the Court should accept my recommendation that the failure to warn, misrepresentation and trade practices claims are not maintainable, it is left to hypothesize what, exactly, remains of Counts I, II, VI, IX, X and XIV. For obvious reasons, I have refrained from attempting to portray these claims in the absence of input from the parties.

Pursuant to the Supreme Court's holding in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), the Court might be within its discretion to enter summary judgment against Counts I, II, VI, IX, X and XIV, *in toto.* In *Celotex,* the Supreme Court held that a plaintiff often must produce the evidence supporting a claim despite the defendant's failure to introduce evidence negating the claim. *Id.* at 323–24. Indeed, the Supreme Court has indicated that defendants, in order to have a motion for summary judgment considered, need not introduce claim-negating evidence at all, so long as they "point[ ] out ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see also id.* at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."). In my view, the Defendants' Motions were sufficient to place the Herzogs on "notice" that the factual basis for a defective design claim was challenged. Nevertheless, from an equitable perspective, it would seem to me that the Defendants' utter failure to brief one or more of the elements of this claim should stay the Court's hand at this stage. After all, ArthroCare's summary judgment motion is so targeted at the failure to warn claim and the proximate cause element of that claim that it fails ever to even mention, for example, Count VI (breach of implied warranty of merchantability) or even to tie its proximate cause arguments to specific Counts in the First Amended Complaint.

**\*6** The other issue of concern involves the pending *Daubert* motions. There are some 27 filings on the docket concerning 15 expert witnesses. When ruling on a *Daubert* motion, the Court is not bound by the summary judgment standard that evidence must be viewed in the light most favorable to the non-moving party. Thus, in circumstances where a non-movant's opposition to summary judgment depends on expert opinion, it is sometimes appropriate to conduct *Daubert* hearings prior to or in the context of disposing of a summary judgment motion. After all, summary judgment facts must be of evidentiary quality and summary judgment should not be denied based on inadmissible evidence. But,

Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)
2003 WL 1785795

because the determination of the pending summary judgment motions does not hinge primarily on the admissibility of any expert witness's testimony, I have not endeavored to dispose of the *Daubert* motions prior to, or in conjunction with, this Recommended Decision. In particular, in discussing the punitive damage claim I have assumed, *arguendo,* that all of the relevant expert testimony would be admissible and I have construed that evidence in the light most favorable to the Herzogs because, in my view, this evidence would still be insufficient to support an award of punitive damages. Furthermore, to the extent that the alternative recommendation referenced in footnote 11 hinges upon the admissibility of Dr. Markel's testimony, the Defendants' motion to exclude Dr. Markel is DENIED for purposes of resolving the summary judgment motions. I think the better course of action in this case would be to defer a final ruling on the *Daubert* motions until the dust finally settles on the various claims and defenses discussed herein. At that point in time the parties can renew any of the *Daubert* motions that remain relevant and only to the extent that they remain relevant.

## I. ARTHROCARE'S MOTION
## FOR SUMMARY JUDGMENT

Dr. Herzog asserts the following causes of action against ArthroCare, ordered by count number: (I) strict liability for a defective and unreasonably dangerous product and for failure to provide an adequate warning; (II) negligence for defective design, insufficient warning and misleading marketing; (III) fraudulent misrepresentation for indicating that the Wand was safe and effective for use on articular cartilage in the knee and that the Wand does not employ a thermal process; (IV) negligent misrepresentation based on the same allegations; (V) violation of the Restatement (Second) of Torts § 402B based on the same allegations; (VI) breach of the implied warranty of merchantability (fitness for intended use); and (VII) violation of the Maine Unfair Trade Practices Act. In addition, Mary Herzog asserts a loss of consortium claim in Count VIII.

In addition to challenging the existence of a defective design theory, ArthroCare argues that the Herzogs cannot support their failure to warn theory because the facts reveal that the alleged failure to warn did not proximately cause the Herzogs' alleged injuries and because the facts do not support a finding that the Wand actually burned Dr. Herzog's articular cartilage sufficiently to cause his alleged injury. Finally,

ArthroCare makes individualized challenges to the Herzogs' misrepresentation claims, unfair and deceptive trade practices claim, punitive damage demand and lost future wage claim. I address these several arguments in the order in which they are presented by ArthroCare.

A. The Herzogs Fail to Generate a Triable Issue on Whether the Alleged Failure to Warn Proximately Caused Their Injuries.
 **\*7** This case illustrates well the role proximate cause plays in the law of torts. Even when a defendant's conduct might best be described as patently reckless, such conduct is not actionable unless it proximately causes an injury. Thus, even though I would ultimately conclude that the Herzogs have generated sufficient evidence to permit a jury to conclude (1) that ArthroCare knew the Wand had the capacity to thermally injure articular cartilage if not employed carefully and (2) that ArthroCare breached a duty of care by marketing the Wand for use on articular cartilage without including in their product and/or marketing materials an adequate warning of the risk of thermal injury, both relatively serious findings, I nevertheless recommend that summary judgment enter based on the absence of proximate causation.

Relying on *Cuthbertson v. Clark Equip. Co.,* 448 A.2d 315 (1982), ArthroCare contends that Dr. Brown's personal knowledge of the risk of thermal injury was sufficiently extensive that receipt of a warning would not have prevented him from conducting the chondroplasty with the Wand or from using the Wand in the manner he did. (Docket No. 43 at 3.) Dr. Herzog characterizes this argument as an invocation of the "knowledgeable user" rule and argues that it does not apply because "a significant factual dispute exists as to whether Dr. Brown was 'fully apprised of *all* of the attendant risks associated with' using the ArthroWand on articular cartilage." (Docket No. 68 at 3 (citing *Anderson v. Sandoz Pharm. Corp.,* 77 F.Supp.2d 804, 808 (S.D.Tex.1999).) What was missing, according to Dr. Herzog, was a warning that "applying the Wand's tip *directly* on the tissue [will] cause significant thermal damage" or that there is a "dangerously high risk of thermal damage when the Wand's tip is held in a particular location for too long." (Docket No. 68 at 4.)

In *Cuthbertson,* plaintiff-appellant argued that the trial court had committed reversible error in not instructing the jury that a distributor has a duty to inform customers and prospective users of the dangers posed by a product it distributes, including the existence of devices or methods for minimizing the dangers. *Id* . at 319. The plaintiff's theory was that her

E015

Case 1:19-md-02875-RMB-SAK   Document 523-6   Filed 07/17/20   Page 16 of 80
PageID: 9966
Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)
2003 WL 1785795

husband's death would not have occurred had the defendant-distributor of a front-end loader notified the decedent's employer of the machine's tendency to roll over and of the availability of a certain "roll-over protective system." *Id.* at 316. The Law Court assumed for purposes of argument that the distributor had a duty to warn purchasers of new protective devices, but concluded that "there could be no causal connection between a failure to warn and the injury which ensued" because the employer already knew of the risk at issue. *Id.* at 319–20.

Application of *Cuthbertson* to the facts of this case is not a straightforward matter. Each of the three supportive authorities cited by the Law Court in *Cuthbertson* has been overruled. *Skyhook Corp. v. Jasper,* 560 P.2d 934, 939 (N.M.1977), *overruled by Klopp v. Wackenhut Corp.,* 824 P.2d 293 (N.M.1992); *Halvorson v. American Hoist & Derrick Co.,* 240 N.W.2d 303, 308 (Minn.1976), *overruled by Holm v. Sponco Mfg.,* 324 N.W.2d 207 (Minn.1982); *Jackson v. New Jersey Mfg. Co.,* 400 A.2d 81, 89 (N.J.App.Div.1979), *cert. denied,* 407 A.2d 1204 (N.J.1979), *overruled by Feldman v. Lederle Labs.,* 479 A.2d 374, 388–89 (N.J.1984) ("[S]ubsequently acquired knowledge, both actual and constructive, also may obligate the manufacturer to take reasonable steps to notify purchasers and consumers of the newly-discovered danger."). Even if *Cuthbertson* were correctly decided with respect to the duty of the distributor in that case, there is no general statement of Maine law that can be readily extracted from it to assist the Court with respect to the duties of a product manufacturer.

**\*8** ArthroCare's argument is really a straight-forward proximate cause argument. In Maine:

> The general rule is that the supplier of a product is liable to expected users for harm that results from foreseeable uses of the product if the supplier has reason to know that the product is dangerous and fails to exercise reasonable care to so inform the user. A products liability action for failure to warn requires a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether

the inadequate warning proximately caused the plaintiff's injury.

*Pottle v. Up–Right, Inc.,* 628 A.2d 672, 675 (Me.1993) (internal citations and quotation marks omitted). "Proximate cause is 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.' " *Merriam v. Wanger,* 2000 ME 159, ¶ 8, 757 A.2d 778, 780 (quoting *Searles v. Trustees of St. Joseph's College,* 1997 ME 128, ¶ 8, 695 A.2d 1206, 1209). "The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment." *Id.* at 781. In failure to warn cases involving medical devices and pharmaceutical products, it is generally recognized that a manufacturer discharges its duty to warn consumers by providing an adequate warning to the learned intermediary (e.g., the prescribing physician) who will utilize or prescribe the medical device or pharmaceutical product at issue. *Violette v. Smith & Nephew Dyonics,* 62 F.3d 8, 13 (1st Cir.1995) (involving appeal from the District of Maine); *see also Ellis v. C.R. Bard, Inc.,* 311 F.3d 1272, 1280 (11th Cir.2002) (applying Georgia law and citing cases from numerous other jurisdictions involving application of the learned intermediary rule where medical devices are concerned). However, even if the manufacturer breaches its duty by failing to warn the learned intermediary, the injured patient must be able to demonstrate that the failure to warn the intermediary proximately caused his or her injury. *Pottle,* 628 A .2d at 675. ArthroCare contends that the alleged failure to warn could not have been the cause of Dr. Herzog's injury because Dr. Brown was already aware of the dangers of direct contact and static application of the Wand.

Dr. Herzog's effort to generate a genuine issue on proximate causation falls short. First, Dr. Brown's testimony indicates that he knew the Wand required a deft touch, that it should be held adjacent to–or very lightly against–the tissue rather than pressed against it, and that thermal damage could result to collateral tissue if the Wand were too vigorously applied. The warning that the Herzogs insist is missing (no direct or static contact) is, essentially, duplicative of information Dr. Brown was already considering. What is more, Dr. Brown's deposition testimony reveals that his use of the Wand would have comported with these warnings. (Docket No. 64, ¶ 36, citing Brown Depo. at 104–105.) Not only does he state that he tried to use as light a touch as possible, but also there is

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 17 of 80
PageID: 9967
Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)
2003 WL 1785795

no indication that he applied the Wand in a static manner. And while the Herzogs do offer Dr. Brown's testimony that he would not have used the Wand if it generated temperatures in the range created by lasers ("several hundred degrees Centigrade"), Dr. Brown testified that the Wand would not reach such temperatures when used on low settings and that he used a "lower" setting. (Docket No. 64, ¶ 21; Docket No. 69, ¶ 37; Brown Depo. at 36–39 & 96–97.) The testimony the Herzogs rely on simply does not support a finding that Dr. Brown would not have used the Wand or that he would have used the Wand in a different fashion had he received a warning from ArthroCare not to press the Wand directly into the tissue and not to hold it static in one location. Without such facts, any determination that the absence of a warning proximately caused Dr. Herzog's injury would necessarily be based on speculation. For that reason, I recommend that summary judgment enter against Count I and II to the extent the Herzogs allege a claim based on a defective product warning. Even if ArthroCare had a duty to supply a warning of the kind suggested, the Herzogs have not generated an issue as to whether the absence of such a warning actually caused Dr. Herzog's injury. [11]

B. The Herzogs Fail to Generate a Triable Issue on Whether They Justifiably and Detrimentally Relied on a Misrepresentation of Fact.

**\*9** In Counts III, IV and V, the Herzogs press claims for fraudulent misrepresentation, negligent misrepresentation and violation of Section 402B of the Restatement (Second) of Torts, respectively. ArthroCare moves for entry of summary judgment based on insufficient evidence of reliance, a key element of all three theories. (Docket No. 43 at 12.) *See Harkness v. Fitzgerald,* 1997 ME 207, ¶ 7, 701 A.2d 370, 372 (outlining elements of fraud); *Perry v. H.O. Perry & Son Co.,* 1998 ME 131, ¶ 8, 711 A.2d 1303, 1305–06 ("[A] showing of detrimental reliance is essential to an action for negligent misrepresentation."); Restatement (Second) Torts § 402B (requiring detrimental reliance for tort of "misrepresentation by seller of chattels to consumer"). In their First Amended Complaint, the Herzogs allege that Dr. Herzog and Dr. Brown justifiably relied on representations "that the ArthroWand was safe and effective for use on articular cartilage in the knee, did not employ a thermal process in its performance, and would not cause unintended damage to tissue." (Docket No. 12, ¶¶ 44, 47, 50, 52.)

The Herzogs misrepresentation claims are unique. Surgical tools like the Wand are simply not marketed to the general public. Instead, manufacturers and sellers of surgical products make their representations directly to surgeons and other medical personnel. Thus, the standard patient would not be able to show that he or she had received false statements of fact, let alone that he or she had relied on such statements when deciding to undergo a surgical procedure. Indeed, but for Dr. Herzog's unique position as an orthopedic surgeon, the misrepresentation claims would not deserve much comment at all. As it is, Dr. Herzog claims that by virtue of his orthopedic practice he was privy to ArthroCare's product representations and that, but for these representations, he would have affirmatively instructed Dr. Brown not to use the Wand during either arthroscopic procedure. The Herzogs' relevant statements of fact assert that, prior to the June 1999 procedure, an ArthroCare salesman informed Dr. Herzog of a "revolution of articular cartilage surgery" and provided him with articles, studies and basic information on the Wand. (Docket No. 70, ¶ 50.) Yet, despite this information, Dr. Herzog testified during his deposition that he never used the Wand to debride osteoarthritic cartilage on the knees of his own patients. (*Id.,* ¶ 49; Herzog Depo. at 30.) [12] The Herzogs also indicate that Dr. Herzog "did not talk to Dr. Brown prior to his surgery about what device [Dr. Brown] was going to use." (Docket No. 70, ¶ 51.) Based on these statements of fact, the Herzogs make the following argument in their memorandum: [13]

It is ... reasonable that Dr. Herzog would have relied on [ArthroCare's] misrepresentations and omissions in deciding that he need not request that Dr. Brown *not* use the ArthroWand on his knee.... Had he known, through conversations with ArthroCare representatives, the truth about the dangers associated with the Wand, it is safe to assume that he would have raised that issue with Dr. Brown. His direct contact with ArthroCare representatives and their marketing materials, in which he was assured that the ArthroWand was safe and effective, implicitly persuaded him to refrain from objecting to the Wand's use on his knee. In light of its extensive, direct sales pitches to Dr. Herzog regarding the safety and efficacy of the Wand, any claim by ArthroCare now that Dr. Herzog could not have relied on its misrepresentations/omissions belies the record, and should be dismissed by this Court.

**\*10** (Docket No. 68 at 15–16.) If there is one thing that is certain about summary judgment practice, it is that a plaintiff cannot meet his or her burden based on assumptions. It is hard to understand why those things the Herzogs want the Court to assume could not have been set

forth affirmatively by way of affidavit. As it is, the only facts the Herzogs introduce are that Dr. Herzog was told of a "revolution" in articular surgery and that he "did not talk to Dr. Brown prior to his surgery about what device he was going to use." (Docket No. 70, ¶¶ 50, 51.) On this limited showing, I do not think the Court should infer that Dr. Herzog relied to his detriment on any "misrepresentations" or "omissions." Nor do I agree with the Herzogs suggestion that a misrepresentation to a surgeon about a surgical tool would support a misrepresentation claim by the patient . [14] Nor do I think the summary judgment record permits a finding that ArthroCare materially mislead Dr. Brown, who acknowledged that he understood the thermal properties of the Wand and the attendant risks of direct application on articular cartilage. My impression is that the summary judgment record no more supports a finding of reliance by Dr. Brown on a misrepresentation than it does a finding that Dr. Herzog's injury was proximately caused by a failure to warn Dr. Brown. For this reason, I recommend that the Court grant ArthroCare summary judgment against Count III, IV and V.

C. Summary Judgment Should Enter Against Count VII Because the Unfair Trade Practice Act Does Not Extend to the Facts of This Case.

In Count VII, Dr. Herzog asserts a claim for violation of Maine's Unfair Trade Practices Act, asserting, "ArthroCare's conduct in its design, research, development, and sale of the ArthroWand constitutes an unfair or deceptive act or practice in the conduct of trade or commerce." (Docket No. 12, ¶ 63.) That Act permits private suits by those who purchase or lease "goods, services or property ... primarily for personal, family or household purposes," under certain circumstances. 5 M.R.S.A. § 213. ArthroCare moves for summary judgment against this claim on the ground that Dr. Herzog was not the purchaser of the Wand that was used on his knee. (Docket No. 43 at 13.) In opposition, Dr. Herzog has established that he paid Orthopedics Associates' invoice for the price of two ArthroCare Wands. (Docket No. 70, ¶ 52.) Whether or not Dr. Herzog paid for his surgeon's acquisition of the Wand or Wands used during his surgery, it is apparent that he did not purchase the Wand for his personal use. I agree with ArthroCare that the Act does not extend protection to individuals who pay the bill for a medical service provider's acquisition of a medical device, even though that device is "used" on them for "personal purposes." Such purchasers do not themselves use the good at issue; nor do they ever possess the good; nor is the good at issue properly understood to be a "consumer good."

D. The Viability of Mary Herzog's Loss of Consortium Claim Depends on the Viability of the Defective Design Claim.

**\*11** Because there remains a question regarding the existence of facts supporting the defective design claim against ArthroCare, I recommend that summary judgment not enter at this time against Mary Herzog's derivative loss of consortium claim, Count VIII.

E. Summary Judgment Should Enter Against Plaintiffs' Demand for Punitive Damages.

Under Maine law, punitive damages are available only where the defendant's conduct was motivated by actual malice directed against the plaintiff or where the defendant's conduct was "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985). Neither recklessness nor gross negligence will suffice under this standard. *Id.* The burden of proof of actual or implied malice is by clear and convincing evidence. *Id.* at 1363. In *Tuttle,* the Law Court reserved for later consideration how the punitive damages regime might apply in products liability cases. *Id. at 1360 n. 20* ("[A]lthough our opinion today provides a careful evaluation of a longstanding doctrine, many issues concerning the availability of punitive damages ... remain for future consideration and resolution. These issues include, *inter alia,* ... the application of punitive damages in products liability ... litigation ."). Thus, it is at least conceivable that the standard may be lowered in some way to account for the strict liability regime.

According to the Herzogs, ArthroCare actively concealed information revealing a serious risk of harm that the Wand could cause significant cellular necrosis when applied directly to, or held "even momentarily" in a stationary position over, articular cartilage. (Docket No. 68 at 18.) The Herzogs contend that such concealment is outrageous given that the device is "a medical product intended for insertion within the human body with an electrical capacity to burn and injure valuable and necessary tissue within the body." (*Id.* at 20.) In addition to challenging the evidentiary basis for Plaintiffs' contention, Defendant relies on *Davies v. Datapoint Corp.,* 1995 U.S. Dist. LEXIS 21739, \*42 (D.Me. Oct. 31, 1995), to argue that even knowing concealment would fall short of the requirements of *Tuttle.*

In their Statement of Additional Undisputed Material Facts (in opposition to ArthroCare's Motion), the Herzogs offer evidence of three sources of information available to ArthroCare prior to Dr. Herzog's operation. The first source involves two documents that were discussed during the deposition of Phillip Eggers, one of the designers/inventors of the Wand. Without divulging in their relevant Statement of Additional Undisputed Material Facts, Docket No. 70, what any of the contents of the documents were, the Herzogs complain that none of the contents were incorporated into ArthroCare's marketing materials. In order to find out what these contents were, one must look to the Herzogs' "Supplemental Statement of Material Facts," Docket No. 65, submitted in opposition to Defendant Surgi–Care's Motion [REDACTED] Additionally, ArthroCare's president inquired of Mr. Eggers, "What happens when I am firmly against the tissue and the vapor layer is not allowed to form?"

[REDACTED]

[REDACTED]

[REDACTED]

**\*12** *Tuttle,* 494 A.2d at 1362;
*DiPietro v. Boynton,* 628 A.2d 1019, 1024 (Me.1993).

F. ArthroCare's Challenge to the Herzogs' Lost Wage Claim Should be Disregarded at this Juncture.
ArthroCare asks that Dr. Herzog's lost future wage claim be stricken. (Docket No. 43 at 16.) This request apparently arises from Dr. Herzog's allegation that, "[a]s a result of ArthroCare's and Surgi–Care's wrongful conduct, Dr. Herzog can no longer earn his livelihood as an orthopedic surgeon" and that "[h]e is physically incapable of performing the tasks necessary to maintain his practice ." (Amended Complaint, Docket No. 12, ¶ 33.) ArthroCare complains that the Herzogs have not designated a vocational expert and that Dr. Herzog's knee injury does not prevent him from working as an orthopedic surgeon. (Docket No. 43 at 17.) According to ArthroCare, "there is absolutely no basis for [Dr. Herzog's] future lost wage claim." (*Id.* at 18.) The Herzogs argue that this challenge is inappropriate in the context of a summary judgment motion and should be raised in an in limine motion. (Docket No. 68 at 21.) They also explain that the future lost wage claim is based on a significant reduction in Dr. Herzog's productivity, which bears directly on his earning potential

and that the facts to support this element of damages can be presented without the assistance of a "vocational expert." (*Id.* at 22.) This aspect of ArthroCare's Motion does not warrant extended discussion and should be denied.

## II. SURGI–CARE'S MOTION
## FOR SUMMARY JUDGMENT.

Dr. Herzog asserts the following causes of action against Surgi–Care, ordered by count number: (IX) strict liability for placing a defective and unreasonably dangerous product in the stream of commerce and for failure to warn of the same; (X) negligence for marketing, selling and placing a defective product in the stream of commerce, for failing to warn and for failing to independently investigate and research the safety and efficacy of the Wand; (XI) fraudulent misrepresentation; (XII) negligent misrepresentation; (XIII) violation of the Restatement (Second) of Torts § 402B; (XIV) breach of implied warranty; (XV) violation of the Maine Unfair Trade Practices Act; and (XVI) violation of the Massachusetts Consumer Protection Act. In addition, Mary Herzog pursues a loss of consortium claim in Count XVII and the Herzogs make their demand for punitive damages in "Count XVIII." Surgi–Care's Motion for Summary Judgment is similar to ArthroCare's, but somewhat more nuanced. Like ArthroCare, they essentially proceed as though the only product liability issue is the adequacy of ArthroCare's warnings.

A. The Herzogs Fail to Generate a Triable Issue on Whether the Alleged Failure to Warn Proximately Caused Their Injuries.
Surgi–Care argues that, even if an inadequate warning was provided with the Wand, Dr. Herzog's alleged injury could not have been caused by a failure to warn because Dr. Brown testified he would not have heeded such a warning. (Docket No. 34 at 4–5.) Although Surgi–Care mischaracterizes Dr. Brown's testimony, Surgi–Care is nevertheless entitled to summary judgment against the failure to warn theory asserted in Counts IX and X for the same reasons I indicated in regard to ArthroCare in Section I.A., *supra* .

B. The Herzogs Fail to Generate a Triable Issue on Whether They Justifiably and Detrimentally Relied on a Misrepresentation of Fact.
 **\*13** In addition to submitting its own Motion for Summary Judgment, Surgi–Care has also "joined" in ArthroCare's Motion for Summary Judgment. (Defendant Surgi–Care,

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 20 of 80
PageID: 9970
Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)
2003 WL 1785795

Inc.'s Joinder in Defendant ArthroCare Corporation's Motions, Docket No. 56.) For the reasons stated in Section I.B., I recommend that summary judgment enter against Counts XI, XII and XIII.

**C. The Learned Intermediary Rule Would Not Entitle Surgi–Care to Summary Judgment.**

I address this argument in the event that the Court should reject my recommendation in Section II.A. Surgi–Care argues that the Herzogs' claims are barred by the learned intermediary doctrine. (Docket No. 34 at 2.) According to Surgi–Care, it satisfied its duty to the Herzogs by providing Dr. Brown "with information and a videotape regarding the proper uses of the ArthroWand." (*Id.*)

"It is generally accepted that in a case involving medical products prescribed or used by a physician or trained medical personnel, the warning runs to the physician not the patient." *Knowlton v. Deseret Med., Inc.,* 930 F.2d 116, 120 n. 2 (1st Cir.1991). Thus, when an *adequate* warning is provided to the "learned intermediary," it is up to the intermediary to pass along the warning to the patient. *See, e.g., Garside v. Osco Drug, Inc.,* 976 F.2d 77, 80 (1st Cir.1992) ("Under this doctrine, the manufacturer's duty is fulfilled once it adequately warns the physician."). But when an inadequate warning or no warning is provided to the learned intermediary, the manufacturer or seller has not satisfied its duty to the consumers. In the opinion of Dr. Tucker, ArthroCare's warning was inadequate in that it was non-existent. (Docket No. 64, ¶ 2.)

**D. The Rule Articulated in Section 6 of the Restatement (Third) of Torts: Product Liability is Not Applicable to the Facts of This Case.**

I address this argument in the event that the Court should reject my recommendation in Section II.A. With respect to Counts IX (strict liability), X (negligence), and XIV (breach of implied warranty), Surgi–Care argues that it fulfilled its duties to the Herzogs as a matter of law because it passed along all of ArthroCare's print and video materials concerning the Wand. (Docket No. 34 at 7–9.) Although Maine's product liability statute clearly imposes liability on sellers and suppliers in addition to manufacturers, 14 M.R.S.A. § 221, Surgi–Care contends that it is against public policy to impose liability on a distributor of medical devices on a failure to warn theory because all that can fairly be expected of the distributor is that it pass along the manufacturer's warning. (*Id.* at 8.)

Surgi–Care's reliance on Section 6 of the Third Restatement of Products Liability is misplaced. Surgi–Care is attempting to make an analogy between its situation as a seller of surgical tools and the situation of pharmacists, who are sometimes sued for failing to supplement a drug manufacturer's inadequate warnings or failing to catch a physicians' inappropriate prescriptions. One problem with this analogy is that the case law generally immunizes pharmacists from strict liability because they are not the kind of "retailers" that strict liability regimes are designed to target. *Jones v. Irvin,* 602 F.Supp. 399, 400 (D.C. Ill.1985) (citing cases). Pharmacists are equally, if not more significantly, service providers. *See, e.g., Murphy v. E.R. Squibb & Sons, Inc.,* 710 P.2d 247, 252 (Cal.1985) (construing California statute to support the conclusion that "even though a pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is to be deemed a service ... immune from strict liability.") This rationale has also been used to exempt hospitals from strict liability for obtaining medical devices and products that are used by physicians in medical procedures. *See, e.g., Parker v. St. Vincent Hosp.,* 919 P.2d 1104, 1106–07 (N .M.App.1996) ("According to the weight of authority, a hospital is not a distributor of medical supplies, even though it may bill separately for the item and charge the patient a markup over the hospital's cost. The courts have generally held that the essence of the hospital's role is the provision of services, regardless of whether a product is involved.") (citing cases). This rationale does not apply to a distributor of medical devices like Surgi–Care, which is nothing if not a retailer. [15] Another distinction between pharmacists and retailers is that pharmacists are not *intermediaries* between manufacturers and physicians the way that distributors of medical devices are. Thus, for instance, a pharmacist is not involved in providing a manufacturer's warnings to a prescribing physician. This fact further highlights that the rule of no liability for pharmacists is not really based on the "learned intermediary" doctrine at all, but on special policy considerations that do not translate to the circumstance of a distributor of medical devices.

**\*14** The authors of the Restatement (Third) of Torts have attempted to restate the foregoing precedent with language suggesting that the rule of strict liability does not extend to a "retail seller or other distributor of a ... medical device" in a failure to warn case. Restatement (Third) of Torts: Products Liability § 6(e) & cmt. h (1998). However, other than one case involving a hospital, *St. Vincent Hosp., supra,* every case cited by the Restatement authors involved injury from ingestion

of pharmaceutical drugs. *See id.,* cmt. h. My assessment of this Restatement provision is that the authors intended the expansive language of § 6(e) to be confined by the definitional provision in § 6(a): "A prescription drug or medical device is one that may be legally sold or otherwise distributed only pursuant to a health-care provider's *prescription ." Id.,* § 6(a) (emphasis added).

In addition to relying on the foregoing Restatement provision, Surgi–Care relies on *Jones v. Irvin, supra,* and *In re Rezulin Prods. Litig.,* 133 F.Supp.2d 272, 288 (S.D.N.Y.2001). However, "[t]he precise issue" in *Jones v. Irvin* was "whether a *pharmacist,* who correctly fills a prescription, is negligent for failing to warn the customer or notify the physician that the drug is being prescribed in dangerous amounts ... or that the various drugs in their prescribed quantities could cause adverse reactions to the customer." *Id.* (emphasis added). The Court held that Illinois law would not impose an independent duty on the pharmacist to second-guess the prescribing physician or to identify and warn of possible adverse effects in a pharmaceutical drug that have never been identified by the manufacturer. *Id.* at 402–403. Similarly, in *Rezulin,* the court ruled that claims for injuries arising from the use of a pharmaceutical drug could not proceed against various pharmacy defendants because imposition of an independent duty to investigate and warn would cause "risk averse" pharmacists "to dispense [warnings] that [might] be uninformed, inapplicable to or misunderstood by the patient." 133 F.Supp.2d at 288. These two cases simply illustrate the special rule described in the Restatement, which is designed for the unique circumstances inherent in the dispensation of prescription drugs and devices.

E. Summary Judgment Should Enter Against the Fraudulent and Negligent Misrepresentation Claims Based on Surgi–Care's Lack of Knowledge of Any Misrepresentation.

I address this argument in the event that the Court should reject my recommendation in Section II.B. Surgi–Care argues that summary judgment should enter against Counts XI (fraudulent misrepresentation), XII (negligent misrepresentation) and XIII (violation of the Restatement (Second) of Torts § 402B) based on the assertion that it had no knowledge of a product design defect or any inadequacy in ArthroCare's marketing materials. [16] According to Surgi–Care, even if the marketing materials contained false or misleading statements, it was merely passing along ArthroCare's statements, without independent knowledge of their falsity, and without owing an independent

duty to assure against false statements by the manufacturer. (Docket No. 34 at 10.) The Herzogs respond only that agents who commit torts on behalf of their principals are equally liable for such torts. (Docket No. 63 at 12.) In my view, even if the Court rejects my recommendation in Section I.B. that the misrepresentation claims fail for lack of detrimental reliance, Surgi–Care would still be entitled to summary judgment against Counts XI and XII, but not against XIII.

**\*15** In order to prevail on a claim of fraud a plaintiff must show, *inter alia,* that the defendant either knew the statement at issue was false or that the defendant made the statement in reckless disregard of its truth or falsity. *McCarthy v. U.S.I. Corp.,* 687 A.2d 48, 53 (Me.1996). The Herzogs fail to articulate in their memorandum the factual basis for a finding that Surgi–Care knew ArthroCare's statements were false. [17] Thus, Surgi–Care would be entitled to summary judgment on Count XI even if the Herzogs could show detrimental reliance. *See, e.g., Emerson v. Ham,* 411 A.2d 687, 689–90 (Me.1980) (affirming directed verdict for real estate broker on fraud claim where the evidence could not support a finding that the broker knew the seller's statement was false). The elements of the negligent misrepresentation claim are similar, but less burdensome on the issue of "knowledge":

> One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary losses caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*Id.* In my view, the Herzogs' presentation would fail to meet even this standard of proof and, thus, I would recommend that summary judgment enter against Count XII even if the Herzogs could show detrimental reliance.

Count XIII, which relies on the Restatement (Second) of Torts, § 402B, does not require any showing that the defendant knew or should have known of the falsity of a statement. Pursuant to Section 402B:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though:

Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)

2003 WL 1785795

(a) it is not made fraudulently or negligently....

Thus, unlike the fraud and negligent misrepresentation claims, a "strict liability" product misrepresentation claim such as the one articulated in Section 402B of the Restatement would not require proof of either actual or constructive knowledge, though it would still require proof of reliance. [18] Section 402B would impose liability for even "innocent" misrepresentations. Thus, to the extent that Surgi–Care moves for summary judgment based solely on a lack of knowledge, it could not succeed against Count XIII. [19]

**F. Summary Judgment Should Enter Against Counts XV and XVI.**

Like ArthroCare, Surgi–Care argues that the UTPA is inapplicable because the Wand is not a consumer product. For the reasons stated in Section I.D, *supra*, I agree. In my view, summary judgment should enter against Count XV. Furthermore, the Herzogs concede that the claim under the Massachusetts consumer protection statute is not actionable. Therefore, summary judgment should enter against Count XVI.

**G. Summary Judgment Should Not Enter Against Count XVII.**

**\*16** Surgi–Care moves for summary judgment against Mary Herzog's loss of consortium claim in the event that summary judgment should enter against all of Dr. Herzog's claims. Because there remains a question regarding the existence of facts supporting the defective design claim, I recommend that summary judgment not enter at this time against Mary Herzog's derivative loss of consortium claim, Count XVII.

**H. Summary Judgment Should Enter Against "Count XVIII" Because There is Insufficient Evidence of Implied Malice on the Part of Surgi–Care.**

There is no evidence in this case that Surgi–Care harbored ill will toward Dr. Herzog. Instead, the Herzogs argue that Surgi–Care behaved outrageously because it had in its possession "critical and important information about the use and effectiveness of the ArthroWand that it chose to conceal." (Docket No. 63 at 17.)

The facts on which the Herzogs base their claim that Surgi–Care engaged in outrageous concealment involve an alleged oral exchange, of a very casual nature, between a Surgi–

Care representative and an orthopedic surgeon in late 1997 or early 1998. According to H. Gary Parker, M.D., he stopped using the ArthroCare Wand for articular cartilage procedures in 1997 after three of his patients experienced rapid osteoarthritis following the use of an ArthroCare Wand on their articular knee cartilage. (Docket No. 65, ¶¶ 4, 5.) Dr. Parker would testify that in late 1997 or early 1998, he mentioned his findings and decision not to use the Wand on knee cartilage to a Surgi–Care representative "several times." (*Id.,* ¶¶ 7, 8.) In addition to denying that any such conversations took place, Surgi–Care points out that even Dr. Parker describes his alleged oral reports as "casual" and "offhand." (Docket No. 72, ¶ 7.) Perhaps most telling is the following deposition exchange:

Q. When you had the conversations with Mark Brountas, were they formal conversations or casual? How would you describe it?

A. They were casual.

Q. You never gave any sort of formal report or written complaint of anything?

A. No. I just said in my hand it doesn't seem to be working.

Q. Did you ever give him the names of patients?

A. No.

Q. Did you give him any–specifically link it not being good in your hands to patient care saying I have three patients or anything as specific as that?

A. No.

(Dr. Parker Deposition at 41–42.) According to the Herzogs, Surgi–Care was duty bound to report this exchange with Dr. Parker to all of its sales representatives, to ArthroCare and to all potential purchasers of the Wand. Even assuming that Surgi–Care was negligent in failing to do so, given the casual and indefinite nature of Dr. Parker's oral comments, no reasonable jury could conclude from this evidence that Surgi–Care's decision not to amounted to "outrageous concealment." I recommend that summary judgment enter against the punitive damages plea recited as "Count XVIII."

**III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*17 I address the Herzogs' Motion for Partial Summary Judgment, in the event that the Court should reject my recommendation to grant the Defendants' summary judgment motions. The Herzogs move for limited summary judgment against ArthroCare's and Surgi–Care's assertions of the affirmative defenses of assumption of the risk and comparative negligence. (Docket No. 39 at 1.) There is no reason to belabor the discussion of this motion. "The theory that a plaintiff's negligence claim could be barred because he or she voluntarily assumed the risk was abolished in Maine with the adoption of comparative negligence principles." *Harvey v. Mid–Coast Hosp.,* 36 F.Supp.2d 32, 34 (D.Me.1999). *See also Merrill v. Sugarloaf Mt. Corp.,* 2000 ME 16, ¶ 9, 745 A.2d 378, 383 & n. 3. Whatever arguments the Defendants wish to pursue under the heading "assumption of the risk" may now be pursued under the heading of "comparative negligence." But in no case will a simple finding that Dr. Herzog "assumed the risk" automatically bar his claim. Any evidence that Dr. Herzog "voluntarily and unreasonably proceed[ed] to encounter a danger known to him" must be compared to the Defendants' fault under 14 M.R.S.A. § 221, if any, or under the other tort theories of liability. *Austin v. Raybestos–Manhattan, Inc.,* 471 A.2d 280, 287–88 (Me.1984). However, the Section 221 product liability claim is special in the following regard: the *only* comparative fault argument that can be offered against this claim is that Dr. Herzog "voluntarily and unreasonably proceed[ed] to encounter a danger known to him." *Id.* The factual statements offered in connection with this Motion reveal that Dr. Herzog did not know that Dr. Brown would use the Wand on his knee, but that Dr. Herzog knew the Wand was present in the office and that some people in the office used it for unspecified procedures. (Docket No. 50, ¶ 4; Docket No. 53, ¶¶ 3, 4.) Dr. Herzog did not himself use the Wand for the sculpting procedure that Dr. Brown performed on him, but Dr. Herzog had previously used the Wand on a knee where "a piece of tissue would be hanging down separated from the joint surface by, let's say, half an inch." (*Id.;* Herzog Depo. at 30.) Dr. Herzog also testified at his deposition that, before the date of the June 1999 procedure, he considered it inadvisable to use the Wand on articular cartilage located on a weight bearing surface because of the risk of thermal injury. (Docket No. 50, ¶ 16.) Viewing this testimony in the light most favorable to the Defendants, a jury might conclude that Dr. Herzog should have known that Dr. Brown might use the Wand on his articular knee cartilage and that, therefore, he unreasonably proceeded to encounter a danger that was known to him. I therefore recommend that the Court deny Plaintiffs' Motion for Partial Summary Judgment.

Conclusion

For the reasons stated herein, I RECOMMEND that the Court GRANT Defendants' summary judgment motions in their entirety EXCEPT against those portions of Counts I, II, IX and X that assert claims premised on defective design AND EXCEPT against Counts VI and XIV, which assert claims for breach of the implied warranty of merchantability. I further RECOMMEND that the Court DENY Plaintiffs' partial summary judgment motion.

NOTICE

*18 A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection. Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1785795

Footnotes

1    Because this is a recommended decision, I cite to the parties' filings to assist the Court with its review. Because the parties are unlikely to be familiar with the docket numbers assigned to their filings, I provide the following citation key for their convenience.

| | |
|---|---|
| Docket No. 34– | "Defendant Surgi–Care, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law"; |
| Docket No. 35– | "Defendant Surgi–Care, Inc.'s Statement of Material Facts"; |

E023   13

| Docket No. 43– | "Defendant ArthroCare's Amended Motion for Summary Judgment and Supporting Memorandum of Law"; |
| Docket No. 44– | "Defendant ArthroCare's Amended Statement of Undisputed Material Facts"; |
| Docket No. 63– | "Plaintiffs' Opposition to Defendant Surgi–Care, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law"; |
| Docket No. 64– | "Plaintiffs John Herzog and Mary Herzog's Opposition to Defendant Surgi–Care, Inc.'s Statement of Material Facts"; |
| Docket No. 65– | "Plaintiffs John Herzog and Mary Herzog's Supplemental Statement of Material Facts"; |
| Docket No. 68– | "Plaintiffs' Opposition to Defendant ArthroCare's Amended Motion for Summary Judgment"; |
| Docket No. 69– | "Plaintiffs' Opposition to Defendant ArthroCare's Amended Statement of Undisputed Material Facts"; |
| Docket No. 70– | "Plaintiffs' Statement of Additional Undisputed Material Facts, Submitted in Opposition to Defendant ArthroCare's Motion for Summary Judgment"; |
| Docket No. 72– | "Defendant Surgi–Care, Inc.'s Reply Statement of Material Facts"; |
| Docket No. 81– | "Sealed Defendant ArthroCare Corporation's Response to Plaintiffs' Statement of Additional Undisputed Material Facts"; |
| Docket No. 84– | "Defendant ArthroCare Corporation's Reply Memorandum in Support of Its Motion for Summary Judgment." |

2    The parties do not endeavor to explain in their statements of material fact exactly what the Wand is or how it works. The following description is provided from non-record sources. It is provided solely for the Court's general information and to provide context. Simply put, an ArthroCare ArthroWand is a medical device used for, among other things, removing tissue. ArthroCare's website describes its Wands as:

the most comprehensive range of radiofrequency (RF) surgical tools for tissue removal, dissection and coagulation. Combining innovative electrode design and patented Coblation® technology, ArthroWands provide surgeons with precise and versatile tools able to remove tissue layers as fine as 120 microns, with only minimal damage to surrounding tissue.

The "patented Coblation technology" is billed as a unique technology that enables the Wand to cut away targeted tissue without generating high temperatures that could cause thermal injury to collateral tissue. According to ArthroCare:

The Coblation process ... is a controlled, non-heat driven process. With Coblation technology, radiofrequency energy [ (RFE) ] is applied to a conductive medium (usually saline), causing a highly focused plasma field to form around the energized electrodes. The plasma field is comprised of highly ionized particles. These ionized particles have sufficient energy to break organic molecular bonds within tissue. The by-products of this non-heat driven process are elementary molecules and low molecular weight inert gases. Instead of exploding tissue, Coblation causes a low temperature molecular disintegration. The result is volumetric removal of target tissue with minimal damage to surrounding tissue.

3    In their Statement of Additional Undisputed Material Facts, Submitted in Opposition to Defendant ArthroCare's Motion for Summary Judgment, the Herzogs assert that it was during the December 29, 1998 surgery that Dr. Brown used the Wand on Dr. Herzog's knee in a way that caused injury. (Docket No. 70, ¶ 4.) But they also assert that it was during the June 3, 1999 surgery that Dr. Brown "shaved," debrided or otherwise sculpted Dr. Herzog's articular knee cartilage with the Wand. (Docket No. 69, ¶¶ 25–30.) Evidently, the Wand was applied to the surface of his knee on both dates, but the prior occasion did not result in disabling pain and the manner in which it was used on that date is not made clear in the summary judgment record.

4    According to ArthroCare, Dr. Herzog resumed athletic activity following this surgery, although its citation to the record is not supportive. (Docket No. 44, ¶ 22.) For his part, Dr. Herzog admits "only that [he] engaged in unicycling in 1999." (Docket No. 69, ¶ 22.) In another statement of fact, Dr. Herzog states that he "was forced to abandon all his previous activities" following "Dr. Brown's surgery." (Docket No. 70, ¶ 21.) It appears that this reference to "Dr. Brown's surgery" is to the later, June 1999 procedure during which the Wand was employed to "sculpt" the articular cartilage of Dr. Herzog's knee. It also appears that some of the confusion in the record stems from a mistaken supposition during Dr. Herzog's deposition that the Wand was used in this fashion during the 1998 procedure rather than the 1999 procedure.

5    See paragraphs 31–40 of Docket Numbers 44 and 69; paragraphs 7–15 of Docket Numbers 70 and 81; and paragraphs 13–37 of Docket Numbers 35 and 64.

6    The Wand is utilized by clinicians for various procedures, including cauterization, which requires a higher setting.

**7**   Dr. Herzog's statement points to the December 1998 surgery, but it seems from the record that he is, once again, confusing the December 1998 and the June 1999 procedures.

**8**   According to Dr. Minas, Dr. Herzog's pain symptoms were located on the "medial side" of his right knee. (Docket No. 70, ¶ 26 (citing Minas Depo. at 79–80).)

**9**   ArthroCare does not challenge Dr. Minas's testimony with a *Daubert* motion. Instead, it contends that Dr. Minas did not actually offer an opinion on the issue of causation. My assessment is that Dr. Minas's deposition testimony does indicate that he considers the Wand to have caused thermal damage to Dr. Herzog's articular cartilage and that such damage significantly increased Dr. Herzog's pain and discomfort.

**10**   The Herzogs do introduce one solitary fact relating to a design defect in opposition to Surgi–Care's Motion for Summary Judgment, but they never allude to it in the body of their memoranda: "According to Dr. Mayor, there is no benefit to using the ArthroCare Wand in debridement of articular cartilage surfaces." (Docket No. 65, ¶ 18.) How this singular fact might generate a trial-worthy issue of whether a design defect proximately caused Dr. Herzog's injury is not discussed. Nor do the Herzogs actually introduce this fact in the context of *ArthroCare' s* independent Motion.

**11**   In the event that the Court should reject my proximate cause recommendation, I address ArthroCare's "specific causation" argument here, albeit in a cursory fashion. In my view, the testimony of Dr. Herzog's experts, if admitted, would generate a genuine issue whether Dr. Brown caused a burn injury with the Wand. Dr. Minas's observation of darkened tissue consistent with a radio frequency would be supportive of this finding as would the opinion of the pathologist, Dr. Rosenberg, that a post-operative slide of this tissue reflected cellular necrosis from a burn injury. In addition to these two experts, Dr. Mark Markel, D.V.M., opines that the carmelization and bubbling on the surface of Dr. Herzog's medial femoral condyle, which is apparently depicted on the videotape of the June 1999 procedure, are indicative of a surface temperature in excess of 100° Celsius, which would result in extensive chondrocyte (cell) death, "often progressing to the subchondral bone." (Docket No. 70, ¶¶ 39–41.) Dr. Markel testified during his deposition that thermal damage to nerve endings beneath the cartilage, on the surface of the bone would cause significant pain. (Docket No. 44, ¶ 47; Docket No. 70, ¶ 43.) This evidentiary presentation relies upon more than just temporal coincidence to establish proximate causation. Although I agree with ArthroCare that the evidence Dr. Herzog has presented at the summary judgment stage is insufficient to support the allegation that the Wand caused total cartilage loss so that the bones of his knee joint were coming into direct contact, or that, but for the Wand, he would not have required a total knee replacement, a jury could conclude from these several evidentiary sources, based on more than mere conjecture or speculation, that the thermal properties of the Wand caused disabling post-operative subchondral pain in Dr. Herzog's medial femoral condyle. Still, such evidence would not establish that a failure to warn proximately caused a burn injury. I note that the expert opinions of Drs. Markel and Rosenberg, but not Dr. Minas, are challenged in ArthroCare's *Daubert* filings. I by no means intend to suggest the likely outcome of those motions in this footnote.

**12**   When discussing his own usage of the Wand, Dr. Herzog basically testified at his deposition that he did not consider it safe to use the Wand to debride articular cartilage surfaces.

Q. Have you ever or did you ever perform arthroscopic surgery using an ArthroCare Wand?

A. Yes.

Q. And did you ever use an ArthroCare Wand on articular cartilage surfaces?

A. I don't recall any exact case, but if a piece of tissue would be hanging down separated from the joint surface by, let's say, half an inch, you could touch that safely and remove it, but it was not a practice to do any arthritic debridement type things, but I did numerous lateral releases and soft tissue resections and even attempted to do menisectomies with it.

Q. With an ArthroCare Wand?

A. Yes.

Q. When you said it is not a practice to do debridement, ... not whose practice?

A. It wouldn't be my preference to burn the tissue on the end of a bone.

Q. Did you ever talk to Dr. Brown prior to his surgery on your knee about what device he was going to use to do debridement?

A. No.

(Herzog Depo. at 30–31.) *See also* Docket No. 50, ¶ 16 concerning Dr. Herzog's "gut instinct" about the Wand.

**13**   The first argument the Herzogs make is that the Court should ignore this challenge based on ArthroCare's failure to produce evidence supporting the challenge. (Docket No. 68 at 14.) This turns the summary judgment process on its head. It is the Herzogs who must demonstrate that facts exist to support their claims. *Celotex*, 477 U.S. at 323.

**14**   Comment j of the Restatement (Second) Torts § 402B states that "reliance need not necessarily be that of the consumer who is injured [but] may be that of the ultimate purchaser of the chattel, who because of such reliance passes it on to

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 26 of 80
PageID: 9976
**Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)**
2003 WL 1785795

the consumer who is in fact injured, but is ignorant of the misrepresentation." In my view, this caveat is addressed to situations in which the plaintiff was the actual "user" of the product, but not the one to whom a product misrepresentation was made. *See id.,* cmt. i (" 'Consumer' is to be understood in the broad sense of one who makes use of the chattel in the manner which a purchaser may be expected to use it. Thus an employee of the ultimate purchaser to whom the chattel is turned over, and who is directed to make use of it in his work, is a consumer, and so is the wife of the purchaser of an automobile who is permitted by him to drive it.").

15    Surgi–Care's policy argument also overlooks the economic impetus behind strict product liability regimes. *See St. Germain v. Husqvarna Corp.,* 544 A.2d 1283, 1287 n. 3 (Me.1988) ("Among the policy reasons that led the American Law Institute to adopt section 402A [was] ... that the cost of damaging events due to defectively dangerous products can best be borne by the manufacturers and sellers of those products....").

16    The claims premised on the Maine and Massachusetts consumer protection statutes are also targeted in this portion of Surgi–Care's Motion. However, rather than attempting to articulate exactly how a lack of knowledge might relate to the specific elements of these claims, which Surgi–Care does not even endeavor to do, I address them in Section II.F.

17    In another portion of their opposition memorandum, the Herzogs discuss statements allegedly made by Dr. Parker to a Surgi–Care representative. These statements, which are discussed in Section II.H., below, are simply too vague and indefinite to support the requisite finding that Surgi–Care knew or acted in reckless disregard of whether ArthroCare's product representations were false.

18    The Law Court has yet to recognize such a tort, though it typically recognizes tort principles set forth in the Restatements. It also appears that this Court has yet to consider the viability of a "strict liability misrepresentation claim."

19    Surgi–Care argues that comment j of Section 402B draws an exception applicable to this case. Pursuant to comment j:

*j. Justifiable reliance.* The rule here stated applies only where there is justifiable reliance upon the misrepresentation of the seller, and physical harm results because of such reliance, and because of the fact which is misrepresented. *It does not apply where the misrepresentation is not known, or there is indifference to it,* and it does not influence the purchase or subsequent conduct.

Surgi–Care takes comment j out of context. It clearly relates to situations in which the *plaintiff* either had no knowledge of the misrepresentation or was indifferent to it and, therefore, could not have relied. The comment is not addressed to situations in which the seller did not know of the misrepresentation. Surgi–Care's argument that its lack of knowledge would preclude liability on this claim is false.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    E026    16

# TAB 4

1999 WL 33548541
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Northeastern Division.

Voyce Ann LANSDELL, Pelmer
L., Lansdell, Sr., Plaintiffs,
v.
AMERICAN HOME PRODUCTS
CORPORATION, Wyeth–Ayerst Laboratories
Company, Barnett Drug Store, Defendants.

No. Civ.A. CV99S2110NE.
|
Oct. 26, 1999.

MEMORANDUM OPINION

SMITH, J.

**\*1** This action is before the court on the motion to dismiss filed by Alten Drugs, Inc., an entity doing business as (and described in plaintiffs' complaint as) "Barnett Drug Store" (hereinafter "Barnett Drugs") (Doc. No. 2), and plaintiffs' motion to remand (Doc. No. 8). Upon consideration of the motions, pleadings, briefs, and oral arguments of counsel, the court finds that Barnett Drugs' motion is due to be granted and plaintiffs' motion denied.

This action was removed from the Circuit Court of Lauderdale County, Alabama on August 12, 1999, by two of the three defendants named in plaintiffs' complaint, American Home Products Corporation ("American Home") and Wyeth–Ayerst Laboratories Company ("Wyeth Labs"). Defendant Barnett Drugs did not join in the removal; even so, both removing defendants contend, as Barnett Drugs asserts in its motion to dismiss, that it was unnecessary for Barnett Drugs to join in the removal, because that defendant was fraudulently joined in this action to defeat diversity jurisdiction.

The crux of both motions before the court is the same: specifically, each requires this court to decide whether a pharmacy may be held liable under Alabama law for correctly dispensing a lawful prescription drug in accordance with a valid prescription written by a licensed physician. The court

finds that it cannot, as such claims are barred by the so-called "learned intermediary doctrine." [1]

I. STANDARDS OF REVIEW

A court may dismiss a complaint for failure to state a claim only if it is clear that no relief can be accorded plaintiffs under any set of facts that could be proven consistent with the allegations in the complaint. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir.1986) ("[W]e may not ... [dismiss] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims in the complaint that would entitle him or her to relief."). The threshold requirements for a complaint to survive a Rule 12(b)(6) motion to dismiss thus are "exceedingly low." *Williams v. City of Montgomery,* 21 F.Supp.2d 1360, 1363 (M.D.Ala.1998).

In this case, however, Barnett Drugs has submitted the affidavit of David Frye, a registered pharmacist and manager of its store in Rogersville, Alabama. If matters outside the pleadings are presented to and considered by the court when ruling upon a Rule 12(b)(6) motion, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Fed.R.Civ.P. 12(b); see also, e.g., Arnold v. United States Postal Service,* 649 F.Supp. 676, 678 (D.D.C.1986) (Richey, J.). The rationale behind such a principle is that the conversion of a motion to dismiss to a motion for summary judgment makes the court's inquiry fact specific. Therefore, the nonmovant may be accorded an opportunity to demonstrate the existence of genuine issues of material facts, if there be any. *But see Denis v. Liberty Mutual Insurance Co.,* 791 F.2d 846, 850 (11th Cir.1986) (recognizing an exception to the requirement that the court afford plaintiff notice of its intent to convert and an opportunity to supplement the record); *Property Management & Investments, Inc. v. Lewis,* 752 F.2d 599, 605 (11th Cir.1985) (same).

**\*2** The instant case presents an anomalous, if not unusual circumstance, however. Plaintiffs unequivocally adopted the affidavit of David Frye in support of their motion to remand. (*See* Doc. No. 9 (plaintiffs' "notice of filing affidavit of David Frye") reading: "Comes now the plaintiffs, who give notice of the filing of the Affidavit of David Frye as Exhibit 'B' to their

1999 WL 33548541

brief in support of [their motion to] remand.") In so adopting the affidavit, plaintiffs have placed uncontested facts before this court, thereby allowing the court to rule upon Barnett Drugs' motion as a matter of law, rather than a matter of fact.

*Cf. Property Management,* 752 F.2d at 605–607. [2]

Moreover, because this case also involves simultaneous consideration of plaintiffs' motion to remand, the court must consider pertinent subject matter jurisdiction principles. Fundamentally, the United States' district courts are forums of limited jurisdiction. *E.g., Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Burns v. Windsor Insurance Co.,* 31 F.3d 1092 (11th Cir.1994). As such, they posses the power to hear only those cases authorized by the Constitution or Congress. "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen,* 511 U.S. at 377, 114 S.Ct. at 1675 (citation omitted); *see also Burns,* 31 F.3d at 1095 ("[I]n deciding a motion to remand where the plaintiff and defendant disagree on issues of jurisdiction, questions or doubts are to be resolved in favor of returning the matter to state court.").

A federal district court possesses original jurisdiction over all cases between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a). Although the statute does not specify complete diversity of citizenship, it has long been the rule that diversity jurisdiction requires all plaintiffs to be diverse from all defendants. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

The Supreme Court also has recognized, however, that a defendant's "right to removal cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy." *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 37, 66 L.Ed. 144 (1921); *see also Coker v. Amoco Oil Co.,* 709 F.2d 1433 (11th Cir.1983).

In the Eleventh Circuit, joinder may be deemed "fraudulent" in three circumstances.

> The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant.... The second is

> when there is outright fraud in the plaintiff's pleading of jurisdictional facts.... [A third situation arises] where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability[,] and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant.

**\*3** *Triggs v. John Crump Toyota, Inc.,* 154 F.3d 1284, 1287 (11th Cir.1998) (citations omitted).

Where a party alleges fraudulent joinder, that party bears the burden of proving its allegations by clear and convincing evidence. *See Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (citing *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989)); *Coker,* 709 F.2d at 1440; *Yawn v. Southern Railway Co.,* 591 F.2d 312, 316 (5th Cir.), *cert. denied,* 442 U .S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 304 (1979). [3] Although the court properly looks to the complaint itself to determine whether there has been a fraudulent joinder, the court also may resort to submissions outside the pleadings, such as deposition testimony and affidavits, when making its determination. *See Cabalceta,* 883 F.2d at 1561; *Coker,* 709 F.2d at 1440. All allegations and submissions must be viewed in the light most favorable to plaintiffs, who chose the state forum and oppose removal. *Id.* Thus, if there is even a possibility that a state court would find that plaintiffs' complaint states a valid claim against a resident defendant, the federal court must find that the joinder was proper and remand the case to the state court. *Id.* at 1440–1441.

## II. FACTUAL BACKGROUND

The following facts are gleaned from the pleadings and affidavit submitted to the court. Plaintiffs, Voyce Ann Lansdell ("Mrs.Lansdell") and her husband, Pelmer L. Lansdell, Sr. ("Mr.Lansdell"), filed a complaint against defendants American Home, Wyeth Labs, and Barnett Drugs in the Circuit Court of Lauderdale County, Alabama on July 14, 1999. They allege that Mrs. Lansdell suffered injuries as a result of ingesting dexflenfluramine hydrochloride, a drug that is better known by its brand-name, "Redux."

Although plaintiffs' complaint is no model of clarity, the court has ascertained that Barnett Drugs is directly named in only three of its seven counts: i.e., Count III, alleging that Barnett Drugs "negligently or wantonly developed, manufactured, marketed, and/or sold" Redux in violation of the Alabama Extended Manufacturers Liability Doctrine ("AEMLD"); Count IV, alleging that Barnett Drugs "negligently or wantonly failed to warn ... of the dangers" of using Redux; and Count V, alleging that Barnett Drugs breached express and/or implied warranties that Redux was "reasonably fit and suitable for the purpose for which it was intended to be used." (Plaintiffs' complaint at 7–9.) [4]

As previously observed, both Barnett Drugs, in support of its motion to dismiss, and plaintiffs, in support of their motion to remand, have submitted the affidavit of David Frye, a registered pharmacist and manager of the Barnett Drugs store which dispensed the contested medication to Mrs. Lansdell. Mr. Frye avers as follows:

> On October 8, 1996, plaintiff Voyce Ann Lansdell brought a prescription to Barnett Drugs from Dr. Lyman Mitchell, Jr. at Florence Clinic, L.L.C., Florence, Alabama, to be filled. The prescription was for 60 Redux 15 mg. capsules.... The prescription authorized five refills.... The prescription was filled exactly as prescribed by Dr. Mitchell. Ms. Lansdell returned to Barnett Drugs on five subsequent occasions for a refill of this prescription. On each of these occasions, the prescription was filled strictly in accordance with the instructions of Ms. Lansdell's prescribing physician.

> *4 On April 5, 1997, Ms. Lansdell brought a second prescription for Redux from Dr. Mitchell to Barnett Drugs to be filled.... The prescription was, like the first prescription, for 60 Redux 15 mg. capsules. The prescription was filled on that occasion exactly as prescribed by Dr. Mitchell. This prescription also called for five refills. Ms. Lansdell returned to Barnett drugs on three occasions for a refill. On each of these occasions, the prescription was filled strictly in accordance with the instructions of Ms. Lansdell's prescribing physician.

> The Redux medication prescribed by Ms. Lansdell's physician was not compounded in any way and there was nothing added to or taken from the medication as it was received from its manufacturer prior to the time it was dispensed to Ms. Lansdell as prescribed by her physician. The prescription was not changed in any way from the manner in which it was written by Ms. Lansdell's physician

> and the Redux medication given to Ms. Lansdell at the time her prescriptions were filled was not in any way different from the Redux medication prescribed by Ms. Lansdell's physician.

> Barnett Drugs did not manufacture the medication. Barnett Drugs is a pharmacy only. Barnett Drugs did not develop or test the medication. Barnett Drugs is in the business of distributing finished products and had no knowledge of any alleged defective condition with respect to the Redux medication and did not contribute to any defective condition. Barnett Drugs has no knowledge of this defective condition superior to that of Ms. Lansdell's prescribing physician or the ultimate user of the medication. Barnett Drugs made no express or implied warranties to Ms. Lansdell with regard to the Redux medication.

(David Frye's Affidavit at 1–3.)

## III. DISCUSSION

A. Diversity of Citizenship
The removing defendants candidly admit that Barnett Drugs is an Alabama citizen and, thus, complete diversity is not present on the face of plaintiffs' complaint. They argue, however, that this court should disregard Barnett Drugs' citizenship, because it was fraudulently joined to prevent removal. Among other things, they contend (as does Barnett Drugs in its motion to dismiss) that all of plaintiffs' claims are barred by the learned intermediary doctrine. [5]

Barnett Drugs contends that it "did nothing ... other than to dispense a prescription drug ... in accordance with the instructions of the plaintiff's prescribing physician, and, as a consequence[,] can have no liability in this case as a matter of law." (Barnett Drugs' motion to dismiss ¶ 2.)

In response, plaintiffs assert that the learned intermediary doctrine is "a new and undocumented subject in Alabama" (plaintiffs' brief in opposition to Barnett Drugs' motion to dismiss, at 10) that does not bar their claims against Barnett Drugs. (*Id.,* at 7–10.)

The seminal Alabama case discussing the doctrine is *Stone v. Smith, Kline & French Laboratories,* 447 So.2d 1301 (Ala.1984),* in which the Alabama Supreme Court adopted the reasoning of the former Fifth Circuit in *Reyes v. Wyeth*

Lansdell v. American Home Products Corp., Not Reported in F.Supp.2d (1999)

1999 WL 33548541

*Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974). The *Stone* court explained the doctrine, as follows:

> **\*5**  We cannot quarrel with the general proposition that where prescription drugs are concerned, the *manufacturer's* duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This *special standard for prescription drugs* is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. [citation omitted.] Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. *His* is the task of weighing the benefits of any medication against its potential dangers. The choice *he* makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. *Pharmaceutical companies then,* who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, *in selling prescription drugs are required to warn only the prescribing physician,* who acts as a 'learned intermediary' between manufacturer and consumer.

*Stone,* 447 So.2d at 1304–1305 (emphasis supplied) (citing *Reyes v. Wyeth Laboratories,* 498 F.2d at 1276).

Although the learned intermediary doctrine as thus defined operates only to bar certain claims against pharmaceutical companies manufacturing prescription medications, it has been expanded by some courts to bar similar claims brought against pharmacists. *See e.g., McKee v. American*

*Home Products Corp.,* 782 P.2d 1045 (Wash.1989); *Nichols v. Central Merchandise, Inc.,* 817 P.2d 1131 (Kan.Ct.App.1991); *Jones v. Irvin,* 602 F.Supp. 399 (S.D.Ill.1985).  The Washington Supreme Court explained why the doctrine applied equally well in pharmacy cases:

> The relationship between the physician-patient-manufacturer applies equally to the relationship between the physician-patient and pharmacist. In both circumstances, the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncrasies of the patient.
>
> ...
>
> Neither manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician-patient relationship.

*McKee,* 782 P.2d at 1050–1051. Moreover, to hold otherwise, would "require the pharmacist to question the physician's judgment regarding the appropriateness of each customer's prescription." *Id.* at 715. Such a policy, inevitably, would wedge the pharmacist into the relationship between a physician and her or his patient and, thereby, interfere with ongoing treatment:

> A physician may often have valid reasons for deviating from the drug manufacturer's recommendations based on a patient's unique condition. The duty which [plaintiff] urges would result in the pharmacist second guessing numerous prescriptions to avoid liability. This would not only place an undue burden on pharmacists, but would likely create antagonistic relations between pharmacists and physicians.

**\*6**  *Id.* at 1053; *see also Nichols,* 817 P.2d at 1133 (reasoning that "imposing a duty on the pharmacist would intrude on the doctor-patient relationship and would force the pharmacist to practice medicine without a license"). Thus, the Washington Supreme Court concluded that the learned intermediary doctrine barred claims against a pharmacy in the following circumstances:

> [O]ur holding is narrow. The pharmacist still has a duty to accurately fill a prescription, [citation omitted] and to be alert for clear errors or mistakes in the prescription. The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug, either orally or by way of the manufacturer's package insert.

*McKee,* 782 P.2d at 1055.

The Alabama Supreme Court has, by implication, evidenced an intent to expand the doctrine beyond a pharmaceutical company to a pharmacist. *See Stafford v. Nipp,* 502 So.2d 702 (Ala.1987). In *Stafford,* the consumer of a prescription drug sued both her physician and the pharmacist who filled her doctor's prescription. 502 So.2d at 703. Although the Alabama Supreme Court reversed the trial court's order granting summary judgment in favor of the pharmacist on the basis of the learned intermediary doctrine, it did so on the basis of the existence of genuine issues of material fact. *Id.* Specifically, the doctor testified that he only issued plaintiff a six-month prescription, without any refills, but the pharmacist continued to refill the prescription for approximately nine years, and denied that he would have done so in the absence of a current prescription from plaintiff's physician. *Id.* The Alabama Supreme Court concluded from such disputed facts that, because the pharmacist possibly dispensed the prescription without authority from a physician, plaintiff could maintain a claim against the pharmacist. *Id.* at 705. "The manufacture's warnings accompanying the drug at the time of its purchase and sale by the pharmacy do not, as a matter of law, shield the pharmacist from liability based on breach of warranty where the pharmacist continues to fill the prescription *without authorization from a doctor." Id.* (emphasis added).

In the present case, however, plaintiffs have not alleged that Barnett Drugs dispensed Mrs. Lansdell's medication without authorization from, or in a manner inconsistent with, her doctor's prescription. Nor have plaintiffs alleged that Barnett Drugs negligently substituted another drug for the prescribed drug, or dispensed the drug in an excessive dose. Indeed, nowhere in plaintiffs' complaint is it alleged that Barnett Drugs failed to fill Ms. Lansdell's prescription in strict accordance with the doctor's directions. In each of these hypotheticals, plaintiffs could potentially have a claim under the court's holding in *Stafford,* based on the theory that Barnett Drugs committed negligence independent of the pharmaceutical manufacturer or prescribing physician. Even so, plaintiffs have alleged merely that Barnett Drugs can be held responsible "under Alabama law for its role in getting the defective product, Redux, in the hands of its customers like the Lansdell–Plaintiffs." (Plaintiff's motion to remand at 7.) Thus, the precise issue submitted to this court by the allegations of plaintiffs' complaint and the affidavit of David Frye is whether a pharmacy, which correctly fills a prescription in strict accordance with the prescribing physician's directions, can be liable in tort for failing to warn the patient of the possible side effects of the medication and/or for dispensing the drug and, thereby, placing it into the stream of commerce.

**\*7** The court finds that under the present facts, where the pharmacy's liability is merely derivative, i.e., it was acting in strict accordance with a licensed physician's valid prescription, the pharmacy *is* protected under Alabama law by the learned intermediary doctrine. *See Harrell v. Wyeth–Ayerst Laboratories, Inc.,* Civil Action No. 98–1194–BH–M (S.D.Ala. February 1, 1999) (Hand, J.) (dismissing claims against pharmacist on the grounds that the learned intermediary doctrine bars "an action against a pharmacist for correctly filling a prescription signed by a medical doctor"); *see also Julie Orr v. Wyeth–Ayerst Laboratories Company,* Case No. CV–98–3000–DIET (Circuit Court of Mobile County, Alabama, August 2, 1999) (Johnston, J.) (dismissing pharmacy defendants in over 150 consolidated diet drug cases on the grounds that such claims were barred by the learned intermediary doctrine).

The court also notes that this conclusion is consistent with the majority of other jurisdictions that have considered this issue and, likewise, have held that the learned intermediary doctrine bars similar actions against pharmacies. *See e.g., Raynor v. Richardson–Merrell,* Inc., 643 F.Supp. 238 (D.D.C.1986); *Ramirez v. Richardson–Merrell,* Inc., 628 F.Supp. 85 (E.D.Pa.1986). *See also Murphy v. E.R. Squibb & Sons,* Inc., 710 P.2d 247 (Cal.1985); *Walker v. Jack Edward Corp.,* 434 S.E.2d 63 (Ga.Ct.App.1993); *Pysz v. Henry's Drug Store,* 457 So.2d 561 (Fla.Dist.Ct.App.1984); *Leesley v. West,* 518 N.E.2d 758 (Ill.App.Ct.1988); *Ingram v. Hook's*

1999 WL 33548541

*Drugs, Inc.,* 476 N.E.2d 881 (Ind.Ct.App.1985); *Guillory v. Dr. X,* 679 So.2d 1004 (La.Ct.App.1996); *Stebbins v. Concord Wrigley Drugs, Inc.,* 416 N.W.2d 381 (Mich.Ct.App.1987); *Kampe v. Howard Stark Professional Pharmacy,* Inc., 841 S.W.2d 223 (Mo.App.1992); *Batiste v. American Home Products Corp.,* 231 S.E.2d 269 (N.C.Ct.App.1977); *Ullman v. Grant,* 450 N.Y.S.2d 955 (N.Y.App.Div.1982); *Coyle v. Richardson–Merrell, Inc.,* 584 A.2d 1383 (Pa.1991).

Because this court finds that plaintiffs' claims against Barnett Drugs are barred by the learned intermediary doctrine and, thus, are due to be dismissed, the court disregards the citizenship of the fraudulently joined defendant for purposes of 28 U.S.C. § 1332. All remaining defendants are completely diverse from plaintiffs and, accordingly, the court finds that defendants have satisfied their burdens with regard to diversity of citizenship.

B. Procedural Deficiencies in the Removal Petition
Additionally, to the extent that plaintiffs argue this case is due to be remanded on the basis of a procedural deficiency, namely, that Barnett Drugs did not join in the removal petition, the court disagrees, and finds that Barnett Drugs was not required to join in removal because it is a fraudulently joined defendant. *See Woods v. Firestone Tire & Rubber Co.,* 560 F.Supp. 588, 590 (S.D.Fla.1983) (finding that "nominal or formal parties, unknown defendants and defendants fraudulently joined may be disregarded in determining the removing defendants' compliance with Section 1446(a)") (citing *Tri–Cities Newspapers, Inc. v. Tri–Cities Pressman & Assistants Local 349,* 427 F.2d 325, 326–27 (5th Cir.1970) (holding that "nominal or formal parties, being neither necessary nor indispensable, are not required to join in the petition for removal")).

C. Amount in Controversy
 **\*8** Finally, and *sua sponte,* the court notes that plaintiffs failed to allege a specific amount of damages in their prayer for relief. The removing defendants contend that the amount in controversy requirement is satisfied because "[t]he amount in controversy *clearly exceeds* $75,000, exclusive of interest and costs." (Notice of removal at 5 (emphasis added).)

The burden of proving the requisite amount in controversy rests with the removing defendants. *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353, 1356 (11th Cir.1996); *Bolling v. Union National Life Insurance Co.,* 900 F.Supp. 400, 403 (M.D.Ala.1995).

Where a plaintiff has specifically claimed *less than* the jurisdictional amount in her state court complaint, the removing defendant must show to a "legal certainty" that the plaintiff would not recover less than $75,000, if she prevailed. *Burns v. Windsor Insurance Co.,* 31 F.3d 1092, 1095 (11th Cir.1994).

> The rationale is that although a defendant has a right to remove in certain cases, a plaintiff is still master of her own claim.... Noting an attorney's twin duties to investigate his client's case and be candid with the court, we reasoned that a pleading containing a specific demand of damages and signed by a lawyer was due deference and a presumption of truth.... We concluded the defendant's burden was a "heavy one" and the legal certainty standard was therefore appropriate.... Any lesser burden would impermissibly expand federal diversity jurisdiction....

*Tapscott,* 77 F.3d at 1356 (citing *Burns,* 31 F.3d at 1095–97).

The rule is different in cases such as this one, however, where the plaintiff does *not* claim a specific amount of damages in her state court complaint.

> Where a plaintiff has made an *unspecified demand* for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Nevertheless, a defendant's ability to remove a state case to federal court is not unfettered. The proper balance between a plaintiff's right to choose his forum and a defendant's right to remove, without unnecessarily expanding federal diversity jurisdiction, is struck by a preponderance of the evidence standard. As the *Gafford* Court stated:

> It does not place upon the defendant the daunting burden of proving, to a legal certainty, that the plaintiff's damages are not less than the amount-in-controversy requirement. Such a burden might well require the defendant to research, state and prove the plaintiff's

claim for damages. On the other end of the spectrum, requiring the defendant to prove that the amount in controversy "may" meet the federal requirement would effectively force the plaintiff seeking remand to prove in rebuttal that only a relatively small amount of damages is legally possible.

*Gafford,* 997 F.2d at 159 (footnote omitted). Thus, we hold where a plaintiff has made an unspecified demand for damages in state court, a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $50,000 [now $75,000] jurisdictional requirement.

**\*9** *Tapscott,* 77 F.3d at 1357 (citing *Gafford v. General Electric Co.,* 997 F.2d 150 (6th Cir.1993)).

Here, the amount in controversy is not apparent from the face of plaintiffs' complaint. Rather, plaintiffs merely request "an amount which will adequately compensate plaintiffs for the injuries and damages sustained by them due to the defendants' conduct; and for exemplary damages in an amount which will adequately reflect the wrongfulness of defendants' conduct." (Complaint at 6–11.) Thus, the removing defendants must prove by a preponderance of credible evidence that those demands, if met, more likely than not would yield a recovery in excess of the $75,000 jurisdictional requirement.

Defendants' attempt to meet their burden solely by reliance on the allegations of damage in the complaint falls short of the required quantum of proof, however. *See King v. Wal–Mart Stores, Inc.,* 940 F.Supp. 213, 216 (S.D.Ind.1996) (remanding slip and fall case where defendant opposed motion to remand by referring solely to plaintiff's allegations in the complaint). On nearly identical facts, the United States District Court for the Southern District of Indiana aptly noted:

> Defendant Wal–Mart conclusorily states that Plaintiff's allegations themselves may be relied upon as competent evidence that the value of Plaintiff's claims exceeds $[75,]000.... Obviously, Defendant cannot satisfy its burden solely through its reliance upon the general allegations in Plaintiff's complaint. Defendant is not well served by resting upon the complaint's general allegations as

evidence of the jurisdictional amount, because it is not "competent proof" and, more significantly, the value of the stated allegations is at the very heart of the dispute.

*King,* 940 F.Supp. at 216–17.

Nevertheless, this court shall not order that the action be remanded *sua sponte.* The court finds that an amendment to plaintiffs' complaint would serve to clarify an unspecified demand for damages and, in deference to the liberal federal rules regarding amendment of pleadings, justice will best be served by permitting the amendment.

Therefore, if plaintiffs desire to remain in the state forum they originally chose, plaintiffs shall forswear any entitlement to any sum or its equivalent value in excess of $75,000, by amending their complaint to contain such a disclaimer, and they shall accompany that disclaimer with a second motion to remand.

Unless plaintiffs do so on or before November 2, 1999, however, the court will proceed as if it has subject matter jurisdiction and that the removal was not improvident.

Plaintiffs should clearly understand that this court will treat the amended complaint as a certification that plaintiffs will neither seek nor accept damages in excess of $75,000 in the state court action. In the event plaintiffs later seek more, this court will assume jurisdiction upon the filing of another, proper notice of removal by defendants.

## IV. CONCLUSION

**\*10** Based on the foregoing, the court finds that Barnett Drugs has been fraudulently joined in this action, as there is no possibility that plaintiffs can maintain a claim against that defendant under the learned intermediary doctrine. Accordingly, Barnett Drugs' motion to dismiss is due to be granted. Additionally, plaintiffs' motion to remand is due to be denied, as complete diversity is present between the remaining parties. Plaintiffs may file another motion to remand, however, should plaintiffs decide to amend their complaint to clarify their unspecified demand for damages. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

Lansdell v. American Home Products Corp., Not Reported in F.Supp.2d (1999)

1999 WL 33548541

ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED that Barnett Drugs' motion to dismiss is granted, and plaintiffs' claims against that defendant are dismissed without prejudice. Any

costs incurred by Barnett Drugs are taxed to plaintiffs. It is further ORDERED that plaintiffs' motion to remand is denied, as Barnett Drugs was fraudulently joined.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 33548541

Footnotes

1    *See* Black's Law Dictionary 898 (7th ed.1999) (defining the learned intermediary doctrine as "[t]he principle that a prescription-drug *manufacturer* fulfills its duty to warn of a drug's potentially harmful effects by informing the prescribing physician, rather than the end-user, of those effects" (emphasis supplied)). As discussed *infra,* this court expands that doctrine to encompass pharmacists.

2    The Eleventh Circuit held in *Property Management* that the trial court did not err in converting a 12(b)(6) motion into one for summary judgment, as the nonmovant:

    is estopped from denying the propriety of the conversion because it submitted its own copy of the [evidence] to the court and, thus, affirmatively sought to effect the conversion about which it now complains.... By submitting this [evidence], the appellant rendered its objections to consideration of the [evidence] ... meaningless, and, indeed, sought such consideration.

    *Property Management,* 752 F.2d at 605–607.

3    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

4    By implication Barnett Drugs arguably is a defendant liable under Count VI of plaintiffs' complaint, in which Mr. Lansdell asserts a claim for loss of his wife's consortium. Because that claim is derivative, and viable only if Mrs. Lansdell succeeds on her direct claims against Barnett Drugs, this count need not detain the court any longer.

5    During oral argument, counsel for Barnett Drugs also argued that plaintiffs' claims for failure to warn (Count IV) and breach of warranty (Count V) were subsumed into their AEMLD claim (Count III). The seeds of such an argument fell upon receptive ground, as this court previously has held that claims of negligence, wanton misconduct, and breach of warranty under Alabama law merge into the so-called "Extended Manufacturers' Liability Doctrine." *See Webb v. Ashland Chemical, Inc.,* Civil Action No. CV99–S–0443–NW (N.D. Ala., June 7, 1999 Order) (Smith, J.) (attached as Exhibit "A" to Barnett Drugs' response to plaintiff's motion to remand). Upon further consideration of that argument, this court agrees with Senior United States District Judge Wm. Brevard Hand of the Southern District of Alabama that failure to warn claims also are subsumed into the AEMLD. *See Johnson v. General Motors Corporation,* Civil Action No. 97–0046–BH–C (S.D. Ala., July 22, 1997 Order) (Hand, J.) (attached as Exhibit "E" to defendants' notice of removal).

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

E035

# TAB 5

E036

2011 WL 4736356
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Elba Maria CEBALLO, Plaintiff,

v.

MAC TOOLS, INC., a Division of Stanley,
Black & Decker, Inc., et al., Defendants.

Civil Action No. 11–4634 (MLC).
|
Oct. 5, 2011.

**Attorneys and Law Firms**

Gerald Allen Marks, Marks & Klein, LLP, Red Bank, NJ, for Plaintiff.

Thomas C. Regan, Todd Avery Rossman, Leclairryan, Newark, NJ, for Defendants.

**MEMORANDUM OPINION**

COOPER, District Judge.

*1 The plaintiff, Elba Maria Ceballo ("Ceballo"), brought this action in New Jersey state court against defendants, Mac Tools, Inc., a Division of Stanley, Black & Decker, Inc. ("Mac Tools"), and John Addalia ("Addalia"), asserting claims for fraudulent inducement of contract and violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1 *et seq.* ("NJCFA"). (Dkt. entry no. 1, Rmv. Not., Ex. 1, Compl.) Mac Tools removed the action to this Court pursuant to 28 U.S.C. § ("Section") 1332. (Dkt. entry no. 2, Amd. Rmv. Not. at ¶ 11.) Ceballo moves to remand this action for lack of complete diversity of citizenship under Section 1332. (Dkt. entry no. 6, Mot. to Remand.) Mac Tools opposes the motion to remand, and cross-moves to dismiss the Complaint with prejudice, or in the alternative, to stay the action and require Ceballo to submit her claims to arbitration. (Dkt. entry no. 8, Cr. Mot. to Dismiss.)

The Court determines the motion and cross motion on the briefs without an oral hearing, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, the Court will grant the motion to remand and deny the cross motion without prejudice.

**BACKGROUND**

**I. Legal Background**

**A. Section 1441(b)**

A state court action that could have been brought initially in federal court under Section 1332 is "removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b); *see Lincoln Prop. Co. v. Roche,* 546 U.S. 81, 84, 126 S.Ct. 606, 163 L.Ed.2d 415 (2005) (stating "[d]efendants may remove an action on the basis of diversity of citizenship if there is complete diversity between all named plaintiffs and all named defendants, and no defendant is a citizen of the forum State"); *Bor. of W. Mifflin v. Lancaster,* 45 F.3d 780, 785 (3d Cir.1995) (stating "[Section] 1441(b) diversity cases have an additional obstacle to removal: a resident defendant is barred from removing to federal court"). This is known as "the forum-defendant rule." For instance, if an action brought against more than one defendant in New Jersey state court is removed under Section 1332, and if one of those defendants is deemed to be a New Jersey citizen, then that action—even if jurisdiction under Section 1332 exists—is nonetheless subject to remand.

**B. Fraudulent Joinder**

A plaintiff bringing an action in state court against more than one defendant may not commit "fraudulent joinder" by naming a defendant who is not of diverse citizenship solely to defeat removal under Section 1332. *Brown v. Jevic,* 575 F.3d 322, 326–27 (3d Cir.2009); *In re Briscoe,* 448 F.3d 201, 215–19 (3d Cir.2006); *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851–54 (3d Cir.1992); *Boyer v. Snap–On Tools Corp.,* 913 F.2d 108, 110–13 (3d Cir.1990); *Abels v. State Farm Fire & Cas. Co.,* 770 F.2d 26, 29–34 (3d Cir.1985).

**II. Factual Allegations**

**A. Citizenship of the Parties**

*2 Ceballo is a citizen of New Jersey. (Dkt. entry no. 1, Civ. Cover Sheet at 1.) Mac Tools is an Ohio corporation with its principal place of business in Ohio. (Amd. Rmv. Not. at ¶ 4.) Mac Tools is, therefore, a citizen of Ohio. [1]

Addalia is a citizen of New Jersey. (*Id.* at ¶¶ 6–7; dkt. entry no. 6, Pl. Br. at 1.) In removing the action, Mac Tools took

Ceballo v. Mac Tools, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 4736356

the position that Addalia is a "nominal defendant only," fraudulently joined in order to destroy jurisdiction under Section 1332, and so did not contact Addalia for his consent to removal. (Amd. Rmv. Not. at ¶¶ 8, 10.)

**B. Alleged Injuries**
Ceballo alleges that her husband is a former Mac Tools dealer. (Compl. at ¶ 1.) Addalia is a former district manager for Mac Tools. (*Id.* at ¶ 6.) Ceballo claims that she incurred losses as the result of Mac Tools' "fraudulent sale to Plaintiff and her husband of an undisclosed franchised business, in violation of [Federal Trade Commission ("FTC") ] Rule 436 and for fraudulent misrepresentations by both commission and omission." (*Id.* at ¶ 8.) Ceballo alleges that she and her husband were fraudulently induced to commit family monies, as well as her own independent funds, to purchase the Mac Tools distributorship. (*Id.* at ¶¶ 10–12.) She alleges a fraudulent scheme on the part of Mac Tools consisting of (1) the sale of a franchise without proper disclosure, in violation of FTC franchise sales regulations; (2) the "churning" of a previously failed route; and (3) the use of fraudulent income representations. (*Id.* at ¶ 14.)

Ceballo asserts that Addalia, *inter alia,* (1) solicited her husband and represented that he could make over $100,000 in income as a Mac Tools distributor; (2) spoke to Ceballo and her husband on a telephone conference call, during which he repeated the income representation; and (3) told Ceballo that the route or "List of Stops" her husband would receive would consist of more than 325 customers, when there were allegedly 130 or less. (*Id.* at ¶¶ 35–39.) Ceballo states that she relied on Addalia's representations in deciding to commit her own money and joint marital funds in the distributorship, which she alleges lost her at least $84,000 during the eleven months her husband operated it. (*Id.* at ¶¶ 40–43.)

Ceballo asserts a cause of action for fraudulent inducement, stating that "Mac Tools through its management, specifically Defendant John Addalia, repeatedly made false, fraudulent, reckless, negligent and misleading representations to Plaintiff by telephone on various dates" both before and after her husband entered into a Mac Tools distributor agreement. (*Id.* at ¶ 60.) She also asserts a cause of action under the NJCFA for acts occurring "under the direction of Mac Tools and its District Manager, Defendant John Addalia," in effecting the sale of an undisclosed franchise business opportunity. (*Id.* at ¶¶ 66–68.)

**C. Motion Practice**
**\*3** Ceballo argues that remand is appropriate because there is no basis for federal jurisdiction. She explains that "two separate causes of action exist," the first being the fraudulent inducement claim against Addalia, the second being the NJCFA claim against Mac Tools. (Pl. Br. at 5.) She further argues that complete diversity of citizenship is lacking, as she and Addalia are citizens of New Jersey and she has asserted a colorable claim against him. (*Id.*) Ceballo asserts that Mac Tools has failed to sustain its "heavy burden" of showing that Addalia was fraudulently joined. (*Id.*)

Mac Tools argues that removal was proper and that the Court has jurisdiction under Section 1332 pursuant to the doctrine of fraudulent joinder. (Dkt. entry no. 10, Def. Br.) It argues that this Court has subject matter jurisdiction because (1) "the fraudulent inducement claim asserted against Addalia (in his capacity as an individual, not a Mac Tools employee) is wholly insubstantial, making him a nominal party"; and (2) "plaintiff has demonstrated that she has no real intention to prosecute this action against Addalia." (*Id.* at 1.)

**DISCUSSION**

A party raising a fraudulent joinder argument has a "heavy burden of persuasion" to show that the plaintiff has (1) no reasonable basis in fact or colorable ground to support the claim against the allegedly fraudulently joined defendant, or (2) no real intention in good faith to prosecute the action against that defendant. *Boyer,* 913 F.2d at 111. When addressing the issue of fraudulent joinder, the Court must (1) resolve in the plaintiff's favor all contested factual issues and any uncertainty as to the current state of controlling substantive law, and (2) find that a defendant was properly joined if there is "even a possibility" that a state court would find that a complaint states a claim. *Id.* For a defendant to be found to be fraudulently joined, the claims asserted against that defendant must be "wholly insubstantial and frivolous." *Batoff,* 977 F.2d at 852.

The standard for addressing dismissal due to fraudulent joinder is not the same as the standard for addressing either dismissal for failure to state a claim or summary judgment. *See Briscoe,* 448 F.3d at 217–18 (stating district court errs if a fraudulent joinder inquiry delves into a claim's merits); *Batoff,* 977 F.2d at 852 (stating district court erred in fraudulent joinder analysis in finding complaint failed to state a valid

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

claim); *Boyer,* 913 F.2d at 111–12 (stating district court not permitted to reach claim's merits in deciding fraudulent joinder issue). An inquiry under a motion to dismiss or for summary judgment "is more searching than that permissible when a party makes a claim of fraudulent joinder." *Batoff,* 977 F.2d at 852. As a fraudulent joinder analysis is not as "penetrating," the rejection of a fraudulent joinder argument does not guarantee that the claim will withstand a motion to dismiss for failure to state a claim on the merits or a motion for summary judgment. *Id.* at 852–53.

**\*4** We find that Ceballo has not fraudulently joined Addalia here, as the claims against him are not wholly insubstantial and frivolous. First, we reject out of hand Mac Tools' argument that Addalia is fraudulently joined because Ceballo has demonstrated no real intention of prosecuting the action against him. Ceballo notes that, contrary to Mac Tools' assertion, Addalia has been served with the Complaint. (Dkt. entry no. 12, Pl. Reply Br. at 1, 3–4 & Marks Cert., Ex. A, Addalia Acknowledgment of Service dated 7–12–11.)

We find that Ceballo has asserted a colorable fraudulent inducement claim against Addalia. In order to plead fraud and misrepresentation in New Jersey, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) a reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997). The Complaint alleges particular facts regarding representations Addalia made to Plaintiff and her husband about the distributorship Ceballo's husband ultimately bought, to Ceballo's financial detriment. (Compl. at ¶¶ 33–41.) Mac Tools' characterization of these representations as non-actionable "puffery" concerning future events is insufficient to deny the motion to remand on the basis of fraudulent joinder at the current procedural posture. (Def. Br. at 4.) *See Boyer,* 913 F.2d at 113 ("[W]here there are colorable claims or defenses asserted against or by diverse and non-diverse defendants alike, the court may not find that the non-diverse parties were fraudulently joined based on its view of the merits of those claims or defenses.").

The Court further observes that, notwithstanding Ceballo's argument that she asserts her NJCFA claim against Mac Tools only, the Complaint as pleaded may be read to assert a colorable claim under the NJCFA against both Mac Tools and Addalia as an individual. (*See* Compl. at ¶¶ 26, 32, 66.) New Jersey law does not bar actions against individual principals or employees of corporations who participated in the conduct giving rise to NJCFA liability. *Allen v. v. & A Bros., Inc.,* No. L–1290–04, 2010 WL 2508842, at \*3 (N.J.App. Div. June 23, 2010) (explaining that courts "have not found it necessary to pierce the corporate veil" in order to reach individual employees because "they have interpreted the CFA, by its use of the term 'person' in the liability provisions ... as providing sufficient statutory authority for the imposition of individual liability"); *Cardillo v. Bolger,* No. L–1272–06, 2009 WL 62866, at \*3 (N.J.App.Div. Jan. 12, 2009) (holding that the NJCFA should be given a liberal construction and that it "appl[ies] equally to corporations and the individuals acting on their behalf"); *Hyland v. Aquarian Age 2,000, Inc.,* 148 N.J.Super. 186, 372 A.2d 370, 373 (N.J.Super.Ct.1977) ("There is no suggestion that the statute was not intended to include natural persons who violate the [NJCFA]."). There is, therefore, "a possibility" that a state court would find that Ceballo has stated an NJCFA claim against Addalia. *Boyer,* 913 F.2d at 111.

**\*5** The Court concludes that Mac Tools has not met the heavy burden of persuasion required to show fraudulent joinder. This Court lacks jurisdiction here. It may be that the claims asserted against Addalia would not survive a motion to dismiss on the merits. Such concern, however, is not relevant here.

## CONCLUSION

The Court will grant the motion to remand, deny without prejudice the cross motion to dismiss, and remand the action. The Court will issue an appropriate order.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4736356

---

Footnotes

1    Corporations are deemed to be citizens of the states in which they are incorporated and have their principal place of business. 28 U.S.C. § 1332(c)(1).

**Cebalo v. Mac Tools, Inc., Not Reported in F.Supp.2d (2011)**

2011 WL 4736356

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# **TAB 6**

2012 WL 6595732
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Michael WALTERS, Plaintiff,

v.

Richard J. CARSON, Matthew J. Ernades, Jr., North Hanover Township Board of Education, Johnson & Johnson, and McNeil–PPC, Inc., Defendants.

Civil No. 11–6545 (RBK/AMD).
|
Dec. 17, 2012.

**Attorneys and Law Firms**

George R. Szymanski, Law Offices of George R. Szymanski, Laurel Springs, NJ, for Plaintiff.

Eric L. Harrison, Methfessel & Werbel, PC, Edison, NJ, David F. Abernethy, Drinker Biddle & Reath, Princeton, NJ, Meredith Reinhardt, Melissa A. Graff, Drinker Biddle & Reath LLP, Philadelphia, PA, for Defendants.

**OPINION**

KUGLER, District Judge.

**\*1** This matter comes before the Court upon Plaintiff Michael Walters's ("Plaintiff") Amended Complaint against Defendant McNeil–PPC, Inc. ("Defendant") asserting claims of negligence, breach of implied and express warranties, and strict liability arising out of Plaintiff's use of certain over the counter medication manufactured and distributed by Defendant. Currently before the Court is Defendant's motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted (Doc. No. 28). See Fed.R.Civ.P. 12(b)(6). For the reasons stated below, Defendant's motion will be granted.

**I. BACKGROUND** [1]

Plaintiff was formerly a custodian employed by the North Hanover Township Board of Education ("the Board"). Amended Compl. ¶ 7. In October 2009, Plaintiff began taking Tylenol Arthritis, a medication manufactured, marketed, distributed, and sold by Defendant. Amended Compl. ¶ 1;

Def.'s Br. in Support of Mot. to Dismiss 1. Later that month, Plaintiff began experiencing stomach problems which caused him to miss work. Amended Compl. ¶ 11.

On November 6, 2009, Plaintiff received a letter from the business administrator of North Hanover Township Schools, Matthew J. Ernandes, Jr. ("Ernandes"). *Id.* at ¶ 12. The letter recommended to the Board and to Richard Carson ("Carson"), superintendent of the North Hanover Township School District ("the District"), that Plaintiff's contract with the District be terminated because Plaintiff had used ten of his twelve allotted sick days since July 1, 2009. *Id.* at ¶¶ 12, 13. The Board followed the recommendation and terminated Plaintiff's employment as of December 1, 2009. *Id.* at ¶ 14.

At some point in 2009 following his termination, Plaintiff learned that Tylenol Arthritis had been known to cause stomach problems in individuals taking the medication and that the manufacturer had ordered a recall. *Id.* at ¶ 15. Plaintiff alleges that the Tylenol Arthritis products he had purchased and used were part of the recall. *Id.*

Plaintiff's Amended Complaint states various federal and state law claims against Carson, Ernades, and the District arising out of his termination. In addition, and the focus of the instant motion to the dismiss, the Amended Complaint asserts three causes of action against Defendant [2] : (1) negligence in the manufacture of Tylenol Arthritis; (2) breach of express and implied warranties in selling the "inherently defective" Tylenol Arthritis"; and (3) strict liability for placing the allegedly defective product into the stream of commerce. Amended Compl. ¶¶ 22–31. [3]

In its instant motion to dismiss under Fed.R.Civ.P. 12(b)(6), Defendant argues that Plaintiff's negligence, implied warranty, and strict liability claims are subsumed by the New Jersey Products Liability Act ("the PLA") and that Plaintiff has failed to state a claim under the Act. Def.'s Br. in Support of Mot. to Dismiss 2. Defendant further asserts that Plaintiff fails to state a claim under New Jersey law for breach of express warranty. Def.'s Br. in Support of Mot. to Dismiss 7.

**II. DISCUSSION AND ANALYSIS**

**A. Legal Standard**

**\*2** Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts

2012 WL 6595732

accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) (quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir.2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal,* 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal,* 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal,* 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. *Id.*

**B. Negligence, Breach of Implied Warranty, and Strict Liability Claims**

It is well established in this Circuit that the PLA creates an "exclusive statutory cause of action" for products liability claims asserted under New Jersey law. *See Kury v. Abbott Labratories, Inc.,* No. 11–803, 2012 WL 124026 at *3 (D.N.J. Jan.17, 2012) (quoting *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir.1991)). That is, after the enactment of the PLA, "only a single product liability action remains" under New Jersey law and it is the sole method by which to bring such a claim. *Id.* (quoting *Tirrell v. Navistar Int'l, Inc.,* 248 N.J.Super. 390, 591 A.2d 643, 647 (N.J.Super.App.Div.1991), *cert. denied,* 126 N.J. 390, 599 A.2d 166 (1991)); *see also id.* at ——3–4, 599 A.2d 166 (quoting *In re Lead Paint Litig.,* 191 N.J. 405, 924 A.2d 484, 503, 504 (N.J.2007)) ("[The PLA] generally subsumes common law product liability claims ... [and] ... encompass[es] virtually all possible causes of action relating to harms caused by consumer and other products.").

In this case, although he brings suit against the manufacturer and distributor of a consumer product like Tylenol Arthritis for alleged injuries caused by that product, Plaintiff has stated common law claims of negligence, breach of implied warranty, and strict liability. However, these common law causes of action are subsumed by the PLA. *See Kury,* 2012 WL 124026 at *3. Thus, Plaintiff's failure to assert his claim under the PLA is a fatal pleading deficiency. Accordingly, the Court will grant Defendant's motion to dismiss Plaintiff's negligence, breach of implied warranty, and strict liability claims as improperly pled.

**C. Breach of Express Warranty Claim**

**\*3** By its own terms, the PLA does not extend to claims for breach of an express warranty. N.J.S.A. § 2A:58C–1(3) (2011). [4] Instead, under New Jersey law, "in order to state a claim for breach of express warranty, [a plaintiff] must properly allege: (1) that [the defendant] made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 706 (D.N.J.2011). When a plaintiff's express warranty claims relies merely on bald assertions "that fail to identify specific affirmations or promises," the claims cannot survive a motion to dismiss. *Id.* at 707. Similarly, a claim "devoid of factual matter" that simply states "a conclusory recitation of the elements of a claim" will be dismissed. *Simmons v. Stryker Corp.,* No. 08–3451, 2008 WL 4936982 at *2 (D.N.J. Nov.17, 2008).

In support of his breach of express warranty claim, Plaintiff alleges only the following: "[Defendant] expressly and impliedly warranted that Tylenol Arthritis was merchantable, free from any defects, and reasonably fit for the foreseeable use and intended purposes for which it was sold" and that "[Defendant] breached [its] express and implied warranties in that the Tylenol Arthritis was inherently defective, hazardous, unsafe, not properly and reasonably merchantable, and unfit for its intended, ordinary and foreseeable use." Amend. Compl. ¶¶ 23–24.

Simply stated, Plaintiff's Amended Complaint does not contain sufficient factual allegations to support a claim for breach of an express warranty. Even if the Court accepts Plaintiff's allegation that Defendant *expressly* warranted

that Tylenol Arthritis was "merchantable," "free from any defects," and "reasonably fit for the foreseeable use and intended purposes for which it was sold," nowhere does Plaintiff allege how that alleged warranty formed any part of the basis of his decision to purchase the product. Instead, Plaintiff's claims are best characterized as "a conclusory recitation of the elements of the claim." *See Simmons, 2008 WL 4936982 at \*2.* Thus, because Plaintiff failed to allege adequately the elements of a breach of express warranty cause of action under New Jersey law, the Court must grant Defendant's motion to dismiss.

## III. CONCLUSION

For the reasons stated above, Defendant's motion is **GRANTED.** An appropriate order shall issue today.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 6595732

## Footnotes

1    When considering the sufficiency of the factual allegations in a plaintiff's complaint, the Court, for purposes of deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), assumes such allegations to be true. *See Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir.2009).*

2    The Amended Complaint also names Johnson and Johnson in the claims concerning Tylenol Arthritis. Defendant explains that it is responsible for the "manufacture, marketing, distribution and sale of the product." Def.'s Br. in Support of Mot. to Dismiss 1. Defendant is a wholly owned subsidiary of Johnson & Johnson. McNeil Corp. Disclosure Statement 2 (Doc. No. 29).

3    The Court exercises supplemental jurisdiction over Plaintiff's state law claims as they form part of the same transaction or occurrence giving rise to Plaintiff's federal claims against the North Hanover Township School Board Defendants. *See* 28 U.S.C. § 1367(b) (2006).

4    That provision reads, in relevant part, "[p]roduct liability action means any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty."

---

**End of Document**                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

2020 WL 64568
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Loretta BUTERA and Greg Holden, on behalf of
themselves and others similarly situated, Plaintiffs,
v.
HONEYWELL INTERNATIONAL, INC., Defendant.

Civil Action No: 18-13417-SDW-LDW
|
Signed 01/06/2020

**Attorneys and Law Firms**

Mitchell Mark Breit, Simmons Hanly Conroy, LLC, New
York, NY, for Plaintiffs.

Neil L. Sambursky, Pillinger Miller Tarallo, Garden City, NY,
for Defendant.

**OPINION**

WIGENTON, District Judge.

**\*1** Before this Court is Defendant Honeywell International,
Inc.'s ("Defendant") Motion to Dismiss Plaintiffs
Loretta Butera ("Butera") and Greg Holden's ("Holden")
(collectively, "Plaintiffs") Second Amended Class Action
Complaint (D.E. 22, "SAC") pursuant to Federal Rules of
Civil Procedure ("Rule") 12(b)(6) and 9(b). Jurisdiction is
proper pursuant to 28 U.S.C. § 1332(d). Venue is proper
pursuant to 28 U.S.C. § 1391. This opinion is issued without
oral argument pursuant to Rule 78. For the reasons stated
herein, the Motion to Dismiss is **GRANTED**.

**I. BACKGROUND AND PROCEDURAL HISTORY**
Defendant is a Delaware corporation with a principal place
of business in New Jersey. (SAC ¶¶ 1, 10.) Defendant is
a designer and manufacturer of commercial and consumer
products including "sensors, switches, and instruments for
measuring temperature, control and metering of gas and
electricity." (Id. ¶ 11.) Plaintiffs allege that between 2010
and 2012, Defendant "designed, manufactured, sold, and
distributed" gas valves for residential hot water heaters
bearing model number WV8840 (the "Valves") "without
disclosing to consumers that [the Valves'] temperature

sensor ["Sensor"] ... is defective." (Id. ¶ 2.) The Valves
were "installed in and sold with gas hot water heaters ...
manufactured and sold under various brand names, including,
but not limited to: Bradford White, American Water Heater,
Proline, Whirlpool, U.S. Craftsman, Rheem, Kenmore, and
A.O. Smith." (Id. ¶ 3.) Plaintiffs allege that the Valves are
"unsuitable for [their] intended use" because their Sensors
are enclosed in a "plastic polymeric casing" (known as
a "thermowell") instead of a metal casing. (Id. ¶¶ 2, 4–
5.) The plastic casing "prematurely erodes or otherwise
deteriorates ... causing water to leak through an affected
thermowell and in turn through the [ ] Valve to the
surrounding premises," damaging consumers' water heaters
and their homes. (Id. ¶¶ 5–6.)

Butera is a citizen and resident of Tennessee who purchased a
water heater from her "local Lowe's in February of 2012." (Id.
¶¶ 8, 49.) Butera does not identify what brand heater she
purchased. Just over six years later, on March 24, 2018, "her
water heater began leaking" from the Valve, flooding her
garage and damaging the basement below. (Id. ¶ 50.) Butera
paid a plumber $308.00 to repair the water heater and replace
the Valve. (Id. ¶ 51.) Butera also contends that she will incur
additional costs to fix the flood damage to her home. (Id.)

Holden is a citizen and resident of California who purchased
a water heater "outfitted with the [Valve] from his local
Home Depot in 2012." (Id. ¶¶ 9, 53.) Holden does not
identify what brand heater he purchased. Six years later, on
April 23, 2018, "his water heater began leaking, flooding his
garage and resulting in water damage to nearby cabinetry and
drywall." (Id. ¶ 54.) Holden does not indicate what caused the
water heater to leak. He contends his water heater could not
be repaired and that he paid $600.00 to replace it and another
$1,400.00 to repair the damage to his property. (Id. ¶ 55.)

**\*2** On August 30, 2018, Plaintiffs filed a putative
class action Complaint in this Court. (D.E. 1.) Plaintiffs
subsequently filed their First Amended Class Action
Complaint (D.E. 9, "FAC") on December 7, 2018. This
Court granted in part Defendant's Motion to Dismiss the
FAC on April 18, 2019 (D.E. 20, "Opinion"), but gave
Plaintiffs 30 days to amend. [1] Plaintiffs filed the SAC on
May 20, 2019, asserting claims for Violation of the Tennessee
Products Liability Act ("TPLA") (Count One, Butera);
Breach of Express Warranty (Count Two, Holden); Breach
of Implied Warranty (Count Three, Holden); Negligence
(Count Four, Holden); Violations of the Magnuson-Moss
Warranty Act ("MMWA") (Count Five, Butera and Holden);

2020 WL 64568

Unjust Enrichment (Count Six, Holden); Strict Product Liability (Count Seven, Holden); Violation of the California Unfair Competition Law ("UCL") (Count Eight, Holden); and Violation of the Song-Beverly Consumer Warranty Act ("SBA") for Breach of Implied Warranty of Merchantability (Count Nine, Holden). Defendant moved to dismiss the SAC on June 10, 2019, and briefing was timely completed.[2] (D.E. 25, 29, 41.)

## II. LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

In considering a Motion to Dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) (discussing the *Iqbal* standard). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679*. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[ ] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b). Plaintiffs "alleging fraud must state the circumstances of the alleged fraud[ulent act] with sufficient particularity to

place the defendant on notice of the 'precise misconduct with which [it is] charged.' " *Park v. M & T Bank Corp.*, Civ. No. 09–02921, 2010 WL 1032649, at *5 (D.N.J. Mar. 16, 2010) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004)).

## III. DISCUSSION

As a federal court sitting in diversity, this Court would normally engage in a choice of law analysis to determine which state's law applies to each of the instant claims.[3] However, Defendant argues, and Plaintiffs do not dispute, that the law of each Plaintiff's home state should apply to Plaintiffs' claims. (D.E. 25-1 at 5–11; D.E. 29 at 1.) Therefore, the Court need not engage in a choice of law analysis and will apply the law of each plaintiff's home state to their respective claims. *See, e.g., UBI Telecom Inc. v. KDDI Am., Inc.*, Civ. No. 13-1643, 2014 WL 2965705, at *9 (D.N.J. June 30, 2014) ("When the parties agree upon which state's law applies ... the Court need not conduct [a] choice-of-law inquiry."); *see also Cole v. NIBCO, Inc.*, Civ. No. 13-7871, 2015 WL 2414740, at *5 (D.N.J. May 20, 2015); *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 737 n.5 (E.D. Pa. 2013); *Sager v. Hoffman La Roche, Inc.*, 2012 WL 3166630, at *14 n.9 (N.J. Super. Ct. App. Div. Aug. 7, 2012).[4]

### A. Tennessee Claim (Count One; Butera)

**\*3** Butera's sole state claim is for violation of the TPLA, which subsumes all product liability actions in Tennessee. *See Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 392 (6th Cir. 2013) (internal citation omitted). Butera's allegations are couched in terms of defective design/manufacture and failure to warn. Specifically, Butera alleges that the Valves "were not reasonably safe for their ordinary and intended use; [Defendant] failed to provide ... adequate and sufficient warnings regarding the known and foreseeable risks and dangers inherent in the [ ] Valves; and the design, methods of manufacture, and testing of the [ ] Valves were inadequate and produced defective products." (SAC ¶ 89.)

In Tennessee, "in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the product was defective and unreasonably dangerous at the time the product left the control of the manufacturer." *Moore v. C.R. Bard, Inc.*, 217 F. Supp. 3d 990, 994 (E.D. Tenn. 2016) (quoting *Higgs v. Gen. Motors Corp.*, 655 F. Supp. 22, 23 (E.D. Tenn. 1985)). Here, Butera fails to allege sufficient

facts for the Court to infer that her Valve was defective or unreasonably dangerous. She alleges that her Valve was defective because Defendant used plastic in the construction of its thermowell and that plastic is unsuitable because it "prematurely erodes or otherwise deteriorates such that pin-sized holes form in the thermowell." (SAC ¶ 5.) However, the fact that the thermowell was made from plastic, standing alone, does not show that her Valve was defective. Under the TPLA, Butera must present "evidence or authority that the use of [plastic] makes the products per se defective or unreasonably dangerous." *Moore*, 217 F. Supp. 3d at 995. Providing no such authority, her "assertions are speculative and conclusory, akin to [the] allegations that were specifically considered—and rejected—by *Iqbal*." *Id.* (granting motion to dismiss). Count I, therefore, must be dismissed. [5] [6]

### B. California Claims (Counts Two – Four, Six – Nine; Holden)

#### 1. Breach of Express Warranty (Count Two)

**\*4** The SAC alleges that Defendant "expressly warranted that the [Valves] were free from defect in materials and workmanship and promised it would replace all defective parts and provide replacement units for those that developed water leaks." (SAC ¶ 94.) The SAC further alleges that Defendant's "time limits on its warranties are unconscionable" because the Valve defect was often only discoverable after the warranty period expired, preventing Holden from timely exercising his rights under the warranty. (*Id.* ¶ 97.)

"To state a claim for breach of express warranty under California law, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 875 (N.D. Cal. 2015) (internal citations omitted). "To allege facts identifying the exact terms of the warranty, a plaintiff must provide 'specifics' about what the warranty statement was, and how and when it was breached." *Id.*

Here, Holden does not plead facts sufficient to allege that Defendant breached its express warranty and that the breach caused Holden's injury. First, even taking the SAC's brief summary of the warranty terms at face value, [7] there can be no breach where Holden did not provide Defendant

with an opportunity to repair or replace the damaged water heater. [8] Second, even if there was a breach, the SAC does not sufficiently allege that the breach proximately caused Holden's injury. Although it states that "his water heater began leaking," there is no allegation that the leak originated in the Valve, let alone that the leak was caused by plastic deterioration in his Valve's thermowell. (SAC ¶ 54.)

The SAC also fails to allege that Holden reasonably relied on or even saw Defendant's express warranty. Although California courts do not require reliance where there is privity between the parties, *see Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1334 (C.D. Cal. 2013), no privity exists here. Holden bought his water heater from a Home Depot; the water heater was manufactured by an unnamed company using a component made by Defendant. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("A buyer and seller stand in privity if they are in adjoining links of the distribution chain. Thus, an end consumer ... who buys from a retailer is not in privity with a manufacturer." (citations omitted)); *Yu-Santos v. Ford Motor Co.*, Civ. No. 06-1773, 2009 WL 1392085, at \*21 (E.D. Cal. May 14, 2009) (dismissing car purchaser's breach of warranty claim against seatbelt manufacturer for lack of privity).

**\*5** Because the SAC fails to sufficiently plead breach, reasonable reliance, or proximate causation, Count II must be dismissed.

#### 2. Breach of Implied Warranty (Count Three)

According to the SAC, Defendant warranted that the Valves "were of merchantable quality and fit for their ordinary purpose," and that they "would operate properly." (SAC ¶ 101.) Holden alleges that Defendant breached this warranty of merchantability when parts of the Valves prematurely deteriorated and caused water heaters to leak. (*Id.*) The Valves thus failed to function as intended and were not of merchantable quality when they left Defendant's control. (*Id.* ¶¶ 101–102.)

"The implied warranty of merchantability requires that 'every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable.' " *Stewart v. Electrolux Home Prods., Inc.*, 304 F. Supp. 3d 894, 912 (E.D. Cal. 2018) (quoting Cal. Civ. Code § 1792). "To state a claim for breach of implied warranty of

merchantability, a party must plead facts sufficient to show that 'the product did not possess even the most basic degree of fitness for ordinary use.' " *Pini USA, Inc. v. NB Glob. Commodities, LLC*, Civ. No. 17-4763, 2017 WL 5054655, at *5 (C.D. Cal. Oct. 31, 2017) (quoting *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (Cal. Ct. App. 2003)). As with breach of express warranty, "[u]nder California law, the general rule is that privity of contract is required in an action for breach of ... implied warranty." *Stewart*, 304 F. Supp. 3d at 914 (citation and some punctuation omitted). "An end consumer who buys from a retailer is not in privity with a manufacturer." *Id.*

Holden does not allege facts sufficient to show that his Valve did not possess "even the most basic degree of fitness for ordinary use." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009) (quoting *Mocek*, 114 Cal. App. 4th at 406). Instead, Holden alleges that his water heater "began leaking," without alleging that the leak originated with the Valve. (SAC ¶ 54.) Holden further alleges that the leak occurred six years after he purchased the water heater, and after the Valve's express warranty expired. (*Id.* ¶¶ 53–54; *see* ¶ 106.) An "implied warranty provides for a minimum level of quality." *Birdsong*, 590 F.3d at 958 (quotation marks and citation omitted). Holden's allegations are insufficient for the Court to infer that the Valve did not meet this minimum level. Therefore, Count III must be dismissed.[9][10]

### 3. Negligence (Count Four)

**\*6** Holden's negligence claim alleges that Defendant owed Holden a duty of reasonable care to ensure that the Valve operated safely for its intended purpose and reasonably expected use. (SAC ¶ 110.) The SAC alleges that Defendant breached this duty: (1) by failing to ensure that the Valve was free from defect and (2) by failing to warn that the Valve was defective and posed a safety hazard, resulting in damages to Holden. (*Id.* ¶¶ 111–13.)

"A negligence claim under California law requires plaintiff to allege that defendant owed plaintiff a legal duty, breached the duty, and that the breach was a proximate or legal cause of plaintiff's injury. In the context of a products liability lawsuit, under a negligence theory, a plaintiff must also prove that the defect in the product was due to negligence of the defendant." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prod. Liab. Litig.*, 754

F. Supp. 2d 1208, 1223 (C.D. Cal. 2010) (internal citations and some punctuation omitted).

As with his breach of express warranty claim, Holden's failure to plead facts sufficient to allege proximate causation is fatal to his negligence claim. Holden does not allege that the Valve in his water heater leaked; he only alleges that his water heater, made by an unnamed manufacturer, leaked. (SAC ¶ 54.) With only the facts being that his water heater leaked six years after he purchased it, Holden also fails to sufficiently allege that Defendant breached its duty to him. The Court cannot infer from these facts that a water heater leaking after six years of use suffered from a defect of any component, let alone specifically its Valve.[11]

Holden also fails to sufficiently allege that Defendant owed him a legal duty to warn. It is not plausible on these facts that consumers needed to be warned that a six-year-old water heater may leak. *See Lucas v. City of Visalia*, 726 F. Supp. 2d 1149, 1158 (E.D. Cal. 2010) (noting that a "manufacturer has a duty to use reasonable care to give warning of the dangerous condition of the product ... if the manufacturer has reason to believe that [those who use the product] will not realize its dangerous condition" (internal citation omitted)).

In fact, Defendant only had a legal obligation to warn consumers about dangers that a "reasonably prudent manufacturer would have known and warned about." *Carlin v. Superior Court*, 920 P.2d 1347, 1351 (Cal. 1996). Plaintiffs do not provide facts sufficient to allege that Defendant knew about or should have known about the Valves' alleged premature deterioration. Plaintiffs allege that Defendant is a member of the water heater component industry and eventually replaced its plastic thermowells with metal thermowells, (SAC ¶¶ 35–48), but these facts alone are insufficient to allege that Defendant knew or should have known of the "particular risk." *See Carlin*, 920 P.2d at 1351; *see also Coleman-Anacleto v. Samsung Elecs. Am., Inc.*, Civ No. 16-02941, 2016 WL 4729302, at *13–14, *19 (N.D. Cal. Sept. 12, 2016) (dismissing negligent-failure-to-warn claim for failure to allege facts showing that defendant knew of defect). Therefore, Count Four must be dismissed.

### 4. Unjust Enrichment (Count Six)

"[C]ourts have repeatedly held that 'there is no cause of action in California for unjust enrichment.' " *In re Apple & AT & T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070,

1077 (N.D. Cal. 2011) (quoting *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347 (Cal. Ct. App. 2003)); *see also Aguiar v. Merisant Co.*, Civ. No. 14-670, 2014 WL 6492220, at \*9 (C.D. Cal. Mar. 24, 2014) ("Defendants contend that California law does not recognize a cause of action for unjust enrichment. The Court agrees."); *In re Ford Tailgate Litig.*, Civ. No. 11-2953, 2014 WL 1007066, at \*5 (N.D. Cal. Mar. 12, 2014) ("California, among other jurisdictions, has rejected independent unjust enrichment claims." (citation omitted)). Therefore, Count Six is dismissed.

### *5. Strict Product Liability (Count Seven)*

**\*7** Under California law, "[t]he elements of a strict products liability cause of action are [i] a defect in the manufacture or design of the product or a failure to warn, [ii] causation, and [iii] injury." *Park-Kim v. Daikin Indus., Ltd*, Civ. No. 15-9523, 2016 WL 5958251, at \*9 (C.D. Cal. Aug. 3, 2016) (quoting *Cnty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 318 (Cal. Ct. App. 2006)). Holden's strict liability claim asserts all three theories: manufacturing defect, design defect, and failure to warn. (SAC ¶¶ 134–45.) However, for the reasons discussed above, Holden fails to allege a defect or causation. Although the SAC states that Holden's "water heater began leaking," there is no allegation that the leak originated in the Valve, let alone that the leak was caused by plastic deterioration in his Valve's thermowell. (SAC ¶ 54.) Because Holden does not factually allege that his Valve was defective and that his injury was caused by the Valve's defective condition, Count Seven must be dismissed. [12]

### *6. Violation of the UCL (Count Eight)*

Holden's UCL claim must meet the pleading standards of both Rules 12(b)(6) and 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (recognizing that "Rule 9(b)'s heightened pleading standards apply to claims for violations of the ... UCL"); *Keegan v. Am. Honda Motor Co.*, 838 F.

Supp. 2d 929, 937 (C.D. Cal. 2012) (noting that UCL claims "sound in fraud, and are therefore subject to the heightened pleading requirement of Rule 9(b)"). Here, the SAC alleges that Defendant "failed to disclose its knowledge of the Defect at the point of sale" and that Defendant "knowingly concealed that the [Valves] suffered from [a] Defect which caused them to fail before their anticipated useful life." (SAC ¶¶ 148, 151.) A claim for failure to disclose pursuant to the UCL must show: "(1) the existence of a design defect; (2) the existence of an unreasonable safety hazard; (3) a causal connection between the alleged defect and the alleged safety hazard; and [ (4) ] that the manufacturer knew of the defect at the time a sale was made." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (citations omitted); *see also Afzal v. BMW of N. Am., LLC*, Civ. No. 15-8009, 2016 WL 6126913, at \*8 (D.N.J. Oct. 17, 2016).

Once again, Holden fails to plead facts sufficient to sustain a UCL claim. The SAC pleads that Defendant, "as a member of the water heater component industry—knew or should have known of the existence of the Defect prior to sale of the [ ] Valves," but does not allege any facts to support a finding that membership in the industry gave Defendant actual or constructive knowledge of the Valves' alleged premature degradation. (SAC ¶ 149.) This is insufficient under both Rule 12(b)(6) and the heightened pleading requirements of Rule 9(b). *See Riachi v. Prometheus Grp.*, Civ. No. 17-811, 2017 WL 2438838, at \*3 (D.N.J. June 6, 2017) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)). [13] Therefore, Count Eight will be dismissed.

### **CONCLUSION**

**\*8** For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED**. [14] An appropriate order follows.

### **All Citations**

Slip Copy, 2020 WL 64568

---

Footnotes

1    Specifically, this Court granted the motion to dismiss Plaintiffs' New Jersey Consumer Fraud Act claims, Butera's state-law and Magnuson-Moss Warranty Act claims, and Holden's California Unfair Competition Law claim. (Opinion at 4–10.) The remainder of the motion was dismissed as moot. (*Id.* at 10–11.)

2    Once again, Plaintiffs' opposition brief does not comply with the font size and line spacing requirements of Local Civil Rule 7.2. Future failure to adhere to the Local Rules may result in sanctions.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

3    Because the putative class has not yet been certified, this action is "one between [the named plaintiffs] and the defendant[ ]" and "must be evaluated as to these particular plaintiffs." *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 659 (3d Cir. 1998).

4    Although Defendant does not raise the issue, the Court notes that the SAC's failure to specify which state's laws apply to the common law claims may not meet the Rule 8 pleading standard. *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009) ("The plaintiffs fail to link their claim to the law of any particular state. As a result of this deficiency, the plaintiffs fail to state a cause of action ...."); *see also Nimley v. PTT Phone Cards Inc.*, Civ. No. 13-2216, 2014 WL 1464311, at *6 n.7 (E.D. Pa. Apr. 15, 2014). However, out of an abundance of caution, the Court will analyze the merits of the SAC. *See Cole*, 2015 WL 2414740, at *5 n.2.

5    Even if the SAC sufficiently alleged that the Valve was defective and unreasonably dangerous at the time it left Defendant's control, Count I must still be dismissed because it does not sufficiently allege that Butera's " 'injury was proximately caused by the defective product.' " *Moore*, 217 F. Supp. 3d at 994 (quoting *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008)). Butera's allegation that her Valve leaked, without pleading facts to indicate that the leak was actually caused by a premature deterioration of the plastic in the thermowell, is insufficient to allege that the Valve's defect proximately caused her injuries. *See Brewer v. Mr. Heater, Inc.*, Civ. No. 13-1330, 2014 WL 1364825, at *2 (W.D. Tenn. Apr. 7, 2014) (dismissing TPLA claim over heater allegedly designed without guard because plaintiff failed to allege "facts indicating 'how' the alleged defect caused her injuries").

6    Similarly, with regard to her failure-to-warn theory, a "plaintiff must show that: (1) the warnings at issue were defective; (2) the defective warning made the product unreasonably dangerous; and (3) the inadequate labeling proximately caused the claimed injury." *Moore*, 217 F. Supp. 3d at 995 (citations omitted). Here, Butera does not plead any facts regarding what warnings from Defendant she saw and relied on, how those warnings were deficient, and/or how the deficient warnings caused her injury. Without these facts, the Court cannot infer that Defendant's allegedly deficient warnings caused Butera's injuries. *See id.*

7    Holden does not allege that he received or saw a copy of the warranty. Nor does he attach a copy of the warranty to the SAC, or even allege the duration of the warranty, which he admits expired before his water heater leaked. (*See* SAC ¶ 97.) Nonetheless, out of an abundance of caution, the Court addresses the merits of his claim based on his brief summary of the alleged warranty terms.

8    Holden argues that providing Defendant with an opportunity to perform under the warranty would have been futile because (1) Defendant would have just replaced the Valve with another defective Valve and (2) the repair request would have been denied for being outside an "unconscionably short warranty period." (D.E. 29 at 12.) However, the SAC alleges that Holden's water heater leaked in 2018, six years after it alleges that Defendant ceased making the defective Valves. (SAC ¶¶ 24, 54.) Therefore, Holden does not allege any facts to support an inference that Defendant would have replaced his Valve with a defective Valve. Additionally, if the repair request did fall outside the warranty period, which Holden does not identify, then there was no warranty in effect that could be breached. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022–23 (9th Cir. 2008) (dismissing breach of express warranty claim made after warranty expiration where "defect allegedly existed before the warranty expired, and [Defendant allegedly] had knowledge of the defect at the time of sale"). Nor does Holden allege any facts to support an inference that the unidentified warranty period was unconscionably short.

9    Holden's claim must also be dismissed for lack of privity. *See Clemens*, 534 F.3d at 1023 (dismissing breach of implied warranty claim for lack of privity, where car purchaser brought suit against car manufacturer over defective head gaskets). Holden argues that a third-party beneficiary exception to privity should apply to him as the end consumer. (D.E. 29 at 17–18.) The Ninth Circuit did not expressly consider a third-party beneficiary exception in *Clemens* but did decline to create a new privity exception for the plaintiff. *Id.* at 1024 ("California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it."). Since *Clemens*, "[d]istrict courts in California [have been] split on a third-party beneficiary exception to privity in the consumer warranty context," and specifically whether *Clemens* forecloses the exception. *Stewart*, 304 F. Supp. 3d at 914–15 (summarizing and analyzing caselaw on both sides of the issue and holding that no such exception exists). Although Plaintiff cites to several cases post-*Clemens* that did find such an exception, (D.E. 29 at 18), none of these cases involved a component manufacturer, who is an additional level removed from the end consumer. *See Mega RV Corp. v. HWH Corp.*, 170 Cal. Rptr. 3d 861, 876 (Cal. Ct. App. 2014) ("a buyer ordinarily does not have an implied warranty claim against a manufacturer of an integrated component part"), *as modified on denial of reh'g* (May 20, 2014). In *Mega RV Corp.*, the California Court of Appeal did suggest some situations where a consumer may have an implied warranty claim against a component manufacturer (*e.g.*, the component can be a standalone product or the consumer received an express warranty from the component manufacturer). *Id.* at 876–77. However, those situations

2020 WL 64568

are not alleged here. Upon review of the caselaw, this Court finds that a third-party beneficiary exception to privity does not exist under California law. *See Stewart,* 304 F. Supp. 3d at 914–15. This Court additionally finds that, even if such an exception did exist, it would not apply to Holden. *See Mega RV Corp.,* 170 Cal. Rptr. 3d at 876.

10    Because Holden fails to state a claim for breach of an express or implied warranty, his claim under California's SBA is also dismissed. *See Birdsong,* 590 F.3d at 958 n.2 (noting that "the court applies state warranty law" to SBA claims and dismissing a claim under the Act because plaintiffs failed to adequately plead a state-law claim for breach of warranty).

11    In Plaintiffs' first complaint, they alleged that the "expected useful life" of a Valve is 6–10 years, (D.E. 1 ¶ 22), an expectation that Holden's Valve met.

12    Holden's failure-to-warn theory must also fail for these reasons and additionally because, as discussed above, Holden does not sufficiently allege that Defendant or the scientific community had knowledge of the risk of plastic thermowells at the time of distribution. *See Coleman-Anacleto,* 2016 WL 4729302, at *17 ("Knowledge, actual or constructive, is a requisite for strict liability for failure to warn.... Typically, under California law, we hold manufacturers strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product." (internal citations and some punctuation omitted)).

13    Holden's allegation that Defendant performed "materials testing" on the Valves prior to sale, and that this testing was either "inadequate" or revealed the defect, (SAC ¶ 150), is a conclusory allegation unsupported by facts and is therefore insufficient to show Defendant's knowledge. *See In re Nexus 6P Prods. Liab. Litig.,* 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) (dismissing as too conclusory an allegation that "Defendants knew (or exercising due diligence should have known) that the [products] were defective at the time of sale").

14    Because this Court grants Defendant's motion to dismiss Plaintiffs' state law claims, it also dismisses Plaintiffs' MMWA claim (Count Five). *See Clemens,* 534 F.3d at 1022 (noting that "claims under the [MMWA] stand or fall with [ ] express and implied warranty claims under state law").

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 54 of 80
PageID: 10004

Giles v. Wal-Mart Louisiana LLC, Not Reported in Fed. Supp. (2016)
2016 WL 2825778

📙 KeyCite Yellow Flag - Negative Treatment

Distinguished by Allen v. Red Frog Events, LLC, M.D.La., September 13, 2018

2016 WL 2825778
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Joycelyn Love GILES,
v.
WAL-MART LOUISIANA LLC et al.

CIVIL ACTION NO: 16-2413
|
Signed 05/13/2016

**Attorneys and Law Firms**

Robert Brent Cueria, George W. Byrne, Jr., Cueria Law Firm, LLC, New Orleans, LA, for Joycelyn Love Giles.

Roy C. Beard, Rachel S. Guttmann, McCranie, Sistrunk, Anzelmo, Hardy, New Orleans, LA, for Wal-Mart Louisiana LLC et al.

## ORDER & REASONS

CARL J. BARBIER, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is a *Motion to Remand* **(Rec. Doc. 13)** filed by Plaintiff, Joycelyn Love Giles; an opposition thereto (Rec. Doc. 17) filed by Defendants, Wal-Mart Louisiana LLC, Wal-Mart Stores Inc., Todd Jabbia, and Industrial Development Board of the City of New Orleans, Louisiana, Inc.; and Plaintiff's reply (Rec. Doc. 21). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

This case arises out of a slip-and-fall accident at a Wal-Mart Supercenter located at 1901 Tchoupitoulas Street in New Orleans, Louisiana. According to the state-court petition, on or about September 5, 2014, Plaintiff, Joycelyn Love Giles, slipped and fell in a hole in the Wal-Mart parking lot and suffered "severe injuries to the structure, tissue and muscles of his [sic] body." (Rec. Doc. 1-1, at 2, 4.) As a result, Plaintiff

filed a petition for damages in the Civil District Court for the Parish of Orleans against Wal-Mart Louisiana LLC, Wal-Mart Stores Inc., Industrial Development Board of the City of New Orleans, Louisiana, Inc., and Todd Jabbia, the Wal-Mart manager at the time of the accident.

On March 23, 2016, Wal-Mart Louisiana LLC and Wal-Mart Stores Inc. (collectively "Wal-Mart") removed this action on the basis of diversity jurisdiction. (Rec. Doc. 1.) There is no dispute that Plaintiff is a Louisiana citizen. Nor is it disputed that Industrial Development Board of the City of New Orleans, Louisiana, Inc. ("IDB") and Todd Jabbia are also Louisiana citizens for purposes of diversity jurisdiction. Although complete diversity appears to be lacking, Wal-Mart asserts that Plaintiff improperly joined IDB and Jabbia "in order to defeat diversity jurisdiction and keep this matter in state court." *Id.* at 3. Wal-Mart contends that Plaintiff has no arguable or reasonable basis on which to state a cause of action against them. *Id.*

Plaintiff maintains that IDB and Jabbia were properly joined in this case and therefore this Court lacks jurisdiction. Accordingly, Plaintiff filed the instant *Motion to Remand* **(Rec. Doc. 13)** on April 19, 2016. Defendants opposed the motion on April 26, 2016. On May 4, 2016, Plaintiff was granted leave to file a reply.

## LEGAL STANDARD

A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a) (2011). "A federal district court has subject matter jurisdiction over a state claim when the amount in controversy is met and there is complete diversity of citizenship between the parties." *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 397 (5th Cir. 2013) (citing 28 U.S.C. § 1332(a)). The amount in controversy required by § 1332(a) is currently $75,000. *Id.* The court considers the jurisdictional facts that support removal as of the time of removal. *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000). Because removal raises significant federalism concerns, any doubt about the propriety of removal must be resolved in favor of remand. *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281-82 (5th Cir. 2007).

**\*2** Section 1441(b) specifies that an action otherwise removable solely on the basis of diversity jurisdiction may not be removed if any "properly joined" defendant is a citizen of

2016 WL 2825778

the state in which the action was brought. 28 U.S.C. § 1441(b) (2). Thus, a properly joined in-state [1] defendant will prevent removal, but an improperly joined in-state defendant will not. *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 572 (5th Cir. 2004).

The party seeking removal bears a heavy burden of proving that the joinder of the in-state defendant was improper. *Id.* at 574. The Fifth Circuit has recognized two ways to establish improper joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party." *Id.* at 573 (quoting *Travis v. Irby*, 326 F.3d 644, 646-47 (5th Cir. 2003)). To establish improper joinder where there is no allegation of actual fraud the defendant must demonstrate that there is no possibility of recovery by the plaintiff against any in-state defendant, which stated differently means that there is no reasonable basis to predict that the plaintiff might be able to recover against an in-state defendant. *Id.* "A 'mere theoretical possibility of recovery under local law' will not preclude a finding of improper joinder." *Id.* at 573 n.9 (quoting *Badon v. RJR Nabisco Inc.*, 236 F.3d 282, 286 (5th Cir. 2000)).

A court should ordinarily resolve the issue by conducting a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendants. *Id.* at 573. The federal pleading standard governs whether a plaintiff has stated a claim against a nondiverse defendant for purposes of the improper joinder analysis. *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, No. 14-20552, 2016 WL 1274030, at *3 (5th Cir. Mar. 31, 2016). Where a plaintiff has stated a claim, but has misstated or omitted discrete and undisputed facts that would preclude recovery, the Court may, in its discretion, pierce the pleadings and conduct a summary inquiry. *Smallwood*, 385 F.3d at 573. Because the purpose of the improper joinder inquiry is to determine whether the in-state defendant was properly joined, the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case.

### DISCUSSION

In order to avoid remand, Defendants must establish that both IDB and Jabbia were improperly joined. If either IDB or Jabbia is a properly joined defendant, then complete diversity does not exist and this Court lacks jurisdiction. With respect to the amount in controversy, Wal-Mart asserts that it is

facially apparent that Plaintiff's claim will exceed 75,000 and points to Plaintiff's interrogatory response that she claims she sustained damages in excess of $75,000. (Rec. Doc. 1-1, at 13.) Thus, the sole issue before the Court is whether IDB and Jabbia were properly joined. Because there is no dispute that IDB and Jabbia are, in fact, Louisiana citizens, the Court must determine whether Plaintiff has stated a claim against IDB or Jabbia.

**\*3** First, the Court considers whether Jabbia is a properly joined defendant. Jabbia is alleged to be the general manager of the Wal-Mart store where the incident at issue occurred. The dispositive issue is whether Plaintiff has stated a claim that Jabbia is personally liable to her. Under Louisiana law, a store manager or employee may be personally liable for a customer's injury on store premises only if (1) the employer owes a duty of care to the customer; (2) the employer delegated that duty to the employee; (3) and the employee breached this duty through his own personal fault and lack of ordinary care. *Moore v. Manns*, 732 F.3d 454, 456-57 (5th Cir. 2013) (citing *Canter v. Koehring Co.*, 283 So. 2d 716, 721 (La. 1973), *superseded on other grounds by statute*, La. Rev. Stat. § 23:1032). However, personal liability cannot be imposed upon the employee simply because of his "general administrative responsibility." *Canter*, 283 So. 2d at 721. The employee "must have a personal duty towards the injured plaintiff, breach of which specifically caused the plaintiff's damages." *Id.*

Plaintiff argues that Jabbia breached his duty to maintain safety of the premises and is therefore personally liable to her for the damages she sustained. Plaintiff's petition alleges that Jabbia "had care, custody and control and/or was responsible for providing and supervising the premises so that safe ingress and egress was available to the area where [Plaintiff] fell." (Rec. Doc. 1-1, at 2.) This is the only allegation specific to Jabbia. Plaintiff further alleges that "all defendants had actual or constructive knowledge that an unreasonably dangerous condition existed and/or that a hole in the floor of the premises existed." *Id.* at 2-3. In addition, Plaintiff's petition includes a boilerplate list of alleged negligent acts committed by all Defendants, including the following:

a. Failure to properly manage and maintain the property and store;

b. Failure to manage and maintain the building and adjacent area and store in safe condition;

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 56 of 80
PageID: 10006

Giles v. Wal-Mart Louisiana LLC, Not Reported in Fed. Supp. (2016)

2016 WL 2825778

c.  Failure to take all precautions such as to avoid this accident;

d.  Failure to discover and correct an existing dangerous condition;

e.  Failure to provide business invitees, such as petitioner, with a safe place to walk;

f.  Failure to maintain the property in accordance with Municipal, State, and other applicable codes;

g.  Failure to maintain the property and store in good working condition;

h.  Failure to properly supervise and conduct the work onsite and operation of the property and store at issue;

i.  Giving express or implied authorization to unsafe practices;

j.  Failure to properly inspect and implement management, maintenance, janitorial, and safety procedures at the property and store at issue;

k.  Failure to implement proper safety and maintenance procedures at property and store at issue;

l.  Failure to repair the hole at the subject fall area;

m.  Failure to maintain the property in good working condition;

n.  Failure to provide signage warning of potential hazards at the subject fall area of the premises at issue.

*Id.* at 3-4. Plaintiff argues that these allegations are sufficient to state a claim against Jabbia for his personal liability.

Several federal district courts in Louisiana have found similar allegations insufficient to support personal liability on the part of a store manager or employee and concluded that the store manager or employee was improperly joined to defeat diversity.[2] For example, in *Robinson v. Wal-Mart Stores, Inc.*, a plaintiff sued a Wal-Mart store and its general manager after she slipped and fell while shopping in the store. No. 15-6871, 2016 WL 1572078, at *1 (E.D. La. Apr. 19, 2016). The defendants removed on the basis of improper joinder of the manager, and the plaintiff moved to remand. *Id.* The court denied the motion to remand, concluding that the manager was improperly joined because the plaintiff failed to allege that the manager owed a personal, independent duty to store

patrons, delegated to him by Wal-Mart, which he breached through personal, rather than technical or administrative, fault. *Id.* at *3.

**\*4**  Similarly, in *Rushing v. Wal-Mart Stores, Inc.*, a plaintiff sued Wal-Mart and the store manager for personal injuries she allegedly sustained when two cases of drinks fell on her head while she attempted to remove a case of drinks from a shelf. No. 15-269, 2015 WL 1565064, at *1 (E.D. La. Apr. 8, 2015). The plaintiff alleged that the manager was liable for a list of negligent acts, such as failing to exercise vigilance, failing to supervise his employees, failing to properly stock the shelves, and failing to inspect the shelving to remove dangerous conditions. *Id.* at *3. The court concluded that plaintiff's allegations against the manager were insufficient to trigger personal liability because plaintiff did not allege that the manager knew of or actively contributed to any alleged unsafe conditions. *Id.* at *4. The court found it to be "a classic case of attempting to place liability upon an employee 'simply because of his general administrative responsibility for performance of some function of employment.'" *Id.* (quoting *Carter v. Wal-Mart Stores Inc.*, No. 04-0072, 2005 WL 1831092, at *3 (W.D. La. July 28, 2005)).

In contrast, in *Lounsbury v. Winn-Dixie Louisiana, Inc.*, the plaintiff was looking at various pie fillings when a store employee walked up behind him and squatted by his feet. No. 95-2544, 1995 WL 626211, at *1 (E.D. La. Oct. 20, 1995). As the plaintiff made his selection, he tripped and fell backwards over the squatting employee. *Id.* The court held that the plaintiff stated a claim against the employee because the plaintiff alleged that the employee "breached his duty to him by obstructing his passage and negligently tripping him." *Id.* at *2. There, the alleged negligence did not arise out of a "general administrative responsibility," but from a personal duty the employee owed to the plaintiff. *Id.*

The allegations in Plaintiff's petition are more analogous to those in *Robinson* and *Rushing* than those in *Lounsbury*. Plaintiff has not alleged that Jabbia owed her a personal, independent duty, the breach of which caused her to slip and fall. Nor has Plaintiff alleged that Wal-Mart delegated to Jabbia the duties which it owed to third-party patrons as a merchant under Louisiana law.[3] Instead, Plaintiff generically alleges that Jabbia failed to supervise, provide proper safety procedures to Wal-Mart's employees, and maintain the premises in a safe condition. These assignments do not entail a personal duty to ensure Plaintiff's safety. *See, e.g.*, *Rushing, 2015 WL 1565064, at *2.* Further, Plaintiff does not allege

Giles v. Wal-Mart Louisiana LLC, Not Reported in Fed. Supp. (2016)
2016 WL 2825778

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 57 of 80
PageID: 10007

that Jabbia personally knew or actively contributed to any alleged unsafe conditions. *See id.* Plaintiff's allegation that all Defendants "had actual or constructive knowledge" of the allegedly dangerous condition on the premises is a conclusory allegation that the Court is not required to accept and it does not amount to an allegation that Jabbia personally knew of the allegedly dangerous hole in the parking lot. *See Martin*, 2016 WL 952258, at *3.

In sum, a review of Plaintiff's petition reveals no allegations that Wal-Mart ever delegated any of its duties to protect the safety of Plaintiff nor that Jabbia ever acted unreasonably. This is "a classic case of attempting to place liability upon an employee 'simply because of his general administrative responsibility for performance of some function of employment.' " *Rushing*, 2015 WL 1565064, at *4. Under such circumstances, Plaintiff cannot recover against Jabbia under Louisiana law. Therefore, Jabbia has been improperly joined.

Second, the Court considers whether IDB is a properly joined defendant. Plaintiff alleges that IDB was the owner of 1901 Tchoupitoulas Street, the premises where the incident at issue occurred. According to Defendants, IDB entered into a lease agreement with Riverview Retail Development Company LLC ("Riverview") for the lease of immovable property on which the Wal-Mart store was constructed. (Rec. Doc. 1-1, at 9.) Riverview then assigned the lease agreement to Wal-Mart Real Estate Business Trust. *Id.* At the time of the incident, Wal-Mart was the lessee under the lease agreement and IDB was the lessor. The lease agreement includes a provision requiring the lessee to make all repairs, and it provides that the lessor shall not be required to maintain or repair any part of the property. *Id.* at 10.

 **5**  Plaintiff argues that IDB is properly joined as a defendant because "Louisiana jurisprudence is well settled that an owner-lessor is held in strict liability for personal injuries sustained by his lessee as a result of defects on the leased premises." (Rec. Doc. 13-2, at 5.) In support of this assertion, Plaintiff cites *Winchell v. Johnson Props., Inc.*, 640 So. 2d 399, 403 (La. App. 3 Cir. 1994) (Cooks, J., dissenting) (citing La. Civ. Code art. 2322). Louisiana Civil Code article 2322, cited in the dissenting opinion in *Winchell*, was amended in 1996. In 1996, the Louisiana legislature enacted sweeping tort reform, which reduced the standard of liability for landowners from strict liability to negligence. *See* 1996 La. Acts 710. Accordingly, under the new legislation, a lessor is no longer held strictly liable in tort for damages resulting from defects

in the premises. Thus, the dispositive issue is whether Plaintiff has stated a claim against IDB for negligence.

Article 2322 currently provides that the owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. La. Civ. Code art. 2322. However, the owner is answerable for damages "only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." *Id.*

Similarly, article 2317.1 provides that the owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, "only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." La. Civ. Code art. 2317.1. Thus, liability under both articles is predicated on negligence. Under both articles, the plaintiff must show that the defendant knew or should have known of the condition that caused the harm.

Plaintiff further argues that IDB's obligation to keep its property free of defects is nondelegable and therefore IDB cannot contractually limit its liability to third persons for injuries arising from defects on the premises. (Rec. Doc. 13-2, at 5.) Plaintiff cites *Klein v. Young*, 111 So. 495 (La. 1927), for this proposition. In *Klein*, the court held that a provision in a contract of lease could not relieve a lessor of liability to third persons. *Id.* at 497. At the time of the court's ruling in *Klein*, article 2322 imposed strict liability on the owner of a building for damage caused by a defect in the property. However, *Klein* was statutorily overruled by Louisiana Revised Statutes section 9:3221.

Louisiana Revised Statutes section 9:3221 provides that "the owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time." La. Rev. Stat. § 9:3221. The statute "was undoubtedly designed to relieve the owner of some of the burdens imposed upon him by law in cases where he had

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 58 of 80
PageID: 10008
Giles v. Wal-Mart Louisiana LLC, Not Reported in Fed. Supp. (2016)
2016 WL 2825778

given dominion or control of his premises to a tenant under a lease." *Jamison v. D'Amico*, 955 So. 2d 161, 166 (La. App. 4 Cir. 2007).

To establish liability on the part of a lessor who has passed on responsibility for the condition of his property to his lessee, "a plaintiff must establish that (1) he sustained damages; (2) there was a defect in the property; and (3) the lessor knew or should have known of the defect." *Smith v. French Mkt. Corp.*, 886 So. 2d 527, 530 (La. App. 4 Cir. 2004). Thus, just as under articles 2317.1 and 2322, a plaintiff must show that the lessor knew or should have known of the defect. [4]

**\*6** Here, Plaintiff's allegations are insufficient to state a plausible claim for relief against IDB. As discussed above, Plaintiff's bald assertion that all Defendants had actual or constructive knowledge of the allegedly defective condition is a conclusory allegation that the Court is not required to accept. Plaintiff fails to plead any facts to demonstrate that IDB knew or should have known of the defect. Defendants submitted the affidavit of IDB President Alan Phillipson, which states that IDB did not know of a hole in the parking lot, did not receive notice of a hole in the parking lot, and, in accordance with the lease agreement, did not inspect the premises or make any repairs. Because Plaintiff has failed to state a claim against IDB, the Phillipson affidavit is immaterial.

In sum, a review of Plaintiff's petition reveals no allegations showing that IDB knew or should have known of the alleged defect or that IDB acted unreasonably. Under such circumstances, Plaintiff cannot recover against IDB under Louisiana law. Therefore, IDB has been improperly joined.

The Court concludes that Defendants have demonstrated that there is no reasonable basis to predict that Plaintiff will

recover on her claims against Jabbia and IDB. Accordingly, the Court may ignore Jabbia's and IDB's citizenship for the purpose of determining the existence of subject matter jurisdiction. The parties have asserted no other impediment to this Court's exercise of diversity jurisdiction, and the pleadings and notice of removal establish that diversity jurisdiction exists in this case. The motion to remand is therefore denied.

For the same reasons that Plaintiff's motion to remand is denied, it is appropriate to dismiss Plaintiff's claims against Jabbia and IDB. *See Int'l Energy Ventures Mgmt.*, 2016 WL 1274030, at *9 ("When, as here, a court determines that a nondiverse party has been improperly joined to defeat diversity, that party *must* be dismissed without prejudice.").

<u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's *Motion to Remand* **(Rec. Doc. 13)** is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants Todd Jabbia and Industrial Development Board of the City of New Orleans, Louisiana, Inc. are **DISMISSED without prejudice.**

New Orleans, Louisiana, this 13th day of May, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 2825778

---

Footnotes

1    The term "in-state" is used to describe a defendant who is a citizen of the state where the action was brought, preventing removal under § 1441(b), as well as a defendant who would be nondiverse from a plaintiff, destroying diversity jurisdiction under § 1332(a).

2    *See, e.g.*, *Martin v. Winn Dixie Montgomery, LLC*, No. 15-5770, 2016 WL 952258, at *3 (E.D. La. Mar. 14, 2016) (holding that plaintiff who slipped and fell on water on the floor near a leaking cooler failed to state a claim against the store manager because plaintiff's "bald assertion" that the manager "had direct knowledge" of the leaking cooler was insufficient to suggest anything beyond the manager's "general administrative responsibility" as store manager); *Gautreau v. Lowe's Home Ctr., Inc.*, No. 12-630, 2012 WL 7165280, at *4 (M.D. La. Dec. 19, 2012) (holding that plaintiff who was injured when a board fell from a shelf and hit her failed to state a claim against the store manager because plaintiff did not allege that the manager "actively contributed to or had any personal knowledge of a harmful condition sufficient to create a personal duty owed to her"); *Brady v. Wal-Mart Stores, Inc.*, 907 F. Supp. 958, 960 (M.D. La. 1995) (holding that plaintiff who was injured when several boxes fell on her failed to state a claim against the store manager because the plaintiff

did not allege that the manager "was the employee who stacked the boxes improperly or who personally caused the accident"); *Tudbury v. Galloway*, No. 91-1719, 1991 WL 112013, at *1 (E.D. La. June 14, 1991) (holding that plaintiff who slipped and fell on a liquid substance failed to state a claim against the store manager because plaintiff did not allege that the manager "caused the spill or saw the spill and neglected to clean it").

3    Wal-Mart, as a merchant, owes its patrons a duty to exercise reasonable care to keep its floors in a reasonably safe condition, ensuring that the premises are free of hazardous conditions which might reasonably cause damage. La. Rev. Stat. § 9:2800.6.

4    Section 9:3221 was enacted in 1932 in order to reduce the lessor's tort liability from strict liability to a negligence standard when the lease contained an assumption of liability clause. Because the 1996 tort reform changed the underlying tort standard, the inclusion of an assumption of liability clause in a lease likely no longer has an effect on tort claims: "the lessor is simply liable for his own negligence, regardless of any agreement of the parties to the contrary." Melissa T. Longrass, *The Anomalous Interaction Between Code and Statute: Lessor's Warranty and Statutory Waiver*, 88 Tul. L. Rev. 423, 464-69 (2014). Although courts continue to utilize a distinct three-part test for liability when the lease contains an assumption of liability clause, "in substance the inquiry is no different from the negligence analyses under articles 2317.1, 2322, and 2315." *Id.* at 468.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2004 WL 1925010
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re: DIET DRUGS (PHENTERMINE/
FENFLURAMINE/DEXFENFLURAMINE)
Products Liability Litigation
Larry Wayne EDWARDS
v.
WYETH, et al.

No. MDL 1203, Civ.A. 03-20284.
|
Aug. 30, 2004.

**Attorneys and Law Firms**

Bryan F. Aylstock, Justin G. Witkin, Neil D. Overholtz, Aylstock, Witkin & Sasser, PLC, Gulf Breeze, FL, Douglass A. Kreis, Sarasota, FL, for Plaintiff. Matthew J. Moore, Toby J. Bonar, Shook Hardy & Bacon LLP, Tampa, FL, Karen Marie Stanford, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Maria Charles Mc Guinness, Carlton Fields Ward Emmanuel Smith & Cut, R. Benjamine Reid, Popham, Haik, Schnobrich and Kaufman, Ltd., Steven E. Siff, McDermott Will and Emery, Miami, FL, for Defendants.

*MEMORANDUM AND PRETRIAL ORDER NO. _____*

BARTLE, J.

**\*1** THIS DOCUMENT RELATES TO:
Before the court is the motion of plaintiff Larry Wayne Edwards, a Florida citizen, to remand his complaint to the Circuit Court of Hillsborough County, Florida. This motion is before the undersigned as transferee judge in MDL 1203, the mass tort litigation involving the diet drug commonly known as fen-phen.

The complaint was originally filed on December 6, 2002, more than five years after the diet drugs Pondimin and Redux were withdrawn from the market in September, 1997. Plaintiff has sued a number of diverse defendants, including Wyeth, the manufacturer of Pondimin and Redux, as well as the phentermine manufacturer Celltech Pharmaceuticals, Inc. ("Celltech"), and Interneuron Pharmaceuticals, Inc., now known as Indevus, a co-promoter of Redux. Plaintiff has

also brought claims against Eckerd Corporation ("Eckerd"), a retail pharmacy chain that allegedly filled his diet drug prescriptions. All of the defendants except Eckerd are of diverse citizenship. There are no federal claims. Wyeth timely removed the action to the United States District Court for the Middle District of Florida. The case was then transferred to this court as part of MDL 1203.

Wyeth contends that Louisiana law governs this dispute because plaintiff's alleged injury occurred in Louisiana. Plaintiff was prescribed diet drugs in Louisiana by a Louisiana physician and obtained them from an Eckerd retail pharmacy in Louisiana. He was purportedly diagnosed with FDA-positive regurgitation in Louisiana by a Louisiana cardiologist and exercised his intermediate opt-out right from Louisiana. Plaintiff apparently moved to Florida thereafter.

As the MDL transferee court in this matter, we must apply the choice-of-law rules of Florida, the state where the transferor court sits. *See In re Sunrise Sec. Litig.,* 698 F.Supp. 1256, 1261 (E.D.Pa.1988); *In re Managed Care Litig.,* 298 F.Supp.2d 1259, 1269 (S.D.Fla.2003). Florida choice-of-law rules require us to apply the law of the state with the most significant relationship to plaintiff's case. *Merkle v. Robinson,* 737 So.2d 540, 542 (Fla.1999). Thus, we must look to the law of the state where the injury occurred unless some other state has a more significant relationship to the occurrence and the parties. *Bishop v. Fla. Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla.1980); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146 (1971).

We need not decide whether Florida or Louisiana law controls because the result would be the same under either standard. Applying Florida law, we find that Eckerd is fraudulently joined as a defendant for the same reasons set forth in Memorandum and Pretrial Order ("PTO") No. 3856 in *Bankston, et al. v. Wyeth, et al.,* CIV. A. No. 03-20765 (E.D.Pa. Aug.12, 2004).

Under Louisiana law, a non-manufacturer seller of a defective product such as Eckerd "may be liable for damages only if he knew or should have known of the dangerous characteristic of the product. Additionally, a seller has no duty to inspect a product for inherent vices or defects prior to sale and has no duty to warn or instruct buyers on proper use." *Strickland v. Brown Morris Pharmacy, Inc.,* 1996 WL 537736, at \*2 (E.D.La. Sept.20, 1996)(internal citations and quotations omitted); *see also* LA. CIV.CODE ANN. art. 2545 (West 2004). Plaintiff contends that "Eckerd made affirmative

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 62 of 80
PageID: 10012
In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Not Reported in...
2004 WL 1925010

representations to the consuming public and the Plaintiff that it could detect and safeguard against dangerous drug-drug interactions." Compl. at ¶ 11. However, plaintiff's complaint falls far short of alleging that Eckerd knew or should have known of the dangers of Pondimin and Redux. Thus, under Louisiana law, there is "no reasonable basis in fact or colorable ground" supporting plaintiff's claims against Eckerd. *See Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990).

**\*2** With respect to plaintiff's claims against Celltech, the phentermine defendant in this case, we find that Celltech is fraudulently joined for the same reasons set forth in PTO No. 2567 in *Anderson v. Am. Home Prods., Co.,* 220 F.Supp.2d 414 (E.D.Pa.2002).

Finally, plaintiff argues that remand is required because Eckerd and Celltech failed to consent to removal. *See* 28 U.S.C. § 1446. However, the consent of a fraudulently joined defendant is not required for us to retain jurisdiction. *Balazik v. County of Dauphin,* 44 F.3d 209, 213 (3d Cir.1995) (citations omitted).

We will deny plaintiff's motion to remand this action to the Circuit Court of Hillsborough County, Florida and will dismiss the complaint as to Eckerd and Celltech.

*PRETRIAL ORDER NO. _____*

AND NOW, this day of August, 2004, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiff to remand is DENIED;

(2) all defendants in the above-captioned action except Wyeth and its related companies and Interneuron Pharmaceuticals are DISMISSED; and

(3) the motion of defendant Wyeth for extension of time to file a response to plaintiff's remand motion (Doc. # 6) is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1925010

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  E062  2

# TAB 10

E063

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Trusted Transportation Solutions, LLC v. Guarantee
Insurance Company, D.N.J., May 4, 2020

2012 WL 3952069
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re CHEERIOS MARKETING AND
SALES PRACTICES LITIGATION.

Civil Action No. 09–cv–2413.
|
MDL Docket No. 2094.
|
Sept. 10, 2012.

**MEMORANDUM AND ORDER**

PETER G. SHERIDAN, District Judge.

**\*1** This matter comes before the Court on Defendant
General Mills, Inc.'s ("Defendant") a motion for summary
judgment. More specifically, the issue is whether the Plaintiffs
have suffered any concrete or particularized injury in order
to have standing to sue. See *Koronthaly v. L'Oreal USA,
Inc.,* 374 Fed. Appx. 257 (2010). On or about January
4, 2010, Plaintiffs, consumers who purchased Cheerios® [1]
cereals produced and distributed by General Mills, Inc., filed
a consolidated amended class action complaint (Amended
Complaint). Plaintiffs allege eight causes of action in the
Amended Complaint: (1) a violation of the Minnesota
Consumer Fraud Act; (2) a violation of the Minnesota
Unlawful Trade Practices Act; (3) a violation of the
Minnesota Deceptive Trade Practices Act; (4) a violation
of the Minnesota False Statement in Advertising Act; (5)
a violation of state consumer protection laws; (6) breach
of express warranty; (7) breach of implied warranty of
merchantability and fitness for a particular purpose; and (8)
unjust enrichment.

About a year ago, the Court denied a motion to dismiss for
failure to allege a cognizable harm or a reasonable means
to measure damages, and instead ordered limited discovery.
Limited discovery seemed reasonable based on counsel's oral
representation that Plaintiffs could not show any injury since
Plaintiffs did not know the cost of Cheerios upon which

damages would be calculated; and other plaintiffs ate all of
the Cheerios purchased for reasons unrelated to the claims
brought in this case. As such, limited discovery focused on
whether the Plaintiffs's could establish quantifiable damages.
In addition, another issue arose as to the choice of law
issue; i.e. whether Minnesota law (where General Mills
is headquartered) should apply in this case. Pursuant to
the discovery schedule, limited discovery consisting of
interrogatories, document production and depositions was
conducted. Upon completion of this discovery, General Mills
filed a motion for summary judgment.

*Facts*

Plaintiffs are consumers of Cheerios who reside in California,
New Jersey, and New York. Although each named Plaintiff
can be associated with a particular state, the Amended
Complaint is on behalf of all similarly situated individuals
in the United States. Defendant, General Mills, a corporation
organized and existing under the laws of the State of
Delaware, maintains a principal place of business in
Minnesota from where it markets, distributes, produces, and
sells Cheerios throughout the United States [2].

This dispute revolves around Defendant's alleged
misrepresentations regarding the health benefits of
Cheerios. Plaintiffs contend that Defendant made "uniform
representations concerning the health benefits of Cheerios
[which] are false, misleading and likely to deceive the
consuming public because they misrepresent Cheerios' ability
to reduce cholesterol, reduce the risk of heart disease and
certain forms of cancer." The most prevailing theme of
the Amended Complaint was the representation concerning
the alleged cholesterol-lowering benefits of Cheerios. For
example, according to Plaintiffs, Defendant advertised that
Cheerios could lower a person's cholesterol by 4% in six
weeks.

**\*2** What led to the filing of this case was a May 5,
2009 warning letter from the Food and Drug Administration
(the "FDA letter") to General Mills. In the FDA Letter,
the FDA reviewed the label and labeling of Cheerios®
Toasted Whole Grain Oat Cereal. The FDA's review found
serious violations of the Federal Food, Drug, and Cosmetic
Act (the Act)" and the applicable regulations. The FDA
noted that General Mill's advertising practices improperly
represented that Cheerios "was intended for use in lowering
cholesterol, and therefore in preventing, mitigating, and

Case 1:19-md-02875-RMB-SAK    Document 523-6    Filed 07/17/20    Page 65 of 80
PageID: 10015
In re Cheerios Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d (2012)

2012 WL 3952069

treating the disease hypercholesterolemia which requires Cheerios to comply with drug regulations." That is, Cheerios' representation to consumers about lowering their cholesterol levels by a certain percentage constituted a pharmaceutical formulation which would subject Cheerios to regulatory approval as a drug. As a result of the FDA Letter, on May 19, 2009, six class action suits were filed in California, New York and New Jersey. Subsequently, the United States Judicial Panel on Multidistrict Litigation Committee consolidated the Plaintiff's actions into this multi-district litigation [3] .

In addition to the present action, there is a separate FDA proceeding pending wherein the FDA is investigating the labeling of foods which advertise specific health benefits such as Cheerios. As a result of the FDA Letter, Cheerios has changed its label in order to avoid the drug approval process.

Plaintiffs also allege that the "health benefits of Cheerios, as represented by General Mills in its marketing, advertising, packaging, labeling and other promotional materials, are a material factor in the promotion of Cheerios, and have led directly to increased product sales, but are misleading and deceptive."

The Amended Complaint provides several examples of the allegedly deceptive statements. In one nationwide advertisement, General Mills stated that by eating Cheerios, "You can Lower Your Cholesterol 4% in 6 weeks." The advertisement also stated that "a study showed that eating two 1 cup servings [4] daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol." Another example is that the main label on the Cheerios box (or the "Principal Display Panel" ("PDP")) features a "fanciful depiction of a heart that is approximately one-third of the PDP's total height," and the label states that Cheerios can lower cholesterol by "10% in one month." The label then states on the lower left-hand portion of the PDP that "Three grams of soluble fiber daily from whole grain oat foods, like Cheerios cereal, in a diet low in saturated fat and cholesterol, may reduce the risk of heart disease—a serving of Cheerios provides 1 gram per serving." On the back of the Cheerios package, the label features in large print the word "WOW!" followed by the question, "I can help lower my cholesterol 10% in one month?" Below that, the label reads:

**\*3** A new study proves Cheerios' cereal plus a reduced calorie diet that is low in fat can help lower bad cholesterol about 10% in one month. The foods you eat or don't eat, along with your lifestyle habits can really make a difference in lowering your cholesterol. Just follow these daily steps for one month to help lower your cholesterol.

General Mills also represents in its advertising that it is the only cereal that reduces cholesterol. The box label noted: "Number of other leading cold cereals clinically proven to help lower cholesterol. 0."

The Amended Complaint also alleges similar statements appear on the General Mill's website:

"Made with whole grain, Cheerios is the only ready-to-eat cereal clinically proven to lower cholesterol when eaten as part of a diet low in saturated fat and cholesterol."

"Our cereals can help lower your cholesterol! As part of a heart healthy diet, the soluble fiber in Cheerios, Honey Nut Cheerios, and Berry Burst Cheerios can help reduce your cholesterol."

"Eating Cheerios each day, as part of a diet low in saturated fat and cholesterol, can help lower your cholesterol, and that could help reduce your risk of heart disease."

"Including whole grain as part of a healthy diet may ... [h]elp reduce the risk of certain types of cancers. Regular consumption of whole grains as part of, a low-fat diet reduces the risk for some cancers, especially cancers of the stomach and colon."

In the limited discovery conducted in advance of this motion, the five named Plaintiffs were deposed and a summary is provided below.

*Edward Myers*

Mr. Myers is a resident of Hudson County, New Jersey. Mr. Myers stated at his deposition that prior to 2008, he often ate bacon, ham and eggs for breakfast before he began consuming Cheerios once per week for breakfast. In 2008, he changed his diet due to his cholesterol count and his doctor's orders. (T. 67, 14–15 and T. 15, 6–20). From 2008 forward, he "ate a lot

of oatmeal," and he "still [eats] at lot of oatmeal." (T 20, 12–14). He also ate Cheerios once per week. (T. 20, 6–9). Since Mr. Myers worked as a limousine driver, and as a result, he dined at restaurants frequently, (T. 21, 10) he ate breakfast at Tommy's Restaurant in Jersey City, (T. 20, 20–21), Di Casa Napoli in Union City, (T. 20, 23–24) and at the Lincoln Inn in Jersey City. (T 21, 2–4). Although Mr. Myers can not estimate how often he ate Cheerios at the restaurants, he recalls that he often ate Cheerios elsewhere on a regular basis including "a bowl of Cheerios and a banana" at his girlfriend's house in the evening. (T. 22, 4–15).

There was little testimony adduced as to whether Mr. Myers read the Cheerios box regarding the cholesterol-lowering benefit at either the restaurants or his girlfriend's house. In addition, Mr. Myers liked the crunchiness and convenience of eating Cheerios. (T. 62, 13–15 and T. 68, 8–21). Mr. Myers conceded that he ate the Cheerios not for any health benefit, but to keep "my belly ... full." (T. 62, 19–23).

 **\*4** Mr. Myers ate Cheerios most of his life. He began buying Cheerios in 1980 (after a divorce) because the yellow box was recognizable. (T. 70, 1–6). He noted "I seen whatever was in there and take one, sometimes two." (T. 70, 7–10). At some point, other people bought Cheerios for Mr. Myers. As Mr. Myers noted "I got a cleaning lady come in and I used to always give them money. I would just write down want I needed and she would get it ... Cheerios is what I put on it." (T. 70, 13–20). Hence, he did not know how much was paid or the size of the boxes purchased. When purchasing Cheerios, Mr. Myers would review the Cheerios box and he noted that the box "said if you use Cheerios, it will lower your cholesterol," but he never saw the media advertisement claiming that Cheerios would lower his cholesterol by a certain percentage. (T. 79, 5–10, T. 79, 15–24).

More pertinent to the case, after a hospital stay in 2008 for cardiac problems, Mr. Myers' girlfriend mentioned the cholesterol-lowering benefit to him, and he began eating Cheerios from a box that had a red heart on the cover. (T. 82, 15–T.83, 7). On this Cheerios box, he read the front cover, but nothing on the back or side of the box. (T. 83, 11–T.84, 4). It is unclear whether it was Mr. Myers or his girlfriend who purchased the Cheerios; however, Mr. Myers could not recall the cost of the Cheerios, or whether the Cheerios that are in a box with a red heart on the box cost more than the boxes without the red heart. (T. 84, 16–22 and T. 85, 2–5).

According to Mr. Myers, he ate Cheerios on the day of his deposition, and Mr. Myers did not discard the Cheerios after he learned of the FDA Letter. It appears that Mr. Myers was comfortable eating Cheerios before and after the FDA Letter for various reasons. Mr. Myers never visited the General Mills website.

*Elsa Acevedo*

Ms. Elsa Acevedo is a resident of Hudson County, New Jersey and she has been eating Cheerios for most of her life, including the day of her deposition. She testified that she suffers from high cholesterol and is under doctor's care for the condition. (T. 18, 9). Ms. Acevedo eats Cheerios because "they are very edible." (T. 18, 24). Ms. Acevedo saw a television commercial about Cheerios reducing cholesterol, and she began eating Cheerios more regularly. According to Ms. Acevedo, after viewing the commercial she "ran to the supermarket and bought a box" (T. 30, 15). She does not recall what she paid for the Cheerios at the Stop n Shop supermarket (T. 30, 18–21), nor did she save any receipts to verify her purchases. (T. 31, 10–13). Ms. Acevedo recalled that she purchased Cheerios because what "caught my eye was like lower your cholesterol." (T. 56, 17–19). Although she remembers the claim about the cholesterol-lowering benefit on the Cheerios box, Ms. Acevedo had no recollection about a more specific representation such as a reduction of cholesterol by "4% in six weeks" or "10% percent in one month." (T. 60, 5–16). Like Mr. Myers, Ms. Acevedo ate Cheerios before, and continued to eat Cheerios after the FDA Letter was issued because "there are very edible." Ms. Acevedo never visited the General Mills website. (T. 92, 17–19).

*Hobin Choi*

 **\*5** Mr. Hobin Choi is a resident of Los Angeles, California. He has been eating Cheerios since he was a kid. (T. 18, 20–24). As an adult, he ate Cheerios because "it lowers cholesterol and ... its just like the common fact ... you always want to lower your cholesterol." (T. 22, 7–13). Mr. Choi understood that Cheerios might lower cholesterol since on "the box it said—right in blue ... said something about lowering cholesterol or helps lower cholesterol" which was a "huge factor" in his decision to purchase Cheerios. He would eat Cheerios 3 to 5 times a day. (T. 58, 8–13). Mr. Choi noted that "it embedded in my head that whatever I eat [something] that is going to be healthier for me .. [it makes] me want to buy it obviously." (T. 23, 13–18). Mr. Choi has not eaten Cheerios since 2009, (T. 25, 16) and that last time he bought Cheerios it cost—"around three to five bucks" (T. 26, 7–8) which he

E066

2012 WL 3952069

characterized as a "guestimation." (T. 27, 18) and T. 31, 22–25). He has no receipts from his purchases of Cheerios. Mr. Choi has never viewed the General Mills website. (T. 35, 14–17).

*Claire Theodore*

Ms. Claire Theodore is a resident of Monmouth County, New Jersey, but she purchased Cheerios in California in 2008 and 2009 about eight times at Ralph's Store and the Pink Dot in Venice, California. (T. 21, 14 through T. 22, 8). Ms. Theodore has no receipts of purchase, but the price she paid was within a "range depending on the size of a box between two something and four something a box. I would guess." (T. 69.1–5). Ms. Theodore did not recall the size of the box she purchased, but testified it was "not the biggest one [but] one that is a little bigger ... than a piece of paper." (T 69, 10–12).

Ms. Theodore read the advertisement on the Cheerios package. The Cheerios package stated: "three grams of soluble fiber daily from whole grain oat food like Cheerios in a diet low in saturated fat and cholesterol may reduce the risk of heart disease." There was nothing about the cholesterol-lowering benefits which enticed her to buy Cheerios because, as Ms. Theodore commented, "I was not trying to lower my Cholesterol." Rather, Ms. Theodore, who has two young children, was impressed with "the simple ingredient list especially the whole grain oats and it's a part of a healthy diet, low in sugar, whole grains ... no chemical preservatives." (T. 76, 10–25). Ms. Theodore remembers seeing a box of Cheerios "with a big heart and the ten percent in a month on the front" and she was "surprised" by the claim (T. 79, 19–25), but this representation did not support her decision to buy Cheerios. (T. 80, 1–15).

Ms. Theodore may have accessed the Cheerios website in 2003. At that time, she was attempting to locate and purchase a container that could be used to carry Cheerios for her baby. (T. 130, 1–10). There is no testimony that Ms. Theodore read the choice of law clause on the website.

*Jeffrey Stevens*

**\*6** Mr. Jeffrey Stevens is a resident of New York. He was under doctor's care for his high cholesterol (T. 24, 18 through T. 25, 12). Due to his high cholesterol count, Mr. Stevens ate Cheerios and shredded wheat for breakfast. (T. 67, 7–13). Mr. Stevens liked Cheerios more than shredded wheat because "its offered in various flavors" (T. 88, 16–17), and lowering his cholesterol was his primary reason for eating it. (T. 88,

20–23). Mr. Stevens did not remember the size of the box he purchased, but recalled it cost "around $4.00" (T. 93, 18–23). Mr. Stevens acknowledged that when Cheerios were on sale at the supermarket, and he and his wife "were looking for those bargains." (T. 96, 4–5). He has no receipts from his purchases of Cheerios.

Mr. Stevens recollection of the Cheerios advertising is ambiguous. For example, when asked if he looked at information about Cheerios, Mr. Stevens answered "no". (T. 113, 10–14). Then he was asked about advertisements he saw, and he was "sure" he saw them, but did not "recall a specific thing." (T. 114, 20–22). On the other hand, Mr. Stevens noted "when you're listening to TV and they're telling you to eat Cheerios and it will lower your Cholesterol, yeah, that could have played a part in it;" but he could not remember any specific advertisement (T. 115, 7–12 and T. 115, 21–25). Mr. Stevens was questioned about the cholesterol-lowering representations on the Cheerios box and any statements associated with that representation, and he stated "the number 5% comes to mind, but I don't know if— I just recall something about 5%, but he did not recall when or where he saw 5% enumerated. (T. 121, 7–16). Mr. Stevens could not "remember" whether any of the boxes he purchased stated that eating Cheerios could "lower your cholesterol 4% in six weeks" (T. 148, 19 through T. 149, 7), nor did he recall the 10% in one month representation. (T. 153, 16–25). Mr. Stevens never looked at the General Mills website. (T. 118, 7–8).

The Plaintiffs also rely on the Declaration of David Elmore, Jr. Mr. Elmore specializes in forensic and investigative accounting, and reviewed some of the 600,000 pages of documents proffered by General Mills. The documents Mr. Elmore reviewed included "Cereal Benefits Association Tracking—Post Wave by MarketTools (2/2006), Heart Health Competitive Review (7/28/08) by General Mills and Symphony IRI retail sales data. Mr. Elmore determined from this data that the cost of Cheerios was about $2.52 per unit (box) in 2006 after sales redemptions. This determination is somewhat consistent with the testimony of the Plaintiffs who indicated the cost to be from "three to five bucks" or "between two something to four something". Mr. Elmore's supplemental report notes that the cost of Cheerios rose by $.10 from 2006–2009 to the price of $3.06 (before sales redemption) while competitor's prices rose by $.05 to the price of $3.35 per box.

The report submitted by Mr. Elmore after his review of the documents provided by General Mills was an interim one, and to finalize it, Mr. Elmore indicated that more data was required. Mr. Elmore, in vague terms, opined that he could use more data to refine his findings. He stated:

**\*7** a. It is possible to calculate the average per unit retail price based on the Symphony IRI sales data for "yellow box" Cheerios;

b. It is further possible to calculate the average per unit reported net sales price charged to retailers by General Mills, Inc.;

c. Based on the "yellow box" Cheerios profitability data, the average operating profit per unit and per ounce can be calculated;

d. With additional data any premium pricing charged by General Mills, Inc. for "yellow box" Cheerios over other competing brands could be calculated; and

e. To the extent additional data becomes available regarding the value to consumers of the health benefits promised within the marketing campaign for "yellow box" Cheerios, it is possible that additional analyses could be performed.

*Law*

The issues pending in this matter are the choice of law issue (i.e. should Minnesota law apply) and whether the Plaintiffs have suffered an injury or have sustained any measurable damages. The analysis is provided below.

*Choice–of–Law*

In MDL proceedings, the court often applies "the choice of law rules of the transferor courts." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 348 (D.N.J.1997). The transferor courts here are California, New Jersey, and New York. When determining choice of law issues, New Jersey courts apply a "most significant relationship" test; and New York and California courts apply a "government interest test." *In re Mercedes–Benz, Tele Aid Contract Litig.,* 257 F.R.D. 46, 57 (D.N.J.2009).

Plaintiffs believe that Minnesota law should apply because General Mills agreed to same on its website. In addition, Minnesota is the headquarters for the corporation and as such

General Mills performed numerous operations there. Namely, the operations listed by Plaintiffs are:

• Minnesota is the location of the marketing department for Cheerios. All of the individuals working within the marketing department for Cheerios, including the vice president of marketing for Cheerios who was the principal person responsible for approving the language contained on the labeling of Cheerios as well as in the advertisements, work out of General Mills' offices in Minnesota.

• Minnesota is the location of the research and development department which plays a role in the marketing and advertising of Cheerios as well as in the approval of language used on the labels of Cheerios. All of the individuals working within the research and development department work out of General Mills offices in Minnesota.

• Minnesota is the location of the quality department which is responsible for reviewing the labeling of Cheerios before it is sent to the printer. All of the individuals working within the quality department work out of General Mills offices in Minnesota.

• Minnesota is the location of the legal department which is involved in reviewing and approving the language used on the Cheerios labels and in the advertisements for Cheerios.

**\*8** • Minnesota is the location of the Bell Institute which was responsible for assisting General Mills with the science involved in their products, including Cheerios.

• Minnesota is the location of the scientists and nutritionists employed by the Bell Institute who consulted with General Mills on the content of the labeling and packaging of Cheerios.

• Minnesota is the location of where the marketing department, research and development department, legal department, the quality department and the Bell Institute all "collaborated" concerning the content of the language or the labeling for the Cheerios packaging as well as the language used in the advertising and marketing of Cheerios.

• Counsel for General Mills has even acknowledged that the marketing of the Cheerios cereal at issue in Plaintiff's complaint emanated from decisions made at General Mills headquarters in Minnesota. General Mills made this same

acknowledgment on a call with Judge Arpert on December 12, 2011 concerning the status of discovery.

• Minnesota is the location of focus groups, a form of "qualitative research" used by General Mills to assist it in its marketing of Cheerios.

• Minnesota is the location of the "brand development" agency, Schawk, which assisted General Mills with the packaging of the Cheerios boxes.

• Minnesota is listed on the packaging of Cheerios boxes as the "General Offices" for General Mills.

• Minnesota is the location of each of the 12 custodians identified by counsel for General Mills as having relevant information to topics related to Cheerios marketing and the science involved in Cheerios.

Contrary to Plaintiffs' contentions, General Mills argues that the law of each state where each Plaintiff resides should be used to determine the law to be applied. To General Mills, the location of purchase, and where the Plaintiffs were when each read the representations should control. General Mills discounts the website reference to Minnesota law because none of the Plaintiffs viewed the choice of law provision on the website.

A. *"Most Significant Relationship" Test (New Jersey)*
Under New Jersey's "most significant relationship" test, before engaging in any substantive choice-of-law analysis, a court first must determine whether there is an actual conflict among the laws of these states. *Agostino v. Quest Diagnostics,* 256 F.R.D. 437, 461 (D.N.J.2009). It is settled law that there are conflicts among the states' various consumer protection statutes. *See Elias v. Ungar's Food Products, Inc.,* 252 F.R.D. 233, 247 (D.N.J.2008); *Fink v. Ricoh Corp.,* 365 N.J.Super. 520, 584 (Super. Ct. Law Div.2003). Moreover, Plaintiffs do not dispute that there is an actual conflict among the consumer protection statutes of New Jersey, California, New York, and Minnesota. (*See* Dkt. No. 37 at 14–15; Dkt. No. 68 at 27–28).

Having resolved the threshold issue, the next step of New Jersey's "most significant relationship" test requires analysis under section 148 of the Restatement (Second) Conflict of Laws *See P.V. ex rel. T.V. v. Camp Jaycee,* 962 A.2d 453, 460 (N.J.2008); *Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 462 (D.N.J.2009). In cases such as the one at bar, where "the plaintiff's action in reliance took place ... in a state other

than where the false representations were made," a court shall consider the following six factors:

**\*9** (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) Conflict of Laws § 148(b). In the instant matter, all of these factors militate in favor of applying the law of the jurisdictions from where class members reside except factor (e), which applies equally to each party and is therefore a nullity. Plaintiffs argue that this situation is identical to *In re Mercedes–Benz Tele Aid Contract Litigation,* 257 F.R.D. 46 (D.N.J.2009), where it was held New Jersey law applied to a multi-district litigation originating from six different states. (Opp'n Br. at 9–12, citing *Mercedes–Benz,* 257 F.R.D. at 66–67). This Court disagrees. First, the facts of *Mercedes–Benz* are slightly distinguishable. In *Mercedes–Benz,* Mercedes–Benz U.S.A., L.L.C., headquartered in New Jersey, actively offered and provided the underlying subscription service. *Mercedes–Benz,* 257 F.R.D. at 51. In the instant case, General Mills sold Cheerios to local retailers, and the local retailers resold Cheerios to Plaintiffs. Second, in *Mercedes–Benz,* the Court stressed the availability of treble damages under the NJCFA as evidence that New Jersey had the strongest interest in applying its own law. *Mercedes–Benz,* 257 F.R.D. at 68. In this case, there is no corresponding interest in applying Minnesota law. (*See* Opp'n Br. at 10 n. 9 ("Minnesota does not allow treble damages ...")). More specifically, Plaintiffs can not rely on any representations made by General Mills on their website because none of them had ever viewed it.

In sum, factors (a), (b), (e), and (f) point to the using the law of the states of purchase while only factor (c) points to using Minnesota law. The next step of the "most significant

2012 WL 3952069

relationship" test requires the Court to examine these contacts in light of the principles stated in Restatement (Second) Conflict of Laws § 6. See *P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 147 (2008). "Reduced to their essence, the § 6 principles are: '(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states.' " *Id.* (quoting *Erny v. Estate of Merola,* 171 N.J. 86 (2002)). Here, Minnesota has no interest in compensating out-of-state consumers. *Cf. Gray v. Bayer Corp.,* Civ. No. 08–4716, 2011 WL 2975768, at *5 (D.N.J. July 21, 2011). Moreover, Plaintiffs only transacted with local retailers and had no direct involvement with General Mills in Minnesota. Minnesota's only contacts with this litigation is by way of Defendant's headquarters. In contrast, Plaintiffs' respective home states have clear interests. The Court thus concludes that the "interests of interstate comity" and the "competing interests of the states" counsel in favor of applying the law of the various jurisdictions from which class members will be drawn. Thus in the instant matter, having analyzed the contacts under § 148 and in light of the principles stated in § 6 of the Reinstatement, the Court will apply state law. For example, New Jersey law will apply to the New Jersey Plaintiffs, Edward Myers and Elsa Acevedo.

B. *"Government Interest" Test (California & New York)*
**\*10** 'The "government interest" test requires the Court to first determine whether a conflict exists between the laws of the interested states. *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 56 (D.N.J.2009). If no conflict exists, the Court will apply the law of the forum state, in this case New Jersey. *Kearney v. Salomon Smith Barney, Inc.,* 137 P.3d 914, 922 (2006); *Karaha Bodas Co., LLC v. Perushahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 85 (2d Cir.2002). However, "if the court finds that there is a true conflict," then the Court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Kearney,* 137 P.3d at 922; *see also Istim, Inc. v. Chem. Bank,* 581 N.E.2d 1042, 1044 (1991). Importantly, "under the 'interests analysis' approach, the law of the jurisdiction having the greatest interest in the litigation will be applied and only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Istim, Inc. v. Chem. Bank,* 581 N.E.2d 1042, 1044 (1991).

As explained above, a conflict exists between the consumer protection laws of Minnesota, California, and New York. (*See* Dkt. No. 37 at 14–15; Dkt. No. 68 at 27–28). Thus, the Court must "evaluate[ ] and compare[ ] the nature and strength of the interest of each jurisdiction in the application of its own law." *Kearney,* 137 P.3d at 922. In the instant matter, discovery has confirmed that the New York and California Plaintiffs purchased Cheerios within their home states. Additionally, neither the California Plaintiffs nor the New York Plaintiffs read Defendant's website provision about conflicts of law during the relevant time period. Based on these facts, the Court has determined that each state's interest in applying their own consumer protection law to their own citizens outweighs any interest possessed by Minnesota. Thus the Court will apply New York law to the New York Plaintiff (Jeffrey Stevens) and California law to the California Plaintiffs (Claire Theodore and Hobin Choi). As such, the four counts concerning Minnesota statutes are dismissed.

*Standing to Sue*
Generally, to meet the constitutional requirement to sue, there must be concrete injury, as well as two other requirements. As Judge Roth enunciated:

> To prove constitutional standing, Koronthaly must demonstrate (1) an injury-in-fact that is actual or imminent and concrete and particularized, not conjectural or hypothetical, (2) that is fairly traceable to the defendant's challenged conduct, and (3) is likely to be redressed by a favorable judicial decision. *Summers v. Earth Island Inst.,* 555 U.S. 488, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009)

*Koronthaly v. L'Oreal USA, Inc.,* 374 Fed. Appx. 257 (2010). This motion concerns whether there is an injury-in-fact that is actual or imminent and concrete and particularized. The briefing of the parties often referred to the damages alleged by the Plaintiffs such as the return of the full purchase price, benefit of the bargain damages, and disgorgement of profits (Amended Complaint, paragraphs 73, 83, 89, and 138).

In re Cheerios Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d (2012)

2012 WL 3952069

*Plaintiffs May Not Recover Full Purchase Price Refunds.*

**\*11** Plaintiffs seek a full refund for all boxes of Cheerios that Plaintiffs purchased during the relevant time-frame. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs "would not have purchased Cheerios" but for Defendant's "deceptive practices." That assertion does not comport with the testimony of the Plaintiffs. Mr. Myers, Ms. Acevedo and Ms. Theodore testified that they still eat or purchase Cheerios today for various reasons including the ingredients (Ms. Theodore), and the taste (Mr. Myers and Ms. Acevedo) and convenience. See, *Romano v. Galaxy Toyota,* 399 N.J.Super. 470, 483 (App.Div.2008). Generally, "the 'out-of-pocket' theory applies when the purchase price of a misrepresented product [may be refunded] so long as ... *the seller's misrepresentations rendered the product essentially worthless." Mann v. TD Bank, N.A.,* 2010 WL 4226526, at \*5 (D.N.J. Oct. 20, 2010) (citation omitted) (emphasis added).

Here, there is no indication that Defendant's misrepresentation "rendered the product essentially worthless." *Mann,* 2010 WL 4226526 at \*5 (citation omitted). Ms. Acevedo and Mr. Myers purchased their Cheerios for crunchiness, taste, convenience and to keep ones "belly full" as well as to lower their cholesterol. Moreover, Ms. Theodore, like many mothers, selected Cheerios due to its healthy, simple ingredients for her children. The contention that these Plaintiffs would not have purchased Cheerios but for Defendant's misrepresentation seems tenuous especially since Mr. Myers and Ms. Acevedo still eat Cheerios today. Moreover, Ms. Theodore had no loss because she purchased Cheerios for the ingredients, hence she did not rely on the cholesterol-lowering benefit. See, *Mason,* 2011 WL 1204556 at \*4. As such, Plaintiffs fail to adequately allege that Plaintiffs are entitled to full purchase price refunds when they ate the Cheerios after learning of the FDA Letter, and are still eating them today for other reasons.

The Plaintiffs rely on *Lee v. Carter Reed,* 4 A.3d 561 (2010). In *Lee,* Plaintiffs had purchased a substance called Relacore which was manufactured by the defendant. Relacore was a weight reduction product that shrinks belly fat and decreases anxiety. The named plaintiff paid $120.00 for three bottles of Relacore. The representations of defendant Carter Reed about the benefits of Relacore were deceptive. In *Lee,* one of the issues was whether there was an ascertainable loss. The Supreme Court of New Jersey noted that a loss cannot be hypothetical or illusory, but is "an out-of-pocket loss, and/or replacement cost." *Id.* at 576–77. *See, Thiedemann v. Mercedes–Benz USA,* 872 A.2d 783 (2005). In *Lee,* the Court

found the ascertainable loss to be "the purchase price of a bottle of broken promises" and the Court considered the cost of Relacore as an out-of-pocket loss. *Lee,* 4 A.3d at 580. The *Lee* case is distinguishable from this case. Unlike consumers of Cheerios, once the consumer knew of the deception, they immediately ceased using Relacore. The same is not true in this case—Mr. Myers and Ms. Acevedo still eat Cheerios; and Ms. Theodore never accepted any representation regarding lowering cholesterol (i.e. no broken promise to her). Hence, return of purchase price is beyond any loss sustained when the Cheerios were fully consumed for other reasons.

*Plaintiffs May Not Receive "Benefit of the Bargain" Damages.*

**\*12** Plaintiffs alternatively seek the difference between what Plaintiffs paid for Cheerios and the price that Plaintiffs would have paid for Cheerios, if Defendant had not engaged in the alleged misrepresentation. Plaintiffs state that Defendant's actions harmed Plaintiffs because Plaintiffs would not have paid as much money for Cheerios but for "[Defendant's] deceptive practices." This theory of relief is equally flawed. Plaintiffs allege that they "paid money for a product that was of lesser value than what was represented." *Mason,* 2011 WL 1204556 at \*4 (internal quotation marks and citation omitted); *see also Solo v. Bed Bath & Beyond, Inc.,* 2007 WL 1237825, at \*3 (D.N.J. Apr. 26, 2007) ("Plaintiff fails to specifically allege that what he did receive was of lesser value than what was promised, i.e., that the sheets he received were worth an amount of money less than he was promised ...."). The *Mason* analysis on this issue is instructive:

> When plaintiffs purchased Diet Coke Plus, they received a beverage that contained the ingredients listed on its label. Plaintiffs have not explained how they experienced any out-of-pocket loss because of their purchases, or that the soda they bought was worth an amount of money less than the soda they consumed. At most, plaintiffs simply claim that their expectations of the soda were disappointed. Dissatisfaction with a product, however, is not a quantifiable loss that can be remedied under the [New Jersey Consumer Fraud Act].

*Mason,* 2011 WL 1204556 at *4 (citations omitted).

Based on *Mason,* Plaintiffs do not adequately allege "benefit of the bargain" damages. As this Court has previously noted, the Amended Complaint "floats upon the FDA's letter and findings." (Transcript of September 1, 2010 Hearing, 15:11–12). Plaintiffs' allegations regarding "an apparent and somewhat arcane [alleged] violation of FDA food labeling regulations" does not show that Plaintiffs purchased boxes of Cheerios that did not contain the ingredients listed on the Cheerios boxes. *Mason,* 2011 WL 1204556 at *5, n. 4. Moreover, the Plaintiffs, except for Mr. Choi and Mr. Stevens, consumed all of the Cheerios purchased for various reasons such as convenience and crunchiness. Plaintiffs therefore fail to adequately allege that Plaintiffs suffered "benefit of the bargain" damages.

Plaintiffs generally rely on the case of *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 99 (D.N.J.2011) to support their benefit of the bargain argument. In *Smajlaj,* one of the major issues was "whether the allegations ... are sufficiently plead an 'ascertainable loss' as required for a claim under the New Jersey Consumer Fraud Act." *Id.* at 84. In *Smajlaj,* the Plaintiff's contention was that Campbell Soup advertised low sodium soup when in fact the low sodium soup contained the same amount of sodium as other regular Campbell soups. The cost of the low sodium soup was 20 to 80 cents higher than the regular soups. According to the District Court, the benefit of the bargain theory "requires nothing more than the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised." *Id.* at 99. However, the district court noted that "a consumer has not experienced any injury if the consumer merely has some expectation about a product that is not met." *Id.* at 99–100. "But if the consumer received a product that "was worth objectively less than what one could reasonably expect," then that type of defeated expectation is an injury." *Id.* See also *Koronthaly v. L'Oreal USA, Inc.,* 374 Fed. App'x 257, 259 (3d Cir.2010). In light of that background, the District Court in *Smajlaj* set forth the standard for finding a benefit of the bargain loss, as

> *13 A plaintiff alleging a benefit-of-the-bargain states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that

the difference in value between the product promised and the one received can be reasonably quantified.

*Smajlaj,* 782 F.Supp.2d at 99. In applying the standard to this matter, the Plaintiffs do not objectively quantify their loss. For instance, Mr. Theodore can not meet part 1 of the aforementioned test because she did not rely on the cholesterol lowering representation. Mr. Myers and Ms. Acevedo can not meet part 2 of the test because they still eat Cheerios today; hence, the misrepresentation did not alter their selection of purchasing Cheerios. In addition, none of the plaintiffs estimated any loss amount, or a difference in price between a comparative produce and Cheerios. Plaintiffs therefore fail to adequately allege they suffered a benefit of the bargain loss.

*Plaintiffs Are Not Entitled to Disgorgement of Profits.*
Plaintiffs additionally seek to recover "equitable monetary relief as may be necessary to disgorge and/or restore monies received by Defendant as a result of Defendant's alleged deceptive conduct." (*See* Amended Complaint, Prayer, ¶ E). Like the two prior theories of relief, Plaintiffs' request for disgorgement of profits fails. "Liability to disgorge profits is ordinarily limited to cases of ... conscious wrongdoing." Restatement Third, Restitution and Unjust Enrichment, Vol. 1 § 3, p. 22 (2011). Accordingly, disgorgement does not apply to "innocent recipients" or "inadvertant tortfeasors". *Id.* In this case, it was surprising for the FDA to assert that Cheerios must seek regulatory approval as a drug, in order to represent that Cheerios could lower cholesterol. Generally, the cholesterol-lowering representation may be true in a broad sense that whole wheat oats are more heart "friendly" than the ham and eggs Mr. Myers chose to eat previously. Parenthetically, the FDA will permit unqualified health claims based upon significant scientific agreement among experts. See, *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales.,* 701 F.Supp.2d 356, 363 (E.D.N.Y.2010). As such, Cheerios broad representation about lowering cholesterol does not appear to be a deliberate misrepresentation by a conscious wrongdoer as set forth by Plaintiffs.

Unjust enrichment is not a viable theory—and disgorgement is therefore not available—in circumstances in which a consumer purchases specific goods and receives those same specific goods. *See Adamson v. Ortho–McNeil Pharm., Inc.,*

In re Cheerios Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d (2012)

2012 WL 3952069

463 F.Supp.2d 496, 505 (D.N.J.2006). In order to obtain disgorgement of profits, a plaintiff must demonstrate that a defendant was unjustly enriched. *See generally, Illiadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 110 (2007). An unjust enrichment cause of action arises where: (1) a defendant received a benefit from the plaintiff; and (2) the defendant's retention of such a benefit is inequitable. *United States v. Albinson,* 2010 WL 3258266, at *18 (D.N.J. Aug. 16, 2010) (citation omitted). As mentioned, Plaintiffs fail to demonstrate that they purchased Cheerios for which they did not receive any value. Healthy ingredients, crunchiness, convenience and taste are value components. *Mason,* 2011 WL 1204556 at *5, n. 4. As such, Plaintiffs have not set forth a viable unjust enrichment cause of action, and disgorgement of profits is not an appropriate remedy. See, *Koronthaly v. L'Oreal USA, Inc.,* 374 Fed. App'x 257, 259 (3d Cir.2010) (wherein a plaintiff lacked standing to sue). The *Koronthaly* court stated "absent any allegation that she received a product that failed to work for its intended purpose or was worth objectively less ... [plaintiff] has not demonstrated a concrete injury in fact" as to the lipstick she purchased. Similarly here, Plaintiffs Mr. Meyers, Ms. Acevedo and Ms. Theodore have not shown any concrete injury.

**\*14** Equitable relief such as disgorgement is often ordered when no other form of relief will compensate for the injury. Often in class actions, the theory is that a class action will address a wrong which will otherwise not be remedied. Here, the FDA notified Cheerios of the over-aggressive labeling, and Cheerios has entered discussions with FDA representatives. As such, the wrong will be remedied in some fashion through regulatory intervention. As such, no other equitable relief is necessary since the representations have been addressed.

From reading the above, there is little discussion about Mr. Choi and Mr. Stevens. The class action claims must be dismissed for the following reason. Fed.R.Civ.P. 23. Generally, "the claims ... of the representative parties are typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3).

Here, Mr. Choi consumed Cheerios two or three times per day and stopped eating Cheerios when he learned of the FDA Letter. Mr. Stevens on the other hand had very little recollection about the content of the Cheerios advertisements, and, he may not be a credible complainant to represent a class due to his faulty memory. Although Mr. Choi and Mr. Stevens may have some injury, their cases can not be considered typical. The cases of Mr. Myers, Ms. Acevedo and Ms. Theodore show that many Cheerios consumers buy them for different reasons and General Mills should be allowed to litigate each claim on the factual differences. As such, the class allegations of Mr. Choi and Mr. Stevens are dismissed.

*Order*

This Court has reviewed all submissions and heard oral argument. For the reasons set forth in the above Memorandum,

IT IS on this 10th day of September, 2012,

ORDERED that Count 1 (Minnesota Consumer Fraud Act), Count 2 (Minnesota Unlawful Trade Practices Act), Count 3 (Minnesota Deceptive Trade Practices Act), and Count 4 (Minnesota False Statement in Advertising Act) are dismissed; and it is further

ORDERED that Defendant's motion for summary judgment is granted against Mr. Myers, Ms. Acevedo and Ms. Theodore; and it is further

ORDERED that Defendants motion for summary judgment is granted on all class action allegations of Mr. Jeffreys' and Mr. Choi's amended complaint.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3952069

Footnotes

1    Although Cheerios® is a registered trademark of General Mills, in this opinion the Court refrains from using the such marks for the sake of convenience.

2    Plaintiffs identified ten brands of Cheerios at issue in this case: (1) original Cheerios, (2) Honey Nut Cheerios, MultiGrain Cheerios, (4) Banana Nut Cheerios, (5) Cheerios Crunch, (6) Berry Burst Cheerios, (7) Frosted Cheerios, (8) Apple Cinnamon Cheerios, (9) Fruity Cheerios, and (10) Yogurt Burst Cheerios. When referring to those brands collectively the Court uses the blanket term "Cheerios."

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3952069

3    One Plaintiff, Charity E. Huey, also filed a complaint in California (Case No. 09–5152), but was dismissed from the case for failure to respond to discovery.

4    According to the FDA, the claim of General Mills that eating 1 ½ cup servings daily of Cheerios cereal reduced bad cholesterol when eaten as part of a diet low in saturated fat and cholesterol "indicates that Cheerios is intended for use in lowering cholesterol, and therefore in preventing, mitigating, and treating the disease hypercholesterolemia." According to the FDA, the health benefits claimed by General Mills exceed those permitted for products that have not obtained FDA approval for marketing as a drug.

---

**End of Document**                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

E075

2020 WL 2306440
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

AIRHAWK INTERNATIONAL, LLC, a

California Limited Liability Company, Plaintiff,

v.

ONTEL PRODUCTS CORPORATION,

a New Jersey Corporation; and Does
1 through 50, inclusive, Defendants.

Case No. 18-cv-00073-MMA-AGS
|
Signed 05/08/2020

**Attorneys and Law Firms**

Michael W. Vivoli, Michael Louis Federici, Vivoli Saccuzzo, LLP, San Diego, CA, for Plaintiff.

Jenny Theresa Slocum, Pro Hac Vice, Dickinson Wright PLLC, Washington, DC, John S. Artz, Pro Hac Vice, Dickinson Wright PLLC, Troy, MI, Scott Phillip Shaw, William Paul Cole, Call & Jensen APC, Newport Beach, CA, Steven Caloiaro, Dickinson Wright PLLC, Reno, NV, for Defendants.

### ORDER DENYING PLAINTIFF'S
### MOTION FOR RECONSIDERATION

HON. MICHAEL M. ANELLO, United States District Judge

**\*1** Plaintiff Airhawk International, LLC ("Airhawk") brings this action against Defendant Ontel Products Corporation ("Ontel") asserting claims of: (1) Trademark Infringement, in violation of the Lanham Act, 15 U.S.C. § 1114(1); (2) Common Law Trademark Infringement; (3) False Designation of Origin and False Description, in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (4) Unfair Competition, in violation of California Business and Professions Code §§ 17000 et seq. and 17500 et seq. See Compl., Doc. No. 1. On January 2, 2020, the Court granted partial summary judgment for Ontel on the issue of Airhawk's request for disgorgement of profits, finding that Airhawk "fail[ed] to provide evidence to raise a triable issue of fact as to whether Ontel willfully infringed its mark." See Doc. No. 130 at 41. [1] Airhawk now moves for reconsideration, arguing that (1) good cause exists to grant reconsideration of partial

summary judgment on the issue of disgorgement of profits, see Doc. 139-1 at 8-10, and (2) an intervening change in the law after the United States Supreme Court decided Romag Fasteners, Inc. v. Fossil Group, Inc., (2020) 590 U.S. ——, Case No. 18-1233 ("Romag") requires reconsideration. See Doc. No. 143. Ontel filed an opposition to the motion, to which Defendant replied. See Doc. Nos. 140, 141. Ontel also filed a response to Airhawk's supplemental brief in support of its motion for reconsideration. See Doc. No. 144. The Court found the matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1. See Doc. No. 141. For the reasons set forth below, the Court **DENIES** Airhawk's motion for reconsideration.

### BACKGROUND

Airhawk is the owner of United States Patent and Trademark Office ("PTO") Registration No. 4,009,225 (hereinafter "the Airhawk word mark") for the standard character mark bearing the word "AIRHAWK." See Compl., Ex. A. The Airhawk word mark was first used in 1997 and has been used continuously for goods or services related to truck and motorcycle seat cushions and/or related products. See id. Airhawk is also the owner of PTO Registration Nos. 4,009,228 and 4,977,720 for the configuration of a hawk design and a hawk design located between the words "AIR" and "HAWK," respectively. See id., Ex. B. [2]

Ontel develops, markets, and distributes a wide variety of consumer products, which it sells through a direct-to-consumer market, commonly referred to in the industry as "As Seen on TV." In 2016, Ontel developed a portable, battery-operated, handheld, automatic air compressor to inflate tires. The air compressor product launched in January 2017. Ontel selected the name "Air Hawk" for its air compressor. On December 12, 2016, Ontel filed a trademark application with the PTO for its "AIR HAWK" logo in connection with air compressors. The PTO approved Ontel's application, finding no conflicting marks that would bar registration. Ontel maintains that it had no knowledge of Airhawk's marks at the time it selected the AIR HAWK name for its product. Airhawk opposed registration of Ontel's application on December 18, 2017 before the Trademark Trial and Appeal Board. The opposition is suspended pending the outcome of this action.

**\*2** Airhawk claims that Ontel's use of the name "Air Hawk" has created confusion among consumers, causing damage to Airhawk's business, reputation, and goodwill.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2306440

Airhawk asserts that Ontel's marketing campaign related to the introduction of Ontel's air compressor product in early 2017 caused Airhawk to experience a decline in sales. In February 2017, Airhawk's intellectual property counsel sent a letter to Ontel regarding Ontel's pending trademark application for "AIR HAWK" and highlighted the similarities between the parties' marks. On March 24, 2017, Ontel's intellectual property counsel responded and identified the differences between the parties' products and trade channels. Airhawk did not respond to Ontel's March 2017 letter.

On January 11, 2018, Airhawk commenced the instant action alleging trademark infringement of PTO Registration Numbers 4,009,225, 4,009,228, and 4,977,720. Compl. ¶ 10. Airhawk further asserts that sales of Defendant's goods utilizing the name "AIR HAWK" constitute a false designation of origin, deceptive trade practices, and unfair competition. *Id.* ¶ 22. Airhawk seeks damages and permanent injunctive relief, including "an order requiring Defendants, and each of them, to account for and pay AIRHAWK all illegal profits from their sale and/or distribution of infringing products." *See* Compl. at 11.

As noted above, the Court previously granted partial summary judgment for Ontel on the issue of Airhawk's request for disgorgement of profits. Airhawk moves for reconsideration, arguing that (1) good cause exists to grant reconsideration of partial summary judgment on the issue of disgorgement of profits, *see* Doc. 139-1 at 8-10, and (2) an intervening change in the law requires reconsideration. *See* Doc. No. 143. Ontel contends that the motion is untimely, improper under Rule 60(b), and fails on the merits, even though *Romag* changed the law with respect to willfulness as a required showing for a plaintiff seeking disgorgement of profits under 15 U.S.C. § 1117(a). *See* Doc. Nos. 140 at 1-8; 144 at 1-3.

## DISCUSSION

### 1. Legal Standard

The Federal Rules of Civil Procedure do not expressly provide for motions for reconsideration. However, a motion for reconsideration may be construed as a motion to alter or amend a final judgment, order, or proceeding under Rule 60(b). *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989); *In re Arrowhead Estates Dev. Co.*, 42 F.3d 1306, 1311 (9th Cir. 1994). Additionally, a motion for reconsideration is proper under Civil Local Rule 7.1.i.1. *See* CivLR 7.1.i.

Reconsideration under Rule 60 may be granted in the case of: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence; or (3) fraud; or if (4) the judgment is void; (5) the judgment has been satisfied; or (6) for any other reason justifying relief. Fed. R. Civ. P. 60(b). Under Rule 60, a motion for "relief from a final judgment, order or proceeding" may be filed within a "reasonable time," but must be filed "no more than a year after the entry of the judgment or order or the date of the proceeding" for reasons (1), (2), and (3). Fed. R. Civ. P. 60(c)(1). Under the Local Rules, "[e]xcept as may be allowed under Rules 59 and 60 of the Federal Rules of Civil Procedure, any motion ... for reconsideration must be filed within twenty-eight (28) days after the entry of the ruling, order or judgment sought to be reconsidered." CivLR 7.1.i.2.

Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). "Ultimately, however, the decision on a motion for reconsideration lies in the Court's sound discretion." *Labastida v. McNeil Techs., Inc.*, No. 10-CV-1690-MMA (CAB), 2011 WL 767169, at *2 (S.D. Cal. Feb. 25, 2011) (citing *Navajo Nation v. Norris*, 331 F.3d 1041, 1046 (9th Cir. 2003)). Airhawk bases its motion for reconsideration on the catchall provision of Rule 60(b)(6). *See* Doc. No. 47 at 6.

### 2. Analysis

**\*3** Airhawk argues that its motion for reconsideration is timely made, and in any event the Court should reach the merits as any delay was not unreasonable. *See* Doc. No. 139-1 at 6-8. Airhawk further argues that the Court granted partial summary judgment for Ontel based on evidence that Ontel has since stipulated it will not rely on "in any way before the Court—including testimony, evidence, argument, and written submissions—to support its 'innocent intent' or 'good faith' affirmative defenses." *See* Doc. No. 139-1 at 8-10 (citing Doc. No. 109 at 2:14-18). Airhawk also asserts that an intervening change in the law requires reconsideration and reversal of the Court's order granting Ontel partial summary judgment on disgorgement of profits. *See* Doc. No. 143 at 2-3. Ontel responds that Airhawk's motion is untimely under the Local Rules and fails on the merits. *See* Doc. No. 140 at 1-8. Ontel also argues that while the Supreme Court's *Romag* decision admittedly changed the applicable law, *Romag* nevertheless supports this Court's grant of partial summary judgment on Airhawk's request for disgorgement of profits. *See* Doc. No. 144 at 1-3. The Court will address these arguments in turn.

2020 WL 2306440

A. Timeliness

As an initial matter, Ontel argues that Airhawk's motion is untimely for failure to comply with Local Rule 7.1.i.2. *See* Doc. No. 140 at 1-2. The Court issued its summary judgment order on January 2, 2020. *See* Doc. No. 130. Because Airhawk did not file its motion for reconsideration until March 4, 2020, *see* Doc. No. 139, its motion is untimely under Local Rule 7.1.i.2. *See Brady v. Grendene USA, Inc.*, No. 3:12-CV-0604-GPC-KSC, 2015 WL 3539702, at *3 (S.D. Cal. June 3, 2015) (motion for reconsideration was untimely when filed outside of Local Rule 7.1.i.2's 28-day window). Airhawk argues that Rule 60's "reasonable time" standard governs, as opposed to Local Rule 7.1.i.2's 28-day window, and in any event, the Court should exercise its discretion to consider the merits of Airhawk's motion. *See* Doc. 139-1 at 7-8.

The Court finds that Airhawk did not file its motion for reconsideration within a reasonable time. As an initial matter, Airhawk could have brought the underlying evidentiary issue to the Court's attention shortly after Ontel filed its August 5, 2019 stipulation "not [to] use its attorney-client communications concerning its trademark search and related documents in any way before the Court ...." Doc. No. 109 at 2:14-18. At that time, Ontel's motion for summary judgment was fully briefed and pending before the Court. Airhawk could have sought leave to file a supplemental brief objecting to Ontel's reliance on evidence falling under the umbrella of "attorney-client communications" and "related documents."

Moreover, even giving Airhawk the benefit of Rule 60's "reasonable time" standard, Airhawk should have filed its motion in a timely fashion after the Court issued its summary judgment ruling. Nevertheless, Airhawk waited until March 4, 2020 to file its motion for reconsideration. According to Airhawk, the reason for the delay is because it interpreted this Court's order to schedule a mandatory settlement conference "to mean the Court did not intend to entertain any further motions by the parties until they first attended the [conference]." Doc. No. 139-1 at 7. However, the Court finds it unreasonable to interpret an order to *schedule* a conference as implying that the Court would not entertain a motion for reconsideration within the 28-day window specified in the Local Rules.

Nevertheless, because the parties agree that there has been an intervening change in the relevant underlying law, the Court will exercise its discretion to consider Airhawk's motion on its merits under Rule 60(b).

B. Effect of Ontel's Stipulation

Airhawk argues that the Court granted partial summary judgment to Ontel on the issue of a profit-based remedy "almost exclusively on evidence that has since been rendered subject to an exclusionary order at trial." Doc. No. 139-1 at 8. Ontel replies that Airhawk cannot meet the Rule 60(b) standard since the Court's partial summary judgment order is not a "final judgment", and in any event, its basis for seeking reconsideration is without merit. *See* Doc. No. 140 at 2-8.

**\*4** By its express terms, Rule 60(b) applies to "final judgment[s], order[s], or proceeding[s] ...." "Final decisions end[ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 884 (9th Cir. 2003) (internal citations and quotations omitted). This Court's order granting partial summary judgment for Ontel is not a final judgment. *See id.* ("An order granting partial summary judgment is usually not an appealable final order under 28 U.S.C. § 1291 because it does not dispose of all of the claims."). The Court's order did not dispose of all claims, as Airhawk may proceed in seeking to recover actual damages as a result of the alleged trademark infringement. *See* Doc. No. 130 at 44. Airhawk neglects to address the standard of finality in briefing its motion for reconsideration and thereby implicitly concedes that it cannot meet this standard.

Even assuming *arguendo* that the partial summary judgment order is "final" for purposes of reconsideration under Rule 60(b), Airhawk also fails to show it is entitled to relief from the Court's ruling. Its asserted basis, that this Court granted partial summary judgment "almost exclusively" based on evidence that will now be excluded at trial, is erroneous. The Court granted partial summary judgment because Airhawk "fail[ed] to provide evidence to raise a triable issue of fact as to whether Defendant willfully infringed its mark." Doc. 130 at 41. Contrary to Airhawk's assertion, the evidence that the Court considered in granting partial summary judgment for Ontel has not since been excluded. As Ontel recognizes, the two key pieces of evidence that the Court considered —(1) Ontel's counsel's March 2017 letter to Airhawk's counsel regarding the parties' respective marks and (2) the United States Patent and Trademark Office's acceptance of Ontel's trademark applications—"have nothing to do with the attorney-client communications that were" the subject of Ontel's stipulation. Doc. No. 140 at 7. Rather, the evidence is non-privileged information bearing on Ontel's mental state with respect to its infringement of Airhawk's marks.

Furthermore, the Court's key finding remains true: Airhawk failed to carry its burden of raising a triable issue of fact as to whether Ontel acted with a mental state demonstrating that disgorgement of profits is an appropriate remedy.

In sum, even if the Court's partial summary judgment order is reviewable under Rule 60(b), the Court based its ruling on evidence that is not subject to exclusion at trial under the terms of the August 5, 2019 stipulation.

### C. *Romag*

Airhawk next argues that under *Romag*, Ontel is not entitled to summary judgment on Airhawk's claim for disgorgement of profits. *See* Doc. No. 143. Ontel replies that *Romag* does not affect the Court's ruling, but rather supports a finding that it was "proper and appropriate." Doc. No. 144 at 1-2.

In *Romag*, the Supreme Court held that willfulness was not an "inflexible precondition" for a trademark plaintiff seeking disgorgement of profits from a defendant for a violation of 15 U.S.C. § 1117(a). Slip Op. at 6-7. However, the Court recognized that given the tradition that considering a defendant's mental state is relevant to assigning an appropriate remedy, "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Id.* at 7.

As discussed above, in reaching its ruling, the Court relied on two key pieces of evidence that were relevant to whether Ontel acted with a culpable mental state in infringing Airhawk's mark. *Romag* recognized that such evidence of Ontel's mental state was a "highly important consideration" for the Court in exercising its discretionary and equitable authority as to whether Airhawk should be awarded disgorgement of Ontel's profits. *Id.* at 7 ("[I]t is a principle long reflected in equity practice where district courts have often considered a defendant's mental state, among other factors, when exercising their discretion in choosing a fitting remedy.") (citations omitted); *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 883 (5th Cir. 2019) ("[D]isgorgement is ultimately an equitable remedy subject to the district court's sound discretion.").

**\*5** Moreover, the Court's consideration of Ontel's mental state was especially appropriate here because Airhawk sought this profit-based remedy not for compensatory purposes, but as a restitutionary measure of damages. *See* Doc. No. 130 n. 17. The Restatement recognizes that disgorgement of profits is typically appropriate in cases involving "conscious wrongdoers;" in these cases, plaintiffs, like Airhawk here, seek disgorgement of profits not necessarily to be made whole, but to prevent the defendant from retaining gains made possible by its wrongdoing. *See* Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) ("This profit-based measure of unjust enrichment determines recoveries against conscious wrongdoers and defaulting fiduciaries. Recovery so measured may potentially exceed any loss to the claimant."). "This is not a case, moreover, where the defendant violated the Lanham Act and emerged unscathed," *Retractable Techs.*, 919 F.3d at 884, as Airhawk may proceed against Ontel for a recovery of any actual damages it can prove at trial. *See* Doc. No. 130.

In short, reconsideration is not warranted here. In opposing Ontel's motion for summary judgment, Airhawk failed to make any showing that disgorgement of profits was appropriate in light of Ontel's mental state and the facts surrounding the alleged § 1117(a) violation. Therefore, the Court exercised its sound discretion in granting partial summary judgment on the issue of disgorgement of profits.

### CONCLUSION

Based on the foregoing, the Court **DENIES** Airhawk's motion for reconsideration.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 2306440

---

Footnotes

1   The Court's citations to electronically filed documents refer to the pagination assigned by the document's author, rather than the pagination assigned by the CM/ECF system.

2   Airhawk's word and design marks are collectively referred to as Airhawk's "marks."

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.