# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

**EXHIBIT F: True and Accurate Copies of Unpublished Judicial Opinions Referenced in Exhibits B and C to the Pharmacy Defendants' Memorandum of Law**

*/s/ Sarah E. Johnston*
Sarah E. Johnston
Kara Kapke
Kristen L. Richer
BARNES & THORNBURG LLP
2029 Century Park East
Suite 300
Los Angeles, CA 90067
(310) 284-3798
(310) 284-3894

*Counsel for CVS Pharmacy, Inc.*
(incorrectly named as CVS Health Corporation)

F001

# **TABLE OF CONTENTS**

**Cases** Tab / Page

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods.*
  *Liab. Litig.*,
  No. 3:11–cv–20153, 2012 WL 1831789 (S.D. Ill. May 18, 2012) .......... 1 / F007

*Sanks v. Parke-Davis*,
  No. 00–S–1122–E, 2000 WL 33910097 (M.D. Ala. Oct. 30, 2000)........ 2 / F012

*Harrell v. Wyeth-Ayerst Labs.*,
  No. Civ.A. 98–1194, 1999 WL 33548540 (S.D. Ala. Feb. 1, 1999)........ 3 / F018

*Orr v. Wyeth-Ayerst Labs.*,
  No. CV-98-3000, 1999 WL 33548162 (Ala. Cir. Ct. Aug. 2, 1999) ....... 4 / F021

*Lansdell v. Am. Home Prods. Corp.*,
  No. Civ.A. CV99S2110NE, 1999 WL 33548541 (N.D. Ala. Oct.
  26, 1999) ................................................................ 5 / F026

*Gardner v. Aloha Ins. Servs.*,
  No. 2:11–CV–3450, 2013 WL 839884 (N.D. Ala. Mar. 4, 2013) .......... 6 / F035

*Strong v. Merck & Co*,
  No. CV 2005-053195, 2009 WL 7233281 (Ariz. Super. Nov. 09,
  2009) .................................................................... 7 / F043

*Mills v. Bristol-Myers Squibb Co.*,
  No. CV 11–00968, 2011 WL 4708850 (D. Ariz. Oct. 7, 2011)............... 8 / F053

*Garza v. Endo Pharm.*,
  No. CV 12–1585, 2012 WL 5267897 (C.D. Cal. Oct. 24, 2012)............. 9 / F058

*Ambriz v. CVS Pharmacy, Inc.*,
  No. 1:19-cv-01391, 2020 WL 1660018 (E.D. Cal. Apr. 3, 2020).......... 10 / F062

*Oshima v. Kia Motors Corp.*,
  Civil No. 11–cv–03349, 2012 WL 1578397 (D. Colo. May 4,
  2012) ................................................................... 11 / F071

*Bullock v. Daimler Trucks N. Am., LLC*,
    Civil Action No. 08–cv–00491, 2010 WL 1380724 (D. Colo. Mar.
    30, 2010) ............................................................... 12 / F078

*Altieri v. CVS Pharm.*,
    No. X06CV020171626S, 2002 WL 31898323 (Conn. Super. Ct.
    Dec. 13, 2002) ......................................................... 13 / F083

*Ealy v. Richardson-Merrell, Inc.*,
    No. 83–3504, 1987 WL 159970 (D.D.C. Jan. 12, 1987) ....................... 14 / F088

*Keffer v. Lorenz*,
    No. 2012 CA 1563 M, 2012 WL 2951228 (D.C. Super. July 5,
    2012) .................................................................... 15 / F092

*Daniels v. Keffee Food Co.*,
    No. CV 16-659, 2018 WL 4217066 (D. Del. Sept. 5, 2018) .................. 16 / F099

*In re Asbestos Litig.*,
    C.A. No. 04C-07-099, 2007 WL 4571196 (Del. Super. Ct. 2007) ......... 17 / F104

*Isham v. Padi Worldwide Corp.*,
    Nos. 06-00382, 06-00386, 2007 WL 2460776 (D. Haw. Aug. 23,
    2007) .................................................................... 18 / F118

*Hale v. Bayer Corp.*,
    No. 15-cv-00745, 2015 WL 5474298 (S.D. Ill. Sept. 16, 2015) ............ 19 / F136

*Aranda v. Walgreen Co.*,
    No. 12-cv-337, 2012 WL 1884737 (S.D. Ill. May 23, 2012) ................ 20 / F141

*Grimmer v. Schmitz*,
    No. 84 C. 3544, 1985 WL 3031 (N.D. Ill. Oct. 3, 1985) ....................... 21 / F147

*Bobay v. Walgreen Co.*,
    No. 1:07-CV-119, 2009 WL 1940727 (N.D. Ind. June 30, 2009) .......... 22 / F150

*A.L. ex rel. Limkemann v. Jake's Fireworks, Inc.*,
    No. 3:18-cv-00028, 2020 WL 3399912 (S.D. Iowa Apr. 2, 2020) ........ 23 / F157

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods.*
*Liab. Litig.*,
Nos. MDL 1203, Civ. A. 99-20186, 2000 WL 1886594 (E.D. Pa.
Dec. 7, 2000)............................................................................ 24 / F164

*Flint v. Target Corp.*,
No. 3:07CV-00600, 2009 WL 87469 (W.D. Ky. Jan. 13, 2009) ........... 25 / F167

*Zehner v. Nordskog Indus., Inc.*,
No. 92-2508, 1992 WL 233984 (E.D. La. Sept. 2, 1992) ...................... 26 / F173

*Herzog v. Arthrocare Corp.*,
No. Civ. 02-76-P-C, 2003 WL 1785795 (D. Me. Mar. 21, 2003).......... 27 / F178

*MCC Millwork Inc. v. Slocum Adhesives Corp.*,
No. 290, 2017 WL 3276370 (Md. Ct. Spec.App. Aug. 2, 2017) ........... 28 / F195

*In re Baycol Prods. Litig.*,
No. 1431, Civ. 03-4954, 2004 WL 1118642 (D. Minn. May 17,
2004) ...................................................................................... 29 / F205

*Holtshouser v. United States*,
No. CV 11-114, 2013 WL 1855775 (D. Mont. May 1, 2013)............... 30 / F210

*Shelton v. Young's Welding & Mach. Shop, LLC*,
No. 8:14CV165, 2015 WL 247834 (D. Neb. Jan. 20, 2015)................. 31 / F220

*Baymiller v. Ranbaxy Pharms. Inc.,*
No. 3:11–cv–858–RCJ–VPC, 2012 WL 2727874 (D. Nev. July 9,
2012) ...................................................................................... 32 / F226

*Kerns v. Hoppe*,
No. 55615, 2012 WL 991651 (D. Nev. Mar. 21, 2012) ....................... 33 / F232

*Rostvet v. Lock City Transp. Co.*,
No. 2:11-cv-21, 2013 WL 11941563 (D.N.D. Nov. 7, 2013) ............... 34 / F241

*Dakota, Mo. Valley & W. R.R. v. JMA Rail Prods. Co.*,
No. A3-00-171, 2006 WL 2349976 (D.N.D. 2006) .............................. 35 / F248

*Paracelsus Healthcare Corp. v. Philips Elecs. N. Am. & Diagnostic*
*Med. Sys.,* No. A3–00–171, 2001 WL 627428 (D.N.D. May 7,
2001) ...................................................................................... 36 / F252

*White v. Mylan, Inc.*,
   No. CIV-12-402-D, 2012 WL 6726593 (W.D. Okla. Dec. 27,
   2012) ................................................................................................ 37 / F257

*Heaton v. Mathes*,
   No. E2019-00493-COA-R9-CV, 2020 WL 1652571 (Tenn. Ct.
   App. Apr. 3, 2020) ......................................................................... 38 / F262

*In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*,
   No. 13-02419, 2016 WL 11045600 (D. Mass. Feb. 29, 2016).............. 39 / F270

*Garcia v. Nissan Motor Co.*,
   No. Civ. A. M-05-059, 2006 WL 869944 (S.D. Tex. Mar. 30,
   2006) ................................................................................................ 40 / F273

*Estate of Baker v. Univ. of Vt.*,
   No. 233-10-03, 2005 WL 6280644 (Vt. Super. May 4, 2005) .............. 41 / F280

*Thomas v. Wyeth*,
   No. Civ. A. 5:05-0094, 2005 WL 3754203 (S.D. W. Va. June 16,
   2005) ................................................................................................ 42 / F292

*Resnick v. Hyundai Motor Am. Inc.*,
   No. CV 16-00593, 2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) ......... 43 / F297

*Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus., Inc.*,
   No. 3:10-cv-437, 2015 WL 5708539 (D. Conn. Sept. 29, 2015) ........... 44 / F325

*Alstom Power, Inc. v. Schwing Am., Inc.*,
   No. 3:04cv1311, 2006 WL 2642412 (D. Conn. Sept. 14, 2006)............ 45 / F331

*Blue Frog Mobile NV Inc. v. Navicomm LLC*,
   No. 1:06-CV-1215, 2007 WL 3334793 (S.D. Ind. Nov. 8, 2007).......... 46 / F340

*Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*,
   No. 01-2243, 2004 WL 1900585 (D. Kan. June 8, 2004)) ..................... 47 / F345

*Multiplan, Inc. v. Holland*,
   No. 1:14CV315, 2016 WL 3983669 (S.D. Miss. July 25, 2016) ........... 48 / F348

*Steadfast Ins. Co. v. Legacy Safety & Consulting, LLC*,
   No. CV 15-00218, 2015 WL 12803775 (D.N.M. June 25, 2015).......... 49 / F353

*Lehmkuhl v. ECR Corp.*,
      No. 06 CA 039, 2008 WL 5104747 (Ohio App. 5 Dist. 2008))............ 50 / F359

*Sheinman Provisions, Inc. v. Nat'l Deli, LLC*,
      No. 08-cv-453, 2008 WL 2758029 (E.D. Pa. July 15, 2008)................ 51 / F365

# TAB 1

2012 WL 1831789
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

In re YASMIN AND YAZ (DROSPIRENONE)
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION.
This Document Relates to:
Jessica Bagley v. Bayer Corp., et al.
No. 3:11–cv–20153–DRH–PMF.

No. 3:09–md–02100–DRH–PMF.
|
MDL No. 2100.
|
May 18, 2012.

**Attorneys and Law Firms**

Mark R. Niemeyer, Onder, Shelton et al, Webster Groves, MO, Michael S. Burg, Burg Simpson Eldredge Hersh & Jardine, Englewood, CO, Michael A. London, Douglas & London. P.C., New York, NY, Roger C. Denton, Schlichter, Bogard et al, St. Louis, MO, Hoyt Gregory Harp, Harp Law LLC, Birmingham, AL, for Jessica Bagley.

Adam L. Hoeflich, Bartlit, Beck et al, Richard M. Waris, Thomas Vincent-Paul Draths, Pretzel & Stouffer, Chicago, IL, John E. Galvin, Terry Lueckenhoff, Fox Galvin LLC, St. Louis, MO, Robert E. Poundstone, IV, William C. McGowin, Bradley Arant, et al, Montgomery, AL, Joseph P. Thomas, Ulmer & Berne LLP, Cincinnati, OH, for Defendants.

## ORDER

DAVID R. HERNDON, Chief Judge.

## I. INTRODUCTION

**\*1** This action was commenced on August 5, 2011 in the Circuit Court of Etowah County, Alabama for personal injuries allegedly suffered by the plaintiff as a result of ingesting Yasmin and Ocella (a generic version of Yasmin). Plaintiff, a citizen of Alabama, brings claims against several non-Alabama entities involved in the manufacture, promotion, and/or sale of Yasmin and Ocella ("pharmaceutical defendants"). Plaintiff has also directed claims against Gregerson's Foods Inc. ("Gregerson's), the Alabama pharmacy that allegedly filled plaintiff's prescription.

On September 8, 2011, the pharmaceutical defendants removed the action to the United States District Court of Alabama, Northern Division on the basis of fraudulent joinder (Doc. 1). Approximately one week after removal, plaintiff filed a motion for remand to state court arguing that the amount in controversy was not satisfied and summarily arguing that Gregerson's was not fraudulently joined (Doc. 11).

While plaintiff's first motion to remand was pending, the case was transferred to this Court (Doc. 13). Upon transfer, plaintiff filed a revised motion for remand (Doc. 14) and Gregerson's filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) (6) (Doc. 21). Before the Court had an opportunity to rule on the claim of fraudulent joinder, plaintiff filed an amended complaint (Doc. 23). In response, Gregerson's filed a revised motion to dismiss seeking dismissal of the claims asserted in plaintiff's amended complaint (Doc. 26).

Because the Court's jurisdiction should be determined based on the facts existing at the time of removal and not upon post-removal developments, the Court only considered plaintiff's original complaint in assessing the claim of fraudulent joinder. On May 10, 2012, the Court, denied plaintiff's motion to remand, finding that Gregerson's had been fraudulently joined. [1] Now before the Court is Gregerson's motion to dismiss plaintiff's amended complaint.

## II. ISSUE BEFORE THE COURT

The Court pauses momentarily to note that the true issue before the Court is whether plaintiff should be granted leave to amend in the first instance and not whether Gregerson's motion to dismiss should be granted. Pursuant to Federal Rule of Civil Procedure 15(a), if a responsive pleading has already been served, "a party may amend its pleading only with the opposing party's written consent or with the court's leave." Fed.R.Civ.P. 15(a). Here, several responsive pleadings had been served prior to the filing of plaintiff's amended complaint. Accordingly, amendment required written consent from the opposing parties or leave of court. Plaintiff obtained neither.

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 9 of 370
PageID: 10039
In re Yasmin and Yaz (Drospirenone) Marketing, Sales,... Not Reported in...
2012 WL 1831789

Thus, the issue before the Court is whether plaintiff
be granted leave to amend her complaint. [2] Generally, under
Federal Rule of Civil Procedure 15(a), leave to amend should
be freely granted where the ends of justice so require.
Leave to amend should be denied, however, if the proposed
amendment is futile. A proposed amendment is futile if the
amended pleading would not survive a Rule 12(b)(6) motion
to dismiss. *See, e.g., Arlin–Golf, LLC v. Village of Arlington
Heights,* 631 F.3d 818, 823 (7th Cir.2011); *London v. RBS
Citizens, N.A.,* 600 F.3d 742, 747 n. 5 (7th Cir.2010); *Gen.
Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074,
1085 (7th Cir.1997). [3]

### III. ANALYSIS

#### A. ORIGINAL COMPLAINT

 **\*2**  The plaintiff's original complaint (Doc. 1–1)
asserted nine separate causes of action: (1) "Negligence
and Negligence Per Se"; (2) "Products Liability—
Unreasonably Dangerous Design"; (3) "Products Liability
—Failure to Warn"; (4) Breach of Express Warranty";
(5) Breach of Implied Warranties"; (6) "Fraudulent
Misrepresentation"; (7) "Fraudulent Concealment"; (8)
"Negligent Misrepresentation"; and (9) "Fraud and Deceit."
All nine causes of action were directed against "Defendants."
The term "Defendants" was defined as "all named
Defendants, with the exception of Defendant Gregerson's
Foods' Inc." In other words, the term "Defendants" included
the pharmaceutical defendants and expressly excluded
Gregerson's.

The claim delineated as "Breach of Express Warranty" was
the only claim directed against Gregerson's. The breach
of express warranty claim asserted that the pharmaceutical
defendants made express representations regarding the safety
and efficacy of Yasmin and Ocella and that Yasmin and
Ocella did not and do not conform to the alleged express
representations. Plaintiff did not allege that Gregerson's made
any express representations with regard to Yasmin and/or
Ocella. As to Gregerson's, the express warranty claim alleged
the following:

> Defendant Gregerson's conduct in this
> matter is actionable because as a
> distributor of the Yasmin, it failed
> to properly warn the Plaintiff of the

> dangerous and injurious side effects of
> the Yasmin product.

(Doc. 1–1 p. 13).

#### B. Amended Complaint

Plaintiff's amended complaint re-asserts the same nine causes
of action but re-defines the term "Defendants" to include
Gregerson's (Doc. 23). For the most part, the claims are
directed generically against "Defendants." However, as with
the original complaint, one paragraph in the breach of express
warranty claim is directed specifically against Gregerson's.
This paragraph again alleges that Gregerson's conduct is
actionable because it failed to warn the plaintiff of the subject
drugs' dangerous side effects. In addition, three paragraphs in
plaintiff's breach of implied warranties claim are now directed
against both "Defendants and Gregerson's."

#### C. Warranty Claims

Plaintiff's claims for breach of express and implied warranty
(Counts IV and V) are the only claims containing allegations
directed specifically against Gregerson's. The breach of
express warranty claim alleges that the "Defendants"
made express representations to the public through their
"aggressive marketing and advertising campaigns" and sales
representatives. Although the term "Defendants" is defined
to include Gregerson's, it is clear that these allegations could
only be directed at the pharmaceutical defendants and not
at Gregerson's. As to Gregerson's specifically, the breach of
express warranty claim states that Gregerson's conduct is
actionable because as a distributor of Yasmin, it failed to warn
the plaintiff of the subject drug's dangerous side effects.

 **\*3**  Plaintiff's breach of express warranty claim, as amended,
would not survive a Rule 12(b)(6) motion to dismiss. Plaintiff
fails to allege that Gregerson's made any affirmative act or
promise that could be the basis of a claim for breach of
express warranty. *See* Ala.Code § 7–2–213(1)(a) (2002) (to
establish a claim for breach of express warranty, a plaintiff
must prove that a manufacturer or seller of a product made
"[a]ny affirmation of fact or promise ... which relates to the
goods and becomes part of the basis of the bargain"). Further,
the only conduct attributed to Gregerson's is its alleged
failure to warn of the subject drugs' purported dangerous side
effects. Alabama law clearly establishes that, as a pharmacy,

Gregerson's may not be held liable for such a claim. *See Walls v. Alpharma USPD, Inc.,* 887 So.2d 881, 882 (Ala.2004). [4]

Plaintiff's breach of implied warranty claim fairs no better. Gregerson's contends that the learned intermediary doctrine applies to foreclose any breach of warranty claims against pharmacies in Alabama. Plaintiff argues that the learned intermediary doctrine, a judicially created concept, is not applicable to breach of warranty claims brought pursuant to Alabama's version of the Uniform Commercial Code. [5] Plaintiff cites to no Alabama case law supporting her argument and Gregerson's directs the Court's attention to the Alabama Supreme Court's decision in *Stafford v. Nipp,* 502 So.2d 702 (Ala.1987).

In *Stafford,* the consumer of a prescription drug sued both her physician and the pharmacist who filled her prescription. The trial court granted summary judgment on the plaintiff's breach of implied warranty claim in favor of the pharmacist on the basis of the learned intermediary doctrine. The Alabama Supreme Court reversed the grant of summary judgment but did so on the basis of the existence of disputed material facts. Specifically, a factual dispute existed with regard to whether the pharmacist filled the prescription without valid authorization from the plaintiff's physician. The court concluded that because the pharmacist may have filled the prescription without authority, a claim against the pharmacist could lie. In so holding, the court stated that the learned intermediary doctrine does not "shield the pharmacist from liability based on breach of warranty where the pharmacist continues to fill the prescription without authorization from a doctor." *Id.* at 705. The clear implication is that, absent such actionable conduct, the learned intermediary rule does shield pharmacists from liability for breach of implied warranty claims. As previously noted, in the instant case, there is no allegation that Gregerson's filled an invalid or unauthorized prescription. Accordingly, there is no reason to conclude that the learned intermediary rule does not, as a matter of law, shield Gregerson's from liability for plaintiff's breach of implied warranty claim.

**D. Remaining Claims**

 ***4** The other seven causes of action are directed generically against "Defendants." Unlike the plaintiff's original complaint, the plaintiff's amended complaint

defines the term "Defendants" as including "all named Defendants." [6] Despite this minor alteration in the definition of the term "Defendants," the Court cannot decipher whether plaintiffs intend to focus any of these claims on Gregerson's. [7] The bulk of the conduct attributed to "Defendants" in these claims is conduct that can only be connected to the pharmaceutical defendants. Further, the fact that plaintiff's breach of warranty claims contain allegations directed specifically against Gregerson's or "Gregerson's and Defendants" tends to indicate that only the breach of warranty claims are directed against Gregerson's.

Assuming that plaintiff is attempting to assert claims against Gregerson's under the AEMLD or under other common law tort concepts, these claims would be subject to dismissal pursuant to Rule 12(b) (6). As discussed above, Alabama law indicates that where a pharmacist correctly fills a valid prescription signed by a licensed physician, no cause of action will lie. *Walls v. Alpharma USPD, Inc.,* 887 So.2d 881, 882 (Ala.2004); *Stafford v. Nipp,* 502 So.2d 702 (Ala.1987). To the extent that plaintiff contends Gregerson's is liable under the AEMLD not because it is a pharmacy but because it is a distributor, the affirmative defense of lack of causal relation precludes liability. Plaintiff does not allege any action by Gregerson's as a retail store which contributed to the harm alleged. Nor does plaintiff allege any reasonable means of inspection by which Gregerson's should have—or even *could* have—discovered the allegedly defective nature of the subject drug. *See Mathis v. Harrell Co., Inc.,* 828 So.2d 248, 258 (Ala.2002); *Fleming Farms v. Dixie Ag Supply, Inc.,* 631 So.2d 922, 927–928 (Ala.1994).

## IV. CONCLUSION

For the reasons discussed above, plaintiff's claims, as amended, would not survive a motion to dismiss. Accordingly, amendment would be futile and leave to amend is **DENIED.** Gregerson's is hereby **DISMISSED** from the action and plaintiff's amended complaint is **STRICKEN.**

**So Ordered.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1831789

Footnotes

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 11 of 370
PageID: 10041
In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2012 WL 1831789

1   Although not expressly stated in the Court's order denying remand, the Court's fraudulent joinder finding effectively dismissed Gregerson's from this action. *See Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 764 (7th Cir.2009) (standard for establishing fraudulent joinder is higher than the standard required for dismissal under Rule 12(b)(6)) (collecting cases). *See also Id.* at 763 (fraudulent joinder doctrine "permits a district court considering removal to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, *dismiss the nondiverse defendants,* and *thereby retain jurisdiction"* (internal quotation marks omitted) (emphasis added). Nonetheless, the plaintiff's amended complaint and Gregerson's revised motion to dismiss must be resolved.

2   As it turns out, this distinction makes no substantive difference in the Court's analysis. In assessing whether leave to amend should be granted, the Court looks to whether plaintiff's complaint could survive a 12(b)(6) motion to dismiss.

3   Arguably, an additional consideration in the instant case is whether, in light of the Court's fraudulent joinder finding, plaintiff's amended complaint constitutes the post-removal joinder of a non-diverse party. Joinder of non-diverse parties after an action has been removed to federal court is governed by 28 U.S.C. § 1447(e), which states that "[i]f after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." The Seventh Circuit has instructed that a court, when faced with a request to join non-diverse parties who would destroy subject-matter jurisdiction, has two options under § 1447(e): it may deny the motion to join; or it may grant the motion and remand. *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 759 (7th Cir.2009). In the instant case, application of these factors, would not lead to a different result. The Court finds that amendment would be futile and would deny leave to amend under both Rule 15(a) and under 28 U.S.C. § 1447(e).

4   Plaintiff contends and the Court agrees that the learned intermediary doctrine does not grant "unfettered immunity" to pharmacists in Alabama. However, Alabama case law clearly indicates that where a pharmacist correctly fills a valid prescription signed by a licensed physician no cause of action will lie. *See e.g., Stafford v. Nipp,* 502 So.2d 702, 705 (Ala.1987) (pharmacist subject to liability for filling a prescription without authorization from a doctor). In the instant case, there is no allegation that Gregerson's incorrectly filled the plaintiff's prescription or filed an invalid prescription. Absent such an allegation, the learned intermediary rule protects Gregerson's from liability.

5   The Court notes that some courts have held the predominant purpose of a transaction between patient and pharmacist is the provision of services and not goods. *See e.g., In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prod. Liab. Litig.,* 692 F.Supp.2d 1025, 1035–1037 (S.D.Ill.2010) (Herndon, C.J.) (discussing Illinois law). As a result, these courts have concluded that specific UCC Article 2 provisions are inapplicable to such transactions. It seems, however, that Alabama courts would find UCC Article 2 provisions are applicable to transactions between pharmacist and patient. *See M.C. Skelton v. Druid City Hospital Board,* 459 So.2d 818 (Ala.1984).

6   As already noted, in plaintiff's original complaint, the term "Defendants" included only the pharmaceutical defendants and expressly excluded Gregerson's.

7   Particularly in light of the claims directed specifically against Gregerson's or against "Gregerson's and Defendants" in plaintiff's warranty claims.

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 2

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 13 of 370
PageID: 10043
Sanks v. Parke-Davis, Not Reported in F.Supp.2d (2000)
2000 WL 33910097

2000 WL 33910097
Only the Westlaw citation is currently available.
United States District Court, M.D. Alabama.

Martha SANKS, Plaintiff,

v.

PARKE–DAVIS, a Warner–
Lambert Division, et al. Defendants.

No. 00–S–1122–E.
|
Oct. 30, 2000.

MEMORANDUM OPINION AND ORDER

COODY, Magistrate J.

## I. INTRODUCTION

**\*1** Plaintiff Martha Sanks's ("Sanks") seven count
complaint was originally filed in the Circuit Court of
Macon County, Alabama against defendants Parke–Davis,
a division of Warner–Lambert ("Warner–Lambert"), Central
Alabama Comprehensive Health ("Comprehensive Health"),
Dr. Velma Braye ("Braye"), [1] and Eufaula Drugs, Inc.
("Eufaula Drugs"). In her complaint, Sanks alleges a violation
of the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C.
§§ 2301–2312, and several violations of Alabama law. [2]
Specifically, Sanks alleges that the defendants knew or
should have known that Rezulin, a drug prescribed for
Type II diabetes, could cause extensive liver damage and
life-threatening side effects. Despite this knowledge, Sanks
alleges that Parke–Davis placed Rezulin into the stream of
commerce. In 1998, Dr. Braye gave Sanks a prescription for
Rezulin which she had filled at Eufaula Drugs. Sanks alleges
that the ingestion of Rezulin caused extensive liver damage,
pain and suffering, and mental anguish. [3]

On August 17, 2000, Warner–Lambert removed the case to
this court, and on August 23, 2000, Sanks filed a motion to
remand. Currently pending before the court is Sanks's
motion to remand (doc. # 3) and the defendants' objection
to the motion (doc. # 5). The parties have consented to a
United States Magistrate Judge rendering final decision in this
case pursuant to 28 U.S.C. § 636(c). The court has carefully
reviewed the plaintiff's motion to remand and the briefs filed

in support of and in opposition to the motion. Based on
its review of these documents, the court concludes that the
plaintiff's motion to remand is due to be denied.

## II. STANDARD OF REVIEW

It is axiomatic that federal courts are courts of limited
jurisdiction and are "empowered to hear only those cases
within the judicial power of the United States as defined
by Article III of the Constitution." *University of South
Alabama v. American Tobacco Co. ., 168 F.3d 405, 409* (11th
Cir.1999) (citing *Taylor v. Appleton, 30 F.3d 1365, 1367* (11th
Cir.1994). "It is to be presumed that a cause lies outside
this limited jurisdiction, and the burden of establishing
the contrary rests upon the party asserting jurisdiction."
*Kokkonen v. Guardian Life Ins. Co. of Am. ., 511 U.S. 375,
114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).* When the parties
disagree on the court's jurisdiction, questions or doubts are
to be resolved in favor of returning the matter to state court
on a properly submitted motion to remand. *Burns v. Windsor
Ins. Co., 31 F.3d 1092, 1095* (11th Cir.1994). Consequently,
the defendant bears the heavy burden of demonstrating that
removal is jurisdictionally proper. *Wilson v. Republic Iron &
Steel Co., 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921).*
Within the context of this standard, the court examines the
parties' respective arguments.

## III. DISCUSSION

### A. PARTIES' POSITIONS

Sanks makes two arguments in support of her motion to
remand. First, she argues that Warner–Lambert waived its
ability to remove the case because, although her complaint
clearly invoked the court's federal question jurisdiction under
the MMWA, it did not file its notice of removal within
thirty days after the receipt of the summons and complaint.
Second, Sanks argues that this court does not have diversity
jurisdiction pursuant to 28 U.S.C. § 1332 because Eufaula
Drugs is an Alabama resident, and subsequently, Warner–
Lambert cannot establish complete diversity of citizenship
among the parties.

**\*2** Warner–Lambert argues that its notice of removal was
timely pursuant to the second paragraph of 28 U.S.C. §
1446(b) because it was filed less than thirty days after

its receipt of Sanks's July 19, 2000 motion dismissing defendants Comprehensive Health and Dr. Braye. According to Warner–Lambert, it was not required to file its notice of removal within thirty days of its receipt of the summons and complaint because Sanks's MMWA claim did not satisfy the Act's jurisdictional minimum and consequently, was not within the court's federal question jurisdiction. Next, Warner–Lambert argues that this court has diversity jurisdiction of this case because Sanks fraudulently joined Eufaula Drugs as a defendant. Sanks cannot establish a cause of action against Eufaula Drugs, argues Warner–Lambert, because under Alabama law a pharmacy that dispenses a prescription drug in accordance with the instruction of the prescribing physician has no duty to warn customers about the drug's potentially dangerous side-effects. Consequently, Warner–Lambert urges the court to disregard the citizenship of Eufaula Drugs and to determine that complete diversity of citizenship exists among the parties.

## B. TIMELINESS OF REMOVAL

Determining whether Warner–Lambert was required to file its notice of removal within thirty days of its receipt of Sanks's complaint or within thirty days of Sanks's July 19, 2000 motion to dismiss requires that the court interpret 28 U.S.C. § 1446(b). [4] The first paragraph of 28 U.S.C. § 1446(b) requires a defendant to file a notice of removal within thirty days of its receipt of the summons and the complaint. However, the second paragraph creates a limited exception to this rule. More specifically, the second paragraph permits a defendant to remove a case that was not initially removable within thirty days of its receipt of any motion which transforms the case into a removable one. Given this framework, Warner–Lambert's ability to prove that it timely filed its notice of removal depends upon whether Sanks's MMWA claim satisfies the MMWA's jurisdictional minimum, thus triggering the court's federal question jurisdiction. Pursuant to 15 U.S.C. § 2310(d)(3)(B), the district courts only have jurisdiction of MMWA claims in excess of $50,000. *See also, Boyd v. Homes of Legend Inc .,* 188 F.3d 1294 (11 th Cir.1999). However, only certain types of damages are included in the computation of the jurisdictional minimum. *See e.g., Ansari v. Bella Automotive Group, Inc.,* 145 F.3d 1270, 1271 (11 th Cir.1998) (holding that the computation of the jurisdictional amount does not include damages flowing from any pendant state law claim brought by a plaintiff); *Boyd,* 188 F.3d at 1306–7 (holding that punitive damages are

unavailable under the MMWA). If the court determines that Sanks's MMWA claim satisfied the MMWA's jurisdictional minimum, then Sanks's motion to remand is due to be granted because the case was within the court's federal question jurisdiction and, pursuant to the first paragraph of 28 U.S .C. § 1446(b), Warner–Lambert was required to file its notice of removal within thirty days of its receipt of the summons and complaint. On the other hand, if the court determines that Sanks's MMWA claim did not satisfy the MMWA's jurisdictional minimum, then Warner–Lambert was not required to file its notice of removal until thirty days after its receipt of Sanks's motion to dismiss Comprehensive Health and Braye. Based on a review of the record, the court concludes that Sanks's MMWA claim did not meet the MMWA's jurisdictional minimum, and thus, the court did not have federal question jurisdiction. Consequently, Warner–Lambert's notice of removal was timely because it was filed within thirty days of its receipt of Sanks's motion to dismiss Comprehensive Health and Braye.

**\*3** Even a fleeting glance at the complaint establishes that Sanks cannot satisfy the MMWA's jurisdictional minimum based solely on the cost of the Rezulin prescription. Thus, the court must determine whether it can consider damages for pain and suffering in determining whether Sanks's claim satisfies the MMWA's jurisdictional minimum. The MMWA contains an explicit provision against the recovery of personal injury damages. That section provides:

> Nothing in this chapter (other than sections 2308 and 2304(a)(2) and (4) of this title) shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supercede any provision of State law regarding consequential damages for injury to the person or other injury. [5]

15 U.S.C. § 2311(b)(2) (Supp.2000). In *Boelens v. Redman Homes,* [6] the former Fifth Circuit addressed the issue of whether claims for personal injury are cognizable under the MMWA, and thus includable in computing the MMWA's jurisdictional minimum. 748 F.2d 1058, 1064 (5 th Cir.1984); *See also, Oliver v. Homes of Legend, Inc.,* No. 00–W–148–S, 2000 WL 1092130 (M.D.Ala. Apr.17, 2000). [7] In

*Boelens* the court held that personal injury damages under § 2311(b)(2) are only available if the complaint alleges a violation of the substantive provisions of § 2308, § 2304(a)(2), or § 2304(a)(3). *Boelens,* 748 F.2d at 1065–6. Section 2308 imposes restrictions on disclaimers, modifications, or limitations on implied warranties; § 2304(a)(2) prohibits the limitations on the duration of implied warranties; and § 2304(a)(3) requires the conspicuous display of warranty information. In this case, Sanks does not allege that Warner–Lambert breached its duty under 2308, § 2304(a)(2), or § 2304(a)(3) by modifying or limiting the duration of the efficacy of Rezulin's implied warranty or by failing to prominently display any express warranties. Thus, Sanks's claims fall squarely within the prohibition of 15 U.S.C. § 2311(b)(2) and cannot be included in the computation of the MMWA's jurisdictional minimum. Consequently, Warner–Lambert's notice of removal was timely filed because Sanks's claim did not satisfy the MMWA's jurisdictional minimum required to trigger the court's federal question jurisdiction.

## C. FRAUDULENT JOINDER

Having determined that Warner–Lambert timely filed its notice of removal, the court now addresses whether, pursuant to 28 U.S.C. § 1332, the court has diversity jurisdiction of this case. The court's diversity jurisdiction depends upon whether Warner–Lambert can prove by clear and convincing evidence that Eufaula Drugs was fraudulently joined.[8] If the court determines that Eufaula Drugs was fraudulently joined, then Warner–Lambert, as the sole remaining defendant, is completely diverse from the plaintiff and thus, can establish complete diversity of citizenship. *See e.g., Strawbridge v. Curtiss,* 3 Cranch 267, 7 U.S. 267, 2 L.Ed. 435 (1806). The court concludes that Warner–Lambert has established complete diversity among the parties because Eufaula Drugs was fraudulently joined.

**\*4** A federal district court has original jurisdiction over all cases where the amount in controversy exceeds $75,000, exclusive of interests and costs, between citizens of different states. *See* 28 U.S.C. § 1332(a). Although not a specific requirement of 28 U.S.C. § 1332(a), the Supreme Court requires all plaintiffs to be diverse from all defendants. *Strawbridge,* 7 U.S. at 269. However, in delineating the requirements for diversity jurisdiction, the law is clear that "removal cannot be defeated by a fraudulent joinder of a residential defendant having no real connection with the controversy." *Wilson,* 257 U.S. at 97. In the Eleventh Circuit,

the defendant has the burden of proving fraudulent joinder by clear and convincing evidence. *Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (citing *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989)). The court looks to the complaint and submissions outside the pleadings, such as deposition testimony and affidavits to determine whether the defendant has met its burden of proof. *Id.*

In counts I, II, III, and VII of her complaint, Sanks essentially alleges that Eufaula Drugs did not warn her about Rezulin's potentially life-threatening side-effects. Conspicuously absent from Sanks's complaint, however, is any allegation that Eufaula Drugs incorrectly filled, dispensed, or labeled her prescription. Under Alabama law, this absence is fatal to her claim against Eufaula Drugs because a pharmacy or pharmacist who correctly fills a prescription in strict accordance with the prescribing physician's directions is protected by the learned intermediary doctrine and is not required to warn patients of potential adverse side effects.[9] *Lansdell v. American Home Prods.,* Civil Action No. 99–S–2110–NE (N.D.Ala. Oct. 26, 1999) (dismissing claims against pharmacist based on the learned intermediary doctrine based upon implicit holding of *Stafford v. Nipp,* 502 So.2d 702 (Ala.1987)); *See also, Harrell v. Wyeth–Ayerst Lab. Inc.,* Civil Action No. 98–1194–BH–M (S.D.Ala. Feb. 1, 1999); *Orr v. Wyeth–Ayerst Lab. Co.,* Case No. CV–98–3000–DIET (Circuit Court of Mobile County, Alabama Aug. 2, 1999). While conceding that she does not have a cause of action against Eufaula Drugs based on its failure to warn,[10] Sanks argues that, under Alabama law, a party can voluntarily assume a duty to warn, thus becoming civilly liable for its negligent or wanton performance of the voluntarily assumed duty. *See e.g., Dailey v. City of Birmingham,* 378 So.2d 728, 729 (Ala.1979). According to Sanks, the court should remand this case because Sanks's affidavit establishes that an Eufaula Drugs pharmacist told her that Rezulin did not have any side-effects.[11] Although not a model of clarity, Sanks apparently argues that this interaction between Sanks and her pharmacist demonstrates that Eufaula Drugs breached a voluntarily assumed duty to warn her about Rezulin's safety. The court finds this argument unpersuasive for two primary reasons. First, Sanks's affidavit does not establish that the pharmacist assumed a duty to warn. The crux of Sanks's affidavit is that, despite knowledge to the contrary, the pharmacist failed to *warn* her of the danger, when he responded negatively to her questions about Rezulin's safety. In other contexts, the Alabama Supreme Court has held that a response to an inquiry is not the same as "volunteering"

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 16 of 370
PageID: 10046
Sanks v. Parke-Davis, Not Reported in F.Supp.2d (2000)

2000 WL 33910097

to act. The court agrees. *Cutts v. American United Life Ins. Co.,* 505 So.2d 1211, 1213 (1987) (holding that a response to request was not a voluntary act within the meaning of *Dailey v. City of Birmingham). See also, Columbia Engineering, Ltd. v. Espey,* 429 So.2d 955, 967 (Ala.1983) (suggesting that where a voluntary undertaking has been found, either direct or indirect participation existed in the injury-causing hazard). Second, the affidavit of Sanks's expert witness, Dr. James O'Donnell, [12] merely reiterates Sanks's allegations that Eufaula Drugs failed to warn her about Rezulin's safety. Dr. O'Donnell's opinion that Eufaula Drugs breached the standard of care does not alter relevant legal authority which holds that Alabama pharmacists and pharmacies do not have a legal duty to warn customers about a medication's potentially life-threatening side-effects.

**\*5** Because Sanks's claims against Eufaula Drugs are barred by the learned intermediary doctrine, the court disregards the citizenship of Eufaula Drugs as a fraudulently joined defendant. Warner–Lambert, as the sole remaining defendant,

is completely diverse from plaintiff. Consequently, the court finds that it has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Accordingly, it is

ORDERED that the plaintiff's motion to remand (doc. # 3) is hereby denied. It is further

ORDERED that pursuant to the provisions of FED. R. CIV. P. 16(b) this case be and is hereby set for a scheduling conference by telephone on November 22, 2000 at 1:30 p.m. The plaintiff shall set up the conference call. Counsel are reminded of their obligation to hold a planning meeting. See FED. R. CIV. P. 26(f); M.D. Ala. LR 26.2(b).

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 33910097

Footnotes

1    On July 19, 2000, Sanks filed a motion to dismiss defendants Comprehensive Health and Dr. Braye.

2    Sanks alleges a claim under the Alabama Extended Manufacturers Liability Doctrine ("AEMLD"); a claim for negligence and wantonness; a claim for negligent and wanton failure to warn; a warranty claim; a medical liability claim; and a concealment claim. *Pl's* Compl. ¶ 11.

3    Sanks's complaint does not ask for a specific amount of damages but asks for damages "in an amount that will serve to punish and deter similar wrongful conduct, together with interest from the date of the injuries and the cost of this proceeding." *Pl's* Complaint, ¶ 39.

4    28 U.S.C. § 1446(b) provides:

     The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

     If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.

5    "It is generally agreed that the reference to section 2304(a)(4) was a draftsmanship error and that section 2304(a)(3) was intended." *Boelens v. Redman Homes, Inc.,* 748 F.2d 1058 (5th Cir.1984).

6    In *Boelens,* the plaintiff alleged that she and her minor children sustained personal injury and endured severe emotional distress from formaldehyde fumes contained in their mobile home.

7    In *Oliver v. Homes of Legend, Inc.,* No. 00–W–148–S, 2000 WL 1092130 (M.D.Ala. Apr.17, 2000), the plaintiff filed suit against the manufacturer of her mobile home alleging various defects in the workmanship, materials, and set-up of the home. The plaintiff also alleged that these defects caused extreme emotional distress.

8    To prove fraudulent joinder, the defendant must prove that (1) there is no possibility that the plaintiff can establish a cause of action against the resident defendant or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the residential defendant into state court. *Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (citing *Cabalceta v. Standard Fruit*

Sanks v. Parke-Davis, Not Reported in F.Supp.2d (2000)
2000 WL 33910097

*Co.,* 883 F.2d 1553, 1561 (11th Cir.1989)). Based on the record and the parties' arguments, only the first element of this paradigm is at issue in this case.

9   Under the learned intermediary doctrine, pharmaceutical manufacturers are only required to warn the prescribing physician, who acts as a learned intermediary between the manufacturer and the consumer, about potentially adverse side-effects. In *Stafford v. Nipp,* 502 So.2d 702 (Ala.1987), the Alabama Supreme Court, by implication, expanded the doctrine to pharmacies and pharmacists.

10  *Pl's* Br. in Supp. of Mot. to Remand, p. 9.

11  Aff. Martha Sanks, *Pl's* Br. in Supp. of Mot. to Remand, *Ex.* 11.

12  Dr. O'Donnell testifies that the pharmacist/pharmacy breached the standard of care because "when a customer requests needed information about a prescription drug being purchased and such drug's literature advises periodic testing of persons taking such drug, the standard of care for a pharmacist requires that the pharmacist so advise his/her customer." *Pl's* Br. in Supp. of Mot. to Remand, *Ex.* 9.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

1999 WL 33548540

1999 WL 33548540
Only the Westlaw citation is currently available.
United States District Court,
S.D. Alabama Southern Division.

Peggy HARRELL, et al., Plaintiffs,

v.

WYETH–AYERST
LABORATORIES, et al., Defendants.

No. Civ.A. 98–1194BHM.
|
Feb. 1, 1999.

ORDER

HAND, Senior J.

**\*1** This cause comes before the court on the motion to dismiss of defendants Florala Healthmart and Tom Frye (Doc. 6). [1] Upon due consideration of all matters presented, the court finds these defendants fraudulently joined and therefore will grant their motion to dismiss with prejudice.

A potentially diversity-destroying defendant is deemed fraudulently joined to an action where "there is no possibility the plaintiff can establish a cause of action against the resident defendant." *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989). The fraudulent joinder standard merely tests the legal sufficiency of the plaintiff's claims. *See, e.g., Wakeland v. Brown & Williamson Tobacco Corp.,* 996 F.Supp. 1213 (S.D.Ala.1998).

The court is persuaded that there is no liability under Alabama law imposed on a pharmacist for correctly dispensing a legal drug in accordance with a facially valid prescription from a medical doctor.

The plaintiffs claim that the pharmacist's legal duty springs not from the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), but from rules imposed on him by the Alabama State Board of Pharmacy. *See generally,* Title 34–Ala. Code, Ch. 23. The fundamental defect in plaintiff's argument is that the Alabama law governing pharmacies and

creating the Alabama State Board of Pharmacy provides only for administrative and criminal remedies. See Ala.Code §§ 34–23–2; 34–23–8(6); 34–23–13; 34–23–30; 24–23–33; 34–23–90; 34–23–92(12); 34–23–93 (Michie 1997). The Board's rules likewise contemplate only administrative enforcement. *See* Rules of Alabama State Board of Pharmacy § 680–X–2–.22(2) ("Violations of any provisions of this rule shall be deemed grounds for disciplinary action...."). The plaintiff cites no Alabama case in which the Board's rules have been held to form the basis of an *actionable* legal duty. In an analogous situation, the Alabama Supreme Court has held that disciplinary rules governing the conduct of attorneys do not create a duty upon which a civil action may be premised. *Terry Cove North, Inc., v. Marr & Friedlander, P.C.,* 521 So.2d 22 (Ala.1988).

Furthermore, the learned intermediary doctrine, adopted by Alabama, would also appear to bar an action against a pharmacist for correctly filling a prescription signed by a medical doctor. *See, e.g., Stone v. Smith, Kline & French Laboratories,* 447 So.2d 1301 (Ala.1984).

Finally, the courts who have considered this precise issue appear to be unanimous in holding that no cause of action will lie. *See, e.g., Coyle v. Richardson–Merrell, Inc.,* 584 A.2d 1383 (Pa.1991); *Kampe v. Howard Stark Professional Pharmacy, Inc.,* 841 S.W.2d 223 (Mo.App.1992); *Stebbins v. Concord Wrigley Drugs. Inc.,* 416 N.W.2d 381, 387–88 (Mich.Ct.App.1987); *Jones v. Irwin,* 602 F.Supp. 399 (S.D.Ill.1985) (Illinois law); *Nichols v. Central Merchandise, Inc.,* 817 P.2d 1131 (Kan.App.1991); *Ferguson v. Williams,* 101 N.C.App. 265, 399 S.E.2d 389 (N.C.App.1991); *McLeod v. W.S. Merrell, Inc.,* 174 So.2d 736 (Fla.1965); *Guillory v. Dr. X,* 679 So.2d 1004 (La.App.1996); *Bichler v. Willing,* 58 A.D.2d 331, 397 N.Y.S.2d 57 (N.Y.App.Div.1977).

**\*2** For the foregoing reasons, the court finds defendants Florala Healthmart and Tom Frye fraudulently joined. It is therefore ORDERED that heir motion to dismiss with prejudice is due to be and is hereby GRANTED. This case remains STAYED pending transfer to Multidistrict action pending in the Eastern District of Pennsylvania.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 33548540

Footnotes

**Harrell v. Wyeth-Ayerst Laboratories, Not Reported in F.Supp.2d (1999)**

1999 WL 33548540

1    Plaintiffs filed, on January 27, 1999, a notice of voluntary dismissal of these defendants pursuant to Fed.R.Civ.P. 41(a)(1) (Doc. 14). However, because Florala Healthmart and Tom Frye were potentially diversity-destroying parties to this case at the time of removal, it is incumbent upon the court to determine the fraudulent joinder status of these defendants, in spite of the recent notice of dismissal. This determination is essential to an accurate assessment of this court's subject-matter jurisdiction under 28 U.S.C. § 1332(a).

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

1999 WL 33548162
Only the Westlaw citation is currently available.
Circuit Court of Alabama.

Julie ORR, Plaintiff,

v.

WYETH-AYERST LABORATORIES
COMPANY, et al., Defendants.

No. CV-98-3000-DIET.
|
Aug. 2, 1999.

ORDER

*1  This cause comes before the Court on the Motion to Dismiss of Defendants Rite Aid Corporation, Walmart Stores, Inc., Citronelle Drug Store, Phar-Mor, Inc., Delchamps, Inc., Lee Drugs, Inc., First Hospital Pharmacy and each of these pharmacy defendants' individual pharmacists named as defendants and joined in or adopted by reference by a number of other pharmacy and pharmacist defendants (herein collectively referred to as the "pharmacy defendants") in these cases. After having considered all matters presented, including briefs submitted by plaintiffs and pharmacy defendants and oral argument at the hearing conducted on July 20, 1999, it is hereby ORDERED, ADJUDGED AND DECREED that the Motion to Dismiss filed by the pharmacy defendants is due to be and is hereby GRANTED.

These consolidated cases are some of the several thousand actions filed throughout the country arising from the use of the diet drugs fenfluramine (Pondimin), dexfenfluramine (Redux) and/or phentermine. The combination of the use of Pondimin and phentermine has been commonly referred to as fen-phen. Plaintiffs in these cases have sued the companies who manufactured and marketed these drugs and in some instances have sued physicians prescribing the drugs and in these particular cases have sued the pharmacy and pharmacists who filled the prescriptions written by a physician for these drugs individually or a combination thereof. Plaintiffs allege multiple causes of action against the pharmacist defendants including negligence, wantonness, breach of implied and expressed warranties, fraud, liability under the Alabama Extended Manufacturers' Liability Doctrine, breach of professional responsibility, conspiracy and breach of contract. However, all of these causes of

action appear to be based upon the single allegation that the pharmacists who filled Plaintiffs' prescriptions for the drugs Pondimin, Redux and/or phentermine failed to warn Plaintiffs of the potential dangers of these prescription drugs. Therefore, the issue before this Court is whether under Alabama law a pharmacist has a duty to warn of potential dangers of a legal prescription drug correctly dispensed in accordance with a facially valid prescription from a medical doctor. The Complaint makes no allegation that the filling pharmacists failed to accurately and correctly fill the prescriptions at issue in this lawsuit.

The overwhelming weight of authority from the courts that have considered this precise issue hold that no cause of action, be it strict liability, negligence or breach of warranty, will lie. *See, e.g., McLeod v. W.S. Merrell Co.,* 174 So.2d 736 (Fla.1965); *Raynor v. Richardson-Merrell, Inc.,* 643 F.Supp. 238 (D.D.C.1986); *Ramirez v. Richardson-Merrell, Inc.,* 628 F.Supp. 85 (E.D.Pa.1986); *Batiste v. American Home Products Corp.,* 231 S.E.2d 269 (N.C.App.1977); *Bichler v. Willing,* 397 N.Y.S.2d 57 (N.Y.App.Div.1977); *Ingram v. Hook's Drugs, Inc.,* 476 N.E.2d 881 (Ind.Ct.App.1985); *Eldridge v. Eli Lilly & Co.,* 485 N.E.2d 551 (Ill.App.Ct.1985); *Coyle v. Richardson-Merrell, Inc.,* 584 A.2d 1383 (Pa.1991); *Kampe v. Howard Stark Professional Pharmacy, Inc.,* 841 S.W.2d 223 (Mo.App.1992); *Stebbins v. Concord Wrigley Drugs, Inc.,* 416 N.W.2d 381 (Mich.Ct.App.1987); *Jones v. Irwin,* 602 F.Supp. 299 (S.D.Ill.1985); *Ferguson v. Williams,* 101 N.C.App. 265, 399 S.E.2d 389 (N.C.App.1991); *Guillory v. Dr. X,* 679 So.2d 1004 (La.App.1996).

*2  Although Alabama courts have not considered this precise issue of whether a pharmacist has a duty to warn its customers of possible risks or side effects of prescribed medication, courts around the country have considered this issue and have uniformly held that a pharmacist has no such duty. Courts that have addressed this issue have held that the reason a pharmacist has no duty to warn of potential hazards associated with a prescription drug is that this is the duty of the treating physician. Persuasive is *McKee v. American Home Products Corp.,* 782 P.2d 1045 (Wash.1989), wherein the court affirmed summary judgment holding that pharmacists do not have a duty to warn consumers of potential hazards of prescription drugs. In so doing, the court summarized various decisions from around the country supporting its ruling:

However, " ' *a pharmacist has no duty to warn the patient of possible side effects of a prescribed medication* where the prescription is proper on its face and neither the physician nor the manufacturer has required that any warning being

given to the patient by the pharmacist." ' Indeed, "*there exists no legal duty on the part of a pharmacist to monitor and intervene with a customer's reliance on drugs prescribed by a licensed treating physician.*" It is the physician who owes the duty to the patient to monitor prescription drug usage and a pharmacist would not be found liable for lawfully filling a prescription issued by a licensed physician.

*Id.* at 1049, citing *Adkins v. Mong,* 425 N.W.2d 151 (Mich.Ct.App.1988) (citations omitted) (emphasis added).

In its opinion, the *McKee* court also cited from *Ramirez v. Richardson-Merrell, Inc., supra,* and stated:

> *To impose a duty to warn on the pharmacist, however, would be to place the pharmacist between the physician who, having prescribed the drug presumably knows the patient's present condition as well as his or her complete medical history, and the patient. Such interference in the patient-physician relationship can only do more harm than good.* As the court in *Batiste v. American Home Products Corp.,* 32 N.C.App. 1, 231 S.E.2d 269, 274 (1977), emphasized, when holding that a pharmacy could not be held liable in negligence for its failure to warn the plaintiff of the potential side effects associated with an oral contraceptive drug, defendant is not a physician and is not qualified or licensed to advise plaintiff with respect to the best medication for her use.

*McKee* at 1051, *citing Ramirez v. Richardson-Merrell, Inc., supra* (emphasis added).

The *McKee* court and the other decisions holding a pharmacist has no duty to warn of dangers associated with the use of prescription drugs rely upon the "learned intermediary" doctrine. Alabama has adopted the "learned intermediary" doctrine. In *Stone v. Smith, Kline & French Lab.,* 447 So.2d 1301, 1305 (Ala.1984), the court held:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as the "learned intermediary" between manufacturer and consumer.

**\*3** A treating physician is in the best, if not only, position to advise his patients regarding possible side effects of drugs that he prescribes. This is the reasoning behind the learned intermediary doctrine, which applies equally to the relationship between the physician/patient and manufacturer to the relationship between the physician/patient and pharmacist. The patient must look to the physician because only the physician can relate the propensities of the drug to the physical idiosyncracies of the patient.

Plaintiffs claim that the rules of conduct promulgated by the Alabama State Board of Pharmacy create a duty for each pharmacist. See generally, Title 34, *Ala.Code,* Ch. 23. Specifically, Plaintiffs contend that certain sections of the rules of the Alabama State Board of Pharmacy create a legal duty that pharmacists should know about the effects of these prescription drugs and had a duty to counsel Plaintiffs about the dangers in a direct consultation.

These arguments fail for two reasons. First, the Rules of the Alabama State Board of Pharmacy do not create an independent common law duty under which an individual can base a cause of action. The Pharmacy Rules were created solely with the remedy in mind of the imposition of disciplinary measures by the Board for violations of these Rules. Nowhere in the entire Code concerning pharmacy rules of conduct does it state that these Rules are to be interpreted so as to provide a standard for which *civil* liability can be brought against the pharmacist or pharmacy in question.

To the contrary, Alabama courts have held that these type of rules do not create a private right of action. *See Terry Cove North, Inc. v. Marr & Friedlander, P.C.,* 521 So.2d 22 (Ala.1988). In *Terry Cove,* plaintiffs filed suit against two attorneys and their firm alleging the attorneys breached duties

1999 WL 33548162

created by the Alabama State Bar's Code of Professional Responsibility. *Id.* at 23. In affirming the trial court's dismissal of the counts premised on the Alabama State Bar Code, the Court held: "The Code of Professional Responsibility is designed *not* to create a private cause of action for infractions of disciplinary rules, but to establish a remedy solely disciplinary in nature." *Id.* (emphasis added). The Court went on to state that Code of Professional Responsibility could not, "independently, serve as a legal basis of a civil action for money damages." *Id.* at 24. The Pharmacy Board was vested with the authority to regulate the pharmacy industry. To that end, the Pharmacy Board promulgated regulations the violation of which can result in disciplinary action. However, these rules, like the rules created by the Alabama State Bar, do not confer upon a litigant a private cause of action. Accordingly, Plaintiffs cannot base their complaints on violations, if any, of the Pharmacy Board rules.

The holding in *Terry Cove* is factually analogous to this matter. The Rules of Conduct promulgated by the Pharmacy Board are established as guidelines for conduct within the profession. In that respect, they are virtually identical to the Rules of Professional Conduct which are promulgated by the State Bar and which govern every attorney licensed to practice in this state. In fact, both sets of rules were created under the authority given to the Pharmacy Board and State Bar, respectively, by power vested through the Legislature. See, Ala.Code §§ 34-23-92 and 34-3-80 (statutes authorizing the respective board to adopt rules and regulations governing the enforcement of the chapters concerning professional conduct of pharmacists and lawyers, respectively).

**\*4** Second, as stated above, assuming arguendo that there is a legal duty under Alabama law that a pharmacist warn a customer presenting a valid prescription of side effects and risks associated with the drug, such a duty would not support a cause of action under Plaintiffs' allegations in this case. This is not a situation in which the Plaintiffs allege that the pharmacists failed to pass along information concerning the side effects and interaction from the drugs that were well publicized by the manufacturers of the drugs. On the contrary, Plaintiffs allege that the manufacturers themselves had not warned physicians and/or the public of the risks that form the basis of Plaintiffs' Complaints. Finding such a duty under those circumstances would obligate pharmacists to have knowledge concerning a drug beyond that being disseminated to physicians and the public by the manufacturers of those drugs. Further, this is not a situation where with regard to drug-drug interaction that Plaintiffs

were taking a drug prescribed by one physician and were subsequently prescribed a drug by another physician. The allegations in the Complaints make clear that the combined use of the diet drugs were specifically prescribed by Plaintiffs' treating physicians.

Finally, the "learned intermediary" doctrine prevents an imposition of a duty to warn by a pharmacist because a similar duty is not even present for the manufacturer of the product. In *Nichols v. Central Merchandise, Inc.,* 817 P.2d 1131 (Kan.Ct.App.1991), a case this Court finds persuasive, the Kansas Court of Appeals addressed an identical situation to that present in this case. In *Nichols,* even though an administrative regulation, similar to the Alabama Pharmacy Board Rules, defined the pharmacist's duties as "reading and interpreting prescriptions, accurately filling prescriptions, affixing necessary labels and 'initiating patient consultation on new prescriptions as a matter of routine to encourage proper patient drug utilization and administration,' ' the Kansas Court of Appeals held that the pharmacist had no duty to warn the plaintiff of the potential consequences of the prescription drug. *Id.* at 1132-1133.

The basis for the court's ruling was that "the doctor is the learned intermediary between the manufacturer and the patient, the patient should rely on the doctor; the pharmacist, at least under the facts of this case, has no legal duty to warn the patient of potential consequences from the use of the drug prescribed by the doctor." *Id.* at 1133. Similarly, the rules promulgated by the Alabama Board of Pharmacy should not create a duty to warn.

This Court notes that the identical issues before this Court on the pharmacy defendants' Motion to Dismiss were also resolved in favor of a pharmacy defendant in *Harrell, et al. v. Wyeth-Ayerst Laboratories,* United States District Court for the Southern District of Alabama, Southern Division, Civil Action No. 98-1194-BH-M (Feb. 1, 1999).

**\*5** This Court finds that the pharmacy defendants had no duty to warn Plaintiffs of potential dangers of using these prescription drugs when the pharmacy defendants accurately filled these legal drugs in accordance with facially valid prescriptions from a medical doctor. Therefore, Plaintiffs have failed to state a claim upon which relief may be granted. It is hereby ORDERED, ADJUDGED AND DECREED that the Motion to Dismiss filed by the pharmacy defendants is due to be and is hereby GRANTED.

Before these cases were consolated, the undersigned, as well as another judge of the Thirteenth Judical Circuit, denied Motions to Dismiss in several of the individual cases. These rulings are hereby SET ASIDE.

The Court expressly finds that there is no just reason for delay and expressly directs entry of judgment in favor of the pharmacy defendants pursuant to Ala.R.Civ.P. 54(b).

**All Citations**

Not Reported in So.2d, 1999 WL 33548162

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 27 of 370
PageID: 10057
Lansdell v. American Home Products Corp., Not Reported in F.Supp.2d (1999)

1999 WL 33548541

1999 WL 33548541
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Northeastern Division.

Voyce Ann LANSDELL, Pelmer
L., Lansdell, Sr., Plaintiffs,
v.
AMERICAN HOME PRODUCTS
CORPORATION, Wyeth–Ayerst Laboratories
Company, Barnett Drug Store, Defendants.

No. Civ.A. CV99S2110NE.
|
Oct. 26, 1999.

MEMORANDUM OPINION

SMITH, J.

 **\*1**  This action is before the court on the motion to dismiss filed by Alten Drugs, Inc., an entity doing business as (and described in plaintiffs' complaint as) "Barnett Drug Store" (hereinafter "Barnett Drugs") (Doc. No. 2), and plaintiffs' motion to remand (Doc. No. 8). Upon consideration of the motions, pleadings, briefs, and oral arguments of counsel, the court finds that Barnett Drugs' motion is due to be granted and plaintiffs' motion denied.

This action was removed from the Circuit Court of Lauderdale County, Alabama on August 12, 1999, by two of the three defendants named in plaintiffs' complaint, American Home Products Corporation ("American Home") and Wyeth–Ayerst Laboratories Company ("Wyeth Labs"). Defendant Barnett Drugs did not join in the removal; even so, both removing defendants contend, as Barnett Drugs asserts in its motion to dismiss, that it was unnecessary for Barnett Drugs to join in the removal, because that defendant was fraudulently joined in this action to defeat diversity jurisdiction.

The crux of both motions before the court is the same: specifically, each requires this court to decide whether a pharmacy may be held liable under Alabama law for correctly dispensing a lawful prescription drug in accordance with a valid prescription written by a licensed physician. The court

finds that it cannot, as such claims are barred by the so-called "learned intermediary doctrine." [1]

I. STANDARDS OF REVIEW

A court may dismiss a complaint for failure to state a claim only if it is clear that no relief can be accorded plaintiffs under any set of facts that could be proven consistent with the allegations in the complaint. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir.1986) ("[W]e may not ... [dismiss] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims in the complaint that would entitle him or her to relief."). The threshold requirements for a complaint to survive a Rule 12(b)(6) motion to dismiss thus are "exceedingly low." *Williams v. City of Montgomery,* 21 F.Supp.2d 1360, 1363 (M.D.Ala.1998).

In this case, however, Barnett Drugs has submitted the affidavit of David Frye, a registered pharmacist and manager of its store in Rogersville, Alabama. If matters outside the pleadings are presented to and considered by the court when ruling upon a Rule 12(b)(6) motion, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Fed.R.Civ.P.* 12(b); *see also, e.g., Arnold v. United States Postal Service,* 649 F.Supp. 676, 678 (D.D.C.1986) (Richey, J.). The rationale behind such a principle is that the conversion of a motion to dismiss to a motion for summary judgment makes the court's inquiry fact specific. Therefore, the nonmovant may be accorded an opportunity to demonstrate the existence of genuine issues of material facts, if there be any. *But see Denis v. Liberty Mutual Insurance Co.,* 791 F.2d 846, 850 (11th Cir.1986) (recognizing an exception to the requirement that the court afford plaintiff notice of its intent to convert and an opportunity to supplement the record); *Property Management & Investments, Inc. v. Lewis,* 752 F.2d 599, 605 (11th Cir.1985) (same).

 **\*2**  The instant case presents an anomalous, if not unusual circumstance, however. Plaintiffs unequivocally adopted the affidavit of David Frye in support of their motion to remand. (*See* Doc. No. 9 (plaintiffs' "notice of filing affidavit of David Frye") reading: "Comes now the plaintiffs, who give notice of the filing of the Affidavit of David Frye as Exhibit 'B' to their

brief in support of [their motion to] remand.") In so adopting the affidavit, plaintiffs have placed uncontested facts before this court, thereby allowing the court to rule upon Barnett Drugs' motion as a matter of law, rather than a matter of fact.

*Cf. Property Management,* 752 F.2d at 605–607. [2]

Moreover, because this case also involves simultaneous consideration of plaintiffs' motion to remand, the court must consider pertinent subject matter jurisdiction principles. Fundamentally, the United States' district courts are forums of limited jurisdiction. *E.g., Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Burns v. Windsor Insurance Co.,* 31 F.3d 1092 (11th Cir.1994). As such, they posses the power to hear only those cases authorized by the Constitution or Congress. "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen,* 511 U.S. at 377, 114 S.Ct. at 1675 (citation omitted); *see also Burns,* 31 F.3d at 1095 ("[I]n deciding a motion to remand where the plaintiff and defendant disagree on issues of jurisdiction, questions or doubts are to be resolved in favor of returning the matter to state court.").

A federal district court possesses original jurisdiction over all cases between citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a). Although the statute does not specify complete diversity of citizenship, it has long been the rule that diversity jurisdiction requires all plaintiffs to be diverse from all defendants. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

The Supreme Court also has recognized, however, that a defendant's "right to removal cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy." *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 37, 66 L.Ed. 144 (1921); *see also Coker v. Amoco Oil Co.,* 709 F.2d 1433 (11th Cir.1983).

In the Eleventh Circuit, joinder may be deemed "fraudulent" in three circumstances.

> The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant.... The second is

when there is outright fraud in the plaintiff's pleading of jurisdictional facts.... [A third situation arises] where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability[,] and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant.

**\*3** *Triggs v. John Crump Toyota, Inc.,* 154 F.3d 1284, 1287 (11th Cir.1998) (citations omitted).

Where a party alleges fraudulent joinder, that party bears the burden of proving its allegations by clear and convincing evidence. *See Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (citing *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989)); *Coker,* 709 F.2d at 1440; *Yawn v. Southern Railway Co.,* 591 F.2d 312, 316 (5th Cir.), *cert. denied,* 442 U .S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 304 (1979). [3] Although the court properly looks to the complaint itself to determine whether there has been a fraudulent joinder, the court also may resort to submissions outside the pleadings, such as deposition testimony and affidavits, when making its determination. *See Cabalceta,* 883 F.2d at 1561; *Coker,* 709 F.2d at 1440. All allegations and submissions must be viewed in the light most favorable to plaintiffs, who chose the state forum and oppose removal. *Id.* Thus, if there is even a possibility that a state court would find that plaintiffs' complaint states a valid claim against a resident defendant, the federal court must find that the joinder was proper and remand the case to state court. *Id.* at 1440–1441.

## II. FACTUAL BACKGROUND

The following facts are gleaned from the pleadings and affidavit submitted to the court. Plaintiffs, Voyce Ann Lansdell ("Mrs.Lansdell") and her husband, Pelmer L. Lansdell, Sr. ("Mr.Lansdell"), filed a complaint against defendants American Home, Wyeth Labs, and Barnett Drugs in the Circuit Court of Lauderdale County, Alabama on July 14, 1999. They allege that Mrs. Lansdell suffered injuries as a result of ingesting dexflenfluramine hydrochloride, a drug that is better known by its brand-name, "Redux."

1999 WL 33548541

Although plaintiffs' complaint is no model of clarity, the court has ascertained that Barnett Drugs is directly named in only three of its seven counts: i.e., Count III, alleging that Barnett Drugs "negligently or wantonly developed, manufactured, marketed, and/or sold" Redux in violation of the Alabama Extended Manufacturers Liability Doctrine ("AEMLD"); Count IV, alleging that Barnett Drugs "negligently or wantonly failed to warn ... of the dangers" of using Redux; and Count V, alleging that Barnett Drugs breached express and/or implied warranties that Redux was "reasonably fit and suitable for the purpose for which it was intended to be used." (Plaintiffs' complaint at 7–9.) [4]

As previously observed, both Barnett Drugs, in support of its motion to dismiss, and plaintiffs, in support of their motion to remand, have submitted the affidavit of David Frye, a registered pharmacist and manager of the Barnett Drugs store which dispensed the contested medication to Mrs. Lansdell. Mr. Frye avers as follows:

On October 8, 1996, plaintiff Voyce Ann Lansdell brought a prescription to Barnett Drugs from Dr. Lyman Mitchell, Jr. at Florence Clinic, L.L.C., Florence, Alabama, to be filled. The prescription was for 60 Redux 15 mg. capsules.... The prescription authorized five refills.... The prescription was filled exactly as prescribed by Dr. Mitchell. Ms. Lansdell returned to Barnett Drugs on five subsequent occasions for a refill of this prescription. On each of these occasions, the prescription was filled strictly in accordance with the instructions of Ms. Lansdell's prescribing physician.

 *4  On April 5, 1997, Ms. Lansdell brought a second prescription for Redux from Dr. Mitchell to Barnett Drugs to be filled.... The prescription was, like the first prescription, for 60 Redux 15 mg. capsules. The prescription was filled on that occasion exactly as prescribed by Dr. Mitchell. This prescription also called for five refills. Ms. Lansdell returned to Barnett drugs on three occasions for a refill. On each of these occasions, the prescription was filled strictly in accordance with the instructions of Ms. Lansdell's prescribing physician.

The Redux medication prescribed by Ms. Lansdell's physician was not compounded in any way and there was nothing added to or taken from the medication as it was received from its manufacturer prior to the time it was dispensed to Ms. Lansdell as prescribed by her physician. The prescription was not changed in any way from the manner in which it was written by Ms. Lansdell's physician

and the Redux medication given to Ms. Lansdell at the time her prescriptions were filled was not in any way different from the Redux medication prescribed by Ms. Lansdell's physician.

Barnett Drugs did not manufacture the medication. Barnett Drugs is a pharmacy only. Barnett Drugs did not develop or test the medication. Barnett Drugs is in the business of distributing finished products and had no knowledge of any alleged defective condition with respect to the Redux medication and did not contribute to any defective condition. Barnett Drugs has no knowledge of this defective condition superior to that of Ms. Lansdell's prescribing physician or the ultimate user of the medication. Barnett Drugs made no express or implied warranties to Ms. Lansdell with regard to the Redux medication.

(David Frye's Affidavit at 1–3.)

### III. DISCUSSION

A. Diversity of Citizenship
The removing defendants candidly admit that Barnett Drugs is an Alabama citizen and, thus, complete diversity is not present on the face of plaintiffs' complaint. They argue, however, that this court should disregard Barnett Drugs' citizenship, because it was fraudulently joined to prevent removal. Among other things, they contend (as does Barnett Drugs in its motion to dismiss) that all of plaintiffs' claims are barred by the learned intermediary doctrine. [5]

Barnett Drugs contends that it "did nothing ... other than to dispense a prescription drug ... in accordance with the instructions of the plaintiff's prescribing physician, and, as a consequence[,] can have no liability in this case as a matter of law." (Barnett Drugs' motion to dismiss ¶ 2.)

In response, plaintiffs assert that the learned intermediary doctrine is "a new and undocumented subject in Alabama" (plaintiffs' brief in opposition to Barnett Drugs' motion to dismiss, at 10) that does not bar their claims against Barnett Drugs. (*Id.*, at 7–10.)

The seminal Alabama case discussing the doctrine is *Stone v. Smith, Kline & French Laboratories,* 447 So.2d 1301 (Ala.1984), in which the Alabama Supreme Court adopted the reasoning of the former Fifth Circuit in *Reyes v. Wyeth*

*Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974). The *Stone* court explained the doctrine, as follows:

> **\*5** We cannot quarrel with the general proposition that where prescription drugs are concerned, the *manufacturer's* duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This *special standard for prescription drugs* is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. [citation omitted.] Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. *His* is the task of weighing the benefits of any medication against its potential dangers. The choice *he* makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. *Pharmaceutical companies then,* who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, *in selling prescription drugs are required to warn only the prescribing physician,* who acts as a 'learned intermediary' between manufacturer and consumer.

*Stone,* 447 So.2d at 1304–1305 (emphasis supplied) (citing *Reyes v. Wyeth Laboratories,* 498 F.2d at 1276).

Although the learned intermediary doctrine as thus defined operates only to bar certain claims against pharmaceutical companies manufacturing prescription medications, it has been expanded by some courts to bar similar claims brought against pharmacists. *See e.g., McKee v. American*

*Home Products Corp.,* 782 P.2d 1045 (Wash.1989); *Nichols v. Central Merchandise, Inc.,* 817 P.2d 1131 (Kan.Ct.App.1991); *Jones v. Irvin,* 602 F.Supp. 399 (S.D.Ill.1985). The Washington Supreme Court explained why the doctrine applied equally well in pharmacy cases:

> The relationship between the physician-patient-manufacturer applies equally to the relationship between the physician-patient and pharmacist. In both circumstances, the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncrasies of the patient.
>
> ...
>
> Neither manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician-patient relationship.

*McKee,* 782 P.2d at 1050–1051. Moreover, to hold otherwise, would "require the pharmacist to question the physician's judgment regarding the appropriateness of each customer's prescription." *Id.* at 715. Such a policy, inevitably, would wedge the pharmacist into the relationship between a physician and her or his patient and, thereby, interfere with ongoing treatment:

> A physician may often have valid reasons for deviating from the drug manufacturer's recommendations based on a patient's unique condition. The duty which [plaintiff] urges would result in the pharmacist second guessing numerous prescriptions to avoid liability. This would not only place an undue burden on pharmacists, but would likely create antagonistic relations between pharmacists and physicians.

**\*6** *Id.* at 1053; *see also Nichols,* 817 P.2d at 1133 (reasoning that "imposing a duty on the pharmacist would intrude on the doctor-patient relationship and would force the pharmacist to practice medicine without a license"). Thus, the Washington Supreme Court concluded that the learned intermediary doctrine barred claims against a pharmacy in the following circumstances:

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 31 of 370
PageID: 10061

> [O]ur holding is narrow. The pharmacist still has a duty to accurately fill a prescription, [citation omitted] and to be alert for clear errors or mistakes in the prescription. The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug, either orally or by way of the manufacturer's package insert.

*McKee,* 782 P.2d at 1055.

The Alabama Supreme Court has, by implication, evidenced an intent to expand the doctrine beyond a pharmaceutical company to a pharmacist. *See Stafford v. Nipp,* 502 So.2d 702 (Ala.1987). In *Stafford,* the consumer of a prescription drug sued both her physician and the pharmacist who filled her doctor's prescription. 502 So.2d at 703. Although the Alabama Supreme Court reversed the trial court's order granting summary judgment in favor of the pharmacist on the basis of the learned intermediary doctrine, it did so on the basis of the existence of genuine issues of material fact. *Id.* Specifically, the doctor testified that he only issued plaintiff a six-month prescription, without any refills, but the pharmacist continued to refill the prescription for approximately nine years, and denied that he would have done so in the absence of a current prescription from plaintiff's physician. *Id.* The Alabama Supreme Court concluded from such disputed facts that, because the pharmacist possibly dispensed the prescription without authority from a physician, plaintiff could maintain a claim against the pharmacist. *Id.* at 705. "The manufacture's warnings accompanying the drug at the time of its purchase and sale by the pharmacy do not, as a matter of law, shield the pharmacist from liability based on breach of warranty where the pharmacist continues to fill the prescription *without authorization from a doctor." Id.* (emphasis added).

In the present case, however, plaintiffs have not alleged that Barnett Drugs dispensed Mrs. Lansdell's medication without authorization from, or in a manner inconsistent with, her doctor's prescription. Nor have plaintiffs alleged that Barnett Drugs negligently substituted another drug for the prescribed drug, or dispensed the drug in an excessive dose. Indeed, nowhere in plaintiffs' complaint is it alleged that Barnett Drugs failed to fill Ms. Lansdell's prescription in strict accordance with the doctor's directions. In each of these hypotheticals, plaintiffs could potentially have a claim under the court's holding in *Stafford,* based on the theory that Barnett Drugs committed negligence independent of the pharmaceutical manufacturer or prescribing physician. Even so, plaintiffs have alleged merely that Barnett Drugs can be held responsible "under Alabama law for its role in getting the defective product, Redux, in the hands of its customers like the Lansdell–Plaintiffs." (Plaintiff's motion to remand at 7.) Thus, the precise issue submitted to this court by the allegations of plaintiffs' complaint and the affidavit of David Frye is whether a pharmacy, which correctly fills a prescription in strict accordance with the prescribing physician's directions, can be liable in tort for failing to warn the patient of the possible side effects of the medication and/or for dispensing the drug and, thereby, placing it into the stream of commerce.

**\*7** The court finds that under the present facts, where the pharmacy's liability is merely derivative, i.e., it was acting in strict accordance with a licensed physician's valid prescription, the pharmacy *is* protected under Alabama law by the learned intermediary doctrine. *See Harrell v. Wyeth–Ayerst Laboratories, Inc.,* Civil Action No. 98–1194–BH–M (S.D.Ala. February 1, 1999) (Hand, J.) (dismissing claims against pharmacist on the grounds that the learned intermediary doctrine bars "an action against a pharmacist for correctly filling a prescription signed by a medical doctor"); *see also Julie Orr v. Wyeth–Ayerst Laboratories Company,* Case No. CV–98–3000–DIET (Circuit Court of Mobile County, Alabama, August 2, 1999) (Johnston, J.) (dismissing pharmacy defendants in over 150 consolidated diet drug cases on the grounds that such claims were barred by the learned intermediary doctrine).

The court also notes that this conclusion is consistent with the majority of other jurisdictions that have considered this issue and, likewise, have held that the learned intermediary doctrine bars similar actions against pharmacies. *See e.g., Raynor v. Richardson–Merrell,* Inc., 643 F.Supp. 238 (D.D.C.1986); *Ramirez v. Richardson–Merrell, Inc.,* 628 F.Supp. 85 (E.D.Pa.1986). *See also Murphy v. E.R. Squibb & Sons,* Inc., 710 P.2d 247 (Cal.1985); *Walker v. Jack Edward Corp.,* 434 S.E.2d 63 (Ga.Ct.App.1993); *Pysz v. Henry's Drug Store,* 457 So.2d 561 (Fla.Dist.Ct.App.1984); *Leesley v. West,* 518 N.E.2d 758 (Ill.App.Ct.1988); *Ingram v. Hook's*

*Drugs, Inc.,* 476 N.E.2d 881 (Ind.Ct.App.1985); *Guillory v. Dr. X,* 679 So.2d 1004 (La.Ct.App.1996); *Stebbins v. Concord Wrigley Drugs, Inc.,* 416 N.W.2d 381 (Mich.Ct.App.1987); *Kampe v. Howard Stark Professional Pharmacy,* Inc., 841 S.W.2d 223 (Mo.App.1992); *Batiste v. American Home Products Corp.,* 231 S.E.2d 269 (N.C.Ct.App.1977); *Ullman v. Grant,* 450 N.Y.S.2d 955 (N.Y.App.Div.1982); *Coyle v. Richardson–Merrell, Inc.,* 584 A.2d 1383 (Pa.1991).

Because this court finds that plaintiffs' claims against Barnett Drugs are barred by the learned intermediary doctrine and, thus, are due to be dismissed, the court disregards the citizenship of the fraudulently joined defendant for purposes of 28 U.S.C. § 1332. All remaining defendants are completely diverse from plaintiffs and, accordingly, the court finds that defendants have satisfied their burdens with regard to diversity of citizenship.

B. Procedural Deficiencies in the Removal Petition
Additionally, to the extent that plaintiffs argue this case is due to be remanded on the basis of a procedural deficiency, namely, that Barnett Drugs did not join in the removal petition, the court disagrees, and finds that Barnett Drugs was not required to join in removal because it is a fraudulently joined defendant. *See Woods v. Firestone Tire & Rubber Co.,* 560 F.Supp. 588, 590 (S.D.Fla.1983) (finding that "nominal or formal parties, unknown defendants and defendants fraudulently joined may be disregarded in determining the removing defendants' compliance with Section 1446(a)") (citing *Tri–Cities Newspapers, Inc. v. Tri–Cities Pressman & Assistants Local 349,* 427 F.2d 325, 326–27 (5th Cir.1970) (holding that "nominal or formal parties, being neither necessary nor indispensable, are not required to join in the petition for removal")).

C. Amount in Controversy
 **8** Finally, and *sua sponte,* the court notes that plaintiffs failed to allege a specific amount of damages in their prayer for relief. The removing defendants contend that the amount in controversy requirement is satisfied because "[t]he amount in controversy *clearly exceeds* $75,000, exclusive of interest and costs." (Notice of removal at 5 (emphasis added).)

The burden of proving the requisite amount in controversy rests with the removing defendants. *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353, 1356 (11th Cir.1996); *Bolling v. Union National Life Insurance Co.,* 900 F.Supp. 400, 403 (M.D.Ala.1995).

Where a plaintiff has specifically claimed *less than* the jurisdictional amount in her state court complaint, the removing defendant must show to a "legal certainty" that the plaintiff would not recover less than $75,000, if she prevailed. *Burns v. Windsor Insurance Co.,* 31 F.3d 1092, 1095 (11th Cir.1994).

> The rationale is that although a defendant has a right to remove in certain cases, a plaintiff is still master of her own claim.... Noting an attorney's twin duties to investigate his client's case and be candid with the court, we reasoned that a pleading containing a specific demand of damages and signed by a lawyer was due deference and a presumption of truth.... We concluded the defendant's burden was a "heavy one" and the legal certainty standard was therefore appropriate.... Any lesser burden would impermissibly expand federal diversity jurisdiction....

*Tapscott,* 77 F.3d at 1356 (citing *Burns,* 31 F.3d at 1095–97).

The rule is different in cases such as this one, however, where the plaintiff does *not* claim a specific amount of damages in her state court complaint.

> Where a plaintiff has made an *unspecified demand* for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Nevertheless, a defendant's ability to remove a state case to federal court is not unfettered. The proper balance between a plaintiff's right to choose his forum and a defendant's right to remove, without unnecessarily expanding federal diversity jurisdiction, is struck by a preponderance of the evidence standard. As the *Gafford* Court stated:
>
> > It does not place upon the defendant the daunting burden of proving, to a legal certainty, that the plaintiff's damages are not less than the amount-in-controversy requirement. Such a burden might well require the defendant to research, state and prove the plaintiff's

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 33 of 370
PageID: 10063
Lansdell v. American Home Products Corp., Not Reported in F.Supp.2d (1999)
1999 WL 33548541

claim for damages. On the other end of the spectrum, requiring the defendant to prove that the amount in controversy "may" meet the federal requirement would effectively force the plaintiff seeking remand to prove in rebuttal that only a relatively small amount of damages is legally possible.

*Gafford,* 997 F.2d at 159 (footnote omitted). Thus, we hold where a plaintiff has made an unspecified demand for damages in state court, a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $50,000 [now $75,000] jurisdictional requirement.

**\*9** *Tapscott,* 77 F.3d at 1357 (citing *Gafford v. General Electric Co.,* 997 F.2d 150 (6th Cir.1993)).

Here, the amount in controversy is not apparent from the face of plaintiffs' complaint. Rather, plaintiffs merely request "an amount which will adequately compensate plaintiffs for the injuries and damages sustained by them due to the defendants' conduct; and for exemplary damages in an amount which will adequately reflect the wrongfulness of defendants' conduct." (Complaint at 6–11.) Thus, the removing defendants must prove by a preponderance of credible evidence that those demands, if met, more likely than not would yield a recovery in excess of the $75,000 jurisdictional requirement.

Defendants' attempt to meet their burden solely by reliance on the allegations of damage in the complaint falls short of the required quantum of proof, however. *See King v. Wal–Mart Stores, Inc.,* 940 F.Supp. 213, 216 (S.D.Ind.1996) (remanding slip and fall case where defendant opposed motion to remand by referring solely to plaintiff's allegations in the complaint). On nearly identical facts, the United States District Court for the Southern District of Indiana aptly noted:

> Defendant Wal–Mart conclusorily states that Plaintiff's allegations themselves may be relied upon as competent evidence that the value of Plaintiff's claims exceeds $[75,]000.... Obviously, Defendant cannot satisfy its burden solely through its reliance upon the general allegations in Plaintiff's complaint. Defendant is not well served by resting upon the complaint's general allegations as

> evidence of the jurisdictional amount, because it is not "competent proof" and, more significantly, the value of the stated allegations is at the very heart of the dispute.

*King,* 940 F.Supp. at 216–17.

Nevertheless, this court shall not order that the action be remanded *sua sponte.* The court finds that an amendment to plaintiffs' complaint would serve to clarify an unspecified demand for damages and, in deference to the liberal federal rules regarding amendment of pleadings, justice will best be served by permitting the amendment.

Therefore, if plaintiffs desire to remain in the state forum they originally chose, plaintiffs shall forswear any entitlement to any sum or its equivalent value in excess of $75,000, by amending their complaint to contain such a disclaimer, and they shall accompany that disclaimer with a second motion to remand.

Unless plaintiffs do so on or before November 2, 1999, however, the court will proceed as if it has subject matter jurisdiction and that the removal was not improvident.

Plaintiffs should clearly understand that this court will treat the amended complaint as a certification that plaintiffs will neither seek nor accept damages in excess of $75,000 in the state court action. In the event plaintiffs later seek more, this court will assume jurisdiction upon the filing of another, proper notice of removal by defendants.

## IV. CONCLUSION

**\*10** Based on the foregoing, the court finds that Barnett Drugs has been fraudulently joined in this action, as there is no possibility that plaintiffs can maintain a claim against that defendant under the learned intermediary doctrine. Accordingly, Barnett Drugs' motion to dismiss is due to be granted. Additionally, plaintiffs' motion to remand is due to be denied, as complete diversity is present between the remaining parties. Plaintiffs may file another motion to remand, however, should plaintiffs decide to amend their complaint to clarify their unspecified demand for damages. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is ORDERED that Barnett Drugs' motion to dismiss is granted, and plaintiffs' claims against that defendant are dismissed without prejudice. Any costs incurred by Barnett Drugs are taxed to plaintiffs. It is further ORDERED that plaintiffs' motion to remand is denied, as Barnett Drugs was fraudulently joined.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 33548541

Footnotes

1    *See* Black's Law Dictionary 898 (7th ed.1999) (defining the learned intermediary doctrine as "[t]he principle that a prescription-drug *manufacturer* fulfills its duty to warn of a drug's potentially harmful effects by informing the prescribing physician, rather than the end-user, of those effects" (emphasis supplied)). As discussed *infra,* this court expands that doctrine to encompass pharmacists.

2    The Eleventh Circuit held in *Property Management* that the trial court did not err in converting a 12(b)(6) motion into one for summary judgment, as the nonmovant:

    is estopped from denying the propriety of the conversion because it submitted its own copy of the [evidence] to the court and, thus, affirmatively sought to effect the conversion about which it now complains.... By submitting this [evidence], the appellant rendered its objections to consideration of the [evidence] ... meaningless, and, indeed, sought such consideration.

    *Property Management,* 752 F.2d at 605–607.

3    In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (*en banc* ), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

4    By implication Barnett Drugs arguably is a defendant liable under Count VI of plaintiffs' complaint, in which Mr. Lansdell asserts a claim for loss of his wife's consortium. Because that claim is derivative, and viable only if Mrs. Lansdell succeeds on her direct claims against Barnett Drugs, this count need not detain the court any longer.

5    During oral argument, counsel for Barnett Drugs also argued that plaintiffs' claims for failure to warn (Count IV) and breach of warranty (Count V) were subsumed into their AEMLD claim (Count III). The seeds of such an argument fell upon receptive ground, as this court previously has held that claims of negligence, wanton misconduct, and breach of warranty under Alabama law merge into the so-called "Extended Manufacturers' Liability Doctrine." *See Webb v. Ashland Chemical, Inc.,* Civil Action No. CV99–S–0443–NW (N.D. Ala., June 7, 1999 Order) (Smith, J.) (attached as Exhibit "A" to Barnett Drugs' response to plaintiff's motion to remand). Upon further consideration of that argument, this court agrees with Senior United States District Judge Wm. Brevard Hand of the Southern District of Alabama that failure to warn claims also are subsumed into the AEMLD. *See Johnson v. General Motors Corporation,* Civil Action No. 97–0046–BH–C (S.D. Ala., July 22, 1997 Order) (Hand, J.) (attached as Exhibit "E" to defendants' notice of removal).

# TAB 6

2013 WL 839884
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama,
Southern Division.

Sandra Johnson GARDNER, Plaintiff,

v.

ALOHA INSURANCE SERVICES, et al., Defendants.

No. 2:11–CV–3450–RDP.
|
March 4, 2013.

**Attorneys and Law Firms**

Sandra Johnson Gardner, Birmingham, AL, pro se.

Adam T. Peterson, Heath Sherman, Leahy Eisenbert &
Fraenkel Ltd., Chicago, IL, Kathleen C. Kaufman, Thomas
M. Rockwell, Rockwell & Kaufman LLC, Mobile, AL, for
Defendants.

***MEMORANDUM OPINION***

R. DAVID PROCTOR, District Judge.

**\*1** Plaintiff filed this action *pro se* in the Circuit Court of
Jefferson County, Alabama. It was removed to this court by
Defendant Wal–Mart. (Doc. # 1). On December 19, 2011,
Plaintiff filed an Amended Complaint. Plaintiff's Amended
Complaint seeks damages from Defendants "[a]s a direct
result and proximate result of the product liability by the
Defendants" relating to a fire at Plaintiff's residence which
she claims originated in a defective ceiling fan. (Doc. #
14). Although Plaintiff's Amended Complaint is somewhat
unclear, it appears (and Defendants have presumed) that she
has asserted a product liability action against Defendants
under the Alabama Extended Manufacturer's Liability
Doctrine ("AEMLD").

This matter is before the court on the following motions:

1. Defendant Aloha Housewares, Inc.'s Motion for
   Summary Judgment (Doc. # 28);

2. Defendant Aloha Housewares, Inc.'s Motion to Strike
   Affidavit of Lewis Gant (Doc. # 37), in which Defendant
   Wal–Mart joins (Doc. # 56);

3. Defendant Aloha Housewares, Inc.'s Motion to Exclude
   Plaintiff's Expert Lewis Gant (Doc. # 38), in which
   Defendant Wal–Mart Stores East, L.P. also joins (Doc.
   # 57);

4. Plaintiff's Motion for Extension to Allow the Admittance
   of the April 6, 2012 Submitted Electrical Expert Witness
   (Doc. # 40);

5. Defendant Wal–Mart Stores East, L.P.'s Motion for
   Summary Judgment (Doc. # 46);

6. Plaintiff's Motion for Production from the Defendants
   Aloha Housewares, Inc. (Doc. # 51); and

7. Plaintiff's Motion for Summary Judgment (Doc. # 52).

These motions are fully briefed.

**I. FACTS** [1]
In approximately 2007 or 2008, Plaintiff purchased a ceiling
fan in a sealed box from the Wal–Mart store located at 9248
Parkway East in Birmingham, Alabama. (Doc. # 1). The fan
was manufactured by Aloha Housewares.

Wal–Mart did not manufacture or assemble the fan. It did not
have any role in designing, testing, packaging, or labeling the
fan. Nor did it make any modifications to the fan. (Doc. # 46–
2 at 162–63).

The fan was installed in Plaintiff's bedroom at her mother's
home in the light fixture over her bed by Harold Hammonds
of Hammonds Construction. (Doc. # 46–2 at 77–80).
Hammonds was performing some other work at the home, and
Plaintiff gave the fan to him to install. (Doc. # 46–2 at 81–82).

On August 26, 2009, the fan caught on fire and set fire to
the bed under the fan. (Doc. # 46–2 at 82, 92–93). Plaintiff
was able to put the fire out before the Birmingham Fire
Department was able to respond. (Doc. # 46–2 at 93–94, 98).
The Fire Department defined the fire as Incident Type: "440–
Electrical wiring/equipment problem, other." (Doc. # 31 at
102, 170–71; Doc. # 5 at 29).

On November 29, 2011, the court entered a Scheduling Order
requiring Plaintiff to disclose any expert reports by January
30, 2012. (Doc. # 12).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 37 of 370
PageID: 10067
Gardner v. Aloha Ins. Services, Not Reported in F.Supp.2d (2013)
2013 WL 839884

At her December 21, 2011 deposition, Plaintiff testified that "I think something happened inside that fan that it caught itself on fire. I think it came from the inside, inner mechanism of that fan." (Doc. # 31 at 102). Plaintiff bases her opinion on the Fire Department's Incident Report. (Doc. # 31 at 102, 170–71; Doc. # 5 at 29).

**\*2** On January 27, 2012, Plaintiff filed a document designated as "Plaintiff's Reports from Retained 'Expert' Under Fed.R.Civ.P. 26(a)(2)." (Doc. # 20). In that document, Plaintiff disclosed her treating physician, Dr. Ernest A. Claybon, Jr., as an expert and produced an affidavit signed by him indicating that he treated Plaintiff for smoke inhalation secondary to the August 26, 2009 house fire. *(Id.)*.

On March 8, 2012, Defendant Aloha Housewares moved for summary judgment. (Doc. # 28). In response to Defendant Aloha Housewares' Motion, Plaintiff submitted an affidavit from Lewis Gant, a purported expert, which had not previously been produced to Defendants in advance of Plaintiff's deadline for expert disclosures. (Doc. # 36 at 19–20).

Mr. Gant's affidavit states that he is a Certified Licensed Electrical Instructor for Lawson State Junior College. (Doc. # 36 at 19). Mr. Gant states that he examined the electrical wiring at Plaintiff's mother's house and found no problems with the wiring. (Doc. # 36 at 19). Mr. Gant did not examine the ceiling fan at issue which had already been removed when Mr. Gant performed his inspection. (Doc. # 36 at 19–20). However, he states that he is "in agreement with the Birmingham Fire Department's assessment; which was that the fire was caused by the electrical wiring/equipment problem which was the defected ceiling fan they removed." (Doc. # 36 at 19–20). He further states that he will testify "that the Birmingham Fire Department's statement: 'Incident Type 44–Electrical wiring/equipment problem' was the way that they defined the inter defected mechanisms of the ceiling fan which they rightfully immediately removed." (Doc. # 36 at 19–20).

On August 28, 2009, Defendant Aloha Housewares wrote to Plaintiff in response to her claim regarding the ceiling fan. (Doc. # 36 at 23). Defendant Aloha provided Plaintiff with a UPS Call Tag and "Call Tag Information" form to enable Plaintiff to return the fan to them for inspection. (Doc. # 36 at 22–23). The document titled "Procedure for UPS Call–Tags" instructs a consumer to "place the defective item or items" in packaging for return. (Doc. # 36 at 22). Plaintiff took the fan to UPS and had them send the fan to Aloha Housewares. (Doc. # 46–2 at 173–74).

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

**\*3** The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir .1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

"To be admissible in support of or in opposition to a motion for summary judgment, a document must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Saunders v. Emory Healthcare, Inc.,* 360 F. App'x 110, 113 (11th Cir.2010) (citing 10 A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2722, at 382–84 (3d ed.1998)).

## IV. DISCUSSION

The Alabama Supreme Court adopted the AEMLD to alleviate the "almost impossible burden" plaintiffs sometimes bore in attempting to establish negligence in a products-liability action under the traditional negligence theories. *McMahon v. Yamaha Motor Corp., U .S.A.,* 95 So.3d 769, 772

(Ala.2012). There is, however, "a measure of commonality" between AEMLD and negligence claims. *McMahon,* 95 So.3d at 772.

> Specifically, a plaintiff pursuing a products-liability claim against a manufacturer under either theory can succeed only if the plaintiff establishes that the product at issue is sufficiently unsafe so as to render it defective. In an AEMLD case, this is done by proving that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the allegedly defective product. *General Motors Corp. v. Jernigan,* 883 So.2d 646, 662 (Ala.2003). Once established, that is sufficient to succeed on the AEMLD claim. In a negligence case, the plaintiff must establish not only that the product at issue is defective, but also that the manufacturer failed to exercise due care in the product's manufacture, design, or sale. [ *Atkins v. American Motors Corp.,* 335 So.2d 134, 139 (Ala.1976) ].

*McMahon,* 95 So.3d at 772.

To establish an actionable AEMLD claim, Plaintiff must prove:

1. she suffered injury or damage to herself or her property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

a. the seller is engaged in the business of selling such a product, and

b. the product is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

*Tanksley v. ProSoft Automation, Inc.,* 982 So.2d 1046, 1049–50 (Ala.2007); *Kirk v. Garrett Ford Tractor, Inc.,* 650 So.2d 865, 866 (Ala.1994); *Yamaha Motor Co. v. Thornton,* 579 So.2d 619, 621 (Ala.1991); *Casrell v. Altec Indus., Inc.,* 335 So.2d 128, 132–33 (Ala.1976).

**\*4** "In an AEMLD action, 'the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition.' " *Tanksley,* 982 So.2d at 1051 (quoting *Jordan v. General Motors Corp.,* 581 So.2d 835, 836–37 (Ala.1991). " 'Without evidence to support the conclusion that the product was defective and/or unreasonably dangerous when it left the hands of the seller, the burden is not sustained.' " *Id.* (quoting *Jordan,* 581 So.2d at 837). Importantly, " '[p]roof of an accident and injury *is not in itself sufficient* to establish liability under the AEMLD; a defect in the product must be *affirmatively shown.*' " *Id.* (quoting *Townsend v. General Motors Corp.,* 642 So.2d 411, 415 (Ala.1994)) (emphasis added).

### A. Plaintiff's Proposed Expert Testimony is Due to be Excluded

A review of the parties' submissions indicates that Plaintiff relies on the "expert" testimony of Lewis Gant to support her claim that the ceiling fan was defective. Therefore, as a threshold matter, the court must address Defendants' motions seeking to strike Mr. Gant's affidavit and exclude his testimony in conjunction with the Motions for Summary Judgment. The following motions are directed to the issue of whether Mr. Gant's testimony should be admitted:

1. Defendant Aloha Housewares, Inc.'s Motion to Strike Affidavit of Lewis Gant (Doc. # 37), in which Defendant Wal–Mart joins (Doc. # 56);

2. Defendant Aloha Housewares, Inc.'s Motion to Exclude Plaintiff's Expert Lewis Gant (Doc. # 38), in which Defendant Wal–Mart Stores East, L.P. also joins (Doc. # 57); and

3. Plaintiff's Motion for Extension to Allow the Admittance of the April 6, 2012 Submitted Electrical Expert Witness (Doc. # 40).

The Motion to Strike Mr. Gant's affidavit is based on two primary arguments: the affidavit (1) is untimely, and (2) based upon speculation. (Doc. # 56). The Motion to Exclude Mr. Gant's expert testimony is based on the argument that Mr. Gant's opinions as set forth in his affidavit fail to meet the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. (Doc. # 57). The Motion to

2013 WL 839884

Exclude also argues that Defendants are prejudiced because Mr. Gant was disclosed as an expert too late in this case. (Doc. # 57).

The court will not strike the affidavit or Mr. Gant as an expert due to untimeliness. although admittedly, the disclosure of Mr. Gant as a witness and the production of his affidavit did occur after Plaintiff's deadline for disclosing experts. That issue becomes moot because the court agrees with Defendants that a *Daubert* analysis requires the exclusion of Mr. Gant's affidavit and proposed expert opinions.

The Eleventh Circuit has instructed that, in determining the admissibility of expert testimony, the court must "engage in a rigorous three-part inquiry," considering whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address;

**\*5** (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert [v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)* ]; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir.2011) (citations omitted, alteration in original). In evaluating the admissibility of proposed expert testimony, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 594–95.

Based upon the record before the court, Mr. Gant is clearly not competent to testify as to the matters contained within his affidavit. Mr. Gant states that he is a Certified Licensed Electrical Contractor. His affidavit purports to opine on the meaning of a document authored by the Birmingham Fire Department. In particular, Mr. Gant's affidavit states that the Birmingham Fire Department determined that the ceiling fan was defective and the cause of the fire. However, nothing in the record indicates that Mr. Gant was involved in the creation of that document, spoke to anyone about the creation of that document, or that he has any expertise related to firefighting or, more importantly, determining causes of fires. Moreover, Mr. Gant's affidavit indicates that he never inspected the fan at issue to be able to independently determine whether it caused

the fire because he states the fan had already been removed by the Fire Department.

Nor can this court even begin to find that Mr. Gant's methodology in reaching his conclusions is sufficiently reliable to be admissible. There simply is no methodology referenced in the affidavit. The affidavit contains pure speculation as to matters outside Mr. Gant's personal knowledge. In *McCreless v. Global Upholstery Co., Inc.,* 500 F.Supp.2d 1350, 1357 (N.D.Ala.2007), the court excluded proposed expert testimony because "[t]he problem with the methods and procedures behind [the expert's opinion] is that, as far as the court can detect, there were no methods or procedures employed." *Id.* at 1357. The same is true here.

Federal Rule of Evidence 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." Rule 702, Fed.R.Evid. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corporation,* 269 F.3d 865, 869 (7th Cir.2001); *see also U.S. v. Majors,* 196 F.3d 1206, 1215 (11th Cir.1999). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*6** Fed.R.Evid. 702.

Under Rule 702, the court "has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." *Whatley v. Merit Distribution Services,* 166 F.Supp.2d 1350, 1353 (S.D.Ala.2001) (citations

2013 WL 839884

omitted). The proponent of the testimony does not have the burden of proving that it is scientifically correct. However, that party must prove, by a preponderance of the evidence, that the witness is qualified, and that his testimony is both reliable and helpful. *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999) (party offering the expert has the burden of satisfying these three elements by a preponderance of the evidence.); *McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir.2004) (same); *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (same). Where the proponent of the testimony fails to meet this burden, that testimony "must be excluded." *Beam v. McNeilus Truack and Mfg., Inc.,* 697 F.Supp.2d 1267, 1271 (N.D.Ala.2010).

Mr. Gant has not been shown to be qualified to the testify to the opinions he proffers, and his affidavit and proposed testimony have simply not been shown to be reliable or potentially helpful to the trier of fact. Therefore, the Motion to Strike Affidavit of Lewis Gant (Doc. # 37), and joinder therein (Doc. # 56), and the Motion to Exclude Plaintiff's Expert Lewis Gant (Doc. # 38), and the joinder therein (Doc. # 57) are due to be granted. Plaintiff's Motion for Extension to Allow the Admittance of the April 6, 2012 Submitted Electrical Expert Witness (Doc. # 40) is moot.

### B. Plaintiff Has Not Presented Substantial Evidence That the Ceiling Fan was Defective

To establish her claim under the AEMLD, Plaintiff must show that the ceiling fan at issue was defective. A " 'defect' is that which renders a product 'unreasonably dangerous,' *i.e.,* not fit for its intended purpose." *Casrell v. Altec Indus., Inc.,* 335 So.2d 128, 133 (Ala.1976). "Thus, for example, a product is defective if it does not meet the 'reasonable expectations of an ordinary consumer as to its safety.' " *Ray v. Ford Motor Co.,* 792 F.Supp.2d 1274, 1282 (M.D.Ala.2011) (quoting *Jordan v. Gen. Motors Corp.,* 581 So.2d 835, 837 (Ala.1991)). "Alabama case law requires an AEMLD plaintiff to come forward with, among other things, *at least some evidence* to support an inference that the product in question was defective." *Ray,* 792 F.Supp.2d at 1282 (citing *Rudd v. Gen. Motors Corp.,* 127 F.Supp.2d 1330, 1345 (M.D . Ala.2001) (emphasis added). Most importantly as it applies to this case, "*[m]ere proof of an accident* with ensuing injuries is *insufficient to establish AEMLD fault* because 'the plaintiff must affirmatively show that the product *was sold with* a defect or in a defective condition.' " *Ray,* 792 F.Supp.2d at 1282 (quoting *Jordan,* 581 So.2d at 836–37) (emphasis added).

*\*7* The *Rule 56* evidence before this court shows that Plaintiff purchased the fan at issue at Wal–Mart in approximately 2007 or 2008. The fan was installed in a light fixture over Plaintiff's bed by Harold Hammonds of Hammonds Construction. (Doc. # 46–2 at 77–82). Then, after normal use for some period of time, on August 26, 2009, the fan caught on fire. There is no admissible evidence in the record to establish the cause of the fire except a note by the Birmingham Fire Department defining the fire as Incident Type: "440–Electrical wiring/equipment problem, other." (Doc. # 31 at 102, 170–71; Doc. # 5 at 29). The record is completely devoid of evidence that the fan at issue was defective at the time it was sold. Plaintiff has merely presented evidence that she was injured in an accident relating to the fan. Under Alabama law, this is insufficient to establish her AEMLD claim. She has failed to affirmatively show (or, in this context, present substantial evidence) that the ceiling fan was sold with a defect or in a defective condition. *Ray,* 792 F.Supp.2d at 1282; *Jordan,* 581 So.2d at 836–37.

"The AEMLD is a fault based doctrine, and accordingly, plaintiff[ ] 'must prove more than the fact that an injury occurred while [the plaintiff was] using the product ... [T]he plaintiff must affirmatively show a defect in the product.' " *Borum v. Werner Co.,* 2012 WL 2047678, *14 (N.D.Ala.2012) (quoting *Verchot v. General Motors Corp.,* 812 So.2d 296, 301 (Ala.2001)). In the final analysis, while Plaintiff has shown that she suffered injuries from the fire related to the ceiling fan, she has failed to show that the ceiling fan was defective when sold or that the alleged defect was the cause of the fire. *See Borum,* 2012 WL 2047678 at *14. Therefore, Defendants, and not Plaintiff, are entitled to summary judgment on Plaintiff's AEMLD claim.[2]

### C. Plaintiff's Claims Against Wal–Mart Are Barred by Alabama Code § 6–5–521

There is another, alternative reason that Wal–Mart is entitled to summary judgment here. Alabama law provides that a plaintiff may not assert any products liability action against a distributor unless one of the enumerated exceptions apply. Ala.Code § 6–5–521(b)(1)–(4)[3]; *Sewell v. Smith & Wesson Holding Corp.,* 2012 WL 2046830 * 2 (N.D.Ala.2012). Section 6–5–521(b) of the Alabama Code states:

(b) No product liability action may be asserted or may be provided a claim for relief against any distributor, wholesaler, dealer, retailer, or seller of a product, or

against an individual or business entity using a product in the production or delivery of its products or services (collectively referred to as the distributor) unless any of the following apply:

> (1) The distributor is also the manufacturer or assembler of the final product and such act is causally related to the product's defective condition.

> (2) The distributor exercised substantial control over the design, testing, manufacture, packaging, or labeling of the product and such act is causally related to the product's condition.

> **\*8** (3) The distributor altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought.

> (4) It is the intent of this subsection to protect distributors who are merely conduits of a product. This subsection is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of negligence, wantonness, warranty violations, or fraud.

Ala.Code § 6–5–521(b)(1)–(4).

Plaintiff has presented no evidence to support the application of any of these exceptions to Wal–Mart. In fact, Plaintiff admitted that Wal–Mart did not manufacture or assemble the fan, did not have any role in designing, testing, packaging, or labeling the fan, and did not make any modifications to the fan. (Doc. # 46–2 at 162–63). Therefore, Wal–Mart is entitled to summary judgment for this additional reason.

### D. Plaintiff's Motion for Production from Defendant Aloha Housewares is Untimely

Plaintiff's Motion for Production from the Defendant Aloha Housewares, Inc. (Doc. # 51) was filed on July 6, 2013. Plaintiff's motion seeks production of the fan she returned to Aloha Housewares and the claim file on the fan. Defendant Aloha Housewares opposes Plaintiff's Motion as being untimely because it was filed after the close of discovery and because it gives no justification for Plaintiff's failure to seek the discovery earlier. (Doc. # 55).

Plaintiff filed her Complaint in this case on August 18, 2011. (Doc. # 1). On October 20, 2011, the parties filed their report of parties' planning meeting in which they proposed a discovery deadline of June 22, 2012. (Doc. # 9). They also

proposed expert disclosure deadlines of January 16, 2012 for Plaintiff and of March 5, 2012 for Defendants. (Doc. # 9). On November 29, 2011, the court conducted a scheduling conference and entered a scheduling order. (Docs.# 11, 12). In the Scheduling Order, the court adopted the parties proposed discovery deadline of June 22, 2011. (Doc. # 12). The court set Plaintiff's expert disclosure deadline for Plaintiff on January 30, 2012. (Doc. # 12).

Defendant Aloha Housewares filed an early Motion for Summary judgment on March 8, 2012. (Doc. # 28). In response, Plaintiff submitted her belated expert affidavit from Mr. Gant. (Doc. # 36). On April 20, Defendant Aloha Housewares moved to strike Mr. Gant's affidavit and exclude him as an expert. (Docs.# 37, 38). On May 1, 2012, Plaintiff moved for an extension to allow her April 6, 2012 expert affidavit admitted. (Doc. # 40). On June 5, 2012, Defendant Wal–Mart filed its Motion for Summary Judgment. (Doc. # 46). Despite all of this briefing, which took place within the discovery period and pointed out Plaintiff's failure to provide expert testimony establishing that the fan was defective, Plaintiff did not timely seek production of the ceiling fan at issue. Rather, her Motion (Doc. # 51) was filed after Defendants' Motions for Summary Judgment had been filed, and three weeks after the discovery deadline.

**\*9** District courts have broad discretion in managing their cases. *Chrysler Int'l Corp. v. Chenaly,* 280 F.3d 1358, 1360 (11th Cir.2002). The broad discretion given to the court includes the management of pretrial activities such as discovery and scheduling. *Id.* (citing *Johnson v. Bd. of Regents of Univ. Georgia,* 263 F.3d 1234, 1269 (11th Cir.2001)). Plaintiff had ample time to conduct discovery in this matter within the period allowed for discovery.[4] Furthermore, Defendants' motions for summary judgment were filed during the discovery period and put Plaintiff on notice that she might need to conduct discovery. Nevertheless, she waited until after the discovery deadline had passed to do so. Plaintiff's failure to initiate discovery during the appropriate time period counsels against her being able to initiate discovery at this late date. Plaintiff's Motion is clearly untimely. *Great American Ins. Co. v. Jefferson County Com'n,* 776 F.Supp.2d 1252, 1259 (N.D.Ala.2010) ("The Eleventh Circuit has consistently held that motions filed after a deadline imposed by a court should be denied as untimely."), citing *Payne v. Ryder Sys., Inc. Long Term Disability Plan,* 173 F.R.D. 537, 540 (M.D.Fla.1997); *AB Diversified Enters., Inc. v. Global Transp. Logistics, Inc.,* 2007 WL 1362632, at *1 (S.D.Fla. May 7, 2007) (denying a motion to compel filed

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 42 of 370
PageID: 10072
Gardner v. Aloha Ins. Services, Not Reported in F.Supp.2d (2013)
2013 WL 839884

two months after the discovery deadline and after summary judgment motions were fully briefed)). *See also Riley v. Harris County Sheriff's Department,* 2009 WL 2913071 at *2 (M.D.Ga.2009) (denying motion to take a deposition after the close of discovery, finding that the plaintiff had ample opportunity to depose the defendant during the discovery period and did not do so); *McMullen v. Charter Schools USA, Inc.,* 2011 WL 56065 at *6 (S.D.Fla.Jan.7, 2011) (finding defendant failed to demonstrate good cause to re-open discovery when discovery closed on September 18, 2010, and defendant knew on August 6, 2010, that it would need additional discovery, but did not attempt to seek the documents until several months after the end of discovery).

For these reasons, Plaintiff's Motion for Production from the Defendants Aloha Housewares, Inc. (Doc. # 51) is due to be denied.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment (Doc. # 44) are due to be granted. The court will issue a separate order consistent with this Memorandum Opinion addressing those and the other outstanding Motions.

**DONE** and **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 839884

Footnotes

1    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta,* 281 F.3d 1220, 1224 (11th Cir.2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir.1994).

2    If Plaintiff's claim had been brought under a common law negligence theory, the failure to establish a defect by affirmative proof would doom that claim as well. "In a negligence case, the plaintiff must establish not only that the product at issue is defective, but also that the manufacturer failed to exercise due care in the product's manufacture, design, or sale." *McMahon,* 95 So.3d at 772; *Atkins,* 335 So.2d at 139.

3    The effective date of Section 6–5–521 was June 9, 2011, prior to the filing of Plaintiff's Complaint. (Doc. # 1).

4    Admittedly, Plaintiff notified the court that she had oral surgery on June 20, 2012 and attended speech therapy thereafter. (Doc. # 50). However, the documentation submitted does not explain Plaintiff's complete failure to initiate *written* discovery seeking inspection of the fan, or for that matter any other type of discovery during the period allowed, *i.e.,* between December 2011 and June 2012.

**End of Document**                                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   F042   7

# TAB 7

2009 WL 7233281 (Ariz.Super.) (Trial Order)
Superior Court of Arizona.
Maricopa County

Sultan Rahim STRONG, et al.,

v.

MERCK & CO INC, et al.

No. CV 2005-053195.
November 9, 2009.

**Minute Entry**

Hon. Edward O. Burke.

XX/XX/

CLERK OF THE COURT

L. Nixon

Deputy

CRAIG A STEPHAN

FOSTER ROBBERSON

PETER C KELLY

STEPHEN D RABER

KATHRYN SNAPKA

The Court has had Defendant, Merck & Co., Inc.'s ("Merck") Motion for Summary Judgment and Defendant Walgreen Arizona Drug Co.'s ("Walgreen") Motion for Summary Judgment Re: Liability under advisement and issues the following rulings.

Defendant Merck's Motion for Summary Judgment is GRANTED in part as to Count 6 (Violation of Consumer Fraud Act) and DENIED as to the remaining counts.

Defendant Walgreen's Motion for Summary Judgment Re: Liability is GRANTED in part as to Count 2 (Manufacturing and Design Defects), Count 3 (Strict Liability For Failure to Warn), Count 6 (Violation of Consumer Fraud Act) and DENIED as to the remaining counts.

*Facts*

In support of their motions for summary judgment, Merck set forth a statement of 35 undisputed facts and Walgreen's set forth 26 statements of fact. Rule 56(c)(2) requires a party opposing a motion for summary judgment to file a statement specifying those paragraphs in the moving party's statement of facts which are disputed, Plaintiff elected not to comply with the rule and simply set forth 6 paragraphs (A-E) which contain general statements such as:

"Plaintiff disputes opinions rendered by Dr. Posner, who is negligent in this case. (See the testimony of Dr. Rushing, below); Plaintiff disputes the contention that adequate warnings were provided by either Merck or Walgreen with respect to the cardiovascular risks of Vioxx; Plaintiff disputes that Vioxx was a safe drug" and "Mr. Hamilton's testimony addresses Merck's marketing tactics many of which were misleading to physicians, patients and the public," with no citations to the record.


Plaintiff did file a 68 page Statement of Facts with 236 separate statements, some of which were argument and others editorial comment. Although not technically required by Rule 56, neither of the moving defendants challenged any of Plaintiff's specific statements of fact. Counsel apparently expected the Court to comb through the voluminous record in this case line by line to try and make certain that there is no genuine issue of material fact. This is not what Rule 56 envisions. See the discussion of this issue in *Tilley v. Delci*, 220 Ariz. 233, footnote 4, 204 P.3d 1082 (App. 2009) which indicates that in a complex case such as this, it is the attorneys' responsibility to search the record and bring such issues to the Court's attention.

The facts set forth by Defendant, Merck include: (References are to paragraphs in Merck's Statement of Facts).
2. On May 20, 1999, the FDA approved Vioxx as "safe and effective" for use in patients with osteoarthritis, menstrual pain, and acute pain. The FDA also approved the label that was required to be used in connection with the manufacturing, marketing, and sale of Vioxx.

3. The FDA approved Vioxx for three additional indications after the initial approval: (1) on April 11, 2002 for rheumatoid arthritis; (2) on March 26, 2004 for migraines; and (3) on August 19, 2004 for juvenile rheumatoid arthritis. With each approval, the FDA determined that Vioxx was "safe and effective" when used in accordance with the label that was approved and required by the FDA.

4. Vioxx was manufactured and labeled in accordance with the terms of the approvals granted by the FDA.

7. Mrs. Strong died shortly after midnight on November 20, 2003.

8. The Death Certificate states that Mrs. Strong died from an "Acute myocardial infarction" due to "hypertension." No autopsy was performed. Vioxx is not listed anywhere on the Death Certificate as a cause of Mrs. Strong's death.

9. Before her death, Mrs. Strong had suffered from a long history of medical problems, including a heart attack in 1984 that was described as "massive" in the medical records. She also had been diagnosed with congestive heart failure, diabetes, lupus, hypertension, hyperlipidemia, kidney failure, and morbid obesity.

10. Before her death, Mrs. Strong smoked a pack of cigarettes a day for more than 30 years. She continued to smoke after her first heart attack, against her doctor's advice, because it "was one of the few joys in her life."

11-12. From June 17, 1997 until her death on November 20, 2003, Mrs. Strong's primary care doctor was Dr. Posner, a medical doctor who is board certified in rheumatology and licensed to practice in Arizona. He has been board certified and licensed in Arizona since 1976.

13. Dr. Posner treated Mrs. Strong for osteoarthritis. When he first saw Mrs. Strong, she "was in significant pain" that caused "major limitation of functional capacity." She had "constant" and "accelerating" pain that was incapacitating, to the point that she was bedridden at times and "limited to bare, basic, vegetative kinds of activities." Dr. Posner believes that Mrs. Strong's life would have been "unbearable" without any pain medication.

14. When Dr. Posner took over Mrs. Strong's care, she was taking prescription narcotics for her chronic pain. Prescription narcotics are associated with serious adverse side effects in that they can become addictive, they can cause constipation, and they can interfere with mental capacity.

15. Mrs. Strong also was taking high doses of a steroid called Prednisone to treat her pain. Well-known side effects of Prednisone include atherosclerosis, obesity, hypertension, and diabetes.

16. Mrs. Strong had a history of GI bleeds while taking Naprosyn, a traditional NSAID that can cause GI bleeds. She also had a history of gastroesophageal reflux disease ("GERD").

17. Dr. Posner prescribed Vioxx for Mrs. Strong for the first time on August 21, 2000. He believed Vioxx was a good choice for her for several reasons: First, Vioxx had a better risk profile than narcotics and steroids; second, Mrs. Strong was already taking such a high dose of narcotics that an additional dose would not be in her best interest; third, Mrs. Strong had a history of potentially serious GI problems; fourth, Celebrex, another drug in the same class as Vioxx, was not an option because Mrs. Strong had a sulfa allergy, which is contained in Celebrex but not Vioxx; and fifth, Vioxx would allow Dr. Posner to taper the use of steroids, which would lower the risk of steroidal side effects and possibly help Mrs. Strong lose weight.

18. In April 2002, the FDA-approved label for Vioxx was changed to add precautions and data from a clinical study known as VIGOR. The VIGOR study showed a significantly higher incidence of serious cardiovascular events for patients taking Vioxx compared to patients taking Naproxen. VIGOR also showed that patients taking Vioxx had a 54% reduction in risk for serious GI side effects (perforations, ulcers, and bleeds) compared to patients taking Naproxen. The FDA convened an Advisory Committee of experts to analyze the data from the VIGOR study before requiring this label change.

19-20. Dr. Posner received a copy of the April 2002 label for Vioxx label contains instructions for prescribing doctors on "Dosage and Administration." The dosage instructions include the following:

a. "The lowest dose of Vioxx should be sought for each patient." (Ex. 6 at 4)

b. For patients with Osteoarthritis: "The recommended starting dose of Vioxx is 12.5 mg once daily. Some patients may receive additional benefits by increasing the dose to 25 mg once daily. The maximum recommended daily dose is 25 mg." (Ex. 6 at 4)

c. "Chronic use of Vioxx 50 mg daily is not recommended."

21. Dr. Posner was aware of these dosage instructions for Vioxx in April 2002 when he prescribed Vioxx for Mrs. Strong. Dr. Posner prescribed a 50 mg daily dose of Vioxx over several months because it was "a matter of discretion and clinical judgment." His "best judgment at the time ... was that [50mg] was the most appropriate dose to control her symptomatic discomfort, and it was based upon knowledge of her needs at that time."

22. Dr. Posner admits that his 50 mg prescriptions were "an off-label use." He explained that these prescriptions by him were "a discretionary judgment based upon clinical experience that that was an appropriate dose for her."

23. Dr. Posner also prescribed a 100 mg daily dose for Mrs. Strong for approximately three months notwithstanding the dosage instructions in the Vioxx label. Dr. Posner admits that the 100 mg prescriptions were "off-label," but explained: "I prescribed it because that was the dose that was most effective for her at that particular time due to the fact that there was exacerbation of her musculoskeletal symptoms occurring during the time I was caring for her."

24. Dr. Posner received a "Dear Health Care Provider" letter from Merck instructing him that "chronic use of Vioxx 50 milligrams daily is not recommended." Dr. Posner chose not to follow that instruction from Merck. He explained: "The issue

has to do with discretion and clinical judgment. The clinical judgment regarding the dose of the drug was based upon her unique response to the medication and careful monitoring. And I did [m]ake the decision to use the dose that was most appropriate for her and that was the reason for that particular prescription."

25. No one from Merck ever suggested or encouraged Dr. Posner to prescribe 50 mg or more for Mrs. Strong.

26. The April 2002 Vioxx label warns prescribing doctors to use caution when prescribing Vioxx to patients with hypertension and congestive heart failure: "Vioxx should be used with caution, and should be introduced at the lowest recommended dose in patients with ... hypertension ... or heart failure." Dr. Posner knew about this warning.

27. Mrs. Strong had hypertension and heart failure, and Dr. Posner knew she had those conditions when he prescribed Vioxx for her.

28. Dr. Posner took into account these precautions about hypertension and heart failure along with Mrs. Strong's condition when he made his prescription decision.

29. The April 2002 Vioxx label warns prescribing doctors about the "Cardiovascular Effects" of Vioxx. The label informs doctors that a large clinical study showed a significantly higher incidence of heart attacks for patients treated with Vioxx compared to patients treated with Naproxen: "The VIGOR study showed a higher incidence of adjudicated serious cardiovascular thrombotic events in patients treated with VIOXX 50 mg once daily as compared to patients treated with naproxen 500 mg twice daily ... This finding was largely due to a difference in the incidence of myocardial infarction between the groups." The April 2002 Vioxx label refers doctors to Tables 2 and 3, which provide precise data about the differences in heart attacks and other cardiovascular events shown in the VIGOR study.

30. The April 2002 Vioxx label advises prescribing doctors to consider these potential cardiovascular effects and warns that "caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease."

31. Dr. Posner knew that Mrs. Strong had a medical history of ischemic heart disease by virtue of her prior heart attack. Dr. Posner also was aware of the cardiovascular risks that were included in the April 2002 label. He understood that those cardiovascular risks included a risk of a myocardial infarction.

32. Dr. Posner took this information about cardiovascular risks into consideration and exercised the appropriate caution in his judgment when he prescribed Vioxx to Mrs. Strong as his patient. He agreed that, as Mrs. Strong's doctor, he was "in the best position to evaluate the information in the label ... about the risks and benefits of a drug and then to make an individualized medical judgment about Mrs. Strong."

33. Dr. Posner used his "independent judgment" when prescribing Vioxx to Mrs. Strong: "This is a complicated case of balancing risk versus benefit and looking at the perspective in which the patient received the medication and determining what is the most reasonable thing to do in a particular clinical environment. And that was indeed a judgment that both I and Juanita obviously found to be in her best interest."

Defendant, Walgreen set forth the following facts: (References are to paragraphs in Walgreen's Statement of Facts).
1. Ms. Strong died on November 20, 2003.

2. Plaintiff's First Amended Complaint alleges that Ms. Strong died of a myocardial infarction (i.e. a "heart attack").

3. Ms. Strong's health and medical history displayed many risk factors associated with coronary artery disease, including, but not limited to: a prior heart attack, morbid obesity, a long history of smoking at least a pack a day, long-term exposure to corticosteroid therapy, a family history of coronary artery disease, kidney disease, hypercholesterolemia and hypertension.

4. Ms. Strong also lived with: lupus, Gastroesophageal Reflux Disease (GERD), and diabetes.

5. Ms. Strong also suffered from rheumatoid arthritis and chronic pain. Dr. Posner characterized her pain as "at least a ten or ten plus," on a scale of one (1) to ten (10).

6. According to Dr. Posner, Ms. Strong's "quality of life was extremely compromised and [ ] she was limited to bare, basic, vegetative kinds of activities." *Id.*

7. Ms. Strong took a variety of medications, including: Oxycontin, Percocet, Premarin, Provera, Digoxin, Paxil, and Prednisone.

8. Ms. Strong's pain was so severe that, for a week in April of 2002, she reported to her doctors that she was taking ten (10) to twenty (20) Percocet per day.

9. To manage Ms. Strong's pain, Dr. Posner prescribed Vioxx. Dr. Posner testified, "I was certainly aware of the fact that there was controversy regarding the side effects and the use of Vioxx in that circumstance, but it wouldn't have necessarily immediately changed my approach to treating this particular patient."

10. Dr. Posner prescribed Vioxx to Ms. Strong because the studies showed that "Vioxx has a far better profile of tolerance in patients," such as Ms. Strong, with gastrointestinal complications:

> "The reason has to do with balancing risk of those kinds of complications against a number of other factors in her care. This is a lady who, in addition to the cardiovascular issues, had a significant history of gastrointestinal complications from prior exposure to medication and to other causes. At the time we were caring for her, the gastrointestinal issues were predominantly the area of concern. She had had a GI bleed just prior to our first dose of prescribed Vioxx. And at the time it was our understanding reflected too in the subsequent literature that Vioxx has a far better profile of tolerance in patients who have a significant GI history, particularly one who had a recent bleed.... it was my judgment that the benefit that the patient was experiencing from Vioxx at the dose that I prescribed completely outweighed at that particular point in time the past history of other cardiovascular problems..."

11. Dr. Posner testified that he specifically considered and understood the doses of Vioxx he prescribed to Ms. Strong, and the risks associated with the same:

Q. "Why did you prescribe 50 milligrams a day to Juanita Strong on several occasions after that?

A. The manner in which one determines what the appropriate dose of a medication often is a matter of discretion and clinical judgment and not infrequently one will adapt the dose that you recommend to a specific patient based upon the patient's specific response to the drug. That's a general principle in medicine. My best judgment at the time I suggested the 50-milligram was that it was the most appropriate dose to control her symptomatic discomfort, and it was based upon knowledge of her needs at that time.

Q. And you went ahead and did that even though the packet insert recommended otherwise?

A. This is not an uncommon occurrence to take discretion when prescribing a medication, be it dose adjustments that are necessary for a particular circumstance or utilizing the off-label medication as needed.

Q. And why did you prescribe 100 milligrams a day of Vioxx to Juanita Strong?

A. I prescribed it because that was the dose that was most effective for her at that particular time due to the fact that there was exacerbation of her musculoskeletal symptoms occurring during the time I was caring for her."

12. Dr. Posner testified that his treatment of Ms. Strong "would have included discussion of the general cardiovascular side effects including risks of myocardial compromise, especially since there had been a past history of congestive hear failure," that he "do[es] recall discussing with her the side effects relating to cardiovascular possible side effects," and that Ms. Strong "was a knowledgeable individual, and she would have recognized [his] concern regarding side effects when [he] discussed it with her.".

13. Notes on Dr. Posner's chart indicate that his "patient's pharmacy [was] notified" that he prescribed Ms. Strong 50mg of Vioxx, one per day, "approval for a year."

16-18. Ms. Strong utilized Walgreen pharmacies to fill her Vioxx and other prescriptions with each Walgreen prescription a person receives a bag containing the medication and stapled to that bag will be a tri-folded Patient Drug Education Monograph.

21. Merck supplied pharmacies with a one page leaflet entitled, "Patient Information about Vioxx." The leaflet was given to every patient who received a Vioxx prescription.

22. Walgreen's monographs expressly state, in all capital letters: "THIS MEDICINE COMES WITH A PATIENT INFORMATION LEAFLET. Read it carefully."

23. In April of 2002, Merck modified the Vioxx Package Insert to include new cardiovascular warnings associated with the use of Vioxx.

24. Merck also changed the Patient Information sheet distributed to Walgreen's customers. In the second column of the leaflet, under the question "What are the possible side effects of Vioxx?" (Emphasis in original.) The information sheet states:

        "Heart attacks and similar serious events have been reported in patients taking Vioxx."

25. Ms. Strong's son, who picked up many of her prescriptions, testified that Walgreen pharmacists read "right off the packaging" to him and that he does "remember getting some instructions when they gave [him] the medication." He explained, "I believe they were reading right off the packaging. So it wasn't something that I went and had to go tell my mom. It was on the package for her to read."

Ms. Somani testified that the filling of Ms. Strong's prescriptions was not unsafe, the pharmacists who filled the prescriptions complied with Walgreen's policies and procedures and complied with the standard of care. Fauzi Somani deposition pp. 153-154.

Plaintiff's essentially unchallenged Statement of Facts includes: (References are to paragraphs in Plaintiff's Statement of Facts). 1. The Vioxx Project 1996 Team Minutes reported unstable angina and that there may be a greater frequency of cardiovascular events.

2-4. The Musliner and Watson November 21, 1996 Memos state that if aspirin prophylaxis is not permitted, there is a substantial chance that significantly higher rates of CV AE events (MIs, angina, strokes, TIAs etc.) will be observed in the Vioxx group as opposed to the standard group.

5. Quotes from the Reicin-Briggs email chain February 25, 1997.

7-8. References the May 12, 1998 Project Team Minutes, April 30, 1999 and Memo from FDA, medical officer Juan Carlos Paleyo.)

10-11. In 1998 and 1999, Dr. Americo Simonini told Merck's scientific representative that there were articles in the scientific literature showing the potential danger of Cox-2 (Vioxx) inhibition in protrombotic and potentially causing cardiovascular events.

16-22. Dr. Rodriguez-Luna testified that he did not expect a pharmaceutical company like Merck to hide information about the significant cardiovascular risks associated with Vioxx.

23-26. Sales bulletins issued to the Merck sales force on April 20, 2001, March 27, 2000, May 24, 2001, and August 21, 2001, advised the sales force not to initiate discussions about studies regarding Vioxx.

27-28. Merck's April, 2002, and September 17, 2003, sales bulletins regarding the VIGOR and other studies involving Naproxen, again advised Merck's sales force not to initiate discussions with physicians regarding Vioxx studies. The September 17, 2003, Solomon study, which Merck sponsored, was issued two months before Plaintiff died.

29. Plaintiff cites an August 26, 2004, bulletin issued 9 months after Plaintiff's death, which the Court finds irrelevant to the issues presented in the Motions for Summary Judgment.

31. Merck's salespersons' CV cards misstate the risk of Vioxx.

87. Merck ran Direct-to-Consumer television ads advertising Vioxx from July 2001, until Mrs. Strong's death on November 20, 2003.

87. Mrs. Strong's first Vioxx fill at Walgreens was on November 15, 2001.

88-90. FDA issued warnings in 1999 and 2001 regarding Vioxx advertising.

98.Insinkerator requested that safety edits be put in place with respect to the dispensing of Vioxx to Insinkerator employees requesting compliance with the dosing recommendations in the Vioxx package insert.

122. Merck withheld data on 6 deaths among persons taking Vioxx in submitting the July 2001 SUR to the FDA.

123. From November 15, 2001, through October 21, 2003, on 14 separate occasions Walgreens dispensed "over-dose" amounts of Vioxx to Ms. Strong.

131-139. Dr. Simonini testified that the April 2002, Vioxx label should have been stronger. Dr. Simonini also testified that he was not an FDA labeling expert.

138. Dr. Simonini testified that if one had all the data known to Merck at the time of the April 2002 revised package insert, it would have raised a red flag in terms of cardiovascular risk, and that by April 2002, there was enough information on Vioxx

known to Merck to justify either a black box warning or withdrawal of the drug, and should have been withdrawn from the market in 2001.

140-144. Dr. Simonini testified to a reasonable degree of medical probability that Vioxx contributed to Mrs. Strong's heart attack, and that but for taking Vioxx she would not have had a heart attack when she did. His opinion is that Vioxx is cardiotoxic from the onset of use by a patient.

149. Without adequate warnings in the April, 2002 Package Insert, Vioxx was a defective and unreasonably dangerous product.

156. Merck was negligent in not withdrawing Vioxx from the market no later than the end of 2001.

158. Vioxx was a substantial contributing factor to Ms. Strong's myocardial infarction and resulting death.

159-175. Dr. Eric Topol testified that the data on Vioxx was seriously misrepresented by Merck.

189-203. Mr. Greg Hamilton, Plaintiff's marketing expert, testified that from May 20, 1999 to September 30, 2004, Merck engaged in an egregious and blatant pattern of practice of placing its own franchise interests ahead of the interest of patients that used Vioxx and that it consciously pursued a course of conduct knowing that it could create a substantial risk of significant harm to others.

228. Walgreen pharmacist, Fauzia Somani testified that customers have a right to expect that the Walgreen pharmacists will dispense a safe dose of a particular medication and every dispense of Vioxx by Walgreen to Mrs. Strong was unsafe per the Vioxx package insert.

233-235 Dr. William N. Kelly testified that Walgreen knew or should have known that there were serious cardiovascular risks associated with a 50 mg dose of Vioxx, Walgreen had a duty to warn Dr. Posner about the risk and it failed to do so, and that Walgreen consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to Ms. Strong. (Paragraphs 7, 8, &9, Affidavit of William N. Kelly, Exhibit 71).

236. On September 30, 2004, Merck withdrew Vioxx from the market.

### Discussion

The court did not consider any "Supplemental" Statements of Fact because there is no provision for them in the Rules of Civil Procedure. Although it is difficult to issue an intelligent ruling on motions for summary judgment when the parties' statements of fact are not challenged other than in general terms, some legal rulings can be made in spite of this problem.

### Merck

The Court does not have to reach the question as to whether the Learned Intermediary Doctrine bars Plaintiff's claims against Merck. Before the Learned Intermediary Doctrine can be applied, the Court must determine that the manufacturer met the duty to warn i.e. that proper warning was given to doctors who may prescribe or administer the drug. *Dyer v. Best Pharmacal,* 118 Ariz. 465, 577 P.2d 1084 (App. 1978) and *Davis v. Cessna Aircraft Corp.,* 182 Ariz. 26, 893 P.2d 26 (App. 1994).

Even though Dr. Posner knew Ms. Strong's medical history and knew of the cardiovascular risks included in the April, 2002 label for Vioxx the unchallenged testimony of Drs. Simonini, Rodriguez-Luna and Topol create questions of fact; i.e. the jury might be able to find that the Learned Intermediary Doctrine is inapplicable because of fraud and misrepresentation by Merck in

the approval process and Merck's warnings were not adequate. (See Plaintiff's Statements of Fact 126, 138, 149, 156, 159-175 and 203).

While expert testimony may be necessary to prove most claims of fraud on the FDA, the withholding of data by Merck regarding 6 deaths may be sufficient in and of itself for a jury to find fraud i.e. Merck's conduct might be found to be not just a violation of duty imposed by statute and federal regulations, but plain common law fraud, particularly in view of the evidence that Merck withdrew Vioxx from the market in 2004.

The Court does not find that A.R.S. § 12-701 is unconstitutional nor that its provisions are preempted by federal law. *Wyeth v. Levine,* 129 S. Ct. 1187 (U.S. 2009)

The Court finds that prescription drugs are not a "product" under Arizona's Consumer Fraud Act. *In Re Rezulin,* 133 F.Supp.2d 272, 289 (S.D.N.Y. 2001). *Whitehurst v. American National Red Cross,* 1 Ariz. App. 326, 328, 402 P.2d 584 (App. 1965).

### *Walgreen*

Walgreen cannot be found liable for strict liability for manufacturing and design defects because pharmacists provide a service not a product. *Murphy v. E. R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 710 P.2d 247, 251 (Cal. 1985).

Prescription drugs are not a "product" under Arizona's Consumer Fraud Act. *In Re Rezulin* and *Whitehurst v. American National Red Cross supra.*

A pharmacist is a service provider and not subject to strict liability in tort. *Murphy v. E. R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 710 P.2d 247, 251 (Cal. 1985).

Walgreen's cannot be found liable for punitive damages. A.R.S. § 12-701.

Ms. Somani's conflicting deposition testimony and Dr. Kelly's affidavit have created questions of fact as to Walgreen's liability for negligence.

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

Mills v. Bristol-Myers Squibb Co., Not Reported in F.Supp.2d (2011)
2011 WL 4708850, Prod.Liab.Rep. (CCH) P 18,737

2011 WL 4708850
United States District Court, D. Arizona.

Beatrice MILLS, Plaintiff,

v.

BRISTOL–MYERS SQUIBB CO.; Sanofi–
Aventis U.S. LLC; Sanofi–Aventis U.S.
Inc.; Sanofi–Synthelabo Inc., Defendants.

No. CV 11–00968–PHX–FJM.
|
Oct. 7, 2011.

**Attorneys and Law Firms**

Gabriel Vicente Kory, Jeffrey B. Miller, Miller Weber Kory
LLP, Phoenix, AZ, Patty Ann Trantham, Robert L. Salim Law
Office, Natchitoches, LA, for Plaintiff.

Amy Michelle Samberg, Cole Jacob Schlabach, Snell &
Wilmer LLP, Phoenix, AZ, Anand Agneshwar, Arnold &
Porter LLP, New York, NY, Daniel S. Pariser, Kevin A. Cline,
Steven G. Reade, Arnold & Porter LLP, Washington, DC, for
Defendants.

**ORDER**

FREDERICK J. MARTONE, District Judge.

 *1 The court has before it plaintiff's motion for leave to
file an amended complaint (doc. 30) and defendants' response
(doc. 34). Plaintiff did not reply.

In January 2009, plaintiff was prescribed Clopidogrel
(branded as "Plavix") by Dr. Xavier for the treatment of
peripheral vascular disease. Plavix is an antiplatelet agent that
is designed to prevent blood clots from forming. Between
January 7 and January 12, 2009, each day plaintiff ingested
one tablet of Plavix along with aspirin pursuant to Dr. Xavier's
instructions. On January 12, 2009, plaintiff began bleeding
extensively from her rectum. She was brought by ambulance
to Mercy Gilbert Medical Center that day. Her bleeding
continued, and on January 13, 2009 plaintiff underwent
surgery to stop the bleeding. Plaintiff was discharged on
January 20, 2009. On January 25, 2009, plaintiff returned
to the hospital due to respiratory distress. She was treated
for bilateral pulmonary embolism and thrombocytopenia, and
was released on January 30, 2009. Plaintiff initiated this

action in the Superior Court of Arizona in Maricopa County
and filed a first amended complaint (the "FAC") on January
19, 2011. Defendants timely removed the action on May 16,
2011. This court granted defendants' motion to dismiss all
counts without prejudice on August 12, 2011 (doc. 25).

Plaintiff now moves to file a Second Amended Complaint
(the "SAC"). The SAC asserts six counts: (1) strict products
liability (failure to warn); (2) strict products liability (pursuant
to Restatement Second of Torts § 402(a)); (3) negligence; (4)
negligent misrepresentation; (5) breach of express warranty;
and (6) breach of implied warranty. Defendants argue that
leave to amend should be denied as futile.

Rule 15(a), Fed.R.Civ.P. instructs that leave to amend "shall
be freely given when justice so requires." If amendment
would be futile, however, we deny leave to amend.
AmerisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d
946, 951 (9th Cir.2006). A proposed amendment is futile
if it would be subject to immediate dismissal. Steckman v.
Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir.1998).
The appropriate test to apply when assessing a proposed
amended complaint is the same used to assess the sufficiency
of a pleading under Rule 12(b)(6), Fed.R.Civ.P. Nordyke v.
King, 644 F.3d 776, 788 n. 12 (9th Cir.2011). To do so,
we assess whether plaintiff's proposed SAC contains "well-
pleaded factual allegations" that "plausibly give rise to an
entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, ——,
129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

Plaintiff's allegation of strict products liability is premised
on two theories: failure to warn, and design defect. Plaintiff
also premises her negligence claim on these theories. For
plaintiff to prevail under both theories she must show that the
product left the defendants' hands in a defective condition, the
defect rendered the product unreasonably dangerous, and the
defect was a proximate cause of plaintiff's injuries. Sw Pet
Prods., Inc. v. Koch Indus., Inc., 273 F.Supp.2d 1041, 1051
(D.Ariz.2003) (internal citations omitted).

 *2 Plaintiff alleges that the chemical structure of Plavix is
defective because it carries a higher risk of adverse events
for patients who carry the genetic variant CYP, who are poor
metabolizers of the drug. [1] Plaintiff contends that Plavix is the
proximate cause of her injuries because, "[u]pon information
and belief," she is a CYP carrier. SAC at 10. Twombly does
not prevent a plaintiff from pleading facts on information and
belief when the information is either "peculiarly" within a
defendant's control or where a belief is based on facts that

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Mills v. Bristol-Myers Squibb Co., Not Reported in F.Supp.2d (2011)

2011 WL 4708850, Prod.Liab.Rep. (CCH) P 18,737

make an inference of liability plausible. *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir.2010); *see also Strand v. John C. Lincoln Health Network, Inc.,* CV–10–02112–PHXNVW, 2011 WL 1253408 at *3 (D.Ariz. Mar.31, 2011) (applying *Arista* ). This is not a case where the facts are in the sole possession of the defendants. Plaintiff's genetic makeup is a fact solely within her control. Tests are available that can reveal whether plaintiff in fact possesses CYP. [2] *See Response,* ex. D. Neither does her belief that she carries the CYP variant make an inference plausible. According to plaintiff, approximately thirty percent of Caucasians possess the CYP variant. This means that about seventy percent do not.

Plaintiff's claim has not moved from the realm of possible to plausible. Next, plaintiff alleges that Plavix is defective because, when combined with aspirin, it creates a heightened risk of bleeding complications for patients with peripheral vascular disease. To support this allegation, plaintiff first cites the Chan study. Plaintiff asserts that this study found that patients who had previously had stomach ulcers that had healed had higher incidents of stomach bleeding when they took a combination of Plavix and aspirin. Plaintiff, however, does not allege that she had a previously healed stomach ulcer when she took Plavix, and she alleges she experienced rectal, not stomach, bleeding. Thus, the Chan study does not show what may be defective about Plavix. Plaintiff also cites the CHARISMA study and "subsequent studies" to support her claim that there is a heightened risk of bleeding complications when patients with her vascular condition ingest Plavix and aspirin. *SAC* at 9. Viewing the pleading in the light most favorable to plaintiff, Plavix is allegedly defective when ingested along with aspirin by people who have peripheral vascular disease.

However, simply pleading a defect is not enough. To prevail on a design defect claim, a plaintiff must also show that the defective product is unreasonably dangerous. *Sw Pet Prods.,* 273 F.Supp.2d at 1051. Although plaintiff's design defect claim is pled pursuant to Restatement (Second) of Torts § 402(a), it no longer appears to be the correct standard for design defect claims in Arizona. Although Arizona has not officially adopted the Restatement (Third) of Torts, it "has demonstrated a willingness to look to [it] as the current statement of the law." *Gebhardt v. Mentor Corp.,* 191 F.R.D. 180, 185 (D.Ariz.1999). *See Sw Pet Prods.,* 273 F.Supp.2d at 1052 n. 17 (collecting cases applying the Restatement (Third) of Torts in Arizona and noting the state's "longstanding policy to look to the Restatement

absent contrary precedent"). Courts in this District apply the Restatement (Third) of Torts' definition of an unreasonably safe prescription drug or medical device to Arizona design defect claims. *See Gebhardt,* 191 F.R.D. at 185; *Harrison v. Howmedica Osteonics Corp.,* CV–06–0745–PHX–RCB, 2008 WL 906585 at *21–22 (D.Ariz. Mar.31, 2008). Section 6(c) of the Restatement (Third) of Torts declares that

> **\*3** A prescription drug or medical device is not reasonably safe due to defective desi n if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Although plaintiff alleges that no reasonable health-care provider would prescribe Plavix for plaintiff knowing of the risks to "Caucasian patients who carry the genetic variant allele CYP who are poor metabolizers of Plavix, and who are diagnosed with peripheral vascular disease and concomitantly ingest Aspirin," *SAC* at 24, nowhere does plaintiff allege that Plavix would not be prescribed for any class of patients. *See Restatement (Third) of Torts: Prod. Liab., § 6,* cmt. b ("Under Subsection (c) a drug is defectively designed only when it provides no net benefit to any class of patients.").

We note that even under a traditional risk/benefit analysis used to determine whether a product is unreasonably dangerous based on the Restatement (Second) of Torts, plaintiff's pleading does not state a plausible claim. *See Dart v. Wiebe Mfg., Inc.,* 147 Ariz. 242, 245–46, 709 P.2d 876, 879–80 (1985) (listing the risk/benefit factors as 1) usefulness of the product, 2) availability of safer products to "meet the same need," 3) "likelihood of injury", 4) obviousness of danger, 5) public expectation of danger, 6) avoidability of injury through due care, and 7) ability to eliminate danger without "seriously impairing the usefulness" of the product or making it too expensive). Plaintiff offers statements including "Plavix was not more efficacious than aspirin" and the risks of bleeding, colectomy, thrombocytopenia, hypotension, and cardiovascular problems "far outweigh any potential benefit to patients," *SAC* at 8, the risk of respiratory disorders "is

greater" than listed on the label, *Id.* at 12, 709 P.2d 876, the risk of "thromboycentica [sic]" is listed on the label as rare, but this risk is "more frequent," *Id.* at 13, 709 P.2d 876, and "there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk" of plaintiff's injuries and were "economically and technologically feasible." *Id.* at 31–32, 709 P.2d 876. Although detailed factual allegations are not necessary in pleadings, "labels and conclusions" are insufficient. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). In sum, plaintiff has failed to plead that Plavix was defectively designed.

For plaintiff to establish proximate cause on her failure to warn claim, she needs to show that had a proper warning been given, the injury would not have happened. *See Gosewisch v. Am. Honda Motor Co., Inc.,* 153 Ariz. 400, 403, 737 P.2d 376, 379 (1987) (superceded by statute on other grounds); *see also Gebhardt,* 191 F.R.D. at 184–85 (granting summary judgment to defendant on failure to warn claim when plaintiff failed to show that a doctor would not have used a medical device on plaintiff if alternative warnings were given). Here, plaintiff pleads "on information and belief" that Dr. Xavier would not have prescribed Plavix had he known of its true risks for patients like plaintiff. *SAC* at 24. We noted in our dismissal of the FAC that plaintiff "could have contacted her physician" to determine facts that were not solely in the control of defendants. *Order* at 2. Plaintiff has not done so. In addition, plaintiff's statements regarding the Plavix label's alleged failure to adequately disclose risks of her injury ignores relevant portions describing the risks of major bleeding. [3] *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001) (we need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit"). Thus, plaintiff has not shown that Plavix was defective due to a failure to warn.

**\*4** Because plaintiff has not pled a plausible strict liability claim, her negligence claim is insufficient. The breach of implied warranty claim also fails. *See Hearn v. R.J. Reynolds*

*Tobacco Co.,* 279 F.Supp.2d 1096, 1103 (D.Ariz.2003) (theories of strict liability and breach of implied warranty merge for product liability claims in Arizona). Similarly, plaintiff's express breach of warranty claim is deficient. As in the FAC, the SAC pleads conclusory assertions that "[d]efendants made representations to Plaintiff about the quality or characteristics of P[lavix] by affirmation of fact, promise and/or description." *SAC* at 39. We explained in our dismissal of the FAC that plaintiff "must actually identify what representations were made to her and how they became the basis of the bargain." *Order* at 4 n. 3. Plaintiff has not identified any representations.

Finally, plaintiff's negligent misrepresentation fails to satisfy the heightened pleading requirement of Rule 9(b), Fed.R.Civ.P. Plaintiff alleges that the defendants "negligently misrepresented material facts" about Plavix to plaintiff, who, along with her "healthcare providers," "justifiably relied on [d]efendants' misrepresentations." *SAC* at 38. Plaintiff fails to identify any specific representations that were made, to which of her healthcare providers these were made, and when they where made. Such general allegations do not satisfy Rule 9(b), Fed.R.Civ.P.'s requirement to plead with particularity.

Because plaintiff's allegations in the SAC would not withstand a Rule 12(b)(6) motion to dismiss, amendment would be futile. **IT IS ORDERED DENYING** plaintiff's motion for leave to amend (doc. 30).

The August 26, 2011 Rule 16 scheduling order (doc. 29) noted that no further motions to amend the complaint would be considered after September 2, 2011. Therefore, **IT IS ORDERED DISMISSING** this case with prejudice. The clerk shall enter judgment.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4708850, Prod.Liab.Rep. (CCH) P 18,737

Footnotes

1    Plavix works less effectively in people with the CYP variant. This genetic variation diminishes Plavix's ability to inhibit platelets. In other words, the drug does not prevent blood clots from forming as well for those with the CYP variation. Higher rates of death from cardiovascular causes, heart attack, and stroke among CYP carriers using Plavix have been observed. Jessica L. Mega, M.D., M.P.H., *et al., Cytochrome P–450 Polymorphisms and Response to Clopidogrel,* 360 New Eng. J. Med. 354 (2009). We may consider documents referenced in the complaint, like this one, when ruling on a Rule 12(b)(6) motion. *See Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir.2007).

**Mills v. Bristol-Myers Squibb Co., Not Reported in F.Supp.2d (2011)**
2011 WL 4708850, Prod.Liab.Rep. (CCH) P 18,737

2    We may consider the Plavix label as it is a matter of public record. *See Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001).

3    For example, plaintiff complains that language in the precautions section only addresses the risk of major bleeding in patients "with recent TIA or stroke who are at high risk of recurrent ischemic events." *SAC* at 12 (emphasis deleted). However, directly under that section, the label contains information about the rate of "major gastrointestinal bleeding" for patients taking a combination of Plavix and aspirin. *See Response,* ex. C at 18. Plaintiff's complaint that the label only warns about bleeding from puncture sites is also contradicted by the label, which warns about "an excess in major bleeding in patients receiving Plavix plus aspirin compared with placebo plus aspirin, *primarily gastrointestinal* and at puncture sites." *Id.* at 20 (emphasis added).

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2012 WL 5267897
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Jessica GARZA, et al.
v.
ENDO PHARMACEUTICALS, et al.

No. CV 12–1585–CAS (OPx).
|
Oct. 24, 2012.

**Attorneys and Law Firms**

George Baltaxe, Law Offices of George Baltaxe, Encino, CA,
Michael Patrick Caruso, The Caruso Firm, San Diego, CA,
for Jessica Garza.

Pamela J. Yates, Robert G. Barnes, Kaye Scholer LLP, Los
Angeles, CA, for Endo Pharmaceuticals et al.

**Proceedings: (In Chambers:) DEFENDANT
GARFIELD BEACH CVS'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT** (filed September 24, 2012)

CHRISTINA A. SNYDER, Judge.

*\*1 Catherine Jeang, Deputy Clerk.*

**I. INTRODUCTION & BACKGROUND**
The Court finds this motion appropriate for decision
without oral argument. Fed.R.Civ.P. 78; Local Rule 7–15.
Accordingly, the hearing date of October 29, 2012 is vacated,
and the matter is hereby taken under submission.

On August 20, 2012, plaintiffs Jessica and David Garza
initiated their suit against Endo Pharmaceuticals, Qualitest
Pharmaceuticals, CVS Caremark, and Does 1–20 in the
Superior Court of California, County of San Bernardino.
Dkt. No. 1.[1] Plaintiffs bring four claims for relief: (1)
products liability; (2) breach of warranty; (3) negligence; and
(4) loss of consortium. Compl. Plaintiffs principally allege
that defendants mislabeled or incorrectly packaged plaintiff
Jessica Garza's birth control pills, which led to an unexpected
pregnancy and birth of their child. Id. On September 18, 2012,

defendants removed to this Court on the basis of diversity
jurisdiction. Dkt. No. 1.[2]

Plaintiff alleges facts as follows. Between September 2010
and August 2011, plaintiff purchased birth control pills known
as Tri–Previfem at defendant Garfield Beach CVS. Compl. ¶
3. These pills were manufactured and packaged by defendants
Endo Pharmaceuticals and Qualitest Pharmaceuticals. Id.
Each time she obtained the pills, plaintiff received a package
with a four-week supply of pills, one-quarter of which were
placebos. Id. ¶ 4. However, at some point, the pills were
purportedly packaged in the wrong order, such that plaintiff
took the placebos at a time when conception could occur. Id.
In September 2011, plaintiff discovered that she was pregnant
with her fourth child. Id. ¶ 6. She gave birth on March 9, 2012.
Id. She then filed the instant suit.

On September 24, 2012, defendant CVS filed a motion to
dismiss plaintiff's complaint. Dkt. No. 5. Plaintiff opposed
the motion on October 11, 2012. Dkt. No. 11. Defendant
responded on the same date. Dkt. No. 10. Defendant's motion
is presently before the Court.

**II. LEGAL STANDARD**

**A. Federal Rule of Civil Procedure 12(b)(6)**
A Rule 12(b)(6) motion tests the legal sufficiency of the
claims asserted in a complaint. "While a complaint attacked
by a Rule 12(b)(6) motion to dismiss does not need detailed
factual allegations, a plaintiff's obligation to provide the
'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." *Bell Atlantic Corp.
v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d
929 (2007). "[F]actual allegations must be enough to raise a
right to relief above the speculative level." *Id.*

In considering a motion pursuant to Rule 12(b)(6), a court
must accept as true all material allegations in the complaint,
as well as all reasonable inferences to be drawn from them.
*Pareto v. F.D.I.C.,* 139 F.3d 696, 699 (9th Cir.1998). The
complaint must be read in the light most favorable to the
nonmoving party. *Sprewell v. Golden State Warriors,* 266 F.3d
979, 988 (9th Cir.2001); *Parks Sch. of Bus., Inc. v. Symington,*
51 F.3d 1480, 1484 (9th Cir.1995). However, "[i]n keeping
with these principles a court considering a motion to dismiss
can choose to begin by identifying pleadings that, because
they are no more than conclusions, are not entitled to the
assumption of truth. While legal conclusions can provide the

Garza v. Endo Pharmaceuticals, Not Reported in F.Supp.2d (2012)

2012 WL 5267897

framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief .") (citing *Twombly* and *Iqbal); Sprewell,* 266 F.3d at 988; W. *Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950.

**\*2** Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,* 102 F.3d 1524, 1537 (9th Cir.1996), *rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999); *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001).

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

### III. ANALYSIS

Plaintiffs' first claim for strict products liability cannot withstand defendant's motion to dismiss. Under the authority of *Murphy v. Squibb,* 40 Cal.3d 672, 221 Cal.Rptr. 447, 710 P.2d 247 (1985), strict liability for defective pharmaceutical products does not extend to the pharmacies that dispense drugs to patients. Because pharmacies are primarily in the business of providing a service to patients, rather than being merely a retailer of drugs, the California Supreme Court found that the doctrine of strict products liability should not apply. *Id.* at 679–80, 221 Cal.Rptr. 447, 710 P.2d 247. Plaintiffs attempt to distinguish *Murphy* by arguing that the decision did not contemplate a case where the pharmacist "mislabeled" the drug in question, *id.* at 676, 221 Cal.Rptr. 447, 710 P.2d 247, but plaintiffs' argument is unavailing. The clear import of *Murphy,* in accordance with other jurisdictions to consider

the issue, is that pharmacies are not properly named in a strict liability products action related to defective drugs-which would include the alleged mispackaging by defendants here. Accordingly, the Court grants defendant's motion to dismiss plaintiffs' claim of strict liability.

In addition, plaintiffs' breach of warranty claim against CVS is also unavailing. Because under California law pharmacies primarily provide a service, not a product, a breach of warranty claim does not lie. *See Hector v. Cedars–Sinai Med. Ctr.,* 180 Cal.App.3d 493, 508 n. 3, 225 Cal.Rptr. 595 (1986) (no breach of warranty claim where strict products liability claim is also unavailable against a hospital). Plaintiffs' attempt to distinguish the reasoning of *Murphy* fails here as well, for it applies in full force to claims of implied breach of warranty. *See In re Rezulin Products Liab. Litig.,* 133 F.Supp.2d 272, 292 n. 75 (S.D.N.Y.2001) (collecting cases finding no breach of warranty liability for pharmacies).

Plaintiffs could potentially state a claim against defendant CVS for negligence, although plaintiffs have failed to do so here. Plaintiffs allegations are that: (1) plaintiff Jessica Garza purchased defectively packaged Tri–Previfem from defendant CVS; and (2) defendants Endo Pharmaceuticals and Qualitest pharmaceuticals are the ones who packaged the pills. Compl. ¶¶ 3–4. Nowhere does plaintiff allege any sort of negligent act, or even a potential negligent act, on the part of defendant CVS. To survive a motion to dismiss brought by CVS, plaintiffs must at least allege some facts demonstrating how CVS was allegedly involved in the purported mispackaging or mislabeling of plaintiff Jessica Garza's birth control medication. Plaintiffs present a number of potential theories by which CVS may have acted negligently in their opposition, Opp'n at 2–3, but arguments in an opposition are not factual allegations that this Court may consider on a motion to dismiss plaintiffs' *complaint.* Accordingly, the Court grants defendant's motion to dismiss plaintiffs' negligence claim. [3]

### IV. CONCLUSION

**\*3** In accordance with the foregoing, the Court hereby GRANTS defendant Garfield Beach CVS's motion to dismiss without prejudice. Plaintiffs shall have **twenty days (20)** from the date of this order to file an amended complaint addressing the deficiencies identified herein. Failure to do so may result in the dismissal of CVS from this action with prejudice.

IT IS SO ORDERED.

Garza v. Endo Pharmaceuticals, Not Reported in F.Supp.2d (2012)

2012 WL 5267897

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5267897

Footnotes

1    Defendant Garfield Beach CVS, LLC ("CVS") is erroneously named as "CVS Caremark."

2    Neither party has challenged this Court's jurisdiction here, but the Court notes that an LLC has the residency of every
     one of its members or owners. *See Johnson v. Columbia Properties Anchorage, LP,* 437 F.3d 894, 899 (9th Cir.2006).
     Because the sole member of Garfield Beach CVS, LLC is CVS Pharmacy, Inc., a Delaware corporation with its principal
     place of business in Rhode Island, the requirement of diversity of citizenship is met here.

3    Plaintiffs' claim for loss of consortium is derivative of their other claims. *See Tucker v. CBS Radio Stations, Inc.,* 194
     Cal.App.4th 1246, 1256, 124 Cal.Rptr.3d 245 (2011). As such, the Court also grants defendant's motion to dismiss this
     claim without prejudice.

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

2020 WL 1660018
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Blanca AMBRIZ, individually and on behalf of
D.A., a minor as his Guardian Ad Litem, Plaintiffs,

v.

CVS PHARMACY, INC. et al., Defendant.

No. 1:19-cv-01391-NONE-SKO
|
Filed 04/03/2020
|
Signed 04/02/2020

**Attorneys and Law Firms**

Vonn Robert Christenson, Christensen Law Firm, Porterville, CA, for Plaintiffs.

Marissa A. Warren, LaFollette Johnson DeHaas Fesler & Ames, Santa Ana, CA, for Defendant.

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT CVS
PHARMACY, INC.'S MOTION TO DISMISS

Dale A. Drozd, UNITED STATES DISTRICT JUDGE

**INTRODUCTION**

*1 Plaintiffs Blanca Ambriz, individually, and on behalf of D.A., a minor as his Guardian ad Litem, filed this action in California state court against defendants CVS Pharmacy, Inc. ("CVS"), CVS Store #2944 – Pharmacy ("CVS Store"), and CVS Health Corporation ("CVS Health") after plaintiff D.A. was allegedly provided an incorrect prescription by the CVS Store and suffered from an adverse reaction as a result. (Doc. No. 2.) CVS removed the action to this federal court asserting jurisdiction based on the diversity of citizenship of the parties and that the amount in

controversy exceeds $75,000. (Doc. No. 2.)[1] Currently pending before the court is CVS' motion to dismiss the complaint in its entirety for failure to state a claim. (Doc. No. 5.) For the reasons discussed below, the motion to dismiss is granted in part and denied in part.

**BACKGROUND**

On March 15, 2018, plaintiffs went to the CVS Store to pick up prescription medication, amoxicillin and ibuprofen, for plaintiff D.A. (Doc. No. 2-4 at ¶ 18.) However, the CVS Store "incorrectly mixed the prescription, leaving it excessively concentrated." (Id.) Plaintiff D.A. ingested the incorrectly mixed medication and "within minutes" he began to vomit, had a fever, his eyes rolled to the back of his head, and his entire body shook for about one minute. (Id.) Plaintiff D.A. was taken to Sierra View Medical Center in an ambulance and was provided medical care by his primary care physician and Valley Children's Healthcare. (Id. at ¶ 19.)

After plaintiff D.A. ingested the incorrect medication, the CVS Store allegedly called plaintiff Ambriz "to inform her that they did not mix the amoxicillin correctly." (Id. at ¶ 18.) The CVS Store called plaintiff Ambriz twice on the same day that plaintiffs picked up the incorrectly mixed prescription medication. (Id. at ¶ 20.) The following day, plaintiff Ambriz went to the CVS Store with the prescription bottles. (Id.) Plaintiff Ambriz spoke to a CVS Store employee who allegedly informed plaintiff Ambriz that "she was sorry for what occurred and said that she was unable to sleep knowing of the mistake that was made." (Id.) Plaintiff Ambriz then provided the prescription bottles to the CVS Store employee. (Id.) Later that day, another CVS employee called plaintiff Ambriz to provide an update regarding the incident, but the complaint does not describe the update that was allegedly provided. (Id.) Though CVS allegedly opened a file regarding the incident, "no cooperation or information has yet been provided" to plaintiffs. (Id. at ¶ 21.)

*2 The complaint alleges that plaintiffs served a notice of intent to commence a civil action on defendants around February 5, 2019. (Id. at ¶ 22.) See California Code of Civil Procedure § 364 (requiring notice of intent to sue at least 90 days before filing a complaint asserting a health care provider's professional negligence). On June 13, 2019, plaintiffs filed a complaint in the Tulare County Superior Court. (Doc. No. 2-4.) The complaint utilizes a California Judicial Council form and has attached to it additional pages with factual allegations. (Id.) The complaint asserts four claims against defendants for negligence, strict products liability, negligent infliction of emotional distress ("NIED"), and negligent hiring, retention, and supervision of staff.[2] (Id.) CVS removed the action to this federal court asserting jurisdiction under 28 U.S.C. § 1332 based on the diversity of

citizenship of the parties and that the amount in controversy exceeds $75,000. (Doc. No. 2.) Plaintiffs have not contested federal jurisdiction and, as noted above, the court appears to have jurisdiction over this action.

## LEGAL STANDARD

The purpose of a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). A dismissal may be warranted where there is "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, the complaint must "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court will not assume the truth of legal conclusions cast in the form of factual allegations. *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Federal Rule of Civil Procedure 8(a) does not require detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 676. A complaint must do more than allege mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

While federal pleading rules require that a plaintiff allege facts showing he or she is entitled to relief, the rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). "Federal Rules of Civil Procedure are designed to discourage battles over

mere form of statement." *Id.* (internal quotations and citation omitted). Therefore, a complaint that is "inartfully drawn" will nonetheless survive dismissal if it contains "sufficient facts under the applicable notice pleading standards" of Rule 8(a). *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

## DISCUSSION

**\*3** Here, CVS moves to dismiss plaintiffs' complaint in its entirety. CVS argues that because California law only allows "professional" negligence claims to be asserted against healthcare providers, plaintiffs' first claim for "general" negligence must be dismissed. As to the second claim, CVS argues that California law prohibits pharmacies from being held strictly liable. Turning to plaintiffs' third claim, CVS argues that plaintiff Ambriz has failed to allege sufficient facts to recover under the "bystander" theory of NIED. As to plaintiffs' final claim asserting negligent hiring, retention, and supervision, CVS argues that this claim is also a "professional" negligence claim and therefore, dismissal is appropriate. The court addresses each claim and the respective arguments as to those claims in order below.

### A. First Claim: Negligence

CVS argues that the "general" negligence claim must be dismissed because California law only allows "professional" negligence claims to be asserted against health care providers. (Doc. No. 5 at 9–12.) Though plaintiffs concede that their first claim should have been labeled as one for professional negligence, they respond that CVS' argument is one of form, rather than substance. (Doc. No. 7 at 4:19–24.) Therefore, dismissal of this claim is not appropriate according to plaintiffs because the complaint includes sufficient factual allegations showing that, if proven, they are entitled to relief under some legal theory. (*Id.*) The court finds plaintiffs' argument on this issue to be persuasive.

California has a statutory regime for medical malpractice and negligence claims, called the Medical Injury Compensation Reform Act of 1975 ("MICRA"). *See, e.g.*, *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 999 (1994) (MICRA "contains numerous provisions effecting substantial changes in negligence actions against health care providers, including a limitation on noneconomic damages, elimination of the collateral source rule as well as preclusion of subrogation in most instances, and authorization for

periodic payments of future damages in excess of $50,000.") (citations omitted).

MICRA governs "professional negligence" claims against "health care providers." The term "professional negligence" is defined under MICRA as:

> a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

Cal. Civ. Code § 3333.1(c)(2). In turn, "health care providers" includes entities that are licensed pursuant to Division 2 of California's Business and Professions Code. Civ. Code § 3333.1(c)(1). Pharmacies, which are licensed under Division 2 of the Business and Professions Code, are considered "health care providers" under MICRA. See Cal. Bus. & Prof. Code § 4110(a). [3] Here, plaintiffs' claim is subject to MICRA because they allege that the CVS Store (i.e., a healthcare provider) negligently filled a prescription (i.e., rendering of professional services). See Civ. Code § 3333.1(c) (2). Therefore, plaintiffs must assert a professional negligence claim.

 **\*4** The elements for professional negligence are duty, breach, causation, and damages. Wright v. City of L.A., 219 Cal. App. 3d 318, 345 (1990); see Jameson v. Desta, 215 Cal. App. 4th 1144, 1166 (2013) (defining breach as "failure to use the skill and care that a reasonably careful professional operating in the field would have used in similar circumstances") (internal quotations and citation omitted). Under California law, a pharmacist who fulfills a doctor's prescription acts as an "extension" of that doctor. Murphy v. E.R. Squibb & Sons, Inc., 40 Cal. 3d 672, 679 (1985). The pharmacist must not only prescribe the medicine "in accordance with the doctor's orders but also must be alert to errors or problems and bring them to the doctor's attention." Huggins v. Longs Drug Stores Cal., Inc., 6 Cal. 4th 124, 132 (1993).

Here, the complaint alleges all the essential elements of a cognizable professional negligence claim. First, it alleges that plaintiffs were owed a duty by CVS. (Doc. No. 2-4 at ¶ 17.) Defendants allegedly "held themselves out to as possessing that degree of skill, ability, and learning, common to healthcare providers in the community, specializing and possessing expertise in the examination, diagnosis, advice, care, treatment and administration of [plaintiff D.A.'s] medical needs." (Id.) Second, the complaint asserts that defendants breached this duty by "incorrectly mix[ing] [plaintiff D.A.'s] prescription, leaving it excessively concentrated." (Id.) Third, the incorrect prescription allegedly caused short-term and long-term harm to plaintiff D.A. (Id. at ¶¶ 18–19.) And fourth, plaintiffs suffered damages in the form of incurring medical costs. (See id.) Therefore, the complaint states a cognizable claim for professional negligence under California law.

CVS argues that because plaintiffs only assert a "general" negligence claim, the court must dismiss it. (Doc. No. 5 at 7:7–10.) Plaintiffs argue that their claim is actually for professional negligence, (Doc. No. 7 at 5:20–21,) even though the complaint labels the claim as "negligence" or "general negligence." (Doc. No. 2-4 at 3, 5–6.) In support of their position, plaintiffs argue that the complaint alleges the correct standard of care for a professional negligence claim and that they sent a pre-suit notice to defendants in compliance with MICRA. (Doc. No. 7 at 5:11–19.)

The court concludes that plaintiffs' complaint gives defendant CVS "fair notice of what the...claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quoting Conley, 355 U.S. at 47). As the pending motion to dismiss makes clear, CVS understands the nature of plaintiffs' claim (i.e., negligence) and the facts upon which it rests (i.e., incorrectly prescribing D.A.'s medicine). (See Doc. No. 5 at 9–12.) The complaint alleges the proper duty for a professional negligence claim and it also states that plaintiffs complied with MICRA's pre-suit notice requirement. (Doc. No. 2-4 at ¶¶ 17, 22.) While the complaint could have labeled the first claim as one for "professional negligence" instead of simply one for "negligence," plaintiffs' "imperfect statement of the legal theory" does not require dismissal under Rule 12(b)(6). See Johnson, 574 U.S. at 11. Although the complaint may be "inartfully drawn," the court finds that it contains "sufficient facts under the applicable notice pleading standards" of Rule 8(a). Mendiondo, 521 F.3d at 1104. For these reasons, CVS' motion to dismiss with respect to plaintiffs' first claim will be denied.

## B. Second Claim: Strict Products Liability

CVS next moves to dismiss plaintiffs' second claim for strict liability, arguing that "[i]t is well-established that a pharmacy or pharmacist cannot be held strictly liable for giving out a properly prescribed medication that leads to negative side effects for the patient." (Doc. No. 5 at 12:13–15) (citing *Murphy,* 40 Cal. 3d at 675.) Plaintiffs counters that the medication given to plaintiff D.A. was not properly prescribed and thus the authority relied upon by CVS is inapplicable here. (Doc. No. 7 at 6:13–20.) The court concludes that plaintiffs' position is unpersuasive and unsupported by California law.

**\*5** The decision in *Murphy* bars plaintiffs' claim for strict liability. There, the California Supreme Court held that a pharmacy could not be held strictly liable for injuries caused by a defective drug. *Murphy,* 40 Cal. 3d at 681. The plaintiff in that case had filed suit against the drug manufacturer and the pharmacy because the prescription drug at issue allegedly suffered from a design defect. *Id.* at 675. *Murphy* did not involve a pharmacy that incorrectly filled a prescription or otherwise failed to follow the doctor's orders. Nonetheless, the California Supreme Court held that pharmacies, as a general matter, cannot be held strictly liable for the sale of prescription medication because pharmacists are primarily in the business of providing a service to the doctor, as opposed to being in the business of selling products to patients. *Id.* at 680 ("The Legislature must have intended, therefore, that even though a pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is to be deemed a service, and, like the manufacturer of blood plasma, a pharmacy is immune from strict liability."); *see also Hernandezcueva v. E.F. Brady Co., Inc.,* 243 Cal. App. 4th 249, 258 (2015) (explaining that "the doctrine of strict liability is ordinarily inapplicable to transactions 'whose primary objective is obtaining services,' and to transactions in which the 'service aspect predominates and any product sale is merely incidental to the provision of the service.' ") (citation omitted). Plaintiffs cannot distinguish *Murphy* on the basis that CVS incorrectly filled plaintiff D.A.'s prescription. The decision in *Murphy* stands for the general proposition that pharmacies cannot be held strictly liable for selling prescription medications. *See Garza v. Endo Pharm.,* No. CV 12–1585–CAS, 2012 WL 5267897, at \*2 (C.D. Cal. Oct. 24, 2012) (Dismissing a strict liability claim against a pharmacy that allegedly "mislabeled" prescription medication and noting that "[b]ecause under

California law pharmacies primarily provide a service, not a product, a breach of warranty claim does not lie.").[4]

Plaintiffs advance two additional arguments, neither of which the court finds to be persuasive. First, they argue that as a general matter "a retailer is strictly liable in tort for defects in products it sells." (Doc. No. 7 at 6:21–22.) In support of this contention, plaintiffs cite a California Supreme Court decision that purportedly "embraced the idea" of applying strict liability principles based on product defects to prescription drugs. (*Id.*) (citing *Sindell v. Abbott Labs.,* 26 Cal. 3d 588 (1980).) However, the case relied upon by plaintiffs discussed liability with respect to drug manufacturers, not drug retailers such as pharmacies. *Sindell,* 26 Cal. 3d at 611. Notably, *Sindell* was also decided five years before the California Supreme Court decided *Murphy,* which as discussed above, bars plaintiffs' claim against the defendant pharmacy for strict liability. Second, plaintiffs argue that a strict liability claim against pharmacies based on a failure-to-warn theory, as opposed to a design-defect theory, is not foreclosed by California law. (Doc. No. 7 at 7:11–15.) Again, in support of this argument plaintiffs rely upon cases discussing a drug manufacturer's duty to warn a doctor, not a pharmacy's duty to warn a patient. *See, e.g., Valentine v. Baxter Healthcare Corp.,* 68 Cal. App. 4th 1467, 1483 (1999). Indeed, in their opposition to the pending motion to dismiss, plaintiffs quote language from the decision in *Valentine* demonstrating the case's inapplicability:

> In the case of prescription drugs and implants, the physician stands in the shoes of the "ordinary user" because it is through the physician that a patient learns of the properties and proper use of the drug or implant. Thus, the duty to warn in these cases runs to the physician, not the patient.

**\*6** (Doc. No. 7 at 7:17–22) (quoting *Valentine,* 68 Cal. App. 4th at 1483.) Plaintiffs are thus not aided by the decision in *Valentine* or the other decisions cited in their opposition to the motion to dismiss.

In sum, plaintiffs cannot overcome the California Supreme Court's decision in *Murphy.* They have failed to cite any state court decision post-*Murphy* suggesting that under California law, pharmacies may be held strictly liable under

the circumstances alleged here. Therefore, plaintiffs' second claim must be dismissed.

**C. Third Claim: NIED**

Plaintiffs' complaint appears to assert the NIED claim on behalf of both plaintiffs. (Doc. No. 2-4 at ¶ 37) ("[B]oth Ms. Ambriz and her minor son were severely traumatized and experienced severe emotional distress.").) In their opposition to the motion to dismiss, however, plaintiffs concede that the NIED claim is "solely" brought on behalf of plaintiff Ambriz. (Doc. No. 7 at 8:4–5.) [5] The court will, therefore, analyze the NIED claim only from the standpoint of plaintiff Ambriz.

"Negligent infliction of emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply." *Huggins v. Longs Drug Stores Cal., Inc.,* 6 Cal. 4th 124, 129 (1993). "The distinction between the 'bystander' and the 'direct victim' cases is found in the source of the duty owed by the defendant to the plaintiff." *Id.* (citation omitted). As the California Supreme Court has explained:

> "Bystander" claims are typically based on breach of a duty owed to the public in general,...whereas a right to recover for emotional distress as a "direct victim" arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff.

*Id.* at 129–30 (citations omitted). To the extent that plaintiff Ambriz's NIED claim is based on a direct-victim theory, her claim is barred. *See id.* at 152 ("When the plaintiff is not the defendant's patient, however, 'courts have not extended the *Molien* direct-victim cause of action to emotional distress which is derived solely from a reaction to another's injury.' ") (citation omitted).

To state a cognizable bystander-NIED claim, plaintiff Ambriz must allege that she:

> (1) is closely related to the injury victim; (2) is present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances.

**\*7** *Thing v. La Chusa,* 48 Cal. 3d 644, 667–68 (1989) (footnotes omitted). Here, the parties do not dispute the first and third elements, but they disagree as to the second element with respect to plaintiff Ambriz's awareness, i.e., whether it is adequately alleged that she was "aware" that the "injury producing event" was "causing injury to the victim." *See id.* CVS argues that plaintiff Ambriz must allege that, at the time she witnessed plaintiff D.A. in pain after ingesting the incorrect medicine, she was aware that defendants' conduct was responsible for causing that pain, as opposed to merely being aware that plaintiff D.A. was in pain without knowing the cause. (Doc. No. 5 at 13:18–22.) Plaintiffs counters that plaintiff Ambriz was not required to be aware that defendants' conduct was negligent. (Doc. No. 7 at 8:15–17.) Plaintiffs' response misses the mark.

As alleged, the complaint fails to state a cognizable claim for NIED against CVS under the bystander theory. The California Supreme Court has held that recovery is allowed under the bystander theory "when there is observation of the defendant's conduct and the child's injury and *contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child.*" *Ochoa v. Superior Court,* 39 Cal. 3d 159, 170 (1985) (emphasis added); *see also Fortman v. Forvaltningsbolaget Insulan AB,* 212 Cal. App. 4th 830, 835 (2013). Although plaintiff Ambriz is not required to allege that she was aware that CVS' conduct was negligent at the time she saw plaintiff D.A. suffer the adverse reactions, she must allege that she was aware at that time that CVS' conduct—incorrectly filling a prescription—was causing plaintiff D.A.'s adverse reaction. Plaintiffs' complaint does not allege, directly or impliedly through factual allegations, that plaintiff Ambriz had "contemporaneous awareness the defendant's conduct" was "causing harm to the child." *See Ochoa,* 39 Cal. 3d at 171. (*See* Doc. No. 2-4 at ¶¶ 32–

39.) Accordingly, plaintiff Ambriz cannot maintain her NIED claim in light of the allegations of the complaint. Therefore, the NIED claim must also be dismissed.

### D. Fourth Claim: Negligent Hiring, Retention and Supervision of Staff

In addition to holding CVS indirectly liable for the negligence of its employees, plaintiffs also seek to hold CVS directly liable for negligently hiring, supervising, and/or retaining its employees. (Doc. No. 1 at ¶ 41.) More specifically, plaintiffs allege that "the staff at CVS were not properly trained and/or were otherwise unfit or incompetent to perform the duties assigned to them" and that CVS was aware of these issues but failed to correct them. (*Id.* at ¶¶ 42–43.) In its pending motion to dismiss, CVS argues that plaintiffs' negligent hiring and supervision claim must be brought as a professional negligence claim instead of as a separate cause of action, and therefore dismissal of it is appropriate. (Doc. No. 5 at 11–12) (citing *So v. Shin*, 212 Cal. App. 4th 652 (2013).) In their opposition, plaintiffs concede that the negligent hiring and supervision claim should be "included" with their first claim, "rather than alleged as a separate" claim, but argue that dismissal is not appropriate where, as here, a party has merely imperfectly stated a legal theory for recovery. (Doc. No. 7 at 5:26–6:2.)

Plaintiffs' allegations of negligent hiring, retaining, and supervising state a cognizable claim for professional negligence. In *So*, the plaintiff filed suit against a doctor and the hospital that employed the doctor following the performance of a medical procedure. 212 Cal. App. 4th at 658. With respect to the negligence claim against the hospital, the plaintiffs' theory was two-fold: first, the hospital was directly liable because it hired and continued to employ the doctor despite knowing that he was unfit for the position, and second, the hospital was indirectly liable because the doctor was its agent/employee, i.e., a theory of *respondeat superior*. *Id.* at 659. Given the shortened statute of limitations period for professional negligence claims, the only issue before the court in *So* was "whether plaintiffs' claim [was] for "professional" negligence, and hence [ ] time-barred, or "ordinary" negligence, and thus [ ] timely." *Id.* at 662. The state appellate court in *So* reversed the trial court's judgment in favor of the hospital on the indirect negligence claim, finding that the doctor's alleged conduct was outside the scope of services for which the hospital was licensed, and thus not subject to MICRA's one-year statute of limitations period. *Id.* at 667–68. However, the court also concluded that the plaintiff could not pursue a direct claim against the

hospital, which was a healthcare provider under MICRA, for negligently hiring and retaining the unfit doctor because that claim was time barred. *Id.* at 668. The court in *So* explained that "hiring and supervising medical personnel, as well as safeguarding incapacitated patients, are clearly within the scope of services for which the hospital is licensed." *Id.* Accordingly, if the hospital negligently provided these services, a claim would lie in professional negligence. *Id.*

**\*8** Here, as in *So*, plaintiffs have a direct claim for professional negligence against CVS for hiring, retaining, and supervising allegedly unfit employees. Plaintiffs' complaint alleges that CVS' employees were "unfit or incompetent to perform the duties assigned to them, and they performed those duties in an incomplete and incompetent manner." (Doc. No. 2-4 at ¶ 42.) Although the complaint does not contain allegations explaining what these exact duties were, it does appear to refer to the general duty of pharmacists to correctly fill prescriptions. However, this duty is "clearly within the scope of services for which the [pharmacy] is licensed." *See So*, 212 Cal. 4th at 668. As state law explains, a pharmacy is where "prescriptions are compounded" and where "controlled substances" are "prepared" and "repackaged" to be "sold" and "dispensed at retail." Bus. & Prof. Code § 4037; *see also Huggins*, 6 Cal. 4th at 132 (noting the duty of pharmacists to fill prescriptions "in accordance with the doctor's orders"). In turn, a pharmacy must be licensed to engage in these services. *See* Bus. & Prof. Code § 4110(a).

Therefore, plaintiffs' claim for negligent hiring, retention, and supervision of staff is based on conduct—incorrectly filling a prescription—that indisputably falls within the scope of services for which CVS is licensed as a pharmacy under California law. Because plaintiffs complain of the negligent rendering of "professional services" by a "healthcare provider," plaintiffs claim sounds in professional negligence and is governed by MICRA. Cal. Civ. Code § 3333.1(c)(2).

Accordingly, it must be determined whether this claim is subject to dismissal, as CVS requests, or should simply be "included" in plaintiffs' first claim, as plaintiffs request. The court will do neither. First, as discussed above, the court will not dismiss a complaint that is "inartfully drawn" so long as it contains "sufficient facts under the applicable notice pleading standards" of Rule 8(a). *Mendiondo*, 521 F.3d at 1104. Here, CVS is on notice that the nature of this claim is one of professional negligence, as its own motion to dismiss points out. (*See* Doc. No. 5 at 11:4– 12:10.) Therefore, CVS' request

to dismiss this claim is inappropriate. *See Johnson*, 574 U.S. at 11 ("Federal Rules of Civil Procedure are designed to discourage battles over mere form of statement.") (internal quotations and citation omitted).

Second, the court will deny plaintiffs' request to "include" this claim in their first claim as unnecessary. As a general matter, a plaintiff may maintain both an indirect and direct claim of negligence against a healthcare provider. An indirect claim is based on a theory of *respondeat superior*, whereas a direct claim seeks to holds the entity directly liable for its own conduct. Here, plaintiffs' first claim seeks to hold CVS liable based on a theory of *respondeat superior*, i.e., CVS' employees were negligent in filling plaintiff D.A.'s prescription. Plaintiffs' fourth claim, on the other hand, seeks to hold CVS liable based on its own conduct or lack thereof, i.e., CVS negligently hired, retained, and supervised its pharmacists and/or employees. Because the court finds that separating the claims provides clarity with respect to the issues presented by plaintiffs' complaint, the court will not "include" this claim into plaintiffs' first claim.

In any event, CVS' motion to dismiss with respect to the fourth claim will be denied. Plaintiffs' complaint states a cognizable professional negligence claim against CVS for hiring, retaining, and supervising allegedly unfit employees.

**E. Leave to Amend**

Federal Rule of Civil Procedure 15(a) instructs courts to "freely give leave when justice so requires." The Supreme Court has held that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). When granting a motion to dismiss, the Ninth Circuit has explained that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citation omitted). Here, plaintiffs have filed only one complaint and requested leave to amend the complaint to address any deficiencies found by the court in their original complaint. (Doc. No. 7 at 10:4–6.) Further, the court finds that plaintiffs' complaint may "be cured by the allegation of other facts." *See Lopez*, 203 F.3d at 1130. Accordingly, the court will grant leave to amend. If plaintiffs elect to file an amended complaint, however, they are advised <u>not</u> to use the California Judicial Council form complaint in this federal action.

**CONCLUSION**

**\*9** For the reasons explained above:

1. CVS' motion to dismiss (Doc. No. 5) is granted with respect to plaintiffs' second and third claims and is denied with respect to the first and fourth claims; and

2. In the event plaintiffs wish to attempt to cure the pleading deficiencies noted herein, they are granted twenty-one (21) days from the issuance of this order to file an amended complaint clearly labeled as such.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1660018

**Footnotes**

1    Although plaintiffs do not contest federal jurisdiction under 28 U.S.C. § 1332(a), the court notes that it appears to have jurisdiction over this case based on CVS' representations. Plaintiffs appear to be citizens of California. (*See* Doc. No. 2-4.) CVS, a corporation, is incorporated and maintains its principal place of business in Rhode Island. (Doc. No. 2 at ¶ 10.) The corporate entity for CVS Store is "Garfield Beach, CVS, L.L.C., whose sole member is CVS." (*Id.* at ¶ 2.) Therefore, CVS Store is also a citizen of Rhode Island. *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) (holding that a limited liability company has the residency of every one of its members). CVS Health is incorporated in Delaware with its principal place of business in Rhode Island. (Doc. No. 2 at ¶ 2.) Therefore, the requirement of complete diversity of citizenship appears to be met. Additionally, plaintiffs do not contest that the amount in controversy exceeds $75,000. (*See id.* at ¶¶ 15–19.) Thus, the court appears to have jurisdiction over this case.

2    In the Judicial Council form, for the first claim, plaintiffs check the box for "General Negligence." (*Id.* at ¶ 10.) The form, however, does not contain a box to check for other types of negligence. (*See id.*) In the additional pages section where litigants are required to provide additional facts, plaintiffs refer to their claim as simply "negligence." (*Id.* at 6.)

3    Under the Business and Professions Code, a "pharmacy" is defined as:

2020 WL 1660018

an area, place, or premises licensed by the board in which the profession of pharmacy is practiced and where prescriptions are compounded. "Pharmacy" includes, but is not limited to, any area, place, or premises described in a license issued by the board wherein controlled substances, dangerous drugs, or dangerous devices are stored, possessed, prepared, manufactured, derived, compounded, or repackaged, and from which the controlled substances, dangerous drugs, or dangerous devices are furnished, sold, or dispensed at retail.

Bus. & Prof. Code § 4037.

4    The court will not read *Murphy* to authorize a cause of action that the court in that case did not consider or discuss. In *Murphy* the California Supreme Court purported to limit its consideration and discussion "only to...a pharmacist who fills prescriptions for drugs on the order of a physician or other medical care provider, *and who has used due care in compounding and labelling the drug.*" 40 Cal. 3d at 676 (emphasis added). However, "[n]o case since *Murphy* has suggested that a pharmacy that does not use due care can be held strictly liable." *Des Barres v. Am. Med. Aesthetics & Wellness, Inc.*, No. BC479762, 2015 WL 9583084, *4 (Cal. Super. Ct. Jan. 30, 2015). Of course, a federal court "sitting in diversity jurisdiction," must "apply, but [ ] not create, state law." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1085 (9th Cir. 2009) (Nelson, J. and Reinhardt, J., concurring). Given that California state courts have not recognized a strict liability claim against pharmacies, this federal trial court will not do so here.

5    While the court may not consider "new allegations" contained in an opposition to a motion to dismiss in determining whether a complaint should be dismissed under Rule 12(b)(6), *see Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (internal quotations omitted), the court may consider "concessions" made in plaintiffs' opposition to the motion to dismiss. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55–56 (1st Cir. 2012) (citation omitted).

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    F070    8

# TAB 11

2012 WL 1578397, Prod.Liab.Rep. (CCH) P 18,844

2012 WL 1578397
United States District Court, D. Colorado.

Fujiko OSHIMA, individually, Denis
Dupeyron, individually and, collectively as
Next Friends of Lena Dupeyron, a minor
and Tomi Dupeyron, a minor, Plaintiffs,

v.

KIA MOTORS CORPORATION; Kia Motors
America, Inc.; Hyundai–Kia America Technical
Center, Inc.; Hyundai–Kia America Technical
Center, Inc. (L.A. Design Studio); and Grand Auto,
Inc., d/b/a Grand Buick Kia GMC, Defendants.

Civil No. 11–cv–03349–REB–MEH.
|
May 4, 2012.

**Attorneys and Law Firms**

Andrew Bradford Clauss, Christopher William Brophy,
Brophy Clauss, LLC, Centennial, CO, Clyde Talbot Turner,
Jerry M. White, Turner & Associates, P.A., North Little Rock,
AR, for Plaintiffs.

Elizabeth Kinland Shoenfeld, Martin Charles Boyle,
Christopher C. Spencer, Richmond, VA, Theresa R. Wardon,
John R. Trigg, Denver, CO, for Defendants.

ORDER DENYING MOTION TO REMAND
AND GRANTING DEFENDANT GRAND
AUTO INC.'S MOTION TO DISMISS

ROBERT E. BLACKBURN, District Judge.

 **\*1** The matters before me are (1) **Plaintiffs' Motion To
Remand and Supporting Memorandum** [# 17][1] filed
January 20, 2012; and (2) **Defendant Grand Auto Inc.'s
Motion To Dismiss Pursuant to Rule 12(b)(6) and Brief
in Support** [# 12] filed December 28, 2011. I deny the
motion to remand, finding that the non-diverse defendant was
fraudulently joined, and grant the motion to dismiss plaintiffs'
claims against that defendant.

**I. JURISDICTION**

I putatively have jurisdiction over this case pursuant to 28
U.S.C. § 1332 (diversity of citizenship).

**II. STANDARD OF REVIEW**

Because plaintiffs' motion to remand implicates issues of the
court's jurisdiction, I address it first. *See Davoll v. Webb,*
194 F.3d 1116, 1128 (10th Cir.1999). To prove that the non-
diverse defendant was fraudulently joined in order to defeat
federal jurisdiction, as asserted in the notice of removal,
defendants must show either that there is no possibility that
plaintiffs will be able to establish a cause of action against
the non-diverse defendant or outright fraud in the pleading
of jurisdictional facts. *Hale v. MasterSoft International Pty.,
Ltd.,* 93 F.Supp.2d 1108, 1113 (D.Colo.2000); *Frontier
Airlines, Inc. v. United Air Lines, Inc.,* 758 F.Supp. 1399, 1404
(D.Colo.1989). Of these two bases for finding fraudulent
joinder, defendants' motion to remand addresses only the
former; I thus do not consider the latter.

The burden of proving fraudulent joinder is extremely heavy.
*Hale,* 93 F.Supp.2d at 1113; *Board of County Commissioners
of County of Mesa v. Atlantic Fidelity, Inc.,* 930 F.Supp.
499, 500 (D.Colo.1996). The removing party must "prove
the non-liability of the [non-diverse] defendant as a matter of
fact or law." *Blackwood v. Thomas,* 855 F.Supp. 1205, 1207
(D.Colo.1994). "If there is even a possibility that the state
court would find that the complaint states a cause of action
against the resident defendant, the federal court must find that
the joinder was proper and remand the case to state court."
*Frontier Airlines,* 758 F.Supp. at 1404.

The court may look to evidence outside the pleadings in
making this determination, although it should not conduct a
full-scale evidentiary hearing. *Hale,* 93 F.Supp.2d at 1113;
*Blackwood,* 855 F.Supp. at 1207. Rather, the court must view
the facts in the light most favorable to the non-removing party
and resolve all disputed questions of fact and uncertain legal
issues in its favor. *Frontier Airlines,* 758 F.Supp. at 1405.

In resolving the motion to dismiss pursuant to Fed.R.Civ.P.
12(b)(6), the court's task is to determine whether the
allegations of the complaint are sufficient to state a claim
within the meaning of Fed.R.Civ.P. 8(a). For many years,
"courts followed the axiom that dismissal is only appropriate
where 'it appears beyond doubt that the plaintiff can prove no
set of facts in support of his claim which would entitle him to
relief.' " *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210,

1214 (10th Cir.2011) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Noting that this standard "has been questioned, criticized, and explained away long enough," the Supreme Court supplanted it in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 562, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). Pursuant to the dictates of *Twombly,* courts now review the complaint to determine whether it " 'contains enough facts to state a claim to relief that is plausible on its face.' " *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974). "This pleading requirement serves two purposes: to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." *Kansas Penn Gaming,* 656 F.3d at 1215 (citation and internal quotation marks omitted).

**\*2** As previously, I must accept all well-pleaded factual allegations of the complaint as true. *McDonald v. Kinder–Morgan, Inc.,* 287 F.3d 992, 997 (10th Cir.2002). Contrastingly, mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not be sufficient to defeat a motion to dismiss. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citations and internal quotation marks omitted). *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1247–48 (10th Cir.2008) ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.") (quoting *Twombly,* 127 S.Ct. at 1974) (internal citations and footnote omitted). Moreover, to meet the plausibility standard, the complaint must suggest "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949. *See also Ridge at Red Hawk,* 493 F.3d at 1177 ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.") (emphases in original). For this reason, the complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Kansas Penn Gaming,* 656 F.3d at 1214 (quoting *Twombly,* 127 S.Ct. at 1965). The standard will not be met where the allegations of the complaint are "so general that they encompass a wide swath of conduct, much of it innocent." *Robbins,* 519 F.3d at 1248. Instead "[t]he allegations must be enough

that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*

The nature and specificity of the allegations required to state a plausible claim will vary based on context and will "require[ ] the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950; *see also Kansas Penn Gaming,* 656 F.3d at 1215. Nevertheless, the standard remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City and County of Denver,* 567 F.3d 1169, 1178 (10th Cir.2009) (quoting *Twombly,* 127 S.Ct. at 1965) (internal quotation marks omitted).

## III. ANALYSIS

This case involves allegations of negligence and strict products liability in connection with a rollover automobile crash. Plaintiffs—husband and wife and their two minor children—were driving their 2008 Kia Rondo through Idaho en route to their second home in Washington state. Plaintiff Fujiko Oshima, who was driving at the time, made "an evasive maneuver in order to avoid a potential crash," causing a rollover. As a result of the accident Ms. Oshima, plaintiff Denis Dupeyron, and their minor son, Tomi Dupeyron, suffered severe physical injuries, and all plaintiffs allegedly suffered emotional and psychological injuries.

**\*3** Plaintiffs allege that the car was defective as designed and manufactured because it had a propensity to roll over during normal driving conditions, including such evasive maneuvers as allegedly were employed by Ms. Oshima. Plaintiffs claim that the car was not crashworthy insofar as the roof of the vehicle was not designed to maintain structural integrity and the doors, seat belts, and safety glass were not designed to protect the occupants of the car in the event of a rollover. They have alleged causes of action for negligence and strict products liability against all defendants, including, most relevantly for present purposes, the dealership, defendant Grand Auto, Inc. ("Grand Auto"), from which they bought the car.

Defendants timely removed this action from state court, alleging that Grand Auto, the only non-diverse defendant, had been fraudulently joined in order to defeat federal diversity jurisdiction. Subsequently, Grand Auto filed its motion to dismiss the claims against it, asserting that Colorado's

Oshima v. Kia Motors Corp., Not Reported in F.Supp.2d (2012)
2012 WL 1578397, Prod.Liab.Rep. (CCH) P 18,844

innocent seller statute precluded its liability on the facts alleged in the complaint.

Before reaching the substantive issues implicated by these motions, it is necessary to resolve the conflict of laws question presented. A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Colorado court's apply the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. Under that test, the court considers and weighs the following relevant contacts:

> (1) the place where the injury occurred;
>
> (2) the place where the conduct causing the injury occurred;
>
> the domicile, residence, nationality, place of incorporation and place of business of the parties; and
>
> (4) the place where the relationship, if any, between the parties is centered.

**RESTATEMENT (SECOND) OF CONFLICT OF LAWS** § 145; *see also Morgan v. United Air Lines, Inc.,* 750 F.Supp. 1046, 1054–55 (D.Colo.1990).

Plaintiffs insist that Idaho, as the locus of their injuries, has the most significant relationship to this case. In general, "in personal injury and wrongful death actions, ... the law of the state of injury should apply unless some other state has a more significant relationship to the litigation." *Morgan,* 750 F.Supp. at 1055 (citation and internal quotation marks omitted). *See also Boone v. MVM, Inc.,* 572 F.3d 809, 812 & n. 1 (10th Cir.2009); *Lewis–DeBoer v. Mooney Aircraft Corp.,* 728 F.Supp. 642, 644 (D.Colo.1990) (citing *Kozoway v. Massey–Ferguson, Inc.,* 722 F.Supp. 641, 643 (D.Colo.1989)). However, this factor is less significant where the location of the injury is merely fortuitous. **RESTATEMENT (SECOND) OF CONFLICT OF LAWS** § 145, cmt. e; *Elvig v. Nintendo of America, Inc.,* 696 F.Supp.2d 1207, 1210–11 (D.Colo.2010).

> ***\*4*** The doctrine of fortuitous injury is most commonly applied in product liability cases involving vehicles (or components thereof) that can be expected to travel freely—and to fail, causing injury—in jurisdictions that otherwise have no particular connection to the parties other than mere happenstance. Where a product causes injury to a victim while that victim is traveling in a jurisdiction away from his state of residence, the locus of injury in that particular state might be said to be fortuitous; by contrast, an injury that occurs in the state where the victim resides and where he purchased and used the product is not fortuitous.

*Elvig,* 696 F.Supp.2d at 1211 (internal citations omitted). Nevertheless, plaintiffs insist that the location of their injuries was not fortuitous because they traveled the same route between their primary residence in Colorado and their second home in Washington state "routinely." *(See* Plf. Motion App., Exh. 1 ¶ 4 at 2.)

Aside from the fact that plaintiffs have failed to provide any detail as to how "routinely" they traveled this particular stretch of highway, I am not convinced that the routine nature *vel non* of their travel plans makes the location of the injury any less fortuitous. Idaho was not plaintiffs' ultimate destination; their only connection to the state was as a pass-through on their way to points west. Nor have they alleged that there was anything singular or unique about this particular portion of their route, however routinely traveled, that made it more likely that a rollover (or any other type of accident) might occur in Idaho as opposed to elsewhere in their trip. The alleged negligence and failure to remedy product defects that form the basis of plaintiffs' claims in this lawsuit could have manifested anywhere plaintiffs happened to be driving. *See Fanning v. Dianon Systems, Inc.,* 2006 WL 2385210 at *3 (D.Colo. Aug.16, 2006). In short, "[t]his is a classic case in which the location of the resulting physical injury 'bears little relation to the occurrence and the parties with respect to the particular issue.' " *Id.* (quoting **RESTATEMENT (SECOND) OF CONFLICT OF LAWS** § 145, cmt. e).

Moreover, as to the other factors relevant to the determination of the forum with the most significant relationship, Colorado clearly predominates, at least with respect to plaintiffs' claims against Grand Auto. Plaintiffs are residents of Broomfield, Colorado. Any long-term effects of their injuries will be felt primarily in this state. Defendant Grand Auto sold the subject vehicle to plaintiffs from its regular place of business

in Adams County, Colorado. Any conduct of Grand Auto that may have contributed to plaintiffs' injuries must have occurred in Colorado, where it sold the car to plaintiffs. The operative relationship between plaintiffs and Grand Auto, including any alleged knowledge of defects on the part of Grand Auto, thus plainly was located in this state. Accordingly, I find and conclude that Colorado has the most significant relationship to this case and therefore that the law of this state should govern resolution of plaintiffs' claims.

**\*5** Product liability actions in Colorado are subject to the provisions and limitations of §§ 13–21–401—13–21–406, C.R.S. A "product liability action" includes

> any action brought against a manufacturer or seller of a product, *regardless of the substantive legal theory or theories upon which the action is brought,* for or on account of personal injury ... caused by or resulting from the manufacture, construction, design, ... or sale of any product ...

§ 13–21–401(2), C.R.S. (emphasis added). Thus, both plaintiffs' negligence and their strict product liability claims are subject to the statutes. *See Bullock ex rel. Bullock v. Daimler Trucks North American, LLC,* 2010 WL 1380724 at \*2 (D.Colo. March 30, 2010) (noting 2003 amendment to innocent seller provision removing language limiting reach of statute to claims based solely on theories of strict product liability).

Moreover, Colorado's product liability laws apply only to a "manufacturer," that is, "a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer." § 13–21–401(1), C.R.S. Accordingly, and pursuant to Colorado's so-called "innocent seller" provision,

> [n]o product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product or the manufacturer of the part thereof

giving rise to the product liability action.

§ 13–21–402(1), C.R.S. However, an exception is recognized, and a seller may be considered a "manufacturer," if it "has actual knowledge of a defect in a product." § 13–21–401(1), C.R.S. [2]

Plaintiffs maintain that their complaint is sufficient to state a claim against Grand Auto under this exception. The pertinent portion of the complaint alleges as follows:

> 25. Specifically, the Kia Defendants were aware that this type of vehicle was more prone to rolling over than other types of family cars, and that the Rondo was prone to rolling over in situations similar to that at issue in this case. The defendants were likewise aware of the high probability of serious injury or death to the occupants in crashes of this nature, particularly when the roof, doors, and safety belts fail to operate in a safe manner, as was the case here.

**(Plfs. Original Complaint ¶** 25 at 6[# 2], filed December 21, 2011 (footnote omitted).) Plaintiffs' reference to the "Kia Defendants" refers to all defendants, including Grand Auto, collectively. *(See id.* at 6 n. 1.)

There are at least two problems with plaintiffs' pleading. First, global references to "defendants" collectively, such as those in plaintiffs' complaint, are insufficient to provide the fair notice required by Fed.R.Civ.P. 8(a). Instead, "the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against *each* of the defendants." *Robbins,* 519 F.3d at 1250 (emphasis added). As in *Robbins,* plaintiffs' complaint

**\*6** fails to isolate the allegedly [actionable] acts of each defendant, and thereby does not provide adequate notice as to the nature of the claims

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 76 of 370
PageID: 10106
Oshima v. Kia Motors Corp., Not Reported in F.Supp.2d (2012)
2012 WL 1578397, Prod.Liab.Rep. (CCH) P 18,844

against each.... Given the complaint's use of either the collective term "Defendants" ..., it is impossible for any of these individuals to ascertain what particular [ ] acts they are alleged to have committed.

*Id.*[3] Particularly with respect to Grand Auto, whose sole alleged involvement was the sale of the car, more detail than this is required to provide a defendant with fair notice of what it is claimed to have done.[4]

Second, and even more relevantly, plaintiffs' complaint fails to allege facts sufficient to " 'raise a right to relief above the speculative level.' " *Kansas Penn Gaming,* 656 F.3d at 1214. Reading plaintiffs' allegations as applicable specifically to Grand Auto, they contend that Grand Auto "was aware that this type of vehicle was more prone to rolling over than other types of family cars," particularly "in situations similar to that at issue in this case." **(Plfs. Original Complaint ¶** 25 at 6.) Aside from the fact that these allegations are "so general that they encompass a wide swath of conduct, much of it innocent," *Robbins,* 519 F.3d at 1248, it is not necessarily a defect for a car to roll over when the driver over-corrects in a skid:

> [T]he fact that under certain circumstances an accident may occur in connection with the use of a product does not necessarily make the product defective and unreasonably dangerous. The critical question is whether the manufacturer has created an unreasonable risk of increasing the harm in the event of a collision.

*Kern v. General Motors Corp.,* 724 P.2d 1365, 1367 (Colo.App.1986). See also *Davis v. Caterpillar Tractor Co.,* 719 P.2d 324, 328–29 (Colo.App.1985) (manufacturer under no duty to warn of objective dangers unconnected to defects in product). A manufacturer is not an insurer of its products and can only be held liable for producing a product that presents an unreasonable risk of harm. *Kern,* 724 P.2d at 1367. Plaintiffs' complaint fails to allege facts that show that Grand

Auto was aware of such a risk in connection with the car sold to plaintiffs.

Nor does plaintiffs' additional allegation that Grand Auto was "aware of the high probability of serious injury or death to the occupants in crashes of this nature, particularly when the roof, doors, and safety belts fail to operate in a safe manner, as was the case here" save their claims. An awareness that injuries may occur in a rollover accident is not only unremarkable, it is insufficient to state a claim where the complaint alleges merely that the car's roof, doors, or safety belts failed. What is not alleged here is that any of these components of the car failed *because* they were defective, i.e., presented an unreasonable risk of harm to others. *Id.*

Indeed, at best, the complaint alleges that the car was not crashworthy. *See Camacho v. Hondo Motor Co., Ltd.,* 741 P.2d 1240, 1242–43 (Colo.1987) (noting applicability of crashworthiness doctrine in Colorado, under which "motor vehicle manufacturer may be liable in negligence or strict liability for injuries sustained in a motor vehicle accident where a manufacturing or design defect, though not the cause of the accident, caused or enhanced the injuries"), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). What it does not allege, however, is that Grand Auto was aware of any particular defect that rendered the vehicle not crashworthy.

**\*7** Absent such an allegation, the complaint runs afoul of the innocent seller exception. Plaintiffs cannot assert a viable products liability claim against Grand Auto for merely selling an allegedly defective car. As such, Grand Auto was fraudulently joined and should be dismissed from this lawsuit, which was properly removed as arising under the federal court's complete diversity jurisdiction.

## IV. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That **Plaintiffs' Motion To Remand and Supporting Memorandum** [# 17] filed January 20, 2012, is **DENIED;**

2. That **Defendant Grand Auto Inc.'s Motion To Dismiss Pursuant to Rule 12(b)(6) and Brief in Support** [# 12] filed December 28, 2011, is **GRANTED;**

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 77 of 370
PageID: 10107

3. That plaintiffs' claims against defendant Grand Auto, d/b/a Grand Buick Kia GMC, are **DISMISSED WITHOUT PREJUDICE;** and

4. That at the time judgment enters, judgment **SHALL ENTER** on behalf of defendant, Grand Auto, d/b/a Grand Buick Kia GMC, against plaintiffs, Fujiko Oshima, individually, Denis Dupeyron, individually and collectively as Next Friends, Lena Dupeyron, a minor, and Tomi,

Dupeyron, a minor, on plaintiffs' claims of negligence and strict product liability asserted in this action; provided, that the judgment as to these claims shall be without prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1578397, Prod.Liab.Rep. (CCH) P 18,844

Footnotes

1   "[# 17]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

2   The statute includes other exceptions that make a seller potentially liable as a manufacturer. None of these are alleged to be relevant in this case, however.

3   Although *Robbins* was decided within the particular context of section 1983 claims, I find its rationale no less compelling in any case where a plaintiff attempts to paint multiple defendants with the same, overly wide brush.

4   Similarly, the other potentially operative allegations of the complaint are little more than bare legal conclusions devoid of factual support. (*See* **Plfs. Original Complaint** ¶ ¶ 30 at 7 & 35 at 8–9.)

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 79 of 370
PageID: 10109
Bullock, ex rel. Bullock v. Daimler Trucks North American LLC, Not Reported in...

2010 WL 1380724, Prod.Liab.Rep. (CCH) P 18,504

2010 WL 1380724
United States District Court, D. Colorado.

Amy BULLOCK, as an individual, as the
next of kin and personal representative of
Jeffrey BULLOCK, deceased, and as parent
and next friend of Adam Bullock, Chelsea
Bullock, and Melissa Bullock, Plaintiffs,
v.

DAIMLER TRUCKS NORTH AMERICA,
LLC, a limited liability company (formerly
Freightliner, LLC); and Penske Truck Leasing
Company, L.P., a limited partnership, Defendants.

Civil Action No. 08–cv–00491–PAB–MEH.
|
March 30, 2010.

West KeySummary

1    **Bailment** 👈 Condition of and defects in
property, and negligence of bailor

**Products Liability** 👈 Manufacturers in
general; identification

**Products Liability** 👈 Crashworthiness in
general

Truck leasing company did not have actual
knowledge of defect in tractor trailer, as would
support conclusion that company was not a
manufacturer of the tractor trailer, for purposes
of Colorado's Product Liability Act. Even if
company had generic knowledge of rollover
danger regarding the tractor trailer's sleeper
compartment, that danger was quantitatively
different than knowledge of the specific alleged
defect, which was that the sleeper compartment
was not crashworthy and the sleeper door would
fail in a rollover crash. Colo.Rev.Stat. § 13–21–
401(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

Michael John Thomson, Purvis Gray, LLP, Boulder, CO, for
Plaintiffs.

John Barton Maxwell, Lasater & Martin, P.C., Highlands
Ranch, CO, Kendell L. Gracey, Arthur R. Karstaedt, III, Mary
Ellen Rayment, Michael Brice Sullivan, Harris, Karstaedt,
Jamison & Powers, PC, Englewood, CO, Darin James Lang,
Hall & Evans, LLC, Denver, CO, for Defendants.

**ORDER**

PHILIP A. BRIMMER, District Judge.

*1 This product liability action is before the Court on
defendant Penske Truck Leasing Company's Motion for
Summary Judgment [Docket No. 140]. The Court has
jurisdiction over this state law case pursuant to 28 U.S.C. §
1332. For the following reasons, the motion is granted.

**I. BACKGROUND**

This case arises from the death of Jeffrey Bullock, who
was killed when he was allegedly ejected from the sleeper
compartment of a tractor trailer in a rollover crash. That
tractor trailer was built by defendant Daimler Trucks North
America, LLC ("Daimler"), and was owned by defendant
Penske Truck Leasing Company ("Penske"). At the time
of the accident, the tractor trailer had been leased by Penske
to Mr. Bullock's employer, Domino's Pizza, and was being
driven by Mr. Bullock and another Domino's employee.
Plaintiffs' theory is that Mr. Bullock's death resulted from
defects in the tractor trailer and, specifically, defects in
the sleeper compartment in which Mr. Bullock was riding.
Penske's motion for summary judgment rests on a simple
and discrete premise: that it is not a "manufacturer" under
Colorado's Product Liability Act and thus cannot be held
liable in this lawsuit. The motion is fully briefed and ripe for
decision.

**II. STANDARD OF REVIEW**

Summary judgment is warranted under Federal Rule of Civil
Procedure 56(c) when "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there
is no genuine issue as to any material fact and that the movant
is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)
(2); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 80 of 370
PageID: 10110
Bullock, ex rel. Bullock v. Daimler Trucks North American, LLC, Not Reported in...
2010 WL 1380724, Prod.Liab.Rep. (CCH) P 18,504

50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir.1994). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir.2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir.1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id.*

### III. ANALYSIS

Plaintiffs assert two product liability claims—one for negligence and one for strict liability—against Penske. Compl. at 6–8. Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332. Both sides assume that Colorado law applies to plaintiffs' claims, and therefore I will as well. *Grynberg v. Total S.A.,* 538 F.3d 1336, 1346 (10th Cir.2008).

Colorado's Product Liability Act provides that "[n]o product liability action shall be commenced or maintained against any seller of a product unless said seller is also the manufacturer of said product or the manufacturer of the part thereof giving rise to the product liability action." Colo.Rev.Stat. § 13–21–402(1). This "innocent seller" provision shields a defendant that has done nothing more than sell a defective product. On the other hand, as discussed below, the definition of "manufacturer" is expansive and is intended "to extend liability to those entities involved in the production of the product or otherwise in control [of] the production process." *Yoder v. Honeywell,* 900 F.Supp. 240, 246 (D.Colo.1995).

**\*2** Penske claims the protections of this innocent seller provision, arguing that it was simply a "purchasing intermediary" between the manufacturer of the tractor trailer in question and its customer. Mot. for Summ. J. [Docket No. 140] at 11. Plaintiffs disagree. In addition to contesting Penske's claim that Penske does not meet the statute's definition of a manufacturer, Pls.' Resp. [Docket No. 146] at 13–17, plaintiffs argue that the innocent seller provision does not apply at all, at least to their negligence cause of action, *id.* at 17–20. I first consider this threshold issue of the provision's applicability to this case.

Citing to the Colorado Court of Appeals' decision in *Wallman v. Kelley,* 976 P.2d 330 (Colo.App.1998), plaintiffs argue that the innocent seller provision does not bar a claim for negligence. While this accurately captures *Wallman's* holding, it ignores its reasoning. The *Wallman* court interpreted a previous version of the innocent seller provision, which stated that " '[n]o product liability action *based on the doctrine of strict liability in tort* shall be commenced or maintained against any seller....' " 976 P.2d at 333 (quoting Colo.Rev.Stat. § 13–21–402 (1997)) (emphasis added). Because "[n]egligence is not the logical equivalent of strict liability," the *Wallman* court found the negligence claim to fall outside of the statute. *Id.* ("[B]y their express terms, the provisions of the statute prohibiting claims against sellers who are not also manufacturers are limited to actions based on the doctrine of strict liability in tort. By the terms of the statute, it does not bar any other theories of action against sellers.").

In 2003, the Colorado legislature amended the innocent seller provision, expressly removing the language that actions must be grounded in a strict liability theory for the provision to apply. With the critical, limiting clause removed, *Wallman's* reasoning does not apply here. Nothing in the current statute suggests that product liability actions based in negligence fall outside of the provision's explicit admonition that "*[n]o product liability action* " may be brought against a mere seller. Colo.Rev.Stat. § 13–21–402(1); *see also* CJI–Civ Ch. 14, Introductory Note ¶ 5 ("The limitation in § 13–21–402(1) ... was broadened by the legislature in 2003, when the provision was amended to preclude any product liability action, regardless of the theory, against a product seller unless that seller is also the manufacturer of the product or component part that is the subject of the action."). Plaintiffs' negligence claim falls within the innocent seller provision. As a result, I must next consider the key question—whether Penske is a "manufacturer" for the purposes of the statute.

The Product Liability Act provides a broad definition of the term "manufacturer." As is relevant here, a manufacturer includes "[1] any seller who has actual knowledge of a defect in a product or [2] a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or [3] who otherwise exercises some significant control over all or a portion of the manufacturing process." Colo.Rev.Stat. § 13–21–401(1). Plaintiffs claim that there is at least a triable issue as to whether Penske qualifies under each of these tests. Pls.' Resp. at 13–14. I disagree.

2010 WL 1380724, Prod.Liab.Rep. (CCH) P 18,504

**\*3** Plaintiffs first argue that there is evidence that Penske had actual knowledge of the defect in the tractor trailer. Specifically, plaintiffs argue that a jury could conclude that Penske had knowledge of the danger rollover accidents can pose to passengers in large trucks. *Id.* at 14. In its briefing, however, plaintiffs cite to little, if any, evidence that Penske actually had such knowledge. A party opposing summary judgment "may not rely merely on the unsupported or conclusory allegations contained in pleadings," but "must respond with specific facts demonstrating genuine issues requiring resolution at trial." *Conaway v. Smith,* 853 F.2d 789, 792 n. 4 (10th Cir.1988). This evidentiary deficiency, alone, would likely justify rejection of this claim. But even assuming that plaintiffs' assertion is correct, generic knowledge of rollover danger is quantitatively different than knowledge of the specific alleged defect—that the sleeper compartment was not crashworthy and the sleeper door would fail in a rollover crash. With absolutely no evidence that Penske had *that* knowledge, no reasonable jury could find that it meets the "actual knowledge" standard of the statute.

Plaintiffs next claim that Penske furnished Daimler with specifications relevant to the alleged defect in the tractor trailer. Pl.'s Resp. at 14–15. Plaintiffs point to evidence that Penske required its customers to select certain features, such as the tent-style restraint system in use in the tractor trailer in which Mr. Bullock was riding, and specifically note that the purportedly problematic sleeper cab access door was an option Penske made available to its customers. *Id.* at 14–16; *see also id.* at 2–6 ¶¶ 20–22. However, these "specifications" were not created by Penske. *See* Mot. for Summ. J. at 6–7 ¶¶ 20–28. The tent-style restraint system was the only restraint Daimler made available when Penske ordered the tractor trailer at issue in this case. *Id.,* Ex. A–3 at 122:12–15. Further, plaintiffs concede that Penske requested Daimler include the relevant sleeper cab access door "at the behest of" Penske's customer, Domino's. Pls.' Resp. at 15. Noticeably lacking from plaintiffs' evidence is any suggestion that Penske provided specifications *in the design or manufacturing sense, i.e.,* provided Daimler the measurements, material, or method for constructing the tractor trailer at issue.

Plaintiffs' argument boils down to a claim that Penske passed along the options selected by its customers to Daimler. In the context of the Product Liability Act, "creat[ing] and furnish[ing] a manufacturer with specifications relevant to the alleged defect," Colo.Rev.Stat. § 13–21–401(1), must mean something more than that. Otherwise, a seller intermediary

who identifies an available option on behalf of its customer would be liable under the statute in the event that option turns out to be defective. Such a rule would eviscerate the Act's "innocent seller" protection of companies who merely sell a defective product. No reasonable jury could conclude that Penske "create[d] and furnish[d]" specifications—as those terms are used in the Act—related to the allegedly defective components of the tractor trailer.

**\*4** Finally, plaintiffs argue that Penske exercised "significant control" over the manufacturing process. Plaintiffs' basic contention is that Penske exercised this control by requesting that Daimler include the sleeper cab access door on the tractor trailer in question. Pls.' Resp. at 15 ("The significant control exercised by Penske was not on some insignificant part of the tractor, the significant control exercised by Penske resulted in this tractor-trailer being built with a sleeper access door."). As already discussed, however, this access door was expressly requested by Domino's. Penske was not controlling the manufacturing process when it merely selected an option on behalf of its customer. Plaintiffs' remaining evidence that Penske controlled the manufacturing process consists of testimony that Penske would internally discuss concerns about Daimler's new truck lines and communicate those concerns to Daimler and that, similarly, Daimler would involve large customers like Penske early on in the vehicle design process and would seek input from those customers on features they might want to see in a new vehicle model. Pls.' Resp. at 2–5 ¶ 20. But this evidence —that general concerns and desires were shared between manufacturer and customer—does not rise to the level of showing that Penske had the sort of control over Daimler's truck design and manufacturing process so as to make Penske itself liable as a manufacturer of the tractor trailer in question. On this record, no reasonable jury could find that Penske exercised "significant control" over Daimler's manufacturing process.

**IV. CONCLUSION**

Even viewed in plaintiffs' favor, the evidence in this case shows that Penske did little more than communicate its customer's truck order to Daimler. As a result, Penske is not a "manufacturer" for the purposes of the Colorado Product Liability Act and is therefore shielded from liability by the Act's innocent seller provision. Accordingly, it is

**ORDERED** that defendant Penske Truck Leasing Company's Motion for Summary Judgment [Docket No. 140] is

2010 WL 1380724, Prod.Liab.Rep. (CCH) P 18,504

GRANTED. All claims against defendant Penske Truck
Leasing Company are dismissed.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1380724,
Prod.Liab.Rep. (CCH) P 18,504

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

Altieri v. CVS Pharmacy, Inc., Not Reported in A.2d (2002)

2002 WL 31898323, 33 Conn. L. Rptr. 524

2002 WL 31898323

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Daren ALTIERI, Administrator of
the Estate of Donna Marie Altieri,
v.
CVS PHARMACY, INC. et al.

No. X06CV020171626S.
|
Dec. 13, 2002.

**Attorneys and Law Firms**

Damico, Griffin & Pettinicchi, Watertown, for Daren Altieri.

Edwards & Angell, Hartford, for CVS Pharmacy, Inc., Southington Main Street CVS, Inc. and CVS Rx Services, Inc.

Cramer, Alissi & Fontaine, P.C., Hartford, for Shyloe Vecchio.

**Opinion**

ROBERT F. McWEENY, J.

 **\*1** The plaintiff brings this complaint in his capacity as the administrator of the estate of his deceased mother, Donna Marie Altieri. The complaint alleges that on or about June 14, 2001, Ms. Altieri presented a prescription for opium tincture camphorated to a CVS Pharmacy located at 310 Main Street in Southington, Connecticut. Instead of properly filling the prescription, the defendants allegedly misfilled the prescription with opium tincture, which contains a substantially higher concentration of morphine than opium tincture camphorated. Ms. Altieri died on June 15, 2001.

The plaintiff in his amended complaint filed October 21, 2002, sets forth the following counts: first count against the defendant CVS Pharmacy, Inc., for pharmaceutical negligence pursuant to General Statutes § 52-555; second count against the defendant CVS Pharmacy, Inc. for wanton and reckless misconduct pursuant to General Statutes § 52-555; third count against the defendant CVS Pharmacy, Inc. under Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; fourth count against the defendant Shyloe Vecchio for professional negligence (the

defendant Shyloe Vecchio was a pharmacist employed by the defendant CVS at the 310 Main Street store in Southington); fifth count against the defendant Southington Main Street CVS, Inc. for pharmaceutical negligence; sixth count against the defendant Southington Main Street CVS, Inc. for wanton and reckless misconduct; seventh count against the defendant Southington Main Street CVS, Inc. under the Connecticut Products Liability Act, General Statutes § 52-572m et seq; eighth count against the defendant Southington Main Street CVS, Inc. under CUTPA; ninth count against the defendant CVS Rx Services, Inc. for pharmaceutical negligence (the defendant CVS Rx Services, Inc. employs the pharmacists at CVS Pharmacies, while the defendant Southington Main Street CVS, Inc. employed the pharmacy technicians and other staff who worked at the 310 Main Street CVS Pharmacy in Southington); tenth count against defendant CVS Rx Services, Inc. for wanton and reckless misconduct; eleventh count against CVS Rx Services, Inc. under CUTPA; and a twelfth count against defendant CVS Rx Services, Inc., for professional negligence.

The defendants CVS Pharmacy, Inc., Southington Main Street CVS, Inc. and CVS Rx Services, Inc. have by motion filed on October 31, 2002, moved to strike the second, third, sixth, seventh, eighth, tenth and eleventh counts of the amended complaint, along with the portions of the prayer for relief corresponding to such counts. The plaintiff has opposed the motion to strike.

The motion argues that the second, sixth and tenth counts, which set forth causes of action for recklessness against each of the defendants, are legally insufficient because they assert only conclusory allegations of recklessness, and merely repeat the allegations of negligence.

The motion seeks to have the CUTPA claims (third, eighth and eleventh counts) stricken on the ground that these claims cannot be based solely on allegations of professional negligence, and otherwise the allegations contained in the third, eighth and eleventh counts fail to conform with the "cigarette rule."

 **\*2** The defendant Southington Main Street CVS (Southington) seeks to have the seventh count stricken on the ground that it characterized its pharmacy function as the provision of a service, rather than as the sale of a product within the meaning of the products liability act. The motion by this defendant also argues that the complaint does not sufficiently allege the existence of a product defect.

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 85 of 370
PageID: 10115
Altieri v. CVS Pharmacy, Inc., Not Reported in A.2d (2002)
2002 WL 31898323, 33 Conn. L. Rptr. 524

Southington also argues and the plaintiff concedes that if the court denies the motion to strike the products liability claim, then it must strike the other claims against Southington because the products liability act provides an exclusive remedy. The plaintiff contends, however, that the CUTPA claim would not be subsumed by the products liability count.

The function of a motion to strike is to test the legal sufficiency of a pleading. *Ferryman v. Groton,* 212 Conn. 138, 142, 561 A.2d 432 (1989); Practice Book § 10-39(a)(5). "[A motion to strike] does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings ..." (Citations omitted; emphasis omitted). *Mingachos v. CVS, Inc.,* 196 Conn. 91, 108, 498 A.2d 368 (1985). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Citations omitted.) *Novametrix Medical Systems v. BOC Group, Inc.,* 224 Conn. 210, 215, 618 A.2d 25 (1992). "The role of the trial court is to examine the pleadings and construe the allegations in the light most favorable to the pleader in order to determine whether the pleader has stated a legally sufficient cause of action or defense." *ATC Partnership v. Windham,* 251 Conn. 597, 603, 741 A.2d 305, cert. denied, 530 U.S. 1214, 120 S.Ct. 2217, 147 L.Ed.2d 249 (1999).

I. Counts Based on Recklessness

The plaintiff correctly points out that the second, sixth and tenth counts, which allege reckless conduct against the respective corporate defendants, do not merely repeat the negligence allegations of the first, fifth and ninth counts. In the second count, paragraph 11, subsection a, the plaintiff's allegations include death as a specific significant danger associated with the misfilling of this prescription, of which the defendants had prior notice. The reckless counts also differ from the negligence counts by their inclusion at paragraph 11, subsection b, which adds the word "numerous" to the reference to the number of prior misfilled prescriptions. Viewing the facts alleged in the light most favorable to the plaintiff, if the plaintiff were to demonstrate numerous misfilled prescriptions of which the defendants had prior knowledge, and deaths resulting from such misfilled prescriptions, then such conduct could meet the legal standard of reckless conduct. *Dubay v. Irish,* 207 Conn. 518, 532, 542 A.2d 711 (1988); *Bishop v. Kelly,* 206 Conn. 608, 614-15, 539 A.2d 108 (1988); *Begley v. Kohl & Madden Printing Co., Inc.,* 157 Conn. 445, 450-51, 254 A.2d 907 (1969). The motion to strike is denied with respect to the second, sixth and tenth counts.

II. Products Liability Act Claim Against Southington

**\*3** Southington seeks to have the products liability claim (seventh count) stricken on the basis that filling a prescription is a service and not the sale of a product as required by Connecticut products liability law. See *Potter v. Chicago Pneumatic Tool Co.,* 241 Conn. 199, 214, 694 A.2d 1319 (1997). Southington cites as authority the Connecticut Supreme Court decision in the *Zichichi v. Middlesex Memorial Hospita1,* 204 Conn. 399, 528 A.2d 805 (1987), and the Supreme Court of California decision in *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 710 P.2d 247 (1985).

The *Zichichi* decision is instructive but not controlling because it was based on application of the Connecticut "blood shield" statute, General Statutes § 19a-280, which provides as follows: "The implied warranties of merchantability and fitness shall not be applicable to a contract for the sale of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir, such other tissues or organs. Such blood, blood plasma and the components, derivatives or a fraction thereof, or tissues of organs shall not be considered commodities subject to sale or barter, but shall be considered as medical services." The rationale for the "blood shield" statute was noted in the *Zichichi* as follows:

> One of the driving forces behind the promulgation of "blood shield" statutes ... is to ensure that certain medical services, namely, the provision of blood and tissue, remain available to citizens in need of such services ... These statutes reflect a legislative judgment that to require providers to serve as insurers of the safety of these materials might impose such an overwhelming [burden] as to discourage the gathering and distribution of blood. To ensure that such services remain adequate and affordable, legislatures have chosen to limit liability to defects that are a result of negligence, thus bringing the provision of such services necessary for medical treatment into the same

category as the provision of other medical services.

*Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 409.

*Murphy v. E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at 672, is more comparable to what must be decided in this case because it specifically finds that a pharmacy may not be held strictly liable for dispensing a prescription drug on the basis that a pharmacist dispensing a prescription drug is primarily furnishing a service rather than selling a product. *Id., at 680.* The rationale for that conclusion is set forth at 40 Cal.3d 678-79:

> [T]he pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs. It is pure hyperbole to suggest, as does plaintiff, that the role of a pharmacist is similar to that of a clerk in an ordinary retail store. With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional requirements for obtaining and retaining a license. A pharmacist must not only use skill and care in accurately filling and labeling a prescribed drug, but he must be aware of problems regarding the medication, and on occasion he provides doctors as well as patients with advice regarding such problems. In counseling patients, he imparts the same kind of information as would a medical doctor would about the effects of the drugs prescribed. A key factor is that the pharmacist who fills a prescription is in a different position from the ordinary retailer because he cannot offer a prescription for sale except by order of the doctor. In this respect, he is providing a service to the doctor in acting as an extension to the doctor in the same sense as

a technician who takes an x-ray or analyses a blood sample on a doctor's order.

**\*4** *Id.*

The plaintiff argues that the *Murphy* decision is distinguishable because the underlying facts involve a pharmacy that sold a properly compounded and properly labeled prescription drug, unlike the plaintiff's decedent, who received the wrong drug in the wrong dosage. The court does not read *Murphy* as so restrictive in application. The scenario involving a properly compounded and properly labeled prescription drug addresses a strict liability concern implicated by products liability law. In this case, the facts describe what is clearly a negligence claim, which is properly dealt with in the counts asserting negligence.

*Murphy* further notes that pharmaceutical services are similar to blood or plasma distribution, and as such, are clearly a service. The *Murphy* court observed that from a comparative functional aspect, pharmacy is more aptly characterized as performance of a service, rather than as a manufacture and sale of a blood product. *Id.,* at 679-80.

The court finds that Southington was engaged in a service when filling a prescription, and therefore is not subject to the products liability act. The seventh count is stricken.

### III. CUTPA Claims

The substance of the plaintiff's CUTPA claims is contained in paragraphs 12 and 13 of the third, eighth and eleventh counts, alleging that:

> (12) This misfiled prescription, and plaintiff's decedent's subsequent death, occurred because of the defendant's unfair and deceptive acts and/or practices in the conduct of its trade and commerce in violation of C.G.S. 42-110a et seq. and specifically in that: a) It continuously failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling of prescriptions, and the misfilling of this prescription in particular despite prior notice of the significant dangers, including death, associated with the misfilling of this prescription, and b) It continuously failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling of prescriptions and the misfilling of

Altieri v. CVS Pharmacy, Inc., Not Reported in A.2d (2002)

2002 WL 31898323, 33 Conn. L. Rptr. 524

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 87 of 370
PageID: 10117

this prescription in particular despite the occurrence of numerous prior misfilled prescriptions.

(13) The continued failure by this defendant to implement appropriate safety systems to prevent the distribution of potentially dangerous, and even fatal, misfilled prescriptions is deceptive and unfair to the consuming public, and plaintiff's decedent in particular, who rely on this defendant to dispense the medication which it claims to be dispensing.

The general rule in Connecticut is that professional negligence of a health care provider does not fall within the purview of CUTPA. *Haynes v. Yale-New Haven Hospital,* 243 Conn. 17, 34, 699 A.2d 964 (1997). The *Haynes* decision indicates that "the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated, or aside from medical malpractice based on adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation." *Id.,* at 38.

*5 In the instant case, the allegations are that the defendants misfilled the prescription and "failed to implement and maintain appropriate systems and safe pharmaceutical practices, policies and procedures to avoid the misfilling." The allegations sound in professional negligence and do not implicate the "entrepreneurial aspects" of the business of pharmacies.

In *Sherwood v. Danbury Hospital,* 252 Conn. 193, 213-14, 746 A .2d 730 (2000), our Supreme Court determined that where the hospital failed to implement proper rules, regulations and quality assurance programs, such allegations did not relate to entrepreneurial aspects of the hospital.

In upholding a trial court's direction of a defendant's verdict on a CUTPA claim against a medical service provider (opthalmologist), the Connecticut Appellate Court in *Janusauskas v.. Fichman,* 68 Conn.App. 672, 793 A.2d 1109 (2002), noted that CUTPA claims against health providers are limited to the entrepreneurial or business aspect of the provision of services, aside from medical competence. With respect to claims related to the entrepreneurial or business aspect of the provision of medical services, the court noted the following:

> Under CUTPA, an act or practice is deceptive if three conditions are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material- that is, likely to affect consumer decisions or conduct.

(Citations omitted; internal quotation marks omitted.) *Id.,* at 681.

The allegations contained in paragraphs 12 and 13 of the third, eighth and eleventh counts fail to contain such assertions. What we are left with is the recast of the health care provider malpractice claim claimed as a CUTPA violation. The allegations of negligent practices compounded by failure to implement appropriate procedures or regulations in the area of quality assurance would transform every malpractice case into a CUTPA claim. This court will not endorse this result. The third, eighth and eleventh counts are stricken.

Conclusion

The motion to strike is granted with respect to the third, seventh, eighth and eleventh counts and their related prayers for relief contained in the amended complaint. The motion to strike the second, sixth and tenth counts of the amended complaint is denied.

**All Citations**

Not Reported in A.2d, 2002 WL 31898323, 33 Conn. L. Rptr. 524

---

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

Ealy v. Richardson-Merrell, Inc., Not Reported in F.Supp. (1987)
1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

KeyCite Yellow Flag - Negative Treatment
Distinguished by Keffer v. Lorenz, D.C.Super., July 19, 2012

1987 WL 159970
United States District Court, District of Columbia.

Sekou EALY et al., Plaintiffs

v.

RICHARDSON–MERRELL, INC., et al., Defendants.

No. 83–3504.
|
Jan. 12, 1987.

**Opinion**

GREEN, District Judge:

**\*1** This matter is before the Court on defendant Foer, Inc.'s ("Foer") motion to dismiss all claims against Mellon Pharmacy for failure to state a claim upon which relief can be granted ("Defendant's Motion to Dismiss"); plaintiffs' opposition thereto, defendant's reply brief, and the entire record herein. For the reasons stated below, the Court grants defendant's motion to dismiss and thereby dismisses defendant Foer from this case.

Plaintiffs commenced this action, one of a number of similar products liability suits, on October 26, 1983, against the manufacturers and distributors of Bendectin, an antinausant drug prescribed to pregnant women. According to the complaint, Sekou Ealy, the infant plaintiff, allegedly suffers from birth defects as a result of his mother's ingestion of Bendectin which defendant Merrell Dow Pharmaceuticals, Inc. manufactures. Complaint ¶ 6, 10, 12. Furthermore, plaintiffs allege that defendant Foer, Inc., trading as Mellon Pharmacy, sold Bendectin to plaintiff Sandra Ealy in 1978, without performing the duties of a reasonably prudent pharmacy. Specifically, the complaint alleges that Foer

had a duty and responsibility to advise the plaintiff, Sandra Ealy, of the therapeutic values and contents of Bendectin, including its hazards and adverse effects, and failed to do so, in violation of the duties imposed upon it of the reasonably prudent pharmacy within the District of Columbia as dictated by the common law of the

District of Columbia, and had a further duty to warn Sandra Ealy and all others similarly situated that antihistamines and pharmaceuticals wherein active ingredients included antihistamines had been scientifically shown to be teratogens in animals and humans, thus causing birth defects in children.

Complaint ¶ 71. Plaintiffs also claim that Foer acted negligently when it failed to warn Sandra Ealy that the United States Food and Drug Administration required warnings against the use in pregnancy "as to all antihistamines ... when sold over the counter without a prescription." Complaint ¶ 72.

Plaintiffs also included a strict liability count in their complaint against Foer. In that count, plaintiffs allege that Sandra Ealy "purchased Bendectin in essentially the same condition as when it left the manufacturer's plant, and the said plaintiff used the product in the manner and for the purpose which The Mellon Pharmacy knew or should have known that it would be used." Complaint ¶ 79. Plaintiffs further claim that the Bendectin purchased by Sandra Ealy from Foer was "defective and unreasonably dangerous when sold by The Mellon Pharmacy" and, therefore, Foer is strictly liable for Sekou Ealy's injuries. Complaint ¶ 83.

Defendant Foer has now moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Foer asserts that "[t]here is no authority whatsoever that holds that, under District of Columbia law, a pharmacist is liable for failure to warn of alleged dangers associated with prescription drugs under either a negligence or strict liability theory." Defendant's Motion to Dismiss at 3. The Court agrees.

**\*2** Before proceeding any further, the Court notes that both parties agree that District of Columbia law controls this case. Sandra Ealy is alleged to be a resident of the District of Columbia, and the Bendectin was prescribed and the prescription filled in the District. Complaint ¶ 2, 3.

The issue before the Court is a narrow one. Plaintiffs do not allege that defendant Foer filled the prescription for Bendectin incorrectly. Instead, plaintiffs' position is that a pharmacist that correctly fills a prescription is liable under theories of negligence and strict liability for failing to warn consumers like Sandra Ealy of the "therapeutic values, contents and hazards of the use of drugs such as Bendectin which were

1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

known to have antihistaminic properties when prescribed ... and said antihistaminic properties were known to be at least teratogenic in animals and suspected of being teratogenic in humans at the time" of purchase. Plaintiffs' Opposition to the Motion to Dismiss All Claims Against Mellon Pharmacy for Failure to State a Claim Upon Which Relief Can Be Granted ("Plaintiffs' Opposition") at 1–2.

Plaintiffs have failed to cite any cases in support of their position. Instead, they rely on sections 2–2002 [1] and 2–2003 of the D.C.Code to support their negligence claim. Plaintiffs' Opposition at 7–8. Section 2–2002 defines conduct in which individuals may only engage in the District of Columbia if they hold a valid license to practice pharmacy. D.C.Code § 2–2002 (1981 & Supp.1986). Section 2–2003 sets out the general prohibitions for persons who engage in the practice of pharmacy. D.C.Code § 2–2003 (1981 & Supp.1986). The Court notes that neither of these sections was enacted at the time the Mellon Pharmacy filled Mrs. Ealy's prescription nor was there an analogous statute in effect. The Court, therefore, finds that plaintiffs' reliance on sections 2–2002 and 2–2003 is misplaced.

"No District of Columbia court has ruled whether pharmacies have a common-law duty to warn customers of the risks associated with the prescription drugs they purchase." Raynor v. Richardson–Merrell, Inc., 643 F.Supp. 238, 246 (D.D.C.1986). Moreover, the two courts in this federal district which have been presented with similar actions against pharmacies have been unwilling to impose a duty to warn on pharmacies. See, e.g., id. at 246–47; and Carita Richardson v. Richardson–Merrell, Inc., Civil Action No. 83–3505 (June 9, 1986 Order granting motion to dismiss of defendants Peoples Drug Store, Inc. and Standard Drug Co., Inc.).

In Raynor, Judge Thomas Hogan turned to Maryland law for guidance on whether such a common-law duty to warn existed for pharmacists in that state. The Raynor decision discusses the holding in Johnson v. Richardson–Merrell, No. B–83–3814 (D.Md. June 1, 1984), a case involving the same facts as those found here. As noted by Judge Hogan, the Johnson case, like Raynor and the present case, involved

> **\*3** no allegation that the pharmacy did any compounding or changed the drug in any way after receiving it from the manufacturer, nor [was] there an allegation that the

pharmacy substituted a different brand or a generic version for the brand prescribed, Bendectin. There is therefore no showing that the pharmacy exercised any independent discretion, skill or knowledge, in filling the prescription.

Raynor, 643 F.Supp. at 246. Based on these facts, and in light of sound policy and legal considerations, the courts in Raynor and Johnson decided not "to impose a duty to warn on pharmacies, reasoning that such a duty would, in effect, require a pharmacy to substitute its judgment for that of the prescribing physician." Id. This Court will follow suit.

It is the duty of the prescribing physician to warn the patient of any potential dangers associated with taking a particular drug. To hold otherwise would "only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability." Jones v. Irvin, 602 F.Supp. 399, 402. Moreover, "[t]o impose a duty to warn on the pharmacist ... would be to place the pharmacist between the physician who, having prescribed the drug presumably knows the patient's present condition as well as his or her complete medical history, and the patient." Ramirez v. Richardson–Merrell, Inc. [CCH PRODUCTS LIABILITY REPORTS ¶ 11,019], 628 F.Supp. 85, 88 (E.D.Pa.1986) (Bendectin litigation). This type of "interference in the patient-physician relationship can only do more harm than good." Id. Accordingly, the Court finds that defendant Foer did not have a duty to warn customers like plaintiffs of any alleged adverse effects from the ingestion of Benedictin.

Plaintiffs' strict liability claim also fails to provide a basis for a suit against Foer. "The District of Columbia has adopted the strict liability position of Section 402A of the Restatement (Second) of Torts, which makes a seller liable for marketing a defective, unreasonably dangerous product." Raynor, 643 F.Supp. at 247 (citing Berman v. Watergate West, Inc., 391 A.2d 1351 (D.C.App.1978); Cottom v. McGuire Funeral Service, Inc. [CCH PRODUCTS LIABILITY REPORTS ¶ 6320], 262 A.2d 807 (D.C.App.1970)). As explained by the court in Raynor, "Comment k makes an exception to the strict liability rule for products such as drugs, which are unavoidably unsafe due to risks associated with and inherent in their use." Id. Under section 402A, a drug is neither defective nor unreasonably unsafe if it is prepared properly and accompanied by adequate warnings of the risks involved.

Ealy v. Richardson-Merrell, Inc., Not Reported in F.Supp. (1987)
1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

Since this Court has held that pharmacies in the District of Columbia do not have any common-law duty to warn when they merely dispense a prescription drug, the limited liability available under section 402A, Comment *k* does not attach to the instant case.

Furthermore, "[r]ecent [state court] cases have uniformly held that a pharmacist is not strictly liable under a products liability theory since he is not a retailer." *Jones,* 602 F.Supp. at 400 (citing *Murphy v. E.R. Squibb & Sons, Inc.* [CCH PRODUCTS LIABILITY REPORTS ¶ 10,141], 156 Cal.App.3d 589, 202 Cal.Rptr. 802 (1984); *Bichler v. Willing* [CCH PRODUCTS LIABILITY REPORTS ¶ 7978], 58 A.D.2d 331, 397 N.Y.S.2d 57 (1977); *Ullman v. Grant,* 114 Misc.2d 220, 450 N.Y.S.2d 955 (1982); *Batiste v. American Home Products Corp.* [CCH PRODUCTS LIABILITY REPORTS ¶ 7903], 32 N.C.App. 1, 231 S.E.2d 269 (1977)). "To hold a druggist strictly liable would be to make the druggist an insurer of the safety of the manufactured drug and would impose on the retail druggist the obligation to test, at its own expense, new drugs." *Ramirez,* 628 F.Supp. at 87. The imposition of such a duty would raise the costs to society, which needs and values the pharmaceutical products sold by druggists, to unduly high and prohibitive levels. Accordingly, the Court finds that a pharmacist should not be held strictly liable for injuries allegedly sustained as the result of the ingestion of certain drugs.

*4 In light of the foregoing conclusions, the Court dismisses plaintiffs' claims of negligence and strict liability against defendant Foer. An appropriate order is attached.

ORDER

Upon consideration of defendant Foer, Inc.'s motion to dismiss all claims against Mellon Pharmacy for failure to state a claim upon which relief can be granted ("Defendant's Motion to Dismiss"); plaintiff's opposition thereto; defendant's reply brief; for the reasons set forth in the accompanying memorandum, and the entire record herein, it is by the Court this 12th day of January 1987.

ORDERED that defendant's motion to dismiss is granted; and it is further

ORDERED that the complaint as to this defendant is dismissed with prejudice.

**All Citations**

Not Reported in F.Supp., 1987 WL 159970, Prod.Liab.Rep. (CCH) P 11,236

Footnotes

1    Plaintiffs cite only to section 2–2003 in their opposition but included the definition of the term "practice of pharmacy" which is contained in section 2–2002. The court assumes, therefore, that plaintiffs base their position on both of these sections.

**End of Document**                                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

2012 WL 2951228 (D.C.Super.) (Trial Order)
Superior Court of the District of Columbia.

Elizabeth Baker KEFFER, et al., Plaintiffs,
v.
Patrick LORENZ, M.D., et al., Defendants.

No. 2012 CA 1563 M.
July 5, 2012.

West Headnotes (1)

[1]    **Health**  👉 Pharmacological services

**Products Liability**  👉 Warnings or Instructions

**Products Liability**  👉 Drugs in general

Pharmacy had a duty to warn patient himself or to notify his physicians of contraindication of two medications patient sought to have filled as prescriptions, when pharmacy's computerized prescription system allegedly alerted pharmacists of serious adverse interaction between the two medications and substantial potential threat it posed to patient; under circumstances, patient was at risk of a specific, defined, and foreseeable harm about which the pharmacists knew or should have known.

**Amended Order** [1]

Bruce J. Klores, Esq., Thomas W. Mitchell, Esq., Klores Perry Mitchell, P.C., 1735 20th Street, N.W., Washington, D.C. 20009.

Robert W. Goodson, Esq., Wilson Elser Moskowitz Edelman & Dicker, 700 11th Street, N.W., Suite 400, Washington, D.C. 20001.

James Gleason, Esq., Gleason, Flynn, Emig & Fogleman, 11 North Washington Street, Suite 400, Rockville, MD 20850.

Jan E. Simonsen, Esq., Carr Maloney, P.C., 2000 L Street, N.W., Suite 450, Washington, D.C. 20036.

Natalia M. Combs Greene, Judge.

**\*1**  This matter is before the Court on Defendant District of Columbia CVS Pharmacy, LLC ("CVS")'s Motion to Dismiss, Plaintiff Elizabeth Keffer ("Mrs. Keffer")'s Opposition, and CVS's Reply thereto. Upon consideration and for the reasons stated herein, the Motion is denied. Background

Mr. Keffer, the decedent, was a CVS patient from 2009 until his death in January 2011. From 2010 to January 2011, one of Mr. Keffer's physicians had prescribed Cymbalta and Vyvanse. Cymbalta and Vyvanse, when taken together, are known to cause serious adverse effects in some patients. CVS simultaneously filled both of these prescriptions for Mr. Keffer. CVS's pharmacy personnel used a computerized prescription system (the "CVS system") that informed them of Mr. Keffer's prescription history, that he had been prescribed both Cymbalta and Vyvanse, and that he was filling both medications simultaneously. In addition,

the CVS system notified CVS's personnel that they should not fill the two prescriptions without first contacting Mr. Keffer's physicians to confirm that they wanted him to take both medications at the same time. CVS never told Mr. Keffer about the drug interaction before it dispensed the Cymbalta and Vyvanse, nor did CVS contact any of his physicians to obtain confirmation. After simultaneously taking Cymbalta and Vyvanse for several months from 2010 to 2011, Mr. Keffer suffered sudden heart failure and died on January 17, 2011.

### Discussion

Defendant CVS argues that it is entitled to dismissal of the claim against it because: (1) it had no duty to warn Mr. Keffer of known contraindications, as its only duty was to accurately fill the prescription; and (2) relying on the learned intermediary doctrine, any other duty rested upon decedent's physician. Plaintiff counters that dismissal is not warranted as there was a duty to warn, particularly in the face of known contraindications, and that the learned intermediary doctrine does not apply for policy reasons.

### Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Luna v. A.E. Eng'g Servs., LLC,* 938 A.2d 744, 748 (D.C. 2007). "Because '[o]ur rules reject the approach that pleading is a game of skill in which one misstep...may be decisive to the outcome' and 'manifest a preference for resolution of disputes on the merits, not on technicalities of pleading,' we construe pleadings 'as to do substantial justice.' " *Clampitt v. Am. Univ.,* 957 A.2d 23, 29 (D.C. 2008) (quoting *Carter-Obayuwana v. Howard Univ.,* 764 A.2d 779, 787 (D.C. 2001)). A complaint should not "be dismissed because a court does not believe that a plaintiff will prevail on [his] claim"; rather "a complaint must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these elements exist." *Grayson v. AT&T Corp.,* 15 A.3d 219, 228 (D.C. 2011); *Williams v. District of Columbia,* 9 A.3d 484, 488 (D.C. 2010).

Specifically, a Complaint must satisfy the pleading standard in Rule 8(a). Under that standard, the court "accept[s] the allegations of the complaint as true, and construe[s] all facts and inferences in favor of the plaintiff." *Solers, Inc. v. Doe,* 977 A.2d 941, 947 (D.C. 2009); *In re Estate of Curseen,* 890 A.2d 191, 193 (D.C. 2006). A complaint need not contain detailed factual allegations, but it must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation..." *Potomac Dev. Corp. v. District of Columbia,* 28 A.3d 531, 543-44 (D.C. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)). Naked assertions devoid of further factual enhancement will not suffice, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Grayson v. AT&T Corp.,* 980 A.2d 1137, 1144 (D.C. 2009). The factual allegations must raise a right to relief above a speculative level. *Clampitt,* 957 A.2d at 29. To survive a motion to dismiss, therefore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Potomac Dev. Corp.,* 28 A.3d at 543-44. A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal for failure to state a claim is warranted only when it appears beyond a doubt that the plaintiff can prove no set of facts in support of their claim. *Murray v. Wells Fargo Home Mortg.,* 953 A.2d 308, 316 (D.C. 2008).

### Pharmacist's Duty to Warn

**\*2**  The Court acknowledges that the issue before the Court, whether CVS had a duty to warn its customer that two drugs prescribed to him by the same physician were contraindicated, is close. Accepting the allegations of the Complaint as true and construing all facts and inferences in Mrs. Keffer's favor, however, the Court finds that dismissal at this stage is not warranted.

Case law instructs that a pharmacist has a duty to exercise the degree of care that a reasonable, prudent person in the same profession would exercise under similar conditions. *E.g., Morgan v. Wal-Mart Stores, Inc.,* 30 S.W.3d 455, 461 (Tex. App. 2000); *Riff v. Morgan Pharmacy,* 508 A.2d 1247, 1251 (Pa. Super. Ct. 1986) ("In the performance of his professional duties

[a pharmacist] will be held to the standard of care, skill, [and] intelligence which ordinarily characterizes the profession."); *Jones v. Irvin,* 602 F.Supp. 399, 400 (S.D. Ill. 1985) ("law requires of druggist only reasonable and ordinary care...such care with reference to him means the highest degree of prudence, thoughtfulness, and diligence, and is proportioned to the danger involved.") (citation omitted); *Hand v. Krakowski,* 453 N.Y.S.2d 121, 123 (N.Y. App. Div. 1982) (Standard of care generally described as "ordinary care in the conduct of his business"; "ordinary care" as applied to druggist means "the highest practicable degree of prudence, thoughtfulness and vigilance commensurate with the dangers involved").

The majority of jurisdictions that have addressed this issue do not impose on pharmacists a general duty to warn patients of the potential adverse affects of their medications. *See e.g., Raynor v. Richardson-Merrell, Inc.,* 643 F.Supp. 238, 246-47 (D.D.C. 1986) (pharmacist did not have a duty to warn pregnant woman of potential side affects of Bendectin); *Jones,* 602 F.Supp. at 401 (pharmacist has no duty to warn the customer or notify the physician that the drug is being prescribed in dangerous amounts, that the customer is being overmedicated, or that the various drugs in their prescribed quantities could cause adverse reactions); *Adkins v. Mong,* 425 N.W.2d 151, 152 (Mich. Ct. App. 1988) (pharmacist had no duty to warn plaintiff of potential side effects of medication, where prescription was facially valid and filled accurately); *Morgan,* 30 S.W.3d at 469 (pharmacists do not have a generalized duty to warn patients of potential adverse reactions to prescription drugs absent some special circumstances).

The general rule is that pharmacists have no duty to warn a customer of the general side effects of her prescription. In many jurisdictions, however, the pharmacist's duty to warn the patient or notify the prescribing physician may arise under certain circumstances. Courts have imposed the duty to warn (on a pharmacy) when the patient's medical history or current medication regime indicates that a prescribed medicine is contraindicated. *See e.g., McKee,* 782 P.2d at 715 ("We agree pharmacists should have a duty to be alert for patent errors in a prescription, for example: obvious lethal dosages, inadequacies in instructions, *known* contraindications, or incompatible prescriptions, and to take corrective measures.) (emphasis in original); *Riff* 508 A.2d at 1252 (pharmacy breached its duty to warn a patient or notify her doctor of obvious inadequacies in physician's instructions); *Klasch v. Walgreen Co.,* 264 P.3d 1155, 1160 (Nev. 2011) (pharmacist has a duty to warn customer or notify physician when he or she is aware of a customer-specific risk); *Deed v. Walgreen Co.,* 927 A.2d 1001, 1003 (Conn. Super. Ct. 2007) (duty to warn arises "when a pharmacy or pharmacist has specific knowledge of potential harm to specific persons in particular cases"). *See also* Morgan, 30 S.W.3d at 466 ("Courts holding that pharmacists owe their customers a duty beyond accurately filing prescriptions do so based on the presence of additional factors, such as *known contraindications,* that would alert a reasonably prudent pharmacist to a potential problem.") (emphasis added); *Hand v. Krakowski,* 453 N.Y.S.2d 121, 123 (N.Y. App. Div. 1982) (pharmacist who filled known alcoholic's prescription for medicine contraindicated with alcohol without warning patient or her physician could be found to be in breach of pharmacist's duty of ordinary care); *and Happel,* 766 N.E.2d at 1130 ("We hold that a narrow duty to warn exists where... a pharmacy has patient-specific information about drug allergies, and knows that the drug being prescribed is contraindicated for the individual patient.")

### The Learned Intermediary Doctrine

**\*3** In some jurisdictions, the learned or informed intermediary doctrine may act to insulate a pharmacist from liability in certain circumstances. "The reluctance of courts to hold pharmacists liable for injuries caused by drugs accurately dispensed according to the terms of a facially valid prescription can be attributed to the application of the 'learned intermediary' doctrine, which typically acts as an exception to a manufacturer's duty to warn customers in products liability cases." *Morgan,* 30 S.W.3d at 461 (citations omitted).

A case frequently cited in which a court has applied the learned intermediary doctrine to dismiss a claim of negligence against a pharmacy is *McKee v. Am. Home Prods., Corp.,* 782 P.2d 1045 (Wash. 1989) (en banc). In *McKee,* the plaintiff was prescribed an amphetamine marketed as an appetite-suppressant. *Id.* at 1046. Because of the drug's addictiveness, the *Physician's Desk Reference* recommended that the drug's use be discontinued after a few weeks. *Id.* McKee became addicted to her medication and the pharmacy continued to fill her prescription for ten years. *Id.* at 1047. McKee brought an action against the pharmacy that filled her prescription on the theory that they had negligently failed to warn her of the addictiveness of the drug. *See id.* Affirming the trial court's grant of the pharmacy's motion for summary judgment, the Washington Supreme Court wrote:

> The relationship between the physician-patient-manufacturer applies equally to the relationship between the physician-patient and pharmacist. In both circumstances the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncrasies of the patient.

*Id.* at 1050. For this reason, the court held that the pharmacy did not have a duty to question the judgment of the patient's physician as to the appropriateness of the prescription, nor did it have a duty to warn the patient of the potential harmful effects of the drug. *Id.* at 1055-56.

*Ealy v. Richardson-Merrell, Inc.,* 1987 WL 159970 (D.D.C. 1987) provides another example where the doctrine was applied to the pharmacist-patient relationship. In *Ealy,* the court applied the learned intermediary doctrine to a woman's claim against her pharmacy for failure to warn of the potential side-effects of Bendectin and held that the pharmacy had no duty to warn. *Id.* at 3. To support its decision, the court wrote that to impose a general duty to warn on pharmacists would encourage pharmacists to "second-guess" the prescribing physician's decisions and would "place the pharmacist between the physician." *Id.*

The learned intermediary doctrine is not always applied to pharmacy-patient cases. In *Happel v. Wal-Mart Stores, Inc.,* 766 N.E.2d 1118 (Ill. 2002), the plaintiff became injured after she consumed Toradol, a medicine to which she was allergic. *Id.* at 1122. The pharmacist who had filled Happel's prescription was aware of her allergies and knew that Toradol was contraindicated. Nonetheless, the pharmacist filled her prescription without warning the person who picked up Ms. Happel's prescription or notifying her doctor. *See id.* at 1121. The pharmacy argued that under the learned intermediary doctrine it had no duty to warn. *Id.* at 1122. Reversing the trial court's grant of summary judgment for the pharmacy, the Illinois Supreme Court wrote:
The reasons for not imposing a duty to warn on pharmacists do not apply in the instant case. Here, Wal-Mart was aware not only of [Happel]'s drug allergies, but also that Toradol was contraindicated for persons such as [Happel] with allergies to aspirin. Imposing a duty to warn of this contraindication would not require the pharmacist to "learn the customer's condition and monitor his drug usage." y(4)27Further, imposing a duty to warn here would not have intruded Wal-Mart into the doctor-patient relationship, forcing it to "practice medicine without a license."

**\*4** *Id.* at 1128.

Our Court of Appeals has adopted the learned intermediary doctrine as it pertains to a manufacturers' duty to warn in product liability cases. In *Payne v. Soft Sheen Prods., Inc.,* the plaintiff brought a claim against her beautician and the manufacturer of a permanent wave product after she sustained second-degree burs from a permanent wave product applied to her hair. 486 A.2d 712, 716 (D.C. 1985). The Court of Appeals reversed the trial court's grant of a directed verdict for the manufacturer, finding that the adequacy of the manufacturer's warnings could not be determined as a matter of law. *Id.* at 723. In a footnote, the court stated that the adequacy of the manufacturer's warnings must be evaluated in relation to the beautician and not the plaintiff. *See id.* at 727 n. 10. ("When, as here, advertising did not induce purchase of the product, but the product was recommended by an intermediary who is a professional, the adequacy of the instructions must be judged in relationship to that professional."). Case law from our jurisdiction, however, is silent as to whether the learned intermediary doctrine applies to pharmacy-patient cases.

In addition, *Payne* may be distinguished from the instant case because it involved a manufacturer and not a pharmacy. A pharmacy typically does not manufacture drugs/prescriptions and thus is not analogous to a manufacturer, not simply because it plays no role in the creation or manufacture of drugs, but also because it, unlike a manufacturer, acts on the behest of physicians to distribute medicines to patients. A pharmacy may be viewed as an entity that serves a role between that of a manufacturer, which produces a product, and a professional, who uses her expertise to recommend, apply, or distribute said product. Thus,

the Court is not convinced that a pharmacy fits within the framework of the learned intermediary doctrine as had to date been defined by our Court of Appeals.

This Court has found no binding precedent upon which it may rely; thus, the Court has looked to case law outside our jurisdiction. The general rule is that a pharmacist has no duty to warn a patient of the potential risks of a given medication, but there is a significant body of authority that stands for the proposition that a pharmacist does have a narrow duty to alert his or her patient or the prescribing physician when the prescription is contraindicated for the patient. If a pharmacist does not have a duty to warn under those circumstances, it may be argued that warning of the existence of a known, adverse drug interaction may fall within the pharmacist's broader duty of ordinary care.

Taking the allegations in the Complaint as true, the CVS system alerted CVS's pharmacists of the serious adverse interaction between Vyvanse and Cymbalta and of the substantial potential threat this posed to Mr. Keffer. Armed with this knowledge, CVS had a duty to warn Mr. Keffer himself or to notify his physician of the contraindication. At this stage it may fairly be said that CVS had a duty to warn because Mr. Keffer was at risk of a specific, defined, and foreseeable harm about which the pharmacists knew or should have known.

 **5**  While our jurisdiction recognizes the existence of the learned intermediary doctrine in product liability cases, our Court of Appeals has never addressed the specific question presented here--whether the doctrine should be extended to pharmacy-patient cases. The Court has assumed, for the sake of argument, that the doctrine would in fact shield CVS from liability under some circumstances in our jurisdiction. Nonetheless, the Court finds it inappropriate to apply the doctrine to the instant case (at this stage) because the sound policy reasons underlying the doctrine do not appear to apply here, as was the case in *Happel, supra*. Had CVS warned its patient or notified his doctor, it cannot be said, at this stage, that Defendant CVS would have acted in obstruction of his access to appropriate medical care, placing themselves between Mr. Keffer and his physician, or to have practiced medicine without a license. The Court finds, at this stage, that the rationale supporting the learned intermediary doctrine does not appear to pertain to this case and should not be applied.

Accordingly, it is this 19th day of July 2012, *nunc pro tunc* to the 5th day of July 2012,

ORDERED that the Motion is hereby DENIED.

SO ORDERED.

<<signature>>

Natalia M. Combs Greene

(Signed in chambers)

Bruce J. Klores, Esq.

Thomas W. Mitchell, Esq.

KLORES PERRY MITCHELL, P.C.

1735 20th Street, N.W.

Washington, D.C. 20009

Robert W. Goodson, Esq.

Wilson Elser Moskowitz Edelman & Dicker

700 11th Street, N.W.

Suite 400

Washington, D.C. 20001

James Gleason, Esq.

Gleason, Flynn, Emig & Fogleman

11 North Washington Street

Suite 400

Rockville, MD 20850

Jan E. Simonsen, Esq.

Carr Maloney, P.C.

2000 L Street, N.W.

Suite 450

Washington, D.C. 20036

Footnotes

1        This Amended Order is issued to correct a typographical error in the case caption.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

2018 WL 4217066
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Jamel DANIELS, Plaintiff,
v.
KEFFEE FOOD CO., et al., Defendants.
and
Global Brands, LLC, Defendant/
Third Party Plaintiff,
v.
Baron Chocolatier, Inc., Third Party Defendant.

Civil Action No. 16-659-RGA
|
Signed 09/05/2018

**Attorneys and Law Firms**

Jamel Daniels, SCI Retreat, Hunlock Creek, Pennsylvania;
Pro Se Plaintiff.

Peter L. Frattarelli, Esquire, Archer & Greiner, P.C.,
Wilmington, Delaware; Counsel for Defendant Keefe Group,
LLC d/b/a/ Keefe Supply Company.

Tracy A. Burleigh, Esquire, Marshall, Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware; Counsel for
Defendant/Third Party Plaintiff Global Brands, LLC.

Robert D. Cecil, Jr., Esquire, Tybout, Redfearn & Pell,
Wilmington, Delaware; Counsel for Third Party Defendant
Baron Chocolatier, Inc.

**MEMORANDUM OPINION**

ANDREWS, U.S. District Judge

**\*1**  Plaintiff Jamel Daniels, a former inmate at the James
T. Vaughn Correctional Center in Smyrna, Delaware, filed
this action pursuant to 42 U.S.C. § 1983. He also raised
supplemental state claims. (D.I. 3). Plaintiff appears *pro se*
and has been granted leave to proceed *in forma pauperis*.
(D.I. 6). Defendants and Third Party Defendant move for
summary judgment. (D.I. 53, 57, 59,61). Briefing on the
matters is complete. Plaintiff failed to file oppositions to
the motions despite the Court's briefing schedule order and

Plaintiff having been given additional time to file oppositions.
(*See* D.I. 68, 71).

**BACKGROUND**

As alleged in the Complaint, on July 7, 2014, Plaintiff
purchased a Sweet Obsession Candy Bar [1] from the JTVCC
prison commissary. (D.I. 3 at ¶ 13). Defendant Keefe Group,
LLC d/b/a/ Keefe Supply Company (improperly pled as
Keffee Food Co.) is or was the commissary vendor for the
JTVCC, and Defendant Global Brands, LLC is or was the
manufacturer of products sold by Keefe Supply. (*Id.* at ¶¶ 7,
8). It appears that the candy bar was delivered to Plaintiff by
prison commissary officers on July 21, 2014. (D.I. 3 at ¶ 15
and Ex. A). When Plaintiff began eating his candy bar, he
noticed blood in his mouth, and realized that his tongue had
been cut and his tooth was chipped. (D.I. 3 at ¶ 16). Plaintiff
spit out an object that looked like a hard piece of chocolate.
(*Id.* at ¶ 17). He washed it and discovered that it was a piece
of glass or hard plastic. (*Id.*) Plaintiff was provided medical
and dental care. (*Id.* at ¶ 19). Plaintiff submitted a grievance
which indicates the incident occurred on July 24, 2014. (D.I.
3 at Ex. B).

Plaintiff took several steps to obtain the name and address
of the manufacturer of the candy bar, Global Brands, LLC.
(*Id.* at ¶¶ 26-30). Plaintiff filed the instant lawsuit on July
24, 2016, [2] alleging unsafe conditions. He seeks declaratory
and injunctive relief as well as compensatory and punitive
damages.

The Complaint was screened pursuant to 28 U.S.C. §§
1915(e)(2)(B) and 1915A(a). Plaintiff was allowed to proceed
with his supplemental state claims against the moving
defendants. (D.I. 8, 9). Thereafter, Global Brands LLC filed
a Third Party Complaint against Baron Chocolatier, Inc. for
contribution and/or indemnification (D.I. 33).

**\*2**  The following facts are gleaned from the record.
According to James Kajosaj, account manager with Keefe
Group, LLC, Keefe Supply is one of several vendors
periodically chosen through an open market engagement
process to supply the JTVCC Commissary. (D.I. 55-1 ¶¶ 1,
4). Keefe Supply's records demonstrate that between July
2012 and December 2014, it did not sell or supply any Sweet
Obsession Candy Bars to the JTVCC Commissary. (*Id.* at ¶
5). Keefe Supply did not alter the Sweet Obsession Candy
Bar that Plaintiff purchased on July 7, 2014 and does not

2018 WL 4217066

have any knowledge of, or the ability to discover, any defect with the candy bar. (*Id.* at ¶¶ 6-7). Keefe Supply did not have any knowledge of any glass located in any Sweet Obsession Candy Bars or other similar products that it supplied to the JTVCC Commissary. (*Id.* at ¶ 8).

Global Brands, LLC is a wholesale distributor of non-durable food products, including such items as candy, salty and fruit snacks, cookies, honey, preserves, and fruit drinks. (D.I. 60-2 at ¶ 2). According to Richard Ennen, President and CEO of Global Brands, LLC, in July 2014, and for the preceding 18 months, Global Brands provided wholesale distribution of Sweet Obsession Chocolate Bars to various vendors throughout the United States. (*Id.* at ¶ 3). Global Brands is not a food manufacturer. (*Id.* at ¶ 4). It does not manufacture Sweet Obsession Chocolate Bars and did not manufacture the Sweet Obsession Chocolate Bar purchased and consumed by Plaintiff. (*Id.*). Global Brands did not sell the candy bar to JTVCC. (*Id.* at ¶ 5). Global Brands did not assemble, alter, modify, inspect, package or repackage the candy bar. (*Id.* at ¶ 6). It did not have any knowledge of, or the ability to discover, any defect with the candy bar. (*Id.* at ¶ 7). Global Brands did not have any knowledge of any glass being located in any Sweet Obsession Chocolate Bars which it distributed in the United States in July 2014, or in the preceding 18 months. (*Id.* at ¶ 8).

Defendants Keefe Supply and Global Brands move for summary judgment on the grounds that: (1) Keefe Supply and Global Brands are neither the legal nor proximate cause of Plaintiff's alleged injures; (2) Delaware's sealed container defense protects Keefe Supply and Global Brands from liability; and (3) the negligence claim is barred by the two-year statute of limitations. (D.I. 53-60). Third Party Defendant Baron Chocolatier moves for summary judgment on the grounds that: (1) Global Brands is not entitled to contribution and/or indemnification because Plaintiff's claims are time-barred; and (2) Delaware's sealed container defense protects it from liability. (D.I. 61-63).

### STANDARDS OF LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw

all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-49 (1986).

Plaintiff did not file oppositions to the motions for summary judgment. The Court, however, will not grant the entry of summary judgment without considering the merits of the unopposed motions. *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991) (district court should not have granted summary judgment solely on the basis that a motion for summary judgment was not opposed.).

### DISCUSSION

To the extent Plaintiff raises either a negligence claim or a breach of the implied warranty of merchantability claim, no reasonable jury could find in his favor.

**\*3 Negligence.** "[I]n order to prevail in a negligence action, a plaintiff must prove by a preponderance of the evidence that the defendant's action breached a duty of care in a way that proximately caused injury to the plaintiff." *Reid v. Hindt*, 976 A.2d 125, 132 (Del. 2009). To establish proximate cause, Plaintiff must prove, "that there was a reasonable probability of a causal connection between each defendant's negligence and his injury." *Id.* When the plaintiff's claim involves bodily injuries, "the causal connection between the defendant's alleged negligent conduct and the plaintiff's alleged injury must be proved by the direct testimony of a competent medical expert." *Roache v. Charney*, 38 A.3d 281, 286 (Del. 2012).

Here, summary judgment is appropriate on behalf of Defendants. Regarding Keefe Supply, there is no evidence of causal connection between Plaintiff's injuries and Keefe Supply. Keefe Supply did not sell or supply the candy bar to the JTVCC.

The evidence of record indicates that Global Brands was the wholesale distributor of Sweet Obsession Candy Bars during the relevant time-frame. Even assuming that Global Brands has a general duty to distribute food items that do not have foreign objects embedded in them, "the general rule is that dealer or retailer is under no duty to inspect for latent defects in articles as they come from the manufacturer unless the

dealer or retailer has knowledge of such defects or reasonable grounds to suspect such defects exist." *Behringer v. William Gretz Brewing Co.*, 169 A.2d 249, 253 (Del. Super. 1961). Even when viewing the evidence in the light most favorable to Plaintiff, Global Brands had no reason to know or anticipate that the candy bar contained a foreign object. Thus, Global Brands breached no duty it owed to Plaintiff.

Finally, under Delaware law, the causation element in a negligence action appears to require Plaintiff to put forth some kind of expert testimony and, without it, Plaintiff cannot prevail, even though as the non-movant the facts are construed in his favor. *See, e.g., Bailey v. Commercial Joint Ventures, LLC*, 2013 WL 5492544, at *2 (Del. Super. Sept. 30, 2013); *Rayfield v. Power*, 840 A.2d 642, 2003 WL 22873037 (Del. Dec. 2, 2003) (table) (explaining that when combating a motion for summary judgment, a personal injury plaintiff must demonstrate that she could succeed on her claim at trial, which requires "direct testimony of a competent medical expert"). [3]

No reasonable jury could find for Plaintiff under a negligence theory. Therefore, the Court will grant the motions for summary judgment. [4]

**\*4 Breach of Implied Warranty of Merchantability.**
To prevail on a claim under the implied warranty of merchantability theory, a plaintiff must prove "(1) that a merchant sold the goods; (2) which were defective at the time of sale; (3) causing injury to the ultimate consumer; (4) the proximate cause of which was the defective nature of the goods; and (5) that the seller received notice of the injury." *Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, 721 A.2d 1267, 1269 (Del. 1998); 6 Del. C. § 2-314. Under Delaware law, a seller is defined as "a wholesaler, distributor, retailer or other individual or entity other than a manufacturer that is regularly engaged in the selling of a product whether the sale is for resale by the purchaser or is for use or consumption by the ultimate consumer." 18 Del. C. § 7001(a)(4). Delaware's Sealed Container statute, 18 Del. C. § 7001(b), provides that "it shall be a defense to an action against a seller of a product for ... personal injury allegedly caused by the defective design or manufacture of a product if the seller establishes that:"

(1) The product was acquired and then sold or leased by the seller in a sealed container and in unaltered form;

(2) The seller had no knowledge of the defect;

(3) In the performance of the duties the seller performed or while the product was in the seller's possession could not have discovered the defect while exercising reasonable care;

(4) The seller did not manufacturer, produce, design or designate the specifications for the product, which conduct was the proximate and substantial cause of the claimant's injury;

(5) The seller did not alter, modify, assemble or mishandle the product while in the seller's possession in a manner which was the proximate and substantial cause of the claimant's injury; and

(6) The seller had not received notice of the defect from purchasers of similar products.

18 Del. C. § 7001(b). The burden of producing evidence belongs to the seller.

A sealed container defense is inapplicable if: "(1) The claimant is unable to identify the manufacturer through reasonable effort; (2) The manufacturer is insolvent, immune from suit or not subject to suit in Delaware; or (3) The seller made any express warranties, the breach of which were the proximate and substantial cause of the claimant's injury." 18 Del. C. § 7001(c).

Both Keefe Supply and Global Brands satisfy all six elements of the sealed container defense. (*See* D.I. 55-1; 60-2). The unrebutted facts are that after reasonable effort, Plaintiff identified Global Brands as the apparent manufacturer of the candy bar as labeled on the packaging of the candy bar (*see* D.I. 64 at Interrog. 2), and Global Brands identified Third Party Defendant Baron Chocolatier as the manufacturer of the candy bar (*see* D.I. 33 at ¶ 6). There is no evidence of record that express warranties were made to Plaintiff.

The unrebutted evidence is that Keefe Supply and Global Brands did not manufacture, design, package, or otherwise alter the Candy Bar, or its packaging. Nor is there evidence of record that they had, or could have had, any knowledge of the alleged defect at issue in this matter with the candy bar purchased by Plaintiff or any Sweet Obsession Candy Bars. In addition, Global Brands did not have notice of the alleged defect in any similar Sweet Obsession Candy Bars that it distributed in the United States between January 2013 and July 2014.

Daniels v. Keffee Food Co., Not Reported in Fed. Supp. (2018)

2018 WL 4217066

All elements of the sealed container defense have been met and therefore, the Court will grant the motions for summary judgment filed by Keefe Supply and Global Brands.

**Contribution/Indemnification.** No reasonable jury could find on behalf of Plaintiff. The evidence of record supports a finding that Keefe Supply and Global Brands cannot be held liable under the facts of this case. It follows then, that Global Brands' Third-Party Complaint for contribution and/or indemnification from Baron Chocolatier is moot as is Baron Chocolatier's motion for summary judgment. *See, e.g., Quereguan v. New Castle Cty.*, 2011 WL 1376304 (Del. Apr. 12, 2011) (table) (Court of Chancery did not abuse discretion in dismissing claims against Defendant and in dismissing as moot third-party indemnification claims against the State of Delaware and the State of Delaware's motion for summary judgment); *Castellani v. Delaware State Police*, 751 A.2d 934, 942 (Del. Super. 1999) (Superior Court granted defendants' motion for summary judgment and dismissed as moot their third party contribution claim against third party defendant). Therefore, the Court will dismiss as moot both Global Brand's Third Party Complaint and Baron Chocolatier's motion for summary judgment.

## CONCLUSION

**\*5** Based upon the above discussion, the Court will: (1) grant Defendant Keffee Food Co.'s Motion for Summary Judgment (D.I. 53); (2) dismiss as moot Defendant Global Brands LLC's Motion for Summary Judgment based upon the statute of limitation (D.I. 57) and grant its motion for Summary Judgment (D.I. 59); (3) dismiss as moot the Third Party Complaint (D.I. 33); and (4) dismiss as moot Third Party Defendant Baron Chocolatier, Inc.'s Motion for Summary Judgment (D.I. 61).

An appropriate order will be entered.

## All Citations

Not Reported in Fed. Supp., 2018 WL 4217066

---

Footnotes

1   It appears that the actual name of the candy bar might be the "Sweet Obsession Chocolate Bar." (D.I. 60-2).

2   The computation of time for complaints filed by pro se inmates is determined according to the "mailbox rule" and deemed filed as of the date it was delivered to prison officials for mailing to the Court. *See Houston v. Lack*, 487 U.S. 266 (1988); *Burns v. Morton*, 134 F.3d 109, 112 (3d Cir. 1998); *Gibbs v. Decker*, 234 F. Supp. 2d 458, 463 (D. Del. 2002). Plaintiff's complaint was signed on July 24, 2016, and the envelope it was mailed in is post-marked July 28, 2016. Therefore, Plaintiff's Complaint was delivered to prison authorities for mailing between July 24, 2016 and July 28, 2016. Giving Plaintiff the benefit of the doubt, the Court concludes that Plaintiffs Complaint was filed on July 24, 2016, the date it was signed, and the earliest date possible that it could have been delivered to prison officials for mailing.

3   There are these broad statements in Delaware cases, but I am not entirely sure that a plaintiff who says he bit on a piece of food that had glass in it, and then spit out a piece of his tooth along with the glass, would be required to have an expert to establish causality as to the tooth.

4   The Court will dismiss as moot Global Brands' motion for summary judgment based upon the statute of limitations (D.I. 57), noting that the record does not support a finding that the negligence claim is time-barred. In Delaware, "[l]awsuits based upon common law principles of negligence are subject to the two-year statute of limitations in 10 Del. C. § 8119." *Harper v. State Farm Mut. Auto. Ins. Co.*, 703 A.2d 136, 137 (Del. 1997). Plaintiff purchased the candy bar on July 7, 2014, and it was delivered to him on July 21, 2014. However, Plaintiff alleges, and exhibits attached to the Complaint indicate, that the injury did not occur until July 24, 2014, when he began eating the candy bar. Plaintiff commenced this action on July 24, 2016.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Satterfield v. Breeding Insulation Co., Tenn., September 9, 2008

2007 WL 4571196
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.

In re ASBESTOS LITIGATION.
Limited to Lillian Riedel.

C.A. No. 04C–07–099–ASB.
|
Submitted: June 26, 2007.
|
Decided: Dec. 21, 2007.

**Synopsis**

**Background:** Wife of former employee who had worked for chemical, pharmaceutical, and insulation manufacturer filed lawsuit against manufacturer, asserting that she was exposed to asbestos while laundering employee's work clothes, and that manufacturer was negligent in failing to warn her or employee of hazards of "take home" asbestos exposure, which resulted in her developing asbestosis. Manufacturer filed motion for summary judgment.

**Holding:** The Superior Court, New Castle County, Slights, J., held that in a matter of first impression, manufacturer had no duty to protect employee's wife from exposure to asbestos dust.

Motion granted.

West Headnotes (1)

[1]    **Negligence** 👈 Relationship between parties

**Negligence** 👈 Protection against acts of third persons

Employer of employee who had been exposed to asbestos on various work sites had no duty to protect employee's wife from exposure to asbestos dust that employee introduced into family home via employee's work clothes that wife laundered, which allegedly resulted in wife developing asbestosis; no relationship existed between employer and wife that would support a duty, and, while employer owed duty of care to employee, that duty did not vicariously pass on to wife in the absence of some independent relationship between her and employer that would justify imposition of a duty.

9 Cases that cite this headnote

Upon Consideration of Defendant ICI Americas, Inc.'s Motion for Summary Judgment. **GRANTED.**

**Attorneys and Law Firms**

Thomas C. Crumplar, Esquire, Jacobs & Crumplar, P.A., Wilmington, Delaware, Attorney for Plaintiff.

Mark L. Reardon, Esquire and Krista R. Samis, Esquire, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Wilmington, Delaware, Attorneys for Defendant, ICI Americas, Inc.

MEMORANDUM OPINION

SLIGHTS, J.

**I.**

 *1  The plaintiff, Lillian Riedel, alleges she was exposed to asbestos while laundering her husband's work clothes.[1] According to Mrs. Riedel, her husband worked for the defendant, ICI Americas, Inc. ("ICI"),[2] for almost thirty years and, during the course of his employment, was exposed to asbestos on various ICI work sites. She alleges that asbestos would accumulate on her husband's work clothes throughout a typical work day. Her husband would wear these same clothes home at the end of the work day and thereby unknowingly expose members of his household to a dangerous carcinogen. She alleges that ICI's negligence in failing to take reasonable measures to prevent its employees

2007 WL 4571196

from leaving the workplace with asbestos covered clothing, or to warn her or her husband of the hazards of "take home" asbestos exposure, was the proximate cause of her asbestosis, a pulmonary disease related to asbestos exposure.

ICI has moved for summary judgment on the ground that it owed no duty to Mrs. Riedel. After carefully considering the parties' arguments, the Court concludes that ICI owed no duty to Mrs. Riedel to prevent her from being exposed to asbestos within her own home. The relationship between Mrs. Riedel and ICI is too tenuous to support a legal duty of care running from ICI to Mrs. Riedel or other members of her household. Accordingly, ICI's motion for summary judgment must be **GRANTED.**

## II.

Plaintiff's husband, John Riedel, Sr., worked for ICI from approximately 1962 to 1990 at the Atlas Point facility. At the time Mr. Riedel began working for ICI, the company's principle business was to manufacture explosives. Over the subsequent years of his employment, ICI moved into other businesses, including research, development and manufacture of chemicals, pharmaceuticals, and various forms of insulation. It also provided environmental control and remediation services. The record suggests that ICI incorporated asbestos into some of its research, development and/or manufacturing projects relating to, among other products, industrial filters, adhesives, coatings, and molding compositions. ICI also may have utilized asbestos-containing products in connection with the operation of its various facilities. [3] As a result of these projects and operations, it is likely that ICI developed an appreciation for the hazards of asbestos exposure during the time Mr. Riedel worked there. [4]

According to Mr. Riedel, ICI never warned him of the dangers associated with asbestos. Of particular relevance here, ICI never advised him of the need to wear special clothing when working around asbestos, or of the need to remove his clothing and leave it at the job site before going home. Mr. Riedel worked at ICI in the clothes he wore from home and returned home in those same clothes. ICI did not provide uniforms to its employees. ICI also never warned either Mr. or Mrs. Riedel of the dangers associated with laundering clothing that was covered with asbestos dust. [5]

**\*2** Mrs. Riedel regularly laundered her husband's work clothes along with her family's other clothes. [6] She recalls that the clothing was frequently covered in dust, although she did not appreciate that the dust was asbestos. By all accounts, Mrs. Riedel was not exposed to asbestos on ICI's premises. Indeed, there is no indication in the record that Mrs. Riedel ever entered any of ICI's properties. To the extent she was exposed to asbestos from ICI's work sites, therefore, it would have been asbestos that was brought from ICI into her home by her husband.

The record suggests that during the time Mr. Riedel worked for ICI, the company would, on occasion, endeavor to warn its employees of dangers they might encounter outside of the work environment. For instance, ICI published and distributed to employees a magazine entitled the *The Atlas Family,* in which it would provide information regarding safe driving practices, safe vacation planning, and "avoiding hazards around the home." [7] The plaintiff points out that none of these publications offered warnings regarding safe practices for removing asbestos-covered clothing before leaving the work site, or the dangers of being exposed to such clothing at home.

By the late 1980's and/or early 1990's, ICI began to require its employees to take steps to minimize the risk of asbestos exposure, such as "wetting down" asbestos materials before working with or around them. [8] ICI also required its employees to wear "appropriate dress (e.g., throw away coveralls, hats, gloves) and use respirators" when working with or around asbestos. [9] It is not clear from the record when these safety precautions were first implemented.

Based on the foregoing, for purposes of the motion *sub judice,* the Court assumes that Mr. Riedel was exposed to asbestos while working at ICI, that some of the asbestos would collect on his work clothes during the course of the day, that he wore those same asbestos-covered clothes home after work, and that Mrs. Riedel was exposed to friable asbestos while laundering these work clothes. The Court also will assume that ICI did not warn either Mr. or Mrs. Riedel of the dangers of take home asbestos exposure, nor did it institute practices to prevent employees from leaving its work sites with asbestos dust on their clothing until some time after Mr. Riedel began working there. Finally, the Court will assume that Mrs. Riedel has contracted asbestosis and asbestos related pleural disease as a result of her exposure to asbestos on her husband's work clothes.

In re Asbestos Litigation, Not Reported in A.2d (2007)
2007 WL 4571196

## III.

ICI's singular contention is that it owed no duty to Mrs. Riedel. It points to the undisputed fact that Mrs. Riedel never stepped foot on any of its properties, and argues that it cannot, as a matter of law, be held liable for an injury that occurred in Mrs. Riedel's own home. According to ICI, a legal duty does not arise merely because one's actions or inactions may foreseeably cause injury to another. Rather, a duty may be imposed only when the relationship between the plaintiff and the defendant is such that the law should impose a duty upon the defendant to "protect the plaintiff from the harm that caused [her] injuries." [10] ICI also contends that the Court must consider the public policy implications of a ruling that would allow a plaintiff who has never entered a property to sue a property owner for injuries sustained off property.

**\*3** Mrs. Riedel argues that ICI has misconstrued the nature of her claim. She is not, as ICI suggests, seeking to hold ICI liable as a premises owner. Rather, she is making a claim of negligence against her husband's employer for unsafe work practices that allowed her husband to bring home friable asbestos on his work clothing. According to Mrs. Riedel, ICI's duty to her arises not from its status as a premises owner, but rather its status as the employer of someone (her husband) with whom she cohabited. Mrs. Riedel argues that, given ICI's extensive knowledge of the hazards of asbestos, a jury could conclude that ICI knew or should have known that, in the absence of appropriate safety measures or warnings, workers exposed to asbestos on its work sites could carry that asbestos home on their clothing and thereby expose members of the household to a dangerous carcinogen.

## IV.

The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact remain for trial. [11] Summary judgment will be granted only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. [12] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record *sub judice,* then summary judgment must be denied. [13]

The moving party bears the initial burden of demonstrating that the undisputed facts support his claim for dispositive relief. [14] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder and/or that the movant's legal arguments are unfounded. [15] When reviewing the record, the Court must view the evidence in the light most favorable to the non-moving party. [16]

## V.

The plaintiff's showcase claim against ICI sounds in negligence. "To state a claim for negligence one must allege that defendant owed plaintiff a duty of care; defendant breached that duty; and defendant's breach was the proximate cause of plaintiff's injury." [17] ICI's motion for summary judgment takes aim at the heart of the negligence cause of action. ICI wisely has chosen not to challenge the legal sufficiency of the more fact-intensive elements of the claim—breach of duty or proximate cause. Instead, ICI has called the threshold legal question of whether it owed a duty of care to Mrs. Riedel. "The ultimate question of whether 'such a relationship exists between the parties that the community will impose a legal obligation upon one for the benefit of the other' is an issue for the court." [18]

As will be discussed in more detail below, Delaware is not the first jurisdiction to confront the question of whether a defendant/employer owes a duty to the spouse of an employee (or other household member) who has been injured as a result of take home exposure to asbestos. Indeed, the question has received thorough treatment from courts throughout the country. Suffice it to say, there is a split of authority—some courts have found a duty and others have not. [19] From these competing lines of authority a pattern has emerged: the courts that recognize a duty focus on the foreseeability of harm resulting from the defendants' alleged failure to warn of or take safety precautions to prevent take home exposure; those that find no duty focus on the relationship (or lack thereof) between the defendant and the injured spouse (or other injured members of the household). [20] The question presented here is one of first impression in Delaware. To answer it, the Court must first review the most fundamental aspect of the negligence cause of action-under what circumstances will the

common law "impose a legal obligation upon one for the benefit of the other." [21]

### A. The Duty of Care In Negligence Actions

 **\*4**  The notion that a defendant must owe a duty of care to the plaintiff before he can be found liable for his harmful actions is of "relatively recent vintage" in the common law. [22] "At early English common law, the existence of a duty of care was not considered an element of an actionable tort." [23] A defendant's liability arose from his "wrongful acts;" strict liability was the prevailing theory of recovery in the British common law courts. [24] "[W]hen negligence began to take form as a separate basis of tort liability, the courts developed the idea of duty, as a matter of some specific relation between the plaintiff and the defendant, without which there could be no liability." [25] Duty was installed as a predicate to negligence liability "as a means by which the defendant's responsibility may be limited." [26] In the absence of this limitation, the common law could be manipulated to impose upon a defendant "an obligation to behave properly" that was "owed to all the world." [27] As one court explained, "the concept of a limited duty disciplined the concept of negligence, requiring the plaintiff to establish a definite legal obligation." [28]

### 1. Duty As A Function Of The Relationship Between The Parties

In Delaware, the law is settled that when determining whether a defendant owed a duty of care to the plaintiff, the court must determine whether "such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other." [29] The focus on the relationship between plaintiff and defendant as the basis upon which a court will impose upon the defendant a legal duty to act with reasonable care towards the plaintiff is not novel or unique to Delaware. Indeed, the recognition that duty springs from the relationship between the parties is basic hornbook law:

> Inherent in the concept of duty is the concept of a relationship between the parties out of which the duty arises. The existence of a duty turns on the basic nature of the relationship between the parties to the cause of action. Thus, in determining whether a duty exists, the court should examine the relationship between the parties.

\* \* \*

> Unless and until some relationship exists between the person injured and the defendant, by which the latter owes a duty to the former, there can be no liability for negligence.... The relationship which gives rise to a duty may be created by contract, statute, municipal ordinance, administrative regulation, common law, or the interdependent nature of human society. [30]

At first glance, the "relationship requirement" in the duty analysis appears simple enough. Find a relationship; find a duty. Yet it is in this apparent simplicity where the challenge in practically applying the standard is revealed. Dean Prosser examined the analytical shortcoming of considering the threshold duty issue strictly in terms of the "relationship" between the parties:

> **\*5**  This concept of a relative duty [derived from relationships] ... has been assailed as serving no useful purpose, and producing only confusion in our [law]. Its artificial character is readily apparent; in the ordinary case, if the court should desire to find liability, it would be quite easy to find the necessary 'relation' in the position of the parties toward one another, and hence to extend the defendant's duty to the plaintiff. The statement that there is not a duty begs the essential question–whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. [31]

Even Am.Jur.2d, in its general description of the "manner and creation of relationship," suggests that a legally cognizable relationship can arise from the "interdependent nature of human society." [32] In an abstract sense, does this suggest that each person owes a duty of care to every other person by virtue of our membership in the human society? Or, is

2007 WL 4571196

one's "relationship" with the human race too attenuated to trigger a legal duty? Needless to say, how the court defines "relationship" in a given case will dictate the result. In this regard, courts must be mindful of Dean Prosser's admonition not to allow outcome-oriented jurisprudence to control the duty analysis. The analytical approach must be thoughtful and intellectually honest.

Courts have long struggled to bring some structure to the determination of whether the relationship between parties should trigger a legal duty. Lord Esher, in *Heaven v. Pender,* [33] offered a standard by which courts could gauge the legal significance of human interaction in the negligence context:

> Whenever one person is by circumstance placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger. [34]

This Court found Lord Esher's standard to be helpful when determining whether one boat operator owed a duty to another boat operator on the same waterway to warn of an impending collision with a third vessel. [35] Commentators have criticized Lord Esher's approach to duty, however, particularly in cases involving nonfeasance (a failure to act), as being too broad and relying too heavily on the notion of foreseeable consequences. [36]

Lord Atkin spoke of the requisite relationship as that which exists between neighbors:

> The rule that you are to love your neighbor becomes in law, you must not injure your neighbor; and the lawyer's question, Who is my neighbor? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbor. Who, then, in law is my neighbor? The answer seems to be-persons who are so closely and directly affected by my act that

> I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question. [37]

**\*6** Once again, Dean Prosser is critical of this approach: "As a formula this dictum is so vague as to have little meaning, and as a guide to decision it has had no value at all." [38]

## 2. The Role of Foreseeability In The Analysis

The jurisprudence of this country is not without its attempts to provide some meaningful focus to the duty analysis. In the case perhaps most readily identified by American law students as symbolic of the complex subtleties of negligence law, *Palsgraf v. Long Island Railroad Co.,* [39] then Chief Judge Cardozo confronted an extraordinarily difficult fact pattern and, in this context, chose to examine carefully the fundamental issue of duty. As we all remember, the plaintiff in *Palsgraf* was waiting on a railway platform for her train to arrive. At this same time, two men were rushing to board another train some distance away. As the conductor pulled one of the men on board the departing train, the man dropped a package filled with fire works which then exploded. The explosion, in turn, caused a large set of scales on the adjoining platform to fall over and strike the plaintiff. The court determined that the conductor may have owed a duty to the two men who were boarding the train, but owed no duty to Palsgraf because "nothing in the situation gave notice that the falling package had in it the potency of peril to persons thus removed [like plaintiff]." [40] Judge Cardozo held that the defendant's duty of care in a tort case is to avoid "risks reasonably to be perceived." [41]

As one commentator has distilled it, *Palsgraf* defines the duty based on whether the "consequences of the challenged conduct should have been reasonably foreseen by the actor who engaged in it." [42] Having said this, it cannot be said that *Palsgraf* abandoned the notion that duty must be based first and foremost upon relationships. To the contrary, Chief Judge Cardozo was keenly aware of the relationship requirement in the duty analysis. In his view, the relationship between the two passengers who were attempting to board the train and the conductor was such that the conductor would have owed a duty to the boarding passengers. On the other hand, he determined that no relationship existed between Palsgraf

and the conductor because the conductor's conduct was not a wrong toward her, she was not a foreseeable victim of his actions and, as such, she could not be "the vicarious beneficiary of a breach of duty to another." [43]

The idea that a defendant owes a duty to everyone that his conduct may foreseeably harm, in the abstract, has been rejected in Delaware. In a thorough discussion of the issue, Judge Longobardi, applying Delaware law, rejected the plaintiff's argument that foreseeability alone drives the duty analysis:

> What Freedman fails to address, however, is the question of whether the law imposes upon the relationship between a franchisor [the defendant] and an unspecified potential investor in an as yet nonexistent franchise [the plaintiff], a duty to protect the investor from harm from the potential franchisee. There can be no such obligation in the absence of some relationship between [the plaintiff and defendant]. In the absence of some relationship, actual or constructively construed, [the plaintiff and defendant] are legal strangers.

\* \* \*

**\*7** Thus, it is clear that the Court [may] not evaluate the imposition of primary negligence liability solely on grounds of the foreseeable risk of harm, but instead [must] determine[ ] whether a duty existed in the first instance. [44] Clearly, our law recognizes several instances where a defendant's conduct might foreseeably harm another and yet the defendant is held to owe no duty to that person. For instance, as a general matter, an employer of a general contractor is not liable for harm caused by the general contractor even though the employer might foresee that certain conduct of the general contractor could cause harm to others. [45] Likewise, Delaware courts recognize the general rule that "there is no duty to control the conduct of a third person to prevent him from causing harm to another [even if such harm may be foreseeable]." [46]

This is not to say that foreseeability is divorced from the duty analysis. Foreseeability is a factor, among others, that our courts will consider when assessing the significance of the relationship between the parties. [47] Foresee ability of risk plays a more pivotal role in the establishment of the duty when the determination of foreseeability (or lack thereof)

can be made on an undisputed record such that it can be made as a matter of law and/or policy. [48] Our courts will also look at the foreseeability of harm to define the duty once the court determines that a duty exists. [49] More often than not the foreseeability analysis implicates a highly fact intensive inquiry that is typically left for the jury along with other more fact-based issues that are inherent in the negligence analysis. [50] The determination of whether a duty exists, however, is a matter of law for the court to decide before the matter ever reaches a jury. The suggestion that the foreseeability of risk alone will dictate whether or not a duty exists ignores the fact-intensive nature of the foreseeability inquiry, the role of the jury in resolving factual issues, and the mandated role of the court in making the predicate determination of whether a defendant owes a duty to the plaintiff as a matter of law.

### 3. Learned Hand's Risk/Benefit Duty Analysis

Yet another formulation of the duty of care in negligence cases was offered by Judge Learned Hand in the seminal decision *United States v. Carroll Towing Co.* [51] There, the court reduced the duty analysis to "algebraic terms:"

> If the probability [of injury] be called P; the injury, L; and the burden [upon the defendant to take precautions to avoid injury], B; liability depends upon whether B is less than L multiplied by P; i.e., whether B is less than PL. [52]

Learned Hand's so-called "risk-benefit method" has taken hold among jurists who subscribe to a "law and economics" approach to tort law. [53] And while not specifically adopted in Delaware, [54] our courts have recognized that it is appropriate when engaged in the duty analysis for the court to measure the risk to the plaintiff caused by the defendant's conduct, and the cost or burden to the defendant in minimizing the risk. [55]

### 4. The Relationship Between The Parties Is Paramount

**\*8** Each of the analytical approaches discussed above, from Lord Esher's "ordinary sensibility" test to Learned Hand's "risk benefit method," attempt to provide some framework within which the court can consider the question of whether the relationship between the parties is such that the court justifiably can impose a legal duty upon the defendant owing to the plaintiff. None of these approaches has been adopted in Delaware to the exclusion of others. At the end of the day,

In re Asbestos Litigation, Not Reported in A.2d (2007)

2007 WL 4571196

as Resident Judge Terry observed, the court must consider the relationship of the parties "in each particular case in light of its peculiar facts." [56] Ultimately, "[i]t is for the court to decide whether a plaintiff's interest in a negligence action is entitled to legal protection as a matter of public policy." [57] And, while this case-by-case inquiry may give rise to the sort of outcome oriented jurisprudence Dean Prosser warned against—i.e., that judges would find a "relationship" when they wanted to a find a duty—our common law has developed certain boundaries within which the inquiry must be confined. The checks and balances inherent in appellate review, and the ability of our General Assembly to serve as the ultimate voice of public policy, also will ensure that the duty of care is imposed thoughtfully and consistently.

### B. The Take Home Exposure Decisions From Other Jurisdictions

As mentioned, the Court is not left to consider this issue in a vacuum. Several other courts have thoroughly addressed the duty issue in take home exposure cases, albeit with conflicting results. [58] In jurisdictions, like Delaware, where the duty analysis focuses on the relationship between the plaintiff and the defendant, and not simply the foreseeability of injury, the courts uniformly hold that an employer/premises owner owes no duty to a member of a household injured by take home exposure to asbestos. [59] For instance, in *In Re Certified Question From the 14 th Dist. Ct. of Appeals of Texas,* [60] the Supreme Court of Michigan, sitting *en banc* to answer a certified question from a Texas appellate court, held that the defendant landowner, an employer of the independent contracting firm for whom the plaintiff's stepfather worked, did not owe a duty of care to a plaintiff who had contracted mesothelioma after laundering her stepfather's work clothes. In doing so, the court offered a sequential approach to the duty analysis that incorporates all of the elements that have been recognized in Delaware:

> To summarize, in determining whether a defendant owes a duty to a plaintiff, competing policy factors must be considered. Such considerations include: the relationship of the parties, the foreseeability of the harm, the burden that would be imposed on the defendant, and the nature of the risk presented. Where there is no relationship between the parties, no duty can be imposed, but where there is a relationship, the other factors must be considered to determine whether a duty should be imposed. Likewise, where the harm is not foreseeable, no duty can be imposed,

but where the harm is foreseeable, other factors must be considered to determine whether a duty should be imposed. Before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable. Once it is determined that there is a relationship and that the harm was foreseeable, the burden that would be imposed on the defendant and the nature of the risk presented must be assessed to determine whether a duty should be imposed. [61]

**\*9** Ultimately, the court concluded that the relationship between the plaintiff and the defendant was "highly tenuous" and that " 'the relationship between the parties' prong of the duty test, which is the most important prong in this state, strongly suggests that no duty should be imposed." [62] In this regard, the court noted that the plaintiff "had never been on or near defendant's property and had no further relationship with defendant." [63] The court went on to hold that the "burden on the defendant prong" and the "foreseeability" prong also supported a finding of no duty. As to the burden on the defendant, the court found that the defendants would face "an extraordinarily onerous and unworkable burden" if they were found to owe a duty to "every person with whom [its] employees and the employees of its independent contractors come into contact, or even with whom their clothes come into contact." [64] As to foreseeability, the court noted that evidence in the record suggested the risk of take home exposure was not foreseeable to the employer during the time frame at issue there. [65] Importantly, however, under the court's sequential duty analysis, it noted that it need not look beyond the relationship of the parties (or lack thereof) to decide the issue. Having found that the relationship between the parties, if any, would not sustain a duty of care running from one to the other, the court found that the duty analysis could, as a matter of law, end there. [66]

The New York Court of Appeals reached an identical result employing similar reasoning. In *In Re New York City Asbestos Litig.,* [67] New York's highest court declined to impose a duty upon an employer in a take home exposure case after concluding that the relationship between the employer and the spouse of an employee could not support the duty that the plaintiffs asked the court to impose. Apparently recognizing that they must demonstrate a relationship between the spouse and the employer, the plaintiffs proffered several potential relationships upon which a duty could be based. First, the plaintiffs argued that the employer owed her a duty because she was the spouse of an employee. The court rejected this

2007 WL 4571196

argument and noted that the imposition of such a duty was unprecedented in New York law. [68]

Next, the court determined that the defendant owed no duty to the spouse as a landowner. The court acknowledged that it has, in certain instances, imposed a duty upon landowners to individuals or entities that have never entered upon the property, such as when a landowner allows toxins to be released from his property into the ambient air and the neighboring community. Nevertheless, the court held that the take home exposure case involves an entirely different set of facts in that the relationship between the plaintiff and the defendant was far more tenuous than the relationship between property owner and neighbor. [69]

The plaintiffs then urged the court to extend the "safe workplace" doctrine to take home exposure cases. The court declined to do so, noting that in New York the doctrine has been codified and the take home exposure facts did not match the statutory elements. The court also declined to find that the employer maintained a special relationship with its employee such that it owed the employee's spouse a duty to control the employee outside of the workplace. [70]

*10 Having failed in their efforts to show a legally significant relationship between the parties, the plaintiffs argued that the court should impose a duty upon the defendant because the plaintiff's injury was a foreseeable consequence of the employer's failure to warn the spouse or the employee of the danger of take home exposure or implement appropriate safety measures. The court was not persuaded: "foreseeability, alone, does not define duty—it merely determines the scope of the duty." [71] The court went on to explain that foreseeability becomes a relevant consideration in the negligence equation only after the court determines that a duty exists:

Foreseeability should not be confused with duty. The principle expressed in *Palsgraf* is applicable to determine the scope of the duty—only after it has been determined that there is a duty. A specific duty is required because otherwise, a defendant would be subjected to limitless liability to an indeterminate class of persons conceivably injured by its negligent acts. Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweighs its costs. [72]

To illustrate its point regarding the potential "limitless liability" to which a defendant could be exposed if foreseeability of injury was the only element of the negligence formula, the court noted in the take home exposure context that recognizing a duty owed to spouses or other household members would not end the matter:

Plaintiffs assure us that this will not lead to "limitless liability" because the new duty may be confined to members of the household of the employer's employee, or to members of the household of those who come onto the landlord's premises. This line is not so easy to draw, however. For example, an employer would certainly owe the new duty to an employee's spouse (assuming the spouse lives with the employee), but probably would not owe the duty to a babysitter who takes care of children in the employee's home five days a week. But the spouse may not have more exposure than the babysitter to whatever hazardous substances the employee may have introduced into the home from the workplace. Perhaps, for example, the babysitter (or maybe an employee from a neighborhood laundry) launders the family members' clothes. In short, ... the 'specter of limitless liability' is banished only when 'the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship.' Here, there is no relationship between the [employer] and the [plaintiff/spouse]. [73]

In its turn to address the *bona fides* of the take home exposure claim, the Supreme Court of Georgia focused on the safe workplace doctrine and whether the employer's duty to provide a safe workplace to its employees would extend to the employee's home and members of the household. [74] The court followed New York's lead in declining to recognize a duty: "As the New York court did in *Widera,* we decline to extend on the basis of foreseeability the employer's duty beyond the workplace to encompass all who might come into contact with an employee or an employee's clothing outside the workplace." [75] In reaching this holding, the court emphasized that "mere foreseeability [has been] rejected by this Court as a basis for extending a duty of care...." [76]

*11 In nearly every instance where courts *have* recognized a duty of care in a take home exposure case, the decision turned on the court's conclusion that the foreseeability of risk was the primary (if not only) consideration in the duty analysis. For example, in *Olivo v. Owes–Illinois, Inc.,* [77] the court described the "foreseeability of harm" as "a crucial

In re Asbestos Litigation, Not Reported in A.2d (2007)

2007 WL 4571196

element in determining whether imposition of a duty on an alleged tortfeasor is appropriate."[78] Similarly, in Tennessee and Louisiana, the courts found a duty in take home exposure cases only after finding that the risk of injury was foreseeable and that "the foreseeability prong [of the duty analysis] is paramount because foreseeability is the test of negligence."[79]

As best as the Court can tell, the Maryland Court of Appeals affirmed the submission of a take home exposure claim to the jury in *Adams v. Owens–Illinois, Inc.,*[80] upon concluding that the trial court properly afforded the plaintiff an opportunity *at trial* to prove "that [defendant] owed a duty to [plaintiff] and breached that duty."[81] Apparently, the trial courts in Maryland instruct the jury to determine whether the defendant owed a duty to the plaintiff rather than requiring the judge to make the determination as a matter of law.[82]

In Washington, the courts recognize a significant distinction between malfeasance and nonfeasance in determining whether a duty exists—in the case of malfeasance, Washington law appears to provide that if a defendant engages in active conduct, then in all instances he owes "a duty to prevent foreseeable injury from any of its unreasonably safe actions," regardless of his relationship with the putative plaintiff.[83] To the Court's knowledge, Delaware has distinguished between active and passive conduct in the tort context only when determining the sufficiency of negligence pleadings,[84] the viability of implied and contractual indemnification obligations,[85] and the requisite proof in claims of recklessness.[86] The court is not aware of any Delaware authority that would direct a different analytical approach to the duty determination depending upon whether the plaintiff was alleging active or passive negligence (or malfeasance versus nonfeasance) on the part of the defendant.

In each instance where courts have endorsed the take home exposure claim, it is clear that the court either has focused primarily on the foreseeability of risk with little regard for the relationship (or lack thereof) between the plaintiff and the defendant, or the court has applied principles of state negligence law that are not applicable in Delaware. For these reasons, the decisions are distinguishable and of little value here.

**C. ICI Owed No Duty To Mrs. Riedel**

The Court is satisfied that Delaware law requires the plaintiff to demonstrate the existence of a legally significant relationship between the plaintiff and the defendant before the common law "will impose a legal obligation upon [the defendant] for the benefit of the [plaintiff]."[87] In determining whether such a relationship exists, Delaware courts frequently will refer to the "definitions and classifications" set forth in the Restatement (Second) of Torts ("the Restatement").[88] In this regard, the Court notes as an initial matter that the plaintiff has not directed the court to any provision of the Restatement that would support her position. The Court's review of the Restatement, likewise, has revealed no provision that would support the imposition of a duty upon an employer or landowner to the spouse of an employee when the spouse has never stepped foot on the employer's property. Neither the employer-based provisions of the Restatement, nor the landowner-based provisions (including the so-called "safe workplace doctrine") apply here.[89] Nor is there a "special relationship" present here, either between Mrs. Riedel and ICI or Mr. Riedel and ICI, that would justify the imposition of a duty upon ICI to control the conduct of its employee while acting outside the scope of his employment and off the ICI premises.[90] Finally, the Court is unaware of any basis in Delaware law upon which to impose a duty upon ICI to Mrs. Riedel as the employer of her spouse.[91]

**\*12** Even when the foreseeability prong is incorporated into the duty analysis, the Court cannot discern a relationship between the plaintiff and the defendant that would support a legal duty. ICI clearly owed a duty to Mr. Riedel just as the conductor in *Palsgraf* owed a duty to the passengers he was helping onto the train.[92] But, just as in *Palsgraf,* the duty owed to Mr. Riedel does not vicariously pass on to Mrs. Riedel in the absence of some independent relationship between ICI and Mrs. Riedel that would justify the imposition of the duty. Her position at the time of the alleged wrong, far removed from ICI's property, is such that she cannot be considered a reasonably foreseeable victim of the alleged breach of the duty ICI owed to her husband (in failing to warn and/or implement safety precautions). There can be no "transferred negligence" under these facts.[93]

The "risk-benefit method" of considering the duty question also leads to the conclusion that no duty should be imposed here.[94] Simply stated, there is no principled basis in the law upon which to distinguish the claim of a spouse or other household member who has been exposed to asbestos while

laundering a family member's clothing, from the claim of a house keeper or laundry mat operator who is exposed while laundering the clothing, or a co-worker/car pool passenger who is exposed during rides home from work, or the bus driver or passenger who is exposed during the daily commute home, or the neighbor who is exposed while visiting with the employee before he changes out of his work clothing at the end of the day. All have been exposed to asbestos from the employee's clothing; all arguably have intersected with the asbestos-covered employee in a foreseeable manner; and all would have viable claims of negligence against the employer/landowner if the take home exposure cause of action is permitted. Yet none were exposed in the course of employment with the defendant/employer, in the course of the asbestos-covered employee's work, or while on the employer's property. The burden upon the defendant to undertake to warn or otherwise protect every potentially foreseeable victim of off-premises exposure to asbestos is simply too great; the exposure to potential liability would be practically limitless.

## VI.

Based on the foregoing, the Court is satisfied that the relationship between Mrs. Riedel and ICI—legal strangers in the context of negligence—is not sufficient to justify the imposition of a duty of care upon ICI to act "for the benefit of" Mrs. Riedel. Accordingly, ICI's motion for summary judgment must be **GRANTED.**

**IT IS SO ORDERED.**

## All Citations

Not Reported in A.2d, 2007 WL 4571196

## Footnotes

1   The Court may refer to the situation whereby a family member is exposed to asbestos brought home from work on the clothing of another family member as "take home" asbestos exposure. This term, along with others such as "household exposure" and "spousal exposure," have become fixtures in the asbestos litigation nomenclature.

2   ICI was previously known as Atlas Powder Company and is now known as AstraZenaca, L.P. The parties have referred to the defendant as "ICI" throughout their motion papers and the Court will adopt that reference here.

3   *See* Tr. ID 14413199 at A–94–99, 175–182.

4   *Id.* at A–197, 205–210, 217–221, 224, 233–234, 162 N.E. 99. As it must, the Court has viewed the facts in a light most favorable to the plaintiff as the non-moving party. *See United Vanguard Fund, Inc. v. Takecare, Inc.,* 693 A.2d 1076, 1079 (Del.1997). The Court recognizes that if this matter were to proceed to trial, ICI would vigorously defend the plaintiff's contention that it knew of the dangers of asbestos at the time Mr. Riedel worked for ICI.

5   *Id.* at A–23–26, 37–40, 62–70.

6   *Id.* at A–37–40.

7   *Id.* at A–147–165.

8   *Id.* at A–68, 87–88.

9   *Id.* at A–101.

10  *See* Tr. ID 13950352, at 4.

11  *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver, Inc.,* 312 A.2d 322, 325 (Del.Super.Ct.1973).

12  *Id.*

13  *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

14  *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979)(citing *Ebersole,* 180 A.2d at 470).

15  *See Brzoska v. Olson,* 668 A.2d 1355, 1364 (Del.1995).

16  *See United Vanguard Fund, Inc. v. Takecare, Inc.,* 693 A.2d 1076, 1079 (Del.1997); *Brzoska,* 668 A.2d at 1364.

17  *New Haverford P'ship v. Stroot,* 772 A.2d 792, 798 (Del.2001).

18  *Naidu v. Laird,* 539 A.2d 1064, 1070 (Del.1988) (citation omitted). *See also Kuczynski v. McLaughlin,* 835 A.2d 150, 153 (Del.Super.Ct.2003)("Whether a duty exists is [ultimately] a question of law to be determined by the court.") (citations omitted).

19  *Compare Olivo v. Owens–Illinois, Inc.,* 186 N.J. 394, 895 A.2d 1143 (N.J.2006)(finding a duty exists); *Satterfield v. Breeding Insulation Co., Inc.,* 2007 Tenn.App. LEXIS 230, 2007 WL 1159416 (Tenn.App.2007)(same); *Chaisson v. Avondale Indus., Inc.,* 947 So.2d 171 (La.App.2006)(same) *cert. denied,* 945 So.2d 145 (La.2997); *Condon v. Union Oil*

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 115 of 370
PageID: 10145
In re Asbestos Litigation, Not Reported in A.2d (2007)
2007 WL 4571196

*Co. of Cal.,* 2004 Cal.App. LEXIS 7975, 2004 WL 1932847 (Cal.App.2004)(same); *Adams v. Owens–Illinois, Inc.,* 119 Md.App. 395, 705 A.2d 58 (Md.App.1998)(same); **with** *In re Certified Question from the 14th Dist. Ct. of App. Of Texas,* 740 N.W.2d 206 (Mich.2007)("*In re Cert. Question* ") (finding no duty); *Exxon Mobile Corp. v. Altimore,* 2007 Tex.App. LEXIS 2971, 2007 WL 1174447 (Tex.App.2007)(same); *Alcoa, Inc. v. Behringer,* 235 S.W.3d 456 (Tex.App.2007)(same); *CSX Trans., Inc. v. Williams,* 278 Ga. 888, 608 S.E.2d 208 (Ga.2006)(same); *In re New York City Asbestos Litig.,* 5 N.Y.3d 486, 806 N.Y.S.2d 146, 840 N.E.2d 115 (N.Y.Ct.App.2005)(same). *See also Rochon v. Saberhagen Holdings, Inc.,* 2007 Wash.App. LEXIS 2392, 2007 WL 2325214 (Wash.App.2007)(finding a duty under general negligence claim but no duty in connection with employer or premises liability claims).

20  This pattern held true with one exception—in Texas, the Court of Appeals found no duty because the risk of injury was not, as a matter of law, foreseeable. *See Alcoa, Inc.,* 235 S.W.3d at 462.

21  *Naidu,* 539 A.2d at 1070 (citation omitted).

22  *James v. Meow Media, Inc.,* 300 F.3d 683, 689 (6th Cir.2002).

23  *Id.*

24  *See* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 53, at 356 (5th Ed.1984)(hereinafter PROSSER & KEETON).

25  *Id.*

26  *Id.*

27  *Id.*

28  *James,* 300 F.3d at 690.

29  *Naidu,* 539 A.2d at 1070. *See also Furek v. University of Delaware,* 594 A.2d 506, 516 (Del.1991)("The scope of the duty of care often turns on the relationship between the party claiming harm and the party charged with negligence."); *Kuczynski,* 835 A.2d at 153 ("tort notions of duty arise from the relationship between plaintiff and defendant.") (citations omitted).

30  57A AM. JUR.2D *Negligence* §§ 81, 82 (2004).

31  PROSSER & KEETON, *supra* note 23, § 53, at 357.

32  57A AM.JUR. 2d *Negligence,* § 82 (2004). 12

33  11 Q.B.D. 503 (1883).

34  *Id.* at 509.

35  *See Kuczynski,* 835 A.2d at 154 (concluding that the defendant was "by circumstances placed in such a position with regard to [the plaintiff—a fellow boater]" that he knew or should have known that if "he did not use ordinary care ... in his own conduct ... he could cause injury" to the plaintiff).

36  *See* PROSSER & KEETON, *supra* note 23, § 53, at 358.

37  *Donoghue v. Stevenson,* A.C. 562, 580–81 (1932)(H.L.(Sc.)).

38  PROSSER & KEETON, *supra* note 23, § 53, at 359.

39  248 N.Y. 339, 162 N.E. 99 (N.Y.Ct.App.1928).

40  *Id.* at 99–100.

41  *Id.*

42  Harper, James & Gray, *The Law of Torts,* § 18.2 (2nd Ed.1986). *See also* PROSSER & KEETON, *supra* note 23, § 43, at 284("In 1928 something of a bombshell burst upon this field, when the New York Court of Appeals [in *Palsgraf* ], forsaking "proximate cause," stated the issue of foreseeability in terms of duty.").

43  *See* PROSSER & KEETON, *supra* note 23, § 43, at 285 ("Negligence, [Judge Cardozo] said, was a matter of relation between the parties, which must be founded upon the foreseeability of harm to the person in fact injured.").

44  *Freedman v. Tenn. Dev. Corp., et al.,* 1993 U.S. Dist. LEXIS 11021, at ——40–41, 43 (citing *Furek,* 594 A.2d at 520).

45  *Urena v. Capano Homes, Inc.,* 933 A.2d 877, 879 (Del.2007)(also recognizing exceptions to the general rule).

46  *Naidu,* 539 A.2d at 1072 (also recognizing exceptions to the general rule).

47  *Kuczynski,* 835 A.2d at 154.

48  *See generally* PROSSER & KEETON, *supra* note 23, § 43, at 287.

49  *See Sirmans v. Penn,* 588 A.2d 1103 (Del.1991)(noting that when a duty of care is imposed in the negligence context, the duty is to "protect against events reasonably foreseeable"); *Delmarva Power & Light Co. v. Burrows,* 435 A.2d 716, 718 (Del.1981)("One breaches [a] duty by not protecting against an event that a reasonably prudent man would protect against. Stated differently, one's duty encompasses protecting against reasonably foreseeable events.").

In re Asbestos Litigation, Not Reported in A.2d (2007)

2007 WL 4571196

50    See *Hercules Powder Co. v. DiSabatino,* 188 A.2d 529, 535 (Del.1963)(noting that questions of "foreseeability of risk [and] the reasonableness of a defendant's conduct" implicate factual inquiries best "submitted to the decision of the jury.").

51    159 F.2d 169 (2nd Cir.1947).

52    *Id.* at 173.

53    See e.g. Posner, *A Theory of Negligence,* 1 J. Leg. Stud. 29 (1972).

54    Surprisingly, the Court could not find a single reference to *Carroll Towing* in Delaware case law.

55    See e.g. *Delmarva Power Co.,* 435 A.2d at 719 ("the social utility of the activity [and cost to the defendant of changing behavior] must be balanced against the risk [of harm to the plaintiff]."); *Graham v. Pittsburgh Corning Corp.,* 593 A.2d 567, 568 (Del.Super.Ct.1990)(same); *Craig v. A.A.R. Realty Corp.,* 576 A.2d 688, 692 (Del.Super.Ct.1989)( "Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others.").

56    *Jeffries v. State of Del. Dept. of Health & Social Serv.,* 1998 Del.Super. LEXIS 177, at *3, 1998 WL 281179.

57    *Id.*

58    Plaintiffs have cited to several Delaware decisions which they claim have addressed the viability of the take home exposure claim in Delaware. *See* Tr. I.D. 14413199, at 17–21. The Court has reviewed each of these decisions and has determined that none of them address the issue *sub judice*—whether a defendant in a take home exposure case owes a duty to the plaintiff. The cases either don't involve take home exposure claims, or they simply reveal that the claim was submitted to a jury without any apparent consideration of the duty issue. Consequently, the Court views this as a case of first impression in Delaware.

59    The court notes that in Texas the courts have focused on the foreseeability of injury in the duty analysis and have determined on the record presented that the defendant owed no duty to the plaintiff because the risk of injury from take home exposure was not foreseeable. *See Exxon Mobil Corp. v. Altimore,* 2007 Tex.App. LEXIS 2971, 2007 WL 1174447.

60    740 N.W.2d 206 (en banc).

61    *Id.* at ——14–15. (Citations omitted)

62    *Id.* at *26.

63    *Id.* The court made a point to emphasize that it was considering the plaintiff's claims as straight forward negligence claims, not premises liability claims. *Id.* at *7, n. 5.

64    *Id. See also Id.* at 29 (court noting that it could find "no principled basis" upon which to distinguish household plaintiffs from other potential plaintiffs outside of the home who might come into frequent contact with the employees' asbestos-covered clothing).

65    *Id.* at ——30–31.

66    *Id.* at ——44–45.

67    5 N.Y.3d 486, 806 N.Y.S.2d 146, 840 N.E.2d 115 (N.Y.Ct.App.2005).

68    *Id.* at 120.

69    *Id.* at 121–22.

70    See *Naidu,* 539 A.2d at 1072 (imposing a duty upon a psychiatrist to control behavior of patient who injured plaintiff in automobile accident based on the "special relationship" between doctor and patient).

71    *In Re New York City Asbestos Litig.,* 806 N.Y.S.2d 146, 840 N.E.2d at 119 (citations omitted).

72    *Id.* (citations and internal quotations omitted).

73    *Id.* at 122.

74    See *CSX Transportation, Inc. v. Williams,* 278 Ga. 888, 608 S.E.2d 208 (Ga.2005).

75    *Id.* at 210.

76    *Id.* at 209.

77    186 N.J. 394, 895 A.2d 1143 (N.J.2006).

78    *Id.* at 1148 (citations omitted).

79    *Satterfield v. Breeding Insul. Co., Inc.,* 2007 Tenn.App. LEXIS 230 *26, 2007 WL 1159416. *See also Chaisson v. Avondale Indus., Inc.,* 947 So.2d 171, 181–82 (Ct.App.La. 14th Cir.2006)(noting that premises owner owes duty "to act reasonably in view of the foreseeable risk of danger....").

80    119 Md.App. 395, 705 A.2d 58 (Md.Ct.App.1998).

81    *Id.* at 66.

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 117 of 370
PageID: 10147
In re Asbestos Litigation, Not Reported in A.2d (2007)
2007 WL 4571196

82    *Id.*

83    *See Rochon v. Saberhagen Holdings, Inc.,* 2007 Wash.App. LEXIS 2392, —— 8–10, 2007 WL 2325214. It is also clear
      that, like Tennessee, New Jersey and Louisiana, Washington emphasizes the foreseeability of injury in determining
      whether a duty exists. *Id.* at *7 ("A risk is 'unreasonable,' and thus a party has a duty to prevent resulting harm, only if a
      reasonable person would have foreseen the risk. Conversely, if the risk is not foreseeable, the person who created the
      risk generally does not have a duty to prevent it.").

84    *See Phillips v. Delmarva Power & Light Co.,* 194 A.2d 690, 697–98 (Del.1963)(holding that active negligence must be
      plead with more particularity than passive negligence).

85    *See Diamond State Tel. Co. v. The University of Del.,* 269 A.2d 52, 57 (Del.1970)(recognizing distinction between active
      and passive negligence in determining the enforceability of an implied indemnification agreement).

86    *See Jardel v. Hughes,* 523 A.2d 518, 531 (Del.1987)("Where the claim of recklessness is based on ... passive negligence,
      the plaintiff's burden is substantial.").

87    *Naidu,* 539 A.2d at 1070.

88    *See generally DiOssi v. Maroney,* 548 A.2d 1361, 1365 (Del.1988).

89    *See* RESTATEMENT (SECOND) OF TORTS § 328E *et. seq.* (Chapter 13 addressing liability of possessors of land);
      RESTATEMENT (SECOND) OF TORTS § 409 *et. seq.* (Chapter 15 addressing liability of employer of independent
      contractor).

90    *Cf. Naidu,* 539 A.2d 1064 (holding that under Section 15 of the Restatement a special relationship between physician and
      patient can create duty of physician to protect third parties from the negligent acts of the patient). *See In the Matter of New
      York City Asbestos Litig.,* 840 N.E.2d at 151 (finding that Section 15 does not apply in the take home exposure context).

91    The Court notes that if the employment relationship formed the basis of some sort of derivative duty to the employee's
      spouse, one must question whether Delaware's workmen's compensation statutory exclusivity provisions would apply to
      bar Mrs. Riedel's claim. *Cf. Nutt v. A. C & S, Inc.,* 466 A.2d 18, 24 (Del.Super.Ct.1983)("To the extent that workmen's
      compensation provide's an exclusive remedy for the employee [ ], it presents an equal bar to a spouse's claim which
      is dependent upon it.").

92    *Palsgraf,* 248 N.Y. 339, 162 N.E. 99 (N.Y.Ct.App.1928). *See also Anderson v. Atchison, Topeka & Sante Fe Railroad,*
      333 U.S. 821, 68 S.Ct. 854, 92 L.Ed. 1108 (1948)(recognizing general acceptance of the view that an employer owes a
      duty of care to its employees in both active and passive negligence contexts).

93    *See generally* PROSSER & KEETON, *supra* note 23, § 43, at 285 (discussing the notion of "transferred negligence"
      under *Palsgraf* and its progeny).

94    *See Carroll Towing,* 159 F.2d 169 (2nd Cir.1947); *Delmarva Power Co.,* 435 A.2d 716 (Del.1981).

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)

2007 WL 2460776, 63 UCC Rep.Serv.2d 917

🚩 KeyCite Yellow Flag - Negative Treatment

Motion for Relief from Judgment Granted by Isham v. Padi Worldwide Corp.,
D.Hawai'i, May 13, 2008

2007 WL 2460776

United States District Court, D. Hawai'i.

Mathew ISHAM and Roxanne Best Isham, Plaintiffs,

v.

PADI WORLDWIDE CORPORATION,
a California Corporation, International
Padi, Inc., aka Professional Association of
Diving Instructors, a California Corporation,
Diving Science and Technology Corp., aka
DSAT, a California Corporation, and Capital
Investments & Ventures Corporation, a.k.a.
CIVCO, a California Corporation, Defendants.
Dennis Claypool, Sheryll Claypool, Scott
Claypool, and Kristin Claypool, Plaintiffs,

v.

Padi Worldwide Corporation, a California
Corporation, International Padi, Inc.,
aka Professional Association of Diving
Instructors, a California Corporation, Diving
Science and Technology Corp., aka DSAT,
a California Corporation, Defendants.

CV. Nos. 06–00382 DAE–
BMK, 06–00386 DAE–BMK.
|
Aug. 23, 2007.

**Attorneys and Law Firms**

Edie A. Feldman, Law Office of Edie A. Feldman, Michele N.
Bass, Lesser & Associates, Harold G. Hoppe, Honolulu, HI,
Joseph W. Walker, Franklin Mosele & Walker, P.C., Houston,
TX, John R. Hillsman, McGuinn Hillsman & Palefsky, San
Francisco, CA, for Plaintiffs.

Carter K. Siu, Randall Y. Yamamoto, James Kawashima,
Kawashima Lorusso & Tom, Honolulu, HI, Mark A. Hruska,
Schwartz & Horwitz PA, Boca Raton, FL, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS CLAYPOOL
PLAINTIFFS' COMPLAINT OR, IN THE ALTERNATIVE,*

*JUDGMENT ON THE PLEADINGS; GRANTING IN
PART AND DENYING IN PART DEFENDANTS' MOTION
TO DISMISS ISHAM PLAINTIFFS' FIRST AMENDED
COMPLAINT OR, IN THE ALTERNATIVE, JUDGMENT
ON THE PLEADINGS; AND DENYING CLAYPOOL
PLAINTIFFS' REQUEST TO AMEND THEIR COMPLAINT*

DAVID ALAN EZRA, United States District Judge.

**\*1** Pursuant to Local Rule 7.2(d), the Court finds this
matter suitable for disposition without a hearing. After
reviewing Defendants Padi Worldwide Corporation ("Padi
Worldwide"), International Padi, Inc., a.k.a. Professional
Association of Diving Instructors ("International Padi"),
Diving Science and Technology Corp., aka DSAT, and
Capital Investments & Ventures Corporation, a.k .a.
CIVCO's (collectively, "Defendants") Motion to Dismiss
Plaintiffs Dennis Claypool, Sheryll Claypool, Scott Claypool,
and Kristin Claypool's (collectively, "Claypool Plaintiffs")
Complaint for Personal Injury Damages and Loss of
Consortium, Filed July 14, 2006, or In the Alternative
for Judgment on the Pleadings ("Motion to Dismiss
Claypool Plaintiffs' Complaint") and Defendants' Motion
to Dismiss Plaintiffs Matthew Isham and Roxanne Best
Isham's (collectively, "Isham Plaintiffs") [1] First Amended
Complaint for Damages, Filed June 1, 2007, Or In the
Alternative For Judgment on the Pleadings ("Motion to
Dismiss Isham Plaintiffs' First Amended Complaint") and the
supporting and opposing memoranda, the Court GRANTS
judgment on the pleadings in favor of Defendants on Claypool
and Isham Plaintiffs' strict liability claims (First Causes of
Action for both); Claypool Plaintiffs' Negligent Manufacture
(Second Cause of Action) and Isham Plaintiffs' Negligence
(Sixth Cause of Action) claims; Isham Plaintiffs' Negligent
Misrepresentation claim (also labeled as a Sixth Cause of
Action); Claypool and Isham Plaintiffs' Breach of Warranty
claims (Third and Second Causes of Action respectively),
including Isham Plaintiffs' Breach of Express and Implied
Warranties (Third Cause of Action); Isham and Claypool
Plaintiffs' emotional distress claims (Ninth and Sixth Causes
of Action respectively), and Isham Plaintiffs' Unfair and
Deceptive Trade Practices claim (Fifth Cause of Action).

The Court DENIES judgment on the pleadings in favor
of Claypool and Isham Plaintiffs' Fraudulent Concealment
claims (Claypool Plaintiffs' Fifth Cause of Action; Isham
Plaintiffs' Fourth Cause of Action), Claypool and Isham
Plaintiffs' Gross Negligence and Willful and Wanton
Indifference punitive damages claims (Claypool Plaintiffs'
Fourth Cause of Action and Isham Plaintiffs' Seventh Cause

2007 WL 2460776, 63 UCC Rep.Serv.2d 917

of Action), and Plaintiffs Sheryll Claypool and Roxanne Isham's loss of consortium claims (Claypool Plaintiffs' Seventh Cause of Action; Isham Plaintiffs' Tenth Cause of Action).

The Court DENIES Claypool Plaintiffs' request to amend their Complaint should the Court find merit to Defendants' arguments.

*BACKGROUND*

Because the instant, consolidated lawsuits arose from the same factual allegations related to a single diving incident, the Court shall address both motions in this Order. On July 13, 2006, Isham Plaintiffs filed a Complaint for Personal Injury Damages and Loss of Consortium with a jury demand, which they amended on June 1, 2007 to add additional claims. On July 14, 2006, Claypool Plaintiffs filed a Complaint for Personal Injury Damages and Loss of Consortium with a jury demand. Based on information contained in the complaints, on or about July 20, 2004, as visitors to the State of Hawaii, Claypool Plaintiffs traveled to the island of Kauai where they went scuba diving and/or snorkeling at or near Makol'e Reef off of the Napali Coast aboard the Port Allen based dive boat, "Blue Dolphin."[2] After qualifying for a dive program known as Discover Scuba Diving Program ("Diving Program"), Claypool Plaintiffs Dennis and Scott participated in the Diving Program with the supervision of a PADI-certified diving instructor, Plaintiff Matthew Isham ("Isham"). The Diving Program includes a PADI "Discover Scuba Diving Instructor Guide" ("PADI Product No. 79181") and a "Discovery Scuba Diving" participant's pamphlet ("PADI Product No. 60109"), among other "various written training materials and bulletins." The Diving Program is designed to "introduce[s] people to scuba diving in a highly supervised and relaxed manner." "Under the guidance of a PADI professional," the Diving Program teaches new divers about "basic safety concepts" and how to "put on equipment and swim around underwater in a closely supervised environment."

**\*2** That afternoon, once anchored at Makol'e Reef, Claypool Plaintiffs Sheryll and Kristin snorkeled in the waters inshore of the Blue Dolphin's mooring site. Around the same time, Isham took the other Claypool Plaintiffs, Dennis and Scott, and two other student divers in the waters offshore of the mooring site. That was the first time that Dennis had been scuba diving, including wearing

scuba equipment and breathing underwater with an artificial breathing apparatus. Shortly after entering the water, Dennis experienced buoyancy problems, causing him to drift toward the surface of the water and to become separated from the rest of the class. While Dennis was experiencing those problems, Isham took the other three students through an underwater lava tube near the bottom of the water.

Isham did not spot Dennis until he had risen to the surface of the water in a busy navigation channel. Before Isham could reach Dennis to assist him, a tourist catamaran, known as the "M/V Spirit of Kauai," passed through the dive site at a speed of approximately 12 knots, striking and injuring Isham and Dennis. Based on allegations in Claypool Plaintiffs' Complaint, the starboard hull and propeller of the catamaran slashed Dennis's right forearm to the bone, shattered and displaced his right radius and ulna, and transected all of the nerves, veins, muscles and tendons serving his right hand and fingers. Based on allegations in Isham Plaintiffs' Complaint, Isham suffered severe injuries to his left leg, causing his left leg to be amputated above the knee. Isham allegedly is unable to serve as an open water dive instructor anymore.

Before Isham Plaintiffs (CV No. 06–382) and Claypool Plaintiffs' (CV No. 06–286) cases were consolidated, Defendants had filed separate motions to dismiss against Isham and Claypool Plaintiffs on December 29, 2006. Following the assignment of the consolidated actions on January 3, 2007, on April 4, 2007, Isham Plaintiffs filed a motion for leave to amend their complaint. Isham and Claypool Plaintiffs filed oppositions on April 11, 2007, to which Defendants replied on April 19, 2007. In light of Isham Plaintiffs' motion for leave, on April 23, 2007, the Court issued an Order directing Defendants to withdraw their motion to dismiss Isham Plaintiffs' Complaint. The following day, Defendants withdrew both of their motions, without prejudice, against Isham and Claypool Plaintiffs.

After Isham Plaintiffs filed their First Amended Complaint, on June 8, 2007, Defendants filed the instant Motions against Isham and Claypool Plaintiffs. On August 1, 2007, Claypool Plaintiffs filed their opposition, and, on August 2, 2007, Isham Plaintiffs filed their opposition. On August 9, 2007, Defendants filed a reply to each motion.[3]

*STANDARD OF REVIEW*

Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

A motion to dismiss, if made before a responsive pleading, will be granted where the plaintiff fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). Review is limited to the contents of the complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). Allegations of fact in the complaint must be taken as true and construed in the light most favorable to the plaintiff. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946 (9th Cir.2005). The Court is not required to accept conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *See Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969, 973 (9th Cir.2004). "[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim." *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988).

 **\*3** If a motion to dismiss is made after a responsive pleading, it shall be treated as a motion for judgment on the pleadings. *See Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 954–55 (9th Cir .2004). Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") provides in pertinent part: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(h)(2) specifically authorizes a moving party to use a motion for judgment on the pleadings to raise the defense of failure to state a claim. *See Aldabe v. Aldabe,* 616 F.2d 1089, 1093 (9th Cir.1980). The standard for a Fed.R.Civ.P. 12(b)(6) motion is the same as that for a 12(c) motion. *See Abbatiello v. County of Kauai,* Civ. No. 04–00562, 2007 WL 473680 (D.Haw. February 7, 2007). Thus, as with a motion to dismiss, the Court need not accept conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *See Cholla Ready Mix, Inc.,* 382 F.3d at 973.

"For purposes of the motion [for judgment on the pleadings], the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1550 (9th Cir.1990). Judgment on the pleadings is proper when, taking all of the allegations in the non-moving party's pleadings as true, the moving party clearly establishes that there are no material issues of fact and the moving party is entitled to judgment as a matter of law. *See Torbet v. United Airlines, Inc.,* 298 F.3d 1087, 1089 (9th Cir.2002); *see also Hal Roach Studios, Inc.,* 896 F.2d at 1550. In other words, the moving party must prove that it is "clearly entitled to prevail ."

*Doleman v. Meiji Mutual Life Ins. Co.,* 727 F.2d 1480, 1482 (9th Cir.1984) (citation omitted).

For both a motion to dismiss and a motion for judgment on the pleadings, the Court's review is limited to the pleadings. *See Hal Roach Studios, Inc.,* 896 F.2d at 1550. If the Court relies on matters presented outside of the pleadings, such as a declaration or other outside statements and/or documents, it shall treat the motion as one for summary judgment. *See id.; Anderson v. Anemone,* 86 F .3d 932, 934 (9th Cir.1996); *see also* Fed.R.Civ.P. 12(b) & 12(c). If the Court does not consider such matters, the motion properly can be treated as one for dismissal. *See Keas v. Tempe Tech. Inst., Inc.,* 110 F.3d 44, 46 (9th Cir.1997).

*DISCUSSION*

The majority of Defendants' arguments rest on the notion that Claypool and Isham Plaintiffs' claims must be dismissed because the Diving Program is not a "product." Thus, Defendants contend, Claypool and Isham Plaintiffs cannot maintain their (1) Strict Products Liability claims (Claypool and Isham Plaintiffs' First Cause of Action), (2) Negligent Manufacture claim (Claypool Plaintiffs' Second Cause of Action) and Negligent Misrepresentation claim (Isham Plaintiffs' Sixth Cause of Action), (3) Breach of Warranty claims (Claypool Plaintiffs' Third Cause of Action and Isham Plaintiffs' Second and Third Causes of Action), and (4) Fraudulent Concealment/Failure to Warn claims (Claypool Plaintiffs' Fifth Cause of Action and Isham Plaintiffs' Fourth Cause of Action).

 **\*4** Defendants also argue that Claypool and Isham Plaintiffs cannot sustain their Gross Negligence and Willful and Wanton Indifference claims (Claypool Plaintiffs' Fourth Cause of Action and Isham Plaintiffs' Seventh Cause of Action) because they amount to nothing more than claims for punitive damages. Additionally, Defendants assert that Claypool Plaintiffs Sheryll, Scott, and Kristin's Emotional Distress (Sixth Cause of Action) and Sheryll's Loss of Consortium (Seventh Cause of Action) claims fail because they are derivative of Plaintiff Dennis's products liability claims. Likewise, Defendants argue for dismissal of Isham Plaintiffs' Emotional Distress claim (Ninth Cause of Action) because (1) Roxanne does not state a valid claim and (2) Defendants are not responsible for Mathew's injuries. Finally, Defendants seek dismissal of Roxanne's Loss of Consortium

claim (Tenth Cause of Action) because it is derivative of Mathew's products liability claims.

Regarding Isham Plaintiffs' two remaining claims, Defendants contend that Isham Plaintiffs' Negligence claim (which, in addition to their Negligent Misrepresentation claim, also listed as a Sixth Cause of Action) must be dismissed because it does not relate back to the original complaint and, thus, it is barred by the statute of limitations. Defendants further argue that Isham Plaintiffs' Unfair and Deceptive Trade Practices claim (Fifth Cause of Action) is not a cognizable claim because the claimed loss is personal injury.

Claypool Plaintiffs respond that Defendants' motion to dismiss should not be considered because it was filed after the answer, making it untimely, and, even if the Court were to construe Defendants' motion as one for judgment on the pleadings, the Court must accept all of Plaintiffs allegations as true and disregard any documents that were not incorporated in the Complaint. Claypool Plaintiffs further assert that the issue of whether the Diving Program is a product creates material issues of fact that cannot be determined at this stage. Moreover, even if the Court were to determine that the Diving Program is not a product, Plaintiffs assert that their remaining causes of action still would be actionable. Finally, Claypool Plaintiffs argue that, even if the Court were to find merit to Defendants' claims, Plaintiffs should be granted leave to amend their Complaint.

Isham Plaintiffs similarly argue that the Diving Program constitutes a "product in a defective condition unreasonably dangerous to the user." Isham Plaintiffs do not address Defendants' remaining arguments.

### I. *Claypool Plaintiffs' Procedural Arguments*
Although Claypool Plaintiffs are correct that a motion to dismiss must be before a further pleading, such as an answer, the Court may treat an untimely Rule 12(b)(6) motion as a motion for judgment on the pleadings pursuant to Rule 12(c), which the Court elects to do here. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 954–55 (9th Cir.2004). As set forth above, Claypool Plaintiffs correctly state the standard of review. Still, when accepting Claypool Plaintiffs' allegations as true, the Court need not accept conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *See Cholla Ready Mix, Inc.,* 382 F.3d at 973.

**\*5** Furthermore, as already set forth, the Court may not consider documents outside of the pleadings, lest it convert the motion for judgment on the pleadings into a motion for summary judgment. *See Hal Roach Studios, Inc.,* 896 F.2d at 1550. Defendants attach three exhibits to both of their motions to dismiss: (1) Exhibit A "Discover Scuba Diving Instructor Guide" ("PADI Product No. 79181"), (2) Exhibit B, "Discovery Scuba Diving" participant's pamphlet ("PADI Product No. 60109"), and (3) Exhibit C, PADI Discovery Scuba Diving Certificate Statement. Claypool Plaintiffs claim that they have no objection to Defendants' Exhibits A and B because Claypool Plaintiffs specifically reference them in paragraph 15 of their Complaint, yet they apparently seek to exclude those documents from review. Claypool Plaintiffs also seek to exclude review of Defendants' Exhibit C, which may or may not be included within the reference to "various written training materials and bulletins" in paragraph 15.

"A court may [ ] consider certain materials-documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice-without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* Here, Claypool Plaintiffs specifically reference in their Complaint the documents contained in Defendants' Exhibits A and B; thus, the Court properly may consider those documents as part of the Complaint. As for Exhibit C, because Claypool Plaintiffs' reference to "various written training materials and bulletins" under paragraph 15 does not clearly identify the document contained in Exhibit C (and Defendants do not argue for that inclusion, as they did for Exhibits A and B), the Court shall not consider Defendants' Exhibit C for the purpose of this motion.

### II. *Substantive Arguments*

#### A. *Diving Program as a "Product" or "Good" for Claypool and Isham Plaintiffs' Strict Products Liability, Negligent Manufacture and Negligence/ Negligent Misrepresentation, Breach of Warranty, and/or Fraudulent Concealment/Failure to Warn claims*

#### 1. *Strict Products Liability*
There is no dispute that admiralty law governs the instant lawsuit. *See, e.g., In the Matter of Pacific Adventures, Inc., et al.,* 5 F.Supp.2d 874, 877 (D.Haw.1998) (involving a scuba diving incident by dive boat); *McClenahan v. Paradise*

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 123 of 370
PageID: 10153
Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2005)
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

*Cruises, Ltd.,* 888 F.Supp. 120, 121–23 (D.Haw.1995) (involving a "snuba" diving incident, which is more akin to snorkeling). "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies," which is "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules" drawn from state and federal sources. *See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864–65 (1986).

**\*6** The Supreme Court and the Ninth Circuit both have recognized that "[g]eneral maritime law incorporates strict liability and negligence principles of products liability." *Matthews v. Hyster Co., Inc.,* 854 F.2d 1166, 1168 (9th Cir.1988); *East River Steamship Corp.* 476 U.S. at 865. Although the Supreme Court has not determined what substantive rules should apply in maritime products liability cases, the Ninth Circuit has adopted the Restatement (Second) of Torts § 402A as the law controlling strict products liability claims in admiralty law. [4] *See Matthews,* 854 F.2d at 1168. Because Restatement (Second) of Torts § 402A since has been superceded by Restatement (Third) of Torts, the Court shall rely on the Restatement (Third) of Torts where applicable. [5]

Generally, "[o]ne engaged in the business of selling or otherwise distributing *products* who sells or distributes a *defective* product is subject to liability for harm to persons or property *caused* by the defect." Restatement (Third) of Torts § 1 (emphasis added). Restatement (Third) of Torts § 19 defines a "product" as: "(a) ... *tangible* personal property distributed commercially for use or consumption .... (b) *Services,* even when provided commercially, are *not* products ...." (emphasis added). The Court must determine whether something is a product as a matter of law. *See* Restatement (Third) of Torts § 19, Comment(a).

Restatement (Third) of Torts § 2 imposes strict liability for defectively manufactured products when the products contain a manufacturing defect, that is, "when the product *departs* from its *intended* design even though all possible care was exercised in the preparation and marketing of the product." *See* Restatement (Third) of Torts § 2(a) and Comment(a) (emphasis added). In other words, a manufacturer or maker of a product will be strictly liable if the product that they sell contains a defect. The problem is not with the design of or the instruction/warning attached to the product, but with the manufacturing or construction of the product itself. The theory of strict liability comports with the Restatement (Second) of Torts § 402A, which theory the Ninth Circuit has

accepted. *See Pan–Alaska Fisheries, Inc. v. Marine Const. & Design Co.,* 565 F.2d 1129, 1135 (9th Cir.1977).

For Claypool and Isham Plaintiffs' Strict Liability claims to survive, their factual allegations therefore must support the existence of a defect(s) in a "product," which Plaintiffs contend is the Diving Program. Specifically, Plaintiffs claim that the Diving Program contained numerous defects that departed from the actual, intended design of the program. Thus, the Court first must determine whether the Diving Program is a "product" for the purpose of strict products liability. The Court concludes that it is not.

To start, the leading policy arguments underlying strict products liability have been articulated to include consumer expectation arguments, deterrence and risk-spreading arguments, and liability rationales, among others. The Hawaii Supreme Court has articulated the "leading arguments" as follows:

> **\*7** The leading arguments for the adoption of a rule of strict products liability have been that the public interest in human life and safety requires the maximum possible protection that the law can muster against dangerous defects in products; that by placing the goods on the market the maker and those in the chain of distribution represent to the public that the products are suitable and safe for use; and that the burden of accidental injuries caused by defective chattels should be placed upon those in the chain of distribution as a cost of doing business and as an incentive to guard against such defects.

*Stewart,* 470 P.2d at 243. In essence, one argument is that a maker's (historically, being a manufacturer's) representation to the public that products are suitable for safe use, *i.e.,* that they are not defective, urges consumers to trust their products, thus alleviating the need for the consumers to evaluate the products before purchase. The fault, therefore, lies on the maker's shoulders for, what amounts to, breaching the consumer's trust in the product. Creating liability where liability is due also promotes accident prevention,

Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

deterring makers from allowing defective products to enter the marketplace. *See Winter v. G.P. Putnam's Sons,* 938 F.2d 1033, 1035 (9th Cir.1991). Additionally, the benefits associated with spreading the risks among consumers through higher prices, which indirectly provides accident insurance from harm for product defects, is generally believed to benefit consumers and makers. *See, e.g., id.* at 1035; *Leong,* 970 P.2d at 974.

Nonetheless, there are limits to the theory of strict products liability when the costs in applying it outweigh the benefits associated with promoting deterrence, risk-spreading, and consumer expectations. *See Winter,* 938 F.2d at 1035. Generally, the purpose of strict products liability is to protect consumers against "tangible" items that enter the marketplace with a defect. *See id.* at 1034. Some courts have recognized intangibles such as power and electricity as "consumable products" for the purpose of strict liability, *see e.g., Ransome v. Wisconsin Elec. Power Co.,* 275 N.W.2d 641, 648 (Wis.1979), though those exceptions are few and inapplicable here. Typically, intangible property such as information contained in books, travel guides, and other instructional and training literature and services (not the tangible medium, but the information) are not considered "products." *See* Restatement (Third) of Torts § 1, Comment(d). For example, "expressions of ideas" contained in "how to" books and travel guides generally are treated as services, not tangible products, to encourage the "unfettered exchange of ideas." *See Winter,* 938 F.2d at 1035 (finding that information contained in an Encyclopedia of Mushrooms was not a product like a highly technical aeronautical chart, but rather was more akin to a "how to use" book detailing thoughts and an expression in a book); *Birmingham v. Fodor's Travel Publ'n, Inc.,* 833 P.2d 70, 78–79 (Haw.1992) (determining that information contained in a travel guide was not a product "focused on the tangible world," but rather constituted expressions of ideas). Additionally, courts have considered tours and training programs, such as raft tours and "taser-gun" training, services rather than products. *See Ferrari v. Grand Canyon Dories,* 38 Cal.Rptr.2d 65, 70–72 (1995) (determining that the defendants provided a "service, i.e., recreational raft transportation on the Colorado River," rather than a product, providing "all the materials for the trip, instructions on rafting safety, and guides to perform the labor and conduct the activities" and that use of the raft was merely incident to the service); *Torres v. City of Madeira,* Nos. CIVFF 02–6385, CV F 03–5999, 2005 WL 1683736, at * 13 (E.D.Cal.2005) (granting summary judgment on taser-gun training because "

'[t]raining' is a service and is not subject to strict products liability theories").

**\*8** One prominent exception is for false information contained in maps and navigational charts because of their highly technical nature and accuracy as guiding tools similar to classic products such as compasses. For instance, the Ninth Circuit has determined that highly technical aeronautical charts are products when such charts graphically depict an "instrument approach procedure" for a particular airport, including "directional heading, distances, minimum altitudes, turns, radio frequencies and procedures to be followed if the approach is missed." *Brocklesby v. United States,* 767 F.2d 1288, 1295 (9th Cir.1985). The Ninth Circuit, focusing on the "distinct" nature of such charts, distinguished the aeronautical charts from other general publications such as trade journals, reasoning that had a pilot relied on the republication of the instrument approach in a trade journal, the journal would have been immune from strict liability. *See id.* at 1297–98. Instead, because the publisher "convert[ed] a government procedure from text into graphic form and represent [ed] that the chart contain[ed] all necessary information," the aeronautical chart constituted a product. *Id.* at 1298.

Plaintiffs attempt to draw comparisons between the Diving Guide and the intangibles that courts have found to be products to argue that the law is not clear in that regard, thus each case must be considered on a case-by-case basis. The Court does not dispute that; as such, it reviews this case on the particular facts presented. The instant Diving Program is a training program that includes instructions and lessons. Isham Plaintiffs argue that the instructions, lessons, and training in the Diving Program are more functional and accurate than literary, thus distinguishing this case from the "books," "travel guide," training and other "services" cases. Claypool Plaintiffs contend that the "mass-produced set of palpable" procedures and guidelines are mandatory and amount to standards more akin to published aeronautical procedures. In short, rather than an expression of ideas, both set of Plaintiffs believe that the Diving Program constitutes a strict manual to be followed closely, containing all information necessary to succeed in the Diving Program.

Despite Plaintiffs apparent attempts to analogize the standards in the Diving Program to those required for technical aeronautical charts, the same level of specificity and technicality that is apparent in the charts simply is not present in the Diving Program. The Diving Program emphasizes the relaxed nature of the program and the guidance and

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

supervision that participants will receive. Certainly, the Diving Program includes standards, such as a required age, location, maximum depth, instructors' qualifications, and requirements pertaining to supervision, equipment, and materials to read. Those standards are not, however, as rigorous, technical, or detailed as the standards required in the aeronautical charts' cases. Rather, the standards are more analogous to the cases involving training and informational material for services, such as raft trips, which include safety instructions and guides to perform the labor and to conduct the activities and the training at issue. *See Ferrari,* 38 Cal.Rptr.2d at 66–67; *Torres,* 2005 WL 1683736, at * 1–2, 21.

**\*9** The Diving Program may provide more specific information (though not necessarily more technical) than, for instance, that contained in a travel guide, *Birmingham,* 833 P.2d at 73, or a reference manual, *Winter,* 938 F.2d at 1034, as it provides a discrete guide to a specific activity rather than general information on a given topic or subject area. Nevertheless, the information contained in the Diving Program does not require the same level of "complete accuracy" of such material as topographical or geographical features as would an aeronautical chart. *See, e.g., Fluor Corp. v. Jeppeson & Co.,* 170 Cal.App.3d 468, 476, 216 Cal.Rptr. 68 (1985). Technical accuracy, of course, may (and should) be a desired goal of the program. Still, the failure to achieve that goal typically will not produce the same degree of devastation as would the failure to include, for instance, a hill in an aeronautical chart. *See id.* at 473.

The Court's determination that the Diving Program does not constitute a product coincides with the purpose of and the policies underlying the strict products liability doctrine. "Unlike mass produced goods, services are not marketed to a wide variety of the general public. Thus, parties injured by poor services are in a better position to locate the tortfeasor and identify the defect caused by the tortfeasor's negligence." *Snyder v. ISC Alloys, Inc.,* 772 F.Supp. 244, 251 (W.D.Pa.1991) (finding no strict liability for technical drawings, services, and information concerning zinc dust plants). Here, the tortfeasor and the "defects," if they exist, in the Diving Program are easily identifiable. The Diving Program is not, like mass produced goods, marketed to the general public at large, but rather it is marketed to a discrete set of consumers interested in scuba diving or snorkeling off the shores of Kauai. Plaintiffs, therefore, should have had less difficulty identifying those at fault, if anyone, and Plaintiffs apparently did identify those allegedly at fault, as evidenced by the prior settlement.

A consideration of the history of strict liability in the context of mass-manufacturing and risk-bearing, liability rationales, as well as the prevailing case law, supports the Court's determination that the Diving Program is not a "product" for the purpose of strict liability. *See Escola v. Coca–Cola Bottling Co. of Fresno,* 150 P.2d 436 (Cal.1944). In any given case, part of the law's goal in relation to liability will be to protect defenseless victims and possibly to spread risks/costs amongst society. To rule on that basis alone, without reflection of the other considerations, would make all manufacturers/ makers subject to strict liability for alleged defects in their material. That cannot be the case for the obvious reason, among others, that the doctrine is limited to "products."

Before concluding, the Court shall address Claypool Plaintiffs' additional arguments that a determination at this stage of the litigation, when the law surrounding what constitutes a "product" is not black and white, would work an injustice on Plaintiffs. Claypool Plaintiffs attempt to distinguish cases that immunized the defendants from strict liability because they were decided on summary judgment motions, rather than motions made pursuant to Fed.R.Civ.P. 12(c), and because all but one interpreted law other than Hawaii's. Claypool Plaintiffs argue that granting judgment on the pleadings at this stage would be "downright unfair" because of the factual issues surrounding whether the various manuals and publications in the Diving Program amount to a "product." Certainly, 12(c) motions do not have the benefit of affidavits/declarations and other evidence to assist a court in determining whether a plaintiff has made factual allegations, which, if proven, could establish essential elements at trial, *e.g.,* that the Diving Program, in fact, is a product. The Court, however, does not see the necessity of such additional evidence here because it can make a determination as a matter of law, while taking all allegations in the pleadings as true (so long as they are not merely conclusory), based on the nature and the description of the Diving Program as set forth in the pleadings. Accordingly, that the Court is dealing with a motion for judgment on the pleadings rather than summary judgment is of no import here.

**\*10** Moreover, as Claypool Plaintiffs point out, the Court recognizes that none of the above cases were based on admiralty law, instead relying on the common law of California or Hawaii. Still, the courts interpreted the meaning of the term "product" for the purpose of strict liability under either the Restatement of Torts and/or the common law of the respective states, which incorporate the Restatement for

guidance. *See, e.g., Winter,* 938 F.2d at 1034 n. 2 ("The California courts look to the Restatement (Second) of Torts, § 402A for guidance on products liability law."); *Birmingham,* 833 P.2d at 75 n. 4, 78 (relying on the Restatement (Second) of Torts § 311 (1965) for a definition of negligent misrepresentation and the other cases cited herein for the definition of "product" for the purpose of determining strict liability, particularly *Winter,* 938 F.2d 1033). If state law principles would lead to the same result, regardless of the state, there is no need to consider to which state law a court should look in admiralty, if any. *See East River Steamship Corp.,* 476 U.S. at 865 n. 2.

Because the Court finds that the Diving Program, which includes instructional material, lessons, and training, constitutes a "service" rather than a "product" for the purpose of strict liability, the Court GRANTS judgment on the pleadings on Claypool and Isham Plaintiffs' strict liability claims (Claypool and Isham Plaintiffs' First Cause of Action).

### 2. *Negligent Manufacture and Negligence/Negligent Misrepresentation*

Claypool Plaintiffs brought a negligent manufacture cause of action (Second Cause of Action), which they now claim should be construed as a general negligence cause of action, based on the "defective and dangerous character" of the design of the Diving Program. Isham Plaintiffs brought a general negligence and negligent misrepresentation claim (both labeled as Sixth Causes of Action) based on the "inherently unsafe and defective" design of the Diving Program. The theories of negligence, negligent manufacture, and negligent misrepresentation are well-recognized theories of product liability. When a product's *design* is defective, that is, when the foreseeable risks could have been reduced or avoided through the adoption of an alternative design, liability is imposed based on a negligence model. *See* Restatement (Third) of Torts §§ 2(b) & 2(c) and Comment(a). In other words, unlike manufacturing or construction defects in products, the claimed problem is with the actual design of the product, which a maker may or may not have been able to make safer through a better design. Generally, a reasonableness test is applied to determine whether a better design could have made the product safer. *See* Restatement (Third) of Torts §§ 1 and 2, Comment(a). That is consistent with the Ninth Circuit's adoption of the negligence principles in the Restatement (Second) of Torts § 395 that were incorporated into general maritime law. *See Matthews,* 854 F.2d at 1168. Restatement (Second) of Torts § 395 provides:

> **\*11** A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.

Comment (b) to Restatement (Second) of Torts § 395 clarifies that the section applies to "products" through the repeated use of that term. Additionally, although "chattel" is not defined, *Black's Law Dictionary* 95 (2d ed.2001) defines chattel as: "[m]ovable or transferable property; esp., personal property," with "chattel personal" being defined as "[a] tangible good or an intangible right (such as a patent."

Claypool Plaintiffs claim that, however labeled, their cause of action states a claim for negligence, which is well-recognized in maritime law. There is no dispute that such a claim exists under maritime law. Rather, the dispute surrounds whether their claim is based on product liability, which, according to the substance of their complaint, it is. To be clear, Claypool and Isham Plaintiffs' claims of negligence are not based on a defect in a tangible product such as a "buoyancy compensator vest," *Sinclair v. Soniform,* 935 F.2d 599, 603 (3d Cir.1991), or against Plaintiff Isham (or another employee), as the instructor, for failing to provide adequate care (or a similar argument). *See id.; Kuntz v. Windjammer "Barefoot" Cruises, Ltd.,* 573 F.Supp. 1277, 1282 (W.D.Penn.1983) (finding an employee of a cruise line in an open water dive negligent in the wrongful death of a dive course participant). In fact, Claypool Plaintiffs commend Mathew Isham's actions, stating that "Isham's actions were in complete compliance with PADI's published guidelines" and that "Isham lost a leg heroically trying to pull his hapless student clear." The only claims, by both set of Plaintiffs, relate to the defective design of the Diving Program, which, however framed, is not a product for the purpose of sustaining a negligence or negligent manufacture claim based on the

defective design of the Diving Program. The Court, therefore, GRANTS judgment on the pleadings in favor of Defendants on Claypool Plaintiffs' Negligent Manufacture (Second Cause of Action) and Isham Plaintiffs' Negligence (Sixth Cause of Action) claims.

As for Negligent Misrepresentation, which claim Isham Plaintiffs brought, Isham Plaintiffs argue that Defendants' material omissions and/or misrepresentations regarding the Diving Program were made without exercise of reasonable care. Specifically, they contend that Defendants failed to disclose to Isham all necessary information to decide whether or not it was safe to instruct inexperienced divers in open ocean waters through the Diving Program. That failure to disclose includes relevant information about the safety and/or hazards of its Diving Program and the increasing number of deaths, injuries or otherwise resulting from the scuba courses. Hawaii follows the Restatement (Second) of Torts § 552 on negligent misrepresentation, which provides as follows:

> **\*12**  (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information....

See State by Bronster v. United States Steel Corp., 919 P.2d 294 (Haw.1996). As in United States Steel Corp., the Court does not interpret Isham Plaintiffs' claim as one stemming from a claim of negligence in the design or construction of the Diving Program. See id. at 304. Rather, recovery for Isham's personal injuries stems from a claim that Defendants did not exercise reasonable care or competence in communicating and/or omitting necessary information about the risks posed in administering the Diving Program and statistics concerning deaths and injuries resulting from such courses. [6]  See id.

Moreover, there is no requirement in Hawaii that a negligent misrepresentation claim must be limited to parties whose business is to supply information for the guidance of others.

See United States Steel Corp., 919 P.2d at 307. Rather, Defendants only are required to "have a pecuniary interest in the transaction or context in which the information is supplied in order to merit the imposition of a duty of care in obtaining and communicating the information." See id. at 308. That information can be supplied in "the guidance of others in their transactions with third parties" for an indirect or direct profit. Id. Based on the pleadings, Defendants appear to have such an interest here in the use of their Diving Program, that is, they offer the program, presumably, in return for some form of payment.

Notwithstanding, Defendants claim that, because Isham Plaintiffs did not raise this claim in their original Complaint, but rather raised it in their First Amended Complaint filed two years after the accident, this claim is barred by the applicable two-year statute of limitations. See Haw.Rev.Stat. § 657–7. That statute is the catch-all statute of limitations for personal injury actions when no specific statute applies. See Pele Defense Fund v. Paty, 837 P.2d 1247, 1260 n. 14 (Haw.1992). Because the instant claim is in the nature of personal injury, the Court finds that Haw.Rev.Stat. § 657–7 applies to the instant action. [7]  Cf. Au v. Au, 626 P .2d 173, 179 (Haw.1981) (finding that Hawaii's general six-year statute of limitations for personal actions, Haw.Rev.Stat. § 657–1(4), applied to fraudulent representations concerning the condition of a home inducing the appellant to purchase it because the nature of the claim was not physical injury to the property).

The question now turns on whether Isham Plaintiffs may sustain their negligent misrepresentation claim, even though the initial Complaint filed within the applicable statute of limitations did not contain that claim (or a similar one, alleging only general negligence, strict liability, and breach of warranty). The Court answers in the negative. "It is the almost universal rule that when an amended complaint states a new and different cause of action from that undertaken to be stated in the original complaint and is not offered until the cause of action therein alleged is barred by the statute of limitations it should on objection be disallowed." Brown v. Bigelow, No. 1740, 1927 WL 3273, at \*6 (Haw.1927). That all necessary facts were included within the original complaint does not alter this result. See Union Pac Ry. Co. v. Wyler, 158 U.S. 285, 295–96 (1895). Had Isham Plaintiffs alleged a cause of action similar to or that could be construed as a cause of action sounding in negligent misrepresentation, the result might be different. As it is, the Court finds that, even if Isham Plaintiffs legally may have been able to maintain a negligent misrepresentation claim, Isham Plaintiffs' claim

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 128 of 370
PageID: 10158
Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

nevertheless is barred by the applicable statute of limitations. The Court, therefore, GRANTS judgment on the pleadings on Isham Plaintiffs' Negligent Misrepresentation claim (also labeled a Sixth Cause of Action). [8]

**\*13** The Court anticipates the argument that the claim for negligent manufacture actually included a claim for negligent misrepresentation. That argument lacks merit because Claypool Plaintiffs not only failed to bring that claim as a cause of action in their Complaint, but they also failed to mention such a cause of action in their opposition to Defendants' motion. Instead, they focus on a "general negligence" theory, which, as the Court has found, is not a viable cause of action on the facts and allegations propounded in this case. Claypool Plaintiffs brought a similar cause of action for fraudulent concealment/failure to warn, which the Court shall address in turn, but they simply did not argue or present facts to support a negligent misrepresentation claim in their pleadings. [9] Accordingly, the Court will not consider such a claim for Claypool Plaintiffs.

### 3. Breach of Warranty

Claypool and Isham Plaintiffs' causes of action for breach of warranty, including Isham Plaintiffs' breach of express and implied warranties, are based on material defects in the Diving Program. State law, not admiralty, governs breach of warranty claims. *See East River,* 476 at 872 n. 7; *see also Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 206 (1996) ("The exercise of admiralty jurisdiction [ ] 'does not result in automatic displacement of state law' "). Claypool Plaintiffs argue that California state law should apply because Defendants are residents of California; Isham Plaintiffs present no argument on this issue (or any other issue besides strict liability); Defendants apply Hawaii law. In light of the disagreement, the Court must apply the forum state's choice of law rules, that is, Hawaii's. *See Fields v. Legacy Health Sys.,* 413 F.3d 943, 950 (9th Cir.2005). In determining the law to apply, Hawaii courts look " 'to the state with the most significant relationship to the parties and subject matter.' " *Mikelson v. United Servs. Auto. Ass'n,* 111 F.3d 601, 607 (Haw.2005) (quoting *Lewis v. Lewis,* 748 P.2d 1362, 1365 (Haw.1988)). The focus is on the state that would have the strongest interest in having its laws applied. *See id.*

Here, Defendants, though organized under the laws of the State of California, are authorized to do business (and do conduct business) as a dive training agency in the State of Hawaii and as the author and publisher of dive training standards and manuals in the State of Hawaii. [10] The Diving Program at issue utilizes those standards and manuals in its performance of services in the State of Hawaii. Furthermore, the relevant acts and injuries occurred in waters surrounding the State of Hawaii, and all services were performed in the State of Hawaii. Accordingly, the Court shall apply Hawaii law to the instant case.

Because breach of warranty claims are grounded in the Uniform Commercial Code (UCC), Plaintiffs apparently assume, without argument, that the Diving Program constitutes a "good" within the meaning of the UCC. See Hawaii Revised Statutes ("Haw.Rev.Stat.") § 490:2–102 (providing that Hawaii's UCC applies to transactions in goods unless otherwise stated). Haw.Rev.Stat. § 490:2–105(1) provides the definition of goods: " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." Hawaii Supreme Court has interpreted personal injury actions grounded in warranty to be synonymous with tort strict products liability claims. *See Larsen v. Pacesetter Sys., Inc.,* 837 P.2d 1273, 1284 (Haw.1992) ("Thus the tort action for strict products liability is the warranty action for tangible injury to persons and property stripped of its contractual mask.") "[W]here a plaintiff seeks to recover for personal injury in warranty, the elements of the action should be governed by the same policies which presently shape the elements of a tort strict products liability claim." *Id.* For the same reasons that the Diving Program does not constitute a product, the Court finds that the Diving Program does constitute a "good" for the purpose of breach of warranty, particularly given that both causes of action rely on the same factual allegations and essentially the same arguments. The Court, therefore, GRANTS judgment on the pleadings on the Breach of Warranty claims (Claypool Plaintiffs' Third Cause of Action; Isham Plaintiffs' Second and Third Causes of Action).

### 4. Fraudulent Concealment/Failure to Warn claims

**\*14** Similar to negligence based on a defective product design, a product may be defective because of inadequate instruction or warning, for which liability may be imposed. *See* Restatement (Third) of Torts §§ 2(b) & 2(c) and Comment(a). As the Diving Program does not constitute a "product," Plaintiffs may not maintain a failure to warn claim based on inadequate instruction or warning of the dangers of the defects in the Diving Program.

Notwithstanding, Plaintiffs also allege fraudulent concealment, which is grounded in the same factual allegations as the failure to warn claim. Despite the same factual underpinning, Plaintiffs may maintain a state law fraudulent concealment claim, which does not require that the Diving Program be a "product." As the Supreme Court has established, the application of maritime law does not automatically displace state law claims. *See Yamaha Motor Corp., U .S.A.,* 516 U.S. at 206; *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 545–46 (1995). Additionally, the Ninth Circuit expressly has found that fraudulent concealment claims may lie in admiralty cases. *See Thorman v. Am. Seafoods Co.,* 421 F.3d 1090, 1094 (9th Cir.2005) (recognizing a claim of fraudulent concealment in admiralty law in a case involving settlement sheets for the payment of fish that were mailed after each fishing trip). As Defendants concede, because such claims are equitable, a claim of fraudulent concealment equitably tolls the statute of limitations. *See id.* at 1094 n. 3. To prevail on such a claim, Plaintiffs must have pled facts that, when taken as true, could establish that (1) Defendants "affirmatively misled" them concerning "the operative facts that gave rise to [Plaintiffs'] claim," and (2) Plaintiffs " 'had neither actual nor constructive knowledge' " of these operative facts despite their diligence in trying to uncover them." *Id.* (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,* 858 F.2d 499, 502 (9th Cir.1988).[11] As for the first prong, "[m]erely keeping someone in the dark is not the same as affirmatively misleading him." *Id.* at 1095. Taking affirmative steps to mislead someone actively rather than passively constitutes affirmative conduct. *See id.* at 1096. As for the second prong, the purpose of equitable tolling, particularly in reference to fraudulent concealment claims, "focuses on whether there was excusable delay by the plaintiff" and "may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Huseman v. Icicle Seafoods, Inc.,* 471 F.3d 1116, 1120 (9th Cir.2006).

Claypool Plaintiffs claim that Defendants knew of the material defects in the Diving Program that:

(1) exposed inexperienced novices such as Plaintiff Dennis Claypool to an obvious and unreasonable risk of underwater injury, buoyancy problems, and the likelihood of becoming separated from their dive instructor and fellow [Diving Program] students, and

**\*15** (2) made the aforesaid [Diving Program] extremely hazardous for us in navigable, open ocean waters.

Similarly, Isham Plaintiffs claim that Defendants knew of the material defects in the Diving Program that:

(1) inexperienced, novice divers would be unable to master the skill of regulating buoyancy after receiving only minimal instruction in a program which all [Diving Program] instructors were obligated to follow,

(2) inexperienced diver experiencing buoyancy problems would likely become separated from the instructor and begin to rapidly surface,

(3) a student-teacher ratio of 1:4 was inadequate for first time, inexperienced novices in the ocean's navigable waters, and

(4) its dive instructors would be faced with an unreasonable risk of harm if the PADI guidelines for instructing participants of the [Diving Program] were followed.

Isham Plaintiffs, furthermore, allege that other instructors had warned Defendants "that on a yearly basis, a significant number of students and/or instructors had died and/or suffered serious injuries while participating in PADI's programs." Those actions, according to both Isham and Claypool Plaintiffs, resulted in fraudulent concealment of known risks associated with the Diving Program. Plaintiffs also claim that, at all times, they were ignorant of such risks and, had they known of them, the Claypools would not have enrolled and Isham would not have participated as an instructor in the Diving Program.

Here, the allegations that Defendants "affirmatively misled" Plaintiffs concerning the known risks associated with the Diving Program, ultimately giving rise to Plaintiffs' claims, may rise to the level of fraudulent concealment if Plaintiffs can prove that Defendants, in fact, actively concealed those known risks. By contrast, Plaintiffs' allegation that they were ignorant of the known risks does not, on its face, support a finding of due diligence. Plaintiffs do not mention in their pleadings any efforts undertaken to uncover the risks known to Defendants, thus demonstrating diligence, even in terms of questioning Isham, other instructors, or management about the risks associated with the Diving Program. As such, the claims seem dubious at best on the facts of this case, given that scuba diving is an inherently dangerous activity with associated risks that Plaintiffs likely could have discovered (if they had not already) upon due diligence.

Nonetheless, because the instant action is still at the pleadings stage and the Court has not had an opportunity to consider anything outside of the pleadings, the Court recognizes that discovery may uncover information pertaining to Plaintiffs' diligence in discovering the known risks. Accordingly, the Court finds that for the purpose of the instant motion, Plaintiffs have pled sufficient facts to withstand judgment on the pleadings. Notwithstanding this determination, if all elements cannot be proven at a later time, Plaintiffs' claims, of course, shall fail. The Court, therefore, DENIES judgment on the pleadings on Plaintiffs' Fraudulent Concealment claims (Claypool Plaintiffs' Fifth Cause of Action; Isham Plaintiffs' Fourth Cause of Action). Plaintiffs' arguments concerning these claims, however, are limited to fraudulent concealment, as they may not maintain claims for a failure to warn.

B. *Gross Negligence and Willful and Wanton Indifference*
 **\*16**  Plaintiffs bring "gross negligence and willful and wanton indifference" claims for the purpose of seeking punitive damages. "Punitive damages are available under the general maritime law and may be imposed for conduct which manifests reckless or callous disregard for the rights of others or for conduct which shows gross negligence or actual malice or criminal indifference." *Churchill v. F/V Fjord,* 892 F.2d 763, 772 (9th Cir.1989) (citation and internal quotation marks omitted). Plaintiffs' gross negligence claims are similar to, and possibly based on, those made for fraudulent concealment. Isham Plaintiffs claim that Defendants:

a.  Knew that it was extremely dangerous to permit instructors to take groups of up to four inexperienced scuba divers into the ocean water, while wearing scuba equipment for the first time, and without proper instruction in the buoyancy compensator device;

b.  Knew that withholding information from Plaintiff Mathew Isham regarding the extremely dangerous nature of the [Diving Program] would induce him to continue his participation as an Open Water Dive Instructor;

c.  Knew that by continuing to encourage and permit its instructors to engage in risky dangerous conduct unbeknownst to them would serve to bolster their corporate profits; and

d.  Knew that by deliberately encouraging instructors and novices to continue to participate in their risky DSD [Discover Scuba Diving] program, future profits could be made at the cost of human life and limb.

Claypool Plaintiffs' claim is essentially the same. Claypool and Isham Plaintiffs also contend that had Defendants exercised a "scintilla or care" or a "modicum of regard," they never would have designed the Diving Program in the way that they did. Furthermore, they argue that, in willfully and wantonly conducting themselves with gross, reckless, and callous disregard for Plaintiffs' safety, Defendants acted with deliberate indifference, entitling Plaintiffs to an award of punitive or exemplary damages.

Plaintiffs' claims boil down to an allegation that Defendants deliberately concealed and/or withheld known information concerning safety hazards related to the Diving Program to bolster corporate profits at the expense of human life, while at the same time encouraging use of the program to induce participants. The facts of this case suggest that even if Defendants actively concealed potential risks in the Diving Program, that act of fraudulent concealment likely would not rise to the level of recklessness or callous disregard to human life. Still, given that the instant motion is one for judgment on the pleadings, depending on the extent of the acts that Defendants undertook to conceal the known risks, the Court concludes that, if such deliberate concealment were made upon Plaintiffs' due diligence in trying to uncover the risks involved, Plaintiffs may be able to sustain a claim of punitive damages, however strained that argument may appear now. Thus, the Court DENIES judgment on the pleadings in regard to Plaintiffs' Gross Negligence and Willful and Wanton Indifference punitive damages claims (Claypool Plaintiffs' Fourth Cause of Action and Isham Plaintiffs' Seventh Cause of Action). Again, if malice cannot be proven at a later time, Plaintiffs' claims, of course, shall fail.

C. *Emotional Distress and Loss of Consortium*
 **\*17**  Sheryll, Scott, and Kristin Claypool bring claims for emotional distress for witnessing the alleged injuries and for being placed at risk of injuries based on the above claims, including fraudulent concealment. Mathew and Roxanne Isham also claim emotional distress based on Defendants' intentional or reckless acts leading to Mathew's alleged injuries and Roxanne's emotional distress for, apparently, having to deal with the consequences of Defendants' acts. Similarly, Sheryll claims loss of consortium as a result of Dennis's injuries, as does Roxanne Isham as a result of Mathew's injuries.

1. *Emotional Distress*

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiffs' respective complaints do not clarify the type of emotional distress alleged, that is, whether they are alleging negligent or intentional. In their opposition, however, Claypool Plaintiffs clarify that their Sixth Cause of Action for emotional distress refers to negligent infliction of emotional distress. Isham Plaintiffs do not address Defendants' emotional distress argument one way or another, though their allegations of intentional and/or reckless acts and/or omissions on the part of Defendants suggest that they are claiming intentional and/or negligent emotional distress.

Negligent infliction of emotional distress ("NIED") claims are cognizable under general maritime law. *See Fawkner v. Atlantis Submarines,* 135 F.Supp.2d 1127, 1134 (D.Haw.2001). Although the Ninth Circuit has not adopted a threshold standard for such claims under maritime law, the Ninth Circuit has three recognizable standards: "physical impact," "zone of danger," or "relative bystander." *See id.* If negligence were at play, Mathew Isham would be the only Plaintiff that possibly could recover for emotional distress under the physical impact test, which requires an accompanying injury or contact.[12] *See id.* Likewise, Sheryll, Scott, and Kristin possibly could recover under the "zone of danger" test for "witness[ing] the peril of another" and being "threatened with physical harm" as result of the alleged negligence." *Id.* Roxanne could not recover under any standard, including the relative bystander test, because there are no factual allegations that she physically was near the scene of the accident and, therefore, she could not have personally observed it. *See id .; see also Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1409 (9th Cir.1994).

Even if those Plaintiffs could satisfy one of those standards, they still must be able to satisfy the elements of a NIED claim. To satisfy such a claim, Plaintiffs must prove three elements: (1) Defendants engaged in negligent conduct, (2) Plaintiffs suffered serious emotional distress, and (3) the negligent conduct was a legal cause of the serious emotional distress. *See Calleon v. Miyagi,* 876 P.2d 1278, 1288 (Haw.1994). Plaintiffs have failed to allege facts that would support a theory of negligence on the part of Defendants. Additionally, the State of Hawaii has adopted a standard to determine the seriousness of the emotional distress similar to that contained in the Restatement (Second) of Torts § 46, comment j. To find serious mental distress, a court must conclude that "a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues v. State,* 472 P.2d 509, 520 (Haw.1970). Plaintiffs have pled facts that may, if

proven, rise to the level of serious emotional distress, such as experiencing great emotional, mental pain, suffering and distress, the intensity and duration of which are likely to continue. It is not enough, however, to prove that serious mental distress has resulted from injuries suffered. Plaintiffs also must have pled facts that would prove causation. That Plaintiffs have failed to do. Because Plaintiffs have failed to plead facts that would prove negligence on the part of Defendants and facts that would prove that Defendants' negligence was the cause of Plaintiffs' serious emotional distress, Plaintiffs' NIED claims may not withstand judgment on the pleadings.

**\*18** There still remains the possibility that Isham Plaintiffs' intentional infliction of emotional distress claim ("IIED") may survive.[13] This Court has recognized a claim for IIED under general maritime law, consistent with Ninth Circuit precedent. *See Fawkner,* 135 F.Supp.2d at 1134. As applied in *Fawkner,* Restatement (Second) of Torts § 46 provides that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." 135 F.Supp.2d at 1135–36. Moreover, as further recognized in *Fawkner,* Restatement (Second) of Torts § 46, comment d. provides the following for "outrageous conduct":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!"

*Id.* at 1136 n. 4. The Court does not question whether Mathew and Roxanne suffered severe emotional distress based on Mathew's claimed injury, *i.e.,* the amputation of his left leg above the knee, as that level of injury surely could cause severe emotional distress to any individual and his or her spouse. The question really surrounds whether Defendants caused that distress through "extreme and outrageous conduct intentionally or recklessly," which

factual allegations Isham Plaintiffs have failed to plead. Even if Plaintiffs could prove that Defendants acted with malice for an award of punitive damages based on a deliberate or "intentional" withholding or concealment of known information in the Diving Program, that proof still would not necessarily support a finding that Defendants' conduct was "so outrageous in character" and "so extreme in degree" that Defendants surpassed "all bounds of decency" in a civilized community. The design of the Diving Program, even if designed for company profit, simply would not alone, without further pleadings of statements and/or omissions or acts made in support of that program by Defendants' agents and/or employees, rise to the level of extreme or outrageous conduct. The Court, therefore, GRANTS judgment on the pleadings on Plaintiffs' emotional distress (NIED and IIED) claims (Isham Plaintiffs' Ninth Cause of Action; Claypool Plaintiffs' Sixth Cause of Action).

*2. Loss of Consortium*

**\*19**  At the outset, Plaintiffs do not bring claims of loss of consortium or society for the wrongful death (or injury) of a seaman against an employer for negligence under the Jones Act or against nonemployers (or employers) on other grounds, such as unseaworthiness, under the Death on High Seas Act, which claims would not be permitted. *See Miles v. Apex Marine Corp.,* 498 U.S. 19, 20, 36–37 (1990) ("Damages recoverable in a general maritime cause of action for the wrongful death of a seaman do not include loss of society"). Although the law surrounding loss of consortium claims in maritime law is indefinite, the Supreme Court has noted the willingness of courts of admiralty to award damages for loss of consortium, citing in support *N.Y. & Long Branch Steamboat Co. v. Johnson,* 195 F. 740 (3d Cir.1912). *See Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 590 n. 25 (1974), *superceded by statute as stated in, Miles,* 498 U.S. at 20. In *Johnson,* the Third Circuit held that the husband of a woman who was injured as a passenger on a steamboat from New York to Long Branch, New Jersey was allowed to maintain a suit in admiralty for loss of society. *See* 195 F. at 741–42; *see also cf. Am. Export Lines, Inc. v. Alvez,* 446 U.S. 274, 276 (1980) (concluding that general maritime law affords a "wife of a harbor worker injured nonfatally aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society"). The Ninth Circuit has recognized a cause of action for loss of consortium for "beneficiaries" of passengers killed or injured on state territorial waters. *Chan,* 39 F.3d at 1407. Although the wives here are not beneficiaries in the typical sense, the Court looks to *Chan* for guidance. In *Chan,* the Ninth Circuit affirmed the district

court's dismissal of loss of consortium and loss of society claims by a husband, his wife, and their three children, finding recovery unavailable under general maritime law under the circumstances of that case for injuries that the husband and a child sustained while on a cruise ship's raft that capsized, throwing them into the surf. *See id.* at 1408. In that case, however, the injuries did not occur in state territorial waters, but rather occurred in the South Pacific near Tahiti, which the Ninth Circuit specifically recognized. *See id.* at 1402, 1407.

By contrast, the injuries here occurred in state territorial waters. Because this action is based on alleged tortious conduct occurring in state territorial waters resulting in injury to individuals who are not claimed seamen and the conduct is not alleged to have occurred through the negligence of an employee, the Court concludes that the wives, Roxanne and Sheryll, may bring a cause of action for loss of consortium. That the injury occurred in territorial waters rather than on land does not, in this case, limit the wives' remedies at law.

The only remaining cause of action to which the loss of consortium claims may attach, however, is fraudulent concealment, as Plaintiffs have failed to plead successfully a claim of negligence against Defendants. Generally, loss of consortium claims are attached to claims of negligence, but such claims are not limited to negligence. *See, e.g., Harbor Tug & Barge Co. v. Papai,* 520 U.S. 548, 551–52 (1997) (bringing causes of action for negligence under the Jones Act and unseaworthiness under general maritime law with a loss of consortium claim by the spouse); *Pulawa v. GTE Hawaiian Tel.,* 143 P.3d 1205 (Haw.2006) (bringing negligence and derivative claims for loss of consortium). They may attach where a defendant carries out alleged tortious conduct that subjects the defendant to liability for such harm. *See Restatement (Second) Torts § 693,* comments a. and b., and § 6, comment a. Consequently, Plaintiffs Sheryll and Roxanne may maintain their loss of consortium claims based on Defendants' alleged fraudulent concealment of known risks associated with the Diving Program that allegedly caused Plaintiffs' injuries. If, however, Plaintiffs are unable to prove fraudulent concealment, then Sheryll and Roxanne's loss of consortium claims shall fail as well. The Court, therefore, DENIES judgment on the pleadings on Sheryll and Roxanne's loss of consortium claims (Claypool Plaintiffs' Seventh Cause of Action; Isham Plaintiffs' Tenth Cause of Action).

D. *Isham Plaintiffs' Unfair and Deceptive Trade Practices*

*Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)*
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

**\*20** The final cause of action is Isham Plaintiffs' unfair and deceptive trade practices claim under Haw.Rev.Stat. §§ 480–1, *et seq.,* which applies to consumers who have been injured as a result of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Haw.Rev.Stat. §§ 480–2, 480–13. Without determining whether Mathew Isham is a consumer for the purpose of this statute, the Court finds that Isham Plaintiffs may not maintain this cause of action on the facts of this case because Hawaii's unfair and deceptive trade practices statute does not apply to personal injury claims. *See Blowers v. Eli Lilly and Co.,* 100 F.Supp.2d 1265, 1267–68 (D.Haw.2000) (holding that Haw.Rev.Stat. §§ 480–2 and 480–13 do not provide a remedy for actions based on personal injury because the purpose of the statute "is to prevent deceptive practices by businesses that are injurious to other businesses and consumers"). Isham Plaintiffs' claim indisputably is based on a loss resulting from personal injury: "As a result of [Mathew Isham's] participation in the [Diving] Program, Plaintiff Mat[ ]hew Isham is forever precluded from teaching any further diving courses for which he is certified to teach because of the extent of his injuries." [14] (*Complaint* ¶ 84.) For that reason, the Court GRANTS judgment on the pleadings on Isham Plaintiffs' Unfair and Deceptive Trade Practices claim (Fifth Cause of Action).

III. *Claypool Plaintiffs' Request for Leave to Amend*
In their opposition, Claypool Plaintiffs request leave to amend their Complaint in the event that the Court grants Defendants' motion, which Defendants oppose. Claypool Plaintiffs claim that they should be given an opportunity to correct any pleading deficiencies in the interest of justice before their claims are dismissed. *See* Federal Rule of Civil Procedure ("Fed. R. Civ.P .") 15(a); *Foman v. Davis,* 371 U.S. 178, 182 (1962). In *Foman,* the Supreme Court found that, pursuant to Fed.R.Civ.P. 15(a), "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." 371 U.S. at 182. It went on to state: "[o]f course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion." *Id.* "Whether to grant or deny a motion for leave to amend is generally determined by reference to the following factors: undue delay, bad faith, futility of amendment, prejudice to the opposing party, and repeated failure to cure deficiencies by amendments

previously allowed." *Grace v. Drake,* 832 F.Supp. 1399, 1402 (D . Haw.1991).

Here, although Isham Plaintiffs have amended their Complaint on one occasion, Claypool Plaintiffs have not. The majority of Claypool Plaintiffs' claims against Defendants rest on the notion that the Diving Program constitutes a product, under which theory neither set of Plaintiffs can sustain a cause of action. Claypool Plaintiffs did not allege any facts that would sustain a negligence claim against Defendants, for example, for failure to train Mathew Isham or another agent/ employee or for the negligent acts/omissions of Mathew. Claypool Plaintiffs not only failed to suggest that Mathew's training or reaction to the situation was negligent, but they actually applauded Mathew for his heroic actions. Although, as previously stated, Claypool Plaintiffs might argue that the Court should permit them to amend their Complaint to allege negligent misrepresentation, Claypool Plaintiffs, although they had a chance to advance that theory, did not make any factual allegations to support it in their Complaint or in their opposition.

**\*21** Notably, Claypool Plaintiffs present no changes that they would make upon amendment; they merely request a second bite at the apple to allege an entirely new set of claims in case their first set of arguments and/or theories fail. Granted, there is no suggestion that burdensome discovery has taken place so far, thus possibly prejudicing Defendants in that way. Still, Defendants have utilized time and resources to respond fully to each of Plaintiffs' current allegations. Having to respond to a second and entirely new set of allegations for the sole reason that Claypool Plaintiffs apparently believe that they should be able to succeed on *some* claim, whatever that claim may be, against Defendants is not a sound reason to permit amendment. To allow amendment on that basis alone would prejudice Defendants by giving Claypool Plaintiffs, who are represented by counsel, multiple opportunities to present legal theories, at Defendants' expense, until they get one right, particularly given the length of time that has passed since the accident in 2004. To be sure, Plaintiffs had a proper subject of relief against a different set of defendants, and they obtained relief against those defendants in previous settlements that occurred before this Court. *See Mathew Isham, et al. v. Blue Dolphin Charters, Ltd., et al.,* CV No. 04–559 HG BMK and *Dennis Claypool v. Captain Andy's Sailing, Inc., Blue Dolphin Charters, Ltd .,* and Blue Dolphin Diving, Ltd., CV No. 04–570 HG BMK. (Docket Nos. 143, 159, 162, 174.) That is not to say, however, that the same applies here against the instant Defendants.

*Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)*
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

If Plaintiffs had been proceeding pro se, had they presented alternative arguments/claims to the Court that might be legally cognizable upon amendment, or had they alleged a different set of underlying facts and circumstances that easily could have given rise to a sound legal argument, the result may be different. As it is, the Court will not condone a course of conduct whereby plaintiffs are given multiple opportunities to file claims in the Court after dismissal until the plaintiffs finally allege a theory of liability that is legally cognizable. The Court, therefore, DENIES Claypool Plaintiffs' request to amend their Complaint should the Court find merit to Defendants' arguments (as it did).

## CONCLUSION

For the reasons stated above, the Court GRANTS judgment on the pleadings in favor of Defendants on Claypool and Isham Plaintiffs' strict liability claims (First Causes of Action for both); Claypool Plaintiffs' Negligent Manufacture (Second Cause of Action) and Isham Plaintiffs' Negligence (Sixth Cause of Action) claims; Isham Plaintiffs' Negligent Misrepresentation claim (also labeled as a Sixth Cause of Action); Claypool and Isham Plaintiffs' Breach of Warranty claims (Third and Second Causes of Action respectively), including Isham Plaintiffs' Breach of Express and Implied Warranties (Third Cause of Action); Isham and Claypool Plaintiffs' emotional distress claims (Ninth and Sixth Causes of Actions respectively), and Isham Plaintiffs' Unfair and Deceptive Trade Practices claim (Fifth Cause of Action).

**\*22** For the reasons stated above, the Court DENIES judgment on the pleadings in favor of Claypool and Isham Plaintiffs' Fraudulent Concealment claims (Claypool Plaintiffs' Fifth Cause of Action; Isham Plaintiffs' Fourth Cause of Action), Claypool and Isham Plaintiffs' Gross Negligence and Willful and Wanton Indifference punitive damages claims (Claypool Plaintiffs' Fourth Cause of Action and Isham Plaintiffs' Seventh Cause of Action), and Plaintiffs Sheryll Claypool and Roxanne Isham's loss of consortium claims (Claypool Plaintiffs' Seventh Cause of Action; Isham Plaintiffs' Tenth Cause of Action).

The Court DENIES Claypool Plaintiffs' request to amend their Complaint should the Court find merit to Defendants' arguments.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 2460776, 63 UCC Rep.Serv.2d 917

## Footnotes

1    Unless the Court refers to "Isham Plaintiffs" or "Claypool Plaintiffs" specifically, the Court's reference to "Plaintiffs" includes both sets of Plaintiffs, Claypool and Isham. The Court, at times, shall refer to the respective Plaintiffs individually by their first name or by their first and last name per the spelling provided in the caption, which the parties, at times, change in their motions.

2    Claypool Plaintiffs are residents and citizens of the State of Arizona. Isham Plaintiffs are residents and citizens of the State of Texas. At all times relevant to this action, Isham Plaintiffs were residing as husband and wife in the County of Kauai, State of Hawaii. Defendants are corporations organized and existing in the State of California with the principal place of business in California. Defendants Padi Worldwide, International Padi, and DSAT are authorized to do business in the State of Hawaii. CIVCO is believed to be the parent corporation of Padi Worldwide, International Padi, and DSAT.

3    As further background, a settlement occurred in a consolidated case involving Isham and Claypool Plaintiffs that previously had been before this Court, *Mathew Isham, et al. v. Blue Dolphin Charters, Ltd., et al.,* CV No. 04–559 HG BMK and *Dennis Claypool v. Captain Andy's Sailing, Inc., Blue Dolphin Charters, Ltd., and Blue Dolphin Diving, Ltd.,* CV No. 04–570 HG BMK.

4    Even if the Court were to rely exclusively or predominantly on Hawaii state law, the same or similar principles of law would apply as Hawaii "essentially" adopted the rules contained in § 402A. *See Stewart v. Budget Rent–A–Car Corp.,* 470 P.2d 240, 243 (1970) (involving a steering defect in a rental car); *see also East River Steamship Corp.,* 476 U.S. at 865 n. 2 (determining that state law principles were not required in this admiralty case, and that, in any event, reliance on state law principles would have led to the same result).

5    Claypool Plaintiffs contest the adoption or approval of the Restatement (Third) of Torts, claiming that the Ninth Circuit adopted the Restatement (Second) of Torts only. Notwithstanding, as discussed *infra,* both the Second and the Third Restatement share similarities in the liability imposed (either strict or negligence), depending on the type of defect at

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Isham v. Padi Worldwide Corp., Not Reported in F.Supp.2d (2007)
2007 WL 2460776, 63 UCC Rep.Serv.2d 917

issue, and both require that the defect pertain to a "product." The definition of a product under Restatement (Third) of Torts § 19, furthermore, is consistent with prevailing case law on the matter, which the Court deems persuasive. Although the Court shall construe the term "product" on a case-specific basis, *see Leong v. Sears Roebuck and Co.,* 970 P.2d 972, 973 (Haw.1998), it shall rely on the Restatement (Third) of Torts for guidance, as the Supreme Court likewise has done in an admiralty case. *See Saratoga Fishing Company v. J.M. Martinac & Co.,* 520 U.S. 875, 879 (1997) (relying on Restatement (Third) of Torts: Products Liability § 6 for the principle "that tort law in this area ordinarily (but with exceptions) does not permit recovery for purely economic losses, say, lost profits").

6    Because Isham is alleging physical injuries and not injuries to the product itself, this case does not implicate the "economic loss" rule, *i.e.,* that one may not sustain a cause of action for negligent misrepresentation on the basis of economic loss to the product alone (which generally is not recoverable in tort). *See East River S.S. Corp.,* 476 U.S. at 868–71; *United States Steel Corp.,* 919 P.2d at 301.

7    Isham Plaintiffs provide no argument to the contrary.

8    As will be discussed, Plaintiffs may, however, maintain a cause of action for fraudulent concealment as an equitable claim regardless of the statute of limitations.

9    As discussed in section III, Claypool Plaintiffs request leave to amend their Complaint should the Court find that Defendants' motion has merit. For the reasons stated therein, the Court shall not permit such an amendment, given the facts and the circumstances of this case.

10    CIVCO is the only Defendant that is not specifically noted as being authorized to do business in Hawaii.

11    Defendants argue that Hawaii state law should apply to prove a claim of fraud, not fraudulent concealment. Although the Court recognizes Claypool Plaintiffs' re-characterization of the allegation in the Complaint, the Court looks to the allegation made in the Complaint only, declining to address the re-characterization as general "fraud" because that was not alleged.

12    Claypool Plaintiffs do not allege emotional distress in relation to Dennis, the injured victim, but only for Sheryll, Scott, and Kristin.

13    As stated, because Claypool Plaintiffs effectively concede that their Sixth Cause of Action relates to negligent infliction of emotional distress only, the Court addresses an IIED claim in relation to Isham Plaintiffs only. *See Claypool Plaintiffs' Opp'n* at 26 ("The Claypools' Sixth Cause of Action states a claim for negligent infliction of emotional distress or 'NIED.' ").

14    As with all other claims besides strict liability, Isham Plaintiffs do not address this argument at all in their opposition.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

Hale v. Bayer Corporation, Not Reported in Fed. Supp. (2015)

2015 WL 5474298

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 137 of 370
PageID: 10167

KeyCite Yellow Flag - Negative Treatment

Distinguished by *Korein Tillery, LLC v. Advanced Analytical Consulting Group, Inc.,* S.D.Ill., September 12, 2017

2015 WL 5474298
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

Kenneth HALE and Viki Hale, Plaintiffs,

v.

BAYER CORPORATION,et al., Defendants.

Case No. 15–cv–00745–JPG–SCW

|

Signed 9/15/2015

|

Filed 09/16/2015

**Attorneys and Law Firms**

Ted N. Gianaris, Jo Anna Pollock, Simmons Hanly Conroy, Alton, IL, for Plaintiffs.

Katherine M. Fowler, Margaret D. Gentzen, Terry Lueckenhoff, Fox Galvin, LLC, St. Louis, MO, Matthew B. Champlin, Michael Reda, Heplerbroom LLC, Edwardsville, IL, for Defendants.

*MEMORANDUM AND ORDER*

J. PHIL GILBERT DISTRICT JUDGE

**\*1** This matter is before the Court on the question of federal subject matter jurisdiction. The Notice of Removal (Doc. 1) [1] filed by Defendant Bayer Corporation ("Bayer") alleges that Defendants Walgreens Co., Walgreens Business Services, LLC, and their related companies and entities ("Walgreens") are the "epitome of fraudulent joinder" and that this Court should disregarded their citizenship for the purposes of determining diversity jurisdiction.

**1. Background.**

This is a strict product liability action alleging that Plaintiff Kenneth Hale took the over-the-counter medication, Aleve, for less than ten days and suffered a permanent kidney injury. Plaintiffs Kenneth and Viki Hale are citizens of Illinois. Bayer is a citizen of Indiana and Pennsylvania and Bayer HealthCare LLC is a citizen of Delaware and Pennsylvania. Walgreens Defendants are citizens of Illinois.

Counts VI–VIII of the Plaintiffs' Complaint are directed towards Walgreens and allege negligence and willful and wanton conduct in that Walgreen worked together with Defendant Bayer to market, advertise and promote Aleve. In support of these counts, Plaintiffs allege that, "The Hales regularly visited and shopped at a Walgreens in Godfrey, Illinois" and that "The Hales' visits to Walgreens and the time they spent in the portion of the store where the Aleve was placed for sale influenced their perception that Aleve was safe when in fact it caused kidney injury." (Doc. 1–1, page 10).

The Plaintiffs previously filed a complaint in this Court (*Hale v. Bayer Corporation,* 3:14–cv–00481–MJR–SCW) which was voluntarily dismissed on April 29, 2015. That matter did not name Walgreens as a defendant, but contained the substantially same allegations against Bayer. After dismissal, the matter was filed in Madison County (2015L 000721) on June 4 [th] , 2015, with the addition of Walgreens as a defendant, and then removed to this Court. Bayer now moves this Court to ignore the citizenship of Walgreens in determining whether this Court has jurisdiction.

**2. Standard.**

District courts have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of $75,000 and is between citizens of different States. 28 U.S.C. § 1332(a)(1). The "proponent of federal jurisdiction has the burden of proof." *Meridian Sec. Ins. Co. v. Sadowski,* 441 F.3d 536, 540 (7th Cir.2006)(citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178 (1936)).

A plaintiff cannot destroy diversity jurisdiction by joining a nondiverse party if the joinder is fraudulent. *Gottlieb v. Westin Hotel Co.,* 990 F.2d 323, 327 (7th Cir.1993). The Court must ignore the citizenship of fraudulently joined parties when determining if it has diversity jurisdiction. Id.; *see Bodine's Inc. v. Federal Ins. Co.,* 601 F.Supp. 47, 48–49 (N.D.Ill.1984). Fraudulent joinder can occur in two circumstances: (1) when there is no possibility that a plaintiff can state a cause of action against the nondiverse defendant in state court or (2) where there has been outright fraud in plaintiff's pleading of jurisdictional facts. *Gottleib,* 990 F.2d at 327. The party invoking the Court's jurisdiction bears a heavy burden of persuasion to demonstrate fraudulent joinder. *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir. 1992). Any doubt with

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 138 of 370
PageID: 10168

Hale v. Bayer Corporation, Not Reported in Fed. Supp. (2015)

2015 WL 5474298

regard to removal should be resolved in favor of the plaintiff's choice of forum. *Schur v. L.A. Weight Loss Centers, Inc.*, 577 F.3d 752 (7 th Cir. 2009).

**\*2** There is no dispute with regard to the amount in controversy and Bayer is not alleging outright fraud in plaintiffs' pleadings. However, Bayer is alleging that there is no possibility that the plaintiffs can state a cause of action against Walgreens. "[A]fter resolving all issues of fact *and law* in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Schur* at 73. As such, "[T]he federal court must engage in an act of prediction: is there any reasonable possibility that a state court would rule against the non-diverse defendant?" *Id*. In this case, is there any reasonable possibility that an Illinois state court would rule against Walgreens?

3. **Analysis.**
Illinois law requires, "All pleadings shall contain a plain and concise statement of the pleader's cause of action, counterclaim, defense, or reply." 735 ILCS 5/2–603. In order to state a cause of action for negligence under Illinois law, the plaintiff must show that: "(1) the defendant owed him a duty of care; (2) the defendant breached that duty; and (3) the breach was the proximate cause of his injuries." *Staples v. Krack Corp.*, 186 F.3d 977, 979 (7th Cir.1999) (*citing Ward v. Kmart Corp.*, 554 N.E.2d 223, 226 (Ill.1990)).

Bayer argues that Walgreens did not owe the Plaintiffs a duty of care. "The existence of a duty is a question of law for the court to decide; however, the issues of breach and proximate cause are factual matters for a jury to decide provided there is a genuine issue of material fact regarding those issues." *Adams v. Norther Illinois Gas Co.*, 809 N.E.2d 1248, 1257 (Ill.2004)(internal citations omitted).

The Plaintiffs allege that Walgreens, in placing Aleve for sale in a portion of their store, owed "a duty to exercise reasonable care to consumers in the promotion, advertising, marketing, distribution, and/or sale of Aleve." (Doc. 1–1, pg 10). Bayer cites to *Walton v. Bayer Corp.*, 643 F.3d 995 (7 th Cir.2011) noting that Illinois court apply the application of the learned-intermediary doctrine to limit the liability of pharmacies.

> Pharmacies (and normally other sellers in the chain of distribution that runs from the manufacturer to the ultimate

> consumer) can't be expected to warn their customers of the possible defects and dangers of the prescription drugs they sell. It would be senseless, especially given drug regulation by the Food and Drug Administration and the extensive tort liability of drug manufacturers, to make pharmacies liable in tort for the consequences of failing to investigate the safety of thousands of drugs." *Id* at 1000.

The court in *Walton* went on to explain that Illinois courts hold that if a pharmacy "knew that the plaintiff was abnormally susceptible to a particular side effect of Yasmin, it had a duty to warn her or her physician." *Id*. In the case bar, there is no indication that the Plaintiffs purchased the Aleve or even that they regularly purchased over-the-counter medication at Walgreens. According to Plaintiff Kenneth Hale's interrogatory responses, he filled his prescriptions at either Express Scripts or Schnucks Pharmacy [2] in Godfrey, Illinois (Doc. 6–4, pg 4). As such, Walgreens could not fall into the exception of the Illinois learned-intermediary doctrine because there is no allegation that Walgreens knew, or could have known, that the plaintiff was susceptible to a particular side effect of Aleve.

The plaintiffs argue that the Court should disregard this, and other pharmacy related cases, as "a pharmacist does not owe a duty to consumers of prescription drugs because such a duty would place the pharmacist in the middle of the doctor-patient relationship ... and this case involves the direct-to-consumer advertising and promotion of an over-the-counter medicine." (Doc. 14, pg 2). The Court does not agree. As quoted above, the *Walton* court stated "(*and normally other sellers in the chain of distribution that runs from the manufacturer to the ultimate consumer*)" (*emphasis added*). The Court agrees with the reasons stated in *Walton* that "It would be senseless, especially given drug regulation by the Food and Drug Administration and the extensive tort liability of drug manufacturers, to make pharmacies liable in tort for the consequences of failing to investigate the safety of thousands of drugs." Id. The logic of *Walton* applies to over-the-counter as well as prescription medication. If Plaintiffs obtained their prescription medications, as well as over-the-counter drugs at Walgreens, then there may have existed an argument that Walgreens should have been aware of a drug

Hale v. Bayer Corporation, Not Reported in Fed. Supp. (2015)

2015 WL 5474298

interaction or prior side effect of the contains of Aleve to the plaintiff, but no such relationship is alleged.

**\*3** The only relationship alleged in the complaint is a consumer relationship between the Plaintiffs and Walgreens. Illinois courts have held that in regard to the duty of care:

" '[t]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a *relationship* to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff.' " *Simpkins v. CSX Transportation, Inc,* 965 N.E.2d 1092,1096 (Ill.2012).

The relationship referred to in this context acts as a shorthand description for the sum of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. *Id at* 1097.

However, the *Simpkins* court went on to state: "Thus, if a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. This does not establish a 'duty to the world at large,' but rather this duty is limited by the considerations discussed above." *Id,* at 1097.

Whether an injury is reasonably foreseeable is determined at the time the alleged negligent action occurred and not with the benefit of hindsight. "While this does not require the plaintiff to set forth evidence in the complaint, it does demand that the plaintiff allege facts sufficient to bring a claim within a legally recognized cause of action. A plaintiff may not rely on conclusions of law or fact unsupported by specific factual allegations." *Id* at 1099.

There are no specific factual allegations other than Walgreens placed Aleve for sale in their store and that such placement influenced the Plaintiffs' perception that Aleve was safe. That Walgreens "marketed, advertised and promoted and warranted" are unsupported by specific factual allegations such as whether the Aleve was set apart from other over-the-counter pain relievers of that type or any other specific allegation that Walgreens specifically endorse Aleve in a manner that an average consumer would take Walgreen's actions above that of an offer of sale.

The Plaintiffs' only allege that by regularly visiting and shopping at a Walgreens store in Godfrey, Illinois, their perception that Aleve was safe was influenced. The Court is certain that numerous stores throughout the Godfrey, Illinois area display and sell Aleve—including the stores in which the plaintiffs testified they obtain their prescription drugs—yet only the in-state Walgreens is a named defendant. Also interesting to note is that Plaintiff Kenneth Hale is currently the Director of Marketing and New Product Development for Olin Brass and has been employed "for the last approximate 34 years in sales and marketing positions." As such, it would appear to the Court that the Plaintiff would be a better position to state at least some manner in which Walgreens "marketed, advertised and promoted and warranted" sufficient to bring his claims within a legally recognized cause of action.

Plaintiffs also allege Walgreens engaged in willful and wanton conduct. Conduct is willful and wanton under Illinois law if it constitutes "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210.

**\*4** Regardless of the number of ways in which the Plaintiffs state, restate, or rephrase, the basic facts to which the Plaintiffs bring their allegations against Walgreens is simply that the Plaintiffs shopped in a Walgreens store in Godfrey, Illinois and that Walgreens had Aleve for sale in the store in such as manner as to influence the Plaintiffs that Aleve is safe. Such general allegations areinsufficient to bring a duty to Walgreens nor is it sufficient to bring a claim within a legally recognized cause of action under Illinois law.

### 4. Conclusion

Based on the above, the Court finds there is no reasonable possibility that an Illinois state court would rule against Walgreens. As such, Walgreens is **DISMISSED** without prejudice and the citizenship of Walgreens is disregarded for the purpose of determining diversity jurisdiction. This Court retains jurisdiction and Walgreen's Motion to Dismiss (Doc. 6) and Plaintiffs' Motion to Remand are **DENIED** as moot.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 5474298

2015 WL 5474298

Footnotes

1    Plaintiffs did not file a specific response to the Notice of Removal, but did file a Motion for Remand (Doc. 14) and a
     Brief in Opposition to Walgreens' Motion to Dismiss (Doc. 13). The Court reviewed and considered both filings in its
     determination of the jurisdictional issue.

2    Express Scipts and Schnucks Pharmacy are Missouri are citizens for the purpose of diversity. See Missouri Secretary of
     State https://bsb.sos.mo.gov/businessentity/BESearch.aspx (last visited 8/26/2015).

---

End of Document                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

Aranda v. Walgreen Co., Not Reported in F.Supp.2d (2012)

2012 WL 1884737, 12 Cal. Daily Op. Serv. 5670

2012 WL 1884737
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

Gaby ARANDA, et al., Plaintiffs,
v.
WALGREEN Co., d/b/
a Walgreens, et al., Defendants.

No. 12–cv–337–DRH.
|
May 23, 2012.

**Attorneys and Law Firms**

Jeffrey J. Lowe, Jeffrey J. Lowe, P.C., St. Louis, MO, Michael Joseph O'Malley, Carey, Danis & Lowe, Belleville, IL, for Plaintiffs.

Bart C. Sullivan, Fox Galvin, LLC, St. Louis, MO, for Defendants.

*ORDER*

HERNDON, Chief Judge.

**\*1** This is the second time this case has been removed to federal court based upon diversity jurisdiction. The first time it was removed, Judge Gilbert remanded this case back to the St. Clair County circuit court on the basis that complete diversity was lacking because the case contained both New Jersey plaintiffs, i.e., Anthony Marone and Roger Coron, and defendants, i.e., Hoffmann–La Roche Inc. and Roche–Laboratories Inc. *See* Doc. 17, 11–cv–00654–JPG–DGW. That impediment to the Court's jurisdiction is no longer here as plaintiffs have voluntarily dismissed Marone's causes of action and have shown that Coron was a citizen of New York, not New Jersey. Rather, this time around, the Court must decide whether defendant Walgreen Co., d/b/a Walgreens, an Illinois citizen (there are four plaintiffs who are alleged to be Illinois citizens [1] ), prohibits this Court from having jurisdiction over this matter. Based upon the Seventh Circuit's decision in *Walton v. Bayer Corp.,* 643 F.3d 994 (7th Cir.2011), the Court finds that the state of plaintiffs' complaint at the time of removal clearly fails to allege what is necessary against the pharmaceutical retailer and so the claims against Walgreens must be dismissed, thereby removing any barrier to the Court's jurisdiction. Thus, plaintiffs motion to remand (Doc. 9) is denied.

**I. Background**

On June 24, 2011, numerous (seventy-one) plaintiffs filed suit against defendants Wagreens, Hoffmann–La Roche Inc., Roche Laboratories Inc., F. Hoffmann–La Roche Ltd., and Roche Holding Ltd. for personal injuries they suffered after being exposed to the pharmaceutical drug Accutane, which is alleged to have been manufactured by defendants Hoffmann–La Roche Inc. and Roche Laboratories, Inc., and sold by defendant Walgreens. On July 29, 2011, defendants Hoffmann–La Roche Inc. and Roche Laboratories Inc. (collectively the answering defendants or defendants) filed a notice of removal (Doc. 3), removing the case from St. Clair County circuit court to this Court on the basis of diversity jurisdiction. Doc. 3, 11–cv654–JPG–DGW. In the notice of removal, defendants alleged that plaintiffs' complaint fraudulently joined defendant Walgreens and fraudulently brought claims on behalf of two New Jersey citizens in order to defeat diversity jurisdiction. Thus, defendants argued that because of the fraudulent joinder and misjoinder of non-resident plaintiffs, the Court had jurisdiction. On August 25, 2011, the Court, via Judge Gilbert, issue a memorandum and order, remanding this case to state court on the basis that there were New Jersey plaintiffs and defendants. *See* Doc. 17, 11–cv–654–JPG–DGW. At the time Judge Gilbert issued his remand order, the case was pending transfer for consolidated multidistrict proceedings in *In re Accutane Products Liability Litigation,* MDL No. 1626.

On April 27, 2012, defendants Hoffmann–La Roche Inc. and Roche Laboratories Inc. filed another notice of removal (Doc. 2) [2] in this Court, noting that since the case was remanded to state court, plaintiffs have dropped the claims of the New Jersey citizen Marone, and that the deposition testimony of plaintiff Coron established that he was a resident of New York, [3] thereby nullifying the district court's prior basis for finding complete diversity lacking. Defendants still contend that defendant Walgreens was fraudulently joined. That same day, defendants filed a notice of potential tag-along with the United States Judicial Panel on Multidistrict Litigation (the Panel), and on May 2, 2012, the Panel issued a Conditional Transfer Order (CTO). On May 7, 2012, plaintiffs filed with the Panel their opposition to the CTO and moved to vacate the CTO because the federal court lacked subject matter jurisdiction. Defendants responses are due May 29, 2012.

**\*2** On May 9, 2012, plaintiffs filed a motion to remand (Doc. 9), a memorandum in support thereof (Doc. 10), and a motion to expedite briefing (Doc. 11) so that plaintiff's motion to remand would be ripe for decision prior to the Panel's May 29, 2012, briefing deadline related to the CTO. On May 11, 2012, the Court granted plaintiffs motion to expedite briefing (Doc. 14), and ordered defendants to file their responses by May 18, 2012. On May 18, 2012, defendants filed their response (Doc. 14), and May 21, 2012, plaintiffs filed a reply to that response (Doc. 15). For the reasons that follow, the Court denies plaintiffs' motion to remand (Doc. 9).

## II. Analysis

In plaintiffs' motion to remand, plaintiffs contend that this case should be remanded back to state court for lack of subject matter jurisdiction "because (1) complete diversity of citizenship is lacking because four [p]laintiffs and [d]efendant Walgreens are citizens of Illinois and (2) [p]laintiffs' claims against Walgreens are recognized as meritorious under prevailing Illinois law, and therefore, Walgreens was not fraudulently joined in this action."[4] DEFENDANTS contend, on the other hand, that Walgreens has been fraudulently joined, and that plaintiffs' tactic of naming a non-diverse pharmacy in a failure to warn lawsuit against a pharmaceutical company constitutes fraudulent joinder under *Walton* . Defendants also contend that due to the troubling conduct of plaintiffs' counsel in alleging New Jersey citizenship, when in fact there were no New Jersey plaintiffs, defendants should be awarded the fees and costs it has incurred in this second removal. Plaintiffs posit that there is no basis for awarding fees and costs to defendants.

It is well known that removal is proper over any action that could have been filed originally in federal court. *28 U.S.C. § 1441; Tylka v. Gerber Products Co.,* 211 F.3d 445, 448 (7th Cir.2000). The removal statute, *28 U.S.C. § 1441,* is construed narrowly and doubts concerning removal are resolved in favor of remand. *Doe v. Allied–Signal, Inc.,* 985 F.2d 908, 911 (7th Cir.1993). Defendant bears the burden to present evidence of federal jurisdiction once the existence of that jurisdiction is fairly cast into doubt. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 607 (7th Cir.1997).

This case was removed here on the basis of diversity jurisdiction. "For good or ill, Congress has authorized the removal of cases in which the parties are of diverse citizenship

and the states exceed $75,000." *Benson v. SI Handling Sys., Inc.,* 188 F.3d 780, 783 (7th Cir.1999). "When either side to such a suit prefers the federal forum, that preference prevails." *Id.*

The statute regarding diversity jurisdiction, *28 U.S.C. § 1332,* requires complete diversity between parties plus an amount in controversy exceeding $75,000, exclusive of interest and costs.[5] Complete diversity means that "none of the parties on either side of the litigation may be a citizen of the state of which a party on the other side is a citizen." *Howell v. Tribune Entm't Co.,* 106 F.3d 215, 217 (7th Cir.1997) (citations omitted).

**\*3** "A plaintiff typically may choose its own forum, but it may not join a nondiverse defendant simply to destroy diversity jurisdiction ." *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 763 (7th Cir.2009) (citing *Schwartz v. State Farm Mut. Auto. Ins. Co.,* 174 F.3d 875, 878 (7th Cir.1999)). "The 'fraudulent joinder' doctrine, therefore, permits a district court considering removal 'to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction.' " *Schur,* 577 F.3d at 763 (quoting *Mayes v. Rapoport,* 198 F.3d 457, 462 (4th Cir.1999)).

"As many courts have noted, the term 'fraudulent joinder' is a bit of a misnomer-the doctrine requires neither fraud nor joinder." *Schur,* 577 F.3d at 763 n. 9. "Actual fraud in alleging jurisdictional facts will suffice to invoke the doctrine, but the more typical ground is that a plaintiff brought a claim against a nondiverse defendant 'that simply has no chance of success, whatever the plaintiff's motives.' " *Id.* (quoting *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992)). "And 'joinder' is also misleading because it is irrelevant whether a nondiverse defendant was actually 'joined' or simply named in the original complaint before the state court." *Schur,* 577 F.3d at 763 n. 9 (citing *Mayes,* 198 F.3d at 461 n. 8).

"Fraudulent joinder is difficult to establish-a defendant must demonstrate that, 'after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant.' " *Schur,* 577 F.3d at 764 (quoting *Poulos,* 959 F.2d at 73). "Framed a different way, the district court must ask whether there is 'any reasonable possibility' that the plaintiff could prevail against the non-diverse defendant." *Schur,* 577 F.3d at 764 (quoting *Poulos,* 959 F.2d at 73). "A defendant faces a 'heavy burden' to

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 144 of 370
PageID: 10174
Aranda v. Walgreen Co., Not Reported in F.Supp.2d (2012)
2012 WL 1884737, 12 Cal. Daily Op. Serv. 5670

demonstrate that the joinder is fraudulent, [citation], and some courts, including district courts within this circuit, have suggested that the burden is even more favorable to the plaintiff than the standard that applies to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), [citations]." Schur, 577 F.3d at 764. "In conducting this analysis, a district court must turn to state law to determine whether the plaintiff has any reasonable possibility of success." Id.

In Illinois, the "learned intermediary" doctrine "excuses the manufacturer of a prescription drug from having to warn customers of the drug's adverse side effects; it need warn only physicians, so that armed with the warning they can make a medical decision to prescribe or not to prescribe the drug for a particular patient." Walton, 643 F.3d at 999–1000. "The prescribing physician is the 'learned intermediary'— the medical professional who, equipped with the knowledge imparted to him by the drug's manufacturer, determines, weighing benefit against risk, the drug's suitability for a particular patient." Id. at 1000. "The underlying rationale of the learned intermediary doctrine is that, with regard to prescription drugs, which are likely to be complex medicines, it is the prescribing physician who knows both the propensities of the drug and the susceptibilities of his patient, and who therefore is in the best position to prescribe a particular drug for the patient." Happel v. Wal–Mart Stores, Inc., 199 Ill.2d 179, 191, 262 Ill.Dec. 815, 766 N.E.2d 1118 (Ill.2002). But the doctrine does not just apply to manufacturers, it also applies to pharmacies when they sell prescription drugs, although the doctrine applies differently from its application to manufacturers. Id. Two cases, one by the Illinois Supreme Court in Happel and one by the Seventh Circuit in Walton are illustrative of this point.

**\*4** In Happel, the plaintiff, who was allergic to aspirin, ibuprofen, and acetaminophen, experienced a severe reaction after taking Toradol, a pain reliever prescribed by her physician. Toradol should not be taken by persons who are allergic to aspirin and other nonsteroidal anti-inflammatory drugs (NSAIDS). The plaintiff subsequently brought a negligence action against her physician and the pharmacy who filled the prescription. The plaintiff's physician settled, and the trial court granted summary judgment in favor of the pharmacy. The Illinois appellate court reversed, and the Illinois Supreme Court granted the pharmacy's petition for leave to appeal. On appeal, the Illinois Supreme Court considered "whether a pharmacy has a duty to warn about a known drug contraindication [6] where the pharmacy is aware of a customer's drug allergies and knows that the medication

prescribed by the customer's physician is contraindicated for person with those allergies." Happel, 199 Ill.2d at 180–81, 262 Ill.Dec. 815, 766 N.E.2d 1118.

The Court concluded that a duty existed, finding that under the circumstances of that case, the pharmacy had a duty to warn that was encompassed within the pharmacists' duty of ordinary care. Id. at 188–89, 262 Ill.Dec. 815, 766 N.E.2d 1118 (citing Eldridge v. Eli Lilly & Co., 138 Ill.App.3d 124, 126, 92 Ill.Dec. 740, 485 N.E.2d 551 (Ill.App.Ct.1985)). In addressing the pharmacy's argument that the " 'learned intermediary doctrine exempts pharmacists and pharmacies from giving warnings to patients,' " the Illinois Supreme Court concluded that this case was outside the purview of the learned intermediary doctrine. Happel, 199 Ill.2d at 193–94, 262 Ill.Dec. 815, 766 N.E.2d 1118. The court provided the following rationale for its decision:

Here, [the pharmacy] was aware not only of [the plaintiff's] drug allergies, but also that Toradol was contraindicated for persons such [the plaintiff] with allergies to aspirin. Imposing a duty to warn of this contraindication would not require the pharmacist to "learn the customer's condition and monitor his drug usage." [Citation]. On the contrary, [the pharmacy] already had the knowledge it needed in order to give an effective warning, and this warning required [the pharmacy] only to notify [the plaintiff's doctor] or [the plaintiff] of the Toradol contraindication, not to monitor [the plaintiff's] drug usage. [Footnote omitted]. Further, imposing a duty to warn here would not have intruded [the pharmacy] into the doctor-patient relationship, forcing it to "practice medicine without a license." [Citation].

Id. at 194, 262 Ill.Dec. 815, 766 N.E.2d 1118. Accordingly, the Illinois Supreme Court held "that a narrow duty to warn exists where ... a pharmacy has patient-specific information about drug allergies, and knows that drug prescribed is contraindicated for the individual patient." Id. at 197, 262 Ill.Dec. 815, 766 N.E.2d 1118.

In Walton, the Seventh Circuit considered whether this court was correct when it determined that the claims against the pharmacy had so little merit that the pharmacy's joinder as a defendant was fraudulent. Applying the "learned intermediary doctrine" to pharmacies, the court noted that "the doctrine's logic applies to pharmacies when they sell prescription drugs (like Yazmin), though applies differently from its application to manufacturers." Id. at 1000. The Court explained how the doctrine applied to pharmacies as follows:

2012 WL 1884737, 12 Cal. Daily Op. Serv. 5670

*5 Pharmacies (and normally other sellers in the chain of distribution that runs from the manufacturer to the ultimate consumer) can't be expected to warn their customers of the possible defects and dangers of the prescription dugs they sell. It would be senseless, especially given drug regulation by the Food and Drug Administration and the extensive tort liability of drug manufacturers, to make pharmacies liable in tort for he consequences of failing to investigate the safety of thousands of drugs. What a pharmacy sometimes knows, however, without investigation, and the manufacturer will not know and even a treating physician may not know, is susceptibilities of particular customers of the pharmacy to the side effects of a drug that it sells them-susceptibilities because of other drugs that the pharmacy knows the customers is taking, or a preexisting physical or mental condition (again known to it) that makes the drug contraindicated for the customer-and then it must warn either the customer or his physician. [Citations]. But not otherwise.

*Id.* at 1000. Thus, the Seventh Circuit concluded "that in 48 states including Illinois a manufacturer or a pharmacy must warn a customer of dangers known to it of which physicians have not been warned, but not of dangers of which physicians have been warned." *Id.* "So if [the pharmacy] knew that the plaintiff was abnormally susceptible to a particular side effect of Yazmin, it had a duty to warn her or her physician." *Id.* "But she doesn't allege that the pharmacy knew anything about her susceptibility, and so it had the full protection of the learned-intermediary doctrine." *Id.* at 1000–01. "So clear is this that the district court was right to invoke the fraudulent joinder as a ground for dismissing [the pharmacy] from the case, with prejudice, leaving only diverse defendants." *Id.* at 1001.

Here, plaintiffs brought two counts against Walgreens: 1) "strict products liability/sale of defective product" and 2) "negligence/failure to warn." Walgreens alleged the following with regard to any susceptibilities that Wagreens may have been aware with regard to its customers:

Walgreens knew or should have known about the respective health conditions of the [p]laintiffs that they sold Accutane to based on their health histories and records of other prescriptions that are in Walgreens' possession. Walgreens provided warnings along with Accutane that contained inaccurate information in that these warnings failed to warn that Accutane had serious side effects, including inflammatory bowel disease, Crohn's disease and ulcerative colitis, and these are side effects that the Walgreens knew or should have know of, and that [p]laintiffs should have been counseled regarding the serious side effects of Accutane.

Despite plaintiffs' arguments to the contrary, the Court finds that this is the *Walton* case all over again. Plaintiffs allege that the manufacturing defendants and Walgreens did not provide adequate warnings; they do not allege that Walgreens had specific knowledge of each individual plaintiffs' susceptibility to the adverse side effects of Accutane. Clearly it is possible to allege for each plaintiff individually his or her medical susceptibility and how Walgreens knew of that condition. While this may seem like a daunting task with so many plaintiffs in one complaint, it is perhaps not as daunting as preparing a different complaint for each plaintiff or paying a filing fee for each plaintiff. Nonetheless, this is what *Walton* requires, and the allegations in this case come no where near the situation in *Happel* where the Illinois Supreme Court found a narrow duty existed. Accordingly, the motion to remand is denied. Walgreens is dismissed from this case with prejudice. No fees and costs will be awarded.

Aranda v. Walgreen Co., Not Reported in F.Supp.2d (2012)

2012 WL 1884737, 12 Cal. Daily Op. Serv. 5670

### III. Conclusion

**\*6**  For the reasons stated above, plaintiff's motion to remand (Doc. 6) is denied, Walgreens is dismissed with prejudice, no fees and costs are awarded, and Hoffmann–La Roche Inc. is ordered to file an affidavit indicating its principle place of business within seven days of this order.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1884737, 12 Cal. Daily Op. Serv. 5670

### Footnotes

1  Those four plaintiffs are: Lindsey Burnham, Sean Landgraf, Viola Lemon, and Ralph Lemon.

2  It is undisputed that defendants filed their notice of removal pursuant to 28 U.S.C. § 1446(b)(3), after discovering through Coron's deposition that he was in fact a citizen of New York and not New Jersey. *See* 28 U.S.C. § 1446(b)(3) ("[A] notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.").

3  Despite defendants alleging residency and not citizenship in the notice of removal, the Court finds that Coron's deposition testimony, the fact that plaintiffs do not dispute that Coron is a citizen of New York, and the fact that defendants argue that Coron is a citizen of New York in their response to plaintiffs' motion to remand, sufficiently establish Coron's citizenship. *See Chi. Stadium Corp. v. Ind.,* 220 F.2d 797, 798–99 (7th Cir.1955) (noting that factual allegations of citizenship must be made in the pleadings, demonstrating complete diversity); *Tylka v. Gerber Products Co.,* 211 F.3d 445, 448 (7th Cir.2000) ("[A]llegations of residence are insufficient to establish diversity jurisdiction.") (citing *Guaranty Nat'l Title Co. v. J.E.G. Assocs .,* 101 F.3d 57, 59 (7th Cir.1996) ("When parties allege residence but not citizenship, the court must dismiss the suit.")).

4  Plaintiffs also contend that this case should be remanded because it is not clear from defendants' allegations where Hoffmann–La Roche Inc. has its principle place of business, and because it is unclear whether defendants' allegation that F. Hoffmann–La Roche, Ltd., and Roche Holding Ltd. are foreign entities is based upon personal knowledge or upon information and belief. Defendants respond by arguing that it is clear plaintiffs have alleged and relied upon the fact that Hoffmann–La Roche Inc. is a New Jersey corporation and that Judge Gilbert recognized it as such in remanding previously, and that F. Hoffmann–La Roche Ltd. and Roche Holding Ltd. are clearly diverse. In any event, plaintiff contends that those entities have never been properly served so their consent to removal is not required. As to this latter argument, the Court agrees. *See Murphy Bros., Inc. v. Michetti Pipe Strining, Inc.,* 526 U.S. 344, 347–48, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999) (holding "that a named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, 'through service or otherwise,' after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service."). With regard to Hoffmann–La Roche Inc.'s principal place of business, the Court orders Hoffmann–La Roche Inc. to file an affidavit indicating its principle place of business within seven days of this order. If Hoffmann–La Roche Inc.'s principle place of business defeats complete diversity, this case will be remanded to state court.

5  It is undisputed that the amount in controversy has been met in this case.

6  " 'The term "contraindication" is defined as "an indication, symptom, or condition that makes inadvisable a particular treatment or procedure." Webster's Third New International Dictionary 495 (1993)." *Happel,* 199 Ill.2d at 180 n. 1, 262 Ill.Dec. 815, 766 N.E.2d 1118.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

1985 WL 3031
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

IVA L. GRIMMER, Plaintiff,

v.

STEVEN M. SCHMITZ, M.D., et al., Defendants.

No. 84 C. 3544.
|
October 8, 1985.

MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

**\*1** This is a medical malpractice case is which the
plaintiff charges negligence on the part of the physician for
prescribing and two pharmacies for dispensing, certain drugs
which caused adverse reactions when taken simultaneously.
Defendant Schmitz, M.D. ('Schmitz') had prescribed
Coumadin for the plaintiff Grimmer's circulatory problem,
and Butazolidin for shoulder tendonitis. Osco Drug, Inc.
dispensed the Coumadin, and Walgreen Company dispensed
the Butazolidin. Neither pharmacy knew nor inquired about
any other medication prescribed to the plaintiff. As a result
of this, neither advised the plaintiff not to ingest the two
drugs simultaneously. Both Osco and Walgreen filed motions
to dismiss under Federal Rule 12(b)(6), for failure to state
a claim upon which relief can be granted. The plaintiff
responded with the assertion that the pharmacies, as sellers,
have a duty to warn about the dangerous propensities of a
product about which they know or should know. All three
parties agree that Illinois law controls.

The issue involved is a narrow one. Plaintiff does not
allege that either pharmacy filled the prescription incorrectly.
Plaintiff's position is that a pharmacist that correctly fills
a prescription is liable under a theory of negligence for
failing to inquire about other medications that the purchaser
may be obtaining from other pharmacies before filling the
prescription and, concurrently, failing to warn the purchaser
of any potential adverse effects of taking two medications
together.

In Jones v. Irvin, 602 F. Supp 399 (1985), Judge Foreman
of the Southern District of Illinois analyzed the duty owed

by a pharmacist to a purchaser under similar facts. There
the plaintiff sustained damages because she consumed an
excessive amount of a prescription drug over a period of
time and because the drug reacted deleteriously with her
other prescriptions. In that instance the plaintiff obtained
all her prescriptions from the same pharmacy. Jones alleged
negligence on the part of the pharmacy:

> '[I]t knew or should have known that the various drugs
> being prescribed for the plaintiff in the quantities in which
> they were being prescribed could have adverse reactions
> and it failed to take any action whatsoever to notify the
> plaintiff or her physician.' Id. at 400.

Judge Foreman surveyed both Illinois case law and the
decisions of the courts of other states and determined that
the overwhelming majority of recent state cases stand for the
proposition that the pharmacist has no duty to warn.

It is convincing that for this court to hold otherwise would be
tantamount to requiring pharmacies to usurp the physician's
function. Each pharmacy would be required to consult with
each purchaser to ascertain the full medical history, check
each new prescription for contraindications against each prior
prescription, and second-guess the doctor as to the validity
and necessity of the prescription. All of this would be in
addition to maintaining the traditional function of precisely
mixing, measuring, and compounding the prescriptions as
written. This grand expansion of the pharmacy's duty is
clearly more than the 'mere logical extension' of current
duties that plaintiff suggests. (Plaintiff's Memorandum in
Opposition, p.8).

**\*2** Indeed this case is even more clear cut than Jones.
In Jones, unlike here, the same pharmacy dispensed the
contraindicated drugs, and therefore already had much of the
information available to it. The pharmacy in Jones might be
held to have acquired a duty to know because both of the
written prescriptions were under its control. Here, on the other
hand, neither pharmacy had any indication that the plaintiff
would be purchasing an adverse medication from another
pharmacy. Neither pharmacy knew the plaintiff personally.
To impose an added duty to inquire in detail about where
each customer purchases his other medications would be
intrusive and unwarranted. The faith of both the pharmacist
and the purchaser is in the physician. They depend upon him
to diagnose and prescribe the necessary drugs.

The duty to inquire into the use of other medications and
to warn about the deleterious effects of drug combinations

**Grimmer v. Schmitz, Not Reported in F.Supp. (1985)**
1985 WL 3031

rests with the physician, not the pharmacist. To hold otherwise would be to usurp the physician's role in health care.

Both defendants, Walgreen and Osco, are dismissed from this case.

**All Citations**

Not Reported in F.Supp., 1985 WL 3031

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

Bobay v. Walgreen Co., Not Reported in F.Supp.2d (2009)

2009 WL 1940727

2009 WL 1940727
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana,
Fort Wayne Division.

Pansey and Dennis BOBAY, Plaintiffs

v.

WALGREEN COMPANY, Defendant.

No. 1:07–CV–119 RM.
|
June 30, 2009.

**Attorneys and Law Firms**

John C. Theisen, Marie M. Kolp, Theisen Bowers &
Associates LLC, Fort Wayne, IN, for Plaintiffs.

Daniel Joseph Palmer, Hunt Suedhoff Kalamaros LLP, Fort
Wayne, IN, for Defendant.

*OPINION AND ORDER*

ROBERT L. MILLER, JR., Chief Judge.

 **\*1** This matter is before the court on Pansey and Dennis
Bobay's motion for relief from the order granting summary
judgment to defendant Walgreen Company (document #
38). The Bobays' suit alleged that Walgreens owed them
a duty to inform or warn of the risk of injuries that
could result from Ms. Bobay taking Gemfibrozil and/or
Vytorin with Cyclosporine, and a duty to refrain from
filling prescriptions that would interact adversely with the
prescribed Cyclosporine previously dispensed to Ms. Bobay.
The Bobays contended that Walgreens was negligent because
it breached those duties. The court entered judgment for
Walgreens on both of the Bobays' claims. The Bobays now
move the court to reconsider the order granting summary
judgment to Walgreens. For the reasons that follow, the court
reconsiders Walgreens' motion for summary judgment as to
the plaintiffs' duty to refrain claim and finds in favor of
Walgreens on different grounds.

BACKGROUND

Pansey Bobay was prescribed Cyclosporine after treatment
for nonHodgkin's lymphoma in 2004. The prescription
was called into the Saddle Creek Road, Omaha, Nebraska
Walgreens store on May 8, 2004. The Saddle Creek Road
store filled the prescription once before the prescription was
transferred to the University of Nebraska Medical Center.
Almost a year later, on April 14, 2005, Dr. Mark Hazen
called in a Gemfibrozil (Lopid) prescription for Ms. Bobay
to the Bluffton, Indiana Walgreens store. The prescription
was filled on that date and refilled again in May and June
2005. Dr. Hazen didn't direct that any warnings be provided
with these prescriptions. On May 31, 2005, Dr. Hazen called
in a prescription for Vytorin for Ms. Bobay to the Bluffton
Walgreens store; the prescription was filled that day. Dr.
Hazen didn't direct that any warnings be provided with this
prescription.

Ms. Bobay used the Bluffton Walgreens pharmacy for the
past two decades. Once or twice in the past when she went to
drop off a prescription, Walgreens told her it wouldn't fill the
prescription until it double checked with the doctor because
of concerns about the prescription and her other medications.

The Bobays claim that as a result of taking Cyclosporine
with Vytorin and/or Gemfibrozil, Ms. Bobay now suffers
from rhabdomyolysis, a condition or disease that results
in the destruction of muscle tissue and adversely effects
the kidneys. The Bobays assert that Walgreens had a duty
to warn Ms. Bobay of potential interactions between these
medications. They also assert that Walgreens had a duty to
act as a reasonable pharmacist and to refrain from filling the
prescriptions of Vytorin and Gemfibrozil to someone with a
history of taking Cyclosporine.

In its earlier order, this court granted the defendant's summary
judgment motion as to the duty to warn claim based on
the Bobays' apparent concession that Indiana law doesn't
recognize a pharmacist's duty to warn where the physician
hasn't directed the pharmacist to provide such warning.
As to the duty to refrain from filling the prescription,
the court granted the defendant's motion for summary
judgment because the Bobays didn't provide expert testimony
to establish that Walgreens owed the Bobays a duty of
reasonable care when filling the prescriptions.

DISCUSSION

**\*2** The Bobays' primary argument for reconsideration is that the parties had agreed not to engage in discovery and the hiring of experts until the court decided the legal issue of whether Walgreens owed a duty to the Bobays to refrain from filling Ms. Bobay's prescriptions. Walgreens disputes that there was ever such an agreement. The parties' alleged agreement wasn't before the court when it decided Walgreens' motion for summary judgment. The court will not now consider evidence that wasn't properly before it when the opinion was entered. If the Bobays needed discovery on the issue of duty—the issue that was before this court—they could have requested additional time to respond to Walgreens' motion pursuant to Federal Rule of Civil Procedure 56(f).

The Bobays also raise another argument, though they address it only briefly. They contend that the only issue before the court was whether Walgreens owed a duty to the Bobays to refrain from filling the prescription, so they weren't aware that expert testimony was required. For the reasons that follow, regardless of whether expert testimony was presented, no duty would exist under the circumstances in this case. As a matter of law, Walgreens didn't owe a duty to Ms. Bobay to refrain from filling the prescription or to verify the prescription.

*Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no genuine issue of material fact when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. *O'Neal v. City of Chicago,* 392 F.3d 909, 910–911 (7th Cir.2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir.2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in its favor. *Lawrence v. Kenosha Cty.,* 391 F.3d 837, 842 (7th Cir.2004); *see also Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901

(7th Cir.2003) ("As we have said before, summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.' " (*quoting Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir.1999)).

*Walgreens' Summary Judgment Motion*

**\*3** To recover on a claim of negligence under Indiana law, the plaintiff must prove: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury the plaintiff proximately caused by the breach." *Ford Motor Co. v. Rushford,* 868 N.E.2d 806, 810 (Ind.2007). "[W]ithout a duty, there can be no recovery in negligence." *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 517 (Ind.1994) (citation omitted). "Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff is a question of law exclusively for the court." *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 517 (citation omitted). The Bobays allege that Walgreens breached its duty to act as a reasonable pharmacist by filling Ms. Bobay's prescription for Vytorin and Gemfibrozil, when it knew or should have known Ms. Bobay was taking Cyclosporine.

As the Bobays concede, Indiana doesn't recognize a duty on the pharmacist to warn a patient of the adverse effects of a prescription drug unless the prescribing physician directs the pharmacist to do so. *See Ingram v. Hook's Drugs, Inc.,* 476 N.E.2d 881, 887 (Ind.Ct.App.1985). The court in *Ingram v. Hook's Drugs* reasoned that physicians, not pharmacists, are in the better position to weigh the potential risks and rewards of particular medications for specific patients. The court explained:

> This individualized treatment is available in the context of a physician-patient relationship which has the benefits of medical history and extensive medical examinations. It is not present, however, in the context of a pharmacist filling a prescription for a retail customer. The injection of a third-party in the form of a pharmacist into the physician-patient relationship could undercut the effectiveness of the ongoing medical

> treatment. We perceive the better rule to be one which places the duty to warn of the hazards of the drug on the prescribing physician and requires of the pharmacist only that he include those warnings found in the prescription.

*Ingram v. Hook's Drugs,* 476 N.E.2d at 886–887 (footnote omitted); *see also Hooks SuperX v. McLaughlin,* 642 N.E.2d at 518 (agreeing with the *Ingram v. Hook's Drugs* decision that the responsibility of warning patients about drug side effects lies with physicians); *Allberry v. Parkmor Drug, Inc.,* 834 N.E.2d 199, 201 (Ind.Ct.App.2005) (declining to find that the pharmacist had a duty to warn; reaffirming the holding in *Ingram v. Hook's Drugs* ). The Indiana court's decision in *Ingram v. Hook's Drugs* was "consistent with the majority of other jurisdictions that have addressed this issue and refused to impose a duty to warn on pharmacists." *See Allberry v. Parkmor Drug,* 834 N.E.2d at 202, and cases cited therein.

Although there is no duty to warn, pharmacists have a duty to cease filling a prescription as written under certain circumstances. *Hooks SuperX v. McLaughlin,* 642 N.E.2d 514. In *Hooks SuperX v. McLaughlin,* the issue before the court was whether the pharmacist had a duty to cease refilling a prescription (pending direct and explicit directions from the prescribing physician) for a customer who was refilling the prescription at a rate that indicated the patient was taking the medication more quickly than the doctor had prescribed. *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 515.

**\*4** In finding that a duty exists, the court utilized a three-part analysis previously set forth in *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991): "(1) the relationship between the parties; (2) the foreseeability of the harm; and (3) public policy issues." *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 517. On the relationship prong, the court found that "[i]t is a matter of common expectation as well as statute that pharmacists possess expertise regarding the dispensing of prescription drugs," *id.* at 517 (citations omitted), so "the relationship between pharmacist and customer is sufficiently close to justify imposing a duty." *Id.* As to foreseeability, the court found that it wasn't disputed that "one who consumes sufficient quantities of addictive substances may become addicted to them, and that such an addiction carries with it certain reasonably foreseeable consequences." *Id.*

Finally, as to public policy, the court noted that there is a "strong public policy interest in preventing intentional and unintentional drug abuse." *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 518. The court reasoned that *Ingram v. Hook's Drugs* wasn't controlling "because it didn't involve the rate at which the customer was consuming drugs" and didn't "address instances where a pharmacist has personal knowledge that a customer is taking medication more quickly than prescribed." *Id.* at 518–519. The court explained that physicians and pharmacists won't likely become "adversaries if pharmacists are expected to cease refilling prescriptions where the customers are using the drugs much more rapidly than prescribed." *Id.* at 519. The court further noted that there was little concern over increased health care costs because Hooks had a computerized system that permitted the pharmacist to review the patient's prior prescription history from a particular store. *Id.* The rate at which the prescription was being filled was already before the pharmacist on the computer screen at the time each prescription was filled. *Id.*

Having recognized a duty, the court in *Hooks SuperX* turned to the standard of care, applying the traditional negligence standard. *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 519 (citing *Miller v. Griesel,* 261 Ind. 604, 308 N.E.2d 701, 706 (Ind.1974)). "[P]harmacists must exercise that degree of care that an ordinarily prudent pharmacist would under the same or similar circumstances." *Id.* What constitutes due care will ordinarily be a question of fact. *Id.* (citing *Miller v. Griesel,* 308 N.E.2d at 707).

This court must determine issues of Indiana law as it believes the highest court of the state would determine them. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This court must therefore decide whether an Indiana court would find that pharmacists have a duty to refrain from filling a prescription that is incompatible with medication previously dispensed to the customer at a different store location. Because any such duty is not well-settled, this court turns to the three-part test set forth in *Webb v. Jarvis* to decide whether a duty exists under the circumstances in this case. *See NIPSCO v. Sharp,* 790 N.E.2d 462, 465 (Ind.2003) ("[T]he three-part balancing test articulated in *Webb* [ ] is a useful tool in determining whether a duty exists, but only in those instances where the element of duty has not already been declared or otherwise articulated."). The parties' relationship is sufficiently close to justify imposing a duty, so the court addresses the foreseeability and public policy factors.

Bobay v. Walgreen Co., Not Reported in F.Supp.2d (2009)

2009 WL 1940727

**\*5**  "[I]t is well-established that a duty is imposed only where a reasonably foreseeable victim is injured by reasonably foreseeable harm." *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 518 (*citing* *Webb v. Jarvis,* 575 N.E.2d at 997). The court should look to the same considerations analyzed in the context of proximate cause, except that foreseeability for purposes of determining duty is a matter of law for the court. *Id.* The issue is whether it is reasonably foreseeable to a pharmacist filling a valid prescription that a customer will suffer harm from an adverse drug interaction with other medications. In the absence of special circumstances placing the pharmacist on notice that the customer is taking other adverse medications, the resulting harm isn't foreseeable.

Unlike in *Hooks SuperX v. McLaughlin,* the facts in this case don't suggest that Walgreens was aware or even should have been aware that Ms. Bobay was taking Cyclosporine in April or May 2005, so it wasn't reasonably foreseeable that her prescriptions for Gemfibrozil and/or Vytorin would cause an adverse drug interaction with Cyclosporine. *See Estate of Heck v. Stoffer,* 786 N.E.2d 265, 269 (Ind.2003) (declining to take a narrow view of *Webb's* foreseeability of harm prong; the court instead reviewed the specific facts in the case and the broad type of victim and harm involved to analyze foreseeability); *see also Lane v. St. Joseph's Regional Medical Ctr.,* 817 N.E.2d 266, 271, n. 4 (Ind.Ct.App.2004) (noting that the decision in *Heck v. Stoffer* implies that specific facts can be reviewed when determining the reasonably foreseeability component of the duty analysis); *Nance v. Holy Cross Counseling Group,* 804 N.E.2d 768, 772 n. 1 (Ind.Ct.App.2004) ("In light of *Heck,* we consider specific facts when addressing foreseeability under duty."). *But see Williams v. Cingular Wireless,* 809 N.E.2d 473, 477 (Ind.Ct.App.2004) ("[T]he foreseeability component of duty requires a ... general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence."); *Clark v. Aris, Inc.,* 890 N.E.2d 760, 764 (Ind.Ct.App.2008) (same).

On May 8, 2004, a prescription for Cyclosporine was called in for Ms. Bobay to the Saddle Creed Road, Omaha Nebraska Walgreens store. The store filled the prescription once and then it was transferred out to the University of Nebraska Medical Center. Almost a year later, Dr. Hazen called in a Gemfibrozil prescription for Ms. Bobay to the Bluffton Walgreens store. That store filled the prescription three times. Around this same time, Dr. Hazen called in a prescription for Vytorin to the Bluffton Walgreens store. The Bobays contend that Walgreens knew or should have known Ms.

Bobay was taking Cyclosporine and so shouldn't have filled the Gemfibrozil and/or Vytorin prescriptions. Despite the Bobays' assertions, nothing in the record could establish that Walgreens knew or should have known that Ms. Bobay was taking Cyclosporine in April/May 2005. *See United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1265 (7th Cir.1990) (mere allegations in the complaint are insufficient to create a genuine issue of material fact). The foreseeability factor weighs against imposing a duty in this case.

**\*6**  Public policy also must be considered. Similar to *Hooks SuperX v. McLaughlin,* the court considers protecting the customer's health and safety, not jeopardizing the physician/patient relationship, and avoiding unnecessary health care costs. *Hooks SuperX v. McLaughlin,* 642 N.E.2d at 518. A strong public policy in protecting the health and safety of the customer is evidenced by Indiana Code § 25–26–13–16, which states:

> (a) A pharmacist shall exercise his professional judgment in the best interest of the patient's health when engaging in the practice of pharmacy.
>
> (b) A pharmacist has a duty to honor all prescriptions from a practitioner or from a physician ... licensed under the laws of another state. Before honoring a prescription, the pharmacist shall take reasonable steps to determine whether the prescription has been issued in compliance with the laws of the state where it originated. The pharmacist is immune from criminal prosecution or civil liability if he, in good faith, refuses to honor a prescription because, in his professional judgment, the honoring of the prescription would:
>
> ...
>
>     (2) be against the best interest of the patient;
>
> ...
>
>     (4) be contrary to the health and safety of the patient.

This statute empowers pharmacists to exercise their professional judgment to refuse to fill a prescription when doing so is contrary to the health and safety of the patient. It should be noted, though, that the statute merely permits—and doesn't require—a pharmacist to decline to fill a valid prescription and as such, the statute alone doesn't create a duty. *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d at 518.

2009 WL 1940727

Relying on the reasoning in *Ingram v. Hook's Drugs,* this court finds that the public policy concern of customer safety in this instance isn't paramount to the policy concern of avoiding interference with the physician-patient relationship. As the *Ingram* court stated, physicians, not pharmacists, are in the better position to weigh the potential risks and rewards of particular medications for specific patients. *Ingram v. Hook's Drugs,* 476 N.E.2d at 886–887. The hazards of taking multiple prescriptions that might have adverse reactions is generally best addressed between physician and patient: the physician is familiar with the patient's history and need for the medication, and the physician can continue to monitor the patient on an ongoing basis. Without the benefit of a patient's medical history, the pharmacist is less qualified to determine the propriety of a particular drug regimen. "The injection of a third-party in the form of a pharmacist into the physician-patient relationship could undercut the effectiveness of the ongoing medical treatment." *Ingram v. Hook's Drugs,* 476 N.E.2d at 887; *see also Allberry v. Parkmor Drug,* 834 N.E.2d at 202 (in finding no duty to warn, the court declined to follow the minority or jurisdictions that have imposed a duty on pharmacies that goes beyond merely filing prescriptions accurately).Unless special circumstances exist alerting the pharmacist to an adverse drug interaction, sound policy reasons exist for not imposing a duty requiring pharmacists to question the physician's judgment.

**\*7** Finally, the concern over health care costs that might result from imposing new duties on pharmacists is also a valid public policy consideration. A duty to check for incompatible prescriptions would require pharmacies to install a computerized information system that records a customer's previous prescriptions filled at any of their stores. If the pharmacy notices a potential interaction with any of the customer's previous prescriptions, it would either have to call the customer's physician or conduct research to determine whether or not to fill the prescription. This would likely increase the operational costs to pharmacies and the cost of prescription drugs in general. All of this might be a good thing, and a legislature might choose to require it. But nothing persuades this court that the Indiana Supreme Court would so hold.

Consideration of the three pertinent factors—the relationship between the parties, foreseeability of the harm, and public policy concerns—convince this court that Walgreens had no duty to refuse to refill Ms. Bobay's prescription under the circumstances in this case.

The Bobays cite to *Shidler v. CVS Pharm.,* No. 2:05–CV–209 CAN, 2007 WL 601748 (N.D.Ind. Feb.20, 2007), in support of their argument that Walgreens had a general duty of reasonable care to the Bobays to refrain from filling Ms. Bobay's prescriptions. In *Shidler v. CVS,* the court addressed whether the pharmacist owed a duty to refrain from filling a prescription that the physician had mistakenly written for a dose that exceeded the recommended quantity. The pharmacist recognized that the dosage appeared high and the CVS computer flagged the prescription for this reason. *Id.* at \* 1. The court reasoned that this case wasn't a duty to warn case as in *Ingram v. Hook's Drugs,* but rather, the issue was whether the pharmacist had a reasonable duty of care to either check with the doctor who wrote the prescription, do more research on the prescription strength, or refuse to fill the prescription in the patient's best interest. *Id.* at \*2. The court held that a duty existed, but found in the pharmacy's favor because the plaintiff didn't provide expert testimony to establish the requisite standard of care or breach. *Id.*

In accordance with the holding in *Shidler v. CMS,* when a pharmacy is alerted to a possible error in the prescription, it has a duty to take action to prevent harm to the customer. There is no evidence, though, that Walgreens was aware or even should have been aware that Ms. Bobay was taking incompatible prescriptions. *See Saukus v. Walker Street Pharm., Inc.,* No. 260560, 2005 WL 1846289, at \*2 (Mich.Ct.App. August 4, 2005) (unpublished) (finding that the pharmacist had no duty to discover that the customer's prescription was incompatible with another medication she was taking where the pharmacy's records indicated that the customer had discontinued use of the other medication six months earlier; the pharmacist had no duty to inquire about or monitor the plaintiff's drug history); *compare Brienze v. Casserly,* No. 01–1655–C, 2003 WL 23018810, at \*2 (Mass.Super.Ct. Dec. 19, 2003) (unpublished) (finding a duty where the pharmacy had filled both prescriptions, knew that the customer was taking both prescriptions, and was aware of potentially adverse interaction between the medications).

**\*8** "[C]ourts holding that pharmacists owe their customers a duty beyond accurately filling prescriptions do so based on the presence of additional factors, such as known contraindications" alerting the pharmacist of a potential problem. *Deed v. Walgreen Co.,* 50 Conn.Supp. 339, 927 A.2d 1001, 1003 (Conn.Super.Ct.2007) (*citing Morgan v. Wal–Mart Stores,* 30 S.W.3d 455, 466 (Tex.App.2000)); *see also McKee v. Am. Home Products Corp.,* 113 Wash.2d 701, 782 P.2d 1045, 1053 (Wash.1989) (finding no duty to warn,

2009 WL 1940727

but agreeing that "pharmacists should have a duty to be alert for patent errors in prescriptions, for example: obvious lethal dosages, inadequacies in the instructions, *known* contraindications, or incompatible prescriptions, and to take corrective measures.") (footnotes omitted)). In absence of such special circumstances, courts have found that no duty exists between a pharmacist and the customer. *Deed v. Walgreen,* 927 A.2d at 1004 (noting that where the pharmacy had no superior knowledge to the customer, it was the customer's, not the pharmacist's, duty to inform her physician of the drugs she was taking so that her physician could decide if they were compatible).

The record in this case doesn't contain special circumstances establishing a duty. Ms. Bobay filled one prescription for Cyclosporine in May 2004 at a Walgreens' pharmacy in Nebraska. In April and May 2005, she filled prescriptions for Gemfibrozil and Vytorin at a Walgreens' pharmacy in Indiana. There is no evidence in the record to infer that Ms. Bobay informed the pharmacist that she was still taking Cyclosporine, that the pharmacy had this information readily available, or that the pharmacist was otherwise aware of Ms. Bobay's previous prescription. Requiring the pharmacy to review customers' previous prescriptions for potential adverse medications when no special circumstances exist alerting the pharmacist of such risks would overly interfere with the patient-physician relationship and require the pharmacist to question the physician's judgment. The court therefore finds no duty to refrain from filling the prescriptions under the circumstances in this case. [1]

CONCLUSION

After reconsideration and for the reasons stated above, the court finds in favor of Walgreens on different grounds.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1940727

Footnotes

1    Walgreens addressed the issue of assumption of duty in its reply brief in support of its motion for summary judgment, but indicated that the Bobays haven't overtly presented this argument. Indeed, the Bobays don't expressly set forth the claim of assumption of duty in their amended complaint, nor do they present this argument in their response brief. While the Bobays present facts relevant to the assumption of duty, they have waived this claim by not asserting it in their response brief. *See Palmer v. Marion County,* 327 F.3d 588, 597–598 (7th Cir.2003) (claims not addressed in a summary judgment opposition brief are abandoned); *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 810 (7th Cir.2001) (non-moving party's failure to raise issue in response resulted in waiver).

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 23

A.L. ex rel. Limkemann v. Jake's Fireworks, Inc., --F.Supp.3d---- (2020)

2020 WL 3399912

2020 WL 3399912
Only the Westlaw citation is currently available.
United States District Court,
S.D. Iowa, Davenport Division.

A.L. EX REL. Margaret LIMKEMANN and
Travis Limkemann; Margaret Limkemann;
and Travis Limkemann, Plaintiffs,
v.
JAKE'S FIREWORKS, INC., Defendant.

No. 3:19-cv-00028-RGE-CFB
|
Signed 04/02/2020

**Attorneys and Law Firms**

Brian P. Galligan, Reid Law Firm, Des Moines, IA, for
Plaintiffs.

Michael Darrell Currie, Grefe & Sidney PLC, Des Moines,
IA, for Defendant.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Rebecca Goodgame Ebinger, United States District Judge

**I. INTRODUCTION**

*1 In July 2017, party revelers shot off fireworks at a
gathering in eastern Iowa. One of the fireworks malfunctioned
and projected sideways into the crowd, hitting Plaintiff
Margaret Limkemann and her infant daughter, Plaintiff
A.L. Margaret Limkemann and her husband, Plaintiff
Travis Limkemann, sue Defendant Jake's Fireworks, Inc.,
individually and on the behalf of A.L., for products liability,
breach of implied warranty, and negligence. Jake's Fireworks
moves for summary judgment. Jake's Fireworks, as a
nonmanufacturer, is immune from Plaintiffs' strict liability
and breach of implied warranty claims under Iowa law.
Plaintiffs do not resist Jake's Fireworks's motion summary
judgment as to their remaining claims. Accordingly, the Court
grants Jake's Fireworks's motion for summary judgment.

**II. BACKGROUND**

**A. Relevant Facts**

The following facts are either uncontested or, if contested,
viewed in the light most favorable to Plaintiffs. *See*
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.
574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Munz
v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994).

In July 2017, Margaret Limkemann, Travis Limkemann, and
their daughter, A.L., attended a party in eastern Iowa at the
home of Richard Fowler. Def.'s Statement Material Facts ¶ 4,
ECF No. 33-1; Pls.' Resp. Def.'s Statement Undisputed Facts
& Statement Add'l Material Facts 1, ECF No. 38-1. A party
guest ignited a Boomer brand firework called the "War Hog
Motorcycle." ECF No. 33-1 ¶ 5; ECF No. 38-1 at 1. The
Boomer War Hog Motorcycle malfunctioned and one of its
explosive shells projected laterally. ECF No. 33-1 ¶ 6; ECF
No. 38-1 at 1. The projectile struck Margaret Limkemann and
A.L., injuring them both. ECF No. 33-1 ¶¶ 7, 8; ECF No.
38-1 at 1. Experts for both Plaintiffs and Jake's Fireworks
agree the Boomer War Hog Motorcycle at issue contained a
manufacturing defect that caused the sideways deployment of
the projectile. ECF No. 38-1 at 4; Def.'s Resp. Pls.' Statement
Add'l Material Facts ¶ 12, ECF No. 41.

Before the party, Fowler purchased fireworks in northern
Missouri. ECF No. 33-1 ¶ 12; ECF No. 38-1 at 2. Fowler
does not know the name of the store where he purchased
the fireworks. ECF No. 33-1 ¶ 13; ECF No. 38-1 at 2. None
of Fowler's fireworks were ignited during the party. ECF
No. 33-1 ¶ 14; ECF No. 38-1 at 2. Some of Fowler's guests
(other than the Limkemanns) provided the fireworks that were
shot off that evening. ECF No. 33-1 ¶ 16; ECF No. 38-1 at
2. Fowler does not know where his guests purchased their
fireworks. ECF No. 33-1 ¶ 17; ECF No. 38-1 at 2.

Jake's Fireworks is a wholesaler, distributor, and retailer of
consumer fireworks. ECF No. 33-1 ¶ 30; ECF No. 38-1 at 2.
Jake's Fireworks imports the Boomer War Hog Motorcycle
from a Chinese company, Changsha Qian Zi Fireworks
Manufacture, Ltd. ECF No. 33-1 ¶ 26; ECF No. 38-1 at
2. Jake's Fireworks holds the trademark for Boomer brand
fireworks. ECF No. 38-1 at 3; ECF No. 41 ¶ 1. The parties
contest whether other firms also import the Boomer War Hog
Motorcycle. *See* ECF No. 31-1 ¶ 31; ECF No. 38-1 at 5.
Jake's Fireworks asserts the defaulted Third-Party Defendant,
North Central Industries, also imports and retails the Boomer
War Hog Motorcycle. ECF No. 33-1 ¶ 46. Jake's Fireworks
points to a fireworks retail website advertising the Boomer
War Hog Motorcycle as sold by North Central Industries.
Def.'s App. Supp. Mot. Summ. J. at App. 69–72, ECF No.

33-2 (print-out of third-party website advertising the Boomer
War Hog Motorcycle with the Boomer logo as sold by North
Central Industries). Michael Baker, Jake's Fireworks's general
counsel and corporate designee, stated he was unaware of
any other company besides Jake's Fireworks that imports the
Boomer War Hog Motorcycle with the Boomer logo. Baker
Dep. 31:25–32:3, Pls.' App. Supp. Resist. Def.'s Mot. Summ.
J. 8, ECF No. 38-2; ECF No. 38-1 at 3; ECF No. 41 ¶ 7. When
asked if he was aware of whether North Central Industries
used the Boomer trademark, Baker replied: "No, but it's not
unlikely." Baker Dep. 30:18–21, ECF No. 38-2 at 8. Baker
also stated he was unaware of Jake's Fireworks ever suing to
enforce the Boomer trademark. *Id.* at 30:14–17.

**\*2** Additional facts are discussed below as necessary.

### B. Procedural Background

Plaintiffs bring four claims against Jake's Fireworks: products
liability manufacturing defect (Count I); products liability
design defect (Count II); breach of implied warranty of
merchantability (Count III); and negligence (Count IV). Pet.,
ECF No. 1-2. Jake's Fireworks moves for summary judgment
on all counts. ECF No. 33; Def.'s Br. Supp. Mot. Summ. J.,
ECF No. 36. Plaintiffs resist in part. ECF No. 38. This matter
came before the Court for hearing on February 25, 2020. Text
Order Setting Hr'g, ECF No. 39. Attorney Brian P. Galligan
appeared on behalf of Plaintiffs. Mots. Hr'g Mins., ECF No.
45. Attorney Michael Darrell Currie appeared on behalf of
Jake's Fireworks. *Id.*

On the morning of the hearing, Plaintiffs moved to amend
their complaint. Pls.' Mot. Amend, ECF No. 44. The
Court allowed argument on Plaintiffs' motion to amend at
the hearing and ordered an expedited schedule for Jake's
Fireworks to respond to Plaintiffs' motion. ECF No. 45; Text
Order Setting Briefing Schedule, ECF No. 46. The Court
subsequently denied Plaintiffs' motion to amend, finding
Plaintiffs failed to show good cause to amend their complaint
outside of the Court's briefing schedule and the amendment,
in part, would be futile. Order Den. Pls.' Mot. Amend, ECF
No. 52.

The Court now addresses Jake's Fireworks's motion for
summary judgment. For the reasons set forth below, the Court
grants Jake's Fireworks's motion.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must
grant a party's motion for summary judgment if there are
no genuine issues of material fact and the moving party is
entitled to judgment as a matter of law. *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322−23, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986). A genuine issue of material fact exists where the
issue "may reasonably be resolved in favor of either party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that
might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment.
Factual disputes that are irrelevant or unnecessary will not be
counted." *Id.* at 248, 106 S.Ct. 2505. Where there is a genuine
dispute of facts, those "facts must be viewed in the light
most favorable to the nonmoving party." *Ricci v. DeStefano*,
557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009)
(quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769,
167 L.Ed.2d 686 (2007)).

To defeat a motion for summary judgment, the nonmoving
party "may not rest upon the mere allegations or denials of his
pleading, but ... must set forth specific facts showing that there
is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106
S.Ct. 2505 (omission in original) (quoting a prior version of
Fed. R. Civ. P. 56(e)). In analyzing whether a party is entitled
to summary judgment, a court "may consider only the portion
of the submitted materials that is admissible or useable at
trial." *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008)
(quoting *Walker v. Wayne Cty.*, 850 F.2d 433, 434 (8th Cir.
1988)). "Where the record taken as a whole could not lead a
rational trier of fact to find for the nonmoving party, there is
no genuine issue for trial" and the moving party is entitled to
judgment as a matter of law. *Torgerson v. City of Rochester*,
643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (quoting
*Ricci*, 557 U.S. at 586, 129 S.Ct. 2658).

## IV. DISCUSSION

### A. Unresisted Claims

**\*3** Plaintiffs do not resist summary judgment on their
products liability design defect claim (Count II) and the
failure-to-warn aspect of their negligence claim (Count IV).
ECF No. 38 at 6 ("Plaintiffs do not resist Defendant's motion
as it relates to failure to warn claims."); ECF No. 38-1 at 2
("Plaintiffs state that they are not pursuing a design defect
claim in this matter."). Consequently, the Court dismisses
Count II and the failure-to-warn aspect of Count IV.

A.L. ex rel. Limkemann v. Jake's Fireworks, Inc., --- F.Supp.3d ---- (2020)

2020 WL 3399912

### B. Manufacturing Defect (Count I) and Breach of Implied Warranty of Merchantability (Count III)

In Count I, Plaintiffs allege a manufacturing defect in the Boomer War Hog Motorcycle caused an aerial shell to deploy laterally through its cardboard holding tube and injure Margaret Limkemann and A.L. ECF No. 1-2 ¶¶ 29–31. Plaintiffs allege this manufacturing defect was a departure from the Boomer War Hog Motorcycle's intended design. *Id.* ¶ 29. In Count III, Plaintiffs allege Jake's Fireworks breached its implied warranty of merchantability by selling the Boomer War Hog Motorcycle in a condition not fit for its ordinary purposes. *Id.* ¶¶ 41–42.

Jake's Fireworks moves for summary judgment on Counts I and III, arguing Plaintiffs have failed to generate a dispute of material fact showing Jake's Fireworks sold or distributed the Boomer War Hog Motorcycle. ECF No. 36 at 7–11. Moreover, Jake's Fireworks argues that as a nonmanufacturer it is immune from Plaintiffs' claims under Iowa Code § 613.18(1)(a). *Id.* at 11–13. For the following reasons, the Court finds there is a genuine dispute of material fact as to whether Jake's Fireworks sold or distributed the Boomer War Hog Motorcycle. Nonetheless, the Court grants summary judgment in favor of Jake's Fireworks on Counts I and III. The Court finds, as a nonmanufacturer, Jake's Fireworks is immune from liability for Plaintiffs' manufacturing defect and breach of implied warranty of merchantability claims under Iowa Code § 613.18(1)(a).

### 1. Product identification

There is a genuine dispute of material fact as to whether Jake's Fireworks sold or distributed the Boomer War Hog Motorcycle that caused Plaintiffs' injuries. To prevail in a products liability suit, a plaintiff "must prove injury caused by a product sold or supplied by the defendant." *Huck v. Wyeth*, 850 N.W.2d 353, 369 (Iowa 2014). "[I]t is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold or was in some way responsible for the product." *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 72–73 (Iowa 1986) (quoting 51 A.L.R.3d 1344, 1349 (1973)). The parties do not dispute the injury-causing firework was a Boomer War Hog Motorcycle. ECF No. 33-1 ¶¶ 5–8; ECF No. 38-1 at 1. Jake's Fireworks, however, contends Plaintiffs have produced no evidence showing Jake's Fireworks sold or supplied the Boomer War

Hog Motorcycle that caused Plaintiffs' injuries. ECF No. 36 at 7. Jake's Fireworks cites the lack of evidence that Fowler or his party guests purchased the Boomer War Hog Motorcycle from Jake's Fireworks. *Id.* at 8–9. Further, Jake's Fireworks contends, based on advertisements on a third-party website, that North Central Industries also imports and retails the Boomer War Hog Motorcycle. *Id.* at 9.

In their resistance, Plaintiffs put forth specific evidence to demonstrate a dispute of material fact as to whether the Boomer War Hog Motorcycle was sold or distributed by Jake's Fireworks. ECF No. 38 at 2–3. First, Plaintiffs provide evidence Jake's Fireworks held the exclusive trademark to the Boomer brand of fireworks. *See* Pls.' Ex. 3 Supp. Resist. Def.'s Mot. Summ. J., ECF No. 38-4 (filings from the United States Patent and Trademark Office). Second, Jake's Fireworks's general counsel, Michael Baker, testified other importers would likely not import products with the Boomer logo. Baker Dep. 31:25–32:3, ECF No. 38-2 at 8. Baker also stated he was not aware of Jake's Fireworks ever enforcing its Boomer trademark against infringement. *Id.* at 30:14–17. [1]

**\*4** Jake's Fireworks admits it owns the trademark for the Boomer War Hog Motorcycle. ECF No. 41 ¶ 1. However, Jake's Fireworks asserts its ownership of the trademark is not "conclusive evidence" it supplied the injury-causing Boomer War Hog Motorcycle. ECF No. 43 at 4. Jake's Fireworks argues, in light of the "untrustworthiness of the Chinese manufacturers," another importer could have imported the firework. *Id.* Jake's Fireworks is correct that Plaintiffs do not proffer conclusive evidence showing it supplied the Boomer War Hog Motorcycle at issue—but that is not the summary judgment standard. Plaintiffs must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Plaintiffs have done so.

The issue of whether Jake's Fireworks sold or distributed the injury-causing Boomer War Hog Motorcycle could reasonably be decided in favor of either party. *See id.* at 250, 106 S.Ct. 2505. Jake's Fireworks's ownership of the Boomer trademark and Baker's statements could lead a rational fact finder to find Jake's Fireworks supplied the injury-causing firework. *See Huck*, 850 N.W.2d at 369. But, Jake's Fireworks's opposing arguments and the evidence related to North Central Industries could also lead a rational fact finder to find there is insufficient evidence to link the injury-causing Boomer War Hog Motorcycle to Jake's Fireworks. Thus, there is a genuine dispute of material fact on this threshold issue.

A.L. ex rel. Limkemann v. Jake's Fireworks, Inc., --- F.Supp.3d ---- (2020)

2020 WL 3399912

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 161 of 370
PageID: 10191

### 2. Iowa Code § 613.18(1)(a)

Despite the genuine dispute of material fact regarding Jake's Fireworks's connection to the injury-causing firework, Plaintiffs' manufacturing defect and breach of implied warranty claims fail as a matter of law. Jake's Fireworks is immune from such claims under Iowa Code § 613.18(1)(a), which provides:

> A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is: ... Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

Section 613.18(1)(a) imposes a limitation on strict liability and implied warranty claims against nonmanufacturers. *Bingham v. Marshall & Huschart Mach. Co., Inc.*, 485 N.W.2d 78, 79 (Iowa 1992). Section 613.18(1)(a) "provides for immunity from suit when the potential claim arises solely from defects in the original design or manufacture of the product." *Id.* at 80. "Section 613.18 represents a judgment by the Iowa legislature that strict liability [and breach of implied warranty of merchantability] for design or manufacturing defects should extend only to those who have some responsibility for the design or manufacture of a product." *Housley v. Orteck Int'l, Inc.*, 488 F. Supp. 2d 819, 831–32 (S.D. Iowa 2007) (alteration in original) (quoting *Stoffel v. Thermogas Co.*, 998 F. Supp. 1021, 1033 (N.D. Iowa 1997)).

Jake's Fireworks argues, as a nonmanufacturer, it is immune from suit for Plaintiffs' manufacturing defect and breach of implied warranty claims. ECF No. 36 at 11–12. Plaintiffs respond Jake's Fireworks, as the trademark holder of the Boomer War Hog Motorcycle, is its apparent manufacturer and therefore is not protected from suit under § 613.18(1)(a). ECF No. 38 at 3–6. Jake's Fireworks replies Plaintiffs fail to plead this theory of liability in their complaint and should not be allowed to amend their complaint through their resistance brief. ECF No. 43 at 2–3. Further, Jake's Fireworks argues the

apparent manufacturer theory is not viable under Iowa law. *Id.* at 5–6.

Federal Rule of Civil Procedure 8(a) requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Although the pleading requirements under Rule 8(a) are relatively permissive, the essential function of notice pleading is to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *WireCo Worldgroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992–93 (8th Cir. 2018) (omission in original) (emphasis omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). However, "[t]he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1219 (3d ed. 2002 & Supp. 2019); *accord Oglala Sioux Tribe v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979).

**\*5** As part of their manufacturing defect claim, Plaintiffs allege, "Jake's Fireworks designed, *manufactured*, assembled, sold, and/or distributed the Boomer Warhog Cake that is the subject of this lawsuit." ECF No. 1-2 ¶ 27 (emphasis added). Plaintiffs did not plead their claim under an apparent manufacturer theory. In their breach of implied warranty claim, Plaintiffs describe Jake's Fireworks as a "merchant of fireworks products." *Id.* ¶ 40. The Court finds Plaintiffs do not provide Jake's Fireworks with adequate notice of the grounds for their manufacturing defect and breach of implied warranty claims. Plaintiffs cannot expand their claims in their resistance based on facts and a theory of liability they fail to plead in their complaint. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[Plaintiff] attempts to expand his claims in his brief, arguing that he was terminated for speaking in the summer session class in May 2003. Having not raised this fact in his Complaint, he cannot rely on it now."). Jake's Fireworks is not required to "intuit additional theories of liability that were not apparent from [Plaintiffs'] complaint." *WireCo Worldgroup, Inc.*, 897 F.3d at 993. Plaintiffs are precluded from alleging additional grounds for their manufacturing defect claim at this stage.

Even assuming Plaintiffs had provided Jake's Fireworks adequate notice of the grounds for their claims, Plaintiffs'

A.L. ex rel. Limkemann v. Jake's Fireworks, Inc., --- F.Supp.3d ---- (2020)
2020 WL 3399912

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 162 of 370
PageID: 10192

apparent manufacturer theory fails as a matter of law. As detailed in the Court's order denying Plaintiffs' motion to amend, the apparent manufacturer doctrine is not cognizable under Iowa law. ECF No. 52 at 8–11. As a nonmanufacturer, Jake's Fireworks is immune from liability for Plaintiffs' manufacturing defect and breach of implied warranty claims. The Court grants summary judgment in favor of Jake's Fireworks on Counts I and III.

### C. Negligence (Count IV)

In the remaining portion of Count IV,[2] Plaintiffs allege Jake's Fireworks engaged in negligent testing by failing "to perform proper testing of the cardboard holding tubes and Boomer Warhog Cake container" and failing "to conduct proper hazard and failure analysis." ECF No. 1-2 ¶ 45(b)–(c). Plaintiffs also allege Jake's Fireworks engaged in "[o]ther unspecified acts of negligence." *Id.* at ¶ 45(d). Jake's Fireworks contends Plaintiffs fail to generate a dispute of material fact as to these claims and argues the claims should be dismissed as a matter of law. ECF No. 36 at 21–23. Plaintiffs respond indirectly to Jake's Fireworks's arguments, asserting Jake's Fireworks's "negligence in this case arises from its permitting negligent and careless conduct of the Chinese manufacturer, Changsha Qian, in its manufacture and assembly of the [Boomer War Hog Motorcycle] firework product." ECF No. 38 at 7. Plaintiffs cite the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, alleging Jake's Fireworks is liable for allowing the negligent conduct of a third party: their Chinese manufacturer. *Id.* Plaintiffs contend Jake's Fireworks was aware of its Chinese manufacturer's "less than primitive manufacturing process," yet failed to determine if the manufacturer had proper quality control measures in place. *Id.* at 8. Plaintiffs also put forth a negligence per se theory of liability, arguing there is a dispute of material fact that Jake's Fireworks violated federal law by selling the defective Boomer War Hog Motorcycle. ECF No. 38 at 10–12. Jake's Fireworks responds the Court should not consider Plaintiffs arguments because Plaintiffs seek to impermissibly amend their complaint by putting forth new theories of liability. ECF No. 43 at 2–3, 6.

Plaintiffs did not provide Jake's Fireworks with notice of the theories of negligence liability they now posit in their resistance. *See* Fed. R. Civ. P. 8(a). Plaintiffs' claim that Jake's Fireworks engaged in "unspecified acts of negligence" is insufficient to allow Jake's Fireworks to intuit the third-party liability or negligence per se arguments in Plaintiffs' resistance. ECF No. 1-2 ¶ 45(d); *see WireCo Worldgroup,*

*Inc.,* 897 F.3d at 993. The Court does not consider the new theories of liability argued in Plaintiffs' resistance. Further, as explained in the Court's order denying Plaintiffs' motion to amend, Plaintiffs' theory of third-party liability is not a cognizable theory for products liability cases in Iowa. *See* ECF No. 52 at 11–13.

**\*6** Thus, the Court considers the remaining aspects of Plaintiffs' negligence claim as pleaded in Count IV. Plaintiffs do not address Jake's Fireworks's arguments about their negligent testing claim. While Plaintiffs provided specific evidence regarding product identification, Plaintiffs set forth no similar specific evidence demonstrating a genuine dispute of fact on their negligent testing claim. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Further, at the hearing on Jake's Fireworks's motion for summary judgment, counsel for Jake's Fireworks stated Plaintiffs do not resist the failure-to-warn and the failure-to-test aspects of the negligence claim. Plaintiffs' counsel did not object. Thus, the Court finds Plaintiffs do not resist summary judgment on their negligence claim as it is pleaded in their complaint. Accordingly, Jake's Fireworks is entitled to summary judgment on Count IV. *See Satcher,* 558 F.3d at 735 (affirming summary judgment against plaintiff on an issue plaintiff did not oppose and noting "[i]t was not the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact").

### D. Loss of Consortium

Plaintiffs do not plead a loss of consortium claim as a separate count in their complaint. In the factual allegations of their complaint, Plaintiffs allege Travis Limkemann will suffer loss of companionship and consortium of his spouse and his daughter because of their injuries. ECF No. 1-2 ¶¶ 18, 22. Plaintiffs also allege A.L. and Margaret Limkemann will lose the companionship and consortium of each other from their respective injuries. *Id.* ¶¶ 19, 22. When a defendant is not liable to a plaintiff as a matter of law on the underlying claim, a related loss of consortium claim cannot survive. *See Johnson v. Moody,* 903 F.3d 766, 774 (8th Cir. 2018). To the extent Plaintiffs allege a loss of consortium claim, the Court grants summary judgment on that claim in favor of Jake's Fireworks.

### V. CONCLUSION

There is a genuine dispute of material fact as to whether Jake's Fireworks supplied the product that caused Plaintiffs' injuries. Nonetheless, Jake's Fireworks, as a nonmanufacturer, is immune from liability under Iowa Code § 618.13(1)(a) for

A.L. ex rel. Limkemann v. Jake's Fireworks, Inc., --- F.Supp.3d ---- (2020)
2020 WL 3399912

Plaintiffs' manufacturing defect claim (Count I) and breach of implied warranty claim (Count III). Plaintiffs do not resist summary judgment on their design defect claim (Count II). As for their negligence claim (Count IV), Plaintiffs do not resist summary judgment on the claim as pleaded in their complaint. The Court does not consider the new theories of negligence liability asserted in Plaintiffs' resistance because Plaintiffs did not provide Jake's Fireworks adequate notice of these theories.

**IT IS ORDERED** that Defendant Jake's Fireworks, Inc.'s Motion for Summary Judgment, ECF No. 33, is **GRANTED**. The parties are responsible for their own costs.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2020 WL 3399912

Footnotes

1    Plaintiffs also point to an email exchange between North Central Industries and Plaintiffs' counsel in which North Central Industries denied carrying the Boomer brand. Pls.' Ex. 2 Supp. Resist. Def.'s Mot. Summ. J., ECF No. 38-3. Plaintiffs rely on this out-of-court statement for the truth of the matter asserted—that is, that North Central Industries did not carry the product at issue. *See* Fed. R. Evid. 801. Plaintiffs do not argue any of the exceptions to the rule against hearsay apply. Although this evidence could be elicited at trial through a representative from North Central Industries, this email exchange is inadmissible at trial and the Court does not consider it in deciding this motion. *See* Fed. R. Evid. 801; *Moore, 514 F.3d at 758.*

2    As discussed above, the Court has dismissed the failure-to-warn claim in Count IV because Plaintiffs do not resist Jake's Firework's motion for summary judgment on this aspect of their negligence claim.

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 165 of 370
PageID: 10195
In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Not Reported in...
2004 WL 1925010

2004 WL 1925010
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re: DIET DRUGS (PHENTERMINE/
FENFLURAMINE/DEXFENFLURAMINE)
Products Liability Litigation
Larry Wayne EDWARDS
v.
WYETH, et al.

No. MDL 1203, Civ.A. 03-20284.
|
Aug. 30, 2004.

**Attorneys and Law Firms**

Bryan F. Aylstock, Justin G. Witkin, Neil D. Overholtz, Aylstock, Witkin & Sasser, PLC, Gulf Breeze, FL, Douglass A. Kreis, Sarasota, FL, for Plaintiff. Matthew J. Moore, Toby J. Bonar, Shook Hardy & Bacon LLP, Tampa, FL, Karen Marie Stanford, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Maria Charles Mc Guinness, Carlton Fields Ward Emmanuel Smith & Cut, Popham, Haik, Schnobrich and Kaufman, Ltd., R. Benjamine Reid, Steven E. Siff, McDermott Will and Emery, Miami, FL, for Defendants.

*MEMORANDUM AND PRETRIAL ORDER NO. _____*

BARTLE, J.

**\*1** THIS DOCUMENT RELATES TO:
Before the court is the motion of plaintiff Larry Wayne Edwards, a Florida citizen, to remand his complaint to the Circuit Court of Hillsborough County, Florida. This motion is before the undersigned as transferee judge in MDL 1203, the mass tort litigation involving the diet drug commonly known as fen-phen.

The complaint was originally filed on December 6, 2002, more than five years after the diet drugs Pondimin and Redux were withdrawn from the market in September, 1997. Plaintiff has sued a number of diverse defendants, including Wyeth, the manufacturer of Pondimin and Redux, as well as the phentermine manufacturer Celltech Pharmaceuticals, Inc. ("Celltech"), and Interneuron Pharmaceuticals, Inc., now known as Indevus, a co-promoter of Redux. Plaintiff has

also brought claims against Eckerd Corporation ("Eckerd"), a retail pharmacy chain that allegedly filled his diet drug prescriptions. All of the defendants except Eckerd are of diverse citizenship. There are no federal claims. Wyeth timely removed the action to the United States District Court for the Middle District of Florida. The case was then transferred to this court as part of MDL 1203.

Wyeth contends that Louisiana law governs this dispute because plaintiff's alleged injury occurred in Louisiana. Plaintiff was prescribed diet drugs in Louisiana by a Louisiana physician and obtained them from an Eckerd retail pharmacy in Louisiana. He was purportedly diagnosed with FDA-positive regurgitation in Louisiana by a Louisiana cardiologist and exercised his intermediate opt-out right from Louisiana. Plaintiff apparently moved to Florida thereafter.

As the MDL transferee court in this matter, we must apply the choice-of-law rules of Florida, the state where the transferor court sits. *See In re Sunrise Sec. Litig.,* 698 F.Supp. 1256, 1261 (E.D.Pa.1988); *In re Managed Care Litig.,* 298 F.Supp.2d 1259, 1269 (S.D.Fla.2003). Florida choice-of-law rules require us to apply the law of the state with the most significant relationship to plaintiff's case. *Merkle v. Robinson,* 737 So.2d 540, 542 (Fla.1999). Thus, we must look to the law of the state where the injury occurred unless some other state has a more significant relationship to the occurrence and the parties. *Bishop v. Fla. Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla.1980); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 146 (1971).

We need not decide whether Florida or Louisiana law controls because the result would be the same under either standard. Applying Florida law, we find that Eckerd is fraudulently joined as a defendant for the same reasons set forth in Memorandum and Pretrial Order ("PTO") No. 3856 in *Bankston, et al. v. Wyeth, et al.,* CIV. A. No. 03-20765 (E.D.Pa. Aug.12, 2004).

Under Louisiana law, a non-manufacturer seller of a defective product such as Eckerd "may be liable for damages only if he knew or should have known of the dangerous characteristic of the product. Additionally, a seller has no duty to inspect a product for inherent vices or defects prior to sale and has no duty to warn or instruct buyers on proper use." *Strickland v. Brown Morris Pharmacy, Inc.,* 1996 WL 537736, at \*2 (E.D.La. Sept.20, 1996)(internal citations and quotations omitted); *see also* LA. CIV.CODE ANN. art. 2545 (West 2004). Plaintiff contends that "Eckerd made affirmative

In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Not Reported in...
2004 WL 1925010

representations to the consuming public and the Plaintiff that it could detect and safeguard against dangerous drug-drug interactions." Compl. at ¶ 11. However, plaintiff's complaint falls far short of alleging that Eckerd knew or should have known of the dangers of Pondimin and Redux. Thus, under Louisiana law, there is "no reasonable basis in fact or colorable ground" supporting plaintiff's claims against Eckerd. *See Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990).

**\*2** With respect to plaintiff's claims against Celltech, the phentermine defendant in this case, we find that Celltech is fraudulently joined for the same reasons set forth in PTO No. 2567 in *Anderson v. Am. Home Prods., Co.,* 220 F.Supp.2d 414 (E.D.Pa.2002).

Finally, plaintiff argues that remand is required because Eckerd and Celltech failed to consent to removal. *See* 28 U.S.C. § 1446. However, the consent of a fraudulently joined defendant is not required for us to retain jurisdiction. *Balazik v. County of Dauphin,* 44 F.3d 209, 213 (3d Cir.1995) (citations omitted).

We will deny plaintiff's motion to remand this action to the Circuit Court of Hillsborough County, Florida and will dismiss the complaint as to Eckerd and Celltech.

*PRETRIAL ORDER NO. _____*

AND NOW, this day of August, 2004, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiff to remand is DENIED;

(2) all defendants in the above-captioned action except Wyeth and its related companies and Interneuron Pharmaceuticals are DISMISSED; and

(3) the motion of defendant Wyeth for extension of time to file a response to plaintiff's remand motion (Doc. # 6) is GRANTED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1925010

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 25

2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

2009 WL 87469
United States District Court, W.D. Kentucky,
at Louisiville.

Edward H. FLINT, Plaintiff

v.

TARGET CORPORATION, Defendant.

Civil Action No. 3:07CV–00600–R.
|
Jan. 13, 2009.

West KeySummary

1    **Products Liability**  👉  **Drugs in General**

A pharmacy customer failed to demonstrate
a genuine issue of material fact that would
overcome the pharmacy's motion for summary
judgment on the pro se customer's claim that he
was given harmful pills. The customer claimed
he had an allergic reaction to some unidentified
harmful ingredient in his prescription refill,
which was manufactured by a different company
than the original prescription he had filled at
the pharmacy. The customer did not dispute that
the pharmacy dispensed the correct medication,
and he presented no proof that the pharmacy
breached the duty of care it owed him. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**Attorneys and Law Firms**

Edward H. Flint, Louisville, KY, pro se.

Kimberly S. Naber, Richard Paul Schiller, Schiller Osbourne
Barnes & Maloney, PLLC, Louisville, KY, for Defendant.

***MEMORANDUM OPINION***

THOMAS B. RUSSELL, Chief Judge.

 **\*1**  In this action, the plaintiff, Mr. Edward H. Flint, is
suing Target Corporation *pro se* [1] because he experienced a
negative physiological reaction after taking some medication

dispensed by his local Target pharmacy. Mr. Flint believes
that the negative reaction was directly caused by some pills
dispensed by the Target pharmacy, and suspects the pills
contained one or more harmful ingredients. In response,
Target asserts that it correctly filled and dispensed Mr. Flint's
prescription in accordance with his doctor's directions, and
that there exists no evidence either that: (a) Mr. Flint's alleged
reaction was caused by the pills in question, or (2) that the
pills dispensed improperly contained harmful ingredients.
Accordingly, Target has filed a motion for summary judgment
of Mr. Flint's claims.

The Court has reviewed Target's motion, Mr. Flint's response
thereto, and the evidence of record in this case. While the
Court is not without sympathy to Mr. Flint's past physical
discomfort, or his frustration over what he believes to be poor
customer service taken to a potentially harmful extreme, [2] it
observes that any recovery to be had would come from the
manufacturer or distributor of the pills, not Target.

In Kentucky, there are two possible theories of recovery
against pharmacists who dispense allegedly harmful
medication: negligence and product liability. In this matter,
there exists no genuine issue of material fact that would
permit plaintiff to proceed to trial against Target on either
claim. Accordingly, for the reasons stated herein, the Court
will grant Target's motion for summary judgment and dismiss
this action.

**I.**

The facts about which the parties agree or, where
disagreements exist, viewed in the light most favorable to Mr.
Flint, are as follows. In November 2006, Mr. Flint's surgeon
issued Mr. Flint a prescription for Pyridium (generic name:
phenazopyridine) following surgery on Mr. Flint's prostate
gland. Pyridium is an analgesic used to relieve symptoms
of urinary tract discomfort. Mr. Flint took the prescription,
which called for an initial supply and two refills, to his local
Target pharmacy to be filled. The first supply of the drug
was dispensed on November 16, 2006, in its generic form.
The first refill, also in generic form, was dispensed by the
same Target pharmacy on November 24, 2006. The second
refill, also in generic form, but manufactured by a different
company, was dispensed on December 6, 2006, again by
the same Target pharmacy. Each time the prescription was
dispensed, it was accompanied by a patient information sheet
which listed several possible contraindications, side effects

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 169 of 370
PageID: 10199
Flint v. Target Corp., Not Reported in F.Supp.2d (2009)
2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

(including headache, mild itching, and stomach cramps), and possible indicia of an allergic or negative physiological reaction (specifically blue or purple skin color, decreased urination, vomiting, yellow skin or eyes, rash, itching, swelling, dizziness, or trouble breathing).

On December 11, 2006, Mr. Flint reported to the pharmacy manager, Mr. Robert Wolford, that he had experienced what he believed to be an allergic reaction to the pills contained in the second refill—itchy hives and bumps inside his mouth, a numb tongue, and a loss of taste. Mr. Wolford examined the prescription and determined that there had been no error in the *filling* of the prescription. In other words, Mr. Wolford confirmed that the drug Pyridium had been dispensed to Mr. Flint (albeit in its generic form, phenazopyridine) and the dosing instructions had been issued in accordance with Mr. Flint's surgeon's instructions. Mr. Wolford instructed Mr. Flint to stop taking the medication, however, and told him to call his surgeon. Mr. Wolford also gave Mr. Flint Target's national customer service number and the names of, and contact information regarding, the two companies who had manufactured the pills dispensed to Mr. Flint. Lastly, Mr. Wolford refunded Mr. Flint's money and gave Mr. Flint a list of the inactive ingredients in the pills sold by Breckinridge Pharmaceutical, the company that had manufactured the pills in the second refill, which contained the pills Mr. Flint was taking when he experienced a negative physiological reaction.

**\*2** Thereafter, Mr. Flint attempted to resolve his concerns directly with Target's customer service department. The experience was not to Mr. Flint's liking. He perceived that Target's customer service agents were not being appropriately responsive to his concerns and were not being sufficiently helpful to his efforts to determine the cause of his reaction. Correctly or incorrectly, this led Mr. Flint to his now firmly-held belief that Target places greater emphasis on profit than customer health and, therefore, does not employ appropriate internal control measures sufficient to ensure that it only purchases quality pharmaceutical supplies from the manufacturers and distributors with whom it does business. He believes that there was some unidentified allergenic or otherwise harmful ingredient in the pills manufactured by Breckinridge Pharmaceutical that caused him to have an allergic reaction, not properly described as a risk on the patient information handouts provided to him when his prescription was dispensed. Hence this lawsuit.

Because Mr. Flint is proceeding without an attorney, his causes of action are not presented in the customary fashion.

That is to say, his specific legal claims are not identified and isolated from his general allegations. Rather, Mr. Flint's Complaint is presented in narrative form, as a series of complaints. This is not impermissible, or even atypical of Complaints filed *pro se,* but it nevertheless does pose some difficulty for the Court and for opposing counsel, who must attempt to liberally construe Mr. Flint's narrative and discern discrete, actionable claims amongst the general prose.

In its motion for summary judgment, Target has construed the Complaint as seeking relief under the theories of negligence and product liability. This comports with the Court's reading of the Complaint, [3] and its understanding of potential theories of recovery available to Mr. Flint under Kentucky law. Accordingly, the Court will now evaluate each cause of action, and determine whether Target's request for summary judgment should be granted or denied.

## II.

It should be well known to all in the legal community by now, but because Mr. Flint is acting as his own counsel, it bears repeating that summary judgment as a matter of law is proper only where there exists no *genuine* issue of *material* fact. FED.R.CIV.P. 56(c)(emphasis added). In considering a motion for summary judgment, this court must construe the evidence and draw all reasonable inferences in favor of the non-moving party (in this case, Mr. Flint), *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party bearing the burden of proof on a particular issue —regardless of whether he is the movant or non-movant— cannot rely on mere allegations or conclusory statements, however. *See Maki v. Laako,* 88 F.3d 361, 364 (1996). Whereas a *pro se* Complaint will be liberally construed and may be presented in narrative form, proof of a *pro se* plaintiff's allegations is a different matter. To defeat Target's motion for summary judgment, Mr. Flint must point to in the record, or proffer, actual evidence. *Id.* What's more, the evidence he proffers must fit within certain parameters. It must be "of an evidentiary quality [i.e., capable of being admitted at any trial of the matter] that demonstrates the existence of a

2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

genuine issue of material fact." *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 145 (6th Cir.1997)(emphasis and bracketed explanation added). To be of evidentiary quality, "[t]he proffered evidence need not be in admissible form, but its content must be admissible." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(emphasis in original omitted)).

**\*3** With that general explanation in mind, the Court will turn to Mr. Flint's claims.

### A. Negligence

Mr. Flint asserts that Target was negligent in its dispensing of his second refill. To successfully prosecute a claim of negligence, a plaintiff must establish the following four elements of that claim, that the Court will describe in terms particular to Mr. Flint's allegations:

1. That Target owed Mr. Flint a duty of care,

2. That Target breached that duty,

3. That Mr. Flint suffered injury, and

4. That the injury he allegedly suffered was directly or proximately caused by Target's breach of its duty of care.

*See, e.g., Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247 (Ky.1992). This, of course, begs the question: What is the specific duty of care owed by pharmacists to their customers? In Kentucky, the care owed is the duty of care by ordinarily skillful and prudent pharmacists under similar circumstances—that is, to dispense the correct medication in accordance with the prescribing physician's instructions. *See Ohio County Drug Co. v. Howard,* 201 Ky. 346, 256 S.W. 705 (Ky.1923)(older, but still good, common law). All of the evidence presented, even when construed in the light most favorable to Mr. Flint, indicates that Target did just that. Moreover, not even Mr. Flint disputes that Target dispensed phenazopyridine (Pyridium) pills in the correct dosage with the correct instructions for their use. Accordingly, putting aside the question of whether Mr. Flint proffered sufficient evidence that the physiological reaction he experienced was caused by the phenazopyridine pills he purchased at Target, [4] and not a reaction to a food or another type of medication he was taking, or even a reaction to another substance in his home or work environments, he cannot establish a key element of his negligence claim, namely that Target breached the duty of care it owed him when filling and re-filling his

prescription. Target is therefore entitled to summary judgment of this claim.

### B. Product Liability

The more complicated question is whether Mr. Flint has alleged a viable product liability claim against Target. Mr. Flint believes that the pills contained in his second refill, *i.e.* those manufactured by Breckinridge Pharmaceutical, may contain one or more inactive ingredients that are either inherently harmful or capable of causing allergic reactions such as the ones he allegedly experienced. In other words, he is asserting that Target sold him a defective product.

Generally speaking, anyone in the stream of commerce—from the manufacturer, to the distributor, to wholesaler, to the retailer—is *potentially* strictly liable for damages caused by a defective product. There are limits, however. As a matter of Kentucky statutory law, if the manufacturer of a defective product is identified and subject to the jurisdiction of the court, then the "middlemen"—namely those in the stream of commerce between the person who made the product and the ultimate consumer—such as distributors and retailers—are not potentially liable for harm caused by the allegedly dangerous product *unless* the product was altered from its original manufactured condition or packaging, *or* the "middleman" either (a) breached an express warranty or (b) "knew or should have known at the time of distribution or sale of such product that the product was in a defective condition unreasonably dangerous to the user or consumer." *See* Ky.Rev.Stat. § 411.340.

**\*4** The first issue, of course is whether the manufacturer of the product has been identified. It has. Target identified Breckinridge Pharmaceutical as the manufacturer of the phenazopyridine dispensed to Mr. Flint in his second refill of his prescription, and Mr. Flint has neither disputed this in his pleadings, nor proffered evidence to the contrary. The next issue is whether Breckinridge is subject to the jurisdiction of this Court. It is, because it contracted to supply phenazopyridine to Target pharmacies in the Commonwealth. *See* Ky.Rev.Stat. 454.210; *see also Intera Corp. v. Henderson III,* 428 F.3d 605, 615 (6th Cir.2005)(discussing the circumstances under which a company may be subject to the jurisdiction of this Court). The Court is thus left to ponder whether there is admissible evidence indicating that the pills sold to Mr. Flint had been altered from their original condition by Target, whether Mr. Flint alleged (in layman's terms) that Target breached an express warranty to him, or whether there is admissible evidence indicating Target knew the pills it

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 171 of 370
PageID: 10201
Flint v. Target Corp., Not Reported in F.Supp.2d (2009)
2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

supplied him were in a defective, unreasonably dangerous condition. If the Court answers "yes" to any of those three questions, Target may be liable to Mr. Flint.

With respect to the first question, this Court is not of the opinion that Kentucky courts would determine that a pharmacy's mere act of dividing and distributing drugs in doses is not sufficient to constitute an alteration of the drug's original condition or package. *See Smith v. Wyeth Inc., 488 F.Supp.2d 625, 629 (W.D.Ky.2007)*(Russell, J.). Something more, some active adulteration, is required. There is no allegation, much less any evidence, that Target deliberately adulterated the drugs from Breckenridge, or otherwise mishandled them in a manner capable of causing harm to a consumer. Rather, Mr. Flint's allegation is that Target's fault stems from its decision to purchase the drugs from Breckenridge. That is a different issue altogether, and will be addressed next.

This Court finds that, as a matter of law, Kentucky courts would agree with the majority of states which held that pharmacists are not liable for breach of either express or implied warranties with respect to the properties of particular drugs. *See id, 488 F.Supp.2d at 629* (internal citations omitted). Thus, even if Mr. Flint's allegations could be liberally construed to include a claim for a breach of an express warranty with respect to the properties of the medicines it dispenses, [5] that claim would fail.

As for the third and last question, there simply is no evidence that the pills supplied by Breckenridge were in a defective, unreasonably dangerous condition. Rather, the evidence presented indicates that they fell within manufacturing specifications. There is no evidence to suggest that they had been altered, tampered with, or subjected to conditions that would have affected their chemical composition (*e.g.,* water, reactive chemicals), even from the testing facility to which Mr. Flint sent samples. Mr. Flint suspects that Breckenridge's generic form of Pyridium may have contained an inactive ingredient that was harmful to him in the sense that it triggered an uncomfortable, and lasting allergic reaction that has

affected his quality of life. He may indeed be correct, but he has not responded to Target's request for summary judgment by providing the Court with the requisite evidence to prove that it did, however, and even if Mr. Flint could identify the putative allergen contained within the Breckenridge, that does not—without more specific proof—establish that the pills in question were defective or unreasonably dangerous. Target is therefore entitled to summary judgment in its favor with respect to Mr. Flint's second claim.

### III.

**\*5** In reaching its decision, the Court is mindful that, while Mr. Flint may not have a cognizable claim against Target, he nevertheless has experienced a physiological reaction that has caused him sufficient discomfort to make him initiate and vigorously maintain a lengthy lawsuit that has drained time, energy and resources. The Court is also mindful that several pending discovery motions recently were remanded pending the Court's adjudication of Target's Motion for Summary Judgment. Mr. Flint will therefore likely feel that this Court's determinations are premature, and that he has been deprived of the opportunity to uncover sufficient evidence to make his case. None of the discovery sought in the remanded motions would have materially affected this Court's determination, however. Not all injuries are capable of redress by the courts, even if plaintiffs were permitted unlimited time and access to potential sources of proof. This is not always easy for a lay person to understand. Courts are supposed to right wrongs and they do, but only when and to the extent the law permits.

The Court will enter an order concurrently with this Memorandum Opinion that grants Target's Motion for Summary Judgment and dismisses Mr. Flint's claims.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

---

Footnotes

1    *Pro se* is a Latin adjective meaning "for self," and a short and convenient phrase courts use to describe a person who represents himself in a legal proceeding without the aid of an attorney.

2    In making this observation, the Court does not mean to imply that it is this Court's official opinion that Target did, in fact, demonstrate poor customer service, much less that it is this Court's official opinion that Target made decisions that put the health or safety of its customers at risk. Rather, the Court is simply observing that Mr. Flint clearly, and earnestly,

2009 WL 87469, Prod.Liab.Rep. (CCH) P 18,157

believes that Target did. As with much of life, there are the rare extremes of indisputable fact on one side and unfounded perception on the other, and then there is the large middle ground in between that consists of varying combinations of the two, neither of which can be dismissed without appropriate consideration and explanation when reaching a judgment.

3      Mr. Flint filed his initial Complaint in Jefferson Circuit Court on October 10, 2007, and it was removed to federal court on October 30. On June 16, 2008, after Target had moved for summary judgment, he filed a motion requesting leave to file an amended complaint. That motion has not been granted and, although it contains additional narrative, the tendered Amended Complaint does not contain additional causes of action, nor would it change this Court's substantive analysis.

4      The evidence proffered indicates that Dr. Kuhn, Mr. Flint's physician and expert witness, testified that he cannot be certain that phenazopyridine caused Mr. Flint's reaction. He further testified that he recommended that Mr. Flint consult with another specialist, Dr. Fowler, who might be able to isolate the cause of Mr. Flint's allergic reaction. There is no evidence that Mr. Flint ever sought Dr. Fowler's assistance, or consulted with any other specialist capable of opining with a reasonable degree of certainty about the cause of Mr. Flint's symptoms.

5      This is the Court's best reading of Mr. Flint's allegations. As noted previously, Mr. Flint believes that Target is not engaging in appropriate quality control in several areas ranging from its customer service, to its selection of suppliers, to its monitoring of the composition of the drugs it dispenses. One way of looking at this complaint (little "c") is that it constitutes a breach of some duty of care to him, the customer. That issue has already been dealt with *supra*. Another way of reading the allegations is that they state a claim for breach of warranty that any medicines sold would not contain any unidentified allergenic or otherwise harmful ingredients.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

1992 WL 233984
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Richard ZEHNER, et al.

v.

NORDSKOG INDUSTRIES, INC., et al.

Civ. A. No. 92–2508.
|
Sept. 2, 1992.

ORDER AND REASONS

FELDMAN, District Judge.

**\*1** Several motions are before the Court: (1) plaintiffs'
second motion to remand; (2) defendant Seither and
Sons, Inc.'s motion for summary judgment; (3) defendant
Briggs–Weaver, Inc.'s motion for summary judgment and
alternatively a motion to dismiss the loss of consortium
claims and to strike the jury demand. For the reasons that
follow, the plaintiffs' motion to remand is DENIED. The
defendant Seither and Sons' motion for summary judgment is
GRANTED, and the defendant Briggs–Weaver's motion for
summary judgment is GRANTED.

I. BACKGROUND

In October 1990, the plaintiffs, Richard Zehner and Cecil
Walker, were injured in an accident involving a Nordskog
electrical flatbed scooter. [1] Zehner was operating the scooter
when it is said to have unexpectedly accelerated and struck a
workbench and tool boxes. Zehner claims he was injured by
the impact; and Walker, a bystander, adds he too was injured,
when he jumped out of the scooter's path.

The plaintiffs sued in state court the manufacturer of the
scooter, Nordskog Industries, Inc. and/or Nordskog Electric
Vehicles, and the distributor, Briggs–Weaver, Inc., alleging
that the scooter was defective. In November 1991, the
defendants removed the case based on diversity jurisdiction.

Thereafter, mindful of the strategy of verdict-shopping, the
plaintiffs moved to amend their complaint to: (1) add a
nondiverse defendant, Seither and Sons, Inc.; (2) add loss of

consortium claims for their wives; and (3) request a trial by
jury. This Court granted the motion and remanded the case.
Undaunted, and still armed with strategy of their own, the
defendants filed a second notice of removal of the action.

The plaintiffs now move again to remand the suit. They
contend that removal was improper because Seither is a
nondiverse party and is somehow potentially liable for
damages. The plaintiffs suggest that Seither may have known
of the alleged speed control defects in the scooter which it sold
and could be liable under Louisiana products liability law.

Briggs–Weaver, Nordskog, and Seither, all counter that
Seither, a non-manufacturer seller of Nordskog vehicles, was
fraudulently joined as a defendant. They underscore that
Seither never performed maintenance or service work on the
scooters, nor did it offer any maintenance or service advice.
The defendants also say that Seither never received notice
from Nordskog regarding updates, changes, or modifications
to the subject scooters. Thus, the defendants conclude that
because the plaintiffs have failed to show that Seither had any
knowledge of the alleged defects in the scooters which it sold,
Seither is not liable under Louisiana products liability law.
And, the defendants urge that because no recovery against
Seither is possible, the plaintiffs' motion to remand should be
denied.

Briggs–Weaver also moves for summary judgment in its
favor, asserting that as a non-manufacturer seller, it cannot be
held liable to the plaintiffs under a product defect theory of
liability. Alternatively, Briggs–Weaver moves: (1) to dismiss
the loss of consortium claims based on the lack of federal
subject matter jurisdiction and prescription; and (2) to strike
the plaintiffs' jury demand as untimely and improper.

**\*2** The plaintiffs invoke the familiar refrain that contested
issues of fact exist regarding the defendants' communications
about the alleged defects in the electrical scooters (the so-
called communications they point to in a deposition do not
even contain a hint of knowledge of defects). They assert
that more discovery is necessary (but fail to explain why,
since October 1991, this now much-needed discovery was not
taken).

II. LAW AND APPLICATION

A. *Motion to Remand*

1992 WL 233984

When a party has removed a case alleging the fraudulent joinder of nondiverse defendants, the burden of proving fraudulent joinder rests with the removing party. *LeJeune v. Shell Oil Co.,* 950 F.2d 267, 271 (5 Cir.1992). The claims of fraudulent joinder must be pleaded with particularity and proved by clear and convincing evidence. *See Grassi v. Ciba–Geigy, Ltd.,* 894 F.2d 181, 186 (5 Cir.1990).

Specifically, the removing party must prove that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the nondiverse defendant in state court, or that there has been outright fraud in the plaintiff's pleadings of jurisdictional facts. *Id.; Carriere v. Sears, Roebuck and Co.,* 893 F.2d 98, 100 (5 Cir.), *cert. denied,* 111 S.Ct. 60 (1990); and *Green v. Amerada Hess Corp.,* 707 F.2d 201, 205 (1983), *cert. denied,* 464 U.S. 1039 (1984). The burden of proof is clearly a heavy one. *Doe v. Cutter Biological,* 774 F.Supp. 1001, 1003 (E.D.La.1991).

To determine whether a plaintiff has fraudulently joined nondiverse parties as defendants to prevent removal of an action, a district court must evaluate all of the factual allegations in the plaintiff's state court pleading in the light most favorable to the plaintiff and resolve all contested issues of substantive fact in favor of the plaintiff. *Carriere,* 893 F.2d at 100; and *Green,* 707 F.2d at 205. A court may also consider affidavits and deposition testimony. *Carriere,* 893 F.2d at 101. Indeed, a court may find fraudulent joinder only if it concludes that the plaintiff has no possibility of establishing a valid cause of action against the nondiverse defendant. *Doe,* 774 F.Supp. at 1003, citing *Laughlin v. Prudential Insurance Co.,* 882 F.2d 187, 190 (5 Cir.1989). *See also Carriere,* 893 F.2d at 100.

The plaintiffs in this case have alleged that the Nordskog scooters were defective. Thus, the plaintiffs must show that the defendants are liable under products liability law.

The Louisiana Products Liability Act mandates that a manufacturer is liable for damage caused by his product. La.R.S. § 9:2800.52. The Act defines a manufacturer as (1) a person who labels a product as his own or otherwise holds himself out to be the manufacturer of the product; (2) a seller who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage; (3) one who incorporates into the product a component or part manufactured by another manufacturer; or (4) a seller who is in the business of importing or distributing a product for resale and is the alter ego of a foreign manufacturer. *See* La.R.S. § 9:2800.53(1).

**\*3** Louisiana jurisprudence instructs that a non-manufacturer seller of a defective product may also be responsible for damages, but only if he knew or should have known that the product sold is defective. *See* La C.C. 2545. *See also, Picolo v. Flex–A–Bed Inc.,* 466 So.2d 652, 654 (La.App. 5 Cir.1985), *writ denied,* 467 So.2d 1134 (La.1985); and *Harris v. Atlanta Stove Works Ins.,* 428 So.2d 1040, 1043 (La.App 1 Cir.1980), *writ denied,* 434 So.2d 1106 (La.1983). There is no duty, however, for a non-manufacturer seller to inspect a product prior to sale to determine the possibility of inherent vices or defects. *Nelton v. Astro–Lounger Mfg. Co.,* 542 So.2d 128, 131 (La.App. 1 Cir.1989). Moreover, such a seller has no independent duty to warn or instruct purchasers in the proper use of a product. *Delanzo v. ABC Corporation,* 572 So.2d 648, 651 (La.App. 5 Cir.1990). It is these latter principles that drive this Court's resolution of the motion issues before it.

In this case, Seither sold repair and replacement parts for Nordskog scooters, which Martin Marietta ordered from Seither by specific part number. Seither became a Nordskog dealer in 1985. From 1985 until 1988, Seither ordered its supply parts from Nordskog. After 1988, Seither ordered its parts from Midwest Equipment Company, a Nordskog dealer.

The deposition testimony of Milton W. Seither, Jr., President of Seither, establishes that Seither does not manufacture the Nordskog scooters or parts. In addition, Seither does not label the product as its own or otherwise hold itself out to be the manufacturer; it does not exercise control over or influence a characteristic of the design, construction or quality of the product: it does not manufacture the product and incorporate a component or part manufactured by another manufacturer; and it is not in the business of importing or distributing for resale the product of a foreign manufacturer, as the alter ego of such manufacturer. Clearly, the record shows that Seither is not a manufacturer within the meaning of the Louisiana Products Liability Act and cannot be liable under the Act.

Moreover, the record is clear that Seither never received any warnings or instructions from Nordskog and it never gave Martin Marietta any representations, warranties, or recommendations on the parts. Seither never performed any maintenance or repair work on the Nordskog scooters; nor did it ever receive notice from Nordskog of any updates,

1992 WL 233984

changes, or modifications to the scooters. These facts are not controverted.

Nordskog also makes clear that the scooters at issue had already been modified when Seither became a Nordskog dealer. [2] And, because Seither was not aware of the change and never performed maintenance on the Nordskog scooters, Seither could not have known the condition or character of the vehicle involved.

Plainly, the record teaches that Seither had neither actual nor constructive knowledge of any alleged defect in the Nordskog scooter, and the brief deposition testimony to which plaintiffs point does nothing to weaken that fact. The plaintiffs would be unable to recover against Seither as a non-manufacturer seller. Accordingly, the court concludes that removal of this case was proper, and the plaintiffs' motion to remand is DENIED.

## B. *Seither's Motion for Summary Judgment*

**\*4** The Fifth Circuit has expressly stated that the procedure for assessing fraudulent joinder claims is similar to the procedure used for ruling on summary judgment motions. *Carriere,* 893 F.2d at 100. Thus, the circuit court treats fraudulent joinder claims as capable of summary determination. *Id.*

In this case, the sum of the evidence indicates that Seither does not manufacture Nordskog scooters or parts, does not label the product as its own, and does not exercise control over the design, construction or quality of the product.

Seither has never received any warnings or instructions from Nordskog nor has it given Martin Marietta any representations, warranties, or recommendations on Nordskog parts. Seither has never performed any maintenance on the Nordskog scooters, and it has not received notice from Nordskog of any updates, changes, or modifications to the scooters.

Indeed, the record compels one conclusion: that Seither is not a manufacturer within the meaning of the Louisiana Products Liability Act and it had neither actual nor constructive knowledge of any alleged defect in the Nordskog scooters. Because the plaintiffs have no possibility of recovery against Seither, Seither is entitled to judgment in its favor as a matter of law. Accordingly, Seither's motion for summary judgment is GRANTED.

## C. *Briggs–Weaver's Motion for Summary Judgment*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact. No genuine issue of fact exists if the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See id.*

In this case, Briggs–Weaver was a distributor for Nordskog until 1985. The deposition testimony of Gwen Gilbert, Vice–President of Briggs–Weaver, indicates that the company did not design or manufacture Nordskog electrical scooters or any of the component parts. Moreover, it did not modify or alter the Nordskog vehicles or component parts.

The deposition testimony further establishes that Briggs–Weaver never used its own trade name on the Nordskog scooters nor in connection with the advertising of the product. It never exercised control over the quality of scooters purchased from Nordskog, and it never provided repair or maintenance services for the vehicles.

The Court finds that the evidence establishes that Briggs–Weaver had no manufacturing responsibility for the allegedly defective scooters and that Briggs–Weaver made no such representations. The Court is not persuaded by the plaintiffs' assertion that the professional relationship between Briggs–Weaver and Nordskog is similar to the relationship between the manufacturer and distributor in *Media Productions Consultants Inc. v. Mercedes–Benz of North America,* 262 So.2d 377, 380 (La.1972), in which the Louisiana Supreme Court found the automobile distributor liable for defect because the distributor represented itself to the public as the manufacturer by assuming responsibility for inspecting, adjusting, and preparing the cars for retail sale and by permitting its name to appear on the owner's service policy and the owner's automobile manual. *Id.* The conduct of the distributor in *Media Production Consultants* is vastly different from the involvement of Briggs–Weaver here.

Zehner v. Nordskog Industries, Inc., Not Reported in F.Supp. (1992)
1992 WL 233984

*5  Neither is the Court persuaded by the plaintiff's weak plea that more discovery is needed. The Court notes that the depositions of Martin Marietta employees, Henry Hitzman and Frank Rhodes, have been taken as well as the corporate deposition of Seither. Moreover, both Martin Marietta and Nordskog have responded to the plaintiffs' interrogatories and requests for production of documents, including maintenance records and manuals regarding the scooters at issue. Indeed, the Court finds that a good bit of discovery has been completed and that the plaintiffs have had plenty of time to do any desired discovery since filing suit against Briggs–Weaver in October 1991.

We are reminded that "[i]f the evidence is merely colorable, or is not significantly probative," then summary judgment is appropriate. *Anderson,* 477 U.S. at 249–50 (citations omitted). In this case, the plaintiffs have wholly failed to produce any evidence which implicates Briggs–Weaver as having knowledge of the alleged defects in the scooters. Accordingly, Briggs–Weaver's motion for summary judgment is GRANTED.

**All Citations**

Not Reported in F.Supp., 1992 WL 233984

Footnotes

1    The plaintiffs were employees of Martin Marietta Space Systems.
2    Nordskog incorporated an auxiliary spring into the scooter accelerator pad assembly.

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

2003 WL 1785795
Only the Westlaw citation is currently available.
United States District Court, D. Maine.

John HERZOG and Mary E. Herzog, Plaintiffs

v.

ARTHROCARE CORPORATION
and Surgi–Care, Inc., Defendants

No. Civ. 02–76–P–C.
|
March 21, 2003.

**Attorneys and Law Firms**

represented by Christopher D. Nyhan, David J. Ekelund, Jr., Evan M. Hansen, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Joel Hall Thompson, Zeldes, Needle & Cooper, Bridgeport, CT, Joseph W. Corrigan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Robert O. Newton, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Lead Attorney, Attorney to be Noticed, for John P Herzog, Plaintiff.

represented by Christopher D. Nyhan, David J. Ekelund, Jr., Evan M. Hansen, Joel Hall Thompson, Joseph W. Corrigan, Robert O. Newton, (See above for address), Lead Attorney, for Mary E Herzog, Plaintiff.

represented by Harold J. Friedman, Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME, Martha C. Gaythwaite, Friedman, Gaythwaite, Wolf & Leavitt, Portland, ME, Lead Attorney, Attorney to be Noticed, for Arthrocare Corporation, Defendant.

represented by John Hubbard Rich, III, Perkins, Thompson, Hinckley & Keddy, Portland, ME, Lead Attorney, Attorney to be Noticed, for Surgi–Care Inc, Defendant.

*PUBLIC VERSION* RECOMMENDED DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT and PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KRAVCHUK, Magistrate J.

**\*1** Plaintiffs John Herzog D.O., and Mary Herzog filed suit against ArthroCare Corporation, the manufacturer of a surgical implement called the AthroWand, and Surgi–Care,

a regional marketer and distributor of the ArthroWand, for injuries Dr. Herzog allegedly sustained from a surgeon's use of an ArthroWand to debride or "sculpt" articular cartilage located on his right knee joint and for Mary Herzog's loss of consortium. The following dispositive motions are now pending, in order of filing date: (1) Surgi–Care's Motion for Summary Judgment; (2) Dr. and Mary Herzog's Motion for Partial Summary Judgment; and (3) ArthroCare's Amended Motion for Summary Judgment. I now recommend that the Court GRANT Defendants' Motions on all of the Plaintiff's claims EXCEPT for those portions of Counts I, II, VI, IX, X and XIV, which rely on the theory of a defective product design or unfit product condition. I further recommend that the Court DENY Plaintiffs' Motion.

Facts

Plaintiffs John Herzog and Mary Herzog live in Grand Blanc, Michigan, but at all times relevant to the events underlying this lawsuit were residents of Maine. Defendant ArthroCare Corporation ("ArthroCare") is a corporation with its principal place of business in Sunnyvale, California. ArthroCare is in the business of manufacturing medical devices, including the device that is the subject of this litigation, a certain 3.0 millimeter 60° Bevel ArthroWand ("the Wand"). (Docket No. 35, ¶ 1.) [1] Defendant Surgi–Care, Inc. is an independent distributor of various medical devices for various manufacturers, including ArthroCare, and has its principal place of business in Waltham, Massachusetts. (*Id.*, ¶¶ 3, 4; *see also* Surgi–Care's "Answer to Plaintiffs' First Amended Complaint," ¶ 7.) [2]

Dr. Herzog alleges in this suit that the Wand used on him during a December 29, 1998 knee surgery, contrary to representations made by the Defendants in their marketing materials and product indications, produced sufficient heat to damage collateral tissue in his knee, causing "serious and permanent injury to his body, including past and future pain, suffering, mental and emotional stress, ... loss of enjoyment of life[,] ... significant medical and rehabilitative expenses[,] ... and ... future lost income and an impairment to his earning capacity." (First Amended Complaint, Docket No. 12, ¶¶ 1, 31–33.) His theories of liability sound mostly in tort–strict product liability, negligence, misrepresentation–but also include breach of the implied warranty of merchantability and unfair trade practices. Dr. Herzog's wife, Mary Herzog, pursues a tort claim for loss of consortium.

In March 1995, Dr. Herzog was involved in a skiing accident and injured his right knee. (Docket Nos. 44 & 69, ¶ 6.) As a result of this injury, Dr. Herzog underwent reconstructive surgery to his anterior cruciate ligament ("ACL") on May 10, 1995. (*Id.,* ¶ 8.) After the operation, Dr. Herzog experienced pain and instability in his knee during exercise, but was still able to tolerate physical activities such as running, snow skiing, windsurfing and waterskiing. (*Id.,* ¶ 9.) Dr. Herzog underwent a second ACL reconstructive surgery on December 15, 1995. (*Id.,* ¶ 10.) This surgery did not succeed in removing the pain and instability, but Dr. Herzog continued to be able to engage in the same physical activities as before. (*Id.,* ¶ 11.) In July 1998, Dr. Herzog "re-injured" his knee while water skiing. (*Id.,* ¶ 13.) Following that incident, Dr. Herzog stopped engaging in a number of physical activities he previously enjoyed, including windsurfing, rollerblading and waterskiing, but continued others, including running. (Docket No. 69, ¶ 22; Docket No. 70, ¶ 21.) [3]

**\*2** In December 1998, Dr. Herzog underwent an arthroscopic procedure, described by the parties as his third knee surgery. (*Id.,* ¶ 14 .) This procedure was performed by Dr. Douglas Brown, an orthopedic surgeon at Orthopedic Associates in Portland, who intended to do a thorough evaluation of the "apparently failed" ACL surgery and to "do what I could short of a redo reconstruction to sort of clean things up and make his knee feel better." (*Id.,* ¶ 19; Brown Depo. at 51–52.) At the time, Dr. Herzog was also employed with Orthopedic Associates as an orthopedic surgeon. From Dr. Herzog's perspective, the procedure was intended to "help increase peak performance in sports." (Docket No. 70, ¶ 18.) During the surgery, Dr. Brown observed significant preexisting osteoarthritis within the articular cartilage of Dr. Herzog's knee, which he identified as degenerative joint disease. (Docket No. 69, ¶ 20.) Dr. Brown classified the degree of cartilage degeneration as "Grade III" on a four-grade scale, where Grade I reflects minimal damage and Grade IV total or near-total destruction of the articular cartilage down to the bone. Grade III signifies "significant" damage. (Docket No. 44, ¶¶ 20, 44.) Specifically, Dr. Brown found, among other areas of damage, "modest sized" areas of degeneration in the medial femoral condyle and "a relatively mild grade III, middle of the road III" on the patella. (Brown Depo. at 131.) During this procedure, Dr. Brown utilized the Wand in some manner not specified by the parties in their summary judgment filings, presumably "to clean things up" in some manner. (Docket No. 35, ¶ 10.) The relative degree of Dr. Herzog's pain and activity level following this procedure

is not established by the parties' filings; to the extent they are suggested, the record citations are unsupportive. [4]

On June 3, 1999, Dr. Brown performed another surgery on Dr. Herzog's knee during which he repaired Dr. Herzog's ACL and also debrided articular cartilage located in certain areas of Dr. Herzog's knee with the aid of the Wand. (Docket No. 44, ¶¶ 25, 29, 30, 49.) Dr. Brown videotaped portions of this surgery and also documented the surgery with notes and photographs. (*Id.,* ¶¶ 26–28.) At his June 2002 deposition, Dr. Brown could not recall all of the areas of Dr. Herzog's knee on which he had used the Wand, but he was confident that he had used it on the medial femoral condyle, or MFC. In an operative record, Dr. Brown indicated that there was "shaving of articular cartilage–patella and MFC." (Docket No. 69, ¶ 29) However, Dr. Brown could not recall with certainty whether the debridement (shaving) he did on Dr. Herzog's patella was accomplished with the Wand or with a mechanical shaver. (Brown Depo. at 65–67.)

The Wand that Dr. Brown used on Dr. Herzog's knee was supplied to Orthopedic Associates by Surgi–Care. (Docket No. 35, ¶ 7.) When supplying the Wand to Orthopedic Associates, Surgi–Care also provided with the Wand the product inserts and statements authored and supplied by ArthroCare, including a videotape that ArthroCare created and disseminated to clinicians entitled "Procedures of the Knee, Articular Cartilage Sculpting." (*Id.,* ¶¶ 8, 12.) The record supports the finding that Dr. Brown viewed this video prior to using the Wand on Dr. Herzog's knee. (Docket No. 69, ¶ 35.) According to Dr. Brown, he applied the Wand in a manner generally consistent with ArthroCare's product indications, except that he attempted to use an even "lighter touch" than the "direct" touch suggested in ArthroCare's indications. (Docket No. 64, ¶¶ 27, 36; Brown Depo. at 104–105, 113–114; Docket No. 69, ¶ 35.)

**\*3** The primary factual dispute involves the degree of Dr. Brown's knowledge concerning the risk of using the Wand to debride the surface of articular cartilage on the knee. The parties' relevant statements of fact [5] refer the Court to Dr. Brown's deposition testimony at pages 13, 24–30, 36–37 and 95–102. It is easier to review this testimony directly than to contend with the parties' sometimes attenuated paraphrasings. What it reveals, when taken in the light most favorable to Dr. Herzog, is that Dr. Brown "gave a paper" in 1991 on the topic of *laser* usage during arthroscopy. (Brown Depo. at 13.) This fact does not support a finding that Dr. Brown had "specialized knowledge" of *radio frequency* ablaters such

as the Wand. Dr. Brown's testimony also revealed that Dr. Brown is a member of the Herodicus Society and attended its 1997 summer meeting in Sun Valley. (Brown Depo. at 24.) At the meeting, Dr. Brown attended an oral presentation on the use of radio frequency devices for chondroplasty, which he described as a "clinical applicability study" that was "in no means meant to be a scientific appraisal." (*Id.* at 25–26.) As Dr. Brown recollected, the substance of the presentation was that radio frequency devices "appear[ ] to make the articular surface look better when ... trying to smooth it than when you use a mechanical device. And it does not appear to cause any excessive damage to the articular surface much beyond what one sees visually...." (*Id.* at 27.) Following the presentation, those in attendance discussed "how deep does the damage go," and how the goal in using such a device is to "do better than a mechanical device" would. (*Id.* at 28.) Dr. Brown specifically recalled "several people whom I considered to be conservative voices in orthopedics saying I wouldn't use it because I don't think we know enough about it," and others saying "well, I don't think there is any real evidence that it's harmful either." (*Id.* at 28–29.) Dr. Brown further testified that over the next year or so, "it was just my general impression from talking to colleagues nationally and in my practice that there was a growing acceptance" of the use of the Wand to debride articular cartilage of the knee. "Not a unanimous acceptance, but a growing acceptance that this may be a good application for radio frequency." (*Id.* at 30.) Dr. Brown also read a peer reviewed article on the topic prior to the June 1999 operation, the findings of which he did not relate during his deposition. (*Id.* at 30.) Dr. Brown understood that, at lower settings, the Wand could be used without causing fluid at the surface of the articular cartilage to boil (reach 100° Celsius), but that at higher settings the Wand could cause surface temperatures capable of damaging collateral tissue. (*Id.* at 37.) [6] He also understood that application of the Wand to articular cartilage required a light touch, that it was "better to hold it a little adjacent to the tissue rather than directly on it." (*Id.* at 96.) Although Dr. Brown was willing to admit that use of the Wand to debride articular cartilage was an "off-label" and innovative approach, his understanding was that "one could use [the Wand] ... without causing injury to adjacent or collateral tissue." (*Id.* at 101–102.) Indeed, this understanding was reached, in part, based on ArthroCare's vido, "Procedures of the Knee, Articular Cartilage Sculpting," which not only depicts the Wand being applied to articular cartilage, but affirmatively indicates that the Wand is suitable for "sculpting" the articular cartilage of the knee. (*Id.* at 31, 102, 113–114; *see also* Gambarella Depo. Ex. 11.)

**\*4** According to Dr. Herzog, he experienced significantly increased amounts of pain in his knee after this procedure, which he had not previously experienced and which included pain when standing. (Docket No. 70, ¶¶ 21, 22.) This statement is supported by Dr. Herzog's own deposition testimony. Dr. Herzog also asserts that during the surgery [7] the Wand "caused additional injury or aggravated his existing diseased articular cartilage, thereby rapidly accelerating and causing complete loss of articular cartilage resulting in his current disabling injury." (*Id.,* ¶ 4.) However, the claim of "complete loss of articular cartilage" blows the underlying testimony out of proportion. The expert testimony the Herzogs cite for this proposition would, if admitted, support only a finding that Dr. Brown's application of the Wand to Dr. Herzog's knee resulted in a burn injury. (Minas Depo. at 75; Mayor Depo. at 182.) Dr. Herzog returned to work as an orthopedic surgeon following the June 1999 surgery and continued in that work until the summer of 2000. However, his productivity was notably reduced due to his inability to stand for any appreciable length of time. (*Id.,* ¶ 48.) As a consequence, Dr. Herzog has since decided to stop working as a full-time orthopedic surgeon. (*Id.,* ¶¶ 5–6.)

Subsequent to the June 1999 procedure in which Dr. Brown employed the Wand, four additional procedures have been performed on Dr. Herzog's right knee. On February 7, 2000, Dr. Thomas Gill performed a microfracture procedure, which involved drilling holes in the cartilage of Dr. Herzog's knee and was intended to increase the supply of blood to stimulate the growth of new cartilage. (Docket No. 44, ¶¶ 51, 52.) On September 27, 2000, Dr. Thomas Minas performed an arthroscopic knee surgery, during which he harvested some articular cartilage in order to grow additional cartilage in the lab for a subsequent transplant procedure. (*Id.,* ¶¶ 53, 59.) On December 4, 2000, Dr. Minas performed a further surgery to implant this cartilage. (*Id.,* ¶ 59.) On May 2, 2001, Dr. Minas performed his third procedure, a minimally invasive, evaluative arthroscopy, to evaluate Dr. Herzog's recovery from the transplant surgery. (*Id.,* ¶ 64.)

During the December 2000 surgery, Dr. Minas observed "tissue that was tan-colored on the back of the patellar lateral facet as well as on th[e] medial femoral condyle," the two areas on which Dr. Brown had "shaved" articular cartilage in June 1999. (Docket No. 70, ¶ 23.) Dr. Minas described this tissue as firm and as appearing the way articular cartilage looks when it is burned. (*Id .,* ¶ 24.) Based on his partial review of a video of Dr. Brown's surgery, Dr. Minas "felt that the area of burnt tissue was compatible with the application

of the radio frequency wand to that area." (*Id.*, ¶ 25.) Based on his observation of burned tissue in these locations, coupled with Dr. Herzog's complaints of "much worse symptoms after the wand was applied to his medial side," [8] Dr. Minas is prepared to opine that Dr. Herzog's knee was worsened as a result of thermal injury arising from application of the Wand. (*Id.*, ¶ 26.) [9] In addition to Dr. Minas, Dr. Herzog's summary judgment statements of fact rely on Dr. Andrew E. Rosenberg and Dr. Michael Brook Mayor. Their anticipated testimony is addressed in the discussion portion of this Recommended Decision, below.

Discussion

**\*5** There are two preliminary comments I would like to make before embarking on a point-by-point discussion of the issues raised in the parties' memoranda. The first concerns how much of a showing a summary judgment movant must make to place a particular legal claim in jeopardy. The second concerns the relationship the parties' numerous *Daubert* motions have to the disposition of the summary judgment motions.

The parties' summary judgment filings raise a significant concern about the nature of summary judgment practice in this District. Surgi–Care asserts in the opening paragraph of its Motion for Summary Judgment that "[t]here is no genuine issue of material fact with respect to any of [the Herzogs'] counts, and Surgi–Care is entitled to judgment as a matter of law on all of the claims that have been asserted against it." (Docket No. 34 at 1.) From there, Surgi–Care proceeds to brief the legal and factual issues as though the Herzogs' action concerns only the adequacy or inadequacy of ArthroCare's product inserts and marketing materials, without even attempting to articulate how its various arguments might relate to the particular elements of a defective design claim. Similarly, ArthroCare begins its principal memorandum with a slightly more emphatic statement that the Herzogs' products liability action is exclusively a failure to warn case. (Docket No. 43 at 1.) It then proceeds to brief the matter as though only a failure to warn theory is being pressed. Like Surgi–Care, ArthroCare never attempts to articulate how any of its arguments might relate to the elements of a defective design claim. For their part, the Herzogs respond simply that they "have made abundantly clear that the ArthroWand used upon [Dr. Herzog] was defective from the standpoint of its design as well ." (Docket No. 68 at 1.) They do not attempt to put forward the facts or articulate in their memoranda how the

facts come together to support a claim for defective design. [10] Thus, if the Court should accept my recommendation that the failure to warn, misrepresentation and trade practices claims are not maintainable, it is left to hypothesize what, exactly, remains of Counts I, II, VI, IX, X and XIV. For obvious reasons, I have refrained from attempting to portray these claims in the absence of input from the parties.

Pursuant to the Supreme Court's holding in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), the Court might be within its discretion to enter summary judgment against Counts I, II, VI, IX, X and XIV, *in toto.* In *Celotex,* the Supreme Court held that a plaintiff often must produce the evidence supporting a claim despite the defendant's failure to introduce evidence negating the claim. *Id.* at 323–24. Indeed, the Supreme Court has indicated that defendants, in order to have a motion for summary judgment considered, need not introduce claim-negating evidence at all, so long as they "point[ ] out ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see also id.* at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence."). In my view, the Defendants' Motions were sufficient to place the Herzogs on "notice" that the factual basis for a defective design claim was challenged. Nevertheless, from an equitable perspective, it would seem to me that the Defendants' utter failure to brief one or more of the elements of this claim should stay the Court's hand at this stage. After all, ArthroCare's summary judgment motion is so targeted at the failure to warn claim and the proximate cause element of that claim that it fails ever to even mention, for example, Count VI (breach of implied warranty of merchantability) or even to tie its proximate cause arguments to specific Counts in the First Amended Complaint.

**\*6** The other issue of concern involves the pending *Daubert* motions. There are some 27 filings on the docket concerning 15 expert witnesses. When ruling on a *Daubert* motion, the Court is not bound by the summary judgment standard that evidence must be viewed in the light most favorable to the non-moving party. Thus, in circumstances where a non-movant's opposition to summary judgment depends on expert opinion, it is sometimes appropriate to conduct *Daubert* hearings prior to or in the context of disposing of a summary judgment motion. After all, summary judgment facts must be of evidentiary quality and summary judgment should not be denied based on inadmissible evidence. But,

because the determination of the pending summary judgment motions does not hinge primarily on the admissibility of any expert witness's testimony, I have not endeavored to dispose of the *Daubert* motions prior to, or in conjunction with, this Recommended Decision. In particular, in discussing the punitive damage claim I have assumed, *arguendo,* that all of the relevant expert testimony would be admissible and I have construed that evidence in the light most favorable to the Herzogs because, in my view, this evidence would still be insufficient to support an award of punitive damages. Furthermore, to the extent that the alternative recommendation referenced in footnote 11 hinges upon the admissibility of Dr. Markel's testimony, the Defendants' motion to exclude Dr. Markel is DENIED for purposes of resolving the summary judgment motions. I think the better course of action in this case would be to defer a final ruling on the *Daubert* motions until the dust finally settles on the various claims and defenses discussed herein. At that point in time the parties can renew any of the *Daubert* motions that remain relevant and only to the extent that they remain relevant.

## I. ARTHROCARE'S MOTION
## FOR SUMMARY JUDGMENT

Dr. Herzog asserts the following causes of action against ArthroCare, ordered by count number: (I) strict liability for a defective and unreasonably dangerous product and for failure to provide an adequate warning; (II) negligence for defective design, insufficient warning and misleading marketing; (III) fraudulent misrepresentation for indicating that the Wand was safe and effective for use on articular cartilage in the knee and that the Wand does not employ a thermal process; (IV) negligent misrepresentation based on the same allegations; (V) violation of the Restatement (Second) of Torts § 402B based on the same allegations; (VI) breach of the implied warranty of merchantability (fitness for intended use); and (VII) violation of the Maine Unfair Trade Practices Act. In addition, Mary Herzog asserts a loss of consortium claim in Count VIII.

In addition to challenging the existence of a defective design theory, ArthroCare argues that the Herzogs cannot support their failure to warn theory because the facts reveal that the alleged failure to warn did not proximately cause the Herzogs' alleged injuries and because the facts do not support a finding that the Wand actually burned Dr. Herzog's articular cartilage sufficiently to cause his alleged injury. Finally,

ArthroCare makes individualized challenges to the Herzogs' misrepresentation claims, unfair and deceptive trade practices claim, punitive damage demand and lost future wage claim. I address these several arguments in the order in which they are presented by ArthroCare.

A. The Herzogs Fail to Generate a Triable Issue on Whether the Alleged Failure to Warn Proximately Caused Their Injuries.

 **\*7** This case illustrates well the role proximate cause plays in the law of torts. Even when a defendant's conduct might best be described as patently reckless, such conduct is not actionable unless it proximately causes an injury. Thus, even though I would ultimately conclude that the Herzogs have generated sufficient evidence to permit a jury to conclude (1) that ArthroCare knew the Wand had the capacity to thermally injure articular cartilage if not employed carefully and (2) that ArthroCare breached a duty of care by marketing the Wand for use on articular cartilage without including in their product and/or marketing materials an adequate warning of the risk of thermal injury, both relatively serious findings, I nevertheless recommend that summary judgment enter based on the absence of proximate causation.

Relying on *Cuthbertson v. Clark Equip. Co.,* 448 A.2d 315 (1982), ArthroCare contends that Dr. Brown's personal knowledge of the risk of thermal injury was sufficiently extensive that receipt of a warning would not have prevented him from conducting the chondroplasty with the Wand or from using the Wand in the manner he did. (Docket No. 43 at 3.) Dr. Herzog characterizes this argument as an invocation of the "knowledgeable user" rule and argues that it does not apply because "a significant factual dispute exists as to whether Dr. Brown was 'fully apprised of *all* of the attendant risks associated with' using the ArthroWand on articular cartilage." (Docket No. 68 at 3 (citing *Anderson v. Sandoz Pharm. Corp.,* 77 F.Supp.2d 804, 808 (S.D.Tex.1999).) What was missing, according to Dr. Herzog, was a warning that "applying the Wand's tip *directly* on the tissue [will] cause significant thermal damage" or that there is a "dangerously high risk of thermal damage when the Wand's tip is held in a particular location for too long." (Docket No. 68 at 4.)

In *Cuthbertson,* plaintiff-appellant argued that the trial court had committed reversible error in not instructing the jury that a distributor has a duty to inform customers and prospective users of the dangers posed by a product it distributes, including the existence of devices or methods for minimizing the dangers. *Id* . at 319. The plaintiff's theory was that her

husband's death would not have occurred had the defendant-distributor of a front-end loader notified the decedent's employer of the machine's tendency to roll over and of the availability of a certain "roll-over protective system." *Id.* at 316. The Law Court assumed for purposes of argument that the distributor had a duty to warn purchasers of new protective devices, but concluded that "there could be no causal connection between a failure to warn and the injury which ensued" because the employer already knew of the risk at issue. *Id.* at 319–20.

Application of *Cuthbertson* to the facts of this case is not a straightforward matter. Each of the three supportive authorities cited by the Law Court in *Cuthbertson* has been overruled. *Skyhook Corp. v. Jasper,* 560 P.2d 934, 939 (N.M.1977), *overruled by Klopp v. Wackenhut Corp.,* 824 P.2d 293 (N.M.1992); *Halvorson v. American Hoist & Derrick Co.,* 240 N.W.2d 303, 308 (Minn.1976), *overruled by Holm v. Sponco Mfg.,* 324 N.W.2d 207 (Minn.1982); *Jackson v. New Jersey Mfg. Co.,* 400 A.2d 81, 89 (N.J.App.Div.1979), *cert. denied,* 407 A.2d 1204 (N.J.1979), *overruled by Feldman v. Lederle Labs.,* 479 A.2d 374, 388–89 (N.J.1984) ("[S]ubsequently acquired knowledge, both actual and constructive, also may obligate the manufacturer to take reasonable steps to notify purchasers and consumers of the newly-discovered danger."). Even if *Cuthbertson* were correctly decided with respect to the duty of the distributor in that case, there is no general statement of Maine law that can be readily extracted from it to assist the Court with respect to the duties of a product manufacturer.

 **\*8** ArthroCare's argument is really a straight-forward proximate cause argument. In Maine:

> The general rule is that the supplier of a product is liable to expected users for harm that results from foreseeable uses of the product if the supplier has reason to know that the product is dangerous and fails to exercise reasonable care to so inform the user. A products liability action for failure to warn requires a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether

the inadequate warning proximately caused the plaintiff's injury.

*Pottle v. Up–Right, Inc.,* 628 A.2d 672, 675 (Me.1993) (internal citations and quotation marks omitted). "Proximate cause is 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred.' " *Merriam v. Wanger,* 2000 ME 159, ¶ 8, 757 A.2d 778, 780 (quoting *Searles v. Trustees of St. Joseph's College,* 1997 ME 128, ¶ 8, 695 A.2d 1206, 1209). "The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment." *Id.* at 781. In failure to warn cases involving medical devices and pharmaceutical products, it is generally recognized that a manufacturer discharges its duty to warn consumers by providing an adequate warning to the learned intermediary (e.g., the prescribing physician) who will utilize or prescribe the medical device or pharmaceutical product at issue. *Violette v. Smith & Nephew Dyonics,* 62 F.3d 8, 13 (1st Cir.1995) (involving appeal from the District of Maine); *see also Ellis v. C.R. Bard, Inc.,* 311 F.3d 1272, 1280 (11th Cir.2002) (applying Georgia law and citing cases from numerous other jurisdictions involving application of the learned intermediary rule where medical devices are concerned). However, even if the manufacturer breaches its duty by failing to warn the learned intermediary, the injured patient must be able to demonstrate that the failure to warn the intermediary proximately caused his or her injury. *Pottle,* 628 A .2d at 675. ArthroCare contends that the alleged failure to warn could not have been the cause of Dr. Herzog's injury because Dr. Brown was already aware of the dangers of direct contact and static application of the Wand.

Dr. Herzog's effort to generate a genuine issue on proximate causation falls short. First, Dr. Brown's testimony indicates that he knew the Wand required a deft touch, that it should be held adjacent to–or very lightly against–the tissue rather than pressed against it, and that thermal damage could result to collateral tissue if the Wand were too vigorously applied. The warning that the Herzogs insist is missing (no direct or static contact) is, essentially, duplicative of information Dr. Brown was already considering. What is more, Dr. Brown's deposition testimony reveals that his use of the Wand would have comported with these warnings. (Docket No. 64, ¶ 36, citing Brown Depo. at 104–105.) Not only does he state that he tried to use as light a touch as possible, but also there is

Herzog v. Arthrocare Corp., Not Reported in F.Supp.2d (2003)

2003 WL 1785795

no indication that he applied the Wand in a static manner. And while the Herzogs do offer Dr. Brown's testimony that he would not have used the Wand if it generated temperatures in the range created by lasers ("several hundred degrees Centigrade"), Dr. Brown testified that the Wand would not reach such temperatures when used on low settings and that he used a "lower" setting. (Docket No. 64, ¶ 21; Docket No. 69, ¶ 37; Brown Depo. at 36–39 & 96–97.) The testimony the Herzogs rely on simply does not support a finding that Dr. Brown would not have used the Wand or that he would have used the Wand in a different fashion had he received a warning from ArthroCare not to press the Wand directly into the tissue and not to hold it static in one location. Without such facts, any determination that the absence of a warning proximately caused Dr. Herzog's injury would necessarily be based on speculation. For that reason, I recommend that summary judgment enter against Count I and II to the extent the Herzogs allege an injury based on a defective product warning. Even if ArthroCare had a duty to supply a warning of the kind suggested, the Herzogs have not generated an issue as to whether the absence of such a warning actually caused Dr. Herzog's injury. [11]

B. The Herzogs Fail to Generate a Triable Issue on Whether They Justifiably and Detrimentally Relied on a Misrepresentation of Fact.

**\*9** In Counts III, IV and V, the Herzogs press claims for fraudulent misrepresentation, negligent misrepresentation and violation of Section 402B of the Restatement (Second) of Torts, respectively. ArthroCare moves for entry of summary judgment based on insufficient evidence of reliance, a key element of all three theories. (Docket No. 43 at 12.) *See Harkness v. Fitzgerald,* 1997 ME 207, ¶ 7, 701 A.2d 370, 372 (outlining elements of fraud); *Perry v. H.O. Perry & Son Co.,* 1998 ME 131, ¶ 8, 711 A.2d 1303, 1305–06 ("[A] showing of detrimental reliance is essential to an action for negligent misrepresentation."); Restatement (Second) Torts § 402B (requiring detrimental reliance for tort of "misrepresentation by seller of chattels to consumer"). In their First Amended Complaint, the Herzogs allege that Dr. Herzog and Dr. Brown justifiably relied on representations "that the ArthroWand was safe and effective for use on articular cartilage in the knee, did not employ a thermal process in its performance, and would not cause unintended damage to tissue." (Docket No. 12, ¶¶ 44, 47, 50, 52.)

The Herzogs misrepresentation claims are unique. Surgical tools like the Wand are simply not marketed to the general public. Instead, manufacturers and sellers of surgical products make their representations directly to surgeons and other medical personnel. Thus, the standard patient would not be able to show that he or she had received false statements of fact, let alone that he or she had relied on such statements when deciding to undergo a surgical procedure. Indeed, but for Dr. Herzog's unique position as an orthopedic surgeon, the misrepresentation claims would not deserve much comment at all. As it is, Dr. Herzog claims that by virtue of his orthopedic practice he was privy to ArthroCare's product representations and that, but for these representations, he would have affirmatively instructed Dr. Brown not to use the Wand during either arthroscopic procedure. The Herzogs' relevant statements of fact assert that, prior to the June 1999 procedure, an ArthroCare salesman informed Dr. Herzog of a "revolution of articular cartilage surgery" and provided him with articles, studies and basic information on the Wand. (Docket No. 70, ¶ 50.) Yet, despite this information, Dr. Herzog testified during his deposition that he never used the Wand to debride osteoarthritic cartilage on the knees of his own patients. (*Id.,* ¶ 49; Herzog Depo. at 30.) [12] The Herzogs also indicate that Dr. Herzog "did not talk to Dr. Brown prior to his surgery about what device [Dr. Brown] was going to use." (Docket No. 70, ¶ 51.) Based on these statements of fact, the Herzogs make the following argument in their memorandum: [13]

It is ... reasonable that Dr. Herzog would have relied on [ArthroCare's] misrepresentations and omissions in deciding that he need not request that Dr. Brown *not* use the ArthroWand on his knee.... Had he known, through conversations with ArthroCare representatives, the truth about the dangers associated with the Wand, it is safe to assume that he would have raised that issue with Dr. Brown. His direct contact with ArthroCare representatives and their marketing materials, in which he was assured that the ArthroWand was safe and effective, implicitly persuaded him to refrain from objecting to the Wand's use on his knee. In light of its extensive, direct sales pitches to Dr. Herzog regarding the safety and efficacy of the Wand, any claim by ArthroCare now that Dr. Herzog could not have relied on its misrepresentations/omissions belies the record, and should be dismissed by this Court.

**\*10** (Docket No. 68 at 15–16.) If there is one thing that is certain about summary judgment practice, it is that a plaintiff cannot meet his or her burden based on assumptions. It is hard to understand why those things the Herzogs want the Court to assume could not have been set

forth affirmatively by way of affidavit. As it is, the only facts the Herzogs introduce are that Dr. Herzog was told of a "revolution" in articular surgery and that he "did not talk to Dr. Brown prior to his surgery about what device he was going to use." (Docket No. 70, ¶¶ 50, 51.) On this limited showing, I do not think the Court should infer that Dr. Herzog relied to his detriment on any "misrepresentations" or "omissions." Nor do I agree with the Herzogs suggestion that a misrepresentation to a surgeon about a surgical tool would support a misrepresentation claim by the patient . [14] Nor do I think the summary judgment record permits a finding that ArthroCare materially mislead Dr. Brown, who acknowledged that he understood the thermal properties of the Wand and the attendant risks of direct application on articular cartilage. My impression is that the summary judgment record no more supports a finding of reliance by Dr. Brown on a misrepresentation than it does a finding that Dr. Herzog's injury was proximately caused by a failure to warn Dr. Brown. For this reason, I recommend that the Court grant ArthroCare summary judgment against Count III, IV and V.

C. Summary Judgment Should Enter Against Count VII Because the Unfair Trade Practice Act Does Not Extend to the Facts of This Case.

In Count VII, Dr. Herzog asserts a claim for violation of Maine's Unfair Trade Practices Act, asserting, "ArthroCare's conduct in its design, research, development, and sale of the ArthroWand constitutes an unfair or deceptive act or practice in the conduct of trade or commerce." (Docket No. 12, ¶ 63.) That Act permits private suits by those who purchase or lease "goods, services or property ... primarily for personal, family or household purposes," under certain circumstances. 5 M.R.S.A. § 213. ArthroCare moves for summary judgment against this claim on the ground that Dr. Herzog was not the purchaser of the Wand that was used on his knee. (Docket No. 43 at 13.) In opposition, Dr. Herzog has established that he paid Orthopedics Associates' invoice for the price of two ArthroCare Wands. (Docket No. 70, ¶ 52.) Whether or not Dr. Herzog paid for his surgeon's acquisition of the Wand or Wands used during his surgery, it is apparent that he did not purchase the Wand for his personal use. I agree with ArthroCare that the Act does not extend protection to individuals who pay the bill for a medical service provider's acquisition of a medical device, even though that device is "used" on them for "personal purposes." Such purchasers do not themselves use the good at issue; nor do they ever possess the good; nor is the good at issue properly understood to be a "consumer good."

D. The Viability of Mary Herzog's Loss of Consortium Claim Depends on the Viability of the Defective Design Claim.

**\*11** Because there remains a question regarding the existence of facts supporting the defective design claim against ArthroCare, I recommend that summary judgment not enter at this time against Mary Herzog's derivative loss of consortium claim, Count VIII.

E. Summary Judgment Should Enter Against Plaintiffs' Demand for Punitive Damages.

Under Maine law, punitive damages are available only where the defendant's conduct was motivated by actual malice directed against the plaintiff or where the defendant's conduct was "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985). Neither recklessness nor gross negligence will suffice under this standard. *Id.* The burden of proof of actual or implied malice is by clear and convincing evidence. *Id.* at 1363. In *Tuttle,* the Law Court reserved for later consideration how the punitive damages regime might apply in products liability cases. *Id. at 1360 n. 20* ("[A]lthough our opinion today provides a careful evaluation of a longstanding doctrine, many issues concerning the availability of punitive damages ... remain for future consideration and resolution. These issues include, *inter alia, ...* the application of punitive damages in products liability ... litigation ."). Thus, it is at least conceivable that the standard may be lowered in some way to account for the strict liability regime.

According to the Herzogs, ArthroCare actively concealed information revealing a serious risk of harm that the Wand could cause significant cellular necrosis when applied directly to, or held "even momentarily" in a stationary position over, articular cartilage. (Docket No. 68 at 18.) The Herzogs contend that such concealment is outrageous given that the device is "a medical product intended for insertion within the human body with an electrical capacity to burn and injure valuable and necessary tissue within the body." (*Id.* at 20.) In addition to challenging the evidentiary basis for Plaintiffs' contention, Defendant relies on *Davies v. Datapoint Corp.,* 1995 U.S. Dist. LEXIS 21739, \*42 (D.Me. Oct. 31, 1995), to argue that even knowing concealment would fall short of the requirements of *Tuttle.*

In their Statement of Additional Undisputed Material Facts (in opposition to ArthroCare's Motion), the Herzogs offer evidence of three sources of information available to ArthroCare prior to Dr. Herzog's operation. The first source involves two documents that were discussed during the deposition of Phillip Eggers, one of the designers/inventors of the Wand. Without divulging in their relevant Statement of Additional Undisputed Material Facts, Docket No. 70, what any of the contents of the documents were, the Herzogs complain that none of the contents were incorporated into ArthroCare's marketing materials. In order to find out what these contents were, one must look to the Herzogs' "Supplemental Statement of Material Facts," Docket No. 65, submitted in opposition to Defendant Surgi–Care's Motion [REDACTED] Additionally, ArthroCare's president inquired of Mr. Eggers, "What happens when I am firmly against the tissue and the vapor layer is not allowed to form?"

[REDACTED]

[REDACTED]

[REDACTED]

**\*12** *Tuttle,* 494 A.2d at 1362;
*DiPietro v. Boynton,* 628 A.2d 1019, 1024 (Me.1993).

F. ArthroCare's Challenge to the Herzogs' Lost Wage Claim Should be Disregarded at this Juncture.
ArthroCare asks that Dr. Herzog's lost future wage claim be stricken. (Docket No. 43 at 16.) This request apparently arises from Dr. Herzog's allegation that, "[a]s a result of ArthroCare's and Surgi–Care's wrongful conduct, Dr. Herzog can no longer earn his livelihood as an orthopedic surgeon" and that "[h]e is physically incapable of performing the tasks necessary to maintain his practice ." (Amended Complaint, Docket No. 12, ¶ 33.) ArthroCare complains that the Herzogs have not designated a vocational expert and that Dr. Herzog's knee injury does not prevent him from working as an orthopedic surgeon. (Docket No. 43 at 17.) According to ArthroCare, "there is absolutely no basis for [Dr. Herzog's] future lost wage claim." (*Id.* at 18.) The Herzogs argue that this challenge is inappropriate in the context of a summary judgment motion and should be raised in an in limine motion. (Docket No. 68 at 21.) They also explain that the future lost wage claim is based on a significant reduction in Dr. Herzog's productivity, which bears directly on his earning potential

and that the facts to support this element of damages can be presented without the assistance of a "vocational expert." (*Id.* at 22.) This aspect of ArthroCare's Motion does not warrant extended discussion and should be denied.

## II. SURGI–CARE'S MOTION FOR SUMMARY JUDGMENT.

Dr. Herzog asserts the following causes of action against Surgi–Care, ordered by count number: (IX) strict liability for placing a defective and unreasonably dangerous product in the stream of commerce and for failure to warn of the same; (X) negligence for marketing, selling and placing a defective product in the stream of commerce, for failing to warn and for failing to independently investigate and research the safety and efficacy of the Wand; (XI) fraudulent misrepresentation; (XII) negligent misrepresentation; (XIII) violation of the Restatement (Second) of Torts § 402B; (XIV) breach of implied warranty; (XV) violation of the Maine Unfair Trade Practices Act; and (XVI) violation of the Massachusetts Consumer Protection Act. In addition, Mary Herzog pursues a loss of consortium claim in Count XVII and the Herzogs make their demand for punitive damages in "Count XVIII." Surgi–Care's Motion for Summary Judgment is similar to ArthroCare's, but somewhat more nuanced. Like ArthroCare, they essentially proceed as though the only product liability issue is the adequacy of ArthroCare's warnings.

A. The Herzogs Fail to Generate a Triable Issue on Whether the Alleged Failure to Warn Proximately Caused Their Injuries.
Surgi–Care argues that, even if an inadequate warning was provided with the Wand, Dr. Herzog's alleged injury could not have been caused by a failure to warn because Dr. Brown testified he would not have heeded such a warning. (Docket No. 34 at 4–5.) Although Surgi–Care mischaracterizes Dr. Brown's testimony, Surgi–Care is nevertheless entitled to summary judgment against the failure to warn theory asserted in Counts IX and X for the same reasons I indicated in regard to ArthroCare in Section I.A., *supra* .

B. The Herzogs Fail to Generate a Triable Issue on Whether They Justifiably and Detrimentally Relied on a Misrepresentation of Fact.
**\*13** In addition to submitting its own Motion for Summary Judgment, Surgi–Care has also "joined" in ArthroCare's Motion for Summary Judgment. (Defendant Surgi–Care,

Inc.'s Joinder in Defendant ArthroCare Corporation's Motions, Docket No. 56.) For the reasons stated in Section I.B., I recommend that summary judgment enter against Counts XI, XII and XIII.

**C. The Learned Intermediary Rule Would Not Entitle Surgi–Care to Summary Judgment.**

I address this argument in the event that the Court should reject my recommendation in Section II.A. Surgi–Care argues that the Herzogs' claims are barred by the learned intermediary doctrine. (Docket No. 34 at 2.) According to Surgi–Care, it satisfied its duty to the Herzogs by providing Dr. Brown "with information and a videotape regarding the proper uses of the ArthroWand." (*Id.*)

"It is generally accepted that in a case involving medical products prescribed or used by a physician or trained medical personnel, the warning runs to the physician not the patient." *Knowlton v. Deseret Med., Inc.,* 930 F.2d 116, 120 n. 2 (1st Cir.1991). Thus, when an *adequate* warning is provided to the "learned intermediary," it is up to the intermediary to pass along the warning to the patient. *See, e.g., Garside v. Osco Drug, Inc.,* 976 F.2d 77, 80 (1st Cir.1992) ("Under this doctrine, the manufacturer's duty is fulfilled once it adequately warns the physician."). But when an inadequate warning or no warning is provided to the learned intermediary, the manufacturer or seller has not satisfied its duty to the consumers. In the opinion of Dr. Tucker, ArthroCare's warning was inadequate in that it was non-existent. (Docket No. 64, ¶ 2.)

**D. The Rule Articulated in Section 6 of the Restatement (Third) of Torts: Product Liability is Not Applicable to the Facts of This Case.**

I address this argument in the event that the Court should reject my recommendation in Section II.A. With respect to Counts IX (strict liability), X (negligence), and XIV (breach of implied warranty), Surgi–Care argues that it fulfilled its duties to the Herzogs as a matter of law because it passed along all of ArthroCare's print and video materials concerning the Wand. (Docket No. 34 at 7–9.) Although Maine's product liability statute clearly imposes liability on sellers and suppliers in addition to manufacturers, 14 M.R.S.A. § 221, Surgi–Care contends that it is against public policy to impose liability on a distributor of medical devices on a failure to warn theory because all that can fairly be expected of the distributor is that it pass along the manufacturer's warning. (*Id.* at 8.)

Surgi–Care's reliance on Section 6 of the Third Restatement of Products Liability is misplaced. Surgi–Care is attempting to make an analogy between its situation as a seller of surgical tools and the situation of pharmacists, who are sometimes sued for failing to supplement a drug manufacturer's inadequate warnings or failing to catch a physicians' inappropriate prescriptions. One problem with this analogy is that the case law generally immunizes pharmacists from strict liability because they are not the kind of "retailers" that strict liability regimes are designed to target. *Jones v. Irvin,* 602 F.Supp. 399, 400 (D.C. Ill.1985) (citing cases). Pharmacists are equally, if not more significantly, service providers. *See, e.g., Murphy v. E.R. Squibb & Sons, Inc.,* 710 P.2d 247, 252 (Cal.1985) (construing California statute to support the conclusion that "even though a pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is to be deemed a service ... immune from strict liability.") This rationale has also been used to exempt hospitals from strict liability for obtaining medical devices and products that are used by physicians in medical procedures. *See, e.g., Parker v. St. Vincent Hosp.,* 919 P.2d 1104, 1106–07 (N .M.App.1996) ("According to the weight of authority, a hospital is not a distributor of medical supplies, even though it may bill separately for the item and charge the patient a markup over the hospital's cost. The courts have generally held that the essence of the hospital's role is the provision of services, regardless of whether a product is involved.") (citing cases). This rationale does not apply to a distributor of medical devices like Surgi–Care, which is nothing if not a retailer. [15] Another distinction between pharmacists and retailers is that pharmacists are not *intermediaries* between manufacturers and physicians the way that distributors of medical devices are. Thus, for instance, a pharmacist is not involved in providing a manufacturer's warnings to a prescribing physician. This fact further highlights that the rule of no liability for pharmacists is not really based on the "learned intermediary" doctrine at all, but on special policy considerations that do not translate to the circumstance of a distributor of medical devices.

**\*14** The authors of the Restatement (Third) of Torts have attempted to restate the foregoing precedent with language suggesting that the rule of strict liability does not extend to a "retail seller or other distributor of a ... medical device" in a failure to warn case. Restatement (Third) of Torts: Products Liability § 6(e) & cmt. h (1998). However, other than one case involving a hospital, *St. Vincent Hosp., supra,* every case cited by the Restatement authors involved injury from ingestion

of pharmaceutical drugs. *See id.,* cmt. h. My assessment of this Restatement provision is that the authors intended the expansive language of § 6(e) to be confined by the definitional provision in § 6(a): "A prescription drug or medical device is one that may be legally sold or otherwise distributed only pursuant to a health-care provider's *prescription ." Id.,* § 6(a) (emphasis added).

In addition to relying on the foregoing Restatement provision, Surgi–Care relies on *Jones v. Irvin, supra,* and *In re Rezulin Prods. Litig.,* 133 F.Supp.2d 272, 288 (S.D.N.Y.2001). However, "[t]he precise issue" in *Jones v. Irvin* was "whether a *pharmacist,* who correctly fills a prescription, is negligent for failing to warn the customer or notify the physician that the drug is being prescribed in dangerous amounts ... or that the various drugs in their prescribed quantities could cause adverse reactions to the customer." *Id.* (emphasis added). The Court held that Illinois law would not impose an independent duty on the pharmacist to second-guess the prescribing physician or to identify and warn of possible adverse effects in a pharmaceutical drug that have never been identified by the manufacturer. *Id.* at 402–403. Similarly, in *Rezulin,* the court ruled that claims for injuries arising from the use of a pharmaceutical drug could not proceed against various pharmacy defendants because imposition of an independent duty to investigate and warn would cause "risk averse" pharmacists "to dispense [warnings] that [might] be uninformed, inapplicable to or misunderstood by the patient." 133 F.Supp.2d at 288. These two cases simply illustrate the special rule described in the Restatement, which is designed for the unique circumstances inherent in the dispensation of prescription drugs and devices.

E. Summary Judgment Should Enter Against the Fraudulent and Negligent Misrepresentation Claims Based on Surgi–Care's Lack of Knowledge of Any Misrepresentation.

I address this argument in the event that the Court should reject my recommendation in Section II.B. Surgi–Care argues that summary judgment should enter against Counts XI (fraudulent misrepresentation), XII (negligent misrepresentation) and XIII (violation of the Restatement (Second) of Torts § 402B) based on the assertion that it had no knowledge of a product design defect or of any inadequacy in ArthroCare's marketing materials.[16] According to Surgi–Care, even if the marketing materials contained false or misleading statements, it was merely passing along ArthroCare's statements, without independent knowledge of their falsity, and without owing an independent

duty to assure against false statements by the manufacturer. (Docket No. 34 at 10.) The Herzogs respond only that agents who commit torts on behalf of their principals are equally liable for such torts. (Docket No. 63 at 12.) In my view, even if the Court rejects my recommendation in Section I.B. that the misrepresentation claims fail for lack of detrimental reliance, Surgi–Care would still be entitled to summary judgment against Counts XI and XII, but not against XIII.

**\*15** In order to prevail on a claim of fraud a plaintiff must show, *inter alia,* that the defendant either knew the statement at issue was false or that the defendant made the statement in reckless disregard of its truth or falsity. *McCarthy v. U.S.I. Corp.,* 687 A.2d 48, 53 (Me.1996). The Herzogs fail to articulate in their memorandum the factual basis for a finding that Surgi–Care knew ArthroCare's statements were false.[17] Thus, Surgi–Care would be entitled to summary judgment on Count XI even if the Herzogs could show detrimental reliance. *See, e.g., Emerson v. Ham,* 411 A.2d 687, 689–90 (Me.1980) (affirming directed verdict for real estate broker on fraud claim where the evidence could not support a finding that the broker knew the seller's statement was false). The elements of the negligent misrepresentation claim are similar, but less burdensome on the issue of "knowledge":

> One who, in the course of his business, profession or employment or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary losses caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*Id.* In my view, the Herzogs' presentation would fail to meet even this standard of proof and, thus, I would recommend that summary judgment enter against Count XII even if the Herzogs could show detrimental reliance.

Count XIII, which relies on the Restatement (Second) of Torts, § 402B, does not require any showing that the defendant knew or should have known of the falsity of a statement. Pursuant to Section 402B:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though:

(a) it is not made fraudulently or negligently....

Thus, unlike the fraud and negligent misrepresentation claims, a "strict liability" product misrepresentation claim such as the one articulated in Section 402B of the Restatement would not require proof of either actual or constructive knowledge, though it would still require proof of reliance. [18] Section 402B would impose liability for even "innocent" misrepresentations. Thus, to the extent that Surgi–Care moves for summary judgment based solely on a lack of knowledge, it could not succeed against Count XIII. [19]

**F. Summary Judgment Should Enter Against Counts XV and XVI.**
Like ArthroCare, Surgi–Care argues that the UTPA is inapplicable because the Wand is not a consumer product. For the reasons stated in Section I.D, *supra,* I agree. In my view, summary judgment should enter against Count XV. Furthermore, the Herzogs concede that the claim under the Massachusetts consumer protection statute is not actionable. Therefore, summary judgment should enter against Count XVI.

**G. Summary Judgment Should Not Enter Against Count XVII.**
 **\*16**  Surgi–Care moves for summary judgment against Mary Herzog's loss of consortium claim in the event that summary judgment should enter against all of Dr. Herzog's claims. Because there remains a question regarding the existence of facts supporting the defective design claim, I recommend that summary judgment not enter at this time against Mary Herzog's derivative loss of consortium claim, Count XVII.

**H. Summary Judgment Should Enter Against "Count XVIII" Because There is Insufficient Evidence of Implied Malice on the Part of Surgi–Care.**
There is no evidence in this case that Surgi–Care harbored ill will toward Dr. Herzog. Instead, the Herzogs argue that Surgi–Care behaved outrageously because it had in its possession "critical and important information about the use and effectiveness of the ArthroWand that it chose to conceal." (Docket No. 63 at 17.)

The facts on which the Herzogs base their claim that Surgi–Care engaged in outrageous concealment involve an alleged oral exchange, of a very casual nature, between a Surgi–

Care representative and an orthopedic surgeon in late 1997 or early 1998. According to H. Gary Parker, M.D., he stopped using the ArthroCare Wand for articular cartilage procedures in 1997 after three of his patients experienced rapid osteoarthritis following the use of an ArthroCare Wand on their articular knee cartilage. (Docket No. 65, ¶¶ 4, 5.) Dr. Parker would testify that in late 1997 or early 1998, he mentioned his findings and decision not to use the Wand on knee cartilage to a Surgi–Care representative "several times." (*Id.,* ¶¶ 7, 8.) In addition to denying that any such conversations took place, Surgi–Care points out that even Dr. Parker describes his alleged oral reports as "casual" and "offhand." (Docket No. 72, ¶ 7.) Perhaps most telling is the following deposition exchange:

> Q. When you had the conversations with Mark Brountas, were they formal conversations or casual? How would you describe it?
>
> A. They were casual.
>
> Q. You never gave any sort of formal report or written complaint of anything?
>
> A. No. I just said in my hand it doesn't seem to be working.
>
> Q. Did you ever give him the names of patients?
>
> A. No.
>
> Q. Did you give him any–specifically link it not being good in your hands to patient care saying I have three patients or anything as specific as that?
>
> A. No.

(Dr. Parker Deposition at 41–42.) According to the Herzogs, Surgi–Care was duty bound to report this exchange with Dr. Parker to all of its sales representatives, to ArthroCare and to all potential purchasers of the Wand. Even assuming that Surgi–Care was negligent in failing to do so, given the casual and indefinite nature of Dr. Parker's oral comments, no reasonable jury could conclude from this evidence that Surgi–Care's decision not to amounted to "outrageous concealment." I recommend that summary judgment enter against the punitive damages plea recited as "Count XVIII."

### III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*17** I address the Herzogs' Motion for Partial Summary Judgment, in the event that the Court should reject my recommendation to grant the Defendants' summary judgment motions. The Herzogs move for limited summary judgment against ArthroCare's and Surgi–Care's assertions of the affirmative defenses of assumption of the risk and comparative negligence. (Docket No. 39 at 1.) There is no reason to belabor the discussion of this motion. "The theory that a plaintiff's negligence claim could be barred because he or she voluntarily assumed the risk was abolished in Maine with the adoption of comparative negligence principles." *Harvey v. Mid–Coast Hosp.,* 36 F.Supp.2d 32, 34 (D.Me.1999). *See also Merrill v. Sugarloaf Mt. Corp.,* 2000 ME 16, ¶ 9, 745 A.2d 378, 383 & n. 3. Whatever arguments the Defendants wish to pursue under the heading "assumption of the risk" may now be pursued under the heading of "comparative negligence." But in no case will a simple finding that Dr. Herzog "assumed the risk" automatically bar his claim. Any evidence that Dr. Herzog "voluntarily and unreasonably proceed[ed] to encounter a danger known to him" must be compared to the Defendants' fault under 14 M.R.S.A. § 221, if any, or under the other tort theories of liability. *Austin v. Raybestos–Manhattan, Inc.,* 471 A.2d 280, 287–88 (Me.1984). However, the Section 221 product liability claim is special in the following regard: the *only* comparative fault argument that can be offered against this claim is that Dr. Herzog "voluntarily and unreasonably proceed[ed] to encounter a danger known to him." *Id.* The factual statements offered in connection with this Motion reveal that Dr. Herzog did not know that Dr. Brown would use the Wand on his knee, but that Dr. Herzog knew the Wand was present in the office and that some people in the office used it for unspecified procedures. (Docket No. 50, ¶ 4; Docket No. 53, ¶¶ 3, 4.) Dr. Herzog did not himself use the Wand for the sculpting procedure that Dr. Brown performed on him, but Dr. Herzog had previously used the Wand on a knee where "a piece of tissue would be hanging down separated from the joint surface by, let's say, half an inch." (*Id.;* Herzog Depo. at 30.) Dr. Herzog also testified at his deposition that, before the date of the June 1999 procedure, he considered it inadvisable to use the Wand on articular cartilage located on a weight bearing surface because of the risk of thermal injury. (Docket No. 50, ¶ 16.) Viewing this testimony in the light most favorable to the Defendants, a jury might conclude that Dr. Herzog should have known that Dr. Brown might use the Wand on his articular knee cartilage and that, therefore, he unreasonably proceeded to encounter a danger that was known to him. I therefore recommend that the Court deny Plaintiffs' Motion for Partial Summary Judgment.

## Conclusion

For the reasons stated herein, I RECOMMEND that the Court GRANT Defendants' summary judgment motions in their entirety EXCEPT against those portions of Counts I, II, IX and X that assert claims premised on defective design AND EXCEPT against Counts VI and XIV, which assert claims for breach of the implied warranty of merchantability. I further RECOMMEND that the Court DENY Plaintiffs' partial summary judgment motion.

## NOTICE

**\*18** A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection. Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 1785795

---

Footnotes

1   Because this is a recommended decision, I cite to the parties' filings to assist the Court with its review. Because the parties are unlikely to be familiar with the docket numbers assigned to their filings, I provide the following citation key for their convenience.

| Docket No. 34– | "Defendant Surgi–Care, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law"; |
| --- | --- |
| Docket No. 35– | "Defendant Surgi–Care, Inc.'s Statement of Material Facts"; |

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

|                |                                                                                                                                   |
| -------------- | --------------------------------------------------------------------------------------------------------------------------------- |
| Docket No. 43– | "Defendant ArthroCare's Amended Motion for Summary Judgment and Supporting Memorandum of Law";                                      |
| Docket No. 44– | "Defendant ArthroCare's Amended Statement of Undisputed Material Facts";                                                           |
| Docket No. 63– | "Plaintiffs' Opposition to Defendant Surgi–Care, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law";          |
| Docket No. 64– | "Plaintiffs John Herzog and Mary Herzog's Opposition to Defendant Surgi–Care, Inc.'s Statement of Material Facts";                 |
| Docket No. 65– | "Plaintiffs John Herzog and Mary Herzog's Supplemental Statement of Material Facts";                                               |
| Docket No. 68– | "Plaintiffs' Opposition to Defendant ArthroCare's Amended Motion for Summary Judgment";                                            |
| Docket No. 69– | "Plaintiffs' Opposition to Defendant ArthroCare's Amended Statement of Undisputed Material Facts";                                 |
| Docket No. 70– | "Plaintiffs' Statement of Additional Undisputed Material Facts, Submitted in Opposition to Defendant ArthroCare's Motion for Summary Judgment"; |
| Docket No. 72– | "Defendant Surgi–Care, Inc.'s Reply Statement of Material Facts";                                                                  |
| Docket No. 81– | "Sealed Defendant ArthroCare Corporation's Response to Plaintiffs' Statement of Additional Undisputed Material Facts";             |
| Docket No. 84– | "Defendant ArthroCare Corporation's Reply Memorandum in Support of Its Motion for Summary Judgment."                               |

2  The parties do not endeavor to explain in their statements of material fact exactly what the Wand is or how it works. The following description is provided from non-record sources. It is provided solely for the Court's general information and to provide context. Simply put, an ArthroCare ArthroWand is a medical device used for, among other things, removing tissue. ArthroCare's website describes its Wands as:

the most comprehensive range of radiofrequency (RF) surgical tools for tissue removal, dissection and coagulation. Combining innovative electrode design and patented Coblation® technology, ArthroWands provide surgeons with precise and versatile tools able to remove tissue layers as fine as 120 microns, with only minimal damage to surrounding tissue.

The "patented Coblation technology" is billed as a unique technology that enables the Wand to cut away targeted tissue without generating high temperatures that could cause thermal injury to collateral tissue. According to ArthroCare:

The Coblation process ... is a controlled, non-heat driven process. With Coblation technology, radiofrequency energy [ (RFE) ] is applied to a conductive medium (usually saline), causing a highly focused plasma field to form around the energized electrodes. The plasma field is comprised of highly ionized particles. These ionized particles have sufficient energy to break organic molecular bonds within tissue. The by-products of this non-heat driven process are elementary molecules and low molecular weight inert gases. Instead of exploding tissue, Coblation causes a low temperature molecular disintegration. The result is volumetric removal of target tissue with minimal damage to surrounding tissue.

3  In their Statement of Additional Undisputed Material Facts, Submitted in Opposition to Defendant ArthroCare's Motion for Summary Judgment, the Herzogs assert that it was during the December 29, 1998 surgery that Dr. Brown used the Wand on Dr. Herzog's knee in a way that caused injury. (Docket No. 70, ¶ 4.) But they also assert that it was during the June 3, 1999 surgery that Dr. Brown "shaved," debrided or otherwise sculpted Dr. Herzog's articular knee cartilage with the Wand. (Docket No. 69, ¶¶ 25–30.) Evidently, the Wand was applied to the surface of his knee on both dates, but the prior occasion did not result in disabling pain and the manner in which it was used on that date is not made clear in the summary judgment record.

4  According to ArthroCare, Dr. Herzog resumed athletic activity following this surgery, although its citation to the record is not supportive. (Docket No. 44, ¶ 22.) For his part, Dr. Herzog admits "only that [he] engaged in unicycling in 1999." (Docket No. 69, ¶ 22.) In another statement of fact, Dr. Herzog states that he "was forced to abandon all his previous activities" following "Dr. Brown's surgery." (Docket No. 70, ¶ 21.) It appears that this reference to "Dr. Brown's surgery" is to the later, June 1999 procedure during which the Wand was employed to "sculpt" the articular cartilage of Dr. Herzog's knee. It also appears that some of the confusion in the record stems from a mistaken supposition during Dr. Herzog's deposition that the Wand was used in this fashion during the 1998 procedure rather than the 1999 procedure.

5  See paragraphs 31–40 of Docket Numbers 44 and 69; paragraphs 7–15 of Docket Numbers 70 and 81; and paragraphs 13–37 of Docket Numbers 35 and 64.

6  The Wand is utilized by clinicians for various procedures, including cauterization, which requires a higher setting.

**7**     Dr. Herzog's statement points to the December 1998 surgery, but it seems from the record that he is, once again, confusing the December 1998 and the June 1999 procedures.

**8**     According to Dr. Minas, Dr. Herzog's pain symptoms were located on the "medial side" of his right knee. (Docket No. 70, ¶ 26 (citing Minas Depo. at 79–80).)

**9**     ArthroCare does not challenge Dr. Minas's testimony with a *Daubert* motion. Instead, it contends that Dr. Minas did not actually offer an opinion on the issue of causation. My assessment is that Dr. Minas's deposition testimony does indicate that he considers the Wand to have caused thermal damage to Dr. Herzog's articular cartilage and that such damage significantly increased Dr. Herzog's pain and discomfort.

**10**     The Herzogs do introduce one solitary fact relating to a design defect in opposition to Surgi–Care's Motion for Summary Judgment, but they never allude to it in the body of their memoranda: "According to Dr. Mayor, there is no benefit to using the ArthroCare Wand in debridement of articular cartilage surfaces." (Docket No. 65, ¶ 18.) How this singular fact might generate a trial-worthy issue of whether a design defect proximately caused Dr. Herzog's injury is not discussed. Nor do the Herzogs actually introduce this fact in the context of *ArthroCare'* s independent Motion.

**11**     In the event that the Court should reject my proximate cause recommendation, I address ArthroCare's "specific causation" argument here, albeit in a cursory fashion. In my view, the testimony of Dr. Herzog's experts, if admitted, would generate a genuine issue whether Dr. Brown caused a burn injury with the Wand. Dr. Minas's observation of darkened tissue consistent with a radio frequency would be supportive of this finding as would the opinion of the pathologist, Dr. Rosenberg, that a post-operative slide of this tissue reflected cellular necrosis from a burn injury. In addition to these two experts, Dr. Mark Markel, D.V.M., opines that the carmelization and bubbling on the surface of Dr. Herzog's medial femoral condyle, which is apparently depicted on the videotape of the June 1999 procedure, are indicative of a surface temperature in excess of 100° Celsius, which would result in extensive chondrocyte (cell) death, "often progressing to the subchondral bone." (Docket No. 70, ¶¶ 39–41.) Dr. Markel testified during his deposition that thermal damage to nerve endings beneath the cartilage, on the surface of the bone would cause significant pain. (Docket No. 44, ¶ 47; Docket No. 70, ¶ 43.) This evidentiary presentation relies upon more than just temporal coincidence to establish proximate causation. Although I agree with ArthroCare that the evidence Dr. Herzog has presented at the summary judgment stage is insufficient to support the allegation that the Wand caused total cartilage loss so that the bones of his knee joint were coming into direct contact, or that, but for the Wand, he would not have required a total knee replacement, a jury could conclude from these several evidentiary sources, based on more than mere conjecture or speculation, that the thermal properties of the Wand caused disabling post-operative subchondral pain in Dr. Herzog's medial femoral condyle. Still, such evidence would not establish that a failure to warn proximately caused a burn injury. I note that the expert opinions of Drs. Markel and Rosenberg, but not Dr. Minas, are challenged in ArthroCare's *Daubert* filings. I by no means intend to suggest the likely outcome of those motions in this footnote.

**12**     When discussing his own usage of the Wand, Dr. Herzog basically testified at his deposition that he did not consider it safe to use the Wand to debride articular cartilage surfaces.

    Q. Have you ever or did you ever perform arthroscopic surgery using an ArthroCare Wand?

    A. Yes.

    Q. And did you ever use an ArthroCare Wand on articular cartilage surfaces?

    A. I don't recall any exact case, but if a piece of tissue would be hanging down separated from the joint surface by, let's say, half an inch, you could touch that safely and remove it, but it was not a practice to do any arthritic debridement type things, but I did numerous lateral releases and soft tissue resections and even attempted to do menisectomies with it.

    Q. With an ArthroCare Wand?

    A. Yes.

    Q. When you said it is not a practice to do debridement, ... not whose practice?

    A. It wouldn't be my preference to burn the tissue on the end of a bone.

    Q. Did you ever talk to Dr. Brown prior to his surgery on your knee about what device he was going to use to do debridement?

    A. No.

    (Herzog Depo. at 30–31.) *See also* Docket No. 50, ¶ 16 concerning Dr. Herzog's "gut instinct" about the Wand.

**13**     The first argument the Herzogs make is that the Court should ignore this challenge based on ArthroCare's failure to produce evidence supporting the challenge. (Docket No. 68 at 14.) This turns the summary judgment process on its head. It is the Herzogs who must demonstrate that facts exist to support their claims. *Celotex,* 477 U.S. at 323.

**14**     Comment j of the Restatement (Second) Torts § 402B states that "reliance need not necessarily be that of the consumer who is injured [but] may be that of the ultimate purchaser of the chattel, who because of such reliance passes it on to

the consumer who is in fact injured, but is ignorant of the misrepresentation." In my view, this caveat is addressed to situations in which the plaintiff was the actual "user" of the product, but not the one to whom a product misrepresentation was made. *See id.,* cmt. i (" 'Consumer' is to be understood in the broad sense of one who makes use of the chattel in the manner which a purchaser may be expected to use it. Thus an employee of the ultimate purchaser to whom the chattel is turned over, and who is directed to make use of it in his work, is a consumer, and so is the wife of the purchaser of an automobile who is permitted by him to drive it.").

15    Surgi–Care's policy argument also overlooks the economic impetus behind strict product liability regimes. *See St. Germain v. Husqvarna Corp.,* 544 A.2d 1283, 1287 n. 3 (Me.1988) ("Among the policy reasons that led the American Law Institute to adopt section 402A [was] ... that the cost of damaging events due to defectively dangerous products can best be borne by the manufacturers and sellers of those products....").

16    The claims premised on the Maine and Massachusetts consumer protection statutes are also targeted in this portion of Surgi–Care's Motion. However, rather than attempting to articulate exactly how a lack of knowledge might relate to the specific elements of these claims, which Surgi–Care does not even endeavor to do, I address them in Section II.F.

17    In another portion of their opposition memorandum, the Herzogs discuss statements allegedly made by Dr. Parker to a Surgi–Care representative. These statements, which are discussed in Section II.H., below, are simply too vague and indefinite to support the requisite finding that Surgi–Care knew or acted in reckless disregard of whether ArthroCare's product representations were false.

18    The Law Court has yet to recognize such a tort, though it typically recognizes tort principles set forth in the Restatements. It also appears that this Court has yet to consider the viability of a "strict liability misrepresentation claim."

19    Surgi–Care argues that comment j of Section 402B draws an exception applicable to this case. Pursuant to comment j:
  *j. Justifiable reliance.* The rule here stated applies only where there is justifiable reliance upon the misrepresentation of the seller, and physical harm results because of such reliance, and because of the fact which is misrepresented. *It does not apply where the misrepresentation is not known, or there is indifference to it,* and it does not influence the purchase or subsequent conduct.

Surgi–Care takes comment j out of context. It clearly relates to situations in which the *plaintiff* either had no knowledge of the misrepresentation or was indifferent to it and, therefore, could not have relied. The comment is not addressed to situations in which the seller did not know of the misrepresentation. Surgi–Care's argument that its lack of knowledge would preclude liability on this claim is false.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 28

2017 WL 3276370

UNDERREPORTED [*]

Court of Special Appeals of Maryland.

MCC MILLWORK INC., et al,

v.

SLOCUM ADHESIVES CORP., et al.

No. 290, Sept. Term, 2016
|
August 2, 2017

Beachley, Shaw Geter, Raymond G. Thieme, Jr. (Senior Judge, specially assigned), JJ.

**Opinion**

Thieme, J.

 **\*1** This appeal arises out of a decision by the Circuit Court for Montgomery County granting summary judgment in favor of Slocum Adhesives Corporation ("Slocum") and Professional Finishes, Inc. ("Professional"), appellees, and against MCC Millwork & Cabinet Corporation, The Cabinet Shop, Inc., Van–Walker Woodworking, Inc., Interior Building Systems Corporation, and Washington Woodworking Company, LLC, (referred to collectively as the "woodworking companies"), appellants. The case began on December 30, 2014, when all of the woodworking companies except Interior Building Systems Corporation filed a complaint against Slocum and Professional asserting claims for breach of warranty, breach of contract, and negligence arising out of the failure of adhesives that were manufactured by Slocum and distributed by Professional. Thereafter, a first amended complaint was filed and Interior Building Systems Corporation was added as plaintiff. The first amended complaint was subsequently amended by interlineation so as to dismiss Brunswick Woodworking Company, Inc. as a plaintiff. [1]

Both Slocum and Professional filed motions for summary judgment. After a March 2, 2016 hearing on both motions for summary judgment, the circuit court requested that the parties submit supplemental memoranda on the issue of the woodworking companies' claims of manufacturing and design defects. The court granted both motions for summary judgment and entered judgments in favor of Professional and Slocum. The court did not provide any memoranda or otherwise explain the reasons for its decisions. This timely appeal followed.

**QUESTION PRESENTED**

The sole question presented for our consideration is whether the circuit court erred in granting summary judgment in favor of Slocum and Professional. For the reasons set forth below, we shall hold that the circuit court erred in granting summary judgment in favor of Slocum with respect to the claim for negligence. In all other respects, we shall affirm.

**FACTUAL BACKGROUND**

All of the woodworking companies are in the business of manufacturing, creating, and installing custom laminate and woodwork in Maryland and Virginia. Slocum creates, distributes, and sells adhesive products for the purpose of bonding materials such as wood, plastic, and metal veneers to base products typically made of wood or wood byproduct. Professional either repackages or relabels and then sells or distributes adhesive products manufactured by Slocum and others. This case arises out of claims by the woodworking companies that certain adhesive products manufactured by Slocum and sold to them by Professional failed to adhere properly, resulting in economic loss.

Beginning in 2012, the woodworking companies purchased and used adhesive products manufactured by Slocum and marketed by Professional as Everbond Rapid Set Red and Everbond Rapid Set Clear. There was no dispute that Professional relabeled the adhesive products it obtained from Slocum, that the only difference between the labels used by Slocum and those used by Professional was the name of the company, and that Slocum's name did not appear on the labels. At no time relevant to this case were written instructions provided for the application or use of the adhesives by either Slocum or Professional. The label on the adhesive products included a notice that provided, in part, "we make no warranty of any kind (including damage or injury) as to the results to be obtained, whether or not used in accordance with the directions or claimed to be so[,]" and "[w]e guarantee the standard quality of this material and its adherence to our specifications, if any, but we expressly disclaim responsibility for its use."

**\*2** The woodworking companies alleged that after using the adhesive products manufactured by Slocum and sold by Professional, they experienced "failures for various commercial and residential contracts" including the "total delamination of solid surface materials bonded to various substrates ... including wood, MDF, plywood, metal and other products." They claimed that they incurred economic losses resulting from the cost of repairing the work they had done for their clients. Upon notification, Professional was advised by Slocum that the failures were caused by the improper application of the adhesives. Based on the information received from Slocum, Professional advised the woodworking companies that the application pressure was too high. The woodworking companies claimed that they had consistently applied the adhesives with pressures that were standard in the industry. Eventually, after multiple product failures, the woodworking companies ceased using the products.

All of the Everbond adhesives sold by Professional to the woodworking companies were purchased from Slocum in sealed 55–gallon drums and 5–gallon buckets. Professional did not dispute that it produced between 30 and 60 five-gallon containers by pouring adhesive from 55–gallon containers into five-gallon containers, but at the hearing on the motions for summary judgment, the woodworking companies conceded that because failures occurred with adhesives obtained from sealed 55–gallon containers, any defect in the adhesives could not have been caused by the repackaging process employed by Professional.

In their first amended complaint, the woodworking companies asserted claims against both Slocum and Professional for breach of contract, breach of warranty, and negligence. They alleged that prior to the time the adhesive products were distributed, Slocum reformulated them "to meet environmental regulations governing adhesives and volatile organic compounds as published by the Environmental Protection Agency," which led to a change in the application rates. They asserted that "the materials manufactured by Slocum may have been altered either in consistency or concentration by Professional prior to delivery" to them, thereby "impacting on the adhesive properties of the product." The woodworking companies claimed that they were not given notice of this change or instructions regarding changes to the proper application rates.

The breach of contract claim was based on the woodworking companies' assertion that the failure of Slocum and

Professional to advise them of the manner of usage and application rates amounted to the breach of an implied contract. Eventually, the woodworking companies conceded that their breach of contract claim against Slocum failed because they had no direct contact with that company.

The breach of warranty claim was based on the assertion that Slocum and Professional failed to provide the woodworking companies with any disclaimer of warranties and that, by the implied warranty of fitness for a particular purpose, Slocum and Professional had warranted that the product would be sufficient for the purpose for which it was advertised and used, namely bonding surfaces such as laminate or wood to other substrates.

The negligence claim was based on the woodworking companies' assertion that Slocum and Professional owed a duty to exercise due care in the production and marketing of its products, including a requirement to provide application instructions. The woodworking companies also alleged that Slocum and Professional failed to exercise due care when they materially altered the formulation and/or application requirements without notifying users of those changes.

After the completion of discovery, both Professional and Slocum filed motions for summary judgment. Professional argued that it was entitled to summary judgment because it met all of the criteria required by the sealed container defense set forth in Md. Code (2013 Repl. Vol., 2015 Supp.), § 5–405 of the Courts and Judicial Proceedings Article ("CJP"). [2] The woodworking companies challenged Professional's reliance on the sealed container defense because between 30 and 60 five-gallon containers of adhesive were poured from 55 gallon containers into five gallon containers and then relabeled. They maintained that Professional's relabeling of the product without disclosing the manufacturer constituted an alteration of the product, that segregation of the component chemicals of the adhesive might have occurred from improper storage by Professional, and that Professional continued to sell the product after it learned from the woodworking companies that there were problems with delamination and adhesion.

**\*3** With respect to the breach of warranty claim, Slocum argued that it had validly disclaimed all warranties when it sold its products to Professional. As for the implied warranty of fitness for a particular purpose, Slocum claimed that its label, which Professional either removed or covered up with its own label, explicitly disclaimed all warranties. There was

MCC Millwork Inc. v. Slocum Adhesives Corp., Not Reported in At. Rptr. (2017)

2017 WL 3276370, 93 UCC Rep.Serv.2d 340

no dispute, however, that Professional reproduced the same disclaimer used by Slocum on its own labels.

With respect to the woodworking companies' claims for negligence, Slocum asserted that the first amended complaint did not include any claim that it manufactured an adhesive that was defective in design or manufacture and that the claim for negligence was limited to the allegation that it failed to provide application instructions for the adhesive. Slocum denied materially modifying or reformulating the adhesives at issue, and argued that Professional and the woodworking companies were sophisticated users, which served as a defense to both the negligent failure to warn and breach of warranty claims.

Both Slocum and Professional argued that the woodworking companies failed to identify an expert witness to testify about the applicable standard of care, and that the expert they did designate, Charles Anderson, Ph.D., employed flawed methodology, lacked a sufficient factual foundation for any opinions as to whether Slocum or Professional breached any duty it might have had toward the woodworking companies, and failed to offer any testimony concerning the type of instructions that should have accompanied the cans of adhesives.

On March 2, 2016, a hearing was held on the motions for summary judgment. During the course of that hearing, the woodworking companies conceded that they had no claim for breach of contract against Slocum and acknowledged that it was irrelevant whether Slocum or Professional provided application instructions because the adhesive itself was defective. They clarified that they merely raised the failure to provide application instructions in the alternative because Slocum had told Professional that high air pressure in the application process was the cause of the product's failure. The woodworking companies asserted that their primary complaint was that Slocum failed to exercise due care when it materially altered the formulation of its adhesive product. The court asked the parties to file supplemental memoranda on the issue of manufacturing and design defects by Slocum, which they did. In two subsequent orders, the court granted summary judgment in favor of Professional and Slocum.

We shall include additional facts as necessary in our discussion of the issue presented.

## STANDARD OF REVIEW

Maryland Rule 2–501(e) provides that summary judgment may be granted when "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." In *Windesheim v. Larocca*, the Court of Appeals set forth the appropriate standard of review in appeals arising from a circuit court's grant of summary judgment:

> We review the Circuit Court's grant of summary judgment as a matter of law. Before determining whether the Circuit Court was legally correct in entering judgment as a matter of law in favor of [appellees], we independently review the record to determine whether there were any genuine disputes of material fact. A genuine dispute of material fact exists when there is evidence "upon which the jury could reasonably find for the plaintiff." "We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party."

**\*4** *Windesheim*, 443 Md. 312, 326 (2015)(internal citations omitted).

As the trial court did not provide any reasoning as to why summary judgment was proper in this case, we are reminded of our statement in *Bond v. NIBCO*:

> It would certainly be preferable to have before us the basis for the circuit court's order. This would not only give us the benefit of the circuit court's reasoning as to why summary judgment was proper but also make it clear whether the lower court found any of the asserted grounds lacked merit, *i.e.*, did not support the grant of summary judgment. In the absence of any such discussion, we must assume that the circuit court carefully considered all of the asserted grounds and determined that all or at least enough of them as to merit the grant of summary judgment were meritorious.

MCC Millwork Inc. v. Slocum Adhesives Corp., Not Reported in A.3d, Rptr. (2017)

2017 WL 3276370, 93 UCC Rep.Serv.2d 340

*Bond*, 96 Md. App. 127, 133 (1993). With these standards in mind, we turn to the issues presented.

### DISCUSSION

### I.

#### A. Professional Finishes

The woodworking companies contend that the circuit court erred in granting summary judgment in favor of Professional under the sealed container defense because it failed to establish the first three required elements of that defense. Specifically, they argue that the adhesive product was not sold in a sealed container in unaltered form, that it continued to sell the product after being placed on inquiry notice that a defect might exist, that it had actual knowledge of a defect in the adhesive product, and that it failed to notify its customers that high pressure applications of the adhesive product were to be avoided. We disagree and explain.

In order for a seller to avoid liability for property damage or personal injury caused by the defective design or manufacture of a product, the seller must establish that (1) the product was acquired and then sold or leased by the seller in a sealed container or in an unaltered form; (2) the seller had no knowledge of the defect; (3) the seller, in the performance of the duties performed, or while the product was in its possession, could not have discovered the defect while exercising reasonable care; (4) the seller did not manufacture, produce, design, or designate the specifications for the product which was the proximate and substantial cause of the claimant's injury; and (5) the seller did not alter, modify, assemble, or mishandle the product while in the seller's possession in a manner which was the proximate and substantial cause of the claimant's injury. CJP § 5–405(b).

In the instant case, although there was evidence that Professional had transferred some adhesives from 55–gallon drums into 5–gallon containers, the woodworking companies conceded that any defect in the adhesive product could not have been caused by any repackaging of the product by Professional because adhesive from unopened 55–gallon drums also resulted in the product failures experienced by the woodworking companies. As a result, Professional established the first requirement of the sealed container defense, that the product was acquired and then sold or leased by it in a sealed container or in an unaltered form.

**\*5** As for the second requirement, that Professional had no knowledge of the defect, there is no evidence that it had knowledge of the adhesive failures until they were reported by the woodworking companies. The fact that Slocum ultimately notified Professional that the newly formulated adhesive, created to comply with new government regulations, required application with a lower pressure than other adhesives, did not constitute a defect in the product itself. Similarly, the woodworking companies' contention that the third required element of the sealed container defense was not met because Professional had actual notice of a defect in the product and failed to advise that high pressure applications were to be avoided, is without merit. At the hearing on the motions for summary judgment, the woodworking companies specifically acknowledged that it was immaterial whether Professional provided application instructions because the adhesive material was defective from the "get-go."

For these reasons, we find that the sealed container defense applied to Professional and, as a result, the circuit court did not err in granting summary judgment in its favor. *See Reed v. Sears, Roebuck & Co.*, 934 F.Supp. 713, 717–18 (D. Md. 1996)(there are no restrictions placed on the nature of the action that may be dismissed once a seller has established the requisite elements of the sealed container defense).

#### B. Slocum Adhesives Corporation

The woodworking companies acknowledged that, with respect to Slocum, no cause of action for breach of contract existed due to a lack of privity, but they disputed that Slocum was entitled to judgment as a matter of law on the warranty and negligence claims. For the reasons set forth below, we conclude that the circuit court did not err in granting summary judgment with respect to the woodworking companies' claims for breach of implied warranty of fitness for a particular purpose, but erred in granting summary judgment with respect to the claim for negligence.

#### 1. Breach of Implied Warranty of Fitness for Particular Purpose

In the first amended complaint, the woodworking companies alleged that Slocum breached an implied warranty of fitness

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

for a particular purpose, namely that the adhesive products would be sufficient to bond surfaces such as laminate to wood or other substrates. In moving for summary judgment, Slocum argued that "it had no way of knowing the manner" in which the woodworking companies would use the adhesive. It also argued that it did not offer any warranties, and had expressly disclaimed all warranties, by virtue of the notice on the label of the adhesive products that provided:

> NOTICE: Our recommendations for the use of this product are based on tests believed to be reliable. However, as the use of the product is beyond our control, we make no warranty of any kind (including damage or injury) as to the results to be obtained, whether or not used in accordance with the directions or claimed so to be. We guarantee the standard quality of this material and its adherence to our specifications, if any, but we expressly disclaim responsibility for its use.

Implied warranties of fitness for a particular use are governed, in part, by § 2–315 of the Commercial Law Article, which provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

Md. Code (2013 Repl. Vol.), § 2–315 of the Commercial Law Article ("CL").

In order to establish an implied warranty of fitness for a particular purpose, the woodworking companies were required to establish the following elements:

(1) The seller must have reason to know the buyer's particular purpose;

(2) The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.

**\*6** (3) The buyer must, in fact, rely upon the seller's skill or judgment.

*Ford Motor Co. v. General Accident Ins. Co.*, 365 Md. 321, 342 (2001).

The official comment to CL § 2–315, which is Maryland's codification of the Uniform Commercial Code, explains:

> A "particular purpose" differs from the ordinary purpose for which goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which the goods are used are those envisaged in the concept of merchantability and to uses which are customarily made of the goods in question.

CL § 2–315, comment 2. Stated otherwise, the particular purpose "must be distinguishable from the normal use of the goods" and "[t]he purpose must be peculiar to the buyer as distinguished from the ordinary or general use to which the goods would be put by the ordinary buyer." *Ford Motor Co.*, 365 Md. at 343 (and cases cited therein).

In addition to establishing a particular purpose, the woodworking companies were required to establish that Slocum "had reason to know, at the time of sale, that the purchaser was relying on the seller's expertise to select an appropriate product for that purpose." *Id.* On that point, the Court of Appeals has noted that:

> The need to establish specific knowledge on the part of the seller often may create a near requirement of direct dealing, if not actual privity, *see Wood Products, Inc. v. CMI Corp.*, 651 F.Supp. 641, 649 (D.Md. 1986)(seeking to apply Maryland law and stating that "[p]rivity is ... required in an action for breach of express warranty or an implied

warranty of fitness for a particular purpose in which only economic loss is claimed"). It is often impossible for a seller to learn of a particular purpose of a buyer, and for a buyer to rely upon a seller to select the right product, without some direct dealing between such buyer and seller.

*Id.* at 343–44.

On this ground, the warranty of implied fitness for a particular purpose "sharply contrasts with the warranty of merchantability, which involves an inherent defect in the goods that existed before they left the hands of the manufacturer." *Id.* at 344 (citation omitted).

In the case at hand, there was a failure of proof of knowledge and particular purpose. The woodworking companies purchased the adhesive products from Professional, not directly from Slocum. Although privity is not required, there was no evidence to show that Slocum knew or had reason to know the particular purpose for which the companies were using the adhesive. All that was alleged in the first amended complaint was that the woodworking companies purchased from Professional adhesive products sold by Slocum and that those adhesives failed to adhere. Nowhere in the complaint did the woodworking companies allege that they purchased the adhesive products for a "particular purpose" that in any way differed from the "ordinary purpose" for which the adhesive might be used. *See Bond*, 96 Md. App. at 137–38 (plaintiffs failed to state a claim for breach of implied warranty of fitness for a particular purpose because there was no allegation that leaky faucets were purchased for a particular purpose that differed from the ordinary purpose of faucets). In effect, they asserted only that they purchased an adhesive that did not adhere. For these reasons, the circuit court did not err in granting summary judgment in favor of Slocum with respect to the claim for breach of warranty of fitness for a particular purpose.

## 2. Negligence

**\*7** The woodworking companies argue that the circuit court erred in granting summary judgment in favor of Slocum with respect to the negligence claim. As a preliminary matter, Slocum argues that the woodworking companies never asserted that there was a manufacturing defect with respect to the adhesives. We disagree. In their first amended complaint, the woodworking companies alleged that Slocum had a duty "to exercise due care in the production" of its

adhesive products and "failed to exercise due care when they materially altered its formulation[.]" That the first amended complaint also made allegations about notice of the change in the formulation of the adhesive and failure to provide instructions with regard to how to apply the adhesive, does not negate the claim that Slocum failed to exercise due care in the production of the adhesives.

We pause to note that Slocum maintains that it did not alter its formulation, but that it developed a new adhesive to comply with certain government regulations. Whether the adhesive sold to the woodworking companies was an altered formulation or a new product is a question of fact that we shall not resolve. Further, with respect to allegations made by the woodworking companies that Slocum failed to provide application instructions, those claims were abandoned at the hearing on the motion for summary judgment, when the following occurred:

THE COURT: Okay, so what does [Anderson] say causes the adhesive to fail?

[PLAINTIFFS' COUNSEL]: The migration of the product, which is the molecular level migration of this product back to its original unblended form. He has said that since day one. He said it in his deposition. It's in his report. The stuff that's mixed up, which is allegedly contact cement, you spray it on. As it dries it unbonds. The molecules come apart and go back home, basically. And what you have now is powder. You don't have the blended product that you're supposed to have that makes glue.

Q.: And so does he say that that's a manufacturing defect, so that's unrelated to the application process?

A.: Correct. That's exactly what he said.

Q.: So it has nothing to do with the application process.

A.: It had nothing to do with the application process. It was Slocum—

Q.: So then it doesn't make any difference whether they gave you any application instructions or not, because the thing was defective from the get-go.

A.: Correct. We pled alternatives because Slocum told Professional Finishes that high air pressure causes this product to flash off. My expert hasn't said that. It's Slocum who's telling Professional that.

Q.: So your case is not based upon a theory that the problem with the adhesive was that it was applied under high pressure, which was the norm for the prior adhesive, that the application had nothing to do with it. The reasons that it doesn't work is because the product from the get-go is defective.

A.: Correct. We introduced the instruction issue because it's Slocum's defense, which it had been since the beginning, that you applied it wrong. Well, you never told us how to apply it, so if we applied it wrong, it's your problem. But we have never alleged that we applied it wrong. We applied it just like we were told to by Professional Finishes, which this is a substitute contact cement that will substitute for what you were using before, that is now EPA and Maryland VOC compliant.

Q.: Well, if you're saying they never really even told you how to apply it, you applied it as you'd always been applying it—

A.: Correct.

Q.: —which had always been successful in the past.

A.: That's correct.

Q.: And they didn't notify you of any change.

A.: That is correct. But that's their defense, and we say well, wait a minute, in defense to that, you didn't tell us there's a difference. That's not our case in chief. Our case is this stuff, whatever came out of this can was anything but glue.

**\*8**  As for whether there was a genuine dispute of material fact with respect to the claim of negligence based on a manufacturing defect, our review of the record demonstrates that there was. The woodworking companies retained Charles Anderson, Ph.D., as an expert witness. In his deposition, Anderson opined that what was "happening fatally" to the adhesive was "that things are separating out and they are changing in terms of the structures and the internal bonding of the molecules, et cetera, this change of polymers." He examined three samples, two of which were obtained from Slocum for the purpose of analysis, and one repackaged red adhesive that was obtained from Professional. He examined the samples after they had aged and found that:

there were indications of material segregating out and forming new structures and the Professional Finishes adhesive forming things that looked almost like particles in

the adhesive, sort of balls of material that were particulate like, forming rod-like structures in the material and forming various filaments of material instead of being uniform in appearance and a, you know, solid that's somewhat soft and whatnot.

It was at that point brittle and it looked very different. At that point it also looked a great deal like some of the failed samples that we had been given. There was a particularly good match with one of them.

When asked if he had reached an opinion as to why the adhesive failed, Anderson stated that instead of remaining evenly mixed, the component materials "separated out from one another" and "no longer had that balance of materials that was supposed to provide them with both the cohesiveness and the adhesive stickiness and also the flexibility that they needed, so it became brittle."

Similarly, in his written report analyzing the percent of solids in three samples of adhesives, Anderson concluded that "[t]his segregation of materials in the failed adhesive samples was characteristic of the failures. Because the additives are not dispersed evenly throughout the rubber solids in the final dried adhesive, they are also not able to inhibit crystallization of the SBS material."

Lastly, in an affidavit, Anderson testified, in part, as follows:

8. That based upon my analysis of the adhesives performed [sic], there was a silicone contaminant present in samples tested of adhesives.

9. That the introduction of a silicone contaminant represents a defect in the quality control standards of a manufacturer, or in the handling standards by an intermediary.

10. That the adhesive crystallized over a short period of time which negated any adhesive properties and demonstrated the lack of compatibility of materials and or manufacturing quality controls.

11. That the percentages of solids found in the two Red adhesives provided were significantly outside the expected quantity of 41.7%.

12. That three samples of adhesives were tested from two different sources and were found to have chemical compositions similar to the adhesives that failed.

MCC Millwork Inc. v. Slocum Adhesives Corp., Not Reported in Atl. Rptr. (2017)

2017 WL 3276370, 93 UCC Rep.Serv.2d 340

13. That in my expert opinion, three disparate samples are adequate to draw a conclusion based upon the circumstances of these failures.

14. That the failures that occurred were nearly identical in nature, and all were to a reasonable degree of professional probability, the result of a defect in manufacturing, or the result of improper repackaging.

Although the affidavit contained a statement that Anderson had "personal knowledge of the facts, matters, and specifications set forth herein[,]" the affirmation at the conclusion of the affidavit provided, "I hereby affirm under the penalties of perjury that the foregoing is true to the best of my knowledge, information and belief." After the hearing on the motions for summary judgment, the woodworking companies submitted an amended affidavit, in which Anderson amended statements 9 and 14 to state:

   **\*9** 9. That the introduction of a silicone contaminant which was present in the sample provided by Slocum represents a defect in the quality control standards of a manufacturer.

\* \* \*

14. That the failures that occurred were nearly identical in nature, and all were to a reasonable degree of professional probability, the result of a [sic] defects and/or lack of controls in the manufacturing process and in the original formulation.

The affirmation on Anderson's amended affidavit was changed so as to state, "I hereby affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true."

Although Slocum criticized Anderson's conclusions and methodology, those criticisms go to the weight of his testimony and do not alter the fact that there was a sufficient factual basis to support his opinions. We further note that resolution of Slocum's challenges to Anderson's credibility are for the trier of fact to resolve. *Laing v. Volkswagen of America, Inc.*, 180 Md. App. 136, 152 (2008)(citing *Syme v. Marks Rentals, Inc.*, 70 Md. App. 235, 238 (1987)). The record shows that there was clearly a genuine dispute of material fact upon which a jury could reasonably find for the woodworking companies. As a result, the trial court's entry of summary judgment in favor of Slocum on the negligence claim was erroneous.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE SLOCUM ADHESIVES CORPORATION.**

**All Citations**

Not Reported in Atl. Rptr., 2017 WL 3276370, 93 UCC Rep.Serv.2d 340

Footnotes

\*     This is an unreported opinion, and it may not be cited in any paper, brief, motion, or other document filed in this Court or any other Maryland Court as either precedent within the rule of stare decisis or as persuasive authority. Md. Rule 1–104.

1     In March 2016, the woodworking companies' second amended complaint was struck by the court.

2     Section 5–405 provides, in relevant part:
      (b) *Elements of defense to action against product's seller.*—It shall be a defense to an action against a seller of a product for property damage or personal injury allegedly caused by the defective design or manufacture of a product if the seller establishes that:
      (1) The product was acquired and then sold or leased by the seller in a sealed container or in an unaltered form;
      (2) The seller had no knowledge of the defect;
      (3) The seller in the performance of the duties he performed or while the product was in his possession could not have discovered the defect while exercising reasonable care;
      (4) The seller did not manufacture, produce, design, or designate the specifications for the product which conduct was the proximate and substantial cause of the claimant's injury; and
      (5) The seller did not alter, modify, assemble, or mishandle the product while in the seller's possession in a manner which was the proximate and substantial cause of the claimant's injury.
      (c) *Defense not available.*—The defense provided in subsection (b) of this section is not available if:

**WESTLAW**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 3276370, 93 UCC Rep.Serv.2d 340

* * *

(6) The seller made any express warranties, the breach of which were the proximate and substantial cause of the claimant's injury.

(d) *Summary judgment; reinstatement of action.*—(1) Except in an action based on an expressed indemnity agreement, if the seller shows by unrebutted facts that he has satisfied subsection (b) of this section and that subsection (c) of this section does not apply, summary judgment shall be entered in his favor as to the original or third party actions.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

📑 KeyCite Yellow Flag - Negative Treatment
Distinguished by Smith v. Baker Concrete Const., Inc., E.D.Tenn., March 28, 2014

2004 WL 1118642
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

In re: BAYCOL PRODUCTS LITIGATION

No. 1431 (MJD/JGL), Civ. 03–4954.
|
May 17, 2004.

**Attorneys and Law Firms**

Bob Owens, Owens Law Firm, PLLC, and Richard A. Freese, Langston Sweet & Freese for and on behalf of Plaintiffs.

C. Alleen McLain, Watkins & Eager, for and on behalf of Defendant Bayer Corporation.

J. Ryan Perkins, Wilkins Stephens & Tipton, P.A., for and on behalf of Defendant Mississippi Discount Drugs.

Kenneth D. McClean, Wise Carter Child & Caraway, P.A., for and on behalf of Defendant Dr. Mack Gorton.

**Opinion**

DAVIS, J.

**\*1** This Document also relates to: Luella Beasley et al.
This matter is before the Court upon Plaintiffs' Motion for Remand (No Doc. No.), Defendant Mississippi Discount Drugs's Motion to Dismiss for Failure to State a Claim (Doc No. 21), and Defendant Dr. Mack Gorton's Amended Motion to Dismiss (Doc. No. 40).

I. BACKGROUND
The case involves nine Plaintiffs who are citizens of the state of Mississippi. Plaintiff Emma Strong is a citizen of the state of Illinois. All Plaintiffs were prescribed Baycol by their physicians, and each alleges they were injured as a result of ingesting Baycol. Plaintiffs have asserted claims against Bayer Corporation ("Bayer"), GlaxosmithKline ("GSK"), MEA Medical Clinic, Plaintiffs' treating physicians, several pharmacies, two Bayer district sales managers, and John Does described in the Complaint as "corporations, entities, individuals, and the like whose identities are unknown to plaintiffs" and who manufactured and sold Baycol. (Compl.¶

33.) This action was originally filed in Mississippi state court. Bayer Corporation timely removed the action to the United States District Court, Northern District of Mississippi asserting subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). In the removal petition, Bayer asserted that the non-diverse defendants were fraudulently joined. The non-diverse defendants include the majority of Plaintiffs' physicians and pharmacies, MEA Medical Clinic, and the Bayer sales managers.

II. PLAINTIFFS' MOTION TO REMAND
Bayer Corporation ("Bayer") opposes the motion to Remand, arguing that this Court has diversity jurisdiction over Plaintiffs' claims because the non-diverse Defendants were fraudulently joined in the Complaint.

Remand to state court is proper if the district court lacks subject matter jurisdiction over the asserted claims. 28 U.S.C. § 1447(c). In reviewing a motion to remand, the court must resolve all doubts in favor of remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. *In re Business Men's Assurance Co. of America,* 992 F.2d 181, 183 (8th Cir.1983) (citing *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3rd Cir.1987) *cert. dismissed* 484 U.S. 1021 (1988)).

Fraudulently joined defendants will not defeat diversity jurisdiction. *Falla v. Norfolk S. Ry. Co.,* 336 F.3d 806, 809 (8th Cir.2003). "Joinder is fraudulent and removal is proper when there exists no reasonable basis in fact and law supporting a claim against the resident defendants." *Wiles v. Capitol Indem. Corp.,* 280 F.3d 868, 871 (8th Cir.2001). The burden is on the removing party to show that there is no possibility that the plaintiff will be able to state a cause of action against the resident defendant or that there has been outright fraud in the pleading of jurisdictional facts. *Parnas v. General Motors Corp.,* 879 F.Supp. 91, 92 (E.D.Mo.1995). In deciding this issue, the Court may consider the pleadings and supporting affidavits. *Id.* at 93. When determining the propriety of remand, the Court must review the plaintiffs' pleading as it existed at the time of removal. *See Pullman Co. v. Jenkins,* 305 U.S. 534, 537 (1939) (citations omitted); *Crosby v. Paul Hardeman, Inc.,* 414 F.2d 1, 3 (8th Cir.1969).

**\*2** Plaintiffs have asserted claims against Defendants based on strict liability, negligence, misrepresentation/suppression, breach of express and implied warranties, and conspiracy. In support of these claims, Plaintiffs allege that Baycol

2004 WL 1118642

is a member of a class of drugs referred to as statins, and that statins are associated with a medical condition called rhabdomyolysis ("rhabdo"). (Compl.¶¶ 38–39.) The number of rhabdo cases associated with Baycol, however, is significantly higher than other statins. (Id.) When Baycol was approved by the FDA, Defendants allegedly "promoted, marketed, distributed, sold and/or prescribed Baycol to consumers by making representations regarding the safety of Baycol and misrepresentations or omissions regarding the risks of Baycol." (Id. ¶ 40.) GSK and Bayer are also alleged to have marketed, promoted, distributed and sold Baycol without disclosing Baycol's defects or associated health risks. (Id. ¶ 41.) The Complaint alleges that "Defendants failed to advise or warn the public, doctors, hospitals, or clinics that there were special risks associated with Baycol." (Id. ¶ 59.) For the most part, the Complaint does not parse out which claims are alleged against individual Defendants. All counts in the Complaint are directed toward "Defendants."

A. *Mississippi Physicians and MEA Medical Clinic*

Seven of the ten Physician Defendants in this case are Mississippi residents. Bayer asserts that their joinder was fraudulent, and was done merely to defeat diversity jurisdiction.

As it has on previous occasions while presiding over the Baycol MDL litigation, the Court finds that claims against the Physician Defendants have no reasonable basis in fact where the main thrust of the complaint is that the Bayer and GSK Defendants misrepresented Baycol's risks and failed to adequately warn the treating physicians of such risks or willfully deceived physicians as to Baycol's risks. *See e.g., Spier v. Bayer Corp. et al.,* (In re Baycol Products Litig.), No. 02–4835, MDL 1431, 2003 WL 21223842, at *2 (D.Minn. May 27, 2003) (a defendant cannot be held liable for failing to warn of unknown risks.) The gravamen of this Complaint is that Bayer and GSK withheld pertinent information, and sold a dangerous product. The Complaint states that "Defendants failed to advise or warn the public, *doctors,* hospitals, or *clinics* that there were special risks associated with Baycol." (Compl.¶ 59) (emphasis added). Thus, the claims against the Physician Defendants and MEA Medical Clinic have no reasonable basis in fact. In fact, the Complaint discredits the allegation that the physicians and MEA Medical Clinic knew of Baycol's risks.

In addition, where the Complaint contains no factual allegations specific to any of the Plaintiffs and the medical treatment they received, Plaintiffs have failed to allege a

sufficient factual basis for any claims against their physicians. In this case, the Complaint contains no factual allegations as to when Baycol was prescribed to a particular Plaintiff, in what dosage, over what period of time, what, if any, side effects or symptoms a particular Plaintiff suffered from and whether such side effects or symptoms were presented to the Physician Defendant. Moreover, the Complaint does not proffer any claims specific to the Physician Defendants individually or as a group, or to the MEA Medical Clinic. The Court thus finds that the allegations asserted against these Defendants are conclusory at best, and do not defeat a finding of fraudulent joinder. *See e.g. In re: Rezulin Prod. Liab. Litig.,* No. 00 Civ. 2843, 2003 WL 43356, at *1 (S.D.N.Y. Jan. 6, 2003); *In re: Rezulin Prod. Liab. Litig.,* 133 F.Supp.2d 272, 295 (S.D.N.Y.2001); *Spier, supra. See also, Young v. City of St. Charles, Mo.,* 244 F.3d 623, 628 (8th Cir.2001) (conclusory allegations not sufficient to withstand motion to dismiss). [1]

B. *Bayer District Sales Managers*

**\*3** Bayer also contends that the sales managers have been fraudulently joined because Plaintiffs have failed to state a cause of action against them. The Complaint does not assert any claims specific to the sales managers. However, Plaintiffs' memorandum of law in support of the instant motion states that the Plaintiffs' misrepresentation/suppression claim applies to these Defendants. (Pl. Mem. Supp. Mot. Remand ¶¶ 2.23–2.25.)

The Court finds that the Complaint fails to state a cause of action for misrepresentation under Mississippi law. In order to maintain a cause of action for fraud or misrepresentation under Mississippi law, Plaintiffs must prove the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9)

2004 WL 1118642

the hearer's consequent and proximate injury.

*Johnson v. Parke Davis,* 114 F.Supp.2d 522, 525 (S.D.Miss.2000) (citing *Allen v. Mac Tools, Inc.,* 671 So.2d 636, 642 (Miss.1996)).

The assertions in the Complaint fall far short of alleging a claim of misrepresentation against the district sales managers. The Complaint is completely devoid of any allegations concerning what representations were made, to whom, in what manner such representations were made, when such representations were made, or that Plaintiffs relied on such representations. *See Walker v. Medtronic. Inc.,* No. 1:03CV74–0–0, 2003 WL 21517997, at *4 (N.D. Miss. June 4, 2003) (allegations in complaint that defendant, in very general terms, engaged in fraudulent conduct not sufficient to state a claim of fraudulent misrepresentation). Since fraudulent joinder is determined at the time of removal, *Pullman,* 305 U.S. at 537, Plaintiffs' assertion that "the misrepresentations provide a potential basis for liability" is unavailing. (Pl. Mem. Supp. Mot. Remand ¶ 2.25.) This is especially true in this case since the Complaint proffers no examples of any misrepresentations that could possibly provide the basis for liability. Therefore, the Bayer sales managers were fraudulently joined.

C. *Mississippi Pharmacies*

The Complaint states that the pharmacy defendants "marketed, promoted, warranted, distributed, and/or sold Baycol products." (Compl.¶ 27.) Other than that, the boilerplate Complaint only contains allegations that "Defendants" continued to promote and sell Baycol in spite of knowing that it was dangerous, and that "Defendants" failed to warn people about Baycol's risks. Plaintiffs' Memorandum in Support of Their Motion to Remand, however, states that the pharmacies may be liable under Mississippi law "for their conduct when dispensing, misrepresenting, and breaching warranties." (Pl. Mem. Supp. Mot. Remand ¶ 2.13.)

*4 The Court finds that Plaintiffs cannot prevail on a failure to warn claim against the pharmacies. The Court has already found that the thrust of the Complaint is that Bayer and GSK failed to inform the public that Baycol was dangerous. The state of Mississippi does not recognize a failure to warn cause of action against a pharmacy for merely filling a prescription in accordance with physician's orders, based

on the learned intermediary doctrine. *See Moore v. Memorial Hosp. of Gulfport & Winn Dixie Louisiana. Inc.,* 825 So .2d 658, 663–65 (Miss.2002).

However, Plaintiffs also argue that since no Mississippi court has addressed the issue of liability against a pharmacy under a breach of warranty theory, there exists a possibility that a Mississippi court would recognize a cause of action against the named pharmacists for breach of warranty. The Court does not agree.

First, other courts that have addressed this issue have found that Mississippi would not recognize such a cause of action. *See, In re Rezulin Prod. Liab. Litig.,* 133 F.Supp.2d at 289–92. Second, even if Mississippi did hold pharmacies liable under theories of breach of warranty, Plaintiffs have failed to allege such a cause of action. Under the Mississippi Products Liability Act, "a manufacturer may be held liable when the product breaches an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product." *Bennett v. Madakasira,* 821 So.2d 794, 808 (Miss.2002) (citation omitted). The Complaint at issue in this case includes no factual allegations that the named pharmacies provided any express warranty in addition to that provided by the manufacturer, made any other express factual representations, or that Plaintiffs relied on any representations. In fact, Plaintiffs' only allegation specific to the pharmacies is that they "marketed, promoted, warranted, distributed, and/or sold Baycol products." (Compl.¶¶ 26–29.) As there is no reasonable basis in fact and law supporting the claims against them, the Court finds that the Pharmacy Defendants have been fraudulently joined.

In conclusion, the Court finds that the Mississippi Defendants have been fraudulently joined, and the Court has diversity jurisdiction over the claims articulated in the Complaint. Accordingly, Plaintiffs' motion to remand is denied. [2]

III. MISSISSIPPI DISCOUNT DRUGS'S MOTION TO DISMISS

Defendant Mississippi Discount Drugs argues that Plaintiffs have failed to state a claim against them under Mississippi law. Plaintiffs respond that they have stated viable claims, and therefore, the motion should be denied.

As discussed in Part II.C., *supra,* the Court finds that the Complaint fails to state a proper cause of action against

In re Baycol Products Litigation, Not Reported in F.Supp.2d (2004)
2004 WL 1118642

Mississippi Discount Drugs based on failure to warn or breach of warranty. However, Plaintiffs argue that they have also stated valid claims based in strict liability and conspiracy. (Pl. Mem. Opp. Mot. Dismiss ¶ 1.12.) The Court does not agree. The Complaint contains *no* factual allegations that support any other claims against Mississippi Discount Drugs. Accordingly, Mississippi Discount Drugs's Motion to Dismiss is granted.

## IV. DR. MACK GORTON'S MOTION TO DISMISS

**\*5** Defendant Dr. Mack Gorton has filed a motion to dismiss. In his original motion, Gorton argued that he cannot be held liable for any harm suffered by Plaintiffs because he works at a community hospital that is owned by a county and a city, and therefore the claims against him are time barred under the applicable statue of limitations. (Gorton Mot. Dismiss at 2.) Furthermore, in his amended motion Gorton states that neither he nor his employer has any record of prescribing Baycol to any of the Plaintiffs in this case. (Gorton Amend. Mot. Dismiss at 1–2.) Thus, according to Gorton, the case against him should be dismissed.

The Court need not reach Gorton's arguments because it can grant his motion with dispatch by relying on its previous finding that the Complaint fails to state a claim against the Physician Defendants. *See* Part II.A., *supra.* Accordingly, Gorton's motion is granted.

IT IS HEREBY ORDERED:

(1) Plaintiffs' Motion to Remand [No Doc. No.] is DENIED;

(2) Defendant Mississippi Discount Drugs's Motion to Dismiss [Doc. No. 21 in Case No. 03–CV–4954] is GRANTED;

(3) The claims against Mississippi Discount Drugs are DISMISSED;

(4) Defendant Dr. Mack Gorton's Amended Motion to Dismiss [Doc. No. 40 in Case No. 03–CV–4954] is GRANTED; and

(5) The claims against Dr. Mack Gorton are DISMISSED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1118642

---

Footnotes

1   In their Memorandum in Support of the Motion to Remand, Plaintiffs aver that the Complaint includes a cause of action for medical malpractice. (Pl. Mem. Supp. Mot. Remand ¶ 28.) The Court can find no allegations in the Complaint alleging medical malpractice. Indeed, the words "medical malpractice" do not even appear in the Complaint.

2   Since the presence of non-Mississippi physicians does not destroy diversity jurisdiction, the Court need not reach Bayer's alternative argument that Mississippi courts lack personal jurisdiction over the non-Mississippi physicians. The non-Mississippi physicians have not filed motions based on lack of personal jurisdiction, and none of the non-Mississippi physicians has filed an answer in this case.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 30

2013 WL 1855775
Only the Westlaw citation is currently available.
United States District Court, D. Montana,
Billings Division.

Harold HOLTSHOUSER and
Kathy Holtshouser, Plaintiffs,
v.
UNITED STATES of America, Defendant.

No. CV 11–114–BLG–RFC.
|
May 1, 2013.

**Attorneys and Law Firms**

Daniel B. Bidegaray, Anna Bidegaray, Bidegaray Law Firm,
Bozeman, MT, for Plaintiffs.

Timothy J. Cavan, Office of the U.S. Attorney, Billings, MT,
for Defendant.

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER**

RICHARD F. CEBULL, Senior District Judge.

**\*1** This matter came before the Court for trial without a
jury on April 22 through 24, 2013. Plaintiffs Harold and
Kathy Holtshouser were represented by Daniel B. Bidegaray.
Defendant United States of America was represented by
Assistant United States Attorney, Timothy J. Cavan.[1]

Witnesses were sworn and testified, and certain exhibits
were offered and received into evidence. From the evidence
presented, the Court makes the following:

### *I. FINDINGS OF FACT*

1. This is a negligence action brought by the plaintiffs
pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §
2671, *et seq.* (Dkt.1). Plaintiffs seek to recover damages from
the United States based on medication filled and dispensed
to Harold Holtshouser (Holtshouser) by the Department of
Veterans Affairs (VA). *Id.*

2. Plaintiffs allege that the VA pharmacy negligently
filled and dispensed prescriptions for a drug known as
Metoclopramide, which caused an abnormal movement
disorder, tardive dyskinesia. Plaintiffs also allege that
it aggravated Holtshouser's Parkinson's symptoms. (Final
Pretrial Order (FPTO) Nature of Action).

3. At the time this action was filed, Plaintiffs were residents
of the State of Montana, and lived in the City of Livingston,
Park County, Montana. (Dkt.1, p. 2).

4. Plaintiffs Harold and Kathy Holtshouser submitted an
administrative tort claim with the VA on May 11, 2010. The
claim form listed both Harold and Kathy Holtshouser as
claimants. The Court determined that the administrative tort
claim form was sufficient for both claimants.

5. Harold Holtshouser was born on February 9, 1922. (FPTO,
Agreed Fact (b)). He is a veteran of the U.S. Navy, and
is eligible for VA healthcare benefits. Holtshouser obtained
his primary medical care from the VA at the VA Bozeman
Community Based Outpatient Clinic and the VA Medical
Center in Fort Harrison, Montana.

6. During the time period from 2001 through 2008,
Holtshouser received his primary medical care at a VA
community outpatient clinic in Bozeman. His primary care
provider during that period was a nurse practitioner, Shaunna
Kersten.

7. The VA pharmacy filled prescriptions and dispensed
Metoclopramide to Holtshouser at various times between
May 15, 2001 and May 20, 2008.

8. Holtshouser suffered from a number of complicated
medical conditions. Since 1975, he has had a 100% VA
disability for chronic anxiety and depression. (Ex. 74, p. 34,
Bates # 255[2]). Also, in addition to regularly being treated
for a multitude of acute medical problems, he also suffered
from a number of other chronic medical conditions, including
Type II diabetes, hyperlipidemia, coronary artery disease
with a history of myocardial infarction and angina, chronic
low back pain with three prior lumbar surgeries, history of
cor pulmonale, degenerative arthritis, mild dimentia, severe
diabetic neuropathy, renal insufficiency, gastroesophageal
reflux disease with diabetic gastroparesis, hypothyroidism,
spinal stenosis, and a history of asbestosis. (Ex. 74, p. 95, #
316).

*2  9. Holtshouser also required many medications for his health problems, and was generally taking more than 20 medications on a daily basis during that time period. (See e.g., Ex. 74, p. 1017–18, # 1238–39).

10. Prior to 2001, Holtshouser had a 20–25 year history of acid reflux symptoms. (Ex. 74, p. 854, # 1075; p. 889, # 1110). In 2001, however, his reflux symptoms became particularly severe. In fact, from April 2001 until October 2001, Holtshouser received and/or sought medical care from the VA or private health care providers for his reflux symptoms on 16 occasions. (Ex. 62, p. 1–9; Ex. 74, p. 849–895, # 1070–1116).

11. In April 2001, he reported to the VA that he felt burning from his mouth to his stomach. (Ex. 74, p. 850, # 1071). By May 3, 2001, he complained that his acid reflux symptoms had become "really bad." (Ex. 74, p. 853, # 1074). He was nauseous, and had acid burning up to his throat and burning his lips. (Ex. 74, p. 854, # 1075). Consequently, a esophagogastroduodenoscopy (EGD) was ordered to evaluate his upper gastrointestinal tract, which was scheduled with the VA surgical department on May 11, 2001. Nevertheless, he returned to the VA on May 8, 2001, and reported that he had constant burning and acid coming up into his mouth and burning his lips, and he felt he could not "take it" until his appointment. (Ex. 74, p. 863, # 1084).

12. Holtshouser's EGD was performed on May 11, 2001, which did not reveal the cause of his symptoms. (Ex. 74, p. 868, # 1089). Since first line therapies for acid reflux, such as H2 Blockers and PPI inhibitors, had not been effective in relieving his condition, the VA surgeon recommended that Holtshouser be put on Carafate and Reglan. (Ex. 74, p. 868, # 1089). Reglan is the brand name for Metoclopramide, which is the medication at issue in this case. VA pharmacy records indicate that a prescription for Metoclopramide was issued by VA surgeon Michael Evans on May 15, 2001. (Ex. 74, p. 3610, # 3835). The prescription was for 10mg, one tablet four times a day before meals and at bedtime. (Ex. 74, p. 4093, # 5898).

13. It appears that Holtshouser did not immediately start the medication, and his severe reflux symptoms persisted. On May 17, 2001, he presented to the emergency room at the Livingston Memorial Hospital with complaints of continuing upper abdominal distress. (Ex. 67, p. 91). The emergency room physician noted that Holtshouser had not been on Reglan. Therefore, he also prescribed Reglan, 10mg before

meals and at bedtime, and directed him to followup at the VA. (Ex. 67, p. 91).

14. When Holtshouser's severe reflux symptoms did not resolve (Ex. 74, p. 885–891, # 1106–1112), he was referred by the VA to a private gastroenterologist, Timothy Johnson, M.D. Holtshouser saw Dr. Johnson on July 12, 2001, and advised Dr. Johnson that he had experienced some improvement on Metoclopramide. (Ex. 62, p. 9). Dr. Johnson, therefore, continued to prescribe Metoclopramide. (Ex. 62, p. 8). Dr. Johnson also performed a repeat EGD and colonoscopy on September 5, 2001, which was again largely unremarkable. (Ex. 62, p. 5–6).

*3  15. While Dr. Johnson ultimately discontinued Holtshouser's Metoclopramide prescription, he also concluded that diabetic gastroparesis was contributing significantly to his reflux and regurgitation symptoms. (Ex. 62, p. 2, 7, 8). When he was unable to manage his symptoms from the condition, however, Dr. Johnson simply referred Holtshouser back to his primary care provider at the VA on September 21, 2001. (Ex. 62, p. 2).

16. Holtshouser was seen back at the VA by NP Kersten on October 2, 2002. He reported that his reflux symptoms were actually worse overall. He could not find anything to eat, he experienced burning all of the time, and had developed a hoarse voice. Like Dr. Johnson, NP Kersten believed that his symptoms were related to diabetic gastroparesis. (Ex. 74, p. 896, # 1117). It is undisputed that Metoclopramide was an appropriate medication to treat diabetic gastroparesis and/or gastroesophageal reflux disease (GERD) in the time period from 2001 through 2008.

17. Due to the severity of Holtshouser's reflux complaints, and NP Kersten's conclusion that his symptoms were the result of diabetic gastroparesis, she continued Holtshouser's prescription for Metoclopramide. (Ex. 74, p. 895–96, # 1116–17). The medication was ultimately effective in relieving Holtshouser's reflux symptoms. Holtshouser spent the winter of 2001 in Arizona, and did not complain of any reflux symptoms during his several visits to the VA in Prescott, Arizona. (Ex. 74, p. 3759–82, # 5488–5511). He returned to the VA clinic in Bozeman on March 21, 2002, and reported at that time that his reflux symptoms were stable. (Ex. 74, p. 902, # 1123).

18. Holtshouser's reflux symptoms remained stable during the periods he was on Metoclopramide for the next 6 years.

His first prescription expired on May 9, 2002, and he was thereafter off the medication for one year, from May 2002 until May 2003. (Ex. 74, p. 3610, # 3835). By May 2003, however, Holtshouser contacted the VA and again complained of "really bad acid reflux" to the extent that it was again burning his lips. (Ex. 74, p. 980, # 1201). It was noted that the surgical department had previously recommended Carafate and Reglan for the condition. (Ex. 74, p. 980, # 1201). NP Kersten recommended that these medications be renewed on a trial basis for one month. (Ex. 74, p. 982, # 1203). Holtshouser's reflux was to be evaluated in a followup appointment in two weeks. (Ex. 74, p. 982, # 1203).

19. Holtshouser returned for a followup on June 12, 2003, and reported that his reflux was better. (Ex. 74, p. 986, # 1207). He was thereafter left on the medication until December 2004, during which time he had minimal complaints of acid reflux. (Ex. 74, p. 986–1165, # 1207–1386).

20. Holtshouser was again off of the medication for approximately two years from December 2004 to November 2006. (Ex. 74, p. 3610, # 3835). The medication was restarted in November 2006. While the circumstances of the second renewal are not clear from the record, NP Kersten testified that it was necessarily at the request of the patient. That is, in order for a medication to be renewed, there must be a request by the patient. (Kersten Dep. 174:2–29). Thereafter, Holtshouser's reflux remained under good control, without significant complaints.

 *4  21. In all, Holtshouser was prescribed the medication during three different periods from 2001 to 2008: May 2001 to June 2002; May 2003 to January 2005; and November 2006 to May 2008. (Ex. 74, p. 3610, # 3835; p. 4093–4105, # 5898–5910).

22. All of the Metoclopramide prescriptions were accurately filled and dispensed by the VA pharmacy, according to the prescriptions issued by VA health care providers licensed to prescribe the medication. (Testimony of Lori Fitzgerald).

23. The VA pharmacy is largely a mail-out operation. There is a pharmacy located at the Fort Harrison VA Medical Center, but it only dispenses medications for inpatient use at the medical center, or for veterans who obtain their prescriptions on-site. Prescriptions for all other VA patients around the state are mailed to the patient. (Testimony of Lori Fitzgerald).

24. Once a prescription is issued by a physician, it is entered into the VA electronic system. A VA pharmacist will review the prescription and request that it be filled at a centralized VA dispensary in Kansas. The medication is then mailed by the dispensary to the patient's residence. (Testimony of Lori Fitzgerald).

25. Package inserts, containing consumer medical information for use, warnings, and side effects were dispensed with each new Metoclopramide prescription, and with each prescription renewal. The information contained in the package inserts from October 2003 through October 2008 was introduced into evidence as Exhibits 77–82. That information was updated periodically, but the inserts consistently advised patients that they should immediately notify their doctor if they experienced any "involuntary movements of the eyes/face/limbs, muscle spasms, trembling of hands," and that symptoms of overdose include "unusual movement of eyes, face, or limbs." In addition, beginning in at least in 2006, warnings were added for elderly patients, advising that they may be more sensitive to "the effects of the drug, especially ... uncontrollable movements of the mouth/face/hands."

26. In May 2008, VA health care providers concluded that Holtshouser was exhibiting signs and symptoms of Parkinson's disease. He was, therefore, taken off of Metoclopramide, pending his evaluation by a neurologist. (Kersten Dep. 180:21–181:8).

27. The medical record does not reveal that Holtshouser exhibited a movement disorder prior to the time the Metoclopramide was discontinued. Even upon his referral to a neurologist for an evaluation in May 2008, no movement disorder was observed.

28. Holtshouser was referred to VA neurologist, Wynde Cheek, D.O. Dr. Cheek saw Holtshouser on May 28, 2008. She did a complete neurologic examination, including an evaluation of his tongue during her cranial examination. (Deposition of Wynde Cheek, M.D. (Cheek Dep .) 16:23–17:10; 52:5–53:13). She spent approximately one hour with Holtshouser, and did not see any abnormal movement of his mouth or tongue. Id.

 *5  29. Holtshouser returned to see Dr. Cheek on August 4, 2008. She again did a complete neurologic exam, and examined his tongue during her cranial examination. She again did not notice any abnormal movements of his tongue or mouth (Cheek Dep., p. 17:1–4).

30. In November 2008, seven months after he had been taken off Metoclopramide, NP Kersten began noting movements of Holtshouser's mouth and tongue in conjunction with dental work. The first entry in the VA record relative to movements of his tongue was on a November 14, 2008. (Ex. 74, p. 1470, # 1691). On that visit, NP Kersten noted that Holtshouser had received new dentures about a year ago, and has had mouth problems ever since. She also noted that he fidgets with his tongue and cheek, and consequently has sore mouth/tongue/gums and bleeding. (Ex. 74, p. 1470, # 1691).

31. On January 8, 2009, NP Kersten again noted that Holtshouser's tongue was constantly moving over his gums and dentures, with gum swelling noted. (Ex. 74, p. 1476, # 1697). Kersten again noted tongue movements during an examination on January 26, 2009, and referred Holtshouser to Dr. Cheek for a neurological consult to evaluate his mouth movements. (Ex. 74, p. 1510, # 1731).

32. Holtshouser returned to see Dr. Cheek on February 18, 2009. (Ex. 74, p. 1512, # 1733). He reported that he had been experiencing pain on the bottom dentures which had started after the placement of pegs to retain his dentures. (Ex. 74, p. 1512, # 1733). He felt as though placing pressure on the bottom teeth with his tongue helped with the pain. (Ex. 74, p. 1512, # 1733). Even at this time, Cheek did not think these were abnormal tongue movements, because Holtshouser was adamant that they were not involuntary, and he was only doing it secondary to pain from the dental work. (Cheek Dep. 22:16–25).

33. Ultimately, Holtshouser's VA providers determined that he had likely developed tardive dyskinesia (TD). TD is a condition characterized by repetitive, involuntary body movements, which often involves the tongue and/or mouth. The condition is treatable, and is, at times, reversible. (Testimony of Matthew Brodsky, M.D.). In Holtshouser's case, some medications have been effective in reducing his tongue and mouth movements, but none have been effective in eliminating his symptoms.

34. Holtshouser did exhibit certain symptoms that could be consistent with Parkinson's disease prior to May 2008. For example, a shuffling gait and possible Parkinson's disease was mentioned in the VA record in a urology consult note in May 2006 (Ex. 74, p. 1249, # 1470), and a nurse's triage note in July 2006. (Ex. 74, p. 1265, # 1486).

35. Holtshouser's most prominent Parkinson's feature was an abnormal gait. (Cheek Dep. 147:18–148:3). He also had chronic low back problems with lumbar stenosis, and three prior back surgeries. (Cheek Dep. 149:20–150:14) He also had "severe, severe sensory peripheral neuropathy," which causes gait abnormalities. (Cheek Dep. 68:4–9; 149:13–19). It was, therefore, difficult to determine whether Holtshouser had Parkinson's symptoms, or was exhibiting symptoms of age associated with his many co-morbid conditions. In fact, a movement disorder specialist who examined Holtshouser in 2010 still did not believe he was "Parkinsonian," and was of the opinion that his gait abnormality was likely the result of vascular disease as opposed to Parkinson's disease. (Ex. 74, p. 3737–38, # 5466–67).

 *6  36. Dr. Cheek eventually concluded Holtshouser fulfilled the criteria for Parkinson's disease after an exam on May 28, 2008. She noted that he had a gait abnormality and decreased facial expression. She also noted a very subtle tremor of his right-hand, which consisted of two slight movements of his right hand in a one-hour period. (Cheek Dep., 51:9–22). The movements were so minor that family, friends, or other physicians not focused on the symptom would not have noticed it. (Cheek Dep., 51:12–18). She characterized his overall Parkinson's symptoms as mild. (Cheek Dep. 154:21–155:2). She prescribed Ropinirole to hopefully improve his ambulation and mobility and thereafter noted a very good response to it. (Ex 74, p. 1448, # 1669).

37. One of Holtshouser's primary complaints in recent years has been ongoing oral pain. His medical records illustrate, however, that Holtshouser has a long history of oral pain and discomfort from dental/denture issues, particularly with his lower jaw.

38. In 2000, he reported that he had not worn a lower denture for some time, stating that his lower denture "never fit right and I threw it away." (Ex. 74, p. 188, # 409; p. 393, # 614). The lower denture was replaced by the VA in 2000. In August 2002, however, he had to have his dentures adjusted. (Ex. 74, p. 927, # 1148). By February 2003, he reported that the bottom denture worked "terrible" and "they hurt." (Ex. 61, p. 9). In 2006, he reported that his dentures fit "pretty good, but always hurt." (Ex. 61, p. 1). His dental records at this time also document that some of his dentures had not been worn for a long time. (Ex. 61, p. 1).

39. In May 2007, he had mini implants placed in his lower jaw to permit the attachment of different dentures. (Ex. 61,

Holtshouser v. U.S., Not Reported in F.Supp.2d (2013)
2013 WL 1855775

p. 5.) This procedure marks the onset of ongoing pain and discomfort in his lower jaw which continues to this date. On August 21, 2007, he reported that he was "still having troubles w/lower teeth implants." (Ex. 74, p. 1310, # 1531). On June 9, 2008, it was reported that his dentures were not fitting due to swelling of the gums and there was a concern of infection. (Ex. 74, p. 1424, # 1645). He again returned to the VA clinic on July 28, 2008 with concerns of mouth pain. (Ex. 74, p. 1447, # 1668).

40. Holtshouser was also seen by a VA dentist at Fort Harrison on March 13, 2008 for problems with his lower denture. (Ex. 74, p. 1342, # 1563). He thereafter had his dentures readjusted by the VA on August 27, September 3, September 15, September 25, October 8, and November 4, 2008. (Ex. 74, p. 1453–55, # 1674–76; p. 1457, # 1678; p. 1465, # 1686; p. 1468, # 1689). It was also reported on October 10, 2008, that his oral pain led to the increased use of narcotics to treat the pain.

41. All of this dental work, and all of this oral pain and discomfort, occurred prior to the onset of any involuntary, abnormal movements of his tongue or mouth. In short, his oral pain had persisted for almost a decade prior to the onset of his TD.

### STANDARD OF CARE

*7 42. The plaintiffs allege that the VA pharmacy violated the standard of care for pharmacists in filling prescriptions for Metoclopramide in excess of the manufacturer's recommendation for duration of treatment, without warning the plaintiffs or contacting Holtshouser's treating provider. (FPTO, Section V). The plaintiffs also maintain that, given Holtshouser's renal impairment, the dosage of the drug was excessive. (FPTO, Section V).

43. Pharmaceutical manufacturers create labels for the use of their products, which include recommendations for the medication's indication and use, dosage and administration, contraindications, adverse reactions and warnings. These labels are approved by the FDA, and are collected and published in the Physician's Desk Reference (PDR).

44. When Holtshouser was first prescribed Metoclopramide in 2001, the manufacturer recommended the medication for the treatment of GERD as well as diabetic gastroparesis. Under "Indications and Usage," the label provided:

### Symptomatic Gastroesophageal Reflux

Reglan Tablets and syrup are indicated as short-term (4–12 weeks) therapy for adults with symptomatic, documented gastroesophageal reflux who fail to respond to conventional therapy.

### Diabetic Gastroparesis (Diabetic Gastric Stasis)

Reglan ... is indicated for relief of symptoms associated with acute and recurrent diabetic gastric stasis. The unusual manifestations of delayed gastric emptying (e.g., nausea, vomiting, heartburn, persistent fullness after meals, and anorexia) appear to respond to reglan within different time intervals. Significant relief of nausea occurs early and continues to improve over a three-week period. Relief of vomiting and anorexia may precede the relief of abdominal fullness by one week or more.

45. The manufacturer's label also contained a number of warnings associated with the use of Metoclopramide, including the possibility of developing Parkinson-like symptoms and/or tardive dyskinesia:

Parkinsonian-like symptoms have occurred, more commonly within the first 6 months after beginning treatment with metoclopramide, but occasionally after longer periods. These symptoms generally subside within 2–3 months following discontinuance of metoclopramide. Patients with preexisting Parkinson's disease should be given metoclopramide cautiously, if at all, since such patients experience exacerbation of parkinsonian symptoms when taking metoclopramide.

### Tardive Dyskinesia

Tardive Dyskinesia, a syndrome consisting of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with metoclopramide. Although the prevalence of the syndrome appears to be highest among the elderly, particularly women, it is impossible to predict which patients are likely to develop the syndrome. Both the risk of developing the syndrome and the likelihood that it will become irreversible are believed to increase with the duration of treatment and total cumulative dose. Less commonly, the syndrome can develop after relatively brief treatment at low doses; in these cases, symptoms appear more likely to be reversible....

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 216 of 370
PageID: 10246
Holtshouser v. U.S., Not Reported in F.Supp.2d (2013)
2013 WL 1855775

**\*8 46.** As far as dosage administration, for symptoms of GERD, the manufacturer recommended 10 to 15 mg up to 30 minutes before meals and at bedtime. It also advised that "[t]herapy longer than 12 weeks has not been evaluated and cannot be recommended."

47. For symptoms associated with diabetic gastroparesis, the manufacturer recommended "10 mg of metoclopramide 30 minutes before each meal and at bedtime for two to eight weeks, depending upon responses and the likelihood of continued well being upon drug discontinuation."

48. For patients with renal impairment, the label also provided:

> Since metoclopramide is excreted principally through the kidneys, in those patients whose creatinine clearance is below 40 mL/min, therapy should be initiated at approximately one-half the recommended dosage. Depending upon clinical efficacy and safety considerations, the dosage may be increased or decreased as appropriate.

49. In 2004, the manufacturer revised the language of its recommendation. Under "Indications and Usage" the manufacturer advised that "[t]he use of reglan tablets is recommended for adults only. Therapy should not exceed 12 weeks in duration."

50. For relief of symptoms associated with diabetic gastroparesis, it continued to recommend therapy for "two to eight weeks, depending upon response and the likelihood of continued well-being upon drug discontinuation."

51. In 2009, after Holtshouser's use of Metoclopramide had been discontinued, the FDA required the manufacturer to add a "black box warning" to its label. The warning highlighted that treatment with Metoclopramide can cause tardive dyskinesia, and recommended that treatment with Metoclopramide beyond 12 weeks should be avoided "in all but rare cases where the therapeutic benefit is thought to outweigh the risk of developing tardive dyskinesia."

52. All of the providers and experts in this case agree on two things with respect to the PDR. First, it is not used by medical practitioners in their practice. As Kluger noted, there are so many side effects listed in the PDR that it is not as helpful as looking at other literature.

53. Second, all of the medical providers, pharmacists, and experts in this case agreed that many medications—and possibly a majority of medications—are prescribed "off label"; *i.e.,* contrary to the usage duration recommendations set forth in the manufacturer's label. In fact, some medications are prescribed more off label than they are according to the label. (Kluger Testimony).

54. As explained by the United States' pharmaceutical expert, Arthur Lipman, Parm.D., a manufacturer's label is not proscriptive, and does not prohibit use for a longer period, or in any other manner not described in the labeling. (Lipman Testimony). Labeling, including indications and duration of therapy, are limited to the clinical studies that the sponsor submits to the FDA to receive approval of a "New Drug Application." (Lipman Testimony). Once the drug is approved, however, a licensed prescriber can prescribe the drug for any use either within or outside of the label, if doing so, in the opinion of the prescriber, is in the best interests of the patient. (Lipman Testimony).

**\*9 55.** Plaintiffs called Sunny A. Linnebur, Pharm D. as a pharmaceutical expert at trial. Dr. Linnebur is an associate professor at the School of Pharmacy at the University of Colorado, and she testified that the VA pharmacists did not meet the appropriate standard of care in filling and dispensing Metoclopramide prescriptions to Holtshouser.

56. It was obvious from Dr. Linnebur's testimony that she was not aware of the standard of care required of pharmacists practicing their profession in Montana, other than a general standard of care. Dr. Linnebur never practiced in Montana and has done no research about how pharmacy is practiced in the state of Montana. Dr. Linnebur contended that the VA has a higher standard of care due to the fact that they have "an integrated system" which allows the patients to have access to a higher level of care than the general public.

57. Dr. Linnebur frequently referred to a "physician description," an internal agency document, for a VA pharmacist in her testimony regarding what she believed was the standard of care for a VA pharmacist in Montana. However, this expert had no specific knowledge of how the

2013 WL 1855775

VA pharmacies operate in Montana. Dr. Linnebur was not aware of a VA pharmacy outside of Fort Harrison where a veteran has personal contact with a pharmacist.

58. Much of Dr. Linnebur's testimony reflected her personal standard of care that had no concept of the reality of the operation of the VA system in Montana.

## II. CONCLUSIONS OF LAW

1. Plaintiff, Harold and Kathy Holtshouser properly exhausted their administrative remedies under the FTCA by submitting an administrative tort claim with the VA on May 1, 2010, and thereafter filing their complaint in this Court within six months of the final denial of his administrative claim on July 7, 2011. This Court, therefore, has subject matter jurisdiction of Harold and Kathy Holtshouser's claims, pursuant to 28 U.S.C. § 1346(b)(1).

2. Venue is proper in the District of Montana, because the plaintiffs reside in the District of Montana. 28 U.S.C. § 1402(b). Further, venue is appropriate in the Billings Division, pursuant to L.R. 1.2(c)(1)(d) and 3.2(b)(1)(B), since the plaintiffs resided in Park County at the commencement of this action.

3. The burden of proof in a civil action is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. Cabrera v. Jakabovitz, 24 F.3d 372, 380 (2d Cir.1994), cert denied, 513 U.S. 876 (1994). That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of their claim by preponderance of the evidence. Preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved is more likely true than not true.

4. Under the FTCA, the United States is liable for torts committed by its agencies and employees in the same manner and to the same extent as a private individual under like circumstances, in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 2674. Applicable state law must be the source of the claim for relief. Trobetta v. United States, 613 F.Supp. 169 (D.Mont.1985).

*10  5. Although the Montana Supreme Court has never addressed the issue, a clear majority of courts have found that a pharmacist has no duty to warn a patient, or to contact the prescribing health care provider regarding a prescription, unless the pharmacist has knowledge of a patient-specific risk associated with the medication. See e.g., Klasch v. Walgreen Co., 264 P.3d 1155 (Nev.2011). Courts have found that the duty to warn customers about potential side effects of medication falls with the physician, not the pharmacist. See e.g., Allberry v. Parkmore Drug, Inc., 834 N.E.2d 199 (Ind.Ct.App.2005).

6. The majority of jurisdictions have refused to apply any greater duty on pharmacists for a number of policy reasons. For example, the "[p]roper weighing of the risks and benefits of a proposed drug treatment and determining what facts to tell the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition." McGee v. Am. Home Prods. Corp, 782 P.2d 1045, 1051 (Wash.1989). It is the physician, not a pharmacist who has no relationship with the patient, "who can relate the propensities of the drug to the physical idiosyncrasies of the patient." Id. at 1050. A physician is also "in the best position to decide when to use and how and when to inform his patient of the risks and benefits pertaining to drug therapy." Id. at 1050–51.

7. Imposing a duty on a pharmacist to intervene in a physician's drug therapy of a patient "would place the pharmacist between the physician—who knows the patient's physical condition—and the patient and could lead to harmful interference with the patient-physician relationship." Allberry, 834 N.E.2d at 202.

8. Moreover, the rule "prevents pharmacists from constantly second-guessing a prescribing doctor's judgment simply in order to avoid his or her own liability to the customer," ... and would thus preserve "the pharmacists role as a conduit for dispensing much-needed prescription medication." Klasch, 264 P.3d at 1159.

9. This Court finds that these are sound policy considerations, and that the Montana Supreme Court would join the majority of jurisdictions which have adopted the rule that pharmacists have no duty to warn patients of the generalized risks inherent in the prescriptions they fill. A pharmacist only has the duty to warn a patient, or to contact the patient's prescribing provider, if he/she has knowledge of a patient-specific risk that would render the prescription contraindicated for the particular patient. Klasch, 264 P.3d at 1160.

10. In the present case, Plaintiffs allege that the VA pharmacy failed to warn Holtshouser of the generalized risks associated with the medication. There is no evidence that the pharmacy had knowledge that Holtshouser had a condition that would render Metoclopramide uniquely hazardous to him. The VA pharmacy, therefore, had no duty to warn Holtshouser, or to contact his treating provider.

**\*11**  11. Even if the VA pharmacy had a greater duty to Holtshouser beyond appropriately screening, filling, and dispensing the Metoclopramide prescription, that duty is determined by the same standard of care analysis applied to other claims of professional negligence. The standard of care is controlled by state law; not federal law and/or VA declarations, job description duties, or regulations.

12. To establish a duty and breach in a medical negligence claim under Montana law, for example, a plaintiff must initially satisfy a two-part threshold obligation: (1) evidence must be presented to establish the standard of professional care in the type of case involved; and (2) it must be shown that the physician departed from this recognized standard in his/her treatment of the plaintiff. *See e.g., Gilkey v. Schweitzer,* 983 P.2d 869, 871 (Mont.1999). Moreover, it must be established that the departure from the standard was the proximate cause of injury to the plaintiff. *Montana Deaconess Hospital v. Gratton,* 545 P.2d 670, 673 (Mont.1976); *Falcon v. Cheung,* 848 P.2d 1050, 1055 (Mont.1993).

13. Plaintiffs' pharmacy expert, Dr. Linnebur, did not apply an appropriate standard of care in this case. Dr. Linnebur testified that the VA pharmacy has an increased standard of care, because VA pharmacists are in a unique position of having access to the medical records of the patient, which are generally not available in a retail setting. Even with respect to "baseline" pharmacy standards, she opined that VA pharmacists are expected to perform at a higher level, because they are in a closed system where the patients receive both their medical care and medications in the same system. Therefore, her opinions in this case consist of what she believes constitutes the standard of care of a VA pharmacist in the VA system.

14. Under the FTCA, however, the United States has waived its sovereign immunity only and rendered itself liable only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. It is liable under the FTCA only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

15. Consequently, the United States is only liable in this case to the extent that a private pharmacist would be liable under Montana law. It is not held to a higher standard. Its standard of care is the same as any privately owned pharmacy in the state—no greater, no less.

16. For these same reasons, Plaintiffs' reliance on internal VA policies, procedures, and guidelines to establish the standard of care is also misplaced. The source of liability under the FTCA must be state law, not federal laws or regulations. *See e.g. FDIC v. Meyer,* 510 U.S. 471, 478 (1994). A private pharmacist is obviously not liable under Montana law for failing to comply with VA policies and guidelines. That being the case, the United States has simply not rendered itself liable under the FTCA for alleged violations of those policies, procedures and guidelines.

**\*12**  17. The Court further finds that the VA did not violate the applicable standard of care in this case.

### III. ORDER

Accordingly, IT IS HEREBY ORDERED, pursuant to Fed.R.Civ.P. 58, that the Clerk of Court enter judgment by separate document in favor of the defendant, United States of America, dismissing Plaintiffs' claims, with prejudice.

IT IS FURTHER ORDERED that the Clerk of Court shall notify the parties of the making of this order.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1855775

Footnotes

1    Due to short time period between the finality of trial and my retirement on May 3, 2013, a transcript of the trial was not complete or available and specific references to the trial transcript are not included in this order.

2    Unless otherwise noted, the page number of the exhibit precedes the bates-numbered page in citation to the exhibits.

**Holtshouser v. U.S., Not Reported in F.Supp.2d (2013)**

2013 WL 1855775

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 31

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 221 of 370
PageID: 10251
Shelton v. Young's Welding and Mach. Shop, LLC, Not Reported in F.Supp.3d (2015)
2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

2015 WL 247834
United States District Court, D. Nebraska.

William SHELTON and Alecia Shelton, Plaintiffs,
v.
YOUNG'S WELDING AND MACHINE SHOP,
LLC, Defendant and Third–Party Plaintiff,
v.
Show–Me Shortline Company,
LLC, Third–Party Defendant.

No. 8:14CV165.
|
Signed Jan. 20, 2015.

**Attorneys and Law Firms**

Gary J. Nedved, Keating, O'Gara Law Firm, Lincoln, NE,
Luke T. Deaver, Person Law Office, Holdrege, NE, for
Plaintiffs.

Roger G. Steele, Steele Law Firm, Grand Island, NE, for
Defendant and Third–Party Plaintiff.

Aimee C. Bataillon, Michael T. Gibbons, Woodke, Gibbons
Law Firm, Omaha, NE, for Third–Party Defendant.

**MEMORANDUM AND ORDER**

LAURIE SMITH CAMP, Chief Judge.

 **\*1**  This matter is before the Court on a Motion to Dismiss
Third–Party Plaintiff's Complaint ("Third–Party Complaint")
(Filing No. 26) filed by Third–Party Defendant Show–
Me Shortline Company, LLC ("Show–Me"). For following
reasons, the motion will be granted.

**BACKGROUND AND FACTS**

For purposes of the pending motion, all well-pled facts are
accepted as true, though the Court need not accept proposed
conclusions of law. The following is a summary of the factual
allegations.

This case arises out of an accident that occurred on February
21, 2012 (the "Accident"). In the course of the Accident,
Plaintiff William Shelton ("Shelton") sustained injuries

when attempting to use a hydraulic bag wrapper machine
("Machine"). (Pl. Am. Compl., Filing No. 37.) The Machine
was manufactured by Young's Welding and Machine Shop,
LLC ("Young's Welding") at the request of Show–Me. Show–
Me is in the business of marketing farm equipment. Show–
Me provided photographs to Young's Welding specifying how
it wanted the Machine manufactured. Thereafter, Show–Me
sold the Machine to an agricultural equipment distributor.
Young's Welding understood from its dealings with Show–
Me, that Show–Me, as the distributor of the Machine, would
train its distributors in the proper use and operation of the
Machine.

**PROCEDURAL HISTORY**

On June 3, 2014, Shelton and Alecia Shelton (collectively
"Plaintiffs") filed a Complaint (Filing No. 1) against Young's
Welding alleging that Young's Welding is strictly liable
in tort for Plaintiffs' injuries and damages arising out of
the Accident. Subsequently, Plaintiffs filed an Amended
Complaint ("Plaintiffs' Complaint") (Filing No. 37) alleging
the same strict liability tort claims against Young's Welding. [1]
Young's Welding filed a Third–Party Complaint (Filing No.
20) against Show–Me alleging that Show–Me is liable to
Young's Welding based on the following theories: strict
liability, negligence, and breach of implied warranties of
merchantability and fitness.

**STANDARD OF REVIEW**

A complaint must contain "a short and plain statement of
the claim showing that the pleader is entitled to relief."
Fed.R.Civ.P. 8(a)(2). "[A]lthough a complaint need not
include detailed factual allegations, 'a plaintiff's obligation
to provide the grounds of his entitlement to relief requires
more than labels and conclusions, and a formulaic recitation
of the elements of a cause of action will not do.' " *C.N. v.
Willmar Pub. Schs., Indep. Sch. Dist. No. 347,* 591 F.3d 624,
629–30 (8th Cir.2010) (quoting *Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 555 (2007)). "Instead, the complaint must set
forth 'enough facts to state a claim to relief that is plausible
on its face.' " *Id.* at 630 (citing *Twombly,* 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Ritchie v. St. Louis Jewish Light,* 630 F.3d 713,

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 222 of 370
PageID: 10252
Shelton v. Young's Welding and Mach. Shop, LLC, Not Reported in F.Supp.3d (2015)
2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

716 (8th Cir.2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). "Courts must accept ... specific factual allegations as true but are not required to accept ... legal conclusions." *Outdoor Cent., Inc. v. GreatLodge.com, Inc.,* 643 F.3d 1115, 1120 (8th Cir.2011) (quoting *Brown v. Medtronic, Inc.,* 628 F.3d 451, 459 (8th Cir.2010)) (internal quotation marks omitted). "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice." *Hamilton v. Palm,* 621 F .3d 816, 817–18 (8th Cir.2010) (quoting *Iqbal,* 556 U.S. at 678). The complaint's factual allegations must be "sufficient 'to raise a right to relief above the speculative level.' " *Williams v. Hobbs,* 658 F.3d 842, 848 (8th Cir.2011) (quoting *Parkhurst v. Tabor,* 569 F.3d 861, 865 (8th Cir.2009)).

**\*2** When ruling on a defendant's motion to dismiss, a judge must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Twombly,* 550 U.S. at 555, 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). The complaint, however, must still "include sufficient factual allegations to provide the grounds on which the claim rests." *Drobnak v. Andersen Corp.,* 561 F.3d 778, 783 (8th Cir.2009).

"Two working principles underlie ... *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679 (citing *Twombly,* 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## DISCUSSION

**I. Strict Liability in Tort**
Young's Welding alleges that Show–Me is liable on a theory of strict tort liability because Show–Me placed the Machine on the market with the following defects: there were no warning labels on the Machine; there were no instruction

labels on the Machine; and there was no emergency shut-off on the Machine. Young's Welding also alleges that Show–Me did not train its distributors in the proper use and operation of the Machine.

Under Nebraska law,[2] "[i]n products liability, there is a significant distinction between a manufacturer's liability for the manufactured product on account of strict liability in tort, as opposed to liability based on negligence." *Kudlacek v. Fiat S.p.A .,* 509 N.W.2d 603, 609–10 (Neb.1994). With respect to products liability actions based on negligence, the question is "whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury, whereas in a cause of action based on strict liability in tort, the question involves the quality of the manufactured product, that is, whether the product was unreasonably dangerous." *Id.* at 610. Nebraska law prohibits plaintiffs from bringing actions based on the doctrine of strict liability in tort against "any seller or lessor of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer unless the seller or lessor is also the *manufacturer* of the product or the part thereof claimed to be defective." Neb.Rev.Stat. § 25–21,181 (2008) (emphasis supplied).

Show–Me argues that it cannot be held strictly liable in tort under Nebraska law because it was not the manufacturer of the Machine. Young's Welding admits that it manufactured the machine referenced in Plaintiffs' Complaint; however, Young's Welding argues that Show–Me should still be held liable under the doctrine of strict liability because (1) Show–Me "was involved in the manufacturing and design process," and (2) Show–Me "was part of the common enterprise that produced the [Machine]." (Filing No. 29 at ECF 3,4.)

### A. Show–Me's Involvement in the Manufacture of the Machine

**\*3** Show–Me's alleged involvement in the manufacture of the Machine does not make Show–Me a manufacturer. The Third–Party Complaint does not allege that Show–Me assisted in, or even influenced, the construction, assembling, packaging, or labeling of the Machine. The only allegation in the Third–Party Complaint supporting the claim that Show–Me was involved in the manufacturing process is that Show–Me provided photographs to Young's Welding depicting how it wanted the Machine manufactured. This is not enough to raise Show–Me to the status of a manufacturer. *See Sherman v. Sunsong Am., Inc.,* 485 F.Supp.2d 1070, 1079 (D.Neb.2007)

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 223 of 370
PageID: 10253
Shelton v. Young's Welding and Mach. Shop, LLC, Not Reported in F.Supp.3d (2015)
2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

(finding that providing testing standards for a product to a manufacturer did not raise supplier and distributor to the status of manufacturer of a product).

### B. Apparent Manufacturer Doctrine

Young's Welding claims that "Nebraska law recognizes that a non-manufacturer can be sued for strict liability" and that "a fact finder can transfer the liability of a manufacturer to a separate entity holding itself out as manufacturer." (Filing No. 29 at ECF 5.) This argument appears to be based on the "apparent manufacturer doctrine."

First, in support of its argument, Young's Welding cites an opinion issued by this Court, *Sherman v. Sunsong America, Inc.,* 485 F.Supp.2d 1070 (2007), discussing the apparent manufacturer doctrine and declining to apply it in a case governed by Nebraska law. *Id.* at 1080. It was recognized that the apparent manufacturer doctrine "allows a fact finder to transfer the liability of a manufacturer to a separate entity holding itself out as the manufacturer." *Id.* at 1079 (quoting *Stones v. Sears, Roebuck & Co.,* 558 N.W.2d 540, 544 (Neb.1997)) (internal quotation marks omitted). The Nebraska Supreme Court has not adopted the doctrine, however, and, in *Sherman,* this Court concluded that even if the Nebraska Supreme Court *did* adopt the doctrine, it would not apply under the facts of *Sherman* because there was no evidence that the plaintiffs "relied upon any brand name, apparent or not, in choosing" the allegedly defective product. *Id.* at 1080.

The reasoning in *Sherman* also applies here. There are no allegations in the Plaintiffs' Amended Complaint or in the Third–Party Complaint to support an inference that the ultimate purchaser of the Machine relied on any brand name. Nor are facts alleged supporting an inference that Show–Me held itself out as a manufacturer. In the Third–Party Complaint, Young's Welding alleged that Show–Me was in the business of *marketing* farm equipment, not the business of *manufacturing* farm equipment. This Court concludes that even if the apparent manufacturer doctrine *were* adopted in Nebraska, it would not apply under the facts of this case.

## II. Negligence

Under Nebraska law, to recover in a negligence action, "a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages." *Martensen v. Rejda Bros., Inc.,* 808 N.W.2d 855, 861–62 (Neb.2012).

### A. Duty

**\*4** In a negligence action, whether a legal duty exists is a threshold question that is a "question of law dependent on the facts in a particular situation." *Durre v. Wilkinson Dev., Inc.,* 830 N.W.2d 72, 80 (Neb.2013). Nebraska law defines legal duty as "an obligation, to which the law gives recognition and effect, to conform to a particular standard of conduct toward another. If there is no duty owed, there can be no negligence." *Id.* (internal citations omitted). With respect to legal duty in negligence cases, the Nebraska Supreme Court has adopted the analysis of the Restatement (Third) of Torts: Liability for Phys. & Emot. Harm ("Restatement (Third)"). *A.W. v. Lancaster Cnty. Sch. Dist. 0001,* 784 N.W.2d 907, 918 (Neb.2010); *Olson v. Wrenshall,* 822 N.W.2d 336, 342–43 (Neb.2012). Under § 7 of the Restatement (Third) (" § 7"), ordinarily, an actor has a "duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010). [3] Generally, the inverse of § 7 is also true in that, "an actor whose conduct has not created a risk of physical harm to another has no duty of care to the other." *Olson,* 822 N.W.2d at 343 (citing the Restatement (Third) § 37 (Proposed Final Draft No. 1, 2005) (published in 2012)).

The Third–Party Complaint alleges that Show–Me negligently placed the Machine on the market with no warning labels, instruction labels, or emergency shut-off feature. It further alleges that Show–Me sold the Machine to a "distributor of agricultural equipment." (Filing No. 20 ¶ 5.) Assuming that Show–Me had any duty to place warning labels, instruction labels, and an emergency shut-off feature on the Machine, the alleged conduct of placing the Machine on the market without such safety features did not create a risk of physical harm to Young's Welding. The Court concludes that Young's Welding failed to allege facts supporting a reasonable inference that Show–Me owed a duty of care to Young's Welding with respect to Show–Me's placement of the Machine on the market.

### B. Breach, Causation, and Damages

Even if Show–Me did owe a duty of care to Young's Welding, Young's Welding still must demonstrate that Show–Me's breach of that duty was the cause of some damage to Young's Welding. Considering all reasonable inferences that may be drawn from the facts alleged in the Third–Party Complaint, the only damage Young's Welding has or will suffer as a result of the Accident is payment of damages to Plaintiffs

Shelton v. Young's Welding and Mach. Shop, LLC, Not Reported in F.Supp.3d (2015)
2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

if Plaintiffs succeed on their claim against Young's Welding for strict liability in tort. Such damages are insufficient when pleading a claim for negligence. *See Lesiak v. Cent. Valley Ag Co-op., Inc.,* 808 N.W.2d 67, 81 (Neb.2012) ("[T]he economic loss doctrine precludes tort remedies ... where the damages caused were limited to economic losses and ... a defective product caused the damage.... [E]conomic losses are defined as commercial losses, unaccompanied by personal injury or other property damage.")

**\*5** Moreover, if the negligence claim against Show–Me was intended as a claim for contribution based on a theory of negligence, Young's Welding failed to plead such a claim. To proceed on a claim for contribution, Young's Welding must share a common liability in tort with Show–Me. *See Estate of Powell ex rel. Powell v. Montange,* 765 N.W.2d 496, 502 (Neb.2009). Plaintiffs only asserted claims against Young's Welding on a theory of strict liability in tort. Thus, at the culmination of Plaintiffs' action against Young's Welding, any liability found on the part of Young's Welding will be based on strict liability in tort. As explained above, Show–Me, a non-manufacturer, does not share in this liability under Nebraska law. Thus, Young's Welding has not alleged any common liability with Show–Me, and any claims for contribution will be dismissed.

### III. Breach of Implied Warranties

In Nebraska, actions for breach of implied warranties arise under Nebraska's Uniform Commercial Code Neb.Rev.Stat. ("Neb.UCC") § 1–101 to § 10–104. Neb. UCC sections 2–314 and 2–315 describe a seller's obligation with respect to implied warranties of merchantability and fitness for a particular purpose. A seller's implied warranty extends to buyers and non-buyer third-parties if the third-party is a "natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Neb. UCC § 2–318. The implied warranties of merchantability and fitness for a particular purpose run from the seller to the buyer and third-party beneficiaries, not the opposite. *See* Neb. UCC §§ 2314, 2–315; *see also In re Gen. Dynamics Asbestos Cases,* 539 F.Supp. 1106, 1112 (D.Conn.1982) ("[T]he representation that a product is safe for its intended use normally flows from the manufacturer to the purchaser, not vice versa.").

Here, the only sales transactions alleged in the Plaintiffs' Amended Complaint and the Third–Party Complaint are the sale of the Machine from Young's Welding to Show–Me and the sale of the Machine from Show–Me to an agricultural equipment distributor. With respect to the first transaction, Young's Welding was the seller, not the buyer. With respect to the second transaction, Young's Welding was not a party. Young's Welding failed to allege any facts supporting a reasonable inference that it was a buyer in any relevant sales transaction. Further, it did not allege any facts supporting an inference that it was a third-party beneficiary to any sales contract. Thus, Young's Welding failed to allege facts from which it can be inferred that it has standing to bring claims for breach of implied warranties.

### CONCLUSION

The Third–Party Complaint alleged claims for strict liability in tort, negligence, and breach of implied warranties. Because Young's Welding failed to allege that Show–Me was a manufacturer of the Machine, the claim for strict liability in tort against Show–Me is prohibited under Nebraska law. With respect to the negligence claim, the facts alleged do not support any inference that Show–Me owed a duty of care to Young's Welding. Finally, with respect to claims for breach of implied warranties, Young's Welding did not allege facts from which it can be inferred that it has standing as a buyer or third-party beneficiary to a sales contract with Show–Me. The Court concludes that the Third–Party Complaint fails to state any claims against Show–Me upon which relief can be granted, and the Third–Party Complaint will be dismissed.

**\*6** IT IS ORDERED:

1. Show–Me's Motion to Dismiss (Filing No. 26) is granted;

2. Young's Welding's Third–Party Complaint (Filing No. 20) is dismissed; and

3. The Clerk's office is directed to terminate Show–Me as a party to the above-captioned action.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

Shelton v. Young's Welding and Mach. Shop, LLC, Not Reported in F.Supp.3d (2015)

2015 WL 247834, 85 UCC Rep.Serv.2d 600, Prod.Liab.Rep. (CCH) P 19,546

Footnotes

1    The Amended Complaint included additional allegations with respect to jurisdictional requirements. (*Compare* Filing No.
     1 at ECF 1, *with* Filing No. 27 at ECF 1.) With the exception of the amount of damages suffered by Plaintiffs, the remainder
     of the allegations in the Amended Complaint are identical to those in the original complaint. (*Compare* Filing No. 1 at
     ¶ 7(a), *with* Filing No. 37 at ¶ 8(a)).

2    Nebraska has adopted Restatement (Second) of Conflicts of Law § 146 (1971), *Malena v. Marriott Int'l, Inc.,* 651 N.W.2d
     850, 856 (Neb.2002), which provides:

         In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities
         of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the
         principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
         Plaintiffs' injuries occurred in Nebraska, and the parties do not dispute that Nebraska law applies to Young's Welding's
         claims against Show–Me.

3    *A.W.,* 784 N.W.2d at 915, 918 (expressly adopting § 7 of the Restatement (Third)).

---

End of Document                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 32

2012 WL 2727874
United States District Court, D. Nevada.

Scott A. BAYMILLER et al., Plaintiffs,
v.
RANBAXY PHARMACEUTICALS,
INC., et al., Defendants.

No. 3:11–cv–858–RCJ–VPC.
|
July 9, 2012.

**Attorneys and Law Firms**

Roger S. Doyle, Thomas E. Viloria, Fahrendorf, Viloria, Oliphant & Oster L.L.P., Reno, NV, for Plaintiff.

S. Samuel Griffin, King & Spalding, Atlanta, GA, Steven E. Guinn, Laxalt & Nomura, Ltd, Linda J. Linton, Linton & Associates, P.C., Reno, NV, Daniel F. Polsenberg, Lewis and Roca LLP, Joel D. Henriod, Beckley Singleton, Chtd. Las Vegas, NV, for Defendant.

**ORDER**

ROBERT C. JONES, Chief Judge.

**\*1** Currently before the Court are four motions to dismiss (# 13, 31, 33, 34). The Court heard oral argument on April 23, 2012.

**BACKGROUND**

In November 2011, Defendant Glaxosmithkline LLC filed a petition for removal and attached the complaint from the Second Judicial District Court in Washoe County, Nevada. (Pet. for Removal (# 1); Compl. (# 1) at 11–27). In the complaint, Plaintiffs Scott A. Baymiller, Kathleen Lynn Baymiller, Mary Arlayne Baymiller, and Scott A. Baymiller as the Co–Special Administrator of the Estate of Charles Alan Baymiller (collectively "Plaintiffs") sued Defendants Ranbaxy Pharmaceuticals, Inc., Aurobindo Pharma USA, Teva Pharmaceutical USA, Glaxosmithkline LLC ("Glaxo"), CVS Pharmacy, Inc., and Rite Aid Corporation (collectively "Defendants"). (Compl .(# 1) at 11).

The complaint alleged the following. (Id. at 12). Scott Baymiller and Kathleen Baymiller were the son and daughter of Mary Baymiller and Charles Baymiller, deceased. (Id.). Mary Baymiller was the surviving wife of Charles Baymiller. (Id.). Ranbaxy was a corporation that had engaged in the design, manufacture, production, testing, study, research, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of pharmaceutical products, including Lorazepam, which was used to treat anxiety, acute seizures, and insomnia. (Id. at 13). Aurobindo was a corporation that had engaged in the design, manufacture, etc. of Paroxetine HCL, which was used to treat depression, obsessive-compulsive disorder, panic disorder, and anxiety. (Id.). Teva was a corporation that had engaged in the design, manufacture, etc. of Paroxetine HCL. (Id.). Glaxo was a corporation that had engaged in the design, manufacture, etc. of Paxil, which was used to treat depression, obsessive-compulsive disorder, and anxiety disorder. (Id. at 13–14). CVS was a corporation that was engaged in the sales and/or distribution of Lorazepam, Paroxetine HCL, and Paxil in Nevada. (Id. at 14). Rite Aid was a corporation that had engaged in the sales and/or distribution of Paroxetine HCL in Nevada. (Id.).

The complaint alleged the following. Since 1992, Glaxo had promoted and advertised and made claims and representations to the medical profession and general public that Paxil was a "safe and effective drug for treatment of depression" (Id. at 15). Paroxetine HCL, as manufactured by Aurobindo and Teva, was the generic equivalent to Paxil. (Id.). Aurobindo and Teva had sold Paroxetine HCL to CVS and Rite Aid pursuant to a sales contract. (Id.).

The complaint alleged the following. Upon information and belief, studies had been conducted and were "available to Defendants showing that Paxil, and its generic Paroxetine HCL, [could] cause extrapyramidial reactions including akathisia associated with violence, selfharm, and psychotic eposides." (Id .). Defendants were aware of the documented increased instances of violence both to oneself and others. (Id.).

**\*2** The complaint alleged the following. Ranbaxy had sold and distributed Lorazepam, a generic equivalent to Ativan. (Id.). Ranbaxy had sold Lorazepam to CVS pursuant to a sales contract. (Id.). Prior to October 4, 2009, there existed sufficient studies that were available to Defendants to make them aware of the side effects of mixing Lorazepam and Paroxetine HCL. (Id. at 15–16). Prior to October

2012 WL 2727874, Prod.Liab.Rep. (CCH) P 18,916

4 or 5, 2009, Defendants had designed, manufactured, packaged, and sold Paroxetine HCL and/or Lorazepam. (*Id.* at 16). Upon information and belief, "Defendants [were] responsible for placing said product in the hands of users" particularly Mary Baymiller on October 4 or 5, 2009. (*Id.*). Defendants had placed a defective and unreasonably dangerous product or combination of products, i.e. Paroxetine HCL and Lorazepam, in the hands of Mary Baymiller without adequate warnings concerning its safe and proper use. (*Id.*). On October 4 or 5, 2009, while under the influence of prescribed Lorazepam and Paroxetine HCL individually and/or in combination and "in a state of somnambulism, while under the associated side effect of the drugs, did use force and violence upon her husband," Charles Baymiller, to cause his death on October 5, 2009, and to cause self harm and violence to herself. (*Id.*).

The complaint alleged the following. Defendants had a duty and were required to warn about the serious hazards associated with the drugs individually and in combination with other drugs as soon as there was "reasonable evidence of association." (*Id.*). Defendants' U.S. packaging inserts and marketing materials had failed to warn about the associated risks of homicidal behaviors or acts of violence toward others. (*Id.*).

The complaint alleged seven causes of action against Defendants. (*Id.* at 17–25). In the first cause of action, Plaintiffs alleged strict products liability (unreasonably dangerous product) because Defendants had placed Lorazepam and Paroxetine HCL, defective and unreasonably safe products, in Nevada which failed to perform in the manner reasonably to be expected in light of their nature and intended function. (*Id.* at 17–18). It was unreasonably dangerous for Defendants to put those products in the hands of Mary Baymiller when the product was known to cause episodes of violence, akathisia, and self-inflicted harm. (*Id.* at 18). Defendants were aware that Paroxetine HCL was unsafe in some patients and could cause psychotic episodes of violence. (*Id.*).

In the second cause of action, Plaintiffs alleged strict products liability (inadequate warnings) because neither Lorazepam nor Paroxetine HCL were accompanied by complete and proper warnings for safe, informed use. (*Id.* at 18–19). Defendants had failed to warn users of the inherent dangers of Lorazepam or Paroxetine HCL. (*Id.* at 19).

In the third cause of action, Plaintiffs alleged negligence. (*Id.*). Defendants owed Plaintiffs, the general public, medical professionals, and pharmacists a duty of care to manufacture a safe drug, to distribute a safe drug, to sell a safe drug, to adequately warn users of the dangers, risks, and side effects, to adequately warn medical professionals and pharmacists of the dangers, to warn users of the safe and proper methods of taking the drugs, and not to represent that the drugs were safe individually or in combination with another when they were not. (*Id.* at 19–20). Plaintiffs alleged the breached their duties to Plaintiffs. (*Id.* at 20). Prior to October 5, 2009, Mary Baymiller had been prescribed Lorazepam and Paroxetine HCL by a nurse practitioner. (*Id.*). After using the drugs, Baymiller informed her treatment provider that her symptoms were not correcting. (*Id.*). The treatment provider increased Mary Baymiller's dosages on September 21, 2009. (*Id.*). Plaintiffs believed that the increased dosages of Lorazepam and Paroxetine HCL individually and/or in combination caused Mary Baymiller to carry out akathisic homicidal behaviors, including the stabbing of her husband with several knives and also caused her self-inflicted injuries. (*Id.*). Defendants failed to adequately warn medical professionals and pharmacists of the dangers associated with those drugs, failed to properly investigate known dangers and side effects of those drugs, failed to warn ultimate users as to the safe and proper methods of taking those drugs, failed to make users and health care providers aware of the level of sophistication and delicate balances regarding psychoactive drugs, negligently and carelessly represented that the drugs were safe individually and in combination with each other, failed to act as a reasonably prudent drug manufacturer, distributor, seller, and/or pharmacy, and failed to warn of the homicidal risks associated with the drugs. (*Id.* at 21).

**\*3** In the fourth cause of action, Plaintiffs alleged breach of implied warranty because Defendants had marketed, sold, licensed, manufactured, warranted, and represented to healthcare providers and product users that the drugs were safe and efficacious. (*Id.* at 22). Mary Baymiller had used Lorazepam and/or Paroxetine HCL in accordance to her healthcare providers' recommendations and instructions in the manner Defendants had intended. (*Id.*). Lorazepam and/or Paroxetine HCL had the implied warranties of merchantable quality, fit for primary purpose, fit for particular purpose, were not defective, and were safe and efficacious. (*Id.* at 22–23).

In the fifth cause of action, Plaintiffs alleged breach of express warranty because Defendants had warranted that the drugs

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 229 of 370
PageID: 10259
Baymiller v. Ranbaxy Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 2727874, Prod.Liab.Rep. (CCH) P 18,916

were safe, effective, or proper for their intended uses, but they were dangerous when put to their intended use. (*Id.* at 23–24).

In the sixth cause of action, Plaintiffs alleged fraud upon purchaser and misrepresentation, pursuant to NRS § 41.600. (*Id.* at 24). Defendants knew or should have known about the risks associated with use of Lorazepam and/or Paroxetine HCL but they failed to take any steps to alert the healthcare community or users to the unreasonable risks. (*Id.* at 24–25). Defendants' actions amounted to fraud because they mis-characterized or misrepresented adverse events and side effects, failed to conclusively study the effects of akathisia by users of the drugs, failed to inform medical and research communities of studies or incidents of violence, self-harm, and/or hypomania, failed to properly conduct research into the effects of the drugs on elderly patients, failed to properly inform the healthcare community and users of potential adverse effects of the combined use of the drugs, and aggressively promoted the drugs to non-psychiatric healthcare providers while acknowledging that a general practitioner's knowledge and training was inadequate to safely and effectively prescribe those drugs. (*Id.* at 25).

In the seventh cause of action, Plaintiffs alleged statutory abuse and neglect pursuant to NRS § 41.1395. (*Id.* at 25–26). Defendants conduct constituted abuse, per the statute, of a person older than 60 years of age. (*Id.* at 26). Both Mary and Charles Baymiller were older than 60 years old. (*Id.*).

This Court granted the parties' stipulations to dismiss Defendants Ranbaxy Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., and Aurobindo Pharm USA, Inc. with prejudice from this case. (Orders (# 43, 48, 55)). As such, the Court denies as moot Ranbaxy's motion to dismiss (# 31). The Court also denies as moot Teva Pharmaceuticals' motion to dismiss (# 13). However, the Court notes that Teva Pharmaceuticals and Rite Aid filed a joint motion to dismiss (# 13). The Court will address Rite Aid's motion to dismiss (# 13) in this order.

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept as true all factual allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1150 n. 2 (9th Cir.2000). Such allegations must be construed in the light most favorable

to the nonmoving party. *Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir.2000). In general, the court should only look to the contents of the complaint during its review of a Rule 12(b)(6) motion to dismiss. However, the court may consider documents attached to the complaint or referred to in the complaint whose authenticity no party questions. *Id.; see Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987).

**\*4** The analysis and purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) (quotations omitted). To avoid a Rule 12(b)(6) dismissal, a complaint does not need detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Clemens v. Daimler Chrysler Corp.,* 534 F.3d 1017, 1022 (9th Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)); *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (stating that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Even though a complaint does not need "detailed factual allegations" to pass muster under 12(b)(6) consideration, the factual allegations "must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966.)

If the court grants a motion to dismiss a complaint, it must then decide whether to grant leave to amend. The court should "freely give" leave to amend when there is no "undue delay, bad faith or dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Generally, leave to amend is only denied when it is clear that the deficiencies of the complaint cannot

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 230 of 370
PageID: 10260
Baymiller v. Ranbaxy Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 2727874, Prod.Liab.Rep. (CCH) P 18,916

be cured by amendment. *See DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir.1992).

## DISCUSSION

### I. Rite Aid Corporation's Motion to Dismiss (# 13)

Rite Aid argues that Plaintiffs' claims against it are derivative based on Rite Aid's sale of Teva's generic paroxetine product. (Mot. to Dismiss (# 13) at 14). Rite Aid argues that there are no allegations or causes of action that specifically identify Rite Aid and there are no independent bases of liability alleged against it. (*Id.*). Rite Aid asserts that because the substantive claims against Teva should be dismissed pursuant to *PLIVA, Inc. v. Mensing,* 131 S.Ct. 2567, 2570, 180 L.Ed.2d 580 (2011), the derivative claims against it should also be dismissed. (*Id.* at 6–8, 14).

 **\*5** In response, Plaintiffs assert that they have valid claims of negligence, breach of warranty, and failure to warn against Rite Aid. (Opp'n to Mot. to Dismiss (# 36) at 3). Plaintiffs assert that *Mensing* is only applicable to generic drug companies and that pharmacists have an affirmative duty to inform customers of known drug interaction issues and hazards. (*Id.*). Plaintiffs argue that, in Nevada, pharmacists have an affirmative duty to warn customers and prescribing doctors of specific side effects and adverse interactions. (*Id.* at 6).

In reply, Rite Aid argues that there are no allegations in the complaint that Rite Aid had knowledge of a customer-specific risk related to Mary Baymiller's use of paroxetine and, therefore, had no duty to warn her in this case. (Reply to Mot. to Dismiss (# 38) at 2). Rite Aid argues that, in Nevada, pharmacies do not have a duty to act to prevent a customer from injuring a third party. (*Id.* at 5).

In *Klasch v. Walgreen Co.,* 264 P.3d 1155 (Nev.2011), the Nevada Supreme Court addressed the duty of care that a pharmacist owes his or her customers. *Id.* at 1156. In doing so, the Nevada Supreme Court explicitly adopted the learned-intermediary doctrine in the context of pharmacist/customer tort litigation and held that pharmacists have no duty to warn of a prescribed medication's generalized risks inherent in the prescriptions they fill. *Id.* at 1157–59. This doctrine "prevents pharmacists from constantly second-guessing a prescribing doctor's judgment simply in order to avoid his or her own liability to the customer." *Id.* at 1159. However, when a pharmacist has knowledge of a customer-specific

risk, the pharmacist has a duty to exercise reasonable care in warning the customer or notifying the prescribing doctor of the customer-specific risk. *Id.* at 1158, 1160.

In this case, the Court grants Rite Aid's motion to dismiss all claims stated against it without leave to amend. There is nothing in the complaint that alleges that Rite Aid had any knowledge of customer-specific risks related to Mary Baymiller. As such, Rite Aid had no duty to warn Mary Baymiller of the generalized risks inherent in her Lorazepam and Paroxetine HCL prescriptions. Moreover, the Court notes that there are no allegations in the complaint that Rite Aid even sold Lorazapam. (*See* Compl. (# 1) at 15). As such, the Court GRANTS Rite Aid's motion to dismiss (# 13) in its entirety.

### II. CVS Pharmacy's Motion to Dismiss (# 33, 34) [1]

CVS argues that the Court should dismiss all claims against it because the learned-intermediary doctrine prevents an action against CVS as a matter of law. (Errata to Mot. to Dismiss (# 34) at 4).

Plaintiffs filed a response and CVS filed a reply. (Opp'n to Mot. to Dismiss (# 49); Reply to Mot. to Dismiss (# 54)).

The Court grants CVS's motion to dismiss (# 33, 34) all claims stated against it for the same reasons stated above. There is nothing in the complaint that alleges that CVS had any knowledge of customer-specific risks related to Mary Baymiller. As such, CVS had no duty to warn Mary Baymiller of the generalized risks inherent in her Lorazepam and Paroxetine HCL prescriptions.

## CONCLUSION

 **\*6** For the foregoing reasons, IT IS ORDERED that Teva Pharmaceuticals USA, Inc. and Rite Aid Corporation's Motion to Dismiss (# 13) is DENIED as moot in part and GRANTED in part. The Court DENIES as moot Teva Pharmaceuticals USA, Inc.'s motion to dismiss (# 13). The Court GRANTS Rite Aid Corporation's Motion to Dismiss (# 13) in its entirety without leave to amend.

IT IS FURTHER ORDERED that Ranbaxy Pharmaceutical Inc.'s Motion to Dismiss (# 31) is DENIED as moot.

IT IS FURTHER ORDERED that CVS Pharmacy, Inc.'s Motion to Dismiss (# 33, 34) is GRANTED in its entirety without leave to amend.

The Clerk of the Court shall enter judgment accordingly.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2727874, Prod.Liab.Rep. (CCH) P 18,916

Footnotes

1    On December 19, 2011, CVS Pharmacy filed its original motion to dismiss. (*See* Mot. to Dismiss (# 33)). On December 20, 2011, CVS Pharmacy filed an errata to its motion to dismiss stating that the errata was the final version of the motion to dismiss rather than the previous one. (*See* Errata to Mot. to Dismiss (# 34) at 1). As such, this Court will cite to the errata when discussing CVS's motion to dismiss.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 33

Kerns v. Hoppe, 128 Nev. 910 (2012)
381 P.3d 630, 2012 WL 991651

KeyCite Yellow Flag - Negative Treatment
Distinguished by Pellham v. Let's Go Tubing, Inc., Wash.App. Div. 3, June 27, 2017

128 Nev. 910
Unpublished Disposition
Supreme Court of Nevada.

Stephanie KERNS, Individually, as Heir to
Warner Kerns and Personal Representative
of the Estate of Warner Scott Kerns, and on
behalf of Kyle Kerns, a minor, Appellant,
v.
Patty HOPPE, as Personal Representative
of the Estate of Walter J. Hoppe, D.O., not
Individually; David Armitage, P.A.-C, an
Individual; Desert Trails Medical, Inc., a Nevada
Corporation; Wal–Mart Stores, Inc., a Delaware
Corporation; Ann Watkins f/k/a Ann Foley,
an Individual; Lisa Spink, an Individual; and
Judy Stinson, an Individual, Respondents.

No. 55615.
|
March 21, 2012.

**Synopsis**
**Background:** Patient's widow brought medical malpractice and negligence action against medical defendants. The Fifth Judicial District Court, Nye County, Robert W. Lane, J., granted summary judgment in favor of medical defendants. Widow appealed.

**Holdings:** The Supreme Court held that:

[1] signing of narcotics contract did not constitute express assumption of risk;

[2] genuine issues of material fact existed regarding whether patient impliedly assumed risk;

[3] genuine issue of material fact existed regarding whether alleged negligence caused patient's death; and

[4] risk that patient would overdose did not render pharmacy negligent for filling prescription.

Affirmed in part, reversed in part, and remanded.

West Headnotes (4)

[1]    **Health**    Contributory and comparative negligence

Patient's signing of narcotics contracts that provided that he would not request or accept controlled substances from any other medical providers and would only receive prescriptions from the doctor providing the contract did not constitute an express assumption of risk of injury from consumption of prescriptions medications, and therefore did not absolve medical defendants of liability in medical malpractice and negligence action stemming from patient's death due to prescription medication intoxication, where language of the contract did not clearly indicate that the patient was assuming the risk of injury caused by any negligent conduct on the part of the medical defendants.

[2]    **Judgment**    Torts

Genuine issues of material fact existed regarding whether patient was fully apprised of the risks of injury or death from prescription medications such that he could have assumed them under primary implied assumption of risk, and therefore summary judgment in favor of medical defendants was precluded in medical malpractice and negligence action stemming from patients's death due to prescription medication intoxication; patient was a man of 31 years who had been warned of the risks of death or injury that could have resulted from narcotic-seeking behavior by at least four doctors when presented with the narcotics contracts, but expert testimony was provided that he was not adequately counseled by the medical defendants, such that he did not fully understand the risks to his health.

*Kerns v. Hoppe, 128 Nev. 910 (2012)*

381 P.3d 630, 2012 WL 991651

**[3]    Judgment  👈  Torts**

Genuine issue of material fact existed regarding whether medical defendants' alleged negligence in prescribing patient prescription medications was the cause of patient's death, and therefore summary judgment in favor of medical defendants was precluded in medical malpractice action stemming from patient's death due to prescription medication intoxication; testimonial evidence was provided that the medical defendants breached the standard of care in prescribing an addict a high dosage of methadone while on a central nervous system depressant, in violation of state and federal law and without adequate monitoring and supervision.

**[4]    Products Liability  👈  Negligence or fault**

**Products Liability  👈  Drugs in general**

Risk that patient would overdose did not render pharmacy negligent for filling prescription for methadone as prescribed by patient's physician, where prescription was issued in the usual course of business and exactly as instructed by physician.

**Attorneys and Law Firms**

Ehrlich Law Firm

Jesse M. Sbaih & Associates, Ltd.

Phillips, Spallas & Angstadt, LLC

John H. Cotton & Associates, Ltd.

*ORDER AFFIRMING IN PART.
REVERSING IN PART AND REMANDING*

**\*1**  This is an appeal from a district court summary judgment in a medical malpractice and negligence action. Fifth Judicial District Court, Nye County; Robert W. Lane, Judge.

Warner Kerns (the decedent) received treatment from respondents Dr. Walter J. Hoppe, D.O.,[1] David Armitage,

PA–C, and Desert Trails Medical, Inc. (collectively, the Medical Defendants), for a long history of intense knee pain resulting from multiple motorcycle accidents that led to narcotics dependence. The decedent's pain was managed through interchanging prescriptions for painkillers including Norco, OxyContin, Vicodin, and methadone as to not encourage addiction to any one medication. The goal was to use the medications for pain management purposes until the decedent had surgery. Because Desert Trails was not licensed as an addiction clinic, it could only prescribe these drugs for pain management purposes and not for addiction. However, in 2005, the Medical Defendants diagnosed the decedent with addiction to OxyContin. The Medical Defendants weaned the decedent off OxyContin over a seven-day period and replaced it with methadone that was then to be slowly decreased until the decedent was off of both medicines. While the decedent was receiving painkillers from the Medical Defendants, he 'doctor shopped' by visiting other physicians to procure extra narcotics. He then filled these prescriptions at various pharmacies. In the years leading up to the decedent's death, Desert Trails and three of the decedent's other medical providers had the decedent sign narcotics contracts acknowledging that it is illegal to obtain multiple prescriptions from various doctors and that it might endanger his health. The contracts also stated that the decedent would not request or accept controlled substances from any other medical providers. Subsequently, the decedent died in his sleep from methadone intoxication. The methadone was prescribed to him at Desert Trails. It was unknown whether the decedent was taking his prescribed dose of the methadone at the time of his death because the decedent's widow, appellant Stephanie Kerns (Kerns), refused to look for the pill bottles. Kerns was asked to produce the pills on two separate occasions and her response was that she did not look for the pill bottles and does not know of the pill bottles whereabouts.

After the decedent's death, Kerns sued the physicians and pharmacy that provided the decedent with the methadone pills. Kerns asserted claims for medical malpractice, negligence, and statutory violations against respondents Wal–Mart Stores, Inc., and various Wal–Mart pharmacists (collectively, the Pharmacy Defendants), in addition to the Medical Defendants. Kerns accused respondents of providing medications to an addict in violation of state and federal law. Because the pharmacy was not a Drug Enforcement Administration (DEA)-registered narcotics-treatment program, it could only legally fill methadone prescriptions for treating pain—not narcotics addiction.

Kerns v. Hoppe, 128 Nev. 910 (2012)

381 P.3d 630, 2012 WL 991651

*2 Respondents moved for, and the district court granted, summary judgment in their favor, finding that the decedent assumed the risk of his death by abusing the various drugs prescribed to him, and that Kerns failed to prove that respondents' actions in prescribing and dispensing the medication to the decedent were the cause of his death. In addition, in the event that summary judgment is reversed on appeal, the district court issued an order granting the Medical Defendants an adverse-inference instruction at trial because of Kerns' failure to attempt to locate the pill bottles. [2]

On appeal, Kerns argues that the district court erred in granting summary judgment in favor of respondents. [3] Kerns also argues that the district court abused its discretion in concluding that, if its grant of summary judgment is reversed on appeal, any jury hearing the case shall be given an adverse-inference instruction that the decedent, prior to his death, took more of the prescription drugs than he was instructed.

We conclude that the district court erred in granting summary judgment based on both the assumption of risk doctrine and causation concerning the alleged negligence of the Medical Defendants. However, we conclude that the district court appropriately granted summary judgment on the claims against the Pharmacy Defendants. We further conclude that the district court properly decided that an adverse-inference instruction should be given upon remand should this case proceed to trial.

*Standard of review*

This court reviews an order granting summary judgment de novo. *Pegasus v. Reno Newspapers, Inc.,* 118 Nev. 706, 713, 57 P.3d 82, 87 (2002). "Summary judgment is appropriate ... when the pleadings [and other evidence in the record] demonstrate that no genuine issue of material fact [remains], and the moving party is entitled to judgment as a matter of law." *Wood v. Safeway, Inc.,* 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005); NRCP 56(c). Under NRCP 56, the burden of proving that there is no genuine issue of material fact lies with the moving party. *Maine v. Stewart,* 109 Nev. 721, 726–27, 857 P.2d 755, 758 (1993). However, once the moving party satisfies his or her burden as required by NRCP 56, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* at 727, 857 P.2d at 759. "[W]hen reviewing a motion for summary judgment, the evidence, and any reasonable inferences drawn from it, must be viewed in a light most favorable to the nonmoving party." *Wood,* 121 Nev. at 729, 121 P.3d at 1029.

The district court's factual findings are given deference and will be upheld "unless they are clearly erroneous and not based on substantial evidence." *International Fid. Ins. v. State of Nevada,* 122 Nev. 39, 42, 126 P.3d 1133, 1134–35 (2006). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion." *Whitemaine v. Aniskovich,* 124 Nev. 302, 308, 183 P.3d 137, 141 (2008).

*Assumption of risk*

*3 Kerns argues that the fact that the decedent knowingly encountered the dangers posed by abusing prescription drugs does not provide respondents with a complete defense to negligently and illegally providing him with methadone. Kerns contends that respondents cannot invoke express assumption of risk by relying on the narcotics contracts signed by the decedent when the contracts do not purport to release respondents from liability for the negligence that took the decedent's life. Kerns also argues that the question of whether the decedent willfully encountered a known risk and what portion of fault he should bear if he did are factual issues that must be submitted to a jury. We agree and conclude that the district court erred in granting summary judgment on this issue.

Generally, assumption of risk is classified into three categories—express, implied primary, and implied secondary assumption of risk. *Turner v. Mandalay Sports Entm't,* 124 Nev. 213, 220, 180 P.3d 1172, 1177 (2008). Both express and primary implied assumption of risk are at issue here. We will discuss each in turn.

*Express assumption of risk*

[1] "Express assumption of risk ... stems from a contractual undertaking that expressly relieves a putative defendant from any duty of care to the injured party; such a party has consented to bear the consequences of a voluntary exposure to a known risk." *Mizushima v. Sunset Ranch.* 103 Nev. 259, 262, 737 P.2d 1158, 1159 (1987), *overruled on other grounds by Turner v. Mandalay Sports Entm't,* 124 Nev. 213, 219–21, 180 P.3d 1172, 1176–77 (2008). An agreement dealing with the express assumption of risk is governed by the law of contracts and will generally be enforced unless it: (1) is barred by an applicable statue, (2) extends protection to willful or gross negligence, or (3) otherwise offends public policy. 57B Am.Jur.2d *Negligence* § 766 (2004). To form the predicate for express assumption of the risk, a document must indicate

that the plaintiff agrees to assume the risk of injury caused by the other party's negligence. *Mizushima,* 103 Nev. at 264, 737 P.2d at 1161.

Here, the decedent signed numerous narcotics contracts that provided that he would not request or accept controlled substances from any other medical providers and would only receive prescriptions from the doctor providing the contract. The Desert Trails narcotics contract informed the decedent that abusing his medications was dangerous and warned him that his medical providers would terminate his treatment and report him to the police if they became aware of any abuse.

Acknowledgement of a risk is not enough for an express assumption of risk—the decedent must have agreed to assume the risk of injury caused by respondents' negligence, if any, in prescribing and dispensing him the methadone that caused his death. From the language of the narcotics contracts, there is no reason that the decedent would have the expectation that he was assuming the risk of injury caused by any negligent conduct on the part of respondents. The form contracts did not act as formal instruments to reapportion legal liability or to forfeit future legal remedies for medical malpractice. *See Hurst v. Lexington–Fayette Urban County Government,* 446 F.Supp.2d 739, 739–41 (E.D.Ky.2006) (a prison release form for the return of confiscated property did not purport to waive any claim based on personal injury or negligence as it only waived liability for property damage); *Mizushima,* 103 Nev. at 264, 737 P.2d at 1161 (determining that a sign-up sheet that contained assumption of risk language did not result in an express assumption of risk when the form did not indicate that there was assumption of risk for the defendant's negligence). Accordingly, we conclude that because the language of the contract did not clearly indicate that the decedent was assuming the risk of injury caused by any negligent conduct on the part of respondents, no express assumption of risk occurred.

*Primary implied assumption of risk*

**\*4** **[2]** Primary implied assumption of risk "arises when 'the plaintiff impliedly assumes those risks that are *inherent* in a particular activity.' " *Turner,* 124 Nev. at 220, 180 P.3d at 1177 (quoting *Davenport v. Cotton Hope Plantation,* 333 S.C. 71, 508 S.E.2d 565, 570 (S.C.1998)). Implied assumption of risk is based on a theory of consent and contains two elements: "(1) voluntary exposure to danger, and (2) actual knowledge of the risk assumed." *Sierra Pacific v. Anderson,* 77 Nev. 68, 71, 358 P.2d 892, 894 (1961) (internal quotations omitted). The knowledge inquiry is a subjective one, and is

only satisfied if it is shown that the plaintiff both knew of and fully appreciated the risk at issue. *Id.* at 71–72, 358 P.2d at 894. "[T]he primary implied assumption of risk doctrine merely 'goes to the initial determination of whether the defendant's legal duty encompasses the risk encountered by the plaintiff.' " *Turner,* 124 Nev. at 221, 180 P.3d at 1177 (quoting *Davenport,* 508 S.E.2d at 570).

We conclude that there is a genuine issue of material fact as to whether the decedent knew of and fully appreciated the risks of doctor shopping in order to procure drugs to feed his addiction. The decedent was a man of 31 years who had been warned of the risks of death or injury that can result from narcotic-seeking behavior by at least four doctors when presented with the narcotics contracts. However, expert testimony was provided that he was not adequately counseled by the Medical Defendants, such that he did not fully understand the risks to his health.

Kerns cites to *Argus v. Scheppegrell,* 472 So.2d 573, 574 (La.1985), for the assertion that "[t]he patient's conduct cannot be, at the same time, both the foreseen risk which imposes the duty on the physician and the defense which totally excuses the physician's breach of that very duty." The Louisiana Supreme Court concluded that "when the rule of law which gave rise to a duty was specifically designed to protect the victim against the risk of his own negligence, recovery should not be absolutely barred for the injury or death which the rule of law was designed to prevent." *Id.* at 577. While we recognize that there are factual differences in this case and in *Argus,* we agree with these underlying principles. Drug-seeking behavior by a patient cannot automatically relieve a physician from a duty to monitor the patient for signs of abuse or addiction and to decline to prescribe the medications when addiction is suspected. To decide otherwise would render meaningless a physician's statutory obligations. *See* 21 C .F.R. § 1306.07(a); NAC 630.230(1); NRS 453.226(1); NRS 453.231.

Accordingly, while the decedent knowingly acquired numerous medications in the weeks prior to his death, issues of material fact remain as to whether he was fully apprised of the risks of injury or death by the Medical Defendants such that he could have assumed them under primary implied assumption of risk. Thus, we conclude that the district court erred in granting summary judgment on this issue.

*Medical malpractice*

Kerns v. Hoppe, 128 Nev. 910 (2012)
381 P.3d 630, 2012 WL 991651

**\*5** Kerns argues that the district court erred in concluding that the possibility that the decedent took more than his prescribed methadone dosage legally foreclosed proximate causation. Kerns contends that whether the decedent took more than his prescribed dose of methadone is a triable issue of fact and argues that she has provided substantial evidence that the highly dangerous cocktail of drugs that respondents provided the decedent with in an unsupervised manner caused his death. Kerns contends that even if the decedent exceeded his dosages, respondents still cannot escape liability as they illegally prescribed and dispensed methadone to the decedent.

To prevail on a medical malpractice action, the plaintiff must establish the following: (1) that the doctor's conduct departed from the accepted standard of medical care or practice, (2) that the doctor's conduct was both the actual and proximate cause of the plaintiff's injury, and (3) that the plaintiff suffered damages. *Prabhu v. Levine,* 112 Nev. 1538, 1543, 930 P.2d 103, 107 (1996); *Perez v. Las Vegas Medical Center,* 107 Nev. 1, 4, 805 P.2d 589, 590–91 (1991). "Negligence is never presumed but must be established by substantial evidence." *Gunlock v. New Frontier Hotel,* 78 Nev. 182, 185, 370 P.2d 682, 684 (1962). To establish proximate causation, the injury must appear to be the natural and probable consequence of the negligence, and it ought to have been foreseen in light of the attending circumstances. *Yamaha Motor Co. v. Arnoult,* 114 Nev. 233, 238, 955 P.2d 661, 664 (1998). Medical malpractice cases require expert testimony to make this showing. *See* NRS 41A.100; *see also Bronneke v. Rutherford,* 120 Nev. 230, 235 n. 9, 89 P.3d 40, 44 n. 9 (2004). A medical expert's opinion regarding causation of an injury or disease and standard of care must be stated to a reasonable degree of medical probability. *Morsicato v. Sav–On Drug Stores, Inc.,* 121 Nev. 153, 158, 111 P.3d 1112, 1116 (2005).

"The courts are reluctant to grant summary judgment in negligence cases because foreseeability, duty, proximate cause and reasonableness usually are questions of fact for the jury." *Thomas v. Bokelman,* 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970). Additionally, "[i]n Nevada, issues of negligence and proximate cause are considered issues of fact and not of law, and thus they are for the jury to resolve." *Nehls v. Leonard,* 97 Nev. 325, 328, 630 P.2d 258, 260 (1981). However, summary judgment is proper when the plaintiff cannot recover as a matter of law. *Thomas,* 86 Nev. at 13, 462 P.2d at 1022.

*The Medical Defendants*

**[3]** Kerns contends that if the Medical Defendants had complied with NAC 630.187 after labeling the decedent an addict and referred the decedent to addiction experts for a specialized evaluation and treatment, then the decedent would have received the supervision needed to prevent any misuse of his prescriptions. Kerns points out that neither Armitage, Dr. Hoppe, nor Desert Trails were ever part of a certified narcotics-treatment program that could legally use methadone to treat addicts.

**\*6** The relevant inquiry on appeal is whether Kerns presented competent expert testimony that tended to show to a reasonable medical probability that the Medical Defendants' allegedly negligent act of prescribing the decedent the methadone caused the decedent's death. Viewing the evidence in the light most favorable to Kerns, we conclude that Kerns demonstrated that there was a genuine issue of material fact as to causation.

Kerns provided testimonial evidence that the Medical Defendants breached the standard of care in prescribing an addict a high dosage of methadone while on a central nervous system depressant—OxyContin—in violation of state and federal law and without adequate monitoring and supervision. *See* 21 C.F.R. § 1306.07 (stating that in order for a practitioner to prescribe methadone to an addict without obtaining a DEA registration, the practitioner must submit a notification to the Secretary of Health and Human Services stating the practitioner's intent to dispense or prescribe narcotic drugs and comply with 21 C.F.R. § 1301.28); NRS 453.226 (requiring that every practitioner who dispenses or proposes to dispense any controlled substance within this State shall biennially register with the Nevada Board of Medical Examiners in accordance with its regulations."); NRS 453.231 (requiring registration before dispensing a controlled substance or conducting research with respect to a controlled substance); NRS 453.056 (providing that the term "dispense" includes prescribing a controlled substance). If a person dispenses a controlled substance without being registered by the Board, that person is guilty of a category D felony. NRS 453.232. The Medical Defendants failed to send the decedent to an addiction specialist upon acknowledging that he was an addict, and instead prescribed him controlled substances without being properly registered or in compliance with the special regulatory standards imposed for such programs. The Medical Defendants presented expert testimony that the standard of care was not breached, however, "it is the jury's province to weigh the experts' credibility." *Prabhu v. Levine,* 112 Nev. 1538, 1544, 930 P.2d 103, 108 (1996).

Kerns v. Hoppe, 128 Nev. 910 (2012)
381 P.3d 630, 2012 WL 991651

The Medical Defendants argue that regardless of their potential negligence, Kerns must still establish through expert testimony that any alleged negligent act caused the injury. While Kerns' only causation expert, Dr. Saeed Jortani, Ph.D., a pathologist, could only testify that it was possible that the decedent only took the prescribed doses, he also testified to a reasonable scientific probability that the methadone caused the decedent's death and that the prescribed amount could have killed him. He stated that methadone's therapeutic range and lethal range overlap almost directly on top of each other. Regardless of whether the decedent took the prescribed amount, the Medical Defendants still prescribed the methadone that ultimately caused his death. A natural and logical consequence of continuing to provide highly addictive controlled substances prescriptions to a patient that is suspected of being an addict is that the patient would abuse the drugs resulting in injury or death. *See Taylor v. Silva, 96 Nev. 738, 741, 615 P.2d 970, 971 (1980)* ( "A negligent defendant is responsible for all foreseeable consequences proximately caused by his or her negligent act."). Under the circumstances of this case, a reasonable jury could find that the Medical Defendants' actions constituted a proximate cause of the decedent's death. Accordingly, we conclude that Kerns demonstrated that there was a genuine issue of material fact as to causation. Thus, the district court erred in granting summary judgment on this issue in regard to the Medical Defendants.

*The Pharmacy Defendants*

**\*7** **[4]** Kerns argues that the foreseeable risk that the decedent would overdose made it negligent for the Pharmacy Defendants to illegally fill his prescription for methadone. Kerns contends that not only did the Pharmacy Defendants fail to check for the purpose of the drug, but also ignored two red flags—the prescription was for a high dosage and the pharmacy had dispensed a 30–day supply of OxyContin to the decedent only 11 days earlier.

The Pharmacy Defendants argue that the district court properly granted summary judgment in their favor because Kerns failed to establish causation—it was impossible to determine if the prescriptions filled by the Pharmacy Defendants caused the decedent's death. The Pharmacy Defendants contend that Kerns has failed to present any legal authority that provides that a pharmacy may be held liable to a customer for his or her overdose where it is undisputed that the pharmacy dispensed the medication exactly as prescribed by the doctor.

We conclude that Kerns failed to make the mandatory causation showing. While only pharmacies that are registered as narcotics-treatment programs can dispense methadone for treating addiction, there are no restrictions for a licensed pharmacy to fill methadone prescriptions for pain management. *See* 42 C.F.R. § 8.12; 21 C.F.R. § 1306.04(a); NRS 453.381. Pursuant to 21 C.F.R. § 1306.04(a) and NRS 453.381(4), a pharmacist must decline to fill a purported prescription if he or she has reason to believe that it was not issued in the usual course of professional practice or treatment. However, the evidence does not support that the prescription was not issued in the usual course of business such that the Pharmacy Defendants should have declined to fill the prescription.

Moreover, in *Klasch v. Walgreen Co.,* 127 Nev. ——, ——, 264 P.3d 1155, 1157–58 (2011), this court adopted the learned-intermediary doctrine and held that pharmacists do not have a duty to warn a customer of the generalized risks inherent in a prescribed medication. It is up to the doctor who has knowledge of the patient's particular situation to convey any relevant safety information to that patient. *Id.* at ——, 264 P.3d at 1158. The rationale behind this rule is "that between the doctor and the pharmacist, the doctor is in the best position to warn the customer of a given medication's generalized risks" and it "prevents pharmacists from constantly second-guessing a prescribing doctor's judgment simply in order to avoid his or her own liability to the customer." *Id.* at ——, 264 P.3d at 1159. "[T]he learned-intermediary doctrine preserves the pharmacist's role as a conduit for dispensing much-needed prescription medications." *Id* .

While the pharmacists could have checked to see why the dosage for the methadone was high and why the OxyContin was dispensed to the decedent 11 days earlier, under the relevant statutes and our decision in *Klasch,* this was not required. "No civil or criminal liability or administrative sanction may be imposed on a pharmacist for action taken in good faith in reliance on a reasonable belief that an order purporting to be a prescription was issued by a practitioner in the usual course of professional treatment...." NRS 453.256(6).[4] Accordingly, we affirm the grant of summary judgment as to the Pharmacy Defendants.

*Adverse-inference instruction*

**\*8** The district court determined that, in the event of a reversal, an adverse inference instruction was permissible

in that it would inform the jury that the decedent took more medicine than prescribed. Kerns takes issue with this determination and contends that the district court abused its discretion by granting the request when she was never in control of the decedent's pill bottles and the decedent was not on notice of a potential legal claim.

We conclude that in light of the fact that the decedent had control over the pills and then, when he passed away, Kerns had control over the premises containing the pills, that the adverse inference instruction may be proper. *See Bass–Davis v. Davis,* 122 Nev. 442, 447–49, 450–51, 134 P.3d 103, 106, 108–09 (2006) (noting that the district court has broad discretion to give an inference instruction that missing evidence would be adverse). Kerns was asked to produce the pills on two separate occasions and her response was that she did not look for the pill bottles and does not know of the pill bottles whereabouts. She was not obliging with the request and, in not searching for the pills, she caused them to be permanently lost. Because either the decedent or Kerns was the last person known to be in possession of the crucial pill bottle evidence, Kerns should bear the burden of its misplacement. *See id.* at 449, 134 P.3d at 107 (stating that a permissible inference instruction provides a "necessary mechanism for restoring the evidentiary balance ... the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss" (internal quotation omitted)). While Kerns claims that neither she nor the decedent knew that the pill bottles were relevant or were on notice of a potential legal claim, we conclude that both Kerns and the decedent were cognizant of the pill bottles' importance. *See id.* at 450, 134 P.3d at 108 (concluding that "a party is required to preserve documents, tangible items, and information relevant to litigation that are reasonably calculated to lead to the discovery of admissible evidence ... once a party is on 'notice' of a potential legal claim," meaning that when litigation is reasonably foreseeable). The decedent knowingly procured multiple prescriptions from several doctors while cognizant of their danger and in doing that should have been able to foresee that his actions could have legal consequences. Moreover, Kerns was aware that the decedent died as a result of his medications and initiated the suit that has led to this appeal. Given these circumstances, it appears that a permissible adverse-inference instruction would balance the evidence and the district court would be within its discretion to give the adverse-inference instruction should this case proceed to trial upon remand.

Accordingly, we [5]

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART AND REMAND this matter to the district court for proceedings consistent with this order.

**All Citations**

128 Nev. 910, 381 P.3d 630 (Table), 2012 WL 991651

Footnotes

1    Dr. Hoppe passed away shortly after litigation was initiated and his estate is represented in this appeal by respondent Patty Hoppe.

2    The parties are familiar with the facts, and we do not recount them further except as necessary to our disposition.

3    When handwriting analysis revealed that Armitage may have forged Dr. Hoppe's signature on the notes that authorized treating the decedent's opioid addiction with methadone, Kerns amended the complaint to add a claim against Armitage for fraud and violation of NRS 630.3062, which prohibits tampering with medical records. Kerns contends that the order granting summary judgment did not dispose of these claims. However, as NRS 630.3062 does not expressly or impliedly afford a private cause of action for individuals or patients affected by medical record tampering, Kerns is unable to pursue this claim. *See Baldonado v. Wynn* Las Vegas, 124 Nev. 951, 958–60, 194 P.3d 96, 100–02 (2008). Because no private remedy may be implied under NRS 630.3062 by this court, Kerns had no right to obtain relief in the district court. Moreover, we conclude that Kerns waived any separate fraud claim by failing to raise it before the district court. *See Old Aztec Mine, Inc. v. Brown,* 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal.").

4    Kerns argues that the decedent's asthma, which created a higher risk of respiratory death from methadone, should have raised a red flag. However, there is no evidence that Wal–Mart pharmacists ever filled a prescription for the decedent for asthma or knew that he had asthma. *See Klasch,* 127 Nev. at ——, 264 P.3d at 1158 (providing that where a pharmacist has knowledge of a customer-specific risk, the pharmacist has a duty to exercise reasonable care by warning the customer or notifying the prescribing doctor of the risk).

**Kerns v. Hoppe, 128 Nev. 910 (2012)**

381 P.3d 630, 2012 WL 991651

5    All other issues on appeal lack merit.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 34

2013 WL 11941563
Only the Westlaw citation is currently available.
United States District Court,
D. North Dakota, Northeastern Division.

Conrad Rostvet, Plaintiff,
v.
Lock City Transportation Co., Inc.;
Zena Associates LLC d/b/a Smart-Hose
Technologies, Inc.; American Crystal Sugar
Co.; and Smart-Hose, Inc., Defendants.

Civil No. 2:11-cv-21
|
Signed 11/07/2013

**Attorneys and Law Firms**

Daniel E. Phillips, Frannie C. Schlossman, Mike J. Miller,
Solberg Stewart Miller, Fargo, ND, for Plaintiff.

M. Daniel Vogel, Robert B. Stock, Vogel Law Firm, Benjamin
J. Hasbrouck, Fredrikson & Byron P.A., Fargo, ND, Andrew
F. Johnson, David P. Bunde, Fredrikson & Byron, PA,
Minneapolis, MN, for Defendants.

Smart-Hose, Inc., pro se.

**MEMORANDUM OPINION AND ORDER
DENYING MOTION FOR SUMMARY JUDGMENT**

Ralph R. Erickson, Chief District Judge

**SUMMARY OF HOLDING**

 *1 Before the Court is Zena Associates LLC's ("Zena")
Motion for Summary Judgment. (Doc. # 33). Conrad Rostvet
brought this complaint against Zena, alleging that a hose
manufactured by Zena burst and sprayed him with sulfur
dioxide, causing serious bodily injury. (Doc. # 1, ¶¶ 21–
27). Zena responds that the allegedly defective hose was
manufactured by Smart Hose, Inc., and that Zena has no
liability for a hose that it neither manufactured nor sold.
Rostvet counters that Zena is liable under the Pennsylvania
product line successor liability doctrine. Because North
Dakota law controls and because North Dakota expressly
rejects the product line successor liability doctrine, Zena
must prevail on this issue. In addition, the undisputed

facts of the case preclude Zena's liability on a theory of
nonmanufacturing seller liability.

However, on the record before the Court, it is unclear
whether Zena is liable for Smart Hose's liabilities under
the mere continuation rule of successor liability. Therefore,
genuine issues of material fact still exist as to Zena's
successor liability, and Zena's motion for summary judgment
is **DENIED**.

Zena's motion came regularly on for hearing on August 30,
2013. In its motion for summary judgment, Zena presented
documentation showing that the allegedly defective hose was
manufactured by Smart Hose, Inc. Zena acquired the assets
of Smart Hose Inc., after the hose had been manufactured
and sold. (Doc. # 36-3, Ex. C; Doc. # 36-4, Ex. D).
Notwithstanding the fact that Zena was neither a manufacturer
nor a seller of the hose, Rostvet argues that Zena is liable
for his injuries under Pennsylvania's product line successor
liability doctrine, a rule that holds a buyer of assets liable
for the seller's prior torts if the buyer continues to operate
the seller's manufacturing product line and produces identical
products following the purchase of the operating line. See
Schmidt v. Boardman Co., 11 A.3d 924, 930–31 (Pa. 2011).
North Dakota has specifically rejected the product line
successor liability doctrine, Downtowner, Inc. v. Acromental,
Inc., 347 N.W.2d 118, 121 (N.D. 1984), which creates a
conflict of law between North Dakota and Pennsylvania
necessitating a choice of law analysis.

**FACTS**

In 2008, a hose allegedly malfunctioned at American Crystal
Sugar's plant in Hillsboro, North Dakota, releasing sulfur
dioxide and seriously injuring Conrad Rostvet, a North
Dakota resident. (Doc. # 1, ¶¶ 14–15). Rostvet has filed this
diversity action against a number of defendants, including
Zena Associates LLC, a Pennsylvania company with its
principal place of business in Pennsylvania. (Doc. # 1, ¶¶ 7,
21–27).

The hose at issue was manufactured and sold to Apache
Hose and Belting Company by Smart-Hose, Inc., another
Pennsylvania company in April 2005. (Doc. #36-1, Ex.
A. to Decl. of Andrea Guevara). Before Smart-Hose was
paid for the hose, it ran into financial difficulty and was
forced to liquidate. On June 30, 2005, Smart-Hose reached
a preliminary agreement to sell its assets for $1.5 million to

2013 WL 11941563

Zena, unless another buyer outbid Zena at a public auction to be held later that year. (Doc. # 43-1, ¶¶ 4, 8). In the interim, Smart-Hose continued its operations and shipped the allegedly defective hose to Apache on July 12. (Doc. # 36-2, Ex. B).

**\*2** A month after Smart-Hose shipped the hose to Apache, it finalized its sale to Zena. (Doc. # 36-3, Ex. C; Doc. # 36-4, Ex. D). The parties structured the sale solely as an asset purchase; Zena did not purchase Smart-Hose's liabilities. (See Doc. # 43-1). The parties also agreed that Pennsylvania law would govern their agreement "without regard to conflict of laws principles." (Doc. #36-4.) A Bill of Sale memorializing the transaction was executed by Smart-Hose and Zena on August 17, 2005. (Doc. # 36-4, Ex. D). Two days later, Apache sent Smart-Hose a check for the hose. (Doc. # 36-3, Ex. C). While not disputing that Apache paid for the hose, Zena now claims that it did not receive the payment, contending it "must have" been received by Smart-Hose. (Doc. # 36, ¶ 5). It is worthy of note that, under the terms of the agreement, Zena purchased "all...accounts receivable, [and] contract rights...of Smart-Hose." (Doc. # 43-1, P. 17, List of Assets to Be Auctioned).

Following its asset purchase, Zena continued to do business as Smart-Hose Technologies, and it was still doing business as Smart-Hose Technologies at the time of Rostvet's accident.[1] (See Doc. # 36, ¶ 1.) Zena moves for summary judgment on the bases that it neither manufactured the defective hose nor assumed Smart-Hose's liabilities.

### DISCUSSION

The Court may grant summary judgment when viewing the evidence in the light most favorable to the nonmoving party, no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Quinn v. St. Louis Cnty., 653 F.3d 745, 750 (8th Cir. 2011). The movant bears the burden of proving that he is entitled to summary judgment. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). If the movant meets this burden, the burden shifts to the non-moving party to show that a genuine issue of material fact exists for trial. Id. A non-moving party may not rely on mere allegations or denials, instead he must set forth specific, disputed facts that create a genuine issue for trial. A failure to show such facts renders summary judgment appropriate. Wingate v. Gage Cnty. Sch. Dist., 528 F.3d 1074, 1078 (8th Cir. 2008).

### I. SUCCESSOR LIABILITY

Under North Dakota and Pennsylvania law, the general rule is that a buyer of assets does not assume the seller's liabilities. Benson v. SRT Commc'ns Inc., 813 N.W.2d 552, 559 (N.D. 2012); Johnson v. American Standard, 8 A.3d 318, 499 n.1 (Pa. 2010). The two states recognize four identical exceptions to this rule – a buyer may be responsible for the seller's liabilities when: (1) the buyer expressly or impliedly assumes liabilities; (2) the transaction amounts to a consolidation or merger of the two companies; (3) the buyer is "merely a continuation" of the seller; or (4) the seller used the sale to defraud its creditors. Downtowner, Inc. v. Acromental, Inc., 347 N.W.2d 118, 121 (N.D. 1984); Dawejko v. Jorgensen Steel Co., 434 A.2d 106, 107 (Pa. Super. Ct. 1981).

Three of the liability theories can be rejected out of hand: (1) The express assumption exception does not apply because Zena did not agree to assume Smart Hose's liabilities. (See Doc. # 43-1); (2) the sale does not "amount to a consolidation or merger" because Zena did not pay for the sale in its own stock, which is the "traditional requirement for a de facto merger." Downtowner, 347 N.W.2d at 121 (See Doc. # 43-1, ¶¶ 4, 8); and (3) There is no hint that Smart Hose used the sale to defraud its creditors.

This leaves two potential theories of liability, the "mere continuation" theory recognized by both states and the "product line" theory recognized under Pennsylvania law. Based on the record before the Court it is unclear whether Zena is liable for Smart Hose's liabilities under the "mere continuation" doctrine. In Leannais v. Cincinnati, Inc., the case the North Dakota Supreme Court cited in Downtowner as representative of its approach, the Seventh Circuit explained, "The key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations." Leannais v. Cincinnati, Inc., 565 F.2d 437, 439–40 (7th Cir. 1977). While argument disclosed some information about Zena, the record is bereft of facts that show that it did not maintain a common identity of Smart Hose's officers, directors, and stockholders when it purchased Smart Hose's assets and began doing business as Smart Hose Technologies. It is possible to infer from the terms of the preliminary agreement, which contemplated a possible sale to someone other than Zena, that mere continuation is unlikely. Even so, the evidence in the record before the Court does not

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 244 of 370
PageID: 10274
Rostvet v. Lock City Transportation Co., Inc., Not Reported in F.Supp.2d (2013)
2013 WL 11941563

foreclose that possibility. A genuine issue, therefore, exists as to whether Zena was a mere continuation of Smart Hose.

**\*3** For these reasons, Zena's Motion for Summary Judgment is **DENIED**. Zena may renew its motion for summary judgment if it presents facts to show that the mere continuation theory is factually unsustainable.

While the ruling on mere continuation resolves the issue before the Court, the Court will address the product line theory, as the issue is one that needs to be resolved prior to trial.

## II. CHOICE OF LAW

A conflict exists between North Dakota's and Pennsylvania's law on the product line theory of liability. Under Pennsylvania law, a court may hold a buyer liable for a seller's tort liabilities when the buyer purchases substantially all of a manufacturer's assets and continues "essentially the same" manufacturing line. Schmidt v. Boardman Co., 11 A.3d 924, 930–31 (Pa. 2011). North Dakota has explicitly rejected this doctrine. Downtowner, 347 N.W.2d at 124–25.

In a diversity case, a federal court applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). North Dakota takes a two-step approach to determine which state's law to apply. Daley v. American States Preferred Ins. Co., 587 N.W.2d 159, 162 (N.D. 1998). First, the court examines the relevant contacts between the litigation and the states to determine which state has more "significant contacts." Id. Next, the court applies these significant contacts to the five "Leflar factors" to decide which state has a more significant interest in applying its law to the case. Id. The laws of the state with the more significant interest apply. Id.

### A. Significant Contacts

Both North Dakota and Pennsylvania recognize the product line exception is a tort doctrine. See Downtowner, 347 N.W.2d at 121; Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 465 (3d Cir. 2006) (applying Pennsylvania law). Because the product line doctrine arises in tort, the Restatement's tort contacts analysis provisions apply. Nodak Mut. Ins. Co., 687 N.W.2d at 230–31. Under the Restatement's tort contacts, a court considers (1) where the injury occurred; (2) where the conduct that caused the injury occurred; (3) the residence or place of business of the parties; and (4) the place where

the relationship, if any, between the parties is centered. Restatement (Second) of Conflicts § 145(2).

Applying these factors, the first factor favors application of North Dakota law because Rostvet was injured while working in a North Dakota plant. The second factor favors application of Pennsylvania law as the hose that caused Rostvet's loss was manufactured there. The third factor slightly favors North Dakota as Rostvet lives in North Dakota and North Dakota's Workforce Safety & Insurance has paid Rostvet benefits for his injury. Against this fact one would balance Zena's Pennsylvania place of business. Because the parties have no relationship outside this litigation, the "center of relationship" factor is irrelevant. On the whole, the North Dakota contacts are slightly more significant than Pennsylvania's.

### B. Leflar Factors

Under North Dakota law, the contacts are then considered in connection with the Leflar factors, which seek to determine which state has the more significant interest in the application of its law. There are five Leflar balancing factors: (1) predictability of results, (2) maintenance of interstate order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law. Daley, 587 N.W.2d at 162.

#### A. Predictability of Results

**\*4** Under Leflar's first factor, a court should give some deference to the law that the parties expected to apply to a dispute. Where the parties considered the governing law ahead of time, the court will promote predictable results by applying the law that fulfills their "justified expectations." Daley, 587 N.W.2d at 164; Apollo Sprinkler Co., 382 N.W.2d at 390.

But this concern is not central for all disputes – it matters more for contractual agreements (such as wills, trusts, and conveyances) than for transactions the parties cannot foresee. Robert A. Leflar et al., American Conflicts Law § 103 (4th ed. 1986). A tort is not an event that parties can typically predict in advance. Therefore, in tort cases the interest in predictability is not a major consideration when "pitted against interests of some other character." Leflar, supra, § 104; see Apollo Sprinkler Co., 382 N.W.2d at 390. While Zena and Smart Hose agreed in the Bill of Sale that Pennsylvania law would govern the asset sale, this choice has no bearing on the present tort action, as Rostvet was not a party to it and its terms

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 245 of 370
PageID: 10275
Rostvet v. Lock City Transportation Co., Inc., Not Reported in F.Supp.2d (2013)

2013 WL 11941563

only apply to the agreement itself. This factor is insignificant
in the Court's decision.

B. Maintaining Interstate Order

In order to maintain interstate order, courts should apply the
laws of the state with the greater interest in the case. Daley,
587 N.W.2d at 164–65. In any dispute, both states will have
some interest. But as a general rule, the state with more
contacts with the dispute has the stronger interest. Leflar,
supra, § 104. North Dakota has greater contacts with the tort.
Therefore, North Dakota has the stronger interest in the case
and applying North Dakota law will maintain interstate order.

C. Simplifying the Judicial Task

To simplify its task, a court should favor the law that is easier
to apply. Where a court faces a choice between the law of
its jurisdiction and a complex foreign law – particularly a
complex procedural law – this factor encourages the court to
apply the law of its jurisdiction. Leflar, supra, § 105. Applying
North Dakota law will simplify the judicial task in the sense
that North Dakota law would wholly defeat the product line
doctrine and end the discussion. Even so, the application or
non-application of the doctrine is a decidedly simple task,
one certainly not beyond the ken of the Court. This factor is
insignificant in the Court's determination.

D. Advancement of the Forum's Government Interests

This factor requires the court to examine the rationale for
the state's law and decide whether the forum has a more
significant interest in applying its laws. American Family
Mut. Ins. Co. v. Farmers Ins. Exch., 504 N.W.2d 307, 310–11
(N.D. 1993). At times, the search for the government interests
in a case may turn into an exercise in lawyering, with the
parties pitting "disputed" policies against each other. Leflar,
supra, § 106 ("[I]t is nearly always possible for a good lawyer
to conjure up governmental interest in just about any state
that has any connection with a set of facts."). To avoid this
artificial dispute, the first issue is whether the states' interests
truly conflict, considering whether the case's contacts with the
forum give the court "real reasons" for applying the forum's
law. Daley, 587 N.W.2d at 165.

In this case, a true conflict exists: Pennsylvania believes
the product line rule will better compensate plaintiffs for
injuries from defective products, a desirable result because
manufacturers are in a better position to spread the risk of
loss than any individual plaintiff. See Dawjenko, 434 A.2d

at 109. North Dakota believes that application of the product
line doctrine is a matter best left to the legislature, as it is a
pure social and economic policy doctrine. Downtowner, 347
N.W.2d at 124–25. ("We nevertheless agree with the courts...
[that hold] that the legislature and not the courts should
be responsible for the adoption of such a rule"). Since this
position was first taken in 1984, the legislature has chosen not
to codify the product line exception.

*5 Because a true conflict exists, the next step is for the court
to decide which forum has a greater interest in applying its law
to this case, considering all "concerns of a justice-dispensing
court," socioeconomic as well as political. Leflar, supra, §
106. Pennsylvania believes that the product line doctrine (1)
keeps a manufacturer's liability from being utterly destroyed
by a sale of assets, (2) spreads the risk among a larger pool that
are in a generally better position to bear the risk of loss, and
(3) keeps the buyer from receiving all the benefits of acquiring
the good will of the manufacturer without assuming any of
the liability attached to it.

North Dakota's interest in non-adoption is more difficult
to discern. The North Dakota Supreme Court's reason for
not adopting the doctrine judicially is a powerful one:
significant policy issues should be left to the policy making
branches of government: the legislature and to a lesser extent
the executive. The legislature has elected not to enact the
doctrine, so the Court is left to divine the policy behind
non-adoption which is by definition a somewhat speculative
venture. The majority of courts that have rejected application
of the doctrine cluster around a number of arguments: (1) the
exception is inconsistent with both product liability principles
and strict liability principles. Niccum v. Hydra Tool Corp., 438
N.W.2d 96, 100 (Minn. 1989); (2) the exception threatens
small successors with economic annihilation because of
the difficult and expensive cost of obtaining insurance for
defects in the predecessor's products. Fish v. Amstad Indus.
Inc., 376 N.W.2d 820, 827 (Wis. 1985); Bernard v. Kee
Mfg. Co., 409 So.2d 1047, 1049 (Fla. 1992); and (3) the
application of the doctrine is such a radical departure from the
ordinary manufacturer liability law that it should be left to the
legislature. Downtowner, 347 N.W.2d at 124-25.

The third consideration may be compelling if the Court
is called upon to create the doctrine—but its relevance is
greatly diminished, where, as here, the Court is simply
performing a choice of law analysis. Thus, the question
is whether the Pennsylvania position that injured parties
should be made whole by successor businesses because the

successor can better bear the loss and because it is unfair to allow them to obtain the good will of a predecessor without also accepting the risk is a more compelling governmental interest when compared to the North Dakota position that the doctrine is inconsistent with traditional tort and product liability principles and creates a risk of annihilation for small successor businesses. Both positions have a solid basis in sound public policy, and neither seems more compelling than the other.

One additional factor slightly favors the application of North Dakota law. North Dakota has an inherent governmental interest in actions arising within its borders and to North Dakota plaintiffs. Polensky v. Continental Cas. Co., 397 F. Supp. 2d 1164, 1171 (D.N.D. 2005). Upon consideration of all of the interests, the Court finds this factor is evenly balanced.

E. Better Rule of Law

The "better rule of law" analysis is always one that is highly debatable. The factor is analyzed by looking at the impact of the rule of law at the time the court analyzes the issue. Daley, 587 N.W.2d at 165–66. The social policies underlying the law are exceptionally close. It is difficult to say that either policy is preferable to the other. Both application of the doctrine and non-application of the doctrine would advance an important societal interest.

While the arguments are close, it is important to note that the product line doctrine is the rule of law in only six states. In the thirty-five years since the California Supreme Court created the product line exception, only five other states have adopted this rule. See John H. Matheson, Successor Liability, 96 Minn. L. Rev. 371, 399 n.115 (2011) (noting that only California, Connecticut, New Jersey, New Mexico, Pennsylvania, and Washington have adopted the product line exception). The failure of the doctrine to advance in applicability across the United States is strong evidence that it is not the better rule of law. This factor favors the application of North Dakota law.

**C. Choice of Law Decision**

*6  Considering the tort contacts and the Leflar factors, the Court finds that North Dakota law governs this dispute, and the product line rule does not apply.

**III. NONMANUFACTURING SELLER LIABILITY**

Under North Dakota law, a plaintiff may bring a product liability claim against a nonmanufacturing seller. N.D.C.C. § 28-01.3-04 (2013). However, a court must dismiss the complaint against the nonmanufacturing seller if the plaintiff has also filed a complaint against the manufacturer and the manufacturer is required to have answered, unless the nonmanufacturing seller either (1) controlled the design of the defective product, (2) had actual knowledge of the defect, or (3) created the defect. N.D.C.C. § 28-01.3-04(2) (2013).

In this case, Rostvet has sued the manufacturer, Smart Hose, and the time for the manufacturer to answer (21 days) has passed. See N.D.C.C. § 28-01.3-04(2); Fed. R. Civ. P. 12(a) (1)(A). In addition, Rostvet has failed to present any genuine issue of material fact that shows that Zena either (1) controlled the design of the allegedly defective hose; (2) had actual knowledge of the alleged defect; or (3) created the alleged defect. N.D.C.C. § 28-01.3-04(2). Rostvet has no claim against Zena as a nonmanufacturing seller. Id.

**CONCLUSION**

North Dakota law applies in this action. A genuine issue still exists as to whether Zena is a mere continuation of Smart Hose. Therefore, Zena's Motion for Summary Judgment is **DENIED**. Zena may renew its motion for summary judgment if it presents uncontested facts to show that the mere continuation doctrine is inapplicable.

**IT IS SO ORDERED.**

Dated this 7th day of November, 2013

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 11941563

Footnotes

1    To avoid confusion, all references in this Order to "Smart-Hose" refer only to Smart-Hose, Inc., not Zena.

**Rostvet v. Lock City Transportation Co., Inc., Not Reported in F.Supp.2d (2013)**
2013 WL 11941563

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 35

2006 WL 2349976
Only the Westlaw citation is currently available.
United States District Court, D. North
Dakota, Southwestern Division.

DAKOTA, MISSOURI VALLEY AND
WESTERN RAILROAD INC., Plaintiff,
v.

JMA RAIL PRODUCTS CO., JMA Railroad
Supply Co., and Miba Bearings U.S., LLC, a
foreign limited liability company, Defendants.

No. 1:06–CV–02.
|
Aug. 9, 2006.

**Attorneys and Law Firms**

Jerry W. Evenson, Zuger Kirmis & Smith, Bismarck, ND, for
Plaintiff.

David S. Maring, Maring Williams Law Office, PC, Larry
L. Boschee, Tiffany L. Johnson, Pearce & Durick, Bismarck,
ND, Alexander Andrews, Ulmer and Berne LLP Columbus
Office, Columbus, OH, for Defendants.


ORDER GRANTING JMA RAIL PRODUCTS CO. AND
JMA RAILROAD SUPPLY CO.'S MOTION TO DISMISS

DANIEL L. HOVLAND, Chief District Judge.

*1 Before the Court is Defendants' JMA Rail Products Co.,
and JMA Railroad Supply Co.'s, (collectively referred to as
JMA) Motion to Dismiss filed on January 27, 2006. The
motion is opposed by the plaintiff, Dakota, Missouri Valley
and Western Railroad Inc. For the following reasons, the
Defendants' motion is granted.


I. BACKGROUND
The plaintiff originally commenced this action in state court
in the District Court of Burleigh County. On January 19,
2006, Defendant Miba Bearings U.S., LLC (Miba) removed
the action to the United States District Court for the District
of North Dakota. See Docket No. 1. The pleadings establish
that the plaintiff purchased upper rod bearings from JMA
to be installed in locomotive engines and that the upper rod
bearings were manufactured by Miba.

In the complaint, the plaintiff alleged that JMA breached
implied warranties of merchantability and fitness for a
particular purpose. See Docket No. 1–3. The alleged breach
of warranty claims stemmed from the failure of the upper rod
bearings after installation in and operation of two locomotive
engines. See Docket No. 1–3. The plaintiff further alleged that
the failure of the rod bearings resulted in damages including
loss of revenue from the use of the locomotives as well as the
cost of parts and labor to rebuild the locomotive engines. See
Docket No. 1–3.

On January 27, 2006, JMA filed an Affidavit of Seller
Pursuant to Section 28–01.3–04 of the North Dakota Century
Code, which the Court treated as a motion to dismiss pursuant
to the Order Re Caption Correction and Additional Briefing
Schedule dated April 14, 2006. See Docket Nos. 15, 20.


II. STANDARD OF REVIEW
The standard for a district court to employ in ruling on a
motion to dismiss is well-established. Crumpley–Patterson
v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir.2004).
"A district court must accept the allegations contained in
the complaint as true, and all reasonable inferences from
the complaint must be drawn in favor of the nonmoving
party." Id. (citing Hishon v. King & Spalding, 467 U.S. 69, 73
(1984); Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir.1996)).
"[D]ismissal is inappropriate 'unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief.' " McCormack v.
Citibank, N.A., 979 F.2d 643, 646 (8th Cir.1992) (quoting
Conley v. Gibson, 355 U.S. 41, 45–46 (1957)). "A motion
to dismiss should be granted 'as a practical matter ... only in the
unusual case in which there is some insuperable bar to relief.'
" Strand v. Diversified Collection Service, Inc., 380 F.3d
316, 317 (8th Cir.2004) (citing Frey v. Herculaneum, 44 F.3d
667, 671 (8th Cir.1995) (quoting Bramlet v. Wilson, 495 F.2d
714, 716 (8th Cir.1974))). It is clear under the Federal Rules
that it is not necessary to plead every fact with formalistic
particularity. BJC Health System v. Columbia Gas. Co., 348
F.3d 685, 688 (8th Cir.2003). "A pleading which sets forth
a claim for relief ... shall contain a short and plain statement
of the claim showing that the pleader is entitled to relief...."
Fed.R.Civ.P. 8(a).


III. LEGAL DISCUSSION
*2 The motion to dismiss is made pursuant to specific
statutory authorization under Section 28–01.3–04 of the

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 250 of 370
PageID: 10280
Dakota, Missouri Valley and Western R.R. Inc. v. JMA..., Not Reported in...
2006 WL 2349976

North Dakota Century Code. Section 28–01.3–04 provides as follows:

> 1. In any products liability action maintained against a seller of a product who did not manufacture the product, the seller shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing the personal injury, death, or damage to property.

> 2. After the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order the dismissal of the claim against the certifying seller, unless the plaintiff can show any of the following:

>> a. That the certifying seller exercised some significant control over the design or manufacture of the product, or provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the personal injury, death, or damage to property.

>> b. That the certifying seller had actual knowledge of the defect in the product which caused the personal injury, death, or damage to property.

>> c. That the certifying seller created the defect in the product which caused the personal injury, death, or damage to property.

> 3. The plaintiff may at any time prior to the beginning of the trial move to vacate the order of dismissal and reinstate the certifying seller if the plaintiff can show any of the following:

>> a. That the applicable statute of limitation bars a product liability action against the manufacturer of the product allegedly causing the injury, death, or damage.

>> b. That the identity of the manufacturer given to the plaintiff by the certifying defendant was incorrect.

N.D.C.C. § 28–01.3–04 (2005).

Section 28–01.3–04(2) of the North Dakota Century Code provides that the court "shall order the dismissal of the claim against the certifying seller" when the plaintiff has filed a complaint against the manufacturer and the manufacturer has or is required to have answered, unless the plaintiff can show that the seller fits into one of the exceptions set forth in Section 28–01.3–04(2)(a–c). It is undisputed that

JMA is a "seller"[1] and that Miba is a "manufacturer"[2] as defined by Section 28–01.3–01. Further, Miba has answered the complaint, and, as required under Section 28–01.3–04(1), JMA has filed an affidavit certifying the correct identity of the manufacturer. See Docket No. 20. Thus, the requirements of Section 28–01.3–04(2) have been satisfied. As a result, it is clear that the Court shall dismiss the claims against the certifying seller (JMA) unless the plaintiff can show that an exception applies under Section 28–01.3–04(2)(a–c). The burden is on the plaintiff to show that JMA fits into one of the exceptions and is not merely a passive seller.

The subcategories of Section 28.1.3–04(2) would prevent dismissal of the claim against the non-manufacturing seller if the plaintiff can show that the seller exercised significant control over the design or manufacture of the product, provided instructions or warnings to the manufacturer concerning the alleged defect, had actual knowledge of the defect, or created the defect. N.D.C.C. Section 28–01.3–04(2)(a–c). The plaintiff has neither alleged, shown, nor attempted to show that JMA satisfied any of these elements. Instead, the plaintiff has based its claims against JMA on breach of warranty grounds and merely alleged that JMA knew of the particular purpose for which the rod bearings were purchased. To support a finding that JMA does not fit within a subcategory of section (2), JMA has filed an affidavit stating that it ordered the upper rod bearings from Miba and that the bearings were shipped from Miba to the plaintiff without coming into the possession or control of JMA. See Docket No. 18, ¶ 2. This is further supported by Miba's admission that JMA ordered bearings from Miba which were shipped directly from Miba to the plaintiff without coming into possession or control of JMA. See Docket No. 3, ¶ 23, and Docket No. 11, ¶ 2.

**\*3** Based on the complaint and the answers submitted by the parties, and after a careful review of the entire record, the Court finds that JMA was a passive, non-manufacturing seller and that the requirements of Section 28–01.3–04(2) have been satisfied. The Court further finds that JMA is entitled to dismissal with regard to the product liability claims.

. A. BREACH OF WARRANTY CLAIMS

The question that remains is whether the dismissal language of Section 28–01.3–04(2) encompasses the breach of warranty claims asserted against JMA as a "seller." By its terms, Section 28–01.3–04(2) applies only to a product liability action which is defined as follows:

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 251 of 370
PageID: 10281
Dakota, Missouri Valley and Western R.R. Inc. v. JMA..., Not Reported in...
2006 WL 2349976

"Product liability action" means any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

N.D.C.C. § 28–01.3–01(2) (emphasis added).

The North Dakota Products Liability Act does not distinguish between the type of claim that is being brought, but rather is focused on relieving the passive, non-manufacturing seller from liability, "regardless of the substantive legal theory or theories upon which the action is brought." N.D.C.C. § 28–01.3–01(2). Under the plain meaning of the statute, a " 'product liability action' means any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought." N.D.C.C. § 28–01.3–01(2). The purpose of

Section 28–01.3–04 is to allow for the dismissal of non-manufacturing sellers in cases where they did nothing more than resell a product claimed to be defective, and had no involvement in the design manufacturing, or labeling of the product. To that end, Section 28–01.3–04(2) operates to dismiss the breach of warranty claims asserted by the plaintiff against JMA in this product liability action.

Having carefully reviewed the relevant statutory and case law, the Court finds that a product liability action under Section 28–01.3–01(2) of the North Dakota Century Code includes claims based on breach of warranty. The dismissal language of Section 28–01.3–04(2) includes the dismissal of breach of warranty claims against a non-manufacturing seller who has certified that it meets the requirements of that statutory provision.

IV. CONCLUSION

The Court expressly finds that the claims or legal theories asserted against JMA in the complaint are entitled to dismissal under Section 28–01.3–04 North Dakota Century Code. Accordingly, the Motion to Dismiss filed by defendants JMA Rail Products Co. and JMA Railroad Supply Co. (Docket No. 20) is GRANTED. The only remaining claims are those asserted by the plaintiff against Miba Bearings U.S ., LLC and the cross-claim of the JMA defendants against Miba. The Clerk of Court is directed to enter judgment accordingly.

**\*4** IT IS SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2006 WL 2349976

Footnotes

1    The term "seller" is defined as follows:
     "Seller" means any individual or entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling or leasing any product for resale, use, or consumption. ...
     N.D.C.C. § 28–01.3–01(3).
2    The term "manufacturer" is defined as follows:
     "Manufacturer" means a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer.
     N.D.C.C. § 28–01.3–01(1).

End of Document                                           © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 36

2001 WL 627428
United States District Court, D.
North Dakota, Southeastern Division.

PARACELSUS HEALTHCARE
CORPORATION, Plaintiff,
v.
PHILIPS ELECTRONICS NORTH AMERICA and
Diagnostic Medical Systems, Inc., Defendants.

No. A3–00–171.
|
May 7, 2001.

MEMORANDUM AND ORDER

WEBB.

I. Introduction

 *1  Before the Court is a motion to dismiss by defendant
Diagnostic Medical Systems, Inc. (DMS) (doc. # 6). Plaintiff
resists the motion (doc. # 15). [1] For the reasons set forth
below, the motion is GRANTED IN PART and DENIED IN
PART.

II. Background

The following facts appear to be essentially uncontested.
Paracelsus purchased a cardiac imaging device known as
the Integris H5000 C system. The device was designed,
manufactured, and marketed by Philips. Paracelsus had
purchased the device not from Philips but from DMS, which
also installed and provided training on it. On August 2,
1999, the device overheated and shut down while physicians
used it to locate a stint in a patient's heart, forcing them to
perform surgery. Paracelsus sued Philips and DMS in state
court, alleging breach of various warranties against both and
negligence against DMS. Philips then removed the case to this
Court—to which DMS consented—and answered.

DMS then filed the instant motion, arguing dismissal is
required by N.D. Cent.Code § 28–01.3–04, which generally
calls for dismissal of any "product liability action"—a defined
term discussed later—against a nonmanufacturing seller if
certain conditions are met. Initially, the seller must file an
affidavit indicating both that it did not manufacture the
product and who did manufacture it; then, the manufacturer

must either answer or the time for doing so must elapse. Both
of these requirements have happened here. Under the statute,
the burden is thus on the plaintiff to show that one of several
exceptions preventing dismissal apply. The Court will address
this at length below.

III. Analysis

In reviewing a motion to dismiss pursuant to Federal Rule
of Civil Procedure 12(b)(6), a court "is constrained by a
stringent standard." Parnes v. Gateway 2000, Inc., 122 F.3d
539, 545–46 (8th Cir.1997) (citations omitted). Generally, a
complaint should not be dismissed unless the plaintiff can
prove no set of facts which would entitle him or her to
relief, and a court considering such a motion must accept
the allegations in the complaint as true and construe them in
plaintiff's favor when making this determination. See Briehl
v. General Motors Corp., 172 F.3d 623, 627 (8th Cir.1999);
Midwestern Mach., Inc. v. Northwest Airlines, Inc., 167 F.3d
439, 441 (8th Cir.1999). However, the motion to dismiss here
is made pursuant to a specific statutory authorization, and not
Rule 12(b)(6). Therefore, the Court must employ the specific
framework set forth by that statute, rather than general Rule
12(b)(6) principles.

The Court begins by reviewing that part of the North Dakota
Products Liability Act, N.D. Cent.Code 28–01.3, on which
DMS depends for its motion. Enacted as part of a 1993
revision of the Products Liability Act, the statute provides, in
relevant part:

 1. In any products liability action maintained against a
 seller of a product who did not manufacture the product, the
 seller shall upon answering or otherwise pleading file an
 affidavit certifying the correct identity of the manufacturer
 of the product allegedly causing the [damages] ...

 *2  2. After the plaintiff has filed a complaint against
 the manufacturer and the manufacturer has or is required
 to have answered or otherwise pleaded, the court shall
 order the dismissal of the claim against the certifying seller,
 unless the plaintiff can show any of the following:

 a. That the certifying seller exercised some significant
 control over the design or manufacture of the product ...

 b. That the certifying seller had actual knowledge of the
 defect in the product ... [or]

 c. That the certifying seller created the defect in the
 product ...

2001 WL 627428, 45 UCC Rep.Serv.2d 51

N.D. Cent.Code. § 28–01.3–04.

As mentioned above, there seems to be no question that the prerequisites of section (1) are met here: Philips has both answered and admitted it manufactured the device, and DMS has filed an affidavit certifying it did not manufacture the device. Thus, assuming that this case is subject to the requirements of the statute, the burden is on Paracelsus to show that DMS fits into one of the subcategories of section (2).

Before addressing Paracelsus' arguments on this matter, however, the Court is concerned that this statute may not, in fact, apply to all the claims at issue. By its very terms, it applies only to a "products liability action." This is a defined term under the definitions section of the Act:

"Product liability action" means any action brought against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product, or the failure to provide proper instructions for the use of any product.

N.D. Cent.Code § 28–01.3–01(2). This definition is, concededly, quite broad on its face. However, because four of plaintiff's five counts against DMS are predicated not on tort but rather on the U.C.C. or general contract law, theories not generally viewed as "products liability," the Court is leery to dismiss them on this basis.

This concern is supported by several decisions of the North Dakota Supreme Court. Though it has not been called upon to interpret the provisions of the existing Act, the court has interpreted identical provisions the previous version, and these interpretations suggest dismissal is inappropriate as to plaintiff's U.C.C. and contract theories.

First, in *Coop. Power Ass'n. v. Westinghouse Elec. Corp.*, 493 N.W.2d 661, 662 (N.D.1992), the court concluded a plaintiff may not sue in tort when the sole damage alleged is to the defective product itself, a rule known as the "economic loss doctrine." In so doing, the court rejected an argument that the definition of "products liability action" in the North Dakota

Products Liability Act—a definition identical to that in the 1993 Act—indicated an intent to undermine the economic loss doctrine. *Id. at 666.* The court wrote:

> **\*3** [Such an] interpretation of that statute would undermine the comprehensive body of law for sales transactions in Article 2 of the Uniform Commercial Code. Tort law was not intended to undermine the Uniform Commercial Code. It is an elementary rule of statutory construction that we construe related statutes in harmony in order to give meaning and effect to all provisions. The general purpose of [the Products Liability Act] is to regulate and limit the scope of products liability actions. In the absence of any specific legislative intent to the contrary, we decline to interpret [the definition of "products liability action" in the Act] to broaden the scope of negligence and strict liability actions and effectively undermine the warranty provisions of the U.C.C.

*Id.* (internal citations omitted). This passage indicates a demarcation between tort and contract law and makes clear that the Products Liability Act does not apply to actions predicated on U.C.C. and contract law, at least to the extent they seek recovery for solely economic losses. *Id.*

More recently, in *Clarys v. Ford Motor Company,* 592 N.W.2d 573 (N.D.1999), the court reiterated this basic position while concluding that the economic loss doctrine applies to consumers. The court again focused on the difference between contract and tort law and the effects of the Products Liability Act, noting that had the legislature intended to make the Act apply to cases in which the only damage is to the product—generally U.C.C. and contract cases—it could have done so. *Id. at 578.* This further reinforces the conclusion that, as interpreted by the North Dakota Supreme Court, the Products Liability Act does not apply to U.C.C. and contract claims for solely economic damages.

Paracelsus Healthcare Corp. v. Philips Electronics North..., Not Reported in...
2001 WL 627428, 45 UCC Rep.Serv.2d 51

Based on these cases, the Court concludes that Counts 5, 6, and 7 of plaintiff's complaint, which allege U.C.C. and contract claims, are not subject to the strictures of the Act. They therefore fall outside the purview of the statute DMS cites for their dismissal. The motion to dismiss them is thus DENIED.

The conclusion is different as to Count 4, however. This count alleges that "DMS, by virtue of its relationship with Paracelsus, had a duty to identify and notify Paracelsus that the device could overheat and shut down without sufficient notice." Initially, the Court notes that, to the extent this relationship depends on contract, it is covered by Count 5, which alleges a breach of contract claim in almost the same language as Count 4 alleges negligence. To the extent that it depends on general tort duties, however, it falls within the Act, and the burden is therefore on Paracelsus to show that one of the requirements of section (2) is met; otherwise, based on the statute, the Court "shall order the dismissal" of this claim.

In its response, Paracelsus argues that DMS must have had actual knowledge that the device lacked an audible warning signal to alert users that the machine was overheating. To support this contention, it relies on an affidavit by the manager of the area where the device was used stating that DMS provided training on the use of the device. In short, plaintiff argues that since DMS provided training, it had to know the device lacked an audible warning signal, and since this is the defect for which it sues, DMS must fit within § 28–01.3–04(2)(b), which prevents dismissal if a plaintiff shows the seller had actual knowledge of a defect.

*4 In reply, DMS points to the statutory definition of a defective product, which requires that at the time of sale "there was a defect or defective condition in the product which made the product unreasonably dangerous to the user of consumer." N.D. Cent.Code § 28–01.3–06. Further, it points out that "unreasonably dangerous" is defined by the Act to mean that

> the product is dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses, together with any actual knowledge, training, or

experience possessed by that particular buyer, user, or consumer.

N.D. Cent.Code § 28–01.3–01(4). Therefore, DMS argues, it is not enough merely to show DMS knew the device had a characteristic Paracelsus now describes as a defect; rather, Paracelsus must show DMS knew the product was dangerous to an extent beyond that contemplated by the ordinary and prudent buyer.

The Court generally agrees with DMS' reasoning. The Products Liability Act, as the North Dakota Supreme Court has pointed out, puts legislative limitations on tort recovery. See Clarys, 592 N.W.2d at 577. It does so in part by providing definitions of terms such as "defective product" and "unreasonably dangerous," which a court applying the section is obliged to utilize when evaluating a plaintiff's claims.

Further, the Act limits recovery by providing broad protection to "nonmanufacturing sellers": Companies which, like DMS, sell but do not design or manufacture products. While it allows plaintiffs to hold such sellers liable in tort, they must show that the seller shares some degree of responsibility for the defect. N.D. Cent.Code § 28–01.3–04(2)(a)–(c). It would be out of touch with the purpose of the legislation to hold that a seller could be held liable under § 28–01.3–04(2) because it was aware that a condition, later discovered to be unreasonably dangerous, existed. Rather, the Act puts a burden on a plaintiff claiming a seller had actual knowledge of a defect, as Paracelsus does here, to come forward with at least some showing that the seller knew the product fit within the definition of "defective," which requires a showing that it was unreasonably dangerous.

This Paracelsus has not even tried to do. Its sole argument in reply to DMS's motion for dismissal under the Act is that DMS surely knew the device had no warning light. [2] Even assuming this is true, it does not mean DMS knew the product was unreasonably dangerous, as that term is defined by the Act. Therefore, in light of plaintiff's failure to rebut the statutory presumption for dismissal of its negligence claim, the motion to dismiss is GRANTED as to Count 4.

IV. Conclusion
For the reasons set forth above, defendant DMS' motion to dismiss is GRANTED as to Count 4 of plaintiff's complaint. However, it is DENIED as to all other counts.

**Paracelsus Healthcare Corp. v. Philips Electronics North.., Not Reported in...**
2001 WL 627428, 45 UCC Rep.Serv.2d 51

**\*5**  IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 627428, 45 UCC
Rep.Serv.2d 51

Footnotes

1    Defendant Philips Electronics North America (Philips) is not involved in the motion and so has filed no briefs on the subject.

2    The Court does not address Paracelsus' other arguments for liability on the part of DMS because they do not pertain to
     the statute at issue, which it must satisfy to keep DMS in the case on products liability theories.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 37

White v. Mylan, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 6726593, Prod.Liab.Rep. (CCH) P 18,987

2012 WL 6726593
United States District Court,
W.D. Oklahoma.

Kristin Dawn WHITE and Steven Kent Phelps, Jr.,
individually and as co-administrators of the Estate
of Steven Kent Phelps, the Deceased, Plaintiffs,
v.
MYLAN, INC.; Mylan Pharmaceuticals, Inc.;
Mylan Technologies, Inc.; Mylan Laboratories
Limited.; Milan Beret Pharmaceuticals, Inc.;
Val Laboratories; Dull Laboratories; Allcare
Pharmacy Flowers & Gifts, Inc.; Walgreens Co.;
and CVS Caremark Corporation, Defendants.

No. CIV–12–402–D.
|
Dec. 27, 2012.

**Attorneys and Law Firms**

Daniel M. Delluomo, Delluomo & Crow, Oklahoma City,
OK, for Plaintiffs.

Clem C. Trischler, Pietragallo Gordon Alfano Bosick &
Raspanti LLP, Pittsburgh, PA, Jon Epstein, Hall Estill,
Oklahoma City, OK, for Defendants.

*ORDER*

TIMOTHY D. DeGIUSTI, District Judge.

**\*1** Before the Court is Plaintiffs' Motion to Remand [Doc.
No. 13], which raises both procedural and jurisdictional
challenges to the removal of this action from state court.
Plaintiffs challenge whether the Notice of Removal was
timely filed and consented to by all defendants, and whether
the allegations of fraudulent joinder of a nondiverse defendant
are sufficient. The removing defendants have timely opposed
the Motion, which is at issue. The question of fraudulent
joinder is a jurisdictional issue, and will be addressed as
a preliminary matter. *See Albert v. Smith's Food & Drug
Centers, Inc.,* 356 F.3d 1242, 1247 (10th Cir.2004).

**Factual and Procedural Background**

This case concerns the death on December 6, 2009, of Steven
Kent Phelps, allegedly due to a defective pharmaceutical
product and drug toxicity resulting from a combination of
prescription medications. Like the decedent, Plaintiffs are
citizens of Oklahoma. The removing defendants are: Mylan,
Inc.; Mylan Pharmaceuticals, Inc.; Mylan Technologies, Inc.;
Mylan Laboratories Limited; Mylan Bertek Pharmaceuticals,
Inc.; and UDL Laboratories [1] (collectively, "Mylan"). These
defendants were involved in the manufacture and distribution
of the Mylan Fentanyl Transdermal System (a pain patch),
which allegedly caused the death; all are corporate citizens
of states other than Oklahoma. Plaintiffs' state court petition
also names as defendants three pharmacies that allegedly
provided prescription drugs to the decedent during 2009; one
of them, Allcare Pharmacy Flowers & Gifts, Inc. ("Allcare")
is a citizen of Oklahoma.

The case was filed in Pottawatomie County, Oklahoma,
but was removed to federal court based on an assertion
of diversity jurisdiction under 28 U.S.C. § 1332, despite
the presence of an Oklahoma defendant. *See also* 28
U.S.C. § 1441(b)(2). The removing defendants contend the
resident defendant, Allcare, should be disregarded because
it was fraudulently joined to defeat federal jurisdiction. This
contention is based on an allegation that Plaintiffs have no
valid claim against Allcare because a pharmacy has no duty
to warn consumers about prescription drugs and because
Plaintiffs fail to allege that Allcare supplied the decedent
with the product that allegedly caused his death. *See* Notice of
Removal [Doc. No. 1], ¶¶ 22, 31.

As stated above, Plaintiffs' Motion challenges Mylan's
allegations of fraudulent joinder, arguing that their claim
against Allcare is factually and legally sound. Plaintiffs also
contend that Mylan should have filed the Notice of Removal
within 30 days after receiving a copy of Plaintiffs' petition, as
required by 28 U.S.C. § 1446(b)(1), even though no service of
process had been made. In addition, Plaintiffs contend Mylan
was required to obtain the joinder or consent of all defendants
when filing the Notice of Removal.

**Standard of Decision**

As a general rule, joinder is fraudulent for jurisdictional
purposes if the plaintiff fails to state a claim against the
nondiverse defendant, and according to settled rules of the
state in which the action is brought, the failure is obvious.
*Town of Freedom v. Muskogee Bridge Co.,* 466 F.Supp. 75, 78

White v. Mylan, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 6726593, Prod.Liab.Rep. (CCH) P 18,987

(W.D.Okla.1978); *see* *Dodd v. Fawcett Publ'ns, Inc.,* 329 F.2d 82, 85 (10th Cir.1964). The court of appeals has explained the analysis as follows:

> **\*2**  In many cases, removability can be determined by the original pleadings and normally the statement of a cause of action against the resident defendant will suffice to prevent removal. But upon specific allegations of fraudulent joinder the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available. The joinder of a resident defendant against whom no cause of action is stated is patent sham, and though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists. This does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty.

*Dodd,* 329 F.2d at 84–85 (citations omitted); *Smoot v. Chicago, Rock Island & Pac. R.R. Co.,* 378 F.2d 879, 882 (10th Cir.1967).

In this case, Mylan disputes that Plaintiffs' pleading states a cognizable claim against Allcare. In the context in which the dispute arises, the question is not simply whether the petition states a claim. The standard to be applied "is more exacting than that for dismissing a claim under Fed.R.Civ.P. 12(b)(6); indeed, the latter entails the kind of merits determination that, absent fraudulent joinder, should be left to the state court where the action was commenced." *See* *Montano v. Allstate Indemnity,* No. 99–2225, 2000 WL 525592, *2 (10th Cir. April 14, 2000)* (unpublished opinion cited pursuant to Fed. R.App. P. 32.1(a) and 10th Cir. R. 32.1). Thus, the question presented by Plaintiff's Motion is whether the alleged defect in their pleading is so obvious as to render Plaintiffs' claims insubstantial and thus allow Allcare to be simply disregarded as a party.

### Discussion

Plaintiffs assert in their pleading a claim of negligence against three pharmacies, including Allcare, which provided prescription medications to the decedent prior to his death. Plaintiffs allege that the pharmacies "had a duty to provide reasonable and adequate warnings of the mixture of drugs and toxicity poisoning" and that they "breached their standard of care by combining the prescription drugs for the patient." *See* Petition [Doc. No. 13–1], ¶¶ 23–24. Similarly, Plaintiffs focus in their Motion to Remand on this negligence claim, arguing that a pharmacist's duty of care includes informing a patient of the danger posed by a *combination* of prescription drugs when taken together. Plaintiffs also assert that a pharmacy which distributes a defective drug may be held strictly liable under a theory of manufacturer's product liability. *See* Pls.' Motion [Doc. No. 13] at 7.

In the Notice of Removal, Mylan contends that Plaintiffs "have no possibility of recovery against Allcare" because their claims "have no legal basis." *See* Notice of Removal [Doc. No. 1] at 9–10, ¶ 21. Characterizing Plaintiffs' claim against Allcare as "sound[ing] in failure-to-warn," Mylan asserts that Oklahoma law imposes on pharmacists no duty to warn patients of a prescription drug's risks because Oklahoma has adopted the learned intermediary doctrine, under which the prescribing physician has the duty to act in the best interest of the patient and a manufacturer or seller of prescription drugs must only provide adequate labeling, instructions, and warnings to apprize the physician of the proper use and dangers of the drug. Focusing on the imputed "failure to warn" theory, Mylan argues at length in the Notice of Removal why this theory has no applicability to a pharmacy such as Allcare. *See id.,* ¶¶ 22–27. Mylan repeats these arguments, almost verbatim, in its brief in opposition to Plaintiffs' Motion. Mylan goes further in its brief, however, and addresses Plaintiffs' theory that a pharmacist has a duty to monitor a patient's combination of prescription drugs. As to this theory, Mylan contends that no such duty exists under Oklahoma law. *See* Mylan's Resp. Br. [Doc. No. 16] at 13–16. Plaintiffs have made no reply to this argument.

 **\*3**  Upon consideration, the Court finds Mylan's position is sound. Plaintiffs have presented no legal authority that would support a tort claim against Allcare under Oklahoma law. The only authority cited by Plaintiffs, *Edwards v. Basel Pharmaceuticals,* 933 P.2d 298, 300 (Okla.1997), does not support their position. The Oklahoma Supreme Court in

2012 WL 6726593, Prod.Liab.Rep. (CCH) P 18,987

*Edwards* reaffirmed the "learned intermediary doctrine" as a principle of state products liability law. The doctrine "shields manufacturers of prescription drugs from liability if the manufacturer adequately warns the prescribing physicians of the dangers of the drug." *Id.* (emphasis omitted). The underlying rationale for this rule is that "[w]here a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer *or seller* and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for ... his patients, and to exercise independent judgment." *Id.* (emphasis added, internal quotation omitted). As a seller of prescription drugs, a dispensing pharmacy or pharmacist is protected by the doctrine.

The Oklahoma Supreme court in *Edwards* also recognized an exception that may operate to remove the shield of the learned intermediary doctrine "[w]hen direct warnings to the user of a prescription drug have been mandated by a safety regulation promulgated for the protection of the user." *Id.* at 301. In this situation, a "failure on the part of the manufacturer to warn the consumer can render the drug unreasonably dangerous," and state tort law determines the adequacy of the manufacturer's warnings. *Id.* at 301, 303. Plaintiffs do not allege in their pleading, nor do any other filings in the case record reveal, that this situation is present here. In addition to the instant Motion, currently pending before the Court is Mylan's Motion to Dismiss Plaintiff's Complaint Under Fed.R.Civ.P. 12(b)(6) [Doc. No. 8], which asserts, in part, that federal statutes and regulations preempt Plaintiffs' state law claims. Upon examination of the parties' briefs regarding all pending motions, the Court finds no contention that the Federal Drug Administration, or any other regulatory body, has mandated a direct warning to the user of the prescription drug product at issue in this case. Accordingly, there is no basis in the record for Plaintiffs to rely on a limited exception to the learned intermediary doctrine.

Therefore, because the learned intermediary doctrine applies, there is no legal basis for Plaintiffs' tort claim against Allcare —under a theory of either strict liability or negligence— based on an alleged failure to warn Plaintiffs' decedent of the risks inherent in the prescription drug product at issue. Further, Plaintiffs' negligence theory based on a pharmacy's alleged duty to monitor the combination of prescription drugs dispensed to a single customer or patient is unsupported by any citation of authority, except *Edwards*. This authority is inapposite. The opinion is silent about any duty of a pharmacist to prevent a patient from, or warn a patient about, combining prescription drugs. Accordingly, the Court finds that Plaintiffs have failed to state any claim against Allcare and that the failure is obvious.

**\*4** For these reasons, the Court finds that the allegation of fraudulent joinder has merit and that the nondiverse defendant, Allcare, should be disregarded. Thus, the Court finds complete diversity of citizenship between the parties and the existence of subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

### Procedural Irregularities

Plaintiffs also seek remand based on an alleged failure of all named defendants to join in or consent to the removal and an alleged failure of Mylan to remove the action within 30 days of receiving a copy of the petition. Neither of these assertions has merit. Under current removal statutes, which were in effect at the time of Mylan's Notice of Removal, "all defendants who have been properly *joined and served* must join in or consent to the removal of the action." *See* 28 U.S.C. § 1446(a) (emphasis added). The consent of improperly joined or unserved defendants was not required. Further, although the statute requires removal "within 30 days after the receipt by the defendants, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief," *id.* § 1446(b), this requirement applies only when a defendant has been served with a summons. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 354 (1999). Plaintiffs acknowledge that Mylan was not served with process prior to removal "but obtained a copy of the petition on its own." *See* Pls.' Mot. Remand [Doc. No. 13], ¶ 3. Accordingly, the 30–day time limit for removal was not triggered.

### Conclusion

For these reasons, the Court concludes that the case was properly removed to federal court, and should not be remanded.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Remand [Doc. No. 13] is DENIED.

IT IS SO ORDERED.

2012 WL 6726593, Prod.Liab.Rep. (CCH) P 18,987

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6726593,
Prod.Liab.Rep. (CCH) P 18,987

Footnotes

1    The last two defendants state they were incorrectly identified in the caption of Plaintiffs' pleading as "Milan Beret
     Pharmaceuticals, Inc." and "Dull Laboratories" or "VAL Laboratories."

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 38

2020 WL 1652571

SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee,
AT KNOXVILLE.

Charles Huddleston HEATON, Jr., et al.

v.

Catherine L. MATHES et al.

No. E2019-00493-COA-R9-CV
|
January 23, 2020 Session
|
FILED 04/03/2020

**Appeal from the Circuit Court for Knox County, No. 3-526-16,** Deborah C. Stevens, **Judge**

**Attorneys and Law Firms**

John Knox Walkup and Andrew J. Pulliam, Nashville, Tennessee, for the appellants, Cigna Home Delivery Pharmacy; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender.

Leslie A. Muse and Grant E. Mitchell, Knoxville, Tennessee, for the appellees, Charles Huddleston Heaton, Jr., and Miki Heaton.

Thomas R. Frierson, II, J., delivered the opinion of the court, in which D. Michael Swiney, C.J., and Richard H. Dinkins, J., joined.

## OPINION

Thomas R. Frierson, II, J.

**\*1** The plaintiffs filed a health care liability action against a pharmacy and other medical defendants, claiming, *inter alia*, that the defendants failed to provide proper patient counseling and failed to warn of the risks associated with a prescription drug. The pharmacy defendants subsequently filed a motion to dismiss, asserting that the gravamen of the complaint against them was a products liability action rather than a health care liability action. The defendants further asserted that the "seller shield" defense found within the Tennessee Products Liability Act provided them with immunity from liability. The trial court denied the defendants'

motion to dismiss, ruling that the complaint stated a health care liability action rather than a products liability action. The trial court subsequently granted the defendants' motion for permission to seek interlocutory appeal regarding whether the seller shield defense contained within the Tennessee Products Liability Act could be asserted when the plaintiffs' claim is made pursuant to the Tennessee Health Care Liability Act. Following our thorough consideration of the issue, we affirm the trial court's judgment, determining that the seller shield defense found in the Tennessee Products Liability Act is inapplicable to claims made under the Tennessee Health Care Liability Act.

I. Factual and Procedural History

On November 28, 2016, the plaintiffs, Charles Huddleston Heaton, Jr., and Miki Heaton, filed a complaint in the Knox County Circuit Court ("trial court") against Dr. Catherine L. Mathes; Tennessee Center for Internal Medicine; Summit Medical Group, PLLC; Novo-Nordisk, Inc.; Cigna Home Delivery Pharmacy ("CHDP"); Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender. In this complaint, the Heatons alleged that they had been damaged as a result of Mr. Heaton's suffering acute pancreatitis and a subsequent traumatic brain injury caused by Mr. Heaton's use of the prescription medication Victoza and the medical providers' failure to appropriately "prescribe, counsel, provide, utilize, and/or discontinue this medication." More specifically, the Heatons alleged claims of strict liability and simple negligence against Victoza's manufacturer, Novo-Nordisk, Inc., and health care liability claims against the remaining defendants, including Mr. Heaton's physician who prescribed Victoza, Dr. Mathes, and the out-of-state, mail-order pharmacies where Mr. Heaton's prescriptions for Victoza were filled as well as the pharmacist who filled them: CHDP; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and pharmacist Dessender (collectively, "the CHDP Defendants").

According to the Heatons, on July 30, 2014, Dr. Mathes prescribed Victoza for Mr. Heaton to treat his diabetes. Subsequently, in the summer of 2015, the Food and Drug Administration issued a Risk Evaluation and Mitigation Strategy ("REMS") for Victoza to warn of the risk of acute pancreatitis with the medication's use. Mr. Heaton asserted that he was not warned of this risk by any of the named defendants.

On September 27, 2015, Mr. Heaton was transported by ambulance to the University of Tennessee Medical Center with a complaint of severe abdominal pain. In November 2015, while traveling for the Thanksgiving holiday, Mr. Heaton was taken to Northridge Medical Center in Commerce, Georgia, where he was diagnosed with and treated for acute pancreatitis, sepsis, and acute respiratory failure. During this hospitalization, Mr. Heaton was allegedly informed that his pancreatitis was likely a result of his use of Victoza.

The Heatons stated in their complaint that on December 30, 2015, Mr. Heaton was taken to the emergency room of Tennova North in Knox County, Tennessee, with complaints of abdominal pain, nausea, and vomiting. Mr. Heaton reportedly had lost approximately thirty pounds, and a gastrostomy tube was inserted during this visit. He remained in the hospital until January 11, 2016, but was later readmitted from January 15 through January 29, 2016, for ongoing treatment of "necrotizing pancreatitis and severe malnutrition." Mr. Heaton was sent to inpatient rehabilitation for approximately four weeks following his discharge from the hospital. Mr. Heaton asserted that after his discharge from inpatient rehabilitation, he remained in a weakened physical state, which resulted in a fall that caused him to suffer a severe traumatic brain injury on April 22, 2016. Mr. Heaton also asserted that he remained disabled as a result of numerous medical complications, all of which were allegedly caused by his use of Victoza.

 **\*2** The Heatons averred in their complaint, *inter alia*, that the CHDP Defendants failed to provide any patient counseling to Mr. Heaton related to risks associated with his continued use of Victoza. They further alleged that the CHDP Defendants failed to notify Mr. Heaton of the 2015 REMS warning, which noted the risk of developing acute pancreatitis with Victoza's use and instructed observation of symptoms and discontinuance of Victoza if pancreatitis was suspected. The Heatons asserted that the CHDP Defendants should be held liable under the Tennessee Health Care Liability Act ("THCLA") and that proper pre-suit notice had been sent to all defendants. *See* Tenn. Code Ann. § 29-26-121(a) (Supp. 2019) (requiring written pre-suit notice to each defendant within a one-year statute of limitations and at least sixty days prior to filing the complaint).

On January 13, 2017, the CHDP Defendants filed a motion to dismiss the complaint based on, *inter alia*, the seller shield statute, which is codified at Tennessee Code Annotated §

29-28-106 (2012) of the Tennessee Products Liability Act ("TPLA"). This statutory subsection provides that a products liability action cannot be maintained against a product's seller, other than the manufacturer, except in certain enumerated circumstances. *See* Tenn. Code Ann. § 29-28-106. The CHDP Defendants asserted that this statute shielded pharmacists from liability in the situation alleged in the complaint. The CHDP Defendants argued that the Heatons' complaint mislabeled the alleged claims against the CHDP Defendants as health care liability claims when the gravamen of the complaint against the CHDP Defendants was a products liability claim. The CHDP Defendants further claimed that the TPLA, codified at Tennessee Code Annotated §§ 29-28-101, *et seq.* (2012), applies to failure-to-warn claims against pharmacists as sellers of drugs and, therefore, the claim should be dismissed based upon Tennessee Code Annotated § 29-28-106 because the CHDP Defendants were merely sellers and not the product's manufacturer. Finally, the CHDP Defendants argued that they had no duty to provide warnings to Mr. Heaton other than those provided by the manufacturer and that the complaint therefore did not state a health care liability action against the CHDP Defendants.

On August 27, 2018, the trial court entered an order denying the CHDP Defendants' motion to dismiss. Addressing the interplay between the TPLA and the THCLA, the court determined that the seller shield statute contained within the TPLA would not shield the CHDP Defendants from a THCLA claim. Concerning that issue, the court relied upon the reasoning of a multi-district federal court decision involving a similar question: *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-02419-RWZ, 2014 WL 4322409 (D. Mass. Aug. 29, 2014) ("*New England*").[1] The trial court explained:

> There are certainly times where it would be more beneficial for one side or the other to proceed under a cause of action as a product liability claim versus a health care liability claim and vice versa. Because of the procedural differences as previously described, there may be situations where one or the other apply but to proceed under both would be unworkable. Absent any particular guidance from the legislation as to the applicability of the product liability defenses that may have been available prior to the passage of the expanded Tennessee Health Care Liability Act, the courts have to examine the gravamen of the complaint.

> In the case at hand, the Plaintiffs allege that the CHDP Defendants are liable for failing to follow the Tennessee Board of Pharmacy Rules; failing to provide patient

counseling; failure to warn and failing to act with due and reasonable care. Complaint at ¶45 and also ¶47-48. Based upon the reasoning set forth in the *New England Compounding Pharmacy* case and the Tennessee precedent regarding pharmacists' duty to warn ... this Court finds that this case should proceed as a health care liability action and the defenses available under the Tennessee Product Liability Act at Tenn. Code Ann. § 29-28-106 are not applicable and therefore the Motion to Dismiss should be DENIED.

**\*3** On September 26, 2018, the CHDP Defendants filed a motion seeking permission for an interlocutory appeal pursuant to Tennessee Rule of Appellate Procedure 9. Following consideration of the Rule 9 factors, the trial court granted the Motion concerning the issue of the interplay between the TPLA and the THCLA and the applicability of a TPLA defense to the Heatons' claims against the CHDP Defendants. The trial court concluded that interlocutory appeal should be granted to enable this Court to address the issue of whether the seller shield defense, codified at Tennessee Code Annotated § 29-28-106, should be applied to bar a claim under the THCLA. This Court likewise granted permission for interlocutory review.

## II. Issue Presented

Pursuant to Tennessee Rule of Appellate Procedure 9, "we are limited on appeal to the question certified by the trial court in its order granting permission to seek an interlocutory appeal and in this Court's order granting the appeal." *In re Bridgestone/Firestone & Ford Motor Co. Litig.*, 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008) (citing Tenn. R. App. P. 9). The trial court's order and this Court's order granting interlocutory appeal present the following issue for our review:

> If the complaint asserts a claim under the Tennessee Health Care Liability Act against the pharmacy/pharmacist defendants (Cigna Defendants), are the pharmacy/pharmacist defendants barred from asserting the "seller shield" defense set forth in the

Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-106?

## III. Standard of Review

Following the grant of an application for interlocutory appeal, "the standard of review is the same standard that would have been applied to the issue(s) in an appeal as of right." *See Peck v. Tanner*, 181 S.W.3d 262, 265 (Tenn. 2005). A trial court's denial of a motion to dismiss is a question of law, which this Court reviews *de novo* with no presumption of correctness. *See Cannon ex rel. Good v. Reddy*, 428 S.W.3d 795, 799 (Tenn. 2014); *see also Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 851 (Tenn. 2010). Upon appeal of such an order, "we take all allegations of fact in the plaintiff's complaint as true, and review the lower courts' legal conclusions *de novo* with no presumption of correctness." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

This appeal also involves the interpretation of state statutes. As our Supreme Court has explained:

> Statutory construction is a question of law that is reviewable on a de novo basis without any presumption of correctness. When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. When a statute is clear, we apply the plain meaning without complicating the task. Our obligation is simply to enforce the written language. It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed.

**\*4** *In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009) (other internal citations omitted).

IV. Interplay Between TPLA and THCLA

The issue on appeal involves the interplay between the TPLA and the THCLA when health care liability claims are asserted against a pharmacist and/or pharmacy for failure to warn of risks associated with a prescription medication. Specifically, the issue presented questions whether defendant pharmacies or pharmacists may assert the seller shield defense contained within the TPLA when the plaintiffs' complaint states a claim pursuant to the THCLA. We agree with the trial court's determination that the seller shield defense is inapplicable to this action.

The "seller shield" is found at Tennessee Code Annotated § 29-28-106 and provides as follows:

No product liability action, as defined in § 29-28-102, shall be commenced or maintained against any seller, other than the manufacturer, unless:

(1) The seller exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that caused the alleged harm for which recovery of damages is sought;

(2) Altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought;

(3) The seller gave an express warranty as defined by title 47, chapter 2;

(4) The manufacturer or distributor of the product or part in question is not subject to service of process in this state and the long-arm statutes of Tennessee do not serve as the basis for obtaining service of process; or

(5) The manufacturer has been judicially declared insolvent.

Tennessee Code Annotated § 29-28-102 (2012) defines a product liability action as:

[A]ll actions brought for or on account of personal injury, death or property

damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever.

In conjunction with an analysis of the interplay between the TPLA and the THCLA, some historical context is helpful. Before the more recent amendments to the THCLA were enacted, the statute originally spoke in terms of "medical malpractice" actions, which the statute defined as

an action for damages for personal injury or death as a result of any medical malpractice by a health care provider, whether based upon tort or contract law. The term shall not include any action for damages as a result of negligence of a health care provider when medical care by such provider is not involved in such action.

**\*5** Tenn. Code Ann. § 29-26-102 (1978). *See Burris v. Hosp. Corp. of Amer.*, 773 S.W.2d 932, 934 (Tenn. Ct. App. 1989).

In *Burris*, a surgeon performed surgery on the patient's lung, utilizing "Teflon felt" to support the sutures used to close the lung. *See id.* at 933. Following the patient's death in 1987, allegedly due to complications she suffered as a result of the Teflon felt, the patient's estate filed suit against the hospital, the surgeon, and others. *See id.* The trial court granted summary judgment to the hospital, determining that

the three-year statute of repose contained within the Medical Malpractice Act would apply. *See id.*

On appeal in *Burris*, the patient's estate argued that the claim asserted was in the nature of a products liability claim, which was not within the purview of the medical malpractice statutes. *See id.* at 935. This Court disagreed, stating that a claim could fall within the purview of the Medical Malpractice Act even though it "involve[d] the characteristics of a products liability case." *See id.* This Court reasoned that because the act used the inclusive phrase, "whether based upon tort or contract law," and because all civil actions were based in either contract or tort, "any ground" alleged would fall within the purview of the Medical Malpractice Act. *See id.*

More specifically, concerning actions against pharmacists and pharmacies, both the Tennessee Supreme Court and this Court have determined that a pharmacist or pharmacy owes a professional duty of care to a patient to act in compliance with the standard of care required by the pharmacy profession. *See Pittman v. Upjohn Co.*, 890 S.W.2d 425, 434 (Tenn. 1994); *see also Dooley v. Everett*, 805 S.W.2d 380, 385 (Tenn. Ct. App. 1990)* ("The pharmacist is a professional who has a duty to his customer to exercise the standard of care required by the pharmacy profession in the same or similar communities as the community in which he practices his profession."). This is, of course, similar to the standard applicable to all medical professionals in malpractice/health care liability actions. *See, e.g., Shipley v. Williams*, 350 S.W.3d 527, 537 (Tenn. 2011) (explaining the standard applicable to medical defendants).

In 2011, the Tennessee Legislature passed the Tennessee Civil Justice Act of 2011, which amended, *inter alia*, Tennessee's Medical Malpractice Act. *See Ellithorpe v. Weismark*, 479 S.W.3d 818, 826 (Tenn. 2015) (citing 2011 Pub. Acts, Ch. 510 § 9 (H.B. 2008)). As our Supreme Court has explained:

> [T]he Tennessee Civil Justice Act of 2011 amended the existing Tennessee Medical Malpractice Act by removing all references to "medical malpractice" from the Tennessee Code and replacing them with "health care liability" or "health care liability action" as applicable. Furthermore, section 29-26-101 was added to the Code which defined "health care liability action" as "any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, *regardless of the theory of liability on which the action is based.*" Tenn. Code

Ann. 29-26-101(a)(1) (Supp. 2011) (emphasis added). This same section went on to provide that "[a]ny such civil action or claim is subject to the provisions of this part regardless of any other claims, causes of action, or theories of liability alleged in the complaint." *Id.* § 29-26-101(c).

**\*6** *Id.*

The THCLA defines a "health care provider" as, *inter alia*, a "health care practitioner licensed, authorized, certified, registered, or regulated under any chapter of title 63 or title 68...." Tenn. Code Ann. § 29-26-101 (a)(2)(A) (Supp 2019). Pharmacies and pharmacists are regulated under Title 63, Chapter 10 of the Code. *See* Tenn. Code Ann. § 63-10-201, *et seq.* (2017). As such, pharmacists and pharmacies clearly come within the THCLA's definition of health care providers.

Although Tennessee courts have previously applied malpractice/health care liability law to claims involving pharmacists or pharmacies who failed to warn patients of the risks of particular medications, our research has revealed no Tennessee cases addressing the interplay between the THCLA and the TPLA when there is an allegation that the medication itself was dangerous. The issue of the interplay between the TPLA and THCLA has only been specifically addressed by the Massachusetts federal district court in the *New England* case, both in the 2014 decision and in a subsequent 2016 decision. *See In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. 13-02419-RWZ, 2016 WL 11045600 (D. Mass. Feb. 29, 2016) ("*New England II*"). In *New England II*, the federal court ultimately determined that the THCLA would control in that litigation. *See id.* at \*1. We note that "[c]ases from other jurisdictions, including federal cases, are always instructive, sometimes persuasive, but never controlling in our decisions." *Summers Hardware & Supply Co., Inc. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990).

The *New England II* plaintiffs had asserted a cause of action concerning a product, methylprednisolone acetate ("MPA"), which adversely affected the plaintiffs following their receipt of the contaminated injections of the drug. *See* 2016 WL 11045600, at \*1. Because the plaintiffs' injuries in that case resulted from both a product and the provision of health care services (injections), the district court determined that both the TPLA and the THCLA ostensibly governed. *See id.* However, in *New England II*, the district court determined that the mutually exclusive liability regimes of the TPLA and the THCLA left them in conflict with one another. *See id.* at \*2. The district court concluded: "Because the coverage provisions of the two statutes overlap in this instance, their

conflicting liability and damages provisions preclude the application of both, and force a choice between them." *Id.* To resolve this conflict, the district court followed Tennessee precedent regarding such conflicts and applied "the more specific statute in lieu of the more general one." *Id.* (citing *Graham v. Caples,* 325 S.W.3d 578, 582 (Tenn. 2010)). Under this approach, the district court concluded that the THCLA was the more specific statute between the two; therefore, the THCLA took precedence and rendered the TPLA inapplicable. *See New England II,* 2016 WL 11045600, at *2.

We determine that the provisions of the TPLA and the THCLA maintain some overlap in coverage when the product involved has a medical use or application. For example, the THCLA governs "any civil action ... alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a)(1). As the federal district court determined in *New England II,* the terms "any" and "related" contained in Tennessee Code Annotated § 29-26-101(a)(1) emphasize the expansive nature of the THCLA. *See* 2016 WL 11045600, at *1. The *New England II* Court explained that "[a] legislature's use of the word 'any' typically indicates its intent for a statute to have maximal reach." *Id.* (citing *United States v. Gonzalez,* 520 U.S. 1, 5 (1997)). Similarly, the *New England II* Court explained that the word, "related," "denotes a similar breadth." *See* 2016 WL 11045600, at *1 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)).

 **\*7** We note that our Supreme Court's interpretation of the THCLA supports this approach. *See Ellithorpe,* 479 S.W.3d at 827 (emphasizing that the THCLA applies to "*all* civil actions alleging that a covered health care provider or providers have caused an injury related to the provision of, or failure to provide health care services"). Likewise, the TPLA also provides expansive coverage governing "all actions brought for or on account of personal injury, death, or property damage caused by or resulting from ... any product ... under any ... theory in tort or contract whatsoever." *See* Tenn. Code Ann. § 29-28-102(6).

As the *New England II* Court explained:

  The THCLA precludes faultless liability, and requires that plaintiffs prove some dereliction of a professionally acceptable standard of care. Tenn. Code Ann. § 29-26-115(a) (West 2015); *see also Rye v. Women's Care*

*Center of Memphis, MPLLC,* [477] S.W.3d [235, 265-67], 2015 WL 6457768 at *23-24 (Tenn. Oct. 26, 2015). The TPLA, however, embraces strict liability, and requires no showing of fault. Tenn. Code Ann. § 29-28-105(a) (West 2015). Further, the two statutes have incompatible rules for joint tortfeasor liability. The THCLA follows Tennessee's general liability rule that "each defendant will be liable only for the percentage of the damages caused by it," *Ridings v. Ralph M. Parsons Co.*, 914 S.W.2d 79, 83 (Tenn. 1996). The TLPA, however, overrides that rule, and imposes joint and several liability in strict products liability actions. *See Owens v. Truckstops of Am.*, 915 S.W.2d 420, 432 (Tenn. 1996) ("[J]oint and several liability ... is essential to the theory of strict products liability.").

*New England II,* 2016 WL 11045600, at *2 (footnote omitted). [2]

In the case at bar, the trial court properly determined that the complaint filed by the plaintiffs was a health care liability action. *See Ellithorpe,* 479 S.W.3d at 827. As the trial court noted in its order granting permission for an interlocutory appeal, "the Cigna Defendants identify the issue [for interlocutory appeal] as 'whether ... Tennessee law allows the seller shield defense ... to be asserted as a defense to claims asserted against a pharmacist under the Health Care Liability Act[.]' " The trial court accordingly determined that the CHDP Defendants had "conceded the applicability of the Health Care Liability Act to this cause of action." As such, the only question that was certified to this Court is "[i]f the complaint asserts a claim under the Tennessee Health Care Liability Act ... are the pharmacy/pharmacist defendants barred from asserting the "seller shield" defense set forth in the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-106[?]"

Based on the question as it was certified to this Court, we must determine only whether the seller shield defense contained within the TPLA may be applied to provide immunity for a defendant sued under the THCLA. This question requires that we engage in statutory interpretation relative to the two acts. As our Supreme Court has previously explained:

  **\*8** "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995). "The text of the statute is of primary importance." *Mills [v. Fulmarque, Inc.]*, 360 S.W.3d [362,] 368 [ (Tenn. 2012) ]. "A statute should be read naturally

and reasonably, with the presumption that the legislature says what it means and means what it says." *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015) (citing *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

*Moreno v. City of Clarksville*, 479 S.W.3d 795, 804 (Tenn. 2015) (other internal citations omitted). Moreover, Tennessee Code Annotated § 1-3-103 (2014) provides that "[i]f provisions of different titles or chapters of the code appear to contravene each other, the provisions of each title or chapter shall prevail as to all matters and questions growing out of the subject matter of that title or chapter." *See, e.g., Sneed v. City of Red Bank, Tenn.*, 459 S.W.3d 17, 27 (Tenn. 2014) (holding that the more recently enacted Tennessee Human Rights Act was "an independent statutory scheme that create[d] remedies and remove[d] governmental immunity" such that it, rather than the Governmental Tort Liability Act, controlled the adjudication of the plaintiff's age discrimination claim against a municipality).

Based on the trial court's determination and the CHDP Defendants' concession that the claims stated fall under the THCLA, we determine that the seller shield defense contained within the TPLA cannot apply. A natural and reasonable reading of the language of Tennessee Code Annotated § 29-28-106 demonstrates that it only applies to product liability actions. *See Moreno*, 479 S.W.3d at 804 (cautioning against the expansion of a statute beyond its intended scope). Furthermore, the THCLA applies to all health care providers, including pharmacies and pharmacists, without limitation

based on any type of product seller immunity. *See, e.g.*, Tenn. Code Ann. § 29-26-101, *et seq.*

The CHDP Defendants' attempts to utilize the TPLA's seller shield defense to immunize themselves from liability for a claim filed pursuant to the THCLA would be akin to an attempt by a defendant in a product liability action to defend on the basis of lack of pre-suit notice, which is a defense only to a claim under the THCLA. Because the complaint states a cause of action pursuant to the THCLA, the provisions of that statute "shall prevail as to all matters and questions growing out of the subject matter of that title or chapter." Tenn. Code Ann. § 1-3-103. As such, the seller shield defense contained within the TPLA is applicable only to product liability actions and cannot be used as a defense to the Heatons' THCLA claims.

### V. Conclusion

For the foregoing reasons, we affirm the trial court's denial of the CHDP Defendants' motion to dismiss. Costs on appeal are taxed to the CHDP Defendants: Cigna Home Delivery Pharmacy; Tel-Drug, Inc.; Tel-Drug of Pennsylvania, LLC; and David Scott Dessender. This matter is remanded to the trial court for further proceedings consistent with this opinion.

**All Citations**

Slip Copy, 2020 WL 1652571, Prod.Liab.Rep. (CCH) P 20,877

Footnotes

1    In *New England*, certain of the defendants were clinics, hospitals, and other health care providers from Tennessee. Because some defendants in the case were from Tennessee, the Massachusetts District Court analyzed the claims pursuant to Tennessee law.

2    Both parties assert that this Court should be persuaded by *McDonald v. W.-Ward Pharm. Corp.*, No. 2:18-CV-02084-JTF-DKV, 2018 WL 6499353, at *6 (W.D. Tenn. Oct. 3, 2018), *report and recommendation adopted sub nom. McDonald v. Schriner*, No. 2:18-CV-02084-JTF-DKV, 2019 WL 1040978 (W.D. Tenn. Mar. 5, 2019). We note that in *McDonald*, the federal court similarly determined that a claim against a pharmacy for dispensing medication without warning of risks fell under the THCLA while claims against the medication's manufacturers fell under the TPLA.

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 39

2016 WL 11045600
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

IN RE: NEW ENGLAND
COMPOUNDING PHARMACY, INC.
PRODUCTS LIABILITY LITIGATION
This Order Applies to Actions Naming St.
Thomas Outpatient Neurological Center, LLC

MDL NO. 13-02419-RWZ
|
Signed 02/29/2016

OPINION AND ORDER

RYA W. ZOBEL, UNITED STATES DISTRICT JUDGE

**\*1** With bellwether trials approaching, both the Plaintiffs'
Steering Committee ("PSC") and the Tennessee Defendants [1]
seek to define the scope of the Tennessee Cases. Each side
has moved for summary judgment on the applicability of
the Tennessee Products Liability Act ("TPLA"), Tenn. Code
Ann. §§ 29-28-101 et seq. (West 2015): the PSC argues
that St. Thomas qualifies as a "seller" under that statute,
while the Tennessee Defendants contend that the Tennessee
Health Care Liability Act ("THCLA"), Tenn. Code Ann.
§§ 29-26-101 et seq. (West 2015), precludes application of
the TPLA. For the reasons discussed below, the Tennessee
Defendants' motion is allowed, and the PSC's motion is
denied.

**I. Background**

Briefly, [2] the Tennessee Cases stem from the injection
of contaminated methylprednisolone acetate ("MPA")
manufactured and sold to St. Thomas by NECC. These
contaminated MPA injections caused many patients who
received them to develop fungal meningitis; in Tennessee, the
disease has caused illness in 153 persons and the death of
sixteen more.

In their Master Complaint, the PSC asserted claims against the
Tennessee Defendants under both the TLPA and the THCLA.
The Tennessee Defendants moved to dismiss both sets of
claims. See Docket # 1360. Ruling on the TLPA claims, I held
only that "plaintiffs have adequately stated claims for relief

under the TPLA.... [g]iven the lack of controlling authority to
the contrary," and declined to dismiss them. Docket # 1360 at
30. Now both the PSC and the Tennessee Defendants test the
TLPA claims through summary judgment.

**II. Standard**

Summary judgment shall issue absent a "genuine dispute as
to any material fact." Fed. R. Civ. P. 56. To defeat a motion
for summary judgment, its opponent must "demonstrate that a
trialworthy issue exists." Mulvihill v. Top-Flite Golf Co., 335
F.3d 15, 19 (1st Cir. 2003).

**III. Discussion**

The parties dispute two issues: first, whether the THCLA
renders the TLPA inapplicable to St. Thomas; and second, if
the THCLA does not preclude the TLPA, whether the TLPA
applies to St. Thomas on the facts before the court.

Turning first to the antecedent question, the two statutes have
partially overlapping coverage, and this overlap creates the
possibility of conflict between them. The THCLA governs
"any civil action ... related to ... the provision of health care
services." Tenn. Code Ann. § 29-26-101(a)(1). Two terms in
this coverage provision—"any" and "related"—emphasize its
expansiveness. A legislature's use of the word "any" typically
indicates its intent for a statute to have maximal reach. See,
e.g., United States v. Gonzalez, 520 U.S. 1, 5 (1997) ("Read
naturally, the word 'any' has an expansive meaning....").
"Related" denotes a similar breadth, with Black's defining
the term as "[c]onnected in some way." Related, Black's
Law Dictionary (10th ed. 2014); see also Morales v. Trans
World Airlines, Inc., 504 U.S. 374, 383 (1992) ("The ordinary
meaning of ['relating to'] is a broad one...."). The conjunction
of the two terms thus means that the THCLA encompasses
all civil actions with some connection to "the provision of
health care services," Tenn. Code Ann. § 29-26-101(a)(1),
a conclusion recently reinforced by the Tennessee Supreme
Court. See Ellithorpe v. Weismark, —— S.W.3d ——, 2015
WL 5853873 at \*7 (Tenn. Oct. 8, 2015) (THCLA applies to
"*all* civil actions" alleging injuries related to the provision of
health care services).

**\*2** The TPLA has similar breadth. It reaches "all actions
brought for or on account of personal injury, death, or
property damage caused by or resulting from ... any product....
under any ... theory in tort or contract whatsoever." Tenn.
Code Ann. § 29-28-102(6) (West 2015). This language
evinces the Tennessee legislature's intent that the TPLA

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 272 of 370
PageID: 10302
In re New England Compounding Pharmacy, Inc. Products..., Not Reported in Fed....
2016 WL 11045600

apply broadly, a conclusion shared by other courts that have examined this issue. See, e.g., Greene v. Brown & Williamson Tobacco Corp., 72 F. Supp. 2d 882, 886–87 (W.D. Tenn. 1999).

Here, the plaintiffs have asserted a cause of action concerning a product—MPA—that adversely affected them as the result of receiving health care services—MPA injections. Both statutes thus ostensibly control, but their mutually exclusive liability regimes leave them in conflict. The THCLA precludes faultless liability, and requires that plaintiffs prove some dereliction of a professionally acceptable standard of care. Tenn. Code Ann. § 29-26-115(a) (West 2015); see also Rye v. Women's Care Center of Memphis, MPLLC, —— S.W.3d ——, 2015 WL 6457768 at *23–24 (Tenn. Oct. 26, 2015). The TPLA, however, embraces strict liability, and requires no showing of fault. Tenn. Code Ann. § 29-28-105(a) (West 2015). Further, the two statutes have incompatible rules for joint tortfeasor liability. The THCLA follows Tennessee's general liability rule that "each defendant will be liable only for the percentage of the damages caused by it," Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 83 (Tenn. 1996). The TLPA, however, overrides that rule, and imposes joint and several liability in strict products liability actions. See Owens v. Truckstops of Am., 915 S.W.2d 420, 432 (Tenn. 1996) ("[J]oint and several liability ... is essential to the theory of strict products liability.").

Under the plain meaning of their coverage provisions, both the THCLA and the TLPA could apply here, as the plaintiffs' allegations concern both a defective product and the provision of health care services. Because the coverage provisions of the two statutes overlap in this instance, their conflicting liability and damages provisions preclude the application of both, and force a choice between them. When faced with such conflicts, Tennessee courts apply the more specific statute in lieu of the more general one. Graham v. Caples, 325 S.W.3d 578, 582 (Tenn. 2010). The parties agree that between the TLPA and the THCLA, the THCLA is the more specific statute, and the plaintiffs do not dispute that the THCLA applies in these cases. [3] The THCLA therefore takes precedence, rendering the TLPA inapplicable in these cases.

Because the TLPA cannot apply here, I need not and do not address the question of whether it applies to St. Thomas.

## IV. Conclusion

The PSC's Motion for Partial Summary Judgment (Docket # 2300) is DENIED, and the Tennessee Defendants' Motion for Partial Summary Judgment (Docket # 2462) is ALLOWED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 11045600

---

Footnotes

1    This opinion adopts the shorthand used in Docket # 2309: "NECC" refers to New England Compounding Pharmacy, Inc., d/b/a New England Compounding Center; and "Clinic-Related Defendants" refers to clinics, hospitals, and healthcare professionals who procured contaminated NECC products and administered them to patients. "Tennessee Defendants" refers to Clinic-Related Defendants located in Tennessee: Saint Thomas Outpatient Neurosurgical Center, LLC ("St. Thomas"); Howell Allen Clinic, P.C.; John Culclasure, MD; Debra Schamberg, RN, CNOR; and Vaughan Allen, MD. Cases naming the Tennessee Defendants are referred to as the "Tennessee Cases."

2    Previous opinions set forth in detail the circumstances giving rise to this multidistrict litigation. See, e.g., In re New England Compounding Pharm., Ind. Prods. Liability Litig., 496 B.R. 256, 260–263 (D. Mass. 2013).

3    Further, any argument that the THCLA does not apply would be unavailing. As discussed above, the THCLA applies to "any civil action ... related to ... the provision of health care services." Tenn. Code Ann. § 29-26-101(a)(1) (West 2015). Plaintiffs' allegations concern the injection of contaminated MPA as a part of pain-treatment services performed by medical professionals, and therefore plainly relate to the provision of health care services.

---

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 40

Garcia v. Nissan Motor Co., Ltd., Not Reported in F.Supp.2d (2006)

2006 WL 869944

🏳 KeyCite Yellow Flag - Negative Treatment

Distinguished by vRide, Inc. v. Ford Motor Co., Tex.App.-Dallas, February 2, 2017

2006 WL 869944
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, McAllen Division.

Jesus GARCIA
v.
NISSAN MOTOR CO., LTD., Nissan North
America, Inc., Bert Ogden McAllen Motors, Inc.

No. Civ.A. M-05-59.
|
March 30, 2006.

**Attorneys and Law Firms**

Michael Raphael Cowen, Attorney at Law, Brownsville, TX, for Jesus Garcia.

Gary W. Davis, Jr., Clark Thomas et al., Austin, TX, Christiana Dijkman, Phillips & Akers, Houston, TX, for Nissan Motor Co., Ltd., Nissan North America, Inc., and Bert Ogden McAllen Motors, Inc.

*ORDER DENYING PLAINTIFF'S MOTION TO REMAND*

CRANE, J.

**\*1** This is a products liability case arising out of an automobile accident that occurred on January 24, 2003. On February 18, 2005, Defendant Nissan North America, Inc. removed this case to the Southern District of Texas based on diversity jurisdiction. Now pending before this Court is Plaintiff's motion to remand (Doc. 10). For the reasons stated below, Plaintiff's motion to remand is DENIED.

*I. BACKGROUND*

Plaintiff Jesus Garcia ("Plaintiff") sues for injuries his son, Jonathan Garcia, sustained from an automobile accident while driving a 2002 Nissan Altima 2.5S. [1] Plaintiff sues Nissan Motor Co., LTD ("Defendant Nissan LTD."); Nissan North America, Inc. ("Defendant Nissan North America"); and Defendant Bert Ogden McAllen Motors ("Local Defendant").

Plaintiff seeks recovery based on theories of strict liability and negligence. [2] Specifically, Plaintiff argues that the Altima in question was defective in that: (1) the vehicle did not have electronic stability control; (2) it was not crashworthy in foreseeable side impact collisions; (3) it lacked a side-curtain airbag; (4) its seat back was defectively designed and was too weak; and (5) the seat lacked a shoulder bolster. (Doc. 4 at 6).

Plaintiff originally filed suit on January 5, 2005, in the 93rd Judicial District Court of Hidalgo County, Texas. *Id.* On February 18, 2005 Defendant Nissan North America, claiming improper joinder of Local Defendant, removed the case pursuant to diversity jurisdiction (28 U.S.C. § 1332 and 28 U.S.C. 1441). (Doc. 1). Plaintiff disputes improper joinder of Local Defendant and now moves to remand. (Doc. 10). In determining whether there is diversity jurisdiction, the only issue before this Court is whether the local Defendant, Bert Ogden McAllen Motors, has been improperly joined. [3]

*II. ANALYSIS*

*A. Improper joinder*

In order to establish that an in-state defendant has been fraudulently joined, the removing party must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or that there has been outright fraud in the plaintiff's pleadings of jurisdictional facts. *B., Inc. v. Miller Brewing Co.,* 663 F.2d 545, 549 (5th Cir.1981). This is a "heavy" burden and the court must resolve contested facts, as well as ambiguities and uncertainties in controlling state law, in favor of the plaintiff. *Griggs v. State Farm Lloyds,* 181 F.3d 694, 699 (5th Cir.1999). It is well established in the Fifth Circuit that it is "insufficient that there be a mere theoretical possibility of recovery;" to the contrary, there must "at least be arguably a reasonable basis for predicting that state law would allow recovery in order to preclude a finding of improper joinder." *Travis v. Irby,* 326 F.3d 644, 648 (5th Cir.2003). Accordingly, if there is any possibility that the plaintiff has stated a cause of action against the non-diverse defendant, this Court must conclude that joinder of the non-diverse defendant was and is proper and the case must be remanded to state court. *Sid Richardson Carbon and Gasoline Company v. Interenergy Resources, Ltd.,* 99 F.3d 746, 751 (5th Cir.1996).

2006 WL 869944

**\*2** A court may resolve the issue of whether a plaintiff has a reasonable basis for recovery under state law in one of two ways. The court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder. Furthermore, there are cases, in which a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder. In such cases, the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry. *See Smallwood v. Ill. Cent. R.R. Co.,* 385 F.3d 568, 573 (5 <sup>th</sup> Cir.2004) (citations omitted). A summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery against the in-state defendant. *Id.* A court may not use improper joinder as an excuse to pre-try the merits of the case. *Id.*

*B. Plaintiff's Claims Against Local Defendant*
Plaintiff alleges three claims against Local Defendant. First, Plaintiff alleges that Local Defendant sold the vehicle without side-curtain airbags despite "knowing the dangers inherent in vehicles that lacked side-curtain airbags." (Doc. 4 at 6). Second, Plaintiff alleges that Local Defendant sold the car without electronic stability control, despite its knowledge of the availability and benefits of electronic stability control. *Id.* Lastly, Plaintiff argues that Local Defendant failed to train its salespersons to educate consumers regarding these issues, and failed to point out the dangers inherent in the Altima, or to recommend the purchase of a vehicle equipped with side-curtain airbags and electronic stability control. *Id.*

*C. Texas Tort Reform Act*
Plaintiff's action is governed by recently-enacted chapter 82 of the Texas Civil Practices and Remedies Code.[4] In 2003, the Texas Legislature added section 82.003, which limits the ability of a plaintiff to recover against a nonmanufacturing seller in a products liability action. Section 82.003(a) provides that "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves ..." any one of several enumerated exceptions. *See* TEX. CIV. PRAC. & REM. CODE § 82.003(a).

Chapter 83 of the Code defines a "products liability action," as: "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." TEX. CIV. PRAC. & REM. CODE § 82.001(2). It is undisputed that Plaintiff's strict liability and negligence causes of action against the Local Defendant are subject to the Texas Tort Reform Act. *See* TEX. CIV. PRAC. & REM. CODE § 82.001(3)('Seller' means a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component or part thereof.). Accordingly, the Local Defendant has no liability absent Plaintiff pleading and, ultimately, proving one or more of the applicable exceptions.[5] Plaintiff claims two exceptions, §§ 82.003(a)(6) and 82.003(b), that provide grounds for Plaintiff's strict liability claim against Local Defendant. If Plaintiff has a possibility of recovery under either theory, then this Court must remand. *See e.g. Gray v. Beverly Enterprises-Mississippi, Inc.,* 390 F.3d 400, 412 (5th Cir.2004).

(i). Section 82.003(a)(6)
**\*3** Plaintiff argues that he has a possibility of recovery under TEX. CIV. PRAC. & REM. CODE § 82.003(a)(6). That section provides that a non-manufacturing seller may be liable when "the seller actually knew of a defect to the product at the time the seller supplied the product and the claimant's harm resulted from the defect." TEX. CIV. PRAC. & REM. CODE § 82.003(a) (6). The language of section 82.003(a) (6) clearly requires actual knowledge of the defect on the part of the seller. *Reynolds v. Ford Motor Co.,* 2004 Dist. LEXIS 27106, \*8 (N.D.Tex.2004). Plaintiff's original petition asserts that the Local Defendant had actual knowledge of two defects in the 2002 Altima at the time it supplied the product and that the defects resulted in harm to Plaintiff's son First, the lack of a side-curtain air-bag and, second, the lack of electronic stability control. Specifically, Plaintiff claims that when the Local Defendant sold the vehicle, it knew that side-curtain airbags were available on some vehicles but not on others, and knew that vehicles with these features were much safer, and further knew about the dangers inherent in vehicles that lacked side-curtain airbags; further, Plaintiff claims that Local Defendant also knew the benefits of electronic stability control. In addition to these two alleged defects, Plaintiff claims that the Local Defendant failed to train its salespersons to educate consumers regarding these issues, and failed to

2006 WL 869944

point out the dangers without such features, or recommend the purchase of a vehicle with these features. (Doc. 10 at 5).

Plaintiff provides evidence of a press release on Nissan's website that states the 2002 Nissan Altima had available "side-impact supplemental airbags and side curtain supplemental airbags for head protection" and claims this is evidence that Local Defendant was aware that the vehicle sold to Plaintiff was not equipped with the safer side-curtain airbags. Plaintiff also offers the affidavit of Michael R. Cowen showing that Nissan put information on its website that side-curtain airbags were an available option in the 2002 Nissan. Plaintiff asserts that the fact that side-curtain airbags were an available safety option, and that the vehicle in question was not equipped with side-curtain airbags is evidence that Local Defendant knew that the vehicle was defective and lacked side curtain airbags when it sold the vehicle. The Court disagrees.

This Court concludes that a nonmanufacturing seller's knowledge of a condition in or of a product without actual knowledge that the condition renders the product defective is insufficient to satisfy the Section 83.002(a)(6) exception. A nonmanufacturing seller is not liable for a product's defects simply because it could have or should have known that a product was defective. *See Reynolds v. Ford Motor Co.,* 2004 Dist. LEXIS 27106, *8 (N.D.Tex.2004).

Plaintiff claims Local Defendant "actually knew of defects in the 2002 Altima at the time it supplied the [sic] product; *it knew that the vehicle lacked electronic stability control and a side-curtain airbag."* (Doc. 4 at 9)(emphasis added). While it is undisputed that Local Defendant knew the vehicle lacked side-curtain airbags and electronic stability control, Plaintiff has failed to show that Local Defendant knew that lack of these features rendered the vehicle defective. The latter does not follow, *a priori,* from the former. Under Texas Law, a product is not defective merely because it could be safer. *Weakley v. Fischbach & Moore, Inc.,* 515 F.2d 1260, 1267 (5th Cir.1975). It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe. *Id;* citing *W. Prosser,* The Law of Torts § 96 at 645 (4th ed.1971). While Local Defendant certainly had knowledge that a car with side-impact airbag or stability control could or would be safer than a car without

these features, this is not equivalent to knowing that the lack of these features rendered the product defective.

**\*4** Defendant Nissan North American offers the Court the affidavit of Mario Bonaccorso ("Mr.Bonaccorso"), the general manager for Local Defendant. Mr. Bonaccorso states that he was unaware that the lack of side curtain air bags or electronic stability control made a vehicle unsafe or unreasonably dangerous. (Doc. 28 at 4). [6] In addition, Defendant Nissan North America offers the affidavit of Mike Kennedy, the chief financial officer of Local Defendant, as evidence that Local Defendant did not have actual knowledge of any alleged defect in the 2002 Altima. [7] Plaintiff does not claim to have any evidence which would refute or cast doubt on either Mr. Bonaccorso's or Mr. Kennedy's affidavits. [8]

Plaintiff relies on *Reynolds v. Ford Motor Co.,* WL 2870079, *3 (N.D.Tex.2004) and *McDonald v. Ford Motor Co.,* 2004 U.S. Dist. LEXIS 27252 (S.D.Tex.2004) to show that the case must be remanded. *Reynolds* and *McDonald* both involved Ford SUV rollover cases. In *McDonald,* the Plaintiff alleged "that the failure of Defendants, with full knowledge of the design defects of the Ford Explorer, to give adequate warning and instructions rendered the Explorer unreasonably dangerous as marketed." *McDonald v. Ford Motor Company,* 2004 U.S. Dist. LEXIS 27252 at *5. While Plaintiff did not use the terms "actually knew" or "actual knowledge," the court construed the factual allegations in Plaintiff's favor. *Id.* at *7. Since the defendant did not offer an affidavit or other summary judgment type evidence denying actual knowledge, the *McDonald* court understandably refused to exercise its discretion in piercing the pleadings pursuant to *Smallwood.* The case was remanded as Defendant had failed to met the "heavy burden" of proving improper joinder. In *Reynolds,* which relies upon *McDonald,* Ford and the local seller defendant removed the case to federal court arguing diversity jurisdiction and claiming improper joinder. The district court remanded the case back to state court because there was competing evidence that the local defendant had actual knowledge that the vehicle was prone to roll over. The Court could not conduct a *Smallwood* inquiry as there were disputed facts of material importance and the Court is not permitted to pre-try these disputed facts. Accordingly, remand was required.

The Court does not find Plaintiff's arguments compelling. In the present case, Plaintiff has not produced any evidence to controvert the affidavits of Local Defendant averring that it had no actual knowledge of a defect in the product at

the time it supplied the product. As stated above, Plaintiff has only shown what is undisputed-that Local Defendant knew the vehicle lacked side-curtain airbags and electronic stability control. This is not enough. Were the Court to accept Plaintiff's reasoning, a nonmanufacturing seller such as a car dealership would be strictly liable anytime technology existed to make the product safer, without any further showing. This is inconsistent with the Texas statutory scheme that imposes liability against a nonmanufacturing seller only when there is some some additional culpability on of the part of the nonmanufacturing seller. Even viewed in a light most favorable to the Plaintiff, Plaintiff has failed to carry its burden as to the applicability of 83.002(a)(6). Therefore, the Court finds that Plaintiff has no reasonable expectation of recovery against Local Defendant Bert Odgen McAllen pursuant to 82.003(a)(6).

(ii). Section 82.003(b)

**5** Plaintiff also alleges that Local Defendant may be liable under TEX. CIV. PRAC. & REM. CODE 82.003(b). Section 82.003(b) states:

> This section [referring to Section 82.003 generally] does not apply to a manufacturer or seller whose liability in a products liability action is governed by Chapter 2301, Occupations Code. In the event of a conflict, Chapter 2301, Occupations Code, prevails over this section.

TEX. CIV. PRAC. & REM. CODE § 82.003(b) (2005). Plaintiff correctly notes that Section 2301.461(b) of the Occupations Code provides:

> (b) Notwithstanding the terms of any franchise or any other law, a manufacturer or distributor shall reimburse the dealer for any loss incurred by the dealer, including legal fees, court costs, and damages, as a result of the dealer having been named a party in a product liability action, except for a loss caused by the dealer's:
>
> (1) failure to comply with an obligation described by Subsection (a);
>
> (2) negligence or intentional misconduct; or

(3) modification of a product without the authorization of the manufacturer or distributor.

TEX. OCC. CODE § 2301.461 (2005). Plaintiff argues that the Local Defendant's liability is governed by Chapter 2301 of the Texas Occupations Code and is, therefore, not subject to the limitation of § 82.003. In support of his argument, Plaintiff offers the Court legislative history as well as various statements made by Texas State Senator Armbrister interpreting the statute. (Doc. 10).

The Court concludes however that Plaintiff's argument that the Legislature chose to single out otherwise innocent franchised automobile dealers for strict liability for selling defective automobiles is unpersuasive. The plain reading of the relevant statutes does not support Plaintiff's argument. The Court agrees with Defendant Nissan North American that nothing in § 2301.461 purports to govern the liability of a franchised automobile dealer to a retail customer. This section merely governs the liability of a manufacturer or distributor to a franchise dealer. *See* TEX. GOVT CODE § 312.002 (words generally shall be given their ordinary meaning).

Although Plaintiff cites to some arguably favorable legislative history, Texas law provides that unless a statute is ambiguous, courts must follow the meaning of the statute's clear language. *See Facility Ins. Corp. v. Employers Ins. of Wausau,* 357 F.3d 508, 516 (5th Cir.2004); *In re Universal Seismic Assocs., Inc.,* 288 F.3d 205, 207 (5th Cir.2002)(When the plain reading of a statute precludes a party's interpretation, no amount of legislative history, be it ever so favorable, can redeem it.). Accordingly, the Court concludes that Plaintiff has no reasonable possibility of recovery against the Local Defendant under Section 82.003(b).

*(iii). Alleged Causes of Action Outside of § 82.003 Exceptions*

Plaintiff also alleges that Local Defendant was negligent in selling the 2002 Altima when it knew it lacked electronic stability control and side-curtain airbags and was further negligent by failing to warn Plaintiff that he could purchase vehicles that contained these features. In addition, Plaintiff claims Local Defendant was further negligent in failing to train and educate its salespersons regarding the benefits and necessity of side-curtain airbags and electronic stability control (Doc. 4 at 6). Plaintiff alleges that Local Defendant voluntarily undertook to provide safety-related information regarding the Altima to Jesus Garcia. *Id.* This voluntary

undertaking created a duty of care under Restatement (Second) of Torts §§ 323 and 324A. According to Plaintiff, Local Defendant negligently breached this duty by failing to provide information regarding side-curtain airbags and electronic stability control and failing to recommend that Jesus Garcia purchase a vehicle with such safety features. *Id.* at 8-9.

*6 This Court has previously concluded that any theories of recovery plead against a non-manufacturing seller must fall within one of the seven exceptions to § 82.003, regardless of whether such allegations otherwise state a viable claim under Texas law. *See Casas v. The Tire Corral, Inc.,* Civil Action No. M-04-123, slip op. at 6 (March 31, 2005); *Alonso v. Maytag Corp.,* 2005 WL 405295, *3 (N.D.Tex.2005)(Because § 82.001 specifically includes strict products liability and negligence causes of action as products liability actions, both causes of action are governed by the provisions set forth in Chapter 82.). Construing section 82.003(b)'s reference to the Texas Occupational Code as a "mechanism for negligence claims" would be inconsistent with the statute. *Rubin v. Daimlerchrysler Corp.,* 2005 WL 1214605, *10 (S.D.Tex.2005).* The statute defines "products liability action" specifically to include negligence theories. TEX. CIV. PRAC. & REM. CODE § 82.001(2). The Court therefore concludes that Plaintiff's negligence claims are precluded by the plain meaning of § 82.003.

*D. Other Considerations*

Plaintiff cites *Smallwood* for the proposition that if the Court, in connection with its determination on the remand issues, were to determine that the automobile was not defective due to the lack of certain safety features, then that defense would inure to all defendants, and must be resolved at the state court level. (Doc. 10 at). The Court does not make such a determination. Accordingly, the *Smallwood* "common defense" remand is not triggered. *See Rainwater v. Lamar Life Ins. Co.,* 391 F.3d 636, 638 (5th Cir.2004).

*III. CONCLUSION*

The Court concludes that section 82.003 of the Texas Civil Practices and Remedies Code precludes Plaintiff's recovery on his claims of strict liability and negligence against Local Defendant Bert Ogden McAllen. The Court therefore holds that Local Defendant has been improperly joined and such defendant is hereby DISMISSED. Because all remaining parties are diverse and the requisite amount in controversy has been satisfied, this Court has subject matter jurisdiction in this present case. Plaintiff's motion to remand for lack of jurisdiction is therefore DENIED. (Doc. 10).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 869944

Footnotes

1    On November 16, 2001 Plaintiff purchased a 4-cylinder 2002 Nissan Altima 2.5 S from Local Defendant. (Doc. 4 at 6). On January 24, 2003, Plaintiff's son, Jonathon Garcia, while driving the car in San Antonio, lost control of the vehicle. The vehicle went into a skid, sliding into a utility pole with the passenger-side rear door hitting the pole. *Id.* at 7. The pole intruded into the backseat area of the vehicle. *Id.* Although Jonathan Garcia was wearing his seat belt, the seat back in his driver's seat yielded rearward, allowing his head to move into the back seat area, where he sustained a severe brain injury from hitting the pole and/or intruding structures. *Id.* Plaintiff claims that a stronger seat back or a side-curtain airbag would have prevented his brain injury. *Id.*

2    Plaintiff is Jonathon Garcia's legal guardian.

3    It is undisputed that all other requirements of diversity jurisdiction have been met.

4    The aforementioned section applies to actions filed on or after September 1, 2003.

5    In addition to arguing two exceptions to 82.003, Plaintiff also argues that he has pled claims or theories against Local Defendant not covered by Section 82.003 but which would provide him a remedy against said Defendant. However, the plain language of 82.003 precludes these "extra-82.003" claims as it applies to "any action" under "any ... theory".

6    Mr. Bonaccorso states:

       As the General Manger for Bert Ogden McAllen Motors, Inc, it is my job to train and supervise the salesman. I was the General Manager for Bert Ogden McAllen Motors, Inc. in November 2001, when Jesus Garcia purchased his

2006 WL 869944

> Nissan Altima. As General Manager, I am generally familiar with our inventory of vehicles, as well as the options available on different models. Bert Odgen McAllen Motors, Inc. sells vehicles manufactured by BMW, in addition to vehicles manufactured by Nissan.
>
> In November 2001, many of the vehicles our customers purchased lacked side curtain air bags and electronic stability control. I was not aware then, and have no reason to believe now, that a vehicle is unsafe or unreasonably dangerous merely because it lacks side curtain airbags and electronic stability control. I was not aware in November 2001 that anyone even claimed that a vehicle is defective simply because it lacks side curtain air bags or electronic stability control. (Doc. 28 at 4).

**7**  Mr. Kennedy states:

> Bert Ogden McAllen Motors, Inc. did not know of any alleged defect to the product at the time it supplied the subject 2002 Nissan Altima. At the time Bert Ogden McAllen Motors, Inc. sold the subject 2002 Nissan Altima, it had no actual knowledge of the defect alleged in the Plaintiff's original petition to have caused harm to Plaintiff. (Doc. 4, att. 4 at 4).

**8**  In analyzing whether a party has been improperly joined, a court has discretion to pierce the pleadings and look to undisputed summary judgment-type evidence. *See Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.,* 99 F.3d 746, 751 (5th Cir.1996); *Smallwood v. Ill. Cent. R.R. Co.,* 352 F.3d 220 (5th Cir.2003).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 41

2005 WL 6280644 (Vt.Super.) (Trial Order)
Superior Court of Vermont.
Orleans County

Estate of Kevin BAKER. Ann Baker, Administrator, Plaintiff,

v.

UNIVERSITY OF VERMONT, Fletcher Allen Health Care, Warren Bickel, John Brooklyn,
Lisa Marsh, Louis Giordiano, and John or Jane Doe aka "staff member," Defendants.

No. 233-10-03 Oscv.
May 4, 2005.

**Decision and Order-Motion for Summary Judgment**

Walter M. Morris, Jr., Presiding Judge.

The case is before the Court on Defendant Fletcher Allen Health Care's ("FAHC") Motion for Summary Judgment, pursuant to V.R.C.P. 56. FAHC seeks judgment in its favor on all of Plaintiff's claims against it. Summary judgment is "appropriate only when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law." *LoPresti v. Rutland Regional Health Services, Inc.,* 2004 VT 105, ¶ 14. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." V.R.C.P. 56 (c)(3). In making such a determination, the Court "will take as true the facts alleged by the nonmoving party, and give the nonmoving party the benefit of all reasonable doubts and inferences." *Fireman's Fund Ins. Co.* V. *CNA Ins. Co.,* 2004 VT 93, ¶ 8 (citation omitted). Further, "[i]t is not the function of the trial court to resolve disputed facts when ruling on a motion for summary judgment." *Quinn v. Grimes,* 2004 VT 89, ¶ 7.

***Undisputed Facts***

1. Warren K. Bickel, Ph.D., a professor of psychiatry at the University of Vermont ("UVM") and the "principal investigator," and Lisa Marsh, M.A. submitted a grant application to the United States Department of Health and Human Services ("DHHS") National Institute on Drug Abuse ("NIDA") for a research project entitled "Improving Combined Buprenorphine-Behavioral Treatment" ("research project"), naming Regina H. White, Director of UVM's Office of Sponsored Programs, as the "official" for the "applicant organization" and UVM's Office of Sponsored Programs as the "applicant organization."
2. The other key personnel noted on the grant application were Stephen T. Higgins, Ph.D., co-investigator, Alan Budney, Ph.D, co-investigator, a TBD Resident Assistant Professor, co-investigator, Gary J. Badger, M.S., biostatistician, and John R. Brooklyn, M.D. All these individuals work for UVM, with the exception of Dr. Brooklyn who works for the Community Health Center. None of these individuals are employed by Fletcher Allen Health Care.

3. The "performance sites" designated on the grant application are the Human Behavioral Pharmacology Lab at UVM and UVM's Substance Abuse Treatment Center ("SATC").

4. Project personnel's salaries followed UVM policy, with UVM covering the difference in salary coverage for Drs. Bickel and Higgins, as necessitated by the National Institute of Health's salary cap.

5. UVM operates the SATC in Burlington, Vermont, on the FAHC campus under the terms of a lease agreement for use of the designated space.

6. Buprenorphine is a narcotic analgesic and also an opioid antagonist, displacing heroin opioids from the mu-opioid receptors when administered to persons using heroin. Buprenorphine is commonly dispensed under the trade names, "Subutex" and "Suboxone".

7. Buprenorphine also acts as a partial agonist, easing withdrawal symptoms experienced by heroin addicts.

8. Federal law requires that an Institutional Review Board ("IRB") review, approve, and supervise research projects involving human subjects.

9. Federal law requires that all IRBs "include at least one member who is not otherwise affiliated with the institution...." 45 C.F.R. § 46.107(d). [1]


10. The University of Vermont's IRB is referred to as the "Committees on Human Research". These are the "Committee on Human Research in the Medical Sciences" ("CHRMS"), and the "Committee on Human Research in the Behavioral Sciences" ("CHRBS"). The work of the latter committee is not in issue in this case. FAHC maintains its own IRB, designated the "Fletcher Allen Health Care Committee on Human Studies". From time to time, FAHC has used UVM's CHRMS as its own IRB, consistent with the by laws of the Committees on Human Research and CHRMS, which authorize such. The by-laws of the UVM CHRMS provide that FAHC's Committee on Human Studies meets "jointly" with the CHRMS only to consider human research protocols that will be carried out in FAHC facilities. The said by-laws also reference the FAHC Committee on Human Studies as "functioning under the by-laws of the Fletcher Allen Health Care Medical Staff". The said by-laws also provide in pertinent part that "To the extent that it is feasible, members of the Fletcher Allen Health Care Committee on Human Studies will also be members of CHRMS.....".

11. The IRB seeks to ensure compliance with DHHS regulations for research projects "that are sponsored by the University of Vermont (UVM) *or* Fletcher Allen health Care (FAHC)." IRB Policy and Procedure Handbook at 2 (emphasis added). Further, all research projects involving human subjects "conducted by University [of Vermont] *and/or* Fletcher Allen Health Care personnel, including students, or done under the auspices or sponsorship of *either* institution must be reviewed by" the appropriate IRB or review committee. Investigator Guidelines for Human Subjects Research, Committees on Human Research, September 27, 2001, at 3 (emphasis added).

12. Members of the CHRMS receive no compensation for their service on the Committee. Actions by members of the CHRMS carried out as a function of Committee appointments are as provided in the by-laws to be included under the University's general liability insurance coverage. Members of the CHRMS are appointed by the Vice Provost of UVM. Members of UVM's CHRMS are not appointed by FAHC. Meetings of the CHRMS are held on UVM premises. All meetings of the CHRMS pertinent to review of the research project in issue in this case were convened at 5:00 PM.

13. Both FAHC and UVM personnel serve on the twenty-two member CHRMS. At the time of initial approval of the buprenorphine study in issue in this case, the CHRMS included nine physicians who were employed both as professors at UVM and as physicians at FAHC. In addition, two members--Marcia Dunham, a research pharmacist and Michealanne Rowen, cardiology research nurse, both solely employees of FAHC served on the Committee. Nine additional members of the CHRMS were employed solely by UVM. The twenty-first member of the CHRMS was an attorney in private practice, and the twenty-second member a priest employed by St. Michael's College. Excepting the nine physicians who were employed both by UVM and FAHC, only two other members of the CHRMS are employees of FAHC. The by laws applicable to CHRMS provide that the chair of the CHRMS must be a UVM faculty member.

14. The project in issue in this case was assigned number "99-207" for reference by the CHRMS. The CHRMS reviewed, approved, and supervised the research project, including its protocol and informed consent form. From May 19, 1999 through October 17, 2001, the CHRMS met a total of seven times to consider and take action with respect to the research project protocols in issue in this case. The CHRMS engaged in active and objective review of the project and its protocols, including the informed consent, as reflected in the minutes of CHRMS meetings and suggestions made from time to time as to content of protocols and informed consent. The chair of the CHRMS at each of these meetings was a physician, employed both as a professor at UVM and a physician at FAHC (Dr. Bernstein, 3/19/99-6/20/01; Dr. Homans thereafter).

15. Under the terms of the project design, UVM/SATC contracted with FAHC to provide pharmacy-related services required for the research project. Specifically, the contract provided for the services of a "full time pharmacy technician". This individual was to "prepare all medications, monitor the inventory and paper trail of all medications. S/he will insure compliance with FDA regulations and assist in the preparation of INDs". The sum payable to FAHC under the contract was to be $23,000.00. See grant proposal, Defendant FAHC's Exhibit A, p. 10.

16. FAHC pharmacy technicians and pharmacists prepared doses of buprenorphine for individuals enrolled in the research project. These FAHC employees acted under the direction of UVM employees and pursuant to the referenced contract with UVM.

17. All buprenorphine required for the research project was ordered by and shipped to Dr. Bickel, a UVM employee. A member of Dr. Bickel's staff delivered the buprenorphine to the Investigational Drug Services Division of FAHC's Pharmacy Services. Required individual doses were then prepared and packaged by FAHC-IDS at the direction of Dr. Brooklyn of the SATC, delivered to the SATC and stored in a safe within the SATC to be later dispensed to individual patients by SATC staff, per Dr. Brooklyn's instructions, in accordance with the research project's protocol.

18. FAHC personnel were not involved with and did not engage in determining eligibility of individuals for the research project, determining when to administer buprenorphine, the size or frequency of any administered dose, actually administering a dose to an individual enrolled in the research project, monitoring an individual before or after getting a buprenorphine dose, or evaluating whether any individual participating in the project should be released and permitted to drive home after having received a dose of buprenorphine.

19. On November 29, 2001, Theodore Pecor enrolled in the UVM study and received doses of Buprenorphine-three 2 milligram-dose Subutex tablets, as prescribed for the so-called "induction phase" of Buprenorphine treatment. This medication was provided to Mr. Pecor by SATC staff, from a stock of induction doses maintained in a safe at the SATC. Mr. Pecor had previously been in treatment as a patient at the SATC, for a period of approximately ten months beginning in April, 1999. During that period of time, Mr. Pecor drove himself to the SATC three days per week to receive doses of buprenorphine, driving home afterward without any apparent adverse incident.

20. At time of his enrollment in the study, Mr. Pecor reviewed and signed an Informed Consent form stating "you must agree to limit your activities, especially driving and operation of machinery, according to the advice of the investigators while participating in this study.... Please understand that you are free not to participate in this study or to withdraw from it at any time." The Informed Consent form also provided Mr. Pecor with warning of potential adverse side effects of administration of buprenorphine, and indicated that buprenorphine may produce temporary sedation and coordination difficulties which could increase the risk of accident. Informed Consent, signed by Mr. Pecor on November 29, 2001, at 7.

21. Pursuant to the research project's protocol, certain sobriety tests were administered by SATC personnel prior to allowing an enrolled individual to leave the SATC.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

22. No FAHC personnel were involved in administering the buprenorphine or monitoring and releasing Mr. Pecor from the SATC on November 29, 2001. There is no evidentiary showing that any FAHC personnel or employees were aware of Mr. Pecor's treatment, personal status, or circumstances of his departure from the SATC on November 29, 2001.

23. The Project's protocol and underlying agreements did not assign to FAHC personnel any functional responsibilities for actual administration of the buprenorphine or the monitoring of and the circumstances of release of patients from the program.

24. On November 19, 2001, buprenorphine, in its forms of Suboxone or Subutex, were "investigational drugs". They were not approved by the Food and Drug Administration ("FDA") until October, 2002. As such, the FDA had not generated any patient information literature, or counseling materials/guidelines or "warnings" recommended for use in conjunction with the dispensing or administration of these drugs. No such literature or documents accompanied the drugs provided to the FAHC pharmacy in conjunction with its preparation and provision of buprenorphine doses to the SATC.

25. As a research pharmacist employed in the Investigational Drug Service Division of FAHC's Department of Pharmacy Services, Marcia Dunham, is, and was on November 29, 2001, familiar with the properties of buprenorphine, and its effects upon patients following administration of the drug. Ms. Dunham had worked with Dr. Bickel on buprenorphine studies for a number of years preceding the events in issue in this case. As noted, Ms. Dunham also served as a member of the CHRMS during the period in issue, and participated in Committee review and approval of the Project #99-207 and its protocols.

26. Participation in the SATC research project was a voluntary undertaking on the patient's part. If an individual enrolled in the SATC research project chose to disregard or otherwise not follow either the terms of informed consent related to treatment, or a research project investigator's recommendation not to leave the SATC or operate a motor vehicle, research project personnel did not have the authority to prevent an enrolled individual from doing so. [2]

27. On November 29, 2001, Mr. Pecor "passed" the protocol's sobriety tests in the assessment of the SATC screener, and SATC staff permitted him to leave SATC. Mr. Pecor left and began driving towards his home in Johnson. The state of Mr. Pecor's sobriety upon departure from the SATC is a matter of factual dispute among the parties. [3]

28. While Mr. Pecor was driving home, the vehicle that he was operating crossed the center line and struck Mr. Baker's car. The collision resulted in the deaths of Mr. Baker and his two passengers. [4]

*Discussion*

The parties have provided the Court with a compelling view into the world of issues associated with the state of federally-supported therapeutic medical studies involving human subjects. Along the way, the Court is well reminded of the historic evils that have been recognized in the annals of human medical experimentation, as well as the virtually miraculous discoveries that have inured to the benefit of all in consequence of scientific studies involving human subjects. With respect and care owing to such profound concerns and interests, we venture to determine the present Motion. [5]

The key to Plaintiff's claims against FAHC is the well-recognized doctrine *of respondeat superior,* under the terms of which an employer is vicariously liable for the actions of employees committed "within the scope of their employment". *Poplaski v. Lamphere,* 152 Vt. 251, 257 (1989). Thus, it is critical to the maintenance of Plaintiff's claims against FAHC that it be shown that FAHC employees, acting within the scope of their employment, breached specific cognizable duties resulting in harm to Plaintiff's deceased, and thus Plaintiff. [6] Plaintiff has stated its claims as to FAHC essentially as consisting of four components: (1) *respondeat superior/vicarious* liability; (2) negligent review/approval/supervision of SATC activities by FAHC employees as members of the CHRMS; (3) breach of duty by FAHC employees serving on the CHRMS to control the conduct of patient Pecor; and (4) actual control of patient Pecor's operation of a motor vehicle by FAHC employees serving on the CHRMS. A

related claim is discerned from the pleadings that sounds in pharmaceutical malpractice, addressed to the conduct of FAHC pharmacy staff in dispensing buprenorphine to the SATC. This claim is addressed separately herein.

The determinative criterion as to the primary claims clearly lies in the *respondeat superior* claim and the sufficiency of evidence related thereto. In the Court's assessment, Plaintiff's claims against FAHC fail because FAHC owed no actionable duty to Mr. Pecor or Mr. Baker, and FAHC connections to the UVM study are, in the Court's assessment, otherwise too tenuous to attach institutional liability.

### Were FAHC Employees Serving on the CHRMS Acting "Within the Scope of Their Employment"?

It is necessary to review FAHC's connections to the research project and the November 19, 2001 accident. It is undisputed that FAHC employees were members of the CHRMS that reviewed and approved the research project, including the informed consent form. Further, under contract, FAHC pharmacy technicians and pharmacists stored and provided the doses of buprenorphine to UVM-SATC employees and research project investigators, who in turn administered the dose to Mr. Pecor. The SATC, while located on the FAHC campus, is, in all respects, operated by UVM.

Plaintiff maintains that FAHC employees serving on the CHRMS acted within their scope of employment when the CHRMS reviewed, approved, and supervised the research project. Further, Plaintiff points out that one FAHC employee serving on the CHRMS, Marcia Dunham, may have provided some contracted pharmaceutical services to UVM. Indeed, the credible record establishes that Ms. Dunham possessed considerable expertise as to buprenorphine and its trade versions, and impacts of the drug upon administration to patients. Ms. Dunham had participated in work and studies related to buprenorphine for a period of years preceding approval and conduct of the project in issue. Plaintiff contends that FAHC is vicariously liable for the actions of its employees who serve on the CHRMS. Notwithstanding these contentions, in the Court's assessment it is clear on the state of the record that FAHC personnel were not acting within the scope of their employment while serving on the CHRMS.

The test to determine whether certain conduct falls within the scope of employment is set forth in *Doe v. Forrest,* 2004 VT 37, ¶ 15. While a determination of the scope of employment is often a question of fact, it may be decided as a matter of law where "facts and the inferences to be drawn there from are not in dispute," as is the case here. *Sweet v. Roy,* 173 Vt. 418, 433 (2002)(internal marks omitted), *quoting Ploof v. Putnam,* 83 Vt. 252, 259 (1910).

> To establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct: (a) is the kind the servant is employed to perform; (b) occurs substantially within the authorized time and space limits; [and] (c) is actuated, at least in part, by a purpose to serve the master.

*Doe,* 2004 VT 37, ¶ 15 (internal marks omitted); *see also Brueckner v. Norwich Univ.,* 169 Vt. 118, 123 (1999); Restatement (second) of Agency § 228(2). Even assigning a broad interpretation to these criteria, the nature and extent of the activities of FAHC personnel serving on the CHRMS in reviewing the UVM-SATC project and protocols in this case plainly fall short of conduct "within the scope of employment" at FAHC.

FAHC employees serving on the CHRMS were not providing the services for which FAHC had employed them, thus failing the first prong of the test. The primary functions of FAHC personnel as FAHC employees were to serve FAHC's needs in providing health care and services to FAHC clients, medical professionals, and patients. Service on the CHRMS was an entirely voluntary undertaking; on this record, there was neither an expectation of service on the CHRMS as a condition of FAHC employment, nor any apparent consequence of an individual's election not to serve. FAHC employees serving on the CHRMS may have been asked to serve on the CHRMS based upon the same expertise and credentials that led to FAHC employment; however,

this does not equate to a conclusion that their service on the CHRMS was the kind of service FAHC employed them to do. Indeed, CHRMS members were asked to serve by and worked at the discretion of UVM's Vice Provost for Research and acted under the direction and control of the Chair of the Committee, a physician employed by both UVM and FAHC. The by laws provide that the Chair of the Committee must be a UVM faculty member. As to the nine physician members of the CHRMS who were employed both by UVM as medical faculty and FAHC as staff physicians, a stronger case might be made as to "scope of employment" of the physicians, as UVM faculty employees. That is, as medical faculty members rather than staff physicians, medical research and related activities might be considered to be not an unexpected consequence of employment as a medical faculty member. However, as relates to FAHC employment, it is clear on this record that the staff physician's responsibility with regard to FAHC is to provide patient care and directly related treatment services.

FAHC from time to time presented its own research projects to the CHRMS for review, utilizing the CHRMS as its IRB. However, it was not required to do so, and apparently FAHC maintained its own IRB, the FAHC Committee on Human Studies, which could be utilized. The project in issue in this case was generated and implemented entirely by UVM through its SATC. The sole exception being the contract with FAHC for pharmacy services, a relatively insignificant component monetarily of the project and the grant providing the financing. There is no genuine issue that as related to CHRMS review of Project/Protocols # 99-207, the CHRMS was functioning as UVM's IRB, and not FAHC's IRB.

UVM in its by laws for the CHRMS provided that actions of the members of the CHRMS were to be included in the University's general liability insurance coverage. Certainly, this latter action on the part of UVM does not equate to a legal conclusion; however, it serves as a declaration on the part of UVM that the institution considers the work of the members of the

CHRMS to be University work for which the institution may be liable. CHRMS members were not paid for their service on the board, which met at UVM. The meetings at which the project and protocols in issue in this case were the subject of CHRMS review and action all were convened at or shortly after 5:00 PM. On this record, and giving due consideration to the fact that the employees here were in professional service, there is no evidence fairly and reasonably tending to establish that FAHC employee service on the CHRMS occurred "substantially within the authorized time and space limits" customarily expected in performance of job functions at FAHC.

Was CHRMS service by FAHC employees "actuated, at least in part, by a purpose to serve the interests" of FAHC? Probably, at least from the perspective of the employee. It would be quite ingenuous to ignore the motivations and professional interests of the individuals involved, as concerns the decision to engage in volunteer service on the CHRMS. As health care professionals, the individuals would no doubt have professional interest in remaining abreast of developments in medical research, being exposed to the various research proposals presented to the CHRMS for review. Information gained in course of service on the CHRMS certainly might enable the individual to perform his/her assigned duties more effectively. Service on the CHRMS might be perceived as helpful in provision of knowledge as to CHRMS procedures, as relates to preparation of FAHC research projects that might go before the CHRMS for review, even if the particular member/employee might be obliged to recuse from the review. Of more immediate impact, an individual volunteering to serve on the CHRMS might view such service as an important asset in career progression or employment competition. For bad or good, such motivations and purposes cannot be ignored. They would certainly extend as well to a wide variety of activities engaged in as a volunteer and related to profession, such as participation in professional societies or community service efforts related directly or indirectly to professional role. Standing alone though, they do not serve to establish that CHRMS service was within the "scope of employment" at FAHC.

The conclusion urged by Plaintiff-that FAHC employees serving as volunteers on the CHRMS were acting within the scope of their employment at FAHC-is just not sustainable on the record presented. The "threads" are just too tenuous. While it is tempting to engage in speculation as to institutional interests that might play out, or be invoked in consequence of the decisions of any institution's IRB, we must be governed by the competent record in our determinations, and not speculation. There is in our assessment no genuine issue of fact presented as to scope of employment.

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 287 of 370
PageID: 10317
Baker v. University of Vermont, 2005 WL 6280644 (2005)

Since FAHC employees serving on the CHRMS were not acting within the scope of their employment, Plaintiff's claims asserting institutional culpability on the part of FAHC for CHRMS' actions are unsustainable. [7]

*FAHC Pharmacy Negligence*

Plaintiff's other claims involve alleged negligence in the pharmaceutical services provided to the research project by FAHC. As the undisputed facts demonstrate, FAHC pharmacists and pharmacy technicians acted pursuant to the requests of research project investigators and the research project's protocol. There is no claim here to the effect that FAHC provided medications other than as specified; that is, that there was negligence associated with erroneous dosage or quantity or quality of the medication prescribed. There is no claim of pharmaceutical malpractice premised upon erroneous "filling" of a prescription. FAHC pharmaceutical services prepared the dose of buprenorphine and gave it to a research project investigator to administer, and never interacted in any way with Mr. Pecor or others enrolled in the research project. The actions of those pharmaceutical employees cannot, as a matter of law, be viewed as negligent.

Plaintiff's negligence claim rests on the theory that FAHC pharmacy employees made no effort to ensure that proper release procedures were being used by SATC, or that they otherwise failed to provide proper warnings related to the consequences of administration of buprenorphine during the so-called "induction" phase. In the present case, FAHC pharmacy employees were acting within their scope of employment with FAHC in dispensing the buprenorphine to research project investigators; however, their actions, as a matter of law, were not negligent.

It is well established that liability for negligence must be predicated upon a duty of care, the existence of which is primarily a question of law to be determined by the Court. Duty may be viewed as an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. *Denis Bail Bonds Inc. v. State of Vermont,* 159 Vt. 481, 487 (1993) (internal marks and citations omitted); *Sorge v. State,* 171 Vt. 171, 174 (2000); W. Prosser & W. Keeton, The Law of Torts § 53, at 538 (5th ed. 1984). Plaintiff in this case asks the Court to extend a duty of care from a pharmacist or pharmacy to a patient and a third person for what amounts to the lawful filling of a prescription given directly to the prescribing doctor. We decline, as a matter of law in this case, to recognize such a duty on the part of the FAHC pharmacy as relates to the interests of Mr. Pecor, Mr. Baker, or to SATC research project personnel.

While apparently never explicitly treated by our Supreme Court, we consider the so-called "learned intermediary doctrine" adopted in a majority of jurisdictions to be of significant dispositive effect in determining the present claims. The learned intermediary doctrine, first recognized in 1966, initially stood for the proposition that a prescription drug manufacturer had a duty to warn of possible side effects in some patients only to a purchasing doctor, the learned intermediary between the manufacturer and patient, and not directly to the patient. *Sterling Drug, Inc. v. Cornish,* 370 F.2d 82, 85 (8th Cir. 1966). The majority of jurisdictions have expanded this approach to cover pharmacists as well. *Cottam v. CVS Pharmacy,* 764 N.E.2d 814, 819 (Mass. 2002) ("[T]he overwhelming majority [of jurisdictions addressing this issue] hold that, in general, a pharmacy has no duty to warn its customers of side effects."); *McKee v. American Home Products, Corp.,* 782 P.2d 1045, 1048-49 (Wash. 1989)(joining the majority of states that hold a pharmacist has no duty to warn). Some jurisdictions have reached this conclusion through expanding the learned intermediary doctrine, while others have used an independent analysis. *See, e.g., Kirk v. Michael Reese Hosp. & Med. Ctr.,* 513 N.E.2d 387, 395 (Ill. 1987), *cert. denied,* 485 U.S. 905 (1988)(expanding the scope of the learned intermediary doctrine to pharmacists), *compare with McKee,* 782 P.2d at 1048-49(finding no duty to warn on the part of pharmacists, independent of the learned intermediary doctrine). In either case, the majority of jurisdictions have apparently concluded that pharmacists have no duty to warn patients of the dangers of a drug provided pursuant to a physician's lawful prescription. *See e.g., Tardy v. Eli Lilly & Co.,* 2004 WL 1925536 (Me.Super. 2004); *Walls v. Alpharma USPD, Inc.,* 887 So.2d 881, *4 (Ala. 2004); *Cottam,* 764 N.E.2d at 819; *Brooks v. Walmart Stores, Inc.,* 535 S.E.2d 55 (N.C. App. 2000), *review denied,* 547 S.E.2d 2 (N.C. 2001); *Walker v. Jack Eckerd Corp.,* 434 S.E.2d 63, 67-68 (Ga. 1993); *McKee,* 782 P.2d at 1048-49; *Adkins v. Mong,* 425 N.W.2d 151, 152 (Mich.App. 1988); *Eldridge v. Eli Lilly & Co.,* 485 N.E.551, 552-53 (Ill.App. 1985); *Pysz v. Henry's Drug Store,* 457 So.2d 561, 562 (Fla. Dist.Ct.App. 1984).

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 288 of 370
PageID: 10318
Baker v. University of Vermont, 2005 WL 6280644 (2005)

A number of policy considerations underpin the rationale of these cases. "[R]equiring the pharmacist to warn of potential risks associated with a drug would interject the pharmacist into the physician-patient relationship and interfere with ongoing treatment.... [T]he physician is in the best position to determine the proper drug therapy and to decide how and when to inform a patient of its risks and benefits." *Silves v. King,* 970 P.2d 790, 794 (Wash.App. 1999). Further, the "pharmacist owes his customers a duty to properly fill lawful prescriptions," and not to second guess or otherwise investigate a prescription that a physician has already determined is proper for his or her patient. *Adkins,* 425 N.W.2d at 152. Finally, a "pharmacist presented with a prescription ordered by a duly licensed physician is not at liberty to substitute his judgment of the product's safety for the patient for that of the physician." *Coyle v. Richardson-Merrel, Inc.,* 584 A.2d 1383, 1387 (Pa. 1991).

We note that in construing whether a duty owes under the particular circumstances presented here, the existence of "warnings" or patient counseling and advisory literature prescribed by the Food and Drug Administration and accompanying medication packaging would bear relevance. Here, the undisputed evidence is that at time of administration of the dosage of buprenorphine to Mr. Pecor, the drug was still in "investigational" status, and had not been approved by the FDA. Thus, there was no warning or patient advisory literature that had been mandated or even recommended by the FDA. No such FDA mandated or recommended literature existed, and certainly had not been provided with the drugs provided by Dr. Bickel's office to the FAHC pharmacy.

The instant case presents facts that differ from those of the majority of cases addressing the issue. This case does not involve the more typical scenario in which a physician prescribes a medication to a patient, who in turn takes it to be filled by a pharmacist. Rather, in this case, FAHC pharmacy services acted pursuant to the research project investigators' directions, who received the buprenorphine dose themselves, and in turn administered the dose to the enrolled individual. These factual differences serve in the Court's assessment to reinforce the logic and rationale underlying a conclusion that a pharmacist has no duty to warn patients or doctors under the circumstances presented here.

Accordingly, the actions of the FAHC pharmacists and pharmacy technicians cannot lead to FAHC liability under the facts of this case. FAHC pharmacy services provided the buprenorphine dose that eventually was administered to Mr. Pecor under the orders and supervision of Dr. Brooklyn and SATC professional staff. The pharmacists and pharmacy technicians provided only intermediary pharmaceutical services, and at no time played a role in carrying out or otherwise participating in the research project beyond providing contracted pharmaceutical services. They owed no duty to warn, monitor or control Mr. Pecor or to provide warning to any investigator in the research project, and indeed never even came into contact with Mr. Pecor. There is no suggestion, and certainly no evidentiary showing, that the FAHC pharmacy personnel provided anything other than medication that was precisely as indicated in the orders for its dispensation. Nor do the pleadings, much less competent evidence, serve to identify any specific employee of FAHC pharmacy who engaged in conduct that would serve as basis for assigning culpability to FAHC as alleged. No breach of applicable standard of care; no breach of obligation of cognizable informed consent obligation. Therefore, no culpability as a matter of law, entitling FAHC to summary judgment herein. [8]

### *Conclusion*

Plaintiff asserts that FAHC owed Mr. Baker a duty. Absent a duty of care owed to a plaintiff by a defendant, an action for negligence fails. *Farnham v. Inland Sea Resort Properties, Inc.,* 175 Vt. 500, 501 (2003). Based on the analysis above, and viewing the facts in the light most favorable to Plaintiff, neither FAHC employees nor FAHC as an entity owed a duty to Mr. Baker as related to the specific claims raised in this case.

Plaintiff claims that the CHRMS-approved informed consent form created a special relationship between CHRMS and Mr. Pecor, leading to a duty on the part of CHRMS to control Mr. Pecor. Plaintiff extends this contention to a claim that CHRMS had actual control over Mr. Pecor on November 29, 2001. As we conclude above, FAHC employees were not acting within their scope of employment in their service on the CHRMS. The entity responsible for the conduct of the research study in issue in this case was, and remains, the University of Vermont acting through its SATC. The Institutional Review Board's exercise of oversight with respect to the project and its protocols does not, on this record, serve to draw FAHC into the circle of liability

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 289 of 370
PageID: 10319
Baker v. University of Vermont, 2005 WL 6280644 (2005)

even though certain individuals, who happened to be employed by FAHC, also happened to serve on the IRB. It is clear, and not in the Court's assessment subject to genuine factual dispute, that in all instances of CHRMS review of Project/Protocol # 99-207, the CHRMS was serving as the IRB for UVM, and not FAHC. FAHC as an institution did not participate in any significant manner in the design, monitoring, or implementation of UVM-SATC's research study. The particular circumstance of service of FAHC employees on the IRB reviewing the project here and its protocols is not reasonably shown to be within the scope of these individuals' employment by FAHC. There is in the Court's assessment no genuine issue of fact as to this point. Further, FAHC pharmacists and pharmacy technicians, while certainly bearing distinct professional responsibilities generally speaking, owed no duty to either Mr. Pecor or Mr. Baker as related to the specific claims presented here.

We grant that certain aspects of the CHRMS, its organization, procedures, lines of authority and thus accountability, may appear to some to be as in the ironic phrase not uncommonly used by Vermonters-"Plain as Mud!". However, our sworn obligation is to assess the merit of the Plaintiff's claims against FAHC upon the evidentiary showing presently made and the arguments advanced on this record. We have previously granted Plaintiff's request for extension of time to engage in further discovery and preparation to respond to the present Motion for Summary Judgment, so that Plaintiff would not be required to prematurely respond, given the complex issues in the case. In our assessment, Plaintiff has failed to present sufficient evidence to establish genuine issue on any of the theories advanced as relates to the Defendant FAHC's Motion. [9]

Construing the facts in a light most favorable to Plaintiff we conclude that there is no genuine issue as to material fact and that Defendant is entitled to summary judgment as a matter of law. Defendant FAHC's Motion for Summary Judgment is GRANTED. [10]

So Ordered at Newport, Vermont, this 4th day of May, 2005.

<<signature>>

Walter M. Morris, Jr.

Presiding Judge

Footnotes

1   The referenced regulation clearly mandates a diversity of membership reflecting a variety of interests, and expertise as relates to the work of IRBs. In pertinent part, the regulation provides that: "Each IRB shall have at least five members, with varying backgrounds to promote complete and adequate review of research activities commonly conducted by the institution. The IRB shall be sufficiently qualified through the experience and expertise of its members, including consideration of race, gender, and cultural backgrounds and sensitivity to such issues as community attitudes, to promote respect for its advice and counsel in safeguarding the rights and welfare of human subjects. In addition to possessing the professional competence necessary to review specific research activities, the IRB shall be able to ascertain the acceptability of proposed research in terms of institutional commitments and regulations, applicable law, and standards of professional conduct and practice. The IRB shall therefore include persons knowledgeable in these areas." "No IRB may consist entirely of members of one profession." "Each IRB shall include at least one member whose primary concerns are in scientific areas and at least one member whose primary concerns are in nonscientific areas." "No IRB may have a member participate in the IRB's initial or continuing review of any project in which the member has a conflicting interest, except to provide information requested by the IRB." 45 CFR Part 46, § 46.107 (a)-(e).

2   "Authority" being of course distinct from the issue of any duty or responsibility flowing from patient declination of SATC recommendation.

3   Resolution of this dispute is not essential to disposition of the present Motion.

4   Two other cases related to this incident are pending before the Court: *Fountain v. University of Vermont,* Docket No. 256-10-03 Oscv, and *Dezotelle v. University of Vermont, et. al.,* Docket No. 275-11-03 Oscv.

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 290 of 370
PageID: 10320
*Baker v. University of Vermont,* 2005 WL 6280644 (2005)

5    As noted in *Grimes v. Kennedy Krieger Institute, Inc.,* 366 Md. 29, 782 A.2d 807, 835 (2001), cited by Plaintiff, "There have been very few court decisions involving human experimentation. It is therefore very difficult for a 'common law' of human experimentation to develop." Federal statutes and regulations of pertinence do of course apply broadly to the conduct of medical research involving human subjects.

6    This formulation of the "test" on the Court's part of course omits certain other elements of the negligence calculus; the issue presented for determination is institutional culpability under the theory of *respondeat superior.*

7    Is an IRB ever to be considered an entity separate from its parent institution for purposes of claims arising in the conduct of research projects that have been reviewed and approved by the IRB? Are individual IRB members liable in their individual capacities for actions undertaken as IRB members in reviewing and approving research projects? Plaintiff has provided some authority which suggests that liability might attach to IRBs under certain circumstances, noting one Oklahoma case in which IRB members were sued in their individual capacities. See, Anderlik and Elster, *Lawsuits Against IRBs: Accountability or Incongruity?,* 29 Journal of Law, Medicine and Ethics 220 (2001). As the authors note, there is very little authority on the questions, and distinct and persuasive contentions both favoring and opposing extension of liability to IRBs and members. Neither of the referenced scenarios is in issue as relates to the parties and their capacities presented in this case.

8    Plaintiff maintains that, consistent with *Peck v. The Counseling Service of Addison County, Inc.,* 146 Vt. 61 (1985), FAHC was entrusted with a duty of care, to monitor and control the activities of Mr. Pecor, owing to a "special relationship" which existed under the terms of the project design and protocols approved by the CHRMS, and the participation of FAHC employees in both the CHRMS review and the dispensing of buprenorphine by the FAHC pharmacy. *Peck* is in our assessment inapposite. There, reviewing the provisions of the Restatement of Torts (2d) § 315, the Court held that notwithstanding patient privilege, a clinical therapist who knows, or should know consistent with professional standards, that the patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger. In *Peck,* a long standing therapeutic relationship existed between patient and therapist. Patient had revealed to therapist that he intended to burn down his parents' barn, and then did so. Under the circumstances, the therapist was privy to very specific information as to an intended harm that patient had declared that he would commit to specific victims. Quite logically, the holding imposes a duty to exercise reasonable care to avert the harm. In *Peck,* the Court also notes the general rule that ordinarily, there is no duty to control the conduct of another to protect third persons from harm. The key thread associated with attachment of duty is one's ability, consistent with the nature of the special relationship, to exercise control over the conduct of the actor. The principles detailed in *Peck* are certainly of application in our assessment here. However, here, it was UVM-SATC that developed and designed the project, maintained a specific treatment relationship with Mr. Pecor, and administered day to day details of Mr. Pecor's treatment, extending to administration of buprenorphine and assessment of its effects upon him. FAHC, either institutionally or through the incidental service of certain of its employees on the CHRMS, had no direct involvement in Mr. Pecor's treatment. No patient relationship existed. In the Court's assessment, review and approval of the protocols generally applicable to the conduct of the UVM-SATC buprenorphine project does not fairly and reasonably serve to establish the "special relationship" contemplated by *Peck* and the Restatement between Mr. Pecor, and FAHC and its employees serving as volunteers on the CHRMS, from which specific duty to control and warn might otherwise be derived. It is logical and reasonable to extend a duty to control and/or warn in a therapeutic relationship where there is a specific, current knowledge base as to a patient's status and specifically identifiable risks; no duty would otherwise extend though, consistent with *Peck* and related authority cited by the parties. *Grimes v. Kennedy Krieger Institute, Inc.,* 366 Md. 29, 782 A.2d 807 (2001), referenced by Plaintiff in its contention that duty, and liability on the part of FAHC derive from a "special relationship" created by approval of the project protocols and Informed Consent, is not to the contrary. In the *Grimes* case, which involved a non-therapeutic research program studying effects of exposure to lead paint by children, the issue was the sponsoring *institution's* liability for injuries sustained in the program after the IRB's approval of an informed consent which failed to disclose known risks to the otherwise healthy children involved, whose "consent" to participation in the project was given by their parents, accompanied with certain financial and other economic benefits. In the Court's assessment, the *Grimes* decision, not surprisingly, holds essentially that a "special relationship" commonly exists between medical researchers and their subjects from which duties derive the breach of which may result in civil liability. The circumstances of the *Grimes* case would appear to have been particularly egregious: non-therapeutic study of exposure of otherwise healthy children to lead paint, without full and reasonable disclosure of known risks, with consent being given by parents under circumstances found by the Court not to have been in the children's best interests. We have determined under the circumstance presented here that no duty attaches to FAHC as an institution; that there is no genuine issue of fact pertinent to the same. While the principles of *Grimes* and other authority cited by Plaintiff may feature in the resolution of other claims presented in the case, they do not dictate the extension of liability as a matter of law to FAHC as an institution.

9    We have not expressly discussed an alternative theory discerned from the pleadings of the Plaintiff, that FAHC is accountable here in that the research study was in effect a joint venture of the two institutions. There is no genuine issue on this record that UVM-SATC was the sole entity directing, and in control of the conduct of the project. FAHC did not possess or exercise co-equal authority

Baker v. University of Vermont, 2005 WL 6280644 (2005)

to direct and control. As noted, FAHC exercised a relatively minor role here, dispensing the required drug as directed, and in manner directed by, SATC. Participation of certain employees of FAHC as members of the IRB does not serve to convert UVM-SATC's project into a joint venture.

10    In consequence of the Court's determination of the Motion for Summary Judgment, FAHC's Motion to Dismiss, filed on or about September 7, 2004, and the pending Motion to Compel Discovery, filed on or about September 27, 2004, are considered moot.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 42

Thomas v. Wyeth, Not Reported in F.Supp.2d (2005)

2005 WL 3754203

2005 WL 3754203
Only the Westlaw citation is currently available.
United States District Court,
S.D. West Virginia.

Wanda THOMAS and John R. Thomas, Sr.,
her husband; Joyce Pendry; Dorothy Spearen
and C.E. Spearen, II, her husband; and Rosella
Trail and Roger Trial, her husband, Plaintiffs,
v.
WYETH a/k/a Wyeth, Inc. (f/k/a American
Home Products Corporation), et al., Defendants.

No. Civ.A. 5:05-0094.
|
June 16, 2005.

**Attorneys and Law Firms**

Anita Mae Johnson, Gary C. Johnson, Pikeville, KY, Stephen
P. New, Beckley, WV, for Plaintiffs.

Gretchen M. Callas, Jackson Kelly, Charles M. Love, III,
Fazal A. Shere, Bowles Rice McDavid Graff & Love,
David B. Thomas, William Scott Wickline, Allen Guthrie
McHugh & Thomas, David K. Hendrickson, R. Scott Long,
Hendrickson & Long, Elliot G. Hicks, Hawkins & Parnell,
Stacy A. Jacques, Farmer Cline & Campbell, Stephen B.
Farmer, Farmer Cline & Arnold, Charleston, WV, Neisha
E. Brown, Tamela J. White, Farrell Farrell & Farrell,
Huntington, WV, Charles F. Johns, David E. Goddard, Steptoe
& Johnson, Clarksburg, WV, Matthew V. Brammer, Ulmer
& Berne, LLP, Cincinnati, OH, Courtney A. Clark, Jodi B.
Buske, Kenneth A. Cohen, U. Gwyn Williams, Goodwin
Procter LLP, Boston, MA, for Defendants.

MEMORANDUM OPINION AND ORDER

CHAMBERS, J.

*1 Pending before the Court is Plaintiffs' Motion to Remand.
For the reasons set forth herein the motion is DENIED.

I.

Factual Allegations and Procedural Background

Plaintiffs Wanda Thomas, John R. Thomas, Joyce Pendry,
Dorothy Spearen, C.E. Spearen II, Rosella Trail, and
Roger Trail [1] filed suit in the Circuit Court of Raleigh
County, West Virginia on July 8, 2004. Plaintiffs Wanda
Thomas, Joyce Pendry, Dorothy Spearen, and Rosella Trail
all underwent hormone replacement therapy ("HRT") and
allege that as a result of the HRT they each developed
serious illnesses. [2] Plaintiffs' complaint named as defendants
two local pharmacies, Contact Pharmacy and Colony Drug
Company (the Pharmacy Defendants), along with numerous
manufacturers of HRT (Drug Defendants). Defendants
removed the case to this Court based on diversity jurisdiction
pursuant to 28 U.S.C. §§ 1446(b) and 1332(a), maintaining
that the Pharmacy Defendants were fraudulently joined to
defeat diversity jurisdiction. Plaintiffs deny that allegation
and their Motion to Remand is currently before the Court.

II.

Standard of Review

"In order to establish diversity jurisdiction, the parties must
be completely diverse; none of the plaintiffs may share
citizenship with any of the defendants." *Owens-Illinois, Inc. v.
Meade,* 186 F.3d 435, 440 (4 th Cir.1999). However, the Court
will ignore a nondiverse defendant's citizenship if the plaintiff
fraudulently joined that defendant. In determining fraudulent
joinder, the Fourth Circuit implemented the following test:

> In order to establish that a nondiverse defendant has been
> fraudulently joined, the removing party must establish
> either:
>
> [T]hat there is *no possibility* that the plaintiff would be
> able to establish a cause of action against the instate
> defendant in state court; or
>
> [T]hat there has been outright fraud in the plaintiff's
> pleading of jurisdictional facts.

*Marshall v. Manville Sales Corp.,* 6 F.3d 229, 232 (4th
Cir.1993) (quoting *B., Inc. v. Miller Brewing Co.,* 663 F.2d
545, 549 (5th Cir.1981)); *see also AIDS Counseling and
Testing Centers v. Group W Television, Inc.,* 903 F.2d 1000,
1004 (4th Cir.1990) (stating that "joinder is fraudulent if there

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 294 of 370
PageID: 10324
Thomas v. Wyeth, Not Reported in F.Supp.2d (2005)
2005 WL 3754203

is no real intention to get a joint judgment, and there is no colorable ground for so claiming") (internal quotations and citations omitted).

The *Marshall* court further explained that "[t]he burden on the defendant claiming fraudulent joinder is heavy: the defendant must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor." 6 F.3d at 232-33 (citing *Poulos v. Naas Foods, Inc.,* 959 F.2d 69, 73 (7th Cir.1992)). *See also Rinehart v. Consolidation Coal Co.,* 660 F.Supp. 1140 (N.D.W.Va.1987). This standard is even more favorable to a plaintiff than the one for ruling on a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6). *See, e.g., Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 852 (3d Cir.1992) (stating that inquiry into validity of complaint is more searching under Rule 12(b)(6) than when party claims fraudulent joinder). As the *Marshall* court noted, this doctrine implements "Congress' clear intention to restrict removal and to resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." 6 F.3d at 232 (citing *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 10, 71 S.Ct. 534, 95 L.Ed. 702 (1951)).

**\*2** The Court must apply West Virginia choice-of-law rules. West Virginia tort and contract law will guide the Court in deciding if there is *any possibility* that the plaintiff would be able to establish a cause of action against the Pharmacy Defendants in state court. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

III.

Analysis

Plaintiffs bring several causes of action against the Pharmacy Defendants including: (1) negligence; (2) failure to warn; (3) breach of express and implied warranty; (4) misrepresentation by seller of chattel; (5) civil conspiracy; (6) fraud; and (7) fraudulent concealment. Defendants argue that West Virginia Code § 30-5-12 affords the Pharmacy Defendants immunity from any liability as a result of dispensing HRT. Plaintiffs' counter that Defendants are misplaced in their reliance on West Virginia Code § 30-5-12, arguing that the code section only provides immunity from strict liability in products liability actions. West Virginia Code § 30-5-12 specifically provides:

all persons, whether licensed pharmacists or not, shall be responsible for the quality of all drugs, chemicals and medicines they may sell or dispense, with the exception of those sold in or dispensed unchanged from the original retail package of the manufacturer, in which event the manufacturer shall be responsible.[3]

This section has been interpreted to bar claims against pharmacies for negligence, willfulness, wantonness, breach of express and implied warranty, and intentional infliction of emotional distress in similar cases. *See In re Rezulin Products Liability Litigation,* 133 F.Supp.2d 272, 295 (S.D.N.Y.2001)(multi-district litigation which included one West Virginia action); *Baker v. Purdue Pharma L.P., et al.,* No. 01-0553 (S.D.W.Va. Mar. 28, 2002)(unpublished opinion). In those cases, the courts found that the plaintiffs failed to allege that the drug in question was dispensed in a condition other than its original packaging. *Id.* The Court finds that Plaintiffs in the present action have also failed to make such factual allegations.[4]

Plaintiffs, in support of their motion to remand, rely upon the opinion of the court in *Little v. Purdue Pharma, L.P.,* 227 F.Supp.2d 838 (S.D.Ohio 2002). In *Little,* the plaintiffs' case involved the prescription pain medicine OxyContin. *Id.* at 842. Specifically, the plaintiffs brought claims of "(1) strict product liability; (2) negligence; (3) breach of express warranty; (4) breach of implied warranty; (5) violation of Ohio Consumer Sales Practices Act, Ohio Rev.Code § 1345.01, *et seq;* (6) fraud; and (7) unjust enrichment." *Id.* at 843. These claims were brought against the corporate manufacturers of OxyContin (corporate defendants) as well as local pharmacies (local defendants). *Id.* at 842. The corporate defendants removed the case to federal court on the basis of diversity jurisdiction, arguing that the local defendants were fraudulently joined. *Id.* Plaintiffs in turn moved to remand. *Id.* The court in considering whether the local defendants had been fraudulently joined, analyzed the plaintiffs' claims both under common law and under the Ohio Products Liability Act (OPLA). *Id.* at 849-50. Under common law, the court found that the question of whether a pharmacy

can be held liable either under a strict liability or negligence standard was a matter of first impression in Ohio; therefore, in the interest of comity it refused to reach a determination that had yet to be answered by the state court. *Id.* The court also questioned the application of the "learned intermediary" doctrine to pharmacies. *Id.* at 850. Additionally, the court considered the defendants' argument that the plaintiffs' claims were barred by the OPLA, specifically Ohio Rev.Code § 2307.78. *Id.* The court found that the provision on which the defendants relied "only governs when a supplier may be held liable for the acts of the manufacturer; it does not concern the liability of a supplier *qua* supplier." *Id.* at 851. The court also noted that the Ohio Supreme Court had previously held that the OPLA does not supersede common law claims. *Id.* at 852. Therefore, the court found that the local defendants had not been fraudulently joined and remand was proper. *Id.*

**\*3** Plaintiffs' reliance on *Little* is misplaced. In remanding the case, the *Little* court relied in part on the OPLA, an act which is much different than the West Virginia statute at issue in the present case. The OPLA only addressed when a supplier may be held liable for the acts of a manufacturer; therefore, because the plaintiffs in *Little* were alleging claims against the suppliers as the supplier, the Act did not relieve them of liability. However, the West Virginia statute currently before the Court protects pharmacies from all claims if their actions fall within the coverage of the statute as discussed above. The reach of West Virginia Code § 30-5-12 is much broader than that of the OPLA, covering both common law and statutory claims. Therefore, relying on *In re Rezulin Products Liability Litigation* and *Baker v. Purdue Pharma L.P., et al.,* which interpreted West Virginia Code § 30-5-12, the Court finds Plaintiffs' claims of negligence, failure to warn and breach of express and implied warranty barred under § 30-5-12.

The Court also finds that Plaintiffs' allegations in the present case against the Pharmacy Defendants are also insufficient to form viable claims of misrepresentation by seller of chattel, conspiracy and fraud. Plaintiffs provide in their complaint an extensive factual history of the HRT market in the United States and Wyeth's position within that market. However, not one factual allegation is centered around the activities of the pharmacies. Plaintiffs allege that Wyeth and other manufacturers engaged in nationwide marketing techniques, targeting doctors and health care providers, to tout the benefits of HRT even though they had failed to

perform adequate testing on the long-term effects of such treatment, "fraudulently inducing physicians and patients alike to use Wyeth's HRT products under the false assumption that such drugs had been sufficiently tested." *See* Plaintiffs' Complaint at 61. At no point in the sixty-five pages of factual allegations contained in their complaint do Plaintiffs provide any allegations that the Pharmacy Defendants were not subject to the same fraudulent inducement as were the doctors and health care providers. The Complaint contains no allegation that the Pharmacy Defendants received complete and accurate information as to the effectiveness and risks of HRT. Furthermore, Plaintiffs never factually allege that the Pharmacy Defendants did anymore than dispense HRT under a prescription to the female Plaintiffs.

The Court recognizes that the standard for finding that the Pharmacy Defendants have not been fraudulently joined is more favorable to Plaintiffs than a motion to dismiss. However, Plaintiffs' thinly alleged claims of civil conspiracy and fraud are not supported by a single factual allegation. The Court, therefore, finds that Plaintiffs have failed to allege any facts against the Pharmacy Defendants that would take their action outside the protection afforded by West Virginia Code § 30-5-12.

IV.

Conclusion

**\*4** For these reasons, the Court concludes that the Complaint fails to state a viable theory against the Pharmacy Defendants. Therefore, the Court finds that the Plaintiffs fraudulently joined the Pharmacy Defendants. The Court accordingly DENIES the Plaintiff's Motion to Remand and DISMISSES the claims against the Pharmacy Defendants.

The Court DIRECTS the Clerk to send a copy of this Written Opinion and Order to counsel of record and any unrepresented parties.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3754203

Footnotes

2005 WL 3754203

1    John R. Thomas is the husband of Wanda Thomas, C.E. Spearen II is the husband of Dorothy Spearen, and Roger Trail is the husband of Rosella Trail.

2    Wanda Thomas, who underwent HRT from approximately 1990 to 2000, was diagnosed with breast cancer and other medical conditions in 2000; Joyce Pendry, who underwent HRT from approximately 1982 to 1999, was diagnosed in 1999 and 2001 with breast cancer; Dorothy Spearen, who underwent HRT from approximately 1998 to 2003, was diagnosed with Lupus in 2003; Rosella Trail underwent HRT since approximately 1994 and in 2002 was diagnosed with asthma.

3    The State of West Virginia Board of Pharmacy interprets West Virginia Code § 30-5-12 to mean, "if a pharmacist only counts out or measures the correct prescribed drug in the prescribed dosage from the original retail package received in bulk, stock bottles from the manufacturer and transfers that dosage unchanged to the pill bottle or container given to the consumer, then they are not liable for the quality of such drugs; the manufacturer is. The pharmacy can only assume that any FDA approved prescription drugs received from the manufacturer are of good quality and if dispensed as received would achieve its therapeutic purpose." *See* Defendants' Response to Plaintiffs' Motion to Remand, Exhibit A.

4    Plaintiffs have submitted a supplemental argument in support of remand in which they provide the deposition testimony of a pharmacist at a non-party pharmacy who states that it is industry practice that the HRT drugs are received in large quantity bottles and the pharmacist count them into smaller bottles prior to dispensing. The Court's opinion; however, is based upon "the record as it stands at the time defendants filed their petition for removal ." *Weekly v. Olin Corp.,* 681 F.Supp. 346, 348 n. 4 (N.D.W.Va.1987) (citing 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3721, at 309 (2d ed.1985)). Therefore, the Court will not consider the deposition testimony contained in Plaintiffs' supplemental brief.

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 43

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re Wells Fargo Insurance Marketing and Sales
Practices Litigation, C.D.Cal., December 14, 2018

2017 WL 1531192
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Michelle RESNICK et al.

v.

HYUNDAI MOTOR AMERICA, INC. et al.

Case No. CV 16–00593–BRO (PJWx)
|
Signed 4/13/2017

**Synopsis**
**Background:** Consumers who purchased cars with allegedly
defective paint brought putative class action against Korean
car manufacturer and its United States subsidiary, asserting
claims for breach of express and implied warranties,
negligent misrepresentation, fraud, unjust enrichment, and
violations of California, Maryland, Florida, Illinois, Texas,
and Massachusetts consumer protection laws. Defendants
moved to dismiss.

**Holdings:** The District Court, Beverly Reid O'Connell, J.,
held that:

[1] consumers failed to state claim for breach of express
warranty;

[2] economic loss rule applied to bar consumers' negligent
misrepresentation claims;

[3] special relationship exception to economic loss doctrine
did not apply to consumers' claims;

[4] consumers failed to state a viable claim against
car manufacturer for breach of the implied warranty of
merchantability under the Song–Beverly Act;

[5] consumers failed to establish that manufacturer had
knowledge of alleged paint defect at time consumers
purchased their vehicles, as required to state claim under
California's Consumers Legal Remedies Act (CLRA);

[6] consumers failed to sufficiently state claim for unlawful,
unfair, or fraudulent business practices under California's
Unfair Competition Law (UCL); and

[7] consumers could not maintain claims for unjust
enrichment.

Motion granted.

West Headnotes (44)

**[1]    Evidence    ⟜    Nature and scope in general**

District court would take judicial notice of
relevant pages of car manufacturer's 2015
owner's handbook and warranty information,
in consumers' putative class action against
manufacturer for claims related to allegedly
defective paint on consumers' cars, where
warranty formed basis of consumers' claims.

**[2]    Federal Civil Procedure    ⟜    Fraud, mistake
and condition of mind**

To plead fraud with particularity, the pleader
must state the time, place, and specific content of
the false representations. Fed. R. Civ. P. 9(b).

**[3]    Federal Civil Procedure    ⟜    Fraud, mistake
and condition of mind**

To plead fraud with particularity, the allegations
must set forth more than neutral facts necessary
to identify the transaction, and the plaintiff must
set forth what is false or misleading about the
statement, and why it is false. Fed. R. Civ. P. 9(b).

**[4]    Federal Civil Procedure    ⟜    Fraud, mistake
and condition of mind**

Where multiple defendants allegedly engaged in
fraudulent activity, plaintiffs cannot merely lump
multiple defendants together; rather, a plaintiff
must identify each defendant's role in the alleged
scheme. Fed. R. Civ. P. 9(b).

2017 WL 1531192

**[5]**    **Sales** 👈 Breach and elements thereof in general

To state a claim for breach of express warranty under California law, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury.

2 Cases that cite this headnote

**[6]**    **Sales** 👈 Future defects and events; future performance

Under California law, consumers failed to state claim for breach of express warranty for paint used on its vehicles, in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off, leading to rusting and corrosion, where consumers' claims related to allegedly defective paint did not arise during the warranty period.

**[7]**    **Sales** 👈 Making and Requisites

**Sales** 👈 Difference from value as warranted

Under California law, a warranty is a contractual promise from the seller that the goods conform to the promise, and if they do not, the buyer is entitled to recover the difference between the value of the goods accepted by the buyer and the value of the goods had they been as warranted.

**[8]**    **Sales** 👈 Obvious, latent, or hidden defects

Under California law, a seller may enumerate an express warranty to limit its liability for defective goods.

**[9]**    **Sales** 👈 Motor vehicles

General rule under California law is that an express warranty does not cover car repairs made after the applicable time or mileage periods have elapsed.

**[10]**    **Sales** 👈 Future defects and events; future performance

Even assuming that any of car manufacturer's statements that its paint would "stand the test of time," "prevent rust," and that the paint protected against corrosion were guarantees that constituted a viable express warranty regarding the quality of manufacturer's paint, rather than non-actionable puffery, warranty would have been limited to same terms as express warranty with respect to actionable period, rather than warranty of unlimited duration suggesting that paint would never fail, and thus consumers failed to state claim for breach of warranty by representation under California law, since claims did not arise during express warranty period.

1 Cases that cite this headnote

**[11]**    **Products Liability** 👈 Economic losses; damage to product itself

Under California law, the "economic loss rule" requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.

**[12]**    **Products Liability** 👈 Economic losses; damage to product itself

Under California law, the purpose of the economic loss rule is to ensure that a plaintiff relies on the law of contracts and implied and express warranties to recover damage to the product sold, rather than resort to tort law.

**[13]**    **Fraud** 👈 Injury and causation

Under California law, economic loss rule applied to bar consumers' negligent misrepresentation claims, in putative class action against car manufacturer alleging that defect in cars' paint caused it to bubble, peel, and flake off of cars, where consumers alleged only that defective paint cost consumers out of pocket losses associated with paint defect, corrosion repairs, and diminished value of their vehicles, and risk

2017 WL 1531192

that defective paint would cause harm to body of vehicle was best placed on the buyers, rather than sellers, after the warranty term had expired.

1 Cases that cite this headnote

**[14]    Products Liability** 🔑 **Economic losses; damage to product itself**

Under California's economic loss rule, a plaintiff may recover in tort only where he or she can allege personal injury or damage to other property, that is, property other than the product itself.

1 Cases that cite this headnote

**[15]    Fraud** 🔑 **Effect of existence of remedy by action on contract**

Under California law, special relationship exception to economic loss doctrine did not apply to consumers' claims against car manufacturer for negligent misrepresentation arising from damages to body of car allegedly caused by defect in cars' paint that caused it to bubble, peel, and flake off, where consumers were not third parties to transactions, but had direct contractual relationship with manufacturer.

2 Cases that cite this headnote

**[16]    Torts** 🔑 **Economic loss doctrine**

Under California law, the economic loss rule does not bar recovery in tort where a special relationship exists between the parties.

3 Cases that cite this headnote

**[17]    Torts** 🔑 **Economic loss doctrine**

Under the special relationship exception to the economic loss rule, a court examines six factors to determine whether such a relationship exists: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm: (3) the degree of certainty the plaintiff would suffer harm; (4) the closeness of the connection between the defendant's conduct and the plaintiff's harm; (5) the moral

blame; and, (6) the policy of preventing future harm.

**[18]    Negligence** 🔑 **Economic loss doctrine**

Under California law, the special relationship exception to the economic loss doctrine applies when a court is required to analyze the circumstances in which a party has a duty of care to avoid imposing economic losses on third parties.

2 Cases that cite this headnote

**[19]    Antitrust and Trade Regulation** 🔑 **Motor vehicles;  "lemon" laws**

Consumers failed to state a viable claim against car manufacturer for breach of the implied warranty of merchantability under the Song–Beverly Act based on alleged defect in cars' paint that caused it to bubble, peel, and flake off of cars, where consumers alleged that the paint defect affected only the aesthetics of the vehicle, not that it rendered the vehicle inoperable, useless, or unsafe. Cal. Civ. Code § 1791.1(a).

**[20]    Antitrust and Trade Regulation** 🔑 **Motor vehicles;  "lemon" laws**

Under the Song–Beverly Act, the implied warranty of merchantability requires only that a vehicle be reasonably suited for ordinary use; it need not be perfect in every detail so long as it provides for a minimum level of quality. Cal. Civ. Code § 1791.1(a).

2 Cases that cite this headnote

**[21]    Antitrust and Trade Regulation** 🔑 **Representations, assertions, and descriptions in general**

Generally, the standard for deceptive practices under the fraudulent prong of California's Unfair Competition Law (UCL) applies equally to claims for misrepresentation under the California Consumer Legal Remedies Act (CLRA). Cal. Bus. & Prof. Code § 17200 et seq.; Cal. Civ. Code § 1770.

2017 WL 1531192

1 Cases that cite this headnote

**[22]    Antitrust and Trade
Regulation** 〰 **Particular cases**

Consumers' allegations were insufficient to establish that car manufacturer had knowledge of alleged paint defect at time consumers purchased their vehicles, as required to state claims under California's Consumers Legal Remedies Act (CLRA) and Unfair Competition Law (UCL), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off; consumers failed to identify how manufacturer's significant quality-monitoring processes, and undated, anonymous complaints made to dealerships and on various websites placed manufacturer on notice that there was possible, post-warranty failure of its paint. Cal. Civ. Code § 1750 et seq.; Cal. Bus. & Prof. Code § 17200 et seq.

4 Cases that cite this headnote

**[23]    Antitrust and Trade
Regulation** 〰 **Particular cases**

Consumers' allegations that car manufacturer did or should have conducted testing on components, including paints and coatings, to verify that materials were free from defects were insufficient to establish that car manufacturer had knowledge of alleged paint defect at time consumers purchased their vehicles, as required to state claim under California's Consumers Legal Remedies Act (CLRA) and Unfair Competition Law (UCL); allegations did not indicate how testing would have placed manufacturer on notice of an alleged paint defect, or would have informed manufacturer of a possible, post-warranty failure of its paint. Cal. Civ. Code § 1750 et seq.; Cal. Bus. & Prof. Code § 17200 et seq.

1 Cases that cite this headnote

**[24]    Antitrust and Trade
Regulation** 〰 **Particular cases**

Fact that rival automobile company had previously used self-healing paint technique on its cars for a short period of time was insufficient to establish that car manufacturer had knowledge of alleged paint defect at time consumers purchased their vehicles, as required to state claim under California's Consumers Legal Remedies Act (CLRA), where consumers failed to allege that manufacturer was aware that company had used and then stopped using paint technique, and was aware of reason why company stopped using it. Cal. Civ. Code § 1750 et seq.

1 Cases that cite this headnote

**[25]    Fraud** 〰 **Fraudulent Concealment**

To state a claim for fraudulent concealment under California law, a plaintiff must establish: (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact.

1 Cases that cite this headnote

**[26]    Fraud** 〰 **Fraudulent Concealment**

Under California law, a plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the result of affirmative conduct by the defendant.

**[27]    Antitrust and Trade
Regulation** 〰 **Particular cases**

Consumers failed to sufficiently state claim against car manufacturer for unlawful, unfair, or fraudulent business practices under California's Unfair Competition Law (UCL), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off vehicles, where consumers failed

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 302 of 370
PageID: 10332

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

to sufficiently plead claim for violation of any other statute, failed to allege that paint failed during the term of its express warranty, and failed to establish that manufacturer was aware of the alleged paint defect at the time it made any alleged misleading or false statements. Cal. Bus. & Prof. Code § 17200 et seq.

**[28]    Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation;  lawfulness

The "unlawful" prong of the California Unfair Competition Law (UCL) borrows violations of other laws and treats them as unlawful practices independently actionable. Cal. Bus. & Prof. Code § 17200 et seq.

**[29]    Antitrust and Trade Regulation** 🔑 In general;  unfairness
**Antitrust and Trade Regulation** 🔑 Reliance;  causation;  injury, loss, or damage

An act or practice is unfair under the California Unfair Competition Law (UCL) if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided. Cal. Bus. & Prof. Code § 17200 et seq.

1 Cases that cite this headnote

**[30]    Antitrust and Trade Regulation** 🔑 Omissions and other failures to act in general;  disclosure

Failure to disclose a defect that might shorten the effective life span of a component part to a consumer product does not constitute a substantial injury under the unfair practices prong of the California Unfair Competition Law (UCL) where the product functions as warranted throughout the term of its express warranty. Cal. Bus. & Prof. Code § 17200 et seq.

**[31]    Antitrust and Trade Regulation** 🔑 Fraud; deceit;  knowledge and intent

To state a claim under the "fraudulent" prong, of the California Unfair Competition Law (UCL) it is necessary only to show that members of the public are likely to be deceived by the business practice or advertising at issue. Cal. Bus. & Prof. Code § 17200 et seq.

**[32]    Antitrust and Trade Regulation** 🔑 Advertising, marketing, and promotion

Consumers failed to establish that car manufacturer knew or should have known of alleged paint defect at the time manufacturer advertised or provided information on its website regarding quality of paint, and thus failed to state claim for violation of California's False Advertising Law (FAL), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off vehicles. Cal. Bus. & Prof. Code § 17500.

**[33]    Antitrust and Trade Regulation** 🔑 Representations, assertions, and descriptions in general
**Antitrust and Trade Regulation** 🔑 Advertising, marketing, and promotion

Consumers failed to adequately allege that they relied on an affirmative misrepresentation made by car manufacturer, as required to succeed on fraudulent concealment claims under California's Consumers Legal Remedies Act (CLRA), California Unfair Competition Law (UCL), and California's False Advertising Law (FAL), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off; even if consumers had established that manufacturer had knowledge of alleged defect at the time it made representations regarding the paint's ability to prevent rust and corrosion regarding the paint, named California plaintiff purchased vehicle before alleged misrepresentations were

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 303 of 370
PageID: 10333
Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

made. Cal. Civ. Code § 1750 et seq.; Cal. Bus. & Prof. Code § 17200 et seq.; Cal. Bus. & Prof. Code § 17500 et seq.

2 Cases that cite this headnote

**[34]    Antitrust and Trade**
**Regulation** 👈 Omissions and other failures to act in general;  disclosure

Consumer failed to sufficiently allege that she relied on material omission made by car manufacturer in purchasing her vehicle, and thus failed to state claim against manufacturer for violation of the Maryland Consumer Protection Act (MCPA), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off, where consumer purchased her car approximately three years before manufacturer made statements regarding paint's ability to prevent rust and corrosion on its website. Md. Code Ann., Com. Law § 13–301 et seq.

**[35]    Antitrust and Trade**
**Regulation** 👈 Reliance;  causation;  injury, loss, or damage

**Antitrust and Trade**
**Regulation** 👈 Omissions and other failures to act in general;  disclosure

A party seeking to recover damages on a material omission theory under the Maryland Consumer Protection Act (MCPA) must prove reliance; requirement of reliance flows from the MCPA's prescription that the party's injury or loss be the result of the prohibited practice. Md. Code Ann., Com. Law § 13–301 et seq.

**[36]    Antitrust and Trade**
**Regulation** 👈 Omissions and other failures to act in general;  disclosure

Under the Texas Deceptive Trade Practices Act (DTPA), there is no duty to disclose if the defendant did not know the material information at the time of the transaction. Tex. Bus. & C. Code § 17.41 et seq.

1 Cases that cite this headnote

**[37]    Antitrust and Trade**
**Regulation** 👈 Advertising, marketing, and promotion

Where a plaintiff has not seen or heard an allegedly deceptive advertisement, she cannot challenge it under Florida's Unfair and Deceptive Trade Practices Act (FDUTPA). Fla. Stat. Ann. § 501.201 et seq.

**[38]    Limitation of Actions** 👈 Concealment of Cause of Action

Consumers failed to adequately allege that car manufacturer actively concealed material facts regarding alleged defect in its paint for purposes of inducing delay in filing of action, as would support tolling of statute of limitations, for purposes of claims against car manufacturer under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off vehicles. Fla. Stat. Ann. § 501.201 et seq.

**[39]    Antitrust and Trade**
**Regulation** 👈 Particular cases

Consumer failed to allege that she viewed rust and corrosion prevention advertisement on car manufacturer's website, and that manufacturer had knowledge of alleged paint defect, as would support claim against manufacturer under Illinois's Consumer Fraud and Deceptive Business Practices Act (ICFDPA), in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[40]    Federal Civil Procedure** 👈 Matters considered

Consumers waived claim under Massachusetts's Unfair and Deceptive Trade Practice Act (MUDTPA), in putative class action against car

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 304 of 370
PageID: 10334

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off, where consumers failed to address manufacturer's argument that consumers failed to provide notice of claims in their opposition to manufacturer's summary judgment motion. Mass. Gen. Laws Ann. ch. 93A, § 9(3).

1 Cases that cite this headnote

[41]    **Implied and Constructive Contracts**  ⚷  **Effect of Express Contract**

Consumers could not maintain claims against car manufacturer for unjust enrichment, in putative class action against car manufacturer alleging that defect in cars' paint caused paint to bubble, peel, and flake off, where there were express contracts between the parties.

[42]    **Implied and Constructive Contracts**  ⚷  **Unjust enrichment**

Unjust enrichment is not a stand-alone cause of action in California, but is, instead, the theory underlying that a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request.

2 Cases that cite this headnote

[43]    **Implied and Constructive Contracts**  ⚷  **Unjust enrichment**

        **Implied and Constructive Contracts**  ⚷  **Restitution**

When a plaintiff alleges an unjust enrichment claim under California law, a court may construe the cause of action as a quasi-contract claim seeking restitution.

4 Cases that cite this headnote

[44]    **Implied and Constructive Contracts**  ⚷  **Effect of Express Contract**

Under California law, an action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties.

3 Cases that cite this headnote

**Attorneys and Law Firms**

David C. Wright, Jae Kook Kim, Richard D. McCune, McCune Wright LLP, Redlands, CA, Gregory F. Coleman, Lisa A. White, Greg Coleman Law PC, Knoxville, TN, John A. Yanchunis, Patrick A. Barthle, III, Morgan and Morgan Complex Litigation Group, Tampa, FL, Jean S. Martin, Law Office of Jean Sutton Martin PLLC, Wilmington, NC, Tammy Barceloux, Napoli Shkolnik PLLC, El Segundo, CA, for Michelle Resnick et al.

Eric Y. Kizirian, Dyanne Jinhyung Cho, Michael Keith Grimaldi, Zourik Zarifian, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, for Hyundai Motor America, Inc. et al.

## ORDER RE DEFENDANTS' MOTION TO DISMISS CASE [80]

BEVERLY REID O'CONNELL, United States District Judge

## I. INTRODUCTION

 *1  Pending before the Court are Defendants Hyundai Motor America, Inc. and Hyundai Motor Co., Ltd.'s (collectively, "Defendants") Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("CCAC"). (Dkt. No. 80 (hereinafter, "Mot.").) After considering the papers filed in support of and in opposition the instant Motion, as well as oral argument of counsel, for the following reasons, the Court **GRANTS** Defendants' Motion.

## II. BACKGROUND

### A. The Parties

Plaintiffs in this action are fifteen individuals from throughout the country who bring this action on behalf of themselves and all others similarly situated. [1] (*See* Dkt. No. 70 (hereinafter, "CCAC") at 1.) Plaintiffs are current owners of 2006–2016 Hyundai Santa Fe, Sonata, and Elantra automobiles manufactured within the United States (the "Class Vehicles") that allegedly have "an identical and inherent defect in the vehicle's paint." (CCAC ¶ 1.) Plaintiffs allege that this defect in the paint manifests itself over time and causes the paint to bubble, peel, and "flake off" of the vehicle, leading to rusting

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

and corrosion. (*Id.*) Plaintiffs claim that Hyundai fraudulently concealed this defect when Plaintiffs purchased their vehicles and has refused to offer Plaintiffs and the proposed class members any relief. (*Id.*)

Defendant Hyundai Motor America, Inc. ("HMA") is a California corporation with its principal place of business in Fountain Valley, California. (CCAC ¶ 26.) HMA is in the business of "designing, manufacturing, marketing, distributing, warranting and selling Hyundai automobiles" throughout the United States. (*Id.*) Defendant Hyundai Motor Co., Ltd. ("HMC") is a corporation organized under the laws of the Republic of Korea with its principal place of business in Seoul, South Korea. (CCAC ¶ 27.) HMA is a subsidiary of HMC. (CCAC ¶ 28.) Plaintiffs allege that HMA distributes the Class Vehicles and that they are sold at Hyundai dealerships throughout the country that HMA authorizes. (CCAC ¶ 30.)

**B. Factual Allegations**

Plaintiffs aver that Hyundai has more than 800 dealerships within the United States and has sold over six million vehicles in the United States since it began selling vehicles here in 1986. (CCAC ¶ 35.) According to Plaintiffs, Hyundai advertises itself as "an automobile manufacturer conscious of quality, technology and innovation, and design." (CCAC ¶ 37.) Further, Plaintiffs claim that the Class Vehicles are advertised "as being backed by 'America's best warranty.' " (*Id.*) Specifically, Hyundai provides a ten-year/100,000–mile powertrain warranty, but provides only a five-year/60,000–mile warranty for new vehicles, and limits its paint warranty to a three-year/30,000 mile warranty. (CCAC ¶ 38.) Plaintiffs allege that Hyundai makes specific representations regarding its use of "state-of-the-art paint" and express warranties about the quality of its painting process, including a commercial in which Hyundai represented that its paint process is used because "beautiful works of art are meant to last." (CCAC ¶¶ 39–40.) According to Plaintiffs, since February 5, 2012, Hyundai has provided information on its website regarding the quality of and process for painting its vehicles. (CCAC ¶¶ 41–42.) Plaintiffs claim that this information expressly represents to consumers that the paint on Hyundai's vehicles will "protect against corrosion, rust and scratches," and will maintain high residual values due to the quality of the paint. (CCAC ¶¶ 43–44.) Plaintiffs allege that, despite receiving "numerous" customer complaints, Hyundai promoted its paint process as a selling point for its vehicles until at least May 2016. (*See* CCAC ¶¶ 46–17.)

\*2 Plaintiffs claim that "self-healing clear coats," such as the "Scratch Recovery Clear" product that Hyundai uses on the Class Vehicles, rely upon ultraviolet light to cause the polymer in it to enter a "molten" state that fills in scratches. (CCAC ¶ 48.) However, since these products were developed, Plaintiffs claim that there has been concern that long-term exposure to ultraviolet light (such as through sun exposure) causes the paint to peel. (CCAC ¶ 49.) Plaintiffs also claim that the "self-healing" repair process does not work on scratches deeper than surface scratches, and that, in fact, deeper scratches or chips may trigger the technology to work in reverse. (CCAC ¶¶ 50–51.) According to Plaintiffs, Nissan used this technology beginning in approximately 2005, but shortly thereafter discontinued the practice as customers complained of peeling paint. (CCAC ¶ 52.) After unveiling this coating technique, Plaintiffs claim that Nissan acknowledged that the coating lasted about three years. (CCAC ¶ 53.) Thus, Plaintiffs aver that Defendants are using a coating with a short lifespan of three years without any warning or disclosure to its customers, like Plaintiffs. (CCAC ¶ 55.)

According to Plaintiffs, since May 2016, Defendants no longer advertise their paint as a selling point for their vehicles, instead focusing on the steel used in their construction. (CCAC ¶ 58.) However, Plaintiffs claim that Defendants continue to represent that the paint protects against corrosion and rust. (*Id.*) Further, Defendants have "marketed, advertised and warranted" that the Class Vehicles' paint "would 'stand the test of time.' " (CCAC ¶ 59.) Defendants do not inform consumers that the self-healing paint technique has a lifespan of only three years and will not provide long-term protection against rust and corrosion. (CCAC ¶ 60.)

Plaintiffs claim that the coating defects in the paint constitute a latent defect that a reasonable purchaser would not be aware of before buying a vehicle. (CCAC ¶ 61.) Thus, Plaintiffs claim that Hyundai had a duty to inform Plaintiffs of the existence of this latent defect, but failed to do so. (*Id.*) Plaintiffs aver that Hyundai was aware of the paint defects due to customer complaints made to Defendants directly as well as to dealerships across the country. (CCAC ¶ 64.)

Further, since December 1999, Hyundai has operated an Overseas Service Quality Center ("OSQC") that processes "real-time filed quality information reports from around the globe, conduct[s] quality surveys, and track[s] Hyundai consumer reports." (CCAC ¶ 66.) In 2002, HMC combined

Case 1:19-md-02875-RBM-SAK    Document 523-7    Filed 07/17/20    Page 306 of 370
PageID: 10336
Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

maintenance and quality operations into one organization to handle both services. (CCAC ¶ 67.) In addition, in 2004, HMC established a "Global Quality Situation Room" to enable the company to respond to quality problems from around the world. (CCAC ¶ 68.) Plaintiffs also claim that HMC's top managers from every department meet twice monthly to ensure customer satisfaction. (CCAC ¶ 69.) HMC claims to conduct "market-driven quality control 'through ongoing communication with customers at all contact points.' " (CCAC ¶ 70.)

Plaintiffs also aver that there are multiple examples of online complaints that may be found on Hyundai–Forums.com and Edmunds.com. (*See* CCAC ¶¶ 72–73.) Defendants promote "the extensive testing" they perform on their vehicles prior to production. (CCAC ¶ 77.) Therefore, according to Plaintiffs, Defendants were aware of customer complaints about the Class Vehicles' paint through (1) customer complaint records, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal testing, and, (5) "various other sources." (CCAC ¶ 78.) Plaintiffs also contend that on November 13, 2013, Defendants announced that they would begin using the third-party website SureCritic to "publicly feature owner-generated ratings and reviews" for Hyundai vehicles. (CCAC ¶ 80.) Plaintiffs claim that the SureCritic website contains various complaints and reviews regarding the peeling paint on the Class Vehicles. (CCAC ¶ 81.) According to Plaintiffs, Hyundai admits to monitoring the SureCritic website, which should have placed it on notice of the paint defect; yet, Hyundai failed to disclose this information to consumers. (CCAC ¶ 82.)

### C. The Specific Facts of Plaintiffs' Cases

**\*3** Plaintiff Michelle Resnick is the original owner of a 2009 Hyundai Santa Fe purchased from a Hyundai dealership in Annapolis, Maryland. (CCAC ¶ 84.) In Spring 2015, paint began peeling from Ms. Resnick's Santa Fe. (CCAC ¶¶ 90, 92.) After informing Hyundai of the peeling paint, Hyundai informed her that it would provide no remedy, because the vehicle was outside of the paint's warranty period. (CCAC ¶ 91.)

Plaintiff Shelby Cramer purchased a pre-owned 2008 Hyundai Santa Fe in 2011. (CCAC ¶ 98.) In 2012, the Santa Fe's paint began peeling above the windshield. (CCAC ¶ 104.) She contacted her local dealership and was told there was nothing they could do because the warranty expired. (*Id.*) In October 2015, the vehicle's paint began peeling in "chunks" during a rainstorm. (CCAC ¶ 105.) She took her vehicle to

two different Hyundai dealerships and contacted Hyundai's corporate office, but everyone declined to provide any repairs due to the warranty period having expired. (*Id.*)

Plaintiff Paul Sandlin is the original owners of both a 2011 and 2013 Hyundai Sonata. (CCAC ¶ 110.) The paint on the 2011 Sonata began peeling once the vehicle had reached 50,000 miles; accordingly, Hyundai informed him there was nothing it could do as the warranty had expired. (CCAC ¶ 115.) In late 2015, the 2013 Sonata's paint began peeling as well. (CCAC ¶ 116.) At the time, the 2013 Sonata also had approximately 50,000 miles on it. (*Id.*) After taking the vehicle to two dealerships, Hyundai's customer service advised him that the condition was just "normal wear and tear." (CCAC ¶ 117.)

Plaintiff Patricia Reynolds is the owner of a 2007 Hyundai Sonata SE. (CCAC ¶ 123.) In 2015, she noticed a blister near her rear license plate. (CCAC ¶ 130.) Ms. Reynolds paid $475 to have two areas on the car repainted. (*Id.*) After performing these repairs, she noticed two additional paint blisters that began to peel. (CCAC ¶ 131.) She communicated her concerns to Hyundai but Hyundai provided no assistance due to the warranty period having expired. (CCAC ¶ 132.)

Plaintiff Lauren Freed purchased a used 2010 Hyundai Santa Fe in November 2011. (CCAC ¶ 137.) In late December 2015, the paint on her hood began peeling off. (CCAC ¶ 142.) Ms. Freed called local Hyundai dealerships in Atlanta, Georgia, but was informed that, because the warranty had expired, any repair would be at her expense. (CCAC ¶ 143.)

Plaintiff Christopher Baker purchased a used 2011 Hyundai Sonata in 2012 in Charlotte, North Carolina. (CCAC ¶ 148.) In approximately November 2015, Mr. Baker noticed the paint on his car had begun peeling. (CCAC ¶ 153.) When he took his car to be repaired, he was informed that the warranty had expired and Hyundai would offer him no recourse. (CCAC ¶ 154.)

Plaintiff Tara Mulrey is the original owner of a 2010 Hyundai Sonata. (CCAC ¶ 160.) In Spring 2015, Ms. Mulrey noticed the paint on her hood and doors had begun peeling. (CCAC ¶ 166.) After contacting her local dealership, she was told it was "normal wear and tear" and there was nothing Hyundai could do. (CCAC ¶ 167.)

Plaintiff Lorraine Strand is the original owner of a 2013 Hyundai Sonata purchased in Fort Myers, Florida in August 2012. (CCAC ¶ 173.) In 2015, Ms. Strand noticed a small

spot of paint on her hood had begun peeling. (CCAC ¶ 179.) The spot soon grew larger with additional paint peeling. (*Id.*) She called her Hyundai dealership "but she was offered no help whatsoever." (*Id.*) The car's paint has continued to peel. (CCAC ¶ 180.)

 **\*4** Plaintiff William Geers is the original owner of a 2009 Hyundai Santa Fe purchased in Clarkesville, Maryland in January 2009. (CCAC ¶ 185.) In 2015, he noticed a small spot of paint on the hood of his vehicle was peeling. (CCAC ¶ 191.) The spot grew larger and more paint began peeling. (*Id.*) Mr. Geers took his car to a local body shop and was told that the defect "was common" in the make and model of his vehicle. (CCAC ¶ 192.) He called his Hyundai dealership but was provided no assistance. (CCAC ¶ 194.)

Plaintiff Krista Verstraete is the owner of a 2009 Hyundai Santa Fe purchased in Peoria, Illinois in 2013. (CCAC ¶ 200.) In 2015, Ms. Verstraete noticed a small spot of paint on the hood of her vehicle was peeling. (CCAC ¶ 205.) She took her car back to the dealership, but was told the paint was not under warranty. (CCAC ¶ 206.)

Plaintiff Scott Shieber purchased a 2013 Hyundai Santa Fe in Macon, Georgia in November 2012. (CCAC ¶ 211.) In December 2015, Mr. Shieber noticed a small spot of paint on the hood of his vehicle was peeling. (CCAC ¶ 214.) He contacted the service manager at his Hyundai dealership in Macon and was informed that he should contact HMA. (*Id.*) HMA responded by indicating that they would pay for the materials needed, but Mr. Shieber would be required to pay for the labor. (CCAC ¶ 215.) After researching the issue, Mr. Shieber declined HMA's offer and informed it that another area on his car had begun peeling. (CCAC ¶ 217.)

Plaintiff Leida Thomas is the owner of a 2010 Hyundai Sonata that she purchased in Cathedral City, California in 2010. (CCAC ¶ 222.) In 2015, Ms. Thomas noticed that, after a heavy rain, the paint on her vehicle had begun to chip and that in several other areas it appeared to be bubbling. (CCAC ¶ 227.) She returned to the dealership where she purchased the vehicle but was told the paint was no longer under warranty. (CCAC ¶ 228.)

Plaintiff Elizabeth Vargo purchased a 2012 Hyundai Santa Fe in Clearwater, Florida in March 2012. (CCAC ¶ 234.) In April 2016, Ms. Vargo noticed the paint on her vehicle had begun peeling. (CCAC ¶ 237.) She returned to the Hyundai dealership, but the dealership referred her to a body shop for

her to have the vehicle repainted at her own expense. (*Id.*) Ms. Vargo called the customer service number for HMA and was told by a representative that if her dealership had a body shop, she would be issued a voucher for the repair. (CCAC ¶ 238.) HMA never reduced this offer to writing, and Ms. Vargo has not received any relief from Hyundai. (CCAC ¶¶ 238–39.)

Plaintiff Daniella Tirone purchased a 2009 Hyundai Santa Fe in Springfield, Massachusetts in September 2009. (CCAC ¶ 246.) In 2012, Ms. Tirone noticed the paint on the hood of her vehicle was peeling. (CCAC ¶ 252.) Her vehicle had approximately 20,000 miles on it at the time. (*Id.*) Ms. Tirone contacted her Hyundai dealership and was initially denied any relief. (CCAC ¶ 253.) After she continued to contact the dealership, one of the sales managers agreed to cover the costs of repainting the hood. (CCAC ¶ 254.) Within six months of having the work performed, the paint on the hood began peeling again. (*Id.*) Since then, other areas of Ms. Tirone's car have begun peeling as well. (CCAC ¶ 258.)

Plaintiff Carmen Ozdemir is the original owner of a 2009 Hyundai Santa Fe purchased from an authorized dealership in Newnan, Georgia. (CCAC ¶ 259.) In 2010, Ms. Ozdemir's daughter informed her that there were bubbles forming on the hood of the vehicle. (CCAC ¶ 265.) Soon thereafter, a mechanic noticed that there were additional small areas on the back and side of the car peeling as well. (*Id.*) The vehicle's paint has continued to peel. (CCAC ¶ 266.)

### D. Procedural History

 **\*5** Plaintiffs first filed this action in this Court on March 30, 2016. (Dkt. No. 1.) On August 15, 2016, Plaintiffs filed a First Amended Complaint ("FAC"). (*See* Dkt. No. 29.) On August 29, 2016, Plaintiffs filed a Notice of Errata and a Corrected First Amended Complaint. (*See* Dkt. No. 35.) On September 9, 2016, Defendants filed a Motion to Dismiss and Motion to Strike the Nationwide Class Allegations. (*See* Dkt. Nos. 40, 42.) On November 14, 2016, the Court granted Defendants' Motion to Dismiss and denied Defendants' Motion to Strike the Class Allegations as moot. (*See* Dkt. No. 57 (hereinafter, "Order").)

On November 28, 2016, Plaintiffs filed their Second Amended Complaint. (*See* Dkt. No. 58.) On January 30, 2017, the Court granted the parties' stipulation to consolidate two cases against Defendants currently proceeding in this Court. (*See* Dkt. No. 69.) On February 3, 2017, Plaintiffs filed their Consolidated Class Action Complaint. (*See* CCAC.) Plaintiffs' CCAC alleges fourteen causes of action: (1)

2017 WL 1531192

breach of express warranty (on behalf of the nationwide class), (CCAC ¶¶ 291–306); (2) negligent misrepresentation (on behalf of the nationwide class), (CCAC ¶¶ 307–14); (3) fraudulent concealment (on behalf of the nationwide class), (CCAC ¶¶ 315–21); (4) violation of the Song–Beverly Consumer Warranty Act (the "Song–Beverly Act"), for breach of implied warranty (on behalf of Plaintiff Leida Thomas and a California class), (CCAC ¶¶ 322–36); (5) violation of California's Unfair Competition Law ("UCL") (on behalf of Leida Thomas and a California class), (CCAC ¶¶ 337–49); (6) violation of California's False Advertising Law ("LAL") (on behalf of Leida Thomas and a California class), (CCAC ¶¶ 350–58); (7) violation of the California Consumer Legal Remedies Act ("CLRA") (on behalf of Leida Thomas and a California class), (CCAC ¶¶ 359–76); (8) violation of the Maryland Unfair and Deceptive Trade Practice Act (on behalf of Plaintiff Michelle Resnick and a Maryland class), (CCAC ¶¶ 378–90); (9) violation of the Texas Unfair and Deceptive Trade Practice Act (on behalf of Plaintiff Paul Sandlin and a Texas class), (CCAC ¶¶ 391–405); (10) violation of North Carolina Unfair and Deceptive Trade Practice Act (on behalf of Plaintiff Christopher Baker and a North Carolina class), (CCAC ¶¶ 406–23); (11) violation of the Florida Unfair and Deceptive Trade Practice Act (on behalf of Plaintiffs Tara Mulrey, Lorraine Strand, William Geers, and Elizabeth Vargo and a Florida class), (CCAC ¶¶ 424–37); (12) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (on behalf of Plaintiff Krista Verstraete and an Illinois class), (CCAC ¶¶ 438–55); (13) violation of the Massachusetts Unfair and Deceptive Trade Practice Act (on behalf of Plaintiff Daniella Tirone and a Massachusetts class), (CCAC ¶¶ 456–65); and, (14) unjust enrichment (on behalf of all Plaintiffs individually and their respective State classes), (CCAC ¶¶ 466–72).

On February 17, 2017, Defendants filed the instant Motion to Dismiss, (*see* Mot.), along with a Request for Judicial Notice, (Dkt. No. 81 (hereinafter, "RJN")). Plaintiffs filed their Opposition on February 27, 2017. (Dkt. No. 84 (hereinafter, "Opp'n").) Defendants replied on March 6, 2017. (Dkt. No. 85 (hereinafter, "Reply").) After the briefing was completed but before the Court held a hearing on Defendants' Motion, the Ninth Circuit published its opinion in *Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (2017), providing further guidance on several issues relevant to Defendants' Motion. Accordingly, the Court ordered supplemental briefing on *Williams's* effect on Defendants' Motion. (*See* Dkt. No. 89.) The parties submitted their supplemental briefs on March 31,

2017. (*See* Dkt. Nos. 90, 91.) The Court held a hearing on April 10, 2017. (Dkt. No. 92.)

## III. REQUEST FOR JUDICIAL NOTICE

**\*6 [1]**  As noted above, along with their Motion, Defendants filed a Request for Judicial Notice. (*See* RJN.) Defendants request that the Court take judicial notice of relevant pages of the 2015 Hyundai Owner's Handbook and Warranty Information.[2] (*See* RJN at 1.) The Court previously took judicial notice of a similar document when deciding Defendants' prior Motion to Dismiss. (*See* Dkt. No. 57 at 9.) When considering a motion to dismiss, a court typically does not look beyond the complaint in order to avoid converting a motion to dismiss into a motion for summary judgment. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Notwithstanding this precept, a court may properly consider: (1) material which is included as part of the complaint; (2) documents incorporated by reference into the complaint; and, (3) material subject to judicial notice pursuant to *Federal Rule of Evidence 201. See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *See Fed. R. Evid. 201(c)(2); In re Icenhower*, 755 F.3d 1130, 1142 (9th Cir. 2014).

Defendants argue that the warranty handbook is judicially noticeable because Plaintiffs include allegations as to the handbook's contents in their CCAC. (RJN at 2.) For instance, Plaintiffs allege that the Class Vehicles are advertised as "being backed by 'America's best warranty,' " (CCAC ¶ 37), Plaintiffs mention the terms of Hyundai's warranties, (CCAC ¶ 38), and bring claims relating to the terms of the warranties, (*see, e.g.*, CCAC ¶¶ 303–06). Plaintiffs do not object to Defendants' Request.

"Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908. This doctrine may apply, for instance, "when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, ... or when a plaintiff's claim about stock fraud is based on the contents of SEC filings." *Id.* (citation omitted). The Court finds that Hyundai's warranty forms the basis of Plaintiffs' claims, much as an insurance plan forms the basis of

2017 WL 1531192

a dispute over insurance coverage. *See id.* Therefore, as it did in its prior Order, the Court **GRANTS** Defendants' Request for Judicial Notice.

## IV. LEGAL STANDARD

### A. Rule 8(a)

Under Rule 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." *Fed. Civ. P. 8(a).* If a complaint fails to do this, the defendant may move to dismiss it under Rule 12(b)(6). *Fed. R. Civ. P. 12(b)(6).* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility' " that the plaintiff is entitled to relief. *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

**\*7** In ruling on a motion to dismiss for failure to state a claim, a court should follow a two-pronged approach: first, the court must discount conclusory statements, which are not presumed to be true; and then, assuming any factual allegations are true, the court shall determine "whether they plausibly give rise to entitlement to relief." *See id.* at 679, 129 S.Ct. 1937; *accord Chavez v. United States,* 683 F.3d 1102, 1108 (9th Cir. 2012). A court should consider the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Lee,* 250 F.3d at 688.

Where a district court grants a motion to dismiss, it should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.").

### B. Rule 9(b)

**[2]** **[3]** **[4]** Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b).* To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *Odom v. Microsoft Corp.,* 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud. *Odom,* 486 F.3d at 553. Where multiple defendants allegedly engaged in fraudulent activity, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir. 2007). Rather, a plaintiff must identify each defendant's role in the alleged scheme. *Id.* at 765.

## V. DISCUSSION

At the outset, the Court notes that the parties make many of the same arguments in support of and in opposition to the instant Motion as they made when making and opposing Defendants' Motion to Dismiss Plaintiff's prior Complaint. Thus, the Court pays particular attention to those arguments raised for the first time in addressing this Motion.

### A. Express Warranty

**[5]** Plaintiffs' first cause of action is for breach of express warranty. (CCAC ¶¶ 291–306.) "To state a claim for breach of express warranty under California law, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury." *Nabors v. Google, Inc.,* No. 5:10-CV-03897 EJD, 2011 WL 3861893, at \*4 (N.D. Cal. Aug. 30, 2011). For the following reasons, the Court finds that Plaintiffs fail to plead an express warranty claim.

### 1. Express Paint Warranty

**[6]** **[7]** **[8]** **[9]** Hyundai provides an express warranty for the paint used on its vehicles. (*See* RJN, Ex. 1.) In

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 310 of 370
PageID: 10340

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

California, "[t]he law governing express warranties is clear." *Daugherty' v. Am. Honda Motor Co.*, 144 Cal.App.4th 824, 830, 51 Cal.Rptr.3d 118 (Cal. Ct. App. 2006). "A warranty is a contractual promise from the seller that the goods conform to the promise. If they do not, the buyer is entitled to recover the difference between the value of the goods accepted by the buyer and the value of the goods had they been as warranted." *Id.* A seller may enumerate an express warranty, however, to "limit its liability for defective goods." *Id.* "The general rule is that an express warranty 'does not cover repairs made after the applicable time or mileage periods have elapsed.' " *Id.* (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986)). In the Court's prior Order, it held that Plaintiffs had failed to plead a viable claim under the terms of the express warranty at issue here because "none of Plaintiffs' claims arose during the express warranty period." (Order at 14.)

**\*8** Nonetheless, Plaintiffs again argue that they have a viable express warranty claim based on nearly identical facts because even though the general rule is that there is no claim based on an express warranty for failures outside of the warranty period, "there are exceptions." (Opp'n at 10.) Plaintiffs argue that one such exception applies; specifically that because they have "pleaded facts [that] tend to show the existence of a latent defect 'substantially certain' to render a warranted product unusable before the end of its life," they have stated a viable claim. (*Id.* (citing *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 534 (C.D. Cal. 2012)).) The Court finds *Keegan* unavailing. As Defendants note, (*see* Reply at 2), *Keegan* was a class certification decision addressing whether a malfunction needed to have already occurred before the proposed could be certified, *see Keegan*, 284 F.R.D. at 534. *Keegan* does not address whether the plaintiff may plead a viable claim when the alleged malfunction does not arise during the warranty period.

Next, Plaintiffs rely on the California Court of Appeal's decision in *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 918, 107 Cal.Rptr.2d 761 (Cal. Ct. App. 2001), for the same proposition. *See id.* ("[W]e conclude proof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product."). Again, however, the Court finds *Hicks* inapposite. *Hicks* is also a class certification decision and does not address the issue here: whether a breach of express warranty claim lies where the alleged malfunction does not arise during the warranty period. In addition, the

plaintiffs in *Hicks* were class members who claimed that the concrete foundations of their houses were defective. *See id.* at 912, 107 Cal.Rptr.2d 761. However, "it is unclear whether *Hicks* applies to consumer products with limited lifespans ... indeed multiple district courts have concluded that it does not." *Elias v. Hewlett–Packard Co.*, 903 F.Supp.2d 843, 851 (N.D. Cal. 2012).

Moreover, as the Court discussed in its prior Order, the Ninth Circuit has explicitly rejected Plaintiffs' argument. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("The repairs in this case were made after the warranty period expired. Therefore, we affirm the dismissal of the express warranty claims."). As this Court is bound to follow the Ninth Circuit's direction, the Court finds that Plaintiffs' claim based on the express warranty fails. [3]

### 2. Plaintiffs' Warranty-by-Representation Claims

**\*9** **[10]** Separate from the express warranty, Plaintiffs also allege that Defendants breached an express warranty by representation based on Hyundai's corporate website and advertisement campaigns. (*See* CCAC ¶¶ 292–302.) Specifically, Plaintiffs claim that Hyundai's statements that its paint "will stand the test of time" and will "prevent rust" and protect against corrosion were guarantees. (CCAC ¶¶ 292–95.) The Court addressed these exact same representations and Plaintiffs' claims based on them in its prior Order. (*See* Order at 15–18.) The Court held that Plaintiffs' representations that its paint "will stand the test of time" were non-actionable puffery. (*See* Order at 16.) The only potentially actionable representation was Plaintiffs' claim that its paint will prevent rust or corrosion. (*Id.*) However, the Court held that Plaintiffs failed to establish that they were exposed to or relied upon these representations when making their decisions. (*See* Order at 17.) Nonetheless, Plaintiffs rely on the same misrepresentations for the proposition that Defendants violated a warranty-by-representation.

As a threshold matter, Plaintiffs' breach of express warranty-by-representation claims are barred for the same reasons Plaintiffs' breach of express warranty claims are barred above. As the Ninth Circuit explained in *Clemens*:

> Every manufactured item is defective
> at the time of sale in the sense that it
> will not last forever; the flip-side of

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 311 of 370
PageID: 10341

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

this original sin is the product's useful life. If a manufacturer determines that useful life and warrants the product for a lesser period of time, we can hardly say that the warranty is implicated when the item fails after the warranty period expires. The product has performed as expressly warranted. Claims regarding other buyer expectations and the manufacturer's state of mind properly sound in fraud and implied warranty.

*Clemens*, 534 F.3d at 1022–23.

In essence, Plaintiffs contend that any representation that Defendants made regarding the quality of the paint established a warranty of unlimited duration suggesting that Hyundai's paint would never fail. "The general rule, however, is that a 'seller may limit its liability for defective goods by disclaiming or modifying a warranty,' and that an express warranty does not cover defects after the applicable warranty period has elapsed." *Smith v. LG Elecs. U.S.A., Inc.*, No. C 13-4361 PJH, 2014 WL 989742, at *6 (N.D. Cal. Mar. 11, 2014). Moreover, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other.' " Cal. Com. Code § 2316(1). Thus, where, as here, there may be two warranties at issue —an expressly enumerated three-year, 36,000–mile warranty for the paint and a warranty regarding the quality of the paint—the two should be read consistently. Therefore, even assuming that any of Defendants' representations constitute a viable express warranty regarding the quality of Hyundai's paint, that warranty is limited to the same terms as Hyundai's express warranty. *See Smith*, 2014 WL 989742, at *6 ("Here, the only reasonable and consistent reading of the warranty and the alleged express warranty statements is to consider the warranty—including the one-year durational limitation —to apply to limit the duration of the six alleged express warranty statements at issue."); *see also Long v. Hewlett– Packard Co.*, No. C 06-02816 JW, 2007 WL 2994812, at *6 n.4 (N.D. Cal. July 27, 2007) (finding that an argument that actionable representations create an indefinite warranty length despite enumerated warranty on the same issue was "wholly untenable" because it would leave the manufacturer "susceptible to a breach of warranty claim" for every good that, at any time, required repairs).

Nonetheless, because it is not clear whether the deficiencies in, at the very least, Ms. Tirone and Ms. Ozdemir's express warranty claims could be cured through amendment,[4] Plaintiffs' express warranty claims are **DISMISSED without prejudice.**

### B. Negligent Misrepresentation
**\*10** **[11]** **[12]** Defendants next argue that Plaintiffs' second cause of action for negligent misrepresentation is barred by the economic loss rule.[5] (Mot. at 12–13.) "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 988, 22 Cal.Rptr.3d 352, 102 P.3d 268 (Cal. 2004). The purpose of the economic loss rule is to ensure that a plaintiff relies "on the law of contracts and implied and express warranties to recover damage to the product sold, rather than resort to tort law." *Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc.*, No. 1:16-cv-00371-DAD-SMS, 2016 WL 3519294, at *4 (E.D. Cal. June 27, 2016). "When applied to product liability suits, one may still sue for damage to property other than the product under the economic loss rule, but losses to the allegedly defective product itself are barred as 'economic' losses." *Id.* As they did when opposing Defendants' prior Motion to Dismiss, Plaintiffs argue that they have sufficiently pleaded that the peeling paint has caused damages beyond simply repairing the paint because Plaintiffs have been required to repair rust and corrosion. (*See* Opp'n at 18–19.) In its prior Order, the Court assumed that Plaintiffs allegations regarding rust and corrosion were sufficient to avoid the economic loss rule (without fully addressing the issue) but held that, regardless, Plaintiffs had failed to plead sufficient facts indicating that they had suffered such damages. (*See* Order at 18–19.) The Court now squarely addresses the issue and determines whether alleged damage to the body of Plaintiffs' car caused by the allegedly defective paint is barred by the economic loss rule.

### 1. Whether Damages to the Body of the Car Are Barred by the Economic Loss Rule

**[13]** "California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) causes to other portions of a larger product (e.g., a house) into which

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 312 of 370
PageID: 10342
Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

the former has been incorporated." *Jimenez v. Superior Court*, 29 Cal.4th 473, 483, 127 Cal.Rptr.2d 614, 58 P.3d 450 (Cal. 2002). For instance, recovery for damages to a home's drywall and framing caused by a home's faulty windows may not be barred by the economic loss rule. *Id.* at 484, 127 Cal.Rptr.2d 614, 58 P.3d 450 (citing *Casey v. Overhead Door Corp.*, 74 Cal.App.4th 112, 123, 87 Cal.Rptr.2d 603 (Cal. Ct. App. 1999)). However, the California Supreme Court has not gone so far as to determine "whether defective raw materials should be treated in the same manner as component parts or whether there may be situations in which the economic loss rule would bar recovery for damages that a defective component part causes to other portions of the finished product of which it is a part." *Id.* It is this second, unaddressed scenario facing the Court here as the allegedly defective paint may be considered a "defective component part" that has caused damage "to other portions of the finished product of which it is a part." *Id.*

[14]   As other courts have noted, "[u]nder the rule, a plaintiff may recover in tort only where he or she can allege person injury or damage to other property, that is, property *other than the product itself.*" *Nada Pac. Corp. v. Power Eng'g & Mfg., Ltd.*, 73 F.Supp.3d 1206, 1221 (N.D. Cal. 2014) (emphasis in original) (internal quotation marks omitted); *see also NuCal Foods, Inc. v. Quality Egg LLC*, 918 F.Supp.2d 1023, 1028 (E.D. Cal. 2013) (explaining that economic loss rule allows recovery in breach of contract only in limited situations. At least one court has held within the context of defective automobile parts that claims for repairs to the vehicle based on a defective part is barred by the economic loss rule. *See Fisher v. Honda N. Am., Inc.*, No. LA CV13-09285 JAK(PLAx), 2014 WL 2808188, at *6–*7 C.D. (Cal. June 12, 2014) (finding that claims that a defective part required plaintiff to purchase a replacement part and complete repairs on his vehicle were barred by the economic loss rule).

Here, Plaintiffs allege only that the defective paint has cost Plaintiffs "out of pocket losses associated with the paint defect, corrosion repairs and diminished value of [their] vehicle[s]." (CCAC ¶¶ 94, 106, 120, 133, 230.) As the alleged economic damages in this case arise from harm to the product itself (i.e., the vehicle), [6] the Court finds that the economic loss rule bars Plaintiffs' claims.

*11   Moreover, "[t]he function of the economic loss rule is to prevent tort law from shifting back to sellers a specific risk that better rests with buyers—the risk that a product will not perform to a particular level beyond that warranted by the seller." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th

979, 997, 22 Cal.Rptr.3d 352, 102 P.3d 268 (Cal. Ct. App. 2004). As Plaintiffs contend, "[a]utomobiles are painted ... for two purposes: to protect the body of the vehicle and for decoration." (CCAC ¶ 2.) Thus, as *Robinson* explains, the risk that defective paint will cause harm to the body of the vehicle —which the paint is intended to protect—is best placed on the buyers, rather than the sellers after the warranty term has expired. Therefore, as Plaintiffs are attempting to do the opposite—that is, shift the risk of liability to the Defendants for alleged defects arising after the expiration of the warranty period—the Court finds that the economic loss rule applies and bars Plaintiffs' negligent misrepresentation claims.

**2. Whether the Special Relationship Exception Applies**

[15]   [16]   [17]   Plaintiffs next contend that the economic loss rule does not apply in this case because Plaintiffs and Defendants are in a "special relationship." (*See* Opp'n at 19.) California law recognizes that the economic loss rule does not bar recovery where a "special relationship exists between the parties." *See J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804, 157 Cal.Rptr. 407, 598 P.2d 60 (Cal. 1979). Under the special relationship exception, the court examines six factors to determine whether such a relationship exists: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm: (3) the degree of certainty the plaintiff would suffer harm; (4) the closeness of the connection between the defendant's conduct and the plaintiff's harm; (5) the moral blame; and, (6) the policy of preventing future harm. *Id.*

[18]   However, the special relationship exception applies when the court is required to analyze "the circumstances in which a party has a duty of care to avoid imposing economic losses *on third parties.*" *See Mega RV Corp. v. HWH Corp.*, 225 Cal.App.4th 1318, 1340, 170 Cal.Rptr.3d 861 (Cal. Ct. App. 2014). Therefore, when, as here, the plaintiff is not a third party to a transaction but has a direct contractual relationship with the defendant, it appears that the special relationship exception does not apply. *See Elsayed v. Maserati N. Am., Inc.*, 215 F.Supp.3d 949, ——, 2016 WL 6091109, at *10 (C.D. Cal. 2016) ("Plaintiff is not a third party in relation to Maserati. To the contrary, his relationship with Maserati was a direct one."); *see also R Power Biofuels, LLC v. Chemex LLC*, No. 16–CV–00716– LHK. 2016 WL 6663002, at *9 (N.D. Cal. Nov. 11, 2016) ("*J'aire* does not apply where the parties are in privity of contract with respect to contracts for goods."); *City of San*

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 313 of 370
PageID: 10343

*Diego v. Amoco Chem. Co.*, No. CIV 98-0474-E(LSP), 1999 WL 33548157, at *4 (S.D. Cal. Sept. 9, 1999) (holding that "*J'Aire's* special relationship test [applies] *only if* the parties are not in contractual privity"); *N. Am. Chem. Co. v. Superior Court*, 59 Cal.App.4th 764, 784, 69 Cal.Rptr.2d 466 (Cal. Ct. App. 1997) (assuming without deciding that "*J'Aire* could properly be applied in a goods or products case only when there is an absence of privity"); *cf. Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F.Supp.3d 887, 896 (N.D. Cal. 2014) ("Cisco and St. Micro therefore had a special relationship that would give rise to a duty to *prevent economic loss to third parties* in negligence actions." (emphasis added)). "The Court refuses to extend the special relationship exception to encompass direct relationships." *Elsayed*, 215 F.Supp.3d at ——, 2016 WL 6091109, at *10. Therefore, the special relationship exception does not apply and Plaintiffs' claims are barred by the economic loss rule. Nonetheless, the Court will grant Plaintiff another opportunity to amend their negligent misrepresentation claims. Accordingly, Plaintiffs' negligent misrepresentation claims are **DISMISSED without prejudice.**

### C. Breach of the Implied Warranty of Merchantability Under the Song–Beverly Act

**\*12**  **[19]**  Next, Ms. Thomas brings a claim for breach of the implied warranty of merchantability under the Beverly–Song Act. (CCAC ¶¶ 315–21.) The Song–Beverly Act "was enacted to regulate warranties and strengthen consumer remedies for breaches of warranty." *Cholakyan v. Mercedes–Benz USA, LLC*, 796 F.Supp.2d 1220, 1241 (C.D. Cal. 2011). Thus, "[u]nless specific disclaimer methods are followed, an implied warranty of merchantability accompanies every retail sale of consumer goods in the state." *Id.* The Song–Beverly Act provides that the implied warranty of merchantability means that the "consumer goods" at issue: (1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately packaged and labeled; and, (4) conform to the affirmations of fact included on the container or label. *See* Cal. Civ. Code § 1791.1(a). The Act defines "consumer goods as "any new product or part thereof that is used, bought, or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code § 1791(a).

In its prior Order, the Court held that Plaintiffs' implied warranty claim failed because the inquiry "is whether Hyundai violated the implied warranty of merchantability as to the vehicle as purchased as a whole" rather than to the paint on its own, and Plaintiffs had not sufficiently pleaded facts

indicating the Class Vehicles were unmerchantable. (Order at 20.) The Court explained that "Plaintiffs allege that the paint defect affected the aesthetics of the vehicle, not that it rendered the vehicle inoperable, useless, or unsafe," and, thus, their implied warranty of merchantability claim failed. (Order at 21.) Plaintiffs allege no new facts in support of Ms. Thomas's claim; instead, they argue that a breach of the implied warranty of merchantability may arise whenever a vehicle's behavior fails to comport with industry standards. (*See* Opp'n at 21.)

**[20]**  Under the Song–Beverly Act, the implied warranty of merchantability "requires only that a vehicle be reasonably suited for ordinary use." *Keegan v. Am. Honda Motor Co.*, 838 F.Supp.2d 929, 945 (C.D. Cal. 2012). "It need not be perfect in every detail so long as it 'provides for a minimum level of quality.' " *Id.* (citation omitted); *see also Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal.App.4th 1291, 1296, 44 Cal.Rptr.2d 526 (Cal. Ct. App. 1995) ("Courts in other jurisdictions have held that in the case of automobiles, the implied warranty of merchantability can be breached only if the vehicle manifests a defect that is so basic it renders the vehicle unfit for its ordinary purpose of providing transportation."). Courts have held that defects based on aesthetics or mere annoyances do not render a vehicle unmerchantable. *See Barakezyan v. BMW of N. Am., LLC*, No. CV 16–00173 SJO (GJSx), 2016 WL 2840803, at *9–*10 (C.D. Cal. Apr. 7, 2016) (dismissing implied warranty of merchantability claim where brakes emitted "long, high-pitched noise" but the vehicle "provide[d] transportation from one point to another and stop[ped]" when needed); *see also Troup v. Toyota Motor Corp.*, 545 Fed.Appx. 668, 669 (9th Cir. 2013) (affirming dismissal of claim where "defect did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage range").

While Plaintiffs are correct that "merely because a vehicle provides transportation from point A to point B, does not mean that it necessarily does not violate the implied warranty of merchantability," *see Elsayed*, 215 F.Supp.3d at ——, 2016 WL 6091109, at *11, cases have consistently held that an implied warranty of merchantability requires something beyond mere aesthetic concerns, *see id.* ("There is no breach of any implied warranties because the Ghibli ... is 'roadworthy in its present condition without any repairs.' ") (quoting *Brand v. Hyundai Motor Am.*, 226 Cal.App.4th 1538, 1548, 173 Cal.Rptr.3d 454 (Cal. Ct. App. 2014)); *cf. Isip v. Mercedes–Benz USA, LLC*, 155 Cal.App.4th 19, 27, 65 Cal.Rptr.3d 695 (Cal. Ct. App. 2007) (explaining that the

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 314 of 370
PageID: 10344

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

implied warranty of merchantability requires a vehicle to be "in safe condition and substantially free of defects," meaning that "[a] vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose"). Here, Plaintiffs allege that the paint defect affected only the aesthetics of the vehicle, not that it rendered the vehicle inoperable, useless, or unsafe. Accordingly, the Court finds that Plaintiff has failed to state a viable claim for breach of the implied warranty of merchantability as to the vehicles. As with Plaintiffs' other claims, however, the Court will allow Plaintiffs the opportunity to amend their claims. Therefore, Plaintiffs' breach of the implied warranty of merchantability claim is **DISMISSED without prejudice.**

### D. Fraudulent Concealment, UCL, CLRA, and FAL Claims

**\*13** Next, Defendants argue that Plaintiffs have once again failed to sufficiently plead their third, fifth, sixth, and seventh causes of action for fraudulent concealment, violation of California's UCL, violation of California's FAL, and violation of the CLRA for the same reasons the Court identified in its prior Order. [7] (*See* Mot. at 16–25.)

As the Court explained previously, and as confirmed by the parties, these claims are based on the same (or substantially similar) facts and come in two varieties: (1) that Defendants made affirmative misrepresentations of fact; and, (2) that Defendants fraudulently concealed their knowledge of the alleged paint defect. In its prior Order, the Court dismissed these claims for two primary reasons: (1) Plaintiffs failed to plead facts adequately indicating that Defendants had knowledge of the alleged defect at the time it made any of the representations in question; and, (2) Plaintiffs failed to plead adequate facts establishing that Plaintiffs relied on any representation (or omission).

As the Court explained in its prior Order, (*see* Order at 21–22), to succeed on their fraud, UCL, and CLRA claims, Plaintiffs must allege that Defendants had sufficient knowledge of any alleged defect at the time of the product's sale, *see Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1145 (9th Cir. 2012) (explaining that fraud, CLRA, and UCL claims require that the plaintiffs sufficiently allege "knowledge of a defect"). In both their First Amended Complaint and in their CCAC, Plaintiffs make the following allegations regarding Defendants' alleged knowledge of the defect: (1) that self-healing paints and coats have "[s]ince their inception" caused concern that they had weaknesses that would lead to vehicles'

paint peeling, (CCAC ¶ 49); (2) Nissan was one of the first automobile manufacturers to use the technology in 2005, "but the experiment was short-lived" due to customer complaints of peeling paint, (CCAC ¶ 56); (3) that consumer complaints regarding the peeling paint began as early as November 6, 2008, on websites such as "Hyundai–Forums.com," and "Edmunds.com," (CCAC ¶¶ 72–73); and, (4) that Hyundai began monitoring the SureCritic website on November 13, 2013, where it received numerous complaints, concerns, and reviews, (CCAC ¶ 80). In addition, in their CCAC, Plaintiffs now allege that: (1) when Nissan began using the paint technology, it acknowledged that the coating lasted approximately three years, (CCAC ¶ 53); (2) Defendants "knew of the defect in the paint through complaints made by consumers across the country" to Defendants directly and to their authorized Hyundai dealerships," (CCAC ¶ 63); (3) since December 1999, Hyundai has operated an OSQC center to track Hyundai consumer reports, (CCAC ¶ 66); (4) in 2002, Hyundai restructured its maintenance and quality control operations); (5) every month top managers within Hyundai meet to discuss quality-related issues, (CCAC ¶ 69); and, (6) Defendants conduct "market-driven quality control" through ongoing communication with customers, including by monitoring reports and complaints regarding premature failure of the paint used on Hyundai vehicles, (CCAC ¶¶ 70–71). [8]

**\*14** Plaintiffs now argue that they need not plead that Defendants actually *knew* of the alleged defect, but that facts indicating that they *should have known* are sufficient. (*See* Opp'n at 27–28.) It is not clear that the Ninth Circuit permits a "should have known" standard. *Wilson*—a Ninth Circuit decision binding on this Court—clearly states that *knowledge* is required to prove a claim based on a failure to disclose a defect. [9] *See Wilson,* 668 F.3d at 1145 ("Plaintiffs must allege HP's knowledge of a defect to succeed on their claims of deceptive practices and fraud."). In any event, even assuming that facts establishing that Defendants "should have known" of an alleged defect are sufficient, the Court finds that, for the same reasons Plaintiffs fail to establish actual knowledge (as explained below), they have also failed to establish that Defendants should have known of any alleged defect.

**[21]** Plaintiffs next argue that even if knowledge of a defect is required to prove claims based on omissions or Defendants' failure to disclose, knowledge is not required to prove claims based on Defendants' alleged affirmative misrepresentations. (*See* Opp'n at 27.) The Court disagrees with this assertion. Though at least one court has held that

"knowledge is not a requirement to maintain an action based on an affirmative representation" under the CLRA and the UCL, *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 658 (S.D. Cal. 2014), as the Court held in its prior Order, "federal district court decisions suggest that a manufacturer's representations about a product should not be considered deceptive under the CLRA merely because the product manifests a defect of which the manufacturer had no prior knowledge or of which it had no reason to know," *Kowalsky v. Hewlett–Packard Co.*, 771 F.Supp.2d 1156, 1163 (N.D. Cal. 2011). The Court finds *Kowalsky's* reasoning more persuasive as it "appears to serve the purpose of the CLRA, which is to protect consumers from 'unfair or deceptive' business practices." *Id.* "[A] representation is not 'deceptive' under the UCL or the CLRA simply because an unanticipated product defect calls the prior representation into question." [10] *Id.* Therefore, the Court finds that whether Plaintiffs have adequately stated a claim under the CLRA and the UCL once again turns on whether they have sufficiently established Defendants' knowledge.

### 1. Knowledge

As explained above, to state a claim for Defendants' alleged failure to disclose the paint defect in Hyundai's vehicles, Plaintiffs must establish that Defendants had knowledge of the defect at the time of sale. *See Wilson*, 668 F.3d at 1145 ("California federal courts have held that, under the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss."). Though Plaintiffs have added allegations in an attempt to establish that Hyundai had knowledge of the alleged paint defect at the time Plaintiffs purchased their vehicles, the Court finds these additional allegations again fail to cure the deficiencies in Plaintiffs' claims.

[22] First, as the Court explained in its prior Order, though Plaintiffs allege generally that there were "concerns" regarding the possibility of self-healing paints or coats peeling, these "concerns" are insufficient to establish that Defendants were aware of any alleged paint defect at the time Plaintiffs purchased their vehicles. Plaintiffs do not allege who had these concerns, the substance of the concerns, or whether the concerns were ever communicated to Hyundai. Thus, allegations regarding any purported concerns are insufficient to establish that Hyundai had knowledge of the complained-of defects in this case at the time Plaintiffs purchased their vehicles. And, while Plaintiffs

now allege that Hyundai had significant quality-monitoring processes in place, including its OSQC, a reorganized quality control department, a "Global Quality Situation Room," and "ongoing communication" with customers, they have not sufficiently alleged *how* any of these quality control mechanisms placed Defendants on notice that there was a possible paint defect in their vehicles. (*See* CCAC ¶¶ 66–71.) The fact that Defendants had quality control programs in place on the one hand, and that several consumers made anonymous complaints online with a few indicating that they spoke to a Hyundai dealership or to its customer service department on the other hand, fails to establish knowledge of a widespread *defect.* Plaintiffs include no allegations indicating that random complaints received across the country would alert Hyundai's international quality control department to an alleged paint defect.

**\*15** Second, as the Court noted previously, though Plaintiffs include allegations and examples of complaints placed on websites such as "Hyundai–Forums.com," and "edmunds.com," Plaintiffs have not presented any facts indicating that Hyundai monitored these websites or was aware of these complaints. *Cf. Long v. Graco Children's Prods. Inc.*, No. 13-cv-01257-WHO, 2013 WL 4655763, at \*6 (N.D. Cal. Aug. 26, 2013) (finding that the defendants had a duty to disclose a product's defects where the plaintiff had sufficiently alleged that defendants had knowledge of the defects because consumers had complained directly to the defendants, the defendants had responded, and the defendants had told the National Highway Traffic Safety Administration that it was "keenly aware" of the issue); *Cirulli v. Hyundai Motor Co.*, No. SACV 08–0854 AG (MLGx), 2009 WL 5788762, at \*3–\*4 (C.D. Cal. June 12, 2009) (finding that plaintiff had pleaded sufficient facts indicating knowledge of a defect where he alleged that Hyundai had consistently reviewed data to track reports of defective Hyundais and learned that its vehicles were experiencing "unusually high levels" of defects). Further, complaints on third-party websites do not, by themselves, commute knowledge to a manufacturer. *See Berenblat v. Apple, Inc.*, Nos. 08–4696 JF(PVT), 09–1649 JF (PVT), 2010 WL 1460297, at \*9 (N.D. Cal. Apr. 9, 2010) ("[T]he complaints on Apple's consumer website merely establish the fact that some consumers were complaining. By themselves they are insufficient to show that Apple had knowledge that the memory slot in fact was defective and sought to conceal that knowledge from consumers.").

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 316 of 370
PageID: 10346
Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

Third, to the extent the proffered online complaints indicate that consumers complained directly to their dealerships, the Court finds these few undated and anonymous complaints to dealerships all over the country are insufficient to establish Defendants' knowledge. *See Wilson*, 668 F.3d at 1147 (noting that courts have rejected "undated customer complaints as offered as a factual basis for a manufacturer's knowledge of a defect because they provide no indication whether the manufacturer was aware of the defect *at the time of sale.*" (emphasis in original)). While the Court in *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1096–97 (N.D. Cal. 2007), found that complaints made on a company's website "may be sufficient to raise a reasonable inference that the defendant knew of a product defect," as the Ninth Circuit noted in *Wilson*, the *Falk* court "considered the amassed weight of customer complaints together with other indications that GM had knowledge of the defect," *Wilson*, 668 F.3d at 1147 (alterations and internal quotation marks omitted). Specifically, the "other indications" included allegations that General Motors Corporation, the defendant there, had access to (1) aggregate data from its dealers, (2) access to pre-release testing data, and, (3) access to numerous complaints from its customers. *See Falk*, 496 F.Supp.2d at 1096. Here, Plaintiffs rely nearly exclusively on the proffered customer complaints (and speculative allegations regarding testing as addressed below) to establish Defendants' knowledge. [11] Therefore, unlike in *Falk*, these customer complaints cannot be taken together with significant other indications that Defendants were aware of the defect. Rather, as with the complaints in *Berenblat*, these complaints merely establish that several customers had issues with their specific vehicles. *See Baba v. Hewlett–Packard Co.*, No. C 09-05946 RS, 2011 WL 317650, at *3 (N.D. Cal. Jan. 28, 2011)* ("Awareness of a few customer complaints, however, does not establish knowledge of an alleged defect.").

**\*16** **[23]** Fourth, Plaintiffs' allegations that "Hyundai did or should have conducted testing on components, including paints and coatings, to verify that the materials are free from defects" are insufficient to establish Defendant's knowledge for three reasons. (CCAC ¶ 83.) As the Court held previously, these allegations are entirely speculative and do not indicate how any alleged testing would have placed Defendants on notice of an alleged paint defect. *See Wilson*, 668 F.3d at 1147 (holding that allegations regarding testing were "speculative and do[ ] not suggest how any tests or information could have alerted HP to the defect"). Second, to the extent they are based in fact, they fail to establish *when* any such testing occurred, thus, the Court cannot conclude that Defendants had

knowledge of the alleged paint defect at the time Plaintiffs purchased their vehicles. Third, even if Defendants had performed this alleged testing, Plaintiffs' allegations fail to adequately establish that it would have informed Hyundai of a possible, post-warranty failure of its paint.

**[24]** Next, Plaintiffs allege that Nissan used the self-healing paint technique for a short period of time. (CCAC ¶ 52.) But Plaintiffs do not sufficiently allege facts suggesting that (1) Hyundai was aware Nissan was using (or that it then stopped using) this paint technique, or, (2) Hyundai was aware of the reason for *why* Nissan stopped using the technique. And, though Plaintiffs now allege that Nissan acknowledged that the coating it used lasted for about three years, (*see* CCAC ¶ 53), this acknowledgement does not indicate that Hyundai should have been aware of a *defect* in the coating or painting process. Thus, Plaintiffs' allegations regarding Nissan also fail to establish that Hyundai had sufficient knowledge of any alleged paint defect when Plaintiffs purchased their vehicles.

Plaintiffs again rely on their allegations that Defendants began monitoring the SureCritic website in November 2013 to establish that Defendants had knowledge of the alleged defects. (*See* Opp'n at 28.) But, as the Court noted previously, even assuming this monitoring alerted Hyundai to the alleged defect, November 2013 appears to post-date all of Plaintiffs' vehicle purchases. [12] Therefore, Plaintiffs' allegations do not give rise to the inference that Defendants were aware of any alleged defect at the time of Plaintiffs' purchases. Accordingly, in sum, the Court finds that Plaintiffs have failed to adequately allege that Defendants had knowledge of any alleged paint defect at the time Plaintiffs purchased their vehicles.

Finally, the Ninth Circuit's decision in *Williams* does not change the Court's conclusion. There, the Court held that the plaintiffs had adequately pleaded presale knowledge of a defect where the complaint "explain[ed] how consumer complaints were recorded and transmitted by the Kennesaw facility so as to make [defendant's] management aware of the number and substance of the complaints, and state[d] that Ms. Foster specifically reviewed the submitted complaints through [the defendant's] private Customer Relations Management (CRM) database." *Williams*, 851 F.3d at 1025. The court found particularly important that the defendant established a complaint-tracking system in order to "account for a ... unusually high level of corrosion complaints." *Id.* at 1027 (alteration and internal quotation marks omitted). In addition, the court acknowledged that

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

where the plaintiff fails to provide dates of complaints "and some evidence that defendant actually *received* the complaints, it would be speculative at best to find that the defendant knew of the alleged defect." *Id.* (citing *Wilson, 668 F.3d at 1147*). Further, the court distinguished cases that include allegations of "an insufficiently small number of complaints, complaints posted in forums unrelated to the defendant, complaints made after the sale dates, or some combination of these circumstances." *Id.* at 1029 n.8.

 *17  The Court finds that the allegations in the instant case are less akin to the allegations in *Williams* and more like the cases *Williams* distinguishes. Here, while Plaintiffs allege the existence of a quality control program and that Defendants' management held quality control meetings, Plaintiffs do not provide any allegations regarding the method by which complaints were recorded and transmitted to management, or otherwise reviewed or received. Thus, Plaintiffs have failed to provide allegations indicating how Defendants were (or should have) been made aware of the alleged customer complaints. *See id.* at 1026 (noting that the plaintiffs "explained in detail how ... complaints were lodged, how [defendant] responded, and the mechanism through which information travelled from consumers to [defendant's] management"). Further, unlike in *Williams,* there are no allegations that these quality control mechanisms were put in place in response to any alleged paint defect. Moreover, like the cases *Williams* distinguishes, here, as explained above, Plaintiffs rely on complaints made on third-party websites unrelated to Defendants and, as to the websites that Defendants specifically monitored, were made after the majority of Plaintiffs' purchases.

The Court is cognizant of *Williams's,* acknowledgement that, at the pleading stage, some information is unavailable to Plaintiffs because discovery has not yet occurred. *See Williams, 851 F.3d at 1028.* There, the Court held that the plaintiffs were excused, at least to some extent, from providing "specific names and dates for consumer complaints," because the plaintiffs had alleged facts regarding "a private internal complaint system, and describe[d] the manner in which it functions and the individual supervisor responsible for its management." *Id.* The court explained that because the defendants had exclusive knowledge of facts regarding this internal complaint system and the plaintiffs had provided sufficient allegations regarding how the system worked, the plaintiffs were not required to also plead the names and dates of those who complained because such information was not in their possession. But *Williams*

does not hold that plaintiffs are generally excused from pleading facts establishing that Defendants were made aware of consumer complaints—in fact, it holds the opposite. Instead, *Williams* acknowledges that plaintiffs need not plead *every* fact regarding customer complaints so long as they plead enough general facts to allow the inference that the defendants had knowledge of the alleged customer complaints. *See id.* ("[Plaintiffs'] description of a separate consumer response system dedicated to handling an unusually high volume of complaints specific to premature corrosion in F–Series motors supports a claim of presale knowledge."). As explained above, unlike in *Williams,* Plaintiffs here do not meet the threshold requirement of providing sufficient general allegations indicating that Defendants had knowledge of the alleged consumer complaints. Plaintiffs cannot rely on facts exclusively within Defendants' knowledge without first alleging these threshold facts.

Therefore, as Plaintiffs have failed to plead sufficient facts to establish that Defendants were aware—or should have been aware—of any alleged customer complaints, the Court finds that Plaintiffs have not adequately pleaded that Defendants knew—or should have known—of any alleged paint defect.

### 2. Fraudulent Concealment

 [25]    [26]  To state a claim for fraudulent concealment, Plaintiffs must establish:

> (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact.

*Graham v. Bank of Am., N.A.*, 226 Cal.App.4th 594, 606, 172 Cal.Rptr.3d 218 (Cal. Ct. App. 2014). "A plaintiff alleging fraudulent concealment must establish that its failure to have

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 318 of 370
PageID: 10348

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

notice of its claim was the result of affirmative conduct by the defendant." *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.,* 858 F.2d 499, 505 (9th Cir. 1988). However, it is unclear to the Court how, absent sufficient allegations that Defendants were aware of the alleged paint defect at the time Plaintiffs purchased their vehicles, Defendants could have affirmatively concealed or suppressed any facts regarding the defect; in other words, Plaintiffs have failed to establish the third element above—how Defendants *intentionally* concealed or suppressed the alleged paint defect. [13] Therefore, Plaintiffs' fraudulent concealment claim is **DISMISSED without prejudice.**

### 3. UCL

**\*18** **[27]** A UCL claim may be based on "any unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200; thus, "it prohibits three separate types of unfair competition: (1) unlawful acts or practices, (2) unfair acts or practices, and (3) fraudulent acts or practices," *In re Sony Grand,* 758 F.Supp.2d at 1091. Here, Plaintiffs allege that Defendants' conduct constitutes "an unlawful, unfair, and fraudulent business practice," bringing claims under all three prongs of the UCL. (CCAC ¶ 338.)

**[28]** The "unlawful" prong "borrows violations of other laws and treats them as unlawful practices independently actionable." *In re Sony Grand,* 758 F.Supp.2d at 1091. Therefore, to have a valid claim under the unlawful prong of the UCL, Plaintiffs must tether its claim to Defendants' violation of another law. As addressed throughout this Order, Plaintiffs have failed to sufficiently plead a claim for the violation of any other statute; thus, Plaintiffs' "unlawful" UCL claim fails.

**[29]** **[30]** "An act or practice is 'unfair' under the UCL 'if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided.' " *Id.* (quoting *Tietsworth v. Sears,* 720 F.Supp.2d 1123, 1137 (N.D. Cal. 2010)). "Failure to disclose a defect that might shorten the effective life span of a component part to a consumer product does not constitute a 'substantial injury' under the unfair practices prong of the UCL where the product functions as warranted throughout the term of its Express Warranty." *Id.* (citing *Clemens,* 534 F.3d at 1026–27). Thus, as Plaintiffs do not allege that Hyundai's

paint failed during the term of its express warranty, Plaintiffs fail to state an "unfair" UCL claim. [14]

**[31]** To state a claim under the "fraudulent" prong, " 'it is necessary only to show that members of the public are likely to be deceived' by the business practice or advertising at issue." *Kowalsky,* 771 F.Supp.2d at 1159 (citation omitted). However, as explained above, "when federal district courts have considered fraudulent prong claims based on representations about defective products, they have generally required a plausible showing that the defendant knew of the alleged defect when it made the representations alleged to be deceptive." *Id.* at 1160 (citing *In re Sony Grand,* 758 F.Supp.2d at 1090); *see also Baba v. Hewlett–Packard Co.,* 2010 WL 2486353, at \*7 (N.D.Cal. June 16, 2010) (dismissing UCL claim where the plaintiffs did not adequately allege "that HP knew of the alleged defects at the time [the plaintiffs] purchased their computers or contacted customer support"); *Neu v. Terminix Int'l, Inc.,* No. C 07-6472 CW, 2008 WL 2951390, at \*3 (N.D. Cal. July 24, 2008) (dismissing complaint where the plaintiff failed to sufficiently allege that the defendants knew statements were false at the time they were made). As determined above, Plaintiffs have not sufficiently established that Defendants were aware of the alleged paint defect at the time it made any of the alleged misleading or false statements. Therefore, Plaintiffs have not sufficiently pleaded a "fraudulent" UCL claim. Accordingly, Plaintiffs' UCL claim is **DISMISSED without prejudice.**

### 4. FAL

**\*19** **[32]** California's FAL prohibits a company from producing an advertisement that "is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. As addressed above, Plaintiffs have failed to establish that Defendants knew or should have known of any alleged paint defect at the time they advertised or provided information on their website. Thus, Plaintiffs' FAL claim is **DISMISSED without prejudice.**

### 5. CLRA

"The CLRA prohibits unfair methods of competition and unfair or deceptive acts or practices in transactions for the sale or lease of goods to consumers." *Elias,* 903 F.Supp.2d

at 853 (internal quotation marks omitted). "Generally, the standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA." *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F.Supp.2d 942, 965 (S.D. Cal. 2012) (citing *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1360, 8 Cal.Rptr.3d 22 (Cal. Ct. App. 2003)). Therefore, just as knowledge is generally required to establish a UCL claim under its fraudulent prong, courts have generally required a defendant to have knowledge of any false statement before allowing an action based on that false statement to proceed. *See Wilson*, 668 F.3d at 1145 ("Consequently, California federal courts have held that, under the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss."); *Kowalsky*, 771 F.Supp.2d at 1163 (dismissing CLRA claim based on alleged affirmative misrepresentations where the plaintiff failed to establish that HP was aware of the defect at the time it made its representations); *Baba*, 2010 WL 2486353, at *4 (finding the plaintiffs failed to state a viable CLRA claim where the complaint made "made no averments that HP knew of the alleged defects" at the time of sale making the plaintiffs' allegations of affirmative misrepresentations "little more than a breach of contract"). Thus, as Plaintiffs have not sufficiently established that Defendants were aware of the alleged paint defect at the time Plaintiffs purchased their vehicles, Plaintiffs have failed to state a viable CLRA claim. Accordingly, Plaintiffs' CLRA claim is **DISMISSED without prejudice.**

### 6. Reliance

**[33]** Moreover, even if Plaintiffs had sufficiently pleaded facts establishing that Defendants had knowledge of the alleged paint defect at the time it made representations regarding the paint's ability to prevent rust and corrosion regarding the paint, Plaintiffs' affirmative misrepresentation theory suffers from a second flaw. To succeed on their fraudulent concealment, UCL, FAL, and CLRA claims, Plaintiffs must adequately plead facts establishing Plaintiffs' relied on these alleged misrepresentations. *See Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 326, 120 Cal.Rptr.3d 741, 246 P.3d 877 (Cal. 2011) ("[A] plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in according with well-settled principles regarding the element of reliance in ordinary fraud actions'...." (citation omitted)); *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 974, 64 Cal.Rptr.2d 843, 938 P.2d 903 (Cal. 1997) (noting that fraudulent concealment claim has "justifiable reliance" element); *see also In re Sony Gaming*, 903 F.Supp.2d at 969 ("For fraud-based claims under [the UCL, the CLRA, and the FAL] the named Class members must allege actual reliance to have standing."). In its previous Order, the Court held that Plaintiffs failed to establish that they were aware of the alleged misrepresentations at the time they purchased their vehicles and had, therefore, failed to sufficiently plead reliance. (*See* Order at 27.)

***20** Plaintiffs contend that their allegations regarding Defendants' extensive advertising campaign are sufficient to establish that Plaintiffs relied on Defendants' alleged misrepresentations. (*See* Opp'n at 30–31.) According to Plaintiffs, they "do not need to prove individual reliance or deception for all Class Members." (Opp'n at 30.) Plaintiffs conflate class certification requirements with pleading requirements. Even if Plaintiffs need not establish reliance for every class member at the certification stage, Plaintiffs *are* required to plead specific reliance for each Plaintiff at the pleading stage. *See, e.g., In re Sony Gaming*, 903 F.Supp.2d at 969. Thus, as to Plaintiffs' affirmative misrepresentation theory, Plaintiffs fail to allege that Ms. Thomas (the only named Plaintiff bringing claims under the California consumer protection laws) viewed or relied upon Defendants' representations regarding rust or corrosion. Further, from Plaintiffs' allegations it appears that Defendants first made representations about the paint preventing rust and corrosion in February 2012. (*See* CCAC ¶ 41.) As Ms. Thomas purchased her vehicle in 2010, it is unclear how she could possibly have relied on these representations. (*See* CCAC ¶ 222.) Therefore, Plaintiffs have failed to adequately allege reliance on any alleged affirmative misrepresentation. *See Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1363, 108 Cal.Rptr.3d 682 (Cal. Ct. App. 2010) (affirming dismissal of a plaintiff's UCL claims where he did not allege facts indicating that he had relied on representations found on the defendant's website or on language found in an agreement he signed).

### E. Plaintiffs' State Law Claims

The knowledge and reliance deficiencies addressed above also preclude Plaintiffs from adequately pleading any of their non-California state law claims, though the Court dismisses Ms. Mulrey, Mr. Geers, and Ms. Tirone's state law claims on other grounds, as addressed below. The Court will address the various state law claims in turn.

2017 WL 1531192

#### 1. Maryland's Consumer Protection Act:

[34]  [35]  "A party seeking to recover damages on a material omission theory under the [Maryland Consumer Protection Act ("MCPA") ] must prove reliance." *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F.Supp.2d 505, 534 (D. Md. 2011); *see also Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 916 A.2d 257, 277 (2007) (explaining that to state a claim under the MCPA, the consumer must have "reli[ed] on the sellers' misrepresentation."). "The requirement of reliance flows from the MCPA's prescription that the party's 'injury or loss' be 'the result of' the prohibited practice (i.e., material omission)." *Id.* Like Ms. Thomas above, it appears that Ms. Resnick purchased her car in 2009, [15] (*see* CCAC ¶ 84), well before Defendants' included any statements regarding the prevention of rust and corrosion on their website in February 2012, (*see* CCAC ¶ 41). Therefore, Plaintiffs have failed to plead reliance and Ms. Resnick's claim arising from the MCPA fails. Accordingly, Ms. Resnick's claim arising under the MCPA is **DISMISSED** without prejudice.

#### 2. Texas's Deceptive Trade Practices —Consumer Protection Act

[36]  Plaintiffs' failure to establish that Defendants' had sufficient knowledge of the alleged defect also causes Mr. Sandlin's claim arising under Texas's Deceptive Trade Practices—Consumer Protection Act ("TDTPA") to fail. "Under the Texas DTPA, there is no duty to disclose if the defendant did not know the material information at the time of the transaction." *Marcus v. Apple Inc.*, No. C 14-03824 WHA, 2015 WL 1743381, at *4 (N.D. Cal. Apr. 16, 2015) (citing *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479 (Tex. 1995)). Further, "[d]emonstrating that the defendant should have known the material information is insufficient." *Id.* As addressed above, Plaintiffs have failed to establish that Defendants knew of the alleged defect at the time any representation (or omission) was made. Therefore, Mr. Sandlin's claim arising under the TDTPA is **DISMISSED** without prejudice.

#### 3. North Carolina's Unfair and Deceptive Trade Practice Act

Mr. Baker's claim arising under the North Carolina's Unfair and Deceptive Trade Practice Act ("NCUDTPA") fail based both on Defendants' lack of knowledge and Mr. Baker's lack of reliance. *See Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 196 (M.D.N.C 1997) ("[I]n order for silence or an omission by the defendants to be an actionable fraud, it must relate to a material matter *known by the defendants* which they had a legal duty to communicate to plaintiff...." (emphasis added)). Further, Plaintiffs claim only that Mr. Baker purchased his vehicle in "2012" without establishing exactly when he did so. (*See* CCAC ¶ 148.) Therefore, it is unclear whether Mr. Baker did, or could have, relied on any representations that appeared on Defendants' website in February 2012. Accordingly, Mr. Baker's claim fails for lack of reliance, as well. *See Darne v. Ford Motor Co.*, No. 13 C 03594, 2015 WL 9259455, at *12 (N.D. Ill. Dec. 18, 2015) (applying the NCUDTPA and holding that misrepresentation claim failed where plaintiff did not allege facts indicating that he relied on misrepresentation before making decision). Therefore, Mr. Baker's claim under the NCUDTPA is **DISMISSED** without prejudice.

#### 4. Florida's Unfair & Deceptive Trade Practices Act

**\*21**  [37]  Lack of reliance also dooms Plaintiffs' claims arising under Florida's Unfair and Deceptive Trade Practices Act ("FUDTPA"). It appears that Ms. Mulrey purchased her vehicle in approximately 2010, [16] (*see* CCAC ¶ 160), and Mr. Geers purchased his vehicle in January 2009, (*see* CCAC ¶ 185). Thus, as explained above, it does not appear that they could have relied on any statements on Hyundai's website beginning in February 2012. In addition, while Ms. Strand and Ms. Vargo purchased their vehicles after February 2012, (*see* CCAC ¶¶ 173, 234), neither allege that they viewed the representations regarding rust and corrosion prevention on Hyundai's website, (*see* CCAC ¶ 174 (alleging that Ms. Strand "was exposed to and relied upon [Defendants'] representations about the quality for the price of Hyundai motor vehicles"—not representations regarding rust and corrosion prevention), 235 (alleging only that Ms. Vargo "researched vehicles online").) "[W]here a plaintiff has not seen or heard an allegedly deceptive advertisement, she cannot challenge it under the FDUTPA." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F.Supp.3d 1050, 1089 (C.D. Cal. 2015); *see also Hall v. Sea World Entm't, Inc.*, No. 3:15-CV-660-CAB-RBB, 2015 WL 9659911, at *15 (S.D. Cal. Dec. 23, 2015) (dismissing FUDTPA claim where the plaintiffs failed "to specifically allege that they viewed

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 321 of 370
                                                     PageID: 10351
Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1531192

any ... statements or advertisements" that were the basis of the dispute." As Plaintiffs have failed to establish that Ms. Mulrey, Ms. Strand, Mr. Geers, or Ms. Vargo viewed any of Hyundai's representations on its website, their claims under the FUDTPA fail.

Further, as Plaintiffs note, in *Matthews v. American Honda Motor Co.*, 12–60630–CIV, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012), the court explained that "Florida courts have recognized that a FDUTPA claim is stated where the defendant *knowingly* fails to disclose a material defect that diminishes a product's value." As determined above, Plaintiffs have failed to establish that Defendants knew of the alleged defect in this case. *See supra* Section IV.D.1. Therefore, it appears that Defendants could not have *knowingly* concealed a defect in this case.

**[38]**   Next, Defendants urge the Court to reconsider whether Ms. Mulrey and Mr. Geers's claims are time-barred under the FDUTPA. (*See* Mot. at 28.) In the Court's prior Order, it noted that Florida courts have been hesitant to determine whether a FDUTPA claim accrues at the time of purchase or at the time of discovery. (*See* Order at 31.) Accordingly, the Court refused to dismiss Ms. Mulrey and Mr. Geers's claims on statute of limitations grounds. (*Id.*)

Defendants now proffer more authority in support of their statute of limitations argument. (*See* Mot. at 28.) Defendants' proffered authority appears to fully support its proposition. The FDUTPA has a statute of limitations of four years. *Speier–Roche v. Volkswagen Grp. of Am., Inc.*, No. 14-20107-CIV, 2014 WL 1745050, at *6 (S.D. Fla. Apr. 30, 2014) (citing Fla. Stat. § 95.1 l(3)(f)). "It is well-settled there is no 'delayed discovery rule' applicable to FDUTPA claims." *Id.*; *see also Marlborough Holdings Grp., Ltd. v. Azimut–Benetti, Spa, Platinum Yacht Collection No. Two, Inc.*, 505 Fed.Appx. 899, 906 (11th Cir. 2013) (holding that the delayed discovery rule is inapplicable to FDUTPA claims and, therefore, a four-year statute of limitations applies). Plaintiffs argue that the statute of limitations is tolled due to Defendants' alleged fraudulent concealment. (*See* Opp'n at 39–40.) But "to invoke a fraudulent concealment toll, Plaintiff must plead facts establishing that Defendant acted deliberately and actively concealed the material facts for purposes of inducing her to delay filing this action." *Speier–Roche*, 2014 WL 1745050, at *7. As determined above, Plaintiffs have failed to adequately plead fraudulent concealment and have not alleged that Defendants intended to delay Ms. Mulrey or Mr. Geers from filing this action. Thus, as it appears that Ms. Mulrey and Mr.

Geers purchased their vehicles more than four years before the commencement of this litigation, (*see* CCAC ¶¶ 160, 185), the Court finds that their claims are time-barred. Nonetheless, the Court will allow Plaintiffs another opportunity to plead facts establishing fraudulent concealment. Accordingly, Ms. Mulrey, Mr. Geers, Ms. Strand, and Ms. Vargo's claims arising under the FUDTPA are **DISMISSED without prejudice.**

### 5. Illinois's Consumer Fraud and
### Deceptive Business Practices Act

**\*22**   **[39]**   Similarly, Ms. Verstraete's claims under Illinois's Consumer Fraud and Deceptive Business Practices Act ("ICFDPA") fail due to a lack of reliance and knowledge. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 861 (Ill. 2005) ("[I]n a cause of action for fraudulent misrepresentation brought under the Consumer Fraud Act, a plaintiff must prove that he or she was *actually deceived* by the misrepresentation in order to establish the element of proximate causation." (emphasis added)); *see also White v. DaimlerChrysler Corp.*, 368 Ill.App.3d 278, 305 Ill.Dec. 737, 856 N.E.2d 542, 549 (2006) ("For purposes of the [ICFDPA], it is important that the defendant be aware of the existence of the material fact before the time of the sale to the plaintiff. Otherwise, an omission of a material cannot be the proximate cause of the plaintiff's damages."). Here, Plaintiffs allege that Ms. Verstraete viewed Hyundai's website prior to purchasing her vehicle, (*see* CCAC ¶ 200), but not that she viewed the rust and corrosion prevention advertisement. In addition, as determined above, Plaintiffs have not established that Defendants had knowledge of the alleged defect. Therefore, Ms. Verstraete's claims arising under the ICFDPA are **DISMISSED without prejudice.**

### 6. Massachusetts's Unfair and
### Deceptive Trade Practice Act

**[40]**   In the Court's prior Order, it held that Ms. Tirone's claim under Massachusetts's Unfair and Deceptive Trade Practice Act ("MUDTPA") failed because she did not provide Defendants with notice of her claims at least thirty days before bringing this action. (*See* Order at 32–33); *see* Mass. Gen. Laws ch. 93A, § 9(3) ("At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 322 of 370
PageID: 10352

or delivered to any prospective respondent."). Defendants again raise this argument in their Motion, (*see* Mot. at 29–b30), and Plaintiffs provide no response in their Opposition, (*see* Opp'n). Failure to oppose an argument raised in a motion to dismiss constitutes waiver of that argument. *See Silva v. U.S. Bancorp,* No. 5:10–cv–01854–JHN–PJWx, 2011 WL 7096576, at *4 (C.D. Cal. Oct. 6, 2011)* (dismissing claims where the plaintiff "failed to address Defendants' arguments in his Opposition"). As Plaintiffs provide no response, it appears this argument is waived. Moreover, even if Plaintiffs had responded, it appears that the Court's prior analysis would apply, and Ms. Tirone's claims would be dismissed, regardless. (*See* Order at 32–33.) Therefore, Ms. Tirone's claims are **DISMISSED with prejudice.**

**F. Unjust Enrichment**

[41]    [42]    [43]    [44]    In their CCAC, Plaintiffs, for the first time, include an unjust enrichment claim. (*See* CCAC ¶¶ 466–72.) Unjust enrichment is not a stand-alone cause of action in California, but is, instead, "the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.' " *Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762 (9th Cir. 2015) (citation omitted). Thus, when a plaintiff alleges an unjust enrichment claim, "a court may construe the cause of action as a quasi-contract claim seeking restitution." *Id.* (internal quotation marks omitted). But "[a]n action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties." *Gerlinger v. Amazon.Com. Inc.,* 311 F.Supp.2d 838, 856 (N.D. Cal. 2004). Here, there is an express contract between the parties—namely, the warranty; therefore, a quasi-contract cause of action cannot lie.

The law of the various Plaintiffs' states holds the same. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 397 (7th Cir. 2003) (explaining that under Illinois law, quasi-contractual relief is inappropriate where there is a valid contract between the parties); *In re Sony Gaming Networks and Costumer Data Sec. Breach Litig.,* 996 F.Supp.2d 942, 984 (S.D.Cal. 2014) (explaining that Florida, Massachusetts, and Texas law holds the same); *United States v. Jurik,* 943 F.Supp.2d 602, 613 (E.D.N.C. 2013) (same under North Carolina law); *Boldt Co. v. Thomason Elec. & Am. Contractors Indem. Co.,* 820 F.Supp.2d 703, 707 (D.S.C. 2007) (same under South Carolina law); *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.,* 426 F.Supp.2d 1356, 1372 (N.D. Ga. 2006) (same under Georgia law); *Swedish Civil Aviation Admin, v. Project Mgmt. Enters., Inc.,* 190 F.Supp.2d 785, 792 (D. Md. 2002) (same under Maryland law); *Brown v. Coleman Invs., Inc.,* 993 F.Supp. 432, 438 (M.D. La. 1998) (same under Louisiana law). Therefore, Plaintiffs' unjust enrichment claims are **DISMISSED without prejudice.**

**VI. CONCLUSION**

**\*23**    For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss. Accordingly, Plaintiffs' claims are **DISMISSED without prejudice,** with the exception of Ms. Tirone's MUDTPA claim, which is **DISMISSED with prejudice.** Plaintiffs are ordered to file an amended complaint, if any, **no later than Monday, May 8, 2017, by 4:00 p.m.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1531192

Footnotes

1    Plaintiffs are: (1) Michelle Resnick, a Maryland resident; (2) Shelby Cramer, a Louisiana resident; (3) Paul Sandlin, a Texas resident; (4) Patricia Reynolds, a South Carolina resident; (5) Lauren Freed, a Georgia resident; (6) Christopher Baker, a North Carolina resident; (7) Tara Mulrey, a Florida resident; (8) Lorraine Strand, a Florida resident; (9) William Geers, a Florida resident; (10) Krista Verstraete, an Illinois resident; (11) Scott Schieber, a Georgia resident; (12) Leida Thomas, a California resident; (13) Elizabeth Vargo, a Florida resident; (14) Daniella Tirone, a Massachusetts resident; and, (15) Carmen Ozdemir, a Georgia resident. (CCAC ¶¶ 11–25.) The Court will refer to all the plaintiffs collectively as "Plaintiffs."

2    Defendants provide a link to the Handbook that does not work. (*See* RJN at 1.) Nonetheless, the Court finds that the Handbook is publicly accessible through Hyundai's website. *See* Search Results: 2015 Owner's Handbook & Warranty Information, Hyundai, https://www.hyundaiusa.com/search.aspx?q=2015+owner%27s+handbook (last visited April 11, 2017).

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 323 of 370
PageID: 10353

Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1531192

3    In their CCAC, Plaintiffs include one new Plaintiff, Carmen Ozdemir. (*See* CCAC ¶ 259.) Ms. Ozdemir alleges that the paint on her 2009 Santa Fe began bubbling in 2010. (*See* CCAC ¶ 265.) Ms. Ozdemir does not indicate whether the bubbling occurred within the warranty's mileage limit, or, more importantly, whether Defendants were presented with the issue and breached the warranty by refusing to repair the vehicle. Thus, Ms. Ozdemir has not adequately pleaded facts indicating that Defendants breached the express warranty in any way.

In addition, at oral argument, Plaintiffs' counsel noted that Ms. Tirone, another Plaintiff, alleges that her paint started peeling at approximately 20,000 miles. (*See* CCAC ¶ 252.) However, Ms. Tirone purchased her car in September 2009 and the peeling of her vehicle allegedly began in 2012. (*See* CCAC ¶¶ 246, 252.) Plaintiffs do not indicate when in 2012 the peeling began. Thus, it is not clear whether the peeling began within the three-year warranty period. Moreover, even assuming the peeling began within the warranty period, Ms. Tirone claims that Hyundai paid for the repair of her vehicle. (*See* CCAC ¶ 254.) Therefore, it is unclear how Defendants breached Ms. Tirone's vehicle's express warranty. *See Bros. v. Hewlett–Packard Co.*, No. C-06-02254 RMW, 2006 WL 3093685, at *7 (N.D. Cal. Oct. 31, 2006) (holding that the plaintiff had failed to adequately plead a breach of express warranty claim where it was undisputed that the defendant had repaired the defect during the warranty period).

4    In fact, at oral argument, Plaintiffs' counsel specifically represented that any deficiencies in Ms. Ozdemir's claim could be cured through amendment.

5    Claims for "negligent misrepresentation must meet Rule 9(b)'s particularity requirements." *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1141 (C.D. Cal. 2003).

6    As the Court addressed in its prior Order when discussing the implied warranty of merchantability, the Court finds that the product in this case is the "vehicle as purchased as a whole," not the paint on its own. (*See* Order at 20.)

7    At the outset, Plaintiffs argue that their UCL claims are not governed by Rule 9(b)'s heightened pleading standard because they are bringing their claims under the unlawful and unfair prong of the California consumer protection statutes. (*See* Opp'n at 22.) The Court disagrees. Plaintiffs' claims arise entirely from Defendants' allegedly fraudulent conduct when they knew about, but failed to inform consumers of, the alleged paint defect in this case. As Plaintiffs note, Rule 9(b) applies when a plaintiff alleges a unified course of fraudulent conduct violated the UCL, meaning the claim is "grounded in fraud." *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *see also In re Sony Grand*, 758 F.Supp.2d 1077, 1088 (2010) (holding that UCL, FAL, and CLRA claims "are rooted in theories of fraudulent concealment and fraudulent misrepresentation and therefore must satisfy Rule 9(b)'s heightened pleading requirements").

8    As the Court noted in its prior Order, Plaintiffs do not differentiate between the Defendants' conduct. (*See* Order at 22 n.15.) Plaintiffs make no attempt to differentiate between the conduct of HMC and HMA in their CCAC. In their Opposition, however, Plaintiffs contend that "both HMA and HMC committed the same operative acts" and, therefore, there was no need to differentiate between them. (*See* Opp'n at 24.) The Ninth Circuit has recently held that "[t]here is no flaw in a pleading ... where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). As Plaintiffs now clarify that they allege Defendants participated in unanimous conduct, it appears that they have not inappropriately "lumped" Defendants' conduct together.

9    Further, while Plaintiffs contend that, more recently, the *Williams* court "did not undertake" a should have known analysis, in fact, the *Williams* court did not indicate that "should have known" is the standard. Instead, like *Wilson*, the court examined only whether the plaintiffs had sufficiently pleaded actual knowledge.

10    "Generally, the standard for deceptive practices under the fraudulent prong of the UCL applies equally to claims for misrepresentation under the CLRA." *Kowalsky*, 771 F.Supp.2d at 1163.

11    Moreover, the question appears to be whether Defendants were aware of a paint defect that would arise during the warranty period and affirmatively misrepresented or omitted facts to the contrary. *See Daugherty*, 144 Cal.App.4th at 835, 51 Cal.Rptr.3d 118 (explaining that a fraudulent omission claim may lie only where the omission was "contrary to a representation actually made by the defendant, or an omission of fact the defendant was obliged to disclose"). Here, many of the online complaints Plaintiffs proffer appear to complain of defects that arose after the warranty period had expired. (*See* CCAC ¶¶ 72–73 (providing fourteen online complaints, only one of which explicitly arose during the warranty period).) Thus, even if Plaintiffs have sufficiently alleged that Defendants had knowledge that Hyundai's paint may, at some point, start to fail, as explained above, Defendants only warranted the paint for a period of three years or 36,000 miles. Thus, Plaintiffs have failed to establish that Defendants were aware that Hyundai's paint was likely to fail during the warranty period in contravention of Defendants' alleged representations. *See Daugherty*, 144 Cal.App.4th at 834, 51 Cal.Rptr.3d 118 (holding that a vehicle manufacturer had not participated in any unlawful or unfair business practice where the plaintiffs' vehicles had "functioned as represented throughout their warranty periods").

**Resnick v. Hyundai Motor America, Inc., Not Reported in Fed. Supp. (2017)**
2017 WL 1531192

12    As to Plaintiff Krista Verstraete, Plaintiffs allege only that she bought her vehicle in "2013," but do not indicate when exactly she made her purchase. (CCAC ¶ 200.) Thus, this allegation fails to allege that her purchase post-dated Hyundai's monitoring of the SureCritic website.

13    Moreover, though not an issue raised by Defendants in the instant Motion, the Court notes that, even if Defendants had knowledge of the alleged paint defect, it is not clear that it had a duty to disclose this defect in this case. "[W]here, as here, a plaintiff's claim is predicated on a manufacturer's failure to inform its customers of a product's likelihood of failing outside the warranty period, the risk posed by such asserted defect cannot be 'merely' the cost of the product's repair, ...; rather, for the omission to be material, the failure must pose 'safety concerns.' " *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 987 (N.D. Cal. 2010); *see also Wilson*, 668 F.3d at 1143 (affirming district court's holding that in order to plead a duty to disclose, the plaintiffs had to plead "that the design defect caused an unreasonable safety hazard"). As Plaintiffs do not allege that the paint defect causes any safety concerns here, it is not clear that Defendants had any duty to disclose, regardless.

14    The only Plaintiffs whose paint may possibly have failed during the warranty period are Ms. Tirone and Ms. Ozdemir. (*See* CCAC ¶ 259.) Neither are California residents, however, and Plaintiffs' CCAC does not purport to bring a UCL claim on their behalf.

15    Plaintiffs do not indicate exactly when Ms. Resnick purchased her vehicle; instead, they explain only that she "is the original owner of a 2009 Hyundai Santa Fe." (CCAC ¶ 84.) It appears that Ms. Resnick likely purchased her vehicle in or around 2009.

16    Like Ms. Resnick above, Plaintiffs allege only that Ms. Mulrey "is the original owner of a 2010 Hyundai Sonata." (CCAC ¶ 160.)

---

**End of Document**                                                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 44

Richard Parks Corrosion Technology, Inc. v. Plas-Pak..., Not Reported in Fed....
2015 WL 5708539

2015 WL 5708539
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

RICHARD PARKS CORROSION
TECHNOLOGY, INC., Plaintiff,
v.
PLAS–PAK INDUSTRIES, INC., V.O., Baker Co.,
Inc., Thomas Baker, and Jason Baker, Defendants.

CASE NO. 3:10-cv-437(VAB)
|
Signed September 29, 2015

**Attorneys and Law Firms**

Dan E. LaBelle, Scott S. McKessy, Stephen P. Fogerty,
Timothy J. McGuire, Halloran & Sage, Westport, CT, for
Plaintiff.

Jared Cohane, Peter J. Martin, Timothy T. Corey, Hinckley
Allen Snyder LLP, Mitchell R. Harris, Day Pitney LLP,
Hartford, CT, Philip R. Bautista, Amelia J. Workman Farago,
Philip R. Bautista, Taft Stettinius & Hillister LLP, Cleveland,
OH, for Defendants.

**RULING ON V.O. BAKER COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

VICTOR A. BOLDEN, UNITED STATES DISTRICT
JUDGE

**\*1** This action arises out of the termination of a
business relationship between Plaintiff, Richard Parks
Corrosion Technology, Inc. ("RPCT"), and Defendants Plas-
Pak Industries, Inc. ("Plas-Pak") as well as V.O. Baker
Company, Inc. ("V.O. Baker"), Thomas Baker, and Jason
Baker (collectively the "Baker Defendants"), involving the
marketing and distribution of a paint cartridge system to the
United States Navy and marine industry.

RPCT's alleges [1] a violation of the Connecticut Unfair Trade
Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*,
by all Defendants and an unjust enrichment claim against V.O.
Baker only. Am. Compl. at Counts Four and Five, ¶¶ 99-105,
ECF No. 207. Plas-Pak asserts five counterclaims against
RPCT for breach of contract, breach of the implied covenant
of good faith and fair dealing, negligent misrepresentation,

fraudulent misrepresentation, and violations of CUTPA. Plas-
Pak's Am. Countercl. at Counts One-Five, ¶¶ 32-67, ECF
No. 129. V.O. Baker also asserts counterclaims against RPCT
for breach of contract, unjust enrichment, estoppel, unfair
competition, and violations of CUTPA. V.O. Baker's Am.
Countercl. at Counts One-Five, ¶¶ 69-91, ECF No. 212.

Before the Court is a Motion for Summary Judgment, ECF
No. 225, filed by V.O. Baker seeking dismissal of RPCT's
unjust enrichment claim. The Court provided V.O. Baker
leave to file this Motion after oral argument on the pending
Motions *in Limine*, ECF Nos. 180, 181, and 194. Scheduling
Order, ECF No. 220. For the reasons that follow, V.O. Baker's
motion, ECF No. 225, is **GRANTED**.

**I. FACTS** [2]

RPCT provides "corrosion control engineering to the United
States Military and private entities in the context of marine
and industrial paints and coatings." Memo. of Decision
on Cross Mots. For Summ. J. 2, ECF No. 130. Plas-Pak
"manufactures, markets, and sells a patented disposable
plastic cartridge system that consumers fill with adhesives
and paints." *Id.* V.O. Baker "repackages industrial products...
and distributes the repackaged products for manufacturers
and other businesses" and has a longstanding business
relationship with Plas-Pak. *Id.* The individual Defendants in
this case, J. Baker and T. Baker, are "current officers and
employees of V.O. Baker." *Id.*

**\*2** On June 1, 2004, RPCT entered into an agreement with
Plas-Pak that granted RPCT the "exclusive right to market
and sell a paint cartridge system to the United States Navy
and marine industry." *Id.* Under this agreement, RPCT had an
obligation to use its "best efforts" to promote and sell the paint
system. *Id.* During its term, RPCT and Plas-Pak expanded
their agreement to cover additional markets on two occasions.
*Id.* at 3.

Incident to the Plas-Pak agreement, RPCT also entered into a
sub-license agreement on January 1, 2005, which named V.O.
Baker the exclusive distributor of Plas-Pak's paint cartridge
system. *Id.* at 2-3; V.O. Baker's Local Rule 56(a)1 Stmt. ¶5,
ECF No. 231. [3] RPCT first contacted a representative of V.O.
Baker in late 2003 about the possibility of distributing Plas-
Pak's paint cartridge system. Baker Defs.' Local Rule 56(a)1
Stmt. ¶11, ECF No. 85-1. [4] In performing this agreement,
V.O. Baker sold the paint cartridge system to "end-users,
such as shipyards, the military, and private and individual

Case 1:19-md-02875-RMB-SAK   Document 523-7   Filed 07/17/20   Page 327 of 370
PageID: 10357
Richard Parks Corrosion Technology, Inc. v. Plas-Pak,... Not Reported in Fed....
2015 WL 5708539

contractors" as well as paint companies, "which then resold them to end users." V.O. Baker's Local Rule 56(a)1 Stmt. ¶ 7, ECF No. 231. Under this sub-license, RPCT received a royalty of 50% of the profit from V.O. Baker's sales. Parks Decl. ¶16, ECF No. 238-2; *see* Parks Dep., Ex. 7, License Agreement, ECF No. 85-1.

Beginning in October 2007, Plas-Pak began expressing concerns about low sales numbers and RPCTs marketing efforts. Memo. of Decision on Cross Mots. For Summ. J. 3, ECF No. 130. Ultimately, on April 9, 2009, Charles Frey, CEO of Plas-Pak, sent an e-mail to Richard Parks, president of RPCT, indicating that "our agreement is terminated." *Id.* at 4-5; Parks Decl. ¶1, ECF No. 238-2. A few months later, on June 10, 2009, V.O. Baker sent RPCT a letter indicating that it considered its sub-license agreement terminated. Memo. of Decision on Cross Mots. For Summ. J. 5, ECF No. 130. On October 5, 2010, RPCT entered into a consulting agreement under which Sulzer Mixpac North America ("Sulzer"), one of Plas-Pak's competitors, became RPCT's exclusive paint cartridge supplier to the United States Navy and marine industry. *Id.* at 3, 5. RPCT's efforts to market and sell Sulzer's paint cartridge system competes with Plas-Pak's efforts to sell its paint cartridge system. *Id.* at 5.

After the termination of the relationship between Plas-Pak and RPCT, V.O. Baker has continued to act as the distributor of Plas-Pak's paint cartridge system. Pl.'s Disputed Issues of Material Fact ¶28, ECF No. 110-1; Pl.'s Disputed Issues of Material Fact ¶1, ECF No. 238-1; Parks Decl. ¶23(h), ECF No. 238-2. Because its sublicense agreement with RPCT has terminated, V.O. Baker no longer pays the royalty to RPCT due under the original agreement. *Id.*

## II. STANDARD

Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record" or by "showing that the materials cited do not establish the [ ] of presence of a genuine dispute." *Fed. R. Civ. P. 56(c) (1)(A)-(B); see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133 (2d Cir. 2000) (citations omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and material if the substantive law governing the case identifies those facts as material. *Williams v. Utica Coll. Of*

*Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (citation and internal quotation marks omitted); *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

**\*3** In assessing a summary judgment motion, the Court must resolve all ambiguities, including credibility questions, and draw all inferences from the record as a whole in favor of the non-moving party. *Kayton v. Elec. Boat Corp.,* 609 F.3d 537, 546 (2d Cir. 2010); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991).

## III. DISCUSSION

" '[A] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.' " *Gagne v. Vaccaro,* 255 Conn. 390, 408 (2001) (citation omitted). In analyzing a claim of unjust enrichment, the Court must " 'examine the circumstances and the conduct of the parties' " and determine " 'what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable.' " *Town of New Hartford v. Conn. Res. Recovery Auth.,* 291 Conn. 433, 451 (2009) (citation omitted).

To survive a summary judgment motion on its unjust enrichment claim, RPCT must show that a genuine question of material fact exists with respect to the following elements: " '(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiff's detriment.' " *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283 (1994) (citation omitted).

RPCT argues that it has met this burden, because V.O. Baker has not paid for and continues to benefit from work RPCT did under its contracts with Plas-Pak and V.O. Baker. *See* Parks Decl. ¶¶22-23, ECF No. 238-2; Opp. Br. 2-3, 4-5, ECF No. 238 ("[T]he services and the expertise which RPCT contributed to the paint program continue to benefit Baker Company today."); Pl.'s Disputed Issues of Material Fact ¶1, ECF No. 238-1. Richard Parks, RPCT's president, indicates that RPCT was the one who "developed the [unique] concept for the paint cartridge program" and that RPCT was

Richard Parks Corrosion Technology, Inc. v. Plas-Pak..., Not Reported in Fed....
2015 WL 5708539

"instrumental" in selecting V.O. Baker for its distribution. Parks Decl. ¶¶1, 23(a)-(b), (g), ECF No. 238-2. RPCT also argues that the value it added to V.O. Baker's current business includes the work it did to develop the infrastructure for the paint distribution program as well as its ideas for future expansion [5] and its contacts with manufacturers of industrial paints as well as in the military, marine, and naval industries. Opp. Br. 4-5, ECF No. 238; Parks Decl. ¶¶22-23, ECF No. 238-2.

More specifically, Mr. Parks notes that prior to contact with his company, V.O. Baker "had no experience with industrial paints in marine and military applications... nor with the approval and requisition procedures for industrial paints utilized by the U.S. military." Parks Decl. ¶¶19-20, ECF No. 238-2. He explains that to do business with the United States Navy and military, one must have knowledge of the technical needs they have as well as the types of approvals required. *Id.* ¶¶ 12-14. In fulfilling its obligations under its contract with Plas-Pak, RPCT contends that it obtained the required "technical approvals" that enable V.O. Baker to sell the paint cartridge system in certain markets today. *Id.* ¶ 23(c). In performing this role, RPCT also argues that it provided an "extensive technical education [ ] in the field of marine and industrial paints [and] government approvals and requirements." *Id.* ¶ 23(d). Mr. Parks avers that V.O. Baker sells to customers that RPCT cultivated as clients and benefits from supply and exclusivity agreements that RPCT negotiated. *Id.* ¶¶ 22, 23(f). Thus, V.O. Baker enjoys an "established position" due to RPCT's efforts, which "makes it more difficult for any competitor to try to enter the paint cartridge market." *Id.* ¶ 23(g). [6]

**\*4** According to RPCT, it is entitled to recover damages from V.O. Baker under an unjust enrichment theory because the existence of a valid, enforceable written contract is not a bar to recovery under this legal theory where a party has opportunistically breached that agreement. Opp. Br. 5-6, ECF No. 238. In its view, the law of restitution is evolving, and it cites to a number of provisions from the Restatement (Third) of Restitution and Unjust Enrichment (2011) that it claims support that position. *Id.* at 6-12. RPCT points to no Connecticut case law providing the relief it requests in an analogous situation; instead, it relies on precedent from Massachusetts. *Id.* at 10-11 (citing *Nat'l Merchandising Corp. v. Leyden,* 370 Mass. 425 (1976)).

The Court disagrees with RPCT's articulation of the law of unjust enrichment. Generally, litigants are precluded from asserting an "unjust enrichment" claim based on subject matter governed by an express contract. *See Meaney v. Conn. Hospital Assoc., Inc.,* 250 Conn. 500, 517-18 (1999) (" 'It is often said that an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter.' ") (citation omitted); *Burns v. Koellmer,* 11 Conn. App. 375, 385 (Conn. App. Ct. 1987) ("Unjust enrichment and quantum meruit are forms of the equitable remedy of restitution by which a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties.") (citations omitted); *Restatement (Third) of Restitution and Unjust Enrichment, § 2,* cmt. c (2011) ("Restitution is [ ] subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach."); *see also Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.,* No. 13 Civ. 1582(PAE), 2015 WL 4191419, at *8 n.10 (S.D.N.Y. July 10, 2015) (surveying the law of a number of states, including Connecticut, on this issue); *see also Alstom Power, Inc. v. Schwing Am., Inc.,* Civil No. 3:04cv1311(JBA), 2006 WL 2642412, at *5 (D. Conn. Sept. 14, 2006) (" '[L]ack of a remedy under [a] contract is a precondition for recovery based upon unjust enrichment.' ") (quoting *Gagne,* 255 Conn. at 401).

To hold otherwise would inappropriately disrupt the balance struck by parties to contracts. *See Total Recycling Servs. Of Conn., Inc. v. Conn. Oil Recycling Servs., LLC,* 114 Conn. App. 671, 678-79 (Conn. App. Ct. 2009) ("[A] party that has made a contract with another cannot simply disregard the contract and claim restitution from the other party for performance rendered under the contract.") (quoting 1 E. Farnsworth, Contracts (3d Ed. 2004) § 2.20, pp. 191-92). To be clear, the existence of a contract "does not preclude equitable relief which is not inconsistent with the contract," meaning that " 'when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice.' " *Rent-A-PC, Inc. v. Rental Mgmt., Inc.,* 96 Conn. App. 600, 605-06 (Conn. App. Ct. 2006) (citation omitted); *Town of New Hartford v. Conn. Resources Recovery Auth.,* 291 Conn. 433, 455 (2009) (citation omitted). RPCT, however, must show both how the relief it seeks is not covered directly by its contract with V.O. Baker and that a genuine question of material fact exists with respect to all elements of its unjust enrichment claim. It has failed to do either.

Richard Parks Corrosion Technology, Inc. v. Plas-Pak... Not Reported in Fed....
2015 WL 5708539

While RPCT may be correct that certain benefits it conferred are still enjoyed by V.O. Baker today, those benefits were conferred during the life of the contracts between RPCT and Plas-Pak and RPCT and V.O. Baker. RPCT had a contractual obligation to confer those benefits, in that it was required to use its "best efforts" to sell the paint cartridge system. [7] V.O. Baker provided consideration for those benefits, which RPCT negotiated as 50% of its profits from sales. Because the benefits were conferred while the contracts were still operative, and indeed made up part of RPCT's performance obligations, they were not unjustly retained and, therefore, cannot be recovered in an unjust enrichment action. *See Meaney,* 250 Conn. at 523 (reversing judgment in favor of the plaintiff on an unjust enrichment claim where the benefit conferred to defendant was a service that plaintiff "was bound to perform [ ] in accordance with his employment contract" and had been compensated for per the contract's terms); *Hosp. of Cent. Conn. v. Neurosurgical Assocs., P.C.,* 159 Conn. App. 87, at *5-7 (Conn. App. Ct. 2015) (affirming the Superior Court's conclusion that a benefit conferred on the defendant was not unjustly retained because the defendant provided the plaintiff with consideration for the benefit); *see also Providence Elec. Co. v. Sutton Place, Inc.,* 161 Conn. 242, 246-47 (1971) (finding no legal basis for an unjust enrichment claim where defendant paid its general contractor for the benefit it received and did not claim fraud or collusion); *accord Powercrete USA, LLC v. D&L Equip., Inc.,* 661 F. Supp.2d 705, 714-15 (W.D. Ky. 2009) (finding that a party to a contract was not unjustly enriched by the other party's "expenditures of effort and knowhow in developing the markets" because such conduct was that party's obligation under the contract to use "best efforts" to promote the sale of the relevant product).

**\*5**  Holding otherwise would inappropriately place this Court in the position of reinventing the business relationship between RPCT and V.O. Baker, which was already negotiated and memorialized in a written contract. By asking for compensation for services RPCT rendered during the life of its contract with V.O. Baker, it is essentially asking the Court to re-write the agreement. There is no record evidence that V.O. Baker or RPCT expected their relationship to be defined by anything other than the written contract between them. Nor is there evidence in the record indicating that either party expected to pay for or be paid, respectively, outside of the terms of the contract, for the benefits that RPCT provided. Given "the importance of safeguarding the autonomy of the parties to determine their own contract relationships without exposure to the risk of judicial override," courts are not in

the business of re-writing agreements post-hoc. *Meaney,* 250 Conn. at 519 (citing *Murray v. ABT Assocs. Inc.,* 18 F.3d 1376, 1378-79 (7th Cir. 1994)); *accord Chesapeake Energy Corp.,* 2015 WL 4191419, at *9 ("[T]he law favors contractual guideposts because a contract makes the parties the masters of their destiny... [which] will generally result in more voluntary, predictable, efficient, and fair outcomes than the *ex post* application of common-law principles of equity.") (citation omitted). The Court sees no reason to do so here.

Moreover, allowing an unjust enrichment claim here would place with the Court the very difficult task "of crafting an appropriately constrained judicial remedy." *Meaney,* 250 Conn. at 519 (citing *Bloomgarden v. Coyer,* 479 F.2d 201, 211 (D.C. Cir. 1973)). "Contract is superior to restitution as a means of regulating voluntary transfers because it eliminates, or minimizes, the fundamental difficulty of valuation. Considerations of both justice and efficiency require that private transfer be made pursuant to contract whenever reasonably possible..." *Chesapeake Energy Corp.,* 2015 WL 4191419, at *8 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2, cmt. c (2011)).

RPCT's claim also must fail because the damages it seeks under its "unjust enrichment" theory are no different from the damages the Court has already ruled were too speculative to sustain a contract claim. Memo. Of Decision on First Mot. for Summ. J. 8-9, ECF No. 130. Under its breach of contract claim, RPCT sought gross profits, which it labeled "lost profits" and derives from RPCT's expert report provided by Mr. DiGiacomo. *Id.*; *see also* DiGiacomo Report dated May 16, 2011 at 2, ECF No. 160 (defining "lost profits" as "50% of the profit from the total VO Baker sales" after June 16, 2009). Under its unjust enrichment theory, it seeks exactly the same figure, "the 50% profit share with Baker has gained and retained" by allegedly removing RPCT from the deal with Plas-Pak. Opp. Br. 3, ECF No. 238.

As the Court determined in its prior ruling, RPCT has failed to provide non-speculative proof of these damages. Memo. Of Decision on First Mot. for Summ. J. 8-9, ECF No. 130. Like a breach of contract claim, a plaintiff must prove damages are not speculative to prevail on an unjust enrichment claim. *See generally Carrano v. Yale-New Haven Hosp.,* 279 Conn. 622, 650 (2006) (" 'Proof of damages should be established with reasonable certainty and not speculatively and problematically... Damages may not be calculated based on a contingency or conjecture.' ") (citation omitted); *see also cf. Schirmer v. Souza,* 126 Conn. App.

Richard Parks Corrosion Technology, Inc. v. Plas-Pak... Not Reported in Fed....
2015 WL 5708539

759, 771-73 (Conn. App. Ct. 2011) (noting in the unjust enrichment context that it is "plaintiffs' burden to prove... that the defendants were benefitted", which includes proof that enables a fact finder to " 'make a fair and reasonable estimate' " of the benefit conferred or damages) (citations omitted); *see also Leisure Resort Tech., Inc. v. Trading Cove Assocs.,* No. X06CV000164799S, 2004 WL 1966952, at *6-7 (Conn. Super. Ct. Aug. 4, 2004) (granting summary judgment on an unjust enrichment claim because plaintiff's claimed damages were too speculative because they required the Court to value the impact of negotiations for a deal on the worth of an interest in a partnership that was sold before the deal closed), *aff'd on other grounds* 277 Conn. 21, 31 n.4 (2006) (noting that plaintiff abandoned its unjust enrichment count on appeal).

**IV. CONCLUSION**

**\*6**  For all of the foregoing reasons, V.O. Baker's Motion for Summary Judgment, ECF No. 225, is **GRANTED**, and RPCT's unjust enrichment claim is hereby dismissed.

SO ORDERED at Bridgeport, Connecticut this 29th day of September 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 5708539

Footnotes

1   In its initial Complaint, RPCT also sought damages for breach of contract, tortious interference with the Plas-Pak license agreement by the Baker Defendants, and violation of the covenant of good faith and fair dealing. Compl. at Counts One, Two, and Three, ¶¶ 54-98, ECF No. 1. These claims were dismissed at summary judgment because the Court found that RPCT could not prove damages to a reasonable certainty. Memo. of Decision on Cross Mots. For Summ. J. 9, ECF No. 130 (dismissing the breach of contract and the covenant of good faith and fair dealing claims); Order Granting Suppl. Mot. for Summ. J., ECF No. 146 (dismissing the tortious inference of contract claim against the Baker Defendants). After all summary judgment motions were decided and three motions *in limine* were filed, ECF Nos. 180, 181, and 194, RPCT amended its Complaint and added the claim for unjust enrichment. Am. Compl. ¶¶ 104-05, ECF No. 207.

2   These facts are based on a review of the Court's earlier summary judgment ruling, ECF No. 130, the parties' pleadings, Local Rule 56(a) Statements, and any responses, as well as exhibits filed by both parties. Unless noted otherwise, facts discussed in this section are undisputed or the opposing party has not pointed to any contradictory evidence in the record.

3   V.O. Baker "outsourced 90% of its filling of Plas-Pak's [c]artridges to Adhesive Packaging Specialities." Memo. of Decision on Cross Mots. For Summ. J. 3 n.1, ECF No. 130.

4   The Court refers to the parties' earlier summary judgment Local Rule 56(a) Statements and exhibits because they explicitly incorporated them into their filings on the instant summary judgment motion. *See* V.O. Baker's Local Rule 56(a) 1 Stmt. at 1, ECF No. 231; Pl.'s Local Rule 56(a) 2 Stmt. at 1, ECF No. 238-1.

5   Mr. Parks claims that RPCT identified additional markets for expansion, into which V.O. Baker has expanded. Parks Decl. ¶ 23(e), ECF No. 238-2.

6   In evaluating V.O. Baker's Motion for Summary Judgment, the Court credits RPCT's assertions about the benefits it claims to have conferred on V.O. Baker. *See Kayton,* 609 F.3d at 546.

7   This "best efforts" obligation existed explicitly under RPCT's agreement with Plas-Pak. *See* Memo. of Decision on Cross Mots. For Summ. J. 3, ECF No. 130. Because this agreement was a necessary precondition to the agreement between V.O. Baker and RPCT, it formed a basis for their bargain as well.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 45

2006 WL 2642412

2006 WL 2642412
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

ALSTOM POWER, INC., Plaintiff,

v.

SCHWING AMERICA, INC., Defendant.

Civil No. 3:04cv1311 (JBA).

|

Sept. 14, 2006.

**Attorneys and Law Firms**

Patrick M. Fryer, Steven Berglass, Seeley & Berglass, New
Haven, CT, for Plaintiff.

Alan H. Maclin, Jeffrey F. Shaw, Briggs & Morgan, St. Paul,
MN, Barry J. Waters, Murtha Cullina LLP, New Haven, CT,
for Defendant.

Ruling on Motion for Summary Judgment [Doc. # 78]

JANET BOND ARTERTON, U.S.D.J.

 **\*1**  This diversity case arises out of a contract dispute
between plaintiff Alstom Power, Inc. ("Alstom"), a Delaware
corporation with its principal office in Windsor, Connecticut,
and defendant Schwing America, Inc. ("Schwing"), a
Minnesota corporation with its principal office in White
Bear, Minnesota. Alstom brought a complaint alleging breach
of contract (Count One), unjust enrichment (Count Two),
negligent misrepresentation as to the goods/services to be
provided under the contract (Count Three), declaratory
judgment with respect to insurance coverage (Counts Four
and Five), violation of the Connecticut Unfair Trade Practices
Act, Conn. Gen.Stat. § 42–110a *et seq.* and the Connecticut
Unfair Insurance Practices Act, Conn. Gen.Stat. § 38a–816(b)
(Count Six), and negligent misrepresentation as to insurance
coverage (Count Seven). Am. Compl. [Doc. # 66]. Defendant
now moves for summary judgment on all counts, which will
be granted for the following reasons.

**I. Factual Background**

In April 1999, ABB, a member of the Alstom Power Group, [1]
was awarded a contract to construct a portion of a 150–
megawatt power plant in Redbank, Australia. Def. L.R.

56(a)1 Stmt. [Doc. # 79] at ¶¶ 2, 4. The plant is near a
coal mine and was designed to convert coal byproducts into
energy. *Id.* at ¶¶ 5, 7; Pl. L.R. 56(a)2 Stmt. ¶ II.5. ABB was
to provide steam generators and related equipment for the
plant, a contract worth $130 million of the total $230 million
(Australian dollars) Redbank budget. Def. L.R. 56(a)2 Stmt.
¶ 10.

The parties dispute the relationship between ABB and
Schwing. ABB characterizes Schwing as a "supplier" who
was to provide one component for its part of the Redbank
project, a "material handling system used to store, mix
and transport the coal slurry." *Id.* at ¶ 12. Schwing, by
contrast, characterizes its role as a subcontractor responsible
for "complete provision of a major portion of the Redbank
power plant, not just for component parts, and plaintiff's
bid included design, engineering, planning, specifications,
services, on-site supervision, inspection and performance...."
Pl. L.R. 56(a)2 Stmt. ¶ 12.

Schwing's response to the bid package, however, proffers a
"price for the *material handling system* used to store, mix
and transport the coal slurry." Def.App. Ex. 4 (9/21/99 letter
from Thomas Lyons to R.T. Smuda) (emphasis added). The
letter further states that Schwing has "included a parts only
warranty in our base equipment offering; however, we offered
a price adder to incur the cost of labor. Labor to service our
equipment must be provided by either a Schwing employee
or authorized agent, specifically Sulzer of Australia." *Id.*

Alstom responded to Schwing's package with a 29–page
purchase order dated October 8, 1999, which requested four
BDT [2]  storage tanks, four storage tank sliding frame silo
systems, four BDT paddle mixers, and four BDT transfer
pumps. Def.App. Ex. 5. Included in the purchase order was
one service trip for one Schwing employee to go to Australia
for two weeks. *Id.* ABB also requested various inspection
and test reports, contract drawings, and instruction manual
specifications. *Id.*

 **\*2**  On October 29, 1999, Schwing responded to the purchase
order with a letter acknowledging receipt of the order and
assuring "successful and timely completion." Def.App. Ex. 6
at 1. The letter also requested a few modifications to the terms
of the purchase order, including a limitation of warranties. *Id.*
at 2. ABB never signed the letter to indicate its agreement to
the changed terms. *Id.* at 6 (showing blank signature lines).

2006 WL 2642412

On June 23, 2000, ABB's Redbank Construction Manager confirmed the delivery at the Redbank site of the equipment that was ordered through the original purchase order, stating that the goods were received and "of good quality and condition." Def. L.R. 56(a)1 Stmt. ¶ 19; Pl. L.R. 56(a)2 Stmt. ¶ II.19; Def.App. Ex. 8. Schwing billed ABB approximately $1.8 million (U.S.Dollars), which was paid timely. Def. L.R. 56(a)1 Stmt. ¶ 20–21; Pl. L.R. 56(a)2 Stmt. ¶ II.20–21.[3]

On May 11, 2001, while the power plant was operating on BDT fuel, one of the "sliding frame power cylinder trunion arms broke," or, as plaintiff characterizes the accident, "exploded including but not limited to a cylinder flying through the system causing extensive and major damage." Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ II.22. Schwing, through its contractor Parker Hannifin, replaced all eight cylinders at Redbank. Def. L.R. 56(a)1 Stmt. ¶ 27. However, plaintiff alleges that the replacement cylinders, which were due on June 30, were delayed until July 16, 2001, and then failed again in December 2001 and in 2002 and 2003. Pl. L.R. 56(a)2 Stmt. ¶ 27. Plaintiff seeks damages of approximately $700,000 for replacement material, commissioning, transportation, repair labor, and 15% overhead. Defendant argues that all of plaintiff's contract claims are barred by the statute of limitations. Defendant also argues that most of these costs are excluded by the parts-only warranty agreed by the parties or because the costs were not incurred by plaintiff.

## II. Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact

in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex,* 477 U.S. at 322–23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–1224 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The nonmoving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson,* 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushida,* 475 U.S. at 586 (citations omitted).

## III. Discussion

### A. Breach of Contract: Statute of Limitations

**\*3** Central to determination of this summary judgment motion is the parties' dispute as to the applicable statute of limitations for this lawsuit filed August 6, 2004. The Uniform Commercial Code, governing sales of goods, establishes a four-year limitations period, *see* Conn. Gen.Stat. § 42a–2–725,[4] while construction and other general contract matters have a six-year limitations period, *see* Conn. Gen.Stat. § 52–576.[5] Thus, the critical issue is whether the parties' contract is a contract for the sale of goods, as Schwing argues, or a construction services contract, as Alstom argues.

"To determine whether a contract ... is governed by the U.C.C., the court must determine whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 747 (2d Cir.1998) (quoting *Incomm, Inc. v. Thermo–Spa, Inc.,* 41 Conn. Supp. 566, 570, 595 A.2d 954, 956–57 (Conn.Super.Ct.1991)). This is a

fact-specific determination that requires examination of "the main objective sought to be accomplished by the contracting parties." *Consol. Edison Co. of N .Y. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358, 361 (S.D.N.Y.1983) (internal citation and quotation marks omitted) (denying motion to dismiss contract action relating to construction of nuclear power plant because factual development required to determine whether it was primarily a construction contract or contract for sale of goods).

The contract was formed pursuant to ABB's Bid Package requisitioning a "BDT Storage Tank (Sliding Frame Silo System)," Def. Ex. 3, by Schwing's acceptance of ABB's "Purchase Order," which sets forth a list of "deliverable items," Def. Ex. 5 at 1, 6. The purchase order refers to the parties as "Seller" and "Purchaser." *Id.* at 2. The items are to be manufactured by Schwing either in the United States or Germany and shipped to Australia. *Id.* at 4. Schwing provided one of its employees to supervise installation in Australia for two weeks, *id.* at 4, but the purchase order did not include the full price of labor necessary for complete installation, which was undertaken by another firm. Alstom emphasizes the fact that Schwing was to engineer and quality-test the items provided and also supply instruction manuals. Under the U.C.C., however, " '[g]oods' means all things, *including specially manufactured goods,* which are movable at the time of identification to the contract...." Conn. Gen.Stat. § 42a–2–105 (emphasis supplied). Thus, the fact that the BDT storage tanks were specially manufactured items that required unique engineering, testing and instruction manuals for operation is not inconsistent with a finding that they are goods within the meaning of the U.C.C.

The cases plaintiff cites for the proposition that its contract is not subject to the U.C.C. are factually distinguishable. In *Insurance Company of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1056 (S.D.N.Y.1996), the defendant was retained to construct an entire power generation facility, including "design[ing] and construct[ing] the facility and procur[ing] necessary equipment." The contract, which "define[d][the] defendant's undertaking as 'services,' " obligated the defendant—denominated as a "contractor"—to "provide [the owner] with a Project that functions...." *Id.* at 1061. Likewise, in *Niagara Mohawk Power Corporation v. Graver Tank & Manufacturing Company,* 470 F.Supp. 1308, 1324 (N.D.N.Y.1979), the contract obligated the "contractor" to "provide all the materials, equipment and apparatus, ... all the labor, tools, services and facilities ... [and] perform all the work and

do all things necessary for the proper construction and erection and completion" of a "containment liner" in a nuclear power plant. Here, Schwing was obligated to provide certain component parts of the Redbank plant but not to install those parts. The contract did not require Schwing to provide "all the labor, tools, services and facilities," *compare id.,* but only obligated Schwing to provide one employee to oversee another subcontractor's work. Finally, the purchase order issued by ABB requests "deliverable items," not "services," and the bid package offered by Schwing is for the component parts of a "material handling *system,"* not for the construction services associated with that system. The fact that Schwing designed and engineered the system does not transmute the purchase order into a construction contract.

**\*4** For these reasons, the Court concludes that this contract is predominantly one for the sale of goods, governed by the U.C.C. Accordingly, a four-year statute of limitations is applicable.

Plaintiff's original complaint [Doc. # 1] was filed on August 6, 2004. Thus the question is whether any breach of contract is alleged to have occurred within four years of that date. Schwing contends that its performance of the contract was complete on June 23, 2000, when ABB's John King sent an email to Schwing confirming that the "BDT Bins and Support structures" were "received at [the Redbank] site and ... [are] of good quality and condition." Def.App. Ex. 8. Alstom, however, contends that performance was not complete in 2000, but "continu[ed] into 2001 and 2002" due to the "failure with the sliding frame cylinder arrangement," which was not fully repaired until July 16, 2001, and failed again in 2002. *See* Pl. L.R. 56(a)2 Stmt. ¶ 19.

Alstom conflates two different issues. Although Alstom contends that the 2001 sliding frame cylinder failure breached the contract, this is a separate question from when Schwing completed its original performance pursuant to the purchase order. Schwing's parts were delivered to Redbank on June 20, 2000, *see* Def.App. Ex. 8 ("All Items Report"), and there is no material dispute of fact that ABB certified Schwing's delivery complete and of acceptable quality as of June 23, 2000, *id.* at Ex. 8 (e-mail from John King to Keith Ireson). There is also no genuine dispute that the Redbank power plant was fully constructed and operating before Spring 2001, because the cylinder failure occurred during the firing of BDT fuel.

*See* Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ 22. The real dispute between the parties thus is whether the

*Alstom Power, Inc. v. Schwing America, Inc., Not Reported in F.Supp.2d (2006)*

2006 WL 2642412

cylinder failure is covered under the agreed warranty, not whether Schwing completed performance under the contract initially. [6]

Under Conn. Gen.Stat. § 42–a–725(2), a "breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." The operative [7] warranty language in the Alstom–Schwing agreement, which is an amendment [8] to the purchase order, reads: "Schwing America, Inc. to include two (2) year parts only warranty or [sic] thru 9–30–02. This warranty does not obligate Schwing America Inc. to bear the cost of labor in replacement of defective parts or the cost of transportation of such parts." Def.App. Ex. 5 at 16.

This warranty is not an explicit guarantee of future performance, such as would be required under § 42a–2–725 to toll the statute of limitations until the time the defect is discovered. The parties' agreed language is a "parts only warranty" obliging Schwing to "replac[e] ... defective parts." It does not oblige Schwing to guarantee that its materials handling system will perform to a certain level over the warranty period. Accordingly, a breach of warranty "occurs when tender of delivery is made." Conn. Gen.Stat. § 42a–2–725(2).

**\*5** In *Flagg Energy Development Corp. v. General Motors Corp.,* 244 Conn. 126, 151, 709 A.2d 1075, 1087 (Conn.1998), a case with very similar facts, the Connecticut Supreme Court expressly "reject[ed] the ... contention that [a] repair or replacement clause in [a] purchase agreement tolls the running of the statute of limitations under § 42a–2–725." In *Flagg,* the parties contracted (via a purchase order) for gas turbine engines for a construction project. The engines malfunctioned approximately 1.5 years after acceptance by the plaintiff, and the plaintiff claimed that because the contract included a repair or replacement clause for defective materials or equipment, the statute of limitations started to run on the date of the malfunction. The Connecticut Supreme Court held that the repair/replacement clause in the contract was not a guarantee of the engines' future performance, *i.e.* an ongoing contractual commitment, but merely an additional remedy promised to the buyer in case of defect, and therefore the statute of limitations started to run on the date performance was tendered. *See Flagg,* 244 Conn. at 150. Likewise, the replacement-parts warranty agreed between Alstom and

Schwing is not an explicit guarantee of future performance, and thus the statute of limitation began to run when delivery of the goods was tendered. [9]

Because there is no genuine dispute of the material fact that ABB accepted Schwing's materials handling system as of June 23, 2000, Alstom's August 6, 2004 breach of contract claim was filed outside the four-year statute of limitations. Accordingly, defendant is entitled to summary judgment on Count One.

**B. Unjust Enrichment**

As an alternative to its breach of contract claim, Alstom alleges a quasi-contractual unjust enrichment claim. "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.... Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro,* 255 Conn. 390, 401, 766 A .2d 416, 424 (Conn.2001). In other words, the remedy of unjust enrichment provides that "a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties." *Burns v. Koellmer,* 11 Conn.App. 375, 383, 527 A.2d 1210, 1215 (Conn.App.Ct.1987) (citing 5 *Williston on Contracts* § 1479 (3d ed.1970); *Restatement of Restitution* §§ 40, 41, 107). However, where an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable. *Lieberman v. Emigrant Mortg. Co.,* 436F.Supp.2d357, 2006 WL 1699515, at *6 (D. Conn. June 2, 2006)* (Hall, J.) ("Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations. Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.") (quoting *Polverari v. Peatt,* 29 Conn.App. 191, 199, 614 A.2d 484 (Conn.App.Ct.1992)).

**\*6** Here, there is no argument that the parties' express written contract is unenforceable, *e.g.,* for lack of consideration or lack of mutual agreement. *Cf. Restatement of Restitution* § 40(2). Plaintiff's action on the contract exists; it is simply barred by the statute of limitations. Therefore, due to the existence of a written contract, plaintiff cannot recover on an unjust enrichment theory, and defendant is entitled to summary judgment on Count Two. [10]

**C. Negligent Misrepresentation**

2006 WL 2642412

Plaintiff's third count alleges that Schwing negligently misrepresented "certain services, materials, equipment, and products" it provided to plaintiff. Am. Compl., Third Claim, ¶ 16. Defendant moves for summary judgment on this count on the grounds that: it is barred by the statute of limitations; Alstom has proffered no evidence of reasonable reliance on Schwing's statements; and Alstom's breach of warranty claim from Count One cannot be combined with a negligent misrepresentation claim. Alstom has not addressed any of these arguments, and appears to have abandoned Count Three.

Even if plaintiff intended to pursue this claim, the Court agrees that it is barred by the applicable three-year statute of limitations. *See* Conn. Gen.Stat. § 52–577 (three-year statute of limitations applies to tort actions); *Krondes v. Norwalk Sav. Soc.,* 53 Conn.App. 102, 113–15, 728 A.2d 1103, 1110–11 (1999) (three-year statute of limitation applied to fraudulent misrepresentation claim). On the facts of plaintiff's complaint, any misrepresentation concerning the quality of the goods took place either when the contract was formed (Schwing's acceptance took place October 29, 1999), or, at the latest, when the goods were delivered to Redbank on June 20, 2000. Either point predates the filing of the August 2004 complaint by more than three years.

Moreover, the Connecticut Supreme Court held in *Flagg,* 244 Conn. at 153, that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation." Thus, where the "factual underpinnings" of both claims are identical, a plaintiff is limited to a breach-of-contract claim. *Id.* at 155. Here, the allegations of plaintiff's negligent misrepresentation claim are identical to its breach of warranty claim, namely, that defendant's sliding frame and cylinder components were defective and malfunctioned in May 2001, causing damage to the Redbank plant. Accordingly, under *Flagg,* plaintiff cannot maintain this negligent misrepresentation claim.

For these reasons, defendant is entitled to summary judgment on Count Three.

**D. Insurance Coverage**

Plaintiff's Fourth and Fifth Counts [11] relate to the insurance coverage provisions of the parties' agreement, which requires that "Seller will maintain general liability insurance on an occurrence basis, having limits of not less than $1,000,000 per occurrence ... and naming Purchaser as an additional insured

with respect to any claim arising out of Seller's performance hereunder." Purchase Order, Pl.Ex. B at 18. It is undisputed that defendants breached this requirement because, although they obtained Commercial General Liability policies with limits of $2 million, ABB/Alstom was not a named insured on these policies. *See* Insurance policies, Def.App. Ex. 21 (only Schwing entities are named insureds); Def. L.R. 56(a)1 Stmt. ¶ 39 (claiming Schwing had CGL policies in effect but not alleging that the policies named ABB/Alstom). Schwing did put up a construction bond in ABB's favor of approximately $240,000, or 10% of the contract. *See* Def.App. Ex. 20. However, Schwing does not argue that this bond satisfied its insurance obligation under the agreement. Rather, Schwing argues that Alstom's insurance coverage claims fail because Alstom has not suffered or claimed any third-party losses for which it sought insurance coverage.

**\*7** The parties dispute whether Redbank's owners have filed a claim against Alstom. At the deposition of Clifton Stalph (Alstom's designated corporate representative knowledgeable about damages), Alstom's attorney stated that Redbank had sued Alstom, but refused to allow Stalph to divulge information about the lawsuit on the grounds of attorney-client privilege. [12] Stalph Depo., Pl. Surreply Ex. D, at 32–35. On this basis, plaintiff argues that it "informed" Schwing about the pending Redbank lawsuit, and that this lawsuit is the third-party claim that should be insured. Pl. Surreply Br. at 5. Plaintiff's Local Rule 56(a) 2 Statement ¶ 40 alleges that Schwing was aware of Redbank's third-party claims "as the result of numerous meetings and communications with plaintiff throughout 2001, 2002, and 2003," but it also frames its cause of action as one for breach of contract for "defendant's failure to honor defendant's indemnity obligations," and acknowledges that Alstom never submitted or attempted to submit an insurance claim to defendant's CGL carrier. *Id.* The record contains no written documentation concerning the Redbank lawsuit, and plaintiff's damages analysis, provided in discovery, makes no claim for any liability to third party Redbank. *See* Def.App. Ex. 22 (claiming materials, labor and overhead for repairing the sliding frames and cylinders).

Regardless of whether plaintiff's claim is characterized as a breach of contract action or an indemnity action related to Redbank, it is not properly before this Court. If it is a breach of contract claim, it is precluded by the statute of limitations, for the reasons discussed above. If, as plaintiff now contends, it is a third-party indemnity action arising from the Redbank lawsuit, liability for Redbank's damages

2006 WL 2642412

is properly determined within or following resolution of Redbank's case.

Under Connecticut law, a cause of action based on an agreement to indemnify loss accrues when the loss occurs, *i.e.,* when the indemnitee "has paid something he is legally obligated to pay." *Amoco Oil Co. v. Liberty Auto and Elec. Co.,* 262 Conn. 142, 150, 810 A.2d 259, 264 (Conn.2002). A cause of action based on an agreement to indemnify liability "would accrue as soon as an indemnitee becomes liable to a third party." *Id.* "When an agreement indemnifies against both loss and liability, ... the statute of limitations begins to run as soon as liability is incurred.... Thus, the first moment in time when an indemnitee can successfully maintain an action to enforce the terms of an indemnity agreement ... is when liability is incurred." *Id.* at 150–51. Connecticut statute provides that "an action for indemnification may be brought within three years from the date of the determination of the action against the party which is seeking indemnification *by either judgment or settlement.*" Conn. Gen.Stat. § 52–598a (emphasis supplied). Thus, the earliest appropriate time to bring an indemnification action is after the indemnitee's liability to a third party has been determined "by either judgment or settlement." The record in this case contains nothing about the Redbank lawsuit, and certainly does not establish that Alstom has been found liable to Redbank via a judgment or settlement. Therefore Alstom's indemnification action is premature.

**\*8** The fact that Alstom seeks a declaratory judgment rather than money damages does not change this analysis, because even a declaratory judgment concerning whether Schwing is liable for Alstom's damages stemming from Redbank's suit would ask this Court to impermissibly determine whether Schwing must indemnify Alstom prior to final determination of liability in the AlstomRedbank case. Not only is this improper under Connecticut law, it would be inefficient, as this Court would be asked to duplicate determinations to be made in the Redbank case.

Alternatively, if Alstom seeks only a declaratory judgment that Schwing breached the contract by failing to name Alstom as an additional insured, this does not present an actual case or controversy between the parties in the absence of any showing that Alstom suffered tangible injury caused by Schwing's failure to name Alstom on the policy—a showing that could only be made, if ever, after Alstom was found liable to Redbank.

Thus, however plaintiff seeks to characterize its claim related to the contract's indemnity provision, it is not one on which this Court can grant relief.

### E. CUTPA/CUIPA/Negligent Misrepresentation as to Insurance

Plaintiff has not briefed its CUTPA/CUIPA claim (Count Six) or its negligent misrepresentation claim as to insurance coverage (Count Seven). The allegations in the complaint are similar to Count Four, alleging that Schwing misrepresented that it would name Alstom as an additional insured on its CGL policies for the Redbank project but neglected to do so.

The statute of limitations under CUTPA and CUIPA is three years from the date of the act or omission complained of. Conn. Gen.Stat. § 42–110g(f); Conn. Gen.Stat. § 52–577; *Grant v. City of New Haven,* No. 382068, 1998 WL 59472, at *2 (Conn.Super.Ct. Feb. 3, 1998). Here, plaintiff complains that Schwing misrepresented in the terms of the written contract that it would name Alstom as an additional insured on its CGL policy but failed to do so. The latest date on which the action could have accrued, therefore, is the date the contract was formed, in this case October 29, 1999, when the purchase order was executed. This date falls outside the three-year statute of limitations. Accordingly, plaintiff's claims under CUTPA and CUIPA are barred and defendant is entitled to summary judgment on those claims.

Plaintiff's negligent misrepresentation claim, also rolled into Count Seven, is based on the identical facts as the CUTPA/CUIPA claim and the breach of contract claim in Count Four, *i.e.,* that defendant promised to name Alstom as an additional insured but failed to do so. As previously discussed with respect to the negligent misrepresentation claim in Count Three, the Connecticut Supreme Court's ruling in *Flagg,* 244 Conn. at 153–55, precludes plaintiff from bringing a misrepresentation claim on the identical facts alleged to be a breach of contract. Furthermore, "pecuniary loss" is an element of negligent misrepresentation, and without any showing of damages resulting from Schwing's alleged misrepresentations concerning its insurance coverage, Alstom cannot succeed on its negligent misrepresentation claim. *Sav. Bank of Manchester v. Ralion Fin. Servs., Inc.,* 91 Conn.App. 386, 389, 881 A.2d 1035, 1037 (Conn.App.Ct.2005).

**\*9** For the reasons above, defendants are entitled to summary judgment on the CUTPA, CUIPA and negligent misrepresentation allegations in Count Seven.

IT IS SO ORDERED.

**IV. Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 78] is GRANTED in its entirety and this case will be closed.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2642412

Footnotes

1    The record is unclear concerning the relationship between ABB and Alstom. Defendant characterizes ABB as a predecessor corporation to Alstom, and plaintiff denies this characterization but does not say what it believes the relationship to be. Regardless, both parties' briefs assume that Alstom is the proper party plaintiff to assert claims arising under ABB's contract.

2    Although not fully explained in the record, BDT appears to be a type of coal byproduct that is processed in the Redbank plant.

3    Plaintiff denies that this amount represented payment in full, given the subsequent dispute that arose between the parties over costs of repairs in 2001–2002; however, plaintiff does not dispute that ABB paid Schwing's original invoice, representing the original equipment ordered.

4    "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Conn. Gen.Stat. § 42a–2–725(1).

5    "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues ..." Conn. Gen.Stat. § 52–576(a).

6    Although the Court finds that breach of warranty is the proper characterization of the parties' dispute, Alstom expressly disclaims a breach of warranty claim. Pl. Mem. in Opp. to Def. Summ. J. Mot. [Doc. # 96] at 1 ("Plaintiff's Amended Complaint dated November 3, 2005 (the operative complaint) alleges breach of contract, and does not allege breach of warranty.").

7    Schwing proposed additional language to the warranty ("This warranty is in lieu of any other warranty expressed or implied ...") in a letter sent to ABB on Oct. 29, 1999, see Def.App. Ex. 6, but ABB never agreed to the modification.

8    Although ABB contends that their boilerplate warranty language on the following page of the purchase order applies, the purchase order explicitly sets forth the negotiated warranty as part of the "Commercial Requirements Amendments" modifying the boilerplate. See Def.App. Ex. 5 at 16–17.

9    Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F .2d 456 (4th Cir.1983), on which plaintiff heavily relies, is distinguishable from this case and from Flagg. In Coakley, a contractor did replace the allegedly defective parts, and the Fourth Circuit held that the warranty on the replacement parts began to run when the replacements were installed. 706 F.2d at 462–63. In the present case, Alstom complains not that the replacement parts were defective, but that Schwing breached the contract because the original parts broke. Accordingly, the warranty period here begins to run upon tender of the original parts.

10   Schwing argues that Alstom's unjust enrichment claim also should be barred by a four-year statute of limitations. The Court finds no Connecticut appellate authority concerning the applicable statute of limitations for unjust enrichment claims; some Superior Courts have applied a six-year period in contracts not involving the sale of goods. See Bailey, Moore, Glazer, Schaefer & Proto, LLP v. Hippeau, No. CV054007301S, 2006 WL 573888, at *2 (Conn.Super.Ct. Feb. 22, 2006) (six-year limitations period in quasi-contract action brought by accountant who was not paid for services rendered); Gianetti v. Greater Bridgeport Indiv. Practice Assoc., No. (X02)CV4001686, 2005 WL 2078546, at *4 (Conn.Super.Ct. July 21, 2005) (six-year period applied to nonpayment of debt action). Defendant argues that a four-year period applies here because Connecticut courts apply the statute of limitations for analogous legal claims to equitable claims, see Dowling v. Finley Assocs., Inc., 248 Conn. 364, 367–68 n. 7, 727 A.2d 1245, 1248 n. 7 (1999), but the Court need not resolve this unsettled issue of state law.

11   Count Five does not set forth a separate cause of action but claims costs and attorney fees relating to the insurance coverage claim in Count Four. Am. Compl. ¶ 29.

12   When Stalph was asked whether he prepared a certain damages analysis at the request of an attorney, Alstom's attorney refused to allow Stalph to answer "because it's related to the Red Bank [sic] claim, the recent lawsuit against Alstom."

**Alstom Power, Inc. v. Schwing America, Inc., Not Reported in F.Supp.2d (2006)**

2006 WL 2642412

---

Stalph Depo., Pl. Surreply Ex. D, at 34. No further information about the lawsuit appears to have been provided to Schwing in discovery and Alstom does not argue that it actually made a formal claim for coverage related to the Redbank suit.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 46

2007 WL 3334793
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

BLUE FROG MOBILE NV INC.,
a Nevada corporation, Plaintiff,

v.

NAVICOMM LLC, a Nevada limited
liability company; OCMC, Inc., an Indiana
corporation; Bob Treash, an individual;
and Joe Pence, an individual, Defendants.

No. 1:06-CV-1215-JDT-TAB.
|
Nov. 8, 2007.

**Attorneys and Law Firms**

Derek A. Newman, Newman & Newman LLP, Seattle, WA, Steven Walter Griesemer, Lewis & Kappes, Indianapolis, IN, for Plaintiff.

Alan S. Brown, John K. McDavid, Locke Reynolds LLP, Jeffrey R. Gaither, Theresa Marie Ringle, Bose McKinney & Evans, LLP, Greg A. Small, Jeffrey C. McDermott, Marc T. Quigley, Krieg DeVault LLP, Indianapolis, IN, for Defendants.

**ENTRY ON DEFENDANT JOE PENCE'S MOTION TO DISMISS THE THIRD, FIFTH, SIXTH, AND EIGHTH CAUSES OF ACTION ASSERTED AGAINST HIM IN THE FIRST AMENDED COMPLAINT (Doc. No. 63)** [1]

JOHN DANIEL TINDER, United States District Judge.

**\*1** This case arose from a failed business relationship between Plaintiff Blue Frog Mobile NV Inc. ("Blue Frog") and Defendants Navicomm LLC ("Navicomm"), OCMC, Inc. ("OCMC"), Bob Treash (a manager of Navicomm), and Joe Pence (President and CEO of OCMC). [2] In February 2005, Blue Frog contracted with Navicomm to provide certain billing and collection services. Under this agreement, Navicomm served as an intermediary, collecting payments from Blue Frog's customers and passing those payments,

less a fee for Navicomm's services, along to Blue Frog. In September 2005, Blue Frog entered into an agreement for similar services with both Navicomm and OCMC. Although payments to Blue Frog pursuant to these agreements (the "Billing and Collection Agreements") proceeded smoothly at first, in December 2005, Navicomm and OCMC stopped making timely, full payments pursuant to these agreements. When Blue Frog subsequently demanded full payment of amounts owed and threatened to terminate the Billing and Collection Agreements, Mr. Treash and Mr. Pence explained that their companies were experiencing temporary financial challenges and that full payment would be forthcoming. The reassurances offered by Mr. Treash and Mr. Pence were crucial in persuading Blue Frog not to immediately terminate the Billing and Collection Agreements.

Despite these reassurances, however, the payment irregularities continued, and in May 2006, Navicomm and OCMC completely ceased payments to Blue Frog. Blue Frog, in turn, terminated the Billing and Collection Agreements. Despite termination of the parties' contractual relationship, Blue Frog alleges that Navicomm and OCMC continued to bill Blue Frog's customers without remitting any portion of the funds collected from such billings to Blue Frog. Blue Frog further alleges that Mr. Pence personally misappropriated funds owed by OCMC to Blue Frog and that he retains control over such funds.

In this action, Blue Frog seeks relief from Mr. Pence and the other Defendants on a variety of theories; those theories relevant to this motion include promissory estoppel (third cause of action), actual fraud (fifth cause of action), constructive fraud (sixth cause of action), and unjust enrichment (eighth cause of action). On July 9, 2007, Mr. Pence moved to dismiss these four causes of action against him under Rule 12(b)(6). On July 24, 2007, Blue Frog agreed to dismiss the first three causes of action, and this court dismissed those causes of action solely with respect to Mr. Pence on July 25, 2007. (Order Granting Mot. Partial Dismissal, Doc. No. 67.) However, Blue Frog still seeks recovery from Mr. Pence on the Eighth Cause of Action, Unjust Enrichment. Mr. Pence has filed his reply to Blue Frog's response brief, and therefore, this motion is ripe for review.

**I. Standard of Review**
In ruling upon a motion to dismiss, this court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiff.

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP,
475 F.3d 824, 833 (7th Cir.2007).* The federal system of
notice pleading requires only that the plaintiff provide "a short
and plain statement of the claim showing that the pleader
is entitled to relief," and therefore, the complaint need not
allege detailed facts. *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d
629, 633 (7th Cir.2007) (citing *Fed.R.Civ.P.* 8(a)(2)) (internal
quotations omitted). However, the plaintiff must provide fair
notice of the grounds for his claim, and therefore, "[f]actual
allegations must be enough to raise a right to relief above the
speculative level." *Id.* (quoting *Bell Atl. Corp. v. Twombly,*
127 S.Ct. 1955, 1965 (2007)) (internal quotations omitted).
The complaint must offer "more than labels and conclusions,
and a formulaic recitation of a cause of action's elements
will not do." *Twombly,* 127 S.Ct. at 1965. However, this does
not represent a "fact-pleading" standard requiring detailed
factual allegations; rather, the plaintiff's pleading obligation
is to avoid factual allegations "so sketchy that the complaint
does not provide the type of notice of the claim to which
the defendant is entitled under *Rule 8.*" *Airborne Beepers
& Video, Inc. v. AT & T Mobility LLC,* 499 F.3d 663, 667
(7th Cir.2007) (interpreting *Twombly's* enhanced pleading
requirements in light of a subsequent decision, *Erickson v.
Pardus,* 127 S.Ct. 2197 (2007)).

## II. Discussion

**\*2** Mr. Pence advances three arguments in support of his
motion to dismiss Blue Frog's claim of unjust enrichment
for failure to state a claim. First, Mr. Pence argues that the
existence of an express contract between OCMC/Navicomm
and Blue Frog precludes Blue Frog's pursuit of an equitable
recovery from Mr. Pence. Second, Mr. Pence argues that even
if Blue Frog were allowed to pursue this equitable theory, it
did not plead all the required elements of unjust enrichment.
Finally, Mr. Pence argues that Blue Frog has not supplied
factual allegations sufficient to demonstrate a right to relief
rising above the merely "speculative level," as required by
*Trombly.* The first and second arguments are matters of state
substantive law, whereas the third is a matter of federal
procedural law. These arguments are addressed below.

### A. State Law Arguments-Unjust Enrichment

Mr. Pence first argues that, under Indiana law, Blue Frog
cannot pursue its unjust enrichment claim against Mr. Pence
due to the express contract that existed between Blue
Frog and OCMC/Navicomm. Mr. Pence describes unjust
enrichment as a "quasi-contract" claim, and cites Indiana
case standing for the proposition that "the existence of an

express contract precludes application of quantum meruit
because a contract provides a remedy at law." (Def.'s Br.
Supp. Mot. Dismiss 14 (citing *King v. Terry,* 805 N.E.2d 397,
400 (Ind.Ct.App.2004))). Therefore, argues Mr. Pence, the
existence of the Billing and Collection Agreements between
Blue Frog and OCMC/Navicomm precludes Blue Frog's
pursuit of an equitable remedy against Mr. Pence.

However, as Blue Frog points out, the existence of a contract
precludes the pursuit of an equitable remedy only by a
party to that contract, on the rationale that such a party
has an adequate remedy at law. *See King,* 805 N.E.2d at
400 ("[A] contract precludes application of *quantum meruit*
because (1) a contract provides a remedy at law and (2)-
as a remnant of chancery procedure-a plaintiff may not
pursue an equitable remedy when there is a remedy at
law.") (emphasis in original). None of the cases cited by
Mr. Pence in support of his argument extend this principle
to bar equitable claims by those who were not parties to
a contract. *See id.* (holding that plaintiff's quantum meruit
claim could proceed because of the absence of evidence
of an express or implied contract between the plaintiff and
defendant); *Troutwine Estates Dev. Co. v. Comsub Design
& Eng'g, Inc.,* 854 N.E.2d 890, 897 (Ind.Ct.App.2006)
(although an express or implied contract between the parties
would have precluded recovery in quantum meruit, no such
contract existed, allowing quantum meruit recovery); *Kelly
v. Levandoski,* 825 N.E.2d 850, 860-61 (Ind.Ct.App.2005)
(holding that trial court did not err in declining to grant
defendant's motion for summary judgment where triable
issues of fact existed regarding plaintiff's ability to recover
under a theory of express contract, unjust enrichment, or
unilateral contract); *Kern v. City of Lawrenceburg,* 625
N.E.2d 1326, 1329-31 (Ind.Ct.App.1993) (vacating quantum
meruit judgment against contractor because the subject area
of the claim was covered by the contract between plaintiff and
contractor). In this case, because Blue Frog had no contract
with Mr. Pence, Blue Frog has no contractual remedy against
Mr. Pence; lacking such a remedy, the contracts between Blue
Frog and OCMC/Navicomm pose no bar to Blue Frog's claim
for unjust enrichment against Mr. Pence. [3]

**\*3** Mr. Pence next argues that Blue Frog has failed to plead
all the required elements of an unjust enrichment claim. In
order to prevail on its claim of unjust enrichment, Mr. Pence
argues, Blue Frog must demonstrate that: (1) a benefit was
rendered to Mr. Pence; (2) at the express or implied request
of Mr. Pence; (3) that allowing Mr. Pence to retain the benefit
without paying for it would be unjust; and (4) that Blue

Frog expected payment from Mr. Pence. (Def.'s Reply Br. Supp. Mot. Dismiss 2 (citing *Troutwine Estates,* 854 N.E.2d at 897)). Mr. Pence contends that Blue Frog never pleaded the second (payment at the request of Mr. Pence) or fourth (Blue Frog expected payment from Mr. Pence) elements of this claim.

However, Mr. Pence describes the requirements for a quantum meruit claim, a specific type of unjust enrichment claim in which the plaintiff seeks to recover damages for services rendered to the defendant. *See Troutwine Estates,* 854 N.E.2d at 897 ("For recovery under *quantum meruit,* it must be demonstrated that a benefit was rendered to another party at the express or implied request of that party, that allowing the defendant to retain the benefit without paying for it would be unjust, and that the plaintiff expected payment.") (emphasis in original); *Black's Law Dictionary* 1276 (8th ed.2004) (defining quantum meruit as "damages awarded in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship" or "a claim or right of action for the reasonable value of services rendered"). Plaintiffs seeking recovery for breach of contract often plead quantum meruit as an alternative theory, because this theory allows for the possibility of recovery even if the court finds that no contract existed or that a contract existed but was unenforceable. *See Black's Law Dictionary* 1276 (8th ed. 2004) ("Quantum meruit is still used today as an equitable remedy to provide restitution for unjust enrichment" and "is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff can recover even if the contract is unenforceable."); *see, e.g., Troutwine Estates,* 854 N.E.2d at 897-98 (finding that no contract existed due to lack of mutual assent but allowing recovery on plaintiff's alternative theory of quantum meruit).

Unjust enrichment is a broader equitable theory which encompasses quantum meruit, but is not confined to its elements. *See Bright v. Kuehl,* 650 N.E.2d 311, 315-16 (Ind.Ct.App.1995) (separately analyzing plaintiff's claims under a theory of quasi-contract, with requirements similar to quantum meruit, and unjust enrichment, with its more general requirements). For a plaintiff to prevail on a general claim of unjust enrichment under Indiana law, he must show only that "a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Id.* at 316 (citing *Bayh v. Sonnenburg,* 573 N.E.2d 398, 408 (Ind.1991)); *see also Dominiack Mech., Inc. v. Dunbar,* 757 N.E.2d 186, 190-91 (Ind.Ct.App.2001) (applying this definition of unjust

enrichment where plaintiff sought to recover damages where funds had been embezzled from plaintiff and used to confer benefits upon third parties); *Encore Hotels v. Preferred Fire Prot.,* 765 N.E.2d 658, 662 (Ind.Ct.App.2002) (applying this definition of unjust enrichment to plaintiff's claim); *cf. King,* 805 N.E.2d at 400 (describing the elements of a quantum meruit claim in terms of the looser definition of an unjust enrichment claim). Unjust enrichment need not be premised on a quasi-contract or quantum meruit theory; for instance, in *Dominiack,* the plaintiff sought damages against third parties who had enjoyed the benefits of funds that had been embezzled from the plaintiff by one of the other defendants. Although the plaintiff's claim against these third parties could not be described as "quasi-contractual" in any sense, the court nevertheless found that the plaintiff had stated a claim against these third parties for unjust enrichment, employing the broader definition of unjust enrichment described above. *Dominiack,* 757 N.E.2d at 190-91.

**\*4** Blue Frog's claim against Mr. Pence sounds in unjust enrichment, but not quantum meruit. Blue Frog does not seek to recover damages for the value of some services that Blue Frog conferred upon Mr. Pence. Instead, in a factual scenario more analogous to *Dominiack,* Blue Frog seeks to recover a "measurable benefit" that has been conferred upon Mr. Pence, in this case by OCMC, "under circumstances in which [Mr. Pence's] retention of the benefit without payment [to Blue Frog] would be unjust." *See Dominiack,* 757 N.E.2d at 190-91. This represents a general claim of unjust enrichment devoid of any assertion that Mr. Pence somehow owes Blue Frog for services rendered by Blue Frog. Therefore, Mr. Pence's argument that Blue Frog failed to plead two of the essential elements of a quantum meruit claim is inapposite; those two elements are not required to plead the sort of general unjust enrichment claim involved in this case.

Blue Frog's unjust enrichment claim against Mr. Pence is not barred by Blue Frog's contract with OCMC/Navicomm, and Blue Frog has alleged the essential elements of an unjust enrichment claim under Indiana law. It remains to be considered whether Blue Frog has supported these elements with factual allegations sufficient to meet federal pleading standards.

**B. Federal Pleading Requirements**

Mr. Pence also contends that Blue Frog failed to support its unjust enrichment pleading with factual allegations sufficient to raise the right to relief above the merely "speculative level." (Def.'s Reply Br. Supp. Mot. Dismiss 2 (citing

*Twombly,* 127 S.Ct. at 1969)). To survive this motion to dismiss for failure to state a claim, Blue Frog must offer "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly,* 127 S.Ct. at 1965. If Blue Frog's unjust enrichment claim is to proceed, it must be supported by factual allegations that provide fair notice of the *grounds* for the claim. *Airborne Beepers & Video, Inc.,* 499 F.3d at 667 (explaining *Twombly's* requirements).

As already recounted in this entry, Blue Frog has supplied extensive factual allegations concerning the withholding of funds owed to Blue Frog by OCMC and Navicomm pursuant to the Billing and Collection Agreements. However, in order to survive this dismissal motion, Blue Frog's claim must also be supported by factual allegations showing that Mr. Pence was unjustly enriched through his participation in these activities. To this end, Blue Frog's First Amended Complaint alleges that Mr. Pence is President and CEO of OCMC, that Mr. Pence controls OCMC, and that OCMC transferred funds owed to Blue Frog to Mr. Pence. (Am.Compl.¶¶ 13, 14.) Blue Frog also alleges that Mr. Pence played a crucial role in persuading Blue Frog to continue doing business with OCMC/Navicomm after payments pursuant to the Billing and Collection Agreements had become partial and irregular. (*Id.* ¶¶ 41-49.)

**\*5** *Twombly* does not require a federal plaintiff to provide "detailed factual allegations," but the facts alleged in the complaint must offer more than a purely speculative basis for relief and must provide the defendant the sort of notice to which he is entitled under Rule 8. *Airborne Beepers & Video, Inc.,* 499 F.3d at 667 (explaining *Twombly's*

requirements). Blue Frog's factual allegations, as described above and accepted as true for purposes of this motion, are more than sufficient to raise its right to relief above the merely speculative level. Blue Frog's First Amended Complaint thoroughly describes allegations of wrongdoing by OCMC and Navicomm, and further explains how Mr. Pence was allegedly unjustly enriched by his participation in these activities. These allegations provide Mr. Pence with more than adequate notice of the grounds for Blue Frog's unjust enrichment claim. Therefore, this court must reject Mr. Pence's argument that Blue Frog's eighth cause of action, unjust enrichment, fails to meet federal pleading requirements.

### III. Conclusion
For the reasons stated above, Mr. Pence's Motion to Dismiss the Third, Fifth, Sixth, and Eighth Causes of Action is **GRANTED** in part and **DENIED** in part. Based on Blue Frog's agreement to voluntarily dismiss the Third, Fifth, and Sixth Causes of Action against Mr. Pence, and this court's corresponding order on July 25, 2007, those causes of action against Mr. Pence have been dismissed. The Eighth Cause of Action, Unjust Enrichment, will not be dismissed. No judgment will be entered at this time, but rather will be deferred until the conclusion of the remaining claims against Mr. Pence.

ALL OF WHICH IS ENTERED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 3334793

Footnotes

1    This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

2    On this motion to dismiss, this court must accept the Plaintiff's factual allegations as true and draw all reasonable inferences in his favor. Therefore, this account of the facts reflects the factual allegations in Blue Frog's complaint and does not incorporate Mr. Pence's response to those factual allegations.

3    It is also worth noting that at the pleading stage, Blue Frog would have been free to plead both a breach of contract theory and, in the alternative, an unjust enrichment theory. It is only a determination that a contract existed that precludes recovery in quantum meruit, and such a determination is not made at the pleading stage. However, because Blue Frog does not plead breach of contract against Mr. Pence, this point merits no further discussion.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 47

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 346 of 370
PageID: 10376
Britvic Soft Drinks Ltd. v. ACSIS Technologies, Inc., Not Reported in F.Supp.2d (2004)
2004 WL 1900585

2004 WL 1900585
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

BRITVIC SOFT DRINKS LTD, Plaintiff,

v.

ACSIS TECHNOLOGIES, INC., Defendant.

No. 01–2243–CM.
|
June 8, 2004.

*MEMORANDUM AND ORDER*

MURGUIA, J.

**\*1** This matter comes before the court on plaintiff's September 22, 2003, Motion to Alter or Amend this court's September 8, 2003 judgment (Doc. 148).

Plaintiff seeks prejudgment interest on its damages. Plaintiff claims that such an award is mandatory under Kan. Stat. Ann. § 16–201 which provides that "creditors *shall* be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due." *Id.* Defendant opposes plaintiff's request for prejudgment interest on the grounds that the damages awarded to plaintiff by the jury are not liquidated.

"In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims." *Miller v. Botwin,* 258 Kan. 108, 119, 899 P.2d 1004 (1995). "A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical calculation." *Hamilton v. State Farm Fire & Cas. Co.,* 263 Kan. 875, 883, 953 P.2d 1027 (1998). "However, the fact that a good-faith controversy exists as to whether the party is liable for the money does not preclude a grant of prejudgment interest." *Varney Bus. Servs., Inc. v. Pottroff,* 275 Kan. 20, 44, 59 P.3d 1003 (2002). Moreover, "liquidated damages do not become unliquidated simply because a counterclaim or setoff reduce the amount of the final award." *Hatch & Kirk Power Servs. Corp. v. City of Girard,* No. 95–1155–DES, 1999 WL 99307, at \*1 (D.Kan. Jan. 19, 1999).

In this case, the jury awarded plaintiff damages for the breach of contract, but less than what plaintiff claimed was the fixed amount of damages it was entitled to receive for the payments it made to defendant under the escrow agreement. The court does not believe the jury's reduction in the amount of damages plaintiff received for the breach of the contract was the result of a setoff or counterclaim. Rather, it appears the jury awarded plaintiff an amount of damages the jury believed plaintiff was entitled to for the breach of contract. "Because this amount could not have been determined until the jury had returned its verdict ..., the damages were not liquidated." *Id.* at \*2. Accordingly, plaintiff is not entitled to prejudgment interest as a matter of right under Kan. Stat. Ann. § 16–201.

However, a trial court may award prejudgment interest, at its discretion, even when the primary damages are not liquidated. *See Koch v. Koch Indus., Inc.,* 996 F.Supp. 1273, 1280 (D.Kan.1998); *see also U.S. Indus., Inc. v. Touche Ross & Col.,* 854 F.2d 1223, 1255 n. 43 (10th Cir.1988); *Royal College Shop, Inc., v. Northern Ins. Co. of N.Y.,* 895 F.2d 670, 675–76 (10th Cir.1990); *Lightcap v. Mobile Oil Corp.,* 221 Kan. 448, 562 P.2d 1 (1977). Prejudgment interest "compensates the injured party 'for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment.' " *Swift–Eckrich, Inc. v. Advantage Sys., Inc.,* 55 F.Supp.2d 1280, 1289 (D.Kan.1999)(quoting *Touche Ross,* 854 F.2d at 1256). The decision to award prejudgment interest involves a two-step analysis: first, whether the prejudgment interest would compensate the injured party; and second, whether equitable considerations would preclude the award. *Id.*

**\*2** In this case, the jury determined that, by its conduct, defendant had breached its duty of good faith to plaintiff. During this lawsuit, plaintiff was denied the use of its moneys paid pursuant to the escrow agreement, and defendant had use of those moneys. Thus, having considered the equities, the court believes an award of prejudgment interest is appropriate to "fairly compensate the plaintiff for the delay in the receipt of the payment." *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.,* 834 F.2d 1533, 1545 (10th Cir.1987). Accordingly the court hereby awards plaintiff prejudgment interest in the amount of One Hundred Thirty–Five Thousand Four Hundred Sixty–Seven Dollars and 58/100 ($135,467.58). [1]

IT IS THEREFORE ORDERED that plaintiff's Motion to Alter or Amend (Doc. 148) is granted.

2004 WL 1900585

IT IS FURTHER ORDERED that the court's September 8, 2003 judgment is amended to add the following award of prejudgment interest:

Plaintiff is entitled to and is hereby awarded One Hundred Thirty–Five Thousand Four Hundred Sixty–Seven Dollars and 58/100 ($135,467.58) as the amount of prejudgment interest due plaintiff on the original judgment awarded plaintiff by this court.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1900585

Footnotes

1    Plaintiff submitted with its Motion to Alter or Amend an interest calculation at 10% per annum, beginning on May 22, 2001, the date plaintiff filed its lawsuit, and ending on September 8, 2003, the date of the judgment. Plaintiff pro-rated a portion of the award based on the date it paid those moneys to defendant, June 16, 2001, which was after the lawsuit began. Plaintiff's calculation of the interest on the $595,000.02 judgment totals $135,467.58. The court finds plaintiff's calculation to be reasonable under Kansas law and thus adopts it for purposes of this Order.

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 48

2016 WL 3983669
Only the Westlaw citation is currently available.
United States District Court,
S.D. Mississippi, Southern Division.

Multiplan, Inc., and Private Healthcare
Systems, Inc., Plaintiffs/Counter-Defendants
v.
Steven W. Holland, Doing Business as
Physical Therapy Clinic of Gulfport,
Defendant/Counter-Claimant.

CAUSE NO. 1:14CV315-LG-RHW
|
Signed 07/25/2016

**Attorneys and Law Firms**

Marlena Powell Pickering, Everett E. White, Jean Cooper Bertas, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Jackson, MS, Craig L. Caesar - PHV, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, New Orleans, LA, Errol J. King - PHV, Baker, Donelson, Bearman, Caldwell & Berkowitz, Baton Rouge, LA, for Plaintiffs/ Counter-Defendants.

Walter J. Blessey, IV, Walter J. Blessey, IV, Attorney at Law, Biloxi, MS, Daniel P. Mitchell - PHV, Barr, Murman & Tonelli, PA, David P. Mitchell - PHV, Maney & Gordon, PA, Tampa, FL, for Defendant/ Counter-Claimant.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART COUNTER-DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COUNTERCLAIM**

LOUIS GUIROLA, JR., CHIEF U.S. DISTRICT JUDGE

**\*1 BEFORE THE COURT** is the Motion [107] to Dismiss Third Amended Counterclaim filed by the counter-defendants Multiplan, Inc., and Private Healthcare Systems, Inc. (PHCS). The Motion has been fully briefed by the parties. After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that the Motion to Dismiss should be granted as to Holland's RICO claims, unjust enrichment, common law fraud, and accounting claims. The Motion is denied in all other respects.

**FACTS**

Steven Holland operated a physical therapy clinic in Gulfport, Mississippi. He entered into a Preferred Provider Organization (PPO) agreement with PHCS in June 2006. "Pursuant to this Agreement, Holland agreed to accept discounted fee rates for treatment of certain patients directed to Holland by PHCS with corresponding identification cards identifying themselves as PHCS enrollees." (3d Am. Countercl. at 9, ECF No. 106). In June 2007, Holland received correspondence from PHCS that informed him that the PPO had been updated. The letter stated, "we're expanding your PHCS relationship to include participation with Multiplan on a complimentary basis." (*Id.* at 10).

Holland alleges that PHCS and Multiplan entered into a Network Access Agreement with a "network broker and repricer" Coventry Health Care Workers' Compensation, Inc. (*Id.* at 11). This access agreement allegedly gave Coventry's clients access to discounts from Holland's physical therapy practice. (*Id.*) Holland asserts that PHCS and Multiplan should not have given Coventry and its clients access to Holland's discounted rates. (*Id.*) Holland also claims that Coventry improperly rented access to Holland's discount rate to numerous insurance payers, PPO administrators, network brokers, and repricers. (*Id.*) Holland asserts that this "Silent PPO scheme" orchestrated by PHCS and Multiplan drastically reduced Holland's revenue and that no additional patients were directed to Holland's practice in exchange for these discounts. (*Id.* at 14-15, 18).

The PPO agreement between PHCS and Holland was terminated on September 25, 2012. (Compl. at 6, ECF No. 1). In 2014, Holland hired Kevin Barrett to attempt to recover Holland's alleged losses from PHCS and Multiplan. Barrett used threatening tactics, and as a result, PHCS and Multiplan filed this lawsuit against Holland and Barrett. Their claims against Barrett have since been dismissed.

Holland has filed a Third Amended Counterclaim in which he attempts to assert the following claims against Multiplan and PHCS: violation of RICO, 18 U.S.C. § 1962(c); violation of RICO, 18 U.S.C. § 1962(d); unjust enrichment; civil conspiracy; common law fraud; and breach of contract. The Counterclaim also includes a demand for an accounting and disgorgement. Multiplan and PHCS have filed the present Motion to Dismiss, seeking dismissal of all of Holland's alleged counterclaims except for the breach of contract claim.

**DISCUSSION**

In order to survive a motion to dismiss filed pursuant to *Fed. R. Civ. P. 12(b)(6)*, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "While we accept all well-pleaded factual allegations as true and interpret the complaint in the light most favorable to the plaintiff, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not establish facial plausibility." *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir 2014). Generally, "[w]hen matters outside the pleadings are presented to and not excluded by the district court, the district court must convert a motion to dismiss into a motion for summary judgment." *Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998). However, courts are permitted to consider a RICO statement [1] while deciding a motion to dismiss. *Int'l Fire & Safety, Inc. v. HC Servs., Inc.*, No. 2:06cv63-KS-MTP, 2006 WL 2483336, at *2 (S.D. Miss. Aug. 28, 2006); *see also Conwill v. Greenberg Traurig, LLP*, No. 09-4365, 2009 WL 5178310, at *2 n.16 (E.D. La. Dec. 22, 2009).

**I. RICO**

\*2  Holland has attempted to file claims pursuant to subsections (c) and (d) of the RICO statute. Subsection (c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962(c)*. Subsection (d) provides that it is unlawful to conspire to violate any subsection of the RICO statute. *18 U.S.C. § 1962(d)*.

"Regardless of subsection, RICO claims under *§ 1962* have three common elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007). " 'Racketeering activity' consists of two or more predicate criminal acts that are (1) related and (2) 'amount to or pose a threat of continued criminal activity.' " *Id.* (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). Holland alleges that Multiplan and PHCS committed the predicate criminal acts of mail fraud and wire fraud. *See 18 U.S.C. § 1961* (providing that mail fraud and wire fraud can constitute predicate acts). Multiplan and PHCS argue that Holland has failed to plead mail or wire fraud with particularity.

Wire or mail fraud must be pled with particularity pursuant to *Fed. R. Civ. P. 9(b)*. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992). "At a minimum, *Rule 9(b)* requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* at 1139. "Put simply, *Rule 9(b)* requires the who, what, when, where, and how [of the alleged fraud] to be laid out." *Kreway v. Countrywide Bank, FSB*, No. 15-50854, 2016 WL 2342717, at *1 (5th Cir. 2016) (quoting *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)).

In his RICO statement, Holland alleges that the alleged fraud occurred throughout 2012. (RICO Statement at 7, ECF No. 116). In his Third Amended Complaint, Holland alleges that either PHCS or Multiplan represented in correspondence that Holland had a contract with PHCS which included discounts for workers' compensation services in violation of Mississippi law, but he does not provide any additional information concerning the correspondence or specify whether Multiplan or PHCS made these alleged misrepresentations or when they made these representations. (*See id.* at 24). In his RICO statement, Holland further alleges:

> [The Explanations of Benefits (EOBs) provided to Holland] contain

the material misrepresentations and omissions, including falsely representing that the payers that obtained the network discounts were participants in the Multiplan or PHCS networks, when in fact they were not; that the payers had accessed Holland's discount rate in accordance with the terms of Holland's PHCS Agreement, including by providing steerage benefits to Holland, when in fact the payers were not obligated to and did not provide any steerage benefits to Holland in exchange for obtaining the discounts; by failing to disclose that the payers had accessed the discount rates through the rental or subscription agreements identified herein; and in some instances, by falsely identifying a PPO network other than Multiplan or PHCS as the source of the discount, and in other cases, omitting the identity of the PPO network utilized in applying the discounts altogether, in an effort to conceal the scheme to defraud.

**\*3** (RICO Statement at 7, ECF No. 116).

Holland attached one sample EOB to the Third Amended Counterclaim and several sample EOBs to the RICO statement. Contrary to Holland's assertions, the sample EOBs contain no statements concerning the PHCS Agreement or steerage. The EOBs merely state: "Network: Multiplan." As a result, the EOBs actually notified Holland that these entities were utilizing the Multiplan network to obtain discounts from Holland. *See Amer. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) (holding that EOBs did not include misrepresentations because the EOBs actually put the plaintiff on notice of the defendant's conduct).

Holland also alleges that Multiplan and PHCS fraudulently listed networks other than Multiplan or PHCS in certain EOBs to hide that other entities were utilizing the Multiplan network, but the dates and circumstances of those alleged misrepresentations have not been provided in either the RICO statement or Third Amended Counterclaim and none of the EOBs provided by Holland contain such misrepresentations.

Furthermore, although Holland claims in his Third Amended Counterclaim that the EOBs were created by Multiplan and PHCS, all of the EOBs indicate that they were actually sent by third parties, such as Sentry, Mitchell, and Gallagher Bassett. (*Id.* at 21). Thus, Holland has not explained how PHCS and Multiplan each participated in the alleged fraud aside from vague assertions that these entities jointly sent unspecified correspondence and notices on unspecified dates that contained unspecified misrepresentations. Since Holland has failed to plead the alleged predicate acts of fraud with particularity, both of his RICO claims must be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)*.

## II. UNJUST ENRICHMENT

Under Mississippi law, "[u]njust enrichment only applies to situations where: (1) there is no legal contract and (2) the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another." *SKL Invs., Inc. v. Hardin*, 170 So. 3d 588, 591 (¶13) (Miss. Ct. App. 2014). Holland has not disputed that his relationship with Multiplan and PHCS is governed by a legal contract; in fact, he has asserted a breach of contract claim against them. Therefore, Holland's unjust enrichment claim must be dismissed.

## III. CIVIL CONSPIRACY

"A civil conspiracy occurs when a combination of persons conspire 'for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.'" *Cook v. Wallot*, 172 So. 3d 788, 801 (Miss. Ct. App. 2013) (quoting *Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 786 (¶37) (Miss. 2004)). "To establish a civil conspiracy, the plaintiff must prove (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Bradley v. Kelley Bros. Contractors, Inc.*, 117 So. 3d 331, 338 (Miss. Ct. App. 2013).

**\*4** Multiplan and PHCS argue that Holland's civil conspiracy claim should be dismissed because, "as a matter of law [Multiplan and PHCS] did not engage in Silent PPO activity because [Multiplan and PHCS] had a contractual relationship with Holland and the clients that applied Holland's provider discount." (Counter-Defs.' Mem. at 18, ECF No. 108). They also assert that any damages suffered

from Holland arose "from performance or non-performance of contract terms ...." *Id.*

The Court cannot hold at this stage of the litigation that all of Multiplan and PHCS's actions were permitted by contract. Such a determination could only be made after reviewing all of the relevant contracts, evidence, and testimony. Furthermore, Holland has argued that Multiplan and PHCS conspired to violate Mississippi's Workers' Compensation law by applying discounts to workers' compensation services provided by Holland. (3d Am. Countercl. at 29, ECF No. 106). Thus, he has stated a plausible claim for civil conspiracy under Mississippi law.

### IV. COMMON LAW FRAUD

For the same reasons stated with regard to Holland's RICO claims, the Court finds that Holland has failed to plead his fraud claim with particularity. Therefore, this claim must be dismissed.

### V. ACCOUNTING

"Under Mississippi law, the factors considered in determining whether an accounting is warranted include '(1) the need of discovery, (2) the complicated character of the accounts, and (3) the existence of a fiduciary or trust relationship." *Teeuwissen v. JP Morgan Chase Bank, N.A.*, 902 F. Supp. 2d 826, 836 (S. D. Miss. 2011). Holland has not alleged the existence of a fiduciary or trust relationship in the present case. Therefore, he is not entitled to an accounting under Mississippi law.

### VI. DISGORGEMENT

Multiplan and PHCS argue that Holland's request for disgorgement should be dismissed, because "Holland admits that he has an adequate remedy at law." (Counter-Defs.' Mem. at 21, ECF No. 108). However, in his Third Amended Counterclaim, Holland actually alleged that he has no adequate remedy at law. As a result, the arguments asserted by Multiplan and PHCS are without merit.

### CONCLUSION

For the foregoing reasons, Holland's RICO, unjust enrichment, common law fraud, and accounting claims are dismissed. His breach of contract, civil conspiracy, and disgorgement claims remain pending.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion [107] to Dismiss Third Amended Counterclaim filed by the counter-defendants Multiplan, Inc., and Private Healthcare Systems, Inc., is **GRANTED IN PART AND DENIED IN PART**. The RICO claims, unjust enrichment claim, common law fraud claim, and accounting claim filed by Steven W. Holland are hereby **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 25th day of July, 2016.

### All Citations

Not Reported in F.Supp.3d, 2016 WL 3983669

---

Footnotes

1    Holland's RICO statement was untimely, because it was not served with his Third Amended Counterclaim. *See* Uniform Local Rule 83.8. Nevertheless, since Multiplan and PHCS have not been prejudiced by the untimely filing of the statement, the Court will consider it. *See Int'lFire & Safety, Inc.*, 2006 WL 2483336, at *2.

---

**End of Document**                                 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 49

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 354 of 370
PageID: 10384
Steadfast Insurance Company v. Legacy Safety &..., Not Reported in Fed....
2015 WL 12803775

KeyCite Yellow Flag - Negative Treatment

Distinguished by Schechner v. Whirlpool Corporation, E.D.Mich., February 14, 2017

2015 WL 12803775
Only the Westlaw citation is currently available.
United States District Court, D. New Mexico.

STEADFAST INSURANCE COMPANY, Plaintiff,

v.

LEGACY SAFETY & CONSULTING, LLC and
Chesapeake Operating, LLC, Defendants.

CV 15-00218 WJ/CG
|
Signed 06/25/2015

**Attorneys and Law Firms**

Kirk R. Allen, Miller Stratvert PA, Albuquerque, NM, Dennis E. Kadian, Bressler, Amery & Ross P.C., Florham Park, NJ, Joni Lee Autrey, Miller Stratvert P.A., Las Cruces, NM, for Plaintiff.

Max Houston Proctor, Max Houston Proctor Attorney at Law, Hobbs, NM, for Defendants.

<u>**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO DISMISS**</u>

WILLIAM P. JOHNSON, UNITED STATES DISTRICT JUDGE

**\*1** THIS MATTER comes before the Court upon the Motion to Dismiss, **(Doc. 8)**, filed on April 8, 2015, by Defendant Chesapeake Operating, LLC ("Chesapeake"). Having reviewed the parties' briefs and applicable law, the Court finds that Chesapeake's motion is well taken and, therefore, is **GRANTED.**

### BACKGROUND

The following well-pleaded allegations in the complaint are accepted as true for present purposes. Plaintiff Steadfast Insurance Company ("Steadfast"), an insurance carrier authorized to transact business in New Mexico, issued a commercial general liability insurance policy to Defendant Legacy Safety & Consulting, LLC ("Legacy") for coverage

from December 31, 2011, to December 31, 2012. Later, this policy was amended to add Chesapeake as an additional named insured. Consideration for this amendment took the form of an additional endorsement premium of $1,000, as assessed by Steadfast based on information submitted by Legacy. However, after conducting an audit, Steadfast determined that the additional endorsement premium should have been valued at $148,831 rather than $1,000. Although Steadfast has sent invoices and demands to Legacy and its insurance broker, Legacy has only paid $20,000 toward this additional endorsement premium and has refused to pay the remaining balance.

Steadfast filed its complaint in this action in March 2015, claiming diversity jurisdiction pursuant to 28 U.S.C. § 1332. Steadfast brings three claims: (I) breach of contract, against Legacy; (II) unjust enrichment, against both Legacy and Chesapeake; and (III) account stated, against Legacy. Although Legacy filed an answer, Chesapeake has filed the present motion to dismiss Count II, the unjust enrichment claim brought against it.

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a case for failure to state a claim upon which relief can be granted. Rule 8(a)(2), in turn, requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court must accept all the complaint's factual allegations as true, the same is not true of legal conclusions. *Id.* Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

### DISCUSSION

2015 WL 12803775

In New Mexico, a plaintiff may prevail on an unjust enrichment claim by showing that "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co., Inc. v. Sanchez*, 129 N.M. 200, 203 (Ct. App. 2000) (citing RESTATEMENT (FIRST) OF RESTITUTION §§ 1, 40, 41 (1988)). Having asserted that Chesapeake accepted the benefits of insurance coverage without paying premiums, Steadfast maintains that its factual allegations satisfy these elements.

**\*2** Boiled down to its essence, Chesapeake's general rebuttal is that Steadfast's unjust enrichment claim against it cannot proceed because Steadfast has an adequate remedy at law, specifically a breach of contract claim against Legacy. A more specific variation of this argument is that an additional named insured can *never* be liable for unpaid premiums in the absence of an express or implied contract saying otherwise; thus, any outstanding premiums must be paid by Legacy rather than Chesapeake.

### I. Unjust Enrichment Claims Against Additional Named Insured

Chesapeake claims that there is "apparent unanimity" among other jurisdictions that in the context of insurance law, "the named insured is not liable for payment of premiums where that insured has not contracted to pay premiums." *Home Ins. of Dickinson v. Speldrich*, 436 N.W.2d 1, 3-5 (N.D. 1989) (citations omitted); *see also, e.g., FPS, Inc. v. Cont'l Contractors, Inc.*, 537 So. 2d 831, 833-34 (La. Ct. App. 1989); 44 AM. JUR. 2D *Insurance* § 874 (2015) ("[A]dditional insureds may not be held liable for unpaid insurance premiums, where the policies do not expressly or implicitly state that they are liable, even if the named insured had procured the policy at their insistence."); 5 COUCH ON INSURANCE § 74:19 (3d ed. 2014). The Court agrees that these cases, and those that they cite, would appear to foreclose the existence of a *contract* remedy against an additional named insured unless the latter expressly or impliedly contracts to pay premiums. *See Home Ins.*, 436 N.W.2d at 3-4 (reviewing contract-based claims from other jurisdictions). However, these authorities do not rule out an *unjust enrichment* claim against an additional named insured *as a matter of law*, instead, each decision considers the specific facts at hand before rejecting such a claim. *See Id.* at 4-5 (recognizing the distinction between the contract cases it cites and the unjust enrichment claim under consideration); *FPS*, 537 So. 2d at 833-34 (separately considering contractual and equitable theories of liability).

Steadfast notes the fact-driven nature of these outcomes and argues that it is too early, at the motion-to-dismiss stage, to conclude that Chesapeake cannot be liable under an unjust-enrichment theory simply because it is only an additional named insured. The Court agrees. In *Home Insurance*, the North Dakota Supreme Court concluded from the evidence that a father procured insurance naming his sons as additional insureds not for their benefit, but for his own, and as such the sons could not have been enriched parties. *See* 436 N.W.2d at 4-5. Similarly, in *FPS*, the Louisiana Court of Appeals did not reach a *per se* rule excluding additional insureds from liability under an unjust enrichment theory; instead, it rejected the claim at issue because the evidence did not suggest that the insurer's "impoverishment" was the result "of any commission or omission" by the additional insured. *See* 537 So. 2d at 834.[1]

Also of relevance is the fact that each of these cases was decided based on another jurisdiction's definition of unjust enrichment. The Court notes that it has little guidance as to how New Mexico specifically would treat Chesapeake's additional-insured defense. The parties do not cite, and the Court is not aware of, any binding New Mexico authorities addressing the viability of unjust enrichment claims brought by an insurer against an additional named insured. However, several New Mexico cases touch on Chesapeake's broader defense—that an unjust enrichment claim cannot survive when the plaintiff has an adequate remedy at law. The Court turns to this argument.

### II. Unjust Enrichment Claims Where a Contract Claim is Available

**\*3** There is no dispute that a claim of unjust enrichment is a claim at equity, rather than one based in statute or contract. *See Ontiveros*, 129 N.M. at 203. As a general rule, "equity will not act if there is a complete and adequate remedy at law." *Sims v. Sims*, 122 N.M. 618, 624 (1996). Chesapeake contends that Steadfast's claim against it must fail because the insurer has a complete and adequate remedy at law available to it, namely a contract claim against Legacy.

In support of its position, Chesapeake relies on the New Mexico Court of Appeals decision in *Ontiveros*. In that action, a general contractor did not pay subcontractors for work on several homes before declaring bankruptcy, and the subcontractors' claims against the contractor were discharged in bankruptcy. *See* 129 N.M. at 202.

2015 WL 12803775

Although the subcontractors filed liens on the homes, the homeowners subsequently defaulted on their mortgages; following foreclosure, the homeowners then exercised their rights of redemption and reclaimed the properties free and clear of any liens. *See Id.* The subcontractors then brought a claim of unjust enrichment against the homeowners. *Id.*

The Court of Appeals observed that the claim of unjust enrichment in New Mexico

> has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity.... Subcontractors' suits against property owners are generally not favored. Remedy is instead viewed as best sought from the underlying general contractor. This general disfavor, however, is not required by anything intrinsic to the subcontractor-property owner relationship, but rather is a reflection of the jurisprudence of equity. Simply, equity does not take the place of remedies at law, it augments them; in this regard, an action in contract would be preferred to one in quasi-contract.

*Id.* at 203-04 (internal citations omitted).

Despite this pronouncement of the general rule, the *Ontiveros* court recognized that the subcontractors had spent significant funds on labor and materials relating to construction of the home; conversely, the homeowners themselves had not paid the bankrupt general contractor a substantial portion of the amount due. *See Id.* at 205. In light of this fact, and given that the subcontractors had no other means available to recover their losses, the Court of Appeals concluded that "the equities weigh heavily in [the] [s]ubcontractors' favor." *See Id.* at 206.

Thus, *Ontiveros* stands for the proposition that a claim for unjust enrichment can be brought, at least in some circumstances, against a party not in contract privity with the plaintiff, even when a contract existed concerning the subject matter of the dispute. This conclusion is indirectly supported by language in other state court decisions, most

prominently in New Mexico Court of Appeals cases holding that the existence of a contract claim does not necessarily foreclose an equitable claim covering the same subject matter. *See Starko, Inc. v. Presbyterian Health Plan, Inc.,* 276 P.3d 252, 278 (N.M. Ct. App. 2011) (citing *Danley v. City of Alamogordo,* 91 N.M. 520, 521 (1978); *Platco Corp. v. Shaw,* 78 N.M. 36, 37 (1967)) (holding that an equitable claim such as one for unjust enrichment may stand even if a contractual relationship exists concerning the subject matter of that claim), *rev'd on other grounds sub nom. Starko, Inc. v. N.M. Human Servs. Dep't,* 333 P.3d 947 (N.M. 2014); *see also Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 178 (1990) ("[U]njust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort." (citation omitted)); *Adenauer v. Conley's Landscaping, Inc.,* No. 30,271, 2012 WL 1719730, at *3 (N.M. Ct. App. Apr. 23, 2012) (unpublished) (citing *Starko,* 276 P.3d at 278). Assuming that the situation in *Ontiveros* is at least partly analogous to the question before the Court, Chesapeake's citation to that decision is therefore somewhat puzzling.

**\*4** On the other hand, binding and persuasive authorities alike establish that New Mexico law strongly disfavors unjust enrichment claims when remedies exist under contract law. *See Sims,* 122 N.M. at 624; *Dydek v. Dydek,* 288 P.3d 872, 883 (N.M. Ct. App. 2012); *Ontiveros,* 129 N.M. at 204; *see also Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.,* 407 F.3d 1091, 1116-17 (10th Cir. 2005) (citing *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa,* 130 F.3d 950, 957 (10th Cir. 1997)); *Abraham v. WPX Energy Prod., LLC,* 20 F. Supp. 3d 1244, 1276, 1284-85 (D.N.M. 2014) (dismissing an unjust enrichment claim against a third party where the plaintiff did not plead an obstacle to recovery from a privy party under contract law). This position is bolstered by illustrations in § 25 of the Restatement (Third) of Restitution and Unjust Enrichment, which conclude that an unjust enrichment claim against a third party cannot stand at all when a contract claim between privy parties is viable. *See* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 25 cmt. B, illus. 3 (2011) (stating that "when A confers a benefit on B as the performance of A's contract with C," an unjust enrichment claim must fail "where A attempts to recover from B in restitution instead of pursuing a viable contract claim against C"); *see also Wagner v. Galbreth,* 500 B.R. 42, 52 (D.N.M. 2013) (noting that New Mexico courts frequently turn to the Restatements for guidance on equitable claims).

Case 1:19-md-02875-RMB-SAK    Document 523-7    Filed 07/17/20    Page 357 of 370
PageID: 10387

Steadfast Insurance Company v. Legacy Safety &..., Not Reported in Fed....

2015 WL 12803775

Although some decisions have suggested that a party may bring a claim of unjust enrichment despite the presence of an adequate remedy at law, these cases are not only significant departures from New Mexico Supreme Court precedent, they are also readily distinguishable from the facts at issue here. Though *Sims* ultimately permitted a statutory claim and an equitable claim to proceed on the same subject matter, it did so only because statutory remedies are not typically interpreted as supplanting existing equitable remedies, *see* 122 N.M. at 624, an argument that does not necessarily apply to contract law in the same fashion. *Starko* concerned an overlap of equitable and contract claims brought by the plaintiff against one defendant, not against a third party not in contract privity with the plaintiff; further, its holding was reversed by the state supreme court on other grounds, so it is not clear that *Starko accurately reflects how the New Mexico Supreme Court would treat that claim. See* 276 P.3d at 278. Unlike this case, the two New Mexico Supreme Court decisions cited for primary support in *Starko* involved equitable claims between two parties in contract privity where the contract was concededly unenforceable. *See Abraham*, 20 F. Supp. 3d at 1281-82 (citing *Danley v. City of Alamogordo*, 91 N.M. 520 (1978); *Platco*, 78 N.M. 36). Likewise, the Court of Appeals in *Ontiveros* permitted an unjust enrichment claim reluctantly, and only because the facts of the case made it clear that no other remedy was available to the plaintiffs. *See* 129 N.M. at 205-06.

Reviewing this landscape, United States District Judge James O. Browning concluded in *Abraham* that "under New Mexico law, the existence of a contract with a different party does not automatically bar [an] unjust enrichment claim, but the plaintiff cannot pursue the unjust enrichment claim unless there is something—bankruptcy, statutes—prohibiting the plaintiff from pursuing the contract claim." *Abraham*, 20 F. Supp. 3d at 1276. This conclusion is bolstered by the state's general rule of disfavoring such claims, combined with the relatively infrequent exceptions to this rule. Thus, even though *Abraham* is not a binding interpretation of New Mexico law, the Court finds that decision's reasoning to be persuasive and applies it to the case at bar.

Judge Browning also determined that for a plaintiff's unjust enrichment claim to survive a motion to dismiss, "the Supreme Court of New Mexico would require [the] plaintiff to allege that there is something preventing his recovery on the contract claim." *Id.* at 1284 (rejecting *Starko* as inconsistent with how the New Mexico Supreme Court would

handle such a motion). The Court has little precedential authority to rely on with respect to that conclusion; none of the New Mexico Supreme Court cases cited herein were decided at the pleading stage, and the value of *Starko's* contrary holding is questionable given that the decision was only reached by the New Mexico Court of Appeals and was subsequently overturned on other grounds. Nonetheless, the reasoning expressed in *Abraham* is consistent with the state's general distaste for equitable claims where a contract claim remains viable. Moreover, this view is consistent with the Tenth Circuit's understanding of New Mexico law. *See Elliot Indus.*, 407 F.3d at 1117 (applying New Mexico law to permit an unjust enrichment claim only "[w]here the plaintiff has no alternative right on an enforceable contract" (quoting 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 68:5 (4th ed. 2004))). The Court therefore adopts this conclusion as well.

**\*5** From there, resolution of Chesapeake's motion is straightforward. Steadfast has not pleaded that anything is preventing it from pursuing a contract remedy against Legacy for recovery of the allegedly unpaid premiums—indeed, Steadfast brings just such a claim in Count I. Simply put, in the absence of any allegations to the contrary, Steadfast has a complete and adequate remedy at law—a contract claim against Legacy. Under these circumstances, its unjust enrichment claim against Chesapeake must fail. *See Sims*, 122 N.M. at 624 ("[E]quity will not act if there is a complete and adequate remedy at law"); *see also Abraham*, 20 F. Supp. 3d at 1284-85.

Given the Court's conclusion that the New Mexico Supreme Court would not allow Steadfast's unjust enrichment claim to proceed under these circumstances, Steadfast's only response is to argue that it could be left without a contract remedy "if Legacy becomes judgment[-]proof or demonstrates that the contract was invalid." Be that as it may, Steadfast has altogether failed to state in its pleadings that there is any reason to believe that it has no remedy at law for the recovery of the allegedly unpaid premiums, and its pursuit of such a remedy suggests that it does not believe this to be the case. Accordingly, Steadfast's unjust enrichment claim against Chesapeake—the only claim brought against that Defendant—must be dismissed.

## CONCLUSION

For the foregoing reasons,

Steadfast Insurance Company v. Legacy Safety &..., Not Reported in Fed....
2015 WL 12803775

IT IS THEREFORE ORDERED that Defendant Chesapeake
Operating, LLC's Motion to Dismiss, **(Doc. 8)**, is hereby
GRANTED. Count II as to Chesapeake is DISMISSED
WITH PREJUDICE, and Chesapeake is dismissed from this
action.

**SO ORDERED**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12803775

Footnotes

1    That said, the Court notes that neither party has referred to any decision where an unjust enrichment claim brought by an
     insurance company against an additional insured was successful. Steadfast's lone citation on this question, *Kowalski v.
     Jackson Nat'l Life Ins. Co.,* 981 F. Supp. 2d 1309, 1322 (S.D. Fla. 2013), did not involve such a claim and is therefore inapt.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 50

2008 WL 5104747, 2008 -Ohio- 6295

2008 WL 5104747

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF LEGAL
AUTHORITY.

Court of Appeals of Ohio,
Fifth District, Knox County.

Phillip D. LEHMKUHL, Plaintiff–Appellant

v.

ECR CORPORATION, Defendant–Appellee.

No. 06 CA 039.
|
Decided Dec. 2, 2008.

**Synopsis**
**Background:** Attorney brought action against client, seeking
recovery for the value of services rendered in the amount
of $6,400. The Mount Vernon Municipal Court, No.
06-CVH-541, entered judgment awarding attorney $480.
Attorney appealed.

**Holdings:** The Court of Appeals, Delaney, J., held that:

[1] attorney's failure to object to trial court's sua sponte entry
of judgment upon presentation of his evidence rendered the
issue subject to plain error review;

[2] trial court's sua sponte entry of judgment at close of
attorney's case and without motion from client for directed
verdict or dismissal was not plain error; and

[3] recovery was appropriately limited to $480 according to
terms of express or implied contract of the parties.

Affirmed.

West Headnotes (4)

[1]    **Appeal and Error**  ⚖️  Judgment
Attorney's failure to object to trial court's sua
sponte entry of judgment upon presentation of
his evidence rendered the issue subject to review

for plain error on appeal, in action in which
attorney sought to recover the value of services
rendered.

1 Cases that cite this headnote

[2]    **Appeal and Error**  ⚖️  Judgment
Trial court's sua sponte entry of judgment
awarding attorney $480 of requested $6,400 in
action to recover fees from client, at close of
attorney's case and without motion from client
for directed verdict or dismissal, was not plain
error, where, although procedurally unusual,
attorney had testified on his behalf, called and
cross-examined witness, and all of his exhibits
had been admitted into evidence.

1 Cases that cite this headnote

[3]    **Attorneys and Legal Services**  ⚖️  Measure
and amount of compensation
Recovery on attorney's claim against client
for unpaid fees was appropriately limited to
$480, where, although attorney sought $6,400,
evidence showed that parties had entered into an
express or implied contract for performance of
three hours of legal services at a rate of $160 per
hour.

[4]    **Implied and Constructive
Contracts**  ⚖️  Effect of Express Contract
A plaintiff may not recover under the theory
of unjust enrichment or quasi-contract when an
express contract covers the same subject.

17 Cases that cite this headnote

Appeal from the Mount Vernon Municipal Court.

**Attorneys and Law Firms**

Phillip D. Lehmkuhl, Pro Se, Mount Vernon, OH, for
plaintiff-appellant.

Steven J. Schrock, Millersburg, OH, for defendant-appellee.

Lehmkuhl v. ECR Corp., Not Reported in N.E.2d (2008)

2008 WL 5104747, 2008 -Ohio- 6295

**Opinion**

DELANEY, J.

**\*1** {¶ 1} Plaintiff-appellant Phillip Lehmkuhl, Esq. ("Lehmkuhl") appeals from the trial court's entry awarding judgment in his favor against defendant-appellee ECR Corporation ("ECR") in the amount of $480, following a bench trial in this attorney-client fee dispute.

{¶ 2} Lehmkuhl is an attorney registered to practice in Ohio. On June 26, 2006, Lehmkuhl filed a complaint in the Mount Vernon Municipal Court seeking payment of unpaid attorney fees for services rendered on behalf of ECR and its employee, Jeff Hall. Both were named defendants in a civil case captioned *Wagner v. Reed, et al.*, Case No. 06OT010046, filed in the Knox County Court of Common Pleas on January 31, 2006.

{¶ 3} The underlying facts follow.

{¶ 4} On February 9, 2006, Marc Hawk, president of ECR, verbally engaged Lehmkuhl to represent ECR and Hall in the *Wagner* litigation. The parties did not execute a written engagement letter. The parties agreed to an hourly rate of $160 per hour. Lehmkuhl discussed the filing of a "Motion for More Definite Statement" on behalf of ECR and Hall in response to the *Wagner* complaint. Hawk testified that he had "a clear expectation that 2 to 3 hours at $160 an hour was an efficient way to do it". (T. at 33). The conversation between the parties lasted for about 15 minutes.

{¶ 5} On February 10, 2006, Lehmkuhl filed a Motion for a More Definite Statement, pursuant to Civ.R. 12(E) on behalf of both ECR and Hall. The motion was opposed by Wagner, and Lehmkuhl filed a reply brief on February 20, 2006.

{¶ 6} On February 23, 2006, Lehmkuhl sent Hawk a bill for legal and secretary services rendered to ECR and Hall between February 8, 2006 to February 21, 2006 in the amount of $6,050. (Ex. A and C). On February 24, 2006, Hawk contacted Lehmkuhl expressing anger over the amount of the bills and informed Lehmkuhl of his plan to obtain substitute counsel. (T. at 35). On March 10, 2006, a notice of substitution of counsel was filed by attorney Steve Schrock. Thereafter, Lehmkuhl billed ECR for additional legal and secretarial services performed from February 24 to March 10, 2008 in the amount of $405 (Ex. B).

{¶ 7} On an unspecified date, the Knox County Court of Common Pleas summarily denied the "Motion for More Definite Statement" filed by Lehmkuhl.

{¶ 8} Lehmkuhl then filed suit in the Mount Vernon Municipal Court, seeking recovery for the value of services he rendered to ECR and Hall in the amount of approximately $6,400. The only defendant was ECR. Lehmkuhl sought recovery under the theories of express contract, implied contract and unjust enrichment.

{¶ 9} A bench trial was held on December 8, 2006. The parties gave opening statements, followed by the testimony of Lehmkuhl and Hawk. After the admission of exhibits, Lehmkuhl rested his case. The court announced a short recess. Upon return, the court addressed the parties, as follows:

**\*2** {¶ 10} "Mr. Lehmkuhl, * * * it is definitely my impression today from hearing this case, that this was a matter of billable hours, not representing your client. First of all, on February 9th, your talking to Mr. Hall—or Hawk and telling him it's gonna take 2 to 3 hours, and you've already billed up 8 hours. You've already spent 8 hours on this case and tellin' him it's gonna take 2 to 3. That just not credible, that you can tell—you're statin' to him that this is only gonna cost him for 2 or 3 hours when you've already spent 8 hours and haven't done anything. So what I'm gonna do, Mr. Lehmkuhl, is—I think you misrepresented the case, what you—the scope of representation, what you were going to be doing for E.C.R. You told Mr. Hawk it'd take 2 to 3 hours. Your rate was $160 Dollars. I'll give you the benefit of the hour—that, and say 3 hours. Judgment for the Plaintiff, $480 Dollars."

{¶ 11} T. at 37.

{¶ 12} Thereafter, the court filed a judgment entry stating, in relevant part:

{¶ 13} * * *

{¶ 14} "At the conclusion of Plaintiff's case, this Court *sua sponte* announced that Plaintiff had failed to prove the existence of a contract with Defendant to perform more than 3 hours of services, at $160/hour, and thus had not proven damages in excess of $480, and therefore would not be entitled to judgment in any greater amount, regardless of any evidence which may be presented by Defendant.

Lehmkuhl v. ECR Corp., Not Reported in N.E.2d (2008)

2008 WL 5104747, 2008 -Ohio- 6295

{¶ 15} "In announcing this decision, the Court further noted in its findings that Plaintiff had attempted to bill Defendant for legal research performed before Defendant retained Plaintiff, that Plaintiff had misrepresented the amount of time for which he would be billing Defendant, and that Plaintiff's bills to Defendant were clearly excessive in time and amount for the services performed ."

{¶ 16} Judgment Entry, December 14, 2006.

{¶ 17} Lehmkuhl timely appeals and raises seven Assignments of Error:

{¶ 18} "I. THE TRIAL COURT ERRED BY FAILING TO AWARD ANY COMPENSATION TO PLAINTIFF FOR SERVICES RENDERED FOR JEFF HALL.

{¶ 19} "II. THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD COMPENSATION TO PLAINTIFF FOR POST–TERMINATION SERVICES TO ECR CORP.

{¶ 20} "III. THE TRIAL COURT ERRED BY FAILING TO AWARD COMPENSATION TO PLAINTIFF FOR SERVICES RENDERED TO ECR CORPORATION IN THE PERIOD MARCH 16, 2006, THROUGH MARCH 26, 2006.

{¶ 21} "IV. THE TRIAL COURT ERRED WHEN IT FAILED TO AWARD COMPENSATION TO PLAINTIFF FOR ROUTINE LITIGATION–RELATED ACTIVITIES.

{¶ 22} "V. THE TRIAL COURT ERRED BY FAILING TO AWARD PLAINTIFF ADEQUATE COMPENSATION FOR SERVICES RENDERED BASED UPON QUANTUM MERUIT CONSIDERATIONS.

{¶ 23} "VI. THE TRIAL COURT ERRED BY FAILING TO AWARD PLAINTIFF ADEQUATE COMPENSATION FOR SERVICES RENDERED BASED UPON IMPLIED CONTRACT CONSIDERATIONS.

{¶ 24} "VII. THE TRIAL COURT ERRED WHEN IT RENDERED JUDGMENT AT THE END OF PLAINTIFF'S CASE, WITHOUT MOTION FROM DEFENDANT FOR A DIRECT VERDICT, OR DISMISSAL, AND PRIOR TO PRESENATION OF DEFENDANT'S CASE."

VII.

*3 [1] [2] {¶ 25} We will first address Lehmkuhl's seventh Assignment of Error.

{¶ 26} As noted above, the trial court ruled directly from the bench in favor of Lehmkuhl after his case-in-chief. He contends this was in error because "[i]t is open to doubt as to whether the Trial Court had the authority to enter a verdict, at the close of Plaintiff's case, except pursuant to a Motion to Dismiss by Defendant, which was not made." Appellant's Brief, p. 24.

{¶ 27} Lehmkuhl further argues that pursuant to Civ.R. 50(A) (4), the trial court was obligated to consider any evidence most strongly in his favor. Had the trial court done so, he contends a prima facie case for an award of more than $480 was justified.

{¶ 28} As an initial matter, we note that Civ.R. 50 pertains to a motion for directed verdict, which only lie in a jury trial. Mennonite Mut. Ins. Co. v. Hoyt, 5th Dist. No. 07CA0058, 2008–Ohio–1741, ¶ 12 (citation omitted). In addition, the record does not reflect that Lehmkuhl objected to the trial court's *sua sponte* entry of judgment upon the presentation of his evidence.

{¶ 29} A party's failure to object waives all but plain error. Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099. Except in the "extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Id. at 122–123, 679 N.E.2d 1099.

{¶ 30} Although procedurally unusual, we find no prejudice to Lehmkuhl in the trial court's entry of judgment after resting his case. The record reflects Lehmkuhl testified on his behalf, he called and cross-examined Hawk (which was ECR's only identified witness) and all of his exhibits were admitted into evidence. As a civil plaintiff, Lehmkuhl had the burden of proving his claims by a preponderance of the evidence. It was within the trial court's providence, as the trier of a fact, to determine if Lehmkuhl had met his burden of proof after resting his case. Any prejudice, if any, would be to ECR and Hall who were precluded from presenting a defense.

{¶ 31} Accordingly, we find no plain error prejudicial to Lehmkuhl in the trial court's ruling from the bench at the close of the plaintiff's case.

Lehmkuhl v. ECR Corp., Not Reported in N.E.2d (2008)
2008 WL 5104747, 2008 -Ohio- 6295

{¶ 32} The seventh Assignment of Error is overruled.

I, II, III, IV, V

**[3]**    {¶ 33} We will address Assignments of Error I, II, III, IV and V together as they all challenge the amount of the trial court's judgment in favor Lehmkuhl.

{¶ 34} In this case, the trial court found an express or oral contract between the parties for the performance of 3 hours of legal services at a rate of $160 per hour. Hence, it limited Lehmkuhl's recovery on the contract to $480. Thus, the trial court found both the hourly fee and amount of hours to be spent was agreed upon.

**\*4**    {¶ 35} Lehmkuhl contends the parties never had a fixed fee agreement, rather he was generally engaged to represent ECR and Hall and therefore, he was impliedly authorized to perform additional tasks, such as filing a reply memorandum, meeting with Hall, conducting research and transferring the case to substitute counsel. Therefore, he is entitled to recovery based upon an implied contract theory.

{¶ 36} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. A reviewing court may not simply reweigh the evidence and substitute its judgment for the trier of fact, who is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

{¶ 37} The record reveals conflicts in the witnesses' testimony in regards to the parties' conversation. Lehmkuhl testified:

{¶ 38} "There were no limits placed on me in that conversation in terms of hours, dollars, activities or scope of representation. It was represent my company and my employee."

{¶ 39} T. at 14.

{¶ 40} On the other hand, Hawk stated:

{¶ 41} "Q: And did you agree to pay for legal services rendered to E.C.R. Corp. and Hall.

{¶ 42} "A: * * * [W]e had a direct conversation about much time you thought it would take to add us to what you had already done; so I had a clear expectation that 2 to 3 hours at $160 Dollars an hour was an efficient way to do it. So yes, that's what I expected.

{¶ 43} "Q: Did you agree to pay me for my time at $160 Dollars per hour billed in quarter units?

{¶ 44} "A: For that period of time, yes; in that scope.

{¶ 45} * * *

{¶ 46} "Q: In our conversation of February 9th, 2006, were you quoted a fixed fee for representing E.C.R. and Hall?

{¶ 47} "A: I interpreted it as a fixed fee.

{¶ 48} Q: Do you recall me giving you a precise dollar figure for representing either Hall or E.C.R.?

{¶ 49} "A: Not a dollar figure from you, but I, I certainly did math in my head. 2 to3 hours x 160 is what I had in my head."

{¶ 50} T. at 33–34.

{¶ 51} Upon a review of the record, we find some competent, credible evidence to support the trial court's decision that Hawk hired Lehmkuhl to perform specific legal services (i.e. filing a motion), agreed to pay Lehmkuhl's $160 hourly rate up to 3 hours of time. Furthermore, the evidence adduced at hearing did not establish that Lehmkuhl's large increase in legal or secretarial fees were rendered with the knowledge and approval of Hawk. It is reasonable to infer from the fact that Hawk quickly disagreed with the bills and discharged Lehmkuhl that Hawk did not agree with Lehmkuhl's broader view of their fee arrangement.

**\*5**    {¶ 52} In conclusion, the existence of the fee agreement and its terms are matters for the trial court to determine. Based upon the evidence presented in this case and our standard of review, we cannot say that the trial court's judgment was not supported by competent, credible evidence.

2008 WL 5104747, 2008 -Ohio- 6295

{¶ 53} The first, second, third, fourth, and fifth assignments of error are overruled.

VI

[4]    {¶ 54} In his last assignment of error, Lehmkuhl contends the trial court erred by failing to award adequate compensation for services rendered upon quantum meruit or unjust enrichment considerations.

{¶ 55} Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject. *Ullmann v. May* (1947) 147 Ohio St. 468, 72 N.E.2d 63, syllabus four; *City of Cincinnati v. Cincinnati Reds* (1984) 19 Ohio App.3d 227, 483 N.E.2d 1181.

{¶ 56} Since we have upheld the trial court's finding of an express contract covering the amount of recovery, an unjust enrichment claim would be barred since it covers the same subject.

{¶ 57} Accordingly, we overrule the sixth Assignment of Error.

{¶ 58} For the reasons set forth above, the judgment of the Mount Vernon Municipal Court is affirmed.

DELANEY, J., GWIN, P.J. and FARMER, J., concur.

**All Citations**

Not Reported in N.E.2d, 2008 WL 5104747, 2008 -Ohio- 6295

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 51

Sheinman Provisions, Inc. v. National Deli, LLC, Not Reported in F.Supp.2d (2008)

2008 WL 2758029

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Gallo v. PHH Mortg. Corp., D.N.J., December 31, 2012

2008 WL 2758029
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

SHEINMAN PROVISIONS, INC., Plaintiff,
v.
NATIONAL DELI, LLC, Defendant.

Civil Action No. 08-cv-453.
|
July 15, 2008.

**Attorneys and Law Firms**

Mark S. Haltzman, Frank Schwartz, Stephen Levin, Lamm Rubenstone Totaro & David, LLC, Trevose, PA, for Plaintiff.

Jacqueline Richelle Dungee, Michael Eidel, Joseph Kernen, DLA Piper Rudnick Gray Cary U.S., LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION AND ORDER**

RUFE, District Judge.

**\*1** Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint, Plaintiff's Response in Opposition, and Defendant's Reply. Defendant's Motion asserts that Plaintiff has failed, in part, to state a claim upon which relief may be granted for breach of contract, and that it has failed to state a claim for fraud in the inducement, unjust enrichment, and tortious interference with contractual and business relationships, as alleged in the Complaint. Defendant seeks dismissal of the breach of contract claim in part, and dismissal of the remaining claims in their entirety. For the reasons that follow, the Court will grant Defendant's Motion.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

As this matter is before the Court on a motion to dismiss, we recite the facts as alleged in the Amended Complaint and assume they are true for the purpose of this motion.[1] Plaintiff and Defendant companies are both involved in the food distribution business. On or about September 21, 2006, Plaintiff Sheinman Provisions,

Inc. ("Plaintiff" or "Sheinman") and Defendant National Deli, LLC ("Defendant" or National Deli) entered into an Inventory Purchase, Asset Rental and Reimbursement Agreement ("Asset Rental Agreement"), whereby National Deli leased assets from Sheinman including, but not limited to, Sheinman's customer list, interest in assumed contracts, interest in the use of Sheinman's business names, and records and information necessary for the continued operation of Sheinman's business. Under the Asset Rental Agreement, the parties also agreed that Sheinman would sell certain of its inventory to National Deli, and National Deli would reimburse Sheinman for certain business expenses. The term of the Asset Rental Agreement is set by, and identical to, the term of the employment agreements of two of Sheinman's principals who became executives of National Deli under the agreement.

The Asset Rental Agreement contains an express provision obligating the parties to exercise good faith and fair dealing in the performance of their respective obligations thereunder. The clause explains that this obligation of good faith and fair dealing may be enforced by any of the parties at law or in equity. During the course of discussions between the parties prior to the execution of the Asset Rental Agreement, the principals and representatives of National Deli assured and represented to the principals of Sheinman that it desired, in good faith, to enter into a "fair and mutually-beneficial business relationship" in a manner which ultimately came to be reflected in the terms of the Asset Rental Agreement.[2] The principals of Sheinman decided to enter into the Asset Rental Agreement as a result of, and in reliance upon, these conversations with National Deli's Principals. Sheinman alleges that when National Deli made these representations, it never intended to honor its obligations to Sheinman under the Asset Rental Agreement, or even to exercise good faith and fair dealing in the performance of its duties.

**\*2** Plaintiff alleges that the principals of National Deli actually intended to use the Asset Rental Agreement, and the business relationship with Sheinman created thereby, as a covert means to unlawfully misappropriate and convert to its own use Sheinman's assets and business relationships, without adequate compensation. Sheinman alleges that National Deli also intended to materially damage and/or destroy Sheinman's viability as a competitive business in the marketplace. The Complaint lists the specific actions of National Deli that allegedly breached its duties under the Asset Rental Agreement, which include, but are not limited to: failing to reimburse Sheinman for business expenses

Sheinman Provisions, Inc. v. National Deli, LLC, Not Reported in F.Supp.2d (2008)
2008 WL 2758029

as agreed to; interfering with and damaging Sheinman's relationships with its customers, vendors and suppliers; unjustifiably terminating valuable and necessary employees of Sheinman; falsely accusing Sheinman's principals of theft; intentionally shipping product to customers not in conformity with the high standards of the Sheinman brand name or the quality control standards required under the Asset Rental Agreement; and engaging in a conspiracy designed to drive Sheinman's principals into an early termination of the Asset Rental Agreement.

Plaintiff originally filed this Complaint in the Court of Common Pleas of Philadelphia County in December 2007, and Defendant removed to this Court in January 2008. Plaintiff's Complaint alleges breach of contract (Count I), fraud in the inducement (Count II), unjust enrichment (Count III), and tortious interference with contractual and business relationships (Count IV).

## II. DISCUSSION

### A. Legal Standard for Rule 12(b)(6) Motion to Dismiss

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all allegations in the complaint, draw all reasonable inferences therefrom, and view them in the light most favorable to the plaintiff. [3] The United States Supreme Court has recently clarified this standard of review, explaining that "[a] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" without the allegation of sufficient facts in support. [4] In order to survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." [5] A court may grant a 12(b)(6) motion only "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." [6]

### B. Breach of Contract

Defendant asserts that the Complaint contains only two factual allegations that could give rise to a breach of contract claim, and that all other factual allegations in the Complaint concerning breach of contract should be dismissed for failure to state a claim. Plaintiff argues that the Complaint contains a clear and plain statement of its breach of contract claim

and that anything that could be considered a breach of the express covenant of good faith and fair dealing in the Asset Rental Agreement would constitute a breach thereof. To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damages. [7] Paragraph number 24 of Plaintiff's Complaint sets out facts alleging breach of the Asset Rental Agreement in twelve different subsections lettered (a) through (l). Defendant's Motion specifically argues that only subsections (a) and (k)-alleging breach of its reimbursement and quality control obligations-could possibly establish a claim for breach of contract, if those allegations are supported by the facts. The Court agrees. Only subsections (a) and (k) of the Complaint address essential terms of the contract and breach thereof. All of the other allegations of breach of contract essentially assert different instances of breach of the covenant of good faith and fair dealing, as Plaintiff's Response in Opposition to Defendant's Motion concedes.

**\*3** Plaintiff erroneously asserts that because the Asset Rental Agreement contains an express covenant of good faith and fair dealing that a breach thereof is sufficient to establish a breach of contract claim. Pennsylvania does not recognize a claim for breach of the covenant of good faith and fair dealing as an independent cause of action. [8] In order to plead a cause of action for breach of the covenant of good faith, whether it is an express or implied covenant, a plaintiff must properly plead the elements of a claim of breach of contract. [9] In other words, a plaintiff must allege facts to establish that a contract exists or existed, including its essential terms, that defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract *other than the covenant of good faith and fair dealing,* and that resultant damages were incurred by plaintiff. Because Plaintiff's Complaint fails to properly allege facts that establish a breach of a specific duty imposed by the Asset Rental Agreement, aside from the express covenant of good faith and fair dealing, we will dismiss Plaintiff's breach of contract claims other than those predicated on subsections (a) and (k) of paragraph 24 of the Complaint. [10]

### C. Fraud in the Inducement

Defendant asserts that Plaintiff's fraud in the inducement claim should be dismissed because it fails to state a fraud claim with the sufficient particularity required by Federal Rule of Civil Procedure 9(b), and because it is barred by

Sheinman Provisions, Inc. v. National Deli, LLC, Not Reported in F.Supp.2d (2008)
2008 WL 2758029

the "gist of the action" doctrine and the parol evidence rule. The Court first addresses the parol evidence rule. The parole evidence rule applies when prior statements and representations contradict, conflict, add, modify or vary the terms of a contract and fall within the scope of the integrated agreement.[11] The Complaint alleges that National Deli represented to Plaintiff that it "desired in good faith to enter into a fair and mutually-beneficial business relationship"[12] during the discussions between the parties prior to entering into the Asset Rental Agreement, and that Defendant fraudulently induced Plaintiffs to enter the agreement because they never intended to cause National to honor its duties and obligations thereunder.

Based upon the parties' pleadings and the Court's own review of the contract at issue, we find that the Asset Rental Agreement is a fully integrated contract, which contains an express provision stating that in entering the Asset Rental Agreement, neither party has relied on any claims, representations or warranties made by the other, except as expressly set forth therein. Therefore, the parole evidence rule squarely applies here because Plaintiff is seeking to offer evidence of representations made prior to the execution of the Asset Rental Agreement to contradict an express provision thereof. As it is well established that "fully integrated contracts preclude fraudulent inducement claims,"[13] this claim will be dismissed as barred by the parole evidence rule. Because the fraudulent inducement claim is defeated by the parole evidence rule, we do not need to address Defendant's arguments based on the gist of the action doctrine and Rule 9(b).

### D. Unjust Enrichment

*4  Defendant argues that Plaintiff's unjust enrichment claim shouldbe dismissed because this claim is unavailable where an express written agreement governs the relationship of the parties. Plaintiff's argues that Federal Rule of Civil Procedure 8(d)(2) allows plaintiffs to claim unjust enrichment in the alternative to a breach of contract claim. Although in Pennsylvania, a contract prevents a party from bringing a claim of unjust enrichment, Federal Rule of Civil Procedure 8(d)(2) allows pleading in the alternative on this type of claim in some circumstances. Courts in this district have permitted plaintiffs to pursue alternative theories of discovery based on breach of contract and unjust enrichment, even where the existence of a contract would preclude recovery for unjust enrichment.[14] However, the facts of those cases are distinguishable from the case at bar. In United States

v. Geri-Care, Inc., the court allowed an unjust enrichment claim to survive defendant's motion to dismiss because it found that defendants failed to prove that a contract or another adequate remedy at law existed.[15] Similarly, in United States v. Kensington Hospital, the court allowed an alternative claim for unjust enrichment where plaintiff had claimed breach of contract because the contract at issue only encompassed a part of the relationship between the parties.

In this case, the agreement at issue is a fully integrated contract and, by its terms, it governs the entire relationship of the parties. Therefore, we disagree with Plaintiff's argument that Rule 8(d)(2) allows pleading in the alternative in this case. Rule 8 only allows alternative claims to be plead if all of the claims are sufficient on their own. Here, even if the breach of contract claim fails, the unjust enrichment claim is still insufficient because Pennsylvania law prohibits unjust enrichment claims where a contract governs the relationship of the parties, as is the case here. The bar to this type of claim is not altered when unjust enrichment is plead in the alternative to an unsuccessful breach of contract claim as the relationship of the parties is still governed by a valid contract, and therefore, there is no reason to apply the quasi-contract doctrine of unjust enrichment. Plaintiff's unjust enrichment claim will be dismissed.

### E. Tortious Interference With Contractual and Business Relationships

Defendant argues that Plaintiff's claim of tortious interference with contractual and business relationship should be dismissed for failure to plead the requisite elements and because it is barred by the gist of the action doctrine. To set out a claim for tortious interference with contract under Pennsylvania law, plaintiffs must plead: 1) the existence of a contractual relationship between Plaintiff and a third party; 2) purposeful action by the defendant, specifically intended to harm the existing relationship; 3) the absence of privilege or justification on the part of the defendant; and 4) actual legal damages as a result of defendant's conduct.[16] Plaintiff's Complaint alleges that Defendant intentionally interfered with Plaintiff's business and contractual relationships with its customers by making disparaging remarks about Plaintiff's principals and personnel to its customers, vendors and suppliers, in a deliberate effort to cause those entities to discontinue purchasing from Plaintiff and deal directly with Defendant. Plaintiff further alleges that it has sustained damages in excess of $50,000 as a result of National Deli's conduct. Defendant argues that Plaintiff has failed to allege

absence of privilege or justification on defendant's part, and therefore, this claim should be dismissed.

 **\*5**  Defendant argues that gist of the action doctrine bars Plaintiff's tortious interference claim. The gist of the action doctrine bars tort claims that essentially complain of a breach of contract. [17] Courts have held that this doctrine bars tort claims: 1) arising solely from a contract between the parties; 2) where the duties allegedly breached were created by and grounded in the contract itself; 3) where liability stems from a contract; or 4) where the tort claim essentially duplicates a breach of contract claim or the success of the tort claim is wholly dependant on the terms of a contract. [18] If Plaintiff's claim "essentially alleges a breach of duties that flow from an agreement between the parties, the claim is contractual in nature, whereas if the duties allegedly breached were a type imposed on members of society as a matter of social policy, the claim is essentially tort-based," and will not be barred by the gist of the action doctrine. [19] Therefore, our analysis here turns on whether the duties allegedly breached by Defendant are created by and grounded in the Asset Rental Agreement.

Under similar circumstances, in *Chemtech International, Inc. v. Chemical Injection Technical, Inc.,* the Third Circuit affirmed the Eastern District of Pennsylvania's dismissal of a tortious interference based on the gist of the action doctrine. [20] In *Chemtech,* plaintiff's tortious interference claim alleged that defendant dealt directly with plaintiff's customers and induced distributors not to deal with plaintiff but to deal with them directly, all without regard to plaintiff's agreements with the distributors and in breach of the agreement between plaintiff and defendant. [21] The Third Circuit held that plaintiff did "not have a right to be free from competition and [defendant] has no duty 'imposed by law as a matter of social policy' not to compete with [plaintiff]. Only a contract can confer such a right and impose such a duty ...." [22] Sheinman's tortious interference claim alleges almost identical facts: that Defendant intentionally interfered with Plaintiff's business and contractual relationships to cause its customers, vendors and suppliers to discontinue purchasing from Plaintiff and deal directly with Defendant. Following the Third Circuit's holding in *Chemtech,* we find that the duties allegedly breached by Defendant were not imposed as a matter of social policy, but rather flowed from the Asset Rental Agreement. Therefore, the gist of the action doctrine bars Plaintiff's tortious interference claim here as

the duties allegedly breached were grounded in the contract between the parties.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss in Part will be granted. We will dismiss Plaintiff's allegations of breach of contract predicated on breach of the covenant of good faith and fair dealing (Count I), fraud in the inducement (Count II), unjust enrichment (Count III), and tortious interference with contractual and business relationships (Count IV).

 **\*6**  An appropriate Order follows.

### ORDER

**AND NOW,** this 15th day of July, 2008, upon consideration of Defendant's Motion to Dismiss [Doc. No. 5], Plaintiff's Response in Opposition [Doc. No. 37], and Defendant's Reply [Doc. No. 40], it is hereby *ORDERED* that Defendant's Motion is GRANTED, as follows:

1. Plaintiff's breach of contract claims based on breach of the express covenant of good faith and fair dealing (Count I) are **DISMISSED** without prejudice, and Plaintiff's remaining breach of contract claims remain;

2. Plaintiff's fraudulent inducement claim (Count II) is **DISMISSED** with prejudice;

3. Plaintiff's unjust enrichment claim (Count III) is **DISMISSED** with prejudice;

4. Plaintiff's tortious interference with contractual and business relationships claim is **DISMISSED** with prejudice; and

5. Plaintiff is granted leave to file amended pleadings on its breach of contract claim consistent with this Memorandum Opinion within **twenty (20) days** of the date of this Order.

It is so **ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2008 WL 2758029

Sheinman Provisions, Inc. v. National Deli, LLC, Not Reported in F.Supp.2d (2008)

2008 WL 2758029

Footnotes

1   *E.g., Rogers v. Am. Can Co.,* 305 F.2d 297, 318 (3d Cir.1962).

2   Compl. ¶ 4.

3   *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989).

4   *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (internal citations omitted).

5   *Id.* (internal citations omitted).

6   *D.P. Enter. Inc. v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir.1984).

7   *E.g., Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225-26 (3d Cir.2003) (citing *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999)).

8   *E.g., Burland v. ManorCare Health Servs., Inc.,* No. 98-4802,1999 WL 58580, at *4 (E.D.Pa. Jan. 26, 1999).

9   *See, e.g., Temple Univ. Hosp., Inc. v. Group Health, Inc.,* No. 05-102,2006 WL 146426, at *5-6 (E.D.Pa. Jan. 12, 2006).

10  Plaintiff's will be granted leave to re-file breach of contract claims based on violation of the covenant of good faith and fair dealing that properly lay out facts illustrating breach of duties specifically imposed by the Asset Rental Agreement other than the covenant of good faith and fair dealing.

11  *E.g., Prof'l Sys. Corp. v. Opex Postal Techs.,* No. 05-2689, 2006 WL 573798, at *2 n. 5 (E.D.Pa. March 8, 2006).

12  Compl. ¶ 14.

13  *Interwave Tech., Inc. v. Rockwell Automation, Inc.,* No. 05-398,2005 WL 3605272, at *19 (E.D.Pa. Dec. 30, 2005).

14  *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1135 (E.D.Pa.1991); *United States v. Geri-Care,* Inc., No. 89-5720,1990 U.S. Dist. LEXIS 1136, at *7-8, 1990 WL 9463 (E.D.Pa. Feb. 2, 1990), *vacated on other grounds.*

15  1990 U.S. Dist. LEXIS 1136, at *8, 1990 WL 9463.

16  *E.g., Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337, 1343 (Pa.Super.Ct.1987).

17  *E.g., Hart v. Arnold,* 884 A.2d 316, 339 (Pa.Super.Ct.2005).

18  *E.g., id.* at 340 (citing *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 19 (Pa.Super.Ct.2002).

19  *Orthovita, Inc. v. Erbe,* No. 07-2395,2008 U.S. Dist. LEXIS 11088, at *12, 2008 WL 423446 (E.D.Pa. Feb. 14, 2008) (quoting *Wilmington Fin., Inc. v. Am. One Fin., Inc.,* No. 06-5559,2007 U.S. Dist. LEXIS 55738, at *6, 2007 WL 2221424 (E.D.Pa. July, 31, 2007)).

20  170 Fed. App'x 805, 809 (3d Cir.2006).

21  *Id.*

22  *Id.*

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---