```
 1

 2                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 3   _____
                                    CIVIL ACTION NUMBER:
 4   IN RE:  VALSARTAN PRODUCTS       1:19-md-02875-RBK-JS
     LIABILITY LITIGATION
 5                                   STATUS CONFERENCE AND
                                     ORAL ARGUMENT ON THE TAR
 6   _____  DISPUTE INVOLVING TEVA AND
                                     PLAINTIFFS (Via telephone)
 7

 8        Wednesday, July 15, 2020
          Commencing at 4:00 p.m.

 9   B E F O R E:              THE HONORABLE JOEL SCHNEIDER,
                               UNITED STATES MAGISTRATE JUDGE
10   A P P E A R A N C E S:

11        MAZIE SLATER KATZ & FREEMAN, LLC
          BY:  ADAM M. SLATER, ESQUIRE
12        103 Eisenhower Parkway
          Roseland, New Jersey 07068
13        For the Plaintiff

14        LEVIN PAPANTONIO
          BY:  DANIEL A. NIGH, ESQUIRE
15        316 S. Baylen, Suite 600
          Pensacola, Florida 32502
16        For the Plaintiff

17        GOLOMB & HONIK PC
          BY:  RUBEN HONIK, ESQUIRE
18            DAVID J. STANOCH, ESQUIRE
          1835 Market Street, Suite 2900
19        Philadelphia, Pennsylvania 19103
          For the Plaintiff
20
          KANNER & WHITELEY LLC
21        BY:  CONLEE S. WHITELEY, ESQUIRE
          701 Camp Street
22        New Orleans, Louisiana 70130
          For the Plaintiff
23            Karen Friedlander, Official Court Reporter
                   friedlanderreporter@gmail.com
24                     (856) 756-0160

25        Proceedings recorded by mechanical stenography;
          transcript produced by computer-aided transcription.
```

*United States District Court*
*Camden, New Jersey*

```
1    A P P E A R A N C E S: - CONTINUED

2         KIRTLAND & PACKARD LLP
          BY:  BEHRAM PAREKH, ESQUIRE
3         1638 South Pacific Coast Highway
          Redondo Beach, California 90277
4         For the Plaintiff

5         DUANE MORRIS LLP
          BY:  SETH A. GOLDBERG, ESQUIRE
6              JOSEPH FERRETTI, ESQUIRE
          30 S. 17th Street
7         Philadelphia, Pennsylvania 19103
          For the Defendant ZHP and the Joint Defense Group
8
          GREENBERG TRAURIG LLP
9         BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
               JEFFREY W. GREENE, ESQUIRE
10        3333 Piedmont Road, NE, Suite 2500
          Atlanta, Georgia 30305
11        For the Defendants, Teva Pharmaceutical Industries Ltd.,
          Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis
12        Pharma, Inc.

13        BARNES & THORNBURG LLP
          BY:  SARAH E. JOHNSTON, ESQUIRE
14        2029 Century Park East, Suite 300
          Los Angeles, CA 90067-2904
15        For the Defendant, CVS Health Co.

16        ULMER & BERNE LLP
          BY:  JEFFREY DANIEL GEOPPINGER
17        600 Vine Street
          Suite 2800
18        Cincinnati, OH 45202
          For the Defendant, AmerisourceBergen
19
          CIPRIANI & WERNER, P.C.
20        BY:  JESSICA M. HEINZ, ESQUIRE
          450 Sentry Parkway, Suite 200
21        Blue Bell, PA  19422
          For the Defendant, Aurobindo Pharma USA, Inc., Aurolife
22        Pharma, LLC and Aurobindo Pharma, Ltd.

23        PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
          BY:  CLEM C. TRISCHLER, ESQUIRE
24             FRANK H. STOY, ESQUIRE
          One Oxford Centre, 38th Floor
25        Pittsburgh, Pennsylvania 15219
          For the Defendant Mylan and the Joint Defense Group
```

1   **A P P E A R A N C E S: - CONTINUED**

2       HILL WALLACK LLP
       BY:  NAKUL Y. SHAH, ESQUIRE
3       21 Roszel Road
       Princeton, NJ  08540
4       For the Defendant, Hetero Drugs, Hetero Labs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (ALL PARTIES VIA TELEPHONE JULY 15, 2020, 4:00 P.M.)

2          THE COURT:  We're on the record, Valsartan MDL,

3    Docket No. 19-2875.  Why don't we get the names of lead

4    counsel for the plaintiffs and the defendants, and whoever

5    else intends to talk today, put your name on the record and

6    just like the other calls we've had, if you could just state

7    your name before you speak, so the court reporter knows who's

8    speaking.

9          Let's start with the plaintiffs.

10          MR. SLATER:  Hello, Your Honor, Adam Slater for

11    plaintiffs.

12          MR. HONIK:  Good afternoon, Your Honor, Ruben Honik

13    for plaintiffs.

14          MR. NIGH:  Good afternoon, Your Honor, Daniel Nigh

15    for plaintiffs.

16          MS. WHITELEY:  Good afternoon, Your Honor, Conlee

17    Whiteley for plaintiffs.

18          MR. STANOCH:  Good afternoon, Your Honor, David

19    Stanoch for plaintiffs.

20          MR. PAREKH:  Good afternoon, Your Honor, Behram

21    Parekh for plaintiffs.

22          THE COURT:  And defendants.

23          MR. GOLDBERG:  Good afternoon, Your Honor, this is

24    Seth Goldberg for the ZHP parties and the defendants.

25          MS. LOCKARD:  Hi, Your Honor, it's Victoria Lockard,

1  and I have Jeffrey Greene from Greenberg Traurig here on

2  behalf of the Teva defendants.

3         MR. TRISCHLER:  Good afternoon, Your Honor, Clem

4  Trischler for the Mylan defendants.

5         MS. JOHNSTON:  Good afternoon, Your Honor, Sarah

6  Johnston for the retailer defendants and CVS.

7         MR. GEOPPINGER:  Good afternoon, Your Honor, Jeff

8  Geoppinger, G-E-O-P-P-I-N-G-E-R, for the wholesaler defendants

9  and AmerisourceBergen.

10         THE COURT:  The Court received the parties' letters

11  including the letter sent late last night regarding the Teva

12  issue.  I'd like to save that issue for last, if you don't

13  mind.

14         Mr. Slater identified two issues in his letter:  The

15  Teva issue and the status of the document production and the

16  request for additional time from the, quote unquote,

17  downstream defendants.  Let's deal with that issue first, the

18  request for extension of time.

19         I would just like to hear if plaintiffs have any

20  position on that.  I read your letter, I know you respect what

21  the Court said at the last conference.

22         Is there anything you want to add?  The downstream

23  defendants have proposed that they do a rolling production

24  August 14, September 14 completed, October 13.

25         Apart from what the Court said at the last

```
 1   conference, do the plaintiffs have any strong objection to the

 2   request?

 3           MR. STANOCH:  Good afternoon, Your Honor, David

 4   Stanoch for the plaintiffs.  Other than Your Honor addressing

 5   the request for the extension at the macro -- at the end of

 6   the macro issue briefing and denying that request, you know,

 7   the only other thing we would add, Your Honor, is that with

 8   respect to the retail pharmacy defendant, that the great

 9   amount of the documents and data requested and then issued

10   here were agreed to way back in March when the parties were

11   about -- when we were about to submit our macro issue briefing

12   to Your Honor.

13           There were only two issues with the retailer pharmacy

14   defendants, which was, one, how much the retailers paid to buy

15   the drug, and No. 2, what the PPP paid when it was dispensed

16   by the retailers.  That's it.  All the other data points they

17   knew about and they had agreed to produce.

18           So, it would be, you know, our position that whether

19   or not these defendants intended to do rolling productions

20   during the macro issue briefing or not or whether they want to

21   wait for the macro issue briefing was resolved, they certainly

22   were on notice for months about the exact things they need to

23   be start pulling and producing and could have been preparing

24   that this whole time.

25           THE COURT:  Okay.  Defendant, let me take the wind
```

 1  out of your sails.  The Court is going to grant your request

 2  for an extension, but I just want to make a comment or two

 3  about what happened here.  The only way -- you know this, from

 4  this and other cases, the only way that this case can

 5  efficiently proceed and manage is if the parties cooperate

 6  with each other, and if a group of defendants takes the

 7  position that they're not going to produce sample documents,

 8  so they're not going to produce exemplar documents and they're

 9  going to wait weeks or months until the Court rules on a

10  bigger issue to produce a single piece of paper, you put the

11  Court in a very, very difficult position to grant request for

12  extensions of time.

13        If the parties work together and they cooperate and

14  they meet and confer and they say to the Court, Judge, we've

15  been working together but we have this tough issue and, you

16  know, we need this time to respond and we've been working

17  cooperatively, trying to move this litigation forward, that

18  makes it so much easier for the Court, because then the Court

19  can say, okay, the parties are acting reasonably and in good

20  faith and if they make a legitimate request for more time,

21  they get it.

22        So on a going-forward basis, what the Court would

23  really like to see, and I don't want to argue, like, in my

24  view, it's static because I know parties are going to deny it

25  happened, but I really would like to see the parties to

1    continue to meet and confer in good faith, cooperate with each

2    other and I am not a judge who thinks that every single

3    discovery dispute has to be worked out if the parties meet and

4    confer.

5        I understand how reasonable minds can disagree in

6    good faith on different issues, just like the TAR issue,

7    that's fine, but I would like to see the parties work

8    cooperatively towards that goal and in all frankness and in

9    all candor, I don't understand, if it happened, why groups of

10   defendants or defendants were steadfast in their refusal to

11   produce obviously relevant, plainly discoverable, sample

12   exemplar documents that will help advance the ball in the

13   litigation.

14       So that's all I have to say. We gave the defendants

15   way back when what they wanted until November to produce their

16   documents. We're going to hold their feet to the fire. The

17   downstream defendants want this 90-day extension until

18   October. They're going to get it. The order is going to

19   require rolling productions, and let's just move on and focus

20   on the merits of the case. Okay?

21       MS. JOHNSTON: Your Honor, this is Sarah Johnston for

22   the retailer defendants. Can I just clarify a few things for

23   just a moment? I promise not to take up too much time.

24       At first, you know, I take to heart what the Court is

25   saying and certainly agree that cooperation on both sides is

1    key to getting this case moving forward, and I think that we

2    previewed that in our submission to the Court yesterday that

3    that is certainly what we're trying to do here.

4         I also would like to just clarify that this is, as to

5    the retailer defendants, this is a situation where this is a

6    group of defendants that sat back and waited to collect

7    documents and then were waiting to push the ball forward on

8    the discovery process until after the macro hearing.

9         But with respect to the Court's frustration on the

10   exemplar issue, I just wanted to clarify for plaintiffs and

11   the Court that again, this is not something that we understood

12   to be an issue that affects the retailers because of the

13   nature of the discovery that we negotiated with plaintiffs,

14   the issue of exemplars was something that was not teed up as a

15   necessary issue.

16        So I want to be clear that as to the retailers, we

17   felt like we were working with plaintiffs and going along with

18   what the Court had, in fact, told the parties as important and

19   with respect to the specific request for an extension that the

20   documents that we've been working to correct fall into really

21   two big categories.  There are the ones that are generally

22   capable of being pulled and collected and reviewed and

23   produced in much simpler fashion and then there are those that

24   take a lot of work, a lot of costly and complicated efforts to

25   collect, and then do all the non nightly processing and other

1    things we outlined in our letter, and we've been very clear

2    with plaintiffs all along that that was going to take some

3    time.

4            And related to that, those very difficult to collect

5    types of documents that were -- that we outlined that would

6    need to be fully vetted by the clients and processed in a

7    significant and expensive manner were dependent on the Court's

8    rulings on macro discovery.  So we found ourself in a position

9    where we could either guess what the Court was going to -- how

10   the Court was going to rule, or we could run the various kinds

11   of searches on it, on a contingency basis, where we were

12   running them three or four times before macro rulings.

13           And so I just want to make sure that it's clear to

14   the Court and to plaintiffs that we are very interested in

15   continuing to work cooperatively and will continue to do so.

16           The extension is truly tied to some of these

17   documents that could not have been collected prior to the

18   hearing on macro discovery, and I think that the proposal

19   we've outlined is fair and makes sense and will continue to

20   keep the ball moving and we appreciate the Court's

21   consideration in granting the extension.

22           MR. GEOPPINGER:  Your Honor, if I may, Jeff

23   Geoppinger for the wholesalers.  I echo Ms. Johnston's comment

24   and also commit that we will continue to work and meet and

25   confer and move the ball forward.

```
 1              I just wanted to clarify for the wholesalers that the
 2   schedule that you'll be entering will be applicable to all
 3   downstream defendants, retailers and wholesalers.
 4              THE COURT:  Yes.
 5              MR. GEOPPINGER:  Thank you.
 6              THE COURT:  Again, I want to save the TAR issue for
 7   last.
 8              Mr. Slater, you had raised an issue about the status
 9   of production.  Was there something you wanted to address?
10              MR. SLATER:  Adam Slater for the plaintiffs, Your
11   Honor.  I just thought it was -- we, as the plaintiffs,
12   thought it was a good idea just because the productions are
13   supposed to begin today to just have a check-in to make sure
14   that the productions were actually coming out to get some sort
15   of an idea that the prioritization is being fulfilled, if the
16   defendants can give some idea of what we can expect to be
17   getting now in this first shot because there was some very,
18   you know, specific orders about what should be produced, and
19   we would expect really a significant percentage of what needs
20   to be produced to be coming.
21              So we were hoping to get some sort of a report to the
22   Court and to us to give us some comfort that, yes, they're
23   following through, yes.  I would think just for the Court's
24   benefit to have that update and then, you know, we would go
25   forward from there.
```

1    MR. STANOCH:  Your Honor, this is David Stanoch for

2  plaintiff.  I hate to interject and go a half step backwards,

3  and it's probably water under the bridge with the extension,

4  Judge, but, you know, if the extension is for the retailers

5  and the wholesalers, that's fine, I was just surprised to hear

6  Mr. Geoppinger say that because he never came to us saying

7  that they wanted an extension, and Mr. Goldberg's leave on

8  counsel letter exclusively talked on behalf of the retailers

9  and the burden about HIPAA concerns and anonymizing patient

10 consumer data up to the point of dispensement.  That's

11 something the wholesalers don't have.

12    So, it is what it is and if that's the Court's

13 ruling, we'll of course abide by it and we'll continue to work

14 with both sets of them.  I just want to put that on the record

15 that the wholesalers were not part of the request either to us

16 or in the letter to Your Honor.

17    THE COURT:  Okay.  I don't think there's anything

18 else to be said on the extension issue.  Frankly, rightly or

19 wrongly, the Court understood that the request was being made

20 on behalf of both groups, and if I was wrong about that, so be

21 it, but I do think -- I don't think that plaintiffs are going

22 to be prejudiced by this and there is some symmetry to it, so

23 let's move forward.

24    But I think Mr. Slater's idea about getting a

25 check-in on if everything is in place for the production today

1    and what plaintiffs can expect, and is there an issue about

2    prioritization, makes sense.

3            So why don't we start with ZHP and then go through

4    all of the manufacturer defendants.

5            MR. GOLDBERG:  Thank you, Your Honor, this is Seth

6    Goldberg for ZHP.  I just want to clarify for the Court, you

7    may recall that the text order that Your Honor entered,

8    No. 416, required that for the production today, it would be

9    comprised of documents that were in the possession of

10   defendants' attorneys for ESI Consultants at the time Your

11   Honor entered that order, and that defendants used reasonable

12   good faith efforts to produce those documents by July 15th or

13   to begin to produce those documents by July 15th, and, for

14   that -- that's what's due today, that's what the order says

15   about production today.

16           And at least for ZHP's part, we were not in position

17   to produce -- we had not collected that kind of information

18   and did not have a production due today, but are nonetheless

19   going to be producing documents today.

20           You may recall this order was entered before ZHP had

21   begun to collect information because of the COVID issues.  But

22   notwithstanding that, ZHP has assembled documents to be

23   produced today and we'll be doing so.

24           THE COURT:  Let's go through all the defendants.

25           MS. LOCKARD:  Your Honor, it's Victoria Lockard.  I'm

 1    happy to speak on behalf of the Teva defendants.  We are also

 2    making a substantial production today currently being prepared

 3    with a focus on the items that have been prioritized by

 4    request by the plaintiffs and that includes the noncustodial

 5    production for the categories that were identified in

 6    plaintiffs' letter and a custodial production from the

 7    priority custodians who were identified in plaintiffs' letter.

 8         And this includes again, you know, our good faith

 9    effort to produce what was in our ESI vendor's possession, as

10    well as some additional items that we endeavor to collect in

11    the noncustodial pool.

12         We, you know, will save the TAR issue for the end of

13    the call, as you requested, but I want to confirm for the

14    Court that that has in no way slowed down our efforts and it

15    has facilitated our ability to produce the documents by

16    today's deadline.  So, we will get into the specifics of that

17    at the end of the call.

18         THE COURT:  Can I go back a step, because maybe I'm

19    wrong about this, but the Court's order that Mr. Goldberg

20    cited to, Docket No. 416 entered on April 20th, 2020, says:

21    "These defendants shall commence the rolling production of the

22    documents required to be produced in Document No. 328, by no

23    later than July 15, 2020."

24         And if you go back to 328, 328 is the order that

25    approved the document request, and I think that an original

1    production date of whatever it was, March 1.

2            So, Mr. Goldberg, where's the limitation that you

3    discussed derived from?

4            MR. GOLDBERG:  So, Your Honor, I -- if Your Honor

5    goes further into the order that you referred to, it starts

6    with the next sentence:  "The defendants shall use reasonable

7    good faith efforts to comply with plaintiffs' prioritization

8    and to the extent responsive documents are currently in the

9    possession of defendants' attorneys or ESI Consultants,

10   defendants shall use reasonable good faith efforts to produce

11   the documents by July 15th, 2020."

12           Your Honor may recall that at the time this order was

13   entered in the case management conference we had that preceded

14   this order, we had raised with the Court -- we had a very

15   lengthy discussion with the Court about the difficulties that

16   different parties were having with respect to collecting and

17   producing documents in light of COVID-19, which, you know,

18   April of 2020 is when it really was presenting a problem and

19   resulted in this new schedule, and there was discussion on the

20   record about the fact that some defendants had not begun to

21   collect documents by the time of that case management

22   conference, ZHP in particular, because of the timing of

23   COVID-19, and that's what led to this sentence about this

24   No. 5 in the order about -- to the extent responsive documents

25   are currently in the possession of defendants' attorneys

1    whereas -- ESI Consultants, then reasonable good faith efforts

2    to produce those documents should be made.  And --

3              THE COURT:  I got it, Mr. Goldberg.  Thanks for

4    clarifying it for me.  Thank you very much.

5              So we heard from ZHP and we heard from Teva.  The

6    other defendants, who are they?  Aurobindo, Hetero, I think

7    there's one more.

8              MR. TRISCHLER:  Your Honor, Clem Trischler.  Mylan is

9    the other one, I believe.

10             THE COURT:  Oh, Mylan, how could I forget Mylan.

11             MR. TRISCHLER:  Which is my client.  I wish you

12   would.

13             (Laughter.)

14             THE COURT:  Not me, Mr. Trischler.  The plaintiff,

15   you want plaintiffs to forget Mylan.

16             MR. TRISCHLER:  I understand and I concur.

17             THE COURT:  So where does Mylan's production stand?

18             MR. TRISCHLER:  Well, Your Honor, Mylan is making the

19   first of its rolling productions today, much like does ZHP and

20   Teva, we attempted to consider in good faith the plaintiffs'

21   prioritization schedule.  I believe when plaintiffs have an

22   opportunity to go through the production, they'll see that we

23   produced a number of materials that are on the prioritization

24   schedule.  I don't pretend to have it all committed to memory,

25   but I believe some of the things that were asked for were

1    things like quality supplier agreements, certificates of

2    analysis for the API, Valsartan finished dose testing

3    information, SOPs.  All those things are included in today's

4    production.

5         Obviously, there's still other materials to come.  I

6    would not suggest or represent that everything on the

7    plaintiffs' prioritization schedule or everything on the

8    request for production of documents is being provided today,

9    but I certainly believe we've made a good faith initial

10   production of a multitude of items that were on the

11   plaintiffs' priority list and we're working diligently to

12   complete the production and I don't see any reason why we

13   would not be able to do so on a continual rolling basis by the

14   end of November.

15        THE COURT:  Okay.  Terrific.

16        Are there any other defendants who are subject to the

17   order requiring a rolling production today?  We did ZHP, Teva

18   and Mylan.  Is that it?

19        MS. HEINZ:  Hi, Your Honor, this is Jessica Heinz for

20   the Aurobindo defendants.  We will also be making a production

21   today.  It is based on the plaintiffs' prioritization letter

22   as well, and it's also going to be an additional -- or a

23   supplemental core discovery production on behalf of all of the

24   Aurobindo defendants as well.

25        THE COURT:  Terrific.

```
 1            Hetero, are you on the phone, Hetero's counsel?
 2            MR. SHAH:  Yes, Your Honor, good afternoon.  This is
 3    Nakul Shah on behalf of the Hetero entities; Hetero Drugs and
 4    Hetero Labs.
 5            Your Honor, we're preparing and finalizing our first
 6    ESI document production two weeks in to plaintiffs by the end
 7    of the day today and we've also made a good faith effort to
 8    keep in mind the plaintiffs' prioritization schedule.  We
 9    additionally completed our core discovery productions, I
10    believe it was this morning.
11            THE COURT:  Terrific.
12            Okay.  So now we have a status, Mr. Slater.
13            Are there any other issues that anybody wants to
14    address before we get to the TAR issue?
15            Okay.  I had one question before we get there.  Are
16    we going to finalize all the fact sheets to be entered by the
17    end of the month?
18            MR. SLATER:  There's an order that we are, so we are.
19            THE COURT:  Okay.  As I see things, and correct me if
20    I'm wrong, once we get those fact sheets entered, I could be
21    wrong about this, but the case will be in a little bit of a
22    hiatus while the defendants produce their documents, while the
23    plaintiffs finish their fact sheets and maybe, maybe not,
24    we'll talk about that at the end of this call.  Maybe we don't
25    need the mid-August call next month.  We could have it at the
```

1    end of the month.  But I just foresee, you know, you've been

2    working hard after we picked up after the COVID lapse, the

3    last month or two or three.  The next few months is going to

4    be focusing on the document and ESI production, issues come up

5    like they always do, but probably come September, it's time to

6    start thinking about the next phase of the case, you know,

7    getting the 30(b)(6) deposition notices cleaned up and dealing

8    with those objections which are invariably going to come.

9         So I'm talking about who is going to be deposed, how

10   many deps, where they're going to be taken, et cetera, et

11   cetera.

12        So I think we're in pretty good shape through the

13   fall, and I anticipate, like I said, we may start depositions

14   December/January of the defendants.  They could start earlier

15   if the plaintiffs want to.  I guess we could talk to the

16   defendants about when they want to start taking plaintiffs'

17   depositions since they'll likely have the information they

18   need to take those depositions sooner rather than later.

19        So the long and short of that is, I think we're in

20   pretty good shape.

21        Let's get to this TAR issue.  I read the papers.  I

22   don't think it's appropriate for the Court to make a ruling on

23   the TAR issue today because at least plaintiff ought to see

24   what the production is that Teva is making, and then I know I

25   had a few questions that I'd like to address with Teva about

1   this TAR review and I anticipate -- since this issue only came

2   up very recently, that there might be continuing discussions

3   amongst the parties that might result in a resolution of this

4   issue.

5        But one of the questions I had for Teva was:  What's

6   the difference between TAR 1.0 and TAR 2.0?

7        MS. LOCKARD:  And, Your Honor, I'm going to turn this

8   over to Jeff Greene from Greenberg who's our eDiscovery

9   counsel on this.  So I think he's best suited to answer these

10  kind of questions.

11       MR. GREENE:  Good afternoon, Your Honor, this is Jeff

12  Greene from Greenberg and a pleasure to be here before your

13  Court.

14       So the direct answer to your question is, TAR 1.0 was

15  more sort of affectionately known as predictive coding, and

16  the process associated with how the computer learns is really

17  what makes the difference between TAR 1.0 and TAR 2.0.

18       In TAR 1.0, there's a seed set training process and

19  basically what that training process is, is there are any

20  number of two to 400 documents in a seed set that are

21  reviewed, and the decisions with respect to the, you know,

22  review process are loaded into the -- into the black box, if

23  you will, into the computer system, and the computer then

24  looks at it and says, okay, we've generated assembling of 400

25  documents and there's a couple different ways you can train

1   the system.  You can train it by loading documents in that we

2   already know are responsive and use that as a starting point,

3   or you can say, give us 400 random sample documents from a

4   variety of custodians and so on.  Those documents are reviewed

5   and those are loaded into the system, and then what the

6   computer system does is say, okay, I'm going to give you

7   another 400 documents and those documents are reviewed, and

8   each time what you should expect to see is the computer get

9   smarter based on the decisions that are made by the reviewer.

10          So if the first set, for example, might only have

11   10 percent response to documents, first set of the first seed

12   set of 400.  The next set might have 23 percent.  Those seed

13   set reviews continue, and sometimes the system gets what I'll

14   call stability, very quickly.  And what I mean by "stability"

15   is the reviewing seed sets, maybe you get to 75 percent or

16   even 85 percent that are responsive.  And once you get that

17   system, what I'll call system stability, you've then sort of

18   reached the end of the exercise.

19          And in my experience, Your Honor, I've done dozens

20   and dozens of these things, sometimes it takes a relatively

21   small number of documents, three or 4,000.  Sometimes it takes

22   20,000 documents or more to get stability.  In other words,

23   that the system is generating -- the sets of documents that

24   the system is generating are consistently responsive, and, you

25   know, generating a high degree of recall and precision, which

1    basically means it's hitting on the document it should hit on,

2    these are the responsive documents, okay?

3            TAR 2.0, sometimes called Continuous Active Learning,

4    in our case it's CMML, is a little bit different.  That

5    process is, we basically just start reviewing documents and

6    there are no seed sets to review, it's functionally we start

7    reviewing and we keep going and rather than getting -- trying

8    to get system stability, what we're looking for, what the

9    system is trying to do is rank the documents to give them a

10   score, if you will, with the most responsive documents being

11   scored 1.0 and the least responsive documents being scored 0.0

12   or 0.01.

13           And what that does, as the more documents are

14   trained, the system gets more intelligent, if you will, and,

15   you know, basically percolates to the top of the stack the

16   most responsive documents and it moves the nonresponsive

17   documents down to the bottom of the stack.  And so there's a

18   ranking of zero to 1.0.  Each document has a score.

19           And so what you do is with a CAL process or a TAR 2.0

20   process, is you continue to review documents and sometimes you

21   may review all the documents, but what CAL allows you to do is

22   prioritize the most responsive documents first.

23           What you can do, Your Honor, though, is CAL can also

24   allow you to look at documents and say, it's no longer

25   necessary to review documents because you keep reviewing

1    documents that are scored with a .2 or a .1 or maybe a .3 and

2    those documents absolutely aren't relevant.  So we may go down

3    and review, you know, a hundred documents from that set and

4    not one of those documents is responsive, and so the CAL

5    system can say to you functionally, hey, look, we're not

6    seeing any more responsive documents in this batch, you know,

7    from here on.

8            You, counsel, can make the determination, if you so

9    choose, to stop at this point, from a statistically

10   significant perspective, you've reached, you know, you've

11   reached your goal of finding the responsive document.

12           So the main difference is how the systems are

13   trained, the difference is what the end result ultimately is,

14   and what CAL does is it says, it basically ranks the

15   documents.  What predictive coding or TAR 1.0 is, basically it

16   says, we're going to give you a batch of documents that we're

17   sure because the system is stable, that we're sure are

18   responsive and everything else absolutely is not responsive or

19   looks nonresponsive.

20           CAL, you know, CAL is, I don't want to say it's new,

21   but TAR 2.0 coming out, you know, almost a decade ago and the

22   predictive algorithms behind it have been in place for

23   decades.  But the original cases, the *DaSilva Moore*s, the *Rio*

24   *Tintos*, all those cases from Judge Peck, those initially were

25   TAR 1.0 cases.  But now we're seeing the prevalence of TAR 2.0

 1   and it's a much more sophisticated technology.  It learns the

 2   lessons that, you know, from TAR 1.0 and allows us to

 3   prioritize the documents and get them to plaintiffs -- into

 4   plaintiffs' hands faster, quite frankly.

 5            THE COURT:  Let me ask you a question.

 6            MR. GREENE:  Sure.

 7            THE COURT:  This is hypothetical, of course.

 8   Hypothetically, let's say Teva has a thousand documents to

 9   review.  The search terms that the Court ordered, they run

10   those search terms.  500 documents are hit by those search

11   terms.  Does this TAR program review the 500 documents or the

12   thousand documents?

13            MR. GREENE:  It can be done either way, Your Honor.

14   Our approach --

15            THE COURT:  What's Teva doing?

16            MR. GREENE:  Our approach would be to layer the CMML

17   algorithms across the documents that hit on the search terms.

18            THE COURT:  Correct.

19            MR. GREENE:  But it can be done either way.

20            THE COURT:  All right.  This is an important point

21   for today's purposes.

22            For today's purposes, okay, the production that Teva

23   is making today, as I understand it, these were the documents

24   that were the highest priority that came up in this program

25   that -- in other words, Teva has not yet gotten to the point

 1   where it says, every document scoring below X that has a hit,

 2   we're not going to review.  Am I right about that, that

 3   decision hasn't been made yet?

 4          MR. GREENE:  Yes, Your Honor, you're correct.

 5          THE COURT:  All right.  So when do you anticipate

 6   that Teva is going to get to the point, because it seems to me

 7   that's what plaintiffs' biggest concern is, that how is the

 8   decision going to be made that a document that hasn't hit is,

 9   quote unquote, not responsive?  In other words, irrelevant,

10   right?

11          MR. GREENE:  Correct.  Well, so obviously, Your

12   Honor, we're doing a rolling production and I think the -- you

13   know, with respect to the priority custodians, we should know

14   that in the not too distant future, within a week or two at

15   most with respect to the priority custodian.

16          The suggestion I have, Your Honor, is that -- you

17   know, and we truly take this in the spirit of the cooperation

18   from *Sedona* and all those cases that say you have to

19   cooperate.  I think, you know, what you saw from the

20   submissions is that, you know, the parties tried to meet and

21   confer and it didn't really go anywhere.  I think there's

22   obviously some, you know, concern amongst plaintiffs about the

23   use of CMML and the use of CMML to, you know, to narrow the

24   scope of what documents need to be reviewed.

25          We have, from our perspective, Teva has complied with

 1   the terms of the ESI protocol and, you know, we've not yet

 2   reached the decision, and I will be frank with Your Honor, I

 3   do expect us to get to that point where we -- we'll leverage

 4   the Teva -- the CMML decisions to restrict or to eliminate

 5   certain documents review population.

 6        My suggestion to Your Honor is in the spirit of

 7   cooperation that you were talking about is, if there are

 8   concerns about the, you know, the validation, if you will,

 9   associated with restricting the number of documents to be

10   reviewed or limiting the dataset to be reviewed, my suggestion

11   is that, you know, let's engage in a reasonable meet and

12   confer process, a productive one where the parties, and this

13   should not necessarily be limited to Teva, but if there are

14   other defendants who intend to use our or some sort of

15   predictive coding or some sort of CAL or CMML exercise, we all

16   get together and we negotiate a protocol for the use of

17   technology and which would include the validation concepts

18   that I think plaintiffs are most concerned about.

19        Because at the end of the day, their concern that,

20   hey, there's this huge batch of documents that are going to be

21   pushed to the side and, you know, and not -- and not reviewed.

22   I think the validation concepts that, you know, if you look at

23   some of the decisional case law that's out there, and I'm

24   speaking specifically of the In Re: *Broiler Chicken* antitrust

25   litigation which is in the eastern -- the Northern District of

 1    Illinois, that gave us a really good idea of what a validation

 2    protocol could look like.  And I think if the parties were

 3    reasonable, and rather than just saying, no, you can't use

 4    CMML, we sat down and I would say cooler heads prevailed, we

 5    could say, let's negotiate a reasonable protocol for the use

 6    of TAR or CMML and for -- that includes a validation process

 7    to allay any concerns that plaintiffs may have about documents

 8    that don't actually get reviewed at the end of the day, in

 9    other words, limiting the dataset which is required under the

10    ESI protocol.

11            And, you know --

12            THE COURT:  Let me see if I understand -- I think I

13    understand what you're saying and I just have a couple more

14    questions, then we'll hear from plaintiffs.  But I think what

15    you're saying is, Judge, we haven't yet reached the point

16    where we're not going to review documents for which there's a

17    hit.  Eventually, we're going to get to that point, Judge, and

18    we're agreeing to meet and confer with the plaintiff to see if

19    we can agree on some type of validation or process, what have

20    you, that would trigger the ability of Teva not to review

21    every document where there's a hit.

22            MR. GREENE:  Your Honor, I couldn't have said it

23    better myself.

24            THE COURT:  Well, yes, you could have.

25            (Laughter.)

1          MR. GREENE:  Your Honor, the only caveat to that

2    would be not necessarily just Teva, but if there are other

3    defendants who are considering using this technology, let's

4    get their input too.

5          THE COURT:  Okay.  One more question, or one to two

6    more questions.  Take TAR out of it.  Suppose you --

7    apparently, there's people who aren't using TAR or companies

8    that aren't using TAR, or go back a few years.  There's a

9    million documents to review.  There's 200,000 hits.  If you're

10   not using TAR, does each one of those 200,000 documents get

11   reviewed to determine if it's relevant to the case by hand?

12         MR. GREENE:  So the answer to that question would be

13   yes, and that's just because of the nature of the -- of a

14   brute force linear review, it has to be.  I mean, it would

15   be -- I'm not sure how we as attorneys could uphold our

16   obligation to the Court by not reviewing every document.  If

17   you were not using CMML or CAL, if you were not using

18   technology, you would have to do that, and, you know, the

19   sophistication of the algorithms in connection with, you know,

20   these systems allow us to do that.

21         They allow us to prioritize the documents that

22   plaintiffs have asked for, and, you know, these systems are

23   inherently flexible so that we can, you know, if we need to

24   make training on the fly so as to account for two documents

25   that enter the work stream, we can do that.

1        A linear brute force review, Your Honor, and not only

2  being less accurate, and this is well-documented by any of the

3  reports written by Maura Grossman and any of the studies that

4  are out there from the Georgia Institute and so on --

5  Georgetown, you know, linear review is well-documented to be

6  far less reliable than technology-assisted review.

7        So what we're getting -- what I'm getting at, and

8  I'll try and keep it short is, we're able to produce the most

9  -- you know, the most responsive documents at the earliest

10 stage of discovery to plaintiffs and it's a more reliable

11 dataset than, quite frankly, than using a linear review.

12       And so where our position is, this should benefit

13 plaintiffs.  And, you know, we're a little perplexed as to why

14 they object to this because there's any number of cases where

15 plaintiffs have tried to foist TAR onto opposing parties and

16 it is black letter law, Your Honor, that -- and I'm sure you

17 know that, you know, the responding party is in the best

18 position to choose the review and production methodology, and

19 that's not what we're trying to do here.

20       So to answer your question, I think you would have to

21 go through every one of those 200,000 documents, but that's

22 just the nature of the beast with linear review.

23       THE COURT:  Does TAR also do a privilege review?

24       MR. GREENE:  TAR does not do a privilege review in

25 sort of the traditional sense.  What we would do in that case,

1    Your Honor, and what we're doing here is, we would run what I

2    will call a privilege screen across documents and that

3    privilege screen would say, for example, find all documents

4    that say Jeffrey Greene and Victoria Lockard and so on, and it

5    would pull those documents out and park them somewhere.  Those

6    documents would then be reviewed.  So attorneys' eyes do go on

7    those documents for sure, because we do have to make a -- we

8    do have to make a true privilege call and actually prepare a

9    privilege log.

10            So if there was a document that, you know, said, you

11   know, that had the words "Jeff" and "Green" in it, Green

12   without an e, as opposed to my name Greene with an e, the

13   system might see that and say, hey, this document looks

14   privileged, but when we put attorneys' eyes on it, it proves

15   not to be privileged.  So TAR would not exclude or this

16   technology that we're using would not be used to exclude

17   privileged documents.  We would use a filter for that, but

18   then attorneys' eyes would be on every document.

19            THE COURT:  One more question.  Go back to my

20   hypothetical.  My hypothetical, 1,000 documents, 500 hits.

21   You do your TAR review and it determines which of those 500

22   are most responsive and it decides, we're going to take your

23   first 250.  So to date, no one has put their hand on the

24   document, after it goes through the hit review, after it's at

25   the top of the priority list, is it then reviewed by someone

1  before it's produced or is it produced just based on what the

2  computer says?

3          MR. GREENE:  So in -- and I'll be specific in the

4  case.  So we're making a production today, Your Honor, I think

5  it's around 70,000 pages and something like 12,000 documents,

6  and every single one of those -- attorneys' eyes have been on

7  every single one of those 12,000 documents.  We've not done

8  any, you know, cutoff on the way up either, which is to say,

9  hey, we're going to say everything above a score of .5 is

10  responsive and, therefore, we're going to turn that over.

11          We're looking at this because frankly, Your Honor, we

12  don't want to produce -- the system may -- could be wrong in a

13  score, although it's usually not, but, you know, if there's a

14  document, for example, that the system scored highly, but it

15  actually has no relevance or responsive to the case, you know,

16  we would lay attorneys' eyes on that and, you know, we may

17  make a decision in rare circumstances to say, no, that's not a

18  responsive document.  The system learns from that.  We do take

19  that document out, but every single document we're producing

20  today has been reviewed.

21          THE COURT:  What happens ten months from now when the

22  system is up and running, it's been validated, test runs,

23  whatever you do, and then you hit a certain number and it's

24  nonresponsive, above a certain number, it's responsive.  Are

25  the responsive documents reviewed by a live person before

1    they're produced?

2            MR. GREENE:  The answer to that would be yes,

3    although I'll qualify it by saying, you know, in general, Your

4    Honor, they don't have to be, but in our case, I would say

5    they will be.

6            THE COURT:  Why?

7            MR. GREENE:  To ensure two things, really, or maybe

8    three things.  To ensure there's no information in there that,

9    for example, doesn't relate to other products, that would be

10   one, you know, trade secret proprietary information that, you

11   know, we need to be obviously concerned about.  We also would

12   look at it in terms of if a document, for whatever reason,

13   missed a privilege filter, that, you know, it -- words that

14   just didn't -- weren't in our privilege screen, want to review

15   that document as well, and then the fourth, Your Honor, is we

16   don't want to produce nonresponsive documents, so we would be

17   reviewing those for those criteria.

18           THE COURT:  All right.

19           MR. GREENE:  Then the fifth probably, Your Honor, is

20   we want to know what documents we have in our case.  We need

21   to look at the documents too.

22           THE COURT:  I think we might have just hit the nail

23   on the head, okay?  And I anticipate Mr. Slater is going to

24   jump all over this.

25           If you're so concerned that the documents that get a

 1   high score have a legitimate high score and you're reviewing

 2   those with a live person, if I was the plaintiff, I would say,

 3   well, why don't you do the same for the nonresponsive

 4   documents.  Why don't you double-check them to make sure that

 5   there's no responsive information on them that should be

 6   produced, that you're checking the responsive documents to

 7   double-check that they're responsive, but you're not checking

 8   the nonresponsive documents to double-check that they're

 9   nonresponsive, right?

10           MR. GREENE:  Actually, Your Honor, that's not right,

11   and I apologize if I wasn't clear.

12           Earlier when I was talking about *DaSilva* being a TAR

13   protocol, I made the reference to a validation protocol and

14   what the validation protocol is, Your Honor, is -- it's that

15   very thing you just described, which is we do sampling

16   exercises of the nonresponsive documents by a human reviewer.

17   So we get sets of hundreds if not thousands of documents from

18   the nonresponsive batches.  So documents that have been scored

19   lowly, right, if that's such a word, the documents that have

20   received low scores, we do a validation exercise, and this is

21   something that we would agree with plaintiffs on if, you know,

22   if we could negotiate in good faith with them, that we have a

23   process.

24           At the end of this exercise, that said, we will agree

25   to do the following:  Review 500 documents here, 2,000

1    documents there, 2500 documents here in batches, and we will

2    share the results of those reviews in terms of metrics.  So if

3    we review 5,000 documents and 50 of those documents prove to

4    be responsive, then, you know, that may drive two things.  It

5    may drive a little bit more work in terms of making -- you

6    know, sharpening the algorithm to make sure we capture those

7    documents.

8            But that validation exercise at the end is a

9    absolutely critical process to prove what we did was right and

10    to prove that we were reasonable and defensible in our

11    approach.

12            So we would never, Your Honor, just say we're going

13    to stop somewhere and not look at those.  We're going to look

14    to, you know, the sample of potentially thousands of

15    documents, but, you know, it can depend.  And you look at

16    those samples and say, of these 5,000 documents or 500

17    documents or whatever it is, how much of it was actually, you

18    know, deemed responsive, and you can do those on a random

19    sample basis.  There's any number of ways you can generate

20    those samples, whether it's by custodian, whether it's purely

21    randomly, but -- and there are a variety of different ways to

22    generate subsamples, but I think the way to approach this,

23    Your Honor, is, let's get an agreement on how to do a

24    validation protocol, which is not heavy lifting if everyone is

25    cooperating, and that will, you know, give plaintiffs and

1  defendants for sure the confidence that we've looked at the

2  responsive material, but we've also conducted a very

3  significant -- statistically significant sample of the

4  nonresponsive material to prove that we're right.

5         THE COURT:  Okay.  But I keep on saying last

6  question, and this is my last question.  The validation

7  process that you're talking about for the nonresponsive

8  documents, are you doing that same or similar validation

9  analysis for the responsive documents, or are you reviewing

10 every single document that's produced?

11        So, in other words, you're double and triple-checking

12 to make sure documents are responsive, but with regard to the

13 nonresponsive documents, it's going to be a validation

14 process.

15        MR. GREENE:  Not exactly.

16        THE COURT:  And I'm guessing that's where plaintiffs'

17 concern is.  I'm guessing.  I don't know.

18        MR. GREENE:  So one of the things about CAL is that

19 -- and this is an important thing to remember, is that it is a

20 continuous process, right?  It's Continuously Active Learning,

21 and so, you know, we can discuss a validation process to be

22 used, I don't want to say at the end of this exercise, but

23 we've already done what are called allusion test samples of

24 the priority custodians, you know, that we're producing today.

25 And what that means, Your Honor, is it's a set of documents

1    and, you know, it's around a thousand documents, I believe,

2    and, you know, and this is for our own purposes, this is not

3    necessarily to prove anything to anyone but we want to make

4    sure we're right here.

5            So we reviewed 800 to a thousand documents from the

6    nonresponsive set for these priority -- for the priority

7    custodians that we're producing today, and of those, I think

8    it's 800 to be perfectly honest, I think of those 800

9    documents, all of 14 -- only 14 documents proved to be, you

10   know, responsive.  In other words, 786 documents the system

11   got right, and we looked at every single one of those

12   documents, attorneys' eyes, and the system proved to be right

13   98, ninety -- almost 99 percent of the time.  And so that

14   gives us great confidence.

15           So there's a validation protocol certainly at the end

16   of the process or, you know, whether we do it on a priority

17   basis, that can be discussed as well.  But we're constantly

18   checking ourselves to ensure that, you know, the documents we

19   have are the right documents.  So -- and, you know, we're

20   happy to provide those statistics to -- or those metrics to

21   plaintiffs and that would be part of a validation protocol,

22   which would be built into a larger TAR protocol.  But at the

23   end of the day, I think, you know, the answer is, it's a

24   constant process of proving to ourselves, proving to the

25   Court, because that's obviously our obligation, and then

1  obviously proving to plaintiffs that we've met our obligation.

2  There's no doubt that this technology works.  Courts all over

3  the country have adopted it and it can be used here.

4          And so, you know, for that reason, I think if you

5  give the opportunity, you know, the parties, say, hey, by July

6  30th, 31st, whatever it is, sit down, bash out any discovery

7  TAR protocol, come back to me in two weeks or in a month or

8  whatever it is, it's not going to slow us down.  We're going

9  to keep reviewing, we're going to keep doing all the tests and

10  all the validations we'd be doing anyway.  That's the logical

11  thing to do here.

12          And I don't want to tell the Court what to do, but if

13  I were to tell the Court what to do, that's how you play this

14  is, let's get together, cooperate, get everyone in a room or

15  Zoom and bash this out.  It's not that difficult.

16          THE COURT:  Mr. Slater, it's time for me to be quiet

17  and let you speak.

18          MR. SLATER:  Thank you, Judge.  And, you know,

19  fortunately through the Benicar years, you taught me to ignore

20  static, so I'm going to ignore static.

21          THE COURT:  Yes.  And I know you're going to --

22  please don't say that, why did they wait until July 1st to

23  tell us about this, because I know that's going to be a burr

24  in your saddle.  It is what it is.  We can't do anything about

25  it.  So let's move forward and not backward, all right?

```
 1          MR. SLATER:  Yeah.  No, let's move forward, Your

 2    Honor.  But everything that you've just heard you can pretty

 3    much reject as having any relevance to this case at this

 4    point.  I'll tell you why.  You know, Mr. Greene talks nicely

 5    about CMMLs and TARs and all these things, and this would have

 6    been a wonderful conversation to have a year ago, but the

 7    idea -- and I'm going to take this word from -- remember, the

 8    defense cited case law to us to justify what they're doing,

 9    and we used those cases in the briefing we submitted to the

10    Court.

11          So I'm going to quote to those cases and I'm going to

12    talk about the law and I'm going to talk about the precedent

13    where defendants have tried exactly what they're trying to do

14    here and tell you about the mischief that's being perpetrated,

15    and it's insidious and it's a serious, serious problem that

16    I'm very concerned about.

17          So what the Judge talked about in the Progressive

18    Casualty Insurance Company verses Delaney case, where almost

19    this exact same scenario played out is that you don't get a

20    do-over.  What the Judge did, he took a defendant who agreed

21    to a search term protocol, a protocol whereby manual search

22    terms as we have, one, Your Honor, ordered last year and then

23    to the consternation of the plaintiffs and the Court, the

24    defendants came back this spring and upended that and we then

25    had to spend months of negotiation and arguments with the
```

1    Court before we finally got to the point where the search

2    terms could be modified based on representations by every

3    defendant, including Teva, that the reason the search terms

4    needed to be modified was because they were pulling too many

5    documents, such that it was going to be unmanageable without

6    the search term modifications for them to manually review the

7    documents under the existing protocol that was agreed to and

8    in place in this litigation.

9          Understand, Your Honor, this TAR application is not

10   intended to be applied to a post-search term application of

11   documents.  It's not being used the way it's intended to.

12   What they're doing, and I'll go through what they're doing,

13   because it is transparent and insidious.

14         What you're supposed to do with TAR is you're

15   supposed to take the entire document set and you're supposed

16   to have both sides come up with the definitions of the tags

17   that are going to be used to define a document as responsive

18   or not.

19         The first massive roadblock that we ran into when we

20   said, look, we'll at least talk to you even though we have

21   serious concerns about where you're driving this, and Your

22   Honor is exactly right, they're ultimately driving this to try

23   to block documents from getting to us.  We said, let's talk

24   about the definition of responsiveness you're using, let's

25   talk through that and they would not tell us.  They said that

1    is our own private privileged information, you, the

2    plaintiffs, don't get to know because we have complete control

3    over this process and we're only talking to you as a courtesy.

4         We tried to talk about how the technology was going

5    to be applied in terms of how you are going to recheck the

6    testing, and it wasn't just me on the phone, it was myself,

7    Mr. Parekh and Mr. Jaffe, our expert on this.  They couldn't

8    get an answer to any of their questions either, how are we

9    going to have input into this process?

10        And the answer was, you're not going to, plaintiffs,

11   we're going to do this and we're going to do it and you're

12   going to be very happy that we did this for you is essentially

13   what the back and forth was.

14        Now, if you look at their own white papers, they talk

15   about the fact that this is an alternative to search terms,

16   not an adjunct.

17        What they're trying to do now is this:  First, they

18   run the search terms, which we in good faith limited, we never

19   in 10 million years would have engaged in that negotiation and

20   those limited those search terms the way we did the last few

21   months if we were told, well, we're also intending to overlay

22   this with a TAR process that's going to end up with a

23   reservoir of documents that are going to be not reviewed.  And

24   whatever systematic testing or whatever they say they're going

25   to do, there's no way this is for our benefit.  The idea that

1    this is somehow for our benefit, that's laughable.

2            The only reason they're doing this, cause first what

3    they do is they take their entire document set and they narrow

4    it with the search terms, then they run their TAR, they

5    further narrow.  Then for the documents, as Your Honor pointed

6    out in your questioning of counsel, that they find to be

7    producible and not privileged, they still review them and they

8    still will pull some of those documents out and not produce

9    them.

10            So they have three levels of review to try to narrow

11    what they give us and they want this blessed by the Court,

12    which we absolutely object to.  We believe that this should be

13    rejected today, Your Honor.

14            And by the way, the fact that they ran this after we

15    objected.  They told me on the telephone when I asked them if

16    you've done this yet, they told us no when we spoke to them on

17    the phone.  The fact that they went ahead and did it, I

18    suppose the only issue is going to be the flow of production,

19    which is something I'll get to, maybe that even they've

20    upended to some extent how the documents would have flowed to

21    us otherwise.  And by the way, 70,000 pages they're producing

22    today.

23            I want to go back, Your Honor, when we had put on

24    issue No. 1 and I was very quiet during that.  When you got

25    these representations from the defendants that they're all

1  complying.  Teva is producing 70,000 pages.  Big deal.  Your

2  Honor well knows 70,000 pages is a drop in the bucket.  That's

3  nothing.  And the other explanations you got are nothing.

4       And to digress for one moment, no other defendant has

5  ever raised the possibility of using TAR, ever.  We've asked

6  about it, I have transcripts going back to November of 2019

7  when Mr. Goldberg said he would talk to us about it, we had

8  discussions and they all told us, we're not doing it.  Because

9  if we knew they were going to do it back then, Your Honor, we

10 would have a meet and confer, that would have taken several

11 months, the Court would have managed it, we would have had

12 multiple lengthy meetings, we would have ended up in front of

13 the Court if there were disputes, which there likely would

14 have been in terms of our input and involvement, and it would

15 have been hammered out and it would have been in writing just

16 like the cases that we have submitted to Your Honor.

17       But that didn't happen because they never intended to

18 do it.  When counsel just suggested to Your Honor, let's get

19 the other defendants on board, too, to start doing this also?

20 So now they're all going to redo the entire protocol and now

21 they're going to layer a new TAR protocol on top of search

22 terms, narrowed documents, which is completely improper under

23 their own white papers and their own methodologies.  We

24 categorically reject that, object to it, et cetera.

25       Let's go back to the *Progressive Casualty Insurance*

1    case.  They -- I'm looking at Page *9 because it's a Westlaw

2    citation.  This is their case.  The Court said:  "Had the

3    parties worked with their eDiscovery consultants and agreed at

4    the onset of this case to a predictive coding based ESI

5    protocol, the Court would not hesitate to approve a

6    transparent, mutually agreed-upon ESI protocol."

7           However, this is not what happened, and then the

8    Court talks about the fact that the defendant *Progressive*

9    agreed to search the universe of documents using search terms.

10          Then the Court talked about the fact that the

11   proposal by that defendant *Progressive Insurance Company* was,

12   okay, we want to replace the manual review with the TAR

13   review.  And the Court said, you don't get a do-over,

14   especially where your proposal lacked transparency, because

15   we've already been doing this, that Court said, for so long.

16          Well, Your Honor, we've been working this for almost

17   a year now, the search term methodology.  We have broken our

18   backs and that includes the Court, broken our backs to try to

19   get a search term protocol in place based on false pretenses.

20   Because for them to now come up at this point in the game and

21   say, well, now, we want to layer this other methodology which

22   is not intended to be run on the narrowed set of hit

23   documents, the search terms, but is intended to be run on the

24   full document set would be completely contrary to the actual

25   literature from the application seller, this Brainspace

1    company that they told us is where they get this from, and we

2    give them multiple opportunities to exclude documents.

3         So what did the Court do in the *Progressive Casualty*

4    *Insurance Company* case?  The Court said, the only way you can

5    use TAR is with, and I'm quoting:  "Unprecedented degrees of

6    transparency and cooperation among counsel in the review and

7    production of ESI responsive to discovery requests."  And the

8    Courts have required the producing parties to provide the

9    requesting parties with full disclosure as to everything.

10        Now, they don't want to do that here.  They wouldn't

11   tell us the definition of responsive and then it got worse

12   from there.

13        So now put this distraction on the plaintiffs at

14   literally the last minute would be enormously and

15   catastrophically prejudicial to what we're doing.  We don't

16   have a quiet time now.  We're going to get hit with all the

17   documents and now what we're going to have to do is we're

18   going to have to be able to come back to the Court to show you

19   all of the gaps in their productions and how they didn't

20   prioritize.

21        But I didn't hear one defendant actually tell us that

22   all the chromatography has been produced today.  I mean, if

23   they haven't all produced their chromatograms and their mass

24   spectrometry, the key testing, then there's a serious problem

25   in this litigation, if they thought that that was going to be

 1   accessible.  We're going to be in front of the Court, there's

 2   no doubt, based on the representations we've heard from

 3   counsel.

 4        So now, while we're dealing with that, we're about to

 5   get hit on Friday with the motions to dismiss.  So all of our

 6   leadership, all of the people that are running the most

 7   important critical decisionmaking are going to be dealing with

 8   that.  We, by the way, served the deposition protocol last

 9   week for fact depositions on the defense.  While all this is

10   going on, they want us to now engage in a meet and confer on

11   ESI for TAR that should have happened last year before the

12   search terms were put in place, and at the worst, should have

13   happened in January when they were supposed to have already

14   started looking at their documents.

15        Remember all the representations Your Honor got.

16   Those papers still exist when they said, hey, we're getting

17   too many hits, this is too many documents to review, we have

18   to narrow the search terms.  They have to live by what they

19   told the Court and they have to live by the representations

20   they made and at some point, the buck has to stop and I think

21   today is the day, Your Honor.  Now they have to actually live

22   with what they told the Court and what they represented and

23   they got judicial intervention on their behalf.

24        That sounds like judicial estoppel to me where they

25   said, we need to narrow these terms being we're doing a search

1    term review.  To now come in with this other set of criteria,

2    and I mentioned this before, Your Honor, this doesn't only end

3    up with this reservoir of -- what we expect to be a massive

4    quantity of documents that they're never going to review, but

5    what it also does is changes how documents are prioritized for

6    production, it changes the flow.

7         And, Your Honor, we gave you very detailed

8    information in that letter.  I think you can appreciate that

9    Mr. Jaffe spent a lot of time consulting with us and helping

10   us to write that letter to Your Honor so that we could lay out

11   for you in detail why it is that from a technical perspective,

12   their proposal, especially in the black box that they have

13   kept it in during our negotiations, would create so much

14   mischief and would change what we're going to get and when

15   we're going to get it.  And, for example, Mr. Jaffe gave us

16   language that we put in that letter about some documents that

17   will have very few of the indicia that will lead to this

18   manual learning application, pulling those documents, which

19   will be some of the most important documents of litigation,

20   and the search term methodology we have in place guarantees us

21   that a good faith reviewer will look at that document and say,

22   you know what, that has to be produced.  It's harmful, but,

23   you know, the way it's worded, maybe it only has one of the

24   search terms in it, but that's clearly relevant, you get it.

25        Their system puts it into the reservoir of we may not

```
 1   need to review this document.  It gives them tremendous
 2   control over this, and again, TAR can never be imposed in that
 3   way.
 4        Now, I've spoken for a while.  I want to just say one
 5   other thing.  The Mercedes Benz case, Your Honor, which is a
 6   well-known case now and it's 2020, you know --
 7        THE COURT:  That's a funny case, because there, the
 8   plaintiffs wanted to use TAR instead of the defendants.
 9        MR. SLATER:  Absolutely.  And what did Judge
10   Cavanaugh say?  Judge Cavanaugh said, "The defendants here
11   object," I'm on *2, "object to the use of TAR, instead
12   indicating they prefer to use the custodian and search term
13   approach which they assert is fair, efficient, and
14   well-established."
15        Now, this is 2020.  This is the system that every
16   other defendant in this litigation has said they're using,
17   even Teva said it until recently that that was -- saw where
18   they were doing it and they called this archaic.  So this is
19   2020.  And what did Judge Cavanaugh say?  He said, "However,
20   defendants are cautioned that the special master will not look
21   favorably on any future arguments related to burden of
22   discovery requests, specifically cost and proportionality when
23   defendants have chosen to utilize the custodian and search
24   term approach despite wide acceptance that TAR is cheaper,
25   more efficient, and superior to key word searching."
```

1          That language is critical.  Your Honor, we put in the

2     provision in the ESI protocol that we were willing to talk

3     about putting a TAR provision in, because plaintiffs like it

4     if it's done the right way, if it's going to be negotiated

5     fully, fairly implemented with input from both sides.  And

6     I'll point Your Honor to a case I cited -- we cited in our

7     letter, the *Actos* MDL, a litigation like this one.  And what

8     did the Court say about Actos in the -- another case that the

9     defense cited, *Rio Tinto* that Teva cited where it quotes right

10    from *Actos* that the reason that worked there at *Actos* is

11    because the parties agreed to let their, quote unquote,

12    experts work together the whole time to run the TAR, to

13    validate the documents as they went, to relearn, reteach.  So

14    both sides did it together from the beginning.

15         That's what we would have agreed to here and we think

16    that's what would have been ordered because it would have been

17    the only transparent way to run it here, but they didn't want

18    to do that.

19         So if you take what Judge Cavanaugh said, who was

20    acting as a special master in the *Mercedes* litigation, he said

21    you can't do what they're doing right here.  You can't come

22    back and redo it, and that's what the Judge in the *Progressive*

23    *Casualty Insurance Company* case said.

24         Let's look at what they said in their letters to us

25    and their letter to the Court.  They said, it's going to cost

1    us six million bucks and 40 months or whatever they said in

2    there.  And what did the Judge say in *Nevada?*  He said, that's

3    fine, produce everything, every document hit by the search

4    terms.  You want a filter for privilege, go ahead.  You want a

5    clawback, you can have it.  Just produce them all.  The

6    plaintiffs are willing to look at them.  And I'll tell you

7    right now, Your Honor, the plaintiffs in this litigation are

8    willing to accept every document hit with a search term, we'll

9    deal with the burden of going through for responsiveness,

10   we'll search it on our own, we have a lot of people on our

11   steering committee, and that was the outcome that Court

12   ordered because the Court said it's too late, you're not going

13   to put this on the plaintiffs at this point in the litigation.

14         So we believe that this is really, you know, a Battle

15   of the Bulge kind of moment, especially where you have

16   Mr. Greene just casually mentioning to the Court and, hey,

17   let's see if any of the other defendants want to sign on to

18   this.  I mean, the documents are rolling out today, Judge.  We

19   were looking.  We got 1620 documents from Mylan today.  We got

20   70 pages from Teva.  We have ZHP who has just told you that

21   they are producing some documents but took that one line from

22   your order to think, well, we hadn't collected documents.

23         I'm going to remind you, Your Honor, ZHP told us

24   during the search term arguments that they had collected

25   documents.  They're on both sides of this.  They keep going

1    back and forth with that, and by the way, they knew in

2    December what documents to get.  Coronavirus didn't hit that

3    Wuhan Province until late January.  So what were they doing

4    for that month-and-a-half?  And by the way, they've also

5    admitted they collected documents for the US entity Solco

6    throughout.  Where are all those documents?  There should be

7    massive document productions happening today based on the

8    order from Your Honor.  We're not going to get it.

9         I can tell you that this is going to be nothing but a

10   blood and guts fight from this point.  I've seen it before,

11   and that's what's happening, and this is a Hail Mary by Teva

12   and then trying to give the other defendants the chance to

13   jump in.

14        This is like when Mylan led the charge on the search

15   terms and then when all the other defendants had to, you know,

16   they just jumped on the bandwagon said, all right, we'll take

17   a shot, and then what happened when that argument fell apart?

18   They all said, yeah, I guess we can live with much better --

19   with different terms.  That's what's happening again.

20        And I apologize for talking this lengthy, but I was

21   biting my tongue through that argument from Mr. Greene.  It

22   was very frustrating.  We feel like there's a real serious

23   moment here in this litigation where we can move things

24   forward the way Your Honor expects them to or we're going to

25   bog down for trench warfare, and that's what's going to

1    happen.

2         Now Mr. Parekh and Mr. Jaffe are on.  If I missed an

3    important technical point, I'll certainly leave it to them to

4    put that in, but I think that I've covered the major points of

5    our argument.

6         THE COURT:  Can I ask you a question -- two questions

7    I have immediately come to mind, Counsel.

8         MR. SLATER:  Sure.

9         THE COURT:  One is, if the defendant Teva does not

10   use this TAR program, hypothetically.  I know the plaintiffs'

11   preference is for them to produce every document with a hit.

12   But in the real world, Teva is probably going to do what

13   everybody else does in my hypothetical -- well, let's take a

14   hypothetical of a million documents, 200,000 hits, is it

15   plaintiffs -- is the inevitable result if TAR is rejected,

16   that Teva has to review those 200,000 documents by hand?

17        MR. SLATER:  Well, remember, Judge, their review, for

18   relevance and privilege is their choice.  Nobody is forcing

19   them to do it, and again, *Progressive Casualty Insurance*

20   *Company* case ordered the hit documents to be produced because

21   the Court there said, you know, this is the end of the line,

22   you're not getting a do-over to redo this from scratch.  So if

23   they choose to do it, they can spend the time and money, which

24   they committed to do when they came before Your Honor a few

25   months ago and said those search terms are too broad, we need

1   to narrow them because that's exactly what we're going to do.

2        They represented to this Court that that's what they

3   were going to do.  If they now -- and remember, Your Honor, I

4   have the transcript from November 30, 2019, when I was

5   imploring you and the defendant in saying, they haven't even

6   tested yet, they're refusing to test.  And that's -- this has

7   been going on for close to a year now.  And now after they

8   made all these representations to the Court that they were

9   going to do that and they needed to narrow the search terms,

10  now they say, well, we don't want to do it, it's too

11  expensive, we want to change our entire process.

12       You know, if they want to use TAR, I guess we'd have

13  to stop their production for the next few months, negotiate a

14  protocol and then we want them to run TAR on all of their

15  documents, not just the ones that got hit with the search

16  terms, because what they're not telling you is, with your

17  example of the thousand documents, 500 get hit and 500 don't

18  get hit, TAR might have picked up another 50 or a hundred or

19  more of the 500 that didn't get hit with the search terms

20  because it's such a better process.

21       And again, I'm telling you, we would have been happy

22  to do that with them but none of the defendants wanted to do

23  it and we knew about the other case law, we know we couldn't

24  force them to do TAR for the production, so we didn't try to

25  force them to do it.  Now they want to put it on us at the end

1  without our input.

2       So I apologize for the long answer, but they don't

3  need to do that.  They can give us all the documents.  That's

4  their choice because they represented to the Court that's what

5  they were going to do.

6       THE COURT:  I thought I heard Mr. Greene say that --

7  I know you said that they weren't responsive to your questions

8  in the last week or two, but I heard Mr. Greene say that they

9  want to sit down and meet and confer with plaintiffs and hash

10  out an acceptable, in their words, validation program.  What's

11  wrong with that?

12       MR. SLATER:  Well, you know, I saw Josey Wales the

13  other day.  Remember the snake oil salesman, the carpetbagger

14  on the barge?  That's what I'm thinking of right now.  This is

15  legal snake oil.  That's what this is.  It's litigation snake

16  oil, because what they're saying is, we know that we're beat

17  on the law, so when they met with us on the telephone, I'm

18  telling you, Judge, we asked the most basic questions and it

19  was not just me, it was Mr. Parekh and Mr. Jaffe and we

20  couldn't get answers.  All we got is, we're going to send you

21  the white papers.  You saw those white papers, Your Honor,

22  they're marketing pieces.

23       The only thing that's really important there is, A,

24  the way that this system is supposed to be run, it's supposed

25  to have multiple tags, so it's run more efficiently, and you

1  have that in our letter.  That's what the document says.  It's

2  on Page 6 of the first white paper.  Multiple tagging.  They

3  don't want to do that.  They want to have one tag because they

4  don't want to run the system at the most efficient level.

5  They're using this to hide documents from us.

6          So they wouldn't give us -- they wouldn't tell us how

7  do you define "responsive."  Couldn't get that information.

8  That's going to be our -- that's our work product.  Our

9  lawyers are going to know what to look for, they're going to

10  do it, they're going to train the system, you have no input

11  into it.

12          So they've already made that clear.  Now they're

13  saying, well, maybe we need to give something up to keep the

14  Judge engaged, but all they're talking about is at the end of

15  the process, they'll talk about a protocol to do sampling of

16  -- I don't know how many documents or pages of documents

17  they're going to push out that we're supposedly never going to

18  see.  I mean, so the answer is, it's snake oil.  It's

19  something that we should not even have to deal.

20          This distraction at this point is massive.  The fact

21  that we're even spending the time -- I've spent probably 20

22  hours on this in the last couple weeks between reading case

23  law, writing things, meeting on the phone with Mr. Jaffe and

24  Mr. Parekh, going through this.  We have spent an enormous

25  amount of time that we should have been spending on other

 1    things because this should have been done so long ago.

 2           So as those cases say, as *Mercedes Benz* says, as

 3    *Progressive* says, these are their own cases.  You cannot foist

 4    this on the plaintiffs at the end of the process when now the

 5    documents are coming out and you don't like what you're

 6    seeing, and that's what we think is going on.  We think they

 7    started looking at the documents that were hit and were

 8    relevant and they said, wow, this is a problem, we need a way

 9    to start to bury some documents and this is a way to do it.

10    And I have no doubt at this point the level of cynicism I have

11    with this process and with some of the answers the Court has

12    heard today from the defense.  What else am I supposed to

13    think?  That's what experience tells me.

14           And we don't want to have to go through this process,

15    frankly, Your Honor.  We don't need this distraction of

16    dealing with them on this proposal at this point.  We don't

17    need to be spending time.  We need to focus on the documents

18    that are hitting our system right now.  We need to start

19    reviewing them and making decisions on what to put before the

20    Court in order to figure out, did they prioritize, did they

21    not, what's missing, do we have attachments being threaded

22    properly.  Mr. Parekh needs to focus on did they e-mail thread

23    properly or did they not.  Did they de-duplicate properly.

24    What are we seeing in terms of the trending.  All the types of

25    analysis we need to do.  We don't need this distraction.  It's

```
 1   completely inequitable for them to dump this on us at this
 2   point.
 3           MR. PAREKH:  Your Honor, this is Behram Parekh, can I
 4   just interject for one moment if that's all right?
 5           THE COURT:  Of course.
 6           MR. PAREKH:  In answer to your question, and more
 7   specifically, the problem is that, one, had we known TAR was
 8   being implemented, when they came back to us, we had this
 9   process in January through the last conference, we would not
10   have made the modifications, the search terms that we would
11   have done and, in fact, we would have expanded the search
12   terms or not used search terms at all.
13           The validation process that they talk about, I'll try
14   to hammer out in the next couple of weeks, is essentially
15   intended from a technical level to give parties confidence
16   that, you know, yeah, you're only missing 5 percent of the
17   documents, you're only missing 7 percent of the documents.
18   That's great if you're starting from the entire universe of
19   documents.  If I agree to search terms, we made all of these
20   concessions, we already know we're missing 7 percent,
21   10 percent, 15 percent of the documents.
22           So now what defendants want us to do is agree to list
23   an even larger percentage of documents on the stuff that hits
24   on the search terms.  That's why layering this process on top
25   of the search terms is inequitable to plaintiffs and why we
```

 1  shouldn't have to go back and agree to some other form of

 2  protocol.

 3          THE COURT:  Question for you:  If this issue had been

 4  raised early in the process, before we spent so much time

 5  working on the search term issue, would there be so much of a

 6  vociferous objection?  So what I'm trying to get at is, is the

 7  essence of this dispute that there is an inherent distrust of

 8  this sort of TAR program, or is it, Judge, we're too far down

 9  the line, we've invested too much time and energy to go

10  backwards and we have other issues to devote our energies and

11  time to, other than working on a search term issue that we

12  already resolved.  Which one is it?

13          MR. PAREKH:  It's actually -- there's no inherent

14  distrust with TAR as a concept, but when you use TAR on top of

15  search terms, what you do is you compound by an order -- an

16  exponential level the magnitude of the error.  The search

17  terms are going to list a set of documents.  All of the

18  parties understand that, which is why you negotiate search

19  terms so heavily.  TAR is going to list a certain percentage

20  of the document.  All of the parties know that, which is why

21  you negotiate TAR the way that you do, and you get metrics and

22  levels.

23          When you combine the two, when you say, okay, now

24  that we've finished negotiating the search terms, now we want

25  to negotiate TAR, what you're saying is, hey, out of that

1    15 percent that you've missed, we're now going to add another

2    15 percent or 7 percent or whatever the confidence level you

3    are at of documents that we're going to miss.  That gives

4    plaintiffs 30 percent of documents that are somehow not being

5    looked at and not being produced.  That's the objection.  It

6    should be one or the other.  It can't be both.

7             THE COURT:  Question:  If we --

8             MR. SLATER:  It is both -- I'm sorry, Your Honor --

9    and the time and effort we've put into the search terms.

10            THE COURT:  If we go back to square one, right at the

11   beginning, before we invested all the time and energy of

12   search terms and Teva had said, we're going to use TAR,

13   plaintiff says okay, we're going to meet and confer.  If a TAR

14   program is used, do you still have to identify the custodial

15   searches that have to be done, or it sounds impractical to

16   say, every single person who works for Teva, their documents

17   are going to be searched, this TAR program.

18            In other words, when you use the TAR, do you still

19   have to identify the custodian you use, even though you may

20   have narrowed it down by search terms?

21            MR. SLATER:  No, you would search the selected

22   custodians.

23            MR. PAREKH:  I'm sorry, Your Honor, this is Behram

24   Parekh.  You would still have to identify the custodians

25   because otherwise, you're searching an insane magnitude of

1    documents.  But in using TAR, the leverage of TAR, what it

2    allows you to be is be broader in terms of the documents that

3    you select and potentially the number of custodians you

4    select, although, you know, that -- you'd have to draw a fine

5    line as to whether or not we would have asked for more

6    custodians or not at this point.

7            THE COURT:  All right.

8            MR. GREENE:  Your Honor, this is Jeff Greene.  If I

9    may just respond for a minute and I promise to keep it brief.

10           THE COURT:  Can I ask you a question or two,

11   Mr. Greene?

12           MR. GREENE:  Of course.

13           THE COURT:  The record reflects that the first time

14   Teva brought this issue of TAR up with plaintiff was July 1.

15           When did Teva decide to use the TAR program and was

16   this issue contemplated even back in December, when the Court

17   had entered its first order regarding the search terms.

18           MS. LOCKARD:  Your Honor, this is Victoria Lockard.

19   You know, Mr. Greene was brought in recently because of the

20   TAR issue, so I'm going to jump in on the historical piece of

21   this.  TAR was brought up and discussed even before last

22   November and December.  It's expressly set out in the ESI

23   protocol which allows --

24           THE COURT:  Right.

25           MS. LOCKARD:  -- search terms and TAR.  We were

1    talking about this in April of 2019 when we were negotiating

2    the protocol.  The protocol says, if we decide to use it, want

3    to use it to eliminate documents, we'll have the discussion in

4    the meet and confer.  That's what we tried to do when we

5    decided to use it.  In the interim, in November, when the

6    parties had their meet and confer in person, conference,

7    plaintiffs asked defendant, do you intend to use TAR.  We've

8    all reserved our right to use TAR during those conferences.

9    The other defendants did.  I haven't heard any defendant yet

10   have an opportunity to speak, you know, we're not here to

11   speak for them, they can do so themselves, but I've seen

12   nothing on the record that suggests that any of them have

13   confirmed to plaintiff that they have no intention to ever use

14   any sort of CMML or TAR process.

15         So the fiction that this was just invented in the

16   last few weeks is just not correct, it's not reflected by the

17   record.

18         Secondly, to the point about, well, we never would

19   have negotiated the search terms, we went to the Court and --

20   all this about, well, estoppel of the Court's ruling, the

21   Court denied our request to modify the search terms.  We had a

22   concern with the breadth of the search terms.  We brought it

23   before the Court.  The Court denied it.  The Court said the

24   parties can work it out.  The parties got together, we got

25   some minor concessions from plaintiffs' counsel on some of

1    these search terms, but I can tell you it made a small dent.

2          When we looked back, we ran all of the searches under

3    the new revised lightly modified search terms, we're still

4    looking at Teva.  The last number I saw was something on the

5    order of, you know, close to 4 million documents.  To expect

6    us to put eyeballs on all of those, you know, in the timeframe

7    that was provided was not reasonable.  That's when we started

8    looking at this TAR.  I'm not an expert on it.  We brought in

9    Mr. Greene at that point.  This has all happened in the last

10   month.

11         We got our experts on it, we talked to our ESI vendor

12   about it and we disclosed it, you know, before we even had to,

13   to Mr. Slater and to Mr. Parekh.  We said, look, we're not

14   using this to set aside or hide documents, we said we're going

15   to use this to help get to the documents we need to get to so

16   we can make our deadline and they still objected.

17         So I just wanted to speak to that history and I'll

18   turn it back over to Mr. Greene and I apologize for jumping in

19   there.

20         THE COURT:  I do have a point.  Hold on one second,

21   Ms. Lockard.  I have the ESI protocol in front of me now.

22         In Section 2 of the protocol, you're correct.  It

23   mentioned the TAR predictive coding.  It says:  "The parties

24   will cooperate in good faith," blah, blah, blah, blah, blah,

25   blah, "prior to using TAR."

 1          Then it says:  "The parties agree to meet and confer,

 2   quote unquote, as early as possible to discuss search

 3   methodology, including TAR."  Okay?  That's what the -- that's

 4   what the order said.  It's undisputed that the first time this

 5   issue was brought to plaintiffs' attention was July 1.  Why

 6   wasn't it brought to plaintiffs' attention earlier?

 7          MS. LOCKARD:  The ESI protocol says that search terms

 8   and protocols and any TAR/predictive coding will be discussed

 9   -- disclosed prior to using any such technology to narrow the

10   pool of collected documents to -- as set under their review.

11          I just want to make sure that the record is clear on

12   that, that that provision requires us to do that prior to

13   narrowing the pool, which we're not doing or -- which we

14   haven't done to date.  And by the way, that's what we told

15   plaintiffs' counsel we had not done to date on our phone call.

16          In terms of why we didn't bring it to their attention

17   before July 1st is because it wasn't until the end of June

18   that we knew we would use this in order to prioritize the most

19   relevant and pertinent documents for this review process.  It

20   was offered to us by our vendor that -- when we are struggling

21   with the sheer volume of the documents, it was offered as a

22   tool, just an additional tool to facilitate the review.

23          THE COURT:  Okay.  So --

24          MR. GREENE:  Your Honor, this is Mr. Greene, if I

25   could just make a quick couple of points here.

1          THE COURT:  Go ahead, Mr. Greene.

2          MR. GREENE:  And I promise I'll keep it brief.  You

3    know, there are -- I think Mr. Slater's inexperience with TAR

4    is telling, because he's unable to distinguish cases, you

5    know, cases that were TAR 1.0 versus 2.0, for example.  The

6    *Progressive* case is -- he can cite to that but, you know,

7    there was no continuous learning, that was a TAR 1.0 case so

8    the process was very different.  There was no ESI -- there was

9    no TAR reference or predictive coding reference in the ESI

10   protocol in that case, and I think that's significant because

11   we do have one in this case, and then I think more

12   importantly, and Mr. Slater can insult me as much as he wants,

13   he does not know me, I've been doing this a long time and he

14   can call me a snake oil salesman, but the reality is, in that

15   case, Progressive was unwilling to engage and be transparent,

16   whereas we are and they've just said no.

17          What we heard, Your Honor, was words from Mr. Slater

18   like "mischief" and "insidious" and "grand conspiracy."  We

19   heard lots of histrionics, but the fact is, he cannot fight

20   the presumption, the black letter law that says we get to

21   chose the review and the search and review methodology, that

22   is beyond doubt, and whether it's *Mercedes Benz,* whether it's

23   *Hyles versus New York City,* 2016 Westlaw 4077114 -- Hyles,

24   H-Y-L-E-S, versus New York City.  The *Rio Tinto* case again,

25   that was a 1.0 decision, a TAR 1.0 decision where there were

 1    seed sets and it made sense for the parties to work together

 2    on those seed sets.  With a Continuous Active Learning

 3    process, we're just reviewing documents and there's no reason

 4    for us to be sitting side by side.

 5            I think a fundamental premise that we have here is

 6    that, you know, the plaintiffs are -- they're spending a lot

 7    of time making up numbers.  We heard 15 percent, we heard

 8    20 percent, we heard 7 percent, and were reducing the sets,

 9    but they have no support for that, and at the end of the day,

10    you know, they cannot possibly dispute that a

11    technology-assisted review process is going to be more

12    reliable and more accurate than a linear review.

13            And the same decision that they want to see as part

14    of a TAR exercise, they don't get to see in terms of a linear

15    review.  So if I have a review attorney, if one of my

16    associates is reviewing a document and they make a decision on

17    what relevance is and Mr. Slater can say that we never gave

18    him the definition of relevance, which we did, so that's

19    false.  We said that, you know, the definition, Rule 26 should

20    give us a boundary and that should be the claims and defenses,

21    documents or information relating to the claims and defenses.

22    And if I have an attorney looking at that document, they make

23    a decision, does this document relate to the claims and

24    defenses of that case.

25            And I suppose another set of guideposts would be the

1    documents that -- the document request that we received.

2    Though it is a multi-layered analysis, we look at it from the

3    perspective of claims and defenses and we look at it

4    specifically with respect to the document request.  There's no

5    grand conspiracy here, Your Honor.  I mean, we're sort of

6    stunned that plaintiffs have taken this position and they've

7    reacted in this way because, you know, they're saying that we

8    want to bury documents.  They have no support for that.

9         They say that, you know, we don't like what we're

10   seeing so we're suddenly engaging in a TAR process.  They have

11   no support for that, and Mr. Slater can engage in whatever

12   histrionic he prefers, but the fact is, they have no proof for

13   any of the statements they're making.

14        At the end of the day, we're happy to engage in a

15   transparent process but they're afraid to do so and, Your

16   Honor, when you asked Mr. Slater the very pointed question,

17   what's wrong with sitting down and meeting with them, he

18   couldn't give you an answer, and I'll stop there, Your Honor.

19        THE COURT:  Mr. Greene, I have two questions of you.

20   One, did you report to any -- can you cite me to any recorded

21   case that talks about TAR 2.0?  Do you have experience using

22   TAR 2.0 in other cases, especially MDL cases?  That's one.

23        And, two, if it's so burdensome to put eyeballs on

24   all of the responsive documents, why aren't the other

25   defendants complaining that they also want to use TAR?  And

1    it's like silence.  I'm taking that as an implicit

2    acknowledgement that they're going to put on -- put eyeballs

3    on their hit documents -- well, their internal, quote unquote,

4    hit documents, I don't think --

5            MR. GREENE:  I can answer that, Your Honor.

6            THE COURT:  I don't think that the burden -- how do I

7    say this?  What I'm trying to say is with regard to the number

8    of hits, I don't think they're going to be disproportionately

9    larger for Teva than it is for some of the other defendants.

10       So why aren't they complaining about a burden, and

11   Teva says they have to use TAR.

12           MR. FERRETTI:  Your Honor, this is Joe Ferretti on

13   behalf of the ZHP defendants.  I acknowledge that it may be an

14   appropriate time for me to speak up in light of your comments.

15       The ZHP defendants aren't planning to use CAL in the

16   same way that Teva is proposing.  However, we are intending at

17   some point to use it.  Right now, we're simply doing a linear

18   review of the custodians who the plaintiff has asked us to

19   prioritize, and at some point very soon after all of our data

20   is processed and de-duplicated and finally in -- 100 percent

21   in the system, we will be flipping on the switch for

22   Continuous Active Learning.

23       I don't view Continuous Active Learning as being the

24   same thing as what the ESI protocol is referring to.  That

25   refers to TAR/predictive coding.  We're not intending to do

1    any predictive coding.  We're intending to use CAL in order to

2    prioritize the documents that are batched out for review for

3    our reviewers, so the CAL system will simply decide which

4    documents it thinks are most likely to be responsive and it

5    will immediately batch those out for review, and based on the

6    number of documents that we've reviewed so far in the system,

7    we expect it to be very good results early on.  We expect

8    there to be some, you know, very good number of responsive

9    documents being front-loaded in our review and produced.

10           And at some point down the line, we expect there may

11   be a time where the responsiveness rate becomes just abysmally

12   low.  As it is, the responsiveness rate that we are

13   encountering is somewhere in the neighborhood of 7 percent.

14   That is a very low responsiveness rate.  So seven out of every

15   hundred documents we're finding that we're reviewing are

16   actually responsive to the document request and we expect that

17   at some point, it's going to be much, much lower because of

18   the use of CAL, and at that point we would approach with

19   plaintiffs and say, what do you want to do here, because we

20   have a very low responsiveness rate and at this point we

21   believe it's disproportional in terms of our level of effort

22   needed to review the remaining number of documents given the

23   one out of every thousand or one out of every 2,000 documents

24   we're finding to be responsive.

25           And at that point, we can talk to plaintiffs about

1    what measures to take, whether we need to shift costs for

2    plaintiffs to bear the cost going forward or whether we need

3    to narrow or focus in on certain things and let the others go.

4    That's the way I envision using it.  It's a common way to use

5    it, as I understand it, and it shouldn't be -- come as any

6    surprise.  It's not -- we're not using it in the way of -- in

7    the way of predictive coding or in the way of trying to rank

8    documents to -- exclude documents based on rank.  We're hoping

9    to use it simply to determine when we've gotten through the

10   vast majority of what will be the responsive documents in the

11   set.

12          And so my hope is, Your Honor, that whatever comes of

13   today, we're not joining in any motion today, we're not a

14   party to any arguments, but what I'm hoping is that whatever

15   decision Your Honor makes today won't preclude our intention

16   -- or preclude us on behalf of the ZHP defendants from

17   applying that approach.

18          THE COURT:  Thank you, Counsel.

19          MR. GREENE:  Your Honor, to answer your question, I

20   think Question 2 just got answered taking them in reverse, you

21   know, as two, why isn't anyone else doing it, you know, why

22   aren't the other defendants.  I can't speak to their datasets,

23   they may have a smaller number of custodians and, you know,

24   they may have different document retention policies in place

25   related to e-mail and so on, so there are any number of

1  factors that could affect the number of hits that are -- the

2  number of documents that an individual custodian has.  So I

3  don't think it's, you know, comparing one defendant to another

4  is an apples-to-apples comparison.

5         I think your first question was, do I personally have

6  any experience with CMML.  Yes, I've been doing this for quite

7  some time, so the answer to that is yes.

8         Do I have experience in CMML in an MDL setting, the

9  answer to that would be no, but I know Consilio our vendor

10  does, but I'm not sure -- I think that's a little bit of a

11  distinction without a difference in terms of -- a complicated

12  case is a complicated case.

13         You use these -- typically, you use

14  technology-assisted review, this CAL exercise, which we're

15  really talking about in the context of a case with a large

16  volume of record, and those are typically larger cases with

17  larger, you know, with larger dollar values at stake.  So I'm

18  not sure the MDL -- except the fact this is an MDL is an

19  issue, at the end of the day, it's really more the size of the

20  case and the number of documents that you are dealing with.

21         MS. LOCKARD:  If I can just add one additional point

22  to the questions on the table.  Again, Victoria Lockard.

23         Just to remind the group and Your Honor, you know,

24  when we discussed the progress of the parties with their

25  discovery responses back in April and the Court entered the

1    order about the July 15th date being set in stone.  You may

2    remember we discussed -- many of the defendants had been

3    focusing their efforts on noncustodial documents because for

4    whatever reason, those were -- you know, that was their focus,

5    that's what they went after, and we disclosed at that point

6    that we, Teva, had already loaded a number of custodians up on

7    our vendor's platform.  I believe we were the only defendant

8    who had done that at that time and others were focusing on

9    noncustodial pieces.  So that's not to compare apples to

10   oranges there.

11        But the point being, we focused our efforts as we

12   rightly were entitled to do so, on the custodial piece and

13   that's why we're out ahead on this issue.  It's not because we

14   stand, you know, out of alignment with anyone, it's because

15   we're first in the line in terms of getting the most

16   custodians loaded on our vendor's platform.

17        THE COURT:  Okay.

18        MR. STOY:  And, Your Honor, if I may, to piggyback on

19   that point.  This is Frank Stoy, S-T-O-Y, on behalf of the

20   Mylan defendants.  I think that we are also considering the

21   use of a TAR 2.0 Continuous Active Learning tool for our

22   custodial document review.

23        As Ms. Lockard just alluded to, the documents that we

24   produced to plaintiffs today were noncustodial, but whether we

25   ultimately take an approach similar to that which Mr. Greene

 1   has described or that which Mr. Ferretti talked about for ZHP,

 2   we haven't yet determined, but we are analyzing those options.

 3          THE COURT:  Okay.

 4          MR. SLATER:  Your Honor, it's Adam Slater.  I'm

 5   sorry, just very briefly.

 6          THE COURT:  Go ahead.

 7          MR. SLATER:  So now you see the virus spreading and

 8   that's what's happening.  I mean, that's what's happening.  I

 9   would love to see the e-mails between these various attorneys

10   where they're saying, well, take a shot, that's why we're

11   salesmen, we want to be able to have the opening to do this

12   too, now.

13          You asked a question and you won't find an answer to

14   the question of, is there a TAR 2.0 case.  Counsel didn't

15   identify one, and he's certainly not going to identify one

16   where it was ordered to be used in conjunction with search

17   terms, because it's not done that way.  So they didn't want to

18   do TAR because they knew that if they did it -- remember,

19   Mr. Greene is a member of the Greenberg Traurig firm.  He's

20   been there the whole time, presumably he's known the whole

21   time how clunky and terrible search terms is as an approach,

22   so why did they want to agree to that, because they didn't

23   want to have TAR run the way it's supposed to be which is with

24   a full process of vetting with involvement like an *Actos* where

25   both sides actively review the documents together and

1    determine responsiveness together against all of the document

2    sets for all of the custodians.  They didn't want to do that.

3         Now they're taking the shot.  It's obvious why

4    everybody is jumping on the bandwagon now, Your Honor.  We

5    implore you -- you know, we just heard ZHP say 7 percent of

6    the documents are responsive.  We're going to have big battles

7    to fight about why so many documents are being held back, if

8    they're going to try to tell us that there's 93 percent of --

9    documents hit with search terms are not actually going to be

10   produced.  So we ask you, Your Honor, to just put to this bed

11   today.  They can't do this.  This is going to be a fight that

12   is going to take over this litigation, and there's no way

13   around it.  There's no way to introduce TAR in a meaningful

14   and fair way this late in the litigation.

15        THE COURT:  Okay.  Counsel, we've been at this a long

16   time and I still think my initial reaction was correct, that

17   I'm not prepared to make a ruling on this issue today, but, I

18   do think it's appropriate to issue in effect a, quote unquote,

19   stay order that, and it doesn't sound, from what I understand

20   Mr. Greene to say, that we've reached the point in the review

21   where any documents are being excluded.  We haven't reached

22   that point yet, so in effect, I think it's appropriate to have

23   a standstill and I'll somehow wordsmith this to say that.

24        You can continue with your TAR and all your reviews

25   and that, but until the Court rules on this issue, no party

 1   can exclude any documents from review because of the TAR

 2   program until the Court rules on this issue.

 3          I think the parties' briefs were extremely

 4   comprehensive.  Oral argument certainly was.  I don't know,

 5   does anyone think there's anything to add to the record on

 6   this issue that they want to add before the Court digests this

 7   and rules on it?

 8          MR. PAREKH:  Your Honor, this is Behram Parekh.  At

 9   the risk of saying yes, I do -- would like to add two items.

10          THE COURT:  Okay.  If anybody wants to add anything

11   to the record on this, can you just submit it in a week?

12          MR. PAREKH:  Your Honor, this is just really brief

13   and it's in response to your point that they can continue to

14   use Continuous Active Learning for prioritization, and the

15   points that I would just make are -- and I'll keep them brief.

16          The first is when TAR -- when Continuous Active

17   Learning is used for prioritization, what it does is, the way

18   the system works is, as it's trained by people selecting

19   things that are relevant and not relevant, what it does is, it

20   prioritizes the most commonly hit relevant documents.

21          So what it means to the end are usually short

22   documents that tend to be relatively, you know, short e-mails

23   and -- but those may be incredibly relevant.

24          What it also does, the way I understand Greenberg

25   Traurig to be using it and the way I understand other

1    defendants to be using it, it's run across the entire spectrum

2    of custodians and therefore, as we get closer to doing

3    depositions, plaintiffs will never know if any particular

4    custodial documents are complete, because the way the TAR

5    system works is, it doesn't care which custodian is being

6    produced, it runs them across them and it says these are the

7    documents that I think are hitting the most from what people

8    are saying, this is relevant.  And so it makes it much more

9    difficult for us to start taking depositions because we will

10   not have complete custodial files until the very end of all

11   production.  I just wanted to bring those two items to your

12   attention, Your Honor.

13        THE COURT:  But do you agree with me that if the

14   Court enters this standstill order, that no documents are to

15   be removed from review pursuant to this program until the

16   Court rules on this issue, plaintiff is not going to be

17   prejudiced.  Do you agree with that or disagree with that?

18        MR. PAREKH:  I do, Your Honor.  I just wanted to make

19   the point that the standstill just preserves it for this

20   particular instance and we could still face prejudice if it

21   continues to be used going forward.

22        THE COURT:  You believe, you and Mr. Slater have said

23   it very well, you believe the plaintiffs will be prejudiced if

24   the Court permits the defendants to remove from review

25   documents using a TAR program.

1          The Court's order is going to say you can't do that

2    until the Court rules on this issue.  I don't know how I'm

3    going to rule on this issue, so I'm -- I'm just trying to give

4    some comfort to the plaintiffs that defendants can continue to

5    do what they're doing, but they're not going to remove any

6    documents from review until at least the Court rules on the

7    issue.

8          That's the Court's intent.

9          MR. PAREKH:  Your Honor, I understand that Your Honor

10   might.  My only point was that it will end up prejudicing our

11   ability to take complete depositions at some point in the

12   future if it's allowed to continue with -- the way it looks

13   like Greenberg and other firms are implementing this, because

14   we will not be assured of complete custodial productions.

15         THE COURT:  Well, isn't the production going to be

16   done in November?  Isn't that the outside date?  So you're

17   going to get everything by November, right?

18         MR. PAREKH:  At that point, then I think we have no

19   issue.

20         MR. SLATER:  Let me just interject, Your Honor, it's

21   Adam Slater.  The issue is this, we have to deal with the

22   briefing on the motions to dismiss.  So if this methodology is

23   used, it's going to deprioritize critical documents that we

24   have prioritized.  So we're not going to get them potentially

25   until after all the briefing is done on the motions to dismiss

1  where those documents could actually have a significant impact

2  on the briefing.  We're asking -- we object to this completely

3  so they can't do it at all.

4      THE COURT:  Mr. Slater, you know as well as I do that

5  they can't use discovery documents outside their pleadings for

6  the Rule 12 motions and neither can the plaintiffs, right?  So

7  it's really irrelevant what the documents say, right?

8      MR. SLATER:  I'm not sure about that, Your Honor.  I

9  mean, they're going to -- but we don't know what they're going

10  to say in their motion.  We think they're going to -- we don't

11  know how their arguments are going to be framed, but if we

12  have a document that shows that one of our claims is valid, I

13  think it would be -- it's potentially going to be presented.

14      I mean, there's obviously rules about when documents

15  outside the pleadings can be utilized and whether they're

16  quoted or whether they are incorporated by reference.  I mean,

17  we know those cases, so I wouldn't want to foreclose that.  I

18  think the data -- the defense has -- they're in a

19  straightjacket to a larger extent where they open the record

20  and turn this to a, quote unquote, summary judgment motion and

21  then the Court can then defer the whole thing until the end of

22  discovery, which is maybe where we'll end up procedurally on

23  some of this.

24      I mean, I can't presuppose everything, but we have

25  the right to get these documents to us -- produced in a

priority fashion as Your Honor ordered them to comply.  We were told, yeah, we're going to comply, and now this system will change the way documents come out to us.

MS. LOCKARD:  Your Honor, the motion to dismiss is due in two days.  I would submit that if there are documents that Mr. Slater thinks he needs to respond to our motion to dismiss outside of the four corners of the pleading, you know, I think that will -- we can address that at a later time, but I'm fairly confident that will not happen.  We do not intend to convert this to a motion for summary judgment.

THE COURT:  That's what I'm assuming, but I guess we'll have to see.  We'll cross that bridge when we come to it.  But we all know the difference between a Rule 12 motion is and a Rule 56 motion.

MR. GREENE:  Your Honor, if I may, it's Mr. Greene, Jeff Greene here, and I apologize for interrupting.

You offered to consider additional information, Your Honor, and we're happy to put together a couple -- and some case law because I think it seems that plaintiffs would have you believe that it's either TAR or search term but not both, and there are a number of cases, large cases, and I've cited to the In Re Boiler -- In Re *Broiler Chicken* antitrust litigation where that was -- specifically, there was a TAR protocol entered in that case which specifically addressed, you know, handled the search term TAR on top of search term

1    issue, so we're happy to provide the Court with that authority

2    to see, so that there's no concern from the Court's

3    perspective on our approach here by using searches -- by using

4    search terms in the first instance and then CAL on top of

5    that.  So if we could have a few days to put that together,

6    we'd appreciate it.

7           THE COURT:  My order is going to say, if anybody

8    wants to submit anything else, do it within a week.

9           So sort of to sum up where we are today, way back

10   when, we started with granting the downstream defendants'

11   request for extension of time.  That will be confirmed in a

12   Court order, and then we talked about the individual

13   defendants' document production, and based upon what we heard,

14   I anticipate we're going to hear disputes about that.

15          And then the bulk of the time was spent on this TAR

16   issue where the Court is going to fashion an order to in

17   effect say, there's a standstill, and then one week to submit

18   due authority you want the Court to review and then the Court

19   will rule promptly, hopefully, on this issue.

20          In the meantime, given the Court's order which is

21   going to, in effect, have a standstill, defendants are not

22   prejudiced, they can do what they're doing, let the computer

23   learn, and plaintiffs are not prejudiced because right now,

24   until the Court rules, no documents are going to be excluded

25   from review.

```
 1          So that's what we're going to do until the Court --

 2   this is not a simple issue, there's equities on both sides and

 3   the Court has to evaluate that.

 4          All right, counsel, for the good of the order,

 5   anything else we need to address?

 6          MR. SLATER:  No, Your Honor.  Thank you.

 7          RESPONSE:  No, Your Honor, thank you.

 8          THE COURT:  Thank you, Counsel.  We are now

 9   adjourned.

10          (6:05 p.m.)

11          -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

12

13          I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   /S/ Karen Friedlander, CRR, RMR
     Court Reporter/Transcriber_____
17

18   July 17, 2020
     Date
19

20

21

22

23

24

25
```

## /

*/S* [1] - 79:16

## 0

**0.0** [1] - 22:11
**0.01** [1] - 22:12
**07068** [1] - 1:12
**08540** [1] - 3:3

## 1

**1** [5] - 15:1, 23:1, 41:24, 59:14, 62:5
**1,000** [1] - 30:20
**1.0** [13] - 20:6, 20:14, 20:17, 20:18, 22:11, 22:18, 23:15, 23:25, 24:2, 63:5, 63:7, 63:25
**10** [3] - 21:11, 40:19, 56:21
**100** [1] - 66:20
**103** [1] - 1:12
**12** [2] - 76:6, 77:13
**12,000** [1] - 31:5, 31:7
**13** [1] - 5:24
**14** [4] - 5:24, 36:9
**15** [7] - 1:7, 4:1, 14:23, 56:21, 58:1, 58:2, 64:7
**15219** [1] - 2:25
**15th** [4] - 13:12, 13:13, 15:11, 70:1
**1620** [1] - 49:19
**1638** [1] - 2:3
**17** [1] - 79:18
**17th** [1] - 2:6
**1835** [1] - 1:18
**19-2875** [1] - 4:3
**19103** [2] - 1:19, 2:7
**19422** [1] - 2:21
**1:19-md-02875-RBK-JS** [1] - 1:4
**1st** [2] - 37:22, 62:17

## 2

**2** [5] - 6:15, 23:1, 47:11, 61:22, 68:20
**2,000** [2] - 33:25, 67:23
**2.0** [11] - 20:6, 20:17, 22:3, 22:19, 23:21, 23:25, 63:5, 65:21, 65:22, 70:21, 71:14
**20** [2] - 54:21, 64:8
**20,000** [1] - 21:22
**200** [1] - 2:20

## 200,000

**200,000** [5] - 28:9, 28:10, 29:21, 51:14, 51:16
**2016** [1] - 63:23
**2019** [3] - 42:6, 52:4, 60:1
**2020** [10] - 1:7, 4:1, 14:20, 14:23, 15:11, 15:18, 47:6, 47:15, 47:19, 79:18
**2029** [1] - 2:14
**20th** [1] - 14:20
**21** [1] - 3:3
**23** [1] - 21:12
**250** [1] - 30:23
**2500** [2] - 2:10, 34:1
**26** [1] - 64:19
**2800** [1] - 2:17
**2900** [1] - 1:18

## 3

**3** [1] - 23:1
**30** [3] - 2:6, 52:4, 58:4
**30(b)(6** [1] - 19:7
**300** [1] - 2:14
**30305** [1] - 2:10
**30th** [1] - 37:6
**316** [1] - 1:15
**31st** [1] - 37:6
**32502** [1] - 1:15
**328** [3] - 14:22, 14:24
**3333** [1] - 2:10
**38th** [1] - 2:24

## 4

**4** [1] - 61:5
**4,000** [1] - 21:21
**40** [1] - 49:1
**400** [5] - 20:20, 20:24, 21:3, 21:7, 21:12
**4077** [114] - 63:23
**416** [2] - 13:8, 14:20
**450** [1] - 2:20
**45202** [1] - 2:18
**4:00** [2] - 1:8, 4:1

## 5

**5** [3] - 15:24, 31:9, 56:16
**5,000** [2] - 34:3, 34:16
**50** [2] - 34:3, 52:18
**500** [9] - 24:10, 24:11, 30:20, 30:21, 33:25, 34:16, 52:17, 52:19
**56** [1] - 77:14

## 6

**6** [1] - 54:2
**600** [2] - 1:15, 2:17
**6:05** [1] - 79:10

## 7

**7** [6] - 56:17, 56:20, 58:2, 64:8, 67:13, 72:5
**70** [1] - 49:20
**70,000** [4] - 31:5, 41:21, 42:1, 42:2
**701** [1] - 1:21
**70130** [1] - 1:22
**75** [1] - 21:15
**756-0160** [1] - 1:24
**786** [1] - 36:10

## 8

**800** [3] - 36:5, 36:8
**85** [1] - 21:16
**856** [1] - 1:24

## 9

**9** [1] - 43:1
**90-day** [1] - 8:17
**90067-2904** [1] - 2:14
**90277** [1] - 2:3
**93** [1] - 72:8
**98** [1] - 36:13
**99** [1] - 36:13

## A

**abide** [1] - 12:13
**ability** [3] - 14:15, 27:20, 75:11
**able** [4] - 17:13, 29:8, 44:18, 71:11
**above-entitled** [1] - 79:14
**absolutely** [5] - 23:2, 23:18, 34:9, 41:12, 47:9
**abysmally** [1] - 67:11
**accept** [1] - 49:8
**acceptable** [1] - 53:10
**acceptance** [1] - 47:24
**accessible** [1] - 45:1
**account** [1] - 28:24
**accurate** [2] - 29:2, 64:12
**acknowledge** [1] - 66:13
**acknowledgement** [1] - 66:2

**Actavis** [2] - 2:11
**acting** [2] - 7:19, 48:20
**ACTION** [1] - 1:3
**Active** [8] - 22:3, 35:20, 64:2, 66:22, 66:23, 70:21, 73:14, 73:16
**actively** [1] - 71:25
**Actos** [5] - 48:7, 48:8, 48:10, 71:24
**actual** [1] - 43:24
**ADAM** [1] - 1:11
**Adam** [4] - 4:10, 11:10, 71:4, 75:21
**add** [8] - 5:22, 6:7, 58:1, 69:21, 73:5, 73:6, 73:9, 73:10
**additional** [6] - 5:16, 14:10, 17:22, 62:22, 69:21, 77:17
**additionally** [1] - 18:9
**address** [5] - 11:9, 18:14, 19:25, 77:8, 79:5
**addressed** [1] - 77:24
**addressing** [1] - 6:4
**adjourned** [1] - 79:9
**adjunct** [1] - 40:16
**admitted** [1] - 50:5
**adopted** [1] - 37:3
**advance** [1] - 8:12
**affect** [1] - 69:1
**affectionately** [1] - 20:15
**affects** [1] - 9:12
**afraid** [1] - 65:15
**afternoon** [12] - 4:12, 4:14, 4:16, 4:18, 4:20, 4:23, 5:3, 5:5, 5:7, 6:3, 18:2, 20:11
**ago** [4] - 23:21, 38:6, 51:25, 55:1
**agree** [11] - 8:25, 27:19, 33:21, 33:24, 56:19, 56:22, 57:1, 62:1, 71:22, 74:13, 74:17
**agreed** [9] - 6:10, 6:17, 38:20, 39:7, 43:3, 43:6, 43:9, 48:11, 48:15
**agreed-upon** [1] - 43:6
**agreeing** [1] - 27:18
**agreement** [1] - 34:23
**agreements** [1] - 17:1
**ahead** [5] - 41:17, 49:4, 63:1, 70:13, 71:6

**aided** [1] - 1:25
**ALFANO** [1] - 2:23
**algorithm** [1] - 34:6
**algorithms** [3] - 23:22, 24:17, 28:19
**alignment** [1] - 70:14
**ALL** [1] - 4:1
**allay** [1] - 27:7
**allow** [3] - 22:24, 28:20, 28:21
**allowed** [1] - 75:12
**allows** [4] - 22:21, 24:2, 59:2, 59:23
**alluded** [1] - 70:23
**allusion** [1] - 35:23
**almost** [4] - 23:21, 36:13, 38:18, 43:16
**alternative** [1] - 40:15
**AmerisourceBergen** [2] - 2:18, 5:9
**amount** [2] - 6:9, 54:25
**analysis** [4] - 17:2, 35:9, 55:25, 65:2
**analyzing** [1] - 71:2
**AND** [2] - 1:5, 1:6
**Angeles** [1] - 2:14
**anonymizing** [1] - 12:9
**answer** [17] - 20:9, 20:14, 28:12, 29:20, 32:2, 36:23, 40:8, 40:10, 53:2, 54:18, 56:6, 65:18, 66:5, 68:19, 69:7, 69:9, 71:13
**answered** [1] - 68:20
**answers** [2] - 53:20, 55:11
**anticipate** [5] - 19:13, 20:1, 25:5, 32:23, 78:14
**antitrust** [2] - 26:24, 77:22
**anyway** [1] - 37:10
**apart** [2] - 5:25, 50:17
**API** [1] - 17:2
**apologize** [5] - 33:11, 50:20, 53:2, 61:18, 77:16
**apples** [3] - 69:4, 70:9
**apples-to-apples** [1] - 69:4
**applicable** [1] - 11:2
**application** [5] - 38:9, 39:10, 43:25, 46:18
**applied** [2] - 39:10, 40:5
**applying** [1] - 68:17
**appreciate** [3] - 10:20,

46:8, 78:6
**approach** [11] - 24:14, 24:16, 34:11, 34:22, 47:13, 47:24, 67:18, 68:17, 70:25, 71:21, 78:3
**appropriate** [4] - 19:22, 66:14, 72:18, 72:22
**approve** [1] - 43:5
**approved** [1] - 14:25
**April** [4] - 14:20, 15:18, 60:1, 69:25
**archaic** [1] - 47:18
**argue** [1] - 7:23
**ARGUMENT** [1] - 1:5
**argument** [4] - 50:17, 50:21, 51:5, 73:4
**arguments** [5] - 38:25, 47:21, 49:24, 68:14, 76:11
**aside** [1] - 61:14
**assembled** [1] - 13:22
**assembling** [1] - 20:24
**assert** [1] - 47:13
**assisted** [3] - 29:6, 64:11, 69:14
**associated** [2] - 20:16, 26:9
**associates** [1] - 64:16
**assuming** [1] - 77:11
**assured** [1] - 75:14
**Atlanta** [1] - 2:10
**attachments** [1] - 55:21
**attempted** [1] - 16:20
**attention** [4] - 62:5, 62:6, 62:16, 74:12
**attorney** [2] - 64:15, 64:22
**attorneys** [5] - 13:10, 15:9, 15:25, 28:15, 71:9
**attorneys'** [6] - 30:6, 30:14, 30:18, 31:6, 31:16, 36:12
**August** [2] - 5:24, 18:25
**Aurobindo** [5] - 2:21, 2:22, 16:6, 17:20, 17:24
**Aurolife** [1] - 2:21
**authority** [2] - 78:1, 78:18

## B

**backs** [2] - 43:18
**backward** [1] - 37:25
**backwards** [2] - 12:2, 57:10
**ball** [4] - 8:12, 9:7, 10:20, 10:25
**bandwagon** [2] - 50:16, 72:4
**barge** [1] - 53:14
**BARNES** [1] - 2:13
**based** [11] - 17:21, 21:9, 31:1, 39:2, 43:4, 43:19, 45:2, 50:7, 67:5, 68:8, 78:13
**bash** [2] - 37:6, 37:15
**basic** [1] - 53:18
**basis** [5] - 7:22, 10:11, 17:13, 34:19, 36:17
**batch** [4] - 23:6, 23:16, 26:20, 67:5
**batched** [1] - 67:2
**batches** [2] - 33:18, 34:1
**Battle** [1] - 49:14
**battles** [1] - 72:6
**Baylen** [1] - 1:15
**Beach** [1] - 2:3
**bear** [1] - 68:2
**beast** [1] - 29:22
**beat** [1] - 53:16
**becomes** [1] - 67:11
**bed** [1] - 72:10
**begin** [2] - 11:13, 13:13
**beginning** [2] - 48:14, 58:11
**begun** [2] - 13:21, 15:20
**behalf** [10] - 5:2, 12:8, 12:20, 14:1, 17:23, 18:3, 45:23, 66:13, 68:16, 70:19
**behind** [1] - 23:22
**BEHRAM** [1] - 2:2
**Behram** [4] - 4:20, 56:3, 58:23, 73:8
**Bell** [1] - 2:21
**below** [1] - 25:1
**benefit** [4] - 11:24, 29:12, 40:25, 41:1
**Benicar** [1] - 37:19
**Benz** [3] - 47:5, 55:2, 63:22
**BERNE** [1] - 2:16
**best** [2] - 20:9, 29:17
**better** [3] - 27:23, 50:18, 52:20
**between** [5] - 20:6, 20:17, 54:22, 71:9, 77:13
**beyond** [1] - 63:22

**big** [3] - 9:21, 42:1, 72:6
**bigger** [1] - 7:10
**biggest** [1] - 25:7
**bit** [4] - 18:21, 22:4, 34:5, 69:10
**biting** [1] - 50:21
**black** [4] - 20:22, 29:16, 46:12, 63:20
**blah** [6] - 61:24, 61:25
**blessed** [1] - 41:11
**block** [1] - 39:23
**blood** [1] - 50:10
**Blue** [1] - 2:21
**board** [1] - 42:19
**bog** [1] - 50:25
**Boiler** [1] - 77:22
**BOSICK** [1] - 2:23
**bottom** [1] - 22:17
**boundary** [1] - 64:20
**box** [2] - 20:22, 46:12
**Brainspace** [1] - 43:25
**breadth** [1] - 60:22
**bridge** [2] - 12:3, 77:12
**brief** [4] - 59:9, 63:2, 73:12, 73:15
**briefing** [8] - 6:6, 6:11, 6:20, 6:21, 38:9, 75:22, 75:25, 76:2
**briefly** [1] - 71:5
**briefs** [1] - 73:3
**bring** [2] - 62:16, 74:11
**broad** [1] - 51:25
**broader** [1] - 59:2
**Broiler** [2] - 26:24, 77:22
**broken** [2] - 43:17, 43:18
**brought** [7] - 59:14, 59:19, 59:21, 60:22, 61:8, 62:5, 62:6
**brute** [2] - 28:14, 29:1
**buck** [1] - 45:20
**bucket** [1] - 42:2
**bucks** [1] - 49:1
**built** [1] - 36:22
**Bulge** [1] - 49:15
**bulk** [1] - 78:15
**burden** [5] - 12:9, 47:21, 49:9, 66:6, 66:10
**burdensome** [1] - 65:23
**burr** [1] - 37:23
**bury** [2] - 55:9, 65:8
**buy** [1] - 6:14
**BY** [12] - 1:11, 1:14, 1:17, 1:21, 2:2, 2:5,

2:9, 2:13, 2:16, 2:20, 2:23, 3:2

## C

**CA** [1] - 2:14
**CAL** [16] - 22:19, 22:21, 22:23, 23:4, 23:14, 23:20, 26:15, 28:17, 35:18, 66:15, 67:1, 67:3, 67:18, 69:14, 78:4
**California** [1] - 2:3
**Camp** [1] - 1:21
**candor** [1] - 8:9
**cannot** [3] - 55:3, 63:19, 64:10
**capable** [1] - 9:22
**capture** [1] - 34:6
**care** [1] - 74:5
**carpetbagger** [1] - 53:13
**case** [46] - 7:4, 8:20, 9:1, 15:13, 15:21, 18:21, 19:6, 22:4, 26:23, 28:11, 29:25, 31:4, 31:15, 32:4, 32:20, 38:3, 38:8, 38:18, 43:1, 43:2, 43:4, 44:4, 47:5, 47:6, 47:7, 48:6, 48:8, 48:23, 51:20, 52:23, 54:22, 63:6, 63:7, 63:10, 63:11, 63:15, 63:24, 64:24, 65:21, 69:12, 69:15, 69:20, 71:14, 77:19, 77:24
**cases** [19] - 7:4, 23:23, 23:24, 23:25, 25:18, 29:14, 38:9, 38:11, 42:16, 55:2, 55:3, 63:4, 63:5, 65:22, 69:16, 76:17, 77:21
**casually** [1] - 44:4
**Casualty** [5] - 38:18, 42:25, 44:3, 48:23, 51:19
**catastrophically** [1] - 44:15
**categorically** [1] - 42:24
**categories** [2] - 9:21, 14:5
**cautioned** [1] - 47:20
**Cavanaugh** [4] - 47:10, 47:19, 48:19
**caveat** [1] - 28:1
**Centre** [1] - 2:24
**Century** [1] - 2:14

**certain** [5] - 26:5, 31:23, 31:24, 57:19, 68:3
**certainly** [8] - 6:21, 8:25, 9:3, 17:9, 36:15, 51:3, 71:15, 73:4
**certificates** [1] - 17:1
**certify** [1] - 79:13
**cetera** [3] - 19:10, 19:11, 42:24
**chance** [1] - 50:12
**change** [3] - 46:14, 52:11, 77:3
**changes** [2] - 46:5, 46:6
**charge** [1] - 50:14
**cheaper** [1] - 47:24
**check** [5] - 11:13, 12:25, 33:4, 33:7, 33:8
**check-in** [2] - 11:13, 12:25
**checking** [4] - 33:6, 33:7, 35:11, 36:18
**Chicken** [2] - 26:24, 77:22
**choice** [2] - 51:18, 53:4
**choose** [3] - 23:9, 29:18, 51:23
**chose** [1] - 63:21
**chosen** [1] - 47:23
**chromatograms** [1] - 44:23
**chromatography** [1] - 44:22
**cincinnati** [1] - 2:18
**CIPRIANI** [1] - 2:19
**circumstances** [1] - 31:17
**citation** [1] - 43:2
**cite** [2] - 63:6, 65:20
**cited** [7] - 14:20, 38:8, 48:6, 48:9, 77:21
**City** [2] - 63:23, 63:24
**CIVIL** [1] - 1:3
**claims** [5] - 64:20, 64:21, 64:23, 65:3, 76:12
**clarify** [5] - 8:22, 9:4, 9:10, 11:1, 13:6
**clarifying** [1] - 16:4
**clawback** [1] - 49:5
**cleaned** [1] - 19:7
**clear** [6] - 9:16, 10:1, 10:13, 33:11, 54:12, 62:11
**clearly** [1] - 46:24
**CLEM** [1] - 2:23

*Clem* [2] - 5:3, 16:8
*client* [1] - 16:11
*clients* [1] - 10:6
*close* [2] - 52:7, 61:5
*closer* [1] - 74:2
*clunky* [1] - 71:21
*CMML* [12] - 22:4, 24:16, 25:23, 26:4, 26:15, 27:4, 27:6, 28:17, 60:14, 69:6, 69:8
*CMMLs* [1] - 38:5
*Co* [1] - 2:15
*Coast* [1] - 2:3
*coding* [10] - 20:15, 23:15, 26:15, 43:4, 61:23, 62:8, 63:9, 66:25, 67:1, 68:7
*collect* [6] - 9:6, 9:25, 10:4, 13:21, 14:10, 15:21
*collected* [7] - 9:22, 10:17, 13:17, 49:22, 49:24, 50:5, 62:10
*collecting* [1] - 15:16
*combine* [1] - 57:23
*comfort* [2] - 11:22, 75:4
*coming* [4] - 11:14, 11:20, 23:21, 55:5
*commence* [1] - 14:21
*Commencing* [1] - 1:8
*comment* [2] - 7:2, 10:23
*comments* [1] - 66:14
*commit* [1] - 10:24
*committed* [2] - 16:24, 51:24
*committee* [1] - 49:11
*common* [1] - 68:4
*commonly* [1] - 73:20
*companies* [1] - 28:7
*Company* [5] - 38:18, 43:11, 44:4, 48:23, 51:20
*company* [1] - 44:1
*compare* [1] - 70:9
*comparing* [1] - 69:3
*comparison* [1] - 69:4
*complaining* [2] - 65:25, 66:10
*complete* [6] - 17:12, 40:2, 74:4, 74:10, 75:11, 75:14
*completed* [2] - 5:24, 18:9
*completely* [4] - 42:22, 43:24, 56:1, 76:2
*complicated* [3] -

*9:24, 69:11, 69:12
*complied* [1] - 25:25
*comply* [3] - 15:7, 77:1, 77:2
*complying* [1] - 42:1
*compound* [1] - 57:15
*comprehensive* [1] - 73:4
*comprised* [1] - 13:9
*computer* [8] - 1:25, 20:16, 20:23, 21:6, 21:8, 31:2, 78:22
*computer-aided* [1] - 1:25
*concept* [1] - 57:14
*concepts* [2] - 26:17, 26:22
*concern* [6] - 25:7, 25:22, 26:19, 35:17, 60:22, 78:2
*concerned* [4] - 26:18, 32:11, 32:25, 38:16
*concerns* [4] - 12:9, 26:8, 27:7, 39:21
*concessions* [2] - 56:20, 60:25
*concur* [1] - 16:16
*conducted* [1] - 35:2
*confer* [14] - 7:14, 8:1, 8:4, 10:25, 25:21, 26:12, 27:18, 42:10, 45:10, 53:9, 58:13, 60:4, 60:6, 62:1
*CONFERENCE* [1] - 1:5
*conference* [6] - 5:21, 6:1, 15:13, 15:22, 56:9, 60:6
*conferences* [1] - 60:8
*confidence* [4] - 35:1, 36:14, 56:15, 58:2
*confident* [1] - 77:9
*confirm* [1] - 14:13
*confirmed* [2] - 60:13, 78:11
*conjunction* [1] - 71:16
*Conlee* [1] - 4:16
*CONLEE* [1] - 1:21
*connection* [1] - 28:19
*consider* [2] - 16:20, 77:17
*consideration* [1] - 10:21
*considering* [2] - 28:3, 70:20
*Consilio* [1] - 69:9
*consistently* [1] - 21:24
*conspiracy* [2] -

*63:18, 65:5
*constant* [1] - 36:24
*constantly* [1] - 36:17
*consternation* [1] - 38:23
*Consultants* [3] - 13:10, 15:9, 16:1
*consultants* [1] - 43:3
*consulting* [1] - 46:9
*consumer* [1] - 12:10
*contemplated* [1] - 59:16
*context* [1] - 69:15
*contingency* [1] - 10:11
*continual* [1] - 17:13
*continue* [11] - 8:1, 10:15, 10:19, 10:24, 12:13, 21:13, 22:20, 72:24, 73:13, 75:4, 75:12
*CONTINUED* [2] - 2:1, 3:1
*continues* [1] - 74:21
*continuing* [2] - 10:15, 20:2
*Continuous* [7] - 22:3, 64:2, 66:22, 66:23, 70:21, 73:14, 73:16
*continuous* [2] - 35:20, 63:7
*Continuously* [1] - 35:20
*contrary* [1] - 43:24
*control* [2] - 40:2, 47:2
*conversation* [1] - 38:6
*convert* [1] - 77:10
*cooler* [1] - 27:4
*cooperate* [6] - 7:5, 7:13, 8:1, 25:19, 37:14, 61:24
*cooperating* [1] - 34:25
*cooperation* [4] - 8:25, 25:17, 26:7, 44:6
*cooperatively* [3] - 7:17, 8:8, 10:15
*core* [2] - 17:23, 18:9
*corners* [1] - 77:7
*coronavirus* [1] - 50:2
*correct* [9] - 9:20, 18:19, 24:18, 25:4, 25:11, 60:16, 61:22, 72:16, 79:13
*cost* [3] - 47:22, 48:25, 68:2
*costly* [1] - 9:24
*costs* [1] - 68:1

*counsel* [14] - 4:4, 12:8, 18:1, 20:9, 23:8, 41:6, 42:18, 44:6, 45:3, 60:25, 62:15, 71:14, 72:15, 79:4
*Counsel* [1] - 51:7, 68:18, 79:8
*country* [1] - 37:3
*couple* [6] - 20:25, 27:13, 54:22, 56:14, 62:25, 77:18
*course* [4] - 12:13, 24:7, 56:5, 59:12
*Court* [7] - 1:23, 20:13, 43:15, 49:11, 52:2, 78:12, 79:16
*COURT* [1] - 1:2
*Court's* [1] - 9:9, 10:7, 10:20, 11:23, 12:12, 14:19, 60:20, 75:1, 75:8, 78:2, 78:20
*courtesy* [1] - 40:3
*courts* [1] - 37:2
*Courts* [1] - 44:8
*covered* [1] - 51:4
*COVID* [2] - 13:21, 19:2
*COVID-19* [2] - 15:17, 15:23
*create* [1] - 46:13
*criteria* [2] - 32:17, 46:1
*critical* [4] - 34:9, 45:7, 48:1, 75:23
*cross* [1] - 77:12
*CRR* [1] - 79:16
*custodial* [7] - 14:6, 58:14, 70:12, 70:22, 74:4, 74:10, 75:14
*custodian* [7] - 25:15, 34:20, 47:12, 47:23, 58:19, 69:2, 74:5
*custodians* [15] - 14:7, 21:4, 25:13, 35:24, 36:7, 58:22, 58:24, 59:3, 59:6, 66:18, 68:23, 70:6, 70:16, 72:2, 74:2
*cutoff* [1] - 31:8
*CVS* [2] - 2:15, 5:6
*cynicism* [1] - 55:10

**D**

*DANIEL* [2] - 1:14, 2:16
*Daniel* [1] - 4:14
*DaSilva* [2] - 23:23,

*33:12
*data* [5] - 6:9, 6:16, 12:10, 66:19, 76:18
*dataset* [3] - 26:10, 27:9, 29:11
*datasets* [1] - 68:22
*date* [6] - 15:1, 30:23, 62:14, 62:15, 70:1, 75:16
*Date* [1] - 79:18
*David* [3] - 4:18, 6:3, 12:1
*DAVID* [1] - 1:18
*DAVIS* [1] - 2:9
*days* [2] - 77:5, 78:5
*de* [2] - 55:23, 66:20
*de-duplicate* [1] - 55:23
*de-duplicated* [1] - 66:20
*deadline* [2] - 14:16, 61:16
*deal* [5] - 5:17, 42:1, 49:9, 54:19, 75:21
*dealing* [5] - 19:7, 45:4, 45:7, 55:16, 69:20
*decade* [1] - 23:21
*decades* [1] - 23:23
*December* [3] - 50:2, 59:16, 59:22
*December/January* [1] - 19:14
*decide* [3] - 59:15, 60:2, 67:3
*decided* [1] - 60:5
*decides* [1] - 30:22
*decision* [10] - 25:3, 25:8, 26:2, 31:17, 63:25, 64:13, 64:16, 64:23, 68:15
*decisional* [1] - 26:23
*decisionmaking* [1] - 45:7
*decisions* [4] - 20:21, 21:9, 26:4, 55:19
*deemed* [1] - 34:18
*Defendant* [6] - 2:7, 2:15, 2:18, 2:21, 2:25, 3:4
*defendant* [15] - 6:8, 6:25, 38:20, 39:3, 42:4, 43:8, 43:11, 44:21, 47:16, 51:9, 52:5, 60:7, 60:9, 69:3, 70:7
*Defendants* [1] - 2:11
*defendants* [65] - 4:4, 4:22, 4:24, 5:2, 5:4, 5:6, 5:8, 5:17, 5:23,

6:14, 6:19, 7:6, 8:10, 8:14, 8:17, 8:22, 9:5, 9:6, 11:3, 11:16, 13:4, 13:11, 13:24, 14:1, 14:21, 15:6, 15:10, 15:20, 16:6, 17:16, 17:20, 17:24, 18:22, 19:14, 19:16, 26:14, 28:3, 35:1, 38:13, 38:24, 41:25, 42:19, 47:8, 47:10, 47:20, 47:23, 49:17, 50:12, 50:15, 52:22, 56:22, 60:9, 65:25, 66:9, 66:13, 66:15, 68:16, 68:22, 70:2, 70:20, 74:1, 74:24, 75:4, 78:21
**defendants'** [5] - 13:10, 15:9, 15:25, 78:10, 78:13
**Defense** [2] - 2:7, 2:25
**defense** [5] - 38:8, 45:9, 48:9, 55:12, 76:18
**defenses** [4] - 64:20, 64:21, 64:24, 65:3
**defensible** [1] - 34:10
**defer** [1] - 76:21
**define** [2] - 39:17, 54:7
**definition** [4] - 39:24, 44:11, 64:18, 64:19
**definitions** [1] - 39:16
**degree** [1] - 21:25
**degrees** [1] - 44:5
**Delaney** [1] - 38:18
**denied** [2] - 60:21, 60:23
**dent** [1] - 61:1
**deny** [1] - 7:24
**denying** [1] - 6:6
**dependent** [1] - 10:7
**deposed** [1] - 19:9
**deposition** [2] - 19:7, 45:8
**depositions** [7] - 19:13, 19:17, 19:18, 45:9, 74:3, 74:9, 75:11
**deprioritize** [1] - 75:23
**deps** [1] - 19:10
**derived** [1] - 15:3
**described** [2] - 33:15, 71:1
**despite** [1] - 47:24
**detail** [1] - 46:11
**detailed** [1] - 46:7
**determination** [1] - 23:8

**determine** [3] - 28:11, 68:9, 72:1
**determined** [1] - 71:2
**determines** [1] - 30:21
**devote** [1] - 57:10
**difference** [6] - 20:6, 20:17, 23:12, 23:13, 69:11, 77:13
**different** [8] - 8:6, 15:16, 20:25, 22:4, 34:21, 50:19, 63:8, 68:24
**difficult** [4] - 7:11, 10:4, 37:15, 74:9
**difficulties** [1] - 15:15
**digests** [1] - 73:6
**digress** [1] - 42:4
**diligently** [1] - 17:11
**direct** [1] - 20:14
**disagree** [2] - 8:5, 74:17
**disclosed** [3] - 61:12, 62:9, 70:5
**disclosure** [1] - 44:9
**discoverable** [1] - 8:11
**discovery** [14] - 8:3, 9:8, 9:13, 10:8, 10:18, 17:23, 18:9, 29:10, 37:6, 44:7, 47:22, 69:25, 76:5, 76:22
**discuss** [2] - 35:21, 62:2
**discussed** [6] - 15:3, 36:17, 59:21, 62:8, 69:24, 70:2
**discussion** [3] - 15:15, 15:19, 60:3
**discussions** [2] - 20:2, 42:8
**dismiss** [5] - 45:5, 75:22, 75:25, 77:4, 77:7
**dispensed** [1] - 6:15
**dispensement** [1] - 12:10
**disproportional** [1] - 67:21
**disproportionately** [1] - 66:8
**DISPUTE** [1] - 1:6
**dispute** [3] - 8:3, 57:7, 64:10
**disputes** [2] - 42:13, 78:14
**distant** [1] - 25:14
**distinction** [1] - 69:11
**distinguish** [1] - 63:4
**distraction** [4] - 44:13,

54:20, 55:15, 55:25
**District** [1] - 26:25
**DISTRICT** [2] - 1:2, 1:2
**distrust** [2] - 57:7, 57:14
**do-over** [3] - 38:20, 43:13, 51:22
**Docket** [2] - 4:3, 14:20
**Document** [1] - 14:22
**document** [45] - 5:15, 14:25, 18:6, 19:4, 22:1, 22:18, 23:11, 25:1, 25:8, 27:21, 28:16, 30:10, 30:13, 30:18, 30:24, 31:14, 31:18, 31:19, 32:12, 32:15, 35:10, 39:15, 39:17, 41:3, 43:24, 46:21, 47:1, 49:3, 49:8, 50:7, 51:11, 54:1, 57:20, 64:16, 64:22, 64:23, 65:1, 65:4, 67:16, 68:24, 70:22, 72:1, 76:12, 78:13
**documented** [2] - 29:2, 29:5
**documents** [220] - 6:9, 7:7, 7:8, 8:12, 8:16, 9:7, 9:20, 10:5, 10:17, 13:9, 13:12, 13:13, 13:19, 13:22, 14:15, 14:22, 15:8, 15:11, 15:17, 15:21, 15:24, 16:2, 17:8, 18:22, 20:20, 20:25, 21:1, 21:3, 21:4, 21:7, 21:11, 21:21, 21:22, 21:23, 22:2, 22:5, 22:9, 22:10, 22:11, 22:13, 22:16, 22:17, 22:20, 22:21, 22:22, 22:24, 22:25, 23:1, 23:2, 23:3, 23:4, 23:6, 23:15, 23:16, 24:3, 24:8, 24:10, 24:11, 24:12, 24:17, 24:23, 25:24, 26:5, 26:9, 26:20, 27:7, 27:16, 28:9, 28:10, 28:21, 28:24, 29:9, 29:21, 30:2, 30:3, 30:5, 30:6, 30:7, 30:17, 30:20, 31:5, 31:7, 31:25, 32:16, 32:20, 32:21, 32:25, 33:4, 33:6, 33:8, 33:16, 33:17, 33:18, 33:19, 33:25, 34:1, 34:3, 34:7,

34:15, 34:16, 34:17, 35:8, 35:9, 35:12, 35:13, 35:25, 36:1, 36:5, 36:9, 36:10, 36:12, 36:18, 36:19, 39:5, 39:7, 39:11, 39:23, 40:23, 41:5, 41:8, 41:20, 42:22, 43:9, 43:23, 44:2, 44:17, 45:14, 45:17, 46:4, 46:5, 46:16, 46:18, 46:19, 48:13, 49:18, 49:19, 49:21, 49:22, 49:25, 50:2, 50:5, 50:6, 51:14, 51:16, 51:20, 52:15, 52:17, 53:3, 54:5, 54:16, 55:5, 55:7, 55:9, 55:17, 56:17, 56:19, 56:21, 56:23, 57:17, 58:3, 58:4, 58:16, 59:1, 59:2, 60:3, 61:5, 61:14, 61:15, 62:10, 62:19, 62:21, 64:3, 64:21, 65:1, 65:8, 65:24, 66:3, 66:4, 67:2, 67:4, 67:6, 67:9, 67:15, 67:22, 67:23, 68:8, 68:10, 69:2, 69:20, 70:3, 70:23, 71:25, 72:6, 72:7, 72:9, 72:21, 73:1, 73:20, 73:22, 74:4, 74:7, 74:14, 74:25, 75:6, 75:23, 76:1, 76:5, 76:7, 76:14, 76:25, 77:3, 77:5, 78:24
**dollar** [1] - 69:17
**done** [16] - 21:19, 24:13, 24:19, 31:7, 35:23, 41:16, 48:4, 55:1, 56:11, 58:15, 62:14, 62:15, 70:8, 71:17, 75:16, 75:25
**dose** [1] - 17:2
**double** [4] - 33:4, 33:7, 33:8, 35:11
**double-check** [3] - 33:4, 33:7, 33:8
**doubt** [4] - 37:2, 45:2, 55:10, 63:22
**down** [12] - 14:14, 22:17, 23:2, 27:4, 37:6, 37:8, 50:25, 53:9, 57:8, 58:20, 65:17, 67:10
**downstream** [5] - 5:17, 5:22, 8:17, 11:3, 78:10

**dozens** [2] - 21:19, 21:20
**draw** [1] - 59:4
**drive** [2] - 34:4, 34:5
**driving** [2] - 39:21, 39:22
**drop** [1] - 42:2
**drug** [1] - 6:15
**Drugs** [2] - 3:4, 18:3
**DUANE** [1] - 2:5
**due** [4] - 13:14, 13:18, 77:5, 78:18
**dump** [1] - 56:1
**duplicate** [1] - 55:23
**duplicated** [1] - 66:20
**during** [5] - 6:20, 41:24, 46:13, 49:24, 60:8

## E

**e-mail** [2] - 55:22, 68:25
**e-mails** [2] - 71:9, 73:22
**earliest** [1] - 29:9
**early** [3] - 57:4, 62:2, 67:7
**easier** [1] - 7:18
**East** [1] - 2:14
**eastern** [1] - 26:25
**echo** [1] - 10:23
**eDiscovery** [2] - 20:8, 43:3
**effect** [4] - 72:18, 72:22, 78:17, 78:21
**efficient** [3] - 47:13, 47:25, 54:4
**efficiently** [2] - 7:5, 53:25
**effort** [4] - 14:9, 18:7, 58:9, 67:21
**efforts** [8] - 9:24, 13:12, 14:14, 15:7, 15:10, 16:1, 70:3, 70:11
**Eisenhower** [1] - 1:12
**either** [7] - 10:9, 12:15, 24:13, 24:19, 31:8, 40:8, 77:20
**eliminate** [2] - 26:4, 60:3
**encountering** [1] - 67:13
**end** [32] - 6:5, 14:12, 14:17, 17:14, 18:6, 18:17, 18:24, 19:1, 21:18, 23:13, 26:19, 27:8, 33:24, 34:8, 35:22, 36:15, 36:23,

40:22, 46:2, 51:21, 52:25, 54:14, 55:4, 62:17, 64:9, 65:14, 69:19, 73:21, 74:10, 75:10, 76:21, 76:22
**endeavor** [1] - 14:10
**ended** [1] - 42:12
**energies** [1] - 57:10
**energy** [2] - 57:9, 58:11
**engage** [5] - 26:11, 45:10, 63:15, 65:11, 65:14
**engaged** [2] - 40:19, 54:14
**engaging** [1] - 65:10
**enormous** [1] - 54:24
**enormously** [1] - 44:14
**ensure** [3] - 32:7, 32:8, 36:18
**enter** [1] - 28:25
**entered** [10] - 13:7, 13:11, 13:20, 14:20, 15:13, 18:16, 18:20, 59:17, 69:25, 77:24
**entering** [1] - 11:2
**enters** [1] - 74:14
**entire** [6] - 39:15, 41:3, 42:20, 52:11, 56:18, 74:1
**entities** [1] - 18:3
**entitled** [2] - 70:12, 79:14
**entity** [1] - 50:5
**envision** [1] - 68:4
**equities** [1] - 79:2
**error** [1] - 57:16
**ESI** [20] - 13:10, 14:9, 15:9, 16:1, 18:6, 19:4, 26:1, 27:10, 43:4, 43:6, 44:7, 45:11, 48:2, 59:22, 61:11, 61:21, 62:7, 63:8, 63:9, 66:24
**especially** [4] - 43:14, 46:12, 49:15, 65:22
**ESQUIRE** [15] - 1:11, 1:14, 1:17, 1:18, 1:21, 2:2, 2:5, 2:6, 2:9, 2:9, 2:13, 2:20, 2:23, 2:24, 3:2
**essence** [1] - 57:7
**essentially** [2] - 40:12, 56:14
**established** [1] - 47:14
**estoppel** [2] - 45:24, 60:20
**et** [3] - 19:10, 42:24

**evaluate** [1] - 79:3
**eventually** [1] - 27:17
**exact** [2] - 6:22, 38:19
**exactly** [4] - 35:15, 38:13, 39:22, 52:1
**example** [7] - 21:10, 30:3, 31:14, 32:9, 46:15, 52:17, 63:5
**except** [1] - 69:18
**exclude** [5] - 30:15, 30:16, 44:2, 68:8, 73:1
**excluded** [2] - 72:21, 78:24
**exclusively** [1] - 12:8
**exemplar** [3] - 7:8, 8:12, 9:10
**exemplars** [1] - 9:14
**exercise** [8] - 21:18, 26:15, 33:20, 33:24, 34:8, 35:22, 64:14, 69:14
**exercises** [1] - 33:16
**exist** [1] - 45:16
**existing** [1] - 39:7
**expanded** [1] - 56:11
**expect** [11] - 11:16, 11:19, 13:1, 21:8, 26:3, 46:3, 61:5, 67:7, 67:10, 67:16
**expects** [1] - 50:24
**expensive** [2] - 10:7, 52:11
**experience** [5] - 21:19, 55:13, 65:21, 69:6, 69:8
**expert** [2] - 40:7, 61:8
**experts** [2] - 48:12, 61:11
**explanations** [1] - 42:3
**exponential** [1] - 57:16
**expressly** [1] - 59:22
**extension** [12] - 5:18, 6:5, 7:2, 8:17, 9:19, 10:16, 10:21, 12:3, 12:4, 12:7, 12:18, 78:11
**extensions** [1] - 7:12
**extent** [4] - 15:8, 15:24, 41:20, 76:19
**extremely** [1] - 73:3
**eyeballs** [3] - 61:6, 65:23, 66:2
**eyes** [6] - 30:6, 30:14, 30:18, 31:6, 31:16, 36:12

### F

**face** [1] - 74:20
**facilitate** [1] - 62:22
**facilitated** [1] - 14:15
**fact** [16] - 9:18, 15:20, 18:16, 18:20, 18:23, 40:15, 41:14, 41:17, 43:8, 43:10, 45:9, 54:20, 56:11, 63:19, 65:12, 69:18
**factors** [1] - 69:1
**fair** [3] - 10:19, 47:13, 72:14
**fairly** [2] - 48:5, 77:9
**faith** [15] - 7:20, 8:1, 8:6, 13:12, 14:8, 15:7, 15:10, 16:1, 16:20, 17:9, 18:7, 33:22, 40:18, 46:21, 61:24
**fall** [2] - 9:20, 19:13
**false** [2] - 43:19, 64:19
**far** [3] - 29:6, 57:8, 67:6
**fashion** [3] - 9:23, 77:1, 78:16
**faster** [1] - 24:4
**favorably** [1] - 47:21
**feet** [1] - 8:16
**fell** [1] - 50:17
**felt** [1] - 9:17
**Ferretti** [2] - 66:12, 71:1
**FERRETTI** [2] - 2:6, 66:12
**few** [10] - 8:22, 19:3, 19:25, 28:8, 40:20, 46:17, 51:24, 52:13, 60:16, 78:5
**fiction** [1] - 60:15
**fifth** [1] - 32:19
**fight** [4] - 50:10, 63:19, 72:7, 72:11
**figure** [1] - 55:20
**files** [1] - 74:10
**filter** [3] - 30:17, 32:13, 49:4
**finalize** [1] - 18:16
**finalizing** [1] - 18:5
**finally** [2] - 39:1, 66:20
**fine** [4] - 8:7, 12:5, 49:3, 59:4
**finish** [1] - 18:23
**finished** [2] - 17:2, 57:24
**fire** [1] - 8:16
**firm** [1] - 71:19
**firms** [1] - 75:13
**first** [21] - 5:17, 8:24,

11:17, 16:19, 18:5, 21:10, 21:11, 22:22, 30:23, 39:19, 40:17, 41:2, 54:2, 59:13, 59:17, 62:4, 69:5, 70:15, 73:16, 78:4
**flexible** [1] - 28:23
**flipping** [1] - 66:21
**Floor** [1] - 2:24
**flow** [2] - 41:18, 46:6
**flowed** [1] - 41:20
**fly** [1] - 28:24
**focus** [6] - 8:19, 14:3, 55:17, 55:22, 68:3, 70:4
**focused** [1] - 70:11
**focusing** [1] - 19:4, 70:3, 70:8
**foist** [2] - 29:15, 55:3
**following** [2] - 11:23, 33:25
**FOR** [1] - 1:2
**force** [4] - 28:14, 29:1, 52:24, 52:25
**forcing** [1] - 51:18
**foreclose** [1] - 76:17
**foregoing** [1] - 79:13
**foresee** [1] - 19:1
**forget** [2] - 16:10, 16:15
**form** [1] - 57:1
**forth** [2] - 40:13, 50:1
**fortunately** [1] - 37:19
**forward** [12] - 7:17, 7:22, 9:1, 9:7, 10:25, 11:25, 12:23, 37:25, 38:1, 50:24, 68:2, 74:21
**four** [2] - 10:12, 77:7
**fourth** [1] - 32:15
**framed** [1] - 76:11
**Frank** [1] - 70:19
**frank** [1] - 26:2
**FRANK** [1] - 2:24
**frankly** [5] - 12:18, 24:4, 29:11, 31:11, 55:15
**frankness** [1] - 8:8
**FREEMAN** [1] - 1:11
**Friday** [1] - 45:5
**Friedlander** [2] - 1:23, 79:16
**friedlanderreporter @gmail.com** [1] - 1:23
**front** [4] - 42:12, 45:1, 61:21, 67:9
**front-loaded** [1] - 67:9
**frustrating** [1] - 50:22

**frustration** [1] - 9:9
**fulfilled** [1] - 11:15
**full** [3] - 43:24, 44:9, 71:24
**fully** [2] - 10:6, 48:5
**functionally** [2] - 22:6, 23:5
**fundamental** [1] - 64:5
**funny** [1] - 47:7
**future** [3] - 25:14, 47:21, 75:12

### G

**game** [1] - 43:20
**gaps** [1] - 44:19
**general** [1] - 32:3
**generally** [1] - 9:21
**generate** [2] - 34:19, 34:22
**generated** [1] - 20:24
**generating** [3] - 21:23, 21:24, 21:25
**GEOPPINGER** [5] - 2:16, 5:7, 5:8, 10:22, 11:5
**Geoppinger** [3] - 5:8, 10:23, 12:6
**Georgetown** [1] - 29:5
**Georgia** [2] - 2:10, 29:4
**given** [2] - 67:22, 78:20
**goal** [2] - 8:8, 23:11
**going-forward** [1] - 7:22
**Goldberg** [6] - 4:24, 13:6, 14:19, 15:2, 16:3, 42:7
**GOLDBERG** [2] - 2:5, 4:23, 13:5, 15:4
**Goldberg's** [1] - 12:7
**GOLOMB** [1] - 1:17
**GORDON** [1] - 2:23
**grand** [2] - 63:18, 65:5
**grant** [2] - 7:1, 7:11
**granting** [2] - 10:21, 78:10
**great** [3] - 6:8, 36:14, 56:18
**Green** [2] - 30:11
**Greenberg** [6] - 5:1, 20:8, 20:12, 71:19, 73:24, 75:13
**GREENBERG** [1] - 2:8
**Greene** [23] - 5:1, 20:8, 20:12, 30:4, 30:12, 38:4, 49:16, 50:21, 53:6, 53:8, 59:8, 59:11, 59:19,

61:9, 61:18, 62:24, 63:1, 65:19, 70:25, 71:19, 72:20, 77:15, 77:16
**GREENE** [26] - 2:9, 20:11, 24:6, 24:13, 24:16, 24:19, 25:4, 25:11, 27:22, 28:1, 28:12, 29:24, 31:3, 32:2, 32:7, 32:19, 33:10, 35:15, 35:18, 59:8, 59:12, 62:24, 63:2, 66:5, 68:19, 77:15
**Grossman** [1] - 29:3
**group** [3] - 7:6, 9:6, 69:23
**Group** [2] - 2:7, 2:25
**groups** [2] - 8:9, 12:20
**guarantees** [1] - 46:20
**guess** [5] - 10:9, 19:15, 50:18, 52:12, 77:11
**guessing** [2] - 35:16, 35:17
**guideposts** [1] - 64:25
**guts** [1] - 50:10

## H

**Hail** [1] - 50:11
**half** [2] - 12:2, 50:4
**hammer** [1] - 56:14
**hammered** [1] - 42:15
**hand** [3] - 28:11, 30:23, 51:16
**handled** [1] - 77:25
**hands** [1] - 24:4
**happy** [7] - 14:1, 36:20, 40:12, 52:21, 65:14, 77:18, 78:1
**hard** [1] - 19:2
**harmful** [1] - 46:22
**hash** [1] - 53:9
**hate** [1] - 12:4
**head** [1] - 32:23
**heads** [1] - 27:4
**Health** [1] - 2:15
**hear** [5] - 5:19, 12:5, 27:14, 44:21, 78:14
**heard** [15] - 16:5, 38:2, 45:2, 53:6, 53:8, 55:12, 60:9, 63:17, 63:19, 64:7, 64:8, 72:5, 78:13
**hearing** [2] - 9:8, 10:18
**heart** [1] - 8:24
**heavily** [1] - 57:19
**heavy** [1] - 34:24

**Heinz** [1] - 17:19
**HEINZ** [2] - 2:20, 17:19
**held** [1] - 72:7
**hello** [1] - 4:10
**help** [2] - 8:12, 61:15
**helping** [1] - 46:9
**hesitate** [1] - 43:5
**Hetero** [7] - 3:4, 16:6, 18:1, 18:3, 18:4
**Hetero's** [1] - 18:1
**Hi** [1] - 4:25
**hi** [1] - 17:19
**hiatus** [1] - 18:22
**hide** [2] - 54:5, 61:14
**high** [3] - 21:25, 33:1
**highest** [1] - 24:24
**highly** [1] - 31:14
**Highway** [1] - 2:3
**HILL** [1] - 3:2
**HIPAA** [1] - 12:9
**historical** [1] - 59:20
**history** [1] - 61:17
**histrionic** [1] - 65:12
**histrionics** [1] - 63:19
**hit** [27] - 22:1, 24:10, 24:17, 25:1, 25:8, 27:17, 27:21, 30:24, 31:23, 32:22, 43:22, 44:16, 45:5, 49:3, 49:8, 50:2, 51:11, 51:20, 52:15, 52:17, 52:18, 52:19, 55:7, 66:3, 66:4, 72:9, 73:20
**hits** [7] - 28:9, 30:20, 45:17, 51:14, 56:23, 66:8, 69:1
**hitting** [3] - 22:1, 55:18, 74:7
**hold** [2] - 8:16, 61:20
**honest** [1] - 36:8
**Honik** [1] - 4:12
**HONIK** [3] - 1:17, 1:17, 4:12
**Honor** [119] - 4:10, 4:12, 4:14, 4:16, 4:18, 4:20, 4:23, 4:25, 5:3, 5:5, 5:7, 6:3, 6:4, 6:7, 6:12, 8:21, 10:22, 11:11, 12:1, 12:16, 13:5, 13:7, 13:11, 13:25, 15:4, 15:12, 16:8, 16:18, 17:19, 18:2, 18:5, 20:7, 20:11, 21:19, 22:23, 24:13, 25:4, 25:12, 25:16, 26:2, 26:6, 27:22, 28:1, 29:1, 29:16,

30:1, 31:4, 31:11, 32:4, 32:15, 32:19, 33:10, 33:14, 34:12, 34:23, 35:25, 38:2, 38:22, 39:9, 39:22, 41:5, 41:13, 41:23, 42:2, 42:9, 42:16, 42:18, 43:16, 45:15, 45:21, 46:2, 46:7, 46:10, 47:5, 48:1, 48:6, 49:7, 49:23, 50:8, 50:24, 51:24, 52:3, 53:21, 55:15, 56:3, 58:8, 58:23, 59:8, 59:18, 62:24, 63:17, 65:5, 65:16, 65:18, 66:5, 66:12, 68:12, 68:15, 68:19, 69:23, 70:18, 71:4, 72:4, 72:10, 73:8, 73:12, 74:12, 74:18, 75:9, 75:20, 76:8, 77:1, 77:4, 77:15, 77:18, 79:6, 79:7
**HONORABLE** [1] - 1:9
**hope** [1] - 68:12
**hopefully** [1] - 78:19
**hoping** [3] - 11:21, 68:8, 68:14
**hours** [1] - 54:22
**huge** [1] - 26:20
**human** [1] - 33:16
**hundred** [3] - 23:3, 52:18, 67:15
**hundreds** [1] - 33:17
**Hyles** [2] - 63:23
**HYLES** [1] - 63:24
**hypothetical** [5] - 24:7, 30:20, 51:13, 51:14
**hypothetically** [2] - 24:8, 51:10

## I

**idea** [7] - 11:12, 11:15, 11:16, 12:24, 27:1, 38:7, 40:25
**identified** [3] - 5:14, 14:5, 14:7
**identify** [5] - 58:14, 58:19, 58:24, 71:15
**ignore** [2] - 37:19, 37:20
**Illinois** [1] - 27:1
**immediately** [2] - 51:7, 67:5
**impact** [1] - 76:1
**implemented** [2] - 48:5, 56:8

**implementing** [1] - 75:13
**implicit** [1] - 66:1
**implore** [1] - 72:5
**imploring** [1] - 52:5
**important** [7] - 19:18, 24:20, 35:19, 45:7, 46:19, 51:3, 53:23
**importantly** [1] - 63:12
**imposed** [1] - 47:2
**impractical** [1] - 58:15
**improper** [1] - 42:22
**IN** [1] - 1:4
**Inc** [3] - 2:11, 2:12, 2:21
**include** [1] - 26:17
**included** [1] - 17:3
**includes** [4] - 14:4, 14:8, 27:6, 43:18
**including** [3] - 5:11, 39:3, 62:3
**incorporated** [1] - 76:16
**incredibly** [1] - 73:23
**indicating** [1] - 47:12
**indicia** [1] - 46:17
**individual** [2] - 69:2, 78:12
**Industries** [1] - 2:11
**inequitable** [2] - 56:1, 56:25
**inevitable** [1] - 51:15
**inexperience** [1] - 63:3
**information** [12] - 13:17, 13:21, 17:3, 19:17, 32:8, 32:10, 33:5, 40:1, 46:8, 54:7, 64:21, 77:17
**inherent** [2] - 57:7, 57:13
**inherently** [1] - 28:23
**initial** [2] - 17:9, 72:16
**input** [6] - 28:4, 40:9, 42:14, 48:5, 53:1, 54:10
**insane** [1] - 58:25
**insidious** [3] - 38:15, 39:13, 63:18
**instance** [2] - 74:20, 78:4
**instead** [2] - 47:8, 47:11
**Institute** [1] - 29:4
**insult** [1] - 63:12
**Insurance** [6] - 38:18, 42:25, 43:11, 44:4, 48:23, 51:19
**intelligent** [1] - 22:14

**intend** [3] - 26:14, 60:7, 77:9
**intended** [7] - 6:19, 39:10, 39:11, 42:17, 43:22, 43:23, 56:15
**intending** [4] - 40:21, 66:16, 66:25, 67:1
**intends** [1] - 4:5
**intent** [1] - 75:8
**intention** [2] - 60:13, 68:15
**interested** [1] - 10:14
**interim** [1] - 60:5
**interject** [2] - 12:2, 56:4, 75:20
**internal** [1] - 66:3
**interrupting** [1] - 77:16
**intervention** [1] - 45:23
**introduce** [1] - 72:13
**invariably** [1] - 19:8
**invented** [1] - 60:15
**invested** [2] - 57:9, 58:11
**involvement** [2] - 42:14, 71:24
**INVOLVING** [1] - 1:6
**irrelevant** [2] - 25:9, 76:7
**issue** [51] - 5:12, 5:15, 5:17, 6:6, 6:11, 6:20, 6:21, 7:10, 7:15, 8:6, 9:10, 9:12, 9:14, 9:15, 11:6, 11:8, 12:18, 13:1, 14:12, 18:14, 19:21, 19:23, 20:1, 20:4, 41:18, 41:24, 57:3, 57:5, 57:11, 59:14, 59:16, 59:20, 62:5, 69:19, 70:13, 72:17, 72:18, 72:25, 73:2, 73:6, 74:16, 75:2, 75:3, 75:7, 75:19, 75:21, 78:1, 78:16, 78:19, 79:2
**issued** [1] - 6:9
**issues** [7] - 5:14, 6:13, 8:6, 13:21, 18:13, 19:4, 57:10
**items** [5] - 14:3, 14:10, 17:10, 73:9, 74:11

## J

**Jaffe** [5] - 40:7, 46:9, 46:15, 51:2, 53:19, 54:23
**January** [3] - 45:13,

50:3, 56:9
**Jeff** [7] - 5:7, 10:22, 20:8, 20:11, 30:11, 59:8, 77:16
**JEFFREY** [2] - 2:9, 2:16
**Jeffrey** [2] - 5:1, 30:4
**JERSEY** [1] - 1:2
**Jersey** [1] - 1:12
**Jessica** [1] - 17:19
**JESSICA** [1] - 2:20
**Joe** [1] - 66:12
**JOEL** [1] - 2:9
**JOHNSTON** [3] - 2:13, 5:5, 8:21
**Johnston** [2] - 5:6, 8:21
**Johnston's** [1] - 10:23
**joining** [1] - 68:13
**Joint** [2] - 2:7, 2:25
**JOSEPH** [1] - 2:6
**Josey** [1] - 53:12
**JUDGE** [1] - 1:9
**Judge** [19] - 7:14, 12:4, 23:24, 27:15, 27:17, 37:18, 38:17, 38:20, 47:9, 47:10, 47:19, 48:19, 48:22, 49:2, 49:18, 51:17, 53:18, 54:14, 57:8
**judge** [1] - 8:2
**judgment** [2] - 76:20, 77:10
**judicial** [2] - 45:23, 45:24
**JULY** [1] - 4:1
**July** [12] - 1:7, 13:12, 13:13, 14:23, 15:11, 37:5, 37:22, 59:14, 62:5, 62:17, 70:1, 79:18
**jump** [3] - 32:24, 50:13, 59:20
**jumped** [1] - 50:16
**jumping** [2] - 61:18, 72:4
**June** [1] - 62:17
**justify** [1] - 38:8

**K**

**KANNER** [1] - 1:20
**Karen** [2] - 1:23, 79:16
**KATZ** [1] - 1:11
**keep** [13] - 10:20, 18:8, 22:7, 22:25, 29:8, 35:5, 37:9, 49:25, 54:13, 59:9, 63:2, 73:15
**kept** [1] - 46:13

**key** [3] - 9:1, 44:24, 47:25
**kind** [3] - 13:17, 20:10, 49:15
**kinds** [1] - 10:10
**KIRTLAND** [1] - 2:2
**known** [4] - 20:15, 47:6, 56:7, 71:20
**knows** [2] - 4:7, 42:2

**L**

**Labs** [2] - 3:4, 18:4
**lacked** [1] - 43:14
**language** [2] - 46:16, 48:1
**lapse** [1] - 19:2
**large** [2] - 69:15, 77:21
**larger** [7] - 36:22, 56:23, 66:9, 69:16, 69:17, 76:19
**last** [20] - 5:11, 5:12, 5:21, 5:25, 11:7, 19:3, 35:5, 35:6, 38:22, 40:20, 44:14, 45:8, 45:11, 53:8, 54:22, 56:9, 59:21, 60:16, 61:4, 61:9
**late** [4] - 5:11, 49:12, 50:3, 72:14
**laughable** [1] - 41:1
**Laughter** [2] - 16:13, 27:25
**law** [9] - 26:23, 29:16, 38:8, 38:12, 52:23, 53:17, 54:23, 63:20, 77:19
**lawyers** [1] - 54:9
**lay** [2] - 31:16, 46:10
**layer** [3] - 24:16, 42:21, 43:21
**layered** [1] - 65:2
**layering** [1] - 56:24
**lead** [2] - 4:3, 46:17
**leadership** [1] - 45:6
**learn** [1] - 78:23
**Learning** [8] - 22:3, 35:20, 64:2, 66:22, 66:23, 70:21, 73:14, 73:17
**learning** [2] - 46:18, 63:7
**learns** [1] - 20:16, 24:1, 31:18
**least** [5] - 13:16, 19:23, 22:11, 39:20, 75:6
**leave** [1] - 12:7, 51:3
**led** [2] - 15:23, 50:14

**legal** [1] - 53:15
**legitimate** [2] - 7:20, 33:1
**lengthy** [3] - 15:15, 42:12, 50:20
**less** [2] - 29:2, 29:6
**lessons** [1] - 24:2
**letter** [17] - 5:11, 5:14, 5:20, 10:1, 12:8, 12:16, 14:6, 14:7, 17:21, 29:16, 46:8, 46:10, 46:16, 48:7, 48:25, 54:1, 63:20
**letters** [2] - 5:10, 48:24
**level** [6] - 54:4, 55:10, 56:15, 57:16, 58:2, 67:21
**levels** [2] - 41:10, 57:22
**leverage** [2] - 26:3, 59:1
**LEVIN** [1] - 1:14
**LIABILITY** [1] - 1:4
**lifting** [1] - 34:24
**light** [2] - 15:17, 66:14
**lightly** [1] - 61:3
**likely** [3] - 19:17, 42:13, 67:4
**limitation** [1] - 15:2
**limited** [3] - 26:13, 40:18, 40:20
**limiting** [2] - 26:10, 27:9
**line** [6] - 49:21, 51:21, 57:9, 59:5, 67:10, 70:15
**linear** [8] - 28:14, 29:1, 29:5, 29:11, 29:22, 64:12, 64:14, 66:17
**list** [5] - 17:11, 30:25, 56:22, 57:17, 57:19
**literally** [1] - 44:14
**literature** [1] - 43:25
**litigation** [16] - 7:17, 8:13, 26:25, 39:8, 44:25, 46:19, 47:16, 48:7, 48:20, 49:7, 49:13, 50:23, 53:15, 72:12, 72:14, 77:23
**LITIGATION** [1] - 1:4
**live** [6] - 31:25, 33:2, 45:18, 45:19, 45:21, 50:18
**LLC** [4] - 1:11, 1:20, 2:11, 2:22
**LLP** [7] - 2:2, 2:5, 2:8, 2:13, 2:16, 2:23, 3:2
**loaded** [5] - 20:22,

21:5, 67:9, 70:6, 70:16
**loading** [1] - 21:1
**LOCKARD** [9] - 2:9, 4:25, 13:25, 20:7, 59:18, 59:25, 62:7, 69:21, 77:4
**Lockard** [7] - 4:25, 13:25, 30:4, 59:18, 61:21, 69:22, 70:23
**log** [1] - 30:9
**logical** [1] - 37:10
**look** [19] - 22:24, 23:5, 26:22, 27:2, 32:12, 32:21, 34:13, 34:15, 39:20, 40:14, 46:21, 47:20, 48:24, 49:6, 54:9, 61:13, 65:2, 65:3
**looked** [4] - 35:1, 36:11, 58:5, 61:2
**looking** [9] - 22:8, 31:11, 43:1, 45:14, 49:19, 55:7, 61:4, 61:8, 64:22
**looks** [4] - 20:24, 23:19, 30:13, 75:12
**Los** [1] - 2:14
**Louisiana** [1] - 1:22
**love** [1] - 71:9
**low** [4] - 33:20, 67:12, 67:14, 67:20
**lower** [1] - 67:17
**lowly** [1] - 33:19
**Ltd** [2] - 2:11, 2:22

**M**

**macro** [9] - 6:5, 6:6, 6:11, 6:20, 6:21, 9:8, 10:8, 10:12, 10:18
**MAGISTRATE** [1] - 1:9
**magnitude** [2] - 57:16, 58:25
**mail** [2] - 55:22, 68:25
**mails** [2] - 71:9, 73:22
**main** [1] - 23:12
**major** [1] - 51:4
**majority** [1] - 68:10
**manage** [1] - 7:5
**managed** [1] - 42:11
**management** [2] - 15:13, 15:21
**manner** [1] - 10:7
**manual** [3] - 38:21, 43:12, 46:18
**manually** [1] - 39:6
**manufacturer** [1] - 13:4

**March** [2] - 6:10, 15:1
**Market** [1] - 1:18
**marketing** [1] - 53:22
**Mary** [1] - 50:11
**mass** [1] - 44:23
**massive** [4] - 39:19, 46:3, 50:7, 54:20
**master** [2] - 47:20, 48:20
**material** [2] - 35:2, 35:4
**materials** [2] - 16:23, 17:5
**matter** [1] - 79:14
**Maura** [1] - 29:3
**MAZIE** [1] - 1:11
**MDL** [6] - 4:2, 48:7, 65:22, 69:8, 69:18
**mean** [11] - 21:14, 28:14, 44:22, 49:18, 54:18, 65:5, 71:8, 76:9, 76:14, 76:16, 76:24
**meaningful** [1] - 72:13
**means** [3] - 22:1, 35:25, 73:21
**meantime** [1] - 78:20
**measures** [1] - 68:1
**mechanical** [1] - 1:25
**meet** [14] - 7:14, 8:1, 8:3, 10:24, 25:20, 26:11, 27:18, 42:10, 45:10, 53:9, 58:13, 60:4, 60:6, 62:1
**meeting** [2] - 54:23, 65:17
**meetings** [1] - 42:12
**member** [1] - 71:19
**memory** [1] - 16:24
**mentioned** [2] - 46:2, 61:23
**mentioning** [1] - 49:16
**Mercedes** [4] - 47:5, 48:20, 55:2, 63:22
**merits** [1] - 8:20
**met** [2] - 37:1, 53:17
**methodologies** [1] - 42:23
**methodology** [7] - 29:18, 43:17, 43:21, 46:20, 62:3, 63:21, 75:22
**metrics** [3] - 34:2, 36:20, 57:21
**mid** [1] - 18:18
**mid-August** [1] - 18:25
**might** [8] - 20:2, 20:3, 21:10, 21:12, 30:13, 32:22, 52:18, 75:10

**million** [5] - 28:9, 40:19, 49:1, 51:14, 61:5
**mind** [3] - 5:13, 18:8, 51:7
**minds** [1] - 8:5
**minor** [1] - 60:25
**minute** [2] - 44:14, 59:9
**mischief** [3] - 38:14, 46:14, 63:18
**miss** [1] - 58:3
**missed** [3] - 32:13, 51:2, 58:1
**missing** [4] - 55:21, 56:16, 56:17, 56:20
**modifications** [2] - 39:6, 56:10
**modified** [3] - 39:2, 39:4, 61:3
**modify** [1] - 60:21
**moment** [5] - 8:23, 42:4, 49:15, 50:23, 56:4
**money** [1] - 51:23
**month** [7] - 18:17, 18:25, 19:1, 19:3, 37:7, 50:4, 61:10
**month-and-a-half** [1] - 50:4
**months** [10] - 6:22, 7:9, 19:3, 31:21, 38:25, 40:21, 42:11, 49:1, 51:25, 52:13
**Moores** [1] - 23:23
**morning** [1] - 18:10
**MORRIS** [1] - 2:5
**most** [17] - 22:10, 22:16, 22:22, 25:15, 26:18, 29:8, 29:9, 30:22, 45:6, 46:19, 53:18, 54:4, 62:18, 67:4, 70:15, 73:20, 74:7
**motion** [8] - 68:13, 76:10, 76:20, 77:4, 77:6, 77:10, 77:13, 77:14
**motions** [4] - 45:5, 75:22, 75:25, 76:6
**move** [7] - 7:17, 8:19, 10:25, 12:23, 37:25, 38:1, 50:23
**moves** [1] - 22:16
**moving** [2] - 9:1, 10:20
**MR** [70] - 4:10, 4:12, 4:14, 4:18, 4:20, 4:23, 5:3, 5:7, 6:3, 10:22, 11:5, 11:10,

12:1, 13:5, 15:4, 16:8, 16:11, 16:16, 16:18, 18:2, 18:18, 20:11, 24:6, 24:13, 24:16, 24:19, 25:4, 25:11, 27:22, 28:1, 28:12, 29:24, 31:3, 32:2, 32:7, 32:19, 33:10, 35:15, 35:18, 37:18, 38:1, 47:9, 51:8, 51:17, 53:12, 56:3, 56:6, 57:13, 58:8, 58:21, 58:23, 59:8, 59:12, 62:24, 63:2, 66:5, 66:12, 68:19, 70:18, 71:4, 71:7, 73:8, 73:12, 74:18, 75:9, 75:18, 75:20, 76:8, 77:15, 79:6
**MS** [12] - 4:16, 4:25, 5:5, 8:21, 13:25, 17:19, 20:7, 59:18, 59:25, 62:7, 69:21, 77:4
**multi** [1] - 65:2
**multi-layered** [1] - 65:2
**multiple** [4] - 42:12, 44:2, 53:25, 54:2
**multitude** [1] - 17:10
**mutually** [1] - 43:6
**Mylan** [1] - 2:25, 5:4, 16:8, 16:10, 16:15, 16:18, 17:18, 49:19, 50:14, 70:20
**Mylan's** [1] - 16:17

**N**

**nail** [1] - 32:22
**Nakul** [1] - 18:3
**NAKUL** [1] - 3:2
**name** [3] - 4:5, 4:7, 30:12
**names** [1] - 4:3
**narrow** [10] - 25:23, 41:3, 41:5, 41:10, 45:18, 45:25, 52:1, 52:9, 62:9, 68:3
**narrowed** [3] - 42:22, 43:22, 58:20
**narrowing** [1] - 62:13
**nature** [3] - 9:13, 28:13, 29:22
**NE** [1] - 2:10
**necessarily** [3] - 26:13, 28:2, 36:3
**necessary** [2] - 9:15, 22:25

**need** [25] - 6:22, 7:16, 10:6, 18:25, 19:18, 25:24, 28:23, 32:11, 32:20, 45:25, 47:1, 51:25, 53:3, 54:13, 55:8, 55:15, 55:17, 55:18, 55:25, 61:15, 68:1, 68:2, 79:5
**needed** [3] - 39:4, 52:9, 67:22
**needs** [3] - 11:19, 55:22, 77:6
**negotiate** [7] - 26:16, 27:5, 33:22, 52:13, 57:18, 57:21, 57:25
**negotiated** [3] - 9:13, 48:4, 60:19
**negotiating** [2] - 57:24, 60:1
**negotiation** [2] - 38:25, 40:19
**negotiations** [1] - 46:13
**neighborhood** [1] - 67:13
**Nevada** [1] - 49:2
**never** [10] - 12:6, 34:12, 40:18, 42:17, 46:4, 47:2, 54:17, 60:18, 64:17, 74:3
**new** [4] - 15:19, 23:20, 42:21, 61:3
**NEW** [1] - 1:2
**New** [4] - 1:12, 1:22, 63:23, 63:24
**next** [7] - 15:6, 18:25, 19:3, 19:6, 21:12, 52:13, 56:14
**nicely** [1] - 38:4
**Nigh** [1] - 4:14
**NIGH** [2] - 1:14, 4:14
**night** [1] - 5:11
**nightly** [1] - 9:25
**ninety** [1] - 36:13
**NJ** [1] - 3:3
**nobody** [1] - 51:18
**non** [1] - 9:25
**noncustodial** [5] - 14:4, 14:11, 70:3, 70:9, 70:24
**none** [1] - 52:22
**nonetheless** [1] - 13:18
**nonresponsive** [13] - 22:16, 23:19, 31:24, 32:16, 33:3, 33:8, 33:9, 33:16, 33:18, 35:4, 35:7, 35:13, 36:6
**Northern** [1] - 26:25

**nothing** [4] - 42:3, 50:9, 60:12
**notice** [1] - 6:22
**notices** [1] - 19:7
**notwithstanding** [1] - 13:22
**November** [8] - 8:15, 17:14, 42:6, 52:4, 59:22, 60:5, 75:16, 75:17
**number** [21] - 16:23, 20:20, 21:21, 26:9, 29:14, 31:23, 31:24, 34:19, 59:3, 61:4, 66:7, 67:6, 67:8, 67:22, 68:23, 68:25, 69:1, 69:2, 69:20, 70:6, 77:21
**NUMBER** [1] - 1:3
**numbers** [1] - 64:7

**O**

**object** [6] - 29:14, 41:12, 42:24, 47:11, 76:2
**objected** [2] - 41:15, 61:16
**objection** [3] - 6:1, 57:6, 58:5
**objections** [1] - 19:8
**obligation** [3] - 28:16, 36:25, 37:1
**obvious** [1] - 72:3
**obviously** [8] - 8:11, 17:5, 25:11, 25:22, 32:11, 36:25, 37:1, 76:14
**October** [2] - 5:24, 8:18
**OF** [1] - 1:2
**offered** [3] - 62:20, 62:21, 77:17
**Official** [1] - 1:23
**OH** [1] - 2:18
**oil** [5] - 53:13, 53:15, 53:16, 54:18, 63:14
**ON** [1] - 1:5
**once** [2] - 18:20, 21:16
**one** [45] - 6:14, 16:7, 16:9, 18:15, 20:5, 23:4, 26:12, 28:5, 28:10, 29:21, 30:19, 30:23, 31:6, 31:7, 32:10, 35:18, 36:11, 38:22, 42:4, 44:21, 46:23, 47:4, 48:7, 49:21, 51:9, 54:3, 56:4, 56:7, 57:12, 58:6, 58:10, 61:20,

63:11, 64:15, 65:20, 65:22, 67:23, 69:3, 69:21, 71:15, 76:12, 78:17
**One** [1] - 2:24
**ones** [2] - 9:21, 52:15
**onset** [1] - 43:4
**open** [1] - 76:19
**opening** [1] - 71:11
**opportunities** [1] - 44:2
**opportunity** [3] - 16:22, 37:5, 60:10
**opposed** [1] - 30:12
**opposing** [1] - 29:15
**options** [1] - 71:2
**oral** [1] - 73:4
**ORAL** [1] - 1:5
**oranges** [1] - 70:10
**order** [31] - 8:18, 13:7, 13:11, 13:14, 13:20, 14:19, 14:24, 15:5, 15:12, 15:14, 15:24, 17:17, 18:18, 49:22, 50:8, 55:20, 57:15, 59:17, 61:5, 62:4, 62:18, 67:1, 70:1, 72:19, 74:14, 75:1, 78:7, 78:12, 78:16, 78:20, 79:4
**ordered** [7] - 24:9, 38:22, 48:16, 49:12, 51:20, 71:16, 77:1
**orders** [1] - 11:18
**original** [2] - 14:25, 23:23
**Orleans** [1] - 1:22
**otherwise** [2] - 41:21, 58:25
**ought** [1] - 19:23
**ourself** [1] - 10:8
**ourselves** [2] - 36:18, 36:24
**outcome** [1] - 49:11
**outlined** [3] - 10:1, 10:5, 10:19
**outside** [4] - 75:16, 76:5, 76:15, 77:7
**overlay** [1] - 40:21
**own** [7] - 36:2, 40:1, 40:14, 42:23, 49:10, 55:3
**Oxford** [1] - 2:24

**P**

**P.C** [1] - 2:19
**p.m** [2] - 1:8, 79:10
**P.M** [1] - 4:1
**PA** [1] - 2:21

*Pacific* [1] - 2:3
*PACKARD* [1] - 2:2
*Page* [2] - 43:1, 54:2
*pages* [6] - 31:5, 41:21, 42:1, 42:2, 49:20, 54:16
*paid* [2] - 6:14, 6:15
*PAPANTONIO* [1] - 1:14
*paper* [2] - 7:10, 54:2
*papers* [6] - 19:21, 40:14, 42:23, 45:16, 53:21
*PAREKH* [11] - 2:2, 4:20, 56:3, 56:6, 57:13, 58:23, 73:8, 73:12, 74:18, 75:9, 75:18
*Parekh* [10] - 4:21, 40:7, 51:2, 53:19, 54:24, 55:22, 56:3, 58:24, 61:13, 73:8
*Park* [1] - 2:14
*park* [1] - 30:5
*Parkway* [2] - 1:12, 2:20
*part* [4] - 12:15, 13:16, 36:21, 64:13
*particular* [3] - 15:22, 74:3, 74:20
*PARTIES* [1] - 4:1
*parties* [31] - 4:24, 6:10, 7:5, 7:13, 7:19, 7:24, 7:25, 8:3, 8:7, 9:18, 15:16, 20:3, 25:20, 26:12, 27:2, 29:15, 37:5, 43:3, 44:8, 44:9, 48:11, 56:15, 57:18, 57:20, 60:6, 60:24, 61:23, 62:1, 64:1, 69:24
*parties'* [2] - 5:10, 73:3
*party* [3] - 29:17, 68:14, 72:25
*patient* [1] - 12:9
*PC* [1] - 1:17
*Peck* [1] - 23:24
*Pennsylvania* [3] - 1:19, 2:7, 2:25
*Pensacola* [1] - 1:15
*people* [5] - 28:7, 45:6, 49:10, 73:18, 74:7
*percent* [21] - 21:11, 21:12, 21:15, 21:16, 36:13, 56:16, 56:17, 56:20, 56:21, 58:1, 58:2, 58:4, 64:7, 64:8, 66:20, 67:13,

72:5, 72:8
*percentage* [3] - 11:19, 56:23, 57:19
*percolates* [1] - 22:15
*perfectly* [1] - 36:8
*permits* [1] - 74:24
*perpetrated* [1] - 38:14
*perplexed* [1] - 29:13
*person* [4] - 31:25, 33:2, 58:16, 60:6
*personally* [1] - 69:5
*perspective* [5] - 23:10, 25:25, 46:11, 65:3, 78:3
*pertinent* [1] - 62:19
*Pharma* [4] - 2:12, 2:21, 2:22
*Pharmaceutical* [1] - 2:11
*Pharmaceuticals* [1] - 2:11
*pharmacy* [2] - 6:8, 6:13
*phase* [1] - 19:6
*Philadelphia* [2] - 1:19, 2:7
*phone* [5] - 18:1, 40:6, 41:17, 54:23, 62:15
*picked* [2] - 19:2, 52:18
*piece* [3] - 7:10, 59:20, 70:12
*pieces* [2] - 53:22, 70:9
*Piedmont* [1] - 2:10
*PIETRAGALLO* [1] - 2:23
*piggyback* [1] - 70:18
*Pittsburgh* [1] - 2:25
*place* [7] - 12:25, 23:22, 39:8, 43:19, 45:12, 46:20, 68:24
*plainly* [1] - 8:11
*Plaintiff* [5] - 1:13, 1:16, 1:19, 1:22, 2:4
*plaintiff* [10] - 12:2, 16:14, 19:23, 27:18, 33:2, 58:13, 59:14, 68:18, 74:16
*plaintiffs* [66] - 4:4, 4:9, 4:11, 4:13, 4:15, 4:17, 4:19, 4:21, 5:19, 6:1, 6:4, 9:10, 9:13, 9:17, 10:2, 10:14, 11:10, 11:11, 12:21, 13:1, 14:4, 16:15, 16:21, 18:6, 18:23, 19:15, 24:3, 25:22, 26:18, 27:7,

27:14, 28:22, 29:10, 29:13, 29:15, 33:21, 34:25, 36:21, 37:1, 38:23, 40:2, 40:10, 44:13, 47:8, 48:3, 49:6, 49:7, 49:13, 51:15, 53:9, 55:4, 56:25, 58:4, 60:7, 64:6, 65:6, 67:19, 67:25, 68:2, 70:24, 74:3, 74:23, 75:4, 76:6, 77:19, 78:23
*PLAINTIFFS* [1] - 1:6
*plaintiffs'* [17] - 14:6, 14:7, 15:7, 16:20, 17:7, 17:11, 17:21, 18:8, 19:16, 24:4, 25:7, 35:16, 51:10, 60:25, 62:5, 62:6, 62:15
*planning* [1] - 66:15
*platform* [2] - 70:7, 70:16
*play* [1] - 37:13
*played* [1] - 38:19
*pleading* [1] - 77:7
*pleadings* [2] - 76:5, 76:15
*pleasure* [1] - 20:12
*point* [43] - 12:10, 21:2, 23:9, 24:20, 24:25, 25:6, 26:3, 27:15, 27:17, 38:4, 39:1, 43:20, 45:20, 48:6, 49:13, 50:10, 51:3, 54:20, 55:10, 55:16, 56:2, 59:6, 60:18, 61:9, 61:20, 66:17, 66:19, 67:10, 67:17, 67:18, 67:20, 67:25, 69:21, 70:5, 70:11, 70:19, 72:20, 72:22, 73:13, 74:19, 75:10, 75:11, 75:18
*pointed* [2] - 41:5, 65:16
*points* [4] - 6:16, 51:4, 62:25, 73:15
*policies* [1] - 68:24
*pool* [3] - 14:11, 62:10, 62:13
*population* [1] - 26:5
*position* [9] - 5:20, 6:18, 7:7, 7:11, 10:8, 13:16, 29:12, 29:18, 65:6
*possession* [4] - 13:9, 14:9, 15:9, 15:25
*possibility* [1] - 42:5
*possible* [1] - 62:2

*possibly* [1] - 64:10
*post* [1] - 39:10
*post-search* [1] - 39:10
*potentially* [4] - 34:14, 59:3, 75:24, 76:13
*PPP* [1] - 6:15
*preceded* [1] - 15:13
*precedent* [1] - 38:12
*precision* [1] - 21:25
*preclude* [2] - 68:15, 68:16
*predictive* [5] - 20:15, 23:15, 23:22, 26:15, 43:4, 61:23, 63:9, 67:1, 68:7
*prefer* [1] - 47:12
*preference* [1] - 51:11
*prefers* [1] - 65:12
*prejudice* [1] - 74:20
*prejudiced* [5] - 12:22, 74:17, 74:23, 78:22, 78:23
*prejudicial* [1] - 44:15
*prejudicing* [1] - 75:10
*premise* [1] - 64:5
*prepare* [1] - 30:8
*prepared* [2] - 14:2, 72:17
*preparing* [2] - 6:23, 18:5
*presented* [1] - 76:13
*presenting* [1] - 15:18
*preserves* [1] - 74:19
*presumably* [1] - 71:20
*presumption* [1] - 63:20
*presuppose* [1] - 76:24
*pretend* [1] - 16:24
*pretenses* [1] - 43:19
*pretty* [3] - 19:12, 19:20, 38:2
*prevailed* [1] - 27:4
*prevalence* [1] - 23:25
*previewed* [1] - 9:2
*Princeton* [1] - 3:3
*prioritization* [10] - 11:15, 13:2, 15:7, 16:21, 16:23, 17:7, 17:21, 18:8, 73:14, 73:17
*prioritize* [8] - 22:22, 24:3, 28:21, 44:20, 55:20, 62:18, 66:19, 67:2
*prioritized* [3] - 14:3, 46:5, 75:24
*prioritizes* [1] - 73:20

*priority* [11] - 14:7, 17:11, 24:24, 25:13, 25:15, 30:25, 35:24, 36:6, 36:16, 77:1
*private* [1] - 40:1
*privilege* [10] - 29:23, 29:24, 30:2, 30:3, 30:8, 30:9, 32:13, 32:14, 49:4, 51:18
*privileged* [5] - 30:14, 30:15, 30:17, 40:1, 41:7
*problem* [5] - 15:18, 38:15, 44:24, 55:8, 56:7
*procedurally* [1] - 76:22
*proceed* [1] - 7:5
*Proceedings* [1] - 1:25
*proceedings* [1] - 79:14
*process* [40] - 9:8, 20:16, 20:18, 20:19, 20:22, 22:5, 22:19, 22:20, 26:12, 27:6, 27:19, 33:23, 34:9, 35:7, 35:14, 35:20, 35:21, 36:16, 36:24, 40:3, 40:9, 40:22, 52:11, 52:20, 54:15, 55:4, 55:11, 55:14, 56:9, 56:13, 56:24, 57:4, 60:14, 62:19, 63:8, 64:3, 64:11, 65:10, 65:15, 71:24
*processed* [2] - 10:6, 66:20
*processing* [1] - 9:25
*produce* [21] - 6:17, 7:7, 7:8, 7:10, 8:11, 8:15, 13:12, 13:13, 13:17, 14:9, 14:15, 15:10, 16:2, 18:22, 29:8, 31:12, 32:16, 41:8, 49:3, 49:5, 51:11
*produced* [22] - 1:25, 9:23, 11:18, 11:20, 13:23, 14:22, 16:23, 31:1, 32:1, 33:6, 35:10, 44:22, 44:23, 46:22, 51:20, 58:5, 67:9, 70:24, 72:10, 74:6, 76:25
*producible* [1] - 41:7
*producing* [6] - 6:23, 13:19, 15:17, 31:19, 35:24, 36:7, 41:21, 42:1, 44:8, 49:21

**product** [1] - 54:8
**production** [36] - 5:15, 5:23, 11:9, 12:25, 13:8, 13:15, 13:18, 14:2, 14:5, 14:6, 14:21, 15:1, 16:17, 16:22, 17:4, 17:8, 17:10, 17:12, 17:17, 17:20, 17:23, 18:6, 19:4, 19:24, 24:22, 25:12, 29:18, 31:4, 41:18, 44:7, 46:6, 52:13, 52:24, 74:11, 75:15, 78:13
**productions** [9] - 6:19, 8:19, 11:12, 11:14, 16:19, 18:9, 44:19, 50:7, 75:14
**productive** [1] - 26:12
**PRODUCTS** [1] - 1:4
**products** [1] - 32:9
**program** [11] - 24:11, 24:24, 51:10, 53:10, 57:8, 58:14, 58:17, 59:15, 73:2, 74:15, 74:25
**progress** [1] - 69:24
**Progressive** [10] - 38:17, 42:25, 43:8, 43:11, 44:3, 48:22, 51:19, 55:3, 63:6, 63:15
**promise** [3] - 8:23, 59:9, 63:2
**promptly** [1] - 78:19
**proof** [1] - 65:12
**properly** [3] - 55:22, 55:23
**proportionality** [1] - 47:22
**proposal** [5] - 10:18, 43:11, 43:14, 46:12, 55:16
**proposed** [1] - 5:23
**proposing** [1] - 66:16
**proprietary** [1] - 32:10
**protocol** [35] - 26:1, 26:16, 27:2, 27:5, 27:10, 33:13, 33:14, 34:24, 36:15, 36:21, 36:22, 37:7, 38:21, 39:7, 42:20, 42:21, 43:5, 43:6, 43:19, 45:8, 48:2, 52:14, 54:15, 57:2, 59:23, 60:2, 61:21, 61:22, 62:7, 63:10, 66:24, 77:24
**protocols** [1] - 62:8
**prove** [5] - 34:3, 34:9,

34:10, 35:4, 36:3
**proved** [2] - 36:9, 36:12
**proves** [1] - 30:14
**provide** [3] - 36:20, 44:8, 78:1
**provided** [2] - 17:8, 61:7
**Province** [1] - 50:3
**proving** [3] - 36:24, 37:1
**provision** [3] - 48:2, 48:3, 62:12
**pull** [2] - 30:5, 41:8
**pulled** [1] - 9:22
**pulling** [2] - 6:23, 39:4, 46:18
**purely** [1] - 34:20
**purposes** [3] - 24:21, 24:22, 36:2
**pursuant** [1] - 74:15
**push** [2] - 9:7, 54:17
**pushed** [1] - 26:21
**put** [22] - 4:5, 7:10, 12:14, 30:14, 30:23, 41:23, 44:13, 45:12, 46:16, 48:1, 49:13, 51:4, 52:25, 55:19, 58:9, 61:6, 65:23, 66:2, 72:10, 77:18, 78:5
**puts** [1] - 46:25
**putting** [1] - 48:3

## Q

**qualify** [1] - 32:3
**quality** [1] - 17:1
**quantity** [1] - 46:4
**questioning** [1] - 41:6
**questions** [11] - 19:25, 20:5, 20:10, 27:14, 28:6, 40:8, 51:6, 53:7, 53:18, 65:19, 69:22
**quick** [1] - 62:25
**quickly** [1] - 21:14
**quiet** [3] - 37:16, 41:24, 44:16
**quite** [3] - 24:4, 29:11, 69:6
**quote** [8] - 5:16, 25:9, 38:11, 48:11, 62:2, 66:3, 72:18, 76:20
**quoted** [1] - 76:16
**quotes** [1] - 48:9
**quoting** [1] - 44:5

## R

**raised** [4] - 11:8, 15:14, 42:5, 57:4
**ran** [3] - 39:19, 41:14, 61:2
**random** [2] - 21:3, 34:18
**randomly** [1] - 34:21
**rank** [3] - 22:9, 68:7, 68:8
**ranking** [1] - 22:18
**ranks** [1] - 23:14
**rare** [1] - 31:17
**RASPANTI** [1] - 2:23
**rate** [4] - 67:11, 67:12, 67:14, 67:20
**rather** [3] - 19:18, 22:7, 27:3
**RE** [1] - 1:4
**Re** [3] - 26:24, 77:22
**reached** [7] - 21:18, 23:10, 23:11, 26:2, 27:15, 72:20, 72:21
**reacted** [1] - 65:7
**reaction** [1] - 72:16
**read** [2] - 5:20, 19:21
**reading** [1] - 54:22
**real** [2] - 50:22, 51:12
**reality** [1] - 63:14
**really** [15] - 7:23, 7:25, 9:20, 11:19, 15:18, 20:16, 25:21, 27:1, 32:7, 49:14, 53:23, 69:15, 69:19, 73:12, 76:7
**reason** [8] - 17:12, 32:12, 37:4, 39:3, 41:2, 48:10, 64:3, 70:4
**reasonable** [10] - 8:5, 13:11, 15:6, 15:10, 16:1, 26:11, 27:3, 27:5, 34:10, 61:7
**reasonably** [1] - 7:19
**received** [3] - 5:10, 33:20, 65:1
**recently** [3] - 20:2, 47:17, 59:19
**recheck** [1] - 40:5
**record** [13] - 4:2, 4:5, 12:14, 15:20, 59:13, 60:12, 60:17, 62:11, 69:16, 73:5, 73:11, 76:19, 79:14
**recorded** [2] - 1:25, 65:20
**redo** [3] - 42:20, 48:22, 51:22
**Redondo** [1] - 2:3

**reducing** [1] - 64:8
**reference** [4] - 33:13, 63:9, 76:16
**referred** [1] - 15:5
**referring** [1] - 66:24
**refers** [1] - 66:25
**reflected** [1] - 60:16
**reflects** [1] - 59:13
**refusal** [1] - 8:10
**refusing** [1] - 52:6
**regard** [2] - 35:12, 66:7
**regarding** [2] - 5:11, 59:17
**reject** [2] - 38:3, 42:24
**rejected** [2] - 41:13, 51:15
**relate** [2] - 32:9, 64:23
**related** [3] - 10:4, 47:21, 68:25
**relating** [1] - 64:21
**relatively** [2] - 21:20, 73:22
**relearn** [1] - 48:13
**relevance** [5] - 31:15, 38:3, 51:18, 64:17, 64:18
**relevant** [11] - 8:11, 23:2, 28:11, 46:24, 55:8, 62:19, 73:19, 73:20, 73:23, 74:8
**reliable** [3] - 29:6, 29:10, 64:12
**remaining** [1] - 67:22
**remember** [8] - 35:19, 38:7, 45:15, 51:17, 52:3, 53:13, 70:2, 71:18
**remind** [1] - 49:23, 69:23
**remove** [2] - 74:24, 75:5
**removed** [1] - 74:15
**replace** [1] - 43:12
**report** [2] - 11:21, 65:20
**Reporter** [1] - 1:23
**reporter** [1] - 4:7
**Reporter/ Transcriber** [1] - 79:16
**reports** [1] - 29:3
**represent** [1] - 17:6
**representations** [6] - 39:2, 41:25, 45:2, 45:15, 45:19, 52:8
**represented** [3] - 45:22, 52:2, 53:4
**request** [19] - 5:16, 5:18, 6:2, 6:5, 6:6,

7:1, 7:11, 7:20, 9:19, 12:15, 12:19, 14:4, 14:25, 17:8, 60:21, 65:1, 65:4, 67:16, 78:11
**requested** [2] - 6:9, 14:13
**requesting** [1] - 44:9
**requests** [2] - 44:7, 47:22
**require** [1] - 8:19
**required** [4] - 13:8, 14:22, 27:9, 44:8
**requires** [1] - 62:12
**requiring** [1] - 17:17
**reserved** [1] - 60:8
**reservoir** [3] - 40:23, 46:3, 46:25
**resolution** [1] - 20:3
**resolved** [2] - 6:21, 57:12
**respect** [9] - 5:20, 6:8, 9:9, 9:19, 15:16, 20:21, 25:13, 25:15, 65:4
**respond** [3] - 7:16, 59:9, 77:6
**responding** [1] - 29:17
**response** [2] - 21:11, 73:13
**RESPONSE** [1] - 79:7
**responses** [1] - 69:25
**responsive** [44] - 15:8, 15:24, 21:2, 21:16, 21:24, 22:2, 22:10, 22:11, 22:16, 22:22, 23:4, 23:6, 23:11, 23:18, 25:9, 29:9, 30:22, 31:10, 31:15, 31:18, 31:24, 31:25, 33:5, 33:6, 33:7, 34:4, 34:18, 35:2, 35:9, 35:12, 36:10, 39:17, 44:7, 44:11, 53:7, 54:7, 65:24, 67:4, 67:8, 67:16, 67:24, 68:10, 72:6
**responsiveness** [7] - 39:24, 49:9, 67:11, 67:12, 67:14, 67:20, 72:1
**restrict** [1] - 26:4
**restricting** [1] - 26:9
**result** [3] - 20:3, 23:13, 51:15
**resulted** [1] - 15:19
**results** [2] - 34:2, 67:7
**retail** [1] - 6:8
**retailer** [4] - 5:6, 6:13,

*8:22, 9:5*
**retailers** [7] - 6:14, 6:16, 9:12, 9:16, 11:3, 12:4, 12:8
**reteach** [1] - 48:13
**retention** [1] - 68:24
**reverse** [1] - 68:20
**review** [64] - 20:1, 20:22, 22:6, 22:20, 22:21, 22:25, 23:3, 24:9, 24:11, 25:2, 26:5, 27:16, 27:20, 28:9, 28:14, 29:1, 29:5, 29:6, 29:11, 29:18, 29:22, 29:23, 29:24, 30:21, 30:24, 32:14, 33:25, 34:3, 39:6, 41:7, 41:10, 43:12, 43:13, 44:6, 45:17, 46:1, 46:4, 47:1, 51:16, 51:17, 62:10, 62:19, 62:22, 63:21, 64:11, 64:12, 64:15, 66:18, 67:2, 67:5, 67:9, 67:22, 69:14, 70:22, 71:25, 72:20, 73:1, 74:15, 74:24, 75:6, 78:18, 78:25
**reviewed** [17] - 9:22, 20:21, 21:4, 21:7, 25:24, 26:10, 26:21, 27:8, 28:11, 30:6, 30:25, 31:20, 31:25, 36:5, 40:23, 67:6
**reviewer** [3] - 21:9, 33:16, 46:21
**reviewers** [1] - 67:3
**reviewing** [13] - 21:15, 22:5, 22:7, 22:25, 28:16, 32:17, 33:1, 35:9, 37:9, 55:19, 64:3, 64:16, 67:15
**reviews** [3] - 21:13, 34:2, 72:24
**revised** [1] - 61:3
**rightly** [2] - 12:18, 70:12
**Rio** [3] - 23:23, 48:9, 63:24
**risk** [1] - 73:9
**RMR** [1] - 79:16
**Road** [2] - 2:10, 3:3
**roadblock** [1] - 39:19
**rolling** [9] - 5:23, 6:19, 8:19, 14:21, 16:19, 17:13, 17:17, 25:12, 49:18
**room** [1] - 37:14
**Roseland** [1] - 1:12

**Roszel** [1] - 3:3
**RUBEN** [1] - 1:17
**Ruben** [1] - 4:12
**Rule** [4] - 64:19, 76:6, 77:13, 77:14
**rule** [3] - 10:10, 75:3, 78:19
**rules** [9] - 7:9, 72:25, 73:2, 73:7, 74:16, 75:2, 75:6, 76:14, 78:24
**ruling** [4] - 12:13, 19:22, 60:20, 72:17
**rulings** [2] - 10:8, 10:12
**run** [15] - 10:10, 24:9, 30:1, 40:18, 41:4, 43:22, 43:23, 48:12, 48:17, 52:14, 53:24, 53:25, 54:4, 71:23, 74:1
**running** [3] - 10:12, 31:22, 45:6
**runs** [2] - 31:22, 74:6

# S

**saddle** [1] - 37:24
**sails** [1] - 7:1
**salesman** [2] - 53:13, 63:14
**salesmen** [1] - 71:11
**sample** [6] - 7:7, 8:11, 21:3, 34:14, 34:19, 35:3
**samples** [3] - 34:16, 34:20, 35:23
**sampling** [2] - 33:15, 54:15
**Sarah** [2] - 5:5, 8:21
**SARAH** [1] - 2:13
**sat** [2] - 9:6, 27:4
**save** [3] - 5:12, 11:6, 14:12
**saw** [5] - 25:19, 47:17, 53:12, 53:21, 61:4
**scenario** [1] - 38:19
**schedule** [6] - 11:2, 15:19, 16:21, 16:24, 17:7, 18:8
**SCHNEIDER** [1] - 1:9
**scope** [1] - 25:24
**score** [6] - 22:10, 22:18, 31:9, 31:13, 33:1
**scored** [5] - 22:11, 23:1, 31:14, 33:18
**scores** [1] - 33:20
**scoring** [1] - 25:1
**scratch** [1] - 51:22

**screen** [3] - 30:2, 30:3, 32:14
**search** [69] - 24:9, 24:10, 24:17, 38:21, 39:1, 39:3, 39:6, 39:10, 40:15, 40:18, 40:20, 41:4, 42:21, 43:9, 43:17, 43:19, 43:23, 45:12, 45:18, 45:25, 46:20, 46:24, 47:12, 47:23, 49:3, 49:8, 49:10, 49:24, 50:14, 51:25, 52:9, 52:15, 52:19, 56:10, 56:11, 56:12, 56:19, 56:24, 56:25, 57:5, 57:11, 57:15, 57:16, 57:18, 57:24, 58:9, 58:12, 58:20, 58:21, 59:17, 59:25, 60:19, 60:21, 60:22, 61:1, 61:3, 62:2, 62:7, 63:21, 71:16, 71:21, 72:9, 77:20, 77:25, 78:4
**searched** [1] - 58:17
**searches** [4] - 10:11, 58:15, 61:2, 78:3
**searching** [2] - 47:25, 58:25
**second** [1] - 61:20
**secondly** [1] - 60:18
**secret** [1] - 32:10
**Section** [1] - 61:22
**Sedona** [1] - 25:18
**see** [9] - 7:23, 7:25, 8:7, 16:22, 17:12, 18:19, 19:23, 21:8, 27:12, 27:18, 30:13, 49:17, 54:18, 64:13, 64:14, 71:7, 71:9, 77:12, 78:2
**seed** [8] - 20:18, 20:20, 21:11, 21:12, 21:15, 22:6, 64:1, 64:2
**seeing** [5] - 23:6, 23:25, 55:6, 55:24, 65:10
**select** [2] - 59:3, 59:4
**selected** [1] - 58:21
**selecting** [1] - 73:18
**seller** [1] - 43:25
**send** [1] - 53:20
**sense** [4] - 10:19, 13:2, 29:25, 64:1
**sent** [1] - 5:11
**sentence** [2] - 15:6, 15:23
**Sentry** [1] - 2:20

**September** [2] - 5:24, 19:5
**serious** [5] - 38:15, 39:21, 44:24, 50:22
**served** [1] - 45:8
**set** [22] - 18:20, 20:20, 21:10, 21:11, 21:12, 21:13, 23:3, 35:25, 36:6, 39:15, 41:3, 43:22, 43:24, 46:1, 57:17, 59:22, 61:14, 62:10, 64:25, 68:11, 70:1
**SETH** [1] - 2:5
**Seth** [2] - 4:24, 13:5
**sets** [9] - 12:14, 21:15, 21:23, 22:6, 33:17, 64:1, 64:2, 64:8, 72:2
**setting** [1] - 69:8
**seven** [1] - 67:14
**several** [1] - 42:10
**SHAH** [2] - 3:2, 18:2
**Shah** [1] - 18:3
**shall** [3] - 14:21, 15:6, 15:10
**shape** [2] - 19:12, 19:20
**share** [1] - 34:2
**sharpening** [1] - 34:6
**sheer** [1] - 62:21
**sheets** [3] - 18:16, 18:20, 18:23
**shift** [1] - 68:1
**short** [4] - 19:19, 29:8, 73:21, 73:22
**shot** [4] - 11:17, 50:17, 71:10, 72:3
**show** [1] - 44:18
**shows** [1] - 76:12
**side** [3] - 26:21, 64:4
**sides** [7] - 8:25, 39:16, 48:5, 48:14, 49:25, 71:25, 79:2
**sign** [1] - 49:17
**significant** [7] - 10:7, 11:19, 23:10, 35:3, 63:10, 76:1
**silence** [1] - 66:1
**similar** [2] - 35:8, 70:25
**simple** [1] - 79:2
**simpler** [1] - 9:23
**simply** [3] - 66:17, 67:3, 68:9
**single** [8] - 7:10, 8:2, 31:6, 31:7, 31:19, 35:10, 36:11, 58:16
**sit** [2] - 37:6, 53:9
**sitting** [2] - 64:4,

*65:17*
**situation** [1] - 9:5
**six** [1] - 49:1
**size** [1] - 69:19
**Slater** [18] - 4:10, 5:14, 11:8, 11:10, 18:12, 32:23, 37:16, 61:13, 63:12, 63:17, 64:17, 65:11, 65:16, 71:4, 74:22, 75:21, 76:4, 77:6
**SLATER** [18] - 1:11, 1:11, 4:10, 11:10, 18:18, 37:18, 38:1, 47:9, 51:8, 51:17, 53:12, 58:8, 58:21, 71:4, 71:7, 75:20, 76:8, 79:6
**Slater's** [2] - 12:24, 63:3
**slow** [1] - 37:8
**slowed** [1] - 14:14
**small** [2] - 21:21, 61:1
**smaller** [1] - 68:23
**smarter** [1] - 21:9
**snake** [5] - 53:13, 53:15, 54:18, 63:14
**Solco** [1] - 50:5
**someone** [1] - 30:25
**sometimes** [5] - 21:13, 21:20, 21:21, 22:3, 22:20
**somewhere** [3] - 30:5, 34:13, 67:13
**soon** [1] - 66:19
**sooner** [1] - 19:18
**sophisticated** [1] - 24:1
**sophistication** [1] - 28:19
**SOPs** [1] - 17:3
**sorry** [3] - 58:8, 58:23, 71:5
**sort** [11] - 11:14, 11:21, 20:15, 21:17, 26:14, 26:15, 29:25, 57:8, 60:14, 65:5, 78:9
**sound** [1] - 72:19
**sounds** [2] - 45:24, 58:15
**South** [1] - 2:3
**speaking** [2] - 4:8, 26:24
**special** [2] - 47:20, 48:20
**specific** [3] - 9:19, 11:18, 31:3
**specifically** [6] - 26:24, 47:22, 56:7,

65:4, 77:23, 77:24
**specifics** [1] - 14:16
**spectrometry** [1] - 44:24
**spectrum** [1] - 74:1
**spend** [2] - 38:25, 51:23
**spending** [4] - 54:21, 54:25, 55:17, 64:6
**spent** [5] - 46:9, 54:21, 54:24, 57:4, 78:15
**spirit** [2] - 25:17, 26:6
**spoken** [1] - 47:4
**spreading** [1] - 71:7
**spring** [1] - 38:24
**square** [1] - 58:10
**stability** [5] - 21:14, 21:17, 21:22, 22:8
**stable** [1] - 23:17
**stack** [2] - 22:15, 22:17
**stage** [1] - 29:10
**stake** [1] - 69:17
**stand** [2] - 16:17, 70:14
**standstill** [5] - 72:23, 74:14, 74:19, 78:17, 78:21
**Stanoch** [3] - 4:19, 6:4, 12:1
**STANOCH** [4] - 1:18, 4:18, 6:3, 12:1
**start** [13] - 4:9, 6:23, 13:3, 19:6, 19:13, 19:14, 19:16, 22:5, 22:6, 42:19, 55:9, 55:18, 74:9
**started** [4] - 45:14, 55:7, 61:7, 78:10
**starting** [2] - 21:2, 56:18
**starts** [1] - 15:5
**state** [1] - 4:6
**statements** [1] - 65:13
**STATES** [2] - 1:2, 1:9
**static** [3] - 7:24, 37:20
**statistically** [2] - 23:9, 35:3
**statistics** [1] - 36:20
**status** [3] - 5:15, 11:8, 18:12
**STATUS** [1] - 1:5
**stay** [1] - 72:19
**steadfast** [1] - 8:10
**steering** [1] - 49:11
**stenography** [1] - 1:25
**step** [2] - 12:2, 14:18
**still** [11] - 17:5, 41:7,

41:8, 45:16, 58:14, 58:18, 58:24, 61:3, 61:16, 72:16, 74:20
**stone** [1] - 70:1
**stop** [5] - 23:9, 34:13, 45:20, 52:13, 65:18
**STOY** [3] - 2:24, 70:18, 70:19
**Stoy** [1] - 70:19
**straightjacket** [1] - 76:19
**stream** [1] - 28:25
**Street** [4] - 1:18, 1:21, 2:6, 2:17
**strong** [1] - 6:1
**struggling** [1] - 62:20
**studies** [1] - 29:3
**stuff** [1] - 56:23
**stunned** [1] - 65:6
**subject** [1] - 17:16
**submission** [1] - 9:2
**submissions** [1] - 55:20
**submit** [5] - 6:11, 73:11, 77:5, 78:8, 78:17
**submitted** [2] - 38:9, 42:16
**subsamples** [1] - 34:22
**substantial** [1] - 14:2
**suddenly** [1] - 65:10
**suggest** [1] - 17:6
**suggested** [1] - 42:18
**suggestion** [2] - 25:16, 26:6, 26:10
**suggests** [1] - 60:12
**Suite** [5] - 1:15, 1:18, 2:10, 2:14, 2:20
**suite** [1] - 2:17
**suited** [1] - 20:9
**sum** [1] - 78:9
**summary** [2] - 76:20, 77:10
**superior** [1] - 47:25
**supplemental** [1] - 17:23
**supplier** [1] - 17:1
**support** [3] - 64:9, 65:8, 65:11
**suppose** [3] - 28:6, 41:18, 64:25
**supposed** [9] - 11:13, 39:14, 39:15, 45:13, 53:24, 55:12, 71:23
**supposedly** [1] - 54:17
**surprise** [1] - 68:6
**surprised** [1] - 12:5
**switch** [1] - 66:21

**symmetry** [1] - 12:22
**system** [33] - 20:23, 21:1, 21:5, 21:6, 21:13, 21:17, 21:23, 21:24, 22:8, 22:9, 22:14, 23:5, 23:17, 30:13, 31:12, 31:14, 31:18, 31:22, 36:10, 36:12, 46:25, 47:15, 53:24, 54:4, 54:10, 55:18, 66:21, 67:3, 67:6, 73:18, 74:5, 77:2
**systematic** [1] - 40:24
**systems** [3] - 23:12, 28:20, 28:22

**T**

**table** [1] - 69:22
**tag** [1] - 54:3
**tagging** [1] - 54:2
**tags** [2] - 39:16, 53:25
**talks** [3] - 38:4, 43:8, 65:21
**TAR** [106] - 1:5, 8:6, 11:6, 14:12, 18:14, 19:21, 19:23, 20:1, 20:6, 20:14, 20:17, 20:18, 22:3, 22:19, 23:15, 23:21, 23:25, 24:2, 24:11, 27:6, 28:6, 28:7, 28:8, 28:10, 29:15, 29:23, 29:24, 30:15, 30:21, 33:12, 36:22, 37:7, 39:9, 39:14, 40:22, 41:4, 42:5, 42:21, 43:12, 44:5, 45:11, 47:2, 47:8, 47:11, 47:24, 48:3, 48:12, 51:10, 51:15, 52:12, 52:14, 52:18, 52:24, 56:7, 57:8, 57:14, 57:19, 57:21, 57:25, 58:12, 58:13, 58:17, 58:18, 59:1, 59:14, 59:15, 59:20, 59:21, 59:25, 60:7, 60:8, 60:14, 61:8, 61:23, 61:25, 62:3, 63:3, 63:5, 63:7, 63:9, 63:25, 64:14, 65:10, 65:21, 65:22, 65:25, 66:11, 70:21, 71:14, 71:18, 71:23, 72:13, 72:24, 73:1, 73:16, 74:4, 74:25, 77:20, 77:23, 77:25, 78:15
**TAR/predictive** [2] - 62:8, 66:25

**TARs** [1] - 38:5
**taught** [1] - 37:19
**technical** [3] - 46:11, 51:3, 56:15
**technology** [11] - 24:1, 26:17, 28:3, 28:18, 29:6, 30:16, 37:2, 40:4, 62:9, 64:11, 69:14
**technology-assisted** [3] - 29:6, 64:11, 69:14
**teed** [1] - 9:14
**telephone** [3] - 1:6, 41:15, 53:17
**TELEPHONE** [1] - 4:1
**ten** [1] - 31:21
**tend** [1] - 73:22
**term** [16] - 38:21, 39:6, 39:10, 43:17, 43:19, 46:1, 46:20, 47:12, 47:24, 49:8, 49:24, 57:5, 57:11, 77:20, 77:25
**terms** [63] - 24:9, 24:10, 24:11, 24:17, 26:1, 32:12, 34:2, 34:5, 38:22, 39:2, 39:3, 40:5, 40:15, 40:18, 40:20, 41:4, 42:14, 42:22, 43:9, 43:23, 45:12, 45:18, 45:25, 46:24, 49:4, 50:15, 50:19, 51:25, 52:9, 52:16, 52:19, 55:24, 56:10, 56:12, 56:19, 56:24, 56:25, 57:15, 57:17, 57:19, 57:24, 58:9, 58:12, 58:20, 59:2, 59:17, 59:25, 60:19, 60:21, 60:22, 61:1, 61:3, 62:7, 62:16, 64:14, 67:21, 69:11, 70:15, 71:17, 71:21, 72:9, 78:4
**terrible** [1] - 71:21
**terrific** [3] - 17:15, 17:25, 18:11
**test** [3] - 31:22, 35:23, 52:6
**tested** [1] - 52:6
**testing** [4] - 17:2, 40:6, 40:24, 44:24
**tests** [1] - 37:9
**Teva** [40] - 2:11, 2:11, 5:2, 5:11, 5:15, 14:1, 16:5, 16:20, 17:17, 19:24, 19:25, 20:5, 24:8, 24:15, 24:22,

24:25, 25:6, 25:25, 26:4, 26:13, 27:20, 28:2, 39:3, 42:1, 47:17, 48:9, 49:20, 50:11, 51:9, 51:12, 51:16, 58:12, 58:16, 59:14, 59:15, 61:4, 66:9, 66:11, 66:16, 70:6
**TEVA** [1] - 1:6
**text** [1] - 13:7
**THE** [3] - 1:2, 1:5, 1:9
**The court** [146] - 4:2, 4:7, 4:22, 5:10, 5:21, 5:25, 6:25, 7:1, 7:9, 7:10, 7:14, 7:18, 7:22, 8:24, 9:2, 9:11, 9:18, 10:9, 10:10, 10:14, 11:4, 11:6, 11:21, 12:17, 12:19, 13:6, 13:24, 14:13, 14:18, 15:14, 15:15, 16:3, 16:10, 16:14, 16:17, 17:15, 17:25, 18:11, 18:19, 19:22, 24:5, 24:7, 24:9, 24:15, 24:18, 24:20, 25:5, 27:12, 27:24, 28:5, 28:16, 29:23, 30:19, 31:21, 32:6, 32:18, 32:22, 35:5, 35:16, 36:24, 37:12, 37:13, 37:16, 37:21, 38:9, 38:23, 38:25, 41:11, 42:11, 42:13, 43:2, 43:5, 43:7, 43:10, 43:13, 43:18, 44:3, 44:4, 44:18, 45:1, 45:19, 45:22, 47:7, 48:8, 48:25, 49:12, 49:16, 51:6, 51:9, 51:21, 52:8, 53:4, 53:6, 55:11, 55:19, 56:5, 57:3, 58:7, 58:10, 59:7, 59:10, 59:13, 59:16, 59:24, 60:19, 60:20, 60:23, 61:20, 62:23, 63:1, 65:19, 66:6, 68:18, 69:25, 70:17, 71:3, 71:6, 72:15, 72:25, 73:2, 73:6, 73:10, 74:13, 74:15, 74:22, 74:24, 75:2, 75:6, 75:15, 76:4, 76:21, 77:11, 78:1, 78:7, 78:16, 78:18, 78:24, 79:1, 79:3, 79:8
**themselves** [1] - 60:11
**therefore** [2] - 31:10,

74:2
**they've** [5] - 41:19, 50:4, 54:12, 63:16, 65:6
**thinking** [2] - 19:6, 53:14
**thinks** [3] - 8:2, 67:4, 77:6
**THORNBURG** [1] - 2:13
**thousand** [6] - 24:8, 24:12, 36:1, 36:5, 52:17, 67:23
**thousands** [2] - 33:17, 34:14
**thread** [1] - 55:22
**threaded** [1] - 55:21
**three** [5] - 10:12, 19:3, 21:21, 32:8, 41:10
**throughout** [1] - 50:6
**tied** [1] - 10:16
**timeframe** [1] - 61:6
**timing** [1] - 15:22
**Tinto** [2] - 48:9, 63:24
**Tintos** [1] - 23:24
**today** [36] - 4:5, 11:13, 12:25, 13:8, 13:14, 13:15, 13:18, 13:19, 13:23, 14:2, 16:19, 17:8, 17:17, 17:21, 18:7, 19:23, 24:23, 31:4, 31:20, 35:24, 36:7, 41:13, 41:22, 44:22, 45:21, 49:18, 49:19, 50:7, 55:12, 68:13, 68:15, 70:24, 72:11, 72:17, 78:9
**today's** [4] - 14:16, 17:3, 24:21, 24:22
**together** [12] - 7:13, 7:15, 26:16, 37:14, 48:12, 48:14, 60:24, 64:1, 71:25, 72:1, 77:18, 78:5
**tongue** [1] - 50:21
**took** [2] - 38:20, 49:21
**tool** [3] - 62:22, 70:21
**top** [7] - 22:15, 30:25, 42:21, 56:24, 57:14, 77:25, 78:4
**tough** [1] - 7:15
**towards** [1] - 8:8
**trade** [1] - 32:10
**traditional** [1] - 29:25
**train** [3] - 20:25, 21:1, 54:10
**trained** [2] - 22:14, 23:13, 73:18
**training** [3] - 20:18, 20:19, 28:24

**transcript** [3] - 1:25, 52:4, 79:13
**transcription** [1] - 1:25
**transcripts** [1] - 42:6
**transparency** [2] - 43:14, 44:6
**transparent** [5] - 39:13, 43:6, 48:17, 63:15, 65:15
**Traurig** [3] - 5:1, 71:19, 73:25
**TRAURIG** [1] - 2:8
**tremendous** [1] - 47:1
**trench** [1] - 50:25
**trending** [1] - 55:24
**tried** [5] - 25:20, 29:15, 38:13, 40:4, 60:4
**trigger** [1] - 27:20
**triple** [1] - 35:11
**triple-checking** [1] - 35:11
**TRISCHLER** [6] - 2:23, 5:3, 16:8, 16:11, 16:16, 16:18
**Trischler** [3] - 5:4, 16:8, 16:14
**true** [1] - 30:8
**truly** [2] - 10:16, 25:17
**try** [7] - 29:8, 39:22, 41:10, 43:18, 52:24, 56:13, 72:8
**trying** [12] - 7:17, 9:3, 22:7, 22:9, 29:19, 38:13, 40:17, 50:12, 57:6, 66:7, 68:7, 75:3
**turn** [4] - 20:7, 31:10, 61:18, 76:20
**two** [23] - 5:14, 6:13, 7:2, 9:21, 18:6, 19:3, 20:20, 25:14, 28:5, 28:24, 32:7, 34:4, 37:7, 51:6, 53:8, 57:23, 59:10, 65:19, 65:23, 68:21, 73:9, 74:11, 77:5
**type** [1] - 27:19
**types** [2] - 10:5, 55:24
**typically** [2] - 69:13, 69:16

**U**

**ULMER** [1] - 2:16
**ultimately** [3] - 23:13, 39:22, 70:25
**unable** [1] - 63:4
**under** [6] - 12:3, 27:9,

39:7, 42:22, 61:2, 62:10
**understood** [2] - 9:11, 12:19
**undisputed** [1] - 62:4
**UNITED** [2] - 1:2, 1:9
**universe** [2] - 43:9, 56:18
**unmanageable** [1] - 39:5
**unprecedented** [1] - 44:5
**unquote** [7] - 5:16, 25:9, 48:11, 62:2, 66:3, 72:18, 76:20
**unwilling** [1] - 63:15
**up** [25] - 8:23, 9:14, 12:10, 19:2, 19:4, 19:7, 20:2, 24:24, 31:8, 31:22, 39:16, 40:22, 42:12, 43:20, 46:3, 52:18, 54:13, 59:14, 59:21, 64:7, 66:14, 70:6, 75:10, 76:22, 78:9
**update** [1] - 11:24
**upended** [2] - 38:24, 41:20
**uphold** [1] - 28:15
**US** [1] - 50:5
**USA** [2] - 2:11, 2:21
**utilize** [1] - 47:23
**utilized** [1] - 76:15

**V**

**valid** [1] - 76:12
**validate** [1] - 48:13
**validated** [1] - 31:22
**validation** [19] - 26:8, 26:17, 26:22, 27:1, 27:6, 27:19, 33:13, 33:14, 33:20, 34:8, 34:24, 35:6, 35:8, 35:13, 35:21, 36:15, 36:21, 53:10, 56:13
**validations** [1] - 37:10
**Valsartan** [4] - 4:2, 17:2
**VALSARTAN** [1] - 1:4
**values** [1] - 69:17
**variety** [2] - 21:4, 34:21
**various** [2] - 10:10, 71:9
**vast** [1] - 68:10
**vendor** [3] - 61:11, 62:20, 69:9
**vendor's** [3] - 14:9, 70:7, 70:16

**verses** [1] - 38:18
**versus** [3] - 63:5, 63:23, 63:24
**vetted** [1] - 10:6
**vetting** [1] - 71:24
**VIA** [1] - 4:1
**Via** [1] - 1:6
**VICTORIA** [1] - 2:9
**Victoria** [5] - 4:25, 13:25, 30:4, 59:18, 69:22
**view** [2] - 7:24, 66:23
**Vine** [1] - 2:17
**virus** [1] - 71:7
**vociferous** [1] - 57:6
**volume** [2] - 62:21, 69:16

**W**

**wait** [3] - 6:21, 7:9, 37:22
**waited** [1] - 9:6
**waiting** [1] - 9:7
**Wales** [1] - 53:12
**WALLACK** [1] - 3:2
**wants** [4] - 18:13, 63:12, 73:10, 78:8
**warfare** [1] - 50:25
**water** [1] - 12:3
**ways** [3] - 20:25, 34:19, 34:21
**Wednesday** [1] - 1:7
**week** [6] - 25:14, 45:9, 53:8, 73:11, 78:8, 78:17
**weeks** [6] - 7:9, 18:6, 37:7, 54:22, 56:14, 60:16
**well-documented** [2] - 29:2, 29:5
**well-established** [1] - 47:14
**well-known** [1] - 47:6
**WERNER** [1] - 2:19
**Westlaw** [2] - 43:1, 63:23
**whereas** [2] - 16:1, 63:16
**whereby** [1] - 38:21
**white** [5] - 40:14, 42:23, 53:21, 54:2
**WHITELEY** [3] - 1:20, 1:21, 4:16
**Whiteley** [1] - 4:17
**whole** [5] - 6:24, 48:12, 71:20, 76:21
**wholesaler** [1] - 5:8
**wholesalers** [6] - 10:23, 11:1, 11:3,

12:5, 12:11, 12:15
**wide** [1] - 47:24
**willing** [3] - 48:2, 49:6, 49:8
**wind** [1] - 6:25
**wish** [1] - 16:11
**wonderful** [1] - 38:6
**word** [3] - 33:19, 38:7, 47:25
**worded** [1] - 46:23
**words** [11] - 21:22, 24:25, 25:9, 27:9, 30:11, 32:13, 35:11, 36:10, 53:10, 58:18, 63:17
**wordsmith** [1] - 72:23
**works** [4] - 37:2, 58:16, 73:18, 74:5
**world** [1] - 51:12
**worse** [1] - 44:11
**worst** [1] - 45:12
**wow** [1] - 55:8
**write** [1] - 46:10
**writing** [2] - 42:15, 54:23
**written** [1] - 29:3
**wrongly** [1] - 12:19
**Wuhan** [1] - 50:3

**Y**

**year** [5] - 38:6, 38:22, 43:17, 45:11, 52:7
**years** [3] - 28:8, 37:19, 40:19
**yesterday** [1] - 9:2
**York** [2] - 63:23, 63:24

**Z**

**zero** [1] - 22:18
**ZHP** [17] - 2:7, 4:24, 13:3, 13:6, 13:20, 13:22, 15:22, 16:5, 16:19, 17:17, 49:20, 49:23, 66:13, 66:15, 68:16, 71:1, 72:5
**ZHP's** [1] - 13:16
**Zoom** [1] - 37:15