

Jeffrey W. Greene
Tel 617.310.6031
Fax 617.987.0931
greenej@gtlaw.com

July 24, 2020

**VIA CM/ECF**

The Honorable Joel Schneider
United States District Court for the District of New Jersey
Mitchell H. Cohen Building
& U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101

      Re:    *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation.*, U.S. District Court for the District of New Jersey; Case No. 1:19-md-02875-RBK-JS

Dear Judge Schneider:

    Defendants Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd., Actavis LLC, Actavis Pharma, Inc., and Arrow Pharm (Malta) Ltd. (collectively, "Teva" or the "Teva Defendants") respectfully submit this supplemental letter brief in support of our request for an order enforcing the Electronic Discovery Protocol ("ESI Protocol") (Dkt. 127) and affirming the Teva Defendants' electronic document review and production process.

      **I.**    **Applying Continuous Multi-Modal Learning ("CMML") on top of Search Terms is an Acceptable Methodology and Fully Defensible**

    During the July 15, 2020 case management conference, Plaintiffs surmised (through pure speculation) that Teva's use of both search terms and a continuous multi-modal learning ("CMML") platform was somehow inappropriate. Although Plaintiffs never mentioned this in the Fall of 2019—when all of the parties were negotiating both the ESI search terms and simultaneously discussing the potential use of TAR/CMML—they now say that, had they been aware of Teva's intent to use CMML, they would have insisted that Teva run CMML across the entire custodial dataset without first applying search terms. Plaintiffs' suggestion that it is inappropriate to use search terms together with CMML is not only contradictory to the plain language of the ESI Protocol (which allows for both to be used in tandem), but is also contrary to the holdings of courts which have held that such a process is perfectly acceptable and fully defensible.

For example, in *In re Biomet* (a multi-district litigation), the defendant applied keyword search terms to its dataset and "then employed technology-assisted review, or predictive coding" to identify the "relevant documents to be produced from the 2.5 million [documents] that emerged from the keyword [terms] and deduplication process." *In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, No. 3:12-MD-2391, 2013 WL 1729682, at *2 (N.D. Ind. Apr. 18, 2013). The Biomet Plaintiffs' Steering Committee opposed the layering methodology, arguing that the defendant's approach was allegedly "inefficient because, although it employed predictive coding, Biomet began with the less accurate keyword search." *Id*. In rejecting Plaintiffs' position and holding that the defendant's use of keyword search terms together with predictive coding was acceptable, the Court stated:

> The issue before me today isn't whether predictive coding is a better way of doing things than keyword searching *prior to* predictive coding. I must decide whether Biomet's procedure satisfies its discovery obligations and, if so, whether it must also do what the Steering Committee seeks. ***What Biomet has done complies fully with the requirements of Federal Rules of Civil Procedure 26(b) and 34(b)(2)*** … I don't read [the rules] as requiring counsel from both sides to sit in adjoining seats while rummaging through millions of files that haven't been reviewed for confidentiality or privilege.

*Id*. (emphasis added).

The *In re Biomet* Court further instructed the parties to continue cooperating in good faith and to meet and confer on Biomet's validation process—which is exactly the type of meet and confer process Teva envisions occurring here. *See also*, *City of Rockford v Mallinckrodt ARD Inc.*, No. 3:17-cv-50107, at Dkt. 158 (N.D. Ill. August 14, 2018) (attached as **EXHIBIT A**) (where Court's order on ESI indicates that keyword terms may be used to cull the document population prior to the application of TAR so long as parties meet and confer in good faith regarding a mutually agreeable protocol); *In re Broilerplate Chicken Antitrust Litigation*, Civ. A. No. 1:16-cv-08637, at Dkt. 586 (N.D. Ill. Jan. 13, 2018) (attached as **EXHIBIT B**) (entering Order Regarding Search Methodology for Electronically Stored Information which expressly contemplates search term culling prior to the applying TAR/CAL unless the requesting party specifically identifies a limited number of custodians whose data would not be culled in this fashion); *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 131-132 (S.D.N.Y. 2015) (approving ESI protocol which allows for use of search terms for purposes of culling the document universe in addition to utilizing TAR where the responding party deems culling reasonable and appropriate and takes steps including meeting and conferring in good faith with the opposing party).

Here, Teva's layering of CMML on top of the documents identified by keyword search terms is fully consistent with Teva's obligations under the Rules of Civil Procedure generally, Rule 26(b)(1) specifically, and the ESI Protocol. That having been said, in the spirit of cooperation, and consistent with the Sedona principles and to avoid further burdening the Court with protracted discovery disputes, ***Teva will agree to apply CMML across its current custodial dataset of approximately 8 million documents, without regard to whether the documents hit on a search***

2

***term, if such an agreement would expedite resolution of this dispute***.[1] This approach should fully alleviate Plaintiffs' concerns regarding the use of search terms together with CMML, which appears to be Plaintiffs' primary objection. As Mr. Parekh indicated during the case management conference before Your Honor, "there's no inherent distrust with TAR as a concept" but only "when you use TAR on top of search terms[.]…" (July 15, 2020, CMC Transcript, 57:13-15).

Moreover, applying CMML across the full database for the 36 Teva custodians will not prejudice Plaintiffs in any way. Teva informed Plaintiffs at the Court-ordered, in-person ESI meeting with Plaintiffs' counsel on November 15, 2019 that Teva was considering the use of technology assisted review. Teva specifically indicated it had a representative from its vendor available by phone if Plaintiffs had questions about the ways in which Teva might employ technology in the future, yet Plaintiffs declined to pose any questions to the vendor. Plaintiffs did not communicate with Teva about the use of TAR at any time after this meeting until Teva, in good faith, raised the issue with Plaintiffs on July 1st, before any decision to cull documents from the review set had been made.

As already set forth in our July 14, 2020, filing before the Court, and as discussed at the July 15, 2020 status conference, Teva reconsidered the use of CMML in June 2020 after the heavily negotiated search terms still left Teva with an enormous volume of documents to review. And, based on the clear language of the ESI Protocol allowing for Teva to layer CMML on top of search terms, Teva had no reason to believe that Plaintiffs would object to such an approach. Furthermore, the search terms were utilized to identify highly responsive documents to train Teva's CMML system and expedite the review of the priority custodians' data.[2]

Nevertheless, even if Teva proceeds with applying CMML across the full custodial dataset without regard to the search terms, Plaintiffs' time was not wasted as they would have had to negotiate the search terms with other defendants in this case that do not intend to use any type of Technology Assisted Review ("TAR") or Continuous Active Learning ("CAL") platform. Nor was this in any way a fruitless exercise with respect to Teva – culling the document set via the negotiated search terms provided Teva with a richer document set to begin training the CMML system, and has enabled Teva to more efficiently identify responsive documents. The only time that will be wasted here is if Teva is forced to linearly review nearly 3.7 million documents, which will take months, if not years, to complete. *See* Consilio Dec. (Dkt. 516-1), ¶¶ 4-7. Teva's proposed path forward involving the use of CMML will ensure that Teva can meet the Court's deadlines, requiring the completion of rolling document productions on the 1st of September, October, and November, and completion of the entire production by November 29, 2020.

## II. Teva has Retained an Internationally Recognized TAR and CAL Expert, Dr. Maura Grossman, Who Can Assist the Parties in Agreeing to a Validation Protocol

---

[1] Teva notes that this proposal is made on behalf of the Teva Defendants alone, after considering the current dataset at issue. Other parties may have unique concerns with their dataset or proportionality considerations that justify a different approach.

[2] Should the Court order Teva to apply CMML to the full dataset of its custodians, Teva will continue to prioritize review of documents in the files of the priority custodians and produce those to Plaintiffs on a priority basis.

As set forth more fully during the telephone conference with the Court, Teva proposes that the parties agree to a validation protocol in order to alleviate any of Plaintiffs' concerns that somehow responsive documents will not be reviewed and produced due to what the CMML platform is predicting to be non-responsive. Put simply, the purpose of such a protocol is to *validate* that Teva's CMML process works and that no responsive documents are left behind.

As a part of that process, Teva has retained Dr. Maura Grossman, an internationally recognized TAR and CAL expert and leading scholar who—literally and figuratively—wrote the book on what a proper validation protocol should look like. A copy of Dr. Grossman's curriculum vitae is attached hereto as **EXHIBIT C**. Teva retained Dr. Grossman not only to demonstrate to Plaintiffs that the process being undertaken here is fully defensible and consistent with the rules of discovery, but also to answer any questions or concerns Plaintiffs may raise about the parameters of a validation protocol. With Dr. Grossman's assistance, Teva is confident that the parties will be able to reach an agreement on a validation protocol that is satisfactory to all parties. For similar cases where Dr. Grossman worked with the parties to prepare validation protocols, *see In re Broilerplate Chicken Antitrust Litigation*, Civ. A. No. 1:16-cv-08637, at Dkt. 586 (N.D. Ill. Jan. 13, 2018); *Rio Tinto PLC*, 306 F.R.D. at 131-132.

As Dr. Grossman's resume reveals, she is a well-known and influential eDiscovery expert. She was described in *Who's Who Litigation E-Discovery Analysis* as "'sensational' according to her peers and . . . a 'go-to' in the area," and by *Chambers & Partners USA Litigation: E-Discovery* as "the best-known person in the area of technology-assisted review; a superstar among superstars." Dr. Grossman's scholarly work on TAR, most notably, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, published in the Richmond Journal of Law & Technology in 2011, has been widely cited in case law, both in the U.S. and abroad. Her longstanding contributions to eDiscovery technology and process were featured in the February 2016 issue of *The American Lawyer* and in the September 2016 *ABA Journal* – where she was recognized as a 2016 Legal Rebel. In 2017, Dr. Grossman was one of 10 additions to the ABA's list of Women in Legal Tech; was named to the Fastcase50 list, which honors "the year's smartest, most courageous innovators, techies, visionaries, and leaders in the law"; and was honored by the Association of Certified E-Discovery Specialists ("ACEDS"), and Women in eDiscovery ('WiE") as one of the "women who have served as pioneers and innovators in eDiscovery and legal technology."

Dr. Grossman has been a court-appointed special master, mediator, and expert to the court in many high-profile federal and state court cases. She has provided eDiscovery training to federal and state court judges, by invitation of the court, and has testified several times before the Advisory Committees on the Federal Rules of Civil Procedure and the Evidence Rules. Dr. Grossman has also taught more than a dozen courses on eDiscovery at Columbia, Georgetown, Pace, and Rutgers–Newark law schools, and has been a guest lecturer at many more. She has authored more than ninety publications in the area of eDiscovery, thirty of which are peer reviewed articles on technology assisted review. Dr. Grossman is not solely an academic – since 2010 she has personally handled or supervised over 100 matters applying TAR or CAL.

Dr. Grossman was a member of the Steering Committee of The Sedona Conference Working Group 1 on Best Practices for Electronic Document Retention and Production from 2012

through 2018, and also served as a member of the Steering Committee of the Seventh Circuit Council on Electronic Discovery and Digital Information. Notably, Dr. Grossman works as an expert on behalf of *plaintiffs* just as often as defendants, in addition to her work as an impartial special master. Suffice to say, there is no other expert out there that is better suited to address how a validation protocol can assuage Plaintiffs' and the Court's stated concerns, and Dr. Grossman will be available to discuss these concerns at the July 29th Case Management Conference.

The negotiation of a validation protocol will not require the parties to "start over" or re-negotiate the ESI Protocol. Rather, any validation protocol will be fully consistent with the ESI Protocol already entered by the Court and will simply operate to govern the parameters of Teva's CMML process. Validation protocols are commonplace in large eDiscovery matters. *See, e.g.*, **EXHIBIT B**, which is the ESI Protocol and Validation Protocol used in the *In re Broilerplate Chicken Antitrust Litigation*, Civ. A. No. 1:16-cv-08637 (N.D. Ill). There, nearly 20 defendants relied on (and complied with) the validation protocol to demonstrate the validity of their CAL or CMML processes. Assuming plaintiffs operate in good faith, this protocol can be quickly and efficiently negotiated.

If Plaintiffs still have concerns about Teva's use of CMML despite Teva agreeing to forego the search terms to apply CMML to approximately 8 million documents, retaining the world's top expert on TAR and CAL, and proposing that the parties agree to a detailed validation protocol, then we have grave concerns about whether Plaintiffs are acting in good faith or whether they are attempting to simply burden the defendants by unnecessarily driving up the costs of discovery. Validation protocols like the one Teva hopes the parties will pursue here are being negotiated in cases all across the country. At this point, Teva is going above and beyond its obligations under the Rules and respectfully requests that the Court enforce the ESI Protocol allowing Teva to leverage CMML for its document review process.

### III.   Teva's Response to Specific Questions from the Court

While some of the Court's questions may now be moot in light of Teva's proposal above, Teva's answers to Your Honor's specific questions are set forth below.

1. *If TAR is used so that Teva could exclude from an "eyeball" review a set of documents the program deems non-responsive, would [defendants] object to giving plaintiffs the option to review every document not reviewed? The review would include the caveat that if it turns out "too many" relevant documents are excluded from review because of Teva's program plaintiffs could make an application for fees and costs in connection with their review.*

Teva objects to producing non-responsive documents in this matter that have not been already reviewed by the Teva Defendants. Forcing Teva to do so would create an unnecessary risk that privileged or work product information would be produced to Plaintiffs, and/or that highly confidential and sensitive business information—none of which has anything to do with the litigation—is ultimately produced. There is simply no reason why a CMML exercise should operate any differently than a traditional linear review as it relates to documents deemed non-responsive. For example, if attorneys engaged in a linear "eyeball" review of 1,000 documents and deemed 800 of those responsive (and produced those 800), absent some allegation of a deficiency,

5

plaintiffs would not be entitled to the production of the remaining 200 documents the opposing party deemed non-responsive during that "eyeball" review.

Here, Teva's use of CMML operates in the same manner as a linear review. Attorneys begin an "eyeball" review of documents and mark them responsive or non-responsive. Then, at some point, the CMML system starts informing those attorneys whether the documents it is continuing to review are likely to be responsive. After the attorneys review a certain number of documents and find that there are no more responsive documents showing up in their review, they may decide that, at that point, the review has reached a point of diminishing returns. Then, the attorneys may decide to cease putting "eyeballs" on each remaining document because the prioritization of CMML appears to have worked, and the only documents remaining in the population are non-responsive. Notably, in a typical CMML process, the system can be adequately trained through review of only a few thousand documents. However, Teva has already conducted human review of over 150,000 documents, each of which is continuously used to train and inform the CMML system, which will lead to a much higher degree of precision in Teva's process than is typically reached in a CMML process (including those approved by the courts noted above).

The Federal Rules of Civil Procedure do not provide for opposing party review of documents a responding party deems non-responsive as matter of course – this is true whether the review is linear or conducted with the aid of technology. If Plaintiffs are permitted to peek behind the curtain into Teva's review process and non-responsive documents, it will be impossible to un-ring the bell should confidential, sensitive, or privileged documents be disclosed. *See In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 391-97 (E.D.N.Y. 2007) (providing an overview of the numerous difficulties which arose after confidential documents were improperly disclosed and distributed through no fault of counsel in the MDL). Any issues arising from this type of intrusion on the ordinary discovery process will lead to further litigation and discovery on discovery that risks grinding this MDL to a halt.

In terms of identifying the universe of documents that are non-responsive, studies have repeatedly shown that a CAL or CMML exercise is more reliable in determining which documents are non-responsive than a linear review. *See* Maura R. Grossman & Gordan V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, 17 Rich. J.L. & Tech., Issue 3 (2011) (concluding that "by all measures, the average efficiency and effectiveness of the five technology-assisted reviews surpasses that of the five manual reviews") (attached as **EXHIBIT D**); Gordan V. Cormack & Maura R. Grossman, *Navigating Imprecision in Relevance Assessments on the Road to Total Recall: Roger and Me*, In *Proceedings of the 40th International ACM SIGIR conference on Research and Development in Information Retrieval, SIGIR 2017, Tokyo, Japan, August 7-11, 2017*, 2017 ("This study contributes to the body of empirical evidence showing that hybrid human-computer classification systems (known in the legal community as "technology-assisted review" or "TAR") can be more effective and more efficient than exhaustive manual review by experts . . . .") (attached as **EXHIBIT E**). Plaintiffs' stated concern about the CMML system learning responsiveness based on a subset of custodians and thereafter failing to identify responsive documents in the data of custodians with dissimilar job functions is similarly unfounded. *See* Gordon V. Cormack & Maura R. Grossman, *Multi-Faceted Recall of Continuous Active Learning for Technology-Assisted Review*, in Proc. of the 38th Int'l ACM SIGIR

Conference on Rsch. & Dev. in Info. Retrieval, at 766 (2015) (attached as **EXHIBIT F**) ("For all experiments, our results are the same: CAL achieves high overall recall, while at the same time achieving high recall for the various facets of relevance, whether topics or file properties."). Thus, using the example set forth above, ***studies show there is a greater risk that a responsive document exists somewhere in the 200 documents attorneys manually reviewed and marked non-responsive (and did not produce), than there is a risk of a responsive document lying in a pool of unreviewed documents after a proper application of CMML.*** The CMML system is also better able to quickly retrain and correct when presented with a new type of potentially responsive document. Put simply, the risk of human error is greater than the risk of error on the part of a CAL or CMML algorithm. *See id.*; Grossman & Cormack *supra*; Cormack & Grossman *supra*.

The way to ensure that all responsive documents have been turned over using a CMML exercise (and to ensure that none have been left behind due to a review being cut off from an "eyeball" review) is to have a proper validation protocol in place. As Dr. Grossman can attest, a proper validation protocol is the standard mechanism in the eDiscovery field to test the validity of a CMML process, but validation is not accomplished by providing opposing parties access to non-responsive materials. Rather, the tried and true path to testing Teva's process and ensuring that a significant number of responsive documents are not excluded from production is for the parties to negotiate a proper validation protocol. This protocol will typically: (1) set out how samples or subsamples of documents are identified for inclusion as part of the validation process; (2) identify who shall perform the validation review; (3) codify the information that shall be provided to the requesting party based on the results of the validation review; and (4) describe the process whereby the parties will meet and confer to discuss whether this data indicates that review can cease and to apply for relief in the event of disagreement. *See In re Broilerplate Chicken Antitrust Litigation*, Civ. A. No. 1:16-cv-08637, at Dkt. 586 (N.D. Ill. Jan. 13, 2018).

To the extent Plaintiffs are concerned that responsive documents for high priority custodians somehow be withheld until the end of the production, Teva can perform sampling and validation exercises on batches of custodians in the interim to confirm that sufficient responsive documents have been produced for these individuals. This tiered approach can easily be incorporated into the validation protocol. For these reasons, Teva proposes that the parties meet in good faith to negotiate such a protocol for this litigation, which will assuredly dispel any concerns regarding potentially overlooked responsive documents or the ability to prioritize certain custodians.

2. *Does Teva object on privilege/work-product grounds to identifying for plaintiffs the precise definition to be used for a "responsive" document? The criteria for determining when a document is deemed responsive or not responsive? Will Teva answer the questions?*

Teva has already explained to Plaintiffs that it is defining a "responsive" document based on the claims and defenses in this case, as well as Plaintiffs' specific requests for production of documents. Any explanation of responsiveness beyond what has already been provided would necessarily be protected by the attorney-client privilege and/or work product doctrine, as it would force Teva to explain its responsiveness determinations across nearly every document. Using the example above, if an attorney engages in an "eyeball" linear review of 1,000 documents and determines that 800 are responsive and should be produced, the opposing party is not entitled to

7

ask questions of the attorney such as: "why did you deem this particular document responsive?" as such a question seeks to get into the mind of the attorney. *See* Hon. John M. Facciola & Philip J. Favro, *SAFEGUARDING THE SEED SET: WHY SEED SET DOCUMENTS MAY BE ENTITLED TO WORK PRODUCT PROTECTION*, 8 Fed. Cts. L. Rev., Issue 3, at 32 (2015) (attached as **EXHIBIT G**) ("[C]ourts must take the lead in creating certainty surrounding the predictive coding process. In particular, this requires courts to protect judgmental seeds as work product.").

Here, again, the CMML process should operate no differently. The prior TAR 1.0 process was more reliant on the accuracy and adequacy of training sets, but that is not so with state-of-the-art CMML. *See Rio Tinto PLC*, 306 F.R.D. at 128 ("If the TAR methodology uses "continuous active learning" (CAL) (as opposed to simple passive learning (SPL) or simple active learning (SAL)), the contents of the seed set is much less significant."). As stated previously, Teva is simply engaging in an "eyeball" linear review of documents at this point, if or until the CMML platform starts indicating that continuing to do so would yield only non-responsive materials. Until that happens, however, there is no meaningful difference in the day-to-day responsiveness decisions that Teva's attorneys are making as compared to those decisions in a linear review. Like in any large-scale document production, a team of first level reviewers trained on the specifics of the case are being supported by a team of Greenberg Traurig attorneys who in turn weigh in on difficult questions, guide the review, and perform rigorous quality control checks.

Absent some allegation of a deficiency in Teva's document production or some claim of spoliation (which there are none), Plaintiffs do not get to peek behind the curtain to effectively obtain discovery on discovery. See, e.g., *Freedman v. Weatherford Int'l Ltd.*, 2014 U.S. Dist. LEXIS 102248, at *9 (S.D.N.Y. July 25, 2014) (denying a motion to compel reports involving Defendant's discovery process where plaintiffs had "not proffered an adequate factual basis for their belief that the current production is deficient); *see also Catlin v. Wal-Mart Stores, Inc*., 2016 WL 7974070, at *1–2 (D. Minn. Sept. 22, 2016) (In denying plaintiff's request to reopen discovery regarding Wal-Mart's data collection process, the court rejected the argument that "collateral discovery" was warranted because plaintiff had "failed to offer anything beyond her own speculation that Wal-Mart's belated disclosure . . . might have been the product of [its] willful conduct." Because plaintiff could not identify any specific area of discovery that might be incomplete, the court refused to "share [her] loss of faith in Wal-Mart's overall compliance with its discovery obligations.").

Plaintiffs' unfounded suggestion during the case management conference that Teva is somehow influencing its responsiveness decisions in order to purposefully train the CMML system away from locating responsive documents is misplaced. As Teva has already indicated, "training" CMML is different than training a traditional TAR 1.0 system and is done by simply engaging in a day-to-day responsiveness review, as any ordinary linear review would take place. Those responsiveness decisions are not only used to mark documents for production (again, as would occur in a linear review), but are used to teach CMML what other types of documents it should be looking for in order to percolate those documents to the top of the review pile. The system Teva is employing does not have the same TAR 1.0 issues and limitations Plaintiffs keep returning to – arguing over "training" documents in a CMML system is anachronistic. *See* Maura R. Grossman & Gordon V. Cormack, *Comments on "The Implications of Rule 26(g) on the Use of Technology*

8

*Assisted Review*, 7 Fed. Cts. L. Rev., Issue 1, at 295-299 (2014) (attached as **EXHIBIT H**) (explaining how various concerns over the construction of seed sets are misplaced in the context of a CAL review). For purposes of a CMML review, as discussed above, what matters is a robust, defensible validation process. *See id.* at 301-12.

Contrary to a pure linear review (which, as set forth above, creates a risk of human error and inconsistent coding decisions), it is extremely difficult to mislead a computer algorithm such as CMML. If, for example, one reviewer marked a document "responsive" and another reviewer marked a very similar document "non-responsive," CMML would generate a conflict report for counsel, which is essentially the computer's way of asking for clarification on whether the document is indeed responsive or not. In a linear review, however, the document marked "non-responsive" by a human reviewer could potentially float into the abyss and never be produced. CMML provides an added layer of protection in terms of the responsiveness coding to ensure that relevant documents are located and produced. And, for the set of documents that ultimately are not reviewed, the validation process operates to confirm that, if any responsive documents still exist in the population—they will be produced as well.

At some point, Plaintiffs must simply trust that Teva understands its legal and ethical obligations in discovery and is going to comply with them. Indeed, the Court specifically stated as much on May 8, 2019, when the parties were negotiating how redactions and withholding of non-responsive documents in families would be dealt with in the very ESI protocol Teva now seeks to enforce:

> THE COURT: Doesn't it go both ways? You have to trust the defendants that they're complying with their professional responsibilities and obligations to produce relevant information. They have to rely on the plaintiffs that the plaintiffs are producing, fulfilling their professional responsibilities. So if the defendant makes a representation that this is an irrelevant product, has nothing to do with case, it fits into the category and it's not another Sartan, why can't we rely on this just like they rely on your representation that certain OBGYN documents medical records you're not producing because they're not relevant to the case.
> . . . .
> But don't we have to trust them? Don't we have to trust them just like they trust the plaintiffs, you have to trust them.

(May 29, 2019, CMC Transcript, 55:6-17 & 56:8-10).

Any further reassurance that Plaintiffs need in order to accept that all responsive documents will have been produced despite the use of CMML will be provided in the form of compliance with a detailed validation protocol, which is standard practice and which will be "blessed" by one of the world's leading expert on the topic.

3. *If TAR is used what additional "choice" tags do plaintiffs want included in addition to responsive / not responsive?*

9

While the Court's third question appears directed to Plaintiffs, Teva believes a response is necessary because CMML does not have the capacity to leverage additional "choice" tags in being trained. Teva understands this question to suggest that issue tags or issue codes, which are used to identify documents representing a topic of interest, and a responsiveness tag, which indicate whether a document is responsive or non-responsive, can both be used to train a CMML predictive model. According to the Brainspace CMML Whitepaper sent to Plaintiffs via letter on July 10, 2020 and attached to Teva's previous submission, however, the CMML application allows the user to "define tags of interest and link these tags to predictive *models*." (Dkt. 516-7 at 6) (emphasis added). Although the CMML application can support multiple tags of interest, a CMML predictive model can only be linked to a single tag. In this case, because Teva's primary goal in using a predictive model is to prioritize responsive documents ("responsive model"), only a single tag indicating whether a document is responsive or non-responsive is linked to this model.

4. *If TAR is used is it feasible to go back to the original Court-Ordered search term list from December?*

Yes, this would be feasible for the Teva Defendants and Teva does not necessarily object to this suggestion. This question would be moot, however, should the Court adopt Teva's proposal to run CMML across its entire dataset and forego the use of search terms altogether. As set forth above, Teva is confident that applying keyword search terms to the data and then layering CMML on those search term hits, whether it be the original search terms or as modified, is fully appropriate, reliable and defensible in this context.

## IV. CONCLUSION

The Teva Defendants' proposal is intended to provide Plaintiffs with the most responsive documents in the most timely fashion, while enabling Teva to control and manage production of its documents as it sees fit. *In re Mercedes-Benz Emissions Litigation*, 2020 WL 103975, at *1 (D. N.J. Jan. 9, 2020) ("[R]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for producing their own electronically stored information."). For the reasons set forth more fully above, the Teva Defendants' respectfully request that this Court enter an order: 1) enforcing the ESI Protocol by overruling Plaintiffs' categorical objection to Teva's use of CMML; 2) ordering that Plaintiffs cooperate in good faith with the Teva Defendants in further application of appropriate CMML utilization as the discovery review progresses, including but not limited to meaningfully meeting and conferring regarding the entry of an appropriate validation protocol; and 3) awarding Teva Defendants costs and fees associated with the instant filing and unnecessary diversions during the CMML negotiations.

Dated: July 24, 2020						Respectfully submitted,

*/s/ Jeffrey Greene*
Jeffrey Greene
GREENBERG TRAURIG, LLP
One International Place
Suite 2000
Boston, MA 02110
Telephone:	(617) 310-6031
Fax:		(617) 897-0931
greenej@gtlaw.com

*/s/ Lori G. Cohen*
Lori G. Cohen
Victoria D. Lockard
Steven M. Harkins
Terminus 200
3333 Piedmont Rd., NE
Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2385
Fax: (678) 553-2386
cohenl@gtlaw.com
lockardv@gtlaw.com
harkinss@gtlaw.com

*/s/ Brian H. Rubenstein*
Brian H. Rubenstein
1717 Arch Street
Suite 400
Philadelphia, PA 19103
Tel: (215) 988-7864
Fax: (215) 689-4419
rubensteinb@gtlaw.com

*Attorneys for Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd., Actavis LLC, and Actavis Pharma, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2020, I served the foregoing letter to the Court was served on all counsel of record via filing in the CM/ECF system.

*/s/ Jeffrey Greene*