**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | No. 1:19-md-2875-RBK Hon. Robert Kugler Hon. Joel Schneider |
| This document relates to: *All Actions* | |

**COMPENDIUM OF UNPUBLISHED CASES CITED IN PLAINTIFFS' BRIEF**

## TABLE OF CONTENTS

**Case**                                                                                        **Tab**

*Allgood v. GMC*,
    No. 1:02-cv-1077-DFH-TAB,2006 WL 2669337 (S.D. Ind. Sep. 18, 2006) ....................1

*Am. Fed'n of State Cty. & Mun. Employees v. Ortho-McNeil-Janssen Pharm., Inc.*,
    No. 08-CV-5904, 2010 WL 891150 (E.D. Pa. Mar. 11, 2010)........................................2

*Atkinson v. Luitpold Pharm., Inc.*,
    No. CV 19-277, 2020 WL 1330705 (E.D. Pa. Mar. 23, 2020) .........................................3

*Bank of New York Mellon v. Fidelity National Title Ins. Co.*,
    No. CV126013698, 2013 WL 5663263 (Conn. Super. Ct. Sept. 20, 2013) .......................4

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline*,
    No. 13-4663, 2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ................................................5

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline*,
    No. 13-4663, 2019 WL 4751883 (E.D. Pa. Sept. 30, 2019)................................................6

*Bondyopadhyay v. The Bank of New York Mellon*,
    Nos. H-20-1340 & H-20-1359, 2020 WL 4676765 (S.D. Tex. Aug. 11, 2020)................7

*Bowman v. RAM Medical, Inc.*,
    No. 10-cv-403, 2012 WL 1964452 (D.N.J. May 31, 2012)................................................8

*Breeze v. Bayco Prod. Inc.*,
    No. 3:19-CV-00848-NJR, 2020 WL 4365471 (S.D. Ill. July 30, 2020) ..........................9

*Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*,
    No. 02cv88, 2005 WL 782698 (N.D. Ill.  Apr. 6, 2005) ................................................10

*Cottrell v. Heritages Dairy Stores, Inc.*,
    No. 09-1743, 2010 WL 3908567 (D.N.J. Sept. 30, 2010)................................................11

*Cromeans v. Morgan Keegan & Co.*,
    No. 2:2-CV-04269, 2013 WL 12129609 (W.D. Mo. Nov. 5, 2013)................................12

*In re Dial Complete Marketing & Sales Practices Litig.*,
    No. 11-md-2263, 2013 WL 1222310 (D. N.H. Mar. 26, 2013)........................................13

*In re Digitek Prods. Liab. Litig.*,
    No. 2:08-md-01968, 2009 WL 2433468 (S.D. W. Va. Aug. 3, 2009).............................14

*In re Diisocynates Antitrust Litig.*,
   MDL No. 2862, 2020 WL 1140245 (W.D. Pa. Mar. 9, 2020)........................................15

*Duell v. Kawasaki Motors Corp.*,
   No. 12-7273, 2014 WL 12908947 (D.N.J. July 18, 2014) ..............................................16

*Estrada v. Johnson & Johnson*,
   No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017) ................................................17

*Fahy v. Taser Int'l, Inc.*,
   No. 4:10-cv-19, 2010 WL 559249 (E.D. Mo. Feb. 10, 2020) ........................................18

*Feldman v. Mercedes–Benz USA, LLC*,
   No. 2:11-cv-00984, 2012 WL 6596830 (D.N.J. Dec.18, 2012)......................................19

*In re FEMA Trailer Formaldehyde Prods. Liab. Lit.*,
   No. 07-1873, 2012 WL 1580761 (E.D. La. May 4, 2012) ..............................................20

*In re Ford Motor Co. E-350 Prods. Liab. Litig.*,
   MDL No. 1687, 2008 WL 4126264 (D.N.J. Sep. 2, 2008) .............................................21

*In re Ford Tailgate Litig.*,
   No. 11-2953, 2014 WL 1007066 (N.D. Cal. Mar. 12, 2014) .........................................22

*Geraczynski v. Nat'l R.R. Passenger Corp.*,
   No. 11-6385, 2013 WL 5934552 (D.N.J. Nov. 1, 2013)................................................23

*Geraczynski v. Nat'l R.R. Passenger Corp.*,
   No. 11-6385, 2015 WL 4623466 (D.N.J. July 31, 2015) ...............................................24

*In re Gerber Probiotic Sales Practices Litig.*,
   No. 12-835, 2013 WL 4517994 (D.N.J. Aug. 23, 2013)................................................25

*Gingras v. Roset*te,
   No. 5:15-cv-101, 2016 WL 2932163 (D. Vt. May 16, 2016)..........................................26

*Gomez v. H&M Int'l Transp., Inc.*,
   No. 17–231,2017 WL 1483306 (D.N.J. Apr. 24, 2017)..................................................27

*Gremo v. Bayer Corp.*, ___ F. Supp. 3d ___,
   No. 1:19-cv-13432, 2020 WL 3496917 (D.N.J., June 29, 2020) ...................................28

*Gubaala v. CVS Pharmacy, Inc.*,
   No. 14-c-9039, 2016 WL 1019794 (N.D. Ill. Mar. 15, 2016) ........................................29

*Hall v. Johnson & Johnson*,
     No. 18-1833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ................................................30

*Hammer v. Vital Pharmaceuticals, Inc.*,
     No. 11-4124, 2012 WL 1018842 (D.N.J. Mar. 26, 2012) ...............................................31

*Hardwick v. 3M Co.*,
     No. 2:18-cv-1185, 2019 WL 4757134 (S.D. Ohio Sep. 30, 2019) ..................................32

*Hart v. BHH, LLC*,
     No. 15-cv-4804, 2017 WL 2912519 (S.D.N.Y. July 7, 2017)........................................33

*Hoffman v. Nutraceutical Corp.*,
     No. 12-5803, 2013 WL 2650611 (D.N.J. June 10, 2013)................................................34

*Hubert v. Gen. Nutrition Corp.*,
     No. 15-1931, 2017 WL 3971912 (W.D. Pa. Sep. 8, 2017)..............................................35

*Hudak v. Berkley Grp., Inc.*,
     No. 3:13–cv–00089, 2014 WL 354676 (D. Conn. Jan. 23, 2014) ..................................36

*Hunt v. Am. Wood Preservers Inst.*,
     No. IP 02-0389, 2002 WL 34447541 (S.D. Ind. July 31, 2002)....................................37

*James v. Johnson & Johnson Consumer Cos., Inc.*,
     No. 10-3049, 2011 WL 198026 (D.N.J. Jan. 20, 2011) .................................................38

*Jones v. Francis*,
     No. 13–04562, 2013 WL 5603848 (D.N.J. Oct. 11, 2013)............................................39

*Joslin v. Ota Camp-Makiba Ass'n*,
     No. CAAP-15-0000545, 2019 WL 1500008 (Haw. Ct. App. Apr. 5, 2019)...................40

*Koronthaly v. L'Oreal USA, Inc.*,
     374 Fed. App'x 257 (3d Cir. 2010) ...............................................................................41

*Kurtz v. Costco Wholesale Corp.*,
     768 Fed. Appx 39 (2d Cir. 2019) ..................................................................................42

*Lempa v. Eon Labs, Inc.*,
     No. 18 C 3821, 2019 WL 1426011 (N.D. Ill. Mar. 29, 2019) .......................................43

*Licul v. Volkswagen Grp. of Am., Inc.*,
     No. 13-61686, 2013 WL 6328734 (S.D. Fla. Dec. 5, 2013)...........................................44

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
    No. 16-MD-2687, 2019 WL 1125589 (D.N.J. Mar. 11, 2019)......................................45

*Majdipour v. Jaguar Land Rover N. Am., LLC*,
    No. 2:12-cv-07849, 2013 WL 5574626 (D.N.J. Oct. 9, 2013) .......................................46

*Marchione v. Playboy Enterprises, Inc.,*
    No. 1:12-cv-01535, 2013 WL 876263 (D. Or. Mar. 7, 2013).........................................47

*McDonough v. Bayer Healthcare, LLC*,
    No. 10-442, 2011 WL 2119107 (D.N.J. May 26, 2011)..................................................48

*In re Mercedes-Benz*,
    No. 16-881, 2016 WL 7106020 (D.N.J. Dec. 6, 2016) ..................................................49

*In re Mercedes-Benz Emissions Litig.*,
    No. 16-881, 2019 WL 413541 (D.N.J. Feb. 1, 2019),
    *vacated in part on other grounds*, 797 Fed. App'x 695 (3d Cir. Jan. 10, 2020)..............50

*Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*,
    72 F. App'x. 916 (4th Cir. 2003)...................................................................................51

*Moore v. Medeva Pharms., Inc.*,
    No. 01-311-M, 2004 WL 57084 (D.N.H. Jan. 13, 2004) ...............................................52

*Ohio State Troopers Ass'n, Inc.*,
    No. 0:17-cv-62051, 2018 WL 3109632 (S.D.Fl. Apr. 5, 2015).......................................53

*Pegasus Aviation IV, Inc. v. Aircraft Composite Technologies, Inc.*,
    No. 1:16-cv-21255-UU, 2016 WL 3390122 (S.D. Fla. June 17, 2016) ..........................54

*Player v. Motiva Enters., LLC*,
    No. 02-3216, 2006 WL 166452 (D.N.J. Jan. 20, 2006) .................................................55

*In re Propulsid Prods. Liab. Litig.*,
    MDL No. 1355, 2002 WL 1446714 (E.D. La. July 2, 2002)...........................................56

*Ramos v. Rite Aid Corp.*,
    No. CV106008649, 2010 WL 4277612 (Conn. Super. Ct. Oct. 7, 2010) .......................57

*Redwind v. W. Union, LLC*,
    No. 3:18-CV-02094-SB, 2019 WL 3069864 (D. Or. June 21, 2019),
    *report and recommendation adopted*, No. 3:18-CV-2094-SB,
    2019 WL 3069841 (D. Or. July 12, 2019).....................................................................58

*Rolland v. Spark Energy LLC*,
  No. 17-2680, 2019 WL 1903990 (D.N.J. Apr. 29, 2019)................................59

*Seniors Benefit Res. v. New Jersey Dep't of Human Servs.*,
  No. 17–1380, 2018 WL 555244 No. 17–1380 (D.N.J. Jan. 25, 2018)...........60

*Sherfey v. Johnson & Johnson*,
  No. 12–4162, 2012 WL 3550037 (Ed. Pa. Aug. 17, 2012) ...........................61

*Sherfey v. Johnson & Johnson*,
  No. 12–4162, 2014 WL 1663966 (Ed. Pa. Apr. 25, 2014)..............................62

*St. Paul Fire & Marine Ins. Co v. Insurance Co. of the State of Pennsylvania*,
  No. 15-cv-02744, 2016 WL 1191808 (N.D. Cal. Mar. 28, 2016)...................63

*Stanko v. Bader*,
  No. CV030193669, 2003 WL 22413476 (Conn. Super. Ct. Oct. 7, 2003)......64

*Steigerwald v. BHH, LLC*,
  No. 1:15-cv-741, 2016 WL 695424 (N.D. Ohio Feb. 22, 2016)....................65

*Sun Chem. Corp. v. Fike Corp.*,
  ___ A.3d ___, 2020 WL 4342658 (N.J. 2020)..............................................66

*In re Takata Airbags Prods. Liab. Litig.*,
  No. 15-02599-MD, 2020 WL 2892366 (S.D. Fla. June 1, 2020) ...................67

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  No. M 07-1827, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011)....................68

*Thompson v. Bayer Corp.*,
  No. 4:07CV00017, 2009 WL 362982 (E.D. Ark. Feb. 12, 2009).................69

*Torres-Hernandez v. CVT Prepaid Solutions, Inc.*,
  No. 3:08-cv-1057, 2008 WL 5381227 (D.N.J. Dec. 17, 2008)......................70

*United Disaster Response, LLC v. Omni Pinnacle, LLC*,
  No. 06-6075, 2009 WL 901763 (E.D. La. Mar. 25, 2009) .............................71

*USACM Liquidating Tr. v. Monaco*,
  No. 2:09-cv-01947, 2010 WL 11579643 (D. Nev. Jan. 27, 2010)..................72

*In re Welspun Litig.*,
  No. 16cv-6792, 2019 WL 2174089 (S.D.N.Y. May 20, 2019).......................73

# Tab 1

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 8 of 751
PageID: 11374
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by People v. Kinder Morgan Energy Partners, L.P.,
S.D.Cal., February 2, 2016

2006 WL 2669337
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana, Indianapolis Division.

Darren ALLGOOD, et al., Plaintiff,

v.

GENERAL MOTORS
CORPORATION, Defendant.

No. 102CV1077DFHTAB.
|
Sept. 18, 2006.

**Attorneys and Law Firms**

Brian J. Leinbach, Elizabeth L. Crooke, Walter J. Lack,
Engstrom Lipscomb & Lack, Carrie J. Rognlien, Robert
William Finnerty, Thomas Vincent Girardi, Girardi & Keese,
Los Angeles, CA, Andrew Rudolph Falk, Gregory P.
Cafouros, James A. Knauer, Jay P. Kennedy, Kurtis Allen
Marshall, Sydney L. Steele, William Bock, III, David E.
Wright, Reynolds B. Brissenden, Kroger Gardis & Regas
LLP, Indianapolis, IN, for Plaintiff.

Bruce A. Featherstone, Frank C. Porada, Featherstone
Desisto LLP, Denver, CO, Douglas W. Gilfillan, W.
Ray Persons, King & Spalding LLP, Atlanta, GA, Frank
Leone, Ignacia S. Moreno, Katharine R. Latimer, Martin
Czinczel Calhoun, Traci Meakem Richmond, Spriggs
& Hollingsworth, Washington, DC, Lee B. McTurnan,
McTurnan & Turner, Indianapolis, IN, for Defendant.

ENTRY ON PENDING MOTIONS

HAMILTON, J.

**\*1** Defendant General Motors Corporation has operated a
die casting plant in Bedford, Indiana since 1946. Plaintiffs
in this case are the owners and residents of 20 parcels of land
located near GM's Bedford plant. Plaintiffs allege that over
the course of several decades, the GM Bedford plant released
polychlorinated biphenyls ("PCBs") that have contaminated
their land. Plaintiffs seek damages for harm to their property
and for future expenses of medical monitoring.

In 2001 GM entered into a Voluntary Performance Based
Corrective Action Agreement ("PBCA") with the United
States Environmental Protection Agency ("EPA"). GM
agreed to investigate, stabilize, and remediate any release of
PCBs at or from its Bedford plant. Docket No. 305, Tab A,
Ex. A. GM then sampled the soil, sediment, water, fish, and
plants on and around the property of the Bedford plant. The
sampling was done at the EPA's direction and in consultation
with the Indiana Department of Environmental Management
("IDEM"). GM entered into a Consent Order with the EPA
in 2003 obligating the company to investigate and remediate
other properties affected in the area. Docket No. 305, Tab
A, Ex. B. This Consent Order requires GM to remove PCB-
contaminated soil from the floodplain areas of the residential
properties near the Bedford plant property to achieve a clean-
up standard of no more than 1.8 parts per million ("ppm")
PCBs in the soil, or to bedrock. *Id.* at 16, ¶ 34(g). IDEM is
reviewing and commenting on GM's investigation and clean-
up efforts. The 1.8 ppm clean-up level complies with IDEM's
default residential clean-up standard.

This remediation might also be called a "removal action"
because it involves the removal of PCB-contaminated
sediments and soils from the stream beds and floodplain areas
to achieve the statistical clean-up criteria of 1.8 ppm for soil
and 1.0 ppm for sediment. The removal action is taking place
on the land of some plaintiffs, those whose properties lie
within the floodplain area delineated by GM. The properties
of other plaintiffs were deemed not to require removal based
on testing performed by GM that showed total PCB levels
at or below the government agreed clean-up level. GM has
employed consultants and engineers to guide the removal
action. GM is obliged to continue the remedial effort until the
EPA finds that the established clean-up standards have been
met.

This private tort lawsuit is an effort to recover the money
needed for a much more extensive clean-up effort, though
without any assurance that a more extensive clean-up would
actually occur. Plaintiffs own both floodplain and non-
floodplain properties. They allege that the removal action and
its clean-up standards will not be sufficient to remediate and
compensate plaintiffs for their losses caused by contamination
of their land by PCBs from the GM Bedford plant. Plaintiffs
have alleged claims of trespass, private nuisance, negligence,
willful and wanton conduct, and unjust enrichment. Plaintiffs

Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)...

2006 WL 2669337

estimate that the cost of a sufficient clean-up is approximately $78 million. Plaintiffs also seek $4 million in medical monitoring costs, as well as currently undetermined amounts of damages for lost property value resulting from what they describe as residual stigma associated with polluted properties, as well as for emotional distress. Plaintiffs also seek punitive damages and other damages.

**\*2** GM has filed several motions challenging the admissibility of the plaintiffs' experts' opinions supporting these claims and moving for partial summary judgment. In terms of dollar effects, the biggest issues are whether there is a sound legal and scientific basis for awarding plaintiffs the costs of a hypothetical clean-up going well beyond the government agencies demands of 1.8 ppm in the soil. Plaintiffs claim to want a clean-up to a standard of 4 parts per trillion (ppt) of one particular PCB molecule or "congener," PCB 126. The clean-up would be only hypothetical because plaintiffs do not actually want to clean up their property (at a cost far greater than the fair market value of the property). They simply want GM to pay them the cost to carry out such a clean-up. As explained below, the plaintiffs have not shown a sound scientific or legal basis for such a claim. One exception, however, is that plaintiffs have presented evidence that raises a genuine issue of material fact as to a need for remediation of three water wells on their property. Plaintiffs' effort to extend the clean-up effort beyond the limits of the floodplain determined in the government-supervised clean-up also is not supported by evidence.

Plaintiffs' hypothetical medical monitoring program also is not supported by the evidence. Again, plaintiffs do not necessarily want the medical monitoring itself, but they would like GM to pay them the costs of a lifetime program. Indiana law would probably recognize such a claim for medical monitoring damages, at least in a proper case. See *Allgood v. General Motors Corp.,* 2005 WL 2218371 (S.D.Ind. Sept.12, 2005) (denying motion to dismiss). Plaintiffs have not supported this claim, however, with evidence that they have higher than normal levels of PCBs in their blood or that any particular course of medical monitoring is appropriate. Plaintiffs also seek damages on a theory of unjust enrichment. GM is entitled to summary judgment on that claim because plaintiffs have not shown that they have no adequate remedy at law or that they provided services or other benefits to GM under circumstances where it would be unjust to leave plaintiffs uncompensated.

Finally, plaintiffs seek damages for reduced property values resulting from the stigma caused by the pollution. This claim is also theoretically viable under Indiana law. See *Terra-Products, Inc. v. Kraft General Foods, Inc.,* 653 N.E.2d 89 (Ind.App.1995). In this case, however, plaintiffs have not supported the claim with evidence that would allow a reasonable jury to find such a stigma or to determine damages other than by speculation, at least before the GM clean-up has been completed. These claims for "stigma" damages will be dismissed as unripe, without prejudice to possible renewal in the future.

*Discussion*

I. *Plaintiffs' Remediation Claims*

To support their claims for additional remediation costs, plaintiffs rely on the testimony of Dr. Bruce Molholt and Dr. Kostas Dovantzis. GM argues that the opinions of Dr. Molholt and Dr. Dovantzis do not satisfy the reliability and relevance requirements of *Rule 702 of the Federal Rules of Evidence,* and as articulated earlier in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). GM has also moved for summary judgment on plaintiffs' remediation claims based on the premise that the experts' testimony should be excluded. Docket No. 300. The *Daubert* motion is granted with respect to the opinions of Dr. Molholt. The motion is granted in part and denied in part with respect to Dr. Dovantzis. His opinions regarding well-monitoring and source identification of contamination are sufficiently reliable to be admitted, but other opinions are not.

**\*3** *Rule 702* provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court's role in applying *Rule 702* is to be a gatekeeper. *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 607 (7th Cir.2006). In fulfilling this role, the court must consider both the relevance and reliability of the proffered evidence. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141,

119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), citing *Daubert,* 509 U.S. at 597. For an expert opinion to satisfy the reliability requirement, the expert must be qualified in the relevant field and the expert's opinion must be based on sound scientific or other relevant methodology. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000). Generally, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* The court's role is not to decide whether the expert is actually correct, however. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

The court's role as "gatekeeper" requires the court to ensure that scientific testimony is grounded in the "methods and procedures of science." *Deimer v. Cincinnati Sub-Zero Products, Inc.,* 58 F.3d 341, 344 (7th Cir.1995), quoting *Daubert,* 509 U.S. at 590. In evaluating the soundness of an expert's methodology, the court should avoid passing judgment on the "factual underpinnings of the expert's analysis and the correctness of the expert's conclusions," a role better left to the fact-finder. *Smith,* 215 F.3d at 718; *Daubert,* 509 U.S. at 595 (court must focus on methodology, not on the conclusions generated by the methodology); *Walker v. Soo Line Railroad Co.,* 208 F.3d 581, 587 (7th Cir.2000) (affirming admission of expert's opinion where it was "appropriate for [him] to rely on the tests that he administered and upon the sources of information which he employed").

The line between methodology and conclusion can be subtle and even elusive in some cases. The court must determine that the data support an admissible expert's opinion by more than merely the say-so of the expert. *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The testimony cannot simply be "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. An opinion becomes speculative when too wide an analytical gap exists between the data and the opinion provided. *Target Market Publishing, Inc. v. ADVO, Inc.,* 136 F.3d 1139, 1144 (7th Cir.1998) (affirming exclusion of expert opinion on expected revenues using unrealistic assumptions), citing *Joiner,* 522 U.S. at 146; see also *Beachler v. Amoco Oil Co.,* 112 F.3d 902, 909 n. 6 (7th Cir.1997) (affirming exclusion of opinion that refiner's assignment of service station franchise

agreements would harm dealers; testimony was speculative and not supported by any factual foundation).

**\*4** In *Daubert,* the Supreme Court identified factors that might be considered to determine the reliability of a scientific expert opinion, including whether the opinion can be tested of falsified, whether the opinion has been subjected to peer review and publication, any known rate of error of the methodology employed, and the degree of general acceptance of the opinion or its methodology within the relevant field. 509 U.S. at 593-94. In *Kumho Tire,* the Court made clear that strict adherence to the factors was not necessary; rather, the factors are examples of criteria that a trial court may use to determine whether the expert, in offering the opinion, acted as would an expert in the field. 526 U.S. at 151-52. As a result, "the *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered." *Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir.2004). Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by testifying experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996).

## A. *GM's Request to Strike the Molholt & Dovantzis Declarations*

Before addressing the merits of the *Daubert* issues, the court must address GM's request under Rule 37 of the Federal Rules of Civil Procedure to strike the declarations of Dr. Molholt and Dr. Dovantzis filed by plaintiffs in response to defendant's *Daubert* motions. GM argues that the declarations are improper efforts to supplement the experts' original disclosures of opinions as required under Rule 26(a)(2).

Rule 37 provides in relevant part that a party may not rely on evidence that was not disclosed in violation of Rule 26(a), (e)(1), or (e)(2) unless the party has either a substantial justification or the information is harmless. An expert report should be sufficiently complete as to include the substance of what the expert is expected to give in direct testimony, and the reasons for such testimony. The report should offer the "how and why" of the results, not mere conclusions. *Salgado v. General Motors Corp.,* 150 F.3d 735, 741-42 & n. 6 (7th Cir.1998) (district court did not abuse its discretion by striking a party's expert reports where the reports were both woefully inadequate and untimely, even after a warning from the court). In *Lava Trading, Inc. v. Hartford Fire Ins. Co.,* 2005 U.S. Dist. LEXIS 4566 (S.D.N.Y. February 14, 2005),

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 11 of 751
PageID: 11377
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

the court excluded expert affidavits submitted in response to a
defendant's *Daubert* motion where the affidavits were the first
detailed reports plaintiff had provided. Because the previous
reports were inadequate, including at least one that "did not
disclose any of the essential details needed to understand and
assess" the expert's conclusions, *id.* at *17, and because the
plaintiff had offered no justification for this problem, the court
excluded affidavits under Rule 37, deeming them to be "new
expert submissions" submitted too late under Rule 26.

 **\*5**  While Rule 26 demands that expert disclosures be
"complete," there is no requirement that such disclosures
cover any and every objection or criticism of which an
opposing party might conceivably complain. In other words,
an expert need not stand mute in response to an opposing
party's *Daubert* motion. Otherwise, if the expert needed to
anticipate and rebut every possible criticism, expert witness
practice would become even more expensive and unwieldy. In
this case, both experts' reports provide more than the kinds of
unsupported conclusory assertions criticized in *Salgado* and
*Lava Trading*. The supplemental declarations of plaintiffs'
experts were lengthy but either responded to GM's specific
*Daubert* criticisms or harmlessly repeat information provided
in the earlier reports. The later submissions do not amount to
the sort of prohibited ambush by an expert. *Salgado,* 150 F.3d
at 741-42 n.6. Accordingly, GM's request to strike is denied.


 B. *Dr. Bruce Molholt*
Dr. Bruce Molholt holds a Ph.D. in microbiology and
is an associate professor of Environmental Studies at
the University of Pennsylvania. Plaintiffs seek to present
testimony by Dr. Molholt regarding a risk assessment of the
PCB exposure on plaintiffs' property. Dr. Molholt sought to
assess the risk of negative health effects related to plaintiffs'
properties at their present levels of PCB contamination.


 1. *The "TEF" Approach*
To understand the experts' opinions in this case, some
general discussion is necessary regarding PCBs and risk
assessment. PCBs, polychlorinated biphenyls, are a group
of toxic, persistent chemicals that were commonly used as
insulation or as lubricants before they were prohibited by
law in 1979. Monsanto manufactured commercial mixtures
of PCBs in the United States under the name Aroclor.
The Aroclor mixtures contained many different kinds of
PCB molecules or "congeners." There are a total of 209
possible PCB congeners. Shifrin Rep. II at 4 n. 4 (Att.C-2).
The EPA's current risk assessment approach methodology

involves determining toxicity by establishing total PCB
concentrations and multiplying those levels of total PCBs by
a cancer potency factor (otherwise termed a "cancer slope
factor") of 2 mg-kg/day$^{-1}$.[1]

To quantify the potential for PCBs to cause cancer, the EPA
developed slope factors. A cancer slope factor is an upper
bound estimate of an individual's excess lifetime cancer risks
per unit dose or exposure to a carcinogen. It is presented
in risk per units of milligrams of material ingested/body
weight in kilograms per day, which is written as (mg/kg)/
day or mg/kg day. The risk, or carcinogenic potency, is
calculated by multiplying the dose (from exposure) of the
carcinogen by the toxicity (cancer slope factor). See http://
www.epa.gov/hudson/humanhealth.htm (last visited Sept. 5,
2006). For example, the carcinogenic potency of the specific
congener PCB 126 is currently recognized by the EPA to
be 15,600 mg/kg-day$^{-1}$, which demonstrates the number of
cancers that could occur if an individual were to be exposed to
one milligram of PCB 126 per kilogram of body weight daily
for a lifetime of 70 years. Molholt Rep. (Att.A-4) at 20.

 **\*6**  Molholt Dep. at 383. Dr. Molholt has worked on sites,
including the Paoli rail yards, where the PCB clean-up level
was 2 ppm. Molholt Dep. at 51. The EPA has established
a clean-up standard of 10 ppm for soil in residential areas,
provided that soil is excavated to at least 10 inches. 40 C.F.R.
§ 761.125(c)(4)(v).

GM and the government agencies have agreed on a clean-
up standard of 1.8 ppm for all PCB molecules or congeners.
Rather than apply this "total PCB" approach, Dr. Molholt
assessed the risk on the plaintiffs' property by what he
describes as a more "avant garde" risk assessment approach,
see Molholt Dep. at 52, known as a toxicity equivalency
factor or "TEF" approach. Of the 209 PCB congeners, some
are considered to be "dioxin-like" because they bear some
similarity to 2,3,7,8-tetrachlorodibenzo-p-dioxin ("2378-
TCDD"). Molholt Dec. Ex. 6 (EPA statement on TEFs).
Under the auspices of the World Health Organization, these
dioxin-like congeners have been assigned toxic equivalency
factors rating their toxicity in relation to 2378-TCDD, which
is rated as having a TEF of 1.0. The TEF approach compares
the relative potency of an individual congener to 2378-TCDD.
The concentration of each component in a mixture is then
multiplied by its TEF to determine the toxic equivalency
("TEQ"); all of the TEQs in a mixture are then added to
determine the total toxic equivalency of a mixture, which is
then compared to reference exposure levels for 2378-TCDD

to determine risk. Molholt Dec. ¶ 76, citing ATSDR 2000 report on PCBs.[2]

Using the TEF approach, Dr. Molholt identified a specific PCB congener, known as PCB 126, which Dr. Molholt found was "detected with frequency" among the samples collected from plaintiffs' properties and GM's Bedford plant site. Molholt Dep. ¶ 46. PCB 126, according to Dr. Molholt, is "universally regarded as the most toxic of PCB congeners," and he claims that PCB 126 accounted for more than 50 percent of the total PCB risk. *Id.* ¶¶ 46-47. PCB 126 has a TEF of 0.1, meaning that it is deemed one-tenth as toxic as 2378-TCDD. Molholt Dec. Ex. 6. An EPA IRIS[3] on PCBs states: "Although PCB exposures are often characterized in terms of Aroclors, this can be both imprecise and inappropriate. Total PCBs or congener or isomer analyses are recommended." The IRIS goes on to state: "When congener concentrations are available, the slope factor approach can be supplemented by analysis of TEQs to evaluate dioxin-like toxicity." Molholt Dec. Ex. 5 at 6.

Defendant argues that Dr. Molholt's application of the TEF approach is not a reliable method for risk assessment and drastically overstates the risks. Dr. Molholt testified that no studies have been done to compare the total PCB and TEF approaches to determine which more accurately assesses risks, though he also testified that such a study would be "almost impossible" to perform. Molholt Dep. at 390-92.

Dr. Molholt could not identify any sites where the "avant garde" TEF approach has been applied with respect to PCB risk assessment, though he indicated that he knew of sites where the TEF approach had been applied in connection with dioxins and other contaminants. *Id.* at 187, 379. Additionally, he could not point to any peer reviewed literature in which the TEF approach was used to determine clean-up levels for a PCB site, though he felt this was due to EPA's failure to adapt its older approach to what he described as the better TEF approach. *Id.* at 388-89. Dr. Molholt testified that he has not seen data specific to PCB 126 from any site other than the GM site in Bedford. *Id.* at 53.

*7 Defendant argues that the TEF methodology is unreliable for several reasons. First, defendant emphasizes that the approach is based mostly on *in vitro* and animal studies, which is a source of some uncertainty in risk analysis. See *id.* at 574. Some *in vitro* or animal studies may differ so greatly from common human experiences with chemical contaminants, such as in exposure pathways or the amount of the exposure

to the contaminant, that extrapolation from the study to a real life situation might be too great an analytical leap. See *Joiner, 522 U.S. at 144-45.* Because of the difficulty of obtaining appropriate epidemiological data and the obvious ethical problems involved in human experiments with known toxins, however, "animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure." Bernard D. Goldstein & Mary Sue Henefin, "Reference Guide on Toxicology," Federal Judicial Center, *Reference Manual on Scientific Evidence* 405 (2d ed.2000). GM has not provided any specific argument as to the specific animal and *in vitro* studies at issue, or why extrapolation from such studies to human exposure risk assessments is unreliable. In light of this dearth of evidence, and in light of the importance of animal and in vitro studies in informing toxicological research, there is no reason to find the TEF method unreliable on this basis alone.

In fact, GM appears to acknowledge that the TEF approach is comparable to the total PCB approach relied upon by GM. See Def. Reply (Docket No. 414) at 10, citing Def. Reply Att. 1. Defendant has pointed to some weaknesses in the TEF approach employed by Dr. Molholt, including concerns relating to the antagonistic effects of non-co-planar PCBs on co-planar PCBs, low-dose linearity, and the "real world" exposure of individuals to a variety of PCB congeners. Nevertheless, despite the "avant garde" aspects of the TEF approach, the literature cited above supporting the use of the TEF approach and defendant's own evidence do not show that the TEF approach is so unreliable that the court should simply exclude all testimony based upon it, without further analysis. However, Dr. Molholt's use of the method goes a significant step further than others have, and the additional step also goes beyond reliable methodology for the court and jury to rely upon it.[4]

### 2. *Dr. Molholt's "Draft" Slope Factor*

GM's attack on Dr. Molholt's critical slope factor is more persuasive. GM claims that Dr. Molholt compounded any problems in his TEF analysis by applying an inappropriate slope factor to measure the risk of very low levels of PCB contamination. In assessing risk using the congener-specific method, a risk assessor would apply the toxicity equivalent factor for the congener at issue to the dioxin slope factor. Rao Dep. at 120-21 (Att.B-8). The current EPA dioxin slope factor is 156,000 mg/kg day$^{-1}$. *Id.* at 121-22; Molholt Dep. at 394. Application of the TEF for PCB 126, which is 0.1, to this dioxin slope factor yielded a factor of 15,600 mg/kg day$^{-1}$.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 13 of 751
PageID: 11379
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

Molholt Dep. at 394-95. In 2000, however, the EPA drafted a document ("the 2000 Reassessment") proposing to modify the dioxin slope factor to between 1 million and 1.4 million mg/kg day$^{-1}$11111111. This document has been submitted to the National Academy of Sciences for further review, but has not yet been formally approved. Rao Dep. at 121-22. In assessing the risk to plaintiffs' property, Dr. Molholt applied the higher slope factor of 1.4 million mg/kg day$^{-1}$ from the 2000 Reassessment to the PCB 126 congener using its TEF of 0.1. See Molholt Dep. at 299, 407; see Molholt Dep. Ex. 13 (Att.D-26). Applying the TEF of 0.1 to this higher dioxin slope factor, one arrives at a PCB 126 slope factor of 140,000 mg/kg day$^{-1}$. See Molholt Dep. at 299-300. The higher slope factor greatly increases the amount of risk indicated in the analysis.

**\*8** GM argues that Dr. Molholt's risk assessment is not reliable because the 2000 Reassessment has not yet been formally adopted by the EPA. Molholt Dep. at 300, 338, 395. Because the current EPA default slope factor for dioxin is 156,000, the argument goes, even if the general TEF approach is sufficiently reliable, Dr. Molholt erred by going further and applying an unreliable slope factor. The 2000 Reassessment is labeled "DRAFT-DO NOT QUOTE OR CITE." The undisputed facts show that the document has not been adopted by the EPA as its official word. The document itself, however, indicates that, while a draft, it has undergone peer review:

The process for developing the Reassessment Documents has been open and participatory. Each of the documents has been developed in collaboration with scientists from inside and outside the Federal Government. Each document has undergone extensive internal and external review, including review by EPA's Science Advisory Board (SAB). In September 1994, drafts of each document were made available for public review and comment. These comments, along with those of the SAB (U.S.EPA, 1995a), have been considered in the drafting of this final document.... In addition, as requested by the SAB, a chapter on Toxic Equivalency has been developed and underwent external peer review in parallel with the Integrated Summary and Risk Characterization in July 2000. The November 2000, review by the SAB of the Dose-Response Chapter, the Toxic Equivalency Chapter and the Integrated Summary and Risk Characterization was the final step in this open and participatory process of reassessment. The full set of background documents and the integrative summary and risk characterization replace

the previous dioxin assessments as the scientific basis for EPA decision-making.

Molholt Dec. Ex. 7. GM points to evidence in the form of an exchange of emails between Dr. Dovantzis and Milt Clark and David Cooper of the EPA in which Cooper recommended *against* using the 1,400,000 mg/kg day$^{-1}$ slope factor provided in the 2000 Reassessment, stating that he did not know anyone at the EPA who had used or was planning to use this figure, recommended using the 1,000,000 mg/kg day$^{-1}$ figure in the uncertainty section explaining the limitations of the risk assessment, and "strongly recommend[ed]" applying the 156,000 mg/kg day$^{-1}$ figure in the body of the assessment. See Att. D-14. Dr. Molholt did not perform any assessment using the 1,000,000 mg/kg day$^{-1}$ figure. Molholt Dep. at 408-10.

The application of the highest draft slope factor in applying the "avant garde" TEF approach renders Dr. Molholt's risk assessment unreliable for present purposes. Although the 2000 Reassessment document indicates that it is the product of peer review, the document is unconditionally in draft form and has emphatically not been adopted as the EPA's accepted approach. Dr. Molholt's assertions that a scientist in the field would "consider" any relevant EPA draft or final publication and that draft reports often express the views of scientific review panels, Molholt Dec. ¶¶ 81-82, does not answer defendant's criticisms regarding the specific use of the highest draft slope factor in this case. Nor is it apparent why any re-evaluation of the toxicity of dioxin would automatically carry over, in a linear way, to risks posed by individual PCB congeners. The email evidence undermines any claim by plaintiffs that the draft dioxin slope factor, which is nearly nine times higher than the currently accepted slope factor, is being used by anyone in the field (apart from this opinion for litigation). Plaintiffs have not shown that Dr. Molholt, in applying the highest slope factor indicated in the 2000 Reassessment, employed a methodology of risk assessment that would be reliable and acceptable among reasonable professionals in his field. See *Cummins v. Lyle Industries,* 93 F.3d 362, 369-69 (7th Cir.1996) ("Rule 702 is designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work."). For all of these reasons, his risk assessment opinions based on the calculations incorporating this slope factor are inadmissible.

### 3. Selection Bias

**\*9** GM also argues that Dr. Molholt's risk assessment cannot be relied upon because he "cherry picked" the environmental samples that he used in calculating the PCB threat around the GM Bedford site. GM argues that Dr. Molholt intentionally included in his risk assessment calculations only those samples that showed the highest exposure and from parcels having the highest contamination levels. GM also criticizes Dr. Molholt for using samples from exposure pathways that were not likely sources of exposure for these specific plaintiffs, such as samples from wells despite evidence that plaintiffs did not drink well water.

The latter argument misses the point of plaintiffs' claims in this case. Plaintiffs' actual use of their land does not control the issue whether GM has released PCBs that have caused some harm to plaintiffs' land for which a remedy is due. GM's characterization of plaintiffs' sampling of different exposure pathways, even those less likely based on plaintiffs' behavior, as some sort of over-inclusive "Garden of Eden" approach, misses the fact that any risk posed by such exposure pathways that might be found to limit plaintiffs' (or their children's or a future buyer's) use of their land may amount to an injury that did not exist before PCB exposure.

Whether a risk assessment based on the samples at issue is reliable is a valid question, however. GM criticized the choice of samples Dr. Molholt included in his risk assessment, which included the following: (1) surface soils from parcel 36, the parcel with the highest concentrations of PCB 126 (4.3 ppb) (see Molholt Dep. at 8-9, Table 2A), (2) well water with the highest PCB concentration, (3) the more contaminated raccoon liver of two samples taken, which had a concentration over 1000 times higher than the other sample, (4) the most contaminated blue bird egg sample, (5) one small fish that showed the highest PCB concentration (a 1993 sample), and (6) a 15 percent add-on for vegetables. See Shifrin II Rep. (Def.Att.C-2) at 25-27; Molholt Rep. at 25. Based on these sources, Dr. Molholt calculated the risk associated with PCB 126 on plaintiffs' property to be $1.22 \times 10^{-1}$, which Dr. Neil Shifrin, GM's proffered expert, described as indicating a 1 in 8 chance of developing cancer. Shifrin Rep. II at 26.[5]

GM attacks Dr. Molholt's sample choices, arguing that he included only samples with the highest concentrations and ignored other samples. For example, GM also notes that Dr. Molholt did not incorporate into his calculation data from other animal samples that showed little or no PCB contamination. See Molholt Dep. at 200, 218, 220-22; Shifrin II Rep. at 23, 27-28. Dr. Molholt testified that he calculated

the 15 percent add-on for vegetables without referring to any site-specific vegetable samples. Molholt Dep. at 220. Dr. Molholt testified that he did not have access to such samples, though the data were available to the plaintiffs. *Id.* at 220-22. Dr. Rao testified that Dr. Molholt knew about the samples because he had discussed the samples with Dr. Molholt, but it is unclear when this occurred. See Rao Dep. at 63.

**\*10** Dr. Molholt testified that he calculated his risk assessment by determining the reasonable maximum exposure. In so doing, he testified, he disregarded samples that showed lower concentration levels. See Molholt Dep. at 327. Using appropriate data, risk assessors commonly calculate their risk assessments by determining the "reasonable maximum exposure" ("RME") that exists on a given site. "The RME is the highest level of human exposure to the substances that is likely to occur," and the risk assessor considers several factors, including present and likely future uses of a site. EPA, Focus on Risk Assessment: Involving the Community, *Superfund Today,* April 1999. Dr. Neil Shifrin, GM's expert, wrote in his second report that Dr. Molholt's risk assessment "presents an inflated depiction of the hypothetical risks" at issue and did not employ an RME calculation that complies with the EPA's accepted approach as detailed in the Risk Assessment Guidance for Superfund ("RAGS"). See Shifrin Rep. II at 27-28. Dr. Molholt says that he did calculate risk in accordance with RAGS.

Plaintiffs counter GM's argument by stating only that the data points chosen by Dr. Molholt in performing his risk analysis amount to the kind of "conclusions" that are better left to the province of a jury. Pl. Br. at 25. Without citation to the extensive record in this case, plaintiffs assert that "Dr. Molholt has amply explained his selection of datasets and defaults," and assert that rather than ignore or omit relevant data, he simply chose data different from that which GM considers important. *Id.*

Plaintiffs' argument is unpersuasive. Questions as to Dr. Molholt's choice in data sampling go to the heart of his methodology. This principle was clearly explained in *Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 387 F.Supp.2d 794 (N.D.Ill.2005). The court in *Loeffel* found not reliable as expert testimony an appraiser's estimate of the plaintiff's lost profits and business as a result of allegedly tortious acts of the defendant. The appraiser's report included financial data pertaining to eight companies to which the plaintiff's company was compared in estimating damages. The opinion could not be reliable, the court explained, because the appraiser

could not explain why the eight companies were given as comparisons. The court explained:

> In order for the sampling chosen by DVC comparison to have the requisite predictive capacity and the reliability that *Daubert* demands, [the appraiser] had to select samples that were truly comparable.... This is often referred to as the yardstick approach. Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative or conjectural.... Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot "logically advance [ ] a material aspect of the proposing party's case...."

*11 *Id.* at 812; see also *Menasha Corp. v. News America Marketing In-Store Inc.,* 238 F.Supp.2d 1024, 1030 (N.D.Ill.2003)* (journalist survey excluded in part because he failed to gather responses from a representative sample accurately representing the target population), *aff'd,* 354 F.3d 661 (7th Cir.2004); *United States v. Mikos,* 2003 WL 22922197, *4 (N.D.Ill.2003)* (finding that FBI database of bullet samples could not be the basis for expert testimony; database could not satisfy *Daubert* requirements where there was no evidence "that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole"). Although these cases have addressed topics distinct from the kind of toxicology inquiry now before the court, each has clearly emphasized (1) that sample choice, the selection of datapoints on which to determine risk in this case, is an issue of methodology, and (2) that to represent adequately the risk or other prediction at issue, the samples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured.

Plaintiffs emphasize that risk assessments are meant to depict representative risk. Dr. Molholt's risk assessment, which is apparently meant to assess the risk on plaintiffs' land in general, was performed by using only a limited number of the available samples, and those that tend to magnify greatly the risk calculation. Dr. Molholt has failed to offer any scientific justification for his sample selection choices, which are central to the reliability of his methodology. For this reason, as well, the court finds that Dr. Molholt's methodology for assessing the plaintiffs' risk of developing cancer was not sufficiently reliable to satisfy the demands of *Daubert*

and Rule 702 due to selection bias and therefore cannot be admitted.[6]

### C. *Dr. Kostas Dovantzis*

GM also seeks to exclude the testimony of Dr. Kostas Dovantzis, who has a Ph.D. in Environmental Engineering. Dr. Dovantzis has issued several formal reports in this case: (1) a May 2004 report estimating $112.6 million in costs, including a "Preliminary Risk Evaluation," (2) a December 2004 report estimating costs at $111.9 million, including a "Supplemental Human Health Risk Assessment," and (3) an April 2005 report indicating a cost estimate of $78 million for the remediation of floodplain areas and parcels proximate to the plant, as well as for monitoring and treating three wells located on plaintiffs' property.

GM bases its motion to exclude Dr. Dovantzis's opinions on several arguments: (1) his testimony indicates that he based his opinions not on scientific inquiry but by the recommendations of the attorneys for the plaintiffs, demonstrated by what GM characterizes as ever-changing damage estimates; (2) Dr. Dovantzis's measurement and recording system used to document sample locations was erroneous, therefore rendering the sampling process unreliable; (3) Dr. Dovantzis erroneously delineated the floodplain; (4) Dr. Dovantzis's removal depth estimates are a product of plaintiffs' counsel's requests and are not based on any professional judgment or scientific determination; and (5) Dr. Dovantzis's monitoring recommendation for three wells is not based on inquiry consistent with the scientific method.

### 1. *The Changing Cost Estimates*

*12 GM argues that Dr. Dovantzis's opinions are litigation driven, dictated by plaintiffs' counsel, and show a goal of maximizing plaintiffs' recovery rather than legitimate scientific inquiry. Dr. Dovantzis completed a preliminary remediation cost estimate of $225 million in September 2003. Att. D-5. Dr. Dovantzis issued a lower cost estimate of $147 million later in September 2003. See Dovantzis Dep. at 510. Dr. Dovantzis wrote plaintiffs' counsel a letter later that month with recommendations and a request for approval of testing and analysis strategies that Dr. Dovantzis believed would "bolster" and "support" plaintiffs' claims. Att. D-4. Of the data collection and analysis strategies referred to in Dr. Dovantzis's letter, he testified: "We proposed to collect additional data to support the cost estimates." Dovantzis Dep. at 507. In November 2003, he sent an email

2006 WL 2669337

to plaintiffs' counsel referring to the risk-based strategy that he recommended following in this case:

> In order to strengthen the claims vs. GM, the overall objective of the risk based strategy would be to establish a correlation of the types of congeners present in the various media/matrices sampled and demonstrate unacceptable risk.

Att. D-12. The email went on to list different parts of the strategy, including outlining sampling and methods of analysis to be used. "Assuming that significant risk is calculated" after a preliminary risk evaluation, Dr. Dovantzis wrote, additional samples were to be collected for analysis. *Id.*

Dr. Dovantzis testified that the "driving factor" behind his work on this case was "to establish if there was risk" at "levels that would be of concern," but he acknowledged that when he wrote that he wanted to "strengthen" plaintiffs' case against GM, he meant that he "wanted to collect data to support the estimates we made before." Dovantzis Dep. at 512-13. GM argues that Dr. Dovantzis's statements regarding efforts to "bolster" or "support" plaintiffs' claims against GM raise a question as to whether Dr. Dovantzis's opinion can be considered the product of a reliable scientific inquiry, or whether he assumed a result and sought data only to support that result.

GM cites *Clark v. Takata Corp.,* 192 F.3d 750, 757 (7th Cir.1999), in which the Seventh Circuit upheld a district court's decision to exclude the testimony of an expert regarding whether plaintiff's seatbelt, manufactured by defendant, had become unlatched during an accident, allowing plaintiff to sustain serious head injuries. Plaintiff's theory of the case was that the seatbelt had been fastened but had disengaged during the rollover of the car.

The expert in *Clark* issued a one and one half page report stating that if the seatbelt had functioned properly, the plaintiff would not have sustained a head injury. He appended to the report a short statement that he believed the seatbelt had been disengaged during the car's rollover, based on the comparative blood amounts on the lap and shoulder belts. Because the expert had testified, however, that he had assumed that the seatbelt had disengaged during the accident and that he did not address this question in preparing his opinion, the Seventh Circuit affirmed exclusion of his testimony. The expert had "assume[d] the very fact that he ha[d] been hired to prove." *Id.* at 756-57; see also *Owens v. Ford Motor Co.,* 297 F.Supp.2d 1099, 1105-06 (S.D.Ind.2003) (excluding expert testimony as to whether plaintiff's air bag inflated in collision where the

expert had assumed the failure to inflate and had studied only the possible causes of such a failure).

**\*13** GM also argues that the repeated modification of the cost estimates, from $225 million to the ultimate $78 million figure in the April 2005 report renders Dr. Dovantzis's opinion unreliable, citing *Comer v. American Electric Power,* 63 F.Supp.2d 927, 935 (N.D.Ind.1999). In *Comer,* the plaintiff's expert testified in an early deposition that a voltage surge occurred that was initially insufficient to cause the breakdown of insulation, thereby causing a fire, but that it had caused the breakdown over a period of days. Later, at trial, the expert testified that the surge caused an immediate breakdown and therefore caused an immediate fire. When asked to explain the discrepancy, the expert testified that he had been misinformed at the time of the deposition as to the date of the fire and that he had altered his opinions of how quickly the surge caused breakdown based on when the fire took place. *Id.* The court excluded the expert's testimony, citing the "breathtaking ease" with which he offered his opinions, "surpassed only by his apparent ability to change them based on nothing more than the mere suggestion of counsel." *Id.*

The evidence before the court does not show the same kind of blind, outcome-driven thinking by Dr. Dovantzis that was shown in *Clark, Owens,* and *Comer.* Dr. Dovantzis explained in his declaration that his evolving damage calculations were due to ongoing and additional data analysis. He described his process as beginning with a working hypothesis and then designing a testing method that would help prove or disprove the hypothesis. Dovantzis Dec. ¶¶ 77-78. These statements and the circumstances of the case indicate that Dr. Dovantzis's multiple estimates were based on evolving information. Dr. Dovantzis's modification of the amounts in response to collection of greater data might be characterized as reasonable responses to the analyses, demonstrating that he followed the scientific method by altering his cost estimates based on incoming data, though that is not the only fair reading of the record. The alteration of his opinions would provide defendant with ample fodder for cross-examination. Nevertheless, this evidence goes more to credibility and does not render his ultimate opinions, formed after the 2005 data collection and analysis in particular, unreliable. See *Deputy v. Lehman Bros., Inc.,* 345 F.3d 494, 507 (7th Cir.2003) (reversing exclusion of expert because she changed her mind regarding her opinion; "the district court went beyond determining admissibility and focused on credibility"; focus should have been on whether experts in the field applied her methodology in preparing expert opinion); *Smith,* 215 F.3d

at 719 ("The question of whether an expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury after the opposing counsel has been provided the opportunity to cross-examine the expert....").

### 2. *Sample Location Recording*

**\*14** GM argues that Dr. Dovantzis's opinions regarding excavation and remediation costs are unreliable because his records of the locations from which he took samples are not reliable. In February 2005, Dr. Dovantzis prepared a sampling plan in the form of maps for the collection of new samples that would provide data to allow the experts to characterize better their previous evaluations. Dovantzis. Dep. at 925-26, 957. The new data from the samples would allow Dr. Dovantzis to calculate excavation costs. *Id.* at 958.

GM argues that the sampling teams carrying out Dr. Dovantzis's plan made errors in collecting the samples, or at least in recording their collection sites, that render the data from the samples unreliable. The sample collectors noted their collection sites by using both the "stake and tape" method, measuring with tape measures as they collected the samples, placing stakes in the ground to show sample locations, and by noting their sample locations using a Global Positioning System ("GPS"). Both parties seem to agree that the GPS coordinates recorded by the samplers included errors, either human or machine. Dr. Dovantzis accounted for such inconsistencies by noting that the GPS systems used have error rates that, depending on weather conditions, may result in inaccuracies of up to 100 feet. Dovantzis Dec. ¶¶ 28-36. Dr. Dovantzis testified that he relied on field staff tape and stake measurements, not on the GPS coordinates that GM argues render his opinion unreliable. *Id.;* Dovantzis Dep. at 1293-98.

The sample collection method on which Dr. Dovantzis relied, while perhaps not the method on the technological cutting edge, was sufficiently reliable. All seem to agree that there were inaccuracies in the GPS coordinates. Evidence from Dr. Dovantzis indicates that he relied on the collection teams' use of the stake and tape method, the general reliability of which has not been questioned. Dr. Shifrin's observations as to the accuracy with which the Handex collection team employed the method are best reserved for cross-examination. See *Daubert,* 509 U.S. at 596 (courts should continue to rely on cross-examination, presentation of contrary evidence, and jury instructions to address weak but admissible evidence), citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

### 3. *Floodplain Delineation*

GM argues more persuasively that Dr. Dovantzis's opinion regarding the floodplain boundary, the limit of plaintiffs' proposed excavation, is unreliable. GM maintains, and plaintiffs have not disputed, that neither Dr. Dovantzis nor Rohan, on whose information Dr. Dovantzis relied in performing the floodplain delineation, see Dovantzis Dec. ¶ 75 & Att. A-3 at 9, have ever before delineated a floodplain. Plaintiffs have also not disputed GM's assertion that if Dr. Dovantzis's floodplain delineation was not methodologically sound, the additional floodplain area designated by Dr. Dovantzis, which is nearly 1 million square feet larger than the floodplain estimate completed by GM, improperly inflates the damage estimate by approximately \$16.1 million. See Shifrin Rep. II at 39.

**\*15** In his Report II, Dr. Shifrin had several criticisms of the floodplain delineation. Dr. Shifrin points out that although Dr. Dovantzis's 2005 report characterizes a floodplain as flat parcel areas that become flooded during storm events of certain duration and intensity, the report did not define the term "storm event." Shifrin Rep. II at 37. Dr. Shifrin wrote in his report that his analysis of Dr. Dovantzis's floodplain delineations (1) ignored topographic boundaries to the extent that the boundaries indicate "water running uphill"; (2) included sharp discontinuities across property lines for no physical or topographical reason; and (3) showed floodplain lines that may defy gravity by requiring water to rise to different elevations on opposite sides of the same creek. Shifrin Rep. II at 38.

In his declaration, Dr. Dovantzis explained his floodplain delineation by noting that he relied on "the kind of commonsense sort of information that any engineer would consider." Dovantzis Dec. ¶ 39. This includes (1) his review of topographic contour maps from GM; (2) consideration of drift lines, wet soil horizons, and soil sampling locations previously established by GM; and (3) interviews with plaintiffs regarding the flooding on their land. *Id.* ¶¶ 39-43.

Even assuming that these strategies are appropriate for measuring floodplain lines, Dr. Dovantzis's floodplain delineation cannot be considered sufficiently reliable because he relied on the unrecorded and untrained observations of Rohan to observe signs of flooding. Rohan testified that in gathering information relevant to the delineation of the floodplain, he and assistants whom he instructed used visual observations of the topography and indicators of a

2006 WL 2669337

previous flood event, which Rohan testified included flood lines (debris or other items showing a previous water line), tree line marks, and wetness. He testified that he learned that these could be indicators for marking floodplains by using common sense and in looking information up on the internet, though he could not recall the details of his internet research. These observations were not recorded in any manner, apart from some photographs of flood lines "on one or two of the parcels." Additionally, Rohan could not recall consulting any agency guidance documents. Rohan Dep. at 137-40. Considering Rohan's lack of experience and relevant training in floodplain delineation and the complete lack of documentation for such observations, upon which Dr. Dovantzis claimed to rely in forming his floodplain estimates, Dr. Dovantzis's floodplain delineation opinions are not sufficiently reliable to submit to a jury or to use as a foundation for a remediation estimate.

### 4. *Excavation Depth Outside the Floodplain*

GM also argues that Dr. Dovantzis's opinion that each of the non-floodplain properties should be 100 percent excavated to a one-foot depth cannot be deemed reliable. The court agrees. Dr. Dovantzis testified that his cost estimate incorporated such excavation of parcel 207, most of parcel 208, and parcels 210, 211, 387, 388, 412, and 415. This estimate was based on results obtained from the collection of a single data point on each parcel and on the proximity of the parcels to the Bedford plant. The data indicating PCB concentrations were collected from a depth of zero to four inches on each parcel. Dovantzis Dep. at 474-84. When asked what influence plaintiffs' counsel had in the decision to excavate to one foot, he testified: "We made the proposal and we discussed it with counsel, so it was a decision reached jointly." *Id.* at 484. GM points to an August 2003 email from Dr. Dovantzis to Rohan noting that plaintiffs' counsel suggested that they prepare two cost estimates for the excavation in the non-floodplain areas, one at an excavation depth of half a foot below grade, and the other at one foot below grade. Dovantzis wrote to Rohan: "This approach would maximize the amount of the claim...." See Att. D-9.

**\*16** Dr. Dovantzis explained in his declaration, as he did in his deposition, that his one-foot depth excavation and backfill estimate was based on soil testing at a 4-inch depth and on the proximity of the non-floodplain parcels to the Bedford plant property. Dovantzis Dep. at 480-82, 84. Dr. Dovantzis also included in his declaration that because GM's testing showed that floodplain parcels showed PCB contamination from one to three feet below grade, that "it

is very likely that these results will also apply to the non-floodplain parcels," and therefore "to adequately reduce the PCB congener concentrations" he assumed that soil in the non-floodplain parcels would need to be excavated to a depth of one foot. Dovantzis Dec. ¶¶ 87-89.

Plaintiffs have failed to demonstrate that Dr. Dovantzis's critical one-foot excavation standard is sufficiently reliable to satisfy Rule 702. While his testimony indicates that the proximity of the soil samples collected at a 4-inch depth indicates PCB contamination, even if the court accepts this as a basis for 100% excavation of the non-floodplain parcels at some given depth, there is no evidence as to why excavation is appropriate to a depth of one foot. Dr. Dovantzis's extrapolation of floodplain data to non-floodplain data does nothing to explain this leap. Again, even accepting as true his assertions that floodplain data apply with the same force to non-floodplain areas, the floodplain data show PCB contamination at depths of between one and three feet. Dr. Dovantzis provides no explanation for establishing a one-foot excavation level other than to maximize plaintiffs' claims. Accordingly, the court finds the one-foot excavation recommendation is arbitrary and unreliable. See *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support."), citing *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

### 5. *Well-Monitoring and Treatment*

Dr. Dovantzis has also prepared a cost estimate seeking over $900,000 to monitor and treat three wells on plaintiffs' property for a period of 20 years. Dovantzis Dep. at 387; Att. A-3 at 2. Defendant argues that this recommendation is unreliable because Dr. Dovantzis did not consult data as to the current use of such wells or as to alternate water sources for the plaintiffs. Whether plaintiffs use their wells, however, is less relevant to the reliability of Dr. Dovantzis's well assessment than evidence regarding any contamination of the wells. Earlier evidence in this case regarding the wells at issue indicated that the wells had "non-detect" PCB concentrations. Dovantzis Dep. at 387. Dovantzis's April 2005 report, however, states that two of the wells for which the monitoring and treatment were recommended contained historic PCB concentrations above the Maximum Contaminant Level ("MCL") of 1 ppb, and one contained

2006 WL 2669337

PCB 126, while the other wells sampled showed non-detect amounts of PCBs. Att. A-3 at 7. GM has not refuted these findings, which Dr. Dovantzis claims are derived from the testing performed by Conestoga-Rovers and Associates, hired by GM. Whether or not plaintiffs use such wells, the court cannot say that Dr. Dovantzis's opinion is unreliable on this score. The presence of PCBs above the MCL in the wells on parcels 207 and 208 and the presence of PCB 126 in the well from parcel 338 support Dr. Dovantzis's assertion that treatment and monitoring of the wells on parcels 207 and 208 and monitoring of the well on parcel 338 would be appropriate. Accordingly, the court finds Dr. Dovantzis's opinion as to well-monitoring sufficiently reliable to satisfy Rule 702.

### D. *Source Analysis*

**\*17** GM also argues that the opinions of Dr. Molholt and Dr. Dovantzis cannot reliably establish that GM was the source of any PCB contamination on the plaintiffs' parcels. The real issue in this assertion is whether GM is the source of the PCBs found at the parcels of the plaintiffs whose properties do not lie within the floodplain. Defendant's counsel conceded during oral argument that GM's PCBs were found on the parcels lying in the floodplain, a concession entirely unsurprising considering GM's current multimillion dollar remediation of floodplain parcels. As explained below, the ratio analysis method generated by Dr. Molholt is not sufficiently reliable within the meaning of *Daubert* and Rule 702 to present to a jury. Nevertheless, evidence relating to Dr. Dovantzis's opinion regarding the levels of PCB contamination on plaintiffs' property and traditional transport mechanism passes muster and supports Dr. Dovantzis's opinion with respect to source identification.

### 1. *Dr. Molholt's Ratio Analysis*

Despite Dr. Dovantzis's assurances in his declaration, his deposition testimony indicates that his opinion regarding the source of the PCBs found on plaintiffs' parcels is based on Dr. Molholt's work and on his own judgment and experience as an environmental engineer. See Dovantzis Dep. at 998-1002, 1227-30.

Dr. Molholt has introduced a method for determining whether PCBs found on plaintiffs' land can be traced to GM by determining a congener-specific ratio analysis in which he determined the ratio of the specific congener PCB 126 to the total PCBs found in a sample. Dr. Molholt's theory is that, because PCB mixtures contain a wide range of congeners

in different combinations, comparison of the ratio of PCB 126 to total PCBs among the samples from (1) GM's site, (2) plaintiffs' non-floodplain properties, and (3) background samples from a state park show that the ratios of PCB 126 in the GM samples and plaintiffs' samples are similar enough to infer that the PCBs on plaintiffs' properties came from GM. Molholt Rep. at 9 & Tables 2A & 2B. Defendant's expert Dr. Shifrin disputes that Dr. Molholt's data show either an internally consistent ratio or a statistically significant similarity between the GM and plaintiffs' non-floodplain parcels. Shifrin Rep. II at 30-32.

Dr. Molholt's ratio analysis theory is not sufficiently reliable to be admitted as evidence that GM is the source of the PCBs on plaintiffs' property. Neither Dr. Shifrin nor Dr. Dovantzis had any knowledge of such a PCB congener ratio being used as a "fingerprint" to determine the source of contamination in any other context. Shifrin Rep. II at 32-33; Dovantzis Dep. at 1229-30. Dr. Molholt testified that, although he had once used the ratio analysis on another site involving a dioxin congener, he had never done a PCB congener ratio analysis to identify a source before, did not know of any other scientist who had done so, and could not cite any published literature or EPA guidance supporting the source identification strategy. Molholt Dep. at 229-33. Additionally, when asked to explain discrepancies in the calculations used to determine the "fingerprint" ratio, he could not. See Molholt Dep. at 240-41; Shifrin Rep. II at 30-32.

**\*18** Whether Dr. Molholt's ratio analysis might provide a point of departure for future research may be of scientific interest but has no legal relevance at this time. "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996). Plaintiffs have failed to demonstrate, with respect to this theory of Dr. Molholt's, that it is a methodology sufficiently reliable and widely recognized that it would be employed by another reasonable expert in the field. See *Kumho,* 526 U.S. at 152; *Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir.2002) (reversing admission of expert opinion where his theory applied in forming his opinion was novel and unsupported by any article, text, study, scientific literature or scientific data produced by others in the field and where expert had not published any writings or studies concerning his theory).

### 2. *Background Levels and Mechanisms of Transport*

2006 WL 2669337

While Dr. Molholt's novel ratio-analysis method has not been shown to be sufficiently reliable in "fingerprinting" PCBs originating from the GM plant, Dr. Dovantzis has provided in his report and through his testimony sufficient evidence to support the inference that the PCBs found on the non-floodplain plaintiffs' properties originated from GM. Results included in Dr. Dovantzis's April 2005 report indicate that "PCB congener TEQ concentrations, and therefore human health risks, above background, exist in all of the plaintiffs' parcel soil samples" with the exception of portions of parcels 30, 208, and 40. Att. A-3 at 6. GM argues that Dr. Dovantzis's figures regarding background levels should be discounted because he omitted from his calculations early background samples in lieu of later samples taken in spring of 2005. See Def. Reply at 15-16. The evidence indicates, however, that the later samples were collected from nearly the identical locations and tested by a laboratory with a lower detection limit than the earlier samples. Dovantzis Dep. at 981-84. Rather than undermine the validity of the testing, as GM claims, the data obtained from the later samples appear to provide information as to background levels with greater precision.

Dr. Dovantzis has offered evidence regarding traditional transport mechanisms for contaminants, which can include seeps and springs, erosion, and atmospheric deposition. See Att. A-1 at 2. PCBs were detected at seeps and springs within the area. See Administrative Order on Consent (Docket No. 379) at 10. As previously mentioned, PCBs were detected in two wells on plaintiffs' property as well. Dr. Dovantzis testified as to his theory of transport using these traditional transport mechanisms identified in his May 2004 report. See Dovantzis Dep. at 289-93; Att. A-1 at 2. Although Dr. Dovantzis testified that in the earlier stages of investigation, he assumed that GM was the source of PCB contamination on plaintiffs' land, Dovantzis Dep. at 296, evidence of greater than background levels on plaintiffs' land indicated in Dr. Dovantzis's April 2005 report, Att. A-3, combined with Dr. Dovantzis's testimony as to generally accepted transport mechanisms, Dovantzis Dep. at 289-93, could raise the inference that GM's PCBs are the source of contamination on the plaintiffs' land. This does not represent a great analytic leap. EPA, IDEM, and GM agree that GM's Bedford plant is the source of PCB contamination in the immediate area, and the properties at issue are either within close proximity to the plant or are located along affected waterways.

**\*19** GM also argues that Dr. Dovantzis cannot demonstrate that GM was the source because he has not offered evidence of the PCB levels on plaintiffs' properties prior to any PCB contamination from the GM's Bedford plant. GM does not suggest how Dr. Dovantzis might possibly have done so. See Dovantzis Dep. at 283-84. GM also notes that Dr. Dovantzis did not perform a fate and transport analysis otherwise to identify GM as the source of PCB congeners found on plaintiffs' land. Reply Br. at 16; Dovantzis Dep. at 296-97, 1003, 1227. While such evidence might have bolstered Dr. Dovantzis's opinion, his omission of such testing does not render his opinion unreliable within the standards provided by *Daubert* and Rule 702. Such criticism is better reserved for cross-examination.

To sum up thus far, Dr. Molholt's risk assessment opinions presented in support of plaintiffs' remediation claims are not sufficiently reliable to meet the standards provided by Rule 702 and *Daubert*. Dr. Dovantzis's opinions pertaining to excavation depth on non-floodplain parcels and floodplain delineation within the floodplain parcels are also not sufficiently reliable. Dr. Dovantzis's opinions regarding the source of PCB contamination on the plaintiffs' property and his opinions regarding well treatment and monitoring do meet the Rule 702 standard and are admissible.

E. *Summary Judgment as to Remediation Cost Claims*
Dr. Molholt and Dr. Dovantzis are the sole experts whose opinions plaintiffs intend to advance in support of their remediation cost claims. Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Only genuine disputes over material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Id.*

In considering GM's motion for summary judgment as to plaintiffs' remediation cost claims, the court views the evidence and all reasonable inferences that might be drawn from it in the light reasonably most favorable to the non-moving parties. See Fed.R.Civ.P. 56(c); *Conley v. Village of Bedford Park,* 215 F.3d 703, 708 (7th Cir.2000). The court must also keep in mind that the plaintiffs' remediation cost claims require determinations that are dependent on evidence from those with specialized knowledge. See generally, *Porter v. Whitehall Laboratories, Inc.,* 791 F.Supp. 1335, 1342 (S.D.Ind.1992) (explaining that medical expert testimony was

Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)

2006 WL 2669337

essential to plaintiffs' claims where such claims implicated questions of science that were not within the understanding of lay persons), *aff'd,* 9 F.3d 607 (7th Cir.1993). Plaintiffs' remediation claims require determinations relating to PCB-related health risk assessments, clean-up strategies and levels, and other questions not within the understanding of lay-persons. The court's decision to exclude much of plaintiffs' expert opinions warrants summary judgment for GM on all of plaintiffs' remediation claims except plaintiffs' claims for monitoring and treatment of the three wells identified in Dr. Dovantzis's report. See Att. A-3 at 2, 7.

**\*20** Plaintiffs argue, however, that their claims for remediation do not depend at all on whether the PCBs present on their property actually pose a significant risk to health. Plaintiffs contend that if they prove that GM caused PCBs to be present on their property, they are entitled to recover from GM the costs of fully restoring their property to the condition it was in before GM caused the deposit of PCBs. According to plaintiffs, regardless of whether PCB levels below the EPA and IDEM clean-up standards pose a meaningful risk to human health or to the use of their property, they are entitled to the costs of a clean-up of their property to background levels, so that PCB 126 is present at no more than 4 parts per trillion (4 nanograms/kilogram) in the soil. As noted, plaintiffs estimate this clean-up would cost $78 million. That sum is approximately twenty times the total fair market value of all plaintiffs' properties (apart from any loss in value for the contamination).

To support this startling result, plaintiffs rely primarily on language from *Terra-Products, Inc. v. Kraft General Foods, Inc.,* 653 N.E.2d 89 (Ind.App.1995), which requires close examination. The property of Terra-Products had been contaminated by PCBs from a neighboring business (which Kraft later bought). The EPA and IDEM ordered a clean-up. Kraft paid for and carried out the clean-up of the property owned by Terra-Products. The clean-up cost much more than the fair market value of the property. 653 N.E.2d at 92. As the clean-up neared completion, Terra-Products sold the property at an auction. Terra-Products then sued Kraft for what it claimed was the difference in price between the auction price and a higher appraised value that assumed no contamination of the property. The trial court granted summary judgment for Kraft, and the Court of Appeals affirmed. Along the way, the Court of Appeals offered guidance on the measure of damages for environmental contamination of land in Indiana.

First, the *Terra-Products* court noted the common law distinction between permanent and temporary injuries to land. Permanent injury occurs when the cost of restoration exceeds the market value prior to injury. In cases of permanent injury, "the measure of damages is limited to the difference between the fair market value of the property before and after the injury, based on the rationale that 'economic waste' results when restoration costs exceed the economic benefit." 653 N.E.2d at 91-92. That difference was the measure of damages sought by plaintiff Terra-Products. Defendant Kraft opposed the request, arguing that it had already spent more than the fair market value of the Terra-Products property to remediate it and that any further damage award would amount to a double recovery.

The court noted that federal and state environmental laws often require remediation (repair) of contaminated land "virtually without regard to cost," and often well in excess of the land's earlier fair market value. *Id.* at 92. The court observed that "PCB contamination, therefore, will generally be considered a temporary injury capable of being remediated or 'repaired.' " *Id.* The *Terra-Products* court then discussed the Third Circuit's decision in *In re Paoli R.R. Yard Litigation,* 35 F.3d 717, 797-98 (3d Cir.1994), and agreed that a plaintiff whose land had been contaminated and then remediated could recover damages if he could show that repair would not restore the value of the property to its prior value and that there is some ongoing risk to his land. 653 N.E.2d at 93.

**\*21** *Terra-Products* does not support plaintiffs' claims for damages on the order of twenty times the pre-contamination fair market value of plaintiffs' property, especially without any showing of any continuing threat to human health. First, the *Terra-Products* court simply did not confront any dispute over the cost of remediation. Defendant Kraft had already completed and paid for remediation to the satisfaction of the EPA and IDEM, presumably by removing PCBs in excess of a target comparable to the 1.8 ppm target that the same agencies have given GM for the clean-up around the Bedford plant. The question actually before the *Terra-Products* court was whether the plaintiff could recover additional damages, such as for a long-term reduction in value even after the remediation. The answer was yes in theory, but the plaintiff lost because it did not have evidence to support such a reduction in value.

Second, there is no indication in *Terra-Products* that the Indiana court was approving the sort of windfall damages that plaintiffs seek here. The question did not arise. In this case,

plaintiffs seek the damages for a purely hypothetical clean-up. If the courts were to embrace their theory, the result would be (a) GM would pay the plaintiffs approximately twenty times the value of their property; (b) plaintiffs would keep their property, and (c) the PCBs in concentrations of less than 1.8 ppm would remain on the land, unless the plaintiffs happened to choose to spend their money on the remediation (a decision that would require an extraordinary degree of economically irrational behavior on the part of the plaintiffs, far beyond what might be justified by personal, family, or other non-economic ties to the property in question).

By way of comparison, federal and state environmental laws do not adopt the common law distinction between permanent and temporary injury to land. Those laws show a distinct preference for restoration of contaminated property, so that remediation may be ordered even when it exceeds the current fair market value of uncontaminated property. See *Terra-Products,* 653 N.E.2d at 92, citing *State of Ohio v. U.S. Department of Interior,* 880 F.2d 432, 445-46 (D.C.Cir.1989) (explaining that preference under CERCLA). Notwithstanding the common law rule, there may situations in which the current fair market value of property does not fully reflect the long term social and environmental loss if that property cannot be used safely in the future. That is why environmental laws sometimes impose those heavy obligations to restore contaminated land so that it available for future use and enjoyment. *Terra-Products* recognized that reality and modified the common law rule to allow additional damages to compensate a plaintiff more fully.

That reasoning does not offer any justification, however, for awarding plaintiffs the extraordinary damages they seek, and for leaving the supposedly contaminated land unremediated. Such a result would not serve any goal of environmental law. It would merely transfer huge sums of money to a few plaintiffs. Such a result would encourage the "economic waste" that Indiana's common law seeks to avoid. The *Terra-Products* court cited *City of Anderson v. Salling Concrete Corp.,* 411 N.E.2d 728, 734 (Ind.App.1980), for the proposition that damages for injury to land would ordinarily not exceed the fair market value of the land because higher damages would result in economic waste. The *City of Anderson* court made the point forcefully, finding in Indiana law "a common thread, consisting of a policy against the law requiring money to be spent wastefully. Whenever the issue of damages has been squarely presented, whether in tort or in contract, the courts of Indiana have refused to command that damages be assessed on a theory of repair, if repairs would

entail costs in excess of the economic benefit such repairs would confer." 411 N.E.2d at 734. *Terra-Products* did not disagree; the case is best understood as adding the gloss that a plaintiff might be able to recover some additional damages beyond the cost of repair if repair will not fully compensate the plaintiff, such as where the evidence shows disruption in use and/or a residual loss in value, despite the repair. 653 N.E.2d at 93.[7]

**\*22** On this subject of damages for contamination of the land, the Restatement (Second) of Torts provides sound guidance that is consistent with Indiana law. Section 929 addresses the measure of damage for harm to land from past invasions, which can include pollution:

(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

Restatement § 929(1)(a) allows a plaintiff to elect to receive restoration costs "in an appropriate case," but comment (b) adds this caution: "If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm." In the present case, the cost of restoring the land to its original condition would be grossly disproportionate to any change in the value of the land, particularly in light of the absence of evidence of harm resulting from the levels below the cleanup target of 1.8 ppm for total PCBs.

At the hearing on the pending motions, the court asked plaintiffs whether they were aware of any decision in any other jurisdiction in the world adopting the theory of damages they advocate here, awarding under the common law the cost of remediation far in excess of the value of the damaged property, without regard for whether remediation actually occurred. Plaintiffs' counsel answered: "I don't believe plaintiffs are aware of any authority one way or another on

Case 1:19-md-02875-RMB-SAK     Document 577-3     Filed 09/18/20     Page 23 of 751
PageID: 11389
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

that issue. I don't think there's any authority suggesting it's not appropriate." Hearing Tr. 59-60.

Plaintiffs later offered two recent Arkansas cases. *State v. Diamond Lakes Oil Co.,* 347 Ark. 618, 66 S.W.3d 613, 618-19 (Ark.2002), affirmed an award against an adjoining property owner responsible for contaminating the property in question. The damage award for the cost of remediating the plaintiff's property was about four times the value of the property. On the surface, that result looks promising for plaintiffs. However, the court affirmed the award only where the state government had actually ordered the plaintiff property owner to carry out and pay for that remediation required as a result of the defendant's actions. In other words, there was going to be a real clean-up, required by government authorities for long-term protection of the environment, and paid for in the first instance by the plaintiff property owner. The Arkansas Supreme Court rejected the argument that the damages were disproportionately high when compared to the value of the contaminated property:

> **\*23** This argument again ignores the fact that it was ADEQ [the state environmental agency] that ordered the remediation; Diamond Lakes had no discretion in the process. Dr. Overton, Diamond Lakes' expert, testified that the reasonable cost of remediation, as directed by the State, was in excess of $260,000; other unreimbursed expenses exceeded $60,500. Of the former amount, ADEQ had only reimbursed $116,000 from the Petroleum Storage Tank Trust Fund. See Ark.Code Ann. § 8-7-905(d) (Repl.2000). The jury awarded $200,000 in temporary damages. This amount was not unreasonable, *because Diamond Lakes had no choice but to conduct the repairs.*

66 S.W.3d at 618-19 (emphasis added). That reasoning is obviously sound. It would be unjust to allow the state to order an expensive clean-up at the plaintiff's expense yet to cap at a much lower level the damages the plaintiff could recover from the real wrongdoer. But that reasoning does not apply to the plaintiffs' claims in this case, seeking the massive costs of a merely hypothetical clean-up that would go far beyond the actual clean-up ordered by state and federal authorities.

Plaintiffs find more direct support from *Felton Oil Co. v. Gee,* 357 Ark. 421, 182 S.W.3d 72, 79 (Ark.2004), where the Arkansas court left behind the key limit on its reasoning in *Diamond Lakes.* In *Felton Oil,* the land where plaintiffs lived was polluted by leaking fuel from an underground storage tank on the neighboring property. Some clean-up had been ordered and completed, apparently funded by a state fund for cleaning up leaks from underground storage tanks. A jury

awarded "temporary property damages" of $180,000, which would have been the cost of cleaning up the groundwater on the plaintiffs' property. There was evidence that the plaintiffs' property had an original fair market value of only $31,500, which the pollution had reduced by $20,500, to $11,000. Unlike *Diamond Lakes,* however, there was no requirement that the plaintiffs spend the $180,000 for actual restoration of the land. The state fund argued that the larger award would amount to a windfall.

The Arkansas Supreme Court affirmed the jury verdict and rejected the "windfall" and economic waste argument. Even though the additional clean-up had not been ordered by the state and might never happen at all, the court noted that the property was the plaintiffs' residence. 182 S.W.3d at 79-80. The court found that repair damages of nine times the reduction in market value were not "grossly disproportionate," and emphasized the state's public policy in favor of remediation. The court acknowledged that the state agency had adopted and implemented a corrective action plan, but affirmed the jury's verdict based on the assumption that more was necessary, even though the jury verdict would not assure any additional restoration of the property or its groundwater. "We see no real distinction between ADEQ directing remediation, as was the case in *Diamond Lakes,* and a jury's verdict that additional restoration was needed, as happened in the instant case. In both situations, the conclusion was that the property could be remediated, and under our holding in *Diamond Lakes,* this means the property damage was temporary." *Id.* at 79.

**\*24** *Felton Oil* is not consistent with Indiana law's policy against windfall damages, and it is highly unlikely that Indiana would adopt that approach, especially on the scale sought by plaintiffs here. More consistent with Restatement (Second) § 929 and with Indiana law and its interest in balancing the rights of the plaintiff against preventing windfall damages is the district court's decision in *Johansen v. Combustion Engineering, Inc.,* 834 F.Supp. 404 (S.D.Ga.1993), in which the court granted summary judgment on the plaintiff landowners' claims for remediation costs exceeding the reduction in the value of their land resulting from pollution.[8] The evidence showed that the aggregate reduction in the value of plaintiffs' land was less than $700,000, but plaintiffs sought remediation costs estimated at $20 million. 834 F.Supp. at 405-06.

In a detailed and thoughtful opinion, the district court predicted that Georgia courts would apply Restatement

(Second) § 929. The court rejected the diminution in value as a rigid cap on damages for injury to land, recognizing that there may be special reasons (historical significance or unique personal value, for example) that would justify restoration costs in excess of the reduction in value. *Id.* at 407-08. But there are still limits: "Even upon a showing of personal reasons supporting restoration, the restoration costs still must be reasonable in light of the special considerations presented-that is, given those considerations, they must not be disproportionate to diminution in value." *Id.* at 409. The *Johansen* court found that the requested remediation costs were disproportionate and not justifiable.

That result is consistent with *Heninger v. Dunn,* 101 Cal.App.3d 858, 864-65, 162 Cal.Rptr. 104 (1980), in which the defendants had trespassed by bulldozing a road across the plaintiffs' land. The new road actually increased the market value of the plaintiffs' land, from $179,000 to $184,000, by providing additional access to it, but plaintiffs did not want to sell and objected to the destruction of 225 trees and other vegetation. Restoration would have been possible at an expense of $241,000. Plaintiffs sought the lesser of the restoration expense or the full value of the property before the trespass. The trial court had dismissed all damages claims.

The appellate court reversed, adopting the flexible remedial standards of Restatement (Second) § 929. The court noted that restoration costs could sometimes exceed the market value of the property, but emphasized the importance of reasonableness. 162 Cal.Rptr. at 106-09. "The overall principles by which the courts are to be guided are 'flexibility of approach and full compensation to the owner, within the overall limitation of reasonableness.' " *Id.* at 108. The appellate court found that full restoration for $241,000 would be "manifestly unreasonable" where the entire property had been worth only $179,000 before the trespass. *Id.* at 109. But the court recognized the plaintiffs' personal valuation of the natural state of the land and the aesthetic value of the trees. The appellate court remanded for a determination of damages based on the aesthetic and timber value of the trees that had been destroyed, as well as such restoration as would be reasonable under the circumstances. *Id.* at 109.

**\*25** When confronting an issue of state law, this court's role is to predict how the Indiana Supreme Court would decide it, using intermediate appellate decisions as important and valuable indications of state law. *E.g., State Farm Mut. Auto. Ins. Co. v. Pate,* 275 F.3d 666, 669 (7th Cir.2001). *Terra-Products,* Restatement (Second) § 929, and the other cases just discussed indicate that Indiana would probably not apply a rigid standard for damages if these plaintiffs can prove their tort claims against GM. The Indiana Supreme Court would instead probably apply the flexible and reasonable standards set forth in *Terra-Products* and Section 929, keeping in mind Indiana's well-established policy against windfall damages and economic waste. It is highly unlikely that the Indiana Supreme Court would adopt the standard urged by plaintiffs here, which would allow them to recover the full cost of restoration of injured land where (a) that cost is roughly twenty times the prior market value of the entire property, (b) there is no evidence that levels of contamination to be left after the government-ordered clean-up pose any risk to human health or otherwise limit the use of the property, and (c) there would be no requirement that the enormous costs of restoration would actually be used to restore the land. Plaintiffs have not offered any evidence of any intermediate value of damages, such as a less extensive clean-up. Accordingly, apart from the well remediation discussed above, GM is entitled to summary judgment on any claim by plaintiffs for the cost of restoring their property to the condition it was in prior to contamination, beyond the conditions to be achieved by the government-ordered clean-up that GM has undertaken, and in excess of the market value of the property in the absence of any contamination.

## II. *Medical Monitoring Damages*

Plaintiffs do not claim to have any present health effects or conditions as a result of the exposure to GM PCBs, but argue that their exposure to PCBs from GM's Bedford plant warrant lifetime medical monitoring to allow proper identification and treatment for any health effects that could be caused by such exposure. As part of the relief sought in this case, however, plaintiffs seek the "reasonable and necessary costs" of lifetime medical monitoring of their health due to PCB exposure. The court earlier denied GM's motion to preclude relief for medical monitoring damages in this case, applying what was in substance a standard applicable to a motion to dismiss for failure to state a claim upon which relief can be granted. 2005 WL 2218371 (S.D.Ind. Sept.12, 2005).

In determining whether Indiana law might permit recovery of medical monitoring damages in tort, this court relied on *Gray v. Westinghouse Electric Corp.,* 624 N.E.2d 49 (Ind.App.1993), which reversed a trial court's dismissal of a plaintiff's claims for medical monitoring. The *Gray* court held that "reasonably justified" fear for safety or health could support medical monitoring damages as part of the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 25 of 751
PageID: 11391
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

relief on a nuisance claim based on pollution. *Id.* at 54. This court noted that, assuming plaintiffs could demonstrate that the concerns about their future health were reasonably justified, as was alleged in the complaint, the "question then would become whether they could prove that the expenses of medical monitoring are reasonably necessary" and whether any tortious act by defendant was the proximate cause of such an expense. 2005 WL 2218371, at *6.

**\*26** In an effort to support their claims for medical monitoring damages, plaintiffs have produced reports from toxicologist Daniel T. Teitelbaum, M.D., and environmental health professor David O. Carpenter, M.D., regarding the need for and cost of a medical monitoring program for the plaintiffs in this case. Plaintiffs intend to call both Dr. Teitelbaum and Dr. Carpenter to give testimony regarding the need for a medical monitoring program based on the general causation evidence regarding plaintiffs' exposure to PCBs. Plaintiffs intend to call Dr. Carpenter to testify on the components and expected cost of an appropriate medical monitoring program.

GM argues that the court should exclude any such testimony by Dr. Teitelbaum and Dr. Carpenter because their opinions do not satisfy the reliability and relevance requirements of Rule 702 of the Federal Rules of Evidence, and as articulated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the standards for which have been articulated above. Because the court finds that Dr. Carpenter's opinion does not meet standards for admission, plaintiffs' medical monitoring claim cannot survive. The court does not reach the question of the admissibility of Dr. Teitelbaum's opinion.

Medical monitoring claims typically permit a plaintiff to recover for the cost of testing and diagnosis of illnesses that have yet to develop, where the risk of disease is greater as a result of a defendant's tortious action. *In re Paoli Railroad Yard PCB Litigation,* 113 F.3d 444, 461-62 (3d Cir.1997); *In re Meridia Products Liability Litigation,* 328 F.Supp.2d 791, 825 (N.D.Ohio 2004), *aff'd, Meridia Products Liability Litigation v. Abbott Laboratories,* 447 F.3d 861 (6th Cir.2006). The Third Circuit has established the elements of a claim for medical monitoring by predicting how such a claim would be recognized under Pennsylvania law in the *Paoli Railroad Yard PCB Litigation:*

We ... predict that the Supreme Court of Pennsylvania would follow the weight of authority and recognize a cause

of action for medical monitoring established by proving that:

1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.

2. As a proximate result of exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.

3. That increased risk makes periodic diagnostic medical examinations reasonably necessary.

4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

916 F.2d 829, 852 (3d Cir.1990); see also *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 785-87 (3d Cir.1994); *Meridia,* 328 F.Supp.2d at 825 (requiring, in place of the third and fourth elements above, that the plaintiff show that a monitoring procedure exists that makes detection possible and that there is "some clinical value in early detection" of the disease).[9] In *Paoli II,* the Third Circuit explained that encapsulated in its four-part test was the requirement that the plaintiff prove that, by reason of increased exposure, a reasonable physician would prescribe for the plaintiff a monitoring regime different from one that would be prescribed had the exposure never occurred. 35 F.3d at 788, citing *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 980 (Utah 1993).

**\*27** The Third Circuit noted that the factors "would, of course, be proven by competent expert testimony." *Paoli I,* 916 F.2d at 852. The court later explained that "where experts individualize their testimony to a group of individuals with a common characteristic," such as exposure to X contaminant over Y level, "we do not think there is a need for greater individualization so long as they testify that the risk to each member of the group is significant. We fail to see the purpose in requiring greater individualization. Nor do we think that an expert must quantify the increased risk." *Paoli II,* 35 F.3d 788.

In the Third Circuit's third consideration of the *Paoli* case, the court looked closely at what plaintiffs may need to show to satisfy the first element of the cause of action. In demonstrating significant exposure to PCBs, the court explained, plaintiffs must show that they were exposed to such toxins at levels significantly above the toxins' normal background presence, or in other words, more of the toxins than they would normally encounter in daily life. 113 F.3d at

Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

459, citing *Redland Soccer Club, Inc. v. Dep't of Army,* 55 F.3d 827, 846-47 (3d Cir.1995). Showing abnormal exposure to the toxin at issue, the *Paoli III* court explained, was an "absolute requisite" to satisfying the significant exposure element of a medical monitoring claim. 113 F.3d at 460.[10] This abnormal showing is necessary, the court reasoned, because such claims are predicated on the plaintiff's greater than normal chance of contracting a toxin-related illness or other health problem. Requiring a plaintiff to show significant exposure beyond that normal for daily life demonstrates that the plaintiff's need for medical monitoring exceeds that of the rest of the world. *Paoli III,* 113 F.3d at 461-62.

Dr. Carpenter is currently the Director of the Institute for Health and Environment and Professor in the Departments of Environmental Health Sciences and Biomedical Sciences at the University of Albany, where he was the founding Dean of the School of Public Health. He was the Director of the Wadsworth Center for Laboratories and Research of the New York State Department of Health from 1980 through 1985. Carpenter Dec. ¶ 2. He has published several articles and has been invited to give lectures on PCB exposure to humans and animals, though he has not published or lectured on medical monitoring programs specifically. Carpenter Smt. 2-9; Carpenter Dep. I 99-100. Plaintiffs plan to have Dr. Carpenter testify as to the necessity for medical monitoring in this case and as to the components and cost of a proper medical monitoring program. While Dr. Carpenter has extensive experience relating to the study of PCBs and their effects, Dr. Carpenter's opinions are not sufficiently reliable and therefore are inadmissible in this case.

A. *Necessity of Medical Monitoring*
Plaintiffs do not dispute that the elements of a claim for medical monitoring, as established by *Paoli I* and its progeny, require them to show that they have been subjected to significant exposure to a hazardous substance that significantly increases their risk of contracting or developing the adverse health effects for which they seek the cost of medical monitoring. Although Dr. Carpenter reports that plaintiffs have had higher than usual exposure, plaintiffs have not shown that this opinion is reliable or that Dr. Carpenter's opinion, even if accepted, would be sufficient to demonstrate their burden under a medical monitoring theory.

**\*28** In determining plaintiffs' exposure to the PCBs from GM's Bedford plant, Dr. Carpenter analyzed the blood serum levels of PCBs in plaintiffs' blood. Based on this analysis, Carpenter opines that "the majority of plaintiffs have been exposed to higher than 'usual' levels of PCBs." Carpenter Dec. ¶ 25. Dr. Carpenter arrived at this figure by comparing plaintiffs' blood serum levels to the mean serum levels reported by the Agencies for Toxic Substances and Disease Registry ("ATSDR"). Dr. Carpenter cites the ATSDR as reporting that mean serum levels (for individuals who do not have diets rich in fish from PCB-contaminated waters) range from 0.9 to 1.5 ppb,[11] a figure to which he compared plaintiffs' serum levels to determine the level of plaintiffs' exposure. Dr. Carpenter emphasizes that all of the plaintiffs have been exposed to PCBs, but testimony from both Dr. Carpenter and Dr. Teitelbaum indicates that, although PCBs do not exist in nature, virtually every person in the world has been exposed to PCBs. Dr. Carpenter opines that plaintiffs have higher than "usual" levels of exposure, however, because 40 of the 47 tested plaintiffs had levels above 0.9 ppb, 9 of the plaintiffs had levels above 3 ppb and some plaintiffs had levels as high as 4.9 ppb. Carpenter Dec. ¶ 25.

If one accepted Dr. Carpenter's assessment, showing essentially that some plaintiffs show signs of exposure up to three times the normal *range,* such results would support plaintiffs' significant exposure argument. Dr. Carpenter's assessment, however, is not reliable. Dr. Carpenter failed to use reliable methodology in determining how to rate such levels as either usual or above background levels. In other words, plaintiffs have not demonstrated that Dr. Carpenter employed reliable methodology in determining that "normal" exposure levels are between 0.9 ppb and 1.5 ppb.

Dr. Carpenter obtained these estimates from the ATSDR's third party publication. ATSDR cited as its source for such information the "Hanrahan study" comparing the serum PCB levels of Great Lakes fish consumers with those who were not regular consumers. The study revealed that of those who were not consumers, the background PCB blood serum levels *ranged* from 0.5 to 9.7 ppb in males and 0.5 to 3.3 ppb in females. See Docket No. 327, Exhibit G. The mean serum levels in this same group were 0.5 for women and 1.5 for men. Dr. Carpenter testified that he had not read the Hanrahan article "carefully," despite acknowledging that the article is the main authority for establishing background ranges for PCBs. He drew from the ATSDR publication the mean values of blood serum levels. He relied on the means but ignored the relevant background range cited by Hanrahan as between 0.5 and 9.7 ppb. See Carpenter Dep. (Docket No. 386) at 88, 138-41 ("I take the ATSDR as my reference, not their

original article."). Under this approach, one would expect half the world's population of approximately six billion people (everyone with levels above the median) to be entitled to a special medical monitoring program, at least if they could identify the sources of their exposure to PCBs.

**\*29** GM cites several other studies and the opinion of defendant's expert Dr. Krieger that the background range is significantly broader than that used by Dr. Carpenter. While this evidence provides at a minimum fodder for cross-examination or rebuttal, Dr. Carpenter's misapplication of his own source reveals a methodological flaw critical to his opinion of whether plaintiffs' exposure is significant. For example, if Dr. Carpenter had applied the background range found in Hanrahan, the source for his source, his findings would reveal that all of the plaintiffs' blood serum levels are within background range. Dr. Carpenter's failure to consider the Hanrahan article and Dr. Carpenter's use of the reported means (instead of the background ranges observed by the study) into the ranges themselves reveals a methodological flaw that cannot be overlooked by the court. Accordingly, plaintiffs have not come forward with reliable expert evidence of the first element of a medical monitoring damages claim.

### B. *Planning and Implementing the Medical Monitoring Program*

Plaintiffs' medical monitoring claim fails for a second reason. Dr. Carpenter is the sole author of the medical monitoring program for which plaintiffs seek costs in this case. Defendant argues that Dr. Carpenter is not qualified to design and implement such a medical monitoring program, therefore rendering his opinion unreliable. Although Dr. Carpenter has admirable experience and expertise, the court agrees that they do not extend to his testimony on the hypothetical medical monitoring program that plaintiffs propose.

Dr. Carpenter states that the study of the health effects of PCBs is his specialty. He directed a large interdisciplinary research study on PCB contamination from a GM site in New York funded by the Superfund Basic Research Program of the National Institute of Environmental Health Services, one of the National Institutes of Health. The investigation of the study included health studies of nearby residents, animal toxicology studies of the side effects of PCBs, determination of levels of PCBs in humans, animals, soils, sediments, air, and water of the region, as well as investigation of methods of destruction and removal of PCBs from soil and water. Carpenter Dec. ¶ 3. Dr. Carpenter has also engaged in studies of the health effects of PCB exposure and has

reviewed thousands of medical records in connection with such studies. *Id.,* ¶ 4. Dr. Carpenter has also served on several national and international advisory committees pertaining to environmental health issues. See *id.,* ¶ 6.

Although Dr. Carpenter's experience studying the health effects of PCBs is extensive, he is not qualified to testify as to the proper components and cost of a proper medical monitoring program in this case. Dr. Carpenter is not and has never been licensed to practice medicine. He is not board certified in any medical field. He is not eligible to diagnose or to prescribe treatments or any diagnostic testing that are part of his proposed program. Carpenter Dep. I at 40-44.

**\*30** Additionally, there is no evidence presented that Dr. Carpenter has ever designed, endorsed, or implemented a medical monitoring program on his own before, though he has offered advice regarding other medical monitoring programs. Carpenter Dep. I, 92-97. According to Dr. Carpenter, he has testified in at least one other case regarding PCB exposure and health risks in humans. He testified that he offered medical monitoring advice in one PCB related case he referred to as "Tolbert," but he noted with respect to this case:

> And I think that there were several of us that provided input so certainly what I provided was not the definitive medical margin. It listed a variety of options. It was the first time I had really been asked to develop a medical monitoring program and it was part of my learning experience of learning to balance the risks of the monitoring versus the risks of the disease.

Carpenter Dep. I at 93. When asked whether he could remember how many doctors and scientists contributed to the *Tolbert* medical monitoring program, Dr. Carpenter testified: "No I don't recall, and I'm not even sure that I was ever totally in the loop. The lawyers for the plaintiffs solicited input from a number of us and on that basis developed a medical monitoring program which became part of the bigger settlement." *Id.* at 93-94. Dr. Carpenter has never testified as to a specific medical monitoring program.

Dr. Carpenter testified that he also contributed to a medical monitoring program relating to perfluorinated sulfinate contamination. He also testified that he was a consultant to a special master's advisory committee implementing a settlement involving medical monitoring at another site, as well. *Id.* at 98. Outside of these experiences, Dr. Carpenter has not been significantly involved with the formation of a medical monitoring program:

Q. Is there any other circumstance besides the Tolbert litigation and the [perfluorinated sulfinate] litigation that you can think of in which you would have participated in some way in developing or prescribing a medical monitoring program?

A. I've had a couple of phone conversations but nothing beyond those two cases where I've been asked to put something in writing.

*Id.* at 97.

Dr. Carpenter reported in his December 2005 declaration that he "consulted with practicing physicians on standards of practice and specific medical monitoring procedures" and that he has "not hesitated to ask advice both on specific tests and the appropriate frequency of and risks of these tests." Carpenter Dec. ¶ 5. The extent to which he consulted with others with either more direct patient experience or experience in crafting medical monitoring programs relating to PCB exposure remains unclear, however. Dr. Carpenter testified in his deposition that he did not specifically share his medical monitoring protocol or recommendations with any of his colleagues for review, Carpenter Dep. I at 109, and that no licensed medical doctor had reviewed the specific medical monitoring program he was proposing. *Id.* at 111.

**\*31**  In designing the medical monitoring program and estimating its cost, Dr. Carpenter testified that he first considered the history, routes of exposure, and mechanism action of PCBs. He then determined the resulting diseases for which risks would be elevated as a result of PCB exposure. He determined that the literature indicated that exposure to PCBs increased the risk of development a number of diseases and conditions. Carpenter Dec. ¶¶ 14, 15. Dr. Carpenter then determined which diagnostic tests would be appropriate for the diseases for which early diagnosis would be beneficial. Finally, Carpenter balanced the risks associated with the diagnostic procedures with their potential benefit in providing early diagnosis, and determined whether such procedures should be eliminated or reduced. *Id.* ¶¶ 16, 17. After Carpenter developed the program, he contacted medical professionals in New York and Indiana to provide cost estimates. *Id.* ¶ 18.

Although Dr. Carpenter's academic and research experience is extensive, there is no indication that he has sufficient experience or qualifications to design and implement a medical monitoring program. He could not legally prescribe the diagnostic tests he advocates for the plaintiffs. Though plaintiffs emphasize that *Daubert* permits this court, to some

extent, to recognize Dr. Carpenter's experience in his field in determining the reliability of his opinions, the record indicates that he has limited experience contributing to medical monitoring programs and no experience developing and implementing one on his own, which is what he seeks to do in this case. (Keep in mind, however, that plaintiffs do not necessarily seek to implement the plan; they simply want GM to pay them the estimated costs of such a plan.) Plaintiffs have not shown that Dr. Carpenter's opinion is reliable because his ability to determine reliably the diagnostic tests necessary and to balance the risks of such tests with the benefits of early detection has not been established before the court.

The court's doubts about Dr. Carpenter's methodology in developing the program are heightened by his lack of experience in this task. Defendant has offered a report by Dr. Jessica Hertzstein regarding generally accepted medical monitoring practices.[12] Dr. Hertzstein's report states that a number of authoritative sources have studied and developed guidelines for medical screening and disease prevention, including the U.S. Preventive Services Task Force (USPSTF), the Canadian Task Force on the Periodic Health Examination, the American Cancer Society, the American College of Physicians, and the American Medical Association. Hertzstein Rep. II at 6.

Dr. Carpenter testified, however, that in developing the program he was not aware of any agency that might recommend periodic screening and did not refer to any guidelines or protocols of either the American Medical Association, the Centers for Disease Control, or USPSTF. Although he testified that he is aware of the guidelines provided by the American Cancer Society and the American Heart Association, Dr. Carpenter testified that he did not refer specifically to any guidelines or recommendations of any health association or organization in developing the medical monitoring program in this case. Carpenter Dep. I at 105, 108, 242, 243. Plaintiffs' argument that any attack on Dr. Carpenter's refusal to refer to such standards goes to the weight of the evidence is misplaced. In light of the other limitations on Dr. Carpenter's expertise for this project, the extent to which he even considered such sources (which plaintiffs do not dispute establish guidelines and protocols that are relevant and well respected in the field) is highly relevant to whether Dr. Carpenter used a method in developing the medical monitoring program that comports with generally accepted practices. This concern, combined with Dr. Carpenter's lack of experience both in developing and implementing medical monitoring programs, and in

2006 WL 2669337

providing clinical treatment to patients, renders his opinion not sufficiently reliable to satisfy the demands of *Daubert* and Rule 702 for the purposes of this case.

**\*32** Without Dr. Carpenter's inadmissible testimony, plaintiffs have no admissible evidence that could allow them to satisfy the elements for a medical monitoring program pursuant to *Paoli* and its progeny. Regardless of the precise formulation that Indiana might adopt for the elements of a medical monitoring claim, plaintiffs bear the burden of proving that certain beneficial diagnostic testing is reasonably necessary as a result of exposure to toxins caused by the defendant. Because plaintiffs have failed to demonstrate the reasonable necessity of the medical monitoring program for which they seek costs as a damage relating to their nuisance claims, GM is entitled to summary judgment on plaintiffs' request for medical monitoring damages.

### III. *Unjust Enrichment*

Count IV of plaintiffs' complaint asserts a claim against GM for unjust enrichment. Plaintiffs acknowledge that they have not undertaken the clean-up effort they claim to seek, have not expended money or provided services toward the effort, and have not otherwise provided anything for GM's benefit. Nor do they claim to have incurred costs for any medical or soil testing performed. Pl. Br. at 2. Plaintiffs' theory on this claim is that GM, by disposing of PCBs onto plaintiffs' land, was spared the expense of properly disposing of such substances, and that equity demands that GM pay plaintiffs' projected remediation costs. This argument fails for several reasons.

First, plaintiffs have failed even to allege facts necessary to demonstrate the elements of an unjust enrichment claim in Indiana. Unjust enrichment, also referred to as *quantum meruit* or quasi-contract, requires a party who has been unjustly enriched at another's expense to make restitution to the aggrieved party. *Bayh v. Sonnenburg,* 573 N.E.2d 398, 408 (Ind.1991), citing Restatement of Restitution § 1 (1937). "To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." The court in *Sonnenburg* went on to explain that one who labors without expectation of payment cannot recover in a quasi-contract action. *Id.* at 408. In *Sonnenburg,* the Indiana Supreme Court held that the plaintiffs' claims for compensation on an unjust enrichment theory relating to work performed during periods of commitment in state mental hospitals could not stand. Because the plaintiffs could

show no expectation of payment in their performance, the court reasoned, no unjust enrichment could be established. *Id.*

To recover under a quasi-contract theory, the plaintiff must generally show that he rendered a benefit to the defendant at the defendant's express or implied request and that the benefit was not a gift, meaning that the plaintiff contemplated some return of consideration from the defendant or that the defendant could not have believed that the plaintiff did not expect some payment. *Biggerstaff v. Vanderburgh Humane Society, Inc.,* 453 N.E.2d 363, 364 (Ind.1983),* cited by *Sonnenburg,* 573 N.E.2d at 409; see also *Knowles & Associates LLC v. Cook,* 784 N.E.2d 1063, 1066 (Ind.App.2003)* (generally, a plaintiff must show that the benefit at issue was rendered to the defendant at his express or implied request). Plaintiffs argue that they need not demonstrate that the benefit was conferred on the defendant at its express or implied request, but that they need only show that the defendant received a benefit unjustly or wrongfully. See Pl. Br. at 6-7.

**\*33** In support of this argument, plaintiffs point to three Indiana cases. In *Paul v. I.S.I. Services, Inc.,* 726 N.E.2d 318, 322 (Ind.App.2000),* the Indiana Court of Appeals upheld a trial court's grant of a preliminary injunction on an unjust enrichment claim relating to the defendant's benefit from funds her husband had embezzled from the plaintiff. The trial court did not err, the court explained, by finding a reasonable likelihood of success where the evidence showed that money allegedly embezzled from plaintiff was placed into an account in which the defendant had an interest, and which had been used to confer a benefit on the defendant. *Id.*

Following *Paul,* in *Dominiack Mechanical, Inc. v. Dunbar,* 757 N.E.2d 186, 190-91 (Ind.App.2001),* the majority reversed a trial court dismissal of a plaintiff's unjust enrichment claim against the guests of an expensive party hosted by an employee of the plaintiff that was financed by funds the employee had embezzled from the plaintiff. Even where the plaintiff had not alleged that the defendants were complicit in the employee's embezzlement, as in *Paul,* the court found the plaintiff had nonetheless shown a legally sufficient claim for unjust enrichment. The court was careful to note, however, that it had not been determined conclusively whether the defendants knew or did not know the source of the party's funding was illegal. *Id.* at 191 n. 5.

Additionally, in *King v. Terry,* 805 N.E.2d 397 (Ind.App.2004),* the Indiana Court of Appeals upheld the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 30 of 751
PageID: 11396
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

grant of defendant's motion to dismiss plaintiff's claim for unjust enrichment. The plaintiff in *Terry* had failed to record a deed on a home he had purchased, and a mistake by the local treasurer resulted in the purchase of the property by the defendant at a tax sale. Plaintiff sued defendant seeking rent and profit from the property that he alleged were "wrongfully" or "unjustly" received by the defendant. Before finding that the claim was time-barred, the court explained that plaintiff's assertions established an action in *quantum meruit* that would otherwise have been sufficient to survive a motion to dismiss. *Id.* at 400.

The court doubts that these cases, which must be considered in the context of their procedural postures, do away with the requirement that a defendant expressly or impliedly request the plaintiff's services. *Paul*, which addressed the claim on a motion for preliminary injunction, must be considered in context. The court considered not only the likelihood of the merits of the unjust enrichment claim but also the restoration of the status quo and the potential risk of harm to the parties in a case where plaintiff sought to prevent the defendant from disposing of allegedly embezzled funds. In *Terry*, the court considered only whether the claim stated a cause of action and found that it did where the plaintiff asserted that the defendant had acted wrongfully and unjustly. *Dominiak* also addressed a claim on a motion to dismiss. The majority was careful to point out that it had not been determined that the defendants did not knowingly accept the benefit of the embezzled funds. These cases do not show that Indiana law has dispensed with the well-established requirement that plaintiff show that the defendant at least impliedly requested the benefit conferred by the plaintiff, especially in light of the line of cases emphasizing the importance of such a showing on an unjust enrichment claim. See, *e.g., Lakes and Rivers Transfer v. Rudolph Robinson Steel Co.,* 691 N.E.2d 1294, 1297 (Ind.App.1998); *Timothy F. Kelly and Associates v. Illinois Farmers Insurance Co.,* 640 N.E.2d 82 85-86 (Ind.App.1994); *Dedelow v. Rudd Equipment Corp.,* 469 N.E.2d 1206, 1209 (Ind.App.1984); *Milwaukee Guardian Ins. Inc. v. Reichhart,* 479 N.E.2d 1340, 1343 (Ind.App.1985); *Kody Engineering Co. v. Fox & Fox Insurance Agency, Inc.,* 158 Ind.App. 498, 303 N.E.2d 307, 310-11 (Ind.App.1973).

**\*34** Plaintiffs have not come forward with evidence to support their unjust enrichment claims in opposing GM's motion for summary judgment. Plaintiffs have not shown that GM expressly or impliedly requested the benefit of avoiding proper PCB removal costs. Plaintiffs also have not shown that they offered such a benefit with any expectation of compensation. Just the opposite, plaintiffs assert that they had no knowledge of GM's actions. This evidence fails to demonstrate a claim for unjust enrichment, as in *Sonnenburg,* where the court clearly held that conferring a benefit without expectation of a payment or other consideration falls short of demonstrating such a claim. See 573 N.E.2d at 408. Accordingly, plaintiffs' effort to recycle their tort claims into a claim for unjust enrichment must fail.

Second, plaintiffs have offered no evidence or argument that could support a proper remedy for their unjust enrichment claims. Plaintiffs' argument is that, because GM benefitted from its use of plaintiffs' property to dispose improperly of PCBs, "a proper measure of damages for GM's unjust enrichment includes the disposal cost of the contaminated soil remaining on Plaintiffs' land (which may be determined by multiplying the disposal cost per unit by the number of contaminated units on each parcel)." Pl. Br. at 10. Plaintiffs assert that the Dovantzis report, which estimates the cost of plaintiffs' remediation, supplies such a figure.

The proper measure of damages for unjust enrichment is restitution. *Sonnenburg,* 573 N.E.2d at 408 (one who is unjustly enriched must make restitution); *Knowles,* 784 N.E.2d at 1066 (plaintiff may prevail in quasi-contract action where defendant was given a benefit at his implied request "under circumstances in which a court of equity invokes the remedy of restitution in order to avoid unjust enrichment"); *Kovatch Mobile Equipment Corp. v. Warren Township,* 831 F.Supp. 665, 671 (S.D.Ind.1993). Restitution requires the disgorgement of the benefit received by the defendant. *Confold Pacific, Inc. v. Polaris Industries, Inc.,* 433 F.3d 952, 957-58 (7th Cir.2006) (unjust enrichment and its synonym, restitution, includes either the return of a defendant's benefit received from commission of a tort or payment of the value of a benefit received by defendant); *Rollings v. Smith,* 716 N.E.2d 502, 507 (Ind.App.1999) (restitution, an award made to remedy defendant's unjust enrichment, "measures the remedy by the defendant's gain and seeks to force disgorgement of the gain"). Plaintiffs have not shown any evidence of the benefit to GM, *i.e.,* the cost saved in disposal of the PCBs over the years of contamination. Plaintiffs' assertion that the remediation costs would be an appropriate measure of damages is unsupported by any Indiana law.

Finally, plaintiffs' unjust enrichment claim cannot stand because there exists a remedy at law for the alleged harm on which this claim is based. It is well settled that a plaintiff may not pursue an action in *quantum meruit,* a remnant of chancery

procedure, where the plaintiff has an adequate remedy at law. *King,* 805 N.E.2d at 400; *Town of New Ross v. Feretti,* 815 N.E.2d 162, 168 (Ind.App.2004); *Mayflower Transit, Inc. v. Davenport,* 714 N.E.2d 794, 800 (Ind.App.1999) ("Where there is an adequate remedy at law, equity will not assume jurisdiction."); *Tri-Professional Realty, Inc. v. Hillenburg,* 669 N.E.2d 1064, 1070 (Ind.App.1996) (same); *Comcount, Inc. v. Coconut Code, Inc.,* 2002 WL 1349913, *3-4 (S.D.Ind.2002) (dismissing promissory estoppel claim where it was "at least in part, a restatement of [plaintiff's] breach of contract claim"). Here, plaintiffs seek the same remedy in equity that they seek at law: compensation for the remediation they claim is due. Because of the overlapping nature of these claims, their claim for unjust enrichment cannot survive.

## IV. *Post-Remediation Stigma*

**\*35** Plaintiffs have also alleged a claim against General Motors for what plaintiffs describe as the reduction in the fair market value of their land due to stigma of the PCB contamination even after completion of the entire remediation process. In support of this claim, plaintiffs offer testimony from Nick Tillema, a licensed real estate appraiser, as to the expected percentage of reduction in the fair market value of their property after the completion of GM's remediation of the land. Additionally, with respect to the "certain plaintiffs" whose land will not be remediated by GM as part of the present remediation plan, Mr. Tillema intends to testify as to the percentage of reduction in the value of their land due to stigma after the remediation on neighboring land has been completed. GM has filed a motion to exclude Mr. Tillema's testimony, arguing that his opinion fails to meet the standards of reliability required by *Rule 702 of the Federal Rules of Evidence.* GM has also filed a motion for summary judgment on plaintiffs' stigma claims.

At this stage in the remediation process, it would be improper for the court to allow this claim to go forward. At some future time, plaintiffs might be entitled to damages relating to post-remediation stigma, but on this record, such damages would have to be based on speculation before the remediation has been completed.

The Indiana Court of Appeals has recognized a right to recover damages for a loss in the fair market value of a plaintiff's land due to post-remediation stigma. In *Terra-Products, Inc. v. Kraft General Foods, Inc.,* 653 N.E.2d 89 (Ind.App.1995), another PCB contamination case, the Indiana Court of Appeals recognized that a plaintiff could

recover damages for a loss in the fair market value of its property due to stigma even where defendant had fully remediated the property. This somewhat unusual recovery for both restoration and diminution in value, the court explained, would be warranted where the plaintiff could demonstrate that an imperfect market rendered its property less valuable despite complete restoration. *Id.* at 93, citing *In re Paoli Railroad Yard Litigation,* 35 F.3d 717, 797-98 (3d Cir.1994). Applying the principle that damages should be applied flexibly in an effort to compensate plaintiffs fully for their losses, the court reasoned, both measures of damages were appropriate. The court applied the three elements for a stigma damages claim provided by the Third Circuit in *Paoli:*

(1) defendants have caused some (temporary) physical damage to plaintiffs' property;

(2) plaintiffs demonstrate that repair of this damage will not restore the value of the property to its prior level; and

(3) plaintiffs show that there is some ongoing risk to their land.

*Terra Products,* 653 N.E.2d at 93, citing 35 F.3d at 797-98.[13]

The *Terra Products* court nevertheless affirmed the trial court's grant of summary judgment in favor of the defendant on plaintiff's stigma claims. The plaintiff had not offered evidence sufficient to meet the demands of the prima facie case, even at the summary judgment stage. 653 N.E.2d at 94. Because the plaintiff had sold the property while it was still in the process of being remediated, and because it presented no other reliable evidence on value prior to contamination, the plaintiff in *Terra-Products* could not demonstrate any actual diminution in value. *Id.*

**\*36** Plaintiffs' claims here run into a second obstacle. The damages they claim would be the difference in value between remediated property and otherwise identical property that had never been through the process of pollution and remediation. The idea that the real estate market might value such properties differently is not startling; it is consistent with the approach to damages for injury to chattels. See *Allgood v. Meridian Security Insurance Co.,* 836 N.E.2d 243, 245-46 (Ind.2005). But a damage award would need to be based on something more than guesswork. At this point, there is no direct evidence about the post-remediation values of plaintiffs' properties because the remediation is not complete. In the absence of such evidence, Mr. Tillema tried to support his opinion with reports from other sites around the country. The problem is that he did not support his opinion with

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 32 of 751
PageID: 11398
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

reports on reduction in fair market value in any other areas contaminated by PCB or any other pollutant after remediation had actually occurred. See Hearing Tr. 84-85. Accordingly, assuming it is possible to draw reliable comparisons between markets, which plaintiffs have not yet shown in this context, the basic foundation of comparative data is missing.

Also, Mr. Tillema has sought to estimate the reduction in fair market value after completion of the remediation. Mr. Tillema's own report and the findings of his sources indicate that reduction in fair market value can be greatly influenced by the stage of remediation. See Tillema Rep. II (Docket No. 323-1) at 3-4; see also Thomas Jackson, *The Analysis of Environmental Case Studies,* Appraisal Journal, Jan. 2002, at 91. Again, the data needed to avoid sheer guesswork simply are not available, or at least have not been presented and considered.

Questions of the reliability and relevance of Mr. Tillema's opinion aside, the circumstances of the case at this stage render the plaintiffs' claims too premature to consider, though claims for post-remediation stigma damages may become ripe at a later stage. Plaintiffs have offered admissible evidence of the pre-contamination value of their properties.[14] On this record, however, it is not possible to provide even a reasonable estimate of any post-remediation stigma, at least at this time. GM's argument in its brief that Mr. Tillema's opinions are necessarily speculative and defendant's comments at oral argument acknowledge that, to the extent these claims might have any merit, they would need to be advanced at a later date. See Def. Br. at 32-34; Hearing Tr. 79-80. This kind of uncertainty was not at issue in *Terra-Products,* where the remediation was already complete. In this case, even today there can be no guarantee as to when GM will complete the current remediation project. Accordingly, proper damages relating to post-remediation stigma may differ substantially based on the date of completion (or expected completion) and the extent of the remediation to be undertaken. While the court does not mean to indicate that a post-remediation stigma claim can be sought only after the last grain of soil has been removed, the present circumstances of this case make clear that any estimate of post-remediation value of the plaintiffs' land would be speculative and premature.

**\*37** The same is true, even if perhaps to a lesser extent, with respect to those plaintiffs whose properties are not currently being remediated by GM as part of the voluntary agreement. These persons, described in the briefs as "certain

plaintiffs," face the same uncertainty with respect to the post-remediation value of their properties. The value of the remediated plaintiffs' land may have a substantial effect on the post-remediation fair market value of the "certain plaintiffs" land. Accordingly, because the evidence essential to the elements of a post-remediation stigma claim for damages cannot be determined at this time, the issue also is not ripe for resolution. The court dismisses all plaintiffs' stigma claims for lack of a ripe, justiciable claim, without prejudice to refiling.

V. *Summary Judgment as to "Certain Plaintiffs"*

GM filed a separate motion for summary judgment (Docket No. 307) as to all claims of the "certain plaintiffs," those whose properties lie outside the designated floodplain and will not be remediated as part of the current GM effort.[15] For reasons the court has already addressed, these plaintiffs do not have viable claims for medical monitoring damages or, at least at this time, for lost property value resulting from any stigma associated with the GM plant and PCB contamination. All of these plaintiffs' properties have been tested for the presence of PCBs. The undisputed facts show that all of these properties have low levels of PCBs in the soil, below the 1.8 ppm clean-up standard adopted by the EPA and IDEM in their agreement with GM. Giving plaintiffs the benefit of conflicts in the evidence, the court assumes for purposes of summary judgment that plaintiffs will be able to show that these plaintiffs' properties contain PCBs at levels above a relevant "background" level, using data reported by Dr. Molholt and Dr. Dovantzis. The court also assumes that a reasonable jury could conclude that PCBs above background levels more likely than not came from GM's Bedford plant.

Plaintiffs contend that regardless of whether the low PCB levels pose a meaningful risk to health or the use of their property, they are entitled to the costs of a clean-up of their property to background levels, so that PCB 126 is present at no more than 4 parts per trillion (4 nanograms/kilogram) in the soil. Plaintiffs estimate this clean-up would cost $78 million, which is approximately 20 times the total fair market value of all plaintiffs' properties. As explained above in Part I-E, plaintiffs are not entitled to these remediation damages, and GM is entitled to summary judgment on those claims for damages.

*Conclusion*

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 33 of 751
PageID: 11399
Allgood v. General Motors Corp., Not Reported in F.Supp.2d (2006)
2006 WL 2669337

For the foregoing reasons, defendant's motion to exclude Dr. Molholt and Dr. Dovantzis and for summary judgment as to plaintiffs' remediation claims (Docket No. 300) is hereby granted with respect to Dr. Molholt's testimony and granted in part and denied in part with respect to Dr. Dovantzis's testimony, and defendant's motion for partial summary judgment on plaintiffs' remediation claims is granted as to all claims except claims for treatment and monitoring of wells. Defendant's motion to exclude expert testimony regarding medical monitoring claims and to strike the claim for medical monitoring damages (Docket No. 311) is hereby granted with respect to expert testimony by Dr. Carpenter and the claim for medical monitoring damages. Defendant's motion for summary judgment as to plaintiffs' unjust enrichment claims (Docket No. 304) is also granted. Defendant's motion to exclude expert testimony of Nick Tillema relating to plaintiffs' stigma damages and for summary judgment as to plaintiffs' stigma claims (Docket No. 310) is denied, but for the reasons stated above, plaintiffs' stigma claims are premature and are dismissed without prejudice. Defendant's motion for summary judgment as to "certain plaintiffs" (Docket No. 307) is granted with respect to claims for remediation, medical monitoring, and stigma damages, but denied to the extent these plaintiffs might seek other types of damages. All remaining motions (including Docket No. 306 and Docket No. 429) are hereby denied as moot. A status conference will be set by separate order.

**\*38** So ordered.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 2669337

---

Footnotes

1    The EPA defines a "slope factor" as: "An upper bound, approximating a 95% confidence limit, on the increased cancer risk from a lifetime exposure to an agent. This estimate, usually expressed in units of proportion (of a population) affected per mg/kgday, is generally reserved for use in the low dose region of the dose-response relationship, that is, for exposures corresponding to risks less than 1 in 100." http:// www.epa.gov/iris/gloss8.htm (last visited Sept. 18, 2006).

2    Dr. Molholt calculated cancer risks using the TEF approach for the PCB 126 congener alone. He did not include risks presented by other congeners or contaminants. Accordingly, he stated in his declaration, his risk calculation likely underestimated the risk presented to plaintiffs. Molholt Dec. ¶ 90.

3    The EPA maintains a database including risk assessment information and guidelines, known as the Integrated Risk Information System ("IRIS"). Molholt Dec. ¶ 30; Environmental Protection Agency, Integrated Risk Information System, http://www.epa.gov/iris/ (last visited Sept. 18, 2006).

4    Plaintiffs object to the admission of Attachment 1 to GM's Reply Brief regarding Dr. Molholt and Dr. Dovantzis, Docket No. 414. The court need not address the merits of this objection because the information within this attachment was either not relied upon by the court or was harmless in that it did not undermine plaintiffs' position.

5    Risk assessors express the likelihood of contracting some form of cancer from an EPA Superfund site in a probability form. A 1 in 10,000 chance is expressed as $1 \times 10^{-4}$ or 1E-04. This probability represents the chance that for 10,000 people exposed to the reasonable maximum exposure level of an area, one extra cancer may occur beyond what would have been expected but for the exposure. A $1 \times 10^{-5}$ probability means that for every 100,000 people exposure to the reasonable maximum exposure level, one extra cancer may occur beyond what would have been expected but for the exposure. EPA, Focus on Risk Assessment: Involving the Community, *Superfund Today,* April 1999. A risk level of $10^{-6}$ to $10^{-4}$, or a chance of between 1 in 1,000,000 and 1 in 10,000 has been deemed an acceptable level of risk defined by the EPA for Superfund sites. Shifrin Rep. II at iii.

6    Additionally, the samples from the well water and the fish did not isolate the specific congener PCB 126. See Shifrin Rep. II at 30. Dr. Molholt extrapolated from the total PCB amount detected to PCB 126 using a PCB 126/Total PCB soil ratio calculation that, as explained in Section I-D regarding source analysis, the court also finds unreliable. This is an additional reason supporting the court's findings that Dr. Molholt's risk assessment does not meet Rule 702 standards.

7    Perhaps the best language in *Terra-Products* for plaintiffs is the statement: "For a temporary injury the proper measure of damages is the cost of restoration." 653 N.E.2d at 92, citing *City of Anderson,* 411 N.E.2d at 734. Taken out of context, the language is helpful to plaintiffs, but the court cannot take the language out of its context, including the strong rejection of wasteful damages in *City of Anderson.*

8    On the issue here, the *Johansen* decision stands as good law. The case has a long subsequent history relating to punitive damages. A trial resulted in a jury verdict of $47,000 in compensatory damages and $45 million in punitive damages,

which the district court reduced to $15 million. The district court decision was affirmed in a memorandum decision, 67 F.3d 314 (11th Cir.1995), but was in turn vacated by the Supreme Court and remanded on other grounds for reconsideration of punitive damages issues in light of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *Johansen v. Combustion Engineering, Inc.,* 517 U.S. 1217, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996). On remand, the district court reduced the punitive damages award to $4.35 million, and the Eleventh Circuit affirmed in relevant part, 170 F.3d 1320 (11th Cir.1999).

9    Some courts have found that a claim for medical monitoring costs has been observed to be its own cause of action. The Indiana Court of Appeals' opinion in *Gray* (relied upon by this court in predicting that Indiana law would recognize a medical monitoring claim in a proper case) indicated that Indiana courts would construe a medical monitoring "claim" as a measure of damages after establishing the tort of nuisance. See *Allgood v. General Motors Corp.,* 2005 WL 2218371, at *5.

10    The only exception to this rule was where a tortfeasor had so contaminated a given area as to distort background levels for those in the area such that the egregiousness of the tort would in effect bar the showing necessary for recovery. Under such circumstances, "background" itself would be elevated as a result of a defendant's actions, and therefore exposure levels within background might still demonstrate significant exposure. 113 F.3d at 461. This exceedingly narrow exception, however, did not apply in *Paoli III.*

11    Dr. Carpenter cited the figures as "0.9-1.5 ppb (g/L)." Carpenter Dec. ¶ 25. A measure of grams per liter of blood would be a measure of parts per thousand. The court assumes Dr. Carpenter meant to refer to micrograms per liter, which would be parts per billion.

12    Dr. Hertzstein is a board certified physician and President of Environmental Health Resources, P.C., a consulting company that develops environmental and medical programs. Dr. Hertzstein served on the ATSDR expert panel that developed the final criteria for determining the appropriateness of a medical monitoring program under CERCLA. Hertzstein Rep. II at 2.

13    The basic premise of a "stigma" claim is analogous to the principle that a tortfeasor may be liable for both repairs to a damaged chattel and any residual reduction in value resulting from the fact of its damage and repair. See *Allgood v. Meridian Security Insurance Co.,* 836 N.E.2d 243, 245-46 (Ind.2005) (under common law tort doctrine, a plaintiff whose vehicle has been damaged in an accident may recover from the tortfeasor costs of repair and, if such cost does not make the plaintiff whole, the diminution in value as well), citing Restatement (Second) of Torts § 928 (1977), and *Wiese-GMC, Inc. v. Wells,* 626 N.E.2d 595, 598 (Ind.App.1993).

14    Under Indiana law, a property owner may testify as to his opinion of the value of his own property. *In re Coyle,* 671 N.E.2d 938, 945 (Ind.App.1996); *Jordan v. Talaga,* 532 N.E.2d 1174, 1188 (Ind.App.1989). Plaintiffs have offered their own estimates of the value of their land before the contamination (or, more accurately, before discovery of contamination).

15    These plaintiffs are adults Darren Allgood, Trace Barlow, Benjamin and Brenda Chambers, James and Heidi Dalton, Robert and Rose Fidler, Marjorie Martin, James and Patricia Moss, Dennis and Rehna Neal, Michael and Susan Taylor, and Lana Walker, and the minors designated in the record as C.A., J.B., F.B., E.B., N.D., and R.S.T.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 2

American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by In re McNeil Consumer Healthcare, Marketing and Sales
Practices Litigation, E.D.Pa., July 15, 2011

2010 WL 891150
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

AMERICAN FEDERATION OF
STATE COUNTY AND MUNICIPAL
EMPLOYEES, District Council 47 Health
Andwelfare Fund, et al., Plaintiffs,
v.
ORTHO–McNEIL–JANSSEN
PHARMACEUTICALS,
INC., et al., Defendants.

Civil Action No. 08–cv–5904.
|
March 11, 2010.

West KeySummary

1    Sales 👉 Parties entitled to notice

Buyer of pain medication patch failed to
notify seller of the alleged breach of warranty,
as required to support buyer's claim for
breach of implied and express warranty under
the Pennsylvania Uniform Commercial Code
(UCC). Although seller may have had notice that
its product was defective since it issued a recall
notice, the buyer did not notify the seller that the
transaction was claimed to involve a breach of
warranty. 13 Pa.C.S.A. § 2607(c)(1).

17 Cases that cite this headnote

**Attorneys and Law Firms**

William D. Marvin, Cohen Placitella & Roth, Philadelphia,
PA, for Plaintiffs.

Kathryn E. Deal, David J. Antczak, Edward M. Posner,
Drinker Biddle & Reath LLP, Philadelphia, PA, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

RUFE, District Judge.

**\*1** Plaintiff American Federation of State, County and
Municipal Employees, District Council 47 Health and
Welfare Funds, and Philadelphia Firefighters Union Local
No. 22 Health and Welfare Fund bring this action against
Defendants Ortho–McNeil–Janssen Pharmaceuticals, Inc.
("OMJ"), Sandoz, Inc., and ALZA Corporation ("ALZA"),
alleging violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law ("UTPCPL"), breach of
express and implied warranties, and unjust enrichment.
Before the Court is Defendants' Motion to Dismiss Plaintiffs'
Complaint.[1] For the reasons set forth below, the Motion will
be granted in part and denied in part.

**I. Factual and Procedural Background**

Defendants OMJ and Sandoz, Inc. market and distribute the
fentanyl transdermal system patch ("fentanyl patch"), which
is a Schedule II narcotic, available only through a doctor's
prescription, designed to deliver a steady, controlled dosage
of a powerful medication that provides relief for severe and
chronic pain .[2] ALZA, an affiliate of OMJ, contracted with
OMJ and Sandoz to manufacture and supply fentanyl patches
throughout the United States .[3] OMJ distributes the patches
under the brand name Duragesic and Sandoz distributes the
patches under a generic equivalent.[4] The fentanyl patches are
available in a variety of dosage delivery rates (e.g., 12.5, 25,
50, 75 and 100 micrograms per hour ("mcg/hour")).[5]

On February 12, 2008, OMJ announced a recall of all 25 mcg/
hour Duragesic patches (and its generic equivalent) stamped
with expiration dates on or before December 2009.[6] The
official press release stated, in pertinent part, that:

[The 25mcg/hr fentanyl transdermal system patches] being
recalled may have a cut along one side of the drug
reservoir within the patch. The result is possible release of
fentanyl gel from the gel reservoir into the pouch in which
the patch is packaged, exposing patients or caregivers

American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

directly to fentanyl gel. Fentanyl patches that are cut or damaged in any way should not be used. Exposure to fentanyl gel may lead to serious adverse events, including respiratory depression and possible overdose, which may be fatal....Anyone who has 25 mcg/hr ... fentanyl patches should check the box or foil pouch for the expiration date ... The recalled patches all have expiration dates on or before December 2009. The cut edge in affected patches can be seen upon opening the sealed foil pouch that holds the patch. Affected patches should not be handled directly.[7]

Plaintiffs are health and welfare trust funds that provide medical coverage, including prescription drug coverage, to their members and their members' dependents.[8] Plaintiffs and other similarly situated third-party payors have paid for supplies of 25 mcg/hour fentanyl patches, which were later recalled by Defendants, on behalf of their qualified members.[9] As a result of the recall, Plaintiffs allege that they, and similarly situated third-party payors, paid or will pay expenses related to the purchase and reimbursement of 25 mcg/hour fentanyl patches that had to be discarded.[10]

**\*2** On December 19, 2008, Plaintiffs filed the underlying class-action Complaint, alleging the following: COUNT I: Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); COUNT II: Breach of an Express Warranty under the Pennsylvania Uniform Commercial Code ("UCC"); COUNT III: Breach of an Implied Warranty; and COUNT IV: Rescission / Unjust Enrichment. On March 25, 2009, Defendants filed the instant Motion to Dismiss, asserting several grounds for dismissal of Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court has carefully reviewed Defendants' Motion, Plaintiffs' Response,[11] Defendants' Reply,[12] and all accompanying materials, and this matter is now ready for disposition.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(1) allows a party to move for dismissal of any claim wherein the district court lacks subject matter jurisdiction.[13] When considering a 12(b)(1) motion, the court "review [s] only whether the allegations on the face of the complaint, taken as true, allege sufficient facts to invoke the jurisdiction of the district court."[14] When subject matter jurisdiction is challenged under 12(b)(1), the plaintiff must bear the burden of persuasion.[15]

In order for a plaintiff to have standing in federal court, the case or controversy presented by the plaintiff must be justiciable and establish an injury-in-fact.[16] To establish an injury-in-fact, a plaintiff must allege that: (1) defendant violated a legally protected interest that is concrete and particularized, and actual or imminent—not merely an injury that is "conjectural" or "hypothetical," (2) the injury is fairly traceable to the challenged conduct, and (3) the injury is redressable by a remedy that federal courts are permitted to give.[17] If the complaint fails to satisfy these requirements, "a federal court does not have subject matter jurisdiction ... [and] the claim[s] must be dismissed."[18]

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal for failure to state a claim upon which relief can be granted.[19] Under 12(b)(6), the moving party "bears the burden of showing no claim has been stated."[20] The court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in a light most favorable to the non-moving party."[21] The United States Supreme Court clarified this standard in *Bell Atlantic Corporation v. Twombly*, explaining that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[22] Instead, a plaintiff must allege facts that "raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[23]

## III. Discussion

### A. FRCP 12(b)(1)

**\*3** Relying upon FRCP12(b)(1), Defendants assert that the Court lacks subject matter jurisdiction because Plaintiffs allegedly (1) failed to plead an injury-in-fact sufficient to satisfy Article III standing; (2) lack standing as a "person" under the UTPCPL; and (3) do not fall within the class of buyers or end-users that may recover for a breach of warranty under the Pennsylvania UCC. The Court will address each argument separately below.

#### (i) Injury–In–Fact

Defendants argue that Plaintiffs' Complaint failed to allege that any of their members actually purchased defective fentanyl patches. Defendants assert that unless Plaintiffs

American Federation of State County and Municipal..., Not Reported in...

2010 WL 891150

pled that their members received patches that were actually defective, Plaintiffs' alleged injury is merely conjectural and hypothetical. Defendants further assert that "[p]ayment for a product that is recalled as a precautionary measure because it might have a defect is not the legal equivalent of payment for a product that actually is defective ."[24] In effect, Defendants' arguments attempt to distinguish between patches that were actually defective (*e.g.,* patches that contained a cut on the gel reservoir) and patches that were subject to Defendants' product recall. The Court finds, however, that Defendants' recall notice made no such distinction. The recall notice warned that "[f]entanyl patches that are cut or damaged in any way should not be used," and that "[e]xposure to fentanyl gel may lead to serious adverse events, including respiratory depression and possible overdose, which may be fatal."[25] Plaintiffs pled that as a result of this warning and product recall, they "have paid or will pay expenses related to the purchase of and reimbursement for supplies of 25 mcg/hour fentanyl patches [previously purchased for their members, bearing the relevant expiration dates] that were unusable, worthless, and had to be discarded."[26] These facts, if accepted as true, plead an economic loss that is concrete, particular, and traceable to a defect resulting from Defendants' manufacturing and distribution process, and would permit a remedy if Plaintiffs are successful on the merits.

Additionally, Plaintiffs' claim, as pled, seeks monetary damages for the purchase price of the recalled fentanyl patches, an injury that directly impacts Plaintiffs, not just the consequential damages that their members may incur from exposure to the defective patches.[27] Claims for monetary damages generally satisfy the injury-in-fact threshold.[28] Based on the allegations pled in the Complaint, the Court finds that Plaintiffs have satisfied the injury-in-fact requirements necessary to establish Article III standing.

#### (ii) Standing Under the UTPCPL

Defendants argue, in the alternative, that Plaintiffs are not "persons" under the UTPCPL, and therefore do not have standing to sue, because "[t]hey do not themselves obtain or consume the fentanyl patches in question" nor were their purchases made for primarily "personal, family, or household purposes."[29] Pennsylvania courts, however, have long recognized the ability of third-party trusts and associations to assert UTPCPL claims on behalf of their constituent members based on the statute's broad definition of "person."[30] Section 201–9.2(a) of the UTPCPL permits a private action for the recovery of damages for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money ... as a result of ... [any] act or practice declared unlawful by this act ...."[31] The UTPCPL defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."[32] In addition, the "purpose" requirement of § 201–9.2(a) focuses on whether the final consumer uses the product for personal, family or household use, not whether the third-party entity personally uses the product or merely purchases it.[33]

**\*4** Defendants, nonetheless, rely on *Balderston v. Medtronic Sofamor Danek, Inc.* to support their position.[34] In *Balderston,* the plaintiff-physician filed suit against a manufacturer of surgical screws, which were used on his patients during spinal fusion operations, claiming that the defendant misrepresented the FDA's approval status of the screws. The plaintiff claimed that he had been misled as to the FDA's approval status, and was subsequently exposed to lawsuits. The district court, however, determined that the plaintiff's patients, not the plaintiff, had actually purchased the screws and therefore concluded that plaintiff lacked standing. The district court further concluded that plaintiff could not qualify as a purchaser because any purchase he would have made was for business purposes, not for "personal, family, or household" use.[35] On appeal, the Third Circuit affirmed the district court's findings and noted that plaintiff unequivocally acknowledged that "purchase [of the surgical screw was] by the consumer, the patient ... [and that] neither plaintiff nor his practice [were] ever billed for the screw and [did] not pay for it."[36]

The distinctions between the facts in *Balderston* and the facts as pled before this Court are clear. Whereas in *Balderston,* the plaintiff could in no way be considered a purchaser or even consumer of the goods at issue, Plaintiffs here actually paid for the fentanyl patches *on behalf* of their members for their members' personal, family or household use.[37] This places Plaintiffs in a far different relationship with Defendants that the distant or tangential relationship between the plaintiff and the defendant in *Balderston.* The facts here compel the conclusion that Plaintiffs allegations, as pled in the Complaint, strongly support the position that they have standing as purchasers under the UTPCPL. The Court finds that since Plaintiffs purchased the fentanyl patches on behalf of their members in their representative capacity, and

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 39 of 751
PageID: 11405

American Federation of State County and Municipal..., Not Reported in...

2010 WL 891150

those patches were purchased for the personal, family and household use of their members, Plaintiffs have properly asserted a claim under the UTPCPL.[38]

### (iii) Buyers Under Pennsylvania's UCC

As a third alternative argument for dismissal under FRCP 12(b)(1), Defendants assert that because "plaintiffs merely pay or reimburse some or all of the purchase price of the covered prescription medicines that their members buy and use," Plaintiffs, as third-party payors, do not qualify as "buyers" under Pennsylvania's UCC.[39] Defendants' argument, however, essentially takes a section of the UCC that *extends* warranty protections to relatives and persons in the same household as the buyer, and incorrectly suggests that this section somehow *limits* buyers to only "natural persons."

Section 2103(a) of the UCC defines "buyer" as a "person who buys or contracts to buy goods."[40] Section 1201(b)(27) of the UCC defines "person" as "[a]ny individual; corporation; business trust; estate; trust; partnership; limited liability company; association; joint venture; government; governmental subdivision, agency or instrumentality, public corporation or other legal or commercial entity."[41] Contrary to Defendants' arguments, the definition of "person" under the UCC is not limited to a "natural person;" rather, the UCC uses a very broad definition, which includes corporations, trusts and business trusts. Therefore, the Court finds that Plaintiffs are in fact considered both "persons" and "buyers" under the UCC. Accordingly, each of Defendants' arguments offered to support its motion to dismiss the Complaint for a lack of subject matter jurisdiction are denied.

### B. FRCP 12(b)(6)

**\*5** Relying upon FRCP 12(b)(6), Defendants assert that the Court should dismiss Plaintiffs' Complaint because Plaintiffs failed to state a claim for which relief can be granted by not pleading that: (1) Defendants committed unfair or deceptive acts or practices under the UTPCPL; (2) Plaintiffs provided Defendants reasonable notification of the alleged breach of warranty as required by Title 13 of the Pennsylvania Consolidated Statutes, Section 2607(c)(1); (3) a warranty was actually breached; (4) an express warranty extended to them as third-party medical benefit payors; and (5) Defendants actually received a benefit as required for a claim of unjust enrichment. The Court will address each argument separately below.

### (i) The UTPCPL

Defendants argue that Plaintiffs' UTPCPL claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to: (1) identify, with particularity, a false or deceptive representation made by Defendants that was material to Plaintiffs' coverage decisions and (2) plead justifiable reliance on Defendants' alleged representations. In support of their first point, Defendants assert that in order for Plaintiffs to plead an unfair or deceptive act or practice under the UTPCPL, Plaintiffs must allege that the "defendants made a representation that their patches would invariably be free from defects."[42] The UTPCPL, however, defines unfair or deceptive acts or practices to include representations that "goods ... have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," or representations "that goods ... are of a particular standard, quality, or grade ..., if they are of another."[43] Under both definitions, Plaintiffs allegations in the complaint, if taken as true, sufficiently plead an unfair or deceptive act committed by Defendants. The "unfair and deceptive" act alleged in Plaintiffs' Complaint is Defendants' representation that the recalled fentanyl patches would release the drug at a safe dosage rate. However, due to the defect and subsequent recall, the fentanyl patches could actually release the drug at a significantly higher and more dangerous dosage rate, which rendered the patches useless to Plaintiffs.

As to their second point, Defendants assert that any alleged reliance by Plaintiffs that the fentanyl patches would be completely free from cuts or damage is not "justifiable," especially given that the fentanyl patches packaging included an insert disclaimer, which warned that broken or cut patches could lead to overdose or death.[44] Plaintiffs argue in opposition that the Complaint sufficiently pleads "the type of representations that fall into the traditional scope of consumer protection statutes—where a product seller promises one thing but delivers another."[45] Plaintiffs assert in the Complaint that Defendants represented to end-users, physicians and third-party payors that the fentanyl patches were designed to safely release the prescription drug at a rate of 25 mcg/hour. However, because of the manufacturing defect, the patches potentially released the drug at an excessive, possibly fatal, rate. Accordingly, the Court finds that Plaintiffs sufficiently alleged that Defendants committed unfair or deceptive acts or practices under the UTPCPL and Plaintiffs sufficiently pled justifiable reliance on the alleged unfair or deceptive acts in their Complaint.

American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

### (ii) Breach of Implied and Express Warranty Under Pennsylvania UCC

**\*6**  Defendants argue that Plaintiffs' breach of express and implied warranty claims should be dismissed for failure to state a claim upon which relief can be granted because Plaintiffs failed to allege in their Complaint that they notified Defendants of the breach of warranty. Under § 2607(c)(1) of the UCC, a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."[46] Defendants argue that "[t]he purpose of the notice requirement is to afford the seller a reasonable time within which to cure the breach or settle the claim."[47] Plaintiffs argue in opposition that Defendants cannot complain of a lack of notice for the breach of warranty, as it was Defendants themselves who first gave notice to the purchasers that the fentanyl patches were defective through the recall notice. According to Plaintiffs, "Defendants were already well aware of the breach and had an opportunity to make good."[48]

Plaintiffs' argument, however, that notification under § 2607(c) is unnecessary because Defendants had actual and constructive knowledge of the breach, is not supported by the language of the UCC, its statutory purpose, or existing case law interpreting § 2607. Plaintiffs appear to confuse the term "notice" with "notify"—which the UCC explicitly distinguishes. Under UCC § 1202(a), a person has *notice* of a fact when the person has actual knowledge of it, has received notification of it, or, from all of the facts and circumstances known to that person at the time in question, has reason to know it exists.[49] On the other hand, § 1202(d) defines *notify* to mean "give a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it."[50]

The purpose of notification under § 2607(c)(1) is not intended to merely make the seller aware of the breach; rather, the notification must "inform [ ] the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."[51] Thus, the purpose of notification under § 2607(c) is to allow the seller an opportunity to resolve the dispute regarding an alleged breach before the buyer initiates a lawsuit. Therefore, even assuming that Defendants were aware that the fentanyl patches were defective, Defendants may not have been aware of Plaintiffs' intent to file a class action lawsuit, and were denied the opportunity to negotiate or settle this claim without judicial involvement. To "notify" under the UCC requires the affirmative act of notification, and Section 2607(c) (1) explicitly requires the buyer to "notify the seller of breach or be barred from any remedy."[52] Plaintiffs' "constructive notice" argument does not address whether Plaintiffs ever actually and affirmatively notified Defendants of the breach, as required by § 2607(c)(1), prior to initiating this litigation.

**\*7**  Additionally, the Third Circuit recently analyzed § 2607(c) of the UCC in *Vanalt Electrical Construction, Inc. v. Selco Manufacturing Corporation,* and concluded that a "review of Pennsylvania precedent and other authorities interpreting the UCC indicates that the Pennsylvania Supreme Court would agree that a buyer must prove compliance with Section 2607 before recovering for a breach of contract or warranty involving nonconforming goods...."[53] Here, the Court must also treat the § 2607(c) reasonable notification requirement as a condition precedent to recovery, with Plaintiffs bearing the burden to prove that reasonable notification was given. As reasonable notification is a material element necessary to sustain recovery of a UCC breach of warranty claim, Plaintiffs were required to affirmatively allege that they reasonably notified Defendants.[54] Inasmuch as § 2607(c) bars a buyer's recovery absent the buyer providing reasonable notification of the breach, it follows that a buyer must also plead, at a minimum, in its Complaint, that it provided reasonable notification in order to state a viable claim for recovery.[55] Plaintiffs were not required to allege in the Complaint that the notification occurred in any substantial form (such as a letter or a formal demand), as the "reasonableness" of the notice is a factual matter left for the jury to resolve. However, Plaintiffs needed to allege, at a minimum, that they notified Defendants in some manner "or be barred from any remedy."[56] The Court finds that Plaintiffs failed to allege that they provided Defendants with notification as required by § 2607(c)(1) of the UCC. As such, the Court further finds that Plaintiffs' breach of express and implied warranty claims should be dismissed under FRCP 12(b)(6).

### (iii) Unjust Enrichment

Defendants also argue that Plaintiffs' unjust enrichment claim should be dismissed for failure to state a claim upon which relief can be granted. To satisfy the pleading requirements of unjust enrichment, the plaintiff must allege the following

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 41 of 751
PageID: 11407
American Federation of State County and Municipal..., Not Reported in...
2010 WL 891150

elements in its complaint: (1) a benefit conferred upon one party by another, (2) appreciation of the benefit by the recipient, and (3) acceptance and retention of the benefit under circumstances that would make it inequitable or unjust for the recipient to retain the benefit without payment of value.[57]

Defendants offer two distinct arguments to defeat Plaintiffs' unjust enrichment claim. First Defendants assert that when an unjust enrichment claim is based upon tortious conduct, and the court dismisses the tort claims based upon the same conduct, the court must also dismiss the unjust enrichment claim as it "is essentially another way of stating a traditional tort claim."[58] The Court finds, however, that this argument is inconsequential and cannot constitute a basis for dismissal in this instance because the Court does not dismiss Plaintiffs' UTPCPL claim.

Second, Defendants assert that Plaintiffs, as third-party payors obligated to reimburse their members' prescription drug expenses, did not confer a "benefit" to Defendants in any way recognized under the law and that "any 'benefit' inured to [D]efendants was merely 'incidental' to [P]laintiffs' performance of their independent contractual obligations."[59] To support this argument, Defendants rely on *Allegheny General Hospital v. Phillip Morris, Inc.*[60] The facts of *Allegheny General,* however, are distinguishable: *Allegheny General* involved a hospital's expenses to treat tobacco-related illnesses caused by the patient's prolonged tobacco use. The hospital and tobacco companies had no preexisting relationship, and the hospital did not directly pay the tobacco companies for any products or services. Under such circumstances, the Third Circuit found that the benefit conferred to the tobacco companies was too incidental or remote to establish a claim of unjust enrichment.[61] Here, however, as pled in the Complaint, Plaintiffs directly paid for or reimbursed the purchase costs of fentanyl patches on behalf their members. The benefit in this case is not remote or incidental; rather, the benefit (the amount paid by Plaintiffs to Defendants for defective fentanyl patches) is direct and measurable.

**\*8** Plaintiffs' Complaint alleges that Defendants "reaped substantial profits from the sale of defective fentanyl

patches," and that "Defendants' profits would have been reduced, but for their wrongful and unlawful conduct."[62] Otherwise stated, Plaintiffs pled that they conferred a monetary benefit to Defendants, that Defendants appreciated the benefit, and that the Defendants retained the benefit under inequitable circumstances. The Court finds that these factual allegations, if taken as true, sufficiently plead a claim of unjust enrichment. Accordingly, Defendants' arguments offered to support its motion to dismiss the Complaint for failure to state a claim upon which relief can be granted are denied as to Plaintiffs' unjust enrichment and UTPCPL claims and granted as to Plaintiffs' breach of express and implied warranty claims.

**IV. Conclusion**
For the foregoing reasons, Defendants' Motion to Dismiss Counts II and III for Plaintiffs' failure to plead reasonable notification as required by 13 Pa. Cons.Stat. § 2607(c) is hereby granted. Defendants' remaining general and specific grounds for dismissal under FRCP 12(b)(1) and 12(b)(6), particularly as to Counts I and IV, are hereby denied.

An appropriate order follows.

**ORDER**

**AND NOW,** this 11th day of March 2010, upon consideration of Defendants' Motion to Dismiss [docket entry No. 14]; Plaintiffs' Answer to Defendants' Motion to Dismiss [docket entry Nos. 15 and 16]; and Defendants' Reply [docket entry No. 19], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS I** and **IV** is **DENIED.** Defendants' Motion to Dismiss Plaintiffs' **COUNTS II** and **III** is **GRANTED. Counts II** and **III** are hereby **DISMISSED.**

It is so **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 891150

**Footnotes**

1        Document No. 14.

American Federation of State County and Municipal... Not Reported in...

2010 WL 891150

2     Compl. [Document No. 1] ¶¶ 6–7, 16.

3     *Id.* ¶ 8.

4     *Id.*

5     *Id.*

6     *Id.* ¶ 19.

7     Defs.' Mot. to Dismiss, Ex. A; *see also* Compl. ¶ 20.

8     Compl.¶¶ 1–2.

9     *Id.* ¶ 21.

10    *Id.* ¶ 23.

11    Document No. 15.

12    Document No. 19.

13    Fed. R. Civ. P. 12(b)(1) (West 2009 Revised).

14    *Licata v. U.S. Postal Serv.,* 33 F.3d 259, 260 (3d Cir.1994).

15    *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

16    *See Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

17    *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

18    *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006).

19    Fed. R. Civ. P. 12(b)(6) (West 2009 Revised).

20    *Kehr Packages,* 926 F.2d at 1409.

21    *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989).

22    550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted).

23    *Id.* (citations omitted).

24    Defs.' Mot. at 8.

25    Defs.' Mot., Ex. A; *see also* Compl. ¶ 20.

26    Compl. ¶¶ 21, 23.

27    Compl. at 13–14; *see also* Pls.' Answer to Defs.' Mot. to Dismiss at 5.

28    *See Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286, 293 (3d Cir.2005).

29    Defs.' Mot. at 10–11.

30    *See Commonwealth v. TAP Pharmaceutical Products, Inc.,* 885 A.2d 1127,1142–1143 (Pa.Commw.2005) (definition of "person" under § 9.2(a) includes third-party medical benefit payors); *See also Valley Forge Towers South Condominium v. Ron–Ike Foam Insulators, Inc.,* 393 Pa.Super. 339, 574 A.2d 641, 644–645 (Pa.Super.1990) ("associations" were explicitly included within the definition of "person" under § 202–2(2) and that even though the breach of warranty claim for defective roofing membranes affected the individual unit owners the association represented, the condominium association could assert a claim as a "person" under § 9.2(a)).

31    73 Pa. Stat. § 201–9.2(a) (2010 Electronic Update).

32    *Id.* § 201–2(2).

33    *See TAP Pharm. Prods.,* 885 A.2d at 1142–1143; *See also Valley Forge Towers,* 574 A.2d at 649.

34    285 F.3d 238 (3d Cir.2002) (a surgeon filed a UTPCPL claim against the manufacturer of pedicle screws, which were used on his patients during various surgical procedures. The Third Circuit held the surgeon did not qualify as a "person" under the UTPCPL because his patients actually purchased the screws, and even if he had directly purchased the screws, the court reasoned that he purchased them primarily for business purposes).

35    *Id.* at 240.

36    *Id.* at 241.

37    *See* Compl. ¶¶ 26, 35.

38    *See TAP Pharm. Products,* 885 A.2d at 1142–1143 (distinguishing *Balderston* from the Commonwealth's third-party payor programs); *see also Valley Forge Towers,* 574 A.2d at 649.

39    Defs. Mot. at 14–15.

40    13 Pa. Cons.Stat. § 2103(a) (2010 Electronic Update).

41    *Id.* § 1201(b)(27).

42    Defs.' Mot. at 12.

American Federation of State County and Municipal... Not Reported in...

2010 WL 891150

43    73 Pa. Stat. § 201–2(4)(v), (vii).

44    Defs.' Mot. at 13.

45    Pls.' Answer at 11.

46    13 Pa. Cons.Stat. § 2607(c)(1).

47    Defs.' Mot. at 16.

48    Pls.' Answer at 14.

49    13 Pa. Cons.Stat. § 1202(a).

50    Id. § 1202(d).

51    Id. § 2607 cmt. 4; see also Beneficial Comm. Corp. v. Brueck, 23 Pa. D. & C.3d 34, 37 (Pa.Ct.Comm.Pl.1982) ("Section 2607(c)'s requirement that the buyer notify the seller of the breach within a reasonable time after he discovers or should have discovered the breach gives the manufacturer the opportunity to cure the defect, settle the claim through negotiation, and gather information that may assist in defending the claim.").

52    Id. § 2607(c)(1).

53    233 Fed. Appx. 105, 111 (3d Cir.2007) (held in a dispute over the sale of goods, the buyer must prove compliance with the notice requirement of Section 2607" and that "reasonable notification is a precondition to the buyer's recovery for breach", with the buyer bearing the burden to prove its requirements).

54    See Vanalt, 233 Fed. Appx. at 111; See also Twombly, 550 U.S. at 562 (quoting Car Carriers v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir.1984) (a complaint " 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory' ").

55    Section 2607(c)(1) requires the buyer to "within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any recovery." 13 Pa. Cons.Stat. § 2607(c)(1).

56    See Id.; see also Vanalt, 233 Fed. Appx. at 112.

57    Allegheny Gen. Hosp. v. Phillip Morris, Inc., 228 F.3d 429, 447 (3d Cir.2000).

58    Defs.' Mot. at 19.

59    Id. at 20.

60    228 F.3d at 434, 446–448. (held a hospital's claim of unjust enrichment filed against certain tobacco companies was based on remote and indirect injuries, consequently the tobacco companies had no legal obligation to pay the non-paying patients' medical expenses, and whatever "incidental benefit" the tobacco companies received was insufficient to establish a claim of unjust enrichment).

61    Id.

62    Compl. ¶ 49.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 3

448 F.Supp.3d 441
United States District Court, E.D. Pennsylvania.

Melanie ATKINSON, Plaintiff,

v.

LUITPOLD PHARMACEUTICALS, INC.,
American Regent, Inc., Daiichi Sankyo,
Inc., Daiichi Sankyo Co., Ltd., and Vifor
Pharmaceuticals Management, Ltd., Defendants.

CIVIL ACTION NO. 19-277
|
Signed 03/23/2020

**Synopsis**

**Background:** Consumer brought action against drug manufacturer, asserting claims for negligence and failure to warn, based on allegations that she suffered and would likely suffer severe and permanent injuries and damages as result of taking injectable medication to treat her iron deficiency anemia. Manufacturer moved to dismiss.

**Holdings:** The District Court, Wendy Beetlestone, J., held that:

[1] federal law preempted statutory exception to rebuttable presumption of adequacy of drug warning labels approved by the Food and Drug Administration (FDA), and

[2] consumer failed to state claims for negligence to extent they were premised on theory of failure to properly test.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (7)

[1]  **States** 🗝 Conflicting or conforming laws or regulations

Under the Supremacy Clause, state law that conflicts with federal law is without effect. U.S. Const. art. 6, cl. 2.

1 Cases that cite this headnote

[2]  **States** 🗝 Preemption in general

There are three categories of preemption: (1) express preemption, (2) field preemption, and (3) conflict or impossibility preemption.

1 Cases that cite this headnote

[3]  **States** 🗝 Preemption in general

Conflict preemption is for a judge to decide, not a jury.

[4]  **States** 🗝 Conflicting or conforming laws or regulations

In deciding whether conflict preemption requires the dismissal of a claim, the judge must simply ask whether the relevant federal and state laws irreconcilably conflict.

[5]  **Products Liability** 🗝 Drugs in general
   **Products Liability** 🗝 Warnings or instructions
   **States** 🗝 Product safety; food and drug laws

Federal law preempted statutory exception to section providing rebuttable presumption of adequacy of drug warning labels approved by the Food and Drug Administration (FDA), in consumer's action against drug manufacturer alleging failure to warn of risk of phosphate level disorder from use of injectable drug prescribed to treat iron deficiency anemia; because statutory exception required plaintiffs to prove fraud on the FDA, it existed solely by virtue of federal Food, Drug, and Cosmetic Act (FDCA) disclosure requirements and in effect asked court, rather than FDA itself, to determine what was required, material, and relevant to the FDA. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; 🚩 Tex. Civ. Prac. & Rem. Code Ann. § 82.007(b)(1).

1 Cases that cite this headnote

**[6]**  **Products Liability** 👉 **Inspection or test**

Under Texas law, a manufacturer has a duty to test its product, and the extent of research must be commensurate with the dangers involved; thus, in Texas there is an independent cause of action based on negligent failure to test.

1 Cases that cite this headnote

**[7]**  **Products Liability** 👉 **Inspection or test**
**Products Liability** 👉 **Drugs in general**

Consumer failed to state claims for negligence against drug manufacturer, arising from purported adverse effects she suffered after receiving injection medication to treat her iron deficiency anemia, to extent such claims were premised on theory of failure to properly test, where consumer made merely conclusory allegations that manufacturer failed to perform reasonable pre- and post-marketing testing of the product to investigate drug's propensity to cause severe phosphate depletion disorder.

**West Codenotes**

**Preempted**

🚩 Tex. Civ. Prac. & Rem. Code Ann. § 82.007(b)(1)

**Attorneys and Law Firms**

**\*442** Michael G. Daly, Gabriel C. Magee, Jeannine M. Kenney, Pogust Millrood, LLC, Conshohocken, PA, for Plaintiff.

Heather C. Giordanella, Kenneth A. Murphy, Michael C. Zogby, Randall L. Christian, Faegre Drinker Biddle & Reath LLP, Philadelphia, PA, for Defendants.

Wendy Beetlestone, J., WENDY BEETLESTONE, J.

**\*443 OPINION**

Plaintiff Melanie Atkinson brings negligence, fraud, strict liability, breach of warranty, and breach of consumer protection law claims following purported adverse effects she suffered after receiving injections of Injectafer, a medication prescribed to treat iron deficiency anemia. Defendants American Regent, Inc., formerly known as Luitpold Pharmaceuticals, Inc.,[1] Daiichi Sankyo, Inc., and Daiichi Sankyo US Holdings, Inc. (collectively, "Defendants") move to dismiss most of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**I. FACTS**[2]

Injectafer is an iron replacement injection medication brought to market in the United States by Defendants for the treatment of iron deficiency anemia ("IDA") in adult patients who have intolerance to oral iron. The injection is to be administered intravenously in two doses separated by at least seven days.

Injectafer is one of several products available for intravenous iron but is the only such product available in the United States formulated with the unique ferric carboxymaltose ("FCM") compound. FCM can cause a condition called severe hypophosphatemia ("Severe HPP"). Hypophosphatemia is an abnormally low level of phosphate in a person's blood, and the condition can be mild, moderate, severe, or persistent. Severe HPP has dangerous effects including muscle weakening, fatigue, severe nausea, and possible medical complications including cardiac arrest, respiratory failure, arrhythmias, and rhabdomyolysis (muscle breakdown).

Prior to its approval in the United States, FCM was available on the European and other markets under the brand name Ferinject—designed, manufactured, promoted, and sold by Defendant Vifor Pharmaceuticals. (Vifor licensed and continues to license FCM to all other Defendants.) During FCM's presence on the European and United States markets, dozens of case reports and pieces of medical literature emerged that revealed the link between FCM and Severe HPP. The studies, of which Defendants were on notice, revealed an increasing number of case reports of intravenous-iron patients developing Severe HPP. In one study, all 18 cases of severe and life-threatening HPP developed after administration of FCM. In another study, of the 78 patients taking FCM, 51% developed HPP, including 13% with Severe HPP. Defendants also had knowledge of the link between Injectafer and Severe HPP from their own clinical studies.

When Luitpold Pharmaceuticals, Inc. ("Luitpold") first submitted a New Drug Application for Injectafer to the Food and Drug Administration ("FDA") in 2006, it received a non-approvable letter in response **\*444** due to the FDA's

Atkinson v. Luitpold Pharmaceuticals, Inc., 448 F.Supp.3d 441 (2020)

Prod.Liab.Rep. (CCH) P 20,862

clinical safety concerns. Luitpold applied again in September 2007 and received another non-approvable letter, which cited "clinically important hypophosphatemia" as a concern. Injectafer eventually received FDA approval, and in 2013 Defendants brought Injectafer to the United States market.

Since then, Injectafer's label has at all times omitted any reference to "Severe HPP" or "clinically important hypophosphatemia." [3] HPP is not listed in the warning sections or in any kind of "black box" warning, but instead is listed as an "adverse reaction" occurring in less than two percent of patients. From July 2013 until January 2018, the Patient Information leaflet referred to "asymptomatic reductions in blood phosphorus." In January 2018, Defendants removed the term "asymptomatic" and simply listed "low levels of phosphorous in your blood" in the leaflet. The "Adverse Reactions in Clinical Trials" section of the labeling refers to "transient decreases in laboratory blood phosphorous levels (<2 mg/dl)." The labeling makes no reference to clinical conditions associated with Severe HPP, including cardiac arrest, respiratory failure, arrhythmias, and rhabdomyolysis (muscle breakdown). The labeling also does not reference FCM's known effect on the FGF23 hormone, which is associated with a decrease in blood phosphorous and can induce HPP.

Plaintiff, a Texas resident, was prescribed Injectafer for the treatment of her IDA at the Medical Clinic of Houston in Houston, Texas. She received her first Injectafer injection at the clinic on or around October 20, 2016. After that injection, Plaintiff's blood phosphate levels dropped to 1.0 mg/dl, as measured on November 21. She was subsequently diagnosed with HPP, was hospitalized multiple times, and suffered from severe nausea, severe weakness and pain, and severe and constant fatigue. She took a leave of absence from work and was only able to return after several months on limited duties. Plaintiff filed this suit, alleging that she suffered and likely will continue to suffer severe and permanent injuries and damages as a result of taking Injectafer. Defendants have now moved to dismiss all claims, in whole or in part.

## II. LEGAL STANDARDS

When evaluating a complaint on a motion to dismiss factual allegations are scrutinized under Rules 8(a) and 12(b)(6) to determine if the allegations and inferences proposed from those allegations are plausible. *See Ashcroft v. Iqbal, 556 U.S. 662, 683, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).* "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *See id.* at 678, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*).

"In light of *Twombly,* 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed] **\*445** conduct.' " *Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 177 (3d Cir. 2010)* (quoting *Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)*). "[R]ote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements" are disregarded. *James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012).* The relevant question is not whether the claimant "will ultimately prevail...but whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer, 562 U.S. 521, 531, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011).*

## III. ANALYSIS [4]

Plaintiff's Complaint includes 11 numbered claims. Each claim contains some or all of the following theories: that Defendants designed, developed, manufactured, marketed, promoted, monitored, labeled, sold, and distributed Injectafer while knowing or reasonably suspecting that the drug was dangerous. Count II is a negligent failure-to-warn claim. Count III is a negligent design defect claim. Count IV is a negligent misrepresentation claim. Count I is a catch-all negligence claim, which uses all the aforementioned theories to allege Defendants had a duty of care to patients and physicians which they breached in developing and distributing a drug they knew to be unreasonably dangerous without adequate warnings. Count V is a fraud claim, alleging Defendants falsely represented Injectafer to patients and doctors by concealing its known risks to induce more Injectafer prescriptions. Counts VI and VII are strict liability claims for failure to warn and for design defect, respectively. Count VIII is a breach of express warranty claim, alleging Defendants represented through language in their labeling, advertising, and marketing materials that Injectafer was safe for patient use. Count IX is a breach of implied warranty claim, alleging that Defendants implied through their labeling, advertising, and marketing that Injectafer was safe. Count X is a breach of state consumer protection laws claim, alleging Defendants deceived patients by claiming

Injectafer was safe and advertising the drug in a way that created misunderstandings about its risks. Count XI is a gross negligence claim. Additionally, Plaintiff seeks punitive damages.

In her brief in opposition to the motion to dismiss, Plaintiff states that she is no longer pursuing Count III (negligent design defect), Count IV (negligent misrepresentation), Count VIII (breach of express warranty), Count IX (breach of implied warranty), and Count X (breach of consumer protection laws). Those claims will accordingly be dismissed with prejudice.

### A. Preemption

Defendants argue that any of Plaintiff's claims that are premised on a failure to warn are preempted by federal law in that they boil down to the theory that Injectafer should have been labeled and designed differently despite FDA approval of the existing label and design.[5]

**\*446** **[1]** **[2]** The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." *U.S. Const., Art. VI, cl. 2*. State law that conflicts with federal law is therefore "without effect." *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 475, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). There are three categories of preemption: (1) express preemption, (2) field preemption, and (3) conflict or impossibility preemption, *see* *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381 (3d Cir. 1999), but only the last one is at issue here.

**[3]** **[4]** Conflict preemption is "for a judge to decide, not a jury." *Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S. Ct. 1668, 1672, 203 L.Ed.2d 822 (2019); *see also* *id. at 1678* (noting that "the complexity" of the legal discussion "helps to illustrate why" conflict preemption should be determined by a judge). Indeed, when conflict preemption presents a purely legal issue, the Court may decide it on a *Rule 12* motion. *See, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623-24, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011); *Riegel v. Medtronic*, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008); *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). In deciding whether conflict preemption requires the

dismissal of a claim, the judge must "simply ask...whether the relevant federal and state laws 'irreconcilably conflict.' " *Merck*, 139 S. Ct. at 1679 (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)).

In a motion to dismiss a related case, *Crockett,* Defendants made the same preemption argument.[6] They argued that the FDA approval process was "onerous" and "lengthy" and referred to two non-approvable letters from the FDA which cited concerns about "clinically important hypophosphatemia[,]" but they did not argue or point to any evidence that they proposed a stronger warning to the FDA or that the FDA would have rejected a different warning label. *Crockett*, 2020 WL 433367, at \*8. Accordingly, the Court held that Defendants had not met the standard for impossibility preemption to show that they "fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning." *Id.* (quoting *Merck*, 139 S. Ct. at 1678). Because Defendants had not met their burden, the Court found that a ruling on preemption with respect to Plaintiff's failure-to-warn and defective design claims would be premature. *Id.* Defendants here advance the same preemption arguments, based on the same federal law and a complaint that is identical to the one in *Crockett* in all legally material ways. Because the same analysis applies here, the pre-approval design-defect claim is not preempted. However, this case presents an additional and unique preemption question because (as the parties agree) Texas law is the substantive law of the case and *Section 82.007 of the Texas Civil Practice & Remedies Code* implicates Plaintiff's failure-to-warn claims. *See* *Tex. Civ. Prac. & Rem. Code § 82.007(a)(1)*. More specifically, Defendants argue that each of Plaintiff's claims which are premised on a failure-to-warn theory are barred by *Section 82.007*, pursuant to which "a drug manufacturer **\*447** enjoys a rebuttable presumption that it is not liable for failure to warn if the [Federal Drug Administration ("FDA") ] has approved 'the warnings of information' accompanying the product alleged to have harmed the Plaintiff." *Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 374 (5th Cir. 2012).

#### i. The Texas Statute

🚩 Section 82.007, which was adopted as a tort reform measure to restrict certain common law claims concerning FDA-approved drugs, gives drug manufacturers a rebuttable presumption in products liability cases that they are not liable for failure-to-warn claims if the FDA has approved the product's warning label. *See* 📄 *id.* at 374, 376. 🚩 Section 82.007(a)(1) creates a statutory presumption that drug manufacturers are not liable for failure-to-warn claims if the FDA has approved the drug's label. Specifically:

> In a products liability action alleging that an injury was caused by a failure to provide adequate warnings of information with regard to a pharmaceutical product, there is a rebuttable presumption that the defendant or defendants...are not liable with respect to the allegations involving failure to provide adequate warnings or information....

*Id.* § 82.007(a)(1).

Included in the statute are five limited ways to rebut this presumption: (1) if the defendant withheld from or misrepresented material information to the FDA; (2) if the drug was sold after an order from the FDA to remove the product from the market; (3) if the product was used as recommended or advertised, and the injury was causally related to the promoted use; (4) if the defendant prescribed the drug for an indication not approved by the FDA; or (5) if the defendant bribed a public official before or after approval, causing the warnings to be inadequate. *Id.* § 82.007(b)(1)-(5). Plaintiff argues that the first exception, which provides as follows, applies to her and she has therefore rebutted the statutory presumption:

> the defendant, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the United States Food and Drug Administration

required information that was material and relevant to the performance of the product and was causally related to the claimant's injury.

*Id.* § 82.007(b)(1). Defendants argue that this exception is preempted by 📄 *Buckman* and therefore all of Plaintiff's claims that are rooted in a failure-to-warn theory—Count I (negligence), Count II (negligent failure-to-warn), Count V (fraud), Count VI (strict liability failure-to-warn), and Count XI (gross negligence)—should be dismissed as a matter of law.

#### ii. Buckman and Its Progeny

In 📄 *Buckman,* the Supreme Court considered whether the Federal Food, Drug, and Cosmetic Act ("FDCA") preempted state "fraud-on-the-FDA" claims. The plaintiffs alleged that a medical device manufacturer obtained FDA approval by making fraudulent misrepresentations to the agency; their sole claim was a fraud-on-the-FDA state law tort. *See* 📄 *Buckman,* 531 U.S. at 343, 121 S.Ct. 1012. The Court explained that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," and thus the traditional presumption against federal preemption of a state law did not apply in the fraud-on-the-FDA context. 📄 *Id.* at 347, 121 S.Ct. 1012 (internal quotations omitted). Thus, state law causes of action that are contingent upon the defendant making fraudulent representations to the FDA conflict with federal law and are, accordingly, **\*448** preempted. 📄 *Id.* at 348, 121 S.Ct. 1012.

The 📄 *Buckman* Court premised its analysis on "the relationship between a federal agency and the entity it regulates[, which] is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." 📄 *Id.* at 347, 121 S.Ct. 1012. If state law fraud-on the FDA claims were permitted to proceed, the federal statutory scheme which empowers the FDA to investigate, punish and deter fraud would be skewed. 📄 *Id.* at 348, 121 S.Ct. 1012. The flexibility and responsibility that the FDA has to take a measured response to fraud by seeking injunctive relief, pursuing civil penalties,

criminally prosecuting, and seizing improperly approved
product is a critical part of that statutory and regulatory
framework. *Id.* at 349, 121 S.Ct. 1012. Permitting state-
law fraud-on-the-FDA claims would "inevitably conflict"
with those FDA responsibilities. *Id.* at 350, 121 S.Ct.
1012. Furthermore, if state law fraud-on-the FDA state law
claims were viable, those who sought approval from the FDA
for a product would be incentivized to submit a "deluge
of information that the [FDA] neither wants nor needs,
resulting in additional burdens on the FDA's evaluation of an
application[,]" *id.* at 351, 121 S.Ct. 1012, all for fear that a
state court may some day find their submission lacking even if
the FDA had found it sufficient. Finally, the Court found that
because fraud-on-the FDA claims exist "solely by virtue" of
federal disclosure requirements and not through "traditional
state tort law" there was a distinction to be made between the
*Buckman* scenario and that found in *Medtronic v. Lohr,
Inc.*, 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700
(1996), in which the Court held that certain state-law causes
of action that paralleled federal safety requirements could
proceed without being preempted. 531 U.S. at 353-54,
121 S.Ct. 1012. The Court reaffirmed this distinction in
*Wyeth v. Levine*, 555 U.S. 555, 565 n.3, 129 S.Ct. 1187, 173
L.Ed.2d 51 (2009), stating that *Buckman* "involved state-
law fraud-on-the-agency claims, and the Court distinguished
state regulation of health and safety as matters to which the
presumption [against preemption] does apply."

Turning now to the effect of *Buckman* on Section 82.007
of the Texas Code: Although a handful and some cases
have evaluated whether it (or another substantially similar
Michigan statute) is preempted by the *Buckman* rationale,
the Third Circuit has not. And, the decided cases, none of
which are binding on this Court, are not in accord. Some have
found preemption. *See Lofton*, 672 F.3d at 380; *Garcia
v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004);
*Gonzalez v. Bayer Pharms.*, 930 F. Supp.2d 808, 816 (S.D.
Tex. 2013); *Murthy v. Abbott Labs.*, 847 F. Supp.2d 958,
976 (S.D. Tex. 2012); *Henderson v. Merck & Co.*, 2005
WL 2600220 (E.D. Pa. Oct. 11, 2005). Others have found
no preemption. *See Desiano v. Warner-Lambert & Co.*,
467 F.3d 85, 97-98 (2d Cir. 2007); *Yocham v. Novartis
Pharms. Corp.*, 736 F. Supp.2d 875, 887 (D.N.J. 2010); *Tigert

v. Ranbaxy Pharms., Inc.*, 2012 WL 6595806 (D.N.J. Dec. 18,
2012).

The only case to have directly considered the question
is *Lofton*, in which the sole issue presented to the
Fifth Circuit was the effect of *Buckman* on Section
82.007(b)(1). *See* 672 F.3d at 375. Christopher Lofton
died after ingesting an FDA-approved, over-the-counter pain
medication. His family sued the manufacturer for failure-
to-warn under negligence and strict liability theories. *Id.*
at 373-74. The defendants moved for summary judgment,
asserting that the failure-to-warn claims which were subject
to the fraud-on-the **\*449** FDA proof requirement of Texas
law were preempted by *Buckman*. *Id.* at 374-75. The
district court granted summary judgment, and the plaintiffs
appealed. *Id.* at 375.

The Fifth Circuit first analyzed whether the presumption
against preemption should apply. *Id.* at 378. Because
police powers traditionally belong to the states rather than the
federal government, the Supreme Court has recognized "the
historic primacy of state regulation on matters of health and
safety" and applied a presumption against federal preemption
in the pharmaceutical drug context. *See Medtronic*, 518
U.S. at 485, 116 S.Ct. 2240; *see also Wyeth*, 555 U.S. at
565, 129 S.Ct. 1187. But the Supreme Court in *Buckman*
did not apply a presumption against preemption given the
singular relationship between a federal agency and the entity
it regulates. 531 U.S. at 347-48, 121 S.Ct. 1012. Given
the "uniquely federal" interest the FDA has in policing fraud
against itself, no presumption was warranted in *Buckman*.
*Id.* at 348, 121 S.Ct. 1012. *Lofton*, in turn, relied on
*Buckman*'s language to conclude that "the primacy of
the state's police powers is not universal[.]" 672 F.3d
at 378. Without assessing "the current scope or existence
of the presumption against preemption," the Fifth Circuit
took "refuge in the conclusion that because § 82.007(b)
(1) requires a Texas plaintiff to prove fraud-on-the-FDA to
recover for failure to warn this requirement invokes federal
law supremacy according to *Buckman*." *Id.* at 379.

Atkinson v. Luitpold Pharmaceuticals, Inc., 448 F.Supp.3d 441 (2020)

Prod.Liab.Rep. (CCH) P 20,862

Next, the Fifth Circuit analyzed whether 🚩 Section 82.007 is an "expression of traditional state common law." 🏴 *Id.* "Traditional state tort law principles of the duty of care" are different from "any sort of fraud-on-the-agency theory[,]" with the former sometimes being allowed to proceed without being preempted, while the latter being impermissible if they "exist solely by virtue of the FDCA disclosure requirements." *See* 🏴 *Buckman*, 531 U.S. at 348-53, 121 S.Ct. 1012. The Fifth Circuit concluded that 🚩 Section 82.007(b)(1) was in the latter, impermissible category. *See* 🚩 672 F.3d at 379. Because 🚩 Section 82.007(b)(1) requires a plaintiff to establish that a manufacturer withheld "required information that was material and relevant" from the FDA, this language both hinges on FDCA disclosure requirements and would require a court—*rather than the FDA itself*—to determine what is required, material, and relevant to the FDA. 🏴 *Id.* In establishing a violation of FDA disclosure requirements, a plaintiff "necessarily re-treads the FDA's administrative ground." 🏴 *Id.* at 380. Moreover, when the FDA itself has not found fraud, allowing courts "to interject varying views on what disclosures are sufficient" would interfere with the agency's processes—the very concern expressed in 🏴 *Buckman*. 🏴 *Id.* at 380; *see also* 🏴 *Buckman*, 531 U.S. at 348-350, 121 S.Ct. 1012. The Fifth Circuit therefore held that 🚩 Section 82.007(b)(1) "is preempted unless the FDA itself has found fraud." 🏴 *Id.* Subsequent Texas district court opinions followed 🏴 *Lofton* in finding that 🚩 Section 82.007(b)(1) was preempted. *See* 🏴 *Gonzalez*, 930 F. Supp.2d at 816; 🏴 *Murthy*, 847 F. Supp.2d at 976.

The Sixth Circuit, relying on similar reasoning, also found 🏴 *Buckman* preempted the statutory fraud-on-the-FDA exception in an analogous Michigan statute.[7] *See* **\*450** 🏴 *Garcia*, 385 F.3d at 966. The plaintiff was prescribed an anti-inflammatory medication that had been approved by the FDA, but the medication caused liver failure. 🏴 *Id.* at 963. After she sued the drug manufacturer, it voluntarily withdrew the drug from the market; she submitted no evidence of the FDA finding fraud. 🏴 *Id.* at 963 & 964 n.1. The Sixth Circuit recognized that the case presented a "somewhat different legal regime from the one invalidated in 🏴 *Buckman*"

given that Michigan created a "general immunity" for drug manufacturers with a specific exception for circumstances involving fraud on the FDA rather than a specific cause of action for fraud on the FDA but found this distinction "immaterial in light of 🏴 *Buckman*." 🏴 *Id.* at 965-66. The court concluded that preemption in this context depends on whether the FDA itself has found that fraud has been committed on the agency:

> Thus, in this setting, it makes abundant sense to allow a State that chooses to incorporate a federal standard into its law of torts to allow that standard to apply when the federal agency itself determines that fraud marred the regulatory-approval process. In the final analysis, the exemptions are invalid as applied in some settings (*e.g.* when a plaintiff asks a state court to find bribery or fraud on the FDA) but not in others (*e.g.* claims based on federal findings of bribery or fraud on the FDA).

🏴 *Id.* at 966; *see also* 🏴 *Henderson v. Merck & Co.*, 2005 WL 2600220, at \*9-\*12 (E.D. Pa. Oct. 11, 2005) (following 🏴 *Garcia* and finding Section 600.2946(5)(a) preempted).

By contrast, the Second Circuit reviewing the Michigan statute held that it was not preempted. *See* 🏴 *Desiano*, 467 F.3d at 98. The court framed the cause of action not as a new tort based on fraud on the FDA, like in 🏴 *Buckman*, but rather as an appropriate exercise of the state legislature regulating as to when victims could recover under preexisting state products liability law, as in 🏴 *Medtronic*. 🏴 *Id.* at 93. The court therefore held that the presumption against federal preemption of state tort law applied. 🏴 *Id.* at 94. It then found that the claims the plaintiffs advanced were "premised on traditional common law duties between a product manufacturer and Michigan consumers" and were not premised exclusively or even principally on a manufacturer's failure to comply with federal disclosure requirements. 🏴 *Id.* at 94-95. Next the court noted that rather than fraud being

Prod.Liab.Rep. (CCH) P 20,862

a required element of a tort, the Michigan statute made it an affirmative defense under law, and preemption in that context "would go far beyond" other preemption cases. *Id. at 96.* Finally, the court found that as long as courts are allowed to consider evidence of agency fraud, pharmaceutical companies will always be incentivized to flood the FDA with information, and the holding in *Desiano* "would not significantly alter that incentive." *Id. at 97.*

### iii. The Texas Statute is Preempted

The Fifth and Sixth Circuit opinions are the more persuasive of the competing precedents. Although this Court is not bound by the Fifth Circuit's rulings, it bears consideration that the Fifth Circuit, **\*451** which is conversant with Texas law, found that the presumption against preemption did *not* apply in a Section 82.007(b)(1) case. *See Lofton, 672 F.3d at 377-80.* Moreover, the Fifth Circuit is the only federal appellate court to have interpreted the Texas exception at issue here, and it did so in a factually analogous circumstance involving common law tort claims after carefully considering the counter-arguments made in *Desiano.*

Section 82.007(b)(1) hinges on FDCA disclosure requirements and necessitates that a plaintiff establish the manufacturer withheld "required information that was material and relevant" from the FDA. The Texas exception therefore exists "solely by virtue of the FDCA disclosure requirements[,]" which *Buckman* used as a rationale for finding preemption. *See 531 U.S. at 353, 121 S.Ct. 1012.* Thus, Section 82.007(b)(1) in effect asks a court to determine what is required, material, and relevant to the FDA, instead of allowing the FDA to make those determinations for itself. *See Lofton, 672 F.3d at 379-80* (finding *Desiano*'s emphasis on the distinction between a fraud-on-the-FDA tort and a fraud-on-the-FDA exception "unpersuasive" because the latter still conditioned recovery on " 'establishing' " what amounts to fraud on the agency").

 **[5]** Moreover, as the *Buckman* opinion described, the FDA is "amply empower[ed]" to investigate fraud, and having courts step into that role would "inevitably conflict" with the FDA's responsibilities. *See 531 U.S. at 348-51,* 121 S.Ct. 1012. Plaintiff argues that "Defendants withheld from or misrepresented to the FDA pertinent clinical data as well as alarming studies linking Injectafer to a Severe Hypophosphatemia[,]" but does not allege that the FDA made any findings of fraud. [8] As the Sixth Circuit correctly held, the analysis would be different here if the FDA *had* found fraud and the plaintiff was suing in light of that finding to recover in tort. *See Garcia, 385 F.3d at 966.* But that is not the case. In the absence of such allegations of FDA findings of fraud, an inevitable conflict exists. *See Buckman, 531 U.S. at 350, 121 S.Ct. 1012; see also Lofton, 672 F.3d at 380* ("[W]here the FDA has not found fraud, the threat of imposing state liability on [a] drug manufacturer for defrauding the FDA intrudes on the competency of the FDA and its relationship with regulated entities."). Accordingly, for the reasons set forth above, the Section 82.007(b)(1) exception is here preempted.

Turning to the scope of the preemption, by statute it applies to any "products liability action alleging that an injury was caused by a failure to provide adequate warnings or information with regard to a pharmaceutical product." Tex. Civ. Prac. & Rem. Code § 82.007(a). A "products liability action" for purposes of Section 82.007 is defined as:

> any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property **\*452** damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories.

Tex. Civ. Prac. & Rem. Code § 82.001(2). From the text of the statute, it is clear that Count I (negligence), Count II (negligent failure-to-warn), Count VI (strict liability failure-to-warn), and Count XI (gross negligence) are preempted insofar as they are based on a failure-to-warn theory.

Defendants argue that Count V (fraud) is also preempted because the allegations are those of a negligent

**Atkinson v. Luitpold Pharmaceuticals, Inc., 448 F.Supp.3d 441 (2020)**
Prod.Liab.Rep. (CCH) P 20,862

misrepresentation claim, merely relabeled as fraud. Defendants cite to one Texas district court case in support of their position. *See* 🔖 *Gonzalez, 930 F. Supp.2d at 820.* But even though 🔖 *Gonzalez* made a passing reference to "fraud-by-omission claims [being] subject to 🚩 Section 82.007", *id.,* the court conducted no analysis to reach that conclusion (fraud had not been pled). The Fifth Circuit has found that the Texas products liability statute is "intentionally broad[,]" which suggests its reach should not be limited to the causes of action enumerated in 🔖 Section 82.001(2). *See* 🔖 *Eckhardt v. Qualitest Pharms., Inc.*, 751 F.3d 674, 678 (5th Cir. 2014) (noting the statute "is written to cover products liability claims, even in situations where the plaintiffs do not label their claims thusly."). Here, Plaintiff's fraud allegations focus on "false representations" and "Defendants' concealment and omissions of material facts[.]" These are failure-to-warn allegations cast under a different heading. Given that 🔖 Section 82.001(2) applies to "any theory or combination of theories" alleging injury because of a failure-to-warn, the fraud claim here is preempted.

Because the drug manufacturer's rebuttable presumption in 🚩 Section 82.007(a)(1) applies here, and because Plaintiff's only argument to rebut the presumption is preempted, Count I (negligence), Count II (negligent failure-to-warn), Count V (fraud), Count VI (strict liability failure-to-warn), and Count XI (gross negligence) shall be dismissed with prejudice insofar as they are based on a failure-to-warn theory. [9]

## B. Strict Liability Defective Design (Count VII)

Defendants argue Plaintiff's design defect claim fails under comment k to Section 402A of the Restatement (Second) of Torts, [10] which has been adopted by the **\*453** Texas Supreme Court. *See* 🔖 *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997). The parties dispute whether comment k bars all strict liability defective design claims against prescription drug manufacturers. Defendants contend that it does. *See* 🔖 *Hackett v. G.D. Searle & Co.*, 246 F. Supp.2d 591, 595 (W.D. Tex. 2002) ("Defendants can only be held strictly liable if the drug was not properly prepared or marketed or accompanied by proper warnings."). Plaintiff argues that courts take a case-by-case approach to applying comment k. *See* 🔖 *Lea v. Wyeth LLC*, 2011 WL 13192701, at *12 (E.D. Tex. Oct. 28, 2011) (collecting cases).

Even taking a case-by-case approach, Plaintiff's argument here fails. Plaintiff argues that in *Lea,* "the federal district court refused to bar plaintiff's strict liability design defect claims where the plaintiff also brought valid claims for inadequate warnings." But Plaintiff here does not have a valid claim for inadequate warnings. Significantly, *Lea* is a Texas district court opinion that was decided before the Fifth Circuit's 🔖 *Lofton* opinion came down. *Lea* allowed the failure-to-warn claim to proceed, finding the 🚩 Section 82.007(b)(1) fraud-on-the-FDA defense was not preempted, in contrast to the subsequent, binding 🔖 *Lofton* decision and in contrast to the decision here. Comment k states that manufacturers are not strictly liable for design defects if "proper warning is given." *See* Restatement (Second) of Torts § 402A cmt. k. As discussed, *see supra* Section III.A, Texas has a rebuttable presumption that FDA-approved prescription drug labels are adequate, and Plaintiff is unable to rebut that presumption. Because the warning here was adequate, given the unique circumstance presented by 🚩 Section 82.007(b)(1), comment k applies, and there can be no strict liability defective design claim. Count VII shall be dismissed with prejudice.

## C. Negligence (Count I) and Gross Negligence (Count XI)

Finally, Plaintiff asserts that even if claims based on her failure-to-warn theory are not viable, claims premised on a theory that Defendants failed to properly test Injectafer should survive. [11] Defendant argues that even assuming a failure-to-test claim can exist separately from a failure-to-warn claim, Plaintiff has not sufficiently pled a failure-to-test claim.

**[6]** Under Texas law, "[a] manufacturer has a duty to test... [its] product. The extent of research...must be commensurate with the dangers involved." *Romero v. Wyeth Pharms., Inc.*, 2012 WL 12547449, at *4 (E.D. Tex. Aug. 31, 2012) (quoting 🔖 *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1090 (5th Cir. 1973) (alterations in original)). Thus, in Texas there is an independent cause of action based on negligent failure to test. *See, e.g.,* **\*454** *Romero*, 2012 WL 12547449, at *4 (collecting cases); 🔖 *Murthy*, 847 F. Supp.2d at 977 (recognizing a failure-to-test claim as distinct from a failure-to-warn claim, but dismissing it for failure to plead sufficient facts); 🔖 *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 437

(Tex. 1997) (recognizing plaintiff's negligent failure-to-test claim).

[7]   Here, the Complaint barely addresses testing. Plaintiff lists "testing" in a long list of other allegations ("development, testing, design, manufacture, inspection, marketing, pharmacovigilance, labeling, promotion, distribution and sale") and then alleges that Defendants failed "to perform reasonable pre- and post-market testing of the product to investigate Injectafer's propensity to cause Severe Hypophosphatemia." These "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements" are disregarded and are, accordingly, insufficient standing alone to state a claim for relief. 📑 James, 700 F.3d at 679. To the extent that a claim is premised on a theory of failure to properly test, it shall be dismissed with leave to amend the allegations regarding testing.

This includes Count I, which is Plaintiff's catchall negligence claim. Thus, none of Plaintiff's negligence claims survive

this motion to dismiss. Without a valid negligence claim, Plaintiff's gross negligence claim fails. See Sanders v. Herold, 217 S.W.3d 11, 20 (Tex. App.–Houston [1st Dist.] 2006, no pet.) (holding that "one's conduct cannot be grossly negligent without being negligent"). Relatedly, without a gross negligence or fraud claim, Plaintiff has no basis for punitive damages under either Texas or Pennsylvania law. See Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (exemplary damages only available for fraud, malice, or gross negligence); Hutchison v. Luddy, 582 Pa. 114, 870 A.2d 766, 770, 772 (2005) (punitive damages are for actions "so outrageous as to demonstrate willful, wanton or reckless conduct" and "a showing of ordinary negligence is not enough to warrant punitive damages").

An appropriate order follows.

**All Citations**

448 F.Supp.3d 441, Prod.Liab.Rep. (CCH) P 20,862

## Footnotes

1   Effective January 1, 2019, Luitpold Pharmaceuticals, Inc. merged with American Regent, Inc..
2   These facts are drawn from the Complaint and, for the purposes of the motion to dismiss, will be taken as true. See 📑 Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).
3   Defendants have attached to their motion to dismiss a copy of the Injectafer Prescribing Information from July 2013, which they allege was in effect at the time of Plaintiff's prescription. "[A] court may consider any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" without converting a motion to dismiss into one for summary judgment. 📑 Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Neither party disputes the authenticity of the Prescribing Information. Given that Plaintiff's Complaint challenges Injectafer's labeling, warning, and patient information, the Prescribing Information may be considered in ruling on Defendants' motion to dismiss.
4   A federal court sitting in diversity must apply state substantive law and federal procedural law. See 📑 Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This Court previously ruled that the substantive law of the state in which the claim arose, Texas, governs this action. See Atkinson v. Luitpold Pharms., Inc., 414 F. Supp.3d 742, 747 (E.D. Pa. 2019). The parties do not dispute that Texas substantive law applies except with respect to punitive damages: Plaintiff believes Texas law applies, while Defendants believe Pennsylvania law applies.
5   As in Crockett v. Luitpold Pharmaceuticals, Inc., 2020 WL 433367 (E.D. Pa. Jan. 28, 2020), Defendants' preemption challenge here is limited to Plaintiff's pre-approval failure-to-warn and defective design claims. Plaintiff concedes that she is not making a post-approval design defect claim, and Defendants are not seeking dismissal of Plaintiff's claim that Defendants negligently failed to change the Injectafer label post-approval.
6   Plaintiff's case is one of nineteen such Injectafer cases filed thus far, all of which are before this Judge.

7    The relevant provision of Michigan law states:

In a product liability action against a manufacturer or seller, a product that is a drug is not defective or unreasonably dangerous, and the manufacturer or seller is not liable, if the drug was approved for safety and efficacy by the United States food and drugs administration, and the drug and its labeling were in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller.

🚩 Mich. Comp. Laws § 600.2946(5). This immunity from liability does not apply if the defendant:

[i]ntentionally withholds from or misrepresents to the United States food and drug administration information concerning the drug that is required to be submitted under the federal food, drug, and cosmetic act and the drug would not have been approved, or the United States food and drug administration would have withdrawn approval for the drug if the information were accurately submitted.

🚩 Mich. Comp. Laws § 600.2946(5)(a) (internal citations omitted).

8    In a motion to dismiss opinion in a related case, this Court stated: "Having failed to meet their burden, Defendants attempt to shift it to Plaintiff by suggesting that because 'Plaintiff pled no facts supporting a reasonable inference that the FDA lacked knowledge of the existing scientific data when it approved Injectafer,' her claims must be dismissed on impossibility preemption grounds. But preemption is an affirmative defense, and it is thus Defendants' burden, not Plaintiff's, to demonstrate that it applies." *Crockett, 2020 WL 433367, at *8* (citing 🔖 *Wyeth*, 555 U.S. at 573, 129 S.Ct. 1187). That opinion was decided under Pennsylvania law, not Texas law as here. Moreover, the *Crockett* plaintiff stated that she was not advancing a "fraud on the FDA" theory, *see id.* at *6 n.14, while Plaintiff here is arguing the fraud-on-the-FDA exception to the Texas statute applies to her. The two cases therefore differ on these points.

9    Although leave to amend should be freely granted "when justice so requires...a court may deny leave to amend when such amendment would be futile." 🔖 *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (internal quotations omitted).

10   Comment k, titled "Unavoidably unsafe products," states: "There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." Restatement (Second) of Torts § 402A cmt. k (1965) (emphasis in original).

11   As pled, Counts I through IV contain a host of other theories against Defendants, such as negligence by "promoting, marketing, and selling Injectafer to physicians for the purposes of off-label use[,]" and "failing to establish and maintain an adequate post-marketing surveillance program[,]" among others. Because these theories have not been briefed and argued, the Court does not address them here.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Tab 4

2013 WL 5663263
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of New Britain.

BANK Of NEW YORK MELLON
v.
FIDELITY NATIONAL TITLE
INSURANCE COMPANY.

No. CV126013698.
|
Sept. 20, 2013.

**Opinion**

JAMES W. ABRAMS, Judge.

*\*1* The issue before the court is whether the defendant's motion to strike counts two and eight, and the prayer for relief in connection with count eight, should be granted. Specifically, as to the breach of contract claim contained in count two, the defendant argues that: (1) the plaintiff does not allege sufficient facts to demonstrate the formation of an agreement between the plaintiff and the defendant; (2) the plaintiff does not allege the requisite element of consideration; and (3) the count is really a tort claim cloaked in contractual language. As to the unjust enrichment count contained in count eight, the defendant argues that: (1) the plaintiff fails to allege a direct connection between the defendant's benefit and the plaintiff's detriment; and (2) the corresponding prayer for relief is improper.

I

FACTS

This action arises out of the closing of an insured mortgage loan. On April 16, 2013, the plaintiff, Bank of New York Mellon, as successor indenture trustee under Novastar mortgage funding trust, series 2006–1, (Bank of New York) filed the operative, revised complaint against the defendant, Lyle Legal Services, LLC (Lyle).[1] In counts two and eight —the counts at issue in the present motion—the plaintiff

attempts to allege breach of contract and unjust enrichment claims, respectively. By way of background, the plaintiff states in its general statement of facts that Kevin Harrison, a non-party, executed a mortgage secured by property located in Berlin, and that the mortgage and note were subsequently assigned to the plaintiff. The plaintiff then alleges, in count two, that the defendant breached the terms of the plaintiff's closing instructions because the mortgage was recorded in the second lien position instead of the first lien position as agreed upon. Then, in count eight, the plaintiff alleges, in the alternative, that the defendant was unjustly enriched because the defendant was paid $568.00 for ensuring that the mortgage would be recorded in the first lien position but failed to do so.

On May 31, 2013, the defendant moved to strike counts two and eight, and the prayer for relief corresponding to count eight. On July 8, 2013, the plaintiff filed its objection thereto along with a memorandum of law in support. On August 16, 2013, the defendant filed a reply. On August 19, 2013, the court heard oral argument in connection with the motion.

II

DISCUSSION OF LAW

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC v. Alves,* 262 Conn. 480, 498, 815 A.2d 1188 (2003). The court takes "the facts to be those alleged in the [complaint] ... and ... construe[s] the [complaint] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *New London County Mutual Ins. Co. v. Nantes,* 303 Conn. 737, 747, 36 A.3d 224 (2012). Thus, "[i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." *Waters v. Autuori,* 236 Conn. 820, 826, 676 A.2d 357 (1996). "[T]he complaint is required only to fairly put the defendant on notice of the claims asserted against him ... As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Citation omitted; internal quotation marks omitted.) *Montanaro v. Gorelick,* 73 Conn.App. 319, 323– 24, 807 A.2d 1083 (2002). "Moreover, we note that [w]hat is

necessarily implied [in an allegation] need not be expressly alleged ... It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted ... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citations omitted; internal quotation marks omitted.) *Gazo v. Stamford,* 255 Conn. 245, 260, 765 A.2d 505 (2001).

A

COUNT TWO

**\*2** With regard to count two, the breach of contract claim, the defendant argues that: (1) the plaintiff does not allege sufficient facts to demonstrate the formation of an agreement between the plaintiff and the defendant; (2) the plaintiff does not allege the requisite element of consideration; and (3) the count is really a tort claim cloaked in contractual language.

In response, the plaintiff argues that: (1) it sufficiently alleges an agreement between the plaintiff and the defendant because a well-defined agreement need be pleaded; (2) from whom the defendant received consideration is immaterial; and (3) the count is not a tort claim because the plaintiff alleges that the parties contracted to obtain a specific result.

1) Formation of an Agreement

"If a complaint contains the necessary elements of a cause of action, it will survive a motion to strike." *Malizia v. Anderson,* 42 Conn.Sup. 114, 116, 602 A.2d 1076 (1991). "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Hawley Avenue Associates, LLC v. Robert D. Russo, M.D. & Associates Radiology, P.C.,* 130 Conn.App. 823, 832, 25 A.3d 707 (2011). "A bald assertion that the defendant[s] ha[ve] a contractual obligation, without more, is insufficient to survive a motion to strike ... Nevertheless, our Supreme Court has determined that a breach of contract claim should not be stricken if a plaintiff has set forth a specific contractual obligation and alleged that it had not been met ... Whether the terms of the contract support that allegation is a factual question to be determined

by the fact finder and, therefore, is not at issue when the trial court considers a motion to strike." (Citations omitted; internal quotation marks omitted.) *Szynkowicz v. Boniauto–O'Hara,* Superior Court, judicial district of Waterbury, Docket No. CV 12 6016649 (July 26, 2013, Zemetis, J.), citing *Commissioner of Labor v. C.J.M. Services, Inc.,* 268 Conn. 283, 293, 842 A.2d 1124 (2004).

In the present case, the plaintiff alleges in count two that, pursuant to the terms of the plaintiff's closing instructions, the defendant agreed in writing and was paid to close the mortgage and ensure that it was recorded in the first lien position; that the defendant failed to do so; and that this failure caused the plaintiff to incur damages. (Revised Complaint, Count Two, ¶¶ 7–12.) It bears emphasizing that the plaintiff specifically alleges in count two that the defendant breached "*the [p]laintiff's* closing instructions." (Emphasis added.) (*Id.,* ¶ 11.) This directly contradicts the defendant's argument that the plaintiff merely alleges that the defendant "acknowledged closing instructions issued by some *unnamed entity* and unilaterally agreed to do something," which "does not demonstrate any contractual agreement between [the defendant] and the plaintiff." (Emphasis added.) (Def.'s Memo., 5/31/13, p. 7.)

**\*3** In light of the above, the plaintiff alleges sufficient facts to demonstrate the formation of an agreement between the plaintiff and the defendant.

2) Consideration

Next, the defendant argues that the plaintiff never alleges from *whom* the defendant received the requisite element of consideration, thus rendering count two insufficient. Specifically, the defendant argues, "[t]here is no allegation that [the defendant] as the promisee received [the] consideration from the plaintiff as the [promisor] in exchange for his promise to close the lien in the first lien position." (Def.'s Memo., 5/31/13, p. 7.) In response, the plaintiff contends that this argument is immaterial to the determination of whether the plaintiff has sufficiently pled a cause of action for breach of contract. The court agrees with the plaintiff.

Generally, if consideration is sufficient for a contract in other respects, it does not matter from whom or to whom it moves. 2 Restatement (Second), Contracts. 71(4), comment (e) (1981); see also 17A Am.Jur.2d, Contracts. 125, p. 139

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 59 of 751
PageID: 11425
Bank of New York Mellon v. Fidelity Nat. Title Ins. Co., Not Reported in A.3d (2013)

*(1991)* (same); and *Republic Ins. Co. v. Pat DiNardo Auto Sales, Inc.,* 44 Conn.Sup. 207, 219–20, 678 A.2d 516 (1995), aff'd, 41 Conn.App. 686, 677 A.2d 21, cert. denied, 239 Conn. 906, 682 A.2d 1005 (1996), citing 2 Restatement (Second), *supra,*. 71(4), comment (e).

### 3) Tort Claim Cloaked as Contract

Finally, the defendant argues that count two is really a tort claim cloaked in contractual language and thus should be stricken. "Although ordinarily—indeed, in most cases—in reviewing a motion to strike, the court must take the plaintiff's allegations at face value, that rule is not absolute. We have, on occasion, looked beyond the specific language of a pleading to discern its real underlying basis. See, e.g., *Allard v. Liberty Oil Equipment Co.,* 253 Conn. 787, 800, 756 A.2d 237 (2000)* ('[the defendant] cannot ... convert its apportionment claim against [the third party defendant] into something other than a product liability claim simply by alleging only negligent misconduct')." *Gazo v. Stamford, supra,* 255 Conn. 262–63. In *Gazo,* our Supreme Court reasoned that "[t]he law should not permit [a party] to recast what is essentially a tort claim as a contract claim solely to gain the potential advantage of a longer statute of limitations"; *id.,* 266; and that this made it "an appropriate case in which to pierce the pleading veil." *Id.,* 263.

Similarly, in *Pelletier v. Galske,* 105 Conn.App. 77, 936 A.2d 689 (2007), cert. denied, 285 Conn. 921, 943 A.2d 1100 (2008), the Appellate Court found that "the sole count in the complaint [was] not governed by the six year statute for contract actions ... but, rather, was time barred by the three year statute of limitations for tort claims ..."; *id.,* 83; because a tort claim cannot be converted into a contract claim "merely by talismanically invoking contract language ..." (Internal quotation marks omitted.) *Id.,* 81.

**\*4** In the present case, unlike *Gazo* and *Pelletier,* no statute of limitations issue has yet been raised. "[O]rdinarily, [a] claim that an action is barred by the lapse of the statute of limitations must be pleaded as a special defense, not raised by a motion to strike." (Internal quotation marks omitted.) *Greco v. United Technologies Corp.,* 277 Conn. 337, 344 n. 12, 890 A.2d 1269 (2006). Consequently, the court chooses not to "pierce the pleading veil," but makes this ruling without

prejudice reconsideration of the issue should the defendant plead as a special defense that the action is time barred.

### B

### COUNT EIGHT

With regard to count eight, the unjust enrichment claim, the defendant argues that: (1) the plaintiff fails to allege a direct connection between the defendant's benefit and the plaintiff's detriment; and (2) the plaintiff's prayer for relief is improper because monetary damages are inconsistent with a claim in equity.

In response, the plaintiff argues that: (1) it sufficiently states a cause of action for unjust enrichment because there is a direct connection between the benefit conferred upon the defendant —the $568.00—and the detriment to the plaintiff—being deprived of the first lien position. Additionally, although the plaintiff concedes that the proper measure of damages for a claim of unjust enrichment is restitution, it nevertheless argues that: (2) the defendant's motion to strike to prayer for relief is procedurally improper.

### 1) Relationship Between Defendant's Benefit and Plaintiff's Detriment

"Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ... Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy ... Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Culver v. Culver,* 127 Conn.App. 236, 249, 17 A.3d 1048, cert. denied, 301 Conn. 929, 23 A.3d 724 (2011).

"The elements of a cause of action for unjust enrichment ... do not include a contractual, 'privity' requirement." *Coastal, Inc. Plumbing–Heating v. TP Builders, Inc.,* Superior Court, judicial district of Ansonia–Milford, Docket No. CV 04 0084236 (April 11, 2005, Stevens, J.) (39 Conn. L. Rptr. 103, 104). "Although unjust enrichment typically arises from a

plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit." *New Hartford v. Connecticut Resources Recovery Authority,* 291 Conn. 433, 468, 970 A.2d 592 (2009). For example, in the context of construction projects, "appellate courts in [Connecticut] have held that where a property owner hires a general contractor ... and thereafter receives the benefit of labor or materials supplied by a subcontractor hired by that general contractor, any enrichment of the property owner from the work of the subcontractor is not unjust absent fraud and provided that the property owner pays the general contractor in full for the subcontractor's services." *Nation Electrical Contracting, LLC v. St. Dimitrie Romanian Orthodox Church,* 144 Conn.App. 808, 817 (2013), citing *Providence Electrical Co. v. Sutton Place, Inc.,* 161 Conn. 242, 246–47, 287 A.2d 379 (1971); see also *Siegel, Reilly & Conlon, LLC v. Cvecich,* Superior Court, judicial district of Fairfield, Docket No. CV 13 6033078 (July 9, 2013, Sommer, J.) [56 Conn. L. Rptr. 438] ("The fact that the plaintiff and defendant did not have a direct contractual relationship is inapposite. [*Providence Electrical Co. v. Sutton Place, Inc., supra,* 161 Conn. 242], and [*New Hartford v. Connecticut Resources Recovery Authority, supra,* 291 Conn. 433], together stand for the proposition that unjust enrichment does not require that the defendant receive a benefit directly from the plaintiff").

**\*5** In the present case, the plaintiff alleges in count eight that the defendant was paid $568.00 to ensure that the mortgage would be recorded in the first lien position. (Revised Complaint, Count Eight, ¶ 8.) Furthermore, the plaintiff alleges that the defendant "was unjustly benefitted as the money it received ... was to ensure clear title ... which [the defendant] failed to accomplish ..." (*Id.,* ¶ 9.) The defendant argues that because the plaintiff fails to allege that it was the plaintiff that paid the defendant, the plaintiff thus fails to establish any direct connection between the plaintiff's detriment and the defendant's unjust enrichment. However, research reveals that no privity of contract is required to properly plead a claim of unjust enrichment.

C

PRAYER FOR RELIEF

The plaintiff concedes that the proper measure of damages for a claim of unjust enrichment is restitution; nevertheless it argues that striking the prayer for relief is procedurally improper. Instead, the plaintiff maintains that the defendant should file a request to revise.

Pursuant to Practice Book. 10–39, a party may move to strike a prayer for relief. However, a prayer for relief may "be stricken only if the relief sought could not be legally awarded." *Pamela B. v. Ment,* 244 Conn. 296, 325, 709 A.2d 1089 (1998). [2] Additionally, in striking a prayer for relief, judges of the Superior Court have at times limited their striking to the relevant portions thereof. See, e.g. *Pereira v. North Carolina Granite Corp.,* Superior Court, judicial district of New Haven, Docket No. CV 09 5031427 (August 5, 2011, Wilson, J.) (52 Conn. L. Rptr. 417, 422) ("the court grants the motions to strike counts one, two, five, six, nine and ten and the portions of the prayer for relief seeking attorneys fees and punitive damages").

III

CONCLUSION

For all of the aforementioned reasons, the defendant's motion to strike is denied as to counts two and eight, but the motion is granted as to those portions of the plaintiff's prayer for relief that seek monetary damages in connection with count eight.

**All Citations**

Not Reported in A.3d, 2013 WL 5663263

**Footnotes**

1   Fidelity National Title Insurance Company (FNTIC) and Fidelity National Title Group (FNTG) are also named defendants in this action. However, for convenience, all references to the defendant are to Lyle because it is the only moving party at issue.

2   Abrogation on other grounds is recognized by ▢ *Markley v. Dept. of Public Utility Control,* 301 Conn. 56, 66 n. 11, 23 A.3d 668 (2011).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 5

2016 WL 6612804
United States District Court, E.D. Pennsylvania.

BLUE CROSS BLUE SHIELD
ASSOCIATION, et al.

v.

GLAXOSMITHKLINE LLC.

CIVIL ACTION No. 13-4663
|
Signed 11/09/2016

### Attorneys and Law Firms

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Uriel Rabinovitz, Lowey Dannenberg Cohen & Hart, PC, White Plains, NY, Gerald Lawrence, Jr., Peter St. Phillip, Lowey Dannenberg Cohen & Hart, P.C., West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Rawlings & Assoc., Robert C. Griffith, Rawlings & Assoc PLLC, Lagrange, KY, for Blue Cross Blue Shield Association, et al.

Andrew D. Schau, Covington & Burling LLP, New York, NY, Joseph E. O'Neil, John J. O'Donnell, Ricky Mario Guerra, Lavin O'Neil Cedrone & Disipio, Philadelphia, PA, Mark H. Lynch, Matthew J. O'Connor, Michael M. Maya, Covington & Burling LLP, Washington, DC, for GlaxoSmithKline LLC.

### MEMORANDUM

Juan R. Sánchez, District Judge

**\*1** Plaintiffs, 41 private health insurance companies that purchased billions of dollars' worth of adulterated pharmaceutical drugs from Defendant GlaxoSmithKline LLC (GSK), bring claims against GSK under the Racketeer Influenced and Corrupt Organizations Act (RICO) and Pennsylvania law, alleging they purchased the drugs at issue based on GSK's misrepresentations that the drugs were manufactured in accordance with federal safety and quality practices. Plaintiffs claim the adulterated drugs were worthless and had they known of the adulteration they would not have included them in their formularies. GSK moves to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that (1) Plaintiffs

have not adequately alleged a cognizable injury to establish standing and (2) all claims are barred by the applicable statute of limitations. GSK also moves to dismiss Plaintiffs' claims pertaining to the drug Paxil CR from April 1, 2002, through March 4, 2005, as barred by its 2009 class action settlements. Because Plaintiffs have adequately pleaded an injury for purposes of standing, and because the merits of the statute of limitations defense turn on factual issues that cannot be resolved at this stage, GSK's motion to dismiss the complaint for failure to state a claim will be denied.[1]

### BACKGROUND[2]

Under federal law, pharmaceutical drugs must be manufactured in accordance with "current Good Manufacturing Practices" (cGMPs) to assure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B). The cGMPs are codified in 21 C.F.R. Parts 210 and 211, and are enforced by the Food and Drug Administration (FDA). Any drug not manufactured in accordance with cGMPs is deemed "adulterated"[3] and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).

**\*2** Between 1997 and 2006, GSK distributed and sold large quantities of adulterated drugs in the U.S. market. All of the drugs at issue[4] were manufactured at a plant in Cidra, Puerto Rico, that was owned and operated by SB Pharmco Puerto Rico, Inc., a wholly owned subsidiary of GSK. The Cidra plant was riddled with chronic and pervasive manufacturing and quality problems that violated numerous cGMPs and affected the integrity of all of the drugs manufactured there. Both GSK and SB Pharmco were aware of these problems, and deliberately cut corners to maximize profits.

The FDA inspected the Cidra plant in 2001, finding significant deficiencies, but determined that GSK was responding adequately to those deficiencies. After another inspection in 2002 that revealed persistent cGMP violations, the FDA issued a Warning Letter[5] to Cidra. GSK responded to the letter by committing to take specific acts to address the violations and assigned the company's Manager of Global Quality Assurance, Cheryl Eckard, to lead a team to ensure those commitments were fulfilled. Throughout 2002 and 2003, Eckard urged GSK management to take action regarding ongoing violations at the Cidra plant. In April 2003, Eckard submitted to GSK executives a report documenting and summarizing the history of cGMP violations at the Cidra

2016 WL 6612804, RICO Bus.Disp.Guide 12,796

plant. The report noted certain high-risk compliance problems and called for increased monitoring by GSK management of compliance improvement initiatives. Eckard's concerns were not addressed, and she was terminated the following month.

Following her termination, Eckard informed the FDA of GSK's unwillingness to address the ongoing deficiencies in the Cidra plant.[6] The FDA ultimately commenced a criminal investigation, and in March 2005 seized all stocks of two drugs manufactured at the Cidra plant, Avandamet and Paxil CR. The following month, the FDA and GSK entered into a consent decree, and the FDA permanently enjoined GSK from directly or indirectly introducing or delivering into interstate commerce any adulterated product from the Cidra plant. In late 2007, GSK announced it would shut down the Cidra plant, which ultimately closed in late 2009. In 2010, SB Pharmco pleaded guilty to the federal crime of introducing into interstate commerce, with intent to defraud and mislead, adulterated versions of four of the drugs manufactured at the Cidra plant, Advandamet, Kytril, Bactroban, and Paxil CR, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 351(a)(2)(B). Plaintiffs allege that the adulteration extended to all of the drugs manufactured at the Cidra plant.

 **\*3** In July 2013, Plaintiffs filed their Complaint in state court alleging GSK violated federal and state law by fraudulently inducing Plaintiffs to pay billions of dollars for the adulterated drugs. The next month, GSK removed this case to federal court. Plaintiffs bring nine causes of action: (1) three Racketeer Influenced and Corrupt Organizations Act (RICO) violations under 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil insurance fraud under 18 Pa. Cons. Stat. § 4117; (4) breach of express warranty under 13 Pa. Cons. Stat. § 2313; (5) breach of the implied warranty of merchantability under 13 Pa. Cons. Stat. § 2314; (6) common law unjust enrichment; and (7) common law negligent misrepresentation. GSK argues all of Plaintiffs' claims should be dismissed for failure to state a claim.

## DISCUSSION

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Id. Although the plausibility standard "is not akin to a 'probability requirement,' " the complaint must support "more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted). A complaint which "pleads facts that are merely consistent with a defendant's liability...stops short of the line between possibility and plausibility of entitlement to relief." Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In evaluating a complaint's sufficiency under these standards, a court must first "tak[e] note of the elements a plaintiff must plead to state a claim." Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 675). Next, the court should "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' " Id. (quoting Iqbal, 556 U.S. at 679). Finally, where there are well pleaded allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. (quoting Iqbal, 556 U.S. at 679).

### A. Paxil CR Claims

GSK asserts Plaintiffs' claims related to their purchases of Paxil CR between April 1, 2002, and March 4, 2005, are barred by two 2009 class action settlements. Def.'s Mot. to Dismiss 26-27. Plaintiffs contend GSK's argument is irrelevant because the only Paxil-related claims concern Paxil and Paxil OS, not Paxil CR. See Compl. ¶ 3. Although Plaintiffs do not list Paxil CR as an at-issue drug, they do reference Paxil CR in their Complaint with regards to "GSK's wrongdoing." See Compl. ¶¶ 4 (noting SB Pharmco's federal guilty plea concerned the proliferation of adulterated versions of Paxil CR), 110 (describing a March 2005 FDA seizure of all stocks of Avandamet and Paxil CR). To the extent Plaintiffs' claims relate to their purchases of Paxil CR between April 1, 2002, and March 4, 2005, the Court will not consider Paxil CR in its analysis of the instant motion, and any purchases of Paxil CR between April 1, 2002, and March 4, 2005, will not be considered for purposes of damages.

### B. Standing

GSK argues the Complaint should be dismissed because Plaintiffs have failed to sufficiently allege a cognizable injury —a necessary element of each of Plaintiffs' claims. Although Plaintiffs allege they suffered a cognizable injury by paying for the adulterated at-issue drugs, GSK argues Plaintiffs cannot demonstrate an actual injury because they do not allege the at-issue drugs were unsafe or ineffective.[7]

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 65 of 751
PageID: 11431
Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....
2016 WL 6612804, RICO Bus.Disp.Guide 12,796

**\*4** To pursue a civil action under RICO, a plaintiff must first establish standing under Section 1964(c), which provides:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

Thus, a RICO plaintiff must make a threshold showing that it has "suffered an injury to business or property and that [the] injury was caused by the defendant's violation of 18 U.S.C. § 1962." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015) (citing *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000)). To establish an injury to business or property, a plaintiff must allege and prove "actual monetary loss, i.e., an out-of-pocket loss." *Maio*, 221 F.3d at 483.

Prior to the Third Circuit's decision in *In re Avandia*, district courts in this Circuit followed *Maio* in analyzing an insurer's standing to pursue claims relating to the purchase of misrepresented drugs. In *Maio*, the Third Circuit held health insurance beneficiaries had not alleged a cognizable RICO injury against their insurer, Aetna, when they alleged Aetna's misrepresentations regarding the services included in their HMO plans caused them to "pay too much in premiums for an 'inferior' health care product." 221 F.3d at 484-85. Because the plaintiffs' alleged injury was premised solely on the possibility they would receive inferior care in the future and not on past substandard care, the Court found the plaintiffs failed to plead a tangible economic injury where they provided "no factual basis for [the] conclusory allegation" that the insurance coverage was "worth less" than what the plaintiffs had paid for it. *Id.* at 490. District courts have interpreted *Maio* to bar insurers' claims where there were no specific allegations that the at-issue drugs were proven to be unsafe or ineffective. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action,* No. 06-CV-5774, 2009 WL 2043604, at \*18 (D.N.J. July 10, 2009) (finding *Maio* "directly on point" in case involving alleged overpayment for misrepresented drugs); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, No. 06-3044, 2008 WL 5413105, at \*7 (D.N.J. Dec. 23, 2008) (finding plaintiffs were "assert[ing] a substantially similar 'overpayment' argument as that made by the unsuccessful plaintiffs in *Maio*").[8]

The Third Circuit distinguished *Maio* in *In re Avandia*, in which the plaintiff-insurers alleged GSK deliberately misrepresented and concealed the safety risks associated with a diabetes drug, causing them to include the drug in their formularies and cover the drug at favorable rates. 804 F.3d at 636. The plaintiffs alleged two theories of injury: (1) the at-issue drug was worth less than the favorable rates at which they covered it (the "excess price" theory); and (2) physicians relied on GSK's misrepresentations in deciding to prescribe the at-issue drug to more patients than they would have had GSK not concealed the risks of the drug (the "quantity effect" theory). *Id.* The Court of Appeals affirmed the district court's denial of GSK's motion to dismiss, finding the insurers' alleged injury—prioritizing the drug on their formularies and overpaying for the drug due to GSK's illegal or deceptive marketing practices—was a concrete economic harm. *Id.* at 640. That concrete injury, cognizable under RICO, was distinguishable from the injury in *Maio*, which was based on contingent future events concerning the quality of health care. *Id.*

**\*5** In reaching its decision, the Third Circuit relied on *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004), which "offer[ed] the closest analogy" to the facts before it. *Id.* In *In re Warfarin*, the plaintiff-insurers alleged the defendant engaged in anticompetitive behavior and disseminated false and misleading information about a low-priced, readily available generic competitor, causing the plaintiffs to purchase the higher-priced brand name drug instead. 391 F.3d at 521. In affirming the district court's approval of a class action settlement, the Court of Appeals rejected an argument that the insurers did not have standing to assert antitrust claims, finding "it well recognized that a purchaser in a market where competition has been wrongfully restrained has suffered an antitrust injury."[9] *Id.* at 531. The *In re Avandia* court concluded that, just as the "injury suffered by the [*Warfarin* plaintiffs] did not depend on the drug's ineffectiveness but rather on the defendant's anticompetitive behavior[,]...the injury suffered by the [third-party payers] in this case does not depend on Avandia's effectiveness, but rather on GSK's fraudulent behavior." 804 F.3d at 640.

Under *In re Avandia*, an insurer's overpayment for a drug due to the manufacturer's deceptive market practices is a concrete economic injury. Plaintiffs have sufficiently pleaded an analogous injury here. Plaintiffs allege GSK caused injury to their business and property because they justifiably relied on GSK's fraudulent material misrepresentations and omissions in placing "adulterated," and effectively "worthless," drugs on their formularies and subsequently paying for those drugs. Compl. ¶¶ 6-7. Plaintiffs allege that but for GSK's fraudulent concealment of the myriad ongoing regulatory violations at

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 66 of 751
PageID: 11432

Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....

2016 WL 6612804, RICO Bus.Disp.Guide 12,796

the Cidra plant, and GSK's misrepresentations and omissions as to the safety, quality, purity, identity, and strength of the at-issue drugs, Plaintiffs would not have paid for those drugs. *Id.* ¶¶ 6, 9, 178. As in *In re Avandia*, Plaintiffs' injury does not depend on the at-issue drugs' ineffectiveness, or factual speculation concerning future events, but rather on GSK's misrepresentations concerning the production, quality, and safety of the drugs.

The parties agree the *In re Avandia* court held a plaintiff may adequately plead economic harm independent of whether the alleged fraud causes physical harm to the drug users. GSK, however, attempts to distinguish *In re Avanadia* by arguing that whereas the plaintiffs in that case alleged GSK's misrepresentations regarding the at-issue drug's safety profile led to higher prices (the price effect) and an increase in the quantity of drugs prescribed by physicians (the quantity effect), here Plaintiffs merely allege the at-issue drugs were rendered adulterated and worthless due to cGMP violations at the plant, but fail to allege how non-disclosure of the violations had any bearing on the quality of the drugs. GSK notes that according to the FDA, "adulterated" does not mean the drugs were ineffective, unsafe, or otherwise caused harm; rather, the term is merely a regulatory designation relating to conditions at the plant where the drug is manufactured, and the drugs may still meet their labeled specifications. Def.'s Mot. to Dismiss 17-18; Def.'s Mem. Concerning *In re Avandia* 5-6. GSK thus argues Plaintiffs' description of the drugs as "worthless" is unfounded, and, therefore, so is their economic harm.[10]

 **\*6** The law is unclear as to the extent to which cGMP violations, by themselves, affect a drug's worth.[11] According to the FDA, drugs produced under conditions that do not comply with cGMPs may nevertheless meet their labeled specifications and be fit for consumption. *See* FDA, *Facts About the Current Good Manufacturing Practices (CGMPs)* (2015), http://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm169105.htm (last visited Oct. 26, 2016) ("If a company is not complying with CGMP regulations, any drug it makes is considered 'adulterated' under the law. This kind of adulteration means that the drug was not manufactured under conditions that comply with CGMP. It does not mean that there is necessarily something wrong with the drug."). Regardless of whether the at-issue drugs were fit for consumption, 21 U.S.C. § 331(a) prohibits the introduction of adulterated drugs into interstate commerce, and Plaintiffs

allege the at-issue drugs were rendered worthless because they were sold illegally. *See* Compl. ¶ 6-9.

Moreover, because "the impact of CGMP violations depends on the nature of those violations and on the specific drugs involved," FDA, *Facts About the CGMPs*, Plaintiffs are entitled to prove that the nature of GSK's violations had a material impact on the drugs for which they paid.[12] Even if "adulterated" is not interchangeable with "unsafe" or "ineffective," the *In re Avandia* court held an at-issue drug does not itself have to be defective, but rather the plaintiffs had to show the masking of safety risks affected its value. Although Plaintiffs here do not allege the same "excess price" and "quantity effect" theories put forth by the *In re Avandia* plaintiffs, they do put forth a theory, with supporting facts, that includes elements of both theories: GSK's non-disclosure rendered the at-issue drugs *worthless* and physicians would have not prescribed the at-issue drugs *at all* had GSK not concealed the cGMP violations because Plaintiffs would not have placed the drugs on the their formularies. The alleged effect is supported by Plaintiffs' allegations of numerous issues with the at-issue drugs' safety and effectiveness, including product mix-ups, product contamination, failure in content uniformity, and foreign particles found in certain drug products, as admitted by SB Pharmco pursuant to its guilty plea. *See* Compl. ¶ 132; U.S. Dept. of Justice, Oct. 26, 2010 Press Release, https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-pay-750-million-resolve-criminal-and-civil-liability-regarding; Guilty Plea Settlement Agreement at 3-4, https://www.justice.gov/archive/usao/ma/news/2010/October/GSK% 20Settlement% 20Agreement10_26.pdf. Thus, contrary to GSK's assertion, Plaintiffs have adequately connected GSK's non-disclosure of cGMP violations, and the effect of those violations, on the quality and packaging of certain at-issue drugs, to Plaintiffs' payment for drugs they allege had no value.

 **\*7** GSK argues that of the alleged cGMP issues, only the aforementioned four quality issues—product mix-ups, product contamination, failure in content uniformity, and foreign particles found in certain drug products—related directly to the quality or packaging of the finished drug products; the remaining allegations relate to allegedly deficient manufacturing processes and procedures at Cidra. Of those four, GSK argues, Plaintiffs failed to allege they paid for the drugs or that they were distributed into the market. Plaintiffs respond that those four issues are illustrative, not

exclusive, and merely demonstrate the nature of GSK's FDA violations.

Again, because the Court finds it premature to dismiss Plaintiffs' claims based solely on cGMP violations, the fact that only four of the alleged cGMP violations are directly quality-related is not fatal. Furthermore, although GSK is correct that Plaintiffs did not specifically allege they paid for the drugs from the affected lots, they reiterate throughout the Complaint that they paid for the "adulterated" at-issue drugs. *See, e.g.,* Compl. ¶¶ 3, 4, 6, 9, 10, 185, 194. They also characterize themselves as the "principal payers" for the at-issue drugs, *id.* ¶ 182, noting they "collectively represent approximately 70% of the U.S. market for non-governmental health insurance," *id.* ¶ 3; "paid billions of dollars for [the] adulterated drugs...manufactured at [the Cidra plant]," *id.*; and "were the biggest single source of GSK's revenues in the U.S. market" from the at-issue drugs, *id.* ¶ 10. Thus, Plaintiffs have plausibly alleged they paid for affected lots of the at-issue drugs, giving rise to their economic injury.

Further, contrary to GSK's contention that Plaintiffs failed to allege the drugs from the affected lots were released to the market, they did allege some of those drugs were released. *See* Compl. ¶ 112 (noting approximately 17 complaints Cidra received in 2002 and 2003 regarding product commingling of Avandia, Paxil, and Coreg); *id.* ¶ 126 (noting SB Pharmco admitted in its guilty plea that in 2003, it "released...lots of Kytril that were deemed adulterated because the manufacturing processes and laboratory testing were insufficient to assure the Kytril was of the quality and purity that Kytril was represented to possess"); *id.* ¶ 128 (noting contaminated Bactroban ointment released to market in 2002; *id.* ¶ 131-32 (describing continued distribution of contaminated Bactroban to the market in 2003); *id.* ¶ 154 ("[I]n September 2004, Cidra rejected a batch of Avandamet due to OOS results in the content uniformity of the rosiglitazone active ingredient, but failed to investigate and released to the market 26 other batches made with the same batch of rosiglitazone."); *id.* ¶ 157 (alleging SB Pharmco admitted it released to the market adulterated Avandamet that was not of the "strength, identity, quality and purity [it] was represented to possess").

Considering the facts alleged bearing on Plaintiffs' economic injury—the cGMP violations, quality of drug issues, FDA seizure of stocks of adulterated drugs, and the existence of a permanent injunction preventing GSK from directly or indirectly introducing or delivering into interstate commerce adulterated product from the Cidra plant in April 2005—Plaintiffs have sufficiently pleaded they suffered injury to their businesses as a result of paying for the adulterated at-issue drugs.

### C. Statute of Limitations

GSK next argues all of Plaintiffs' claims are barred by the applicable two-or four-year statute of limitations.[13] Plaintiffs allege their injuries arose between 1997 and 2006. Compl. ¶ 12. Because Plaintiffs filed their suit on July 15, 2011, their claims are timely only if their claims accrued on or after July 15, 2007 for claims subject to a four-year statute of limitations, and on or after July 15, 2009 for claims subject to a two-year statute of limitations. GSK argues because Plaintiffs had ample notice of the cGMP violations at the Cidra plant before July 15, 2011, they knew or should have known of their claims before that date and their claims are therefore time-barred.

**\*8** A district court may consider a limitations defense on a motion under Rule 12(b)(6) "only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks and citation omitted). However, "if the bar is not apparent on the face of the complaint, then it may not afford the basis" for dismissal. *Id.*

Pennsylvania's discovery rule "tolls the accrual of the statute of limitations when a plaintiff is unable, 'despite the exercise of due diligence, to know of the injury or its cause.' " *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (quoting *Pocono Int'l Raceway v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). "For the statute of limitations to run, a plaintiff need not know the 'exact nature' of his injury, as long as it objectively appears that the plaintiff 'is reasonably charged with the knowledge that he has an injury caused by another.' " *Id.* at 510-11 (quoting *Ackler v. Raymark Indus., Inc.*, 551 A.2d 291, 293 (Pa. 1988)). "A plaintiff therefore is obligated to exercise reasonable diligence in ascertaining the existence of the injury and its cause." *Id.* at 511 (internal quotation marks and citation omitted).

Similarly, in terms of RICO's four-year statute of limitations, the Third Circuit has held courts should apply an injury discovery rule "whereby a RICO claim accrues when plaintiffs knew or should have known of their injury." *Cetel*, 460 F.3d at 507 (internal quotation marks and citations

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 68 of 751
PageID: 11434
Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....
2016 WL 6612804, RICO Bus.Disp.Guide 12,796

omitted). When plaintiffs should have known the basis of
their claims "depends on whether [and when] they had
sufficient information of possible wrongdoing to place them
on 'inquiry notice' or to excite 'storm warnings' of culpable
activity." *Id.* (quoting *Benak ex. rel. Alliance Premier Growth
Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400
(3d Cir. 2006)). "Moreover, plaintiffs have inquiry notice
'whenever circumstances exist that would lead a reasonable
investor of ordinary intelligence, through the exercise of due
diligence, to discovery of his or her injury.' " *Id.* (quoting
*Matthews v. Kidder Peabody & Co.*, 260 F.3d 239, 252 (3d
Cir. 2001)). A court's analysis of inquiry notice involves
two steps: (1) defendant must show the existence of "storm
warnings";[14] and (2) plaintiffs then must show that, "heeding
the storm warnings, they exercised reasonable diligence but
were unable to find and avoid the storm." *Id.*

GSK argues Plaintiffs were, or should have been, aware of
their claims by 2003, or by early 2005 at the latest, due
to the series of public disclosures of the cGMP issues at
the Cidra plant, including (1) the FDA's recall of select lots
of Bactroban, and issuance of a Warning Letter regarding
cGMP violations in 2002; (2) the FDA's commencement of a
criminal investigation of the Cidra plant in 2003, which was
documented in pharmaceutical publications and the national
media; (3) GSK's 2003 Annual Report, disclosing that the
FDA issued two Forms 483[15] to Cidra; (4) the FDA's seizure
in March 2005 of all stocks of Avandamet, which was
widely publicized in the media and disclosed in GSK's annual
reports; and (5) publicity following the April 2005 Consent
Decree between GSK and the United States, discussing the
issues at Cidra, the March 2005 seizure, and the terms of the
consent decree.[16]

**\*9** In response, Plaintiffs contend GSK has failed to carry its
heavy burden of proof in establishing their claims are time-
barred for three reasons. Pls.' Opp'n 15 (citing *Van Buskirk
v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir.
1985)). First, they assert the public record between 2002
and 2005 is insufficient to show they had inquiry notice
regarding the probability of alleged injury, as any problems
at the plant were confined to specific drugs and/or batches
of drugs, the FDA allowed the plant to continue operating,
and GSK assured the public it was cooperating fully with
the FDA. In fact, they assert the public had no notice of
the truth regarding the Cidra plant until GSK announced its
global settlement of Eckard's qui tam case[17] and SB Pharmco's
guilty plea in October 2010. Second, even if Plaintiffs were

on inquiry notice, further inquiry would have been fruitless.
Plaintiffs argue they could not have independently discovered
the extent of the issues at the Cidra plant because GSK
was actively concealing them from the FDA. At minimum,
Plaintiffs argue, the question whether additional inquiry
would have been fruitful is an unresolved factual issue. Third,
GSK's fraudulent concealment[18] of those conditions tolled
the limitations period.

The Court cannot conclude that Plaintiffs knew or should have
known the extent of GSK's misrepresentations regarding the
cGMP violations at Cidra and the resulting issues concerning
the quality and safety of the at-issue drugs at any time
before July 11, 2007. Factual issues remain as to whether the
public disclosures of cGMP issues between 2002 and 2005
constituted "storm warnings" establishing inquiry notice,
especially in light of GSK's attempts to minimize the extent
of the cGMP violations, the violations' effect on the quality
and safety of the drugs produced at Cidra, and GSK's
involvement.[19] *See Mathews v. Kidder, Peabody & Co.*, 260
F.3d 239, 253 (3d Cir. 2001) ("[W]e are mindful of the
dangers in adopting too broad an interpretation of inquiry
notice."); *In re Schering-Plough Corp. Intron*, 2009 WL
2043604, at *22 ("[I]t is not clear that the FDA warning
letter, public filings and newspaper articles reporting the
Government's investigation...provided warnings sufficient to
put Plaintiffs on notice of their purported RICO claims...."); 
*Stafford Inv. LLC v. Vito*, Nos. 04-3182, 06-1112, 06-4424,
2008 WL 5062136, at *3 (E.D. Pa. Dec. 1, 2008) ("Unless
there is a clear basis for the court to determine when plaintiff
knew or should have known of the existence of her cause
of action, the issue of whether the plaintiff had a reasonable
opportunity to discover the violation is a question to be
resolved by a jury.").

**\*10** For example, the Bactroban recall in 2002 was followed
by only an FDA Warning Letter advising of cGMP violations.
In 2003, the FDA opened a criminal investigation of the Cidra
plant and executed search warrants at the facility. However,
although GSK argues the investigation was documented in
"pharmaceutical publications and the national media," Def.'s
Mot. to Dismiss 23, the coverage was extremely minimal and
vague as to the nature or extent of the investigation.[20]

Although the FDA's March 2005 seizure of all stocks of
Avandamet (and Paxil CR), and subsequent Consent Decree,
was widely covered in the news media, GSK continued
to downplay the extent of its issues and assure the public
of its compliance with FDA demands. In its 2004 Annual

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 69 of 751
PageID: 11435

Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....

2016 WL 6612804, RICO Bus.Disp.Guide 12,796

Report, published in 2005, GSK noted the FDA's inspection of the Cidra plant in November 2004 and subsequent issuance of two Forms 483 containing "observations relat[ing] to certain aspects of production controls, process validation and laboratory investigations." Def.'s Mot. to Dismiss, Ex. 14. The Report further stated, "In response to the FDA's observations, the Group, among other things, voluntarily recalled certain shipments of Paxil CR and Avandamet from wholesalers. In March 2005 the FDA initiated seizures of Paxil CR and Avandamet tablets manufactured at Cidra on grounds that those products failed to meet FDA manufacturing standards. The Group continues to cooperate with the FDA in responding to [its] observations...." *Id.* In an April 2005 *New York Times* article describing the Consent Decree, GSK's global chief of pharmaceuticals reported GSK "was able to resolve the issue [of the drug recalls] quickly because of its strong relationship with the F.D.A." *Id.*, Ex. 36.

GSK presented the same sentiments of resolution in its annual reports. The 2005 and 2006 Annual Reports each provided a single sentence regarding the recall ("In March 2005 the FDA halted distribution of supplies of Paxil CR and Avandamet due to manufacturing issues."), followed by a description of the Consent Decree: the "Consent Decree provides for an independent expert to review manufacturing processes at the site for compliance with [GMP] requirements," requires GSK to "provide[ ] a report to the FDA on the deficiencies identified in [its] review, setting out a corrective plan and timetable for completion," and imposes "no financial penalties." *Id.*, Ex. 15 & 16. The 2006 Annual Report further states that "[i]n June 2006, the FDA confirmed that the status for the site has been upgraded to 'voluntary action indicated,' which means that the FDA deems the [Cidra plant] acceptable for the export of products and for routine manufacturing operations." *Id.*, Ex. 16. GSK continually noted its "commit[ment] to working cooperatively with the FDA to address any issues in a timely fashion." *Id.*, Ex. 15 & 16. In its 2007 Annual Report, GSK noted, "In March 2007, the FDA completed a general GMP inspection which resulted

in four inspectional observations. The Group has been advised by the FDA that the Group's response to the inspectional observations is satisfactory." Pl.'s Opp'n, Ex. B.

**\*11** Because factual issues remain as to whether Plaintiffs were on inquiry notice that the at-issue drugs were adulterated, and if inquiry notice existed, whether Plaintiffs exercised due diligence, GSK's motion to dismiss Plaintiffs' claims as time-barred is denied.

Just as the Court finds it premature to decide whether Plaintiffs' were on inquiry notice as to their claims prior to July 2007, an inquiry into whether GSK fraudulently concealed those claims similarly would be premature. *See Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331, 336-38 (E.D. Pa. 2006) ("In cases involving tolling due to allegations of fraudulent concealment, the Third Circuit has encouraged and approved of allowing the factual record to be sufficiently developed before reaching the issue." (citing *Byrnes v. De Bolt Transfer, Inc.*, 741 F.2d 620, 626-27 (3d Cir. 1984), and *Urland v. Merrell–Dow Pharm., Inc.*, 822 F.2d 1268, 1276-77 (3d Cir. 1987))). Further discovery is necessary to reveal whether GSK affirmatively concealed information that misled Plaintiffs, and whether Plaintiffs in turn exercised reasonable due diligence to stay apprised of potential wrongdoing on the part of GSK prior to 2007.[21]

Because Plaintiffs have adequately pled an injury for the purposes of standing, and there remain legitimate questions of fact as to whether Plaintiffs had a reasonable opportunity to discover GSK's alleged fraudulent conduct underlying their claims, GSK's motion to dismiss Plaintiffs' claims is denied.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6612804, RICO Bus.Disp.Guide 12,796

---

Footnotes

1   GSK filed its motion to dismiss on October 11, 2013. While the motion was pending, the Third Circuit agreed to hear an interlocutory appeal in another case raising a similar issue regarding RICO standing. *See In re Avandia Marketing, Sales Practices & Products Liability Litigation*, No. 10-5419, 2013 WL 5761202 (E.D. Pa. Oct. 23, 2013). On May 5, 2014, the Court stayed and put this case in suspense pending the resolution of that appeal. The Third Circuit decided *In re Avandia* on October 26, 2015, and the parties in this case then filed briefs addressing the impact of the decision on GSK's motion to dismiss.

2   The following facts are drawn from Plaintiffs' Complaint, the well-pleaded factual allegations of which this Court must accept as true in evaluating the instant motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....
Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 70 of 751
PageID: 11436
2016 WL 6612804, RICO Bus.Disp.Guide 12,796

3    Drugs are deemed to be adulterated if the manufacturer fails to comply with cGMPs to assure the drugs' safety, quality, purity, identity, and strength and/or if they are contaminated. *See* 21 U.S.C. § 351(a)(2)(A), (B). Federal law prohibits a manufacturer from directly or indirectly causing adulterated drugs to be introduced or delivered for introduction into interstate commerce. *See id.* § 331(a).

4    The at-issue drugs in this case include Paxil, Paxil OS, Avandia, Avandamet, Coreg, Bactroban, Kytril, Compazine, Denavir, Dyazide, Dibenzyline, Thorazine, Stelazine, Relafen, Factive, Dyrenium, and Albenza. Compl. ¶ 3. Only some of these drugs—Avandamet, Kytril, Bactroban, and Paxil CR—were found by the FDA to be adulterated. Nevertheless, Plaintiffs claim that because the Cidra plant was chronically in violation of FDA regulations, all of the at-issue drugs were adulterated.

5    The FDA issues "Warning Letters" to achieve voluntary compliance and to establish prior notice" before initiating enforcement action. U.S. Food & Drug Administration, *4.1 Warning Letters,* http://www.fda.gov/ICECI/ ComplianceManuals/RegulatoryProceduresManual/ucm176870.htm (last visited Oct. 31, 2016). Warning Letters are "issued only for violations of regulatory significance." *Id.*

6    Eckard also brought a qui tam suit under the False Claims Act in 2004, which was later joined by the Department of Justice. GSK eventually settled the suit for $600 million. *See* Pl.'s Rico Case Stmt. 5 (citing *United States ex rel. Eckward v. SmithKline Beacham Corp., d/b/a/ GlacoSmithKline, et al.*, No. 04-CV-10375-JLT (D. Mass.)).

7    As the same injury is alleged with respect to all claims, and because the parties do not argue that the respective injury standards for Plaintiffs' remaining claims differ in any material way, the Court will follow suit and analyze the injury issue in a RICO framework. *See Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 139 n.5 (3d Cir. 2009).

8    These cases generally deal with allegations of fraud and misrepresentation by defendant-drug companies engaged in off-label marketing which is prohibited by the FDA.

9    Defendants argue *In re Warfarin*, an antitrust case, is inapplicable to RICO claims. Def.'s Reply Mem. in Supp. of its Mot. to Dismiss 5 (citing *In re Schering-Plough Corp.*, 2009 WL 2043604, at *21; *Dist. 1199P*, 2008 WL 5413105, at *6). The Third Circuit, however, found *In re Warfarin* applicable in *In re Avandia*, a RICO case, because "RICO's standing requirements were decided on antitrust law." 804 F.3d at 649 n.32.

10    The fact that Plaintiffs alleged not overpayment, as in *In re Avandia*, but payment they would have not made at all due to the "worthlessness" of the at-issue drugs is of no import. In *In re Avandia*, GSK argued the plaintiffs' claim that doctors relied on GSK's misrepresentations when prescribing the at-issue drug failed because there was no allegations that an alternative prescription would have been cheaper. 804 F.3d at 644-45. The Third Circuit rejected that argument, noting the plaintiffs' injury was not entirely contingent on the existence of cheaper alternative drugs because under plaintiffs' "excess price" theory, they could show the at-issue drug cost too much regardless of whether cheaper drugs existed on the market. *Id.* at 645.

11    Defendants cite several cases for the proposition that cGMP violations alone are insufficient to show a drug is defective and, therefore, resulted in economic harm to the party paying for the drug. However, the cases were decided before *In re Avandia*. They are also distinguishable on their facts and the standard applied. *See In re McNeil Consumer Healthcare*, 877 F. Supp. 2d 254, 271 (E.D. Pa. 2012) (finding plaintiffs who purchased non-recalled drugs but "claimed their losses arose at the time of sale because they paid premium prices for products that were manufactured at facilities with quality control problems" and relied on "experiences of other individuals" who suffered adverse effects failed to state a cognizable injury); *Polk v. KV Pharm. Co.*, No. 4:09-CV-00588 SNLJ, 2011 WL 6257466, at *5-6 (E.D. Mo. Dec. 15, 2011) (holding consumer-plaintiff's "conclusory allegation that [a drug] was adulterated and therefore worthless" did not support the inference the drug "was anything less than what it purported to be," where the allegation was based solely on a FDA consent decree in which the defendant disclaimed any liability); *In re Digitek Prod. Liab. Litig.*, 821 F. Supp. 2d 822, 835-36 (S.D. W. Va. 2011) (granting summary judgment in product defect case in favor of defendants where evidence showed only single defective tablet was released, and drug recall and ongoing cGMP violations were insufficient to give rise to a reasonable inference that the drug reached the market and caused harm to plaintiffs); *Myers-Armstrong v. Actavis Totowa, LLC*, No. C 08-04741 WHA, 2009 WL 1082026, at *4 (N.D. Cal. Apr. 22, 2009) (dismissing consumer-plaintiff's claims because the mere fact that the drug was adulterated due to cGMP violations was insufficient to allege a cognizable injury absent a "manifestation of a defect that results in some injury or rational fear of injury") *aff'd*, 382 Fed.Appx. 545 (9th Cir. 2010).

12    An overview of the specific nature of the problems that occurred at the Cidra plant can be found in paragraph 77 of the Complaint. These problems are subsequently addressed in exhaustive detail between paragraphs 111-174.

13    The limitations periods applicable to Plaintiffs' claims are as follows: (1) RICO claims are subject to a four-year statute of limitations, *see Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006); (2) claims for common law fraud are

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 71 of 751
PageID: 11437
Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....

2016 WL 6612804, RICO Bus.Disp.Guide 12,796

subject to a two-year statute of limitations, *see Beauty Time, Inc. v. VU Skin Systems, Inc.*, 118 F.3d 140, 143 (3d Cir. 1997) (citing 42 Pa. Cons. Stat. § 5524(7)); (3) claims for statutory civil insurance fraud are subject to a two-year statute of limitations, *see State Farm Mut. Auto. Ins. Co. v. Midtown Med. Ctr. Inc.*, 2005 WL 627969, at *3 (E.D. Pa. 2005); (4) unjust enrichment claims are subject to a four-year statute of limitations, *Harry Miller Corp. v. Mancuso Chemicals Ltd.*, 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007); (5) negligent misrepresentation claims are subject to a two-year statute of limitations, *see Cooper v. Sirota*, 37 Fed.Appx. 46, 48 (3d Cir. 2002); and (6) breach of warranty claims are subject to a four-year statute of limitations, *Gunsalus v. Celotex Corp.*, 674 F. Supp. 1149, 1154-55 (E.D. Pa. 1987).

14  "Storm warnings" include "any information or accumulation of data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Cetel*, 460 F.3d at 507. "This charge saddles the investor with responsibilities like reading prospectuses, reports, and other information related to the investments, and, additionally, assumes knowledge of publicly available news articles and analyst's reports." *Id.* (internal quotation marks and citations omitted).

15  The FDA describes a Form 483 as follows:

An FDA Form 483 is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts.... Observations are made when in the investigator's judgement, conditions or practices observed would indicate that any food, drug, device or cosmetic has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health....Companies are encouraged to respond to the FDA Form 483 in writing with their corrective action plan and then implement that corrective action plan expeditiously.

*FDA Form 483 Frequently Asked Questions*, http://www.fda.gov/ICECI/Inspections /ucm256377.htm (last visited Nov. 7, 2016).

16  In making their arguments regarding inquiry notice, the parties rely on news articles and GSK's annual reports, which they attach as exhibits. It is not clear whether the Court may consider those exhibits at this stage. However, even considering such documents, the Court cannot decide the applicable statutes of limitations bar Plaintiffs' claims at this stage.

17  Plaintiffs assert the *Eckard* case was filed under seal in 2004 and was not unsealed until July 16, 2007, less than four years before they filed suit in July 2011. Further, Plaintiffs assert the case remained unpublicized until 2010, except for brief one-sentence references to the case in GSK's annual reports beginning in 2007. For example, in its 2007 Annual Report, published in 2008, GSK stated only that "in July 2007, the Group learned that the US District Court for the District of Massachusetts had unsealed a complaint brought by a former employee under the federal False Claims Act," i.e., the *Eckard* case.

18  Under the doctrine of fraudulent concealment, "a corollary to the discovery rule," the statute of limitations is tolled where a plaintiff proves by "clear, precise and convincing evidence" that "through fraud or concealment the defendant cause[d] the plaintiff to relax his vigilance or deviate from the right of inquiry." *Bohus v. Beloff*, 950 F.2d 919, 925 (3d Cir. 1991) (citation omitted). "There must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." *Id.* Once fraudulent concealment is established, "the statute of limitations is tolled until the plaintiff knew or using reasonable diligence should have known of the claim." *Id.* at 925-26 (internal quotation marks and citation omitted); *see also In re Schering-Plough Corp. Intron*, 2009 WL 2043604, at *22 ("In addition, Plaintiffs' allegation that Defendants concealed their illegal conduct raises the possibility that the applicable statutory periods should be tolled and, by implication, creates an additional hurdle to establishing that the RICO claims are barred.").

19  Defendants argue "extensive publicity" of the cGMP issues would have caused a reasonable insurance company to conduct further investigation, citing *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Product Liability Litigation*, 352 F. Supp. 2d 533 (E.D. Pa. 2004). In that case, however, the district court found a consumer of a certain diet drug had inquiry notice of her potential claims following extensive publicity of the drug's recall, including (1) "leading stories on major television network news programs;" (2) a "front-page story [in *USA Today*] regarding the withdrawal of [the] drugs, its effects,... the response by various organizations throughout the United States regarding the news," and "potential [imminent] litigation"; (3) the defendant's efforts to notify consumers about the recall through press releases, full-page ads in leading national and regional newspapers, and a " 'Dear Health Care Provider Letter" to approximately 450,000 physicians and pharmacists in which it informed them of the withdrawal of the drug from the market and of the potential association between use of the drugs and instances of valvular heart disease' "; and (4) the "comprehensive publicity campaign surrounding the nationwide class action Settlement Agreement with [the defendant]." *Id.* at 538-39. Furthermore, the court noted the plaintiff in that case admitted she had inquiry notice of a problem potentially related to the diet drug in her deposition. *Id.* at 538. The publications and news coverage in this case fall short of such "extensive publicity" and outreach efforts.

**Blue Cross Blue Shield Association v. Glaxosmithkline LLC, Not Reported in Fed. Supp....**

2016 WL 6612804, RICO Bus.Disp.Guide 12,796

20    The coverage included (1) a 140-word *Drug Industry Daily* article noting that although the "FDA ha[d] begun an investigation into manufacturing issues at [GSK's] facility in Cidra, Puerto Rico," the FDA "did not tell GSK the specific nature of the investigation," and GSK "would not interrupt the supply from the plant," *see* Def.'s Mot. to Dismiss, Ex. 10; (2) an article in *The Guardian*, "Glaxo plant in Puerto Rico under FDA scrutiny," which noted GSK was uninformed about the specific nature of the FDA's investigation, and quoted finance director John Coombe as stating, " 'The issues raised [in the FDA's Warning Letter] were fully resolved and closed up. The FDA are now back. They are being quite coy about exactly what they are looking for,' " *id.*, Ex. 9; (3) a 253-word article from *HIS Global Insight*, "GSK Plant in Puerto Rico Faces FDA Manufacturing Probe," noting " it remains unclear precisely what the FDA is investigating;" *id.*, Ex. 11; and (4) a 274-word article from the Glasgow *Herald*, "Glaxo pre-tax profits climb 22% to (pounds) 1.7bn," which references the investigation in a single line noting "investors were also unnerved by news that the [FDA] was investigating a Glaxo factory in Puerto Rico," *id.*, Ex. 12.

21    GSK argues Plaintiffs' breach of warranty claims are barred by the statute of limitations because the discovery rule does not apply to such claims. Def.'s Mot. to Dismiss 25-26 (citing 13 Pa. Cons. Stat. §§ 2725(a)-(b), 5525(a)(2)); *see also Gunsalus*, 674 F. Supp. at 1154-55 (discovery rule does not toll statute of limitations on breach of warranty claims unless there is an explicit warranty of future performance). In response, Plaintiffs argue fraudulent concealment equitably tolls the limitations period for warranty claims, as it does for their other claims. Pls.' Opp'n 27 n.23 (citing *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2008 WL 4126264, at *18-19 (D.N.J. Sept. 2, 2008), and *Connaught Labs., Inc. v. Lewis*, 557 A.2d 40, 43-44 (Pa. Cmmw. Ct. 1989)). Because the Court will not decide whether fraudulent concealment tolls the statute of limitations, the question of whether Plaintiffs' breach of warranty claims are barred is also left for another day.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 6

2019 WL 4751883
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

BLUE CROSS BLUE SHIELD
ASSOCIATION, et al.
v.
GLAXOSMITHKLINE LLC

CIVIL ACTION No. 13-4663
|
Filed 09/30/2019

**Attorneys and Law Firms**

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, for Blue Cross Blue Shield Association, Aetna, Inc., Amerigroup/HMS, Avmed Health Plans, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Montana, Inc., Blue Cross and Blue Shield of North Carolina, Blue Cross & Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Bluecross Blueshield of Tennessee, Carefirst of Maryland, Inc., Connecticut General Life Insurance Company, Emblem Health, Government Employees Health Association, Group Health Cooperative, Group Hospitalization and Medical Services, Inc., Health Net, Inc., Healthnow New York, Highmark Inc., Highmark West Virginia Inc., HMO Partners, Inc., Kps Health Plans, Medical Mutual of Ohio, Noridian, Premera Blue Cross, Priority Health, The Regence Group, Usable Mutual Insurance Company, Wellcare Health Plans, Inc., Wellcare Health Plan of Iowa, Inc., Wellmark, Inc., Wellpoint, Inc.

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, John Gregory Murphy, Baton Rouge, LA, for Louisiana Health Service Indemnity Company.

David H. Pittinsky, Edward D. Rogers, Stephen J. Kastenberg, William B. Igoe, Leslie E. John, Barbara A. Schwartz, Daniel Mullin, Elizabeth P. Weissert, JoAnna Rebecca Hess Kunz, Juliana Carter, Thomas J. Gallagher, IV, Ballard Spahr Andrews & Ingersoll LLP, Ricky Mario Guerra, Blank Rome LLP, Philadelphia, PA, Joseph E. O'Neil, John J. O'Donnell, Campbell Conroy & O'Neil, P.C., Berwyn, PA, Mark H. Lynch, Covington & Burling, Matthew F. Dunn, Matthew J. O'Connor, Michael M. Maya, Jason C. Raofield, Covington & Burling LLP, Washington, DC, William Mark LaNier, Houston, TX, for GlaxoSmithKline LLC.

## MEMORANDUM

Juan R. Sánchez, C.J.

**\*1** Plaintiffs, 38 private health insurance companies that purchased billions of dollars' worth of adulterated pharmaceutical drugs from Defendant GlaxoSmithKline LLC (GSK), bring the instant action, alleging they purchased the drugs at issue based on GSK's misrepresentations that the drugs were manufactured in accordance with the Food and Drug Administration's "current Good Manufacturing Practices."[1] Plaintiffs claim the adulterated drugs were worthless and had they known of the adulteration they would not have included the drugs in their formularies. GSK has moved to exclude Plaintiffs' five expert witnesses pursuant to Federal Rule of Evidence 702—Phillip Russ; David A. Kessler, M.D.; Matthew Perri III, B.S. Pharm, PhD, RPh; Stephen W. Schondelmeyer, PhD; and Rena Conti, PhD. GSK's motion is granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the Motion will be denied.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 75 of 751
PageID: 11441
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Slip Copy (2019)

2019 WL 4751883

## BACKGROUND

This case arises out of Plaintiffs' providing prescription drug coverage for seventeen drugs—Albenza, Avandia, Avandamet, Bactroban, Compazine, Coreg, Denavir, Dibenzyline, Dyazide, Dyrenium, Factive, Horowitz, Kytril, Paxil IR, Paxil OS, Stelazine, and Thorazine (collectively, the At-Issue Drugs). The drugs were manufactured by GSK's corporate affiliate, SB Pharmco Puerto Rico Inc. (SB Pharmco), at a pharmaceutical manufacturing plant in Cidra, Puerto Rico (the Cidra Plant). From 2000 to 2005 (the Relevant Period), Plaintiffs assert SB Pharmco's poor manufacturing process and quality control system at the Cidra Plant were non-compliant with the Food and Drug Administration's (FDA) "current Good Manufacturing Practices" (cGMP). According to Plaintiffs, the drugs were therefore "adulterated" under the Food, Drug & Cosmetic Act (FDCA). *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). Plaintiffs allege GSK fraudulently misrepresented that the At-Issue Drugs manufactured at the Cidra Plant were cGMP compliant, resulting in Plaintiffs providing coverage for adulterated drugs they claim were worthless.[2] In support of their case, Plaintiffs have retained the five expert witnesses.

Plaintiffs retained Philip Russ to analyze the nature and extent of the cGMP violations at the Cidra Plant during the Relevant Period. *See* Pls.' Resp. in Opp'n to Def.'s *Daubert* Mot. (Pls.' Opp'n) 2. Russ is the owner and president of Innovative Consultants GXP, which "provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device, and biologics industry." GSK's Mot. to Exclude Expert Test. of Phillip Russ, Drs. David Kessler, Matthew Perri, Stephen Schondelmeyer, and Rena Conti (GSK Mot.) Ex. 3, at 4. Russ has twenty-three years of experience in the pharmaceutical, medical device, and biologics industry, focusing on the regulatory compliance aspects of developing and managing quality management systems and cGMP compliance. *See id.* Russ's report evaluates "the extent to which manufacturing at the [Cidra Plant] was in material violation of 21 U.S.C. § 351." *Id.* at 3. Russ's report is based upon a review of (1) cGMP records of compliance activities; (2) FDA inspection results; (3) GSK's internal audits; (4) internal GSK emails and other correspondence and memoranda related to the Quality Management System (QMS) at the Cidra Plant; and (5) the observations of Quantic Regulatory Services, the third-party expert engaged by GSK to evaluate cGMP compliance at the Cidra Plant as a result of a Consent Decree entered into between GSK and the FDA. *Id.* at 3-4. After review of

these documents, Russ concluded "all products manufactured at the Cidra Plant between 2000 and 2005 were materially non-compliant with cGMPs and lacked the assurance of conformance to their represented properties." *Id.* at 105.

**\*2** Plaintiffs retained David A. Kessler, M.D., as an expert on cGMP regulations and cGMP compliance. Dr. Kessler was FDA Commissioner from 1990 until 1997. *See id.* Ex. 7, at ¶ 2 As the FDA Commissioner, Dr. Kessler oversaw the FDA's promulgation and implementation of proposed and finalized regulations concerning cGMPs for pharmaceuticals. *See id.* at ¶ 5-7. Dr. Kessler's expert report opines on four central questions: (1) "[w]hy is compliance with cGMPs important?"; (2) "[w]hy are a drug manufacturer's responsibilities with regard to cGMP compliance?"; (3) "[f]rom a regulatory point of view, what types of cGMP violations can have a 'material impact' on a drug?"; (4) "[i]f specific drugs are recalled from the market or seized from a plant because they violate cGMPs, what conclusions can be drawn as to whether other drugs at the same plant are cGMP compliant?" *id.* at ¶ 11(a)-(d). Dr. Kessler opines that (A) cGMP compliance is important "because it assures that what a drug manufacturer says is in a drug is actually in the drug;" *id.* at ¶ 12, (B) drug manufacturers "[can]not sell products that fall below the represented standards," *id.* at ¶ 28, and must "investigate, understand, and correct quality deviations," *id.* at ¶ 30, (C) there "are three categories of cGMP violations that can have a 'material impact' on a drug," *id.* at ¶ 35, and (D) "[t]he fact that specific drug products are recalled from the market or seized from a plant because they violate cGMPs does not mean that other drugs are cGMP-compliant," *id.* at ¶ 43.

Matthew Perri III, B.S. Pharm, PhD, RPh, is offered as an expert in pharmaceutical marketing and his expert report assesses "the nature and significance of the marketing activities of [GSK] related to ongoing problems at [the Cidra Plant]." *Id.* Ex. 8, at 3. Dr. Perri is a Professor at the University of Georgia, teaching undergraduate and graduate courses in healthcare and pharmaceutical marketing and other related areas. *See id.* at ¶ 1-3. Dr. Perri offers seven opinions including, inter alia, (1) it is the pharmaceutical manufacturer's job to ensure its drug products are manufactured in compliance with all FDA regulations; (2) patients, pharmacists, prescribers, and third-party payers rely on the assurance that a drug is what the manufacturer represents it to be; (3) major pharmaceutical manufacturers control the information their personnel disseminate into the market place; and (4) it is not feasible, or expected, for third-

party payers to monitor FDA enforcement actions, given the number of drugs listed on third-party payers' formularies. *See id.* at 3. In reaching his conclusions, Dr. Perri asserts his opinions are based on "universally accepted principles of marketing." *Id.* at ¶ 11.

Next, Plaintiffs offer Stephen Schondelmeyer, PhD, as a causation expert to demonstrate that, had Plaintiffs known about the cGMP violations at the Cidra Plant, they would have removed the At-Issue Drugs from their formularies and that non-cGMP compliant drugs have no economic value to third-party payors. Dr. Schondelmeyer is a Professor of Pharmaceutical Management and Economics at the University of Minnesota. *See id.* Ex. 11, at ¶¶ 1, 4. Dr. Schondelmeyer has more than 40 years of experience related to pharmaceutical economics and public policy research. *See id.* at ¶ 4. In his six-page opinion, Dr. Schondelmeyer concludes, based on his experience, "no payer in the United States would knowingly and willingly pay for such material non-compliant drugs [and] [s]uch drug products for all practical purposes have no value in the U.S. market and would be considered non-salable." *Id.* at ¶ 19.

Finally, Plaintiffs offer Rena Conti, PhD, as an expert on damages. Dr. Conti is an Associate Professor at Boston University's Questrom School of Business and an economist for the FDA's Center for Drug Evaluation and Research. *See id.* Ex. 15, at ¶ 8. She focuses her research on the market for prescription drugs and the pricing of pharmaceutical products in the United States market. *See id.* at ¶ 10. Dr. Conti concludes only prescription drugs "manufactured in compliance with [cGMPs] may be assigned a non-zero value by patients and third-party payers, and drugs which fail to meet those standards have no economic value." *Id.* at ¶ 4. Applying the economic principle of supply and demand, Dr. Conti concluded there can be no legitimate supply curve to establish an economic value because the FDCA prohibits the sale of adulterated drugs. *See id.* at ¶ 37-40. Dr. Conti further determined that, "[b]ecause GSK produced and sold non-compliant drugs, plaintiffs paid for illegitimate products that have no economic value." *Id.* at ¶ 5. As a result, Dr. Conti calculated the aggregate damages for all Plaintiffs as $2.82 billion, and individual damages for each Plaintiff as ranging between $3.3 million to $483.7 million. *See id.* at ¶ 52.

## DISCUSSION

**\*3** Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) that testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, that a "a gatekeeping role for the [trial] judge." 509 U.S. 579, 597 (1993). However, "the court's role as a gatekeeper is not intended to serve as a replacement for the adversary system," because, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D. Del. 2004) (internal quotation marks and alterations omitted).

Following *Daubert*, the Third Circuit Court of Appeals has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999). Rule 702 envisions a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). GSK does not seek to exclude Plaintiffs' experts based on their qualifications and this requirement will therefore not be further discussed.

To meet the "reliability" requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable ... [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda*, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.' " *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (citation omitted). The Court must focus on the expert's methodology—not his or her

conclusions. *In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions.")

When evaluating the reliability of a witness's methodology, the Court is guided by several factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*4** *id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

To meet the "fit" requirement "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Like a typical relevance inquiry, the standard for analyzing the fit of an expert's analysis is "not that high." *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007). Nevertheless, expert testimony can be powerful and misleading, and the Third Circuit has cautioned courts to "tread carefully when evaluating proffered expert testimony." *Id.* at 219 n.6. With these standards in mind, the Court turns to GSK's motion to exclude.

GSK first moves to exclude Russ's testimony arguing it does not fit the question before the Court. GSK contends the question before the Court is whether Plaintiffs can prove that GSK's cGMP violations had a "material impact" on the drugs for which they paid. GSK asserts Russ proposes to testify only that GSK could not assure that the At-Issue Drugs were not impacted by the cGMP violations at the plant. GSK claims such testimony would confuse the jury and is irrelevant. GSK's argument is unpersuasive.

In denying GSK's motion to dismiss, this Court previously held "Plaintiffs [were] entitled prove that the nature of GSK's [cGMP] violations had a material impact on the drugs for which they paid." *See* Mem. 11, Nov. 9, 2016, ECF No. 105. Russ's report finds the Cidra Plant had significant fundamental failures in all six essential quality systems—

which relate to a manufacturer's ability to certify a drug's purity, uniformity, quality, and manufacturing. The report concludes that, due to these chronic failures, GSK could not assure the At-Issue Drugs "conformed to their represented properties of safety, identity, strength, purity, and quality." GSK Mot. Ex. 4, at 9. This testimony fits the question in this case and is relevant because a reasonable jury could find GSK's cGMP violations had a material impact on the value of the At-Issue Drugs as GSK could not assure their conformance to their representative properties—i.e., their quality was not as labeled and advertised.

GSK also argues Russ's opinion fails the reliability test because (1) his opinion applies to every product made at the Cidra plant during the relevant time period, not just the At-Issue Drugs; (2) he has never used the phrase "material violation" before this litigation and it does not have the same meaning as "material impact"; and (3) he could not answer why the FDA chose to seize a certain drug manufactured at the Cidra Plant but concurrently stated consumers could continue to take another drug manufactured at the Cidra Plant with confidence. These arguments, however, go to the weight and credibility of Russ's testimony and can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Crowley*, 322 F. Supp. 2d at 536. Therefore, GSK's motion to exclude Russ's testimony will be denied.

**\*5** GSK next moves to exclude Dr. Kessler's expert opinion asserting it draws an impermissible legal conclusion. GSK contends Dr. Kessler's opinion is merely a legal conclusion because he seeks to interpret the "material impact" language from the Court's November 9, 2016, Memorandum. GSK argues this is a legal term the Court must instruct the jury on, and therefore, Dr. Kessler may not opine on it.

GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact." Quoting the Court's November 9, 2016, Memorandum, Dr. Kessler seeks to opine on "what types of cGMP violations have a 'material impact' on a drug" and interpret the language in the Court's Memorandum. *See* GSK Mot. Ex. 8, at 2 ("The Court in this case cited the FDA's statement, then noted that Plaintiffs are entitled to show a "material impact" on drugs for which they paid. From a regulatory point of view, what types of cGMP violations can have a "material impact" on a drug?"). Allowing Dr. Kessler to opine on what constitutes a material impact on

2019 WL 4751883

the case would run afoul of *Daubert* as it would allow Dr. Kessler to directly opine on the legal issue in this case. *See Whitmill v. City of Philadelphia,* 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998)("As a general rule an expert's testimony on issues of law is inadmissible.")(quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also In re Wellbutrin SR Antitrust Lit.,* Nos. 04-5525, 05-5898, 05-396, 2010 WL 8425189, at *3-5 (E.D. Pa. Mar. 31, 2010) (collecting cases and finding the experts in the instant case could testify about the background of patent law and procedure but could not testify about whether a previous patent lawsuit was objectively baseless—a legal issue in the case). Therefore, Dr. Kessler will be precluded from defining "material impact." However, Dr. Kessler will be permitted to testify about FDA regulations generally and how cGMP violations occur on a spectrum, including how violations range in severity and provide examples of how cGMP violations fall on that spectrum.[3] Therefore, GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact" during his testimony at trial.[4]

**\*6** Next, GSK moves to exclude Dr. Perri's testimony based on reliability.[5] GSK argues Dr. Perri's opinion must be excluded because he fails to explain or define the reliable methodology he used to come to his opinion. Specifically, GSK asserts Dr. Perri explains he applied "universally accepted principles of marketing," *see* GSK Mot. Ex. 8, at ¶ 11, but never defined the principles, applied specific principles, or explained why these principles would assist the jury in determining whether Plaintiffs would have removed the At-Issue Drugs from its formularies.

GSK's arguments are unpersuasive. While GSK focuses on the phrase "universal principles of marketing" to argue Dr. Perri's analysis is unreliable, Dr. Perri applies the case study method—an objective methodology—and consults additional academic sources regarding the pharmaceutical industry, to apply his own pharmaceutical and healthcare marketing experience to the facts of the instant case and draw his conclusions. *See generally id.* ¶ 13-75. As other courts have held, this is sufficient to meet the reliability prong under *Daubert. See Wolfe v. McNeil–PPC, Inc.,* No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011) (finding three doctor's testimony sufficiently reliable where the doctors used the case study method and "extensive[ly] review[ed] of plaintiff's medical records and deposition testimony of plaintiff's treating physicians" and determined "the three

doctors' use of case studies in reaching their conclusion affects only the weight to be given their testimony, not its admissibility...."); *Acosta v. WPN Corp.,* No. 14-1494, 2018 WL 3707418, at *6 (W.D. Pa. Aug. 3, 2018) (admitting expert testimony where the expert used "her experience and specialized knowledge" to discern a standard of fiduciary care and apply it to the facts of the case). In any event, the issues GSK takes with Dr. Perri's analysis pertain to the credibility and weight of Dr. Perri's testimony, which GSK may test through cross-examination and the presentation of contrary evidence. *See Crowley,* 322 F. Supp. 2d at 536.

GSK further asserts Dr. Perri's expert opinion should be excluded because it is similar to the excluded opinion he offered in *United States v. AseraCare, Inc.,* No 12-0245, 2014 WL 6879254, at *1 (N.D. Ala. Dec. 4, 2014). In *AseraCare,* the Government sought to offer Dr. Perri as a "marketing expert" to support its theory that an operator of hospice facilities knew it had submitted false Medicare claims. *Id.* at *11. To support his opinion, Dr. Perri relied on "universal principles of marketing." *Id.* at *12. The court ultimately excluded Dr. Perri's opinion, stating "Dr. Perri has no experience in the hospice industry, did not study any other hospice companies, and did not review any of the guidance from [the Centers for Medicare and Medicaid Services] regarding many of the topics on which he opined." *Id.* at *11. GSK contends *AseraCare* is nearly identical to this case, and the Court should therefore exclude Dr. Perri's testimony on the same grounds.

GSK's reliance in *AseraCare* is misplaced. Dr. Perri's opinion in *AseraCare* was excluded because he did not have *any* experience in the hospice industry and failed to explain why his universal principles of marketing methodology had any bearing in the hospice industry. *Id.* at *12. Unlike *AseraCare,* in the instant case, Dr. Perri has significant experience in the pharmaceutical marketing industry—a point which GSK does not dispute. *See* GSK Mot. Ex. 7, at ¶ 1-11 (discussing Dr. Perri's qualifications). Further, unlike *AseraCare,* Dr. Perri has connected his "universally accepted principles of marketing" to the pharmaceutical industry. *See id.* at ¶ 13-17 (describing marketing principles generally and how they apply in the pharmaceutical market). Therefore, the reasons for excluding Dr. Perri's testimony in *AseraCare* do not apply and GSK's motion to exclude Dr. Perri's testimony will be denied.

**\*7** Turning Dr. Schondelmeyer, GSK argues Dr. Schondelmeyer's testimony should be excluded because it is

2019 WL 4751883

unreliable. GSK asserts Dr. Schondelmeyer's report states he provided his opinion as an "expert on economic and public policy issues," GSK Mot. Ex. 11, at ¶ 1, but when deposed he stated his opinion was "not really" economic in nature, *id.* Ex. 12, at 176:18-20. GSK further contends Dr. Schondelmeyer failed to tie his expert opinion to the facts of the case by failing to cite any source for his key opinions. The Court agrees with GSK and finds Dr. Schondelmeyer has failed to offer a reliable methodology as the basis for his opinion.

Initially, the type of expert analysis Dr. Schondelmeyer purports to provide is unclear. In his report, Dr. Schondelmeyer states he provides his opinion as an "independent expert on economic and public policy issues." GSK Mot. Ex. 11, at ¶ 1. However, in his deposition, he stated his opinion provides no economic analysis. *See id.* Ex. 12, at 176:18-20. Yet, in his reply report, Dr. Schondelmeyer states his opinion is that non-cGMP-compliant drugs have "no economic value," *id.* Ex. 13, at ¶ 5 ("Under federal law, materially non-compliant drugs cannot be lawfully distributed and sold. For payers acting within the law, therefore, such drugs have no economic value." (footnote omitted)). Adding further confusion is Plaintiffs' presentation of Dr. Schondelmeyer as a "healthcare insurance expert." *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 17 ("Dr. Stephen Schondelmeyer (Plaintiffs' healthcare insurance expert)."). The Court is hard pressed to find an acceptable basis on which to allow Dr. Schondelmeyer to testify about non-cGMP-compliant drugs having "no economic value" while claiming he is not providing an economic analysis and being offered as a healthcare expert.

In any event, Dr. Schondelmeyer provides no reliable basis for his opinions. In two brief paragraphs of his short six-page report, Dr. Schondelmeyer concludes that, based on his experience, insurers rely on a drug manufacturer's assurances regarding cGMP compliance and no insurer or third-party payer would pay for drugs with material cGMP violations. *See* GSK Mot. Ex. 11, at ¶ 18-19. Dr. Schondelmeyer's opinion, however, provides no more than a paradigm example of "say-so" expert testimony. While the Court does not doubt his qualifications and experience in the pharmaceutical industry, Dr. Schondelmeyer has failed to demonstrate or explain how his experience is reliably applied to the facts of this case. *See id.* ("My experience includes consulting for payers that provide drug benefits to insured individuals or beneficiaries, including, but not limited to, self-insured employers ... In my experience, no payer in the United States would knowingly and willingly

pay for such materially non-compliant drug products."). Unlike Dr. Perri, whose experience-based testimony was applied to the instant case through the objective case study methodology and supplemented with additional academic sources, Dr. Schondelmeyer's experience-based testimony is *entirely subjective* and premised solely on his say-so, which cannot be adequately tested through cross-examination. *In re TMI Lit.*, 193 F.3d at 703 n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."). The Court will therefore grant GSK's motion to exclude Dr. Schondelmeyer's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the expert must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); *see also* Player v. Motiva Enters., LLC, 240 F. App'x 513, 520 (3d Cir. 2007) (stating the "District Court certainly had the discretion to exclude opinion evidence that is connected to existing data only by the ipse dixit [or say-so] of the expert." (internal citations omitted)).

**\*8** Finally, GSK moves to exclude Dr. Conti's expert testimony on four grounds: (1) she impermissibly bases her opinion on a legal interpretation of the FDCA; (2) she provides no reliable economic methodology for her opinion; (3) she improperly regurgitates Plaintiffs' allegations; and (4) she fails to account for the rebates Plaintiffs received for purchasing the At-Issue Drugs and fails to consider the cost of alternative treatment options. GSK's arguments to exclude Dr. Conti's testimony are unavailing.

First, Dr. Conti's testimony does not render an impermissible legal conclusion. Dr. Conti's expert report states the FDCA prevents companies from introducing adulterated drugs into the market place. *See* 21 U.S.C. § 331(a) ("The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."). According to Dr. Conti, based on this prohibition, economic principles state there is no legitimate supply curve for these drugs. *See, e.g.*, GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because Dr. Conti is explaining the FDCA's prohibition on adulterated drugs—based on her own previous experience and discussions with pharmaceutical companies—and not providing a legal conclusion, she is not rendering an impermissible legal opinion. *See* Hartle

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 80 of 751
PageID: 11446
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Slip Copy (2019)

2019 WL 4751883

*v. FirstEnergy Gen. Corp.*, Nos. 08–1019, 08–1025, 08–1030, 2014 WL 5089725, at *1-2 (W.D. Pa. Oct. 9, 2014) (permitting an expert to explain regulations but not offer an opinion on whether the defendant violated the provisions at issue).

Second, GSK's argument that Dr. Conti's expert opinion is not based on a reliable economic methodology is similarly without merit. As her expert report demonstrates, Dr. Conti relied on peer-reviewed journal articles, textbooks, studies regarding the economic value of drugs, *see id.* Ex. 17, at ¶ 9 n.15-16, conversations with providers and insurers, *see id.* Ex. 16, at 83:23-84:7, and the generally accepted economic principles of supply and demand in support of her opinion, *see id.* Ex. 15, at ¶ 38 ("There is no equilibrium between the demand for compliant prescription drugs and the supply of non-compliant drugs."). Dr. Conti has therefore provided a sufficient reliable basis and methodology for her expert opinion. *In re Paoli*, 35 F.3d at 744 ("[Proponents of expert testimony] do not have to demonstrate to the judge ... that the assessments of their experts are correct, they only have to demonstrate ... that their opinions are reliable."). To the extent GSK argues Dr. Conti's analysis is superficial and conclusory, this argument goes to the credibility of Dr. Conti's testimony and may be elicited through cross-examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("[T]he burden of exploring the facts and assumptions underlying the testimony of an expert witness [is placed] on opposing counsel during cross-examination.").

Third, GSK's argument that Dr. Conti merely parrots Plaintiffs' allegations because she lacks real-world experience as a third-party payor is not a reason to exclude Dr. Conti's testimony. GSK points to two lines in Dr. Conti's deposition where she said she is not a third-party payer and has never worked for one. *See* GSK Mot. Ex. 16, at 153:6-8 ("I'm not a third-party payer. I've never worked in a third-party payer"). And GSK argues Dr. Conti has no basis to opine on the value insurers assign to non-complaint drugs. GSK's argument again goes to the credibility and weight of Dr. Conti's testimony, not the admissibility of her opinion. *See Stecyk*, 295 F.3d at 414.

*9 Finally, Dr. Conti's damages calculation is not flawed for not factoring in any rebates Plaintiffs may have received for the At-Issue Drugs or any therapeutic alternatives they may have had to cover as a result of discontinuing coverage for the At-Issue Drugs. GSK's argument that Dr. Conti should have reduced her damages amount—as suggested by GSK's expert Dr. Mohan Rao—is not a basis to exclude Dr. Conti's analysis. Rather, it demonstrates a fact question the jury must resolve because it requires a credibility determination and comparison of each expert's methodology. *Compare* GSK Mot. Ex. 15, at ¶ 43 ("Based on my assessment that spending on prescription drugs cannot be separated from the quality manufacturing assured by the manufacturer and overseen by government regulators, non-compliant prescription drugs have no economic value. Therefore, the appropriate measure of damages in this matter is the total amount paid....") *with* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. 222, at ¶ 48 ("Dr. Conti fails to account for rebates received by Plaintiffs after the initial reimbursement of a claim, causing her to overstate Plaintiffs' purchases by approximately 8 percent. She also fails to deduct payments on claims where Plaintiffs served in an administrative role only...."). Accordingly, GSK's motion to exclude Dr. Conti's testimony will be denied. *See In re Asbestos Prods. Liab. Lit. (No. VI)*, 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010) ("[I]t is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.").

## CONCLUSION

In sum, GSK's motion to exclude will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the motion will be denied.

An appropriate order follows.

**All Citations**

Slip Copy, 2019 WL 4751883

Footnotes

1    At the time of filing, 41 private health insurance companies were named as plaintiffs in this action. Since filing, three plaintiffs—Blue Cross of Idaho Health Service, Inc., Health Care Services Corporation, and Horizon Blue Cross Blue Shield of New Jersey—have settled with GSK.

**2** In light of the Court having provided a detailed recitation of the facts of this case in its September 30, 2019, Memorandum granting in part and denying in part GSK's Motion for Summary Judgment, the Court will not further discuss the factual background of this case.

**3** GSK also moves to exclude Dr. Kessler's opinion on what constitutes a "material impact" because there is no FDA practice or policy grounding his opinion. However, because the Court will prevent Dr. Kessler from defining "material impact," GSK's argument is moot.

**4** GSK directs the Court to a handful of cases, which it asserts demonstrate that Dr. Kessler's testimony has regularly been excluded. However, in the majority of the cases GSK relies on, Dr. Kessler's testimony was not excluded but merely narrowed. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Dr. Kessler is qualified to opine on FDA regulatory issues that relate to Bard filters, and his testimony in this regard would prove helpful to the jury. But no expert, including Dr. Kessler, will be permitted to give ultimate legal opinions on state law claims, improperly narrate or regurgitate facts, or speculate about motives or intent."); Order, *Bartolini v. Abbott Labs., Inc.*, No. 15-702 (S.D. Ill. May 23, 2017), ECF No. 277 (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *In re Prograf Antitrust Litig.*, No. 11-2242, 2014 WL 7641156, at *2-3 (D. Mass. Dec. 23, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Drake v. Allergan, Inc.*, No. 13-234, 2014 WL 5392995, at *5-6 (D. Vt. Oct. 23, 2014) ("Allergan's Motion [to exclude Dr. Kessler's testimony] is granted to the extent it sought the general guidance given above and denied to the extent that some objections will have to be raised at trial"); *Allen v. Takeda Pharm. N.A., Inc.*, Nos. 11-2299, 12-64, 2014 WL 120973, at *4-19 (W.D. La. Jan. 10, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Wells v. Allergan*, No. 12-973, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (allowing defendants to object at trial if Dr. Kessler speculates or regurgitates facts).

**5** GSK's motion to exclude also states GSK seeks to exclude Dr. Perri's testimony on the basis of fit. *See* GSK Mot. 1. GSK's arguments, however, all pertain to the reliability of Dr. Perri's opinion.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 7

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 83 of 751
PageID: 11449
Bondyopadhyay v. Bank of New York Mellon, Slip Copy (2020)

2020 WL 4676765
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

Probir K. BONDYOPADHYAY, et al., Plaintiffs,

v.

The BANK OF NEW YORK MELLON, Defendant.

Probir K. Bondyopadhyay, et al., Plaintiffs,

v.

Shellpoint Mortgage Servicing, Defendant.

Civil Action No. H-20-1340,
Civil Action No. H-20-1359,
|
Signed 08/11/2020

**Attorneys and Law Firms**

Probir K. Bondyopadhyay, Houston, TX, pro se.

Madhuri Bondyopadhyay, Houston, TX, pro se.

Monica Lizette Summers, Akerman LLP, San Antonio, TX,
Walter Lewis Edmond McInnis, Akerman LLP, Dallas, TX,
for Defendant.

**MEMORANDUM AND OPINION**

Lee H. Rosenthal, Chief United States District Judge

 **\*1** Probir and Madhuri Bondyopadhyay, representing
themselves, sued The Bank of New York Mellon, the holder of
the Bondyopadhyays's mortgage note and the trustee on their
deed of trust, and Shellpoint Mortgage Servicing, the loan
servicer, in separate state court proceedings, seeking to stave
off the foreclosure of their home. The Bank and Shellpoint
removed based on diversity jurisdiction. (Case No. 20-1340,
Docket Entry No. 1; Case No. 20-1359, Docket Entry No.
1). The two cases were brought before a single judge for
coordinated case management. (Case No. 20-1359, Docket
Entry No. 7).

In both cases, the Bank and Shellpoint filed identical motions
to dismiss the Bondyopadhyays's claims under Rule 12(c).
(Case No. 20-1340, Docket Entry No. 21; Case No. 20-1359,
Docket Entry No. 18). For clarity, the court cites only to
the motion in the first case, *Bondyopadhyay v. The Bank*

*of New York Mellon*, No. 4:20-cv-1340 (S.D. Tex. Apr. 15,
2020). Based on the motions, the responses, the record and the
applicable law, the court grants the motions and dismisses the
cases, with prejudice. Final judgment is entered by separate
order.

The reasons for this ruling are set out below.

**I. Background**

Probir and Madhuri Bondyopadhyay live in Houston, Texas.
(Case No. 20-1340, Docket Entry No. 21 at 3). In December
1998, the Bondyopadhyays took out a home mortgage,
borrowing from Full Spectrum Lending. (Case No. 20-1359,
Docket Entry No. 6-2 at 13). Full Spectrum assigned the
mortgage to Countrywide Home Loans, Inc. (*Id.*). In 2011,
Countrywide assigned the mortgage to The Bank of New York
Mellon. (*Id.*). Shellpoint Mortgage Servicing became the loan
servicer at some point after 2016.

The Bondyopadhyays sued The Bank and Shellpoint for
fraud, alleging that Countrywide Home Loan secretly placed
the loan in "continuous foreclosure status" in July 2000.
(Case No. 20-1340, Docket Entry No. 1-2 at 2; Case No.
20-1359, Docket Entry No. 1-2 at 4). They claim that they
learned of the foreclosure status in August 2001 and paid
"the borrowed amount by force of the Chapter –13 federal
process five times during the period August 31, 2001 through
September 2009." (Case No. 20-1340, Docket Entry No.
1-2 at 4). They also allege that the loan was "destroyed"
by a class action lawsuit brought by "49 State Attorney
Generals of the U.S. including Texas." (Case No. 20-1340,
Docket Entry No. 1-2 at 4; Case No. 20-1359, Docket Entry
No. 1-2 at 1). While they claim that they paid off the
mortgage, they also allege that "the Bank of America Home
Loan" became the custodian of the mortgage and "pleaded
guilty to foreclosure fraud in December 2012." (Case No.
20-1340, Docket Entry No. 1-2 at 4; Case No. 20-1359,
Docket Entry No. 1-2 at 4). The Bondyopadhyays contend
that these actions amount to a conspiracy in which Anthony
Vincent, an attorney for The Bank, both claimed and denied
ownership of the mortgage. Vincent signed the foreclosure
petition in Harris County court, in his capacity as attorney
for The Bank. (Case No. 20-1340, Docket Entry No. 1-2
at 5; Case No. 20-1359, Docket Entry No. 1-2 at 5). The
Bondyopadhyays repeatedly ask, "who is the beneficiary
owner of this Defendant 'security,' " filing multiple motions
requesting that the defendants disclose the identity of the
beneficiary owner. (Case No. 20-1340, Docket Entry Nos. 8,
10; Case No. 20-1359, Docket Entry Nos. 9, 12).

**\*2** Shellpoint moved to designate the Bondyopadhyays as vexatious litigants, which the court denied. (Case No. 20-1359, Docket Entry No. 6; Docket Entry No. 15). Shellpoint identified several earlier suits by the Bondyopadhyays contesting the enforcements of liens on their property. (*See* Case No. 20-1359, Docket Entry No. 6 at 1). Those suits are summarized below:

- The Bondyopadhyays sued Bank of America, Bayview Loan Servicing, LLC and The Bank of New York Mellon in 2014, raising allegations similar to the allegations in the present cases, about the payment of the loan through Chapter 13, the destruction of the loan because of a class action, and the fraudulent "continuous foreclosure" status. (Case No. 2014-56962). The state court granted summary judgment to the defendants in March 2016. (*See* Docket Entry No. 6-3).

- The Bondyopadhyays sued foreclosure counsel and one of its attorneys in November 2015, again raising similar claims. (Case No. 2015-67497). The state court granted summary judgment to the defendants in December 2016. (*See* Docket Entry No. 6-6).

- The Bondyopadhyays sued Bayview Loan Servicing, the previous loan servicer, and foreclosure counsel in January 2016, again raising claims about fraud related to their mortgage. (Case No. 2017-01064). The state court granted summary judgment to each defendant. (*See* Docket Entry Nos. 6-9, 6-11).

- The Bondyopadhyays sued The Bank of New York Mellon again in December 2018, raising similar claims about mortgage fraud. (Case No. 2018-88693). The state court granted summary judgment to The Bank of New York Mellon in April 2019. (*See* Docket Entry No. 6-15).

- The Bondyopadhyays sued foreclosure counsel in January 2019, again alleging mortgage fraud. (Case No. 2019-01192). The state court granted the defendants' motion to dismiss. (*See* Docket Entry No. 6-18).

The Bank also sued for judicial foreclosure in state court in May 2019. (Case No. 20-1340, Docket Entry No. 21 at 4; *see also* Case no. 20-1359, Docket Entry No. 6-19). The state court held as of July 31, 2019, that "the amount of the lien held by [the Bank] in the Property [was] $317,983.94," and that the Bank was "authorized to proceed with foreclosure." (*Id.* at 2– 3). The Bondyopadhyays did not appeal the judgment. (Case No. 20-1340, Docket Entry No. 21 at 4).

The Bank and Shellpoint now move to dismiss the Bondyopadhyays's lawsuit under Rule 12(c), arguing that their complaint is frivolous and that their claims are barred under res judicata. (Case No. 20-1340, Docket Entry No. 21; Case No. 20-1359, Docket Entry No. 18). The Bondyopadhyays objected and responded to the motion to dismiss, raising the same argument that the mortgage was destroyed and The Bank and Shellpoint are acting fraudulently. (Case No. 20-1340, Docket Entry Nos. 23, 24, 25).

## II. The Legal Standard

"A motion brought pursuant to Federal Rule of Civil Procedure 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). The Rule 12(c) standard for judgment on the pleadings is the same as the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Gentiello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010). Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

**\*3** "To withstand a Rule 12(b)(6) motion, [a] complaint must allege 'more than labels and conclusions,' " and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (alteration in original) (quoting *Twombly,* 550 U.S. at 557). A "complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Sullivan,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* (quotation and alteration omitted).

The court should generally give the plaintiff a chance to amend under Rule 15(a) before dismissing the action with prejudice, unless to do so would be futile. *See Carroll v. Fort James Corp.,* 470 F.3d 1171, 1175 (5th Cir. 2006); *Great Plains,* 313 F.3d at 329 ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court has discretion to deny a motion to amend for futility if the amended complaint would fail to state a plausible claim. *Villarreal v. Wells Fargo Bank, N.A.,* 814 F.3d 763, 766 (5th Cir. 2016).

### III. Analysis

The Bank and Shellpoint argue that the Bondyopadhyays's claims are barred under res judicata because final judgement has already been entered on the merits. (Case No. 20-1340, Docket Entry No. 21 at 1). The Bondyopadhyays did not respond to this argument and instead repeated their claim that the Bank and Shellpoint are acting fraudulently because no mortgage exists. (Case No. 20-1340, Docket Entry No. 24).

Res judicata encompasses two related doctrines: claim preclusion and issue preclusion. *See Taylor v. Sturgell,* 553 U.S. 880, 892 (2008); *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 571 (5th Cir. 2005). Claim preclusion "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *Test Masters,* 428 F.3d at 571. Demonstrating that claim preclusion bars a

plaintiff's claims requires a defendant to show that: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Id.* Issue preclusion prevents relitigation of particular issues already resolved in a prior suit. *In re Southmark Corp.,* 163 F.3d 925, 932 (5th Cir. 1999). Issue preclusion applies when four conditions are met: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine. *Pace v. Bogalusa City Sch. Bd.,* 403 F.3d 272, 290 (5th Cir. 2005); *State & County Mut. Fire Ins. Co. v. Miller,* 52 S.W.3d 693, 697 (Tex. 2001).

The Bank and Shellpoint argue that claim preclusion bars the Bondyopadhyays's claims. (Docket Entry No. 21 at 7). Each of the state court cases listed above resulted in final judgments on the merits by a court of competent jurisdiction. (*See* Case No. 20-1359, Docket Entry Nos. 6-3, 6-9, 6-11, 6-15, 6-18, 6-19). The suits all involved "the investor, [the Bank], or its servicers and foreclosure counsel," a sufficiently close relationship to be found in privity. *See New York Pizzeria, Inc. v. Syal,* 53 F. Supp. 3d 962, 968 (S.D. Tex. 2014) (a party is in privity when its interests are represented by or it is a successor in interest to a party to the action). The Bondyopadhyays's claims were raised or could have been raised in the prior suits because the actions at the heart of the Bondyopadhyays' claims date back to at least 2012. While the Bondyopadhyays also describe recent activities by The Bank and Shellpoint, they claim those actions are fraudulent because of the mortgage destruction in 2012. (*See* Case No. 20-1340, Docket Entry No. 24 at 2 (citing a July 2010 letter from Bank of America Home Loan)).

**\*4** The Bank and Shellpoint also argue that the Bondyopadhyays's claims should be dismissed because they have not alleged facts to establish the elements of fraud. The Texas Supreme Court has held that "[a] fraud cause of action requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.' " *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47-48 (Tex. 1998) (citing

*Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990)). The Bondyopadhyays have not alleged facts that plausibly support a finding that they relied on a material misrepresentation, to their injury. If there was a misrepresentation about the identity of the servicer, there is no claim that it led to the Bondyopadhyay's failure to make mortgage payments and suffer foreclosure. Nor are the Bondyopadhyays's allegations sufficient to meet the federal pleading standard for fraud. To satisfy Rule 9(b), a plaintiff must "state the who, what, when, where, and how of the alleged fraud." *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, 759 F. App'x 280, 286 (5th Cir. 2019). The Bondyopadhyays have not done so, despite repeated filings.

## VI. Conclusion

The Bank of New York Mellon and Shellpoint's motion to dismiss the Bondyopadhyays's claims, (Case No. 20-1340, Docket Entry No. 21; Case No. 20-1359, Docket Entry No. 18), is granted. Because the Bondyopadhyays's claims are precluded, their cases are dismissed with prejudice; further amendment would be futile. Their pending motions to produce written authorization, (Case No. 20-1340, Docket Entry No. 17); for a court order removing the fraudulent lien, (Case No. 20-1340, Docket Entry No. 19); to remove the fraudulent lien, (Case No. 20-1340, Docket Entry No. 20); and for an immediate change of basis of jurisdiction, [1] (Case No. 20-1340, Docket Entry No. 29), are denied as moot.

The cases are dismissed, with prejudice. Final judgment is entered by separate order.

**All Citations**

Slip Copy, 2020 WL 4676765

## Footnotes

[1]    The Bondyopadhyays argue that the court has federal-question jurisdiction instead of diversity jurisdiction. (Case No. 20-1340, Docket Entry No. 29 at 1–2). They do not argue that the court does not have jurisdiction.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 8

2012 WL 1964452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Edna Diane BOWMAN and
Amy McHenry, Plaintiffs,

v.

RAM MEDICAL, INC., Amerimed
Corp., Henry Schein, Inc., Marathon
Medical Corp., Medline Industries,
MMS–A Medical Supply Co.,
and Q–Med Corp., Defendants.

Civil Action No. 10–cv–4403 (DMC)(MF).
|
May 31, 2012.

**Attorneys and Law Firms**

Philip A. Tortoreti, Victoria Hwang-Murphy, Daniel R. Lapinski, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Plaintiffs.

Kenneth N. Laptook, Wolff & Samson, PA, West Orange, NJ, Karen E. Clarke, Proskauer Rose, LLP, Newark, NJ, Scott L. Haworth, Nora Coleman, Haworth Coleman & Gerstman, LLC, New York, NY, Stuart Mark Feinblatt, Sills Cummis Epstein & Gross, P.C., Newark, NJ, John C. Whipple, Arseneault, Whipple, Fassett & Azzarello, LLP, Chatham, NJ, Thomas McKay, III, John Philip Johnson, Cozen & O'Conner, Esqs., Cherry Hill, NJ, for Defendants.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Indus., MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55). Pursuant to Fed.R.Civ.P. 78, which

states that the court has the authority to provide for submitting and determining the motions on briefs without oral hearings, no oral argument was heard.

**I. Background**

**A. Factual Background**

Defendants are in the business of marketing, distributing, selling, manufacturing or causing to be manufactured the surgical mesh at issue in this litigation. (Pl.'s Compl. ¶ 35, Aug. 26, 2010, ECF No. 1). Defendants, at all relevant times, allegedly sold surgical mesh as sterile, Food and Drug Administration ("FDA") approved, indicated for surgical use and Bard-manufactured. *Id.* at ¶ 36. Plaintiffs bring this action on behalf of themselves and putatively on behalf all other similarly situated persons "in the United States who had Defendants' counterfeit surgical mesh surgically implanted from September 1, 2007 until the present." (Pl.'s Compl. ¶ 26). The Complaint includes specific information about two Plaintiffs, Edna Diane Bowman and Amy McHenry. On December 1, 2009, Plaintiff Edna Diane Bowman underwent a surgical procedure at Lexington Medical Center in West Columbia, South Carolina ("LMC"), during which Defendants' counterfeit surgical mesh was implanted in her body. *Id.* at ¶ 40. On February 23, 2010, Plaintiff Amy McHenry underwent a laparoscopic hernia repair procedure at LMC, during which Defendants' counterfeit mesh was implanted in her abdomen. *Id.* at ¶ 37. On July 19, 2010, Plaintiff Bowman received a letter from LMC informing her that the surgical mesh implanted during her surgery was "counterfeit surgical mesh." *Id.* at ¶ 51. On July 15, 2010, Plaintiff McHenry received a letter from LMC informing her of the same. *Id.* at ¶ 49.

Essentially, Plaintiffs claim that a counterfeit product was used during surgery without their consent or knowledge. However, Plaintiffs cite no physical injury or harm resulting. Plaintiffs state their claims in five counts including: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"), (2) unjust enrichment and common law restitution, (3) breach of express warranty, (4) breach of implied warranty of merchantability and (5) breach of implied warranty of fitness for a particular purpose. Plaintiffs contend the nature of the action involves false, misleading, inaccurate, deceptive and unconscionable commercial practices. (Pl.'s Compl. ¶ 1).

Plaintiffs explain that their belief was that the surgical mesh implanted was: (1) Bard-manufactured, (2) sterile, (3) approved for use by the FDA, and (4) indicated for surgical

2012 WL 1964452

use. (Pl.'s Compl. ¶ 47). Plaintiffs claim that in the condition in which Defendants sold their counterfeit mesh, the mesh had zero value. *Id.* at ¶ 48. Further, Plaintiffs state that had they known that Defendants' surgical mesh was not as represented, they would not have purchased, or agreed to purchase of the surgical mesh for use during the surgical procedures. *Id.* at ¶ 54. The only ascertainable loss Plaintiffs allege is the purchase price of a product they believed to be something else. *Id.* at ¶ 55. Plaintiffs vaguely state they "will incur [future] costs to repair the damages caused by Defendants' unlawful activity," but omit to further explain such "repairs." *Id.*

**\*2** Plaintiffs seek relief that includes: class certification; declarations that Defendants' unlawful actions violate the NJCFA, breach express and implied warranties of merchantability and implied warranties of fitness, and unjustly enrich Defendants; orders directing disgorgement of profits derived from unlawful practices, compelling Defendants to reimburse Plaintiffs in an amount equal to their ascertainable loss, and treble damages pursuant to N.J.S.A. 56:8–1 *et seq.;* restitution; and, attorney's fees. (Pl.'s Compl. ¶ 93).

### B. Procedural Background

This matter comes before the Court upon the motion by Defendants RAM Medical, Inc., Henry Schein, Inc., Marathon Medical Corp., Medline Indus., MMS–A Medical Supply Co. and Q–Med Corp. (collectively, "Defendants") (ECF No. 34) to dismiss Plaintiff's complaint (ECF No. 1), filed on January 31, 2011. An amended motion to dismiss was filed by Defendants on September 30, 2011 (ECF No. 51). This Court *sua sponte* consolidated the *Calo Action* (Docket No. 11–cv–7381) with this matter on April 17, 2012.

Defendant C.R. Bard, Inc. filed a motion to dismiss on April 23, 2012 (ECF No. 55).[1] Plaintiff Irene Kirk Calo then filed a motion to voluntarily dismiss her action, without prejudice, on May 21, 2012 (ECF No. 58), which this Court **granted** (ECF No. 58) pursuant to Fed. R. Civ. P. 41(a)(2).

### II. Standard of Review

In deciding a motion to dismiss, the District Court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to [the Plaintiff]." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224. 228 (3d Cir.2008V The Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Instead, when their truth is assumed, those factual allegations "must be enough to raise a right to relief above a speculative level." *Twombly,* 550 U.S. at 555. Plaintiff's obligation "requires more than labels and conclusions." *Id.* at 545. To survive a motion to dismiss, the complaint must state a plausible claim, not merely conclusory statements deriving from assumptions or inferences. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

In reviewing a motion to dismiss, it is well-established that a court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *M & M Stone Co. v. Pa.,* 388 Fed.Appx. 156, 162 (3d Cir.2010).

### III. Discussion

#### A. Standing

As an initial matter, this Court must discuss whether jurisdiction is founded in this case, given the requirements of Article III. Defendants say Plaintiffs lack standing because they state no injury in fact. (Def.'s Am. Mot. Dismiss 1, Sept. 30, 2011, ECF No. 51). Under Article III, federal judicial power is restricted to cases and controversies. *Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 269, 273, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). The case-or-controversy requirement means that Plaintiff must establish standing. *Id.* Without standing, the federal court lacks subject matter jurisdiction and must dismiss the action. *Common Cause of Pa. v. Pa.,* 558 F.3d 249, 257 (3d Cir.2009). Article III standing requires adequate establishment of: 1) an injury in fact, 2) causation, and 3) redressability. *Sprint Commc'ns,* 554 U.S. at 273. An injury in fact involves a concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical, invasion of a legally protected interest. *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The causation element of standing requires a connection between the alleged injury in fact and the alleged conduct of the Defendant. Id The redressable element means that it is likely, and not merely speculative, that the injury in fact would be remedied by the relief sought. *Id.*

**\*3** Defendants, in their motion to dismiss, explain how Plaintiffs fail to adequately establish the injury in fact element of standing:

> In the instant matter, [P]laintiffs summarily allege that they "will incur costs to repair the damages caused by [D]efendants' unlawful activity" [ (Pl.'s Compl. ¶¶ 55 and 64) (emphasis omitted) ] without any indication of when or why such costs might be incurred, and while explicitly excluding any allegations of personal injury, either present or future. [ (Pl.'s Compl. ¶ 10) ] ... Plaintiffs have not alleged present, manifest or even imminent damages, or any adverse consequences whatsoever. The allegations are purely subjective and hypothetical. (Def.'s Am. Mot. Dismiss 7).

Plaintiffs counter that the injury in fact is the cost of buying a product that they would not have bought, had facts that arose later been apparent at the time when they could have made a choice. (Pl.'s Opp'n 10, Mar. 28, 2011, ECF No. 37). In the same vein, Plaintiffs argue that they received something other than what was bargained for. *Id.*

Defendants supply strong argument showing that Plaintiffs fail to adequately establish that the instant scenario demonstrates injury in fact. On the spectrum of proof relevant to injury in fact, Plaintiffs' case presents more of an "abstract" notion of injury, rather than a harm that is "distinct and palpable." *See Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343; *and O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Indeed, it can be assumed from the complaint that Plaintiffs might not have even discovered that "counterfeit mesh" was implanted without the letter from LMC describing the situation as such. Though Plaintiffs cleverly oscillate between contract and tort theories in an attempt to show that a harm amounts to "injury in fact" as envisioned under the standards for Article III standing, their arguments fall short of concrete proof.

Thus, this Court lacks subject matter jurisdiction over Plaintiffs claim and must dismiss. Though no further analysis is required due to the lack of subject matter jurisdiction, this Court will engage in a brief analysis of each Count of the Complaint.

### B. Count I: Violation of the New Jersey Consumer Fraud Act ("NJCFA")

Plaintiffs argue that their NJCFA claims are distinct and sustainable based on an economic injury theory, given they paid a premium for a product based on Defendants' misrepresentations. *See Id.* at 9; *see also Medley v. Johnson & Johnson Consumer Cos., Inc.,* No. 10–cv–2291, 2011 WL 159674, at \*2 n. 2 (D.N.J. Jan.18, 2011) (DMC). Plaintiffs will not establish the elements required by the NJCFA based on the fact that their allegations are "founded in the principals of economic inequities, not tort ..." (Pl.'s Opp'n 5). A claim under the NJCFA requires proof of: 1) an unlawful practice as defined under the Act; 2) ascertainable loss of moneys or property; and 3) a causal relationship between Defendant's unlawful conduct and Plaintiff's ascertainable loss. N.J.S.A. 56:8–19 (1998).

**\*4** Plaintiffs state that Defendants' business practice of marketing, advertising and promoting counterfeit surgical mesh is "false, misleading, inaccurate and deceptive." (Pl.'s Compl. ¶ 58). However, Plaintiffs oppose Defendants' motion to dismiss with argument that focuses almost exclusively upon the heightened pleading requirement Defendants' suggest, and not at all upon the supplemental evidence that would buttress Plaintiff's otherwise conclusory claims. The NJCFA requires an unlawful practice such as an affirmative act, a knowing omission or a regulatory violation. *Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, \*2 (D.N.J. Jan.14, 2008) (citation omitted). Plaintiffs did not specifically allege any conduct that tends to amount to an "unlawful practice" under the NJCFA.

Otherwise fatal to Plaintiffs' claim is the failure of proof problem with the contention that they never received the benefit of the bargain or "paid for a product that was of no value." (Pl.'s Compl. ¶ 63). Such allegations do not satisfy the NJCFA's "ascertainable loss" requirement, without more. Though the "counterfeit surgical mesh" has a price tag, the "no value" concept of it, considering Plaintiffs do not assert any physical injury or otherwise, is abstract. Plaintiffs do not provide specific proofs of harm to support, or upon which this Court could infer a quantifiable loss. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 252, 872 A.2d 783 (2005); *see also, Parker v. Howmedica Osteonics Corp.,* 2008 WL 141628, at \*3 (D.N.J. Jan.14, 2008). Stating the expectation of a future loss, similarly fails to meet the requirement of the CFA, because it is too speculative. *Id.* This insurmountable problem is the same as that which precluded Plaintiff from establishing injury in fact or standing purposes. Plaintiffs fail to state a claim under the NJCFA.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 91 of 751
PageID: 11457
Bowman v. RAM Medical, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1964452

### C. Count II: Unjust Enrichment and Common Law Restitution

Plaintiffs may not sidestep Article III standing requirements by basing their claim in contract theory. Plaintiffs allege that they would not have purchased the product if it was not sterile, Bard-manufactured, FDA approved or indicated for surgical use. As such, Plaintiffs contend Defendants were unjustly enriched by their purchase and that they are therefore entitled to restitution. The parties point to a matter previously before this Court, *Koronthaly v. L'Oreal USA, Inc.,* No. 07–cv–5588, 2008 WL 2938041 (D.N.J. July 29, 2008), *aff'd,* 374 Fed.Appx. 257 (3d Cir.2010) (Plaintiff asserted lipstick products contained lead in far greater amounts than permitted in candy by the FDA). The Third Circuit reviewed a similar issue of whether a consumer could recover on the basis that she did not know what she was getting or would not have purchased the product had she known certain details about it. *Koronthaly,* 374 Fed.Appx. at 258. In a short opinion, the Court held that the purchases were not made pursuant to a contract and therefore Plaintiff had failed to prove that that which would have precluded her from buying the product had formed part of the basis of any bargain. *Id.* at 259. Plaintiff's claim failed because she did not demonstrate a concrete injury in fact, and it could not otherwise be sustained by artful pleading dependent upon contract theory. *Id.* Despite Plaintiffs' contentions that this case is distinguishable from *Koronthaly,* the fact that Plaintiffs did not actually received the product they intended to purchase and paid for, does not affect Plaintiffs' failing contract claims. Rather, the Third Circuit guides that the focus is upon the harm, or in this case, the lack thereof, rather than the buyer's expectation.

### D. Count III: Breach of Express Warranty

**\*5** Plaintiffs fail to demonstrate specifically that they relied upon labeling or other expressions of promise that could have formed the "basis of the bargain." Plaintiffs frame their breach of express warranty claim almost identically to their breach of implied warranty claims. In other words, Plaintiffs submit no specific proof of promises that were expressed, whether they amounted to, as Plaintiffs suggest, assertions that the product was (1) Bard-manufactured, (2) sterile, (3) FDA approved, (4) indicated for surgical use or otherwise. Rather, Plaintiffs frame their claims upon assumptions of promise

and information that the surgical mesh used was counterfeit. Establishing an express warranty requires more substantial proof. Indeed, the Third Circuit held that breach of an express warranty sounds in breach of contract and, as such, Plaintiffs' claim foils for reasons similar to those described in the prior section. *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 484 (3d Cir.1965). This Court will not assume, even considering LMC's concession that the mesh was counterfeit, that these four expressions were specifically made and relied upon. Such a lack of specificity does not comport with the nature of the theories supporting consumer reliance upon an express warranty.

### E. Counts IV and V: Breach of Implied Warranty of Merchantability and Fitness for a Particular Purpose

Defendants convince this Court that, standing alone, the counterfeit nature of the surgical mesh "does not demonstrate that [Plaintiffs] or others could not use the product safely." (Pl.'s Opp'n 27). Plaintiffs do not supply any supporting facts, other than the counterfeit designation of the mesh, rendering the product valueless or unfit. Finally, Plaintiffs fail to assert any injury, and in fact disclaim any physical harm, resulting from the product. Plaintiffs again rely on the abstract concept of the mesh's "zero value" without proving specifically how the product failed. Plaintiffs further tail to show that the product is generally or otherwise unfit for the ordinary purpose which it was used. Rather, Plaintiffs declare that the surgical mesh continues to work for the purpose for which it was designed, to this day, despite any misrepresentations or omissions regarding the brand or otherwise. Plaintiffs can sustain neither a claim of breach of implied warranty of merchantability nor fitness for a particular purpose.

### IV. Conclusion

For the foregoing reasons, this Court hereby **grants** Defendants' motion to dismiss Plaintiff's complaint. An appropriate order, filed on this day, follows this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1964452

---

Footnotes

1    Thereafter, Plaintiff Calo and C.R. Bard, Inc. stipulated to dismissal of Plaintiff's claims against C.R.Bard, Inc. with prejudice on May 29, 2012. Since Calo's motion for voluntary dismissal was granted on this day, this point is moot.

**Bowman v. RAM Medical, Inc., Not Reported in F.Supp.2d (2012)**

2012 WL 1964452

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S.
Government Works.

Tab 9

2020 WL 4365471
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

David BREEZE and Heather Fletcher, Individually
and as Co-Independent Administrators of the
Estate of Gina Renee Breeze, Deceased, Plaintiffs,
v.
BAYCO PRODUCTS INC. and Walmart Inc.,
d/b/a Wal-Mart Stores, Inc., Defendants.

Case No. 3:19-CV-00848-NJR
|
Signed 07/30/2020

**Synopsis**
**Background:** Estate of tenant who was killed in a fire
after her landlord installed a clamp light with a heat bulb
under her house to remedy frozen water pipes brought action
against manufacturer and seller of clamp light, alleging
strict liability, negligence, violations of Illinois Consumer
Fraud Act (ICFA), breach of warranty under Illinois Uniform
Commercial Code (UCC), wrongful death, and survival.
Manufacturer and seller both moved to dismiss for failure to
state a claim.

**Holdings:** The District Court, Nancy J. Rosenstengel, Chief
Judge, held that:

[1] estate pleaded sufficient allegations to prevent dismissal of
product liability claim against seller under seller's exception;

[2] estate pleaded ICFA claim with sufficient particularity and
specificity;

[3] estate satisfied consumer nexus test, and therefore had
standing to bring ICFA claim;

[4] estate sufficiently alleged deceptive practices by
manufacturer and seller in ICFA claim;

[5] estate alleged actual damages in ICFA claim;

[6] estate gave adequate pre-suit notice of breach required
under UCC; and

[7] estate's claims for punitive damages survived tenant's
death.

Motions denied.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (27)

[1]    **Products Liability**  ☛  Miscellaneous products
       **Products Liability**  ☛  Strict liability
       Under Illinois law, estate of tenant who was
       killed in a house fire allegedly caused by
       a defective clamp light pleaded sufficient
       allegations in its complaint to prevent dismissal
       of its product liability action against seller of
       clamp light under seller's exception, although
       seller provided an affidavit that was satisfactory
       for purposes of seller's exception to strict
       liability, and manufacturer of clamp light had
       been named as a defendant in estate's action;
       estate's complaint alleged that seller knew or
       should have known of defective condition of
       clamp light. 🚩 735 Ill. Comp. Stat. Ann.
       5/2-621(c).

[2]    **Products Liability**  ☛  Nature and elements in
       general
       To establish a product liability under Illinois law,
       a plaintiff must demonstrate: (1) that an injury
       resulted from a condition in the products; (2)
       the condition of the product was unreasonably
       dangerous; and (3) the condition existed at the
       time the product left the manufacturers control.

[3]    **Products Liability**  ☛  Persons Liable
       Illinois law applies strict liability to all entities in
       the distributive chain of a defective product.

[4]    **Products Liability**  ☛  Manufacturers in
       general;  identification

An exception to the broad imposition of strict liability in a products liability claim under Illinois law is the "seller's exception," which provides for dismissal of product liability claims against a non-manufacturer defendant where that defendant files an affidavit identifying the manufacturer of the product in question and the manufacturer is joined in the suit. 735 Ill. Comp. Stat. Ann. 5/2-621.

**[5]**    **Federal Civil Procedure** ⚖ Fraud, mistake and condition of mind

Estate of tenant who was killed in a house fire allegedly caused by a defective clamp light pleaded its claim against manufacturer and seller of clamp light under Illinois Consumer Fraud Act (ICFA) with sufficient particularity and specificity, although estate failed to allege actual reliance on misrepresentations about clamp light; estate's complaint identified alleged misrepresentations about clamp light, entities that made those misrepresentations, and method by which misrepresentations were communicated, relevant period of time in question was brief and circumscribed, beginning shortly before marketing statements induced tenant's landlord to purchase clamp light and ending with tenant's death nine days later, and actual reliance was not a necessary element of an ICFA claim. Fed. R. Civ. P. 9(b); 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[6]**    **Federal Civil Procedure** ⚖ Fraud, mistake and condition of mind

A complaint alleging a violation of the Illinois Consumer Fraud Act (ICFA) must be pleaded with the same particularity and specificity as that required for common law fraud. Fed. R. Civ. P. 9(b); 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[7]**    **Federal Civil Procedure** ⚖ Fraud, mistake and condition of mind

To meet the federal pleading requirements, a plaintiff alleging a claim under the Illinois

Consumer Fraud Act (ICFA) may not simply characterize acts as fraudulent or deceptive, but rather must plead the who, what, when, where and how of the alleged deception. Fed. R. Civ. P. 9(b); 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[8]**    **Federal Civil Procedure** ⚖ Fraud, mistake and condition of mind

In the context of pleading a claim under the Illinois Consumer Fraud Act (ICFA), a plaintiff must identify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. Fed. R. Civ. P. 9(b); 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[9]**    **Antitrust and Trade Regulation** ⚖ Private entities or individuals

Estate of tenant who was killed in a house fire allegedly caused by a defective clamp light satisfied consumer nexus test, as required to have standing to plead a claim against manufacturer and seller of clamp light under Illinois Consumer Fraud Act (ICFA), despite argument by manufacturer and seller that estate was not a natural person and because connection between allegedly misleading representations about clamp light and end consumers was too conclusory and tenuous; plaint language of ICFA clearly allowed for claims by legal representatives such as estates, not just natural persons, and representations at issue were not made between individual parties to a commercial transaction, but rather were placed on manufacturer's and seller's websites and directed to consumer public in general. 815 Ill. Comp. Stat. Ann. 505/1, 505/10a.

**[10]**    **Antitrust and Trade Regulation** ⚖ Public impact or interest;  private or internal transactions

**Antitrust and Trade Regulation** 👈 Private
entities or individuals

To have standing to bring a claim under the
Illinois Consumer Fraud Act (ICFA), a plaintiff
must either be a consumer or satisfy the
"consumer nexus test," which requires a plaintiff
to allege conduct that involves trade practices
addressed to the market generally or otherwise
implicates consumer protection concerns. 📑 815
Ill. Comp. Stat. Ann. 505/1 et seq.

**[11]** **Antitrust and Trade Regulation** 👈 Public
impact or interest; private or internal
transactions

**Antitrust and Trade Regulation** 👈 Private
entities or individuals

In order to satisfy the consumer nexus test,
as required to have standing to bring a
claim under the Illinois Consumer Fraud
Act (ICFA), a plaintiff must show: (1) that
their actions were akin to a consumer's
actions to establish a link between them and
consumers; (2) how defendant's representations
concerned consumers other than plaintiff; (3)
how defendant's particular activity involved
consumer protection concerns; and (4) how the
requested relief would serve the interests of
consumers. 📑 815 Ill. Comp. Stat. Ann. 505/1 et
seq.

**[12]** **Antitrust and Trade Regulation** 👈 Public
impact or interest; private or internal
transactions

**Antitrust and Trade Regulation** 👈 Private
entities or individuals

In order to satisfy the consumer nexus test,
as required to have standing to bring a
claim under the Illinois Consumer Fraud Act
(ICFA), the connection between a defendant's
representations and the ultimate consumer
cannot be too tenuous. 📑 815 Ill. Comp. Stat.
Ann. 505/1 et seq.

**[13]** **Antitrust and Trade Regulation** 👈 Other
particular products

Estate of tenant who was killed in a house
fire allegedly caused by a defective clamp light
sufficiently alleged that deceptive practices by
manufacturer and seller of clamp light directly or
indirectly caused tenant's injury, as was required
to plead a claim against manufacturer and seller
of clamp light under Illinois Consumer Fraud
Act (ICFA), despite argument by manufacturer
and seller that estate failed to show actual deceit
on part of either manufacturer or seller; estate
alleged that manufacturer and seller actually
knew or should have known about clamp light's
defects, and as estate based its claims on a
failure-to-warn theory, it was not required to
show actual deceit. 📑 815 Ill. Comp. Stat. Ann.
505/1 et seq.

**[14]** **Antitrust and Trade Regulation** 👈 Fraud;
deceit; knowledge and intent

Actual deceit may not be necessary to plead a
claim under the Illinois Consumer Fraud Act
(ICFA), where a plaintiff relies on a failure to
warn theory, alleging that a defendant knew of
a defect and concealed that knowledge from
customers. 📑 815 Ill. Comp. Stat. Ann. 505/1 et
seq.

**[15]** **Antitrust and Trade
Regulation** 👈 Particular cases

Estate of tenant who was killed in a house
fire allegedly caused by a defective clamp light
alleged actual damages, as was required to
plead a claim against manufacturer and seller of
clamp light under Illinois Consumer Fraud Act
(ICFA), where harm alleged in estate's complaint
was death of tenant, which was very real and
substantial, despite not readily corresponding to
a precise monetary value. 📑 815 Ill. Comp. Stat.
Ann. 505/1 et seq.

**[16]** **Antitrust and Trade Regulation** 👈 Pleading

To state a claim under the Illinois Consumer Fraud Act (ICFA), plaintiffs must allege actual damages. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[17]    Antitrust and Trade Regulation    Grounds and Subjects**

Damages on a claim under the Illinois Consumer Fraud Act (ICFA) must go beyond mere intimations of psychological harm or claims of nuisance. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[18]    Antitrust and Trade Regulation    Measure and amount**

Plaintiffs asserting claim under the Illinois Consumer Fraud Act (ICFA) need not put a precise dollar value on damages. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**[19]    Sales    Commencement of litigation as notice**

The estate of a tenant who was killed in a fire after her landlord installed a clamp light with a heat bulb under her house in order to remedy frozen water pipes provided the manufacturer and seller of the clamp light with adequate pre-suit notice of the alleged breach, as was required to bring an action against the manufacturer and seller for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in Illinois; as the estate was in the position of a consumer and was clearly pleading a personal injury arising from the alleged breach, they satisfied the notice requirement simply by filing a complaint stating a breach of warranty claim against the manufacturer and seller. 810 Ill. Comp. Stat. Ann. 5/2-607(3)(a).

**[20]    Sales    Notice as condition precedent**

Under the Uniform Commercial Code (UCC), as adopted in Illinois, a plaintiff seeking to bring an action under a theory of breach of the implied warranty of merchantability must provide the defendant with notice of the alleged breach within a reasonable time after the plaintiff discovers or should have discovered any breach or else the plaintiff is barred from any remedy. 810 Ill. Comp. Stat. Ann. 5/2-607(3)(a).

**[21]    Sales    Commencement of litigation as notice**

Under the Uniform Commercial Code (UCC), as adopted in Illinois, if a consumer plaintiff alleges a personal injury arising from the breach of the implied warranty of merchantability, notice may be satisfied simply by filing a complaint stating a breach of warranty action against the seller. 810 Ill. Comp. Stat. Ann. 5/2-607(3)(a).

**[22]    Death    Survival of right of action of person injured**

Under Illinois law, claims for punitive damages against manufacturer and seller of clamp light by estate of tenant who was killed in a fire allegedly caused by defect in clamp light survived death of tenant; punitive damages were an important component of product liability actions, there was a strong public interest in discouraging introduction of dangerously defective products into marketplace, and as injuries described by estate, while sufficiently real to allow for standing, were difficult to measure in monetary terms, allowing claims for punitive damages to survive would help ensure that estate would not receive a de minimis award if it prevailed on merits of its complaint. 755 Ill. Comp. Stat. Ann. 5/27-6.

**[23]    Death    Survival of right of action of person injured**

The Illinois Survival Act determines which actions survive the death of the injured party. 755 Ill. Comp. Stat. Ann. 5/27-6.

**[24]**    **Death** 👉 Survival of right of action of person injured

The Survival Act itself is silent regarding punitive damages, but states broadly that actions to recover damages for an injury to the person shall survive the death of the injured party. 755 Ill. Comp. Stat. Ann. 5/27-6.

**[25]**    **Death** 👉 Survival of right of action of person injured

The factors generally considered in determining whether an action for punitive damages survives the death of the injured party are: (1) whether under ordinary circumstances the requested punitive damages have a statutory basis or are an integral component of a regulatory scheme and the remedy available thereunder; and (2) whether strong equitable considerations favor survival of an action for punitive damages.

**[26]**    **Death** 👉 Survival of right of action of person injured

Matters which are relevant in considering whether strong equitable considerations favor survival of an action for punitive damages after the injured party's death include whether the defendant's alleged conduct offends against a strong and clearly articulated public policy, whether the underlying conduct constituted intentional misconduct which is also a crime, instead of mere willful and wanton conduct which shades into simple negligence, and whether absent an award of punitive damages, a plaintiff who prevailed on the merits of his or her claim would at most be entitled to only a comparatively small recovery.

**[27]**    **Antitrust and Trade Regulation** 👉 Punitive or exemplary damages

While there is no explicit provision for punitive damages in the Illinois Consumer Fraud Act (ICFA) or other Illinois statutes related to product liability, punitive damages are a common remedy in such actions and form a recognizable

component of the state's regulatory scheme. 815 Ill. Comp. Stat. Ann. 505/1 et seq.

**Attorneys and Law Firms**

Mark S. Schuver, Melissa C. Meirink, William J. Niehoff, Mathis, Marifian & Richter, Ltd., Belleville, IL, for Plaintiffs.

Craig M. Derrig, Wilson, Elser et al., Kevin S. Borozan, Wood, Smith, Henning & Berman LLP, Chicago, IL, for Defendant Bayco Products, Inc.

Craig M. Derrig, Wilson, Elser et al., Kevin S. Borozan, Wood, Smith, Henning & Berman LLP, Chicago, IL, Beth C. Boggs, Boggs, Avellino, Lach & Boggs, LLC, St. Louis, MO, for Defendant Walmart Inc.

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

**\*1**  Pending before the Court are two Motions to Dismiss for Failure to State a Claim (Docs. 85, 91) filed by Defendant Walmart Inc. ("Walmart"), and a Motion to Dismiss for Failure to State a Claim (Doc. 89) filed by Defendant Bayco Products, Inc. ("Bayco"). For the reasons set forth below, the Court denies the motions.

## FACTUAL & PROCEDURAL BACKGROUND

This action is based on an incident in which a fire broke out at the home of Gina Renee Breeze on January 5, 2018, resulting in her death. In their latest amended complaint, Plaintiffs David Breeze and Heather Fletcher, as administrators of the estate of Gina Renee Breeze ("Plaintiffs"), allege 18 counts of strict liability, negligence, consumer fraud, breach of warranty, wrongful death and survival actions arising out of the sale of a 10.5-inch Brooder Clamp Light (the "Clamp Light"), manufactured by Bayco and sold by Walmart (Doc. 87). Plaintiffs allege that Gina Renee Breeze notified her landlord that water pipes in the home had frozen and requested that the landlord take action to have them unfrozen on December 27, 2017 (*Id.* at 4). To remedy the frozen water pipes, the landlord purchased the Clamp Light and a 250 watt

bulb from Walmart on January 3, 2018, placing them in a crawlspace under the home on January 4 (*Id.* at 4–5).

Plaintiffs allege that "at all times relevant" Bayco marketed the Clamp Light as a "safe, quality product that is suitable for use in all spaces" and that Bayco marketed the Clamp Light as safe for use with bulbs up to 300 watts (*Id.* at 5). The amended complaint refers to certain specific statements which Plaintiffs allege were on Bayco's website "at all times relevant[,]" including statements to the effect that the Clamp Light gives "the light you need, wherever and whenever you need it[,]" that the Clamp Light can hold "securely to virtually any surface" and that the Clamp Light "will handle up to a 300W Med Screw Base Bulb" (*Id.* at 6).

Plaintiffs further allege that Walmart "at all times relevant" had statements on its website to the effect that the Clamp Light was "ideal to use ... in your backyard ... or working on projects in dim areas" and that the Clamp Light is "suitable for use on a variety of surfaces" and "with a 300-watt incandescent bulb" and that the Clamp Light could be used with a heat lamp bulb to "prevent freezing of water pipes, car radiators, and pumps" (*Id.* at 7-8).

Plaintiffs allege that both Bayco and Walmart made the statements on their websites with the intent of inducing reliance by customers, and that Walmart further stocked 250-watt heat lamp bulbs on retail shelves immediately next to the Clamp Light for the purpose of inducing customers to buy heat lamp bulbs with the clamp light (*Id.*).

Plaintiffs further allege the Clamp Light was inherently defective and dangerous and, as a result, caused the fire to originate in the crawlspace where it was placed (Doc. 87 at 8–9). Bayco and Walmart failed to warn consumers of the unreasonably dangerous and defective conditions of the Clamp Light, Plaintiffs allege (*Id.* at 9).

**\*2** On April 23, 2020, Walmart filed a motion to dismiss for failure to state a claim (Doc. 85). On May 8, 2020, Plaintiffs filed an amended complaint (Doc. 87), and Walmart on May 22 refiled its motion to dismiss with arguments amended to address the amended complaint (Doc. 91). In Walmart's second motion to dismiss, it argues that Counts X and XI, alleging product liability claims against Walmart for the Clamp Light, should be dismissed pursuant to the statutory seller's exception in Illinois law. Walmart further argues that Counts XIV and XV, alleging claims against Walmart under the Illinois Consumer Fraud Act (ICFA),

should be dismissed because Plaintiffs: (1) have not satisfied pleading requirements under Fed. R. Civ. P. 9(b), (2) are not a consumer under the ICFA and lack standing under the "consumer nexus" test, and (3) do not allege actual deceit and show proximate cause as required by the ICFA. Walmart next argues that claims XVI and XVII, alleging claims for breach of implied warranty of merchantability against Walmart, should be dismissed because Plaintiffs failed to give pre-suit notice as required by the Uniform Commercial Code ("UCC"). Lastly, Walmart argues that Counts XI and XIII, which involve claims for punitive damages against Walmart, should be dismissed as those claims do not survive the death of Gina Breeze.

In its Motion to Dismiss (Doc. 89), Bayco reiterates the arguments made by Walmart regarding the ICFA in relation to Counts V and VI, which allege ICFA claims against Bayco. Bayco further reiterates Walmart's arguments regarding the implied warranty of merchantability in relation to Counts VII and VIII which present analogous claims against Bayco. Lastly, Bayco repeats Walmart's claims regarding punitive damages in relation to Counts II and IV, which seek punitive damages against Bayco.

## LEGAL STANDARD

In addressing a motion to dismiss for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assess whether the complaint includes "enough facts to state a claim to relief that is plausible on its face." *Khorrami v. Rolince,* 539 F.3d 782, 788 (7th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

The Court of Appeals for the Seventh Circuit has clarified that, even after *Twombly,* courts must still approach Rule 12(b)(6) motions by construing the complaint in the light most favorable to the non-moving party, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in the non-moving party's favor. *Hecker v. Deere & Co.,* 556 F.3d 575, 580 (7th Cir. 2009), *cert. denied,* 558 U.S. 1148, 130 S.Ct. 1141, 175 L.Ed.2d 973 (2010) (quoting *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008)).

## DISCUSSION

### I. Seller's Exception to Product Liability

**[1]    [2]    [3]    [4]**  To establish a product liability under Illinois law, a plaintiff must demonstrate: (1) that an injury resulted from a condition in the products; (2) the condition of the product was unreasonably dangerous; and (3) the condition existed at the time the product left the manufacturers control. *Lexington Ins. Co. v. Office Depot, Inc.*, 943 F. Supp. 2d 844, 848 (N.D. Ill. 2013). Illinois law applies strict liability to "all entities in the distributive chain of a defective product." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 745 (7th Cir. 2007) (quotations omitted). An exception to this broad imposition of strict liability is the "Seller's Exception" created by 735 Ill. Comp. Stat. 5/2-621, which provides for dismissal of product liability claims against a nonmanufacturer defendant where that defendant files an affidavit identifying the manufacturer of the product in question and the manufacturer is joined in the suit. A plaintiff may avoid dismissal pursuant to the Seller's Exception, however, where he may prove one of the following:

> (1) "that the defendant exercised some significant control over the design and manufacture of the product, or has provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the injury, death or damage;
>
> (2) that the defendant actually knew of the product defect that caused the injury, death or damage; or
>
> (3) that the defendant created the product defect that caused the injury, death or damage."

735 Ill. Comp. Stat. 5/2-621(c).

Here, it is undisputed that Walmart has provided an affidavit that is satisfactory for purposes of the Seller's Exception and that Bayco has been named as a defendant in this action. Accordingly, dismissal is appropriate unless Plaintiffs can demonstrate that one of the exceptions of § 621(c) applies. Here, however, Plaintiffs' amended complaint does allege that both Bayco and Walmart were aware of the defective nature of the Clamp Light, stating that they "knew or should have known," of the defective nature of the Clamp Light.

**\*3**  In its response to Walmart's motion, Plaintiffs note that at certain points in their amended complaint they state that Walmart "knew or should have known" of the defective nature of the Clamp Light. *See, e.g.*, Doc. 87 at 30, ¶ 133. Walmart points to its own affidavit in support of its contention that it had no knowledge, and it may well be able ultimately prevail in this argument. This is a factual issue, however, which must be resolved at a later stage in this action. The allegations in Plaintiffs' complaint are facially sufficient to prevent dismissal pursuant to the Seller's Exception.

### II. ICFA Claims

#### A. 9(b) Pleading Standard

**[5]    [6]    [7]    [8]**  A complaint alleging a violation of ICFA must be pleaded with the same particularity and specificity under Rule 9(b) as that required for common law fraud. *E.g.*, *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 731 (N.D. Ill. 2005). To meet the requirements of Rule 9(b), a plaintiff may not simply characterize acts as fraudulent or deceptive, but rather must plead "the who, what, when, where and how" of the alleged deception. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In the context of the ICFA, this means that a plaintiff must identify "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Schiffels v. Kemper Fin. Servs.*, 978 F.2d 344, 352 (7th Cir. 1992).

Here, Walmart and Bayco allege that Plaintiffs' amended complaint falls short of the specificity required by Fed. R. Civ. P. 9(b) because it does not state the date of Walmart and Bayco's alleged representations with enough precision and does not allege actual reliance on misrepresentations.

Plaintiffs have identified alleged misrepresentations, they have identified the entities making the misrepresentations, and the method by which they communicated. Plaintiffs' statement that such misrepresentations were on Walmart's and Bayco's websites "at all times relevant" is indeed vague, and Walmart and Bayco point to other cases in which complaints have been deemed insufficient due to such broad language. Looking beyond the phrase "at all times relevant," a more fulsome examination of the complaint reveals that the time period in question is in fact rather brief and circumscribed: it is clear that Gina Breeze died on January 5, 2018, and that the Clamp Lights were purchased by her landlord after her initial complaint about frozen pipes on December 27, 2017. Accordingly, the time period "relevant" to the complaint

would appear to be the period of no more than a month prior to January 5, 2018, when marketing statements by Bayco and Walmart would have been likely to influence the decision to purchase and install the Clamp Light. It seems unreasonable to expect Plaintiffs to know the exact timing of when certain statements were present on specific websites at the pleading stage, and given the relatively static nature of most commercial websites it seems likely that most such statements would not be of such a fleeting nature that their timing would need to be stated with great specificity. While Plaintiffs' complaint could be better worded, taken in full the Court views its allegations as sufficiently specific in terms of timing. Defendants' arguments regarding failure to plead actual reliance similarly go beyond the specificity required by Rule 9(b), as actual reliance is not a necessary element of a claim under the ICFA, as discussed below.

### B. Consumer Nexus Test

**[9]**  **[10]**  **[11]**  To have standing to bring a claim under the ICFA, a plaintiff must either be a consumer or satisfy the "Consumer Nexus Test," which requires a plaintiff to allege "conduct [that] involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 651 (N.D. Ill. 2015) (quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33, 41 (1989)). In order to satisfy the Consumer Nexus Test, a plaintiff must show:

> **\*4**  (1) that their actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations ... concerned consumers other than [plaintiff]; (3) how defendant's particular [activity] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers.

*Roppo*, 100 F. Supp. 3d at 651 (quoting *Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 298 Ill.App.3d 146, 232 Ill.Dec. 419, 698 N.E.2d 257, 268 (1998)).

**[12]**  The connection between a defendant's representations and the ultimate consumer cannot be too tenuous. For example, courts have observed that merely noting that products traded between two commercial partners will ultimately be sold to end consumers is insufficient to establish a consumer nexus, as "[a]lmost every product sold by one commercial party to another will ultimately be sold to or otherwise effect a consumer" and to permit a claim on this basis would allow the ICFA to apply to "nearly all commercial transactions[,]" contravening the intent of the legislature. *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 807 (N.D. Ill. 1996).

Certain courts have used the phrase "natural person" in referring to plaintiffs within the scope of the Consumer Nexus Test. *E.g.*, *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 911 (N.D. Ill. 2012) (quoting *Bank One Milwaukee v. Sanchez*, 336 Ill.App.3d 319, 270 Ill.Dec. 642, 783 N.E.2d 217, 221 (2003)). The text of the ICFA, however, uses a broader definition, providing that "any person" may bring an action under the ICFA and defining "person" as:

> "any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, member, stockholder, associate, trustee or cestui que trust thereof."

815 Ill. Comp. Stat. §§ 505/1, 505/10a.

Indeed, despite the use of the phrase "natural person" in *Thrasher-Lyon*, Illinois courts have in fact rejected the notion that only natural persons may have standing through the consumer nexus test. *Bank One Milwaukee*, 270 Ill.Dec. 642, 783 N.E.2d at 221 (holding consumer nexus test "applies to any entity seeking to bring an action" under the ICFA, not just natural persons).

Here, Walmart and Bayco argue that Plaintiffs fail to satisfy the Consumer Nexus Test because they are not a natural person and because the connection between the allegedly misleading representations and end consumers was too conclusory and tenuous. Both of these arguments, however, misinterpret the decisions that they rely upon. First, the plain language of the ICFA clearly allows for claims by legal representatives such as estates, not just natural persons, and Illinois courts have rejected such restrictive

Breeze v. Bayco Products Inc., --- F.Supp.3d ---- (2020)

definitions of potential plaintiffs under the ICFA. Secondly, the representations at issue in this case were not made between individual parties to a commercial transaction as in the cases cited by Defendants but rather were placed on Defendants' websites and directed to the consumer public in general. As such, the connection between Defendants' representations and end consumers is sufficiently clear. In sum, Plaintiffs satisfy the Consumer Nexus Test for standing.

*C. Actual Deceit & Proximate Cause*

**[13]** **[14]** Courts have found that certain provisions of the ICFA, namely Section 2, require a showing that a defendant's alleged deceptive practices directly or indirectly caused the plaintiff's injury. *Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213, 217 (2004) (citing *Zekman v. Direct Am. Marketers*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853, 860-61 (1998)). Actual deceit may not be necessary, however, where a plaintiff relies on a failure to warn theory, alleging that a defendant knew of a defect and concealed that knowledge from customers. *Pappas v. Pella Corp.*, 363 Ill.App.3d 795, 300 Ill.Dec. 552, 844 N.E.2d 995, 1004 (2006) (distinguishing facts from *Shannon* where "plaintiffs allege they relied on [defendant's] concealment by silence."). In *IWOI, LLC v. Monaco Coach Corp.*, 581 F. Supp. 2d 994, 1004 (N.D. Ill. 2008), the Northern District of Illinois broadly interpreted *Pappas* as standing for the proposition that "manufacturers can be liable under the Illinois Consumer Fraud Act when they knowingly place a materially defective product into the stream of commerce whether or not they are in privity of contract with or communicate directly to the end consumer."

**\*5** Here, Defendants argue that Plaintiffs' failure to show actual deceit and proximate cause is fatal to their complaint, but again they misinterpret the decisions upon which their arguments rely. While certain actions alleging actual deceit may require such a showing, Plaintiffs here allege that Defendants actually knew or should have known of the defects in the Clamp Light, and an argument based on a failure to warn theory does not require a showing of actual deceit. Accordingly, Plaintiffs' complaint is sufficient in this respect.

*D. Pleading Damages*

**[15]** **[16]** **[17]** **[18]** To state a claim under the ICFA plaintiffs must allege actual damages. *Avery v. State Farm*

*Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (2005). Such damages must go beyond mere intimations of psychological harm or claims of nuisance. *Morris v. Harvey Cycle and Camper, Inc.*, 392 Ill.App.3d 399, 331 Ill.Dec. 819, 911 N.E.2d 1049, 1053-54 (2009). Plaintiffs, however, need not put a precise dollar value on damages. *Kirkpatrick v. Strosberg*, 385 Ill.App.3d 119, 323 Ill.Dec. 755, 894 N.E.2d 781, *appeal denied*, 229 Ill.2d 669, 326 Ill.Dec. 871, 900 N.E.2d 1118 (2008).

Defendants seek to argue that the damages alleged by Plaintiffs are vague and insubstantial, comparing them to claims of emotional and psychological harms that have been deemed insufficient by courts in the past. Harm such as the death of the decedent in this action is very real and substantial, even if it may not readily correspond to a precise monetary value. Accordingly, Plaintiffs have pleaded sufficient damages.

## III. Implied Warranty of Merchantability

**[19]** **[20]** **[21]** Under the UCC, as adopted by Illinois, a plaintiff seeking to bring an action under a theory of breach of the implied warranty of merchantability must provide the defendant with notice of the alleged breach "within a reasonable time after [the plaintiff] discovers or should have discovered any breach" or else the plaintiff is "barred from any remedy." 810 Ill. Comp. Stat. § 5/2-607(3)(a). Courts have interpreted this provision as requiring pre-suit notice of a warranty claim. *See, e.g.*, *Connick v. Suzuki Motor Corp.*, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 589 (1996); *see also Anthony v. Country Life Mfg., LLC*, 70 F. App'x 379, 384 (7th Cir. 2003). This rule, however, is not without exceptions—most notably, if a consumer plaintiff alleges a personal injury arising from the breach, notice may be satisfied simply by filing a complaint stating a breach of warranty action against the seller. *Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill.App.3d 935, 230 Ill.Dec. 743, 694 N.E.2d 1021, 1026 (1998) (citing *Connick*, 221 Ill.Dec. 389, 675 N.E.2d at 589).

Here, Defendants seek to dismiss based on Plaintiffs' lack of pre-suit notice of the alleged breach. Plaintiffs, however, are clearly pleading a personal injury arising from the alleged breach, and as discussed they are in the position of a consumer. Accordingly, they have satisfied the notice requirement with the filing of their complaint.

Breeze v. Bayco Products Inc., --- F.Supp.3d ---- (2020)

## IV. Punitive Damages

 **[22]**    **[23]**    **[24]**    The Illinois Survival Act, 755 Ill. Comp. Stat. § 5/27-6, determines which actions survive the death of the injured party. The Act itself is silent regarding punitive damages, but states broadly that "actions to recover damages for an injury to the person" shall survive. *Id.* Generally, Illinois courts have found that punitive damages do not survive the death of the injured party. *Ballweg v. Springfield*, 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373, 1377 (1986) (citing *Froud v. Celotex Corp.* 98 Ill.2d 324, 74 Ill.Dec. 629, 456 N.E.2d 131 (1983); *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509 (1975)). The Illinois Supreme Court, however, allowed for an exception to this rule in *Froud* and *Mattyasovszky*, noting that punitive damages might survive "where 'strong equitable considerations' existed such as the unavailability of any other remedy." *Froud*, 74 Ill.Dec. 629, 456 N.E.2d at 135 (quoting *Mattyasovszky*, 330 N.E.2d at 512).

 **\*6**    **[25]**    **[26]**    Illinois courts have expanded on the factors to be examined in determining if such equitable considerations are present, stating that:

> "The factors generally considered in determining whether an action for punitive damages survives are: (1) whether under ordinary circumstances the requested punitive damages have a statutory basis or are an integral component of a regulatory scheme and the remedy available thereunder; and (2) whether strong equitable considerations favor survival of an action for punitive damages. Matters which are relevant in considering the second of the above factors include whether the defendant's alleged conduct offends against a strong and clearly articulated public policy; whether the underlying conduct constituted intentional misconduct which is also a crime, instead of mere willful and wanton conduct which shades into simple negligence; and whether absent an award of punitive damages, a plaintiff who prevailed on the merits of his or her claim would at most be entitled to only a comparatively small recovery."

*Penberthy v. Price*, 281 Ill.App.3d 16, 216 Ill.Dec. 902, 666 N.E.2d 352, 356 (1996) (quoting *Grunloh v. Effingham Equity, Inc.*, 174 Ill.App.3d 508, 124 Ill.Dec. 140, 528 N.E.2d 1031, 1037-38 (1988)).

 **[27]**    While there is no explicit provision for punitive damages in the ICFA or other Illinois statutes related to product liability, punitive damages are a common remedy in such actions and form a recognizable component of the state's regulatory scheme. More broadly, the Illinois Supreme Court has noted a strong public interest favoring the protection of human life from defective products placed in the stream of commerce. *E.g.*, *Cassidy v. China Vitamins*, LLC, 427 Ill.Dec. 892, 120 N.E.3d 959, 968 (2018).

Here, seek to dismiss Plaintiffs' claims for punitive damages based on the general principle that such claims do not survive the death of the injured party. In this case, however, conditions are present which permit an exception from that general rule. First, as observed, punitive damages are an important component of product liability actions, and Illinois law has expressed a strong public interest in discouraging the introduction of dangerously defective products into the marketplace. Second, the injuries described by Plaintiffs, while sufficiently real to allow for standing, are difficult to measure in dollar terms and may ultimately result in a relatively small award. Allowing claims for punitive damages to survive will help to ensure that Plaintiffs do not receive a *de minimis* award should they prevail on the merits of their complaint.

### CONCLUSION

For the reasons set forth above, the Court denies the Motions to Dismiss (Docs. 85, 89, 91).

### IT IS SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2020 WL 4365471

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 10

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 105 of 751
PageID: 11471
Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
57 UCC Rep.Serv.2d 136

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Duncan Place Owners Association v. Danze, Inc., N.D.Ill., June 30, 2016

2005 WL 782698

United States District Court,
N.D. Illinois, Eastern Division.

CANADIAN PACIFIC RAILWAY COMPANY, a
Canadian Corporation, Plaintiff, Counter-Defendant,
NATIONAL CAR STEEL, LIMITED,
a Canadian Corporation, Involuntary
Plaintiff, Counter-Defendant,

v.

WILLIAMS-HAYWARD PROTECTIVE
COATINGS, INC., an Illinois Corporation,
Defendant, Counter-Plaintiff.

No. 02 C 8800.
|
April 6, 2005.

**Attorneys and Law Firms**

Susan M. Humiston, Alison Crawford Archer, Leonard, Street and Deinard, Minneapolis, MN, David K. Schmitt, Margaret Anne Gisch, Elizabeth A. Eberspacher, Field & Golan LLP, Chicago, IL, for Plaintiff.

Eric H. Jostock, Henry J. Jostock, P.C., David Alan Belofsky, Douglas Merrill Belofsky, Lance Russell Minor, Belofsky & Belofsky, P.C., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.

**\*1** In its Second Amended Complaint, Plaintiff, Counter-Defendant Canadian Pacific Railway Company ("CPR") alleges breach of express and implied warranties, unjust enrichment, and promissory estoppel arising out of the use of Defendant, Counter-Plaintiff Williams-Hayward Protective Coatings, Inc.'s ("Williams-Hayward") High-Rubber Thermalbond paint on its boxcars. In its Second Amended Counterclaim, Involuntary Plaintiff, Counter-Defendant National Steel Car, Ltd. ("NSC") alleges breach of express and implied warranties, unjust enrichment, promissory estoppel, tortious interference with contract, and fraudulent misrepresentation and concealment against

Williams-Hayward. Williams-Hayward filed Counterclaims against both NSC and CPR, including a breach of contract claim in Count I against NSC. Before the Court is Williams-Hayward's Motions for Summary Judgment as to all of CPR's claims in its Second Amended Complaint and all of NSC's claims in its Second Amended Counterclaim. Williams-Hayward also moves for summary judgment against NSC on Count I of Williams-Hayward's Counterclaim. For the following reasons, the Court grants in part and denies in part Williams-Hayward's motions.

BACKGROUND

**I. Northern District of Illinois Local Rules**

Northern District of Illinois Local Rule 56.1 governs the admission of facts in this background section. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. If a responding party does not admit or deny each fact presented by the movant, the movant's statement may be deemed as admitted. *See Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir.1997). If the responding party denies the movant's facts, he must also provide citations to evidentiary material supporting the denial. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir.2003). With these standards in mind, the Court turns to the relevant facts in this case.

**II. Relevant Facts**

*A. Parties and Individuals Involved*

CPR is a Canadian corporation that operates a Class I railroad through the United States and Canada, and is headquartered in Calgary, Alberta. (R. 282-1, Plaintiffs' Joint Statement of Facts, ¶ 1; R. 250-1, Defendant's Statement of Facts, ¶ 3.) NSC is a rail car manufacturer located in Hamilton, Ontario. (Pls' Stmt. ¶ 2; Def.'s Stmt. ¶ 2.) Williams-Hayward is an Illinois corporation that manufactures paint. (Pls' Stmt. ¶ 4; Def.'s Stmt. ¶ 1.)

Wayne Kurcz is Williams-Hayward's Executive Vice President and is responsible for Williams-Hayward's internal operations. (*Id.* ¶ 5.) Kurcz has a Masters Degree in chemistry and has worked at Williams-Hayward since 1973. (*Id.*)

*Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...*
57 UCC Rep.Serv.2d 136

Williams-Hayward's technical service staff includes Norman Black, who also serves as Williams-Hayward's Director of Canadian Operations. (*Id.* ¶ 6.) Prior to working at Williams-Hayward, Black worked for a company in the business of constructing, repairing, and leasing rail cars and for another company that is a coating supplier and competitor of Williams-Hayward. (*Id.* ¶ 7.)

**\*2** Martin Quintal has served as CPR's sourcing manager since 2002. (Def.'s Stmt. ¶ 17.) Between 1999 and 2002, Quintal was CPR's senior sourcing specialist and from 1997 until 1999, Quintal was the purchasing manager for freight cars. (*Id.*) As purchasing manager, Quintal handled new freight car purchases, replenished freight car parts, and supervised six subordinates. (*Id.* ¶ 19.) As senior sourcing specialist, Quintal continued to handle the purchasing of freight cars and car parts. (*Id.* ¶ 20.) Quintal's duties as sourcing manager are similar to his responsibilities as a senior sourcing specialist, except that he also supervises a sourcing specialist and two buyers. (*Id.* ¶ 21.)

CPR has employed Charles Cheun since 1997 as a car equipment engineer. (*Id.* ¶ 26.) From 1981 until 1997, Cheun held the positions of quality system engineer, senior quality assurance, manager of quality assurance, supervisor of quality assurance, and assistant supervisor of quality assurance. (*Id.*) Cheun has a Bachelors Degree in mechanical engineering and a certificate of general management from the University of Calgary. (*Id.*)

B. Bi-Level Boxcar Build

In 1999, Williams-Hayward and CPR had an initial meeting concerning a bi-level boxcar build at which Cheun, Quintal, and Kurcz discussed Kurcz's desire for CPR to specify Williams-Hayward's High-Rubber Thermalbond paint on a car build for bi-level auto racks that CPR was planning to manufacture. (Pls' Stmt. ¶ 14; Def.'s Stmt. ¶ 44.) At the end of the meeting, there was an understanding that Kurcz would contact Quintal about their discussions. (Pls' Stmt. ¶ 14.) On August 30, 1999, Kurcz sent a letter to Quintal stating:

> Based upon my discussions with you and Mr. Charles N.P. Cheun, we are pleased to make the following proposals. Williams-Hayward Protective Coatings, Inc.'s ultimate goal is to develop a long-term

> contract to freeze pricing for three to four years, however, we understand the problem you may face projecting future new car and repair business. We, therefore, will offer a one year contract renewable at the Canadian Pacific Railway's option. If we are able to stabilize pricing through the time period then rebate values will remain the same. If not, then your office will be notified 90 days prior to your renewal date.

(Def.'s Stmt. ¶ 46; Def.'s Ex 4; Pls' Stmt. ¶ 15.)

Kurcz attached a proposed purchase agreement, including a rebate agreement signed by Kurcz on behalf of Williams-Hayward, to his August 30, 1999, letter. (Def.'s Stmt. ¶ 46; Def.'s Ex. 4.) The proposed rebate agreement contained a warranty provision that provided in pertinent part:

*PRO-RATED WARRANTY*

> All goods sold by WHPC are warranted to be free from defects in material and workmanship pro-rated over the five (5) years on exterior, eight (8) years on the interior from the date of application of paint on the railroad unit provided from the date the paint was shipped from WHPC. The foregoing warranty is in lieu and excludes all other warranties not expressly set forth herein, whether express or implied by operation of law or otherwise, including but not limited to any implied warranties of merchantability or fitness....

> **\*3** THIS WARRANTY IS IN LIEU OF ALL WARRANTIES, OR MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTIES, EXPRESS OR IMPLIED, EXCEPT OF TITLE AND AGAINST PATENT INFRINGEMENT.

(Def.'s Stmt. ¶ 48; Def.'s Ex. 4.) In a letter dated September 3, 1999, from Kurcz to Quintal, Kurcz provided prices for various Williams-Hayward paints for the rail cars that CPR was contemplating building. (Def.'s Stmt. ¶ 53.) The letter contained no references to any warranties. (*Id.*)

The parties do not dispute that Quintal never signed the proposed purchase agreement. (Pls' Stmt. ¶ 17; Def.'s Ex. 4.) At his deposition, Quintal testified that he could not accept

Canadian Pacific Railway Co. v. Williams-Hayward... Not Reported in...
57 UCC Rep.Serv.2d 136

Kurcz's proposal on its terms because CPR could not give Williams-Hayward all of its paint business. (Pls' Stmt. ¶ 17; Pls' Ex. 6.) Instead, Quintal sent a letter to Kurcz on October 1, 1999, which stated:

Please refer to your proposals dated August 30th and September 3rd, 1999, which includes [sic] rebates and prices for paint products related to our new freight car program. This letter will confirm CPR's desire to do business with Williams-Hayward Protective Coatings, Inc. (WHPC).

As discussed, we will not be able to guarantee 90% of our business to WHPC. I will however offer you our business in year 2000 relative to new bi-level racks, using rebates offered by WHPC for these cars.

The first confirmed project consists in 243 bi-level racks to be built by Thrall Manufacturing starting in January, 2000 (Job no. 99-0534). We have specified WHPC's Thermalbond paint in our car specifications to Thrall.

My understanding of your offer is that:

(1) a U.S. $1.00/U.S. Gal. rebate will be remitted to CPR at the end of the program.

(2) WHPC will track volume of paint ordered by Thrall for this order and gallonage shipped will be faxed to me for my records. A monthly report of the rebate status will also be faxed to this office.

(3) WHPC will perform unannounced audits at Thrall, at the minimum once, with copies of the audits sent to this office.

(4) pro-rated warranty on this product is 5 years.

Please confirm that my understanding is correct.

As I might have hinted to you, CPR has other projects for 2000 such as coal cars, boxcars and more bi-levels. If this initial project proves to be successful, I am prepared to maximize the business given to WHPC for those projects. I will keep you posted.

(Def.'s Stmt. ¶ 54; Pls' Ex. 25.)

In a letter dated October 4, 1999, Kurcz responded to Quintal's October 1, 1999, letter:

Thank you for you response of October 1st, and you are correct as to our agreement. As we had discussed, Williams-Hayward Protective Coatings, Inc. is very interested in demonstrating the value of our waterborne products on your hopper fleet, also, and would appreciate any assistance the Canadian Pacific Railway can give us to do so at your Canadian manufacturers. Naturally, the rebates will apply as stated in my earlier communique.

**\*4** (Def.'s Stmt. ¶ 57; Def.'s Ex. 7.)

At his deposition, Quintal testified that he had telephone conversations and meetings with Kurcz concerning their projects after the bi-level boxcar build. (Pls' Ex. 6, Quintal Dep. at 100-01.) Kurcz and Quintal also discussed the rebates for the different car builds. (*Id.* at 101.) Although Williams-Hayward gave CPR rebates on several different projects, the parties dispute whether an agreement on a rebate applied to the boxcar project at issue in this litigation. (Pls' Stmt. ¶ 24; Def.'s Stmt. ¶¶ 74-78.) At his deposition, Kurcz testified that he believed that Quintal's October 1, 1999, letter "activated" the warranty provisions in the initial 1999 rebate agreement and that the warranty provisions and disclaimers applied to all of the parties' subsequent projects. (Pls' Stmt. ¶ 24; Pl.'s Ex. 1; Kurcz Dep. at 263-66.)

### C. Paper Boxcar Build

In 2000, CPR formed a project team to acquire a large number of boxcars. (Pls' Stmt. ¶ 35; Def.'s Stmt. ¶ 86.) CPR management requested Cheun to draft the specifications for the contemplated construction of three types of boxcars- paper boxcars, pulp boxcars, and oriented strand board (OSB) boxcars. (Pls' Stmt. ¶ 36; Def.'s Stmt. ¶ 106.) The boxcar team concluded that CPR needed a new boxcar designed for the purpose of carrying paper rolls to expand capacity, reduce damage to the paper rolls, and make it easier to load and unload the lading. (Def.'s Stmt. ¶ 99.) The paper boxcars were to carry rolled paper used to print newspapers. (Pls' Stmt. ¶ 37.)

On July 18, 2000, CPR issued a Request for Quotation ("RFQ") for the construction of 1,000 boxcars to several car builders in North America, including NSC. (Pls' Stmt. ¶ 41.) The RFQ stated that CPR's objective was "to provide CPR shippers with a high quality, state-of-the-art boxcar that not only ensures damage free transportation, but also accommodates 286,000 lbs loading." (Def.'s Stmt. ¶ 127.) CPR received bids from several manufacturers and in December 2000, CPR verbally awarded NSC the contract to manufacture the boxcar order. (Pls' Stmt. ¶ 42; Def.'s Stmt. ¶ 146.) On June 21, 2001, NSC and CPR entered into a written purchase agreement for NSC's construction of the OSB and paper boxcars. (Pls' Stmt. ¶ 45, Def.'s Stmt. ¶ 147.)

Prior to awarding NSC the contract, Hugh Nicholson of NSC emailed Quintal and Cheun about CPR's approved listing of suppliers for waterborne paints. (Def.'s Stmt. ¶¶ 148-150; Def.'s Ex. 263.) Cheun responded to Nicholson indicating that they had three approved suppliers-Sigma, Williams-Hayward, and Davis Frost. (Def's Stmt. ¶ 150; Pls' Stmt. ¶ 52.) On July 20, 2000, Nicholson emailed Cheun stating that it was NSC's intention to quote Williams-Hayward Thermalbond Acrylic TER Polymer paint. (Def.'s Stmt. ¶ 151; Def.'s Ex. 398.) On July 21, 2000, Cheun emailed Norman Black, Williams-Hayward's Director of Canadian Operations, asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our new paper boxcars or if there is a better coating that you would recommend?" (Pls' Stmt. ¶ 54; Def.'s Stmt. ¶ 152.) On July 25, 2000, Black responded by suggesting certain interior and exterior Thermalbond products. (Pls' Stmt. ¶ 55; Def.'s Stmt. ¶ 153.) At his deposition, Black testified that he knew that CPR planned to build boxcars and that some of the boxcars would be used for paper service. (Pls' Stmt. ¶ 57, Pls' Ex. 4, Black Dep. at 661.)

**\*5** In July 2000, Black met with Dennis Ryan, NSC's Managing Director. (Pls' Stmt. ¶ 56.) Ryan testified that Black provided him with information concerning Williams-Hayward's recommendations for the exterior and interior paint for the boxcars and indicated that Williams-Hayward was CPR's supplier of choice. (Pls' Stmt. ¶ 58; Pls' Ex.10, Ryan Dep. at 63-64.) The information Black provided included the recommended part numbers, also known as "specs," and pricing. (*Id.* at 64.) Ryan also testified that in later meetings with Black, they discussed the specifics of the paper boxcar projects, such as the type of loading, the importance of the interior lining, and that the boxcars would be hauling newspaper service. (*Id.* at 69.)

At his deposition, Quintal testified that he discussed the OSB and paper car builds with Kurcz prior to CPR awarding the boxcar project to NSC. (Pls' Stmt. ¶ 46; Pls' Ex. 6, Quintal Dep. at 158-59.) Cheun testified that both Kurcz and Black had told him that other railways had used Williams-Hayward paint in boxcar and paper service. (Pls' Stmt. ¶ 48; Pls' Ex. 5, Cheun Dep. at 283-84.) Before NSC commenced construction of the boxcar order, Kurcz gave NSC a Power Point presentation on Williams-Hayward's waterborne coating systems. (Pls' Stmt. ¶ 64.)

On at least five occasions, NSC performed trial applications of Williams-Hayward's paint at which Black attended. (*Id.* ¶ 77.) Some, but not all of these trial applications involved the use of High-Rubber Thermalbond. (*Id.*) None of these trial applications were performed on boxcars. (*Id.*) At his deposition, Black testified that the main purpose of the trial applications was to go over the "do's and don't's" for using waterborne as opposed to solvent-based paints, educate the painters, and remind them to use the correct techniques. (*Id.* ¶ 78.) Black also attended the trial applications to answer questions and oversee the application of the paint. (*Id.*)

### D. NSC's Purchase Order

In May 2001, NSC issued a purchase order for the paint to be applied to the paper boxcars. (Def.'s Stmt. ¶ 6; Pls' Stmt. ¶ 85.) Conditions in the purchase order contained the following language: "Unless otherwise specified, the Seller expressly warrants that all the material and work covered by this order will conform to the specifications, drawings, samples or other description, if any, furnished or specified by Buyer, and will be merchantable, of good material and workmanship and free from defect." (Pls' Stmt. ¶ 96, Pls' Ex. 56.) The purchase order also stated: "Suppliers are responsible for understanding the nature of the work and the tolerances the parts must meet." (*Id.* ¶ 98, Pls' Ex. 56, at 9.) Also, the purchase order specifically prohibited "any attempt by the Seller to impose any additional terms through invoices." (*Id.* ¶ 94, Pls' Ex. 56, ¶ 1(B).)

NSC mailed Williams-Hayward a signed copy of the purchase order and an "Acknowledgment Copy" for Williams-Hayward to sign. (Pls' Stmt. ¶ 101.) Williams-Hayward signed the "Acknowledgment Copy" of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT TO ALL TERMS AND

57 UCC Rep.Serv.2d 136

CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF. (Pls' Ex. 56, at 1.)

E. Pull-Ahead Car and Subsequent Correspondence
**\*6** On August 1, 2001, NSC delivered to CPR the first paper boxcar, also know as the pull-ahead car. (Pls' Stmt. ¶ 108; Def.'s Stmt. ¶ 173.) The newsprint paper supplier loaded the pull-ahead car and shipped it to the Minneapolis Star Tribune. (Pls' Stmt. ¶ 110, Def.'s Stmt. ¶ 173.) Upon unloading, it was discovered that the protective wrappers that covered the paper rolls were sticking to the wall of the paper boxcar, tearing off the rolls, and thus exposing the paper rolls. (Pls' Stmt. ¶ 111, Def.'s Stmt. ¶¶ 173-74.) After the pull-ahead car run, the supplier of the paper rolls required a second test run before it would accept the fleet of rail cars into its business service. (Pls' Stmt. ¶ 115.)

Following his inspection of the pull-ahead car, Williams-Hayward's Black informed Alistair Wilson, Executive Vice President of NSC, that if NSC controlled its millage parameter-the minimum and maximum thickness requirements-the sticking problem would be eliminated. (*Id.* ¶¶ 116-17.) During this time period, NSC requested Black's approval to switch from the High-Rubber Thermalbond to another paint for application to the paper boxcar's interiors. (*Id.* ¶ 119.) Black informed NSC that Williams-Hayward would not warrant the alternate coating. (*Id.* ¶ 120.) Consequently, NSC asked Black for a letter of assurance that, if the High-Rubber Thermalbond paint was properly applied and dried, the paint would not present the type of sticking problems NSC experienced with the pull-ahead car. (*Id.*)

On September 5, 2001, Black emailed Kurcz about the situation:

> As you are aware CP reported to NSC that they had a problem with one of the cars from the first 375 car order. The car was loaded with finished paper and after unloading the first load from the subject car the customer reported that some of the paper wrapping had stuck to the floor and walls. I think that the floor is an issue with chalking. NSC's records indicate that the walls of the subject car had received considerable repairs after the initial coating application. I get the impression that NSC are [sic] thinking that the problem may be an isolated case and they may have contributed to the problem. As you may also be aware, NSC approached me yesterday to see if we would supply General Service interior white for the next group of CP boxcars (625 cars). They originally specified our high

rubber white (72-6427-CP). I spoke to Mark about this and have since informed NSC that this is not a good idea and WHPC would not warranty this coating in dedicated paper service. I advised them about the recent Valspar/Gunderson cars (that they were aware of). The next group of CP cars are in position to paint/coat tonight or tomorrow. I have adequate stock of 72-6427 at NSC.

> TO GET TO THE POINT-NSC requested a letter from WHPC that would assure them that if this product is applied correctly and force cured it will not present the type of problem they experienced with this one car. They would like some type of assurance that we have used this product in paper service for X number of years etc. I offered to provide them this letter but they requested that it come from higher up and longer tenure than I. The reason I have to send this request to you.

> **\*7** Can you please provide such a letter/email to Mr. Todd Pafford at NSC, Todd's email address is, _____, as soon as possible.

> Give me a call if you have any questions or wish to discuss.

(*Id.* ¶ 122, Pls' Ex. 57.) On September 5, 2001, Kurcz wrote Todd Pafford via email in response to Black's request. (*Id.* ¶ 123; Def.'s Stmt. ¶ 178.) Kurcz stated:

> I am writing you this communique in response to you [sic] request of our Director of Canadian Operations as to our recommendations for the interior of Boxcars that are exposed to the chemical environment of Paper service. Thermalbond High Rubber coatings were developed in 1984 as replacements for vinyl's and epoxies in severely corrosive services. Since that time these products have been successfully used in both acid and alkali services for tank car hopper cars and interiors of boxcars and potash service. High rubber Thermalbond has become the standard in the Cloro-Alkali business and the Sulfuric Acid business. The chemical resistance has stood the test of time and this is the main reason we recommend this system for such severe services. We believe the situation that has been noted on one unit done by NSC for the CP is isolated and most likely associated with the high mills in the repair areas that might not have been fully dry; this should not at all reflect on the viability of the product for the end use intended. We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 110 of 751
PageID: 11476
Canadian Pacific Railway Co. v. Williams-Hayward ..., Not Reported in ...
57 UCC Rep.Serv.2d 136

and to our mutual customer Canadian Pacific Railroad. We will not Warranty a general service version of Thermalbond in corrosive service for our Warranties are based on real fleet data and not theoretical data. The histories of current industry failures, not related to our products only add credence to our claims. If applied and dried properly these systems have and will for National Steel Car pose no problems in the service they are being used for. We are confident that NSC has for the over whelming [sic] majority of the units fulfilled their requirements on the application side. Once we see the unit in question we may better determine what the causes are, in my 30 years of developing water based products for the rail and chemical industry there have been times where neither the applicator nor the coating are the cause. When push comes to shove we rely on our rich in service fleet data and NSC can be confident that using these products will in the long run reduce concerns rather than create them.

Thank your [sic] for using our unique High Rubber Thermalbond and General Service Thermalbond products and if I may be of any further service plead do not hesitate to contact me.

(Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

On September 19-20, 2001, Wilson and Kurcz exchanges a series of emails regarding the sticking problem in the pull-ahead car. (Pls' Stmt. ¶¶ 128-29.) Initially, Wilson emailed Kurcz about the "jack test" NSC used to simulate roll pressure against the wall of a paper boxcar and that the "jack test" had failed because paper fibers were stuck to the wall of the boxcar. (Id. ¶ 128.) Wilson stated to Kurcz: "Because of our limited experience with this material we need concurrence that this is the way the material is supposed to react." (Id. ¶ 129, Pls' Ex. 33.) Wilson further stated: "Based upon our observation of this test we have elected to discontinue applying the interior coating until advised otherwise which will have an impact on our production effectiveness. It is most important that we receive your confirmation or further instructions as quickly as absolutely possible." (Id.) Wilson also explained to Kurcz: "Again because of our limited experience with this material we need full "buy-off" from Williams Hayward that our application is being applied in accordance with your technical requirements and is fit for the service intended." (Id. ¶ 130, Pls' Ex. 33.)

**\*8** During Kurcz and Wilson's email exchange, Kurcz responded to Wilson's concerns stating the following:

There is absolutely nothing wrong with our product and your test cars will prove it.

Williams Hayward Protective Coatings will take no exceptions and warranty our product as to your process.

Williams Hayward Protective Coatings feels no need for you to perform any tests. We are satisfied NSC may proceed with your currant [sic] applications as long as you are following the recommended cure parameters we have given you. Norm [Black] will work very close with your people to ensure these procedures are followed and any concerns you may have are addressed.

If you listen to us then you will be successful and if we mislead you it is our responsibility and liability.

(Id. ¶ 133, Pls' Ex. 33.)

### F. The Second Trial Car
On October 12, 2001, NSC released another trial boxcar-paper car 220164. (Pls' Stmt. ¶ 145.) In November 2001, the newsprint paper supplier loaded paper car 220164 and then shipped the paper rolls to the Minneapolis Star Tribune, where the paper rolls were unloaded. (Id. ¶ 146.) Again, there was a problem with paint sticking to the paper rolls and the interior walls of the boxcar, and thus the Star Tribune would not sign-off on the paper cars' usage at that time. (Id. ¶¶ 146-47, Pls' Ex. 62.) Cheun of CPR then emailed Kurcz requesting that Kurcz send someone to investigate paper car 220164 in Minneapolis. (Id. ¶ 148, Pls' Ex. 66.) On November 4, 2001, Kurcz forwarded Cheun's email to Black and Ed Kurcz of Williams-Hayward and stating: "Check this out get photos and mill thickness readings. Immediately. Ed I need you to go personally also this could be big trouble if it is not a mill thickness issue up stay in contact with Norm. I have my mobile with me." (Id.)

### G. Changes to the Paint Application Process
Meanwhile, in late September 2001, Black recommended that NSC change its paint application process and NSC subsequently implemented the recommended process. (Id. ¶¶ 139-142.) On November 14, 2001, Williams Hayward gave NSC a 10-page document entitled "Facility Coatings Application & Cure Recommendations for Canadian Pacific Railroad Box Cars for Hot Paper Service at National Steel Car, Hamilton, Ontario" that Kurcz had signed. (Id. ¶ 152.) This document contained detailed recommendations

concerning the procedures for applying the paint and NSC complied with these new procedures. (*Id.* ¶ 157.) The November 14, 2001, recommendation stated: "It is of critical importance that Williams Hayward Protective Coatings representatives are permitted to audit the Process established to certify and write off on the cars for shipment. Our method of write off on each car will be to certify in writing the process at the beginning of each shift taking all necessary measurements and verifying against the standards established." (*Id.* ¶ 154.)

**\*9** From November 14, 2001, to December 19, 2001, Black of Williams-Hayward monitored the dry film thickness readings. (*Id.* ¶ 158.) Williams-Hayward also reformulated the High-Rubber Thermalbond by replacing a solvent to make it dry faster, and sent the reformulated paint to NSC in mid-November 2001. (*Id.* ¶¶ 162-63.)

### H. Events of November 2001

Around November 16, 2001, paper boxcars were loaded with newsprint paper rolls and then shipped to Lancaster, Pennsylvania. (*Id.* ¶ 164.) After unloading the paper cars, it was discovered that the paper rolls stuck to the interior paint. (*Id.*)

On or about November 21, 2001, CPR informed NSC that it would not accept any paper boxcars with Williams-Hayward interiors unless they were lined with cardboard. (*Id.* ¶ 165.) On November 21, 2001, NSC wrote Williams-Hayward and informed it that because NSC was in full compliance with Williams-Hayward's requirements, the cost of lining the paper boxcars with cardboard would be held strictly to Williams-Hayward's account. (*Id.* ¶ 166.) Williams-Hayward replied that it would not accept any charges and therefore had no choice but to request NSC to terminate use of the High-Rubber Thermalbond until they clarified the issue. (*Id.* ¶ 167.)

### I. Events of December 2001

On December 18, 2001, Kurcz sent an email to Pafford at NSC that stated in relevant part:

I received your voice mail and have put together some information that may help you understand why one would choose or we would recommend Thermalbond as the coating system for the insides of the boxcars. I guess after all these years, I have taken for granted, that everyone in the rail industry knows of Williams Hayward Protective Coatings [sic] position with water-based paints. While for

many years in the U.S. we have been the major source of supply of these products at all major railroads and car builders; that has most certainly not been the case with National Steel Car. Not to take up too much of your time I put together a little history of our High rubber Thermalbond as it relates to box car interiors. As to our relationship with the Canadian Pacific Railroad it goes back many years, for we have been the major supplier for Thrall Car Manufacturing since the mid 1970s. For any freight cars, (auto-racks, coal cars, gondolas, hoppers etc.), built for the Canadian Pacific Railroad or for that matter any other Rail Road by Thrall since 1994, Thermalbond would be the coating system applied.

So the total number of boxcars we can prove had our Thermalbond Interior product in, over the years is 12,000. Whether you wish to believe it or not there has not been "ONE" paper sticking complaint over the years and we are still supplying to this day, the Union Pacific Rail Road, the Canadian National/IC Rail Road and the Canadian Pacific shops.

Any and all things I have stated can be substantiated, for Williams Hayward Protective Coatings is the oldest supplier of water based products in the rail industry and we are confident we are also the best. The system given to The [sic] CP and applied by you is a time tested excellent product with a long pedigree. The product will do the job it was intended to do and give the customer the extra chemical resistance they need in pulp services.

**\*10** (Def's Stmt. ¶ 200, Pls' Stmt. ¶ 172, Pls' Ex. 64.)

According to NSC's Wilson, in December 2001, CPR informed NSC that it would no longer accept or pay for any paper cars whose interiors were coated with High-Rubber Thermalbond. (Pls' Stmt. ¶ 173.) On December 20, 2001, NSC stopped processing the paper cars. (*Id.* ¶ 174.) On December 21, 2001, NSC, CPR, and Williams-Hayward participated in a conference call. (*Id.* ¶ 175.) The parties dispute that during the conference call, Kurcz stated that some of the boxcars from the other railroad companies that had used High-Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that it was an accepted industry problem. (*Id.*; Wright's Dep. at 249-255, Kurcz's Dep. at 729-735.) Further, the parties dispute that Kurcz stated that had he known that paper sticking was not acceptable to CPR, he never would have recommended

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...

57 UCC Rep.Serv.2d 136

the High Rubber Thermalbond paint for the interior of the boxcars. (*Id.*)

SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See* Anderson, 477 U.S. at 255.

ANALYSIS

I. Summary Judgment Motion Against CPR
In support of its motion for summary judgment against CPR, Williams-Hayward makes the following arguments: (1) the rebate agreement between Williams-Hayward and CPR disclaims all warranties; (2) CPR cannot assert claims for breach of implied warranty because it is not in contractual privity with Williams-Hayward; (3) CPR cannot assert its claim for breach of express warranty because it is not in contractual privity with Williams-Hayward; (4) CPR cannot establish a claim for unjust enrichment; (5) CPR cannot establish a claim for promissory estoppel; (6) the statute of frauds bars CPR's claims; and (7) CPR cannot establish that Williams-Hayward proximately caused its damages. The Court addresses each argument in turn.

A. Rebate Agreement
Central to Williams-Hayward's arguments on summary judgment is whether CPR and Williams-Hayward had a written "rebate agreement" containing disclaimers of warranties that would bar CPR's warranty claims and quasi-contract claims of unjust enrichment and promissory estoppel.

Williams-Hayward contends that the "rebate agreement" is memorialized in Kurcz's August 30, 1999, letter and attached purchase agreement. Williams-Hayward asserts that this rebate agreement governs all of the parties' projects.

**\*11** In Kurcz's August 1999 letter, he proposed an arrangement where CPR would agree to purchase large volumes of paint from Williams-Hayward in exchange for long-term fixed pricing. Kurcz suggested a fixed one-year pricing structure renewable at CPR's option with a rebate component. Kurcz attached a proposed purchase agreement to the letter that included a rebate agreement signed by Kurcz on behalf of Williams-Hayward. The proposed rebate agreement included language that the warranty described within was "in lieu of all warranties, or merchantability, fitness for purpose, or other warranties, express or implied."

The parties do not dispute that Quintal never signed the purchase agreement attached to the August 30, 1999 letter. CPR contends that Quintal rejected the offer and then made a counter-offer in his October 1, 1999, letter to Kurcz. The October 1, 1999, letter concerned 243 bi-level auto racks that Thrall Manufacturing would build and for which CPR would specify Williams-Hayward's Thermalbond paint. It further provided that CPR may award Williams-Hayward with additional projects if the initial project proved successful. The October 1, 1999, letter did not contain any disclaimers of warranties or limitations of remedies. Kurcz responded to Quintal in a letter dated October 4, 1999, stating that Quintal was correct as to the agreement.

Based on this correspondence, CPR argues that it did not agree to the disclaimers of warranty in the rebate agreements in the first instance. CPR also contends that the October 1, 1999, letter only pertains to the 243 bi-level racks to be built by Thrall Manufacturing, and not to any of the parties' subsequent projects.

In contrast, Kurcz testified that the 1999 purchase agreement covered all sales relative to CPR and applied to the paper boxcars at issue in this litigation. Williams-Hayward also contends that because CPR's filings in this matter are pleaded under Illinois law and the purchase agreement expressly provided that the contract was governed by Illinois law, CPR has adopted the purchase agreement, including the rebate agreement containing the disclaimers of warranties.

Viewing the evidence and reasonable inferences in a light most favorable to CPR, CPR has established that a genuine

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 113 of 751
PageID: 11479
Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...

57 UCC Rep.Serv.2d 136

issue of material fact exists as to whether CPR and Williams-Hayward had a written agreement containing disclaimers of warranties that would bar CPR's warranty claims concerning the paper boxcars. In other words, CPR has presented evidence upon which a reasonable jury could find that the parties did not have a written agreement containing disclaimers of warranties. The parties' correspondence after Kurcz's August 1999 letter, plus Quintal's deposition testimony concerning future projects, calls into question whether Quintal accepted Kurcz's offer in the first instance and also whether the disclaimers of warranties applied to the parties' subsequent projects, including the paper boxcars at issue in this litigation. Under Illinois law, when there is a factual dispute, the question of whether a contract exists is one for the factfinder. *Reese v. Forsythe Mergers Group, Inc.,* 288 Ill.App.3d 972, 979, 224 Ill.Dec. 647, 682 N.E.2d 208 (Ill.App.Ct.1997); *see also* Glass v. Kemper Corp., 133 F.3d 999, 1001 (7 th Cir.1998) ("when the existence of a contract depends on inference from a series of documents, the inference is to be drawn by the trier of fact"). Accordingly, whether the rebate agreement exists is a question for the jury. [1]

### B. Implied Warranty Claims
**\*12** In Counts II and III of its Second Amended Complaint, CPR alleges that Williams-Hayward breached the implied warranties of merchantability and fitness. Williams-Hayward contends that because CPR does not have contractual privity concerning the Thermalbond paint purchased by NSC, CPR cannot bring these claims. CPR, on the other hand, contends that it falls within the narrow class of plaintiffs that may assert implied warranty claims absent contractual privity.

#### 1. Privity Requirement & Exceptions
As opposed to an express warranty in which the warrantor has made the requisite affirmation as part of a contract, an "implied warranty is derived from the interplay of a transaction's factual circumstances with the foreseeable expectations of a buyer or other person who is protected by law in those expectations." *Collins Co. v. Carboline Co.,* 125 Ill.2d 498, 508-09, 127 Ill.Dec. 5, 532 N.E.2d 834 (Ill.1988) (implied warranty arises despite seller's actual wishes). In general, Illinois law requires a plaintiff suing for breach of implied or express warranties to establish contractual privity. *See* Reed v. City of Chicago, 263 F.Supp.2d 1123, 1125 (N.D.Ill.2003). Section 2-318 of the Illinois Uniform Commercial Code, however, contains exceptions to the general privity requirement. *Id.* Section 2-318 reads in pertinent part: "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Although this section lists mandatory exceptions to the privity requirement, this list is not exhaustive. *Reed,* 263 F.Supp.2d at 1125; *see also* Whitaker v. Lian Feng Mach. Co., 156 Ill.App.3d 316, 321, 108 Ill.Dec. 895, 509 N.E.2d 591 (1987) (UCC warranty extends to buyer's employee). The Illinois Supreme Court, however, has not completely abolished the privity requirement in economic loss actions for breach of implied warranties. *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill.1986); *see also* Collins, 125 Ill.2d at 516, 127 Ill.Dec. 5, 532 N.E.2d 834 (Section 2-318 and its comments leave "a door at least slightly ajar for future extension of some warranties in appropriate circumstances to nonprivity plaintiffs.").

CPR contends that because Williams-Hayward knew its identity, the purpose and requirements of the Thermalbond paint to be applied to the paper boxcars, and then delivered the paint to meet CPR's needs, CPR can bring its breach of implied warranty claims despite its lack of contractual privity. Indeed, Illinois courts recognize an exception to the privity requirement "when the remote manufacturer knows the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Crest Container Corp. v. R.H. Bishop Co.,* 111 Ill.App.3d 1068, 1076, 67 Ill.Dec. 727, 445 N.E.2d 19 (Ill.App.Ct.1982) (quoting Frank's Maint. & Eng'g v. C.A. Roberts Co., 86 Ill.App.3d 980, 992-93, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct.1980)).

**\*13** Without a clear explanation or citations to legal authority, Williams-Hayward contends that it is doubtful that this exception survived the Illinois Supreme Court's decision in *Szajna.* Courts in this district, however, have concluded that this exception did survive the *Szajna* decision and have applied this exception after the *Szajna* decision was entered. *See, e.g.,* Outboard Marine Corp. v. Babock Indus., Case No. 91 C 7247, 1995 WL 296963, at \*5 (N.D.Ill. May 12, 1995); *Hirn v. Teledyne Cont'l Motors,* Case No. 93 C 7787, 1994

*Canadian Pacific Railway Co. v. Williams-Hayward ... Not Reported in...*
57 UCC Rep.Serv.2d 136

WL 685071, at *3 (N.D.Ill.Dec.7, 1994); *Omni-Circuits, Inc. v. DRP, Inc.,* Case No. 85 C 9081, 1987 WL 7290, at *2 (N.D.Ill. Feb.23, 1987).

In *Omni-Circuits,* Judge Hart noted that the *Szajna* court did not address this exception and the Illinois court's reasoning behind requiring privity in economic loss cases allows for this exception to the privity requirement. *Id.* at *2-3, 104 Ill.Dec. 898, 503 N.E.2d 760. Also, as the Illinois Supreme Court recognized after its *Szajna* decision, Section 2-318 of the UCC may allow for future extensions of some warranties to nonprivity plaintiffs. *See Collins,* 125 Ill.2d at 516, 127 Ill.Dec. 5, 532 N.E.2d 834. Finally, after a thorough search of Illinois case law, the Court has not found any Illinois cases that abrogate the *Crest Container* exception subsequent to the *Szajna* holding. Accordingly, the Court concludes that the *Szajna* decision did not abolish the exception articulated in *Crest Container.* The Court thus turns to whether CPR has established a genuine issue of material fact relating to this exception.

Deposition testimony reveals that Quintal discussed the paper boxcar builds with Kurcz prior to CPR awarding the boxcar project to NSC. Further testimony indicates that Kurcz and Black were aware of CPR's specific paint needs because they told Cheun that other railways had used Williams-Hayward paint in boxcars and paper service. In addition, Cheun emailed Black asking: "Can you advise if the Thermalbond Acrylic Terpolmer [sic] coating is the appropriate one for our *new paper boxcars* or if there is a better coating that you would recommend?" (emphasis added). Black responded by suggesting certain interior and exterior High-Rubber Thermalbond products. Black also testified that he knew of CPR's plans to build boxcars and that it would use some of the boxcars for paper services. Viewing the facts and inferences in a light most favorable to CPR, CPR has established that there are genuine issues of material fact whether Williams-Hayward (1) knew CPR was the ultimate consumer of the paint, (2) was aware of the paint's purpose, and (3) delivered the paint to meet CPR's needs.

2. CPR's Opportunity to Examine the Thermalbond Paint
Williams-Hayward contends that even if CPR and Williams-Hayward were in privity of contract, CPR would not have claims for breach of implied warranties because CPR had the opportunity to examine Williams-Hayward's paint. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co.,* 882 F.2d

1254, 1259 (7 th Cir.1989) (citing Section 2-316 of the Illinois Uniform Commercial Code). Section 2-316(3)(b) provides in pertinent part, "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Comment 8 of Section 2-316 explains: " 'Examination' as used in this paragraph is not synonymous with inspection before acceptance or at any other time after the contract has been made. It goes rather to the nature of the responsibility assumed by the seller at the time of the making of the contract."

*14 CPR admits that it examined the Williams-Hayward paint on various boxcars, but contends that it could not have discovered the latent defects of the paint by mere observation, but instead needed chemical testing. [2] Comment 8 to 2-316 explains: "However, an examination under circumstances which does not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing." In other words, latent defects cannot be excluded from implied warranties by a parties' mere examination of the product. *Id.; Dacor Corp. v. Sierra Precision,* Case No. 93-2708, 1994 WL 83303, at *4 (7 th Cir. Mar.14, 1994).

CPR has raised a genuine issue of material fact that the paint's defects were not obvious upon mere examination. Whether CPR's examination precludes it from bringing the implied warranty claims is a question for the jury.

Williams-Hayward also argues that because CPR is a "professional buyer" that examined a product in their field, CPR "assumed the risk as to all defects which a professional in the field ought to observe." *See UCC § 2-316,* Comment 8. Williams-Hayward, however, does not fully explain how a corporation that operates a railroad is a professional buyer of paint. Instead, Williams-Hayward contends that CPR purchased "billions of dollars of goods and services each year" and that Cheun had experience selecting paint for boxcars. Without more, Williams-Hayward has not established that CPR is a professional buyer of paint. *See R & L Grain Co. v. Chicago Eastern Corp.,* 531 F.Supp. 201, 208 (N.D.Ill.1981) (under Illinois law "it is the burden of the party seeking to invoke a warranty exclusion to plead and prove its effect").

Finally, the Court rejects Williams-Hayward's argument that CPR did not rely on Williams-Hayward's conduct and assertions in selecting a suitable paint for the paper boxcars. As discussed throughout this opinion, CPR has established a genuine issue of material fact for trial concerning whether it relied on Williams-Hayward's assertions as to what was required for the coating in the paper boxcar service.

### 3. Merchantability of Paint

Next, Williams-Hayward contends that CPR's paint requirements for the paper boxcars were not "ordinary," and thus CPR's claim does not fall within the warranty of merchantability. To establish a claim for breach of the implied warranty of merchantability, a plaintiff must show (1) a sale of goods, (2) that the seller of the goods is a merchant with respect to those goods, and (3) the goods were not of merchantable quality, that is, the goods were unfit for the ordinary purposes for which they are used. *See Brandt v. Boston Scientific Corp.,* 204 Ill.2d 640, 645, 275 Ill.Dec. 65, 792 N.E.2d 296 (Ill.2003); *Crest Container,* 111 Ill.App.3d at 107, 66 Ill.Dec. 524, 443 N.E.2d 207.

Williams-Hayward has provided evidence that CPR's paper boxcars were intended to be state-of-the-art boxcars that would ensure damage free transportation. Based on this evidence, Williams-Hayward contends that use of its paint was not for the ordinary purposes for which they are used. *See Brandt,* 204 Ill.2d at 645, 275 Ill.Dec. 65, 792 N.E.2d 296. This evidence alone, however, does not unequivocally establish that Williams-Hayward's paint was merchantable. Instead, the question of whether the paint's use in the paper boxcars was "ordinary," is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct.2003). The Court, therefore, denies Williams-Hayward's motion for summary judgment as to Count II of CPR's Second Amended Complaint.

### C. Express Warranty Claim

**\*15** CPR also alleges a claim for breach of express warranties under Section 2-313 of the Illinois Uniform Commercial Code. Section 2-313(1)(a) states: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." The Illinois Supreme Court has explained that an express "warranty arises only

because the warrantor has willed it into being by making the requisite affirmation as part of a contract to which it is an adjunct." *Collins,* 125 Ill.2d at 509, 127 Ill.Dec. 5, 532 N.E.2d 834. In general, because an express warranty is a "creature of contract," a party must have privity to the contract before bringing a breach of express warranty claim. *See id.* at 510-11, 127 Ill.Dec. 5, 532 N.E.2d 834; *see also Collins Co., Ltd. v. Carboline Co.,* 837 F.2d 299, 301 (7th Cir.1988) (applying Illinois law).

Williams-Hayward contends that because CPR has no privity of contract to the sales contract between Williams-Hayward and NSC, CPR cannot bring any express warranty claims. CPR argues that despite its lack of privity to the paint contract, express warranties are enforceable by those to whom the warranties are made. In support of this argument, CPR relies on case law involving the purchase of automobiles with express written manufacturer warranties or implied warranties under the federal Magnuson-Moss Act. These cases are both factually and legally distinguishable from this matter. *See Rothe v. Maloney Cadillac,* 119 Ill.2d 288, 116 Ill.Dec. 207, 518 N.E.2d 1028 (Ill.1988); *Connick v. Suzuki Motor Co., Ltd.,* 275 Ill.App.3d 705, 212 Ill.Dec. 17, 656 N.E.2d 170 (Ill.App.Ct.1995), *rev'd on other grounds,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996); *see also Ampat/Midwest, Inc. v. Illinois Tool Works, Inc.,* No. 85 C 100029, 1988 WL 53222 (N.D.Ill. May 12, 1988).

In the context of a buyer purchasing a product from a dealer and not the manufacturer, Illinois courts have concluded that brochures, documents, and advertisements may be the basis of express warranty. *See Connick,* 275 Ill.App.3d at 713, 212 Ill.Dec. 17, 656 N.E.2d 170. In other words, manufacturer documents given directly to the buyer prior to a purchase may give rise to an express warranty because the assertions become part of the basis of the bargain unless clear affirmative proof shows otherwise. *See Ampat/Midwest, Inc.,* 1988 WL 53222, at \*4; *Crest Container,* 111 Ill.App.3d at 1074, 67 Ill.Dec. 727, 445 N.E.2d 19 (coil manufacturer's catalog created express warranty).

Here, CPR does not explain how this exception to the privity requirement applies to the circumstances at hand. For instance, CPR does not come forward with evidence

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 116 of 751
PageID: 11482
Canadian Pacific Railway Co. v. Williams-Hayward ..., Not Reported in...
57 UCC Rep.Serv.2d 136

of manufacturer brochures, catalogs, or advertisements that were part of the basis of the bargain supporting their claim for express warranties. Specifically, CPR has not established that Williams-Hayward made specific, written promises or warranties via manufacturer's catalogs or other marketing materials. Without more, the Court would be hard-pressed to extend this exception to CPR's claims that Black and Kurcz made statements that constitute express warranties.

**\*16** As discussed, there are very few exceptions to the privity requirement for a plaintiff suing for breach of express or implied warranty, *see* Reed, 263 F.Supp.2d at 1125, and CPR has failed to establish that it fits within any exception to this requirement regarding express warranties. Accordingly, the Court grants Williams-Hayward's summary judgment motion as to Count I of CPR's Second Amended Complaint.

D. Unjust Enrichment and Promissory Estoppel
Williams-Hayward contends that because it has established that the rebate agreement governs the parties' disputes, CPR cannot bring its claims of promissory estoppel and unjust enrichment. Indeed, when a specific contract governs the parties' relationship, quasi-contractual theories, such as unjust enrichment or promissory estoppel, cannot form a basis for damages. *See* Hartigan v. E & E Hauling, Inc., 153 Ill.2d 473, 497, 180 Ill.Dec. 271, 607 N.E.2d 165, 177 (Ill.1992); Wagner Excello Foods, Inc. v. Fearn Int'l, Inc., 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956, 964 (Ill.App.Ct.1992) (plaintiff cannot bring promissory estoppel claim when parties have entered a binding contract on same subject matter).

1. Alternative Claims
CPR, however, has brought these quasi-contractual claims in the alternative to its breach of warranty claims, a practice not only allowed under Federal Rule of Civil Procedure 8(e)(2), but one that is common. *See, e.g.,* Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir.2003); *see also* Prentice v. UDC Advisory Servs., Inc., 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 695, 648 N.E.2d 146, 151 (Ill.App.Ct.1995) (alternative claims for breach of contract and promissory estoppel permissible). In *Cromeens,* the Seventh Circuit explained that under the doctrine of pleading in the alternative, "a party is allowed to plead breach of contract, or if the court finds no contract was formed, to

plead for quasi-contractual relief in the alternative. Once a valid contract is found to exist, quasi-contractual relief is no longer available." *Id.; see also* Prentice, 271 Ill.App.3d at 512, 207 Ill.Dec. 690, 648 N.E.2d 146 (once enforceable contract exists, party may no longer recover under theory of promissory estoppel).

CPR has established that a genuine issue of material fact exists as to whether there is a contract between the parties, as discussed above. Because there is a factual dispute, the question of whether a contract exists is for the jury to decide. *See* Reese, 288 Ill.App.3d at 979, 224 Ill.Dec. 647, 682 N.E.2d 208. As such, CPR may maintain its alternative quasi-contractual theories at this procedural juncture.

2. Unjust Enrichment
Without a fully-developed explanation, Williams-Hayward contends that CPR cannot establish that it was unjustly enriched because NSC still owes it money for the paint. Williams-Hayward does not provide the Court with any legal authority supporting its argument that because it has not been paid the full amount for NSC's purchase, it has not unjustly retained any benefits to CPR's detriment.

**\*17** To establish unjust enrichment, CPR must show that Williams-Hayward has unjustly retained a benefit to CPR's detriment and that Williams-Hayward's retention of that benefit violates fundamental principles of justice, equity, and good conscience. HPI Health Care Servs., Inc. v. Mount Vernon Hosp., Inc., 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill.1989).

Here, CPR sets forth evidence that Williams-Hayward allegedly recommended paint for the paper cars that was more expensive than Williams-Hayward's general service paint. (Pls' Stmt. ¶ 119.) Further, CPR has provided evidence that NSC paid Williams-Hayward a "significant sum" for the paint. (Id. ¶ 185, 137 Ill.Dec. 19, 545 N.E.2d 672.) Thus, CPR contends that it would be fundamentally unjust for Williams-Hayward to retain the benefit of selling a more expensive product when CPR did not receive the benefit of a superior coating for the paper boxcars.

Viewing the facts and inferences in a light most favorable to CPR, the Court concludes that CPR has established a genuine issue of material fact as to whether Williams-Hayward was

unjustly enriched. Accordingly, the Court denies Williams-Hayward's motion for summary judgment as to Count IV.

E. Statute of Frauds

Williams-Hayward argues that because the sale of paint was in excess of $500, any alleged contract must be in writing to satisfy the statute of frauds, and thus CPR cannot succeed on any of its claims. CPR contends that Williams-Hayward has waived this affirmative defense because Williams-Hayward makes this argument for the first time in its motion for summary judgment.

"Federal Rule of Civil Procedure 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading. We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chicago Hous. Auth.,* 360 F.3d 721, 735 (7th Cir.2004); *see also Perry v. Sullivan,* 207 F.3d 379, 382 (7th Cir.2000) (collecting cases). The Seventh Circuit has further articulated that if "Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the *eleventh hour,* without excuse and without adequate notice to the plaintiff." *Venters v. City of Delphi,* 123 F.3d 956, 969 (7th Cir.1997) (emphasis added).

Williams-Hayward brings its statute of frauds defense for the first time in its motion for summary judgment-approximately two months before trial is set to commence and well over two years after CPR filed its original complaint. Williams-Hayward does not explain why it brought this affirmative defense so late in the proceedings. Although Williams-Hayward contends that it has given CPR adequate notice concerning its statute of frauds defense, Williams-Hayward fails to take into account that the trial is scheduled to begin on May 2, 2005. In other words, it is the eleventh hour. Under these circumstances, there is no excuse for Williams-Hayward's failure to raise its affirmative defense earlier in the proceedings. *See Castro* 360 F.3d at 735.

F. Damages

**\*18** Last, Williams-Hayward argues that CPR cannot establish that its damages were proximately caused by Williams-Hayward. First, Williams-Hayward argues that because CPR failed to make a claim for the difference between the value of the goods accepted and the value they would have if Williams-Hayward had warranted them, CPR cannot recover any damages in this matter.

Under the Illinois Uniform Commercial Code, Section 2-714(2): "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* Courts read the "special circumstances" exception in conjunction with Section 1-106 of the UCC, which provides that UCC remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed." *Razor v. Hyundai Motor Am.,* 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct.2004). Also, an aggrieved party may recover incidental and consequential damages under Section 2-714(3). *Id.*

Based on these standards, "the difference between the value of the goods accepted and the value they would have had if they been warranted" is not the sole measure of damages as Williams-Hayward asserts. Therefore, CPR's claims of incidental and consequential damages flowing from the breach are appropriate under the circumstances.

Second, Williams-Hayward contends that CPR cannot establish that its incidental and consequential damages are reasonable or were foreseeable by Williams-Hayward at the time of contracting.[3] Williams-Hayward specifically argues that because it had no reason to know CPR's particular requirements for the paper boxcars, it cannot be liable for any losses resulting from them. This argument is based on a fact in dispute, namely, whether Williams-Hayward knew of CPR's requirements for the paper boxcars. Because damages are determined by the factfinder "in the exercise of sound discretion and in any manner reasonable under the circumstances," *see id.* at 660, 286 Ill.Dec. 190, 813 N.E.2d 247, Williams-Hayward's argument fails.

II. Summary Judgment Motion Against NSC

In support of its motion for summary judgment against NSC, Williams-Hayward contends that NSC cannot establish: (1) that Williams-Hayward made any express warranties; (2) its claims for breach of implied warranties; (3) its promissory estoppel claims; (4) its tortious interference with contract claim; (5) its fraud and fraudulent concealment claim; and

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
57 UCC Rep.Serv.2d 136

(6) that Williams-Hayward proximately caused its alleged
damages. The Court discusses each argument below.

### A. Breach of Express Warranties

Count I of NSC's Second Amended Counterclaim alleges a
claim for breach of express warranties under Section 2-313
of the Illinois Uniform Commercial Code. Under Section
2-313(1)(a): "Any affirmation of fact or promise made by the
seller to the buyer which relates to the goods and becomes
part of the basis of the bargain creates an express warranty
that the goods shall conform to the affirmation or promise." In
other words, "in a breach of express warranty action under the
UCC, plaintiff must show a breach of an affirmation of fact
or promise that was made a part of the basis of the bargain."

*Hasek v. DaimlerChrysler Corp.,* 319 Ill.App.3d 780, 788,
253 Ill.Dec. 504, 745 N.E.2d 627 (Ill.App.Ct.2001).

#### 1. Verbal Assurances

**\*19**  Williams-Hayward contends that it made no verbal
warranties to NSC that its High-Rubber Thermalbond paint
would be an acceptable treatment for the paper boxcars.
Specifically, Williams-Hayward argues that the information
Norman Black, Williams-Hayward's Director of Canadian
Operations, gave Dennis Ryan, NSC's Managing Director,
when NSC was preparing its bid for CPR do not amount to
"affirmations of fact or promises." Williams-Hayward relies
on Black and Ryan's first meeting when Black provided Ryan
with information concerning Williams-Hayward's alleged
recommendations for the exterior and interior paint for the
boxcars. (*See* Pls' Stmt ¶ 58; Pls' Ex. 10, Ryan Dep. at 63-64.)

NSC, however, contends that Williams-Hayward ignores
other testimony in the record that Ryan informed Black that
some of the boxcars would be used in paper service and that
the elimination of damage to the paper rolls was a critical
feature of the paper boxcars. For example, Ryan testified that
in his later meetings with Black, they discussed the specifics
of the paper boxcar projects, such as the type of loading, the
importance of the interior lining, and that the boxcars would
be hauling newspaper service.

Nevertheless, Williams-Hayward contends that the parole
evidence rule bars any evidence of its alleged verbal
recommendations made to NSC. Under Illinois common
law, parol or extrinsic evidence regarding a prior or
contemporaneous agreement is not admissible to vary or
contradict a fully integrated contract. *Eichengreen v.*

*Rollins, Inc.,* 325 Ill.App.3d 517, 521, 259 Ill.Dec. 89, 757
N.E.2d 952 (Ill.App.Ct.2001).

NSC, however, brings its express warranty claim under
the Illinois Uniform Commercial Code. Relying on the
Restatement (Second) of Contracts, Section 214, the Illinois
Supreme Court expressly stated that in UCC cases, as opposed
to claims based on Illinois common law, parol evidence is
admissible to determine whether an agreement is completely
or partially integrated and also to explain the meaning of a
fully integrated contract. *McMahon Food Corp. v. Burger
Dairy Co.,* 103 F.3d 1307, 1314 (7 [th] Cir.1996) (citing *J &
B Steel Contractors, Inc. v. C. Iber & Sons, Inc.,* 162 Ill.2d
265, 271-72, 205 Ill.Dec. 98, 642 N.E.2d 1215 (Ill.1994)).
In addition, courts need not decide that the a contract
is ambiguous as a condition for the admission of parol
evidence in UCC cases. *See Hessler v. Crystal Lake Chrysler-
Plymouth, Inc.,* 338 Ill.App.3d 1010, 1020-21, 273 Ill.Dec.
96, 788 N.E.2d 405 (Ill.App.Ct.2003). As such, the parol
evidence rule does not bar evidence of Williams-Hayward's
alleged verbal assurances or recommendations.

#### 2. Written Warranties

NSC has also establish that the purchase order contains
express written warranties. [4]  For instance, conditions to the
purchase order include that "the Seller expressly warrants that
all the material and work covered by this order will conform
to the specifications, drawings, samples or other description,
if any, furnished or specified by Buyer." Further, NSC points
to language in the purchase order stating: "Suppliers are
responsible for understanding the nature of the work and the
tolerances the parts must meet."

**\*20**  Williams-Hayward's argument that NSC waived
any express warranty claims because Williams-Hayward
informed NSC that it would supply free epoxy paint to
replace the High-Rubber Thermalbond on the paper boxcars
is a disputed fact. Accordingly, it cannot be the basis for a
finding of waiver. NSC has established a genuine issue of
material fact as to whether Williams-Hayward made express
warranties to NSC and whether Williams-Hayward breached
those express warranties. [5]

### B. Breach of Implied Warranties

In Counts II and III of its Second Amended Counterclaim,
NSC alleges that Williams-Hayward breached the implied
warranties of fitness and merchantability. Williams-Hayward

contends that NSC's experience with Williams-Hayward's paint and its opportunities to test the paint preclude its claims for breach of implied warranties. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co.,* 882 F.2d 1254, 1259 (7 th Cir.1989).

First, Williams-Hayward argues that NSC is a professional buyer that examined a product in its field, and thus NSC "assumed the risk as to all defects which a professional in the field ought to observe." *See* Illinois UCC Section 2-316, Comment 8. Williams-Hayward does not completely explain how a rail car manufacturer is a professional buyer of paint. Indeed, in his email of December 18, 2001, Kurcz admits that NSC did not have experience with Williams-Hayward's High-Rubber Thermalbond paint. Nevertheless, Williams-Hayward argues that because NSC maintained a department devoted to the purchase of speciality items, including paint, for the rail cars it manufactured, it is a "professional in the field." This limited argument simply does not satisfy Williams-Hayward's burden of establishing the exclusion of claims based on the implied warranty of fitness or merchantability. *See R & L Grain Co. v. Chicago Eastern Corp.,* 531 F.Supp. 201, 208 (N.D.Ill.1981).

Second, Williams-Hayward contends that because NSC had the opportunity to examine the High-Rubber Thermalbond paint in trial applications, it cannot bring its claims for breach of implied warranties. *See* Illinois UCC Section 2-316, Comment 8. NSC, however, correctly notes that the purpose behind the trial applications was for Williams-Hayward's Black to explain how to apply the paint safely and properly. In addition, there is no evidence in the record that NSC examined the High-Rubber Thermalbond's propensity to fuse with paper or its ability to perform in paper service, because NSC contends that the paint's propensity to stick was a latent defect. Also, NSC asserts that it did not have the ability to load paper rolls into the paper boxcars after they were painted. (*See* Pls' Stmt. ¶ 82.) Finally, after the pull-ahead car exhibited sticking problems and NSC's own "jack test" failed, Kurcz of Williams-Hayward emailed NSC's Wilson explaining that he did not see a need for any paint testing if NSC proceeded with its process and used the recommended cure parameters.

**\*21** Based on this evidence, NSC has created a genuine issue of material fact of whether it is barred from bringing its implied warranty claims based on the "examination" exception under Comment 8 of Section 2-316 if the Illinois Uniform Commercial Code. [6]

### C. Promissory Estoppel Claims
NSC brings two counts based on promissory estoppel-promissory estoppel related to the suitability of the paint and promissory estoppel related to the application of the paint. Williams-Hayward contends that because there is a binding sales contract between the parties, NSC cannot bring any claims of promissory estoppel. *See Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.,* 235 Ill.App.3d 224, 235, 76 Ill.Dec. 258, 601 N.E.2d 956 (Ill.App.Ct.1992) (plaintiff cannot bring promissory estoppel claim when parties have entered into binding contract on same subject matter). NSC, on the other hand, contends that the promises underlying its promissory estoppel claims concern different subject matter than the sales contract. *See Prentice v. UDC Advisory Servs., Inc.,* 271 Ill.App.3d 505, 512, 207 Ill.Dec. 690, 648 N.E.2d 146 (Ill.App.Ct.1995); *see also Industrial Life Truck Serv. Corp. v. Mitsubishi Int'l Corp.,* 104 Ill.App.3d 357, 361-61, 60 Ill.Dec. 100, 432 N.E.2d 999 (Ill.App.Ct.1982)("general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests").

Here, NSC has presented statements and recommendations made by Kurcz that pertain to the circumstances after the pull-ahead car and paper car 220164 experienced paint sticking problems. These allegations are different in subject matter than the sales contract. Williams-Hayward's "promises" include Kurcz's assurances made to Pafford and Wilson in the fall of 2001 and Williams-Hayward's recommended changes to the process in which NSC would coat and cure the paint. Based on this evidence, NSC has established a genuine issue of material fact that its promissory estoppel claims concern a different subject matter than the sales contract.

Finally, Williams-Hayward contends that the statute of frauds prohibits NSC from bringing its promissory estoppel claims. The Court notes that Williams-Hayward's alleged promises to NSC that form the basis of its promissory estoppel claims are in writing. The Court rejects Williams-Hayward's statute of frauds defense for the reasons stated in detail above.

### D. Tortious Interference with Contract
NSC brings a claim of tortious interference with contract, which requires a plaintiff to show (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) defendant's awareness of the contract, (3) defendant's intentional and unjustified inducement of a breach

Canadian Pacific Railway Co. v. Williams-Hayward ... Not Reported in...

57 UCC Rep.Serv.2d 136

of the contract, (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party, and (5) damages resulting from the breach. *Purmal v. Robert N. Wadington & Assocs.,* 354 Ill.App.3d 715, 289 Ill.Dec. 578, 820 N.E.2d 86 (Ill.App.Ct.2004).

**\*22** Williams-Hayward contends that NSC cannot establish that it intentionally and unjustifiably induced CPR to breach its contract with NSC. NSC does not address Williams-Hayward's argument, instead, NSC argues that sufficient evidence exists to establish fraudulent intent. A claim of tortious interference with contract, however, does not require that the actor have "fraudulent intent."

"The tort of interference with existing or prospective contractual relations requires that the interference be both intentional and improper." *LaRocco v. Bakwin,* 108 Ill.App.3d 723, 730, 64 Ill.Dec. 286, 291-92, 439 N.E.2d 537 (Ill.App.Ct.1982) (citing Section 767 of the Restatement (Second) of Torts)). Comment d. to Section 767 of the Restatement (Second) of Torts explains that because interference with contractual relations is an intentional tort, "the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct."

NSC does not argue either how Williams-Hayward desired to interfere with NSC and CPR's contract or how Williams-Hayward knew that CPR's alleged breach would be a "substantially certain result" of its conduct. In addition, NSC presents no arguments with supporting evidence that CPR actually breached their contract. Without more, NSC's tortious interference with contract must fail. [7] Therefore, the Court grants Williams-Hayward's motion for summary judgment as to Count VI of NSC's Second Amended Counterclaim.

### E. Fraudulent Misrepresentation and Concealment

In Count VII of its Second Amended Counterclaim, NSC alleges fraudulent misrepresentation and concealment against Williams-Hayward. Under Illinois law, a party must prove the elements of fraud by clear and convincing evidence. *In re Application of Rosewell,* 106 Ill.2d 311, 318-19, 88 Ill.Dec. 28, 478 N.E.2d 343 (Ill.1985); *see also Bixby's Food Sys., Inc. v. McKay,* 193 F.Supp.2d 1053 (N.D.Ill.2002). At summary judgment NSC must establish the elements of fraudulent misrepresentation and concealment by clear and convincing evidence because it must carry this burden of proof at trial.

*See Celotex Corp.,* 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252-53.

The elements of a claim for fraudulent misrepresentation are: (1) defendant made a false statement of material fact; (2) defendant knew that the statement was false; (3) defendant intended that the statement would induce the plaintiff to act; (4) plaintiff relied on the truth of the statement; and (5) plaintiff's damages resulted from reliance on the statement. *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 882 (7th Cir.2005); *Board of Educ. of City of Chicago v. A, C, and S, Inc.,* 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 546 N.E.2d 580 (Ill.1989). "In its general sense, 'fraud' means anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Tri-G Inc. v. Burke, Bosselman & Weaver,* 353 Ill.App.3d 197, 216, 288 Ill.Dec. 580, 817 N.E.2d 1230 (Ill.App.Ct.2004).

#### 1. False Statements of Fact

**\*23** Williams-Hayward contends that NSC cannot establish that it made false statements of fact because the asserted facts amount to nothing more than Williams-Hayward's opinions. In general, an expression of opinion will not support an action for fraud. *See Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 489, 57 Ill.Dec. 904, 429 N.E.2d 1267, 1272 (Ill.App.Ct.1981); *see also West v. Western Cas. & Surety Co.,* 846 F.2d 387, 393 (7th Cir.1988) ("statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation"). Whether a statement is one of fact or opinion depends on the circumstances of a case. *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300, 309, 265 Ill.Dec. 722, 773 N.E.2d 84 (Ill.App.Ct.2002). "A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact." *West,* 846 F.2d at 393. When a speaker "holds himself out as or understood as having special knowledge of the matter which is not available to the plaintiff," the speaker's "opinion becomes in effect an assertion summarizing his knowledge." *Id.* (citing *Duhl,*

102 Ill.App.3d at 489, 57 Ill.Dec. 904, 429 N.E.2d 1267). "Thus, the general rule is that it is not 'the form of the statement which is important and controlling, but the sense in which it is reasonably understood.'" ' *West,* 846 F.2d at 394 (quoting Prosser & Keeton on Torts § 109, at 755 (W. Keeton 5th ed.1984)).

NSC, however, has presented sufficient evidence, under the clear and convincing standard of proof, to establish that a genuine issue of material fact exists to whether Kurcz's statements in his email of September 5, 2001, Kurcz's subsequent assurances made in September 2001, and Kurcz's email of December 18, 2001, contained false statements of material facts. For instance, NSC has set forth evidence that Kurcz held himself out as experienced in developing water based products for the rail and chemical industry for over 30 years and that Williams-Hayward "know[s] of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate." (*See* Def.'s Stmt. ¶ 178.) Kurcz also stated that Williams-Hayward was the "oldest supplier of water based products in the rail industry and we are confident we are also the best." (*See* Def.'s Stmt. ¶ 200.)

Furthermore, NSC has come forward with evidence of Kurcz's assertion that Williams-Hayward's High-Rubber Thermalbond paint, if properly applied, would pose no problems for the transport of the paper rolls. Kurcz also explained to NSC's Todd Pafford that the High-Rubber Thermalbond paint would do the job it was intended to do. Also, there is sufficient evidence in the record that Kurcz knew the problem of the paint sticking in the paper cars when he made these statements.

**\*24** Based on this evidence, a reasonable jury could find that Kurcz made false statements of fact. Specifically, examining the emails in the context of the paper boxcar sticking problems that occurred during the fall of 2001, a reasonable jury could find that Kurcz had summarized his knowledge of the paint systems based on his background and expertise, and that Kurcz's emails contained false statements of material facts.

### 2. Scienter

Williams-Hayward also contends that NSC cannot prove that it intentionally made a false statement of material fact. The Court notes that "evaluations of motive and intent are

generally inappropriate on a motion for summary judgment," *see Kyle v. Patterson,* 196 F.3d 695, 698 (7th Cir.1999), and that "resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible." *FDIC v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir.1980) (summary judgment often inappropriate in fraud claims because district court would be required to resolve subjective issue of fraudulent intent). There is no absolute rule, however, that precludes summary judgment concerning fraud claims. *Id.; see also Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985) ("although summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position").

NSC has presented evidence upon which a reasonable jury could find by clear and convincing evidence that Williams-Hayward made representations in reckless disregard or culpable ignorance of their truth or falsity. *See Hartmann Co. v. Capital Bank & Trust Co.,* 296 Ill.App.3d 593, 602, 230 Ill.Dec. 830, 694 N.E.2d 1108 (Ill.App.Ct.1998). Specifically, NSC has set forth evidence that while Williams-Hayward was making assurances that the High Rubber Thermalbond paint, if applied properly, would pose no problems for the transport of the paper rolls, Kurcz admitted to Black and Ed Kurcz that the paint sticking problem "could be trouble if it is not a mill thickness issue." (Pls' Stmt. ¶ 148.) Despite Kurcz's assurance to NSC's Pafford that they never had one paper sticking complaint in all Williams-Hayward's years of service, there is evidence in the record that during the December 21, 2001, telephone conference, Kurcz stated that some of the boxcars from the other railroad companies that had used High-Rubber Thermalbond for transporting paper had experienced paper sticking problems, but that this was an accepted industry problem.

### 3. Reliance

Next, Williams-Hayward contends that NSC cannot establish that it relied on Kurcz's statements made in his fall of 2001 emails. To establish justifiable reliance, NSC must show that it reasonably relied on Williams-Hayward's representations in light of the facts within NSC's actual knowledge and any facts NSC might have discovered by the exercise of ordinary prudence. *See D.S.A. Fin. Corp. v. County of Cook,* 345 Ill.App.3d 554, 559, 280 Ill.Dec. 130, 801 N.E.2d 1075

57 UCC Rep.Serv.2d 136

(Ill.App.Ct.2003). Justifiable reliance is typically a question of fact for the jury. *Id.*

**\*25** Here, NSC has established that there is a genuine issue of material fact as to its reliance on Kurcz's assurances and statements. There is evidence in the record that because of NSC's limited experience with High-Rubber Thermalbond paint, NSC needed full "buy-off" from Williams-Hayward that NSC's application was in accordance with Williams-Hayward's technical requirements and was fit for the service intended. NSC also presents evidence that it relied on Williams-Hayward's assurances and followed Black's and Williams-Hayward's revised paint application process.

### 4. Fraudulent Concealment-Duty to Disclose

To establish a claim for fraudulent concealment, a plaintiff must show, in addition to the elements of fraudulent misrepresentation, that the defendant concealed a material fact when it was under the duty to disclose that fact to the plaintiff. *W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 351 Ill.App.3d 752, 762, 286 Ill.Dec. 734, 814 N.E.2d 960 (Ill.App.Ct.2004). The duty to disclose certain material facts may arise out of several situations, including if (1) plaintiff and defendant are in a fiduciary or confidential relationship, or (2) plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority. *Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 250, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996) (citations omitted).

A genuine issue of material fact exists as to whether NSC placed trust and confidence in Williams-Hayward. The record reveals that Williams-Hayward knew that NSC had no experience with High Rubber Thermalbond prior to its contract with CPR to manufacture the paper boxcars. Not only did Williams-Hayward develop the High-Rubber Thermalbond in the first instance, but Kurcz expressly stated that Williams-Hayward had extensive experience in the industry. Specifically, Kurcz emailed Pafford: "We know of no company offering coatings systems in the corrosive services that can produce the actual fleet data of over 90,000 units in service for over 15 years with such a success rate. Therefore we are confident with our recommendation for the use of High Rubber Thermalbond products at NSC and to our mutual customer Canadian Pacific Railroad." (Def.'s Stmt. ¶ 178, Pls' Stmt. ¶ 124, Pls' Ex. 58.)

Because NSC has established that a genuine issue of material fact exists as to whether it placed trust and confidence in Williams-Hayward, the question of whether Williams-Hayward had a duty to disclose material facts is a question for the jury.

### F. Damages

Last, Williams-Hayward contends that NSC cannot establish that Williams-Hayward caused its alleged damages.

### 1. Breach of Warranty Claims

Williams-Hayward argues that because NSC failed to make a claim for the difference between the value of the goods accepted and the value they would have had they been warranted, NSC cannot recover any damages in this matter. As discussed above, under the Illinois Uniform Commercial Code, Section 2-714(2), "the difference between the value of the goods accepted and the value they would have had they been warranted" is not the sole measure of damages as Williams-Hayward asserts. Instead, an aggrieved party may recover incidental and consequential damages under Section 2-714(3) and also damages if "special circumstances show proximate damages of a different amount." *See* *Razor v. Hyundai Motor America,* 349 Ill.App.3d 651, 659, 286 Ill.Dec. 190, 813 N.E.2d 247 (Ill.App.Ct.2004).

**\*26** Nonetheless, Williams-Hayward contends that it had no reason to know of NSC's particular requirements for the paper cars at the time of contracting, and thus it cannot be held liable for any losses resulting from them. The Court, however, has already concluded that there is a genuine issue of material fact concerning Williams-Hayward's knowledge of the paint's requirements for the paper boxcars. Accordingly, Williams-Hayward's argument fails.

### 2. Promissory Estoppel Claims

Next, Williams-Hayward contends that the promissory estoppel claims are merely a reiteration of the warranty claims; therefore, the proper damages are the "difference between the value of the goods accepted and the value they would have had they been warranted." *See* Illinois Uniform Commercial Code, Section 2-714(2). The Court, however, has rejected Williams-Hayward's argument that the promissory estoppel claims are based on the same subject matter as the sales contract. Williams-Hayward's argument concerning promissory estoppel damages also fails.

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...
57 UCC Rep.Serv.2d 136

3. Fraud Claim

Williams-Hayward asserts that NSC cannot recover damages for loss of reputation, interest charges, and cost overruns from the repainting of the paper boxcars because these damages were not a foreseeable result of Williams-Hayward's alleged fraud. Williams-Hayward discusses the law of proximate cause, but does not support its argument with facts in the record. Without a more developed argument, Williams-Hayward has failed to establish that, as a matter of law, NSC cannot establish damages based on its fraudulent misrepresentation and concealment claim. Because proximate cause for tort damages is generally a question of fact, this issue is for the jury to decide. *Kavales v. City of Berwyn,* 305 Ill.App.3d 536, 547, 238 Ill.Dec. 738, 712 N.E.2d 842 (Ill.App.Ct.1999).

Finally, Williams-Hayward contends that NSC cannot establish any entitlement to exemplary damages because there is no evidence of Williams-Hayward's fraudulent conduct. As discussed, NSC has established a genuine issue of material fact as to its fraud claim against Williams-Hayward, and thus Williams-Hayward's argument regarding exemplary damages fails.

III. Summary Judgment Motion on Williams-Hayward's Count I of Counterclaim

In Count I of its Counterclaims, Williams-Hayward, relying on Illinois Uniform Commercial Code Section 2-709, contends that, as a matter of law, it is entitled to the payment of the purchase price and additional accrued charges for the paint accepted by NSC. For the following reasons, Williams-Hayward's argument fails.

NSC asserts that it properly revoked acceptance of the "non-conforming goods" under Section 2-608 of the Illinois Uniform Commercial Code, and thus is not required to pay the remainder of the purchase price as Williams-Hayward contends. Section 2-608 reads:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

**\*27** (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

In essence, when a buyer has already accepted goods, he may revoke acceptance when a nonconformity substantially impairs the value of the goods. *See Sorce v. Naperville Jeep Eagle, Inc.,* 309 Ill.App.3d 313, 320-21, 242 Ill.Dec. 738, 722 N.E.2d 227 (Ill.App.Ct.1999). Whether an attempted revocation of acceptance is valid hinges on material questions of fact. *Id.* at 321, 242 Ill.Dec. 738, 722 N.E.2d 227 ("trier of fact must determine whether the alleged nonconformities in the goods caused substantial impairment to the buyer")

Based on Williams-Hayward's assurances that the paint's stickiness problems would be cured, NSC contends that it may revoke its acceptance under Section 2-608. Williams-Hayward, however, contends that despite the alleged assurances made in the fall of 2001, NSC's continued use of the High-Rubber Thermalbond demonstrates that NSC never revoked its acceptance of the paint. Illinois courts, however, reject the notion that use by the buyer constitutes irrevocable acceptance. *See North Am. Lighting, Inc. v. Hopkins Mfg. Corp.,* 37 Ill.F.3d 1253, 1259 (7th Cir.1994); *Frank's Maint. & Eng'g v. C.A. Roberts Co.,* 86 Ill.App.3d 980, 986, 42 Ill.Dec. 25, 408 N.E.2d 403 (Ill.App.Ct.1980).

Nonetheless, Williams-Hayward argues that NSC has failed to demonstrate that it "experienced a substantial impairment of value after it accepted and consumed Williams-Hayward's paint." To establish the substantial impairment of the value of goods, a buyer must bring forward objective evidence that, with respect to his needs, the value of the goods was substantially impaired. *GNP Commodities, Inc. v. Walsh Heffernan Co.,* 95 Ill.App.3d 966, 978, 51 Ill.Dec. 245, 420 N.E.2d 659 (Ill.App.Ct.1981); *see also North Am. Lighting, Inc.,* 37 F.3d at 1259.

NSC has provided ample evidence that due to the propensity of the High-Rubber Thermalbond to fuse with the paper rolls, the paint had no value to NSC. For example, after hauling newsprint paper rolls, the pull-ahead car and subsequent trial cars all exhibited sticking problems, namely, the paint stuck to the paper rolls' wrappings and exposed the paper rolls to damage. Because of this damage, the newsprint paper supplier refused to accept the paper boxcars for its service. A

reasonable jury could find that the paint's stickiness problems rendered the boxcars unsuitable for paper service.

Next, Williams-Hayward contends that NSC exercised improper ownership over the paint remaining on NSC's premises after NSC determined that the paint was non-conforming. Section 2-603(1) of the Illinois Uniform Commercial Code explains that absent instructions from the seller with respect to the goods, a "buyer does not have a duty to return goods; rather the burden is on the seller to repossess them if he wants them." *See* *Frank's Maint.,* 86 Ill.App.3d at 986, 42 Ill.Dec. 25, 408 N.E.2d 403. NSC has set forth evidence that Williams-Hayward never provided instructions regarding the disposition of the paint, nor did Williams-Hayward attempt to retrieve the paint. (Pls' Stmt. ¶¶ 180-82.)

Because NSC has raised a genuine issue of material fact concerning the disposition of the paint, Williams-Hayward's argument fails.

CONCLUSION

**\*28** For these reasons, the Court grants in part and denies in part Defendant's Motions for Summary Judgment.

All Citations

Not Reported in F.Supp.2d, 2005 WL 782698, 57 UCC Rep.Serv.2d 136

## Footnotes

1    For the first time in its Reply Brief, Williams-Hayward contends that CPR's claims are nothing more than "thinly-disguised tort claims" barred by *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 452 (Ill.1982). Williams-Hayward waives this argument because it was brought for the first time in its Reply Brief. *See* *Carter v. Tennant Co.,* 383 F.3d 673, 679 (7 th Cir.2004).

2    Any examinations made by CPR after the contract was formed do not affect the existence of the implied warranties. *See* White & Summers, Uniform Commercial Code § 12-6 (4 th ed.)

3    For the first time in its Reply Brief, Williams-Hayward contends that CPR cannot recover consequential damages. *See* *Szajna v. General Motors Corp.,* 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (Ill.1986). Williams-Hayward waives this argument because it was made for the first time in the Reply Brief. *See* *Carter v. Tennant Co.,* 383 F.3d 673, 679 (7 th Cir.2004). Also, Williams-Hayward's reliance on the dicta in *Szajna* is misplaced.

4    Williams-Hayward argues that its invoices following the shipments of paint, and not the purchase order, are the controlling contractual documents. Williams-Hayward, however, signed the acknowledgment copy of the purchase order under language stating: WE HEREBY ACKNOWLEDGE RECEIPT AND ACCEPTANCE OF YOUR ORDER, SUBJECT TO ALL TERMS AND CONDITIONS APPEARING ON THE FACE AND BACK, THEREOF. By signing this acknowledgment, Williams-Hayward accepted NSC's offer set forth in the purchase order. *See* *Outboard Marine Corp. v. Babock Indus.,* Case No. 91 C 7247, 1995 WL 296963, at \*5 (N.D.Ill. May 12, 1995) (citing UCC Section 2-207.) Furthermore, because the purchase order prohibits any attempts to impose additional terms to the contract through invoices, Williams-Hayward's subsequent invoices are not part of the contract for the purchase of the paint. *See id.*

5    Based on facts in dispute, Williams-Hayward makes the cursory argument that NSC did not rely on the alleged verbal representations, and thus they were not the "basis of the bargain" as required for a breach of express warranty claim. Because Williams-Hayward's argument is undeveloped, the Court considers it waived. *See* *Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7 th Cir.2005) ("Perfunctory or undeveloped arguments are waived"); *see also* *Weng v. Allison,* 287 Ill.App.3d 535, 538, 223 Ill.Dec. 123, 678 N.E.2d

Canadian Pacific Railway Co. v. Williams-Hayward..., Not Reported in...

57 UCC Rep.Serv.2d 136

1254 (Ill.App.Ct.1997) (burden on seller to establish by affirmative proof that affirmations did not become part of basis of bargain).

6    Again, Williams-Hayward makes the argument that the paint was merchantable because it was not used for an "ordinary purpose." As discussed in detail above, whether the use of High-Rubber Thermalbond in the paper boxcars was "ordinary" is a question of fact for the jury. *See Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.,* 342 Ill.App.3d 150, 159, 276 Ill.Dec. 579, 794 N.E.2d 829 (Ill.App.Ct.2003).

7    It is not the Court's role to construct the litigants' legal arguments, especially when the parties are represented by counsel. *See Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir.1996).

---

End of Document                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 11

2010 WL 3908567
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Maryann COTTRELL and
Richard Holland, Plaintiffs,

v.

HERITAGES DAIRY STORES,
INC., et al., Defendants.

Docket No. 23.
|
Civil No. 09–1743 (RBK/JS).
|
Sept. 30, 2010.

**Attorneys and Law Firms**

Maryann Cottrell, Glassboro, NJ, pro se.

Richard G. Holland, Glassboro, NJ, pro se.

Mark B. Shoemaker, Ward Shoemaker LLC, Woodbury, NJ, for Defendants.

**OPINION**

KUGLER, District Judge.

 *1  This matter comes before the Court on a motion by Defendants to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Complaint brings claims under the Americans with Disabilities Act ("ADA"), the New Jersey Law Against Discrimination ("NJLAD"), the Civil Rights Act and the New Jersey Civil Rights Act ("NJCRA"). For the reasons expressed below, the Court will grant Defendants' motion to dismiss.[1]

**I. BACKGROUND**

Mr. Richard Holland and Ms. Maryann Cottrell are advocates for disabled persons. Although neither Holland nor Cottrell are themselves disabled, Cottrell's daughter is severely disabled, and as a result of her daughter's disability, Cottrell is permitted to park her vehicle in parking spaces reserved for disabled persons.

To further the rights of disabled persons, Holland and Cottrell actively observe commercial establishments to ensure that local business owners comply with laws and ordinances designed to protect handicapped persons. When local businesses fail to meet their statutory obligations, Cottrell "informs the proper authorities/agencies," (Am.Compl.¶ 12.), and "signs citizen complaints regarding handicap parking and failure to provide access," (Am.Compl.¶ 13.). Cottrell and Holland receive no financial compensation for their efforts.

Heritage Dairy Stores, Inc. is a corporation consisting of thirty-six convenience stores located throughout the State of New Jersey. On several occasions, Cottrell and Holland observed vehicles that were not bearing the appropriate handicapped tags parked in spaces reserved for handicapped persons, access aisles, and passenger loading zones. In particular, Cottrell and Holland allege that Heritage violated various local ordinances at its convenience stores in Clarksboro, Clayton, and Williamstown. For example, on September 14, 2006, Holland and Cottrell observed a Pepsi Cola delivery truck obstructing a handicap space located at the front entrance of the Heritage store in Clarksboro, (Am.Compl.¶ 20.), and on November 6, 2006 they observed Heritage allowing a "Heating & Cooling" contractor to park in a designated handicap parking space at the same location. Additionally, on September 16, 2008, Cottrell and Holland watched a delivery truck from Marksman Transport park on an access ramp adjacent to a parking stall reserved for handicapped persons. On a separate occasion, Holland and Cottrell observed Heritage allow a paint contractor to park in a designated handicap spot at the Clayton store. Finally, Cottrell and Holland allege that they watched a Pepsi Cola delivery truck park in a spot reserved for handicapped persons at the Williamstown store on December 7, 2006.

When Cottrell and Holland observed these vehicles, they took photographs of the vehicles, recorded the vehicle license plate numbers, and filed citizen complaints against the vehicle owners. (Am.Compl.¶ 17.) Cottrell and Holland allege that Heritage responded by sending them a letter on April 11, 2009 advising them to refrain from entering the premises of any Heritage convenience store. The letter also warned Holland and Cottrell that Heritage would file criminal charges against them if they continued to enter the premises of Heritage stores.

Cottrell v. Heritages Dairy Stores, Inc., Not Reported in F.Supp.2d (2010)
2010 WL 3908567

*2 Plaintiffs brought this action on April 9, 2009, alleging retaliation under the ADA, the NJLAD, the Civil Rights Act and the New Jersey Civil Rights Act. Defendants filed this motion to dismiss on March 18, 2010. In their brief, Defendants adopt wholesale Judge Simandle's recent opinion in *Cottrell v. Bob's Little Sport Shop, Inc.,* No. 09–1987, 2010 WL 936212 (D.N.J. Mar.11, 2010). In *Cottrell v. Bob's Little Sport Shop, Inc.,* Judge Simandle dismissed retaliation claims under the ADA and the NJLAD that were substantially similar to the claims brought by Cottrell and Holland in this dispute for lack of Article III standing. 2010 WL 936212 at *4. Cottrell and Holland submitted an opposition brief, but Defendants did not submit a reply brief. The motion is now ripe for review.

## II. STANDARD

Although styled as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted, Defendants' assertion that Plaintiffs lack standing is technically an attack on this Court's subject matter jurisdiction and is properly brought pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Mars Inc. v. JCM Am. Corp.,* No. 05–3165, 2008 WL 5401604, at *2 (D.N.J. Dec.23, 2008) (citing *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007)).

### A. Federal Rule of Civil Procedure 12(b)(1) Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint or portions of a complaint may be dismissed for lack of subject matter jurisdiction. Fed R. Civ. P. 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction may be brought at any time and may either (1) "attack the complaint on its face" or (2) "attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. and Loan* Ass'n, 549 F.Supp.2d 884, 891 (3d Cir.1977). In the second type of 12(b)(1) motion, the court does not presume that the allegations in the plaintiff's complaint are true, and the "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* In such a case, "the court can consider affidavits attached to the moving papers or even require such affidavits be submitted." *New Hope Books, Inc. v. Farmer,* 82 F.Supp.2d 321, 324 (D.N.J.2000) (citing *Growth Horizons, Inc. v. Delaware Cnty., Pennsylvania,* 983 F.2d 1277, 1281 n. 4 (3d Cir.1993)). Furthermore, the plaintiff has the burden of proving that the court has subject matter jurisdiction. *Mortensen,* 549 F.2d at 891. If a court lacks subject matter jurisdiction, it must dismiss the case without prejudice. *In re*

*Orthopedic "Bone Screw" Prod. Liab. Litig.,* 132 F.3d 152, 155–56 (3d Cir.1997).

Standing "is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution." *Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 117 (3d Cir.1997); *see Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The party invoking federal jurisdiction bears the burden of establishing standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *accord FOCUS v. Allegheny Cnty. Court of Common Pleas,* 75 F.3d 834, 838 (3d Cir.1996).

*3 At the pleading stage, therefore, the plaintiff must allege facts sufficient to establish his standing to invoke the court's jurisdiction. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. Thus, [plaintiffs] in this case must allege facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing.") (internal alterations, omissions, quotations, and citations omitted); *Warth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The rules of standing ... are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); *Anjelino v. N.Y. Times Co.,* 200 F.3d 73, 88 (3d Cir.2000) ("Standing is established at the pleading stage by setting forth specific facts [satisfying the elements of standing].").

Although it is the duty of the plaintiff to "clearly and specifically set forth facts sufficient to satisfy [the] standing requirements," the level of specificity necessary to avoid dismissal for lack of standing should not be "exaggerated." *Hosp. Council of W. Pa. v. City of Pittsburgh,* 949 F.2d 83, 86–87 (3d Cir.1991). At the pleading stage, the court may "presume that the general allegations in the complaint [as to standing] encompass the specific facts necessary to support those allegations." *Steel Co.,* 523 U.S. at 104. Alternatively, however, it is "proper" and "within the trial court's power," even on a motion to dismiss, "to require the [plaintiff]

to go beyond ... general allegations in the complaint and allege particularized facts supportive of its standing." *Newark Branch NAACP v. Town of Harrison,* 907 F.2d 1408, 1415 & n. 10 (3d Cir.1990) (quoting *Warth,* 422 U.S. at 501–02).

## III. DISCUSSION

Plaintiffs lack Article III standing because they failed to allege immediate or future harm from Defendants' decision to ban them from the premises of any Heritage store. Defendants argue that "Plaintiff fails to allege any injury that is a consequence of being banned from ... Heritage's premises and therefore have failed to establish standing under Article III of the Constitution." (Mem. of Law in Supp. of Def. Mot. Dismissing The Pl. Compl. 3.) In support of this line of reasoning, Defendants make no specific arguments for why Plaintiff lacks standing; rather, Defendants adopt wholesale, Judge Simandle's opinion in *Cottrell v. Bobs Little Sport Shop, Inc..* Plaintiffs do not refute Defendants' specific argument for why they lack Article III standing, rather they simply allege that "Plaintiff[']s complaint states an onslaught of their protected rights by the defendant revoking their status as business invitees in retaliation for their efforts to enforce [the] ADA and LAD." (Pl.'s Opp'n to Def.'s Mot. to Dismiss 7.)

 **\*4** The only relief available to a plaintiff for a retaliation claim under the ADA is injunctive relief. *See* 42 U.S.C. §§ 12203(c), 12188; *Cottrell v. Zagami, LLC,* No. 08–3340, 2009 WL 1416044, at *3 n. 1 (D.N.J. May 20, 2009); *Cottrell,* 2010 WL 936212, at *3; *Rothman v. City of Chicago,* No. 02 C 3533, 2004 WL 2271851, at *2 (N.D.Ill. Oct.6, 2004) ("[A] plaintiff alleging retaliation based on public accommodation discrimination may seek only injunctive relief under the ADA."). In order to have Article III standing for a retaliation claim, a plaintiff seeking injunctive relief must "establish a real and immediate threat" that he will suffer a future injury. *Brown v. Fauver,* 819 F.2d 395, 400 (E.D.Pa.1987) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). As the Supreme Court held in *Lyons,* "[injunctive relief] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.' " *461 U.S. at 111* (quoting

*O'Shea v. Littleton,* 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

Plaintiffs fail to allege injury-in-fact because they do not allege that they have any plans to return to a Heritage store in the future, or that they will suffer any harm from Defendants' allegedly retaliatory conduct. The facts of this case are indistinguishable from *Cottrell v. Bob's Little Sport Shop, Inc.,* where the court dismissed the plaintiff's claim for lack of standing under Article III.2010 WL 936212 at *3. In *Cottrell v. Bob's Little Sport Shop, Inc.,* the plaintiffs brought a retaliation claim under both the ADA and the NJLAD against a sporting goods store for the same conduct for which they brought this lawsuit against Defendants. *Id.* at * 1. The court dismissed the claims, finding that because the plaintiffs failed to "allege [ ] concrete plans to return to Bob's Little Sport Shop ... there [was] no real and immediate threat that they [would] be prevented entry to the store or otherwise harmed by Defendants' allegedly retaliatory conduct in the future." *Id.* (citing *Zagami,* 2009 WL 1416044, at *3). Likewise, here, Plaintiffs failed to allege that they will return to Defendants' store in the future or that they will be subjected to any retaliatory conduct by Defendants. Thus, Plaintiffs lack standing.

Therefore, absent any allegation of a real or immediate threat of future harm from Defendants' allegedly retaliatory conduct, Plaintiffs fail to allege standing to bring their claim under the ADA and the NJLAD.

## IV. CONCLUSION

For the foregoing reasons, this Court will grant Defendants' motion to dismiss Plaintiffs' retaliation claims without prejudice. If Plaintiffs elect to file an amended complaint, they must do so within 30 days of the entry of the Order accompanying this opinion.

An accompanying order shall issue today.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 3908567

## Footnotes

1    This Court will dismiss Plaintiffs' claims under the NJCRA and the Civil Rights Act. In order to state a claim under the NJCRA, a plaintiff must "prove that [the defendants] are state actors." *See* N.J. Stat. Ann. § 10:6–2(c); *Wilson v. Cnty. of Gloucester,* 256 F.R.D. 479, 488 n. 13 (D.N.J.2009) ("Under both § 1983 and the New Jersey Civil Rights Act, plaintiffs

**Cottrell v. Heritages Dairy Stores, Inc., Not Reported in F.Supp.2d (2010)**

2010 WL 3908567

must also prove that Defendants are state actors."). Because Plaintiffs have not alleged that Defendants are state actors, Plaintiffs NJCRA claim is dismissed. Furthermore, Plaintiffs' claim of discrimination under the "Civil Rights Act of 1963," is also dismissed. The public accommodation provision of the Civil Rights Act of 1964 provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination ... on the ground of *race, color, religion,* or *national origin."* 42 U.S.C. § 2000a (1964) (emphasis added). Because disabled persons are not a protected class under the public accommodation provision of the Civil Rights Act of 1964, Plaintiffs fail to state a claim under the Civil Rights Act of 1964.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 12

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 132 of 751
PageID: 11498
Cromeans v. Morgan Keegan & Co., Inc., Not Reported in Fed. Supp. (2013)

2013 WL 12129609
Only the Westlaw citation is currently available.
United States District Court,
W.D. Missouri, Central Division.

John W. CROMEANS., Jr., Individually and on
Behalf of all others similarly situated, Plaintiff,

v.

MORGAN KEEGAN & CO., INC., and
Armstrong Teasdale, LLP, Defendants.

No. 2:12–CV–04269–NKL
|
Signed 11/05/2013

**Attorneys and Law Firms**

Andrew P. Campbell, Caroline Smith Gidiere, John C.
Guin, Stephen D. Wadsworth, Campbell, Guin, Williams,
Guy & Gidiere LLC, J. Timothy Francis, James L. North
& Associates, Birmingham, AL, Richard E. McLeod, The
McLeod Law Firm PC, Kansas City, MO, for Plaintiff.

Bernard Suter, Lisa Bertain, Elyse Whitehead, San Francisco,
CA, Charles W. Hatfield, Erin M. Naeger, Jeremy A.
Root, Stinson Leonard Street LLP, Dale C. Doerhoff,
Heidi Doerhoff Vollet, Timothy W. Van Ronzelen, Cook,
Vetter, Doerhoff & Landwehr, P.C., Jefferson City, MO, for
Defendants.

## ORDER

NANETTE K. LAUGHREY, United States District Judge

**\*1** Pending before the Court is Defendant Armstrong
Teasdale, LLP's Motion for Summary Judgment on Plaintiff
John Cromeans' Claims for Legal Malpractice, Negligent
Misrepresentation, and Unjust Enrichment. [Doc. # 93]. For
the reasons set forth below, Defendant's motion is GRANTED
on the Malpractice and Negligence claims and DENIED on
the Unjust Enrichment claim.

## I. Undisputed Facts

On July 15, 2010, the City of Moberly, Missouri ("the
City") approved the issuance of $39 million in municipal
bonds by the Industrial Development Authority of the City
("IDA"). The bonds were issued by the IDA to finance a

project that included constructing and equipping a sucralose
manufacturing and processing facility within the City ("the
Project.").The Project would be owned by the City and
operated by a company called Mamtek. Approximately 140
persons or entities purchased the bonds. Mamtek failed and
the bonds are now worthless.

During the process leading up to the sale of the bonds,
the City selected Defendant Morgan Keegan & Company,
Inc. ("Morgan Keegan") to serve as the underwriter for
the bonds. As underwriter, Morgan Keegan was responsible
for preparing the Official Offering Statement, which
provided information about the bond offering to prospective
purchasers.

Morgan Keegan engaged Armstrong Teasdale to serve
as underwriter's counsel. According to the engagement
letter between Morgan Keegan and Armstrong Teasdale,
Armstrong Teasdale was to provide limited legal services
to Morgan Keegan. The legal services included preparing
the offering materials, a bond purchase agreement, and
continuing disclosure agreement, as well as generally
advising Morgan Keegan in connection with issuance of the
bonds by the IDA.

In 2009, Cromeans opened an account with Morgan Keegan
for the purpose of purchasing municipal bonds. For bond
purchases, Cromeans interacted with a Morgan Keegan
financial advisor named Brian McGee. Cromeans was not
aware of the Moberly bond offering until he received an
email from McGee on November 1, 2010. This two-page e-
mail contained only a bullet point memo prepared by Morgan
Keegan and a five-page attachment containing the Standard
& Poor's ratings analysis for the bonds. Cromeans purchased
$50,000 of the Moberly bonds from Morgan Keegan a few
hours after he received McGee's November 1, 2010 email.

The only documents that Cromeans reviewed before deciding
to purchase the bonds were McGee's November 1, 2010 email
and the Standard & Poor's attachment. Cromeans did not
review the Official Statement before purchasing the Moberly
bonds and did not actually see the Official Statement until
sometime in 2012 in his counsel's office. Cromeans did testify,
however, that he relied on particular excerpts from the Official
Statement that his broker communicated to him.

Cromeans has never spoken with anyone at Armstrong
Teasdale or read anything that Armstrong Teasdale or its
attorneys wrote. Cromeans has not (1) asked Armstrong

Teasdale to be his attorney, (2) relied on Armstrong Teasdale for legal advice, or (3) entertained any expectation that Armstrong Teasdale would be acting as his lawyer.

## II. Discussion

### A. Legal Malpractice

**\*2** Armstrong Teasdale argues that it is entitled to summary judgment on Cromeans' claim for legal malpractice because the undisputed facts show that: 1) no attorney-client relationship existed between Armstrong Teasdale and Cromeans; and 2) Morgan Keegan did not retain Armstrong Teasdale with the specific intent to benefit Cromeans.

Ordinarily, an attorney-client relationship must exist before a plaintiff can recover for legal malpractice against an attorney. *Donahue v. Shughart, Thomson & Kilroy, P.C.*, 900 S.W.2d 624, 627 (Mo. 1995) (en banc); *see also Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., Inc.*, 931 S.W.2d 166, 176–77 (Mo. Ct. App. 1996). The Missouri Supreme Court has held, however, that this element of a legal malpractice claim may be satisfied if a non-client plaintiff can show that "the attorney-defendant performed services specifically intended by a client to benefit [the] plaintiff[ ]." *Donahue*, 900 S.W.2d at 628–29. If this is established, a six-factor balancing test is then used to determine, "[a]s a separate matter, the question of legal duty of attorneys to non-clients." *Id.* at 629. The Court referred to this as a "modified balancing of factors approach," and reasoned that it permits "consideration of relevant policy concerns," while concurrently requiring the plaintiff to plead and prove "that an attorney-client relationship existed in which the client specifically intended to benefit the plaintiff." *Id.* at 628. In adopting this rule, the Court addressed at length the concern that expanding legal malpractice to include actions brought by non-clients would extend liability "to an unlimited class of individuals." *Id.* at 628. The Court reasoned that "if the transaction was specifically intended to benefit the plaintiff, liability is not extended to an unlimited class." *Id.* Accordingly, the Court emphasized the need to prove the client's specific intent to benefit the non-client plaintiff, stressing that "[a] benefit that is merely incidental or indirect will not satisfy this factor." *Id.*

Cromeans suggests that the client's specific intent is only one factor in the *Donahue* balancing test and that not every factor must be satisfied in order to succeed on a claim for legal

malpractice. It is clear from the *Donahue* decision, however, that the existence of the client's specific intent to benefit the plaintiff is a condition precedent to the application of the balancing test. The Missouri Supreme Court held that "that the first element of a legal malpractice action may be satisfied by establishing as a matter of fact [ ] that ... an attorney-client relationship existed in which the attorney-defendant performed services specifically intended by the client to benefit plaintiffs. *As a separate matter*, the question of legal duty of attorneys to non-clients will be determined by weighing the factors in the modified balancing test." *Donahue*, 900 S.W.2d at 628–29 (emphasis added); *accord Johnson v. Sandler, Balkin, Hellman, & Weinstein, P.C.*, 958 S.W.2d 42, 49 (Mo. Ct. App. 1997) ("Applying *Donahue* to the facts of this case, this court must first determine whether there is sufficient evidence which, if true, would establish as a matter of fact that an attorney-client relationship existed in which the attorney-defendant performed services specifically intended by the client to benefit the plaintiffs. Then, as a separate matter, the question of legal duty of the attorneys to the appellants must be determined by weighing the factors in the modified balancing test."); *see also Merchs. Bonding Co. v. Noland*, No. 2:10–CV–04095–NKL, 2010 WL 3584017, at *3 (W.D. Mo. Sept. 7, 2010) ("[P]roof of specific intent is a condition precedent and the six factors need not be weighed until specific intent is established.").

**\*3** Having concluded that Cromeans must show that Morgan Keegan specifically intended Armstrong Teasdale's services to benefit Cromeans, the next question is whether Cromeans has presented sufficient evidence to meet his burden. In this regard, Cromeans relies exclusively on a memorandum to Mamtek from Mark Boatman of Armstrong Teasdale. This memorandum requests from Mamtek the materials necessary for Morgan Keegan and Armstrong Teasdale "to conduct properly their due diligence review." [Doc. # 128–2 at 2]. This memorandum states, in part:

> The due diligence process is necessitated by federal and state securities laws that impose duties to disclose to potential purchasers of securities information that is material to the ability of purchasers to make an informed investment decision. Federal securities laws specifically provide that it is unlawful for any person, in

connection with the offering or sale of any security, to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In order to provide this information to potential purchasers, information describing the Borrower, the Project, and the Bonds will be set forth in the Official Statement.... Each underwriter involved in a public securities offering has a responsibility to use reasonable care to form a belief as to the accuracy and adequacy of the information provided for inclusion in the official statement. The information requests made by the Underwriter [Morgan Keegan] and Underwriter's Counsel [Armstrong Teasdale] during this transaction are necessary to enable the Underwriter to exercise such reasonable care.

[Doc. # 128–2 at 2–3]. Cromeans maintains that this passage reveals Armstrong Teasdale's understanding that the bond purchasers were the intended beneficiaries of the work Armstrong Teasdale was doing for Morgan Keegan.

However, the services Armstrong Teasdale agreed to provide Morgan Keegan explicitly excluded any responsibility for conducting the type of factual investigation that Cromeans now argues Morgan Keegan intended for Armstrong Teasdale to perform for the benefit of the prospective bond purchasers. In a letter Armstrong Teasdale sent to Morgan Keegan at the end of its representation, Armstrong Teasdale wrote:

In accordance with our [Armstrong Teasdale's] understanding with you [Morgan Keegan], we have rendered legal advice and assistance to you in the course of your investigation with respect to, and participation in the preparation of, the Official Statements and certain other matters related to the Bonds.... *With your*

*consent, we did not independently verify any facts that came to our attention during the course of such assistance*. We are not expressing (and cannot express) any opinion or view with respect to the authorization, issuance, delivery, or validity of the Bonds or the tax-exempt status of the interest paid on the Bonds. Because the primary purpose of our professional engagement was not to establish factual matters and because of the wholly or partially nonlegal character of many of the determinations involved in the preparation of the Official Statements, *we are not passing upon and do not assume responsibility for, the accuracy, completeness or fairness of the statements contained in the Official Statement and make no representation that we have independently verified the accuracy, completeness or fairness of such statements*. However, based upon the review and discussions as described above and in reliance upon the accuracy of the information contained in the aforementioned documents, certificates, opinions, records, and instruments, no facts have come to our attention which lead us to believe that the Official Statements contain as of the date hereof any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

**\*4** [Doc. # 128–18 at 3] (emphases added). Cromeans has presented no evidence that Morgan Keegan ever asked Armstrong Teasdale to provide the services outlined above; nor any evidence that Morgan Keegan disputed the role Armstrong Teasdale described in its letter to Morgan Keegan. Had Morgan Keegan intended Armstrong Teasdale to confer a benefit on prospective bond holders by doing a factual audit, a reasonable juror would expect that issue to be raised by Morgan Keegan in response to Armstrong Teasdale's letter.

*Cromeans v. Morgan Keegan & Co., Inc., Not Reported in Fed. Supp. (2013)*

The mere fact that Armstrong Teasdale recognized that the purpose of a due diligence audit is to protect future bond purchasers is too thin a reed to support a factual finding that Morgan Keegan specifically intended Armstrong Teasdale's legal services to benefit those bond buyers. Instead, the focus must be on what Morgan Keegan intended and the evidence presented is insufficient to show that Morgan Keegan intended or even expected Armstrong Teasdale to do a factual investigation; much less that such an investigation was to confer a benefit on future bond purchasers. This is particularly so given *Donahue's* concern about the dangers of expanding legal malpractice remedies "to an unlimited class of individuals," *Donahue, 900 S.W.2d at 628.*

That Armstrong Teasdale played some role in what was ultimately communicated to the prospective bond purchasers does not establish that Armstrong Teasdale had a duty to every prospective purchaser to perform services beyond those that Morgan Keegan asked Armstrong Teasdale to provide. Rather, Missouri law recognizes that "lawyers frequently make statements or express opinions to persons engaged in transactions with their clients without intending to assume a duty as attorney to such persons, and reliance alone upon the advice or conduct of a lawyer does not create an attorney-client relationship." *Donahue, 900 S.W.2d at 626; accord St. Paul Surplus Lines Ins. Co. v. Remley,* No. 4:08CV1868–DJS, 2009 WL 2070779, at *2 (E.D. Mo. July 13, 2009).

In conclusion, Cromeans' evidentiary submissions fail to show that Morgan Keegan specifically intended Armstrong Teasdale's services to benefit the bond purchasers. Therefore, summary judgment is granted on Cromeans' malpractice claim.

## B. Negligent Misrepresentation

Armstrong Teasdale contends that an attorney acting in the course of his or her representation of a client does not owe a duty of care to non-clients, unless the requirements of *Donahue* are satisfied. Cromeans argues otherwise. However, the Court need not resolve this dispute because even if a non-client such as Cromeans can raise a negligent misrepresentation claim, he has failed to present sufficient evidence to make that claim submissible. Specifically, he has failed to show that he relied on any misrepresentation or omission made by Armstrong Teasdale. *See Ryann Spencer Grp., Inc. v. Assurance Co. of Am.,* 275 S.W.3d 284, 288 (Mo. Ct. App. 2008) (stating the essential elements of a claim for negligent misrepresentation, which include justifiable reliance by the plaintiff on information supplied by the defendant).

Prior to purchasing the Mamtek stock, Cromeans never read any document prepared by Armstrong Teasdale. Instead, he read a bullet point memo sent to him by Morgan Keegan, which purportedly contained statements prepared by Armstrong Teasdale. That bullet point memo, however, omitted Armstrong Teasdale's express disclaimer that previously had been communicated to Morgan Keegan, in which Armstrong Teasdale notified Morgan Keegan that Armstrong Teasdale had made no attempt to independently verify the accuracy of the documents which Armstrong Teasdale used to prepare the Official Statement. Courts have consistently rejected claims for negligent misrepresentation against law firms where the firms relied on facts provided by clients and clearly stated that they were not asked, and did not attempt, to independently verify those facts. *See Nolte v. Pearson,* 994 F.2d 1311, 1316–18 (8th Cir. 1993); *Buford White Lumber Co. Profit Sharing & Sav. Plan & Trust v. Octagon Props., Ltd.,* 740 F. Supp. 1553, 1563 (W.D. Okla. 1989); *see also McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 794 (Tex. 1999) (ruling that a law firm may limit its liability for negligent misrepresentation "by setting forth (1) limitations as to whom the representation is directed and who should rely on it, or (2) disclaimers as to the scope and accuracy of the factual investigation or assumptions forming the basis of the representation or the representation itself."). Similarly, it would be illogical for a jury to find that Cromeans relied on Armstrong Teasdale's statements when Armstrong Teasdale used information provided by its client and had disclaimed any effort to verify the facts provided. While Cromeans was not given the disclaimer, that decision was made by Morgan Keegan, not Armstrong Teasdale, and there is no reason to impute that decision to Armstrong Teasdale. This is particularly so since it is Armstrong Teasdale's failure to adequately investigate the facts contained in the Official Statement that is the basis for Cromeans' negligent misrepresentation claim.

**\*5** Accordingly, summary judgment is granted on Cromeans' negligent misrepresentation claim

## C. Unjust Enrichment

Cromeans v. Morgan Keegan & Co., Inc., Not Reported in Fed. Supp. (2013)

Armstrong Teasdale argues that Cromeans' claim for unjust enrichment fails as a matter of law because Cromeans has not alleged that he conferred a direct benefit on Armstrong Teasdale. In support, Armstrong Teasdale cites the Missouri Supreme Court's decision in *ACLU/Eastern Missouri v. Miller*, 803 S.W.2d 592, 595 (Mo. 1991), for the proposition that "[a]n essential element of this tort [unjust enrichment] is a benefit conferred *upon the defendant by the plaintiff*." (emphasis added).

Yet, in the very same paragraph, the *Miller* Court also found that "it cannot be said that [the defendant] received money *at the expense of* [the plaintiff]." *Id.* (emphasis added). A review of Missouri case law reveals that these are both frequently stated, equally valid iterations of the elements of a claim for unjust enrichment. For every decision stating that the plaintiff must have conferred a benefit upon the defendant, another decision frames the matter in terms of whether the defendant received a benefit at the expense of the plaintiff. *Compare, e.g., Mays–Maune & Assocs., Inc. v. Werner Bros., Inc.*, 139 S.W.3d 201, 205 (Mo. Ct. App. 2004) ("The elements of a claim of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; ...."), *with Miller v. Horn*, 254 S.W.3d 920, 924 (Mo. Ct. App. 2008) ("The elements of unjust enrichment are: "(1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff"...."). While the particular iteration of the rule advanced by Armstrong Teasdale may be read to imply that the defendant must receive a benefit directly from the plaintiff, the alternative statement of the rule does not lend itself to such a restrictive interpretation.

More importantly, Armstrong Teasdale has not cited, and the Court's research has not revealed, any case applying Missouri law that has rejected a claim for unjust enrichment on the basis that the defendant did not receive a benefit directly from the plaintiff. Rather, courts applying Missouri law have taken a decidedly more flexible, totality of the circumstances approach in cases where the defendant indirectly received a benefit at the plaintiff's expense. *See, e.g., Ticor Title Ins. Co. v. Mundelius*, 887 S.W.2d 726, 728 (Mo. Ct. App. 1994) ("To determine if the payor should be reimbursed, courts must balance the equities, considering the relationship of the parties.").

In *Farmers New World Life Insurance Co. v. Jolley*, 747 S.W.2d 704 (Mo. Ct. App. 1988), for example, an insurance company sued the law firm that had represented the beneficiary of a life insurance policy following the

reappearance of the insured policy holder. The firm had been retained under a contingent fee contract to represent the beneficiary's interest in the insurance policy following the disappearance, and presumed death, of the insured. *Id.* at 705. The insurer and the beneficiary ultimately settled the matter, with the resulting agreement providing for the return of the funds paid to the beneficiary in the event that the insured was actually alive. *Id.* Pursuant to the contingent fee contract, the beneficiary's attorneys retained twenty-five percent of the beneficiary's total recovery. *Id.* When the insured was revealed to be alive, the insurer filed suit against the beneficiary and obtained a judgment in its favor. *Id.* The insurer also sued the beneficiary's attorneys, seeking to recover the attorney's fees they had paid as part of the settlement. *Id.*

**\*6** In considering this claim, the *Jolley* court first remarked that the "law of restitution is ill-defined, and there are no rules for determining when there has been unjust enrichment." *Id.* As a result, the court focused on "whether, under equitable principles, [the firm's] retention of the fee would amount to unjust enrichment." *Id.* at 706. The court did reject the insurer's reliance on "cases in which the defendant benefited directly from acts by the plaintiff," *id.*, but it did not hold that the insurer's claim for unjust enrichment failed due to the indirectness of the benefit the insurer conferred upon the attorney. Rather, the court ruled that "[w]hen restitution is sought from a third person, other considerations are present." *Id.* Specifically, these circumstances require "[c]onsideration of all the facts," which in *Jolley* ultimately led to the "conclusion that [the attorney] was not unjustly enriched at the expense of [the insurer]." *Id.* at 707.

A similar analysis was conducted in *Federated Mutual Insurance Co. v. Peery's Auto Parts, L.L.C.*, No. 11–00172–CV–W–FJG, 2012 WL 3062720 (W.D. Mo. July 26, 2012). That case concerned an insurance policy that Federated Mutual Insurance Company ("Federated") had issued to Peery's Auto Parts, under which a separate business owned by Debbie Peery, C & A Automotive, Inc. ("C & A"), was a named insured. *Id.* at \*1. After Federated paid a claim under the policy based on a fire that had damaged C & A, Federated sued to recover the payment, alleging "that one or more agents of C & A concealed and/or misrepresented material facts regarding the claim and failed to cooperate with Federated's investigation and settlement of the claim." *Id.* Although it was unclear "whether Peery's Auto Parts or C & A Automotive was the direct beneficiary of Federated's payment," the court

found "that the payment can be traced from Federated to Perry's Auto Parts to C & A to Debbie, Abby, and Cody Peery." *Id.* at *2 n.1. Peery's Auto Parts as well as Debbie, Abby, and Cody Peery moved to dismiss Federated's claim for unjust enrichment. *Id.* at *1.

The court's decision addressed only the second and third elements of a claim for unjust enrichment, specifically whether the defendant benefitted at the expense of the plaintiff and whether it would be unjust to permit the defendant to retain the benefit. *Id.* at *2. With respect to the former, the court first found that "it has been held that a benefit conferred directly on a limited liability corporation benefits the corporation not the owners." *Id.* (citing *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010)). At the same time, however, the court determined that "Missouri courts, ... have also found that other considerations are present when restitution is sought from a third party beneficiary rather than a direct beneficiary." *Id.* (citing *Jolley*, 747 S.W.2d at 706). Ultimately, the court focused on the third element, which the court considered to be "the most important" under Missouri law. *Id.* (citing *S & J, Inc. v. McLoud & Co., L.L.C.*, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003)).

Consequently, with respect to the individual defendants, Debbie, Abby, and Cody Peery, the court considered whether it would be unjust for these individuals to retain the benefit they received, namely a portion of the insurance benefit, as opposed to whether Federated directly conferred a benefit upon them. *Id.* at 2–3. For instance, with respect to Abby Peery, the court reasoned that Federated "asserted that Abby Peery received an indirect benefit from Federated's payment to C & A. Additionally, one can infer that without the mistaken payment to C & A, no benefit would have been conferred on Abby." *Id.* at *3. Nonetheless, the court dismissed the insurer's unjust enrichment claim as against Abby Peery because she was not alleged to have participated in any wrongdoing. *Id.* Her "passive receipt of the benefit, without any fault or undue advantage on her part, [did] not establish that her retention of the benefit would be unjust." *Id.* With respect to Debbie Peery, however, the court denied the motion to dismiss, because she was alleged to have "engaged

in wrongful conduct by misrepresenting the value of C & A's insurance claims to Federated." *Id.*

**\*7** As these cases demonstrate, there does not appear to be any bright line rule regarding how directly the defendant must have received a benefit at the plaintiff's expense. Rather, a claim for unjust enrichment must be considered in light of the totality of the circumstances. *Cf. Miller*, 803 S.W.2d at 595 (ruling that unjust enrichment "occurs where a benefit is conferred upon a person in circumstances in which retention by him of that benefit ... would be unjust."). Furthermore, none of the cases cited by Armstrong Teasdale support the application of the hard and fast, direct benefit rule advanced by Armstrong Teasdale. Rather, these decisions were based on a finding that the plaintiff failed to allege or prove that the defendant received any benefit at all. *See e.g., Earley v. Wachovia Bank, N.A.*, 361 F. App'x 699, 700 (8th Cir. 2010); *Bauer Dev. LLC v. BOK Fin. Corp.*, 290 S.W.3d 96, 100 (Mo. Ct. App. 2009).

In this case, Cromeans claims that Armstrong Teasdale received a benefit, specifically fees for services rendered to Morgan Keegan, which occurred at his expense, in that the fee was paid with the proceeds from the sale of the bonds. Whether or not it is inequitable for Armstrong Teasdale to retain that benefit in light of the circumstances of this case has not been addressed by either party. Because the Court has rejected Armstrong Teasdale's claim that Missouri law limits unjust enrichment claims to circumstances where the plaintiff directly conferred a benefit upon the defendant, dismissal of this claim is not warranted.

### IV. Conclusion

For the foregoing reasons, Armstrong Teasdale's Motion for Summary Judgment, [Doc. # 93], is GRANTED with respect to Cromeans' claims for Legal Malpractice and Negligent Misrepresentation and DENIED with respect to Cromeans' claim for Unjust Enrichment.

### All Citations

Not Reported in Fed. Supp., 2013 WL 12129609

---

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 13

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 139 of 751
PageID: 11505
In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...

2013 WL 1222310, 2013 DNH 043

2013 WL 1222310
United States District Court, D. New Hampshire.

In re DIAL COMPLETE MARKETING
AND SALES PRACTICES LITIGATION.

No. 11–md–2263–SM.
|
March 26, 2013.

**Attorneys and Law Firms**

Eric D. Holland, Gerard B. Schneller, Randall Seth
Crompton, Steven J. Stolze, Holland Groves Schneller Stolze,
LLC, St. Louis, MO, Lucy J. Karl, Shaheen & Gordon,
Concord, NH, Charles E. Schaffer, Levin, Fishbein, Sedran
& Berman, Philadelphia, PA, David Charles Rash, Rash Law
Office, Weston, FL, James C. Shah, Shepherd Finkelman
Miller & Shah LLP, Media, PA, Ronie M. Schmelz, Sidley
Austin Brown & Wood LLP, Mark John Geragos, Shelley
Kaufman, Tamar G. Arminak, Geragos and Geragos APC,
Los Angeles, CA, Thomas D. Mauriello, Mauriello Law Firm
APC, San Clemente, CA, D. Scott Kalish, Scott Kalish Co,
Llc, John R. Climaco, John A. Peca, Jr., Climaco Wilcox
Peca Tarantino & Garofoli Co, LPA, Cleveland, OH, Frank
E. Piscitelli, Jr., Piscitelli Law Firm, Highland Heights,
OH, Patrick G. Warner, Climaco Wilcox Peca Tarantino
& Garofoli, Columbus, OH, Douglas P. Dehler, Shepard
Finkelman Miller & Shah, LLC, Milwaukee, WI, Jordan
Lucas Chaikin, Parker Waichman, LLP, Bonita Springs, FL,
Richard J. Arsenault, Neblett Beard & Arsenault, Alexandria,
LA, Adam J. Levitt, Grant & Eisenhofer, PA, Joseph J. Siprut,
Siprut PC, Chicago, IL, for Plaintiffs.

Allison W. Reimann, Elizabeth M. Chiarello, Eugene A.
Schoon, Jeffrey Michael Schieber, Richard D. Raskin, Sidley
Austin LLP, Chicago, IL, Amy Bloom, Patricia Elaine Lowry,
Squire Sanders & Dempsey, LLP, West Palm Beach, FL,
Chad W. Pekron, Robert Ryan Younger, Quattlebaum Grooms
Tull & Burrow PLLC, Little Rock, AR, John E. Galvin,
III, Jonathan H. Garside, Fox Galvin, LLC, St. Louis, MO,
Karl A. Bekeny, Robert C. Tucker, Tucker Ellis & West,
LLP, Cleveland, OH, Paul E. Benson, Michael Best &
Friedrich, LLP, Milwaukee, WI, Robert H. Miller, John–Mark
Turner, Sheehan Phinney Bass & Green, Manchester, NH, for
Defendants.

*ORDER*

STEVEN J. McAULIFFE, District Judge.

**\*1** This consolidated, multi-district litigation is brought
by consumers in Arkansas, California, Florida, Illinois,
Louisiana, Missouri, New Hampshire, New York, Ohio, and
Wisconsin, on behalf of themselves and similarly situated
consumers in those states. Plaintiffs accuse defendant,
The Dial Corporation ("Dial"), of falsely advertising the
antibacterial properties of its "Dial Complete" branded soaps.
They advance claims under their respective state consumer
protection/unfair trade practices statutes, as well as statutory
and common law causes of action for breach of warranty
and unjust enrichment. Dial moves to dismiss all counts of
plaintiffs' Consolidated Amended Complaint, saying none
adequately pleads a viable claim. *See* Fed.R.Civ.P. 12(b)(6).
Plaintiffs object.

For the reasons discussed, Dial's motion to dismiss is denied.

**Standard of Review**

When ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)
(6), the court must "accept as true all well-pleaded facts set out
in the complaint and indulge all reasonable inferences in favor
of the pleader." *SEC v. Tambone,* 597 F.3d 436, 441 (1st
Cir.2010). Although the complaint need only contain "a short
and plain statement of the claim showing that the pleader is
entitled to relief," Fed.R.Civ.P. 8(a)(2), it must allege each of
the essential elements of a viable cause of action and "contain
sufficient factual matter, accepted as true, to state a claim
to relief that is plausible on its face." *Ashcroft v. Iqbal,*
556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)
(citation and internal punctuation omitted).

In other words, "a plaintiff's obligation to provide the
'grounds' of his 'entitlement to relief' requires more than
labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." *Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929
(2007). The facts alleged in the complaint must, if credited
as true, be sufficient to "nudge[ ] [plaintiff's] claims across
the line from conceivable to plausible." *Id.* at 570. If,
however, the "factual allegations in the complaint are too

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 140 of 751
PageID: 11506

In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...

2013 WL 1222310, 2013 DNH 043

meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Tambone,* 597 F.3d at 442.

### Background

Accepting the allegations set forth in the Consolidated Amended Complaint as true, the relevant facts are as follows. Dial manufactures, markets, and sells a line of antibacterial hand-washing products under the name "Dial Complete." The active ingredient in Dial Complete is a compound known as triclosan—a product originally patented as an herbicide and currently registered with the Environmental Protection Agency as a pesticide. Because of its antibacterial properties, triclosan has been used in some soaps and other household products since the 1960's.

According to plaintiffs, Dial markets Dial Complete employing numerous misleading and deceptive claims, which include the following: that Dial Complete "kills 99.99% of germs;" that it kills 99.9% of illness-causing bacteria; that it is "doctor recommended;" that it "kills more germs than any other liquid hand soap;" and that it has been "shown to help reduce disease transmission by 50% compared to washing with a plain soap." Consolidated Amended Complaint (document no. 32) at paras. 47–51. Plaintiffs also take issue with Dial's claim that Dial Complete delivers a "100 to 1,000 fold increase in germ-killing activity compared to washing with just plain soap and water." *Id.* at para. 60.

**\*2** According to plaintiffs, Dial Complete has no greater efficacy than soaps that do not contain triclosan, and there is no clinical support for defendant's advertising and packaging claims concerning the product. They say Dial's "claims about Dial Complete's effectiveness and superiority are false, deceptive, unfair, and unconscionable because there is not sufficient, competent and/or reliable scientific evidence" to support such claims. *Id.* at para. 69. Plaintiffs assert that Dial's claims appear to be based upon a single, in-house study, conducted at the "Dial Center for Innovation." And, Dial's advertising and packaging materials fail to disclose the study's substantial limitations which, say plaintiffs, render the study incomplete, unreliable, and insufficient to support Dial's false and deceptive claims about its Dial Complete line of products. [1] Plaintiffs also complain that Dial's advertising and packaging materials for Dial Complete fail to warn consumers that using products containing triclosan may lead

to the emergence of bacteria that are resistant to triclosan and/or other antimicrobial agents. *Id.* at 78.

In support of their claims, plaintiffs point to several scientific studies, including one published in 2004 in the *American Journal of Infection Control.* The authors of that study concluded that "after testing the efficacy of fourteen different hand hygiene agents including a hand wash with 1% triclosan, washing with plain soap and water was more effective than triclosan after just one wash." Consolidated Amended Complaint at para. 80. [2]

Plaintiffs also rely on several published studies that they say found little evidence to support the claim that "triclosan soap affords any benefit in the reduction of infectious symptoms, bacterial counts, or types of bacteria on the hands of individuals within the household setting in the developed world." *Id.* at para. 81. In another study, published in *Clinical Infectious Diseases,* plaintiffs say researchers reviewed 27 separate studies conducted over the past 30 years and determined that "soaps containing added ingredients such as triclosan in liquid soap and Triclocarbon in bar soap do not show a benefit above and beyond soap that does not contain those ingredients in the real world environment." Consolidated Amended Complaint at para. 83.

Additionally, plaintiffs allege that, in 2005, the U.S. Food and Drug Administration ("FDA") concluded that antimicrobial soaps do not reduce the risk of illness and infection in the home. And, more recently, in a 2010 "Consumer Update," the FDA stated that "[a]t this time, FDA does not have evidence that triclosan added to antibacterial soaps and body washes provides extra health benefits over soap and water." *Id.* at para. 87 (citation omitted).

In light of the foregoing, plaintiffs allege that Dial has engaged in, and continues to engage in, the following course of wrongful conduct:

**\*3** a. Representing, both expressly and by implication, that Dial Complete's antibacterial properties and its health benefits are more substantial than they actually are;

b. Failing to disclose to consumers the reasonably foreseeable risks associated with using Dial Complete, as well as the existence (and nature) of material defects in the product; and

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 141 of 751
PageID: 11507
In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...
2013 WL 1222310, 2013 DNH 043

c. Falsely representing in advertising materials that Dial possesses clinical and/or scientific data to support its false claims about the efficacy of Dial Complete.

*See id.* at para. 94.

The Consolidated Amended Complaint advances four causes of action: violation of various state consumer protection laws (count one); breach of express warranty (count two); breach of implied warranty (count three); and unjust enrichment (count four). Plaintiffs seek class certification, *see* Fed.R.Civ.P. 23, and, once certified, they seek monetary damages and an award of costs and attorney's fees. Although they originally sought injunctive relief as well (count five), plaintiffs have since filed an assented-to motion to withdraw that count, without prejudice. *See* Document no. 75.

Parenthetically, the court notes that this litigation is substantially similar to the consolidated multi-district litigation currently pending in this court against Colgate–Palmolive. *See In re Colgate–Palmolive Softsoap Antibacterial Handsoap Marketing and Sales Practices Litigation,* Case no. 12–MD–2320–PB. And, not surprisingly, many of the issues raised in this case have been raised and/or resolved in the Colgate–Palmolive case as well.

**Discussion**

Pursuant to Fed.R.Civ.P. 12(b)(6), Dial moves to dismiss the Consolidated Amended Complaint, asserting that plaintiffs have failed to plead their claims with sufficient specificity under Rules 8 and 9(b); that, under the primary jurisdiction doctrine, the court should refer this case to the FDA to allow that agency to apply its expertise to important scientific and regulatory issues raised by plaintiffs' claims; and that plaintiffs have failed, as a matter of law, to state viable claims under state law.

I. *Pleading Claims with Sufficient Specificity.*
In support of its motion to dismiss, Dial first argues that because plaintiffs' claims either affirmatively allege deception and fraud, or because they incorporate by reference the fraud-based allegations of the complaint, the "sounds in fraud" doctrine requires those claims be pled with added specificity. And, says Dial, plaintiffs have failed to do so.

To satisfy the heightened pleading requirements imposed by Rule 9 of the Federal Rules of Civil Procedure, plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). That, in turn, requires them to "specify the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 29 (1st Cir.2004). Finally, the complaint must also set forth specific facts that give rise to a reasonable inference that the defendant knew a particular statement was materially false or misleading. *See N. Am. Catholic Edu. Programming Foundation, Inc. v. Cardinale,* 567 F.3d 8, 13 (1st Cir .2009). Because the Consolidate Amended Complaint meets those heightened pleading requirements, the court need not resolve whether the "sounds in fraud" doctrine applies to this case; even assuming that doctrine does apply, plaintiffs have pled their claims with sufficient specificity under Rules 8 and 9(b).

**\*4** According to Dial, plaintiffs' complaint falls short of the requirements imposed by Rules 8 and 9(b) because plaintiffs "do not allege the existence of a single study that refutes the claims made about Dial Complete that they challenge." Defendant's memorandum (document no. 36–1) at 5. While it is true that plaintiffs cite no studies that specifically tested the antibacterial efficacy of Dial Complete, that absence is not fatal. Plaintiffs have alleged sufficient facts—including the existence of various scientific studies, and the FDA's own conclusion that it "does not have evidence that triclosan added to antibacterial soaps and body washes provides extra health benefits over soap and water"—to support their claims that, in essence: (1) Dial Complete does not provide any additional antibacterial benefits over plain soap and water; and (2) Dial was aware of that fact when it published claims about Dial Complete's superior antibacterial properties and health benefits.

Dial responds by pointing out the unique—indeed patented —formula of its Dial Complete products, suggesting that Dial Complete is more effective at killing bacteria than the triclosan-based products that were the subject of the studies cited by plaintiffs. That may, of course, be true. But, at this early stage of the litigation, plaintiffs need not disprove that claim. They need only plead sufficient facts to support their assertion that Dial knowingly misrepresented the antibacterial efficacy of its Dial Complete product line. They have done so.[3]

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 142 of 751
PageID: 11508
In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...
2013 WL 1222310, 2013 DNH 043

II. *Primary Jurisdiction.*

Next, Dial points out that the FDA has, for many years, been studying the safety, efficacy, testing, and labeling of products containing triclosan. And, because Dial still apparently believes that "proposed regulations on these issues are imminent," it asserts that the court should invoke the doctrine of primary jurisdiction, "dismiss Plaintiffs' claims[,] and refer this case to the FDA for administrative determination." Defendant's memorandum (document no. 36–1) at 15.

A. *Legal Background.*

The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western P.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). It may be invoked when claims properly pending before a court involve issues that fall within the special competence of an administrative agency, and the court would benefit from obtaining the agency's expertise on those matters. *See Pejepscot Indus. Park v. Maine Central R.R.,* 215 F.3d 195, 205 (1st Cir.2000). In those circumstances, the court may, in its discretion, refer such issues to the agency in order to obtain its views.

But, as the Supreme Court has observed, "[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pacific,* 352 U.S. at 64. Consequently, before invoking the doctrine, there are several factors a court should consider, including whether its ruling on a particular matter might disturb or disrupt the regulatory regime of the agency in question, and whether "the goal of national uniformity in the interpretation and application of a federal regulatory regime is furthered by permitting the agency that has primary jurisdiction over the matter in question to have a first look at the problem." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.,* 163 F.3d 74, 81 (1st Cir.1998). Additionally, the Court of Appeals for the First Circuit has instructed lower courts to consider:

> **\*5** (1) whether the agency determination lies at the heart of the task assigned the agency by Congress;

> (2) whether agency expertise is required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Massachusetts v. Blackstone Valley Elec. Co.,* 67 F.3d 981, 992 (1st Cir.1995) (citing *Chicago Mercantile Exch. v. Deaktor,* 414 U.S. 113, 114–15, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973)).

B. *Invocation of the Primary Jurisdiction Doctrine Is not Appropriate in this Case.*

As noted above, this court (Barbadoro, J.) has before it a substantially similar consolidated, multi-district case involving claims that the Colgate–Palmolive Company marketed its version of an antibacterial soap with false and misleading claims. In that case, as here, defendant invoked the primary jurisdiction doctrine in support of its motion to dismiss or stay plaintiffs' claims. The court rejected that argument in a thorough and thoughtful opinion. *In re Colgate–Palmolive Softsoap Antibacterial Handsoap Marketing and Sales Practices Litigation,* Case no. 12–MD–2320–PB, 2013 DNH 038 (D.N.H. March 18, 2013) ("*Colgate–Palmolive* ").

The substance of the *Colgate–Palmolive* opinion need not be recounted in detail. It is sufficient to note that the court's reasoning applies with equal force to this case and counsels in favor of denying defendant's request to apply the primary jurisdiction doctrine. First, the issues presented in this litigation are not "at the heart of the task assigned [to the FDA] by Congress." *Blackstone Valley Elec.,* 67 F.3d at 992. As Judge Barbadoro explained:

> [P]laintiffs seek to prove that Colgate made implied claims that Softsoap Antibacterial is superior to other products; that it misrepresented Softsoap Antibacterial's effectiveness; and that it misled consumers with unsubstantiated claims about its products. To resolve those claims, the court will examine the state of scientific knowledge in the past, when Colgate made its advertising and labeling claims relating to Softsoap Antibacterial's safety and effectiveness. It will determine what data Colgate possessed to support its marketing claims at the time they were made and whether Colgate ignored data that contradicted its claims. The court will also determine

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 143 of 751
PageID: 11509

In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...
2013 WL 1222310, 2013 DNH 043

how a reasonable consumer would have interpreted Colgate's marketing campaign for Softsoap Antibacterial. Essentially, this litigation is backward-looking; it seeks to determine whether past conduct was misleading.

The FDA's monograph process, in contrast, is forward-looking. It will determine the permissible content of future product labels. It will establish the permissible concentrations of triclosan in consumer hand soaps, if it permits use of the ingredient at all. The monograph will articulate the FDA's findings, based on the current state of scientific knowledge, about the safety and effectiveness of triclosan as used in consumer hand soaps.

**\*6** The FDA will not draw any factual conclusions about Colgate's past conduct. The agency will not address whether Colgate's past advertising claims were substantiated. Nor will the FDA's monograph shed light on what information Colgate knew or could have known at the time it made the advertising and labeling claims at issue in this case. The FDA will not address whether Colgate's past product labels or advertising claims were misleading when they were made or make any pronouncement on how a reasonable consumer would interpret Colgate's marketing claims. Accordingly, although the FDA's conclusions may touch on some issues in this case, the case does not turn on factual disputes that lie at the heart of the FDA's regulatory authority.

*Colgate–Palmolive,* at 18–20.

Next, the FDA's expertise is not "required to unravel intricate, technical facts" involved in this case. *Blackstone Valley Elec.,* 67 F.3d at 992. In fact, the questions presented in this case are relatively straight-forward, such as whether scientific data supported Dial's marketing claims, and how a reasonable consumer would interpret those claims. "The FDA does not have technical expertise related to questions of fraud and deceit. Courts, by contrast, routinely determine whether past conduct or statements were false or misleading." *Colgate–Palmolive,* at 21.

Additionally, Dial has failed to demonstrate that FDA action in this realm would "materially aid the court" in resolving plaintiffs' claims. *Blackstone Valley Elec. Co.,* 67 F.3d at 992. Again, because the FDA's monograph process is largely forward-looking, and because resolution of plaintiffs' claims requires inquiry into what Dial knew when it made the challenged marketing claims, staying this case until the FDA

has issued a final determination on the effectiveness of hand soaps containing triclosan would seem to make little sense.

And, finally, as Judge Barbadoro noted, "[a]ny minimal value that an FDA ruling might have on the resolution of this case is greatly outweighed by the harm that the plaintiffs will suffer if the action is delayed." *Colgate–Palmolive,* at 24.

[T]he FDA began investigating triclosan products in 1972. Since then, it has issued two [tentative final monographs or "TFMs"] and reopened the administrative record on multiple occasions. Several years ago, the agency decided to split its original monograph on triclosan products into three separate monographs. Since then, the agency has missed multiple self-imposed deadlines for publishing the TFM, most recently in February 2013.

Once a TFM is issued, the agency will require a minimum of fourteen more months to prepare the final monograph in accordance with the procedures set out in the regulations. Thus, even if the TFM were issued tomorrow, the final monograph would not enter into force until May 2014 at the earliest. Moreover, the final monograph is not the end of the road: It may be appealed to the federal courts, and the Commissioner has discretion to stay the effective date for all or part of the monograph pending final court adjudication. This long unavoidable delay in issuing a final monograph on consumer antiseptics weighs strongly in favor of rejecting the doctrine.

**\*7** *Id.* at 24–25 (citations omitted).

For the foregoing reasons, the court concludes that this is not a case in which the doctrine of primary jurisdiction counsels in favor of delaying resolution of plaintiffs' claims pending further administrative action by the FDA.

III. *Miscellaneous Grounds for Dismissal.*

Finally, defendant says that various state-specific claims advanced by some of the plaintiffs fail as a matter of law.

A. *Consumer Protection Claims.*

Dial asserts that plaintiffs' claims under the consumer protection statutes in Arkansas, California, Illinois, and Ohio fail to "specify which of the statutes' enumerated unlawful practices are allegedly at issue, leaving Dial without requisite notice under Rules 8 and 9(b)." Defendant's Reply Memorandum (document no. 46) at 11–12. The court disagrees. The Consolidated Amended Complaint adequately

In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...
2013 WL 1222310, 2013 DNH 043

alleges that Dial engaged in unfair and deceptive practices in marketing and selling its Dial Complete line of products, by knowingly and intentionally making untrue and deceptive representations about those products' health benefits, their antibacterial efficacy, and their superiority to other hand-washing products on the market.

With regard to claims under the Arkansas Deceptive Trade Practices Act ("ADTPA"), plaintiffs' have adequately alleged that Dial's wrongful conduct caused them to suffer actual (albeit modest) damage or injury, not simply diminution in the value of the product they purchased. At a minimum, plaintiffs' allegations are sufficient to survive a motion to dismiss. *See generally* M.S. Wholesale Plumbing, Inc. v. Univ. Sports Pubs. Co., 2008 WL 90022 *3–4 (E.D.Ark. Jan.7, 2008).

Similarly, plaintiffs' claims under the California Consumer Legal Remedies Act ("CLRA") are sufficient to state viable a cause of action. Dial asserts that plaintiffs failed to allege that they engaged in a "transaction" with Dial, since plaintiffs purchased Dial Complete from various retailers. That, says Dial, is fatal to a claim under the CLRA. Again, the court disagrees. *See, e.g.,* In re Sony Vaio Computer Notebook Trackpad Litigation, 2010 WL 4262191, *5 (S.D.Cal. Oct.28, 2010) (holding that plaintiffs stated a viable CLRA claim against Sony, despite the fact that they purchased their computer notebooks from Best Buy, rather than directly from Sony).

Finally, Dial asserts that plaintiffs' class action claims under Ohio's Consumer Sales Practices Act ("OCSPA") fail because Dial did not receive "prior notice" that its conduct was deceptive or unconscionable. *See* Ohio Revised Code ("O.R.C.") § 1345.09. Plaintiffs respond by saying that Dial had notice that its deceptive marketing statements violated Ohio law because the OCSPA itself makes it an unlawful deceptive act or practice for a company to "[m]ake any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true," Ohio Admin. Code 109:4–3–10(A)–precisely the type of claims plaintiffs advance. *See also* O.R.C. § 1345.02(B)(1) (defining a deceptive trade practice to include making representations that a product has "approval, performance characteristics, accessories, uses, or benefits that it does not have"). Plaintiffs also assert that Dial had prior notice of the wrongfulness of its conduct based upon correspondence sent by plaintiffs' counsel to Dial. *See* Exhibits A and B to Plaintiffs' Memorandum.

Defendant has not adequately supported (or briefed) its claim that the asserted notice is legally insufficient under Ohio law. Accordingly, its motion to dismiss on that basis is necessarily denied.

**B.** *Express and Implied Warranty Claims.*
**\*8** Next, defendant moves to dismiss plaintiffs' implied warranty claims, asserting that they are duplicative of plaintiffs' express warranty claims. It is, however, premature to reach that conclusion.

The parties appear to agree that the relevant state laws are substantially similar and, in order to assert a viable claim for breach of implied warranty under the law of any of those states, plaintiffs must allege that Dial Complete was unfit for its intended purpose, or not of merchantable quality as promoted, packaged, or sold. If Dial Complete's "intended purpose" is simply to act as a hand-washing soap, whether it has the antibacterial properties claimed by Dial would be of little moment (at least in the context of a breach of implied warranty claim). Even absent any superior antibacterial properties, it still no doubt serves as a perfectly adequate hand-washing soap. But, if its intended purpose is more focused, plaintiffs would seem to have stated a viable claim. That is to say, if the "intended purpose" of Dial Complete is to provide a hand-washing soap that, say, better prevents the spread of illness-causing bacteria, and if it lacks any greater antibacterial properties than ordinary soap, it would appear that it could plausibly be thought unfit for that particular purpose.

The parties have, however, not engaged on that issue. Nor have they provided helpful briefing on whether determining a product's "intended purpose" is a legal or factual or mixed question. Accordingly, it is, at best, premature to grant defendant's motion to dismiss plaintiffs' breach of implied warranty claims.

Finally, with regard to Dial's general assertion that privity is required for express warranty claims under Illinois and Florida law, it has not adequately shown that to be an accurate statement of the governing law. *See, e.g.,* Smith v. Wm. Wrigley Jr. Co., 663 F.Supp.2d 1336 (S.D.Fla.2009) (holding, under circumstances similar to those presented in this case, that the plaintiff need not demonstrate privity in order to pursue a breach of warranty claim).

In re Dial Complete Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...
2013 WL 1222310, 2013 DNH 043

C. *Unjust Enrichment.*

Lastly, Dial moves to dismiss plaintiffs' unjust enrichment claims, noting that "the doctrine does not apply where a contract allegedly governs the parties' relationship." Motion to Dismiss at 31–32. That may well be an accurate statement of the governing law. But, consistent with Federal Rules, plaintiffs have simply pled their claims in the alternative. *See* Fed.R.Civ.P. 8(d)(2). And, the mere fact that plaintiffs have pled arguably inconsistent theories of recovery is not, standing alone, a sufficient basis to dismiss one of those claims. The United States District Court for the District of Massachusetts recently addressed precisely this point.

> [Defendant] also contends that the unjust enrichment claims should be dismissed because equitable remedies will not be granted when the plaintiffs have an adequate remedy at law. While [defendant] states the law correctly, it is inappropriate to dismiss equitable remedies at the pleading stage on this basis. Under the Federal Rules of Civil Procedure, plaintiffs have the prerogative to plead alternative and even conflicting theories of recovery. For those reasons, [defendant's] motion to dismiss the unjust enrichment claims will be denied.

*\*9* *In re Celexa & Lexapro Marketing & Sales Practices Litig.,* 751 F.Supp.2d 277, 297 (D.Mass.2010) (citations omitted). *See also In re Light Cigarettes Mktg. Sales Practices*

*Litig.,* 751 F.Supp.2d 183, 191–92 (D.Me.2010) (collecting cases denying motions to dismiss because the federal rules permit plaintiffs to plead inconsistent causes of action).

**Conclusion**

For the foregoing reasons, as well as those set forth in plaintiffs' memorandum (document no. 40), it is plain that plaintiffs have pled their claims with sufficient specificity under Rules 8 and 9(b). It is equally plain that this is not an appropriate case in which to invoke the doctrine of primary jurisdiction. *See generally Colgate–Palmolive, supra.*

As to the remaining bases for defendant's motion to dismiss, none has been shown to warrant dismissal of plaintiffs' claims-at least not at this stage. It would, however, appear that several of defendant's arguments (e.g., privity as a requirement for implied warranty claims in some states, the requirement of prior notice under Ohio's Consumer Sales Practices Act, etc.) lend themselves more properly to resolution at the summary judgment stage, based upon a more complete record and more thorough legal briefing by the parties.

Defendant's motion to dismiss (document no. 36) is, therefore, denied. Plaintiffs' assented-to motion to dismiss, without prejudice, their request for injunctive relief (document no. 75) is granted.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1222310, 2013 DNH 043

**Footnotes**

1    According to plaintiffs, the study's alleged limitations include: (a) that only two types of bacteria were tested; (b) that the study failed to determine whether repeated use of Dial Complete led to the development of immunity to the product's antimicrobial properties; (c) that only seven to thirteen subjects participated in the study (which, plaintiffs suggest, renders the study scientifically unreliable); and (d) that the study did not compare Dial Complete with any other antibacterial soap. *Id.* at para. 74.

2013 WL 1222310, 2013 DNH 043

2    The packaging and labeling materials submitted by the parties disclose that triclosan is present in Dial
     Complete at a concentration of less than one-half of one percent. *See* Consolidated Amended Complaint at
     12. *See also* Exhibit B to Defendant's Motion to Dismiss (document no. 36–4).

3    Dial says it was granted a patent based upon its discovery that an "antibacterial agent that is free in the
     solution and not tied up in a surfactant is able to perform its function of killing bacteria quickly." Defendant's
     Memorandum at 3. The existence of that patent, says Dial, establishes the truth of its marketing claims about
     Dial Complete's superior efficacy and warrants dismissal of plaintiffs' complaint. It does not. The patent simply
     teaches an apparently novel means by which to formulate an "antibacterial composition." Moreover, the court
     notes that the patent states that, in preferred embodiments, the active antimicrobial agent "is present in an
     amount of at least 2%, and preferably at least 25%, of saturation, when measured at room temperature." *See*
     Exhibit B to Defendant's Memorandum (document no. 36–3). As noted above, the labeling materials provided
     by the parties show that triclosan is present in Dial Complete at a concentration of 0.46%—substantially
     below the concentration specified in the patent's preferred embodiment. It is, then, unclear how the patent
     conclusively establishes the truth of Dial's marketing claims about Dial Complete. If it does, Dial has failed
     to explain how.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 14

2009 WL 2433468
United States District Court, S.D. West Virginia.

In re DIGITEK PRODUCTS
LIABILITY LITIGATION.
This Order Relates to All Cases.

MDL No. 2:08–md–01968.
|
Aug. 3, 2009.

**PRETRIAL ORDER # 33 (Memorandum Opinion and Order re Motions to Dismiss)**

JOSEPH R. GOODWIN, Chief Judge.

**\*1** Pending are the motions to dismiss filed by Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Bertek Pharmaceuticals Inc., and UDL Laboratories, Inc. ("Mylan Defendants") relating to Counts One, Two and Three of the Master Consolidated Complaint ("master complaint") [Docket 100] and the motions to dismiss filed by all Defendants relating to Counts Five and Eighteen [Docket 102 and 105]. For the reasons that follow, I **DENY** the Mylan Defendants' motion to dismiss Count One and Defendants' motion to dismiss Count Five. I also **DENY WITHOUT PREJUDICE** the Mylan Defendants' motion to dismiss Counts Two and Three and Defendants' motion to dismiss Count Eighteen.

I.

Defendants Actavis Totowa, LLC ("Actavis Totowa"), Mylan BertekPharmaceuticals, Inc., and UDL Laboratories, Inc., are citizens respectively of New Jersey, Delaware, Texas, and Illinois. Defendants Actavis, Inc., and Actavis Elizabeth, Inc., are citizens of Delaware. Plaintiffs allege those defendants manufactured, marketed, tested, promoted, sold and/or distributed Digitek® ("Digitek®" or "Digoxin" interchangeably). Defendants Mylan, Inc., and Mylan Pharmaceuticals, Inc., are respectively citizens of Pennsylvania and West Virginia. Plaintiffs allege those defendants marketed, promoted, sold and/or distributed Digoxin. Mylan Pharmaceuticals, Inc., is also alleged to have distributed Digitek® (Digoxin) through its affiliates, Mylan Bertek Pharmaceuticals, Inc. and UDL Laboratories, Inc..

Digitek® is the brand-name of a cardiac glycoside, a compound affecting the myocardium of the heart. The drug is widely used to treat various heart conditions, including atrial fibrillation, atrial flutter, and heart failure that are uncontrolled by other medications. The United States Food and Drug Administration ("FDA") approved the drug with a certain level of the active ingredient, in the following dosages: (1) Digitek® (Digoxin tablets, USP) 0.125mg, and (b) Digitek® (Digoxin tablets, USP) 0.250 mg. The approved quantities are important because Digitek® has a narrow therapeutic index. Specifically, there is a limited margin between effectiveness and toxicity. An excessive dose of the active ingredient can cause result in serious health problems and death.

The plaintiffs allege that some of the Digitek® at issue in this action was, among other things, designed and manufactured at a plant in Little Falls, New Jersey ("Little Falls facility"), owned by one or more of the defendants. On or about August 15, 2006, the FDA issued a letter warning to the defendants through Actavis Totowa, LLC, for failing to file periodic safety reports from the Little Falls facility ("August 2006 Warning Letter"). The FDA cautioned that the defendants, through Actavis Totowa, LLC, had violated federal adverse medical event reporting obligations, marketed drugs without proper clearance, and caused at least twenty-six (26) adverse drug experiences ("ADEs") by failing to submit periodic safety reports. The August 2006 Warning Letter also noted an FDA inspection in early 2006 that revealed six potentially serious and unexpected adverse drug events dating back to 1999 for products, including Digoxin, that were not properly reported to the agency. The plaintiffs additionally allege that the defendants, through Actavis Totowa, LLC, were alerted that they were (1) not properly investigating serious and unexpected ADEs, (2) not adequately reviewing ADE information, (3) failing to develop proper procedures for surveillance, receipt, evaluation and reporting of ADEs, and (4) failing to file periodic safety reports which resulted in the twenty-six (26) unreported ADEs.

**\*2** On or about February 1, 2007, the FDA issued a Revised Warning Letter to the defendants through Actavis Totowa ("Revised Warning Letter"). It cited "significant deviations from the current Good Manufacturing Practice ['cGMP'] regulations." This likely accounts for the plaintiffs' allegation that the defendants' manufacturing, production, testing and inspection processes did not meet the then-current cGMP regulations found in 21 C.F.R. §§ 210 and 211. The

2009 WL 2433468, 74 Fed.R.Serv.3d 116

cGMP regulations describe the methods, controls, equipment, and facilities that must be in place for drug manufacturing operations. The regulations serve to ensure consumer safety and a drug's consistency with its purported identity, strength, quality, and purity.

The plaintiffs allege that the deviations resulted in the adulteration of drugs manufactured by the defendants, and were observed by the FDA, during inspections on July 10 and August 10, 2006. According to the FDA's Revised Warning Letter:

> Significant deficiencies were found in the operations of your firm's quality control unit, and as a result there is no assurance that many drug products manufactured and released into interstate commerce by your firm have the identity, strength, quality and purity that they purport to possess.

(Master Compl. ¶ 29).

On August 10, 2006, the deviations were presented to Actavis Totowa on an FDA–483 ("List of Inspections").

The Revised Warning Letter also cited deficiencies in the operations of the quality control unit, which included instances where the unit failed to adequately investigate and resolve laboratory deviations and out-of-specification test results for drug products. Specifically, according to the Revised Warning Letter:

> Our investigators observed numerous instances where the quality control unit failed to adequately investigate and resolve laboratory deviations and out-of-specification test results involving drug products that ultimately were released for distribution into interstate commerce. Additionally, our investigators uncovered out-of-specification test results in laboratory raw data that were not documented in laboratory notebooks, and found that products were released based on retesting without any justification for discarding the initial out-of-specification test results.

(Master Compl. ¶ 31).

The Revised Warning Letter also stated that analysts did not always document the preparation and testing of samples at the time they were performed:

> Master and batch production and control records were found to be deficient in that they did not include complete procedures for documenting the collection of samples.

Although your firm's procedures require the collection of in-process blend uniformity samples of three times the weight of finished product tablets or capsules, master production records do not require, and batch records do not contain, documentation that the samples are being collected accordingly.

(Master Compl. ¶ 32).

 **\*3** The FDA also cited a failure to assure the accuracy of the input and outputs from a system used to run the high-performance liquid chromatography testing during drug analysis. Other deficiencies cited by the FDA in the Revised Warning Letter include: (1) a failure of the quality control unit to recognize that some tablets did not meet in-process specifications; (2) inconsistent documentation of failures to meet in-process specifications during tablet compression operations and failure to show that process deviations were promptly corrected to avoid releasing out of specification tablets; (3) a lack of adequate procedures for conducting bulk product holding time studies; (4) a failure to identify and control rejected in-process materials; (5) inadequate qualification of select equipment; and (5) a failure to establish and follow written procedures for maintaining manufacturing equipment.

An example found in the Revised Warning Letter provides as follows concerning Actavis Totowa's manufacturing processes:

> Your firm's cleaning validation studies were found to be inadequate and, as a result, there was no assurance that equipment is adequately cleaned between the manufacture of different drug products. [21 CFR 211.67(b) ] For example: a) Cleaning validation was performed for the process trains without evaluating for sample recovery for numerous products, including: ... Digoxin Tablets, USP, 0.25mg.

> [W]e are concerned about the quality of drug products that have been released from your facility under the serious lack of cGMP controls found during the inspection. Your response provides no assurance that the records and conditions of manufacture and testing of each such lot of drug products released and marketed by your firm will be evaluated to assure that the released drug products have their appropriate identity, strength, quality and purity.

(Master Compl. ¶ 35).

As a result of the inspection findings, the defendants, through Actavis Totowa, were allotted 15 working days to provide

---

a written listing of all unexpired, released lots of finished drug products associated with any out-of-specification test results during manufacture. Additionally, the FDA ordered a description of the actions taken to ensure that lots were suitable for release.

A Class I Recall of a drug is instituted only when "there is a reasonable probability that the use or exposure to a violative product will cause serious adverse health consequences or death." On or about April 25, 2008, the FDA announced a Class I Recall of all lots of Bertek and UDL Laboratories Digitek® (Digoxin) ("recalled Digitek® (Digoxin)"). The Class I recall stated as follows:

> Digitek (Digoxin Tablets, USP): Audience: Cardiologists, family physicians, pharmacists, other healthcare professionals, patients [Posted 04/28/2008] Actavis Totowa LLC notified healthcare professionals of a Class I nationwide recall of all strengths of Digitek, a drug used to treat heart failure and abnormal heart rhythms.

 **\*4**  The products are distributed by Mylan Pharmaceuticals Inc., under a "Bertek" label and by UDL Laboratories, Inc. under a "UDL" label—The product is being recalled due to the possibility that tablets with double the appropriate thickness may contain twice the approved level of active ingredient. The existence of double strength tablets poses a risk of digitalis toxicity in patients with renal failure. Digitalis toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac instability and bradycardia. Several reports of illnesses and injuries have been reported. Patients should contact their healthcare professional with questions. [April 25, 2008—Press Release—Actavis Totowa, LLC]

(Master Compl. ¶ 38).

The plaintiffs allege that the Recalled Digitek® (Digoxin) is an adulterated drug. They also contend that its label and packaging are misbranded. The defendants are charged with having failed to inform the medical community and the public, including the plaintiffs, of the following material items:

1. How many and which lots of Digitek® (Digoxin) contained amounts of unapproved Digoxin;

2. How long the defendants manufactured and produced the recalled Digitek ® ... and how long the adulterated drug was supplied, sold, distributed, and released into the stream of commerce;

3. How many reports of illness and injuries have been received; and

4. The nature and extent of the reports of illness and injuries that were received.

The plaintiffs allege that these failures are consistent with the safety violations which led the FDA to issue the August 2006 Warning Letter and their failure to satisfy the cGMP regulations, including:

1. Deviating, without written justification, from their own written specifications, test procedures, and laboratory mechanisms, 21 C.F.R. § 211.160(a);

2. Failing to establish the accuracy, specificity, and reproducibility of the test methods they employed, 21 C.F.R. § 211.165(d);

3. Maintaining incomplete laboratory records of all testing data, 21 C.F.R. § 211.194(a)(4);

4. Failing to verify the suitability of all testing methods used under actual conditions of use, 21 C.F.R. § 211.194(a)(2);

5. Failing to investigate unexplained out-of-specification testing results for drugs, 21 C.F.R. § 211.192;

6. Failing to follow the defendants' own written stability testing program, 21 C.F.R. § 211.166(a);

7. Failing to record and justify deviations from the defendants' own written production and process control procedures, 21 C.F.R. § 211.100(b) 12

8. Failing to examine and test samples to ensure that in-process materials conform to their specifications, 21 C.F.R. § 211.110(b);

9. Failing to follow defendant's own written quality control procedures, 21 C.F.R. § 211.22(d);

10. Failing to ensure that all data was reviewed and laboratory deviations were fully investigated and resolved prior to the release of drugs into commercial distribution, 21 C.F.R. § 211.22(a);

 **\*5**  11. Failing to have laboratory controls sufficient to ensure that components, in-process materials, and finished drug products have the appropriate standards

of identify, strength, quality, and purity and conform to their written specifications, 21 C.F.R. § 211.160(b); and

12. Failing to reject products that do not meet established standards or specifications and any other relevant quality control criteria, 21 C.F.R. § 211.165(f).

Noting the "serious manufacturing practice, quality assurance and product safety issues with the production of Digitek® ... as well as other products produced, manufactured, tested, marketed, distributed and sold or otherwise placed into the stream of commerce by Defendants[,]" the plaintiffs further allege that the Class–I recall for all-lots, all-doses of Digitek® bearing the defendants' labels resulted in the stoppage of production lines and the shuttering of the Little Falls plant.

The plaintiffs charge that the defendants, during the events outlined above, have "repeatedly emphasized their reputations for quality manufacturing in publically available corporate documents and corporate run websites ... and under-reported, underestimated and/or downplayed the serious dangers and the defective nature of Digitek® ..." (Master Compl. ¶¶ 46–47). The plaintiffs further allege that the defendants "have a history of [ (1) ] releasing drug products for public consumption that have been adulterated or misbranded ... [ (2) ] ... failing reliably to establish the identity, strength, quality and purity of drug products they release for public consumption ... [and (3) ] failing adequately to investigate and document test results on their drug products. (*Id.* at 48–50).

The plaintiffs' factual allegations conclude with the following representations concerning the defendants' omissions:

The defendants are drug companies, that upon information and belief, engaged in the marketing, design, development, manufacture, production, processing, compounding, formulating, testing, sale, labeling, packaging, dosing, advertising, promotion, supplying, releasing and/or distribution of Digitek® ... tablets with amounts of the active ingredient that was not consistent among Digitek® ... tablets and amounts of the active ingredient that was inconsistent with the dose on the Digitek® ... label.... At all times relevant to this action, Defendants knew, and/or had reason to know that the recalled Digitek® ... tablets were not safe for the patients for whom the drug was prescribed because inconsistent or excess does of Digoxin can cause serious medical problems, Digoxin overdose, Digitalis toxicity and, in certain patients, catastrophic injuries and death.... Defendants failed to adequately warn users of the defective drug of its unreasonably dangerous characteristics due to the inconsistent and/or excess levels of active ingredient the drug contained.

*6 (*Id.* at 51–53).

The filing of various civil actions in state and federal courts across the country followed the recall, in which plaintiffs claimed injuries from alleged exposure to defectively manufactured Digitek®. On August 13, 2008, the Judicial Panel on Multidistrict Litigation entered an order establishing a multidistrict litigation ("MDL") proceeding in this District consolidating federal Digitek® related actions for joint case management. In Pre-trial Order # 10, dated January 29, 2009, the court directed the filing of a Master Complaint. The Master Complaint filed on February, 9, 2009, alleges the following claims:

| Count One: | Failure to Warn and Instruct | Count Eleven: | Constructive Fraud |
|---|---|---|---|
| Count Two: | Manufacturing Defect | Count Twelve: | Violation of the WVCCPA |
| Count Three: | Design Defect | Count Thirteen: | Other UTPA Violations |
| Count Four: | Negligence | Count Fourteen: | Wrongful Death |
| Count Five: | Negligence per Se | Count Fifteen: | Survival Action |
| Count Six: | Breach of Implied Warranty | Count Sixteen: | Medical Monitoring |
| Count Seven: | Breach of Express Warranty | Count Seventeen: | Unjust Enrichment |

In re Digitek Products Liability Litigation, Not Reported in F.Supp.2d (2009)

2009 WL 2433468, 74 Fed.R.Serv.3d 116

| Count Eight: | Negligent Misrepresentation | Count Eighteen: | Medicare MSP Liability |
| Count Nine: | Intentional Misrepresentation | Count Nineteen: | Loss of Consortium |
| Count Ten: | Fraud | | |

At the conclusion of Counts One, Two and Three, the plaintiffs allege that "[a]s a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained severe physical injuries and/or death, severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial." (Master Compl. at ¶¶ 65, 73, and 81. Count Five alleges that "[a]s a direct and proximate result of Defendants' negligent, reckless, willful, wanton and grossly negligent acts and omissions" the same types of losses occurred. (*Id.* at 97). Count Eighteen, previously quoted in full, contains allegations of personal injury claims and "expenditures resulting from their injuries suffered in connection with the recalled Digitek (Digoxin)." (*Id.* at 175).

On April 20, 2009, the Mylan Defendants moved to dismiss Counts One, Two and Three, and all of the defendants moved to dismiss Counts Five and Eighteen. Responses were received on May 19, 2009 and replies on June 2, 2009.

## II.

### A. Governing Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing ... entitle[ment] to relief." Fed.R.Civ.P. 8(a)(2); *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted ..." Fed.R.Civ.P. 12(b)(6).

The required "short and plain statement" must provide " ' fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957), overruled on other grounds, *Twombly,* 550 U.S. at 1969)); *see also Anderson v. Sara Lee Corp.,* 508 F.3d 181, 188 (4th Cir.2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions...." *Twombly,* 127 S.Ct. at 1965. It is now settled that "a formulaic

recitation of the elements of a cause of action will not do." *Id.; Giarratano v. Johnson,* 521 F.3d 298, 304 (4th Cir.2008).

\*7 The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an element" of the claim. *Chao v. Rivendell Woods, Inc.,* 415 F.3d 342, 349 (4th Cir.2005) (quoting *Iodice v. United States,* 289 F.3d 270, 281 (4th Cir.2002)). Instead, the opening pleading need only contain "[f]actual allegations ... [sufficient] to raise a right to relief above the speculative level." *Twombly,* 127 S.Ct. at 1965; *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009)(noting the opening pleading "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). Stated another way, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *Giarratano,* 521 F.3d at 302. The recent decision in *Iqbal* provides some guiadance concerning the plausibility requirement:

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.... Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 129 S.Ct. at 1949–50 (citations omitted).

As noted in *Iqbal,* the Supreme Court has consistently interpreted the Rule 12(b)(6) standard to require a district court to " 'accept as true all of the factual allegations contained in the complaint ....' " *Erickson,* 127 S.Ct. at 2200 (quoting *Twombly,* 127 S.Ct. at 1965); *see also South Carolina Dept. of Health And Environmental Control v. Commerce and Industry Ins. Co.,* 372 F.3d 245, 255 (4th Cir.2004) (quoting *Franks v. Ross,* 313 F.3d 184, 192 (4th Cir.2002)). The court is additionally required to "draw[ ] all reasonable ... inferences from those facts in the plaintiff's favor .... " *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999).

**\*8** As a further overlay to this deferential standard, MDL courts have observed generally that a "master complaint should not be given the same effect as an ordinary complaint. Instead, it should be considered as only an administrative device to aid efficiency and economy." *See In re Propulsid Products Liability Litig.,* 208 F .R.D. 133, 142 (E.D.La.2002); *see also In re Vioxx Products Liability Litig.,* 239 F.R.D. 450, 454 (E.D.La.2006) (noting that a master complaint is simply "an administrative device used to aid efficiency and economy and, thus, should not be given the status of an ordinary complaint."); *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 56 (D.N.J.2009)("In the absence of ... consent, the majority of courts treat consolidated complaints filed in multi-district litigations as a procedural device rather than a substantive pleading with the power to alter the choice of law rules applicable to the plaintiffs' claims."); *Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* 489 F.Supp.2d 932, 936 (D.C.Minn2007) ( "The transfer under [28 U.S.C.] § 1407, even after the filing of an amended complaint, is only a change in courtrooms. Consolidation of a master complaint is merely a procedural device designed to promote judicial economy, and, as such, it does not affect the rights of the parties in separate suits .").

The administrative nature of a master complaint and its focus on facilitating management of the litigation, as opposed to being a primary operative pleading, has been considered in analyzing the motions to dismiss. Since it is uncertain how a master complaint should be treated when it is challenged via Rule 12(b)(6), the document has been read and construed at this point in the litigation in light of its procedural purpose.

### B. Count One—Failure to Warn

The Mylan defendants claim it has not been alleged that they, as distributors, knew or had reason to know of the existence of a manufacturing defect prior to the recall. The Mylan Defendants further contend that they cannot be held liable for a failure to warn because there are no instructions or warnings that could have made Digitek® safe for consumers under the alleged circumstances.

The Mylan defendants are correct that the master complaint lacks detailed factual allegations respecting their specific knowledge of a manufacturing defect. It does allege though that all of the defendants knew generally of a manufacturing defect and that they failed to act. Paragraphs 51–53, quoted above, are illustrative. (*See, e.g.,* ¶¶ 54–63.)[1] The plaintiffs contend in the master complaint that, among other alleged misdeeds, (1) the Mylan defendants were involved in multiple cases of adverse drug events, (2) a number of these potentially serious and unexpected events were related to products including Digoxin, (3) Digoxin was the subject of multiple advisory letters from the FDA, foregoing an ultimate recall of Digitek®, which would have been directed, at least in part, to the Mylan defendants, and (4) the Mylan defendants failed to appropriately inform the medical community and the public, including the plaintiffs, of (a) how many and which lots of Digitek® contained amounts of unapproved Digoxin, (b) how long the recalled Digitek® was manufactured, produced, supplied, sold, distributed, and released into the stream of commerce, and (c) the number, nature and extent of the reports of illness and injuries that had been received.

**\*9** In the Count One the plaintiffs further outline that (1) Digitek® was in an unsafe, defective and inherently dangerous condition which was unreasonably dangerous to its users; (2) the labeling, packaging and warnings were insufficient to alert consumers, including the plaintiffs, of the dangerous risks and reactions associated with the recalled Digitek®; (3) the plaintiffs are alleged to be in a class of persons that the defendants, including Mylan defendants, should have been considered to be subject to harm caused by Digitek®'s defective nature; (4) the defendants knew, or should have known, through quality control procedures,

In re Digitek Products Liability Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 2433468, 74 Fed.R.Serv.3d 116

testing, adverse event reporting or otherwise that Digitek® was in a defective condition and the label, warnings, and dosage information provided with the recalled Digitek® were not accurate and (5) the defendants failed to provide adequate and timely warnings or instructions regarding Digitek®. (Master Compl. at ¶¶ 57–61). Also pled is the Mylan defendants' default on its continuing duty to warn the plaintiffs of the dangers associated with the recalled Digitek® and the assertion that if they had done so, the plaintiffs would not have used it. (*Id.* at 63–64).

In applying *Twombly's* plausibility standard, each of these factual allegations is treated as entirely accurate, however true or misguided a fact finder might ultimately find them to be. Plaintiffs allege and infer that as distributors of the drug which was, at least in part, the subject of the FDA warning letters and the eventual recall, it is plausible the Mylan Defendants knew or had reason to know of the alleged manufacturing defects, and then failed to appropriately warn and instruct the plaintiffs. Additionally, the Mylan Defendants concede that a party may be held liable for failure to warn even if it only has "constructive knowledge" of a product's defective nature. (*See, e.g.,* Memo. in Supp. of Mot. to Dis. Cts. One, Two, and Three at 3).

Accordingly, the Master Complaint provides the Mylan Defendants adequate notice of the claims pled against them and, accepting the associated factual allegations as true, a plausible claim for relief is alleged in Count One. I **DENY** the Mylan Defendants' motion to dismiss Count One.[2]

*C. Counts Two and Three—Product Liability— Manufacturing and Design Defect*

The Mylan defendants next assert that Counts Two and Three should be dismissed because distributors that did not participate in a product's design or manufacture cannot be held liable for defects that arose in the product at those two stages of the manufacturing process. Plaintiffs contend that the law is to the contrary in a majority of jurisdictions. Both parties rely upon case law not dealing with allegations of a defective prescription drug. The entirety of the briefing on the point spans just a few pages.

The *Restatement (Third) of Torts* speaks to the liability of manufacturer and distributor defendants involved in the production and sale of defective prescription drugs. Section 6(e) provides as follows:

**\*10** (e) A retail seller or other distributor of a prescription drug or medical device is subject to liability for harm caused by the drug or device if:

> (1) at the time of sale or other distribution the drug or medical device contains a manufacturing defect as defined in § 2(a); or

> (2) at or before the time of sale or other distribution of the drug or medical device the retail seller or other distributor fails to exercise reasonable care and such failure causes harm to persons.

Restatement (Third) of Torts: Prod. Liab. § 6 (1998). The commentary to section 6(e) provides as follows:

> *h. Liability of retail seller of prescription drugs and medical devices for defective designs and defects due to inadequate instructions or warnings.* The rule governing most products imposes liability on wholesalers and retailers for selling a defectively designed product, or one without adequate instructions or warnings, even though they have exercised reasonable care in marketing the product. See § 1, Comment e, and § 2, Comment o. Courts have refused to apply this general rule to nonmanufacturing retail sellers of prescription drugs and medical devices and, instead, have adopted the rule stated in Subsection (e). That rule subjects retailers to liability only if the product contains a manufacturing defect or if the retailer fails to exercise reasonable care in connection with distribution of the drug or medical device. In so limiting the liability of intermediary parties, courts have held that they should be permitted to rely on the special expertise of manufacturers, prescribing and treating health-care providers, and governmental regulatory agencies. They have also emphasized the needs of medical patients to have ready access to prescription drugs at reasonable prices.

Restatement (Third) of Torts: Prod. Liab. § 6 (1998) (comment.).

The Restatement approach casts doubt on a non-manufacturing party's liability for design defects, at least where that down-the-line entity is not negligent. *See* 1 David G. Owen *et al., Madden & Owen on Products Liability* § 5:12 (3d ed.2009) (noting section "6(e) provides that retail sellers are subject only to negligence liability for selling such products containing design or warnings defects."); *see* 3 J.D. Lee & Barry Lindahl, *Modern Tort Law: Liability and Litigation* § 27:45 (2d ed.2009). At the same time, the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 155 of 751
PageID: 11521
In re Digitek Products Liability Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 2433468, 74 Fed.R.Serv.3d 116

Restatement approach has not been uniformly accepted. *See* 5 Roxanne Barton *et al., Litigating Tort Cases* § 60:23 (2009) ("Indeed, the Wisconsin court declined to adopt the new Restatement, noting that the new provision had been the subject of controversy, and that it had even been referred to by various commentators as 'a wish list from manufacturing America' and a vehicle for tort reform.").

The unsettled and apparently complex nature of the law of the fifty states aside, a different issue also precludes dismissal at this juncture. The Mylan defendants contend that "[p]laintiffs are aware that [the] Mylan Defendants did not participate in the design or manufacture of Digitek®." (Defs.' Memo. in Supp. at 6). At the same time, they candidly concede that the matter is "not always consistently pleaded...." *Id.* The exact relationship between the defendants, their knowledge of material events, the timing of their receipt of that knowledge, and the impact those fact intensive questions may have on the application of the unsettled, governing law all counsel in favor of allowing the challenged Counts to proceed to discovery.

 **\*11** At the conclusion of that process, the parties may brief the matter anew at summary judgment, supported by a multi-state survey of the governing law. I can then best determine whether the matter is suitable for coordinated resolution. Accordingly, I **DENY** without prejudice the Mylan Defendants' motion to dismiss Counts Two and Three.

*D. Count Five—Negligence Per Se*
Count Five alleges a claim for negligence *per se.* Plaintiffs cite the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, along with unstated "related amendments, codes and federal regulations provided there under, and other applicable laws, statutes, and regulations" as the legislatively imposed standard of care supporting their negligence *per se* claim (Master Compl. ¶ 91). After alleging that they reside within the class of individuals that the FDCA and the other unnamed "statutes and regulations" are designed to protect, they further contend as follows

Defendants' acts constitute an adulteration and misbranding as defined by the ... [FDCA] and the regulations promulgated there from and constitutes a breach of duty under the theory of negligence *per se.*

Defendants' manufacturing, production, testing and inspection processes are not good manufacturing processes in violation of the ... [FDCA] and the regulations

promulgated therefrom and constitutes a breach of duty under the theory of negligence *per se* .

The acts and omissions set forth above, demonstrate that Defendants failed to meet the standard of care set by the applicable statutes and regulations, which were intended for the benefit of individuals such as Plaintiffs making Defendants negligent *per se.*

(Master Compl. ¶¶ 92–95).

The defendants initially moved to dismiss Count Five as an improper private FDCA enforcement action. In their response, Plaintiffs concede a private right of action does not exist under the FDCA. They clarified, however, that Count Five was solely based in negligence, with the FDCA merely serving as one component of the violations of law in which they claim defendants engaged. In reply, the defendants persist in asserting the claim fails as a matter of law.

The analysis is controlled by *Talley v. Danek Medical, Inc.,* 179 F.3d 154 (4th Cir.1999). In *Talley,* plaintiff had a medical device implanted. She asserted that the device was used for a purpose not approved by the FDA. The district court dismissed the action at summary judgment. Plaintiff asserted on appeal that genuine issues of material fact remained over whether defendant "violated the ... [FDCA] and that a violation of the FDCA constitutes negligence *per se* in Virginia." *Id.* The court of appeals, in an opinion authored by Judge Niemeyer, first discussed generally the nature of a negligence *per se* claim:

[I]n negligence *per se* cases, the courts "adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation."

 **\*12** An example illustrates the doctrine's application. If the statutory speed limit on a road is 35 m.p.h. and the defendant drives 40 m.p.h., causing him to collide with the plaintiff pedestrian and to injure her, the plaintiff may establish the breach element of her negligence claim *by pointing to the violation of the speed limit.* The defendant is barred from putting on evidence, specific to his situation, that driving at 40 mph. on that particular road was reasonable because the *"violation of the statute constitutes conclusive evidence of negligence."*
*Id.* at 158.

The decision in *Talley* also observes that the negligence *per se* doctrine "is not a magic transforming formula that automatically creates a private right of action for the civil

enforcement, in tort law, of every statute." *Id.* Instead, the claim substitutes a standard of care created by the legislature for one that would otherwise be created by the common law. There are also limits placed on the doctrine to assure that it does not become a means to practically create private rights of action for statutory violations. The decision in *Talley* recognizes at least two means for "cabin[ing]" the doctrine:

First, not all statutory provisions dictate a standard of care, and therefore not all statutory violations can provide a basis for establishing negligence *per se.* Second, even when a statutory provision does specify a standard of care, a plaintiff must still prove the additional elements of duty, proximate causation, and injury to establish liability.

*Id.* at 159. A statute will be deemed not to define a standard of care where it only imposes an administrative requirement, "such as the [mandate] to obtain a license or to file a report to support a regulatory scheme...." *Id.*

The plaintiff in *Talley* asserted a violation of 21 U.S.C. § 360e(a), which requires premarket approval for certain medical devices.[3] As noted, she asserted that premarket approval had not occurred because the implanted device was used in a manner not approved by the FDA. The court of appeals explained why her theory could not support a negligence *per se* claim:

Breach of the requirement not to misbrand a surgical nail[, as in the case of *Orthopedic Equipment Co. v. Eutsler,* 276 F.2d 455 (4th Cir.1960),] is similar to a breach of a speed limit; each violates a specific and substantive standard of care that is intended to protect others. The holding in *Eutsler,* however, does not establish the principle that the simple failure to obtain approval of a device from the FDA, standing alone, can support a negligence per se claim. The administrative requirement that a given device be approved by the FDA before being marketed—as opposed to a specific substantive requirement that a device be safe and effective—is only a tool to facilitate administration of the underlying regulatory scheme. Because it lacks any independent substantive content, it does not impose a standard of care, the breach of which could form the basis of a negligence per se claim. Its breach is analogous to the failure to have a drivers license.

   **\*13** *Id.* at 161.

Unlike the mandate of section 360e(a), and the circumstances in *Talley,* Count Five, and section 331(a), speak to the breach of a clear cut statutory prohibition. Specifically, Congress has commanded drug manufacturers not to deliver in interstate commerce any misbranded drug. Plaintiffs have, in addition to other violations, specifically alleged misbranding. The statutory directive found in section 331(a) is not unlike the unadorned legislative prohibition on exceeding a certain speed on an interstate highway. The analogy is, in light of the analysis in *Talley,* fatal to defendants' Rule 12(b)(6) challenge to Count Five. Accordingly, I **DENY** the defendants' motion to dismiss Count Five.

### E. Count Eighteen—Medicare Secondary Payer Act

The defendants assert that Count Eighteen fails to state a claim because (1) it lacks an allegation that plaintiffs are a "primary plan[,]" and (2) defendants have no responsibility for any Medicare payments to the plaintiffs. Aside from an additional paragraph incorporating prior allegations, the entirety of Count Eighteen reads as follows:

In addition to their own personal injury claims, Plaintiffs, whose medical care costs arising from Digitek® (Digoxin) were paid in whole or in party by Medicare, bring this cause of action pursuant to the private cause of action provisions of the Medicare as Secondary Payer Statute [("MSP") 42 U.S.C. § 1395y(b)(3)(A)] to recover "double damages" of all Medicare expenditures resulting from their injuries suffered in connection with the recalled Digitek® (Digoxin).

(Master Compl. ¶ 175).

The United States Court of Appeals for the First Circuit recently explained the nature and workings of the MSP:

Prior to 1980, Medicare generally paid for medical services whether or not the Medicare beneficiary also was covered by another health plan. The MSP statute, which was enacted in 1980 to reduce federal health care costs, makes Medicare the secondary payer for medical services provided to Medicare beneficiaries whenever payment is available from another primary payer.

To that end, the MSP statute prohibits Medicare from making any payment to a beneficiary for medical expenses if "payment has been made, or can reasonably be expected to be made promptly (as determined in accordance with regulations) under ... an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance." Should Medicare determine that the primary insurer has not paid and that no prompt payment reasonably can be expected from the primary insurer, however, Medicare may pay the beneficiary up front,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 157 of 751
PageID: 11523
In re Digitek Products Liability Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 2433468, 74 Fed.R.Serv.3d 116

but such payment is conditioned on Medicare's right to reimbursement in the event that a primary plan later pays or is found responsible for payment of the item or service.

To facilitate recovery of these conditional payments, the MSP ... creates a private cause of action with double recovery to encourage private parties to bring actions to enforce Medicare's rights....

*14 *United Seniors Ass'n, Inc. v. Philip Morris USA,* 500 F.3d 19, 21–22 (1st Cir.2007).

The Defendants primarily assert that their responsibility for any Medicare monies expended to treat plaintiffs must be judicially fixed before the MSP private right of action ripens, meaning Count Eighteen is premature. Plaintiffs assert that they are entitled to establish defendants liability under the MSP in the same action that would serve as the predicate to MSP liability. In the alternative, plaintiffs ask the court to bifurcate Count Eighteen until such time, if ever, that defendants' liability for plaintiffs' injuries is established.

To the extent it is not unanimous, the overwhelming weight of the case law has adopted the defendants' position. The United States Court of Appeals for the Eleventh Circuit recently observed as follows:

Our conclusion that section 1395y(b)(3) does not create a private cause of action against alleged—as opposed to proved—tortfeasors whose responsibility for payment of medical costs has not been previously established is supported by three additional considerations. First, Plaintiffs' proposed interpretation of section 1395y(b)(3) (A) would drastically expand federal court jurisdiction by creating a federal forum to litigate any state tort claim in which a business entity allegedly injured a Medicare beneficiary, without regard to diversity of citizenship or amount in controversy. Second, under Plaintiffs' interpretation, an alleged tortfeasor that is sued under the MSP (instead of under state tort law) could not contest liability without risking the penalty of double damages: defendants would have no opportunity to reimburse Medicare after responsibility was established but before the penalty attached. Third, Plaintiffs' proposed interpretation would allow individuals acting as private attorney generals to litigate the state tort liability of a defendant towards thousands of Medicare beneficiaries—as a predicate to showing MSP liability—without complying with class action requirements. We are confident that, if Congress intended such radical innovations in jurisdiction, federal-

state relations, and tort liability, it would have more clearly expressed its intent.

*Glover v. Liggett Group, Inc.,* 459 F.3d 1304, 1309 (11th Cir.2006); *see also, e.g., Mason v. American Tobacco Co.,* 346 F.3d 36, 43 (2nd Cir.2003)(observing that "[D]efendants are clearly correct when they assert that 'the trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits.' "); *National Committee to Preserve Social Sec. and Medicare v. Philip Morris USA Inc.,* 601 F.Supp.2d 505, 509 (E.D.N.Y.2009) ("Little discussion is required, as the weight of authority is entirely with defendants. Indeed, each of the federal courts to have considered the questions raised here has rejected plaintiffs' view of the ... [MSP].").

*15 The precise issue raised by the defendants has, however, recently been presented for decision to the United States Court of Appeals for the Fourth Circuit in *Bio–Medical Applications of N.C., Inc. v. Brooks Food Group, Inc.,* No. 08–1819 (4th Cir. Jul. 29, 2008). Oral argument is scheduled for September 22, 2009. Pending the decision in Brooks Food Group, **I DENY WITHOUT PREJUDICE** defendants' motion to dismiss Count Eighteen.

III.

Based upon the foregoing analysis, I(1) **DENY** the Mylan Defendants' motion to dismiss Count One and Defendants' motion to dismiss Count Five, and (2) **DENY WITHOUT PREJUDICE** the Mylan Defendants' motion to dismiss Counts Two and Three and Defendants' motion to dismiss Count Eighteen.

The court **DIRECTS** the Clerk to file a copy of this memorandum opinion and order in 2:08–md–1968 which shall apply to each member Digitek-related case previously transferred to, removed to, or filed in this district, which includes counsel in all members cases up to and including civil action number 2–09–cv–875. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 158 of 751
PageID: 11524
In re Digitek Products Liability Litigation, Not Reported in F.Supp.2d (2009)
2009 WL 2433468, 74 Fed.R.Serv.3d 116

may be accessed through the CM/ECF system or the court's website at www.wvsd.uscourts.gov.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2433468, 74 Fed.R.Serv.3d 116

## Footnotes

1   The Mylan Defendants rely upon *Bryson v. Gonzales,* 534 F.3d 1282 (10th Cir.2008), for the proposition that a generic allegation aimed at multiple defendants does not allege facts sufficient to give notice or establish a plausible right to recovery. The decision in *Bryson* involved a pleading by an inmate convicted of sexual assault who spent 19 years in jail until exonerated by DNA evidence. He sued a host of officials, including a police chemist, a district attorney, and a former police chief, alleging that they falsely procured his original conviction and then prevented him from obtaining access to the DNA evidence. Among other factors readily distinguishing *Bryson* from this action is the court of appeals' observation that follows:

   "In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state."

   *Id.* at 1290 (citation and quoted authority omitted).

2   The Mylan Defendants assert in the alternative that no instructions or warnings could have made Digitek® safe under the circumstances. They appear to contend that if it is impossible to cure a potential defect, such as double thickness tablets mistakenly created, which cannot be rendered reasonably safe for consumers through adequate warnings, that the Mylan defendants should be exonerated as a matter of law as to Count One. No case law is cited for the proposition and Defendants did not further address the argument in their reply. I do not deem this contention to warrant dismissal of Count One at this early stage. Discovery will better illuminate the timing and substance of the knowledge possessed by the Mylan defendants, and the adequacy of any warnings they should have offered in light of those considerations.

3   Coincidentally, the plaintiff, as in this case, relied as well upon 21 U.S.C. § 331(a), which provides as follows:

   The following acts and the causing thereof are prohibited:

   (a) The introduction or delivery for introduction into interstate commerce of any ... drug ... that is adulterated or misbranded. *Id.* The court of appeals does not appear to have separately discussed the suitability of this subsection to support a negligence *per se* claim.

---

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 15

In re Diisocyanates Antitrust Litigation, Slip Copy (2020)
2020 WL 1140245

2020 WL 1140245
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

IN RE: DIISOCYANATES
ANTITRUST LITIGATION
This Document Relates to: All Cases

Master Docket Misc. No. 18-1001
|
MDL No. 2862
|
Signed 03/09/2020

**OPINION AND ORDER**

AMBROSE, United States Senior District Judge

**SYNOPSIS**

*1 This multi-district litigation stems from an alleged conspiracy to reduce supply and increase price for methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI"), precursor ingredients for the manufacture of polyurethane foam and thermoplastic polyurethanes.

Before the Court is a joint Motion to Dismiss filed by foreign Defendants BASF SE, Bayer A.G.,[1] Covestro A.G., Mitsui Chemicals, Inc. ("Mitsui"), MCNS, and Wanhua Chemical Group Co., Ltd. ("Wanhua") (collectively, "Defendants" or "foreign Defendants"). (ECF No. 229). All of the foreign Defendants assert that this Court lacks personal jurisdiction over them, and seek dismissal pursuant to Fed. R. Civ. P. 12(b)(2). (ECF No. 231). Plaintiffs have filed a response to Defendants' Motion, and Defendants have replied. (ECF Nos. 249, 250, 265). Plaintiffs contend that sufficient aggregate minimum contacts exist in the United States to permit the exercise of jurisdiction, based on four concepts: 1) Defendants' status as co-conspirators with domestic entities; 2) the effects of Defendants' tortious conduct in the United States, per Calder v. Jones, 465 U.S. 783, 790-91, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984); 3) the conduct of Defendants' domestic subsidiaries, under an alter ego theory; and 4) the conduct of Defendants' domestic subsidiaries, under an agency theory.

For the following reasons, the Defendants' Motion will be denied, without prejudice. Further, the Court concludes that a period of limited jurisdictional discovery is warranted.

**OPINION**

**I. RULE 12(b)(2) STANDARD**

" 'A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.' " Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990).

"[I]n reviewing a motion to dismiss under Rule 12(b)(2), [the Court] 'must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.' "

Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). If the moving party submits competent evidence contradicting jurisdiction, the non-moving party bears the burden of showing, by a preponderance of the evidence, that the exercise of jurisdiction is proper. NextGear Capital, Inc. v. Gutierrez, No. 18-1617, 2019 WL 1896564, at *2, 2019 U.S. Dist. LEXIS 71565, at *5 (M.D. Pa. Apr. 29, 2019). "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004). However, a plaintiff may not, at any time, rely on the pleadings alone to meet its burden. Id. at 101 n.6 (3d Cir. 2004); Time Share Vacation Club v. Atl. Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984).

*2 Given this Court's contemporaneous decisions on Defendants' Rule 12(b)(2) and Rule 12(b)(6) Motions, it is important to note that the applicable standards differ. "While a 12(b)(6) motion requires a court to accept the allegations of the non-moving party as true, a 12(b)(2) motion 'requires resolution of factual issues outside the pleadings, i.e., whether in personam jurisdiction actually lies.' " Bassil v. Starwood Hotels & Resorts Worldwide, Inc., No. 12-4204, 2014 WL 4795001, at *1, 2014 U.S. Dist. LEXIS 135927 at *3 (E.D.

In re Diisocyanates Antitrust Litigation, Slip Copy (2020)
2020 WL 1140245

Pa. Sep. 24, 2014) (quoting Time Share Vacation, 735 F.2d at 66 n.9).

## II. PERSONAL JURISDICTION

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.' " Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). [2] "The foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum ... are such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). "It is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ..., thus invoking the benefits and protections of its laws." Id. at 475, 105 S. Ct. 2174. Under any jurisdictional theory, the "constitutional touchstone" of personal jurisdiction "remains whether the defendant purposefully established 'minimum contacts' in the forum State." Id. at 474, 105 S. Ct. 2174. Requiring "minimum contacts" between the defendant and the forum affords a defendant fair warning that he may be called to defend a suit in that forum. Clarity Sports Int'l LLC v. Redland Sports, 400 F. Supp. 3d 161, 170 (M.D. Pa. 2019).

In accordance with these principles, a court may exercise either specific or general jurisdiction over a defendant. Specific jurisdiction "allows the court to adjudicate claims related to defendant's contacts with the forum." In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 557 (M.D. Pa. 2009). General jurisdiction, in turn, is based on a defendant's continuous and systematic contacts with the forum state, regardless of those contacts' relationship to the litigation at hand. See Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414-15, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). "Because an incorporated organization is a 'legal fiction,' the question of whether it 'has made [sufficient] contacts justifying the exercise of personal jurisdiction is, in reality, a question of whether the contacts made by the agents and employees of the corporation are sufficient to justify the exercise of jurisdiction.' " In re Auto.

Refinishing Paint Antitrust Litig., 229 F.R.D. 482, 491 (E.D. Pa. 2005) (quoting 16 Moore's Federal Practice § 108.42[3][b][ii] ).

After a court has found that minimum contacts exist, those contacts may be considered in light of other factors, to determine whether the exercise of jurisdiction would comport with fair play and substantial justice. Burger King, 471 U.S. at 476, 105 S.Ct. 2174. In appropriate cases, the court may consider the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in convenient and effective relief, the interstate judicial system's interest in the efficient resolution of controversies, and the states' shared interest in furthering substantive social policies. Id. at 477, 105 S. Ct. 2174. "[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." Id. at 477-78, 105 S. Ct. 2174.

### A. Pertinent Forum

*3  As a threshold matter, the parties dispute whether Defendants' contacts nationwide, or instead in a narrower forum, are relevant to the "minimum contacts" inquiry. As Defendant acknowledges, under the so-called "national contacts doctrine," personal jurisdiction in federal antitrust litigation is assessed based on a defendant's aggregate contacts with the United States as a whole. See In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004). "This means that personal jurisdiction must comply with the due process requirements of the Fifth Amendment, which requires only that the ... Plaintiffs show that [defendant] had minimum contacts with the United States as a whole." In re Liquid Aluminum Sulfate Antitrust Litig., No. 16-2687, 2019 WL 1125589, at *5, 2019 U.S. Dist. LEXIS 39364, at *38 (D.N.J. Mar. 11, 2019). This principle stems from the notion that if Congress has authorized nationwide or worldwide service of process, a court's jurisdiction is not confined to the state in which the court sits. See, e.g., Pinker., 292 F.3d at 369-70. Pertinent here, Section 12 of the Clayton Act provides as follows:

> Any suit, action, or proceeding under
> the antitrust laws against a corporation

may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

Defendants contend, however, that because all of them other than Mitsui were served under the Hague Convention, rather than the Clayton Act, a nationwide contacts analysis is inapplicable.[3] In support of their argument, Defendants cite to Gen. Cigar Holdings, Inc. v. Altadis, S.A., 205 F. Supp. 2d 1335 (S.D. Fla. 2002).[4] In that case, defendant was served under the Hague Convention. Id. at 1340. The Court found that service under the Clayton Act is the event that activates the statute's worldwide service provision. Id. Further, the Court concluded, it would be inappropriate to extend the territorial reach of a statute when service is not effected pursuant to the authorizing statute. Id. at 1340-41. Thus, the Court declined to consider defendant's nationwide contacts. Id.

I decline to follow General Cigar. In the first instance, our Court of Appeals has never endorsed the approach of General Cigar. In Clayton Act cases, our Court of Appeals has used language suggesting that the pertinent inquiry involves the nature of the plaintiff's claim and the breadth of service authorized by statute, rather than the mechanism of service actually used to serve a particular defendant. For example, the Court of Appeals has approved reliance on national contacts "when the plaintiff's claim rests on a federal statute authorizing nationwide service of process." See, e.g., In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d at 298. District courts within this Circuit have used similar language. Cf., e.g., Emerson Elec. Co. v. Le Carbone Lorraine, S.A., No. 05-6042, 2008 WL 4126602, at *2-3, 2008 U.S. Dist. LEXIS 72505, at *6 (D.N.J. Aug. 27, 2008). Moreover, as recently observed in S&W Forest Prods. v. CedarShake & Shingle Bureau, No. 19-202, 2019 WL 3716457, at *4, 2019 U.S. Dist. LEXIS 132569, at *8-9 (W.D. Wash. Aug. 7, 2019):

**\*4** No other jurisdiction besides the 11th has followed the [General Cigar] rule (it has only even been cited once since 2002). Plaintiff's claims against [defendant] are made under the Sherman Act, which authorizes nationwide service of process; the Court fails to see how (in terms of either fundamental fairness or due process) it makes any difference whether the service is actually made "under" the Sherman Act.

For these reasons, and in the absence of guidance or suggestion to the contrary from our Court of Appeals, I will assess personal jurisdiction in light of Defendants' nationwide contacts.

**B. Conspiracy Jurisdiction**

To establish jurisdiction under a co-conspirator theory, "the plaintiff must allege that substantial acts in furtherance of the conspiracy occurred within the forum state and that the foreign defendant was, or should have been, aware of them." United Healthcare Servs. v. Cephalon, Inc., No. 17-555, 2018 WL 878766, at *, 2018 U.S. Dist. LEXIS 23720, at *10 (E.D. Pa. Feb. 13, 2018); see also Aetna Inc. v. Insys Therapeutics, Inc., 324 F. Supp. 3d 541, 551 (E.D. Pa. 2018).[5] "To impute the contacts of a co-conspirator to a defendant, Plaintiffs must plead with particularity that ... substantial acts in furtherance of the conspiracy occurred in [the forum], and the non-forum co-conspirator was aware or should have been aware of those acts." Insys Therapeutics, 324 F. Supp. 3d at 551 (emphasis added); Arrington v. ColorTyme, Inc., 972 F. Supp. 2d 733, 745 (W.D. Pa. 2013). Notably, this theory of jurisdiction must be approached with caution, lest we contravene the dictates of due process. See In re Libor-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262, 2019 WL 1331830, at *11, 2019 U.S. Dist. LEXIS 49700, at *28 (S.D.N.Y. Mar. 25, 2019). Here, Plaintiffs rest on the allegations in the CAC that the moving Defendants maintained domestic subsidiaries that sold MDI and TDI, and that all the entities conspired together.[6] They also assert, without citation to the CAC, that the moving Defendants

directed the price fixing. These assertions do not rise to the level of particularity required, under a Rule 12(b)(2) analysis, to allow this Court to conclusively and comfortably exercise jurisdiction over foreign entities at this time.

## C. Effects Test

Under the "effects test" set forth in Calder v. Jones, 465 U.S. 783, 790-91, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984), personal jurisdiction exists if the defendant committed an intentional tort, the plaintiff felt the brunt of the tort in the forum, and defendant aimed his tortious conduct at the forum. IMO Indus. v. Kiekert AG, 155 F.3d 254, 266 (3d Cir. 1998). This test confers jurisdiction when a defendant's tortious activity outside the forum produces foreseeable results in the forum. See id. at 265-66.

**\*5** Under this test, a plaintiff must point to "acts undertaken by the defendant which demonstrate that he 'expressly aimed' his tortious conduct at the United States, and [show that] defendant knew that plaintiff would suffer the brunt of the harm in the United States. In so doing, the plaintiffs may not rely on the bare pleadings alone, but must cite evidence to support their claim." In re Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-6030, 2006 WL 1084093, at \*8, 2006 U.S. Dist. LEXIS 45762, at \*23 (D.N.J. Apr. 24, 2006). In this Circuit, "the defendant must manifest behavior intentionally targeted at and focused on the forum for Calder to be satisfied." Eagle Comput. Assocs. v. Chesapeake Software Servs., No. 99-2583, 1999 WL 1030441, at \*4, 1999 U.S. Dist. LEXIS 17509, at \*10-11 (E.D. Pa. Nov. 9, 1999) (quoting IMO, 155 F. 3d at 265). [7]

One court within this Circuit has found that evidence of a defendant's worldwide price-fixing conduct, "read liberally," suggests a conspiracy to fix prices in the United States as well; thus, such evidence supports a conclusion that a defendant directed acts in furtherance of the conspiracy to the United States. In re Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-6030, 2007 WL 2212713, at \*9, 2007 U.S. Dist. LEXIS 54906, at \*\*25-26 (D.N.J. July 30, 2007) (citations omitted). In so finding, the Court noted the rather unique context of the "effects test" in an antitrust case:

> The special character of an antitrust claim leads the Court to interpret more liberally the phrase "expressly aim[...]

tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." To be sure, plaintiffs' evidence is thin, but at this stage of the proceedings it is sufficient to defeat a Rule 12(b)(2) motion. Second, the jurisdictional inquiry here strongly implicates the merits of the case, and ultimately any final determination as to the question of personal jurisdiction is best deferred until after the parties have presented the full array of evidence.

Id. at \*26.

In this case, Plaintiffs rest on their allegations that Defendants knowingly price-fixed a global commodity, which was then sold by them or their subsidiaries in the United States, causing harm to consumers. The liberal approach taken in In re Bulk [Extruded] Graphite Prods. stemmed, in part, from the existence of evidence that a witness suggested to the foreign Defendant that he "establish prices ... to facilitate extracting a higher level of profitability from the ... market in the United States," and a cooperation policy relating to pricing in the United States. Id. at \*7, 2007 U.S. Dist. LEXIS 54906, at \*\*21-23, 2007 WL 2212713. No evidence of this type exists here. At this time, Plaintiffs' generalized reliance on the allegations of the CAC does not allow this Court to conclude that Defendants manifested behavior intentionally focused on the United States, or that jurisdiction lies under Calder.

## D. Alter Ego

"The alter-ego test looks to whether 'the degree of control exercised by the parent is greater than normally associated with common ownership and directorship' and whether 'the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent.'" Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig. v. Enterprise Rent-A-Car Co., 735 F. Supp. 2d 277, 319 (W.D. Pa. 2010). "No one aspect of the relationship between two corporations unilaterally disposes of the analysis, and the court may consider any evidence bearing on the corporations' functional interrelationship." Chocolate Confectionary, 674 F. Supp. 2d at 598; see also Enterprise Rent-A-Car, 735 F. Supp. at 318-19 (discussing ten-factor alter ego test).

**\*6** My colleague in this District has described the pertinent inquiry as follows:

> Plaintiff must show that the parent controls day-to-day operations of the subsidiary to the extent that the subsidiary appears to be a "mere department" of the parent. Other ways to frame the inquiry are: whether the parent exercised its ability to control the subsidiary; whether the structure of the corporate family operated vertically as strategic business units; whether the parent in essence conscripted employees of the subsidiaries to discharge group-wide management functions across corporate boundaries; and whether the parent failed to adhere to corporate boundaries by exercising managerial power over the operations and functions of subsidiaries through employees of separate but affiliated corporations.

Hooper v. Safety-Kleen Sys., No. 16--123, 2016 WL 7212586, at \*6, 2016 U.S. Dist. LEXIS 171712, at \*16 (W.D. Pa. Dec. 13, 2016).

At this juncture, it is plain that Plaintiffs have not adduced sufficient information to meet their burden of establishing alter-ego jurisdiction. Plaintiffs seek to establish "vicarious presence" in the United States with evidence including the following: wholly-owned subsidiary status; shared executives or employees; use of common e-mail domains; websites' descriptions of global groups; common marketing images, trademarks, and the like; shared marketing; and communications between employees regarding issues such as pricing, marketing, and supply proposals and agreements. With some exceptions, Plaintiff describes similar facts relating to all Defendants. None of these facts, for any of the Defendants, indicates a greater than normal degree of control, the failure to adhere to corporate boundaries, or disregard for separate corporate existence. Indeed, while each case is unique, alter-ego jurisdiction has been rejected under similar circumstances. Cf., e.g., Enterprise Rent-A-Car, 735 F.

Supp. 2d at 323. At this time, Plaintiffs have not adequately established facts demonstrating that the exercise of alter-ego jurisdiction is appropriate.

### E. Agency Jurisdiction

Finally, agency jurisdiction rests on the concept that a principal is responsible for the conduct of its agent. D'Jamoos v. Pilatus Aircraft Ltd., 566 F.3d 94, 108 (3d Cir. 2009). "[A]s all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred." Id. It appears that the mere fact of agency is insufficient, as "courts in this district appear to focus on the degree of control exercised by a foreign entity when determining whether an agency theory establishes personal jurisdiction." E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV, 335 F. Supp. 3d 657, 670 (D. Del. 2018).

Plaintiffs' agency-based argument is relatively insubstantial. They contend that Defendants' domestic subsidiaries "clearly" perform sales and marketing functions that the parents, which are entities with a global sales presence, would otherwise have conducted themselves.[8] For reasons similar to those stated in the alter-ego context, supra, I find that Plaintiffs have not established a degree of control that warrants the exercise of personal jurisdiction based on an agency relationship alone. I echo the statement of my sister Court, as I have "real concerns that if [I] were to adopt Plaintiff's theory, it would always result in the finding of specific personal jurisdiction between a parent and subsidiary, or between affiliates, on an agency theory." High 5 Games, LLC v. Marks, No. 13-7161, 2019 WL 3761114, at \*7, 2019 U.S. Dist. LEXIS 134359, at \*19 (D.N.J. Aug. 9, 2019).

### F. Discovery

**\*7** A court has discretion to allow discovery when considering a motion to dismiss for lack of personal jurisdiction ... 'Parties are entitled to a fair opportunity to engage in jurisdictional discovery to obtain facts necessary for thorough consideration of the [jurisdictional] issue.' ... if a plaintiff presents factual allegations that suggest "with reasonable particularity" the possible existence

of the requisite "contacts between [the party] and the forum state," the plaintiff's right to conduct jurisdictional discovery should be sustained.

Streamlight, Inc. v. ADT Tools, Inc., No. 03-1481, 2003 WL 22594316, at *1, 2003 U.S. Dist. LEXIS 19843, at *14 (E.D. Pa. Oct. 9, 2003).

"Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, ... courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (quoting Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 107 F.3d 1026, 1042 (3d Cir. 1997)) (citations omitted).

As Defendants point out, Plaintiffs seek primarily to establish jurisdiction under theories that would impute to Defendants the conduct of other entities. I agree with Defendants that at this juncture, Plaintiffs have not demonstrated the existence of minimum contacts through a conspiracy, alter-ego, or agency theory, or via the effects test.

Plaintiffs, however, request the opportunity to conduct jurisdictional discovery. With respect to at least some of the theories propounded, Plaintiffs have adequately demonstrated the possible existence of the requisite contacts.[9] Accordingly, the moving Defendants and Plaintiffs shall engage in a period of limited discovery. During the pendency of this limited discovery and the Court's final ruling on personal jurisdiction, the foreign Defendants are exempt from general discovery.

## CONCLUSION

In conclusion, the Defendants' Motion will be denied without prejudice. A limited period of jurisdictional discovery is warranted, consistent with the foregoing Opinion. An appropriate Order follows.

## ORDER OF COURT

AND NOW, this 9th day of March, 2020, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant's Motion (ECF No. 229) is DENIED, without prejudice to Defendants to renew the Motion after jurisdictional discovery.

By March 19, 2020, the foreign Defendants and Plaintiffs shall file a joint proposed case management order regarding the form of and schedule for jurisdictional discovery.

**All Citations**

Slip Copy, 2020 WL 1140245

## Footnotes

1    Since the filing of the Motion to Dismiss, Plaintiffs have voluntarily dismissed Bayer AG and Bayer Corp. (ECF Nos. 264, 267). As a result, Bayer A.G. and Bayer Corp. are no longer parties to this MDL. Id.

2    In cases arising under federal law, the jurisdictional inquiry is guided by the Fifth Amendment due process clause, and incorporates Fourteenth Amendment due process standards. In re Bulk [Extruded] Graphite Prods. Antitrust Litig., No. 02-6030, 2007 WL 2212713, at *4, 2007 U.S. Dist. LEXIS 54906, at *11 (D.N.J. July 30, 2007).

3    Plaintiffs attempted to serve all of the moving Defendants pursuant to Fed. R. Civ. P. 4(f)(3), and Defendants opposed that request. The foreign Defendants refused to waive service. (ECF No. 156).

4    Koken v. Pension Benefit Guar. Corp., 430 F. Supp. 2d 493, 499 (E.D. Pa. 2006), to which Defendants cite, does not support their position. In that case, defendant was served pursuant to the Hague convention, instead of ERISA; however, the defendant could not have been served pursuant to ERISA, which allowed only nationwide service. In other words, unlike the Clayton Act in this case, the scope of ERISA's service provision did not extend to the Koken defendant.

5    One court has noted that conspiracy jurisdiction, as applied to foreign defendants, "has been widely criticized by courts and scholars." In re Platinum & Palladium Antitrust Litig., No. 14-9391, 2017 WL 1169626, at *49, 2017 U.S. Dist. LEXIS 46624, at *149 (S.D.N.Y. Mar. 28, 2017) (citing Tymoshenko v. Firtash, No. 11--2794, 2013 WL 1234943, at *4, 2013 U.S. Dist. LEXIS 43543, at *2-4 (S.D.N.Y. Mar. 27, 2013)). I do not hold today that a conspiracy theory alone provides viable grounds for the exercise of jurisdiction.

6    The selling of a price-fixed product may qualify as an overt act in furtherance of a conspiracy. In re Magnesium Oxide Antitrust Litig., No. 10-5943 (DRD), 2011 WL 5008090, 2011 U.S. Dist. LEXIS 121373 (D.N.J. Oct. 20, 2011).

7    The effects test is closely related to the traditional jurisdictional concepts of purposeful availment. See, e.g., Plumbers' Local Union No. 690 Health Plan v. Apotex Corp., No. 16-665, 2017 WL 3129147, at *7-8, 2017 U.S. Dist. LEXIS 114733, at *24 (E.D. Pa. July 24, 2017).

8    The Supreme Court has warned that an inquiry into the importance of an agent's services "stacks the deck, for it will always yield a pro-jurisdiction answer: 'Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do "by other means" if the independent contractor, subsidiary, or distributor did not exist.' " Daimler AG v. Bauman, 571 U.S. 117, 136, 134 S. Ct. 746, 759, 187 L.Ed.2d 624 (2014) (quoting Bauman v. DaimlerChrysler Corp., 676 F.3d 774 (9th Cir. 2011) (O'Scannalin, J., dissenting)).

9    Although the Court harbors doubts about whether Plaintiffs have demonstrated the possible existence of sufficient contacts under all of their proffered theories, it would be both inefficient and burdensome to attempt to delimit the scope of discovery accordingly. The Court notes that Plaintiffs' assertion that they have established the "possible existence" of the requisite contacts appears to focus solely on their theory of jurisdiction under Calder's effects test. Specifically, Plaintiffs' brief reads as follows: "Plaintiffs' allegations of a price-fixing conspiracy by the Foreign Defendants, causing harm through sales in the United States, sufficiently suggests, at the very least, the possible existence of requisite contacts." (ECF No. 249, p. 25).

---

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 16

Duell v. Kawasaki Motors Corp., U.S.A., Slip Copy (2014)

**2014 WL 12908947**
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

Douglas DUELL and Heather Duell, and
William I. Rozanski, III, Guardian Ad
Litem of D.D., a minor child, Plaintiffs,

v.

KAWASAKI MOTORS CORP., U.S.A., Kawasaki
Heavy Industries, Ltd., East Coast Cycles,
Powersports East, and John Does I-X, Defendants.

Civil No. 12-7273 (JBS/AMD)
|
Signed 07/18/2014

**Attorneys and Law Firms**

Michael Morris Mulligan, Carney'S Point, NJ, Richard
Grungo, Jr., Cherry hill, NJ, for Plaintiffs.

Robert A. Assuncao, James Simon Coons, Ansa Assuncao,
LLP, East Brunswick, NJ, Delia A. Clark, Rawle &
Henderson, LLP, Marlton, NJ, for Defendants.

**ORDER**

ANN MARIE DONIO, UNITED STATES MAGISTRATE
JUDGE

**\*1** In this product liability action, Plaintiff William I.
Rozanski, III, Esquire, minor Plaintiff D.D's guardian *ad
litem* (hereinafter, "Plaintiff"), moves to file a second
amended complaint. Defendant Kawasaki Motors Corp.,
U.S.A. (hereinafter, "Kawasaki") opposes the motion on
futility grounds to the extent Plaintiff asserts a purportedly
new failure to warn claim and seeks punitive damages.
Defendant East Coast Cycles, Inc. d/b/a Powersports East
(hereinafter, "East Coast Cycles") also opposes the motion
on futility grounds to the extent Plaintiff seeks punitive damages.
The Court decides this matter pursuant to Federal Rule of
Civil Procedure 78(b). For the reasons set forth herein, the
Court grants Plaintiff's motion.

Plaintiff alleges that the proposed amended pleading seeks:
(1) to reflect Plaintiff's appointment as guardian *ad litem*; (2)
to "clarify" Plaintiff's "existing" claims under New Jersey's

Product's Liability Act, N.J.S.A. 2A:58C-1, et seq.; (3)
to "clarify" Plaintiff's "existing" common law negligence
claim against East Coast Cycles; (4) to "clarify" Plaintiff's
request for punitive damages; and (5) to add Kawasaki Motor
Enterprise (Thailand) Co., Ltd. as a new defendant. [1] (Brief
in Support of Plaintiff's Motion for Leave to File a Second
Amended Complaint (hereinafter, "Pl.'s Br.") [Doc. No. 53],
8 on the docket.) Plaintiff generally asserts that the proposed
second amended complaint neither alleges futile claims nor
imposes undue prejudice on Defendants. (Id. at 12-16 on
the docket.) Rather, Plaintiff contends that the proposed
amendments clarify the claims and requested relief set forth
in Plaintiffs' initial pleadings in this action. (See id.; see also
REPLY BRIEF to Opposition to Motion (hereinafter, "Pl.'s
Reply") [Doc. No. 56], 1-2.)

East Coast Cycles and Kawasaki only oppose the pending
motion with respect to certain claims. East Coast Cycles
asserts that Plaintiff's proposed pleading fails to delineate
facts sufficient to support Plaintiff's assertion that East
Coast Cycles engaged in wanton and willful conduct, and
therefore purportedly fails to establish Plaintiff's entitlement
to an award of punitive damages. (Defendant East Coast
Cycles, Inc. d/b/a Powersports East's Brief in Opposition
to Plaintiff's Motion for Leave to File Second Amended
Complaint (hereinafter, "East Coast Cycles' Opp'n") [Doc.
No. 54-1], 4, 7.) East Coast Cycles accordingly contends
that Plaintiff's motion should be denied as futile to
the extent it seeks punitive damages against East Coast
Cycles. (Id. at 8.) Kawasaki similarly asserts that Plaintiff's
proposed pleading is futile because it "provides only a bald
assertion, unsupported by facts" that Kawasaki engaged in
" 'negligent, gross, reckless, willful and wanton conduct[.]'
" (Defendant Kawasaki Motors Corp., U.S.A.'s Brief in
Opposition to Plaintiff's Motion for Leave to File a Second
Amended Complaint (hereinafter, "Kawasaki's Opp'n") [Doc.
No. 55], 5 (citation omitted).) Kawasaki also asserts
that Plaintiff "disclaimed" any "failure-to-warn theory" in
Plaintiff's discovery responses and also fails to set forth a
sufficient factual predicate "to support a warnings theory of
liability." (Id. at 4.) Kawasaki therefore opposes the pending
motion to the extent it seeks to assert entitlement to punitive
damages against Kawasaki and to the extent it sets forth a
failure to warn claim. (Id. at 4-6.)

**\*2** "Under Federal Rule of Civil Procedure 15(a), leave
to amend pleadings shall be 'freely give[n]' when 'justice
so requires.' " 🔖 Custom Pak Brokerage, LLC v. Dandrea
Produce, Inc., No. 13-5592, 2014 WL 988829, at \*1 (D.N.J.

*Duell v. Kawasaki Motors Corp., U.S.A., Slip Copy (2014)*

Feb. 27, 2014) (quoting FED. R. CIV. P. 15(a)(2)). A court may, however, deny a motion to amend on the " 'grounds that amendment would cause undue delay or prejudice, or that amendment would be futile.' " Winer Family Trust v. Queen, 503 F.3d 319, 330-331 (3d Cir. 2007) (citation omitted). An amendment would be futile if the complaint, as amended, advances a claim or defense that "would fail to state a claim upon which relief could be granted." Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). In evaluating futility, courts employ the " 'same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6).' " Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010) (citing Shane, 213 F.3d at 115); see also Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) ("An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."). In accordance with this standard, the Court must generally accept as true the factual allegations in the complaint, and construe "all reasonable inferences" in the light most favorable to the plaintiff. Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007). However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' " fails to suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). Rather, for a complaint to survive dismissal pursuant to this standard, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (hereinafter, the "Twombly/Ashcroft plausibility standard"). The Court shall first address East Coast Cycles' and Kawasaki's objections to the proposed punitive damages claim, and shall then turn to Kawasaki's assertion concerning the futility of Plaintiff's proposed failure to warn claim.

Plaintiff's proposed two-count complaint alleges that "Defendants' negligent, gross, reckless, willful and wanton conduct" violated New Jersey's Product Liability Act, and that East Coast Cycles' conduct constitutes common law negligence. (Exhibit A [Doc. No. 53], ¶¶ 25-29.) Plaintiff's proposed complaint further asserts that Defendants' collective conduct caused minor Plaintiff D.D. "to suffer serious and painful injuries of a permanent and disabling nature" and, accordingly, seeks compensatory and punitive damages commensurate with this alleged harm. (Id. at ¶¶ 25,

29.) New Jersey's Punitive Damages Act requires a plaintiff to "specifically pray[ ]" for an award of punitive damages, N.J.S.A. 2A:15-5.11, and provides that punitive damages may only be awarded if the plaintiff ultimately proves, by clear and convincing evidence, that the defendant acted with "actual malice" or with "a wanton and willful disregard of persons" foreseeably harmed by the defendant's acts or omissions. N.J.S.A. 2A:15-5.12(a).[2] Actual malice, in turn, must generally be actuated by " 'nothing more or less than intentional wrongdoing—an evil-minded act.' " Di Giovanni v. Pessel, 260 A.2d 510, 511-12 (N.J. 1970) (citations omitted). Wanton or willful conduct similarly requires the 'conscious and deliberate disregard of the interests of others.' " Skelcy v. UnitedHealth Grp., Inc., No. 12-1014, 2012 WL 6087492, at *6 (D.N.J. Dec. 6, 2012). The proposed pleading asserts that when minor Plaintiff D.D. first operated Kawasaki's motorcycle for its intended and foreseeable purpose, the throttle mechanism purportedly "jammed and/ or stuck and/or remained in an 'open' position" resulting in minor Plaintiff D.D.'s crash and subsequent injuries. (Exhibit A [Doc. No. 53], ¶ 12, 17.) The proposed pleading then alleges that East Coast Cycles "negligently and/or *intentionally modified*" and "negligently, grossly, recklessly, willfully and wantonly assembled, tested, or maintained" the Kawasaki motorcycle operated by D.D., the minor Plaintiff. (Exhibit A [Doc. No. 53], ¶¶ 20, 27 (emphasis added).) The proposed pleading further alleges that Kawasaki created, exercised some significant control, knew, and/or should have known of the "unreasonably dangerous conditions and defects" in the product "manufactured by and/or sold by" Kawasaki. (Id. at ¶¶ 21-23.) In addition, the proposed pleading alleges that Defendants manufactured, distributed, and/or sold the Kawasaki motorcycle, notwithstanding the fact that Defendants allegedly knew or should have known of the product's "dangerous and defective characteristics." (Id. at ¶¶ 22-25.) The proposed pleading therefore sets forth allegations in support of the proposed amendment with respect to both Defendants in their respective capacities.[3] Moreover, the Court need not at this time address the ultimate viability of the proposed demand for punitive damages.[4] See Jones v. Francis, No. 13-4562, 2013 WL 5603848, at *3 (D.N.J. Oct. 11, 2013) (finding that the Court "should not decide the availability or unavailability of punitive damages as a matter of law on a motion to dismiss" because "[r]equests for this type of relief, while boilerplate, embody a central tenet of notice pleading under the federal rules, even post Twombly and Iqbal" and "subsequent discovery may reveal facts that bring to light previously unknown but nevertheless appropriate redress"). Rather, in light of the

Duell v. Kawasaki Motors Corp., U.S.A., Slip Copy (2014)

liberal standard applicable to motions to amend, the Court finds that the proposed complaint sets forth sufficient factual matter, accepted as true, to permit the filing of the proposed amendment. See Skelcy, 2012 WL 6087493, at *7 (denying without prejudice defendants' motion to dismiss claims for punitive damages where a "small" chance remained that "a trier of fact could find punitive damages justified"). The Court therefore grants Plaintiff's motion to the extent it asserts a demand for punitive damages.

**\*3** With respect to Plaintiff's proposed failure to warn claim, the Court notes that New Jersey's Product Liability Act, N.J.S.A. 2A:58C-2, permits Plaintiff to assert a cause of action against a "manufacturer or seller of a product" where the disputed product failed to be "reasonably fit, suitable or safe for its intended purpose" because it "failed to contain adequate warnings or instructions[.]" Id. As set forth supra, the proposed pleading asserts that when minor Plaintiff D.D. first operated Kawasaki's motorcycle for its intended and foreseeable purpose, the throttle mechanism purportedly "jammed and/or stuck and/or remained in an 'open' position" resulting in minor Plaintiff D.D.'s crash and subsequent injuries. (Exhibit A [Doc. No. 53], ¶ 12, 17.) In light of this purported defect, Plaintiff's proposed pleading alleges that Kawasaki "negligently failed to warn and/or instruct concerning the dangerous and defective design, manufacture, assembly, testing, or maintenance, and operating characteristics of [the disputed] product when it/

they knew or in the exercise of due care should have known" of the product's dangerous and defective characteristics. (Id. at ¶ 23.) The Court finds these allegations sufficient in the context of a motion to amend to state a failure to warn claim under New Jersey's Product Liability Act, and rejects Kawasaki's assertion that the proposed claim lacks sufficient pleaded facts. [5] (Kawasaki's Opp'n [Doc. No. 55], 4.) The Court therefore grants Plaintiff's motion to assert a claim under a failure to warn theory. See FED. R. CIV. P. 15(a)(2) (noting that leave to amend should be "freely give[n] ... when justice so requires"). Consequently, for the reasons set forth herein, and for good cause shown:

IT IS on this 18th day of July 2014,

**ORDERED** that Plaintiff's motion to file a second amended complaint [Doc. No. 53] shall be, and hereby is, **GRANTED**; and it is further

**ORDERED** that Plaintiff shall file the second amended complaint in the form attached to Plaintiff's motion, **within fourteen (14) days** from the date of entry of this Order, and shall serve the second amended complaint in accordance with the Federal Rules of Civil Procedure.

### All Citations

Slip Copy, 2014 WL 12908947

### Footnotes

1    On November 26, 2012, Plaintiffs Douglas and Heather Duell, the parents of D.D., filed the initial complaint in this action (see Complaint [Doc. No. 1] ), followed by an amended complaint on January 22, 2013. (See Amended Complaint [Doc. No. 3].) In the amended complaint, Plaintiffs Douglas and Heather Duell alleged on D.D.'s behalf that Defendants' design, manufacture, and assembly of a "defective" motorcycle caused minor Plaintiff D.D. to sustain "serious and permanent personal injuries requiring the care and treatment of physicians, hospitalization, and therapeutic medical treatment." (Amended Complaint [Doc. No. 3], ¶¶ 5, 8.) In light of Defendants' counterclaims against Plaintiffs Douglas and Heather Duell, the Court appointed William I. Rozanski, III, Esquire, as minor Plaintiff D.D.'s guardian ad litem. (See Order [Doc. No. 44], Feb. 27, 2014, 5.)

2    East Coast Cycles addresses New Jersey law in its opposition to the pending motion, but represents a future intention to "assert at the appropriate phase of the litigation the position that Delaware law should control the issues against East Coast Cycles." (East Coast Cycles' Opp'n [Doc. No. 54-1], 5 n.1.)

3    The Court therefore rejects East Coast Cycles' assertion that Plaintiff fails "to separate claims against East Coast Cycles from those lodged against the Kawasaki Defendants[.]" (East Coast Cycles' Opp'n [Doc. No. 54-1], 4.)

Duell v. Kawasaki Motors Corp., U.S.A., Slip Copy (2014)

4    East Coast Cycles asserts that the Court may consider the substance of Plaintiff's expert report in the context of the pending motion to amend, without converting the pending motion into one for summary judgment pursuant to Federal Rule of Civil Procedure 56. (East Coast Cycles' Opp'n [Doc. No. 54-1], 7.) Though the legal standard prescribed by Federal Rule of Civil Procedure 12(b)(6) governs an evaluation of futility, East Coast Cycles provides no support for its assertion that the Court may consider the expert report in connection with a motion to amend. Plaintiff's proposed amended complaint neither explicitly incorporates the expert report nor appends the substance of the report. Therefore, the Court shall not consider any excerpts of the expert report in the context of the pending motion.

5    Kawasaki asserts that Plaintiff's proposed failure to warn claim contravenes Plaintiff's "prior discovery responses[.]" (Kawasaki's Opp'n [Doc. No. 55], 4.) Counsel for Plaintiff, however, asserts that counsel intends to "supplement" discovery responses as appropriate. (Letter Brief [Doc. No. 56], 2.) The Court further notes that counsel for Plaintiff had not been retained at the time counsel for Douglas and Heather Duell served these discovery responses. (See Letter Brief [Doc. No. 56], 2.) The Court therefore finds that the substance of the discovery responses, without more, fails to warrant denial of the pending motion. The Court notes, however, that Federal Rule of Civil Procedure 26(e) imposes a continuing obligation on Plaintiff to timely supplement or correct discovery disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" FED. R. CIV. P. 26(e)(1)(A).

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 17

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 173 of 751
PageID: 11539
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Mercedes-Benz Emissions Litigation, D.N.J.,
February 1, 2019

2017 WL 2999026
Only the Westlaw citation is currently available.
**FOR PUBLICATION**
United States District Court, D. New Jersey.

Mona ESTRADA, on behalf of herself
and all others similarly situated, Plaintiff,
v.
JOHNSON & JOHNSON and
Johnson & Johnson Consumer
Companies Inc., Defendants.

Civil Action No. 16-7492 (FLW)
|
Signed 07/14/2017

**Attorneys and Law Firms**

Alison D. Hawthorne, Charles Lance Gould, PHV, W. Daniel
Miles, PHV, III, Beasley, Allen, Crow, Methvin, Portis
& Miles, P.C., Montgomery, AL, Paula Michelle Roach,
Timothy G. Blood, Thomas J. O'Reardon, II, Blood, Hurst &
O'Reardon, LLP, San Diego, CA, for Plaintiff.

Allen W. Burton, O'Melveny & Myers LLP, New York,
NY, Matthew David Powers, O'Melveny & Myers LLP, San
Francisco, CA, Gene M. Williams, Kathleen A. Frazier, Scott
A. James, Shook Hardy & Bacon LLP, Houston, TX, for
Defendants.

**OPINION**

Hon. Freda L. Wolfson, United States District Judge

**\*1** In this putative consumer class action, which has been
transferred to this Court as part of the *In re Johnson &
Johnson* MultiDistrict Litigation ("MDL"), Plaintiff Mona
Estrada ("Plaintiff") accuses Defendants Johnson & Johnson
("J&J") and Johnson & Johnson Consumer Companies
("J&J Consumer") (collectively, "Defendants") of engaging
in unfair and illegal business practices by manufacturing,
marketing, and distributing baby powder products without
informing consumers that use of baby powder by women

in the genital area leads to an increased risk of developing
ovarian cancer. Plaintiff asserts various California state law
consumer-fraud related claims against Defendants.

Presently before the Court is Defendants' Motion to Dismiss
Plaintiff's First Amended Class Action Complaint (the "FAC"
or "Complaint") for lack of standing and failure to state a
claim on which relief can be granted. For the reasons set
forth below, the Court grants Defendants' Motion on the
basis that Plaintiff lacks standing to bring suit, and therefore,
all of Plaintiff's claims are dismissed. However, Plaintiff is
given leave to amend her Complaint, consistent with this
Opinion, within thirty-days (30) from the date of the Order
accompanying this decision.

**I. FACTUAL BACKGROUND AND PROCEDURAL
HISTORY**
For the purposes of the instant Motion, the Court will recount
only relevant facts from the Complaint, taking them as true.
Plaintiff is a resident of Stockton, California. FAC ¶ 11.
Defendant J&J is a New Jersey corporation with its principal
place of business in New Brunswick, New Jersey. *Id.* at ¶ 12.
Defendant J&J Consumer is a New Jersey corporation that
operates as a subsidiary to J&J. *Id.* at ¶ 13.

Defendants research, develop, market, and sell consumer
products, including Johnson's® Baby Powder ("Baby
Powder"), throughout the United States, including California.
*Id.* at ¶ 13. Baby Powder is comprised almost entirely of talc,[1]
with a small amount of fragrance. *Id.* at ¶ 14. According to
Plaintiff, Defendants developed Baby Powder in 1893, and
manufacture, distribute, market, and sell Baby Powder "as a
daily use powder intended to eliminate friction on the skin
and to absorb unwanted excess moisture for both babies and
women." *Id.* at ¶ 14.

Plaintiff's allegations center on Defendants' marketing of
Baby Powder to women. In that regard, Plaintiff alleges that
Defendants market Baby Powder to women specifically—
encouraging women to dust themselves with Baby Powder
to maintain freshness and cleanliness, and to mask odors—
despite the fact that the use of Baby Powder by women in
the genital area results in an increased risk of developing
ovarian cancer. *Id.* at ¶¶ 1, 15. Plaintiff avers that Defendants
failed to disclose the risks associated with the use of Baby
Powder by women, and continued to market the product as
safe despite knowledge of those risks. *Id.* at ¶ 1. In support of
her allegations regarding the increased cancer risk associated

Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

with Baby Powder, Plaintiff cites numerous clinical studies that have been conducted since 1961. *See id.* at ¶¶ 24-60. Plaintiff alleges that since at least 1982, Defendants have been aware of the studies associating talcum powder with an elevated risk of ovarian cancer. *See id.* at ¶¶ 67-72.

**\*2** On April 28, 2014, Plaintiff filed her original complaint in this matter in the United States District Court for the Eastern District of California. ECF No. 1. On March 27, 2015, the Honorable Troy L. Nunley, U.S.D.J., dismissed Plaintiff's original complaint for lack of Article III standing, finding that Plaintiff failed to allege an injury-in-fact. *Estrada v. Johnson & Johnson,* No. 14-01051, 2015 WL 1440466, at \*5 (E.D. Cal. Mar. 27, 2015). Specifically, Judge Nunley found that Plaintiff failed to allege an "economic injury to meet Article III standing because Plaintiff did not allege specific misrepresentations by Defendants, received the benefit-of-the-bargain, and did not allege any alternative product that she would have purchased." *Id.* at \*5.

On April 24, 2015, Plaintiff filed the FAC, asserting four causes of action against Defendants. ECF No. 27. Plaintiff brings these claims individually and on behalf of putative classes of consumers who have purchased Baby Powder manufactured and sold by Defendants. FAC ¶ 7. Count I of the FAC seeks injunctive and equitable relief, on the grounds that Defendants violated the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.,* by failing to disclose the increased risk of ovarian cancer associated with consumption of Baby Powder on its product labels and packages, and by representing that Baby Powder is clinically proven to be safe, gentle, and mild. *Id.* at ¶ 90. Count II of the FAC asserts claims pursuant to California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.,* alleging that Defendants committed unlawful business practices by making misrepresentations and omitting material facts regarding the safety of Baby Powder. *Id.* at ¶¶ 96-97. Count III of the FAC asserts a related claim for negligent misrepresentation. *Id.* at ¶¶ 107-108. Finally, Count IV of the FAC asserts a claim for breach of the implied warranty of merchantability, alleging that Defendants impliedly warranted Baby Powder to be safe, despite the fact that it is unsafe and not merchantable. *Id.* at ¶¶ 114-117.

The FAC alleges that as a result of Defendants' misrepresentations and omissions, Plaintiff suffered economic injury in the form of the purchase price of Baby Powder. Alternatively, the FAC alleges that had Plaintiff

known of the increased cancer risk associated with Baby Powder, she would have purchased an alternative cornstarch-based product rather than Baby Powder. Plaintiff does not allege that she suffered any physical harm as a result of consuming Baby Powder.

On May 18, 2015, Defendants filed a motion to dismiss the FAC in the Eastern District of California. ECF No. 29. That motion was fully briefed before Judge Nunley. ECF No. 29-31. However, on October 5, 2016, the case was transferred to this Court by the Multi-District Litigation Panel as part of the *In re Johnson & Johnson* MDL assigned to me. ECF No. 39. Thereafter, Defendants filed the instant Motion to Dismiss on December 22, 2016. ECF No. 47.

Defendants move to dismiss the FAC on several grounds, including that Plaintiff lacks Article III standing to bring the present action, and fails to state a claim on which relief can be granted. Because the Court finds that Plaintiff lacks Article III standing to bring the present action, it need not reach Defendants' other theories.

## II. LEGAL STANDARD

Standing under Article III of the United States Constitution is an element of subject matter jurisdiction. *See Hartig Drug Co. Inc. v. Senju Pharm. Co.,* 836 F.3d 261, 269 (3d Cir. 2016). Under Rule 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 243 (3d Cir. 2012). "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir. 2007). In evaluating whether a complaint adequately pleads the elements of standing, courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *In re Schering Plough Corp.,* 678 F.3d at 243.

**\*3** In reviewing a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). As such, a motion to dismiss for failure to state a claim upon which relief can be granted does not attack the merits of the action, but merely tests the legal sufficiency of the complaint.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."). In other words, to survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

However, "the tenet that a court must accept as true all the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). A plaintiff must show that there is "more than a sheer possibility that the defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In other words, for the plaintiff to prevail, the "complaint must do more than allege the plaintiff's entitlement to relief"; it must " 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211 (quoting *Phillips*, 515 F.3d at 234–35).

The Third Circuit has cautioned, however, that *Twombly* and *Iqbal* "do not provide a panacea for defendants"; rather, "they merely require that plaintiff raise a 'plausible claim for relief.' " *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679). Thus, factual allegations must be more than speculative, but the pleading standard "is not akin to a 'probability requirement.' " *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## III. DISCUSSION

### A. Article III Standing

Article III of the United States Constitution confines the scope of federal judicial power to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2. This "bedrock requirement," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), protects the system of separation of powers and respect for the coequal branches by restricting the province of the judiciary to "decid[ing] on the rights of individuals." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803). Indeed, " '[n]o principle is more fundamental to

the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("In order to remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches.").

The courts have developed several justiciability doctrines to enforce the "case" or "controversy" requirement. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). Among those doctrines, "[t]he Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important...." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The seminal standing question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Seldin*, 422 U.S. at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

*\*4* To satisfy the "irreducible constitutional minimum" of Article III standing, the plaintiff must establish three well-settled elements:

First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations, alterations, and citations omitted); *see Spokeo*, 136 S. Ct. at 1547 ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."). Although the plaintiff bears the burden of establishing each of these three elements, the Third Circuit has stressed that the "injury-in-fact element is often determinative." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009);

Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

see also *Spokeo*, 136 S. Ct. at 1547 ("This case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements.") (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). To satisfy the injury-in-fact requirement, the injury must be "particularized," such that it affects the plaintiff in a "personal and individual way." *Lujan*, 504 U.S. at 560 n. 1. The Supreme Court has emphasized that the injury must also be "concrete in both a qualitative and temporal sense"; *i.e.*, the "complainant must allege an injury to himself that is 'distinct and palpable,' as opposed to merely '[a]bstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (internal quotations and citations omitted). To that end, allegations of a potential future injury, or the mere possibility of a future injury, will not establish standing. *See id.* at 158; *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("Allegations of 'possible future injury' are not sufficient to satisfy Article III.").

Additionally, the injury-in-fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972); *see In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017). Put differently, "[w]hile it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way." *Lujan*, 504 U.S. at 581. The requirement that that the injury affect the plaintiff in a personal and individual way "preserves the vitality of the adversarial process by assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome, and that 'the legal questions presented ... will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.' " *Id.* (quoting *Valley Forge*, 454 U.S. at 472).

**\*5** The standing inquiry "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen*, 468 U.S. at 752. To that end, at the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly*, 664 F.3d at 41 (quoting *Whitmore*, 495 U.S. at 155); *see Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d

Cir. 2016) ("Plaintiffs do not allege an injury-in-fact when they rely on a 'chain of contingencies' or 'mere speculation.' ") (citation omitted).

**B. Statutory Standing**

In addition to satisfying the federal standing requirements under Article III, Plaintiff must also demonstrate statutory standing under the UCL and the CLRA. The UCL broadly prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...." *Cal. Bus. & Prof. Code § 17200*. The CLRA prohibits unfair and deceptive business practices, including various forms of misrepresentation. *See Cal. Civ. Code § 1770*.

To establish standing to bring a claim under either the UCL or the CLRA, a plaintiff must "meet an economic injury-in-fact requirement, which demands no more than the corresponding requirement under Article III of the U.S. Constitution." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). "To adequately plead a CLRA claim, a plaintiff must allege that she relied on the defendant's alleged misrepresentation and that she suffered economic injury as a result." *Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1075 (N.D. Cal. 2014); *see Cal. Civ. Code § 1780(a)* ("Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by *Section 1770* may bring an action against that person...."). Similarly, under the UCL, a plaintiff must demonstrate that she "suffered injury in fact and has lost money or property as a result of the unfair competition." *Cal. Bus. & Prof. Code § 17204*.

Where a UCL claim is premised on the basis of a misrepresentation, a plaintiff "must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance...." *Doe*, 70 F. Supp. 3d at 1075 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009)). To demonstrate actual reliance, a plaintiff must allege that "the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct[,] ... by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *In re Tobacco II Cases*, 46 Cal. 4th at 326 (citation omitted). "While a plaintiff need not demonstrate that the defendant's misrepresentations were 'the sole or even the predominant or decisive factor influencing his conduct,' the misrepresentations must have 'played a substantial part'

2017 WL 2999026

in the plaintiff's decisionmaking." *Doe*, 70 F. Supp. 3d at 1076 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 326).

"Both the UCL and the CLRA prohibit not only affirmative misrepresentations, but also material omissions that deceive reasonable consumers." *Doe*, 70 F. Supp. 3d at 1075 (citing *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 925 (N.D. Cal. 2012)). To bring a claim under either the UCL or the CLRA on the basis of an omission, the "omission must be 'contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.' " *Donohue*, 871 F. Supp. 2d at 925 (quoting *Baltazar v. Apple, Inc.*, No. 10-3231, 2011 WL 588209, at *4 (N.D. Cal. Feb. 10, 2011)). There are four circumstances in which a duty to disclose may arise: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; or (4) when the defendant makes partial representations but also suppresses some material fact." *Donohue*, 871 F. Supp. 2d at 925. Additionally, "[t]o establish the causal nexus between the omission and a plaintiff's harm, a plaintiff must plead that she would not have purchased the product or service at issue if she had known the material fact that Defendant allegedly omitted." *Doe*, 70 F. Supp. 3d at 1076.

**\*6** In the instant case, Plaintiff contends that Defendants have violated the UCL and CLRA through both affirmative misrepresentations regarding the safety of Baby Powder, and through the omission of material facts concerning the alleged risks associated with that product. Because Plaintiff's claims under the UCL and CLRA require her to demonstrate that she suffered an economic injury-in-fact, and Plaintiff's sole theory of harm for Article III purposes is economic injury, the Court will analyze standing under Article III and the California statutes concurrently. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 960 (9th Cir. 2009).

**C. Injury-in-Fact**
Economic injury is one of the paradigmatic forms of injury-in-fact. *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005). The FAC sets forth three potential bases from which this Court could find that Plaintiff suffered an economic injury: (1) that Plaintiff did not receive the benefit of her bargain in purchasing Baby Powder, and thus, her damages are the purchase price of that product; (2) that Plaintiff would have purchased an alternative product, had she known of the increased cancer risk associated with the

use of Baby Powder; and (3) because Defendants failed to disclose the risks associated with the use of Baby Powder, Baby Powder was marketed and sold at a premium price. The Court will address those three theories in turn.

**1. Benefit-of-the-Bargain**

Plaintiff alleges that she has suffered an economic injury-in-fact, because she did not receive the benefit of her bargain when she purchased Baby Powder. Specifically, Plaintiff avers that she purchased Baby Powder under the belief that it was safe, and, had she known that using Baby Powder in the genital area led to an increased risk of developing ovarian cancer, she would not have purchased the product. FAC ¶ 11. Thus, Plaintiff's theory of harm is purely economic.[2] In that connection, Plaintiff maintains that she need not allege the existence of a cheaper alternative product, in the context of her benefit-of-the-bargain theory, to show economic harm; rather, her allegation that she would not have purchased Baby Powder, had Defendants disclosed the risks associated with its use, is sufficient to demonstrate injury-in-fact. In other words, Plaintiff contends that standing exists because she paid money for Baby Powder that, absent Defendants' omissions and misrepresentations regarding the alleged cancer risk associated with Baby Powder, she otherwise would not have paid.

Defendants posit that Plaintiff lacks standing, because Plaintiff received the full benefit of her bargain; that is, Plaintiff was able to use the product as intended—for the elimination of friction on the skin, the absorption of unwanted excess moisture, and the maintenance of freshness—without suffering any adverse consequences. Stated another way, Defendants argue that because Plaintiff received the benefit of her bargain, she cannot claim that she spent money she otherwise would not have for Baby Powder.

At the outset, with respect to Plaintiff's theory of harm based on Defendants' alleged omissions, Plaintiff has not cited, and the the Court has not been able to locate, a case recognizing injury-in-fact under the benefit-of-the-bargain theory premised on an alleged omission, except in circumstances where the plaintiff has pled that the defendant was under an affirmative obligation to disclose the omitted fact. *Compare Koronthaly v. L'Oreal USA, Inc.*, 374 Fed.Appx. 257, 259 (3d Cir. 2010) (finding no standing where the plaintiff alleged that defendant failed to disclose the presence of lead in the product at issue, where FDA

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 178 of 751
PageID# 11544
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

guidelines stated that the level of lead in the product did not require a warning), *and Boysen v. Walgreen Co.*, No. 11-06262, 2012 WL 2953069, at *7 (N.D. Cal. July 19, 2012) (finding the plaintiff's allegations that he suffered economic injury as a result of the defendant's failure to disclose the presence of arsenic and lead in its products to be insufficient to constitute Article III standing, where the plaintiff did not allege that defendant violated FDA guidelines) *with Brod v. Sioux Honey Ass'n, Co-op.*, 927 F. Supp. 2d 811, 820 (N.D. Cal. 2013), *aff'd*, 609 Fed.Appx. 415 (9th Cir. 2015) (finding standing where the plaintiff alleged that the defendant violated its state law "duty to label Sue Bee Honey in a way that discloses the removal of pollen to potential consumers."). Here, Plaintiff has not alleged that Defendants were under any legal obligation to disclose the risks associated with Baby Powder on the product's label or advertisements.[3] Nor does Plaintiff allege that Defendants are in a fiduciary relationship with Plaintiff. *See Donohue*, 871 F. Supp. 2d at 925. Absent any authority to the contrary, Plaintiff cannot assert a benefit-of-the-bargain theory of economic harm based on an omission, where Plaintiff has failed to allege that Defendants are under a legal duty to disclose the omitted fact.

**\*7** Plaintiff's benefit-of-the-bargain theory of economic harm was also previously rejected by Judge Nunley, albeit without indicating whether that dismissal was due to deficiencies in Plaintiff's allegations of omissions or misrepresentations. *See Estrada*, 2015 WL 1440466 at *5. On claims nearly identical to those asserted in this case,[4] Judge Nunley reasoned as follows:

> Furthermore, Plaintiff cannot claim that she paid a premium for the Baby Powder because she received all of the intended benefits of the bargain. Plaintiff used the Baby Powder for decades presumably because Plaintiff enjoyed the benefits of the elimination of friction on the skin, the absorption of unwanted excess moisture, and the maintenance of freshness.... Her continued purchase of the Baby Powder suggests that Plaintiff indeed received such benefits from the Baby Powder and believed it was worth the price. Thus, Plaintiff received the benefit-of-the-bargain for the Baby Powder. Because she received the benefit-of-the-bargain, Plaintiff's allegation that she paid a premium for the Baby Powder fails. Plaintiff received exactly what she paid for—the elimination of friction on the skin, the absorption of unwanted excess moisture, and the maintenance of freshness. Plaintiff's only complaint against the Baby Powder is the alleged

risk of ovarian cancer. Plaintiff received the benefit-of-the-bargain because she received the exact product she intended to purchase, unlike the cases she cites where the consumers received products that were mislabeled or defective. Here, Plaintiff received the exact benefits for which she purchased the Baby Powder. Because Plaintiff received the benefit-of-the-bargain, she cannot claim that she spent money that she would not have otherwise spent by paying a premium or by not purchasing the product.

*Id.* at *4.

The Court finds Judge Nunley's analysis consistent with the law of Third Circuit, as well as with other jurisdictions that have considered similar complaints alleging that a plaintiff did not receive the benefit of his or her bargain, based on both omissions and misrepresentations. For example, in *Koronthaly*, a purchaser of lipstick products filed a class action complaint against the manufacturer for allegedly selling lipstick products that contained lead. 374 Fed.Appx. at 258. While the purchaser did not suffer any physical harm from consuming the products, she attempted to establish standing by alleging that she did not receive the benefit of her bargain. *Id.* at 259. The Third Circuit affirmed the order of the district court granting the manufacturer's motion to dismiss, noting that the "purchases were not made pursuant to a contract, and therefore [the purchaser] could not have been denied the benefit of any bargain." *Id.* More importantly, the Third Circuit held that "[a]bsent any allegation that she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [the purchaser] has not demonstrated a concrete injury-in-fact." *Id.*

**\*8** Similarly, in *James v. Johnson & Johnson Consumer Companies, Inc.*, 10-03049, 2011 WL 198026 (D.N.J. Jan. 20, 2011), purchasers of baby shampoo filed an action against the product's manufacturer, alleging that the manufacturer included a toxic ingredient in the shampoo. 2011 WL 198026 at *2. The purchasers did not allege that their children suffered any physical harm after using the shampoo; rather, the purchasers attempted to establish Article III standing by alleging that they suffered economic harm, because they would not have purchased the shampoo had they known of its alleged toxicity. *Id.* The court rejected the purchasers' theory of standing, holding that the purchasers failed to establish an injury-in-fact. *Id.* The court explained that "[o]nce the product had been consumed ... there was no economic injury for Plaintiffs to complain of, and the fear of future injury is legally insufficient to confer standing. Plaintiffs received the

benefit of their bargain so long as there were no adverse health consequences, and the product worked as intended, meaning that the hair of Plaintiff's children was cleansed, and their eyes and skin were not irritated." *Id.*[5]

Additionally, in *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002), the Fifth Circuit held that the purchaser of a prescription painkiller, which had been withdrawn from the market due to a potential increased risk of liver damage associated with its consumption, lacked Article III standing to pursue her class action complaint. *Id.* at 321. The Fifth Circuit noted that, as in the present case, the purchaser's theory of harm was economic rather than physical:

> Rivera's claim to injury runs something like this: Wyeth sold *Duract*; Rivera purchased and used *Duract*; Wyeth did not list enough warnings on *Duract*, and/or *Duract* was defective; other patients were injured by *Duract*; Rivera would like her money back. The plaintiffs do not claim *Duract* caused them physical or emotional injury, was ineffective as a pain killer, or has any future health consequences to users. Instead, they assert that their loss of cash is an "economic injury."
>
> *Id.* at 319.

In holding that the purchaser failed to demonstrate an injury-in-fact, the *Rivera* court found that she received the benefit of her bargain, because she "paid for an effective pain killer, and she received just that...." *Id.* at 320. Additionally, the Fifth Circuit noted that in attempting to assert economic harm on a benefit-of-the-bargain theory, the purchaser conflated her tort claims in the context of contract law damages:

> The confusion arises from the plaintiffs' attempt to recast their product liability claim in the language of contract law. The wrongs they allege—failure to warn and sale of a defective product—are products liability claims.... Yet, the damages they assert—benefit of the bargain, out of pocket expenditures—are contract law damages. The plaintiffs apparently believe that if they keep oscillating between tort and contract law claims, they can obscure the fact that they have asserted no concrete injury. Such artful pleading, however, is not enough to create an injury in fact.
>
> *Id.* at 320–21.[6]

**\*9** In this case, Plaintiff cannot establish economic injury based on her allegation that she did not receive the benefit of her bargain based upon Defendants' alleged omissions. Plaintiff's claims are similar to those alleged by the consumers

in *Koronthaly*, *James*, *Medley*, and *Rivera*: Plaintiff alleges that she consumed Baby Powder; it was effective for its intended uses of eliminating friction, absorbing unwanted excess moisture, and maintaining freshness; she was not physically injured; Defendants failed to list enough warnings about the alleged increased risk of ovarian cancer associated with consumption of Baby Powder; and that Plaintiff would like her money back. Absent an allegation of adverse health consequences from using Baby Powder, or that Baby Powder failed to perform satisfactorily for its intended use, Plaintiff cannot claim that she was denied the benefit of her bargain. *See Koronthaly*, 374 Fed.Appx. at 259; *James*, 2011 WL 198026 at *2. In sum, Plaintiff's benefit-of-the-bargain theory of economic harm, based on Defendants' alleged omissions, is an insufficient basis for this Court to find that Plaintiff suffered an injury-in-fact, and, should Plaintiff seek to amend her Complaint to reassert such a theory, she must point to an affirmative legal duty on the part of Defendants to disclose the allegedly omitted facts.

While Plaintiff places reliance on several cases recognizing standing on a benefit-of-the-bargain theory of economic harm, *see Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011); *In re Mercedes-benz Emissions Litig.*, No. 16-881, 2016 WL 7106020 (D.N.J. Dec. 6, 2016); *Hodges v. Vitamin Shoppe, Inc.*, No. 13-3381, 2014 WL 200270 (D.N.J. Jan. 15, 2014); *In re Gerber Probiotic Sales Practices Litig.*, No. 12-835, 2013 WL 4517994 (D.N.J. Aug. 23, 2013), those cases are distinguishable from the present matter. Importantly, in each of those cases, the courts found that the plaintiffs did not receive the benefit of their bargain because either: (i) the plaintiffs received a defective product; or (ii) the plaintiffs pled facts sufficient for the court to conclude that they would not have purchased the product at issue but for a specific misrepresentation made by the defendants; *i.e.*, that the plaintiff was induced into purchasing the product by a specific misrepresentation.

First, in *Kwikset*, the Supreme Court of California was tasked with determining whether purchasers of locksets labeled as "Made in U.S.A." had statutory standing under California's UCL and False Advertising Law ("FAL"). 51 Cal. 4th at 316. The state statutes at issue required the plaintiffs to demonstrate that they suffered an economic injury-in-fact. *See id.* at 323. The court found that the plaintiffs had sustained their burden of demonstrating economic injury-in-fact, holding that "plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it

2017 WL 2999026

otherwise, ... have standing to sue." *Id.* at 317. The court reasoned as follows:

> For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately. This economic harm—the loss of real dollars from a consumer's pocket —is the same whether or not a court might objectively view the products as functionally equivalent. A counterfeit Rolex might be proven to tell the time as accurately as a genuine Rolex and in other ways be functionally equivalent, but we do not doubt the consumer (as well as the company that was deprived of a sale) has been economically harmed by the substitution in a manner sufficient to create standing to sue. Two wines might be almost any palate taste indistinguishable—but to serious oenophiles, the difference between one year and the next, between grapes from one valley and another nearby, might be sufficient to carry with it real economic differences in how much they would pay. Nonkosher meat might taste and in every respect be nutritionally identical to kosher meat, but to an observant Jew who keeps kosher, the former would be worthless.

> **\*10** A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.

*Id.* at 329–30.

In so holding, however, the *Kwikset* court did not reach the issue of whether an individual who actually receives the full benefit of his or her bargain has standing to raise a claim. *See id.* at 332 ("Whether or not a party who actually received the benefit of his or her bargain may lack standing, in this case, under the allegations of the complaint, plaintiffs did not."). Rather, the court explained that the plaintiffs had set forth allegations sufficient to conclude that they purchased the locksets "because they were 'Made in U.S.A.'; they would not have purchased them otherwise; and, it may be inferred, they value what they actually received less than either the money they parted with or working locksets that actually were made in the United States." *Id.* In other words, the court found that the plaintiffs did not receive the benefit of their bargain because they purchased locksets that the defendant had represented were manufactured in the United States, but were not. *Id.*[7]

Second, in *In re Mercedes-benz Emissions Litig.*, a class of consumers alleged that the defendants misled them into "purchasing certain 'BlueTec Clean Diesel' vehicles ... by misrepresenting the environmental impact of these vehicles during on-road driving." 2016 WL 7106020 at *1. The consumers attempted to establish standing on a benefit-of-the-bargain theory, arguing that "they would not have purchased their BlueTEC vehicles or would have paid less had they known about [the defendants'] misrepresentations and omissions." *Id.* at *4. In finding that the consumers had pled an injury-in-fact sufficient to withstand a motion to dismiss, the court emphasized that the consumers' complaint identified "precise representations" made by the defendants, which the consumers relied on in purchasing their vehicles. *Id.* Indeed, the court listed the following misrepresentations alleged in the consumers' complaint:

> "Mercedes vigorously markets its BlueTEC vehicles as 'the world's cleanest and most advanced diesel' with 'ultra-low emissions, high fuel economy and responsive performance' that emits 'up to 30% lower greenhouse-gas emissions than gasoline' and that Mercedes 'also represents that its BlueTEC vehicles 'convert[ ] the nitrogen oxide emissions into harmless nitrogen and oxygen' and 'reduces the nitrogen oxide in the exhaust gases by up to 90%.' "

> "Mercedes promotes its Clean Diesel vehicles as 'Earth Friendly: With BlueTEC, cleaner emissions are now an equally appealing benefit.' "

Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)

2017 WL 2999026

"Mercedes' advertisements, promotional campaigns, and public statements represented that the Affected Vehicles had high fuel economy, low emissions, reduced NOx by 90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles." **\*11** *Id.* at \*5. The court found that, taking those allegations as true on a motion to dismiss, the consumers had "plausibly pled that the products received did not live up to the claims made by Defendants," and thus, that they suffered an injury-in-fact. *Id.* at \*4.

Third, in *Hodges*, a consumer alleged that the defendant mislabeled and falsely advertised a dietary supplement "as a bodybuilding, fitness training and endurance developing formula," when, "contrary to statements made by [the defendant] about the Product's efficacy, the Product cannot deliver the promised results because the Product's ingredients are ineffective and/or because the instructed dosage is insufficient to achieve the results." 2014 WL 200270 at \*1. Although the consumer did not suffer physical harm, the court held that he had satisfied the injury-in-fact requirement by alleging that he was induced into purchasing the product after reading and relying on the defendant's misrepresentations, and as a result "bought merchandise that was 'useless.' " *Id.* at \*2.

Finally, in *In re Gerber Probiotic Sales Practices Litig.*, a class of consumers asserted that the defendant engaged in deceptive, false, and misleading marketing and labeling of its products, because, "despite representations to the contrary, the Products (1) do not provide immune system benefits; and (2) are not are not near equal to breast milk." 2013 WL 4517994 at \*1. The consumers' complaint identified specific representations made by the defendant in the labeling, packaging, and advertisement of the products, which the consumers alleged were "likely to mislead consumers, acting reasonably under the circumstances, into believing that the Products are superior to other products because they are the near-equivalent of breast milk and that they provide immune system benefits." *Id.* at \*2. In arguing that the consumers did not suffer an injury-in-fact, the defendant sought to rely on "a number of consumer protection cases where the products at issue contained potentially dangerous substances, but the plaintiffs suffered no ill effects." *Id.* at \*5. The court rejected that argument and held that the consumers suffered an injury-in-fact. *Id.* Specifically, the court found that, unlike in the consumer protection cases cited by the defendant, the consumers sufficiently alleged an injury-in-fact by claiming

"that they paid a premium for the Products at issue based on false, deceptive, and misleading representations." *Id.*

Unlike the consumers in *Kwikset*, *In re Mercedes-benz Emissions Litig.*, *Hodges*, and *In re Gerber Probiotic Sales Practices Litig.*, Plaintiff fails to allege facts sufficient for this Court to find that Plaintiff suffered an economic injury-in-fact. Not only does Plaintiff fail to allege that Baby Powder was ineffective for its intended use; to the contrary, she continued purchasing Baby Powder for a substantial period, and consumed the product in its entirety each time. Moreover, as discussed below, Plaintiff has not sufficiently alleged that she was induced into purchasing Baby Powder based on specific misrepresentations made by Defendants on the product's label or advertisements, or on Defendants' website.

In the FAC, Plaintiff alleges that she was deceived into believing that Baby Powder was "safe," based on the following representations that were allegedly made by Defendants on the product's label:

- **\*12** • The current Baby Powder label, which states that "Johnson's® Baby Powder is designed to gently absorb excess moisture helping skin feel comfortable. Our incredibly soft, hypoallergenic, dermatologist and allergy-tested formula glides over skin to leave it feeling delicately soft and dry while providing soothing relief." FAC ¶ 4.

- The recommendation on the label to "[u]se anytime you want skin to feel soft, fresh and comfortable. For baby, use after every bath and diaper change," which Plaintiff argues conveys "the message that the Baby Powder is appropriate for use by all consumers, including women." FAC ¶ 7.

With regard to the alleged misrepresentations on the Baby Powder label, the FAC alleges that "[p]rior to making her purchase, Plaintiff read the label for Baby Powder," and that, "[i]n reliance on the label," Plaintiff believed that Baby Powder was safe. FAC ¶ 11. However, the label does not expressly state that the product is "safe," and, unlike the cases cited above, Plaintiff has not alleged that but for those generalized representations, she would not have purchased Baby Powder. Indeed, as Judge Nunley recognized, "[t]hese statements lack sufficient specificity to substantiate an injury." *Estrada*, 2015 WL 1440466 at \*4. The FAC fares no better. Plaintiff does not sufficiently allege that she was induced into purchasing Baby Powder by the statements on the product's label.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 182 of 751
PageID: 11548
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

The FAC alleges further that Defendants deceived Plaintiff into believing that Baby Powder was safe based on the following misrepresentations in their advertisements and on their website:

- Statements on a website maintained by Defendants that "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed." FAC ¶ 7.

- A "Five-Level Safety Assurance Process" marketed by Defendants, which states that "for decades, ours has been one of the most thorough and rigorous product testing processes in our industry—to ensure safety and quality of every single product we make." FAC ¶ 7.

- Defendants' "Promise to Parents and their Babies," stating that "[w]hen you bring our baby care products into your home, you can be assured of our commitment to the safety of your family and families around the world." FAC ¶ 7.

- The statement on Defendants' website for Baby Powder, stating that the product is "[c]linically proven to be safe, gentle and mild." FAC ¶ 7.

To the extent Plaintiff's misrepresentation claims arise from Defendants' advertising and website, the Court finds that Plaintiff has not sufficiently alleged that she relied on those statements in purchasing Baby Powder. *See Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 846–47 (N.D. Cal. 2012) (finding that although "[o]verpaying for goods or purchasing goods a person otherwise would not have purchased based upon alleged misrepresentations by the manufacturer would satisfy the injury in fact requirement," there was no injury-in-fact where the plaintiff "fail[ed] to allege specifically which statements she found material to her decision to purchase an Apple Device or App."). With respect to those alleged misrepresentations, the FAC alleges only that "[r]elying on these statements and Defendants' marketing and branding efforts, consumers, including Plaintiff, reasonably believe Defendants are a company that can be trusted to provide safe products, and that their Baby Powder is in fact safe." FAC ¶ 19. However, Plaintiff has not pled any facts demonstrating that she read or was aware of those statements prior to purchasing Baby Powder, or that she would not have purchased Baby Powder but for the alleged misrepresentations. *See Branca v. Nordstrom, Inc.*,

No. 14-2062, 2015 WL 1841231, at *4 (S.D. Cal. Mar. 20, 2015) (finding the plaintiff failed to allege standing based on statements on the defendant's website, where the plaintiff did "not allege that he observed-or was even aware of-Nordstrom Rack's website. Thus, Plaintiff alleges no facts to demonstrate, or even suggest, that he had would not have purchased the items absent the representations on the website."). Indeed, Plaintiff alleges that she purchased Baby Powder for general use from "about 1950 to sometime in 2013," FAC ¶ 3; a substantial number of these years predate any of the Internet advertisements on which she allegedly relied.

**\*13** In short, the Court cannot find that Plaintiff has adequately alleged that she specifically relied upon Defendants' representations in purchasing Baby Powder, and was subsequently denied the benefit of that bargain upon learning that Baby Powder allegedly causes an increased risk of ovarian cancer. Rather, Plaintiff received a product that was effective for its intended uses, and Plaintiff has not alleged sufficiently that she was induced into purchasing that product by deceptive conduct. Accordingly, Plaintiff's benefit-of-the-bargain theory of economic harm, based on Defendants' alleged omissions and misrepresentations, is an insufficient basis for this Court to conclude that Plaintiff suffered an injury-in-fact.

### 2. Alternative Product

Next, Plaintiff alleges that had she been properly warned by Defendants, she would have purchased an alternative cornstarch-based powder, that does not have the same increased cancer risk as talc-based powders. Defendants argue that although consumers who can allege that they would have purchased a cheaper alternative product are generally able to establish economic harm, here, Plaintiff fails to allege that a cornstarch-based product would have been *cheaper* than Baby Powder.

Courts have found that a legally cognizable Article III injury-in-fact exists where a consumer alleges that, absent the defendant's misrepresentations or omissions, the consumer would have purchased a cheaper alternative product.[8] *See Loreto v. Procter & Gamble Co.*, 515 Fed.Appx. 576, 580-81 (6th Cir. 2013); *In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*, No. 05-01699, 2007 WL 2028408, at *7 (N.D. Cal. July 10, 2007); *see also Musgrave v. ICC/Marie Callender's Gourmet Prod. Div.*, No. 14-02006,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 183 of 751
PageID: 11549
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

2015 WL 510919, at *7 (N.D. Cal. Feb. 5, 2015) (finding standing where the plaintiff alleged that "had he known that the products were not 'all natural,' he would have purchased other 'all natural' brands or, if such alternatives were not available, would have purchased *less expensive* non-natural food products.") (emphasis added); *Victor v. R.C. Bigelow, Inc.,* No. 13-02976, 2014 WL 1028881, at *1, 4 (N.D. Cal. Mar. 14, 2014) (finding standing where plaintiff alleged, *inter alia,* that " 'cheaper alternatives' [were] available."); *Khasin v. Hershey Co.,* No. 12-01862, 2012 WL 5471153, at *6 (N.D. Cal. Nov. 9, 2012) (holding that the plaintiff alleged facts sufficient to find Article III standing, where plaintiff alleged "that he had *cheaper product alternatives* for purchase at his disposal," and would not have purchased the products at issue but for the defendant's omissions, which violated labeling standards) (emphasis added); *James,* 2011 WL 198026 at *2 n. 2 ("It should be noted that Plaintiffs have not alleged economic injury on a theory that they paid a premium price for this brand of shampoo based on Johnson & Johnson's misrepresentation of their product as being safe and non-toxic for children, more so than comparable but less expensive alternatives."); *In re Vioxx Consol. Class Action,* No. 4247, 2006 Cal. App. Unpub. LEXIS 11771, at *14-16, 2006 WL 6305290 (App. Div. Jul. 18, 2006) ("[P]laintiffs allege they lost the purchase price of *Vioxx,* or at least the difference between the purchase price and the price of a traditional NSAID [cheaper alternative], as a result of defendant's deceptive practices. This sufficiently states an injury under the CLRA, UCL and FAL.").

For example, in *Loreto,* the plaintiffs brought a consumer-fraud action against the defendant for including allegedly misleading statements about the health benefits of Vitamin C in their multi-symptom flu and cold relief products. *See* 515 Fed.Appx. at 576-77. The plaintiffs alleged that but for the defendant's false or misleading statements regarding the benefits of Vitamin C, they "would have purchased a lower-priced competing product instead." *Id.* at 578. The district court found that the plaintiffs had failed to demonstrate an ascertainable loss under New Jersey's Consumer Fraud Act, because the plaintiffs did not allege that the product failed to effectively treat their colds; *i.e.,* "plaintiffs received precisely what they paid for—an effective cold remedy." *Id.* at 580.

**\*14** On appeal, the Sixth Circuit reversed, finding that the plaintiffs had demonstrated an ascertainable loss, and thus could demonstrate an injury-in-fact for Article III purposes,[9] by alleging "that they suffered an out-of-pocket loss when they purchased DayQuil or NyQuil Plus Vitamin C instead

of a lower-priced competing cold medicine that did not contain the vitamin." *Id.* at 580. The Sixth Circuit found that the plaintiffs' measure of damages was "the difference in price between Procter & Gamble's product and a lower-priced competing product." *Id.* In so holding, the Sixth Circuit rejected the defendant's attempt to rely on *Rivera* and *Medley* for the proposition that the plaintiffs could not demonstrate an injury-in-fact, distinguishing those cases on the grounds that: (1) the plaintiffs in *Rivera* failed to allege that that "they would have purchased a lower-priced alternative but for the failure to warn," *id.* at 581; and (2) the parents in *Medley* "never alleged an economic injury from paying a premium for the product." *Id.*

Similarly, in *In re Bextra,* the plaintiffs alleged that the defendants marketed their prescription pain relief medication by intentionally misrepresenting its effectiveness and safety over other less expensive drugs. 2007 WL 2028408 at *1. The defendants moved to dismiss, arguing that the plaintiffs had failed to demonstrate an injury-in-fact. *Id.* at *5. In holding that the plaintiffs had demonstrated that they sustained an injury-in-fact, based on their allegation that they would have purchased a cheaper alternative product but for the defendants' misleading advertisements, the court noted that the cheaper alternative product allegation distinguished that case from those cases holding that a plaintiff who receives the benefit of his or her bargain cannot claim economic damage:

> Defendants' theory, and the theory articulated in many of the cases they cite, is that the plaintiffs cannot state a claim because they were willing to pay a certain amount for an effective pain reliever that caused fewer gastrointestinal symptoms, and since they did not suffer from any such symptoms, plaintiffs received exactly what they paid for. *The distinction here, however, is the additional allegation that but for the misrepresentation that Celebrex is better than the cheaper drugs on the market, plaintiffs could have received the same benefit at a lower price.* None of the cases cited by defendants include such an allegation. Plaintiffs have sufficiently alleged causation for their state consumer protection law claims.

*Id.* at *7 (emphasis added).

Unlike the plaintiffs in *Loreto* and *In re Bextra,* here, the FAC does not allege that a *cheaper* alternative product was available, and that Plaintiff's damages are the difference in price between Baby Powder and that alternative product. In that regard, while the FAC does allege that Plaintiff would have purchased an alternative cornstarch-based product, had Plaintiff known of the alleged increased risk of ovarian

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 184 of 751
PageID: 11550
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

cancer, the FAC does not allege that the cornstarch-based product would have been *cheaper* than Baby Powder. Indeed, in her Opposition to Defendants' Motion to Dismiss, Plaintiff notes specifically that she "does not premise her injury on allegations that the alternative cornstarch product was cheaper." Pl.'s Opp. to Defs.' Mot. to Dismiss 17. Accordingly, since Plaintiff does not allege that an alternative cornstarch-based product would have been cheaper than Baby Powder, and indeed, disavows that theory, I cannot find that Plaintiff has suffered an economic injury-in-fact on her alternative product theory of harm.

### 3. Premium Price

**\*15** Finally, the FAC alleges that as a result of Defendants' misrepresentations and omissions, Defendants "have been able to sell the product for more than they otherwise would have had they properly informed consumers about the safety risks." FAC ¶¶ 6, 77. Plaintiff's argument essentially falls into the "price premium" line of cases. In price premium cases, a plaintiff alleges that the defendant's misrepresentations or omissions caused that plaintiff to overpay for a product. *See In re Clorox Consumer Litig.*, No. 12-00280, 2013 WL 3967334, at *4 (N.D. Cal. July 31, 2013) (finding that the plaintiff adequately alleged an injury-in-fact, where the plaintiff alleged that he would not have purchased the defendant's product over competitors' products, but for the defendant's advertisements that its product was superior); *Manchouck v. Mondelēz Int'l Inc.*, No. 13-02148, 2013 WL 5400285, at *1-2 (N.D. Cal. Sept. 26, 2013), *aff'd sub nom. Manchouck v. Mondelez Int'l, Inc.*, 603 Fed.Appx. 632 (9th Cir. 2015) (finding injury-in-fact where the plaintiff alleged that she would not have paid a premium price for the defendant's products, but for the defendant's misrepresentations that those products were "made with real fruit.").

For example, in *In re Clorox Consumer Litig.*, a putative class of plaintiffs brought an action against the manufacturer of Fresh Step cat litter, alleging that but for the manufacturer's advertisements regarding the alleged superiority of Fresh Step cat litter over competing products, they would not have paid a premium for that product. 2013 WL 3967334 at *1. Specifically, the plaintiffs pointed to the manufacturer's advertisements, which represented that "Fresh Step is the only cat litter that uses carbon, and that Fresh Step is better at eliminating cat waste odors than other brands of cat litter that use baking soda." *Id.* To support their argument that the manufacturer charged a premium for its carbon-based

cat litter, the plaintiffs alleged that the manufacturer sold its carbon-based cat litter at a higher price than a competing brand's non-carbon-based litter. *See id.* The manufacturer moved for judgment on the pleadings, arguing that the plaintiffs lacked Article III standing. *See id.* at *2. The court found that the plaintiffs had sufficiently pled an injury by alleging that they paid a premium for the carbon-based cat litter as a result of the manufacturer's advertisements. *See id.* at *4.[10]

Here, by contrast, Plaintiff's threadbare allegation that she purchased Baby Powder at a premium, without any factual allegations to support that claim, is insufficient to find an injury-in-fact. *See Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1280 (C.D. Cal. 2016) ("It is true that both overpayment and diminution in value are theoretically cognizable injuries-in-fact.... But, a plaintiff must still plead facts sufficient to establish these injuries-in-fact.") (internal citation omitted). Plaintiff has not alleged that she would not have paid a premium for Baby Powder, but for Defendants' advertisements of that product as superior to competing products. Indeed, Plaintiff does not allege that Defendants advertised Baby Powder as superior to other products. Nor does the FAC set forth any comparable, cheaper products to demonstrate that Baby Powder was in fact sold at a premium price. Accordingly, Plaintiff has not sufficiently alleged that she purchased Baby Powder at a premium.

### IV. CONCLUSION

**\*16** In sum, while the Court is cognizant that "[i]njury-in-fact is not Mount Everest," *Danvers Motor Co.*, 432 F.3d at 294, the Count cannot find, based on the allegations in the FAC, that Plaintiff has suffered an injury-in-fact. Because Plaintiff does not have standing to bring the present action, the the FAC must be dismissed for lack of subject matter jurisdiction. *See Ballentine*, 486 F.3d at 810. Moreover, it is well-settled that, absent subject matter jurisdiction, the Court is without authority to address the parties' remaining merit-based arguments. *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2010). For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiff's lack of standing to bring suit. Plaintiff is given leave to amend her Complaint, consistent with this decision, within thirty-days (30) from the date of the Order accompanying this Opinion. Specifically, to the extent that Plaintiff seeks to amend her benefit-of-the-bargain theory on the basis of an omission, Plaintiff must allege that Defendants had an affirmative legal obligation to disclose the omitted fact. In addition, to the extent Plaintiff

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 185 of 751
PageID: 11551
Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017)
2017 WL 2999026

seeks to amend her benefit-of-the-bargain theory on the basis of the alleged misrepresentations appearing in Defendants' advertisements or on their website, Plaintiff must allege that she actually relied on those misrepresentations in purchasing Baby Powder.[11] Plaintiff will not be given leave to amend her alternative product theory, however, in light of her concession that a cornstarch-based alternative would not have been cheaper than Baby Powder. Should Plaintiff seek to assert a price premium claim, that claim must be pled with sufficient factual support.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2999026

## Footnotes

1   Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. FAC ¶ 1.

2   Because Plaintiff did not suffer physical harm from using Baby Powder, and does not allege any sort of medical monitoring claim, she cannot premise standing on a theory of physical injury. To that end, it is well established that "[f]ear and apprehension about a possible future physical or medical consequence ... is not enough to establish an injury in fact." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 636 (3d Cir. 1996) (Wellford, J., concurring).

3   While Plaintiff alleges that Defendants failed to register Baby Powder with the California Department of Public Health ("CDPH"), as required under the California State Cosmetics Act, *see* FAC ¶ 66, Plaintiff fails to allege the connection between that purported violation and Defendants' marketing of Baby Powder to consumers. To that end, Plaintiff does not allege that Defendants were under any affirmative duty, as a result of the California State Cosmetics Act or any other law, to disclose the risks associated with Baby Powder on the product's label or in its marketing. Nor does Plaintiff allege that she relied on the CDPH registration database in determining whether to purchase Baby Powder. In light of these shortfalls, the Court cannot conclude, based on the FAC, that Defendants were under any affirmative legal duty to disclose the alleged risks associated with Baby Powder.

4   The only allegation differentiating the FAC from Plaintiff's original complaint, for standing purposes, is the additional allegation that had Plaintiff known of the increased cancer risk associated with Baby Powder, she would have purchased a cornstarch-based alternative. To that end, in the original complaint, Plaintiff asserted the same theory of harm that she seeks to rely upon in the FAC: that she purchased Baby Powder as a result of Defendants' misrepresentations and omissions concerning the alleged cancer risk associated with the product, and is entitled to damages in the form of its purchase price. Additionally, as discussed below, Plaintiff continues to allege, in the FAC, that she relied on the same misrepresentations as identified in the original complaint.

5   Similarly, in *Medley v. Johnson & Johnson Consumer Companies, Inc.*, No. 10-02291, 2011 WL 159674 (D.N.J. Jan. 18, 2011), the court held that a class of plaintiffs asserting claims identical to those asserted in *James* lacked standing, where the plaintiffs had consumed the shampoo without adverse health consequences, and the product worked for its intended purpose of cleansing hair. 2011 WL 159674 at *2.

6   In noting that the damages sought by the plaintiff, under the benefit-of-the-bargain theory, constituted contract law damages, the Fifth Circuit echoed the explanation of the Third Circuit in *Koronthaly*; *i.e.*, that a plaintiff must demonstrate the existence of a contract to support a claim that he or she was denied the benefit of the bargain. *See Koronthaly*, 374 Fed.Appx. at 259 ("Furthermore, to the extent that Koronthaly contends that the injury-in-fact was the loss of her 'benefit of the bargain,' she mistakenly relies on contract law.... Her lipstick purchases were not made pursuant to a contract, and therefore she could not have been denied the benefit of any bargain.") (internal citation omitted); *see also Bowman v. RAM Med., Inc.*, No. 10-4403, 2012 WL 1964452, at *3 (D.N.J. May 31, 2012) ("Though Plaintiffs cleverly oscillate between contract and tort theories in an attempt to show that a harm amounts to 'injury in fact' as envisioned under the standards for Article III standing, their arguments fall short of concrete proof."). While the Court need not reach the issue of whether benefit-of-the-bargain damages are cognizable on a California consumer fraud claim, based on the fact that Plaintiff was not denied the benefit of her bargain, Plaintiff's failure to allege any contract between herself and Defendants further supports the Court's finding that Plaintiff's benefit-of-the-bargain theory of economic harm is an insufficient basis to find Article III standing in this case.

7   In so holding, the California Supreme Court thus endorsed the benefit-of-the-bargain theory of economic harm, in the context of CLRA claims, where a plaintiff can allege that he or she was induced into purchasing a product by a specific misrepresentation.

8   Indeed, Defendants acknowledge that "under some circumstances, customers who can allege that they would have purchased a cheaper alternative product may be able to allege an economic loss." Defs.' Mot. to Dismiss 20.

Estrada v. Johnson & Johnson, Not Reported in Fed. Supp. (2017...

2017 WL 2999026

**9**   Specifically, in rejecting the defendant's argument that the plaintiffs did not suffer an injury-in-fact, the Sixth Circuit found that "Plaintiffs' allegation that they suffered a monetary loss by paying more for a cold remedy because of the company's misrepresentation establishes a cognizable injury." *Loreto,* 515 Fed.Appx. at 581.

**10**   In so holding, the court distinguished the case from *Rivera,* reasoning as follows:

> Clorox's cases are inapposite. Unlike the instant action, the advertisements in the cited cases did not compare the defendants' products to their competitors'. Accordingly, none of Clorox's authority addresses the question presented here: does paying a premium for a product as a result of claims of product superiority constitute an injury in fact when the purportedly inferior product is cheaper and more effective? To the extent that the cited cases discuss economic injuries, they are distinguishable. For example, in *Rivera,* the court rejected the plaintiff's assertion that she had not received the benefit of her bargain, since, by her own admission, she had paid for and received an effective pain killer. 283 F.3d 320. In contrast, here, Plaintiffs allege that they paid a premium for an inferior product as a result of Clorox's misleading advertising.

> *In re Clorox Consumer Litig.,* 2013 WL 3967334 at *4.

**11**   Should Plaintiff choose to amend, Plaintiff must bear in mind the Court's advisement regarding the sufficiency of her misrepresentation allegations. Additionally, while the Court need not reach, for the purposes of this Opinion, the issue of whether Plaintiff's consumer-fraud based claims satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), should Plaintiff choose to amend, any allegations of misrepresentation will need to be pled with particularity in accordance with Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see, e.g., In re Riddell Concussion Reduction Litig.,* 77 F. Supp. 3d 422, 433 (D.N.J. 2015) (finding that plaintiffs did not satisfy Rule 9(b) where the plaintiffs failed to identify which specific misrepresentations they were exposed to and relied on); *In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.,* No. 14-3722, 2015 WL 4591236, at *31 n. 46 (D.N.J. July 29, 2015) (dismissing consumer-fraud claims for failure to satisfy Rule 9(b)'s heightened pleading standard, where the plaintiffs failed to allege "that they saw or relied upon a specific misrepresentation by Caterpillar.").

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 18

Fahy v. Taser Intern., Inc., Not Reported in F.Supp.2d (2010)

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Miravalle v. One World Technologies, Inc., E.D.Mo., August 1, 2018

2010 WL 559249
Only the Westlaw citation is currently available.
United States District Court,
E.D. Missouri,
Eastern Division.

Colin FAHY, Plaintiff,

v.

TASER INTERNATIONAL, INC., et al., Defendants.

No. 4:10CV19 CDP.
|
Feb. 10, 2010.

West KeySummary

1    **Products Liability** 🔑 Distributors and Wholesalers

**Products Liability** 🔑 Weapons and Ammunition

**Removal of Cases** 🔑 Improper or Collusive Joinder of Parties

The manufacturer of a stun gun used by police failed to meet its burden to show that a distributor, a resident defendant, had been fraudulently joined by an injured party in order to defeat diversity jurisdiction in a removed products liability action. The manufacturer did not establish that there was no possibility that the injured party would be able to state claims against the distributor under Missouri law. The manufacturer argued that Missouri's "innocent seller" statute precluded the injured party's claims against the distributor because they were based solely on its status as a seller in the stream of commerce. However, the "innocent seller" statute did not affect liability at the pleadings stage, but rather it established an affirmative defense. As an avenue of defense only, the statute had no bearing on whether the injured party stated a cause of action against the distributor, which was the relevant inquiry for fraudulent joinder. V.A.M.S. § 537.762; .

**Attorneys and Law Firms**

William T. Dowd, Alex Lumaghi, Dowd and Dowd, St. Louis, MO, for Plaintiff.

Timothy J. Maher, Barnes and Thornburg, LLP, South Bend, IN, Deanne R. Jockish, Baker and Sterchi, L.L.C., St. Louis, MO, James R. Jarrow, Baker Sterchi Cowden & Rice, LLC, Kansas City, MO, for Defendants.

*MEMORANDUM AND ORDER OF REMAND*

CATHERINE D. PERRY, District Judge.

**\*1** Colin Fahy brought this products liability action in state court after the police electrocuted him with a Taser device. Fahy's petition names the manufacturer of the device (Taser) and the licensed dealer who sold it to the police department (Ed Roehr) as defendants. Taser is a Delaware corporation. Ed Roehr is a Missouri citizen. [1] Fahy, who is also a Missouri citizen, seeks compensatory and punitive damages in his five-count petition. Taser removed the state case to this Court, claiming Roehr was fraudulently joined so this Court has diversity jurisdiction over Fahy's claims. [2] I conclude that there is no fraudulent joinder and complete diversity does not exist. I will grant Fahy's motion to remand.

*Additional Background Facts*

According to Fahy's state-court petition, Taser designs and manufactures the X26 Taser, a "conducted energy device." Ed Roehr sold the X26 Taser to the St. Louis Metropolitan Police Department. On December 7, 2007, St. Louis police officers used the X26 Taser on Fahy, causing him to go into ventricular fibrillation and cardiac arrest. Fahy brings claims against both defendants for design defect (Count I), strict liability - failure to warn (Count II), negligent failure to warn (Count IV), and negligently supplying a dangerous instrumentality for supplier's business purposes (Count V). Fahy's petition also states a separate claim against Taser for negligent design defect (Count III).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 189 of 751
Fahy v. Taser Intern., Inc., Not Reported in F.Supp.2d (2010)
PageID: 11555

*Discussion*

28 U.S.C. § 1441(b) allows a defendant to remove a civil action from state court to federal court based on diversity jurisdiction only if none of the properly joined defendants are citizens of the state on which the original action was filed. Applied here, I lack jurisdiction over this case if one of the defendants is citizen of Missouri. 28 U.S.C. § 1441(b); Hurt v. Dow Chem. Co., 963 F.2d 1142, 1145 (8th Cir.1992). The defendant, as the party invoking jurisdiction, bears the burden of proving that all prerequisites to jurisdiction are satisfied. See In re Business Men's Assur. Co. of America, 992 F.2d 181, 183 (8th Cir.1993). Removal statutes are strictly construed, and any doubts about the propriety of removal are resolved in favor of remand. Transit Cas. Co. v. Certain Underwriters at Lloyd's of London, 119 F.3d 619, 625 (8th Cir.1997).

Removal will not be defeated, however, by collusive or fraudulent joinder of a resident defendant. See Anderson v. Home Ins. Co., 724 F.2d 82, 84 (8th Cir.1983). When a party seeking removal alleges fraudulent joinder, the removing party bears the substantial burden of proving the alleged fraud. See Parnas v. General Motors Corp., 879 F.Supp. 91, 92 (E.D.Mo.1995). To establish that a resident defendant has been fraudulently joined, the removing party must show that: (i) there is no possibility the plaintiff would be able to establish a cause of action against the resident defendant in state court; or (ii) there has been outright fraud in the plaintiff's pleadings of jurisdictional facts. Monroe v. Consolidated Freightways, Inc., 654 F.Supp. 661, 662-63 (E.D.Mo.1987). Any contested fact issues must be resolved in favor of the plaintiff. See id. at 663 (citation omitted).

**\*2** Because Ed Roehr is a citizen of Missouri, this case is not removable under 28 U.S.C. § 1441(b) unless Ed Roehr is fraudulently joined. Here, Taser argues that Ed Roehr's citizenship should be disregarded for removal purposes because Fahy does not have a reasonable basis for asserting claims against the resident defendant in this case. Taser argues that Missouri's "innocent seller" statute, Mo.Rev.Stat. § 537.762, precludes Fahy's claims against Ed Roehr because they are based solely on its status as a seller in the stream of commerce.[3] Fahy's petition alleges that Ed

Roehr transferred the Taser into "the stream of commerce and sold it to the St. Louis Metropolitan Police Department" and then asserts products liability claims against both defendants.

Here, Fahy has stated claims that might impose liability on Ed Roehr under Missouri law. Missouri's "innocent seller" statute, § 537.762, does not affect a defendant's potential liability to a plaintiff at the pleadings stage, but rather it establishes an affirmative defense. See Dorsey v. Sekisui America Corp., 79 F.Supp.2d 1089, 1091 (E.D.Mo.1999). "Under the innocent seller statute, dismissal is proper only where the seller's liability is based solely on its status as a seller in the stream of commerce." Id. "Further, an innocent seller may be dismissed only if another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claims." Id. (internal quotation marks and citation omitted). As Missouri courts have explained. § 537.762 "does not change the substantive law relating to an innocent seller's liability." Malone v. Schapun, Inc., 965 S.W.2d 177, 182 (Mo.Ct.App.1997). "A seller in the stream of commerce is still subject to liability under the doctrine of strict product liability." Id. (citation omitted). As an avenue of defense only, the statute has no bearing on whether Fahy has stated a cause of action against Ed Roehr at the pleadings stage, which is the relevant inquiry for fraudulent joinder. See Dorsey, 79 F.Supp.2d at 1091.

Moreover the innocent seller defense, even if did apply here, has no effect on the status of parties for jurisdiction purposes. According to the statute, "[n]o order of dismissal under this section shall operate to divest a court of venue or jurisdiction otherwise proper at the time the action was commenced. A defendant dismissed pursuant to this section shall be considered to remain a party to such action only for such purposes." Mo.Rev.Stat. § 537 .762(6). Subsection 7 of the statute provides that "an order of dismissal under this section shall be interlocutory until final disposition of plaintiff's claim by settlement or judgment and may be set aside for good cause shown at anytime prior to such disposition." Mo.Rev.Stat. § 537.762(7). Under the statute, Ed Roehr would still be considered a party to the case and would remain potentially liable to Fahy under Missouri law even if it were dismissed under § 537.762(1). See Dorsey, 79 F.Supp.2d at 1092; Pender v. Bell Asbestos Mines, Ltd., 46 F.Supp.2d 937, 940 (E.D.Mo.1999). For these reasons, Taser has not established that there is no possibility that Fahy would be able to state claims against Ed Roehr in state court. As a result, Taser has

failed to meet its burden to show that Ed Roehr, a resident defendant, has been fraudulently joined. *See Moeller v. Ford Motor Co.,* 2008 WL 161905 *1, *5-6 (E.D.Mo. Jan.15, 2008).* This case was improperly removed to federal court, and I am without jurisdiction to hear the case. *See Hurt,* 963 F.2d at 1146.

**\*3** Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to remand [# 14] is granted, and this action is remanded to the Circuit Court for the City of St. Louis under 28 U.S.C. § 1447(c).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 559249

## Footnotes

1   A corporation is deemed a citizen of any state in which it is incorporated and the state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). Here, Fahy's petition alleges-and defendants do not dispute-that Ed Roehr is a Missouri corporation with its principal place of business in Missouri.
2   Ed Roehr joins in the removal.
3   "Section 537.762 provides that a defendant, whose liability is based solely on his status as a seller in the stream of commerce, may be dismissed from a product liability claim if another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claims."

    *Malone v. Schapun, Inc.,* 965 S.W.2d 177, 181 (Mo.Ct.App.1997) (internal quotation marks and citation omitted).

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 19

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 192 of 751
PageID: 11558
Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by MZL Capital Holdings, Inc. v. TD Bank, N.A., D.N.J., August 18, 2015

2012 WL 6596830
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Regina FELDMAN and Lynn Deutsch, individually
and on behalf of others similarly situated, Plaintiffs,
v.
MERCEDES–BENZ USA, LLC,
and Daimler, AG, Defendants.

Civ. No. 2:11–cv–00984 (WJM).
|
Dec. 18, 2012.

**Attorneys and Law Firms**

David A. Mazie, Eric D. Katz, Matthew Ross Mendelsohn, Mazie, Slater, Katz & Freeman, LLC., Roseland, NJ, for Plaintiffs.

Jennifer Marino Thibodaux, Melissa Catherine Dehonney, Michael R. McDonald, Christopher T. Walsh, Gibbons, PC, Newark, NJ, for Defendants.

**OPINION**

WILLIAM J. MARTINI, District Judge.

**\*1** Plaintiffs Regina Feldman ("Feldman") and Lynn Deutsch ("Deutsch") filed this putative class action against Defendants Mercedes–Benz USA, LLC ("MBUSA") and Daimler, AG ("Daimler") (collectively "Defendants"). This matter comes before the Court on motions to dismiss filed by both Defendants, and Defendants' request to strike the class allegations from the Amended Complaint. There was no oral argument. Fed.R.Civ.P. 78(b). For the reasons set forth below, MBUSA's motion to dismiss is **GRANTED** in part, and **DENIED** in part; Daimler's motion to dismiss is **GRANTED** in part, and **DENIED** in part; and Defendants' request to strike Plaintiffs' class allegations is **DENIED**.

**I. BACKGROUND**

This products liability action was filed by Plaintiffs on behalf of themselves, a putative nationwide class, and a California

subclass comprised of current and former Mercedes–Benz vehicle owners and lessees of the following Mercedes vehicle models: 2007–2011 GL Class vehicles, 2006–2011 ML Class vehicles, and 2006–2011 R Class vehicles ("Class Vehicles"). First Amended Complaint ("Amended Complaint" or "FAC") ¶ 1, ECF No. 20. Defendant MBUSA is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at Montvale, New Jersey. FAC ¶ 39. MBUSA is a wholly-owned subsidiary of Defendant Daimler. *Id.* Daimler is a German corporation headquartered in Stuttgart, Germany. *Id.* ¶ 40. Daimler designs and manufactures the Class Vehicles, while MBUSA distributes, services, and warrants them in the United States. *Id* . ¶¶ 42–43.

**A. THE ALLEGED AIR INTAKE SYSTEM DEFECT**

The gravamen of Plaintiffs' Amended Complaint is that the Class Vehicles were equipped with a defective Air Intake System ("AIS"). The AIS provides fresh air from outside the vehicle to be used by the climate control system. *Id.* ¶ 2. Plaintiffs allege that the AIS in the Class Vehicles is defective because it fails to prevent leaves, twigs, and other objects from entering the AIS, causing it to clog. *Id.* The AIS contains a "closedend" drain valve made of a rubber-like material at the bottom of the AIS. *Id* . The material and the shape of the drain valve allegedly cause organic debris to be trapped and clog the valve. *Id.* As a result, during rain or when the vehicle is washed, water builds up in the AIS and enters the Class Vehicles' climate control system and vehicle interior, resulting in substantial electrical failure and damaging to the interior components of the Class Vehicles. These alleged defects are referred to herein as "the AIS Defect."

Plaintiffs allege that the AIS Defect presents a safety hazard and is unreasonably dangerous to consumers because of the danger of catastrophic engine and/or electrical system failure while the vehicle is in operation. *Id.* ¶ 3. Plaintiffs assert that flooding can cause sudden engine failure at any time and under any driving conditions or speeds, including highway speeds, thereby contributing to traffic accidents. *Id.*

**\*2** Plaintiffs allege that, since late 2005, if not before, Defendants knew the Class Vehicles and their AIS were defectively manufactured and/or designed, not fit for their intended purposes, and were an unreasonably dangerous safety risk. *Id.* ¶ 4. Plaintiffs allege that Defendants actively concealed and failed to disclose this defect to Plaintiffs and prospective Class Members at the time of purchase, lease,

repair or thereafter. *Id.* In January 2006, MBUSA issued a Dealer Technical Bulletin ("DTB") to its dealers, stating:

> If you receive customer reports in the
> above model vehicles of tree debris
> collecting in the cowl area or water
> ingress into the interior of the vehicle
> due to the climate unit overflowing, the
> drain valve in the bottom of the climate
> control system air intake should be
> removed. In heavy rain, the water in
> the air intake housing may not drain
> due to the drain valve being blocked
> with debris. This is more common with
> vehicles that are parked under trees
> which shed more leaves, needles etc.

*Id.* ¶ 6. The DTB instructed the dealer to modify the AIS by "remov[ing] the drain valve (star-shaped grommet) from the bottom of the climate unit" ("AIS modification"). *Id.* ¶ 7. The DTB further states, "[t]he allowable labor operations should be used when submitting a warranty claim for this repair," and the DTB provides a damage code for use "[i]n [c]ase of [w]arranty." *Id.*

Plaintiffs allege that Defendants failed to notify owners and lessees of the 2006–2008 Class Vehicles, in maintenance booklets or otherwise, that they had an independent duty to inspect and clean the AIS. *Id.* ¶¶ 32–35. Starting in 2009, MBUSA included in its maintenance schedule for the 2009–2011 Class Vehicles the requirement that they undergo service to "clean water drain in air/water duct" at every "20,000 miles or 2 years." *Id.* However, MBUSA failed to provide the same notice to the owners and lessees of 2006–2008 Class Vehicles, which contain the same parts. *Id.*

Plaintiffs allege that because of Defendants' concealment of the AIS Defect and refusal to cover the AIS modification under warranty, Plaintiffs incurred substantial economic damages.

### B. PLAINTIFF FELDMAN

On November 13, 2008, Plaintiff Regina Feldman purchased a Certified PreOwned 2006 Mercedes–Benz R350 from an authorized Mercedes–Benz dealer, Keyes European, in Van Nuys, California. *Id* . ¶ 20. At the time of purchase the

vehicle was covered under the Certified Pre–Owned 100,000–mile express warranty ("CPO Warranty"). *Id.* On or about December 23, 2010, when her vehicle had approximately 46,000 miles on the odometer, the AIS clogged and water flooded into the interior portion of the vehicle, causing substantial damage to the climate control system, the electrical system, and the carpeting. *Id.* ¶ 21. Feldman discovered the damage when she attempted to use her vehicle and it would not start. *Id.* ¶ 22. She jump started her flooded vehicle and drove it to Keyes European for evaluation. *Id.* Keyes European confirmed her vehicle had the AIS Defect and that it sustained water ingress damage to numerous components, including parts in the electrical system and climate control system, and advised Feldman that the damage was not covered under the terms of her CPO Warranty. *Id.* Feldman was further advised to contact her insurance company and request that the carrier pay for the repairs under her comprehensive and collision insurance coverage. *Id.*

**\*3** Feldman submitted the matter to her insurance company. *Id.* ¶ 23. A January 2, 2011 repair estimate showed $17,061.76 worth of damage as a result of the flooding, and Feldman's insurance company determined that the damage to the vehicle represented a total loss. *Id.* As a result, the insurance company paid Feldman the fair market value of the vehicle, less a $500.00 insurance deductible. *Id.*

### C. PLAINTIFF DEUTSCH

On January 9, 2010, Plaintiff Lynn Deutsch purchased a used 2007 MercedesBenz R350 from a dealer in California with approximately 20,396 miles on its odometer. *Id.* ¶ 25. On or about November 26, 2010, while her vehicle was covered under the New Vehicle Limited Warranty ("NVLW"), Deutsch noticed it would not start. *Id.* ¶ 26. In response, Deutsch jump started the vehicle and brought it to an authorized MercedesBenz dealer, Autobahn Motors in Belmont, California. *Id.* Deutsch was advised that her vehicle's AIS drain was clogged with organic debris, which resulted in water backing up into the AIS and overflowing into the interior of the vehicle. *Id.*

Deutsch's vehicle sustained significant damage, including but not limited to damage to the interior, electrical system, and climate control system. *Id.* ¶ 27. As a result of the damage, it was no longer possible to safely operate the vehicle without it undergoing extensive repairs. Despite the fact that Deutsch's vehicle was still covered under the NVLW, she was advised the repairs would not be covered because the water leak was an "outside influence" not covered under MBUSA's 4–

Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

year/50,000–mile express warranty. *Id.* ¶ 28. Accordingly, she was provided an estimate of $2,280 to repair the damage, including the AIS modification that MBUSA had outlined in its DTB. *Id.*

Deutsch requested that MBUSA repair the damage to her vehicle under the NVLW. *Id.* ¶ 29. In response, MBUSA refused to cover the repair under the NVLW, but offered to provide Deutsch with a "one time goodwill repair to insure client satisfaction" and to charge her only for the parts and not for the labor to perform the repairs. *Id.* ¶ 31. Because Deutsch needed the vehicle repaired, she accepted the offer and paid about $1,033.00 for the repairs. *Id.* The dealer also refused to pay for Deutsch's rental car fees while her vehicle was out of service for approximately 20 days. *Id.*

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff.

*See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998).

**\*4** Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PL–4NCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks

for more than a sheer possibility." *Iqbal,* 129 S.Ct. at 1949 (2009).

Pursuant to Federal Rule of Civil Procedure 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007)

(quoting *Lum v. Bank of America,* 361 F.3d 217, 223–224 (3d Cir.2004)) (internal quotation marks omitted). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation. *Id.*

## III. DISCUSSION

Plaintiffs assert ten causes of action in their Amended Complaint:

(1) Count I: Violation of the New Jersey Consumer Fraud Act ("NJCFA");

(2) Count II: Breach of Express Warranty;

(3) Count III: Breach of the Implied Warranty of Merchantability;

(4) Count IV: Common Law Fraud;

(5) Count V: Breach of the Duty of Good Faith and Fair Dealing;

(6) Count VI: Unjust Enrichment;

(7) Count VII: Violation of California Consumer Legal Remedies Act ("CLRA");

(8) Count VIII: Violation of California Secret Warranty Law ("SWL");

(9) Count IX: Violation of California Unfair Competition Law ("UCL"); and

(10) Count X: Injunctive Relief.

Defendants have moved to dismiss every Count, except for the breach of express warranty claim made by Plaintiff Deutsch. Defendants also seek to strike the class allegations from the Amended Complaint.

Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

The Court will first address choice of law for the asserted claims. The Court will then address the motions to dismiss. Finally, the Court will address Defendants' request to strike the class allegations.

**A. CHOICE OF LAW**

Plaintiffs argue that the Court should apply New Jersey law to the claims asserted on behalf of the putative nationwide class, and California law to the claims asserted on behalf of the putative California subclass. Defendants argue that the Court should apply the law of Plaintiffs' home state—California—to all of Plaintiffs' claims. For the reasons set forth below, the Court finds that the law of each individual's home state should be applied. Accordingly, the Court will apply California law to Plaintiffs' claims.

**\*5** The Court will first address the legal standard governing choice of law, generally. Second, the Court will address considerations governing choice of law analysis on a motion to dismiss. Third, the Court will address choice of law analysis for Plaintiffs' fraud claims. Finally, the Court will address choice of law for Plaintiffs' contract claims.

**i. Choice of Law, Generally**

A federal court sitting in diversity applies the forum state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As such, the Court will apply the choice of law rules of New Jersey.

New Jersey has adopted the "most significant relationship" test of the Restatement of Conflict of Laws. *P.V. v. Camp Jaycee,* 197 N.J. 132, 142–43, 962 A.2d 453 (2008). This test requires a two-step analysis. *Id.* at 143, 962 A.2d 453. The first step is to determine whether an actual conflict of laws exists, for if no conflict exists, the law of the forum state applies. *Id.* Second, if a conflict does exist, the Court must determine which state has the "most significant relationship" to the claim, by "weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action." *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 717 (D.N.J.2011). Choice of law analysis is performed on an issue-by-issue basis. *Id.*

**ii. Choice of Law on a Motion to Dismiss**

Plaintiffs argue that it is premature to conduct a proper choice of law analysis, as the Court does not yet have a full factual record. Due to the factual inquiry that may be necessary to properly weigh the Restatement factors, "it can be inappropriate or impossible for a court to conduct that analysis at the motion to dismiss stage when little or no discovery has taken place." *In re Samsung DLP Television Class Action Litigation,* No. 07–2141, 2009 WL 3584352, at \*3 (D.N.J. Oct.27, 2009). For that reason, courts in this District sometimes defer choice of law analysis until the class certification stage. *See id.* However, "[s]ome choice of law issues may not require a full factual record and may be amenable to resolution on a motion to dismiss." *Harper v. LG Elecs. USA, Inc.,* 595 F.Supp.2d 486, 491 (D.N.J.2009). As such, courts, including the Third Circuit, frequently determine that choice of law analysis in a putative class action can be done at the motion to dismiss stage. *See, e.g., Cooper v. Samsung Elec. Am., Inc.,* 374 F. App'x 250, 255 n. 5 (3d Cir.2010); *Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 699–700 (D.N.J.2011); *Warma Witter Kreisler, Inc. v. Samsung Electronics America, Inc.,* No. 08–5380, 2010 WL 1424014, at \*2 (D.N.J. April 8, 2010).

In this case, deferring choice of law analysis until the class certification stage is unnecessary, as the choice of law issues presented do not require a full factual record.

**iii. Choice of Law for Fraud Claims**

Five Counts of the Amended Complaint sound in fraud: (1) Count I: Violation of the NJCFA; (2) Count IV: Common Law Fraud; (3) Count VII: Violation of the CLRA; (4) Count VIII: Violation of the SWL; and (5) Count IX: Violation of the UCL (together, "Fraud Counts"). For the reasons set forth below, the Court finds that the law of each Plaintiffs' home state governs the Fraud Counts.

**\*6** Under the first step of New Jersey's choice of law analysis, Courts in this District have recognized that the NJCFA materially conflicts with the consumer protection statutes of California, the CLRA and UCL. *Maniscalco v. Brother Int'l Corp. (USA),* 793 F.Supp.2d 696, 704 (D.N.J.2011); *see also Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 461 (D.N.J.2009) ( "*Agostino I* ") (significant conflicts exist between the NJCFA and the consumer protection statutes of other states).

Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

Under the second step of New Jersey's choice of law analysis, the Court considers the factors set forth in the relevant Restatement. Claims sounding in fraud or misrepresentation are governed by Section 148 of the Restatement (Second) of Conflicts of Law. Restatement (Second) of Conflict of Laws § 148 (1971); *see also* 🚩 *Agostino I,* 256 F.R.D. at 462–64 (applying Section 148 to claim for common law fraud and claims under various state consumer fraud statutes).

Section 148 has two subsections, and the parties disagree about which subsection applies. Section 148(1) governs when the defendant "made" the fraudulent representations in the same state in which the consumer relied on the representations. *Agostino v. Quest Diagnostics Inc.,* No. 04–4362, 2010 WL 5392688, at * 16 (D.N.J. Dec.22, 2010) ("*Agostino II* "). Section 148(2) governs when the misrepresentations and the reliance occurred in different states. *Id.* Defendants argue that Section 148(1) applies because any representations were made to Plaintiffs in California and any omitted information would have been communicated to them in California. Plaintiffs argue that Section 148(2) applies because the representations and omissions emanated from MBUSA's headquarters in New Jersey. This Court will follow the Third Circuit and the majority of courts in this District in finding that the alleged representations were "made" at the Defendants' headquarters, not in the consumers' home states. *See, e.g.,* 📙 *Cooper,* 374 F. App'x at 255; 📙 *Nikolin v. Samsung Elecs. Am., Inc.,* No. 10–1456, 2010 WL 4116997, at *3–4 (D.N.J. Oct.18, 2010). Thus, the Court will apply Section 148(2) instead of Section 148(1).

Under Section 148(2), courts consider the following six factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where the tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant. Restatement (Second) of Conflict of Laws § 148(2).

In this case, based on the allegations in the Amended Complaint, the six factors weigh in favor of applying the law of each Plaintiffs' home state. First, the place where Plaintiffs acted in reliance upon Defendants' representations was California. Second, the place where Plaintiffs received the representations was California. Third, the place where MBUSA made the representations was New Jersey, and the place where Daimler made the representations was Germany. Fourth, Plaintiffs reside in California, MBUSA is headquartered in New Jersey and incorporated in Delaware, and Daimler is domiciled in Germany. Fifth, the tangible things which are the subject of the transaction between the parties, namely, the Class Vehicles, were situated in California. Finally, the place where Plaintiffs were to render performance under the contracts which they were induced to enter by the alleged false representations of Defendant was California. Four of the six factors clearly weigh in favor of applying California law; none of the factors clearly weigh in favor of applying New Jersey law. Thus, the Court finds that the Section 148(2) factors weigh in favor of applying the law of Plaintiffs' home state.

**\*7** In holding that the law of Plaintiffs' home state applies, this Court follows a long line of cases in this Circuit holding that a consumer's home state law should apply to transactions that "bear[ ] no relationship to New Jersey other than the location of [the defendant's] headquarters." 📙 *Cooper,* 374 F. App'x at 255; *see also* 📙 *Nikolin,* 2010 WL 4116997, at *4 ("[T]his Court is persuaded by the majority of courts that have held that the location of the manufacturer's headquarters does not supersede the numerous contacts with the consumer's home state"); 🚩 *Agostino I,* 256 F.R.D. at 464 ("The Court concludes that each plaintiff's home state has the most significant relationship to the parties and the issues affecting each plaintiff's [fraud] claims"); 📙 *Warma Witter Kreisler, Inc.,* 2010 WL 1424014, at * 1–2 (allegation that product was designed in New Jersey "does not outweigh other, more significant ties" to plaintiff's home state); 📙 *In re Philips/*

Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

*Magnavox TV. Litig.,* No. 09–3072, 2010 WL 3522787, at *9–10 (D.N.J. Sept.1, 2010) (same).

Plaintiffs rely heavily on 🚩 *In re Mercedes–Benz Tele Aid Contract Litig.,* 257 F.R.D. 46, 55 (D.N.J.2009) (*"Tele Aid "*) to support their argument that MBUSA's headquarters alone should determine the choice of law analysis. However, courts in subsequent cases have declined to follow *Tele Aid,* as it "appears to be the only case from this District to have applied § 148(2) to hold the NJCFA applicable to out-of-state consumers." *Gray v. Bayer Corp.,* No. 08–4716, 2011 WL 2975768, at *6 (D.N.J. July 21, 2011); *see also* 📘 *Nikolin,* 2010 WL 4116997, at *4 (distinguishing *Tele Aid* as the minority view). Plaintiffs also argue that New Jersey has an interest in deterring wrongful activity by New Jersey corporations. Plaintiffs are correct. However, the question here is not whether New Jersey has any interest in this matter at all; it is whether New Jersey has the most significant relationship with this dispute. 📘 *Nikolin,* 2010 WL 4116997, at *4. This Court finds that it does not.

### iv. Choice of Law for Breach of Contract Claims

Four Counts of the Amended Complaint sound in contract: (1) Count II: Breach of Express Warranty; (2) Count III: Breach of the Implied Warranty of Merchantability; (3) Count V: Breach of the Duty of Good Faith and Fair Dealing; and (4) Count VI: Unjust Enrichment (together, "Contract Counts"). For the reasons set forth below, the Court finds that the law of each Plaintiffs' home state governs the Contracts Counts.

Under the first step of New Jersey's choice of law analysis, courts have held that an actual conflict exists between the laws of New Jersey and California governing contract claims. *See Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 720 (D.N.J.2011).* Under the second step, claims sounding in contract are governed Section 188 of the Restatement (Second) of Conflicts of Law. Restatement (Second) of Conflict of Laws § 188; *see also –rlandson,* 📘 792 F.Supp.2d at 704 ("[S]ince breach of express and implied warranty claims sound in contract, courts look to Section 188 of the Restatement to determine which state's law applies"); *Clark v. Prudential Ins. Co. of Am.,* No. 08–6197, 2009 WL 2959801, at *19 (D.N.J. Sept.15, 2009) (Section 188 governs good faith and fair dealing claims); *Feinberg v. Saunders, Karp & Megrue, L.P.,* No. 97–207, 1998 WL 863284, at *7 (D.Del. Nov.13, 1998) (Section 188 governs unjust enrichment claims).

**\*8** Section 188 of the Restatement requires courts to consider: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188. Additionally, courts look to the more general factors set forth in Section 6 of the Restatement: (1) interests of interstate comity, (2) interests of the parties, (3) interests underlying the field of law, (4) interests of judicial administration, and (5) competing interests of the states.

Restatement (Second) of Conflict of Laws § 6; 📘 *P.V. v. Camp Jaycee,* 197 N.J. 132, 962 A.2d 453, 463 (2008).

In this case, the Section 188 factors weigh in favor of applying the law of each Plaintiffs' home state. First, the place of contracting was California. Second, to the extent that any negotiations took place, they took place in California. Third, the place of performance under the contracts was California. Fourth, the Class Vehicles that were the subject matter of the contract were located in California. Finally, Plaintiffs reside in California, MBUSA is headquartered in New Jersey and incorporated in Delaware, and Daimler is domiciled in Germany. Four of the five factors clearly weigh in favor of applying California law; none of the factors clearly weigh in favor of applying New Jersey law. The factors set forth in Section 6 do not change this result. *See Clark v. Prudential Ins. Co. of Am.,* No. 08–6197, 2009 WL 2959801 (D.N.J. Sept.15, 2009) ("the factors of Restatement § 6 do not serve to alter the analysis conducted under Restatement § 188 as to which state has the most significant relationship to the Plaintiffs' [contract] claims"). Thus, the Court finds that the factors weigh in favor of applying the law of Plaintiffs' home state to the Contract Counts.

In holding that the law of Plaintiffs' home state applies, this Court follows other cases in this Circuit holding that warranty claims should be governed by the law of each consumers' home state. *See, e.g.,* 🚩 *Agostino I,* 256 F.R.D. at 465 ("[T]he Court will apply the laws of the prospective Class members' home states because each state has the most significant relationship with the contract claims asserted by their home state plaintiffs."); 📘 *Yocham v. Novartis Pharms. Corp.,* 736 F.Supp.2d 875, 883 (D.N.J.2010).

### B. MOTION TO DISMISS

Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

Plaintiffs assert ten causes of action in the Amended Complaint. Defendants have moved to dismiss every Count, except for the breach of express warranty claim made by Plaintiff Deutsch. The Court will address each Count in turn.

### i. Count I: Violation of the NJCFA

In Count I, Plaintiffs assert a claim for violation of the NJCFA on behalf of the putative nationwide class. Defendants move to dismiss. Because the law of each consumer's home state applies to their consumer fraud claims, the named Plaintiffs cannot invoke the NJCFA on behalf of themselves or the putative nationwide class. Accordingly, the motion to dismiss Count I is **GRANTED,** and Count I is **DISMISSED WITH PREJUDICE.**

### ii. Count II: Breach of Express Warranty

**\*9**  In Count II, both Plaintiffs assert claims against MBUSA for breach of express warranty. Plaintiffs do not assert breach of express warranty claims against Daimler. FAC ¶ 89. MBUSA moves to dismiss the claim asserted by Feldman for breach of the CPO Warranty. MBUSA does not move to dismiss the claim asserted by Deutsch for breach of the NVLW.

The CPO Warranty lists a number of parts from the electrical system and climate control system that are covered under the Warranty and states: "If a Part is Not Listed, It Is Not Covered." McDonald Decl., Ex. 2 at 11. The CPO Warranty does not list the "AIS" as a covered part. *Id.* at 11–14; *see also id.* at 16 ("If a system, item, part, or accessory is not listed ... it is not covered"). The Court recognizes that the AIS is likely comprised of component parts and may not be referred to in the CPO Warranty using the exact words "Air Intake System." That said, the Amended Complaint fails to identify these component parts or link them to the list of parts in the CPO Warranty. Thus, Feldman fails to state a claim for breach of the CPO Warranty.

Feldman also argues that, as a result of damage to the AIS, other covered parts of her vehicle were damaged. However, the CPO Warranty states that "[t]his limited warranty does not cover any consequential or secondary damages that may be suffered as a result of the need to repair or replace a warranted part...." McDonald Decl., Ex. 2 at 16. Feldman therefore cannot recover under the CPO Warranty for any consequential damages.

Accordingly, the motion to dismiss Feldman's claim under Count II is **GRANTED,** and Feldman's claim under Count II is **DISMISSED WITHOUT PREJUDICE.**

### iii. Count III: Breach of the Implied Warranty of Merchantability

In Count III, Plaintiffs assert a claim for breach of the implied warranty of merchantability on behalf of the putative California subclass. Defendants move to dismiss this claim, arguing that Plaintiffs' implied warranty expired before the alleged AIS defect arose. The Court agrees with Defendants.

California's Song–Beverly Consumer Warranty Act ("Song–Beverly Act") provides that, for used cars like Plaintiffs', the duration of the implied warranty of merchantability is in no event "less than 30 days nor more than three months following the sale...." Cal. Civ.Code § 1795.5(c). Feldman bought her vehicle on November 13, 2008, so at the latest, her implied warranty expired three months later on February 13, 2009, yet the alleged flooding incident occurred in December 2010, long after this implied warranty had expired. FAC, ¶¶ 20–22. Deutsch purchased her vehicle in January 2010, yet her water ingress issue occurred more than three months later in November 2010. FAC, ¶¶ 20–22, 25–26. Because Plaintiffs' implied warranties expired before the alleged AIS defect arose, Plaintiffs have failed to state a claim for breach of implied warranty.

Plaintiffs argue that the implied warranty did not expire because the Class Vehicles were defective when sold. However, California courts have held that reading the Song–Beverly Act to encompass such claims would essentially eviscerate the time limits set forth in the Act. *See* *Hovsepian v. Apple, Inc.,* No. 08–5788, 2009 WL 2591445, at \*6–8 n. 7 (N.D.Cal. Aug.21, 2009) (explaining that the plain language interpretation of the Act has been adopted by the vast majority of California courts).

**\*10**  Accordingly, the motion to dismiss Count III is **GRANTED,** and Count III is **DISMISSED WITHOUT PREJUDICE.**

### iii. Count IV: Common Law Fraud

In Count IV, Plaintiff asserts a claim for common law fraud on behalf of the putative nationwide class. Defendants move to dismiss. The Court finds that the motion to dismiss Count IV should be denied.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 199 of 751
PageID: 11565
Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

The elements of fraud in California are: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.,* to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.,* 34 Cal.4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004). Although allegations of fraud must meet the heightened pleading standards of Rule 9(b), plaintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim. *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1098–99 (N.D.Cal.2007).

Plaintiffs adequately state a claim of fraud by omission. They allege specific facts showing Defendants' knowledge and concealment of the alleged defect. They allege that Defendants were obligated to, but did not, disclose specific material facts about the AIS from 2005 onward for specified model years of specified vehicles. They alleged justifiable reliance in that a reasonable customer would not have purchased the car or would have paid less for it had the defect been disclosed, and they allege actual damages for the expense of repairing the AIS and related damage. *See Marsikian v. Mercedes Benz USA, LLC,* No. 08–4876, 2009 U.S. Dist. LEXIS 117012, at \*16–17,2009 WL 8379784 (C.D.Cal. May 4, 2009) (holding similar allegations regarding the AIS Defect to be sufficient under Rule 9(b)); *see also Falk,* 496 F.Supp.2d at 1099. Accordingly, the motion to dismiss Count IV is **DENIED.**

### v. Count V: Breach of the Duty of Good Faith and Fair Dealing

In Count V, Plaintiffs assert a claim for breach of the duty of good faith and fair dealing on behalf of the putative nationwide class. Defendants move to dismiss. Plaintiffs' good faith and fair dealing claim is based on precisely the same conduct alleged to support their other contract claims and fails for the same reasons. *Woods v. Google Inc.,* No. 05:11–1263, 2011 WL 3501403, at \*6 (N.D.Cal. Aug.10, 2011) ("If the allegations in a breach of implied covenant claim do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated").

Further, Plaintiffs fail to allege any contractual relationship with Daimler. Accordingly, the motion to dismiss Count V is **GRANTED,** and Count V is **DISMISSED WITHOUT PREJUDICE.**

### v. Count VI: Unjust Enrichment

In Count VI, Plaintiffs assert a claim for unjust enrichment on behalf of the putative nationwide class. Defendants move to dismiss. California law does not recognize claims for unjust enrichment. *Smith v. Ford Motor Co.,* 749 F.Supp.2d 980, 997 (N.D.Cal.2010); *Melchior v. New Line Prods., Inc.,* 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003) ("[T]here is no cause of action in California for unjust enrichment"). Accordingly, the motion to dismiss Count VI is **GRANTED,** and Count VI is **DISMISSED WITH PREJUDICE.**

### vii. Count VII: Violation of the CLRA

**\*11** In Count VII, Plaintiffs assert a claim for violation of the CLRA on behalf of the putative California subclass. Defendants move to dismiss. The Court finds that the motion to dismiss Count VII should be denied.

"The CLRA proscribes specified 'unfair methods of competition and unfair or deceptive acts or practices in transactions for the sale or lease of goods to consumers.' " *Daugherty v. American Honda Motor Co.,* 144 Cal.App.4th 824, 833, 51 Cal.Rptr.3d 118 (2006) (quoting Cal. Civ.Code § 1770(a)). Such acts and practices include "[r]epresenting that goods ... have characteristics ... which they do not have," Cal. Civ.Code § 1770(a)(5), and [r]epresenting that goods ... are of a particular standard, quality, or grade ... if they are of another," *id.* § 1770(a)(7).

A manufacturer cannot be found liable for an omission under the CLRA absent an obligation to disclose. *See Daugherty,* 144 Cal.App.4th at 835–36, 51 Cal.Rptr.3d 118. "Under California law, there are four circumstances in which an obligation to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *Smith v. Ford Motor Co.,* 749

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 200 of 751
PageID: 11566
Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

F.Supp.2d 980, 987 (N.D.Cal.2010). Plaintiffs allege that the second and third circumstances exist here.

California law recognizes that " 'the purpose of a warranty is to contractually mark the point in time during the useful life of a product when the risk of paying for repairs shifts from the manufacturer to the consumer.' " *Smith,* 749 F.Supp.2d at 988. Thus, "[a] manufacturer's duty to consumers is limited to its warranty obligations absent either [ 1 ] an affirmative misrepresentation or [2] a safety issue." *Oestreicher v. Alienware Corp.,* 322 Fed.Appx. 489, 493 (9th Cir.2009).

In this case, Plaintiffs have adequately pled exclusive knowledge and active concealment. According to the Amended Complaint, Defendants had exclusive knowledge of material facts not known to Plaintiffs, through "pre-release testing data, early consumer complaints about the AIS Defect ... testing conducted in response to those complaints, warranty and post-warranty claims, replacement part sales data, aggregate data from Mercedes dealers, and from other internal sources." FAC ¶ 55. Plaintiffs further allege that Defendants concealed the problem from the general customer base.

Further, drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have adequately pled that the AIS Defect is a safety issue. Plaintiffs allege that the AIS Defect causes sudden and unexpected engine failure that could result in personal injury or death. It is not implausible that the issues that caused Feldman's vehicle to be totaled could give rise to safety concerns. Courts considering similar allegations have reached the same conclusion. *See Marsikian,* 2009 U.S. Dist. LEXIS 117012, at * 16–17,2009 WL 8379784 (C.D.Cal. May 4, 2009) (denying a motion to dismiss a CLRA claim where plaintiff alleged that Mercedes–Benz AIS Defect could cause catastrophic engine and electrical system failure); *Cholakyan v. Mercedes–Benz USA, LLC,* 796 F.Supp.2d 1220, 1236 (C.D.Cal.2011) (allegations of a water leak issue that could lead to sudden and unexpected engine failure resulting in personal injury or death sufficient to state a claim under the CLRA); *Ehrlich v. BMW of North America,* LLC, No. 10–1151, 801 F.Supp.2d 908, 918 (C.D.Cal. Aug.11, 2010).

**\*12** Defendants assert that Plaintiffs fail to state a CLRA claim because they did not enter into transactions with Defendants. However, California courts have held that "a cause of action under the CLRA may be established

independent of any contractual relationship between the parties." *McAdams v. Monier, Inc.,* 182 Cal.App.4th 174, 186, 105 Cal.Rptr.3d 704 (2010).

Accordingly, the motion to dismiss Count VII is **DENIED.**

**viii. Count VIII: Violation of the SWL**
In Count VIII, Plaintiff asserts a claim for violation of the SWL on behalf of the putative California subclass. Defendants move to dismiss. The Court finds that the motion to dismiss Count VIII should be granted.

The SWL provides that "[a] manufacturer shall, within 90 days of the adoption of an adjustment program, subject to priority for safety or emission-related recalls, notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program." Cal. Civ.Code § 1795.92(a); *Smith,* 749 F.Supp.2d at 995. " 'Adjustment program' means any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing ... any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall campaign. 'Adjustment program' does not include ad hoc adjustments made by a manufacturer on a case-by-case basis." Cal. Civ.Code § 1795.90(d).

Here, Plaintiffs allege that the DTB was a secret warranty program, which extended class members' warranties beyond their original limits. However, the plain language of the DTB compels the opposite conclusion: the DTB directs MBUSA dealers to perform the AIS modification under warranty. *See* DTB, FAC Ex. 1 (providing a damage code for use "[i]n [c]ase of [w]arranty," and stating that "[t]he allowable labor operations should be used when submitting a warranty claim for this repair"). The DTB makes no mention of free repairs to vehicles no longer under warranty. Because Plaintiffs failed to allege facts that would support a finding that the DTB extended warranty coverage beyond the original period or constituted an adjustment program, the SWL claim must be dismissed. *See Cholakyan v. Mercedes–Benz USA, LLC,* 796 F.Supp.2d 1220, 1240 (C.D.Cal.2011) (dismissing similar allegations).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 201 of 751
PageID: 11567
Feldman v. Mercedes-Benz USA, LLC, Not Reported in F.Supp.2d (2012)

Accordingly, the motion to dismiss Count VIII is **GRANTED,** and Count VIII is **DISMISSED WITHOUT PREJUDICE.**

### ix. Count IX: Violation of the UCL

In Count IX, Plaintiff asserts a claim for violation of the UCL on behalf of the putative California subclass. Defendants move to dismiss this claim. The Court finds that the motion to dismiss Count IX should be denied.

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof.Code § 17201, 17203. The California Supreme Court has construed the term "unfair competition" broadly. *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) ("[Section 17200's] coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law"). Section 17200 "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Id.*

**\*13** Defendants' challenge to the unfair business practices claim turns on whether the allegations support a duty to disclose known and material defects. For the reasons already stated, Plaintiffs have stated a viable claim of failure to disclose. Further, Plaintiffs seek the injunctive relief afforded by the Act. Thus, they have adequately stated a UCL claim. *See Marsikian,* 2009 U.S. Dist. LEXIS 117012, at \* 16–17, 2009 WL 8379784 (C.D.Cal. May 4, 2009) (denying a motion to dismiss UCL claim based on similar allegations). Accordingly, the motion to dismiss Count IX is **DENIED.**

### ix. Count X: Injunctive Relief

In Count X, Plaintiffs assert a claim for injunctive relief on behalf of the putative nationwide class. Defendants move to dismiss. Injunctive relief is, by definition, a remedy, not a cause of action. *See* UCL, Cal. Bus. & Prof.Code § 17203. Accordingly, the motion to dismiss Count X is **GRANTED,** and Count X is **DISMISSED WITH PREJUDICE.**

### C. REQUEST TO STRIKE CLASS ALLEGATIONS

Defendants move to strike the class allegations from the Amended Complaint under Federal Rule of Civil Procedure 12(f).

Rule 12(f) permits a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Numerous "cases have affirmed that motions to strike should be used sparingly ... generally are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Ehrhart v. Synthes,* No. 07–01237, 2007 WL 4591276, at \*3 (D.N.J. Dec.28, 2007). Similarly, numerous cases in this District have emphatically denied requests to strike class allegations at the motion to dismiss stage as procedurally premature. *See id.; Andrews v. Home Depot U.S.A., Inc.,* 2005 WL 1490474 (D.N.J.2005); *Myers v. Medquist, Inc.,* 2006 WL 3751210 (D.N.J.2006).

Given the early stage of the proceedings, the Court finds that Defendants' request to strike the class allegations is premature. Defendants' the request to strike the class allegations is therefore **DENIED.** Defendants may re-raise their arguments in response to a motion for class certification.

### IV. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are **GRANTED** in part, and **DENIED** in part. Specifically:

- Count I (Violation of the NJCFA), Count VI (Unjust Enrichment), and Count X (Injunctive Relief) are dismissed with prejudice.

- Feldman's claim under Count II (Breach of Express Warranty), Count III (Breach of the Implied Warranty of Merchantability), Count V (Breach of the Duty of Good Faith and Fair Dealing), and Count VIII (Violation of the SWL) are dismissed without prejudice.

- Deutsch's claim under Count II (Breach of Express Warranty), Count IV (Common Law Fraud), Count VII (Violation of the CLRA), and Count IX (Violation of the UCL) will proceed.

**\*14** Defendants' request to strike the class allegations is **DENIED.** An appropriate order follows.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6596830

---

**End of Document**                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 20

2012 WL 1580761
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

In re FEMA TRAILER FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION.

This Document Relates to Member
Cases Referenced in Rec. Docs.
25292, 25293, 25294, 25295, 25296,
25298, 25300, 25301, 25303.

MDL No. 07–1873.
|
May 4, 2012.

**Attorneys and Law Firms**

Gerald Edward Meunier, Justin I. Woods, Gainsbrough,
Benjamin, David, Meunier & Warshauer, New Orleans, LA,
for Plaintiff.

Andrew D. Weinstock Duplass, Zwain, Bourgeois, Morton,
Pfister & Weinstock, Metairie, LA, Adam Michael Dinnell,
Jonathan Richard Waldron, Michelle George Boyle, U.S.
Department Of Justice, Henry Thomas Miller, John Adam
Bain, Washington, DC, Michael David Kurtz, Baker
Donelson Bearman Caldwell & Berkowitz, Ralph Shelton
Hubbard III, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard,
Charles E. Leche, Deutsch, Kerrigan & Stiles LLP, New
Orleans, LA, for Defendants.

***ORDER AND REASONS***

KURT D. ENGELHARDT, District Judge.

**\*1** Before the Court are the following motions:

1) Plaintiffs' Motion to Sever Claims and in the Alternative to
Transfer or Remand (Rec.Doc.**25292**); 2) Plaintiffs' Motion
to Sever Claims and in the Alternative to Transfer or Remand
(Rec.Doc.**25293**); 3) Plaintiffs' Motion to Sever Claims and
in the Alternative to Transfer or Remand (Rec.Doc.**25294**);
4) Plaintiffs' Motion to Sever Claims and in the Alternative to
Transfer or Remand (Rec.Doc.**25295**); 5) Plaintiffs' Motion
to Sever Claims and in the Alternative to Transfer or Remand

(Rec.Doc.**25296**); 6) Plaintiffs' Motion to Sever Claims and
in the Alternative to Transfer or Remand (Rec.Doc.**25298**);
7) Plaintiffs' Motion to Sever Claims and in the Alternative to
Transfer or Remand (Rec.Doc.**25300**); 8) Plaintiffs' Motion
to Sever Claims and in the Alternative to Transfer or
Remand (Rec.Doc.**25301**); and 9) Plaintiffs' Motion to Sever
Claims and in the Alternative to Transfer or Remand
(Rec.Doc.**25303**).

The plaintiffs have filed the instant motions to comply
with the Court's directive in Pre–Trial Order No. 96
(Rec.Doc.24856) that they file Rule 21 motions to sever in
all mixed venue cases, *i.e.,* cases in which plaintiffs with
proper venue in this District are joined with plaintiffs for
whom venue is not proper in this District. The motions
are unopposed, except that Gulf Stream Coach, Inc. ("Gulf
Stream") and Forest River, Inc. ("Forest River") have
informed the Court that they oppose the inclusion of any
language regarding the effect of these direct filings on
the tolling of limitations, such as that which the movants
has requested be included in the Court's order regarding
severance.[1] Even without the defendants' opposition in this
regard, the Court would not have addressed the limitations
issue for the reasons discussed below. The purpose of the
motions is to sever claims with improper venue (against
non-settling defendants) so that they may be transferred to
the proper district pursuant to 28 U.S.C. § 1406(a),[2] in
conjunction with this Court's suggestion of remand as to
unsettled tag-along cases transferred to this Court by the
United States Judicial Panel on Multidistrict Litigation (the
"Judicial Panel") pursuant to 28 U.S.C. § 1407(a) and MDL
Rules 10.1 and 10.2.

The question of prescription (or limitations) has no place in
this process. The plaintiffs knew when they directly filed
these claims in this Court that such direct filing could
potentially affect their substantive rights. This was one of the
reasons that the Court denied the PSC's Motion for Direct
Filing. *See* Rec. Doc. 1186 (denying motion for essentially
the reasons stated in Rec. Doc. 1111); Rec. Doc. 1111 at
17–18 ("Plaintiffs simply cannot argue that experimenting
with direct filing in this case will not potentially alter the
substantive rights of the parties."); *see also In re Heartland
Payment Systs., Inc. Customer Data Sec. Breach Litigation,
MDL No.2046, 2011 WL 1232352 at \*4 (S.D.Tex. Mar.31,
2011)* (although direct filings are provided for under MDL
rules, they "may present jurisdictional, venue, or related
issues"); *In re Vioxx Products Liability Litigation, 478
F.Supp.2d 897, 904 (E.D.La.2007)* (noting that "potential

[choice-of-law] implication of direct filing is one that should be considered by other MDL courts"). While this Court is of the opinion that severance under Rule 21 and subsequent transfer pursuant to section 1406, as such, should serve to preserve the plaintiffs' claims *provided they have not already prescribed or otherwise expired pursuant to the applicable statute of limitation or repose,*[3] the Court expressly makes no comment as to the timeliness of the claims when filed in this Court, the effect of such filing on the running of any limitations period, or any other issue relating to the limitation question.

**\*2**  The timeliness of the movants' claims is not before the Court today. The limitations issue has not been briefed by the movants, and even if it had been, the record is devoid of the facts necessary to decide the multiple questions inherent in the limitations issue as to each of the individual movants, including the question of which state's choice-of-law rules apply, which state's limitations period applies to the individual plaintiff, when the limitations period began to run (and whether it runs against minors), the applicability or not of *contra non valentem* or other equitable tolling, and the effect of the plaintiff's filing of a complaint in this Court. Because these are not common issues, but rather turn on the individual facts of each plaintiff's claim, because venue is not proper here, and because of the posture of this MDL, the question of prescription (limitation) will be litigated, if at all, in the transferee Court, who will likely "apply whatever law it would have applied had the action been properly commenced there." *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1141 (5th Cir.1992).

With regard to the severance issues, the motions are unopposed. However, certain issues remain that render certain of the cases inappropriate for transfer at this time. In particular, cases filed against Stewart Park Homes, Inc. (Rec.Doc.25294), Lakeside Park Homes, Inc. (Rec.Doc.25296), American Camper Manufacturing, LLC (Rec.Doc.25301), and Tom Stinnett Holiday RV Center (Rec.Doc.25298) have been the subject of recent Orders relating to call docket issues, some of which remain unresolved. Likewise, call docket issues remain in certain cases against Mitchell County Industries, LLC, formerly known as Superior Park Model Homes (Rec.Doc.25295), which will be the subject of a future Order. Thus, these motions will be denied without prejudice at this juncture, pending resolution of the remaining call docket issues.

With regard to the motions relating to cases filed against Gulf Stream (Rec.Doc.25292), Forest River (Rec.Doc.25293), Vanguard Industries of Michigan, Inc. (Rec.Doc.25300), and Monaco Coach Corporation (Rec.Doc.24303), the motions will be granted, with the exception of plaintiff's request for commentary regarding the limitations issue. The Court strongly urges counsel for the movants to scrutinize carefully the pleadings it files in accordance with the directions set forth below. In particular, counsel should make absolutely certain that they name in the severed complaints only those plaintiffs for whom venue is improper in this District. Merely because a plaintiff has provided a non-Louisiana address as his or her current address, it does not necessarily follow that venue is improper under 28 U.S.C. § 1391. If a plaintiff's case is improvidently transferred due to mistakes in this regard, the transferee Court understandably may be disinclined to find that a subsequent transfer is warranted "in the interest of justice" under either section 1404(a) or section 1406(a). Further, given that many plaintiffs have asserted duplicative claims in this litigation, it is imperative that counsel make absolutely certain that none of the claims asserted in the new amended complaints were previously asserted in an action that was transferred to this Court by the Judicial Panel pursuant to section 1407(a). If a plaintiff's claims originally came to this Court via transfer by the Panel, rather than by direct filing, then this Court's transfer of the case likely would run afoul of *Lexecon, supra* at note 2.

**\*3**  Once the necessary clerical steps have been completed, the Court will issue an order to show cause why the severed cases should not be transferred forthwith to the districts where venue is proper. Accordingly,

**IT IS ORDERED** that the following motions are hereby **DENIED WITHOUT PREJUDICE:** 1) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25294**); 2) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25295**); 3) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25296**); 4) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25298**); and 5) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25301**).

**IT IS FURTHER ORDERED** that the following motions are hereby **DENIED IN PART,** in that they are denied with respect to the movants' request "that the Court's order provide that the statutes of prescription/limitation for these plaintiffs

were tolled at the time of the filing of the respective original complaints," as stated herein; and **GRANTED IN PART,** in that they are granted in all other respects: 1) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25292**); 2) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25293**); 3) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25300**); and 4) Plaintiffs' Motion to Sever Claims and in the Alternative to Transfer or Remand (Rec.Doc.**25303**).

**IT IS FURTHER ORDERED,** with regard to Rec. Docs. 25292, 25293, 25300, and 25303, that all plaintiffs for whom venue is improper in this District shall, no later than May 14, 2012, file amended complaints. Such amended complaints: (1) shall be filed with the Clerk of Court on paper, not electronically; (2) shall join only plaintiffs for whom venue is proper in the same district (*i.e.,* a separate amended complaint must be filed for each transferee district); and (3) shall be accompanied by (a) a copy of the original complaint in the relevant member case(s), and (b) a copy of this Order and Reasons. Upon such filing, the Clerk will assign a new case number to each Amended Complaint and will allot the case to Section "N" (5) for consolidation with MDL No. 07–1873, *In Re: FEMA Trailer Formaldehyde Products Liability Litigation.* No filing fee shall be required.

**IT IS FURTHER ORDERED** that plaintiffs for whom venue is proper in this District shall not file an amended complaint. The claims of such plaintiffs will be retained in the existing member cases.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1580761

**Footnotes**

1   Plaintiffs ask "that the Court's order provide that the statutes of prescription/limitation for these plaintiffs were tolled at the time of the filing o[f] the respective original complaints." *See, e.g.,* Rec. Doc. 25292–1 at 7.

2   Whereas the remand of transferred cases can be decided only by the Judicial Panel pursuant to section 1407(a), the Panel has held that it does not have the power to transfer cases from the MDL district other than to remand a case pursuant to section 1407(a) to the district from which it was originally transferred by the Panel. *See In re Delta Airline, Inc. Flight Attendant Weight Stds. Litigation,* 411 F.Supp. 795, 797 (J.P.M.L.1976) (Panel did not have power to remand or transfer case that had been transferred to MDL district not by the Panel pursuant to § 1407, but by another district court pursuant to § 1404(a)); *see also* R.P.J.P.M.L. 7.2(a) ("Potential tag-along actions filed in the transferee district do not require Panel action."); Wright, Charles, et al, Federal Practice & Procedure 3d § 3865 at p. 509 (2007 & Supp.2011). Further, section 1406(a) vests the authority to transfer in the district court. Thus, the transfer of these cases will be handled by this Court, rather than by the Judicial Panel. Because these are direct filings rather than tag-alongs transferred to this Court by the Judicial Panel, it does not appear that the Supreme Court's ruling in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) is implicated by this Court's direct transfer of these cases.

3   *See, e.g., Burnett v. New York Ctrl. R.R. Co.,* 380 U.S. 424, 430 & n. 7, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) ("Both federal and state jurisdictions have recognized the unfairness of barring a plaintiff's action solely because a prior timely action is dismissed for improper venue after the applicable statute of limitations has run. In both federal and state systems of justice rules have been devised to prevent this from happening. Thus ... 28 U.S.C. s 1406(a), allows a district court ... to 'transfer such case to any district or division in which it could have been brought.' * * * * Numerous cases hold that when dismissal of an action for improper venue would terminate rights without a hearing on the merits because plaintiff's action would be barred by a statute of limitations, 'the interest of justice' requires that the cause be transferred."); *DirecTV, Inc. v. Leto,* 467 F.3d 842, 845 (3d Cir.2006) ("when a court 'severs' a claim against a defendant under Rule 21, the suit simply continues against the severed defendant in another guise....The statute of limitations is held in abeyance, and the severed suit can proceed so long as it initially was filed within the limitations period."); *Lee v. Cook County,* 635 F.3d 969, 971–72 (7th Cir.2011) (Easterbrook, J.). However, neither section 1406 transfer nor Rule 21 severance operate to cure limitation defects that otherwise exist. *See Crase v. Astroworld, Inc.,* 941 F.2d 265, 267 n. 5 (5th Cir.1991); *Phillips v. Ill. Ctrl. Gulf R.R.,* 874 F.2d 984, 987–88 (5th Cir.1989).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 21

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Stockroom, Inc. v. Dydacomp Development Corp.,
D.N.J., April 24, 2013

2008 WL 4126264
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re FORD MOTOR CO.
E−350 VAN PRODUCTS
LIABILITY LITIGATION (NO. II).

Civ. No. 03−4558 (HAA).
|
MDL No. 1687.
|
Sept. 2, 2008.

**Attorneys and Law Firms**

Daniel R. Lapinski, Esq., Kevin P. Roddy, Esq.,
Jennifer Sarnelli, Esq., Wilentz, Goldman & Spitzer P.A.,
Woodbridge, NJ, Ira Press, Esq., Kirby McInerney, LLP, New
York, NY, for Plaintiffs.

C. Scott Toomey, Esq., Diane L. Scialabba, Esq., Campbell
Campbell Edwards & Conroy, P.C., Woodbury, NJ, Garrett W.
Wotkyns, Esq., S. Bradley Perkins, Esq., O'Melveny & Myers
LLP, Washington, D .C., James D. Smith, Esq., Meridyth M.
Andresen, Bryan Cave LLP, Phoenix, AZ, for Defendant.

**_OPINION & ORDER_**

ACKERMAN, Senior District Judge.

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | Background .................... | | *3* |
| II. | Analysis ...................... | | *5* |
| A. | Choice of Law ................ | | *6* |
| B. | Presence of an Express Warranty .............. | | *7* |
| C. | Express and Implied Warranties: Pre–Litigation Notice .......... | | *11* |
| | 1. | Alabama ................ | ............. *14* |
| | 2. | Arkansas ................ | ............. *18* |
| | 3. | California. ................ | ............. *20* |
| | 4. | Illinois ................ | ............. *23* |
| D. | Express and Implied Warranties: Actual Injury ............ | | *26* |
| | 1. | California ................ | ............. *27* |
| | 2. | New Jersey ................ | ............. *29* |
| E. | Express and Implied Warranties: Time Bar ............... | | *31* |
| F. | Implied Warranty ................ | | *37* |
| | 1. | Implied Warranty: Failure to Allege Lack of Merchantability ................ | ............. *38* |
| | 2. | Implied Warranty: Durational Limitations ................ | ............. *39* |
| G. | Unjust Enrichment ................ | | *41* |

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

H.   State Consumer Fraud ................                                      *43*

1.   Alabama ................                                          .............. *44*

2.   Arkansas ................                                         .............. *44*

3.   California ................                                       .............. *46*

     a.   The California UCL................................................   *46*

     b.   The CaliforniaFAL................................................   *49*

     c.   The California CLRA................................................   *50*

4.   Illinois ................                                          .............. *51*

5.   New Jersey ................                                        .............. *53*

III.   Conclusion and Order ................                           *58*

**\*1** Before the Court is a motion (Doc. No. 33) by Defendant Ford Motor Company ("Ford") to dismiss the Consolidated and Amended Class Action Complaint in this multidistrict litigation. For the reasons set forth below, Defendant's motion to dismiss will be granted in part and denied in part.

## I. Background

On June 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL Panel") transferred five actions[1] to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Ford Motor Co. E–350 Van Prods. Liab. Litig. (No. II),* 374 F.Supp.2d 1353 (J.P.M.L.2005). Following the transfer to this Court, Plaintiffs filed on January 1, 2006, a Consolidated and Amended Class Action Complaint ("Complaint"). In the Complaint, Plaintiffs allege that their Ford E–350 "15–passenger" vans are defectively designed due to a high center of gravity that leads to an unusually high rollover rate, and therefore an increased risk of death or injury. No Plaintiffs or members of the proposed class have actually suffered a rollover. Plaintiffs, however, claim economic harm because the alleged defect makes the E–350 vans unsuitable and unfit for transporting 15 passengers.

Plaintiffs bring the following causes of action: (1) breach of express warranty; (2) breach of implied warranty; (3) unjust enrichment; and (4) violation of state consumer fraud statutes. Specifically, Plaintiffs seek damages for the alleged diminution in value of their vehicles as a result of the vehicles' alleged defects; the cost of purchasing or leasing additional vehicles and of training drivers; equitable relief requiring Ford to correct the alleged defect and enjoining Ford from selling any more extended passenger vans unless the alleged defect is corrected; restitution; disgorgement of revenues; and applicable statutory damages.

The Complaint asserts claims on behalf of eight named Plaintiffs, including: New Bethlehem Baptist Church (Alabama) ("New Bethlehem"), Eleventh Street Baptist Church (Arkansas) ("Eleventh Street"), Greater All Nation Pentecost Church of Jesus Christ (California) ("Greater All Nation"), Pentecostal Temple Church (Illinois) ("Pentecostal"), Faith Tabernacle Church (New Jersey) ("Faith Tabernacle"), Macedonia Free Will Baptist Church (New Jersey) ("Macedonia Free Will"), Greater Holy Trinity Baptist Church (New Jersey),[2] and Social Clubhouse, Inc. (New Jersey). The Complaint also asserts claims on behalf of a putative nationwide class that includes: "all persons and entities who purchased or otherwise lawfully acquired E350 '15–passenger' vans (a/k/a E350 Super Club Wagons, Econoline '15–passenger' vans, or E350 Super Duty Extended Length passenger vans) manufactured by Defendant Ford Motor Company ... model years 1991–2005, and who reside in the fifty states and/or the District of Columbia." (Compl.¶ 1.) This class includes persons or entities who purchased new or used vans between January 1, 1991 and the date of the filing of the Complaint, inclusive. The proposed class, however, specifically excludes those who claim damages for personal injury as a result of purchasing or leasing a Ford E350 van. (Compl.¶ 63.)

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

## II. Analysis

**\*2** Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint, or a count therein, for failure to state a claim upon which relief may be granted. In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court "must accept as true all well-pleaded allegations of the complaint [ ] and construe them liberally in the light most favorable to the plaintiffs." *Labov v. Lalley,* 809 F.2d 220, 221 (3d Cir.1987). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1964–65 (2007) (internal citations omitted). A complaint must contain "enough facts to state a claim to relief that is plausible on its face," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 127 S.Ct. at 1965, 1974. A court need not accept " 'unsupported conclusions and unwarranted inferences,' " *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007) (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.,* 113 F.3d 405, 417 (3d Cir.1997)), and "[l]egal conclusions made in the guise of factual allegations ... are given no presumption of truthfulness," *Wyeth v. Ranbaxy Labs., Ltd.,* 448 F.Supp.2d 607, 609 (D.N.J.2006) (citing *Papasan v. Attain,* 478 U.S. 265, 286 (1986)).

As a general rule, a court "may only consider the pleading which is attacked by an FRCP 12(b)(6) motion in determining its sufficiency." *Pryor v. NCAA,* 288 F.3d 548, 560 (3d Cir.2002). However, a court "may consider documents which are attached to or submitted with the complaint, as well as legal arguments presented in memorand[a] or briefs and arguments of counsel." *Id.* (emphasis omitted).

### A. Choice of Law

At the outset, this Court must determine which law to apply to Plaintiffs' claims. When a federal court is called upon to decide matters of state law, it must apply the choice-of-law rules of the state in which its sits. *Klaxon v. StentorElec. Mfg. Co.,* 313 U .S. 487, 496 (1941). "New Jersey choice of law principles require an interest analysis, in which the forum court compares the interests of the states whose laws are potentially involved in the underlying action and determines which state has the greatest interest in having its law applied."

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 347–48 (D.N.J.1997) (citing *Gantes v. Kason Corp.,* 145 N.J. 478 (1996)).

Ford maintains that the laws of each Plaintiff's home state must be applied because those states have interests that outweigh the interests of any one state, such as Michigan, where the E350s were designed and manufactured. In their pleading, Plaintiffs assert that "all 50 states and the District of Columbia" provide consumer protection laws, but in the alternative, Plaintiffs plead, if any one jurisdiction's law applies, that it is Michigan, "the state in which Ford is headquartered." (Compl.¶¶ 73, 96.) In their brief, Plaintiffs do not otherwise seriously contest Ford's choice of law argument, citing law from all five jurisdictions where Plaintiffs reside in discussing Plaintiffs' claims on the merits.

**\*3** The Court agrees with Ford. As another court in this District determined upon similar facts:

> Each plaintiffs home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws.

> These interests arise by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective vehicles or the place where plaintiffs' alleged damages occurred.

> While it might be desirable, for the sake of efficiency, to settle upon one state—like Michigan or New Jersey— and apply its laws in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class member's case before certification. Since the laws of each of the fifty states vary on important issues that are relevant to plaintiffs' causes of action and defendants' defenses, the court cannot conclude that there would be no conflict in applying the law of a single jurisdiction, whether it be Michigan, or New Jersey, as the plaintiffs suggest. Thus, the court will apply the law of each of the states from which plaintiffs hail.

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. at 348. Similarly, this Court concludes that the states in which the plaintiffs reside have a greater interest in the underlying litigation than Michigan or any one state. The named plaintiffs bringing the Complaint are residents of Alabama, Arkansas, California, Illinois, and New Jersey. Except where there is no material difference, the Court "will apply the law of those states to determine whether the

causes of action brought by these named plaintiffs are legally cognizable." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* Nos. 96–3125, –1814, –3198, 2001 WL 1266317, at *5 (D.N.J. Sept. 30, 1997).

### B. Presence of an Express Warranty

In the First Cause of Action of their Complaint, Plaintiffs allege breach of express warranty under UCC § 2–313, as codified by each of the states at issue. According to Plaintiffs, with each sale of an E350 van, Ford expressly warranted by its representations that the van could "legally and practically" accommodate "15–passenger[s.]" (Compl.¶ 78.) In turn, Ford breached its warranty by selling a defective vehicle which could not safely transport 15 passengers. (*Id.* ¶ 79.)

In the instant motion to dismiss, Ford asserts that Plaintiffs have failed to properly allege the existence of any specific statement or affirmation that could support an express warranty claim. Ford argues that many of the statements that Plaintiffs allege were made by Ford occurred after Plaintiffs had already purchased their respective vehicles, and thus could not have formed the basis for Plaintiffs' respective bargains. Although Plaintiffs cite many of Ford's advertisements and public statements, Ford insists that such advertisements could not create express warranties. In particular, Ford argues that its statements that the E350 van "is a very safe vehicle," and that the E350 van is "America's Most Trustworthy" constitute "classic examples of non-actionable opinion," or puffing. (Def.'s Br. at 16.) Notably, Plaintiffs do not suggest otherwise. And courts have routinely deemed such statements non-actionable. *See, e.g., Lithuanian Comm. Corp., Ltd. v. Sara Lee Hosiery, 214 F.Supp.2d 453, 459 (D.N.J.2002)* ("[I]n contracts for the sale of goods governed by New Jersey's U.C .C., a seller's statement about the value of goods cannot create a warranty."); *Haskell v. Time, Inc., 857 F.Supp. 1392, 1399 (E.D.Cal.1994)* ("Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery."); *Avery v. State Farm Mat. Auto. Ins. Co., 835 N.E.2d 801, 847 (Ill.2005)* ("Describing a product as 'quality' or as having 'high performance criteria' are the types of subjective characterizations that Illinois courts have repeatedly held to be mere puffing."); *Mason v. Chrysler Corp., 653 So.2d 951, 953–54 (Ala.1995)* (holding that a national advertising campaign referring to a vehicle's quality engineering, reliability and smooth riding was puffing); *Cornish v. Friedman, 126 S.W. 1079, 1083 (Ark.1910)* ("[M]ere words of praise and commendation or which merely

express the vendor's opinion, belief, judgment, or estimate, do not constitute a warranty.").

**\*4** Plaintiffs, however, do not concede Ford's argument in full. Instead, Plaintiffs pin their express warranty claim on Ford's purported "core description" of the E350 van as a "15–passenger van." Plaintiffs argue that "Ford does not deny that it advertised, described and labeled the E350 as a 15–passenger van .... Indeed, Ford, simply by the act of outfitting the E350 with seats for fifteen passengers, expressly warrants that the van is in fact capable of transporting 15 passengers." (Pls.' Br. at 9.) Because the E350 vans "could not safely carry 15 passengers," Plaintiffs argue, Ford's express warranty that the vehicles were "15–passenger" vans was breached.

Section 2–313 of the UCC recognizes three general classes of statements or representations by which a seller may create an express warranty:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See* Ala.Code § 7–2–313(1); Ark.Code Ann. § 4–2–313(1); Cal. Com.Code § 2313(1); Ill. Comp. Stat. Ann. § 5/2–313(1); N.J.S.A. § 12A:2–313(1). Importantly, under the UCC, "[i]t is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." *See, e.g.,* N.J.S.A. § 12A:2–303(2). However, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.*

Plaintiffs sufficiently allege that Ford's description of the E350 as a "15–passenger" van constitutes an express warranty under UCC § 2–313. First, accepting Plaintiffs' allegations as true, Ford's representation that the E–350 van was capable of transporting 15 people was not a subjective statement relating to the good's value, but rather an objective representation warranting the van's design and safety. Second, this Court

Case 1:19-md-02875-BMB-SAK    Document 577-3    Filed 09/18/20    Page 212 of 751
PageID: 11578
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

observes that whether a given statement constitutes an express warranty is normally a question of fact for the jury. *See Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1130 (7th Cir.1994)* ("[Defendant] does not challenge the jury's determination that [its] representation as to the relative range of the CitationJet constituted an express warranty."); *Union Ink Co., Inc. v. AT & T Corp.,* 352 N.J.Super. 617,645 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact."); *Lucky Mfg. Co. v. Activation, Inc.,* 406 So.2d 900, 905 (Ala.1981) (recognizing that jury found express warranty as to written representation); *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 60 (1963) ("The jury could also reasonably have concluded that statements in the manufacturer's brochure ... constituted express warranties"); *Cornish,* 126 S.W. at 1083 ("[W]hether a particular assertion is an affirmance of a positive fact, or, on the other hand, only praise and commendation, opinion or judgment, is a question for the jury, where the meaning is ambiguous, and the intention of the parties may be gathered from the surrounding circumstances.") (citation omitted).

**\*5** Here, several issues cannot be resolved on a motion to dismiss, including: whether Ford's description of the E350 van as a "15–passenger" van or Ford's outfitting the vans with seats for 15 passengers independently supports an express warranty; if so, whether any such warranty was the basis of the bargain between Plaintiffs and Ford; and whether Ford breached any such warranty. Therefore, this Court will deny Ford's motion to dismiss Plaintiffs' express warranty claims.

## C. Express and Implied Warranties: Pre–Litigation Notice

Ford argues that the breach of express and implied warranty claims asserted by Plaintiffs New Bethlehem (Alabama), Eleventh Street (Arkansas), Greater All Nation (California), and Pentecostal Temple (Illinois) must be dismissed based upon Plaintiffs' failure to allege compliance with the notice requirement of section 2–607(3)(a) of the Uniform Commercial Code.[3]

Defendant asserts that the laws of Alabama, Arkansas, California, and Illinois require a buyer, prior to the filing of a complaint, to notify a seller that there has been a breach; failure to provide such notice serves as a bar to suit. *See Hart v. Yamaha–Parts Distribs., Inc.,* 787 F.2d 1468, 1474 (11th Cir.1986); *Fieldstone Co. v. Briggs Plumbing Prods. Inc.,*

62 Cal.Rptr.2d 701, 708–709 (Cal.Ct.App.1997); *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 590 (Ill.1996); *Williams v. Mozark Fire Extinguisher Co.,* 888 S.W.2d 303, 305–06 (Ark.1994); *Parker v. Bell Ford, Inc.,* 425 So.2d 1101, 1103 (Ala.1983).

Nowhere in the Complaint does any Plaintiff plead that it provided direct notice of the alleged breach to Defendant or any immediate seller of the vehicles. However, according to Plaintiffs, the pre-litigation notice requirements of the state statutes at issue were satisfied because: (1) Ford had actual notice of the alleged defect of the E350 van model generally; (2) Ford had constructive notice of the alleged defect based upon the filing of the complaint; (3) Ford failed to allege any prejudice due to any lack of notice; and (4) the sufficiency of Plaintiffs' notice is a question of fact not to be decided on a motion to dismiss. (Pls.' Br. at 33–36.) For the reasons discussed below, this Court will grant Defendant's motion to dismiss for failure to plead pre-litigation notice as to the Plaintiffs from Alabama, Arkansas and Illinois, but not as to the California Plaintiff. The breach of warranty claims that are dismissed are done so without prejudice and with leave to amend. If Plaintiffs from Alabama, Arkansas and Illinois can allege that they provided pre-litigation notice to Ford in any way recognized under the respective laws of those states, they may do so in an amended complaint.

The pre-litigation notice requirement stems from § 2–607(3) of the Uniform Commercial Code, which provides: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." This language has been adopted in the codes of each state at issue. Ala.Code § 7–2–607(3)(a); Ark.Code Ann. § 4–2–607–(3)(a); Cal. Com.Code. § 2607(3)(A); 810 Ill. Comp. Stat. 5/2–607(3)(a).

**\*6** The notice requirement of § 2–607(3)(a) is supported by a number of justifications, such as to prevent stale claims, allow sellers to marshal evidence for a defense, and allow sellers to correct the defect or mitigate damages. *See Hobbs v. Gen. Motors Corp.,* 134 F.Supp.2d 1277, 1283 (M.D.Ala.2001); *Jackson v. Swift–Eckrich,* 830 F.Supp. 486, 491 (W.D.Ark.1993); *Goldstein v. G.D. Searle & Co.,* 62 Ill.App.3d 344, 350 (Ill.App.Ct.1978), *holding limited by Bd. of Educ. of City of Chicago v. A, C & S, Inc.,* 131 Ill.2d 428,462 (Ill.1989); *Pollard v. Saxe & Yolles Dev. Co.,* 525 P.2d 88, 92 (Cal.1974).

With this background in mind, the Court first considers Plaintiffs' contention that direct notice of the breach of warranty should be excused because Ford had actual notice of the alleged defects of the E350 vans. Specifically, Plaintiffs allege that Ford was "fully aware of the alleged defect from the earliest stages of the E350's development, [and] was further warned by the NTSB and NHTSA, to which agencies the Defendant gave extensive responses." (Pls.' Br. at 33.) To be sure, Plaintiffs' Complaint alleges numerous occasions upon which Defendant likely became aware of the possibility that its E350 vans contained design defects. (Compl.¶¶ 21– 55.) For example, Plaintiffs allege that in April 2001, the NHTSA released a study that found that " '15–passenger' vans manufactured and sold by Ford, when loaded with ten or more occupants, exhibited a rollover rate in single vehicle crashes (crashes in which no other vehicle was involved) that was nearly three times the rate of crashes involving vehicles that were 'lightly loaded' (i.e., having just a driver and no passengers)." (*Id.* ¶ 28.) Plaintiffs also allege that in an April 2002 recommendation to consumers, the NHTSA announced that 15–passenger vans should be operated only by specially trained, experienced drivers, rather than ordinary or unskilled drivers. (*Id.* ¶ 31 .) According to Plaintiffs, Ford issued a September 5, 2002 press release in response to this NHTSA recommendation in which Ford asserted that the E350 vans were "very safe" vehicles, yet "warned its E350 van customers that 'it is important that 15–passenger vans be operated by trained, experienced drivers,' that drivers should avoid 'sharp turns' and 'abrupt maneuvers,' and that 'extra precautions should be taken.' " (*Id.*) Plaintiffs assert that on two occasions in 2002, the alleged hazards of Ford's E350 vans were the subject of segments on the television program "60 Minutes II." (*Id.* ¶¶ 38, 61.) Based upon these alleged events, among others, Plaintiffs insist that Defendant had actual, if not direct, notice of the alleged defects.

Plaintiffs contend that in a "majority of cases," actual notice sufficiently complies with the notice requirement of UCC § 2–607(3). (Pls.' Br. at 33 (citing James J. White & Robert S. Summers, Uniform Commercial Code 611 n.1 (4th ed.1995); U.C.C. § 1–201(25).)[4] However, whether there exists a majority or minority position regarding the purpose of the UCC's notice requirement is of limited value. This Court is not writing on a blank slate; it must canvas the interpretation of the pre-litigation notice requirement in Alabama, Arkansas, California, and Illinois. As discussed above, choice-of-law analysis requires that this Court render a decision in accordance with the prevailing law of the

appropriate forum state. Accordingly, the Court turns to an analysis of the laws in the four states at issue.

**1. Alabama**

**\*7** This Court finds that Alabama Plaintiff New Bethlehem failed to comply with the notice requirement. Defendant asserts that New Bethlehem's warranty claims are barred because the Complaint fails to allege compliance with Alabama Code § 7–2–607(3)(a), which describes a buyer's obligation upon learning of a defect in a product he has accepted:

> (3) Where a tender has been accepted: (a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of the breach or be barred from any remedy[ .]

Ala.Code § 7–2–607(3)(a). The Alabama Supreme Court has recognized that, although this provision "does not indicate what constitutes sufficient notice," the corresponding Committee Comment states that "[t]he notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." *Jewell v. Seaboard Indus., Inc.,* 667 So.2d 653, 660 (Ala.1995) (citing Ala.Code § 7–2–607 cmt 4). The Court noted that UCC § 7–1–201(26) "provides that a person 'notifies or gives a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.' " *Id.* Further, "[t]he question of sufficient notice 'must be tested in light of the facts of the particular case.' " *Id.*

The Alabama Supreme Court has recognized that pre-litigation notice, as required by Alabama Code § 7–2–607(3)(a), is a "condition precedent to recovery" for a breach of warranty action. *Parker,* 425 So.2d at 1102; *see also Hart v. Yamaha–Parts Distribs., Inc.,* 787 F.2d 1468, 1474 (11th Cir.1986) ("The Alabama courts have held that notice of breach is a condition precedent to bringing a breach of warranty action ... which must be affirmatively pleaded in the complaint.") (citations omitted).

However, in certain circumstances, such as personal injury actions, the notice requirement for asserting warranty claims has been abrogated by Alabama courts. *Hobbs,* 134 F.Supp.2d at 1283 (citing *Simmons,* 368 So.2d 509 (Ala.1979)). The court's departure in certain circumstances from strict enforcement of the UCC notice requirement evinces a policy on the part of the Alabama Supreme Court to evaluate

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

the underlying justifications for notice in a given case. *See* *Hobbs,* 134 F.Supp.2d at 1284. For example, according to the Alabama Supreme Court, the policies which support the notice requirement are not applicable to personal injury actions where "notice is inconsequential in preventing or mitigating the harm since the injury has already occurred." *Simmons,* 368 So.2d at 514.

Following a detailed discussion of the treatment by Alabama courts of the notice requirement under § 7–2–607(3)(a), a district court in Alabama held in *Hobbs* that a breach of warranty action against a car manufacturer was barred for failure to give timely notice. The court in *Hobbs* acknowledged that another district court in Alabama had previously determined "albeit in dicta, that under Alabama law, if a plaintiff is a buyer, and not a third party beneficiary of a consumer warranty, the plaintiff must notify the seller of an alleged breach of warranty before being allowed to pursue a warranty action against the remote manufacturer." *Id.* at 1286 (citing *Snell v. G.D. Searle & Co.,* 595 F.Supp. 654 (N.D.Ala.1984)). Further distilling this idea, the court in *Hobbs* determined that under Alabama law:

> **\*8** for remote manufacturers to be held liable for an unintentionallycreated express warranty, as are sellers under the UCC, remote manufacturers should be afforded the same protections as sellers, either by way of notice provided directly to them, or through notice provided to them by the direct seller from the buyer.

*Id.* at 1285. Therefore, the notice requirement applies to suits against car manufacturers, like Defendant Ford in the instant matter, as it does to sellers.

Notably, the court recognized that the Alabama Supreme Court's decision in *Parker* stands for the proposition that "in the context of economic harm rather than personal injury, the filing of a lawsuit is not considered to be sufficient notice under Alabama law." *Id.* at 1285 ("Notice must, therefore, precede the filing of the complaint."); *see also Rampey v. Novartis Consumer Health, Inc.,* 867 So.2d 1079, 1086 (Ala.2003). Hence, New Bethlehem's argument that notice-by-suit is sufficient under Alabama's notice requirement is without merit.

The court in *Hobbs* recognized that as a general matter, "the issue of sufficiency of notice is a question of fact for a jury to determine. Where, however, no notice is given, there is no issue of sufficiency for a jury to determine." *Id.* (citing *Parker,* 425 So.2d at 1103). In other words, where no form of notice recognized under Alabama law is given, the issue of *sufficiency* of notice need not be determined by a jury; logically, no notice is insufficient notice. *See id.* at 1286 n.3. Thus, the issue remains one of law, not fact, and this Court may properly address the issue of notice on the instant motion to dismiss.

As noted above, Plaintiff New Bethlehem also challenges a strict application of the notice requirement under Alabama law where a defendant has "actual notice" of an alleged defect. According to Plaintiff New Bethlehem, "[a]ll that is required is that the seller know that the transaction is still troublesome and must be watched." (Pls.' Br. at 33– 34 (internal quotation marks omitted).) There are several problems with Plaintiffs argument. Plaintiff New Bethlehem does not allege that Ford, or any immediate seller of its E350 van, knew that New Bethlehem's specific "transaction" was "troublesome and must be watched." Additionally, the statement that "actual notice is sufficient to satisfy 2–607" is correct, but in a limited context. After a careful inspection of the treatise to which Plaintiff cites, and specifically the footnote in which the authors suggest that a "majority of cases find actual notice to suffice," this Court is not persuaded that the Alabama Supreme Court would recognize such an exception to the notice requirement as Plaintiff New Bethlehem now pursues. First, the authors rely on no Alabama case to support this proposition.[5] Second, in no case relied upon by the authors does a court hold that absent knowledge of problems with the product of a specific transaction, a manufacturer's general awareness of an alleged defect with a product line satisfies the notice requirement of § 2–607(3)(a). Recognition of "actual notice" as an exception to the notice requirement, in the cases cited by the authors, and in every other case applying Alabama law of which this Court is aware, is limited to situations where a seller has actual knowledge of the defect of the product sold in a *particular transaction,* prior to the filing of a lawsuit. Contrary to Plaintiffs' argument, generalized knowledge of alleged defects in a product line has not been held to suffice.

**\*9** Evidently, prior to filing suit, New Bethlehem took no steps to notify Defendant regarding the alleged breach of warranties, or any problem it was having in connection with its E350 van. As such, Defendant was not "afforded the same protections" under the UCC as are provided for sellers. *See Hobbs,* 134 F.Supp.2d at 1285. Given its importance, this Court is not persuaded that the Alabama Supreme Court would create an exception to the notice requirement that exonerates plaintiffs from taking any affirmative steps to notify a seller that a particular transaction is problematic

prior to bringing a claim for breach of warranty. Similarly, this Court is not persuaded that the Alabama Supreme Court would waive the notice requirement where a defendant does not allege prejudice.

Therefore, New Bethlehem's claims for breach of warranty will be dismissed without prejudice. If New Bethlehem can allege that it provided pre-litigation notice to Ford in any way recognized under Alabama law, it may do so in an amended complaint.

### 2. Arkansas

Defendant argues similarly that Arkansas Plaintiff Eleventh Street's warranty claims are barred for failure to allege compliance with Arkansas Code § 4–2–607(3)(a), which provides that a "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." For the following reasons, this Court agrees with Defendant and will dismiss without prejudice Eleventh Street's warranty claims.

Plaintiff Eleventh Street's argument that notice by complaint satisfies the notice requirement under Arkansas law is without merit. *See Williams v. Mozark Fire Extinguisher Co.,* 888 S.W.2d 303, 306 (Ark.1994) ("[N]otice must be more than a complaint."); *see also Jackson,* 830 F.Supp. at 491 (W.D.Ark.1993) (recognizing that although "notice need not be in writing," it nevertheless "must be more than a complaint"). The more difficult question, however, is whether the Supreme Court of Arkansas would recognize other exceptions to the pre-litigation notice requirement, such as actual notice. As a district court in Arkansas noted: "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *Jackson,* 830 F.Supp. at 491. Here, the Court is unable to evaluate the "content of the notification," *i.e.,* whether Eleventh Street included a claim for damages, threatened litigation, or other resort to remedy, because Eleventh Street does not allege that it provided Defendant with *any* notification. Thus, prior to filing the Complaint, Plaintiffs pursued no course of communication that would have "open[ed] the way for negotiation of a normal settlement." *Id.*

In addition, the Arkansas Supreme Court has recognized that the purpose of the statutory notice requirement for breach "is twofold." *Mozark Fire Extinguisher,* 888 S.W.2d at 306. "First, it is to give the seller an opportunity to minimize damages in some way, such as by correcting the defect.

Second, it is to give immunity to a seller against stale claims." *Id.* (citing *LA. Green Seed,* 438 S.W.2d at 720). Although the seller in *Mozark Fire Extinguisher* could no longer minimize damages because the system was destroyed, the Court noted that the "other statutory purpose," *i.e.,* immunity against stale claims, "is present." *Id.* Thus, the Court declined to ignore the statutory requirement. *See id.*

**\*10** Here, unlike the destroyed fire extinguishing system in *Mozark Fire Extinguisher,* Eleventh Street alleges no comparable injuries to itself as a result of the E350 vans' alleged defect. Therefore, the first statutory purpose recognized by the Arkansas Supreme Court—providing a seller an opportunity to minimize damages in some way, such as by correcting the defect—remains present. Although the notice requirement under Arkansas law is "not stringent," *Jackson,* 830 F.Supp. at 491, for similar reasons as discussed above with respect to Alabama law, this Court is not persuaded that the Arkansas Supreme Court would adopt an exception based on a manufacturer's general awareness of the alleged warranty breaches for an entire line of products. This Court is aware of no case applying Arkansas law that requires, or even suggests, such an application of the statutory notice requirement of § 4–2–607(3)(a). Likewise, this Court is not persuaded that the Arkansas Supreme Court would waive the notice requirement where a defendant does not allege prejudice.

Plaintiff Eleventh Street also asserts that the question of sufficiency of notice "for purposes of § 4–2–607(3)(a), is a question of fact, inappropriate to be decided on a motion to dismiss ." (Pls.'s Br. at 35 (citing *Jackson,* 830 F.Supp. at 491).) But, as discussed above, where a plaintiff alleges no pre-litigation notice at all, the issue of the notice's sufficiency is moot and appropriately can be decided as a matter of law at this stage. Eleventh Street's claims for breach of warranty will be dismissed without prejudice.

### 3. California

Under California Commercial Code § 2607(3)(A), a "buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." In certain circumstances, the Supreme Court of California has excused the notice requirement. For instance, in *Greenman v. Yuba Power Products,* a plaintiff who had been injured while using a power tool brought claims for breach of warranty against the retailer and manufacturer of the tool. 377 P.2d 897, 888 (Cal.1963). The injured plaintiff actually provided the

Case 1:19-md-02875-BMB-SAK    Document 577-3    Filed 09/18/20    Page 216 of 751
PageID: 11582

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

retailer and manufacturer written pre-litigation notice of the claimed breaches of warranties, but he only did so about ten months after he was injured. The manufacturer argued that the plaintiff had not provided notice within a reasonable time and was therefore barred by the statutory notice requirement.[6] *Id.* at 899. The Court held that the statutory notice requirement was "not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt." *Id.* at 900. The Court reasoned:

> As between the immediate parties to the sale [the notice requirement] is a sound commercial rule, designed to protect the seller against unduly delayed claims for damages. As applied to personal injuries, and notice to a remote seller, it becomes a booby-trap for the unwary. The injured consumer is seldom "steeped in the business practice which justifies the rule," and at least until he has had legal advice it will not occur to him to give notice to one with whom he has had no dealings.

 **\*11**  *Id.* (quoting William L. Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1130 (1960)) (citation omitted).

By contrast, a California appellate court in *Fieldstone Co. v. Briggs Plumbing Products, Inc.,* held that a residential developer who had purchased sinks from plumbers, as opposed to the plaintiff in *Greenman,* was "a sophisticated development company which has built many thousands of homes over the last two decades." 62 Cal.Rptr.2d 701, 708 (Cal.Ct.App.1997). The court determined that the statutory notice provision should apply because the plaintiff in *Fieldstone* was not "unaware of his rights as against the manufacturer until he had received legal advice." *Id.* (citing *Presiding Bishop v. Cavanaugh,* 32 Cal.Rptr. 144 (Cal.Ct.App.1963)).

Based on these two cases applying the California statutory notice requirement, and viewing Greater All Nation's allegations in a favorable light, this Court finds that Greater All Nation's position as a consumer is more analogous to the injured plaintiff in *Greenman.* According to the Complaint, Greater All Nation brings the instant action based upon its October 1999 purchase of one used E350 van. (Compl.¶ 9.) Greater All Nation is a not-for-profit religious organization that apparently uses its E350 van "to transport church members to retreats, volunteer events and other community functions." (*Id.*) Thus, by any measure, Greater All Nation is not in the business of purchasing vans, and, as opposed to the residential developer in *Fieldstone,* likely was entirely

unaware of its rights vis a vis Defendant Ford until it received legal advice. *See Fieldstone,* 62 Cal.Rptr.2d at 708.

At the same time, this Court notes that *Greenman* is not directly analogous to this case. The injured plaintiff in *Greenman,* unlike California Plaintiff Greater All Nation, did in fact provide written pre-litigation notice of claimed breaches of warranties to the retailer and to the manufacturer. *Id.* at 898. Additionally, the decision in *Greenman* occurred in the context of a personal injury action. Thus, it is unclear whether the Supreme Court of California would have arrived at the same broad conclusion in *Greenman* had the plaintiff not suffered any personal injury, and had the plaintiff not notified either the retailer or the manufacturer prior to bringing suit. Nevertheless, given the prior application of the statutory notice requirement in California cases, this Court is not persuaded that the Supreme Court of California would apply § 2607(3)(A) so strictly, and necessarily foreclose Greater All Nation from pursuing its breach of warranty claims. Therefore, Defendant's motion to dismiss on this ground will be denied.

**4. Illinois**

Under 810 ILCS 5/2–607, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]" Like other jurisdictions, Illinois recognizes several methods of notice.

 **\*12**  In *Connick,* purchasers of a Samurai sport utility vehicle (SUV) sought to recover for, *inter alia,* breach of express and implied warranties based upon the allegation that the Samuris manufactured by defendant were "unsafe because [they] had an excessive risk of rolling over during sharp turns and accident avoidance maneuvers." 675 N.E.2d at 588. The Supreme Court of Illinois recognized that the notice requirement can be fulfilled either by direct notice or under two exceptions: when a "seller has actual knowledge of the defects of a particular product" or, in certain circumstances, when a "seller is deemed to have been reasonably notified by the filing of [a] buyer's complaint alleging breach of UCC warranty." *Id.* (citing *Malawy v. Richards Mfg. Co.,* 501 N.E.2d 376 (1986), and *Perona v. Volkswagen of Am., Inc .,* 684 N.E.2d 859, 863 (Ill.App.Ct.1997)). Ultimately, however, the Court dismissed plaintiffs' breach of warranty claims, holding that the plaintiffs failed to allege direct notice to the defendant and, importantly, were unable to rely on either exception to the direct notice requirement. *Connick,* 675 N.E.2d at 591. The Court reasoned that, despite public

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 577-3    Filed 09/18/20    Page 217 of 751
PageID: 11583

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

reports of the products' general defects, the "complaint does not allege that Suzuki had actual knowledge of the alleged breach of the *particular* products purchased by the named plaintiffs in this lawsuit." *Id.* at 590 (emphasis added). In addition, the filing of a complaint did not suffice to constitute notice "where the breach has not resulted in personal injury" because "the UCC indicates a preference that the breach be cured without a lawsuit." *Id* at 591.

Here, Plaintiffs likewise assert compliance with the notice requirement of § 2–607 based upon Ford's actual or constructive notice of the alleged E350 van defects. Plaintiffs' description of the events that necessarily would have informed Ford of the alleged defects of the E350 vans, *e.g.,* the NHTSA reports, Ford's response to the NHTSA recommendations, and the 60 Minutes II broadcasts, is comparable to the events the *Connick* plaintiffs claimed "separately or cumulatively" provided actual notice to the defendant manufacturer. *Id.* at 589–90 (noting an unfavorable Consumers Union report, an investigation by seven states' attorneys general, and the commencement of the various actions). According to the court in *Connick,* it was undisputed that the defendant was actually aware of the safety concerns of the Samurai SUV. *Id* at 590. Nevertheless, the Court held that a manufacturer's awareness of problems with a *product line* is not a substitute for awareness problems "with the *particular* product purchased by a *particular* buyer." *Id* (emphasis added). *Connick* also stands for the proposition that constructive awareness based upon the filing of a complaint is not an exception to the notice requirement in non-personal injury actions.[7] *Id* at 590–91.

 **\*13** In the instant matter, Plaintiffs have satisfactorily alleged that Defendant Ford was actually aware of the alleged design defects of the E350 van product line prior to the filing of Plaintiffs' Complaint. There is, however, no indication from Plaintiffs' Complaint that, prior to the filing of the Complaint, Defendant was ever apprised of a problem with Pentecostal Temple's particular van, or of any potential warranty claims to be brought by Pentecostal Temple. Therefore, Pentecostal Temple's pleadings are insufficient pursuant to the limited scope of the actual notice exception as described by the Illinois Supreme Court. And because Pentecostal Temple asserts only economic harm and no personal injuries, the limited exception of constructive notice, *i.e.,* notice-by-suit, is not available with regard to the Illinois notice requirement.

Relying on a decision from a district court in the Northern District of Illinois, Plaintiffs argue that dismissal is inappropriate because Defendant has failed to allege any prejudice due to lack of notice. (Pls.'s Br. at 34 (citing *Blommer Chocolate Co. v. Bongards Creameries, Inc.,* 635 F.Supp. 911, 918 (N.D.Ill.1985)).) This Court finds instructive the fact that the Illinois Supreme Court in *Connick* did not specifically recognize lack of prejudice as one of the two noted exceptions to the direct notice requirement under 810 ILCS 5/2–607(3). *Connick,* 675 N.E.2d at 589. Additionally, in *Connick,* the court recognized that "the UCC indicates a preference that the breach be cured without a lawsuit." *Id.* at 591. This preference, therefore, militates against requiring that Defendant allege prejudice due to a lack of direct pre-litigation notice because, here, a lawsuit ensued nevertheless. This Court, therefore, finds that Plaintiffs' "failure to allege prejudice" argument is unsupported under Illinois law as an exception to the notice requirement. Accordingly, mindful of Court's holding in *Connick,* this Court is constrained to grant Defendant's motion to dismiss Plaintiff Pentecostal Temple's breach of warranty claims for failure to comply with the notice requirement of 810 ILCS 5/2–607(3).

To recap, this Court will dismiss the breach of express and implied warranty claims of the Alabama, Arkansas and Illinois Plaintiffs. However, if they can allege that they provided pre-litigation notice to Ford in a manner recognized under the respective laws of those states, they may do so in an amended complaint. As for California Plaintiff Greater All Nation, its breach of warranty claim will survive.

### D. Express and Implied Warranties: Actual Injury
Ford also moves to dismiss Plaintiff's express and implied warranty claims for failure to adequately allege an actual injury.[8] No Plaintiff has sustained a rollover or claimed any personal injury as a result of purchasing or leasing an E350 van. In fact, the proposed Plaintiff Class expressly excludes anyone who claims personal injury damages. (Compl.¶ 63.) Hence, although the Complaint alleges that the E350 vans "are defectively designed due to [the van's] high center of gravity leading to an unusually high rollover rate," (*id.* ¶ 17) Plaintiffs and members of the proposed Class, by definition, have never experienced a rollover-related accident or physical injury. According to Plaintiffs, however, the alleged defect of the E350 vans resulted in "loss of use of the van's full capacity, diminishment of the van's resale value and increased insurance costs." (Pls.' Br. at 14.)

**\*14** Because the Court will dismiss the warranty claims of the Alabama, Arkansas, and Illinois Plaintiffs for lack of pre-litigation notice, the Court will only examine the "actual injury" issue as it concerns the California and New Jersey Plaintiffs.

### 1. California

Ford argues that, under California law, Plaintiff Greater All Nation's breach of warranty claims must be dismissed absent a present and manifest injury. For the reasons discussed below, this Court does not find that California precedent mandates dismissal of Greater All Nation's breach of warranty claims on this ground.

In *American Suzuki Motor Corp. v. Superior Court,* a case relied upon by Ford, the issue before the California Court of Appeals was whether plaintiffs could state a cause of action for breach of implied warranty where "they have suffered no personal injury or property damage from a vehicle they claim is defectively designed, *and it is impliedly conceded that their vehicles have remained fit for their ordinary purpose."* 44 Cal.Rptr.2d 526, 527 (Cal.Ct.App.1995) (emphasis added). The California appellate court answered this question in the negative, reversing the trial court's class certification. *Id.* at 531.

Importantly, Greater All Nation has not conceded that its Ford E350 has remained fit for its ordinary purpose. Plaintiffs specifically allege that their "E350 vans were totally unfit to accommodate and safely transport 15 passengers, and, accordingly, Ford breached its implied warranty of merchantability in violation of UCC § 2–314." (Compl.¶ 84.) Yet, whether a vast majority of Ford E350s "did what they were supposed to do for as long as they were supposed to do it"—*i.e.,* whether they were fit for their ordinary purpose—remains an open question which this Court cannot determine on a motion to dismiss, especially where, unlike plaintiffs in *American Suzuki,* Greater All Nation does not concede merchantability. *American Suzuki,* therefore, does not mandate dismissal of Greater All Nation's breach of warranty claim.

The only other California case upon which Ford relies for this point is *Khan v. Shiley Inc.,* 266 Cal.Rptr. 106 (Cal.Ct.App.1990). There, the court suggested that "[n]o matter which theory is utilized [including breach of express and implied warranty] where a plaintiff alleges a product is defective, proof that the product has malfunctioned is essential to establish liability for an injury *caused by the*

*defect."* Id. at 855. (emphasis in original). However, a more recent California appellate court decision has challenged the propriety of the "sweeping language in *Khan,"* and in particular the quoted sentence. *See Hicks v. Kaufman & Broad Home Corp.,* 107 Cal.Rptr.2d 761, 771 (Cal.App.Ct.2001). "[T]hat sentence does not accurately reflect the holding in *Khan* nor the state of the law on breach of warranty claims." *Id.* According to *Hicks,* "the primary right alleged to have been violated in *Khan* was not the right to take a product free from defect but the right to be free from *emotional distress* caused by worry the defect would result in physical injury." *Id.* (emphasis added). Accordingly, *Hicks* held that a product's malfunction is not an element of a cause of action for breach of warranty where "the primary right alleged to have been violated ... [is] the right to take a product free from defect." *Id.* at 771; *see also id.* at 773 n.54. Instead, to establish a breach of express or implied warranty, a plaintiff must ultimately prove that a product contains an inherent defect that is "substantially certain to result in malfunction during the useful life of the product." *Id.* at 773. ("We see no reason why [plaintiff] should have to wait for the inevitable injuries to occur before recovering damages to repair the defect and prevent the injuries from occurring."). A cause of action for breach of warranty "does not require proof the product has malfunctioned." *Id.* at 768.

**\*15** In *Hicks,* plaintiffs pursued breach of warranty claims based upon the allegedly defective concrete foundations of their houses. It is unclear whether the "substantial certainty" requirement described in *Hicks* would necessarily apply in the instant matter. That is not something this Court need or should decide today. And this Court finds *Hicks* 's criticism of the sweeping language of *Khan* to be highly persuasive. A California court likely would not find that product malfunction is a necessary element of Greater All Nation's breach of warranty claims. *See id.* at 771–72. Hence, California Plaintiff Greater All Nation's breach of warranty claims will not be dismissed for failure to plead actual injury.

### 2. New Jersey

Ford relies on several cases in support of its argument that New Jersey Plaintiffs' warranty claims should be dismissed for failure to allege actual injury. For example, in *Yost v. General Motors Corp.,* 651 F.Supp. 656, 657 (D.N.J.1986), the district court dismissed the plaintiffs breach of warranty and fraud claims because the plaintiff failed to allege that he suffered any present damages: "All he is able to allege is that the potential leak is 'likely' to cause damage and 'may' create potential safety hazards." *Id.* By contrast, Plaintiffs here assert

Case 1:19-md-02875-BMB-SAK    Document 577-3    Filed 09/18/20    Page 219 of 751
PageID: 11585

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

that the E350 van is presently defective, and that such defect currently creates a potential safety hazard. *See Connick,* 656 N.E.2d at 178–79 (distinguishing *Yost* where plaintiffs did not allege the engine was actually defective). Additionally, Plaintiffs allege damages not discussed in *Yost,* including loss of use of the van's full capacity and increased insurance costs. Given these differences, this Court is not convinced that *Yost* mandates dismissal of Plaintiffs' breach of warranty claims.

Ford next draws this Court's attention to *Walus v. Pfizer, Inc.,* 812 F.Supp. 41, 42 (D.N.J.1993), for the court's assertion that "New Jersey courts have never allowed recovery based on a product that is and has been working normally." 812 F.Supp. at 42. Although *Walus* provides sweeping language regarding a product liability claim, that decision did not concern breach of warranty claims. Thus, *Walus* also does not mandate dismissal of Plaintiffs' claims.

In another case, *Thiedemann v. Mercedes–Benz USA, LLC,* 872 A.2d 783, 793 (2005), the Supreme Court of New Jersey affirmed a grant of summary judgment for a defendant car manufacturer based upon alleged violations of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. §§ 56:8–1 to –20. Specifically, plaintiff had alleged a defect in the fuel gauges in Mercedes–Benz vehicles. Although plaintiff had asserted a claim for breach of the implied warranty of merchantability under N.J.S.A. § 12A:2–314, the Court limited its review to the "enigmatic requirement of an 'ascertainable loss' " under the CFA. 872 A.2d at 786–87. Because plaintiff made no attempt to sell his vehicle, and did not "present any expert evidence to support an inference of loss in value notwithstanding the lack of any attempt to sell the vehicle, *i.e.,* that the resale market for the specific vehicle had been skewed by the 'defect,' " the court determined that plaintiff's CFA diminution in value argument was "too speculative." *Id.* at 795. Hence, even though the car owner could not satisfy his burden on summary judgment, the court in *Thiedemann* clearly acknowledged that diminution in value could qualify as an ascertainable loss under the CFA. *Id.* at 792.

**\*16** *Thiedemann* does not mandate dismissal of the New Jersey Plaintiffs' breach of warranty claims at this juncture. *Thiedmann* dealt exclusively with the CFA's ascertainable loss requirement; moreover, the Supreme Court of New Jersey certainly did not foreclose entirely the use of "diminution in value" as a form of ascertainable loss. Apparently, the court contemplated the possibility of certain proofs of diminution in value such as "expert evidence directed to [a] defective vehicle's loss in value or some other similarly quantifiable lost

benefit-of-the-bargain." *Id.* Perhaps in the future this Court, on a full record at a later procedural stage, will determine whether the New Jersey Plaintiffs' diminution-in-value claim is "too speculative." *Thiedemann,* 183 N.J. 234, 238 (2005) *Id.* at 795. That is not an appropriate inquiry, however, at this stage on a motion to dismiss.

For the reasons discussed above, Ford has not demonstrated that the New Jersey Plaintiffs' breach of warranty claims should be dismissed under New Jersey law for failure to allege actual injury, and this Court is aware of no New Jersey precedent that suggests dismissal.[9] Accordingly, Ford's motion to dismiss New Jersey Plaintiffs' breach of warranty claims for failure to plead actual injury will be denied.

To summarize, after an exhaustive review of caselaw from California and New Jersey, this Court is satisfied that the California and New Jersey Plaintiffs' warranty claims do not require dismissal for failure to plead actual injury as a matter of law.

### E. Express and Implied Warranties: Time Bar

Defendant moves to dismiss the breach of express and implied warranty claims of Plaintiffs Eleventh Street (Arkansas), Greater All Nation (California), Pentecostal Temple (Illinois), and the New Jersey parties on the grounds that they are barred by their states' relevant statute of limitations.[10] Again, because the Court will dismiss the breach of warranty claims alleged by the Alabama, Arkansas, and Illinois Plaintiffs for failure to comply with notice requirements, the Court will here only address Ford's time bar argument as to the California and New Jersey Plaintiffs.

A district court may "dismiss a complaint for failure to state a claim, based on a time-bar, where 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' " *Bieregu v. Ashcroft,* 259 F.Supp.2d 342, 355 n.11 (D.N.J.2003) (quoting *Bethel v. Jendoco Constr. Co.,* 570 F.2d 1168, 1174 (3d Cir.1978)). The Court looks to the allegations of the complaint when assessing a dismissal on statute of limitations grounds: "When reviewing a Rule 12(b)(6) dismissal on statute of limitations grounds, we must determine whether the time alleged *in the statement of a claim* shows that the cause of action has not been brought within the statute of limitations." *Cito v. Bridgewater Twp. Police Dep't,* 892 F.2d 23, 25 (3d Cir.1989) (emphasis in original). Although a statute of limitations defense is not included in the enumerated defenses

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

listed in Rule 12(b)(6), the defense may be raised in a motion to dismiss where it is clear on the face of a complaint that the action is not brought within the statute of limitations. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n.1 (3d Cir.1994). District courts are cautioned, however, that "[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002) (internal citation and quotation marks omitted).

**\*17** Section 2–725 of the Uniform Commercial Code provides the relevant statute of limitations:

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued.

....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made[.]

....

(4) This Section does not alter the law on tolling of the statute of limitations ....

This language has been adopted without change in California and New Jersey. *See* Cal. Com.Code. § 2725; N.J.S.A. § 12A:2–725. According to this provision, Plaintiffs' claims for breach of warranty accrued when "tender of delivery" was made for their E350 vans. Thus, at the latest, the four-year statute of limitations commenced against each named Plaintiff when they actually obtained their individual vehicles. This analysis, however, is substantially complicated by the fact that Plaintiffs do not clearly specify the model year or purchase date of every E350 at issue in the instant matter. The Court gathers the following information from paragraphs 6–12 of the Complaint:

• Greater All Nation (California) purchased a used E350 van of unspecified model year on October 29, 1999;

• Faith Tabernacle (New Jersey) purchased a used E350 van of unspecified model year on August 30, 2001;

• Macedonia Free Will (New Jersey) purchased two new 2002 E350 vans on an unspecified date; and,

• Social Clubhouse (New Jersey) purchased five different E350 vans including those from model years 1993, 1994, 1997, and 2002. The 1997 model was purchased on August 8, 2002, and the 2002 model was purchased on April 9, 2003.

Unless otherwise specified, it is also unclear whether each E350 van was purchased in new or used condition.

The earliest complaint filed by any individual Plaintiff in the instant matter was that of Social Clubhouse, which filed its original complaint in the Superior Court of New Jersey on August 11, 2003. Greater All Nation, which purchased a van on October 29, 1999, first filed suit in California state court on February 17, 2005. Thus, Greater All Nation filed suit more than 4 years after purchasing its respective vehicles. As listed above, only some of the vans purchased by New Jersey Plaintiffs appear to have been purchased less than four years prior to filing suit.

Plaintiffs propose several reasons why their breach of warranty claims are not barred by the relevant statutes of limitations. Plaintiffs' chief argument is that Ford's fraudulent concealment tolled the statute of limitations. Due to Ford's false and misleading statements, Plaintiffs argue that their causes of action accrued only when Ford's breach was or should have been discovered. "Here, Plaintiffs had no reason to discover Defendant Ford's false and misleading statements because the problems with the E350 were not publicized until shortly before the plaintiff filed suit." (Pls.' Br. at 38.) The Official Comment to UCC § 2–725 states: "Subsection (4) makes it clear that this Article does not purport to alter or modify in any respect the law on tolling of the Statute of Limitations as it now prevails in the various jurisdictions." Thus, Plaintiffs' warranty claims are not time-barred if they allege proper grounds for equitable tolling. *See* Cal. Com.Code. § 2725(4); *Mills,* 108 Cal.App. 4th at 641 (enforcing statute of limitations for breach of warranty claim "subject to tolling or estoppel"); *Simpson v. Widger,* 311 N.J.Super. 379, 390 (App.Div.1998) ("[T]he presence of fraud may toll the running of the statute" for breach of warranty claims); *see also Foodtown v. Sigma Mktg Sys., Inc.,* 518 F.Supp. 485, 488 (D.N.J.1980).

**\*18** To establish fraudulent concealment for the purposes of tolling a statute of limitations, the Ninth Circuit has recognized that, applying California law, a "complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

actual or presumptive knowledge of fact sufficient to put him on inquiry." *Conerly v. Westinghouse Electric Corp.,* 623 F.2d 117, 120 (9th Cir.1980) (citing *Baker v. Beech Aircraft Corp.,* 114 Cal.Rptr. 171, 175 (Cal.Ct.App.1974)). New Jersey law sets forth comparable elements. *See Dewey v. Volkswagen AG,* —— F.Supp.2d ——, Nos. 07–2249, –2361, 2008 WL 878324, at *13 (D .N.J. Apr. 1, 2008).

Defendant argues that Plaintiffs have failed to plead the fraudulent concealment elements necessary to avoid a limitations-based dismissal. Specifically, Defendant argues that Plaintiffs must allege "actual reliance" on statements made by Defendant. It is true that "reliance" is an element of a claim for misrepresentation. For example, in *Simpson,* a case cited by Plaintiffs, "[a] misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, *resulting in reliance by that party to his detriment."* 311 N.J.Super. at 392 (citing *Jewish Ctr. of Sussex County v. Whale,* 432 A.2d 521 (N.J.1981)) (emphasis added).

Although Plaintiffs could have done so with greater precision, this Court finds that for the purposes of withstanding a motion to dismiss, Plaintiffs have sufficiently pled reliance on Defendant's alleged misrepresentation and omissions. Notably, in the Complaint, Plaintiffs allege that Defendant's conduct constituted acts of "deception, fraud, false pretenses, false promises, misrepresentation and/or a knowing concealment, suppression, or omission of material facts with the intent that Plaintiffs ... would *rely* upon such concealment, suppression, or omission in connection with the sale, marketing, advertisement and subsequently performance of the E350 van." (Compl.¶ 93.) (emphasis added). In addition, Plaintiffs assert that Ford's conduct "ha[d] the capacity to, and did, deceive consumers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15 passengers." (*Id.*)

The Court finds that the California and New Jersey Plaintiffs allege a claim for fraudulent concealment in the context of tolling the statute of limitations. Although Ford proffers that claims for breach of warranty accrue on the date of delivery rather than on the date of discovery, it fails to articulate why the principles of equitable tolling premised on fraudulent concealment are not available to Plaintiffs as a matter of law. Assuming the truth of Plaintiffs' allegations, and drawing inferences in a light most favorable to them,

Plaintiffs sufficiently contend that they discovered Ford's alleged fraudulent concealment between the years 2002 and 2005, under circumstances owing to the revelation of the alleged defects by the media and other public reports. For instance, Plaintiffs allege that the television program "Sixty Minutes II" publicized the concerns regarding the vans' safety on September 9, 2002, and that a former Ford test driver testified to the vans' defects in January 2003. (Compl. ¶ 23.) Furthermore, Plaintiffs allege that they are not at fault for failing to discover the alleged defects earlier because Ford acted wrongfully by issuing repeated assurances of the vans' safety despite Ford's alleged knowledge of the falsity of their warranty. (*Id.* ¶¶ 2, 22–23, 31, 36–37, 48–52, 54.) Thus, looking first at Greater All Nation, its 2005 filing does not run afoul of the four-year statute of limitations because Plaintiffs allegedly discovered the breach within four years prior to 2005. Similarly, the earliest filing by a New Jersey Plaintiff was in 2003, also well within four years of Plaintiffs' supposed discovery of Defendant's alleged concealment.

**\*19** In sum, reading Plaintiffs' Complaint with latitude, the California and New Jersey Plaintiffs' warranty claims are not barred by the relevant statutes of limitations and exceptions thereto because "the bar is not apparent on the face of the [C]omplaint." *Robinson,* 313 F.3d at 135 (internal citation and quotation marks omitted). Ford's motion to dismiss the California and New Jersey Plaintiffs' warranty claims on statute of limitations grounds will be denied.

### F. Implied Warranty

In the second cause of action of their Complaint, Plaintiffs allege breach of implied warranty under UCC § 2–314, as codified by each of the states at issue. Because the Court has already dismissed the warranty claims brought by Plaintiffs New Bethlehem (Alabama), Eleventh Street (Arkansas), and Pentecostal Temple (Illinois) for failure to comply with notice requirements, the Court examines only the California and New Jersey Plaintiffs' Second Cause of Action on the merits.

According to Plaintiffs:

83. ... Ford impliedly warranted that the E350 vans were merchantable and w [ere] fit for the ordinary purposes for which a 15–passenger van is used.

84. The E350 vans were totally unfit to accommodate and safely transport 15 passengers, and accordingly, Ford breached its implied warranty of merchantability on [sic] violation of UCC § 2–314.

....

86. Plaintiffs and members of the Class have been damaged as a result of the conduct complained of herein, and the conduct continues and the harm or risks of harm is ongoing.

(Compl.¶¶ 83–84, 86.)

Defendant argues that Plaintiffs' claims for breach of the implied warranty of merchantability should be dismissed for several reasons in addition to those discussed previously, including: failure to allege the E350 vans were not merchantable at the time of sale; enforceability of the durational limitations of Ford's implied warranty, and lack of privity. (Def.'s Br. at 28–29.) For the following reasons, Defendant's motion to dismiss the California and New Jersey Plaintiffs' implied warranty claims will denied.

### 1. Implied Warranty: Failure to Allege Lack of Merchantability

Section 2–314 of the Uniform Commercial Code has been adopted by California and New Jersey. Cal. Com.Code § 2314; N.J.S.A. § 12A:2–314. As both parties acknowledge, to state a claim for breach of the implied warranty of merchantability under § 2–314 of the UCC, a plaintiff must allege (1) that a merchant sold goods, (2) which were not "merchantable" at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which were was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury. See 1 James J. White & Robert S. Summers, Uniform Commercial Code § 9–7, at 510–11 (4th ed.1995) (footnote omitted).

Pursuant to the implied warranty of merchantability, a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used. See, e.g., N.J.S.A. § 12A:2–314. Merchantability does not mean that the goods are perfect or that they are exactly as the merchant described them to be, but only that they are "reasonably fit for the purpose intended." Jakubowski v. Minn. Mining & Mfg. Co., 199 A.2d 826, 831 (N.J.1964). The implied warranty of merchantability need not be specifically mentioned in a contract; instead, it arises by operation of law. See, e.g., N.J.S.A. § 12A:2–314.

*20 Ford argues that Plaintiffs' implied warranty of merchantability claims should be dismissed for failure to allege "that their vehicles were not merchantable at the time of sale." (Def.'s Br. at 30.) Plaintiffs, however, alleged in the second cause of action in their Complaint that due to a design defect, "the E350 vans were *totally unfit* to accommodate and safely transport 15 passengers and, accordingly, Ford breached its implied warranty of *merchantability* in violation of UCC § 2–314." (Compl. ¶ 84 (emphasis added).) Based upon the aforementioned language of the Complaint, this Court finds that Plaintiffs have sufficiently alleged a breach of the implied warranty of merchantability. Specifically, Plaintiffs assert that at the time of the sale, their E350 vans they were "totally unfit," *i.e.,* not reasonably fit for their intended purpose of safely transporting 15 passengers, and, therefore, not merchantable. Hence, this requirement has been sufficiently pled,

### 2. Implied Warranty: Durational Limitations

Ford argues that by virtue of the limited written warranties that come with each E350 van, it has limited its liability for breach of the implied warranty of merchantability to vehicle malfunctions that occur during the warranty coverage period. (Def.'s Br. at 31.) Section 2–316 of the UCC provides that parties may limit or exclude entirely the warranty of merchantability that is otherwise implied in a contract for a sale of goods.[11]

In the Second Cause of Action of the Complaint, Plaintiffs allege that "[a]ny express limitation or negation of Ford's implied warranties that E350 vans were fit to accommodate and safely transport 15 passengers, when such was not the case, would be unreasonable and unconscionable and, accordingly, is unenforceable pursuant to UCC § 2–316." (Compl.¶ 85.) Pursuant to § 2–302(a) of the UCC, this Court may strike a clause of a contract "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made[.]" *See* Cal. Com.Code § 2302; N.J.S.A. § 12A:2–302. Further, § 2–302(b) provides that "[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." *See id.*

As noted above, Plaintiffs alleged that the durational limitations on the implied warranty of merchantability that accompanied Plaintiffs' E350s are "unreasonable and unconscionable and, accordingly, [are] unenforceable." Based on UCC § 2–302(b), this Court cannot make this determination at the motion to dismiss stage. *See In re*

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

*Ford Motor Co. Ignition Switch Products Liability Litig.,* Nos. MDL No. 1112, Civ. A. 96–3125, 96–1814, 1999 WL33495352, at *12 (D.N.J. May 14, 1999) ("[The court is] unable at this juncture to determine, as a matter of law, whether or not Ford's durational limitation of the implied warranty of merchantability that accompanied plaintiff's Ford vehicles at the time of their original retail sale was unconscionable.") (vacated in part on other grounds by July 27, 1999 order). Accordingly, Ford's motion to dismiss on this ground will be denied, and the California and New Jersey Plaintiffs' implied warranty claim shall remain at issue.

### G. Unjust Enrichment

**\*21** In the Third Cause of Action of their Complaint, Plaintiffs allege unjust enrichment on the part of Ford. Generally, to claim unjust enrichment, a plaintiff must allege that "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J.2004). Although there may exist slight variations in various state claims for unjust enrichment, any differences are not material to the instant motion to dismiss on the grounds proffered by Ford. *See In re Terazosin Hydochloride,* 220 F.R.D. 672, 697 n.40 (S.D.Fla.2004) ("The standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical. Courts have recognized that state claims of unjust enrichment are universally recognized causes of action that are materially the same throughout the United States.") (citation and quotation marks omitted).

Essentially, Plaintiffs allege that they purchased a defective product that was marketed and sold by Ford or its agents for the price of a non-defective product and that, as a consequence, Ford received a benefit from the sales at Plaintiffs' expense. While Plaintiffs do not explicitly allege the presumed difference in value between a defective and non-defective van, Plaintiffs do contend that a defective van's value is "greatly reduced" from the value of a non-defective van. (Compl.¶ 88.) Plaintiffs also allege that Ford obtained additional benefits in the form of revenues from repairs to E350 vans that failed after the expiration of the 90–day "Limited Warranty." "As a result Ford has been unjustly enriched, having retained the benefits of its sales of defective E350 vans and payment for repair services." (Compl.¶ 90.) Based on these statements, Plaintiffs sufficiently allege a claim for unjust enrichment.

Ford argues that Plaintiffs' unjust enrichment claims must be dismissed because Plaintiffs have not alleged any cognizable injury. However, Ford cites no case dismissing an unjust enrichment claim for failure to plead a cognizable injury. Thus, this Court does not find that Plaintiffs' unjust enrichment actions merit dismissal for failure to plead injury.

Next, Ford asserts that unjust enrichment is not a cause of action in California, and thus Greater All Nation's claim for unjust enrichment should be dismissed. (Def.'s Reply Br. at 25.) In *Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1100 (N.D.Cal.2006), a district court observed that uncertainty exists as to whether a court applying California law may recognize a claim for unjust enrichment as a separate cause of action. The *Nordberg* court concluded, however, that causes of action labeled as "unjust enrichment" may nonetheless be understood as claims for restitution. *Id.* ("Although their Eighth cause of action is entitled 'unjust enrichment' it is clear that plaintiffs are seeking restitution."). Thus, although Plaintiffs' cause of action as it relates to Greater All Nation and members of the putative Class from California may have mischaracterized the legal theory underlying this claim, Ford's argument for dismissal is unavailing.

**\*22** Ford also argues that unjust enrichment is based on quasi-contract, and that such equitable proceedings are barred when there are adequate remedies at law. Although Plaintiffs allege breach of express and implied warranty in the first and second causes of action of the Complaint, the Court, at this juncture, cannot resolve these legal issues. *See In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J.2004) ("Plaintiffs, however, are clearly permitted to plead alternative theories of recovery. Consequently, it would be premature at this stage of the proceedings to dismiss the ... unjust enrichment claims on this basis."). Therefore, the presence of these potential remedies at law does not mandate dismissal of Plaintiffs' unjust enrichment claims. *See, e.g., In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069, 1104 (S.D.Ind.2001), *rev'd on other grounds,* 288 F.3d 1012 (7th Cir.2002).

Accordingly, Ford's motion to dismiss with regard to Plaintiffs' unjust enrichment claim will be denied.[12]

### H. State Consumer Fraud

In their Fourth Cause of Action, Plaintiffs allege that Ford violated state consumer fraud statutes. "State consumer-

protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules." *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1018 (7th Cir.2002) (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 568–73 (1996)). Thus, this Court will examine Plaintiffs' fourth claim separately under the law of each relevant jurisdiction: Alabama, Arkansas, California, Illinois, and New Jersey.

### 1. Alabama

The Alabama Deceptive Trade Practices Act ("Alabama DTPA") provides a cause of action for a "consumer," Ala.Code § 8–19–10, who is defined as "any natural person who buys goods or services for personal, family or household use." Ala.Code § 8–19–3(2). "Only 'consumers' have private rights of action under this section ." *Deerman v. Fed. Home Loan Mortg. Corp.,* 955 F.Supp. 1393, 1399 (N.D.Ala.1997). Plainly, Plaintiffs are not natural persons; nor have they purchased the E350 vans for personal, family or household use. Plaintiffs offer no argument or authority to the contrary, and this Court finds as a matter of law that Alabama Plaintiff New Bethlehem lacks standing to bring this claim. *See EBSCO Indus., Inc. v. LMN Enter., Inc.,* 89 F.Supp.2d 1248, 1266 (N.D.Ala.2000) (dismissing Alabama DTPA claim for lack of standing); *see also In re Bextra and Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,* 495 F.Supp.2d 1027, 1036 (N.D.Cal.2007) ("It is undisputed that the [plaintiffs] are not 'natural persons,' and thus they do not have a private right of action [under the Alabama DTPA].") (quoting Ala.Code § 8–19–3(2)). Thus, New Bethlehem's Alabama DTPA claim will be dismissed.

### 2. Arkansas

Eleventh Street fails to state a cognizable claim under the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"). Under that statute, the responsibility for civil enforcement rests largely with the Attorney General. *See* Ark.Code Ann. § 4–88–113(a)–(e). A private cause of action is limited to instances where a person has suffered "actual damage or injury as a result of an offense or violation as defined in this chapter." Ark.Code Ann. § 4–88–113(f).

**\*23** Defendant cites *Wallis v. Ford Motor Co.,* 208 S.W.3d 153, 159 (Ark.2005) for the proposition that Plaintiffs fail to plead actionable injury to sustain a claim under the Arkansas DTPA. 208 S .W.3d at 159. In that case, the Supreme Court of Arkansas held that an DTPA claim could not be maintained where an SUV owner's only alleged injury was a diminution

in value of the vehicle. Plaintiff had sought to certify a class consisting of Ford Explorer owners and lessees based upon Ford's alleged concealment of a design defect that caused Explorers to roll over under normal operations. *Id.* at 154. Like Plaintiffs in the instant matter, "Wallis [did] not allege any personal injury or property damage caused by the design defect, nor [did] he allege that the Explorer malfunctioned in any way." *Id.* Wallis's entire damages claim instead rested on his assertion that his Explorer's value had been "substantially diminished" as a result of the design defect. *Id.* at 155. Yet the Court noted that "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself." *Id.* at 161. Accordingly, the Court held that Wallis did "not state a cognizable cause of action under [ ]DTPA where the only injury complained of is a diminution in value of the vehicle." *Id.*

*Wallis* is squarely on point here. Plaintiffs' allegation of damages for diminution of value is insufficient as a matter of law under the Arkansas DTPA. In addition, even though Plaintiffs also cite "loss of use" damages, *Wallis* elaborated that "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself." *Id.* at 161. Here, Plaintiffs do not allege damages resulting from any malfunction or manifest defect. In other words, Plaintiffs do not adequately allege *actual* damages as required for an Arkansas DPTA claim under *Wallis.* Because Arkansas law bars private rights of action under the Arkansas DPTA where no actual damages are alleged, this Court must dismiss Eleventh Street's statutory consumer fraud claim.

### 3. California

Plaintiff Greater All Nation asserts claims under three California statutes: the California Unfair Competition Law ("California UCL"), Cal. Bus. & Prof.Code § 17200, *et seq.;* the California False Advertising Law ("California FAL"), Cal. Bus. & Prof.Code § 17500, *et seq.;* and the California Consumers Legal Remedies Act ("California CLRA"), Cal. Civ.Code § 1750, *et seq.* For the following reasons, the Court will dismiss Plaintiffs' claim under the California CLRA, but permit Plaintiffs' claim under the California UCL and FAL to proceed.

#### a. The California UCL

The California UCL permits civil recovery for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof.Code, § 17200. The UCL's purpose is to protect

both consumers and competitors from unlawful, unfair or fraudulent business practices "by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.,* 27 Cal.4th 939, 949 (2002). Until the UCL was amended in 2004, the statute "authorized 'any person acting for the interests of itself, its members or the general public' ... to file a civil action for relief." *Californians for Disability Rights v. Mervyn's, LLC,* 39 Cal.4th 223, 228 (2006) (quoting former § 17204). As Plaintiffs argue, standing to bring such an action did not depend on a showing of injury or damage. *See Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal.3d 197, 211 (1983) ("Allegations of actual deception, reasonable reliance, and damage are unnecessary."). *superseded by statute,* Cal. Bus. & Prof.Code § 17204 (2004), *as recognized in Mervyn's,* 39 Cal.4th at 228.

**\*24** Now amended, however, the California UCL defines who may sue to enforce the statute: any "association, or ... person who has suffered *injury in fact and has lost money or property* as a result of the unfair competition." Cal. Bus. & Prof.Code § 17204 (emphasis added); *see also Standfacts Credit Servs. v. Experian Info. Solutions, Inc.,* Nos. 04–0358, –1055, 2006 WL 4941834, at *1–2 (C.D.Cal. Oct. 12, 2006) ("[S]ince [the plaintiff] has failed to allege that it ... has lost money or property, it lacks standing to bring its UCL claims.") (internal quotation marks omitted); *Hall v. Time Inc.,* 158 Cal.App. 4th 847, 852 (Cal.Ct.App.2008) ("Proposition 64, approved by the voters at the November 2, 2004, General Election, changed the standing requirements for a UCL claim to create a two-prong test: A private person now has standing to assert a UCL claim only if he or she (1) 'has suffered injury in fact,' and (2) 'has lost money or property as a result of such unfair competition.' ").

This Court must determine whether Plaintiffs allege injury in fact and money or property damages within the meaning of amended § 17204. The Court finds that they do. Since § 17204 was amended, few California courts have had occasion to directly address what constitutes injury in fact and loss of money or property as a result of unfair competition for purposes of determining standing. Among those courts that have interpreted the new standing requirements, § 17204 has been interpreted to permit UCL suits when a plaintiff has: (1) expended or lost money (or property), *see, e.g., Monarch Plumbing Co. v. Ranger Ins. Co.,* No. 06–1357, 2006 WL 2734391, at *6 (E.D.Cal. Sept. 25, 2006); or (2) been denied money to which it has a right, *see, e.g., Starr–Gordon v. Mass. Mut. Life Ins. Co.,* No. 03–68, 2006 WL 3218778, at *6–7 (E.D.Cal. Nov. 7, 2006) ("[D]isgorgement [under the UCL] is

permissible only to the extent that it constitutes restitution") (internal quotation omitted); *see also Hall,* 158 Cal.App. 4th at 854–55 (collecting cases).

Admittedly, none of the allegations in these cases resemble those before the Court here, where Plaintiffs allege diminution in value and loss of use damages. However, the California Court of Appeal decision in *Hall v. Time, Inc.* offers instructive guidance. In *Hall,* a customer agreed to try a book from a publisher for a "free trial period" and later paid for it via a collection agency after the free trial period expired. 158 Cal.App. 4th at 850. The customer subsequently brought a California UCL action, alleging that the publisher used fraudulent tactics to trick customers into believing that they were not obligated to pay for the book. *Id.* at 850–52. The court held that there was no injury in fact, in part because the customer did *not* allege that "the book was unsatisfactory, or [that] the book was worth less than what he paid for it." *Id* at 855. In reaching this conclusion, the court also noted that a common dictionary definition for "[a] loss is '[a]n undesirable outcome of a risk; the disappearance *or diminution of value,* usu[ally] in an unexpected or relatively unpredictable way.' " *Id.* (quoting Black's Law Dict. 963).

**\*25** *Hall* is readily distinguishable from this case because here, Plaintiffs allege injury in fact and money or property damages based on their contentions, as enumerated earlier, that the E350 vans have diminished in monetary value because they are incapable of safely transporting 15 passengers. In other words, the E350 vans are "unsatisfactory" or "worth less" than what Plaintiffs paid for them. Furthermore, liberally construing Plaintiffs' allegations, Plaintiffs sufficiently allege that Ford's fraudulent behavior *caused* Plaintiffs pecuniary damages. (Compl. ¶ 62 ("*As a result of* ... the actual risks posed by operation of the defective E350 vans, Plaintiff and Class members have sustained economic losses including, but not limited to, a significant diminution in the value of their vans.") (emphasis added); *id.* ¶ 93 ("Ford's [fraudulent] conduct ... did[ ] deceive consumers into believing that they were purchasing a vehicle that could be used safely, legally, and practically to accommodate and transport 15 passengers.").) Given that Plaintiffs allege that the E350 vans are unsatisfactory and have diminished in value, this Court cannot find, as a matter of law, that Plaintiffs fail to plead a proper UCL claim. Thus, the Court will deny Ford's motion to dismiss Plaintiffs' California UCL claim.[13]

*b. The California FAL*

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

In order to state a claim under the California FAL, Plaintiffs must allege that statements or other representations appearing on Defendant's product labels are "likely" to deceive a reasonable consumer. *Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995). If an alleged misrepresentation would not deceive a reasonable person or amounts to mere puffery, then this claim may be dismissed, as a matter of law, on a motion to dismiss. *Haskell v. Time, Inc.,* 857 F.Supp. 1392,1399 (E.D.Cal.1994). The term "likely" indicates that deception must be probable, not just possible. *Freeman,* 68 F.3d at 289. California courts have defined the "reasonable consumer" as an ordinary member of the public who acts reasonably in the situation presented. *Lavie v. Procter & Gamble Co.,* 105 Cal.App. 4th 496, 510, 510 (Cal.App.2003). A California FAL claim must be pled with particularity, *Bennett v. Suncloud,* 56 Cal.App. 4th 91, 97 (Cal.Ct.App.1997), here in accordance with Rule 9(b), *see* Fed.R.Civ.P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud[.]").

This Court finds that Plaintiffs properly plead a cause of action under the California FAL. In addition to Plaintiffs' exhaustive, particularized allegations discussed by the Court in Section II.E, *supra,* describing the circumstances surrounding Ford's alleged fraudulent concealment, Plaintiffs allege that "Ford's conduct herein is an unfair practice that has the capacity to, and did, deceive customers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15 passengers." (Compl.¶ 93.) This Court has already found that Plaintiffs adequately allege an express warranty claim based on Ford's description of the E350 vans as a "15 passenger" van. *See supra* Section II.B. Based on that determination, and the Court's finding that Plaintiffs sufficiently allege fraudulent concealment in the context of equitable tolling, the Court finds that Plaintiffs adequately allege that Ford's description is "likely" to deceive a reasonable customer into believing the E350 was capable of safely transporting 15 passengers. Accordingly, Plaintiffs' California FAL claim withstands Ford's motion to dismiss.

### c. The California CLRA

**\*26** Ford challenges Plaintiffs' California CLRA claim on the ground that Greater All Nation lacks standing. The California CLRA applies to any contract "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770(a). Section 1761(d) defines "consumer" to mean "an individual who seeks or acquires, by purchase or

lease, any goods or services for personal, family, or household purposes." Cal. Civ.Code § 1761(d). "Accordingly, the CLRA does not apply to commercial or government contracts, or to contracts formed by nonprofit organizations and other non-commercial groups." *Ting v. AT & T,* 319 F.3d 1126, 1148 (9th Cir.2003); *see also* Von Grabe v. Sprint PCS, 312 F.Supp.2d 1285, 1303 (S.D.Cal.2003). Plaintiff Greater All Nation, a nonprofit church organization, does not fit within the CLRA's limited definition of "consumer," and thus does not have standing to file suit. The Court will dismiss Plaintiffs' California CLRA claim.

### 4. Illinois

Ford challenges Plaintiffs' claim brought under the Illinois Consumer Fraud Act ("Illinois CFA"), 815 ILCS § 505/1, *et seq.* To state a claim under the Illinois CFA, Plaintiffs must allege (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce. *Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 542 (1992); *see also First Midwest Bank, N.A. v. Sparks,* 289 Ill.App.3d 252, 257 (Ill.App.Ct.1997) ("Concealment is actionable where it is employed as a device to mislead and the concealed fact must be such that had the other party been aware of it, he would have acted differently."). Plaintiffs need not allege reliance, *see* Harkala v. Wildwood Realty, Inc., 200 Ill.App.3d 447, 453 (Ill.App.Ct.1990), though a proper claim must allege that the consumer fraud proximately caused Plaintiffs' injury, *see* Wheeler v. Sunbelt Tool Co., 181 Ill.App.3d 1088, 1109 (App.Ct.1989). Plaintiffs' Illinois CFA claim must be pled with particularity. *Connick,* 675 N.E.2d at 593.

The Court finds that Plaintiffs sufficiently state a claim under the Illinois CFA. As previously detailed in this Opinion, Plaintiffs allege that Ford deceived Plaintiffs by withholding information concerning the safety of E350 vans, that Ford intended that Plaintiffs rely, and that this deception occurred during the course of commerce.[14] (Compl.¶¶ 2, 14–17, 48–54, 93, 98.) Ford argues that a claim sounding in fraudulent concealment requires an allegation of a fiduciary duty, *see* Lionel Trains, Inc. v. Albano, 831 F.Supp. 647, 650 (N.D.Ill.1993), but Ford "has not directed the court to any persuasive authority holding that these requirements of common law fraud are incorporated into a claim of statutory fraud under Illinois' Consumer Fraud Act," *Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1129 (N .D. Ill.1995). The Court finds this requirement inapplicable in this

*In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...*
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

context. *See id.* at 1130 (concluding "that the common law requirement of a duty to disclose is not required in order for an omission or concealment to be actionable under the Consumer Fraud Act"); *see also White v. DaimlerChrysler Corp.,* 368 Ill.App.3d 278, 285 (Ill.App.Ct.2006) ("Defendant ... reads into the [Illinois CFA] a duty requirement that does not exist."); *Miller v. William Chevrolet/GEO, Inc.,* 326 Ill.App.3d 642, 658 (Ill.App.Ct.2001) ( "[C]ourts have recognized that the common law duty requirements do not appear in the Act's broad language."). That the Illinois CFA has less restrictive elements than common law fraud is no accident, given its broader scope and remedial legislative purpose. *See Eshaghi v. Hanley Dawson Cadillac Co., Inc.,* 214 Ill.App.3d 995, 1001 (Ill.App.Ct.1991) ("In interpreting the Consumer Fraud Act, courts have declined to use the restrictive elements of common law fraud and have been willing to give effect to the legislative goals behind enactment of this genre of consumer protection legislation."). Without clear state authority requiring Plaintiffs to plead a fiduciary relationship with Ford under the Illinois CFA, the Court here declines to legislate an additional element from the bench.

**\*27** Moreover, Illinois courts have regularly found actionable CFA claims in like circumstances to this case, where a plaintiff brings suit against an automobile manufacturer for allegedly deceiving the consumer about safety risks. *See, e.g., Lipinski v. Martin J. Kelly Oldsmobile, Inc.,* 325 Ill.App.3d 1139, 1143 (Ill.App.Ct.2001) (finding proper claim under Illinois CFA where plaintiff alleged that defendant knowingly concealed a defect in vehicle prior to sale, thus constituting an actionable omission); *Perona v. Volkswagen of Am., Inc.,* 292 Ill.App.3d 59, 67–69 (Ill.App.Ct.1997) (holding that plaintiffs properly stated a claim under the Illinois CFA in class action brought against car manufacturer for concealing safety risks); *Connick,* 675 N.E.2d at 594 ("Plaintiffs alleged that Suzuki was aware of the Samurai's safety problems, including its tendency to roll over and its inadequate protection for passengers.... Plaintiffs further alleged that Suzuki failed to disclose these defects."); *Totz v. Cont'l Du Page Acura,* 236 Ill.App.3d 891, 903 (Ill.App.Ct.1992) (holding that failure of a used car dealer to disclose a known history of vehicle damage was actionable under the Illinois CFA, regardless of the existence of a common law duty to disclose). The Court will deny Ford's motion to dismiss Plaintiffs' Illinois CFA claim.

### 5. New Jersey

The New Jersey Consumer Fraud Act ("New Jersey CFA") declares it to be an unlawful practice for "any person"

to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact ... in connection with the sale or advertisement of any merchandise." N.J.S.A. § 56:8–2. "Thus, to state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 12 (App.Div.2003); *see also Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 473 (1988). Under the CFA, "person" is defined broadly to include any natural person, partnership, corporation or company. N.J.S.A. § 56:8–1(d). Dismissal for failure to state a claim, "in the [New Jersey] CFA context, is ... appropriately approached with hesitation." *Schering–Plough Corp.,* 367 N.J. Super, at 13 (citing *Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 249–50 (App.Div.2002)).

Ford does not dispute that Plaintiffs properly allege the first element, unlawful conduct under the New Jersey CFA, and this Court finds that Plaintiffs' allegations satisfy this prong. As the Court has already found, Plaintiffs allege fraudulent concealment of the E350 safety risks with regard to equitable tolling. For similar reasons, Plaintiffs properly allege fraudulent behavior in the context of the New Jersey CFA. However, again citing *Thiedemann,* 872 A.2d 794, Ford contends that Plaintiffs fail to allege an "ascertainable loss" as mandated by the statute. For the reasons expressed earlier, *see supra* Section II.D.2, the Court finds this argument unavailing at this juncture. *See Perkins v. DaimlerChrysler Corp.,* 383 N.J.Super. 99, 110–11 (App.Div.2006) ("[U]nlike *Thiedemann,* where the court reviewed a summary judgment, we cannot affirm the dismissal of the complaint based upon plaintiff's failure to provide evidence of a diminution in value."); *Lamont v. OPTA Corp.,* No. 2226–05, 2006 WL 1669019, at *7 (N.J.App. Div. June 16, 2006) ("There is nothing in *Thiedmann* that requires the pleading of an ascertainable loss element of a consumer Fraud Act cause of action with any special specificity.").

**\*28** Ford also challenges Plaintiffs' New Jersey CFA claim for lack of a causal nexus between the violation and the resulting loss. Specifically, Ford argues that Plaintiffs pursue a "fraud on the market" theory of recovery to prove causation. (Ford Br. at 66–67.) Under that theory, "plaintiffs who purchased securities are permitted to demonstrate that they were damaged simply because defendant engaged in behavior

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

otherwise prohibited was there a change in price." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 392 (2007). Yet, New Jersey courts "have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation." *Id.; see also Kaufman v. i-Stat Corp.,* 165 N.J. 94, 118 (2000). Thus, to the extent Plaintiffs indeed allege their New Jersey CFA claim under a fraud on the market theory, this theory cannot survive. *See Schering–Plough,* 367 N.J.Super. at 16 (determining, on motion to dismiss, that fraud on the market theory has "no place as a part of the proofs required of plaintiffs in the CFA context").

Here, however, Plaintiffs do not expressly, nor impliedly, plead such a theory. Rather, the Court finds that Plaintiffs adequately allege causal nexus under circumstances distinguishable from fraud on the market. Plaintiffs allege that "Ford's conduct herein is an unfair practice that has the capacity to, and did, deceive customers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15 passengers." (Compl.¶ 93.) Construing Plaintiffs' allegations in a light most favorable to them, the Complaint charges that Ford's alleged violations led to Plaintiffs' damages by virtue of Ford's misrepresentations and omissions directed at Plaintiffs as direct customers. These facts differ from fraud on the market, because under that theory, a plaintiff must allege "only that the price charged" for the product at issue "was higher than it should have been as a result of defendant's fraudulent marketing campaign[.]" *Merck,* 192 N.J. at 392. In other words, a party pursues fraud on the market, or "price inflation theory," when it alleges that "the fact of advertising the products caused the prices to rise both for the ones that are effective and for these, allegedly ineffective products as well." *Schering–Plough,* 367 N.J.Super. at 15, 16. Yet here, Plaintiffs allege that Ford's fraudulent acts and omissions caused Plaintiffs' damages in the form of diminution in value and loss of use. They do not claim that the price charged for the allegedly unsafe vehicles was inflated by a broad advertising campaign. Thus, unlike the plaintiffs in *Merck* and *Schering–Plough,* Plaintiffs here do not pursue the price inflation theory, nor otherwise allege circumstances associated with a "change in price" on the market. *Merck,* 192 N.J. at 392. Given the "hesitation" urged by New Jersey courts in approaching motions to dismiss New Jersey CFA claims, and generally construing Plaintiffs' allegations with liberality, the Court cannot find that Plaintiffs plead fraud on the market as a matter of law. Accordingly, for the reasons discussed with regard to Plaintiffs' California UCL claim, *supra* Section

II.H.3, Plaintiffs properly plead a causal relationship between their loss and Ford's alleged unlawful conduct.

**\*29** Ford last argues that Plaintiffs' New Jersey CFA claim is nevertheless barred by the economic loss doctrine. While the Supreme Court of New Jersey has excluded recovery in tort for purely economic losses that instead may be pursued under contract or warranty claims, *see Alloway v. Gen. Marine Indus., L.P.,* 695 A.2d 264, 275 (N.J.1997), Ford cites no authority extending this doctrine to bar recovery under the New Jersey CFA. Indeed, in *Alloway,* the court expressly recognized "the Consumer Fraud Act, which provides generous protection to defrauded consumers[,]" as an example of a statutory enactment granting consumers the right to recover economic losses. *Id.* at 274; *see also Payne v. Fujifilm U.S.A., Inc.,* No. 07–385, 2007 WL 4591281, at *10 (D.N.J. Dec 28, 2007) (rejecting defendant's economic loss doctrine argument and permitting New Jersey CFA and warranty claims to proceed); *First Valley Leasing, Inc. v. Goushy,* 795 F.Supp. 693, 699 (D.N.J.1992) ("[T]he court believes that ... the New Jersey Supreme Court would permit plaintiff to pursue its claims for tort [fraud and New Jersey CFA] damages against defendant" alongside UCC claims); *Coastal Group v. Dryvit Sys.,* 274 N.J.Super. 171, 180 (App.Div.1994) ("Since this case must be remanded to the trial court to permit plaintiff to pursue its claims of fraud, misrepresentation and violation of the Consumer Fraud Act, we believe that the interests of justice will be served by also allowing plaintiff to amend its complaint to assert a claim against Dryvit under the UCC."); *Perth Amboy Iron Works v. Am. Home Assurance Co.,* 226 N.J.Super. 200, 226– 27 (App.Div.1988) (holding that commercial buyer of yacht could maintain Consumer Fraud Act and common-law fraud claims based on economic loss).

Moreover, the UCC expressly preserves a buyer's right to maintain an action in fraud. *See* N.J.S.A. § 12A: 1–103 ("Unless displaced by the particular provisions of this Act, ... the law relative to ... fraud ... shall supplement [the UCC's] provisions."), *aff'd,* 118 N.J. 249 (1990); *see also Delgozzo v. Kenny,* 266 N.J.Super. 169, 183 (App.Div.1993) (noting that under N.J.S.A. § 12A:1–103, the UCC does not "preempt" either common law fraud or CFA claims). Thus, Plaintiffs properly plead a violation of the New Jersey CFA, an ascertainable loss, and a causal connection. Accordingly, the Court concludes that Plaintiffs state a claim for relief under the New Jersey CFA.

### III. Conclusion and Order

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 229 of 751
PageID: 11595
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
2008 WL 4126264, 66 UCC Rep.Serv.2d 726

For the foregoing reasons, Ford's motion to dismiss (Doc. No. 33) is GRANTED IN PART and DENIED IN PART. Specifically,

1. Plaintiffs' First Cause of Action, breach of express warranty, is4 DISMISSED WITHOUT PREJUDICE as to the Alabama, Arkansas, and Illinois parties for failure to comply with notice requirements. The First Cause of Action, however, remains at issue for Plaintiffs' California and New Jersey suits.

2. Plaintiffs' Second Cause of Action, breach of implied warranty, insofar as it is brought by the Alabama, Arkansas, and Illinois parties, is DISMISSED WITHOUT PREJUDICE for failure to comply with notice requirements. However, the Second Cause of Action remains pending as to Plaintiffs' California and New Jersey suits.

 *30  3. Ford's motion to dismiss Plaintiffs' Third Cause of Action, sounding in unjust enrichment, is DENIED. Plaintiffs' Third Cause of Action shall endure as to all parties.

4. Plaintiff New Bethlehem's (Alabama) Fourth Cause of Action, brought under the Alabama DTPA, is DISMISSED for lack of standing.

5. Plaintiff Eleventh Street's (Arkansas) Fourth Cause of Action, brought under the Arkansas DTPA, is DISMISSED for lack of cognizable damages.

6. Plaintiff Greater All Nation's (California) Fourth Cause of Action, insofar as it is brought under the California CLRA theory, is DISMISSED for lack of standing. However, Plaintiff Greater All Nation's Fourth Cause of Action with regards to the California UCL and California FAL, remains in contention.

7. Ford's motion to dismiss Plaintiff Pentecostal Temple's (Illinois) Fourth Cause of Action, brought under the Illinois CFA, is DENIED. Pentecostal Temple's Fourth Cause of Action remains at issue.

8. Ford's motion to dismiss Plaintiffs' Fourth Cause of Action, insofar as it sounds in the New Jersey CFA, is DENIED. Plaintiffs' New Jersey CFA claim endures.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4126264, 66 UCC Rep.Serv.2d 726

---

Footnotes

1    *New Bethlehem Baptist Church v. Ford Motor Co.,* No. 2:05–519 (N.D.Ala.); *Eleventh Street Baptist Church v. Ford Motor Co.,* No. 4:05–4020 (W.D.Ark.); *Greater All Nation Pentecost Church of Jesus Christ v. Ford Motor Co.,* No. 2:05–1765 (C.D.Cal); *Pentecostal Temple Church of God in Christ v. Ford Motor Co.,* No. 1:05–1340 (N.D.Ill.); *Social Clubhouse, Inc. v. Ford Motor Co.,* No. 2:03–4558 (D.N.J.).

2    On May 4, 2007, Greater Holy Trinity Baptist Church voluntarily dismissed its lawsuit.

3    Defendants do not argue that the New Jersey Plaintiffs' claims suffer from the same infirmity.

4    For this proposition, however, Plaintiffs cite no specific cases from, or applying the law of, Alabama, Arkansas, California, or Illinois.

5    The authors also do not cite to any case from Arkansas or California to support this proposition.

6    At the time, the notice requirement appeared in section 1769 of the Civil Code, which provided that if a "buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor." *Id.*

7    Plaintiffs rely on a prior Illinois Supreme Court decision for the proposition that "the filing of a lawsuit by injured consumers constitutes sufficient notice." (Pls.' Br. at 34 (citing *Goldstein v. G.D. Searle & Co.,* 378 N.E.2d 1083, 1088 (Ill.App.Ct.1978).) That decision was limited by the Illinois Supreme Court in *Board of Education of City of Chicago v. A, C and S, Inc.,* 546 N.E.2d 580, 596 (Ill.1989), to cases involving personal injuries to consumers. *Brookings Mun. Utilities, Inc. v. Amoco Chem. Co.,* 103 F.Supp.2d 1169, 1177 n.8 (D.S.D.2000). Here, Illinois Plaintiff Pentecostal Temple asserts economic harm, not personal injuries, and Plaintiffs' proposed class specifically excludes any person who claims damages for personal injury as a result of purchasing or leasing an E350 van.

8    Other elements of Plaintiffs' implied warranty claims are discussed in greater detail later in this Opinion. *See infra* Section II.F.

9    *Sinclair v. Merck & Co.,* 195 N.J. 51 (2008), handed down on June 4, 2008, and cited by Ford in supplemental briefing, is inapposite. There, the Supreme Court of New Jersey dismissed a Products Liability Act ("PLA") claim for failure to allege

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 230 of 751
PageID: 11596
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

2008 WL 4126264, 66 UCC Rep.Serv.2d 726

a "physical injury" as required by the statute. *Id.* at 64. Here, Plaintiffs do not pursue a PLA claim, in part because, by design, the PLA "except[s] actions for harm caused by breach of an express warranty[,]" which Plaintiffs expressly allege. N.J.S.A. § 2A:58C-lb(3). The *Sinclair* Court also does not mandate dismissal of unjust enrichment and state consumer fraud claims where a party does not plead a PLA claim. *See Sinclair,* 195 N.J. at 65.

10    Ford does not move to dismiss Plaintiff New Bethlehem's (Alabama) warranty claims based on statute of limitations grounds.

11    The following language has been codified by California and New Jersey law:

   (2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

   *See* Cal. Com.Code § 2316; N.J.S.A. § 12A:2–316.

12    According to Ford, Plaintiffs' unjust enrichment claims are also time barred. Although Plaintiffs failed to address this issue in their opposition brief, Ford also did not articulate why principles of fraudulent concealment or equitable tolling, as methods of tolling the relevant statutes of limitations, are not available to Plaintiffs in connection with their unjust enrichment claims.

13    Ford's argument that Plaintiffs' California UCL claim is barred by the statute of limitations is unavailing. The discovery rule is inapplicable to a UCL claim, but as found earlier, Plaintiffs state a proper claim for "equitable tolling based on fraudulent concealment." *Stutz Motor Car of Am., Inc. v. Reebok Int'l., Ltd.,* 909 F.Supp. 1353, 1364 (C.D.Cal.1995); *see also Suh v. Yang,* 987 F.Supp. 783, 795 n.8 (N.D.Cal.1997) ("The doctrine of equitable tolling suspends the running of the statute of limitations if the plaintiff proves that the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence.") (internal quotation omitted).

14    Ford's arguments that the statute of limitations bars Plaintiffs' claim, and that Plaintiffs failed to plead with particularity, lack merit. *See supra* Sections II.H.2; II.H.3.a.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 22

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 232 of 751
PageID: 11598
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

KeyCite Yellow Flag - Negative Treatment

Order Corrected on Denial of Reconsideration by In re Ford Tailgate Litigation, N.D.Cal., April 15, 2014

2014 WL 1007066
United States District Court, N.D. California.
**San Francisco Division**

In re Ford Tailgate Litigation

Case No. 11–CV–2953–RS
|
Signed March 11, 2014
|
Filed March 12, 2014

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT FORD MOTOR COMPANY'S MOTION TO DISMISS PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT**

Richard Seeborg, United States District Judge

**\*1** This putative class action involves thirty named plaintiffs from twenty-five states who seek to represent a nationwide class of millions of current and former owners or lessees of Ford vehicles. Plaintiffs allege that due to faulty manufacturing and/or design, the Ford vehicles at issue are defective in that the appliqué panel on the rear liftgate of the vehicles is prone to cracking, thereby posing a safety hazard. The alleged defect is referred to here as the "Cracked Tailgate Problem." None of the named plaintiffs alleges the panel on his or her vehicle exhibited any cracking during the vehicle's warranty period. Defendants now move for partial dismissal of plaintiffs' Second Consolidated Amended Complaint. For the following reasons, plaintiffs' express and implied warranty claims arising under state law, as well as other state tort claims are dismissed without leave to amend. Plaintiffs' Magnuson Moss Warranty Act claim is dismissed with leave to amend, as are the majority of plaintiffs' unjust enrichment claims. The motion to dismiss is denied as to certain of plaintiffs' consumer protection and deceptive trade practices claims.

II. BACKGROUND

A. *Procedural History*

This case consolidates three separate lawsuits filed in this district: *Nettleton v. Ford Motor Co.,* No. CV–11–2953; *Gettman v. Ford Motor Co.,* No. CV–11–3133; and *Perrone v. Ford Motor Co.,* No. CV–11–3832. Plaintiffs' First Consolidated Amended Complaint added several named Plaintiffs and sought certification of both a nationwide class and twenty-five state subclasses. Ford answered the complaint, and discovery commenced.

Plaintiffs filed their Second Consolidated Amended Class Action Complaint (SCAC) on November 1, 2013, adding two additional plaintiffs (one in New Jersey and one in Florida). There are now a total of thirty named plaintiffs representing twenty-five states.[1] The nationwide class is defined as "[a]ll current and former owners or lessees of a model 2002 through model 2005 Ford Explorer or Mercury Mountaineer, or model 2003 through model 2005 Lincoln Aviator, in the United States." (SCAC ¶ 294.) Plaintiffs assert claims on behalf of themselves and a putative nationwide class for violations of the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301–2312. (*Id.* ¶¶ 10, 304–12.) Plaintiffs also represent subclasses of current and former owners and lessees who purchased the subject vehicles in one of the twenty-five states in which the individual named plaintiffs reside. (*Id.* ¶ 295(a)–(y)). Plaintiffs further allege state law claims, including breach of express and implied warranties, breach of implied warranty of merchantability, unjust enrichment, violation of state consumer protection statutes, negligence, and other state tort law claims. (*Id.* ¶¶ 313–876.) Ford now moves to dismiss with prejudice fifty-seven of plaintiffs' seventy-four claims under Fed.R.Civ.P. 12(b)(6).[2]

B. *Factual Background*[3]

**\*2** In 2002, Ford redesigned its primary four-door sports utility vehicle model known then as the Ford Explorer/ Mercury Mountaineer. The 2002 redesign served as the basis for the 2002 to 2005 model years for the Ford Explorer and Mercury Mountaineer vehicles and the 2003 to 2005 Lincoln Aviator. Thus, all the vehicles at issue are mechanically identical, share the same model chassis, and have materially identical liftgates and tailgates. Ford marketed, distributed, and warranted the Ford vehicles in the United States. During the calendar years 2002 through 2005, Ford sold at least 1,386,086 Ford Explorers, 174,243 Mercury Mountaineers, and 70,890 Lincoln Aviators in the United States, totaling approximately 1.6 million Ford vehicles at issue in this litigation.

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 233 of 751
PageID: 11599
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

Plaintiffs allege that Ford has been aware of the defect in the appliqué since the first car rolled off the assembly line in 2002. Among other reasons, they base that claim on allegations that the Cracked Tailgate Problem began occurring: (a) almost immediately after the first models of the Ford vehicles were sold; (b) in an identical position on the defective part (i.e., the lower panel on the tailgate); (c) with nearly identical resulting damage to the defective part (a vertical crack across the lower panel); (d) across all three brand models (i.e., Ford, Lincoln, and Mercury); and (e) to thousands of Ford vehicles throughout the United States. Ford thereafter issued several Technical Service Bulletins to its dealerships regarding the Cracked Tailgate Problem. These bulletins, issued between December of 2002 and November 2005, were circulated only to dealership service departments and not to vehicle owners or to the public.

The Cracked Tailgate Problem presents known safety hazards, according to plaintiffs. They claim that as a result of the defect, the liftglass window portion of the tailgate is more susceptible to breaking and shattering, which poses a risk of bodily harm. Plaintiffs aver that the appliqué may also detach and fly off while a vehicle is in operation, resulting in the known danger of vehiclerelated road debris.

Plaintiffs allege that Ford has actively concealed material information regarding this defect, thereby allowing the company to continue to sell and/or lease these vehicles to putative class members and to avoid the expense of the repair or redesign necessary to address properly the Cracked Tailgate Problem. As a result, plaintiffs aver, neither they nor the other putative class members could have discovered, even upon the reasonable exercise of diligence, that the Cracked Tailgate Problem was caused by a design or manufacturing flaw in the use of ABS or Xenoy for the tailgate.

III. LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Pleadings must be so construed so as to do justice." Fed.R.Civ.P. 8(e). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." Id. at 679.

In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. Lucas v. Dep't of Corporations, 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. Dumas v. Kipp, 90 F.3d 386, 393 (9th Cir.1996).

IV. DISCUSSION

A. Express and Implied Warranty Claims

1. Breach of Express Warranty

 *3  Ford first argues that plaintiffs' express and implied warranty claims must be dismissed because none of the plaintiffs aver that the alleged defect (i.e., the cracked tailgate) manifested during the warranty period. Ford's New Vehicle Limited Warranty (NVLW) provides that "[d]uring the coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust, all parts on [the] vehicle that are defective in factory-supplied materials or workmanship." (Tew Decl., Ex. 1 at 5–6; Ex. 2 at 6–7.)[4] The NVLW further provides that "coverage begins at the warranty start date and lasts for three years or 36,000 miles whichever occurs first" and "[t]he warranty period starts on the day [the buyer] take[s] delivery of [the] new vehicle or the day it is first put into service." (Id. at 2, 6–7.)

In response, plaintiffs counter that the alleged defect is not a cracked tailgate but rather a defective tailgate made from material prone to cracking. According to plaintiffs, this latent defect was present at the time of the purchase or lease, thus triggering Ford's obligations under its NVLW regardless of when the tailgates themselves cracked. In other words, according to plaintiffs, a cracked tailgate is simply a by-product of the defect and not the defect itself.

Ford persuasively argues that a majority of states have rejected similar latent defect claims, invoking cases from many—though not all[5]—of the states in which plaintiffs bring express warranty claims. Ford also points to a Ninth Circuit case recognizing that California has adopted this majority position: "The general rule is that an express warranty does not cover repairs made after the applicable time or mileage

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 234 of 751
PageID: 11600
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

periods have elapsed." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir.2008) (quoting *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App.4th 824, 830, (2006)). *Clemens* goes on to criticize the position asserted by plaintiffs here, which the Ninth Circuit characterizes as one that "conflate[s] notions of express and implied warranty and pushe[s] the definition of "defect" to the breaking point." *Id.* The Ninth Circuit explains:

> Every manufactured item is defective at the time of sale in the sense that it will not last forever; the flip-side of this original sin is the product's useful life. If a manufacturer determines that useful life and warrants the product for a lesser period of time, we can hardly say that the warranty is implicated when the item fails after the warranty period expires. The product has performed as expressly warranted. Claims regarding other buyer expectations and the manufacturer's state of mind properly sound in fraud and implied warranty.

*Id.*

Plaintiffs offer only a single counter-example in which a federal court, applying Michigan and Tennessee state law, allowed the plaintiffs to proceed with an express warranty claim predicated on a latent defect theory. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069 (S.D.Ind.2001), *rev'd on other grounds,* 288 F.3d 1012 (7th Cir.2002). However, the plaintiffs in *Bridgestone/Firestone* alleged the defendants "expressly warrant[ed] the Tires and Explorers to be free of defects at the time of delivery." *Id.* at 1101. Plaintiffs make no such averment here; *Bridgestone/Firestone* is thus of little persuasive value. Indeed, as the Seventh Circuit noted on appeal, "most states would not entertain the sort of theory that plaintiffs press." 288 F.3d at 1017 (reversing the district court's class certification decision in that case on other grounds). In fact, the only Tennessee state court decision cited by either party rejected a similar latent defect argument. *Moulton v. Ford Motor Co.,* 13 UCC Rep. Serv. 55, 59, 1973 WL 21361 (Tenn.Ct.App. May 25, 1973).

**\*4** Defendants acknowledge they could not locate case law on point in Alabama, Indiana, New Hampshire, or West Virginia. Plaintiffs, however, make no argument as to why those states, which have also adopted the Uniform Commercial Code (U.C.C.), would reach any contrary result. Though mindful that the burden rests squarely with defendants to show that the facts as alleged fail to state even a plausible claim for relief, the absence of any contrary authority is persuasive. Plaintiffs' claims for breach of express warranty, must therefore be dismissed without leave to amend.[6]

### 2. Implied Warranty Claims

In addition to their express warranty claims, plaintiffs assert implied warranty claims in six states.[7] Ford counters that its NVLW expressly limits any implied warranties "to the time period covered by the written warranties." (Tew Decl., Ex. 1 at 4; Ex. 2 at 5.) The U.C.C., as adopted by each of the plaintiffs' states, permits sellers or manufacturers to limit expressly the duration of any implied warranties, as does the federal Magnuson–Moss Warranty Act.[8] Plaintiffs do not challenge Ford's ability to impose such a limit or the adequacy of this provision of the NVLW. Nor do they make any allegation that this particular provision was unconscionable. Instead, plaintiffs assert that the same latent defect theory discussed above makes this provision inapplicable as the vehicles were therefore not fit at the time of sale.

While plaintiffs point to various state and federal decisions to suggest that an implied warranty claim may lie where a product is allegedly prone to defect at the time of sale even if the defect does not manifest, if at all, until after the close of the warranty period, none are persuasive. In fact, only one of those decisions concerns a state in which plaintiffs advance such a claim: *Hornberger v. Gen. Motors Corp.,* 929 F.Supp. 884, 887–88 (E.D.Pa.1996).[9] The district court in *Hornberger* found that the plaintiff did not receive any disclaimer of the implied warranty until after the sale was completed; thereby rendering the disclaimer invalid. Plaintiffs make no such allegation here, nor do they otherwise answer defendant's assertion that it explicitly limited all implied warranties to the duration of its express warranty as permitted by the law of each relevant state. In the absence of any allegation by plaintiffs that the durational limit here was unconscionable or otherwise invalid, plaintiffs implied warranties claims must be dismissed without leave to amend.[10]

**\*5** Plaintiffs also assert a claim for tortious breach of warranty under Ohio law, a form of action apparently intended to provide a remedy to remote purchasers not covered by written warranties due to the lack of privity. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.,* 537 N.E.2d 624, 634 (Ohio 1989). As the *Chemtrol* court explained, "Application of the doctrine of implied warranty in tort to all products liability cases would render useless many, if not all, of the Uniform Commercial Code provisions involving

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 235 of 751
PageID: 11601
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

products liability." *Id.* (internal quotations omitted). In this case, the Ohio plaintiff, Diana Brunner, purchased her vehicle from a Ford dealership and otherwise appears to be entitled to the benefit of Ford's express NVLW and any implied warranties not explicitly disclaimed therein. As such, Ford argues and plaintiffs do not dispute that Brunner is not entitled to relief under this hybrid tort remedy. In any case, Ohio allows manufacturers to limit the duration of any implied warranties. Ohio Rev.Code Ann. § 1302.29. The cases relied upon by plaintiffs concern class certification and do not establish any exception to the general rule discussed above. County Forty–Nine is therefore dismissed without leave to amend.

### 3. Magnuson–Moss Warranty Act

The Magnuson–Moss Warranty Act (MMWA) provides a federal class action remedy for breach of an implied or express warranty. 15 U.S.C. § 2310(d). "[C]laims under the Magnuson—Moss Act stand or fall with [plaintiffs'] express and implied warranty claims under state law. Therefore, this court's disposition of the state law warranty claims determines the disposition of the Magnuson—Moss Act claims." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1022 (9th Cir.2008). Those plaintiffs whose state law warranty claims are herein dismissed therefore lack any basis to assert claims under the Magnuson—Moss Act. Plaintiffs' bare assertion that "any attempt by Defendants to limit the express warranties in a manner that would exclude coverage of the Ford Vehicles is unconscionable and any such effort to disclaim, or otherwise limit, liability for the Ford Vehicles is null and void," without more, is insufficient to show that warranties should be treated as deceptive under the MMWA. The Ninth Circuit has held that the same Ford NVLW at issue in this litigation is not unconscionable. *See Smith v. Ford Motor Co.,* 462 Fed.Appx. 660, 663 (9th Cir.2011).

Plaintiffs MMWA claim must also be dismissed as to those plaintiffs in California, Florida, Illinois, Louisiana, Michigan, New York, and Washington who do not allege any breach of warranty claims under their respective state laws. Plaintiffs argue they are "masters of their complaint [who] may choose which claims to bring or not to bring." That may be true, but without any allegations as to how plaintiffs in those states have suffered a cognizable claim for breach of an implied or express warranty under their states' laws when plaintiffs' other express and implied warranty claims have failed, the SCAC is insufficient to assert claims under the MMWA on their own behalf or on behalf of others in those states. To the extent that

any of these deficiencies may be cured, Count One is therefore dismissed with leave to amend.

### B. *Unjust Enrichment Claims*

Ford next moves to dismiss plaintiffs' unjust enrichment claims. There is some debate as to whether a plaintiff may allege a stand-alone claim for unjust enrichment at all. California, among other jurisdictions, has rejected independent unjust enrichment claims. *See Jogani v. Superior Court,* 165 Cal.App.4th 901 (2008); *see also Baba v. Hewlett–Packard Co.,* C 09–05946 RS, 2010 WL 2486353 (N.D. Cal. June 16, 2010). Other states, like Florida, recognize such a claim only where plaintiffs lack an adequate remedy at law. *See Matthews v. Am. Honda Motor Co., Inc.,* 12–60630–CIV, 2012 WL 2520675 (S.D. Fla. June 6, 2012).

To the extent unjust enrichment is available as an independent claim, and not merely a remedy, it will not stand where the claim simply mirrors other statutory or tort claims. Plaintiffs are, of course, entitled to plead alternative claims. Fed.R.Civ.P. 8(d). However, "where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action." *Licul v. Volkswagen Grp. of Am., Inc.,* 13–61686–CIV, 2013 WL 6328734 (S.D.Fla. Dec. 5, 2013); *see also In re Apple & AT & T iPad Unlimited Data Plan Litig.,* 802 F.Supp.2d 1070, 1077 (N.D.Cal.2011) ("plaintiffs can not assert unjust enrichment claims that are merely duplicative of statutory or tort claims"). As in those cases, plaintiffs do not distinguish the alleged deception underlying their unjust enrichment claims from that underlying their state tort claims. If plaintiffs claim they were damaged as a result of consumer deception, the proper remedy is under their respective state consumer protection statutes. If plaintiffs claim Ford failed to perform under the terms of its express warranty or implied warranty, the appropriate remedy is under those claims for relief. Should plaintiffs ultimately be unable to recover under either a contract or tort theory, it does not mean a legal remedy was unavailable (thereby justifying an equitable remedy of unjust enrichment), but only that their claim lacks merit. Defendant's motion to dismiss must therefore be granted as to plaintiffs' claims for unjust enrichment.[11] These claims are dismissed with leave to amend except for the California claim (Count Seven), as that state has specifically rejected such a claim in this context. *See Jogani,* 165 Cal.App.4th 901.[12]

## C. *Economic Loss Doctrine*

### 1. *Ohio Negligence Claim*

**\*6** Like many jurisdictions, the Ohio Supreme Court has held that a plaintiff cannot recover in negligence for purely economic losses allegedly caused by a defective product when the only damage is to the product itself. *Inglis v. Am. Motors Corp.,* 209 N.E.2d 583, 588 (1965); *see E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 868–75 (1986). A more recent Ohio decision suggested in dicta that this rule applies only where the consumer was in privity with the manufacturer at the time of sale. *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.,* 537 N.E.2d 624 (Ohio 1989). "For an ordinary consumer, i.e., one not in privity of contract with the seller or manufacturer against whom recovery is sought, an action in negligence may be an appropriate remedy to protect the consumer's property interests." *Id.* at 631. The question presented in *Chemtrol* was whether a commercial buyer could recover economic loss in strict liability where the parties are in privity of contract, a question the Ohio court answered in the negative. *Id.* at 635. The Ohio state courts, however, continue to apply *Inglis* not *Chemtrol* in cases involving individual consumers. *See Potts v. Safeco Ins. Co.,* No.2009CA0083, 2010 WL 183 973 8, at *2 (Ohio Ct.App. May 3, 2010) (affirming summary judgment for insurance company, agent, and agency against noncommercial plaintiffs' negligence action to recover economic losses); *Hundemer v. Partin,* No. CA2007–01–006, 2007 WL 3054324, at *5 (Ohio Ct.App. Oct. 22, 2007) (affirming dismissal of individual's negligence claim); *Lee v. Chrysler Corp.,* No.2004CA00164, 2005 WL 449762, at *3 (Ohio Ct.App. Feb. 22, 2005) (affirming dismissal of consumer's negligence claim against the manufacturer for economic losses).

Plaintiffs rely on three recent decisions from the federal district court that applied *Chemtrol* to allow negligence claims where, as here, the parties are not in privity. *See, e.g., In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.,* 880 F.Supp.2d 801, 816, 871–73 (S.D.Ohio 2012); *Hale v. Enerco Grp., Inc.,* No. 1:10 CV 00867–DAP, 2011 U.S. Dist. LEXIS 781, at *19–20 (N.D.Ohio Jan. 5, 2011) ("[I]n cases where the parties are not in privity of contract, [Ohio] courts apply a more relaxed rule, allowing individual consumers to bring negligence claims for solely economic injuries.") (quotation omitted); *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.,*684 F.Supp.2d 942, 951 (N.D.Ohio 2009) (same). None of these federal cases cite *Inglis* or discuss the continuing viability of that case. Because

*Inglis* continues to be the rule in Ohio, defendant's motion to dismiss plaintiffs' Ohio negligence claim (Count Fifty–One) must be granted without leave to amend.

### 2. *North Carolina and Pennsylvania Consumer Protection Claims*

Ford next argues the economic loss rule bars plaintiffs consumer protection claims in North Carolina and Pennsylvania. As the law is not clear in either state, plaintiffs' claim cannot be dismissed at this stage as a matter of law.

Ford's argument that the economic loss rule should bar plaintiffs' claim under North Carolina's Unfair and Deceptive Trade Practice Act (UDTPA) rests on federal district court cases holding such claims should be barred. Neither party here points to any North Carolina cases directly addressing whether the economic loss rule precludes claims under the UDTPA. Plaintiffs rely on *Coley v. Champion Home Builders Co.,* 590 S.E.2d 20 (N.C.Ct.App.2004), which held that the plaintiffs sufficiently pleaded actual injury on the basis of a product defect that exposed them to the risk of personal injury and property damage, even though they did not seek damages beyond their replacement cost. *Coley* did not consider the economic loss rule, but neither does Ford point to any decisions from North Carolina precluding such claims. In the absence of such authority, it cannot be said at this juncture that plaintiffs' claims in Count Forty–Six are barred as a matter of law.

The same is true in Pennsylvania. In the absence of any binding authority from the Pennsylvania courts concerning the economic loss rule, the Third Circuit upheld the district court's dismissal of similar claims, predicting that the Pennsylvania courts would apply the economic loss doctrine to bar such claims under Pennsylvania's Unfair Trade Practices and Consumer Protection Claims Law (UTPCPL). *See Werwinski v. Ford Motor Co.,* 286 F.3d 661, 681 (3d Cir.2002). The Pennsylvania Supreme Court has yet to weigh in, but several Pennsylvania trial and intermediate appellate decisions have rejected the Third Circuit's analysis. In rejecting *Werwinski,* "[t]he [Pennsylvania] state courts explained that applying the economic loss doctrine to claims under the Pennsylvania Law would eviscerate the purpose of the statute and that the Pennsylvania legislature was fully aware of the doctrine when it enacted the Pennsylvania Law and thus did not intend for the doctrine to bar claims brought pursuant to the Law." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.,* No. 05 C 4742, 05 C 2623, 2009 WL 937256, at *9 (N.D.Ill. Apr. 6, 2009) (citations omitted);

see also *Seward v. Certo,* No. 05–6363, 2006 WL 266150, at *2 (E.D.Pa. Feb. 2, 2006) ("Pennsylvania courts, noting that lower federal court holdings are not binding on state courts, have expressly disagreed with *Werwinski* 's holding and refused to apply the economic loss doctrine to UTPCPL claims.") (citations omitted). In light of this contradictory authority, plaintiffs' claim (Count Fifty–Seven) cannot be dismissed at this stage as a matter of law.

### 3. Colorado Strict Liability Claim

**\*7** In 2000, the Colorado Supreme Court adopted the economic loss doctrine, holding "that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1264 (Colo.2000). Although the claim at issue in *Town of Alma* was for negligence, the state court engaged in a broad review of the development of the economic loss rule in tort law. *Id.* at 1259–1264. The court concluded, "Consistent with this duty analysis, we now expressly adopt the economic loss rule. We hold that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264. Consistent with *Town of Alma,* Ford's motion to dismiss is granted without leave to amend as to plaintiffs' strict liability claim (Count Nine).

### D. Statute of Limitations

#### 1. Florida Deceptive and Unfair Trade Practices Act and Unjust Enrichment Claims

Ford next moves to dismiss the claims of Florida plaintiffs Zane Dery and Lynne Benson brought under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Count Fourteen) and for unjust enrichment (Count Sixteen).[13] Benson purchased a new 2005 Ford Explorer in 2006. Dery's claims are predicated on two different Ford vehicle purchases: a used 2003 Lincoln Aviator purchased in 2006 and a used 2005 Lincoln Aviator purchased in 2008. Ford does not argue Dery's FDUPTA and unjust enrichment claims predicated on the 2008 purchase are time barred. It does argue, however, that Benson's claims and Dery's claims as they relate to his 2006 purchase are barred by the four-year statute of limitations set forth in Fla. Stat. § 95.11(d)(f). *See McKissic v. Country Coach, Inc.,* No. 07–1488, 2008 WL 616093, at *4 (M.D.Fla. Mar. 3, 2008) (FDUTPA claim); *Swafford v. Schweitzer,* 906

So.2d 1194, 1195 (Fla.Dist.Ct.App.2005) (unjust enrichment claim).

Under Florida law, the statute of limitations applies from the time the action accrued; in this case, the date of purchase. *See S. Motor Co. of Dade Cnty. v. Doktorczyk,* 957 So.2d 1215, 1217 (Fla.Dist.Ct.App.2007) (holding that FDUTPA claim accrues at time vehicle was purchased); *Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.,* 938 So.2d 571, 577 (Fla.Dist.Ct.App.2006) (holding that unjust enrichment claim accrues when benefit is conferred). Time thus began to accrue in 2006 for both Benson and Dery, expiring sometime in 2010 for both claims and before this action was filed in 2011.

Plaintiffs argue incorrectly that the statute of limitations was tolled until plaintiffs discovered the defect according to the doctrine of fraudulent concealment. Florida's tolling statute, Fla. Stat. Ann. § 95.051, "specifically precludes application of any tolling provision not specifically provided therein." *Hearndon v. Graham,* 767 So.2d 1179, 1185 (Fla.2000) (holding delayed discovery may delay the time of accrual but does not toll the applicable statute of limitations). Fraudulent concealment is not listed in § 95.051 among the bases for tolling a statute of limitations. Plaintiffs do not assert delayed discovery here. *Cf. McKissic,* 2008 WL 616093, at *4 (holding that delayed discovery does not apply to FDUTPA and/or unjust enrichment claims). Benson's claims under the FDUTPA (Count Fourteen) and for unjust enrichment (Count Sixteen) must therefore be dismissed without leave to amend, as must Dery's claims as to his 2003 model year vehicle.

#### 2. California Legal Remedies Act (CLRA) Claim

A CLRA claim must "be commenced not more than three years from the date of the commission of such method, act, or practice." Cal. Civ.Code § 1783. Ford argues that plaintiff Sally Nettleton's CLRA claim is time-barred because she alleges she discovered the crack in the appliqué in February 2008 but did not file her Complaint until June 15, 2011.

**\*8** In response, plaintiffs claim that the delayed discovery rule applies as Nettleton's discovery of the crack did not constitute discovery of the alleged defect. "In order to invoke the discovery rule, the plaintiff must plead and prove facts showing: (a) lack of knowledge; (b) lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date); and (c) how and when he did actually discover the fraud or mistake." *Saaremets v. Whirlpool Corp.,* No. 09–2337, 2010 U.S. Dist. LEXIS 26165, at *16 (E.D.Cal. Mar. 18, 2010)

(citing *Gen. Bedding Corp. v. Echevarria,* 947 F.2d 1395, 1397 (9th Cir.1991)). Plaintiffs do not allege any facts to satisfy this third requirement.

Plaintiffs further argue the statute of limitations was tolled in December 2010 by the filing of a putative class action compliant in the Southern District of California that encompassed Nettleton's claims pursuant to *American Pipe & Construction Co. v. Utah,* 414 U.S. 538 (1974). The equitable tolling doctrine articulated in *American Pipe,* however, applies only to federal question claims and not to plaintiffs' state law claim under the CLRA. *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1025 (9th Cir.2008) (declining to apply the doctrine of cross jurisdictional tolling to a California state law claim).

In the alternative, plaintiffs allege the statute of limitations was tolled by virtue of the fraudulent concealment doctrine. To establish fraudulent concealment, a plaintiff must plead the following: "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Saarremets,* 2010 U.S. Dist. LEXIS 26165 at *19–20 (quoting *Clemens,* 534 F.3d at 1024). Fraudulent concealment tolling must be pled with particularity under Fed.R.Civ.P. 9(b). If, as plaintiffs allege, the crack discovered by Nettleton in 2008 is merely a symptom of the defect and not the defect itself, then plaintiffs do not plead the circumstances under which Nettleton became aware of the defect, making it impossible to determine what information was lacking in 2008 such that she possessed neither actual nor presumptive knowledge of facts sufficient to put her on notice as to the nature of her claim. On this basis, Count Five must therefore be dismissed with leave to amend.

### 3. Louisiana Redhibition Claim

The prescriptive period for Louisiana redhibition claims is one year from the date the buyer discovers the alleged defect, or four years from the date the product is delivered to the buyer, whichever is earlier. La. Civ.Code Art. 2534(A)(1). If the seller knows, or is presumed to know, of the existence of the alleged defect, the one-year discovery rule applies regardless of the delivery date. La. Civ.Code Art. 2534(B).

Louisiana Plaintiff Connie Samaha alleges she discovered the cracked appliqué for the first time in 2005 (compl.¶ 175), and then discovered a second crack in April 2011 (compl.¶ 176). Although the tolling period would have run in 2006

based on her discovery of the initial crack, plaintiffs argue Samaha's discovery of the crack in 2005 did not constitute discovery of the underlying defect. This is the same latent defect argument rejected in most jurisdictions, as discussed above, and plaintiffs do not point to any contrary authority from Louisiana. Samaha's redhibition claim (Count Twenty–Six) is therefore time-barred and must be dismissed without leave to amend.

### E. *Statutory Fraud Claims In California, West Virginia, And Massachusetts*

 *9 Ford next moves to dismiss plaintiffs' statutory fraud claims in California (Count Five), Massachusetts (Count Thirty–Two), and West Virginia (Count Seventy–Two) because the SCAC does not adequately allege that plaintiffs provided the required pre-suit notice to Ford before filing the original complaints in these consolidated cases. Pre-suit notice is required by the law of each of these states. The CLRA mandates that "[t]hirty days or more prior to the commencement of an action for damages [under the CLRA], the consumer shall ... [n]otify the person alleged to have" violated the CLRA "of the particular alleged violations" and "[d]emand that the person correct, repair, replace, or otherwise rectify" the violations. Cal. Civ.Code § 1782(a). Similarly, the Massachusetts Consumer Protection Act requires the plaintiff to allege and prove that the defendant was sent a demand letter thirty days prior to filing suit. Mass. Gen. Laws. ch. 93A, § 1; *see York v. Sullivan,* 338 N.E.2d 341, 346 (Mass.1975). Under the West Virginia Consumer Credit and Protection Act, the plaintiff must provide the defendant notice of the alleged violation of the WVCCPA in writing and by certified mail prior to filing suit. W. Va.Code Ann. § 46A–6–106(b).

In support of their Massachusetts and West Virginia claims, plaintiffs generally plead that notice was given to Ford. (SCAC ¶¶ 294, 542.) Nothing more is required at this stage. In Massachusetts, moreover, the failure of a buyer to notify the seller of a breach of warranty only permits a bar for recovery when there has been prejudice to the defendant—a factual determination. *See* M.G.L.A. c. 106, § 2–318; *Henrick,* 458 N.E.2d 773; *see also Baba v. Hewlett–Packard Co.,* C 09–05946 RS, 2010 WL 2486353 (N.D. Cal. June 16, 2010). Defendant's motion must therefore be denied as to Counts Thirty–Two and Seventy–Two.

Plaintiffs do not allege that notice was provided as to the California claim, arguing instead that notice is not required as plaintiffs do not seek compensatory relief, only restitution,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 239 of 751
PageID: 11605
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

declaratory relief, and injunctive relief. Cal. Civ.Code § 1782(d) expressly provides that "an action for injunctive relief" may be brought without pre-suit notice. Section 1782(a) specifies that the notice requirement applies to an "action for damages." There is some disagreement as to whether pre-suit notice is required when the only monetary relief sought is restitution. *Compare Cuevas v. United Brands Co., Inc.,* No. 11–991, 2012 WL 760403 (S.D.Cal. Mar. 8, 2012) (holding that a claim for disgorgement or restitution is a claim for damages) *with Util. Consumers' Action Network v. Sprint Solutions, Inc.,* No. 07–2231, 2008 WL 1946859 (S.D.Cal. Apr. 25, 2008) ("Prefiling notice is not required for a CLRA claim for restitution."). However, the statutory scheme when read as a whole favors defendants' interpretation. Section 1780, lists the available remedies for violations of the CLRA, including "actual damages," injunctive relief, and restitution. If the notice requirement in § 1782(a) pertaining to "an action for damages" is read narrowly to apply only to "actual damages," it would render the word "actual" in § 1780 redundant and ignore the Legislature's specific exemption of "injunctive relief" in § 1782(d).[14] Accordingly, plaintiffs' restitution claim under CLRA (Count Five) is dismissed with leave to amend if plaintiffs can allege that pre-filing notice was given.

*F. Tennessee Consumer Protection Act Claim*

Finally, Ford moves to dismiss the putative class claim under the Tennessee Consumer Protection Act (TCPA). The Tennessee Supreme Court has held that the language of the TCPA is "unambiguous" that it applies only to claims brought individually. *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 309 (Tenn.2008). "[W]hether a state law displaces a federal rule 'turns on whether the state law actually is part of a State's framework of substantive rights or remedies.' " *Bearden v. Honeywell Int'l Inc.,* 2010 WL 3239285, at *9 (M.D.Tenn. Aug. 16, 2010) (citing *Shady Grove Ortho Assoc., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 418 (2010) (hereinafter *Shady Grove* )). *Bearden* held "that the class action limitation contained in the TCPA is so intertwined with that statute's rights and remedies that it functions to define the scope of the substantive rights.... Because the restriction is a part of Tennessee's framework of substantive rights and remedies, Rule 23 does not apply." *Id.* at *10.[15] *See also Tait v. BSH Home Appliances Corp.,* 2011 WL 1832941, at *8 (C.D.Cal. May 12, 2011) (following *Bearden* 's analysis and dismissing the class claim under the TCPA with prejudice); *In re Optical Disk Drive Antitrust Litig.,* 3:10–MD–2143 RS, 2012 WL 1366718 (N.D.Cal. Apr.

19, 2012) (similar).[16] Tennessee plaintiff Gary Buck's claim under the TCPA (County Sixty–One) must be dismissed to the extent that he asserts the TCPA claim on behalf of a class, with leave to amend.

V. CONCLUSION

**\*10** For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part.[17]

The following counts of the SCAC are hereby DISMISSED without leave to amend:

- *Breach of Express Warranty:* Counts Two, Twelve, Twenty–Three, Thirty, Thirty–Three, Thirty–Seven, Forty, Forty–Seven, Fifty–Four, Fifty–Eight, Sixty–Two, Sixty–Nine, and Seventy–Three;

- *Breach of Implied Warranty:* Counts Ten, Seventeen, Forty–Three, Fifty–Five, Fifty–Nine, and Sixty–Five;

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Counts Five, Fourteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only); Twenty–Five, and Fifty–Three;

- *Unjust Enrichment:* Count Seven, Sixteen (as to Plaintiff Benson entirely, and as to Plaintiff Dery's 2003 model year vehicle only), and Twenty–Eight;

- *Tort Claims:* Counts Nine, Fifteen, Thirty–Six, Forty–Nine, Fifty–One, Sixty–Six; and

- *Other:* Counts Twenty–Six and Twenty–Seven.

The following counts of the SCAC are hereby DISMISSED with leave to amend:

- *Magnuson Moss Act Claim:* Count One;

- *Unjust Enrichment:* Counts Three, Thirteen, Sixteen (as to Plaintiff Dery's 2005 model year vehicle only), Nineteen, Twenty–One, Twenty–Four, Thirty–One, Thirty–Four, Thirty–Eight, Forty–One, Forty–Five, Forty–Eight, Fifty, Fifty–Six, Sixty, Sixty–Three, Sixty–Seven, Seventy, and Seventy–Four; and

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Fourteen (as to Plaintiff Dery's 2005 model year vehicle only), and Sixty–One.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 240 of 751
PageID: 11606
In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

Defendants' motion to dismiss is DENIED as to the following counts of the SCAC:

- *Violation of Consumer Protection/Deceptive Trade Practices Statutes:* Thirty–Two, Forty–Six, Fifty–Seven, and Seventy–Two.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2014 WL 1007066, 83 UCC Rep.Serv.2d 115

## Footnotes

1     Alabama, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, Washington, and West Virginia

2     Ford's partial motion to dismiss comes three years after the filing of the first complaint relative to the Cracked Tailgate Problem, two and a half years after the complaints in this litigation were filed, and a full year and a half after Plaintiffs filed their Consolidated Amended Complaint setting forth their common allegations. Nevertheless, plaintiffs do not argue that any portion of Ford's motion is precluded by its answer to the prior complaint.

3     All factual allegations from the complaint are taken as true for purposes of this motion to dismiss.

4     The warranties may be considered without converting this motion into a motion for summary judgment. *See Elias v. Hewlett–Packard Co.,* 903 F.Supp.2d 843, 850 n.1 (N.D.Cal.2012) (holding that court may consider contents of a manufacturer warranty on a Rule 12(b)(6) motion); *see also Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir.2006) ("A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.") (internal citations omitted).

5     Defendants rely upon decisions on point in Connecticut, Maryland, Massachusetts, Mississippi, North Carolina, Oklahoma, Pennsylvania, Tennessee, and Virginia, but acknowledge they could not locate case law on point in Alabama, Indiana, New Hampshire, or West Virginia.

6     Counts Two (Alabama), Twelve (Connecticut), Twenty–Three (Indiana), Thirty (Maryland), Thirty–Three (Massachusetts), Thirty–Seven (Mississippi), Forty (New Hampshire), Forty–Seven (North Carolina), Fifty–Four (Oklahoma) Fifty–Eight (Pennsylvania), Sixty Two (Tennessee), Sixty–Nine (Virginia), Seventy–Three (West Virginia).

7     Colorado, Georgia, New Jersey, Oklahoma, Pennsylvania, and Texas.

8     See U.C.C. § 2–316(2); see also 15 U.S.C.A. § 2308(b) ( "implied warranties may be limited ... to the duration of a written warranty); Col.Rev.Stat. Ann. § 4–2–316; Tex. Bus. & Com.Code Ann. § 2.316; Ga.Code Ann. § 11–2–316; N.J. Stat. Ann. § 12A:2–316; Okla. Stat. Ann. tit. 12A, § 2–316; 13 Pa. Cons.Stat. Ann. §§ 2314–16.

9     Plaintiffs assert a related claim of tortious breach of warranty under Ohio state law, which is addressed below.

10    In the alternative, Ford argues the express and implied warranty claims in New Jersey, Connecticut and Maryland do not allege facts sufficient to satisfy the pre-suit notice requirement in those three states. In language adopted and incorporated into the commercial codes of each of these states, the Uniform Commercial Code, § 2–607(3) provides that a buyer must "within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." The SCAC, however, makes no averment that New Jersey plaintiffs Spencer Ware and Brian Martin ever notified Ford of the alleged defect. (SCAC ¶¶ 213–224.) Count Forty–Three (breach of implied warranty of merchantability under New Jersey law) is therefore also subject to dismissal for lack of pre-suit notice. Plaintiffs generally allege with respect to their Connecticut and Maryland warranty claims that "Ford has received sufficient and timely notice of the breaches of warranty." (SCAC ¶¶ 398, 529.) Plaintiffs also allege "[u]pon discovery the damage" to her vehicle, Maryland plaintiff Vivian Buchanan "requested that Ford repair the Cracked Tailgate Problem on her vehicle." (SCAC ¶ 183.) It is not necessary to determine whether general averments or a request to repair is sufficient as plaintiffs' express warranty claims in these states (Counts Twelve and Thirty) are otherwise dismissed without leave to amend for the reasons discussed above.

11    Counts Three, Thirteen, Sixteen, Nineteen, Twenty–One, Twenty–Four, Thirty–One, Thirty–Four, Thirty–Eight, Forty–One, Forty–Five, Forty–Eight, Fifty, Fifty–Six, Sixty, Sixty–Three, Sixty–Seven, Seventy, and Seventy–Four.

12    The Florida claim (Count Sixteen) is also dismissed without leave to amend as to one of the two Florida plaintiffs as that claim is partially time-barred, for reasons discussed below.

In re Ford Tailgate Litigation, Not Reported in F.Supp.2d (2014)
83 UCC Rep.Serv.2d 115

13    Ford also moves to dismiss the Florida plaintiffs' negligence claim (Count Fifteen); plaintiffs do not oppose this motion.

14    *See Laster v. T–Mobile USA, Inc.,* No. 5–1167, 2008 WL 5216255 (S.D.Cal. Aug. 11, 2008) (reaching the same conclusion) *aff'd sub nom. Laster v. AT & T Mobility LLC,* 584 F.3d 849 (9th Cir.2009) rev'd on other grounds, 131 S.Ct. 1740 (2011).

15    *Thorogood v. Sears Roebuck and Co.,* 547 F.3d 742 (7th Cir.2008) does not hold otherwise. Although that decision noted in dicta that the Tennessee court's decision on state substantive law does not control federal procedure in a diversity case, the court went on to observe the defendant there was "on to something." *Id.* at 746. "Even though the plaintiff bases his claim, and that of any other Tennesseans who happen to be members of the class, on Tennessee law, he and they are seeking a breadth of relief that Tennessee does not offer them in its courts. Maybe that is a defect of Tennessee law. But the purpose of the diversity jurisdiction is to protect out-of-state residents against state judicial bias in favor of residents; it is not to expand the relief obtainable under state law." *Id.* (reversing class certification on other grounds).

16    The Ninth Circuit has not yet addressed *Shady Grove,* in which a fractured Court articulated contrasting approaches to determine whether a New York statute prohibiting class actions in particular suits precluded a federal district court sitting in diversity from entertaining a class action under Rule 23. District court decisions in this circuit have varied. *See, e.g. In re Hydroxycut Mktg. & Sales Practices Litig.,* No. 09–2087, 2014 WL 295302 (S.D.Cal. Jan. 27, 2014) (analyzing the fractured opinion in *Shady Grove* according to *Marks v. United States,* 430 U.S. 188, 193, (1977) and concluding that "Rule 23 governs Plaintiffs' claims, and Plaintiffs' claims are not subject to dismissal based on the state statutes prohibiting class actions").

17    Plaintiffs do not oppose Ford's motion to dismiss Plaintiff Dery's, Benson's, Caunt's, and Hardee's negligence claims (Counts Fifteen, Thirty–Six, and Sixty–Six); Plaintiff Samaha's claims for violation of the Louisiana Unfair Trade Practices and Consumer Protection Act (Count Twenty–Five), breach of contract (Count Twenty–Seven), or unjust enrichment (Count Twenty–Eight); or Plaintiff Douglas's claim under the Oklahoma Deceptive Trade Practices Act (Count Fifty–Three). These claims are therefore dismissed with prejudice.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 23

2013 WL 5934552
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

William GERACZYNSKI and
Christine Geraczynski, Plaintiffs,
v.
NATIONAL RAILROAD PASSENGER
CORPORATION, d/b/a Amtrak, et al., Defendants.

Civil Action No. 11–6385 (SRC).
|
Nov. 1, 2013.

**Attorneys and Law Firms**

Samuel J. Rosenthal, Barish Rosenthal, Philadelphia, PA, for Plaintiffs.

Andrew B. Charkow, Brad M. Gallagher, Landman, Corsi, Ballaine & Ford, Newark, NJ, Glenn Alan Montgomery, Montgomery, Chapin & Fetten, PC, Bridgewater, NJ, Roseann Primerano, Law Office of Joseph Carolan, Parsippany, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

**\*1** This matter comes before the Court upon the motion for summary judgment filed by Defendants SAFCO Products Company ("SAFCO"), Liberty Diversified International ("Liberty Diversified"), Staples, Inc. ("Staples") and Corporate Express ("CE") (collectively, the "Moving Defendants"). Opposition to the motion has been filed by Plaintiffs William and Christine Geraczynski and by Defendant Oasyschair Co., Ltd. ("Oasyschair"). The Court has considered the papers filed by the parties and proceeded to issue its ruling based on the written submissions and without oral argument, as authorized by Federal Rule of Civil Procedure 78. For the reasons expressed below, the motion for summary judgment will be granted in part and denied in part.

**I. BACKGROUND**
On April 20, 2011, while attending a job briefing and safety meeting in the course of his employment with Defendant Amtrak, Plaintiff William Geraczynski ("Geraczynski") suffered injuries when the chair in which he was seated collapsed, causing Geraczynski to fall to the floor. The chair was located in the office room trailer at Amtrak's Sunnyside Yard facility in Queens, New York. Geraczynski, a resident of New Jersey, initially filed suit in this Court against Amtrak only, asserting a claim pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51, but later amended his Complaint to name additional defendants and assert product defect claims under the New Jersey Product Liability Act, N.J. S.A. § 2A:58C–1, et seq., and the common law theories of breach of express warranty and negligence.

The subject chair was a "Nesting Chair" model number 3480 BL manufactured by Defendant Oasyschair. While the parties dispute which entity controlled the design of the chair, the record contains evidence that it was designed by Oasyschair in collaboration with Defendant SAFCO, or at the very least according to input and specifications provided by SAFCO. SAFCO, a wholly owned subsidiary of Defendant Liberty Diversified, was the chair's distributor. SAFCO purchased the Nesting Chair from Oasyschair and sold it to Defendant Staples and/or Corporate Express (a wholly owned subsidiary of Staples), which in turn sold it to Amtrak.

According to Plaintiff's expert, George P. Widas, a professional engineer, the subject chair failed due to a manufacturing defect. Specifically, he stated that the steel reinforcing pin in the lower seat back was not inserted to the proper depth, preventing the chair from tolerating the weight load for which it was designed. In his opinion, had the chair been manufactured properly, with the reinforcing pin inserted according to the design, it would have sustained the force and weight of someone sitting in the chair and leaning back on it. He testified at his deposition:

Q. What about this chair did you find defective or improper?

A. It wasn't manufactured according to the design, which generated excessive stresses under foreseeable loading less than its design tolerance and it failed readily as a loading considerably less than its design tolerance.

**\*2** Q. Can you tell a lay jury, pretend a lay jury is here in front of you. Can you tell them what you are talking about?

A. The chair was designed to be strong enough for somebody to sit in it and exert force to the back of the chair. This chair wasn't built according to that design. It was built

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

very weak and when somebody leaned against the back of it the right way it broke. It was at a very weak level.

Q. Is that the nature of your opinion with respect to the chair?

A. Yes.

*  *  *

Q. Your allegation is that this chair was assembled incorrectly?

A. Yes. Manufactured, when I said assembled I mean the reinforcing pin was not inserted to a proper depth according to the original design.

Q. So, your belief, if I could put this in layman's terminology, had the pin been inserted deep enough, according to the original design, that would have rendered the chair not defective and okay as far as you are concerned.

Q. Yes.

(Widas Tr. at 117:7–25; 120:9–20.)

The Plaintiff's expert has been clear that it is not his opinion that the subject chair failed due to a design flaw. In fact, he testified at his deposition that "it is designed properly." (*Id*. at 117:5–6.) He confirmed that the only defect he found was the insertion of the reinforcing pin to an improper depth during the manufacture of the chair. He testified as follows:

Q. So, your beef, the bottom line beef, is that the pin was not inserted deep enough. Correct?

A. Yes.

Q. Is that the bottom line?

A. Yes.

Q. How much deeper should it have been inserted to render the unit non-defective?

A. Point six zero inches.

Q. Had it been inserted .60 inches to the plane, it could have rendered it non-defective as far as you are concerned?

A. Yes.

Q. Is that the only defect you found?

A. Yes.

(*Id*. at 122:20–123:8.)

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson,* 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman,* 327 F.3d 229, 238 (3d Cir.2003) (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

**\*3** Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985).

Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to rule in its favor at trial." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir.2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex,* 477 U.S. at 322–23).

**B. Analysis**

Plaintiffs seek to hold the Moving Defendants liable for personal injuries caused by the alleged chair defect under the New Jersey Product Liability Act. The Product Liability Act is the "exclusive remedy" for personal injury caused by product defect. *Koruba v. Am. Honda Motor Co.,* 396 N.J.Super. 517, 531, 935 A.2d 787 (App.Div.2007). Its enactment has eliminated the availability of claims for negligence or breach of implied warranty related to product defect, with a carved out exception for claims based on the breach of an express warranty. [1] *Id.; Tirrell v. Navistar Int'l,* 248 N.J.Super. 390, 398, 591 A.2d 643 (App.Div.1991). The method of proof for a claim asserted under the Product Liability Act is essentially the same as "that recognized for strict liability claims." *Tirrell,* 248 N.J.Super. at 398, 591 A.2d 643. In relevant part, the statute provides as follows:

A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for

its intended purpose because it: [a] deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or [b] failed to contain adequate warnings or instructions, or [c] was designed in a defective manner. N.J.S.A. § 2A:58C–2.

As the quoted provision reflects, both product manufacturers and product sellers are exposed to liability under the Product Liability Act. The statute, however, provides a mechanism for an "innocent" seller to be relieved of liability if it can demonstrate that it had "no significant responsibility for the alleged product defect and the manufacturer is amenable to service of process and is likely to be able to satisfy any judgment." *Claypotch v. Heller, Inc.,* 360 N.J.Super. 472, 485, 823 A.2d 844 (App.Div.2003). Stated differently, the New Jersey Appellate Division held that a product seller may avail itself of the immunity provided by N.J. S.A. § 2A:58C–9 if it is "truly innocent of responsibility for the alleged defective product" and if the injured party retains a viable claim against the manufacturer. *Id.; see also Bashir v. Home Depot,* No. 08–4745, 2011 WL 3625707, at *3 (D.N.J. Aug.16, 2011) (holding same, in reliance on *Claypotch* ). The relevant provision, invoked by the Moving Defendants as a basis for this summary judgment motion, requires the product seller to "file an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death or damage." N.J.S.A. § 2A:58C–9(a). This identification of the product manufacturer will relieve the seller of liability, subject to various conditions set forth in subsection d of the provision. N.J.S.A. § 2A:58C–9(b). Subsection d provides:

**\*4**  A product seller shall be liable if:

(1) The product seller has exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product which caused the injury, death or damage; or

(2) The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 246 of 751
PageID: 11612
Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.2d (2013)

(3) The product seller created the defect in the product which caused the injury, death or damage.

N.J.S.A. § 2A:58C–9(d). The burden is on the product seller to prove that the statutory exceptions to immunity do not apply. *Fidelity and Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.,* ––– F.Supp.2d –––, 2013 WL 1299184, at *10 (D.N.J. Mar. 26, 2013); *see also Bashir,* 2011 WL 3625707, at *3 (holding that a product seller must present evidence that the factors in subsection (d) do not apply or point to a "lack of evidence in the record supporting opposite conclusions.").

Defendant SAFCO has demonstrated that it is entitled to summary judgment on Plaintiffs' product liability claim. It complies with the statute by submitting the Affidavit of Pam La Fontaine, SAFCO's Director of Global Sourcing. As required by § N.J.S.A. 2A:58C–9, the affidavit identifies Oasyschair as the product manufacturer. Clearly, Plaintiffs can pursue a viable claim against Oasyschair, as it is in fact a named party actively defending against Plaintiffs' claims in this lawsuit. Moreover, SAFCO has established that it is not the manufacturer of the subject chair, played no role in the manufacture of the chair or in the creation of the alleged defect which caused the chair to collapse, and had no reason or basis to know that the reinforcing pin in the chair's lower back was inserted to an insufficient depth in the manufacturing process. In the affidavit, La Fontaine states that "that area of the chair (the pins in the seats) is completely enclosed and not subject to visual inspection at any time after manufacture." (La Fontaine Aff. at ¶ 21.) She further asserts that "SAFCO had no control of any nature whatsoever regarding the manufacture of the chair, and did not manufacture the chair, nor did they place the metal pins into the plastic seats where the chair allegedly failed." (*Id.* at ¶ 22.)

Neither Plaintiffs nor Oasyschair have come forward with any evidence to dispute these facts. Instead, they attempt to create an issue of fact by pointing to evidence, consisting mostly of emails exchanged between SAFCO and Oasyschair, they contend demonstrate that SAFCO was "deeply involved" with the design, labeling and packaging of the chair. Such evidence, even when viewed in the light most favorable to non-movants Oasyschair and Plaintiffs, fails to create a genuine issue of material fact because, quite simply, the design of the chair is completely immaterial to Plaintiffs' product liability claim. Plaintiffs' expert states unequivocally, in both his deposition testimony as well as the two reports he prepared, that the only defect in the subject chair is a manufacturing defect. Neither the chair's design, nor for

that matter its labeling and packaging, are at issue in this case. Even if it were assumed, for the sake of argument, that Defendant SAFCO had exercised significant control over the design of this product, or at the very least that the evidence proffered by the non-movants pointed to a genuine dispute as to SAFCO's participation in the design, such facts are completely irrelevant.[2] They do not refute SAFCO's satisfactory demonstration that it is "truly innocent of responsibility" for the improper insertion of the reinforcing pin. Indeed, to the contrary, the product was correctly designed, according to Plaintiffs' expert, who opined that had the chair been manufactured in compliance with the design specification regarding the proper depth for the reinforcing pin, it would not have failed. SAFCO, in short has carried its burden of establishing the affirmative defense provided by the Product Liability Act for "innocent sellers."

**\*5** The other Moving Defendants, however, have not made a sufficient demonstration on this motion to avail themselves of innocent seller immunity. While the Court's review of the record strongly suggests that, like SAFCO, Defendants Liberty Diversified, Staples and CE would be entitled to summary judgment for having no involvement in creating the defect at issue, these Defendants have not complied with N.J.S.A. § 2A:58C–9. The statutory immunity provision *requires* a product seller to (1) file an affidavit identifying the product manufacturer; (2) establish that the manufacturer "is amenable to service of process and is likely to be able to satisfy any judgment;" and (3) establish that it had no "significant responsibility" for the alleged defect. *Claypotch,* 360 N.J.Super. at 485, 823 A.2d 844 (interpreting and applying N.J.S.A. § 2A:58C–9). The only Moving Defendant to file an affidavit and otherwise comply with the statute's innocent seller provision is SAFCO. The Court will accordingly deny the motion for summary judgment on the Product Liability Act claim as to Liberty Diversified, Staples and CE but will do so without prejudice to a renewed motion by these Defendants.

Additionally, insofar as the motion for summary judgment pertains to the claim for breach of an express warranty, it must be denied without prejudice as to all Moving Defendants. While they may be correct that Plaintiffs have no viable claim for breach of express warranty because Plaintiffs did not purchase the subject chair, Moving Defendants raise this argument for the first time in their reply brief. Their moving brief gives no indication that they seek summary judgment on the breach of express warranty claim nor the basis on which they contend that summary judgment is warranted,

thus giving the other parties no meaningful opportunity to present a responsive argument. The Court will therefore not consider the Moving Defendants' arguments as to the breach of express warranty claim, without precluding them from properly moving for summary judgment on this claim going forward. *Anspach v. City of Philadelphia,* 503 F.3d 256, 259 n. 1 (3d Cir.2007); *Bayer AG v. Schein Pharma. Inc.,* 129 F.Supp.2d 705, 716 (D.N.J.2001), *aff'd* 301 F.3d 1306 (2002).

## III. CONCLUSION

For the reasons discussed, this motion will be granted in favor of Defendant SAFCO only insofar as it seeks summary judgment on Plaintiffs' claim under the Product Liability Act. Summary judgment will be granted in favor of all Moving Defendants on the negligence claim. The remainder of the Rule 56(a) motion filed by Defendants SAFCO, Liberty Diversified, Staples and CE will be denied without prejudice. An appropriate order will be filed.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5934552

## Footnotes

1    The Court notes that the Third Amended Complaint asserts negligence claims against each of the Moving Defendants, which have argued in their moving brief that the Product Liability Act is Plaintiffs' subsumes common law actions for negligence. Non-movants Oasyschair and the Plaintiffs do not dispute this point. Accordingly, the Court understands the motion to include a request for summary judgment on the negligence claim. This portion of the motion will be granted, as a negligence claim in a product liability action is clearly not viable. *Koruba,* 396 N.J.Super. at 531, 935 A.2d 787; *Tirrell,* 248 N.J. at 398.

2    For this reason, the Court finds unavailing non-movants' argument that summary judgment must be denied because they need to conduct further discovery, including the deposition of La Fontaine. They have not demonstrated, pursuant to Rule 56(d), that discovery of additional facts regarding SAFCO's involvement with the design or other aspects of bringing the chair to market could negate SAFCO's entitlement to product seller immunity. In other words, Plaintiffs and Oasyschair have not shown that additional facts could give rise to a genuine issue as to SAFCO's involvement in or knowledge of the manufacture of the subject chair.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 24

KeyCite Blue Flag – Appeal Notification
Appeal Filed by WILLIAM GERACZYNSKI, ET AL v. NATIONAL
RAILROAD PASSENGER CO, ET AL., 3rd Cir., September 2, 2015

2015 WL 4623466
Only the Westlaw citation is currently available.
Not For Publication
United States District Court, D. New Jersey.

William GERACZYNSKI and
Christine Geraczynski, Plaintiffs,

v.

NATIONAL RAILROAD
PASSENGER CORPORATION, d/
b/a Amtrak, et al., Defendants.

Civil Action No. 11–6385 (SRC).
|
Signed July 31, 2015.

**Attorneys and Law Firms**

Samuel J. Rosenthal, Barish Rosenthal, Philadelphia, PA, for
Plaintiffs.

Andrew B. Charkow, Brad M. Gallagher, Landman, Corsi,
Ballaine & Ford, Newark, NJ, Glenn Alan Montgomery,
Montgomery, Chapin & Fetten, PC, Bridgewater, NJ,
Cynthia V. Fitzgerald, Daniel W London, Anthony D.
Capasso, London Fischer, LLP, New York, NY, Roseann
Primerano, Law Office of Joseph Carolan, Parsippany, NJ, for
Defendants.

**OPINION**

CHESLER, District Judge.

*1 This matter comes before the Court upon various motions
for summary judgment filed by Defendants and one motion to
dismiss brought by the Third–Party Defendant. The motions,
which concern Defendants' cross-claims for indemnification
and a third-party claim for insurance coverage, have all
been opposed and fully briefed. The Court has considered
the papers filed by the parties in connection with these
motions and proceeds to issue its ruling based on the written
submissions and without oral argument, as authorized by
Federal Rule of Civil Procedure 78.

## I. Background

The core of this product liability action concerned
allegations of a defectively manufactured chair, which failed
and collapsed, resulting in injuries to Plaintiff William
Geraczynski in the course of his employment with Defendant
Amtrak. In addition to bringing a negligence claim against
Amtrak pursuant to the Federal Employers' Liability Act,
Geraczynski a New Jersey resident, also sought to hold
various companies liable under the New Jersey Product
Liability Act, based on their commercial involvement with the
allegedly defective chair. Those Defendants are as follows:
SAFCO Products Company ("SAFCO") and its parent
company Liberty Diversified International (collectively
"SAFCO"); and Staples, Inc. and its predecessor company
Corporate Express (collectively "Staples"). The background
facts out of which this litigation arose have been set forth in
this Court's November 1, 2013 Opinion, issued in connection
with motions for summary judgment with respect to Plaintiff's
product liability claims.

Plaintiff settled his claims against all Defendants, with the
product manufacturer, Oasyschair, bearing full responsibility
for the settlement. Left unresolved were Defendants' cross-
claims against each other for indemnification. Various
motions were filed, which the Court held in abeyance at
the request of the parties, while they endeavored to mediate
their dispute. These efforts were only partially successfully.
Amtrak's motion, concerning its cross-claim against Staples
for contractual indemnification, is now moot, as its settlement
with Staples has extinguished that claim. The Court now
proceeds to rule on the remaining motions. They are: (1)
Staples' motion for summary judgment on its cross-claims
against SAFCO; (2) SAFCO's motion for summary judgment
on its cross-claims against Oasyschair; (3) Third–Party
Defendant Columbia Casualty Co.'s ("Columbia") motion
to dismiss SAFCO's third-party claim for a declaration of
insurance coverage; and (4) SAFCO's motion for summary
judgment on its declaratory judgment claim for coverage.[1]

## II. Discussion

### A. Staples' Indemnification Cross–Claim Against
SAFCO

Staples seeks contractual indemnification from SAFCO for
the losses incurred in defending against Plaintiffs' claims

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 250 of 751
PageID: 11616
Geraczynski v. National R.R. Passenger Corp., Not Reported in F.Supp.3d (2015)
2015 WL 4623466

as well as losses associated with Amtrak's cross-claim for contractual indemnification. Staples, seller of the allegedly defective chair to ultimate consumer Amtrak, obtained the product from distributor SAFCO. At the time of the wholesale purchase transaction involving the subject chair, Staples and SAFCO were parties to a Vendor Agreement, which applied to all furniture products purchased by Staples from SAFCO from January 1, 2005 to December 31, 2011. The Vendor Agreement contains an indemnification provision, which provides as follows:

**\*2** Vendor [SAFCO] agrees, at Vendor's expense, to promptly indemnify and hold Staples harmless against any and all third party claims, actions, proceedings or investigations (each a "Claim") arising from an actual or alleged breach of any representations, warranties or covenants made by Vendor under this Vendor Agreement. (Spencer Aff., Ex. A: Vendor Agreement, ¶ 19.) Under the Vendor Agreement, SAFCO "represents and warrants to Staples that: (a) all Product is free from defects...." (*Id.*, ¶ 15.)

Amtrak's cross-claims against Staples fall squarely within the Vendor Agreement's obligation on SAFCO to indemnify Staples. There is no dispute that Amtrak is a third party with respect to the Vendor Agreement. Amtrak's cross-claims against Staples asserted that, under its own contract with Staples, Staples was obligated to indemnify it for medical expenses associated with the injuries Plaintiff sustained in the collapse of the allegedly defective chair and for the legal expenses incurred in defending Plaintiff's negligence claims related to the chair failure. Amtrak's cross-claims against Staples were based on Staples's contractual obligation (1) to provide it with products that were "free from defects in design, material and workmanship" and (2) to hold Amtrak harmless from any claims, losses or expenses incurred as a result of Staples' breach of that warranty and/or as result of injuries directly or indirectly caused by products supplied by Staples. In the Vendor Agreement governing the relationship between SAFCO and Staples, SAFCO expressly warranted to Staples that the product was "free from defects" and undertook the obligation to indemnify Staples against claims arising from breach of that representation. Indeed, the warranty made by Staples in the contract covering the sale of the chair to Amtrak essentially mirrors the warranty made by SAFCO in the Vendor Agreement covering SAFCO's sale of the chair to Staples.

SAFCO does not controvert or dispute these material facts concerning the nature of the claims against Staples or the scope of the indemnification provision in the Vendor Agreement. Instead, it attempts to re-cast the dispute as a choice of law issue and in that way avoid enforcement of the Vendor Agreement's indemnification obligation. SAFCO argues that the contractual indemnification claim made by Staples conflicts with the statutory scheme of the New Jersey Product Liability Act, which imposes liability on the product manufacturer, in this case, named party Oasyschair. SAFCO stresses that, as the product distributor, it is an innocent party under the Product Liability Act and should not bear the costs and fees sought by another participant in the product distribution chain, particularly where the indemnity claim, SAFCO argues, has arisen from indemnitee Staples' independent fault under its own agreement with Amtrak. Staples's indemnity claim, however, arises from the alleged breach of an express warranty by SAFCO in the Vendor Agreement, and SAFCO cites no authority to support its argument that the New Jersey Product Liability Act precludes agreements between parties in the chain of distribution to allocate responsibility for losses stemming from product defect. *Cf. Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 515, 562 A.2d 202 (1989) (holding that while, as a general rule, a party higher up the chain of product distribution should indemnify a party lower in the chain, "parties in a distributive chain may contract for a different allocation of the risk of loss."). SAFCO also invokes the principle that "an indemnitee who has defended against allegations of its independent fault may not recover its defense costs." *Mantilla v. NC Mall Assoc.,* 167 N.J. 262, 272, 770 A.2d 1144 (2001). The argument fails, however, because that rule is inapposite to the facts of this case. As the Court has noted, the warranties made by Staples to Amtrak concerning the subject product are essentially the same as those it received from SAFCO about the product SAFCO provided.

**\*3** There is no genuine issue of material fact concerning SAFCO's obligation to indemnify Staples for losses incurred in connection with Amtrak's cross-claims, and thus summary judgment is warranted as to this portion of the indemnification claim against SAFCO.

Insofar as Staples seeks indemnification against Plaintiffs' claims, summary judgment is also warranted. Plaintiffs' claims sought relief for injuries allegedly caused by the defectively manufactured chair provided by distributor SAFCO to Staples. They therefore implicate SAFCO's warranty in the Vendor's Agreement that the product was not defective. Indemnity is required not only as a matter of contract but also as a matter of common law, which requires a

product distributor to indemnify other distributors and sellers further down the chain of distribution, with the ultimate responsibility for losses caused by product defect resting at the top of the chain with the manufacturer. This latter point regarding common law indemnity will be discussed in the section below.

### B. SAFCO's Indemnification Cross–Claim Against Oasyschair

In is uncontroverted that SAFCO has not adduced evidence of a written contract requiring Oasyschair to indemnify it for losses arising from claims of a defective product. New Jersey courts, however, recognize the common-law right of a downstream distributor or seller to indemnification from an upstream participant in the chain of product distribution. *Promaulayko v. Johns Manville Sales Corp.,* 116 N.J. 505, 513–15, 562 A.2d 202 (1989). In this lawsuit, Plaintiff's sole theory of product defect maintained that the subject chair had been defectively manufactured. (See November 1, 2013 Op. at 2–3, 9.) SAFCO is a downstream distributor in relation to product manufacturer Oasyschair and as such is entitled to indemnification from Oasyschair on all claims against SAFCO in this lawsuit.

Oasyschair argues that the general rule of indemnity as set forth by the New Jersey Supreme Court in *Promaulayko* does not apply in this situation because Plaintiffs, in their Complaint, had also claimed that SAFCO breached an express warranty. This claim, Oasyschair contends, transforms SAFCO's responsibility from one of passive wrongdoing to one of independent, active fault, thus invalidating SAFCO's claim of entitlement to indemnity. This argument is unavailing. Oasyschair has come forward with no evidence that SAFCO was at fault on any basis other than its role as a conduit in the distribution of the chair indisputably manufactured by Oasyschair. Indeed, the Court had noted in its Opinion granting summary judgment in favor of SAFCO on Plaintiffs' Product Liability Act claims that it refrained from granting summary judgment on the breach of express warranty claim because the request was raised in a reply brief, not because of proof indicating that Plaintiff's claim against SAFCO might be meritorious.

Here, on the cross-motions brought by SAFCO and Oasyschair regarding the latter's duty of indemnification, the record is clear that the claims and cross-claims against SAFCO stem from its distribution of a product placed in the stream of commerce by Oasyschair with an alleged manufacturing defect. Accordingly, SAFCO's motion for summary judgment on its cross-claim for indemnification from Oasyschair will be granted, and Oasyschair's cross-motion on the claim will be denied.

### C. Insurance Coverage Dispute Between SAFCO and Columbia

**\*4** Defendant SAFCO filed a Third–Party Complaint against Columbia, asserting a single claim for insurance coverage. SAFCO claims it is entitled to coverage as an additional insured under a commercial general liability policy issued by Columbia to Oasyschair. Columbia has moved to dismiss that claim pursuant to Rule 12(b)(6), arguing that no relief can be granted because the Third–Party Complaint has failed to set forth that SAFCO meets a condition precedent to coverage under the policy's additional insured endorsement. SAFCO opposes the motion, and has filed its own motion seeking summary judgment on the claim, asserting that there are no genuine issues of fact that it is entitled to coverage.

The policy at issue contains an endorsement which modifies the policy in that it provides coverage to vendors for losses relating to "all products insured under this policy." (Lem Cert., Ex. D.) The endorsement does not name any particular vendor but rather identifies an additional insured according to the following terms: "as required by written contract or agreement executed prior to the occurrence." (*Id.*) Columbia has argued that SAFCO cannot meet the requirements for coverage because it has failed to produce a contract between SAFCO and Oasyschair which required Oasyschair to provide insurance coverage and/or name it as an additional insured in any applicable commercial general liability policy.

Columbia's motion to dismiss the claim must be denied. A claim survives a Rule 12(b)(6) motion if the complaint contains "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556.) The declaratory judgment claim asserted by SAFCO, asserting its entitlement to insurance coverage, alleges a loss falling within the Oasyschair policy and further alleges that SAFCO and its parent company Liberty are additional insureds under the policy per the vendor's endorsement. It also avers that "prior to the date of the incident that is the subject matter of

this litigation, SAFCO/LIBERTY entered into an agreement with Oasyschair as a downstream distributor of the chair manufactured by Oasyschair." (Am. Third Party Compl., ¶ 8.) The Third Party Complaint contains a factual allegation, which, taken as true, establishes that SAFCO and Liberty meet the endorsement's terms for coverage as additional insureds. These allegations suffice to state a plausible claim for relief, that is, a declaration that SAFCO is entitled to coverage. Columbia's argument regarding the absence of a contract or agreement in the record goes to SAFCO's ability, or lack thereof, to prove the allegation. Challenges to a claim for lack of evidentiary support fall within the purview of summary judgment under Federal Rule of Civil Procedure 56(a). The Court will accordingly proceed to consider SAFCO's motion for summary judgment on the claim.

**\*5** SAFCO concedes that it has not produced a written contract in which Oasyschair was required to secure insurance coverage for SAFCO for losses and claims related to product defects. It nevertheless argues that it meets the conditions of the vendor's endorsement based on the existence of an agreement, evidenced by the course of dealing between SAFCO and Oasyschair, to name SAFCO as additional insured. Before reaching the question of whether SAFCO has proffered sufficient evidence to demonstrate that a reasonable juror would conclude that there is such an agreement, the Court must address the issue of whether, under the terms of the endorsement, an unwritten agreement can satisfy the requirement for additional insured status. This task is one of contract interpretation.

Columbia submits that the Court should apply the law of the state of New Jersey with regard to matters of insurance contracts, taking the position that New Jersey has the most significant relationship to this case. SAFCO does not disagree, and in fact supports its arguments for summary judgment on the insurance coverage claim with New Jersey caselaw. As the parties agree on the application of New Jersey state law to their insurance coverage dispute, and the substantive law of this state would apply according to the *Erie* doctrine, the Court will examine the claim accordingly.

Facts regarding the applicable insurance policy and the endorsement at issue are not in dispute, and as such the interpretation of vendor's endorsement is a question for the court to decide as a matter of law. *Am Cas. Co. of Reading, Pa. v. Continisio,* 819 F.Supp. 385, 396 (D.N.J.1993) (citing *Weedo v. Stone–E–Brick, Inc.,* 155 N.J.Super. 474, 479,

382 A.2d 1152 (App.Div.1977), *rev'd on other grounds,* 81 N.J. 233, 405 A.2d 788 (1979)). In construing an insurance contract, a court must "search broadly for the probable common intent of the parties to find a reasonable meaning in keeping with the express general purposes thereof." *Bello v. Hurley Limousines, Inc.,* 249 N.J.Super. 31, 40, 591 A.2d 1356 (App.Div.1991). "If the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.,* 195 N.J. 231, 238, 948 A.2d 1285 (2008). A court may look to extrinsic evidence to resolve the ambiguity. *Id.* It must construe the ambiguous terms so as to apply the interpretation which sustains coverage. *Mazzilli v. Accident & Casualty Ins. Co.,* 35 N.J. 1, 7, 170 A.2d 800 (1961); *see also Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 336, 495 A.2d 406 (1985) (holding that ambiguities in an insurance contract should be resolved against the insurance company). However, where the contract language is unambiguous, a court should enforce an insurance contract in accordance with its plain language. *Chubb,* 195 N.J. at 238, 948 A.2d 1285. "Indeed, in the absence of an ambiguity, a court should not 'engage in a strained construction to support the imposition of liability' or write a better policy for the insured than the one purchased." *Id.* (quoting *Progressive Cas. Ins. Co. v. Hurley,* 166 N.J. 260, 272–73, 765 A.2d 195 (2001)).

**\*6** The vendor's endorsement at issue here states that, for the endorsement to apply, there must be a "written contract or agreement executed" which requires policyholder Oasyschair to name the vendor in question as an additional insured. SAFCO contends that the endorsement accepts either a "written contract" or "agreement" as sufficient to trigger coverage, and thus the Court should consider the parties' course of dealing to determine whether such an agreement was in place. At the very least, according to SAFCO, the endorsement contains an ambiguity as to whether an agreement must be in writing, and the court should resolve that ambiguity in favor of the insured.

SAFCO's argument implies that the word "written" qualifies only the word "contract" but not "agreement," as a different interpretation would render use of the generally interchangeable terms redundant. Citing the Uniform Commercial Code's definition of the word "agreement," SAFCO notes that the terms can be distinct. The UCC, it points out, defines the term as follows: " 'Agreement,' as distinguished from contract, means the bargain of the parties in fact, as found in their language or inferred from other

circumstances, including course of performance, course of dealing, or usage of trade." *N.J.S.A.* 12A:1–201(3).

The flaw in SAFCO's argument, however, is that the vendor's endorsement also uses the term "executed" to describe the kind of "written contract or agreement" required to secure additional insured status under the Oasyschair policy with Columbia. The pertinent definitions of "execute" in Black's Law Dictionary state that the term means "to perform or complete (a contract or duty)" or "to make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form." *Black's Law Dictionary* (10th ed.2014). The former meaning would have at best a strained application to the endorsement language, as an agreement between policyholder Oasyschair and any vendor to be named as an additional insured would require no performance, beyond the mere meeting of the minds between the parties that the vendor would, in fact, be covered under the Oasyschair insurance policy. The latter meaning of "execute," signifying the act of formalizing the agreement by signing, is the only one that makes sense in the context of the insurance contract and vendor's endorsement. Thus, contrary to SAFCO's argument, the endorsement language is not susceptible to alternative reasonable meanings, and thus does not call for the Court to consider extraneous evidence to aid in deciphering it. It clearly provides that coverage will be provided to an additional insured where there has been a written or signed manifestation of a commitment by Oasyschair to include the vendor in the policy.

SAFCO bears the burden of proof on its claim against Columbia for insurance coverage, but it has not come forward with a written contract or signed agreement to establish that it is an additional insured. On this record, the Court cannot conclude that no reasonable trier of fact could find in Columbia's favor. In other words, SAFCO has failed to demonstrate that it is entitled to a declaration of insurance coverage as a matter of law.

 **\*7** The Court further concludes that even if it were to find the language of the vendor's endorsement ambiguous, and construe it in SAFCO's favor to mean that an unwritten agreement for additional insured coverage would suffice, SAFCO would not have established that summary judgment on the insurance coverage claim is warranted. SAFCO argues that the course of dealing between Oasyschair and SAFCO establishes that an agreement exists but fails to provide evidence to establish such an implied contract-in-fact. The risk manager for Liberty Diversified, SAFCO's

parent company, states in his certification that "on many prior occasions (10 to 15), Oasyschair and/or its carrier, would always step forward and defend and indemnify SAFCO [on product claims.]" (Towne Cert. ¶ 11.) This assertion that "Oasyschair and/or its carrier" has indemnified SAFCO in the past does not necessarily indicate that Oasyschair has routinely named SAFCO as an additional insured or that Columbia has routinely provided coverage to SAFCO on product claims pursuant to the vendor's endorsement. SAFCO also relies on the Certificate of Liability Insurance issued by Oasyschair's insurance broker, which pertains to the Columbia commercial general liability policy held by Oasyschair. The certificate states that "SAFCO Products Company is named as an additional insured per broad form vendors endorsement where required by writ [sic] contract or agreement." (SAFCO Mot., Ex. B.) This may constitute relevant evidence on the insurance coverage claim but does not establish SAFCO's entitlement to judgment on the claim as a matter of law. The representation made in the certificate by and large parrots the language of the vendor's endorsement, and as discussed, SAFCO has failed to establish an agreement requiring that SAFCO be named as an additional insured. Moreover, the certificate does not amend or enlarge the coverage provided by the Oasyschair commercial general liability policy issued by Columbia. In fact, it expressly cautions as follows:

> This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not affirmatively amend, extend or alter the coverage afforded by the policies below. This certificate of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer and the certificate holder.

(SAFCO Mot., Ex. B.)

While SAFCO has failed to satisfy the burden for summary judgment on its claim against Columbia, its motion has placed before the Court those parts of the record pertinent to the claim. Upon searching the record, the Court concludes that no reasonable juror could find in SAFCO's favor on the insurance coverage claim, making summary judgment appropriate in favor of Columbia pursuant to Rule 56(f)(1). While notice of a court's intent to grant summary judgment pursuant to this rule is typically required, an exception to this rule applies when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue. *Gibson v. Mayor & Council of City of Wilmington,* 355 F.3d 215, 223–24 (3d Cir.2004). Moreover, the Third Circuit has held a party may be deemed to be on notice of

2015 WL 4623466

a *sua sponte* summary judgment ruling when "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Id.* (affirming district court's grant of summary judgment *against* a party that brought a motion for summary judgment, without first giving notice to that party); *see also Zimmerlink v. Zapotsky,* 539 F. App'x 45, 49 (3d Cir.2013) (holding same and quoting *Gibson).* Here, SAFCO has put the merits of the insurance coverage claim squarely before the Court on its motion for summary judgment on a claim on which it bears the burden of proof, and in so doing, has had the opportunity to present all evidence and arguments supporting its claim, that is, "to put its best foot forward." It has had, consistent with the Third Circuit's guidance in *Gibson* and *Zimmerlink,* sufficient notice for this Court to exercise its authority under Rule 56(f)(1) .[2]

**\*8** Accordingly, SAFCO's motion for summary judgment on the third-party claim against Columbia must be denied, and the Court will grant Columbia summary judgment SAFCO's insurance coverage claim pursuant to Rule 56(f)(1).

### III. Conclusion

For the reasons discussed, the pending motions will be adjudicated as follows: Staples' and SAFCO/Liberty's motions for summary judgment on the indemnification cross-claims will be granted, and Oasyschair's cross-motion will be denied. Columbia's motion to dismiss the Third–Party Complaint filed by SAFCO will be denied. SAFCO's motion for summary judgment on its Third–Party Complaint against Columbia will be denied, and summary judgment in favor of Columbia on the insurance coverage claim brought by SAFCO will be granted. Amtrak's motion for summary judgment on its cross-claim against Staples will be dismissed as moot. An appropriate order will be filed.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4623466

### Footnotes

1    Summary judgment is appropriate under Federal Rule of Civil Procedure 56(a) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2    The Court notes that, in addition, the circumstances presented justify an exception to the notice requirement. For the reasons discussed, there is no surprise or unfairness to SAFCO. Clearly, with discovery long completed, the record is fully developed, and the threshold issue on the insurance coverage claim concerns interpretation of the vendor's endorsement, a purely legal question of contract construction.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 25

2013 WL 4517994

KeyCite Yellow Flag - Negative Treatment
Disagreed With by Counts v. General Motors, LLC, E.D.Mich., February 14, 2017

2013 WL 4517994
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re GERBER PROBIOTIC
SALES PRACTICES LITIGATION.

Civil Action No. 12–835 (JLL).
|
Aug. 23, 2013.

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, Donald A. Ecklund, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, Richard Daniel Devita, Devita & Associates, Hoboken, NJ, Antonio Vozzolo, Courtney E. Maccarone, Faruqi & Faruqi, LLP, Yitzchak Kopel, Bursor & Fisher PA, New York, NY, Ro nald A. Marron, San Diego, CA, for Plaintiffs.

Scott A. Ohnegian, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, for Defendants.

**OPINION**

LINARES, District Judge.

 *1  This matter comes before the Court by way of a motion to dismiss the Second Consolidated Amended Complaint ("SAC") (CM/ECF No. 48) pursuant to Federal Rule of Civil Procedure 12(b)(6) (CM/ECF No. 53) by Gerber Products Company (hereafter "Defendant" or "Gerber"). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. After considering the submissions of the parties in support of and in opposition to the instant motions, Defendant's motion to dismiss is granted.

*I. BACKGROUND*

The instant putative consumer-protection class action arises out of the alleged deceptive, false, and misleading marketing of three Gerber products (collectively the "Products"): Good Start Protect Infant Formula and Good Start Protect Formula for 9 through 24 months ("Good Start"), and DHA & Probiotic Cereal—Single Grain Oatmeal and Rice varieties. (SAC ¶ 2). Plaintiffs[1] allege that the marketing and labeling of those products are deceptive in two primary ways: despite representations to the contrary, the Products (1) do not provide immune system benefits; and (2) are not are not near equal to breast milk.

Plaintiffs first assert that the Products' marketing and labeling contain false and misleading representations based on the immune system effect of probiotic bacteria, "Bifidus BL." (SAC ¶ 1). The allegation is essentially that despite Defendant's representations regarding the Products' immune system benefits, "numerous studies show that the Products do not and cannot provide the immune-related health benefits Defendant claims." (SAC ¶ 3). Specifically, Plaintiffs allege:

> Gerber's representations are designed to induce the consumer, who is unaware that healthy babies' bodies already maintain the proper balance of intestinal bacteria, to buy the Products. Gerber advertises the Products as the only formulas and cereals that include probiotics that will strengthen and support the immune systems of young children. However, Defendant's marketing message is false and deceptive, as the "probiotic" bacteria in the Products do not perform as advertised, and scientific studies ... demonstrate that probiotic supplementation in infant formula does not support infant immunity or provide the advertised health benefits including because such supplementation does not (a) decrease the levels of harmful pathogens in babies' intestinal microflora, (b) increase the levels of good bacteria in babies' intestinal micro-flora, or (c) reduce infections

(SAC ¶ 7, see also ¶¶ 16, 17).

With regard to the Good Start products, Plaintiffs maintain that the Gerber marketing strategy deliberately includes "IMMUNIPROTECT," which contains the trademarked Bifidus BL probiotic bacteria, as a "deceptive marketing hook." (SAC ¶ 5). Plaintiffs also maintain that to further reinforce the allegedly deceptive message, Gerber represents that the Products' "advanced" immune system benefits result from the use of Bifidus BL, which is found in breast milk. (SAC ¶ 6).

 *2  Second, Plaintiffs allege that despite the fact that "experts unanimously agree that breast milk is best for infants," Gerber also adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 257 of 751
PageID: 11623
In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 4517994

labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk." (SAC ¶ 11, *see also* ¶¶ 12, 14). However, scientific evidence allegedly demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 14).

Plaintiffs assert that even though the Products' marketing implies that there is a proven scientific basis for the immune system benefits, by representing that the health-related claims are based on "studies" and "research," "the body of scientific evidence on probiotic supplementation in infant formula shows that the probiotic ingredient in the Products *does not* support the infant immune system and *does not* otherwise provide the advertised health benefits." (SAC ¶ 18, *see e.g.* ¶ 37, 39) (emphasis in original). Similarly, "scientific evidence proves that, contrary to Defendant's advertising, formula supplemented with probiotics does not provide breast milk-quality nutrition." (SAC ¶ 19).

In support of their position that the findings of numerous studies contradict Defendant's representations regarding the Products, Plaintiffs point to a number of scientific studies and reports. (SAC ¶¶ 70–86). In addition, Plaintiffs allege that Defendants cite no studies that effectively support certain of its claims and, in fact, the studies cited by Defendants actually demonstrate the falsity of Defendant's advertising and otherwise do not support its immunity strengthening claims. (SAC ¶¶ 87–91, 93–102). Therefore, Plaintiffs allege that "[n]one of these studies, even if they could be characterized as clinical—which they cannot—supports the conclusion that Gerber Products in fact strengthen and support a baby and toddler's immune system as labeled and advertised." (SAC ¶ 92).

Accordingly, Plaintiffs allege that the "labeling and advertising claims are false and deceptive because they imply that the Products provide more health benefits than other, less costly predecessor and regular formulas that do not contain probiotics, Bifidus BL, or "IMMUNIPROTECT."" (SAC ¶ 65). Therefore, Plaintiffs allege that Defendant's representations regarding the Products are likely to mislead consumers, acting reasonably under the circumstances, into believing that the Products are superior to other products because they are the near-equivalent of breast milk and that they provide immune system benefits. (SAC ¶ 66). They also maintain that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations

and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104).

Plaintiffs assert that despite rebranding the Products in February 2010 and re-naming them in early 2011, Defendant has manufactured, marketed, and sold the Products since at least September 27, 2009 with false and misleading representations on the packaging, labeling, and online advertising. (SAC ¶¶ 3, 33). Defendants allegedly advertise and promote the Products primarily through "the front-of-pack and back-of-pack" labeling claims. (SAC ¶ 47). In addition, Defendants allegedly use online advertising, its website, and other media, including television commercials. (SAC ¶¶ 48, 63). Gerber allegedly sells the Products at a premium over predecessor and regular formula products without probiotics. (SAC ¶ 21).

**\*3** Plaintiffs assert the following causes of action in the SAC[2]: (1) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8–2 *et seq.* ("NJCFA") on behalf of Plaintiffs Dourdoulakis and Jose and the putative Class or New Jersey Subclass; (2) violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins, and Thomas and the putative California Subclass; (3) unlawful business acts and practices in violation of California Business & Professions Code Section 17200, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins and Thomas and the putative California Subclass; (4) violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.,* on behalf of Plaintiff Rudich and the putative Illinois Subclass; (5) violation of the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349, *et seq.,* on behalf of Plaintiff Siddiqi and the putative New York Subclass; (6) violation of the Washington Deceptive Trade Practices Law, Wash. Rev.Code. §§ 19.86.020, *et seq* on behalf of Plaintiff Burns and the putative Washington Subclass. In addition, without specifying under which state's law they are brought, the SAC also contains a number of state law claims on behalf of all Plaintiffs and the putative class: (1) breach of express warranty (Count VII); (2) breach of implied warranty of merchantability (Count VIII); and (3) unjust enrichment (Count IX).

## II. JURISDICTION and LEGAL STANDARD

Jurisdiction is premised upon 28 U.S.C. § 1332(d)(2), as Plaintiffs allege that the matter in controversy, exclusive of interest and cost, exceeds the value of $5 million and is a class

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

action in which at least one class member is a citizen of a different state from Defendant.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the ... claim is and the grounds upon which it rests." Twombly, 550 U.S. at 545 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. See Phillips v. County of Alleghen y, 515 F.3d 224, 234 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (2007). Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 557 (2007)). However, this " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." West Penn Alleghen y Health Sys. Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir.2010) (quoting Phillips v. County of Alleghen y, 515 F.3d 224, 234 (3d Cir.2008)).

*IV. DISCUSSION*

**\*4** Defendant argues that dismissal is warranted on several grounds: (1) the SAC does not allege a plausible false advertising claim; (2) Plaintiffs have not adequately plead their fraud claims with the requisite level of particularity under Federal Rule of Civil Procedure 9(b); (3) Plaintiffs lack constitutional standing to bring their claims; (4) Plaintiffs lack standing to seek injunctive relief; (5) Plaintiffs fail to satisfy the essential elements of the applicable state consumer fraud and false advertising statutes; (6) Plaintiffs fail to allege a breach of warranty; and (7) Plaintiff's unjust enrichment claim is improper.

Plaintiffs' standing to assert claims under Article III of the Constitution is a threshold jurisdictional question. See e.g. O' Shea v. Littleton, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Accordingly, the Court begins its analysis there. The Court concludes for the reasons set forth below that Plaintiffs only have standing to assert claims premised on the alleged misrepresentations on the Products' labeling. In addition, Plaintiffs do not have standing to seek injunctive relief. The Court has considered the parties' arguments based on the Product labeling and determines, again for the reasons set forth below, that as Plaintiffs' claims are based on Defendant's overall marketing in connection with the Products, the SAC does not sufficiently allege false advertising claim based on the labeling alone. Accordingly, the Court dismisses the SAC without prejudice.

**A. Standing**

Defendant argues that Plaintiffs' allegations are insufficient to demonstrate that they have constitutional standing in two regards: (1) they do not sufficiently plead an injury for purposes of Article III; and (2) they do not adequately plead causation. In addition, Gerber submits that Plaintiffs do not have standing to seek injunctive relief because they do not plead a threat of future injury, as required to maintain a claim for injunctive relief.

Gerber asserts that "Plaintiffs have not adequately pled injury in fact and causation, which are necessary elements to establish Article III standing." (Def.'s Mot. 4). The requirements of Article III constitutional standing are as follows:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury, be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Darners Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 290–91 (3d Cir.2005); Society Hill Towers Owners' Ass' n v. Rendell, 210 F.3d 168, 175–76 (3d Cir.2000).

2013 WL 4517994

**\*5** "In the class action context, however, traditional notions of standing are not completely informative of what claims may be asserted." *In re Franklin Mut Funds Litig.,* F.Supp.2d at 461. However, "if none of the named plaintiffs purporting to represent a class establishes the requisite case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Hayes v. Wal–Mart Stores, Inc.,* ––– F.3d ––––, 2013 WL 3957757, at \*9 (3d Cir.2013) (quoting *O' Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). At the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp.,* 664 F.3d 38, 41 (3d Cir.2011) (quoting *Lujan,* 504 U.S. at 561; *Whitmore v. Arkansas,* 485 U.S. 149, 155 (1990)).

### 1. Injury In Fact

With regard to the injury in fact requirement, Defendant asserts that "not one plaintiff alleges (even in conclusory terms) that he did not receive the health benefits from the products as advertised. This is a fatal flaw." (Def.'s Mot. 4; *see also* Def.'s Mot. 24–25).[3] In arguing that Plaintiffs did not suffer an injury-in-fact, Defendant relies on a number of consumer protection cases where the products at issue contained potentially dangerous substances, but the plaintiffs suffered no ill effects. (Def.'s Mot. 25) (citing *In re Fruit Juice Products Mktg. & Sales Practices Litig.,* 831 F.Supp.2d 507 (D.Mass.2011) (plaintiffs suffered no injury-in-fact where they alleged that fruit juice contained trace amounts of lead); (Def.'s Reply 14–15) (citing *Koronthaly v. L' Oreal USA, Inc.,* 2008 WL 2938045, at \*4–5 (D.N.J. Jul.29, 2008) (plaintiff did not have standing where she alleged she was denied the benefit of the bargain when she purchased lipstick containing lead). However, as discussed above, that is not the substance of Plaintiffs' claim. Throughout the SAC and their Opposition, Plaintiffs claim that they paid a premium for the Products at issue based on false, deceptive, and misleading representations. Plaintiffs correctly argue that "[m]onetary harm is a classic form of injury in fact. Indeed it is often assumed without discussion." (Pl.'s Opp'n. 22) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d at 293) (internal citation omitted). Accordingly, at this stage of the litigation, Plaintiffs sufficiently allege an actual injury which is concrete and particularized. *See Wang v. OCZ Tech. Grp., Inc.,* 276 F.R.D. 618, 625 (N.D.Cal.2011).[4]

### 2. Causation

As to causation, Defendant submits that "plaintiffs fail to specify which allegedly false or misleading advertisement was reviewed prior to purchasing the product(s) and how that statement influenced the purchasing decision." (Def.'s Mot. 4). However, Defendant does not point to a requirement that such specificity is required to demonstrate constitutional standing generally. Rather, Gerber points to a number of cases which analyzed the standing requirements for certain specific state consumer protection statutes, which the parties do not dispute are analyzed under the lens of Rule 9(b)'s heightened pleading requirement.[5] (Def.'s Mot. 25) (citing *In Re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.,* 2009 WL 2940081, at \*13 (D.N.J. Sept.11, 2009) (considering claims asserted under New Jersey's Consumer Fraud Act)[6]; *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, at \*8 (N.D.Cal. Apr.11, 2012) (discussing the reliance requirement under California's Unfair Competition Law, False Advertising Law and Consumer Legal Remedies Act); *Wang v. OCX Tech. Grp., Inc.,* 276 F.R.D. 618, 628 (N.D.Cal.2011) (considering whether allegations satisfy the heightened pleading requirements of Rule 9(b)); *Johns v. Bayer Corp.,* 2010 WL 476688, at \*5 (S.D.Cal. Feb.9, 2010) (discussing statutory standing requirements of California's Unfair Competition Law and Consumer Legal Remedies Act)). In their Opposition, Plaintiffs argue that "[t]here is a causal connection between the Plaintiffs' injury and Defendant's conduct. Plaintiffs thought they were purchasing, and paying for, products with the immune benefits Gerber stated they had, but Plaintiffs did not receive what they paid for because [ ] Gerber misrepresented the qualities of its products." (Pls.' Opp'n. 23).

**\*6** A number of Plaintiffs allege that they relied on alleged misrepresentations contained only on the Products' labeling. Plaintiffs Rudich, Siddiqi, and Lhomas all identify the Products they purchased and allege that they "viewed and specifically relied upon Defendant's claims by reading the representations made on the product label concerning the probiotic benefit of the Products, purchased Gerber Products in reliance on these claims, and sustained injury in fact and lost money as a result of the wrongful conduct described herein." (SAC ¶¶ 29–31). On the other hand, a number of Plaintiffs state in a conclusory fashion that they relied on Defendant's "advertisements and labeling." Plaintiffs Burns, Dourdoulakis, Ginger, Hawkins, and Jose all allege that they purchased certain of the Products based on "Gerber's misleading claims in its advertisements and labeling that

2013 WL 4517994

the Products contained probiotic bacteria strains that provide immunity-related health benefits and are near-equivalents to breastmilk." (SAC ¶¶ 24–28). In addition, one Plaintiff merely alleges only that she would not have purchased the Products but for Gerber's "misrepresentations." (SAC ¶ 23). Plaintiff Alvarez alleges that she "would not have purchased and paid a premium for the Gerber products but for Gerber's misrepresentations, and she suffered injury in fact and lost money as a result of Gerber's deceptive, unfair, and fraudulent practices described herein." (SAC ¶ 23).

Separate and apart from the product labeling, the SAC references a number of different types of representative "advertisements," including television commercials, press releases, and excerpts from Gerber's website. Indeed, as discussed in greater detail below, Plaintiffs premise their claims on Gerber's overall marketing campaign in connection with the Products. However, no Plaintiff provides facts sufficient to allege causation in connection with those aspects of Defendant's marketing campaign. For example, other than the Products' label, no Plaintiff alleges even the general type or medium of "advertising" to which they were allegedly exposed. Nor do Plaintiffs otherwise allege facts as to how misrepresentations in the "advertising" caused their injuries. Therefore, the SAC does not contain sufficient facts to allege that the injuries which resulted to Plaintiffs were fairly traceable to any of Gerber's representations other than those on the Products' labeling. *See Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587, 599, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."))

### 3. *Injunctive Relief*
Next, Defendant argues that Plaintiffs lack standing to seek injunctive relief because they have not alleged a threat of a future injury, which is required to obtain prospective relief. (Def.'s Mot. 4, 26–27). On the other hand, Plaintiffs argue that it is premature to decide whether they have standing to seek injunctive relief. (Pls.' Opp'n. 23). Plaintiffs further argue that "[i]n the instant case, Plaintiffs' ability to seek injunctive relief on behalf of other class members to prevent Gerber from continuing to falsely tout the qualities of its Products arises only because of the class-action context of this case. As a result, Plaintiffs' standing to seek injunctive relief should be determined after class certification, in relation to whether the class as a whole would have standing to seek injunctive relief,

not just the named Plaintiffs." (Pls.' Opp'n. 25). Plaintiffs also point to a number of cases from the district courts of California to argue that standing should not be so narrowly construed. (Pls.' Opp'n. 23–24).

**\*7** "An injury-in-fact 'must be concrete in both a qualitative and temporal sense.' " *Reilly v. Ceridian Corp.,* 664 F.3d at 42. As explained by the Third Circuit, where a plaintiff seeks prospective relief, "the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp., Inc.,* 672 F.3d 213, 223 (3d Cir.2012) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). "The threat of injury must be sufficiently real and immediate, and, as a result of the immediacy requirement, past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. if unaccompanied by any continuing, present, adverse effects." *Id.* (internal citations and quotations marks omitted). The Court agrees with Defendant that in this instance, no Plaintiff alleges that he or she is likely to "suffer future injury from the defendant's conduct [and in] the class action context, that requirement must be satisfied by at least one named plaintiff." *Id.; see also Dicuio v. Brother Intern. Corp.,* Civ. No. 2012 WL 3278917, at * 15 (D.N.J. Aug. 9, 2012) ("[I]t is not enough that other, non-named members of the class may intend to purchase [the product] in the future."). Therefore, the Court dismisses without prejudice Plaintiffs' claim for injunctive relief. *Dicuio,* 2012 WL 3278917, at * 14–16; *Robinson v. Hornell Brewing Co.,* Civ. No. 11–2183, 2012 WL 1232188, at *3–7 (D .N.J. Apr. 11, 2012).

### B. False or Misleading Advertising
In essence, Gerber maintains that the Products' marketing is not deceptive or misleading as a matter of law. Defendant submits that the law of New Jersey, California, New York, and Washington requires that allegedly false advertisements must have the capacity to mislead the average consumer. (Def.'s Mot. 6–7). Similarly, Defendant contends that the law of Illinois requires a plaintiff to allege that he was deceived and that deception caused him damages." (Def.'s Mot. 7). Accordingly, Gerber argues that Plaintiffs' false advertising claim is deficient due to the following: (1) Gerber's Good Start Formula Products are not marketed as an equivalent of breast milk; (2) Plaintiffs' lack of substantiation allegations are not viable; and (3) the cited studies are either irrelevant or confirm the advertised healthy immune system benefits.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 261 of 751
PageID: 11627
In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 4517994

Defendants argue that private individuals may not bring an action demanding substantiation for advertising claims. (Def.'s Mot. 9). In Opposition to this instant motion, Plaintiff asserts that: "Gerber casts Plaintiffs' case as something it is not-a 'lack of substantiation case'-and then contends the re-defined case must be dismissed." (Pls.' Opp'n. 1). Rather, Plaintiffs clarify that their claim is based on Defendant's alleged false and deceptive marketing regarding "probiotic" bacteria which is alleged to not perform as advertised. (Pl's Opp'n. 1) (citing SAC ¶¶ 64–65, 67–69, 78, 93). Plaintiffs distinguish a lack of substantiation argument-where a plaintiff argues that there is no competent evidence to support a claim made in defendant's advertising or labeling-from their claim which they maintain is premised upon allegations that competent scientific evidence demonstrates that claims made by a defendant are objectively false. (PL's Opp'n. 9). Accordingly, they argue that the scientific evidence to which they point supports their allegations of false advertising. (PL's Opp'n. 8–9). They concede, however, that their claims are not viable to the extent that it is premised upon a lack of substantiation theory. Therefore, to the extent Plaintiffs' claims are based on a lack of substantiation theory, they are dismissed with prejudice. *Franulovic v. Coca–Cola Co.,* 390 F. App'x. 125, 128 (3d Cir.2010); *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684, 10–5628, 2012 WL 2916827, at *6–7 (D.N.J. Jul.17, 2012).

**\*8** Gerber additionally argues that Plaintiffs may not rely on a lack of substantiation theory to "so easily sidestep their obligation to allege *facts* demonstrating falsity in order to survive a motion to dismiss." (Def.'s Mot. 2). However, as discussed above, Plaintiffs do cite a number of studies and reports and allege in detail that those relied upon by Defendant in its marketing are false or misleading. (Pl's Opp'n. 6–8). Thus, Plaintiffs do not merely assert that no credible science supports Defendant's claims; rather, they allege that the representations regarding the Products are affirmatively false. *Hughes v. Ester C Co.,* —— F.Supp.2d ——, 2013 WL 1080533, at *13 (E.D.N.Y. Mar.15, 2013).

Notwithstanding, Gerber argues that "Plaintiffs' reliance on these studies is misplaced: the studies either confirm the immunity benefits of Gerber's probiotic formula and cereal products ... or are entirely irrelevant. Merely citing a gaggle of studies might create the appearance of factual issues, but in this case the tactic does not withstand even minimal scrutiny-it was rejected in a very recent decision and should likewise be rejected again here." (Def.'s Mot. 3) (citing *Route,* 2013 WL 658251, at *5).* The Court

concludes that *Route* is distinguishable from this case. In *Route,* the court characterized plaintiff's allegations of falsity as based on allegations that: "(1) one paper discusses both the evidence supporting the advertisement's claim and the evidence that doesn't support it, (2) unidentified experts and studies have shown that the advertisement's claims are false, and (3) [p]laintiff subjectively believes that the advertisement's claims are false." *Route,* 2013 WL 658251 at *5. In this case, however, Plaintiffs point to a number of studies, which they contend have "demonstrated that the bacteria in the Products do not provide any clinically relevant immunity benefits. This means that it does not provide these benefits, rendering the advertising false or misleading." (PL's Opp'n. 12) (internal citations omitted). The parties dispute the reliability and findings of certain studies, as well as the applicability of same to infants and children who consume the Products at issue. In this regard, however, the Court agrees with Plaintiffs that it is not appropriate to consider the content of the studies and resolve the factual issues at this stage of the litigation. Indeed, in arguing that other courts have rejected similar claims, Defendant relies on two cases that involved motions for summary judgment. (Def.'s Mot. 17–18) (citing *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684 and 10–5628, 2012 WL 2916827, at *7 (D.N.J. Jul.17, 2012)[7]; *Stanley v. Bayer Healthcare, LLC,* No. 11–862, 2012 WL 1132920, at * 5 (S.D.Cal. April 3, 2012).* Therefore, the Court declines to hold that Gerber's representations regarding purported immune system benefits are neither false, deceptive, nor misleading.

### a. *Equivalence of Breast Milk*

**\*9** The Court now turns to whether a reasonable consumer could find Gerber's representations regarding the products misleading. Gerber maintains that it "endorses breast milk in the clearest of terms on its products and its website as the ideal source of nutrition for babies." (Def.'s Mot. 7, *see also* 8). Further, Defendant asserts: "Remarkably, Gerber's statements-which eviscerate plaintiffs' breast milk equivalence claim-are carefully edited out of the SAC." (Def.'s Mot. 8).[8] Specifically, Defendant points to the use of ellipses in place of the word "ideal" throughout the SAC and writes: "Is this really how lawyers should state a claim? Alleging a fraud only by deleting the truth? The Court should not approve such tactics." (Def.'s Mot. 9) (citing *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 253 (3d Cir.2011); *Freeman v. Time, Inc.,* 68 F.3d 285, 290 (9th Cir.1995)); *see also Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. Defendant argues

2013 WL 4517994

that it clearly and unmistakably endorses breast milk as the ideal nutrition for babies.[9] However, the parties do not dispute that the appropriate inquiry is whether a reasonable person would be misled by the overall advertising. (Pls.' Opp'n 3, n. 2.; Def.'s Reply 3).

In their Opposition, Plaintiffs write: "With overblown and false indignation, Gerber accuses Plaintiffs of 'the consummate blue smoke and mirrors' by 'repeatedly replac[ing] Gerber's statements promoting breast milk as the 'ideal' source of nutrition for babies with 'dot-dot-dot. Gerber should focus on being more accurate and less accusatory.'" (Pls.' Opp'n. 4) (internal citations omitted, alteration in original). Plaintiffs quote allegations in the SAC at length and clarify that the substance of their claim is that: despite touting the benefits of probiotic cultures in Good Start which are "like those naturally promoted by breast milk to support an infant's healthy immune system," those claims are allegedly contrary to scientific evidence which demonstrates that "formula supplemented with probiotics does not provide breast milk-quality nutrition." (PL's Opp'n. 2, 4–5). Therefore, Plaintiffs explain that they "never allege that Gerber advertises that Good Start is *better* than breast milk. Instead, Plaintiffs allege that Gerber falsely or deceptively *equates* Good Start to breast milk." (PL's Opp'n. 3). Stated another way, Plaintiffs allege that "Gerber clearly holds out breastfeeding as the gold standard, and then (falsely) equates Good Start to that gold standard." (PL's Opp'n. 4). Accordingly, Plaintiffs argue "that this is not the 'rare' case where an advertisement can be declared not deceptive as a matter of law." (PL's Opp'n. 5) (citing *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir.2008)).

The Court notes that whether a practice is deceptive or misleading is generally a question of fact. *See e.g. Williams,* 552 F.3d at 938–39 ("whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' " and usually cannot be resolved through a motion to dismiss); *Union Ink Co. v. AT & T Corp.,* 352 N.J.Super. 617, 645, 801 A.2d 361 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact."). Here, Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly

equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 11,14).

**\*10** Notwithstanding, as discussed above, Plaintiffs only establish standing to assert claims based on the alleged misrepresentations on the Products' labeling. However, the allegedly deceptive or misleading practice on which Plaintiffs base their claims is the overall marketing of the Products, which includes both the labeling as well as many other aspects of Gerber's marketing/advertising. Stated another way, Plaintiffs do not assert independent claims based on the Product's labeling alone.

In addition, both parties rely on representations of Defendant's overall marketing message in both the advertising as well as the labeling of the Products in support of their arguments. For example, throughout Plaintiffs' brief, they point to concrete examples of misleading statements from press releases and the website in the SAC. Plaintiffs also refer to Defendant's "misrepresentations" without specifying the source. (*See e.g.* SAC ¶ 66). Also, they allege that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104). Further, in responding to Defendant's argument that Plaintiffs have not alleged that a reasonable consumer is "likely to be deceived" under California law, Plaintiffs point to the following which exemplifies the issue:

> Gerber expressly advertises that Good Start contains probiotics, which makes Good Start a near-equivalent to breast milk. For example, in one press release, Defendant stated "Nestle believes that GOOD START formula provides mothers, who cannot or who choose not to breastfeed, a healthy breast milk alternative." SAC ¶ 44; *see also* ¶ 12 (Good Start contains probiotics "like those promoted by breast milk"), ¶ 40 (same), ¶ 41 ("This breakthrough product is the first and only older-baby formula in the U.S. with the probiotic, BIFIDUS BL-beneficial cultures like those found in breast milk that help support babies' immune system."), ¶ 57 and ¶ 59 (product packaging and labeling), ¶¶ 60–62 (Gerber website, including a FAQ "How does GOOD START Protect compare with breast milk?"), ¶ 63 (tv ad).

(Pls.' Opp'n. 29). To be sure, the Court does not suggest that Plaintiffs may never refer to Defendant's collective misrepresentations in the SAC. However, as determined above, Plaintiffs only have standing to assert claims based on the labeling of the Products. In light of the fact that Plaintiffs'

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 263 of 751
PageID: 11629
In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

claims are premised on Gerber's overall marketing campaign, the Court cannot determine whether Plaintiffs state a plausible right to relief based on the representations contained on the Products' labels alone. Accordingly, the Court dismisses the SAC without prejudice.

### IV. CONCLUSION

For the reasons set forth above, Defendant's motion is GRANTED. The SAC only establishes standing to sue for injuries caused by the alleged misrepresentations on the Products' labels. However, as Plaintiffs premise their claims on Defendant's overall marketing message and assert no independent claims based on the labeling of the Products alone, they do not clearly allege a plausible right to relief. In addition, Plaintiffs do not allege a plausible future injury which could suffice as a basis for injunctive relief in the Third Circuit. Accordingly, the Court dismisses the SAC without prejudice. However, the Court dismisses with prejudice Plaintiffs' claims to the extent that they are premised upon a lack of substantiation theory.

*11 If Plaintiffs choose to amend, the Court advises the parties of the following in light of the Court's inherent authority to manage its cases and docket. Plaintiffs assert claims for breach of express warranty, breach of implied warranty, and unjust enrichment without specifying which state or states' laws they seek to invoke. As a general matter, absent a conflict, a court sitting in diversity applies the law of the forum state. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir.2006). Choice of law analysis must also be applied in the class action context. *Phillips Petroleum v. Shutts, All* U .S. 797 (1985). Accordingly, the parties should make clear which law they contend applies, to the extent possible given the posture of the litigation, for purposes of determining plausibility and otherwise.

In addition, Plaintiffs assert causes of action under the consumer fraud and false advertising statutes of a number of States. To the extent that any of the parties make general arguments regarding those claims, they should exercise caution to ensure that those arguments are indeed applicable to all claims and make clear where they are not. For example, Defendant argues that dismissal is warranted because "not one of the nine named plaintiffs identifies the advertisements on which he relied or how that advertisement influenced the purchasing decision." (Def.'s Mot. 3–4; *see also* 19–20). However, the Court notes that while almost all of the relevant statutes require a plaintiff to satisfy the heightened pleading standards of 9(b), Defendants do not address which of the state consumer protection statutes at issue require individual reliance.[10] Defendant also argues that Plaintiffs fail to satisfy Rule 9(b) because they do not allege the "premium" they allegedly paid. However, Defendants do not explain why this is fatal to state claims in light of the essential elements of each. For example, Defendants address the "ascertainable loss" requirement in the New Jersey Consumer Fraud Act[11] at length but make no similar arguments regarding the laws of other states. Therefore, as the essential elements of the relevant consumer fraud and false advertising statutes vary, the parties should organize their briefs in a manner which makes clear to which elements Rule 9(b) applies and which of their arguments are generally applicable.

An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 4517994

---

Footnotes

1    The following plaintiffs assert claims in the SAC: Maria Alvarez, Ryan Burns, Irene Dourdoulakis, Chad Ginger, Shavonda Hawkins, Joven Jose, Andrew Rudich, Saba Siddiqi and Janna Thomas. (SAC ¶¶ 23–31) (collectively "Plaintiffs").

2    Defendant explains:
     This case began when ten separate nationwide class actions were filed in six different District Courts between February and April 2012. On June 7, 2012, the five then-pending New Jersey cases were consolidated and a single consolidated complaint was filed. Dkt. No. 28. On October 16, 2012, the Judicial Panel on Multidistrict Litigation denied consolidation of all pending cases in the District of Washington. *In re Gerber Probiotic Prods. Mktg and Sales Practices Litig.,* —— F.Supp.2d ——, 2012 WL 495523 (J.P.M.L. Oct. 16, 2012). Following that ruling, the California plaintiffs consolidated their actions, and Gerber moved to transfer the two remaining non-New Jersey actions to this Court pursuant to 28 U.S.C. § 1404(a). Both courts determined that the paramount 1404 factors (avoiding duplication, fostering judicial

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 264 of 751
PageID: 11630
In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4517994

economy and conserving limited judicial resources) weighed in favor of transfer. *Burns v. Gerber Prods. Co.,* 922 F.Supp.2d 1168, 2013 WL 518664 (E.D.Wash. Feb.12, 2013); *Hawkins v. Gerber Prods. Co.,* 924 F.Supp.2d 1208, 2013 WL 627066 (S.D.Cal. Feb.20, 2013). The Second Amended Consolidated Complaint (Dkt.48) was filed on April 10, 2013.

(Def.'s Mot. 1 n. 1).

3    The Court agrees with Plaintiffs that this argument goes to the merits of the claim. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal citations and quotations omitted). To the extent that a state consumer statute or other cause of action requires a showing of same, it would be more appropriate to address Defendant's arguments within the context of that discussion. The Court notes, however, that it does not reach Defendant's argument that Plaintiff fails to plead certain essential elements of their consumer fraud claims.

4    Even under the more exacting standard of Rule 9(b), courts in this District have held that an exact dollar amount is not required to plead an ascertainable loss under the New Jersey Consumer Fraud Act. *Nelson v. XACTA 3000 Inc.,* No. 08–5426, 2010 WL 1931251, at *7 n. 3 (D.N.J. May 12, 2010); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.,* No. 08–1057, 2008 WL 5381227, at *7 n. 3 (D.N.J. Dec.17, 2008)

5    The parties do not dispute that most of Plaintiffs' false advertising claims asserted under state statutes, including New Jersey, Illinois, California, and Washington, must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). (Def.'s Mot. 3; Def.'s Reply 9).

6    For the sake of completeness, it is worth noting that in *In re Toshiba* the court concluded that the plaintiff's allegations regarding ascertainable loss and causation under the NJFCA satisfied neither Rule 8(a) or 9(b). 2009 WL 2940081, at *13.

7    The Court notes for the sake of completeness that *Scheuerman* disposed of both a motion to dismiss and a motion for summary judgment. 2012 WL 2916827, at *7. However, in concluding that the plaintiffs' claims premised upon false or misleading statements were insufficient, the court considered evidence adduced throughout discovery as well as opinions of experts. *Id.* at 7–9.

8    The parties do not dispute that the Court may properly consider the contents of the advertisements upon which Plaintiffs base their claims in deciding the instant motion to dismiss. (Def.'s Mot. 8) (citing *Am. Cyanamid Co. v. S.C Johnson & Son, Inc.,* 729 F.Supp. 1018, 1021–22 (D.N.J.1989)).

9    In its Reply, Defendant further argues that Plaintiffs fail to distinguish *Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. (Def.'s Reply 5). That case also involved allegedly misleading representations made in connection with the marketing of baby formula. Defendants point to the following language from a footnote in that case: "[I]t appears that Plaintiff would have this Court find that anytime baby formula is advertised as providing health benefits *analogous* to those found in breast milk, the advertisement is misleading. This surely cannot be." (Def.'s Reply 5) (quoting *Route,* 2013 WL 658251, at *5 n. 6) (emphasis added by Defendant). Notably, the decisions of other district courts are not binding on this court. In any event, here Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide" (SAC ¶ 11, 14).

10    Defendant cites this Court's Opinion in another case for the proposition that " 'general exposure to, and reliance upon, some advertisements, is insufficient to survive [the] heightened scrutiny' of Rule 9(b)." (Def.'s Br. 20) (quoting *Gray v. Bayer Corp.,* No. 08–4716, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009) (Linares, J.) (no alteration supplied). The Court notes, however, that the excerpt to which Defendant points related to the Court's discussion of Rule 9(b) with regard to negligent and intentional misrepresentation, which require a plaintiff to allege and prove reliance upon a defendant's misrepresentations. 2009 WL 1617930, at *3.

11    *See e.g. Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 929 A.3d 1076, 1086 (N.J.2007). (In order to state a claim under the NJCFA, a plaintiff must allege the following: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.)

---

Tab 26

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 266 of 751
PageID: 11632
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

2016 WL 2932163
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Jessica GINGRAS and Angela C.
Given, on behalf of themselves and all
others similarly situated, Plaintiffs,

v.

Joel ROSETTE, Ted Whitford, Tim McInerney,
Think Finance, Inc., TC Loan Service, LLC, Kenneth
E. Rees, TC Decision Sciences, LLC, Tailwind
Marketing, LLC, Sequoia Capital Operations, LLC
and Technology Crossover Ventures, Defendants.

Case No. 5:15-cv-101
|
Signed May 18, 2016

**Attorneys and Law Firms**

Matthew B. Byrne, Esq., Gravel & Shea PC, Burlington, VT,
for Plaintiffs.

Andre D. Bouffard, Esq., Downs Rachlin Martin PLLC,
Ritchie E. Berger, Esq., Dinse, Knapp & McAndrew,
P.C., Burlington, VT, Jay A. Dubow, Esq., Matthew B.
Homberger, Esq., Richard J. Zack, Esq., Pepper Hamilton
LLP, Philadelphia, PA, James R. McGuire, Esq., Lauren L.
Wroblewski, Esq., Morrison and Foerster LLP, San Francisco,
CA, for Defendants.

**OPINION AND ORDER RE: CROSS MOTION FOR
JURISDICTIONAL DISCOVERY AND MOTIONS
TO DISMISS AND TO COMPEL ARBITRATION**

Geoffrey W. Crawford, Judge United States District Court

**\*1** Plaintiffs have filed a class action against individuals
and companies involved in an online lending venture operated
by the Chippewa Cree Tribe of the Rocky Boy's Indian
Reservation in Montana (the Tribe). They claim that the
"payday" loans offered by Plain Green, LLC violate federal
and state law because of the usurious interest rates (between
198 and 376% annually) and other unlawful features of the
loans such as the lender's automatic access to the consumer's
bank account to facilitate repayment.

All Defendants have filed motions to dismiss or to compel
arbitration. (Docs. 64, 65, 66, 67, 76, 77.) Also pending is
Plaintiffs' Motion for Jurisdictional Discovery on the issues
of subject-matter jurisdiction and arbitration. (Doc. 43.) The
court heard argument on all of the pending motions on
December 16, 2015. Plaintiffs filed Supplemental Authority
and Supplemental Documents on January 18, 2016 (Doc. 107)
and April 8, 2016 (Doc. 114), at which time the court took the
motions under advisement.

**Background**

The facts as they appear in Plaintiff's 43-page First Amended
Complaint ("FAC") (Doc. 18) may be summarized as
follows. [1]

Plaintiffs are Vermont residents who have borrowed money
from Plain Green, LLC. Plain Green holds itself out as a
"tribal lending entity wholly owned by the Chippewa Cree
Tribe of the Rocky Boy's Indian Reservation." (Doc. 18 ¶ 2.)
The reservation is located in Montana.

Plain Green operates its lending business over the internet.
It has no physical place of business in Vermont or any
property or employees in Vermont. Instead, borrowers reply
to an internet site and apply for credit through an online
application process. (*Id.* ¶ 21.) Within the banking industry,
these loans are commonly called "payday loans" because
they are frequently marketed as loans sufficient to tide the
borrower over until the next paycheck. Plain Green employs
subsidiaries of Think Finance, Inc. to market, administer, and
collect its loans. (*Id.* ¶ 57.)

Plaintiffs borrowed relatively small sums of money from
Plain Green for periods of up to one year. Frequently one
loan would follow close on the heels of the repayment of the
previous loan.

In July 2011, Plaintiff Jessica Gingras borrowed $1,050 from
Plain Green at a rate of 198.17%. She repaid this loan with
interest. During July and August 2012, she borrowed a total
of $2,900 at a rate of 371.82%. She has not repaid the second
loan. (*Id.* ¶¶ 48-50.) [2]

Plaintiff Angela Given borrowed $1,250 from Plain Green in
July 2011. She completed repayment a year later. The annual
interest rate was 198.45%. (*Id.* ¶ 60.) Within a few days, in
July 2012, she borrowed $2,000. She completed repayment a

year later in July 2013 at an annual interest rate of 159.46%. (*Id.* ¶ 61.) She also borrowed $250 in May 2013 which she repaid within a few weeks at an annual interest rate of 376.13%. In July 2013, she borrowed $3,000 at 59.83%. She has not completed repayment of the most recent loan.

**\*2** Plaintiffs allege that the high interest rates violate Vermont's usury laws which permit a maximum rate of interest of 24%. *See* 9 V.S.A. § 41a. The loan agreements contain other provisions which Plaintiffs say violate state and federal law, including the provision for automatic access to the borrower's bank account in violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1). (Doc. 18 ¶¶ 181-195.)

Plaintiffs have not sued Plain Green. Instead, they have sued Joel Rosette, who is the Chief Executive Officer of Plain Green, and Ted Whitford and Tim McInerney (the "Tribal Defendants"), who are members of Plain Green's Board of Directors. All three are sued in their official capacity for declaratory and injunctive relief only pursuant to the authority expressed in *Ex Parte Young*, 209 U.S. 123 (1908).

Plaintiffs have also sued Think Finance, Inc. ("Think Finance" or "TF") and its former President, Chief Executive Officer, and Chairman of the Board Kenneth Rees. Think Finance is a Delaware corporation. Kenneth Rees is a citizen of Texas. The FAC alleges that these defendants developed a plan to make loans through a tribal entity in order to take advantage of tribal immunity from state banking laws. (Doc. 18 ¶ 80.) They control the operations of Plain Green. They dictated the terms of the Tribe's finance code. In Plaintiffs' view, Plain Green is a shell company created by Think Finance and Mr. Rees in order to provide a layer of legal protection for a lending business which the Federal Trade Commission and state banking regulators have determined to be illegal. (*See id.* ¶ 3; *see also id.* ¶ 37 ("Plain Green's very existence is an effort to avoid liability.").) Plaintiffs allege that the tribal law relevant to this lending business and the tribal courts with potential jurisdiction over any dispute have been subverted by the money generated by Plain Green.

The next group of defendants are subsidiaries of Think Finance which perform various tasks in connection with the payday lending operation. These include TC Decision Sciences, LLC, Tailwind Marketing, LLC, and TC Loan Service, LLC. (These defendants, together with Think Finance, Inc., are referred to as the "Think Defendants.")

Finally, Plaintiffs have sued two of the financial institutions which they claim provide the funding for loans made by Plain Green. These are Sequoia Capital Operations, LLC (Sequoia) and Technology Crossover Ventures (TCV). [3]

Both of the loan agreements between Plain Green and Plaintiffs contain arbitration clauses. The clauses are detailed and cover several pages of the parties' loan agreements. [4] The arbitration provisions require the borrowers to submit any dispute to binding arbitration, including disputes with "related third parties." (Doc. 13-5 at 50.) The borrower may opt out of the arbitration provision within 60 days of the receipt of loan funds. (*Id.* at 49.) The borrower may select the procedures of the American Arbitration Association or JAMS and the arbitration may occur on the reservation or within 30 miles of the borrower's residence at the choice of the borrower. Plain Green will bear the cost of the arbitration including the filing fee and the arbitrator's costs. Each side pays its own attorneys fees. The arbitrator may award attorneys fees to the prevailing party.

**\*3** The arbitrator is required to apply Chippewa Cree tribal law to the dispute. He or she is not authorized to hear class-wide claims. He or she must refer any dispute over class arbitration to a tribal court of the Chippewa Cree Tribe. The arbitrator must make written findings to support an award. Any award must be supported by substantial evidence and must be consistent with the loan agreement. The tribal court has authority to aside an award if these conditions are not met. The arbitration agreement and the loan agreement as a whole are subject to tribal law and are not subject to the laws of any state.

<u>Analysis</u>

**I. Subject-Matter Jurisdiction**
The pending motions to dismiss or to compel arbitration invoke almost all of the categories of defenses outlined in Fed. R. Civ. P. 12(b). The court begins with Rule 12(b)(1)—the defense of lack of subject-matter jurisdiction. [5] "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it ....' " *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015)

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 268 of 751
PageID: 11634
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

(quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A court lacks constitutional power to adjudicate a case where "the plaintiff lacks constitutional standing to bring the action." *Id.*

"The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue.' " *Id.* (alteration in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). "In resisting a motion to dismiss under Rule 12(b)(1), plaintiffs are permitted to present evidence (by affidavit or otherwise) of the facts on which jurisdiction rests." *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004). "[C]ourts generally require that plaintiffs be given an opportunity to conduct discovery on these jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party." *Id.*

Plaintiffs assert the following five bases for federal subject-matter jurisdiction: (1) federal question jurisdiction under 28 U.S.C. § 1331; (2) diversity jurisdiction under 28 U.S.C. § 1332; (3) class action jurisdiction under 28 U.S.C. § 1332; (4) jurisdiction under RICO, 18 U.S.C. § 1965; and (5) jurisdiction under the Federal Consumer Financial Law, 12 U.S.C. § 5481. (Doc. 85 at 28.) Plaintiffs assert federal-question jurisdiction on the basis of claims arising under the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a), the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1). They also assert a civil RICO claim pursuant to 18 U.S.C. § 1962(c).

The Tribal Defendants seek dismissal under Rule 12(b)(1) asserting that: (1) the action is barred by tribal sovereign immunity, and (2) the Plaintiffs lack Article III standing. Plaintiffs argue that tribal immunity and subject-matter jurisdiction are distinct concepts. They also assert that they have Article III standing.

### A. Tribal Sovereign Immunity
**\*4** The first issue is whether tribal sovereign immunity is a jurisdictional question at all. Plaintiffs assert that

*Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014), stands for the proposition that tribal immunity and federal subject-matter jurisdiction are entirely separate concepts. The court disagrees. In *Bay Mills*, the Supreme Court observed that no provision of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq., limited the grant of jurisdiction under the general federal-question statute, 28 U.S.C. § 1331. *Bay Mills*, 134 S. Ct. at 2029 n.2. But that observation related to the initial question of whether federal-question jurisdiction existed, not the subsequent question of whether tribal sovereign immunity might destroy subject-matter jurisdiction. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) (noting that a federal court can address tribal sovereign immunity only after it confirms that subject-matter jurisdiction exists).

Courts in the Second Circuit have held that Rule 12(b)(1) is a proper vehicle for invoking tribal sovereign immunity. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001) (analyzing tribal sovereign immunity as an issue of subject-matter jurisdiction); *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966(CBA), 2009 WL 705815, at \*2 (E.D.N.Y. Mar. 16, 2009) (" '[A] motion to dismiss based on tribal immunity is appropriately examined under Fed. R. Civ. P. 12(b)(1).' " (quoting *Bassett v. Mashantucket Pequot Museum & Research Ctr. Inc.*, 221 F. Supp. 2d 271, 276 (D. Conn. 2002))). Decisions from outside the Second Circuit—some post-dating *Bay Mills*—are in accord. [6] The court therefore analyzes the Tribal Defendants' sovereign-immunity claim in the Rule 12(b)(1) context.

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority." *Bay Mills*, 134 S. Ct. at 2030 (internal quotation marks omitted). "Among the core aspects of sovereignty that tribes possess ... is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.' " *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)). Tribal immunity applies to suits brought by States as well as those brought by individuals. *Id.* at 2031. Tribal immunity also applies "for suits arising from a tribe's commercial activities, even when they take place off Indian lands." *Id.* (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751 (1998)). [7] Generally, a plaintiff "cannot circumvent tribal immunity by merely

naming officers or employees of the Tribe when the complaint concerns actions taken in defendants' official or representative capacities and the complaint does not allege they acted outside the scope of their authority." *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004) (per curiam).

**\*5** The answer to the Tribal Defendants' sovereign-immunity claim stems from an exception to the general rule stated in *Chayoon.* As individuals sued for injunctive and declaratory relief in their official capacity, the Tribal Defendants are subject to suit by analogy to *Ex Parte Young.* The Supreme Court has recognized the application of the doctrine to tribe members. *See Bay Mills*, 134 S. Ct. at 2035 (under analogy to *Ex Parte Young*, tribal immunity does not bar suit "for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct"); *Santa Clara Pueblo*, 436 U.S. at 59.

The Second Circuit in *Garcia* noted two important "qualifications" limiting a plaintiff's ability to obtain injunctive relief when she invokes the *Ex Parte Young*-type exception. First, any law under which a plaintiff seeks injunctive relief "must apply substantively" to the tribe. *Garcia*, 268 F.3d at 88. An example of a circumstance in which a law does not "apply substantively" to a tribe is when the law specifically exempts "an Indian tribe" from its prohibitions. *See id.* (citing 42 U.S.C. § 2000e(b)). Second, a plaintiff "must have a private cause of action to enforce the substantive rule." *Id.* The Tribal Defendants assert that Plaintiffs' federal claims fail on both counts. However, the court does not read the "qualifications" articulated in *Garcia* as components of the *jurisdictional* analysis. The court treats the Tribal Defendants' arguments on these points as necessary below.[8]

The Tribal Defendants argue that Plaintiffs seek more than prospective injunctive or declaratory relief, and actually seek money damages from the Tribal Defendants—a remedy not available under the *Ex Parte Young*-type exception. (*See* Doc. 66 at 19 n.5.) The FAC does indeed assert (apparently without excepting the Tribal Defendants) that "funds should be returned to the people who fell victim to Defendants' illegal scheme"; and further requests an "[e]quitable surcharge seeking return of all interest charged above a reasonable rate and any financial charges associated with the loan" and also "[a] constructive trust over funds obtained illegally." (Doc. 18 at 42-43.) The court concludes that, to the extent the FAC

seeks money damages against the Tribal Defendants, that relief is unavailable.[9]

Finally, the Tribal Defendants assert that the *Ex Parte Young*-type exception applies only to violations of *federal* law, and that as a result all of Plaintiffs' state-law claims fail. (Doc. 66 at 23.) *Ex Parte Young* is itself "inapplicable in a suit against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Thus under the *Ex Parte Young* doctrine, "a federal court's grant of injunctive relief against a state official may *not* be based on violations of state law." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 595 (2d Cir. 1990) (citing *Pennhurst*, 465 U.S. at 106). Extending that reasoning to tribal cases, the court in *Frazier v. Turning Stone Casino* held that *Ex Parte Young* "only allows an official acting in his official capacity to be sued in a federal forum to enjoin conduct that *violates federal* law." 254 F. Supp. 2d 295, 310 (N.D.N.Y. 2003) (emphasis added).

**\*6** *Frazier* might have been persuasive authority prior to the Supreme Court's decision in *Bay Mills.* But in *Bay Mills* the Supreme Court stated that, if a tribe were to set up an off-reservation casino, the state "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license." 134 S. Ct. at 2035. That is because "a State, on its own lands, has many other powers over tribal gaming that it does not possess (absent consent) in Indian territory," and because, when not on Indian lands, tribal officials "are subject to any generally applicable state law." *Id.* at 2034. Thus, as other courts have recognized, *Bay Mills* establishes that "tribal officials may be subject to suit in federal court for violations of state law under the fiction *of Ex Parte Young* when their conduct occurs outside of Indian lands." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015).[10]

Plaintiffs assert that "the activities of the Plain Green enterprise occurred outside the reservation." (Doc. 85 at 32.) The Tribal Defendants disagree (at least in part), maintaining that the loan agreements at issue were formed on the Tribe's reservation. (Doc. 66 at 32.) In support of that argument, the Tribal Defendants cite 2 Williston on Contracts § 6:62 (4th ed.): "[I]f the acceptance is not made simultaneously with the offer, and is made in a different place, ... the place of the contract is the place where the last act necessary to the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 270 of 751
PageID: 11636
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

completion of the contract is done ....'" The Tribal Defendants then rely on the following assertion in Joel Rosette's affidavit: "The act triggering the release of a loan to a borrower is Plain Green's final assessment of the consumer's loan application. Plain Green undertakes this final determination from its office," which is on the Tribe's Reservation. (Doc. 66-1 ¶¶ 6, 9.)

The Tribal Defendants do not explain why the "final assessment" of a consumer's loan application is an "acceptance" in the language of contract-formation. In any case, even if the contract was formed on the Tribe's reservation, a substantial part of the events giving rise to Plaintiffs' claims occurred outside the reservation. [11] The Second Circuit made a similar observation in *Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, concluding that the plaintiff-tribes in that case (which were also involved in making short-term internet loans) had "provided insufficient evidence to establish that they are likely to succeed in showing that the internet loans should be treated as on-reservation activity." 769 F.3d 105, 115 (2d Cir. 2014).

As the court observed in *Otoe-Missouria*:

> Much of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation. Even if we concluded that the loan is made where it is approved, the transaction ... involves the collection as well as the extension of credit, and that collection clearly takes place in New York. The loan agreements permit the lenders to reach into the borrowers' accounts, most or all of them presumably located in New York ....

*Id.* Here, the circumstances are similar and the Tribal Defendants have presented no more evidence than the tribes in *Otoe-Missouria*. Thus, at least for the purposes of the motions to dismiss, the result predicted in that case is the same in this one: the relevant conduct occurred outside of Indian

lands. The Tribal Defendants may thus be subject to suit under the *Ex Parte Young* analogy.

**\*7**  Finally, the Tribal Defendants assert that nothing in *Bay Mills* authorizes suits by *private citizens* based on violations of state law. (Doc. 92 at 16.) It is true that Plaintiffs in this case are private citizens, whereas in *Bay Mills* and *PCI Gaming* the plaintiffs were States. But *Bay Mills* does not explicitly limit the application of the *Ex Parte Young* analogy to suits brought by States. In fact, the Court stated that, "[u]nless federal law provides differently, Indians going beyond reservation boundaries are subject to *any generally applicable state law.*" *Bay Mills*, 134 S. Ct. at 2035 (internal quotation marks omitted; emphasis added). That plain language includes state laws that may be enforced by private citizens. *See* Am. Indian Law Deskbook § 7:4 (noting that tribal officer-capacity suits under *Bay Mills* are a "potential remedy for states *and other parties*" (emphasis added)). [12]

Ultimately, tribal sovereign immunity may limit the shape and nature of the relief against the Tribal Defendants, but it is not a complete bar to a lawsuit against them.

**B. Standing**

The Tribal Defendants, joined by the Think Defendants and TCV, contend that Plaintiffs lack standing because they have not yet incurred injury or damages and because they do not seek redress for injuries they have sustained personally. (Doc 66 at 24–27.) [13] Plaintiffs respond that they continue to owe money on unlawful loans and suffer reputational harm through credit reporting of non-payment. The court agrees with Plaintiffs that the FAC contains sufficient allegations to support individualized standing for each Plaintiff. There is little dispute that both borrowed money on terms which would violate Vermont's usury laws. (*See* Doc. 91 at 12, Amicus brief filed by the Office of the Vermont Attorney General.) Whether Plain Green is subject to these laws is in dispute, but Plaintiffs' status as people alleging injury through violations of state law is not.

Defendants' arguments that no injury is sustained because a person has an outstanding loan balance which has not been reduced to judgment or otherwise affected her interests is contrary to the allegations of the FAC, which the court accepts as true at this stage of the case. The specific relief sought by Plaintiffs demonstrates their direct, personal stake in the dispute. They seek declaratory relief under statutes including the Vermont Consumer Fraud Act. Such relief could

Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

relieve them of any future repayment obligation. They seek repayment of any interest collected above a legal rate. And they seek an injunction shielding them from future collection efforts. (Doc. 18 at 43.) As these claims make clear, Plaintiffs' interest in the subject matter of this lawsuit and the clear potential for relief in their individual cases confers standing for purposes of Article III.

## II. Personal Jurisdiction

The next step is to consider Rule 12(b)(2): whether the court has personal jurisdiction over each of the Defendants. The Tribal Defendants, Mr. Rees, Sequoia, and TCV all assert that the court lacks personal jurisdiction over them. (Doc. 66 at 32; Doc. 67-2 at 16; Doc. 77-1 at 4; Doc. 76 at 14.) As with the subject-matter jurisdiction issues, the personal-jurisdiction issues require some relatively extensive analysis.

"On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendants." *Dodge v. Manchester Police Dep't*, No. 5:13-CV-228, 2014 WL 4825632, at *4 (D. Vt. Sept. 25, 2014). "In the absence of jurisdictional discovery, the court presumes the truth of the complaint's allegations and construes the complaint in the light most favorable to the plaintiff." *Id.* "A plaintiff must make *a prima facie* showing of jurisdiction." *Id.*

**\*8**  Personal jurisdiction may be either general or specific in nature. Plaintiffs do not contend that any of the defendants has a presence in Vermont which would support general jurisdiction for all purposes. They argue that the specific acts alleged in the FAC give rise to personal jurisdiction for purposes of claims arising out of those acts.

The exercise of personal jurisdiction over non-resident defendants raises issues of due process because of the potential unfairness of compelling these parties to defend actions in distant jurisdictions. The Due Process Clause of the Fourteenth Amendment limits the assertion of personal jurisdiction in diversity cases. In federal question cases, similar protection is afforded by the Due Process Clause of the Fifth Amendment. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

Within the structure of the Federal Rules of Civil Procedure, the permissible scope of effective service is co-extensive with the limits of personal jurisdiction. As amended in 1993, Fed. R. Civ. P. 4(k) provides for service and therefore the

exercise of personal jurisdiction over persons subject to the jurisdiction of state courts of general jurisdiction and "when authorized by a federal statute." A variety of federal statutes, including the RICO statute, provide for nationwide service of process. *See* 18 U.S.C. § 1965. The extension of personal jurisdiction in these federal question cases remains subject to the constitutional limits of due process.

With this background in mind, the questions the court must answer in resolving the personal jurisdiction issues in this case are:

1. Would Defendants be subject to personal jurisdiction in the courts of general jurisdiction in Vermont under principles of due process expressed in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)?

2. Alternatively, does the provision for nationwide service of process in the RICO statute support the court's exercise of personal jurisdiction over Defendants?

3. Does the exercise of the jurisdiction over the state-law claims fall within the doctrine of pendent personal jurisdiction?

### A. Officials of Plain Green—the Tribal Defendants

Plaintiffs have sued three tribal members who play important roles in Plain Green. These are Mr. Rosette, the chief executive officer, and Ted Whitford and Tim McInerney, two board members. All three are residents of Montana. They serve as proxies in this case for Plain Green, and suit is filed against them in their official capacity to avoid the defense of tribal sovereign immunity. *See supra*; *see also Bay Mills*, 134 S. Ct. at 2035 (recognizing the application of *Ex Parte Young* to suits against tribal leaders).

The FAC alleges that Mr. Rosette is "responsible for all operations of Plain Green." (Doc. 18 ¶ 6.) As CEO, he "is responsible for and can stop the illegal activity described in this Complaint." (*Id.*) Mr. Whitford and Mr. McInerney are board members. The FAC alleges that the board of directors "has the power to fire the CEO of Plain Green and appoint a new CEO who will comply with the law." (*Id.* ¶¶ 7, 8.)

Personal jurisdiction over state or tribal officials in an *Ex Parte Young* case raises special issues in "minimum contacts" analysis. Is the court considering the contacts between Vermont and the individuals, or the contacts between the

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 272 of 751
PageID: 11638
Gingras v. Rossette, Not Reported in Fed. Supp. (2016)

state and Tribe and Vermont? *See* Tracy O. Appleton, Note, *The Line Between Liberty and Union: Exercising Personal Jurisdiction Over Officials From Other States*, 107 Colum. L. Rev. 1944 (Dec. 2007). The lower courts have differed on this issue, and it has not been resolved by the Supreme Court. *See* Leroy v. Great W. United Corp., 443 U.S. 173, 180-81 (1979) (by-passing issue in order to resolve case on non-constitutional grounds).

**\*9** One line of authority looks to contacts between the forum and the defendant state or tribe. In *Great Western United Corp. v. Kidwell*, the Fifth Circuit held that specific jurisdiction existed in Texas over an Idaho official because of the effects of Idaho regulations on business conducted in Texas. 577 F.2d 1256, 1267-68 (5th Cir. 1978), *rev'd on other grounds sub nom.*, *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979); *see also* Ass'n for Molecular Pathology v. U.S. Patent and Trademark Office, 669 F. Supp. 2d 365 (S.D.N.Y. 2009), *aff'd in part, rev'd in part*, 653 F.3d 1329 (Fed. Cir. 2011) (holding that state university officials in Utah were subject to suit in New York due to the actions of a university foundation in seeking to enforce patents in the forum state). In these cases, whether an individual official had personal contact with the forum state was not necessary to a determination that the court had jurisdiction. Personal jurisdiction for officials sued in a representative capacity arose from the conduct of their state or agency.

The Second Circuit considered these issues in *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005), *cert. denied*, 549 U.S. 951 (2006). In *Pryor*, parties challenging the action of 30 state attorneys general in reaching a master settlement in the nationwide cigarette litigation of the 1990s filed suit in New York. The Second Circuit held that personal jurisdiction over state officials was present as a result of the trips they or their representatives made to New York City to negotiate the settlement. The decision followed traditional "minimum contacts" analysis in predicating personal jurisdiction on physical presence of the named defendants within the forum state. Had the master settlement agreement been negotiated in Chicago, the federal courts in New York State would have had no basis for jurisdiction over the state attorneys general from other states. Although the effects of the master settlement agreement would still have been felt in New York State (and every other state which joined in the settlement), personal jurisdiction

over state officials would not be present except as a result of the contacts of individuals with the forum state.

Plaintiffs make no claim that the Tribal Defendants ever visited Vermont or communicated with anyone in Vermont. Instead, they rely on Plain Green's contacts with Vermont. They allege that Plain Green operated a website which advertised loans across the United States, including Vermont. Once Plaintiffs replied to the advertisement from their homes in Vermont, Plain Green sent them a series of emails and a loan application. Following approval of the loan, Plain Green transferred the loan principal to their bank accounts in Vermont. These frequent contacts would have been sufficient to subject Plain Green to personal jurisdiction in Vermont at least for causes of action, like this one, which arise out of the particular contacts and resulting loan transaction. *See* Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158 (2d Cir. 2010) (internet sales of handbags from California to New York residents satisfies minimum contacts requirements); Blue Compass Corp. v. Polish Masters of Am., 777 F. Supp. 4, 5 (D. Vt. 1991) (California defendant who advertised his business in at least one national magazine and obtained one Vermont customer had sufficient contacts with Vermont to support personal jurisdiction).

But Plain Green's contacts with Vermont are not vicariously attributed to its officials any more than directors of a corporation are subject to suit personally in any forum where the actions of the corporation satisfy the minimum contacts test. *See* Dumont v. Corr. Corp. of Am., No. 2:14-cv-209, 2015 WL 3791407, at *5 (D. Vt. June 17, 2015) (citing cases). In following *Pryor*, the court rules that the absence of contacts between Vermont and the Tribal Defendants means that these Defendants would not be subject to suit in a Vermont state court of general jurisdiction. The first of the two potential bases for personal jurisdiction is not present.

**\*10** The court turns now to the question of whether the grant of nationwide service within the RICO statute provides a second basis for personal jurisdiction. Section 1965(a) of Title 18 provides for suit in any district court in which a defendant "resides, is found, has an agent, or transacts his affairs." Section 1965(b) permits a suit for civil remedies to be filed in "any district court of the United States in which it is shown that ends of justice require that other parties residing in any other district be brought before the court ...."

The Second Circuit has never interpreted these provisions to provide for nationwide personal jurisdiction over any defendant named in a RICO complaint. In *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65 (2d Cir. 1998), the court held that § 1965(a) by its express terms required traditional "minimum contacts" within the forum state for at least one defendant. Section 1965(b) permits other defendants to be brought in from distant jurisdictions upon a showing of necessity despite the absence of minimum contacts. "There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought." *PT United,* 138 F.3d at 71–72. This restrictive reading has withstood the test of time, and is still the law in this Circuit. *See Pincione v. D'Alfonso,* 506 Fed.Appx. 22 (2d Cir. 2012).

In the context of this case, § 1965(a) and (b) require that at least one Defendant meet the minimum contacts test before parties not otherwise subject to suit in Vermont can be sued here. None of the three Tribal Defendants meet "minimum contacts" tests in Vermont. Unless the presence of other defendants triggers the "ends of justice" provision of § 1965(b), the absence of contact between the Tribal Defendants and Vermont places them outside the scope of the nationwide jurisdiction permitted under certain circumstances by the RICO statute.

**B. Kenneth Rees and the Think Defendants**

Plaintiffs allege that Mr. Rees and the companies which he controls performed the actual work of Plain Green, including making the loans provided to Plaintiffs. Assuming this to be true for purposes of the motions to dismiss, the role of Rees and the Think Defendants in providing the leadership, underwriting, marketing, and servicing for the Plain Green loans subjects them to personal jurisdiction. They cannot avoid personal jurisdiction for these actions by acting in the name of Plain Green. If, as Plaintiffs allege, these Defendants were the critical actors in making loans on illegal terms to Vermont residents, then they are subject to personal jurisdiction for claims arising out of the acts they performed.

The use of the internet is an important factor in analyzing the minimum contacts test for Rees and the Think Defendants. Although Mr. Rees has visited Vermont rarely and never

for reasons related to Plain Green, (*see* Doc. 67-1 ¶ 9), the Think Defendants have entered the Vermont marketplace by creating a website which is accessible to any Vermont consumer with an internet connection. The Second Circuit has recognized that this degree of "interactivity"—the direct connection between an internet business located at a great remove from the forum state and its customers within the forum state—is a factor which supports a finding of minimum contacts. *See Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 252 (2d Cir. 2007) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F. Supp. 1119 (W.D. Pa. 1997)).

**\*11** Turning to the specific allegations, the FAC alleges that Mr. Rees "personally designed and directed the business activity described in the Complaint." (Doc. 18 ¶ 10.) After federal regulators shut down his former business known as ThinkCash, Inc., Mr. Rees renamed the business Think Finance, Inc. With a new identity in hand, he approached the Tribe and offered to "provide everything the Tribe needed to ran a successful payday loan enterprise if the Tribe would let them use the concept of tribal immunity to stymie state and federal regulators." (*Id.* ¶ 23.) The Tribe created Plain Green in order to join with Mr. Rees and Think Finance in the payday lending business. (Doc. 18-1 (Term Sheet for Think Finance-Chippewa Cree Transaction).)

The FAC charges Rees and the Think Defendants with using their control over Plain Green to violate state and federal law. These include seeking to avoid state usury limits; blocking access to information about borrowers' accounts; and misrepresenting the nature of the Plain Green loans to credit reporting agencies. (Doc. 18 ¶¶ 32-35.) In Plaintiffs' words, "[d]efendants Rees and Think Finance intentionally and willfully dominated and still dominate the operations of Plain Green. Other than the sovereignty that they attempted to purchase, Rees and Think Finance provided everything that the enterprise needed to operate." (*Id.* ¶ 80.)

These allegations are neither conclusory nor implausible. They are factually detailed—at least as detailed as is possible without the advantages of discovery. They include a description of a similar business venture involving Mr. Rees and the First Bank of Delaware which was dissolved following an FDIC enforcement action and consent decree concerning similar practices. (*Id.* ¶¶ 38-40.) They are consistent with similar allegations in a case brought by the Pennsylvania Attorney General's office against Think Finance, Inc. and other parties in the Eastern District of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 274 of 751
PageID: 11640
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

Pennsylvania. *See* Pennsylvania v. Think Finance, Inc., No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

The critical issue for a determination of the court's personal jurisdiction over Rees and the Think Defendants is whether their activities satisfy the minimum contacts test. Defendants assert that Mr. Rees has had few personal contacts with Vermont, owns no property in the state, and has not visited since 1999 and then for non-business reasons. But a personal, physical presence in the state is not required to satisfy the minimum contacts test. Plaintiffs allege that Mr. Rees and the companies which he controls developed a nationwide, illegal lending scheme which resulted in predatory loans to Vermont residents. According to the FAC, the actions he took in other states led to predictable results in Vermont and other states where borrowers responded to the website and took out loans. This is typical of jurisdiction based on "minimum contacts" arising from activities in one state which is directed into others. *See* Colder v. Jones, 465 U.S. 783 (1984) (employees of a national publication subject to personal jurisdiction for libel claim in the forum where the results of targeted intentional conduct were felt).

The same analysis applies to the Think Defendants. According to the FAC, all of these companies joined in developing, marketing, and operating the loan operation. As designed by Mr. Rees and as executed by his companies, the loans were made over the internet to residents of many states, including Vermont. They were marketed through Plain Green in order to skirt state consumer protections. The affiliated corporations which provided specific services such as marketing and underwriting expected their efforts to result in loans made in states including Vermont. The misconduct alleged by Plaintiffs is entirely intentional and directed into Vermont (as well as many other states). That Rees and the Think Defendants might have to respond in court to defend their practices in a state like Vermont where they enabled Plain Green to lend money is hardly surprising or unfair.

 **\*12**  The court concludes that Plaintiffs have made plausible allegations sufficient to support a determination of minimum contacts for purposes of personal jurisdiction for the specific claims made in this case against Rees and the Think Defendants. As the court's discussion indicates, they could have been sued on these claims in the Vermont state courts on the basis of their actions in developing the payday loan which they operated through Plain Green and which they directed into Vermont. Such conduct satisfies both the minimum

contacts test and the related requirement of due process that the exercise of personal jurisdiction meet general standards of fairness.

### C. Sequoia Capital and Technology Crossover Ventures

The court has an insufficient basis for making a ruling about minimum contacts and due process requirements with respect to Sequoia and TCV because Plaintiffs allege very little about their respective roles in the Plain Green operation. As the following discussion of personal jurisdiction under RICO makes clear, however, they are potentially subject to suit as additional defendants subject to the court's jurisdiction in the interests of justice. *See* 18 U.S.C. § 1965(b). The court returns to the question of personal jurisdiction over Sequoia and TCV in the course of its RICO analysis below.

### D. Nationwide Jurisdiction Under RICO

Because the court has determined that Rees and the Think Defendants are subject to personal jurisdiction, it returns to the question of whether 18 U.S.C. § 1965(b) permits the Tribal Defendants to be sued in Vermont. The Second Circuit has interpreted § 1965(b) to permit the exercise of jurisdiction over parties who do not meet the minimum contacts test so long as at least one other defendant meets the test and the exercise of jurisdiction is required by the "ends of justice." *PT United*, 138 F.3d at 71 n.5. The standard is one of necessity and last resort. "There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought. Congress has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora." *Id.* at 71-72.

The court concludes that the ends of justice fairly require jurisdiction in Vermont against the Tribal Defendants pursuant to 18 U.S.C. § 1965(b). Several reasons support this conclusion. First, the impact of this lawsuit on the Tribal Defendants is modest. There is no claim against them for money damages. They are being asked only to cease violating federal and state consumer protections. This court has no jurisdiction over Plain Green and understands that Plaintiffs seek only injunctive relief against its officials in the form of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 275 of 751
PageID: 11641
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

an order requiring them to obey state and federal laws that regulate lending in Vermont.

Second, it is not clear that there is another forum in which all defendants can be sued (except pursuant to § 1965(b)). Only the Tribal Defendants are citizens of Montana. The other parties and Mr. Rees are from different states. While the record is not fully developed on this point, no party has offered an alternative forum in which personal jurisdiction is present for all parties.

Third, there is nothing inherently unfair or unjust about requiring representatives of a lender doing business in Vermont to appear to defend their practices in this state. These Defendants are already ably represented by highly qualified counsel. The payday lending business gives every indication of being a highly lucrative business which can afford to appear through counsel in the states in which it operates.

 **\*13**  Finally, there is the issue of the viability of the RICO claims. "Ends of justice" RICO jurisdiction can only be exercised if the allegations state a viable RICO claim. *See* 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc., No. 13 Civ. 981(PGG), 2015 WL 1514539, at *7 n.2 (S.D.N.Y. Mar. 31, 2015) (citing cases). For the reasons discussed in detail below, the court concludes that the FAC states viable RICO claims against the Tribal Defendants. This case qualifies as one in which 18 U.S.C. § 1965(b) extends the personal jurisdiction of the federal court to RICO claims against the Tribal Defendants, who would not otherwise be subject to suit in Vermont. Once the Tribal Defendants are before the court on this basis, the doctrine of pendent personal jurisdiction permits the court to hear the other claims against them which arise from state law or federal statutes other than RICO.

The court cannot reach the same conclusion as to Sequoia and TCV. For the reasons discussed below, the court concludes that the FAC fails to state a viable RICO claim against those Defendants. Absent RICO jurisdiction over those Defendants, the court reiterates its observation that there is an insufficient basis for making a ruling about minimum contacts and due process requirements with respect to them because Plaintiffs allege very little about their respective roles in the Plain Green operation. The court, will, however, exercise its discretion to permit discovery on the question of personal jurisdiction over Sequoia and TCV. *See* Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (court may permit discovery in aid of Rule 12(b)(2) motion).

## III. Arbitration and Arbitrability

The court comes now to the question raised by all Defendants: does this dispute belong in arbitration instead of in court? Each Defendant asserts that the dispute must go to arbitration. (Doc. 64 at 2; Doc. 66 at 27-31; Doc. 67-2 at 23; Doc. 77-1 at 8-10; Doc. 76 at 26-30.) Plaintiffs maintain that the purported arbitration agreement is unenforceable as, among other things, "unconscionable" and "fraudulent." (*See* Doc. 85 at 48-78.)

Neither Plaintiff made use of the "opt out" provision during the first 60 days following receipt of her loan. Both seek to apply state and federal consumer loan protections to this case. Neither wishes to go to arbitration. And both seek to serve as class representatives. For these reasons, the first issue for the court is to determine whether Plaintiffs are bound by the arbitration clause and the related choice-of-law clause. The questions which must be answered are:

1. What law governs the issue of arbitrability?

2. Does tribal law govern the enforceability of the arbitration clause with respect to issues of unconscionability?

3. Can individual borrowers in Vermont who are not normally subject to tribal law become subject to tribal law through their consent to an arbitration clause?

4. Is the tribal law, including its enforcement through the arbitration clause, unenforceable on grounds of unconscionability?

5. Are there other reasons raised by Plaintiffs which prevent enforcement of the arbitration clause?

6. Are all Defendants subject to the arbitration clause?

The court begins with the question of the law that governs.

### A. What law governs?

The parties agree that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., (the "FAA") applies to the parties' dispute. This case concerns two transactions in interstate commerce, conducted over the internet between a tender located on an Indian reservation in Montana and borrowers in Vermont. Section 2 of the FAA provides for the enforceability of arbitration clauses which appear in contracts subject to the

Act "save upon such grounds as exist at law or in equity for the revocation of any contract." This "savings clause" requires the court to turn to state law (or possibly tribal law) to resolve claims of unconscionability and the other grounds for avoidance of contract. *Littlejohn v. TimberQuest Park at Magic, LLC,* 116 F.Supp.3d 422, 430 (D. Vt. 2015) (claims of unconscionability are matters arising under state substantive law'); *see also* 📑 *Cap Gemini Ernst & Young, U.S., LLC., v. Nackel,* 346 F.3d 360, 365 (2d Cir. 2003) (per currant) ("[Q]uestions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA").

**\*14** "[G]enerally, a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract." 📑 *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 50 (2d Cir. 2004). In this case, the arbitration agreement includes a provision requiring the application of Chippewa Cree tribal law to any dispute, including disputes over arbitrability. [14] In considering whether to follow the Chippewa Cree law as it relates to enforcement of arbitration provisions, the court is guided by several considerations. All of these favor the application of Vermont law—the law of the forum—instead of tribal law to this limited question.

The primary obstacle to the adoption by contract of the Chippewa Cree law of arbitration is that no court has ever been able to determine what that law is or where it can be found. In a series of cases cited by Defendants, other federal trial courts rejected claims that the Chippewa Cree law concerning the arbitrability of claims against non-signatories provided a different rule of decision than the laws of the forum state because plaintiffs were unable to produce evidence of a different rule under tribal law. [15] In those cases, plaintiff-borrowers sought to invoke tribal law on a question of arbitrability. They were unable to demonstrate any difference between the law of the forum state and tribal law because there was no source of tribal law (with the limited exception of the *Booth* case in which counsel represented that tribal law allowed for the doctrine of estoppel).

This case is no different. Although Defendants seek to apply the Chippewa Cree law concerning arbitration, they cannot direct the court to any specific provisions of that law. In an extended footnote, the Tribal Defendants argue that "Chippewa Cree law provides a standard for evaluating unconscionability, which may be supplemented by Montana

or federal law." (Doc. 92 at 18 n. 13.) Although they refer to the *Gunson* decision, that is a decision in which the judge rejected a similar claim due to a lack of showing of the substance of Chippewa Cree law. 📑 *Gunson v. BMO Harris Bank, N.A.,* 43 F. Supp. 3d 1396, 1400 (S.D. Fla. 2014).

**\*15** The Tribal Defendants also cite section 10-3-602 of the Tribal Lending Code which bars arbitration clauses which are "oppressive, unconscionable, unfair, or in substantial derogation of a Consumer's rights." (Doc. 92-1 at 11.) This section adopts the standards of the American Arbitration Association ("AAA") as presumptive proof that an arbitration clause does not violate the Lending Code. The rules and standards promulgated by the AAA provide neutral procedures that govern the arbitration hearing itself. These standards do not define "unconscionability" or otherwise provide rules of decision for when a decision is subject to arbitration. The reference to AAA standards provides no insight into the substantive content of the tribal law.

The denunciation of oppressive and unconscionable arbitration clauses in the tribal lending law tells the court nothing about what those terms might be. Section 10-3-602 of the tribal finance code represents a potential starting point. It is an invitation to regulators or tribal courts to develop a body of law defining the content of "unconscionability." But Defendants offer no evidence that such a body of law exists.

The court intends no disrespect to the tribal law or to the judges of the tribal courts of the Tribe. The entry of the Tribe into payday lending appears to be relatively recent. The use and enforcement of arbitration provisions under tribal law do not appear to have been a topic which the tribal lawmakers had reason to consider in the past. The parties have not directed the court to any prior decisions by the tribal courts on the enforcement of agreements to arbitrate. At least on the record provided to the court through the parties' memoranda, Chippewa Cree law is almost entirely silent on questions of arbitrability of disputes.

The absence of a body of tribal law means that a reference to tribal law within the contract does little to establish the terms of the parties' agreement. If this body of law is uncertain or not yet developed, the reference to it fails to add anything to the parties' agreement. In the absence of evidence of the content of tribal law, the court reaches two conclusions. The first is that it cannot enforce the contractual choice-of-law provision because neither the court nor the parties have been able to

determine the content of the tribal law. The court cannot adopt by reference an unknown body of law.

The second is that the only remaining choice for substantive rules of decision about unconscionability and the enforcement of the arbitration clause is Vermont law. There is no viable alternative. But additionally, as the brief submitted by the Vermont Attorney General makes clear, Vermont has a strong interest in the issues of consumer protection raised in this case. The two plaintiff-borrowers are Vermont residents. They entered into the loan agreements from their homes in Vermont. They seek to vindicate banking rules under Vermont law as well as federal law. The choice of Vermont law concerning the potential unconscionability of the arbitration clauses is neither surprising nor inherently unfair.

### B. Who decides whether the claims made in this case are subject to arbitration?

The parties disagree over whether the court or the arbitrator have the authority to decide whether the claims of unlawful lending practices are subject to arbitration. Most commonly, the validity of an arbitration agreement is an issue for determination by the courts. *See* 📄 *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Delegation of such questions to the arbitrator herself is permitted on the basis of clear and unmistakable evidence that the parties have chosen to give such questions to an arbitrator.

*See* 📄 *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010). In this case, Defendants rely upon language in the arbitration agreement which indicates that the question of arbitrability has been delegated to the arbitrator. Specifically, they direct the court's attention to the definition of "disputes" subject to arbitration which includes the following provision: "A Dispute [subject to arbitration] includes ... any issue concerning the validity, enforceability or scope of this loan or the Agreement to Arbitrate." (Doc. 13-5 at 50.)

**\*16** In response, Plaintiffs argue that the delegation clause does not really place the arbitrator in charge with respect to issues concerning arbitrability. Disputes concerning any claim for class-wide arbitration are reserved to "a court of competent jurisdiction located within the Chippewa Cree Tribe, and not by the arbitrator." (Doc. 13-5 at 51.) Since the claim in this case is a class-wide claim, the arbitrator is without authority to consider the scope of his or her authority as an arbitrator. Plaintiffs also contend that Defendants have failed to provide proof of the content of Tribal law concerning arbitration, including the extent of the arbitrator's authority

to invalidate an arbitration agreement pursuant to § 2 of the FAA. They also point to the inherent conflict within the arbitration provisions between the authority of the arbitrator and the broad scope of review and appellate supervision to be exercised by the tribal court over any arbitration award.

The court agrees with Plaintiffs that issues concerning the validity of the arbitration clause should be decided by the court for two reasons.

First, the arbitration clause does not explicitly delegate authority on this subject to the arbitrator. Questions related to the arbitrability of class action claims are sent instead to the tribal court. More broadly, all decisions by the arbitrator are subject to plenary review by the tribal court. The arbitration provisions include a statement—remarkable in the context of arbitration law—that "[t]he arbitration award will be supported by substantial evidence and must be consistent with this Agreement and applicable law or may be set aside by the tribal court upon judicial review." (Doc. 13-5 at 51.) [16] This provision removes much of the arbitrator's independent authority to make binding determinations on any issue, including legal issues concerning the scope of the arbitration agreement. It effectively refers these questions to the tribal court which has broad authority to review for legal and factual error. The arbitrations conducted pursuant to this agreement more closely resemble bench trials with a right of appellate review rather than binding arbitrations.

Second, Plaintiffs' challenge to the arbitration provision is separate and distinct from their attack on the payday loan agreement. The challenge to the payday loan agreement is one of illegality. Plaintiffs allege that the exceedingly high interest rates and related loan terms violate substantive restrictions on consumer lending imposed at the state and federal levels. The challenge to the arbitration clause is different. Plaintiffs allege that the tribal law and the tribal court system have been corrupted by large investors from outside the reservation. The claim is plausible for purposes of federal pleading standards since Plaintiffs have alleged a variety of facts which bring into question the independence and objectivity of the tribal legal system. (The court makes no determination on this issue on a motion to dismiss, but the claim—still unproven—is sufficient to support discovery and, potentially, proof of these allegations at trial.)

This separate attack on the arbitration clause satisfies the majority's test in *Rent-A-Center*. Plaintiffs have attacked the arbitration clause directly and the delegation clause

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 278 of 751
PageID: 11644
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

specifically. In paragraph 131 of the FAC, Plaintiffs allege that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent." (Doc. 18 ¶ 131.) Plaintiffs identify the right of review in the tribal courts of any decision by the arbitrator as a basis for invalidity because Defendants "had the ability to control the Tribe's law and presumably could control actions taken by the tribal court. As a result, any review by the tribal court would be nothing more than a sham." (*Id.*) Unlike the attack on the contract as a whole which the Supreme Court identified as subject to arbitration in *Rent-a-Center*, this is a focused claim that the delegation clause itself is unconscionable.

**\*17** Since Plaintiffs have made a specific attack on the delegation clause as unconscionable, the court, not the arbitrator, must determine whether the arbitration clause is valid. It is hard to see how the outcome could be different. If Plaintiffs are able to prove that the tribal legal system, both with respect to its law and to its judiciary, are subject to improper influence and control by Defendants, then delegating the question of arbitrability to the very system under attack is unlikely to result in a fair evaluation of Plaintiffs' claim that the tribal justice cannot fairly evaluate claims of its own shortcomings. It is an elementary principle of justice that no one should serve as the judge in their own cause. *Nemo iudex in causa sua.*

### C. Have Plaintiffs identified a sufficient basis for a decision by the court that the arbitration award is unconscionable?

Payday lending over the internet by lenders located on Indian reservations has increased sharply in recent years.[17] Arbitration agreements very similar to the one in this case have become common. Such agreements typically require arbitration which is governed by tribal law and conducted in a manner which permits the tribe to exert influence or control over the outcome. Such arbitration agreements commonly require the application of tribal law in a manner calculated to defeat state and federal consumer protections. Appellate courts hearing these cases have become increasingly candid in refusing to enforce the arbitration clauses because these clauses represent an obvious effort to deprive consumers of legal protections from unlawful lending and collection practices.

In *Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016), the Fourth Circuit struck down an arbitration clause on facts relatively similar to those in this case. The

lender—Western Sky—was an online lender owned by a member of the Cheyenne River Sioux Tribe. Its offices were located on the Cheyenne River Indian Reservation in South Dakota. As in this case, Western Sky issued short-term, extremely high interest loans over the internet. Western Sky stopped issuing loans following FTC enforcement action and numerous private lawsuits. *See FTC v. Payday Fin. LLC, 989 F. Supp. 2d 799, 822 (D.S.D. 2013)* (disgorgement of profits in the amount of $417,740). Before going out of business, Western Sky assigned its loan service and collection work to Delbert Services Corp. Delbert sought dismissal of a borrower's action complaining of illegal loan collection activities by relying upon the arbitration clause in the loan agreement.

In a strongly worded decision, the Fourth Circuit held that an arbitration agreement which attempts to preclude a consumer's recourse to federal consumer law protecting borrowers rendered the arbitration provision invalid and unenforceable. The offending provision, like the arbitration language at issue in this case, stated that the arbitration agreement shall be governed by tribal law. The court recognized that the FAA favors arbitration as a legitimate exercise of the right to form private contracts. However, said the court:

> [R]ather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game the entire system. Perhaps in the future companies will craft arbitration agreements on the up-and-up and avoid the kind of mess that Delbert is facing here.

**\*18** *Hayes*, 811 F.3d at 676.

The facts of the *Hayes* case differ in some respects from this case. Delbert—a debt collector—was not located on an Indian reservation or in some other way subject to tribal law. The arbitration clause required arbitration by an authorized representative of the tribe subject to the borrower's right to select AAA, JAMS, or another arbitration organization to "administer the arbitration." *Id.* at 670. The arbitration

clause stated that "no United States state or federal law applies to this Agreement." *Id.*

The present case is a little different. The arbitration is not merely administered but actually conducted by an AAA or JAMS arbitrator at a location convenient for the borrower. There is no express disclaimer of all federal law although there is such language with respect to state law. But these differences are minor and do not reach the heart of the *Hayes* decision, which is that an arbitration agreement crafted to preclude federal and state consumer protections is unenforceable as unconscionable. As in *Hayes*, the arbitration clause states that it is governed by the Indian Commerce Clause and "the laws of the Chippewa Cree Tribe." (Doc. 13-5 at 52.) [18] By its express terms, therefore, the arbitration clause authorizes the arbitrator—bound by her oath to implement the terms of the parties' contract—to follow a body of law which Plaintiffs claim does not include basic federal and state protections against predatory loan practices because it was drafted in order to avoid such regulation.

The Western Sky arbitration agreement fared no better before the Seventh Circuit. In *Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1894 (2015), the appellate panel refused to enforce what it termed an "illusory" arbitration clause which required arbitration before a tribal elder or three members of the tribal council with the borrower's participation by phone or videoconference. *Id. at 768*. In sharply critical terms, the court held the agreement to be unconscionable both because it referred to arbitration procedures on the reservation which did not exist and because it was drafted to ensure partiality. *Id. at 779*.

In the present case, the referral to AAA or JAMS arbitration avoids the criticism that the arbitration forum does not really exist. But the same fundamental criticism applies. By incorporating the tribal financial law and making all arbitrations reviewable by the tribal court on both the law and the facts, the defendants have effectively insulated themselves from claims that they have violated state and federal lending laws. Those are Plaintiffs' claims, in any event, and Plaintiffs are entitled to an opportunity to prove that they are true.

## IV. Forum Non Conveniens, Venue, and Indispensable Parties

**\*19** Having determined that Defendants are properly before the court and that Plaintiffs have alleged facts which could render the arbitration clause unenforceable, the court turns to remaining issues related to the court's authority to hear this case. These are the claims of forum non conveniens, venue (Rule 12(b)(3)), and absence of indispensable parties (Rule 12(b)(7)).

### A. Forum Non Conveniens

The Tribal Defendants argue that, if the court declines to enforce the arbitration agreements, the court should enforce the agreements' forum-selection clauses and dismiss the case under the doctrine of forum non conveniens. (Doc. 66 at 31 n.20.) Mr. Rees joins in that argument. (Doc. 67-2 at 23.) Forum non conveniens allows a court to dismiss a case when "the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere else." *Grammenos v. Lemos*, 457 F.2d 1067, 1074 n.5 (2d Cir. 1972). However, "since the enactment of 28 U.S.C. § 1404(a), 'the federal doctrine of *forum non conveniens* has continuing applicability only in cases where the alternative forum is abroad.' " *Saunders v. Morton*, 269 F.R.D. 387, 400 (D. Vt. 2010) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 449 n.2 (1994)). No party proposes a foreign jurisdiction where this case should be brought; thus forum non conveniens does not apply.

The Tribal Defendants' request is, apparently, that the case be transferred to the District of Montana. Transfer "[f]or the convenience of parties and witnesses" and "in the interest of justice" is authorized under 28 U.S.C. § 1404(a), but Defendants raise no real "convenience" argument. Their objections to the presence of the case in this district as opposed to some other court are either related to personal jurisdiction or arbitrability. The court has already rejected dismissal on these grounds. The court will not dismiss the case on forum non conveniens grounds or transfer the case under § 1404.

### B. Venue

Venue in this case is predicated on 18 U.S.C. § 1965 and the general venue statute at 28 U.S.C. § 1391(b)(2). Either is a sufficient basis for venue in this court. Section 1965(a) authorizes a civil RICO suit to be filed in any district in which the defendant "transacts his affairs." Section 1391(b)(2) authorizes venue in any district where "a substantial part of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 280 of 751
PageID: 11646
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

the events or omissions giving rise to the claim occurred."
Plaintiffs' allegations—that as a result of the actions of
Rees and the Think Defendants, Plain Green entered into
multiple illegal loan transactions with Plaintiffs—satisfies
either standard. Venue is proper in the District of Vermont.

#### C. Indispensable Parties

The Tribal Defendants seek dismissal under Rules 12(b)(7)
and 19 because Plaintiffs have not brought suit against Plain
Green or the Tribe itself. They argue that since the FAC
seeks to declare Plain Green's lending model to be illegal,
the lawsuit cannot proceed in the absence of Plain Green and
the Tribe which formed it. On that theory, since Plain Green
and the Tribe enjoy sovereign immunity, the claims against
the other Defendants must be dismissed. Plaintiffs respond
that the doctrine of *Ex Parte Young* permits suit against tribal
officials and satisfies concerns about the effect of this court's
ruling on an absent defendant.

**\*20** The short answer to the claim of indispensable party
is that the presence of the Tribal Defendants in this case
satisfies the requirements of Rule 19. The essential purpose
of the *Ex Parte Young* doctrine is to permit suits for injunctive
relief against entities such as state agencies which would
otherwise be subject to sovereign immunity. In the case of
tribes, the courts have long recognized that tribal interests
may be adjudicated through *Ex Parte Young. See Bay Mills,
supra.* The application of *Ex Parte Young* to suits against
tribal officials extends to claims arising under state as well
as federal law. *See Puyallup Tribe, Inc. v. Dep't of Game
of State of Washington,* 433 U.S. 165 (1977) (tribal officials
subject to suit to enjoin violations of state law).

#### V. Plausibility and "Group Pleading"

The Think Defendants contend that Plaintiffs have failed
to allege plausibly that the Think Defendants have engaged
in unlawful conduct, and that Plaintiffs' "group pleading"
allegations are insufficient to state a claim against TC Loan
Service, TC Decision Sciences, and Tailwind Marketing.
(Doc. 65 at 2.) Thus, before considering the motions to
dismiss in the context of individual causes of action, the
court considers the plausibility of Plaintiffs' allegations under
principles expressed in *Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662
(2009).

Many of the allegations in the case are undisputed. All parties
agree that Plaintiffs took out a series of loans from Plain
Green at interest rates greatly in excess of the 24% maximum
allowed by Vermont's usury law. The parties agree that Think
Finance, Inc. provided services and support which enabled the
Tribe to form Plain Green and enter into the internet-lending
business. (Doc. 18-1.) In exchange for its participation, the
Tribe would receive approximately 5% of cash revenue
generated by the loans. (*Id.*) Plain Green entered into loan
agreements with borrowers which permitted electronic access
to the borrowers' accounts. These allegations are entirely
plausible since they are undisputed.

Where the parties disagree most sharply is over the issue
of whether Defendants are engaged in an illegal business.
Defendants view Plain Green as a sovereign entity exempt
from state usury requirements. There is no limit on interest
rates under the law of the Tribe. For many years, banks
operating in the United States have avoided state usury laws
by establishing themselves in states such as South Dakota and
Delaware which do not have usury restrictions. [19] Through
the doctrine of federal preemption, banks providing credit
card services and other loans have avoided the effects of
state law. (*See* Doc. 18 ¶ 38.) [20] Defendants seek similar
treatment for Plain Green through tribal immunity. Whether
this argument succeeds presents a mixed question of law
and fact. Factual issues may include the claim that the tribal
lending law and the courts that enforce it are corrupt or that the
law does not exist in important areas. The principal legal issue
concerns the conflict of tribal law and Vermont consumer
protections in the context of loans made through the internet.
These issues do not raise questions about the plausibility of
the pleadings.

**\*21** A second area where the parties disagree concerns the
role of Mr. Rees and the Think Defendants in the Plain Green
loan business. The FAC alleges that Mr. Rees "personally
designed and directed the business activity described in this
Complaint." (Doc. 18 ¶ 10.) The FAC describes this business
activity as an "illegal scheme" and "a new way to prey on
unsuspecting people." (*Id.* ¶ 23.) The FAC describes Mr.
Rees as the former President and CEO (and current Chairman
of the Board) of Think Finance and the current CEO of
Elevate Credit, Inc. He is alleged to maintain a "controlling
interest and operational role in Think Finance." (*Id.* ¶ 10.)
Plaintiffs allege that Mr. Rees and Think Finance "created
the whole [Plain Green] enterprise and ran its operation
through an assortment of subsidiaries and affiliates like

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 281 of 751
PageID: 11647
Gingras v. Rosette, Not Reported in Fed. Supp. (2019)

Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences." (*Id.* ¶ 101.)

Rees and the Think Defendants describe their role in less colorful terms. Mr. Rees describes himself as a former Chairman of the Board of Think Finance from September 2005 until May 2015 and a former President and CEO of TC Loan Service during the same period. (Doc. 67-1, Affidavit of Kenneth Rees, ¶¶ 2-3.) He denies having been a majority shareholder and as of the date of his affidavit in September 2015, did not have an "operational role" in Think Finance. The Think Defendants are described as companies providing services through "the usual relationship between a lender and its service providers." (Doc. 65 at 3.) One might recall the words of the police officer, "Nothing to see here, folks. Move along."

Determining which side is right is beyond the scope of a motion to dismiss. But in weighing plausibility, the court finds the FAC to be a plausible and coherent account of otherwise inexplicable facts. No defendant offers a reason why Think Finance would join with a tribe in Montana to form an internet lending business except as a means of avoiding financial regulation under the flag of sovereign immunity. There may be other reasons, but they do not appear on this record.

The Tribal Defendants offer no reason why their tribe would form an internet lender in exchange for a 4.5% share of revenue. One plausible reason is that by adopting a tribal lending code tailored to the needs of Think Finance and Mr. Rees, they could offer some measure of immunity from state regulation. It may be that the adoption of the tribal lending law in 2013 had no connection with the confidential "Term Sheet for Think Finance-Chippewa Cree Transaction" signed in 2011. Such a proposition appears unlikely since the second paragraph of the term sheet calls for the Tribe to "adopt a finance code that is acceptable to all parties and provide for the licensing of an arm of the tribe to engage in consumer lending." (Doc. 18-1 at 1.) In short, whether Plaintiffs can prove their allegations is a question for another day, but the allegations are specific and plausible in their description of a plan to avoid financial regulation of consumer lending.

The court also finds that the claim of "group pleading" does not require dismissal of the case. The FAC contains specific allegations against Tailwind Marketing and TC Decision Sciences. Tailwind Marketing provides approved borrowers for Plain Green. (Doc. 18 ¶ 89.) TC Decision Sciences provides "customer service, verification and collections of

customer accounts" for Plain Green. (*Id.* ¶ 90.) Both are controlled by Mr. Rees and Think Finance. There is no uncertainty about the allegations against these two companies which would support dismissal.

## VI. Substantive Claims

We have arrived, at last, in the world of Rule 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*); *see also* Fed. R. Civ. P. 8(a)(2). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000).* In addition to considering the pleadings, the court may refer to "statements or documents incorporated into the complaint by reference" and to "documents possessed by or known to the plaintiff and upon which [she] relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).* Applying that standard, the court addresses below the motions to dismiss specific substantive claims.

### A. Consumer Financial Protection Act (Count One)

**\*22** Defendants are correct in their claim that the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5481 et seq., does not provide for a private cause of action. Although reported cases on this issue are scarce, the structure and specific provisions of the CFPA makes it clear that Congress did not intend to create a private cause of action. It is Congressional intent which determines whether a statute, otherwise silent on the point, authorizes private lawsuits. *See M.F. v. State of N.Y. Exec. Dep't Div. of Parole, 640 F.3d 491, 495 (2d Cir. 2011)* (analysis focuses on congressional intent). The CFPA is explicit in the creation of a new federal agency, the Bureau of Consumer Financial Protection, which acts as both the rulemaking body and the federal enforcement agency for federal consumer laws previously entrusted to multiple agencies. *See* 12 U.S.C. § 5491(a) ("There is established in the Federal Reserve System, an independent bureau to be known as the 'Bureau of Consumer Financial Protection', which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."). The Bureau has broad authority

Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

to file civil actions in federal court to enforce the provisions of the federal consumer protection laws. *Id.* § 5564.

The CFPA contains no express authority for its enforcement through private lawsuits. It authorizes enforcement actions by state attorneys general and state regulators. *Id.* § 5552. But it is entirely silent regarding private remedies. Legislative silence on such an issue is most frequently regarded by courts as an expression of legislative intent to exclude private remedies. *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (courts "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided"). Courts in this circuit have held that the CFPA creates no private right of action. *See Nguyen v. Ridgewood Sav. Bank*, Nos. 14-CV-1058 (MKB), 14-CV-3464 (MKB), 14-CV-3989 (MKB), 2015 WL 2354308, at \*11 (E.D.N.Y. May 15, 2015) ("Plaintiffs provide no statutory basis, and the Court can find none, for finding a private right of action under these provisions of the statute, which outlines duties, authorities and enforcement powers of the CFPB.").

The absence of a private remedy is unsurprising because the CFPA's primary purpose is to place responsibility for enforcing many different federal consumer protection statutes with a single newly formed regulator. 12 U.S.C. § 5492. The CFPA itself contains few new substantive provisions. Plaintiffs direct the court's attention to one: section 5533 which provides in part that "[s]ubject to rules prescribed by the Bureau, a covered person shall make available to a consumer, upon request, information ... concerning [any consumer transaction]." *Id.* § 5533(a). To date the Bureau has not issued rules to implement this provision. The obvious intent of the provision is to prompt the adoption of a detailed regulatory system for placing information about a financial transaction in the hands of the consumer. The court sees no indication that this provision was enacted in order to create a new private right to sue for damages whenever information is withheld by an entity subject to the CFPA.

For these reasons, the court concludes that the CFPA does not create a new private cause of action. Count One of the FAC is DISMISSED.

### B. Federal Trade Commission Act (Count Two)
For similar reasons, it has long been settled that the Federal Trade Commission Act, 15 U.S.C. § 41 et seq., does not authorize a private cause of action. Like the CFPA,

the FTCA creates an enforcement agency and delegates specific powers to the agency to define the scope of unfair methods of competition through its rule-making authority, to conduct administrative hearings to punish and prevent unfair practices, and to file civil actions for violations of its rules and orders. 15 U.S.C. §§ 57a and 57b. The Second Circuit has long held that this grant of authority to the federal agency does not also create a private cause of action. *See Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974) ("[T]he provisions of the Federal Trade Commission Act may be enforced only by the Federal Trade Commission. Nowhere does the Act bestow upon either competitors or consumers standing to enforce its provisions."); *see also Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 561 (2d Cir. 1978).

**\*23** Since the FTCA does not authorize a private cause of action, Count Two of the FAC is DISMISSED.

### C. Electronic Funds Transfer Act (Count Three)
In contrast to the CFPA and FTCA, the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., creates individual rights and provides a private remedy. The EFTA specifically authorizes private lawsuits, including class action lawsuits as ruled appropriate by the courts hearing those cases. 15 U.S.C. § 1693m. Congress included a specific statement of purpose for the statute at section 1693: "It is the purpose of this title to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems. The primary objective of this title, however, is the provision of individual consumer rights." *Id.* § 1693(b). Section 1693m authorizes lawsuits for damages in the federal courts. The provision specifically contemplates class actions to the extent ruled appropriate by individual courts. *Id.* § 1693m(a).

The specific claim is that Defendants violated § 1693k(1) by conditioning the extension of short-term credit to Plaintiffs on their authorization of electronic fund withdrawals from their accounts as the mandatory method of making repayment. (Doc. 18 ¶¶ 182-193.) Such conduct would violate the EFTA and related regulations. Defendants contend, however, that Plaintiffs' claims under the EFTA are too late and are foreclosed by the language of the loan agreement.[21] Defendant Rees argues that he cannot be held vicariously liable for the actions of the lender.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 283 of 751
PageID: 11649
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

### 1. Statute of Limitations

The EFTA provides a one-year statute of limitations for private lawsuits. 15 U.S.C. § 1693m(g). Plaintiffs do not dispute that they filed suit in May 2015—more than a year after the loans at issue were made. But the limitations period is subject to equitable tolling. *Apostolidis v. JP Morgan Chase & Co.*, No. 11-CV-5664(JFB)(WDW), 2012 WL 5378305, at *7 (E.D.N.Y. Nov. 2, 2012). Plaintiffs contend that equitable tolling is appropriate in this case. (Doc. 85 at 83.)

Equitable tolling is a fact-specific doctrine. Plaintiff Gingras offer no reason for the application of equitable tolling to her claim. Plaintiff Given, on the other hand, claims that Plain Green blocked access to her account during the limitations period and that there are other facts which would support tolling the limitations period so as to preserve her claim.

**\*24**  The EFTA claim of Plaintiff Gingras is DISMISSED as beyond the statute of limitations. The court cannot rule on the timeliness of Plaintiff Givens' EFTA claim because she has raised facts which may support a determination that her claim is timely.

### 2. Conditioning the Loan on Electronic Fund Withdrawals

The loan agreements signed by Plaintiffs include two ways in which the loan may be funded and repaid. The first is by electronic fund authorization. Funding by electronic transfer ("as soon as the next business day") is conditioned on ACH Authorization (electronic withdrawal from the customer's account). (Doc. 13-5 at 31.) Funding by postal mail ("up to 7 to 10 days" in the language of the loan agreement) is conditioned on payments by money order or certified check. (*Id.*)

Plaintiffs allege that the choice offered to consumers between funding "as soon as the next business day" which is conditioned on electronic fund authorization and the much longer process offered for people electing to pay by mail is a false choice. Defendants respond that since electronic fund authorization was not the *only* way to obtain a loan, the EFTA does not apply.

The court sees this issue as fact-specific and not one which can be resolved through a motion to dismiss. It is possible that Plaintiffs are correct that Defendants have so obstructed the choice of repayment by check with delay ("up to 7 to 10 days" plus the expiration of a "right of rescission") that the option is a false choice. Given the nature of the loan itself—immediate cash at very high interest rates—it seems unlikely that Defendants ever funded a loan to any borrower with repayment by check. It remains for discovery and for fact-finding to determine if the loan agreement is drafted so as to skate around the restrictions of EFTA.

### 3. Mr. Rees's Role

Mr. Rees contends that Plaintiffs seek to hold him vicariously liable for the actions of Plain Green. The court reads the FAC differently. Plaintiffs seek to hold Mr. Rees liable for any EFTA violation because they claim that he developed the entire scheme, including the alleged violation of EFTA, and is responsible as the principal in an unlawful business arrangement. This is an issue which cannot be resolved on a motion to dismiss.

The EFTA claim of Plaintiff Gingras only is DISMISSED because she does not assert that her claim is subject to equitable tolling or for some other reason timely. The motion to dismiss the EFTA claim of Plaintiff Given is DENIED.

### D. Vermont Consumer Fraud Act (Count Four)

In contrast to the FTCA, the Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. § 2451 et seq., provides a private cause of action. Section 2461(b) of Title 9 authorizes suits for damages including attorneys' fees and punitive damages. A violation of the FTCA is one of the potential bases for liability under the VCFA. In defining "unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce"—which may form the basis for liability—the Vermont legislature stated: "It is the intent of the Legislature that in construing [this provision,] the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act. ..." *Id.* § 2453(b).

**\*25**  In effect, the VCFA provides a state-law private remedy for violations of the FTCA (as well as for claims of fraud in businesses beyond the scope of the FTCA). In the setting of this case, the VCFA restores the claims which the court dismissed under the FTCA for lack of a private cause of action. *See Vt. Mobile Home Owners' Ass'n, Inc. v. Lapierre,*

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 284 of 751
PageID: 11650
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

131 F. Supp. 2d 553, 558 (D. Vt. 2001) (court applying VCFA would be guided by the construction given to the FTCA). The FTC itself has filed enforcement actions in other states against other payday lenders which seek to avoid regulation by locating themselves on Indian reservations. *See, e.g.*, *FTC v. AMG Servs., Inc.*, No. 2:12-CV-00536-GMN, 2014 WL 910302, at *6 (D. Nev. Mar. 7, 2014) (holding, in case where FTC alleged violations of the FTCA, the Truth in Lending Act, and the EFTA, that "the FTC Act is a federal statute of general applicability that ... grants the FTC authority to regulate arms of Indian tribes, their employees, and their contractors"). These claims are similar to the claims made by the private plaintiffs in this case. The determination of the FTC that internet lending of this nature violates the FTCA is a strong indication that these practices also violate the VCFA.

Although the VCFA follows the FTCA in many respects, it is not limited to federal violations. As the amicus brief submitted in this case by the State of Vermont through the Vermont Attorney General's Office demonstrates, Vermont has enacted its own measures which define unfair and deceptive actions for purposes of the VCFA. These include 9 V.S.A. § 2481w(b), which addresses loans by unlicensed lenders and loans with interest rates in excess of Vermont's usury limits of 12-24%. *See* 8 V.S.A. § 2201 (requiring lenders to be licensed) and 9 V.S.A. § 41a(b) (setting interest rate limits).

Vermont consumer law specifically identifies internet lenders as subject to state regulation. 8 V.S.A. § 2233(b). In a 2014 report, the Vermont Attorney General's Office describes the harm caused by unlicensed, high-interest loans.[22] In the case of Plain Green, the Vermont attorney general sent a cease and desist letter which failed to change the company's lending practices. (Doc. 91 at 3.)

The court therefore rejects the Tribal Defendants' contention (Doc. 66 at 43) that Plaintiffs have failed to allege any unfair or deceptive acts.

Mr. Rees argues that any potential liability is vicarious and not based upon actionable conduct by him. The short answer is two-fold:

1. Plaintiffs have alleged Rees was a critical participant in an unlawful plan. Mr. Rees provided the leadership and experience in the payday lending business. Plaintiffs allege that he is the principal architect of the business built around

Plain Green. (Doc. 18 ¶ 23 (describing Mr. Rees as "the mastermind of this illegal scheme").) There could have been little doubt that the business was one of doubtful legality.

*See* *Bay Mills*, 134 S. Ct. at 2052 (Thomas, J., dissenting) (noting "questionable legality"). Internet lenders providing loans at these interest rates and on these terms are the subject of suit and enforcement action by prosecutors and regulators. *See* Indictment, *United States v. Hallinan*, No. 2:16-cr-130-ER-1 (E.D. Pa. Mar. 31, 2016) (charges against individuals involved in alleged "rent-a-tribe" payday lending scheme); Indictment, *United States v. Tucker*, No. 1:16-cr-91-PKC (S.D.N.Y. Feb. 8, 2016) (same).[23]

2. At the stage of the motion to dismiss, the court accepts the allegations described above as true. Plaintiffs have come forward with detailed, plausible allegations of wrongdoing. Whether these can be proved is an issue for another day. The motion to dismiss fails because the FAC contains plausible allegations that Mr. Rees developed Plain Green, negotiated the term sheet which governs the business arrangements, and enabled the alleged violations of Vermont law to occur.

### E. Unjust Enrichment (Count Seven)

**\*26**  In Count Seven, Plaintiffs allege that "Defendants have been unjustly enriched by their continued possession of funds illegally taken from people in financially challenged positions." (Doc. 18 ¶ 224.) Mr. Rees argues that Plaintiffs have failed to state a claim for unjust enrichment. (Doc. 67-2 at 49.)[24]

In Vermont, "[a] claim for unjust enrichment requires that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) it would be inequitable for defendant not to compensate [plaintiff] for its value." *Unifund CCR Partners v. Zimmer*, 2016 VT 33, ¶ 21.[25] "Unjust enrichment applies if 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22, 194 Vt. 446, 82 A.3d 1121 (quoting *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 882 A.2d 1177). "The common remedy for unjust enrichment is imposition of a constructive trust, where the person with the legal title cannot enjoy the beneficial interest without violating the rules of honesty and fair dealing." *Mueller v. Mueller*, 2012 VT 59, ¶ 29, 192 Vt. 85, 54 A.3d 168 (internal quotation marks omitted).[26]

Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

Rees asserts that the FAC fails to allege that he received or accepted any benefit from Plaintiffs. He contends that Plaintiffs obtained a loan from *Plain Green* and repaid those loans to *Plain Green*. (Doc. 67-2 at 49.) Plaintiffs say that they have alleged that Rees received a benefit as an investor-owner of Think Finance, which retains 95% of the revenue from the lending operation. (Doc. 85 at 139.)

The court concludes that the FAC adequately alleges that Rees benefitted from Plain Green's transactions with Plaintiffs. The FAC alleges that he is a substantial investor in Think Finance, and that Think Finance retained almost all of the revenue produced from Plain Green's lending operation. That is a sufficient "benefit" for the purposes of unjust enrichment. *See Powell v. H.E.F. P'Ship*, 793 F. Supp. 91, 92-93, 96 (D. Vt. 1992) (declining to dismiss unjust enrichment claim against major lender for its role in allegedly fraudulent development project); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth. Subject to that limitation, the benefit that is the basis of a restitution claim may take any form, direct or indirect.").

**\*27** Rees further contends that unjust enrichment does not apply where the parties have entered into an express contract, and that Plaintiffs in fact did enter into contracts—namely, the loan agreements with Plain Green. (Doc. 67-2 at 50.) The Vermont Supreme Court has recognized that "it can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created." *DJ Painting, Inc. v. Baraw Enters., Inc.* 172 Vt. 239, 245, 776 A.2d 413, 419 (2001); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2(1) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). However, Plaintiffs have plausibly alleged that the loan agreements are not valid because they are unlawful, as part of a plan to avoid financial regulation. If Plaintiffs prove that, then relief under an unjust enrichment theory is not foreclosed. *See* Restatement (Third) of Restitution and Unjust Enrichment § 32.

#### F. Civil RICO Claims (Counts Five and Six)

Plaintiffs allege that Defendants are liable under the federal RICO statute, 18 U.S.C. § 1961 et seq., because they took part in "collection of unlawful debt" as well as "racketeering" activities. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."). [27] "The requirements of section 1962(c) must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). There are multiple elements required to state a RICO claim; and Defendants raise challenges related to almost every element. [28]

#### 1. Equitable Relief is Available in Private RICO Actions

As against the Tribal Defendants, Plaintiffs seek only equitable relief for the alleged RICO violations. (Doc. 18 ¶¶ 207, 215.) The Tribal Defendants argue that RICO's civil remedies provision, 18 U.S.C. § 1964, authorizes recovery for money damages only—not equitable relief. (Doc. 66 at 21.) It is true that 18 U.S.C. § 1964(c) authorizes recovery of damages without mentioning injunctive relief. But the court disagrees with the Tribal Defendants' narrow reading of the relief available in private RICO actions.

The Tribal Defendants concede that the Second Circuit has not expressly decided whether equitable relief is available in private RICO actions. (Doc. 66 at 21.) [29] Other circuits have reached differing conclusions on the issue. [30] District courts within the Second Circuit are also divided. [31] For largely the reasons stated by Judge Kaplan in *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), this court concludes that equitable relief is available in private RICO actions. The court must read the subsections of § 1964 together, and that reading reveals that subsections (b) and (c) "provide remedies in addition to, and not in place of, the remedies provided for in Section 1964(a)." *Donziger*, 974 F. Supp. 2d at 569.

#### 2. "Persons" Suable under RICO

**\*28** The Tribal Defendants assert that RICO does not apply substantively to the Tribe (or to them, by extension)

because tribal sovereigns "are not expressly included among the 'persons' or entities subject" to RICO. (Doc. 66 at 20 n.7.) Section 1962(c) applies to "person[s]." The statute defines "person" to include "any individual *or entity* capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (emphasis added). That broad definition contains no specific exemption for tribes. *Cf.* 42 U.S.C. § 2000e(b) (specifically excluding Indian tribes from the definition of "employer" for the purposes of Title VII of the Civil Rights Act).

According to one prominent treatise, governmental entities "are not subject to RICO liability as defendants." Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11(A). "There is some disparity in the case law as to whether governmental entities should be deemed not to be 'persons' or should be recognized as 'persons' but simply immune ones." *Id.* For most purposes, "[t]he result is the same: they cannot successfully be sued." *Id.* The Tribal Defendants' argument, however, requires a decision on the precise rationale.[32]

The court concludes that, for the purposes of RICO, tribes are "persons" but that they enjoy immunity. This follows from the natural reading of the broad definition of "person" in § 1961(3)—it includes *any* "entity" capable of holding an interest in property. Sovereign governments like state governments are governmental entities. Entity, *Black's Law Dictionary* (10th ed. 2014). It follows that tribal governments are also "entities." And there is no dispute that such entities are capable of holding an interest in property.

As discussed above, tribes enjoy immunity. But, as also discussed above, the immunity of tribal officials in their official capacity is limited by the analogy to *Ex Parte Young.* The court therefore concludes that tribal officials in their official capacity may be sued for injunctive relief for conduct occurring outside of Indian lands that violates 18 U.S.C. § 1962.

### 3. Mens Rea

The mens rea requirement in RICO is coextensive with the mens rea requirement found in the predicate crimes. *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986). The Tribal Defendants contend that Plaintiffs cannot establish

the requisite mens rea for a RICO violation. (Doc. 66 at 46.) Plaintiffs maintain that the Tribal Defendants' argument is "irrelevant" and "based on several incorrect premises." (Doc. 85 at 127-28.)

The Tribal Defendants' argument might be persuasive if the rationale for the Tribe's immunity were that, as a governmental entity, the Tribe is incapable of forming the mens rea necessary for a predicate RICO act. Some courts have indeed rested on similar rationales. *See Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991) (RICO claims failed because "government entities are incapable of forming a malicious intent"); *Andrade v. Chojnacki*, 65 F. Supp. 2d 431, 449 (W.D. Tex. 1999) (same; quoting *Lancaster); see also* Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 11(A) ("Most courts reason that state and local governments are immune from RICO liability because they are incapable of forming the mens rea necessary to commit a predicate act." (collecting cases)). That rationale, however, is unpersuasive. As the Third Circuit has observed, it "does not distinguish adequately those situations where municipal corporations are indeed held liable for the tortious or criminal acts of [their] officials, even where such acts require a malicious, willful or criminal intent." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 909 (3d Cir. 1991).

**\*29** The Tribal Defendants also contend that the FAC fails to allege that any of them "intended to defraud the Plaintiffs as required by the mail and wire fraud statutes." (Doc. 66 at 48 n.36.) According to the Tribal Defendants, the FAC alleges that Mr. Rees and Think Finance entered into agreements with the Tribal Defendants' *predecessors*, not the Tribal Defendants themselves. (*See id.* (citing FAC ¶ 209).) That argument, however, ignores the fact that the Tribal Defendants are sued in their official capacity—as the individual official representatives who, according to the FAC, have authority to stop the allegedly illegal conduct. The "intent" to be analyzed is the intent of the entity that the Tribal Defendants represent.

### 4. Injury; Causation

To establish a RICO claim, a plaintiff must prove, among other things, that she suffered "an injury to business or property." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001). The Tribal Defendants argue that Plaintiffs cannot

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 287 of 751
PageID: 11653
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

demonstrate that they have suffered any such injury. (Doc. 66 at 45.) Mr. Rees argues the same. (Doc. 67-2 at 34.) The court rejects those arguments for the same reasons that it concludes that Plaintiffs have constitutional standing: they have a direct, personal stake in the dispute. They explicitly claim that they paid excessive interest. (Doc. 18 ¶ 115.) Their claims demonstrate their interest in the subject matter of this lawsuit and the clear potential for relief in their individual cases.

The "by reason of" language in § 1964(c) "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 86 (2d Cir. 2015) (alteration in original) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). The proximate cause requirement "mandates 'some direct relation between the injury asserted and the injurious conduct alleged' that is not 'too remote.' " *Id.* (quoting *Holmes*, 503 U.S. at 268).

Mr. Rees contends that Plaintiffs have failed to allege that their harm was proximately caused by any alleged RICO violation. (Doc. 67-2 at 35.) He argues that "[n]owhere in the FAC is it alleged that Plaintiffs or anyone else relied upon any misrepresentations by Rees in deciding to enter into the loans." (*Id.* at 36.) "And, nowhere in the FAC are there facts alleged demonstrating that it was a misrepresentation or fraudulent conduct by Rees that *caused* plaintiffs to suffer their injury." (*Id.*) Plaintiffs insist that, as borrowers of usurious debt, they meet the proximate cause test for RICO. (Doc. 85 at 133.)

Here, the FAC alleges that "Plaintiffs would not have had their bank accounts debited with illegal ACH transactions in excess of any legal amount of interest but for Defendants Rees and Think Finance establishing and running the corrupt enterprise of Plain Green." (Doc. 18 ¶ 115.) Of course, alleging but-for causation does not necessarily establish proximate causation. But the allegations of the FAC sufficiently claim a relation between the allegedly injurious conduct and the injury that is not "too remote." The conduct at issue includes the alleged marketing and collection of usurious interest rates. The injury is the alleged payment of interest at excessive rates. That is a sufficiently direct relationship to satisfy proximate cause. Mr. Rees's argument that Plaintiffs have failed to allege reliance on any misrepresentation does not alter that conclusion and,

as discussed below, fails to address the core of the scheme alleged in the FAC.

### 5. Enterprise; Distinctiveness

The FAC alleges that Plain Green is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). (Doc. 18 ¶ 76.) That is a legal conclusion, not a factual allegation. But no Defendant challenges the "enterprise" element of Plaintiffs' RICO claim insofar as Plaintiffs claim that Plain Green is the "enterprise" at issue.

**\*30** The Tribal Defendants do contend, however, that Plaintiffs' RICO theory violates the "distinctiveness" requirement. (Doc. 66 at 47 n.35.) According to the Tribal Defendants, by suing them in their official capacities as officers and directors of Plain Green, Plaintiffs are functionally suing Plain Green. Thus, according to the Tribal Defendants, Plaintiffs have designated Plain Green as both the RICO defendant and enterprise, which the Tribal Defendants say is fatal to Plaintiffs' RICO theory. (*Id.*)

It is true that, "[u]nder section 1962(c), a defendant and the enterprise must be distinct." *DeFalco*, 244 F.3d at 307. However, Plaintiffs are suing the Tribal Defendants not solely as directors of Plain Green, but also as official representatives of the Tribe. (*See* Doc. 18 ¶ 209.) The Tribal Defendants concede that the Tribe and Plain Green are distinct entities. (Doc. 92 at 19 n.14.) The court concludes that the allegations in the FAC do not violate RICO's distinctiveness requirement.

### 6. Management and Operation

A necessary element for liability under § 1962(c) is that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). Interpreting that provision, the Supreme Court has held that such conduct or participation requires that a defendant "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Under that "operation or management" test, "participation" requires a defendant to have "some part in directing" the enterprise's affairs, and thus RICO liability for "participation" is "not limited to those with primary

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 288 of 751
PageID: 11654
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

responsibility for the enterprise's affairs." *Id.* Liability under § 1962(c) is not limited to "upper management"; an enterprise may be "operated" "not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. The court discusses whether each set of Defendants meets this test. [33]

### a. Mr. Rees and the Think Defendants

Mr. Rees and the Think Defendants contend that the FAC does no more than allege that they provided *services* to the alleged enterprise, and that such allegations fall short of alleging their "operation or management." (Doc. 65 at 14; *see also* Doc. 67-2 at 46.) It is true that, in the term sheet, Think Finance described what it brought to the deal with the Tribe as "services":

> TF will license its software to the Tribe pursuant to a software license agreement acceptable to the parties. TF will also provide risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement and market and/or identify access channels for consumer loans on the Tribe's behalf (jointly "Services").

(Doc. 18-1 at 1.) Plaintiffs note that the FAC explicitly asserts that Think Finance did more than provide "services." (*See* Doc. 18 ¶ 101 ("Defendants Rees and Think Finance hoped to avoid liability by falsely claiming that they only provided services to Plain Green, when in reality they created the whole enterprise and ran its operation through an assortment of subsidiaries and affiliates like Defendants Tailwind Marketing, TC Loan, and TC Decision Sciences.").) According to the Think Defendants, that allegation is merely conclusory. (Doc. 96 at 4.)

**\*31** Evaluating the factual allegations in the FAC, the court concludes that Plaintiffs have plausibly alleged that Rees and Think Finance "participated" in the operation or management of the enterprise. The FAC alleges that Rees and

Think Finance prepared the term sheet (Doc. 18 ¶ 78), which required the Tribe to "adopt a finance code that is acceptable to all parties and provide for the licensing of an arm of the tribe to engage in consumer lending" (*id.* ¶ 79). [34] The FAC further asserts that Rees and Think Finance "intentionally and willfully dominated and still dominate the operations of Plain Green" and "provided everything that the enterprise needed to operate." (*Id.* ¶ 80.) Rees and Think Finance also "defined precisely the type of loan Plain Green would offer to customers and the terms on which the loan would be offered," (*id.* ¶ 83), and required the enterprise to enter into certain banking and attorney-client relationships (*id.* ¶¶ 85, 87). The court concludes that Plaintiffs have plausibly alleged that both Think Finance and Mr. Rees have played at least some part in directing the affairs of the enterprise.

The court cannot reach the same conclusion with respect to TC Loan Service, LLC, TC Decision Sciences, LLC, and Tailwind Marketing, LLC. The FAC alleges that Mr. Rees and Think Finance created those entities as subsidiaries (*id.* ¶ 99), and that Mr. Rees and Think Finance "control and dominate" them (*see id.* ¶¶ 89, 90). No allegations in the FAC describe those entities as having any role in directing the affairs of the enterprise. The court will accordingly DISMISS the RICO claim against those Defendants.

### b. TCV and Sequoia

TCV and Sequoia each argue that the FAC fails to allege that they conducted or participated in the enterprise's affairs. (Doc. 76 at 22; Doc. 77-1 at 19.) The principal factual allegations against these two Defendants are as follows:

> Defendants Sequoia and Technology Crossover Ventures provide money that is used to start the illegal lending process. They reap rewards through obtaining significant returns on the investment of their funds in the enterprise. Sequoia and Technology Crossover were fully aware of the practices of the enterprise and knew that the practices violated the law. Sequoia and Technology Crossover do not make investments without substantial due diligence into their investments, including legal review

of the activities of their investment vehicle.

(Doc. 18 ¶ 154.) The FAC also asserts that Sequoia and TCV "executed a series of agreements that documented their relationship with Defendants Rees and Think Finance" but that "[t]hey have concealed these arrangements through confidentiality clauses in the agreements" and have refused to comment on their role in the RICO enterprise. (*Id.* ¶ 155.) None of those allegations describe TCV or Sequoia as having any role in directing the affairs of the enterprise.

Allegations that TCV and Sequoia provided financing to the RICO enterprise are not sufficient to show that they conducted or participated in the enterprise's affairs.[35] Allegations that TCV and Sequoia are "investors" (shareholders) in Think Finance, or obtained returns on those investments, are similarly insufficient. Neither would TCV and Sequoia be RICO "participants" just because they were "fully aware" of Plain Green's practices. *See* Rosner v. Bank of China, 528 F. Supp. 2d 419, 423, 431 (S.D.N.Y. 2007) (despite allegations that bank "knew about the fraudulent scheme and its role in the fraudulent scheme," bank's provision of banking services did not qualify as participation in a RICO enterprise); Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.), 924 F. Supp. 449, 468 (S.D.N.Y. 1996) ("One can 'knowingly participate' in fraud without having 'some part in directing the affairs of the enterprise.' ").

**\*32** Plaintiffs argue that *Sumitomo* and *Rosner*—cited in the footnote above—actually support their position. The court disagrees. In *Sumitomo*, the plaintiff, Sumitomo Corporation, sued two major banks, alleging that they participated in a scheme to defraud Sumitomo "by structuring certain transactions so that they appeared to be normal copper transactions without disclosing other related transactions that transformed these transactions into bank loans of which plaintiff was unaware." Sumitomo, 2000 WL 1616960, at \*1. The "enterprise" in that case was a former Sumitomo employee, Hamanaka, and each of the two banks. The court recognized that merely providing financing to a RICO enterprise would not constitute "participation" in the affairs of the enterprise, but held that the complaints sufficiently alleged "participation" because "it is the fraudulent financing operation which is itself the RICO enterprise, and the complaints sufficiently allege the particular defendant's participation in its affairs." *Id.* Here, the FAC does allege

a fraudulent financing operation (Plain Green), but that operation extends financing to consumers like Plaintiffs. TCV and Sequoia are not themselves alleged to be the RICO "enterprise"; nor are they alleged to directly make loans to consumers.

*Rosner* is similarly unpersuasive. The court in that case referenced an earlier related action— Commodity Futures Trading Commission v. International Financial Services (New York), Inc., 323 F. Supp. 2d 482 (S.D.N.Y. 2004)— in which Sociedade Comercial Siu Lap Limitada (Siu Lap) was a defendant held liable for fraudulently and without authorization engaging in transactions in foreign currency futures contracts.[36] Siu Lap's role in the fraudulent scheme involved funding codefendant International Financial Services, Inc. *See Rosner*, 528 F. Supp. 2d at 422. That was not Siu Lap's only role,[37] but even assuming it was, Siu Lap was held liable not under RICO, but under the Commodity Exchange Act (CEA). Int'l Fin. Servs., 323 F. Supp. 2d at 485. Plaintiffs do not explain how Siu Lap's liability under the CEA has any bearing on the "operation or management" element that appears in RICO.

Plaintiffs say they have "additional allegations" (not appearing in the FAC) regarding TCV and Sequoia's "participation" in the affairs of the enterprise. (Doc. 85 at 101, 107; Doc. 85-1.) Plaintiffs assert that TCV General Partner John Rosenberg has served on the Think Finance Board since 2009. (Doc. 85-1 ¶ 1.) Plaintiffs also say that Sequoia General Partner Michael Goguen previously served as a director of Think Finance. (*Id.* ¶ 3.) Plaintiffs allege that both Rosenberg and Goguen were "fully aware" of the Plain Green enterprise (*id.* ¶ 1, 3), and that they both "directed the strategy that Think Finance followed, including its domination and control of Plain Green" (*id.* ¶¶ 2, 4).

TCV and Sequoia both contend that Plaintiffs' reliance on allegations not appearing in the FAC is procedurally improper. (Doc. 97 at 12; Doc. 99 at 8.) The court agrees. *See* Sherman v. Ben & Jerry's Franchising, Inc., No. 1:08-CV-207, 2009 WL 2462539, at \*8 (D. Vt. Aug. 10, 2009) (supplementary allegations that did not appear in the Amended Complaint were improper because "parties may not amend the complaint through supportive memoranda" (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998))). The court's analysis is limited to the FAC as it stands currently.

Gingras v. Rosette, Not Reported in Fed. Supp. (2019)

Case 1:19-md-02875-RMB-SAK     Document 577-3     Filed 09/18/20     Page 290 of 751
PageID: 11656

However, since the court is permitting discovery as to TCV and Sequoia's minimum contacts with Vermont, the court will also permit Plaintiffs to discover facts related to the "additional allegations." To defeat a jurisdiction-testing motion after such discovery, Plaintiffs will be required to aver "facts that, if credited by the trier, would suffice to establish jurisdiction" over TCV and Sequoia. *Dorchester*, 722 F.3d at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Meanwhile, the court will defer ruling on any of the claims against Sequoia and TCV.

### 7. Racketeering

**\*33** Under RICO, "racketeering activity" includes "any act which is indictable under ... [18 U.S.C.] section 1341 (relating to mail fraud), [or] section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Defendants argue that Plaintiffs have failed to state a racketeering claim for a variety of reasons.

#### a. Scheme to Defraud

"The mail and wire fraud statutes do not define 'scheme to defraud,' but it has been described as a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.' " *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). "It is characterized by a departure from community standards of 'fair play and candid dealings.' " *Id.* (quoting *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992)). "[M]ateriality of falsehood" is an element of a scheme to defraud. *Neder v. United States*, 527 U.S. 1, 25 (1999).

Plaintiffs' theory is that Mr. Rees and Think Finance "had a plan or scheme to defraud thousands of people in a financially challenged position by extending loans at illegally high and

extortionate interest rates, while at the same time claiming that the business was legitimate and in compliance with the law." (Doc. 18 ¶ 101.) According to Plaintiffs, Rees and Think Finance used Plain Green and the Tribal Defendants as "intermediaries" and Tailwind, TC Loan, and TC Decision Sciences as "subsidiaries and affiliates" to advance the scheme. (*Id.*) The FAC outlines alleged misrepresentations in furtherance of the alleged scheme as including: (1) that Plain Green was the lender; (2) that Chippewa Cree law governed; (3) that the lender was not subject to any state or federal laws; (4) that Plain Green loans are less expensive than a payday loan; (5) that Plain Green charges low fees. (Doc. 18 ¶¶ 106, 107, 124, 125, 126.) According to the FAC, those alleged misrepresentations appear on Plain Green's website and in the arbitration agreements. (*See id.*)

The parties devote considerable energy to discussing whether those five statements are true, whether they are material, and whether they are sufficiently specific under Rule 9(b). All of those arguments distract from the real question. *Representations* that Think Green's business model is legal or that it offers a good deal are not at the core of the alleged scheme. Rather, the alleged plan—as the court understands it—was to avoid financial regulation of consumer lending. That is the alleged "falsehood" at issue; the court need not focus on any specific alleged false statements. *See United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003) (concluding that the Supreme Court in *Neder* "addressed the materiality of misrepresentation, not the specificity"), *cert. denied*, 540 U.S. 1025 (2003). As the court concluded above, the allegations of the FAC are specific and plausible in their description of such a plan.

#### b. Fraudulent Intent; Participation in Scheme

Mr. Rees and Think Finance contend that the FAC fails to allege that they had any fraudulent intent. (Doc. 65 at 16; Doc. 67-2 at 42.) Plaintiffs do not dispute that they need to plead fraudulent intent, but assert that such intent may be alleged generally under Rule 9(b), and that the FAC alleges Think Finance's direct knowledge and also that it had motive and opportunity. (Doc. 85 at 114.)

**\*34** Although Rule 9(b) permits intent to be alleged generally, Plaintiffs must still "allege facts that give rise to a *strong* inference of fraudulent intent." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d

Gingras v. Rosette, Not Reported in Fed. Supp. (2019)

Cir. 2004) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The court concludes that the FAC pleads sufficient facts to give rise to a strong inference of fraudulent intent. The FAC alleges that Rees, the Think Defendants, and the Tribal Defendants had motives to commit the alleged fraud. According to the FAC, federal regulators had shut down Rees's former "rent-a-bank" internet payday business. (Doc. 18 ¶ 23, 37-41.) Rees's new venture, Think Finance, is allegedly a different kind of law-avoidance scheme that uses a "rent-a-tribe" model. (*Id.* ¶ 42; *see also id.* ¶ 82.) Thus, as the FAC puts it, the motive for Rees and the Think Defendants was to find a business model that would be profitable and that would avoid the legal issues that doomed the previous "rent-a-bank" model. According to the FAC, the Tribe (represented by the Tribal Defendants) also had a motive: it would receive 4.5% of the revenues from the operation. (*Id.* ¶ 23.) The opportunity for Rees, the Think Defendants, and the Tribal Defendants arose in March 2001 when, according to the FAC, Rees and Think Finance approached the Tribe regarding formation of a tribal entity to conduct an internet-lending operation. (*Id.* ¶ 77.)

Mr. Rees contends that the FAC fails to allege that he "participated" in any mail or wire fraud. (Doc. 67-2 at 38.) He asserts that a RICO claim against him "cannot be based on allegations that *the enterprise* simply engaged in acts of mail fraud, wire fraud, or the collection of unlawful debt." (Doc. 98 at 22 (emphasis added).) Citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993), Rees argues that "[c]onclusory allegations that Rees somehow controlled the individual Tribal Defendants to take unspecified actions do not suffice." (Doc. 67-2 at 40.)

It is true that "[t]he focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d) [RICO's conspiracy provision]." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987). But the FAC alleges that Rees (and Think Finance), "through their control over" the Tribal Defendants, wired money into and out of Plaintiffs' bank accounts (Doc. 18 ¶¶ 53, 54, 68, 69, 100), and used the mail to collect payments and communicate with other parts of the Plain Green enterprise (*id.* ¶ 100). The FAC includes more than just bare allegations that Rees was in "control"— it alleges that he (and Think Finance) actually designed the system under which the wire and mail transactions occurred. (*See* Doc. 18 ¶¶ 23, 81.)[38] If that is not an allegation of "participation," it is hard to imagine what might be.

### c. Use of Mails or Wires

**\*35** The Tribal Defendants contend that the FAC "wholly fails" to establish their liability under a mail fraud theory, and that the FAC "fails to state how the mails were used to further the scheme to defraud." (Doc. 66 at 50 & n.37.) The FAC does indeed allege relatively few facts about the mail; perhaps the most detailed factual allegation is that Defendants Rees and Think Finance "use[d] the mail to collect payments and communicate with other parts of the Plain Green enterprise." (Doc. 18 ¶ 100.) Plaintiffs have clarified that they do not allege that any misstatements were communicated through the mail, but allege mail fraud "solely based on it advancing the fraudulent scheme." (Doc. 85 at 22 n.2.) Therefore, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998). The court concludes that Plaintiffs have alleged a connection between the scheme and the mails. The court therefore rejects the Tribal Defendants' argument that the FAC is insufficiently detailed with respect to the allegations of mail fraud.

Plaintiffs assert that they allege wire fraud "based both on Defendants' fraudulent statements and based on the wiring being merely incidental to a larger fraudulent scheme." (Doc. 85 at 22 n.2.) For the reasons stated above, the court concludes that the inquiry need not focus on the five alleged misrepresentations that Plaintiffs say were transmitted over wires. However, Plaintiffs have alleged a detailed description of the scheme, and have also alleged a connection between the scheme and the wires.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 292 of 751
PageID: 11658
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

### 8. Collection of Unlawful Debt

Section 1962(c) of Title 18 identifies "collection of unlawful debt" as one of the specific offenses which may give rise to civil liability under the RICO statute. Unlawful debt is defined as a debt:

> (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). To state a claim for collection of an unlawful debt, Plaintiffs must allege that:

> [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with the "business of lending money ... at a [usurious] rate," ... [3] the usurious rate was at least twice the enforceable rate ... [4] as a result of the above confluence of factors, it was injured in its business or property.

Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 666 (9th Cir. 1988) (alterations and omissions in original) (quoting Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 248 (2d Cir. 1985)).

### a. Unenforceable Debt

The Tribal Defendants assert that there was no "unlawful debt" in this case because the Tribe's governing law imposes no interest rate cap. (Doc. 66 at 52.)[39] The Tribal Defendants further contend that no state usury laws can be enforced against them because doing so "would amount to an improper state regulation of on-reservation activity in contravention of well-established preemption and infringement principles." (*Id.*)

The court rejects the Tribal Defendants' arguments. For the reasons stated above, the court has concluded that, at least on the present record, the relevant conduct occurred *outside* of the Tribe's lands. *See* Otoe-Missouria, 769 F.3d at 115. The interest rates charged may not have violated Chippewa Cree law, but under *Bay Mills* the Tribal Defendants can be sued for injunctive relief if their off-reservation commercial activities violate state law.

### b. Business of Lending Money at a Usurious Rate

**\*36** The Think Defendants contend that the FAC fails to allege that any Defendant was in the "business of lending money at a usurious rate." (Doc. 65 at 19.) According to the Think Defendants, the only entity alleged to be in the "business" of lending money is the alleged RICO enterprise (and non-party) Plain Green. (*Id.* at 19 n.9.) Plaintiffs argue that they do not have to show that every defendant lent money because RICO only requires that a defendant "conduct or participate, directly or indirectly" in the enterprise's affairs. (Doc. 85 at 96.) In their reply, the Think Defendants return to the refrain that Plaintiffs have failed to satisfy *Reve's* "operation and management" test. (Doc. 96 at 7.) For the reasons stated above, the court agrees that TC Loan Service, LLC, TC Decision Sciences, LLC, and Tailwind Marketing, LLC do not satisfy the "operation and management" test, but that Mr. Rees and Think Finance do.

Mr. Rees and Think Finance also assert that the FAC fails to allege that they themselves acted to "collect" any unlawful debt.[40] Think Finance relies on *Durante*, in which the Second Circuit—tracking the language of § 1962(c)—listed as an element that "the individual defendants participated in the conduct of the affairs of the enterprise through collection of unlawful debt." Durante, 755 F.2d at 248 (emphasis added). Rees contends that a RICO claim against him "cannot be based on allegations that *the*

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 293 of 751
PageID: 11659
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

*enterprise* simply engaged in acts of mail fraud, wire fraud, or the collection of unlawful debt." (Doc. 98 at 22 (emphasis added).) Thus, both Rees and Think Finance argue that the FAC fails to allege that they *individually* took any actions constituting collection of unlawful debt. Plaintiffs insist that "[t]here is no requirement that each defendant personally lend any money, only that they participate, *directly or indirectly."* (Doc. 85 at 96.) [41]

As noted above, "[t]he focus of section 1962(c) is on the individual [acts] engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d) [RICO's conspiracy provision]." *Persico, 832 F.2d at 714.* For largely the same reasons stated above regarding racketeering, the court concludes that the FAC adequately alleges that Rees and Think Finance participated in the collection of allegedly unlawful debt. The FAC alleges that Rees and Think Finance designed the system under which borrowers would be charged allegedly usurious interest rates. That is plainly an allegation of "participation."

### c. Twice the Enforceable Rate

This element does not appear to be in dispute. The FAC alleges that the rates charged were between 198 and 376% annually—well in excess of twice the rate enforceable under Vermont law.

### d. Injury to Business or Property

**\*37** For the reasons discussed above, the FAC alleges the requisite injury.

### Conclusion

All Defendants' motions to compel arbitration (Docs. 64, 66, 67, 77, 76) are DENIED.

The Tribal Defendants' Motion to Dismiss (Doc. 66) is GRANTED FN PART and DENIED FN PART. On all counts against the Tribal Defendants, Plaintiffs can obtain only prospective injunctive or declaratory relief. Counts One and Two are DISMISSED. Count Three is DISMISSED as to Plaintiff Gingras; but remains as to Plaintiff Givens. The Vermont state-law claims (Counts Four and Seven) survive against the Tribal Defendants. The RICO claims (Counts Five and Six) remain in the case. The unjust enrichment claim (Count Seven) also remains.

The Think Defendants' Motion to Dismiss (Doc. 65) is GRANTED IN PART and DENIED IN PART. Counts One and Two are DISMISSED. Count Three is DISMISSED as to Plaintiff Gingras, but remains as to Plaintiff Givens. The VCFA claim (Count Four) remains against the Think Defendants. The RICO claim (Count Six) as against TC Loan, TC Decision, and Tailwind Marketing is DISMISSED, but remains as against Think Finance. The Think Defendants have not sought dismissal of the unjust enrichment claim (Count Seven), so that claim remains against them.

Kenneth Rees's Motion to Dismiss (Doc. 67) is GRANTED IN PART and DENIED EN PART. Counts One and Two are DISMISSED. Count Three is DISMISSED as to Plaintiff Gingras, but remains as to Plaintiff Givens. The VCFA claim (Count Four) remains against Mr. Rees. The RICO claims (Counts Five and Six) remain against Mr. Rees. The unjust enrichment claim (Count Seven) remains.

TCV and Sequoia's Motions to Dismiss (Docs. 76, 77, respectively) are DENIED without prejudice, and may be renewed following discovery on the issue of personal jurisdiction.

Plaintiffs' Motion for Jurisdictional Discovery (Doc. 43) on the issues of subject-matter jurisdiction and arbitration is MOOT.

### All Citations

Not Reported in Fed. Supp., 2016 WL 2932163

### Footnotes

Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

1    Additional factual allegations are recited as necessary in the discussion below.

2    In addition to loans taken out from Plain Green, Jessica Gingras borrowed $1,200 from FBDLoans in March 2000. This loan was transferred to ThinkCash (a company operated by Kenneth Rees) and later transferred to Plain Green. (*Id.* ¶ 47.)

3    At the December 16, 2015 hearing, counsel for TCV remarked that "Technology Crossover Ventures" does not exist, and that Plaintiffs presumably intended to name "TCV V" as a defendant. The court treats TCV V as the defendant in question, and refers to it as "TCV." Counsel for Sequoia Capital Operations, LLC remarked that that entity is an operations organization that makes no investments, and that Plaintiffs presumably intended to name Sequoia Capital. The court treats Sequoia Capital as the defendant in question, and refers to it as "Sequoia."

4    The FAC incorporates the agreements by reference. (*See* Doc. 18 ¶ 118.)

5    The various motions to compel arbitration raise an issue that is also of great importance, but the court's first obligation is to satisfy itself that it has jurisdiction. *See Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) (addressing jurisdiction prior to arbitrability); *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653 (D. Vt. 2012) (noting that, "[o]rdinarily, subject matter jurisdiction must 'be established as a threshold matter' " (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998))).

6    *See Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (tribal sovereign immunity is "quasi-jurisdictional" and maybe decided under Rule 12(b)(1)); *Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B.*, 786 F.3d 662, 670 (8th Cir. 2015) ("Tribal sovereign immunity is a 'jurisdictional threshold matter.' " (quoting *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999))); *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1228 (11th Cir. 2012) ("Tribal sovereign immunity is a jurisdictional issue."); *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 920 (6th Cir. 2009) (dismissal for lack of jurisdiction proper if entity enjoyed tribal sovereign immunity); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 28 (1st Cir. 2000) ("[T]ribal sovereign immunity is jurisdictional in nature ....").

7    Four dissenting Justices in *Bay Mills* opined that *Kiowa* was wrongly decided and has led to "inequities" and "mounting consequences." *Bay Mills*, 134 S. Ct. at 2045-46 (Thomas, J., dissenting). Notably, the dissenters gave one example of particular interest in this case, stating: "payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." *Id.* at 2052.

8    Similarly, the court addresses below the Tribal Defendants' assertion that Plaintiffs' EFTA claim is time-barred, as well as Defendants' argument that RICO's civil remedies provision does not authorize equitable relief.

9    As a practical matter, Plaintiffs claim that only a tiny percentage of the revenues generated by Plain Green remain with the Tribe. The term sheet outlining the discussion of revenues allocates 5% to the Tribe. The rest goes to Think Finance and other non-tribal companies. (Doc. 18-1.)

10   Even prior to *Bay Mills*, the Supreme Court had held that sovereign immunity did not prevent suit to enjoin off-reservation violations of state law by individual tribe members. *Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.*, 433 U.S. 165, 171 (1977).

11   The court reaches the same conclusion in its analysis of the venue issue, *infra*.

12   These conclusions make it unnecessary to consider the Vermont Attorney General's argument (Doc. 91 at 4) that Plain Green is not a tribal entity or an "arm of the Tribe" to which tribal immunity might apply in the first place.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 295 of 751
PageID: 11661
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

13    The Think Defendants and TCV incorporate the Tribal Defendants' standing argument. (Doc. 65 at 20; Doc. 76 at 26.)

14    Both arbitration agreements include the following choice-of-law provision:

This Agreement and the Agreement to Arbitrate are governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Chippewa Cree Tribe. We do not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States.

(Doc. 13-5 at 52.)

15    *See* *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1400 (S.D. Fla. 2014) ("Luckily, the Court need not delve into the nuances of tribal or Delaware law, as Gunson has not demonstrated that there is a conflict with Florida law."); *Booth v. BMO Harris Bank, N.A.*, Civil Action No. 13-5968, 2014 WL 3952945, at *4 n.4 (E.D. Pa. Aug. 11, 2014) ("Plaintiff has not alleged that any true conflict exists, and according to [the defendants] no conflict does exist because the applicable tribal law allows estoppel."); *Graham v. BMO Harris Bank, N.A.*, No. 3:13cv1460(WWE), 2014 WL 4090548, at *5 (D. Ct. July 16, 2014) ("To the extent that plaintiffs maintain that tribal law may apply to this controversy, the Court notes that plaintiffs have not demonstrated a conflict with Connecticut law on estoppel. In fact, plaintiffs state that they do not take a position on the applicability of any foreign law but only point out that defendants have not addressed the issue in their memoranda.").

16    It is difficult to imagine what this means in practice. It appears to anticipate that a record of the proceedings will be kept and the transcript reviewed for evidentiary support of the outcome. It also contemplates written findings of fact and conclusions of law since a one-line award could not be reviewed by the tribal court for consistency with tribal law.

17    *See Illegal Lending: Facts and Figures* (Report by Vermont Attorney General's Office, Apr. 23, 2014), at 5, *available at* http://ago.vermont.gov/assets/files/Consumer/IUegal_Lending/Illegal%20Lending%20Report%20April%202014.pdf (noting that, increasingly, online lenders claim affiliation with Indian tribes).

18    The reference to the Indian Commerce Clause is an irrelevancy which is repeated in many of the tribal lending agreements. That clause is a grant of legislative authority to Congress to regulate commerce "with the Indian Tribes." It has nothing to do with the authority of tribes to enact their own laws.

19    *See* Mark Furletti, *The Debate Over the National Bank Act and the Preemption of State Efforts to Regulate Credit Cards*, 77 Temp. L. Rev. 425, 443 (2004) (reporting that in 2003, South Dakota, Delaware, and four other states were home to national banks holding approximately 70% of all credit card debt in the United States.).

20    *See also* *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313 (1978) (under the National Bank Act, 12 U.S.C. § 85, bank located in Nebraska could charge out-of-state credit-card customers the lending rate allowed by Nebraska).

21    The Tribal Defendants also assert that the EFTA does not apply substantively to the Tribe (or to them, by extension) because tribal sovereigns "are not expressly included among the 'persons' or entities subject" to the EFTA. (Doc. 66 at 20 n.7.) Section 1693k prohibits conduct by "person[s]." The EFTA itself does not define "person," but the regulations implementing the EFTA define "person" as "a natural person or an organization, including a corporation, government agency, estate, trust, partnership, proprietorship, cooperative, or association." 12 C.F.R. § 1005.2(j). That broad interpretation is entitled to deference, and—for reasons similar to those discussed below regarding "persons" suable under RICO—the court concludes that the Tribal Defendants may be sued under the EFTA.

22    *See Illegal Lending: Facts and Figures* (Report by Vermont Attorney General's Office, Apr. 23, 2014), at 3, *available at* http://ago.Vermont, gov/assets/files/Consumer/IIlegal_Lending/Illegal%20Lending%20Report%2 0April%202014.pdf.

23    The Office of the Vermont Attorney General says that it "specifically sent a cease-and-desist letter to Plain Green Loans, LLC ... advising the company to immediately cease making and collecting on all loans made to Vermont Customers." (Doc. 91 at 3.)

24    The Think Defendants and the Tribal Defendants do not appear to join this argument. Rees argues that Count Seven only recites the bare elements of a claim without any factual allegations. (Doc. 67-2 at 49; Doc. 77-1 at 21.) The court rejects that argument because Count Seven explicitly incorporates by reference all of the factual allegations in the FAC. (Doc. 18 ¶ 223.)

25    These are the elements for what has also been termed a claim on a contract "implied in law." *Mount Snow Ltd. v. ALLI, the Alliance of Action Sports*, No. 1:12-cv-22-jgm, 2013 WL 4498816, at *8 (D. Vt. Aug. 21, 2013). A separate claim, for "contract implied in fact," requires different elements, including "mutual intent to contract and acceptance of the offer." *Id.* Plaintiffs raise the former claim here, and the court therefore rejects TCV's contention (Doc. 76 at 21) that Plaintiffs must prove "mutual intent."

26    As described above, Plaintiffs' remedies against the Tribal Defendants are limited to prospective injunctive or declaratory relief. That would rale out the constructive trust remedy for any unjust-enrichment claim.

27    Plaintiffs' two RICO counts both appear to be claims under § 1962(c): one claim premised on an alleged pattern of racketeering activity (Count Five), and one claim premised on alleged collection of unlawful debt (Count Six). Plaintiffs assert (Doc. 85 at 108) that the FAC alleges a RICO conspiracy under § 1962(d), but also concede that the FAC does not contain a count alleging such a conspiracy. The court accordingly limits its analysis to § 1962(c).

28    Some elements—for example, that Plain Green is an "enterprise" or that it is engaged in or affects interstate commerce—are not challenged by any Defendant. The discussion that follows is organized according to the elements that are contested, with analysis of each individual Defendant's argument on each of those elements.

29    In dicta, the Second Circuit has expressed "doubts as to the propriety of private party injunctive relief" under RICO. *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28 (2d Cir. 1983). *See also Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489 n.20 (2d Cir. 1984) ("It ... seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief"), *rev'd on other grounds*, 473 U.S. 479 (1985).

30    *Compare Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1080-89 (9th Cir. 1986) (concluding that RICO's legislative history forecloses injunctions for private plaintiffs), *with Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001) (concluding that "the text of the RICO statute, understood in the proper light, itself authorizes private parties to seek injunctive relief"), *rev'd on other grounds*, 537 U.S. 393 (2003).

31    *Compare Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 568-70 (S.D.N.Y. 2014) (concluding that equitable relief is available in private RICO actions), *with Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) ("Based upon the weight of Second Circuit authority and Congress's failure to address the issue within the statutory language itself, this Court will not infer that the right to injunctive and declaratory relief exists for private litigants under Section 1964 of RICO.").

32    In many contexts, it may be sensible to conclude that it is unnecessary to determine the precise rationale for immunity because, absent immunity, a successful RICO claim against a governmental entity could heap duplicative financial harm on taxpayers who might already have been harmed. *See id.* That concern plays no role in this case, however, because the Tribal Defendants cannot be liable for money damages.

33    The Tribal Defendants raise no argument on this RICO element; presumably because, as directors of Plain Green, they would indisputably meet the operation or management test.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 297 of 751
PageID: 11663
Gingras v. Rosette, Not Reported in Fed. Supp. (2016)

34    Rees points out that he is not a party to the term sheet, nor is he a signatory to it. (Doc. 98 at 16.) Inspection of the term sheet (Doc. 18-1) reveals that to be true, but does not foreclose the plausible allegation that Rees prepared the term sheet (or caused it to be prepared) for execution by the parties to that document.

35    *See* Alkhatib v. N.Y. Motor Grp. LLC, No. CV-13-2337(ARR), 2015 WL 3507340, at *18 (E.D.N.Y. June 3, 2015) (bank did not satisfy operation or management test where its only alleged activities were "summarily granting the loan applications created by the dealership defendants, failing to investigate the plaintiffs' claims of fraud, and collecting the payments due under the allegedly fraudulent loans"); Berry v. Deutsche Bank Tr. Co. Americas, No. 07 Civ. 7634(WHP), 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008) ("Lending money to an enterprise does not establish a role in 'directing the enterprise's affairs.' "); Rosner v. Bank of China, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) (Bank of China's alleged provision of banking services that aided in the perpetration of a fraudulent scheme did not qualify as participation in a RICO enterprise); Sumitomo Corp. v. Chase Manhattan Bank, No. 99Civ.4004(JSM), 2000 WL 1616960, at *1 (S.D.N.Y. Oct. 30, 2000) ("[M]erely providing financing to a RICO enterprise did not constitute participation in the affairs of the enterprise." (citing Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 347 (S.D.N.Y. 1998))).

36    The claims against Siu Lap were not resolved in the 2004 decision. The court had entered default judgment against Siu Lap in 2002. *See* Order of Default Judgment, *Int'l Fin. Servs.*, No. 1:02-cv-5497-GEL (S.D.N.Y. Aug. 15, 2002), ECF No. 19.

37    Siu Lap also "hired inexperienced currency traders as independent contractors, grouped the traders by their ethnicity, and encouraged them to solicit customers from their respective ethnic communities." *Id.* The independent contractors then misled customers. *See id.*

38    Rees describes as "ludicrous" and "incredible" any allegation that he personally deposited funds into or withdrew funds from Plaintiffs' accounts. (Doc. 98 at 16.) The court does not read the FAC as alleging that, but instead as alleging that he designed a system under which such transactions would occur. (*See* Doc. 18 ¶ 10 (alleging that Rees "personally designed and directed the business activity described in this Complaint").)

39    TCV joins this argument. (Doc. 76 at 22.)

40    Rees and the Think Defendants assert that the proper definition of "collection" for purposes of § 1962(c) is "to induce in any way any person to make repayment thereof." United States v. Pepe, 747 F.2d 632, 674 (11th Cir. 1984). Plaintiffs object that the Think Defendants are inappropriately seeking to add an additional "inducement" element onto RICO. (Doc. 85 at 95.) Plaintiffs argue that, in any case, they have alleged that the Think Defendants "induced" repayment. (*Id.* at 96.) To the extent that there is an "inducement" element, the court concludes that it is alleged in the FAC by the allegations that funds were actually electronically collected directly from Plaintiffs' bank accounts. (*See* Doc. 18 ¶¶ 30, 54, 69, 100.)

41    Plaintiffs also assert that they have alleged that Rees and Think Finance "took many acts that were designed to induce the repayment of an unlawful debt." (Doc. 85 at 93.) Referring to the allegations that Rees and Think Finance controlled the Tribal Defendants (Doc. 18 ¶¶ 54, 69), Plaintiffs maintain that the FAC does allege that Rees and Think Finance "collected unlawful debt multiple times from both Jessica Gingras and Angela Given." (Doc. 85 at 94, 96.)

**End of Document**                                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 27

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 299 of 751
PageID: 11665
Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1483306
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Carmen Rosa GOMEZ, Individually, and
as Administrator Ad Prosequen-dum of the
Estate of Jorge L. Gomez, Deceased, Plaintiff,

v.

H&M INTERNATIONAL
TRANSPORTATION, INC., Defendant.

Civil Action No.: 17–231 (JLL)
|
Signed 04/24/2017

**Attorneys and Law Firms**

Stephen John Liakas, Liakas Law PC, New York, NY,
Plaintiff.

William Edward Marsala, Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP., White Plains, NY, John F.
Karpousis, Freehill, Hogan & Mahar LLP, Jersey City, NJ,
Thomas C. Hart, Ruprecht, Hart, Weeks & Ricciardulli, LLP,
Westfield, NJ, Thaddeus J. Hubert, Iii, Hoagland, Longo,
Moran, Dunst & Doukas, LLP, New Brunswick, NJ, Mark
Samir Hanna, Vincent E. Reilly, Kinney Lisovicz Reilly
& Wolff, PC, Parsippany, NJ, Jeffrey A. Segal, Salmon,
Ricchezza, Singer & Turchi, LLP, Sewell, NJ, Kevin J.
Mcgee, Mcdermott & Mcgee, LLP, Millburn, NJ, William
Paul Cunningham, Daly, Lamastra, Cunningham, Kirmser &
Skinner, Whitehouse Station, NJ, for Defendant.

**OPINION**

JOSE L. LINARES, U.S.D.J.

**\*1** This matter comes before the Court by way of Defendant
Hoist Liftruck Manufacturing, Inc.'s ("HLM") motion to
dismiss the Complaint filed by Plaintiff Rosa Gomez. Plaintiff
has opposed this motion. (ECF No. 24No. 24). Defendants
H&M Transport Management ("H&M") and FedEx Freight,
Inc. ("FedEx") have also opposed HLM's motion. (ECF Nos.
26, 27), and HLM has replied to those oppositions (ECF
No. 28No. 28). [1]  The Court decides this matter without oral
argument pursuant to Federal Rule of Civil Procedure 78.
The Court has reviewed all papers filed in support of and in

opposition to the pending motion, and for the reasons stated
herein, Defendant HLM's motion to dismiss the Complaint is
granted.

**I. Background**
Plaintiff Carmen Rosa Gomez ("Plaintiff") is the surviving
wife of decedent  Jorge L. Gomez. (ECF No. 1, "Compl."
¶ 1). This action arises out of an incident that occurred at
the Croxton Intermodal Terminal in Jersey City, New Jersey.
(Id. ¶ 51). Plaintiff alleges that on August 15, 2016, Mr.
Gomez was working at the Terminal "as a lift machine-
operator/switcher." (Id. ¶ 66). On that date, "[Mr. Gomez]
was in the act of transferring intermodal container FDXU
532907 from railcar DTTX 732196(c) on Track E within
Croxton Intermodal Terminal, onto Capacity Jockey Truck
#22645, using Hoist Life Truck—Loaded Container Handler
#28–9347 when the boom of the Hoist Lift Truck—Loaded
Container Handler #28–9347 and the attached intermodal
container FDXU 532907 struck" decedent. (Id. ¶ 76). Plaintiff
alleges that this incident resulted in Mr. Gomez's death. (Id.
¶ 80).

Plaintiff filed the instant action on January 12, 2017, asserting
claims in her own name and on behalf of Mr. Gomez's estate.
Plaintiff asserts claims against a number of Defendants,
each of which appear to be business entities involved in
the commercial railroad industry. (See Compl. ¶¶ 4–12).
Specifically, Plaintiff alleges the following claims: violation
of the Federal Employers' Liability Act (Count I); negligence
(Count II); design defect (Count III), manufacturing defect
(Count IV) and failure to warn (Count V) under the New
Jersey Products Liability Act; wrongful death (Count VI);
a survival action (Count VII); and loss of consortium
(Count VIII). Plaintiff also seek punitive damages against
Defendants. (Count IX).

Defendant HLM filed the pending motion to dismiss on
February 28, 2017. (ECF No. 15No. 15, "HLM Mov. Br.").
Plaintiff, as well as HLM's Co–Defendants, H&M and
FedEx, have each opposed HLM's motion to dismiss. (ECF
No. 24No. 24, "Pl.'s Br."; ECF No. 26No. 26, "H&M
Br."; ECF No. 27No. 27, "FedEx Br."). HLM replied to
these oppositions on March 27, 2017. (ECF No. 28No. 28,
"HLM Reply Br."). This motion is now ripe for the Court's
adjudication.

**II. Legal Standard**

*Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)*

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 62, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

### III. Discussion

#### a. Negligence (Count II)

**\*2** In Count II of the Complaint, Plaintiff asserts a claim of negligence against the following Defendants: H&M, Norfolk Southern Corporation, Consolidated Rail Corporation, Technical Services International, MI–Jack Products, Inc., HLM, FedEx, General Cable Industries, Inc. and PMX Industries, Inc. (Compl. at 17). HLM argues that dismissal of Plaintiff's negligence claim is warranted because same is precluded by Plaintiff's NJPLA claims and because Plaintiff has failed to specifically plead any allegations of negligence as against HLM in particular. (HLM's Mov. Br. at 8; HLM's Reply Br. at 8). The Court agrees that Plaintiff's negligence claim is deficient in both regards.

A plaintiff asserting a claim under the New Jersey Products Liability Act ("NJPLA") foregoes the ability to recover under any other theory of liability as it relates to the defective product. N.J.S.A. 2A:58C–l(b)(3). The language of the PLA makes it clear the Act is the only vehicle a plaintiff may use to recover for a product liability action, expressly providing that: "*any claim* or action for harm caused by a product, *irrespective of the theory underlying the claim*, except actions for harm caused by breach of an express warranty" falls under the ambit of the Act. Id. (emphasis added); *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir. 1991) ("[I]t [is] clear that [the PLA] ... effectively creates an exclusive statutory cause of action for claims falling within its purview."). Furthermore, New Jersey courts have expressly held that "[t]he [PLA] no longer recognizes negligence or

breach of warranty (with the exception of express warranty) as a viable separate claim for 'harm' ... caused by a defective product." *Tirrell v. Navistar Int'l, Inc.*, 248 N.J. Super. 390, 398 (N.J. Super. Ct. App. Div. 1991); *see Reiff v. Convergent Tech.*, 957 F. Supp. 573, 583 (D.N.J. 1997)("Under New Jersey products liability law, negligence and breach of warranty are no longer viable as separate claims for harm caused by a defective product."); *Oquendo v. Bettcher Indus., Inc.*, 939 F. Supp. 357, 361 (D.N.J. 1996)(same).

According to Plaintiff, the "claims for negligence should not be subsumed by Plaintiff's product liability claims as the negligent conduct arises from entirely separate circumstances and is properly pleaded to include other negligent conduct on the part of Defendant, not inherent to the product itself." (Pl.'s Br. at 16). Specifically. Plaintiff argues that the negligence claims pertain to HLM's "maintenance, repair, inspection and modification of the Hoist Lift Truck." (Id.).

Yet, nowhere in the Complaint does Plaintiff assert negligence in the maintenance, repair, inspection or modification of the truck on the part of HLM. Rather, and as HLM notes, Plaintiff alleges negligence as against nine Defendants, but fails to differentiate between the conduct of any of these Defendants. (HLM's Reply Br. at 8). That is, each allegation of negligence is asserted against "the answering Defendant," as opposed to any particular Defendant, and nowhere in the Complaint has Plaintiff identified who "the answering Defendant" is. Not only does this pleading deficiency fail to properly apprise each of the Defendants as to the allegations against them, but it also results in nonsensical pleadings. For example, in subsequent paragraphs of the Complaint, Plaintiff states that "the answering Defendant was the lessee of the Hoist Lift Truck," and that "the answering Defendant was the lessor of the Hoist Lift Truck." (Compl. ¶¶ 111, 112).

The Opposing Parties attempt to cure this fatal pleading deficiency by relying on an attachment to Plaintiff's brief in opposition to the pending motion to dismiss. (Pl.'s Br. at 16; FedEx Br. at 8; H&M Br. at 5). Plaintiff relies upon this document as evidence of HLM's agreement to repair and replace various aspects of the machines, which, according to Plaintiff "allow[s] for a separate claim for negligence to proceed." (Pl.'s Br. at 16). The Court declines to consider this document for the purposes of this motion. "[M]atters extraneous to the pleadings" are not normally considered on a motion to dismiss unless they are "integral to or explicitly relied upon in the complaint." *West Penn Allegheny Health*

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 301 of 751
PageID: 11667

Gomez v. H&M International Transportation, Inc., Not Reported in Fed. Supp. (2017)

*Sys., Inc. v. UPMC,* 627 F.3d 85, 97 (3d Cir. 2010). In this case, the "agreement" now relied upon by the Opposing Parties was not "integral to or explicitly relied upon in the complaint," nor was it attached to that pleading. Plaintiff cannot attempt to amend the pleading through the filing of a newly-identified exhibit. Therefore, the Court declines to consider the implications, if any, of the agreement on Plaintiff's ability to assert a claim for negligence that is sufficient distinct from her NJPLA claims.

**\*3** For all of the above reasons, Defendant HLM's motion to dismiss Plaintiff's negligence claim is granted.

### b. New Jersey Products Liability Act (Counts III, IV, V)

HLM argues that Plaintiff's claims under the NJPLA must be dismissed because the Complaint does not allege the requisite facts to support these claims. (HLM's Mov. Br. at 9–11). The Court agrees.

At the outset, the Court notes that Plaintiff's claims under the NJPLA suffer from the same deficiency as the negligence claim. That is, despite the fact that Plaintiff has brought her three products liability claims against three separate Defendants—Technical Services International, Mi–Jack Products Inc., and HLM—the Complaint fails to plead specific allegations against the separate Defendants. Instead, all allegations are asserted against the unidentified "answering Defendant" or "Defendant." (See Compl. at 27–35). In other words, Plaintiff has failed to put HLM on notice as to which allegations are asserted against HLM as opposed to Technical Services International or Mi–Jack Products, Inc. For this reason alone, counts III, IV and V of Plaintiff's Complaint are subject to dismissal.

In any event, even if Plaintiff had pled allegations as against Defendant HLM specifically, the Complaint would nonetheless fail to state a claim under the NJPLA. The NJPLA provides for liability on the part of the manufacturer or seller of a product upon a showing that the product contained a manufacturing defect or a design defect, or upon a showing of a failure to warn. N.J.S.A. 2A:58C–2.

Here, the Complaint is completely devoid of any factual allegations tending to support a products liability claim. Instead, the Complaint contains conclusory language modeled off the causes of action for design defect, manufacturing defect, and failure to warn. For example, a

plaintiff asserting a claim under the NJPLA "must prove that the product was defective, that the defect could cause injury to a reasonably foreseeable user, and that the defect was the proximate cause of the plaintiff's damages." *London v. Lederle Laboratories, Div. of American Cyanamid Co.,* 290 N.J. Super 318, 326–327 (N.J. Sup. Ct. App. Div. 1996). A product is defective if it is not "reasonably fit, suitable and safe for its intended use or foreseeable purposes." *Id.* (quotations omitted).

Here, Plaintiff summarily alleges that the "Hoist Lift Truck—Loaded Container Handler #28–9347 is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation." (Compl. ¶ 204). Plaintiff thereafter offers more conclusory allegations that the product was "defective." However, nowhere does Plaintiff offer any specific factual allegations explaining how the product at issue is or was, in fact, "defective." Instead, Plaintiff's Complaint contains "a formulaic recitation of the elements of a cause of action," which pleading will not stand against a motion to dismiss for failure to state a claim. *Twombly,* 550 U.S. at 555.

### c. Plaintiff's Derivative Claims (Counts VI, VII, VIII, IX)

**\*4** Finally, HLM moves for dismissal as to Plaintiff's claims for wrongful death, survival action, loss of consortium and for punitive damages. Specifically, HLM maintains that because these claims are derivative of the NJPLA and negligence claims, dismissal of those claims is warranted. The Court agrees. That is, in the absence of underlying substantive allegations, Plaintiff's claims for wrongful death, survival action, loss of consortium and for punitive damages cannot stand. *See, e.g., Smith v. Whitaker,* 160 N.J. 221, 233 (1999) (explaining that "a wrongful death action ... is a derivative action arising in favor of beneficiaries named under that act" and that a claim under the "Survival Act preserves to the decedent's estate any personal cause of action that decedent would have had if he or she had survived"); *Finley v. NCR Corp.,* 964 F. Supp. 882, 889 (D.N.J. 1996) ("Loss of consortium is a derivative claim which depends for its sustenance upon a viable tort claim of the spouse.").

### IV. Conclusion

For the reasons stated herein, HLM's motion to dismiss the Complaint is granted. The Court, therefore, dismisses Plaintiff's claims as against HLM, without prejudice to Plaintiff filing an amended pleading that cures the deficiencies identified herein. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1483306

## Footnotes

1    On April 6, 2017, by way of letter to the Court, Defendant General Cable Industries joined in the oppositions filed by Plaintiff, H&M, and FedEx. (ECF No. 29No. 29).

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 28

2020 WL 3496917
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Kimberly GREMO, Plaintiff,

v.

BAYER CORPORATION, Bayer Healthcare
LLC, Bayer Healthcare Pharmaceuticals,
Inc., GE Healthcare, Inc., General Electric
Company, Mallinckrodt, Inc., Mallinckrodt
LLC, Guerbert LLC, Liebel-Farlsheim Company
LLC, Amerisource Bergen Corporation,
Amerisource Bergen Drug Corporation, Defendants.

1:19-cv-13432-NLH-AMD
|
Signed 06/29/2020

**Attorneys and Law Firms**

DEREK BRASLOW, KETTERER BROWNE &
ANDERSON, 11130 SUNRISE VALLEY DRIVE, SUITE
140, RESTON, VA 20190, T. MATTHEW LECKMAN, pro
hac vice, LITTLEPAGE BOOTH LECKMAN, 1912 W.
MAIN ST., HOUSTON, TX 77098, On behalf of Plaintiff.

JENNIFER GREENBLATT, pro hac vice, EDWARD
DUMOULIN, pro hac vice, GOLDMAN ISMAIL
TOMASELLI BRENNAN & BAUM LLP, 564 W.
RANDOLPH ST., STE. 400, CHICAGO, IL 60661,
WILFRED P. CORONATO, MCCARTER & ENGLISH
LLP, FOUR GATEWAY CENTER 100 MULBERRY ST.,
NEWARK, NJ 07102, On behalf of Defendants Bayer
Corporation, Bayer HealthCare LLC, and Bayer HealthCare
Pharmaceuticals Inc.

STEPHEN G. TRAFLET, DEBRA M. ALBANESE,
TRAFLET & FABIAN, 264 SOUTH STREET,
MORRISTOWN, NJ 07960, MICHAEL L. O'DONNELL,
pro hac vice, JEREMY A. MOSELEY, pro hac
vice, WHEELER TRIGG O'DONNELL LLP, 370
SEVENTEENTH STREET, #4500, DENVER, COLORADO
80202, On behalf of Defendants GE Healthcare Inc. and
General Electric Company.

ERIN (LOUCKS) LEFFLER, SHOOK, HARDY & BACON
L.L.P., TWO COMMERCE SQUARE, 2001 MARKET
STREET, SUITE 3000, PHILADELPHIA, PA 19103,
DEVIN K. ROSS, pro hac vice, ROBERT T. ADAMS,

pro hac vice, SHOOK, HARDY & BACON L.L.P., 2555
GRAND BOULEVARD, KANSAS CITY, MO 64108, On
behalf of Defendants Mallinckrodt, Inc., Mallinckrodt LLC,
Amerisource Bergen Corporation, and Amerisource Bergen
Drug Corporation

JAMIE L. KENDALL, BRAD M. WELSH, ALEXANDRA
H. SCHULZ, KENDALL LAW PC, 308 E. LANCASTER
AVENUE, SUITE 315, WYNNEWOOD, PENNSYLVANIA
19096, BRIAN W. SHAFFER, MORGAN LEWIS
& BOCKIUS LLP, 1701 MARKET STREET,
PHILADELPHIA, PENNSYLVANIA 19103-2921, On
behalf of Defendants Guerbet LLC and Liebel-Farlsheim
Company, LLC.

**OPINION**

HILLMAN, District Judge

**\*1** This matter concerns FDA-approved gadolinium-based
contrast agents ("GBCAs") administered intravenously by
medical professionals to enhance the quality of magnetic
resonance imaging ("MRI"). The MRIs are used to diagnose
serious conditions, such as cancer, strokes and aneurysms.
Plaintiff, Kimberly Gremo, claims that Defendants' GBCAs
caused her "gadolinium toxicity, or Gadolinium Deposition
Disease (GDD), as characterized by a multitude of
symptoms," including "skin issues including rashes," "teeth
issues including darkened teeth and spots," "brain fog and
memory loss," and "loss of smell."

Plaintiff has filed suit against Defendants Bayer Corporation,
Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals,
Inc. (collectively "Bayer"), GE Healthcare, Inc., General
Electric Company (collectively "GE"), Mallinckrodt,
Inc., Mallinckrodt LLC (collectively "Mallinckrodt"),
Guerbet LLC ("Guerbert"), Liebel-Farlsheim Company LLC
("Liebel-Farlsheim"), Amerisource Bergen Corporation,
and Amerisource Bergen Drug Corporation (collectively
"AmerisourceBergen"), as "manufacturers" or "sellers" of
the GBCAs to which Plaintiff was exposed: Magnevist
(manufactured and sold by Bayer), Omniscan (manufactured
and sold by GE), and OptiMARK (manufactured and
sold by Guerbet, Mallinckrodt, Liebel-Farlsheim, and
AmerisourceBergen [1] ).

In her amended complaint, [2] Plaintiff has asserted two counts
for Defendants' alleged violations of New Jersey's Product

Liability Act (PLA), N.J.S.A. 2A:58C-2: failure to warn (Count I) and defective design (Count II). Plaintiff has also asserted a breach of express warranty claim against Defendants pursuant to N.J.S.A. 12A:2-313 (Count III).

Defendants have moved to dismiss all of Plaintiff's claims against them for numerous reasons. Plaintiff has opposed Defendants' motions. For the reasons expressed below, Defendants' motions will be denied.

# I. JURISDICTION

Defendants removed Plaintiff's complaint from state court to this Court pursuant to 28 U.S.C. § 1331.

As the Court found in denying Plaintiff's motion to remand under the well-pleaded complaint rule (see Docket No. 108), even though the three counts in Plaintiff's complaint assert claims based on state law, on the face of Plaintiff's complaint, over which she is the "master," she has also raised claims arising under the laws of the United States, as well as claims that necessarily depend on resolution of a substantial question of federal law, to both of which § 1331 applies. [3]

See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 22, 28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ("[T]he party who brings the suit is master to decide what law he will rely upon," but "it is an independent corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." "Congress has given the lower federal courts jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."). [4] Thus, this Court may properly exercise subject matter jurisdiction over Plaintiff's complaint pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's other state law claims under 28 U.S.C. § 1367. [5]

# II. DISCUSSION

## A. Standard for Motion to Dismiss

**\*2** When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.

Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (alterations, quotations, and other citations omitted).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8, 127 S.Ct. 1955 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); see also Iqbal, 556 U.S. at 684, 129 S.Ct. 1937 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' ...."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (" Iqbal ... provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to

relief that is plausible on its face.' " Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).

A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56. Fed. R. Civ. P. 12(b).

**B. Summary of Plaintiff's allegations**

Plaintiff's amended complaint contains almost 20 pages of explanatory background concerning the development of GBCAs, their effects on the human body, the interaction of the FDA with the GBCA industry for the approval, labeling, marketing, and sale of GBCAs, and Plaintiff's experience with Defendants' GBCAs. (Docket No. 62 at 12-31.) In Plaintiff's oppositions to Defendants' motions to dismiss, Plaintiff presents a two-page summary of the information and allegations contained in her amended complaint:

**\*3** Gadolinium is a chemical element that does not occur naturally in the body and is toxic in its free, cationic state. *See* Amended Complaint, Doc. No. 62, at ¶¶ 90-92, 100. Because gadolinium is highly paramagnetic, it is particularly effective for use in Magnetic Resonance (MR) imaging, and gadolinium-based contrast agents (GBCAs) have been developed as means to introduce gadolinium into the body and enhance diagnostic imaging. *See id.* at ¶¶ 93-99. Because naturally occurring gadolinium is toxic, GBCAs are "chelated" constructs, meaning the gadolinium is bound in either a "linear" or "macrocyclic" compound. *See id.* at ¶¶ 101-110. Linear GBCAs are less stable and more prone to separation of the gadolinium from its compound (or "de-chelation"). *See id.* Once de-chelated, free gadolinium will bind to tissue or cells in a biological structure. *See id.* In other words, if the chelation separates or falls away from the gadolinium, the patient would become exposed to raw and highly toxic gadolinium. So

chelation is designed to protect the human body from direct exposure to a toxic heavy metal. The kidneys play a central role in the clearance of GBCAs from the body, so predictably, patients with compromised kidney function are at risk for slower or reduced clearance of GBCAs, which in turn increases the risk of de-chelation and retention of free gadolinium in the body. *See id.* at ¶ 111. The undisputed public record shows that, in patients with compromised kidney function, GBCAs can cause the rare and often fatal disease, Nephrogenic Systemic Fibrosis (NSF), *see, e.g., id.* at ¶¶ 112-116, and the class labeling for GBCAs has warned physicians about that risk since 2007. *See id.* at ¶¶ 115-116.

Plaintiff Kimberly Gremo contends that NSF is the end-stage of a broader condition that runs on a continuum, with pre-cursor symptoms and ailments, such as those she has suffered, on one end and full-blown NSF on the other. *See, e.g., id.* at ¶¶ 124, 147-48, 156-59. She contends that the risk for NSF and NSF-like injuries is not limited to those with compromised kidney function but instead extends to *all* patients exposed to GBCAs. *See id.* Furthermore, she contends that macrocyclic GBCAs, which have long been FDA-approved and available as alternatives to their linear counterparts in the United States, are more stable, less prone to de-chelation, and consequently safer alternatives. *See id.* at ¶¶ 105-110. Her suit alleges that Defendants knew or should have known about this safety information and yet failed to warn the medical community and failed to alter the design of their linear products to comport with that of their macrocyclics. *See id.* at ¶¶ 168-205.

From 2007 to 2016, Plaintiff was exposed to the linear GBCAs manufactured by Defendants on at least ten separate occasions. *See id.* at ¶ 164. She was exposed to Mallinckrodt / Guerbet's OptiMARK on at least six occasions [; Bayer's Magnevist on at least one occasion; and GE's Omniscan on at least three occasions]. *See id.* She alleges that, as a direct and proximate result of her linear GBCA exposure, she developed gadolinium toxicity, evidenced by a multitude of symptoms, ailments, injuries and adverse health effects that she now suffers, to wit: skin issues, including rashes, dermatitis, burning, hyperpigmentation, rough patches, loss of elasticity, peeling and callus-like buildup; teeth issues, including darkened teeth and spots, cracking, and sensitivity; neurological issues, including brain fog and memory loss; pain in her hips, back, bones and joints; neuropathy; fatigue; muscle aches and fasciculation; and loss of smell. *See id.* at ¶¶ 165-67.

(See Docket No. 82 at 4-5; 83 at 5-6; 85 at 6-7.)

**C. Plaintiff's claims under the PLA**

Under the New Jersey Product Liability Act (PLA),

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. 2A:58C-2.

The cited statutory text establishes three causes of action under the PLA: (1) design defect, (2) manufacturing defect, or (3) warnings defect. Mendez v. Shah, 28 F. Supp. 3d 282, 296 (D.N.J. 2014) (citing Roberts v. Rich Foods, Inc., 139 N.J. 365, 375, 654 A.2d 1365 (N.J. 1995); Dziewiecki v. Bakula, 361 N.J. Super. 90, 97-98, 824 A.2d 241 (App. Div. 2003)). The standard of liability is that the product "was not reasonably fit, suitable or safe for its intended purpose." Id. (citing Cornett v. Johnson & Johnson, 414 N.J. Super. 365, 998 A.2d 543 (App. Div. 2010)). The "mere occurrence of an accident and the mere fact that someone was injured are not sufficient to demonstrate the existence of a defect." Id. (citation omitted).

**\*4** Plaintiff has asserted a warnings defect claim and a design defect claim.

**1. Count I - Failure-to-Warn**

To prove a failure-to-warn claim, a plaintiff must show: (1) the product was defective; (2) the defect existed when the product left the defendant's control; and (3) the defect caused injury to a reasonably foreseeable user. Lopez v. Borough of Sayreville, 2008 WL 2663423, at *15–16 (N.J. Super. Ct. App. Div. 2008) (citing Coffman v. Keene Corp., 133 N.J. 581, 593, 628 A.2d 710 (1993)). In a failure-to-warn case, "the duty to warn is premised on the notion that a product is defective absent an adequate warning for foreseeable users that the product can potentially cause injury." Id. (citing Clark v. Safety–Kleen Corp., 179 N.J. 318, 336, 845 A.2d 587 (2004)) (other citation omitted). The failure to provide necessary warnings constitutes a breach of duty. Id. (citation omitted).

Initially, the plaintiff must establish that the defendant had a duty to warn. Id. (citing James v. Bessemer Processing Co., 155 N.J. 279, 297–98, 714 A.2d 898 (1998)). The manufacturer of a product has a duty to warn about any risk relating to the product that it knows or ought to know, unless the risk and the way to avoid it are obvious. Id. (citing Feldman v. Lederle Labs., 97 N.J. 429, 434, 479 A.2d 374 (1984)) (other citation omitted). Once plaintiff establishes a duty to warn, she must then establish that an adequate warning was not provided. Id. (citation omitted). A manufacturer "shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction." N.J.S.A. 2A:58C-4.

An "adequate warning" is defined as:

> [O]ne that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used....

N.J.S.A. 2A:58C-4.

"Causation is a fundamental requisite for establishing any product-liability action," and a "plaintiff must demonstrate ... the defect in the product was a proximate cause of the injury." Lopez, 2008 WL 2663423 at *15–16 (citation omitted).

"Ordinarily, the jury considers issues of proximate cause." Id. (citing Shelcusky v. Garjulio, 172 N.J. 185, 206, 797 A.2d 138 (2002)).

In the context of products regulated by the FDA, such as GBCAs, issues of federal pre-emption arise. See Merck Sharp & Dohme Corp. v. Albrecht, — U.S. —, 139 S. Ct. 1668, 1672, 203 L.Ed.2d 822 (2019) (explaining that federal pre-emption "takes place when it is impossible for a private party to comply with both state and federal requirements") (quoting Mutual Pharmaceutical Co. v. Bartlett, 570 U. S. 472, 480, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013) and citing U.S. Const., Art. VI, cl. 2). Applicable here, "[t]he state law that we consider is state common law or state statutes that require drug manufacturers to warn drug consumers of the risks associated with drugs. The federal law that we consider is the statutory and regulatory scheme through which the FDA regulates the information that appears on brand-name prescription drug labels. The alleged conflict between state and federal law in this case has to do with a drug that was manufactured by [Defendants] and was administered to [Plaintiff] without a warning of certain associated risks." Id.

**\*5** "[S]tate law failure-to-warn claims are pre-empted by the Federal Food, Drug, and Cosmetic Act and related labeling regulations when there is 'clear evidence' that the FDA would not have approved the warning that state law requires." Id. at 1676 (discussing Wyeth v. Levine, 555 U.S. 555, 571, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). This "impossibility pre-emption" - i.e., federal law makes it impossible for a defendant to also comply with state law - is a "a demanding defense." Id. (discussing Wyeth, 555 U.S. at 573, 555, 129 S.Ct. 1187, finding that "absent clear evidence that the FDA would not have approved a change to [the drug's] label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements"). Despite the FDA's oversight of drug labeling, [6] "a central premise of federal drug regulation [is] that the manufacturer bears responsibility for the content of its label at all times." Id. at 1677 (citing Wyeth, 555 U.S. at 570-71, 129 S.Ct. 1187).

"[F]ederal law - the FDA's CBE ["changes being effected"] regulation - permits drug manufacturers to change a label to reflect newly acquired information if the changes add or strengthen a ... warning for which there is evidence of a causal association, without prior approval from the FDA." Merck, 139 S. Ct. at 1679 (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)) (quotations omitted). "Of course, the FDA reviews CBE submissions and can reject label changes even after the manufacturer has made them," and "manufacturers cannot propose a change that is not based on reasonable evidence." Id. (citing §§ 314.70(c)(6), (7). 314.70(c)(6)(iii)(A)). "But in the interim, the CBE regulation permits changes, so a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both." Id.

Defendants in this case argue that the impossibility pre-emption doctrine requires the dismissal of Plaintiff's failure-to-warn claims under the New Jersey PLA.[7] At this pleading stage, the Court disagrees.

**\*6** As a primary matter, Plaintiff has properly pleaded her failure-to-warn claims under the PLA. Plaintiff alleges Defendants' GBCA product labels were defective (Amend. Compl. Docket No. 62 ¶¶ 170-174), the defect existed when the products left Defendants' control (id. ¶ 170), and the defect caused injury to Plaintiff, a reasonably foreseeable user (id. ¶¶ 181-182). Plaintiff has also pleaded how Defendants' failure to provide necessary warnings constitutes a breach of their duty to warn Plaintiff of the risks related to their GBCAs of which Defendants knew or should have known. (Id. ¶¶ 174-179.)

To determine whether Plaintiff's properly pleaded failure-to-warn claims are pre-empted by the Federal Food, Drug, and Cosmetic Act and related labeling regulations, Defendants must show by clear evidence that the FDA would not have approved the warning that Plaintiff contends state law requires. Merck, 139 S. Ct. at 1676 (citing Wyeth, 555 U.S. at 571, 129 S.Ct. 1187). For Defendants to do this at the motion to dismiss stage, Defendants are constrained to point to the contents of Plaintiff's complaint, or "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit, 998 F.2d at 1196. Defendants, however, have not so constrained themselves.

Defendants assert various arguments for why the impossibility pre-emption doctrine bars Plaintiff's state law failure-to-warn claims, but as the Supreme Court

has reiterated, impossibility pre-emption is "a demanding defense" rather than a pleading requirement. Moreover, the impossibility pre-emption defense places the burden on Defendants - and not Plaintiff - to support that defense with "clear evidence," which is evidence provided by Defendants that "shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning." Merck, 139 S. Ct. at 1672.

Even though "a judge, not the jury, must decide the pre-emption question," id. at 1676, that question is not properly before the Court to answer at this time. See, e.g., Wyeth, 555 U.S. at 572-73, 129 S.Ct. 1187 (finding that after the completion of discovery and at the trial-ready stage of the case Wyeth's pre-emption defense failed for who reasons: (1) the record did not show that Wyeth supplied the FDA with an evaluation or analysis concerning the specific dangers that would have merited the warning, and (2) the record did not show that Wyeth attempted to give the kind of warning required by state law but was prohibited from doing so by the FDA) (quotations and alterations omitted).

Plaintiff's failure-to-warn claims against all Defendants [8] in Count I may proceed. [9]

### 2. Count II - Defective Design
**\*7** The elements for proving a design defect claim are essentially the same as for a failure-to-warn claim. Lopez v. Borough of Sayreville, 2008 WL 2663423, at \*15–16 (N.J. Super. Ct. App. Div. 2008) (citing Jurado v. W. Gear Works, 131 N.J. 375, 385, 619 A.2d 1312 (1993)).

In determining whether a product was defectively designed, courts apply a risk-utility analysis. Lopez, 2008 WL 2663423, at \*25 (citing Cavanaugh v. Skil Corp., 164 N.J. 1, 8, 751 A.2d 518 (2000); Lewis v. American Cyanamid Co., 155 N.J. 544, 715 A.2d 967, 980 (N.J. 1998)). "A plaintiff must prove either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Id. (citing Lewis, 715 A.2d at 980).

There are seven listed factors in the classical statement of the risk-utility analysis, [10] but the prevalent view is that unless one or more of the other factors might be relevant in a particular case, the issue upon which most claims will turn is the proof by plaintiff of a reasonable alternative design, the omission of which renders the product not reasonably safe. Cavanaugh v. Skil Corp., 164 N.J. 1, 751 A.2d 518, 522 (2000) (citation omitted). The burden is on the plaintiff to prove "the existence of an alternative design that is both practical and feasible" and "safer" than that used by the manufacturer. Lopez, 2008 WL 2663423 at \*25 (citing Lewis, 715 A.2d at 980) ("Plaintiffs who assert that the product could have been designed more safely must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible.").

Generally, the factfinder is required to perform a risk-utility analysis in order to determine whether a product is defective in its design, and in performing a risk-utility analysis, an expert opinion is ordinarily relied upon to establish a reasonable alternative design. Rocco v. New Jersey Transit Rail Operations, Inc., 330 N.J.Super. 320, 749 A.2d 868, 879 (2000). "Except in the rare case when the risk-utility analysis points to the appropriate result as a matter of law, the jury, not the court, ultimately resolves factual issues arising from a risk-utility analysis." Lewis, 715 A.2d at 979 (citing Dreier et al., *Current N.J. Products Liability and Toxic Torts Law*, § 5.2 at 29 (1998)); see also Toms v. J.C. Penney Co., Inc., 304 F. App'x 121, 124 (3d Cir. 2008) (citations omitted) ("[T]he existence of a design defect is frequently proven through the testimony of an expert who has examined the product and offers an opinion on its design.").

**\*8** Plaintiff alleges that the risks of Magnevist, Omniscan, and OptiMARK outweighed their utility, and Defendants could have and should have designed each product as a macrocyclic GBCA, which would have minimized or eliminated the risk of harm posed by Defendants' GBCAs. Plaintiff further claims that had Magnevist, Omniscan, and OptiMARK been designed without defect, Plaintiff's injuries would have been avoided. (Amend. Compl. Docket No. 62 ¶ 187-191, 193, 203.) Plaintiff has properly pleaded a viable design defect claim under the PLA.

Several Defendants argue, however, that Plaintiff's design defect claim is pre-empted by federal law, relying upon Mutual Pharmaceutical Co., Inc. v. Bartlett, 570 U.S. 472,

484, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). In Bartlett, the Supreme Court analyzed New Hampshire's product liability law and noted that New Hampshire employs the risk-utility analysis for design defect claims which requires the consideration of three factors: "the usefulness and desirability of the product to the public as a whole, whether the risk of danger could have been reduced without significantly affecting either the product's effectiveness or manufacturing cost, and the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses." Bartlett, 570 U.S. at 483, 133 S.Ct. 2466 (citation omitted). The Supreme Court observed that in "the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of danger' would require redesigning the drug: A drug's usefulness and its risk of danger are both direct results of its chemical design and, most saliently, its active ingredients." Id. (citing 21 C.F.R. § 201.66(b)(2)). As the New Hampshire courts found, because the drug at issue in Bartlett was a generic drug, redesign was not possible for two reasons: (1) the FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based, and (2) the drug's simple composition rendered it chemically incapable of being redesigned. Id. at 483-84, 133 S.Ct. 2466.

The only recourse for the plaintiff's state law design defect claim was to strengthen the drug's warning. Id. at 483, 133 S.Ct. 2466. The Supreme Court held that this was in direct conflict with federal law because federal law prevents generic drug manufacturers from changing their labels: "When federal law forbids an action that state law requires, the state law is 'without effect.' Because it is impossible for Mutual and other similarly situated manufacturers to comply with both state and federal law, New Hampshire's warning-based design-defect cause of action is pre-empted with respect to FDA-approved drugs sold in interstate commerce." Id. at 486-87, 133 S.Ct. 2466 (citations omitted). Ultimately, the Supreme Court held "that state-law design-defect claims like New Hampshire's that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling." Id. at 490, 133 S.Ct. 2466.

To support its argument that Plaintiff's design defect claim is pre-empted by federal law, Defendants seize on the Bartlett Court's statement that a state law which requires a manufacturer to alter the drug's composition is in conflict with federal law. Defendants argue that Plaintiff's contention that they should stop selling their GBCA products altogether because they should have been designed as a macrocyclic instead of with a linear structure conflicts with federal law, which prohibits a drug manufacturer from changing the drug's composition once it has been approved by the FDA.

*9  Bartlett did not announce such a cut-and-dry pre-emption rule. The Supreme Court stated, "[A]s we have tried to make clear, the duty to ensure that one's products are not 'unreasonably dangerous' imposed by New Hampshire's design-defect cause of action, involves a duty to make one of several changes. In cases where it is impossible—in fact or by law—to alter a product's design (and thus to increase the product's 'usefulness' or decrease its 'risk of danger'), the duty to render a product 'reasonably safe' boils down to a duty to ensure 'the presence and efficacy of a warning to avoid an unreasonable risk of harm from hidden dangers or from foreseeable uses.' " Bartlett, 570 U.S. at 491-92, 133 S.Ct. 2466. In this case, unlike the drug at issue in Bartlett, Plaintiff's design defect claim does not confer a duty on Defendants to design their GBCAs in a different way that would be impossible to achieve. Plaintiff claims that a safer design of a linear GBCA is a macrocyclic structure, such as ProHance, Gadovist, and Dotarem, which "pose a lower risk of transmetallation compared to linear GBCAs because of stronger binding and chemical stability under physiologic conditions." (Amend. Compl. Docket No. 62 ¶ 193.)

Simply because Plaintiff claims that Defendants should redesign their GBCAs to make them safer does not mean that Plaintiff is demanding that Defendants cease making their GBCAs at all. By way of example, where a refrigerator leaks water and a plaintiff claims a design defect is the culprit, the plaintiff's claim that a better design would fix the problem necessarily requires a change to the composition of the refrigerator such that the manufacturer, if it implemented such design change, would no longer sell its original product. In that sense, the refrigerator manufacturer would have ceased selling its originally designed refrigerators altogether. If Defendants' interpretation of Bartlett were to stand, then all design defect claims would be rendered impossible and therefore not actionable because any alteration of a product's

design changes its original structure, and technically results in a manufacturer no longer making that original product.

In Bartlett, it was impossible for the drug manufacturer to redesign the drug's composition because it was a generic drug required to identically match the brand drug. Here, Plaintiff has claimed that a safer redesign of Defendants' GBCAs is possible. Accepting that premise as true as it must, the Court cannot find at the motion to dismiss stage that Plaintiff's design defect claims are pre-empted by federal law.

### 3. Count III - breach of express warranty

To state a claim for breach of express warranty under New Jersey law, [11] a plaintiff must allege the following three elements: "(1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." Snyder v. Farnam Companies, Inc., 792 F. Supp. 2d 712, 721 (D.N.J. 2011).

"A statement can amount to a warranty, even if unintended to be such by the seller, if it could fairly be understood ... to constitute an affirmation or representation that the [product] possess[es] a certain quality or capacity relating to future performance." Volin v. General Electric Company, 189 F. Supp. 3d 411, 420 (D.N.J. 2016) (citations omitted). "[S]tatements that are nothing more than mere puffery are not considered specific enough to create an express warranty." Snyder, 792 F. Supp. 2d at 721.

**\*10** "Under New Jersey law, a representation is presumed to be part of the basis of the bargain 'once the buyer has become aware of the affirmation of fact or promise' and can be rebutted by 'clear affirmative proof that the buyer knew that the affirmation of fact or promise was untrue.' " Volin, 189 F. Supp. 3d at 420 (citing Viking Yacht Co. v. Composites One LLC, 496 F. Supp. 2d 462, 469 (D.N.J. 2007) (quoting Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 825 (3d Cir. 1999) (internal quotation omitted)).

Plaintiff claims that the product labeling for Magnevist, Omniscan, and OptiMARK was identical in all material respects, and that they represented: a. Linear GBCAs are generally safe for use; b. Linear GBCAs are not any less safe or stable than macrocyclic GBCAs; c. GBCAs pose a risk of NSF only to patients with kidney conditions; d. GBCAs are contraindicated only in patients with chronic, severe kidney disease, acute kidney injury, or a history of severe hypersensitivity; and e. Any retention of gadolinium in non-kidney patients is harmless. (Amend. Compl. Docket No. 62 ¶ 209.) Plaintiff further claims that "Defendants breached said express warranties by delivering to Plaintiff and her prescribing physicians linear GBCAs that did not confirm to and/or meet those warranties," and "[e]ach of Defendant's breach of the aforesaid express warranties was direct and proximate cause of Plaintiff's injuries and damages as set forth herein." (Id. ¶¶ 210-11.) Plaintiff has properly pleaded her breach of express warranty claims against Defendants. [12]

### 4. Punitive Damages

Defendants argue that Plaintiff's request for punitive damages must be stricken because New Jersey's PLA prohibits the award of punitive damages for FDA-approved drugs, and such an award of punitive damages is otherwise pre-empted by federal law. Plaintiff argues that her claim for punitive damages may proceed to discovery because such a claim is not pre-empted, and she is entitled to offer proof of Defendants' misrepresentations to the FDA to support punitive damages for her failure-to-warn and design defect claims. The PLA provides:

> Punitive damages shall not be awarded if a drug or device or food or food additive which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. § 301 et seq. or the "Public Health Service Act," 58 Stat. 682, 42 U.S.C. § 201 et seq. and was approved or licensed; or is generally recognized as safe and effective pursuant to conditions established by the federal Food and Drug Administration and applicable regulations, including packaging and labeling regulations. However, where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question, punitive damages may be awarded.

**\*11** N.J.S.A. 2A:58C-5(c).

To support their pre-emption argument, Defendants rely upon a New Jersey Appellate Division case, McDarby v. Merck & Co., Inc., 401 N.J.Super. 10, 949 A.2d 223, 275 (Ct.

App. Div. 2008), which in turn relies upon a United States Supreme Court case, Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). In Buckman, the plaintiffs alleged that a drug manufacturer made fraudulent representations to the FDA as to the intended use of defendant's bone screws and that, as a result, the devices were improperly given market clearance and were subsequently used to the plaintiffs' detriment. Buckman, 531 U.S. at 347, 121 S.Ct. 1012. The Supreme Court held that the plaintiffs' state-law fraud-on-the-FDA claims conflicted with, and were impliedly pre-empted by, federal law. Id. at 348, 121 S.Ct. 1012. The Supreme Court explained, "The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law." Id.

In McDarby, the New Jersey Appellate Division noted that the punitive damages provision of New Jersey's PLA was "designed to effectuate the State's interest in punishing unlawful conduct," and "[i]n that context, a plaintiff bringing a product liability action acts in a fashion akin to a private attorney general, since any damages awarded on his punitive damage claim do not compensate him for his injury, but instead vindicate societal interests. And in this context, the statutory focus, like that in Buckman, is narrowly drawn upon a defendant's act of knowingly withholding from or misrepresenting to the FDA information material to the harm alleged. This limited claim for punitive damages [ ] focused upon deterring a manufacturer's knowingly inadequate response to FDA informational requirements...." McDarby, 949 A.2d at 275 (citations omitted).

The McDarby court concluded, "Because the punitive damages provisions of N.J.S.A. 2A:58C–5c impinge upon federal statute and regulation to the same extent that was recognized in Buckman, 531 U.S. at 349, 121 S.Ct. 1012, we find the principles of implied pre-emption applied by the Court in Buckman to be applicable here." Id. at 276. Thus, the McDarby court reversed the trial court's award of punitive damages on the plaintiff's claim that if Merk

had furnished the FDA with the complete meta-analysis, the FDA would have responded in a different fashion to Merck's supplemental new drug application. Id.

Defendants argue that Plaintiff's claim for punitive damages based on Defendants' alleged misrepresentations to the FDA are pre-empted under McDarby and Buckman. Plaintiff counters that Buckman does not stand for the proposition that Plaintiff is prohibited from offering proof of, as opposed to asserting a claim regarding, a drug company's misrepresentations to the FDA to support her state law failure-to-warn and design defect claims.

**\*12** Although it appears to this Court that the holding in McDarby effectively invalidated the fraud-on-the-FDA punitive damages provision of N.J.S.A. 2A:58C-5(c) by finding it is pre-empted by federal law, the New Jersey Supreme Court did not explicitly consider that finding, instead finding that its grant of certification on the issue was improvidently granted based on the United States Supreme Court's decision in Wyeth. See McDarby v. Merck & Co., Inc., 200 N.J. 267, 979 A.2d 766 (2009) ("This matter having been duly considered and the Court having determined that in light of the decision of the United States Supreme Court in Wyeth v. Levine, 555 U.S. 555, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009), certification was improvidently granted.").

The United States Supreme Court in Wyeth stated, "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history." Wyeth, 555 U.S. 555 at 574, 129 S.Ct. 1187, 173 L.Ed.2d 51. The Supreme Court further explained,

> In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation. The FDA has limited resources to monitor the 11,000 drugs on the market, and manufacturers have superior access to information about their drugs, especially in the postmarketing

phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times. Thus, the FDA long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation.

📑 Id. at 578-79, 129 S.Ct. 1187.

Keeping in mind these consideration of the Supreme Court regarding the permissible co-existence of FDA regulations and state court tort law, this Court declines to hold at this stage in the case that Plaintiff's request for punitive damages under New Jersey's PLA is pre-empted by federal law. For the same reasons as the Court's analysis of the impossibility pre-emption doctrine regarding Plaintiff's failure-to-warn claims, the Court will not strike Plaintiff's request for punitive damages at this time.

**5. Statute of limitations**

Several Defendants argue that Plaintiff's claims are barred by the two-year statute of limitations because Plaintiff filed her complaint on April 24, 2019, but her claims accrued in January 2015. Defendants contend that a "GoFundMe" page set up by Plaintiff's husband on January 26, 2015, which requested financial assistance for Plaintiff's chelation

therapy, shows that Plaintiff was aware of her alleged injuries due to Defendants' GBCAs at that time, which is well outside the two-year statute of limitations.

Plaintiff raises several arguments in opposition. The Court agrees with all of them: (1) Plaintiff pleads in her amended complaint, which the Court accepts as true, that she "was reasonably unaware, and had no reasonable way of knowing, that Plaintiff's injuries described herein were caused by Defendants' conduct until at the very earliest, Summer 2018" (Amend. Compl. Docket No. 62 at 39-40 "TOLLING: FRAUDULENT CONCEALMENT, DISCOVERY RULE, AND EQUITABLE ESTOPPEL"); (2) at the motion to dismiss stage, the application of the statute of limitations must be apparent on the face of complaint, [13] and that is not the case here; and (3) Plaintiff's husband's awareness of Plaintiff's sickness and the request to friends and family for financial assistance with various treatments does not plainly translate into Plaintiff's awareness that Defendants' alleged violations of the PLA and their express warranties caused her injuries.

  **[13]**  The Court will not dismiss Plaintiff's claims based on Defendants' statute of limitations defense.

### III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's claims pursuant to federal pre-emption doctrines will be denied without prejudice. Plaintiff's counts under the New Jersey PLA and for breach of express warranty, as well as her request for punitive damages, may proceed to discovery.

An appropriate Order will be entered.

**All Citations**

--- F.Supp.3d ----, 2020 WL 3496917

**Footnotes**

1    According to Plaintiff's amended complaint, Defendant Mallinckrodt Inc. developed, invented, manufactured, tested, marketed, advertised, and sold a linear GBCA named OptiMARK before it sold its contrast media portfolio, including OptiMARK, to Guerbet LLC in 2015. Defendant Guerbet LLC manufactured, tested,

marketed, advertised and sold OptiMARK before it removed OptiMARK from the United States market in 2018. In August 2016, OptiMARK's product label indicated that it was manufactured and distributed by Defendant Liebel-Flarsheim Company LLC. Defendant AmerisourceBergen has been engaged in the distribution, supply, marketing, and sale of OptiMARK in the State of New Jersey.

2    Defendants moved to dismiss Plaintiff's original complaint. In response, Plaintiff filed an amended complaint. The motions to dismiss Plaintiff's original complaint are therefore moot. Pending are Defendants' motions to dismiss Plaintiff's amended complaint.

3    For example, Plaintiff pleads: "Upon information and belief, the Defendants have or may have failed to comply with all federal standards and requirements applicable to the sale of GBCAs including, but not limited to, violations of various sections and subsections of the United States Code and the Code of Federal Regulations." (Pl. Compl., Docket No. 1 at 38, ¶ 126.) Plaintiff further claims that "notwithstanding the overwhelming evidence of causal association between GBCAs and NSF [renal impairment called nephrogenic systemic fibrosis], the FDA [Food and Drug Administration] and the GBCA industry have cast the issue of retention as separate from the medical community's experience with NSF, coming short of acknowledging any untoward health effects from gadolinium retention in non-renal patients," and "to date, the FDA and the GBCA industry have refused to acknowledge that GBCAs can cause NSF in renal patients but also can cause, in non-renal patients, a variety of NSF-like injuries and symptoms along a continuum, ranging from minor to severe." (Id. at 36, ¶¶ 120-21.)

4    Separate from the well-pleaded complaint rule, another basis for federal jurisdiction is be complete pre-emption. See ▯ Ben. Nat'l Bank v. Anderson, 539 U.S. 1, 8, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) (explaining that there is an exception to the well-pleaded complaint rule "when a federal statute wholly displaces the state-law cause of action through complete pre-emption," and this exception exists because "[w]hen the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law"). However, in contrast to complete pre-emption, the defenses of impossibility pre-emption and other pre-emption defenses may not serve as the basis for federal jurisdiction at the time of removal. See ▯ Caterpillar Inc. v. Williams, 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (explaining that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue). Regardless of which type of pre-emption doctrine may possibly apply to Plaintiff's claims, as discussed below, the Court cannot determine at this stage in the case whether Plaintiff's PLA claims are pre-empted by federal law - either completely or through a pre-emption defense - and therefore federal pre-emption has not been established to support subject matter jurisdiction under that principle at this time.

5    Because there is no diversity of citizenship between Plaintiff and Defendants, subject matter jurisdiction under ▯ 28 U.S.C. § 1332(a) is unavailable.

6    Prospective drug manufacturers work with the FDA to develop an appropriate label when they apply for FDA approval of a new drug. ▯ 21 U.S.C. §§ 355(a), ▯ 355(b), ▯ 355(d)(7); 21 C.F.R. § 314.125(b)(6). But FDA regulations also acknowledge that information about drug safety may change over time, and that new information may require changes to the drug label. Id. §§ 314.80(c), 314.81(b)(2)(i). Drug manufacturers generally seek advance permission from the FDA to make substantive changes to their drug labels. However, an FDA regulation called the "changes being effected" or "CBE" regulation permits drug manufacturers to change a label without prior FDA approval if the change is designed to "add or strengthen a ... warning" where there is "newly acquired information" about the "evidence of a causal association" between the drug and a risk of harm. 21 C.F.R. § 314.70(c)(6)(iii)(A).

7    Several Defendants also argue that Plaintiff's claims against them fail to satisfy the pleading standards of Fed. R. Civ. P. 8 and ▯ Twombly/ ▯ Iqbal, particularly because she often refers to "Defendants" collectively. Although it is often the case that pleading claims against defendants as a group without identifying who

did what is fatal to the viability of those claims, see, e.g., 📙 Twombly, 550 U.S. at 558, 127 S.Ct. 1955 (insisting "upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" to an "inevitably costly and protracted discovery phase"), Plaintiff's amended complaint does not meet that fate. Plaintiff's amended complaint specifies which Defendant is responsible for which GBCA and when Plaintiff was administered each GBCA. Because the product labeling (and thus allegations regarding Defendants' failure to warn of the risks of their GBCAs), the product design (and thus allegations concerning design defects), and the express warranties are all the same for each GBCA, Plaintiff's collective reference to "Defendants" is permissible, and indeed preferable, so that she avoids veering into Rule 12(f) territory if she were to restate every collective allegation specific to each Defendant. See Fed. R. Civ. P. 12(f) (providing that the court on its own or on the motion of defendant the court may strike redundant matter). Plaintiff's amended complaint does not run afoul of proper pleading standards.

8   In addition to joining in on the arguments made by Mallinckrodt, AmerisourceBergen argues that it is entitled to dismissal of Plaintiff's product liability claims because it is a "product seller" within the meaning of N.J.S.A. 2A:58C-8 and it meets the requirements for immunity enumerated by N.J.S.A. 2A:58C-9. "While those in the wholesale and retail chain of distribution may potentially be liable for the foreseeable injuries proximately caused by defective products intended for ultimate sale to the public, they may be relieved from liability where they comply with the exculpatory provisions of the Products Liability Act, N.J.S.A. 2A:58C–9." D.J.L. v. Armour Pharmaceutical Co., 307 N.J.Super. 61, 704 A.2d 104, 117 n.25 (1997). To that end, AmerisourceBergen provides an affidavit to demonstrate the exculpatory provisions by "certifying the correct identity of the manufacturer of the product" at issue, demonstrate that it has not "exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product which caused the injury," demonstrate that it neither "knew [nor] should have known of the defect in the product which caused the injury," and demonstrate that it did not "create the defect in the product that caused the injury." Because AmerisourceBergen has moved to dismiss Plaintiff's claims pursuant to Rule 12(b)(6), and AmerisourceBergen has not cited to any law that would permit this Court to consider its affidavit in the context of a Rule 12(b)(6) motion, the Court will deny AmerisourceBergen's motion. The Court additionally notes that AmerisourceBergen's status under the PLA does not affect Plaintiff's breach of express warranty claim against AmerisourceBergen, which claim is discussed below in Section II C. 3.

9   Several Defendants also contend that the learned intermediary doctrine bars Plaintiff's failure-to-warn claims. The doctrine holds that the prescribing physician - as a learned intermediary - generally is in the best position to advise the patient of the benefits and risks of taking a particular drug to treat a medical condition. In re Accutane Litigation, 235 N.J. 229, 194 A.3d 503, 524 (2018) (citation omitted). In the case of prescription drugs, the PLA codifies the learned intermediary doctrine, and a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities. Id. (citing N.J.S.A. 2A:58C-2) (other citations omitted). Like Defendants' pre-emption defense, the resolution of whether the doctrine is applicable in this case, and if it is, whether it defeats Plaintiff's failure-to-warn claim, cannot be resolved through the instant motion to dismiss. See Hindermyer v. B. Braun Medical Inc., 419 F.Supp.3d 809, 828 n.4 (D.N.J. 2019) ("Determining whether a prescribing physician was given sufficient warning in connection with a defendant's medical product pursuant to the learned intermediary doctrine raises factual questions that generally cannot be resolved on an undeveloped record.").

10   The seven listed factors in the classical statement of the risk-utility analysis are:

   (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

   (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

   (3) The availability of a substitute product which would meet the same need and not be as unsafe.

   (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

   (5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. (Ordinarily, a consideration only for the court.)

Grier v. Cochran Western Corp., 308 N.J.Super. 308, 705 A.2d 1262, 1269 n.4 (1998).

11    Under the New Jersey U.C.C., N.J.S.A. 12A:2-313, an "express warranty" is:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. 12A:2-313.

12    Several Defendants argue that Plaintiff's breach of express warranty claims against them are barred because she did not provide them with reasonable pre-suit notice of those claims. The Court will not dismiss Plaintiff's breach of express warranty claims on this basis. See Devane v. Church & Dwight Co., Inc., 2020 WL 998946, at *7 (D.N.J. 2020) (citing Taylor v. JVC Americas Corp., 2008 WL 2242451, at *6 (D.N.J. 2008) (quoting

Strzakowlski v. General Motors Corp., 2005 WL 2001912, *3 (D.N.J. 2005) ("[E]ven if notice to [Defendant] is necessary under section 2–607(3)(a), the filing of Plaintiff's Complaint satisfied this requirement," and "whether this notice-by-suit was provided within a reasonable time is a question for the fact finder. Therefore, the timing question is beyond the scope of a motion to dismiss for failure to state a claim.")).

13    See Stephens v. Clash, 796 F.3d 281, 288 (3d Cir. 2015) (citations and quotations omitted) ("A statute of limitations defense is an affirmative defense that a defendant must usually plead in his answer. Nevertheless, we permit a limitations defense to be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. Thus, a district court may grant a motion under Rule 12(b)(6) raising a limitations defense if the face of the complaint demonstrates that the plaintiff's claims are untimely. But federal courts may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense. Thus, if the pleading does not reveal when the limitations period began to run, then the statute of limitations cannot justify Rule 12 dismissal.").

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 29

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1019794

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 318 of 751
PageID: 11684

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re 100% Grated Parmesan Cheese Marketing and Sales
Practices Litigation, N.D.Ill., August 24, 2017

2016 WL 1019794
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Derek GUBALA, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,

v.

CVS PHARMACY, INC., Defendant.

No. 14 C 9039
|
Signed 03/15/2016

**Attorneys and Law Firms**

Richard Lane Miller, II, Gregory Wood Jones, Michael Loren
Silverman, Joseph J. Siprut, Siprut, PC, Chicago, IL, Sharon
S. Almonrode, The Miller Law Firm, P.C., Rochester, MI,
Nick Suciu, III, Barbat, Mansour & Suciu PLLC, Detroit, MI,
for Plaintiff.

Zachary J. Watters, Michael Best & Friedrich LLP, Chicago,
IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Honorable Thomas M. Durkin, United States District Judge

**Table of Contents**

I. Introduction

II. Background
A. The Amended Complaint

B. Cvs's Motion To Dismiss

III. Discussion
A. Federal Preemption Principles

B. Nutrition Facts Disclosures ("Back Panel")

1. Section 101.9(c)(7)(i) and (Ii)—protein Content
Versus Protein Quality

2. Section 101.9(g)(2)—composite of 12 Subsamples

3. Section 101.9(g)(4)(ii)—80% Safe Harbor Rule

C. Front Label Disclosures

1. Product Name—"whey Protein Powder"

2. Nutrient Content Claim—"26 Grams of
Highquality Protein"

D. Ingredients Disclosures

1. Asparagine and Hydroxyproline

2. Glutamine and Bcaas L-leucine, Lisoleucine, and
L-valine

E. Primary Jurisdiction

F. Failure To State Valid State Law Claims

1. Deceptive Trade Practices

2. Unjust Enrichment

3. Breach of Express Warranty

III. Conclusion

**III. Conclusion**
*1 Plaintiff Derek Gubala filed this putative consumer class
action lawsuit on November 11, 2014, alleging that Defendant
CVS Pharmacy, Inc. ("CVS") makes false and misleading
claims on the label of its protein powder supplement "WHEY
PROTEIN POWDER NATURALLY AND ARTIFICIALLY
FLAVORED DRINK MIX" (hereinafter the "Product"). CVS
filed its first motion to dismiss on January 15, 2015, R.
16, which the Court granted without prejudice on June 16,
2015, R. 32 (Gubala v. CVS, Inc., 2015 WL 3777627 (N.D.
Ill. June 16, 2015)). Thereafter, Plaintiff filed an amended
complaint. R. 33. Currently before the Court is CVS's second
motion to dismiss ("Motion"), which addresses Plaintiff's new
allegations in the amended complaint. R. 40. For the reasons
that follow, the Court now denies CVS's Motion.

**II.**

**Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)**
2016 WL 1019794

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 319 of 751
PageID: 11685

## Background

### A. The Amended Complaint[1]

Plaintiff alleges that CVS makes false statements regarding the Product's (1) total protein content in grams, (2) protein daily value percentage ("DV%"), and (3) amino acids under "Ingredients" on the back label. Plaintiff also alleges that the product name "Whey Protein Powder" and representation "26 grams of high-quality protein," appearing on the Product's front label, are misleading.[2] According to Plaintiff, the only protein source that is an "actual protein" is whey protein.[3] Plaintiff alleges the Product contains only 21.8 grams of whey protein, and he attaches a copy of a laboratory report to support that allegation. The remaining 4.2 grams of protein CVS advertises on the label is not made up of whey protein but free form amino acids and other non-protein ingredients, which are cheaper and less nutritionally beneficial than whey protein. Plaintiff alleges that this difference is significant because "[s]everal studies show that free-form amino acids are not absorbed as effectively as whole protein" and therefore "do not provide the same beneficial effects as whole protein." R. 33, ¶ 25 (footnote omitted).

How these free form amino acids and other non-protein ingredients come to be included in the total protein count disclosed on the Product's label is explained in somewhat greater detail in the amended complaint. *See* R. 33, ¶¶13-14. Essentially, however, the parties appear to agree that, pursuant to 21 C.F.R. § 101.9(c)(7), the United States Food and Drug Administration ("FDA") generally allows the protein content in food products to be calculated based on a methodology that measures the nitrogen content of the food:

> **\*2** Protein content may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International"..., except when the official procedure for a specific food requires another factor.

The Court will refer to the FDA-approved methodology for determining protein content as the nitrogen content method. The nitrogen content method allows a manufacturer to boost the declared protein content in a food product by adding nitrogen-containing ingredients that are not actually proteins, such as free form amino acids. Plaintiff refers to this practice as "protein-spiking," and it has sparked the filing of numerous

putative consumer class action lawsuits like the present one,[4] as well as commentary from within the food industry.[5]

Plaintiff's claims in the amended complaint are based on state law: Count I alleges a claim for unfair and deceptive trade practices under the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*; Count II alleges a claim for unjust enrichment; and Count III alleges a claim for breach of express warranty. The amended complaint seeks certification of a national class of all persons in the United States who purchased the Product, as well as a subclass of Illinois purchasers. Jurisdiction in this Court is premised on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A).[6]

### B. CVS'S MOTION TO DISMISS

**\*3** The original complaint was premised on the same underlying alleged misconduct as the amended complaint —that the Product's label suggests that the entire protein content in the Product is made up of whey protein when, in fact, that is not the case. The Court dismissed the original complaint because Plaintiff conceded that CVS was permitted by federal law to calculate the protein content of the Product using the nitrogen content method. Therefore, the Court held, Plaintiff's state law claims seeking to recover for deception that allegedly flows from the permitted calculation were preempted by federal law. In the current Motion, CVS argues that Plaintiff's re-pled state law claims also are preempted. In addition, CVS raises various other arguments it previously made in moving to dismiss the original complaint. The Court will address each of CVS's arguments in turn.

## III.

## Discussion

### A. Federal Preemption Principles

CVS's arguments for dismissal based on federal preemption are properly addressed under Fed. R. Civ. P. 12(b)(6). *See Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 840-41 (7th Cir. 2015) (citing *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 425 (7th Cir. 2011) (holding that if plaintiff's state law claim is preempted then dismissal under Rule 12(b) (6) is the proper outcome rather than dismissal for want of federal jurisdiction)). The Seventh Circuit has "treated federal preemption as an affirmative defense upon which the defendant bears the burden of proof, and presumably the

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 320 of 751
PageID: 11686

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

burden of persuasion, even if no additional facts must be proven and the issue is only a question of law." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010). Moreover, the Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action," particularly in cases involving the historic police powers of the States to regulate health and safety. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

CVS argues that Plaintiff's state law claims are preempted by the express labeling requirements of the Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"). The FDCA requires most foods to bear nutrition labeling and regulates nutrient content claims and certain health messages on food labels. Section 343(q)(1)(D) requires food labels to bear nutrition information that provides, among other things, the amount of total protein contained in each serving size or other unit of measure. 21 U.S.C. § 343(q)(1)(D). Section 343(r) states that if a food label makes an express or implied characterization about the level of a nutrient in a product it must comply with certain specified requirements. 21 U.S.C. § 343(r). Section 343(a) declares generally that a food is misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1).

CVS's Motion is premised on § 343-1, which is an express preemption provision that prohibits the establishment of any labeling requirement falling within the scope of the FDCA provisions enumerated therein unless the labeling requirement is identical to the requirements of the enumerated provisions. 21 U.S.C. § 343-1. As Plaintiff points out, 21 U.S.C. § 343(a)(1), which contains the general "false or misleading in any particular" language, is not one of the provisions identified in 21 U.S.C. § 343-1 as having preemptive effect. Section 343(q) and § 343(r), however, are included among the enumerated provisions to which § 343-1 expressly gives preemptive effect. The labeling requirements of those sections are further delineated in 21 C.F.R. § 101.9 and other parts of the implementing regulations of the FDA, which also have preemptive effect. *See Fidelity Fed. Savs. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

**\*4** The preemptive effect of § 343-1 "reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005). A cause of action under

Illinois law for false or misleading product labeling is preempted, therefore, whether based on an Illinois statute, regulation, or common law duty, if it seeks to impose labeling or other requirements that are not identical to the requirements imposed by § 343(q), § 343(r), and the implementing regulations for those provisions. The FDA has said that "'[n]ot identical to'...means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that: (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act; or (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the act." 21 C.F.R. § 100.1(c)(4). Claims under state law that parallel the FDCA's requirements, however, are *not* preempted. *Turek*, 662 F.3d at 426; *see Beverages: Bottled Water*, 60 Fed. Reg. 57076-01, 57120, 1995 WL 668939 (FDA Nov. 13, 1995) ("[I]f the State requirement does the same thing that the Federal law does,...then it is effectively the same requirement as the Federal requirement....[T]he only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements on matters that are covered by section [343-1] of the act.").[7] "The state thus can impose the identical requirement or requirements, and by doing so be enabled, because of the narrow scope of the preemption provision in the [NLEA], to enforce a violation of the Act as a violation of state law. This is important because the [FDCA] does not create a private right of action." *Turek,* 662 F.3d at 426 (citations omitted).

CVS argues that the Court must "ignore" any allegation by Plaintiff "that CVS is violating or has violated the FDCA." R. 41 at 4 n.7. That statement, however, is incorrect. Instead, "the conduct on which [Plaintiff's] claim[s] [are] premised *must* violate the FDCA if [his] claim[s] [are] to escape express preemption." *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009) (emphasis in original). At the same time, Plaintiff's claims also must be premised on "the type of conduct that would traditionally give rise to liability under state law— and that would give rise to liability under state law even if the FDCA had never been enacted." *Id.* Whether Plaintiff has adequately alleged a violation of Illinois law is addressed later in this opinion. For purposes of federal preemption, however, the issue to be decided is whether Plaintiff alleges a violation of the FDCA.

**B. Nutrition Facts Disclosures ("Back Panel")**

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 321 of 751
PageID: 11687

The original complaint did not allege that the protein content disclosed on the Product label was inaccurate using the nitrogen content method in 21 C.F.R. § 101.9(c)(7). Further, Plaintiff conceded that § 101.9(c)(7) permitted CVS to use that method to calculate the protein content of the Product. *See* R. 26 at 14-15. Nevertheless, Plaintiff contended that the Product label was misleading because it failed to disclose that the protein content in the Product included non-protein amino acids. In its ruling on CVS's first motion to dismiss, the Court concluded that Plaintiff's claims would require CVS to differentiate in some manner on the Product label between whey protein and non-protein ingredients, which would have the effect of imposing a labeling requirement different from what federal law imposed on CVS. As a result, the Court held that Plaintiff's deceptive labeling claims were preempted by the federal regulations, which allow CVS to do exactly what it does (include non-protein ingredients in the total protein calculation). *See* R. 32 at 10.

The amended complaint differs from the original complaint in that it contains additional allegations regarding the requirements of the federal regulations. The primary new allegation is that federal regulations require CVS to calculate and disclose the *quality* of the protein in the Product, not just the total amount of protein in the Product. Plaintiff alleges that the quality of the protein must be calculated according to a methodology set out in 21 C.F.R. § 101.9(c)(7)(ii) called the Protein Digestibility Amino Acid Correct Score or "PDCAAS."

**\*5** CVS does not say in its Motion whether it agrees with or contests Plaintiff's allegation that it is required to calculate and disclose the quality of the protein in the Product using the PDCAAS. Instead, CVS proceeds as if it is unnecessary to address that issue, arguing that even if that allegation is true, Plaintiff's new claims based on the PDCAAS are preempted by two provisions of the implementing regulations found in 21 C.F.R. § 101.9(g). Those provisions address the method (21 C.F.R. § 101.9(g)(2)) and standard (21 C.F.R. § 101.9(g)(4)) by which the FDA measures a food manufacturer's compliance with federal labeling requirements. As an initial matter, it seems inaccurate to say that CVS's arguments are preemption arguments. Both Plaintiff's new allegations and CVS's reasons for dismissal of those new allegations are based on FDA regulations, and it would be incorrect to say that one federal regulation can preempt another. In reality, CVS's argument is that the regulatory provisions on which it relies substantively preclude a claim from being asserted under the regulatory provisions on which Plaintiff relies. To

properly evaluate that argument, the Court must consider the regulations as a whole, and how each of the provisions at issue fit into the overall scheme. To that end, the Court first will outline the regulatory provisions on which Plaintiff's new allegations regarding the PDCAAS are based, and then address the two provisions on which CVS relies for dismissal of Plaintiff's claims.

### 1. Section 101.9(c)(7)(i) and (Ii)—Proteincontent Versus Protein Quality

The primary regulation that governs nutritional labeling of food is 21 C.F.R. § 101.9. As provided in § 101.9(c), the declaration of nutritional information on the label of a food must contain information about the level of certain specified nutrients, one of which is protein. *See* 21 C.F.R. § 101.9(c)(7). The label's declaration regarding protein must include "[a] statement of the number of grams of protein in a serving[.]"[8] *Id.* The number of grams of protein per serving is referred to as the protein content. *Id.* As the Court noted earlier, protein content may be calculated using the nitrogen content method, as set forth § 101.9(c)(7).

In addition to the concept of protein content, § 101.9(c)(7) introduces the concept of "protein quality value." The regulatory language is somewhat confusing, but based upon the Court's reading, the language appears to relate "protein quality value" to the term "protein digestibility-corrected amino acid score," which in turn appears to be a measurement used to calculate something called the "corrected amount of protein per serving." The "corrected amount of protein" is determined by a procedure set out in § 101.9(c)(7)(ii), which states:

> The "corrected amount of protein (gram) per serving"...is equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for protein digestibility....The protein digestibility-corrected amino acid score shall be determined by methods given in..."Protein Quality Evaluation, Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," Rome, 1990, except that when official AOAC procedures described in section (c)(7) of this paragraph require a specific food factor other than 6.25, that specific factor shall be used....

Pursuant to § 101.9(c)(7)(ii) in conjunction with § 101.9(c)(7), it appears that the quality of the protein in a product

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 322 of 751
PageID: 11688
Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1019794

is measured by multiplying the protein content (determined using the nitrogen content method) by the PDCAAS, to arrive at a "corrected amount of protein (gram) per serving." Once the corrected amount of protein (gram) per serving is determined using § 101.9(c)(7)(ii), that number is "calculated as a percentage of the Daily Reference Value (DRV)...and expressed as Percent of Daily Value." 21 C.F.R. § 101.9(c)(7). In other words, the corrected amount of protein is expressed not as a content score or measurement in weight (grams), but as a percentage of the daily reference value (%DV).[9]

**\*6** Although it is not immediately obvious from reading the regulations, it appears that in most cases a %DV for protein is not required to be placed on the food label. For instance, under § 101.9(c)(7), if the "protein quality value" is "less than 20 expressed as a percent," then the label must contain "adjacent to the declaration of protein content by weight" (*i.e.*, the uncorrected protein content score) either (1) the statement "not a significant source of protein"; or (2) a "listing...of the corrected amount of protein...expressed as Percent of Daily Value." 21 C.F.R. § 101.9(c)(7); *see Food Labeling: Revision of the Nutrition and Supplement Facts Labels (hereinafter "FDA 2014 Proposed Revisions"), 79 Fed. Reg. 11880-01, 11912, 2014 WL 794562 (Mar. 2014)* ("FDA regulations require the declaration of the amount of protein by weight, and provide for voluntary declaration of the percent DV for protein on the Nutrition Facts label (§ 101.9(c)(7)(i))."). FDA guidelines confirm that the regulations do not require that a %DV for protein be placed on the label of a food product except in limited circumstances. *See* FDA Food Labeling Guide, 2008 WL 2155725 at \*26 (April 2008) (Section VII, Question No. N22), *available at http://www.fda.gov/Food/GuidanceRegulationGuidanceDocuments/RegulatoryInformation/LabelingNutrition/ucm064894.htm*.[10] FDA guidelines state that the reasons for not requiring a protein %DV are: (1) current scientific evidence that protein intake is not a public health concern for adults and children over 4 years of age; and (2) the costs associated with a determination of the PDCAAS. *Id.* The salient point, however, is that when a %DV is disclosed, the regulations require that it be calculated using the *corrected protein content*, which means the protein content (calculated using the nitrogen content method) *corrected* by the PDCAAS for protein digestibility (protein quality). *Id.* at \*26-27 (Section VII, Question No. N23). ("When...the % DV is calculated...the actual amount of protein in grams per serving [is corrected] by multiplying the amount by its amino acid score corrected for protein digestibility....").

Plaintiff's claims in the amended complaint are based on the new allegation that CVS was required to use the corrected protein content to calculate a protein %DV for the Product. The reason this was required and not optional, Plaintiff alleges, is that the label makes a protein claim for the Product. The regulatory basis for this allegation is § 101.9(c)(7)(i):

> A statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as Percent of Daily Value, may be placed on the label, except that such a statement *shall* be given *if* a protein claim is made for the product....

21 C.R.F. § 101.9(c)(7)(i) (emphasis added). Plaintiff's new allegation thus raises the question of what is a "protein claim." For the answer, the Court looks to 21 C.F.R. § 101.13.

Section 101.13 sets forth the general rules applicable to "nutrient content claims." It defines a nutrient content claim as "[a] claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36."[11] 21 C.F.R. § 101.13(b). The label declares in the Nutrient Fact panel on the *back* label that the Product contains 26 grams of protein. This type of statement falls in the category of express nutrient content claims. *See id.* (defining an expressed nutrient content claim as "any direct statement about the level (or range) of a nutrient in the food, e.g., 'low sodium' or 'contains 100 calories'").[12] It is *not* a nutrient content claim, however, because of its location on the nutrition panel on the back label. *See* 21 C.F.R. § 101.13(c) (excluding from the definition of a nutrient content claim "information that is required or permitted by § 101.9 or § 101.36, as applicable, to be declared in nutrition labeling, *and that appears as part of the nutrition label*") (emphasis added). On the other hand, the statement "26 grams of high-quality protein" appearing on the *front* label of the Product *is* a nutrient content claim. *See id.* ("If such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims."). Thus, "[w]hile a required statement inside a nutrition label escapes regulations reserved for nutrient content claims, the identical statement outside of the nutrition label is still considered a nutrient content claim and is therefore subject to section 101.13." *Reid v. Johnson & Johnson,* 780 F.3d 952, 960 (9th Cir. 2015).

**\*7** Because the Product contains a nutrient content (protein) claim on the front label, both the requirements of § 101.13 and § 101.9(c)(7)(i) apply. Insofar as the Product's back

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 323 of 751
PageID: 11689

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

label Nutrition Facts disclosures are concerned, Plaintiff alleges a violation of § 101.9(c)(7)(i).[13] As previously noted, § 101.9(c)(7)(i) requires that if a protein claim is made, the manufacturer is required to calculate a %DV using a "corrected amount of protein per serving" according to the PDCAAS. This means that the manufacturer must "correct the actual amount of protein in grams per serving by multiplying the amount by its amino acid score corrected for protein digestibility, divid[e] by 50 grams, and convert[ ] to percent." FDA Food Labeling Questions and Answers, 1994 WL 16188668 at *2-3 (Question No. N17) (Aug. 1994).[14] In short, Plaintiff's new allegation is that, because of the protein claim on the front label of the Product ("26 grams of high-quality protein"), CVS was required pursuant to § 101.9(c)(7)(i) to take the 26 gram protein content (calculated with the nitrogen content method), correct that number for protein digestibility by using the PDCAAS, divide by 50, convert that number to a percent, and then list the result on the back label under the heading %DV.

**2. Section 101.9(g)(2)—Composite of 12 subsamples**

CVS's first argument for dismissal of Plaintiff's newly alleged claims is that Plaintiff fails to state a claim under the regulations discussed above because he has not alleged compliance with 21 C.F.R. § 101.9(g)(2). That provision states that nutrient analysis for compliance purposes shall be determined as follows:

> The sample for nutrient analysis shall consist of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot. Unless a particular method of analysis is specified in paragraph (c) of this section, composites shall be analyzed by appropriate methods as given in the "Official Methods of Analysis of the AOAC International,"...or, if no AOAC method is available or appropriate, by other reliable ad appropriate analytical procedures....

21 C.F.R. § 101.9(g)(2).

CVS argues that dismissal of Plaintiff's mislabeling claims is appropriate because Plaintiff does not allege that the results of his testing of the protein content of the Product was based on a composite of 12 subsamples taken 1 from each of 12 different randomly chosen shipping cases. Instead, Plaintiff attaches to the amended complaint the result of what appears to be a single test on a single sample of the Product. CVS cites to several district court opinions that have dismissed a

mislabeling claim based on this argument. The first decision so holding was *Vital v. One World Company*, No. 12-314, unpublished order (C.D. Cal. Nov. 30, 2012). *Vital* involved the alleged overstatement of the magnesium and sodium content in a coconut water product. The court held that the plaintiffs' state law claims were preempted by § 101.9(g)(2) because the plaintiffs did not calculate the magnesium and sodium content from a composite of 12 subsamples in attempting to show that the actual content of those minerals in the defendant's product was less than represented on the label. Significantly, *Vital* was decided only after the district court converted the defendant's motion to dismiss to a motion for summary judgment and gave the plaintiffs a 45-day extension of time to conduct discovery. The court said that the plaintiffs "could have conducted testing using the § 101-9(g)(2) methodology, but decided against it." *Id.,* slip op at 11. *Vital* therefore does not stand for the proposition that a plaintiff must *allege* the results of testing from a composite of 12 subsamples to avoid dismissal of his or her complaint.

**\*8** Nevertheless, that was the ruling of the next district court to consider the issue. In *Salazar v. Honest Tea, Inc.*, 74 F. Supp. 3d 1304 (E.D. Cal. 2014), the court extended *Vital* to a ruling on a motion to dismiss, holding that because the plaintiff failed to *allege* that she had conducted testing on a composite of 12 subsamples, her state law claim that the defendant's teas "did not contain the amount of antioxidants represented on their labels" was preempted. *Id.* at 1313-14. Several other district courts have followed suit. *See, e.g., In re Whole Foods Mkt., Inc.,* 2016 WL 631532, at *5-6 (W.D. Tex. Feb. 16, 2016);*Dougherty v. Source Naturals, Inc.,* 2015 WL 8481864, at *3-4 (E.D. Mo. Dec. 8, 2015); *Durnford,* 2015 WL 9258079, at *4; *Mee,* 2015 WL 2251303, at *4.[15]

In response, Plaintiff cites to two district court cases that reached the opposite result. *See Clay,* 2015 WL 5007884; *Smith v. Allmax Nutrition, Inc.,* 2015 WL 9434768, at *7 (E.D. Cal. Dec. 24, 2015). The *Smith* court explained its reasoning as follows:

> To the extent that other courts have found that supporting a complaint with test results that do not show compliance with the 12 sample methodology implicates preemption, this Court disagrees....Rule 8 requires a plaintiff to state sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Based upon the allegations in the complaint, the Court can plausibly infer that tests conducted in compliance with the 12 sample methodology

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 324 of 751
PageID: 11690
Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1019794

would support Plaintiff's allegations that the Product is mislabeled.

*Id.*

The Court agrees with the *Clay* and *Smith* courts. On a motion to dismiss for failure to state a claim, the complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above a 'speculative level [.]'" *Tamayo v. Blagojevich,* 526 F.3d 1074, 1084 (7th Cir. 2008). "Plausibility" in this context does not imply that a court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), the "plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Id.* In other words, "the court will ask itself could these things have happened, not did they happen." *Id.* Like the district courts in *Clay* and *Smith,* this Court holds that Plaintiff may rely on the testing results attached to the amended complaint to nudge his claims based on an overstated declaration of protein content "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Whether independent testing along the lines of § 101.9(g)(2) confirms Plaintiff's claim of overstated protein content is an issue of proof, and Plaintiff does not need to prove his case at the pleading stage of the case.[16]

**\*9** In addition to the above, Plaintiff makes two other arguments that also may have merit. To begin with, Plaintiff argues that the sampling method in § 101.9(g)(2) is used by the FDA in compliance and enforcement actions, and that not even CVS is required to use that method in determining the contents of its label. This does appear to be the case, as shown by the following statement of the FDA regarding § 101.9(g)(2):

> Section 101.9(g) sets out the methods that the agency will use for compliance determinations. Manufacturers may use nonofficial methods of analysis to establish nutrient content label values, but in doing so, they should ensure the validity of their methods with respect to applicability, specificity, sensitivity, accuracy, precision, and detectability. If they fail to do so, and their methods produce significantly different results than the official method, their label may subject them to

regulatory action....Thus, ...[a *manufacturer] [is] not preclude[d] ...from using alternative analytical methods for determining nutrient content label values.*

FDA Comments on Final Rule, *supra* n.12, 58 Fed. Reg. 2302-1, 2311.[17]

If CVS can show regulatory compliance using other reliable methods, then it would make sense that Plaintiff should similarly be able to show non-compliance using other reliable methods. Whether this is the proper approach to § 101.9(g)(2) in the context of a private enforcement action or whether § 101.9(g)(2) is in fact a substantive requirement that Plaintiff would have to meet to establish liability on the part of CVS is simply not clear to the Court at this point in time. Because CVS bears the burden of persuasion on preemption issues, however, *see Russian Media Grp., LLC,* 598 F.3d at 309, the Court is not prepared to dismiss the amended complaint on this basis. *See Gustavson,* 2014 WL 60197, at *6 (rejecting defendant's interpretation of FDA regulation where defendant did not cite to any "interpretive authority that would support" it).

In addition, Plaintiff makes a possibly more compelling argument that § 101.9(g)(2) is irrelevant to his claims in this case. Plaintiff alleges that CVS did not correct the protein content using the PDCAAS before disclosing the protein %DV. That allegation is supported by the Product label, which Plaintiff attaches to the amended complaint. The Product label discloses 26 grams of protein and a 52% DV. CVS concedes that the 26 grams of protein is calculated using the nitrogen content method. Thus, Plaintiff makes a credible argument that the Product is misbranded on its face, because the 52% DV stated on the back label is obviously calculated using the *un*-corrected protein content of 26 grams (26÷50=0.52). If the protein content were to be corrected, Plaintiff alleges it would be 21.8 grams, which means the %DV should be 44% (21.8÷50=0.436).

**\*10** If Plaintiff's claim was simply that the 26 grams protein content disclosure is inaccurate, then it would make more sense to apply the testing method of § 101.9(g)(2). But Plaintiff's claim is that CVS did not test for and disclose protein quality as required by § 101.9(c)(i), a claim that can be proven without proving the inaccuracy of the 26 grams protein content disclosure. The focus under Plaintiff's claim is CVS's alleged failure to use the correct testing method to make the required %DV disclosure. Therefore, Plaintiff argues, he is entitled to discover what testing methods CVS followed in determining the %DV, and thereby

Case 1:19-md-02875-RMB-SAK Document 577-3 Filed 09/18/20 Page 325 of 751
PageID: 11691

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

establish a violation of the FDCA without having to prove an inaccurate protein content claim by the composite of 12 samples methodology. The FDA's explanation of the required PDCAAS testing confirms that the goal of the PDCAAS is to disclose to the consumer information about the quality of protein in the product. *See* FDA 2014 Proposed Revisions, *supra*, 79 Fed. Reg. 11880-01, 11935 ("Calculating the percent DV for protein incorporates a measure of protein quality," making it "a useful tool to indicate protein quality to the consumer"). Accordingly, it makes sense that the violation at issue here might be the failure to use the PDCAAS, not the disclosure of amount of protein in grams. Again, CVS has not met its burden of persuading the Court that the correct interpretation of the regulations is otherwise. Therefore, this is an additional reason why CVS's argument for Rule 12(b)(6) dismissal of the amended complaint based on § 101.9(g)(2) must be rejected.

### 3. Section 101.9(g)(4)(ii)—80% Safe Harbor Rule

CVS's second reason for dismissal of Plaintiff's new allegations even if PDCAAS testing is required is that, assuming the truth of Plaintiff's allegation that the Product contains only 21.8 grams of actual protein, that number is 83.8% of the 26 grams of protein declared on the Product's label and therefore within the 80% safe harbor provision of § 101.9(g)(4)(ii). As an initial matter, if Plaintiff is correct and the violation is CVS's failure to use the PDCAAS to provide a corrected protein content value expressed as a %DV, then it may not be relevant that the disclosure of the uncorrected protein content is within the safe-harbor range.

Aside from that issue, the Court also disagrees with CVS's interpretation of the regulations regarding when the 80% safe harbor rule applies. When interpreting a regulation promulgated by a federal agency under its statutory authority, "analysis begins with the text." *Chase Rank USA, N.A. v. McCoy*, 562 U.S. 195, 204 (2011). Section 101.9(g) defines two nutrient classes—Class I and Class II. 21 C.F.R. § 101.9(g)(3). Class I nutrients are defined as "[a]dded nutrients in fortified or fabricated foods." 21 C.F.R. § 101.9(g)(3)(i). Class II nutrients are "[n]aturally occurring (indigenous) nutrients" that are added to foods. 21 C.F.R. § 101.9(g)(3)(ii). If a product contains a Class I nutrient, the rule is that the amount of that nutrient in the Product must be equal to the value for that nutrient declared on the product's label. 21 C.F.R. § 101.9(g)(4)(i). If the nutrient is a Class II nutrient, however, the regulations state that the product can contain less than the amount declared on the product label, so long as it contains at least 80% of the declared value. 21 C.F.R. § 101.9(g)(4)(ii).

FDA guidelines state that Class I applies to nutrients "added in fortified or fabricated foods," whereas Class II applies to nutrients "that occur naturally in a food product." FDA Guide for Developing Data Bases, *supra* n.17, 1998 WL 34327548, at *3. For Class II to be applicable, protein would have to "occur naturally" in the Product. It seems self-evident that it does not. Instead, whey protein (along with other ingredients) is added to the Product to create a fabricated drink called Whey Protein Powder. CVS concedes that the Product is a manufactured food. *See* R. 45 at 6 (the Product is a "flavored whey protein powder drink mix"). Thus, CVS concedes the Product is a "fabricated" food within the meaning of § 101.9(g)(3)(i). *See* Oxford English Dictionary ("fabricate:...1a. to construct, manufacture"). Further, the Product, is "fortified" with protein. *See id.* ("fortify:...4b. To add nutrients, usually vitamins, to (food)"). Thus, the protein in the Product fits within the definition of a Class I nutrient because it is an "added nutrient in a fortified or fabricated food." *Cf. CreAgri, Inc. v. USANA Health Sciences., Inc.*, 474 F.3d 626, 628 (9th Cir. 2007) ("There is no evidence, nor could there be, that hydroxytyrosol is 'naturally' found in Olivenol, a manufactured dietary supplement. Rather, hydroxytyrosol is added to Olivenol, which is manufactured pursuant to a patented method."); F.R. Supplemental Info., *supra* n.17, Section E, paragraph 41 ("dietary supplements of vitamins and minerals are fabricated products"). "Consequently, federal regulations require that [protein] be, in fact, found in [the Product] in a quantity 'at least equal' to that stated on the label." *CreAgri, Inc.*, 474 F.3d at 628.

**\*11** In reaching this conclusion, the Court does not disagree with CVS's contention that not all nutrients in manufactured foods are Class I nutrients; some may in fact be Class II nutrients. The definition of a Class II nutrient is:

"Class II. Naturally occurring (indigenous) nutrients. If any ingredient which contains a naturally occurring (indigenous) nutrient is added to a food, the total amount of such nutrient in the final food product is subject to class II requirements unless the same nutrient is also added.

21 C.F.R. § 101.9(g)(3)(ii). CVS argues that the whey protein added to the Product constitutes a "naturally occurring (indigenous) nutrient[ ] [that] is added to" the Product, within the meaning of this provision. But is whey protein an "ingredient" which "contains" protein, or is whey protein just

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 326 of 751
PageID: 11692

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

simply the nutrient, meaning it is itself the nutrient in question? Without knowing more about whey protein, the Court cannot say. If whey protein is itself the nutrient, then Class I still applies.

But even if whey protein is an *ingredient* which contains protein, CVS still fails to take into account the last clause of the Class II definition stating that "the final food product is subject to class II requirements *unless the same nutrient is also added*." 21 C.F.R. § 101.9(g)(c)(ii) (emphasis added). The "same nutrient" language could be read to encompass the non-protein amino acids and other nitrogen-containing ingredients that CVS includes in the 26-gram protein content. In other words, the Product would not fall under Class II even assuming the whey protein constitutes an ingredient that contains "a naturally occurring (indigenous) nutrient" (protein) which "is added" to the Product, because "the same nutrient" (other forms of protein) is "also added" to the Product.[18]

### C. Front Label Disclosures

### 1. Product Name—"whey Protein Powder"

The Court previously held that Plaintiff's state law claims based on the product name, "Whey Protein Powder," were not preempted because Plaintiff sought to enforce a violation of the FDCA, namely, 21 C.F.R. § 101.18(b). Section 101.18(b) provides that "[t]he labeling of a good which contains two or more ingredients may be misleading by reason (among other things) of the designation of such food in such labeling by a name which includes or suggests the name of one or more but not all such ingredients, even though the names of all such ingredients are stated elsewhere in the labeling." *See Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *12 (E.D.N.Y. July 21, 2010) (state law claim "that vitaminwater's labeling is misleading in that it uses a product name that includes [ ] two of the product's ingredients (vitamins and water) but fails to mention one other notable ingredient (sugar)" is not preempted because it seeks to enforce § 101.18(b)). While the Court held that this claim was not preempted, the Court also held that the name "Whey Protein Powder" was not misleading as a matter of law because the Product label also stated that the Product was a Vanilla "Naturally and Artificially Flavored Drink Mix," thereby making clear that the Product did in fact include ingredients other than whey protein.

*12 Upon reconsideration of this issue, the Court concludes that a reasonable person might be misled by the Product name, but for a different reason. Rather than focusing on whether a reasonable person might be misled as to whether the Product contains only one ingredient to the exclusion of others, the Court now focuses on whether a reasonable person might be misled by the Product name into believing that the Product contains only one kind of *protein* (whey protein) to the exclusion of other proteins (or more accurately, protein-like substances that are used in place of actual proteins). This characterization of Plaintiff's claim based on the Product name was rejected under the allegations of the original complaint because it was preempted based on Plaintiff's concession that CVS was authorized by federal regulation to calculate protein content using the nitrogen content method. *See, e.g. Henderson v. Gruma Corp.*, 2011 WL 1362188, at *13 (C.D. Cal. Apr. 11, 2011) (state law claim that "0 g transfat" and "0 g cholesterol" are misleading because they falsely suggest the products are healthy is preempted because plaintiff was challenging "the use of terms that the FDA, through its regulations, has defined and permitted").

But under the new allegations of the amended complaint, this characterization of Plaintiff's claim is not preempted, because Plaintiff plausibly alleges that the use of the term "protein" to include both actual protein and non-protein substances is not sanctioned by the FDA in this case. Therefore, Plaintiff has adequately alleged a disputed issue of fact as to whether the Product name is misleading in that it suggests that the protein in the Product is comprised exclusively of pure whey protein, as opposed to whey protein mixed with other non-protein substances. *See Ackerman*, 2010 WL 2925955, at *15 ("The plaintiffs have sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer into believing that vitaminwater is either composed solely of vitamins and water, or that it is a beneficial source of nutrients[.]").

### 2. Nutrient Content Claim—"26 Grams of High-quality Protein"

In ruling on CVS's first motion to dismiss, the Court held that Plaintiff's state law claims based on the front label statement "26 grams of high-quality protein" were preempted because the FDCA does not require CVS to distinguish between whey protein and non-protein amino acids. The amended complaint now alleges, however, that CVS was required to distinguish between the two kinds of protein by virtue of § 101.9(c)(7)

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 327 of 751
PageID: 11693
Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

(i). In addition the amended complaint's new allegations also raise the applicability of § 101.13, which states that, while CVS is permitted to make a nutrient content claim such as "26 grams of high-quality protein" on the front label, that claim cannot be "false or misleading in any respect." 21 C.F.R. § 101.13(i)(3). Under the allegations of the original complaint, Plaintiff had no factual basis for alleging that the front label representation was false or misleading because such a finding would have required CVS to distinguish between actual protein and non-protein content. But because the Court now finds that Plaintiff has alleged a plausible claim for why the FDCA does require CVS to distinguish between whey protein and non-protein amino acids, the Court also finds that Plaintiff has stated a valid claim that the front label representation "26 grams of high-quality protein" is misleading in violation of § 101.13(i)(3).[19]

**\*13** CVS argues for dismissal of Plaintiff's front label claim for two additional reasons. The first is that Plaintiff's claim based on the front label representation "26 grams of high-quality protein" is preempted by the requirements of 21 C.F.R. § 101.9(g). The Court already has rejected that argument.

The second reason CVS gives is that the phrase "high-quality protein" is non-actionable puffery. In its previous memorandum opinion and order, the Court agreed with that argument. *See* R. 32 at 17-19. "Statements that boast unverifiably the quality of a product constitute puffing and will not create express warranties." *Accurate Transmissions, Inc. v. Sonnax Indus., Inc.*, 2007 WL 1773195, at \*5 (N.D. Ill. June 14, 2007) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 846 (Ill. 2005) ("'Puffing' denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined.")); *see also Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud.").

It is true that the term "high-quality" in most cases will fall into the category of puffing. *See Avery*, 35 N.E.2d at 846 (citing *Evanston Hosp. v. Crane*, 627 N.E.2d 29, 33, 36 (Ill. App. 1993) ("high-quality" patient care)). But in this case, Plaintiff's allegation is that the term "high-quality" is used not generically in reference to the quality of the Product but specifically to identify the supposed type or category of an *ingredient* in the Product. "Whether a statement is one of fact or of opinion can depend on the circumstances of the case. A

statement that would otherwise be an opinion can constitute a statement of fact if it is made in such a way that the consumer could reasonably treat it as a statement of fact." *Borchering v. Anderson Remodeling Co.*, 624 N.E.2d 887, 892 (Ill. App. 1993) (citations omitted); *see Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 908 (N.D. Ill. 2013) ("statements that ascribe specific virtues to a product that it does not possess are not considered puffing."); *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 270 (E.D.N.Y. 2014) ("Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product.") (internal quotation marks and citation omitted); *Mitchell v. Gen. Motors LLC*, 2014 WL 1319519, at \*8 (W.D. Ky. Mar. 31, 2014) (An express warranty may arise regarding a product where a representation is made that refers to "specific factual attributes...of which a buyer might be ignorant.").

The Court must accept as true so long as it is plausible Plaintiff's allegation that the term "high-quality protein" has a specific factual meaning to a consumer of the Product.[20] Because the term "high-quality protein" could be understood as a factual representation regarding the source of the protein in question, Plaintiff has stated a valid misrepresentation claim. *See, e.g., NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1133 (D. Colo. 2007) (motion to dismiss denied where statements that defendant's "leads are 'better' or 'higher quality' than NetQuote's leads" could be understood as "'false statements with specific comparisons" between MostChoice's and NetQuote's services"); *F.T.C. v. US Sales Corp.*, 785 F. Supp. 737, 746 (N.D. Ill. 1992) ("Defendants' representations about the quality and cost of the cars available by auction are representations of fact and not of opinion.").

### D. Ingredients Disclosures

#### 1. Asparagine and Hydroxyproline

**\*14** Plaintiff alleges that the test results it attaches to the amended complaint show the presence of Asparagine and Hydroxyproline, which are not disclosed in the Ingredients list on the Product back label. These substances are, according to Plaintiff, non-essential amino acids that CVS uses to "spike" the protein content of the Product.

Plaintiff first alleges a violation of the FDCA based on CVS having added Asparagine and Hydroxyproline to the Product. According to Plaintiff, this is a separate violation from CVS's failure to disclose the presence of those substances

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 328 of 751
PageID: 11694

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

on the Product's label because food additive amino acids may be used as nutrients added to foods only when they are "used or intended for use to significantly improve the biological quality of the total protein in a food containing naturally occurring primarily intact protein that is considered a significant dietary protein source." 21 C.F.R. § 172.320(c).

CVS asserts that it does not add Asparagine and Hydroxyproline to the Product but that those substances instead are present in partially hydrolyzed whey protein. CVS concedes that it does add partially hydrolyzed whey protein to the Product (and that ingredient is disclosed on the back label). According to CVS, "partially hydrolyzed" means partially broken down, and Asparagine and Hydroxyproline are two of the amino acids that make up whey protein and therefore appear in "partially broken down" whey protein. But the source of the Asparagine and Hydroxyproline in the Product is a factual issue, which the Court cannot decide on a motion to dismiss. In addition, even if the Court were to credit CVS's explanation in its brief regarding the source of these ingredients, that explanation still means that CVS adds the two substances; CVS is just saying that it does so under another name ("partially hydrolyzed whey protein"). CVS has not provided any argument to the Court to support the view that adding partially hydrolyzed whey protein (which pursuant to CVS's explanation is just another name for the amino acids that result from breaking whey protein down) is not a violation of 21 C.F.R. § 172.320(c). Therefore, CVS has not met its burden of persuasion on this issue.

Plaintiff also asserts a claim based on CVS's failure to disclose the presence and amounts of Asparagine and Hydroxyproline. Plaintiff alleges that CVS's failure to disclose violates 21 C.F.R. § 101.4(b)(2) and 21 C.F.R. § 172.320(e)(2):

An ingredient which itself contains two or more ingredients and which has an established common or usual name,...shall be designated in the statement of ingredients on the label of such food by either...(i)...

declaring the established common or usual name of the ingredient followed by a parenthetical listing of all ingredients contained therein in ....[or] (ii) ...incorporating into the statement of ingredients in descending order of predominance in the finished food, the common or usual name of every component of the ingredient without listing the ingredient itself.

21 C.F.R. § 101.4(b)(2).

The food additive amino acids [listed herein] may be safely used as nutrients added to foods...[but] (e) [t]o assure safe use of the additive, the label and labeling of the additive and any premix thereof shall bear...(1) The name of the amino acid(s) contained therein...[and] (2) The amounts of each amino acid contained in any mixture.

**\*15** 21 C.F.R. § 172.320.

In response, CVS contends that § 101.4(b)(2) only requires itemization of sub-ingredients for ingredients that are known by a common name but actually contain two or more ingredients. Partially hydrolyzed whey protein, according to CVS, is not an ingredient made up of two or more ingredients; it is a single ingredient that is made up of certain substances, including the amino acids Asparagine and Hydroxyproline. CVS has not cited to any authority for its legal argument that disclosure of these amino acids is not required under the regulations. In this regard, the Court notes that the regulations state that "[w]hey, concentrated whey, reconstituted whey, and dried whey may be declared as 'whey,'" 21 C.F.R. § 101.4(b)(7), but they say nothing about "partially hydrolyzed whey." Moreover, even apart from whether CVS's legal interpretation of the regulations is correct, the Court cannot resolve in CVS's favor on a motion to dismiss the factual issue of whether Asparagine and Hydroxyproline were added to the Product separately from or through the partially hydrolyzed whey protein.

## 2. Glutamine and Bcaas L-leucine, L-Isoleucine, and L-valine

Plaintiff also alleges that the Product's Ingredient list falsely claims that the Product contains Glutamine and three Branched Chain Amino Acids ("BCAAs")—L-Leucine, L-Isoleucine, and L-Valine, two valuable and sought-after sub-nutrients. According to Plaintiff, the testing results attached to the amended complaint show that these substances are not found in the Product. This false disclosure, according the Plaintiff, constitutes a violation of 21 C.F.R. §§ 101.4(a)(1) and (b)(2). The only argument CVS has made regarding this allegation is that it is preempted by Plaintiff's failure to conduct testing on a composite of 12 subsamples pursuant to § 101.9(g)(2). Because the Court has rejected that argument as a basis for dismissal of the amended complaint, Plaintiff's claim regarding CVS's allegedly improper representations that the Product contains Glutamine and BCAAs survives CVS's Motion along with his other claims.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 329 of 751
PageID: 11695

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

### E. Primary Jurisdiction

CVS next argues that the Court should stay or dismiss this case under the primary jurisdiction doctrine. "The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience, expertise, and insight." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (internal quotation marks and citation omitted).[21] "Where, as here, the doctrine is invoked at the motion to dismiss stage, the question is whether the complaint plausibly asserts a claim that would not implicate the doctrine." *Chavez v. Nestle USA, Inc.*, 511 Fed. Appx. 606, 607 (9th Cir. 2013) (unpublished) (internal quotation marks and citation omitted). CVS advances two arguments for why the Court should apply the doctrine of primary jurisdiction here.

**\*16** First, CVS argues that the issues raised by the amended complaint "are clearly technical questions," which the FDA is uniquely qualified to answer. R. 41 at 12-13. But this statement by itself is conclusory, and CVS fails to identify the issues it believes require the FDA's technical expertise. The Court is well qualified to interpret the regulations and to resolve matters regarding allegations of false and misleading representations. *See Sciortino v. Pepsico, Inc.*, 108 F. Supp. 3d 780, 813-14 (N.D. Cal. 2015) ("the issues raised by Plaintiffs' claims, particularly its state law misrepresentation claims, do not require FDA's expertise or benefit from uniformity in administration") (citing cases); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1349 (S.D. Fla. 2013) (plaintiff's claims regarding whether defendant's representations were false or misleading and whether consumers relied on them did not raise any issues on which the FDA has greater technical expertise than the courts) (internal quotation marks and citation omitted) (citing cases). At least at this point in the proceedings, it is not apparent that agency expertise would be required to resolve the matters before the Court.

Second, CVS argues that the Court should stay this action while the FDA considers proposed amendments to the current food labeling requirements. But CVS does not point to any proposed amendments that would change the protein labeling requirements. From the Court's review of the proposed revisions, there do not appear to be any relevant changes. *See* FDA 2014 Proposed Revisions, *supra*, 79 Fed. Reg.

11880-01, 11912-11914. As CVS points out, R. 45 at 11, the FDA has already received public comments on this proposed rule, and issued a supplemental proposed rule. The supplemental proposed rule also does not appear to make any changes to the protein disclosure rules that would be applicable to this case. *See* Food Labeling: Revision of the Nutrition and Supplement Facts Labels; Supplemental Proposed Rule To Solicit Comment on Limited Additional Provisions, 80 Fed. Reg. 44303-01, 2015 WL 4504335 (FDA Dkt. No. 2015-17928 (July 2015). In short, the FDA appears to have "shown virtually no interest in" changing the regulations applicable to this case. *Chavez*, 511 Fed. Appx. at 607 (reversing district court's dismissal based on primary jurisdiction doctrine of claims alleging false and misleading labeling and advertisements because "the product actually contains very small amounts of the touted ingredient, DHA").

The sole basis for CVS suggesting that the Court should defer to the agency rule-making process is the AHPA commentary referenced earlier in this opinion. *See supra* n.5. There is no indication that the FDA is interested in making changes in response the AHPA's suggestions, however, and, even if it did, those changes would not affect the issues in this case. AHPA is suggesting that the rules by modified to provide that protein quality always be taken into account in determining protein content. *See* AHPA Comments, *supra* n.5, at 4. The AHPA would do this by eliminating the nitrogen content method of accounting for protein content and replacing it with an analytical method called the Digestible Indispensible Amino Acid Score (DIAAS), which, like the PDCAAS, takes into account the digestibility of individual essential amino acids. The AHPA would use the DIAAS in place of the PDCAAS because the DIAAS "is believed to be a more accurate method of evaluating protein quality." *Id.* at 3.

CVS's argument to stay or dismiss under the primary jurisdiction doctrine based upon the AHPA's comments ignores the theory of liability now advanced in the amended complaint. The amended complaint alleges that the current regulations already require that protein quality be taken into account through the PDCAAS in the specific circumstances under consideration here—when a protein content claim is made about a product. The possibility that the FDA might agree with the comments of the AHPA and extend the use of the PDCAAS, or an alternative analytical method for measuring protein quality such as the DIAAS to all products, not just those making a protein claim, would not have any bearing on CVS's liability in this case. In this respect, this case is similar to *McMahon v Bumble Bee Foods LLC*, 2015

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

WL 7755428, at *3-4 (N.D. Ill. Dec. 12, 2015), wherein Judge Tharp rejected the defendant's argument that the plaintiff's state law deceptive labeling claim was preempted by the FDCA because it alleged a violation of a new rule that had been announced by the FDA but had not yet taken effect. The new rule broadened the scope of the old rule, but the plaintiff stated a valid claim, the court held, under the old rule. Similarly, here, CVS urges the Court to wait to decide this case based on the possibility that the standard Plaintiff seeks to enforce here will ultimately be adopted for all situations, when the Plaintiff's claim is that it already has been adopted for the only purpose relevant to this Court in resolving this case. As the *McMahon* court stated, "there is no basis to infer that in deferring the implementation of more stringent regulation, the FDA intended to invalidate the existing regulatory requirements[.]" *Id.* at 4. In short, there is no reason for the Court to wait to see whether the FDA ultimately decides to impose a more stringent regulatory rule regarding the manner in which protein content is to be calculated. The Court therefore rejects CVS's primary jurisdiction argument.

### F. Failure To State Valid State Law Claims

#### 1. Deceptivetrade Practices

 *17  CVS argues that the Court should dismiss Plaintiff's Consumer Fraud Act claim for two reasons.

First, CVS contends that the Illinois Consumer Fraud Act does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b(1). This argument requires a finding that Plaintiff's claims are based on labeling requirements not identical to those specified in the FDCA and implementing regulations. As discussed above, the Court has found that the amended complaint alleges claims that seek to impose requirements identical to those imposed by the FDCA. Therefore, 815 ILCS 505/10b(1) does not apply, and this argument must be rejected.

Second, CVS contends that the amended complaint alleges no more than a contract dispute. *See Sklodowski v. Countrywide Home Loans, Inc.*, 832 N.E.2d 189, 196-97 (Ill. App. 2005) ("It is well settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy.")

(internal quotation marks and citation omitted). The principle stated in *Sklodowski,* however, does not mean that every case involving a contract fails to state a Consumer Fraud Act claim. "When allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (citation omitted). The amended complaint alleges more than just a breach of contract. Plaintiff alleges that, even if CVS did not enter into a contract with him promising 26 grams of whey protein, he was misled by the Product label into believing that was what he was getting when he purchased the Product. *See Pressalite Corp. v. Matsushita Elec. Corp. of Am.*, 2003 WL 1811530, at *7 (N.D. Ill. Apr. 4, 2003) ("Pressalite does not allege fraud based on [ ] Matsushita's 'alleged *contractual* obligation'....Rather, it alleges an entirely separate fraud arising from Matsushita's alleged intentional concealment of defects. As a result, Pressalite's [fraud] claim is not duplicative [of its breach of warranty claim].") (citations omitted) (emphasis in original).

Moreover, Illinois courts have explained the proper approach to distinguishing between garden variety breach of contract cases and cases involving a violation of the Consumer Fraud Act as follows: "where a plaintiff attempts to allege a violation of the Act in a case which appears on its face to involve only a breach of contract, the relevant inquiry is whether the alleged conduct * * * implicates consumer protection concerns." *Lake Cnty. Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.*, 654 N.E.2d 1109, 1116 (Ill. App. 1995) (internal quotation marks and citation omitted). False labeling of food products raises a quintessential consumer protection concern. *See Simon v. Oltmann*, 2001 WL 1035719, at *8 (N.D. Ill. Aug. 31, 2001) ("Courts have struggled to define the scope of [consumer protection concerns], but it generally involves sharp practices designed to mislead consumers about a competitor, or public health, safety or welfare issues.") (internal citations omitted). Thus, the Court concludes that Plaintiff has stated a claim under the Illinois Consumer Fraud Act, notwithstanding Plaintiff's pleading of the existence of a contractual relationship.

### 2. Unjust Enrichment

 *18  CVS argues that Plaintiff's unjust enrichment claim fails because "'unjust enrichment is based on an implied contract, and it does not apply where there is a specific

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

contract that governs the relationships of the parties.'" R. 41 (quoting *SwedishAmerican Hosp. Ass'n of Rockford v. Ill. State Med. Inter-Insurance Exch.*, 916 N.E.2d 80, 108 (Ill. App. 2009)). CVS argues that because the amended complaint alleges the existence of a contract between Plaintiff and CVS, Plaintiff's claim for unjust enrichment must be dismissed. But the Federal Rules of Civil Procedure allow Plaintiff to plead alternative theories, one based on an implied contract (unjust enrichment), and one based on an express contract (breach of express warranty). *See* Fed. R. Civ. P. 8(d). Therefore, dismissal of Plaintiff's unjust enrichment claim on the basis of Plaintiff's breach of express warranty claim is not warranted.

CVS also contends that Plaintiff's unjust enrichment claim should be dismissed because the Court previously held that unjust enrichment was not a "stand-alone" cause of action. That statement is inaccurate. The Court held that unjust enrichment *is* a stand-alone claim, but that it was a theory of recovery which depended on the same underlying conduct held to be insufficient in that ruling to state a claim for false or deceptive labeling. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517-18 (7th Cir. 2011); *see also McMahon*, 2015 WL 7755428, at *5-6. On CVS's second motion to dismiss, the Court holds that Plaintiff's false and deceptive labeling claims survive dismissal. Therefore, Plaintiff's unjust enrichment cause of action also survives.

**3. Breach of Express Warranty**

Plaintiff finally argues that the amended complaint does not sufficiently allege why Plaintiff purchased the Product and how he was deceived such that a reasonable inference can be drawn that CVS's allegedly false statement was the "basis for the bargain" between Plaintiff and CVS. The Court disagrees.

"To state a claim for breach of express warranty, the buyer must allege that the seller made: (1) an affirmation of fact or promise made to the plaintiff; (2) relating to the goods; (3) which becomes part of the basis for the bargain; and (4) guaranteeing that the goods will conform to the affirmation or promise." *Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Phillip Morris, Inc.*, 34 F. Supp. 2d 656, 664 (N.D. Ill. 1998). "To satisfy these claims, it is sufficient for [a] plaintiff[ ] to attach the express warranty to the complaint." *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 64 F. Supp. 2d 741, 747 (N.D. Ill. 1999) (citing *Bd. of Educ. of City of Chi. v. A, C & S, Inc.*, 546 N.E.2d 580, 595 (Ill. 1989)). The front and back label of the Product are reproduced

in the amended complaint. Moreover, the amended complaint describes the alleged representations from the Product label on which Plaintiff allegedly relied, and further alleges that Plaintiff would not have purchased the Product had he known the true nature of the Product's ingredients and what the Product contained. R. 33, ¶ 100. The Court therefore rejects CVS's argument that the amended complaint fails to allege facts sufficient to state a claim for breach of express warranty.

**III.**

**Conclusion**

**\*19** In conclusion, Plaintiff has successfully pled around the preemption problems he encountered in the original complaint. In the original complaint, Plaintiff tried to impose an obligation that Plaintiff conceded at the time was explicitly disclaimed by FDA regulations, and so its imposition through state law was held to be preempted. In the amended complaint, Plaintiff's state law claims all rely on the theory that, by not complying with the relevant federal laws and regulations, the Product's label misleads and deceives consumers. The Court has found these new allegations to be plausible. Since the re-pled state law claims rely on federal law and regulations without modification, those claims are not preempted. Moreover, none of CVS's other arguments for dismissal of the amended complaint withstand scrutiny either. Accordingly, CVS's Motion to Dismiss the First Amended Class Action Complaint, R. 40, is denied.

APPENDIX

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 1019794

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 332 of 751
PageID: 11698





**All Citations**

Not Reported in Fed. Supp., 2016 WL 1019794

Footnotes

1   In deciding CVS's Motion, the Court accepts all well-pleaded facts of the amended complaint as true and draws all reasonable inferences in favor of Plaintiff. *See Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013).

2   The front and back package labels are reproduced in the Appendix to this opinion.

3   The amended complaint alleges that "[w]hey is a complete protein source, meaning it contains all the essential amino acids needed to build protein-based compounds, such as muscle tissue, skin, fingernails, hair and enzymes. It is especially rich in branded chain amino acids—leucine, isoleucine, and valine—which are metabolized directly within the muscles (as opposed to being processed in the liver first)." R. 33, ¶ 10.

4   *See, e.g., Durnford v. Musclepharm Corp.*, 2015 WL 9258079 (N.D. Cal. Dec. 18, 2015); *Gubala v. Allmax Nutrition, Inc.*, 2015 WL 6460086 (N.D. Ill. Oct. 26, 2015); *Clay v. Cytosport, Inc.*, 2015 WL 5007884 (S.D. Cal. Aug. 19, 2015); *Brauner v. MusclePharm Corp.*, 2015 WL 4747941 (C.D. Cal. Aug. 11, 2015); *Mee v. IA Nutrition, Inc.*, 2015 WL 2251303 (N.D. Cal. May 13, 2015); *Rodriquez v. Giant Sports Prods.*, 2014-cv-08378 (C.D. Cal. Oct. 29, 2014); *Mencer v. NBTY, Inc.*, 2014-cv-05030 (E.D.N.Y. Aug. 25, 2014); *see also Smith v. Allmax Nutrition, Inc.*, 2015 WL 9434768 (E.D. Cal. Dec. 24, 2015).

5   The amended complaint cites to comments purportedly made in the press as well as on the website of a company that sells nutritional supplements. Also, both parties cite to published comments submitted to the FDA by the American Herbal Products Association (AHPA), which do not discuss "protein spiking," but do advocate that the nitrogen content method be eliminated from the regulations and that the FDA require food manufacturers to exclude non-protein nitrogen sources such as free form amino acids from the declared grams of protein on the labels of all products. *See* Comments of AHPA on Proposed Rule on Food Labeling: Revision of the Nutrition And Supplement Facts Labels (hereinafter "AHPA Comments"), Dkt. No. FDA-2012-N-1210 at 4-5 (Aug. 2014), available at *http://www.regulations.gov /#!documentDetail;D=FDA-2012-N-1210-0399*. The Court can take judicial notice of the *AHPA Comments* and their

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 333 of 751
PageID: 11699
Gubala v. CVS Pharmacy, Inc., Not Reported in Fed.Supp. (2016)
2016 WL 1019794

contents. *See Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (in ruling on motion to dismiss, district court may take judicial notice of the indisputable facts that documents in the public domain exist and that they say what they say).

6    The CAFA grants federal jurisdiction over class actions in which at least $5,000,000 is in controversy, minimal diversity exists between the parties, and the total number of members of the class is greater than 100. *See* 28 U.S.C. § 1322(d). Plaintiff alleges that he is a citizen of Illinois and that CVS is a citizen of Delaware and Rhode Island, thus establishing the minimal diversity requirement. The amended complaint alleges upon information and belief that "[c]lass members number in the thousands to millions." R. 33, ¶ 78. While this number is sufficient to establish the minimum class number of more than 100, the question remains whether there is a sufficient number of class members to satisfy the $5,000,000 threshold amount in controversy. If the only damages each member of the class suffered is the $20 purchase price alleged in the amended complaint, then the class would have to consist of at least 250,000 members. Thus, the thousands to millions range given in the amended complaint is too broad for the Court to say whether Plaintiff can meet the jurisdictional minimum. Nevertheless, Plaintiff alleges that his claims and the claims of the other members of the Class exceed $5,000,000, R. 33, ¶ 5, and CVS has not challenged that allegation. Therefore, the Court concludes for purposes of CVS's Motion that jurisdiction has been properly alleged. *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 542-43 (7th Cir. 2006) (court must accept the plaintiff's factual allegations on which jurisdiction is based at pleading stage unless they are contested by the defendant).

7    The Court may consider FDA documents in the Federal Register in ruling on CVS's Motion. *See Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (citing 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed ...."); *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 172 (4th Cir. 2002) (appeals court can take judicial notice of proposed rule published in Federal Register even if the proposed rule was not called to the attention of the trial court); *Poindexter v. United States*, 777 F.2d 231, 236 (5th Cir. 1985) (appeals court is required to take judicial notice of information contained in agency regulations)).

8    A serving or serving size is defined as "an amount of food customarily consumed per eating occasion by a person 4 years of age or older which is expressed in a common household measure that is appropriate to the food." 21 C.F.R. § 101.9(b)(1).

9    The daily reference value for protein for adults and children over 4 is defined in the regulations as 50. *See* 21 C.F.R. § 101.9(c)(7)(iii).

10    The Court can take judicial notice of the FDA Food Labeling Guide because it is available on a government agency website. *See, e.g., Gustavson v. Wrigley Sales Co.*, 2014 WL 60197, at *3 (N.D. Cal. Jan. 7, 2014); *Shepard v. DineEquity, Inc.*, 2009 WL 8518288, at *3 n.4 (D. Kan. Sept. 25, 2009); *Hansen Beverage Co. v. Innovation Ventures, LLC*, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009).

11    Section 101.36 relates to dietary supplements, whereas § 101.9 relates to nutrients in foods. The requirements are parallel, but the parties appear to be in agreement that the Product is a food governed by § 101.9, rather than a dietary supplement governed by § 101.36.

12    *See also* Food Labeling; General Provisions; Nutrition Labeling; Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food (hereinafter "FDA Comments on Final Rule"), 58 Fed. Reg. 2302-01, 2303-2304, 1993 WL 1540 (F.R.) (Jan. 1993) (rejecting suggestion that the definition of a nutrient content claim should be limited to nutrient claims that "characterize" the level of a nutrient such as "high in protein" (*i.e.,* implied nutrient content claims) and exclude claims about a specific level of a nutrient such as "26 grams" (*i.e.,* express nutrient content claims), stating that Congress intended the term "nutrient content claims" to include both types of claims).

13    While the nutrient content claim appears on the front label of the Product, the making of that claim has implications for both the back and front label. This section deals with § 101.9(c)(7)(i) and the back label. But Plaintiff also alleges a violation of § 101.13 regarding the front label, which is addressed in the next section.

14    *See also* FDA Food Labeling Guide, 2008 WL 2155725 at *27 (Section VII, Question No. N.23) ("When protein is listed as a percent of the 50 gram DRV and expressed as % DV, the % DV is calculated by correcting the actual amount of protein in grams per serving by multiplying the amount by its amino acid score corrected for protein digestibility, dividing by 50 grams and converting to percent. 21 CFR 101.9(c)(7)(ii).").

15    CVS also cites to *Burke v. Weight Watchers Int'l, Inc.*, 983 F. Supp. 2d 478, 483 (D.N.J. 2013), but that case involves another regulatory provision, not § 101.9(g)(2).

16    Plaintiff argues that it is not possible for him to perform the 12 sample testing because he does not have access to facilities to ensure proper collection of the "12 subsamples...taken 1 from each of 12 different randomly chosen shipping cases." 12 C.F.R. § 101.9(g)(2). CVS responds that argument is ludicrous because all Plaintiff has to do is purchase the Product

Gubala v. CVS Pharmacy, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 1019794

from 12 different CVS stores. The parties appear to have a different understanding regarding what is required to compile the composite described in § 101.9(g)(2). If it later becomes necessary to address this issue, the Court will require further clarification from both sides regarding their divergent views of how to implement the methodology of § 101.9(g)(2).

17 See also Guidance For Industry FDA Nutrition Labeling Manual—A Guide For Developing and Using Data Bases (hereinafter "FDA Guide for Developing Data Bases"), 1998 WL 34327548 (F.D.A.), at *2 (Mar. 1998) ("The source of the data used to calculate nutrition label values is the prerogative of the manufacturer."); Food Labeling; General Requirements for Nutrition Labeling for Dietary Supplements of Vitamins, Minerals, Herbs, or Other Similar Nutritional Substances, Supplemental Information Final Rule (hereinafter "F.R. Supplemental Info."), FR Doc No: 93-31813, Section E, paragraph 40 (Jan. 4, 1994), available at https://www.gpo.gov/fdsys/pkg/FR-1994-01-04/html/93-31813.htm ("Manufacturers ...are free to use whatever methodology they believe will give results consistent with methods used by FDA.").

18 At the very least, CVS has not met its burden of persuasion on this point. See Mee v. I A Nutrition, Inc., 2015 WL 4776301, at *9 (N.D. Cal. Aug. 13, 2015) (finding that the defendant's reliance on § 101.9(g)(4) was "at best, premature," because it failed to cite to anything that would suggest "the 'protein' referenced on the front of the label of Super Quad Protein is a Class II protein"); Clay, 2015 WL 5007884, at *5 and n.2 (stating that it was unclear from both the parties' briefs and a reading of § 101.9(g) how a nutrient's Class I or Class II membership is to be determined, and therefore the Court would not resolve the issue on a motion to dismiss).

19 In its previous discussion of this issue, the Court relied on a citation provided by CVS to comments of the FDA. See R. 32 at 10-11 (quoting FDA Comments on Final Rule, supra n.12, 58 Fed. Reg. 2302, 2344; R. 17 at 8 (quoting same). Those comments, as it turns out, were misinterpreted. The FDA's comments were responding to a suggestion advocating that "high" and "source" claims for protein "be based on protein quality as well as level because such claims may be misleading if a food contains a lower quality protein." FDA Comments on Final Rule, 58 Fed. Reg. 2302, 2344. That suggestion was rejected by the FDA. Id. In the first place, the "high" protein claim addressed in this comment was not the same as the one currently before the Court. The comment dealt with a claim that a product is "high in protein," not a claim that the product contains "high-quality protein." Claims that a product is "high in" or a "good source of" a certain nutrient are implied nutrient claims governed by the additional criteria imposed under 21 C.F.R. § 101.54. Section 101.54 requires, among other things, that the product contain "20 percent or more of the RDI or the DRV per reference amount customarily consumed" before a "high in" or "good source of" claim can be made about the product. 21 C.F.R. § 101.54(b)(1). The phrase "26 grams of high-quality protein" on the Product's front label is an express nutrient content claim, which is not governed by § 101.54(b), so the FDA's response to the suggestion in question has no direct application to this case. But more to the point, the FDA's response to the suggestion in question, when properly understood, actual supports Plaintiff's claims in this case. The comment "suggested a second criterion" under § 101.54 (i.e., in addition to the 20% or more of the RDI or DRV criterion) that would require a certain PDCAAS score for either a "high in" or a "good source" claim to be made about a food. See FDA Comments on Final Rule, 58 Fed. Reg. 2302, 2344. The FDA rejected this suggestion, stating that it believed "adding a second criterion based on the PDCAAS for 'high' and 'good source' in protein claims is not necessary." Id. CVS quoted the "not necessary" language to suggest that the FDA rejected a requirement that food manufacturers distinguish between actual protein and non-protein content. But the real reason the FDA thought a second criterion for a § 101.54(b)(1) claim based on the PDCAAS was "not necessary" was not that it did not think manufacturers should have to distinguish between actual protein and non-protein content. Instead, it was because "§ 101.9(c)(7)(i)...provides that percent DRV for protein must represent the correct amount of protein based on its PDCAAS." Thus, the agency has already factored in the PDCAAS." Id. (emphasis added). In other words, the FDA did not add a requirement to use the PDCASS for implied nutrient content claims under § 101.54(b)(1) because it already imposed that requirement through § 101.9(c)(7)(i).

20 In its first motion to dismiss briefing, CVS urged the Court to "take judicial notice that there is no specific protein called 'high-quality protein,'" but rather that there are "proteins that fall into the subjectively-described category 'high-quality,'" which, according to CVS, "is a classic example of puffery." R. 29 at 8-9. For the Court to take judicial notice of a fact, the fact must not be "subject to reasonable dispute because it .... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Resolution of this issue is not a proper subject for judicial notice because a statement to the effect that "high-quality protein" refers to a subjective quality rather than an objectively identifiable type of protein is subject to reasonable dispute. Indeed, the FDA appears to ascribe factual meaning to the similarly subjective-sounding term "good quality protein" by using that term interchangeably with the term "complete protein." See FDA 2014 Proposed Revisions, supra, 79 Fed. Reg. 11880-01, 11914.

21    The term "primary *jurisdiction*" as applied in this case is somewhat of a misnomer. As the Seventh Circuit has explained, "[c]ases in which a court refers an issue to an agency because of the agency's superior expertise,...rather than because of the agency's jurisdiction, are not felicitously described as cases of primary *jurisdiction*. They are akin to those *Burford* abstention cases that...concern arcane regulatory issues; or cases in which the court solicits an amicus curiae brief from an interested agency; or cases in which the court has in effect appointed the agency to be a special master....In such cases, either court and agency have concurrent jurisdiction to decide an issue, or only the court has the power to decide it, and seeks merely the agency's advice." *Arsberry v. Illinois,* 244 F.3d 558, 563-64 (7th Cir. 2001) (emphasis in original).

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S.
                                                            Government Works.

Tab 30

2019 WL 7207491

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

**\*NOT FOR PUBLICATION\***
United States District Court, D. New Jersey.

Frank HALL, individually and on behalf
of all others similarly situated, Plaintiff,
v.
JOHNSON & JOHNSON, et al., Defendants.

Civil Action No.: 18-1833 (FLW)
|
Filed 12/27/2019

**OPINION**

Hon. Freda L. Wolfson U.S. Chief District Judge

**\*1** Presently before the Court is a motion by Defendants Johnson & Johnson ("J&J" or the "Company"), Alex Gorsky ("Gorsky"), Dominic Caruso ("Caruso"), Sandra Peterson ("Peterson"), Carol Goodrich ("Goodrich"), Joan Casalvieri ("Casalvieri"), Michael Sneed ("Sneed"), and Tara Glasgow ("Glasgow") (collectively, "Defendants"), to dismiss Lead Plaintiff San Diego County Employees Retirement Association's ("Plaintiff") Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). In this putative class action securities litigation, Plaintiff alleges that it, and other similarly situated investors, purchased J&J stock between February 2013 and October 2018 (the "Class Period"), and that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Furthermore, Plaintiff avers that Defendants Gorsky, Caruso, Peterson, Goodrich, Sneed, Glasgow, and Casalvieri (collectively, "Individual Defendants") violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiff alleges that Defendants fraudulently inflated the value of J&J's stock by issuing false and misleading statements as part of a long-running scheme to conceal the truth from investors that the Company's talc products were contaminated with asbestos, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment. In the instant matter, Defendants move to dismiss the Amended Complaint on the basis that the alleged misstatements and omissions were not material, that Plaintiff has failed to plead with particularity that Defendants acted with scienter, and that Plaintiff has not sufficiently alleged loss causation.

For the reasons set forth below, Defendant's motion is **granted in part and denied in part**. Plaintiff's Section 10(b) and Rule 10b–5 claims are limited to those stemming from Defendants' statements regarding the safety of its talc products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research, and Plaintiff's claims based upon Defendants' alleged misstatements about the viability of the Product Liability lawsuits are dismissed. Furthermore, because Plaintiff has not adequately alleged facts suggesting a strong inference of scienter as to defendants Caruso, Peterson, and Sneed, those defendants are dismissed from the lawsuit.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following allegations are taken from the Amended Complaint ("AC") and are assumed to be true for purposes of this motion to dismiss. [1]

**A. Defendants**

**\*2** J&J is a multinational company engaged in research and development, manufacturing, and sale of a broad range of healthcare products. AC ¶20. J&J has three business segments: pharmaceutical, medical device, and consumer. *Id*. The products produced by the consumer segment include Baby Powder ("Baby Powder") and "Shower-to-Shower" [2] ("Shower-to-Shower") (collectively, the "Talc Products"), which are both made from cosmetic talc. [3] *Id*. at ¶¶48, 49.

Each of the Individual defendants is, or was, a senior J&J executive and, along with other personnel, allegedly helped perpetuate the Company's fraudulent scheme over its investors. [4]

Alex Gorsky is the Chairman of the Board and Chief Executive Officer ("CEO") of J&J. *Id*. at ¶21. He has served as CEO since April 26, 2012, and has been the Chairman since December 28, 2012. *Id*. Gorsky began his career at J&J in 1988, and has served in various leadership roles in the Company prior to being selected as CEO. *Id*.

Dominic Caruso was the Chief Financial Officer ("CFO") of the Company from 2007 until his retirement in September 2018, and also served as the Executive Vice President from April 2016 until his retirement. *Id.* at ¶22.

Sandra Peterson was Group Worldwide Chair at J&J from 2012 to October 2018. Peterson, the first outsider to ever join the Company's Executive Committee, is allegedly a "corporate fixer" who was hired to fix quality and supply chain issues, which the Company was facing leading up to the Class Period. *Id.* at ¶23. However, on June 22, 2018, just over two months after the first jury verdict against J&J in a case alleging harm from asbestos in the Company's Talc Products, the Company announced Peterson's retirement, effective October 1, 2018. *Id.* at ¶211.

Carol Goodrich is the Director of Corporate Media Relations at J&J. *Id.* at ¶24. In 2013, Goodrich allegedly drafted the text of J&J's "Our Safety & Care Commitment" website, which addressed the safety of the Talc Products, and made public statements on behalf of J&J from 2016 through 2018. *Id.*

Joan Casalvieri, Ph.D. was the Director of Toxicology and Skincare at JJCI. *Id.* at ¶25. She allegedly spearheaded the Company's efforts to defend talc from both scientific and regulatory scrutiny in 2005. *Id.*

Michael Sneed has worked at the Company since 1983, and has been J&J's Executive VP of Global Corporate Affairs & Chief Communication Officer since 2012. *Id.* at ¶26. He is also a member of J&J's Executive Committee. *Id.*

Tara Glasgow was VP of Research and Development ("R&D") for the baby product unit of J&J's consumer division. *Id.* at ¶27. Glasgow allegedly made public statements on behalf of J&J from 2015 through 2017. *Id.*

### B. The Talc Products and the Alleged Fraudulent Scheme

**\*3**  Defendants allegedly concealed the truth about the asbestos in its Talc Products through a highly organized campaign of deceit and regulatory manipulation. According to Plaintiff, Baby Powder "stands out as a symbol of J&J's history and legacy" and has been described by the Company's executives as "an institution," "flagship product," and "sacred cow." AC ¶¶43,47. Plaintiff contends that the Talc

Products "are contaminated with cancer-causing asbestos." *Id.* at ¶1. Cosmetic talc is a naturally occurring mineral that is mined from rock and then ground into powder form. *Id.* at ¶49. Talc can be naturally contaminated with different types of asbestos, such as chrysotile, tremolite, actinolite, anthophyllite, amosite, and crocidolite minerals, that develop as bundles of long, thin fibers that are flexible and easily separable, rather than as solid rock. *Id.* at ¶50 Tremolite, actinolite, and anthophyllite minerals can also develop naturally as larger rocks, *i.e.*, "non-asbestiform." *Id.* at ¶50 n.6. The parties dispute the health risks, if any, posed by those minerals in their non-asebstos form, however, they agree that asbestos fibers can cause fatal cancers. *Id.* at ¶50, 50 n.6; *see* ECF No. 44-1, Memorandum of Law in Support of Defendants' Motion to Dismiss First Amended Class Action Complaint ("Def. Br."), at 5.

According to Plaintiff, in the 1970's, concerns about the safety of talc-based products and the potential for asbestos contamination began to surface, and as a result, J&J allegedly initiated a concerted effort to convince the public that talc was safe. *Id.* at ¶51. Similarly, after public health researchers in the 1980's started to consider a potential association between talc powder usage and ovarian cancer, the Company's alleged scheme turned to quelling those concerns. *Id.* at ¶74. To that end, the Company allegedly "lied to the public, influenced regulators, and purposely avoided testing methods that could detect the trace amounts of asbestos that the Company knew were present," *id.* at 51, and sought to preclude health organizations such as the National Toxicology Program ("NTP") and the World Health Organization ("WHO") from listing talc as a carcinogen, *id.* at ¶¶82-84, 100-102.

Plaintiff alleges that the Company was aware, as early as 1969, that J&J's talc contained "unavoidable trace amounts of tremolite," and Plaintiff cites to internal documents wherein pediatricians and the Company's own employees had expressed concern about potential adverse effects of talcum powder on the lungs of babies or mothers. *Id.* at ¶52. Throughout the 1970's, the Company allegedly received testing results from outside laboratories, and following those results, internally acknowledged the existence of asbestos in its Talc Products, but endeavored to keep the issue hidden from regulators and the public. *Id.* at ¶¶55, 57, 59. For example, Plaintiff alleges that in 1971, an internal Company memorandum, drafted by Dr. T. M. Thompson, the son of the Company's co-founder, noted that that "[t]he talc used in JOHNSON'S Baby Powder came from a Vermont mine containing 'trace amounts of fibrous minerals (tremolite/

actinolite).' While the talc went through a 'washing process,' 'three independent consulting laboratories' showed that the resulting talc still had 'traces of fibrous minerals.' " *Id.* at ¶55. Further, the memo acknowledged that "if it became known that [the Company's] formulations contained any significant amount of Tremolite" the [C]ompany could face a "furor" and "become involved in litigation." *Id.* at ¶53. In 1972, two other outside laboratories allegedly tested talcum powder samples and found the presence of tremolite asbestos fibers. *Id.* at ¶¶56-57.

J&J allegedly avoided testing methods which might reveal the presence of asbestos in its talc. *Id.* at ¶¶63-67, 230. Plaintiff alleges that in 1973, J&J hired a consultant who concluded that detecting trace amounts of asbestos was like looking for a "needle in a haystack" and requires testing large amounts of talc. *Id.* at ¶63. Accordingly, the consultant "considered [it] essential" to concentrate the asbestos before the talc was examined. *Id.* at ¶63. Knowing that the concentration method might lead to the detection of asbestos, the Company allegedly agreed internally that it "want[ed] to avoid promotion of this [testing] approach," and that it "really want[ed] to exclude concentration techniques in any proposed analytical procedure." *Id.* at ¶65. Plaintiff also alleges that in addition to the historical issues regarding J&J's testing methods, more recently, a 2016 internal audit report found that the Company's methods for testing its talc were "questionable at best." *Id.* at ¶110. Furthermore, RJ Lee, the outside lab utilized by J&J indicated that the test method required by J&J was "not an optimal method for asbestos testing." *Id.* In addition to avoiding testing methods which might find asbestos in its Talc Products, in 1974, J&J allegedly authorized a clandestine "asbestos-destruction experiment," through which the Company hoped to identify methods to destroy the tremolite and chrysotile in its talc. *Id.* at ¶60.

**\*4** Unable to remove the asbestos fibers from its talc, J&J also allegedly made efforts to control the scientific community's research regarding the safety of talc and purportedly sponsored "talc safety studies" to "neutralize or hold in check data already generated by investigators who question the safety of talc." *Id.* at ¶68. Simultaneously, J&J set out to obtain "maximal leverage for defending the product" by contradicting "negative data," *id* at ¶70; *see also id.* at ¶¶ 68-73. To that end, J&J allegedly led efforts to preclude the National Toxicology Program ("NTP") from considering whether talc was a potential carcinogen and including talc in its biennial Report on Carcinogens ("RoC").

*Id.* at ¶¶37, 82-84. The RoC is published every two years and lists substances "either known or reasonably anticipated to be human carcinogens." *Id.* at ¶37. In 2000, the NTP was considering whether to include talc in its next RoC, and J&J and its talc supplier allegedly worked hand in hand to undermine those efforts. *Id.* at ¶¶82-85. They succeeded in convincing the NTP to defer its decision on talc, by pointing out an "alleged fatal flaw" in the then-existing research linking ovarian cancer and talc: most of the studies involved the use of talc products produced before 1976, the year after which talc was supposedly required to be "asbestos-free." *Id.* at ¶¶82-83.

Later, when the NTP, again, decided to review whether talc was a potential carcinogen, the Company allegedly assigned Casalvieri the task of directing the project to "defend talc." *Id.* at ¶94. J&J worked with its talc supplier and outside experts "to develop documents" that undermined any link between talc and ovarian cancer, for potential submission to the NTP and for publication. *Id.* at ¶¶95,97. For example, J&J and its talc supplier allegedly secretly funded a study that sided with the Company on the safety of talc. *Id.* at ¶¶97-99. In order to conceal their involvement, J&J purportedly retained a law firm which hired the researchers and through which payments to the researchers were funneled. *Id.*

In October 2005, the NTP withdrew talc from consideration as a carcinogen. *Id.* at ¶¶37, 103. An internal company email sent to 30 individuals, including Casalvieri, celebrated the NTP's decision, proclaiming, "We did it!" and acknowledging that the decision was "a direct result" of J&J's efforts, along with those of its talc supplier. *Id.* at ¶104.

Plaintiff alleges that J&J went to extreme lengths to defend its products, including updating the Company's website to address the safety of the Talc Products, and seeking to conceal negative data from the FDA. *Id.* at ¶¶227, 288, 299. Plaintiff alleges that while the Company was engaged in its offensive tactics to conceal negative data regarding its talc from the public, J&J was repeatedly informed, and internally discussed, the asbestos contamination in its Talc Products. For example, a March 1992 internal memorandum at J&J's talc supplier allegedly illustrates that it was "common knowledge" that asbestiform minerals such as tremolite and actinolite were present in the Vermont talc mines utilized by the Company. *Id.* at ¶76. In 2004, a news channel allegedly tested J&J Baby Powder and found that it "tested at above normal levels for asbestos." *Id.* at ¶88. Upon receiving the information, the Company allegedly "frantically called its talc

supplier," and discovered that during the prior three years, the supplier had not been performing quarterly asbestos testing on the talc it was supplying to J&J. *Id*. at ¶90. In a series of 2008 emails, the Company's Global Creative Director repeatedly expressed concern that talc was not safe for use around babies, and was ultimately, reprimanded. *Id*. at ¶¶107-108.

### C. Alleged Misrepresentations and Omissions during the Class Period

In 2013, J&J began facing lawsuits alleging a connection between ovarian cancer and talc, and that asbestos in its talc powder caused cancer. ¶¶120, 179-186, 192-201, 204, 213-222. Plaintiff alleges that, shortly thereafter, the Company began issuing numerous false and misleading statements – a continuation of its decade's long scheme–which form the basis of Plaintiff's instant claims. Plaintiff further alleges that the various misstatements made during the Class Period were aimed at preserving the public trust and precluding the discovery of the Company's longstanding misinformation campaign.

**\*5**  For example, in October 2013, following a jury verdict against the Company in a case where the plaintiff alleged that there was a link between asbestos and talc, the Company's "Safety & Care Commitment" webpage was updated to state that "[f]ew ingredients have demonstrated the same performance, mildness and safety profile as cosmetic talc, which has been used for over 100 years" and has "a long history of safe use." *Id*. at ¶¶126-127. The webpage stated that the Company's "talc is carefully selected, processed and tested to ensure that [it] is asbestos free" and that this has been "confirmed by regular testing conducted since the 1970s." *Id*. at ¶127. Plaintiff alleges that these statements were false, as indicated by a draft version of the website contained in the Company's internal documents. *Id*. at ¶¶128-129, 142. Plaintiff alleges that the draft of the webpage, modified by Goodrich and held in her files, contained the following edit: "Talc has over 100 years of ~~safe~~ use in personal care products." *Id*. at ¶128. Additionally, Plaintiff further alleges that commentary in the draft document, purportedly added by Goodrich, acknowledged, "I don't think we can link cosmetic talc to 100 years of use," and that J&J "cannot say [the Talc Products have] 'always' been asbestos free." *Id*. at ¶128

In February 2016, a Missouri state jury returned a verdict against J&J for failure to warn, negligence, and conspiracy, and awarded $72 million in damages to a long-time user

of J&J's talcum powders who suffered from ovarian cancer. *Id*. at ¶147. This verdict was reportedly the first to award damages to a plaintiff linking ovarian cancer to J&J's talc products, and it included an award of $62 million in punitive damages. *Id*.

On February 25, 2016, following the $72 million verdict, the FDA requested, in writing, that J&J "provide all safety literature and data regarding talc, including data in support of the safety of this active ingredient and data that shows potential harmful effects." *Id*. at ¶150. In the company's letter-response, J&J allegedly represented that "[n]o asbestos-form structures have been found during any testing" of its body powders. *Id*. at ¶151. The Company did not reveal that over the years at least three independent laboratories had found asbestos in the Company's talc. The statements to the FDA were not the Company's only commentary on the safety of talc during that time period. Following articles about the jury verdict, Plaintiff alleges that the Company's website was updated to include various "materially false and misleading" statements including the following:

- "JOHNSON's talc products do not contain asbestos."

- It is a "misperception ... that JOHNSON's Baby Powder contains talc made with asbestos."

- "Since the 1970s, talc used in consumer products has been required to be asbestos-free."

- "The grade of talc used in cosmetics is of high purity ... and is free from asbestos and asbestiform fibers."

- "Cosmetic grade talc is only mined from select deposits from certified locations .."

- "Cosmetic grade talc is ... milled to relatively large, non-respirable particles size."

-  "Our sources for talc undergo comprehensive qualification."

- "The incoming talc is routinely evaluated ...."

- "The incoming talc is ... evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards."

- "The safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards."

*Id.* at ¶148. Defendant Glasgow allegedly made similar representations in a June 2016 Houston Chronical editorial. *Id.* at ¶163. There, she claimed that 30 years of scientific studies and regulatory reviews have shown that "cosmetic talc is safe" and that "I can tell you the science is clear – cosmetic talc is, and has been, safe for use and that is the most important guiding principle for every product Johnson & Johnson Consumer Inc. offers to consumers and patients." *Id.* at ¶¶163-164.

Despite the Company's efforts, throughout 2017 and 2018, it is alleged that the truth regarding asbestos in the Talc Products was slowly disclosed, and the Company's stock price began to decline. *Id.* at ¶¶184-237. On September 21, 2017, a law firm issued a press release (the "Bernstein Liebhard Press Release"), entitled "Talcum Powder Lawsuit Plaintiffs Claim Unsealed Documents Show Johnson & Johnson Knew of Talc-Asbestos Danger in 1970s, Bernstein Liebhard LLP Reports." *Id.* at ¶184. The press release indicated that plaintiffs in the ovarian cancer lawsuits were looking to add asbestos allegations to their ovarian cancer claims. *Id.* In response to the news, J&J's stock price declined from a close of $130.94 on September 26, 2017 to a close of $129.75 on September 27, 2017, and an event study allegedly "determined that [the decline] was statistically significant" and "cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information." *Id.* at ¶185, 185 n.21.

 **\*6** On January 30, 2018, testimony began in a New Jersey state court case (the "*Lanzo* Case") where the plaintiff, Stephen Lanzo, alleged that he developed mesothelioma as a result of exposure to J&J Baby Powder containing asbestos. That same day, after the markets closed, Law360 published an article regarding the Plaintiff's allegations and summarizing some of the testimony, including the allegation that J&J had been aware that its talc contained asbestos since the 1970s. *Id.* at ¶192. In response to that disclosure, J&J's stock dropped 3% from a close of $142.43 on January 30, 2018 to a close of $138.19 on January 31, 2018. *Id.* ¶193. An event study allegedly determined that the decline was statistically significant. *Id.*

On February 5, 2018, *Mesothelioma.net* published an article anticipating use of "damaging internal company documents" during the *Lanzo* trial. *Id.* at ¶194. The article explained that the anticipated documents would

show that as long ago as the early 1970s, company officials were questioning each other about the impact of asbestos, and specifically about how much asbestos an infant might inhale if the company's baby powder contained a 1% concentration of the carcinogen. This type of documentation is likely to weigh heavily against the consumer products giant as they assert in court that their product has always been completely asbestos free.

*Id.* Plaintiff alleges that following the publication of that article, the Company's stock declined over 5%, from a close of $137.68 on February 2, 2018, to a close of $130.39 on February 5, 2018, the following trading day, which an event study determined to be statistically significant. *Id.* at ¶195. Contemporaneous publications from financial news outlets and analysts also attributed the stock drop to the article's pronouncements. *Id.* at ¶196-199.

On February 7, 2018, the Beasley Allen Law Firm, co-lead counsel on behalf of thousands of women in ovarian cancer related product liability lawsuits, issued a press release emphasizing the significance of recently disclosed J&J internal documents, which had been produced to it in discovery. *Id.* ¶201. Among other things, the press release alleged that the documents "shed light on just how prevalent asbestos and heavy metals are in the talc used in Baby Powder. The documents also show the corporations' response to growing concerns about cancer risks." *Id.* Following the press release, J&J's stock declined nearly 4%, from a close of $131.42 on February 7, 2018 to a close of $126.36 on February 8, 2018, which was determined to be statistically significant. *Id.* at ¶202.

Shortly thereafter, in April 2018, the jury in the *Lanzo* case found J&J and its talc supplier liable for the plaintiff's mesothelioma. *Id.* at ¶204. Following the verdict, Goodrich was quoted in a New York Daily News article as stating that "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos or cause mesothelioma," and "[w]e believe that once the full evidence is reviewed, this decision will be reversed." *Id.* at ¶205. Other

spokesperson for the Company made similar statements to investors during various conferences throughout May 2018. For example, during the Consumer and Medical Devices Business Review, Global Chief Technology Officer Josh Ghaim claimed that, "our ingredients have ... always been safe" and Jorge Mesquita, Executive VP of the J&J subsidiary which produces the Baby Powder product, promised that "we've been through this extensively, and we are 100% sure that our talc product is safe." *Id* at ¶208. During another conference on May 21, 2018, Mesquita similarly promised on May 21, 2018, that "[w]e are absolutely certain that science shows that our talcum product is safe." *Id*. During that same conference, Peterson represented that the Company's global supply chain had been largely fixed, and that she had ensured "we've got the right quality and compliance in all of our manufacturing sites around the world, both internal and external." *Id*. at ¶210.

**\*7** On July 12, 2018, a jury in a Missouri product liability lawsuit (the *Ingham* case), the first trial where plaintiffs alleged that their ovarian cancer was caused by asbestos in the Talc Products, rather than talc itself, issued a $4.69 billion verdict in favor of the plaintiffs. *Id*. at ¶213. Following the jury verdict, the Company's stock price declined 1% which an event study determined to be statistically significant. *Id*. at ¶214. Market commenters and financial analysts also contributed the decline to the jury verdict. *Id*. at ¶¶215-218.

Much like after the *Lanzo* verdict, the Company went on the defensive, and made public statements decrying the verdict in the *Ingham* case. *Id*. at ¶¶219-222. In a July 2018 corporate statement, J&J promised that "the evidence in the case was simply overwhelmed by the prejudice" J&J had suffered during the proceeding, and J&J "remains confident that its products do not contain asbestos and do not cause ovarian cancer." *Id*. at ¶219. In fact, the Company allegedly commented that the "the multiple errors in this trial were worse than those in the prior trials which have been reversed." *Id*. Similarly, Bloomberg reported on July 12, 2018, that Goodrich had stated in an email that the verdict " 'was the product of a fundamentally unfair process,' " and that " 'the evidence in the case was simply overwhelmed by the prejudice' " of the proceeding. *Id*. at ¶220. Goodrich also blamed " 'multiple errors' " in the proceeding for the verdict and again promised that J&J's products were asbestos-free and did not cause ovarian cancer. *Id*. During an earnings call on July 17, 2018, Gorsky specifically referenced the *Ingham* case and avowed that "we remain confident that our products do not contain asbestos and do not cause ovarian cancer,"

and that "preeminent scientific and regulatory bodies ... have fully reviewed the full body of scientific evidence on multiple occasions and found that it does not support the allegation that talc causes ovarian cancer." *Id*. at ¶222.

On December 14, 2018, Reuters published a highly detailed investigative report (the "Reuters report") entitled, "Powder Keg: Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder." *Id*. at ¶223. The article purportedly provided new information regarding the Company's knowledge of asbestos contamination in the Talc Products, the Company's alleged offensive campaign to convince regulators that talc was not a carcinogen, the Company's unsuccessful efforts to remove asbestos from its talc, and its failure to use "essential" testing methods. *Id*. at ¶¶223-243. Furthermore, the article allegedly included never-before-seen internal J&J documents that detailed the Company's knowledge of asbestos in the Talc Products and documented J&J's longstanding fraudulent cover-up scheme. *Id*. at ¶223.

Following the publication of the Reuters article, J&J's stock price plummeted 10% from a closing price of $147.78 the prior day to a closing price of $133. *Id*. at ¶233. An event study allegedly determined that the decline "was statistically significant." *Id*. Financial analysts and market commenters from entities such as Forbes, Wells Fargo, and Credit Suisse also attributed the decline to the new information revealed in the Reuters article. *Id*. at ¶¶234-237.

Following the Reuters report's revelations, several government entities announced investigations into its allegations. A U.S. senator from the Environment and Public Works Committee requested that the FDA "immediately investigate" to determine whether J&J's "actions have placed at risk the public's health and safety." *Id*. at ¶245. Another senator, from the Committee on Health, Education, Labor and Pensions, requested documents related to the " 'alleged decades-long effort by J&J to potentially mislead regulators and consumers about the safety' " of Baby Powder. *Id*. at ¶248. The Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") sent J&J "preliminary inquiries and subpoenas" regarding the instant securities class action lawsuit, a shareholder derivative suit, two Employee Retirement Income Security Act of 1974 class action lawsuits, and the product liability multidistrict litigation. ¶¶250-252.

#### D. **This Putative Class Action**

**\*8**  On February 8, 2019 plaintiff Frank Hall filed a putative class action complaint, on behalf of all investors that purchased J&J securities between February 22, 2013 and February 7, 2018, alleging violations of Section 10(b) of the Securities Act of 1934 and Rule 10(b)(5) (Count 1) by all Defendants, and violations of Section 20(a) of the 1934 Act by defendants J&J, Gorsky, and Caruso (Count 2). *See* ECF. No. 1. On February 28, 2019, the Court appointed San Diego County Employees Retirement Association as Lead Plaintiff. *See* ECF No. 20. An Amended Complaint was filed on February 28, 2019. *See* ECF No. 33. The new pleadings added Sandra Peterson, Carol Goodrich, Joan Casalvieri, Michael Sneed, and Tara Glasgow as defendants, and also extended the Class Period through December 2018. *Id.*

Subsequently, Defendants filed the instant motion to dismiss, arguing that Plaintiff has failed to state a claim under the applicable securities laws because: (1) the allegedly "new" information about the existence of asbestos in J&J's talc is immaterial; (2) alleged misrepresentations and omissions are either true or a non-actionable opinion; (3) Plaintiff has failed to allege a strong inference of scienter; 4) Plaintiff has not sufficiently alleged loss causation; and (5) Plaintiff's claims based on events occurring after February 7, 2018 (the end of the class period proposed in the initial Complaint) are not viable. Plaintiff opposes the motion.

#### II. **LEGAL STANDARD**

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's

entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

**\*9**  "Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of its alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise

misconduct with which [it is] charged.' " *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA, 15 U.S.C § 78u, *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema*, 438 F.3d at 276. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions ... if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent ...") (quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter,

state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA complements Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted).

## III. ANALYSIS

### A. Judicial Notice

Defendants request that this Court take judicial notice of seventeen documents pursuant to Federal Rule of Civil Procedure 201. *See* ECF No. 44, Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss ("Def. Judicial Notice Br."), Ex. 1-17. Plaintiff objects to judicial notice of eleven of the proffered exhibits. [5] *See* ECF No. 45-4, Lead Plaintiff's Brief in Opposition to Defendants' Request for Judicial Notice ("Pl. Judicial Notice Br.").

**\*10** On a motion to dismiss, courts may consider "document[s] integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiffs' claims are based on the document." *In re Asbestos Product Liability Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016). Courts may also consider facts and documents which are subject to judicial notice under Federal Rule of Evidence 201. A fact is appropriate for judicial notice if it "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiff does not oppose limited judicial notice of Exhibit 1, an SEC form 10-K filed by J&J, for the fact that the form

was filed with the SEC and that the statements included in the filing were made. Pl. Judicial Notice Br. at 5. However, Plaintiff objects to judicial notice of the document to the extent J&J seeks to admit the exhibit "for the truth of contested matters it discusses – such as J&J's defensive position that there is an 'absence of any credible scientific evidence suggesting that the Talc Products contain dangerous levels of tremolite asbestos or any other type of asbestos." *Id.* Similarly, Plaintiff does not object to judicial notice of the existence of the contents of Exhibits 2, 5, and 9, each of which is a document issued by a government entity or public agency, but objects to the Court assuming the truth of the matters asserted in those documents. *Id.* Because these documents are publicly available authentic records, or documents issued by government and public agencies, the Court will take judicial notice of Exhibits, 1, 2, 5, and 9, however, to the extent Defendants attempt to rely on those documents to create a defense to the Complaint's otherwise well-pled allegations, and suggest that this Court should assume the factual assertions in those documents to be true, the Court finds it inappropriate to do so, at this juncture.

Finally, Plaintiff objects to judicial notice of the remaining exhibits: Ex 3., March 5, 2019 Statement from U.S. Food and Drug Administration Commissioner Scott Gottlieb, M.D. and Susan Mayne, Ph.D., director of the Center for Food Safety and Applied Nutrition; Ex. 4, The U.S. Food and Drug Administration webpage regarding a 2009-2010 talc study; Ex. 10, a 2016 scientific study from the Journal of the National Cancer Institute, entitled "Douching, Talc Use, and Risk of Ovarian cancer"; Ex. 12, "Prospective Study of Talc Use and Ovarian Cancer"; Ex. 14, February 13, 1975 letter from G. Lee regarding "CTFA Talc Subcommittee Meeting with Food and Drug Administration, Washington, D.C., February 7, 1975,"; Ex. 16-17., CNN articles by Matt Egan from February 5 and February 8, 2019.

Exhibits 3 and 4 are both excerpts from the Food and Drug Administration's (FDA) website. Although statements from government entities are typically appropriate for judicial notice, Exhibit 3 was issued on March 5, 2019, three months after the close of the Class Period. Thus, it arguably has minimal relevance to the claims at issue, here. Exhibit 4, although it does not contain a publication date, notes the release of a March 12, 2019 safety alert regarding cosmetic talc, and thus, also appears to post-date the Class Period. Accordingly, the Court declines to take judicial notice of either document. *See* *In re PTC Therapeutics, Inc. Sec. Litig.,* 2017 WL 3705801, at *3 n.5 (D.N.J. Aug. 28, 2017)

(declining to take judicial notice of post-class period public documents because "their relevance to the issues here – e.g., what was known to PTC at the time it made the alleged misstatements – is quite low").

**\*11**  Exhibit 10 is a scientific study sponsored U.S. National Institutes of Health (NIH) and published in the National Cancer Institute journal. Defendants contend that the study is appropriate for judicial notice because it was sponsored by the NIH and courts may take notice of information reported by government administrative agencies. Def. Judicial Notice Br. at 5. Although Defendants are correct that courts may generally take judicial notice of a document issued by a governmental agency, the Court declines to take judicial notice of Exhibit 10. *Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir. 2014) (finding it appropriate to take judicial notice of documents that are the records of government agencies). Defendant primarily seeks to introduce Exhibit 10 to contest the allegation that there is a link between talc and ovarian cancer. *See* Def. Br. at 27 (citing Exhibit 10 for the proposition that "a large prospective study" "did not observe an association between recent talc use and ovarian cancer.") Because Exhibit 10 addresses the merits of Plaintiff's claims, is not relied upon or integral to the Complaint, and would require the court to delve into the scientific evidence that forms the crux of the parties' dispute, the Court declines to take judicial notice of the study.

Defendants contend that Exhibits 12 and 14 are documents linked directly from the Reuters article, which is Exhibit 3 to the Amended Complaint. Def. Judicial Notice Br. at 5-6. Similarly, Exhibit 12 is a study referenced in the draft of the J&J Safety Care and Commitment Website, and quoted in Paragraph 131 and Exhibit 2 of the Amended Complaint. *Id.* Although these documents are referenced in exhibits to the Complaint, they are not, themselves, "integral to" or "expressly relied upon" in the Complaint. *In re Asbestos Product Liability Litig.,* 822 F.3d at 134 n.7. The mere fact that the documents are referenced or quoted in an Exhibit to the Amended Complaint does not render the exhibits themselves appropriate for consideration on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) ("[T]he critical [issue] is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."). Furthermore, the inferences that Defendants wish to draw from these documents are inappropriate at this juncture. Like Exhibit 10, Defendants largely point to these documents

*Hall v. Johnson & Johnson, Slip Copy (2019)*

Fed. Sec. L. Rep. P 100,720

to establish substantive merits-based defenses regarding the science underlying the Complaint's allegations. Accordingly, the Court declines to take judicial notice of Exhibits 12 and 14.

Exhibit 16-17 are both CNN news articles, which are not referenced in the Complaint, but provide analysis of the Dow Jones' historical average price data. Because the documents convey historical stock data, the Court will take judicial notice of Exhibits 16 and 17. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 272-74 (D.N.J. 2007) (taking judicial notice of "stock price data compiled by a reliable financial news service."). However, to the extent Defendants seeks to create factual disputes regarding the cause for the decline in J&J stock, the Court will grant Plaintiff the benefit of all reasonable inferences from the facts as alleged, as required at this phase of the litigation.

### B. The Section 10(b) and Rule 10b–5 Claims

The private right of action under Section 10(b) and Rule 10b–5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 141. In relevant part, Rule 10b–5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) and Rule 10b–5, the plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

**\*12** Under Section 10(b) and Rule 10b–5, a misrepresentation or omission of fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision, and there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v.*

*Northway*, 426 U.S. 438, 440, 449 (1976)); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). Importantly, to be actionable, a statement or omission must have been materially misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Additionally, because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 n. 11 (3d Cir. 1992) (citation omitted). The Third Circuit has warned that the task of determining materiality can be especially difficult when the statement at issue contains "soft" information, i.e., statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts. *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3d Cir. 1989).

However, regardless of whether a piece of information is material, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Indeed, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014) (quoting *Basic*, 485 U.S. at 239 n. 17). Rather, "[d]isclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.' " *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); *see also City of Edinburgh*, 754 F.3d at 174; *Burlington*, 114 F.3d at 1432 ("[P]ossession of material nonpublic information alone does not create a duty to disclose it.").

Additionally, according to the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, when the alleged misleading statement at issue is an opinion or a belief, whether that statement is 'misleading' "depends on the perspective of a reasonable investor: The inquiry (like the one into materiality) is objective." 575 U.S. 175, 185 (2015). Although *Omnicare*

examined claims under Section 11 of the Securities Act of 1933, these principles are "not unique to § 11." *Id.* at 191. Rather, "[t]hey inhere, too, in much common law respecting the tort of misrepresentation," *id.*, and are therefore arguably applicable to claims under Section 10(b) as well. *See In re Merck & Co.,* No. 05-1151, 2015 WL 2250472, at \*21 (D.N.J. May 13, 2015) (finding *Omnicare*'s analysis of misleading opinions, instructive, to some extent, on the viability of claims regarding misleading opinions under Section 10(b)). As the Supreme Court observed:

> The Restatement of Torts, for example, recognizes that '[a] statement of opinion as to facts not disclosed and not otherwise known to the recipient may' in some circumstances reasonably 'be interpreted by him as an implied statement' that the speaker 'knows facts sufficient to justify him in forming' the opinion, or that he at least knows no facts 'incompatible with [the] opinion.' When that is so, the Restatement explains, liability may result from omission of facts—for example, the fact that the speaker failed to conduct any investigation—that rebut the recipient's predictable inference.

\*13 *Omnicare,* 575 U.S. at 191 (quoting Restatement (Second) of Torts § 539 at 85, Comment a at 86, Comment b at 87 (1976) (citations omitted)). These principles are consistent with the Third Circuit's admonition that when evaluating Section 10(b) claims, courts must examine allegedly misleading statements in context, to determine whether they were indeed misleading. *See City of Edinburgh,* 754 F.3d at 167. Furthermore, the Third Circuit has deemed determinative that "[o]pinions are only actionable under securities laws [including Section 10(b),] if they are not honestly believed and lack a reasonable basis." *Id.* at 170.

In addition to opinions and beliefs, a defendant may not be held liable for an alleged misrepresentation that consists of nothing more than vague and nonspecific expressions of corporate optimism. *Advanta,* 180 F.3d at 538. Such statements "constitute no more than 'puffery' and are understood by reasonable investors as such." *Id.* (quoting *Burlington,* 114 F.3d at 1428 n. 14). Thus, if a false or misleading statement is "too vague to ascertain anything on which a reasonable investor might rely," it is inactionable as corporate puffery. *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 284 (3d Cir. 2010).

### i. The Alleged Material Misstatements and Omissions

As an initial matter, the Court makes clear that, at this pleading phase of the litigation, the Court has not, and will not, assess the substantive merits, or truthfulness, of the alleged misstatements and omissions identified by Plaintiff. Critically, in this case, many of the identified misstatements involve interpretations of complex scientific evidence, which are the appropriate fodder for expert testimony. The Court assumes, as it must on a motion to dismiss, the truth of Plaintiff's well-pled allegations; to the extent Plaintiff has sufficiently alleged facts suggesting that the identified statements were false or misleading, the Court grants Plaintiff all reasonable inferences from those facts, without expressing an opinion as to the underlying substance of Plaintiff's allegations.

The basis of Plaintiff's claims in the instant case are hundreds of allegedly false or misleading misstatements issued by Defendants between February 2013 – and October 2018 in furtherance of J&J's purported scheme to conceal the truth about the safety of its Talc Products from investors and the public. *See* AC ¶¶253-391. Here, Defendants argue that Plaintiff has failed to adequately allege that Defendants' statements are materially false or misleading. In that regard, Defendants do not specifically point to particular misleading statements in the Amended Complaint; instead, they identify categories of statements, and provide examples within those categories, which they contend are insufficient to sustain a securities fraud claim. Def. Br. at 10-1. Specifically, Defendants argue that each of the alleged misstatements falls into one of several broad categories 1) "[g]eneral statements regarding J&J's commitment to quality, research and development, and product safety," *see, e.g.,* AC ¶¶ 253, 258, 261, 263, 269, 271, 273, 275, 277, 278, 281, 284, 296, 309, 327, 356, 358, 360, 361, 367-69.; 2) "[s]pecific statements that J&J's talc and consumer talc products are 'carefully tested,' 'safe,' and 'asbestos free,' " *see, e.g., id.* at ¶¶ 292, 294, 299, 302-03, 311, 318, 321, 331, 335, 338-41, 346-47, 350, 359, 370, 375, 379, 382, and 3) "[s]tatements about J&J subsidiaries involvement in product liability lawsuits ... and [c]ertain Defendants ... assessment of jury verdicts rendered against the Company in the PL Lawsuits," *see, e.g., id.* at ¶¶ 272, 274, 282, 286, 297, 302, 307, 315-16, 324-26, 329, 333, 344, 353-55, 365, 379-80, 388, 390. The Amended Complaint spans over 240 pages and contains numerous, detailed, allegations of false or misleading statements which were issued in, among other

things, J&J's SEC filings, website, earnings calls, press releases, and media reports. *See generally id.* at ¶¶ 253-391. In that connection, Plaintiff has provided the Court with a chart, totaling over 100 pages, summarizing each misstatement or omission identified in the complaint, the speaker, and the reason why the statement is allegedly false or misleading. *See* ECF No. 45-1, Appendix 1. However, the Court will not examine each statement individually, but rather, consistent with the parties' briefing, the Court will assess each category of allegedly false and misleading statements, and identify specific statements as examples, where necessary.

### 1. General Statements Regarding the Company's Commitment to Product Safety and Quality

**\*14** Defendants contend that Plaintiff has not adequately alleged that any of the statements regarding the quality and safety of the Talc Products are inaccurate. Def. Br. at 31. Furthermore, Defendants contend that even if false, the statements are "vague" and "general," and constitute non-actionable "puffery." Def. Br. at 31.

Plaintiff contends that both Defendants' present-day and historical statements about J&J's commitment to safety and quality assurance policies were materially misleading. Pl. Br. at 27. In that regard, Plaintiff points to Defendants' statements, in various SEC filings between 2013 and 2017, expressing that the Company was "committed to investing in research and development with the aim of delivering high quality," and "improving existing products." *See, e.g.,* AC ¶¶256, 258, 263, 273, 275, 281, 296, 327, 356. Plaintiff also alleges, for example, in July 2013, during a conference call with investors, Peterson allegedly informed investors that as part of its "quality initiative," the Company was "trying to ensure that we have the highest standard of quality for the safety and care of our patients and consumers" and the Company was identifying problems with its products early and taking any necessary corrective action. *Id.* at ¶261. As another example, during a healthcare conference on January 12, 2015, Gorsky allegedly stated that "quality and safety" was the Company's "number-one priority" and that they had made a number of changes to "make sure that [J&J] addressed any of the outstanding issues that [the Company] was facing." *Id.* at 277. On several occasions, Gorsky and Glasgow, both in oral statements and on the Company's website, emphasized the Company's commitment to "taking care of mothers and babies" and helping people live longer, healthier, and happier lives." *Id.* at 278, 284

In Plaintiff's view, these statements regarding the safety and quality of J&J's products were material misstatements or omissions, because Defendants failed to disclose that (i) asbestos had repeatedly been found in the Company's Products, (ii) J&J purposely avoided "essential" testing methods, and (iii) J&J had purposely influenced and manipulated regulators and lied to the FDA regarding asbestos testing and safety. Pl. Br. at 29. Relying primarily on out-of-circuit cases, Plaintiff contends that "puffery in one context may be material in other contexts" and here, because the Company's actions were such an extreme departure from its public representations about J&J's current and past practices, the statements were materially misleading, rather than mere puffery. *Id.*

"[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such." *Advanta*, 180 F.3d at 538 (internal quotes and citations omitted); *see also Aetna*, 617 F.3d at 283 (noting that puffery includes "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."). "[A]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Aetna*, 617 F.3d at 283.

**\*15** In *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), relied upon by Plaintiff, the defendant, a banking institution, characterized its lending policies as "prudent," "cautious," and "conservative," and also emphasized its "strict" credit administration practices, its "minimal" foreign loan exposure, and its "basic" approach to loan management.

*Id.* at 276. It also represented that its loan loss reserves were "strong" or "very strong," and had been and would continue to be "maintained at a level adequate." *Id.* While making those representations, the company allegedly concealed the truth about the company's loan loss reserves, financial health, lending practices, and internal controls.

*Id.* at 281–82. The Third Circuit explained that "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully." *Id.* at 282. Further, it found that, although

the terms used by the company were general, "a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers." *Id.* Thus, the court found that defendant's general statements in that regard were actionable as securities fraud.

Here, although Defendants have broadly identified this category of statements as "[g]eneral statements regarding J&J's commitment to quality, research and development, and product safety," the Court finds that certain statements within this category are actionable as securities fraud, while others are not.

As an initial matter, some of the alleged misstatements within this category are clearly more general statements regarding the Company's values and motivations, and thus, constitute puffery. For example, the Amended Complaint identifies the following misstatements: (1) statements on the Company's website that J&J "continue[s] to take [its] research to the next level by looking at all the science ... that help our babies thrive and grow" and that J&J "help[s] families make the little moments – like bath time" serve as "an opportunity to nurture your baby's ability to learn," AC ¶278; (2) a statements by Gorsky during a January 2014 conference call that the Company's "Chief Medical and Chief Quality Officers are setting new benchmarks for medical safety and implementing a more consistent global approach for monitoring the use of our end market products that is very patient- and consumer-centric for ensuring that they are safe and performing as expected and as intended. While we're pleased with the progress that we've made here, we're not yet satisfied, and we'll keep doing whatever it takes to ensure that we continue to earn the trust of consumers and patients around the world," *id.* at ¶269; (3) a statement by Gorsky at an April 23, 2015 Shareholders Meeting, that "Johnson & Johnson is committed to helping mothers and babies, we never want to forget the needs of the world's smallest patients ... Caring inspires us day in and day out as we strive to make a difference for people who count on us the most. And as the world's largest and best healthcare company in the world, we're committed to reaching more people in more places in more ways. We're helping people ultimately live longer, healthier, and happier lives," *id.* at ¶284; and (4) a statement by Gorsky at an April 2018 shareholder meeting that "at Johnson & Johnson, we are committed to meeting the needs of our stakeholders, as defined in Our Credo, the doctors, the nurses and patients and

the mothers and fathers and all others who use our products.... Guided by our purpose-driven strategies and values that are rooted in our credo, we will always put the needs and well-being of the people we serve first," *id.* at ¶361. These statements – and other similar statements identified in the Amended Complaint – are general value-oriented statements regarding the Company's commitment to consumer safety; critically, many of these statements do not even specifically address the Talc Products or make any specific claims about the Company's quality assurance process and procedures, related to those products. *See Ong v. Chipotle Mexican Grill, Inc.,* 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (finding that company's statements that it was "committed to serving safe, high quality food to [its] customers" and that its "food safety programs are also designed to ensure that [the company] compl[ies] with applicable federal, state and local food safety regulations" were inactionable puffery because they were "couched in aspirational terms."). Unlike in *Shapiro*, where the defendant addressed specific business practices, these statements are the type of "vague and general statements of optimism" and aspirational goal statements routinely issued by companies selling consumer products and not the type of assertions upon which a reasonable investor would rely. *Advanta,* 180 F.3d at 538; *see also U.S. S.E.C. v. Kearns,* 691 F. Supp. 2d 601, 617 (D.N.J. 2010) (finding that medical transcriptions company's statements about "disciplined business practice" and the experience and discipline of its management team, were merely puffery because no reasonable investor would have relied on them); *In re Hertz Glob. Holdings, Inc. Sec. Litig.,* No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017), *aff'd sub nom,* 905 F.3d 106 (3d Cir. 2018) (finding that statements about "strong" and "record" financial results, as well as the generally optimistic statements, constituted puffery because they "are not determinate, verifiable statements."). Thus, I find that the identified value-oriented statements – and other similar statements -- are not sufficiently material to rise to liability for securities fraud, and Plaintiff's claims premised on such statements are dismissed.

**\*16** However, certain statements regarding the Company's quality assurance process were ostensibly meant to preclude investors and the public from second-guessing the Company's approach to quality assurance and research, which according to Plaintiff, furthered the alleged scheme to cover up the truth about the safety of the Talc Products. In addition to the statements regarding quality control and assurance in the Company's SEC filings, many of the Individual Defendants

made public announcements that, although they did not specifically reference the Talc Products, suggested that the Company was taking corrective action to address quality control issues with its products. For example, in a July 2013 conference call regarding the Company's second-quarter 2013 financial results, Peterson explained that

> [the Company's] quality effort is across the enterprise, across all of our businesses, our manufacturing sites as well as all of our R&D sites, because they are under the scope of trying to ensure that we have the highest standard of quality for the safety and care of our patients and consumers. So, when we launched the quality initiative a number of years ago, the focus really was on ensuring that we've got consistent quality standards.... And we have, obviously as we've gone through all of this work, we have identified corrective actions, and we've immediately taken those corrective actions.... We're putting in place processes and systems so that we have early warning systems in place to understand if we think there may be something going on with a product. So we identify it early and we go out and correct it.... one of the very important changes that we have been making with our global supply chain is ensuring that all of our external suppliers – so, our material suppliers – are thoroughly reviewed, are thoroughly managed, and that they are living up to our quality standard

*id.* at ¶261. Similarly, during a healthcare conference on January 12, 2015, Gorsky stated that "quality and safety, [is] our number-one priority in dealing with patients and consumers. We've made a number of changes over the last few years, frankly to make sure that we addressed any of the outstanding issues that we were facing, but also more importantly to set us up for a benchmark going forward." *Id.* at ¶277.

By placing the nature of the Company's quality assurance procedures "in play," Defendants were also required to disclose "certain facts contradicting th[ose]representations." *Shapiro,* 964 F.2d at 281. Here, Plaintiff specifically alleges that, despite various individual defendants' attestations to the contrary, the Company was not focused on quality assurance, and research and development. The identified statements, and other similar attestations, go to the heart of Plaintiff's theory that the Company's quality assurance procedures were intentionally deficient, and that the Company deliberately avoided utilizing "essential" testing which might reveal the existence of asbestos in its Talc Products. Other courts have similarly concluded that statements emphasizing the strength of a particular business operation may be actionable as securities fraud, where those operations are in reality deficient. *See e.g., In re Equifax Inc. Sec. Litig.,* 357 F. Supp. 3d 1189, 1218–19 (N.D. Ga. 2019) (finding that defendants' alleged representations that it possessed a "highly sophisticated data information network" and "advanced security protections" were material misrepresentations where the plaintiff alleged "a variety of facts showing that [the company's] cybersecurity systems were outdated, below industry standards, and vulnerable to cyberattack, and that [the company] did not prioritize data security efforts."); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,* 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (finding that defendants alleged representations that it "conducted 'extensive' training and safety programs" were materially misleading where the plaintiff alleged facts suggesting that "the measures were insufficient to address applicable legal requirements and created a high risk of legal exposure."); *cf. Howard v. Arconic Inc.,* 395 F. Supp. 3d 516, 547 (W.D. Pa. 2019) (finding that company's "general statements about its values, workplace safety, and ethics—which read like mission statements rather than guarantees" were not misleading where the plaintiff's securities fraud claims did not involve safety issues, but rather, involved allegations that the company sold a particular product for inappropriate end uses). Thus, at this juncture, in light of Plaintiff's allegations that the Company was knowingly hiding the existence of asbestos in its Talc Products, purposefully avoiding the use of testing methods which might reveal the existence of asbestos, and making misrepresentations to the FDA regarding asbestos testing and safety, the Court cannot conclude that the Company's representations that it was focusing on research and development, ensuring the quality of its outside materials, and providing high quality products, were "so obviously

unimportant to an investor that reasonable minds cannot differ on the questions of materiality." 🔖 *Shapiro,* 964 F.2d. at 280.

### 2. Statements that the Talc Products were "safe" and "asbestos free"

**\*17** Defendants also contend that the statements that the Talc Products are "safe" and "asbestos free" are inactionable. Def. Br. at 19-20. First, Defendants argue that those statements are actually true, as Plaintiff has failed to identify data, test results, or other facts supporting the inference that the statements were false at the time they were made; and second, that even if proven false, the statements are inactionable opinions. Def. Br. at 20; ECF No. 48, Reply Brief to Opposition to Motion ("Def. Reply Br.") at 5. In that connection, Defendants insist that Plaintiff has not provided "contemporaneous testing data" indicating the existence of asbestos in the Company's Talc Products and that Plaintiff relies on isolated and debunked testing results which are insufficient to adequately allege that the Talc Products were unsafe or contaminated with asbestos between 2013 and 2018. Def. Br. at 22-23. In Defendants' view, the historical allegations regarding the avoidance of essential testing methods in the 1970s and the finding of asbestos in the Baby Powder in 2004, "are irrelevant to the question of whether Defendants made misstatements regarding troubling testing results regarding asbestos during (or anywhere near in time) to the Class Period" which began in 2013. Def. Reply Br. at 5. Further, Defendants argue that the statements are "at most, subjective interpretations of complex data, which constitute inactionable opinion statements that cannot support a claim for securities fraud." Def. Reply Br. at 6.

Plaintiff disputes Defendants' characterization of the statements regarding the asbestos free nature of their products as opinions, and contends that Defendants' statements "were not 'subjective interpretation[s] or expression[s] of belief,' " but rather " 'painted a favorable picture without including the details that would have presented a complete and less favorable one.' " Pl. Br. at 18 (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC,* 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018)). Furthermore, even if the statements are found to be opinions, in Plaintiff's view, Defendants did not honestly believe the proffered statements regarding the safety of talc, as indicated by the Company's internal documents, and Defendants lacked a reasonable basis for making the proffered statements. *Id.* at 19. Additionally, Plaintiff contends that "Defendants' statements put the

safety and purported asbestos-free nature of the products at issue, but withheld existing material information on those same subjects," such as J&J's alleged avoidance of important testing methods, J&J's unsuccessful attempts to remove tremolite from its talc, and the Company's alleged scheme to conceal the asbestos contamination; according to Plaintiff, these omissions rendered the Company's statements materially misleading. Pl. Br. at 30. Thus, Plaintiff argues that both Defendants' historical statements, and those during the Class Period, are materially misleading. *Id.*

The Court finds that Plaintiff has sufficiently alleged facts suggesting that that Defendants' statements regarding the safety and asbestos free nature of its Talc Products were either false or materially misleading, at the time they were made. To begin, in addition to public statements in newspapers and to investors during conference calls, during the Class period, the Company repeatedly issued statements on its website reaffirming the safety of talc and its talc products. The Company's "Our Safety and Care Commitment" website was updated to include the following statement from Casalvieri, Director of Toxicology and Skincare, which stated that

> [a]s a toxicologist in our Consumer business, my job is to make certain a product is safe by assessing whether any ingredient in that product poses a risk. We want to assure women and caregivers who use our talc products that numerous studies support its safety, and these include assessments by external experts in addition to our company testing. Many research papers and epidemiology studies have specifically evaluated talc and perineal use and these studies have found talc to be safe.

AC ¶266. On February 24, 2016, following the $72 million verdict in one of the first successful cases linking talc and ovarian cancer, J&J allegedly created a page on its website, entitled "The Facts About Talc Safety" which explained among other things, that "Johnson's talc products do not contain asbestos," the "[t]he safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards," and that the Company's "sources for talc undergo comprehensive

**Hall v. Johnson & Johnson, Slip Copy (2019)**

Fed. Sec. L. Rep. P 100,720

qualification. The incoming talc is routinely evaluated using a sophisticated battery of tests designed to ensure quality, safety, and compliance with all global standards." *Id.* at ¶299; *see also* ¶147. Similarly, Goodrich was quoted in a New York Daily News article, following the *Lanzo* verdict, as stating that "Johnson's Baby Powder has been used for more than 120 years and it does not contain asbestos or cause mesothelioma." *Id.* at ¶359

**\*18** Notwithstanding those statements, Plaintiff's Complaint alleges that during the Class Period, J&J and Goodrich internally acknowledged that the Company could not espouse that "talc has over 100 years of safe use in personal care products," *id.* at ¶¶128, 267; *see also* AC Ex. 2; that J&J's outside testing laboratory did not think the testing method used by J&J was "optimal" for identifying asbestos, *id.* at 110; and that "[t]o this day, J&J has not adopted concentration method for testing its talc despite the Company's knowledge that this would allow detection of asbestos in its talc and talcum powders when present in trace amounts," *id.* at ¶67. To the extent Defendants rely on other tests as providing a reasonable and good faith basis for their statements, Plaintiff has sufficiently alleged the existence of alternative testing and that Defendants allegedly chose to remain willfully ignorant of the possibility that there was asbestos in the Company's Talc Products. Additionally, Plaintiff claims that Goodrich admitted internally that scientific sources "could be interpreted as suggesting a causal effect" between talc and ovarian cancer, and that studies cited by J&J "send mixed messages." *Id.* at ¶¶266-268.

Indeed, as alleged, Defendants were admittedly aware of contrary test results and yet, indicated to the public at large, via statements on the Company website and elsewhere, that J&J had "carefully assessed all available data on talc and consumers can feel confident that the overwhelming body of research and clinical evidence continues to support the safety of cosmetic talc." *Id.* at ¶288. Thus, Plaintiff has sufficiently alleged the existence of scientific evidence, of which defendants were aware, suggesting the falsity of Defendants' statements; although expert discovery may eventually prove otherwise, at this early juncture, the Court assumes those statements to be true. Accordingly, the Court finds that Defendants' statements that their Talc Products were asbestos-free, in the face of the alleged contrary scientific evidence that Defendants were aware of, were arguably false.

Furthermore, even assuming Defendants' statements were merely opinions based on assessment of all the scientific evidence available to the Company, Plaintiff has sufficiently alleged that the statements were "materially misleading," because they did not express the actual belief of the Company and lacked a reasonable basis. *City of Edinburgh*, 754 f.3d at 170. In *Omnicare*, the Supreme Court explained that an opinion may be an actionable misrepresentation or misleading omission if (1) the statement expresses an opinion not actually held by the speaker (subjectively false) and contains an embedded assertion of incorrect facts (objectively false), or (2) the speaker omits facts concerning the basis for the opinion and "those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1326, 1329; *see also City of Edinburgh*, 754 F.3d at 170 ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis.").

Although Defendant's statements regarding the safety of its Talc Products required some degree of interpretation of scientific evidence, here, unlike in *City of Edinburgh*, Plaintiff alleges that defendant's own internal statements undercut their public interpretations of the data available. In that case, investors brought a securities fraud suit against Pfizer, a pharmaceutical manufacturer, and the company's executives. *City of Edinburgh*, 754 F.3d at 170. The plaintiff alleged that the pharmaceutical manufacturer's statement in a press release, that it planned to proceed to the third phase of a clinical trial of an experimental drug based on the success of the second phase's interim results, was false and actionable as securities fraud. *Id.* The plaintiff alleged that confidential witnesses from the company indicated that phase 2 of the trial had presented certain safety concerns and did not show a significant deviation between patients treated with the experimental drug and the placebo. *Id.* In reviewing the allegations, the Third Circuit concluded that at best, plaintiff's allegations demonstrated "a difference of opinion" regarding whether initiating phase 3 of the clinical trial was warranted, and absent allegations that defendants "did not honestly believe their interpretation of the interim results or that it lacked a reasonable basis" the opinion was not actionable as securities fraud. *Id.* Further, the Third Circuit noted that that the press release did not proffer statements about the efficacy or safety of the drug, or the strength of the results, and in fact, explicitly cautioned investors that no conclusion could be drawn about the phase 2 interim results until the conclusion of the phase 2 trial. *Id.* at 174-75. Here, unlike in *City of Edinburgh*, J&J's statements regarding the safety of its Talc Products and the existence of asbestos in those

products, as alleged, do not merely stem from a difference in opinion regarding the efficacy of the testing utilized or the interpretation of the scientific results. Critically, Plaintiff has alleged that the Company's own internal documents and statements directly contradicted the Company's public statements regarding the safety of the Talc Products. *C.f.*

📄 *Hoey v. Insmed Inc.*, No. 16-4323, 2018 WL 902266, at *15-17 (D.N.J. Feb. 15, 2018)(finding that plaintiff had failed to adequately allege falsity where there were no allegations of the company being "informed about any concerns" with the trial and no allegations that defendant doubted or contradicted the opinion it represented to investors). For example, the draft version of the Company's "Safety & Care Commitment" deliberately omitted the word "safe" from the Company's statement that "Talc has over 100 years of *safe* use in personal care products" and internal comments by Goodrich stated "I don't think we can link cosmetic talc to 100 years of use," and that J&J "cannot say [the company's Talc Products have] 'always' " been asbestos free. AC ¶128; *see also* AC, Ex. 2. Furthermore, another note in the draft document acknowledged that there were omitted scientific sources from the webpage which "could be interpreted as suggesting a causal effect [between ovarian cancer and talc]" and noted that even some of the studies references on the webpage "send mixed messages," because one of the studies cited indicated that "that 'perineal talc use may modestly increase the risk of invasive serous ovarian cancers.' " *Id*. at ¶131. Furthermore, the internal documents referenced in the Reuters article allegedly show that from at least 1971 to the early 2000s, the Company's raw talc and finished powders sometimes tested positive for small amounts of asbestos, and that company executives, mine managers, scientists, doctors and lawyers discussed the problem and how to address it while failing to disclose it to regulators or the public. *Id*. at ¶223. Although Defendants correctly contend that the last alleged test which identified asbestos in any of the Talc Products was conducted in 2004, the lack of contemporaneous testing during the Class Period is not dispositive of Plaintiff's claims. *See* Def. Br. at 23. The misstatements identified by Plaintiff do not only address the present-day safety of Talc Products during the Class Period. Plaintiff alleges that, in addition to making statements about the current safety of the Talc Products, at various points throughout the Class Period defendants also allegedly represented that the Talc Products had never contained asbestos and had always been safe. *See e.g.*, AC ¶338 (Since the 1970s, talc used in consumer products has been required to be asbestos-free, so Johnson's talc products do not contain asbestos"), *id*. at ¶339 ("We are confident that our talc products are, and always have been, free of asbestos,

based on decades of monitoring, testing and regulation"), *id*. at ¶350 (same), *id*. at ¶369 ("While our ingredients have always been safe, our new formulations contain no unwanted ingredients."). More importantly, Plaintiff alleges that despite being aware of potential asbestos contamination in its Talc Products, J&J did not conduct further scientific studies, using the appropriate methodology, because it chose to remain willfully blind to the existence of asbestos in its talc. Accordingly, the alleged evidence of historical testing – of which Defendants were allegedly aware – renders those statements materially misleading, at this pleading stage.

**\*19**  Accordingly, Plaintiff has sufficiently alleged that Defendants statements that J&J's Talc Products were "safe" and "asbestos free" were either false or materially misleading.

### 3. The Statements Regarding the Product Liability Lawsuits

Plaintiff alleges that Defendants repeatedly represented to J&J's investors that the Company believes it has "substantial defenses" to the Product Liability lawsuits. *See* AC at ¶¶259, 272, 274, 297. The Amended Complaint alleges that in various SEC filings, Defendants "boasted of having substantial defenses" to talc-related litigation, but omitted critical information that undermines its statements such as, the prior findings of asbestos in the Company's talc, the Company's attempts to remove tremolite from its talc, and the Company's avoidance of concentration methods that could potentially detect asbestos. *Id*. at ¶¶166, 169, 272, 389, 390-91. For example, in the Company's First Quarter 2013 10-Q, it disclosed that

> [c]ertain subsidiaries of [J&J] are involved in numerous product liability cases. The damages claims are substantial, and while these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited.

Hall v. Johnson & Johnson, Slip Copy (2019)

Fed. Sec. L. Rep. P 100,720

Changes to the accruals may be
required in the future as additional
information becomes available.

AC ¶259. Additionally, various individual defendants made
statements criticizing the *Lanzo* and *Ingham* verdicts against
J&J and avowing that they would be overturned on appeal,
such as, "[w]e believe that once the full evidence is reviewed,
this decision will be reversed," and "the evidence in the case
was simply overwhelmed by the prejudice," and that there
were "multiple errors" in the verdicts. *Id.* at ¶¶148, 205,
219-22, 358. Plaintiff argues that Defendants "understood
J&J faced massive litigation exposure," yet did not disclose
the degree of that exposure to its investors, thus Defendants'
statements regarding the Talc Litigation were "false and
misleading statements." Pl. Br. at 30.

Defendants contend that those statements are nonactionable
opinions, as indicated by the repeated use of the word
"believe," and Plaintiff has not demonstrated that Defendants
did not actually believe that the Company had substantial
defenses. Def. Br. at 29. In that regard, the Defendants
highlight "numerous recent jury verdicts" in favor the
Company. Def. Reply Br. at 9-10.

Defendants' statements regarding the viability of the lawsuits
against J&J clearly constitute opinions regarding the success
of the litigation, rather than statements of fact. *See Axar
Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57
(S.D.N.Y. 2018) (finding litigation disclosure stating that
"[w]e believe the allegations [in a lawsuit] are unfounded
and without merit" and that defendant intended to "pursue
[its] rights, remedies and defenses in the litigation" was non-
actionable opinion statement). Plaintiff has not adequately
alleged facts suggesting that Defendants' opinion statements
regarding the existence of defenses to the product liability
lawsuits were "not honestly believed and lack a reasonable
basis." *City of Edinburgh*, 754 F.3d at 170. Plaintiff's
argument on this point is, essentially, that because Defendants
knowingly engaged in a fraudulent scheme to conceal the
truth about its asbestos products, none of the statements
regarding the viability of the lawsuits against the Company
could have possibly been in good faith. That type of circular
reasoning is insufficient to satisfy the Supreme Court's
decision in *Omnicare*. Notably, even assuming as true that
there was asbestos in J&J's Talc Products, the Company
may very well have defenses to the lawsuits premised
on other bases such as lack of causation, or procedural

issues occurring at trial. Plaintiff has not identified any
specific facts indicating that any of the Defendants possessed
information regarding the viability of the lawsuits against
the Company or suggesting that Defendants knew they had
no viable defenses against the lawsuit. Indeed, the Company
continues to actually litigate these cases to resolution, with
some success, demonstrating its belief in the viability of its
defenses. Accordingly, Plaintiff's claims premised on alleged
misstatements regarding the viability of the Product Liability
lawsuits are dismissed.

## ii. Scienter

**\*20** Scienter" stands for the "mental state [of] intent
to deceive, manipulate or defraud." *Ernst & Ernst v.
Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Under the
PSLRA's pleading requirement, a plaintiff must " 'state
with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind.' "
*Avaya*, 564 F.3d at 267 (quoting 15 U.S.C. § 78u-4(b)
(2)). The scienter standard requires a plaintiff to allege
facts giving rise to a strong inference "of either reckless or
conscious behavior." *Advanta*, 180 F.3d at 534-35. Courts
must weigh the "plausible, nonculpable explanations for the
defendant's conduct" against the "inferences favoring the
plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference"
of scienter is one that is "cogent and at least as compelling
as any opposing inference of nonfraudulent intent." *Id.*
at 314; *see id.* at 324 ("The inference that the defendant
acted with scienter need not be irrefutable, *i.e.*, of the
'smoking-gun' genre, or even the most plausible of competing
inferences" (internal quotation marks omitted)). Scienter can
typically be shown via recklessness, which is defined as "an
extreme departure from the standards of ordinary care ...
which presents a danger of misleading ... that is either known
to the defendant or is so obvious that the actor must be
aware of it." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d
1236, 1244 (3d Cir. 1989) (internal quotation marks omitted).
However, "it is not enough for plaintiffs to merely allege
that defendants 'knew' their statements were fraudulent or
that defendants 'must have known' their statements were
false." *GSC Partners CDO Fund v. Washington*, 368 F.3d
228, 239 (3d Cir. 2004). Rather, a plaintiff must, at least,
specifically allege facts constituting strong circumstantial
evidence that "defendants knew or, more importantly, should

have known that they were misrepresenting material facts related to the corporation." *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 599 (D.N.J.2001).

In conducting the scienter analysis, "[t]he inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). However, the Third Circuit has "explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole." *Hertz*, 905 F.3d at 115 (citing *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (concluding that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole")); *see also Avaya*, 564 F.3d at 280 ("Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate [the plaintiffs'] allegations collectively rather than individually."). Accordingly, the Court will, therefore, follow this approach and consider the alleged facts bearing on scienter individually, while at the same time considering whether, holistically, they give rise to a strong inference of scienter.

Here, Plaintiff contends that Defendants' consistent and repeated denials that there was not, and has never been, asbestos in the Company's Talc Products are indicative of scienter in light of the various efforts allegedly taken by Defendants to conceal the truth. *Id.* at 37. In that regard, Plaintiff identifies certain public statements by Glasgow, Casaliveri, and Gorsky, as well as internal documents drafted by Casalivieri and Goodrich, which, Plaintiff argues, are also indicative of scienter. *Id.* at 37-40. Furthermore, Plaintiff alleges that because Baby Powder is the Company's "sacred cow" and "flagship" product, "[t]he perceived importance of [Baby Powder] supports an inference that [defendants were] paying close attention to [it]," Pl. Br. at 44 (quoting *Avaya*, 564 F.3d at 271), as does the extensiveness of the Company's scheme and the number of employees allegedly involved, *id.* at 47. Additionally, Plaintiff contends that ongoing government investigations, including by the FDA, SEC, DOJ, and U.S. Senate, further support the strong inference of scienter. *Id.* at 48.

Defendants, in turn, argue that the "core operations doctrine" does not support an inference of scienter under the circumstances, as the Talc Products represent .3% of J&J's combined company sales. Def. Br. at 36-37; Def. Reply Br. at 12; AC at ¶186. Further, Defendants argue that Plaintiff has not pled specific facts showing that "any individual Defendant was aware of any credible test results that contradicted JJ's public statements, let alone that any Defendant intended to deceive investors." Def. Reply Br. at 12.

**\*21** As an initial matter, the Court finds that the each of the alleged misrepresentations at issue involve the "core operations" of J&J, supporting an inference of scienter. The "core operations doctrine"[6] provides that a plaintiff may be able to demonstrate a strong inference of scienter by alleging "that a defendant made misstatements concerning the 'core matters' of central importance to a company." *Martin v. GNC Holdings, Inc.,* 757 F. App'x 151, 155 (3d Cir. 2018); *see also Avaya*, 564 F.3d at 268 (explaining that when the misrepresentations and omissions involve " 'core matters' of central importance" to the company and its principle executives, an inference of scienter may arise). In order to support a finding of scienter based upon the core operations doctrine, plaintiff must also allege "some additional allegation of specific information conveyed to management and related to the fraud." *Id.* (internal quotation marks omitted); *see Rahman*, 736 F.3d at (declining to apply core operations doctrine in the absence of allegations demonstrating that defendants knew the information they disseminated was false)*; PharmaNet*, 720 F. Supp. 2d at 566 (rejecting application of the core operations doctrine in absence of "other individualized allegations"); *In re Amarin Corp. PLC*, Civ. No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) (rejecting application of the core operations doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements").

Plaintiff has sufficiently alleged that the Talc Products are a "core matter" of central importance." *Avaya*, 564 F.3d at 268. Although Defendants contend that the Talc Products make up only .3% of the Company's total sales, Plaintiff has alleged that the Company views its Talc Products, more specifically Baby Powder, as "an institution," "flagship product," and "sacred cow." AC ¶¶43,47. One corporate representative allegedly testified under oath that Baby Powder is among "the top one or two products that people think

of when they think of J&J." *Id.* at ¶412. In June 2012, the entire Board of Directors allegedly received, via email, a presentation on the "reputational risk" the talc-related lawsuits posed to the Company. *Id.* at ¶171. The safety of J&J's self-professed flagship product clearly falls within the Company's core operations. 📑 *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (noting that alleged misrepresentations at issue in securities fraud case involved company's "flagship product" thus, finding it "exceedingly unlikely" that false statements about product were innocently made by corporate executives); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (applying core operations doctrine where alleged misrepresentations addressed three drugs that made up a "substantial portion" of the defendant company's revenues and operations during the class period). Accordingly, Plaintiff has sufficiently alleged that the misstatements and omissions at issue in this case touch upon J&J's "core operations." However, the Court must also assess whether Plaintiff's core operations theory of scienter is supported by additional specific allegations that each of the Individual Defendants' had access to specific information related to the alleged fraud and the Talc Products. *Rahman*, 736 F.3d at 247.

### 1. Gorsky

**\*22**  With respect to defendant Gosky, Plaintiff alleges that that he publicly stated that he had been "paying attention to 'the significant amount of clinical information [and] control data' involving talc and talcum powders, including from agencies like the National Cancer Institute ("NCI") and FDA, and claimed to have sufficient knowledge to form an opinion on 'the safety of talc." AC ¶394. During a health care conference in September 2017, Gorsky allegedly assured investors that "more than a 100 years of experience," and findings from agencies, including the FDA "clearly demonstrate[d] the safety of talc." *Id.* at ¶335. Further, Plaintiff alleges that on June 6, 2017, Gorsky received an email which provided an update on the talc lawsuits and discussed the potential "reputational risk" the lawsuits posed to the Company. *Id.* at ¶171. Gorsky also assured investors, on at least one occasion, that the Company's "Chief Medical and Chief Quality Officers [were] setting new benchmarks for medical safety" and J&J was "monitoring the use of our end market products" to "ensu[re] that they are safe." *Id.* at ¶133

As alleged, Gorsky repeatedly professed to have knowledge regarding both the current science as to the safety of Talc and the Company's quality assurance procedures. However, Gorsky began serving as the Company's CEO in 2012, just as the allegations between talc and cancer began to reach their zenith, and has continued to serve as CEO throughout the Class Period. In that time period, a 2016 internal audit report allegedly discovered quality assurance issues at the lab where J&J performed its asbestos testing, and revealed that the Company's methods for testing its talc were "questionable at best" and "not an optimal method for asbestos testing." *Id.* at ¶¶65, 111. Given Gorsky's professed knowledge of the safety of talc, at best, he recklessly disregarded potentially contrary facts – many of which involved incidents which occurred during his tenure as CEO – Gorsky's failure to disclose the contrary information of which he was allegedly aware is suggestive of scienter. *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (finding scienter where plaintiff alleged that company executives made "public comments regarding the clinical data in press releases and earnings calls" because the "officers were speaking as authoritative sources who possessed the information to support their statements. When they did so, they knew that withholding the negative data that contradicted their public statements was misleading to investors.") Accordingly, the Court finds that Plaintiff has sufficiently alleged that Gorsky knew, or had reason to know, of the alleged falsity of his statements, thus Plaintiff has adequately alleged a strong inference of scienter as to Gorsky.

### 2. Caruso

As to Caruso, Plaintiff alleges that as CFO of the Company, he was responsible for signing the Company's SEC filings and ensuring that the statements contained therein were not false or materially misleading. AC at ¶395. Additionally, Plaintiff alleges that during the Class Period, Caruso led the Company's investor relations activities, which "effectively guaranteed that Caruso had access to the information that defendants withheld from investors during the Class Period." *Id.*

Plaintiff has not sufficiently alleged that specific information regarding the alleged fraud was conveyed to Caruso. Plaintiff's only allegations in that regard are that Caruso must have had information regarding the Company's fraudulent scheme because he was the CFO who signed the Company's SEC filings. However, a "general awareness of the the

day-to-day workings of the company's business does not establish scienter. *Rahman.*, 736 F.3d at 247. Accordingly, the Court finds that Plaintiff has not alleged any specific facts suggesting that Caruso had knowledge of the alleged falsity of any of the statements in the SEC filings.

### 3. Goodrich

Goodrich allegedly personally worked on the Company's "Our Safety & Care Commitment" webpage, and touted talc's "long history of safe use," and use "for over 100 years," despite internally expressing misgivings that J&J could not accurately say that talc was "always" safe. *Id.* at ¶401. Goodrich was also allegedly aware, as indicated by commentary on a draft of the webpage, that other scientific sources not cited on the "Our Safety & Care Commitment" website could actually "be interpreted as suggesting a causal effect" between talc and ovarian cancer. *Id.* Additionally, she recognized that "[e]ven some of the studies" cited by J&J on its website sent "mixed messages," including a study recognizing that "perineal talc use may modestly increase" the risk of ovarian cancer. *Id.* These alleged contradictions between Goodrich's public and internal statements demonstrate actual knowledge of the alleged falsity of her public statements. Thus, the Court finds that Plaintiff has adequately alleged a strong inference of scienter as to Goodrich.

### 4. Casalvieri

 **\*23**  Like Goodrich, Casalvieri is also alleged to have been involved in drafting and issuing public statements on the Company's website. Casalvierri was featured on the Company's "Our Safety & Care Commitment," which represented that "[w]e have carefully assessed all available data on talc," including the "body of research and clinical evidence." *Id.* at ¶402. She also issued other public statements where she professed to examine "assessments by external experts" and emphasized that "[a]s a toxicologist in our Consumer business," "my job is to make certain a product is safe." *Id.* Furthermore, internal company emails indicate that she was allegedly assigned the task of directing J&J's project "to defend talc" from potential inclusion in the NTP's biennial RoC. *Id.* at ¶403. That project allegedly included "develop[ing] documents that scientifically support the lack of a relationship of talc and ovarian cancer," and secretly funding a -study supportive of talc. *Id.* at ¶403. As alleged,

Casalvieri was heavily involved in the Company's scheme to preclude the NTP and other organizations from listing talc as a potential carcinogen. Accordingly, the Court finds that Plaintiff has sufficiently alleged a strong inference of scienter as to Casalvieri.

### 5. Peterson

Plaintiff generally alleges that because of her position in the Company, Peterson was, at the very least, reckless to the potential falsity of her statements regarding the Company's quality assurance systems. In that regard, Plaintiff alleges that Peterson was brought into her role as Group Worldwide Chair, for the purpose of "fixing the consumer and supply chain issues once and for all." *Id.* at ¶404. In that role, she allegedly represented to investors that she was paying attention to and implementing J&J's "processes and systems so that [J&J has] early warning systems" to monitor potential product problems. *Id.* at ¶405. However, Plaintiff has not alleged facts suggesting that during her tenure at J&J, Peterson was aware of, or should have been aware of, specific facts alerting her to existing quality control issues, rendering her statements false. Peterson joined the Company in September 2012, well after the most recent testing in 2004 which indicated asbestos in J&J's Talc Products. *Id.* at ¶88. Similarly, the audit report indicating quality control issues with J&J's outside asbestos testing facility was released in April 2012, before she was hired by J&J. *Id.* at ¶110. Plaintiff has not adequately alleged that Peterson's had knowledge of, or reason to know, that her statements regarding the Company's quality control systems were false, or that Peterson was aware of the alleged scheme to prevent the truth about the safety of talc from reaching the public.

In addition to Peterson's alleged knowledge of the Company's core operations, Plaintiff alleges that Peterson retired under suspicious circumstances, supporting an inference of scienter: "(i) Peterson's retirement was close in time to the first jury finding in favor of a plaintiff alleging harm from asbestos in J&J's talcum powders, (ii) Peterson had been brought in to fix the JJCI business's quality control issues but elected to retire at a time when the business had very serious quality control issues still unresolved, (iii) Peterson had taken on an additional leadership role only one year prior, (iv) J&J was required to shuffle various executives around as a result of Peterson's departure to leave, indicating lack of a premeditated transition plan, and (v) at least one analyst

following J&J expressed surprise at the announcement due to the strange timing." *Id.* at ¶406.

Under certain circumstances, the departure of a corporate executive can strengthen an inference of scienter. "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of' the release of bad news." *Hertz, 905 F.3d at 118* (quoting *Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1002 (9th Cir. 2009),* amended on other grounds, (Feb. 10, 2009)). As the Third Circuit explained in *Hertz,* "[c]hanges in leadership are only to be expected when leadership fails. That is not a symbol of fraud. Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." *Id.* In this case, Plaintiff alleges that the announcement of Peterson's resignation occurred on June 22, 2018, just over two months after the first jury verdict against J&J in a case alleging harm from asbestos in the Company's Talc Products. AC ¶211. First, as alleged, there is no indication, aside from the timing of the announcement, that Peterson's departure from the company was related to a discovery of her involvement in the fraud. *Roofer's Pension Fund v. Papa,* No. 16-2805, 2018 WL 3601229, at *20 (D.N.J. July 27, 2018) (finding "some probative value," in employee's resignation, which was announced the same day as an investigation into company's revenue recognition practices but noting that departure was not "involuntary or accompanied by some form of corporate sanction."); *In re Intelligroup Sec. Litig.,* 527 F.Supp.2d 262, 347 (D.N.J. 2007)("a defendant's resignation could constitute a 'piece to the scienter puzzle' if the resignation both takes place within a couple of months of the announcement of the errors committed and is accompanied by an extraordinary corporate punishment measure, *e.g.,* denial of severance payment."). Furthermore, Plaintiff's own theory of the case undercuts the inference of scienter. "A resignation may support a finding of scienter because it may be implied that the individual knew of the fraud being perpetrated. Once those outside the fraud find out, supposedly, they terminate (or force to resign) all those who may have been responsible." *In re Toronto-Dominion Bank Sec. Litig.,* No. 17-1665, 2018 WL 6381882, at *18 (D.N.J. Dec. 6, 2018). Here, however, Plaintiff's theory of the case is that the alleged fraud was a long-standing comprehensive scheme, reaching into every crevice of the Company; yet, paradoxically, Peterson was the

employee allegedly impacted by the scheme's reveal. The inference that Peterson resigned, or was forced to resign, due to her role in the fraudulent scheme, is not as compelling or cogent as the inference that she resigned for other business reasons.

**\*24**  Accordingly, the Court finds that Plaintiff has not sufficiently alleged, utilizing the core operations theory or otherwise, particularized facts supporting a strong inference of scienter as to Peterson.

### 6. Glasgow

Plaintiff alleges that Glasgow, the Company's Vice President of Research and Development, made public statements emphasizing that she, and others at the Company had allegedly reviewed "decades" of scientific data on the safety of talc. AC at ¶407. She allegedly, "held herself out as having reviewed "30 years of scientific studies and regulatory reviews," along with "the medical facts and science" regarding the Company's talcum powder products" and represented that she had reviewed the studies, "science, research and clinic evidence" regarding the safety of talc. *Id.* at ¶408.

Taking those allegations at face-value, Glasgow would have been aware of the allegedly contrary scientific evidence identified by Plaintiff. Accordingly, the Court finds that Galsgow's unqualified statements regarding the safety of talc, in the face of the contrary evidence, are suggestive of scienter.

*See* *In re RAIT Fin. Tr. Sec. Liti*g., 2008 WL 5378164, at *12-*13 (E.D. Pa. Dec. 22, 2008) (finding scienter where plaintiff alleged that the individual defendants were senior executives, with access to information contradicting their public statements).

### 7. Sneed

As to Sneed, Plaintiff alleges that as VP of Global Corporate Affairs, Sneed was "responsible for public relations and knew that checking the accuracy of corporate statements was vitally important." *Id.* at ¶409. Thus, in Plaintiff's view, he knew or recklessly disregarded that his statements were false and misleading. *Id.* As an initial matter, many of the misstatements attributed to Sneed fall within the category of statements which this Court has already identified as

puffery and determined to be inactionable as securities fraud. Plaintiff alleges that the misleading statements proffered by Sneed include, statements made at a 2013 annual shareholder meeting that that J&J had "really embraced transparency"; that J&J had a history of and was driven by " 'car[ing] unconditionally for others' " and that it had " 'own[ed] up to [its] mistakes,' " and that J&J made "great strides" in "really get[ting] past" the quality issues the Company faced. *Id.* at ¶257. To the extent those statements are the only ones alleged to have been made by Sneed, the Court need not assess whether they were made with scienter, because Plaintiff has not adequately alleged that the statements were materially misleading.

Regardless, the Court finds that Plaintiff has not adequately alleged facts suggesting that Sneed acted with scienter. The sole allegations Plaintiff makes in that regard are generalized allegations regarding his role in the Company. Absent additional allegations of specific information conveyed to Sneed, such generalized statements cannot adequately allege scienter. *Rahman*, 736 F.3d at 247.

### 8. The Context and Content of the Individual Defendant's Statements Indicates Scienter

Additionally, irrespective of the core operations doctrine, the content and context of many of the alleged misleading statements further enhances the finding of scienter with respect to the individual defendants whom the Court has found to have the requisite scienter. *See Utesch v. Lannett Co., Inc,* 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (" 'the most powerful evidence of scienter is the content and context' of the misleading statements.") (quoting *Avaya,* 564 F.3d at 269).). In *Avaya,* the company's CEO made statements "repeatedly assur[ing] analysts and investors that although there was pressure in the market, there were no significant changes to the pricing environment." 564 F.3d at 245. The plaintiffs alleged that the CFO made these statements while "kn[owing] of or recklessly disregard[ing] the fact that competition was forcing unusually large 20% to 40% price discounts that were hurting profit margins." *Id.* Addressing whether the complaint adequately alleged that those statements were made with scienter, the Third Circuit explained that:

**\*25** [t]aken together, the extent of the alleged discounting, the importance to the "Avaya story" of maintaining margins, the amount by which the second quarter results missed expectations, the proximity of [the CFO]'s statements to the end of the quarter and the release of results, [the CFO]'s position as Chief Financial Officer, and most significantly, the content and context of the statements themselves, give rise to a strong inference that [the CFO] either knew at the time that his statements were false or was reckless in disregarding the obvious risk of misleading the public.

Thus, the Third Circuit found that "the context (specific analyst queries) and content (consistent denials of unusual discounting) of the statements," supported the inference that the statements were made with scienter. *Id.* at 270. Similarly, here, the content and context of many of the Individual Defendants' statements suggest that the Invidual Defendants were, at best, reckless to the possibility that their statements might mislead investors. As alleged, Defendants repeatedly stated that the Talc Products were safe, in the face of contrary test results, various lawsuits, and inquiries from the press and investors. Even following two high-figure jury verdicts linking the Talc Products to ovarian cancer and mesothelioma, Defendants allegedly doubled down on their insistence that the Talc Products were "safe" and "asbestos free." Such repeated, unqualified assurances, in the face of inquiries from the public, and regulatory authorities such as the FDA, further suggest that Defendants' statements were made with scienter. *See Utesch,* 385 F. Supp. 3d at 422 (finding that defendants' repeated statements, in the face of ongoing investigations by multiple law enforcement bodies, and questions from the press, were indicative of scienter.); *Roofer's Pension Fund,* 2018 WL 3601229, at \*21 (finding that defendant repeatedly responded to questions from analysts and investors with answers that indicated knowledge about drug pricing and the repeated inquiries "would have made Defendants aware of the importance of generic drug pricing to the investing public" thus defendants'

failure to disclose certain facts in its answers was indicative of scienter).

The internal acknowledgements of potential asbestos contamination in the Talc Products, and the potential association with mesothelioma and ovarian cancer, coupled with the fact that the allegations of fraud relate to a core operation of the Company, collectively, give rise to a strong inference of scienter. Defendants assert that the facts as alleged support a plausible inference that after reviewing the scientific data, defendants concluded that the bulk of the evidence supports their position that the Company's Talc Products were safe. However, taken together, Plaintiff's allegations are "as compelling as [that] opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. Although Plaintiff has failed to specifically allege scienter as to certain defendants, and those defendants are dismissed from the lawsuit, Plaintiff's contentions, when considered holistically, satisfy the scienter pleading standard as to Gorsky, Goodrich, Casalvieri, and Glasgow. Plaintiff has sufficiently pled that, at minimum, those defendants had access to information which would have alerted them to the allegedly misleading nature of their statements regarding the safety of the products. As alleged, Defendants either failed to adequately investigate the potential dangers of the Talc Products, despite its obvious relevance evidenced by the many public inquiries, or Defendants knowingly disseminated false and inaccurate statements as part of a long standing fraudulent scheme. Either scenario is suggestive of scienter. The Court finds that, viewing Plaintiff's scienter allegations, holistically, Plaintiff has adequately pled scienter.

### iii. Loss Causation

**\*26** Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). "The loss causation inquiry asks whether the misrepresentation or omission proximately caused the economic loss." McCabe v. Ernst & Young, LLP, 494 F.3d 418, 426 (3d Cir.2007). The fact that a misrepresentation occurred and the share price declined is not enough. Id. Instead, to demonstrate loss causation, the plaintiff must prove "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." Id. (quotation and citation omitted). The Third Circuit has repeatedly cautioned that this determination is a fact-sensitive

inquiry typically left to the trier of fact. See id. at 427 n. 4; EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000).

As an initial matter, the parties dispute the applicable pleading standard for analyzing whether Plaintiff has adequately pled loss causation. Defendants urge this court "to follow the clear trend" and apply the heightened pleading requirements of Rule 9(b) to Plaintiff's loss causation allegations, consistent with the approach utilized by the Fourth, Seventh, Ninth, and Eleventh Circuits. Def. Br. at 50 n. 37. However, Plaintiff contends that under Rule 8(a) it "need only provide a 'short and plain statement' giving defendants 'some indication of the loss and the causal connection that [they have] in mind,' " Pl. Br. at 51 (quoting Dura, 544 U.S. at 336), and that it has adequately alleged loss causation under either standard. Id. at 52 n.45.

In Dura, the Supreme Court reversed a Ninth Circuit decision that had found that a Section 10(b) complaint adequately pleaded loss causation merely by alleging that the price of the security on the date of purchase was inflated because of the defendants' misrepresentations. 544 U.S. at 338. In analyzing the plaintiff's claims, the Court suggested that the pleading standard for loss causation was governed by Rule 8(a)(2). Id. at 346. The Court noted that Rule 8(a)(2) merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and "assume[d], at least for argument's sake, that neither the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." Id. at 346 (finding that plaintiffs' complaint failed to allege loss causation under Rule 8 where it contained only one sentence addressing loss causation). Since that time, the Supreme Court has not provided any further guidance as to the applicable pleading standard for analyzing loss causation, and the Circuit courts have reached diverging conclusions. As Defendants note, the Fourth, Seventh, Ninth, and Eleventh Circuits apply Rule 9(b) as the pleading standard for loss causation. See e.g., In re Mutual Funds Investment Litigation, 566 F.3d 111, 119–20 (4th Cir. 2009) (noting that prior to the enactment of the PSLRA, Section 10(b) fraud claims were governed by Rule 9, and holding that, because the PSLRA does not govern the analysis of loss causation or reliance, the traditional pleading requirement

*Hall v. Johnson & Johnson*, Slip Copy (2019)
Fed. Sec. L. Rep. P 100,720

for fraud claims applies to loss causation); *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (applying Rule 9(b) as the pleading standard for all elements of a securities fraud claim without discussion); *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (holding that Rule 9(b) is the appropriate pleading standard for loss causation because 1) the rule "applies to all circumstances of common law fraud" and since securities fraud is derived from common law fraud, it makes sense to apply the same pleading standard; 2) "Rule 9(b) clearly states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" and "[l]oss causation is part of the circumstances constituting fraud because, without it, a claim of securities fraud does not exist" and 3) applying rule 9(b) provides for a "consistent standard" for assessing pleadings in a Rule 10(b) action); *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 861 (11th Cir. 2015) (applying Rule 9(b) as the pleading standard for all elements of a securities fraud claim without discussion).

**\*27**  However, the Fifth and Second Circuits generally apply Rule 8(a) to determine whether a plaintiff has adequately pled loss causation. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (holding that in light of *Dura* and *Twombly*, in order to establish loss causation, a plaintiff must plead a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 183 (2d Cir. 2015) (noting that the level of particularity necessary to plead loss causation "is an open question" in the Second Circuit but also noting that pleading loss causation is "not a heavy burden"); *Wilamowsky v. Take–Two Interactive Software, Inc.*, 818 F.Supp. 2d 744, 753 & n. 7 (S.D.N.Y.2011) ("The question of whether Rule 9(b) applies to loss causation has not yet been definitively addressed by the Second Circuit, but the vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8."). Moreover, although the Third Circuit has not yet addressed the issue, courts of this district have consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b). *See In re Galena Biopharma, Inc. Sec. Litig.*, No. 17-929, 2019 WL 5957859, at \*18 (D.N.J. Nov. 12, 2019) ("[a] [p]laintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion

to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)" (quoting *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010)(Wolfson J.)); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449, 2019 WL 3562134, at \*13 (D.N.J. Aug. 6, 2019)("The PSLRA does not impose any heightened pleading standards on the element of loss causation; ordinary pleading rules apply" (quoting *Dura*, 544 U.S. at 347)); *Hull v. Glob. Digital Sols., Inc.*, No. 16-5153, 2017 WL 6493148, at \*11 (D.N.J. Dec. 19, 2017) (Wolfson J.)("Importantly, alleging loss causation or economic loss does not require a plaintiff to satisfy the heightened pleading standard under Rule 9(b)"); *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 558 ("Plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)"); *Dudley v. Haub*, No. 11-5196, 2013 WL 1845519, at \*18 (D.N.J. Apr. 30, 2013) ("Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA...."). In light of the Supreme Court's reasoning in *Dura*, and absent guidance from the Third Circuit, this Court aligns itself with the decisions of its sister districts, as well as this Court's prior decisions on this issue, and applies the standard provided by Rule 8(a) to Plaintiff's loss causation allegations.

Plaintiff relies on six disclosures to show loss causation: the Bernstein Liebhard Press Release on September 27, 2017; the *Lanzo* Law 360 Article on January 30, 2018; the *Lanzo* Metholeliona.net Article on February 5, 2018; the Beasley Allen Press Release on February 7, 2018; the *Ingham* Verdict on July 12, 2018; and the Reuters Article on December 14, 2018, Plaintiff contends that after each of these disclosures, J&J's stock price suffered statistically significant declines. AC ¶ 421.

Defendants challenge loss causation on two bases. First, that none of the alleged corrective disclosures revealed "new" information, but rather the alleged disclosures repeated or shed additional light on longstanding allegations of asbestos contamination in J&J's Talc Products and a link between talc and cancer. Def. Br. at 48-57. In Defendants' view, none of the alleged disclosures contain material information which was disclosed for the first time, rather the identified disclosures merely proffer additional details about previously available information and do not constitute corrective disclosures. Def. Br. at 51-55. Furthermore, Defendants contend that

Hall v. Johnson & Johnson, Slip Copy (2019)

Fed. Sec. L. Rep. P 100,720

Plaintiff cannot establish that the Class Members' alleged losses are attributable to the alleged misrepresentations rather than "overall market trends and market reaction to litigation risk." *Id.* at 58-60. For example, Defendants note that on February 5 and February 8, 2018, the Dow Jones Industrial Average dropped significantly, suggesting that any loss on those dates "can only be reasonably attributed to market-wide phenomena that day" rather than the alleged corrective disclosures. *Id.* at 60.

The Court, first, addresses Defendants' contention that the identified disclosures did not proffer "new" information.[7] "A corrective disclosure need not take a particular form; it is the exposure of the falsity of the fraudulent representation that is the critical component." *Hull v. Glob. Digital Sols., Inc.,* No. 16-5153, 2017 WL 6493148, at *14. Ultimately, "so long as the plaintiff alleges that the public disclosure reveals that the defendant company made false claims, and that based on those disclosures, a corresponding drop in stock price occurred, loss causation is adequately pled." *Id.* Viewed in the light most favorable to Plaintiff, the facts as alleged suggest that the disclosure do not merely repeat information. Although many of the alleged disclosures address the same subject matter – J&J's alleged knowledge of asbestos in its Talc Products and the ensuing scheme to prevent the dissemination of that information – each provided new information as to the seriousness and extent of the Company's alleged fraud. *See In re Bradley Pharm., Inc. Sec. Litig.,* 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006) (finding that the revelation of the truth about the Company's misrepresentations "did not take the form of a single unitary disclosure, but occurred through a series of disclosing events."). In that regard, some of the disclosures clearly profess that the information being conveyed is new. As alleged, the Reuters article purportedly indicated that it was disclosing new information from internal J&J documents which were being "reported to the public for the first time." ¶223-232. Accordingly, the Court finds that Plaintiff has sufficiently alleged that each of the identified disclosures provided new information.[8]

**\*28** Furthermore, Defendant's argument that the drop in J&J's stock price was attributable to other causes such as market trends and the market's reaction to litigation risk is premature. Plaintiff's theory of loss causation is that J&J made fraudulent misrepresentations and that the truth was slowly revealed throughout the course of 2017 and 2018, culminating when the Reuters Article revealed the true extent of the Company's alleged deceptions. In support of that theory, Plaintiff has identified specific disclosures of new information and corresponding impacts on stock price. Each of the alleged drops in stock price is allegedly supported by an event study which found the drops to be statistically significant and isolated the impact of the disclosure.

At this stage, plaintiff has sufficiently alleged loss causation, by alleging that after Defendants' purportedly misleading statements and fraudulent scheme were revealed, J&J's stock prices decreased significantly. Although Defendants point to other possible bases for the decline in stock price, such a factual dispute cannot be adjudicated at this early, motion to dismiss stage of the litigation. *See Omanoff v. Patrizio & Zhao LLC,* No. 14-723, 2015 WL 1472566, at *6 (D.N.J. Mar. 31, 2015) (rejecting defendants argument, on a motion to dismiss, that decline in share price was attributable to other weaknesses disclosed by the company because argument raised "a factual dispute that cannot be adjudicated at this early stage"). Accordingly, Plaintiff has sufficiently pled loss causation.

### a. The Class Period

Defendants also seek to limit the Class Period to February 7, 2018, rather than December 13, 2018. Def. Br. at 60-62. Defendants contend that the allegations relating to events occurring after February 7, 2018 – the date when this lawsuit was initiated – are not plausible because they could not have "been material to investors." Def. Br. at 61. Defendants argue that as of February 8, 2018 – when Plaintiff initiated this lawsuit – the market was fully aware of the allegations regarding the Talc Products, thus Plaintiff's allegations related to events occurring after that date could not have "been material to investors." Def. Br. at 61. In Defendants' view, following the filing of the Complaint, "no reasonable investor would consider any information allegedly misstated or omitted form Defendants' statements to 'significantly alter the total mix of information available.' " *Id.* Further, Defendants contend that Plaintiff's theory of the case is identical to the one alleged in the initial complaint "that J&J has known for decades that its talc products ... include asbestos fibers and that the exposure to those fibers can cause ovarian cancer and mesothelioma," and that Defendants allegedly "misrepresented and failed to disclose the danger that J&J's talc products posed to consumers ...." rendering it implausible that, "after Plaintiffs had enough knowledge to file their claim, additional details could have significantly

altered the total mix of information available or served as a corrective disclosure." Def. Br. at 24-25 (comparing ECF No.1 ¶ 2 with AC ¶¶ 1-14).

Plaintiff contends that the Class Period is appropriate because Plaintiff alleges that the true extent of Defendants' several decades long scheme was revealed for the first time by the Reuters article published on December 14, 2018. Pl. Br. at 64. Furthermore, in Plaintiff's view, the theory of the operative complaint has changed significantly since the, now moot, initial complaint, supporting the extension of the Class Period in light of the complex scheme detailed in the Amended Complaint. *Id.* Accordingly, "considering all the information provided to the market after February 7, 2018, '[p]articularly in light of defendants' repeated' reassuring statements, 'it was reasonable for plaintiffs to rely upon defendants' statements until the publication of the' Reuters report." Pl. Br. at 64-65

(quoting *Pharmacia*, 554 F.3d at 351-52).

**\*29**  As a general rule, liability based on material misrepresentations or omissions is terminated "when curative information is publicly announced or otherwise effectively

disseminated." *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J.1984) (quoting *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 364 (N.D. Cal. 1982)). Whether a release of corrective information terminates liability based on misrepresentations or omissions is a determination of "whether the facts which underlie the gravamen of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely." *Id.* "[D]oubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period." *Id.* (citing *In re LTV Sec. Litig.*, 88 F.R.D. 134, 147 (N.D.Tex. 1980)).

At this juncture, the Court finds that there is sufficient doubt as to whether the true extent of the Company's alleged fraudulent scheme was revealed prior to the publication of the Reuters article on December 14, 2014. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (finding that class period should close once plaintiffs had received sufficient notice regarding the facts giving rise to fraud, "which in the exercise of reasonable diligence, would have led to actual knowledge," rather than on earlier date when accounting improprieties were first revealed, because "[a]t that time, neither the full financial impact of the alleged improprieties nor the fact that it was

allegedly attributable to fraud by Alstom senior corporate officials had been revealed."). Although the alleged asbestos contamination and connection between ovarian cancer and talc, and mesothelioma and talc, had already been publicly discussed and several product liability lawsuits had already been filed prior to the publication of the Reuters article, Plaintiff has alleged that the Company continued to issue public denials of wrongdoing and repeatedly averred that its products were "safe" and "do not contain asbestos or cause mesothelioma." *See e.g,* AC ¶¶379-380, 382, 390. As pled, it was the publication of the Reuters article that directly refuted Defendants' allegedly false statements and provided never-before-seen internal Company documents that detailed J&J's knowledge of the asbestos in the Company's talcum powder and J&J's longstanding fraudulent scheme to cover it up. *Id.* at ¶223. According to Plaintiff, the Reuters article kicked off a crisis for J&J by exposing new details and analysis regarding the Company's alleged fraudulent scheme to conceal the truth about the safety of its Talc Products. The Reuters report, itself, even professes that the information being reported was novel, stating "[a] small portion of the documents have been produced at trial and cited in media reports. Many were shielded from public view by court orders that allowed J&J to turn over thousands of documents it designated as confidential. Much of their contents is reported here for the first time." *Id.* at ¶223. Accordingly, the Court finds that December 14, 2018, the publication date of the Reuters article, is an appropriate conclusion for the Class Period.

### b. The Section 20(a) Claims

Plaintiff also alleges that Individual Defendants are liable under Section 20(a) of the Exchange Act. This statute reads, in pertinent part:

§ 78t. Liability of controlling persons and persons who aid and abet violations

(a) Joint and several liability

...

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ...

**\*30**  15 U.S.C. § 78t(a); *see also* 🚩 *Suprema*, 438 F.3d at 285 (discussing the statute). However, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." 🚩 *Avaya*, 564 F.3d at 252 (citing 🚩 *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)). Where a Plaintiff fails to sufficiently plead a claim under Section 10(b), it is "impossible for the [Individual Defendants] liable under § 20(a)." 🚩 *Shapiro*, 964 F.2d at 279.

Because Defendants' only arguments in support of dismissal of the Section 20(a) claim is that Plaintiff failed to plead a claim under Section 10(b), Defendants' motion to dismiss the Section 20(a) claim is also denied. However, because Plaintiff has failed to adequately plead a Section 10(b) claim against Caruso, Peterson, and Sneed, the Section 20(a) claims against those defendants are dismissed, as well.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is denied in part and granted in part. Plaintiff's Section 10(b) and Rule 10b–5 claim is limited to Defendants'

statements regarding the safety of its Talc Products, the "asbestos-free" nature of its talc, and the Company's commitment to product safety, quality assurance, and research. Plaintiff's claims based upon Defendants' alleged misstatements about the viability of the Product Liability lawsuits are dismissed. Furthermore, because Plaintiff has not adequately alleged facts suggesting a strong inference of scienter as to defendants Caruso, Peterson, and Sneed, those defendants are dismissed from the lawsuit.

Although the Court finds that Plaintiff has adequately alleged, for purposes of this motion to dismiss and assuming the facts pled to be true, that Defendants made materially misleading or false statements regarding the safety of J&J's Talc Products, such a ruling should not be construed as the Court's acknowledgment of the underlying merits of the substance of Plaintiff's claims, including whether the scientific evidence supports Plaintiff's allegations. Any such a determination must be based upon a full record and not upon the pleadings alone.

**All Citations**

Slip Copy, 2019 WL 7207491, Fed. Sec. L. Rep. P 100,720

---

### Footnotes

1     The Amended Complaint spans approximately 250 pages, plus exhibits, and includes numerous detailed factual allegations describing J&J's alleged thirty-year long fraudulent scheme. The following factual background does not purport to be an exhaustive summary of all of those facts, but rather recounts the most salient allegations.

2     J&J produced Shower-to Shower until 2012, after which the brand was sold to Valeant Pharmaceuticals International, Inc. AC ¶49 n.5

3     The consumer segment is housed within a subsidiary of J&J, Johnson & Johnson Consumer, Inc. ("JJCI"). JJCI is the entity primarily responsible for the formulation, manufacture, testing, marketing, and sale of the Talc Products. In order to avoid confusion, for the purposes of this Opinion, the Court will refer to both JJCI and J&J as J&J.

4     In addition to Individual Defendants, Plaintiff's Complaint and Exhibit 1 to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss ("Pl. Br.") identify numerous other J&J employees who purportedly played a role in the Company's alleged scheme. AC ¶¶28-41; ECF No. 45-3 Ex. 1, "J&J Personnel Involved in J&J's Longstanding Fraudulent Scheme."

5     Plaintiff does not oppose Defendants' request for judicial notice of Exhibits 6-8,11,13,15, each of which was either expressly relied upon in the Amended Complaint or consists of historical stock price data. *See* Pl. Judicial Notice Br. at 3-5. Accordingly, the Court takes judicial notice of those exhibits.

6     In addition to the core operations doctrine, the parties also discuss the "corporate scienter," also known as "collective scienter" doctrine. Under that doctrine, a plaintiff may successfully "plead an inference of

scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246. Defendants contend that Plaintiff implicitly raises a "corporate scienter" theory because the Amended Compliant does not tie the scienter allegations to any Individual Defendants. Plaintiff contends that the Third Circuit has suggested that the corporate-scienter doctrine may be viable where a company "engaged in a variety of tactics ... to keep news of the scope of the problem from reaching safety regulators and investors," as alleged here. Pl. Br. at 49. n.42 (internal citations and quotation marks omitted). The Third Circuit has "neither ... accepted nor rejected the doctrine

of corporate scienter in securities fraud actions." *Rahman*, 736 F.3d at 246; *see also* *City of Roseville Emps. Ret. Sys.*, 442 F. App'x at 676-77 (declining to decide "if ... it were possible to plead scienter against a corporation without pleading scienter against an individual"). However, Plaintiff does not rely solely on corporate scienter; the Amended Complaint does, in fact, proffer individualized allegations of scienter as to each Individual Defendant. Accordingly, this Court need not – and does not -- determine whether corporate scienter, alone, is applicable to the instant facts.

7    In support of their argument that the disclosures did not convey "new" information, Defendants cite *Lanzo* for the proposition that "a large volume of [information regarding the product liability lawsuits] including copious internal testing documents – were cited and attached as exhibits in support of publicly filed motions" prior to two of the alleged corrective disclosures identified by Plaintiff, the release of the Bloomberg article and the Bernstein Liebhard Press Release. *See* Def. Br. at 52. In its opposition to Defendants' motion for judicial notice, Plaintiff moves to strike Defendant's reference to *Lanzo* pursuant to Federal Rule of Civil Procedure 12(f), arguing that "the reference is confusing, immaterial and should not be considered." Pl. Judicial Notice Br. at 14. Plaintiff further argues that the citation to *Lanzo* "lacks meaning" and notes that there is no docket entry or date associated with the citation provided. *Id*. The Court denies Plaintiff's motion to strike and finds it appropriate to consider *Lanzo* in connection with Defendant's argument that certain allegedly damaging disclosures were already publicly available.

8    Defendants also contend that the articles about jury verdicts cannot constitute a corrective disclosure because "Plaintiffs cannot use a jury verdict as a conclusive disclosure of the 'truth.' " Def. Br. at 57-58 (collecting cases). However, none of the cases cited by Defendant stand for the proposition that a jury verdict cannot, as a matter of law, constitute the disclosure of new information. The *Ingham* jury verdict was allegedly the first to award damages to a plaintiff linking ovarian cancer to asbestos in J&J's talc products, rather than to the talc, itself. AC ¶213. To the extent the jury verdict or documents publicly released during the lawsuit contained new information regarding an association between asbestos and ovarian cancer, and the existence of asbestos in the Company's Talc Products – revealing the alleged falsity of Defendants' assertions to the contrary – the jury verdict may have been a corrective disclosure.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 31

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 367 of 751
PageID: 11733
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

KeyCite Yellow Flag - Negative Treatment
Called into Doubt by Fidelity and Guar. Ins. Underwriters, Inc. v. Omega
Flex, Inc., D.N.J., March 26, 2013

2012 WL 1018842
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Charles HAMMER, on behalf of herself
and all others similarly situated, Plaintiffs

v.

VITAL PHARMACEUTICALS, INC. d/
b/a VPX; ABC Cos. nos. 1–100; John
Does Nos. 1–100; XYZ Cos Nos. 1–
100; Robert Roes Nos. 1–100, DEF Cos.
Nos. 1–100 and John Smiths Nos 1–
100 and (fictitious names), Defendants.

Civil Action No. 11–4124.
|
March 26, 2012.

**Attorneys and Law Firms**

Frank V. Floriani, Sullivan, Papain, Block, McGrath &
Cannavo, PC, Hackensack, NJ, for Plaintiffs.

George H. Parsells, McElroy, Deutsch, Mulvaney &
Carpenter, LLP, Morristown, NJ, for Defendants.

**OPINION**

WOLFSON, District Judge.

 *1  This putative class action brought by Plaintiff
Charles Hammer ("Hammer" or "Plaintiff") challenges the
marketing and sales practices of Liquid Clenbutrx Hardcore
("Clenbutrx"), a "dietary supplement" manufactured by
Defendant Vital Pharmaceuticals, Inc. d/b/a VPX/REDLINE
(improperly pled as Vital Pharmaceuticals, Inc. d/b/a VPX)
("VPX" or "Defendant"). In the Complaint, Plaintiff alleges
that Defendant's advertisements and packaging of Clenbutrx
contained various affirmative misrepresentations concerning
the supplement that were deceptive and misleading,
that Plaintiff purchased the products pursuant to these
misrepresentations, and he suffered damages as a result

thereof. Based on these averments, Plaintiff asserts violations
of the New Jersey Consumer Fraud Act, N .J.S.A. § 56:8–
1 et seq. ("NJCFA") (Count I), as well as claims for
common law fraud (Count II), unjust enrichment (Count
III), breaches of express (Count IV) and implied warranties
(Count V) and injunctive relief (Count VI). In the instant
matter, Defendant moves to dismiss the Complaint in its
entirety. For the reasons set forth below, Defendant's motion
is granted as follows: with respect to Counts I (NJCFA)
and II (Common Law Fraud), Plaintiff's claims regarding the
misrepresentation that Clenbutrx is "certified by science" and
that Clenbutrx is a "dietary supplement" are DISMISSED
WITHOUT PREJUDICE. The remaining fraud allegations
—i.e., statements regarding Clenbutrx is the world's fastest,
hardest hitting fat incinerator and authentic synergistic blend
of ingredients—are DISMISSED WITH PREJUDICE. In
addition, Counts III (Unjust Enrichment) and VI (Injunctive
Relief) are DISMISSED WITHOUT PREJUDICE. Lastly,
Count IV (Breach of Express Warranty) and Count V
(Breach of Implied Warranty) are DISMISSED WITHOUT
PREJUDICE.

**I. BACKGROUND**

In addressing Defendant's Motion to Dismiss, this Court must
accept as true the allegations contained in the Complaint. See
Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d
Cir.2003); Dayhoff, Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1301
(3d Cir.1996). Thus, the facts recited herein are taken from the
Complaint and do not represent this Court's factual findings.

VPX manufactures, markets and sells a line of "dietary
supplements" including Clenbutrx. Compl. ¶ 14. Since
2006[1], inter alia, internet advertisements and the product
packaging represented and warranted that Clenbutrx contains
"Apple Geranium (Pelargoium odorantissomum) (leaves)
standardized to 1, 3 Dimethylpentylamine." Id. ¶ 16. In
addition, VPX advertises that Clenbutrx is "certified by
science, backed by the real world, and proven to give you
mind blowing energy" and that its "authentic synergistic
blend of ingredients ... leave[s] scientists wondering how
amazing this stuff is." Id. ¶ 17. Because of these
misrepresentations, Plaintiff purchased Clenbutrx for $29.99.
Id. ¶ 36.

 *2  On July 18, 2011, Plaintiff filed the instant Complaint
against VPX, asserting a violation of the NJCFA, common
law fraud, unjust enrichment, and breaches of express and
implied warranties. The genesis of Plaintiff's complaint is

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 368 of 751
PageID: 11734
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

that Defendant's advertisements and packaging of the dietary supplement, Clenbutrx, contained false and misleading statements which led Plaintiff to purchase such product.[2] Specifically, Plaintiff alleges that the various representations concerning Clenbutrx induced consumers to believe that they were purchasing a product containing "apple geranium ... [standardized] to 1, 3 Dimethylylamine." *Id.* ¶ 18. Contrary to this representation, Plaintiff alleges that, apple geranium, a natural substance, does not normally contain 1, 3 Dimethylpentylamine, which is a synthetic laboratory-produced chemical compound. *Id.* ¶¶ 20–21. In that regard, Plaintiff complains that he was induced into purchasing Clenbutrx, a self proclaimed dietary supplement, when the supplement actually contains a synthetic compound. *Id.* ¶ 26. As a result, Plaintiff avers that Defendant's "misrepresentation[ ]" that Clenbutrx "is a 'DIETARY SUPPLEMENT' " that contains Apple Geranium has "misled consumers in general and Plaintiff in particular into believing that ... Clenbutrx ... is a dietary supplement, and as a dietary supplement contains *only* dietary ingredients ...." *Id.* ¶ 28 (emphasis added). In addition, Plaintiff claims that VPX's representations that Clenbutrx is "certified by science, backed by the real world," and that "scientists [are] wondering how amazing this stuff is" are false because "[n]o scientist has ever 'certified' or 'backed' this product's ingredient at issue." *Id.* ¶ 57.

On or about August 9, 2011, Defendant filed the instant Motion to Dismiss, contending that: (1) Plaintiff did not plead the fraud claims with sufficient particularity; (2) the labeling of Clenbutrx as a "dietary supplement" was mandated by federal law; (3) the alleged misleading statements on Clenbutrx's website are puffery; and (4) Plaintiff did not suffer an ascertainable loss. Def's Mot. at 6–11. In addition, Defendant contends that Plaintiff's unjust enrichment and warranty claims fail as a matter of law.

On or about September 28, 2011, Plaintiff filed opposition to Defendant's Motion to Dismiss. Defendant filed a Reply Brief on or about October 17, 2010.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a complaint "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). The purpose of a

complaint is "to inform the opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1182 (3d ed.2004).

**\*3** When reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 561 (quoting *Conley,* 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element'." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 550 U.S. at 556).

In affirming that *Twombly* standards apply to all motions to dismiss, the Supreme Court recently explained the following principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. At 1949 (quoting *Twombly,* 550 U.S. at 556). Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

'show' such an entitlement with its facts." *Fowler, 578 F.3d at 211.* In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complaint's claims are based upon these documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

## III. DISCUSSION

### A. NJCFA and Common Law Fraud

**\*4** The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8–2.

The term "person" as used in the NJCFA includes, *inter alia,* natural persons, partnerships, corporations, companies, trusts, business entities and associations. N.J.S.A § 56:8–1(d).

To state a prima facie case under the NJCFA, a plaintiff must sufficiently plead three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *Payan v. GreenPoint Mortg. Funding, Inc.,* 681 F.Supp.2d 564, 572 (D.N.J.2010) (citing *Bosland v. Warnock Dodge, Inc.,* 197 N.J. 543, 964 A.2d 741, 749 (2009)). Unlawful practices under the NJCFA fall into three general categories: affirmative acts, knowing omissions, and regulation violations. *Frederico v. Home Depot,* 507 F.3d at 188 (3d Cir.2007)). Intent to defraud is not necessary to show unlawful conduct by an affirmative act of the defendant, but is an element of unlawful practice by knowing omission of the defendant. *See Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.,* No. 08–1057, 2008 WL 5381227, at \*6 (D.N.J. Dec.17, 2008).

Moreover, it is well-established that claims under the NJCFA must also meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See, e.g., Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007); *Arcand v. Brother Intern. Corp.,* 673 F.Supp.2d 282 (D.N.J.2009). Pursuant to that rule, a plaintiff alleging fraud must state the circumstances of the alleged fraud with particularity. Fed.R.Civ.P. 9(b). In order to satisfy this heightened pleading standard, a plaintiff "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.' Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3 at 200. Indeed, the Third Circuit has advised that, at a minimum, a plaintiff must support allegations of fraud with all the essential factual background that would accompany " 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006) (citations omitted) *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, L.T.D.,* 551 U.S. 308, 322–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Moreover, a complaint sounding in fraud must do more than assert generalized facts, it must allege facts specific to the plaintiff. *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658–59 (3d Cir.1998) *abrogated on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (where the complaint failed to allege "what actually happened to either" of the plaintiffs, the complaint did not plead "fraud with the specificity required by Rule 9(b).").

**\*5** In addition, Plaintiff's common law fraud must also be pled with specificity. To plead a fraud claim, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resultant damages." *Banco Popular North America v. Gandi,* 184 N.J. 161, 172–73, 876 A.2d 253 (2005).

### 1. Unlawful Conduct

Plaintiff's NJCFA claim must contain specific allegations of Defendants' unlawful conduct, subject to the heightened pleading requirements of Rule 9(b). To constitute an affirmative misrepresentation under the NJCFA, the statement must be: (1) material to the transaction; (2) a statement of fact; (3) found to be false; (4) and calculated to induce the buyer

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 370 of 751
PageID: 11736
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

to make the purchase. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 607, 691 A.2d 350, 366 (1997). "A statement of fact is material if: (a) a reasonable person would attach importance to its existence in determining a choice of action ...; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Ji v. Palmer,* 333 N.J.Super. 451, 755 A.2d 1221, 1228 (N.J.App.Div.2000) (quoting Restatement (Second) of Torts § 538(2)).

In the Complaint, Plaintiff alleges that VPX marketed Clenbutrx as a dietary supplement, and that this advertising was misleading because the product did not contain only dietary ingredients. In addition, Plaintiff contends that the nutrition label on the product touted that the product contains "apple geranium ... [standardized] to 1, 3 Dimethylpentylamine"; however, Plaintiff contends that contrary to the representation on the label, apple geranium, a natural dietary ingredient, contained 1, 3 Dimethylpentylamine, which is a synthetic compound. Finally, Plaintiff argues that Defendant made false and misleading representations concerning Clenbutrx including that the product was "the world's fastest hardest hitting fat incinerator," that the product was "certified by science, backed by the real world, and proven to give you mind blowing energy," and that its "authentic synergistic blend of ingredients ... leave[s] scientists wondering how amazing this stuff is." In response, Defendant argues that Plaintiff cannot establish a violation of the NJCFA for three separate reasons: (1) there was no unlawful conduct by Defendant because the labeling of Clenbutrx as a "dietary supplement" was mandated by federal law; (2) the alleged misleading statements on Clenbutrx's website are puffery; and (3) Plaintiff did not suffer an ascertainable loss.

The Court will separately consider each of the alleged misrepresentations.

**i. The Labeling of Clenbutrx as a "Dietary Supplement"**
As discussed above, in the Complaint, Plaintiff alleges that Defendant's labeling of Clenbutrx as a "dietary supplement" is actionable under the NJCFA. Specifically, Plaintiff contends that Defendant affirmatively misrepresented Clenbutrx as a "dietary supplement" because the product does not contain "only dietary ingredients." Compl. ¶ 26. In other words, Plaintiff appears to allege that because apple geranium contains 1, 3, Dimethylpentylamine, it was improper to label

Clenbutrx as a dietary supplement. Plaintiff's allegations fall short of stating a viable claim.

**\*6** Pursuant to 21 U.S.C. § 321(ff)(1), a dietary supplement is "a product (other than tobacco) intended to supplement the diet that bears or contains *one or more* of the following dietary ingredients: (A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in (A), (B), (C), (D), or (E)." 21 U.S .C. § 321(ff)(1) (emphasis added); *see GNC Franchising LLC v. Sala,* No. 06–191, 2006 U.S. Dist. LEXIS 11320, at *11–13 (W.D.Pa. Mar. 20, 2006). Significantly, a substance's intended use is relevant to deciding whether the product is a dietary supplement. *See* 21 U.S.C. § 321(ff)(1); *see United States v. Lane Labs–USA, Inc.,* 324 F.Supp.2d 547, 564 (D.N.J.2004).

Here, responding to Plaintiff's allegations, Defendants argue that "Clenbutrx contains dietary ingredients, including other botanicals, [thus] the labeling of this product as a 'dietary supplement' " was entirely proper. Def's Rep. Br. at 5. At the motion to dismiss stage, the Court cannot credit Defendant's assertion regarding what types of ingredient are contained in Clenbutrx. However, even taking the Complaint as true, Plaintiff's allegations fail to state a claim. Plaintiff has failed to allege that there is *no* dietary ingredient listed on the Clenbutrx label; instead, Plaintiff alleges only that because apple geranium, a natural ingredient, contains 1, 3, Dimethylpentylamine, it was improper to label Clenbutrx as a dietary supplement. This lone allegation does not come close to state a claim under the statutory scheme of § 321(ff). Rather, the statute specifically provides for the labeling of a product as a "dietary supplement" if the supplement contains *one or more* specified dietary ingredients. *See* 21 U.S.C. § 321(ff)(1). In fact, the statute does not require that *every* ingredient must be a dietary ingredient. In that regard, Plaintiff does not allege that Clenbutrx does not contain other botanicals, or that there are no other dietary ingredients in Clenbutrx. Simply stated, the mere fact that apple geranium in Clenbutrx may not be an herb or a botantical does not necessarily mean that Clenbutrx does not have other dietary ingredients that would qualify it as a dietary supplement. Moreover, Plaintiff has failed to allege that Clenbutrx is not intended to be used as a dietary supplement. Accordingly, the Court finds that Plaintiff's claim, as it is currently pled, concerning the labeling of Clenbutrx as a dietary supplement

Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

is not actionable under the NJCFA. This claim is dismissed without prejudice.

### ii. Statements Made on Clenbutrx's Website

Next, Plaintiff contends that the following separate statements on Defendant's website constitute affirmative misrepresentations: (1) Clenbutrx is "the world's fastest, hardest hitting fat incinerator"; (2) Clenbutrx is "certified by science, backed by the real world, and proven to give you mind-blowing energy"; and (3) Clenbutrx's "authentic synergistic blend of ingredients ... leave[s] scientists wondering how amazing this stuff is." (Compl.¶ 16.) In response, Defendant argues that these statements are not actionable under the NJCFA because they are puffery.

**\*7** "The NJCFA distinguishes between actionable misrepresentations of fact and 'puffery.' " " *In re Toshiba America HD DVD Marketing and Sales Practices Litigation,* Civ. No. 08–939, 2009 WL 2940081, at \*9 (D.N.J. Sept. 11, 2009) (citing *Rodio v. Smith,* 123 N.J. 345, 352, 587 A.2d 621 (1991)) (finding that the slogan "[y]ou're in good hands with Allstate" was "nothing more than puffery" and as such was not "a deception, false promise, misrepresentation, or any other unlawful practice within the ambit of the Consumer Fraud Act.") "Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Id.* at \*10, 587 A.2d 621 (quoting *Haskell v. Time, Inc.,* 857 F.Supp. 1392, 1399 (E.D.Cal.1994)); *see, e.g., Hughes v. Panasonic,* Civ. A. No. 10–846, 2011 WL 2976839, at \*35, 36 (D.N.J. July 21, 2011) (holding that Panasonic's statements about the televisions' "industry leading black levels and contrast ratios" as well its representations about the television technology's ability to render images "the way the director intended" and producing "breathtaking" and "vivid" colors are non-actionable puffery). Morever, "[i]t has been noted in the context of Lanham Act cases that, unlike puffery, 'false claims that explicitly or implicitly address product attributes of importance to customers and make statements that are measurable by comparative research are not puffery." *Bracco Diagnostics, Inc., v. Amersham Health, Inc.,* 627 F.Supp.2d 384, 464 (D.N.J.2009) (citing *Castrol Inc., v. Pennzoil Co.,* 987 F.2d 939, 945–46 (3d Cir.1993) (holding that Pennzoil's claim of superior engine protection was more than mere puffery because "it is both specific and measurable by comparative research")). The Court will consider each statement in turn.

Here, Plaintiff argues that the statements that Clenbutrx is "the world's fastest, hardest hitting fat incinerator" and that Clenbutrx contains an "authentic synergistic blend of ingredients ... [that] leave[s] scientists wondering how amazing this stuff is" are actionable misrepresentations under the NJCFA. The Court does not agree. These statements are the epitome of vague and highly subjective claims of superiority. *See, e.g, In re Toshiba,* 2009 WL 2940081, at \*10. While Defendants use the buzz words "authentic" or "scientists," that is not sufficient to bring the statements out of the realm of puffery because these statements are not making a specific claim as to the product. *See Tatum v. Chrysler Group LLC,* No. 10–4269, 2011 U.S. Dist. LEXIS 32362, at \*14, 2011 WL 1253847 (D.N.J. Mar. 28, 2011) ("Absent specific claims as to the braking system, Defendant's general advertising was puffery ...."). Indeed, neither of these statements contains a specific or detailed factual assertion upon which a reasonable consumer would rely. *See Angrisani v. Capital Access Network, Inc.,* 175 Fed. Appx. 554, 556 (3d Cir.2006) ( "statements that can be categorized as "puffery" or vague and "ill-defined opinions" are not assurances of fact and do not constitute misrepresentations.") (citation omitted). Rather, such statements are routinely made by companies seeking to gain a competitive advantage in their respective industries, and therefore they are considered puffery. *In re Toshiba,* 2009 U.S. Dist. LEXIS 82833 at \*28. As such, the Court holds that these statements do not constitute actionable misrepresentations for purposes of the NJCFA, and Plaintiff is precluded from bringing NJCFA claims based upon those statements of puffery.

**\*8** On the other hand, the statement that Clenbutrx is "certified by science" is not puffery and thus could be actionable under the NJCFA. Indeed, unlike the above statements, Defendant's use of the term "certified by science," transforms a subjective statement that might otherwise be considered puffery, i.e., that the product will "give you mind blowing energy," into something that appears "both specific and measurable." *Castrol,* 987 F.2d at 946; *see, e.g., Lieberson v. Johnson & Johnson Consumer Cos.,* No. 10–6196, 2011 U.S. Dist. LEXIS 107596, at \*24, 2011 WL 4414214 (D.N.J. Sept. 21, 2011) (product labels touting that the products were "clinically proven to help babies sleep better" was not puffery). Moreover, Plaintiff alleges that no scientist has ever "certified" or "backed" Clenbutrx. Compl. ¶ 57. Thus, the Court finds that the statement that Clenbutrx is "certified by science, backed by the real world,

Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

and proven to give you mind blowing energy" is an actionable misrepresentation under the NJCFA.

Thus, the Court will consider the additional prongs required to set forth a claim under the NJCFA regarding the statement that Clenbutrx is "certified by science."[3]

## 2. Ascertainable Loss

Next, Defendant argues that Plaintiff has not pled an ascertainable loss sufficient to establish a cause of action under the NJCFA because he "purchased a dietary supplement manufactured in compliance with the dietary supplement guidelines. Thus, Plaintiff did not suffer a loss in receiving what he paid for." Def's Rep. Br. at 6. In response, Plaintiff argues that he suffered an ascertainable loss of $29.99, i.e., the price he paid for Clenbutrx. The Court agrees that at this juncture, Plaintiff has pled an ascertainable loss.

Under the NJCFA, "[a]n ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.' " *Lee v. Carter–Reed Co., L.L.C.,* 203 N.J. 496, 522 (2010) (quoting *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 248, 872 A.2d 783 (2005)). There are at least three recognized theories of ascertainable loss that may apply to a NJCFA claim. In cases involving product misrepresentation, "either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle...." *Thiedemann,* 872 A.2d at 792. The "out-of-pocket" theory may include the purchase price of a misrepresented product if the purchasers did not receive a refund and the seller's misrepresentations rendered the product essentially worthless. *See Lee,* 2010 N.J. LEXIS 951, at *51–52, 2010 WL 3781595. A "loss-in-value" theory is based on the quantifiable difference in value between the merchandise as advertized and the merchandise as delivered. *Thiedemann,* 872 A.2d at 792 (stating that an expert may employ a "market conditions" approach to product value to determine ascertainable loss). Under the third theory, an "ascertainable loss" can include a nominal overcharge for which the plaintiffs have not made a "pre-suit demand for a refund." *Bosland,* 964 A.2d at 751.

**\*9** Here, it is clear that Plaintiff is asserting an "out-of-pocket" theory of loss; specifically, Plaintiff alleges that he "suffered an ascertainable loss of monies, including, but not necessarily limited to the purchase price of the Liquid Clenbutrx Hardcore [he] purchased[.]" In addition, Plaintiff contends that he "would not have purchased" the product but

for Defendant's misrepresentations. Compl. ¶ 38. The Court notes, however, that the ascertainable loss would only relate to the misrepresentations regarding Clenbutrx as a dietary supplement and the statement that Clenbutrx is "certified by science."

Accordingly, the Court finds that Plaintiff has sufficiently pled ascertainable loss.

## 3. Causation

Finally, Defendant argues that Plaintiff has not established the third prong of a NJCFA claim—i.e. a causal relationship between the alleged unlawful conduct and Plaintiff's ascertainable loss. Indeed, it is well-established that "[c]ausation under the CFA is not the equivalent of reliance." *Lee,* 203 N.J. at 522; *see also Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192 N.J. 372, 929 A.2d 1076 (2007) (holding that the CFA "essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove an ascertainable loss.") "To establish causation, a consumer merely needs to demonstrate that he or she suffered an ascertainable loss 'as a result of' the unlawful practice." *Id.*

However, in the context of advertisements, causation is particularly crucial under the Rule 9(b) heightened pleading requirements. In that regard, Plaintiff, here, must allege how his ascertainable loss was attributable to the unlawful conduct. In other words, Plaintiff must allege where and when he saw the advertisement which contained the alleged misrepresentation. *See, e.g., Gross v. Johnson & Johnson– Merck Consumer Pharms. Co.,* 303 N.J.Super. 336, 346, 696 A.2d 793 (App.Div.1997) (CFA class could only include persons who "saw the challenged advertisements" and "would not have purchased the Pepcid but for the challenged advertisements."); *Solo v. Bed Bath & Beyond, Co.,* No. 06–1908, 2007 U.S. Dist. LEXIS, at *12 (D.N.J. Apr. 26, 2007); *Franulovic v. The Coca–Cola Company,* No. 07– 539, 2007 U.S. Dist. LEXIS, at *24, 2007 WL 3166953 (D.N.J. Oct.25, 2007) (plaintiff failed to "allege that she purchased Enviga because of a certain misleading ad, or that she purchased the prescribed amount of Enviga and did not enjoy the advertised effects. Melfi also does not allege that other consumers actually purchased the beverage because of Defendants' advertising, or that they did not get the advertised results. Instead, Melfi's claims generally state that Enviga's marketing was false and misleading, without alleging that this false advertising caused her a quantifiable loss.").

Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

Plaintiff has fail to so plead here. Instead, Plaintiff, in a broad-brush fashion, alleges that he purchased Clenbutrx "upon being induced, by Defendant VPX's packaging and promotional materials and Internet advertising ...." Compl. ¶ 26. While Plaintiff lists various websites wherein VPX advertised Clenbutrx, Plaintiff fails to identify any specific advertisement he viewed, where he viewed it, how he was misled by these advertisements and how these advertisements caused his injuries. In other words, the Complaint fails to identify which, if any, of the promotional or marketing materials were viewed by Plaintiff, and if they were, when these materials were viewed and how they induced Plaintiff to purchase Clenbutrx. More simply stated, Plaintiffs have failed to allege any specific facts establishing a connection between the alleged conduct of Defendants and the alleged injury claimed. Morever, as a corollary issue, Plaintiff also fails to allege where he purchased Clenbutrx, i.e., a store, by mail, or on the internet. This is important because according to Plaintiff's allegations, he was induced by Defendants' online advertisement into purchasing the supplement. At the same time, Plaintiff also alleges that he was induced by the packaging of Clenbutrx, but he does not specify where he observed the packaging. Absent any explanation of the connection between Plaintiff's alleged damages and the wrongful conduct of VPX, Plaintiff's NJCFA claim also fails on this basis.

**\*10** In light of the above analysis, the Court dismisses without prejudice Plaintiff's NJCFA claim regarding the alleged misrepresentation that Clenbutrx is a "dietary supplement" and the statement that Clenbutrx is "certified by science." The remaining allegations related to Plaintiff's NJCFA claim are dismissed with prejudice.

Finally, Plaintiff's common law fraud claim is dismissed without prejudice for the same reasons stated above.

### C. Plaintiff's Unjust Enrichment Claim

Under the set of facts Plaintiff has alleged, Plaintiff has not stated a claim for unjust enrichment. "To establish unjust enrichment, the plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). Specifically, "the unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time if performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* Importantly, in New Jersey, a claim

for unjust enrichment requires a direct relationship between the parties. *See, e.g., Cooper v. Samsung Elecs. Am. Inc.,* No. 07–3853, 2008 U.S. Dist. LEXIS 75810, 2008 WL 4513924 (D.N.J.2008); *see also Premier Pork L.L.C. v. Westin Inc.,* No. 07–1661, 2008 U .S. Dist. LEXIS 20532, 2008 WL 724352, at \*14 (D.N.J.2008) ("quasi contract claims involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit ..."); *Callano v. Oakwood Park Homes Corp.,* 91 N.J.Super. 105, 109, 219 A.2d 332 (App.Div.1966) (citing importance of either a direct relationship or a mistake in quasi-contract). For example, in *Cooper,* the court held that although plaintiff alleged that the manufacturer was unjustly enriched through the purchase of a television, plaintiff had not conferred a direct benefit on the manufacturer since the purchase was made through a retailer. As a result, the court dismissed plaintiff's unjust enrichment claim.

Applied here, the Court finds that Plaintiff has not sufficiently alleged a claim for unjust enrichment. Indeed, as in *Cooper,* Plaintiff has not alleged where he purchased Clenbutrx, i.e., whether he purchased it directly from Defendant or if he purchased the product through a retail establishment, online or otherwise. As a result, the Court is unable to determine whether there is a direct relationship between the parties such that Plaintiff can establish that he conferred a benefit upon Defendant for purposes of an unjust enrichment claim. Thus, the Court will dismiss Plaintiff's unjust enrichment claim without prejudice.

### D. Warranty Claims

#### 1. Pre-litigation Notice

Plaintiff asserts claims of breach of express warranty and breach of implied warranty of merchantability. However, fatal to both claims is the lack of allegations involving pre-litigation notice. New Jersey has adopted the Uniform Commercial Code's ("UCC") notice requirement for an express warranty claim. *Luppino v. Mercedes–Benz USA, LLC,* No. 09–5582, 2011 U.S. Dist. LEXIS 65495, at \*7, 2011 WL 2470625 (D.N.J. Jun. 20, 2011); *Joc, Inc. v. Exxonmobil Oil Corp.,* No. 08–5344, 2010 WL 1380750, at \*4 (D.N.J. Apr.1, 2010); *Slack v. Suburban Propane Partners, L.P.,* No. 10–2548, 2010 WL 5392845, at \*4–5 (D.N.J. Dec.22, 2010). It provides: "Where a tender has been accepted ... the buyer must within a reasonable time after [s]he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.J.S.A. 12A:2–607(3)(a). Based upon the language, this statutory notice is a "condition

precedent to filing any suit for breach of warranty." *Joc,* 2010 WL 1380750 at *4. A similar requirement is needed for a breach of implied warranty. *See C.F. Seabrook Co. v. Beck,* 174 N.J.Super. 577, 593, 417 A.2d 89 (App.Div.1980) ("New Jersey law on sales requires notice as a prerequisite to the buyer's assertion that the seller breached an implied warranty of merchantability." (citing *Johnson v. Hoffman,* 7 N.J. 123, 131, 132, 80 A.2d 624 (1951)).

**\*11** Here, Plaintiff has failed to plead that he provided the pre-litigation notice of breach. More importantly, Plaintiff offers no excuse or explanation for his failure to do so. Accordingly, because Plaintiff has failed to allege that the condition precedent has been met—sending a pre-litigation notice—Plaintiff's express and implied warranty claims necessarily fail. *See Luppino,* 2011 U.S. Dist. LEXIS 65495 at *7 ("At no time has any court in this district or in the state of New Jersey found that a buyer is not required to provide a direct seller with pre-suit notice in an action for express breach of warranty. Thus, Stern and Casiero's admission that they have failed to provide notice to Defendant proves fatal to their breach of express warranty claims.").

However, regardless of notice, both warranty claims are also inadequately pled and thus subject to dismissal. The Court turns to those analyses.

### 2. Breach of Express Warranty

In the Complaint, Plaintiff alleges that by labeling Clenbutrx as a "dietary supplement," Defendant expressly warranted that the product contained only dietary ingredients including "Apple Geranium ... standardized to 1, 3 Dimethylpentylamine." Compl. ¶¶ 69, 71. In its Motion to Dismiss, Defendant argues that Plaintiff did not adequately plead his claim for breach of express warranty. Specifically, Defendant argues that Clenbutrx "conforms to all affirmations, promises or descriptions made by VPX," and that Clenbutrx "contains all of the ingredients on the product's label, which include components, in addition to apple geranium, that qualify it as a dietary supplement." Def's Br. at 14–15.

Under New Jersey law, a breach of express warranty claim has four elements: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico,* 507 F.3d at 203. Moreover, courts in this Circuit have held that an advertisement may create an express warranty. *See, e.g., Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 575–76 (3d Cir.1990) rev'd in part on other grounds 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (concluding that cigarette advertisements representing that the cigarettes were safe could constitute an express warranty); *Elias v. Ungar's Food Products, Inc.,* 252 F.R.D. 233, 252 (D.N.J.2008) (packaging statements regarding fat and caloric content created express warranty). For example, in Elias, plaintiff alleged that descriptions on the packages of five products about fat and caloric content did not conform with the product because the product contained substantially more calories and fat than described. As a result, plaintiffs argued that the express warranty concerning the lower caloric and fat content had been breached. *Id.* at 251. The court agreed and held that the express warranty appeared to be breached. *Id.*

**\*12** In the instant matter, Plaintiff argues that by labeling Clenbutrx as a "dietary supplement," Defendant warranted that the product contained only dietary ingredients. As discussed above, 21 U.S.C. § 321(ff)(1) provides that a product may be labeled as a dietary supplement if it contains one or more dietary ingredients. Thus, even if Defendant's labeling of Clenbutrx as a "dietary supplement" created an express warranty between the parties, because Plaintiff does not allege that the product does not contain any "dietary ingredients" as defined by 21 U.S.C. § 321(ff)(1), Plaintiff has not stated a claim for breach of that warranty. Simply put, taking Plaintiff's Complaint as true, even if apple geranium is not a dietary ingredient, Plaintiff has failed to allege that there are no other dietary ingredients, or equivalent, contained in Clenbutrix. Without those allegations, Plaintiff has not sufficiently alleged a breach of an express warranty. Accordingly, this claim is dismissed without prejudice.

### 3. Breach of Implied Warranty of Merchantability

In addition, Plaintiff alleges that VPX breached the implied warranty of merchantability because Clenbutrx was "not adequately packaged, labeled, sold, promoted, or fit for the ordinary purposes" as a dietary supplement. Compl. ¶¶ 75, 78. Specifically, Plaintiff appears to argue that Defendant "impliedly warranted that the product is composed entirely of dietary ingredients, that 1, 3 dimethylpentylamine is found in apple geranium, and that therefore the product is safe." Compl. ¶ 75.[4]

Pursuant to N.J.S.A. 12A:2–314, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 375 of 751
PageID: 11741
Hammer v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 1018842, 77 UCC Rep.Serv.2d 283

kind ..." *N.J.S.A.* 12A:2–314. " 'Merchantability' requires
that a product conform to its ordinary and intended use."
*Hughes,* 2011 WL 2976839 at *22 (quoting *Berenblat v.
Apple, Inc.,* 2009 WL 2591366, at *2 (N.D.Cal. Aug.21,
2009)). "In order for the implied warranty of merchantability
to be breached, the product at issue must have been defective
or not fit for the ordinary purpose for which it was
intended." *In re In re Toshiba Am. HD DVD Marketing and
Sales Practices Litigation* at *16. "The implied warranty of
merchantability does not 'impose a general requirement that
goods precisely fulfill the expectation of the buyer. Instead,
it provides for a minimum level of quality.' " *Hughes,* 2011
WL 2976839, at *22 (quoting *Berenblat* at *3). Indeed, the
warranty of merchantability " 'simply means that the thing
sold is reasonably fit for the *general* purpose for which it is
manufactured and sold.' " *Ferrari v. American Honda Motor
Co., Inc.,* 2009 WL 211702, at *3 (N.J.App.Div. Jan. 30,
2009) (quoting *Henningsen v. Bloomfield Motors, Inc.,* 32
N.J. 358, 370, 161 A.2d 69 (1960) (emphasis added)).

In this instant matter, Plaintiff does not dispute that Clenbutrx
is sold for the ordinary purpose as a dietary supplement.
*See, e.g.,* Compl. ¶ 76 ("Defendant made such implied
warranties knowing that the ordinary purpose for which
Liquid Clenbutrx Hardcore was to be used was as a dietary
supplement."). Instead, with regard to the implied warranty
claim, Plaintiff alleges, at most, that the product contains
ingredients other than dietary ingredients, and therefore, the
product is unsafe. However, Plaintiff has proffered nothing
by way of pleadings to support its assertion that a dietary
supplement is not "merchantable" if it contains components
other than dietary ingredients or that Clenbutrx is somehow
unsafe. Similarly, Plaintiff has entirely failed to allege or
explain why the inclusion of "apple geranium standardized
to 1, 3 Dimethylpentylamine" renders Clenbutrx unfit for the
purpose of being a dietary supplement. Thus, the Court will
dismiss Plaintiff's claim for breach of the implied warranty of
merchantability without prejudice.

### E. Plaintiff's Claim for Injunctive Relief
**\*13** Finally, Plaintiff asserts a cause of action for injunctive
relief, arguing that Defendant should be enjoined from
continuing its marketing and sale of Clenbutrx. Compl. ¶
87. In response, Defendant contends that injunctive relief is
not a recognized cause of action and should be dismissed.
In addition, Defendant contends that even if the Court

recognized this cause of action, since VPX has changed its
labeling and advertisements, this cause of action is moot.
Def's Rep. Br. at 15.

Initially, the Court notes that at least one court in this
district has held that injunctive relief is not separate cause
of action. *See Smajlaj,* 2011 WL 1086764, at *2 ("Plaintiffs
also seek injunctive relief, which they mistakenly characterize
as a cause of action."). Moreover, the Court finds that in
this matter, Plaintiff's claim for injunctive relief appears to
be expressly tied to his fraud claims; specifically, Plaintiff
alleges that Defendant's actions "of marketing, advertising,
promoting, distributing, and selling" Clenbutrx "continue
to deceive" the public. Compl. ¶ 85. Thus, Plaintiff asks
this Court to enjoin Defendant from "continuing their
marketing, advertisement, promotion, distribution, and sale"
of Clenbutrx. Compl. ¶ 87. Because the Court has already
dismissed Plaintiff's fraud claims, and in the apparent absence
of any other cause of action connected to Plaintiff's claim
for injunctive relief, the Court will dismiss Plaintiff's cause
of action for injunctive relief without prejudice. Importantly,
however, in the event Plaintiff re-pleads his fraud claims, he
must request an injunction as a part of the relief, not as a
separate cause of action.

### IV. CONCLUSION
For the foregoing reasons, Defendants' Motion to Dismiss
is GRANTED. Specifically, with respect to Counts I
(NJCFA) and II (Common Law Fraud), Plaintiff's claims
regarding the misrepresentation that Clenbutrx is "certified
by science" and that Clenbutrx is a "dietary supplement"
are DISMISSED WITHOUT PREJUDICE. The remaining
fraud allegations—i.e., statements regarding Clenbutrx as the
world's fastest, hardest hitting fat incinerator and authentic
synergistic blend of ingredients—are DISMISSED WITH
PREJUDICE. In addition, Counts III (Unjust Enrichment)
and VI (Injunctive Relief) are DISMISSED WITHOUT
PREJUDICE. Moreover, with respect to Count IV (Breach of
Express Warranty) and Count V (Breach of Implied Warranty)
are DISMISSED WITHOUT PREJUDICE. An order will be
entered consistent with this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1018842, 77 UCC
Rep.Serv.2d 283

2012 WL 1018842, 77 UCC Rep.Serv.2d 283

Footnotes

1    The Court notes that in Plaintiff's opposition brief, he points out that after being served with the Complaint, Defendant removed "Apple Geranium (Pelargonium odorantissomum) (leaves) standardized to 1, 3 dimethylpentylamine" from the ingredients of Clenbutrx, as well as its marketing materials. Pl's Opp. Br. at 3. This fact was not disputed by Defendant.

2    The language of the allegations in the Complaint, specifically, ¶¶ 18–22, are subject to varying interpretations. However, in light of the nature of Plaintiff's claims, the Court will construe these allegations in the manner set forth in this Opinion.

3    In the event Plaintiff amends the Complaint on his affirmative misrepresentation claim regarding Clenbutrx's characterization as a "dietary supplement"—which the Court has dismissed—Plaintiff must be mindful that in order to properly allege a NJCFA claim based on that representation, the allegations must conform to the Court's rulings on the remainder of the NJCFA elements.

4    Plaintiff also asserts that Defendant breached an implied warranty by failing to publish its "money back" guarantee on the Clenbutrx packaging materials; the guarantee was only published on its website. As stated above, a breach of implied warranty concerns the merchantability of the product; however, nothing in Plaintiff's allegations regarding the money back guarantee concerns the product's fitness for its ordinary purpose. Thus, Plaintiff's allegations in this context cannot form a legal basis for a breach of implied warranty claim. Morever, even if this were a sufficient basis, Plaintiff has not cited any authority that requires a manufacturer or seller to offer a money back guarantee as a matter of law, let alone requiring companies to advertise that guarantee in a particular way. Accordingly, the Court will dismiss these allegations with prejudice.

---

**End of Document**                                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 32

2019 WL 4757134
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Eastern Division.

Kevin D. HARDWICK, Plaintiff,

v.

3M COMPANY, et al., Defendants.

Case No. 2:18-cv-1185
|
Signed 09/30/2019

**Attorneys and Law Firms**

David John Butler, Jonathan N. Olivito, Taft Stettinius & Hollister LLP, Columbus, OH, Michael A. London, Pro Hac Vice, Rebecca G. Newman, Pro Hac Vice, Douglas & London, PC, New York, NY, Neil E. McWilliams, Jr., Pro Hac Vice, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA, Pensacola, FL, Robert A. Bilott, Taft Stettinius & Hollister, Cincinnati, OH, for Plaintiff.

Richard Donovan Schuster, John Joseph Kulewicz, Jonathan P. Corwin, Vorys, Sater, Seymour and Pease LLP, Columbus, OH, Daniel Leslie Ring, Pro Hac Vice, Joshua D. Yount, Pro Hac Vice, Megan E. Stride, Pro Hac Vice, Michael Scodro, Pro Hac Vice, Mayer Brown, Chicago, IL, Rosemary D. Welsh, Vorys Sater Seymour & Pease LLP, Cincinnati, OH, for Defendant 3M Company.

Shawn J. Organ, Erik J. Clark, Sean M. Stiff, Organ Cole LLP, Columbus, OH, Andrew D. Carpenter, Pro Hac Vice, Shook, Hardy & Bacon LLP, Kansas City, MO, John K. Sherk, Pro Hac Vice, Shook, Hardy & Bacon LLP, San Francisco, CA, for Defendants E.I. du Pont de Nemours and Company, The Chemours Company.

Ronald S. Kopp, Jessica A. Lopez, Roetzel & Andress, Akron, OH, Eric P. Gotting, Pro Hac Vice, Keller and Heckman LLP, Washington, DC, for Defendant Archroma Management LLC.

James A. King, Porter Wright Morris & Arthur, Columbus, OH, Daniel A. Spira, Pro Hac Vice, Maja C. Eaton, Pro Hac Vice, Sara J. Gourley, Pro Hac Vice, Sidley Austin LLP, Chicago, IL, for Defendants Arkema, Inc., Arkema France, S.A.

Theodore M. Grossman, Jones Day, New York, NY, for Defendant Daikin Industries Ltd.

Dustin M. Koenig, Matthew A. Kairis, Jones Day, Columbus, OH, Theodore M. Grossman, Jones Day, New York, NY, for Defendant Daikin America, Inc.

Drew H. Campbell, Bricker & Eckler, Columbus, OH, Gwyn Williams, Pro Hac Vice, Latham & Watkins LLP, Boston, MA, Kegan A. Brown, Pro Hac Vice, Latham & Watkins LLP, New York, NY, for Defendant SolvaySpecialty Polymers, USA, LLC.

Carl A. Aveni, II, Carlile Patchen & Murphy LLP, Columbus, OH, Clifford Zatz, Pro Hac Vice, Laura Offenbacher Aradi, Pro Hac Vice, Peter C. Condron, Pro Hac Vice, Crowell & Moring LLP, Washington, DC, for Defendant AGC Chemicals Americas, Inc.

**OPINION AND ORDER**

EDMUND A. SARGUS, JR., UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court on Defendants' Joint Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction (ECF No. 67) and Defendant Arkema Inc.'s and Arkema France's Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction (ECF No. 83), Defendants' Motions to Dismiss for Lack of Personal Jurisdiction (ECF Nos. 68, 69, 71, 72, 73, 82, 84, 113), Plaintiffs' Combined Memorandum in Opposition to all Defendants' Motions to Dismiss (ECF No. 94) and Plaintiff's Memorandum in Opposition to Arkema Inc.'s and Arkema France's Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction (ECF No. 119), Defendants' Joint Reply Brief in Support of the Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction (ECF No. 105), and Defendants' Reply Briefs in Support of their Motions to Dismiss for Lack of Personal Jurisdiction (ECF Nos. 105–111, 121). For the reasons that follow, the Court **DENIES** all of these motions.

I.

This case focuses on "PFAS," which are man-made chemicals described by the United States Environmental Protection Agency as follows:

> Per- and polyfluoroalkyl substances (PFAS) are a group of man-made chemicals that includes PFOA, PFOS and GenX chemicals. Since the 1940s, PFAS have been manufactured and used in a variety of industries around the globe, including in the United States. PFOA and PFOS have been the most extensively produced and studied of these chemicals. Both are very persistent in the environment and in the human body. Exposure to certain PFAS can lead to adverse human health effects.

https://www.epa.gov/pfas/pfas-what-you-need-know-infographic

Plaintiff Kevin D. Hardwick filed the instant action, describing the nature of it as follows:

> This is a national class action brought on behalf of Plaintiff individually, and on behalf of all others similarly situated, for injunctive, equitable, and declaratory relief, by Plaintiff and other class members for injuries arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with contamination of the blood and/or bodies of Plaintiff and other class members with synthetic, toxic per- and polyfluoroalkyl substances (collectively "PFAS"), including but not limited to perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (CAS # 13252-13-6/C3 Dimer Acid/P-08-508/FRD903/GX903/C3DA/GenX), and HFPA Dimer Acid Ammonium Salt (CAS# 62037-80-3/ammonium salt of C3 Dimer Acid/P-08-509/FRD902/GX902/GenX), which resulted and continues to result from Defendants using Plaintiff and the other class members as part of a massive, undisclosed human health experiment without the knowledge and/or consent of Plaintiff or the other class members.

**\*2** (Am. Compl. ¶ 1, ECF No. 96.)

In this Opinion and Order, the Court reviews only the plausibility of Mr. Hardwick's individual claims and makes

no determination as to whether they are appropriate for class certification.

Mr. Hardwick alleges that he is a citizen of the State of Ohio and a resident of the Southern District of Ohio, and has "worked as a firefighter for more than forty years, during which he has used firefighting foams containing one of more PFAS materials, used equipment/gear treated and/or coated with materials containing and/or contaminated with one or more PFAS materials, and/or otherwise was exposed to one or more PFAS materials, and now has one or more PFAS materials in his blood serum." *Id.* ¶ 4.

Mr. Hardwick names as Defendants 3M Company ("3M"), E. I. du Pont de Nemours and Company ("DuPont"), the Chemours Company ("Chemours"), Archroma Management L.L.C. ("Archroma"), Arkema, Inc. ("Arkema America"), Arkema France, S.A. ("Arkema France"), Daikin Industries Ltd. ("Daikin Industries"), Daikin America, Inc. ("Daikin America"), Solvay Specialty Polymers, USA, LLC ("Solvay"), and Asahi Glass Company, Ltd. ("Asahi Glass").

Plaintiff and Asahi Glass filed a Joint Stipulation (ECF No. 89), in which they stipulated that Asahi Glass did not engage in business in Ohio or the United States. They stipulated that all of the chemical products produced by Asahi Glass, including products that contain PFAS, were sold in the United States and in Ohio by AGC Chemicals Americas, Inc. ("AGC Chemicals"). AGC Chemicals is registered to do business in Ohio and has a registered agent in Ohio. Based on this Joint Stipulation, Asahi Glass was dismissed without prejudice and in Plaintiff's Amended Complaint he substituted AGC Chemicals for Asahi Glass.

In the Amended Complaint, Plaintiff alleges that "Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in Ohio and this District, in such a way as to cause the contamination of Plaintiff's and the class members' blood and/or bodies with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or bodies of Plaintiff and other class members." (Am. Comp. ¶ 29.)

Mr. Harwick further alleges that "Defendants manufacturing and/or using PFAS materials released such PFAS materials into the environment during, as a result of, or in connection with their manufacturing and other commercial operations,

including into the air, surface waters, ground water, soils, landfills, and/or through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, including in Ohio and this District, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiff and the other class members to such PFAS." *Id.* ¶ 34.

The Amended Complaint provides a history of PFAS materials, which "were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s." *Id.* ¶ 28. Plaintiff alleges that PFAS are unique chemicals because of their biopersistent and bioaccumulative qualities. The pleading contains allegations that PFAS cause significant adverse health effects, "including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medially-diagnosed high blood pressure, high cholesterol and is known to cause permanent subcellular injuries." *Id.* ¶ 53.

**\*3** Plaintiff alleges that each Defendant learned of various studies and data indicating that exposure to PFAS have significant negative impacts on human health, including "increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects." *Id.* ¶ 43. Plaintiff further states that Defendants "knew and shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or adverse health effects and/or risks." *Id.* ¶ 54.

Mr. Hardwick alleges that in spite of these studies and data and Defendants' knowledge of them, "Defendants repeatedly assured and represented" to "the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials" that exposures to PFAS "presented no risk of harm and were of no legal, toxicological, or medical significance of any kind." *Id.* ¶ 44.

Plaintiff additionally avers that, although Defendants were aware of the dangers and risks of PFAS, they not only withheld that information from the public and regulators, but that they also actively misled the public and regulators as to such dangers and risks. Mr. Hardwick alleges that Defendants made efforts to conceal this

data and to manipulate public, regulatory and scientific perception and knowledge of the injurious nature of PFAS. Specifically, Plaintiff states that "Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS materials in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff or the class members from discovering the existence and extent of any injuries/harm as alleged herein." *Id.* ¶ 58.

He further avers that "Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including into Ohio and this District, by their customers and others, including but not limited to through manufacture, use, and release, of aqueous fire-fighting foams containing or made with PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS, including in Ohio and this District, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities." *Id.* ¶ 61.

Mr. Hardwick alleges that, although there is evidence and data to the contrary, "[t]o this day, Defendants deny that the presence of any PFAS in Plaintiff's or any class member's blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance"; they deny that "any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to Plaintiff or any class member that the presence of any PFAS material in their blood, at any level, is of any legal, toxicological, medical, or other significance"; that "Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions." *Id.* ¶¶ 63–65.

2019 WL 4757134

**\*4** Mr. Hardwick specifies that because "[t]here is no naturally-occurring 'background,' normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants." *Id.* ¶ 56. Plaintiff continues, averring that "Defendants have collectively reaped billions of dollars in profits from the acts and/or omissions that caused, permitted, allowed, and/or otherwise resulted in the PFAS contamination of Plaintiff's and the other class members' blood and/or bodies and resultant biopersistence and bioaccumulation of such PFAS in such blood and/or bodies." *Id.* ¶ 78.

Plaintiff alleges that the "presence, accumulation, toxic invasion, and/or persistence of PFAS in human blood, including that of Plaintiff and the other class members, is injurious and physically harmful and results in unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injury and/or adverse impacts to the blood and/or bodies of Plaintiff and the other class members, including but not limited to subcellular injuries, including but not limited to biopersistence and bioaccumulation within the body." *Id.* ¶ 57.

Mr. Hardwick brings claims for negligence, battery, conspiracy, and declaratory judgment. He asks for equitable relief in the form of a panel of scientists to study the effects that the PFAS has in his body and for medical monitoring as part of that relief.

Defendants moved jointly to dismiss this case in its entirety for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, and each Defendant moved separately for dismissal based on lack of personal jurisdiction. After these motions were filed, Plaintiff amended the complaint and the parties jointly moved to apply the motions to dismiss to the Amended Complaint. (ECF No. 101.) The Court ordered oral argument on Defendants' Joint Motion to Dismiss for Failure to State a Claim and for Lack of Subject Matter Jurisdiction, which was held on August 27, 2019. (Transcript ("Tr."), ECF No. 126.) Defendants' motions are now ripe for decision.

## II.

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### A. Standard
"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (*quoting DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)). Defendants here make a facial attack, and therefore, "[a]s with a Rule 12(b)(6) motion, [the Court] must accept the allegations set forth in the complaint as true, drawing all inferences in favor of the plaintiff," and determine whether Plaintiff has stated a plausible claim. *Gaylor v. Hamilton Crossing CMBS*, 582 Fed. Appx. 576, 579 (6th Cir. 2014) (citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–5570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*).

### B. Analysis
Defendants move for dismissal of Mr. Hardwick's negligence, battery, and conspiracy claims, summarizing why they are entitled to dismissal as follows:

> The Court lacks Article III authority to resolve the dispute; the complaint alleges no 'injury' under Ohio law; it seeks relief exceeding this Court's equitable and constitutional powers; it fails to state a claim under the federal pleading standards and Ohio law; and it runs headlong into the Ohio Product Liability Act.

**\*5** (Defs' Mot. to Dismiss at (i), ECF No. 67-1.) Defendants further assert that because Mr. Hardwick has failed to allege injury under Ohio law, "all three of Hardwick's substantive claims under Ohio law—negligence, battery, and conspiracy" fail. *Id.* at 13.

The Court will first address all of Defendants' arguments under Rules 12(b)(1) and 12(b)(6), except those related to the Ohio Product Liability Act ("OPLA"), which it will address separately below.

**1. Subject Matter Jurisdiction, Injury Under Ohio Law, Pleading Under Ohio and Federal Standards, and Requested Relief**

Article III standing is "the threshold question in every federal case," and if the plaintiff lacks standing, the federal court lacks jurisdiction. *Worth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional standing consists of three elements: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

Defendants contend that Mr. Hardwick has failed to show that he possesses standing under federal law and "[u]nder Ohio law, exposure to a toxic substance does not create an 'injury' unless an identifiable 'condition' results." (Defs' Mot. to Dismiss at 13) (citing the law on constitutional standing set out by this Court *supra*, and *Bouchard v. Am. Home Prods. Corp.*, 213 F. Supp. 2d 802, 807 (N.D. Ohio 2002)). Further, Defendants maintain that the relief of a science panel "was not 'traditionally accorded by courts of equity' and thus cannot be accorded now either." *Id.* at 15 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Finally, Defendants assert that "even if this relief were generally available, awarding it in this case would violate the Seventh Amendment, Article III, and due process." *Id.* That is, Defendants contend that if a science panel was fashioned in the exact way Plaintiff requests, such a panel would decide the issue of general causation, removing the constitutional right to a trial by jury. Defendants further submit that the role of a science panel would not be bound by the rules of evidence, and would not include procedural safeguards. Defendants' arguments are not well taken.

With regard to standing and injury, Defendants maintain that Mr. "Hardwick's alleged injury—the mere presence of an unidentified level of some type of PFAS in his blood —does not constitute currently existing or future injury in fact." (Defs' Mot. to Dismiss at I, ECF No. 67-1.) They continue:

> *No Article III standing.* To begin with, Article III courts may not decide abstract disputes like this one. Hardwick admits to: not being ill; not having symptoms of illness; not having suffered any actual harm; being concerned only with the *potential* effects of the substances at the center of this lawsuit, per- and polyfluoroalkyl substances (PFAS);

> ....

> *No injury under Ohio law.* Courts applying Ohio law have consistently dismissed amorphous claims such as these for failure to state a concrete injury. Simply put, in the absence of an actual identifiable condition or illness, the mere presence of a substance, even if allegedly toxic, in a plaintiff's blood or body does not constitute "injury" under Ohio law.

> **\*6** *Id.* at 1.

At oral argument, defense counsel maintained:

> The fact that they have asked for a science panel, even if they were to withdraw that request today, the fact that they have asked for a science panel, it's what that substitutes for in the complaint that is fatal here with regard to the 12(b)(6). It substitutes for any allegation that there is a harmful substance in the plaintiff.

(Tr. at 13, ECF No. 126.)

Plaintiff disagreed, contending:

> Defendants refuse to recognize that Mr. Hardwick has pleaded an injury—a significant one—the unwanted presence of a man-made chemical toxin in his blood, caused by Defendants' actions, without his consent, that persists, continues to accumulate, and has altered the structure of his blood. That concrete and present injury, coupled with the additional imminent harm that will continue to manifest as the chemicals continue to accumulate and interact synergistically, is more than sufficient to establish an injury in fact.

> ....

> In fact, the Sixth Circuit has recognized the possibility that a plaintiff could recover under Ohio law for the "increased risk" of disease as the result of the defendant's actions. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011). As such, Defendants' claim that an identifiable condition is a prerequisite for an injury is a significant overstatement of what Ohio law requires.

(Mem. in Opp. at 5, 15, 19, ECF No. 94.)

The Court finds *Hirsch v. CSX Transportation, Inc.*, on point and binding. *Hirsch* was born of a train derailment that was "accompanied by a chemical spill, fire, and rail car explosion, allegedly causing toxic substances, toxic fumes, and/or carcinogens (collectively 'toxic substances'

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 383 of 751
PageID: 11749

hereinafter) to be released into the atmosphere, ground and water." *Hirsch v. CSX Transp., Inc.*, No. 1:07-cv-3512, slip op. at 2 (N.D. Ohio Oct. 22, 2008) (Opinion & Order granting in part and denying in part Defendant's Motion to Dismiss). A group of individuals, on behalf of a putative class comprising those individuals exposed to the allegedly toxic substances, brought, *inter alia*, a negligence claim against the defendants "primarily seeking the establishment of a judicially administered medical monitoring program, punitive damages and attorney's fees." *Id.* at 2. Within the plaintiff groups, one was described by the trial court as follows:

The remaining group of eleven Plaintiffs have not alleged any symptoms but have alleged exposure to potentially toxic materials arising from the derailment (the "no injury" Plaintiffs).
*Id.* at 11.

Similar to Defendants in the case *sub judice*, the *Hirsch* defendant moved to dismiss at the pleadings stage the claims filed by the "no injury" Plaintiffs, as stated by the trial court:

Defendant challenges the sufficiency of the damages allegations as to the "no injury" Plaintiffs and the sufficiency of both the damages and causation allegations as to the "injury" Plaintiffs.

Defendant contends that the "no injury" Plaintiffs have not stated a claim because they do not have any physical injuries. Defendant further argues that allegations of exposure and potential injury do not give rise to a viable tort claim under Ohio law because they are not actual injuries.
**\*7** *Id.* at 11.

The trial court disagreed with the defendant and found that "physical injury is not required to demonstrate damages" in an Ohio tort claim. *Id.* The Court explained:

While physical injury is not required to demonstrate damages entitling a plaintiff to medical monitoring relief, a plaintiff must demonstrate that because of defendant's actions, he has incurred an increased risk of disease or illness. "It is sufficient for the Plaintiffs ... to show by expert medical testimony that they have increased risk of disease which would warrant a reasonable physician to order monitoring." *Day v. NLO*, 851 F.Supp. [869, at] 881 [ (S.D. Ohio 1994) ]. *See also Hansen v. Mountain Fuel Supply*, 858 P.2d at 979 ("Because the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove ... probability of

actually experiencing the toxic consequences of exposure. It is sufficient that the plaintiff show the requisite increased risk.").

Thus, a claim for medical monitoring relief must sufficiently allege that defendant's conduct created an increased risk of disease or illness.
*Id.* at 12.

While the trial court held that medical monitoring was not an independent cause of action under Ohio law, it noted that "Ohio law recognizes medical monitoring as a form of damages for an underlying tort. *See Wilson v. Brush Wellman*, 103 Ohio St.3d 538, 817 N.E.2d 59, 63 (Ohio 2004)." *Id.* at 3. The trial court further observed:

Holding that "[c]ourt supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive," the [*Brush Wellman*] court evidenced a clear intent to permit medical monitoring damage claims to move forward.
*Id.* at 3-4 (first alteration in original).

The *Hirsch* trial court denied the defendant's motion to dismiss the plaintiffs' negligence claims, relying on the allegations in the complaint:

To summarize, Plaintiffs have sufficiently alleged that toxic substances were on the train and were released because of the derailment, they were exposed to these substances because of the derailment, the toxic substances are associated with increased risk of disease, and because Defendant's conduct caused them to be exposed to these toxic substances they face an increased risk of disease requiring medical monitoring. Since Plaintiffs' allegations must be accepted as true when analyzing a 12(b)(6) motion to dismiss, Plaintiffs have alleged injuries sufficient for a negligence claim seeking medical monitoring relief. Defendant's motion to dismiss as to these "no injury" representative Plaintiffs is therefore denied.
*Id.* at 14.

After discovery, the *Hirsch* defendant moved for summary judgment, arguing that the plaintiffs failed to proffer the expert testimony and evidentiary support required to prove the causation and risk/injury elements of their negligence case. The district court agreed and granted the defendant's motion for summary judgment. Plaintiffs appealed that decision.

**\*8** On review, the Sixth Circuit began:

We next turn to the merits of this case. To succeed on a negligence claim in Ohio, the Plaintiffs must show the basic elements taught to every first-year law student: duty; breach; causation; and damages....

What makes the present claim conceptually unique is that the Plaintiffs—though no doubt distraught from the stress of a train crash and evacuation—have, even by their own admission, as of now not suffered any discernable compensable injury. Rather, their alleged injuries consist solely of the increased risk of—and corresponding cost of screening for—certain diseases that, according to Plaintiffs, are more likely to occur as a result of the train crash. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 825–26 (D.C. Cir. 1984). Assuming that Ohio would recognize such an injury, the remedy could be a medical monitoring program that would spare the Plaintiffs these expenses.

*Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011).

The Sixth Circuit relied on the district court's finding regarding medical monitoring, stating that the trial "court was clear that court-supervised medical monitoring was available as an equitable remedy under Ohio law." *Id.* at 361 (citing *Wilson v. Brush Wellman*, 103 Ohio St.3d 538 (2004) and *Day v. NLO*, 851 F. Supp. at 869 (S.D. Ohio 1994) ("[W]here periodic fixture medical treatment[s], including tests, are required these have traditionally been granted as compensable future medical expenses.")).

The Sixth Circuit then framed this issue before it as follows:

But the question remains: are these Plaintiffs actually at such an increased risk of disease that they are entitled to a medical monitoring program?
*Hirsch*, 656 F.3d at 363. The court continued:

After all, not every increased risk of disease warrants increased medical scrutiny. The expenses must be reasonable. *See Friends for All Children*, 746 F.2d at 825; *Day*, 851 F. Supp. at 880. In other words, for the Plaintiffs to prevail, there must be evidence that a reasonable physician would order medical monitoring for them.
*Id.*

Thus, the Sixth Circuit adopted the trial court's evidentiary standard that must be met by a plaintiff utilizing the equitable relief of medical monitoring as damages in an Ohio negligence case. The court found that the *Hirsch* plaintiffs had not met this standard on summary judgment: "The Plaintiffs in this case have failed to produce sufficient evidence such that a reasonable jury could believe that a reasonable physician would order medical monitoring." *Id.* at 364.

*Hirsch* provides the following guidance:

Our holding today does not foreclose any number of possibilities; for example, perhaps the Plaintiffs might have been able to survive summary judgment had Dr. Kornberg provided some indication of why medical monitoring would be the standard practice for risks this remote. Perhaps, though we do not require blood tests in every toxic tort case, *see Redland Soccer Club v. Dep't of the Army*, 55 F.3d 827, 847 (3d Cir. 1995), the Plaintiffs might have survived summary judgment had they obtained conclusive medical evidence that they faced a one-in-a-million increased risk of cancer. Those would be harder cases, and we leave them for another day. In this case, the Plaintiffs have failed to show a genuine issue of material fact. We therefore AFFIRM the judgment of the district court.
**\*9** *Id.* at 364.

The Sixth Circuit has since then relied upon *Hirsch* and *Brush Wellman* for the proposition that medical monitoring is an available remedy in a tort action under Ohio law. In *Baker v. Chevron U.S.A. Inc.*, 533 Fed. Appx. 509, 517 (6th Cir. 2013), the Sixth Circuit referred to *Hirsh* as "a case in which this court addressed the evidentiary requirements for medical monitoring damages under Ohio law." The court observed:

As this court explained in *Hirsch*, in accordance with *Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994) and *Wilson v. Brush Wellman, Inc.*, 103 Ohio St.3d 538, 817 N.E.2d 59 (2004), "medical monitoring" is a remedy for being presently injured with an "increased risk of—and corresponding cost of screening for—certain diseases that ... are more likely to occur as a result of [a defendant's tortious conduct]." *Hirsch*, 656 F.3d at 363.
*Id.* at 525 (alteration in original).

Relying on *Hirsch, Baker, and Brush Wellman,* this Court finds that Mr. Hardwick has alleged injury sufficient to state a claim of negligence and/or battery upon which relief can be granted. The Court disagrees with Defendants' position that the request for a science panel substitutes for any allegation that there is a harmful substance in Mr. Hardwick's body. As

set forth above in the fact section, the Amended Complaint reflects allegations in similar fashion to the *Hirsch* complaint that survived the defendant's motion to dismiss.

That is, comparable to the "no injury" *Hirsch* plaintiffs, Mr. Hardwick alleges that PFAS are toxic substances that are in aqueous firefighting foams and/or emergency responder protection gear or equipment and other media, that the PFAS were released into Ohio because of Defendants' acts and/or omissions, that he was exposed to PFAS because of Defendants' conduct, that PFAS is associated with increased risk of disease in humans, that each Defendant's conduct caused him to be exposed to these toxic substances in Ohio, and that he now faces an increased risk of disease requiring medical monitoring and scientific research.

Specifically, Mr. Hardwick alleges that he has worked as a firefighter for more than forty years and has used firefighting foams containing one or more PFAS materials, used equipment/gear treated and/or coated with materials containing and/or contaminated with one or more PFAS materials, and/or otherwise was exposed to one or more PFAS materials in Ohio. (Am. Compl. ¶¶ 1, 4, 31, 37, 57, 69, 72, 100, 103, 109, 25.) He further specifies that each of the Defendants marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS in Ohio and, through their commercial operations, contaminated Ohio's air, surface waters, ground water, soils, landfills and/or otherwise was exposed Plaintiff to one or more PFAS materials. *Id.* ¶¶ 6, 8, 10, 12, 14, 17, 20, 22, 24, 27, 29, 34, 56, 61, 78, 97. He alleges that Defendants tried to encourage and foster the increased and further use of PFAS in Ohio, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities resulting in the contamination in Ohio and in Mr. Hardwick's body and blood. *Id.* ¶¶ 29, 34, 56, 61, 78, 109, 110, 116, 125. He additionally specifically alleges that Defendants conspired to, among other things, conceal material facts regarding the dangers of PFAS so that they could conduct operations and activities that resulted in PFAS contaminating his blood and body in Ohio. *Id.* ¶¶ 44, 53, 58, 60–65. Mr. Hardwick avers that the PFAS are toxic substances that are associated with increased risk of disease including cancer, and that Mr. Hardwick faces an increased risk of disease as a result of Defendants' conduct causing him to be exposed to PFAS. *Id.* ¶¶ 43, 53, 54, 57.

**\*10** These same allegations support Article III standing. Plaintiff avers (1) that he has the present injury in fact of an increased risk of disease caused by the PFAS that is currently in his blood and body, (2) that the injury is fairly traceable to each Defendant whose acts and/or omissions placed the PFAS into Ohio and into Plaintiff's body (discussed more below in section on personal jurisdiction), and (3) that the injury is likely to be redressed by a favorable decision from the Court granting injunctive relief (discussed next).

Moving to Plaintiff's requested injunctive relief, Defendants assert that Mr. Hardwick's request for a science panel is beyond this Court's power to award. They contend:

> *Impermissible relief requested.* Just as federal courts may decide only what was traditionally considered a Case or Controversy, they may award only the kind of relief traditionally awarded by courts at the founding.

(Defs' Mot. to Dismiss at 1) (citing, *inter alia*, *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939) (for the proposition that "federal courts exercising their equitable powers have only the 'authority to administer' the 'judicial remedies which had been devised and [were] being administered by the English Court of Chancery' at the time the Constitution was ratified").

Defendants further contend that, to the extent medical monitoring is available as relief, Plaintiff has not sufficiently requested it in his Amended Complaint, stating at oral argument:

> And the fact is medical monitoring around the country in various jurisdictions has taken on a variety of forms, some of which require -- all of them require more than is pled here and far more than is pled here.

(Tr. at 8, ECF No. 126.) This Court, however, disagrees.

As the Sixth Circuit has explained, "[t]he equity jurisdiction of the District Courts, and of their predecessor circuit courts, as it has existed since conferred by § 11 of the Judiciary Act of 1789 (1 Stat. 78), has never been held to exceed in scope that which the High Court of Chancery in England ... [which] is why Federal courts of equity have always eschewed jurisdiction of divorce matter, and of determinations as to child custody; and of the probate of wills and the administration of estates, including the enforcement of charitable bequests." *Slapin v. Slapin*, 352 F.2d 55, 56 (6th Cir. 1965) (dissent relying on, among others, *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563 (1939)). In the instant action, Plaintiff does not ask this Court to extend

its jurisdiction over the type of case described in *Slapin*, *supra*. Instead, Plaintiff pleads traditional tort claims and seeks medical testing and monitoring as a remedy. "Once invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' " *Milliken v. Bradley*, 433 U.S. 267, 281 (1977).

The Court also finds that the Amended Complaint sufficiently requests medical monitoring relief. Mr. Hardwick requests "monitoring deemed appropriate" by the science panel and any other equitable relief the Court deems suitable under the circumstances. (Am. Compl. ¶ 133, ECF No. 96.) The Court need not make a determination as to the exact nature of the requested relief as long as it has the power to provide some of the requested relief, which is the case as to medical monitoring only. Therefore, at this juncture the Court need not address the exact parameters of the relief sought by Plaintiff in the form of a science panel.

 **\*11**  The Court notes, however, that requesting oversight of further scientific study in some fashion in an Ohio tort claim with medical monitoring as the remedy is not exceptional. Indeed, it is not new to this Court. Thirty years ago in *In re Fernald Litigation,* this Court heard a case in which the plaintiffs "sought an order requiring defendants to establish a fund to pay the costs of medical monitoring for all class members and epidemiology to determine the adverse health affect caused by defendants' operation of the [Feed Material Production Center]." *In re Fernald Litig.*, C-1-85-149, 1989 WL 267039, at \*1 (S.D. Ohio Sept. 29, 1989). This case involved a class action against National Lead of Ohio and National Lead Industries of Ohio. The plaintiffs brought claims for, *inter alia,* negligence and punitive damages with property value diminution and potential physical injury as the alleged damages.

This Court explained that "to facilitate pretrial settlement, ... [a]n advisory summary jury trial was conducted." *Id.* at \*2. "During the summary jury trial and following same, the parties conducted settlement negotiations, on some occasions with the assistance of the Court." *Id.* "At the conclusion of the summary jury trial, the jury returned a non-binding verdict in favor of the plaintiffs awarding them a total of $136,000,000, including $1,000,000 for diminution of property values, $80,000,000 for a medical monitoring fund, and $55,000,000 for punitive damages. No award of damages was made by the summary jury to the bellwether plaintiffs

for their specific claims of diminution of property value and emotional distress." *Id.*

After the summary jury trial, the *In re Fernald Litigation* parties settled and moved for Court approval of the settlement. In the portion of its Opinion and Order that considered the "potential relief that plaintiffs may realize following a full trial on the merits balanced against the relief offered by the settlement," the Court addressed the scientific studies encompassed in the medical monitoring relief that had been requested by the plaintiffs and awarded by the summary jury:

> [The Court] find[s] that the advisory summary jury verdict suggests that there are considerable risks inherent in proceeding to a full trial on the merits. Specifically, the plaintiffs did not convince the advisory jury that they had endured compensable harm in the form of diminution of property or emotional distress as a result of the defendant's conduct in operating the FMPC. The summary jury did endorse plaintiffs' claim for damages for the establishment of a fund for medical monitoring and epidemiological studies and punitive damages.

*In re Fernald Litig.*, 1989 WL 267039, at \*4.

The Court approved the settlement which included the following provision:

> The Fund shall be used as follows:

> 1. An amount shall be set aside for epidemiology and medical monitoring as more fully defined by the Court. The costs, nature, and extent of epidemiology and medical monitoring shall be subject to approval of the Court pursuant to Plaintiffs' counsel's recommendations. The Defendants shall have a right to have input into the nature and extent of medical monitoring and epidemiology. It is the intention of the parties that epidemiology and medical monitoring will be administered by one or more academic or medical institutions acceptable to the Court, in cooperation with the Centers for Disease Control.

*Id.* at \*11.

Additionally, the Ohio Supreme Court in *Brush Wellman* discussed scientific studies as part of medical monitoring relief in considering and adopting guidelines to determine whether an action is injunctive. *See Brush Wellman, Inc.*, 103 Ohio St. at 543 ("Court supervision and participation in medical-monitoring cases is a logical and sound basis on which to determine whether the action is injunctive. It has the added advantage of being a bright-line test,

which can be readily and consistently applied. We hereby adopt that guideline for making such determinations."). In *Brush Wellman*, the Ohio Supreme Court, reviewed the "multitudinous variations that these claims may take" and quoted this Court as follows:

**\*12** "Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief constitute[s] injunctive relief as required by rule 23(b)(2).

"However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to *which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies*. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstances, the relief constitutes injunctive relief as required by rule 23(b)(2)." *Day v. NLO, Inc.*, 144 F.R.D. at 335–336.

*Brush Wellman, Inc.*, 103 Ohio St. 3d at 543 (emphasis added).

Finally, the Court notes that the Northern District of Ohio too has evaluated a request for scientific studies as part of medical monitoring relief. In a multidistrict litigation regarding welding fumes, the plaintiffs asked for "court[-]supervised observational epidemiological study of steel welders that is sufficiently powered to assess the association between such welding and neurological and neuropsychological injury." *In re Welding Fume Products Liab. Litig.*, 245 F.R.D. 279, 285 (N.D. Ohio 2007).

The Court here makes no final determination as to the appropriateness of scientific studies in the present action. The Court does find that Plaintiff has properly pleaded a plausible claim for damages and medical monitoring sufficient to survive the 12(b)(1) and 12(b)(6) motions.

### 2. Ohio Product Liability Act

Defendants move for dismissal of this case, claiming that artfully pleaded claims of negligence and battery are in

fact product liability claims. A " 'product liability claim' means a claim or cause of action that is asserted in a civil action ... that seeks to recover compensatory damages from a manufacturer or supplier ... that allegedly arose from ... [t]he design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product." Ohio Rev. Code § 2307.71(13).

In the instant action, nowhere in the Amended Complaint does Plaintiff seek compensatory damages. Further, in his briefing on this issue, he likewise states:

> Neither Mr. Hardwick nor the class seeks compensatory damages for personal injuries in this action. (Compl. ¶ 140.) Hardwick and the class seek only declaratory, equitable, and/or injunctive relief. (*Id.* at PageID #31-32.)

(Pl's Mem. in Opp. at 29.)

Defendants, however, contend that although Plaintiff's Amended Complaint seeks injunctive and declaratory relief only, Plaintiff is actually seeking compensatory damages in a disguised way. Defendants maintain that "the statutory language [of OPLA] does not specify the way in which a claim must seek compensatory damages." (Defs' Reply at 28.) They continue: "For example, [Mr. Hardwick] seeks declarations of liability on each of his claims that serve no function other than to lay the basis for a compensatory-damages award." (Defs' Mot. to Dismiss at 29.) Further, Defendants assert that Mr. "Hardwick also seeks compensatory damages through his demand that Defendants fund the science panel he requests." (Defs' Reply at 28.)

**\*13** Defendants conclude that Mr. "Hardwick seeks, in essence, a shortcut on a future route to the courthouse to seek money damages, predicated on potential declaratory judgments and science-panel findings. He also seeks to have Defendants pay for his initial investigative costs." *Id.* Defendants caution the Court that if it "refus[es] to apply OPLA abrogation to complaints that seek compensatory damages in roundabout or disguised ways, as Hardwick would have it, [it] would open a massive loophole, allowing plaintiffs to easily circumvent OPLA abrogation through artful pleading." *Id.*

Plaintiff responds:

> Mr. Hardwick and the class do not seek compensatory damages, which is fatal to Defendants' argument. Defendants contend, however, that because Mr. Hardwick and the class might seek compensatory damages in a future

2019 WL 4757134

action, the Court should disregard his request for relief and conclude that Mr. Hardwick is seeking compensatory damages. No logical or legal basis supports this argument.

Defendants have not pointed to any instance where a court has found that an action is a product liability claim despite the fact that the claim does not seek compensatory damages. Nor have Defendants identified any instance where a court has concluded that a claim seeks compensatory damages because the plaintiff might seek compensatory damages in a future case. Defendants cannot point to such case law because the plain language of § 2307.71(A)(13) defines product liability claims as claims that, among other things, *seek to recover compensatory damages.* Nowhere in the statute is there a reference to potential future claims for compensatory damages. (Pl's Mem. in Opp. at 33.) Plaintiff's arguments are well taken.

Plaintiff has requested only injunctive relief as that phrase is interpreted under OPLA. Defendants have not presented, nor has the Court found, any case that provides support for their proposition that Plaintiff's requested relief constitutes compensatory damages. Indeed, as stated *supra,* the Ohio Supreme Court has held that relief is considered injunctive when the plaintiff requests medical monitoring to be established and overseen by a court. *Brush Wellman, Inc.,* 103 Ohio St. 3d at 538. The *Brush Wellman* court specifically stated that "the relief constitutes injunctive relief" where the medical monitoring is established and overseen by a court, and that the "defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration." *Brush Wellman, Inc.,* 103 Ohio St. 3d at 538.

Accordingly, because Plaintiff's requested relief is injunctive, not compensatory damages, the Court finds that his claims are not abrogated by OPLA.

## III.

Each individual Defendant has filed a Motion to Dismiss for Lack of Personal Jurisdiction. They also move to dismiss the claims brought on behalf of non-Ohio putative class members. The Court declines Defendants' invitation to determine whether this Court has jurisdiction over non-Ohio putative class members as there is currently no class certified, nor a motion to certify, to which such an opinion would pertain.

### A. Standard

When faced with a motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff bears the burden of proving personal jurisdiction exists over each defendant. *CompuServe Inc. v. Patterson,* 89 F.3d 1257, 1262-63 (6th Cir. 1996). "[A] motion to dismiss brought under Fed. R. Civ. P. 12(b)(2) may be heard and determined before trial, but [ ] the court has the power to defer hearing of evidence and a ruling on the motion until trial." *Serras v. First Tennessee Bank Nat. Ass'n,* 875 F.2d 1212, 1213–14 (6th Cir. 1989). "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Id.* (quoting *Gibbs v. Buck,* 307 U.S. 66, 71–72 (1939)).

 *14 If a trial court "decides that the motion can be ruled on before trial," and "rules on the motion without an evidentiary hearing, the plaintiff need only make a '*prima facie*' case that the court has personal jurisdiction." *Conn v. Zakharov,* 667 F.3d 705, 711 (6th Cir. 2012). In other words, "[t]he court need only find that plaintiff has set forth specific facts that support a finding of jurisdiction in order to deny the motion to dismiss." *Kroger Co. v. Malease Foods Corp.,* 437 F.3d 506, 510 (6th Cir. 2006); *see also Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002) (stating that a plaintiff may make a *prima facie* showing by "establishing with reasonable particularity sufficient contacts between [the defendants] and the forum state to support jurisdiction").

In deciding a Rule 12(b)(2) motion to dismiss, the Court is to "construe the facts in the light most favorable to the non-moving party." *Id.* The Court "will not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Id.* This refusal to weigh the defendants' controverting assertions is necessary "to prevent non-resident defendants from avoiding jurisdiction simply by filing an affidavit that denies all jurisdictional facts." *CompuServe,* 89 F.3d at 1262 (citing *Theunissen,* 935 F.2d at 1459).

In the instant action, four Defendants filed affidavits to support their motions and the remaining Defendants filed briefs unsupported by evidence. The Court will review each group separately.

### B. DuPont, Chemours, 3M, Solvay, Daiken America, and AGC Chemicals

DuPont, Chemours, 3M, Solvay, Daiken America, and AGC Chemicals contend that Plaintiff has failed to sufficiently

allege that they are responsible for the PFAS in Ohio and in Mr. Hardwick, and therefore Defendants are not subject to personal jurisdiction in Ohio. Thus, the Court will construe the facts in the light most favorable to Plaintiff and determine whether he has sufficiently made a *prima facie* showing of personal jurisdiction over these Defendants.

"Under Ohio law, personal jurisdiction over non-resident defendants is available only if (1) the long-arm statute confers jurisdiction and (2) jurisdiction is proper under the Federal Due Process Clause." *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012). Further, "[u]nlike other jurisdictions, Ohio does not have a long-arm statute that reaches to the limits of the Due Process Clause, and the analysis of Ohio's long-arm statute is a particularized inquiry wholly separate from the analysis of Federal Due Process law." *Id.*

Ohio's long-arm statute provides in relevant part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

(2) Contracting to supply services or goods in this state;

(3) Causing tortious injury by an act or omission in this state;

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;

...

(6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

Ohio Rev. Code Ann. § 2307.382 (West)

The Due Process Clause requires that the nonresident defendant possessed "minimum contacts" with the forum state such that exercising jurisdiction would comport with "traditional notions of fair play and substantial justice." *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 356 (6th Cir. 2014) (citing *Beydoun v. Wataniya Restaurants Holding,*

*Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014)) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). A three-part test assesses the existence of "minimum contacts":

**\*15** First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* (quoting *Beydoun*, 768 F.3d at 505).

### 1. Ohio's Long-Arm Statute

Plaintiff contends that he has sufficiently alleged jurisdiction under Ohio's long-arm statute:

Mr. Hardwick's allegations satisfy sections (1) and (2) of the long-arm statute. The Complaint pleads that each Defendant transacted business in Ohio and contracted to supply goods or services in Ohio. Each Defendant did so in the variety of ways repeatedly described in the Complaint —from marketing to manufacturing to distributing to training in the use of PFAS products. (Compl. ¶¶ 6, 8, 10, 12, 14, 16, 19, 22, 24, 26, 29, 37.) Those actions occurred in Ohio and caused harm in Ohio by contaminating the blood of Mr. Hardwick. (*Id.*)

Sections (3), (4), and (6) of the long-arm statute are satisfied for the same reasons. Paragraphs 42, 69, and 79 of the Complaint describe how each Defendant committed torts in Ohio and outside Ohio that affected Ohio residents. Each Defendant manufactured and used PFAS, thereby releasing it into Ohio and injuring Mr. Hardwick and others in Ohio.

Through their commercial operations, each Defendant contaminated Ohio's air, surface waters, ground water, soils, landfills. (Compl. ¶ 42.) Their PFAS was used in the fire-fighting foams and on the gear that Ohio firefighters, including Mr. Hardwick, use and are exposed to. (Compl. ¶ 69.) And each Defendant knew or should have known that their manufacture, release, distribution, and use of PFAS would cause harm in Ohio. (Compl. ¶ 79.)

(Pl's Mem. in Opp. at 39–40) (footnoting that "AGC Chemicals Americas admits that it does business in Ohio and sells PFAS products in Ohio" in the Joint Stipulation, which "alone satisfies the basic elements of the long-arm statute as to it" citing ECF No. 89).

Defendants maintain that, while "Ohio's long-arm statute grants Ohio courts personal jurisdiction over a non-resident if his conduct falls within the nine bases for jurisdiction listed by the statute ... there is a further requirement—the long-arm statute allows jurisdiction only for 'causes of action arising from' these enumerated bases." (Daiken America Mot. to Dismiss at 3, ECF No. 72) (citing *Conn*, 667 F.3d at 712 and Ohio Rev. Code § 2307.382(C)); *see also* (3M's Mot. to Dismiss at 5, ECF No. 68); (Archroma's Mot. to Dismiss at 4–8, ECF No. 69); (Solvay's Mot. to Dismiss at 3, ECF No. 71); (DuPont's and Chemours' Mot. to Dismiss at 5–7, ECF No. 73); (Daiken Ind.'s Mot. to Dismiss at 2, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 9–12, ECF No. 84); (AGC Chemicals Mot. to Dismiss at 5, ECF No. 113). They continue:

> Here, "arising from" means that there is "a 'proximate cause' relationship between a plaintiff's ... claim and the defendant's conduct in Ohio." *Brunner v. Hampson*, 441 F.3d 457, 463, 466 (6th Cir. 2006); *see also Seitz v. U.S. Nat'l Whitewater Ctr., Inc.*, No. 2:17-CV-524, 2018 WL 582553, at *2 (S.D. Ohio Jan. 26, 2018) ("contact with the forum state must be proximately related to the plaintiff's injuries").

*Id.* at 3–4; *see also* (3M's Mot. to Dismiss at 5, ECF No. 68); (Archroma's Mot. to Dismiss at 4–8, ECF No. 69); (Solvay's Mot. to Dismiss at 5, ECF No. 71); (DuPont's and Chemours' Mot. to Dismiss at 6, ECF No. 73); (Daiken Ind.'s Mot. to Dismiss at 4–6, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 12–14, ECF No. 84); (AGC Chemicals Mot. to Dismiss at 5–6, ECF No. 113).

**\*16** Defendants argue that the Amended Complaint offers the exact same boilerplate, vague, and conclusory allegations of wrongdoing as to each of the Defendants, and thus pleads no specific facts that could establish with reasonable particularity a basis for jurisdiction. This Court, however, disagrees.

First, as to proximate cause, in Ohio it is defined as an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred. *In re: E. I. Du Pont De Nemours and Co. C-8 Personal Injury Litig.*, 2:13-CV-170, 2016 WL 659112, at *62 (S.D. Ohio Feb. 17, 2016) (citations omitted). "To prove proximate cause, [a plaintiff] must show that her injuries were a natural and probable consequence of [the defendant's] conduct." *Id.* To be considered the natural and probable consequence of an act, Plaintiff must prove that Defendants should have foreseen

or reasonably anticipated that injury would result from the alleged negligent act. *See id.*

In the case at bar, Plaintiff alleges that through their commercial operations, each Defendant contaminated Ohio's air, surface waters, ground water, soils, landfills and additionally that their PFAS was used in the fire-fighting foams and on the gear that Ohio firefighters, including Mr. Hardwick, used. He alleges that each Defendant knew or should have known that their manufacture, release, distribution, and use of PFAS would cause harm in Ohio and that each Defendant conspired with the others to keep the dangers associated with the PFAS secret, failing to inform Mr. Hardwick of the danger associated with the PFAS to which he was subjected, and that Defendants misled government agencies, refused to publish relevant findings and information, and chose not to study the injuries their own studies showed were potential harmful effects of the PFAS materials. Plaintiff maintains that those acts and failures to act of each Defendant, in a natural and continuous sequence, resulted in the contamination of Mr. Hardwick's body and/ or blood with PFAS, and without each Defendant's acts or failures to act the PFAS would not have entered Ohio and entered Mr. Hardwick's body and/or blood. Consequently, Plaintiff has alleged a proximate cause relationship between his claims and each Defendants' conduct in Ohio.

Second, Defendants contend that Mr. Hardwick's allegations are vague and conclusory and "[are] capable of multiple interpretations ..., at least one of which does not support personal jurisdiction in Ohio." (Daiken America Mot. to Dismiss at 6, ECF No. 72.) They posit:

> In short, even if conclusory allegations were enough to plead personal jurisdiction (which they are not), the conclusory "allegations contained in [Plaintiff's] complaint [are] capable of multiple interpretations ..., at least one of which does not support personal jurisdiction in Ohio." *Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 253 (6th Cir. 2009). And as a result, Plaintiff fails to plead "specific facts that could establish with reasonable particularity a basis for jurisdiction." *Id.*

*Id.; see also* (3M's Mot. to Dismiss at 2, ECF No. 68); (Archroma's Mot. to Dismiss at 3, ECF No. 69; Reply at 6, ECF No. 108); (Solvay's Reply at 4, ECF No. 112); (DuPont's and Chemours' Mot. to Dismiss at 3, ECF No. 73; Reply at 7, ECF No. 111); (Daiken Ind.'s Mot. to Dismiss at 7, ECF No. 82); (Arkema and Arkema France's Mot. to Dismiss at 10, ECF No. 84; Reply at 4, ECF No. 109).

**\*17** Defendants are correct that the *Palnik* court found that the plaintiffs' allegations were not pleaded with particularity when they were capable of two equally plausible interpretations, at least one of which did not support personal jurisdiction. However, Mr. Hardwick's allegations are not susceptible to *any* interpretation that does not support personal jurisdiction. By way of explanation, the *Palnik* plaintiff made very similar allegations to those made by Mr. Hardwick, as described by the Sixth Circuit:

> His complaint, to be sure, makes a number of relevant allegations. About our defendants, it asserts that "PEC [Picture Entertainment Company] is a producer and/or distributor" and that "Cineville, Inc. or Cineville, LLC, or both, are producers and/or distributors" of the movie.

> And it makes *allegations about the defendants collectively.* It alleges that the "Defendants have made, and will continue to make, substantial profit from the sale of the Infringing work" and that the "Defendants have offered for sale and rental, and have distributed and continue to distribute, through sale, rental or otherwise substantial numbers of copies of the Infringing Work throughout the United States, including in the Southern District of Ohio...."

*Palnik*, 344 F. App'x at 251–52 (alterations in original, emphasis added).

The *Palnik* court concluded that when "[d]rawing inferences for Palnik, as we must, these allegations permit two potential conclusions as to the distribution of [the product] to Ohio." *Id.* at 252. Specifically, the court explained:

> First, our defendants, after making the movie, caused it to be distributed to Ohio through a national or regional distribution contract. Second, our defendants, for whatever reason—because they do not own the distribution rights, because they deferred entirely to a third-party distributor, or for another reason that gave them no control over the movie's distribution—were not responsible for the movie appearing in Ohio.
> *Id.*

In other words, if one of the defendants to which the collective allegation pertained was a producer and distributor, the allegations were sufficient to sustain personal jurisdiction over that defendant The allegations to which the court refers that were sufficient to sustain personal jurisdiction are what Defendants in the present case refer to as boilerplate, conclusory, and vague. *Id.* (the *Palnik* plaintiffs alleged

collectively that "Defendants have made, and will continue to make, substantial profit from the sale of the Infringing work" and that the "Defendants have offered for sale and rental, and have distributed and continue to distribute, through sale, rental or otherwise substantial numbers of copies of the Infringing Work throughout the United States, including in the Southern District of Ohio."). The *Palnik* court found that these allegations constituted specific facts that established with reasonable particularity a basis for jurisdiction.

Conversely, the *Palnik* court explained that if the defendant was only the producer it was not responsible for the product appearing in Ohio, and the allegations were therefore insufficient.

In the instant action, however, Mr. Hardwick's allegations support *only* a conclusion that each Defendant was responsible for putting PFAS into Ohio and into Mr. Hardwick. For example, in the paragraph Defendants take most issue with, Plaintiff alleges that each individual Defendant "marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS ... including in Ohio and this District, in such a way as to result in the contamination of Plaintiff's and other class members' blood and/or bodies." (Am. Compl. ¶ 29.)

**\*18** These are the only conclusions from this collective allegation, which all support jurisdiction: 1) Each Defendant marketed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 2) Each Defendant developed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 3) Each Defendant manufactured PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 4) Each Defendant distributed PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 5) Each Defendant released PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 6) Each Defendant trained users on PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; 7) Each Defendant

produced instructional materials on PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio; and 8) Each Defendant sold PFAS in Ohio and in this District and/or otherwise handled and/or used PFAS in such a way as to result in the contamination of Plaintiff's blood and/or body in Ohio.

This same exercise may be done with all of the collective allegations made by Plaintiff. Accordingly, as did the *Palnik* plaintiff in the first scenario supporting jurisdiction, Plaintiff has with reasonable particularity set forth specific facts supporting personal jurisdiction over each Defendant.

**2. Due Process**

Defendants argue that Plaintiff alleges no facts to establish that the assertion of specific jurisdiction over Defendants would comport with due process. Defendants rely on *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014) for the proposition that to exercise specific jurisdiction consistent with due process, the claims must arise out of Defendant's activities in the forum state.

The Sixth Circuit recently addressed *Walden*, explaining that it stands for the proposition that a plaintiff cannot create jurisdiction on the basis of his or her contacts with the forum; jurisdiction is created by the relationship between a defendant and the forum. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017). The *Schmuckle* court explained:

> As an initial matter, we are not persuaded by Schmuckle's argument that *Walden* precludes a finding of jurisdiction in this case. In *Walden*, the Court considered whether a federal court in Nevada had jurisdiction over a Georgia police officer who had filed a false affidavit against two Nevada residents knowing that it would affect them in Nevada. 134 S.Ct. at 1120. The Court found that the officer lacked minimum contacts because the officer's conduct occurred in Georgia and he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 1124–25. The officer's only connection to Nevada was by way of the plaintiffs he targeted there. *Id.*

In holding that "mere injury to a forum resident is not a sufficient connection to the forum," *id.* at 1125, the Court distinguished its prior decision in *Colder v. Jones*, 465 U.S. 783 (1984), where it had found personal jurisdiction in California over an out-of-state defendant based on a libelous article published there, reasoning that the tort had involved the California community beyond just the plaintiff. *Walden*, 134 S.Ct. at 1125; *Colder*, 465 U.S. at 788–89.

*Id.* at 900 (parallel citations omitted).

As to the scope of *Walden*, the *Schmuckle* court stated:

> We need not define the exact scope of *Walden* and its effect on *Calder* in order to resolve this case. It is enough to say that plaintiffs must do more than claim that Schmuckle's actions affected them in Michigan and must show that Schmuckle had some level of contact with the state, and that Schmuckle cannot avoid jurisdiction by framing all of his activities as contacts with plaintiffs—who happen to be in Michigan—instead of contacts with Michigan itself.

*Id.* at 901.

Here, Mr. Hardwick does not allege that this Court possesses personal jurisdiction over Defendants based only on his contacts with Ohio and/or the contention that Defendants' actions affected him in Ohio. Mr. Hardwick, as set out in detail above, alleges that each Defendant has significant contact with Ohio, and his claims arise out of that specific contact that Defendant has with Ohio. Those allegations are sufficient to comport with due process.

**C. Archroma, Daiken Industries, Arkema America, and Arkema France**

**\*19** Archroma, Daiken Industries, Arkema America, and Arkema France have all supported their Motions to Dismiss for Lack of Personal Jurisdiction with affidavits that they contend factually challenge the allegations in the Amended Complaint. Archroma offers a declaration that avers that it was established in 2013 and it has not engaged in any of the activities in Ohio as alleged by Plaintiff. (ECF No. 69-1.) Daiken Industries offers a declaration that states that it does not currently engage in any of the activities in Ohio alleged in the Amended Complaint. (Decl., ECF No. 82-1.) Arkema and Arkema France have offered declarations that aver that at least since 1998 they have not engaged in any of the activities in Ohio as alleged in the Amended Complaint. (ECF Nos. 84-1, 84-2.) None of the affidavits addresses whether these four Defendants or their predecessor companies engaged in any of the activities alleged in the Amended Complaint during the 40 years that Mr. Hardwick alleges he was subjected to their PFAS in Ohio.

These Defendants rely on the law that provides that "in the face of a properly supported motion for dismissal, the

plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 930 (6th Cir. 1974)). These Defendants argue that, because Plaintiff has failed to set forth an affidavit to support his allegations made in the Amended Complaint, they are entitled to dismissal. Plaintiff, however, has otherwise set forth the following facts:

> [T]he Defendants manufactured PFAS and released it into the world—no one else is responsible for the PFAS existing and spreading across the world because it is not naturally occurring and only Defendants manufacture it; PFAS contamination exists in Ohio; PFAS contamination exists in Mr. Hardwick. There is no other plausible explanation for how Mr. Hardwick and his class members have become contaminated by PFAS except by the actions of these Defendants.

(Pl's Mem. in Opp. at 36–37.)

Additionally, the Court notes that these declarations do not factually challenge Plaintiffs' allegations that these Defendants' contacts with Ohio led to his exposure to PFAS in Ohio over the last 40 years. But even if the declarations did factually challenge any conduct that would be sufficient for this Court to exercise personal jurisdiction over them, the Court is not permitted to "weigh the controverting assertions of the party seeking dismissal." *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir. 1996). In reversing and remanding the district court's finding of lack of personal jurisdiction in *CompuServe, Inc. v. Patterson,*

the Sixth Circuit pointed out that "[a]t various points in its consideration of the case, however, the district court expressly relied on Patterson's affidavit." *Id.* The court went on to explain that "we want 'to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts.' " *Id.*

The Court here merely makes a "threshold determination that personal jurisdiction exists" but it "does not relieve [the plaintiff] ... at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.' " *Serras,* 875 F.2d at 1216. If after discovery it is shown that personal jurisdiction is lacking, any Defendant may, of course, move for dismissal on those grounds.

Accordingly, the Court **DENES** the Motions to Dismiss for Lack of Personal Jurisdiction of Archroma, Daiken Industries, Arkema America, and Arkema France. (ECF Nos. 69, 82,83.)

## IV.

Based on the foregoing, the Court **DENIES** Defendants' Motions to Dismiss. (ECF Nos. 67, 68, 69, 71, 72, 73, 82, 83, 84, 113.)

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4757134

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 33

Hart v. BHH, LLC, Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment
Distinguished by In re Amla Litigation, S.D.N.Y., October 24, 2017

2017 WL 2912519
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joanne HART and Sandra Bueno,
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
BHH, LLC d/b/a Bell + Howell, et ano., Defendants.

15cv4804
|
Signed 07/07/2017

**Attorneys and Law Firms**

Frederick John Klorczyk, Joshua David Arisohn, Neal
Jamison Deckant, Yitzchak Kopel, Joseph Ignatius Marchese,
Bursor & Fisher, P.A., New York, NY, for Plaintiffs.

Howard B. Randell, Scott Wing, Robert J. Ostojic, Leahy,
Eisenberg & Franenkel, Ltd., Chicago, IL, for Defendants.

OPINION & ORDER

WILLIAM H. PAULEY III, United States District Judge:

 **\*1**  Defendants Bell + Howell and Van Hauser ("BHH")
move to dismiss Joanne Hart ("Hart") and Sandra Bueno's
("Bueno") (together, "Plaintiffs") amended complaint.
Separately, Plaintiffs seek class certification. For the reasons
that follow, BHH's motion to dismiss is granted in part and
denied in part, and Plaintiffs' motion for class certification is
granted.

BACKGROUND

This consumer fraud class action arises from BHH's sale of
ultrasonic pest repellers, which Plaintiffs claim are ineffective
and worthless. Plaintiffs purchased the pest repellers from
third-party retailers. Hart bought her device from the Home
Shopping Network which advertised that it was an "ultrasonic
pest repeller" designed to drive out mice, rats, roaches, ants,
and spiders. Bueno purchased the repeller from the Harriet
Carter Gifts catalogue, relying on the same representations as

Hart. After receiving these devices, both plaintiffs discovered
that they did not work as advertised.

In May 2016, this Court granted in part and denied in
part BHH's motion to dismiss the original complaint. See
Hart v. BHH, LLC, 2016 WL 2642228, at *5 (S.D.N.Y.
May 5, 2016). The Magnuson-Moss Warranty Act and
unjust enrichment claims were dismissed. Hart's claims
regarding Animal Repellers were also dismissed for lack
of standing. However, this Court allowed the breach of
warranty claims and California consumer protection claims
under the Consumer Legal Remedies Act (CLRA), the Unfair
Competition Law ("UCL"), and the False Advertising Law
("FAL") to proceed.

After fact discovery closed, Hart amended her complaint to
add a common law fraud claim, and a new plaintiff—Bueno
—who purports to represent two new putative classes: the
fraud class and the breach of express warranty class. (See First
Amended Complaint ("Compl."), ECF No. 62.) It is unclear
from the parties' submissions why Hart could not represent
these new putative classes, nor why Bueno could not also
represent the California class. Adding to the confusion, BHH
elected to file a motion to dismiss the amended complaint
rather than interpose an answer.

Concurrently, Plaintiffs moved to certify three classes: (1) a
nationwide class asserting a claim for fraud (the "Nationwide
Fraud Class"); (2) a multi-state class asserting a claim for
breach of warranty (the "Multistate Breach of Warranty
Class"); and (3) a California-only class asserting claims under
California's consumer protection laws, fraud, and breach of
express warranty (the "California Class").

DISCUSSION

I. Motion to Dismiss

   A. Standard
On a motion to dismiss, all allegations in the complaint are
accepted as true, and all reasonable inferences are drawn
in the Plaintiffs' favor. See Rescuecom Corp. v. Google
Inc., 562 F.3d 123, 127 (2d Cir. 2009). The complaint must
"contain sufficient factual matter" to "state a claim to relief
that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 663,
678 (2009) (citation omitted). For a viable claim, "[f]actual
allegations must be enough to raise a right to relief above

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 396 of 751
PageID: 11762
Hart v. BHH, LLC, Not Reported in Fed. Supp. (2017)

the speculative level." 🔖 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A pleading that recites conclusory allegations or a "formulaic recitation of the elements of a cause of action" fails to state a claim. 🔖 Iqbal, 556 U.S. at 678 (citation omitted).

### B. Analysis

#### i. Fraud Claim

**\*2** BHH contends that the common law fraud claim should be dismissed because it is barred by the economic loss rule. That doctrine provides that "a plaintiff who has suffered economic loss, but not personal or property injury, may not recover in tort if the damages are the type remedial in contract." 🔖 Weisblum v. Prophase Labs, Inc., 88 F Supp. 3d 283, 297 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). The rule is rooted in the principle that "contract and warranty law should govern the economic relationship between a buyer and a seller and between a manufacturer and a consumer." 🚩 Robinson Helicopter Co. v. Dana Corp., 105 Cal. App. 4th 749, 759–60 (Cal. Ct. App. 2003).

BHH claims that because Plaintiffs allege damages amounting only to the economic cost of the pest repellers, their fraud claim doubles as a breach of warranty claim. But there are exceptions to the economic loss rule. Relevant here is the fraudulent inducement exception, which applies when "a contract is secured by fraudulent representations" and provides an option for the injured party to "elect to affirm the contract and sue for fraud." 🔖 United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp., 660 F. Supp. 2d 1163, 1183 (C.D. Cal. 2009). Thus, the "economic loss rule does not bar a properly pled fraudulent inducement claim." Missud v. Oakland Coliseum Joint Venture, 2013 WL 3286193, at *18 (N.D. Cal. June 27, 2013).

"Courts applying both New York and California law have allowed intentional misrepresentation claims to proceed, notwithstanding the economic loss rule." 🔖 Weisblum, 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015); see also 🔖 EED Holdings v. Palmer Johnson Acquisition Corp., 387 F. Supp. 2d 265, 278–79 (S.D.N.Y. 2004) (allowing fraud claim to proceed in tandem with contract claims to recover

economic loss). In such cases, misrepresentations that induce a party into contract stand separate and apart from the misrepresentations inherent to the contract. Put another way, the "plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." 🔖 Lazar v. Sup. Ct., 12 Cal. 4th 631, 638 (Cal. 1996). Thus, an independent fraud claim may exist if a false promise was made to consummate the contract. 🔖 EED Holdings, 387 F. Supp. 2d at 279 ("[I]t is well established that a misrepresentation of present fact which is the inducement for a contract ... can support a separate fraud claim.");

🔖 StreamCast Networks, Inc. v. IBIS LLC, 2006 WL 5720345, at *10 (C.D. Cal. May 2, 2006) ("[C]ourts have routinely recognized the availability of both a fraud and a contract action ... in which a party contends that it was fraudulently induced to enter into a contract."). In essence, the question this Court must ask has less to do with "whether the damages for contract and tort claims necessarily overlap, and more [with] whether the conduct giving rise to the separate claims is distinct. The economic loss rule does [not] bar tort claims for fraud or intentional misrepresentation if the allegedly tortious conduct is independent of the conduct constituting a breach." Sherwin-Williams Co. v. JJT, Inc., 2014 WL 2587483, at * 6 (S.D. Cal. June 10, 2014) (emphasis added).

Under the fraudulent inducement exception to the economic loss rule, Plaintiffs' common law fraud claim may proceed. While not technically pled as "fraudulent inducement," the amended complaint sufficiently alleges the elements of such claim: (1) misrepresentation; (2) knowledge of the falsity of the representation; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages. Swingless Golf Club Corp. v. Taylor, 732 F. Supp. 2d 899, 908 (N.D. Cal. 2010). And a "claim of fraudulent inducement ... has the same elements as fraud under California law." Romero v. San Pedro Forklift, Inc., 266 Fed.Appx. 552, 556 n.2 (9th Cir. 2008). Here, Plaintiffs allege (1) three principal misrepresentations regarding the pest repellers (Compl. at ¶¶ 14, 67); (2) that BHH knew about the falsity of these misrepresentations (Compl. at ¶¶ 15–20, 68); (3) that such misrepresentations were made to induce reliance (Compl. at ¶ 69); (4) that Plaintiffs justifiably relied on them (Compl. at ¶¶ 6, 7, 69); and (5) that Plaintiffs suffered damages (Compl. at ¶ 70).

**\*3** The alleged misrepresentations at issue—namely that the pest repellers can drive out certain pests from the home—also form the basis of the breach of warranty claim. But

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 397 of 751
PageID: 11763
Hart v. BHH, LLC, Not Reported in Fed. Supp. (2017)

if Plaintiffs, as they allege, can prove that BHH knowingly made and endorsed these false statements, then their claim becomes less about the product's value and quality—elements that are usually at the heart of express and implied warranties—and more about blatant lies and deception characteristic of fraud claims. Thus, the fraudulent inducement exception here acknowledges the "extra measure of blameworthiness inherent in fraud," allowing plaintiffs to "recover 'out-of-pocket' damages in addition to benefit-of-the-bargain damages." Robinson Helicopter, 34 Cal. 4th at 992.

Plaintiffs primarily seek relief in the form of restitution—i.e., the return of monies paid for the devices. (Compl. at ¶ 71(f); Hearing Transcript dated May 19, 2017 at 7:15–23.) But the amended complaint also seeks "compensatory and punitive damages" arising from the fraud claim. (Compl. at ¶ 71(d).) While relief "may be limited by the rule against double recovery of tort and contract compensatory damages," Plaintiffs nevertheless have "a cause of action in tort as an alternative at least, and perhaps in some instances in addition to [their] cause of action on the contract." Lazar, 12 Cal. 4th at 638.

Finally, BHH challenges the sufficiency of the allegations underlying the fraud claim. However, as this Court discussed in its prior order—albeit with respect to the fraud elements of the California consumer protection claims—Plaintiffs' allegations at this stage satisfy Rule 9(b)'s heightened pleading standard for claims sounding in fraud. BHH, 2016 WL 2642228, at *5 (allegations regarding the falsity of representations in conjunction with two scientific studies undermining the efficacy of the ultrasonic technology suffice at the pleadings stage).

In the amended complaint, Plaintiffs allege that the products did not work as advertised. (Compl. at ¶¶ 6–7.) Moreover, they cite a number of scientific studies discrediting the ultrasonic technology embedded into the products (Compl. at ¶¶ 15–16) and regulatory investigations into ultrasonic pest repeller manufacturers who sell products like BHH (Compl. at ¶¶ 17–20). Such allegations are sufficient, at the pleadings stage, to support an inference of knowledge and an intent to deceive. Finally, the amended complaint alleges that Hart and Bueno believed the product representations to be true and relied on them in purchasing the pest repellers—facts sufficient to satisfy the element of reliance. (Compl. ¶¶ 6–7, 69.) In sum, enough has been alleged for Plaintiffs' fraud claim to survive dismissal at the pleadings stage.

## ii. Breach of Warranty Claim

BHH seeks dismissal of the breach of warranty claim on the basis that the pest repeller's representations are not actionable warranties. Phrases like "help repel," says BHH, are imprecise, vague, and unquantifiable descriptions that are not objectively verifiable facts. (Memo. of Law in Support of Defendants' Motion to Dismiss ("MTD Mot."), ECF No. 73, at 13.) Moreover, according to BHH, the representation that the "devices were ultrasonic pest repellers" is merely a description of the product, not a testament to its quality or performance. (MTD Mot. at 13.)

These arguments are unavailing. "To prevail on a breach of express warranty claim, a plaintiff must prove that the seller: (1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff." Keegan v. Am. Honda Motor Co. Inc., 838 F. Supp. 2d 929, 949 (C.D. Cal. 2012). General, vague, and non-specific statements usually "constitute mere puffery on which a reasonable consumer cannot rely." Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d 1000, 1015 (9th Cir. 2003). "However, misdescriptions of specific or absolute characteristics of a product are actionable." Paduano v. Am. Honda Motor Co., Inc., 169 Cal. App. 4th 1453, 1500 (2009).

 *4 The amended complaint references a specific promise: that the ultrasonic pest repellers would repel and drive out mice, rats, roaches, ants, and spiders. (Compl. ¶¶ 6, 7, 62.) BHH maintains that its use of the term "help" neither specifies the precise degree of efficacy, nor the time it would take to drive pests out. But Plaintiffs allege that the repeller failed to work at all. In other words, it did not "help" even in the slightest. Qualifying such promise with the word "help" does not make the statement any less of an actionable warranty. See Bailey v. KIND LLC, 2016 WL 3456981, at * *1, 6 (C.D. Cal. June 16, 2016) ("eating two KIND bars a day helps prevent weight gain" is a "specific and unequivocal warranty") (emphasis added); Aguilar v. Boulder Brands, Inc., 2013 WL 2481549, at *6 (S.D. Cal. June 10, 2013) ("affirmation that the plant sterols help block the cholesterol

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 398 of 751
PageID: 11764
Hart v. BHH, LLC, Not Reported in Fed. Supp. (2017)

in the butter" is sufficient to state a claim for breach of express warranty) (emphasis added).

Finally, BHH's argument that the representations at issue "merely describe[ ] the type of product" and do not "purport to represent the quality or performance of the product" (MTD Mot. at 13) is belied by well-settled law that a "description of goods at issue can create an express warranty so long as it was part of the basis of the parties' bargain." Asghari v. Volkswagen Grp. of Am., Inc., 42 F. Supp. 3d 1306, 1333–34 (C.D. Cal. 2013). The description at issue in this action —that the devices are "ultrasonic pest repellers"—was the sole basis of the parties' bargain. Such phrase constitutes a verifiable affirmation of fact that Plaintiffs exclusively relied on in making their purchases, and qualifies as a "written warranty sufficient to survive a motion to dismiss." Ebin v. Kangadis Food Inc., 2013 WL 6504547, at *4 (S.D.N.Y. Dec. 11, 2013).

### iii. California UCL and FAL Claims

Generally, restitution and injunctive relief are the only remedies available under the UCL and FAL. Optima Tax Relief LLC v. Channel Clarity, Inc., 2015 WL 12765016, at *8 (C.D. Cal. Aug. 26, 2016). "[R]estitution means the return of money to those persons from whom it was taken or who had an ownership interest in it." Madrid v. Perot Sys. Corp., 130 Cal. App. 4th 440, 455 (Cal. App. 2005). Thus, the remedial objective of these California statutes is to "return to the plaintiff funds in which he or she has an ownership interest." Madrid, 130 Cal. App. 4th at 455. The funds must, however, be traceable to the plaintiff. Allegations that a defendant received ill-gotten gains are insufficient to state a claim under these statutes unless plaintiff also alleges a vested interest in the money. See Madrid, 130 Cal. App. 4th at 455; Rosen v. Uber Tech., Inc., 164 F. Supp. 3d 1165, 1178 (N.D. Cal. 2016) ("In regards to the FAL claims (as well as the [ ] UCL claims) ... such claims were limited to situations in which defendants directly took property from plaintiffs, or in which plaintiffs had a vested interest in the property."). The UCL and FAL only permit "restitution from a defendant whose unfair business practices caused plaintiff to pay money to a third party, as long as it is reasonable to infer that the defendant indirectly received that money from the third party." Ferrington v. McAfee, Inc., 2010 WL 3910169, at *8 (N.D. Cal. Oct. 5, 2010) (emphasis added).

Although Plaintiffs urge this Court to infer that BHH received their payments, the amended complaint does not allege any fact on which this Court may infer that BHH "indirectly received [their] mon[ies] from the third party" retailers. Ferrington, 2010 WL 3910169, at *8. Without some allegation—even one—to suggest that BHH received monies from the third parties retailers, Plaintiffs overlook the purpose of restitution, namely the return of "profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1148 (Cal. 2003); Acedo v. DMAX, Ltd., 2015 WL 12912365, at *16 (C.D. Cal. July 31, 2015) (must allege "money or property with which [Plaintiffs] departed."). The amended complaint is bereft of any allegation tying Plaintiffs' payments with BHH's receipt of those payments.

**\*5** Plaintiffs' reliance on Diaz First Am. Home Buyers Prot. Corp., 541 Fed.Appx. 773, 776 (9th Cir. 2013), Shersher v. Sup. Ct., 154 Cal. App. 4th 1491, 1494 (Cal. Ct. App. 2007), and Troyk v. Farmers Grp., Inc., 171 Cal. App. 4th 1305, 1338 (Cal. Ct. App. 2009) is misplaced. Those decisions merely stand for the unremarkable proposition that recovery of restitution is not categorically barred for payments made to third parties. That principle is not inconsistent with the UCL and FAL requirement that plaintiffs "who paid a third party money (i.e., money in which the plaintiff had a vested interest)" allege that such payments were received by a defendant "whose unlawful business practice caused the plaintiff to pay that money." Troyk, 171 Cal. App. 4th at 1338.

Because Plaintiffs have not "alleged facts indicating that defendants, as opposed to independent [third party retailers], obtained [their] money or property, or that defendants are in possession of funds that rightly belong to [them]," they have failed to state a plausible claim for restitution under the UCL and FAL. Acedo, 2015 WL 12912365, at *16 (emphasis original); Cheverez v. Plains All Am. Pipeline, LP, 2016 WL 4771883, at *2 (C.D. Cal. Mar. 4, 2016) ("Plaintiffs are correct that they need not prove that the money or property was ever in their possession so long as they can demonstrate a vested interest, but they still must prove that the money or property in which they had a vested interest is now in Defendants' possession.").

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 399 of 751
PageID: 11765
Hart v. BHH, LLC, Not Reported in Fed. Supp. (2012)

Accordingly, the UCL and FAL claims are dismissed. In view of the mature stage of this litigation, and the pending class certification motion, leave to re-plead is denied.

## II. Class Certification

### A. Standard

Rule 23 governs the framework for class actions. Plaintiffs must demonstrate by a preponderance of the evidence that the putative class action satisfies four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). An implicit fifth requirement—ascertainability of the class—must also be satisfied. Flores v. Anjost Corp., 284 F.R.D. 112, 122 (S.D.N.Y. 2012). In addition, Plaintiffs must meet at least one of two requirements set forth in Rule 23(b): (1) predominance, i.e., that law or fact questions common to the class predominate over questions affecting individual members; or (2) superiority, i.e., that the class action is superior to other methods.

Before certifying a class, this Court is obliged to conduct a "rigorous analysis" to determine whether all requirements have been satisfied. In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006). Certification is appropriate only after resolving factual disputes relevant to each Rule 23 requirement. Berks Cnty. Empl. Ret. Fund v. First Am. Corp., 734 F. Supp. 2d 533, 536 (S.D.N.Y. 2010). "The Court must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met. The burden of demonstrating its satisfaction by a preponderance of the evidence, moreover, rests with the moving party." Berks Cnty. Empl. Ret. Fund, 734 F Supp. 2d at 536.

### B. Analysis

#### i. Numerosity

"[N]umerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs assert that BHH sold approximately 2.48 million devices during the class period.

(Decl. of Yitzchak Kopel in Support of Motion for Class Certification, ECF No. 70 ("Kopel Decl."), Ex. 4.) Common sense compels the conclusion that numerosity is satisfied here. Deflumer v. Overton, 176 F.R.D. 55, 58 (N.D.N.Y. 1997) (citing German v. Fed. Home Loan Mortg., 885 F. Supp. 537, 551 (S.D.N.Y. 1995)) (A "precise quantification of the plaintiffs' class is unnecessary, as the court may make common sense assumptions to support a finding of numerosity.").

#### ii. Commonality

**\*6** The commonality factor requires a finding that there are questions of law or fact common to the class. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," though that does not necessarily mean they suffered a violation of the same provision of law. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349–50 (2011). Plaintiffs' "claims must depend upon a common contention," which must "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350. Here, the putative class members relied on the same alleged misrepresentations of fact regarding the efficacy of the pest repeller, and suffered the same economic harm.

#### iii. Typicality

Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936–37 (2d Cir. 1993). The putative class members' claims arise from generally the same course of events—they watched or read an advertisement, relied on the product representations, and purchased the product. In seeking relief, they will make essentially the same argument to prove liability—that BHH

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 400 of 751
PageID: 11766
Hart v. BHH, LLC, Not Reported in Fed. Supp. (2012)

knew its products were ineffective yet marketed and sold them anyway.

### iv. Adequacy of Representation

"Under 🔖 Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be qualified, experienced and generally able to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another." 🔖 Drexel Burnham, 960 F.2d at 291. The first prong is easily dispensed with in view of the undersigned counsel's work in similar consumer product class actions in this district. See 🔖 Ebin v. Kangadis Food Inc., 297 F.R.D. 561, 566 (S.D.N.Y. 2014); 🔖 In re Scotts EZ Seed Litig., 304 F.R.D. 397, 407 (S.D.N.Y. 2015). This Court therefore finds that Bursor & Fisher, P.A., is qualified, experienced, and able to conduct this litigation.

With respect to the second prong, the "focus is on uncovering conflicts of interest between named parties and the class they seek to represent." 🔖 In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009). But that conflict "must be fundamental." 🚩 In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001). The risk of a fundamental, antagonistic conflict, at this juncture in the litigation, is minimal. The named plaintiffs and the absent class members both share a consistent, if not identical, interest in proving liability in this case. More importantly, they share a common goal: "to obtain the highest possible recovery" for every subclass of plaintiffs. 🔖 Drexel Burnham, 960 F.2d at 291. The named plaintiffs have regularly communicated with undersigned counsel, participated in discovery, and appear to be invested in the strategy and outcome of this action. (See Decl. of Joanne Hart in Support of Motion to Certify Class, ECF No. 67; Decl. of Sandra Bueno in Support of Motion to Certify Class, ECF No. 68.) Thus, Plaintiffs have satisfied the adequacy of representation requirement.

### v. Ascertainability

Ascertainability of the class is an implied requirement built into 🔖 Rule 23(a) and considered the "fifth pre-condition to class certification." 🔖 Ebin, 2014 WL 737960, at *4.

This factor requires that "the identity of class members must be reasonably ascertainable by reference to objective criteria." 🔖 Ebin, 2014 WL 737960, at *4. The standard for ascertainability is "not demanding" and is "designed only to prevent the certification of a class whose membership is truly indeterminable." Gortat v. Capala Bros., Inc., 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010). In other words, Plaintiffs must have the ability to identify the individuals who purchased nearly 2.4 million units of BHH pest repellers, and employ a reasonable method to prove their purchase and ownership of those products.

**\*7** BHH contends that "it is not administratively feasible for the Court to identify class members given that most consumers cannot produce any demonstrable proof of having purchased the devices during the Class Period—by way of receipt, packing slip, product packaging, or otherwise." (Memo. in Opposition to Motion for Class Certification ("Class Cert. Opp."), ECF No. 81 at 9.) Thus, according to BHH, in the "absence [of] any means of proving an eligible purchase, there is no administratively feasible way to identify the putative class members, or to confirm on a class-wide basis whether the putative class members actually purchased one of the devices during the Class Period." (Class Cert. Opp. at 10.)

BHH describes a problem that is common in everyday consumer good purchases. Once consumers purchase an item, they are likely to throw away the packaging and receipt in the absence of a decision to return the product. But the absence of a receipt is not fatal to Plaintiffs' task of demonstrating ascertainability. See 🔖 Goldemberg v. Johnson & Johnson Cons. Cos., Inc., 2016 WL 5817012, at *17 (S.D.N.Y. Oct. 4, 2016) ("[D]enial of class certification in consumer protection cases like these on the basis of ascertainability would severely contract the class action mechanism.").

Plaintiffs' initial proposal to identify class members is to pose a simple question in the class action notice to all consumers: did you purchase the pest repellers in the United States during the class period? (Memo. of Law in Support of Motion to Certify Class ("Class Cert. Mot."), ECF No. 71, at 16.) The onus is on the consumer to answer this question, and to submit information through the appropriate channels.

Moreover, Plaintiffs may subpoena customer and purchase related information from the third party retailers to whom the devices may have been distributed. For example, with respect

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 401 of 751
PageID: 11767
*Hart v. BHH, LLC*, Not Reported in Fed. Supp. (2017)

to the two named Plaintiffs here, the parties discovered that the Home Shopping Network maintains contact information for certain purchasers, and Harriet Carter Gifts possesses information for its customers. (Class Cert. Mot. at 17; see also Kopel Decl., Exs. 7 and 8.) Access to a database of purchasers and their specific transactions, including information about the devices and number of units in question, will narrow the universe of potential class members.

Finally, the decision to allow use of a self-identification method turns on "whether the alleged misrepresentation was uniform across all products." 📙 *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 66 (E.D.N.Y. 2015). Although different models of BHH pest repeller products were sold, there is, in essence "[o]nly one product [ ] at issue, and it was labeled in a uniform manner" making the same alleged misrepresentation.

📙 *Belfiore*, 311 F.R.D. at 66; 📙 *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (finding ascertainability among New York and California purchasers who did not have receipts). Here, because the devices bore three common representations on their labels, class members who may not have proof of purchase may still claim class membership.

### vi. Predominance and Superiority

#### 1. Predominance

Fatal to certification, according to BHH, is the absence of the 📙 Rule 23(b) factors: predominance and superiority. With respect to the California consumer protection claims, BHH asserts that not all class members saw or relied on the same representations, and therefore any common issues do not predominate. BHH further contends that common questions of law or fact do not predominate the proposed nationwide fraud class and multi-state breach of warranty class because of the differences in the law of each state. (Class Cert. Opp. at 13.)

With respect to the sole remaining California claim—the CLRA—common questions predominate over any individual issues because all of the pest repellers bear the same three representations. That is sufficient to foreclose BHH's argument, especially since relief under the CLRA is available even "without individualized proof of deception, reliance and injury." 🚩 *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011). Moreover, even if every class member

did not see the alleged misrepresentations when purchasing the device, the CLRA permits an inference of reliance if the representations are objectively material. As previously noted, the representations are material because they purport to do the only thing for which a reasonable consumer would ever purchase the pest repeller—to repel pests. *Steigerwald v. BHH, LLC*, 2016 WL 695424, at *8 (N.D. Ohio Feb. 22, 2016) (holding that representations are material because repellers were "used for only one reason, to repel pests.")

**\*8** BHH's arguments regarding the fraud and breach of warranty claims have slightly more traction but nevertheless fail because any issues specific to an individual plaintiff's claim are eclipsed by common questions of law and fact. BHH argues that a class action will require this Court to apply the laws of every state represented in the common law fraud and breach of warranty classes. Those variations in the law, according to BHH, will hamstring this Court from efficiently resolving those claims.

The primary problem here is not whether the elements of fraud are so materially different from state to state that they cannot be resolved on a classwide basis. For the most part, the elements of fraud are generally the same; it is the standard of proof required to prove each element that varies. (See Class Cert. Opp. at 15–17.) The same is true, says BHH, for the breach of warranty claims which are subject to variations in the laws of twenty-five states. (Class Cert. Opp. at 18.)

As an initial matter, the "predominance inquiry frequently hinges on whether elements of each class member's case can be proven through generalized proof, and whether the issues that can be so proven are more substantial than the issue subject only to individualized proof." *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 142 (S.D.N.Y. 2015). "If, in order to prove causation or liability, a trial will need to address the facts of each individual claim, then the Plaintiffs have not carried their burden." *Adkins*, 307 F.R.D. at 142. That does not appear to be the case here.

The "Second Circuit has held that the predominance requirement is met for claims sounding in fraud that are based on uniform representations made to all members of the class." 📙 *Ebin*, 297 F.R.D. at 569 (citing 📙 *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)) ("Fraud actions must ... be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 402 of 751
PageID: 11768

Hart v. BHH, LLC, Not Reported in Fed. Supp. (2017)

are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof."). Many elements of a fraud claim —misrepresentation, reliance, and causation—are easily addressed through generalized proof of the product's label and proof of plaintiffs' purchases.

"[P]roof of misrepresentation—even widespread and uniform misrepresentation—only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof." Crab House of Douglaston Inc. v. Newsday, Inc., 2013 WL 1338894, at *13 (E.D.N.Y. Mar. 29, 2013) (internal quotation marks and citation omitted). For product labeling cases such as this, reliance and causation are generally established through the presumption that a customer would not have purchased the product for any other reason than the advertised one. In other words, all class members "necessarily had to rely on" the uniform misrepresentations when purchasing the product. Ebin, 297 F.R.D. at 569; Steigerwald, 2016 WL 695424, at *8 ("[H]owever reliance is defined, it is present where the only reason a customer buys the product is to use it as a pest repeller.").

Proving knowledge and intent to deceive, while subject to varying standards in certain states, can be addressed on a classwide basis. Maywalt v. Parker & Parsley Petroleum Co., 147 F.R.D. 51, 58 (S.D.N.Y. 1993) (analyzing laws of numerous states "does not preclude class action litigation"). That such elements require individualized proof does not preclude a predominance finding since this Court may utilize a number of management tools, including special verdict sheets and subclasses. See Rodriguez v. It's Just Lunch Intern., 300 F.R.D. 125, 140 (S.D.N.Y. 2014); In re Visa Check, 280 F.3d at 141; In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 129 (2d Cir. 2013) ("[G]eneralized proof will resolve many issues, [the court] may choose to handle other less numerous and less substantial issues through the creation of a limited number of homogeneous subclasses.");

In re LILCO Sec. Litig., 111 F.R.D. 663, 670 (E.D.N.Y. 1986) ("In the event that there are material variations in the law of the fifty states, the Court may employ subclasses or decertify those state law subclasses whose adjudication becomes unmanageable.").

**\*9** Common questions also predominate among the breach of warranty class. BHH's only arguments worthy

of consideration are their reliance and pre-suit notice contentions. First, the element of reliance, like the fraud claim, may either be actual or presumed given the nature of the alleged misrepresentations at issue. There is no other way a reasonable consumer could have interpreted the phrase "repel pests" other than to believe that purchase and use of such product would in fact drive out pests. Second, any pre-suit specific issues that vary among jurisdictions can be addressed through subclasses.

2. Superiority

Having found the requirements of Rule 23(a) and predominance satisfied, this Court concludes that a class action is the superior method to resolve the underlying claims. "The superiority requirement reflects the goal of class actions to achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness." N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc., 2014 WL 1013835, at *11 (S.D.N.Y. Mar. 17, 2014) (quotation marks and alterations omitted). "Four other factors —individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability —should be considered in making these determinations." Adkins v. Morgan Stanley, 307 F.R.D. 119, 141 (S.D.N.Y. 2015).

Managing this litigation through class representatives and their counsel will be easy and efficient. For many members, the cost of bringing a lawsuit substantially outweighs the cost incurred in purchasing a defective pest repeller. Sykes v. Mel Harris and Assocs., LLC, 285 F.R.D. 279, 294 (S.D.N.Y. 2012). Moreover, while a separate but similar litigation was pending in the Southern District of Ohio, that case is now closed. Therefore, this action is the only way for plaintiffs to obtain any meaningful redress. Further, that this litigation is based in New York does not move the needle particularly in any direction.

Finally, the fourth factor—manageability—is "the most critical issue in determining" superiority and is something that is "peculiarly within a district court's discretion." Adkins, 307 F.R.D. at 147. Fact discovery concluded in December 2016, yielding enough information for Plaintiffs to structure classwide notice and an objectively verifiable means to identify class members. This Court has ample tools in its kit to address any "difficulties likely to arise in managing this class

action." Sykes, 285 F.R.D. at 294 (internal quotation marks and citation omitted).

Accordingly, Plaintiffs' motion for certification of three classes—the Nationwide Fraud Class, the Multi-State Warranty Class, and the California CLRA Class—is granted.

## CONCLUSION

For the foregoing reasons, BHH's motion to dismiss the UCL and FAL claims is granted, and BHH's motion to dismiss the fraud and breach of warranty claims is denied. Plaintiffs' motion to certify the Nationwide Fraud Class, the Multi-State Warranty Class, and the California CLRA Class is granted.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 66 and 72.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2912519

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 34

2013 WL 2650611
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Harold M. HOFFMAN, individually and on
behalf of those similarly situated, Plaintiff,

v.

NUTRACEUTICAL CORP., Defendant.

Civil Action No. 12–5803 (ES).
|
June 10, 2013.

**Attorneys and Law Firms**

Harold M. Hoffman, Englewood, NJ, pro se.

Michael R. O'Donnell, Riker, Danzig, Scherer, Hyland, &
Perretti, PA, Morristown, NJ, for Defendant.

*OPINION*

SALAS, District Judge.

**I. INTRODUCTION**
 *1 Pending before this Court is Nutraceutical Corp.'s
("Defendant") Motion to Dismiss Harold M. Hoffman's
("Plaintiff") Complaint. (D.E. No. 10, Brief in Support of
Motion to Dismiss Plaintiff's Complaint ("Br.")). The motion
is unopposed. The Court has reviewed the submissions
and decides the motion without oral argument pursuant to
Fed.R.Civ.P. 78(b). For the following reasons, the Court
GRANTS the motion without prejudice.

**II. BACKGROUND**
On August 9, 2012, Plaintiff, individually and on behalf of
those similarly situated, filed a complaint against Defendant
in the Superior Court of New Jersey, Bergen County. (D.E.
No. 1, Complaint ("Compl.")). On September 14, 2012,
Defendant removed the state court case to this District (D.E.
No. 1, Notice of Removal ("Removal")).[1]

In the Complaint, Plaintiff alleges that Defendant advertised
KAL Glucosamine Chondroitin MSM (the "product") as
"pure, unadulterated and of the highest quality." (Compl.12).

Plaintiff claims that despite the express promise that "[n]o
ingredient other than those listed on the label have been added
to this product," Defendant's product was "contaminated
by 1.7 micrograms of lead per daily use." (*Id.* at 4).
Next, Plaintiff claims that he and other members of the
putative class relied on the express representations with
respect to purity of the product and made the purchase of
the product in reliance thereof. (*Id.* at 5–6). Accordingly,
Plaintiff argues that Defendant's conduct violates the
New Jersey Consumer Fraud Act, N.J.S.A. 56:8–2, and
constitutes: an unconscionable commercial practice (Count I);
deception (Count II); fraud (Count III); false pretense, false
promise and/or misrepresentation (Count IV); and knowing
concealment, suppression and/or omission of material facts
(Count V). In addition, Plaintiff raises the following claims-
common-law fraud (Count VI); unjust enrichment (Count
VII); breach of express warranty (Count VIII); and breach of
implied warranty of merchantability (Count IX). (Compl.14–
18).

In response, Defendant moves to dismiss the above counts
pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiff does not
state any claim upon which relief may be granted. (Br.2).
Specifically, Plaintiff fails to "allege that he was injured by the
Product or the alleged lead therein, nor could he as he never
claims to have even used the Product." Nor does Plaintiff
"make any allegations regarding the Product's performance or
efficacy, again having never used the Product." (*Id.* at 5).[2]

**III. ANALYSIS**

  **A. Legal Standard**
For a complaint to survive dismissal, it "must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.' " *Ashcroft v. Iqbal,*
556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)
(citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In determining the
sufficiency of a complaint, the Court must accept all well-
pleaded factual allegations in the complaint as true and draw
all reasonable inferences in favor of the non-moving party.
*See Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d
Cir.2008). But, "the tenet that a court must accept as true all
of the allegations contained in a complaint is inapplicable to
legal conclusions[;][t]hreadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do
not suffice." *Iqbal,* 556 U.S. at 678.

Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)
2013 WL 2650611

## B. Plaintiff's Consumer Fraud Act ("CFA") Claims (Counts I–V)

*2 Plaintiff claims that "[t]he product delivered by Defendant to [P]laintiff and members of the putative class misrepresented the safety, quality, constituent ingredients and purity of defendant's product. Indeed, the spoiled and contaminated product delivered by Defendant to consumers, lacked the purity and beneficial qualities promised by Defendant." (Compl.6). Defendant contends that Plaintiff's CFA claims must be dismissed because Plaintiff fails to show damages in connection thereto. (Br.15). The Court agrees.

To state a cause of action under the CFA, plaintiff must allege: "(1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements—defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Parker v. Howmedica Osteonics Corp.,* No. 07–02400, 2008 WL 141628, at *2 (D.N.J. Jan.14, 2008) (citing *N.J. Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 842 A.2d 174, 176 (N.J.Super.Ct.App.Div.2003)).

First, plaintiff must allege an unlawful practice. An unlawful practice "typically involves an affirmative act of fraud and can arise from an affirmative act, an omission, or a violation of an administrative regulation." *Adamson v. Ortho–McNeil Pharm., Inc.,* 463 F.Supp.2d 496, 501 (D.N.J.2006). "[N]ot just 'any erroneous statement' will constitute a misrepresentation prohibited" under the CFA. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 607, 691 A.2d 350 (1997). "The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Id.*

Next, plaintiff must allege an ascertainable loss. Although the CFA does not define "ascertainable loss," courts have interpreted it as a "cognizable and calculable claim of loss due to the alleged CFA violation." *Solo v. Bed, Bath & Beyond, Inc.,* No. 06–1908, 2007 WL 1237825, at *3 (D.N.J. Apr., 26, 2007) (citing *Thiedmann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 249, 872 A.2d 783 (2005)); *Hoffman v. Hampshire Labs, Inc.,* 405 405 N.J.Super. 105, 963 A.2d 849, 854 (N.J.Super.Ct.App.Div.2009). To properly plead an ascertainable loss, plaintiff must allege facts showing "either an out-of-pocket loss or a demonstration of loss in value." *Dist. 1199P Health and Welfare Plan v. Janssen, L.P.,* 784 F.Supp.2d 508, 530 (D.N.J.2011) (citing *Thiedmann,* 183 N.J. at 248, 872 A.2d 783). This requirement to show

a demonstration of a loss in value includes a benefit-of-the-bargain theory that "requires nothing more than that the consumer was misled into buying a product that was ultimately worth less to the consumer than the product he was promised. *Smajlaj v. Campbell Soup Co.,* 782 F.Supp.2d 84, 99 (D.N.J.2011); *Henderson v. Hertz Corp.,* No. 6937–03, 2005 WL 4127090, at *7–8 (N.J.Super.Ct.App.Div.2005).

Finally, plaintiff must show a causal nexus between the misrepresentation or concealment of the material fact by defendant and the loss suffered by any person. *Dewey v. Volkswagen AG,* 558 F.Supp.2d 505, 526 (D.N.J.2008). Here, Plaintiff failed to make the necessary three-part showing under the CFA. Specifically, Plaintiff failed to show that Defendant's alleged CFA violation caused Plaintiff's "ascertainable loss." Plaintiff merely alleged that some of Defendant's product contained 1.7 micrograms of lead in it. Even under a benefit-of-the-bargain theory of damages, Plaintiff failed to show that the alleged lead in Defendant's product caused the product to be worth less than was promised. Plaintiff failed to show that the product he used actually contained lead. Moreover, Plaintiff failed to establish that the presence of 1.7 micrograms of lead in the product constituted a misrepresentation that is contrary to the product being "pure, unadulterated and of the highest quality."[3] Because Plaintiff failed to make the requisite showing under the CFA, Plaintiff's CFA claims are dismissed.

## C. Plaintiff's Common Law Fraud Claim (Count VI)

*3 Plaintiff avers that "Defendant, in the advertisement, marketing and sale of the [product], deliberately and knowingly engaged in concealment, suppression and/or omission of material facts with the intent that others, including members of the plaintiff-class, rely upon same, and, upon information and belief, members of the class did justifiably rely upon same to their detriment." (Compl.14). Such conduct, according to Plaintiff, constitutes common-law fraud. (*Id.* at 15). Defendant disagrees and argues that Plaintiff's common-law fraud claim must be dismissed because Plaintiff "failed to sufficiently plead damages resulting from the alleged trace amount of lead in the [p]roduct." (Br.19).

To properly plead common-law fraud in New Jersey, plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5)

Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)

2013 WL 2650611

resulting damages." *Gennari v. Weichert Co. Realtors,* 148
N.J. 582, 610, 691 A.2d 350 (1997) (citing *Jewish Ctr. of
Sussex Cnty. v. Whale,* 86 N.J. 619, 624–25, 432 A.2d 521
(1981)).

Here, Plaintiff failed to identify the resulting damages, a
requisite showing to properly plead common law fraud.
Significantly, Plaintiff does not even allege that the product
that he personally purchased, and used, contained lead.
Consequently, the Court dismisses Plaintiff's claim of
common-law fraud.

### D. Plaintiff's Breach of Unjust Enrichment Claim (Count VII)

Plaintiff states that "as a result of [Defendant's] false
and deceptive conduct ... [Defendant] became indebted to
class members for the sums paid by class members ... for
purchase of a misrepresented product." (Compl.16). And
retention of said sums "without reimbursement, would result
in the unlawful, unjust and inequitable enrichment." (*Id.*).
Defendant disagrees and argues that because Plaintiff "failed
to plead that the [p]roduct failed to function as advertised
or that he was injured by the [p]roduct ... there was nothing
unjust about [Defendant's] accepting and retaining money in
exchange for delivering the [p]roduct to [Plaintiff]." (Br.20).

The doctrine of unjust enrichment "rests on the
equitable principle that a person shall not be allowed
to enrich himself unjustly at the expense of another."
*Assocs. Comm. Corp. v. Wallia,* 211 N.J.Super. 231,
511 A.2d 709, 716 (N.J.Super.Ct.App.Div.1986) (citing
*Callano v. Oakwood Park Homes Corp.,* 219 A.2d 232,
234 (N.J.Super.Ct.App.Div.1966)). To establish "unjust
enrichment, a plaintiff must show both that defendant
received a benefit and that retention of that benefit without
payment would be unjust." *VRG Corp. v. GKN Realty Corp.,*
135 N.J. 539, 554, 641 A.2d 519 (1994).

Here, Plaintiff's allegations fail to support the claim of unjust
enrichment. Even accepting all allegations as true, there is
nothing in the record to suggest that Defendant's retention
of Plaintiff's money is unjust. Plaintiff received the benefit
of the product that he paid for and Defendant received the
benefit of payment for said product. As such, the doctrine of
unjust enrichment is inapposite here. Accordingly, the Court
dismisses Plaintiff's claim of unjust enrichment.

### E. Plaintiff's Breach of Express Warranty and Implied Warranty of Merchantability Claims (Counts VIII & IX)

**\*4** Plaintiff raises claims of breach of express and implied
warranties. Specifically, Plaintiff alleges that he entered into
a contract with Defendant for the purchase of the product,
and in the contract, Defendant made express promises as to
the purity of the product. (Compl.17). Additionally, Plaintiff
claims that the implied warranty of merchantability was
breached because the product "was not fit for the ordinary
purpose for which it was intended to be used." (*Id.* at 19,
641 A.2d 519). Defendant disagrees and argues that the
warranty claims must be dismissed because "Plaintiff alleges
no specific lead level in his product, and no actual injury from
using the [p]roduct." (Br.21).

Under New Jersey law, an express warranty is "[a]ny
affirmation of fact or promise made by the seller to the buyer
which relates to the goods and becomes part of the basis of the
bargain." N.J. STAT. ANN. § 12A:2–313(1)(a). "The plaintiff
in a warranty action need not establish the existence of a
defect; the failure of the goods to perform as warranted is
sufficient." *Spring Motors Distribs., Inc. v. Ford Motor Co.,*
98 N.J. 555, 586, 489 A.2d 660 (1985). Proof of causation
is also required, but "mere failure of promised performance
is enough without proof of any defect." *Realmuto v. Straub
Motors, Inc.,* 65 N.J. 336, 343, 322 A.2d 440 (1974). To
recover damages for breach of express warranty, plaintiffs
must establish that such damages were reasonably foreseeable
at the time that the contract was entered into. *Spring
Motors Distribs., Inc.,* 98 N.J. at 579–80, 489 A.2d 660
(describing that damages for misrepresenting products comes
from "society's interest in the performance of promises").

An implied warranty "simply means that the thing sold
is reasonably fit for the general purpose for which it is
manufactured and sold." *Henningsen v. Bloomfield Motors,
Inc.,* 32 N.J. 358, 370, 161 A.2d 69 (1960). To establish
a breach of implied warranty, plaintiff must show "that the
product was not reasonably fit for the ordinary purposes for
which it was sold and such defect proximately caused injury
to the ultimate consumer." *Hollinger v. Shoppers Paradise
of New Jersey, Inc.,* 134 N.J.Super. 328, 340 A.2d 687, 692
(N.J.Super. Ct. Law Div.1975).

Here, Plaintiff fails to make the necessary showing of
damages required for both a breach of express warranty claim
and an implied warranty of merchantability claim. Plaintiff
merely asserts that some of Defendant's product contained

**Hoffman v. Nutraceutical Corp., Not Reported in F.Supp.2d (2013)**
2013 WL 2650611

1.7 micrograms of lead. As such, Plaintiff fails to establish what damages resulted from the product containing said lead. Consequently, Plaintiff's claims of breach of express and implied warranty are dismissed.

## IV. CONCLUSION

For these reasons, the Court GRANTS Defendant's Motion to Dismiss without prejudice. An appropriate Order follows this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2650611

Footnotes

1    On September 21, 2012, Plaintiff filed a motion to remand to state court. (D.E. No. 4). The motion was denied by Judge Mannion via Report & Recommendation ("R & R") on January 24, 2013. (D.E. No. 20). Plaintiff subsequently objected to Judge Mannion's decision exercising jurisdiction on January 27, 2013. (D.E. No. 21). Judge Salas adopted Judge Mannion's R & R and overruled Plaintiff's objection on March 8, 2013. (D.E. No. 25).

2    Defendant also seeks to disqualify Plaintiff as class counsel. The Court need not address the issue in this Fed.R.Civ.P. 12(b) (6) motion.

3    On the contrary, Defendant notes that the recommended daily intake of lead is 75 micrograms, or 44 times the amount found in the product at issue. (Br.5).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 35

🚩 KeyCite Yellow Flag - Negative Treatment
Disagreed With by Debernardis v. IQ Formulations, LLC, 11th Cir.(Fla.),
November 14, 2019

2017 WL 3971912
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Daniel HUBERT, individually
and on behalf of all others
similarly situated, Plaintiff,

v.

GENERAL NUTRITION
CORPORATION, Defendant.

2:15-cv-01391
|
Signed 09/08/2017

**Attorneys and Law Firms**

D. Aaron Rihn, Robert Peirce & Associates, P.C., Pittsburgh,
PA, Gregory F. Coleman, Lisa A. White, Mark E. Silvey, Greg
Coleman Law PC, Knoxville, TN, Arthur Stock, Shanon J.
Carson, Berger & Montague, P.C., Philadelphia, PA, Jennifer
S. Goldstein, Whitfield Bryson & Mason, Washington, DC,
for Plaintiff.

Amy B. Alderfer, Brett Nicole Taylor, Cozen O'Connor,
Los Angeles, CA, Paul K. Leary, Jr., Mark E. Utke, Cozen
O'Connor, Philadelphia, PA, for Defendant.

**OPINION**

Mark R. Hornak, United States District Judge

 **\*1**  Presently before the Court is a motion by Defendant
General Nutrition Corporation ("GNC" or "Defendant")
to dismiss the First Amended Consolidated Class Action
Complaint (the "Amended Complaint") filed by Plaintiff
Daniel Hubert, individually and on behalf of similarly
situated individuals (ECF No. 39) pursuant to Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion to
Dismiss") (ECF No. 48). In this prospective class action
litigation, Plaintiff Hubert alleges that he and other consumers
("Plaintiffs") purchased supplements sold by GNC with false
and misleading labeling in violation of the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301, et seq., and the consumer
fraud protection laws of numerous states.[1] Plaintiffs further
assert that GNC breached implied warranties, engaged in
negligent misrepresentation and unjustly enriched itself to the
detriment of consumers. Defendant has moved to dismiss the
Amended Complaint for lack of subject matter jurisdiction
and for failure to state a claim. For the reasons set forth below,
Defendant's Motion to Dismiss for lack of subject matter
jurisdiction will be granted, and the Amended Complaint will
be dismissed, without prejudice.[2] Because the Court finds that
Plaintiffs lack standing to bring this case, it need not address
Defendant's other theories.

**I. BACKGROUND**

GNC, which is headquartered in Pittsburgh, Pennsylvania, is
the largest global specialty retailer of nutritional supplements.
Am. Compl. ¶¶ 25, 36. Plaintiffs allege that GNC marketed
and sold supplements manufactured by third party vendors,
which allegedly contained picamilon, BMPEA or acacia
rigidula, despite having known that these substances are
not dietary ingredients.[3] Id. ¶¶ 3, 4, 38. The supplements
at issue here are primarily weight-loss and sports nutrition
supplements available as powders and liquids. Id. ¶ 27.

 **\*2**  Plaintiffs aver that federal and state law place primary
responsibility for the safety of dietary supplements,[4] as
well as truthful labeling and advertising, on supplement
manufacturers and distributors such as GNC. Am. Compl.
¶ 28. According to Plaintiffs, GNC sold products with false
and misleading labeling, and it failed to disclose material
facts about the dangers of ingesting picamilon, BMPEA
and acacia rigidula. Id. ¶ 5. Plaintiffs claim that they were
"hoodwinked" into purchasing supplements containing these
substances and would not have done so if GNC had disclosed
that they contained mislabeled ingredients which purportedly
pose serious health risks and are not marketable as dietary
supplements. Id. ¶¶ 6, 24.

Regarding picamilon, Plaintiffs allege that Jennifer Jakel
("Jakel"), who was GNC's Senior Project Manager for
Technical Research, reviewed documents translated from
Russian indicating that it is a "derivative of gamma-amino-
butyric acid and nicotinic acid." Am. Compl. ¶ 43. In 2007,
Jakel made a notation stating "[n]o NDI that I could find,"
suggesting that a NDI submission was not tendered to the
Food and Drug Administration ("FDA") for picamilon. Id. ¶¶
31, 44. Again in April 2014, Jakel wrote "still no NDI found."
Id. ¶ 44.

Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

Subsequently, on September 28, 2015, Dr. Cara Welch of the FDA issued a declaration stating that "picamilon does not qualify as a dietary ingredient" under the Food, Drug and Cosmetic Act (the "FDC Act"). Am. Compl. ¶ 40. Plaintiffs allege that GNC continued to sell dietary supplements containing picamilon until September 21, 2015, despite having known since 2007 that it was not a dietary ingredient. Id. ¶¶ 44, 46.

Plaintiffs additionally claim that GNC has been aware since the fall of 2013 that some dietary supplements labeled as containing acacia rigidula actually contained BMPEA. Am. Compl. ¶¶ 52. Ms. Jakel supposedly was notified in November 2013 of a study by FDA researchers which revealed that many dietary supplements purportedly containing acacia rigidula actually contained BMPEA, despite no testing to show that BMPEA was safe for humans (hereinafter, "the FDA Study"). Id. ¶¶ 49, 52. Subsequently, Jakel allegedly emailed a USA Today article about the FDA Study to approximately 100 recipients at GNC. Id. ¶ 52.

Plaintiffs allege that despite knowing of the FDA Study, GNC continued to sell supplements containing acacia rigidula, without testing them to determine whether they were adulterated with BMPEA. Am. Compl. ¶¶ 55. However, in April 2015, when the FDA formally announced that BMPEA did not meet the definition of a dietary ingredient, GNC stopped selling products containing BMPEA. Id. ¶ 60.

Concerning acacia rigidula, Plaintiffs allege that the FDA warned six manufacturers in March 2016, that it is a new dietary ingredient which lacks evidence of safe use and therefore could not be lawfully sold in the United States. Am. Compl. ¶ 67. Plaintiffs allege that GNC did not provide the FDA with the required pre-market notification showing a history of acacia rigidula's safe use, yet it was openly found on labels of supplements offered for sale at GNC. Id. ¶¶ 70, 72.

*3 Plaintiffs aver that despite GNC's alleged knowledge regarding picamilon, BMPEA and acacia rigidula, GNC sold products containing those substances which were supplied by third-party vendors. Am. Compl. ¶ 78. Plaintiffs claim that GNC exercised significant control over the third-party products it sold by reviewing and pre-approving labels, warnings, packaging and advertising. Id. ¶¶ 73, 74. In addition, third-party vendors could not alter approved formulas, labels or advertising without GNC's permission. Id.

¶ 74. By controlling the product labels of third party vendors, Plaintiffs allege that GNC misrepresented that supplements containing picamilon, BMPEA and acacia rigidula were safe for consumers and legal to sell. Id. ¶ 79. According to Plaintiffs, it is irrelevant that GNC received guarantees from third-party vendors that products containing those substances complied with legal requirements because GNC knew or should have known that they were not safe and could not be lawfully sold. Id. ¶¶ 75, 76.

In sum, Plaintiffs allege that picamilon, BMPEA and acacia rigidula were listed on the labels of a variety of supplements available for sale at GNC, including products that they purchased. Am. Compl. ¶¶ 47, 65, 72. Plaintiffs claim that through this labeling, GNC misrepresented that those substances were safe and could be legally sold in the United States. Id. As a result, Plaintiffs assert that they purchased supplements they otherwise would not have purchased, paid more for supplements than they otherwise would have paid and have been subjected to unreasonable safety risks. Id. ¶¶ 6, 24, 81.

## II. STANDARD OF REVIEW

Under Fed.R.Civ.P. 12(b)(1), "a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). "A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

In evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1), a court first must determine whether the movant presents a facial or a factual attack. See Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). The distinction is important because it determines how the complaint must be reviewed. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " Davis, 824 F.3d at 346 (citation omitted). A factual challenge "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.' " Id. (citation omitted). Here, GNC makes a facial challenge because it has not disputed the validity of Plaintiffs' factual claims in its Motion to Dismiss. In essence, GNC contends that the

2017 WL 3971912

allegations of the Amended Complaint, even accepted as true, are insufficient to establish Plaintiffs' Article III standing.

In considering a facial challenge to standing, courts are to apply the same standard as on review of a Rule 12(b)(6) motion for failure to state a claim. See Petruska v. Gannon Univ., 462 F.3d 294, 299 n.1 (3d Cir. 2006) (explaining "that the standard is the same when considering a facial attack under Rule 12(b)(1) or a motion to dismiss for failure to state a claim under Rule 12(b)(6)") (citation omitted). Consequently, the court is to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff [has standing]." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Nonetheless, "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, "[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter" that would establish standing if accepted as true. Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

**\*4** GNC argues that the Amended Complaint must be dismissed for lack of standing because Plaintiffs have not sufficiently pled the essential element of injury-in-fact. According to GNC, Plaintiffs simply allege that they purchased the supplements, but do not allege that they actually consumed them or suffered any adverse health consequences from them. GNC points out that any apprehension Plaintiffs may have about possible future injury is insufficient to establish injury-in-fact.

Plaintiffs respond that they have suffered an economic injury, which suffices to establish injury-in-fact for standing purposes. Plaintiffs contend that they incurred economic injury because they purchased products with false, misleading and inaccurate labeling, which omitted information material to their purchases.

GNC counters that the gravamen of the Amended Complaint involves picamilon, BMPEA and acacia rigidula purportedly endangering the health of consumers. GNC contends that despite the emphasis on the alleged health dangers posed by those substances, Plaintiffs attempt to shift the focus to economic injury in order to establish an injury-in-fact for standing purposes. Even so, GNC urges that Plaintiffs have not sufficiently pled the element of injury-in-fact because they

do not allege they purchased the supplements after the FDA issued warning letters.

For reasons explained below, the Court agrees that an economic injury can qualify as an injury-in-fact for standing purposes, but concludes that Plaintiffs have not adequately alleged that they suffered an injury-in-fact in this case. Therefore, the Amended Complaint must be dismissed for lack of standing.

### A. Article III Standing

Article III of the Constitution limits the scope of federal judicial power to the adjudication of "cases" or "controversies." U.S. Const., art. III, § 2. "The courts have developed several justiciability doctrines to enforce the case-or-controversy requirement, and perhaps the most important of these doctrines is the requirement that a litigant have standing to invoke the power of a federal court." In re Schering Plough, 678 F.3d at 244 (internal quotations and citation omitted). "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

It is well established that the "irreducible constitutional minimum" of standing consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Lujan, 504 U.S. at 560-61). The plaintiff, as the party invoking federal jurisdiction, bears the burden to establish standing. Lujan, 504 U.S. at 561. At the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element. Spokeo, 136 S.Ct. at 1547 (quoting Warth, 422 U.S. at 518).

Although there are three required elements of constitutional standing, the Third Circuit has emphasized that "the injury-in-fact element is often determinative." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3d Cir. 2009); see also Spokeo, 136 S.Ct. at 1547 (observing that injury-in-fact is the "[f]irst and foremost" of standing's three elements) (citation omitted). To establish injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 413 of 751
PageID: 11779
Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. Although "[i]njury-in-fact is not Mount Everest," Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir. 2005), the complaint still must "clearly and specifically set forth facts sufficient to satisfy" Article III standing requirements. Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

*5 The Third Circuit has explained that "[w]hile it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." Danvers Motor, 432 F.3d at 291. Indeed, "[m]onetary harm is a classic form of injury-in-fact." Id. at 293 (citation omitted). However, allegations of "possible future injury" are insufficient to satisfy the requirements of Article III. Whitmore, 495 U.S. at 158; Reilly v. Ceridian Corp., 664 F.3d 38, 42 (3d Cir. 2011).

**B. Plaintiffs Have Not Established That They Suffered an Injury-in-Fact, Thus They Lack Standing.**
Plaintiffs are correct that economic injury can suffice to establish injury-in-fact for standing purposes. However, the question here is whether Plaintiffs have suffered an economic injury. The Court concludes that the Amended Complaint does not adequately plead facts that establish they have; consequently, Plaintiffs have not established that they suffered an injury-in-fact.

**1. Analysis of Injury-In-Fact**

The Court's standing analysis is informed by precedent from courts within this Circuit that have evaluated whether the plaintiff suffered an injury-in-fact in cases where, as here, it was alleged the product at issue contained a dangerous substance that was unknown to the consumer or the product label contained alleged misrepresentations.[5]

First, in Koronthaly v. L'Oreal USA, Inc., 374 Fed.Appx. 257 (3d Cir. 2010), our Court of Appeals affirmed a district court's dismissal for lack of standing in a case where the plaintiff purchased lipstick that contained lead, which was not disclosed on the packaging or the product, and the plaintiff claimed she would not have purchased the lipstick had she known about the lead. In finding no standing, the Third Circuit deemed it significant that the plaintiff conceded she suffered no adverse health consequences from using the lipstick, and her subjective allegation that trace amounts of lead in the lipstick were unacceptable to her was not an

injury-in-fact. Id. at 259. Further, to the extent the plaintiff claimed that the injury-in-fact was the loss of the "benefit of the bargain," the Third Circuit explained that she mistakenly relied on contract law. Id. Because the plaintiff's lipstick purchases were not made pursuant to a contract, she could not have been denied the benefit of any bargain. Id. The Third Circuit concluded that "[a]bsent any allegation that [the plaintiff] received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, [she] has not demonstrated a concrete injury-in-fact." Id.

In Young v. Johnson & Johnson, Civil Action No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012), the district court determined that the plaintiff lacked standing in a case involving the alleged misrepresentation of the nutritional content and health benefits of Benecol, a butter/margarine substitute. The court found that the plaintiff did not sufficiently plead an injury-in-fact because he merely alleged that he purchased Benecol fairly regularly during a five-year period, but he did not allege that he actually consumed it or that he suffered any adverse health effects from it. Id. at *3. In addition, the court found unavailing the plaintiff's contention that he satisfied the injury-in-fact requirement based on allegations that he was deprived of the "benefit of the bargain," received an inferior product and paid a premium price because he believed Benecol was healthy, when in fact it was not. Id. at *4. In finding no economic injury, the court explained that the plaintiff's purchases of Benecol were not made pursuant to a contract and he did not allege how he paid a premium for it or received a product that did not deliver the advertised benefits. Id. (citing Koronthaly, 374 Fed.Appx. 259).

*6 In both James v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-03049, 2011 WL 198026 (D.N.J. Jan. 20, 2011) and Medley v. Johnson & Johnson Consumer Cos., Inc., Civil No. 10-cv-02291, 2011 WL 159674 (D.N.J. Jan. 18, 2011), the district court accepted the plaintiffs' contention that economic injury suffices to confer standing, but found that they could not clear the threshold requirement for showing an economic injury. The cases involved ten plaintiffs who alleged Johnson & Johnson violated the FDA's ban on methyl chloride in cosmetic products because its baby shampoo contained that substance. The economic injury for which the plaintiffs sought redress was the price they paid for the shampoo, which the court noted they apparently used in bathing their children without adverse health reactions. Id. at *2. The court accepted as true the plaintiffs' allegation that

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 414 of 751
PageID: 11780
Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)
2017 WL 3971912

had they known the true nature of the baby shampoo, they would not have purchased it or allowed their children to be exposed to it, but determined that economic damages did not follow as a consequence. Id. The court concluded that once the shampoo had been used, there was no economic injury for the plaintiffs to complain of and the fear of future injury is insufficient to confer standing. Id. The court observed that the plaintiffs received the benefit of their bargain so long as there were no adverse health effects and the shampoo worked as intended, meaning that is cleansed the children's hair without producing irritation, and nothing in the complaint suggested otherwise. Id. As such, the court found that the plaintiffs did not demonstrate that they suffered an injury-in-fact.

Likewise, in Estrada v. Johnson & Johnson, Civil Action No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), the court found that the plaintiff did not suffer an injury-in-fact and therefore lacked standing. In that case, the plaintiff asserted California state law consumer-fraud claims against Johnson & Johnson, claiming that it had been aware since at least 1982 of studies associating talcum powder with an elevated risk of ovarian cancer for women, yet failed to disclose that risk to consumers and continued to market baby powder as safe despite knowledge of the risk. As a result of Johnson & Johnson's misrepresentations and omissions, the plaintiff claimed to have suffered an economic injury based on three theories: (1) benefit of the bargain; (2) alternative product; and (3) premium price. Id. at * 6.

First, the plaintiff claimed that she did not receive the benefit of her bargain because she purchased baby powder under the belief that it was safe, but she would not have done so had she known that using baby powder in the genital area could lead to an increased risk of developing ovarian cancer. Estrada, 2017 WL 2999026, at *6. The court ultimately found that the plaintiff did not suffer an economic injury-in-fact based on a benefit of the bargain theory. Id. at *13. The court noted that the plaintiff's claim was similar to those alleged by the consumers in Koronthaly, James and Medley: she alleged that she used baby powder; it was effective for its intended uses of eliminating friction and absorbing excess moisture; she was not physically injured; Johnson & Johnson failed to list enough warnings about an alleged increased risk of ovarian cancer associated with baby powder use; and she would like her money back. Id. at *9. However, the court found that absent a plausible allegation of adverse health consequences from using baby powder or that it failed to perform satisfactorily for its intended use, the plaintiff could not claim that she was denied the benefit of her bargain.[6] Id.

(citing Koronthaly, 374 Fed.Appx. at 259; James, 2011 WL 198026, at *2). The court held that the plaintiff's benefit of the bargain theory, based on Johnson & Johnson's alleged omissions, was an insufficient basis to find that she suffered an injury-in-fact. Id. at *9, 13. If the plaintiff wanted to file an amended complaint to reassert a benefit of the bargain theory, the court required that she point to an affirmative legal duty on Johnson & Johnson's part to disclose the facts that allegedly were omitted. Id. at *9.

*7 Next, the Estrada court found that the plaintiff did not establish that she suffered an injury-in-fact under an alternative product theory of economic harm. Estrada, 2017 WL 2999026, at * 14. The court recognized that injury-in-fact exists where a consumer alleges that, absent the defendant's omissions or misrepresentations, she would have purchased a cheaper alternative product. Id. at *13 (citations omitted). Although the plaintiff alleged she would have purchased an alternative cornstarch-based powder had she known of the increased cancer risk purportedly associated with baby powder, she did not allege that an alternative product would have been cheaper than baby powder. Id. at *14.

Finally, the Estrada court found that the plaintiff's premium price theory of economic harm did not sufficiently establish that she suffered an injury-in-fact. Estrada, 2017 WL 2999026, at *15. In premium price cases, a plaintiff alleges that the defendant's omissions or misrepresentations caused her to overpay for a product. Id. (citations omitted). Under that theory, the plaintiff claimed that as a result of Johnson & Johnson's omissions and misrepresentations, it was able to sell baby powder for more than it otherwise would have if consumers had been properly informed about the safety risks. The court determined that the plaintiff's "threadbare" allegation that she purchased baby powder at a premium, without any supporting factual allegations, was insufficient to establish an injury-in-fact. Id. It was significant in the court's analysis that the plaintiff did not allege that Johnson & Johnson advertised baby powder as superior to other products, nor did she identify any comparable, cheaper products to show that baby powder was sold at a premium price. Id.

## 2. The Amended Complaint Fails to Adequately Plead That Plaintiffs Suffered an Economic Injury-In-Fact.

In view of the foregoing authority, Plaintiffs here do not sufficiently allege that they suffered an economic injury to satisfy the injury-in-fact element of standing. At the outset,

2017 WL 3971912

Plaintiffs allege that GNC sold supplements with false and misleading labeling and otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. Am. Compl. ¶ 5. Plaintiffs then allege that they were hoodwinked into purchasing the supplements and would not have done so if GNC had disclosed that they contained mislabeled ingredients which supposedly pose serious health risks or were unlawful. Id. ¶¶ 6, 24. As a result of GNC's practices, Plaintiffs claim that they purchased supplements they otherwise would not have purchased, paid more for supplements than they otherwise would have paid[7] and have been subjected to unreasonable safety risks. Id. ¶ 81. Based on these allegations, Plaintiffs apparently attempt to assert two theories of economic injury: (1) they did not receive the benefit of their bargain; and (2) they paid a premium price for the supplements.[8]

 *8  First, Plaintiffs' premium price allegations do not sufficiently establish that they suffered an economic injury. Although Plaintiffs broadly aver that GNC's alleged omissions and misrepresentations caused them to pay more for supplements than they otherwise would have paid, that "threadbare" allegation, without any supporting factual allegations, is insufficient to establish an injury-in-fact. See Estrada, 2017 WL 2999026, at *15 ("threadbare" allegation that the plaintiff purchased a product at a premium, without factual support, was insufficient to establish injury-in-fact); Young, 2012 WL 1372286, at *4 (finding no injury-in-fact where, inter alia, the plaintiff did not set forth allegations as to how he paid a premium price for the product). As in Estrada, the Court finds it significant that Plaintiffs do not allege GNC advertised the supplements they purchased as superior to other products, nor do Plaintiffs identify any comparable, cheaper products to show that the supplements they purchased from GNC were sold at a premium price. See Estrada, 2017 WL 2999026, at *15.

Next, Plaintiffs' allegation that they did not receive the benefit of their bargain when they purchased the supplements does not suffice to establish that they suffered an economic injury-in-fact. As stated, Plaintiffs allege that they paid money for the supplements that, absent GNC's alleged omissions and misrepresentations, they otherwise would not have paid. See Am. Compl. ¶¶ 6, 24, 81; see supra n. 7. Although Plaintiffs do not allege that they consumed the supplements,[9] they certainly do not claim they suffered any adverse health consequences from them. Furthermore, Plaintiffs do not allege that the supplements at issue, which are "primarily weight-loss and sports-nutrition supplements,"

see Am. Compl. ¶ 27, failed to work for their intended purpose or did not deliver the advertised benefits.

The Amended Complaint presents some of the same concerns as in Koronthaly, Young, James, Medley and Estrada, which ultimately led the courts to find that the plaintiffs in those cases did not suffer an injury-in-fact. As observed in Koronthaly and Young, Plaintiffs' purchases of the supplements were not made pursuant to a contract, thus they could not have been denied the benefit of any bargain. Beyond that, as in Koronthaly, Young, James, Medley and Estrada, Plaintiffs have not alleged that the supplements failed to work for their intended purpose of weight loss and/or sports nutrition, and there is no allegation that Plaintiffs' health was adversely affected.

While we accept as true Plaintiffs' allegation that they would not have purchased the supplements had they known the supplements purportedly contained dangerous ingredients, economic damages do not necessarily follow as a consequence. To the extent Plaintiffs consumed the supplements, see supra, n. 9, once they were used, there would be no economic injury for Plaintiffs to complain of and apprehension concerning future health consequences is insufficient to establish an injury-in-fact. See James, 2011 WL 198026, at *2; Medley, 2011 WL 159674, at *2. As in James and Medley, Plaintiffs would have received the benefit of their bargain so long as the supplements worked as intended, meaning they provided weight-loss and sports nutrition benefits, and they produced no adverse health effects. See id. Nothing in the Amended Complaint suggests this was not the case.

Plaintiffs appear to base their benefit of the bargain theory upon GNC's alleged omissions and misrepresentations, claiming that GNC sold products with false and misleading labeling, and it otherwise failed to disclose material facts about the dangers of ingesting picamilon, BMPEA and acacia rigidula. See Am. Compl. ¶ 5. However, Plaintiffs do not allege what material facts GNC failed to disclose about the dangers of ingesting those substances or whether GNC had a duty to do so. Thus, the Court cannot conclude that Plaintiffs did not receive the benefit of their bargain based on alleged omissions by GNC. See Estrada, 2017 WL 2999026, at *6 (the plaintiff could not assert a benefit of the bargain theory of economic harm based on an omission where she failed to allege that the defendant was under a duty to disclose the omitted fact).

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 416 of 751
PageID: 11782
Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)
2017 WL 3971912

**\*9** In addition, the Court finds that Plaintiffs were not deprived of the benefit of their bargain based on alleged misrepresentations by GNC. As observed in Estrada, courts have found that a plaintiff did not receive the benefit of the bargain in cases where sufficient facts were pled for the court to conclude that the plaintiff was induced into purchasing the product at issue by a *specific* misrepresentation made by the defendant. See Estrada, 2017 WL 2999026, at \*9–\*11 (citations omitted). Unlike those cases, the plaintiff in Estrada did not sufficiently allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website or on the product's label or advertisements. Id. at \*11. Rather, the plaintiff simply alleged that she read the label prior to purchasing baby powder and in reliance on the label, she believed that baby powder was safe. Id. at \*12.

Likewise, here, Plaintiffs fail to allege that they were underlined into purchasing the supplements based on *specific* misrepresentations made by GNC. Plaintiffs allege that picamilon, BMPEA and acacia rigidula were "openly found" on the labels of various supplements available for sale at GNC; thus, through labeling, GNC misrepresented that the products were safe. See Am. Compl. ¶¶ 47, 65, 72, 79. Although Plaintiffs do not specifically allege it, they suggest that they read the labels on the supplements and believed they were safe. As in Estrada, that is insufficient, particularly in view of the fact that Plaintiffs do not otherwise allege they were induced into purchasing the supplements by any specific statements on the labels.

In sum, the Court is well-aware that "[i]njury in fact is not Mount Everest," Danvers Motor, 432 F.3d at 294, but, for the reasons explained herein, we conclude that Plaintiffs have not sufficiently alleged that they suffered an economic injury to satisfy the injury-in-fact element. Therefore, Plaintiffs have failed to establish that they have standing to bring the present action. Because Plaintiffs do not have standing, the Amended Complaint will be dismissed for lack of subject matter jurisdiction. Absent subject matter jurisdiction, the Court is without authority to rule on the remaining merit-based arguments.[10] ACLU-NJ v. Township of Wall, 246 F.3d 258, 261 (3d Cir. 2001) ("If plaintiffs do not possess Article III standing, ... the District Court ... lack[s] subject matter jurisdiction to address the merits of plaintiffs' case.").

### IV. CONCLUSION

Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2). Therefore, to the extent that Plaintiffs wish to file a second amended complaint to cure the deficiencies discussed herein, they will be granted leave do so within 30 days from the date of this decision.

**\*10** Accordingly, the Motion to Dismiss filed by GNC as to Plaintiffs' lack of standing will be granted, and the Amended Complaint will be dismissed without prejudice at this time.

An appropriate order will be entered.

### All Citations

Not Reported in Fed. Supp., 2017 WL 3971912

---

Footnotes

1   Plaintiffs allege that GNC violated the following state laws: Arkansas's Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101, *et seq.;* California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.;* California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.;* Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.;* Iowa's Private Right of Action for Consumer Frauds Act, Iowa Code Ch. 714H; Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.;* Minnesota's Unlawful Trade Practices Act, Minn. Stat. Ann. § 325D.09, *et seq.;* Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43, *et seq.;* Minnesota's Consumer Fraud Act, Minn. Stat. Ann. § 325F.68, *et seq.;* Minnesota's False Statement in Advertising Act, Minn. Stat. Ann. § 325F.67; Minnesota's Private Attorney General Statute, Minn. Stat. Ann. § 8.31, *et seq.;* New York's General Business Law, N.Y. Gen. Bus. Law § 349; New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, *et seq.;* Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.;* and Texas' Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

Hubert v. General Nutrition Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 3971912

2   In view of the Court's ruling granting the Motion to Dismiss for lack of subject matter jurisdiction, Defendant's Request for Judicial Notice (ECF No. 49-5) and Plaintiffs' Motion to Strike Declaration of Stephen Cherry (ECF No. 59) will be denied as moot.

3   Picamilon is a synthetic chemical which is used as a prescription drug in Russia, but it is not approved as a drug in the United States, BMPEA is an amphetamine-like chemical that is not found in nature, acacia rigidula is an herb or other botanical, and both BMPEA and acacia rigidula allegedly have no history of safe use. Am. Compl. ¶¶ 4, 39, 48, 66.

4   A dietary supplement is a product intended to supplement the diet that contains one or more of the following dietary ingredients: a vitamin; a mineral; an herb or other botanical; an amino acid; or a combination thereof. Am. Compl. ¶ 29. A dietary ingredient that was not previously marketed in the United States prior to October 14, 1994, is considered a "new dietary ingredient" ("NDI"). Id. ¶ 30. A manufacturer is required to notify the FDA if it intends to market a supplement that contains a NDI. Id. ¶ 31. If the FDA does not comment within 75 days after the NDI submission, the ingredient may be used in dietary supplements. Id.

5   The Court is cognizant that Plaintiffs cite cases from other jurisdictions to support their position that they have suffered an economic injury. See Plaintiffs' Resp. in Opp'n (ECF No. 61 at 6, n.3). As stated, however, the Court relies on the precedent from the Third Circuit discussed herein to assess whether the Plaintiffs have sufficiently established an injury-in-fact for standing purposes.

6   The Estrada court distinguished cases cited by the plaintiff which recognized standing on a benefit of the bargain theory of economic harm, explaining that the plaintiffs in those cases did not receive the benefit of their bargain because either: (1) they received a defective product; or (2) they pled facts sufficient for the court to conclude that they were induced into purchasing the product at issue based on a specific misrepresentation made by the defendants. See Estrada, 2017 WL 2999026, at *9-*11 (citations omitted). Unlike the consumers in those cases, the plaintiff in Estrada did not sufficiently allege that she was induced into purchasing baby powder based on specific misrepresentations made by Johnson & Johnson on its website, or on the product's label or advertisements. Id. at *11.

7   In connection with Plaintiffs' various state law claims, Plaintiffs allege generally throughout the Amended Complaint that they purchased supplements from GNC that they otherwise would not have, or would not have paid as much for them as they did. See Am. Compl. ¶¶ 144, 154, 162, 172, 180, 213, 223, 232, 241, 259, 273, 279 and 282.

8   We note that the Amended Complaint contains no allegations that Plaintiffs would have purchased a cheaper, alternative product absent GNC's alleged omissions or misrepresentations, thus injury-in-fact cannot be established under an alternative product theory of economic injury. Further, to the extent that Plaintiffs urge that they have standing based upon concerns of health problems that have yet to occur, see Am. Compl. ¶ 81 (alleging that "[a]s a result of GNC's practices, Plaintiffs ... have been subjected to unreasonable safety risks"), apprehension concerning possible future injury is insufficient to establish injury-in-fact. Whitmore, 495 U.S. at 158; Reilly, 664 F.3d at 42.

9   Plaintiffs simply allege that they purchased the supplements on various occasions between 2011 and 2015. See Am. Compl. ¶¶ 11-22. However, in view of the fact that a number of Plaintiffs purchased supplements on multiple occasions over a period of months or years, see id. ¶¶ 11-13, 15, 17-21, it is logical to infer that they must have consumed the supplements. Indeed, it is highly unlikely that a consumer would make multiple purchases of items that he never used in the first place.

10  Although the Court is not empowered to address GNC's arguments for dismissal under Rule 12(b)(6), and expresses no opinion on the merits of that motion, we note the possibility that GNC's preemption claim could be premature. "[F]ederal preemption is an affirmative defense on which the defendant bears the burden of proof." In re Asbestos Prods. Liab. Litig., 822 F.3d 125, 133 n.6 (3d Cir. 2016). The Third Circuit has explained that "[t]his allocation of the burden of proof suggests that a motion under Rule 12(c) for judgment on the pleadings is a more appropriate procedural vehicle for dismissing cases on preemption grounds, instead of a motion under Rule 12(b)(6), except for cases in which preemption is manifest in the complaint itself." Id. (citations omitted). As stated, the Court expresses no opinion at this juncture as to whether this is a case in which preemption is manifest in the complaint itself, but simply raises the issue for the parties' consideration at the appropriate time.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 36

2014 WL 354676
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jonathan HUDAK, Plaintiff,
v.
The BERKLEY GROUP, INC. and
Caribbean Cruise Line, Inc., Defendants.

No. 3:13–cv–00089–WWE.
|
Jan. 23, 2014.

**Attorneys and Law Firms**

Sergei Lemberg, Lemberg & Associates, LLC, Stamford, CT, for Plaintiff.

Jeffrey A. Backman, Richard W. Epstein, Greenspoon Marder, P.A., Fort Lauderdale, FL, Richard A. Roberts, Nuzzo & Roberts, Cheshire, CT, for Defendants.

*MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS*

WARREN W. EGINTON, Senior District Judge.

**\*1** Plaintiff alleges that defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.,* ("TCPA") and the Connecticut Unfair Trade Practices Act ("CUTPA") by making, or causing a third party to make on their behalf, up to two calls a day to plaintiff's cellular phone using an automated telephone dialing system with an artificial or prerecorded voice ("robocalls").

Defendants have filed a motion to dismiss for (1) lack of personal jurisdiction and (2) failure to state a claim. Defendants also argue that the TCPA does not permit damages for emotional distress. For the following reasons, defendants' motion to dismiss will be granted in part and denied in part.

*BACKGROUND*

For purposes of ruling on a motion to dismiss, the Court accepts the allegations of the complaint as true and draws all inferences in favor of plaintiff.

Plaintiff Jonathan Hudak is a resident of Wilton, Connecticut. Defendants The Berkley Group, Inc. and Caribbean Cruise Line, Inc. are Florida corporations.

Defendants work in concert to market and sell timeshare properties. In furtherance of this marketing effort, defendants placed, or caused to be placed, hundreds of robocalls to plaintiff's cellular phone. These robocalls prompt the listener to stay on the line to claim a "free" cruise to the Bahamas. In reality, the "free" cruise is not free, as persons accepting the cruise offer are required to pay various fees and/or costs and must attend a sales presentation for timeshares that defendants market. Plaintiff claims that these unsolicited telemarketing calls to his cellular phone violate the TCPA by using an artificial or prerecorded voice to deliver a message without the prior express consent of plaintiff. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff further claims that the calls misrepresented that he had won a "free" cruise because the calls failed to adequately disclose various fees, costs and conditions associated with accepting defendants' offer. Accordingly, the calls violate CUTPA's prohibition on deceptive practices.

*DISCUSSION*

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King,* 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

**I. Personal Jurisdiction**
**\*2** "[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits...." *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963). In Connecticut the court must determine if the state's long-arm

Hudak v. Berkley Group, Inc., Not Reported in F.Supp.3d (2014)

2014 WL 354676

statute reaches the foreign corporation. If so, the court must decide whether the exercise of jurisdiction comports with due process. *Bensmiller v. E.I. Dupont de Nemours & Co., State of La.,* 47 F.3d 79, 81 (2d Cir.1995).

"Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d. Cir.1996). "After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d. Cir.1990). At this preliminary stage, plaintiff's *prima facie* showing may be established solely by allegations. *Id.*

Plaintiff alleges that this court may exercise personal jurisdiction over the out-of-state defendants because his claims arise out of or relate to the multiple phone calls defendants made, or caused to be made, into the State of Connecticut. Defendants deny that they made any of the calls at issue but do not deny that they caused them to be made. Defendants argue that they lack sufficient contacts with Connecticut to give rise to general jurisdiction.

Connecticut's long-arm statute provides:

(f) Every foreign corporation shall be subject to suit in this state ... on any cause of action arising as follows: ...

(2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; ...

(4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen.Stat. § 33–929(f)

Here, plaintiff alleges that defendants have committed tortious conduct and repeatedly solicited business in this state. Either allegation, if true, would subject defendants to personal jurisdiction under Connecticut's long-arm statute.

Even if the Court were to consider defendants' affidavits, which deny direct responsibility for the calls at issue, the FCC, in implementing the TCPA, stated that "the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Mem. Op. & Order, 100 FCC Rcd 12391, 12397 ¶ 13 (1995). As discussed above, defendants have not denied causing the calls at issue to be made. Even if they had, it would not make plaintiff's allegations legally insufficient. Accordingly, plaintiff has met his *prima facie* burden of demonstrating personal jurisdiction under Section 33–929(f)(4).

**\*3** Plaintiff also asserts personal jurisdiction based on defendants' repeated solicitation of business in Connecticut. Defendants respond that "CCL's contact with residents of Connecticut is limited to direct mailing and phone calls." Nevertheless, under Section 33–929(f)(2), if a defendant repeatedly solicits business in Connecticut, "a plaintiff need only demonstrate that the defendant could reasonably have anticipated being hauled into court here by some person who had been solicited in Connecticut and that the plaintiff's cause of action is not materially different from an action that might have resulted directly from that solicitation." *A Slice of Pie Productions, LLC v. Wayans Bros. Entertainment,* 392 F.Supp.2d 297, 304 (D.Conn.2005). Here, where plaintiff's causes of action are based upon phone solicitations themselves, the defendants could reasonably have anticipated being hauled into court where such solicitations were targeted. As discovery has not begun, plaintiff's well-pleaded allegations—that defendants' joint telemarketing scheme is widespread in Connecticut—satisfy the *prima facie* burden of demonstrating "continuous and systematic general business contacts." *See Metropolitan Life* 84 F.3d at 568. Accordingly, plaintiff has met his *prima facie* burden of demonstrating personal jurisdiction under Section 33–929(f)(2).

As the facts in plaintiff's complaint support the conclusion that defendants were responsible for the phone calls at issue in this case, and the phone calls were directed to Connecticut, defendants have sufficient minimum contacts with this forum to give rise to specific jurisdiction in the context of this lawsuit. *See Kernan v. Kurz–Hastings, Inc.* 175 F.3d 236, 242 (2d Cir.1999). Moreover, subjecting defendants to this Court's jurisdiction does not offend traditional notions of fair play and substantial justice. Indeed, defendants purposely availed themselves of the privilege of doing business in Connecticut and could foresee being haled into court here. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

Hudak v. Berkley Group, Inc., Not Reported in F.Supp.3d (2014)
2014 WL 354676

In determining whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice," the Second Circuit considers the following five *Asahi* factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Metropolitan Life,* 84 F.3d at 568; *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 11316 (1987).

There is no evidence that defendants will be subjected to undue hardship by defending this suit in Connecticut, where they admittedly solicit business, especially since "the conveniences of modern communication and transportation ease what would have been a serious burden" in the past. *ICG America, Inc. v. Wine of the Month Club, Inc.,* 2009 WL 2843261 at *8 (D.Conn.). The interests of Connecticut in adjudicating this case are compelling as the alternative would force Connecticut residents to seek justice afar, in this instance Florida, despite that defendants purposefully targeted their communications on Connecticut. In other words, Connecticut has a strong interest in ensuring citizens that are victims of tort or deception while in Connecticut may have their grievances addressed in Connecticut. Plaintiff's interest in obtaining convenient and effective relief is similarly strong in that the alternative—filing suit in Florida—may be so inconvenient as to be impracticable.

**\*4** The interstate judicial system's interest in obtaining the most efficient resolution of the controversy is a neutral factor. If plaintiff and all similar plaintiffs were forced to file suit in Florida, Florida courts could specialize in analyzing defendants' practices, increasing the efficiency of administering similar lawsuits. Nevertheless, fewer controversies would be resolved if, as is likely, the burden of travel on some potential plaintiffs would overmatch their will to bring suit. Finally, the shared interest of the states in furthering substantive social policies favors allowing plaintiff to bring suit here in Connecticut, as potential plaintiffs would be more likely to seek enforcement of social policies through suit when they can do so in their home state.

The five *Asahi* factors, considered together, weigh in favor of subjecting defendants to this Court's jurisdiction. Under the circumstances, assertion of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

Accordingly, the Court will not dismiss plaintiff's claims for lack of personal jurisdiction.

## II. Failure to State a Claim: "lumping"

Defendants argue that plaintiff impermissibly lumps them together, making it unclear which defendants are alleged to have committed which wrongs. The complaint clearly alleges that the two defendants acted jointly in violation of the TCPA by causing calls to be made to plaintiff's phone. Prior to discovery, plaintiff need not explain the details of each defendant's role in the planning, funding, and executing defendants' alleged joint telemarketing scheme. Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.

## III. Failure to State a Claim: TCPA

The relevant portion of the TCPA provides the following:

(1) Prohibitions

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

\* \* \*

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

47 U.S.C. § 227(b)(1)

Defendants argue that plaintiff fails to allege (1) that defendants made the calls at issue and (2) that defendants used automatic dialing technology and/or an artificial or prerecorded voice. Defendants contend that plaintiff has offered mere legal conclusions with no supporting facts. More specifically, defendants state, "Plaintiff must provide *facts,* which they [sic] have blatantly failed to do and cannot do, as no such facts exist."

**\*5** Neither of defendants' contentions has merit. Plaintiff's amended complaint alleges that defendants "made, or caused

a third-party to make on their behalf, up to two calls a day to [plaintiff's] cellular phone using an automated telephone dialing system with an artificial or prerecorded voice." Am. Compl. ¶ 13. Moreover, plaintiff's amended complaint contains supporting facts, including information from defendant Caribbean Cruise Lines' website. Under the "Terms and Conditions" section, the website provides the following:

This is an offer to sell travel and all recipients are entitled to the free round-trip Caribbean Cruise Line cruise with meals and entertainment included to and from Grand Bahama Island, with no purchase necessary.

* * *

Caribbean Cruise Line markets and is responsible for quality travel packages to promote specific hotels and resorts in Orlando, Ft. Lauderdale, and Grand Bahama Island which it exclusively owns and operates, and in return requires the attendance at a presentation on the sale of independent vacation ownership resorts such as Vacation Village at Bonaventure and Vacation Village at Parkway.

* * *

This advertising material is being used for the purpose of soliciting sales of a vacation ownership plan.

Am. Compl. ¶ 18. The two timeshare properties that defendant Caribbean Cruise Lines mentions by name on its website (Vacation Village at Bonaventure and Vacation Village at Parkway) are two of the properties that defendant Berkely markets and sells. In addition, these timeshares are featured in the sales presentation that "free" cruise recipients are required to attend. Finally, plaintiff points out that the Better Business Bureau gives defendant Caribbean Cruise Lines an "F" rating, noting that 1,336 complaints were closed in the last three years. Under the "Additional Complaint Information" section of that website, the Better Business Bureau states:

Our file contains a pattern of complaints from consumers who state they were contacted by this company and told they won a free three day two night cruise to the Bahamas. The only fees mentioned are the port fees in the amount of $59 per person. Some consumers state they are not told of additional fees or that they must attend a two hour timeshare presentation as a part of the agreement. Consumers report the timeshare presentation is very high pressure as well as high pressure sales to upgrade their cruise.

Am. Compl. ¶ 23.

While defendants argue that plaintiff's TCPA claim is not plausible, more implausible is the theory that defendants have nothing to do with a telephone marketing campaign for their own products and services. Plaintiff has adequately alleged that defendants made the calls at issue in this case.

Finally, defendants cite *Knutson v. ReplyA, Inc.* for the proposition that a court may not rely on naked assertions to infer that calls were randomly generated or impersonal. *See* 2011 WL 291076 at *2 (S.D.California). There, the California court was looking at whether the calls were randomly generated, not at whether they were prerecorded. Here, in contrast, plaintiff's amended complaint provides details about the hundreds of prerecorded calls that he received: "Defendants' Robocalls started with the sound of a horn and continued with an artificial or prerecorded voice prompting plaintiff to stay on the line to claim the 'free' cruise to the Bahamas he won." Am. Compl. ¶ 15. After receiving hundreds of calls, plaintiff is in a good position to determine if the calls were prerecorded. Accordingly, the Court is not relying on naked assertions. As plaintiff has adequately alleged that an artificial or prerecorded voice was used by defendants to make the calls at issue, plaintiff's TCPA claim will not be dismissed for failure to state a claim.

### IV. Emotional Distress: TCPA

**\*6** Defendants argue that binding legal authority prohibits emotional distress damages for a TCPA violation but then cite to cases from the District of Minnesota and the Northern District of Illinois. The cases cited by defendants do not come anywhere close to holding that emotional distress damages are not available for TCPA violations. *See Edeh v. Midland Credit Management, Inc.* 748 F.Supp.2d 1030, 1042 (D.Minn.2010) (finding unclear to what extent the plaintiff's emotional distress was attributable to the defendant's violation of the TCPA and holding that a reasonable jury could award the plaintiff damages for emotional distress); *Martin v. Leading Edge Recovery Solutions, LLC,* 2012 WL 3292838 at *4 (finding that the plaintiffs were *not required* to allege emotional distress in order to avoid having their case dismissed for lack of standing).

Plaintiff responds with persuasive authority that "a remedy offered by the TCPA is actual damages." *See Universal Underwriters Ins. Co. v. Lou Fusz Automotive Network, Inc.,* 300 F.Supp.2d 888, 893 (E.D.Mo.2004); *See also G.M. Sign, Inc. v. Group C Communications, Inc.* 2011 WL 98825 at *2 (N.D.Ill.) ("The TCPA provides for a private right of action

to recover the greater of actual damages or $500 in statutory damages for each violation."). Accordingly, the Court will not dismiss plaintiff's request for emotional distress damages at this time.

### V. Failure to State a Claim: CUTPA

Defendants argue that plaintiff has failed to state a claim for CUTPA violation. Plaintiff has not opposed dismissal of the CUTPA count. Accordingly, the CUTPA count will be dismissed.

### *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion to dismiss [doc. # 22] is GRANTED as to the CUTPA count but DENIED as to the TCPA count and as to plaintiff's request for emotional distress damages.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 354676

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Tab 37

2002 WL 34447541
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

Andrew HUNT, et al., Plaintiffs,

v.

AMERICAN WOOD PRESERVERS
INSTITUTE, et al., Defendants.

No. IP 02–0389–C–M/S.
|
July 31, 2002.

*ORDER*

LARRY J. McKINNEY, Chief District Judge.

**\*1** The Court GRANTS that portion of Defendant's, Universal Forest Products, Motion to Dismiss addressed to the Plaintiffs' medical monitoring claim, as such a claim is not cognizable in the State of Indiana.

The Court now orders the Plaintiffs to file an amended complaint on the additional counts, giving attention to the requirements of FRCP 8(a). The Court accepts Plaintiffs' declaration that they do not allege fraud against the Defendants.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 34447541

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 38

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 427 of 751
PageID: 11793
James v. Johnson & Johnson Consumer Companies, Inc., Not Reported in F.Supp.2d...
2011 WL 198026

2011 WL 198026
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Tenisha JAMES, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
JOHNSON & JOHNSON CONSUMER
COMPANIES, INC., Defendants.

Civil No. 10–cv–03049 (DMC)(JAD).
|
Jan. 20, 2011.

**Attorneys and Law Firms**

Scott M. Lempert, Sandals & Associates, P.C., Philadelphia, PA, for Plaintiff.

Daniel B. Carroll, Drinker, Biddle & Reath, LLP, Florham Park, NJ, for Defendant.

**OPINION**

DENNIS M. CAVANAUGH, District Judge.

**\*1** This matter comes before the Court upon motion by Johnson & Johnson Consumer Companies, Inc. ("Defendant") to dismiss the Plaintiff's Consolidated Amended Class Action Complaint ("CACAC") pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. Pursuant to Fed. R. Civ. Pro 78, no oral argument was heard. After considering the submissions of the parties, and based upon the following, Defendants motion is **granted.**

**I. BACKGROUND**

The ten plaintiffs joined in this Complaint allege that Defendant J & J violated the FDA's ban on methylene chloride as an ingredient in cosmetic products, pursuant to 21 C.F.R. § 700.19. Attorney for Plaintiffs previously brought six virtually identical cases before this Court, four of which were dismissed on August 2, 2010 for lack of standing pursuant to a motion for reconsideration filed by Defendant Johnson & Johnson.[1] The CACAC allegedly raises new factual and legal issues that distinguish this Complaint from the others

that were dismissed by this Court, including allegations that Johnson & Johnson has been investigated by the FDA, and that methyl chloride is an ingredient in its baby shampoo.

**II. *LEGAL STANDARD***

As the Supreme Court has long held, "Constitutional standing requires (1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Moreover, a "legally and judicially cognizable" injury-in-fact must be "distinct and palpable," not "abstract or conjectural or hypothetical." *Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotations omitted) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). As the Third Circuit has held, "while it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." *See Danvers Motor Co., Inc. v. Ford Motor Co.* 432 F.3d 286, 291 (C.A.3 (N.J.),2005).

"There is a fundamental difference of review under Fed.R.Civ.P. 12(b)(1), where the existence of disputed facts will not preclude the Court from evaluating the merits of the jurisdictional claim, and Fed.R.Civ.P. 12(b)(6) where the Court is required to accept as true all the allegations of the complaint and all inferences arising from them." *Anjelino v. New York,* 200 F.3d 73, 87 (Dd Cir., 1999). "[T]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." *Kehr Packages, Inc. V. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir., 1991).

**III. *DISCUSSION***

**\*2** The Court accepts Plaintiff's contention that economic injury is sufficient to confer Article III standing such that the Court has subject matter jurisdiction over this case. The Court notes the language of *Danvers Motor Co., Inc. v. Ford Motor Co.* 432 F.3d 286, 293 (C.A.3 (N.J.),2005) in which the Third Circuit held that "monetary harm is a classic form of injury-infact," and that "injury-in-fact is not Mount Everest." In spite of that language, however, Plaintiffs cannot clear

the threshold requirement for showing economic injury. As the Court understands the CACAC, the economic injury for which Plaintiffs seeks redress is the price Plaintiffs paid for shampoo, which they then apparently used in bathing their children, without adverse health reactions. Whatever injury they claim to have suffered due to their subsequent discovery of methyl chloride in the shampoo could not, therefore, have been economic.[2] Simply put, Plaintiffs bought and used shampoo, and subsequently wished that they had not done so because they feared for the future safety of their children. Their assertion that because the product was tainted, the injury occurred at the moment of purchase, is unavailing. Plaintiff's reasoning in the CACAC is circular and unpersuasive as to the contention that Plaintiffs suffered an injury-in-fact. The CACAC avers that "had Plaintiffs known the true nature of Defendant's baby shampoo, they neither would have purchased it nor allowed their children to be exposed to it." This is undoubtedly correct, but the conclusion that "consequently, Plaintiffs have been economically damaged" simply does not follow. (*See* ECF Doc. 27, page ID# 483). Presumably, had Plaintiffs known about the alleged toxicity of the shampoo prior to using the product they would either have returned it unopened, or not purchased it in the first place. Once the product had been consumed, however, there was no economic injury for Plaintiffs to complain of, and the fear of future injury is legally insufficient to confer standing. Plaintiffs received the benefit of their bargain so long as there were no adverse health consequences, and the product worked as intended, meaning that the hair of Plaintiff's children was cleansed, and their eyes and skin were not irritated. There is nothing in the CACAC to suggest otherwise. The Court finds that the facts as pled in the CACAC are legally insufficient to demonstrate an injury-in-fact of even the most

*de minimis* amount, and that no further restyling of the CACAC could overcome this jurisdictional hurdle. It would be both foolish and impossible to parse and measure the amount of shampoo each Plaintiff used prior to the discovery of taint, and the Court will not entertain such a fractionated analysis. Short of seeking redress for the unused portion of a bottle of shampoo that was discarded subsequent to discovery of the alleged contamination, a practical and legal absurdity, there is simply no cognizable economic injury. The Court need not reach the issue on which the previous four cases were dismissed, namely the contention that methyl chloride was not an "ingredient" as that term is understood by the Food and Drug Administration, although the Court notes that Plaintiff's syllogistic reasoning, that methyl chloride was a "component," and therefore an "ingredient" is neither a factual nor a legal improvement over Plaintiff's previous allegations. To the extent that there is no injury-in-fact, either economic or otherwise, the "per se" adulteration of the product is simply irrelevant to these Plaintiffs, since they have no standing to bring the claim before this Court. Plaintiff should consider this issue to have been fully litigated and thus precluded for future consideration by the Court.

### III. *CONCLUSION*

**\*3** For the reasons contained herein, Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is **granted** An appropriate order follows this opinion.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 198026

Footnotes

1    *Vercellono v. Gerber Products Co. et al.,* Case 2:09–cv–02905 DMC–MF, CLOSED 8/2/10; *Crouch v. Johnson and Johnson Consumer Cos., Inc. et al.,* Case 2:09–cv–02905 DMC–MF, CLOSED 8/2/10; *Levinson v. Johnson & Johnson Consumer Cos., Inc. et al.,* Case 2:09–cv–03317 DMC–MF, CLOSED 8/2/10; *Boyd v. Johnson & Johnson Consumer Cos. Inc.,* Case 2:09–cv–03135 DMC–MF; CLOSED 8/2/10.

2    It should be noted that Plaintiffs have not alleged economic injury on a theory that they paid a premium price for this brand of shampoo based on Johnson & Johnson's misrepresentation of their product as being safe and non-toxic for children, more so than comparable but less expensive alternatives. *See Desiano v. Warner–Lambert Co.,* 326 F.3d 339 (2d Cir., 2003).

End of Document                                              © 2020 Thomson Reuters. No claim to original U.S.
                                                                                        Government Works.

Tab 39

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 430 of 751
PageID: 11796
Jones v. Francis, Not Reported in F.Supp.2d (2013)

2013 WL 5603848
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Keith JONES, Dieunane Jean, Jayden Jones by
and Through His guardian ad litem Dieunane
Jean, Janiah Jones by and Through Her guardian
ad litem Dieunane Jean, Jordan Jones by and
Through His guardian ad litem, and Justin Jones
by and Through His guardian ad litem, Plaintiffs,
v.
Marvin FRANCIS, Carlisle Carrier Corp., John
Does 1–5 and ABC Corps. 1–10, Defendants.

Civil Action No. 13–04562(SRC).
|
Oct. 11, 2013.

**Attorneys and Law Firms**

Edward P. Capozzi, Fishman, McIntyre, PC, Fort Lee,
NJ, James P. Kimball, Seigel C,LLC, Ridgewood, NJ, for
Plaintiffs.

Matthew T. Pisano, Mount Laurel, NJ, for Defendants.

**OPINION**

CHESLER, District Judge.

 **\*1** This matter comes before the Court upon the Rule
12(b)(6) motion filed by Defendants Marvin Francis and
Carlisle Carrier Corp. (collectively, "Defendants") to dismiss
the punitive damages demand in Count One of the Complaint.
[Docket Entry 6.] Plaintiffs Keith Jones, Dieunane Jean,
Jayden Jones, Janiah Jones, Jordan Jones, and Justin Jones
(collectively, "Plaintiffs") have opposed the motion. [Docket
Entry 11.] The Court has considered the papers filed by the
parties, and, pursuant to Federal Rule of Civil Procedure 78,
rules on the motion without oral argument. For the reasons
stated herein, Defendants' motion will be denied.

**I. Background**

For purposes of the present motion, the Court accepts as
true all well-pleaded facts in the Complaint. *Pryor v.
Nat'l Collegiate Athletic Assoc.,* 288 F.3d 548, 559 (3d

Cir.2002). This lawsuit arises from an April 18, 2013
automobile accident. Plaintiffs allege that they were travelling
along Freeway Drive in East Orange, New Jersey when a
commercial vehicle owned by Defendant Carlisle Carrier
Corp. and driven by Defendant Marvin Francis struck their
automobile. (Compl.¶¶ 13, 17.) As a result of the collision,
Plaintiffs' vehicle was thrown over a retaining wall and onto
Interstate 280 twenty feet below. (Compl.¶ 19.) Plaintiffs
allege the collision was the result of the careless, negligent,
and reckless operation, maintenance, or repair of Defendants'
vehicle. (Compl.¶ 17.) Each Plaintiff was hospitalized with
substantial injuries.

Plaintiffs brought their personal injury and loss of consortium
lawsuit in New Jersey Superior Court, demanding judgment
for "compensatory damages, punitive damages, interest, costs
of suit, attorney's [sic] fees, and other such relief as the Court
may deem proper." (Compl. at 9–10 (First Count).) Because
the parties are completely diverse and the Complaint requests
damages well in excess of $75,000, Defendants removed to
this Court. [Docket Entry 1.] Defendants have now moved
under Rule 12(b)(6) to dismiss Plaintiffs' punitive damages
request, arguing that under federal pleading standards and
the New Jersey Punitive Damages Act Plaintiffs fail "to
state a claim that would support the imposition of punitive
damages...." (Mov. Br. at 2.) In other words, Defendants do
not argue that the Complaint fails to state a claim upon which
relief can be granted, but instead take issue with the nature of
the damages Plaintiffs request as one form of that relief.

**II. Discussion**

**A. Standard of Review**
A complaint will survive a motion under Rule 12(b)(6) only
if it states "sufficient factual allegations, accepted as true,
to 'state a claim for relief that is plausible on its face.' "
*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173
L.Ed.2d 868 (2009) (quoting *Bell Atlantic v. Twombly,* 550
U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). Following
*Iqbal* and *Twombly,* the Third Circuit has held that, to prevent
dismissal of a claim, the complaint must show, through the
facts alleged, that the plaintiff is entitled to relief. *Fowler
v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 431 of 751
PageID: 11797
Jones v. Francis, Not Reported in F.Supp.2d (2013)

While the Court must construe the complaint in the light most favorable to the plaintiff, it need not accept a "legal conclusion couched as a factual allegation." *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007); *Fowler,* 578 F.3d at 210–11; *see also Iqbal,* 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." *Iqbal,* 556 U.S. at 678.

**B. Viability of Plaintiffs' Request for Punitive Damages**

**\*2** Initially, the Court notes that Defendants' argument ascribes a breadth to the Supreme Court's *Twombly* and *Iqbal* decisions that is not warranted by the language of those cases or, in fact, Federal Rule of Civil Procedure 8(a) itself. As demonstrated in the standard of review section that accompanies this and every other opinion on a Rule 12(b)(6) motion, the "plausibility" pleading regime addresses the types of facts a plaintiff must allege to make out a cause of action, not the types of damages the alleged cause of action may eventually warrant. Indeed, nothing in *Twombly, Iqbal,* or their progeny refers to pleading requirements for damages requests at all; instead, the cases themselves analyze the well-pleaded facts exclusively in the context of the elements of the alleged cause of action. *See Iqbal,* 556 U.S. at 680, 687 ("Rule 8 does not empower respondent to plead the bare elements of his cause of action [for invidious discrimination] ... and expect his complaint to survive a motion to dismiss."); *see also Malleus v. George,* 641 F.3d 560, 563 (3d Cir.2011) ("a court must ... look[ ] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements [a plaintiff must plead to state a claim] are sufficiently alleged"). In sum, once a civil complaint shows a claim to be "facially plausible," *Fowler,* 578 F.3d at 210, nothing in Rule 8 or its judicial gloss suggests, let alone requires, that this Court scrutinize the damages requested by plaintiff as redress for that claim.

This conclusion is not altered by Defendants' reliance on New Jersey's Punitive Damages Act, N.J. Stat. Ann. § 2A:15–5.9 to –5.17. [1] Under the Act, punitive damages may be awarded only if the plaintiff "proves by clear and convincing evidence" that the harm suffered was the result of acts or omissions

"actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed...." *Id.* at § 2A:15–5.12(a). This burden of proof, Defendants argue, requires Plaintiffs to have plead "facts as to defendants' intentional, willful, or wanton conduct ... within the four corners of the Complaint." (Mov. Br. at 3.)

Defendants' argument fails. The excerpt from the Punitive Damages Act upon which Defendants rely is, quite simply, an "evidentiary inquiry," since "it defines the quantum of proof [Plaintiffs] must present" on the issue of punitive damages. *See Fowler,* 578 F.3d at 213. "Under the Federal Rules of Civil Procedure," however, "an evidentiary standard is not a proper measure of whether a complaint fails to state a claim." *Id.* (citing *Powell v. Ridge,* 189 F.3d 387, 394 (3d Cir.1999)). Should the opportunity arise in this case, Defendants can move under Rule 56(a) for summary judgment on the issue of punitive damages if Defendants believe Plaintiffs have failed to adduce proofs sufficient to carry their burden under New Jersey law. The Court, however, will not force Plaintiffs to use their pleadings to do so. [2]

**\*3** The Court also notes that punitive damages in the case of an automobile accident, while rare, are not out of the realm of possibility. Punitive damages awards been upheld where, for instance, an oil truck struck and killed a motorist and the nominal plaintiff submitted "substantial proof" that the truck was driven by an highly inexperienced driver who knew the brakes were not working but had not been trained how to fix them. *Smith v. Whitaker,* 313 N.J.Super. 165, 713 A.2d 20, 34–35 (N.J.Super.Ct.App.Div.1998). Elsewhere, the Appellate Division has held presenting proof that a driver who caused an accident was intoxicated plus evidence of "separate aggravating circumstances" creates a jury question on the issue of punitive damages. *See Dong v. Alape,* 361 N.J.Super. 106, 824 A.2d 251, 259 (N.J.Super.Ct.App.Div.2003). In short, a lawsuit arising from what may seem like "a simple motor vehicle accident" (*see* Mov. Br. at 3), may in fact turn out to be something more. Then again, it might not. It follows that the Court should not decide the availability or unavailability of punitive damages as a matter of law on a motion to dismiss, and Defendants' motion is thus denied . [3]

**III. Conclusion**

For the reasons stated herein, the Court will deny Defendants' motion to dismiss the request for punitive damages contained in Plaintiffs' Complaint. An appropriate form of Order will be filed.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5603848

## Footnotes

1    The parties do not dispute that New Jersey law applies here.

2    The Punitive Damages Act requires that a plaintiff specifically request a punitive damages award in the complaint. N.J. Stat. Ann. 2A:15–5.11. It stands to reason that if the New Jersey legislature intended for a heightened pleading standard—say, one which approximates an evidentiary burden of proof—to apply to such a request, the legislature would have said so. Instead, the Punitive Damages Act, as written, deals with pleading and proving punitive damages in two separate and entirely unrelated sections.

3    Were the Court to accept Defendants' argument, every request for damages, including standard fare like attorneys' fees or "such other relief as the Court may deem proper," (*see, e.g.,* Compl. at 10), could be attacked at the motion to dismiss stage, on the theory that the facts alleged did not support a claim for such a remedy. Requests for this type of relief, while boilerplate, embody a central tenet of notice pleading under the federal rules, even post *Twombly* and *Iqbal*—once a plaintiff plausibly states his cause of action, subsequent discovery may reveal facts that bring to light previously unknown but nevertheless appropriate redress.

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 40

144 Hawai'i 154
Unpublished Disposition
Unpublished disposition. See
HI R RAP Rule 35 before citing.
Intermediate Court of Appeals of Hawai'i.

Robert H. JOSLIN dba Hawaii Public
Adjusters, Plaintiff-Appellee/Cross-Appellant,

v.

OTA CAMP-MAKIBAKA ASSOCIATION,
INC., a Hawaii nonprofit corporation,
Defendant-Appellant/Cross-Appellee,

and

Taira Proctor and Melinda Domagsac,
Defendants-Appellees/Cross-Appellees,

and

Alterra Excess & Surplus Insurance Company,
Interpleader-Appellee/Cross-Appellee

NO. CAAP-15-0000545
|
April 5, 2019

APPEAL FROM THE CIRCUIT COURT OF THE FIRST
CIRCUIT (CIVIL NO. 14-1-2086-10 (KKS))

**Attorneys and Law Firms**

On the briefs:

Dennis W. King, Eric Seeleman, for Plaintiff-Appellee/Cross-Appellant.

Richard S. Ekimoto, Dan C. Oyasato, for Defendant-Appellant/Cross-Appellee.

(By: Ginoza, Chief Judge, Fujise and Leonard, JJ.)

___

MEMORANDUM OPINION

**\*1**    Defendant-Appellant/Cross-Appellee Ota Camp-Makibaka Association, Inc. (**Association**) appeals from a "Judgment" entered on June 24, 2015, by the Circuit Court of the First Circuit (**circuit court**)[1] and also challenges: an "Order Granting in Part and Denying in Part Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Counter Motion for Summary Judgment on Counts I, II, III, IV and V of Complaint Dated October 2, 2014 Against Defendant

Ota Camp-Makibaka Association, Inc., Taira Proctor, and Melinda Domagsac" (**Summary Judgment Order**), filed January 2, 2015; an "Order Denying Defendant Ota Camp-Makibaka Association, Inc.'s Motion to Dismiss Complaint Filed on October 2, 2014" (**Order Denying Dismissal**), filed January 2, 2015; and an "Order Granting Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Motion for Award of Attorneys' Fees and Costs" (**Attorney's Fee Order**), filed June 24, 2015.

Plaintiff-Appellee/Cross-Appellant Robert H. Joslin, DBA Hawaii Public Adjusters (**Joslin**) cross-appeals from the Summary Judgment Order and the Attorney's Fee Order.

On appeal, the Association argues the circuit court erred by: (1) concluding that Hawaii Revised Statutes (**HRS**) Chapter 431 is the more specific statutory provision over HRS Chapter 514B as it relates to the payment of insurance proceeds where a public adjuster is involved; (2) concluding that HRS § 431:9-230 (2005) grants Joslin the right to receive earned commissions for adjusting a claim, payable out of proceeds from Alterra Excess & Surplus Insurance Company (**Alterra**) paid to the Association under the Association's property insurance policy (**Policy**); (3) concluding that the Association was unjustly enriched by Joslin's contribution of labor and expertise; and (4) granting attorney's fees to Joslin.

On cross-appeal, Joslin contends that: (1) the circuit court should have granted an equitable lien to Joslin against the proceeds paid by Alterra; (2) the circuit court erred in concluding that the Association did not tortiously interfere in Joslin's contract with Taira Proctor and Melinda Domagsac (collectively, **Defendant Homeowners**) because there was no privity of contract between Joslin and the Association; and (3) should attorney's fees not be awarded under HRS § 632-3 (2016), attorney's fees are merited under either HRS §§ 514B-157 (2018) or 607-14 (2016).

For the reasons discussed below, we vacate and remand.

**I. Background**

**A. Undisputed Facts**

In this case, Joslin seeks to be compensated for his actions as a public adjuster on a claim made against an insurance policy issued to the Association for fire damage to a detached home located on Leowaena Place, in Waipahu, Hawai'i (**Subject Property**). The Subject Property was owned by the

Defendant Homeowners and subject to the "By-Laws of the Association of Apartment Owners of Ota Camp" (**Bylaws**).

On September 19, 2013, a fire destroyed the Subject Property.

On September 20, 2013, the Association submitted a claim to Alterra for all units damaged in the fire. The Association's adjuster confirmed the claim the same day, and inspected the site the following day.

**\*2** On September 21, 2013, Joslin, a Hawai'i licensed Public Insurance Adjuster, entered into a contract with the Defendant Homeowners to adjust their claim for damages to the Subject Property in exchange for a fee totaling twelve-percent of the insurance proceeds obtained, plus applicable taxes (**the Contract**). The Contract states, in relevant part:

> CLIENT'S ACCEPTANCE OF PERCENTAGE FEE AND OTHER FEES PAYMENT CLAUSE: Client or Clients or their subsequent heir(s) or benefactor(s) or trustee(s) do hereby agree to pay [Hawaii Public Adjuster (HPA) ] a sum equal to 12% (Twelve Percent) as a fee charge against all monies obtained, received or recovered by compromise, or agreement or judgment against the insurer, its subsidies or their agents- plus any outside and separate expert consultants' fees that may be required for the claim- plus a 4.166% SOH GET sales tax. APPROVAL FOR INCURRING ANY CONSULTANT'S FEES WILL FIRST BE OBTAINED FROM THE CLIENT IN WRITING.
>
> ....
>
> PAY WHEN PAID CLAUSE: The Client hereby agrees to pay, and shall authorize to pay, all HPA invoice(s) immediately when presented. Any PIA invoice shall not be due prior to the primary loss payment being issued from the insurer. Each payment pertaining to this claim(s) shall be remunerated to HPA in the promptest manner.
>
> ENGAGEMENT NOTICE: The Client does herein further agree that the amounts eminently due under this contract shall be issued as a joint check naming Hawaii Public Adjusters and the client(s). The assignment of the insurer's payments is for the security of monies to be paid and owing to HPA. The Client(s) shall execute an ENGAGEMENT NOTICE TO INSURER(S). The separate document provides, in part, a notice to the insurer(s), agents, adjusters, any mortgage company named and any property financer or lien holders named or unnamed in the policy.

The engagement notice is without regards to the position or positions held or encumbrances on or upon or against the client or the clients' insured property; of HPA's primary position with regards to amounts owed. The notice also provides other information concerning the engagement and representation of HPA. The Client(s) hereby acknowledges and further accept this additional document as being part of this contract by initialing below.

On the same day, Defendant Homeowners signed an "Engagement Notice to Insurer(s), Agents, Adjusters, Contractors and Mortgagees" (**Engagement Notice**).

Over the next several months, Joslin, on behalf of the Defendant Homeowners, pursued insurance proceeds for the Subject Property claim from Alterra.

On December 18, 2013, Joslin filed a complaint with the Insurance Division, State of Hawaii (**Insurance Division Complaint**) arguing, *inter alia*, that Alterra has failed to timely perform its obligations to Defendant Homeowners pursuant to ⬛ HRS § 431:13-103(11) (2005) by virtue of Alterra's delayed response or payment.

On February 5, 2014, Engle Martin & Associates, Inc., (**EMCAS**) the third party claim administrative firm assigned by Alterra to investigate the Subject Property claim, sent a check to Joslin for $231,940.00, made out to "OTA Camp Makibaka Association, Inc., Taira Proctor; Melinda Domagsac; and Hawaii Public Adjusters." This amount exceeded the total insurance upon the Subject Property, $219,440.00, as set forth in the Policy.

On February 10, 2014, Joslin sent a letter to the Defendant Homeowners with the EMCAS check for their signature. The letter referred to the check as "your check" and requested that "yourselves and Ota Camp Makibaka Association" sign and return it. The letter stated that the check would be deposited into a client trust account, the fees would be removed, and a new check issued from Joslin. The letter included an invoice for Joslin's services totaling $28,992.31.

**\*3** On February 14, 2014, Richard Ekimoto (**Ekimoto**), legal counsel for the Association, stated in an email to Equity Properties (**Equity**), the property management company for the Association, that under the Bylaws, the Association is responsible for the repair of the unit. Thus, if the Association signs the check over to the Defendant Homeowners and they

do not repair the unit, the Association will have breached its duty and be liable to the current owners. [2]

On September 4, 2014, Ekimoto sent a letter to EMCAS, stating:

> This letter is being written with respect to the above-referenced claim [regarding the Subject Property] and the subsequent settlement payment issued by Alterra. This letter shall also serve as notice of the Association's request that the settlement payment check [pertaining to the Subject Property] be cancelled upon receipt of this letter, and properly reissued as payable to the order of OTA CAMP MAKIBAKA ASSOCIATION, INC., as the sole payee. This request is made pursuant to 🔖 Hawaii Revised Statutes ("HRS") § 514B-143, and the Association in its capacity and as the Named Insured on [the Policy].

### B. Procedural Background

On October 2, 2014, Joslin filed a Complaint against the Defendant Homeowners and the Association, requesting: (1) a declaratory judgment that Joslin is entitled to fees under 🔖 HRS § 431:9-230, and that public adjusters are entitled to an equitable lien against insurance proceeds (**Count I**); (2) a finding that the Association was unjustly enriched by Joslin's actions (**Count II**); (3) the grant of an equitable lien against the insurance proceeds (**Count III**); (4) a finding that the Defendant Homeowners breached their contract with Joslin and the implied covenant of good faith and fair dealing (**Count IV**); and (5) a finding that the Association's actions amounted to tortious interference in the contractual relationship between Joslin and the Defendant Homeowners (**Count V**).

On October 24, 2014, non-party Alterra filed a "Motion to Intervene and for Interpleader Relief."

On October 30, 2014, the Association filed a "Motion to Dismiss Complaint Filed on October 2, 2014" (**Motion to

Dismiss**) on the grounds that: (1) Joslin is not entitled to proceeds from the Association's policy because 🔖 HRS § 431:9-230 is inapplicable and 🔖 HRS § 514B-143(a)(1) (2006) requires the Association to use all proceeds for the benefit of the Subject Property; (2) Joslin acted outside the scope of his license as a public adjuster and Joslin had no contract with the Association; (3) no provision of law allows for an equitable lien on the insurance proceeds; (4) there was no unjust enrichment because the Association did not benefit from Joslin's services; and (5) the Association did not interfere with contractual relations between Joslin and the Defendant Homeowners.

On November 13, 2014, Joslin filed a "Counter Motion for Summary Judgment on Counts I, II, III, IV, and V of the Complaint dated October 2, 2014" (**Counter Motion for Summary Judgment**).

On December 1, 2014, the circuit court held a hearing on the Motion to Dismiss and the Counter Motion for Summary Judgment. The circuit court granted Alterra's motion to intervene and interplead the disputed proceeds to the clerk of the court for distribution, denied the Motion to Dismiss, and entered the Summary Judgment Order granting in part the Counter Motion for Summary Judgment as to Count I. The circuit court ruled that Joslin was entitled to have his commission paid from the insurance proceeds as a public adjuster because 🔖 HRS § 431:9-230 is the more specific statute over 🔖 HRS § 514B-143, and directed that Joslin's commission be paid out of the interpleaded funds. The circuit court also provided rulings in the alternative for Counts II, IV and V in case the circuit court's interpretation of the statutes was incorrect as to Count I. Specifically, the circuit court ruled in the alternative that: (1) the Defendant Homeowners are contractually bound by the Contract to Joslin; (2) for the question in equity, Joslin did confer a benefit on the Association, but there exists a genuine issue of material fact as to the amount of value actually conferred; and (3) the Association did not have privity of contract with Joslin and thus could not have tortiously interfered in the contractual relationship between Joslin and the Defendant Homeowners. The circuit court did not mention the potential existence of an equitable lien for Joslin against the proceeds.

**\*4**  On May 27, 2015, Joslin filed his "Motion for Award of Attorneys' Fees and Costs" given the Summary Judgment Order. Joslin based his claim for attorney's fees and costs on

HRS § 607-14 (2016), § 632-3 (2016), and 📘 § 514B-157(a) (2018).

On June 24, 2015, the circuit court issued the Judgment pursuant to the Summary Judgment Order.

On June 24, 2015, the circuit court also issued the Attorney's Fee Order in favor of Joslin, awarding $53,217.25 in attorney's fees pursuant to HRS § 632-3 because the court had ruled in favor of Joslin on his declaratory judgment claim in Count I.

On July 23, 2015, the Association timely appealed.

On August 6, 2015, Joslin timely cross-appealed.

## II. Standards of Review

### A. Summary Judgment

The appellate court reviews "the circuit court's grant or denial of summary judgment *de novo*." Accordingly, "[o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."

Kawashima v. State, 140 Hawai'i 139, 148, 398 P.3d 728, 737 (2017) (internal citations omitted) (formatting altered).

Moreover, "summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." 📘 Bhakta v. Cty. of Maui, 109 Hawai'i 198, 207-08, 124 P.3d 943, 952-53 (2005) (citation omitted).

### B. Statutory Interpretation

Statutory interpretation is a question of law reviewable *de novo*. Our construction of statutes is guided by the following rules: First the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and

unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

Kawashima, 140 Hawai'i at 148-49, 398 P.3d at 737-38 (internal citations and quotation marks omitted) (formatting altered).

### C. Attorneys' Fees

> [The appellate] court reviews the denial and granting of attorney's fees under the abuse of discretion standard. The same standard applies to [the appellate] court's review of the amount of a trial court's award of attorney's fees. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*5 📘 Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 106 Hawai'i 416, 431, 106 P.3d 339, 354 (2005) (internal quotation marks, citations, brackets, and ellipses omitted) (quoting 📘 Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 92 Hawai'i 432, 439, 992 P.2d 127, 134 (2000) (citation omitted)).

## III. Discussion

### A. Applicable Statutory Provisions: HRS Chapter 431 or 📘 HRS § 514B-143

Joslin v. Ota Camp-Makibaka Association, Inc., 144 Hawai'i 154 (2019)
438 P.3d 286

The Association argues that the circuit court erred when it concluded that: statutes in HRS Chapter 431 were more specific than  HRS § 514B-143 (2006) regarding commissions owed to Joslin, as a public adjuster, for the insurance proceeds paid through the Policy issued to the Association; and under  HRS § 431:9-230, Joslin was entitled to receive his commissions for services rendered in adjusting the claim in this case.

The relevant provisions in HRS Chapter 431 are HRS §§ 431:9-105 (Supp. 2006) and  431:9-230. HRS § 431:9-105 provides, in relevant part:

> § 431:9-105 Definitions. As used in this article, unless the context otherwise requires:
>
> "Adjuster":
>
> (1) Means any individual who:
>
> > (A) Acts solely on behalf of either the insurer or the insured, as an independent contractor or as an employee of an independent contractor; and
> >
> > (B) Investigates for, reports to, or adjusts for the individual's principal relative to claims arising under insurance contracts; but
>
> (2) Does not include an individual who is:
>
> > (A) An attorney at law who adjusts insurance losses from time to time incidental to the practice of the attorney's profession;
> >
> > (B) An adjuster of marine losses;
> >
> > (C) A salaried employee of an insurer or salaried employee of an adjusting corporation or an association owned or controlled by an insurer; or
> >
> > (D) An individual who acts for a self-insurer or for an insured that administers its own group insurance contract.
>
> "Independent adjuster" means an adjuster representing the interests of the insurer.
>
> ....
>
> "Public adjuster" means an adjuster employed by and solely representing the financial interests of the insured named in the policy.

(Emphasis added). Further,  HRS § 431:9-230 provides, in relevant part:

>  § 431:9-230. Reporting and accounting for premiums.
> (a) Every licensed adjuster shall have the responsibilities of a trustee for all premium and return premium funds received or collected under this article.
>
> (b) The licensee, upon receipt of the funds, shall either:
>
> (1) Remit the premiums (less commissions) and return premiums received or held by the licensee to the insurers or the persons entitled to such funds; or
>
> (2) Maintain the funds at all times in a federally insured account with a bank, savings and loan association, or financial services loan company situated in Hawaii, separate from the licensee's own funds or funds held by the licensee in any other capacity, in an amount at least equal to the premiums (net of commissions) and return premiums received by such licensee and unpaid to the insurers or persons entitled to such funds. Return premiums shall be returned within thirty days, unless directed otherwise in writing by the person entitled to the funds.
>
> The licensee shall not be required to maintain a separate bank account or other account for the funds of each insurer or person entitled to such funds, if and so long as the funds held for the insurer or person entitled to such funds are reasonably ascertainable from the books of account and records of the licensee. Only such additional funds as may be reasonably necessary to pay bank, savings and loan association, or financial services loan company charges may be commingled with the premium funds. In the event the bank, savings and loan association, or financial services loan company account is an interest earning account, such licensee may not retain the interest earned on such funds to the licensee's own use or benefit without the prior written consent of the insurers or person entitled to such funds. A premium trustee account shall be designated on the records of the bank, savings and loan association, or financial services loan company as a "trustee account established pursuant to  section 431:9-230, Hawaii Revised Statutes", or words of similar import.

**\*6** (Emphasis added).

In turn, ▢ HRS § 514B-143 (2006) provides, in relevant part:

▢ § 514B-143 Insurance. (a) Unless otherwise provided in the declaration or bylaws, the association shall purchase and at all times maintain the following:

(1) Property insurance:

(A) On the common elements;

(B) Providing coverage for special form causes of loss; and

(C) In a total amount of not less than the full insurable replacement cost of the insured property, less deductibles, but including coverage for the increased costs of construction due to building code requirements, at the time the insurance is purchased and at each renewal date;

....

(b) If a building contains attached units, the insurance maintained under subsection (a)(1), to the extent reasonably available, shall include the units, the limited common elements, except as otherwise determined by the board, and the common elements. The insurance need not cover improvements and betterments to the units installed by unit owners, but if improvements and betterments are covered, any increased cost may be assessed by the association against the units affected.

For the purposes of this section, "improvements and betterments" means all decorating, fixtures, and furnishings installed or added to and located within the boundaries of the unit, including electrical fixtures, appliances, air conditioning and heating equipment, water heaters, or built-in cabinets installed by unit owners.

(c) If a project contains detached units, then notwithstanding the requirement in this section that the association obtain the requisite coverage, if the board determines that it is in the best interest of the association to do so, the insurance to be maintained under subsection (a)(1) may be obtained separately for each unit by the unit owners; provided that the requirements of subsection (a)(1) shall be met; and provided further that evidence of such insurance coverage shall be delivered annually to the association. In such event, the association shall be named as an additional insured.

(d) The board, in the case of a claim for damage to a unit or the common elements, may:

(1) Pay the deductible amount as a common expense;

(2) After notice and an opportunity for a hearing, assess the deductible amount against the owners who caused the damage or from whose units the damage or cause of loss originated; or

(3) Require the unit owners of the units affected to pay the deductible amount.

....

(f) Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association. The insurance proceeds for that loss shall be payable to the association, or to an insurance trustee designated by the association for that purpose. The insurance trustee or the association shall hold any insurance proceeds in trust for unit owners and secured parties as their interests may appear.

(Emphasis added).

The circuit court held that the definitions of "adjuster" and "public adjuster" in HRS § 9:9-105 were ambiguous and thus could be interpreted liberally to allow public adjusters to represent individuals "named in the policy, covered, or protected by the policy, irrespective of whether the individual is the holder of the insurance policy." Following this definition, the court found that Joslin and the Association are both trustees for the Defendant Homeowners "who are the beneficiaries covered or protected by the policy" under

▢ HRS §§ 431:9-230(a) and ▢ 514B-143(f), respectively.

The court held that since a public adjuster is involved, ▢ HRS § 431:9-230(a) is the more specific statute and thus "[Joslin] is entitled to receive its commissions for services rendered in adjusting the claim." The circuit court ordered that Joslin be paid his commission in the amount of $28,992.31 from the insurance proceeds interpleaded to the clerk of the court.

**\*7** We agree with the circuit court only to the extent that, in the context of HRS Chapter 431 Article 9, the definition of "public adjuster" in HRS § 431:9-105 is ambiguous as to whether it allows a public adjuster to represent an insured who is not expressly named in a policy, but is nonetheless covered by the policy. HRS § 431:9-105 defines

a "public adjuster" as "an adjuster employed by and solely representing the financial interests of the insured **named in the policy**[,]" (emphasis added) which suggests the insured to whom the policy is issued. However, HRS § 431:9-226 (2005) provides that an adjuster is authorized to act "only on behalf of **insureds** if licensed as a public adjuster." (Emphasis added). Reading HRS Chapter 431 Article 9 as a whole, we agree there is ambiguity as to whom a public adjuster is authorized to represent.

We need not resolve this ambiguity, however, because we ultimately disagree with the circuit court's interpretation that HRS § 431:9-230 provides authority for Joslin to be paid commissions out of the insurance proceeds paid under the Association's policy. Rather, this statute deals with an adjuster's responsibilities as trustee "for all premium and return premium funds received or collected under this article." HRS § 431:9-230. Although "premium and return premium funds" are not defined in Article 9, the plain reading of "premium" in the insurance context is meant as "[t]he amount paid at designated intervals for insurance; esp., the periodic payment required to keep an insurance policy in effect." Black's Law Dictionary 1371 (10th ed. 2014); see also Merriam-Webster's Collegiate Dictionary 980 (11th ed. 2003) (defining "premium" as "the consideration paid for a contract of insurance[.]"). Indeed, HRS § 431:9-230 references in several parts that the premium funds in issue are for the "insurer" or other persons entitled to the funds. HRS §§ 431:9-230(b)(1) and (2). Nothing in HRS § 431:9-230 suggests that it is addressing insurance proceeds paid by an insurer due to a claim on a policy.[3] We thus disagree with the circuit court's ruling that Joslin was entitled to commissions based on HRS § 431:9-230.

We conclude that HRS § 514B-143 is the applicable statute for purposes of this case. Specifically, HRS § 514B-143(f) provides:

> (f) Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association. The insurance proceeds for that loss shall be payable to the association, or to an insurance

trustee designated by the association for that purpose. The insurance trustee or the association shall hold any insurance proceeds in trust for unit owners and secured parties as their interests may appear.

(Emphasis added).

Joslin argues that HRS § 514B-143(f) does not apply to this case because the property insurance required under HRS § 514B-143(a)(1) applies only to the common elements, not to individual units, of the Ota Camp-Makibaka subdivision. We disagree.

HRS § 514B-143(a)(1) provides:

> (a) Unless otherwise provided in the declaration or bylaws, the association shall purchase and at all times maintain the following:
>
> (1) Property insurance:
>
>> (A) On the common elements;
>>
>> (B) Providing coverage for special form causes of loss; and
>>
>> (C) In a total amount of not less than the full insurable replacement cost of the insured property, less deductibles, but including coverage for the increased costs of construction due to building code requirements, at the time the insurance is purchased and at each renewal date[.]

**\*8** (Emphasis added). In turn, subsections (b) and (c) dealing with the "units" in an association expressly contemplate the property insurance set out in subsection (a)(1) as covering the "units."[4] HRS §§ 514B-143 (b) and (c) provide:

> (b) If a building contains attached units, the insurance maintained under subsection (a)(1), to the extent reasonably available, shall include the units, the limited common elements, except as otherwise determined by the board, and the common elements. The insurance need not cover improvements and betterments to the units installed by unit owners, but if improvements and betterments

are covered, any increased cost may be assessed by the association against the units affected.

For the purposes of this section, "improvements and betterments" means all decorating, fixtures, and furnishings installed or added to and located within the boundaries of the unit, including electrical fixtures, appliances, air conditioning and heating equipment, water heaters, or built-in cabinets installed by unit owners.

(c) If a project contains detached units, then notwithstanding the requirement in this section that the association obtain the requisite coverage, if the board determines that it is in the best interest of the association to do so, the insurance to be maintained under subsection (a)(1) may be obtained separately for each unit by the unit owners; provided that the requirements of subsection (a)(1) shall be met; and provided further that evidence of such insurance coverage shall be delivered annually to the association. In such event, the association shall be named as an additional insured.

(Emphasis added.)

We thus reject Joslin's argument that the property insurance required under subsection (a)(1) pertains only to the common elements. Rather, reading HRS § 514B-143 as a whole establishes that the property insurance referred to in subsection (a)(1) applies to the units as well. However, as to "detached" units, an association board may decide that the insurance under subsection (a)(1) "may be obtained separately for each unit by the unit owners[,]" as specified in subsection (c).

In sum, then, HRS § 514B-143(f) applies in this case and provides in pertinent part: "Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association. The insurance proceeds for that loss shall be payable to the association, or to an insurance trustee designated by the association for that purpose." There is no statutory basis for Joslin to be paid out of the insurance proceeds paid under the Policy issued to the Association.

Thus, the circuit court erred in granting summary judgment in favor of Joslin, and denying the Association's motion to dismiss, with respect to Count I of Joslin's Complaint seeking declaratory judgment.

**B. The Association did not tortiously interfere with the contract between Joslin and the Defendant Homeowners.**

The circuit court correctly concluded in its Summary Judgment Order that there was no tortious interference by the Association with the Contract between Joslin and the Defendant Homeowners.

**\*9**  The Hawai'i Supreme Court has held that the elements of a claim for tortious interference in contractual relations are:

> 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff.... [I]t is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

Weinberg v. Mauch, 78 Hawai'i 40, 50, 890 P.2d 277, 287 (1995).

In this case, although there is a contract between Joslin and the Defendant Homeowners and the Association acquired knowledge of the contract, not all elements of the claim are satisfied. There is no evidence that the Association induced the Defendant Homeowners to withhold payment from Joslin under the contract. Furthermore, there is no absence of justification on the part of the Association. Rather, as the Association asserts, Joslin had no statutory right to the proceeds because HRS § 431:9-230 does not apply to proceeds from an insurance claim. Here, the Association was justified in taking actions which effectively prevented the Defendant Homeowners from paying Joslin out of the proceeds paid under the policy issued to the Association.

Joslin v. Ota Camp-Makibaka Association, Inc., 140 Hawai'i 254 (2019)
438 P.3d 286

Joslin cannot prevail on his claim that the Association tortiously interfered in the contract between himself and the Defendant Homeowners, and the circuit court did not err in this regard.

### C. There exist: genuine issues of material fact as to whether the Association was unjustly enriched under equitable principles.

The circuit court erred in concluding as a matter of law that the Association was unjustly enriched by the actions of Joslin. Specifically, the court concluded without comment that the Association received a benefit from Joslin because Joslin "caused Alterra to issue an undisputed payment for $231,940.00[,]" and "[i]t would be unjust for [the Association] to retain the benefit of [Joslin]'s contribution of labor and expertise without compensating [Joslin]." Upon review of the record on appeal, we conclude that there exist genuine issues of material fact as to whether the Association was unjustly enriched by the actions of Joslin.

The Hawai'i Supreme Court has held:

It is a truism that "[a] person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or cho[o]ses in action, ..., or in any way adds to the other's security or advantage." Restatement of Restitution § 1 comment b (1937). One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust. Id. § 1 comment a. And it is axiomatic that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Id. § 1. We realize unjust enrichment is a broad and imprecise term defying definition. But in deciding whether there should be restitution here, we are guided by the underlying conception of restitution, the prevention of injustice. See A. Denning, The Changing Law 65 (1953).

*10 Durette v. Aloha Plastic Recycling, Inc., 105 Hawai'i 490, 502-03, 100 P.3d 60, 72-73 (2004) (footnotes omitted)

(citing Small v. Badenhop, 67 Haw. 626, 635-36, 701 P.2d 647, 654 (1985)) (emphasis omitted).

The dispositive questions in the instant case are whether, when viewed in a light most favorable to the Association, a genuine issue of material fact exists as to: (1) whether Joslin conferred a benefit upon the Association by causing Alterra to issue an undisputed payment for $231,940.00, and (2) whether the Association's retention (of the money resulting

from Joslin's labor and expertise without compensating Joslin) was unjust. Id. at 503, 100 P.3d at 73 (citing Simmons v. Puu, 105 Hawai'i 112, 117-18, 94 P.3d 667, 672-73 (2004)).

First, as to whether Joslin conferred a benefit upon the Association by causing Alterra to issue an undisputed payment for $231,940.00, we note that Joslin's investigation and adjustment of the claim on behalf of the Homeowners occurred roughly parallel to the Association's own independent pursuit of the claim.

The Association first initiated the claim on September 20, 2013, the day after the fire, through its own insurance agent, who confirmed the claim the same day. On September 21, 2013, Alterra's adjuster conducted an initial inspection. On October 5, 2013, Alterra's adjuster submitted his report with a Replacement Cost Value (**RCV**) (as required by the Policy) for the Subject Property of $258,128.64, well over the Policy's maximum payable value for the Subject Property of $219,440.00.

Joslin was engaged by the Defendant Homeowners on September 21, 2013, and did not submit his proof of loss binder to the Association's adjuster on behalf of the Defendant Homeowners until October 18, 2013. Over the next two months, Alterra worked through EMCAS to conduct additional inspections and investigate any possibilities for subrogation. Despite Joslin's frequent insistence in various pleadings, there is no evidence that Alterra was preparing to deny the claim due to arson. Joslin's pleadings are the only documents in the record to use the word "arson." On December 26, 2013, Alterra's further inspections returned an RCV of $265,707.50, again in excess of the maximum value allowed under the Policy.

Joslin argues in his Answering Brief that his activities, including "expert review of the bylaws, insurance policy, and schedule of properties; production of an extensive 'proof of loss binder'; fending off a subrogation investigation; and persistently pressuring the insurance company to make a payment on the claim through direct communications and communication with the Insurance Division of the State of Hawaii[,]" were directly responsible for the payment to the Association. In other words, Joslin argues that his activities, rather than the actions of the Association's own insurance agent, Alterra, or EMCAS, are what conferred a benefit on the Association.

Joslin v. Ota Camp-Makibaka Association, Inc., 144 Hawai'i 158 (2019)

438 P.3d 286

While there is evidence showing Joslin's activities, there is also evidence that activities were conducted (both earlier and later than Joslin) by both the Association's own insurance agent and by Alterra through EMCAS. Thus, there remains a genuine issue of material fact as to whether it would be unjust for the Association not to compensate Joslin.

 **\*11** Joslin claims unjust enrichment because the Association refuses to pay despite the fact that Joslin "acted in good faith and worked cooperatively and in concert with the Association and Defendant Homeowners at all times in attempting to [benefit the parties]" 🔖 Badenhop 67 Haw. at 635, 701 P.2d at 653-54. This formulation misstates the reasoning in Badenhop, which required not only good faith and cooperation by the aggrieved party, but also the existence of a fiduciary or confidential relationship between the parties. 🔖 Id. at 636-37, 701 P.2d at 654-55. According to the court in Badenhop, such a relationship is very broad: any relationship "in which confidence has been reposed and betrayed." 🔖 Id. at 637, 701 P.2d at 655 (quoting Meheula v. Hausten, 29 Haw. 304, 314 (1926) (citation omitted)).

In this case, there remains a genuine issue of material fact as to whether such a relationship existed between Joslin and the Association. Joslin repeatedly asserts that his notice to the Association of his representation of the Defendant Homeowners is sufficient to establish that Joslin was also working on behalf of the Association. However, the Engagement Notice that Joslin points to as establishing such a relationship only provides notice to "insurer(s), agents, adjusters, contractors and mortgagees[,]" "any mortgage company or companies named," and "any property financer or lien holders[.]" There is no indication from that language that the Association should have known that Joslin was operating on its behalf.

Finally, in balancing equities, the Supreme Court of Hawai'i has expressed that "he who comes into equity must come with clean hands[,]" 7's Enters., Inc. v. Del Rosario, 111 Hawai'i 484, 494, 143 P.3d 23, 33 (2006), and "whether the party against whom the maxim is sought to be applied engaged in iniquitous conduct is primarily a question of fact[.]" Shinn v. Edwin Yee, Ltd., 57 Haw. 215, 230, 553 P.2d 733, 743 (1976). In this case, viewed in the light most favorable to the Association, Joslin signed a contract with the Defendant Homeowners, then, after reviewing a copy of the Policy, Joslin continued to solely represent the Defendant Homeowners and never directly approached

the named insured in the Policy (the Association) about representing the Association in its claim under the Policy. Joslin then claimed both a contractual and statutory right to insurance proceeds which the other party to the contract (the Defendant Homeowners) did not have authority to authorize and which Joslin, as a licensed public adjuster, did not have statutory authority to claim.

Thus, the circuit court erred in concluding in the alternative that there exist no genuine issues of material fact with regard to whether the Association was unjustly enriched by the activities of Joslin.

### D. Joslin is not entitled to an equitable lien against the proceeds.

Joslin asserts on appeal that the circuit court erred in not concluding that Joslin should be entitled to an equitable lien against the proceeds paid by Alterra. The circuit court made no conclusion or finding on this issue in either its Summary Judgment Order or Judgment, except to say the issue is moot if Joslin prevailed under Count I of the Complaint. As Joslin cannot prevail under Count I of the Complaint for reasons discussed *supra*, we now review the issue of whether Joslin is entitled to an equitable lien.

In his Complaint, Joslin requested an equitable lien against the proceeds solely as a remedy in the event that he prevailed on his claim of unjust enrichment. "This court has observed that '[t]he necessary prerequisite ... [for] equitable remedies is ... the absence of an adequate remedy at law.' " 🔖 Porter v. Hu, 116 Hawai'i 42, 55, 169 P.3d 994, 1007 (App. 2007) (quoting 🔖 Bd. of Dirs. of the Ass'n of Apt. Owners of Regency Tower Condo. Project v. Regency Tower Venture (Regency Tower Venture), 2 Haw. App. 506, 513, 635 P.2d 244, 249 (1981)). Specifically, upon a ruling in equity, "[r]estitution, ... may be accomplished 'not only by ... compelling the surrender ... of property ..., but also by imposing an equitable lien upon the property in favor of the plaintiff.' " 🔖 Badenhop, 67 Haw. at 639, 701 P.2d at 656. Thus, an equitable lien is only available as a means of restitution in equity when other remedies at law are unavailable. In this case, the funds at issue have been ordered interpleaded to the Clerk of the Court and there is no need to grant an equitable lien against them in favor of Joslin; the funds will be distributed by the Clerk of the Court in accordance with the final judgment in this case.

**\*12**  On appeal, Joslin substantially expanded his argument by additionally requesting that an equitable lien be granted in order to give HRS § 431:9-230(b)(1) full effect in protecting public adjusters' rights to be paid out of the proceeds of an insurance contract for services.

Joslin's argument is without merit. As discussed *supra*, HRS § 431:9-230 does not establish a public adjuster's right to commissions out of proceeds paid under an insurance policy.

**E. The Circuit Court erred in granting attorney's fees to Joslin.**

We conclude above that Joslin does not have a statutory right to receive his commissions from the insurance proceeds under the policy issued to the Association, and that the circuit court erred in granting summary judgment for Joslin on his declaratory judgment claim in Count I. Given these rulings, the circuit court also erred in awarding attorney's fees to Joslin under HRS § 632-3.

With regard to Joslin's cross-appeal contention that he is alternatively entitled to attorney's fees under HRS § 514B-157 or § 607-14, we do not reach those issues because they were not addressed by the circuit court.

**IV. Conclusion**

Based on the foregoing, we vacate the Circuit Court of the First Circuit's "Judgment" entered on June 24, 2015, the "Order Granting Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Motion for Award of Attorneys' Fees and Costs" entered on June 24, 2015, and the "Order Granting in Part and Denying in Part Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Counter Motion for Summary Judgment on Counts I, II, III, IV, and V of Complaint Dated October 2, 2014 Against Defendants Ota Camp-Makibaka Association, Inc., Taira Proctor, and Melinda Domagsac" entered on January 2, 2015. We further vacate the "Order Denying Defendant Ota Camp-Makibaka Association, Inc.'s Motion to Dismiss Complaint Filed on October 2, 2014" entered on January 2, 2015, to the extent that it is inconsistent with this Memorandum Opinion.

This case is remanded to the circuit court for further proceedings consistent with this Memorandum Opinion.

**All Citations**

144 Hawai'i 154, 438 P.3d 286 (Table), 2019 WL 1500008

**Footnotes**

1    The Honorable Karl K. Sakamoto presided.

2    On November 18, 2013, two months after the fire, the Defendant Homeowners deeded the Subject Property to Jermaine Kailani Dias and Darcelle Felisse Dias. In this appeal, we do not address the Association's duties with respect to the unit owners.

3    We do not suggest that public adjusters are not entitled to commissions, as commissions are clearly contemplated in both HRS § 431:9-229 (2005) and HRS § 431:9-230. Rather, we simply hold that HRS § 431:9-230 does not deal with commissions from proceeds paid on an insurance claim.

4    In this case, it appears undisputed that the Subject Property is a detached unit within the Association.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    11

Tab 41

Koronthaly v. L'Oreal USA, Inc., 374 Fed.Appx. 257 (2010)

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by City of Greenville, Ill. v. Syngenta Crop Protection, Inc., S.D.Ill., November 18, 2010

374 Fed.Appx. 257
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Ruth KORONTHALY, individually
and on behalf of all others
similarly situated, Appellant

v.

L'OREAL USA, INC., a New York
Corporation; The Procter and Gamble
Distributing LLC, an Ohio Corporation.

No. 08–4625.
|
Argued Nov. 10, 2009.
|
Opinion Filed: March 26, 2010.

**Synopsis**
**Background:** Purchaser of lipstick products containing lead brought class action against companies that manufactured, marketed, and distributed the products. Defendants filed motions to dismiss. The United States District Court for the District of New Jersey, Dennis M. Cavanaugh, J., 2008 WL 2938045, granted the motions and subsequently denied plaintiff's motions for reconsideration and to file a second amended complaint. Plaintiff appealed.

**Holdings:** The Court of Appeals, Roth, Circuit Judge, held that:

[1] plaintiff's subjective allegation that the trace amounts of lead in the lipsticks were unacceptable to her was not an injury-in-fact sufficient to confer constitutional standing, and

[2] to the extent plaintiff contended that she lost the "benefit of the bargain" in purchasing the lipsticks, she did not demonstrate a concrete injury-in-fact.

Affirmed.

West Headnotes (2)

[1]    **Products Liability** 🔑 Nature of Injury or Damage

**Products Liability** 🔑 Persons Entitled to Sue

**Products Liability** 🔑 Cosmetics, soaps, and hair-care products

Subjective allegation made by purchaser of lipstick products containing lead, that the trace amounts of lead in the lipsticks were unacceptable to her, was not an injury-in-fact sufficient to confer constitutional standing; purchaser's argument that she was misled into purchasing unsafe lipstick products was belied by Food and Drug Administration (FDA) report finding that lead levels in manufacturers' lipsticks were not dangerous and therefore did not require warnings, and purchaser conceded that she had suffered no adverse health effects from using the lipsticks. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

17 Cases that cite this headnote

[2]    **Sales** 🔑 Standing

To the extent purchaser of lipstick products containing lead contended that she lost the "benefit of the bargain" in purchasing the lipsticks, she did not demonstrate a concrete injury-in-fact, as required for standing; because her purchases were not made pursuant to a contract, she could not have been denied the benefit of any bargain, and purchaser did not allege that she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably have expected. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

31 Cases that cite this headnote

**\*258** On Appeal from the United States District Court for the District of New Jersey (District Court No. 2–07–cv–05588), District Judge: Dennis M. Cavanaugh.

**Attorneys and Law Firms**

Philip A. Tortoreti, Esquire, Daniel R. Lapinski, Esquire (Argued), Wilentz, Golman & Spitzer, P.A., Woodbridge, NJ, for Appellant Ruth Koronthaly.

Scott L. Haworth, Esquire (Argued), Nora Coleman, Esquire, Sedgwick, Detert, Moran & Arnold, New York, NY, Anthony J. Anscombe, Esquire, Sedgwick, Detert, Moran & Arnold, LLP, Chicago, IL, James H. Keale, Esquire, Sedgwick, Detert, Moran & Arnold, LLP, Newark, NJ, for Appellee L'Oreal USA, Inc.

Michael R. McDonald, Esquire (Argued), Damian V. Santomauro, Esquire, Gibbons, P.C., Newark, NJ, for Appellee The Procter & Gamble Distributing, LLC.

Before: AMBRO, GARTH, and ROTH, Circuit Judges.

OPINION

ROTH, Circuit Judge:

**\*\*1** Ruth Koronthaly appeals from the District Court's order granting defendant Procter & Gamble Company's ("P & G") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing and defendant L'Oreal USA, Inc.'s ("L'Oreal") motion to dismiss pursuant to Rule 12(b)(6). We exercise plenary review over a grant of a motion to dismiss for lack of standing and review the factual elements underlying the standing determination for clear error. *Goode v. City of Phila.,* 539 F.3d 311, 316 (3d Cir.2008). The burden of proving each standing element rests with the plaintiff. *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir.2005). We assume the parties' familiarity with the factual and procedural history, which we describe only as necessary to explain our decision. We will affirm the District Court's order.

Koronthaly purchased lipstick products manufactured, marketed, and distributed by appellees L'Oreal. and P &

G. These lipstick products contain lead. The FDA does not regulate the presence of lead in lipstick, but Koronthaly asserts that the lipstick contains lead in far greater amounts than permitted in candy by the FDA. Neither the packaging nor the products themselves contained any indication that the lipstick contained any lead.

Koronthaly did not know when she purchased the products that they contained any lead, and when she learned of the lead content she immediately stopped using them. Moreover, had she known of the lead she would not have purchased the products.

In November 2007, Koronthaly filed a class action complaint in the District Court for the District of New Jersey. She invoked the District Court's jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). After it was amended in March 2008, her complaint asserted claims for: (1) violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1 *et seq.;* (2) breach of implied warranty under the New Jersey UCC; (3) breach of implied warranty under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2310(d)(1); (4) strict liability; (5) negligence per se; (6) unjust enrichment; and (7) injunctive relief.

**\*259** L'Oreal and P & G filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(1), respectively. On July 25, 2008, the District Court granted those motions, finding that Koronthaly lacked standing to pursue the action. On October 24, 2008, the District Court denied Koronthaly's motion for reconsideration, and her motion for leave to file a second amended complaint. Koronthaly then filed a timely notice of appeal.

To prove constitutional standing, Koronthaly must demonstrate (1) an injury-in-fact that is actual or imminent and concrete and particularized, not conjectural or hypothetical, (2) that is fairly traceable to the defendant's challenged conduct, and (3) is likely to be redressed by a favorable judicial decision. *Summers v. Earth Island Inst.,* ––– U.S. ––––, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009). In this case, standing founders on the first requirement, injury-in-fact.

**\*\*2** **[1]** Koronthaly's argument that she was misled into purchasing unsafe lipstick products is belied by the FDA's report finding that the lead levels in the Defendants' lipsticks were not dangerous and therefore did not require warnings. Moreover, Koronthaly concedes that she has suffered no

adverse health effects from using the lipsticks. Koronthaly therefore has asserted only a subjective allegation that the trace amounts of lead in the lipsticks are unacceptable to her, not an injury-in-fact sufficient to confer Article III standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (injury-in-fact must be accompanied by "continuing, present adverse effects") (citation omitted); *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 636 (3d Cir.1996) (Wellford, J., concurring) ("Fear and apprehension about a possible future physical or medical consequence ... is not enough to establish an injury *in fact.*").

 **[2]**    Furthermore, to the extent that Koronthaly contends that the injury-in-fact was the loss of her "benefit of the bargain," she mistakenly relies on contract law. *See Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 319–21 (5th Cir.2002) (plaintiff, whose only claim was that she "would like her

money back" for having purchased a product that failed to make certain disclosures and allegedly was defective, did not have an injury-in-fact sufficient to create standing). Her lipstick purchases were not made pursuant to a contract, and therefore she could not have been denied the benefit of any bargain. Absent any allegation that she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect, Koronthaly has not demonstrated a concrete injury-in-fact.

For the foregoing reasons, we will affirm the order of the District Court granting the Defendants' motions to dismiss.

**All Citations**

374 Fed.Appx. 257, 2010 WL 1169958

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 42

768 Fed.Appx. 39 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

D. Joseph KURTZ, individually
and on behalf of all others similarly
situated, Plaintiff-Appellee,

v.

COSTCO WHOLESALE
CORPORATION, Kimberly-Clark
Corporation, Defendants-Appellants.
Anthony Belfiore, individually and
on behalf of all others similarly
situated, Plaintiff-Appellee,

v.

Procter & Gamble Company,
Defendant-Appellant.

17-1856
|
17-1858
|
17-1861
|
May 14, 2019



Appeal from a March 27, 2017 order of the United
States District Court for the Eastern District of New York
(Weinstein, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the cases
are **REMANDED** for further proceedings consistent with this
order.

**Attorneys and Law Firms**

For Plaintiffs-Appellees: Douglas Wilens (Samuel H.
Rudman, Mark S. Reich, Vincent M. Serra, on the brief),
Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for D.
Joseph Kurtz. Lester L. Levy (Matthew Insley-Pruitt, Robert
S. Plosky, on the brief), Wolf Popper LLP, New York, NY, for
Anthony Belfiore.

For Defendants-Appellants: Brian R. Matsui (Bryan J.
Leitch, James M. Bergin, Kayvan Betteridge Sadeghi, on
the brief), Morrison & Foerster LLP, Washington, DC, for
Cotsco Wholesale Corporation. Eamon P. Joyce (Kwaku A.
Akowuah, Kara L. McCall, Daniel A. Spira, on the brief),
Sidley Austin LLP, New York, NY, for Kimberly-Clark
Corporation. Mark W. Mosier (Henry Liu, Kevin King, Emily
Johnson Henn, on the brief), Covington & Burling LLP,
Washington, D.C., for Procter & Gamble Company.

Present: Guido Calabresi, Debra Ann Livingston, Raymond
J. Lohier, Jr., Circuit Judges.

**\*40  SUMMARY ORDER**

D. Joseph Kurtz, on behalf of himself and all others similarly
situated, filed suit against Costco Wholesale Corporation
("Costco") and Kimberly-Clark Corporation ("Kimberly-
Clark") in the United States District Court for the Eastern
District of New York ("EDNY") on February 21, 2014.
Anthony Belfiore, on behalf of himself and all others similarly
situated, initiated suit against Procter & Gamble Company
("P & G") in EDNY on July 1, 2014. Kurtz and Belfiore
(collectively, "Plaintiffs") both alleged, *inter alia*, violations
of New York General Business Law ("GBL") § 349. Plaintiffs
claimed, in essence, that Costco, Kimberly-Clark, and P &
G (collectively, "Defendants") had falsely represented that
their wipes were "flushable" and that all purchasers of these
supposedly "flushable" wipes had paid a price premium
attributable to that alleged misrepresentation. On March 27,
2017, the district court (Weinstein, *J.*) certified damages and
injunctive relief classes in each litigation pursuant to Federal
Rule of Civil Procedure 23 ("Rule 23"). We assume the
parties' familiarity with the underlying facts, the procedural
history of the case, and the issues on appeal.

Rule 23(b)(3), under which the district court certified damages classes, requires the plaintiff to prove "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). This requirement of proof applies to all requirements of Rule 23—including the predominance requirement described above. *See* Comcast Corp. v. Behrend, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). On appeal, Defendants contend, *inter alia*, that Plaintiffs have not proven that common issues will predominate because they have not shown that they can establish two necessary elements of their cause of action—injury and causation—by common proof. In particular, Defendants argue that Plaintiffs' expert has not demonstrated, but has merely alleged, that he can apply hedonic regression analysis to establish on a classwide basis whether the class members paid a price premium for Defendants' products attributable to the "flushable" representation.

On the record presently before us, the panel cannot decide whether the Defendants' predominance argument has merit, and therefore we conclude that further development of the record is appropriate. Under these circumstances, we conclude that the proper course of action is a remand pursuant to the procedure set out in United States v. Jacobson, 15 F.3d 19, 21–22 (2d Cir. 1994), so that the parties may be afforded the chance to supplement the record with additional evidence and so that the district court can then make appropriate findings on the predominance issue. In so doing, we follow the approach of our decision in Davis v. New York City Housing Authority, 205 F.3d 1322 (2d Cir. 2000) (summary order), where we remanded pursuant to Jacobson in search of "further factual development" and instructed that "the district court, after receiving any additional submissions from the parties and their experts, make further express findings and, if warranted, modify its existing **\*41** findings." Id. at 1322. We remand for the same purposes here. In particular, we note our specific concern with the Plaintiffs' proof that they can establish the injury and causation elements of their claims at trial with common evidence.

A mandate shall issue forthwith remanding the case to the district court. On remand, the district court should offer the parties the opportunity to submit additional evidence and should then assess whether the Plaintiffs have "affirmatively demonstrated [their] compliance" with Rule 23(b)(3)'s predominance requirement. Wal-Mart, 564 U.S. at 350, 131 S.Ct. 2541. After further review of the record, the district court should choose whether to decertify the damages classes or maintain the current certification orders. Any party to these appeals may then restore jurisdiction to this Court within 30 days of entry of the district court's judgment by letter to the Clerk's Office (attaching a copy of the relevant supplemental order) advising the Clerk that the appeal should be reinstated. In that event, no new notice of appeal or additional filing fee will be required. In the interest of judicial economy, any reinstated appeal will be assigned to this panel. The panel will stay further consideration of these appeals as they relate to the injunctive relief classes until such time as jurisdiction is restored.

**All Citations**

768 Fed.Appx. 39 (Mem)

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 43

2019 WL 1426011
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Lawrence LEMPA, as Independent Executor
of the Estate of Linda Lempa, Plaintiff,
v.
EON LABS, INC. and Sandoz, Inc., Defendants.

No. 18 C 3821
|
Signed 03/29/2019

**Attorneys and Law Firms**

Bridget Colleen Duignan, Latherow & Duignan, Chicago, IL, for Plaintiff.

Lori G. Cohen, Sara K. Thompson, Pro Hac Vice, Greenberg Traurig, LLP, Atlanta, GA, Douglas Michael Grom, Gregory Edward Ostfeld, Michael Baier, Greenberg Traurig, LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Honorable Edmond E. Chang, United States District Judge

*1 Linda Lempa suffered from a non-life-threatening heart condition called atrial fibrillation.[1] R. 1.2, Compl. ¶ 11.[2] In November 2012, Linda's doctor prescribed her amiodarone, a drug manufactured by Defendant Sandoz, Inc., to treat her condition. Id. ¶ 12. Several months later in March 2013, Linda passed away from acute hypoxic respiratory failure. Id. ¶¶ 19-21. Linda's husband, Lawrence Lempa, now brings this claim against Sandoz alleging that amiodarone was the direct and proximate cause of Linda's death. Id. ¶ 31. He alleges that Sandoz breached its duty to warn Linda about the risks associated with taking amiodarone as a "first line" treatment for non-life-threatening conditions—a use for which it was not approved by the FDA—and negligently promoted the drug for this off-label use. Id. ¶¶ 7-10, 30. He also alleges that Sandoz failed to provide Medication Guides in violation of FDA regulations. Id. ¶¶ 26-29. He brings claims for failure to warn, negligence per se, and fraudulent concealment on behalf of himself and Linda. Sandoz and its predecessor, Eon Labs, Inc., now move to dismiss the Complaint. For the

reasons explained below, the motion is granted in part and denied in part.

**I. Background**

For the purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. Erickson v. Pardus, 551 U.S. 89, 94 (2007). Amiodarone is a prescription medication used as drug of last resort to treat certain heart conditions, such as ventricular fibrillation and ventricular tachycardia. Compl. ¶ 8. The brand-name version of amiodarone is called Cordarone® and was approved by the FDA in 1985. Compl. ¶ 7; Mtn. Dismiss at 4. Eon Labs, Inc. (Eon) received approval from the FDA to sell the generic formulation—amiodarone—in 200 mg tablets in 1998. Mtn. Dismiss at 5. In 2005, Sandoz, Inc. acquired Eon Labs, Inc., and since then has continued to manufacture and sell amiodarone in 200 mg tablets. R. 15, Defs.' Answer ¶ 7.

Amiodarone is approved by the FDA only to treat recurrent, life-threatening heart conditions, and only once all other forms of treatment have failed. Compl. ¶ 8. Nonetheless, the medication is sometimes prescribed as a "first line" treatment for other heart conditions, like atrial fibrillation. Id. ¶ 10. Lempa also alleges that Sandoz promotes these "off-label" uses of amiodarone and does not warn prescribing physicians of the dangers associated with using the medication to treat non-life-threatening heart conditions. Id. ¶¶ 9-10.

In November 2012, Linda Lempa (Linda) was diagnosed with atrial fibrillation, a non-life-threatening heart condition. Compl. ¶ 11. At the time, she was in good pulmonary health and suffered from no underlying respiratory issues or conditions. Id. ¶ 22. Her cardiologist at the time, Dr. Peter Kakavas, prescribed 200 mg of amiodarone, to be taken twice a day for 30 days, to treat her atrial fibrillation. Id. ¶ 12. Lempa alleges that Linda never received a Medication Guide—a document that explains the risks associated with the medication—with her prescription, nor any other type of warning from her doctor or pharmacist. Id. ¶¶ 16, 29, 30. On February 18, 2013, Linda began to experience shortness of breath and labored breathing, and, two days later, she was admitted to a local hospital with potential pneumonia or pulmonary fibrosis. Id. ¶ 17. Linda was again given amiodarone while hospitalized. Id. ¶ 18. Several days later, she was diagnosed with acute respiratory failure, at which point her doctors intubated her and discontinued the amiodarone. Id. ¶ 19. Linda's condition continued to decline

nonetheless, and she was eventually transferred to Rush University Hospital, where she passed away from hypoxic respiratory failure on March 4, 2013. *Id.* ¶¶ 20, 21.

**\*2** Lempa sued Sandoz, Eon, and several other defendants in the Circuit Court of Cook County, Illinois on March 6, 2018. Notice of Removal ¶ 1. The other defendants were eventually all voluntarily dismissed by Lempa. *Id.* ¶¶ 2, 8. Sandoz and Eon (collectively, Sandoz) successfully removed the suit to this Court. *Id.* at 1. In his Complaint, Lempa alleges that amiodarone caused Linda's death from acute hypoxic respiratory failure, and that Sandoz is liable for failing to warn her of the risks associated with the drug's off-label uses. Compl. ¶¶ 20-21, 30-31, 36-37. Sandoz now moves to dismiss Lempa's complaint as untimely, preempted by federal law, and insufficiently pled. Mtn. Dismiss at 1-2.

### II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (cleaned up). [3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal,* 556 U.S. at 678-79.

### III. Analysis

#### A. Statute of Limitations

Sandoz begins its Motion to Dismiss by arguing that Lempa's claims are barred by the statute of limitations, because they were filed "more than two years after his causes of action accrued" at the time of Linda's death on March 4, 2013. Mtn. Dismiss at 6. Sandoz also asserts that neither the discovery rule nor fraudulent concealment saves Lempa's claims, because Lempa "does not allege or plead that he was unable to determine the cause of his wife's death before the statute of limitations expired." *Id.* at 7. Lempa responds by pointing out that the statute of limitations is an affirmative defense, [4] making dismissal on those grounds inappropriate, and arguing that his claims are subject to the continuing violations doctrine because Sandoz is "engaged and [is] still engaging in a continuous course of negligent conduct." R. 26, Pl.'s Resp. at 3-4.

Lempa's first argument is correct. The statute of limitations is indeed an affirmative defense, and a complaint need not plead around it in order to survive dismissal. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.,* 782 F.3d 922, 928 (7th Cir. 2015). And, "[u]nless the complaint alleges acts that create an ironclad defense, a limitations argument must await factual development." *Foss v. Bear, Stearns & Co., Inc.,* 394 F.3d 540, 542 (7th Cir. 2005); *see also Chi. Bldg. Design, P.C. v. Mongolian House, Inc.,* 770 F.3d 610, 613-14 (7th Cir. 2014) (explaining that dismissal is appropriate "only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense") (cleaned up).

**\*3** Here, Lempa's allegations do not establish with certainty that his claims are untimely. The Complaint certainly raises questions about the timeliness of the claims, given the two-year statute of limitations for personal injury claims under Illinois law. *See* 735 ILCS 5/13-202. But it also does not rule out a set of facts that could defeat a statute of limitations defense. Indeed, Lempa alleges that he and Linda had no knowledge she was being prescribed amiodarone for an off-label use and were "unaware of the potential life-threatening complications of amiodarone." Compl. ¶¶ 13-14. Lempa presumably discovered these facts later on, and that might

serve to toll the statute of limitations (right now, the Court does not express an opinion on this one way or the other).

*See* *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995) (explaining that the discovery rule postpones "the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused");

*Mitsias v. I-Flow Corp.*, 959 N.E.2d 94, 99-100 (Ill. App. Ct. 2011) (applying discovery rule to product-liability action).

This is all that is required of Lempa at the pleading state, despite Sandoz's assertion that Lempa needed to "allege or plead that he was unable to determine the cause of his wife's death before the statute of limitations expired." Mtn. Dismiss at 7. As already mentioned, pleading around a defense of untimeliness is not required under the Federal Rules of Civil Procedure. And, because there is a set of facts that if proven would establish Lempa's claims as timely, they will not be dismissed on these grounds. *See Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003) (reversing dismissal because, "at this stage, the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations, and that possibility exists" (emphasis in original) (citation omitted) ); *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 80 (7th Cir. 1992) ("[W]hen a complaint is dismissed at the pleadings stage the question is not what are the facts, but is there a set of facts that if proved would show that the case had merit?").

Lempa should not confuse this holding as either an explicit or implicit adoption by the Court of the continuing-violations argument he made in the response brief. That doctrine is inoperative here. Regardless of Sandoz's behavior towards *others*, its interaction with Lempa ceased when Linda died— and discontinued using amiodarone—in March 2013, which is also when Lempa suffered his injury. *Tuduj v. Sanofi-Aventis U.S. LLC*, 721 F. App'x 496, 500 (7th Cir. 2018) (non-precedential disposition) (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003) ) (explaining that the continuing-violations doctrine was inapplicable because the plaintiff's injury ceased when his psychotic breakdown ended and he stopped taking the drugs at issue). In other words, even if Sandoz continued to mislead *other* consumers following Linda's death, as Lempa alleges, Sandoz did not continue to inflict injury on Lempa, and its actions, thus, do not constitute a continuing violation.

## B. Federal Preemption

Sandoz next argues that Lempa's claims must be dismissed because they are "preempted under the Supreme Court's broad and sweeping decisions in *Bartlett* and *Mensing*." Mtn. Dismiss at 9. To the extent that Lempa's claims are premised on an argument that Sandoz's warnings or labeling (or both) were inadequate, Sandoz is correct. The Supreme Court has explained that generic drug manufacturers labor under a "duty of sameness," that requires "generic drug labels [to] be the same at all times as the corresponding brand-name drug labels." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011); *see also* *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486 (2013). So "federal law preempts state tort laws when the generic drug manufacturer could not have abided by this duty without: (1) changing the drug's formula; (2) changing the drug's label; or (3) withdrawing the generic drug from the market altogether." *Wagner v. Teva Phars. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016). Here, there are at least some allegations in the Complaint that challenge the adequacy of Sandoz's labeling. *See* Compl. ¶¶ 30(a), 30(e), 37, 41-42. And, in relation to those allegations, there was no way for Sandoz to fulfill its duty to warn without changing the formula for the drug, changing the label, or to discontinue selling it. Any challenges to the adequacy of amiodarone's warning and labels are thus preempted.

**\*4** Lempa points out in his response brief, though, that his claims are at least partly premised "on the defendants' violation of the FDCA's requirement to provide distributors with medication guides" and Sandoz's promotion of "amiodarone for off-label use." Pl.'s Resp. at 6-7. This distinguishes these claims from those brought in *Mensing* and *Bartlett*. Sandoz counters that, even if this is true, Lempa's claims are still impliedly preempted because the duties to provide a Medication Guide and refrain from promoting off-label uses both arise under the Federal Food, Drug, and Cosmetic Act (FDCA). R. 31, Defs.' Reply at 7-8; *see* 21 C.F.R. § 208.24(b) (requiring drug manufacturers to make Medication Guides available for distribution to each patient with each prescription, by providing them—or the means to produce them—to distributors, packers, or authorized dispensers of the drug); 21 C.F.R. § 202.1(e)(6) (regulation under the FDCA prohibiting a drug manufacturer from promoting off-label uses of its prescription drugs). Relying on recent Sixth Circuit precedent, Sandoz argues that Lempa attempts "to privately enforce federal medication guide duties

that only the federal government is permitted to enforce under 21 U.S.C. § 337(a)." *Id.* at 7 (citing 🔖 *McDaniel v. Upsher-Smith Labs, Inc.*, 893 F.3d 941, 943 (6th Cir. 2018) ). The Court disagrees.

Although state law claims that seek only to enforce FDA regulations are impliedly preempted, 🔖 *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344 (2001), Lempa does not literally bring claims for violations of the FDCA. He instead claims that Sandoz was negligent and violated its duty to warn Linda of the risks associated with amiodarone when it failed to provide a Medication Guide and promoted off-label uses. These are claims for violations of well-established state-law duties that predate the FDCA and do not necessarily depend on violations of the requirements imposed under the statute. Put another way, Lempa could bring his same claims—for failure to warn and negligence—even if the FDCA did not require Medication Guides nor prohibit off-label promotion. But given that the statute *does* do those things, Lempa is allowed to introduce evidence about the indications for which the FDA approved amiodarone and the reasons it requires Medication Guides because those statutory requirements run parallel to Sandoz's state law duties. 🔖 *Bausch v. Stryker Corp.*, 630 F.3d 546, 557 (7th Cir. 2010)("The evidence showing a violation of federal law shows that the device is adulterated and goes a long way toward showing that the manufacturer breached a duty under state law toward the patient.") [5] ; *see also In re Testosterone Replacement Therapy Prod. Liab. Litig.*, 2017 WL 1836443, at *7 (N.D. Ill. May 8, 2017) ("In the present cases, plaintiffs' marketing claims are not impliedly preempted by the FDCA or under *Buckman*, because the claims are grounded in traditional state law principles of liability, such as negligence, failure to warn, strict product liability, and fraud that predate the relevant FDCA requirements."); 🔖 *Gravitt v. Mentor Worldwide, LLC*, 289 F. Supp. 3d 877, 890 (N.D. Ill. 2018).

In sum, Lempa's claims survive preemption, but only to the extent that they rely on his allegations that Sandoz failed to provide a Medication Guide and promoted off-label uses of amiodarone. Lempa is not permitted to argue that Sandoz's labels were inadequate, because those claims are preempted under *Mensing* and *Bartlett*.

## C. Learned Intermediary Doctrine

Sandoz also challenges Lempa's claims under the learned intermediary doctrine, which states that prescription drug manufacturers have a duty to warn health-care professionals —but not the ultimate end-consumer—of the risks associated with its product. Mtn. Dismiss at 18 (citing *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 452-53 (Ill. App. Ct. 2011) ). The underlying basis for the doctrine "is that a doctor is considered in the best position to prescribe drugs and monitor their use because he is knowledgeable of the propensities of the drugs he is prescribing and the susceptibilities of his patient." 🔖 *Kennedy v. Medtronic, Inc.*, 851 N.E.2d 778, 784 (Ill. App. Ct. 2006) (citing 🔖 *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392 (Ill. 1987) ). Lempa responds that Linda's doctor could not be considered a learned intermediary because Sandoz's warning was inadequate. Pl.'s Resp. at 8.

**\*5** The Court agrees that there is, at least, a question of fact about Sandoz's warnings to Linda's doctor about off-label uses of amiodarone. Lempa alleges, among other things, that Sandoz "did not include warnings to prescribing physicians of amiodarone of the potential dangers associate with amiodarone toxicity and dangers to atrial fibrillation patients." Compl. ¶ 10. This precludes application of the learned intermediary doctrine at this stage of the litigation, because, under Illinois law, doctors are not considered learned intermediaries if they receive insufficient warnings. 🔖 *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 43 (Ill. 2002) ("Doctors who have not been *sufficiently* warned of the harmful effects of a drug cannot be considered learned intermediaries and the adequacy of warnings is a question of fact, not law, for the jury to determine.") (cleaned up) (emphasis in original). Moreover, Lempa correctly asserts that the learned intermediary doctrine is not typically applied at the dismissal-motion stage, because "[o]nly a physician or someone with specialized knowledge would be qualified to determine whether the warning was inadequate," meaning expert testimony is needed. *Hernandez*, 958 N.E.2d at 455-56 (cleaned up). Accordingly, the learned intermediary doctrine does not bar Lempa's claims at this stage.

## D. Failure to State a Claim

Sandoz's lastly challenges Lempa's claims as insufficiently pled. Mtn. Dismiss at 15-20. Sandoz first takes issue with Lempa's off-label promotion and fraudulent concealment claims, which it argues do not meet the pleading standards

Lempa v. Eon Labs, Inc., Slip Copy (2019)

for fraud under Rule 9(b). Mtn. Dismiss at 16-18 (citing Fed. R. Civ. P. 9(b) ). The Court agrees with Sandoz as to Lempa's fraudulent concealment claims. To prove a claim of fraudulent concealment under Illinois law, a plaintiff must allege "that the defendant [engaged in the] concealment [of] a material fact when he was under a duty to disclose that fact to plaintiff." *Squires-Cannon v. Forest Pres. Dist. of Cook Cty.*, 897 F.3d 797, 805 (7th Cir. 2018) (cleaned up)

(quoting 🚩 *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996) ). Rule 9(b) imposes a heightened pleading standard on claims of fraud—including fraudulent concealment—and requires plaintiffs to allege their claim with "particularity." *Squires-Cannon*, 897 F.3d at 805. The Seventh Circuit has interpreted this requirement as one "calling for the first paragraph of any newspaper story"; a plaintiff must plead the who, what, when, where, and how.

🚩 *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012).

Here, Lempa provides only broad, general allegations to support his claim that Sandoz fraudulently failed to disclose that amiodarone was approved by the FDA only as a drug of last resort. Compl. ¶¶ 40-41. He does not describe where and when these omissions occurred or who should have disclosed these material facts at what time. Lempa's fraudulent concealment allegations simply do not meet the requirements of Rule 9(b) as drafted.

Having said that, the Court is not convinced that Rule 9(b) precludes any of Lempa's other claims. Sandoz asserts that Lempa's off-label promotion allegations are subject to Rule 9(b), presumably because they sound in fraud. Defs.' Reply at 2. Assuming this is true, the Court agrees that Lempa's off-label promotion allegations do not meet the Rule 9(b) standard. But, it is far from clear, based on the Complaint, that Lempa intended his off-label promotion allegations to sound in fraud. The term "off-label" is mentioned four times in the Complaint, and is never accompanied by the terms "fraudulently," "knowingly," or "willingly." Compl. ¶¶ 9, 13, 30(b), 36. It is included in Lempa's section on failure to warn and negligence per se, but not his section on fraudulent concealment. And Lempa critically alleges that Sandoz engaged in "*negligent* promotional, marketing and sales efforts." Compl. ¶ 12 (emphasis added); *see also* Compl. ¶ 30(c). Lempa's "off-label" promotion allegations are thus not subject to Rule 9(b)'s heightened pleading standard, but rather Rule 8's notice pleading standard.

Under Rule 8, the remainder of Lempa's claims, which all sound in negligence, survive. In order to state a claim for negligence under Illinois law, "a plaintiff must plead a duty owed by a defendant to that plaintiff, a breach of duty, and injury proximately caused by the breach of duty."

🚩 *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1148 (7th Cir. 2010) (cleaned up) (quoting 🚩 *Bell v. Hutsell*, 931 N.E.2d 299, 302 (Ill. 2010) ). When proceeding under a failure-to-warn theory, as Lempa does here, a plaintiff must show that the manufacturer failed to disclose an unreasonably dangerous propensity of the product known to the manufacturer, as to which the average consumer would

not be aware. 🚩 *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002). And, under Illinois law, the doctrine of negligence per se "provides that where a cause of action does exist at common law, the standard of conduct to which a defendant will be held may be defined as that required by statute, rather

than as the usual reasonable person standard." 🚩 *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) (cleaned up).

**\*6** Lempa's allegations in the Complaint are sufficient to state a claim for failure to warn and negligence per se. He has alleged that Sandoz failed to disclose the risks associated with using amiodarone as a "first line" treatment for atrial fibrillation and failed to provide Medication Guides to distributors, pharmacists, physicians, and Linda, in violation of its duties under Illinois law. *See, e.g.*, Compl. ¶¶ 9, 30, 37. Lempa also alleges that Linda would not have taken amiodarone had she known the risks, *id.* ¶ 38, and, "[a]s a direct and proximate result of the defendants' respective negligence, Linda Lempa ingested the drug as instructed, and died," *id.* ¶ 31. Finally, Lempa alleges that Sandoz breached FDA regulations when it negligently marketed amiodarone for an off-label use and failed to provide a Medication Guide. *Id.* ¶¶ 13, 15-16, 26-29, 30(c)-(d), 30(f), 36-37. This is enough for Lempa's negligence claims to survive dismissal.

Accordingly, only Lempa's fraudulent concealment claim is dismissed at this stage of the litigation. Because Lempa has not yet amended his Complaint in federal court, by April 22, 2019, he may have file an amended complaint repleading fraudulent concealment if he wishes to attempt to satisfy Rule 9(b) on that claim. [6]

**IV. Conclusion**

For the reasons discussed, the Defendants' motion to dismiss is granted as to Lempa's fraudulent concealment claim and any claims that rely on an argument that Sandoz's labeling was inadequate. It is denied as to the remainder of Lempa's claims. Lempa may have two weeks to file an amended complaint repleading his fraudulent concealment claim, this time with particularity.

**All Citations**

Slip Copy, 2019 WL 1426011

## Footnotes

1      This Court has subject matter jurisdiction over these state law tort claims under 28 U.S.C. § 1332. Plaintiff Lawrence Lempa is a citizen of Illinois. R. 1.2, Compl. ¶ 1. Defendant Sandoz, Inc. is a citizen of Colorado and New Jersey, *id.* ¶ 3; R. 1, Notice of Removal ¶ 13, while Defendant Eon Labs, Inc. is a citizen of Delaware and New York, *id.* ¶ 14.

2      Citations to the docket are noted by "R." followed by the docket entry and page or paragraph number.

3      This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

4      Although this argument is barely developed in Lempa's response, he has not waived it. He clearly states that "[i]n Illinois, the statute of limitations is an affirmative defense," and argues that he has not pled himself out of court, making dismissal for untimeliness inappropriate at this stage. Pl.'s Resp. at 3-4.

5      Sandoz argues that *Bausch* is inapplicable here because it addressed the express preemption clause applicable to medical devices under the Medical Device Amendments to the FDCA. Defs.' Reply. at 9. Sandoz overlooks the heading in *Bausch* that states "implied preemption," as well as the court's statement that it was addressing implied preemption under *Buckman*. *Bausch*, 630 F.3d at 556.

6      The Court strongly encourages Lempa to leave the contours of his other claims unchanged in order to avoid a second round of dismissal briefing over the same issues.

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 44

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 460 of 751
PageID: 11826
Licul v. Volkswagen Group of America, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 6328734

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by Harris v. Nordyne, LLC, S.D.Fla., November 14, 2014

2013 WL 6328734
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Oliver LICUL and Scheherazade
Marles, on behalf of themselves and
all others similarly situated, Plaintiffs,

v.

VOLKSWAGEN GROUP OF
AMERICA, INC., Defendant.

No. 13–61686–CIV.
|
Dec. 5, 2013.

Attorneys and Law Firms

James C. Shah, Shepherd Finkelman Miller & Shah, Media, PA, Nathan C. Zipperian, Shepherd Finkelman Miller & Shah LLC, Weston, FL, Mark Schlachet, Cleveland, OH, for Plaintiffs.

Jeffrey L. Chase, Michael B. Gallub, Herzfeld & Rubin, P.C., New York, NY, Michael Daniel Begey, Larry Martin Roth, Rumberger, Kirk & Caldwell, P.A., Orlando, FL, Defendant.

*ORDER GRANTING MOTION TO DISMISS*

JAMES I. COHN, District Judge.

**\*1** **THIS CAUSE** is before the Court upon Defendant's Dispositive Motion to Dismiss [DE 18] ("Motion"). The Court has considered the Motion, Plaintiffs' Opposition [DE 28], and Defendant's Reply [DE 30], and is otherwise advised in the premises.

**I. BACKGROUND**

This putative class action arises from an alleged defect in the door-locking mechanisms of Volkswagen Jetta sedans ("Jettas"). Plaintiffs allege that Jettas of model years 1999 to 2012, manufactured and sold by Defendant Volkswagen Group of America, Inc. ("Volkswagen"), contain defective door-locking mechanisms (the "Door Locks"). DE 1 ¶ 2.

Specifically, the Door Locks allegedly fail, and passengers are unable to lock or unlock the Jettas. *Id.* ¶ 3. If the Door Locks fail in the "locked" position, consumers may become locked in or out of their cars. *Id.* If the Door Locks fail in the "unlocked" position, the unlocked doors may pose a safety hazard or render the Jettas more susceptible to crime. *Id.*

Plaintiffs contend that Volkswagen knew of the defects in the Door Locks as early as February 7, 2000. *Id.* ¶ 26. Volkswagen, however, continues to manufacture and sell the Jettas. *Id.* ¶ 29. Plaintiffs allege that Volkswagen has concealed the defects of the Door Locks from consumers. *Id.* ¶ 6.

The named plaintiffs herein, Oliver Licul and Scheherazade Marles, have at various times owned a Jetta. Specifically, in April 2001, Marles purchased a new 2001 Jetta. *Id.* ¶ 34. Marles's Jetta, like other Jettas, came with a two–year/24,000–mile limited warranty, which covered repairs to correct manufacturer's defects. *Id.* ¶ 17. Marles married Licul in 2006, at which time she sold the Jetta to Licul. *Id.* ¶ 34. In 2011, the front driver-side Door Lock on Plaintiffs' Jetta failed, and froze in the "locked" position. *Id.* ¶ 35. In 2012, the Door Locks on the rear doors of the Jetta also failed. *Id.* ¶ 36.

Plaintiffs have brought suit against Volkswagen based upon the defective Door Locks. They seek relief on their own behalf and on behalf of similarly situated owners and lessees of Jettas. *Id.* ¶¶ 44–45. Plaintiffs have asserted five causes of action: (1) Violation of the Magnuson–Moss Act (id.¶¶ 53–68); (2) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (id.¶¶ 69–75); (3) Breach of Express Warranty (id.¶¶ 76–84); (4) Breach of the Duty of Good Faith and Fair Dealing (id.¶¶ 85–88); and (5) Unjust Enrichment (id.¶¶ 89–94). Volkswagen has moved to dismiss.

**II. DISCUSSION**

**A. *Legal Standard***

Under Federal Rule of Civil Procedure 12(b)(6), a court shall grant a motion to dismiss where, based upon a dispositive issue of law, the factual allegations of the complaint cannot support the asserted cause of action. *Glover,* 459 F.3d at 1308. "Factual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'

2013 WL 6328734

" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

**\*2** A complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor. *Twombly,* 550 U.S. at 555. A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *Id.* A well-pleaded complaint will survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted). Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

### B. *Analysis*

#### 1. *Breach of Express Warranty Under Florida Law*
Plaintiffs' claim for breach of express warranty under Florida law fails because the express warranty on their Jetta expired prior to the manifestation of the Door Locks' defects. Plaintiffs have also failed to plead that the durational limits on the express warranty were unconscionable. Because Plaintiffs cannot establish a breach of the express warranty during its term, the Court will dismiss the claim.

The defect in the Door Locks of Plaintiffs' Jetta manifested well after the expiration of their express warranty. See DE 1 ¶¶ 17, 34–36. As a general rule, a plaintiff may not bring a claim for breach of an express warranty where a defect has not manifested during the warranty period. E.g., *Brisson v. Ford Motor Co.,* 349 F. App'x 433, 434 (11th Cir.2009) (per curiam); *Aprigliano v. Am. Honda Motor Co.,* No. 13–22066, 2013 U.S. Dist. LEXIS 154539, at *23–24, 2013 WL 5788771 (S.D.Fla. Oct. 28, 2013); *see also Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir.1986) (collecting cases). Plaintiffs argue that the defective Door Locks pose an exception to the rule, because Volkswagen knew of the defect when it sold a Jetta to Marles. DE 28 at 15.

A defendant's knowledge of a latent defect at the time of sale, however, does not salvage a claim for breach of express warranty where the warranty has expired before the defect manifests. *See, e.g., Aprigliano,* 2013 U.S. Dist. LEXIS 154539, at *2, *23–24, 2013 WL 5788771 (dismissing express warranty claim where latent defect in defendant's knowledge since time of manufacture manifested only after expiration of warranty); *McCabe v. Daimler AG,* No. 12–

2494, 2013 U.S. Dist. LEXIS 80161, at *18–20, 2013 WL 2452180 (N.D. Ga. June 7, 2013) (applying, inter alia, Florida law); *Suddreth v. Mercedes–Benz, LLC,* No. 10–05130, 2011 U.S. Dist. LEXIS 126237, at *8–9, 2011 WL 5240965 (D.N.J. Oct. 31, 2011). "[V]irtually all product failures discovered in automobiles after the expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty." *Abraham,* 795 F.2d at 250. Manufacturers are aware of these potential failures and consider them in pricing and setting limitations upon warranties. *Id.* To hold that a manufacturer's knowledge of potential failures renders such limitations unenforceable would thus "render meaningless time/mileage limitations in warranty coverage," *id.,* and would be contrary to the overwhelming weight of precedent enforcing such limitations.

**\*3** Plaintiffs nevertheless argue that the defects of the Door Locks require different treatment because they could "manifest at any time." DE 28 at 15. Plaintiffs do not explain why a defendant's knowledge of a defect that can "manifest at any time" should be treated any differently than a defect that is expected to manifest after a given period of time. In either case, the manufacturer is aware of a flaw in the product that it has sold, and has represented that it will remedy such defect if it manifests during the term of the express warranty. The Court thus declines Plaintiff's invitation to craft an exception to the rule that a defendant's knowledge of a defect does not allow a plaintiff to state a claim for breach of warranty upon a defect that manifests after the warranty's expiration. Cf. *Aprigliano,* 2013 U.S. Dist. LEXIS 154539, at *2, *23–24, 2013 WL 5788771 (dismissing claim brought after expiration of warranty period where manifestation of defect not alleged to depend upon passage of given timeframe).

The Court also rejects Plaintiffs' contention that the durational limits on the Jetta's express warranty are unconscionable. Under Florida law, a court may refuse to enforce an unconscionable contract or clause. Fla. Stat. § 672.302. A contract or clause is unconscionable when it is both procedurally and substantively unconscionable. *Zephyr Haven Health & Rehab Ctr., Inc. v. Hardin,* 122 So.3d 916 (Fla. 2d DCA 2013); *Premier Real Estate Holdings, LLC v. Butch,* 24 So.3d 708, 711 (4th DCA 2009); *Fotomat Corp. v. Chanda,* 464 So.2d 626, 629–31 (Fla. 5th DCA 1985). Plaintiffs, however, do not contend that the warranty was substantively unconscionable, nor have they sufficiently pled procedural unconscionability.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 462 of 751
PageID: 11828
Licur v. Volkswagen Group of America, Inc., Not Reported in F.Supp.2d (2013)
2013 WL 6328734

A contract is substantively unconscionable if its provisions are "so 'outrageously unfair' as to 'shock the judicial conscience.' " *Gainesville Health Care Ctr., Inc. v. Weston,* 857 So.2d 278, 284–85 (Fla. 1 st DCA 2003). Plaintiffs do not argue that the duration limitation of the warranty was so unreasonable as to "shock the judicial conscience," which is understandable given that such limitations are both common in the industry and routinely enforced by the courts. *See generally In re OnStar Contract Litig.,* 278 F.R.D. 352, 385 (E.D.Mich.2011) (discussing approach of courts to durational limitations in automobile warranties); *Daugherty v. Am. Honda Motor Co.,* 144 Cal.App.4th 824, 830–32, 51 Cal.Rptr.3d 118 (Cal.App.2006) (same).

Procedural unconscionability, on the other hand, may arise if the circumstances surrounding a transaction indicate that the time of complaining party had no meaningful choice at the time of contracting. *Gainesville Health Care Ctr., Inc.,* 857 So.2d at 284. Plaintiffs do not allege that they had no meaningful choice at the time of contracting, no opportunity to bargain, or no opportunity to understand the terms of their contract. *See id.* Instead, Plaintiffs suggest that the warranty was procedurally unconscionable because Volkswagen's knowledge of the defective Door Locks resulted in a "substantial disparity in the parties' relative bargaining power." DE 28 at 16 (internal quotation marks omitted). However, unconscionability of an express warranty requires more than a defendant's mere knowledge of a defect at the time of sale. *McCabe,* 2013 U.S. Dist. LEXIS 80161, at *18–20; 2013 WL 2452180 *see also Suddreth,* 2011 U.S. Dist. LEXIS 126237, at *8–9, 2011 WL 5240965 (rejecting argument for unconscionability of warranty's durational limitations premised solely on defendant's knowledge of defect). Without more, Plaintiffs have failed to allege facts supporting a finding of procedural unconscionability.

*4 In sum, Plaintiffs cannot bring a claim for breach of warranty because the defect they complain of manifested after the expiration of the express warranty. Volkswagen's alleged knowledge of the defect at the time of sale does not require a different outcome. Nor have Plaintiffs pled facts that would justify ignoring the warranty's durational limitations on unconscionability grounds. The Court will therefore dismiss Plaintiffs' state-law claim for breach of express warranty.

**2. *Breach of Express Warranty Under the Magnuson–Moss Warranty Act (15 U.S.C. §§ 2301, et seq.)***
The Magnuson–Moss Warranty Act ("MMWA") provides a federal cause of action to consumers for breaches of product

warranties. 15 U.S.C. § 2310(d)(1). Some disagreement exists among the courts regarding whether the MMWA incorporates state law on warranty actions or creates an independent cause of action. *Karhu v. Vital Pharms., Inc.,* No. 13–60786, 2013 U.S. Dist. LEXIS 112613, at *14, 2013 WL 4047016 (S.D.Fla. Aug. 9, 2013). Plaintiffs seize upon this ambiguity to argue that Volkswagen's arguments for the dismissal of the state-law breach of express warranty claim do not justify dismissal of the MMWA claim. DE 28 at 17–18.

The Court need not delve into the intricacies of the relationship between state law and the MMWA to conclude that Plaintiffs fail to state a MMWA claim for breach of express warranty. In *Brisson v. Ford Motor Co.,* the Eleventh Circuit illustrated that the rule preventing a plaintiff from claiming breach of an express warranty where a defect has not manifested during the warranty period applies with equal force in the MMWA context. 349 F. App'x 433. In affirming a district court's dismissal of a MMWA claim for breach of express warranty, the Eleventh Circuit agreed with the lower court's finding that the plaintiffs' failure to allege that they experienced a defect within the durational limitations of the express warranty was fatal to claims of both express and implied warranties under the MMWA. *Id.* at 434–35; *see also Brisson v. Ford Motor Co.,* 602 F.Supp.2d 1227, 1231–33 (M.D.Fla.2009), *rev'd on other grounds,* 349 F. App'x 433 (11th Cir.2009) (per curiam). Therefore, because the defects in Plaintiffs' Door Lock did not manifest prior to the expiration of the warranty on their Jetta, they cannot state a claim for breach of express warranty, under state law or the MMWA.

**3. *Breach of the Duty of Good Faith and Fair Dealing***
Volkswagen argues (DE 18 at 17–18), and Plaintiff does not contest (DE 28 at 19), that a cause of action for breach of the implied covenant of good faith and fair dealing may only succeed where premised upon a breach of an express term of a contract. *See Centurion Air Cargo, Inc. v. UPS Co.,* 420 F.3d 1146, 1152 (11th Cir.2005). Here, Plaintiffs premise their claim for breach of the implied covenant of good faith and fair dealing upon the alleged breach of the terms of the express warranty. See DE 28 at 19. Because Plaintiffs cannot state a claim for breach of the warranty (see *supra* pp. 3–7), neither can they state a claim for breach of the implied covenant of good faith and fair dealing contained in that contract. See *Centurion Air Cargo, Inc.,* 420 F.3d at 1152. The Court therefore will dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

Licul v. Volkswagen Group of America, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 6328734

### 4. *Violation of FDUTPA (Fla. Stat. § 501.201, et seq.)*

**\*5** Volkswagen next argues that Plaintiffs have failed to plead a claim for a violation of FDUTPA and that any such claim would be time-barred. The Court agrees that Marles cannot plead a FDUTPA claim, as she has suffered no actual damage from Volkswagen's alleged misconduct. Plaintiffs' FDUTPA claim also appears time-barred. The Court will therefore dismiss Plaintiffs' FDUTPA claim.

Volkswagen contends that Plaintiffs have failed to plead a FDUTPA claim because Plaintiffs have not alleged the facts supporting their claim with the particularity required by Federal Rule of Civil Procedure 9(b). DE 18 at 13–14. As this Court has previously acknowledged, courts within this district have reached varying conclusions with regard to whether Rule 9(b) applies to FDUTPA claims. See *Toback v. GNC Holdings, Inc.,* No. 13–80526, 2013 U.S. Dist. LEXIS 131135, at \*4–5 & n. 1, 2013 WL 5206103 (S.D.Fla. Sept. 13, 2013). This Court, however, has held that Rule 9(b) does not apply to FDUTPA claims, *see id.,* and is not persuaded that it should reconsider this position. The Court therefore declines to dismiss Plaintiffs' FDUTPA claim for failure to satisfy Rule 9(b).

Nevertheless, the FDUTPA claim with respect to Marles is insufficiently pled, even under the more lenient standard of Rule 8. A plaintiff asserting a FDUTPA claim must allege: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Galstadi v. Sunvest Cmnties. USA, LLC,* 637 F.Supp.2d 1045,1056 (S.D.Fla.2009). Here, Marles cannot plead actual damages. Marles contends that she was harmed by Volkswagen's failure to disclose the defect in the Door Locks because she paid more for her Jetta than she otherwise would have, thereby suffering from the diminished value of the Jetta. DE 28 at 11–12 (citing *Collins v. DaimlerChrysler Corp.,* 894 So.2d 988, 990 (Fla. 5th DCA 2004)). Her claim fails, however, because she also sold the Jetta to an unsuspecting purchaser before the defect in the Door Locks had manifested. In other words, Marles purchased the Jetta at a price that did not take account of the defect, and she sold the Jetta at a price that did not take account of the defect. She therefore did not suffer the loss of any value in the Jetta that could constitute "actual damages." *See Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 195–97, 296 Ill.Dec. 448, 835 N.E.2d 801 (2005) (holding no "actual damage" under Illinois Consumer Fraud Act where plaintiff sought damages for unsatisfactory parts used in vehicle, but had sold vehicle at price that did not reflect lower value resulting from inclusion of such parts). Nor did Marles suffer from the defect itself

during the term of her title to the Jetta, as the defect manifested only after she had sold the car to Licul. DE 1 ¶¶ 34–35. Because Marles cannot show any pecuniary loss or other inconvenience arising from the defective Door Locks while she held title to the Jetta, she cannot plead actual damages, and her claim under FDUTPA is deficient as a matter of law. *See Dorestin v. Hollywood Imps., Inc.,* 45 So.3d 819, 824–25 (Fla. 4th DCA 2010).

**\*6** Plaintiffs' FDUTPA claim also appears time-barred. The statute of limitations on a FDUTPA claim expires four years from the date of sale of the product at issue. Fla. Stat. § 95.11(3)(f); *Matthews v. Am. Honda Motor Co.,* No. 12–60630, 2012 U.S. Dist. LEXIS 90802, at \*9–12, 2012 WL 2520675 (S.D. Fla. June 6, 2012). The limitations period on the FDUTPA claim in this action, barring the application of any tolling doctrine, therefore expired in 2005, four years after Marles purchased the Jetta from Volkswagen. See DE 1 % 34.

Plaintiffs contend that the doctrines of delayed discovery, equitable estoppel, and fraudulent concealment toll the statute of limitations in this action. DE 28 at 4–8. As an initial matter, the delayed discovery rule is inapplicable to FDUTPA claims. *Marlborough Holdings Grp., Ltd. v. Azimut–Benetti,* SPA, 505 F. App'x 899, 905–06 (11th Cir.2013), cert. denied, 187 L.Ed.2d 39 (U.S.2013). Equitable estoppel, on the other hand, only applies when a plaintiff is aware that he has a cause of action during the limitations period, but forbears from bringing suit because of the defendant's misrepresentations. *Spadaro v. City of Miramar,* 855 F.Supp.2d 1317, 1329 (S.D.Fla.2012); *Black Diamond Props., Inc. v. Haines,* 69 So.3d 1090, 1093–94 (Fla. 5th DCA 2011). Because Plaintiffs did not know of the defective Door Locks until after the limitations period had expired, the doctrine of equitable estoppel is inapplicable here. *See Spadaro,* 855 F.Supp.2d at 1329.

Plaintiffs have also failed to plead facts to support tolling under the doctrine of fraudulent concealment, though the doctrine could conceivably apply here. A plaintiff seeking to toll the statute of limitations as a result of fraudulent concealment "must allege ... (1) successful concealment of the cause of action, (2) fraudulent means to achieve that concealment, and (3) plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of his claim." *Burr v. Philip Morris USA* Inc., No. 07–01429, 2012 U.S. Dist. LEXIS 159084, at \*10–11, 2012 WL 5290164 (M .D.Fla. Sept. 28, 2012) (citing *Beresford v.*

*Jack Eckerd Corp.,* 667 So.2d 809, 811–12 (Fla. 4th DCA 1995)). The "fraudulent means" alleged must go beyond mere non-disclosure, and must constitute active and willful concealment. *Raie v. Cheminova, Inc.,* 336 F.3d 1278, 1282 n. 1 (11th Cir.2003); *Nardone v. Reynolds,* 333 So.2d 25, 39 (Fla.1976).

Here, casting aside the conclusory labels applied by Plaintiffs to Volkswagen's actions, Plaintiffs have failed to plead any facts to support their claim that Volkswagen concealed the defects in the Door Locks through any fraudulent means. In terms of actual facts, Plaintiffs allege only that Volkswagen "has not publicized the defect to the public" (DE 1 ¶ 5), has not "warned its customers of the defect" of the Door Locks (id.¶ 28), and "fail [ed] to notify Plaintiffs ... of the Defective Door Lock in the [Jettas]" (id.¶ 87). These allegations of Volkswagen's inaction and non-disclosure are wholly insufficient to supply the affirmative steps taken to prevent Plaintiffs from discovering the basis of their claims that would be necessary before tolling based on fraudulent concealment becomes appropriate. See Raie, 336 F.3d at 1282 n. 1; Burr, 2012 U.S. Dist. LEXIS 159084, at *13.

**\*7** Nor are Plaintiffs' allegations salvaged by their unsupported conclusions of more dastardly behavior, for example that Volkswagen "actively concealed and failed to disclose the Defective Door Lock" (DE 1 ¶ 6), made a "conscious effort to conceal material facts" (id.¶ 10), "concealed its knowledge from Plaintiffs and other consumers" (id.¶ 29), "knowingly and intentionally conceal[ed] ... the fact that the [Jettas] suffer from a defect" (id.¶ 73), and that "[a]ny applicable statute of limitations has been tolled by [Volkswagen's] knowing and active concealment and denial of the facts alleged [in the Complaint]" (id .¶ 43). These assertions of concealment are devoid of actual facts showing Volkswagen's purported intent or actions taken to conceal the defects in the Door Locks.

Because Plaintiffs have pled only labels and conclusions to support their theory of fraudulent concealment, tolling of the applicable limitations period is inappropriate, and the Court will dismiss the FDUTPA claim with respect to Licul as time-barred. See Fla. Stat. § 95.11(3)(f); *Twombly,* 550 U.S. at 555. Nevertheless, because Plaintiffs may be able to allege additional facts to justify tolling under the fraudulent concealment doctrine, this dismissal shall be without prejudice.[1]

**5.** *Unjust Enrichment*

Finally, the Court will dismiss Plaintiffs' claim for unjust enrichment as duplicative of the other counts in the Complaint. Unjust enrichment is an equitable cause of action that is unavailable where the underlying wrongs are properly addressed by a legal remedy. *Bowleg v. Bowe,* 502 So.2d 71, 72 (Fla. 3d DCA 1987). A plaintiff may plead unjust enrichment as an alternative theory to a legal cause of action. *Weaver v. Mateer & Harbert, P.A.,* No. 09–514, 2012 U.S. Dist. LEXIS 104771, at *55–56, 2012 WL 3065362 (M.D.Fla. July 27, 2012), aff'd, 523 F. App'x 565 (11th Cir.2013). However, where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action. *Id.* at *56 ("[A]lthough Plaintiff may be entitled to plead in the alternative, that is not what Plaintiff has done in this case. Plaintiff's unjust enrichment claim relies on the factual predicate common to all its claims.").

Here, Plaintiffs' unjust enrichment claim is a vague catch-all that does no more than incorporate by reference the alleged wrongdoing already addressed by their other legal causes of action, and thus should be dismissed as duplicative. See DE 1 ¶¶ 91–93. Plaintiffs allege broadly that it would be inequitable for Volkswagen to retain benefits gained through the "misconduct" and "unfair and deceptive conduct" alleged elsewhere throughout the Complaint. *Id.* ¶¶ 92–93. Plaintiffs make no effort to distinguish the "misconduct" and "unfair and deceptive conduct" supporting their unjust enrichment claim from the alleged wrongdoing underlying their FDUTPA claim. *See* DE 1 ¶¶ 69–75. Therefore, if Volkswagen's sale of the Jettas was "unfair and deceptive," Plaintiffs' appropriate legal remedy is under FDUTPA. *See Guerrero v. Target Corp.,* 889 F. supp.2d 1348, 1356–57 (S.D.Fla.2012) (dismissing as duplicative unjust enrichment claim predicated on "same wrongful conduct as [plaintiff's] FDUTPA claim").

**\*8** The unjust enrichment claim also fails as an alternative to Plaintiffs' breach of warranty claims. Plaintiffs assert their unjust enrichment claim "in the alternative ... to the extent that any contracts do not govern the entirety of the subject matter of the disputes with Defendant." DE 1 ¶ 90. Plaintiffs acknowledge that "an unjust enrichment claim can only be pled in the alternative [to a contract claim] if one or more parties contest the existence of an express contract governing the subject of the dispute." DE 28 at 20 (quoting *Zarella v. Pac. Life Ins. Co.,* 755 F.Supp.2d 1218, 1227 (S.D.Fla.2010)). Defendant concedes that the express warranty supporting

Licul v. Volkswagen Group of America, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 6328734

Plaintiffs' warranty claims exists to govern the relationship between the parties with regard to the defective Door Locks. DE 18 at 19; DE 30 at 10. Plaintiffs nevertheless contend that Volkswagen "contests the existence of an express contract governing the subject of the dispute." DE 28 at 20. The passage in Volkswagen's papers which Plaintiffs rely upon to support this contention, however, is not a denial of the existence of a contract, but instead refers to a purported lack of detail in Plaintiffs' allegations supporting their breach-of-good-faith claim. See DE 18 at 17–18. Plaintiffs' unjust enrichment claim therefore also fails as an alternative to their breach of warranty claims. *See Weaver,* 2012 U.S. Dist. LEXIS 104771, at *55–56, 2012 WL 3065362.

Because Plaintiffs' unjust enrichment claim merely restates their other causes of action, it fails as a matter of law. *See Bowleg,* 502 So.2d at 72. The Court will therefore dismiss the claim for unjust enrichment.[2]

## III. CONCLUSION

In sum, Plaintiffs' claims for breach of express warranty, breach of the covenant of good faith and fair dealing, and unjust enrichment fail as a matter of law. Accordingly, the Court will dismiss those claims with prejudice. Similarly, Marles cannot state a claim under FDUTPA because she has suffered no actual damages, and her FDUTPA claim will be dismissed. Finally, Licul's FDUTPA claim will be dismissed

without prejudice as untimely, as Licul could conceivably plead additional facts to support his allegations of fraudulent concealment to toll the applicable statute of limitations. In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

(1) Defendant's Dispositive Motion to Dismiss [DE 18] is **GRANTED;**

(2) Counts I and III through V of the Complaint herein are **DISMISSED with prejudice;**

(3) Count II is **DISMISSED with prejudice** as to Plaintiff Scheherezade Marles;

(4) Count II is **DISMISSED without prejudice** as to Plaintiff Oliver Licul; and

(5) Plaintiffs shall file any Amended Complaint on or before **December 20, 2013.** If no Amended Complaint is filed by that date, the Court will direct that this case be closed.

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6328734

---

Footnotes

1    Because the Court finds that Plaintiffs have failed to plead fraudulent concealment under the standard of Rule 8, it declines to address whether Plaintiffs must satisfy the heightened pleading standard of Rule 9(b) to justify tolling. Cf. *Wallace v. Mortg. Elec. Registration Sys., Inc.,* No. 10–2509, 2011 U.S. Dist. LEXIS 36415, at *9–10, 2011 WL 1298195 (M.D.Fla. Apr. 1, 2011) (applying Rule 9(b) to find that plaintiff had failed to plead tolling based upon failure to disclose and deceptive lending practices); *Williams v. Saxon Mortg. Servs., Inc.,* No. 06–0799, 2007 U.S. Dist. LEXIS 72337, at *13 n. 8, 2007 WL 2828752 (S.D.Ala. Sept. 27, 2007) (collecting precedent holding that allegations of fraud supporting tolling must satisfy Rule 9(b) standard).

2    That Plaintiffs' warranty and FDUTPA claims may also prove without merit does not impact whether their unjust enrichment claim should be dismissed as duplicative. *See Matthews,* 2012 U.S. Dist. LEXIS 90802, at *5–13, 2012 WL 2520675 (dismissing FDUTPA claim as untimely and dismissing unjust enrichment claim as duplicative of FDUTPA claim); *David v. Am. Suzuki Motor Corp.,* 629 F.Supp.2d 1309, 1324–25 (S.D.Fla.2009) (dismissing unjust enrichment claim as duplicative without determining viability of contractual claim predicated on same facts).

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 45

2019 WL 1125589
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE LIQUID ALUMINUM
SULFATE ANTITRUST LITIGATION
This Document Relates to: Civ. Action Nos.
18-9781, 18-3440, 18-11027, and 18-9231

Civil Action No.: 16-md-2687 (JLL)
|
Signed 03/11/2019

**OPINION**

JOSE L. LINARES, Chief Judge

**\*1** This matter comes before the Court by way of several motions to dismiss by various Defendants in differing underlying actions. These motions are as follows:

- Defendant USALCO, LLC ("USALCO") moves to dismiss the City of Akron ("Akron")'s Complaint filed in Civil Action Number 18-9781 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1100). [1]

- Defendants Brenntag Mid-South, Inc., Brenntag Southeast, Inc., and Brenntag North America (collectively "Brenntag") move to dismiss the Commissioners of Public Works of the City of Charleston (*d.b.a* Charleston Water System) and Grand Strand Water & Sewer Authority ("GSWSA") (collectively "the Charleston Plaintiffs")'s Complaint filed in Civil Action Number 18-3440 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1116).

- Brenntag moves to dismiss the Commission of Public Works of the City of Greenville (*d.b.a.* Greenville Water) ("Greenville")'s Complaint filed in Civil Action Number 18-11027 pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 1117).

- USALCO moves to dismiss the Charleston Plaintiffs, Greenville, and the Commission of Public Works of the City of Spartanburg, the City of Winston-Salem, and the South Carolina Public Service authority (*d.b.a.* Santee Cooper) (collectively "the Spartanburg

Plaintiffs" and all together "the South Carolina Plaintiffs")'s Complaints filed in Civil Action Numbers 18-3440, 18-11027, and 18-9231 pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF No. 1143).

- Delta Chemical Corporation and John D. Besson (the "Delta Defendants") move to dismiss the South Carolina Plaintiffs' Complaints filed in Civil Action Numbers 18-3440, 18-11027, and 18-9231 pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (ECF Nos. 1144–46).

All Plaintiffs named above have submitted oppositions (ECF Nos. 1101, 1118, 1147–48), to which all Defendants named above have replied. (ECF Nos. 1104, 1120, 1149, 1152). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. Because of the similarity of the facts in these complaints and the similarity of the arguments set forth in the motions and oppositions, the Court will consolidate the analysis where feasible. For the reasons set forth below, the Court denies Defendants' motions to dismiss.

## I. **BACKGROUND** [2]

The Court has set forth, at length, the factual and procedural background as it pertains to this Multidistrict Litigation in its Opinion dated July 20, 2017. (ECF No. 405 at 1–24). Accordingly, the Court need not restate, and hereby incorporates, that factual and procedural background herein. Thus, the Court will set forth only the relevant factual and procedural background as it pertains to these specific Defendants and their motions.

**\*2** Plaintiffs brought these actions seeking to recover monetary damages and injunctive relief against Defendants for conspiring to suppress and eliminate competition in the sale and marketing of aluminum sulfate ("Alum"), pursuant to the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Clayton Antitrust Act, 15 U.S.C. §§ 12–17 & 29 U.S.C. §§ 52–53, and the laws of the State of South Carolina and North Carolina. [3] (FAC ¶ 1; Civ. No. 18-9231, ECF No. 1 ("Spartanburg Compl.") ¶ 1). Plaintiffs contend that Defendants agreed to "rig bids and allocate customers for. and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipal authorities in the United States from January 1, 1997 through at least

February 2011 ...." (FAC ¶ 1). Specifically, Plaintiffs allege that Defendants met to "discuss their respective Alum businesses," agreed to " 'stay away' from each other's historical customers," submitted "intentionally high," or "throw away" bids, and withdrew winning bids "in cases where a bid was inadvertently submitted." (FAC ¶ 4).

Defendant John D. Besson is presently a resident of Miami Beach, Florida. (FAC ¶ 21). He was the president of Delta Chemical and "oversaw its sale and marketing of water treatment chemicals, including Alum," in addition to "effectuating attempts" to sell or merge Delta Chemical with another company. (FAC ¶ 21). Plaintiffs allege that Defendant John Besson "joined, participated in, and benefitted from the unlawful [Alum] conspiracy." (FAC ¶ 21). After Delta Chemical combined with USALCO in November 2011, Defendant John Besson became a USALCO consultant. (FAC ¶ 21).

Defendant Delta Chemical is a Maryland corporation with a principal place of business in Baltimore, Maryland. (FAC ¶ 49). Delta Chemical sold Alum throughout the United States. (FAC ¶ 49). Plaintiffs allege that "[f]rom the beginning of the Conspiracy Period to the date USALCO combined with Delta Chemical on November 17, 2011, Delta Chemical was an active participant in, and benefitted from, the conspiracy." (FAC ¶ 49). Moreover, "[a]s a result of Delta Chemical's combination with USALCO, Delta Chemical ceased to be a potential competitor in the sale and marketing of Alum." (FAC ¶ 49). Plaintiffs contend that the combination "was made in furtherance of, and intended to reinforce, the Defendants' unlawful conspiracy ... by increasing USALCO's market power and eliminating the possibility of competition emerging ...." (FAC ¶ 50). Plaintiffs also argue that Defendant John Besson "profited handsomely" from the combination of the two firms. (FAC ¶ 51).

Defendant USLALCO is a Maryland corporation with a principal place of business in Baltimore, Maryland. (FAC ¶ 48). USALCO manufactures and distributes Alum throughout North America. (FAC ¶ 48). After the combination of Delta Chemical and USALCO, USALCO "assumed Delta Chemical's rights and obligations under Delta Chemical's then-operative Alum supply contracts." (FAC ¶ 49). Thus, USALCO became the successor in interest to Delta Chemical's liabilities. (FAC ¶ 49).

Brenntag Mid-South and Brenntag Southeast are wholly owned subsidiaries of Brenntag North America, which are

Kentucky and North Carolina corporations with principal places of business in Kentucky and North Carolina, respectively. (FAC ¶¶ 54, 56). Brenntag North America is a Delaware corporation with a principal place of business in Reading, Pennsylvania. (FAC ¶ 55). Brenntag distributes Alum throughout the United States and is alleged to have participated in the conspiracy. (FAC ¶ 55).

Akron alleges that USALCO was part of a conspiracy to fix Alum prices, allocate consumers, and reduce competition amongst the members of the conspiracy. (Akron Compl. ¶ 5). In order to further and effectuate the conspiracy, Akron contends that USALCO met and communicated in secret to exchange confidential, competitive information regarding their business with other members of the conspiracy. (Akron Compl. ¶ 5). Those meetings and conversations resulted in agreements to: (1) "stay away" from each firm's historical customers, (2) track the bid and pricing histories of the co-conspirators for the purposes of rigging bids, (3) actually submit those rigged or—"throw away"—bids to intentionally lose the bid for a coconspirator's customer, (4) set price floors for the price of Alum, (5) compensate the losing firm where one of the other firms could not withdraw a bid that it was not supposed to win, (6) teach new employees how to figure out how to comply with the bid rigging arrangement, and (7) sell Alum to customers at non-competitive rates. (Akron Compl. ¶¶ 5–6, 56–74).

**\*3** The South Carolina Plaintiffs assert similar allegations against Defendants. For example, they point to an example from March 2005, where USALCO entered into a three-year contract with Grand Rapids, Michigan at a price of $149.52 per ton. (FAC ¶ 185(a) ). The other two bidders were General Chemical and C&S Chemicals which submitted bids that were 25% and 55% higher than USALCO's, indicating a practice of "throw-away" bidding. (FAC ¶ 185(a) ). On top of these anomalous bidding practices, a study of forty-seven United States drinking water utilities indicated an average 53% price increase over the preceding year from 2008 to 2009. (FAC ¶ 99). These stark price jumps can be seen in Brenntag's winning bid for a contract with GSWSA in 2009. (FAC ¶ 244). Brenntag's bid—at $359.75 per ton of Alum —constituted a 94% increase in price from 2007. (FAC ¶ 244). Plaintiffs also contend that Defendants' bidding history with respect to Alum contracts was not "freight-logical," because Defendants did not bid (or submitted higher bids) on customers that were close to their production plants, which would have reduced shipping costs. (FAC ¶ 181–84).

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)

2019 WL 1125589, 2019-1 Trade Cases P 80,712

"As a result of the conspiracy among Defendants," the Plaintiffs were allegedly "forced to pay supra-competitive prices for Alum." (FAC ¶ 264). The Charleston Plaintiffs, for example, saw their cost for Alum quadruple over a decade rising from $95.34 per ton in 1998 to $319.10 per ton in 2011. (FAC ¶ 264). Plaintiffs argue that Defendants "used non-public means of communication ... to eliminate competition by, *inter alia*, fixing prices, rigging bids, and allocating customers for Alum in the United States." (FAC ¶ 271). Moreover, Defendants allegedly "took additional affirmative acts of concealment, including ensuring that there were few written communications regarding their conspiracy and agreement." (FAC ¶ 282).

Accordingly, Plaintiffs assert the following contested claims: Conspiracy in Restraint of Trade in violation of the Sherman Act against all Defendants; [4] Arrangements, Contracts, Agreements, Trusts and Combinations Adversely Affecting Competition or Price in violation of *South Carolina Code Ann. § 39-3-10* against all Defendants; Common Law Fraud against Brenntag; Breach of Contract against Brenntag (by GSWSA only); and Restitution, Disgorgement, and Unjust Enrichment against the Delta Defendants. [5]

Defendants now seek to dismiss Plaintiffs' complaints for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)* and for failure to state a claim upon which relief can be granted under *Federal Rules of Civil Procedure 12(b)(6)*.

## II. LEGAL STANDARD

### A. 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

In a multi-district litigation such as this, the "transferee court can exercise personal jurisdiction to the same extent that the transferor court could." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004). In this case, that would be the District Court for the District of South Carolina.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, the burden shifts to the plaintiff to prove that jurisdiction exists. *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). Where, as here, there is no evidentiary hearing, a plaintiff need only establish a prima facie case of personal

jurisdiction and the court must construe the facts and draw inferences in favor of the plaintiff. *Id.*

A federal court sitting in South Carolina has jurisdiction over parties to the extent provided under South Carolina state law. *Gracious Living Corp. v. Colucci & Gallaher, PC*, 216 F. Supp. 3d 662, 667 (D.S.C. 2016). "South Carolina's long-arm statute extends to the outer limits allowed by the Due Process Clause." *Id.* A district court sitting in South Carolina may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts [with South Carolina] such that the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945) ).

**\*4** A court's personal jurisdiction over a non-resident defendant is either specific or general. *ESAB Grp. v. Centricut, Inc.* 126 F.3d 617, 623–24 (4th Cir. 1997). General jurisdiction results from systematic and continuous contact between a non-resident defendant and the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & nn. 8–9 (1984). [6] Specific jurisdiction over a defendant exists where the suit is related to the defendants conduct in the forum. *Id.*

The Fourth Circuit has established a three-part test for specific jurisdiction: first, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum; second, the plaintiff's claims must arise out of those activities related to the forum; and third, the exercise of jurisdiction must be "constitutionally reasonable." *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001).

### B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)
2019 WL 1125589, 2019-1 Trade Cases P 80,712

at 678 (citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting Twombly, 550 U.S. at 556).

To determine the sufficiency of a complaint under Twombly and Iqbal in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court can review the record of prior actions between the parties and take judicial notice of the same in considering a motion to dismiss. See *Toscano v. Conn. Gen. Life Ins. Co.*, 288 F. App'x 36, 38 (3d Cir. 2008).

## III. ANALYSIS

### A. Personal Jurisdiction

USALCO and the Delta Defendants move to dismiss the South Carolina Plaintiffs' complaints for lack of personal jurisdiction pursuant to Rule 12(b)(2).

#### i. *USALCO*

USALCO argues that this Court lacks personal jurisdiction over it because the South Carolina Plaintiffs' complaints "are devoid of any ... factual allegations sufficient to establish personal jurisdiction" and instead "make two sweeping, generalized, bare and conclusory allegations that they fail to back up with supporting facts." (ECF No. 1143-2 at 7–8). USALCO contends that the South Carolina Plaintiffs have failed to establish jurisdiction by lumping all Defendants together in their allegations, and that the allegations specific to USALCO are vague and conclusory. (ECF No. 1143-2 at 8). The South Carolina Plaintiffs respond that USALCO is

subject to personal jurisdiction on three grounds: (1) under the national contacts doctrine applicable in federal antitrust actions, (2) as a co-conspirator in the Alum conspiracy, and (3) under the doctrine of pendant personal jurisdiction for the state law claims. (ECF No. 1147 at 5–6).

*5 The South Carolina Plaintiffs are correct that personal jurisdiction in federal antitrust lawsuits is assessed under the national contacts doctrine, which bases personal jurisdiction on a defendant's aggregate contacts with the United States where the relevant statute authorizes nationwide service of process. See e.g., *ESAB Grp.*, 126 F.3d at 626–27 (applying the national contacts doctrine to a RICO suit, where Congress has authorized nationwide service of process); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 299 ("We hold that personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."). This means that personal jurisdiction must comply with the due process requirements of the Fifth Amendment, which requires only that the South Carolina Plaintiffs show that USALCO had minimum contacts with the United States as a whole. *ESAB Grp.*, 126 F.3d at 626–27. The South Carolina Plaintiffs allege that USALCO is a Maryland corporation, with a principal place of business in Maryland, that manufactured, distributed and sold Alum throughout the United States from January 1, 1997 through at least February 2011. (FAC ¶ 48). Plaintiffs also allege that USALCO has manufacturing facilities in Indiana, Louisiana, Maryland, and Ohio. (FAC ¶¶ 1, 48). Such contacts are sufficient to establish personal jurisdiction.[7] See *In re Celotex Corp.*, 124 F.3d at 630 (holding that there is "no doubt" that a Delaware corporation with a principal place of business in New York has sufficient contacts with the United States so as not to offend the Due Process Clause of the Fifth Amendment). With respect to the state law antitrust claims, this Court has pendant jurisdiction over those claims, as those claims arise out of the "same nucleus of operative fact." *ESAB Grp.*, 126 F.3d at 628.[8]

#### ii. *The Delta Defendants*

The Delta Defendants make the same arguments regarding lack of personal jurisdiction as USALCO, and the South Carolina Plaintiffs respond in the same manner with one exception: individual defendant John Besson. (ECF Nos. 1144-1 at 17–20; 1145-1 at 17–20; 1146-1 at 17–20; 1148

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)
2019 WL 1125589, 2019-1 Trade Cases P 80,712

at 16–22). The South Carolina Plaintiffs allege that Delta Chemical is a Maryland Corporation, with a principal place of business in Maryland and that throughout the injury period, Delta Chemical sold Alum across the United States. (FAC ¶ 49). For the same reasons that these allegations established personal jurisdiction over USALCO, they establish personal jurisdiction over Delta Chemical for both the federal and state antitrust claims.

As to John Besson, the Delta Defendants argue that he is not subject to personal jurisdiction as an officer of Delta Chemical. (ECF No. 1144-1 at 19). Personal jurisdiction over an officer of a defendant corporation is established where there is a "showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury." *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 315 (D.S.C. 1992) (quoting *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980) ). This Court has already found that John Besson participated in the conspiracy, (ECF No. 1030 at 10, 12), and as such there has been a showing of Besson's direct and personal involvement that was causally related to the plaintiff's injury.

**B. Failure to State a Claim**
For the following reasons, Defendants' motions to dismiss Plaintiffs' complaints are denied.

*i. Conspiracy in Restraint of Trade in Violation of the Sherman Act*
To survive a motion to dismiss, Plaintiffs must prove two essential elements for a claim of conspiracy in restraint of trade (1) violation of the Sherman Act. Plaintiffs must show that (1) a contract, combination, or conspiracy existed and that (2) such contract, combination, or conspiracy "imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (quoting *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008) ).

Preliminarily, this Court has already found that, at least at the pleading stage, a conspiracy existed. (ECF No. 405 at 45–65). In addition to the specific examples of alleged bid-rigging and collusive behavior detailed above, Plaintiffs allege that Defendants conspired to suppress and eliminate competition in the sale and marketing of Alum. (FAC ¶ 1). Specifically,

Plaintiffs allege that Defendants agreed to "rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipal authorities in the United States from January 1, 1997 through at least February 2011 ...." (FAC ¶ 1). Furthermore, Plaintiffs allege Defendants met to "discuss their respective Alum businesses," agreed to " 'stay away' from each other's historical customers," submitted "intentionally high," or "throw away" bids, and withdrew winning bids "in cases where a bid was inadvertently submitted." (FAC ¶ 4). These allegations are sufficient to support a prima facie claim that Defendants engaged in a conspiracy which imposed an unreasonable restraint on the trade of Alum in violation of the Sherman Act. Hence, the claim must survive Defendants' motions to dismiss.

**\*6** As to USALCO's argument that they have been improperly lumped together with other Defendants in the Akron Complaint, that argument fails. "If 'inferences can be fairly drawn from the behavior of the alleged conspirators' which indicate that they participated in the conspiracy, the Court should construe the Complaint 'liberally in the plaintiffs' favor' at the motion to dismiss stage and allow the case to proceed. *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) (quoting *Jung v. Assoc. of Am. Med. Colleges*, 300 F. Supp. 2d 119, 157–58) (D.D.C. 2004) ). Given the Court's preliminary findings about the existence of a conspiracy, (ECF No. 405 at 45–65), Akron's Complaint sufficiently ties USALCO to that wide-ranging conspiracy in that it alleges that USALCO manufactures and sells Alum in a market that is conducive to collusion and that has seen guilty pleas from other participants in that same market who are involved in this litigation, (Akron Compl. ¶¶ 3–4, 8–9, 27, 44–55).

Brenntag also makes a statute of limitations argument as well as one it claims is unique to its position as a distributor of Alum rather than a manufacturer. First, it argues that the Charleston Plaintiffs and Greenville's claims are barred by the Sherman Act's four-year statute of limitations. (ECF No. 1116-1 at 10–13). [9] Second, Brenntag argues that it had no rational economic incentive to participate in the conspiracy, and even if it did, its conduct complied with federal law. (ECF No. 1116-1 at 14–19).

The Sherman Act's statute of limitations would apply unless the Charleston Plaintiffs and Greenville have sufficiently pled fraudulent concealment. *In re Elec. Carbon Prods.*, 333 F. Supp. 2d at 315. For fraudulent concealment to toll the

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)
2019 WL 1125589, 2019-1 Trade Cases P 80,712

statute of limitations, a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

The Court is satisfied that the Charleston Plaintiffs and Greenville have adequately pled fraudulent concealment. First, the Court has already found that the conspiracy was self-concealing and that the applicable statute of limitations may be tolled as to other defendants in the conspiracy. (ECF No. 405 at 38–40). The Charleston Plaintiffs and Greenville make very similar allegations to those that this Court already found established fraudulent concealment. They allege that Brenntag participated in a "self-concealing" conspiracy, that the participation in that conspiracy was secret, and that Brenntag included non-collusion provisions in their bid invitations to hide their conspiratorial acts. (FAC ¶¶ 270, 276, 277–79). These allegations, coupled with a detailed history of Brenntag's participation in the conspiracy, (FAC ¶¶ 241–55), are sufficient to establish a claim of fraudulent concealment. Brenntag's argument that the Charleston Plaintiffs and Greenville should have been on notice of the conspiracy because due diligence would have uncovered the obviously coordinated nature of their bids has already been rejected by this Court. (ECF No. 405 at 37–40).

As to Brenntag's economic incentive to participate in the conspiracy, the Charlotte Plaintiffs and Greenville point to emails that they allege show that Brenntag's profit was based on a percentage of the price charged for Alum. (FAC ¶¶ 250–52). As the Charlotte Plaintiffs and Greenville correctly indicate, it is a matter of mathematics that a fixed percentage of a higher sale price would result in higher profits for Brenntag, if that is indeed how the compensation structure was arranged. (ECF No. 1118 at 22). In any event, accepting those allegations as true at this stage, Brenntag had sufficient financial incentive to participate in the conspiracy. Nor was Brenntag's conduct "equally consistent with lawful conduct," as they allege, (ECF No. 1116-1 at 17). As explained above, the Charleston Plaintiffs and Greenville have made several allegations and attached several documents indicating Brenntag's participation in the conspiracy. (*See, e.g.*, FAC ¶ 250 (purporting to show bid coordination between C&S Chemical and Brenntag); ECF No. 1118-3 at 2 (an internal GEO Specialty Chemicals report noting that they discussed with Brenntag their "concerns with competitive activity [they]

have experienced at municipal accounts," and that Brenntag assured it would "work closely with GEO to eliminate the opportunity of taking any direct accounts of [theirs]") ). Consistent with this Court's earlier decisions in this MDL, such allegations are sufficient to state a claim under the Sherman Act at the motion to dismiss stage.

ii. *Arrangements, Contracts, Agreements, Trusts and Combinations Adversely Affecting Competition or Price in violation of South Carolina Code Ann. § 39-3-10*

**\*7** "South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement." *Drs. Steuer and Latham, P.A. v. Nat'l Med. Enters.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd* 846 F.2d 70 (4th Cir. 1988) (quoting *In re Wiring Device Antitrust Litig.*, 489 F. Supp. 79, 87 (E.D.N.Y. 1980) ). As such, claims brought under South Carolina's state antitrust law will be interpreted the same as claims brought under federal antitrust law. *Id.* Because the South Carolina Plaintiffs' claims pursuant to the Sherman Act are sufficient to survive Defendants' motions to dismiss, the South Carolina Plaintiffs' claims under South Carolina state antitrust claims must also survive. [10]

iii. *Common Law Fraud as to Brenntag*

Brenntag fails to brief the Court on the requirements of a common law fraud claim in South Carolina and instead only argues that Greenville and the Charleston Plaintiffs fail to meet the standard of Rule 9(b). (ECF No. 116-1 at 20–21). The Court must analyze Greenville and the Charleston Plaintiffs' fraud claim in the context of the relevant state law, so the elements of a South Carolina fraud claim are as follows: (1) a representation; (2) that is false; (3) and material; (4) made with either knowledge of or reckless disregard for its truth or falsity; (5) with the intent that it be acted upon; (6) where the hearer is ignorant of the representation's falsity; (7) relies on its truth; (8) had a right to rely on its truth; (9) and was proximately injured by that reliance. *Ardis v. Cox*, 431 S.E.2d 267, 269 (S.C. 1993).

The Greenville and Charleston Plaintiffs allege that Brenntag "used deception," "made a misrepresentation," and "concealed, suppressed or omitted material facts in connection with the sale" of Alum. (FAC ¶ 319). Specifically, Defendants allegedly "represented" that Alum prices were offered based on a "competitive market" while participating in an unlawful conspiracy to "inflict monetary harm" on

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)
2019 WL 1125589, 2019-1 Trade Cases P 80,712

Plaintiffs. (FAC ¶¶ 320, 324). For example, Greenville and the Charleston Plaintiffs have set forth a number of communications that they allege show explicit bid coordination between Brenntag and C&S chemicals. (FAC ¶¶ 250–52). One such communication shows the vice president of C&S Chemicals directing the market manager of Brenntag Southeast to bid on the Greenville contract at $246.75. (FAC ¶ 250). Brenntag bid that amount, and C&S chemicals submitted a bid only 25 cents higher. (FAC ¶ 250). The Greenville and Charleston Plaintiffs also allege that Brenntag affirmatively concealed this conspiratorial behavior in their contracts, which contained sections affirming and ensuring compliance with federal, state, and local law, and assured the parties to the contract that the bids were not collusive. (FAC ¶¶ 277–79).

Greenville and the Charleston Plaintiffs' allegations, when taken as true, support the claims that Brenntag knowingly misrepresented the propriety of their Alum bidding practices with the purpose of defrauding Greenville and the Charleston Plaintiffs and that Greenville and the Charleston Plaintiffs reasonably relied upon Brenntag's representation and suffered a resulting compensable injury. *Ardis*, 431 S.E.2d at 269. Therefore, at this juncture, Plaintiffs' claims of common law fraud must survive Brenntag's motion to dismiss.

### iv. *Breach of Contract against Brenntag*

**\*8** Brenntag argues only that GSWSA's breach of contract claim fails for the same reasons that its antitrust claims fail: "no allegations plausibly suggest that Brenntag engaged in collusive conduct." (ECF No. 1116-1 at 21). As this Court has already found that there are allegations plausibly suggesting that Brenntag engaged in collusive conduct, Brenntag's argument fails and this Court will allow GSWSA's breach of contract claim to proceed.

### v. *Restitution, Disgorgement, and Unjust Enrichment*

In South Carolina, to support a claim for unjust enrichment, a "plaintiff must show: (1) he conferred a non-gratuitous benefit on the defendant; (2) the defendant realized some value from the benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." *Inglese v. Beal*, 742 S.E.2d 687, 691 (S.C. Ct. App. 2013). "The remedy for unjust enrichment is restitution." *Id.*

The South Carolina Plaintiffs assert that it would be "inequitable" for the Delta Defendants "to be allowed to retain the benefits" they "obtained from their illegal agreements, manipulative acts, and other unlawful conduct" at the expense of the South Carolina Plaintiffs. (FAC ¶ 338). Moreover, the South Carolina Plaintiffs aver that it would be equally inequitable for Defendant John Besson to be "allowed to retain the millions of dollars that he personally received ... in connection with Delta Chemical's combination with USALCO" because of its alleged connection to the aforementioned conspiracy. (FAC ¶ 339). However, the Delta Defendants argue, and the South Carolina Plaintiffs do not contest, that there were no contracts between the Delta Defendants and the South Carolina Plaintiffs for the sale of Alum, and thus there was no benefit conferred. (ECF No. 1144-1 at 33). [11]

The question then is whether a claim for unjust enrichment can be based on the inflated prices that the South Carolina Plaintiffs paid for Alum and the allegedly excess profits that the Delta Defendants received, albeit not directly from the South Carolina Plaintiffs, based on the conspiracy as a whole. One court, analyzing state-law unjust enrichment claims (including South Carolina) in a nationwide antitrust class action at the motion to dismiss stage, collected substantial authority indicating that the benefit conferred on the defendant need not be direct. *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 896–97 (E.D. Mich. 2014) (collecting cases and concluding that the "critical inquiry" is whether the relationship between the plaintiff's detriment and defendant's benefits "flow[s] from the challenged conduct" (quoting *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) ) ); *see also In re Auto. Parts Antitrust Litig.*, 12-md-2311, 2014 WL 2993753, at *36 (E.D. Mich. July 3, 2014) (finding that where the plaintiffs alleged that they "conferred a benefit to [the defendants] because they paid more than the true value of [the product] as a result of [the defendants'] conspiracy," those allegations satisfied the elements of South Carolina law at the pleading stage for a claim of unjust enrichment); Daniel R. Karon, *Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 418–28 (2005) (surveying unjust enrichment claims in antitrust cases across the country and concluding that the plaintiff need not pay a direct benefit to the defendant).

**\*9** As discussed above, the South Carolina Plaintiffs have sufficiently alleged the existence of the Delta Defendants' collusive behavior, which contributed to higher prices of Alum across the United States and increased profits for the

In re Liquid Aluminum Sulfate Antitrust Litigation, Slip Copy (2019)

2019 WL 1125589, 2019-1 Trade Cases P 80,712

Delta Defendants. As such, the South Carolina Plaintiffs have adequately pled a claim for unjust enrichment against the Delta Defendants. [12]

## IV. CONCLUSION

For the aforementioned reasons, Defendants' motions to dismiss are denied. An appropriate Order accompanies this Opinion.

**All Citations**

Slip Copy, 2019 WL 1125589, 2019-1 Trade Cases P 80,712

## Footnotes

1    The ECF numbers cited to herein refer to the main consolidated docket: 16-md-2687.

2    For purposes of brevity, the Court will cite only to the Charleston Plaintiffs' Amended Complaint whenever the Akron, Greenville, and or Spartanburg Complaints allege similar facts. Hence, this background is generally derived from Charleston Plaintiffs' Amended Complaint ("FAC"), which was docketed on the consolidated docket, 16-md-2687. (ECF No. 839). The Court must accept the allegations therein as true at this stage of the proceedings. *See* 🔖 *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

3    Akron does not bring state law claims. (Civ. No. 18-9781, ECF No. 1 ("Akron Compl.") ).

4    This is the only count Akron asserts in its Complaint.

5    This claim is not being brought by the Spartanburg Plaintiffs.

6    Plaintiffs are not asserting general jurisdiction, so the Court will not go into detail regarding that legal standard.

7    The Court need not analyze service of process and venue, as USALCO waived service of process, (ECF No. 804), and it does not challenge venue.

8    USALCO also moves in the alternative for a more definite statement concerning the pleading of certain facts related to the Court's personal jurisdiction analysis. (ECF No. 1143-2 at 12–14). As the Court finds that the South Carolina Plaintiffs have established personal jurisdiction without relying on those facts, USALCO's motion for a more definite statement is denied as moot.

9    It also argues that the Charleston Plaintiffs and Greenville's state antitrust claims are time-barred under that statute's three-year statute of limitations. (ECF No. 1116-1 at 13–14). For the same reasons that this Court finds that the Charleston Plaintiffs and Greenville's federal antitrust claims are not time-barred, their state antitrust claims are not time-barred.

10   The City of Spartanburg brings its state antitrust claims under the antitrust laws of North Carolina. The Delta Defendants admit that this analysis is substantially the same as the federal antitrust analysis. (ECF No. 1146-1 at 31).

11   It should be noted that the absence of a contract is not fatal to an unjust enrichment claim; on the contrary, it is a requirement. 🔖 *Swanson v. Stratos*, 564 S.E.2d 117, 120 (S.C. Ct. App. 2002).

12   The Delta Defendants also argue that for the South Carolina Plaintiffs to proceed on their unjust enrichment claim against John Besson, they must pierce the corporate veil. (ECF No. 1144-1 at 33–34). However, the cases cited by the Delta Defendants do not establish that this is the law of South Carolina. The Court declines to weigh in on what appears to be unsettled state law, particularly in light of the fact that it has already allowed unjust enrichment claims to proceed against John Besson based on nearly identical allegations, (ECF No. 1030 at 15).

Tab 46

KeyCite Yellow Flag - Negative Treatment

Distinguished by Hall v. General Motors, LLC, E.D.Mich., March 18, 2020

2013 WL 5574626
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Simon MAJDIPOUR and Pamela Austin,
individually and on behalf of a class of
similarly situated individuals, Plaintiffs,
v.
JAGUAR LAND ROVER NORTH
AMERICA, LLC and Jaguar Land
Rover Automotive, Plc, Defendants.

Civ. No. 2:12–cv–07849 (WHW).
|
Oct. 9, 2013.

**OPINION**

WALLS, Senior District Judge.

*\*1* Defendant Jaguar Land Rover North America, LLC ("Land Rover") moves for dismissal of Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Under Federal Rule of Civil Procedure 78(b), this motion is decided without oral argument. The motion to dismiss is granted in part and denied in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Simon Majdipour and Pamela Austin bring this action individually and on behalf of putative classes of similarly situated individuals against Land Rover and Jaguar Land Rover Automotive, PLC for various causes of action related to an alleged defect in the electronic air suspension system in Range Rover sport utility vehicles for the 2003 through 2006 model years (the "Subject Vehicles"). [1] ECF No. 14, First Am. Compl. ¶¶ 1–8.

Plaintiffs are California citizens who each purchased a certified pre-owned ("CPO") 2006 Range Rover from a Land Rover authorized dealer in California—Land Rover Encino.

Id. ¶¶ 19, 45, 52. Land Rover is a limited liability company with its headquarters and principal place of business in Mahwah, New Jersey. Id. ¶ 20.

Plaintiffs allege that Land Rover sold Subject Vehicles containing a suspension defect (the "Defect"), which "causes the suspension system's rubber air bellows ... to develop leaks, releasing air pressure and losing their ability to properly hold the vehicle's weight," resulting in "a serious safety hazard, including the sudden loss of suspension on one side of the vehicle (rendering it lopsided while it is in motion), a loss of handling and the consequent inability to steer the vehicle in a straight line ." Id. ¶ 27. The Defect has also resulted in "the vehicles suddenly dropping while being driven, sitting unevenly and leaning to one side, and/or suddenly losing the ability to travel in a straight line." Id. ¶ 30.

Plaintiffs' individual allegations are similar. Plaintiff Austin purchased her CPO 2006 Range Rover in February 2008, and Plaintiff Majdipour purchased his vehicle in October 2009. Id. ¶¶ 46, 52. Both Plaintiffs "considered Land Rover marketing materials concerning the subject vehicle, including Land Rover television commercials which failed to disclose ... the alleged Defect." Id. ¶¶ 46, 53. Austin also reviewed "Land Rover's website and Range Rover brochures." Id. ¶ 53. Both Plaintiffs spoke with Land Rover Encino employees before purchasing their vehicles. Id. ¶¶ 46, 53. Majdipour was informed that his vehicle had "passed Land Rover's comprehensive 140–poi nt inspection and was certified to be in good condition." Id. ¶ 46. Austin also received and reviewed the 140–point checklist. Id. ¶ 53. Neither the employees with whom Plaintiffs spoke on the 140–point certification warned of the alleged Defect. Id. ¶¶ 46, 54.

When Plaintiffs purchased their vehicles, Land Rover provided a CPO Limited Warranty for the earlier of 6 years or 75,000 miles—measured from the original in-service date and zero miles. Id. ¶ 79–80, Ex. B, pg. 5. This warranty supplements Land Rover's 4 year/50,000 mile express warranty for new vehicles. Id. ¶ 80. The CPO Limited Warranty provides:

> *\*2* Land Rover North America, Inc., through its authorized retailers, will repair, replace or reimburse the policy holder for the reasonable cost to repair or replace any of the parts covered, if required due to a

mechanical breakdown or failure....
MECHANICAL BREAKDOWN OR
FAILURE is defined as the inability
of any covered part(s) to perform the
function(s) for which it (they) was
(were) designed due to defects in
material or workmanship.

*Id.* ¶ 80, Ex. B, pg. 5. The CPO Limited Warranty also
explains that "[t]here is a $100 deductible per repair visit, for
which the customer is responsible." First Am. Compl. Ex. B,
pg. 5.

Each Plaintiff alleges two manifestations of the Defect.
Plaintiff Majdipour first encountered a problem on November
17, 2010 with approximately 47,986 miles on the odometer,
when his vehicle "suddenly dropped to one side while being
driven, and suspension warning lights illuminated on the
dashboard." First Am. Compl. ¶ 47. An authorized Land
Rover dealer concluded there was a " 'leak at right front
air spring,' " which the dealer replaced under the CPO
Limited Warranty in addition to making other suspension-
related repairs. *Id.* ¶ 48. Maj di pour paid the $100 deductible.
*Id.* Majdi pour further asserts that he was never told during
the repair visit "that this was a known systemic defect in the
[Subject] Vehicles that may manifest again," and he alleges
that "the dealer failed to repair all the defective air suspension
parts at this repair visit." *Id.*

Majdipour's second experience occurred on April 6, 2012
with approximately 65,783 miles on the odometer, when
his vehicle "suddenly and without warning dropped to one
side while being driven, thereby rendering it immobile and
inoperable." *Id.* ¶ 49. Madjipour alleges that his wife was
informed by a Land Rover dealer that the alleged Defect
was not covered under warranty. *Id.* ¶ 50. An independent
mechanic "found the left air spring leaking and failing to hold
pressure," *id.,* and a different mechanic charged Majdipour
$1,409.45 to "replace[ ] both defective front air springs with
aftermarket components," *id.* ¶ 51.

Plaintiff Austin first "visited Land Rover Encino complaining
that her suspension had dropped" on November 26, 2011
with approximately 57,633 miles on her vehicle's odometer.
*Id.* ¶ 56. The dealer "verified [her] concern and replaced
the 'leaking [ ] right front spring,' " charging Austin the
deductible. *Id.* Austin alleges that the dealer "failed to repair
or replace other defective air suspension parts." *Id.* Austin's

second visit to Land Rover Encino came on December
14, 2011 with approximately 58,046 miles on her vehicle's
odometer because "her suspension fault message was on." *Id.*
¶ 57. The dealer found that the "left front spring was leaking"
and replaced it, again charging Austin a deductible. *Id.* Austin
asserts that she was not informed during either visit that "this
was a known systemic defect in the [Subject] Vehicles that
may manifest again." *Id.*

**\*3** Plaintiffs draw on their individual experiences and
seek to represent two classes: (1) a "Nationwide Class"
consisting of "[a]ll persons or entities in the United States
who are current or former owners and/or lessees of a [Subject]
Vehicle," and (2) a "California Sub–Class" comprised of
"[a]ll persons or entities in California who are current or
former owners or/and lessees of a [Subject] Vehicle." *Id.* ¶ 59.
To support their claims, Plaintiffs rely on "complaints to the
National Highway Traffic Safety Administration ('NHTSA')
and on the internet," in order to assert that "an extraordinary
number of purchasers and lessees of the [Subject] Vehicles
have experienced problems with the electronic air suspension
as a result of the Defect." *Id.* ¶ 31. According to Plaintiffs,
these complaints "reveal that the Defect is widespread and
dangerous and that it manifests without warning." *Id.*

Plaintiffs allege that Land Rover had exclusive and superior
knowledge of the Defect and has been aware of it since
2003, yet failed to disclose its existence to Plaintiffs or other
purchasers of Subject Vehicles or to repair the Defect. *Id.* ¶ 29.
Plaintiffs assert this placed them and others at risk and forced
them to pay the costs of necessary repairs, which Plaintiffs
claim can total up to $2,500. *Id.* ¶¶ 29, 32, 37.

Plaintiffs support these contentions in three ways. First,
Plaintiffs set forth seven "examples of consumer safety
complaints on the internet or to NHTSA that have been posted
on [NHTSA's] website concerning the Defect...." *Id.* ¶ 33.
Second, Plaintiffs allege, based on information and belief:

Land Rover knew about the
Defect through sources not available
to consumers, including pre-
release testing data, early consumer
complaints about the Defect to Land
Rover and their dealers, testing
conducted in response to those
complaints, high failure rates and
replacement parts sales data contained

*Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)*

in [Land Rover's] warranty databases, as well as high reimbursement claims paid to Land Rover dealers who directly reported to Land Rover consumers' high failure rates and seeking assistance for repairs, among other sources of aggregate information about the problem.

*Id.* ¶ 36.

Third, Plaintiffs allege that in August 2006, "Land Rover quietly acknowledged the existence of the Defect to only their dealers in a Technical Service Bulletin ('TSB')." *Id.* ¶ 4. The TSB applied to vehicles through model year 2004 and explained that although "[n]o obvious system leaks may be found," vehicles "may develop hairline cracks in the rubber material of the front air spring." *Id.* Ex. A, pg. 1. The TSB called for a "leak" test and a replacement with "upgraded spring material." *Id.* Although Plaintiffs acknowledge that the TSB only applied to vehicles through model year 2004, they allege that the vehicles for the remaining model years suffered from the same Defect. First Am. Compl. ¶ 5. In addition, Plaintiffs allege that the "upgraded spring materials" also contained the Defect, and that Land Rover called for this "temporary fix to prolong the amount of time that will elapse before the [Subject] Vehicles again experience the Defect ... thus helping to ensure that the Defect occurs outside the express warranty period...." *Id.* ¶ 6.

 **\*4** Plaintiffs also allege that Land Rover has "actively concealed the existence and nature of the [D]efect from Plaintiffs and members of the proposed class at the time of purchase, lease or repair and thereafter." *Id.* ¶ 40. Plaintiffs contend that "Land Rover has failed to disclose or actively concealed" the Defect "at and after the time of purchase, lease or repair." *Id.* They also claim that Land Rover failed to disclose or actively concealed "that the [Subject] Vehicles and their electronic air suspension were defective," and that they "were not fit for their intended purposes ... despite the fact that Land Rover learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2003." *Id.*

In short, Plaintiffs declare that "Land Rover has caused Plaintiffs and Members of the [Proposed] Class to expend money at their dealerships to repair or replace the [Subject]

Vehicles' electronic air suspension components, despite Defendants' knowledge of the defect." *Id.* ¶ 41.

From these factual assertions, Plaintiffs bring eight causes of action: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"); (2) breach of express warranty; (3) common law fraud; (4) breach of the duty of good faith and fair dealing; (5) unjust enrichment; (6) breach of the implied warranty of merchantability under California's Song–Beverly Act (on behalf of the California Sub–Class only); (7) violation of California's Consumer Legal Remedies Act ("CLRA") (on behalf of the California Sub–Class only); and (8) violation of sections of the California Business & Professional Code, commonly referred to as the Unfair Competition Law ("UCL") (on behalf of the California Sub–Class only).

Defendant Land Rover moves to dismiss the First Amended Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b) (6) and 9(b). ECF No. 17, Mem. of Law in Support of Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Mem.") pg. 7. Land Rover argues that counts three, seven, and eight fail to meet Rule 9(b)'s pleading standards applicable to fraud-based claims and insufficiently allege that Land Rover owed Plaintiffs a duty to disclose. *Id.* at 1–2, 13, 17. Land Rover also contends that Plaintiffs have failed to state a claim on counts two, four, five, and six. *Id.* at 2, 27, 32, 35, 38–40. In addition, the parties dispute whether New Jersey or California law applies to several causes of action, and Land Rover argues that a choice of law determination should result in the dismissal of count one. *Id.* at 1, 7–13.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), the court is required to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 306 (3d Cir.2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). A claim is plausible on its face "when the plaintiff pleads factual

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 479 of 751
PageID: 11845
Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*5** "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). Thus, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Id.* at 563 n. 8 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In evaluating the plaintiffs' claims, the court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint. *See Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Ci r.2003); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1357 at 299 (2d ed.1990). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Fed. Reserve Bank of N. Y.,* 359 F.3d 251, 255 n. 5 (3d Ci r.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

Federal Rule of Civil Procedure 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake": The plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007); *see also Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Ci r.1984) (explaining that the purpose of the rule is to "place the defendants on notice of the precise misconduct with which [they are] charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior"). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Freder ico,* 507 F.3d at 200.

Normally, *Rule 9(b)* requires, at a minimum, that plaintiffs support their allegations ... with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006) (citations and quotation marks omitted). "Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (citation omitted). Moreover, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

## DISCUSSION

**\*6** Defendant Land Rover's Motion to Dismiss and Plaintiffs' opposition require this Court to proceed in several steps. First, the Court decides the choice of law issues raised by the parties, including the implications of those decisions for the remaining issues before the Court. Next, the Court addresses the sufficiency of Plaintiffs' allegations with respect to their fraud-based claims. Finally, the Court address the sufficiency of Plaintiffs' remaining pleadings.

## Choice of Law

A federal court applies the choice of law rules of its forum state—here, New Jersey—to determine which law controls in cases under its diversity jurisdiction. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Maniscalco v. Brother Int'l (USA) Corp.,* 709 F.3d 202, 206 (3d Ci r.2013). "New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws. This is a two-part test." *Maniscalco,* 709 F.3d at 206 (citing *P.V. ex rel. T.V. v. Camp Jaycee,* 197 N.J. 132, 142–43, 962 A.2d 453 (2008)). "[T]he first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453 (quoting *Lebegern v. Forman,* 471 F.3d 424, 430 (3d Cir.2006) (further citation omitted)). "If

Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

there is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." *Lebegern, 471 F.3d at 428.* "If, however, an actual conflict is found to exist, the inquiry proceeds to the second step." *Cooper v. Samsung Elecs. Am., Inc., 374 F. App'x 250, 254 (3d Cir.2010).*

"Under the second part of the inquiry, the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco, 709 F.3d at 207* (quoting *Camp Jaycee, 197 N.J. at 144, 962 A.2d 453).* To make that determination, courts look to the Second Restatement, which "provides specific guidance for resolving particular types of cases." *Camp Jaycee, 197 N.J. at 140, 962 A.2d 453; see also Montich v. Miele USA, Inc., 849 F.Supp.2d 439, 446 (D.N.J.2012)* (court "must weigh the factors set forth in the Restatement section that corresponds to Plaintiff's cause of action"). "The Second Restatement assessment takes place on an issue-by-issue basis. It is qualitative, not quantitative." *Camp Jaycee, 197 N.J. at 143, 962 A.2d 453* (citations omitted). "[I]n balancing the relevant elements of the most significant relationship test," courts should "apply the law of the state that has the strongest connection to the case." *Id. at 155, 962 A.2d 453.*

In this case, there are several choice of law issues. First, the Court addresses Defendant Land Rover's argument that "the consumer fraud laws of California, not New Jersey, apply here," and therefore Plaintiffs' claim under count one for a violation of the NJCFA should be dismissed. Def.'s Mem. at 7–8. Second, the Court resolves the parties' dispute over which law—that of New Jersey or California—applies to Plaintiffs' claim for breach of express warranty. As explained later, the law that applies to this claim will also necessarily apply to Plaintiffs' claim for breach of the duty of good faith and fair dealing. Third, although not briefed by the parties, the Court addresses the remaining choice of law issues, which relate to Plaintiffs' allegations of common law fraud and unjust enrichment.

### 1. The New Jersey Consumer Fraud Act

**\*7** Land Rover argues that count one, alleging a violation of the NJCFA, should be dismissed because the consumer fraud laws of California and New Jersey conflict, a choice of law analysis is necessary and appropriate at this time, and California's consumer fraud laws, and not those of New Jersey, should apply. Def.'s Mem. at 7–13. Plaintiffs disagree. They respond that a choice of law analysis is "premature at this early stage of litigation," that Land Rover has failed to demonstrate that the NJCFA conflicts with California's consumer protection laws, and that if the Court does conduct the choice of law inquiry and finds a conflict, New Jersey has the "most significant relationship" to this case. ECF No. 18, Pls.' Mem. of Law in Opp'n to Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl.("Pls.' Opp'n") pgs. 6–12. Plaintiffs argue that the Court should uphold the NJCFA claim. *Id .*

For the reasons that follow, the Court finds that the NJCFA and California's consumer protection laws do conflict, that conducting the choice of law analysis is appropriate at this time, and that California's consumer protection laws should apply because it has the most significant relationship to this case. As a result, the Court grants Land Rover's motion to dismiss count one.

### a. The NJCFA and California's Consumer Protection Laws Conflict

The first step in the choice of law inquiry is to determine whether the "substance of the potentially applicable laws" conflict. *Camp Jaycee, 197 N.J. at 143, 962 A.2d 453.* Plaintiffs do not dispute Land Rover's assertion that the potentially applicable laws are the NJCFA and California's CLRA and UCL. Def.'s Mem. at 8. The Court finds that these laws clearly conflict.

The NJCFA, *N.J. Stat. Ann. § 56:8–2 (West 2013),* requires Plaintiffs to prove three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss ." *Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557, 964 A.2d 741 (2009).* The law "does not require proof that a consumer has actually relied on a prohibited act in order to recover." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 391, 929 A.2d 1076 (2007).* "In place of the traditional reliance element of fraud and misrepresentation," the act "require[s] that plaintiffs demonstrate that they have sustained an ascertainable loss." *Id.*

*Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)*

By contrast, both the UCL and CL RA require a showing of reliance: "[A] plaintiff must plead and prove actual reliance to satisfy the standing requirement of section 17204 [of the UCL]," *In re Tobacco II Cases, 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20, 40 (Cal.2009),* and "actual reliance must be established for an award of damages under the CL RA," *Cohen v. DIRECTV, Inc., 178 Cal.App.4th 966, 101 Cal.Rptr.3d 37, 47–48 (Cal.Ct.App.2009).* Therefore, the "substance" of the laws conflict, *Camp Jaycee, 197 N.J. at 143, 962 A.2d 453,* and the Court must proceed to the second step of the analysis.

*See also Feldman v. MercedesBenz USA, LLC,* No. 2:11–cv–00984 (WJM), 2012 WL 6596830, at *6 (D.N.J. Dec. 18, 2012)* ("Courts in this District have recognized that the NJCFA materially conflicts with the consumer protection statutes of California, the CLRA and UCL.").

**b. A Choice of Law Analysis is Appropriate at this Time and California has the "Most Significant Relationship" to this Case**

**\*8** Under the second step of the analysis, the Court looks to the applicable section of the Second Restatement to determine which state has the "most significant relationship" to this case with respect to the consumer fraud allegations. *Maniscalco, 709 F.3d at 207; Camp Jaycee, 197 N.J. at 140, 962 A.2d 453.* "Where a fraud or misrepresentation claim has been alleged, the court looks to the factors found in § 148 of the Restatement (Second) of Conflict of Laws." *Maniscalco, 709 F.3d at 207.* Subsection (2) is applicable because "the plaintiff[s'] action[s] in reliance took place in whole or in part in a state other than that where the false representations" are alleged to have been made. *Restatement (Second) of Conflict of Laws § 148(2) (1971); see Maniscalco, 709 F.3d at 207–08.* Under this subsection, the Court considers the following factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domici l[e], residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Restatement (Second) of Conflict of Laws § 148(2).* "The relative importance of each of the factors in a given case 'should be determined in light of the choice-of-law principles stated in § 6 [of the Restatement].' " *Maniscalco, 709 F.3d at 207* (quoting *Restatement (Second) of Conflict of Laws § 148* cmt. e). Those principles are "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort l aw; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee, 197 N.J. at 147, 962 A.2d 453* (internal citation and quotation marks omitted).

As an initial matter, Plaintiffs argue that this inquiry "requires the court to engage in a factsensitive analysis that cannot be undertaken on a record consisting solely of a complaint and motion to dismiss." Pls.' Opp'n at 7. In support, they cite statements by other courts in this district stating that, in the context of those cases, the factual record was not developed enough to make the choice of law determination. *See id.* In response, Land Rover acknowledges that "some cases defer a choice-of-law analysis where a relevant factual deficit exists," but contends that postponing the inquiry is inappropriate "when no additional facts are needed for the analysis." ECF No. 24, Reply Mem. of Law in Support of Def. Jaguar Land Rover N. Am., LLC's Mot. to Dismiss Pls.' Am. Compl. ("Def.'s Reply") pg. 1. Land Rover argues that this case falls into the latter category. *Id.*

**\*9** Land Rover is correct. Plaintiffs have failed to show how further development of the record would affect the choice of law analysis. Specifically, they have failed to demonstrate even the possibility that additional information concerning any of the six factors in *section 148* might impact the Court's inquiry. *See Montich, 849 F.Supp.2d at 447–48* ("Plaintiff's Complaint provides all necessary facts for the Restatement analysis. Indeed, Plaintiff's conclusory position that the Court cannot engage in a choice-of-law analysis is belied by her inability to indicate what other facts are necessary to decide this issue."); *see also Cooper, 374 F.*

Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

App'x at 255 n. 5 (rejecting similar argument "that the District Court erred in resolving the choice-of-law determination as to his statutory consumer fraud act claim at the motion to dismiss stage").

Plaintiffs argue for postponing a choice of law analysis because more facts are needed regarding Restatement section 148 factor (c), "the place where the defendant made the representations." § 148(2)(c). They point to a portion of the Third Circuit's opinion in Maniscalco in which the court distinguished an earlier district court opinion, 🚩 In re Mercedes–Benz Tele Aid Contract Litig., 257 F.R.D. 46 (D.N.J.2009). The Third Circuit explained that in Tele Aid, "the court was bound at the motion to dismiss stage to accept as fact that the defendant's marketing team was solely responsible for any alleged misrepresentations and omissions, and that all of the misconduct took place in New Jersey." 📙 Maniscalco, 709 F.3d at 211. Therefore, in Tele Aid, factor (c) pointed toward New Jersey law. In Maniscalco, however, discovery had revealed that the representations were actually made in Japan, and not New Jersey, and therefore factor (c) did not weigh in favor of New Jersey law. Id.

Maniscalco does not help Plaintiffs. Plaintiffs argue that New Jersey law should apply. Pls.' Opp'n at 8–12. Discovery might confirm that New Jersey was "the place where the defendant made the representations." Restatement § 148(2)(c). Or, as in Maniscalco, discovery might show that the alleged representations were made elsewhere, thus weakening the connection to New Jersey. As explained more fully later, even accepting that factor (c) weighs in favor of New Jersey law, this Court finds that the balance of factors weighs clearly in favor of applying California consumer fraud law. The Court agrees with Land Rover that discovery is unnecessary because "[w]hether it confirmed Plaintiffs' allegations or disproved them, their home state's law would still apply." Def.'s Reply at 2.

Turning to the section 148(2) factors, the parties do not appear to dispute the result of analyzing each individual factor. Rather, they differ over the weight to assign the factors in light of the relevant precedent and the principles in section 6 of the Restatement. Factors (a), (b), and (e) —the place where Plaintiffs acted in reliance, where they received the representations, and where the subject of the transactions were located—clearly point to California, where both Plaintiffs allege they purchased their vehicles after reviewing marketing material and interacting with Land

Rover employees. First Am. Compl. ¶¶ 45–46, 52–53. Factor (c)—where defendant made the representations—weighs in favor of New Jersey because the Court must accept as true Plaintiffs' allegation that "New Jersey is where the conduct causing injury to the Plaintiffs ... occurred and from where it emanated." Id. ¶ 17. Factor (d)—the domicile, residence, nationality, place of incorporation and place of business of the parties—does not weigh strongly in favor of either state, as Plaintiffs are citizens of California and Land Rover is headquartered in New Jersey. Id. ¶¶ 19–20. It may weigh slightly in favor of California. See 📙 Maniscalco, 709 F.3d at 208 (emphasizing comment i to section 148, which states "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship"). Finally, factor (f) "is inapplicable since there is no contract performance required by Plaintiff[s]." 📙 Montich, 849 F.Supp.2d at 448. In sum, three factors clearly favor application of California law, one favors New Jersey law, one does not weigh heavily in either direction, and one is inapplicable.

**\*10** Land Rover argues that it is "legally insufficient" for factor (c) alone to result in the application of New Jersey law, Def.'s Reply at 2, and that "the Third Circuit has [so] held," Def.'s Mem. at 10. That is an overstatement. While the Third Circuit in Maniscalco did hold that, in that case, "this single factor—factor (c)—d[id] not warrant 📙 applying New Jersey law," 709 F.3d at 209, it did not lay down a blanket rule. The Third Circuit voiced skepticism at the rationale of the Tele Aid court, which had found that New Jersey's "interest in deterring misconduct by corporations headquartered within its borders" justified the application of New Jersey law. 📙 Maniscalco, 709 F.3d at 210. The court, however, stopped short of explicitly rejecting such an approach. See id. ("But even were we to find the reasoning of the Tele Aid court persuasive, the case before us is distinguishable."). It might, therefore, be possible to envision a case in which the Tele Aid approach is appropriate.

This is not that case. In Maniscalco, the Third Circuit emphasized that "[n]othing else about the relationship between the parties, other than the fortuitous location of [defendant's] headquarters, took place in the state of New Jersey." 📙 709 F.3d at 208. Rather, plaintiff's "home state, in which he received and relied on [defendant's] alleged fraud,

Case 1:19-md-02875-RBK-SAK    Document 577-3    Filed 09/18/20    Page 483 of 751
PageID: 11849
Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

ha[d] the 'most significant relationship' to his consumer fraud claim." *Id.* at 209. Here, Plaintiffs' only allegations related to New Jersey arise out of the fact that Land Rover is headquartered there. *See* First Am. Compl. ¶ 17 ("Land Rover NA's marketing and advertising efforts, warranty and goodwill policies and procedures, and maintenance schedules and recommendations were all likely created in and orchestrated from the location of Land Rover NA's present headquarters in New Jersey."). Plaintiffs have not alleged any other connection with the state, other than this "fortuitous location" of Land Rover's headquarters. *Maniscalco,* 709 F.3d at 208. As a result, Plaintiffs have failed to distinguish this case from *Maniscalco* and other similar cases in this jurisdiction. *See also Cooper,* 374 F. App'x at 255 ("The transaction in question bears no relationship to New Jersey other than the location of Samsung's headquarters. Cooper's claim bears the most significant relationship with Arizona, the state in which the television was marketed, purchased, and used.").

The Court also rejects Plaintiffs' invitation to apply New Jersey law by relying on the principles in section 6 of the Restatement or on the *Tele Aid* court's public policy rationale. Pls.' Opp'n at 9–12. Under similar circumstances, the *Maniscalco* court found that "[a]pplying Section 6 of the Restatement" in fact "bolsters the conclusion" that the law of Plaintiffs' home state should apply. 709 F.3d at 209; *see also id.* at 209–10 (analyzing each principle). As for the *Tele Aid* decision, the Third Circuit commented, "New Jersey's deterrent interest might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters." *Id.* at 210.

**\*11** The Court finds that application of the factors in section 148(2) of the Restatement results in the clear choice of California's UCL and CLRA, which are already pled in counts seven and eight. Land Rover's motion to dismiss count one alleging a violation of the NJCFA is granted.

### 2. Breach of Express Warranty

Land Rover argues that there is a conflict between the express warranty laws of New Jersey and California, and that under the applicable section of the Restatement, this Court should find that California law applies to Plaintiffs' breach of express warranty claim. Def.'s Mem. at 26–27. Plaintiffs counter that a choice of law analysis is premature and that Land Rover "fails to meet its burden to demonstrate that New Jersey and California warranty laws conflict." Pls.' Opp'n at 30. As such, Plaintiffs ask the Court to apply New Jersey l aw. *Id.* at 31. Because the Court concludes that Land Rover has not demonstrated a conflict in the express warranty laws of New Jersey and California, New Jersey law applies to Plaintiffs' breach of express warranty claim. This conclusion also means that New Jersey law applies to Plaintiffs' claim for breach of the duty of good faith and fair dealing.

As an initial matter, Land Rover's citation to an opinion of another court of this district for the proposition that "courts have held that an actual conflict exists between the laws of New Jersey and California governing contract claims," Def.'s Mem. at 26 (quoting *Feldman v. Mercedes–Benz USA, LLC,* No. 2:11–cv–00984 (WJM), 2012 WL 6596830, at \*7 (D.N.J. Dec. 18, 2012)), is insufficient to meet its burden. It is possible that the "substance," *Camp Jaycee,* 197 N.J. at 143, 962 A.2d 453, of some contract laws will conflict between different states while others will not. As example, the laws on express warranty might conflict while the laws on implied warranty do not. That is why "[t]he Second Restatement assessment takes place on an issue-by-issue basis." *Id.* Land Rover does better on reply, arguing that California law on breach of express warranty requires an allegation of reasonable reliance on the terms of the warranty, whereas there is no requirement of reliance under New Jersey law. Def.'s Reply at 10. The Court finds, however, that Land Rover has failed to demonstrate a conflict.

In New Jersey, "[a]s a rule, no proof of the buyer's reliance on the warranty is necessary other than that the seller's statements were of a kind which naturally would induce the purchase. The warranty need not be the sole inducement." *Elias v. Ungar's Food Products, Inc.,* 252 F.R.D. 233, 239 (D.N.J.2008) (citation omitted). Rather, to state an express warranty claim in New Jersey, Plaintiffs must establish an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.J. Stat. Ann. § 12A:2–313 (West 2013). "[A] promise is presumed to be a 'part of the basis of the bargain' under New Jersey law 'once the buyer has become aware of the affirmation of fact or promise....' " *Liberty LincolnMercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 825

*Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)*

(3d Ci r.1999) (quoting 🚩 *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 568 (3d Cir.1990), *overruled on other grounds,* 🔖 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). In determining whether the "basis of the bargain" requirement is met, "the focus is not on any particular language at a particular point in time but whether the seller's actions or language when viewed in light of his relationship with the buyer were fairly regarded as part of the contract to purchase the good." *Id.* A defendant may rebut the presumption by showing "clear affirmative proof ... that the buyer knew that the affirmation of fact or promise was untrue." 🚩 *Cipollone,* 893 F.2d at 568.

**\*12** In California, the statutory language is identical, and also requires that there be an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Cal. Com.Code § 2313 (West 2013). However, the case law raises some question as to whether a stronger form of reliance—different from the "basis of the bargain" requirement under New Jersey law—is required.

The matter appeared to be resolved by California state courts. The California Supreme Court has observed: "The basis of the bargain requirement represents a significant change in the law of warranties. Whereas plaintiffs in the past have had to prove their reliance upon specific promises made by the seller ... the Uniform Commercial Code requires no such proof." 🔖 *Hauter v. Zogarts,* 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377, 383 (Cal.1975) (citation omitted). The California Courts of Appeal have expanded upon that comment. In *Keith v. Buchanan,* the court explained:

> The change of the language in section 2313 of the California Uniform Commercial Code modifies both the degree of reliance and the burden of proof in express warranties under the code. The representation need only be part of the basis of the bargain, or merely a factor or consideration inducing the buyer to enter into the bargain. A warranty statement made by a seller is presumptively part of the basis of the bargain, and the burden is on the seller to prove that the resulting

bargain does not rest at all on the representation.

🔖 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 398 (Cal.Ct.App.1985). This description of the law closely mirrors the express warranty law of New Jersey. More recently, in *Weinstat v. Dentsply Int'l, Inc.,* the Court of Appeal stated, "[B]reach of express warranty arises in the context of contract formation in which reliance plays no role." 🔖 180 Cal.App.4th 1213, 103 Cal.Rptr.3d 614, 625 (Cal.Ct.App.2010). In addition, the court found "persuasive[ ]" a description of the "basis of the bargain" requirement as relating "to the essence of the contract." *Id.* (quoting 🔖 *Autzen v. John C. Taylor Lbr. Sales, Inc.,* 280 Or. 783, 572 P.2d 1322, 1326 (Or.1977) (emphasis removed)). *Keith* and *Weinstat'* s description of California's express warranty law does not conflict with the express warranty law of New Jersey.

However, some federal district courts in California have read these cases narrowly. In 🔖 *Coleman v. Boston Scientific Corp.,* No. 1:10–cv–01968–OWW, 2011 WL 3813173, at \*4– 5 (E.D.Cal. Aug.29, 2011), the court distinguished *Keith* and *Weinstat* on the basis that in both cases there was privity of contract between the buyer and seller, concluding, "[n]either *Weinstat* nor *Keith* supports Plaintiff's erroneous contention that reliance is not required where privity is absent." The court also found the "invocation of California Commercial Code section 2313 ... unavailing, as it does not alter the requirement that reliance (or some other substitute for privity) is required for an express warranty claim against a non-selling manufacturer of a product." *Id. See also* 🔖 *Keegan v. Am. Honda Motor Co., Inc.,* 284 F.R.D. 504, 546 (C.D.Cal.2012) ("[I]n the absence of privity, California law requires a showing that a plaintiff relied on an alleged omission or misrepresentation.").

**\*13** These courts appear to draw on developments in the law concerning whether *privity* is necessary in express warranty cases. There is a "general rule ... that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." 🔖 *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 268 P.2d 1041, 1048 (Cal.1954). There are "[s]ome particularized exceptions to the rule," such as "when

the plaintiff *relies on* written labels or advertisements of a manufacturer." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir.2008) (emphasis added). The courts reason, therefore, that *either* privity or reliance is required to state a claim for breach of express warranty. If that were so, the laws of California and New Jersey would conflict, since neither privity nor reliance is required in New Jersey. *See Elias,* 252 F.R.D. at 239; *Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 642, 695 A.2d 264 (1997) ("Under the U.C.C. as construed by this Court, moreover, the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer.").

While there is logic to this argument, it finds no support in the opinions of the California state courts. Neither *Keith* nor *Weinstat* purport to limit their statements to situations in which there is privity. Rather, they refer to what the California Supreme Court called the "significant change in the law of warranties," *Hauter,* 120 Cal.Rptr. 681, 534 P.2d at 383, resulting from California's adoption of the Uniform Commercial Code. *See Weinstat,* 103 Cal.Rptr.3d at 626 ("Pre–Uniform Commercial Code law governing express warranties required the purchaser to prove reliance on specific promises made by the seller.... The Uniform Commercial Code, however, does not require such proof." (citation omitted)); *Keith,* 220 Cal.Rptr. at 397 ("Under former provisions of law, a purchaser was required to prove that he or she acted in reliance upon representations made by the seller. California Uniform Commercial Code section 2313 indicates only that the seller's statements must become 'part of the basis of the bargain.' " (citations omitted)).

The Court finds that Land Rover has not established that California law requires a showing of reliance in a breach of express warranty claim, and so Land Rover has failed to demonstrate that the express warranty laws of New Jersey and California conflict. The Court will apply New Jersey law to Plaintiffs' breach of express warranty claim.

In addition, because a claim for breach of the duty of good faith and fair dealing may not "arise absent an express or implied contract," *Wade v. Kessler Inst.,* 172 N.J. 327, 345, 798 A.2d 1251 (2002), the law of the state governing the express contract must also govern that claim. Because the Court finds New Jersey law applies to the express warranty claim, New Jersey law also applies to their claim for breach of the duty of good faith and fair dealing.

**3. Remaining Issues**

**\*14** Although not briefed by either party, there are also choice of law considerations with respect to Plaintiffs' two remaining causes of action relating to the putative Nationwide Class: common law fraud and unjust enrichment.

The elements of common law fraud are the same in New Jersey and California. *Compare Robinson Helicopter Co., Inc. v. Dana Corp.,* 34 Cal.4th 979, 22 Cal.Rptr.3d 352, 102 P.3d 268, 274 (Cal.2004) ("The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."), *with Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610, 691 A.2d 350 (1997) ( "The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."). The Court will therefore apply New Jersey law to Plaintiffs' cause of action for common law fraud.

As for Plaintiffs' cause of action for unjust enrichment, there is some uncertainty over whether there is a conflict between California and New Jersey law on this issue. *See Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 459–61 (D.N.J.2012) (surveying case law to conclude "a conflict may exist between New Jersey's and California's application of the law of unjust enrichment," but declining to decide the issue absent briefing by the parties). However, the Court finds it unnecessary to engage in this choice of law inquiry because, as explained below, Plaintiffs' cause of action for unjust enrichment must be dismissed under the law of either state.

Finally, the Court notes that because counts six, seven, and eight are brought individually and on behalf of only the putative California Sub–Class under specific California statutory provisions, they raise no choice of law issues.

**Plaintiffs' Fraud–Based Claims**

Land Rover argues that Plaintiffs' claims in counts three, seven, and eight for common law fraud, violation of the CLRA, and violation of the UCL should be dismissed for

*Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)*

failure to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). Def.'s Mem. at 13–16. Land Rover also contends that dismissal is warranted because Plaintiffs have failed to adequately allege that Land Rover owed them a duty to disclose the existence of the alleged Defect. *Id.* at 17–25. Nonetheless, the Court finds that Plaintiffs' allegations meet the heightened pleading requirements of Rule 9(b) and that Plaintiffs have adequately alleged that Land Rover owed them a duty to disclose based on allegations that Land Rover had exclusive knowledge of the Defect.

### 1. Federal Rule of Civil Procedure 9(b)

Land Rover argues that Plaintiffs' fraud-based claims lack the particularity required by Federal Rule of Civil Procedure 9(b). Def.'s Mem. at 13–16. In particular, Land Rover suggests that Plaintiffs must identify specific samples of representations on which they relied which did not contain the allegedly omitted information. *Id.* at 13–14 (citing *Eisen v. Porsche Cars N. Am ., Inc.,* No. CV 11–9405(CAS), 2012 WL 841019, at *3 (C.D.Cal. Feb.22, 2012)). Land Rover also contends that Plaintiffs have failed to sufficiently specify the "where" and "when," *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276–77 (3d Cir.2006), of the allegedly omitted information. Def.'s Mem. at 15–16; Def.'s Reply at 4 ("[T]hey attempt to skirt the 'when' and 'where' requirements of Rule 9(b)...."). The Court disagrees and finds that Plaintiffs' allegations satisfy Rule 9(b).

**\*15**  As several courts have noted, Rule 9(b)'s "heightened standard is somewhat relaxed in a case based on a fraudulent omission," rather than one based on misrepresentation. *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 451 (D.N.J.2012); *see also Feldman v. Mercedes–Benz USA, LLC,* No. 2:11–CV–00984 (WJM), 2012 WL 6596830, at *10 (D.N.J. Dec.18, 2012) ("[P]laintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim."). This is because "a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1098–99 (N.D.Cal.2007). Land Rover does not quarrel with these statements, but argues that Plaintiffs have failed to meet even this "relaxed" standard because "[l]ess specificity does not mean *no* specificity." Def .'s Mem. at 16; Def.'s Reply at 4.

Luckily for Plaintiffs, their allegations rise far above the level of "no specificity."

Plaintiffs have alleged "the who, what, when, where and how of the events at issue." *Suprema Specialties,* 438 F.3d at 276–77. They allege the "who"—Land Rover, and the "what" and "how"—failing to disclose and actively concealing the Defect which "causes the suspension system's rubber air bellows ... to develop leaks, releasing air pressure and losing their ability to properly hold the vehicle's weight," resulting in "a serious safety hazard, including the sudden loss of suspension on one side of the vehicle (rendering it lopsided while it is in motion), a loss of handling and the consequent inability to steer the vehicle in a straight line." First Am. Compl. ¶ 27. They also allege the "when" and "where." Plaintiff Austin purchased her CPO 2006 Range Rover in February 2008, and Plaintiff Maj di pour purchased his vehicle in October 2009 at Land Rover Encino. *Id.* ¶¶ 46, 52. Each Plaintiff spoke with Land Rover employees and allegedly relied on Land Rover's CPO 140–poi nt checklist, but none of the representations made to them warned of the Defect. *Id.* ¶¶ 46, 53–54. The Plaintiffs also allege specific occasions on which they took their vehicles to Land Rover authorized dealers for repair, and that the dealers failed to disclose "that this was a known systemic defect in the [Subject] Vehicles that may manifest again." *Id.* ¶¶ 48, 57. Plaintiffs have certainly satisfied the requirement that they "inject precision or some measure of substantiation into [the] fraud allegation," by providing "sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007).

Land Rover places particular emphasis upon its reading of the Ninth Circuit case *Kearns v. Ford Motor Co.,* 567 F.3d 1120 (9th Cir.2009), for its contention that Plaintiffs must provide samples of the representations or advertisements on which they relied. Def.'s Mem. at 13–14. But as Plaintiffs rightly point out, *Kearns* involved misrepresentations, not alleged fraudulent omissions. Pls.' Opp'n at 27. *See Kearns,* 567 F.3d at 1125 ("Kearns alleges that Ford's marketing materials and representations led him to believe that CPO vehicles were inspected by specially trained technicians and that the CPO inspections were more rigorous and therefore more safe."). To be sure, *Kearns* also summarily dismissed, with little discussion, Plaintiff's non-disclosure claims, *id.* at 1127, but the discussion and standard on which Land Rover relies dealt specifically with the claims

for affirmative misrepresentations. Moreover, even were *Kearns* an applicable precedent, Plaintiffs' pleading would be sufficient. The *Kearns* plaintiff "failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle." *Id.* at 1126. Here, Plaintiffs have specifically referred to the CPO 140–point checklist and discussions with Land Rover employees, all of which allegedly failed to disclose the defect. First A m. Compl. ¶¶ 46, 53–54. [2]

**\*16** Finally, Land Rover argues that Plaintiffs' allegations concerning the remaining Subject Vehicles (i.e., those in the putative classes) fail to meet Rule 9(b)'s particularity requirement because they "ignore time and place entirely" or "imply that all times and places are relevant." Def.'s Mem. at 15. However, in circumstances such as these, where Plaintiffs allege that there was a failure to disclose a particular Defect in various advertisements and representations throughout a relevant time period, their allegations suffice where they allege their individual experiences in detail and also allege the omitted information that should have been disclosed in those advertisements and representations. *See Lynch v. Tropicana Products, Inc.,* No. 2:11–CV–07382 (DMC), 2013 WL 2645050, at \*5 (D.N.J. June 12, 2013) ("Plaintiffs assert that the alleged misrepresentations appeared on the labels, packaging, and advertisements for Tropicana's orange juice throughout the Class Period. Therefore, the 'where' requirement may be satisfied by the misrepresentations allegedly contained on Tropicana's labels or packages; there need not be strict identification of one particular store location where it is alleged that the labeling and packaging in question was sold in thousands of locations throughout the country."); *Gutierrez v. TD Bank,* No. 11–5533(JLL), 2012 WL 272807, at \*7 (D.N.J. Jan.27, 2012) ("Plaintiffs need only state with particularity the who, what, when and where of the false misrepresentations or omissions made by Defendants based on their familiarity with said misrepresentations as experienced by them in the mortgage transactions....").

The Court finds that Plaintiffs' allegations satisfy the requirements of Federal Rule of Civil Procedure 9(b).

### 2. Allegations of Land Rover's Duty to Disclose

Land Rover also challenges Plaintiffs' fraud-based claim by arguing that Plaintiffs have failed to adequately allege that Land Rover owed them a duty to disclose the existence of the Defect. Def .'s Mem. at 17. Under both the CLRA and UCL, "a manufacturer is not liable for a fraudulent omission concerning a latent defect ... unless the omission is 'contrary

to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.'

" *Wilson v. Hewlett–Packard Co.,* 668 F.3d 1136, 1141 (9th Cir.2012) (quoting *Daugherty v. Am. Honda Motor Co., Inc.,* 144 Cal.App.4th 824, 51 Cal.Rptr.3d 118, 126 (Cal.Ct.App.2006); *see also Baba v. Hewlett–Packard Co.,* No. C 09–05946 RS, 2010 WL 2486353, at \*3 (N.D.Cal. June 16, 2010) ("A duty to disclose under UCL requires the same showing as a duty to disclose under CLRA."). A duty to disclose can arise in four ways: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins,* 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539, 543 (Cal.Ct.App.1997). Plaintiffs have not alleged a fiduciary relationship. Land Rover challenges the adequacy of their allegations with respect to the remaining possi b i l ities. [3]

**\*17** The Court finds that Plaintiffs' allegations concerning Land Rover's exclusive knowledge contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). Plaintiffs allege that Range Rovers for the 2003 through 2006 model years contain a Defect that Land Rover has known about since 2003. First Am. Compl ¶¶ 1, 36. They also allege that "the Defect cannot be detected until after it manifests," and therefore "Plaintiffs and other members of the proposed class were not reasonably able to discover the problem...." *Id.* ¶ 23. To support this allegation, Plaintiffs rely on complaints to the N H STA and on the i nternet, the TSB issued by Land Rover, and a long list of "internal sources of aggregate information about the problem" that were "not available to consumers." *Id.* ¶¶ 4– 5, 33, 36.

As an initial matter, the Court agrees with Land Rover that the "undated, anonymous comments" from the NHSTA and internet, Def.'s Mem. at 21, do nothing to bolster Plaintiffs' allegations. That is because "plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of sale to survive a motion to dismiss," *Wilson,* 668 F.3d at 1145, and "[n]one of those postings or complaints ... include any

dates, and therefore shed no light on when [Land Rover] knew of the alleged defects." 📖 *Baba,* 2010 WL 2486353, at \* 5. Plaintiffs also fail to allege that Land Rover ever read these comments or that they were forwarded *to* Land Rover.

This is not fatal to Plaintiffs' claim, as the Court finds that Plaintiffs' remaining allegations, taken together, adequately plead Land Rover's exclusive knowledge. Plaintiffs' allegations concerning "pre-release testing data, early consumer complaints about the Defect to Land Rover and their dealers, testing conducted in response to those complaints, high failure rates and replacement parts sales data contained in [Land Rover's] warranty databases, as well as high reimbursement claims paid to Land Rover dealers," First Am. Compl. ¶ 36, are similar to allegations found sufficient in analogous cases. *See* 📖 *Feldman v. Mercedes–Benz USA, LLC,* N o. 2:11–CV–00984 (WJM), 2012 WL 6596830, at \*11 (D.N.J. Dec. 18, 2012) (finding sufficient allegations that "Defendants had exclusive knowledge of material facts not known to Plaintiffs, through pre-release testing data, early consumer complaints about the A IS Defect ... testing conducted in response to those complaints, warranty and post-warranty claims, replacement part sales data, aggregate data from Mercedes dealers, and from other internal sources" (quotation marks omitted)); 📖 *Ehrlich v. BMW of N. Am., LLC,* 801 F.Supp.2d 908, 918–19 (C.D.Cal.2010) ("pre-release testing data, early consumer complaints to BMW and dealers, testing done in response to complaints, replacement part sales data, aggregate data from BMW dealers, and other internal sources"); 📖 *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1096–97 (N.D.Cal.2007) (" '[o]nly GM had access to the aggregate data from its dealers[,] only GM had access to pre-release testing data[, and] only GM had access to the numerous complaints from its customers' ").

**\*18** These allegations are not concl usory. Land Rover does not deny that it engages in the types of testing alleged or maintains the other types of aggregate data asserted. Plaintiffs have no way of knowing what these data showed, but have adequately alleged that they showed a Defect and gave Land Rover exclusive knowledge of it. Moreover, Plaintiffs support their contention by submitting the TSB, issued by Land Rover, which warned that vehicles "may develop hairline cracks in the rubber material of the front air spring." First Am. Compl. Ex. A, pg. 1. The TSB supports Plaintiffs allegations that Land Rover engaged in testing or otherwise learned of the Defect through internal sources: Land Rover issued an

internal bulletin advising dealers on how to repair the very Defect Plaintiffs complain of. The TSB makes Plaintiffs' allegation that Land Rover had "internal sources of aggregate information about the problem" that were "not available to consumers," First Am. Compl. ¶ 36, entirely plausible.

Land Rover challenges Plaintiffs' reliance on the TSB in two ways. It argues that the TSB, by its terms, only applies to vehicles through model year 2004, and therefore does nothing to support Plaintiffs' claims with respect to their model year 2006 Range Rovers. Def.'s Reply at 7, 8. Plaintiffs, however, allege that all vehicles for model years 2003 through 2006 contain the same Defect. First Am. Compl. ¶ 5. Moreover, the TSB not only supports Plaintiffs' allegations concerning the existence of the Defect, it also supports Plaintiffs' allegations that Land Rover engaged in internal testing and otherwise maintained internal sources of aggregate information about the problem. 📖 *Id.* ¶ 36.

Land Rover also argues that "courts in this District have repeatedly refused to view TSBs as evidence of a defect or consumer fraud," Def.'s Mem. at 20, because it "may discourage manufacturers from responding to customers in the first place," *id.* (quoting 📖 *Chan v. Daimler AG,* No. 11–5391, 2012 WL 5827448, at \*7 (D.N.J. Nov.9, 2012) (citation omitted)). This argument is off mark. The Court, at this stage, is not making findings as to whether the TSB should be considered as evidence or an admission of liability in evaluating the claim on the merits. Rather, the question is whether the TSB, together with the allegations of "internal sources of aggregate information about the problem," First Am. Compl. ¶ 36, support a claim that is "plausible on its face." 📖 *Iqbal,* 556 U.S. at 678. Even if there is a public policy rationale for excluding TSBs as evidence of a defect or an admission of liability, the Court will not now stretch that rationale to raise the bar that Plaintiffs must meet at the pleading stage, especially when they allege that the information showing the Defendant's exclusive knowledge is within the Defendant's exclusive control.

The Court denies Land Rover's motion to dismiss counts three, seven, and eight.

## Plaintiffs' Remaining Claims

**\*19** Land Rover moves to dismiss Plaintiffs' remaining claims for breach of express warranty, breach of the duty of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 489 of 751
PageID: 11855
Majdipour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

good faith and fair dealing, breach of the implied warranty of merchantability, and unjust enrichment.

### 1. Breach of Express Warranty

Land Rover argues that Plaintiffs have not alleged a breach of the CPO Limited Warranty and their claim in count two should be dismissed. Def.'s Mem. at 27–29. Plaintiffs respond that "Land Rover ... breached the [warranty] with respect to both Plaintiffs by failing to repair and/or replace Plaintiffs' air suspension systems while the vehicles were still covered under the CPO warranty." Pls.' Opp'n at 31. Plaintiffs argue that on each of their initial visits, the dealer breached the warranty by only partially repairing the suspension system, "after which the defect recurred." *Id.* The Court finds that Plaintiffs have failed to allege a breach of express warranty.

The CPO Limited Warranty required Land Rover to "repair, replace or reimburse" covered parts "if required due to a mechanical breakdown or failure." First Am. Compl. Ex. B at 5. According to Plaintiffs' First Amended Complaint, this is precisely what occurred. Plaintiff Majdipour's first incident involved his right front air spring, which a dealer replaced under warranty. First. Am. Compl. ¶¶ 47–48. Plaintiff Austin's first incident involved her right front spring, and her second incident involved the left front spring. *Id.* ¶¶ 56–57. Both of these problems were replaced by the dealer under warranty. *Id.*

As for Plaintiff Majdipour's second incident, in which he was allegedly informed that his repairs would not be covered under warranty, Land Rover is correct that he has not alleged that the incident occurred *during* the term of the warranty —the earlier of 6 years/75,000 miles from the original in-service date. While Majdipour does allege that there were 65,783 miles on the odometer, *id.* ¶ 49, he does not allege that April 6, 2012—the date of the incident—was within 6 years from the original in service date for his 2006 Range Rover. *See Moulton v. LG Electronics USA, Inc.,* CIV. A. 11–4073 JLL, 2012 WL 3598760 (D.N.J. Aug.21, 2012) ("In the Third Circuit, an express warranty does not cover repairs made after the applicable time has elapsed.").

Plaintiffs' suggestion that the repairs were incomplete because Land Rover did not replace parts of the suspension system that had not yet broken down runs against the express terms of the warranty. The Court agrees with Land Rover that the express warranty "does not require Land Rover to predict parts' possible future failures or replace parts prophylactically."

Def.'s Reply at 11. *See Herbstman v. Eastman Kodak Co.,* 68 N.J. 1, 12, 342 A.2d 181 (1975) ( "We do not agree ... that Kodak's express 'warranty' was that the camera would be free of mechanical defects. Rather, the language used contemplated that such defects might occur and, if so, Kodak would repair them.").

**\*20** The Court also finds Plaintiffs' claims that the terms of the express warranty were unconscionable to be without merit. There is nothing substantively unconscionable about a 6 year/75,000 mile warranty per se. *See Nelson v. Nissan N. Am., Inc.,* 894 F.Supp.2d 558, 565–66 (D.N.J.2012). The allegations that Land Rover knew that the Defect might manifest after the express warranty term do not implicate the consciability of that term. The Second Circuit has persuasively explained the reason this is so:

> All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir.1986); *see also Nelson,* 894 F.Supp.2d at 566 ("Nissan's alleged knowledge of a transmission defect is an insufficient basis on which to find the warranty limit unconscionable."); *Alban v. BMW of N. Am.,* No. CIV. 09–5398(DRD), 2011 WL 900114, at \*9 (D.N.J. Mar.15, 2011) ("[A]llegations that BMW knew that the sound insulation in his vehicle would fail after the expiration of the warranty

agreement do not indicate that the time and mileage limitation clause was unconscionable.").

The Court also rejects Plaintiffs' claim that the warranty was procedurally unconscionable because they had "no meaningful choice" in determining the time limits and because a "gross disparity in bargaining power existed." First Am. Compl. ¶ 87. First, the clear weight of authority has rejected this argument. *See* *Smith v. Ford Motor Co.,* *462 F. App'x 660, 663–64 (9th Ci r.2011)* ( "Smith was presented with a meaningful choice, not just the option of purchasing a different vehicle from a different manufacturer, but also the option of purchasing a different warranty with an extended durational limit from Ford."); *Alban,* *2011 WL 900114, at * 9* ("Alban's bare-bones allegations that he 'had no meaningful choice in determining' the time and mileage limitation, and that 'a gross disparity in bargaining power existed between' him and BMW, are 'no more than conclusions [that] are not entitled to the assumption of truth.' " (quoting *Iqbal,* *556 U.S. at 679*)). Second, Plaintiffs' own allegations make it clear that there was a choice— Plaintiff Austin chose to purchase an additional warranty for 8 years/96,000 miles. First Am. Compl. ¶ 80 n. 6.

Because Plaintiffs have failed to allege a breach of the CPO Limited Warranty, the Court grants Land Rover's motion to dismiss count two.

### 2. Breach of the Duty of Good Faith and Fair Dealing

**\*21** Land Rover moves to dismiss Plaintiffs' claim in count four for a breach of the duty of good faith and fair dealing. With respect to New Jersey law,[4] Land Rover argues that Plaintiffs have failed to allege facts showing bad faith and that the claim also fails because the "allegations of supposed bad faith are precisely those alleging breach of warranty." Def.'s Reply at 14. The Court finds that Plaintiffs have sufficiently alleged a breach of the duty of good faith and fair dealing under New Jersey l aw.

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.,* *168 N.J. 236, 244, 773 A.2d 1121 (2001).* "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Id.* "Good faith entails adherence to community standards of decency, fairness or reasonableness ... and requires a party to refrain from destroying or injuring the right of the other party to receive its contractual benefits. A plaintiff must also prove the defendant's bad motive or intention." *Iliadis v. Wal–Mart Stores, Inc.,* *191 N.J. 88, 109–10, 922 A.2d 710 (2007)* (citations and quotation marks omitted). "[T]he breach of the implied covenant arises when the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.,* *172 N.J. 327, 345, 798 A.2d 1251 (2002)* (citation and quotation marks omitted).

The Court has already concluded that Plaintiffs have failed to allege a violation of the express terms of the contract —the CPO Limited Warranty. However, Plaintiffs have adequately alleged a violation of the duty of good faith and fair dealing such that the Court will allow that claim to go forward. Plaintiffs allege that during their repair visits, Land Rover dealers failed to alert them to the fact that the suspension system was defective, and only repaired the parts that had actually broken down, despite Land Rover's alleged knowledge that other parts of the suspension system were defective and would break down in the future. First. Am. Compl. ¶¶ 47–48, 56–57, 82, 95. While Land Rover is correct that "[n]o *contractual* responsibilities obligate Land Rover to notify Plaintiffs of any alleged defect," Def.'s Mem. at 37, New Jersey's implied covenant of good faith and fair dealing may impose such an obligation. Plaintiffs have alleged that this action by Land Rover injured their "right ... to receive the fruits of the contract." *Wade,* *172 N.J. at 345, 798 A.2d 1251.* And though the Court is mindful that a "plaintiff must also prove the defendant's bad motive or intention," *Iliadis,* *191 N.J. at 110, 922 A.2d 710,* "at the pleading stage all that is required is an allegation of bad faith," *Alin v. Am. Honda Motor Co., Inc.,* *No. CIV A 08–4825(KSH), 2010 WL 1372308, at * 11 (D.N.J. Mar.31, 2010). See Seidenberg v. Summit Bank,* *348 N.J.Super. 243, 263, 791 A.2d 1068 (App.Div.2002)* ("[T]he presence of bad faith is to be found in the eye of the beholder or, more to the point, in the eye of the trier of fact.").

**\*22** The Court finds Plaintiffs' allegations sufficient to allow this claim to proceed. *See* *Alin,* *2010 WL 1372308, at \*12* (finding sufficient allegations that "Honda unfairly exercised its discretion in not performing under the warranty by deciding not to notify Alin of the defects in the A/C system

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 491 of 751
PageID: 11857
Majidpour v. Jaguar Land Rover North America, LLC, Not Reported in F.Supp.2d (2013)

and by not covering the repair costs"). Land Rover's motion to dismiss count four is denied.

### 3. Breach of the Implied Warranty of Merchantability

Land Rover argues that "Plaintiffs' implied warranties expired before the events forming the basis of their claims occurred." Def .'s Mem. at 32. Land Rover relies on the Song–Beverly Act, under which Plaintiffs bring their claim in count six, which provides: "The duration of the implied warranty of merchantability ... with respect to used consumer goods sold in this state, ... in no event shall" be "less than 30 days nor more than three months following the sale of used consumer goods to a retail buyer." Cal. Civ.Code § 1795.5(c) (West 2013). As both Plaintiffs allegedly experienced the Defect more than three months following the purchase of their vehicles, Land Rover argues they have failed to state a claim for breach of implied warranty. Def.'s Mem. at 32–33. Plaintiffs respond that the durational limits of the statute do not apply where a latent defect that existed at the time of sale manifests after those limits expire. Pls.' Opp'n at 33. The Court agrees with Plaintiffs and denies Land Rover's motion to dismiss count six.

In *Mexia v. Rinker Boat Co., Inc.,* 174 Cal.App.4th 1297, 95 Cal.Rptr.3d 285, 290–91 (Cal.Ct.App.2009), the California Court of Appeal held that "[t]he implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale." The court explained that "[u]ndisclosed latent defects ... are the very evil that the implied warranty of merchantability was designed to remedy," *id.* at 291 (citation omitted), and stressed the "distinction between unmerchantabi l ity caused by a latent defect and the subsequent discovery of the defect," *id.* at 293. "I n the case of a latent defect, a product is rendered unmerchantable, and the warranty of merchantability is breached, by the existence of the unseen defect, not by its subsequent discovery." *Id.* at 291. As for the suggestion "that latent defects must be discovered and reported to the seller within the specified time," the court concluded it "has no support in the text of the statute." *Id.* at 295.

Land Rover, faced with this authority, argues that the Court should disregard it. Relying principally on discussions in a handful of federal district court opinions, Land Rover asserts that "*Mexia* enjoys the limelight as a case 'contrary to established California case law with respect to the duration of

the implied warranty of merchantability.' " Def.'s Mem. at 33 (quoting *Marchante v. Sony Corp. of Am.,* 801 F.Supp.2d 1013, 1022 (S.D.Cal.2011) (citation omitted)). Land Rover contends *Mexia* should not be followed because it " ' 'renders meaningless any durational limits on implied warranties,' as '[e]very defect that arises could conceivably be tied to an imperfection existing during the implied warranty period.' " *Id.* at 34, 95 Cal.Rptr.3d 285 (quoting *Marchante,* 801 F.Supp.2d at 1022).

**\*23** The Court declines Land Rover's invitation to ignore *Mexia.* "A n intermediate appellate state court's decision 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 406 (3d Cir.2000) (quoting *West v. American Telephone & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). *Mexia* is a thoroughly reasoned, published opinion by a California Court of Appeal that is less than five years old. The court took into account the statutory history, its language, and its purpose in reaching its decision. It ultimately concluded that applying the durational limits to latent defects that existed at the time of sale and manifest after those limits expire is "unsupported by the text of the statute, legal authority, or sound policy." *Mexia,* 95 Cal.Rptr.3d at 296–97. The skepticism of a few federal district courts concerning the wisdom of that decision are not, in this Court's view, "persuasive data that the highest court of the state would decide otherwise." *Boyanowski,* 215 F.3d at 406 (citation omitted). *See also Ehrlich v. BMW of N. Am., LLC,* 801 F.Supp.2d 908, 924 (C.D.Cal.2010) ("The Court will follow *Mexia* ... to find that Plaintiff can pursue his Song–Beverly Act claim. *Mexia* directly addressed and rejected the precise argument BMW makes here, holding that, so long as a latent defect existed within the one-year period, its subsequent discovery beyond that time did not defeat an implied warranty claim.").

Land Rover also argues that, even if *Mexia* is applicable, it only applies to "defects that render the product unmerchantable from the outset." Def.'s Mem. at 34 (quoting *Marchante,* 801 F.Supp.2d at 1021). To be sure, some courts have appeared to read this limitation into *Mexia'* s holding. *See, e.g., Ortega v. Toyota Motor Sales, U.S.A.,*

*Inc.,* 422 F. App'x 599, 601 (9th Cir.2011) ("[T] he court suggested that to ultimately prevail, Mexi a still needed to demonstrate a defect existed at the time of sale."). Land Rover is incorrect, however, in its suggestion that Plaintiffs must allege that their vehicles "failed to *work properly* from the outset." Def.'s Mem. at 34 (emphasis added). In making this argument, Land Rover makes the very mistake the *Mexia* court warned against: It "ignores the distinction between unmerchantabi l ity caused by a latent defect and the subsequent discovery of the defect" when it manifests. *Mexia,* 95 Cal.Rptr.3d at 293. Plaintiffs have adequately alleged that the vehicles were unmerchantable *at the time of sale* because they contained the alleged Defect. *See* First Am. Compl. ¶ 1. This Defect was also allegedly undiscoverable until it manifested; it was latent. *Id.* ¶¶ 23–24. It follows that the three month durational limitation does not bar the claim, and the motion to dismiss count six is denied.

### 4. Unjust Enrichment

**\*24** Land Rover argues that Plaintiffs' cause of action in count five for unjust enrichment must be dismissed under both California and New Jersey law. It asserts that there is no cause of action for unjust enrichment in California, and that New Jersey law does not permit a cause of action for unjust enrichment when the claim sounds in fraud. Def.'s Mem. at 38, 40; Def.'s Reply at 15.[5] The Court agrees with Land Rover and grants its motion to dismiss count five.

It is well-settled that "[t]here is no cause of action in California for unjust enrichment." *Durell v. Sharp Healthcare,* 183 Cal.App.4th 1350, 108 Cal.Rptr.3d 682, 699 (Cal.Ct.App.2010) (citation and quotation marks omitted). "Rather, it is a general principle underlying various doctrines and remedies, including quasi-contract." *Jogani v. Superior Court,* 165 Cal.App.4th 901, 81 Cal.Rptr.3d 503, 511 (Cal.Ct.App.2008) (citation omitted). *See also Bosinger v. Belden CDT, Inc.,* 358 F. App'x 812, 815 (9th Cir.2009) ("In California there is no cause of action for unjust enrichment; it is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." (citation and quotation marks omitted)). A party may sometimes elect to *recover* based on unjust enrichment, but it is not a "freestanding cause

of action." *Munoz v. MacMillan,* 195 Cal.App.4th 648, 124 Cal.Rptr.3d 664, 675 (Cal.Ct.App.2011).

In New Jersey, "[u] nj ust enrichment is of course a familiar basis for imposition of liability in the law of contracts." *Castro v. NYT Television,* 370 N.J.Super. 282, 299, 851 A.2d 88 (App.Div.2004). However, "New Jersey does *not* recognize unjust enrichment as an independent tort cause of action." *Warma Witter Kreisler, Inc. v. Samsung Electronics Am., Inc.,* No. CIV. 08–5380(JLL), 2009 WL 4730187, at \*7 (D.N.J. Dec.3, 2009). This is because "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion." *Castro,* 370 N.J.Super. at 299, 851 A.2d 88. *See also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 936–37 (3d Ci r.1999) ("I n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched."). In this matter, Plaintiffs' cause of action for unjust enrichment unquestionably relies on a tort theory sounding in fraud. *See* First Am. Compl. ¶¶ 98, 99, 100 ("As a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations ..."). This cause of action for unjust enrichment is not permitted in New Jersey.

*See Pappalardo v. Combat Sports, Inc.,* No. CIV.A. 11–1320(MLC), 2011 WL 6756949, at \*12 (D.N.J. Dec.23, 2011) (dismissing unjust enrichment claim because it was "presented as a tort-based theory of recovery").

Land Rover's motion to dismiss count five is granted.

### CONCLUSION

**\*25** Land Rover's motion to dismiss is granted in part and denied in part. An appropriate Order follows.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5574626

**Footnotes**

1    Although Plaintiffs label these "Class Vehicles," no class has been certified at this point.

2    The Court has reviewed the remaining district court cases relied on by Land Rover and finds them either inapplicable or clearly distinguishable.

3    Land Rover does not challenge that the existence of the Defect would be a "material fact." Def.'s Reply at 6 ("Land Rover has not raised the issue of materiality.").

4    Much of Land Rover's argument pertains to California law, but the Court has concluded that New Jersey law applies to this claim.

5    Land Rover also makes an argument, which Plaintiffs dispute, based on a lack of privity between the parties, Def.'s Mem. at 38–9. The Court finds it unnecessary to resolve this issue.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 47

Marchione v. Playboy Enterprises, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 876263
Only the Westlaw citation is currently available.
United States District Court, D. Oregon,
Medford Division.

Steve MARCHIONE, Plaintiff,
v.
PLAYBOY ENTERPRISES, INC.
and Steve Clayton, Inc., Defendant.

Civ. No. 1:12–cv–01535–CL.
|
March 7, 2013.

**Attorneys and Law Firms**

Richard H. Rizk, Richard Rizk, Attorney at Law, Portland, OR, Kenneth C. Baker, Houston, TX, for Plaintiff.

Lewis W. Dahlin, Foster Denman, LLP, Medford, OR, G. Henry Welles, Best Best & Krieger LLP, Indian Wells, CA, for Defendant.

ORDER

CLARKE, United States Magistrate Judge.

 **\*1** This matter comes before the court on the motion to dismiss [# 18] filed by Defendant Playboy Enterprises, Inc. ("Playboy"). Defendant Steve Clayton, Inc. ("Clayton") does not join in the motion. The court has jurisdiction under 28 U.S.C. § 1332. For the reasons below, Playboy's motion is denied.

BACKGROUND

Plaintiff's claims are based on two separate transactions: the first between Playboy and Clayton, and the second between Clayton and Plaintiff Marchione. In the first transaction, Playboy hired Clayton pursuant to an October, 2005 license agreement, which authorized Clayton to create and market a unique guitar using Playboy's name and trademarks. The 2005 agreement also authorized Clayton to retain third party developers to assist in the design of the Playboy-themed guitars. Under the terms, Clayton agreed to secure a written assignment from any third party developer transferring all rights, title, and interest in the designs and work product

to Playboy. Clayton would then manufacture and sell the guitars from its facility in Oregon. Clayton also agreed to pay Playboy guaranteed royalties on all sales of Playboy-themed instruments.

In the second transaction, as outlined in the above license agreement, Clayton retained the plaintiff as a third party developer to design three custom guitars using Playboy's name and distinctive trademarks. This transaction took place under the terms of a June, 2006 development agreement between Clayton and the plaintiff. Under the 2006 agreement, the plaintiff conveyed all ownership rights in his designs and work product to Clayton; pursuant to the 2005 agreement, Clayton then assigned the rights to Playboy. Plaintiff was to receive 3% of the net sales of the guitars, according to the 2006 agreement.

Plaintiff claims that he duly performed all the terms and conditions of the contract with Clayton, timely providing him with unique instrument designs. He claims that Clayton manufactured and sold guitars based on his designs, and that Clayton continues to do so. Additionally, Plaintiff alleges that his designs increased the value and sales volume of the guitars in excess of the use of an alternative design, and he asserts that Playboy is currently accepting more royalties for the sales of these guitars than it would have done with the use of an alternative design.

LEGAL STANDARD

Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984). In answering this question, the court must assume that the plaintiffs' allegations are true and must draw all reasonable inferences in the plaintiffs' favor. See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987). A complaint need not make "detailed factual allegations," however, "a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555–56 (2007). To survive a motion to dismiss under FRCP 12(b)(6), plaintiffs must allege sufficient facts to

"raise a right to relief above the speculative level." *Id.* at 555. That is, plaintiffs must show that their claims not merely conceivable, but plausible. *Id.* at 570; *Ashcroft v. Iqbal,* 556 U.S 662, 679 (2009).

## DISCUSSION

**\*2** As against Defendant Playboy, the plaintiff asserts claims for unjust enrichment, constructive trust, and quantum meruit. The parties agree that Oregon law should apply to these claims. *See Nelson v. Int'l Paint Co.,* 716 F.2d 640, 643 (9th Cir.1983) ("In diversity cases, the district court normally applies the substantive law of the forum state, including its choice of law rules").

All three claims may be collapsed into one cause of action based on a quasi-contract claim. First, "[t]he concept of constructive trust does not stand on its own as a substantive claim, but exists solely as an equitable remedy, available to divest an individual who has been unjustly enriched of property that he or she 'ought not, in equity and good conscience, hold and enjoy.' " *Tupper v. Roan,* 349 Or. 211, 219–20, 243 P.3d 50, 56–57 (2010) *citing Marston v. Myers et ux.,* 217 Or. 498, 509, 342 P.2d 1111 (1959). The concepts of constructive trust and unjust enrichment thus are "intertwined" such that a constructive trust may be used to avoid unjust enrichment when the plaintiff will not be made whole by money damages alone. *See id.*

Second, unjust enrichment and quantum meruit are both quasi-contract claims. *See Summer Oaks Ltd. P'ship v. McGinley,* 183 Or.App. 645, 653–54, 55 P.3d 1100, 1104–05 (2002) (unjust enrichment); *Safeport, Inc. v. Equip. Roundup & Mfg., Inc.,* 184 Or.App. 690, 706, 60 P.3d 1076 (2002) (quantum meruit). The elements of a quasi-contract claim are (1) a benefit conferred, (2) awareness by the recipient that a benefit has been received, and, (3) under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it. *Jaqua v. Nike, Inc.,* 125 Or.App. 294, 298, 865 P.2d 442, 445 (1993).

Defendant Playboy argues that (1) no benefit was conferred on it, and (2) even if there was a benefit conferred, it was not unjust. The two arguments are based on essentially the same idea: that there was no direct relationship between Playboy and the plaintiff. Playboy asserts that the royalties

and the guitar designs were conferred upon it by Clayton, not by the plaintiff. Additionally, Playboy claims that "Plaintiff did not negotiate or contract with Playboy for the sale of its designs, and Playboy never had an obligation to "compensate" Plaintiff for its designs." Motion to Dismiss, 8.

In its Reply brief [# 24], Playboy cites to three cases to support the idea that a benefit must be conferred directly from the plaintiff to the defendant to support a claim for unjust enrichment; the court finds none of these persuasive. *See Dost v. NW Tree Servs. Inc.,* 3:11–CV–00270–ST, 2011 WL 6794028 (D.Or. Dec. 21, 2011) (holding that a claim for unjust enrichment fails when the defendants profited from loans made not to the plaintiff, but to unknown third parties);

*Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957, 961 (9th Cir.1999) (holding that defendant tobacco companies had to no legal obligation to pay smokers' medical bills; therefore plaintiff's payments of those bills did not benefit the defendant); *Nat. Trust, Ltd. Liab. Co. v. Gunderson,* 132 F.Supp.2d 1284, 1286 (D.Or.2000) (holding that a defense of unjust enrichment was unavailable for a defendant where it granted two promissory notes on the same piece of property that eventually became held by a corporation and its subsidiary; foreclosing on both notes was not a "double recovery, and therefore not unjust enrichment). These cases demonstrate that a quasi-contract cause of action must allege an actual benefit to the defendant, or detriment to the plaintiff. They do not interpret the cause of action as requiring a direct, uninterrupted relationship between the plaintiff and the defendant, contractual or otherwise.

**\*3** Plaintiff has alleged facts that state a claim for relief based on a quasi-contract cause of action. First, plaintiff claims that a benefit was conferred on Playboy when it was paid royalties over and above the royalties it would have received with the use of an alternative guitar design. Plaintiff also claims that the ownership rights in his guitar designs are a benefit conferred on Playboy. Second, plaintiff claims that Playboy was aware of these benefits because it specifically contracted with Clayton to receive them. Plaintiff alleges that Playboy reviewed and approved the plaintiff's designs before authorizing the manufacture and sale of the guitars, and that Playboy was informed in writing that the plaintiff had not been compensated for the designs. Finally, plaintiff claims that it would be unjust to allow Playboy to continue collecting royalties and exercising ownership rights over the plaintiff's guitar designs while the plaintiff remains uncompensated for those designs. The facts, as alleged in the complaint, state

a plausible claim for relief under Oregon law; the fact that Clayton may have acted as a middleman will not prevent Plaintiff from claiming that Playboy was unjustly enriched. Whether or not plaintiff can ultimately prevail on that claim is not properly at issue in this motion to dismiss.

This would end the analysis but for Playboy's claim that there is a fourth element to an unjust enrichment cause of action that the plaintiff has not met. Citing 🔖 *Tum–A–Lum Lumber v. Patrick,* 95 Or.App. 719, 770 P.2d 964 (1989), Playboy asserts that, due to the plaintiff's contract with Clayton, the plaintiff must first exhaust his remedies against Clayton before he can bring a valid claim for relief against Playboy.

In *Tum–A–Lum Lumber,* a supplier brought suit against a landowner after the contractor failed to pay the supplier under a construction contract for materials used in a job on the landowner's property. *Id.* at 721. The court held that a supplier cannot state a claim for unjust enrichment against a landowner unless the supplier first exhausts all the remedies that it may have had against the contractor. *Id.* The court,

however, limited its holding to the facts of the case, and noted specifically that the holding was supported by the policy underlying Oregon's construction lien statutes, which "are intended to provide notice to a landowner that the land may be subject to a construction lien by a furnisher of materials and provide a remedy to a furnisher of materials in plaintiff's circumstances." *Id.* at 721–22. The case at bar is not subject to the construction lien statutes or notice requirements, and the court finds no reason to extend the holding of *Tum–a–Lum– Lumber* to non-construction cases.

### CONCLUSION

Plaintiff states a valid claim for relief. Therefore, defendant Playboy's Motion to Dismiss [# 18] is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 876263

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 48

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 499 of 751
PageID: 11865
McDonough v. Bayer Healthcare, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 2119107

2011 WL 2119107
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Brian McDONOUGH and Joseph
Tobin, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
BAYER HEALTHCARE, LLC, Defendant.

Civ. No. 10–442.
|
May 26, 2011.

**Attorneys and Law Firms**

Paul Diamond, Diamond Law Office, LLC, Fort Lee, NJ,
Gary S. Graifman, Kantrowitz, Goldhamer & Graifman,
Esqs., Montvale, NJ, Jeffrey W. Herrmann, Cohn, Lifland,
Pearlman, Herrmann & Knopf, LLC, Saddlebrook, NJ,
Michael Scott Green, Green & Pagano, Milltown, NJ, for
Plaintiffs.

Lorna A. Dotro, Mark K. Silver, Coughlin Duffy, LLP,
Morristown, NJ, for Defendant.

**OPINION**

WILLIAM J. MARTINI, District Judge.

 *1  This matter comes before the Court on Defendant Bayer
Healthcare LLC's ("Bayer") motion to strike pursuant to
Federal Rule of Civil Procedure 12(f) and motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6). There
was no oral argument. Fed.R.Civ.P. 78. For the reasons stated
below, Defendant's motion to strike is **GRANTED,** and
Defendant's motion to dismiss is **GRANTED** in part and
**DENIED** in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**
Plaintiffs' Amended Complaint ("Complaint") brings a
putative class action on behalf of themselves and other
purchasers and users of "spot on" flea and tick treatments
manufactured by Defendant. Defendant Bayer manufactures
K9 Advantix, a flea and tick control pesticide product for
dogs containing the insecticide Imidacloprid and Permethrin.

(Compl.¶ 4.) Bayer is considered a "spot on" flea and tick
treatment because the pesticide is applied directly to the dog's
skin in a localized area. (See Compl., Ex. B.) On April 21,
2009, the Environmental Protection Agency ("EPA"), which
regulates the safety of pesticides, issued a press release,
reporting a "recent sharp increase in the number of incidents
being reported from the use of spot-on pesticide products for
flea and tick control for pets." (Compl., Ex. C.)

Plaintiffs allege that K9 Advantix is unsafe because it
caused skin irritation and neurological problems for their
pets. (Compl.¶ 8.) Plaintiff Brian McDonough, a resident of
New Jersey, alleges that on or about November 2009, he
purchased and used K9 Advantix on his dog. (Compl.¶ 27.)
Approximately one day after applying the product, Plaintiff's
dog began to have neurological problems, which were
diagnosed by a veterinarian as neurological seizures. (Comp.¶
29.) Although the Complaint focuses on K9 Advantix,
Plaintiff Joseph Tobin, a resident of California, alleges that his
cat was harmed by Bayer's Advantage product and eventually
had to be put to sleep. (Compl.¶ 30–33.)

Plaintiffs, on behalf of themselves and other purchasers of
Defendant's product, bring the following causes of action:
(1) breach of express warranty (Count One); (2) breach
of implied warranty of merchantability (Count Two); (3)
unjust enrichment (Count Three); and (4) violation of the
New Jersey Consumer Fraud Act ("NJCFA") (Count Four).
Specifically, Plaintiffs seek economic damages based upon
the difference between the amount they paid for the product
and the diminished (or nonexistent) value of the product as a
result of it being unsafe to apply to their pets.[1]

**II. DISCUSSION**

  **A. Motion to Strike**
Defendant includes a motion to strike, pursuant to Federal
Rule of Civil Procedure 12(f), with its motion to dismiss.
(Def.'s Moving Br. at 3–5.) Defendant moves to dismiss
any references to Advantage, another flea and tick product,
from the Complaint, which only asserts claims related to
K9 Advantix. Additionally, Defendant moves to dismiss any
reference to "cats," as K9 Advantix is a product only for use
on dogs. Because Plaintiff Joseph Tobin's factual allegations
relate to using Advantage on his cat, while the causes of action
stated relate only to K9 Advantix, Defendant moves to strike
Joseph Tobin's factual allegations and have him dismissed
from the matter. Plaintiffs do not object, and Joseph Tobin's
claims have been withdrawn at this time. (Pls.' Reply Br. at 1.)

Additionally, Plaintiffs' do not seem to object to striking all references to "cats" and to "Advantage." Finally, Defendant moves to strike references to "Frontline and Frontline Plus products," since those products are not manufactured by Defendant. Since this is likely a typographical error by Plaintiffs, this will also be stricken. As such, the Court grants Defendant's motion to strike in its entirety.

### B. Motion to Dismiss Standard

**\*2** Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States,* 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true,[2] the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility ..." *Iqbal,* 129 S.Ct. at 1949 (2009).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick,* 502 F.3d 263 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Coll. Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002).

### C. Choice of Law Principles

Since Plaintiff Joseph Tobin has withdrawn his claims at this time in response to Defendant's motion to strike, only Plaintiff Brian McDonough remains as a named Plaintiff. Mr. McDonough is a resident of New Jersey, and Bayer has its principal place of business in New Jersey. Therefore, Bayer rightfully is not challenging the application of New Jersey law at this time. (Def.'s Reply Br. at 1 n. 1); *see also Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 659 (3d Cir.1998) ("Until the putative class is certified, the action is one between the [named plaintiffs] and the defendants.").

### D. Counts Two, Three and Four—Breach of Implied Warranty, Unjust Enrichment and Violation of the NJCFA

Defendant argues that Plaintiff's theories of breach of implied warranty, unjust enrichment, and consumer fraud are not independently actionable, as under New Jersey law, claims arising from harm caused by products can only be asserted under the NJPLA. The NJPLA governs any "product liability action," which is defined as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty." N.J. Stat. Ann. § 2A:58C–1(b)(3). "Harm" is defined in the statute as, "(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J. Stat. Ann. § 2A:58C–1(b)(2). Thus, the Third Circuit has determined that the PLA "effectively creates an exclusive statutory cause of action for claims falling within its purview." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 492 (3d Cir.1991). If any of Plaintiff's claims constitute a "product liability claim," they will be subsumed under the NJPLA.

**\*3** Plaintiff attempts to classify his claims as non-product liability claims by alleging only economic damages related to the price of the product as opposed to damages related to the harm caused by the product. However, "[l]imiting a claim to economic injury and the remedy sought to economic loss cannot be used to obviate the PLA." *Vercelleno v. Gerber Prods. Co.,* Civ. No. 09–2350, 2010 U.S. Dist. LEXIS 9477, at \*20, 2010 WL 455388 (D.N.J. Feb. 3, 2010). The New Jersey Supreme Court has held that "[t]he language of the PLA represents a clear legislative intent that ... the PLA is

2011 WL 2119107

paramount when the underlying claim is one for harm caused by a product." *Sinclair v. Merck & Co., Inc.,* 195 N.J. 51, 66, 948 A.2d 587 (N.J.2008). As such, regardless of how a claim is pleaded, where the *core issue* is the harmfulness of the product's chemicals, the claim must be pleaded as an NJPLA claim. *Crouch v. Johnson & Johnson,* Civ. No. 09–2905, 2010 WL 1530152, at *7 (D.N.J. April 15, 2010).

Though Plaintiff asserts contract, quasi-contract, and consumer fraud claims, the issue underlying his claims is that the chemicals in K9 Advantix are dangerous and caused physical damage to Plaintiff's property, in the form of harm to his pet's health. *See Harabes v. The Barkery, Inc.,* 791 A.2 d 1142, 1144 (N.J.Super. Ct. Law Div.2001) (classifying pets as personal property). This fits squarely within the NJPLA's definition of "harm" as "physical damage to property." N.J. Stat. Ann. § 2A:58C-1(b)(2) (a).

While Plaintiff points to the New Jersey Appellate Division case *Wendling v. Pfizer, Inc.,* No. L–348–04, 2008 WL 833549 (N.J.App.Div. March 31, 2008), to support the position that Plaintiff's claims are not subsumed, the facts of *Wendling* are distinguishable. In *Wendling,* the plaintiffs brought a claim under the NJCFA that a product claiming to control tapeworms in horses failed to do so, causing harm to plaintiffs' horses from the tapeworms that were insufficiently treated. The Appellate Division found that plaintiffs' claim was not subsumed by the NJPLA because in *Wendling,* "it was not the product itself that caused the harm, but allegedly its misleading promotion." *Wendling,* 2008 WL 833549, at *8. Here, Plaintiff is not alleging that Defendant's product failed to kill fleas and ticks, causing harm to Plaintiff's pet because the fleas and ticks went untreated. Instead, Plaintiff is alleging that the product is unusable as it harmed his pet in the process of successfully killing the fleas and ticks as promised. Simply "articulating a claim in terms of pure economic harm where the core issue is the potential injury arising as a consequence of the products' allegedly harmful chemicals" does not obviate the NJPLA's reach. *Vercelleno,* 2010 U.S. Dist. LEXIS 9477, at *20, 2010 WL 455388.[3] Therefore, Plaintiff's breach of implied warranty, unjust enrichment and consumer fraud claims are subsumed under the NJPLA, as "irrespective of the theory underlying the claim," the core issue in Plaintiff's claims is "harm caused by a product." N.J. Stat. Ann. § 2A:58C-1(b)(3). While these claims fail as pleaded, the Court is making no determination at this juncture as to whether Plaintiff can successfully state a claim under the NJPLA. As such, the Court will dismiss these claims, but

will allow Plaintiff the opportunity to amend the Complaint to plead them as product liability causes of action instead.

### E. Count One—Breach of Express Warranty

**\*4** Since claims for breach of express warranty are expressly preserved by the NJPLA, Count One is not subsumed. Defendant contends that Count One still fails to state a claim, however, because Plaintiff fails to claim that the alleged express warranties[4] were part of the "basis of the bargain" for the product. *New Hope Pipe Liners, LLC v. Composites One, LCC,* Civ. No. 09–3222, 2009 U.S. Dist. LEXIS 111217, at *15 (D.N.J. Nov. 25, 2009). Under New Jersey law, in order to state a claim for breach of express warranty, Plaintiff must properly allege: (1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description. *New Hope Pipe Liners,* 2009 U.S. Dist. LEXIS 111217, at *15; N.J. Stat. Ann. § 12A:2–313.

Plaintiff alleges that Defendant made the following affirmations and promises:

(1) A statement on Bayer's website for veterinary professionals that its corporate mission is to "protect animals" and "safeguard[ ] the health of animals." It further states that K9 Advantix is "gentle enough for puppies as young as 7 weeks." (Compl. ¶ 4; Ex. A.)

(2) A statement on the package advertising that "Individual sensitivities, while rare, may occur after using ANY pesticide product for pets." (Compl. ¶ 9; Ex. B.)

Defendant contends that Plaintiff has failed to satisfy the "basis of the bargain" requirement, as he has not pleaded any connection between his purchasing decision and the alleged express warranties at issue. (Def.'s Moving Br. at 12.) However, "[t]o establish a breach of an express warranty under N.J. Stat. § 12A:2–101, the plaintiff need not prove privity or traditional reliance." *Knipe v. Smithkline Beecham,* 583 F.Supp.2d 602, 625 (E.D.Pa.2008). While some states require such elements, New Jersey's "basis of the bargain" requirement is much broader. Plaintiff must only show that the alleged express warranties "were of a kind which naturally would induce the purchase." *Elias v. Ungar's Food Prods., Inc.,* 252 F.R.D. 233, 239 (D.N.J.2008).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 502 of 751
PageID: 11868
McDonough v. Bayer Healthcare, LLC, Not Reported in F.Supp.2d (2011)
2011 WL 2119107

Defendant claims that the Third Circuit further requires that a plaintiff prove he has "read, seen, or heard the advertisements at issue" to satisfy the "basis of the bargain" requirement. *Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 569 (3d Cir.N.J.1990). However, the *Cipollone* decision is narrower than Defendant's interpretation. First, the Court in *Cipollone* pointed out that this additional burden on the plaintiff would not apply where a "written warranty delivered to the purchaser in connection with a sale" was at issue. *Cipollone,* 893 F.2d at 567 n. 29. Here, one of the alleged warranties was included with the sale of the product, so that "there is no question that the plaintiff has knowledge that the alleged warranty exists." *Id.* Furthermore, the requirement established in *Cipollone* was in regard to what must be included in jury instructions at trial, not what must be pleaded to survive a motion to dismiss. *Id.* at 563–64. At this stage, it is sufficient that Plaintiff has pleaded alleged warranties that plausibly could have been the basis of the bargain. *See*

*In re Ford Motor Co. E–350 Van Prods. Liab. Litig.,* Civ. No. 03–4558, 2008 U.S. Dist. LEXIS 73690, 2008 WL 4126264 (D.N.J.2008) (holding that whether an alleged warranty was the basis of the bargain cannot be resolved on a motion to dismiss).

### III. CONCLUSION

**\*5** For the reasons stated above, Defendant's motion to dismiss is **GRANTED** as to Counts Two, Three and Four, and Counts Two, Three and Four are **DISMISSED** as subsumed under the NJPLA. Defendant's motion to dismiss as to Count One is **DENIED,** and Defendant's motion to strike is **GRANTED.** An Order follows this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 2119107

Footnotes

1    In addition to this action, multiple putative class actions have been filed against various other "spot on" flea and tick treatment manufacturers in this Court. The Court has issued parallel opinions on the motions to dismiss pending in the following flea and tick treatment cases: *Smith v. Merial Limited,* Civ. No. 10–439; *Arlandson v. Hartz Mountain Corp.,* Civ. No. 10–1050; *Snyder v. Farnam Companies,* Civ. No. 10–1391; and *Johansson v. Central Garden and Pet Company,* Civ. No. 10–6372.

2    This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* ––– U.S. –––, –––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

3    Plaintiff attempts to distinguish *Vercelleno,* as well as various other cases finding subsumption by the NJPLA, based on reasoning provided in dicta in another decision that the NJPLA does not subsume claims where a breach of express warranty has been alleged and an NJPLA claim has not. *See In re Ford Motor Co. E–350 Van Products,* Civ. No. 03–4558, 2008 U.S. Dist. LEXIS 73690, *48 n. 9 (D.N.J. Sept. 3, 2008). This Court disagrees with this reasoning, as no such proposition stems from the NJPLA or from the New Jersey Supreme Court's instructive decision in *Sinclair v. Merck & Co., Inc.,* 195 N.J. 51, 948 A.2d 587 (N.J.2008). While the NJPLA does expressly exempt breach of express warranty claims, the presence or absence of either a breach of express warranty claim or an NJPLA claim does not affect the analysis of Plaintiff's other claims.

4    At this time Bayer is not challenging whether the alleged statements constitute express warranties, but has reserved the right to later raise this issue. (Def.'s Moving Br. at 13 n. 6.)

Tab 49

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 504 of 751
PageID: 11870
In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 7106020

KeyCite Yellow Flag - Negative Treatment
Disagreed With by In re Volkswagen "Clean Diesel" Marketing, Sales
Practices, and Products Liability Litigation, N.D.Cal., October 3, 2018

2016 WL 7106020
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE MERCEDES-BENZ
EMISSIONS LITIGATION.

Civil Action No.: 16-881 (JLL)(JAD)
|
Signed December 5, 2016
|
Filed 12/06/2016

**OPINION**

LINARES, District Judge.

**\*1** This matter comes before the Court by way of Defendants
Mercedes-Benz USA, LLC's and Daimler AG's motion
to dismiss the Consolidated and Amended Class Action
Complaint ("CAC") and to compel arbitration. (ECF No.
38). Plaintiffs have opposed this motion (ECF No. 45), and
Defendants have replied to that opposition (ECF No. 54).
The Court decides this matter without oral argument, pursuant
to Federal Rule of Civil Procedure 78. For the reasons
stated herein, Defendants' motion is granted, and the CAC is
dismissed without prejudice.

**I. Background**[1]
This action involves allegations that Defendants Mercedes-
Benz USA, LLC ("MBUSA") and Daimler AG ("Daimler")
(collectively, "Defendants" or "Mercedes") have unlawfully
mislead consumers into purchasing certain "BlueTec Clean
Diesel" vehicles (the "Affected Vehicles") by misrepresenting
the environmental impact of these vehicles during on-road
driving. (See, e.g., CAC ¶ 12).[2]

According to Plaintiffs, "Mercedes' advertisements,
promotional campaigns, and public statements represented
that the Affected Vehicles had high fuel economy, low
emissions, reduced NOx by 90%, had lower emissions than
comparable diesel vehicles, and had lower emissions than

other comparable vehicles." (Id. ¶ 101). For example, the
CAC cites to press releases that indicated that Mercedes offers
"the world's cleanest diesel automobiles" and that the BlueTec
Clean Diesel vehicles have "ultra-low emissions." (Id. ¶ 10ľa-
10ľb). Plaintiffs cite to similar representations located, inter
alia, on Mercedes' website and in promotional brochures. (Id.
¶ 101).

Plaintiffs allege that these representations are false and
misleading. Specifically, Plaintiffs allege that Defendants
utilize "defeat devices" in the BlueTec vehicles, which
devices are said to "reduce[ ] the effectiveness of the emission
control system under conditions which may reasonably be
expected to be encountered in normal use." (Id. ¶ 11). Thus,
Plaintiffs claim that "these Mercedes vehicles are not 'clean
diesels' and emit more pollutants than allowed by federal
and state laws—and far more than their gasoline fueled
counterparts and far more than what a reasonable consumer
would expect from a 'Clean Diesel'." (Id. ¶ 12).

Each individual Plaintiff offers similar allegations with
respect to their reliance on Defendants' representations with
respect to the Affected Vehicles. For example, New Jersey
Plaintiff Anthony Caputo alleges as follows:

> Plaintiff selected and ultimately purchased his vehicle,
> in part, because of the BlueTec Clean Diesel system, as
> represented through advertisements and representations
> made by Mercedes. Plaintiff recalls that advertisements
> and representations touted the cleanliness of the engine
> system for the environment and the efficiency and
> power/performance of the engine system. None of the
> advertisements or representations received by Plaintiff
> contained any disclosure that the Affected Vehicle had high
> emissions compared to gasoline vehicles and the fact that
> Mercedes had designed part of the emissions reduction
> system to turn off during normal driving conditions.

**\*2** (Id. ¶ 20).

The Plaintiffs proceed to allege that if Defendants had
been truthful in their representations, they either would not
have purchased or leased their respective vehicle, or would
have paid less for them. (Id.). As a result of Defendants'
conduct, Plaintiffs allege that they have suffered the following
ascertainable loss: "out-of-pocket loss and future attempted
repairs, future additional fuel costs, decreased performance of
the vehicle, and diminished value of the vehicle." (Id. ¶ 18).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 505 of 751
PageID: 11871
In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 7106020

Against this backdrop, Plaintiffs allege claims for breach of contract and State statutory and common law claims sounding in fraudulent concealment and violations of consumer protection laws. (CAC at 104-398). A number of individual plaintiffs filed similar claims in this District, on behalf of overlapping putative classes. On May 5, 2016, for the purposes of judicial efficiency, this Court ordered that these actions, and any substantially similar cases subsequently filed in or transferred to this District were to be consolidated for all purposes. (ECF No. 19). On May 6, 2016, Plaintiff filed the operative CAC.

In the pending motion, Defendants argue that Plaintiffs' claims should be dismissed due to both jurisdictional bars and pleading deficiencies. Respecting jurisdictional preclusion, Defendants maintain that Plaintiffs lack standing to bring this lawsuit and that their claims are preempted by Federal legislation and barred by the primary jurisdiction doctrine. The Court will begin its analysis with the standing issue, as standing is a threshold question that implicates the Court's power to hearing this case. *See, e.g., O'Shea v. Littleton, 414 U.S. 488, 493 (1974).*

## II. Motion to Dismiss on Standing Grounds: Legal Standard

Federal courts have limited jurisdiction and are permitted to adjudicate "cases" and "controversies" only as permitted under Article III of the Constitution. *See* U.S. Const. Art. III, § 2; *see also Phila. Fed'n of Teachers v. Ridge, 150 F.3d 319, 322-23 (3d Cir. 1998).* "That case-or controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008).* "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro. v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006)* (citing *Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003)); Daimler Chrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)* ("If a dispute is not a proper case or controversy, the courts have no business deciding it....").

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin, 422 U.S. 490, 489 (1975).* To that end, "the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)* (citing *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).* "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citations omitted).[3]

**\*3** In the context of a putative class action lawsuit, "[t]he standing inquiry does not change." *In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451, 461 (D.N.J. 2005).* That is, "a predicate to [a plaintiff's] right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class." *Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970).* At the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp., 664 F.3d 38, 41 (3d Cir. 2011)* (quoting *Lujan, 504 U.S. at 561); Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).*

" 'A motion to dismiss for want of standing is ... properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.' " *In re Schering-Plough Corp. Intron/ Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)* (quoting *Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)).* It is not necessary for the Court to restate the standard for resolving motions to dismiss for lack of standing, because that standard has already been enunciated. *See, e.g., Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977); U.S. ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007).*

Here, Defendants maintain that Plaintiffs have failed to allege the existence of any defect or deficiency in the emissions profile of the make and model of the vehicles that Plaintiffs themselves actually owned or leased. (ECF No. 38-1 ("Defs.' Mov. Br.") at 7). Additionally, Defendants contend that Plaintiffs' allegations as to "damage" are "not particularized, speculative, and not plausibly pled." (*Id.* at 10-13). Lastly, Defendants argue that Plaintiffs have not shown that their injury is "fairly traceable" to Defendants' conduct. The Court addresses each of these arguments below.

## III. Discussion

Plaintiffs contend that they have sufficiently pled an injury in fact by alleging that they were denied the "benefit of the bargain." (ECF No. 45 ("Pls.' Br.") at 10-15).[4] Plaintiffs correctly note that "benefit of the bargain damages are recoverable for overpayment and recoverable to confer

In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 7106020

standing" under certain circumstances, and neither party contends that a benefit of the bargain theory is inappropriate to confer standing as to claims alleged in the CAC. (*Id.* at 11). A plaintiff may establish an injury in fact vis à vis the benefit of the bargain theory by "alleg[ing] that she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect." *Koronthaly v. L'Oreal USA, Inc.*, 374 Fed.Appx. 257, 259 (3d Cir. 2010).

**\*4** Plaintiffs' benefit of the bargain theory proceeds as follows: "Had [Plaintiffs] known Mercedes' undisclosed manipulations and the higher emissions produced by the BlueTECs, Plaintiffs would not have purchased or leased those vehicles, or would have paid substantially less than they did." (Pls.' Br. at 11). Stated differently, "Plaintiffs here allege that they would not have purchased their BlueTEC vehicles or would have paid less had they known about Mercedes' misrepresentations and omissions." (*Id.* at 13).

## A. Whether Plaintiffs have Sufficiently Pled an Injury in Fact

Defendants maintain that Plaintiffs cannot establish an injury in fact via the benefit of the bargain theory because: (1) they have failed to allege that the advertisements and statements relied upon by Plaintiffs were, in fact, false, and; (2) Plaintiffs have not sufficiently established that the particular vehicles that the named Plaintiffs actually owned or leased were defective or did not meet applicable regulatory standards.

As to the first point, Defendants argue that Plaintiffs have not sufficiently pled the benefit of the bargain theory because " 'even taking all of [P]laintiffs' allegations as true, the Court still cannot draw a plausible inference that [P]laintiffs did not receive the benefit of the bargain because the Mercedes-Benz 'Clean Diesel' vehicles were less 'environmentally friendly' than they were advertised to be or do not meet regulatory standards.' " (Defs.' Mov. Br. at 12-13). In other words, Defendants state that "Plaintiffs' benefit-of-the-bargain theory [ ] fails because they cannot allege facts showing that the advertisements they challenge—even *if* they had seen and relied on these statements—were false or deceptive." (Defs.' Reply Br. at 5). Specifically, Defendants argue that Plaintiffs fail to allege the following "critical factual allegations":

- That there is any objective measure of "environmental friendliness" that can be used to determine whether the vehicles were as "environmentally friendly" as advertised;

- That allegedly elevated levels of NOx emissions are not counteracted by lower levels of other exhaust emissions, such as ammonia or greenhouse gases, resulting in a low level of emissions overall; or

- That the "FTP standard" used as a benchmark by [P]laintiffs is considered by the regulatory agencies to be an appropriate or applicable standard for measuring test results for on-road driving, such that [P]laintiffs' on-road tests can be considered evidence of non-compliance.

According to Defendants, in the absence of these factual allegations, among others, "[P]laintiffs' allegations are equally consistent with the inference that, given modern engineering constraints, complex chemical reactions, and existing industry regulations, Mercedes-Benz diesel vehicles are, as advertised, 'environmentally friendly,' CAC ¶ 101, and compliant with all regulations, *id.* ¶ 104." (Defs.' Mov. Br. at 13). Thus, Defendants contend that "exactly how Plaintiffs 'received a product that did not deliver the advertised benefits' cannot be plausibly inferred from their allegations, so [P]laintiffs' claims must be dismissed for lack of standing." (*Id.* at 13).

The Court finds that, at the motion to dismiss stage and as to the standing issue, Plaintiffs have plausibly pled that the products received did not live up to the claims made by Defendants. First, the CAC identifies the precise representations made by Defendants. Among other of Defendants' alleged misrepresentations, Plaintiffs claim that:

**\*5** • "Mercedes vigorously markets its BlueTEC vehicles as 'the world's cleaniest and most advanced diesel' with 'ultra-low emissions, high fuel economy and responsive performance' that emits 'up to 30% lower greenhouse-gas emissions than gasoline' " and that Mercedes "also represents that its BlueTEC vehicles 'convert[ ] the nitrogen oxide emissions into harmless nitrogen and oxygen' and 'reduces the nitrogen oxide in the exhaust gases by up to 90%.' " (CAC ¶ 5).

- "Mercedes promotes its Clean Diesel vehicles as 'Earth Friendly: With BlueTEC, cleaner emissions are now an equally appealing benefit.' " (*Id.* ¶ 6).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 507 of 751
PageID: 11873

In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 7106020

• "Mercedes' advertisements, promotional campaigns, and public statements represented that the Affected Vehicles had high fuel economy, low emissions, reduced NOx by 90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles." (*Id.* ¶ 101).

Plaintiffs have further alleged that "[t]hese representations are deceptive and false" and that "Mercedes has programmed BlueTEC vehicles to turn off or otherwise limit the effectiveness of the emissions reduction systems during real-world driving." (*Id.* ¶ 7). In support of these statements, Plaintiffs cite to (1) on-road testing of the vehicles, which appear to have been conducted by Plaintiffs' experts (*id.* ¶¶ 124-135); (2) tests conducted by foreign entities (*id.* ¶¶ 137-138); and (3) Defendants' alleged admissions (which Defendants deny) (*id.* ¶¶ 106, 107).

In reply, Defendants argue that Plaintiffs have not and cannot allege any factual allegations to support their position that Mercedes' statements are false or misrepresentations. (*See* Defs.' Reply Br. at 5-8). However, at this stage of the litigation and in viewing the allegations in the CAC in the totality, the Court finds Plaintiffs' allegations sufficient to support Plaintiffs' claims that the vehicles do not live up to Defendants' representations.

As to the second point, Defendants argue that Plaintiffs cannot establish their benefit of the bargain theory because they "fail to allege that the particular makes or models of vehicles *they* own or lease produce more emissions than Defendants represented, or are defective because they do not meet applicable regulatory emissions standards." (Defs.' Mov. Br. at 7) (emphasis in original). Defendants maintain that Plaintiffs' extensive reliance on testing and reports based upon European models of MBUSA vehicles is misplaced. (*Id.* at 8). First, Defendants note that any tests run on European vehicles are irrelevant to the analysis of Plaintiffs' vehicles, since Plaintiffs' vehicles "were designed for and sold in the United States." (*Id.*). Second, according to Defendants, the testing of European vehicles have no bearing on Plaintiffs' vehicles since European emissions standards differ from those of the United States. (*Id.*). Moreover, Defendants state that the vehicles tested in the European studies were of different models than Plaintiffs' vehicles. (*Id.*). Even if testing of European vehicles could permit any inference with respect to Plaintiffs' vehicles, Defendants explain that the test results do not support Plaintiffs' claims because, contrary to Plaintiffs'

representations, those test results affirmatively disclaimed any illegal activity. (*Id.* at 8-9).

In response, Plaintiffs note that although "the European studies did not test the precise models at issue here," the "findings based on testing of similar engines using similar pollution control technologies buttress Plaintiffs' allegations regarding the U.S. models." (Pls.' Br. at 17, n.12).

**\*6** Additionally, Defendants challenge Plaintiffs' reliance on the results of their experts' "on road" testing. (*Id.* at 9). That is, Defendants note that "[P]laintiffs fail to allege facts showing that any of *their* vehicles were tested— or even which model(s) or model year(s) were tested" and that there is, therefore, "no basis to infer that testing of undisclosed vehicles under unregulated conditions can plausibly demonstrate anything about the emissions of [P]laintiffs' vehicles." (*Id.*) (emphasis in original).

In response Plaintiffs explain that it "it is not necessary to test each specific model in order to allege injury" because "[t]he BlueTECs have one of two engine types: 2.1 liter or 3.0 liter." (Pls.' Br. at 7, n.5). According to Plaintiffs, "[a]ll 2.1 liter engine models have the same engine and emissions control system, as do all 3.0 liter engine models. Plaintiffs' experts tested both engine types covering all class vehicles." (*Id.*). Further, Plaintiff argues that "it is implausible to suggest that the emissions systems are different in each model; they were not in Volkswagen, where the EPA issued violation notices based on engine size (2.0 and 3.0 liters) and did not differentiate based on models or year. In other words, all 2.0 models were in violation, not, for example, some but not all Jettas or Jettas but not Passats. Similarly, what is common to all Mercedes class vehicles, regardless of engine, is the BlueTEC system." (*Id.*).

Given that the above statements pertaining to the relationship between the engine types of Plaintiffs' vehicle and the engine types of the vehicles that were tested were not included in the Complaint, the Court will not consider them at the motion to dismiss stage. *See, e.g., In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443 (SRC), 2014 WL 3012873, at \*7 (D.N.J. July 2, 2014) (citing *Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007)). However, because, for the reasons stated below, the Court will dismiss the complaint without prejudice on other grounds, Plaintiffs will have the opportunity to amend their pleading to add these new allegations.[5]

In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 7106020

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 508 of 751
PageID: 11874

## B. Whether the Alleged Injury is "Fairly Traceable" to Defendants' Conduct

"The second requirement of Article III standing is 'traceability.' If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on *who* inflicted that harm." *Toll Bros., Inc. Twsp. Of Readington,* 555 F.3d 131, 142 (3d Cir. 2009) (citation omitted). Here, Defendants argue that "Plaintiffs have not plausibly alleged that any purported injury of 'overpayment' is 'fairly traceable to the challenged action of the [Defendants].' " (Defs.' Mov. Br. at 13) (quoting *Toll Bros.,* 555 F.3d at 137-38). That is, Defendants state that Plaintiffs have not identified any specific misrepresentations that the named Plaintiffs relied upon in purchasing or leasing their vehicles. (Defs.' Mov. Br. at 13). Moreover, Defendants note that Plaintiffs have not alleged that any of the suspect advertisements related to the specific models Plaintiffs purchased or leased.

**\*7** In response, Plaintiffs maintain that they have sufficiently pled facts to show that Defendants' conduct was fairly traceable to their decision to purchase or lease their vehicles. As an example, Plaintiffs cite to the following allegations of New Jersey Plaintiff Anthony Caputo:

> Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United Sates emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Affected Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes disclosed this design, and the fact that the ML 350 actually

emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

(Pls.' Br. at 18) (citing CAC ¶ 20, and noting that the CAC makes nearly identical allegations for all other Plaintiffs). Plaintiffs opine that they "need not demonstrate their reliance on specifically-delineated advertisements because they each plead: (i) that they relied on pervasive advertisements touting the cleanliness of the BlueTEC engines, advertisements that Plaintiffs contend caused them to purchase their vehicles, and (ii) that they would not have bought or leased the vehicles had they known the truth, or would have paid less." (Pls.' Br. at 40-41). While the Court agrees with Plaintiffs that they do not need to point to specific advertisements that they relied upon, Plaintiffs' vague reference to "advertisements and representations" is insufficient to prove reliance (or "causation") on any alleged misrepresentations.

In *In re Gerber Probiotic Sales Practices Litig.,* 12-cv-835, 2013 WL 4517994 (Aug. 23, 2013)—relied upon by Defendants herein—a putative class of consumers brought consumer fraud claims arising out of the alleged deceptive, false, and misleading marketing of certain Gerber baby products. The *Gerber* plaintiffs alleged that the manufacturer represented the products as providing immune system benefits that it did not, in fact, provide. *Id.* at * 1. Like the Plaintiffs in the case at bar, the *Gerber* Plaintiffs relied upon a benefit of the bargain theory to confer standing. *Id.* at *5 ("Plaintiffs claim that they paid a premium for the Products at issue based on false, deceptive and misleading representations.").

**\*8** In its standing analysis, this Court considered whether plaintiffs had sufficiently pled reliance on Gerber's labeling and advertising to show that Defendants' conduct was fairly traceable to Plaintiffs' alleged injury. There, the plaintiffs pled reliance on defendants' advertising and labeling to varying degrees of specificity. This Court explained:

> [O]ther than the Products' label, no Plaintiff alleges even the general type of medium or "advertising" to which they were allegedly exposed.... Therefore, the SAC does not contain sufficient facts to allege that the injuries which resulted to Plaintiffs were fairly traceable to any of Gerber's representations other than those on the Products' labeling.

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 509 of 751
PageID: 11875
In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 7106020

*Id.*[6] Thus, this Court concluded that "[t]he SAC only establish[ed] standing to sue for injuries caused by the alleged misrepresentations on the Products' labels." *Id.* at *10.

In the case at bar, Plaintiffs reference a number of specific advertisements throughout the Complaint. (*See, e.g.*, CAC ¶ 98 (citing a 2008 press release), ¶ 100 (referencing print advertising and brochures), ¶ 101(c) (citing Mercedes' website)). However, no Plaintiff has alleged that he or she relied upon any of the cited advertisements in deciding to lease or purchase one of Defendants' vehicles. (*See, e.g.*, CAC ¶ 20). That is, Plaintiffs in this action, just as the plaintiffs in *Gerber*, hinge the causation element of standing on a general advertising scheme. Specifically, Plaintiffs allege that they purchased or leased their vehicles "in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system." (CAC ¶ 20). Just as their counterparts in *Gerber*, Plaintiffs here have not " 'allege[d] the general type of medium or 'advertising' to which they were [personally] allegedly exposed.' " *Gerber*, 2013 WL 4517994, *6. For example, Plaintiffs have not alleged that they actually viewed any category of advertisements—*i.e.*, Defendants' website, press releases, etc.—that contained the alleged misrepresentations. *See Gerber II*, 2014 WL 1310038, *4-6. Accordingly, the Court finds that the CAC does not contain sufficient facts to allege that Plaintiffs' injuries were fairly traceable to any of Defendants' representations. *See Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 599 (2007) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.")).

Because the Court finds that Plaintiffs do not have standing based upon the facts alleged in the CAC, the Court is without subject matter jurisdiction to address Defendants' remaining arguments for dismissal.

### IV. Conclusion

**\*9** For the reasons stated herein, Defendants' motion to dismiss Plaintiffs' CAC is granted. Plaintiffs' CAC is hereby dismissed without prejudice. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7106020

---

Footnotes

1   The facts as stated herein are taken as alleged in the Consolidated Class Action Complaint. (ECF No. 17, "CAC")

2   Specifically, "Plaintiffs allege that the following Mercedes models powered by BlueTec diesel fueled engines are affected by the unlawful, unfair, deceptive, and otherwise defective emissions controls utilized by Mercedes: ML 320, ML 350, G320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter (the Affected Vehicles)." (CAC ¶ 13).

3   In the recent past, courts have held that "[s]tanding implicates both constitutional requirements and prudential concerns." *Common Cause v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004)). In 2014, however, in *Lexmark International, Inc. v. Static Control Components, Inc.*, the Supreme Court appears to have refined the prudential standing doctrine, stating that "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." 134 S. Ct. 1377, 1388 (2014); *see also* Scholtes, Virginia, *The Lexmark Test for False Advertising Standing: When Two Prongs Don't Make a Right*, 30 Berkeley Tech. L. J. 1023, 1028 (2015). As the standing issue at bar does not implicate prudential standing concerns, the Court need not address this prong of standing.

4   Plaintiffs plead several damages theories in the CAC. (*See* CAC ¶¶ 142-145). In a section of the CAC entitled "The Damage," Plaintiffs espouse the public health and environmental consequences of increased NOx emissions. (*See* CAC ¶¶ 142-143). Plaintiffs further plead that in the event Defendants recall the affected vehicles to make them EPA-compliant, Plaintiffs' vehicles will have a diminished value and Plaintiffs will incur greater fuel costs than anticipated. (*Id.* ¶¶ 144-145). Finally, Plaintiffs plead a "benefit of the bargain" theory. (*Id.* ¶ 145). Specifically, Plaintiffs allege that had they "known of the higher emissions at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did."

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 510 of 751
PageID: 11876
In re Mercedes-benz Emissions Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 7106020

With respect to Plaintiffs' damages theories rooted in (1) environmental harm; (2) public health consequences; and (3) diminished value and increased fuel prices, Defendants contend that these allegations are far too generalized and speculative to confer standing on Plaintiffs. (Defs.' Mov. Br. at 10-12). Plaintiffs have not disputed that these three theories are inadequate to confer standing. (*See* Pls.' Br. at 10-15). In fact, Plaintiffs state the Defendants' cases respecting the possibility of future injury or harm to the public at large are inapplicable because "[t]his is not a case about fear of future injury; Plaintiffs were deceived and overpaid as a result of Mercedes' deception, resulting in a present, concrete injury recognizable by law." (Pls.' Br. at 16). Thus, Plaintiff appear to have abandoned each of their damages theories, with the exception of that premised upon overpayment.

**5** Plaintiffs also refute Defendants' statement that "Plaintiffs lack standing because they fail 'to allege that they experienced a [ ] defect.' " (Pls.' Br. at 13). Specifically, Plaintiffs explain that they are not required to allege a defect in order to succeed on their benefit of the bargain theory. (*Id.* at 13-16). While the Court agrees with Plaintiffs that Defendants contend that the evidence alleged in the CAC does not support the existence of a defect generally, the Court construes Defendants' brief as primarily arguing that Plaintiffs have not explained how their particular vehicles are defective. (*See, e.g.*, Defs.' Mov. Br. at 9) ("Among other things, [P]laintiffs fail to allege facts showing that any of *their* vehicles were tested—or even which model(s) or model year(s) were tested. As with the European testing, there is no basis to infer that testing of undisclosed vehicles under unregulated conditions can plausibly demonstrate anything about the emissions *of [P]laintiffs' vehicles*.") (emphasis in original). To the extent Defendants argue that Plaintiffs cannot prove any misrepresentations, the Court has addressed these arguments, above.

**6** In a subsequent opinion in *Gerber*, this Court held that the plaintiffs had sufficiently amended their complaint to demonstrate causation for standing purposes where "[e]ach [p]laintiff [alleged that he or she] saw the product labels" and where several plaintiffs also alleged that they viewed the company's website or saw print, television, or in-store advertisements. *In re Gerber Probiotic Sales Practices Litig. ("Gerber II")*, No. 12-cv-835 (JLL), 2014 WL 1310038, *4-6 (D.N.J. Mar. 31, 2014).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 50

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 512 of 751
PageID: 11878
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

KeyCite Red Flag - Severe Negative Treatment
Vacated and Remanded by In re Mercedes-Benz Emissions Litigation, 3rd
Cir.(N.J.), January 10, 2020

2019 WL 413541
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE MERCEDES-BENZ
EMISSIONS LITIGATION

Civil Action No.: 16-881 (JLL)(JAD)
|
Signed 02/01/2019

# OPINION

JOSE L. LINARES, Chief Judge

**\*1** This matter comes before the Court by way of Defendants Mercedes-Benz USA, LLC's and Daimler AG's motion to dismiss the Fourth Consolidated and Amended Class Action Complaint ("FAC"), (ECF No. 117), as well as Defendant Robert Bosch LLC's motion to dismiss the FAC, (ECF No. 118). Plaintiffs have opposed these motions (ECF Nos. 126–27), and Defendants have replied thereto, (ECF Nos. 131–32). The Court decides this matter without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, Defendants' motions are granted in part and denied in part.

## I. BACKGROUND[1]

### A. Facts

This is a putative class action involving allegations that Defendants Mercedes-Benz USA, LLC and Daimler AG (collectively, "Mercedes"), together with Bosch GmbH and Bosch LLC (collectively, "Bosch") have unlawfully mislead consumers into purchasing certain "BlueTEC diesel" vehicles (the "Polluting Vehicles") by misrepresenting the environmental impact of these vehicles during on-road driving. (FAC ¶ 10–20).[2]

According to Plaintiffs, "Mercedes' advertisements, promotional campaigns, and public statements represented that the Polluting Vehicles had high fuel economy, low

emissions, reduced NOx by 90%, had lower emissions than comparable diesel vehicles, and had lower emissions than other comparable vehicles." (FAC ¶ 323). However, Mercedes, with help of Bosch, installed an electronic control unit in the Polluting Vehicles known as the EDC17. (FAC ¶ 358). The EDC17 allegedly functions as a defeat device, meaning it turned off or limited emissions reductions during real-world driving conditions. (FAC ¶¶ 16–17, 21). This defeat device was "only discoverable when conducting over-the-road testing that is not part of the certification protocol." (FAC ¶ 252). The Polluting Vehicles also allegedly failed to perform up to their touted environmental standards in other situations, such as when ambient temperatures drop below 50°F/10°C—a defect Mercedes has acknowledged. (FAC ¶ 135).

Plaintiffs contend that Mercedes never disclosed the existence of the defeat device, nor the fact that the BlueTEC engines emit emissions substantially higher than those of gasoline vehicles, and thus, "defrauded its customers by omission, and engaged in fraud and unfair and deceptive conduct under federal and state law." (FAC ¶¶ 19, 313). Had Plaintiffs known of the emissions issues associated with the Polluting Vehicles, they would not have purchased those vehicles, or they would have paid substantially less for them. (FAC ¶ 317). As to Bosch, the FAC sets forth that Mercedes and Bosch entered into a scheme to evade U.S. emissions requirements and to deceive "the public into believing the Polluting Vehicles were 'clean diesels,' " in order to "bolster revenue, augment profits and increase Mercedes' share of the diesel vehicle market." (FAC ¶¶ 17, 356).

**\*2** Plaintiffs, on behalf of a national class and state subclasses, now assert claims for violation of the RICO Act, as well as violations of state consumer protection statutes, and fraudulent concealment. (FAC ¶¶ 342–1752).

### B. Procedural History

Plaintiffs initiated this action on February 18, 2016. (ECF No. 1). On May 6, 2016, Plaintiffs filed the Consolidated and Amended Class Action Complaint ("CAC"). (ECF No. 17). Mercedes moved to dismiss the CAC on July 8, 2016. (ECF No. 38). This Court granted that motion on December 6, 2016. (ECF Nos. 58–59). The Court found that Plaintiffs failed to establish Article III standing because the CAC did not allege that their injury was fairly traceable to Mercedes' conduct. (ECF No. 58 at 11–14). In particular, the Court found that "Plaintiffs have not alleged that they actually viewed any category of advertisements ... that contained the alleged

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 513 of 751
PageID: 11879
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

misrepresentations." (ECF No. 58 at 14). Accordingly, the Court dismissed the CAC without prejudice. (ECF Nos. 58–59). Plaintiffs then filed a third consolidated and amended class action complaint on March 3, 2017, (ECF No. 81), and finally, they filed the operative FAC on September 25, 2017 adding Bosch as a defendant and the accompanying RICO allegations. Mercedes and Bosch now move separately to dismiss the FAC arguing that Plaintiffs lack Article III standing, that Plaintiffs' state-law claims are preempted by the Clean Air Act or, alternatively, fail to state a claim, and finally that Plaintiffs fail to state a RICO claim.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1): Standing

Defendants seek to dismiss Plaintiffs' Complaint for lack of standing. "Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter." *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 n.3 (3d Cir. 2015).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ). "It is axiomatic that, in addition to those requirements imposed by statute, plaintiffs must also satisfy Article III of the Constitution ...." *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455 (3d Cir. 2003). The requirements of Article III standing are as follows:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (quoting *United States v. Hays*, 515 U.S. 737, 742–43 (1995) ); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (reiterating the same factors and articulating the second factor as "fairly traceable to the challenged conduct of the defendant").

On a motion to dismiss for lack of standing, the plaintiff " 'bears the burden of establishing' the elements of standing,

and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.' " *FOCUS v. Allegheny Cty. Ct. Com. Pl.*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ). "For the purpose of determining standing, [the court] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the complaining party." *Storino*, 322 F.3d at 296 (citing *Warth*, 422 U.S. at 501).

### B. Federal Rule of Civil Procedure 12(b)(6)

**\*3** To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under Twombly and Iqbal in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

### A. Article III Standing

As mentioned briefly above, this Court had previously dismissed Plaintiffs' CAC for lack of standing. In its prior

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 514 of 751
PageID: 11880
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

Opinion, this Court found that while the Plaintiffs had set forth allegations "sufficient to support [their] claims that the [Polluting Vehicles] do not live up to Defendants' representations," Plaintiffs nevertheless failed to establish Article III standing because it was not clear that the injury was "fairly traceable" to Defendants' conduct. (ECF No. 58 at 8, 14). This was because "no Plaintiff ha[d] alleged that he or she relied upon any of the cited advertisements in deciding to lease or purchase one of Defendants' vehicles." (ECF No. 58 at 13–14). Both Mercedes and Bosch now argue that Plaintiffs lack Article III standing. (ECF Nos. 117-1 at 19–25; 118-1 at 19–27). Mercedes and Bosch both claim that Plaintiffs failed to address the traceability deficiencies raised in the Court's prior Opinion. (ECF Nos. 117-1 at 19–23; 118-1 at 25–27). Mercedes also argues that Plaintiffs allegations contain three theories of injury that are foreclosed as a matter of law: allegations regarding public environmental and health harms, violations of environmental regulations, and allegations of future harm, and that Plaintiffs have nevertheless abandoned these theories as a basis for standing. (ECF No. 117-1 at 24). Mercedes argues that Plaintiffs' benefit of the bargain theory is unsupported by allegations in the FAC. (ECF No. 117-1 at 24). Bosch similarly claims that Plaintiffs have abandoned all theories of injury except for a benefit-of-the-bargain injury, but that the "benefit of the bargain, upon which Plaintiffs base their claim for overpayment, cannot serve as the basis for an Article III injury in the absence of a contract or any 'bargain' between [Bosch] and Plaintiffs." (ECF No. 118-1 at 20–21). The Court will address these arguments in turn.

1. Injury-in-Fact

**\*4** Plaintiffs have established an injury in fact that can serve as the basis for Article III standing. In its prior Opinion, this Court found that "Plaintiffs have plausibly pled that the products received did not live up to the claims made by Defendants," and that "benefit of the bargain damages are recoverable for overpayment and recoverable to confer standing." (ECF No. 58 at 6, 8). In challenging Plaintiffs' benefit of the bargain theory of injury in fact, both Mercedes and Bosch argue that Plaintiffs have not shown that the Polluting Vehicles "failed to work for [their] intended purpose or [are] worth objectively less than what one could reasonably expect." (ECF No. 117-1 at 24 (quoting *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) ); ECF No. 118-1 at 21). However, accepting Plaintiffs' allegations as true, they paid a higher price for the BlueTEC clean diesel engines, which, in reality, polluted at levels far higher than would be expected. (FAC ¶¶ 317, 323). "In other words, they paid for a product which did not operate in the way they

believed it did." *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1052 (E.D. Mich. 2018). Claims of overpayment for a misrepresented product are "classic form[s] of injury in fact," that "[are] concrete and particularized." *In re Gerber Probiotic Sales Practice Litig.*, No. 12-835, 2013 WL 4517994, at \*5 (D.N.J. Aug. 23, 2013).

Defendants' reliance on cases like *Koronthaly* and *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 WL 2999026 (D.N.J. July 14, 2017), is misplaced, as those cases are distinguishable. In fact, *Estrada* explains why the facts before Judge Wolfson in that case and before the Third Circuit in *Koronthaly* are different from those present here. Judge Wolfson wrote that:

> [w]hile Plaintiff places reliance on several cases recognizing standing on a benefit-of-the-bargain theory of economic harm, those cases are distinguishable from the present matter[, because] ... in each of those cases, the courts found that the plaintiffs did not receive the benefit of their bargain because either: (i) the plaintiffs received a defective product; or (ii) the plaintiffs pled facts sufficient for the court to conclude that they would not have purchased the product at issue but for a specific misrepresentation by the defendants; *i.e.*, that the plaintiff was induced into purchasing the product by a specific misrepresentation.

*Estrada*, 2017 WL 2999026, at \*9. In both *Koronthaly* and *Estrada*, the plaintiffs pled injury-in-fact based on economic harm from an alleged physical injury that came from an undisclosed risk from using a cosmetic product. 374 F. App'x at 259; 2017 WL 2999026, at \*9. However, these are cases where "the plaintiffs suffered no ill effects." *In re Gerber*, 2013 WL 4517994, at \*5. That is not the case here, as Plaintiffs have pled facts asserting that they fall into either of the two categories recognizing standing on a benefit of the bargain theory as outlined in *Estrada*.

In addition, Bosch argues that Plaintiffs have not established an injury-in-fact in their claims against it, because "[Bosch] was not a party to any of Plaintiffs' vehicle-purchase contracts, and no named Plaintiff makes any allegation that they had any relationship with [Bosch]." (ECF No. 118-1 at 21). Bosch's reliance on the absence of privity of contract is not relevant in this context. In the cases Bosch cites in support of this proposition—*Koronthaly, Bowman v. RAM Med., Inc.*, No. 10-cv-4403, 2012 WL 1964452 (D.N.J. May 31, 2012), and *Young v. Johnson & Johnson*, No. 11-4580, 2012 WL 1372286 (D.N.J. Apr. 19, 2012)—the lack of the contract alone was not the only reason the plaintiffs failed

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 515 of 751
PageID: 11881
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

to establish injury-in-fact. In each case, it was the lack of privity of contract in addition to a failure to allege facts demonstrating that the product failed to work as intended or was worth less than what a reasonable consumer would expect. *Koronthaly*, 374 F. App'x at 259; *Bowman*, 2012 WL 1964452, at *3; *Young*, 2012 WL 1372286, at *4. Judge Chen explained in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices and Products Liability Litigation ("FCA ")*:

> **\*5** [T]he courts in *L'Oreal* and *Johnson & Johnson* never held that a plaintiff must have a contractual relationship with a defendant in order to assert a cognizable overpayment injury. Instead, those courts simply noted that the plaintiffs there had invoked a benefit-of-the-bargain theory of injury, but could not maintain such a theory because they had not entered into contracts with the defendants. Here, Plaintiffs do not allege that they entered into contracts with the Bosch Defendants, which were then breached. Rather, Plaintiffs assert that the Bosch Defendants played a role in designing, implementing, and concealing software that was used in the Class Vehicles to cheat emissions tests.... The benefit-of-the-bargain contract analysis in *L'Oreal* and *Johnson & Johnson* is therefore inapplicable.

295 F. Supp. 3d 927, 953 (N.D. Cal. 2018).[3]

### 2. Fairly Traceable

Defendants' traceability arguments also fail. While this Court is very cognizant of its previous Opinion dismissing the CAC on traceability grounds, it now finds that the FAC addresses these concerns, in light of Plaintiffs amendments and a spate of recent decisions in other districts addressing Article III standing in very similar cases which support a finding that Plaintiffs have established Article III standing. Mercedes and Bosch attack the traceability query from different angles, so the Court will address their arguments separately.

#### i. *Mercedes*

Mercedes argues that "fifty-four out of the sixty named plaintiffs in the FAC [ ] still fail to allege facts sufficient to support Article III standing," despite the Court's prior Opinion holding that those same Plaintiffs did not establish reliance on the cited advertisements in their decision to purchase or lease a Polluting Vehicle. (ECF No. 117-1 at 19–20). Mercedes claims that twenty-four of those plaintiffs reallege the same boilerplate, generalized assertions of deception and

reliance that the Court previously rejected. (ECF No. 117-1 at 20–21). Another seventeen Plaintiffs point to advertising from non-party dealerships, while seven Plaintiffs do not allege that the advertisements they saw "contained the alleged misrepresentations." (ECF No. 117-1 at 21–22). Finally, six more Plaintiffs do not allege that they viewed or relied on Mercedes' ads before buying or leasing their vehicle. (ECF No. 117-1 at 23).

Plaintiffs argue that they have cured these defects by retooling their complaint and "focusing on Mercedes' omissions and referencing the 'clean diesel' marketing campaign to demonstrate that those omissions were plausibly material to the targeted consumers." (ECF No. 126 at 28). The Court agrees. Plaintiffs have, for example, alleged that "Mercedes marketed the BlueTEC-equipped vehicles as environmentally friendly and fuel efficient," that this advertising "[was] widely disseminated throughout the United States," and that Mercedes "h[eld] itself out as a protector of the environment." (FAC ¶¶ 321–22, 324). At the same time, Plaintiffs allege that "Mercedes intentionally shut[ ] down or severely limit[ed] the emissions control system when the BlueTEC vehicles are on the road," and that Mercedes "intentionally concealed" and hid this fact "from the consuming public at the same time that" it "touted the vehicles as 'clean,' earth friendly, and complaint with all the relevant emissions standards." (FAC ¶ 16).

**\*6** Similar allegations have been found by other courts addressing defeat device-based diesel emissions scandals across the country. In *Counts v. General Motors*, the plaintiffs also asserted an overpayment theory. 237 F. Supp. 3d 572, 582 (E.D. Mich. 2017). The Court explained as follows:

> GM promised a clean diesel engine—including 'at least 90% less nitrogen oxide and particulate emissions'—but actually delivered a vehicle that turns off its emissions reduction system when in use. GM charged more for the diesel Chevrolet Cruze model than a comparable gasoline model and Plaintiffs chose the diesel model based at least in part on its 'clean diesel' features. Accordingly, Plaintiffs allege that GM's misrepresentations resulted in their overpaying for a vehicle because the diesel did not work in the way GM promised it would.

*Id.* The *Counts* Court found that:

> [t]his alleged disparity between what the Cruze was represented to be and what it actually is ... is sufficient to constitute an injury in fact. Even if the Plaintiffs did not specifically rely on the 'clean diesel' advertising in

2019 WL 413541, RICO Bus.Disp.Guide 13,132

choosing to buy the Cruze, they paid a price, determined the market, which relied upon GM's representation that the vehicle included a fully functional 'clean diesel' system.... Plaintiff's overpayment can thus be traced directly to GM's alleged actions.

*Id.* at 586.

In *In re Duramax Diesel Litigation*, the plaintiffs alleged that GM "represented the Duramax [diesel] engine as providing both low emissions and high performance." 298 F. Supp. 3d 1037, 1046 (E.D. Mich. 2018). However, the *Duramax* plaintiffs alleged that the high power and efficiency of the Duramax engine was obtained only by reducing emissions controls with the aid of a defeat device. *Id.* at 1047. The *Duramax* plaintiffs alleged that had they known "of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did." *Id.* at 1050. The *Duramax* Court found that the injury was "traceable to GM's actions: GM developed the Duramax engine (including the alleged defeat devices), marketed its diesel vehicles as environmentally friendly, and set the MSRP for its diesel vehicles." *Id.* at 1052.

Lastly, in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, the Court analyzed whether inflated financing and leasing fees paid by former lessees of the class vehicles were fairly traceable to the conduct of Volkswagen. —— F. Supp. 3d ——, 2018 WL 4777134, at \*9 (N.D. Cal. Oct. 3, 2018). The plaintiffs in that case alleged that they paid a premium for Volkswagen's TDI "clean diesel" vehicles, which Volkswagen marketed as "being low-emission, environmentally friendly, fuel efficient, and high performing," while concealing "the fact that VW had installed software in these cars that caused their emission controls to perform one way during emissions testing, and another (less effective) way during normal driving conditions. *Id.* at \* 1. The Court found that the increased fees were fairly traceable to Volkswagen's conduct, because the ' "clean diesel' premium plausibly increased the price of the financed vehicles, which in turn would have led directly to higher financing fees." *Id.* at \*9.

\*7 The allegations in the three cases finding Article III standing above are sufficiently similar to those before this Court to support a finding that the alleged injury in fact was fairly traceable to Mercedes' conduct. As to Mercedes' argument that fifty-four of the sixty named plaintiffs fail to establish Article III standing, this argument fails for the same

reasons elaborated above. The "boilerplate" allegations that Mercedes' claims are insufficient are quite the opposite. That language is as follows:

> Unknown to Plaintiff, at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "Clean Diesel", and at many multiples of that allowed by federal law. Mercedes' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the ML 350 without proper emission controls has caused Plaintiff out-of-pocket loss, future attempted repairs, and diminished value of his vehicle. Mercedes knew about, manipulated, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the BlueTEC Clean Diesel system, as represented through advertisements and representations made by Mercedes. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Mercedes had designed part of the emissions reduction system to turn off during normal driving conditions. Had Mercedes disclosed this design, and the fact that the ML 350 actually emitted pollutants at a much higher level than gasoline vehicles do, and at a much higher level than a reasonable consumer would expect, and emitted unlawfully high levels of pollutants, Plaintiff would not have purchased the vehicle, or would have paid less for it.

(FAC ¶27). The FAC sets out these same allegations for each named Plaintiff. (FAC ¶¶ 27–87). These allegations mirror those in *Counts, Duramax*, and *Volkswagen*, in addition to the other portions of the FAC already outlined above. As such, the Court rejects Mercedes' arguments regarding the deficiencies of the named plaintiffs' claims as to Article III standing.

ii. *Bosch*

Bosch argues that Plaintiffs' allegations are based on its alleged misconduct with Volkswagen and Fiat-Chrysler, and Bosch's conduct with respect to other auto-makers "cannot serve to establish a causal relationship to Plaintiffs' alleged injuries concerning Mercedes vehicles." (ECF No. 118-1 at 25). Even if those allegations could establish a causal relationship, Bosch argues, Plaintiffs have failed to identify any advertisements, representations, or omissions by Bosch itself, and thus Plaintiffs' injuries are not fairly traceable to Bosch. (ECF No. 118-1 at 26).

**\*8** Plaintiffs argue that they have adequately alleged that their injuries are fairly traceable to Bosch's conduct for the same reasons that the injuries are fairly traceable to Mercedes' conduct. (ECF No. 127 at 16). This Court agrees. The FAC is littered with allegations detailing Bosch's active participation in the alleged scheme to market the BlueTEC line of vehicles as "clean diesels" when Bosch knew they were not. For example, Plaintiffs allege that without Bosch's "knowing and active cooperation, Mercedes would not have been able to carry out the 'Clean Diesel' scheme outlined in this complaint," and that Bosch "participated not just in the development of the defeat device, but in the scheme to prevent U.S. regulators from uncovering the device's true functionality." (FAC ¶¶ 20, 106). Bosch also allegedly "marketed 'Clean Diesel' in the United States and lobbied U.S. regulators to approve 'Clean Diesel.' " (FAC ¶ 106).

In *FCA*, the Northern District of California dealt with facts nearly identical to the case before this court. There, the plaintiffs alleged that they paid more for the EcoDiesel feature, which the defendant falsely advertised as delivering more power, performance, fuel economy, and environmental friendliness than comparable gasoline vehicles. 295 F. Supp. 3d at 946. Bosch argued similarly that the plaintiffs had "not identified any statement that [Bosch] made to [the plaintiffs] that could support a purportedly inflated price for the Class Vehicles," and that because Bosch was not a party to the contract with Plaintiffs, it could not have deprived them of their benefit of the bargain. *Id.* at 951. There, as here, the plaintiffs alleged that Bosch "participated in a scheme and conspiracy with [the auto manufacturers] to develop, implement, and conceal software used in the Class Vehicles to cheat emissions tests." *Id.* The *FCA* Court found that the hidden software in the EDC17 rendered the affected vehicles

defective, and thus less valuable, and that because Bosch "had a hand in developing and implementing this software, their conduct plausibly caused Plaintiffs' economic loss." *Id.* The *FCA* Court continued: "to the extent [Bosch] knowingly concealed the software installed in the Class Vehicles from regulators and consumers, Plaintiffs' economic injuries are also fairly traceable to that conduct," because the *FCA* plaintiffs, like the Plaintiffs here, alleged that the would not have bought or leased the Polluting Vehicles, or would have paid less to do so had the defeat device been disclosed. *Id.* at 952. Thus, the *FCA* court determined that the plaintiffs did not "need to identify a statement on which they relied that was made by [Bosch] to plausibly trace their economic injuries to these entities." *Id.*

The *Duramax* Court reached the same conclusion when facing Bosch's arguments regarding traceability. There, the Plaintiffs alleged that Bosch participated in the scheme to develop the defeat device and prevent U.S. regulators from discovering it, in addition to lobbying U.S. regulators to approve "clean diesel." 298 F. Supp. 3d at 1053. Faced with these allegations, Bosch argued that, because it did not manufacture the *Duramax* engine or market the affected vehicles, "any overpayment by Plaintiffs [was] attributable solely to GM's actions." *Id.* The *Duramax* Court reasoned that though "the exact nature of [Bosch's] marketing is unclear, it is plausible that Bosch's efforts contributed to the market demand for 'clean diesel' vehicles, generally, in the United States," and that the premiums Plaintiffs paid for those vehicles "were a natural consequence of that market demand." *Id.* "In other words, Plaintiffs overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the *Duramax* vehicles." *Id.* Thus, the *Duramax* Plaintiffs adequately alleged that their injury was fairly traceable to Bosch's conduct. *Id.* at 1054. Both *FCA* and *Duramax* lay out factually analagous precedent for finding that Plaintiffs have established Article III standing as to their claims against Bosch, and this Court will apply that precedent here in finding the same.

**B. Rico Claims**
**\*9** Plaintiffs have also alleged a RICO claim against defendants. They state:

> For many years now, the RICO Defendants have aggressively sought to increase the sales of Polluting Vehicles in an effort to bolster revenue, augment profits and increase Mercedes' share of the diesel vehicle market. Finding it impossible to achieve their goals

lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were "clean diesels." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate § 1962(c) and (d).

(FAC ¶ 336).

The Racketeer Influenced and Corrupt Organizations Act "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *In re* Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962(c) ). Section 1962(d) expands liability under the statute by making it "unlawful for any person to conspire to violate [18 U.S.C. § 1962(c)]". 18 U.S.C. § 1962(d). "The RICO statute provides for civil damages for 'any person injured in his business or property by reason of a violation of [§ 1962].' " *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (quoting Tabas v. Tabas, 47 F.3d 1280, 1289 (3d Cir. 1995) ). A violation of the statute requires:

> (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The plaintiff must, of course, allege each of these elements to state a claim. Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is the mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.

*Id.* (quoting Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) ).

Defendants argue that Plaintiffs have failed to allege a RICO injury, RICO causation, and a RICO enterprise, and that they have otherwise failed to allege a pattern of racketeering with particularity. (ECF Nos. 117-1 at 25–39; 118-1 at 27–55).

### 1. RICO Injury

The injury to business or property element of a RICO claim requires "proof of a concrete financial loss and not mere

injury to a valuable intangible property interest." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting Steele v. Hosp. Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994) ). A complaint therefore must contain allegations "of actual monetary loss, i.e., an out-of-pocket loss" to adequately plead the injury element. *Id.* Physical or emotional harm to a person is insufficient to show that a person was injured in his business or property under the act. *Magnum v. Archdiocese of Phila.*, 253 F. App'x 224, 227 (3d Cir. 2007). "Similarly, losses which flow from personal injuries are not [damage to] property under RICO." *Id.* (quotations omitted).

**\*10** Defendants argue that Plaintiffs alleged injuries—diminished value and overpayment—are not cognizable under RICO. Diminished value is not a proper RICO injury, according to Defendants, because Plaintiffs have not alleged facts showing that the vehicles have a lower resale value, and RICO injury cannot be based on possible future events or factual speculation. (ECF Nos. 117-1 at 26; 118-1 at 31–32). Defendants are correct that RICO does not recognize injuries conditioned on future events or injuries that are impermissibly speculative. *Maio*, 221 F.3d at 495.

In fact, Plaintiffs fail to address Defendants' contentions that their diminished value claims are not sufficient for RICO purposes. "Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue." *Markett v. PNC Fin. Servs. Grp.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011). Thus, to the extent Plaintiffs' RICO claims are based on their diminished value theory of injury,[4] Plaintiffs do not have RICO standing. *See Duramax*, 298 F. Supp. 3d at 1071 (finding that the plaintiffs' diminished value damages—based on a nearly identical paragraph to paragraph 332 of the FAC—"are contingent on future, uncertain developments," and that those "injuries may never occur," "are ... currently unmeasurable," and "cannot give rise to RICO standing").

Plaintiffs' overpayment theory does not suffer from the same fatal flaws. As described above, Plaintiffs allege that had Defendants disclosed the existence of the defeat device and the true emissions performance of the Polluting Vehicles, they would not have purchased those vehicles or would have paid substantially less for them. Defendants argue that Plaintiffs' overpayment allegations fail to establish RICO standing because "loss of value" or "benefit of the bargain" damages are typically not available in RICO suits, and because "absent the sale of [a Polluting] Vehicle at a loss,

2019 WL 413541, RICO Bus.Disp.Guide 13,132

Plaintiffs' overpayment theory is a claim for a speculative, intangible property interest rather than a concrete financial loss." (ECF Nos. 117-1 at 27; 118-1 at 29). The existing diesel emissions litigation decisions squarely reject these arguments and distinguish the cases relied upon by Mercedes and Bosch. *Volkswagen*, 2018 WL 4777134, at *13–15, *FCA*, 295 F. Supp. 3d at 959–61; *Duramax*, 298 F. Supp. 3d at 1068–73. The Court agrees with those decisions.

Defendants rely heavily on *In re Bridgestone/Firestone, Inc. Tires Products Liabilities Litigation*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001), *In re General Motors LLC Ignition Switch Litigation*, Nos. 14-md-2543, 14-mc-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016), and *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), in support of their claim that overpayment allegations are insufficient to create RICO standing.

**\*11** The *Bridgestone* plaintiffs asserted a RICO claim against Bridgestone/Firestone on the grounds that there was an alleged defect in certain tires that created a dangerous likelihood of tread separation. 155 F. Supp. 2d at 1077. The plaintiffs based their RICO injury on their need to "bear the financial loss associated with the cost of replacing the Tires and/or the diminished value of their vehicles equipped with the Tires now that the truth regarding their safety and lack of roadworthiness is known." *Id.* at 1089. Plaintiffs also based RICO injury on the fact that, had they known of the defect, they would not have bought, or would have paid substantially less for the defective tires or the vehicles equipped with them. *Id.* The Court determined that these injuries were too speculative to sustain a RICO injury as "[t]he actual failure of the Tires ... is a contingency upon which Plaintiffs' economic damages are dependent." *Id.* at 1092.

In *Ignition Switch*, the plaintiffs' RICO claim was premised on GM's manufacture of vehicles with a defective ignition switch. 2016 WL 3920353, at *1. The plaintiffs' theory of injury was that they would not have purchased those cars, or paid less for them, had they known of the defective ignition switch. *Id.* at *7. The Court held that this theory did not create RICO standing, because " 'loss of value' or 'benefit of the bargain' damages 'are generally unavailable in RICO suits' and 'plainly' unavailable where (similar to the case here) a RICO claim 'sound[s] in fraud in the inducement.' " *Id.* at *16 (quoting *McLaughlin*, 522 F.3d at 228–29).

Finally, *McLaughlin* concerned a class action based on allegations that the defendants—tobacco companies

fraudulently marketed light cigarettes as healthier alternatives to "full-flavored" cigarettes. 522 F.3d at 220. The plaintiffs' theory of injury in this case was again based on a benefit of the bargain argument: the plaintiffs created a "loss of value" model which measured "the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth." *Id.* at 228. The Second Circuit held that these expectation-based damages did not suffice to create a RICO injury, because "Defendants' misrepresentation could in no way have reduced the value of the cigarettes that plaintiffs actually purchased, they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id.* at 229. Additionally, the plaintiffs' theory required the Second Circuit to "conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing." *Id.* at 229.

There are critical differences between the theory of injury set forth here by Plaintiffs and the RICO injuries alleged in the three aforementioned cases. First, Plaintiffs allege that they overpaid for the Polluting vehicles *at the time of purchase*. FAC ¶ 400. All three courts to have dealt with the question of RICO injury in the context of a defeat device-based diesel emissions litigation have concluded that the fact that the injury occurred at the time of purchase constitutes a RICO injury. In *Duramax*, the Court wrote that such an injury, "clearly suffices to create RICO standing," as the plaintiffs had identified "a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct." 298 F. Supp. 3d at 1071–72. In *FCA*, the Court similarly found that "Plaintiffs' allegations of overpayment easily clear[ed] the threshold" for establishing a concrete RICO injury where "Plaintiffs ... identified a particular, reasonably narrow range by which they allegedly overpaid for the Class Vehicles." 295 F. Supp. 3d at 962.

While Defendants argue that *Duramax* and *FCA* are distinguishable because they allege an overpayment of a specific amount, (ECF Nos. 134–35, 143–44), that is not the hill upon which RICO injury dies. In *Volkswagen*, Plaintiffs adequately alleged a RICO injury where they contended that "they each paid a premium for something that they did not receive—a vehicle with low emissions." 2018 WL 4777134, at *14. This injury was sufficiently concrete and tangible, despite the fact that these plaintiffs did not identify the specific amount of damage. *Id.* In fact, the *FCA* Court

2019 WL 413541, RICO Bus.Disp.Guide 13,132

acknowledged the same. 295 F. Supp. 3d at 962 (noting that the threshold for RICO injury does not require a particular dollar amount); *see also In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 804 F.3d 633, 639–640 (3d Cir. 2015) (finding plaintiffs adequately alleged RICO injury based on allegations that they overpaid—absent a specific dollar amount—for a drug due to the inflationary effect that a drug manufacturer's illegal or deceptive marketing practices had on the drug); *In re Aetna UCR Litig.*, MDL No. 2020, Civ. No. 07-3541, 2015 WL 3970168, at *10 (D.N.J. June 30, 2015) (finding plaintiffs adequately alleged RICO injury where plaintiffs claimed they suffered "out-of-pocket losses in the form of higher co-payments" and "overpaid for their health insurance plans"). What is important, and what is alleged here, is that the overpayment occurred at the time of purchase, rather than being "contingent on a future occurrence or on the vagaries of the free market." *Duramax*, 298 F. Supp. 3d at 1072.

**\*12** Additionally, "courts have recognized expectation damages under RICO ... where an agreement between the parties provided for a certain performance guarantee that the defendant had no intention of keeping." *Ignition Switch*, 2016 WL 3920353, at *17 (collecting cases). Here, as in *Volkswagen, FCA,* and *Duramax*, Plaintiffs allege that Defendants participated in a scheme to place a defeat device in the Polluting Vehicles, rendering them defective from the moment they were manufactured. Because Defendants allegedly knew of—and orchestrated the creation of—that defect, they had no intention of delivering vehicles with heightened fuel efficiency and environmental friendliness. *See Duramax*, 298 F. Supp. 3d at 1072 ("But, here, GM allegedly sold Duramax vehicles, for a premium, which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.").

Finally, to the extent there remains a question whether Plaintiffs' overpayment theory constitutes an injury to business or property for the purposes of RICO, Supreme Court precedent indicates that it does. *Reiter v. Sonotone Corporation* is an antitrust case in which the Supreme Court interpreted Section 4 of the Clayton Act, which allows any person injured "in his business or property" by the violation of an antitrust law to sue under that statute. 442 U.S. 330, 337 (1979) (quoting 15 U.S.C. § 15). The Supreme Court concluded that when "a consumer ... acquires] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated

by reason of the anticompetitive conduct complained of." *Id.* at 339. The Third Circuit has referenced the Supreme Court's rationale in *Reiter* when analyzing a RICO claim as support for the conclusion that monetary loss suffices to constitute a RICO injury. *Maio*, 221 F.3d at 483–84 (3d Cir. 2000). Thus, *Reiter* would indicate that Plaintiffs' allegations that they overpaid for the Polluting Vehicles as a result of Defendants' deceptive conduct constitute injuries to property. *See Volkswagen*, 2018 WL 4777134, at *14 (interpreting *Reiter* the same way); *FCA*, 295 F. Supp. 3d at 959 (same); *Duramax*, 298 F. Supp. 3d at 1067–68, 1072–73 (same).

### 2. RICO Causation

A civil RICO plaintiff is required "to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but the proximate cause as well.' " *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 563 U.S. 258, 268 (2010) ). The "central question" is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Mercedes argues that Plaintiffs' "entire theory of RICO conduct relies on the claim that" the defendants perpetrated a fraud against United States government regulators, and thus Plaintiffs have failed to allege that they were injured by the enterprise's conduct. (ECF No. 117-1 at 28). Even if Plaintiffs do allege that they were directly deceived by the enterprise, Mercedes argues that Plaintiffs' RICO allegations should be dismissed because they "are based on the same generalized advertising scheme that the Court previously found insufficient to satisfy the 'fairly traceable' requirement of Article III standing." (ECF No. 117-1 at 29). Bosch separately argues that Plaintiffs have not established either proximate or "but for" cause, because they have failed "to allege (1) reliance upon any actionable misstatement or omission, or (2) a direct relationship between Bosch LLC's purported conduct and their alleged injuries." (ECF No. 118-1 at 33).

#### i. Mercedes

Mercedes makes the argument that Plaintiffs fail to establish RICO causation for the same reasons that they failed to establish traceability for the purposes of Article III standing. (ECF No. 117-1 at 29). As this Court has already determined that Plaintiffs have adequately alleged that Plaintiffs' injuries were fairly traceable to Mercedes' conduct, it need to not

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 521 of 751
PageID: 11887
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

rehash that analysis here, as Mercedes has not set forth any new arguments to the contrary.

**\*13** Alternatively, Mercedes argues that, because Plaintiffs' RICO claim centers around a fraud-on-the-regulators theory, Plaintiffs have failed to meet RICO's proximate cause requirement. (ECF No. 117-1 at 30). The reasoning goes: because the purpose of the alleged enterprise was to deceive regulators (rather than promulgate advertisements), Plaintiffs' overpayment as a result of the advertisements touting the emissions bona fides of the Polluting Vehicles is in no way connected to the fraud on the regulators. (ECF No. 117-1 at 30–31).

Mercedes relies on *Anza* as support for its claim that Plaintiffs' RICO allegations do not satisfy the proximate cause requirement. In *Anza*, the plaintiff sued its primary competitor under the RICO statute, alleging that the competitor reduced its prices without harming its bottom line by "failing to charge the requisite New York sales tax to cash-paying customers." 547 U.S. at 453 54. The Supreme Court found that this theory of injury did not satisfy RICO's proximate cause requirement, because "[i]t was the State that was being defrauded and the State that lost tax revenue as a result." *Id.* at 458. The Court also observed that the cause of Plaintiff's injury—lower prices—was "entirely distinct" from the alleged RICO violation—the defrauding of the state—and that the plaintiff's lost sales could have resulted from any number of alternative factors. *Id.* at 458–59.

The facts in *Anza* are distinct from what Plaintiff's allege here. Plaintiff's specifically allege that Mercedes defrauded its customers when it failed to disclose the existence of the defeat device, and that this deception caused Plaintiffs' injuries. (FAC ¶¶ 313–15). Furthermore, while Plaintiffs allege that Defendants deceived regulators, those regulators are not alleged to have been harmed by that deception like the State of New York was in *Anza. FCA*, 295 F. Supp. 3d at 966. Plaintiffs argue that the deception of the regulators inevitably led to their injuries, because "but for [that] deception about compliance, it would not have been able to sell the Polluting Vehicles." (ECF No. 126 at 36–37). These allegations are sufficient to establish RICO causation. *FCA*, 295 F. Supp. 3d at 967 ("By deceiving regulators, Defendants were able to sell Class Vehicles that emitted NOx at levels up to 20 times legal limits and that contained one or more defeat devices ..., [which] plausibly caused Plaintiffs to overpay for the defective Class Vehicles by an amount directly attributable to the alleged wrongful conduct of the Defendants."); *see also*

*Volkswagen*, 2018 WL 4777134, at \*15 ("[T]he regulators were more like gatekeepers than victims of the fraud: they did not lose money from the fraud like consumers did. Also, Plaintiffs base their RICO claims at least in part on allegations that VW (on behalf of the enterprise) directly deceived consumers into believing that the class vehicles were 'clean' and 'environmentally friendly,' when they were not. To prevail on this theory, Plaintiffs would not even need to prove that VW first defrauded EPA and CARB; they would only need to demonstrate that VW defrauded *them* about certain vehicle attributes.") (citations omitted).

### ii. *Bosch*

Bosch first argues that the misstatements Plaintiffs allegedly relied on are either non-actionable puffery, assert compliance with U.S. emissions standards, or made by Mercedes, breaking "any causative link to Bosch."[5] (ECF No. 118-1 at 33–34). Secondly, Bosch argues that Plaintiffs fail to establish "any direct relationship between [Bosch's] alleged conduct and their alleged injuries." (ECF No. 118-1 at 35). These arguments have all been rejected in *Duramax, FCA,* and *Volkswagen,* and this Court agrees with those prior decisions.

**\*14** In *Duramax,* Bosch argued that "to the extent Plaintiffs claim that their injury resulted from their reliance on purportedly false ads by GM, that itself breaks any causal link to the Bosch Defendants." 298 F. Supp. 3d at 1075. The *Duramax* Court deemed that argument "clearly inconsistent" with Supreme Court precedent, pointing to the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnification Co.,* 553 U.S. 639 (2008). *Id. Duramax* explained that *Bridge* held that reliance is not a requirement of a RICO cause of action and explicitly rejected the notion that "a plaintiff who brings [a RICO claim predicated on mail fraud] must show that it relied on the defendant's misrepresentations in order to establish the requisite element of causation." *Id.* at 1076 (quoting *Bridge,* 553 U.S. at 653). In fact, *Bridge* stands for the proposition that a plaintiff has identified a "a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury" where "[i]t was a foreseeable and natural consequence of [the defendant's] scheme." *Bridge,* 553 U.S. at 657–58. The *Duramax* Court, applying this standard, then found that the plaintiffs' allegations established but-for and proximate cause. 298 F. Supp. 3d at 1076–77 ("According to Plaintiffs, Bosch 'exerts near-total control' over the customization of EDC17, eliminating the possibility

Case 1:19-md-02875-RMB-SAK Document 577-3 Filed 09/18/20 Page 522 of 751
PageID: 11888

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

that GM programmed the functionality which enables use of defeat devices without Bosch's knowledge.").

Here, Plaintiffs make nearly identical allegations: "All Bosch ECUs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch GmbH exerts near-total control. In fact, the software is typically locked to prevent customers, like Mercedes, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end." (FAC ¶ 270). Thus, Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation. *See Volkswagen*, 2018 WL 4777134, at *15–17 (rejecting Bosch's argument that the actions of the car manufacture break the causal link in the chain, and thus, that there is not a sufficiently direct relationship between Bosch and the plaintiff's RICO injury); *FCA*, 295 F. Supp. 3d at 967–68 (same).

### 3. The Merits of the RICO Claim

#### i. *Impermissible Group Pleading*

Bosch contends that Plaintiffs "make impermissible group pleadings against 'RICO Defendants' and varying definitions of 'Bosch.' " (ECF No. 118-1 at 38). Bosch argues that this "blurs the conduct of the various defendants and does not put each defendant on notice of its precise conduct," and thus fails to satisfy the pleading requirements of Rule 9(b). (ECF No. 118-1 at 38–39). Rule 9(b) requires that Plaintiffs "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) ). However, Rule 9(b) does not require that that a plaintiff plead with specificity "which fraudulent acts were caused or performed by which individual defendants." *In re Midlantic Corp. S'holder Litig.*, 758 F. Supp. 226, 233 (D.N.J. 1990).

Bosch made similar, unsuccessful arguments in both *FCA* and *Duramax. See FCA*, 295 F. Supp. 3d at 976–77 (rejecting Bosch's arguments that the plaintiffs "improperly 'lumped' the Bosch entities together" for the purposes of Rule 9(b), because the structure of the Bosch entities was such that there were employees "at both entities [who] work together on

certain projects, including the EDC17 project."); *Duramax*, 298 F. Supp. 3d at 1056 ("Given Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific."). Here, Plaintiffs plead allegations similar to those that were found sufficient in *FCA* and *Duramax*: Bosch GmbH and Bosch LLC "operate under the umbrella of the Bosch Group," individuals from both Bosch GmbH and Bosch LLC worked in divisions relevant to the creation and design of the EDC17, and Bosch itself does not distinguish between its own legal entities when describing its business. (FAC ¶¶ 109, 111–12). The FAC sufficiently puts Bosch on notice of the claims made against it.

#### ii. *RICO Enterprise*

**\*15** To allege an association-in-fact enterprise, which Plaintiffs purport to do here, they must plead a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage*, 618 F.3d at 366 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009) ). Defendants argue that Plaintiffs have not alleged a sufficient purpose or relationship between Defendants to constitute an association-in-fact enterprise. (ECF Nos. 117-1 at 31–35; 118-1 at 40–43).

An association-in-fact enterprise "need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent from the group's pattern of racketeering activity." *In re Aetna UCR Litig.*, 2015 WL 3970168, at *27 (quoting *In re Ins. Brokerage*, 618 F.3d at 368). Plaintiffs allege that the purpose of Defendants' enterprise was to "deceive the regulators and the public into believing the Polluting Vehicles were 'clean diesels.' " (FAC ¶ 356). Defendants worked together to design, manufacture, distribute, test, and sell the Polluting Vehicles, while implanting the EDC17, falsifying emissions tests, and distributing deceptive marketing materials. (FAC ¶¶ 360–67). Plaintiffs allege that Defendants profited from this enterprise due to the increased number of vehicles sold as a result of the fraudulently obtained Certificates of Compliance ("COCs") and Executive Orders ("EOs"), as well as through misleading advertising. (FAC ¶ 367). These allegations sufficiently allege a purpose of the enterprise. *See In re Ins. Brokerage Antitrust Litig. ("In re Ins. Brokerage II"), MDL No. 1663, No. 04-5184, 2017 WL 3642003, at*

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 523 of 751
PageID: 11889

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed.Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

*10 (D.N.J. Aug. 23, 2017) (finding that plaintiffs properly pleaded a purpose for the enterprise where they alleged that certain agreements existed "to facilitate the sale of insurance, in particular, the sale of insurance at supra-competitive rates to compensate both brokers and syndicates above what a competitive market would dictate"); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *27 (finding that plaintiffs properly alleged a purpose for the enterprise where the plaintiffs alleged a dual purpose: "(1) 'to create a mechanism through which Aetna, UHG and the Insurer Conspirators could under-reimburse subscribers ... for Nonpar services through use of flawed and invalid data' and (2) to increase insurer profits by deceptively underpaying ONET benefits to their policy holders") (citation omitted); *see also Duramax*, 298 F. Supp. 3d at 1066, 1078–79 (finding a properly plead common purpose based on nearly identical allegations to those in this case, including that the purpose of the enterprise was "to deceive the regulators and the public into believing the Polluting Vehicles were 'clean' and 'environmentally friendly,' " ' and that GM and Bosch "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs ... and EOs ..., false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities").

With respect to the relationships of those associated with the enterprise, Mercedes argues that Plaintiff's FAC is deficient in that nearly all of the allegations "address Bosch's relationships with *other* vehicle manufacturers, namely Volkswagen and FCA." (ECF No. 117-1 at 32). Bosch, meanwhile, contends that Plaintiffs have done no more than "list the purported RICO participants," and have provided no allegations ' "plausibly implying the existence of an enterprise' separate from the legal entities." (ECF No. 118-1 at 42 (citations omitted) ). Both Defendants allege that Plaintiffs plead nothing more than an ordinary business relationship. (ECF No. 117-1 at 34–35; ECF No. 118-1 at 42–43).

*16 It is true that ordinary business relationships are not sufficient to impose RICO liability. *Duramax*, 298 F. Supp. 3d at 1080 (describing a "widespread consensus" to this effect). However, both *Duramax* and *FCA* addressed similar arguments and concluded that similar pleadings sufficiently alleged the existence of the kind of relationships necessary to establish an association-in-fact. The *Duramax* Court rejected GM and Bosch's argument that "any alleged relationship between them [was] simply a routine business relationship."

298 F. Supp. 3d at 1079. There, the plaintiffs alleged that defendants "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs and EOs, false emissions tests, and deceptive and misleading marketing and materials, and deriving profits and revenues from those activities." *Id.* at 1080. The Court held that such allegations established a business relationship that was "far from 'routine,' " and was instead a course of conduct that was "inherently deceptive[, because] Bosch and GM collaborated to create an engine which performed one way when being tested for emissions and another way when in normal use." *Id.*

The Court in *FCA* came to the same conclusion. *FCA* reasoned that the EDC17 "had only a deceitful purpose—to cheat emissions tests," and that the plaintiffs' "allegations plausibly support[ed] that each Defendant participated in developing or implementing the [defeat devices]." 295 F. Supp. 3d at 981. The FCA court came to this conclusion based on allegations that set forth "that the Bosch Defendants' software documentation describes parameters and functions that correlate with many of the hidden [defeat devices]," and that the FCA Defendants initiated and oversaw development of the EcoDiesel engine and activated the [defeat devices] in the Class Vehicles." 295 F. Supp. 3d at 981–82. Such allegations went "beyond connecting Defendants to each other by way of normal commercial dealings." *Id.* at 982. Plaintiffs here have laid out many of the same allegations in the FAC, alleging, for example, that Bosch "continuously cooperated with Mercedes to ensure that the EDC Unit 17 was fully integrated into the Polluting Vehicles," and that it concealed "the defeat devices on U.S. documentation and in communications with U.S. regulators." (FAC ¶ 374). The EDC 17 was "customized ... for installation in the Polluting Vehicles with unique software code to detect when it was undergoing emissions testing." (FAC ¶ 360). Such allegations are sufficient to show a relationship between Defendants beyond a normal business relationship.

### iii. *Directing the Conduct of the RICO Enterprise*

As part of their RICO claim, Plaintiffs must also allege that Defendants "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "The word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 524 of 751
PageID: 11890

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179. Defendants again argue that Plaintiffs have failed to assert anything more than legal conclusions as to their participation in the enterprise, and that any facts alleged show merely an ordinary business relationship. (ECF No. 117-1 at 35 –37; ECF No. 118-1 at 43–47).

On top of Plaintiffs' allegations mentioned *supra* in Section III.B.3.ii, Plaintiffs have sufficiently alleged the participation of Mercedes and Bosch in the enterprise. They set forth that the EDC17 contains a "unique set of specifications and software code" made for the Polluting vehicles, that the implementation of those EDC17s into the Polluting Vehicles required Mercedes and Bosch to collaborate closely, and that Defendants knowingly and actively intended the EDC17 to function as a defeat device to evade United States emissions requirements. (FAC ¶¶ 13, 104, 108, 268, 270, 360, 374). Plaintiffs then allege that Defendants concealed the existence of the defeat device and lied to U.S. regulators. (FAC ¶¶ 125, 273–74, 374). Very similar allegations based on very similar facts have been found to satisfy this pleading element of a RICO claim in other diesel emissions litigations. *See FCA*, 295 F. Supp. 3d at 983 (finding that the plaintiffs adequately alleged participation in the enterprise where the FCA Defendants "conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards" and oversaw the development of those engines, while Bosch's argument "that they were simply performing services for the enterprise," was "not sustainable at the pleading stage" "given the level of control they are alleged to have maintained over the emissions software in the Class Vehicles"); *Duramax*, 298 F. Supp. 3d at 1086–87 (holding that Bosch's argument that it simply "worked together with GM to design and implement software and ... participated in promoting clean diesel technology generally" was a similarly faulty "repackaging of [its] previous argument that ... the relationship between the Defendants was merely a routine business relationship," where the plaintiffs alleged "that Bosch was an integral part of the operation of the enterprise because Bosch 'locked out' EDC17 ... [and] worked closely with its customers to customize EDC17," which performed "an inherently deceptive function," and thus Bosch's responsibility for programming the operation of the EDC17 was at the "heart of the fraudulent enterprise").

iv. *Pattern of Racketeering Activity*

**\*17** A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "These predicate acts of racketeering may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *In re Ins. Brokerage*, 618 F.3d at 363 (quoting *Lum*, 361 F.3d at 223. Here, Plaintiffs allege precisely these two predicate acts. In order to plead mail or wire fraud, Plaintiffs must describe "(1) the existence of a scheme to defraud; (2) the use of the mails [or wires] ... in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant, that is, participation by the defendant with specific intent to defraud." *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005). These allegations must satisfy the pleading standards of Federal Rule of Civil Procedure 9(b). *In re Ins. Brokerage II*, 2017 WL 3642003, at \*6.

Mercedes argues that Plaintiffs have failed to plead a pattern of racketeering activity for two reasons: First, they have failed to satisfy Rule 9(b), because they "allege only nondescript acts by unidentified parties at unspecified times, and second, Plaintiffs "have not pled any facts demonstrating how the applications [for certification to the EPA] further the purposes of the alleged" enterprise. (ECF No. 117-1 at 38–39). Bosch additionally argues that Plaintiffs have failed to plead a claim of mail or wire fraud against it with the particularity required by Rule 9(b), as they have failed to allege a scheme to defraud, any participation by Bosch in that scheme, facts showing that Bosch should be held vicariously liable for Mercedes' alleged acts of mail and wire fraud, or a specific intent to defraud. (ECF No. 118-1 at 49–55).

Plaintiffs have sufficiently plead a pattern of racketeering activity with respect to Defendants. First, the allegations discussed at length in Parts III.B.3.ii and iii clearly allege the existence of scheme to defraud. Importantly, as noted in this Opinion's standing analysis, Plaintiffs pin Defendants' alleged liability on omissions rather than affirmative misrepresentations. Reliance on omissions on their own is sufficient to plead the predicate acts of mail and wire fraud. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) ("Under the mail fraud statute, a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 525 of 751
PageID: 11891
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension ... [and] [t]he scheme need not involve affirmative misrepresentation.") (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 597 (D.N.J. 2000) (quoting the same language from *Kehr Packages*). As laid out in *Duramax*:

allegations of omissions—as opposed to affirmative misrepresentations—will inevitably be less specific. Misrepresentations occur at a definite point in time, but omissions occur over periods of time. And, because misrepresentations involve action while omissions involve inaction, plaintiffs are less likely to uncover discrete evidence of omissions. It must be remembered that the essential purpose of Rule 9(b) is to provide the defendants with adequate notice of the allegations so that they can defend against the claims.

298 F. Supp. 3d at 1083 (citations omitted); *see also Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 99–100 (3d Cir. 1983) ("In applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud. Moreover, in applying the rule, focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' ") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969) ). As such, "plaintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim." *Feldman v. Mercedes Benz USA*, No. 11-984, 2012 WL 6596830, at *10 (D.N.J. Dec. 18, 2012).

**\*18** To adequately plead the use of the mails and wires in furtherance of the scheme, Plaintiffs need not allege that each Defendant personally mailed or wired the allegedly fraudulent communications, only that the mailing or wiring of that communication was foreseeable to Defendants. *United States v. Tiller*, 302 F.3d 98, 101 (3d Cir. 2002). Furthermore, "the gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information." ' *Bridge*, 553 U.S. at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989) ). Plaintiffs allege several uses of the mails and wires in furtherance of the scheme, such as numerous, specific applications for certification of various Polluting Vehicles to the EPA, (FAC ¶ 384), as well as advertisements touting the low emissions and environmental friendliness of

the BlueTEC engine, (*see, e.g.*, FAC ¶¶ 32, 33, 36, 321, 323, 325).

These allegations are sufficient to establish the use of the mails and wires in furtherance of the scheme. The applications submitted to the EPA

affirmed that the vehicles complied with emission standards. Without those mailings and electronic communications, [Mercedes] would have been unable to sell the vehicles. The applications and resulting certificates also increased the likelihood that consumers would perceive the [BlueTEC] vehicles as emitting pollution at a low level. And although Bosch may not have directly used the mail or wire to further the fraudulent scheme, [Mercedes'] uses of the mail and wire were inevitable and thus reasonably foreseeable.

*Duramax*, 298 F. Supp. 3d at 1084;[6] *see also FCA*, 295 F. Supp. 3d at 979 (applying the same standard to similar facts and coming to the same conclusion). As to the advertisements identified by Plaintiffs, if they

were relying on these advertisements as the basis for [their] claim of fraud, then Defendants' arguments regarding puffery and duty to disclose would become relevant. However, these representations do not constitute the fraudulent scheme; they merely further it. The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. [Mercedes'] extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme.

*Duramax*, 298 F. Supp. 3d at 1084.

Finally, with respect to Defendants' culpable participation in the scheme, Plaintiffs need only allege intent generally. Fed. R. Civ. P. 9(b); *In re Ins. Brokerage II*, 2017 WL 3642003, at *9. Defendants' intent to defraud can be inferred from the scheme alone. *United States v. Chartock*, 283 F. App'x 948, 954–55 (3d Cir. 2008); *United States v. Pearlstein*, 576 F.2d 531, 541 (3d Cir. 1978); *see also FCA*, 295 F. Supp. 3d at 977 ("Because the AECDs themselves plausibly have a deceitful purpose, allegations supporting that each Defendant knew about yet concealed the AECDs also support a plausible claim that each Defendant intended to defraud."); *Duramax*, 298 F. Supp. 3d at 1083 ("[I]ntent can be inferred from the nature of the alleged conduct. The way in which

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 526 of 751
PageID: 11892

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

EDC17 interacted with the Duramax engine is inherently deceptive. The alleged purpose of the device is to provide the perception of reduced emissions while avoiding the reality of reduced emissions. Defendants cannot reasonably argue that the deceptive nature of EDC17 was unanticipated or unintended, and even if they do, that argument could be resolved only by a jury."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 4890594, at *15 (N.D. Cal. Oct. 30, 2017) ("Bosch's intent to defraud reasonably [could] be inferred from the scheme itself," as no party had "sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions."). Thus, Plaintiffs have adequately alleged Defendants' intent to defraud and have adequately established a pattern of racketeering activity based on the predicate acts of mail and wire fraud.

### v. *RICO Conspiracy*

**\*19** Bosch argues that Plaintiffs failed to adequately plead a RICO conspiracy because they failed to plead a substantive RICO violation. As Plaintiffs have adequately plead their substantive RICO claim and that Bosch had knowledge of the racketeering activity, they have adequately plead a RICO conspiracy.

### C. Preemption

Defendants contend that Plaintiffs' state-law claims are preempted by the Clean Air Act ("CAA"). (ECF No. 117-1 at 39; ECF No. 118-1 at 55). This argument has been discussed thoroughly and rejected several times over by courts dealing with diesel emissions litigations. *Volkswagen*, 2018 WL 4777134, at *18–23; *FCA*, 295 F. Supp. 3d at 990–1003; *Duramax*, 298 F. Supp. 3d at 1057–65; *Counts*, 237 F. Supp. 3d at 588–92. For the same reasons, this Court also rejects Defendants' preemption arguments.

"Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia*, 625 F.3d 97, 115 (3d Cir. 2010).

Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same

subject." Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Both Defendants argue that Plaintiffs state-law claims are expressly preempted by the CAA, while Mercedes advances an additional implied preemption argument.

#### 1. Express Preemption

Section 209 of the Clean Air Act reads:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). Defendants are correct that the CAA contains an express preemption clause. *See In re Caterpillar, Inc. C13 and C15 Engine Prods. Liab. Litig.*, 14-3722, 2015 WL 4591236, at *10 (D.N.J. July 29, 2015) ("The CAA's express preemption provision is specific and unambiguous.").

Defendants argue that Plaintiffs' state-law claims fall squarely within that preemption provision because they relate to the Polluting Vehicles' compliance with emissions standards and are an attempt to enforce federal regulatory standards under state law. (ECF No. 117-1 at 41–42; ECF No. 118-1 at 56–57). Plaintiffs' state-law claims do not fall under the express preemptive scope of the CAA for several reasons. First, while Plaintiffs do reference violations of federal emissions standards those violations are not an essential element of their state-law claims. To prove their state-law claims, Plaintiffs must show that Defendants lied to or deceived them, not that Defendants violated federal emissions standards. The proof in which Plaintiffs must ground their claims pulls those claims outside the scope of the express preemption of the CAA. *Volkswagen*, 2018 WL 4777134, at *19; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061; *Counts*, 237 F.Supp. 3d at 591–92. Second, Plaintiffs could prove that Mercedes lied about claims concerning its BlueTec engines, such as that it was "the world's cleanest and most advanced diesel" with "ultra-low emissions, high fuel economy and

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 527 of 751
PageID: 11893

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

responsive performance," (FAC ¶ 11), without having to prove that emissions exceeded EPA-established limitations or that Defendants installed a defeat-device prohibited by the EPA. *Volkswagen*, 2018 WL 477134, at *20; *FCA*, 295 F. Supp. 3d at 993–94; *Duramax*, 298 F. Supp. 3d at 1061–62; *Counts*, 237 F. Supp. 3d at 591–92. Thus, Plaintiffs' state-law claims are not expressly preempted by the CAA.[7]

2. Implied Preemption

**\*20** Mercedes argues that even if Plaintiffs' claims are not expressly preempted, they are impliedly preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). When dealing with a question of implied preemption, the Court begins its "analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ). *Buckman* involved a defendant that allegedly made fraudulent representations to the FDA in order to gain approval for its orthopedic bone screws that plaintiffs alleged caused their injuries. 531 U.S. at 343. The Supreme Court held that allowing the plaintiffs to proceed on their state tort claims based on the alleged fraud on the FDA would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives." *Id.* at 350. Mercedes argues that *Buckman* thus preempts all state tort claims "stemming from a defendant's alleged fraud on a federal agency." (ECF No. 117-1 at 43–44).

Importantly, *Buckman's* holding rested in part on the fact that the Supreme Court had "clear evidence that Congress intended that the [Medical Device Amendments] be enforced exclusively by the Federal Government," and that the plaintiffs' "fraud claims exist[ed] solely by virtue of the [Food, Drug, and Cosmetic Act] disclosure requirements." 531 U.S. at 352–53. While Mercedes frames Plaintiffs' claims as "all stem[ing] from the threshold allegation that 'the COCs were fraudulently obtained' and the vehicles were therefore 'never legal for sale; nor were they EPA or CARB complaint,' " (ECF No. 117-1 at 44 (quoting FAC ¶ 275) ), this does not place Plaintiffs' state-law claims within the realm of *Buckman*. As explained above, Plaintiffs' claims do not "exist solely by virtue" of the alleged violations of the EPA's emissions standards. The core allegation of Plaintiffs' state-law tort claims is that Defendants lied to and

deceived consumers, and so *Buckman* does not preempt these claims. *See FCA*, 295 F. Supp. 3d at 994–95 (applying the same reasoning to distinguish *Buckman* from state-law claims nearly identical to those before this Court); *In re Caterpillar*, 2015 WL 4591236, at * 14 (holding that consumer fraud claims were not impliedly preempted by the CAA, as those claims were not "about the ability of Caterpillar's Engines to comply with EPA emissions standards").

D. Plaintiffs' State-Law Misrepresentation Claims

Mercedes argues that "[a] vast majority of plaintiffs' misrepresentation claims—including those arising under state common law and state consumer protection statutes—should also be dismissed because they are based on nonactionable puffery." (ECF No. 117-1 at 44). As mentioned *supra* Section III.A.2.i, Plaintiffs have shifted the focus of the FAC away from claims relying on Defendants' affirmative misrepresentations and are instead basing those claims on Defendants' omissions. This is reinforced by the fact that Plaintiffs do not respond to Mercedes' argument that their state-law misrepresentation claims should be dismissed. (*See* ECF No. 126 at 60 (addressing Mercedes' puffery arguments only in the context of fraudulent concealment) ). Thus, to the extent that Plaintiffs' state-law consumer protection claims are based solely on affirmative misrepresentations, those affirmative misrepresentation claims are dismissed. *Griglak v. CTX Mortg. Co.*, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count.").

E. Plaintiffs' State-Law Fraudulent Concealment Claims

Defendants also argue that this Court should dismiss Plaintiffs' fraudulent concealment claims. Both Defendants claim that Plaintiffs have failed to set forth facts showing a duty to disclose, (ECF Nos. 117-1 at 51–53; 118-1 at 58–60), while Mercedes also attacks the fraudulent concealment allegations in the FAC under Rule 9(b), (ECF No. 117-1 at 48–51). Defendants principally challenge Plaintiffs' fraudulent concealment claims under New Jersey law, which Plaintiffs seek to apply to the nationwide class.[8] To state a claim for fraudulent concealment under New Jersey law, a plaintiff must establish: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Delaney v. Am. Express Co.*, No. 06-5134,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 528 of 751
PageID: 11894

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

2007 WL 1420766, at *5 (D.N.J. May 11, 2007); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Rule 9(b) applies to fraudulent concealment claims, *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, No. 09-4656, 2010 WL 2179094, at *4 (D.N.J. May 26, 2010); however, as mentioned above, Plaintiffs are not required to plead fraud by omissions claims as precisely as affirmative misrepresentation claims, *Feldman*, 2012 WL 6596830, at *10, so long as the complaint places "the defendant on notice of the precise misconduct with which it is charged, *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 443 (D.N.J. 2012) (quoting *Frederico*, 507 F.3d at 200).

**\*21** Mercedes contends that Plaintiffs have failed to satisfy the what, who, where, or when of the alleged fraudulent concealment, as required by Rule 9(b). In doing so, Mercedes mistakenly focuses on Mercedes' affirmative misrepresentations set forth in the FAC. For example, Mercedes argues that "every plaintiff fails to plead sufficiently the 'what' to satisfy Rule 9(b) because they fail to specify what false statements were allegedly made regarding *their* vehicle." (ECF No. 117-1 at 48–49 (referring to Plaintiff Andary, who "allege[d] that she read on the 'Mercedes website' 'something about a "green generation of Mercedes' ' ") (quoting FAC ¶ 33) ). With regard to the "who" element of Rule 9(b), Mercedes again argues that "[f]orty-nine plaintiffs ... attribut[e] claimed statements to dealership representatives or unidentified third-party websites." (ECF No. 117-1 at 49). In attacking Plaintiffs' fraudulent concealment claims, Mercedes applies a heightened Rule 9(b) standard to affirmative statements that Plaintiffs no longer rely on except to show the materiality of the omissions.

When looking at Plaintiffs' allegations concerning Defendants' omissions, they have sufficiently notified Mercedes and Bosch of the precise misconduct with which they are charged. Plaintiffs allege that Defendants "programmed [the] BlueTEC vehicles to turn off or otherwise limit the effectives of the emission reduction systems during normal real world driving," throughout the entire period of BlueTEC vehicle production and sale in the U.S. (FAC ¶¶ 10, 13). Plaintiffs also allege that Mercedes failed to disclose these facts about the emissions controls nationwide. (FAC ¶ 316). Similar allegations have been found to satisfy Rule 9(b) both within and outside of this district in other automotive defect cases. *See Volkswagen*, 2018 WL 4777134, at *24 (dismissing plaintiffs' fraudulent misrepresentation claims but finding that the fraudulent omissions claims survived,

because plaintiffs identified "the specifics of what VW failed to disclose: (1) that 'the Clean Diesel engine systems were not EPA-compliant,' and (2) that the class vehicles 'used software that caused the vehicles to operate in low-emission test mode during emissions testing' "); *Counts*, 237 F. Supp. 3d at 599 (finding that plaintiffs sufficiently alleged that GM "actively concealed and had exclusive knowledge of the alleged 'defeat device' "); *Feldman*, 2012 WL 6596830, at *10 (holding that plaintiffs adequately stated a claim of fraud by omission where they "allege[d] specific facts showing Defendants' knowledge and concealment of the alleged defect"). This Court will not dismiss Plaintiffs' state-law fraudulent concealment claims for failure to meet the standards of Rule 9(b).

Mercedes concludes that "[b]ecause no plaintiff has sufficiently alleged under Rule 9(b)'s heightened pleading standard the *what, who, where*, and *when* of any fraud, no plaintiff has adequately pled reliance, and all of their claims must be dismissed." (ECF No. 117-1 at 50–51). However, as the Court just found, Plaintiffs met the standards of Rule 9(b). Even still, the burden of establishing reliance on an omission is not difficult. Plaintiffs need not "offer direct proof that the entire class relied on defendant's representation that omitted materials facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued." *Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000); *see also Counts*, 237 F. Supp. 3d at 596 97 (citing *Varacallo* and concluding that the plaintiffs need not plead individualized reliance for fraud by omission under New Jersey law).[9]

**\*22** Bosch also contends that Plaintiffs "fail[ed] to plead any facts to suggest reliance on any specific or actionable representation by [it]." (ECF No. 118-1 at 59). However, for the same reasons that Plaintiffs need not establish direct reliance on Mercedes representations, they need not establish direct reliance on Bosch's: they allege that Bosch intentionally withheld the existence of the defeat device while simultaneously promoting clean diesel technology around the country.

Under New Jersey law, "courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.' " *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The categories of relationships that give rise to a duty to disclose are: "(1) fiduciary

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 529 of 751
PageID: 11895

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* Here, Plaintiffs do not assert that they fall into one of the special relationship categories with Defendants. As such, the Court will only focus on the parties' arguments challenging whether or not a duty to disclose existed to make a previous statement true.[10]

Mercedes claims that Plaintiffs "cannot establish that disclosure was necessary to make true a previous statement made by [Mercedes]," because "the alleged representations vary from plaintiff to plaintiff." (ECF No. 117-1 at 53). Mercedes argues that this distinguishes the facts at hand from *In re Volkswagen Timing Chain Products Liability Litigation*, No. 16-2765, 2017 WL 1902100 (D.N.J. May 8, 2017), because in *Timing Chain*, the partial disclosures were uniform. (ECF No. 117-1 at 53). The Court disagrees and finds that the facts at hand establish a duty to disclose for Mercedes and Bosch. Here, Plaintiffs set forth numerous examples of Mercedes' nationwide marketing efforts to promote its BlueTEC clean diesel vehicles. (FAC ¶¶ 323–27). In none of those examples does Mercedes disclose that the purported benefits of the BlueTEC engine could only be achieved through or were completely obscured by the use of a defeat device. These allegations are sufficient to establish partial disclosures that Mercedes had an obligation to make true. *See Timing Chain*, 2017 WL 1902160, at *20 (finding that the plaintiffs plead a partial disclosure after which the defendant had a duty to disclose "any and all information regarding the Timing Chain System" to plaintiffs, where the plaintiffs alleged that the defendant "represent[ed] in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance"); *Strawn v. Canuso*, 271 N.J. Super. 88, 104 (App. Div. 1994) (establishing a duty on buyers and brokers of real estate to disclose the existence of off-site conditions that were unknown to the buyer but that were known or should have been known to the seller and that would reasonably and foreseeably affect the value or desirability of the property), *aff'd* 140 N.J. 43 (1995).

**\*23** In fact, in *Strawn*, the New Jersey Supreme Court adopted the interpretation of the Restatement (Second) of

Torts which imposes a "duty upon a party to disclose to another 'facts basic to the transaction, if he knows that the other is about to enter into it under a mistake ... and the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts,' " where the nondisclosure of those facts amounts to taking advantage of the plaintiffs ignorance, such that it would be "shocking to the ethical sense of the community, and [would be] so extreme and unfair, as to amount to a form of swindling." " *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 554 (App. Div. 1997) (citations omitted). It is this Court's opinion that Mercedes and Bosch's active concealment of the existence of the defeat device amounts to such a situation. *Cf. FCA*, 295 F. Supp. 3d at 1009 (finding that allegations of defendants' active concealment of the defeat devices was sufficient to establish a duty to disclose under New Jersey law); *Counts*, 237 F. Supp. 3d at 600 (noting that the defendant's alleged active concealment of the defeat device was sufficient to establish a duty to disclose in some states).[11]

## F. Plaintiffs' State Statutory Claims

### 1. Rule 9(b), Causal Nexus, and False, Deceptive, or Misleading Statements

Mercedes argues that Plaintiffs fail to state claims for violations of various states' consumer protection statutes under Rule 9(b) because Plaintiffs have not pled a "causal nexus" between Mercedes' unlawful conduct and Plaintiffs' injury with enough specificity and because Plaintiffs have "failed to allege facts establishing that the Mercedes Defendants made" false, deceptive, or misleading statements. (ECF No. 117-1 at 54–55). Mercedes attempts to address these state-specific arguments by citing to an "Appendix B," attached to their brief. (ECF No. 117 at 54–55). Appendix B is a six-page document containing four columns: the state law that applies, the causes of action under that state's law, the elements of the cause of action that Plaintiffs allegedly fail to establish, and "relevant authorities." (ECF No. 117-3 at 1–6). There is no context or analysis accompanying this document. Two courts have rejected similar attempts to argue that Plaintiffs have failed to meet the pleading requirements of various states' consumer protection statutes through an appendix. *See FCA*, 295 F. Supp. 3d at 1015 (deeming arguments made in a joint appendix regarding the plaintiffs' failure to allege reliance, a deceptive act, omission, or practice, and a concrete, nonspeculative loss in relation to consumer protection claims as waived); *Counts*, 237 F. Supp. 3d at 593–94 ("Neither party makes a colorable

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 530 of 751
PageID: 11896
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

effort to individually address the validity of Plaintiffs' ... consumer protection ... claims on a state specific basis. Rather, each attempts to 'raise' certain state-specific arguments by referencing appendices attached to their briefing.... The parties' scattershot effort to raise arguments and defenses by simply citing to cases, if not hundreds, of state court cases will not be addressed."). This Court will also do the same. As in *Counts*, this Court agrees that "[c]ourts are not responsible for combing through appendices in an attempt to *sua sponte* raise and resolve legal arguments which the parties have not briefed." 237 F. Supp. at 594.

In any event, Mercedes' arguments regarding causal nexus and false, deceptive, or misleading statements have been adequately addressed elsewhere in this Opinion. As to the existence of a causal nexus, this Court conducted an in-depth analysis of the causal link between Mercedes' alleged unlawful conduct and Plaintiffs' alleged injuries in the portions of the brief discussing Article III standing and RICO causation. *See supra* Sections III.A.2, B.2. With respect to whether Plaintiffs have adequately pled false, deceptive, or misleading statements, that has been discussed throughout, but particularly in reference to Plaintiffs' common law fraud claims *supra* Section III.E. This Court also notes that *Duramax* analyzed the state consumer protection claims in conjunction with the state common law fraud claims without meaningful distinction. 298 F. Supp. at 1057–65.

### 1. Bosch and the Michigan Consumer Protection Act

**\*24** Bosch argues that Plaintiffs fail to state a claim under the Michigan Consumer Protection Act ("MCPA"), because they have failed "to identify any purportedly false affirmative misrepresentation by" Bosch, they have not identified Bosch's duty to disclose, and they have not alleged any injury as a result of Bosch's conduct. (ECF No. 118-1 at 60). By Bosch's own admission, an omission suffices as a "material misrepresentation" under the MCPA. (ECF No. 118-1 at 60). The Court has already established that Bosch made material omissions that it had a duty to disclose. *Supra* Section III.E. Additionally, the Court has rejected Bosch's argument that Plaintiffs have not adequately pled that they suffered an injury as a result of Bosch's conduct. *Supra* Section III.A.2.ii.

### 2. Ascertainable Loss under New Jersey and Florida Law

Mercedes argues that Plaintiffs Caputo, Caniero, Watkins, Carroll, and Cunningham "fail to plead injury with the specificity required under the consumer protection statutes of New Jersey and Florida because they have not alleged

sufficient facts to show they suffered an ascertainable loss." (ECF No. 117-1 at 56). Ascertainable loss is an essential element of a claim under the New Jersey Consumer Fraud Act (NJCFA). *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 97 (D.N.J. 2011). Mercedes claims that because Plaintiffs have failed to plead how much they paid for their vehicles and how much a comparable vehicle would cost, they have not satisfied the standard for ascertainable loss. (ECF No. 117-1 at 56 (citing *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 439 (D.N.J. 2015) ) ). Plaintiffs contend that *Riddell* is in conflict with New Jersey Supreme Court precedent, suggesting that New Jersey's highest court does not require a plaintiff to plead a price comparison, because "if the damages calculation were so simple, expert testimony would never be necessary." (ECF No. 126 at 66–67).

Here, Mercedes has the better argument. "In cases involving ... misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle ...." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005). In demonstrating that out-of-pocket loss or loss in value, the New Jersey Supreme Court has explicitly endorsed the necessity of a price comparison in pleadings seeking to state a claim under the NJCFA. *See D'Agostino v. Maldonado*, 216 N.J. 168, 191 (2013) (detailing that an ascertainable loss must be capable of calculation); *Thiedemann*, 183 N.J. at 248 (describing ascertainable loss as "not hypothetical or illusory" and a loss that "must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity"). This district has interpreted the New Jersey Supreme Court precedent to require this price comparison as well. *E.g.*, *Riddell*, 77 F. Supp. 3d at 439; *Smajlaj*, 782 F. Supp. 2d at 100–01. In fact, in *Bosland v. Warnock Dodge, Inc.*, the New Jersey Supreme Court addressed the question of ascertainable loss in an automobile overcharge case. There, the Supreme Court held that "the overcharge in question is one that can be readily quantified and thus [ ] ascertainable within the meaning of the CFA." 197 N.J. 543, 559 (2009). The plaintiff in *Bosland* though had specifically outlined the fee payments demonstrating that she could have been overcharged by either $40 or $20. *Id.* at 548.

Plaintiffs have not done that here. In their brief they do not set forth any instances of a price comparison in the FAC, nor can the Court find any. What Plaintiffs have done is set the table for a price comparison, alleging that Plaintiffs would not have purchased or leased the BlueTEC vehicles at the

prices they paid, or would have purchased or leased a less expensive alternative. (*E.g.*, FAC ¶ 535). They have not gone one step further to compare the price of a Polluting Vehicle with what they believe to be a comparable replacement. *E.g.*, *Smajlaj*, 782 F. Supp. 2d at 103 (finding a sufficient allegation of ascertainable loss where plaintiffs alleged that when they bought a can of soup mislabeled as low-sodium they overpaid for what was essentially full-sodium soup that they alleged to be 20 to 80 cents cheaper).

**\*25** Additionally, Plaintiffs' argument that expert testimony would never be required if the NJCFA only allowed claims with easily calculable ascertainable losses misses the mark. This is because, as mentioned above, the pleading need not demonstrate the ascertainable loss "in all its particularity." *Thiedemann*, 183 N.J. at 248. Ascertainable loss sets "the stage for establishing the measure of damages." *Id.* "There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied. The two concepts indeed have separate functions in the analysis." *D'Agostino*, 216 N.J. at 192. Thus, the idea that requiring Plaintiffs to plead ascertainable loss as described above will necessarily write out a nuanced calculation of damages is incorrect. As such, Plaintiffs have failed to state a claim under the NJCFA. The Court will allow Plaintiffs to amend this claim.

As to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), this Court agrees with Judge Simandle in *Riddell* that actual damages under the FDUTPA are measured as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." 77 F. Supp. 3d at 439 (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) ). However, this Court does not agree that this definition from *Rollins* establishes a pleading standard, as nothing in that case indicates that the Florida District Court of Appeal intended that definition to apply as a hurdle that must be cleared at the motion to dismiss phase. In fact, the 11th Circuit, the Southern District of Florida, and other courts analyzing FDUTPA have held that the *pleading standard* for a an FDUTPA claim is less stringent than the definition of actual damages. *See, e.g.*, *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) ("[E]ach putative class member would only need to show that he or she paid a premium for YoPlus to be entitled to damages under the FDUTPA."); *Hasemann v. Gerber Prods. Co.*, No. 15-2995, 2016 WL 5477595, at \* 21 (E.D.N.Y. Sept. 28, 2016) ("A plaintiff may recover damages under the FDUTPA

by alleging that the plaintiff 'paid a price premium' for the allegedly deceptive product.") (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016) ); *Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1367 n.1 (S.D. Fla. 2011) (stating that a consumer suffers damages when she pays "more for the product than she otherwise would have," based on a manufacturer's deceptive practice, regardless of whether or not the consumer relied on the deceptive practice). Thus, Plaintiffs have adequately stated their FDUTPA claim.

3. <u>Statutory Time Bars</u>

Mercedes next argues that Plaintiff Mose's Alabama claim, Findlay and Rubey's Indiana claims, and Watkins' Florida claim are time barred, as those statutes of limitation and repose "begin to run from the date that the alleged tort *occurred—i.e.*, the original purchase date of the vehicles." (ECF No. 117-1 at 57).

The parties do not dispute that Alabama's consumer protection statute is subject to a four-year statute of repose. Mercedes presumes that Mose's purchase took place "in or near 2007," because it was a 2007 model vehicle. (ECF No. 117-1 at 57). However, the FAC explicitly states that Mose purchased his vehicle in February of 2013, (FAC ¶ 29), and thus falls within the statute of repose. Mercedes also argues in a footnote that because Mose asserted an Alabama Deceptive Trade Practices Act, he waived his right to bring other claims. (ECF No. 117-1 at 57 n.25). Given that Mercedes asserted an argument on which there is a split of authority, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 405 (S.D.N.Y. 2017), in a footnote, this Court declines to address that argument. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived).

**\*26** As to Plaintiff Watkins' Florida claim, Mercedes again argues that because Watkins purchased a used vehicle in 2013, the vehicle must have originally been sold prior to 2013 and thus is subject to a four-year statute of limitations. (ECF No. 117-1 at 57–58). Mercedes cites no law supporting its proposition that the original sale date of the new car is what starts the clock running on the statue of limitations rather than the purchase date of the used car by Plaintiff Watkins. Moreover, Mercedes incorrectly argues that FDUTPA's statute is not tolled by the actions at bar. *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324,1344, 1346 (S.D. Fla. 2016) (stating that "the doctrine of fraudulent concealment will operate to toll the statute of limitations when

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury," and tolling the plaintiffs FDUTPA claim based on this reasoning). Plaintiff Watkins' FDUTPA claim is not barred by the statute of limitations.

With respect to Findlay and Rubey's Indiana consumer protection claims, Mercedes again uses the vehicle model years as the purchase dates, (ECF No. 117-1 at 58), when Findlay purchased his vehicle in August 2015 and Rubey purchased his vehicle in January 2014. This would put Findlay's purchase inside the two year statute of limitations. Ind. Code § 24-5-0.5-5(b). As to Rubey's purchase, Mercedes' alleged active and intentional fraudulent concealment operates to toll the statute of limitations. *Cwiakala v. Economy Autos, Ltd.*, 587 F. Supp. 1462, 1466 (N.D. Ind. 1984).

4. State Consumer Protection Class Action Bars

Mercedes also argues that Plaintiffs' claims under the consumer protection laws of Alabama, Georgia, Mississippi, Montana, Ohio, South Carolina, and Tennessee are barred because the consumer protection laws of those states do not permit class actions. (ECF No. 117-1 at 59). Mercedes argues that pursuant to *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Company*, 559 U.S. 393 (2010), Rule 23 does not override state substantive law to permit class actions in this situation. (ECF No. 117-1 at 59). This Court has twice addressed and rejected this argument. *In re Liquid Aluminum Sulfate Antitrust Litig.*, 16-md-2687, 2017 WL 3131977, at *25 (D.N.J. July 20, 2017) (holding that *Shady Grove* instructs that state consumer protection class action bars do not apply to those claims if brought as a class action under Federal Rule of Civil Procedure 23); *Timing Chain*, 2017 WL 1902160, at *24 (holding the same); *see also Fitzgerald v. Gann Law Books, Inc.*, 956 F. Supp. 2d 581, 586 (D.N.J. 2013) ("*Shady Grove* holds that, even where a federal-court plaintiff asserts a state-law cause of action, Rule 23 may permit class-wide relief where state law would deny it.").

**G. Arbitration**

Mercedes' final argument is that two plaintiffs, Andary and Feller, are bound to arbitrate all of their claims pursuant to their purchase agreements. (ECF No. 117-1 at 61). Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *E.M.*

*Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001) (citing *AT&T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 649 (1986) ). In doing so, the district court applies "the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party." *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288–89 (3d Cir. 2017).

**\*27** "[F]ederal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24–25). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit, Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980), *abrogated on other grounds by Aliments*, 851 F.3d at 287–88. In considering a motion to compel arbitration, a court must engage in a two-step analysis: it must determine first whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the scope of said agreement. *See Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009).

Andary and Feller's arbitration provision reads as follows:

ARBITRATION PROVISION

PLEASE REVIEW • IMPORTANT • AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.

2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 533 of 751
PageID: 11899
In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 413541, RICO Bus.Disp.Guide 13,132

CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIDIVDUAL ARBITRATIONS.

3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAIABLE IN ARBITRATION.

(ECF No. 117-4 at 9, 13).

Mercedes admits that it was not a signatory to these purchase or lease agreements. (ECF No. 117-1 at 62). As this Court explained in *Timing Chain:*

> Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014) (defining privity of contract as "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so"). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established Hence, without privity of contract between the parties, Defendant ... cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with [*Century Indemnification Company*,] there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

2017 WL 1902160, at *8.

Even still, Mercedes argues, this is the type of relationship in which a non-signatory can enforce the arbitration agreement. (ECF No. 117-1 at 62). Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont*

*de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001). For example, courts have "bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont*, 269 F.3d at 199 200 (citations and quotations omitted). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* at 202.

**\*28** This Court rejected the same argument in *Timing Chain,* 2017 WL 1902160, at *9. As in *Timing Chain*, the FAC indicates that Plaintiffs each purchased and/or leased their vehicle from an authorized car dealership, that they entered into the purchase or lease agreement with that dealership, and that the agreement contained only the dealership's name and Andary and Feller's names. "Accordingly, there [is] no relationship, let alone a close one, that" indicates that the Court should permit Mercedes to enforce the arbitration agreements. As such Mercedes' motion to compel arbitration is denied.

## IV. CONCLUSION

For the reasons stated herein, Mercedes' motion to dismiss the First Amended Complaint is granted in part and denied in part, and Bosch's motion to dismiss the First Amended Complaint is denied. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 413541, RICO Bus.Disp.Guide 13,132

Footnotes

1    The facts as stated herein are taken as alleged in the FAC, (ECF No. 107).

2    The Polluting Vehicles consist of the following Mercedes models powered by BlueTEC diesel engines: ML 320, ML 350, GL 320, E320, S350, R320, E Class, GL Class, ML Class, R Class, S Class, GLK Class, GLE Class, and Sprinter. (FAC ¶ 18).

3    Bosch also argues that the R320 and GLE types of the Polluting Vehicles should excluded from the claims because, "Plaintiffs have no standing to pursue claims based on Affected Vehicles that they did not purchase or lease." (ECF No. 118-1 at 13–14). This argument is premature at the motion to dismiss stage. *Luppino v. Mercedes-Benz USA, LLC*, No.

In re Mercedes-Benz Emissions Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 413541, RICO Bus.Disp.Guide 13,132

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 534 of 751
PageID: 11900

09-5582, 2013 WL 6047556, at *6 (D.N.J. Nov. 12, 2013) (finding that "dismissal of Plaintiffs' claims related to vehicle wheel tire combinations Plaintiffs did not purchase would be premature" at the motion to dismiss stage).

4    Plaintiffs diminished value theory is articulated as follows: "Moreover, when and if Mercedes recalls the Polluting Vehicles and degrades the BlueTEC Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines." (FAC ¶ 332).

5    The actionability of the misstatements as puffery are addressed *infra* Section III.B.3.iv. To the extent Bosch claims that Plaintiffs are trying to enforce compliance with emissions standards, that argument is addressed by Parts III.B.2.i and III.C.

6    *Duramax* also explicitly rejects "Bosch's repeated argument that Plaintiffs must specifically allege that *Bosch* used the mail or wire to defraud," as "simply, wrong," and notes that even though the plaintiffs had not "specifically alleged the date of the applications or the specific identity of the employee who prepared them," the plaintiffs had "alleged enough detail to put Defendants on notice of the alleged predicate acts." *Id.*

7    The key cases that Defendants rely on in support of their express preemption argument, such as *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), and *In re Office of Att'y Gen. of N.Y.*, 709 N.Y.S.2d 1 (App. Div. 2000), have already been discussed at length and distinguished appropriately by the four cases cited in this paragraph. As such, in the interest of judicial economy, the Court refers the parties to the appropriate discussion of these cases in *Volkswagen, FCA, Duramax*, and *Counts*.

8    Mercedes' challenges to fraudulent concealment claims under laws other than New Jersey's are few. Defendant alleges that there is no private cause of action for fraudulent concealment under Connecticut law, (ECF No. 117-1 at 48 n.17 (citing *Traylor v. Awwa*, 899 F. Supp. 2d 216, 224 25 (D. Conn. 2012) ) ), and argues that a commercial transaction does not give rise to a duty to disclose under Illinois law, and thus mirrors New Jersey law, (ECF No. 117-1 at 52 n.22). The Court agrees with Plaintiffs regarding Connecticut law, in that Connecticut recognizes claims for fraudulent concealment but calls them fraud by "suppression" or "nondisclosure." *Reville v. Reville*, 312 Conn. 428, 441 (2014) ("Fraud by nondisclosure ... involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak.... A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment."). As to the question of whether Defendants had a duty to disclose under Illinois law, that question is answered below.

9    Mercedes does not brief the Court on the differences in the laws of the various state subclasses with respect to reliance and fraudulent concealment. To the extent that Mercedes purports to rely on Appendix A to its brief, that attachment does not provide state-specific legal citation or information beyond a boilerplate statement that there was a "[f]ailure to satisfy Rule 9(b) with respect to *reliance*, by failing to allege the *what* and *when* of the purported fraud." (*e.g.*, ECF No. 117-2 at 4 (referencing Plaintiff Roberts) ). Thus, the Court declines to do a state-by-state analysis on the differing requirements for pleading reliance in fraudulent concealment claims at this stage. *See Counts*, 237 F. Supp. 3d at 597 (deciding that "the Court will not *sua sponte* analyze the elements of fraudulent concealment from each state's law that Plaintiffs purport to sue under" where the defendant did not specifically raise the argument).

10   Bosch ignores the aspect of the duty to disclose that flows from a previous false statement and instead only focuses on the existence of a special relationship. (ECF No. 118-1 at 59).

11   As to Mercedes' contention that Illinois law would also not impose a duty to disclose in this scenario, that argument fails. *See Heider v. Leewards Creative Crafts*, 613 N.E.2d 805, 814 (1993) ("Mere silence in a business transaction does not amount to fraud. Yet, silence accompanied by deceptive conduct or suppression of material facts gives rise to active concealment; it is then the duty of the party which has concealed information to speak.").

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

797 Fed.Appx. 695
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

IN RE: MERCEDES-BENZ
EMISSIONS LITIGATION

Ulyana Lynevych; John Lingua; Jimmy
Bird; Jonathan Mose; Arthur Daschke;
Richard Yanus; Walter Louis; Keith
Caniero; Caroline A. Ledlie; Chandrakant
Patel; Tiffany Knight; Susan Albers; Craig
Thorson; Shelby A. Jordan; Gwendolyn
Andary; Scott Morgan; Henry Silverio;
Dedrick Watkins; Terrence Garmey;
Wendell Dingle; Seid Dilgisic; Jorge
Salvador Servin; Andrew Deutsch;
Devin Downs; Freddie T. Holbrook;
Geoffrey C. Cunningham; Billy Fox;
Lorrie Vidal; James Edwards; Sheila
Reed; Zbigniew Kurzawa; Janice Sheehy;
Bradford Smith; Gustavo Fraga-Errecart;
Robert Trepper; James Schafer; Vincent
Minerva; Henry Silverado; Jeff Findlay;
Andrew H. Rubey; Christopher Gates;
Darrell Feller; Stephen Carroll; David I.
Ashcraft; Lars Dannenberg; Adrian Clive
Roberts; Randolph Rolle; Gina McVey;
Anthony Caputo; Catherine Roberts;
Keith Hall; Flavio Moy; A. Eric Ngwashi;
Bobby Hamilton; Maryana Melnyk;
Paul Herrmann; Lynn Doherty Munoe;
Brenda Oneal; Charles Wolford; Thomas
Weiss; John Laurino; Andrew Deutsch;
Michael Medler; Dr. Gregory Chan; Lars

Dannberg; Hassan Zavareei, on behalf of
himself and all others similarly situated;
Hagop Bazrganian; Robert Gershberg;
Melanie Johnson; Derek Steelberg
v.
Mercedes-Benz USA, LLC, a Delaware
Limited Liability Company; Daimler AG;
Robert Bosch LLC; Robert Bosch GmbH;
Daimler Trucks North America LLC;
Detroit Diesel Corporation; Daimler Vans
USA, LLC; Daimler Vehicle Innovations,
LLC, a New Jersey Limited Liability
Company; Daimler North America
Corporation, a New Jersey Corporation;
Calstar Motors, a Mercedes Benz Dealer;
Carrie Kenny, an individual; Does 1
through 100, inclusive Mercedes-Benz
USA, LLC, and Daimler AG, Appellants

No. 19-1484
|
Argued October 30, 2019
|
(Filed: January 10, 2020)

**Synopsis**
**Background:** Buyers of vehicles that they believed were
"clean diesel" but allegedly were not filed putative nationwide
class action against vehicle manufacturers and software
suppliers for violations of federal and state laws. The
United States District Court for the District of New Jersey,
Jose L. Linares, Chief Judge, 2019 WL 413541, partially
denied manufacturers' motion to dismiss fourth consolidated
and amended complaint upon determining two named
plaintiffs were not compelled to arbitrate with manufacturers.
Following manufacturers' notice of appeal, two named
plaintiffs filed joint notice of voluntary dismissal without
prejudice, after which remaining named plaintiffs filed fifth
consolidated and amended complaint. Two named plaintiffs
moved to dismiss appeal as moot.

**Holdings:** The Court of Appeals, Phipps, Circuit Judge, held
that:

[1] appeal was not rendered moot by post-appeal filings, but

[2] issue of arbitrability required choice-of-law analysis.

Motion denied; vacated in part and remanded.


West Headnotes (3)


[1]    **Alternative Dispute Resolution** 🗝️ Review

In putative class action against vehicle manufacturers for violations of federal and state laws by selling vehicles that buyers believed were "clean diesel" but allegedly were not, two named plaintiffs' joint notice of voluntary dismissal without prejudice and remaining named plaintiffs' filing of fifth amended complaint did not render moot manufacturers' interlocutory appeal of district court's denial of their motion to dismiss fourth amended complaint upon determining two named plaintiffs were not compelled to arbitrate, since district court's jurisdiction was divested upon manufacturers' filing of notice of appeal, so suit could not be altered by operation of civil rules during pendency of appeal, and both filings in district court occurred while appeal was pending. Fed. R. App. P. 42; Fed. R. Civ. P. 1.

1 Cases that cite this headnote


[2]    **Alternative Dispute Resolution** 🗝️ Determination and disposition

Vehicle manufacturers forfeited their appellate argument that two named plaintiffs were required to arbitrate their class action claims based on gateway arbitrability defense by manufacturers as non-signatories without any express mention in arbitration clauses of vehicle purchase agreements, but did not forfeit their appellate arguments invoking equitable estoppel and third-party beneficiary theory, since manufacturers failed to raise gateway arbitrability argument before district court, but district court had analyzed third-party beneficiary theory that implicated principles of equitable estoppel.

[3]    **Alternative Dispute Resolution** 🗝️ Determination and disposition

District court's order partially denying vehicle manufacturers' motion to dismiss fourth consolidated and amended class action complaint upon determining that two named plaintiffs were not compelled to arbitrate with manufacturers under arbitration clause in vehicle purchase agreements required vacatur and remand for consideration of manufacturers' third-party beneficiary and equitable estoppel arguments under applicable state law, since district court failed to conduct choice-of-law analysis to resolve which state substantive law governed construction of arbitration clauses, and parties did not provide any choice-of-law analysis on appeal.


\*697  On Appeal from the United States District Court for the District of New Jersey (D.C. No. 2:16-cv-881)

District Judge: Honorable Jose L. Linares

### Attorneys and Law Firms

Matthew J. Kemner, Troy M. Yoshino, Squire Patton Boggs, 275 Battery Street, Suite 2600, San Francisco, CA 94111, Daniel W. Nelson, Lucas C. Townsend, [ARGUED], Gibson Dunn & Crutcher, 1050 Connecticut Avenue, N.W., Washington, DC 20036, Counsel for Appellants Mercedes Benz USA, LLC, and Daimler AG

James E. Cecchi, Lindsey H. Taylor, Carella Byrne Cecchi Olsteing Brody & Agnello, 5 Becker Farm Road, Roseland, NJ 07068, Steven W. Berman, Hagens Berman, Sobol Shapiro, 1301 2nd Avenue, Suite 2000, Seattle, WA 98101, Kevin K. Green, [ARGUED], Hagens Berman Sobol Shapiro, 533 F Street, Suite 207, San Diego, CA 92101, Counsel for Appellees Gwendolyn Andary and Darrell Feller

Before: HARDIMAN, PHIPPS, and NYGAARD, Circuit Judges.

OPINION[*]

PHIPPS, Circuit Judge.

This interlocutory appeal about compelled arbitration arises out of a broader dispute regarding Mercedes BlueTEC diesel vehicles. That wider controversy involves a putative class action of individual buyers who purchased Mercedes BlueTEC diesel vehicles from Mercedes dealerships, believing that those vehicles were 'clean diesel' when allegedly they were not. From those allegations, 60 named plaintiffs bring an array of claims as a nationwide class for violations of federal law and as thirty-three subclasses for violations of various state laws. Those claims are directed not against the dealerships but rather against two manufacturers, Mercedes-Benz USA, LLC and Daimler AG, as well as their software suppliers. The two manufacturer defendants, the 'Mercedes Manufacturers,' moved to dismiss the initial complaint, and that led to several cycles of amended complaints and subsequent motions to dismiss.

The Mercedes Manufacturers take this appeal from the District Court's partial denial of their motion to dismiss the Fourth Consolidated and Amended Class Action Complaint. Although that motion presented numerous bases for dismissal, only one of those – the request to compel **\*698** arbitration – is at issue in this interlocutory appeal. That request to compel arbitration relates to two named plaintiffs, Gwendolyn Andary and Darrell Feller, who purchased vehicles from Mercedes dealerships, one located in California, the other in Virginia. In seeking to compel arbitration, the Mercedes Manufacturers rely on the terms of the purchase agreements between those dealerships and Andary and Feller. But those purchase agreements do not mention the Mercedes Manufacturers, nor are the Mercedes Manufacturers signatories to those agreements. On the briefing below, the District Court rejected the argument that the purchase agreements compelled Andary and Feller to arbitrate with the Mercedes Manufacturers directly or as third-party beneficiaries. The Mercedes Manufacturers noticed an interlocutory appeal as permitted by the Federal Arbitration Act. *See* 9 U.S.C. § 16(a)(1)(C).

Neither side appears content with the record for this interlocutory appeal. For the first time on appeal, the Mercedes Manufacturers raise a 'gateway' arbitrability defense. Meanwhile, Andary, Feller, and the other named plaintiffs have augmented the District Court docket during the pendency of this appeal. Andary and Feller filed a joint notice of voluntary dismissal under Civil Rule 41 in an attempt to dismiss themselves, without prejudice, as named plaintiffs. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). Shortly afterwards, the remaining named plaintiffs filed a Fifth Consolidated and Amended Class Action Complaint, which did not include either Andary or Feller as a named plaintiff. That amended pleading did, however, define the putative nationwide class and two subclasses such that Andary and Feller would be included as class members. Based upon those filings, Andary and Feller moved to dismiss this appeal as moot, even though they remain as putative class members under the most recent amended complaint.

From this unusually fluid posture, two central issues emerge on appeal. First is the question of whether this appeal is moot. Second is the issue of whether the District Court erred in not compelling Andary or Feller to arbitrate with the Mercedes Manufacturers. For the reasons set forth below, we hold that this appeal is not moot, and we will vacate the District Court's order in part and remand for the District Court to evaluate the Mercedes Manufacturers' motion to compel arbitration on state-law grounds.

I

[1] The post-appeal filings in the District Court do not moot this appeal. Once the Mercedes Manufacturers noticed this appeal, jurisdiction over Andary's and Feller's claims was divested from the District Court and vested in this court. *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *see also Hudson United Bank v. LiTenda Mort. Corp.*, 142 F.3d 151, 158 (3d Cir. 1998) ("[J]urisdiction that is originally and properly vested in the district court becomes vested in the court of appeals when a notice of appeal is filed."); *Venen v. Sweet*, 758 F.2d 117, 120-21 (3d Cir. 1985). Because the District Court did not retain jurisdiction over Andary's and Feller's claims, their suit could not be altered through operation of the Civil Rules during the pendency of this appeal. *See generally* Fed. R. Civ. P. 1 (providing that the Civil Rules "govern the procedure in all civil actions and proceedings in the United States *district courts*" **\*699** (emphasis added)); *cf.* Fed. R. App. P. 42 (providing for the

voluntary dismissal of an appeal). But both the notice of voluntary dismissal and the Fifth Consolidated and Amended Class Action Complaint were filed in the District Court while this appeal was pending. Because the District Court did not have jurisdiction over Andary and Feller's suit at those times, neither filing moots this appeal.

Without mootness as a bar, this court has jurisdiction over this appeal. The District Court had jurisdiction over the federal causes of action, *see* 28 U.S.C. § 1331, as well as the related state-law causes of action, *see* 28 U.S.C. §§ 1332, 1367. And under the Federal Arbitration Act, this court has jurisdiction over an interlocutory appeal of the District Court's denial of the Mercedes Manufacturers' motion to compel arbitration. *See* 9 U.S.C. § 16(a)(1)(C).

## II

 **[2]**  The remainder of this appeal focuses on whether the District Court erred by not compelling Andary and Feller to arbitrate with the Mercedes Manufacturers. According to the Mercedes Manufacturers, the purchase agreements between the dealerships and Andary and Feller require arbitration with the Mercedes Manufacturers. But the Mercedes Manufacturers were not signatories to those purchase agreements. And the purchase agreements require arbitration only with the dealerships or specific categories of other entities, such as the dealerships' "employees, agents, successors or assigns." The Mercedes Manufacturers do not contend that they qualify as an employee, agent, successor, or assign of either dealership. Rather, as non-signatories without any express mention in the arbitration clauses, they invoke three legal theories on appeal to compel arbitration: (i) a 'gateway' arbitrability defense; (ii) equitable estoppel; and (iii) a third-party beneficiary theory. But the first of those arguments – 'gateway' arbitrability – was not raised before the District Court and has been forfeited. *See United States v. Jones, 565 U.S. 400, 413, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012)* (considering an argument not raised below as forfeited); *Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 249 (3d Cir. 2013)* ("We generally refuse to consider issues that the parties have not raised below."). The remaining two issues have not been forfeited because the District Courted analyzed a third-party beneficiary theory that implicated principles of equitable estoppel.

 **[3]**  In evaluating those two arguments, it is necessary at the outset to identify the applicable substantive law. Traditional

principles of state law govern arbitration clauses, but it is not clear which state's substantive law should apply here. *See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630-31, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)* (looking to state law to determine whether an arbitration clause is enforceable with respect to a third party); *see also In re Remicade (Direct Purchaser) Antitrust Litig., 938 F.3d 515, 519-22 (3d Cir. 2019); Aliments Krispy Kernels, Inc. v. Nichols Farms, 851 F.3d 283, 289 (3d Cir. 2017)*. The lawsuit was filed in New Jersey, yet Andary is a California resident who purchased her car in California, and Feller is a Washington state resident who purchased his car in Virginia. Andary's purchase agreement indicates that federal law and California law apply, while Feller's purchase agreement has no provision regarding applicable law.

From these facts, a choice-of-law analysis is needed to resolve the question of which state substantive law governs the construction of these arbitration clauses. *See Aliments Krispy Kernels, 851 F.3d at 289* ("Because we look to applicable **\*700** law to determine whether the parties agreed to arbitrate, we begin with a choice-of-law analysis."); *White v. Sunoco, Inc., 870 F.3d 257, 263 (3d Cir. 2017)*. But in advancing their arguments on compelled arbitration, the parties have not provided any choice-of-law analysis on appeal. Nor did the District Court conduct such an analysis.

That is a problem: without a choice-of-law analysis and subsequent application of the appropriate state substantive law, it cannot be conclusively determined whether Andary's and Feller's purchase agreements compel them to arbitrate with the Mercedes Manufacturers. The choice-of-law analysis should have been performed by the District Court. *See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)* ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Freeman, 709 F.3d at 249* ("We generally refuse to consider issues that the parties have not raised below."); *see also Bernhardt v. Polygraphic Co. of Am., 350 U.S. 198, 205, 76 S.Ct. 273, 100 L.Ed. 199 (1956)* (stating in *dicta* that remand is appropriate when there is a "question in doubt or deserving further canvass" regarding state law governing an arbitration clause). Accordingly, we will vacate the District Court's order and remand this matter to the District Court for consideration of the Mercedes Manufacturers' third-party beneficiary and equitable estoppel arguments under applicable state law.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 539 of 751
PageID: 11905

**All Citations**

797 Fed.Appx. 695

Footnotes

\*        This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

---

**End of Document**                                                          © 2020 Thomson Reuters. No claim to original U.S.
Government Works.

Tab 51

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by In re Processed Egg Products Antitrust Litigation, E.D.Pa., March 20, 2012

72 Fed.Appx. 916
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

METRIC CONSTRUCTORS,
INCORPORATED, Plaintiff–Appellant,
and

J.A. Jones, Incorporated, Plaintiff,

v.

THE BANK OF TOKYO–MITSUBISHI,
LIMITED, New York Branch; Barclays
Bank PLC, New York Branch; Bayerische
Vereinsbank, Ag, New York Branch;
Dai–Ichi Kangyo Bank, Limited,
New York Branch; Mees Pierson NV,
New York Agency; Credit Local De
France; Bank of Tokyo–Mitsubishi
Trust Company, defendants-Appellees.

No. 02–1425.
|
Argued May 9, 2003.
|
Decided July 30, 2003.

**Synopsis**

Construction company brought diversity action against banks on unjust enrichment theory after banks stopped funding construction of facilities that would have converted garbage to energy. The United States District Court for the Eastern District of North Carolina, W. Earl Britt, J., granted judgment for banks. Company appealed. The Court of Appeals held that: (1) contractor conferred benefit on banks by improving their collateral; (2) contractor showed that it anticipated being

compensated for its work; (3) value of contractor's work was measurable; and (4) banks consciously accepted benefit of contractor's work.

Vacated and remanded.

West Headnotes (4)

**[1]** **Implied and Constructive Contracts** 🔑 Work and Labor in General; Quantum Meruit

Contractor showed that it conferred benefit upon banks by improving their collateral through its work on construction project financed by banks, in lawsuit brought by contractor against banks alleging unjust enrichment under North Carolina law; although contractor did not have contract with banks, banks had direct interest in construction project, having held first-priority security interest.

6 Cases that cite this headnote

**[2]** **Implied and Constructive Contracts** 🔑 Gratuitous Services

Contractor showed that benefit it conferred upon banks, through its work on construction project financed by banks, was not conferred officiously or gratuitously, in lawsuit brought by contractor against banks alleging unjust enrichment under North Carolina law; although there was no express contract between contractor and banks, contractor anticipated that it would be compensated for its work. Restatement of Restitution § 110.

18 Cases that cite this headnote

**[3]** **Implied and Constructive Contracts** 🔑 Work and Labor in General; Quantum Meruit

Contractor showed that value of its work on construction project was measurable as benefit to banks, who financed project, in lawsuit brought by contractor against banks alleging unjust enrichment under North Carolina law; although

Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 Fed.Appx. 916 (2003)

contractor did not have contract with banks, banks had direct interest in construction project, having held first-priority security interest, and contractor's work enhanced the value of banks' collateral.

1 Cases that cite this headnote

[4]   **Implied and Constructive Contracts** 🔑 Rendition and Acceptance of Services in General

Contractor showed that banks who financed construction project consciously accepted benefit of contractor's work on project, in lawsuit brought by contractor against banks alleging unjust enrichment under North Carolina law; although contractor did not have contract with banks, banks were aware that contractor was installing equipment and otherwise improving the project.

11 Cases that cite this headnote

**\*917**  Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (CA–97–369–5 BR(1)).

**Attorneys and Law Firms**

**\*918   ARGUED:** Douglas Leo Patin, Spriggs & Hollingsworth, Washington, D.C., for Appellant. Thomas Joseph Hall, Chadbourne & Parke, L.L.P., New York, New York, for Appellees. **ON BRIEF:** Eric A. Frechtel, Spriggs & Hollingsworth, Washington, D.C., for Appellant. Matthew W. Sawchak, Ellis & Winters, L.L.P., Raleigh, North Carolina; Randel E. Phillips, Gregory J. Murphy, Scott M. Tyler, Moore & Van Allen, Charlotte, North Carolina, for Appellant. Benjamin D. Pergament, Chadbourne & Parke, L.L.P., New York, New York; L. Neal Ellis, Jr., Hunton & Williams, Raleigh, North Carolina, for Appellees.

Before  WILLIAMS,  MICHAEL,  and  SHEDD,  Circuit Judges.

Vacated and remanded by unpublished PER CURIAM opinion.

**OPINION**

PER CURIAM.

 **\*\*1**  Metric Constructors, Inc. ("Metric") appeals from the district court's order granting summary judgment in favor of several banks (the "Banks") on Metric's claim for unjust enrichment.[1] We conclude that Metric produced substantial evidence to prove each of the four elements of a claim for unjust enrichment under North Carolina law. Accordingly, we reverse the judgment below and remand for further proceedings.

I.

Metric contracted with Carolina Energy, Limited Partnership ("CELP") to build a multi-million-dollar facility in North Carolina that would convert solid waste into fuel and recyclable materials. Two months after it executed this construction contract, CELP entered into a separate project financing agreement with the Banks. The Banks agreed to lend credit to support CELP's bond financing for the project; in return, CELP gave the Banks a first priority security interest in the project and all its tangible assets. The Banks were not parties to the construction contract, and Metric was not a party to the financing agreements.

The construction contract provided that CELP would make "progress payments" to Metric according to a milestone and payment schedule attached to the contract. Under the payment procedure detailed in the contract, each month Metric submitted to CELP an application for payment describing the milestones completed during the previous month. These applications showed the amount due for each completed milestone and certified that the work was completed in accordance with the terms of the construction contract. In addition, the contract required Metric to provide with each of its applications for payment a waiver and release of lien for itself and its subcontractors "to assure an effective release of liens for previous payments." According to the contract, CELP and an independent engineer had 15 days to review an application for payment and approve a progress payment. CELP then had 10 days to make payment to Metric.

CELP had few assets of its own, and it never paid Metric directly. Under its separate agreement with the Banks, CELP was authorized to submit an application to the Banks

for release of funds to pay various obligations, including obligations to Metric. The Banks would release requested funds only if seventeen specific funding conditions were satisfied. Among these **\*919** conditions were requirements that (1) CELP provide the Banks with unconditional lien waivers from Metric and its subcontractors showing full payment and (2) the Banks and their independent engineer believe that the project would be able to achieve the debt service coverage ratios set out in the financing agreement.[2]

Thus, each request by Metric for a progress payment was considered in two steps. First, CELP and the Banks' engineer reviewed Metric's application to verify that the performance milestones had been met in compliance with the construction contract. Second, the Banks reviewed CELP's request for release of funds to pay Metric to verify that payment was due and that the other funding conditions had been satisfied. If Metric's request for payment survived both sets of review, then the Banks would transfer funds to Metric directly. The Banks hired Roy F. Weston, Inc. ("Weston") as their engineer to monitor Metric's progress on the project.

 **\*\*2** Metric began construction in January 1996 and made applications for payment pursuant to the construction contract. For the first nine months of construction, the Banks processed Metric's payment requests (through CELP) without incident. By late September and early October, the Banks were developing significant concerns about the continued financial viability of the project. Weston was reporting to the Banks that the project was not meeting the required debt service coverage ratios, that CELP was agreeing to change orders that significantly raised the cost of the project, and that the relationship between Metric and CELP was deteriorating. In addition, a related project had recently gone into default. Despite these internal concerns (as well as a dispute concerning the lien waiver provided by Metric), Weston and the Banks approved Metric's October 1996 application for payment. It is undisputed that the Banks paid Metric in full for work performed through September 30, 1996—a total of more than $48 million.

In November 1996, Metric submitted to CELP and Weston an application for payment for October's work, totaling more than $6 million. This application, like Metric's October application, indicated several exceptions to the required lien waiver. Specifically, Metric claimed that it was entitled to at least an additional $1.75 million above the contract price (for change orders), and it claimed at least 88 days of delay as the result of various *force majeure* events. Weston visited the site

to verify the progress described in the payment application, and it approved the application without qualification. Despite Weston's certification, however, the Banks notified CELP on November 22, 1996 that they would not release the funds requested to pay Metric because the seventeen funding conditions had not been satisfied.

Metric was unaware of the Banks' position for weeks. Meanwhile, Metric submitted its pay application for November's work—more than $8.5 million—and Weston visited the site and approved the application. Weston made no mention to Metric about the Banks' concerns, even after Metric raised a question about the as-yet unpaid November application. Metric sent CELP a notice of default on December 10, 1996, alerting CELP that it had not received payment on the November application. Three days later, CELP notified Metric that the Banks had ceased funding **\*920** the project. On December 18, 1996, Metric told CELP that it was stopping work for nonpayment. Even after it stopped work, Metric maintained a presence on site through June 1997 to secure the partially-constructed facility while CELP and the Banks attempted to restructure the project's financing.

CELP and the Banks were unable to keep the project afloat. CELP was in default on its bond obligations, and the bond trustee drew on the Banks' letters of credit to repay bondholders. This transaction left the Banks with a loss of more than $30.4 million on the project. The Banks then foreclosed their collateral in the project and conducted a sale under Article 9 of North Carolina's version of the Uniform Commercial Code. This sale netted the Banks only about $2.6 million, so that the Banks' net loss on the project was approximately $27.8 million.

 **\*\*3** Metric sued the Banks to recover for the work it performed on the project without payment. The district court dismissed Metric's claims for tortious interference with contract and breach of contract, and it rejected Metric's remaining claims—conversion, unfair trade practice, breach of fiduciary duty, civil conspiracy, unjust enrichment, constructive trust, and equitable lien—on summary judgment. Metric appealed the summary judgment with respect to its claims for unfair trade practice, breach of fiduciary duty, and unjust enrichment. In that appeal, we affirmed the district court's summary judgment for the Banks on the claims for unfair trade practice and breach of fiduciary duty. *Metric Constr., Inc. v. Bank of Tokyo–Mitsubishi, Ltd.,* 230 F.3d 1353 (4th Cir.2000) (unpublished). We vacated the judgment on

Metric's unjust enrichment claim and remanded for further proceedings, holding that the district court improperly grafted onto the unjust enrichment cause of action a requirement that the Banks enjoyed a net gain from the project. *Id.* On remand, the district court again awarded summary judgment to the Banks on Metric's unjust enrichment claim. This appeal followed.

II.

We review the district court's summary judgment for the Banks *de novo,* taking the facts in the light most favorable to Metric. *See Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 132 (4th Cir.2002). This is a diversity case, and North Carolina law applies. We apply the law in accordance with the decisions of the North Carolina Supreme Court, or where the law is unclear, as the North Carolina Supreme Court likely would apply it. *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.,* 296 F.3d 308, 312 (4th Cir.2002). We shall not "surmise or suggest ... expansion" of North Carolina law. *Tritle v. Crown Airways, Inc.,* 928 F.2d 81, 84 (4th Cir.1990).

The law of unjust enrichment in North Carolina proceeds from the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Booe v. Shadrick,* 322 N.C. 567, 369 S.E.2d 554, 555–56 (1988) (internal quotations omitted). In order to prevail on a claim for unjust enrichment, a plaintiff must prove that (1) it conferred a benefit on the defendant, (2) the benefit was not conferred officiously or gratuitously, (3) the benefit is measurable, and (4) the defendant consciously accepted the benefit. *Id.* at 556. An unjust enrichment claim is available only in the absence of an express contract between the parties. *Id.*

A.

 **[1]**   North Carolina law requires that a plaintiff seeking recovery for unjust enrichment "must have conferred a benefit on the other party." *Id.* Metric produced **\*921** evidence showing that it continued working on the project from October 1996 through the middle of December 1996 and, arguably, through June 1997. Weston, the Banks' engineer, verified that Metric continued meeting construction milestones. This work increased the value of the project, in which the Banks held a first-priority security interest. Even

after Metric stopped working on the project, it spent its own resources to secure and maintain the project site and assets.

 **\*\*4**   Rather than challenging the assertion that Metric's work amounted to a benefit, the Banks contend that Metric conferred that benefit upon CELP, not the Banks. The Banks rely upon *Effler v. Pyles,* 94 N.C.App. 349, 380 S.E.2d 149 (1989), for the proposition that there can be no claim for unjust enrichment unless the plaintiff conferred a benefit *directly* on the defendant. The district court held that "any benefit that the Banks received was not sufficiently direct to satisfy Metric's burden" on this element.

The "direct benefit" rule applied by the district court derives from an intermediate appellate court's decision on facts readily distinguishable from this construction dispute. The plaintiff in *Effler* co-signed a note to help her daughter and son-in-law buy a house. The children promised to make all the monthly payments on the note, by selling other properties if necessary. The plaintiff's daughter died, and the son-in-law stopped making payments on the note. The plaintiff made the payments instead. When the son-in-law remarried, he transferred the titles to the house and another property to himself and his new wife. The couple then sold the second property but did not apply the proceeds to the plaintiff's note. The plaintiff sued the son-in-law's new wife for unjust enrichment. The Court of Appeals affirmed summary judgment for the new wife, noting that she had received title to the house from her husband, not the plaintiff. *Id.* at 152. "Although he has previously acquired his interest in this property with plaintiff's assistance, this does not satisfy plaintiff's burden of showing that she conferred a benefit directly on defendant." *Id.*

The Banks had a direct interest in the construction project. Indeed, the Banks held a first-priority security interest that was so important to them that they sent their own engineer to monitor Metric's progress and report on its work. The Banks did not receive a fully-matured benefit by grace, as the new wife in *Effler* received title to her house. Rather, the Banks paid Metric each month as it made progress on their construction project.

More important for this diversity case, the North Carolina Supreme Court has never held that a contractor may not obtain equitable relief from a lender with whom it had no contract. To the contrary, a contractor may be entitled to equitable relief where the contractor completed a project but the lender (with whom the contractor did not have a contract) refused to pay.

*Embree Constr. Group, Inc. v. Rafcor, Inc.,* 330 N.C. 487, 411 S.E.2d 916, 923 (N.C.1992). This decision suggests a broader approach to unjust enrichment than is indicated by *Effler's* "direct benefit" rule. Under North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction. Metric produced substantial evidence that it conferred a benefit on the Banks by improving their collateral, and it therefore satisfied the first element under *Booe.*

B.

**\*\*5** **[2]** Not only must a plaintiff demonstrate that it conferred a benefit on the **\*922** defendant, but it must also prove that the benefit was not conferred officiously or gratuitously. *Booe,* 369 S.E.2d at 556. In other words, the plaintiff must show that it rendered the services at issue with an expectation of compensation. *Britt v. Britt,* 320 N.C. 573, 359 S.E.2d 467, 470 (1987); *Jonson v. Sanders,* 260 N.C. 291, 132 S.E.2d 582, 584 (1963). The burden rests upon the plaintiff to "show circumstances from which it might be inferred that the services were rendered and received with the mutual understanding that they were to be paid for.... [S]uch an inference is permissible when a person knowingly accepts from another services of value, or ... under circumstances calculated to put a reasonable person on notice that the services are not gratuitous." *Lindley v. Frazier,* 231 N.C. 44, 55 S.E.2d 815, 816 (1949).[3]

Metric produced substantial evidence that its work on the project was not gratuitous. As the district court found, Metric worked on the project "in anticipation of payment" as the construction contract provided. Moreover, the Banks sent Weston to the site to monitor Metric's progress for nine months; Weston approved Metric's pay applications; and the Banks wired funds directly to Metric's account. This evidence, taken together, supports an inference that Metric and the Banks understood that Metric's services were to be paid for.[4] *See id.*

The Banks contend that Metric's performance was gratuitous because Metric was obliged to work on the project pursuant to the construction contract with CELP. According to the Banks, there can be no unjust enrichment where the benefit conferred upon the defendant resulted from services rendered by the plaintiff "in discharge of some obligation." *Atlantic Coast Line R.R. v. State Highway Comm'n,* 268 N.C. 92, 150 S.E.2d 70, 73 (1966). Similarly, the Banks invoke § 110 of the *Restatement of Restitution* for the proposition that "[a] person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." According to the Banks, the fact that Metric performed its contractual duties to CELP forecloses its claim in equity against the Banks.

This argument fails for at least two reasons. First, *Atlantic Coast Line* merely states that a plaintiff cannot recover for unjust enrichment where it rendered services out of a sense of moral obligation or some obligation imposed by law. 150 S.E.2d at 73. The plaintiff in *Atlantic Coast Line* conferred a benefit on the defendant, **\*923** but it did so pursuant to a court order (based on a state statute) and not with any expectation of compensation from the defendant. *Id.* There is no suggestion in this case that Metric kept working on the project out of any sense of moral obligation to the Banks, nor was there any statute or court order requiring Metric to do the work. Metric plainly anticipated that it would be compensated for its work.

**\*\*6** Second, this is not a case, as the Banks argue, where the contract between the plaintiff and a third party calls for the plaintiff to render services for the benefit of the defendant. *Cf. Restatement of Restitution* § 110. Section 110 describes the classic third-party beneficiary scenario in which *A's* contract with *B* requires *B* to provide services for *C.* In that situation —where *B* confers a benefit on *C* "as the performance" (and not merely as a result of its performance) of its contract with *A*—*A* cannot recover restitution from *C* simply on account of *A's* failure to pay *B* pursuant to the contract. Section 110 is inapposite to this case because the construction contract between Metric and CELP made no reference at all to the Banks. In other words, Metric's performance of its contract with CELP did not, by itself, necessitate any benefit to the Banks; that benefit accrued by virtue of the Banks' separate security agreement with CELP. The gravamen of Metric's unjust enrichment claim is that although the Banks were not parties to any contract with Metric, they nevertheless obtained a benefit from Metric's work on the project and that it would be unjust for the Banks to retain that benefit under the circumstances of this case.

The Banks seek to use the contract between Metric and CELP as both a sword and a shield. On one hand, they argue that Metric was required to comply with all the conditions of that contract in order to make a proper claim for payment; they even imply that Metric was required to comply with

conditions set out in their separate contract with CELP. On the other hand, the Banks contend that there can be no claim against them in equity because Metric had a contract with CELP.[5] Yet it is precisely because there is no express contract between Metric and the Banks that an action for unjust enrichment is available. *See Booe,* 369 S.E.2d at 556 ("If there is a contract between the parties the contract governs the claim and the law will not imply a contract.").

C.

**[3]**   Metric must also prove that the benefit conferred on the Banks is measurable. *Id.* We have already concluded that Metric has demonstrated, at least for summary judgment purposes, that it conferred a benefit on the Banks. We further conclude, with no argument from the Banks to the contrary, that the benefit conferred is measurable. The restitution to be made for unjust enrichment is measured according to the value of the benefit conferred on the defendant, not the plaintiff's loss. *Booe,* 369 S.E.2d at 556. In this case, the value of the benefit conferred on the Banks should be measured as the amount by which Metric's additional work from October through mid-December enhanced the value of the Banks' collateral. *See Britt,* 359 S.E.2d at 470.

D.

**[4]**   Finally, Metric must prove that the Banks consciously accepted the benefit conferred by Metric's work on the project. **\*924** *See Booe,* at 556. It is undisputed that the Banks were aware that Metric would be installing equipment and otherwise improving the project during October, November, and December 1996. It is also undisputed that the Banks sent Weston to the site each month to monitor Metric's progress. The Banks stayed well informed of Metric's activities at the site, and they consciously accepted every improvement Metric made to their collateral. *See Britt,* 359 S.E.2d at 470. Metric has satisfied this final element of a claim for unjust enrichment.

III.

**\*\*7**   In response to the Banks' motion for summary judgment, Metric forecast evidence sufficient to satisfy each of the elements of a claim for unjust enrichment under North Carolina law. Accordingly, we vacate the decision below and remand for proceedings consistent with this opinion.

*VACATED AND REMANDED.*

**All Citations**

72 Fed.Appx. 916, 2003 WL 21752892

Footnotes

1   The Banks are The Bank of Tokyo–Mitsubishi, Ltd., Barclays Bank PLC, Bayerische Vereinsbank Ag, Dai–Ichi–Kangyo Bank, Ltd., Mees Pierson NV, Credit Local De France, and Bank of Tokyo–Mitsubishi Trust Company.

2   The debt service coverage ratio was calculated by dividing the project's revenue available for debt service in a particular time period by the projected debt service for that period. The agreement between the Banks and CELP required a debt service coverage ratio of 1.3.

3   North Carolina law suggests a presumption that this inference arises whenever a benefit is conferred by one party and consciously accepted by another. *See Allen v. Seay,* 248 N.C. 321, 103 S.E.2d 332, 333 (1958) (noting the "general rule" that "the performance of valuable services for one who knowingly and voluntarily accepts the benefits thereof raises the implication of a promise to pay").

4   The evidence further demonstrates that the Banks induced Metric's continued work on the project. *See Wright v. Wright,* 305 N.C. 345, 289 S.E.2d 347, 351 (1982). Despite having serious concerns about the viability of the project, the Banks never communicated to Metric their concerns and never told Metric they intended to stop funding the project. Indeed, Weston continued approving pay applications as late as December 1996 without so much as hinting to Metric that the Banks had concerns about the project.
    The inference of mutual expectation of compensation does not arise with respect to work performed after Metric became aware of the Banks' refusal to pay. Thus, Metric's work after December 13, 1996—the date on which CELP gave Metric notice that the Banks were no longer funding the project—was gratuitous and cannot be the basis for any recovery here.

5    The Banks also argue that their contract with CELP, which expressly disclaimed liability to third parties, somehow shields the Banks from liability to Metric. Of course, Metric was not a party to that contract, and it is immaterial to the outcome of this unjust enrichment case.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 52

2004 DNH 013

2004 WL 57084

United States District Court, D. New Hampshire.

Linda E. MOORE and Wallace Moore, Plaintiffs
v.
MEDEVA PHARMACEUTICALS, INC., a/
k/a Celltech Pharmaceuticals, Inc., and
Celltech Pharmaceuticals Ltd., Defendants

No. Civ. 01–311–M.
|
Jan. 13, 2004.

**Attorneys and Law Firms**

John H. O'Neil, Jr., Smith, Elliott, Smith & Garmey, Saco, ME, for Plaintiffs.

Jennifer Humphreys, Pierce & Atwood, Portland, ME, Daniel P. Gibson, Gibson & Behman PC, Burlington, MA, David M. Cohen, Peter C. Neger, Bingham McCutchen LLP, New York, NY, Kevin H. O'Neill, Gibson & Behman PC, Manchester, NH, for Defendants.

*ORDER*

MCAULIFFE, J.

**\*1** Linda Moore says that in October of 1998, after receiving a flu vaccine allegedly manufactured, distributed, and/or sold by defendants (and their predecessors), she contracted a "paralytic ailment known as Guillain–Barre Syndrome and other consequential and incidental ailments." Amended complaint (document no. 28), para. 8. Defendant Celltech Pharmaceuticals, Inc. ("CPI") moves for summary judgment, claiming it did not manufacture, distribute, or sell the vaccine in question. Nor, says CPI, did it develop or supply the package information or other warnings included with the vaccine. Plaintiffs object, asserting that there are genuinely disputed material facts with regard to CPI's involvement in the vaccine's chain of distribution.

*Standard of Review*

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all

reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center,* 103 F.3d 196, 199–200 (1st Cir.1996) (citations omitted).

*Discussion*

I. *Background.*

Complicating the resolution of CPI's pending motion for summary judgment is the fact that the relationships between the entities responsible for manufacturing, distributing, and selling the vaccine is, to say the least, complex. In a prior memorandum, CPI described some of the relevant relationships as follows:

> The influenza flu vaccine (the "Vaccine") referenced [in plaintiffs'] interrogatories for the year 1998 was manufactured in the United Kingdom by Medeva Pharma Limited, a corporation organized under the laws of the United Kingdom. Medeva Pharma Limited was formerly known as Evans Medical Limited. The name change to Medeva Pharma Limited occurred on July 6, 1998. Medeva Pharma Limited merged into Celltech Pharmaceuticals, Ltd. on April 2, 2001. Medeva Pharma Limited has since sold the assets related to the manufacture of the Vaccine to Evans Vaccines Ltd. in October, 2000. Evans Vaccines Ltd. is an unrelated company to Medeva Pharma Limited and [CPI].

CPI's Answers to Plaintiffs' Interrogatories, Exhibit 2 to CPI's memorandum in support of its motion in limine (document no. 36). *See also* CPI's memorandum at 9 n. 3 ("Medeva

Pharma Limited [formerly known as Evans Medical Limited] merged into Celltech Pharmaceuticals, Ltd. on April 2, 2001. On September 9, 2002, this Court granted Plaintiffs' Motion to Amend their Complaint to add Celltech Pharmaceuticals, Ltd. as a defendant in this case. As such, Evans is now essentially a defendant in this case.").

**\*2**  Based upon CPI's statement of the relationships between the various parties, it would appear that defendant Celltech Pharmaceuticals, Ltd. ("Celltech") is the successor-in-interest to the entity that manufactured the vaccine in question. In fact, in its answer to plaintiffs' amended complaint, Celltech admitted that "prior to October 2, 1998, it manufactured Fluvirin Lot No. E20228KA"—the vaccine at issue in this case. Celltech's Answer (document no. 55) at para. 6. And, in response to plaintiffs' requests for admissions, Celltech admitted that:

> it manufactured the influenza vaccine, Fluvirin, used during the 1998–1999 vaccine season and was responsible for its sale, including the development and provision of package labeling and other warnings approved by the Food and Drug Administration and/or other governmental entities. During the 1998–99 influenza vaccine season, Celltech Pharmaceuticals, Ltd. shipped packages of Fluvirin, including its approved package labeling directly to, and only to, General Injectables and Vaccines, Inc. ("GIV"), a Virginia corporation. The vaccine was then distributed by GIV. Defendant, Celltech Pharmaceuticals, Ltd. has no knowledge of GIV's distribution methods.

Exhibit 3 to CPI's memorandum (document no. 68), Celltech's Response to Plaintiffs' Request for Admissions at 1–2.

Notwithstanding Celltech's admitted (and, at least according to it and CPI, its exclusive) role in manufacturing the vaccine at issue in this case, preparing and shipping the package inserts approved by the FDA, and contracting for the vaccine's distribution in the United States through General Injectables and Vaccines, Inc., plaintiffs assert that CPI might still

be liable to them, based upon the following three factors. First, plaintiffs point out that CPI's "Medical Information department ... fielded questions from the medical community and its patients regarding medical questions concerning the flu vaccine generally, and Fluvirin, specifically." Exhibit 1 to plaintiffs' memorandum, CPI's Amended Answer to Plaintiffs' Interrogatory No. 10 at 2. Second, CPI was listed in the Physicians' Desk Reference as an American affiliate of the vaccine's foreign manufacturer. Exhibit 2 to plaintiffs' memorandum, 1999 Physicians' Desk Reference at 3456. And, finally, CPI was registered with the Food and Drug Administration as the United States agent for the vaccine's foreign manufacturer. *See* Plaintiffs' memorandum at 5. *See also* 21 C.F.R. § 207.40(c) (each foreign drug manufacturer required to register with the FDA must provide the name and address of its United States agent). [1]

## II. *Plaintiffs' Claims Against CPI.*

Plaintiffs' complaint advances three substantive claims against CPI, as well as three derivative claims by Mr. Moore for loss of consortium. Unfortunately, in opposing CPI's motion for summary judgment, plaintiffs do not describe how the three factors listed above, even if proved at trial, might possibly give rise to liability on the part of CPI—an entity that did not manufacture, distribute, promote, sell, administer, or provide the package warnings or inserts with regard to the vaccine at issue in this case . [2]

**\*3**  In count one of their amended complaint, plaintiffs allege that CPI was negligent insofar as it failed to warn Mrs. Moore of the risks associated with taking the vaccine and that it was "otherwise negligent in manufacturing, selling, and administering the Vaccine to Plaintiff Linda Moore." Amended complaint at para. 14. First, since plaintiffs have failed to point to any evidence that might suggest CPI had a role in "manufacturing, selling, [or] administering" the vaccine, their negligence claim, to the extent it is based upon such conduct, necessarily fails.

Beyond that shortcoming in their amended complaint, plaintiffs have failed to articulate precisely how (or why) CPI had a duty, independent of those borne by the manufacturer and distributor, to warn Mrs. Moore of the potential risks associated with the vaccine. CPI's role as United States agent for the vaccine's manufacturer obligated it only to act as an intermediary between the manufacturer and the FDA; the regulations upon which plaintiffs rely do not purport to impose any obligations on a United States agent of

a foreign drug manufacturer. And, plaintiffs have failed to point to any case law (binding or persuasive) supporting their assertion that, as a result of its status as the United States agent for the manufacturer (or because it fielded questions about the vaccine, or because of its status as an "affiliate" of the vaccine's manufacturer), CPI assumed the obligation to warn potential recipients of the vaccine of the risks associated with its use. Consequently, in light of the undisputed facts of record, CPI is entitled to judgment as a matter of law with regard to count one (negligence) of plaintiffs' amended complaint.

In count three of their amended complaint, plaintiffs allege that the vaccine was defective and unreasonably dangerous. Amended complaint, para. 22. Accordingly, they say CPI is strictly liable to them for damages. As noted above, however, the undisputed material facts demonstrate that CPI did not manufacture, sell, distribute, or administer the vaccine in question. And, plaintiffs have failed to articulate how CPI's status as the manufacturer's United States agent, or its listing in the Physicians' Desk Reference as an "affiliate" of the manufacturer, might give rise to strict liability for an (allegedly) unreasonably dangerous product. Nor have plaintiffs cited any judicial opinions that are supportive of their strict liability claim against CPI. CPI is, therefore, entitled to summary judgment as to count three of plaintiffs' complaint.

Count five of plaintiffs' amended complaint alleges that CPI "warranted to Plaintiff Linda Moore that the Vaccine would be free from defects and free from unreasonably dangerous or unsafe qualities," but that CPI breached that warranty. Amended complaint at para. 28–29. Again, however, plaintiffs' objection to CPI's motion for summary judgment provides little insight into the precise nature of their claims. Plaintiffs do not, for example, identify whether the "warranties" referenced in count five were express or implied. Nor do they identify any case law supportive of their theory of the case.

*4 In their pre-trial memorandum, plaintiffs do say that their claims are governed by "New Hampshire products liability law and the New Hampshire Uniform Commercial Code." Plaintiffs' Pretrial Memorandum (document no. 29) at 6. Importantly, however, New Hampshire's Uniform Commercial Code imposes warranties (both express and implied) only upon manufacturers, sellers, and suppliers of goods. *See* N.H.Rev.Stat. Ann. ("RSA") 382–A:2–318. *See also* RSA 382–A:2–313, 2–314, and 2–315. Since plaintiffs have failed to point to any evidence suggesting that CPI manufactured, sold, or supplied the vaccine in question, and because plaintiffs have not identified any other legal theory under which CPI might be liable to them for breach of warranty, CPI is entitled to judgment as a matter of law as to plaintiffs' breach of warranty claim.

Finally, since CPI is entitled to summary judgment on all of Mrs. Moore's claims against it, it is also entitled to summary judgment on all of the derivative claims for loss of consortium advanced by Mr. Moore (counts two, four, and six).

## Conclusion

For the foregoing reasons, plaintiffs have failed to demonstrate that there are any genuinely disputed material facts. Given the undisputed material facts, Defendant CPI is entitled to judgment as a matter of law. Accordingly, Celltech Pharmaceuticals, Inc.'s motion for summary judgment (document no. 68) is hereby granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 57084, 2004 DNH 013

## Footnotes

1    Section 207.40(c) of Title 21 of the Code of Federal Regulations provides, in pertinent, part:
      Each foreign drug establishment required to register under paragraph (a) of this section shall submit the name, address, and phone number of its United States agent as part of its initial and updated registration information in accordance with subpart C of this part. Each foreign drug establishment shall designate only one United States agent.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                3

**Moore v. Medeva Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2004)**

2004 DNH 013

(1) The United States agent shall reside or maintain a place of business in the United States.

(2) Upon request from the FDA, the United States agent shall assist FDA in communications with the foreign drug establishment, respond to questions concerning the foreign drug establishment's products that are imported or offered for import into the United States, and assist FDA in scheduling inspections of the foreign drug establishment. If the agency is unable to contact the foreign drug establishment directly or expeditiously, FDA may provide information or documents to the United States agent, and such an action shall be considered to be equivalent to providing the same information or documents to the foreign drug establishment.

2    While it appears that CPI *did* distribute an influenza vaccine during the 1996–1997 flu season, that was the only year during which it did so; CPI did *not* distribute a vaccine during the 1998–1999 flu season and, perhaps more importantly, it did not distribute the particular vaccine at issue in this case: Fluvirin, Lot No. E20228KA.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    4

Tab 53

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 554 of 751
Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....
PageID: 11920

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Toca v. Tutco, LLC, S.D.Fla., March 4, 2020

2018 WL 3109632
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

OHIO STATE TROOPERS
ASSOCIATION, INC., et al., Plaintiffs,
v.
POINT BLANK ENTERPRISES, INC., Defendant.

Case No. 0:17-cv-62051-UU
|
Signed 04/05/2018

**Attorneys and Law Firms**

Allan Kanner, Cynthia St. Amant, Kanner & Whiteley, LLC, New Orleans, LA, David M. Cohen, Complex Law Group, LLC, Marietta, GA, Herschel M. Sigall, Ohio State Troopers Association, Inc., Gahanna, OH, Michael Wayne Moskowitz, Ari Jonathan Glazer, Moskowitz Mandell Salim & Simowitz, Fort Lauderdale, FL, for Plaintiffs.

Brian Michael Ercole, Melissa Marie Coates, Clay Matthew Carlton, Morgan, Lewis, Bockius LLP, Miami, FL, Elisa P. McEnroe, Troy S. Brown, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Leonard Keith Samuels, Berger Singerman LLP, Fort Lauderdale, FL, for Defendant.

## ORDER ON MOTIONS TO DISMISS

URSULA UNGARO, UNITED STATES DISTRICT JUDGE

**\*1** THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("The Motion") (D.E. 30).

THE COURT has considered the Motion and the pertinent portions of the record and is otherwise fully advised in the premises. For reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following allegations are taken from the Plaintiffs' Complaint. D.E. 1.

Defendant Point Blank Enterprises, Inc. is one of the world's largest manufacturers of law enforcement and military protective products, including bullet resistant vests. D.E. 1 ¶ 1. Defendant sells its bullet resistant vests nationally and internationally to police officers and others through various channels, including, but not limited to, authorized distributors and representatives. *Id.* Defendant manufactures these products through wholly-owned subsidiaries and/or brand names, including, Point Blank Body Armor, Inc. ("PBBA"), Protective Apparel Corporation of America ("PACA") and others. *Id.* At all times relevant to the instant matter, Defendant controlled all aspects of the design, manufacture, marketing, distribution, and labeling of the "PBBA" and "PACA" model bullet resistant vests which contain what Defendant "touts in its marketing materials as a proprietary and exclusive 'Self-Suspending Ballistic System' ("SSBS") feature". *Id.* ¶ 41. The Plaintiffs and class members purchased bullet resistant vests containing the SSBS feature (the "SSBS Vests") either directly from Defendant or from one of Defendant's authorized representative distributors. Defendant's authorized representative distributors were not intended to be the ultimate consumers of the SSBS Vests. *Id.* ¶ 55. Rather, the Individual Plaintiffs and class members were the intended third-party beneficiaries of the alleged warranties associated with the SSBS Vests. *Id.* ¶ 56. The warranties associated with the SSBS Vests were designed for and intended to benefit the ultimate consumers. *Id.*

Bullet resistant vests typically contain two primary components: (1) the ballistic panel system; and (2) the carrier or outer shell in which the ballistic panel is placed. *Id.* ¶ 13. Traditionally, attachments or a "suspension system" are not integrated directly into the ballistic panel system. *Id.* ¶ 14. Instead, any straps or suspension system are incorporated into the carrier or outer shell. *Id.* However, in the SSBS Vests, the "suspension system" is directly incorporated into the ballistic panel system. *Id.* ¶ 18. The SSBS Vests' ballistic panel system "contains shoulder straps that connect to Velcro or similar material sewn directly into the ballistics panel." *Id.* The carrier or outer shell then covers the ballistic panel system. *Id.* According to Plaintiffs, SSBS Vests are not like typical bullet resistant vests because the carrier does not have its own shoulder straps or other suspension system to hold them in place when worn. *Id.*

Plaintiffs allege that the SSBS Vests are defective. *Id.* ¶ 2. According to Plaintiffs, the design of the SSBS Vests causes them "to fall apart in the field when movement causes the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 555 of 751
PageID: 11921

Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

SSBS to fail such that the ballistic panels separate from the shoulder straps." *Id.* ¶ 22. When that happens, the ballistic panel sinks down inside the user's uniform. *Id.* The user then needs to find some way to hold the vest in place other than the failed SSBS. *Id.* According to Plaintiffs, law enforcement officers have turned to various methods such as duct tape, electrical tape, and safety pins, to address the failure of their SSBS Vests. *Id.* Plaintiffs allege that the SSBS Vests contain this defect from the time the SSBS Vests leave the manufacturing line. *Id.* ¶ 27.

**\*2** Plaintiffs allege that Defendant supplies a five-year written warranty covering the SSBS Vests' ballistic panel system and a separate two-year written warranty for the carriers. *Id.* ¶ 16. In its Care and Maintenance Manual (the "Manual"), which is shipped with the SSBS Vests after sale, "Defendant expressly warrants any component of the ballistic panel system of SSBS Vests for a five-year period: 'During the warranty period, any soft ballistic component having a manufacturing or material defect, as determined through inspection by an authorized Point Blank representative, will be repaired or replaced at no cost to the customer.' " *Id.* ¶ 46. Plaintiffs aver that the SSBS is a component of the soft ballistic panel system of the SSBS Vest. *Id.* Another express warranty in the Manual provides that Defendant warrants the ballistic panels for a period of five years against manufacturing defects. *Id.* ¶ 48. Additionally, Defendant provides an express warranty on the face of the ballistic panels by having the words "Warranty Period: 5 years" directly integrated/sewn into the panel. *Id.* ¶ 50. Plaintiffs further allege that Defendant made additional express representations and warranties regarding the SSBS Vests through "its website advertisements, the descriptions in State Pricing Lists and State Contracts throughout Florida and the country, and [Defendant]'s other sales and marketing materials that were part of the basis of the bargain." *Id.* ¶ 51. In all of these materials, Defendant "consistently represented that the SSBS is a Self Suspending Ballistic System, not an outer carrier system, warranted by Defendant for not only the five-year period for 'components' of the 'ballistic system' but also warranted to 'keep[ ] the ballistic panels completely suspended ... throughout the life of the vest,' " which Plaintiffs assert is at minimum the five-year warranty. *Id.* Plaintiffs allege that Defendant has breached express and implied warranties in that, among other things, the SSBS Vests do not pass without objection in the trade, are unsuitable for the ordinary and intended uses for which they were sold, and are not merchantable. *Id.* ¶ 57. As a result of Defendant's breach of its contract and warranties, Plaintiffs

allege that they have been damaged in the amount of the purchase price of their SSBS Vests. *Id.* ¶ 58. Plaintiffs further allege that Defendant's warranties and purported remedy of "repair" fail of their essential purpose and are unconscionable because: "(i) the defects in the SSBS Vests are latent and not discoverable on reasonable inspection; (ii) Defendant was aware of the problems with the vests; (iii) there is no indication that Defendant can repair the latent defects; and (iv) Defendant's repeated efforts to stop the SSBS failures have been unsuccessful." *Id.* ¶ 33. As such, Plaintiffs assert that "[a]ny remedy short of replacing the SSBS Vests with a non-SSBS Vest is inadequate." *Id.* ¶ 32.

The Plaintiffs to the instant matter are Ohio State Troopers Association, Inc. ("OSTA"), International Union of Police Associations ("IUPA"), Trevor Koontz, Steven Eric Rohner, and Ryan Purpura. OSTA is a membership organization whose members are Ohio State Highway Patrol Troopers ("Troopers") and others. *Id.* ¶ 3. OSTA exists to protect and advance the interests of its membership and is the sole and exclusive bargaining agent for approximately 1,500 Troopers. *Id.* OSTA's obligations to its members' safety is directly invoked by the instant matter because, "among other reasons, there is a mandatory 'wear policy' for all Troopers" which requires them to wear bullet resistant vests at all times. *Id.*

The IUPA is a union chartered exclusively for law enforcement and law enforcement support personnel. *Id.* ¶ 4. Among other things, the IUPA "represent[s] the needs of law enforcement officers and support personnel, whether that be for safe and better equipment, more staff or a fair wage." *Id.* The IUPA has "incurred time and expense in connection with the unacceptable safety risks the defective SSBS Vests have subjected its members to, including many of its members in Florida that have SSBS Vests." *Id.* Both the OSTA and IUPA are Plaintiffs solely for purposes of the injunctive relief sought in Count IV of the Complaint as explained *infra.*

Plaintiff Trevor Koontz has served as a Trooper for the past five years. *Id.* ¶ 5. Koontz purchased a new SSBS Vest through one of Defendant's sales representatives and an authorized distributor. *Id.* In December 2012, Koontz's SSBS Vest was manufactured at Defendant's facility in Florida then shipped by Defendant directly to Koontz. Koontz' SSBS Vest "is defective (including in design), has fallen apart (including in the field while Trooper Koontz was on foot patrol at the Republican National Convention in Cleveland in 2016) and poses a life-threatening safety issue." *Id.* Between July and November 2016, Koontz notified and corresponded directly

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 556 of 751
Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....
PageID: 11922

with Defendant numerous times regarding these defects at Defendant's corporate headquarters in Florida. *Id.* Koontz requested that Defendant honor its warranties and replace his SSBS Vest. Defendant refused to properly address and honor its warranties and replace the defective SSBS Vest with a properly functioning SSBS Vest. *Id.* "Rather, Defendant sent Trooper Koontz a new set of shoulder straps and carrier" which "did not and cannot correct the defects ... Koontz was forced to use duct tape while on duty to prevent his SSBS Vest from falling off because of the SSBS failure." *Id.*

Plaintiff Steven Eric Rohner has served as a Trooper for sixteen years. *Id.* ¶ 6. Rohner purchased an SSBS Vest from one of Defendant's sales representative and an authorized distributor. *Id.* His SSBS Vest was manufactured at Defendant's facility in Florida in May 2015 and shipped by Defendant directly to Rohner. Rohner's SSBS Vest "is defective (including in design), has fallen apart (including while on duty in the field) and poses a life-threatening safety issue." *Id.* Rohner, through counsel, notified and corresponded with Defendant and its counsel regarding the breaches of warranties, defects, and failures in the field of his SSBS Vest in writing, by telephone, and at an in-person meeting in Florida on April 26, 2017. *Id.* Rohner notified Defendant "that he and other Troopers were experiencing the failures as early as within the first year, and that new replacement shoulder straps do not fix the problem." *Id.* Through counsel, Rohner also informed Defendant "that when the failure occurs in the field he needs to remove his uniform and vest and attempt to reattach the SSBS connections in the field." *Id.* As a result, Rohner "was forced to use electrical tape while on duty to prevent the vest from falling off because of the SSBS failure." *Id.* Rohner further informed Defendant that it is mandatory for him and all other Troopers to wear their bullet resistant vests. *Id.*

**\*3** Plaintiff Ryan Purpura is a Sergeant in the Ohio Highway Patrol where he has served for the past twelve years. *Id.* ¶ 7. Purpura purchased an SSBS Vest through one of Defendant's sales representatives and an authorized distributor. *Id.* The vest was manufactured at Defendant's facility in Florida in March 2015 and was shipped by Defendant directly to Purpura. *Id.* Purpura's SSBS Vest "is defective (including in design), has failed and poses a life-threatening safety issue." *Id.* Through his counsel, Purpura notified and corresponded with Defendant's representatives and its counsel "in writing, by telephone numerous times, and at an in-person meeting in Florida on April 26, 2017 about the breaches of warranties and defects in his SSBS Vest and that new replacement shoulder

straps do not fix the problem." *Id.* Furthermore, Defendant was provided a draft copy of the instant Complaint (D.E. 1) on March 30, 2017. *Id.*

Based on these underlying allegations, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and a nationwide class of all persons who "purchased new SSBS Vests from Defendant or Defendant's authorized distributors or sales representatives, and who continue to purchase such vests up to the date a class is certified by this Court" (the "Class"). *Id.* ¶ 63. Plaintiffs bring the following five claims against Defendant on their behalf and on behalf of the Class: Breach of Warranty in Warrant Statements (Count I), Breach of Implied Warranty of Merchantability (Count II), Breach of Implied Warranty of Fitness of a Particular Purpose (Count III), Injunctive Relief (Count IV), and Deceptive and Unfair Trade Practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count V). Defendant filed the instant Motion to Dismiss on December 5, 2017 (D.E. 30). For the reasons outlined below, the Motion is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While the Court must consider the allegations contained in the plaintiff's complaint as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim has facial plausibility when the plaintiff pleads

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 557 of 751
PageID: 11923
Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw upon its judicial experience and common sense. *Id. at 679, 129 S.Ct. 1937.*

## ANALYSIS

### I. Applicable Law

Given that the Court has diversity jurisdiction over the instant matter, the Defendant contends that the Court should determine whether Florida or Ohio law applies to Plaintiffs' claims before evaluating whether the Complaint states a valid cause of action. Defendant is a corporation organized under the laws of the state of Florida where it maintains its principal office and manufacturing facility. Plaintiffs Trevor Koontz, Ryan Purpura, and Steven Rohner (the "Individual Plaintiffs") are residents of the state of Ohio. Defendant asserts that because the Individual Plaintiffs purchased their SSBS Vests and were injured in Ohio, the Court should apply Ohio law. [1] In their Response, Plaintiffs argue that the choice of law issue is premature at this stage of the litigation, and that the Court should defer ruling on this matter until the class certification hearing. D.E. 36 ¶ III.A. Plaintiffs further argue that the Court need not make the choice of law determination at this juncture because no conflict of law exists between Ohio and Florida law as applied to Plaintiffs' claims.

**\*4** A federal court sitting in diversity applies the conflict of law rules of the forum state. *Gevaerts v. TD Bank, NA,* 56 F.Supp.3d 1335, 1339 (S.D. Fla. 2014) (internal citation omitted). Before beginning a conflict of law analysis, however, a court should determine whether a conflict of laws truly exists. *Id.* (internal citation omitted). No conflict of laws exists when the asserted conflict is a false conflict. *Id.* (internal citation omitted). A false conflict arises when: (i) the laws of the different sovereigns are the same; (ii) the laws of the different sovereigns are different but produce the same outcome under the facts of the case; or (iii) when the policies of one sovereign would be furthered by the application of its

laws while the policy of the other sovereign would not be advanced by the application of its laws. *Id.* (internal citation omitted). Plaintiffs bring the following five claims against Defendant: Breach of Warranty in Warrant Statements (Count I), Breach of Implied Warranty of Merchantability (Count II), Breach of Implied Warranty of Fitness of a Particular Purpose (Count III), "Injunctive Relief" (Count IV), and Deceptive and Unfair Trade Practices (Count V). With respect to Counts I through III, the Court finds that the asserted conflict of law in the instant matter is a false conflict. The Court's decision on this matter is grounded in the Court's conclusion that Florida and Ohio law as applied to Plaintiffs' first four claims is the same. Alternatively, even if the laws for these claims differ between Florida and Ohio, the Court finds that the facts alleged in the Complaint, applied to the law of both jurisdictions under the motion to dismiss standard, would still result in the same outcome for the reasons more fully set forth below. Accordingly, the Court will apply Florida law to Counts I through III at this juncture.

As for Counts IV[2] and V of the Complaint, Defendant asserts that Plaintiffs cannot bring claims under the FDUTPA because they did not purchase their SSBS Vests in Florida nor do they live in Florida. Florida courts are split on whether the FDUTPA extends to out-of-state consumers, and the Florida Supreme Court has not addressed the issue. *Melton v. Century Arms, Inc.,* 243 F.Supp.3d 1290, 1305 (S.D. Fla. 2017).* Some Florida case law holds that the FDUTPA should only be applied to in-state consumers. *Id. citing Hutson v. Rexall Sundown, Inc.,* 837 So.2d 1090, 1093–94 (Fla. Dist. Ct. App. 2003) (affirming refusal to certify nationwide class in FDUTPA suit against manufacturer of calcium supplements where injury occurred at points of sale outside of Florida); *OCE Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.,* 760 So.2d 1037, 1042 (Fla. Dist. Ct. App. 2000) (reversing order certifying nationwide class under FDUTPA because "only in-state consumers can pursue a valid claim"). However, other Florida courts have permitted claims by out-of-state consumers. *See Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen.,* 761 So.2d 1256, 1262 (Fla. Dist. Ct. App. 2000) (FDUTPA claim could be based on communications to out-of-state consumers "where the allegations in this case reflect that the offending conduct occurred entirely within this state."); *Renaissance Cruises, Inc. v. Glassman,* 738 So.2d 436, 439 (Fla. Dis. Ct. App. 1999) (affirming certification of nationwide class in FDUTPA suit related to port charges for cruises where defendant's

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 558 of 751
PageID: 11924

Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

operations were controlled and carried out from Florida and any overages were kept by defendant in Florida). "Most federal courts in the Southern District of Florida that have considered the issue have followed *Millennium." Melton, 243 F.Supp.3d at 1305* (citing *Bank of Am., N.A. v. Zaskey,* No. 9:15-cv-81320, 2016 WL 2897410, at \*9 (S.D. Fla. May 18, 2016) ). *But see Stein v. Marquis Yachts, LLC,* No. 14-24756-CIV, 2015 WL 1288146, at \*6, 2015 U.S. Dist. LEXIS 35088 (S.D. Fla. Mar. 20, 2015) (FDUTPA claims dismissed where plaintiff purchased goods in Canada and there were no allegations about any pre-sale representations made in Florida. Here, Plaintiffs' injuries occurred where the SSBS Vests were purchased—outside of Florida. However, Plaintiffs have alleged many facts connecting Florida to Defendant's alleged misconduct giving rise to the claim. The Complaint states that Defendant designed, manufactured, marketed, distributed, and labeled the SSBS Vests from its headquarters in Florida. D.E. 1 ¶ 40. Accordingly, there are sufficient connections with Florida which could justify application of the FDUPTA to the instant matter. Therefore, the court will not dismiss Plaintiff's FDUPTA claim based on Defendant's choice of law argument. However, the Court will readdress the issue after further fact development at class certification. *Melton,* 243 F.Supp.3d at 1305-06 (*citing* *Cohen v. Implant Innovations, Inc.,* 259 F.R.D. 617, 626–27 (S.D. Fla. 2008) ).

## II. Breach of Express Warranty (Count I)

**\*5** Defendant argues that Plaintiff's breach of express warranty claim should be dismissed because no Individual Plaintiff "alleges that he complied with the warranty obligations by sending his SSBS [V]est to [Defendant] for inspection and repair or replacement." D.E. 30 at \*16 (internal emphasis and citations omitted). Defendant further states that Plaintiffs failed to allege that Defendant "refused to repair any problems with the SSBS Vests or replace the vests, if Defendant could not repair them." *Id.* at 17. In response, Plaintiffs state that the warranty at issue does not require them to send their SSBS Vests to Defendant for inspection. D.E. 36 at \*14. While the Complaint contains a number of allegations regarding the SSBS Vests' warranty, Plaintiffs did not attach a copy of the warranty to the Complaint. While Defendant attached a copy of the warranty to the instant Motion to Dismiss (D.E. 30-1), Plaintiffs assert in their Response that the warranty provided by Defendant is not the warranty they received at the time of purchase. D.E. 36 at \*12-13.[3] "The Court may consider materials that are

incorporated by reference to a complaint without converting a motion to dismiss to a motion for summary judgment if the document is (1) central to plaintiff's claim and (2) undisputed." *Richard Thorpe & Darrel Weisheit v. Walter Investment Management,* Corp., 111 F.Supp.3d 1336, 1352 (S.D. Fla. 2015). *See also, Harris v. Ivax Corp.,* 182 F.3d 799, n.2 (11th Cir. 1999) ("[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute.") (*citing e.g., Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997) ). In the instant matter, the warranty attached to Defendant's Motion to Dismiss is in dispute. As such, the Court cannot consider the warranty provided by Defendant at this juncture. Additionally, while Plaintiffs attached one of the warranties to their Response, Plaintiffs cannot amend their Complaint through an attachment to their Response as the Court may only examine the four corners of the Complaint in deciding a motion to dismiss. *See Raber v. Osprey Alaska, Inc.,* 187 F.R.F. 675, 677 (M.D. Fla. 1999); *Rickman v. Precisionaire, Inc.,* 902 F.Supp. 232, 233 (M.D. Fla. 1995). Accordingly, because the Court must consider the allegations contained in the Plaintiffs' Complaint as true at the motion to dismiss stage, the Court views the terms of the warranty as pled in the Complaint as true. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Given that Plaintiffs do not allege that the SSBS Vests' warranty required them to send the vests to Defendant for inspection and repair or replacement, Defendant's argument that Plaintiffs breached their warranty obligation necessarily fails at this stage of the litigation.

Defendant further argues that "Plaintiffs complain about a 'design' defect, but a 'design' defect is not covered by the warranty, and the warranty makes clear that all other warranties are disclaimed." D.E. 30 at \*17. Defendant's argument regarding the contents of the warranty fails for the same reason discussed *supra* as Plaintiffs did not allege that the warranty disclaimed design defects. Moreover, while Plaintiffs do allege a defect in the SSBS Vests' design, their breach of warranty claim is also based on their allegation that the SSBS Vests contain manufacturing and material defects. D.E. 1 ¶ 2; D.E. 36 at \*17. Accordingly, Defendants inaccurately "narrow" Plaintiffs' breach of warranty claim "to that of a design defect only theory." *Sanchez-Knutson v. Ford Motor Co.,* 52 F.Supp.3d 1223, 1231-32 (S.D. Fla. 2014) (denying motion to dismiss).

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 559 of 751
Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....
PageID: 11925

Finally, Defendant asserts that Plaintiffs Trevor Koontz and Steven Rohner "concede that they have taken steps to void the Warranty for SSBS [V]ests" because the warranty provides that it is "void ... [if] [a]ny garment, shield, plate or helmet [is] altered or modified in any way other than [Defendant]/ authorized factory alternations." D.E. 30 at *18 (internal quotation omitted). Plaintiff does not allege in the Complaint that the warranty provides that any unauthorized alteration of the SSBS Vests voids such warranty. Accordingly, as discussed *supra*, at this juncture, the Court must accept Plaintiff's allegations regarding the warranty as true and therefore, cannot conclude that avoiding alteration "is a condition precedent for their warranty claim." D.E. 41 at *6. Moreover, Plaintiffs point out correctly that Defendant's argument is an affirmative defense which is not properly raised on a motion to dismiss. D.E. 36 at *17-18. A plaintiff is "not required to negate an affirmative defense in [its] complaint." *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Tregenza v. Great American Commc'ns Co.,* 12 F.3d 717, 718 (7th Cir. 1993) ). Thus, "[g]enerally, the existence of an affirmative defense will not support a motion to dismiss." *Quiller v. Barclays American/Credit, Inc.,* 727 F.2d 1067, 1069 (11th Cir. 1984), *en banc reh'g,* 764 F.2d 1400 (11th Cir. 1985) (per curiam) (reinstating panel opinion). While a complaint may be dismissed "when the existence of an affirmative defense 'clearly appears on the face of the complaint' ", that is not the case in the instant matter given the parties' disagreements regarding the warranty. *Id.; see also Bingham v. Thomas,* 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) ("A complaint may be dismissed if an affirmative defense ... appears on the face of the complaint.") (*citing Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ). Plaintiff's motion to dismiss Count I of the Complaint is, therefore, denied.

### III. Breach of Implied Warranty of Merchantability (Counts II)

**\*6** Defendant alleges that Plaintiffs' claim for breach of implied warranty of merchantability fails because: (1) it is "excluded by a conspicuous disclaimer in the warranty; and (2) Plaintiffs have failed to sufficiently allege privity of contract." D.E. 41 at *7. Given that the substance of the warranty remains in question, as discussed in Section II, *supra*, the Court must rely on Plaintiffs' allegations regarding the warranty language. The Complaint does not allege that the SSBS Vests' warranty contained a disclaimer of

warranty. Furthermore, Plaintiffs allege that "they were not provided any disclaimers of implied warranties, until after sale, when Defendant shipped the Manual with the SSBS Vests to Plaintiffs." D.E. 36 at *20 (citing D.E. 1 ¶ 45). "By definition, a disclaimer that appears for the first time after the sale in something supplied by the seller is not a part of the basis of the bargain and therefore is not binding on the buyer." *Bowdoin v. Showell Growers,* Inc., 817 F.2d 1543, 1545-46 (11th Cir. 1987). *See also Rehurek v. Chrysler Credit Corp.,* 262 So.2d 452, 455 (Fla. Dist. Ct. App. 1972) ("the disclaimer clause in the warranty booklet is immaterial because it was not incorporated into the contract and therefore was not a basis for the bargain").[4] Thus, Plaintiffs are not bound by the disclaimer to which they did not agree at the time of sale and which first appeared in the Manual mailed to them post-sale. *Id.*

Defendants also argue that Plaintiffs' claim for breach of implied warranty of merchantability fails as a matter of law because Plaintiffs are not in privity with Defendant. Defendant bases this assertion on the fact that the Individual Defendants "purchased the SSBS Vests through [Defendant's] distributors in Ohio, not directly from [Defendant]." D.E. 30 at *20 (*citing* D.E. 1 ¶¶ 5-7). A cause of action for breach of implied warranty of merchantability or fitness for a particular purpose cannot exist in the absence of privity. *Kramer v. Piper Aircraft Corporation,* 520 So.2d 37 (Fla. 1988), *see also Cedars of Lebanon Hospital Corp. v. European X-Ray Distributors of America, Inc.,* 444 So.2d 1068 (Fla. 3d DCA 1984).[5] Plaintiffs argue that they have alleged privity between themselves and Defendant in that:

> they purchased the vests from one of Defendant's sales representatives and authorized distributor; (2) Defendant then shipped each vest directly to the Individual Plaintiffs, including with each shipment a copy of the Manual containing the terms of certain written warranties and thus, providing written warranties directly to each Individual Plaintiff; (3) the Manual contained a warranty response card which Defendant directed each Plaintiff to complete and return to Defendant in

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 560 of 751
PageID: 11926

Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

Florida; and (4) with respect to tears in the soft body armor ballistic panel cover, Defendant's express warranty contained in the Manual instructed the purchaser to return the vest to Defendant for inspection and repair.

D.E. 36 (*citing* D.E. 1 ¶¶ 5-7, 45, 55). Accordingly, Plaintiffs have arguably established that they contracted with the Defendant. *T.W.M. v. American Medical Systems, Inc.,* 886 F.Supp. 842, 844 (N.D. Fla. 1995). However, even if Plaintiffs purchased their vests from third parties, "Florida courts have found the privity requirement to be satisfied when a manufacturer directly provides a warranty to, or otherwise has direct contact with, a buyer who purchases from a third party." *Global Quest, LLC v. Horizon Yachts, Inc.,* 849 F.3d 1022, 1032 (11th Cir. 2017); *Cedars of Lebanon Hosp. Corp. v. European X-Ray Dist. of Am.,* 444 So.2d 1068, 1072 n.4 (Fla. Dist. Ct. App. 1984) ("We wish to emphasize that we are focusing on the direct contacts between the manufacturer and the ultimate purchaser/consumer in finding that privity exists in this case."). [6]

**\*7** Plaintiffs have also properly alleged privity as third-party beneficiaries. *Pegasus Aviation IV, Inc. v. Aircraft Composite Technologies, Inc.,* No. 1:16-cv-21255-UU, 2016 WL 3390122, \*5 (S.D. Fla. June 17, 2016) ("Plaintiff can state a claim for breach of express warranty and breach of implied warranty of merchantability, even without direct privity, as long Plaintiff adequately alleges that it was a third party beneficiary of the contract for the sale of the thrust reversers."); *Sanchez-Knutson v. Ford Motor Co.,* 52 F.Supp.3d 1223, 1233-34 ("Plaintiff can pursue a claim of breach of implied warranty through third-party beneficiary law."). [7] The Complaint alleges that that Defendant's authorized distributors were not intended to be the ultimate consumers of the SSBS Vests. D.E. 1 ¶ 56. Instead, the warranties associated with the SSBS Vests were intended for the benefit of the ultimate consumers, which in this case were the Individual Plaintiffs. [8] *Id.* Indeed, Defendant's act of mailing warranties and a warranty card directly to the Individual Plaintiffs for them to fill out and return to Defendant supports Plaintiff's claim that Defendant knew that they, and not the third-party dealers, were the ultimate consumers. *See also,* *Lebel v. Rampage Sport*

*Fishing Yachts,* 2007 WL 1724942 at \*3 (S.D. Fla. June 14, 2007) (denying summary judgment because Plaintiff alleged that he purchased a boat from an "authorized dealer" of Defendant and therefore whether privity existed was a question of fact precluding summary judgment.) Accordingly, Defendant's motion to dismiss Count II of the Complaint is denied.

## IV. Breach of Implied Warranty of Fitness for a Particular Purpose (Count III)

Defendant argues that Plaintiff's claim for breach of implied warranty for fitness for a particular purpose fails because: (1) the claim is disclaimed by the warranty; (2) the Individual Plaintiff's are not in privity with Defendant; and (3) Plaintiffs have failed to allege a particular purpose for which they purchased the SSBS Vests beyond the ordinary purpose of providing protection. D.E. 30 at \*20. Given that the parties dispute the text of the warranty, for the reasons discussed in Section II, *supra,* Defendant's argument regarding the disclaimer necessarily fails at this juncture. Defendant's claim regarding privity also fails as discussed in Section III, *supra.* However, Defendant is correct that Plaintiffs have failed to allege a particular purpose for which they purchased the SSBS Vests beyond the ordinary purpose of providing protection, let alone that Defendant was aware of such particular purpose. In their Response, Plaintiffs claim that they alleged the particular purpose of "easy donning and doffing at the shoulder." D.E. 36 at \*25. However, Plaintiffs do not provide a single citation to the Complaint for such allegation and a review of the Complaint shows that Plaintiffs did not make a single allegation regarding a particular purpose. Additionally, the only time the term "donning and duffing" is used in the Complaint is at paragraph 27 wherein Plaintiffs state that "[t]he defects in the SSBS Vests exist from the time the SSBS Vests leave the manufacturing line, in that the SSBS will fail as it is repeatedly used by officers when donning and doffing their SSBS Vests." [9] Count III is, therefore, dismissed without prejudice.

## V. Injunctive Relief (Count IV)

### a. Count IV as to all Plaintiffs

**\*8** Defendant argues that Plaintiffs' claim for injunctive relief fails because it is not an independent cause of action. [10] In their Response, Plaintiffs argues that " 'Florida district courts routinely permit the pleading of preliminary

injunctions as individual counts in a complaint, particularly where a complaint alleges statutory claims or a breach of a restrictive covenants.' " D.E. 36 at *19-20 (*quoting Jewelry Repair Enters. v. Son Le Enters*, 2016 WL 8739605 at *2 (S.D. Fla. April 1, 2016)) (internal citations omitted) ). Plaintiffs aver that, "[j]ust as in *Jewelry Repair Enters.*, here Plaintiffs allege violation of a statutory claim—FDUTPA." *Id.* at 20. However, Plaintiffs makes no reference to the FDUTPA or a violation thereof in Count IV. Even absent such reference, Plaintiff does not allege in Count IV that Defendant engaged in a deceptive act or practice in trade or commerce with regards to the instant matter. [11] *See Klinger v. Weekly World News, Inc.*, 747 F.Supp. 1477, 1479 (S.D. Fla. 1990). Accordingly, Plaintiff fails to state claim for injunctive relief based on an alleged violation of the FDUPTA. Count IV is, therefore, dismissed without prejudice.

### b. IUPA's Claim for Injunctive Relief

Defendant asserts that Plaintiff IUPA doesn't have standing for its claim for injunctive relief because the IUPA does not allege that it purchased any SSBS Vests. According to Defendant, the IUPA does not allege any concrete injury giving rise to a valid claim because—it only alleges that "it somehow spent 'time' addressing the issue with the SSBS [V]ests." [12] D.E. 30 at *26. While the Court has dismissed Count IV without prejudice, Defendant's argument that IUPA lacks standing to bring such a claim is incorrect. An association has standing to sue on behalf of its members when: "(1) at least one of its members has standing to sue in his own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Disability Advocates and Counseling Group, Inc. v. Betancourt*, 379 F.Supp.2d 1343, 1357 (S.D. Fla. 2009) (internal citations omitted). The Supreme Court has held that the third prong of the associational standing requirement "is a prudential, not constitutional, requirement." *Id.* (*citing United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552-53 (1996) ). Accordingly, the third prong "is not normally necessary when an association seeks prospective or injunctive relief for its members". *Id.*

Defendant asserts that the "IUPA fails to show how it meets the associational standing requirements." D.E. 41 at *11. The

Court disagrees. The Complaint alleges that IUPA is a union charted exclusively for law enforcement and law enforcement personnel. D.E. 1 ¶ 4. IUPA's membership "represent[s] the needs of law enforcement officers and support personal, whether that be for safe and better equipment, more staff or a fair wage." *Id.* The Complaint further states that the IUPA "has incurred time and expense in connection with the unacceptable safety risks the defective SSBS Vests have subjected its members to, including many of its members in Florida that have SSBS Vests." *Id.* Plaintiff IUPA has, therefore, pled sufficient facts to establish that at least one if its members has standing to sue in his own right and that the interests at stake are germane to the organization's purpose. Accordingly, IUPA has standing to seek injunctive relief in the instant matter and is not barred from amending Count IV of the Complaint. [13]

### VI. Plaintiff Trevor Koontz's Claims

**\*9** Defendant argues that Plaintiff Koonts' claims fail because his vest worked as warranted during the two-year warranty period for the Velcro c-clamps. According to Defendant, "Plaintiffs insist that the warranty period for the Velcro c-clamps and shoulder straps is five years because they are 'sewn' to the ballistic panels for the SSBS [V]ests. But the [w]arranty makes clear that only 'bullet/stab-resistant elements' ... are covered by a five-year warranty ... Thus, they are covered by the two-year warranty for non-ballistic components." D.E. 41 at *10. However, Plaintiffs assert that Defendant is simply "attempt[ing] to construe the applicable express warranty as a 2-year warranty, contrary to both the actual warranty terms and to Plaintiff's allegations." D.E. 36 at *13. For the reasons stated in Section II, *supra*, the Court must construe the allegations contained in the Complaint as true. Given Plaintiffs' allegations regarding the five year warranty as to the Velcro c-clamps contained in the SSBS Vests' ballistics panel, Defendant's argument regarding the warranty necessarily fails. Moreover, it appears to the Court that the question of whether the Velcro c-clamps constitute part of the SSBS Vests' ballistic panel is one of fact that will have to be resolved later in this litigation.

Defendant also argues that Plaintiff Koontz' FDUTPA claim is barred by the applicable four-year statute of limitations. "The statute of limitations on a FDUTPA claim expires four years from the date of sale of the product at issue." *Licul v. Volkswagon Group of America, Inc.*, 2013 WL 6328734 at *6 (S.D. Fla. 2013) (*citing Fla. Stat. § 95.11(3)(f)* );

Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 562 of 751
PageID: 11928

📄 *Matthews v. Am. Honda Motor Co.,* No. 12-60630, 2012 U.S. Dist. LEXIS 90802, 2012 WL 2520675 (S.D. Fla. June 6, 2012). The limitations period on Plaintiff Koontz's FDUTPA claim in this action, barring the application of any tolling doctrine, appears to have expired on or about December 2016, four years after Plaintiff Koontz purchased his SSBS Vest from Defendant. *See* D.E. 1 ¶ 4. Accordingly, Count V is dismissed without prejudice as to Plaintiff Koontz.

VII. Plaintiff Ryan Purpura's Claims

Defendant also argues that Plaintiff Purpura fails to allege any facts about his experience with his SSBS Vest, specifically why and when it failed. "Purpura merely alleges that the vest 'failed' at some unidentified time and in some unidentified way." D.E. 30 at *26. The Court agrees. Unlike the other Individual Plaintiffs, the Complaint does not contain any factual allegations regarding the manner in which Plaintiff Purpura's SSBS Vest "failed". The Complaint only makes the conclusory allegation that Purpura's SSBS Vest failed, which is not sufficient to state a claim upon which relief can be granted. Accordingly, Counts I through V on behalf of Plaintiff Purpura are dismissed without prejudice.

Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendants' Motions to Dismiss, D.E. 30, is GRANTED IN PART and DENIED IN PART, as follows:

(1) Counts III and IV of the Complaint are DISMISSED WITHOUT PREJUDICE and with leave to amend.

(2) Counts I, II, and V of the Complaint, as brought by Plaintiff Purpura, are DISMISSED WITHOUT PREJUDICE and with leave to amend.

(3) Defendant's Motion to Dismiss is DENIED with respect to Counts I, II, and V of the Complaint as brought by Plaintiff Rohner.

(4) Defendant's Motion is DENIED with respect to Counts I and II of the Complaint as brought by Plaintiff Koontz.

(5) Count V of the Complaint, as brought by Plaintiff Koontz, is DISMISSED WITHOUT PREJUDICE and with leave to amend.

(6) If Plaintiffs elect to file an amended complaint, Plaintiff's are cautioned that they must allege specific facts supporting their legal theories and such complaint shall be filed no later than **Monday, April 16, 2018**.

It is further

ORDERED AND ADJUDGED that the Initial Planning and Scheduling Conference in this case is HEREBY RESET for **Friday, May 4, 2018** at 11:30 a.m.

DONE AND ORDERED in Chambers at Miami, Florida, this 5th day of April, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3109632

---

### Footnotes

1    Plaintiff Ohio State Troopers Association, Inc. ("OSTA") is "a membership organization whose members are Ohio State Highway Patrol Troopers [ ] and others." D.E. 1 ¶ 3. Plaintiff International Union of Police Associations ("IUPA") is a "union chartered exclusively for law enforcement and law enforcement personnel" which is organized and licensed in the state of Florida, where it maintains its headquarters. D.E. 1 ¶ 4. OSTA and IUPA are Plaintiffs only for purposes of the injunctive relief sought in Count 4 of the Complaint.

2    Plaintiffs assert that their injunctive relief claim is based on Defendant's violation of the FDUTPA. D.E. 36 at *20.

3    Plaintiffs allege in their Response that Defendant "attach[ed] the wrong copy of one of several warranties it issued." D.E. 36 at *12-13.

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 563 of 751
PageID: 11929
Ohio State Troopers Association, Inc. v. Point Blank..., Not Reported in Fed....

4    The same is true under Ohio Law. See 📎 *Volovetz v. Tremco Barrier Solutions, Inc.*, 74 N.E.3d 743, 750
     (Ohio Ct. App. 2016) (finding that disclaimers of implied warranties must be part of the parties' bargain in
     fact and collecting cases).

5    Privity is also required under Ohio Law. *See* 📎 *Norcold, Inc. v. Gateway Supply Co.*, 154 Ohio App. 3d 594,
     628, 798 N.E.2d 618 (Ohio Ct. App. 2003).

6    Additionally, under Ohio law, "a manufacturer and consumer are in privity of contract only when the
     manufacturer is so involved in the sales transaction that the distributor merely becomes an agent of the
     manufacturer". *Wotring Towing v. Ford Motor Co.*, No. 2:16-cv-1193, 2017 WL 2378003, *2 (S.D. Ohio May
     31, 2017) (internal quotation omitted). *See also* 📎 *Bobb Forest Prods. Inc. v. Morbark Indus. Inc.*, 151 Ohio
     App.3d 63, 783 N.E.2d 560, 576 (Ohio Ct. App. 2002) ("when the manufacturer is so involved in the sales
     transaction that the distributor merely becomes the agent of the manufacturer, then the manufacturer and the
     ultimate consumer are in privity of contract"); 📎 *Risner v. Regal Marine Industries, Inc.*, No. 1:11-cv-00191,
     2013 WL 1758876, *13 (S.D. Ohio April 24, 2013) (same). Here, Plaintiff asserts that Defendant controlled
     all aspects of the design, material selection and purchases, manufacture, marketing and distribution of the
     SSBS Vests. D.E. 1 ¶¶ 41,104. Accordingly, Plaintiff alleges sufficient facts to establish that they were in
     privity with Defendant under Ohio law.

7    Plaintiffs have also properly alleged privity as third-party beneficiaries under Ohio law. *See Wotring Towing v.
     Ford Motor Company*, 2017 WL 2378003 at *2 (S.D. Ohio 2017) ("A consumer may also be in privity of contract
     with a manufacturer if that consumer is an intended third-party beneficiary to a contract.") (internal quotation
     omitted); *Asia-Pacific Futures Research Symposium Planning Commt. v. Kent State Univ.*, 63 N.E.3d 780,
     785 (Ohio Ct. App. 2016) ("Intended third-party beneficiaries have the rights of parties in privity of contract
     and thus may bring suit for breach of contract or to enforce performance.").

8    The cases cited by Defendant in opposition to Plaintiffs' third-party beneficiary argument are entirely
     distinguishable from the instant matter both in terms of posture and fact. *See* 📎 *Curl v. Volkswagon of Am.,
     Inc.*, 114 Ohio St.3d 266, 871 N.E.2d 1141 (2007); *Kuns v. Ford Motor Co.*, 926 F.Supp.2d 976 (2013);
     📎 *Savett v. Whirlpool Corp.*, No. 12-cv-310, 2012 WL 3780451 (N.D. Ohio August 31, 2012).

9    Moreover, Plaintiffs' claim that "two warranties are not mutually exclusive and overlap or merge in some
     circumstances" is inapplicable here. D.E. 36 at *25. Plaintiff does not cite a single Florida or Ohio case for
     this proposition. Furthermore, in 📎 *Beech v. Aircraft Corp. v. Flexible Tubing Corp.*, 270 F.Supp. 548, 562
     (D. Ct. 1967), cited by Plaintiffs, the Defendants or their agents were informed of a particular purpose for
     which Plaintiff intended to use the product at issue and the claim was upheld even though such purpose
     coincided with the product's general function. Plaintiffs have made no allegation that they made Defendant
     or its authorized sellers aware of the particular purpose for which they intended to use the SSBS Vests.

10   Defendant also argues that Plaintiffs have not alleged an inadequate remedy at law and cannot show that
     there is a threat of future harm as to them. However, such allegations are not required to state a claim for
     violation of the FDUTPA: "The [FDUTPA] is clear on its face. Any person aggrieved by a violation of the
     FDUTPA may seek declaratory and/or injunctive relief under the statute. There is no requirement that a
     plaintiff show an ongoing practice or irreparable harm, and declaratory relief is available regardless of whether
     an adequate remedy at law also exists." 📎 *Galstaldo v. Sunvest Communities USA, LLC*, 637 F.Supp.2d
     1045, 1057 (S.D. Fla. 2009).

11   The only allegation Plaintiffs make in Count IV regarding a deceptive act or practice by Defendant relates to
     a past actions not at issue in the instant matter. *See* D.E. 1 ¶ 92.

12   This statement is inaccurate because the Complaint alleges that the IUPA "incurred time and expense in
     connection with the unacceptable safety risks the defective SSVS Vests have subjected its members to".
     D.E. 1 ¶ 4.

13    In the event that IUPA does amend and reasserts Count IV, it is advisable to plead more specific facts regarding IUPA's associational standing under the two prongs discussed *supra*.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 54

Pegasus Aviation IV, Inc. v. Aircraft Composite..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 566 of 751
PageID: 11932

🏷 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Toca v. Tutco, LLC, S.D.Fla., March 4, 2020

2016 WL 3390122

Only the Westlaw citation is currently available.

United States District Court, S.D. Florida.

PEGASUS AVIATION IV, INC., Plaintiff,

v.

AIRCRAFT COMPOSITE
TECHNOLOGIES, INC., Defendant.

Case No. 1:16-cv-21255-UU

|

Signed 06/17/2016

**Attorneys and Law Firms**

Mark L. Hejinian, Richard R. Patch, Virginia A. Crisp, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, Fred Owen Goldberg, Berger Singerman LLP, Miami, FL, for Plaintiff.

Bruce David Fischman, Jenna Leigh Fischman, The Fischman Law Firm, P.A., Miami, FL, for Defendant.

**ORDER ON MOTION TO DISMISS**

URSULA UNGARO, UNITED STATES DISTRICT JUDGE

**\*1** THIS CAUSE is before the Court upon Defendant's Motion to Dismiss, D.E. 18, filed May 2, 2016. The Motion is fully briefed and ripe for disposition.

THE COURT has reviewed the pertinent portions of the record and is otherwise fully advised in the premises. For reasons set forth below, Defendant's Motion is DENIED.

**BACKGROUND**

The following allegations are taken from Plaintiff's Complaint ("the Complaint"). D.E. 1.

This action arises from Defendant's, Aircraft Composite Technologies, Inc.'s ("Defendant" or "ACT"), alleged breach of contract, breach of express warranty and breach of implied warranty of merchantability stemming from the sale of six aircraft thrust reversers to Pegasus Aviation IV, Inc.

("Plaintiff") for use in a MD 11F airplane owned by Plaintiff (the "Aircraft"). Plaintiff leased the Aircraft to AV Cargo Airlines, Ltd. ("AV Cargo"), which is a British freight operator. *Id.* ¶ 8.

In November 2013, Plaintiff entered into negotiations with ACT and GMAir, an aircraft supply company, to purchase one overhauled thrust reverser from GMAir that would be overhauled by ACT for use in the Aircraft. *Id.* ¶ 12. Under the parties' agreement, GMAir would supply the thrust reverser, and ACT would perform the overhaul process in compliance with the Original Equipment Manufacturers' ("OEM") overhaul procedures. *Id.*

On November 27, 2013, Plaintiff entered into a contract with GMAir for the purchase of one overhauled thrust reverser for a total purchase price of $380,000. *Id.* ¶ 13. ACT was included in the email communications between GMAir and Pegasus during the negotiation of the contract and was, therefore, aware that the overhauled thrust reverser was for use by Pegasus in the Aircraft. *Id.* On or about January 6, 2014, ACT completed the overhaul. *Id.* On or about January 7, 2014, ACT shipped the thrust reverser to the Aircraft. *Id.* Plaintiff paid all amounts due under the November 27, 2013 contract. *Id.*

In May 2014, Plaintiff began negotiating directly with ACT for the purchase of five additional overhauled thrust reversers to install in the Aircraft. *Id.* ¶ 14. These negotiations took place orally and via e-mail. *Id.* ¶¶ 14-16. On May 28, 2014, the parties entered into a contract, whereby ACT would supply five overhauled thrust reversers at a price of $300,000 per thrust reverser. *Id.* ¶ 16. ACT agreed to a twenty-four month warranty for these five overhauled thrust reversers, which would commence upon installation of the thrust reversers, and requested that Plaintiff prepare and send a conforming purchase order. *Id.* On or about May 28, 2014, Plaintiff sent ACT a purchase order for the five thrust reversers (the "Purchase Order"). *Id.* ¶ 17. The Purchase Order included ACT's twenty-four month warranty. *Id.*

On or about June 19, 2014, ACT completed its overhaul process and shipped the five thrust reversers to the Aircraft in Indonesia. *Id.* ¶ 18. Plaintiff paid all amounts due under the May 28, 2014 contract. *Id.* The thrust reversers subject to the May 28, 2014 contract were installed in the Aircraft in July 2014. *Id.* ¶ 19. Due to other maintenance issues, the Aircraft remained in Indonesia until June 2015. *Id.*

Pegasus Aviation IV, Inc. v. Aircraft Composite..., Not Reported in Fed....

**\*2**  On or about June 27, 2015, the Aircraft made its first flight following installation of the five additional thrust reversers. *Id.* ¶ 20. During this flight, which lasted only two hours, four thrust reversers suffered catastrophic failures, thereby posing an immediate safety hazard to the Aircraft and its crew members. *Id.* The Aircraft was grounded in Singapore and transferred to the ST Aerospace Services Co. ("SASCO"), which is a maintenance facility at Singapore's Changi Airport. *Id.* SASCO performed tests on the malfunctioning thrust reversers and determined that the reversers had failed and that the acoustical mesh layer was delaminating, or separating, from the skin layer, which indicated that the bonding was failing. *Id.* ¶ 21. Because of the extent of damage to the thrust reversers, SASCO could not repair the reversers on site. *Id.* ¶ 22.

Soon thereafter, Plaintiff provided written notice to ACT to inform ACT of the failed thrust reversers. *Id.* ¶ 23. ACT failed to repair the damaged thrust reversers or to otherwise propose a reasonable avenue to repair or pay for the repair of the four failed thrust reversers. *Id.* Plaintiff then retained UTC Aerospace Systems ("UTAS"), an affiliate of the OEM of the thrust reversers, to inspect and repair the damaged thrust reversers. *Id.* ¶ 24. In August 2015, Plaintiff entered into a contract with UTAS to perform the repairs. *Id.* ¶ 25.

UTAS could not repair the thrust reversers on site and, on August 17, 2015, shipped the four failed thrust reversers to a UTAS facility for further inspection and repair. *Id.* UTAS disassembled the four thrust reversers and concluded that seven of the eight cowl and translating sleeve components in the four failed reversers were defective. *Id.* ¶ 26. UTAS further concluded that ACT's overhaul of the thrust reversers did not comply with the OEM overhaul procedures specified in the OEM Repair Manual because ACT: (1) failed to use proper adhesive materials; (2) failed to adequately remove corrosion; and (3) failed to apply primer during the overhaul process. *Id.* ¶ 27. After UTAS' inspection, Plaintiff retained Vertical Aerospace, a company that provides airplane maintenance, repair and overhaul services ("VA"), to perform a second analysis of the cause of the delamination on the failed thrust reversers. *Id.* ¶ 28. VA confirmed UTAS' conclusion that ACT's overhaul did not comply with the OEM overhaul procedures and that this improper overhaul caused the thrust reversers to fail. *Id.*

In October 2015, UTAS repaired the seven failed components in the four malfunctioned thrust reversers, at a total cost of $1.35 million. *Id.* ¶ 29. Plaintiff paid UTAS the full amount of

the repair cost, and the Aircraft resumed flights in or around December 2015. *Id.*

In February 2016, the eighth component—the translating sleeve on one of the four already-malfunctioned thrust reversers—failed. *Id.* ¶ 30. The Aircraft was, once again, grounded. *Id.* Plaintiff informed ACT of the part's failure and ACT refused to repair the damaged part or to otherwise propose a reasonable avenue to repair or pay for the repair. *Id.* ¶ 31. AV Cargo, the lessee of the Aircraft, replaced the component at a cost exceeding $150,000. *Id.* ¶¶ 8, 30. Plaintiff did not pay AV Cargo for these repairs, but anticipates that AV Cargo will seek reimbursement of these repair costs. *Id.* ¶ 30.

Based on these underlying allegations, Plaintiff brings four Counts. Count I alleges a claim for breach of contract, as a third party beneficiary, of the contract between GMAir and ACT related to Plaintiff's purchase of one thrust reverser from GMAir on November 27, 2013 (the "GMAir-ACT Contract"). Count II alleges a claim for breach of contract of the May 28, 2014 contract (the "Plaintiff-ACT Contract"). Count III alleges a claim for breach of express warranty based on both the GMAir-ACT Contract and Plaintiff-ACT Contract. Lastly, Count IV alleges a claim for breach of implied warranty of merchantability based on both the GMAir-ACT Contract and Plaintiff-ACT Contract.

**\*3**  On May 2, 2016, ACT moved to dismiss Plaintiff's Complaint, in its entirety, under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, to strike Plaintiff's request for attorneys' fees pursuant to Federal Rule of Civil Procedure 12(f).

## LEGAL STANDARD

In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." While a court, at this stage of the litigation, must consider the allegations contained in the plaintiff's complaint as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of

Pegasus Aviation IV, Inc. v. Aircraft Composite..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 568 of 751
PageID: 11934

action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw on its judicial experience and common sense. *Id.* at 679.

## DISCUSSION

Defendant moves to dismiss each Count of Plaintiff's Complaint because: (1) Plaintiff fails to attach the GMAir-Act Contract to its Complaint and, moreover, does not adequately plead a claim for breach of contract as a third party beneficiary (Count I); (2) Plaintiff fails to satisfy Florida's Statute of Frauds (Count II); (3) there is no privity between ACT and Plaintiff, thereby defeating Plaintiff's express and implied warranty claims (Counts III and IV); and (4) Plaintiff does not show that Defendant's breach of implied warranty of merchantability proximately caused Plaintiff's injuries (Count IV). Alternatively, Defendant moves to strike Plaintiff's request for attorneys' fees in its prayer for relief. The Court will address each argument in turn.[1]

### I. Breach of GMAir-ACT Contract (Count I)

#### A. Failure to Attach Contract

Defendant moves to dismiss Count I because Plaintiff did not attach the GMAir-ACT Contract to its Complaint or, alternatively, refer to ACT's breach of specific provisions within the contract. D.E. 18 pp. 5-6. In response, Plaintiff contends that the Complaint plausibly alleges a claim for breach of the GMAir-ACT Contract for two reasons. First, Plaintiff states that *Iqbal* and *Twombly* do not require it to attach the GMAir-ACT Contract to the Complaint in order to

state a claim. D.E. 25 at 9-10. Second, Plaintiff argues that the Complaint states a claim because it alleges: (1) the specific contracts at issue; (2) the terms that Defendant breached; and (3) damages stemming from Defendant's breach of contract. D.E. 25 at 11-12.

**\*4** The Court agrees with Plaintiff. As an initial matter, Plaintiff is not required to attach the GMAir-ACT Contract to state a claim. *Haese v. Celebrity Cruises, Inc.*, No. 12-20655-CIV, 2012 WL 3808596, at \*1 (S.D. Fla. May 14, 2012); *Punta Gorda—Charlotte Harbor Dev., LLC v. Allstate Ins. Co.*, No. 2:08-CV-719-FtM-29SPC, 2009 WL 3418260, at \*2 (M.D. Fla. Oct. 20, 2009) ("Failure to attach the contract as an exhibit is not fatal to the Amended Complaint ... [because] Rule 8 does not require a plaintiff to plead with the greatest specificity it can."); *Manicini Enters., Inc. v. American Exp. Co.*, 236 F.R.D. 695, 698 (S.D. Fla. 2006); *but see* *Burgess v. Religious Tech. Ctr., Inc.*, 600 Fed.Appx. 657, 664-665 (11th Cir. 2015) (failing to attach contract to complaint warranted dismissal of breach of contract claim because "there were multiple contracts at issue, including the Financial Policy, the Admission and Services Agreement, the Student Rules of Conduct, the Confidentiality Agreement, and various Consent forms ... [s]ome of [which] ... were signed only by the patients and others by the plaintiffs and the patients"). Instead, Plaintiff need only allege enough facts to plausibly show that the Defendant breached the GMAir-ACT Contract. Plaintiff has done so by alleging that: (1) GMAir and ACT entered into a "written contract for ACT to overhaul the thrust reverser;" (2) ACT breached this contract by, among other things, "failing and refusing to deliver a properly overhauled thrust reverser, failing to comply with the overhaul procedures specified in the OEM manual, and failing and refusing to repair or replace the defective thrust reverser or to pay for the cost of repair or replacement; and (3) ACT's breach caused Plaintiff to suffer injury. D.E. 1 ¶¶ 35, 38, 39; *see also* *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1341 (S.D. Fla. 2011) ("To state a claim for breach of contract under Florida law, Plaintiff must allege: (1) a valid contract, (2) a material breach, and (3) damages.").

#### B. Third Party Beneficiary

Defendant also argues that Plaintiff fails to state a claim in Count I because it does not refer to specific contractual provisions to indicate that Plaintiff is a third party beneficiary of the GMAir-ACT Contract, but instead merely alleges that it "is informed and believes and thereon alleges that GMAir

and ACT entered into a written contract for ACT to overhaul the thrust reverser with the clear and manifest intent that the contract primarily and directly benefit [Plaintiff]." D.E. 18 pp. 6-7; D.E. 1 ¶ 35. Plaintiff responds, in relevant part, that it has plausibly alleged that GMAir and ACT contracted with the intent to benefit Plaintiff, especially given that ACT shipped the overhauled thrust reverser, which was the subject of the GMAir-ACT Contract, directly to Plaintiff on January 7, 2014. D.E. 25 pp. 10-11.

Defendant's argument has no merit. As already discussed, Plaintiff identified the contract at issue in Count I, the provisions within the contract that were likely breached, and the damages stemming from that breach. D.E. 1 ¶ 35, 38, 39. Plaintiff also alleges that GMAir and ACT entered into the GMAir-ACT Contract "with the clear and manifest intent that the contract primarily and directly benefit" Plaintiff, as evidenced by the fact that ACT was "included in email communications between GMAir and [Plaintiff] during the negotiation of the contract" and that ACT delivered the overhauled thrust reverser directly to Plaintiff's Aircraft, and not to GMAir. *Id.* ¶¶ 13, 35-36. These allegations are more than enough to state a claim for breach of contract as a third party beneficiary. *See, e.g., Principal Bank v. First Am. Mortgage, Inc.,* No. 2:10-cv-190-FtM-29DNF, 2012 WL 473507, at *8 (M.D. Fla. Feb. 14, 2012)* ("At this stage of the proceedings, plaintiff must simply allege an intent to benefit it as the third-party, not prove that it is in fact a third-party beneficiary."). Accordingly, Defendant's Motion is denied with respect to Count I.

**II. Breach of Plaintiff-ACT Contract (Count II)**

Defendant argues that Plaintiff's claim for breach of the Plaintiff-ACT Contract (Count II) should be dismissed because it is barred by Florida's Statute of Frauds. D.E. 18 p. 9. Under Florida's Statute of Frauds, "a contract for the sale of goods for the price of $500 or more is not enforceable ... unless ... signed by the party against whom enforcement is sought." Fla. Stat. § 672.201. Here, Defendant argues that the Purchase Order attached to Plaintiff's Complaint is unexecuted and, therefore, precludes Plaintiff from stating a claim for breach of the Plaintiff-ACT Contract.

**\*5** In response, Plaintiff argues that the Purchase Order is not the basis for its breach of contract claim, but is instead evidence of an agreement already reached by Plaintiff and ACT via e-mail. D.E. 25 p. 13. Plaintiff also argues that, in any event, the Plaintiff-ACT Contract falls outside the Statute of Frauds because it concerns "goods for which payment has

been made and accepted or which have been received and accepted." *Id.* (citing Fla. Stat. § 672.201(3)(c)).

The Court concludes that the Plaintiff-ACT Contract falls outside of Florida's Statute of Frauds because Defendant performed under the Plaintiff-ACT Contract which, standing alone, removes the contract from the Statute of Frauds. Fla. Stat. § 672.201(3)(c); *see also LEA Indus., Inc. v. Raelyn Int'l, Inc.,* 363 So. 2d 49, 52 (Fla. 3d DCA 1978). Accordingly, Defendant's Motion is denied with respect to Count II.

**III. Breach of Warranty Claims (Counts III &IV)**

A. The GMAir-ACT Contract

Defendant argues that Plaintiff fails to state a claim for breach of express warranty (Count III) and breach implied warranty of merchantability (Count IV), in so far as these claims rely on the GMAir-ACT Contract, for two reasons. First, Defendant argues that Plaintiff failed to either attach the GMAir-ACT Contract to the Complaint or, alternatively, to specify the express warranty provision breached by Defendant. D.E. 18 p. 11. Second, Defendant argues that Plaintiff lacks privity of contract with ACT, thereby defeating its warranty claims. *Id.* pp. 11-12.

In response, Plaintiff argues that: (1) it is not required to attach the GMAir-ACT Contract to the Complaint; (2) it adequately alleged breach of express warranty; and (3) it adequately alleged that Plaintiff was a foreseeable user of the thrust reversers, which is enough for a third party beneficiary to state a claim for breach of express or implied warranty under Florida law. D.E. 25 pp. 15-16.

Plaintiff is correct. Just as with its breach of contract claims, Plaintiff is not required to attach the relevant contracts to state a claim for breach of express warranty or breach of implied warranty of merchantability. *See, e.g., Allianz Glob. Risks U.S. Ins. Co. v. Singlesource Roofing Corp.,* No. 2:05-cv-603-FtM-29SPC, 2006 WL 2536705, at *2 (M.D. Fla. August 31, 2006)* (concluding that "failure to attach the [warranty] documents is not a basis for dismissal of the Complaint"). And Plaintiff plausibly alleges each of the elements required for breach of express and implied warranty. *See* 📄 *Moss v. Walgreen Co.,* 765 F. Supp. 2d 1363, 1368 (S.D. Fla. 2011) (setting forth elements of breach of express warranty); *see also Marcus v. Anderson/Gore Holmes, Inc.,* 498 So. 2d 1051, 1052 (Fla. 4d DCA 1986) (setting forth elements of breach of implied warranty of merchantability).

Pegasus Aviation IV, Inc. v. Aircraft Composite..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 570 of 751
PageID: 11936

Defendant's argument concerning privity of contract also fails. Plaintiff can state a claim for breach of express warranty and breach of implied warranty of merchantability, even without direct privity, as long Plaintiff adequately alleges that it was a third party beneficiary of the contract for the sale of the thrust reversers. *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla. 2014); *Dineen v. Pella Corp.*, No. 2:14-CV-03479-DCN, 2015 WL 6688040, at *12 (D.S.C. Oct. 30, 2015) (applying Florida law); *see also Fed. Ins. Co. v. Bonded Lightning Prot. Sys., Inc.*, No. 07-80767-CIV, 2008 WL 5111260, at *7 (S.D. Fla. Dec. 3, 2008). Here, Plaintiff alleges that ACT was included in email communications between GMAir and Plaintiff concerning the thrust reverser ultimately subject to the GMAir-ACT contract, and that ACT delivered the overhauled thrust reverser directly to Plaintiff. D.E. 1 ¶¶ 13, 35-36. This is enough to allege that Plaintiff was a third party beneficiary of the GMAir-ACT Contract and, therefore, is sufficient to state a claim for breach of express and implied warranty based on Plaintiff's status as the "ultimate consumer of the subject" thrust reverser. *Sanchez-Knutson*, 52 F. Supp. 3d at 1233. Accordingly, Plaintiff's Complaint states a claim for breach of express warranty and breach of implied warranty of merchantability with respect to the thrust reverser sold under the GMAir-ACT Contract.

### B. The Plaintiff-ACT Contract

**\*6** Defendant argues that Plaintiff's warranty claims brought in Counts III and IV should be dismissed, to the extent that these claims rely on the Plaintiff-ACT Contract, because: (1) the underlying contract violates the Statute of Frauds; and (2) ACT's alleged breach was not the proximate cause of Plaintiff's injuries, as Plaintiff's Aircraft also suffered from other maintenance issues while it remained grounded in Indonesia in or around June 2015. D.E. 18 p. 12

The Court has already concluded that Defendant's Statute of Frauds argument fails, as Defendant performed its duties under the Plaintiff-ACT Contract. Fla. Stat. § 672.201(3)(c); *LEA Indus., Inc.*, 363 So. 2d at 52. Moreover, the Court cannot determine whether ACT's alleged breach proximately caused Plaintiff's injuries because, at this stage, the Court may not resolve disputed issues of fact. *Perlman v. Bank of Am., N.A.*, 561 Fed.Appx. 810, 812 (11th Cir. 2014). For these

reasons, the Court finds that the Complaint states a claim for breach of express warranty in Count III and breach of implied warranty of merchantability in Count IV.

### IV. Attorneys' Fees

Defendant moves to strike Plaintiff's request for attorneys' fees on grounds that there is no contractual, statutory or constitutional provision that permits Plaintiff to recover such fees. D.E. 18 p. 13. In response, Plaintiff argues that while the Complaint does not allege a specific basis for attorneys' fees, it would be premature to strike its request for attorneys' fees in the prayer for relief. D.E. 25 pp. 17-18.

The Court agrees with Defendant. Under Rule 12(f), the Court may strike "redundant, immaterial, [or] impertinent" allegations. Here, Plaintiff's request for attorneys' fees is immaterial because there is no basis for Plaintiff to recover attorneys' fees under Florida law absent an express provision in the GMAir-ACT Contract or Plaintiff-ACT Contract permitting such fees, and the Complaint does not point to such a provision. *See, e.g.*, *Kittel v. Kittel*, 210 So. 2d 1, 3 (Fla. 1967) ("It is an elemental principle of law in this State that attorney's fees may be awarded a prevailing party only under three circumstances, viz: (1) where authorized by contract; (2) where authorized by a constitutional legislative enactment; and (3) where awarded for services performed by an attorney in creating or bringing into the court a fund or other property."); D.E. 1. Accordingly, it is

ORDERED AND ADJUDGED that Defendant's Motion, D.E. 18, is GRANTED IN PART and DENIED IN PART. Plaintiff's demand for attorneys' fees is HEREBY STRICKEN from the Complaint. The Motion is otherwise DENIED. It is further

ORDERED AND ADJUDGED that Defendant SHALL file an Answer to Plaintiff's Complaint no later than **Wednesday, June 22, 2016.**

DONE AND ORDERED in Chambers at Miami, Florida this 17th day of June, 2016.

### All Citations

Not Reported in Fed. Supp., 2016 WL 3390122

### Footnotes

1    "It is undisputed that Florida law governs the substantive issues in this case because jurisdiction is based
     on diversity of citizenship." *See, e.g.,* *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.,* 420
     F.3d 1317, 1326 (11th Cir. 2005).

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 55

**Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)**
2006 WL 166452

2006 WL 166452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Jeff PLAYER, et al., Plaintiffs,

v.

MOTIVA ENTERPRISES LLC, a successor in interest to Star Enterprises, Defendant.

No. Civ. 02–3216(RBK).
|
Jan. 20, 2006.

**Attorneys and Law Firms**

Keith A. McKenna, McKenna, Mulcahy & McKenna, Montclair, NJ, for Plaintiffs.

Jeffrey W. Moryan, Connell Foley LLP, Roseland, NJ, for Defendant.

OPINION

KUGLER, United States District Judge:

**\*1** This matter comes before the Court upon motions by Defendant Motiva Enterprises, LLC, ("Defendant" or "Motiva") for summary judgment of the claims of Plaintiffs Jeff Player, et al. ("Plaintiffs"), and to exclude Plaintiffs' experts Michael Gochfeld, M.D., Ph.D. ("Gochfeld"), R. Brian Ellwood, Ph.D. ("Ellwood"), Bruce M. Gallo ("Gallo"), and Daniel McDonald ("McDonald"). For the reasons set forth below, Defendant's motions will be granted in part and denied in part.

I. Background[1]
This environmental contamination suit is brought by the current and former owners of twenty-seven parcels of residential property located in the Spring Hollow Subdivision in Gloucester Township, New Jersey.[2] Plaintiffs allege that emissions from Defendant's nearby Texaco gasoline service station contaminated their property and the Kirkwood Cohansey Aquifer, the underground water source for their potable wells.

Contamination of the aquifer was first detected on April 5, 2000, when significant concentrations of the gasoline-related compound methyl tertiary butyl ether ("MTBE") was discovered in a drinking fountain at Camden County Community College. New Jersey Consumers Water Company ("Consumers"), the entity responsible for providing water to the college, conducted sampling of some of its wells and discovered significant amounts of gasoline-related compounds in municipal supply well number 8 ("CW–8"). Consumers took the well offline on April 10.

While investigating the contamination, the New Jersey Department of Environmental Protection ("NJDEP") detected a discharge of volatile organic compounds ("VOCs") from Defendant's service station, located at 585 Berlin Cross Keys Road ("Motiva site" or "contamination site").[3] The NJDEP issued a Field Directive on April 12, 2000, requiring Motiva to investigate the source and extent of the discharge, to implement an interim treatment system, and to submit a remedial action work plan to the NJDEP. Defendant installed an interim recovery system and twenty-five monitoring and recovery wells between April and June 2000.

The NJDEP issued a second directive on May 5, 2000, ordering Defendant to cease gasoline retail operations and provide treatment or an alternate source of water to replace CW–8. Defendant replaced the interim system with a permanent ground water recovery and treatment system in June 2000, and installed forty-one additional monitoring wells from June 2000 to present. As further required by the NJDEP, Defendant regularly sampled potable wells located on approximately forty residential properties in the vicinity of the Motiva site. Defendant detected small amounts of MTBE in thirteen of the residential wells it sampled.[4]

Per the NJDEP directive, Motiva submitted a Remedial Investigation Work Plan/Remedial Investigation report on July 2000 and a Remedial Action Workplan ("RAW") on November 14, 2000. In its RAW, Defendant requested permission to cease sampling of the residential wells, contending that the MTBE detected in those wells could not have come from the Motiva site since the wells are located upgradient[5] or sidegradient from the site, and no emissions were detected in most of the monitoring wells between the Motiva site and the potable wells.[6] Motiva also claimed that recent literature indicated that traces of MTBE in groundwater could likely result from "non-point sources." (March 2001 Directive at 2.)

**\*2** Plaintiffs' expert, R. Brian Ellwood, Ph.D ("Ellwood"), submitted a response to the RAW on January 17, 2001. In his report, Ellwood notes that as of January 17, 2001, "[c]ontrol of contamination at depth beneath the site, control of offsite contamination, and possibly control of contamination at the northern site boundary, has not been established." (Preliminary Report Sicklerville Road Groundwater Contamination ("Ellwood Report"), McKenna Cert. in Opp. to Def.'s Mot. Summ. J., filed Oct. 12, 2005 ("McKenna Cert."), Ex. F, at 2.) Ellwood also offered possible theories to demonstrate the plausibility of Defendant's responsibility for the MTBE in spite of Motiva's arguments to the contrary.

The NJDEP ultimately rejected Defendant's request to cease sampling of the residential wells in its March 2001 Directive on the basis that "there is insufficient evidence for Equiva to conclude that the MTBE detected in the 13 potable wells in the area did not originate from the Cross Keys Texaco site" and "that regardless of the source of the MTBE in these wells, which is obviously debatable, ongoing sampling of these wells is required *primarily due to their proximity to the site.*" (March 2001 Directive at 2) (emphasis in original).

Also in the March 2001 Directive, the NJDEP approved a Classification Exemption Area ("CEA") for the site that excluded all but 1/10 of an acre of 583 Berlin Cross Keys Road (the Wallace Property). The CEA establishes the boundaries of a ground water plume where VOCs exceed the GWQS.[7]

Through summer 2004, the NJDEP regularly reduced the testing requirements. By August 18, 2003, the NJDEP required only:

> annual sampling of the wells at 4, 7, 11, 13 and 14 Donna Marie Court; 2, 4, 6, and 8 Latham Way; 12 and 20 Spring Hollow Drive, and; 937 and 948 Sicklerville Road. For all the sampling events of the aforementioned potable wells conducted April 2002, the Department notes that all wells continue to exhibit no gasoline related contamination in excess of the Department's Drinking Water Quality Standards.

(NJDEP Directive, Aug. 18, 2003, McKenna Cert., Ex. D.)

The NJDEP approved shut down of the recovery and treatment system on April 30, 2004. (NJDEP Correspondence, Aug. 9, 2004, Mairo Cert., Ex. S., at 2.)

Finally, on August 9, 2004, the NJDEP determined that "Defendant's Remedial Action Progress Reports "meet the conditions of the March 21, 2001 Remedial Action Workplan (RAW) approval. Shell Oil Products U.S. (Shell OPUS) is, therefore, in compliance with N.J.A.C. 7:14B–6." (Aug. 9, 2004, NJDEP Correspondence, Mairo Cert., Ex. S., at 1.)

B. The Residential Properties

Plaintiffs own twenty-seven respective residential properties near Defendant's gasoline station.[8] Twenty-six of the twenty-seven properties-all but 583 Berlin Cross Keys Road ("the Wallace property")-contain potable wells located in the Kirkwood Cohansey Aquifer. Because Plaintiffs' properties are north/northeast of the contamination site, (Undisputed Facts ¶ 38), they are considered upgradient or sidegradient of the contamination site, depending on whether CW–8 is pumping.[9]

**\*3** Consistent with the requirements of the NJDEP directives, Defendant tested the Plaintiffs' residential wells for six gasoline-related compounds: benzene, toluene, ethylbenzene, xylenes, MTBE, and TBA. No testing detected any gasoline-related compound on eighteen of the properties.[10] Detection of compounds on the remaining eight properties was as follows:

- A single detection of 0.79 ppb toluene and ten detections of MTBE (highest at 15.5 ppb) at 4 Latham Way,

  - Three detections of MTBE (highest at 0.76 ppb) at 14 Donna Marie Court,

  - Three detections of MTBE (highest at 1.4 ppb) at 6 Latham Way,

  - A single detection of 1.4 ppb toluene at 850 Sicklerville Road,

  - A single detection of 0.4 ppb MTBE at 4 Donna Marie Court,

  - A single detection of 0.3 ppb MTBE at 12 Donna Marie Court,

  - A single detection of 1.2 ppb MTBE at 8 Latham Way, and

  - A single detection of 0.3 ppb MTBE at 20 Spring Hollow Road.

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

The GWQS for toluene is 1,000 ppb and the GWQS for MTBE is 70 ppb. No gasoline-related compound was detected on any Plaintiff's property after April 2001. According to the Certification of Julian Davies, a Project Manager for EnviroTrac, Ltd., an environmental consulting firm retained by Defendant to remediate the Motiva site, the NJDEP never restricted the consumption of water from Plaintiffs' potable wells, and never required Defendant to treat the water, provide Plaintiffs with an alternate source of water, or collect soil samples from the residential properties.[11] (Julian Davies Cert., Mairo Cert., Ex. R, at 2.)

Since the fact of the contamination became known, several Plaintiffs have sold their property. Maria and John Wallace sold 583 Berlin Cross Keys Road for $350,000.00 in September 2001, Plaintiffs Thomas and Tina Stankiewicz sold 9 Spring Hollow Drive in July 2002 for $143,000.00, Barbara Tanner sold 17 Spring Hollow Drive for $134,000.00 in February 2002, Daniel and Maria Rodriguez sold 18 Spring Hollow Drive for $138,000.00 in July 2003, David Lodi sold 5 Donna Marie Court for $104,000.00 in September 2001, 13 Donna Marie Court was sold for $109,900.00 in July 2000, and 19 Spring Hollow Drive was sold for $133,900.00 in May 2001.

Defendant filed motions for summary judgment and to exclude experts on June 24, 2005, after requesting and receiving permission from this Court to extend by one week the date for the filing of dispositive and *in limine* motions. Briefs in opposition were due July 22, 2005, however, Plaintiffs instead filed an untimely request for an extension on August 2, 2005, and a second request on September 6, 2005, moving the deadline to September 30, 2005. On October 5, 2005, Plaintiffs filed another untimely request for an extension, and ultimately did not submit a complete Opposition until October 14, 2005. Nevertheless, because a district court should not grant a motion for summary judgment without examining the merits, *Stackhouse v. Mazurkiewicz,* 951 F.2d 29, 30 (3d Cir.1991) (citing *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168 (3d Cir.1990)), this Court will exercise its discretion to consider Plaintiffs' Opposition, even though it is untimely. Local Civ. R. 7.1(d) (5).

**II. Standard**

**\*4** Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex,* 477 U.S. at 322); *Heffron v. Adamar of N.J., Inc.,* 270 F.Supp.2d 562, 568–69 (D.N.J.2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party." *Heffron,* 270 F.Supp.2d at 69 (citing *Anderson,* 477 U.S. at 249–50).

**III. Motion to Exclude Expert Daniel McDonald**

Defendant moves to exclude the testimony of Plaintiffs' expert Daniel McDonald ("McDonald") on the grounds that he is unqualified and his report is unreliable.[12] Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13] In the Third Circuit, the admissibility of expert testimony is contingent on the "qualifications" of the expert and the "reliability" of his methodology. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) (interpreting *Daubert* ); *see also Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

**A. *In Limine* Hearing**

In certain instances, courts are obligated to provide *in limine* hearings before applying *Daubert* to exclude expert testimony. *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3d Cir.1999). A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." *Id.* In other words, where a report is "conclusory and did not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." *Oddi,* 234 F.3d 136, 152 (3d Cir.2000) (holding that the district court did not err "in granting summary judgment here without an *in limine* hearing") (quoting *Padillas,* 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. *Id.* at 153.

**\*5** The evidence before this Court clearly establishes the process by which McDonald "arrived at his conclusions," *Oddi,* 234 F.3d at 152, and McDonald's report and deposition details the methodology underlying his determinations. As discussed below, this Court will exclude McDonald's testimony on the grounds that his analysis and methodology are baseless and inconclusive, not because his report is insufficiently explained. Additionally, Defendant's motion for summary judgment alerted Plaintiffs to the *Daubert* challenge, yet Plaintiffs neither requested a hearing nor offered any affidavit or evidence in support of McDonald. Accordingly, an *in limine* hearing is unnecessary.

**B. Qualifications**

The Third Circuit instructs courts to "liberally" evaluate an expert's qualifications. *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000). In particular, the Circuit has "eschewed overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *In re Paoli,* 35 F.3d at 741 (citing *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982) and *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir.1979)). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id.*

Nevertheless, the Third Circuit has "also set a floor with respect to an expert witness's qualifications." *Elcock v. Kmart Corp.,* 233 F.3d 734, 742 (3d Cir.2000). To demonstrate when an expert would not be qualified under Rule 702, the *Elcock* Court offered the pre-*Daubert* case, *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110 (3d Cir.1987), which held a tractor salesperson unqualified to testify as an expert about the cause of a tractor fire. *Elcock,* 233 F.3d at 742 (citing *Aloe Coal,* 816 F.2d 110).

In *Elcock* itself, the Court determined with "misgivings" that the district court had not abused its discretion by concluding that a psychologist with experience in obtaining employment for disabled individuals was qualified to testify to the possibility for vocational rehabilitation of the injured plaintiff. However, the Court acknowledged that it also would have upheld a decision to exclude the expert since "he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform."[14] *Elcock,* 233 F.3d at 744. Taken together, *Elcock* and *Aloe Coal* indicate that where a proposed expert's area of experience is adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.

McDonald has worked as a licensed appraiser in New Jersey for approximately twenty-two years. Defendant argues that McDonald is nevertheless unqualified to testify to the diminution in value of Plaintiffs' properties because McDonald has no experience in appraising contaminated property. Defendant notes that McDonald has never appraised property allegedly contaminated by emissions from a gasoline station and has never acted as an expert in a situation involving contamination of the groundwater or allegations of a leaking underground storage tank. (Daniel McDonald Dep. ("McDonald Dep."), Mairo Cert. in Supp. Def.'s Mot. to Exclude Plaintiffs' Expert Daniel McDonald, Ex. C, at 23–24.) Defendant also points out that McDonald did not entirely understand the Ellwood and Gallo reports upon which he relied, including the charts indicating the presence and degree of contaminating agents on the property. (McDonald Dep. at 55–56.)

**\*6** This case lies squarely between *Aloe Coal* and *Elcock.* Although McDonald is an experienced appraiser, no evidence indicates that he has any experience appraising contaminated properties or is qualified to value the effects of stigma

Case 1:19-md-02875-RBM-SAK Document 577-3 Filed 09/18/20 Page 577 of 751
PageID: 11943
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

on property values. Just as a psychologist experienced in assisting individuals to find work may be unqualified to testify about the general availability of jobs in the economy, an individual able to appraise an uncontaminated property may have no grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma. Because nothing in McDonald's experience indicates knowledge or expertise in issues of contamination, he is unqualified to testify to the loss of value to Plaintiffs' properties arising from the alleged contamination.

C. Reliability

Because expert testimony has the potential to bear considerable weight with a jury, the district court functions as a gatekeeper responsible for assuring "that the scientific methodology upon which the expert opinion is founded is reliable" and that the "expert's conclusion is based on good grounds." *In re Paoli,* 35 F.3d at 732–33. To ascertain "reliability," the court must examine a number of factors, both those established in *Daubert* and those previously enumerated by the Third Circuit in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985). *Oddi,* 234 F.3d 145 (citing *Paoli II,* 35 F.3d at 742). In particular, the court must consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II,* 35 F.3d at 742 n. 8; *see also Elcock,* 233 F.3d at 746 (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli,* 35 F.3d at 744.

Of course, an expert's opinion need not be "perfect," and judges may not substitute their opinions for those of an expert. *Paoli,* 35 F.3d at 744; *see also Crowley v. Chait,* 322 F.Supp.2d 530, 536 (D.N.J.2004). However, courts also need not admit mere conclusions or "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 608 (D.N.J.2002) (quoting *General Elec. Co.*

*v. Joiner,* 522 U.S. 136, 145–46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

**\*7** Mere assumptions, without causal evidence or methodological analysis may be inadmissible. *In re TMI Litig.,* 193 F.3d 613, 667–68 (3d Cir.1999). Conclusions based only on the expert's experience, *Oddi,* 234 F.3d at 140–41, and testimony founded on methods that are not generally accepted or lack testable hypotheses may also fail to surmount the *Daubert* standard, *Elcock,* 233 F.3d at 746. Furthermore, conclusions based on analogies that are too dissimilar to the subject of the testimony may also merit exclusion. *General Elec.,* 522 U.S. at 144 (rejecting expert testimony that plaintiff's cancer was due to exposure to PCBs when the testimony was based on animal studies of infant mice that had developed cancer after exposure to PCBs).

In response to Defendant's motion to exclude McDonald's testimony, Plaintiffs argue that "Mr. McDonald's opinions are based upon credible facts, NJDEP records, the reports of Plaintiffs' liability experts and individual appraisal reports prepared for each residential property." (Pl.s' Opp. Def.'s Mot. Summ. J. ("Opp."), filed Oct. 12, 2005, at 30.) However, McDonald testified in his deposition that he relied only on the Gallo and Ellwood Reports, and he specifically testifies that he did *not* "review any correspondence from the NJDEP related to this site." (McDonald Dep. at 15.)[15]

In spite of Plaintiffs' arguments to the contrary, this Court cannot avoid the conclusion that McDonald's methodology is entirely unreliable. In his report, McDonald determines that the value of Plaintiffs' properties with no evidence of contamination should be discounted 35% percent and property with onsite contamination should be discounted by 66%. (McDonald Report ("McDonald Report"), Mairo Cert. in Support of Def.'s Mot. Exclude Pl.s' Expert Daniel McDonald, Ex. B., at 31, 33.) McDonald reached the 35% and 66% figures without discussing, or even recognizing, the extent to which the property was actually contaminated. As demonstrated by his ignorance of the "ND"/Not Detected signifier in the Gallo and Ellwood Reports, McDonald did not know how to read the charts denoting the levels of contamination. (McDonald Dep. at 56.) Nor had McDonald ever conducted any physical inspection of or visit to the properties prior to writing the report.[16] (McDonald Dep. at 15–16.)

Furthermore, to quantify the stigma attached to Plaintiffs' properties, McDonald relies upon a highly misleading

2006 WL 166452

analogy with a site of profoundly contaminated residential properties in Dover Township. (McDonald Report at 27.) Specifically, McDonald compares Plaintiffs' properties with "an area of Dover Township that had ground water contamination from Union Carbide and ... Ciba Geigy that resulted in what was commonly known as a cancer cluster among children," meaning "an inordinate number of children with cancer." (McDonald Dep. at 158–59.) McDonald selected the Dover site not because of its comparability, but because McDonald "didn't know of any other cases that, where the data was as readily available." (McDonald Dep. at 159.)

**\*8** Employing the Dover analogy, McDonald determined that the property in the Dover site is in the final stages of recovery and continues to suffer a stigma loss of 13%. Because McDonald considered Plaintiffs' properties in the early stages of recovery, McDonald determined that they must bear a stigma discount of at least two or three times that of the Dover site, resulting in a discount of 35%.[17] However, the severity of the contamination and resulting illness among Dover residents undercuts any grounds for comparison with Plaintiffs' properties where there were few detections of contaminants and no reported physiological effects.

The methodology employed to reach the 66% figure is equally unreliable. To assess the value of properties with some evidence of contamination, McDonald sent an email to thirteen financial lenders to determine whether they would "lend on a property that has known contamination, or the stigma of contamination, to the ground water." (McDonald Report at 32.) Of the thirteen lenders, six replied. One of those refused to comment, and one said that it would loan given certain circumstances. The other four lenders stated that they would not lend on a property that is contaminated, but the content of their brief responses suggested that they understood the email hypothetical to denote property that was actually contaminated and out of compliance with state requirements.[18]

From the results of the email test, McDonald concludes that there would be no buyers other than those who could pay cash.[19] McDonald then assessed the discount in value given cash-only buyers, extrapolating from this a discount of 66%. (McDonald Report at 33.) However, the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually present,

and the unclear calculations and assumptions underlying McDonald's arrival at 66%.

Ultimately, McDonald's report does not fulfil any of the reliability factors. His method is untestable and arbitrary, without a generally accepted, established, or peer reviewed methodology, and his evaluation was conducted without any real standards. Because McDonald is unqualified and his evaluation is unreliable, Defendant's motion *in limine* to exclude his testimony will be granted.

IV. Plaintiffs' Claims

A. Negligence and Gross Negligence
To surmount a motion for summary judgment of a negligence claim, Plaintiffs must provide evidence such that a reasonable jury could find "breach of a duty of care and actual damages sustained as a proximate cause of the breach." *Muise v. GPU, Inc.,* 371 N.J.Super. 13, 35, 851 A.2d 799 (App.Div.2004) (citing *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987)); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 45, 477 A.2d 1224 (1984) ("[T]he plaintiff must show a breach of duty and resulting damage to prevail in a negligence action."). Motiva argues that Plaintiffs have failed to establish damages and causation and requests summary judgment of Plaintiffs' gross negligence claim on the same basis.[20]

**\*9** The absence of an injury will preclude a negligence claim, even where a clear breach of duty is present. *Rocci v. MacDonald–Cartier,* 323 N.J.Super. 18, 24–25, 731 A.2d 1205 (App.Div.1999) (affirming summary judgment for insufficient evidence of damages in defamation case and noting that "a plaintiff must present proof of a material question of fact as to both liability and damages") (citing *Norwood Easthill Assoc. v. Norwood Easthill Watch,* 222 N.J.Super. 378, 384, 536 A.2d 1317 (App.Div.1988) (affirming summary judgment of malicious interference claim on basis that "plaintiff has suffered no injury or damage")). At the summary judgment stage, Plaintiffs must provide actual evidence of injury and cannot simply rely upon "unsubstantiated allegations." *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992) (reversing district court's denial of summary judgment). Just as "a residential customer not in residence during a power loss, or a commercial customer whose store was closed, might have no damages except the inconvenience of resetting clocks," *Muise, 371 N.J.Super. at 49, 851 A.2d 799,* the release of contaminants into the groundwater aquifer does not

itself generate damages, unless Plaintiffs can show that they suffered harm.

Plaintiffs concede that they "have not presented and will not present claims for the present manifested bodily injury." (Undisputed Facts ¶ 67.) However, they argue that they have adequately established damages for medical monitoring and property damage. They do not address their claim for emotional distress.[21]

1. Medical Monitoring

Damages for medical monitoring are appropriate where a plaintiff exhibits no physical injury, but nevertheless requires medical testing as a proximate result of a defendant's negligent conduct. *Ayers v. Jackson Twp.,* 106 N.J. 557, 600, 525 A.2d 287 (1987). The risk of injury need not be quantified to merit medical surveillance damages; however, the plaintiff must establish that the risk of serious disease is "significant." *Id.* at 599–600, 525 A.2d 287; *Campo v. Tama,* 133 N.J. 123, 131, 627 A.2d 135 (1993) (awarding medical monitoring damages to a plaintiff with a "fifty- to seventy-five-percent chance of suffering a recurrence of cancer" due to the delay resulting from defendant doctor's malpractice). In the case of toxic exposure, "medical-surveillance damages may be awarded only if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury." *Theer v. Philip Carey Co.,* 133 N.J. 610, 627, 628 A.2d 724 (1993). Such damages are "not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered an injury or condition resulting from that exposure." *Id.* at 628, 628 A.2d 724.

Low level contamination, "that is, contamination below the minimum level set by DEP for water remediation," typically is insufficient to establish injurious toxic exposure. *Muralo Co., Inc. v. Employers Ins. of Wausau,* 334 N.J.Super. 282, 290–291, 759 A.2d 348 (App.Div.2000) ("[S]ince it is clear that no untreated groundwater is ever entirely pure, we are satisfied that DEP standards are the most reliable guide for determining whether contamination causing damage ... has occurred."). Here, contaminants have been detected in only eight of Plaintiffs' wells, and no detection has been even close to the GWQS. The NJDEP never restricted Plaintiffs' use of water from their potable wells, nor required Defendant to treat Plaintiffs' wells or to provide Plaintiffs with an alternate water source.

**\*10** Plaintiffs rely on the testimony of Dr. Michael Gochfeld, Ph.D. ("Gochfeld"), to establish the significant health risks and necessity of medical surveillance following from the alleged contamination of Plaintiffs' property. However, nothing in Gochfeld's report concludes that the individual Plaintiffs themselves require medical monitoring under the circumstances. Rather, Gochfeld's report creates a medical monitoring program for a hypothetical target population without taking into consideration the actual exposure of any plaintiff.[22] (Gochfeld Dep. at 26–29.) Gochfeld prepared his report under the assumption that "there were known or actual or potential exposure to a variety of constituents of gasoline." (Gochfeld Dep. at 12.) He states in deposition that he had "no specific factual knowledge of the actual exposures in this case," and he confirms that he has never examined the individual Plaintiffs. (Gochfeld Dep. at 10, 29.)

Gochfeld himself notes that "[w]hether a person exposed to MTBE requires medical monitoring depends in large measure on the level of exposure and the time over which it occurred" and notes that "clearly people that are exposed to MTBE casually would not require one." (Gochfeld Dep. at 24.) Furthermore, Gochfeld stated that he "probably would not" recommend medical monitoring for the minor and often single detections of MTBE on Plaintiffs' properties.[23] (Gochfeld Dep. at 46–50.) Consequently, Gochfeld's report does not establish that Plaintiffs require medical monitoring.

Plaintiffs also appear to argue that their wells may have been more contaminated prior to the initiation of Defendant's testing in July 2000. (Opp. at 20.) However, Plaintiffs provide no evidence suggesting that such exposure actually occurred or that any exposure prior to July 2000 was more than minimal. Plaintiffs also argue for the first time in their Opposition that they may have ingested water from contaminated sources besides the potable wells on their property. (Opp. at 20.) However, Plaintiffs offer no evidence that any Plaintiff actually consumed water from CW–8. Without any evidence supporting their theories, Plaintiffs cannot establish a claim for medical monitoring sufficient to survive summary judgment.

Because Plaintiffs have provided no evidence of a "distinctive increased risk of future injury" from the exposure, Plaintiffs are not entitled to damages for medical monitoring.

2. Property Damage

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

Defendant requests summary judgment of Plaintiffs' claims of property damage on the grounds that the contamination caused no actual damage to Plaintiffs' properties.[24] Instead of claiming that their property was physically harmed, Plaintiffs contend that the news of the contamination stigmatized their property, reducing its value in the minds of potential buyers.

In support of their claim for stigma damages, Plaintiffs offer the expert testimony of Daniel McDonald. However, as discussed previously, McDonald's testimony must be excluded as unreliable. Plaintiffs also argue that the testimony of individual Plaintiffs establishes a stigma discount to their property:

> **\*11** Plaintiff Marie Wallace has submitted sworn Interrogatory statements documenting a $150,000.00 loss on the sale of her property. See Exhibit 0 to McKenna Certification. Other Plaintiffs have similarly provided certified answers to Interrogatories and Deposition testimony as to the loss in value through sales transactions, which occurred from the discharge. See Exhibit N–R to the McKenna Certification.

(Opp. at 20–21.)

This evidence fails to establish an injury. Exhibits N–R consist of contracts for sale and unexecuted contracts for sale of three of Plaintiffs' properties, including the Wallace property, leaving it to the Court's imagination to ascertain how these contracts demonstrate a loss in value. Wallace's testimony also fails to establish a stigma injury to the property.

Specifically, Wallace claims that she received a verbal offer for her asking price of $500,000.00 from a man named "Amin," whose last name she cannot recall. (Marie Wallace Dep., McKenna Cert., Ex. 0, M.) Wallace claims that he reneged from the agreement after she told him about the release, however, the alleged offeror never gave Wallace the offer in writing and she has no evidence of the offer or "Amin's" motive for withdrawing. Consequently, even construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Plaintiffs' properties were stigmatized on the basis of this evidence alone.

### 3. Emotional Distress

Defendant also moves for summary judgment of Plaintiffs' claim for emotional distress. Plaintiffs do not respond to this argument in their Opposition, and Defendant is entitled to summary judgment of Plaintiffs' emotional distress claim for Plaintiffs' failure to present evidence of significant distress or physical injury.

A claim for emotional distress cannot succeed absent evidence of physical injury or "severe and substantial" emotional distress, even where a person has a reasonable concern of an enhanced risk of future disease. *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co.,* 243 N.J.Super. 170, 174–75, 578 A.2d 1248 (App.Div.1990) (noting that "[i]n the absence of physical injury, damages are allowed where the resultant emotional distress is severe and substantial" and listing cases). Without some physical injury, mere exposure to toxic chemicals does not give rise to a claim for emotional distress damages. *Id.* (holding plaintiffs unable to sustain emotional distress claim for exposure to chemicals manufactured at plant near their residences); *see also Mauro v. Raymark Indus., Inc.,* 116 N.J. 126, 137, 561 A.2d 257 (1989); *Troum v. Newark Beth Israel Med. Ctr.,* 338 N.J.Super. 1, 17, 768 A.2d 177 (App.Div.2001). Because Plaintiffs provided no evidence of significant emotional distress or physical injury, Defendant's motion for summary judgment will be granted.

### B. Trespass

Defendant moves for summary judgment of Plaintiffs' claim for trespass. Plaintiffs argue that Defendant's "intentional refusal" to remove the contamination from their property and failure to install remediation equipment amounts to an intentional trespass.[25] (Opp. at 25.)

**\*12** The Restatement (Second) of Torts defines intentional trespass as:

> One who intentionally and without a consensual or other privilege
>
> (a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or
>
> (b) remains thereon, or
>
> (c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner stated in §§ 160 and 161, is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

Rest. (2d) Torts § 158.

2006 WL 166452

As Defendant argues, New Jersey has moved away from "such common law claims as trespass and nuisance" in environmental pollution cases. *Mayor and Council of Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1053 (D.N.J.1993); *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 256, 497 A.2d 1310 (1985) ("There is no need for us ... to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned."). Regardless of the continuing viability of trespass claims in the environmental context, however, Plaintiffs have failed to come forward with any evidence supporting their claim and cannot survive summary judgment.

Plaintiffs note that they are "not arguing that Defendants intentionally caused the contamination of their property," but rather are claiming that "defendants have repeatedly refused to perform the horizontal and vertical delineation of the soil and groundwater contamination in the area of the residential properties." (Opp. at 25.) However, no evidence suggests that such measures were necessary to remove contaminants from Plaintiffs' properties. Rather, the record indicates that Defendant consistently complied with NJDEP requirements, including the installation and maintenance of a groundwater recovery system to rehabilitate the aquifer, and the NJDEP never required Defendant to install any sort of remediation equipment on any of the residences. Given that there has been no detection of a gasoline-related contaminant in any Plaintiff's potable well since April 2001, the argument that Defendant permitted contamination to remain on Plaintiffs' properties lacks any viable evidentiary foundation. Defendant's motion for summary judgment of Plaintiffs' trespass claim will be granted.

C. Strict Liability
Plaintiffs originally claimed a cause of action for strict liability under the theory that the handling, storage, or use of gasoline constitutes an abnormally dangerous activity. However, Plaintiffs voluntarily dismissed this claim in their Opposition. (Pl.'s Opp. at 3.) Accordingly, the Court will not address the merits of Plaintiffs' strict liability claim.

D. Environmental Statutes

1. New Jersey Environmental Rights Act
Plaintiffs allege a right to recover under the New Jersey Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A–1 *et seq.* Defendant requests summary judgment on the grounds that Plaintiffs have not satisfied the ERA's notice

provision, N.J.S.A. 2A:35A–11, and that an ERA claim is not actionable where the NJDEP has acted to institute and oversee remediation of the contamination.

**\*13** Section 4(a) of the ERA, permits "any person" to "maintain an action in a court of competent jurisdiction against any other person to enforce, or to restrain the violation of, any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A–4(a). Although the ERA itself does not create substantive rights, it confers standing on private persons to enforce other environmental statutes, including the New Jersey Spill Compensation and Control Act ("Spill Act"). *Rockaway,* 811 F.Supp. at 1054; *Allied Corp. v. Frola,* 701 F.Supp. 1084, 1091 (D.N.J.1988).

The NJDEP is "entrusted initially with the right to determine the primary course of action to be taken." *Howell Township v. Waste Disposal, Inc.,* 207 N.J.Super. 80, 95, 504 A.2d 19 (App.Div.1986) ("In order to be effective, [the NJDEP] must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly."). Consequently, the right of private parties to sue under the EPA is "an alternative to inaction by the government which retains primary prosecutorial responsibility." *Superior Air Prod. Co. v. NL Indus., Inc.,* 216 N.J.Super. 46, 58, 522 A.2d 1025 (App.Div.1987); *Rockaway,* 811 F.Supp. at 1054 ("[T]he primary goal of the ERA is to limit lawsuits by private litigants to those instances where the government has not acted.").

A private ERA suit may be permitted even in the absence of complete government inaction if the NJDEP has "failed in its mission ... failed or neglected to act in the best interest of the citizenry or has arbitrarily, capriciously or unreasonably acted." *Howell,* 207 N.J.Super. at 96, 504 A.2d 19; *Morris County Transfer Station, Inc. v. Frank's Sanitation Serv., Inc.,* 260 N.J.Super. 570, 578, 617 A.2d 291 (App.Div.1992) (permitting private ERA action where the NJDEP would not address violation for three years and had taken no enforcement actions against contaminating defendant who continued operating its illegal facility two months after receiving a violation notice). Where NJDEP "action subsequently proves sufficient to protect the environment," however, NJDEP "action under the Spill Act is preemptive of private rights under ERA." *Superior Air Prod.,* 216 N.J.Super. at 61, 522 A.2d 1025. The permissibility of private action must be evaluated on a case-by-case basis. *Id.*

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

Here the record indicates consistent and pervasive NJDEP oversight of the remediation process, requiring Defendant to regularly test Plaintiffs' wells and institute interim and permanent groundwater recovery systems. Plaintiffs have not claimed that the NJDEP failed to act or acted unreasonably, and there are no grounds for finding NJDEP inaction sufficient to permit a private ERA suit. Furthermore, as discussed below, Plaintiffs failed to give the NJDEP the requisite notice of their private suit. Accordingly, Defendant's motion for summary judgment of Plaintiffs' ERA claim will be granted.

2. Notice

**\*14** Before a private party may commence an action under the ERA, the party must "at least 30 days prior to the commencement thereof, direct a written notice of such intention by certified mail, to the Attorney General, the Department of Environmental Protection, the governing body of the municipality in which the alleged conduct has, or is likely to occur, and to the intended defendant." N.J.S.A. 2A:35A–11. The notice provision is intended to give the government an adequate opportunity to intervene in the litigation and to allow the NJDEP:

> to exercise value judgments in individual cases, e.g., whether it will join in that litigation or enforcement proceeding, whether other actions it may have taken already with respect to the particular problem or offender would render the litigation subject to collateral estoppel or res judicata principles, whether its expertise would assist the court, whether broad State interests would be sacrificed unduly to regional or personal interests by the instigators of that litigation, etc.

*Howell,* 504 A.2d at 95; *Morris County,* 260 N.J.Super. at 578, 617 A.2d 291 (quoting *Howell* for same).

Because Plaintiffs did not provide the required thirty day notice to the NJDEP or the Attorney General, they are barred from further pursuing their claim under the ERA. Plaintiffs argue that Defendant is judicially estopped from claiming lack of notice for failure to raise this issue at an earlier stage in the case. Plaintiffs analogize the ERA requirement to that of an affidavit of merit, required in certain cases to avoid "unmeritorious and frivolous malpractice lawsuits at an early stage of litigation." *Knorr v. Smeal,* 178 N.J. 169, 197–98, 836 A.2d 794 (2003) (holding judicially estopped defendant's request for summary judgment for plaintiff's failure to file affidavit of merit) (citing *Palanque v. Lambert–Woolley,*

168 N.J. 398, 404, 774 A.2d 501, 505 (2001)); *Ferreira v. Rancocas Orthopedic Assoc.,* 178 N.J. 144, 836 A.2d 779, (2003) (same).

Defendant argues that the ERA notice requirement is more analogous to the notice of intent in the Resource Conservation and Recovery Act (RCRA), which the Supreme Court held to be a jurisdictional prerequisite to suit in *Hallstrom v. Tillamook County,* 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) ("[C]ompliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit."); *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1189 (3d Cir.1995) (holding notice jurisdictional in context of Clean Water Act ("CWA")); *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency,* 126 F.3d 461, 471 (3d Cir.1997) (holding notice provision jurisdictional in context of Endangered Species Act ("ESA")).

However, the language of the notice requirement in RCRA is not entirely analogous to that of the ERA. RCRA states, under the heading of "Actions prohibited" that "No action may be commenced ... prior to 60 days after the plaintiff has given notice of the violation to" the Administrator, the state and the alleged violator. 42 U.S.C.A. § 6972. The ERA lacks the "no action may be commenced" language of the RCRA, CWA, and ESA, and states only that notice must be sent "at least 30 days prior to the commencement" of suit. Consequently, the argument that the plain language of the statute creates a jurisdictional bar is not as strong in the context of the ERA.

**\*15** Nevertheless, because the purpose of the notice provision is to provide the Attorney General and NJDEP with notice of the suit and opportunity to intervene, *Howell,* 504 A.2d at 95, and not merely to protect defendants, as in the case of the affidavit of merit, Defendant is not judicially estopped from raising Plaintiffs' lack of compliance with the notice provision and is entitled to summary judgment of Plaintiffs' ERA claim.

E. Spill Act Claim

In their complaint, Plaintiffs assert a private right of action under the Spill Act, N.J.S.A. 58:10–23.11 *et seq.*[26] As amended in 1991, the Spill Act authorizes a private cause of action for individuals to recover costs for environmental damage to their property. *Housing Auth. of City of New Brunswick v. Suydam Inv., L.L.C.,* 177 N.J. 2, 18, 826 A.2d 673 (2003). Actions under the Spill Act are limited to clean

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 583 of 751
PageID: 11949
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

up and removal costs, *Bahrle v. Exxon Corp.,* 145 N.J. 144, 155, 678 A.2d 225 (1996), defined as:

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to section 1 of P.L.2002, c. 37 associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property.

N.J.S.A. 58:10–23.11b(d). The Act does not authorize "damages arising from emotional distress, enhanced risk of disease, loss of enjoyment of property, and other economic and financial harm." *Bahrle,* 145 N.J. at 155, 678 A.2d 225. Plaintiffs maintain that the investigation conducted by Ellwood was a reimbursable clean up and removal cost under the Spill Act. As Plaintiffs suggest, because "a discharge cannot be addressed until the contaminants are defined and the extent of the discharge determined," certain forms of investigative costs are implicitly included in the Act. *Metex Corp. v. Federal Ins. Co.,* 290 N.J.Super. 95, 115, 675 A.2d 220 (App.Div.1996).

However, for a private party to obtain reimbursement under the Act, the party must have obtained "written approval from the department," for example, in a memorandum of agreement, prior to incurring the cost. N.J.S.A. 58:10–23.11b(d); *Id.* Such approval permits the NJDEP to "review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action." *Id.; see also Interfaith Cmty Org. v. Honeywell Intern., Inc.,* 263 F.Supp.2d 796, 867 (D.N.J.2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act."). Because Plaintiffs have not obtained NJDEP approval for any cost incurred, including the Ellwood report, Defendant is entitled to summary judgment of Plaintiffs' Spill Act Claim.

**\*16** The accompanying Order shall enter today. *Elcock,* 233 F.3d at 741.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 166452

**Footnotes**

1  The following facts are taken from Defendant's statement of undisputed material facts, filed June 24, 2005, ("Undisputed Facts") and Plaintiffs' counterstatement of undisputed facts, filed Oct. 14, 2005, ("Counterstatement Facts"). Plaintiffs did not provide a separate statement of undisputed facts.
   Although Plaintiffs dispute the majority of Defendant's statements of fact, Plaintiffs' counterstatements typically provide additional facts without setting forth any conflicting evidence. Where no actual disputes are presented, Defendant's statements will be treated as undisputed. *See e.g., Tofano v. Reidel,* 61 F.Supp.2d 289, 292 n. 1 (D.N.J.1999) (citing Fed.R.Civ.P. 56(e)) ("This court will ... not consider assertions without evidential support as creating genuine issues of disputed fact."); *Talbot v. United States,* 2005 WL 2917463, *2 (D.N.J.2005) (noting that where the nonmoving party does not submit facts in opposition, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted" (quoting *Allebach v. Sherrer,* No. 04–287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J.2005)).
   More generally, Plaintiffs' brief suffers from numerous typographical errors and a dearth of citations to page numbers in the record. This "alone warrants exclusion of the evidence." *See Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774–75 (9th Cir.2002) (holding that party's failure to cite page and line numbers when referencing the deposition merits exclusion of evidence); *Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir.1999) ( "[J]udges need not paw over the files without assistance from the parties."); *Nissho–Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988) (parties must designate specific facts and their location in the record).
2  Among the original litigants to the suit were also former plaintiffs Michael and Susan Kammerhoff and Norma Simmons. The Kammerhoff plaintiffs were voluntarily dismissed, and plaintiff Norma Simmons died on August 26, 2000.
3  VOCs generally associated with gasoline discharge include MTBE, benzene, toluene, ethylbenzene, xylene (collectively "BTEX"), and tertiary butyl alcohol ("TBA"). The NJDEP has issued a Ground Water Quality Standard ("GWQS") for each of these VOCs, also known as "gasoline-related compounds." MTBE, for example, has a GWQS of 70 parts per billion ("ppb").

4   Although Motiva detected MTBE in thirteen residential wells, not all of these wells are owned by Plaintiffs to this litigation. Of the twenty-seven parcels of property at issue in this suit, only eight of the properties contain wells that ever tested positive for any gasoline-related compound.

5   The direction of water's flow in an aquifer is described as "downgradient," and the direction against the current is "upgradient."

6   In particular, testing revealed emissions in monitoring wells 6–Shallow ("MW–6S") and 7–Deep ("MW–7D"), which lie between the Motiva site and the residential properties. However, the majority of upgradient monitoring wells did not test positive for gasoline-related contaminants. (NJDEP Directive, March 21, 2001 ("March 2001 Directive"), Mairo Cert. in Supp. Def.'s Mot. Summ. J., filed June 24, 2005 ("Mairo Cert."), Ex. O, at 4.)

7   Plaintiffs dispute Defendant's characterization of the CEA, (Counterstatement Facts ¶ 31), on the basis that Defendant proposed the CEA prior to conducting an actual delineation of the plume and that "the Plaintiffs' residential wells could only had [sic] been included in the CEA, if Defendant intended to supply a permanent public water supply to Plaintiffs' properties." While Plaintiffs' contention with the CEA is not entirely clear, Plaintiffs have not provided any evidence indicating that the NJDEP improperly approved the CEA or that the CEA was an inaccurate representation of the boundaries of contaminants in excess of the GWQS.

8   Plaintiffs' properties are: 850 Sicklerville Road; 565, 569, 581, and 583 Berlin–Cross Keys Road; 6, 9, 10, 12, 13, 14, 1, 16, 17, 18, 20 Spring Hollow; 2, 4, 6, and 8 Latham Way; 3, 4, 5, 7, 12, 14, and 15 Donna Marie Court.

9   CW–8 is located approximately 1,000 feet downgradient of the contamination site. (March 2001 Directive at 2.) While active, CW–8 pumps approximately 500 gallons per minute and causes the groundwater to flow southwest. (Ellwood Report at 2.) When CW–8 is not pumping, the groundwater flow is more westerly. (Ellwood Report at 2.)

10  Plaintiff disputes these facts on the basis that:

    The Defendant has no data for any portable [sic] water supply of the Plaintiffs prior to July 2000. The Defendant never performed any delineation of the groundwater plume in the areas of the residential properties despite having actual knowledge of such contamination in MW–6, MW–7 and MW–12. See Gallo Certification and Exhibits C, D and E.

    (Counterstatement Facts ¶¶ 46–48.) However, because Defendant makes no averment of the presence or absence of contamination prior to July 2000, Defendant's statements are not actually in dispute. Plaintiffs provide no fact indicating an inaccuracy in Defendant's statements regarding the testing of Plaintiffs' wells. Consequently, there is no actual dispute regarding the presence or amount of *detected* gasoline-related compounds.

11  Plaintiffs dispute these statements by citing to Exhibit F of the McKenna certification; however, Exhibit F is the Ellwood report and therefore is not indicative of the NJDEP requirements. Plaintiffs nowhere cite to a statement by the NJDEP requiring Defendant to treat their water or provide them with an alternate water source, and therefore this fact is undisputed.

12  Because this Court will grant Defendant's motion for summary judgment, it will not reach the merits of Defendant's motions to exclude experts Gochfeld, Ellwood, and Gallo.

13  After *Daubert*, Rule 702 was amended to encompass the *Daubert* analysis:

    If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

    Fed.R.Evid. 702. While *Daubert* itself addressed only the admissibility of scientific evidence, the Court has since noted that courts' gatekeeping obligations extend to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

14  The Court noted that it had "misgivings" about the expert's qualifications in spite of:

    (1) [the expert's] general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments; (5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place no restrictions on membership; and (7) the fact that when [the expert] was in school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless.

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

15    Plaintiffs also argue that "Defendant does not attack the methodology, standard or factual basis for the opinions," (Opp. at 31), however, it is quite clear from Defendant's motion that the reliability of McDonald's methodology is hotly disputed.

16    McDonald also appeared unaware of the fact that Plaintiffs' properties are served by potable wells, even though the potable wells contain the evidence of contamination.

> Q: Do you know whether or not the plaintiffs' properties have potable wells?
> A: It's my understanding that they are hooked to a public water system.
> Q: If each of the properties did in fact have a potable well, would that be a factor that you were consider relevant in your analysis?
> Mr. McKenna: You may want to review the documents that you referenced in your report to assist you in this area. Just separate the Ellwood and Gallo reports. I'm going to go to the men's room.
> (Whereupon, a recess is taken.)
> Mr. Mairo: I am going to object that Mr. McKenna was basically coaching the witness.
> Back on the record.
> A: Your question about whether or not each of these houses were, was, had their own private well on site-
> Q: Uh-huh?
> A: -it's my understanding that each house is served by wells within and around the neighborhood and that Consumer, Consumers Water Company owns those wells and supplies that water to the homes.

(McDonald Dep. at 36.)

17    McDonald reaches the 35% devaluation figure with the following methodology:

> The subject properties are in the early stages of monitoring, and clean up of the ground water contamination. The properties from Dover Twp. are beyond the clean up stage and into the final stage of recovery, yet they still show a 13% loss in value as compared to similar properties outside of the contamination. The subject area is in stage D of recovery, which is the beginning of the remediation process. Based on the acceptance of the Detrimental Condition Model as a viable process for valuing Detrimental Conditions to Real Estate, by the appraisal community and the Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services, it would be logical to assume that the discount to the properties which are the subject of this report, would be 2 to 3 times that of properties in the final stage of recovery. In this case a discount of 35% would be considered reasonable.

(McDonald Report at 31.)

18    Interbay Funding, for example, qualified their statement that they would not lend by noting, "The property would have to be completely cleaned up. They would have to file all necessary documents to the state of NJ and we would require something from the state telling us the property is cleaned up." (McDonald Report at 32.) From this, McDonald concluded that Interbay Funding would not lend on properties such as Plaintiffs', without considering that none of Plaintiffs' properties were contaminated in excess of state standards.

19    In evaluating this data, McDonald states:

> The lenders that did respond have overwhelmingly stated that they would not approve the loan at all, or they would require substantial conditions to the loan. In the case of the subject properties, it can be assumed that a purchaser with private financing or cash would be the only potential buyer of houses in this area.

(McDonald Report at 32.)

20    Because the Court now finds that there is no evidence of any actual injury arising from Defendant's negligence, this Court will not address Defendant's causation argument.

21    Plaintiff argues that Defendant's motion for summary judgment of its negligence claim should be denied on the basis of the doctrine of *res ipsa loquitur*. However, *res ipsa loquitur* acts only to "permit[ ] an inference of defendant's negligence" (i.e., that defendant acted in an unreasonable manner) under particular circumstances. *Jerista v. Murray,* 185 N.J. 175, 192, 883 A.2d 350 (2005). The doctrine does not establish either causation or the presence of damages. *See e.g., Bahrle v. Exxon Corp.,* 279 N.J.Super. 5, 35, 652 A.2d 178 (App.Div.1995) (holding *res ipsa* doctrine inapplicable where "there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect"). Accordingly, because Defendant is contesting only causation and damages, the *res ipsa* doctrine does not apply.

22    Gochfeld testifies in his deposition that he created his report without any specific information about the Plaintiffs:

> Q: So, for example, in determining the percentage of the target population that was in high exposure category, that wasn't based on the ground water, your review of the ground water tables that were attached to Mr. Gallo's report?
> A: It was not.
> Q: That was based purely on just an assumption of yours?

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 586 of 751
PageID: 11952

> A: It was an assumption based on experience with previous programs or programs that are currently underway in our communities.
>
> Q: Having no specific factual knowledge of the actual exposures in this case?
>
> A: That's correct, these are hypotheticals.

(Gochfeld Dep. at 28–29.)

23    Gochfeld also states that he would not even recommend medical monitoring for the one property with by far the highest detection of MTBE (13.8 ppb at 4 Latham Way) "on this data alone" because "[i]t is possible that a person living there would only be drinking bottled water, would not be in the house very much." (Gochfeld Dep. at 50.)

24    Defendant argues further that New Jersey law does not permit Plaintiffs to recover for stigma damages in the absence of some physical harm to their property. Because Plaintiffs have provided no evidence of any stigma to their property, the Court will not reach Defendant's alternative argument.

25    It is unclear whether Plaintiffs allege negligent trespass since they discuss only the Restatement (Second) of Torts § 158, Intentional Trespass, in their Opposition. Unlike intentional trespass, negligent or reckless trespass requires evidence of "harm to the land, to the possessor, or to a thing or a third person." Rest. Torts 2d § 165; *see also Burke v. Briggs,* 239 N.J.Super. 269, 271, 571 A.2d 296 (App.Div.1990) (citing Rest.2d Torts § 158 with approval for another premise); *Karpiak v. Russo,* 450 Pa.Super. 471, 481, 676 A.2d 270 (Pa.Super.1996) (affirming dismissal of trespass claim for entry of dust onto property since the "evidence failed to establish that the dust caused appellants harm"). As discussed previously, Plaintiffs have not provided any evidence of injury to their persons or property. Consequently, to the extent that Plaintiffs are claiming negligent trespass, Defendant is entitled to summary judgment.

26    It is unclear whether Plaintiffs also raise a claim for cleanup and removal costs from the Spill Compensation Fund under N.J.S.A. 58:10–23.11g(a). (Opp. at 12–13.) However, the appropriate procedure to obtain compensation under the Fund is by filing a claim with the administrator of the Fund, "not later than one year after the date of discovery of damage. The administrator shall prescribe appropriate forms and procedures for such claims." N.J.S.A. 58:10–23.11k. In the event "a party, including a potentially responsible party ... contests the amount or validity of" a claim for reimbursement from the Spill Fund, "the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division," and the arbitrator's decision will be final unless it was "arbitrary, capricious, or unreasonable." *Lacey Municipal Util. Auth. v. New Jersey Dept. of Envir. Prot., Envir. Claims Admin.,* 369 N.J.Super. 261, 273, 848 A.2d 843 (App.Div.2004). Accordingly, this is an improper forum for a Spill Compensation Fund claim.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 56

In re Propulsid Products Liability Litigation, Not Reported in F.Supp.2d (2002)

2002 WL 1446714
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

In re: PROPULSID PRODUCTS
LIABILITY LITIGATION

No. MDL 1355, CIV.A. 01–1300.
|
July 2, 2002.

**Synopsis**
Consumers brought state court products liability action against manufacturers of prescription drug as well as certain pharmacies which allegedly sold drug to consumers. Defendants obtained removal. On defendant pharmacy's motion to dismiss, the District Court, Fallon, J., held that: (1) pharmacy was not a manufacturer under the Louisiana Products Liability Act (LPLA); (2) consumers stated claim for negligent and intentional misrepresentation; and (3) consumers stated a claim in redhibition.

Denied in part and granted in part.

West Headnotes (3)

[1]  **Products Liability**  ✍  Manufacturers in general; identification

    **Products Liability**  ✍  Drugs in general

    Pharmacy which allegedly sold prescription drug to consumers could not be deemed a "manufacturer," under the Louisiana Products Liability Act (LPLA), because pharmacy did not make the product nor did it have any input into the design of the product nor did it have any control over either the construction or quality of the product. LSA-R.S. 9:2800.53(1, 2).

[2]  **Fraud**  ✍  Statements recklessly made; negligent misrepresentation

    **Fraud**  ✍  Fraudulent representations or concealment as to particular facts

    Allegation that pharmacies affirmatively misrepresented side effects of prescription drug,

by acting as independent advisors to prescribing physicians and offering objective professional opinions and advice concerning possible side effects of drug, and misrepresented to consumers the drug's possible side effects, stated claim for negligent and intentional misrepresentation under Louisiana law, as allegations were not based on failure to warn but suggested that pharmacies may have voluntarily assumed a duty of care which was not ordinarily imposed and accordingly could be liable in negligence for breach of that duty.

[3]  **Sales**  ✍  Redhibitory defects or vices

    Consumers' allegation that pharmacy knew or should have known that prescription drug dispensed and sold by pharmacy was defective and unreasonably dangerous stated claim in redhibition under Louisiana law. LSA-C.C. art. 2520, 2545.

ORDER & REASONS

FALLON, District J.

 **\*1** Before the Court is the motion of defendant Forshag's Drug Store, Inc. ("Forshag's") in consolidated civil action No. 01–1300 captioned *Yvonne Adams, et al. v. Forshag's Drug Store, Inc., et al.* In its motion, Forshag's seeks dismissal of all claims asserted against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For reasons set forth below, the motion is DENIED IN PART AND GRANTED IN PART.

I. *Background*
This litigation concerns the alleged harmful side-effects of the prescription drug Propulsid which was developed, manufactured, and distributed by Johnson & Johnson, Co. and its wholly owned subsidiary, Janssen Pharmaceutica, Inc. In this consolidated case plaintiffs have named as defendants both the manufacturers of the drug as well as certain Louisiana pharmacies which allegedly sold Propulsid to the plaintiffs. Plaintiffs initially filed this action in the Civil District Court for the Parish of Washington, State of

Louisiana. On April 27, 2001, the action was removed to this Court on the basis of diversity jurisdiction. The defendants argued that there was complete diversity believing the non-diverse pharmacies to be fraudulently joined. Plaintiffs did not seek remand. Subsequently, the action was consolidated with *In re Propulsid Products Liability Litigation* MDL–1355. On December 12, 2001, defendant Forshag's Drug Store, Inc. filed the present motion to dismiss.

Plaintiffs allege that the prescription drug Propulsid carries the risk of serious side effects including heart rhythm disorders, such as ventricular tachycardia, ventricular fibrillation, torsades de point and QT prolongation. Plaintiffs contend that they have suffered physical and emotional damages from their use of the drug and assert numerous theories of liability against the various defendants including products liability, negligence, breach of implied warranty, negligent misrepresentation, and fraud. With regard to the pharmacy defendants in particular, plaintiffs allege that (i) the pharmacies offered objective professional opinions and advice to physicians and intentionally and/or negligently misrepresented the effects and side effects caused by the drug, and (ii) that in selling the drug, the pharmacies breached an implied warranty that the drug was reasonably safe for the purpose for which it was intended. In support of its motion to dismiss, Forshag's argues that under Louisiana law the duty of a pharmacist is limited in scope and the pharmacist cannot be held liable for failing to tell patients of the harmful side effects of a drug.

II. *Analysis*
The Federal Rules of Civil Procedure permit a defendant to seek dismissal of a complaint based on the "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a district court should construe the complaint liberally in favor of the plaintiff, assuming all factual allegations to be true. *See* Leleux v. United States, 178 F.3d 750, 754 (5th Cir.1999). A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting Lowrey v. Texas A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir.1997)).

*1. Claims Based on Louisiana Products Liability Act*
**\*2** **[1]** Under the Louisiana Products Liability Act ("LPLA"), La. R.S. § 9:2800.51, *et seq.,* a manufacturer is

liable to consumers if a condition of its product caused harm to the consumer, the condition made the product unreasonably dangerous to normal use, and the condition existed at the time the product left the manufacturers control. Klem v. E.I. DuPont De Nemours Co., 19 F.3d 997 (5th Cir.1994).

The LPLA defines "manufacturer" as follows:

(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product.

"Manufacturer" also means:

(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.

(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of a product that causes damages.

(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.

(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer....

La. R.S. § 9:2800.53(1).

The LPLA defines "seller" as a "person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value." La. R.S. § 9:2800.53(2).

In the present case, plaintiffs allege in Count Eight of their complaint that the pharmacy defendants "kept in stock, ordered and sold the Propulsid drug, a defective product, to the [p]laintiffs serving as a seller and/or conduit for the defective drug" and thereby breached both express and implied warranties that the drug was "safe for the purpose for which it was intended." However, based on the facts alleged, defendant Forshag's does not meet the criteria under which a seller may be treated as a manufacturer according to the LPLA. Forshag's did not make the product nor did it have any input into the design of the product nor did it have any

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 590 of 751
PageID: 11956
In re Propulsid Products Liability Litigation, Not Reported in F.Supp.2d (2002)

control over either the construction or quality of the product. Accordingly, as a mere seller in this matter, Forshag's is not subject to the liability for defective products established by the LPLA. These claims, therefore, must be dismissed.

### 2. Claims Based on Negligent and Intentional Misrepresentation

**[2]**    In Count Eight of the complaint, plaintiffs claim that the pharmacies made express warranties that the drug was safe for its intended use. Defendant contends that there is no basis for holding a pharmacy liable for dispensing an FDA-approved drug to the plaintiff in accordance with a lawful prescription from a licensed physician in the dosage and amount properly prescribed. Plaintiffs correctly note that the Louisiana courts impose a duty upon pharmacists to do more than accurately fill prescriptions. Indeed, the Louisiana courts have held that pharmacists have a limited duty not only to fill prescriptions correctly, but also to inquire with the prescribing physician when clear errors or mistakes are apparent on the face of the prescription, such as when excessive dosages have been prescribed. *See Gassen v. East Jefferson Gen. Hosp., 628 So.2d 256, 258–59 (La.App. 5th Cir.1993).* However, a pharmacist does not have a duty to warn a patient of adverse reactions. *See id.; Guillory v. Dr. X, 679 So.2d 1004 (La.App. 3rd Cir.1996); Pilet v. Ciba–Geigy Corp., 1996 WL 89262 (E.D.La.).*

**\*3**    In the present case, plaintiffs allege that the pharmacies affirmatively misrepresented the side effects of the drug. In particular, plaintiffs claim that the pharmacies acted as "independent advisors" to the prescribing physicians and "offered objective professional opinions and advice" concerning the possible side effects of the drug. Further, plaintiffs claim that the pharmacies misrepresented to the plaintiff themselves the possible side effects of the drug. The misrepresentation claims asserted are not based on a failure to warn, rather the claims are based on an alleged affirmative misrepresentation. Assuming the truth of the allegations, which the Court must do in 12(b)(6) motions, the pharmacies may have voluntarily assumed a duty of care which is not ordinarily imposed and accordingly, they may be liable in negligence for a breach of that duty. *See generally, Baker v. Arbor Drugs, Inc., 215 Mich.App. 198, 544 N.W.2d 727 (Mich.Ct.App.1995).* Thus, these claims survive a 12(b)(6)

motion. They may, however, encounter a significant challenge in sustaining a subsequent motion for summary judgment.

### 3. Claims Based on Redhibition

**[3]**    In Count Six of their complaint, plaintiffs allege that the pharmacy defendants knew or should have known that the drug they dispensed and sold was defective and unreasonably dangerous. While this claim is cast in terms of negligence, the claim may be construed as one in redhibition. Louisiana Civil Code article 2545 provides that "a seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees." In contrast, Article 2531 provides that "a seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing ...." Article 2520 defines a redhibitory defect as one that "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer a right to obtain recission of the sale." Insofar as the plaintiffs have alleged that the defendants knew of the defect, plaintiffs have stated a claim in redhibition under which they may seek damages.

### III. *Conclusion*

For the reasons set forth above, the motion is DENIED IN PART AND GRANTED IN PART. To the extent the present motion seeks dismissal of the claims asserted against Forshag's which are based on alleged affirmative misrepresentations and those which are based on redhibition, the motion is DENIED. As to all other claims asserted against Forshag's the motion to dismiss is GRANTED.

### All Citations

Not Reported in F.Supp.2d, 2002 WL 1446714

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 57

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 592 of 751
PageID: 11958
Ramos v. Rite Aid Corp., Not Reported in A.3d (2010)

2010 WL 4277612
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

Superior Court of Connecticut,
Judicial District of Fairfield.

Evelyn RAMOS
v.
RITE AID CORPORATION.

No. CV106008649.
|
Oct. 7, 2010.

**Attorneys and Law Firms**

Daly Weihing & Bodell, Bridgeport, for Evelyn Ramos.

Gordon Muir & Foley, Hartford, for Rite Aid Corporation.

**Opinion**

BRUCE L. LEVIN, Judge of the Superior Court.

*\*1* The issue raised by the defendant's motion to strike is
whether a products liability claim may be brought against a
pharmacy for dispensing the wrong medication to a customer.
The court holds it may not.

The plaintiff's complaint alleges that the plaintiff's physician
prescribed her an anti-anxiety medication. The plaintiff had
the prescription filled at the defendant's pharmacy. Instead
of properly filling her prescription, the pharmacy provided
her with Naproxin. The plaintiff ingested the Naproxin and
became ill. At oral argument, the plaintiff conceded that there
was nothing defective about the Naproxin, just that it was
mistakenly given to the plaintiff.

The plaintiff has brought this action in three counts. The first
count alleges negligence by the defendant. The second count
alleges negligent infliction of emotional distress. The third
count alleges a products liability pursuant to General Statutes
§ 52-572m et seq. The defendant has moved to strike the
third count on the grounds that the dispensing of the wrong

medication by a pharmacy is the negligent performance
of a service, and not within the ambit of the products
liability action. The plaintiff disagrees. In the alternative, the
defendant moves to strike the first and second counts on the
grounds that where a products liability action lies, it is the
exclusive remedy. See General Statutes § 52-572n (a).

"General Statutes 52-572m(b) defines a product liability
claim as including 'all claims or actions brought for personal
injury ... caused by the ... marketing ... of any product.'
Section 52-572n(a) allows such claims to be brought against
'product sellers.' Section 52-572n(a) defines 'product seller,'
in pertinent part, as 'any person or entity ... who is engaged
in the business of selling such products whether the sale
is for resale or for use or consumption.' To maintain a
product liability action under § 52-572m et seq., the plaintiff
must establish and prove, *inter alia,* 'that ... the defendant
was engaged in the business of *selling* the product ... [and]
the defect existed at the time of the sale ...' Giglio
v. Connecticut Light & Power Co., 180 Conn. 230, 234,
429 A.2d 486 (1980); Coe-Park Donuts, Inc. v. Robertshaw
Controls Co., 1 Conn.App. 84, 86, 468 A.2d 292 (1983);
2 Restatement (Second), Torts § 402A. Once a particular
transaction is labeled a 'service,' as opposed to a 'sale' of
a 'product,' it is outside the purview of our product liability
statute. See General Statutes § 52-572m et seq.; Coffee v.
Cutter Biological, 809 F.2d 191, 193 (2d Cir.1987) (transfer of
blood not a 'sale' but a service; therefore, not within purview
of § 52-572m et seq.) ..." (Emphasis in original.) Zichichi v.
Middlesex Memorial Hospital, 204 Conn. 399, 403, 528 A.2d
805 (1987).

While it is true that "the pharmacist is engaged in a hybrid
enterprise, combining the performance of services and the
sale of prescription drugs"; Murphy v. E.R. Squibb &
Sons, Inc., 40 Cal.3d 672, 678, 710 P.2d 247, 221 Cal.Rptr.
447 (1985); where the gist of a claim is that the wrong
medication was dispensed on prescription to a customer,
and that there was nothing defective about the medication
itself, the transaction is a service and is outside the purview
of our products liability statute. See *Henderson v. CVS
Pharmacy,* Superior Court, judicial district of New Haven,
CV 08 5017128 (July 31, 2008, Cosgrove, J.) (46 Conn. L.
Rptr. 25); *Silber v. Walgreen Co.,* Superior Court, judicial
district of New Haven, Docket No. 04 4009662 (May 4,
2005, Thompson, J.) (39 Conn. L. Rptr. 271); *Altieri v. CVS
Pharmacy, Inc.,* Superior Court, complex litigation docket at
Waterbury, No. X06-CV-02-017 1626 (December 13, 2002,

*McWeeney, J.*) (33 Conn. L. Rptr. 524); *Madison v. American Home Products Corp.,* 358 S.C. 449, 455, 595 S.E.2d 493 (2004);* contra *Silva v. Walgreen Co.,* Superior Court, judicial district of Fairfield, No. CV 04 4001615 (November 24, 2006, *Hiller, J.*) (42 Conn. L. Rptr. 407); *Silva v. Walgreen Co.,* Superior Court, judicial district of Fairfield, No. CV 04 4001615 (October 25, 2005, *Radcliffe, J.*) (40 Conn. L. Rptr. 187); *Stanko v. Bader,* Superior Court, judicial district of Stamford-Norwalk at Stamford, No. CV 03 0193669 (October 7, 2003, *D'Andrea, J.T. R.*) (35 Conn. L. Rptr. 605); *Stevens v. Romer,* Superior Court, judicial district of

Stamford-Norwalk at Stamford, No. CV 98 0168402 (March 24, 1999, *D'Andrea, J.*) (24 Conn. L. Rptr. 279); cf. *Dunn v. Upjohn Co.,* 350 So.2d 127, 129 (1977) ("we consider that the filling of a prescription by a pharmacist is more in the nature of processing a product than it is a personal service"). The motion to strike the third count is granted.

**All Citations**

Not Reported in A.3d, 2010 WL 4277612

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 58

2019 WL 3069864
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

Sage REDWIND, Plaintiff,

v.

WESTERN UNION, LLC, Defendant.

Case No. 3:18-cv-02094-SB
|
Signed 06/21/2019

**Attorneys and Law Firms**

Sage Redwind, Hillsboro, OR, pro se.

Elizabeth A. Falcone, Paul E. Cirner, Amanda C. Van Wieren, Ogletree Deakins Nash Smoak & Stewart P.C., Portland, OR, for Defendant.

**FINDINGS AND RECOMMENDATION**

STACIE F. BECKERMAN United States Magistrate Judge

 *1  Plaintiff Sage Redwind ("Redwind"), appearing as a self-represented litigant, brings this action against her former employer, Western Union, LLC ("Western Union"), alleging claims for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 1.)

Pending before the Court is Western Union's partial motion to dismiss (ECF No. 5), and Redwind's motion for sanctions. (ECF No. 15.) The Court has jurisdiction over this case under 28 U.S.C. § 1331. For the following reasons, the Court recommends that the district judge grant in part, and deny in part, Western Union's motion to dismiss. The Court denies Redwind's motion for sanctions.

**BACKGROUND**[1]

Redwind, a woman of Indian ancestry, started working for Western Union in February 2008. (Compl. ¶¶ 1, 3.) Redwind began as a Territory Manager and later became an Account Executive for the state of Oregon. (Compl. ¶ 3.)

**Allegations of Disparate Treatment**

Redwind excelled at her job, winning numerous performance awards and consistently receiving high marks in annual company performance reviews. (Compl. ¶ 4.) Despite Redwind's strong work performance, Western Union treated employees of other races more favorably. (Compl. ¶¶ 5-6.) Specifically, Redwind alleges that Western Union disproportionately hired, promoted, and gave raises to Latinx employees. (Compl. ¶¶ 5-6.)

On January 15, 2018, Redwind asked Stefani Carroll ("Carroll"), a human resources ("HR") professional, about the average salary for her position. (Compl. ¶ 24.) Carroll declined to answer, citing company confidentiality. (Compl. ¶ 24.) Undeterred, Redwind asked another HR employee the same question on February 1, 2018, and learned that $56,000 was "the minimum" for her position. (Compl. ¶ 25.) That same day, Redwind revealed to Carroll what she had learned. (Compl. ¶ 27.) Carroll "acknowledged that Redwind's salary was below the company approved minimum but took no corrective action[.]" (Compl. ¶ 27.)

**Allegations of Retaliation**

During the course of her employment, Redwind filed a grievance against her former manager, Lorena Casillas Calvo ("Calvo"). (Compl. ¶ 8.) Calvo responded to Redwind's grievance by requiring Redwind to work sixteen to twenty hours a day with no breaks. (Compl. ¶ 8.) Redwind complained to Calvo about her work schedule. (Compl. ¶ 9.) Calvo forwarded Redwind's complaints to Calvo's manager, Brad Lewis Gray ("Gray"), who then dismissed Redwind's concerns as "unproductive and uncivil." (Compl. ¶ 9.)

Following these interactions, Western Union referred Redwind's grievance to outside counsel. (Compl. ¶ 11.) This was not Western Union's "common practice for handling employee grievances." (Compl. ¶ 11.) When Redwind asked for Western Union's HR department to handle her grievance instead of outside counsel, Western Union "refused and threatened that if [Redwind] did not comply by engaging their attorney, disciplinary action may be taken against her." (Compl. ¶ 12.) Redwind then filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 12.)

**\*2** On October 31, 2017, Redwind applied for an open Account Executive position in Spokane, Washington. (Compl. ¶ 13.) On January 23, 2018, Redwind learned that her final interview was set for February 3, 2018. (Compl. ¶ 15.) Two days later, Western Union informed Redwind via email that the position she applied for had closed. (Compl. ¶ 15.) On February 13, 2018, Western Union terminated Redwind's employment. (Compl. ¶ 35.)

**Prior and Current Litigation Between the Parties**

On October, 27, 2014, Redwind filed an action in the District of Oregon against Western Union, "alleging claims for defamation, discrimination, harassment, retaliation, and discriminatory pay practices." *Redwind v. Western Union, LLC*, No. 3:14-cv-01699-AC, 2016 WL 3606595, at \*1 (D. Or. May 2, 2016); Compl. ¶ 2.[2] The district court granted, and the Ninth Circuit affirmed, summary judgment for Western Union on all of Redwind's claims. *See Redwind v. Western Union, LLC*, 698 F. App'x 346 (9th Cir. 2017).

On December 12, 2018, Redwind filed this case against Western Union, alleging Title VII claims for retaliation and discrimination. (ECF No. 1.) This motion followed. (ECF No. 5.)

**ANALYSIS**

**I. STANDARD OF REVIEW**

A well-pleaded complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A federal claimant is not required to detail all factual allegations, but the complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above a speculative level." *Id.* While the court must assume all facts alleged in a complaint are true and view them in a light most favorable to the nonmoving party, it need not accept as true any legal conclusion set forth in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, a plaintiff must set forth a plausible claim for relief, a possible claim for relief will not do. *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quotations and citation omitted)). "In sum, for a

complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

"A document filed *pro se* is to be 'liberally construed,' and a '*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Woods v. Carey*, 525 F.3d 886, 889-90 (9th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 127 (2007)).

**II. DISCUSSION**

Western Union asks the Court to dismiss Redwind's pay discrimination claim on the grounds that (1) Redwind fails to state a valid claim for relief; and (2) principles of claim preclusion bar any pay discrimination claim that accrued before April 5, 2015. (Def.'s Mot. at 6.) Western Union also asks the Court to dismiss part of Redwind's retaliation and discrimination claims because Western Union's decision to refer her grievances to outside counsel does not constitute an adverse employment action. (Def.'s Mot. at 8.)

**\*3** Redwind responds by asking the Court to deny Western Union's motion to dismiss for three reasons: (1) Western Union violated Local Rule ("LR") 7-1(a)(1)(A) by failing to confer in good faith before filing its motion; (2) Federal Rule of Civil Procedure 12(b)(6) does not allow a party to move for partial dismissal of a complaint; and (3) Redwind has stated valid claims for relief. Redwind also moves for sanctions against Western Union, raising the same arguments. (ECF No. 15.) The Court will address Redwind's procedural arguments before turning to the merits.

**A. LR 7-1(a)(1)(A)**

LR 7-1(a)(1)(A) requires a moving party to certify that the "parties made a good faith effort through personal or telephone conferences to resolve the dispute, and have been unable to do so[.]" LR 7-1(a)(1)(A). This rule "encourage[s] parties to resolve amicably disputes when possible, preserving judicial resources for those matters that require the court's intervention." *Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1172 (D. Or. 2004).

Redwind argues that Western Union failed to comply with LR 7-1(a)(1)(A) because Redwind informed Western Union during the parties' conferral that her claims did not arise from

her previous suit against Western Union, thereby resolving any dispute about that issue. (Pl.'s Opp'n at 2, 4-5.) As Western Union points out, however, LR 7-1(a)(1)(A) does not require a party to agree with the legal conclusions an opposing party makes during conferral. Rather, LR 7-1(a)(1)(A) only requires a party to discuss disputed issues with an opposing party before seeking court intervention. Western Union did so, and therefore the Court finds that Western Union complied with LR 7-1(a)(1)(A).

**B. Partial Motion to Dismiss**

Redwind argues that Western Union's partial motion to dismiss is procedurally improper because Federal Rule of Civil Procedure ("Rule") 12(b)(6) does not allow a party to seek partial dismissal of a claim. Instead, Redwind argues that Western Union should have filed a motion to strike under Rule 12(f).[3] (Pl.'s Opp'n at 2, 9.)

Rule 12(f) authorizes courts to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). By contrast, Rule 12(b)(6) allows a party to move for dismissal when a complaint fails to state a valid claim for relief. Fed R. Civ. P. 12(b)(6). The Ninth Circuit has made clear that "an attempt to have certain portions of [the plaintiff's] complaint dismissed" is an action "better suited for a Rule 12(b)(6) motion [ ], not a Rule 12(f) motion." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010); *see also Yamamoto v. Omiya*, 564 F.2d 1319, 1327 (9th Cir. 1977) ("Rule 12(f) is neither an authorized nor a proper way to procure the dismissal of all or a part of a complaint.") (citation and quotation marks omitted). Allowing litigants to use Rule 12(f) "to dismiss some or all of a pleading" "create[s] redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion ... already serves such a purpose." *Whittlestone, Inc.*, 618 F.3d at 975.

**\*4** Although Rule 12(b)(6) is the proper procedural mechanism to dismiss part of a complaint, many courts have recognized that a party may not use Rule 12(b)(6) to dismiss only part of a *claim. See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original); *Doe v. Napa Valley Unified Sch. Dist.*, No. 17-cv-03753-SK, 2018 WL 4859978, at \*2 (N.D. Cal. Apr. 24, 2018) ("By its own terms, there does not appear to be any way to grant partial dismissal of a

claim under Fed. R. Civ. P. 12(b)(6).") (quoting *In re Netopia, Inc., Sec. Litig.*, No. C-04-03364 RMW, 2005 WL 3445631, at \*3 (N.D. Cal. Dec. 15, 2005)). In other words, courts may not dismiss only some of the claim's allegations if the claim otherwise survives. *See Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009) ("The Court is unaware, however, of any situation in which a Rule 12(b)(6) motion may be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged."); *In re Netopia, Inc*, 2005 WL 3445631, at \*3 (denying a motion to dismiss because Rule 12(b)(6) "should not be used on subparts of claims; a cause of action either fails totally or remains in the complaint"); *Limone v. United States*, 271 F. Supp. 2d 345, 364 (D. Mass. 2003) (holding that a defendant may not "seek dismissal of *facts* rather than *claims*" under Rule 12(b)(6)) (emphasis in original).

Here, Western Union moves to dismiss only one aspect of Redwind's retaliation and discrimination claim—Western Union's decision to refer Redwind's grievance to outside counsel. Granting Western Union's motion to dismiss this allegation would not result in dismissing Redwind's retaliation and discrimination claim because she also alleges, among other things, that Western Union terminated her after she filed a charge with the EEOC. (Compl. ¶¶ 12, 15.) Accordingly, the district judge should deny Western Union's motion to dismiss only part of Redwind's retaliation claim. *See Finnegan v. Washoe Cty.*, No. 3:17-cv-00002-MMD-WGC, 2017 WL 3299040, at \*3 (D. Nev. Aug. 2, 2017) ("While Defendant asks the Court to strike the paragraphs ..., the purpose of a Rule 12(b)(6) motion is not for the Court to strike selected portions of a plaintiff's complaint. Thus, although the allegations in these paragraphs of the [complaint] may not amount to acts of discrimination or adverse employment action under Title VII, [the plaintiff] is still permitted to include them.").

**C. Merits**

Western Union moves to dismiss Redwind's pay discrimination claim on the ground that Redwind has failed to state a claim because she does not allege that Western Union paid similarly situated employees a higher salary. (Def.'s Mot. at 5-6.) The Court agrees.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a). To establish a *prima*

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 598 of 751
                                                    PageID: 11964
Redwind v. Western Union, LLC, Slip Copy (2019)

2019 WL 3069864

*facie* case of pay discrimination, Redwind must allege that: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) Western Union paid similarly situated individuals outside her protected class a higher salary. *See Redwind*, 2016 WL 3606595, at *9 (citing *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

Here, Redwind has not alleged the final required element. Although Redwind alleges that Western Union treats Latinx employees more favorably, Redwind does not allege that these employees are similarly situated or that Western pays them a higher salary. As a result, the district judge should dismiss without prejudice Redwind's pay discrimination claim. *See Ross v. Rengo Packaging, Inc.*, No. 17-cv-00200 RLP, 2017 WL 3821776, at *2 (D. Haw. Aug. 31, 2017) (dismissing the plaintiff's Title VII discrimination claim for failure to allege that the defendant "treated other similarly situated employees more favorably"); *see also Simons v. Costco Wholesale Corp.*, No. 3:18-cv-00755-SB, 2018 WL 7078666, at *3 (D. Or. Dec. 6, 2018) (finding a plaintiff's allegation that he was demoted "for a purported improper employee practice, for which similarly situated Caucasian colleagues were neither disciplined, nor demoted" to be "no more than a conclusory assertion that Plaintiff and his co-workers were similarly situated" because the plaintiff did "not describe the purported improper employment practice at issue, or allege facts related to the circumstances of Defendant's differential treatment"); *Demekpe v. Cty. of Los Angeles*, No. 15-cv-06007, 2015 WL 13237302, at *8 (C.D. Cal. Dec. 8, 2015) (holding that the plaintiff "failed to allege facts showing that he was 'similarly situated' to" employees outside his protected class where the plaintiff alleged "only vague facts about his own conduct and no facts about the conduct" of the other employees); *Barrett v. Kaiser Found. Health Plan of the Nw.*, No. 3:14-cv-020160-SI, 2015 WL 1491037, at *3 (D. Or. Apr. 1, 2015) (dismissing the plaintiff's Title VII discrimination claim because the plaintiff provided "no more than a conclusory assertion that [the] [p]laintiff and [his comparator] were similarly situated," and failed to allege any facts about his comparator's circumstances); *Brown v. Litchfield Elementary Sch. Dist. No. 79*, No. 10-2808, 2011 WL 2976874, at *3 (D. Ariz. July 22, 2011) (dismissing the plaintiff's race discrimination claim because the plaintiff alleged "no facts to demonstrate that she and the [comparator] ... displayed similar conduct").[4]

Footnotes

**D. Sanctions**

**\*5** On January 25, 2019, Redwind filed a motion for Rule 11 sanctions. (ECF No. 15.) Redwind argues that sanctions are warranted because: (1) Western Union falsely certified that the parties were unable to resolve their dispute without the Court's intervention; (2) Western Union's motion to dismiss is procedurally improper; (3) Redwind sufficiently alleged a claim for relief; and (4) Western Union failed to file an answer to Redwind's complaint. (ECF No. 15.) For the reasons stated above, the Court finds that Western Union had a reasonable basis for filing its motion to dismiss under Rule 12(b)(6), and for not filing an answer to Redwind's complaint. Therefore, the Court denies Redwind's motion for sanctions.

**CONCLUSION**

For the reasons stated, the Court recommends that the district judge GRANT Western Union's motion to dismiss Redwind's pay discrimination claim, and DENY Western Union's motion for partial dismissal of Redwind's retaliation and discrimination claims. (ECF No. 5.) The district judge should allow Redwind to file an amended complaint within fourteen days if she is able to cure the deficiencies discussed herein. The Court DENIES Redwind's motion for sanctions. (ECF No. 15.)

**SCHEDULING ORDER**

The Court will refer its Findings and Recommendation to a district judge.[5] Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

**All Citations**

Slip Copy, 2019 WL 3069864

2019 WL 3069864

1    The following facts are either undisputed or viewed in the light most favorable to Redwind.

2    The Court takes judicial notice of the court records in Redwind's prior suit against Western Union. *See United States v. Raygoza-Garcia,* 902 F.3d 994, 1001 (9th Cir. 2018) (noting that courts may take judicial notice of undisputed matters of public record, including "court records") (citations omitted).

3    Redwind further argues that Western Union's partial motion to dismiss did not excuse its obligation to answer Redwind's complaint within twenty-one days. (Pl.'s Opp'n at 13.) On the contrary, "[m]any district courts have held that a motion to dismiss filed by a defendant that is directed against less than all of the claims alleged by a plaintiff suspends the time for that defendant to answer the unchallenged claims." *In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 198 F. Supp. 3d 1183, 1191 (D. Or. 2016) (citing *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.,* 2011 WL 6296833, at *5 (D. Ariz. Dec. 16, 2011)). Consistent with this line of authority, the Court finds that Western Union's partial motion to dismiss suspended its obligation to answer Redwind's complaint.

4    Western Union also moved to dismiss Redwind's pay discrimination claim to the extent that it accrued prior to April 5, 2015. Redwind represented in her response to Western Union's motion and to the Court at oral argument that her pay discrimination claim arises only from events that occurred in 2017-2018. Although in her original complaint Redwind references her ten-year employment relationship with Western Union (*see* Compl. ¶¶ 26, 51), the Court is satisfied that Redwind understands she is estopped from re-litigating her previously-litigated pay discrimination claims.

5    Absent consent of all parties to the jurisdiction of a U.S. Magistrate Judge, the undersigned must refer any dispositive motions to a U.S. District Judge by issuing Findings and Recommendation ("F&R"). Parties may avoid this review process, while preserving the right of appeal to the Ninth Circuit Court of Appeals, by consenting to the jurisdiction of a U.S. Magistrate Judge. Parties may consent at any time prior to trial, and Standing Order 2017-4 directs that parties may file consents electronically (in CM/ECF, "Consents" may be found under "Civil Events," "Other Filings"). Consents filed while an F&R is pending will not become effective until after the U.S. District Judge has ruled on the pending F&R.

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3069841
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

Sage REDWIND, Plaintiff,

v.

WESTERN UNION LLC, Defendant.

No. 3:18-cv-2094-SB
|
Signed 07/12/2019

**Attorneys and Law Firms**

Sage Redwind, Hillsboro, OR, pro se.

Elizabeth A. Falcone, Paul E. Cirner, Pro Hac Vice, Amanda C. Van Wieren, Ogletree Deakins Nash Smoak & Stewart P.C., Portland, OR, for Defendant.

OPINION AND ORDER

MICHAEL W. MOSMAN, Chief United States District Judge

 **\*1** On June 21, 2019, Magistrate Judge Stacie F. Beckerman issued her Findings and Recommendation (F&R) [50] and recommended granting Defendant Western Union LLC's (Western Union) Motion [5] to dismiss Plaintiff Sage Redwind's pay discrimination claim and denying Western Union's Motion [5] for partial dismissal of Ms. Redwind's retaliation and discrimination claims. Judge Beckerman also denied Ms. Redwind's Motion [15] for sanctions. Ms. Redwind filed objections, and Western Union responded.[1]

**DISCUSSION**

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendations as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). The court, however, is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed. See Thomas v. Arn, 474 U.S. 140, 149 (1985); United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny with which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F&R. 28 U.S.C. § 636(b)(1)(C).

Upon careful review, I agree with Judge Beckerman's recommendations to grant the Motion [5] to dismiss Ms. Redwind's pay discrimination claim and deny the Motion [5] for partial dismissal of her retaliation and discrimination claims and ADOPT the F&R as my own opinion. To the extent necessary, I also adopt Judge Beckerman's denial of Ms. Redwind's Motion [15] for sanctions. I grant Ms. Redwind fourteen days from the date this Opinion and Order to file an amended complaint that cures the deficiencies discussed in Judge Beckerman's F&R. This matter is referred back to Judge Beckerman.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 3069841

Footnotes

1    I denied Ms. Redwind's Motion for leave to reply to Western Union's objections on the basis that additional briefing would not aid in my review of the F&R. [55].

Tab 59

2019 WL 1903990
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Janet ROLLAND, Plaintiff,

v.

SPARK ENERGY, LLC, Defendant.

Civil Action No. 17-2680 (MAS) (LHG)
|
Signed 04/29/2019

**Attorneys and Law Firms**

Matthew Ross Mendelsohn, Mazie Slater Katz & Freeman
LLC, Roseland, NJ, for Plaintiff.

Ezra Dodd Church, Morgan Lewis & Bockius LLP,
Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Michael A. Shipp, United States District Judge

 *1 This matter comes before the Court on Defendant
Spark Energy, LLC's ("Defendant") Third Motion to Dismiss
and Motion to Strike Class Allegations. (ECF No. 54.)
Plaintiff Janet Rolland ("Plaintiff") filed a Second Amended
Complaint ("SAC") on August 17, 2018. (ECF No. 48.)
Plaintiff opposed Defendant's Motion (ECF No. 59), and
Defendant replied (ECF No. 67).[1] The Court has carefully
considered the parties' submissions and decides the matter
without oral argument pursuant to Local Civil Rule 78.1. For
the reasons set forth below, the Court grants in part and denies
in part Defendant's Motion.

**I. Background**[2]
The parties are familiar with the matter's factual history, and
therefore, the Court only repeats those facts necessary to
resolve the instant motion. Plaintiff enrolled in Defendant's
electricity services from February 25, 2012 to December 24,
2014. (SAC ¶¶ 7, 24.) Defendant offered a twelve-month low,
fixed-rate for new customers. (Id. ¶¶ 2, 17.) After twelve
billing cycles, Defendant placed Plaintiff on a month-to-
month variable rate plan ("Variable Rate Plan"). (Id. ¶ 17.)

Defendant notified Plaintiff before the last billing cycle that
her initial fixed-rate services were ending and she would be
automatically enrolled in the Variable Rate Plan if she did not
terminate her service. (Id. ¶ 20.) Plaintiff did not respond and
was automatically enrolled into the Variable Rate Plan. (Id.)
The price of the Variable Rate Plan was higher than the initial
fixed rate. (Id. ¶¶ 17-31.) According to Plaintiff, the variable
rare jumped 108% from the introductory fixed rate at the end
of the first billing cycle, and Defendant's prices were 93% to
114% higher than competitors' rates. (Id. ¶ 24.)

Defendant moves to dismiss Count One of Plaintiff's SAC.
(Id. ¶¶ 54-66.) Plaintiff filed two previous complaints (ECF
Nos. 30, 48) after this Court granted Defendant's Motions
to Dismiss without prejudice (ECF Nos. 28, 44). The Court
denied Defendant's original Motion to Dismiss Plaintiff's
breach of contract and breach of implied covenant of good
faith and fair dealing claims. (First Mot. to Dismiss, ECF
No. 28.) The Court, however, granted Defendant's Motion
to Dismiss Plaintiff's New Jersey Consumer Fraud Act
("NJCFA") claim, finding Plaintiff did not satisfy Federal
Rule of Civil Procedure[3] 9(b)'s pleading standards as to
the NJCFA. (Dec. 7, 2017 Hr'g Tr. 6:7-12, ECF No. 34.)
Specifically, the Court cited to Melville v. Spark Energy, Inc.,
No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016), and
Vitale v. U.S. Gas & Electric, Inc., No. 14-4464, 2016 WL
1060807 (D.N.J. Mar. 16, 2016), as setting the appropriate
pleading standard, and provided Plaintiff leave to file an
amended complaint. (Id. at 5:23-6:12.)

 *2 Plaintiff subsequently filed an Amended Complaint.
(ECF No. 30.) Defendant moved to dismiss, arguing
Plaintiff failed to satisfactorily plead an NJCFA claim.
(Second Mot. to Dismiss 8-13, ECF No. 37.) In its
July 11, 2018 Memorandum Opinion, the Court granted
Defendant's motion, finding Plaintiff again failed to provide
sufficiently detailed allegations to plead an NJCFA claim.
(July 11, 2018 Mem. Op. 6, ECF No. 43.) The Court
further reiterated its prior determination that Melville and
Vitale set forth the proper NJCFA pleading standard, and
found Plaintiff's Amended Complaint failed to "allege that
Plaintiff purchased electricity through Defendant based on
any specific representation(s), or that price was considered
by Plaintiff when purchasing from Defendant." (Id. at 5-6.)
The Court granted Plaintiff one final opportunity to cure the
deficiencies in her Amended Complaint. (Id. at 7.)

Plaintiff subsequently filed the SAC. (See generally SAC.)
Currently before the Court is Defendant's third Motion to

Dismiss Plaintiff's NJCFA claim. (*See* Def.'s Moving Br., ECF No. 54-1.) Defendant moves to dismiss with prejudice Plaintiff's NJCFA claim, and further moves to dismiss or strike Plaintiff's nationwide class allegations. (*Id.*)

## II. Legal Standard

When analyzing a Rule 12(b)(6) motion, the district court conducts a three-part analysis. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* at 210-11. Finally, the court must determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief." *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). "[W]here the well-pleaded facts do not permit the court to infer more than mere possibility of misconduct," the claim is insufficient. *Iqbal*, 556 U.S. at 679.

Where a plaintiff pleads fraud, however, the plaintiff "must meet a heightened pleading standard under [Rule] 9(b)." *Zuniga v. Am. Home Mortg.*, No. 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). The NJCFA is subject to the heightened standard of Rule 9(b). *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 98 (D.N.J. 2011) (citing *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876-77 (3d Cir. 1994) ). "In alleging fraud ..., a party must state with particularity the circumstances constituting fraud ...." Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' " *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) ). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of ... fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

A plaintiff seeking a claim under the NJCFA must present evidence of: (1) unlawful conduct; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. *Melville*, 2016 WL 6775635, at *2 (citing *Int'l Union of Operating Eng'gs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007) ); *see also* N.J.S.A. 56:8-19. Unlawful conduct includes, "any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation ... in connection with the sale or advertisement of any merchandise or real estate...." N.J.S.A. 56:8-2. A plaintiff must allege "substantial aggravating circumstances" to state a valid NJCFA claim. *Neuss v. Rubi Rose, LLC*, No. 16-2339, 2017 WL 2367056, at *7 (D.N.J. May 31, 2017) (citation omitted).

**\*3** Finally, under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject matter jurisdiction. Because federal courts are courts of limited jurisdiction, the party seeking to invoke the court's jurisdiction bears the burden of proving the existence of subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

## III. Analysis

### A. Plaintiffs NJCFA Claim

Defendant asserts that Plaintiff's SAC does not address the inadequacies from the prior dismissed complaints. (Def.'s Moving Br. 4.) Defendant contends Plaintiff failed to plead the third element of an NJCFA claim—a causal nexus between her injury and Defendant's allegedly unlawful conduct. (*Id.* at 8 citing *Arcand v. Bro. Int'l Corp.*, 673 F. Supp. 2d 282, 303 (D.N.J. 2009) ).) Specifically, Defendant contends, "Plaintiff fails to state that she ... read, reviewed, looked at, or relied on the Terms of Service or the Renewal Notice. Instead, Plaintiff pleads she merely 'received' or was 'provided' those documents ...." (*Id.* at 9 (emphasis removed).)

Defendant also argues Plaintiff again failed to allege that she considered price when she purchased services from Defendant, and instead, continues to "resort only to the considerations of a 'reasonable consumer'—an attempt the Court specifically rejected." (*Id.* at 10 (citing July 11, 2018 Mem. Op. 6 ("Plaintiffs Amended Complaint does not allege that Plaintiff purchased electricity through Defendant based on any specific representation(s), or that price was considered

2019 WL 1903990

by *Plaintiff* when purchasing from Defendant.") ).) Thus, Defendant contends that although "Plaintiff speculates about what the platitudinal 'reasonable consumer' would think and do. she does not state facts—let alone particularized facts— of a representation that caused *her* to roll over to a [V]ariable [R]ate [Plan] and to stay there." (*Id.* at 11.)

Moreover, Defendant contends Plaintiff failed to allege any misrepresentation or omission on behalf of Defendant. (*Id.* at 12.) Rather, Defendant argues "Plaintiff simply points to additional language in the Terms and Conditions that an administrative fee would not be included in the fixed rate —an allegation that has nothing to do with her variable-rate allegations." (*Id.* at 13.) Defendant disputes Plaintiff's statement that Defendant's use of the terms "competitively priced" amounts to a misrepresentation of the Variable Rate Plan. (*Id.* at 14.) Instead, Defendant alleges this phrase is merely "puffery," which this Court has previously found as not actionable under the NJCFA. (*Id.* citing *Urbino v. Ambit Energy Holdings, LLC*, No. 14-5184, 2015 WL 4510201, at *5 n.7 (D.N.J. July 24, 2015) ("[C]laims of 'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions. As such, they are not actionable under the [NJ]CFA.") ).)

Finally, Defendant contends Plaintiff has not pled substantial aggravating circumstances sufficient to constitute consumer fraud under the NJCFA. (*Id.* at 15.) *See Hassler v. Sovereign. Bank*, 374 F. App'x 341, 344 (3d Cir. 2010) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 429 (N.J. 1995) ("To constitute consumer fraud ... the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer ....") ); *see also Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997) (differentiating between mere breach of contract or warranty and an NJCFA violation). Thus, Defendant contends, "No basis exists to morph the breach of contract claim ... into a treble-damages [NJ]CFA claim." (*Id.* at 16.)

**\*4** This Court previously identified *Melville* and *Vitale* as providing the appropriate NJCFA pleading standard. (July 11, 2018 Mem. Op. 5 (citing *Melville*, 2016 WL 6775635; *Vitale*, 2016 WL 1060807).) In *Melville*, the plaintiff took the agreement into consideration when he read and reviewed the terms. *Melville*, 2016 WL 6775635, at *1. The *Melville* court also stated that "as with common law and equitable fraud, an NJCFA violation must be pled with particularity" and held that the plaintiff satisfied the Rule 9(b) standard because the

plaintiff attached the agreement and referenced a specific encounter between the defendant and the plaintiff. *Id.* at *4.

In *Vitale*, the plaintiffs claimed the defendant told them, and provided them with documentation, that stated the rates were "competitive" when the plaintiffs switched to the defendant's services. *Vitale*, 2016 WL 1060807, at *1. Further, the plaintiffs directly quoted the standardized telephone sales pitch that induced them to switch electricity providers. *Id.* at *3. There, the court held the plaintiffs satisfied the NJCFA pleading requirements because the plaintiffs demonstrated the specific misleading statements that they considered, which induced them to switch to the defendant's services. *Id.*

In the instant matter, Plaintiff again fails to allege that she considered any of Defendant's representations when she purchased Defendant's electricity services. "To properly plead a causal nexus, a plaintiff cannot rely on legal conclusions that fail to allege when statements were made or when the plaintiff[ ] [was] exposed to the statements." *Torres-Hernandez v. CVT Prepaid Sols., Inc.*, No. 08-1057, 2008 WL 5381227, at *7 (D.N.J. Dec. 17, 2008) (citation omitted). Here, although Plaintiff attached the Terms of Service and Renewal Notice to her SAC, Plaintiff did not plead any facts demonstrating that she saw, read, heard, or in any way took those documents into consideration. (*See* SAC, Ex. 1; SAC, Ex. 2.) In fact, Plaintiff merely alleges that she "received" Defendant's Renewal Notice, and Defendant "provided her" its Terms of Service. (SAC ¶¶ 18, 20). Therefore, Plaintiff failed to establish the Terms of Service and Renewal Notice were material to her decision making, but instead, pleads pursuant to a reasonable consumer, which the Court has already rejected. (*See* July 11, 2018 Op. 5-6 (collecting cases); *see also id.* at 6.) *See also Mladenov v. Wegmans Food Mkts., Inc.*, 124 F. Supp. 3d 360, 377 (D.N.J. 2015) (finding the plaintiffs failed to plead an NJCFA claim with sufficient particularity because, among other things, the "[p]laintiffs [did] not specify any instance in which they even saw [the d]efendant's advertisements"); *Berman v. ADT LLC*, No. 12-7705, 2015 WL 4496517, at *5 (D.N.J. July 22, 2015) (finding the plaintiffs failed to successfully plead an NJCFA claim because the record lacked evidence that the defendants' representations were "material to [the plaintiffs'] decision-making").

The Court is also not persuaded by Plaintiff's assertion that Defendant's use of the phrase "competitively priced offers" in the Renewal Notice constitutes a misrepresentation. (SAC, Ex. 2.) This Court has previously determined, "claims of

'substantial savings,' 'low, competitive rates,' 'exceptional value,' and 'great savings' are not factual assertions, As such, [those phrases] are not actionable under the NJCFA." *Urbano*, 2015 WL 4510201, at *5 n.7 (citation omitted); *see also Glass v. BMW of N. Am.*, No. 10-5259, 2011 WL 6887721, at *6 (D.N.J. Dec. 29, 2011) (citation omitted) ("Advertising that amounts to mere puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims, as opposed to specific, detailed factual assertions."); *Berman*, 2015 WL 4496517, at *5 (alteration in original) (internal quotation marks and citation omitted) ("[I]dle comments or mere puffery are not material because reasonable consumers do not rely on puffery."). Here, Defendant's assertion that its rates were competitively priced falls squarely into the category of puffery. Nonetheless, as stated previously, Plaintiff failed to plead that she read or considered the Renewal Notice, and therefore, has not demonstrated that she even took the phrase "competitively priced" into consideration.[4]

### B. Plaintiff's Multistate Class Allegations

**\*5** Defendant next argues the SAC fails to support a multistate class. Specifically, Defendant moves to dismiss Plaintiff's class allegations pursuant to Rules 12(b)(1), 12(b)(6), or 23(d)(1)(D). (Def.'s Moving Br. 17-21.)

Plaintiff's class definition does not include a geographic limitation, *i.e.* New Jersey, but rather, Plaintiff brings the suit "on behalf of a class of consumers who purchased electricity on a variable rate from Defendant from April 19, 2011, to present." (SAC ¶ 6.) Plaintiff further provides that Defendant "has thousands of customers in New Jersey and elsewhere," and operates in "New Jersey and other states." (SAC ¶ 8.) Although the Court recognizes Plaintiff's nationwide class allegations are limited, Plaintiff's allegations are sufficiently broad to encompass a class outside of the State of New Jersey.

Moreover, the Court is not inclined to dismiss or strike Plaintiff's class allegations at the motion to dismiss stage, and finds this issue better suited for the class certification stage.[5] *See Rubi Rose, LLC*, 2017 WL 2367056, at *10 ("[S]trik[ing] ... class allegations at [the motion to dismiss] stage would be premature, and the Court's consideration of this issue is better suited for the class certification stage."); *see also Durso v. Samsung Elecs. Am., Inc.*, No. 12-5352, 2013 WL 5947005, at *13 (D.N.J. Nov. 6, 2013) (citation omitted) ("Dismissal of class claims prior to discovery and a motion to certify the class by plaintiff is the exception rather than the rule."); *Fishman v. Gen. Elec. Co.*, No. 12-585, 2013 WL 1845615, at *6 (D.N.J. Apr. 30, 2013) (explaining that a motion to strike under Rule 12(f), rather than a motion to dismiss under Rule 12(b)(6), is the "proper procedural mechanism" for disputing nationwide class allegations, and finding the defendant's motion premature at the motion to dismiss stage); *cf. Bell v. Cheswick Generating Station*, No. 12-929, 2015 WL 401443, at *5-7 (W.D. Pa. Jan. 28, 2015) (reviewing the defendant's motion brought pursuant to Rules 12(b) and 23(c)(1)(A) as a motion to strike class allegations). The Court, accordingly, denies Defendant's motion to dismiss or strike Plaintiff's nationwide class allegations.[6]

### IV. Conclusion

For the reasons set forth above, the Court dismisses with prejudice Plaintiff's NJCFA claim. The Court denies Defendant's Motion to Strike Plaintiff's nationwide class. The Court will enter an Order consistent with this Memorandum Opinion.

### All Citations

Slip Copy, 2019 WL 1903990

---

Footnotes

1    The Court permitted Plaintiff and Defendant to submit a sur-reply and sur-sur-reply, respectively, but reserved on its decision as to whether it would consider the arguments advanced in that correspondence. (ECF Nos. 68, 69, 70, 71, 72, 73.) The Court hereby grants Plaintiffs and Defendant's Motions to submit a sur-reply and sur-sur-reply. (ECF Nos. 71, 72.) Further, the Court acknowledges receipt of the notices of supplemental authority (ECF Nos. 77, 79), and the responses thereto (ECF Nos. 78, 80).

2    For purposes of the instant motion, the Court accepts all well-pled factual allegations in the Complaint as true. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

3    Unless otherwise noted, all references to "Rules" hereinafter refer to Federal Rules of Civil Procedure.

4    Plaintiff's arguments regarding the Administrative Fee lack merit as the Terms of Service provides that fixed rate plan customers will not pay an administrative fee, and Plaintiff does not allege that she paid an administrative fee during the time she was enrolled in the fixed rate plan. (SAC, Ex. 1; *see also* SAC ¶ 39 (stating Plaintiff began paying an administrative fee after switching to the Variable Rate Plan).)

5    The Court acknowledges that "[c]ourts are divided on the question of the appropriate standard of review for pre-discovery motions to strike class allegations ...." *Bell v. Cheswick Generating Station*, No. 12-929, 2015 WL 401443, at *3 (W.D. Pa. Jan. 28, 2015) (collecting cases). Here, the Court finds Defendant's motion premature, and therefore, does not reach the issue.

6    The Court further finds Defendant's standing argument unpersuasive. *See, e.g.*, *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018) ("[W]hether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing ....").

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Tab 60

2018 WL 555244
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

SENIORS BENEFIT RESOURCE, Plaintiff,

v.

NEW JERSEY DEPARTMENT OF
HUMAN SERVICES, et al. Defendants.

Civ. Action No. 17–1380–BRM–LHG
|
Signed 01/25/2018

**Attorneys and Law Firms**

Gregg L. Zeff, Law Firm of Gregg L. Zeff, MT. Laurel, NJ,
for Plaintiff.

Deborah E. Shane-Held, Francesco Ferrantelli, Jr., State of
New Jersey Office of the Attorney General, Division of Law,
Trenton, NJ, for Defendants.

**OPINION**

BRIAN R. MARTINOTTI, United States District Judge

**\*1** Before this Court is Defendants New Jersey Department
of Human Services ("DHS"): Division of Medical Assistance
and Health Services ("DMAHS"), Kathy Martin, Valerie
Harr, and Meghan Davey's[1] ("Defendants") Motion to
Dismiss Plaintiff Senior Benefit Resource's ("SBR") claims
against them pursuant to Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). (ECF No. 4.) SBR opposes Defendants'
Motion. (ECF No. 6.) Pursuant to Federal Rule of Civil
Procedure 78(b), the Court did not hear oral argument. For
the reasons set forth herein, Defendants' Motion to Dismiss
is **GRANTED**.

### I. Background
For the purposes of this Motion to Dismiss, the Court accepts
the factual allegations in the Complaint as true and draws all
inferences in the light most favorable to SBR. *Phillips v. Cty.
of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

In this action, SBR asserts claims against Defendants for
alleged violations of its rights to procedural and substantive

due process. SBR is "a corporation that facilitates access
to insurance policies" for nursing home residents who have
periodontal disease. (Compl. (ECF No. 1) ¶ 15.) DHS is a
government agency that promulgates regulations to determine
eligibility for Medicaid in New Jersey. N.J. Stat. Ann. §
30:4D–7. DMAHS is an agency within DHS that administers
Medicaid in New Jersey. N.J. Admin. Code. § 10:49–1.1.
In order to receive Medicaid, applicants must be financially
eligible. N.J. Admin. Code. § 10:71–1.2. An applicant's
eligibility is based on his or her income and resources. N.J.
Admin. Code. § 10:71–3.15. If a nursing home resident
who is eligible for Medicaid has income over a certain
threshold, after allowable deductions, Medicaid reduces the
payment to the nursing home and the resident must pay the
difference out of his or her income. 42 C.F.R. § 435.725(a).
Of particular relevance to this litigation, one of the allowable
deductions is "other health insurance premiums," such
as supplemental insurance. 42 C.F.R. § 435.725(c)(4)(i).
If a Medicaid-eligible nursing home resident wants to
purchase supplemental insurance, he or she must submit a
redetermination application pursuant to 42 C.F.R. § 435.916
("Redetermination Application") to ensure the supplemental
policy does not affect Medicaid payments to the nursing
home.

SBR alleges Defendants have violated federal law by refusing
to promptly process nursing home residents' Redetermination
Applications, which in turn delayed the residents' purchase
of supplemental insurance. (Id. ¶¶ 18–24.) SBR claims Kathy
Martin, who was the Acting Director of DMAHS during the
time of the allegations, "and her staff disobeyed orders of
Centers for Medicaid and Medicare Services." (Id. ¶ 23.)
According to SBR, DHS Deputy Commissioner Valerie Harr
"specifically instructed employees in County Welfare Offices
to ignore the applications" for supplemental insurance. (Id.
¶ 24.) SBR alleges Defendants implemented burdensome
requirements for determining eligibility, including requiring
applicants to complete an eight-page packet and to provide
bank records. (Id. ¶ 26.) As a result of Defendants' inaction,
SBR claims it has suffered financial losses, and New Jersey
Medicaid recipients have not received periodontal treatment.
(Id. ¶ 28.)

**\*2** On February 27, 2017, SBR filed the Complaint. (ECF
No. 1.) Plaintiff asserts five claims against Defendants: (1)
a claim pursuant to 42 U.S.C. § 1983 for violations of
its Fourteenth Amendment right to procedural due process
(Count One); (2) a claim pursuant to 42 U.S.C. § 1983 for
violations of its Fourteenth Amendment right to substantive

Seniors Benefit Resource V. New Jersey Department of..., Not Reported in Fed....
2018 WL 555244, Med & Med GD (CCH) P 306,221

due process (Count Two); (3) a claim pursuant to N.J. Stat. Ann. § 10:6–1 *et seq.* for violations of its rights under the New Jersey Constitution (Count Three); (4) a claim pursuant to the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1–1, *et seq.* for negligence (Court Four); and (5) a claim for tortious interference with a business relationship (Count Five). (*Id.* ¶¶ 29–48.)

On April 11, 2017, Defendants filed their Motion to Dismiss. (ECF No. 4.) On May 22, 2017, SBR filed its opposition to the Motion. (ECF No. 6.)

## II. Legal Standard

Defendants move to dismiss the Complaint on the grounds the Court lacks subject matter jurisdiction, pursuant to Rule 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6). (Br. in Support of Defs.' Mot. to Dismiss (ECF No. 4–1).) "Caution is necessary because the standards governing the two rules differ markedly, as Rule 12(b)(6) provides greater procedural safeguards for plaintiffs than does Rule 12(b)(1)." *Davis v. Wells Fargo*, 824 F.3d 333, 348–49 (3d Cir. 2016).

### A. Federal Rule of Civil Procedure 12(b)(1)

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis*, 824 F.3d at 346. A facial attack "challenges the subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.' " *Id.* (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). A factual attack, on the other hand, "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.' " *Id.* (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)). A "factual challenge allows a court [to] weigh and consider evidence outside the pleadings." *Id.* (citation omitted). Thus, when a factual challenge is made, "no presumptive truthfulness attaches to [the] plaintiff's allegations." *Id.* (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Rather, "the plaintiff will have the burden of proof that jurisdiction does in fact exist," and the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.*

The Third Circuit has "repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits." *Davis*, 824 F.3d at 348–49 (collecting cases). "[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.' " *Id. at 350* (quoting *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987)). "In this vein, when a case raises a disputed factual issue that goes both to the merits and jurisdiction, district courts must 'demand less in the way of jurisdictional proof than would be appropriate at a trial stage.' " *Id.* (citing *Mortensen*, 549 F.2d at 892 (holding that dismissal under Rule 12(b)(1) would be "unusual" when the facts necessary to succeed on the merits are at least in part the same as must be alleged or proven to withstand jurisdictional attacks)). These cases make clear that "dismissal via a Rule 12(b)(1) factual challenge to standing should be granted sparingly." *Id.*

**\*3** Here, Defendants are asserting a facial 12(b)(1) challenge and, for the purposes of their Motion, do not contest the facts in the Complaint. (ECF No. 4–1 at 2 n.1.) Therefore, the Court considers the allegations in the light most favorable to Plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *Mortensen*, 549 F.2d at 891.

### B. Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Philips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 610 of 751
PageID: 11976
Seniors Benefit Resource v. New Jersey Department of..., Not Reported in Fed....
2018 WL 555244, Med & Med GD (CCH) P 306,221

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.' " *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than 'an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Decision

Defendant argues the Court should dismiss SBR's Complaint for lack of subject matter jurisdiction because SBR lacks both Article III standing and prudential standing to assert a claim under the Supreme Court's precedent in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

### A. Article III Standing

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.' " *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2016). "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Id.* (citation omitted). Article III "standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "Absent Article III standing, a federal

court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009) (quoting *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

**\*4**  As in *Spokeo*, "[t]his case primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

Defendants argue SBR "has not adequately alleged that a legally protected right has been violated." (ECF No. 4–1 at 11.) Defendants point to 42 C.F.R. § 435.907(a), which governs Redetermination Applications and states only nursing home residents or their authorized representatives may submit a Redetermination Application. (*Id.* at 12.) Defendants argue SBR's allegation that it lost business due to Defendants' alleged delays in processing the Redetermination Applications is insufficient to confer standing, because SBR does not allege a concrete particularized injury or causation. (*Id.*) SBR argues it has standing because it has a legally protected economic interest related to the processing of Redetermination Applications. (ECF No. 6 at 4 (citing *Clinton v. New York*, 524 U.S. 417, 432 (1998)).)

The fact SBR is not directly involved in the Redetermination Applications does not preclude Article III standing. To allege an injury in fact, "a plaintiff must claim 'the invasion of a concrete and particularized interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical." *Finkelman v. National Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 278 (3d Cir. 2014) (citing *Lujan*, 504 U.S. at 560)). An injury is "concrete" when it is "real, or distinct and palpable, as opposed to merely abstract." *Id.* (citing *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 238 (3d Cir. 2011). "To be sufficiently 'particularized,' an injury must 'affect the plaintiff in a personal and individual way.' " *Id.* (quoting *Lujan*, 504 U.S. at 560). A plaintiff does not properly allege an injury in fact when the claim relies on a "chain of contingencies" or "mere speculation." *Id.* (quoting

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 611 of 751
PageID: 11977
Seniors Benefit Resource v. New Jersey Department of..., Not Reported in Fed....
2018 WL 555244, Med & Med GD (CCH) P 306,221

*Constitution Party of Pa.*, 757 F.3d at 364). "Typically, a plaintiff's allegations of financial harm will easily satisfy each of [the *Spokeo*] components, as financial harm is a 'classic' and paradigmatic form[ ]' of injury in fact." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 163 (3d Cir. 2017) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir. 2005)). The Third Circuit has "explained that where a plaintiff alleges financial harm, standing 'is often assumed without discussion.' " *Id.* (quoting *Danvers*, 432 F.3d at 293).

Here, SBR alleges Defendants' actions and inaction have led it to "suffer[ ] financial losses." (ECF No. 1 ¶ 28.) SBR's alleged injury is concrete, because its financial losses are not "merely abstract." *See Finkelman*, 810 F.3d at 193 (quoting *N.J. Physicians, Inc.*, 653 F.3d at 238). SBR is affected in an individual way by its alleged financial losses. *See id.* (citing *Lujan*, 504 U.S. at 560.) Finally, SBR's claim does not rely on mere speculation. *See id.* (citing *Constitution Party of Pa.*, 757 F.3d at 364). SBR alleges Defendants' failure to process Redetermination Applications has directly led to its injury. (ECF No. 1 ¶ 28.)

**\*5** Similarly, the Court finds SBR has adequately alleged its injuries are "fairly traceable to the challenged action of the defendant." *Finkelman*, 810 F.3d at 193. The traceability, or causation, element of standing is "akin to 'but for' causation in tort and may be satisfied 'even where the conduct in question might not have been a proximate cause of the harm." *Id.* (quoting *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 418 (citing *The Pitt News v. Fisher*, 215 F.3d 354, 360–61 (3d Cir. 2000))). SBR alleges Defendants' failure to process more than one hundred Redetermination Applications prevented nursing home residents from purchasing supplemental insurance, which prevented SBR from earning revenue on services it would provide to the residents. (ECF No. 1 ¶¶ 20, 28.) Therefore, SBR has sufficiently alleged Defendants' actions and inaction caused its injuries.

Finally, the Court finds SBR has alleged a favorable decision would likely redress the injury. *See Common Cause of Pennsylvania*, 558 F.3d at 257. Based on the allegations in the Complaint, if Defendants process the Redetermination Applications, the nursing home residents would be able to purchase supplemental insurance and SBR would no longer lose revenue from those transactions. *See The Pitt News*, 215 F.3d at 361 (finding the redressability requirement of Article III standing is satisfied as long as it is not "merely

speculative" and a favorable result would cure plaintiff's injury.).

The Court finds SBR has Article III standing to bring its claims, because it has sufficiently alleged it suffered an injury in fact that is traceable to Defendants' conduct, and it has alleged a favorable outcome would likely redress that injury. Furthermore, "where a plaintiff alleges financial harm, standing 'is often assumed without discussion.' " *Cottrell*, 874 F.3d at 163 (quoting *Danvers*, 432 F.3d at 293).

**B. Prudential Standing Requirements**

"In contrast to constitutional standing, prudential standing 'embodies judicially self-imposed limits on the exercise of federal jurisdiction.' " *Common Cause of Pennsylvania*, 558 F.3d at 250 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). Among the requirements for prudential standing is the principle "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulation by the statutory provision or constitutional guarantee invoked in the suit." *Bennet v. Spear*, 520 U.S. 154, 162 (1997) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75 (1982)).

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone-of-interests] test denies a right of review if the plaintiff's interest are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Clake v. Securities Industry Ass'n*, 478 U.S. 388, 399–400 (1987). "The test, however, is not so stringent that it requires the would-be plaintiff to be specifically targeted by Congress as a beneficiary of the statute." *Schering Corp. v. Food and Drug Admin.*, 51 F.3d 390, 395 (3d Cir.), *cert. denied*, 516 U.S. 907 (1995) (citations omitted).

SBR's claims arise from Defendants' alleged failure to enforce and abide by Medicaid regulations. (ECF No. 1 ¶¶ 18–19.) Medicaid was enacted to "provid[e] medical assistance to the needy." *Lewis v. Alexander*, 685 F.3d 325, 331 (3d Cir. 2012). The regulations at issue in this case deal with nursing home residents and their eligibility to deduct supplement insurance costs from their income. 42 C.F.R. § 435.916; 42 C.F.R. § 435.725. SBR, as an insurance facilitator, is not within the

Seniors Benefit Resource v. New Jersey Department of..., Not Reported in Fed....

2018 WL 555244, Med & Med GD (CCH) P 306,221

zone of interests of Medicaid and the regulations it cites in its Complaint. While SBR apparently stands to profit when nursing home residents purchase supplemental insurance—after Defendants process Redetermination Applications—this benefit is incidental to the Medicaid scheme. *See Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 517 (finding an incidental benefit to plaintiff did not bring plaintiff within a statute's zone of interests); *see also, Pennsylvania Pharm. Ass'n v. Dep't of Pub. Welfare of Com. of Pa.*, 542 F. Supp. 1349, 1356 (W.D. Pa. 1982) (finding plaintiff lacked standing despite lost profits, because a "state participating in the Medicaid program has no duty to administer its state plan in such a manner as to guarantee a profit to an inefficient health care provider").

**\*6** SBR cites several cases in support of its argument it has prudential standing. (ECF No. 6 at 6–7 (citing *Lion Health Servs., Inc. v. Pennsylvania*, 635 F.3d 693, 699 (5th Cir. 2011); *Westside Mothers v. Haveman*, 289 F.3d 852, 864 (6th Cir. 2002); *Wilmac Corp. v. Bowen*, 811 F.2d 809 (3d Cir. 1987); *St. Joseph's Hosp. v. Dep't of Pub. Welfare of Com. of Pa.*, 103 B.R. 643 (Bankr. E.D. Pa. 1989) *abrogated by In re Sacred Hearth Hosp. of Norristown*, 204 B.R. 132 (E.D. Pa. 1997)).) The cases SBR cites concern Medicaid providers suing under provisions governing reimbursement. The Supreme Court has

held medical providers are intended beneficiaries of certain Medicaid provisions. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509 (1990). SBR is not a Medicaid provider, but a facilitator of insurance. SBR does not allege it receives any Medicaid proceeds for the provision of its services. Therefore, the cases SBR cites are inapposite.

The Court finds, while SBR has alleged it has sustained an injury in fact, it is not an intended beneficiary under Medicaid and does not have prudential standing to assert its claims for violations of its rights under the United States Constitution and the New Jersey Constitution. Therefore, Defendants Motion to Dismiss is **GRANTED**.

**IV. Conclusion**

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 4) is **GRANTED**. The Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. An appropriate Order will follow.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 555244, Med & Med GD (CCH) P 306,221

---

Footnotes

1    Kathy Martin is the Acting Director of DMAHS's Office of Eligibility. Valerie Harr is the Deputy Commissioner of the DHS, though she is pled as the Director of the DHS. Meghan Davey is the Director of DMAHS, though she is pled as the Acting Commissioner of the DHS.

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 61

2014 WL 1663966
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Stacy SHERFEY, as an administrator
of the estate of Tracen Sherfey, a
minor, deceased, Stacy Sherfey,
and Neil Sherfey, Plaintiffs,

v.

JOHNSON & JOHNSON,
et al., Defendants.

Civil Action No. 12–4162.
|
Signed April 25, 2014.

**Attorneys and Law Firms**

Joseph L. Messa, Jr., Thomas N. Sweeney, Messa &
Associates, Irene M McLafferty, Philadelphia, PA, for
Plaintiffs.

Michael B. Hewes, Butler Snow LLP, Gulfport, MS, Sarah
Elizabeth Moccaldi, Butler Snow LLP, Memphis, TN,
Melissa A Graff, David F. Abernethy, Meredith Nissen
Reinhardt, Drinker Biddle & Reath LLP, David Newmann,
Stephen A. Loney, Jr., Hogan & Hartson, Philadelphia, PA,
Cyrus Y. Chung, Michael L. Kidney, Hogan Lovells US LLP,
Washington, DC, for Defendants.

*MEMORANDUM*

ROBERT F. KELLY, Senior District Judge.

*1 Presently before the Court is Defendants, Inmar Inc.,
Carolina Supply Chain Services, LLC, and Carolina Logistics
Services, LLC's (collectively, the "Inmar Defendants"),
Motion to Dismiss the Complaint pursuant to Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6), Plaintiffs,
Stacy Sherfey, as the administrator of the Estate of
Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil
Sherfey's, (collectively, "Plaintiffs") Response, and the Inmar
Defendants' Reply. For the reasons stated below, the Motion
is granted.

## I. BACKGROUND[1]

Plaintiffs[2] filed the Complaint on June 27, 2012, against
Johnson & Johnson ("J & J"), McNeil–PPC, Inc. ("McNeil"),
Johnson & Johnson Sales & Logistics Company, LLC
("JJSLC") (collectively, the J & J Defendants"), Wal–Mart
Stores, Inc., the Inmar Defendants[3], and individual executives
and officers of McNeil in the Court of Common Pleas of
Philadelphia County. Defendants removed this action to this
Court based on diversity of citizenship and the inapplicability
of the forum defendant rule set forth in 28 U.S.C. § 1441(b)
(2). Plaintiffs filed a Motion to Remand, which we denied
on January 29, 2014. *See Sherfey,* 2014 WL 715518, at *1.
We also dismissed from this action the individual executive
Defendants because they were fraudulently joined. *Id.* at 5–
11.

Plaintiffs assert that their two-week-old son, Tracen Sherfey
("Tracen") died from ingesting defective and recalled Infants'
Tylenol. In their Complaint, Plaintiffs allege that on February
16, 2009, Stacy Sherfey gave Tracen a recommended dose
of Infants' Tylenol based on the suggestion of Tracen's
doctor. *Id.* ¶ 103. The following morning, Stacy Sherfey
gave Tracen another dose of Infants' Tylenol in accordance
with the instructions on the package, and later this same
day, gave Tracen another dose. *Id.* ¶¶ 104–105. Tracen began
vomiting blood, and Stacy Sherfey took him to the local
emergency room. *Id.* Tracen was later airlifted to Children's
Primary Hospital in Salt Lake City, Utah. *Id.* ¶ 107. On
February 19, 2009, Tracen died from acute liver failure.
*Id.* ¶ 108. Plaintiffs assert the following causes of action
against the Inmar Defendants:[4] (1) Count XVIViolation of
Nevada Consumer Protection Law; (2) Count XVII–Civil
Conspiracy; (3) Count XVIIIAiding and Abetting; and (4)
Count XIXPunitive Damages.

The Inmar Defendants filed the instant Motion to Dismiss on
February 21, 2014. (Doc. No. 56.) Plaintiffs filed a Response
on March 25, 2014, and the Inmar Defendants filed a Reply
on April 10, 2014. (Doc. Nos.60, 64.)

## II. DISCUSSION

### A. Standing
The concept of standing is an integral part of "the
constitutional limitation of federal-court jurisdiction to actual
cases or controversies." *Hagan v. United States.* No. 01–5506,
2002 WL 338882, at *4 (E.D.Pa. Mar.2, 2002) (citing *Simon*

*v. Eastern KY. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). A motion to dismiss for want of standing implicates the court's subject matter jurisdiction, and is therefore appropriately brought under *Federal Rule of Civil Procedure* 12(b)(1). *Id.* (citing *Miller v. Hvgrade Food Prods. Corp.,* 89 F.Supp.2d 643, 646 (E.D.Pa.2000)). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims and they must be dismissed." *Common Cause of PA. v. Pennsylvania,* 558 F.3d 249, 257 (3d Cir.2009) (citing *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006)).

**\*2** The "irreducable constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, the plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* (internal citations omitted). A particularized injury is one that affects the plaintiff in a personal and individual way. *Id.* at 560 n. 1. Second, there must be a causal connection between the injury and the conduct complained of, which requires the injury to be "fairly ... traceable to the challenged action of the defendant and not th[e] result [of] the independent action of some third party not before the court." *Id.* at 560–61 (citing *Simon,* 426 U.S. at 41–42). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id (citing *Simon,* 426 U.S. at 38). At all times, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.' " *Id.* (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

Here, the Inmar Defendants argue that the Complaint should be dismissed against them under *Rule* 12(b)(1) because Plaintiffs lack standing to assert claims against them. (Defs.' Mot. Dismiss at 8.) Specifically, they state that Plaintiffs "lack standing because no plausible causation theory makes their alleged injury traceable" to the Inmar Defendants. (*Id.*) Plaintiffs respond that "[w]ithout the clandestine assistance of the Inmar Defendants, J & J and McNeil could not have concealed for so long the manufacturing defects of its pediatric medicines." (Pls.' Resp. at 3.) Plaintiffs allege further that the "Inmar Defendants' implementation of the phantom recall of pediatric medicines permitted J & J

and McNeil to further conceal from Plaintiffs that the later-recalled Infants' Tylenol, which killed Tracen Sherfey, was dangerous and defective." (*Id.*) Plaintiffs aver in their Complaint:

> To conceal from the public the defects in Infants' and Children's Tylenol products, the Defendants employed the services of Inmar and its subsidiaries Carolina Supply Chain Services and Carolina Logistics Services to implement a phantom recall and conduct "market assessments" to determine the risk that children faced by the defective medicines.
>
> At the direction of J & J, McNeil and their executives, Inmar, Carolina Supply Chain Services and Carolina Logistics Services analyzed J & J and McNeil's exposure by traveling to retail outlets across the United States to measure what defective medicines remained on the shelves.
>
> Inmar, Carolina Supply Chain Services and Carolina Logistics Services conducted the work clandestinely so that the FDA and the public would be unaware that the J & J and McNeil products were defective and dangerous.

**\*3** Compl. ¶¶ 86–88.

The Inmar Defendants assert that two recent cases from this District decided by the Honorable Mary A. McLaughlin, *In re McNeil Comsumer Healthcare, et al., Marketing and Sales Litig.,* MDL No. 2190, 2011 WL 2802854, at \*1 (E.D.Pa. July 15, 2011) and *Moore v. Johnson & Johnson,* No. 2:12–cv–00490–MAM (E.D.Pa. Feb. 4, 2014),[5] which dismissed them as parties based on similar allegations as those alleged in this action, support their position that Plaintiffs lack standing to bring the instant causes of action against them. We agree.

*In re McNeil* was a multi-district consolidated consumer class action, principally alleging that "quality control issues affect[ed] certain over-thecounter healthcare products manufactured by Johnson & Johnson's consumer healthcare division, McNeil Consumer Healthcare." *McNeil,* 2011 WL 2802854 at \*1. With respect to the Inmar Defendants, plaintiffs alleged that they participated in a June 2009 market removal which they termed a "phantom recall" of Motrin IB and a "market assessment" of non-Motrin products. *Id.* at 5. Plaintiffs argued that had the Inmar Defendants not participated in the phantom recall, J & J would have been forced to publicly disclose the defective nature of the products. *Id.* at \*15. The Court dismissed the Inmar Defendants for lack of standing holding that plaintiffs failed to establish causation. *Id.* at 18. The Court stated:

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 616 of 751
PageID: 11982
Sherley v. Johnson & Johnson, Not Reported in F.Supp.3d (2014)
2014 WL 1663966

First, there are no allegations that the Contractor Defendants[6] participated in, or had influence over, the decision to conduct a "phantom recall," or decisions regarding the scope of said recall. Second, the plaintiffs have not alleged that the Contractor Defendants had any knowledge of the specific defects affecting Motrin IB, such that they would have or should have refused to conduct a "phantom recall." Finally, even if the Contractor Defendants had refused to conduct a "phantom recall," there is no basis for assuming that the J & J Defendants would have been unable to find other contractors to conduct the recall, or that the J & J Defendants otherwise would have foregone a "phantom recall" in favor of a public recall. The plaintiffs' theory of causation, therefore, hinges on the Contractor Defendants' possessing a degree of influence over the J & J Defendants that is not plausible on the limited allegations in the CAC. Instead, the plaintiffs' injuries appear to be based on conduct more appropriately attributed to the J & J Defendants.

*Id.* at *16.

In *Moore v. Johnson & Johnson,* the plaintiffs advanced similar allegations against the Inmar Defendants as those in *In re McNeil. See* Doc. No. 111 at 1–3. The difference was that the *Moore* complaint alleged personal injury and the *In re McNeil* complaint alleged economic harm. *Id.* at 3. In *Moore,* the plaintiffs averred that the Inmar Defendants' "acts allowed the J & J defendants to conceal the manufacturing defects of Children's Tylenol." *Id.* at 2–3. If the Contractor Defendants [Inmar Defendants] had not been involved, Katy Moore would not have purchased the Children's Tylenol that led to River Moore's death. The plaintiffs 'seek wrongful death and survival damages from [Inmar Defendants] for their role in hiding the dangers of the J & J Defendants' pediatric over-the counter drugs.' " *Id.* at 5. The *Moore* Court stated that the same analysis that applied in *In re McNeil* applied to *Moore. Id.* at 6. The Court, in dismissing the Inmar Defendants, found that the plaintiffs lacked standing because they could not establish causation. *Id.* The Court reasoned:

> **\*4**  The Complaint's only allegation is that the Contractor Defendants were hired to conduct a "market assessment." The Complaint does not allege that the Contractor Defendants knew or should have known that the products involved in the "market assessment" were defective or dangerous. There are no allegations that the Contractor Defendants had any influence over J & J's decision to conduct a market assessment, that the market assessment

was wrongful in any way, or that the market assessment influenced the way J & J and McNeil conducted the recall of the Children's Tylenol products.

*Id.* The Court further concluded that:

> The Complaint does not establish how the Contractor Defendants' performance of a market assessment to determine the amount of product on store shelves in July 2009 could have possibly caused Katy Moore to purchase defective Children's Tylenol or administer it to River Moore.

*Id.* at 6–7.

In the case before this Court, Plaintiffs assert in their Response that the Inmar Defendants's Motion is "based on the bizarre claim that Plaintiffs lack 'standing' to assert claims against them."[7] (Pls.' Resp. at 2.) We first note that this argument is puzzling because Judge McLaughlin adopted this exact same Article III standing analysis in dismissing the Inmar Defendants in *In re McNeil* and *Moore.* We also note that, while Plaintiffs attempt to distinguish *In re McNeil* from this present action in their Response, they make no attempt to distinguish *Moore* from the instant case.

Plaintiffs attempt to distinguish this action from *In re McNeil* by arguing that the "Inmar Defendants seek to equate this matter with a dismissed consumer fraud case where the putative class plaintiffs could not articulate an 'injury in fact.' " (*Id.* at 2.) Plaintiffs assert that *In re McNeil* involved "plaintiffs' standing and the sufficiency of pleading of the economic harm." (*Id.*) Plaintiffs further claim that they have adequately pleaded the harms in this case since it involved the death of a two-week-old boy. (*Id.*) However, it is apparent from even a cursory reading of *In re McNeil* that, while the issue of "injury in fact" under *Lujan's* first prong was discussed, the Court clearly dismissed the Inmar Defendants for failure to establish Article III causation. The Court stated that:

> [t]he plaintiffs have failed to establish that their purported injuries are "fairly traceable" to the Contractor Defendants' conduct. The Court will therefore dismiss all claims against the Contractor Defendants for lack of standing. The dismissal will be with prejudice, because the Court concludes that the plaintiffs would be unable to establish causation upon amendment.

*In re McNeil,* 2011 WL 2802854, at *18.

In the instant action, there is no issue that the Plaintiffs suffered an "injury in fact." The issue before us, regarding

standing, is clearly causation. *See Lujan,* 504 U.S. at 560. To satisfy this causation requirement, the plaintiffs must establish that the injuries in question "fairly can be traced to the challenged action" of a particular defendant, rather than to the action of an independent third party. *In re McNeil,* 2011 WL 2802854, at *18 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *see also Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 137–38 (3d Cir.2009). "This requirement is not as demanding as the proximate causation required under tort law. Instead, an indirect causal relationship may suffice, so long as there is a 'substantial likelihood' that the defendant's conduct caused the plaintiffs' harm." *Id.* (citing *Pub. Interest Research Grp. v. Powell Duffryn Terminals,* 913 F.2d 64, 72 (3d Cir.1990).

 **\*5** Here, we agree with the holdings in *In re McNeil* and *Moore,* and find that the Complaint does not support a "causal connection between the injury and the conduct complained of," and the death of Tracen is not "fairly ... traceable to the challenged action[s]" of the Inmar Defendants. *See Lujan,* 504 U.S. at 560–61. The *In re McNeil* and *Moore* Courts determined that the plaintiffs' theory of causation hinged on the Inmar Defendants possessing a degree of influence over the J & J Defendants that was not plausible on the limited allegations in the complaints. *See In re McNeil,* 2011 WL 2802854, at * 18; *Moore,* Doc. 111 at 6. Likewise, in this case, Plaintiffs' Complaint does not establish that the Inmar Defendants had such influence over the J & J Defendants. In fact, there are no allegations in the Complaint that the Inmar Defendants had influence over the J & J Defendants decision to conduct a "phantom recall," and/or decisions regarding the scope of such a recall. The Complaint also does not allege that the Inmar Defendants had any knowledge of the specific defects affecting the Infants' Tylenol. *See Id.* at 16.

In addition, the Complaint fails to allege any facts to support a conclusion that the Inmar Defendants carried out "market assessments" of Infants' Tylenol. As in *In re McNeil* and *Moore,* Plaintiffs, here, fail to define the term "market assessment," or explain in any way how the Inmar Defendants, as part of this market assessment, could have influenced the J & J Defendants with respect to recall decisions. *See In re McNeil,* 2011 WL, at *17 n. 30; *see also Moore,* Doc. No. 111 at 4. Like *Moore,* we are of the opinion that the instant Complaint does not define "market

assessments," and does not explain why such assessments were unlawful. *Id.* at 6–7.

Moreover, the Complaint fails to allege facts to support a conclusion that the Inmar Defendants even carried out a "phantom recall" of Infants' Tylenol and/or conducted a "market assessment" that caused or could have contributed to the cause of Tracen's death. The sole factual basis regarding the genesis of a phantom recall and/or a market assessment is an email communication from Peter Luther, President of McNeil ("Luther"), dated May 27, 2009. Comp. ¶¶ 92, 226. Specifically, Plaintiffs assert that in this email, Luther "ratified and approved the phantom/stealth recalls/ unethical 'market assessments.' "[8] Compl. ¶ 226. However, it is alleged that Tracen consumed the defective product and died in February 2009.[9] Therefore, we agree with the Inmar Defendants that the alleged phantom recall post-dated Tracen's death, and, therefore, could not have caused it.[10] Accordingly, we dismiss all claims against the Inmar Defendants for lack of standing.

An appropriate Order follows.


## ORDER

**AND NOW,** this 25th day of April, 2014, upon consideration of Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, LLC's (collectively, the "Inmar Defendants"), Motion to Dismiss the Complaint (Doc. No. 56), Plaintiffs, Stacy Sherfey, as the administrator of the Estate of Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil Sherfey's, Response, and the Inmar Defendants' Reply, it is hereby **ORDERED** that the Motion is **GRANTED.**

 **\*6** Accordingly, it is **ORDERED** that Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, LLC are **DISMISSED** from this action.


### All Citations

Not Reported in F.Supp.3d, 2014 WL 1663966

Footnotes

1    A complete procedural and factual history of this case is set forth in this Court's prior Memorandum Opinion. *See Sherfey v. Johnson & Johnson.* No. 12–4162, 2014 WL 715518, at *1 (E.D.Pa. Jan.29,2014).

2    Stacy Sherfey and Neil Sherfey, wife and husband, are residents of the State of Nevada. Compl. ¶ 29. They are the parents of Tracen Sherfey who is deceased. *Id.*

3    Inmar is a North Carolina corporation with its principal place of business in North Carolina. *Id.* ¶ 42. CSCS and CLS are limited liability companies with principal places of business in North Carolina. *Id.* ¶¶ 43–44.

4    For purposes of this Motion, we list only the causes of action against the Inmar Defendants.

5    This Order and decision rendered by Judge McLaughlin is not cited in Westlaw or Lexis at present. We, thus, will cite to it using its document number on the Court's docket.

6    We note that in both *In re McNeil* and *Moore,* Judge McLaughlin refers to the Inmar Defendants as the "Contractor Defendants."

7    Plaintiffs also assert that the Inmar Defendants's Motion to Dismiss is "premised on the misrepresentation that the Inmar Defendants' 'phantom recall' activities were limited to Motrin products, not the Infants' Tylenol which killed Tracen Sherfey." (Pls.' Resp. at 1.) We disagree. The Inmar Defendants clearly rely on the *Moore* decision in seeking dismissal for lack of standing. As indicated above, *Moore* dealt with allegedly defective Children's Tylenol and generally discussed the alleged "phantom recall" of "Children's Tylenol products." (Doc. No. 111 at 6.) Thus, while the Inmar Defendants rely on *In re McNeil* and *Moore,* they do not rely on the premise that the Inmar Defendants' activities were limited to Motrin products.

8    The email stated:

      Group,

      Where is the miss here? Given our current financial situation, I hope we're not going to really double our cost to do this. Let's make this happen ASAP.

      Thanks,

    Compl. ¶ 226.

9    It is notable that in *Moore,* Plaintiffs alleged that the "market assessment" conducted by the Inmar Defendants occurred in July 2009, or about six months after the death of Tracen. (Doc. No. 111 at 3.)

10   In their Response, Plaintiffs spend much space asserting allegations of wrong-doings by J & J executives, including planning a secret recall of Infants' and Children's Tylenol products, and hiring the Inmar Defendants to implement a phantom recall. (Pls.' Resp. at 3–7.) However, as noted earlier, we dismissed these individual Defendants in our prior Memorandum Opinion as being fraudulently joined. *See Sherfey,* No. 12–4162, 2014 WL 715518, at *5–11.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 62

2014 WL 1663966
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Stacy SHERFEY, as an administrator
of the estate of Tracen Sherfey, a
minor, deceased, Stacy Sherfey,
and Neil Sherfey, Plaintiffs,

v.

JOHNSON & JOHNSON,
et al., Defendants.

Civil Action No. 12–4162.
|
Signed April 25, 2014.

**Attorneys and Law Firms**

Joseph L. Messa, Jr., Thomas N. Sweeney, Messa &
Associates, Irene M McLafferty, Philadelphia, PA, for
Plaintiffs.

Michael B. Hewes, Butler Snow LLP, Gulfport, MS, Sarah
Elizabeth Moccaldi, Butler Snow LLP, Memphis, TN,
Melissa A Graff, David F. Abernethy, Meredith Nissen
Reinhardt, Drinker Biddle & Reath LLP, David Newmann,
Stephen A. Loney, Jr., Hogan & Hartson, Philadelphia, PA,
Cyrus Y. Chung, Michael L. Kidney, Hogan Lovells US LLP,
Washington, DC, for Defendants.

*MEMORANDUM*

ROBERT F. KELLY, Senior District Judge.

**\*1** Presently before the Court is Defendants, Inmar Inc.,
Carolina Supply Chain Services, LLC, and Carolina Logistics
Services, LLC's (collectively, the "Inmar Defendants"),
Motion to Dismiss the Complaint pursuant to Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6), Plaintiffs,
Stacy Sherfey, as the administrator of the Estate of
Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil
Sherfey's, (collectively, "Plaintiffs") Response, and the Inmar
Defendants' Reply. For the reasons stated below, the Motion
is granted.

## I. BACKGROUND[1]

Plaintiffs[2] filed the Complaint on June 27, 2012, against
Johnson & Johnson ("J & J"), McNeil–PPC, Inc. ("McNeil"),
Johnson & Johnson Sales & Logistics Company, LLC
("JJSLC") (collectively, the J & J Defendants"), Wal–Mart
Stores, Inc., the Inmar Defendants[3], and individual executives
and officers of McNeil in the Court of Common Pleas of
Philadelphia County. Defendants removed this action to this
Court based on diversity of citizenship and the inapplicability
of the forum defendant rule set forth in 28 U.S.C. § 1441(b)
(2). Plaintiffs filed a Motion to Remand, which we denied
on January 29, 2014. *See Sherfey,* 2014 WL 715518, at *1.
We also dismissed from this action the individual executive
Defendants because they were fraudulently joined. *Id.* at 5–
11.

Plaintiffs assert that their two-week-old son, Tracen Sherfey
("Tracen") died from ingesting defective and recalled Infants'
Tylenol. In their Complaint, Plaintiffs allege that on February
16, 2009, Stacy Sherfey gave Tracen a recommended dose
of Infants' Tylenol based on the suggestion of Tracen's
doctor. *Id.* ¶ 103. The following morning, Stacy Sherfey
gave Tracen another dose of Infants' Tylenol in accordance
with the instructions on the package, and later this same
day, gave Tracen another dose. *Id.* ¶¶ 104–105. Tracen began
vomiting blood, and Stacy Sherfey took him to the local
emergency room. *Id.* Tracen was later airlifted to Children's
Primary Hospital in Salt Lake City, Utah. *Id.* ¶ 107. On
February 19, 2009, Tracen died from acute liver failure.
*Id.* ¶ 108. Plaintiffs assert the following causes of action
against the Inmar Defendants:[4] (1) Count XVIViolation of
Nevada Consumer Protection Law; (2) Count XVII–Civil
Conspiracy; (3) Count XVIIIAiding and Abetting; and (4)
Count XIXPunitive Damages.

The Inmar Defendants filed the instant Motion to Dismiss on
February 21, 2014. (Doc. No. 56.) Plaintiffs filed a Response
on March 25, 2014, and the Inmar Defendants filed a Reply
on April 10, 2014. (Doc. Nos.60, 64.)

## II. DISCUSSION

### A. Standing
The concept of standing is an integral part of "the
constitutional limitation of federal-court jurisdiction to actual
cases or controversies." *Hagan v. United States,* No. 01–5506,
2002 WL 338882, at *4 (E.D.Pa. Mar.2, 2002) (citing *Simon*

v. *Eastern KY. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). A motion to dismiss for want of standing implicates the court's subject matter jurisdiction, and is therefore appropriately brought under *Federal Rule of Civil Procedure 12(b)(1)*. *Id.* (citing *Miller v. Hygrade Food Prods. Corp.,* 89 F.Supp.2d 643, 646 (E.D.Pa.2000)). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims and they must be dismissed." *Common Cause of PA. v. Pennsylvania,* 558 F.3d 249, 257 (3d Cir.2009) (citing *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir.2006)).

 **\*2** The "irreducable constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, the plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* (internal citations omitted). A particularized injury is one that affects the plaintiff in a personal and individual way. *Id.* at 560 n. 1. Second, there must be a causal connection between the injury and the conduct complained of, which requires the injury to be "fairly ... traceable to the challenged action of the defendant and not th[e] result [of] the independent action of some third party not before the court." *Id.* at 560–61 (citing *Simon,* 426 U.S. at 41–42). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Id (citing *Simon,* 426 U.S. at 38). At all times, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.' " *Id.* (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)).

Here, the Inmar Defendants argue that the Complaint should be dismissed against them under *Rule 12(b)(1)* because Plaintiffs lack standing to assert claims against them. (Defs.' Mot. Dismiss at 8.) Specifically, they state that Plaintiffs "lack standing because no plausible causation theory makes their alleged injury traceable" to the Inmar Defendants. (*Id.*) Plaintiffs respond that "[w]ithout the clandestine assistance of the Inmar Defendants, J & J and McNeil could not have concealed for so long the manufacturing defects of its pediatric medicines." (Pls.' Resp. at 3.) Plaintiffs allege further that the "Inmar Defendants' implementation of the phantom recall of pediatric medicines permitted J & J

and McNeil to further conceal from Plaintiffs that the later-recalled Infants' Tylenol, which killed Tracen Sherfey, was dangerous and defective." (*Id.*) Plaintiffs aver in their Complaint:

> To conceal from the public the defects in Infants' and Children's Tylenol products, the Defendants employed the services of Inmar and its subsidiaries Carolina Supply Chain Services and Carolina Logistics Services to implement a phantom recall and conduct "market assessments" to determine the risk that children faced by the defective medicines.

> At the direction of J & J, McNeil and their executives, Inmar, Carolina Supply Chain Services and Carolina Logistics Services analyzed J & J and McNeil's exposure by traveling to retail outlets across the United States to measure what defective medicines remained on the shelves.

> Inmar, Carolina Supply Chain Services and Carolina Logistics Services conducted the work clandestinely so that the FDA and the public would be unaware that the J & J and McNeil products were defective and dangerous.

 **\*3** Compl. ¶¶ 86–88.

The Inmar Defendants assert that two recent cases from this District decided by the Honorable Mary A. McLaughlin, *In re McNeil Comsumer Healthcare, et al., Marketing and Sales Litig.,* MDL No. 2190, 2011 WL 2802854, at *1 (E.D.Pa. July 15, 2011) and *Moore v. Johnson & Johnson,* No. 2:12–cv–00490–MAM (E.D.Pa. Feb. 4, 2014),[5] which dismissed them as parties based on similar allegations as those alleged in this action, support their position that Plaintiffs lack standing to bring the instant causes of action against them. We agree.

*In re McNeil* was a multi-district consolidated consumer class action, principally alleging that "quality control issues affect[ed] certain over-thecounter healthcare products manufactured by Johnson & Johnson's consumer healthcare division, McNeil Consumer Healthcare." *McNeil,* 2011 WL 2802854 at *1. With respect to the Inmar Defendants, plaintiffs alleged that they participated in a June 2009 market removal which they termed a "phantom recall" of Motrin IB and a "market assessment" of non-Motrin products. *Id.* at 5. Plaintiffs argued that had the Inmar Defendants not participated in the phantom recall, J & J would have been forced to publicly disclose the defective nature of the products. *Id.* at *15. The Court dismissed the Inmar Defendants for lack of standing holding that plaintiffs failed to establish causation. *Id.* at 18. The Court stated:

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 622 of 751
PageID: 11988
Sherley v. Johnson & Johnson, Not Reported in F.Supp.3d (2014)
2014 WL 1663966

First, there are no allegations that the Contractor Defendants[6] participated in, or had influence over, the decision to conduct a "phantom recall," or decisions regarding the scope of said recall. Second, the plaintiffs have not alleged that the Contractor Defendants had any knowledge of the specific defects affecting Motrin IB, such that they would have or should have refused to conduct a "phantom recall." Finally, even if the Contractor Defendants had refused to conduct a "phantom recall," there is no basis for assuming that the J & J Defendants would have been unable to find other contractors to conduct the recall, or that the J & J Defendants otherwise would have foregone a "phantom recall" in favor of a public recall. The plaintiffs' theory of causation, therefore, hinges on the Contractor Defendants' possessing a degree of influence over the J & J Defendants that is not plausible on the limited allegations in the CAC. Instead, the plaintiffs' injuries appear to be based on conduct more appropriately attributed to the J & J Defendants.

*Id.* at *16.

In *Moore v. Johnson & Johnson,* the plaintiffs advanced similar allegations against the Inmar Defendants as those in *In re McNeil. See* Doc. No. 111 at 1–3. The difference was that the *Moore* complaint alleged personal injury and the *In re McNeil* complaint alleged economic harm. *Id.* at 3. In *Moore,* the plaintiffs averred that the Inmar Defendants' "acts allowed the J & J defendants to conceal the manufacturing defects of Children's Tylenol." *Id.* at 2–3. If the Contractor Defendants [Inmar Defendants] had not been involved, Katy Moore would not have purchased the Children's Tylenol that led to River Moore's death. The plaintiffs 'seek wrongful death and survival damages from [Inmar Defendants] for their role in hiding the dangers of the J & J Defendants' pediatric over-the counter drugs.' " *Id.* at 5. The *Moore* Court stated that the same analysis that applied in *In re McNeil* applied to *Moore. Id.* at 6. The Court, in dismissing the Inmar Defendants, found that the plaintiffs lacked standing because they could not establish causation. *Id.* The Court reasoned:

> **\*4** The Complaint's only allegation is that the Contractor Defendants were hired to conduct a "market assessment." The Complaint does not allege that the Contractor Defendants knew or should have known that the products involved in the "market assessment" were defective or dangerous. There are no allegations that the Contractor Defendants had any influence over J & J's decision to conduct a market assessment, that the market assessment

was wrongful in any way, or that the market assessment influenced the way J & J and McNeil conducted the recall of the Children's Tylenol products.

*Id.* The Court further concluded that:

> The Complaint does not establish how the Contractor Defendants' performance of a market assessment to determine the amount of product on store shelves in July 2009 could have possibly caused Katy Moore to purchase defective Children's Tylenol or administer it to River Moore.

*Id.* at 6–7.

In the case before this Court, Plaintiffs assert in their Response that the Inmar Defendants's Motion is "based on the bizarre claim that Plaintiffs lack 'standing' to assert claims against them."[7] (Pls.' Resp. at 2.) We first note that this argument is puzzling because Judge McLaughlin adopted this exact same Article III standing analysis in dismissing the Inmar Defendants in *In re McNeil* and *Moore.* We also note that, while Plaintiffs attempt to distinguish *In re McNeil* from this present action in their Response, they make no attempt to distinguish *Moore* from the instant case.

Plaintiffs attempt to distinguish this action from *In re McNeil* by arguing that the "Inmar Defendants seek to equate this matter with a dismissed consumer fraud case where the putative class plaintiffs could not articulate an 'injury in fact.' " (*Id.* at 2.) Plaintiffs assert that *In re McNeil* involved "plaintiffs' standing and the sufficiency of pleading of the economic harm." (*Id.*) Plaintiffs further claim that they have adequately pleaded the harms in this case since it involved the death of a two-week-old boy. (*Id.*) However, it is apparent from even a cursory reading of *In re McNeil* that, while the issue of "injury in fact" under *Lujan's* first prong was discussed, the Court clearly dismissed the Inmar Defendants for failure to establish Article III causation. The Court stated that:

> [t]he plaintiffs have failed to establish that their purported injuries are "fairly traceable" to the Contractor Defendants' conduct. The Court will therefore dismiss all claims against the Contractor Defendants for lack of standing. The dismissal will be with prejudice, because the Court concludes that the plaintiffs would be unable to establish causation upon amendment.

*In re McNeil,* 2011 WL 2802854, at *18.

In the instant action, there is no issue that the Plaintiffs suffered an "injury in fact." The issue before us, regarding

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 623 of 751
PageID: 11989
Sherfey v. Johnson & Johnson, Not Reported in F.Supp.3d (2014)
2014 WL 1663966

standing, is clearly causation. *See Lujan,* 504 U.S. at 560. To satisfy this causation requirement, the plaintiffs must establish that the injuries in question "fairly can be traced to the challenged action" of a particular defendant, rather than to the action of an independent third party. *In re McNeil,* 2011 WL 2802854, at *18 (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *see also Toll Bros., Inc. v. Twp. of Readington,* 555 F.3d 131, 137–38 (3d Cir.2009). "This requirement is not as demanding as the proximate causation required under tort law. Instead, an indirect causal relationship may suffice, so long as there is a 'substantial likelihood' that the defendant's conduct caused the plaintiffs' harm." *Id.* (citing *Pub. Interest Research Grp. v. Powell Duffryn Terminals,* 913 F.2d 64, 72 (3d Cir.1990).

 **\*5** Here, we agree with the holdings in *In re McNeil* and *Moore,* and find that the Complaint does not support a "causal connection between the injury and the conduct complained of," and the death of Tracen is not "fairly ... traceable to the challenged action[s]" of the Inmar Defendants. *See Lujan,* 504 U.S. at 560–61. The *In re McNeil* and *Moore* Courts determined that the plaintiffs' theory of causation hinged on the Inmar Defendants possessing a degree of influence over the J & J Defendants that was not plausible on the limited allegations in the complaints. *See In re McNeil,* 2011 WL 2802854, at * 18; *Moore,* Doc. 111 at 6. Likewise, in this case, Plaintiffs' Complaint does not establish that the Inmar Defendants had such influence over the J & J Defendants. In fact, there are no allegations in the Complaint that the Inmar Defendants had influence over the J & J Defendants decision to conduct a "phantom recall," and/or decisions regarding the scope of such a recall. The Complaint also does not allege that the Inmar Defendants had any knowledge of the specific defects affecting the Infants' Tylenol. *See Id.* at 16.

In addition, the Complaint fails to allege any facts to support a conclusion that the Inmar Defendants carried out "market assessments" of Infants' Tylenol. As in *In re McNeil* and *Moore,* Plaintiffs, here, fail to define the term "market assessment," or explain in any way how the Inmar Defendants, as part of this market assessment, could have influenced the J & J Defendants with respect to recall decisions. *See In re McNeil,* 2011 WL, at *17 n. 30; *see also Moore,* Doc. No. 111 at 4. Like *Moore,* we are of the opinion that the instant Complaint does not define "market

assessments," and does not explain why such assessments were unlawful. *Id.* at 6–7.

Moreover, the Complaint fails to allege facts to support a conclusion that the Inmar Defendants even carried out a "phantom recall" of Infants' Tylenol and/or conducted a "market assessment" that caused or could have contributed to the cause of Tracen's death. The sole factual basis regarding the genesis of a phantom recall and/or a market assessment is an email communication from Peter Luther, President of McNeil ("Luther"), dated May 27, 2009. Comp. ¶¶ 92, 226. Specifically, Plaintiffs assert that in this email, Luther "ratified and approved the phantom/stealth recalls/ unethical 'market assessments.' "[8] Compl. ¶ 226. However, it is alleged that Tracen consumed the defective product and died in February 2009.[9] Therefore, we agree with the Inmar Defendants that the alleged phantom recall post-dated Tracen's death, and, therefore, could not have caused it.[10] Accordingly, we dismiss all claims against the Inmar Defendants for lack of standing.

An appropriate Order follows.

## ORDER

**AND NOW,** this 25th day of April, 2014, upon consideration of Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, LLC's (collectively, the "Inmar Defendants"), Motion to Dismiss the Complaint (Doc. No. 56), Plaintiffs, Stacy Sherfey, as the administrator of the Estate of Tracen Sherfey, a minor, deceased, Stacy Sherfey, and Neil Sherfey's, Response, and the Inmar Defendants' Reply, it is hereby **ORDERED** that the Motion is **GRANTED.**

 **\*6** Accordingly, it is **ORDERED** that Defendants, Inmar Inc., Carolina Supply Chain Services, LLC, and Carolina Logistics Services, LLC are **DISMISSED** from this action.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1663966

Footnotes

2014 WL 1663966

1   A complete procedural and factual history of this case is set forth in this Court's prior Memorandum Opinion. *See Sherfey v. Johnson & Johnson.* No. 12–4162, 2014 WL 715518, at *1 (E.D.Pa. Jan.29,2014).

2   Stacy Sherfey and Neil Sherfey, wife and husband, are residents of the State of Nevada. Compl. ¶ 29. They are the parents of Tracen Sherfey who is deceased. *Id.*

3   Inmar is a North Carolina corporation with its principal place of business in North Carolina. *Id.* ¶ 42. CSCS and CLS are limited liability companies with principal places of business in North Carolina. *Id.* ¶¶ 43–44.

4   For purposes of this Motion, we list only the causes of action against the Inmar Defendants.

5   This Order and decision rendered by Judge McLaughlin is not cited in Westlaw or Lexis at present. We, thus, will cite to it using its document number on the Court's docket.

6   We note that in both *In re McNeil* and *Moore,* Judge McLaughlin refers to the Inmar Defendants as the "Contractor Defendants."

7   Plaintiffs also assert that the Inmar Defendants's Motion to Dismiss is "premised on the misrepresentation that the Inmar Defendants' 'phantom recall' activities were limited to Motrin products, not the Infants' Tylenol which killed Tracen Sherfey." (Pls.' Resp. at 1.) We disagree. The Inmar Defendants clearly rely on the *Moore* decision in seeking dismissal for lack of standing. As indicated above, *Moore* dealt with allegedly defective Children's Tylenol and generally discussed the alleged "phantom recall" of "Children's Tylenol products." (Doc. No. 111 at 6.) Thus, while the Inmar Defendants rely on *In re McNeil* and *Moore,* they do not rely on the premise that the Inmar Defendants' activities were limited to Motrin products.

8   The email stated:

    Group,

    Where is the miss here? Given our current financial situation, I hope we're not going to really double our cost to do this. Let's make this happen ASAP.

    Thanks,

    Compl. ¶ 226.

9   It is notable that in *Moore,* Plaintiffs alleged that the "market assessment" conducted by the Inmar Defendants occurred in July 2009, or about six months after the death of Tracen. (Doc. No. 111 at 3.)

10  In their Response, Plaintiffs spend much space asserting allegations of wrong-doings by J & J executives, including planning a secret recall of Infants' and Children's Tylenol products, and hiring the Inmar Defendants to implement a phantom recall. (Pls.' Resp. at 3–7.) However, as noted earlier, we dismissed these individual Defendants in our prior Memorandum Opinion as being fraudulently joined. *See Sherfey,* No. 12–4162, 2014 WL 715518, at *5–11.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S.
                                                       Government Works.

Tab 63

2016 WL 1191808
Only the Westlaw citation is currently available.
United States District Court,
N.D. California,
San Jose Division.

St. Paul Fire & Marine Insurance Company, Plaintiff,
v.
Insurance Company of the State
of Pennsylvania, Defendant.

Case No. 15-CV-02744-LHK
|
Signed 03/28/2016

**ORDER ON MOTIONS TO DISMISS**

Re: Dkt. Nos. 41, 44

LUCY H. KOH, United States District Judge

 **\*1** Before the Court are two motions to dismiss defendant and counter-plaintiff The Insurance Company of the State of Pennsylvania's ("ICSOP") counterclaims: one motion to dismiss filed by counter-defendant Zurich American Insurance Company ("Zurich") and one motion to dismiss filed by plaintiffs and counter-defendants St. Paul Fire and Marine Insurance Company ("St. Paul") and Travelers Property Casualty Company of America ("Travelers") (collectively, "St. Paul/Travelers").

Having considered the submissions of the parties, the record in this case, and the relevant law, the Court hereby DENIES Zurich's motion to dismiss and GRANTS St. Paul/Travelers' motion to dismiss, for the reasons stated below.

**I. BACKGROUND**

 **A. Factual Background**
The parties do not dispute the relevant factual background for the instant motions to dismiss. The instant lawsuit is an insurance coverage dispute arising from the settlement of an underlying construction defect lawsuit.

The underlying construction defect lawsuit relates to the allegedly defective construction of 17 apartment buildings at the University of California at Santa Cruz (the "Project").

ICSOP Counterclaims, ECF No. 22, ¶ 12. The Regents of the University of California (the "Regents") hired Devcon Construction, Inc. ("Devcon") as the contractor for the Project. *Id.* ¶¶ 13. Devcon hired subcontractor The Brady Companies ("Brady") to perform certain work on the Project. *Id.* ¶ 14-15.

Over the course of the relevant time period, three different insurance companies provided primary insurance coverage to Brady. St. Paul insured Brady under a commercial general liability policy from June 1, 2004 to June 1, 2005. *Id.* ¶ 20. The St. Paul policy had a coverage limit of $1,000,000 per event with a total policy limit of $2,000,000. *Id.* The St. Paul policy required Brady to pay a $75,000 deductible per event. FAC, ECF No. 38, Exh. A, at 21. Travelers insured Brady under a commercial general liability policy from June 1, 2005 to June 1, 2006. ICSOP Counterclaims ¶ 22. The Travelers policy had a coverage limit of $1,000,000 per event with a total policy limit of $2,000,000. *Id.* The Travelers policy required Brady to pay a $75,000 deductible per event. FAC, Exh. B at 31. Zurich insured Brady under a series of successive commercial general liability policies from June 1, 2006 to June 1, 2014. ICSOP Counterclaims ¶ 27. From June 1, 2006 to June 1, 2012, the Zurich policies had a coverage limit of $1,000,000 per event with a total policy limit of $2,000,000. *Id.* From June 1, 2012 to June 1, 2014, the Zurich policies had a coverage limit of $2,000,000 per event with a total policy limit of $4,000,000. *Id.*

In addition, two different insurance companies provided excess insurance coverage to Brady. Everest National Insurance Company ("Everest") provided excess commercial general liability insurance to Brady from June 1, 2006 to June 1, 2009. FAC ¶ 16. The Everest policy is not at issue in the instant motions to dismiss. ICSOP provided excess commercial general liability insurance to Brady from June 1, 2004 to June 1, 2006. *Id.* ¶ 17. The ICSOP policy has a liability limit of $10,000,000 per event and in total. ICSOP Counterclaims ¶ 32. ICSOP alleges that the ICSOP policy "pays 'ultimate net loss' in excess of underlying limits of insurance. The ICSOP Policy defines 'ultimate net loss' as 'the amount payable in settlement of the liability of the Insured after making deductions for all recoveries for other valid and collectible insurances....'" *Id.* ¶ 33. Because ICSOP is an excess insurer for Brady, the ICSOP policy does not provide coverage until the applicable coverage limits of Brady's relevant primary insurance policies have been exhausted. *Id.* ¶ 34.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 627 of 751
PageID: 11993
St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

**\*2** On June 27, 2012, the Regents filed suit against Devcon, alleging various defects in construction of the Project. *Id.* ¶ 11. On May 20, 2013, Devcon filed a First Amended Cross-Complaint against Brady and other subcontractors who worked on the Project. *Id.* ¶ 17.

On January 24, 2014, the University made a confidential settlement demand to Devcon. *Id.* ¶ 36. On March 28, 2014, Devcon made a confidential settlement demand to Brady that Brady contribute to the settlement of the case against Devcon. *Id.* ¶ 37. Brady forwarded Devcon's confidential settlement demand to Brady's insurers. *Id.* ¶ 38. On May 11, 2015, a global settlement was reached in the underlying construction defect lawsuit. *Id.* ¶¶ 18, 42. Brady's insurers collectively contributed $4,000,000 to the settlement. *Id.* ¶ 42. St. Paul/Travelers contributed $1,000,000 collectively to Brady's contribution to the settlement. *Id.* ¶ 43. Zurich, ICSOP, and Everest each contributed $1,000,000 to Brady's contribution to the settlement. *Id.* Brady's insurers made their respective contributions to the global settlement with a reservation of all rights to have the settlement reallocated amongst Brady's insurers. *Id.*

**B. Procedural History**

On May 15, 2015, ICSOP made a demand to St. Paul/Travelers and Zurich that St. Paul/Travelers and Zurich contribute an additional $302,178.75 towards Brady's share of the global settlement as "Supplementary Payments." FAC ¶ 20. On June 18, 2015, St. Paul/Travelers filed the instant lawsuit against ICSOP, seeking a declaratory judgment that St. Paul/Travelers are not required to make additional contributions to the global settlement for "Supplementary Payments." *See* Complaint, ECF No. 1; *see also* FAC. ICSOP answered the complaint on August 12, 2015. ECF No. 7.

On October 2, 2015, St. Paul/Travelers and ICSOP stipulated to ICSOP's filing of ICSOP's counterclaims, pursuant to Federal Rule of Civil Procedure 15(a)(2). ECF No. 23. ICSOP filed its counterclaims against St. Paul/Travelers and Zurich the same day. ECF No. 22. Zurich was not previously a party to this case.

ICSOP's counterclaims include six causes of action. In the first cause of action in its counterclaims, ICSOP seeks a declaration that St. Paul/Travelers and Zurich are obligated to contribute additional sums to Brady's portion of the global settlement because the underlying construction defect litigation was the result of multiple covered events. *See* FAC. In the second cause of action in ICSOP's counterclaims,

ICSOP additionally seeks a declaration that St. Paul/Travelers and Zurich must make the additional "Supplementary Payments" at issue in the St. Paul/Travelers complaint. *Id.* The third and fourth causes of action in ICSOP's counterclaims are equitable subrogation claims seeking reimbursement from St. Paul/Travelers and Zurich for the same payments at issue in the first and second causes of action, respectively. *Id.* The fifth and sixth causes of action are claims seeking the same reimbursement from St. Paul/Travelers and Zurich as the third and fourth causes of action under a theory of unjust enrichment. *Id.*

St. Paul/Travelers filed an answer to ICSOP's counterclaims on October 23, 2015. ECF No. 30. St. Paul/Travelers filed the FAC on November 4, 2015. ECF No. 35 (FAC); ECF No. 38 (Errata to FAC). ICSOP filed an answer to the FAC on November 24, 2015. ECF No. 40.

**\*3** Zurich filed its motion to dismiss claims five and six of ICSOP's counterclaims on December 7, 2015. ECF No. 41.[1] ICSOP filed a response on December 21, 2015, ECF No. 53, and Zurich filed a reply on December 28, 2015, ECF No. 56.

St. Paul/Travelers filed its motion to dismiss ICSOP's counterclaims on December 7, 2015. ECF No. 44. ICSOP filed a response on December 21, 2015, ECF No. 54, and St. Paul/Travelers filed a reply on December 28, 2015, ECF No. 57.

**II. LEGAL STANDARD**

**A. Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted when a complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 628 of 751
PageID: 11994
St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Rule 12(b)(7) and Rule 19

Rule 12(b)(7) of the Federal Rules of Civil Procedure authorizes the Court to dismiss an action if a plaintiff has failed "to join a party under Rule 19." Federal Rule of Civil Procedure 19(a)(1)(B) provides, *inter alia*, that a person "must be joined as a party" if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." If that required person cannot be joined, then "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The Rule 19 inquiry is "fact specific," and the party seeking dismissal has the burden of persuasion. *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

### C. Leave to Amend

**\*4**  If the Court concludes that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15...[is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks omitted). Nonetheless, a district court may deny leave

to amend a complaint due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Zurich and St. Paul/Travelers have each filed a motion to dismiss ICSOP's counterclaims. The Court first discusses the arguments raised in Zurich's motion to dismiss and then turns to St. Paul/Traveler's motion to dismiss.

### A. Zurich's Motion to Dismiss

Zurich moves to dismiss ICSOP's fifth and sixth counterclaims in which ICSOP seeks reimbursement from Zurich and St. Paul/Travelers for unjust enrichment. ECF No. 41. Zurich argues that because ICSOP is an excess insurer, the only claim ICSOP may bring against the primary insurers —Zurich and St. Paul/Travelers—is a claim for equitable subrogation. *Id.* Zurich additionally argues that ICSOP's unjust enrichment counterclaims must fail because primary insurers do not owe a direct duty to an excess insurer. *Id.* Finally, Zurich argues that unjust enrichment is not a viable cause of action in California. *Id.* [2]

As an initial matter, contrary to Zurich's argument, California law permits claims for reimbursement for unjust enrichment in the insurance context. *See Hartford Casualty Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998-1000 (2015) (recognizing the availability of a claim for reimbursement for unjust enrichment in an insurance case). Thus, Zurich's argument that California law does not permit claims based on unjust enrichment is untenable.

Additionally, Zurich's argument that primary insurers do not owe a direct duty to an excess insurer does not affect the viability of ICSOP's unjust enrichment counterclaims. Under California law, "[a]n individual who has been unjustly enriched at the expense of another may be required to make restitution. Where the doctrine applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty." *Id.* at 998. Therefore, California law does not require an independent

direct duty owed by a primary insurer to an excess insurer for unjust enrichment to apply.

However, neither party has cited nor has the Court found any California or federal court decision directly addressing whether California law permits an *excess* insurer to bring against a primary insurer a claim for reimbursement for unjust enrichment.

Zurich argues that, under California law, the only claim that may be brought by an excess insurer against a primary insurer is a claim for equitable subrogation. In support of its position, Zurich relies upon two cases from California state courts — *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal. 3d 912 (1980), and *Fireman's Fund Ins. Co. v. Maryland Casualty Co. ("Fireman's Fund I")*, 21 Cal. App. 4th 1586 (1994) — and one case from the Northern District of California interpreting the California case law — *Fireman's Fund Ins. Co. v. Commerce & Industry Ins. Co. ("Fireman's Fund II")*, No. C-98-1060VRW, 2000 WL 1721080 (N.D. Cal. Nov. 7, 2000). Zurich contends that extrapolating the principles of these three cases leads to the conclusion that as an excess insurer, ICSOP's sole recourse against Zurich is a claim for equitable subrogation. Thus, Zurich argues that ICSOP may not maintain its claim for reimbursement for unjust enrichment.

**\*5** ICSOP argues in response that the cases relied upon by Zurich do not limit the ability of an excess insurer to bring a quasi-contract claim based upon unjust enrichment against Brady's primary insurers because the cases relied upon by Zurich do not discuss unjust enrichment. ICSOP asserts that the cases relied upon by Zurich instead stand only for the proposition that the sole *contract law* claim that may be brought by an excess insurer against a primary insurer is a claim for equitable subrogation. In support of its position, ICSOP cites to two federal court decisions from the Eastern District of California finding that California law permits an excess insurer to bring claims other than equitable subrogation against a primary insurer — *Continental Casualty Co. v. St. Paul Surplus Lines Ins. Co.*, No. 2:07-CV-01744-TLN-EF, 2014 WL 4661087 (E.D. Cal. Sept. 17, 2014); and *Lexington Ins. Co. v. Sentry Select Ins. Co.*, No. CV F 08-1539LJO GSA, 2009 WL 1586938 (E.D. Cal. June 5, 2009).

None of the cases relied upon by either Zurich or ICSOP are directly on point. Nevertheless, the Court finds the analysis

in the state and federal cases instructive to the analysis of the instant case. The Court therefore provides a description of each of the cases relied upon by Zurich and ICSOP.

### 1. The California Cases: *Commercial Union* and *Fireman's Fund I*

Both of the California cases—*Commercial Union* and *Fireman's Fund I*—deal with claims for breach of the duty of good faith and fair dealing. *See Commercial Union*, 26 Cal. 3d at 916-21 (analyzing whether an excess insurer could bring a claim for breach of the duty of good faith and fair dealing against a primary insurer); *Fireman's Fund I*, 21 Cal. App. 4th at 1599-1603 (same). The implied covenant of good faith and fair dealing arises between the parties to any contract. *See Commercial Union*, 26 Cal. 3d at 917 (stating that the implied covenant of good faith and fair dealing "is part of any contract").

Because an excess insurer's liability arises only after the primary insurer has satisfied its duty to the insured, equitable subrogation permits an excess insurer to stand in the place of the insured and bring any claims against the primary insurer that the insured would be able to bring. *See Commercial Union*, 26 Cal. 3d at 917-18 (explaining that through a claim of equitable subrogation "the excess carrier, who discharged the insured's liability as a result of [the primary insurer's] wrongful refusal to settle], stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted"). In *Commercial Union* and *Fireman's Fund I*, the California courts held that an excess insurer may bring a claim for breach of the duty of good faith and fair dealing against a primary insurer only through equitable subrogation. *See Commercial Union*, 26 Cal. 3d at 917-18 (stating that in California, an excess insurer may bring a claim for breach of the duty of good faith and fair dealing by wrongfully refusing to settle only on a theory of equitable subrogation); *Fireman's Fund I*, 21 Cal. App. 4th at 1603 ("[T]he only basis for [the excess insurer] to sue [the primary insurer] for breach of the implied covenant [of good faith and fair dealing] is by way of equitable subrogation to the insured's rights."). The California courts based their holdings on the fact that, because an excess insurer and a primary insurer each separately contract with the insured and do not enter a contract directly with each other, no direct duty of good

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 630 of 751
PageID: 11996
St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

faith and fair dealing arises between the excess and primary insurers. *See* Commercial Union, 26 Cal. 3d at 917-18 (stating that the ability of an excess insurer to bring suit under equitable subrogation for breach of the duty of good faith and fair dealing against a primary insurer "does not rest upon the finding of any separate duty owed to an excess insurance carrier"); Fireman's Fund I, 21 Cal. App. 4th at 1601 (stating that in California a primary insurer does not owe an independent duty of good faith and fair dealing to an excess insurer, so "an excess insurer has rights against the primary only by way of equitable subrogation").

**\*6** However, ICSOP's unjust enrichment counterclaims do not depend upon any explicit or implied contractual duties. *See* Hartford Casualty Ins. Co., 61 Cal. 4th at 998 ("Where the doctrine [of unjust enrichment] applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty."). Unjust enrichment creates an obligation where none previously existed, *id.*, so an excess insurer need not resort to equitable subrogation to sue based on the duty owed by the primary insurer to the insured. By contrast, *Commercial Union* and *Fireman's Fund I* hold that equitable subrogation is necessary for an excess insurer to bring a contract-based claim against a primary insurer. Therefore, *Commercial Union* and *Fireman's Fund I* do not directly address whether the Court should dismiss ICSOP's unjust enrichment counterclaims.

### 2. The Federal Cases: *Fireman's Fund II*, *Lexington*, and *Continental Casualty*

All of the federal cases relied upon by Zurich and ICSOP address the availability of claims for equitable indemnity brought by an excess insurer against a primary insurer. Although ICSOP does not assert a counterclaim for equitable indemnity, ICSOP's claim for reimbursement for unjust enrichment is similar to a claim for equitable indemnity because equitable indemnity itself is based upon unjust enrichment principles. Specifically, in California "[t]he basis for the remedy of equitable indemnity is restitution. One person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." Amerigas Propane, LP v. Landstar Ranger, Inc., 184 Cal. App. 4th 981, 989 (2010) (internal quotation marks omitted).

*Fireman's Fund II*, the federal case upon which Zurich relies, specifically addressed the relationship between and the availability of equitable contribution, equitable subrogation, and equitable indemnity in a case brought by an excess insurer against a primary insurer. 2000 WL 1721080, at \*2-5. The court in *Fireman's Fund II* first noted that under California law, it is established that "[a] claim under equitable contribution arises when one co-insurer has paid more than its proportionate share of the loss." *Id.* at \*3. In order for two insurers to be considered co-insurers, such that equitable contribution applies, the two insurers must "share the same level of obligation on the same risk as to the same insured." *Id.* Thus, because an excess insurer and a primary insurer do not share the same level of obligation on the same risk, equitable contribution is not available in a suit by an excess insurer against a primary insurer. *Id.* The court in *Fireman's Fund II* then addressed the availability of equitable indemnity in a case brought by an excess insurer against a primary insurer by analogizing equitable indemnity to equitable contribution. *Id.* at \*3-5. The court acknowledged that California case law does not resolve whether an excess insurer may bring a case for equitable indemnity against a primary insurer. *Id.* at \*4 ("No case law exists, however, that directly addresses whether *excess insurers* have an equitable indemnification claim against primary insurers in California."). In the absence of California case law directly on point, the court concluded that because some California courts appear to refer to equitable contribution and equitable indemnity interchangeably, equitable indemnity should be limited to claims brought by one insurer against another insurer who shares the same level of obligation on the same risk. *Id.* at \*4. Thus, the court in *Fireman's Fund II* held that of the three claims it considered—equitable contribution, equitable indemnity, and equitable subrogation —only equitable subrogation could be brought by an excess insurer against a primary insurer. *Id.* at \*5. The court did not discuss the availability of other possible claims, such as unjust enrichment.

**\*7** The two cases relied upon by ICSOP—*Continental Casualty* and *Lexington*—both held that, notwithstanding *Fireman's Fund II*, equitable indemnity is not equivalent to equitable contribution. Continental Casualty, 2014 WL 4661087, at \*18; Lexington, 2009 WL 1586938, at \*19. Both cases therefore concluded that unlike a claim for equitable contribution, a claim for equitable indemnity could be brought by an excess insurer against a primary insurer. Continental Casualty, 2014 WL 4661087, at \*18; Lexington, 2009 WL

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 631 of 751
PageID: 11997
St. Paul Fire & Marine Insurance Company v. Insurance... Not Reported in...

1586938, at *19. The court in *Continental Casualty* reached this conclusion solely based upon the fact that equitable indemnity is a restitution-based claim resulting from unjust enrichment. 2014 WL 4661087, at *18.

The court in *Lexington* engaged in a lengthier comparison of equitable indemnity and equitable contribution. 2009 WL 1586938, at *16-19. Ultimately, the court in *Lexington* held that equitable contribution and equitable indemnity are not equivalent because whereas contribution requires two parties to equally share a burden, equitable indemnity requires only that one insurer pay a liability that another insurer should have discharged. *Id.* Because equitable indemnity does not require the two insurers to share the same exposure to the same risk, the court in *Lexington* held that nothing in the California case law prevented an excess insurer from suing a primary insurer for equitable indemnity. *Id.* at *19.

### 3. The Availability of Unjust Enrichment in the Instant Case

The Court finds the reasoning of *Continental Casualty* and *Lexington* persuasive for how to resolve the availability of unjust enrichment in the instant case. As all three federal courts to address this issue have recognized, the California court rulings in *Commercial Union* and *Fireman's Fund I* are limited to the availability of contract-based causes of action generally, and more specifically, the availability of claims for the alleged breach of the duty of good faith and fair dealing. *Commercial Union* and *Fireman's Fund I* held merely that such contract-law claims "devolve [ ] by subrogation to the insured's rights against the primary carrier, rather than by reason of some independent duty." *Fireman's Fund I*, 21 Cal. App. 4th at 1600. Thus, equitable subrogation is the only available cause of action for an excess insurer who wishes to bring a claim for breach of a contractual duty against a primary insurer. *Id.* This result occurs because there is no privity of contract directly between the excess insurer and the primary insurer.

By contrast, claims based upon unjust enrichment do not depend upon a direct contractual duty between the excess insurer and the primary insurer. Indeed, unjust enrichment arises precisely when the parties do not otherwise owe one another any express duty. *See Hartford Casualty Ins. Co.*, 61 Cal. 4th at 998 ("Where the doctrine [of unjust enrichment] applies, the law implies a restitutionary obligation, even if no

contract between the parties itself expresses or implies such a duty."). Because unjust enrichment does not depend upon privity of contract between the excess and primary insurers, the holdings of *Commercial Union* and *Fireman's Fund I* do not limit the availability of claims based upon unjust enrichment.

Furthermore, the Court finds that the further limitation in California that equitable contribution is only available between primary insurers does not apply to claims based on unjust enrichment. Equitable contribution claims in California may not be brought by an excess insurer against a primary insurer because contribution in California requires that the two parties equally share responsibility for a liability. *Fireman's Fund II*, 2000 WL 1721080, at *3. Thus, an excess insurer cannot bring a claim against a primary insurer for equitable contribution because the excess insurer and the primary insurer are responsible for *different* liabilities. However, this limitation on equitable contribution claims does not apply to a claim for reimbursement based upon unjust enrichment because unjust enrichment does not require that the parties share the same liability, nor that any contribution agreement exist between the two.

**\*8** Based on its exhaustive review of the federal and California case law, the Court concludes that nothing in California insurance law prevents an excess insurer from bringing a claim for reimbursement against a primary insurer under a theory of unjust enrichment. Accordingly, because California courts generally recognize claims for reimbursement for unjust enrichment in insurance cases, *see Hartford Casualty*, 61 Cal. 4th at 998-1000 (recognizing the availability of a claim for reimbursement for unjust enrichment in an insurance case), the Court concludes that, under California law, such a claim is permissible.

Therefore, the Court DENIES Zurich's motion to dismiss ICSOP's unjust enrichment counterclaims.

### B. St. Paul/Travelers' Motion to Dismiss

St. Paul/Traveler move to dismiss ICSOP's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19 for failure to join a necessary party. St. Paul/Travelers argue that Brady, the insured, should be joined as a necessary party to ICSOP's counterclaims under Rule 19(a)(1)(B). St. Paul/Travelers acknowledge that Brady can be joined as a defendant, so any dismissal under Rule 12(b)(7) should be without prejudice.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 632 of 751
PageID: 11998

St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

Under Rule 19(a)(1)(B), a person "must be joined as a party" if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B). [3] St. Paul/Travelers argue that Brady must be joined under Rule 19 because Brady's insurance policies with St. Paul/Travelers require Brady to make additional deductible payments if settlement of the underlying construction lawsuit resolved more than one occurrence, as ICSOP's counterclaims assert that it did.

ICSOP opposes St. Paul/Travelers' motion on the grounds that Brady does not "claim[ ] an interest relating to the subject of the action," Brady's ability to protect any interest Brady does have will not be impaired or impeded by the pending litigation, and omitting Brady from the litigation will not "leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." See Fed. R. Civ. P. 19(a)(1)(B).

The Court first addresses ICSOP's argument that Brady has disclaimed an interest in the instant litigation such that Brady need not be joined as a necessary party. Because the Court concludes that Brady does have an interest in the instant litigation, the Court then addresses whether Brady's absence will either impair or impede Brady's ability to protect that interest, or expose St. Paul/Travelers to substantial risk of incurring multiple or inconsistent obligations.

### 1. Brady's Interest in the Instant Counterclaims

In order for Brady to be a necessary party under Rule 19(a)(1)(B), Brady must claim an interest in the subject matter of ICSOP's counterclaims. The Ninth Circuit has held that the interest must be a "legally protected" interest in order to qualify as a necessary party under Rule 19. See Ward v. Apple Inc., 791 F.3d 1041, 1051 (9th Cir. 2015).

**\*9** Pursuant to the terms of Brady's insurance policies with St. Paul/Travelers, Brady is required to pay a $75,000 deductible per occurrence for which St. Paul/Travelers make

liability payments on Brady's behalf. FAC, Exh. A at 21; id. Exh. B at 31. Thus, if ICSOP is correct in its assertion that the underlying construction defect lawsuit was the result of multiple occurrences, the portion of the settlement for which Brady is responsible through its deductible will increase. Brady's accordingly has a legally protectable interest in the instant counterclaims. See Ins. Co. of the State of Pennsylvania v. Gemini Ins. Co ("Gemini"), No. 313-cv-02931BAS(DHB), 2014 WL 7407466, at \*9 (S.D. Cal. Dec. 30, 2014) (finding that absent insureds had an interest in and were necessary parties to a claim regarding the number of occurrences involved in an insurance coverage action).

ICSOP does not dispute that Brady has a legally protectable interest in the instant counterclaims. Rather, ICSOP argues that Brady does not "claim[ ] an interest" in the counterclaims as required by Rule 19 because "Brady has not sought to participate in this action despite its awareness of the number of occurrences dispute between its insurers." ECF No. 54 at 6.

The Ninth Circuit has held that "[w]here a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder is 'unnecessary.'" Altmann v. Republic of Austria, 317 F.3d 954, 971 (9th Cir. 2002). In the instant case, however, ICSOP does not argue that Brady is aware of ICSOP's counterclaims. See generally ECF No. 54. Instead, ICSOP bases its argument on the unsupported assertion that Brady is aware of "the number of occurrences dispute between its insurers." Id. at 6. ICSOP does not assert, let alone point to any evidence in the record, that Brady is aware of ICSOP's counterclaims.

By contrast, where there is no evidence that the absent party is aware of an action, the Court may conclude that the absent party is necessary under Rule 19 without the absent party taking affirmative steps to indicate a desire to participate in the lawsuit. See, e.g., Gemini, 2014 WL 7407466, at \*9 (finding that absent insureds had an interest in and were necessary parties to a claim regarding the number of occurrences involved in an insurance coverage action).

Therefore, because there is no indication in the record that Brady is aware of ICSOP's counterclaims but has chosen not to claim an interest in the litigation, Brady's failure to assert an interest in the litigation does not prevent the Court from concluding that Brady is a necessary party under Rule 19. See Altmann, 317 F.3d at 971 ("Where a party is aware of an

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 633 of 751
PageID: 11999

St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

action and chooses not to claim an interest, the district court
does not err by holding that joinder was 'unnecessary.'").

Thus, Brady has an interest in ICSOP's counterclaims.
Accordingly, the Court must determine the impact of Brady's
absence in order to determine whether Brady is a necessary
party under Rule 19.

### 2. Impact of Brady's Absence

Because Brady is a person with an interest relating to the
subject of ICSOP's counterclaims, Brady is a necessary party
under Rule 19(a)(1)(B) if Brady's absence from the litigation
would either "(i) as a practical matter impair or impede
[Brady's] ability to protect [Brady's] interest; or (ii) leave an
existing party subject to a substantial risk of incurring double,
multiple, or otherwise inconsistent obligations because of
[Brady's] interest."

The Court need not reach the first prong—Brady's ability
to protect Brady's interest— because the Court concludes
that the second prong—whether Brady's absence would leave
an existing party subject to a substantial risk of incurring
double, multiple, or otherwise inconsistent obligations—is
dispositive.

 **\*10**  If Brady is not joined as a party to the instant action,
Brady would not be bound by this Court's judgment as to
the number of occurrences. See Taylor v. Sturgell, 553
U.S. 880, 893 (2008). Thus, Brady could bring a subsequent
lawsuit against St. Paul/Travelers to separately determine
the number of occurrences, which would affect Brady's
deductible of $75,000 per occurrence.

St. Paul/Travelers argue that they would be subject to a
substantial risk of incurring inconsistent obligations if Brady
is not joined because ICSOP's counterclaims could result in
a judgment that the underlying construction defect lawsuit
resulted from multiple occurrences while a subsequent
adjudication with regard to Brady could result in a judgment
that there was only a single occurrence. St. Paul/Travelers
would thus be obligated to pay $2 million towards the
settlement as a result of ICSOP's counterclaims, and Brady's
deductible would be $150,000 or more depending on the
number of occurrences. However, in the adjudication with
regard to Brady, St. Paul/Travelers would only have been
required to pay $1 million and would only be able to collect
$75,000 as a deductible from Brady.

The Ninth Circuit has held that "[i]nconsistent obligations
occur when a party is unable to comply with one court's
order without breaching another court's order concerning the
same incident." Cachil Dehe Band of Wintun Indians of
the Colusa Indian Community v. California, 547 F.3d 962,
976 (9th Cir. 2008). "Inconsistent adjudications or results, by
contrast, occur when a defendant successfully defends a claim
in one forum, yet loses on another claim arising from the
same incident in another forum." Id. Accordingly, in Cachil,
the Ninth Circuit held that the State of California would not
confront inconsistent obligations if California's contract with
several tribes were subject to different interpretation for each
tribe because California could adhere simultaneously to a
different interpretation for each tribe. Id. Similarly, where
the outcome of any subsequent litigation would account for
damages paid in the initial lawsuit, under Cachil there is no
risk of inconsistent obligations. See Bird v. Keefe Kaplan
Maritime, Inc., No. 14-CV-03277-MEJ, 2015 WL 1009015,
at *4 (N.D. Cal. March 5, 2015) (holding that a subrogee was
not a necessary party in part because any future recovery by
the subrogee would take into consideration the recovery in the
initial lawsuit).

By contrast, in the instant case, St. Paul/Travelers would be
subject to the risk of inconsistent judgments with regard to
the same obligation—the $1 million in coverage St. Paul/
Travelers owes if there were multiple occurrences. If ICSOP
prevails in establishing that there were multiple occurrences,
St. Paul/Travelers would be obligated to contribute $2 million
total to the settlement and would be entitled to at least
$150,000 in deductible payments from Brady. However, if
in a subsequent action Brady establishes that there was only
a single occurrence, St. Paul/Travelers would be obligated
to contribute only $1 million total to the settlement and
would be entitled to only $75,000 in deductible payments. St.
Paul/Travelers would not be able to fully comply with both
judgments, and thus St. Paul/Travelers faces a substantial risk
that it would be subject to multiple obligations regarding St.
Paul/Travelers' required contribution to the settlement. See
Gemini, 2014 WL 7407466, at *9 (holding that the absent
insureds were necessary parties to an insurance coverage
action because the risk of inconsistent judgments regarding
the number of occurrences would subject the insurer
to inconsistent obligations). Therefore, Brady's absence
subjects St. Paul/Travelers to a substantial risk of incurring
inconsistent obligations, and Brady is a necessary party under
Rule 19(a)(1)(B)(ii). The Court GRANTS St. Paul/Travelers'
motion to dismiss for failure to join Brady as a necessary party

St. Paul Fire & Marine Insurance Company v. Insurance..., Not Reported in...

with leave to amend because St. Paul/Travelers does not argue that joining Brady would be infeasible. *See* ECF No. 44 (St. Paul/Travelers' motion to dismiss).

## IV. CONCLUSION

 **\*11**  For the foregoing reasons, the Court DENIES Zurich's motion to dismiss ICSOP's counterclaims and GRANTS St. Paul/Travelers' motion to dismiss with leave to amend.

ICSOP's amended counterclaims must be filed within thirty (30) days of this Order. Failure to timely amend will result in dismissal of ICSOP's counterclaims with prejudice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1191808

## Footnotes

1    Zurich additionally filed a request for judicial notice. ECF No. 42. The request for judicial notice asks this Court to take judicial notice of St. Paul/Travelers' original complaint in the instant lawsuit, ECF No. 1, and ICSOP's counterclaims, ECF No. 22, which are the subject of Zurich's motion to dismiss. Both of the documents for which Zurich requests judicial notice are pleadings filed in the instant case. Because the Court may consider the allegations contained in the pleadings when ruling on a motion to dismiss, *see* *Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007)* (per curiam), the Court DENIED Zurich's request for judicial notice as moot.

2    Zurich additionally argued in their motion to dismiss that ICSOP improperly joined Zurich as a counter-defendant to ICSOP's counterclaims. *See* ECF No. 41 at 8. However, in Zurich's reply, Zurich withdrew this argument. *See* ECF No. 56 at 6.

3    Rule 19(a)(1)(A) additionally states that a person is a necessary party if "in that person's absence, the court cannot afford complete relief among existing parties." St. Paul/Travelers do not argue that Brady is a necessary party under Rule 19(a)(1)(A).

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    9

Tab 64

Stanko v. Bader, Not Reported in A.2d (2003)

35 Conn. L. Rptr. 605

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lake Road Trust, LTD. v. ABB, Inc., Conn.Super., July 5, 2012

2003 WL 22413476

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Stamford-Norwalk.

Stephen STANKO,
v.
Elaine BADER, R.Ph.

No. CV030193669.
|
Oct. 7, 2003.

**Attorneys and Law Firms**

Silver Golub & Teitell, Stamford, for Stephen Stanko.

Williams Cooney & Sheehy, Trumbull, for Elaine Bader and Stop and Shop Supermarket Co. Inc.

**Opinion**

D'ANDREA, J.

**\*1** The plaintiff, Stephen Stanko, filed a four-count complaint against Elaine Bader and Stop and Shop Supermarket, Inc. d/b/a Stop and Shop Pharmacy (Stop and Shop or defendant). According to the complaint on April 17, 2002 the plaintiff went to the pharmacy department at Stop and Shop in Norwalk to fill a prescription for Requip, a drug used to treat the effects of Parkinson's disease. However, instead of correctly filling the prescription for Requip, the defendant Bader placed risperidone, an anti-psychotic drug, in the bottle labeled for Requip and sold it to the plaintiff. Four days later, after ingesting multiple doses of the risperidone, the plaintiff's symptoms worsened.

After calling Stop and Shop to inquire about the medication, Stop and Shop sent an employee to the plaintiff's home to correct the mistake. The employee told the plaintiff that he was given the wrong dosage of Requip, but never mentioned that the bottle contained risperidone. Three days later the plaintiff became "disoriented" and fell to the floor and remained there for more than twenty-four hours. He was then hospitalized and has suffered permanent injuries.

On February 20, 2003 the defendants filed a motion to strike (# 102) counts three and four. [1] Counts three and four are directed solely at Stop and Shop and contain claims for strict products liability and recklessness, respectively. The plaintiff filed opposition papers.

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court." (Internal quotation marks omitted.) Macomber v. Travelers Property & Casualty Corp., 261 Conn. 620, 629, 804 A.2d 180 (2002). "It is fundamental that in determining the sufficiency of a [pleading] challenged by a ... motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted ... Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citation omitted; internal quotation marks omitted.) Doe v. Yale University, 252 Conn. 641, 667, 748 A.2d 834 (2000).

Count three alleges a products liability claim. A products liability claim "includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of *any product.*" (Emphasis added.) General Statutes § 52-572m(b). Products liability claims also include, *inter alia,* "all actions based on ... strict liability in tort [and] negligence." *Id.*

The defendant argues that the filling of a prescription by a pharmacy is "not the sale of a product" within the meaning of the Connecticut's Products Liability Act, General Statutes § 52-572m et seq. (CPLA). The defendant further contends that the dispensing of a prescription drug is more akin to a professional service and not product sales. The plaintiff argues that prescription drugs are products within the CPLA and that a pharmacy is not a service business. As set forth below, this court agrees with the plaintiff.

**\*2** The first issue to be decided is whether a misfilled prescription drug qualifies as a defective "product" under the CPLA. Initially, it is important to note that the CPLA does not define the term "product," see Zichichi v. Middlesex Memorial Hospital, 204 Conn. 399, 403, 528 A.2d 805 (1987); nor have the appellate courts explicitly determined that prescription drugs are "products" under the products

35 Conn. L. Rptr. 605

liability statute. Interestingly, in *Vitanza v. Upjohn Co.,* 257 Conn. 365, 778 A.2d 829 (2001), the Supreme Court ruled that the learned intermediary doctrine remains a viable affirmative defense in products liability actions against a drug manufacturer. If a prescription drug was not a "product" under the CPLA, the Supreme Court would have certainly not reached this conclusion.

This court previously ruled on this precise issue. In *Stevens v. Romer,* Superior Court, judicial district of Stamford/Norwalk, Docket No. CV 980168402 (March 24, 1999, D'Andrea, J.) (24 Conn. L. Rptr. No. 8, 279), this court denied a motion to strike on facts nearly identical to the case at bar. In *Stevens,* the plaintiff sued a pharmacy for products liability for dispensing the wrong medication. This court ruled that when a pharmacy misfills a prescription, a plaintiff can allege that the "product" was defective. *Id.* at 280, citing *Potter v. Pneumatic Tool Co.,* 241 Conn 199, 211, 694 A.2d 1319 (1997).

In this case, the plaintiff alleges that his doctor prescribed Requip. However, when refilling his prescription, the defendant incorrectly sold him risperidone. This court finds no reason to exempt prescription medication from the definition of "product" under the CPLA, thus the plaintiff's complaint sufficiently alleges that he was injured by a defective product.

The next issue involves whether a pharmacy is a "product seller" under the CPLA. A products liability claim can only be asserted against one who is a "product seller." General Statutes § 52-572m(a); *Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 403; *Gerrity v. R.J. Reynolds Tobacco Co.,* 263 Conn. 120, 126, 818 A.2d 769 (2003). Whether the defendant is a "product seller" is a question of law for the court to decide. *Burkert v. Petrol Plus of Naugatuck, Inc.,* 216 Conn. 65, 72, 579 A.2d 26 (1990). Under the CPLA, a "product seller" is defined as "any person or entity, including a manufacturer, wholesaler, distributor or *retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.*" (Emphasis added.) General Statutes § 52-572m(a). On its face, this definition encompasses the defendant's retail pharmacy business because the defendant's business involves retail sales of prescription medication to consumers.

The defendants argue that its pharmacy is a service and, consequently, cannot be held liable in products liability. "Once a particular transaction is labeled a 'service,' as opposed to the sale of a 'product,' it is outside the purview of our product liability statute." *Zichichi v. Middlesex Memorial Hospital, supra,* 204 Conn. at 403. Although our appellate courts have not decided this issue, the Superior Court, in *Altieri v. CVS Pharmacy, Inc.,* Superior Court, judicial district of Waterbury, Docket No. CV 020171626 (December 13, 2002, McWeeny J.) (33 Conn. L. Rptr. 524), cited by the defendant, ruled that the defendant-pharmacy was "primarily furnishing a service" and not subject to the products liability statute. However, this court finds *Alteri* unpersuasive. First, that decision relied solely on a California decision based on a manufacturer's design defect that specifically excluded from its holding cases involving pharmacies that fail to exercise "due care." *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 676, 710 P.2d 247 (1985).

**\*3** Second, the definition of "product seller" under the CPLA does not address hybrid transactions, those that, arguably, involve a combination of sales and service. In *Truglio v. Hayes Construction Co.,* 66 Conn.App. 681, 684, 785 A.2d 1153 (2001), the court looked to the commentary of the Draft Uniform Products Liability Act, [2] upon which the CPLA was based, see *Potter v. Pneumatic Tool Co., supra,* 241 Conn. at 230, for guidance into the meaning of "product seller." That commentary suggested that "a party be considered a product seller where a sale of a product is a principal part of the transaction and where the essence of the relationship between the buyer and seller is *not* the furnishing of professional skill or services." (Emphasis in original.) *Truglio v. Hayes Construction Co., supra,* 66 Conn.App. at 685, citing, Fed.Reg. 3003. Similarly, courts have looked to the nature of the contract. *Acmat Corp. v. Jansen & Rogan Construction,* Superior Court, judicial district of New Britain, Docket No. CV 96 0474249 (Aug. 23, 1999, Robinson, J.) (25 Conn. L. Rptr. 463).

In this case, the plaintiff went to the pharmacy to purchase a prescription drug and nothing more. Although the filling of a prescription may involve some service, such as checking for conflicts in medication, it seems clear that the plaintiff primarily expected to receive Requip, a drug prescribed by his doctor. This court finds that the defendant pharmacy is a

"product seller" under the CPLA, because the principal part of the transaction was the sale of medication.

The defendant also moves to strike the fourth count (recklessness) for legal insufficiency. To determine whether the plaintiff's complaint sufficiently states a cause of action for recklessness, this court must define reckless behavior. "Recklessness is a state of consciousness with reference to the consequences of one's acts ... It is more than negligence, more than gross negligence ... The state of mind amounting to recklessness may be inferred from conduct. But in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Frillici v. Westport,* 264 Conn. 266, 277-78 (2003). "It is well established that causes of action for negligence and [recklessness] are separate and distinct causes of action. There is a substantial difference between negligence and [reckless] conduct, and a complaint should employ language explicit enough to inform the court and opposing counsel clearly that [reckless] conduct is being asserted." *Warner v. Leslie-*

*Elliot Constructors, Inc.,* 194 Conn. 129, 138, 479 A.2d 231 (1984).

In this case, recklessness was sufficiently alleged in the complaint. The plaintiff alleged that he called the defendant's pharmacy to inform it about the wrong medication he was given. The defendant sent an employee to the plaintiff's home to retrieve the incorrect prescription and supply the correct medication. The plaintiff next alleges that the defendant's employee told the plaintiff that he was simply given the "wrong dosage," even though, by implication, the defendant knew that the plaintiff had ingested risperidone. These allegations, if proven, could evidence a reckless disregard for the plaintiff's safety and welfare.

**\*4** Accordingly, defendant's motion to strike count three (products liability) and count four (recklessness) is denied.

**All Citations**

Not Reported in A.2d, 2003 WL 22413476, 35 Conn. L. Rptr. 605

# Footnotes

1    For some reason the defendants filed a duplicate motion to strike (# 107), which is identical to the first with the exception that the second has copies of different cases attached.

2    Draft Uniform Products Liability Law, § 102(1), 44 Fed.Reg. 2996, 2997-98 (1979).

End of Document                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 65

Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2016)

2016 WL 695424
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

Jeanne Steigerwald, Plaintiff,
v.
BHH, LLC, et al., Defendants.

CASE NO. 1:15 CV 741
|
Signed 02/22/2016

**Attorneys and Law Firms**

Frank A. Bartela, Nicole T. Fiorelli, Patrick J. Perotti,
Dworken & Bernstein, Painesville, OH, for Plaintiff.

Howard B. Randell, Scott Wing, Leahy, Eisenberg &
Fraenkel, Chicago, IL, Matthew P. Baringer, Thomas W.
Wright, Davis & Young, Cleveland, OH, for Defendant.

**Memorandum of Opinion and Order**

PATRICIA A. GAUGHAN, United States District Judge

**Introduction**

 **\*1**  This matter is before the Court upon plaintiff's Motion for
Class Certification (Doc. 19). This case involves consumer
sales of electronic pest control devices which plaintiff alleges
do not repel pests. For the following reasons, the motion is
GRANTED.

**Facts**

Plaintiff Jeanne Steigerwald filed this Class Action Complaint
against defendants BHH, LLC; Van Hauser, LLC; and E.
Mishan and Sons, Inc dba Emson, Inc. The Complaint
originally asserted five claims. In briefing on a prior motion
to dismiss, plaintiff stated that she was not pursuing Counts
Three and Five. The Court granted the motion to dismiss
as to Count One and denied it as to Counts Two and Four.
Accordingly, those two claims remain: fraud and breach of
express warranty. The Complaint alleges the following.

Defendants manufacture, market, and distribute electronic
pest control devices that allegedly repel pests from the
user's home. Despite defendants' advertisements stating that
the devices repel mice, ants, spiders, and other pests by

electromagnetic/ultrasonic power using wiring within the
walls to emit a signal, the devices do not repel pests.

In order to expel pests from her house, plaintiff went to a Wal-
Mart in May 2013 and purchased a Bell+Howell-trademarked
electronic/ultrasonic pest control device manufactured and
marketed by defendant. Defendant BHH licenses the Bell
+Howell trademark to defendants Van Hauser and Emson
for the purpose of designing, manufacturing, distributing,
marketing, and selling the ultrasonic pest control device
purchased by plaintiff. The device's packaging labels it as an
"electronic pest repeller" and states that it uses "ultrasonic
sound waves [to] help to eliminate mice, rats, roaches,
spiders, and ants." Defendants' website also states that the
device uses ultrasonic power to emit a signal to drive away
insects and rodents. Plaintiff purchased the device based
on defendants' representations. Although plaintiff used the
device as instructed, it did not repel pests in and/or around
plaintiff's home. The scientific literature indicates that these
products have no effect on pests. Defendants had reason to
know that their claims and representations were false and
contrary to scientific evidence, but they continued to advertise
the devices as effectively controlling pests.

The parties engaged in discovery and provide the following
facts. BHH, LLC; Van Hauser, LLC; and E. Mishan and
Sons, Inc (Emson) are owned and operated by members of
one family. Van Hauser and Emson market and sell products
under brand names, such as Bell & Howell. According to
representative Jeffrey Mishan, the main business of BHH
is owning "the Bell & Howell brands, and they attempt to
license out the brand." BHH authorized Van Hauser and
Emson to purchase and sell the ultrasonic pest repellers
using the Bell & Howell logo. Around 2011, the two entities
then began selling the product to retailers and distributors,
such as Wal-Mart, and to catalog companies. Plaintiff asserts
that the devices do not work at all-"anywhere, anytime,
anyhow." In 2001, the Federal Trade Commission posted
a notice stating, "Staff of the Federal Trade Commission's
Division of Enforcement today announced that they have sent
warning letters to more than 60 manufacturers and retailers
of ultrasonic pest-control devices, stating that efficacy
claims about those products must be supported by scientific
evidence."

 **\*2**  Between 2011 and June 2015, defendant sold 107,782
ultrasonic pest repellers which amounted to $897,745 in sales.
The devices were sold in packaging using the language,
"Ultrasonic Pest Repeller." Other than the packaging,

defendants did not engage in other advertising or marketing for the product. The packaging noted, "Plug It In...Drive Pests Out!" The packaging depicted ants, mice/rats, spiders, and roaches with a slash line through their depiction.

Plaintiff went to her local Wal-Mart and purchased a three pack of defendants' ultrasonic pest repeller devices in the spring of 2014 after noticing mice droppings in her pantry, kitchen, and garage. Plaintiff had done some research over the internet, but noticed the defendants' packaging upon arriving at the store to look for pest devices. She paid cash, approximately $25.00. At home, plaintiff read the packaging and the "little folded up paper inside." As instructed, plaintiff plugged the devices into outlets in the pantry, kitchen, and garage. Plaintiff noticed by the next day that the devices did not deter the mice. Plaintiff continued to hope that the devices would work. Plaintiff never contacted Wal-Mart and never attempted to return the devices. Nor did she attempt to contact the manufacturer of the product.

Plaintiff "was still holding out for hope that they would start working at some point." She left the devices plugged in where they remained when she moved out about a year later because she could not stand the mice in her house. The mice problem was unabated. Plaintiff also had a problem with spiders, but used a spray which seemed to help manage them.

Defendants submit a "Bell + Howell Ultrasonic Pest Repeller Efficacy Test Report" of two companies, SGS (a Swiss entity) and Intertek (British) which performed tests in 2011 and 2012. The report concluded that the mice, rats, spiders, and ants stayed away from the pest repeller chamber when the device was on.

Plaintiff filed this lawsuit seeking to represent a class of persons who purchased an electronic pest control device manufactured and/or marketed by defendants during the class period.

## Discussion

Plaintiff moves to certify a class of "all persons who purchased one or more ultrasonic pest repellers manufactured and/or marketed by Defendants during the putative class period, including, but not limited to, the Bell and Howell branded ultrasonic pest repellers from April 16, 2011 to April 16, 2015." (Doc. 19 at 2) Additionally, plaintiff asks to certify a class of "all Ohio residents: who purchased one or more ultrasonic pest control devices manufactured and/or marketed by Defendants during the putative class period, including,

but not limited to, the Bell and Howell branded ultrasonic pest repellers from April 16, 2011 to April 16, 2015." (*Id.*) [1] Plaintiff asserts the following. All class members nationwide bought the same product, represented by defendants as a pest repeller, to repel pests. If the product does not repel pests, then all class members were damaged in the same manner. All class members were subject to the same representation, same loss, and same damage.

**\*3** The decision to certify a class action is within the discretion of the district court, but that discretion must be exercised within the framework set forth in Federal Rule of Civil Procedure 23. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). Before certifying a class, the district court must conduct a rigorous analysis of the Rule 23 prerequisites. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). The party moving for certification bears the burden of showing that the requirements for certification are met. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Rule 23 sets forth a two-part test for certifying a class action. First, to obtain class certification, plaintiff must show the four prerequisites in Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation*, 722 F.3d 838 (6th Cir. 2013) (quoting Rule 23).

If the threshold requirements of numerosity, commonality, typicality, and adequacy of representation set forth in Rule 23(a) are met, "parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.*; *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiff argues that this action can be maintained under Rule 23(b)(3), which requires a court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy. *In re Whirlpool* (quoting 📙 Rule 23).

Decisions on class certification should not be conditioned on the merits of the case. A court may, however, go beyond the pleadings to the extent necessary to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Id.*

In addition to the 📙 Rule 23 requirements, both parties have noted that courts in this Circuit have recognized that ascertainability of class members is an implied prerequisite of 📙 Rule 23. *See Romberio v. Unumprovident Corp.*, 385 Fed.Appx. 423, 431 (6th Cir.2009); *Givens v. Van Devere, Inc.*, 2012 WL 4092738 (N.D.Ohio 2012); *Galoski v. Applica Consumer Products*, 309 F.R.D. 419 (N.D. Ohio 2015).

### (1) ascertainability

"Before a court may certify a class pursuant to 📙 Rule 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." 📙 *Young v. Nationwide Mutual Insurance,* 693 F.3d 532 (6th Cir. 2012)(citations omitted). "The class must be susceptible of precise definition... For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Id. See also* 📙 *Rikos v. The Procter & Gamble Company,* 799 F.3d 497 (6th Cir. 2015) ("In our circuit, the ascertainability inquiry is guided by *Young*...we noted that for a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.")

**\*4** Defendants assert that the proposed class is not sufficiently ascertainable because it requires individualized assessments and so is not administratively feasible. The class is premised on a self-identification method of ascertaining membership which fails to take into account that most consumers will have no demonstrable proof of having purchased the devices during the class period. Defendants point out that plaintiff paid cash and did not keep her receipt which leaves no way to trace the purchase. And, defendants contend, the self-identification method affords no safeguards

to defendants because consumers for whom the devices were effective could gain membership in the class without having suffered harm.

The Court finds the class is sufficiently ascertainable. Plaintiff maintains that its proposed class provides objective criteria that will allow every class member to easily determine if he is included in the class: Did the individual purchase one of the defendants' electronic pest repeller devices? Did the individual make the purchase in the United States? Was the purchase within the stated period? *Rikos v. The Procter & Gamble Company*, 1:11 CV 226 (S.D.Ohio June 19, 2014), involved consumer sales of a probiotic nutritional supplement. The district court rejected defendant's argument that the class was not ascertainable given that class membership could not be reliably or feasibly ascertained. In so doing the court noted, "Courts in this Circuit routinely certify classes of purchasers of over-the-counter products where it will be impossible to identify and notice every member of the class. To deny certification on ascertainability grounds in this case would be to abandon the law in the Sixth Circuit that only requires that the class definition describe objective criteria that allows a prospective class member to identify himself or herself as having a right to recover or opt out based on the description." *Id.* at 13-14 (citing *Young, supra*). On appeal, defendant argued that there was no reliable method for identifying class members given that most consumers purchased the product from a commercial retailer, in stores or online. As such, defendant contended, there was no plausible way to verify that any one single individual actually purchased the product. In affirming the district court's decision, the Sixth Circuit found the proposed class to be defined by objective criteria: anyone who purchased the product in one of the five named states. The court stated that "these single state sub-classes can be determined with reasonable-but not perfect-accuracy. Doing so would require substantial review, likely of internal P&G data. But as the district court pointed out, such review could be supplemented through the use of receipts, affidavits, and a special master to review individual claims." 📙 *Rikos,* 799 F.3d at 526.

While in *Rikos* half of the sales were online which would provide the name and shipping address of purchasers and many customers purchased the product through their physician who could verify the purchase, the district court collected cases rejecting the notion that without receipts or proof of purchase the class is unmanageable. *Rikos* at 13. Additionally, another court in this district recently certified a class action involving purchasers of ultrasonic

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 643 of 751
PageID: 12009
Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2018)

or electronic pest repellers. *Galoski v. Applica Consumer Products,* 309 F.R.D. 419 (N.D.Ohio Aug 28, 2015). There, the court found that the proposed class was defined by objective criteria: Members must have purchased the product marketed by defendant, sold under the specified trademark, that represented itself as an ultrasonic or electronic pest repeller, with model numbers provided, during the dates specified. The court noted that this Circuit does not require that defendant be able to specifically identify each class member, but only that a prospective class member be able to identify himself as having a right to recover or opt out based on the class description. The court stated that consumers who fit the class definition could provide evidence of their inclusion through purchase records of the retailers, personal receipts, return of the products, affidavits, or otherwise. Also, as herein, defendant had records of the total number of sales during the period which would alleviate "any fear that they will have to pay out on unsubstantiated claims" which would exceed their ultimate maximum responsibility.

 **\*5** Defendants contend that the self-identification method offers no procedural due process protections given that consumers for whom the devices were effective could be included in the class without suffering harm. But, plaintiff points out that notice in similar cases is commonly achieved through the use of publication notice by posting notice at retailers which sold the repellers, publishing notice in large newspapers with national circulation, hosting a website that contains the notice and all appropriate papers, and publishing notice on high volume internet sources. Then, during the claims process at the case's termination, verification would be required by declaration to participate in any payment available. In *Forcellati v. Hyland's Inc.,* 2014 WL 1410264 (C.D. Cal. April 9, 2014), relied upon by the district court and Sixth Circuit in *Rikos,* a class was certified of purchasers of defendant's children's cold or flu products within a prescribed time frame. The court rejected defendant's argument that the proposed class was insufficiently ascertainable because, although it knew how many sales it made, there were no records confirming class membership because purchasers likely did not retain proof of purchase for such a low cost item and defendant did not have any records identifying the consumers who purchased the products through retail intermediaries. The court also rejected defendant's due process argument: "In short, because defendants' liability will be determined in the aggregate, and they will have no claim to any leftover damages, whether any given individual is or is not a rightful class member is entirely immaterial to defendants' monetary liability in this case." The court cited

cases finding that a defendant's interest is only in the total amount of damages for which it would be liable, and not in the identities of those receiving damage awards.

Plaintiff herein points out that where no purchaser records exist, the use of an affidavit in the claims process is the standard method employed to address potential false claims. At that point, defendant could challenge individual claims appearing problematic. As in *Galoski,* defendants' records clearly outline the total number of devices sold during the class period, and total amount collected from the sales.

The Court finds ascertainability to be established.

### (2) Numerosity

Defendants do not dispute that numerosity is satisfied. As stated earlier, the evidence shows that 107,782 units were sold during the class period.

### (3) Commonality

Rule 23(a)(2) "states that [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if...there are questions of law or fact common to the class. Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Rikos,* 799 F.3d at 505 (citations omitted).

Plaintiff maintains that there are specific, common questions in this case for which common proofs apply to all class members: 1) whether defendants' representations were based on competent and reliable evidence, 2) whether defendants' pest repeller can actually repel pests, 3) whether defendants fraudulently represented to plaintiff that their product would repel pests, and 4) whether defendants fraudulently represented to plaintiff that their product was proven to repel pests.

Defendants assert that plaintiff's first and fourth purported questions are improper on their face, let alone common questions. As to the first, defendant asserts that it has been "rendered moot" by the fact of the Efficacy Test Report which shows that defendants' representations were based on competent and reliable evidence given that two entities concluded that the repellers do repel pests. Plaintiff argues that whether the devices actually work is not litigated at this juncture but at trial. The inquiry, rather, is whether the issue of

Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2016)

the devices' efficacy can be determined on a class-wide basis, which it can.

The Court agrees with plaintiff. In *Rikos,* a case involving the sale of an over-the-counter probiotic supplement which plaintiffs alleged did not work as advertised, the district court found commonality in the question of determining whether the product provided any digestive health benefit. On appeal, defendant argued that commonality was not established because while plaintiffs had some anecdotal evidence that the product did not work for them, there was probative evidence that the product was beneficial to some customers and some studies appeared to conclude that the product was effective in promoting digestive health. The Sixth Circuit stated,

> P & G misconstrues Plaintiffs' burden at the class-certification stage. Whether the district court properly certified the class turns on whether Plaintiffs have shown, for purposes of 🔖 Rule 23(a)(2), that they *can prove*—not that [they] have already shown—that all members of the class have suffered the same injury.

**\*6** 🔖 Rikos, 799 F.3d at 505 (internal citations and quotations omitted). Further,

> ...Plaintiffs have identified a common question—whether Align is 'snake oil' and thus does not yield benefits to *anyone,*—that will yield a common answer for the entire class and that, if true, will make P & G liable to the entire class. The district court conducted a sufficient analysis of the record evidence in finding commonality here. It concluded that no individual would purchase Align but-for its digestive health benefits, which P & G promoted through an extensive advertising campaign. If Align does not provide any such benefits, then every class member was injured in the sense that he or she spent money

on a product that does not work as advertised. No more investigation into the merits (i.e., whether Align actually works) is needed for purposes of satisfying 🔖 Rule 23(a)(2)'s commonality requirement.

🔖 *Id.* at 507.

Similarly, in *Galoski, supra,* the district court found commonality where the question common to all potential class members was whether defendant's product could, under any circumstances, act as a pest repeller. The court noted that no one would have bought a pest repeller had he known it was incapable of repelling pests.

Next, defendants assert that plaintiff's fourth proposed question has no basis in the Complaint given that plaintiff alleged that defendants did not possess competent and reliable scientific evidence to support its advertising claims and its sale of the products, but did not allege that defendants represented that their product was *proven* to repel pests. In fact, defendants maintain, they did not make such a representation although it would have been justified given the results of the Efficacy Test Report. The Court agrees with plaintiff that, as found in *Galoski* and other alleged "snake oil" cases, the representations challenged go to whether the product works at all, not how well the product works. The Complaint alleges that the device was marketed as an electronic pest repeller. Every purchaser would have relied on this representation as the product only has one purpose. And, as in *Galoski,* no one would have purchased the device had he known it was incapable of repelling pests.

As to the second purported common question, defendants assert there is no common standard or objective measure by which the class members are to determine whether the devices actually repel pests. Defendants point out that plaintiff alleged in her Complaint that the devices did not repel the pests around her house and that the devices do not repel pests. Yet, she testified at deposition that the spiders were somewhat controlled at her home which leaves open the possibility that the devices repelled the spiders.[2] Again, the Court finds the argument not persuasive given plaintiff's contention that the devices never work. As in *Rikos,* the court granted certification finding that plaintiff's assertion "that Align is worthless—is capable of resolution

Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2018)

through classwide scientific proof such that common issues predominate." 📑 *Rikos,* 799 F.3d at 520.

**\*7** Finally, defendants contend that the third proposed question involves issues of an individualized nature such as interpretations of defendants' representations and the degree to which class members' expectations were derived from the representations. Similar to the above discussion, the only purpose of the device was to repel pests. If the product was incapable of doing so, it was worthless.

The Court finds commonality to be satisfied.

#### (4) Typicality
As stated in *Galoski,*

> ...typicality is generally satisfied if the representative plaintiff would be able to prove other class members' claims by proving his own claim... In this case, if plaintiff can prove that ultrasonic or electronic pest repellers cannot repel pests, as she is claiming, then she will, in fact, prove the other class members's claims as she proves her own.

*Galoski,* 309 F.R.D. at 423. Plaintiff asserts that her claim is typical because the wrong to her—defendant marketing and selling a product that does not do what it says it does—is the same as the wrong to the class. If the product will never, under any circumstances, repel pests, a refund claim for the product is common and identical for every customer. Defendants argue that plaintiff's claims are not typical because plaintiff's own claims for fraud and breach of express warranty are barred under Ohio law. This Court disagrees.

First, defendants argue that plaintiff's fraud claim is barred by the Ohio rule stating that a breach of express warranty claim, which is treated as a contract-based claim under Ohio law, precludes a tort (fraud) claim that is based on the same conduct and seeks no additional damages. Because both of plaintiff's claims are based on the same conduct, and the fraud claim seeks no additional damages, it is barred. The Court agrees with plaintiff, however, that even if true, this is a legal

issue true of all Ohio claimants and plaintiff's claim is still typical.

Second, defendants argue that plaintiff's breach of express warranty claim is barred by her failure to provide pre-suit notice of the alleged breach. Plaintiff confirmed at deposition that she did not notify Wal-Mart, or any of the defendants, of the alleged defect prior to filing suit.

In ruling on defendants' motion to dismiss this claim based on failure to notify, this Court stated

> Under Ohio law, to state a claim for breach of express warranty, plaintiff must provide the defendant with reasonable notice of the defect. Failure to plead pre-litigation notice requires dismissal of a breach of warranty claim. 📑 *St. Clair v. Kroger Co.,* 581 F.Supp.2d 896 (N.D.Ohio 2008). Defendants point out that plaintiff has not alleged that it notified defendants that the product did not repel pests as advertised. Plaintiff disagrees, relying on 📑 *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.,* 42 Ohio St.3d 40 (1989).
>
> This Court previously recognized in *The* 📑 *Lincoln Electric Co. v. Technitrol,* 718 F.Supp.2d 876 (N.D.Ohio 2010), that although the Ohio Supreme Court stated in *Chemtro l* that "in a proper case the filing of a civil complaint could serve as notice of breach,"
>
>> [s]ince *Chemtrol,* Ohio courts and federal courts applying Ohio law have continued to hold that a plaintiff must notify a defendant of the alleged breach prior to the complaint...The Court recognizes that under *Chemtrol,* Ohio does not have a per se rule that the filing of a complaint cannot constitute notice under § 1302.65(C)(1), but the Ohio Supreme Court was clear that a complaint could only constitute notice in "a proper case." The circumstances in this case are similar to the circumstances described by the court in *Chemtrol* that would preclude the complaint from constituting sufficient notice: defendant had no prior knowledge of the defects, and the complaint was filed a long period of time after plaintiff's damages were sustained.

**\*8** *Lincoln Electric,* 718 F.Supp.2d at 843.

Ultimately, this Court concluded that the claim, generally involving issues of fact, was not subject to dismissal on the motion to dismiss. [3]

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 646 of 751
PageID: 12012
Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2018)

Defendants assert that now that discovery has closed, plaintiff has no evidence that defendants had actual notice of the alleged breach which would excuse her failure to provide pre-suit notice. In fact, based on the Efficacy Test Report, defendants knew the devices were effective.

Again, the Court agrees with plaintiff that the question of whether plaintiff and the class were required to provide pre-suit notice of the breach of warranty represents a common question to all class members. The Court will not decide this issue on a motion for class certification.

Finally, defendants contend that plaintiff's lack of reliance, an element of both remaining claims, shows that her claims are not typical of the proposed class. Defendants assert that plaintiff's testimony establishes that she relied more on her "hope" that the device would work and her online research rather than on the representations on the product packaging. But, plaintiff testified that she purchased the device after being attracted by its packaging and reading it. Additionally, defendants' contentions regarding whether the pest repeller worked for a particular class member have no merit given plaintiff's allegation that the devices never work under any circumstances. Thus, the devices either repel pests as represented on the packaging or not—a determination made on a class-wide basis.

For the foregoing reasons, the Court finds that the prerequisites of Rule 23(a) are met.

**(5) Rule 23(b)(3)**

Defendants assert that class issues do not predominate over individual issues due to differences in state law and the nature of claims requiring individual proofs.

Plaintiff maintains that where, as here, a cause of action implicates no variation of the black letter law on the subject, a ruling for plaintiff is properly applied to every customer. Plaintiff's Complaint makes a uniform threshold challenge to the pest repeller: does it work at all, in any circumstances? The answer is "no." Plaintiff points out that all states (except Louisiana and North Dakota which only have statutory fraud claims) recognize black letter common law fraud in the sales context: a representation intended to be relied on by the customer, which results in purchase of the product, where the supplier knows the representation is untrue. Defendants' conduct in providing a product used for only one reason,

to repel pests, and selling it by representing that it repels pests when defendants knew it did not, is fraud in all jurisdictions. However reliance is defined, it is present where the only reason a customer buys the product is to use it as a pest repeller. Plaintiff asserts that it will present expert testimony, tracking the FTC's findings, that show the devices do not work. If a jury agrees, then for the entire class of customers, defendants' statement to the contrary was knowingly false. Likewise, as to Ohio fraud, the claim involves a representation about the only element of the product: that it can repel pests. All the devices contained the same packaging.

**\*9** As to the breach of express warranty claim, plaintiff asserts the claims can be resolved through common legal issues in multiple jurisdictions. Under Ohio law, this claim requires the existence of a warranty, the product failed to perform as warranted, the plaintiff provided reasonable notice of the defect, and the plaintiff suffered an injury as a result of the defect. The elements are present where the advertisement constitutes the warranty, class members relied on the warranty since the sole reason for buying the product was to repel pests, and privity of contract is not required in Ohio. Plaintiff reiterates that the Ohio Supreme Court has rejected a rule that pre-litigation notice is required. Finally, plaintiff points out that all class members were uniformly harmed and the law of express warranty in Ohio is akin to that of those states upon which plaintiff is seeking certification: Alaska, California, Colorado, Iowa, Maine, Minnesota, New Hampshire, New Jersey, Oklahoma, and Texas.

As to the fraud claim, defendants maintain that because issues of reliance must be resolved on an individualized basis, a fraud class action cannot be certified. As discussed earlier, where, as here, the fraud is uniform through the marketing of a product whose only function is to repel pests, but never work, fraud can be demonstrated on a class-wide basis. Defendants also assert that the application of the economic loss doctrine (which generally prevents recovery in tort of damages for purely economic loss) in product performance cases is inconsistent among the states, especially with respect to actions sounding in fraud. But, as plaintiff points out, courts decline to employ the economic loss doctrine where, as here, there is no breach of contract claim. Additionally, defendants point to the differing states' statutes of limitations for fraud claims. The Court agrees with plaintiff that courts have concluded that differences among the applicable statute of limitations periods are not a bar to class certification and, therefore, is not a basis for finding that common issues

**Steigerwald v. BHH, LLC, Not Reported in F.Supp.3d (2016)**

do not predominate with regard to the fraud claim. Finally, defendants contend that certification of an Ohio fraud class is inappropriate given the individual issues which predominate regarding reliance. Again, the Court agrees with plaintiff that, as recognized in *Galoski,* "no one would have bought a pest repeller had they known it was incapable of repelling pests." Given that the only purpose of the devices was to repel pests and which were labeled as such, all class members must have relied on the representation that the product repelled pests.

As to the breach of warranty claim, defendants again argue that reliance requires proof on an individualized basis. The Court has already addressed this contention. Further, as the court pointed out in *Galoski,* "it is safe to say that all, or nearly all purchasers of this product relied on the packaging name and description to identify the product and its intended purpose." *Id.* at footnote 1. Defendants also contend that should the Court find that the pre-suit notice requirement does not apply, consumers only in those states that do not require pre-suit notice may be members of the class with respect to the breach of warranty claim. But, defendants do not identify the states requiring pre-suit notice. Defendants contend that because Ohio has no privity requirement for breach of express warranty claims, only consumers from states that also do not require privity for these claims may be members. Defendants identify those states as California, Colorado, New Jersey, and Texas. But, plaintiff points out that the remaining states (Alaska, Iowa, Maine, Minnesota,

New Hampshire, and Oklahoma) identified for proposed certification do not require privity either. Nonetheless, even accepting defendants' arguments regarding individual issues, they do not predominate over those of the class. Rather, the questions of law or fact common to class members predominate.

**\*10** The Court finds that predominance is satisfied.

As to superiority, the Court agrees with plaintiff that a class action is the superior method of resolving the issues here given that class members spent a small amount on the devices which plaintiff alleges do not repel pests. It would not be feasible to hire counsel in each instance to prosecute the claim.

The Court finds 📑 Rule 23(b)(3) satisfied.

### Conclusion
For the foregoing reasons, plaintiff's Motion for Class Certification is granted.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2016 WL 695424

---

### Footnotes

1    Plaintiff requests that the Court certify the proposed class for fraud in Ohio and on a national basis except Louisiana and North Dakota, and for breach of express warranty for Ohio, Alaska, California, Colorado, District of Columbia, Iowa, Kansas, Maine, Minnesota, New Hampshire, New Jersey, North Carolina, Oklahoma, and Texas.

2    Plaintiff, however, testified that she sprayed the spiders which seemed to have an effect.

3    The Court also noted that defendants did not dispute that under Ohio law, plaintiff is required only to notify the immediate seller, i.e., Wal-Mart, which is not a party herein.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 66

2020 WL 4342658
Only the Westlaw citation is currently available.
Supreme Court of New Jersey.

SUN CHEMICAL CORPORATION,
Plaintiff-Appellant,

v.

FIKE CORPORATION and
Suppression Systems Incorporated,
Defendants-Respondents.

A-89 September Term 2018
|
082815
|
Argued March 17, 2020
|
Decided July 29, 2020

**Synopsis**

Synopsis

**Background:** Buyer of an explosion isolation and suppression system brought action in federal court against sellers of the system under the Consumer Fraud Act (CFA) arising out of an explosion that occurred on the first day the system was operational. The United States District Court for the District of New Jersey, John Michael Vazquez, J., 2017 WL 6316644, awarded summary judgment to sellers on the ground that the claim was governed by the Products Liability Act (PLA). Buyer appealed, and the United States Court of Appeals for the Third Circuit certified questions of law. The Supreme Court reformulated and accepted the questions.

**[Holding:]** The Supreme Court, Solomon, J., held that as a matter of first impression, a CFA claim alleging express misrepresentations may be brought in the same action as a PLA claim premised upon product manufacturing, warning, or design defects.

Certified question answered.

West Headnotes (20)

**[1]** **Torts** 👈 Economic loss doctrine

The "economic loss doctrine" prohibits the recovery in a tort action of economic losses arising out of a breach of contract.

**[2]** **Products Liability** 👈 Economic losses; damage to product itself

Under the economic loss doctrine, the Products Liability Act and common law tort actions do not apply to damage caused to the product itself, or to consequential but purely economic losses caused to the consumer because of a defective product. N.J. Stat. Ann. § 2A:58C-1 et seq.

**[3]** **Antitrust and Trade Regulation** 👈 Purpose and construction in general

**Attorney General** 👈 Powers and Duties

In enacting the Consumer Fraud Act (CFA), the Legislature intended to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public. N.J. Stat. Ann. § 56:8-1 et seq.

**[4]** **Antitrust and Trade Regulation** 👈 Private entities or individuals

The private right of action authorized under the Consumer Fraud Act (CFA) is integral to fulfilling the CFA's legislative purposes. N.J. Stat. Ann. § 56:8-19.

**[5]** **Antitrust and Trade Regulation** 👈 Costs
**Antitrust and Trade Regulation** 👈 Attorney fees

By allowing recovery of attorney fees and costs by successful private plaintiffs under the Consumer Fraud Act (CFA), private attorneys are incentivized to bring CFA claims, thus reducing the enforcement burdens that otherwise would fall on the State. N.J. Stat. Ann. § 56:8-19.

2020 WL 4342658

**[6]    Antitrust and Trade Regulation** 🔑 **Purpose and construction in general**

The language of the Consumer Fraud Act (CFA) evinces a clear legislative intent that its provisions be applied broadly. N.J. Stat. Ann. § 56:8-1 et seq.

**[7]    Antitrust and Trade Regulation** 🔑 **Purpose and construction in general**

Like most remedial legislation, the Consumer Fraud Act (CFA) should be construed liberally in favor of consumers. N.J. Stat. Ann. § 56:8-1 et seq.

**[8]    Antitrust and Trade Regulation** 🔑 **Exemptions and safe harbors**

Because the plain terms of the Consumer Fraud Act (CFA) provide that its rights, remedies and prohibitions are in addition to and cumulative of any other right, remedy or prohibition under state law, courts are reluctant to undermine the CFA's enforcement structure by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. N.J. Stat. Ann. § 56:8-2.13.

1 Cases that cite this headnote

**[9]    Antitrust and Trade Regulation** 🔑 **Exclusive and Concurrent Remedies or Laws**

**Products Liability** 🔑 **Nature and form of remedy**

The Consumer Fraud Act (CFA) and Products Liability Act (PLA) are intended to govern different conduct and to provide different remedies for such conduct; there is thus no direct and unavoidable conflict between the CFA and PLA. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[10]    Antitrust and Trade Regulation** 🔑 **Exclusive and Concurrent Remedies or Laws**

**Products Liability** 🔑 **Nature and form of remedy**

If a claim against the manufacturer or seller of a product is premised upon a product's manufacturing, warning, or design defect, that claim must be brought under the Products Liability Act (PLA) with damages limited to those available under that statute; Consumer Fraud Act (CFA) claims for the same conduct are precluded. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[11]    Antitrust and Trade Regulation** 🔑 **Exclusive and Concurrent Remedies or Laws**

**Products Liability** 🔑 **Nature and form of remedy**

Nothing about the Products Liability Act (PLA) prohibits a claimant from seeking relief under the Consumer Fraud Act (CFA) for deceptive, fraudulent, misleading, and other unconscionable commercial practices in the sale of the product. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[12]    Antitrust and Trade Regulation** 🔑 **Exclusive and Concurrent Remedies or Laws**

**Products Liability** 🔑 **Nature and form of remedy**

If a claim against the manufacturer or seller of a product is based on deceptive, fraudulent, misleading, and other unconscionable commercial practices, it is not covered by the Products Liability Act (PLA) and may be brought as a separate Consumer Fraud Act (CFA) claim. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[13]    Pleading** 🔑 **Particular causes of action**

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 651 of 751
PageID: 12017
Sun Chemical Corporation v. Fike Corporation, --- A.3d ---- (2020)

2020 WL 4342658

Products Liability Act (PLA) and Consumer Fraud Act (CFA) claims may proceed in separate counts of the same suit, alleging different theories of liability and seeking dissimilar damages. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[14]     Antitrust and Trade**
**Regulation** ☞ Exclusive and Concurrent
Remedies or Laws

Consumer Fraud Act (CFA) rights and remedies are cumulative to those created by other sources of law, and the presumptive application of the CFA is overcome only if a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. N.J. Stat. Ann. § 56:8-2.13.

**[15]     Antitrust and Trade**
**Regulation** ☞ Exclusive and Concurrent
Remedies or Laws
**Products Liability** ☞ Nature and form of
remedy

Had the Legislature intended for the Products Liability Act (PLA) to preempt, displace, or subsume the Consumer Fraud Act (CFA), it would have said so; instead the Legislature announced that the CFA supplements any other right or remedy available. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-2.13.

**[16]     Federal Civil Procedure** ☞ Alternate,
Hypothetical and Inconsistent Claims
**Pleading** ☞ Separate Counts on Same Cause
of Action

Neither the Federal Rules of Civil Procedure nor the New Jersey Court Rules preclude separate claims premised upon separate theories of liability from being advanced in the same pleading and sought at the same trial. Fed. R. Civ. P. 8(d)(3); N.J. Ct. R. 4:5-6.

**[17]     Pleading** ☞ Theory and form of action

How a given claim must be pled depends on what is at the heart of plaintiffs' case, that is, the underlying theory of liability. N.J. Ct. R. 4:5-6.

**[18]     Products Liability** ☞ Nature and form of
remedy
**Sales** ☞ Warranties

Aside from breach of express warranty claims, claims that sound in the type of products liability actions defined in the Products Liability Act (PLA) must be brought under the PLA. N.J. Stat. Ann. § 2A:58C-1(b)(3).

**[19]     Antitrust and Trade**
**Regulation** ☞ Exclusive and Concurrent
Remedies or Laws
**Products Liability** ☞ Nature and form of
remedy

The nature of the plaintiff's damages does not determine whether a cause of action against the manufacturer or seller of a product falls under the Consumer Fraud Act (CFA) or Products Liability Act (PLA); rather, it is the theory of liability underlying the claim that determines the recoverable damages. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

**[20]     Antitrust and Trade**
**Regulation** ☞ Exclusive and Concurrent
Remedies or Laws
**Products Liability** ☞ Nature and form of
remedy

A Consumer Fraud Act (CFA) claim alleging express misrepresentations, that is, deceptive, fraudulent, misleading, and other unconscionable commercial practices, may be brought in the same action as a Products Liability Act (PLA) claim premised upon product manufacturing, warning, or design defects; in other words, the PLA will not bar a CFA claim alleging express or affirmative misrepresentations. N.J. Stat. Ann. §§ 2A:58C-1 et seq., 56:8-1 et seq.

On certification of question of law from the United States Court of Appeals for the Third Circuit.

**Attorneys and Law Firms**

Lance J. Kalik argued the cause on behalf of appellant (Riker Danzig Scherer Hyland & Perretti, attorneys; Lance J. Kalik, Morristown, of counsel and on the briefs, and Jeffrey A. Beer, Jr., Morristown, on the briefs).

Gino P. Mecoli argued the cause on behalf of respondents (Reilly, McDevitt & Henrich, attorneys; Gino P. Mecoli and Suzanne I. Turpin, Merchantville, on the brief).

Christopher M. Placitella argued the cause on behalf of amicus curiae New Jersey Association of Justice (Cohen, Placitella & Roth, attorneys; Christopher M. Placitella, Jared M. Placitella, and Michael Coren, of counsel and on the brief).

Kevin R. Jespersen, Assistant Attorney General, argued the cause on behalf of amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General and Janine N. Matton, Assistant Attorney General, of counsel, and Zachary N. Klein, Deputy Attorney General, on the brief).

**Opinion**

JUSTICE SOLOMON delivered the opinion of the Court.

New Jersey's Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -224, and Products Liability Act (PLA), N.J.S.A. 2A:58C-1 to -11, are remedial statutes that target different wrongs, address distinct types of harm, and provide for divergent remedies.

The CFA is to be expansively read to proscribe unconscionable business practices. The PLA's reach is more limited -- it permits pursuit of product liability claims brought by "claimants" for "harm," as those terms are defined in the statute. Just as the PLA is more limited in scope, it is more limited in remedy: it provides only for damages traditionally available in tort actions, such as remuneration for destroyed property, emotional distress, and loss of consortium; the CFA on the other hand entitles successful plaintiffs to treble damages, costs, and attorney's fees.

In this case we consider, in response to a question of law certified by the United States Court of Appeals for the Third Circuit pursuant to Rule 2:12A-3, whether "a Consumer

Fraud Act claim [can] be based, in part or exclusively, on a claim that also might be actionable under the Products Liability Act."[1]

**\*4** We conclude that, irrespective of the nature of the damages, a CFA claim alleging express misrepresentations -- deceptive, fraudulent, misleading, and other unconscionable commercial practices -- may be brought in the same action as a PLA claim premised upon product manufacturing, warning, or design defects. It is the nature of the claims brought, and not the nature of the damages sought, that is dispositive of whether the PLA precludes the separate causes of action. In other words, the PLA will not bar a CFA claim alleging express or affirmative misrepresentations.

I.

A.

We rely upon the following facts provided by the opinions of the Third Circuit and the United States District Court for the District of New Jersey.

Sun Chemical Corporation (Sun) has long operated an ink manufacturing business in New Jersey. In 2012, Sun installed a new dust collection system at its facility. Sun then purchased an explosion isolation and suppression system (Suppression System) from Fike Corporation and Suppression Systems Incorporated (collectively, Fike) to prevent and contain potential explosions in that dust collection system.

On the first day that the Suppression System was operational, a fire occurred in the dust collection system and an alarm on the Suppression System's control panel activated but was not audible. Sun employees attempted to extinguish the fire, but an explosion sent a fireball through the ducts of the dust collection system, injuring seven Sun employees and causing damage to Sun's facility.

B.

Sun brought a single-count complaint under the CFA alleging that Fike made material oral and written misrepresentations about four aspects of the Suppression System: (1) the Suppression System would prevent explosions; (2) the Suppression System would have an audible alarm; (3) the

Suppression System complied with industry standards; and (4) the system had never failed. Following discovery, both parties moved for summary judgment. The District Court granted Fike's motion, finding that Sun's claims would be governed by the PLA and noting that "a plaintiff may not avoid the requirements of the PLA by artfully crafting its claims under the CFA."

Sun appealed, and the Third Circuit noted that, although "the resemblance of Sun's claim to a product liability action" suggests it would fall under the PLA, the plain text of the CFA seems potentially hospitable to Sun's argument that "affirmative misrepresentations can be brought under the CFA ... even though the damages claimed for those representations involve[ ] personal injuries to third parties and some property damage." After determining that extant New Jersey case law was not sufficiently on point to guide its determination of which of the two statutes to apply, the Third Circuit certified its questions to this Court.

After reformulating and accepting the question, we granted motions by the New Jersey Attorney General and the New Jersey Association for Justice (NJAJ) to participate as amici curiae. We consider their arguments along with those of the parties.

II.

Sun concedes that five percent of its losses result from damage to its facility and are "physical damage to property" -- a "harm" specifically identified in N.J.S.A. 2A:58C-1(b) (2)(a), a section of the PLA. Sun maintains that the PLA is nevertheless inapplicable to those losses because they resulted from Fike's misrepresentations, not alleged defects.

Sun argues that the cost of the failed Suppression System likewise does not fall within the PLA, which explicitly excludes from its definition of "harm" in N.J.S.A. 2A:58C-1(b)(2)(a) any "damage ... to the product itself." According to Sun, the cost of the Suppression System is a purely economic loss outside the scope of the PLA but specifically cognizable under the CFA.

*5 [1] [2] Sun further contends that lost workhours and workers' compensation benefits paid as a result of injuries to its employees are purely economic losses and thus do not establish "loss deriving from" personal injury within the meaning of N.J.S.A. 2A:58C-1(b)(2)(b) or (b)(2)(d) of

the PLA. In support, Sun notes that the PLA codified the economic loss doctrine,[2] which provides that economic loss resulting from harm to employees is not a cognizable "loss deriving from" personal injury. In any case, Sun suggests that it should be able to proceed with a PLA count for its PLA damages and a separate count for its non-PLA damages.

Fike argues that the cost of the Suppression System does not qualify as "damage ... to the product itself" under N.J.S.A. 2A:58C-1(b)(2)(a) because the Suppression System was not defective and was not damaged during the explosion. Fike further contends that the losses resulting from injuries to Sun's employees constitute "loss deriving from" personal injury under N.J.S.A. 2A:58C-1(b)(2)(b) and (b)(2)(d). Fike asserts that Sun cannot avoid application of the PLA by pleading only economic damages. Rather, Fike argues, New Jersey courts look to the "essential nature of the claim" and will apply the PLA where appropriate, regardless of how the claim is pled.

Amicus curiae NJAJ argues that CFA and PLA claims should be able to proceed concurrently if both are supported by the facts. NJAJ asserts that the correct reading of the two statutes is that, "[s]ince representation-based claims and products liability claims deal with two distinct categories of unlawful conduct rather than two different theories covering the same underlying conduct, the PLA does not subsume representation-based claims." (quoting Francis E. Parker Mem'l Home, Inc. v. Georgia-Pacific LLC, 945 F. Supp. 2d 543, 556 n.5 (D.N.J. 2013)).

The Attorney General argues that recovery under the PLA is limited to those tort-based theories of recovery for losses that fit the PLA definition of harm. The Attorney General also asserts that losses premised on non-tort theories of recovery and losses that do not fit the PLA definition of harm can proceed in separate counts of the same suit as PLA counts.

III.

There is no authority directly addressing the interplay between the CFA and PLA in this setting. Nevertheless, their statutory language, legislative history, and this Court's relevant jurisprudence regarding both statutes inform our answer to the question before us. We therefore begin by reviewing the pertinent provisions of the CFA and PLA, their purposes, and cases applying them.

A.

**[3]** The Legislature passed the CFA in 1960 "to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer." Cox v. Sears Roebuck & Co., 138 N.J. 2, 14, 647 A.2d 454 (1994) (quoting S. Comm. Statement to S. 199 (1960)). In so doing, the Legislature "intended to confer on the Attorney General the broadest kind of power to act in the interest of the consumer public." Kugler v. Romain, 58 N.J. 522, 537, 279 A.2d 640 (1971).

The CFA prohibits deceptive, fraudulent, misleading, and other unconscionable commercial practices "in connection with the sale ... of any merchandise or real estate." N.J.S.A. 56:8-2. "Merchandise" is broadly defined to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). For the purposes of this certified question, the parties do not dispute that the Suppression System is a product offered to the public for sale.

***6** **[4]** **[5]** In 1971, the Legislature amended the CFA to provide for private causes of action by consumers to recover for an "ascertainable loss of moneys or property, real or personal." Weinberg v. Sprint Corp., 173 N.J. 233, 247-51, 801 A.2d 281 (2002) (quoting N.J.S.A. 56:8-19). The amendment also enabled successful private plaintiffs to recover treble damages, reasonable attorneys' fees and costs, and "any other appropriate legal or equitable relief." Id. at 250, 801 A.2d 281 (quoting N.J.S.A. 56:8-19). The private right of action "is integral to fulfilling the [CFA's] legislative purposes," Cox, 138 N.J. at 16, 647 A.2d 454, and by allowing recovery of attorneys' fees and costs, private attorneys are incentivized to bring CFA claims, thus reducing the enforcement burdens that otherwise would fall on the State, Weinberg, 173 N.J. at 248-49, 801 A.2d 281.

The CFA's history "is one of constant expansion of consumer protection." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 691 A.2d 350 (1997). The statute has been "repeatedly amended and expanded ... often by adding sections to address particular areas of concern and to include them specifically within its protective sweep." Czar, Inc. v. Heath, 198 N.J. 195, 201, 966 A.2d 1008 (2009) (listing statutory changes).

**[6]** **[7]** In addition to its ever-growing scope, "[t]he language of the CFA evinces a clear legislative intent that its provisions be applied broadly." Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997). "[L]ike most remedial legislation, the [CFA] should be construed liberally in favor of consumers." Cox, 138 N.J. at 15, 647 A.2d 454.

**[8]** And, by the plain terms of the statute, "[t]he rights, remedies and prohibitions" created by the CFA are "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." N.J.S.A. 56:8-2.13. Courts are therefore reluctant "to undermine the CFA's enforcement structure ... by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law." Lemelledo, 150 N.J. at 270, 696 A.2d 546.

This Court considered the reach of the CFA in the context of other regulatory laws in Lemelledo v. Beneficial Management Corp. of America and Real v. Radir Wheels, Inc. We review those decisions in turn.

1.

In Lemelledo, a consumer brought a class action under the CFA against a financial services company for loan packing -- increasing a loan amount by including related services like credit insurance. Id. at 259-60, 696 A.2d 546. The defendant argued that the CFA was preempted by other statutes regulating consumer loans. Id. at 271-73, 696 A.2d 546. We rejected that argument, holding there is a "presumption that the CFA applies to a covered activity," a presumption that can be overcome only when a court is satisfied "that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes." Id. at 270, 696 A.2d 546.

Tying the claim in Lemelledo to the CFA's purpose, we noted that,

[i]f the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation.

[Ibid.]

With respect to other remedial statutes specifically, we noted that "[i]t is not readily to be inferred that the Legislature, by enacting multiple remedial statutes designed to augment protection, actually intended that parties be subject only to one source of regulation." Id. at 271, 696 A.2d 546. We nevertheless held that, in applying statutes that cover the same conduct as the CFA, courts should avoid statutory interpretations that impose overlapping or conflicting duties and obligations:

*7 Conflicting applications of the respective statutes and regulatory schemes can be avoided if courts are cognizant of the obligations created by other statutes and if they interpret the scope of the broad language of the CFA so as not to impose conflicting duties or duplicative financial obligations on the regulated party.

[Id. at 273, 696 A.2d 546.]


2.

Later, in Radir Wheels, we applied the principles set forth in Lemelledo in considering whether the Used Car Lemon Law, N.J.S.A. 56:8-67 to -80, preempted a CFA claim for fraudulent advertisement brought by the purchaser of a used automobile from a private seller. 198 N.J. 511, 514, 969 A.2d 1069 (2009). The Appellate Division held that the consumer failed to state a cause of action under the CFA because the "commercial activities of a casual seller ... d[id] not fall within the CFA's private civil cause of action. Ibid. We disagreed.

Discussing the standard for displacing the CFA set forth in Lemelledo, we noted that "[t]he measured application of those principles has led to few, very limited exceptions to the CFA's reach." Id. at 523, 969 A.2d 1069 (citing Macedo v. Dello Russo, 178 N.J. 340, 345-46, 840 A.2d 238 (2004) (explaining that the CFA does not apply to "learned professionals ... operating in their professional capacities"); Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 272-73, 390 A.2d 566 (1978) (holding the CFA inapplicable "to public utility rates subject to the Board of Public Utilities' exclusive rate-setting jurisdiction")); see also id. at 523 n.9, 969 A.2d 1069 (collecting examples of additional settings in which the CFA did not apply).

Ultimately, we held that the consumer's CFA claim was not preempted by the Used Car Lemon Law, which expressly provides that "[n]othing in this act shall in any way limit the rights or remedies which are otherwise available to a consumer under any other law." Id. at 526, 969 A.2d 1069 (quoting N.J.S.A. 56:8-75).


B.

The PLA was enacted in 1987, nearly three decades after the CFA. See Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 94-95, 577 A.2d 1239 (1990). As a New Jersey tort-reform statute, the PLA codified certain issues relating to the common law governing product liability actions and "establish[ed] new rules regarding the burden of proof and the imposition of liability." Id. at 95, 577 A.2d 1239.

The PLA is intended to protect users from harm caused by defective products by "establish[ing] clear rules" in "actions for damages for harm caused by products." N.J.S.A. 2A:58C-1(a). Specifically, the PLA imposes liability upon the manufacturer or seller for a product's "manufacturing defects, warning defects, and design defects." Assemb. Ins. Comm. Statement to S. Comm. Substitute for S. 2805 (L. 1987, c. 197) (June 22, 1987); Sponsor's Statement to S. 2805 (L. 1987, c. 197) (Nov. 17, 1986); see also N.J.S.A. 2A:58C-2.

Under the PLA, a claimant can recover damages against the "manufacturer or seller of a product" upon proof "that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose." N.J.S.A. 2A:58C-2. A "claimant" is "any person who brings a product liability action," N.J.S.A. 2A:58C-1(b)(1), and a "product liability action" is a claim for harm caused by a manufacturing, warning, or design defect, "except actions for harm caused by breach of an express warranty," N.J.S.A. 2A:58C-1(b)(3).[3] In addition to the exception for breach of an express warranty, the PLA excludes environmental tort actions. N.J.S.A. 2A:58C-6.

*8 Damages recoverable under the PLA for "harm" caused by the product are:

(a) physical damage to property, other than to the product itself; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) any loss of consortium or services or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph.

[N.J.S.A. 2A:58C-1(b)(2).]

This Court has considered the kinds of claims covered by the PLA in In re Lead Paint Litigation and Sinclair v. Merck & Co. We review those cases below.

1.

Twenty years after enactment of the PLA, this Court decided Lead Paint in which we scrutinized a nuisance-based pleading and, based on a pleading-to-statute comparison, held that the PLA subsumed the plaintiffs' common law public nuisance causes of action that were fundamentally PLA claims. 191 N.J. 405, 436-37, 924 A.2d 484 (2007). In Lead Paint, twenty-six municipalities and counties asserted common law public nuisance claims against manufacturers and distributors of lead paint, in part for the costs of medical care for lead poisoning and for the detection and removal of the paint. Id. at 408-09, 924 A.2d 484. In doing so, the municipalities sought to apply the environmental tort exception to the PLA, N.J.S.A. 2A:58C-6. Id. at 437, 924 A.2d 484.

We found that the harms attributable to the lead paint -- physical damage to property and personal physical illness or injury -- were of the type intended to be remedied through the PLA. The common law claims asserted by the plaintiffs essentially sounded in "product liability" for failure to warn and were therefore also covered by the PLA. Id. at 436-40, 924 A.2d 484.

The central focus of plaintiffs' complaints is that defendants were aware of dangers associated with lead -- and by extension, with the dangers of including it in paint intended to be used in homes and businesses -- and failed to warn of those dangers. This classic articulation of tort law duties, that is, to warn of or to make safe, is squarely within the theories included in the PLA.

[Id. at 437, 924 A.2d 484.]

Thus, we determined that the theory of liability claimed by the plaintiffs was, in reality, a PLA claim and was therefore actionable only under the strictures of the PLA. Id. at 440, 924 A.2d 484.

2.

One year later, in Sinclair, we considered whether plaintiffs who used the drug Vioxx could maintain both CFA and PLA claims. 195 N.J. 51, 54, 948 A.2d 587 (2008). In that case,

the plaintiffs sought certification of a nationwide class of individuals who took the drug "for at least six consecutive weeks" and "who had not sought to recover damages for personal injuries caused by Vioxx." Id. at 55, 948 A.2d 587. The plaintiffs alleged that "as a result of their direct and prolonged consumption of Vioxx" they were at increased risk of future cardiac disorders like heart attack or stroke; they therefore sought medical monitoring and punitive damages. Id. at 55-56, 948 A.2d 587.

Unlike the present case where Sun brought CFA and PLA claims in the same count of a single-count complaint, in Sinclair the CFA and PLA causes of action were brought in separate but nearly indistinguishable counts. First Amended Class Action Complaint for Damages and Equitable and Injunctive Relief ¶¶ 119, 123, Sinclair v. Merck & Co., ATL-L3771-04 MT (N.J. Super. Ct. Law Div. Mar. 17, 2015). Further, the relief the plaintiffs sought under the CFA count of the complaint matched the PLA count word-for-word. Compare id. ¶ 124 with id. ¶ 133.

*9  The focus of Sinclair was whether the plaintiffs' claimed risk of future cardiovascular injury was cognizable under the PLA despite their failure to allege present physical injuries. We found that the plaintiffs' claimed risk of future cardiovascular injury was not cognizable under the PLA because the statute "require[s] a physical injury." Sinclair, 195 N.J. at 64, 948 A.2d 587; see ibid. ("Nothing in the legislative history of the PLA suggests that the Legislature intended to eliminate that physical component."). More importantly, we determined, after considering the nature of the plaintiffs' allegations, that the plaintiffs sought "to avoid the requirements of the PLA by asserting their claims as CFA claims," even though "[t]he heart of [their] case [was] the potential for harm caused by Merck's drug." Id. at 65-66, 948 A.2d 587. That claim, we explained, "does not fall within an exception to the PLA, but rather clearly falls within its scope." Id. at 66, 948 A.2d 587.

IV.

A.

[9]  As our review of the statutes reveals, the CFA and PLA are intended to govern different conduct and to provide different remedies for such conduct. There is thus no direct and unavoidable conflict between the CFA and PLA. The PLA governs the legal universe of products liability actions

as defined in that Act and the CFA applies to fraud and misrepresentation and provides unique remedies intended to root out such conduct.

We have stressed that the PLA cannot be stretched to encompass claims sounding in contract, noting that the PLA's definition of harm "draw[s] a clear line between remedies available in tort and contract." See *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 305, 8 A.3d 766 (2010). Although we have thus rejected the idea that contract-based claims could be pled under the PLA, we have not yet considered the question at the center of this matter: whether tort-based claims that can be pled under the PLA can also -- or instead -- be pled under the CFA.

Legislative intent to allow certain CFA claims to co-exist with separately pled statutory PLA claims may be found in the CFA's 1990 and 2007 amendments requiring notice and prohibiting the sale of certain defective, hazardous, or dangerous children's products. See N.J.S.A. 56:8-20, -51, and -53.1 to -53.5. Those post-PLA amendments to the CFA evidence the statutes' complementary nature since both concern product safety and the protection of child consumers. Violation of either amendment would give rise to a CFA claim irrespective of whether a product defect caused injury actionable under the PLA. The failure to warn of a product defect is likewise cognizable under the PLA, N.J.S.A. 2A:58C-2 (identifying as actionable the failure to provide adequate warnings or instructions for a product), while an affirmative misrepresentation that a specific flaw did not exist or a product had never failed may be brought under the CFA, N.J.S.A. 56:8-2 (identifying as actionable a "misrepresentation or the knowing[ ] concealment, suppression or omission of any material fact").

[10]   [11]   [12]   If a claim is premised upon a product's manufacturing, warning, or design defect, that claim must be brought under the PLA with damages limited to those available under that statute; CFA claims for the same conduct are precluded. But nothing about the PLA prohibits a claimant from seeking relief under the CFA for deceptive, fraudulent, misleading, and other unconscionable commercial practices in the sale of the product. Indeed, the CFA is expressly "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." N.J.S.A. 56:8-2.13. Said differently, if a claim is based on deceptive, fraudulent, misleading, and other unconscionable commercial practices, it is not covered by the PLA and may be brought as a separate CFA claim.

[13]   [14]   We agree with amici that PLA and CFA claims may proceed in separate counts of the same suit, alleging different theories of liability and seeking dissimilar damages. As we noted in *Lemelledo*, CFA rights and remedies are "cumulative to those created by other sources of law," 150 N.J. at 264, 268, 696 A.2d 546, and the presumptive application of the CFA is overcome only if "a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes," id. at 270, 696 A.2d 546.

**\*10**   [15]   And as we pointed out in *Sinclair*, had the Legislature intended for the PLA to preempt, displace, or subsume the CFA, it would have said so. 195 N.J. at 65-66, 948 A.2d 587; see also *DiProspero v. Penn*, 183 N.J. 477, 494-95, 874 A.2d 1039 (2005) ("[T]he Legislature knows how to incorporate into a new statute a standard articulated in a prior opinion of this Court."); *Miah v. Ahmed*, 179 N.J. 511, 520, 846 A.2d 1244 (2004) (explaining that judicial interpretation begins with the plain language of the statute). Instead, as noted above, the Legislature has announced the opposite -- the CFA supplements any other right or remedy available. See N.J.S.A. 56:8-2.13.

[16]   Neither the Federal Rules of Civil Procedure nor the New Jersey Court Rules preclude separate claims premised upon separate theories of liability from being advanced in the same pleading and sought at the same trial. See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); R. 4:5-6 ("As many separate claims or defenses as the party has may be stated regardless of their consistency and whether based on legal or on equitable grounds or on both.").

B.

[17]   How a given claim must be pled, in turn, depends on what is at the "heart of plaintiffs' case" -- the underlying theory of liability. *Sinclair*, 195 N.J. at 66, 948 A.2d 587.

The phrase "the essential nature of the claim[ ]" was referenced by this Court in *Lead Paint* when we were engaged in a review of the pleadings to determine whether the theory pled on the facts presented, although denoted as a nuisance claim, was in fact one of the three codified theories made exclusively actionable under the PLA. 191 N.J. at 437, 924 A.2d 484. If so, then the claim was supplanted by the PLA.

Although helpful in explaining our analysis in that matter, it is not to be regarded as the interpretative guide to the PLA. It is best understood not as an assessment of whether a claim is for harm caused by a product, but of whether the claim is based upon a product's manufacturing, warning, or design defect and therefore covered by the PLA. See Sinclair, 195 N.J. at 54, 62, 948 A.2d 587 (finding the "essential nature" of the disputed pleading to be a product defect claim); Lead Paint, 191 N.J. at 437, 924 A.2d 484 (finding the disputed pleading to be essentially a failure to warn claim).

[18] We noted in Sinclair that the Legislature intended that the defined products liability actions remain "within the scope of the PLA," 195 N.J. at 65, 948 A.2d 587, and expressly excluded from that "actions for harm caused by breach of an express warranty," id. at 62, 948 A.2d 587 (quoting N.J.S.A. 2A:58C-1(b)(3)). Notably, breach of an express warranty may be covered by the CFA as a misleading commercial practice. See N.J.S.A. 56:8-2 (declaring unlawful the use of a "false promise ... in connection with the sale or advertisement of any merchandise"). Thus, aside from breach of express warranty claims,[4] claims that sound in the type of products liability actions defined in the PLA must be brought under the PLA.

[19] Significantly, it is the nature of the action giving rise to a claim that determines how a claim is characterized. Sun is mistaken in its heavy reliance on the nature of the damages it seeks, claiming they are economic losses rather than damages for injury to persons or property. The nature of the plaintiff's damages does not determine whether the cause of action falls under the CFA or PLA; rather, it is the theory of liability underlying the claim that determines the recoverable damages.

*11 [20] Therefore, a CFA claim alleging express misrepresentations -- deceptive, fraudulent, misleading, and other unconscionable commercial practices -- may be brought in the same action as a PLA claim premised upon product manufacturing, warning, or design defects. In other words, the PLA will not bar a CFA claim alleging express or affirmative misrepresentations.

V.

For the reasons set forth above, we answer the certified question in the affirmative. A CFA claim alleging express or affirmative misrepresentations -- deceptive, fraudulent, misleading, and other unconscionable commercial practices -- may proceed in separate counts of the same pleading as a PLA claim alleging product design, manufacturing, or warning defects.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, and FERNANDEZ-VINA join in JUSTICE SOLOMON's opinion. JUSTICES PATTERSON and TIMPONE did not participate.

**All Citations**

--- A.3d ----, 2020 WL 4342658

Footnotes

1    In accepting the certified question, 241 N.J. 411, 228 A.3d 1235 (2019), we exercised our authority under Rule 2:12A-2 to reformulate as the single question indicated above the following questions posed by the Third Circuit:
    (1) When a court decides a CFA claim based on affirmative and material misrepresentation about the features of a product, but the plaintiff is seeking damages for harm caused by the product's failure to conform to those features, what criteria should the court consider to determine whether the claim may proceed as a CFA claim or is subsumed under the PLA?
    (2) In determining whether a claim may proceed under the CFA or is subsumed under the PLA, what significance should a court place on a plaintiff's assertion that its harm resulted primarily from physical injury to third parties (like employees) rather than property damage or personal injury?
    (3) Where a complaint pleads a single CFA claim that asserts multiple harms, some of which fall within the ambit of the PLA, and others which do not, is the entire claim subsumed by the PLA or should the distinct categories of harm be deemed severable claims, some of which would not be subsumed and could instead be pursued under the CFA?
    (4) Under the CFA, when can a commercial purchaser of a product recover consequential economic losses -- such as workers' compensation payments, attorneys' fees incurred in litigation, fees incurred in government investigations, and increased labor or production costs -- based on alleged misrepresentations the seller made about the features and capabilities of the product?

2020 WL 4342658

2    The economic loss doctrine prohibits the recovery in a tort action of economic losses arising out of a breach of contract. See Dean v. Barrett Homes, Inc., 204 N.J. 286, 296-97, 8 A.3d 766 (2010). Thus, under the economic loss doctrine, "the [PLA] and common law tort actions do not apply to damage caused to the product itself, or to consequential or but purely economic losses caused to the consumer because of a defective product." Ford Motor Credit Co., LLC v. Mendola, 427 N.J. Super. 226, 240, 48 A.3d 366 (App. Div. 2012).

3    The PLA and its legislative history, to which the Legislature expressly encourages reference, makes clear that the PLA did not intend to wholly supplant the products liability case law in New Jersey. See N.J.S.A. 2A:58C-1(a). Thus, our focus must be on the PLA's defined theories on which claims of harm may be actionable against a manufacturer or seller. See id. at -2.

4    As explained previously, environmental tort actions are also excepted from the PLA. N.J.S.A. 2A:58C-6.

---

**End of Document**              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  

Tab 67

2020 WL 2892366
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

IN RE TAKATA AIRBAG PRODUCTS
LIABILITY LITIGATION
Bridget Boyd, et al., individually and on behalf
of all others similarly situated, Plaintiffs,
v.
FCA US LLC, Defendant.

MDL No. 2599
|
Master File No. 15-02599-MD-MORENO
|
Economic Loss No. 14-24009-CV-MORENO
|
Signed 06/01/2020

**Synopsis**
**Background:** Consumers brought class actions against
distributor vehicles with purportedly defective airbags
asserting a claim under Magnuson-Moss Warranty Act
(MMWA), state law claims for breach of implied warranty,
negligence, unjust enrichment, and fraud, as well as violations
of state consumer protection statutes. After actions were
consolidated in multidistrict litigation (MDL), distributor
moved to dismiss.

**Holdings:** The District Court, Federico A. Moreno, J., held
that:

[1] consumers stated a fraud claim against distributor;

[2] consumer's claim against vehicle distributor for violation
of Arizona Consumer Fraud Act, accrued when consumer
discovered airbag defect;

[3] intentional misrepresentation exception to Massachusetts
economic loss rule applied to consumers' claim against
distributor;

[4] under Ohio law, economic loss rule did not bar consumers'
fraud-based claims against distributor;

[5] consumers satisfied "personal purpose" requirement to
bring class action claims under the Michigan Consumer
Protection Act and the Missouri Merchandising Practices Act;

[6] named-plaintiffs lacked standing to assert nationwide-
class claim under MMWA; and

[7] fraudulent concealment tolling applied to consumers
statewide-class breach of implied warranty claims against
distributor.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim; Motion to Dismiss for Lack of Standing.

West Headnotes (52)

**[1]** **Federal Civil Procedure** 🔑 Fraud, mistake
and condition of mind

To comply with heightened pleading standard
in rule requiring that fraud claims be pled
with particularity, a plaintiff must allege:
(1) the precise statements, documents, or
misrepresentations made, (2) the time, place,
and person responsible for the statement, (3) the
content and manner in which these statements
misled the plaintiffs, and (4) what the defendants
gained by the alleged fraud; in other words,
a plaintiff is required to plead the "who,
what, when, where, and how" pertaining to the
underlying fraud. Fed. R. Civ. P. 9(b).

**[2]** **Federal Civil Procedure** 🔑 Fraud, mistake
and condition of mind

The purpose of particularity pleading for fraud
claims is to alert the defendants to their precise
misconduct and protect them against baseless
charges of fraudulent behavior. Fed. R. Civ. P.
9(b).

**[3]** **Federal Courts** 🔑 Effect of transfer and
subsequent proceedings

2020 WL 2892366

Questions of federal law in cases transferred under statute governing multidistrict litigation (MDL) are governed by the clearly settled law of the transferee district court's circuit. 28 U.S.C.A. § 1407.

---

[4]    **Federal Courts** 🔑 Conflict of Laws; Choice of Law

Questions arising under state law are generally governed by the substantive state law dictated by the choice of law rules of the federal court's state.

---

[5]    **Federal Courts** 🔑 Effect of transfer and subsequent proceedings

In cases transferred under statute governing multidistrict litigation (MDL), the transferee district court must apply the substantive state law dictated by the choice of law rules of the transferor court's state. 28 U.S.C.A. § 1407.

---

[6]    **Action** 🔑 What law governs

Michigan choice of law rules recognize a presumption in favor of lex fori and require Michigan law to apply unless a rational reason to do otherwise exists.

---

[7]    **Action** 🔑 What law governs

In determining whether there is a rational reason to displace Michigan law as part of a choice-of-law analysis, a court must determine if any foreign state has an interest in having its law applied, and if no state has such an interest, the presumption that Michigan law will apply cannot be overcome.

---

[8]    **Action** 🔑 What law governs

Under Michigan choice-of-law rules, if a foreign state has an interest in having its law applied, the court must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests.

---

[9]    **Federal Courts** 🔑 Effect of transfer and subsequent proceedings

Multidistrict litigation (MDL) court, to which consumers' consolidated products liability complaint concerning airbag defect in vehicles they purchased from vehicle distributor, was transferred, would apply transferor court's, specifically Michigan's, choice of law rules, and for consumers who purchased their vehicles in their state of residence, MDL court would apply state substantive law of state where vehicle was purchased or leased. 28 U.S.C.A. § 1407.

---

[10]    **Federal Courts** 🔑 Effect of transfer and subsequent proceedings

Multidistrict litigation (MDL) court, to which consumers' consolidated products liability complaint concerning airbag defect in vehicles they purchased from vehicle distributor, was transferred, would apply transferor court's, specifically Michigan's, choice of law rules, and would apply Michigan substantive law to claims of consumers who purchased or leased a vehicle in a state where they did not live. 28 U.S.C.A. § 1407.

---

[11]    **Products Liability** 🔑 Representations or concealment; fraud

**Products Liability** 🔑 Seat belts and occupant restraint systems

Consumers adequately alleged that vehicle distributor had independent knowledge of inflator defect in airbags that contained ammonium nitrate as a propellant which were installed in vehicles, as required to state a fraud claim against distributor for failing to disclose defect. Fed. R. Civ. P. 9(b).

---

[12]    **Products Liability** 🔑 Representations or concealment; fraud

**Products Liability** 🖙 Seat belts and occupant restraint systems

Consumers adequately alleged that vehicle distributor had a duty to disclose inflator defect in airbags that contained ammonium nitrate as a propellant, as required to state a fraud claim against distributor; consumers alleged that distributor had a duty to disclose because it had exclusive and far superior knowledge and access to the facts and knew the facts were not known to or reasonably discoverable by consumers and that they intentionally concealed and made incomplete representations about the safety and reliability of the airbags and vehicles, while purposefully withholding material facts from consumers. Fed. R. Civ. P. 9(b).

[13] **Products Liability** 🖙 Representations or concealment; fraud

**Products Liability** 🖙 Seat belts and occupant restraint systems

Consumers adequately alleged that vehicle distributor made material misstatements about safety features in vehicles which contained purportedly defective airbags, as required to state a fraud claim against distributor; consumers alleged that distributor provided marketing material that, among several other safety promotions, touted vehicles as "top safety picks," which were later subject to recalls for airbag defect, published brochures for vehicle models that specifically promoted the airbag features, which were later subject to recalls, and that through its promotions, distributor continuously maintained that its vehicles were safe and reliable, yet uniformly concealed airbag defect, which was material to consumers' decisions to purchase or lease vehicles from distributor. Fed. R. Civ. P. 9(b).

[14] **Federal Civil Procedure** 🖙 Fraud, mistake and condition of mind

Consumers adequately alleged that they relied on vehicle distributor's material misstatements about safety features in vehicles which contained purportedly defective airbags that contained

ammonium nitrate as a propellant, as required to state a fraud claim against distributor; consumers alleged that omissions and concealed material facts about defective airbags caused injuries, and that if they had known of the concealed or suppressed facts, they would not have purchased or leased vehicles, or would not have paid as much for them. Fed. R. Civ. P. 9(b).

[15] **Limitation of Actions** 🖙 Discovery of Fraud

Although Arizona does not recognize fraudulent concealment tolling, under Arizona's discovery rule, the statute of limitations for a claim under the Arizona Consumer Fraud Act begins running when the defrauded party discovers or with reasonable diligence could have discovered the fraud. 📙 Ariz. Rev. Stat. Ann. § 12-541(5).

[16] **Limitation of Actions** 🖙 Questions for Jury

Under Arizona law, when discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury.

[17] **Limitation of Actions** 🖙 In general; what constitutes discovery

Under Arizona law, the jury must determine at what point plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action.

[18] **Federal Civil Procedure** 🖙 Limitations, laches and prematurity

Even though the statute of limitations is an affirmative defense that is properly raised in a motion to dismiss, where it appears from the face of the complaint that the claim is barred, the motion should not be granted unless it appears certain plaintiff will not be entitled to relief under any set of facts susceptible of proof under the claims stated.

**[19]**    **Limitation of Actions** 🔑 **Nature of statutory limitation**

Under Arizona law, the statute of limitations defense is never favored by courts.

**[20]**    **Limitation of Actions** 🔑 **What constitutes discovery of fraud**

Consumer's claim against vehicle distributor for violation of Arizona Consumer Fraud Act, accrued, and one-year statute of limitations period began to run, when consumer discovered airbag defect in vehicle. 📙 Ariz. Rev. Stat. Ann. § 12-541(5).

**[21]**    **Limitation of Actions** 🔑 **What constitutes discovery of fraud**

Consumer's Arizona common-law fraud claim against vehicle distributor accrued, and three-year statute of limitations began to run, when recall of vehicle consumer purchased was announced due to defective airbag. Ariz. Rev. Stat. Ann. § 12-543(3).

**[22]**    **Limitation of Actions** 🔑 **Concealment of Cause of Action**

Fraudulent concealment tolling applies in Georgia ,Ohio, and Texas.

**[23]**    **Fraud** 🔑 **Injury and causation**

Consumers sufficiently invoked the fraud exception to the economic loss rule in Arizona, Michigan, Missouri, New Jersey, New York, and Ohio in action against vehicle distributor that sold consumers vehicles with purportedly defective airbags; consumers alleged that distributor had knowledge of risks posed by installing defective airbags in its vehicles, that distributor had duty to disclose inflator defector, that distributor made material misstatements regarding safety of its vehicles, and that but-for the omissions of the defect, consumers would not have purchased their vehicles form distributor or

would not have paid as much for them as they did.

**[24]**    **Torts** 🔑 **Economic loss doctrine**

In Massachusetts, purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.

**[25]**    **Fraud** 🔑 **Injury and causation**

Under Massachusetts law, the economic loss rule does not apply to pecuniary loss incurred as a result of an actionable misrepresentation.

**[26]**    **Products Liability** 🔑 **Economic losses; damage to product itself**

Under Massachusetts law, exception to economic loss rule extends to intentional misrepresentation claims regarding the quality of products made in a commercial setting to induce the purchase of products where the product is subject to certain warranties.

**[27]**    **Fraud** 🔑 **Elements of Actual Fraud**

Under Massachusetts law, to state a claim for intentional or fraudulent misrepresentation, the plaintiff must allege that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.

**[28]**    **Fraud** 🔑 **Injury and causation**

Intentional misrepresentation exception to Massachusetts economic loss rule applied to consumers' claim against vehicle distributor for allegedly concealing inflator defect in vehicles' airbags that contained ammonium nitrate as a propellant; consumers alleged that distributor had knowledge of risks posed by

installing defective airbags in its vehicles, that distributor had duty to disclose inflator defector, that distributor made material misstatements regarding safety of its vehicles, and that but-for the omissions of the defect, consumers would not have purchased their vehicles form distributor or would not have paid as much for them as they did.

**[29]    Fraud** 👈 **Injury and causation**

Consumers' fraud claim against vehicle distributor which sold them vehicles with purportedly defective airbags was barred by South Carolina's economic loss doctrine, and thus consumers could not recover damages for purely economic losses that did not extend beyond vehicles themselves.

**[30]    Torts** 👈 **Duty and breach thereof in general**

Under Ohio law, when a duty in tort exists, a party may recover in tort.

**[31]    Fraud** 👈 **Persons entitled to sue**

Privity is not required to plead a fraud-based claim under Ohio law.

**[32]    Fraud** 👈 **Fiduciary or confidential relations**

Under Ohio law, a duty arises in business transactions only where: (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.

**[33]    Fraud** 👈 **Injury and causation**

Under Ohio law, economic loss rule did not bar consumers' fraud-based claims against vehicle distributor that sold them vehicles with purportedly defective airbags that contained ammonium nitrate as a propellant; consumers

sufficiently alleged that distributor had a duty to disclose airbag defect because it had superior knowledge and access to facts that were not known to or reasonably discoverable by consumers, and which distributor intentionally concealed from consumers, all the while making incomplete representations about the safety and reliability of their vehicles.

**[34]    Federal Courts** 👈 **Class actions**

Federal class action rule did not alter substantive rights and obligations under deceptive trade practices statutes in Arkansas, Alabama, and South Carolina, and thus class action rule, rather than prohibition on class claims in state statutes, applied under federal Rules Enabling Act to consumers' class action against vehicle distributor, for economic loss related to purportedly defective airbags installed in vehicles; distributor was obligated to comply with state statutes by making accurate representations, consumers had substantive right to purchase vehicles that complied with representations, consumers were entitled to seek redress under state statutes, and class action rule allowed consumers to bring one action instead of separate actions.

**[35]    Antitrust and Trade Regulation** 👈 **Motor vehicles**

Consumers sufficiently alleged that they purchased or leased their vehicles from distributor for personal, family, and household use, as required to satisfy "personal purpose" requirement to bring class action claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act against distributor for selling them vehicles that contained purportedly defective airbags.

**[36]    Antitrust and Trade Regulation** 👈 **Injunction**

**Antitrust and Trade Regulation** 👈 **Monetary Relief; Damages**

**Antitrust and Trade Regulation** 👉 **Attorney fees**

Consumers could seek restitution and injunctive relief against vehicle distributor under California's Unfair Competition Law (UCL) for selling them vehicles with purportedly defective airbags, but could not obtain damages or attorney's fees. 🚩 Cal. Bus. & Prof. Code § 17203.

**[37]** **Antitrust and Trade Regulation** 👉 **Grounds, Subjects, and Scope of Relief**

Relief under Georgia's Uniform Deceptive Trade Practices Act is limited to an injunction. Ga. Code Ann. § 10-1-373(a).

**[38]** **Antitrust and Trade Regulation** 👉 **Monetary Relief; Damages**

A plaintiff cannot seek damages under Illinois's Uniform Deceptive Trade Practices Act. 815 Ill. Comp. Stat. Ann. 510/3.

**[39]** **Antitrust and Trade Regulation** 👉 **Particular cases**

**Antitrust and Trade Regulation** 👉 **Particular cases**

**Antitrust and Trade Regulation** 👉 **Attorney fees**

Consumers could pursue claims for injunctive relief and attorney's fees against vehicle distributor, which sold vehicles with purportedly defective airbags, under Georgia and Illinois Deceptive Trade Practices Act, but could not pursue claims for damages. Ga. Code Ann. § 10-1-373(a); 815 Ill. Comp. Stat. Ann. 510/3.

**[40]** **Implied and Constructive Contracts** 👉 **Unjust enrichment**

Consumers who purchased vehicles with allegedly defective airbags that contained ammonium nitrate as a propellant could bring state-law unjust enrichment claims against vehicle distributor only if they conferred a benefit on distributer by purchasing their vehicles directly from one of its dealerships, but could not bring unjust enrichment claims against distributor if they did not purchase their vehicles from a dealership.

**[41]** **Implied and Constructive Contracts** 👉 **Unjust enrichment**

To state a claim for unjust enrichment under Maryland law, a plaintiff must prove: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention of the benefit by the defendant of the benefit under such circumstances as to make it inequitable for the defendants to retain the benefit without payment of its value.

**[42]** **Implied and Constructive Contracts** 👉 **Declaration, complaint, or petition**

Under New Jersey law, when a plaintiff fails to allege a direct relationship, that plaintiff has failed to assert a claim for unjust enrichment, and under those circumstances, dismissal is appropriate.

**[43]** **Implied and Constructive Contracts** 👉 **Unjust enrichment**

To state a claim for unjust enrichment under North Carolina law, a plaintiff must allege that he or she conferred a benefit on the other party that is measurable and not gratuitous.

**[44]** **Implied and Constructive Contracts** 👉 **Unjust enrichment**

Consumers who purchased vehicles with allegedly defective airbags that contained ammonium nitrate as a propellant sufficiently alleged that they did not have an adequate remedy at law, as required to bring state-law unjust enrichment claims against vehicle distributor; consumers alleged that all applicable warranties were procedurally and

substantively unconscionable and were therefore not enforceable.

**[45]    Implied and Constructive Contracts** 🔑 **Effect of Express Contract**

It is only upon a showing that an express contract exists between the parties that the unjust enrichment count fails.

**[46]    Implied and Constructive Contracts** 🔑 **Restitution**

Under California law, restitution is required only if the circumstances are such that, as between two persons, it is unjust for the recipient of a benefit to retain it.

**[47]    Implied and Constructive Contracts** 🔑 **Unjust enrichment**

**Implied and Constructive Contracts** 🔑 **Restitution**

Under Texas law, overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment.

**[48]    Federal Civil Procedure** 🔑 **Fact issues**

District court would decline to dismiss consumers' nationwide-class common-law negligence claim against vehicle distributor that sold them vehicles with purportedly defective airbags for lack of causation based on fact that airbag manufacturer entered into a court-approved criminal plea agreement, since the contents of the plea agreement were heavily disputed.

**[49]    Products Liability** 🔑 **Economic losses; damage to product itself**

Mississippi bars negligence claims under the economic loss doctrine if the only damage sustained was to the product.

**[50]    Antitrust and Trade Regulation** 🔑 **Private entities or individuals**

**Federal Civil Procedure** 🔑 **Consumers, purchasers, borrowers, and debtors**

Named-plaintiffs in nationwide products liability class action against vehicle distributor that sold vehicles with purportedly defective airbags lacked standing to represent putative class members of states for which there were no breach of implied warranty claims asserted, and thus could not pursue a nationwide-class claim under the Magnuson-Moss Warranty Act (MMWA), since implied warranty claims under MMWA arose out of and were defined by state law. Magnuson-Moss Warranty--Federal Trade Commission Improvement Act, § 101 et seq., 15 U.S.C.A. § 2301 et seq.

**[51]    Limitation of Actions** 🔑 **Concealment of Cause of Action**

Fraudulent concealment tolling applied to consumers statewide-class breach of implied warranty claims against vehicle distributor that sold them vehicles with purportedly defective airbags, in Arkansas, California, Michigan, Mississippi, Missouri, New Jersey, Pennsylvania, Texas, Maryland, and North Carolina; consumers asserted numerous allegations detailing distributor's knowledge of the risks posed by airbags installed in its vehicles, distributor's alleged failure to fully investigate or disclose seriousness of issue to consumers or regulatory authorities, and their continued selling and leasing of vehicles installed with defective airbags.

**[52]    Products Liability** 🔑 **Proximate Cause**

**Products Liability** 🔑 **Seat belts and occupant restraint systems**

To prevail on claim that defendant, in its capacity as purchaser of assets of bankrupt car manufacturer, was liable to consumers, who purchased vehicles with purportedly defective airbags, for post-closing wrongful conduct, consumers would have to prove that defendant's

post-closing conduct was a proximate cause of their economic losses.

**ORDER GRANTING IN PART AND DENYING IN PART FCA US LLC'S MOTION TO DISMISS**

FEDERICO A. MORENO, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

**\*1** This multidistrict litigation consolidates allegations of economic loss and personal injury related to airbags manufactured by former-defendants Takata Corporation and TK Holdings (collectively, "Takata") and equipped in vehicles distributed by FCA US LLC. The allegations are that FCA's vehicles were equipped with Takata airbags containing the chemical ammonium nitrate, which creates a small explosion to inflate the airbags during a crash. Plaintiffs, who are consumers of FCA's vehicles, contend that when exposed to high heat and humidity, the explosion is much more forceful and can cause significant injuries and even death.

The crux of Plaintiffs' legal claims is that FCA knew or should have known of the Takata inflator defect prior to installing the Takata airbags in their vehicles, and that FCA concealed from, or failed to notify, the Plaintiffs and the general public of the full and complete nature of the inflator defect. Plaintiffs allege that as a result of FCA's concealment, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did.

FCA vigorously contests the sufficiency of the allegations supporting the myriad of claims remaining in the 46-count Complaint. The Court has thoroughly reviewed the allegations in the Complaint and the arguments in the parties' moving papers. This Order resolves all remaining claims asserted by the Consumer Plaintiffs against FCA.

For the reasons explained below, FCA's Motion to Dismiss **(D.E. 2983)** is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina (Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- **\*2** • The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia, Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

## II. LEGAL STANDARD

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). Although legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. Id. at 679, 129 S.Ct. 1937. Detailed factual allegations are not required, but the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted). The factual

allegations must be enough to "raise a right to relief above the speculative level." Id. (citations omitted).

[1] [2] Where a cause of action sounds in fraud, the allegations in the complaint must satisfy the particularity pleading requirement of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake"; although "conditions of a person's mind," such as malice, intent, and knowledge may be alleged generally. Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1380–81 (11th Cir. 1997) (per curiam) (citation omitted). In other words, a plaintiff is required to plead the "who, what, when, where, and how" pertaining to the underlying fraud. See Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). The purpose of particularity pleading is to alert the defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior. See Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (citation omitted).

**\*3** Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiffs and accept well-pleaded facts as true. See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 954 (11th Cir. 1986).

## III. DISCUSSION

In a previous order, the Court resolved FCA's personal jurisdiction challenge and ruled on the sufficiency of the allegations supporting the Racketeer Influenced and Corrupt Organizations Act claims. See In re Takata Airbag Prods. Liab. Litig., 396 F. Supp. 3d 1101 (S.D. Fla. 2019). After thoroughly reviewing the Complaint and the moving papers, the Court dismissed the RICO claims (Counts 2 and 3), and the "Direct-File Action" in its entirety for lack of personal jurisdiction.

The Court will now resolve FCA's challenges to the claims remaining in the 46-count Complaint, which includes: a nationwide-class claim under the Magnuson-Moss Warranty Act (Count 1); nationwide-class common-law claims for fraud, unjust enrichment, and negligence (Counts 4–6); and statewide-class claims alleging breach of implied warranty and violations of various state unfair and deceptive trade practices statutes (Counts 7–46). Before addressing the sufficiency of the allegations, the Court will determine the substantive law governing the claims of each named-Plaintiff.

## A. UNDERLINE APPLICABLE LAW

[3] Questions of federal law in cases transferred under 28 U.S.C. Section 1407 are governed by the clearly settled law of the transferee court's circuit. *See In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1336 (S.D. Fla. 2001) (citing *Murphy v. F.D.I.C.*, 208 F.3d 959, 966 (11th Cir. 2000) ("Since the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit.") (citing *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (ruling, in the context of a Section 1407(a) transfer, that "[b]inding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit"))).

[4]  [5] Questions arising under state law are generally governed by the substantive state law dictated by the choice of law rules of the federal court's state. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). But in cases transferred under Section 1407, the transferee court must apply the substantive state law dictated by the choice of law rules of the transferor court's state. *See In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1332 (S.D. Fla. 2016) (quoting *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1296 (S.D. Fla. 2003)).

## B. CHOICE-OF-LAW ANALYSIS

The Complaint consolidates the Plaintiffs and the claims that were filed in the *Dwinnells* Complaint in the Eastern District of Michigan and later transferred to this Court by the Judicial Panel on Multidistrict Litigation, with the claims of Plaintiff Victor Khoury, the only plaintiff to file his claims directly in this MDL proceeding. *See In re Takata Airbag Prods. Liab. Litig.*, 379 F. Supp. 3d 1333, 1336–37 (S.D. Fla. 2019) (summarizing procedural and substantive background of the *Dwinnells* Complaint). The claims asserted by Khoury were previously dismissed in their entirety, thus obviating any choice of law analysis here. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1169 & n.17.

**\*4** [6]  [7]  [8] For the remaining named-Plaintiffs, the Court will now apply Michigan choice of law rules, which recognize a presumption in favor of *lex fori* and apply Michigan law "unless a 'rational reason' to do otherwise exists." *Std. Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013) (quoting *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562 N.W. 2d 466, 471 (1997)). In determining whether there is a rational reason to displace Michigan law, the Court must undertake a two-step analysis. *Sutherland*, 562 N.W. 2d at 471. First, the Court "must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* On the other hand, if a foreign state does have an interest in having its law applied, the Court "must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* (citing *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W. 2d 292, 304–05 (1987)).

[9] As in the *Whitaker* Order, the Court finds that for the named-Plaintiffs that purchased or leased their vehicle in their state of residence, there is a "rational reason" to depart from applying Michigan substantive law. (D.E. 3838 at 7–8 (the "*Whitaker*" Order") (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at \*5 (S.D. Fla. Sept. 21, 2016); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 6072406, at \*6 (S.D. Fla. Oct. 14, 2016)).) Accordingly, substantive law applies to these named-Plaintiffs as follows: **Arizona** law to Laurie Reynolds; **Arkansas** law to Cathy Parker and Bobbie Simmons; **California** law to Rushelle Gonder, Pedro Lucero, and Ronaldo Maldia; **Georgia** law to Michelle Gibson and Debrah Johnson; **Illinois** law to John Fuesting and Priscilla Fuesting; **Maryland** law to Daniel Dwinnells; **Massachusetts** law to Carla Campagnone; **Michigan** law to Deborah Hillyer and Dave Krzeminski; **Mississippi** law to Arlen Sturgis; **Missouri** law to Jason

Williams; **New Jersey** law to Gene Marsilio; **New York** law to Rmzy Abdallah; **North Carolina** law to Laquintha O'Neal and Terrie Swanson; **Ohio** law to Victoria Lykins and Reginald Price; **Pennsylvania** law to Marcia Griffith; **South Carolina** law to T'Keya Cooper, Jamelle Lowery, and Michael McClellion; and **Texas** law to Bridget Boyd and Shanna Moore.

**[10]** Also like the *Whitaker* Order, the Court finds that Michigan substantive law applies to the named-Plaintiffs that purchased or leased their vehicle in a state where they do not live. (*See* D.E. 3838 at 8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 6072406, at *6).) These named-Plaintiffs include: Michael Eikenberry, Kenneth Fischer, Randy Nielsen, and Elizabeth Washington.

Based on this choice-of-law analysis, certain claims must be dismissed. Because the substantive laws of Alabama, Florida, and Indiana do not apply to any named-Plaintiffs, the statutory claims arising under the laws of these states (Counts 7, 16, and 21–22) are **DISMISSED** in full; as are the common law claims (Counts 4–6) to the extent they are asserted under the laws of these states. By extension, all these counts are also **DISMISSED** as to all putative class members with these claims. *See Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000)).

Even though FCA attacks these claims with several arguments, for sake of brevity and clarity, the Court will not specifically elsewhere reference these claims or FCA's corresponding arguments elsewhere in this Order. For the same reasons, the Court also will not reference these claims in the conclusion sections of each heading. Where applicable, however, the Court refers to these dismissals as the "choice-of-law dismissals."

**\*5** Having determined the substantive law that governs the claims of each named-Plaintiff, the Court will now address the sufficiency of Plaintiffs' allegations. The Court will begin by reviewing the fraud-based claims (common law and statutory), and then evaluate the remaining common law claims (negligence and unjust enrichment). Next, the Court will analyze the nationwide-class Magnuson-Moss Warranty Act claim and the statewide-class breach of implied warranty

claims. And finally, the Court will assess FCA's argument that the Sale Order bars all claims by certain named-Plaintiffs.

## C. NATIONWIDE-CLASS COMMON-LAW FRAUD AND STATEWIDE-CLASS STATUTORY CONSUMER PROTECTION CLAIMS

Plaintiffs assert a nationwide-class common-law fraud claim (Count 4) and numerous statewide-class statutory consumer protection claims (Counts 7–9, 12–14, 16–21, 24–25, 27, 30–32, 34–35, 37, 39–40, 42–43, and 45). The Court will first address the arguments common to both types of "fraud-based" claims, and then address claim-specific arguments. For ease of reference, the Court refers to the common-law fraud and statutory consumer protection claims as "fraud-based" claims; this term accurately describes the claims and is consistent with the *Puhalla* and *Whitaker* Orders. (*See In re Takata Airbag Prods. Liab. Litig.*, ––– F. Supp. 3d ––––, 2020 WL 2764196, at *6 (S.D. Fla. May 27, 2020) ("*Puhalla* Order"); D.E. 3838 at 10.)

### 1. Common Challenges

FCA argues that all fraud-based claims should be dismissed because Plaintiffs fail to adequately allege: (1) that FCA had actual knowledge of the alleged inflator defect; (2) that FCA made material misrepresentations or omissions; and (3) that Plaintiffs relied on any of FCA's material misrepresentations or omissions. FCA also urges that certain fraud-based claims are either time-barred, barred by the economic loss rule, or fail for lack of privity. The Court addresses each argument in turn.

#### a) Knowledge of Inflator Defect

**[11]** First, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to allege that FCA had actual knowledge of the inflator defect. Notably, "knowledge may be alleged generally." *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1118 (quoting Fed. R. Civ. P. 9(b)). And after closely reviewing the allegations in the Complaint, the Court found in a previous order that Plaintiffs sufficiently alleged that FCA had knowledge of the risks posed by installing Takata airbags in their vehicles. *See id.* at 1159.[1] Accordingly, the Court declines to dismiss the fraud-based claims on this basis.

#### b) **Omissions and Misstatements**

Second, FCA argues that all fraud-based claims must be dismissed because Plaintiffs do not adequately allege that FCA either failed to disclose the Takata inflator defect, or made any actionable misstatements about the safety of its vehicles. Plaintiffs maintain that FCA breached a duty owed to the Plaintiffs by failing to fully inform them about the nature of the Takata inflator defect. Plaintiffs also contend that FCA made actionable misstatements by falsely touting the safety of their vehicles.

In the *Puhalla* and *Whitaker* Orders, the Court resolved a similar challenge brought by Mercedes, Audi, Volkswagen, and General Motors. Looking to prior rulings in this case, the Court explained that, by definition, Plaintiffs cannot point to one particular statement because an *omission* is a non-statement. (*See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at *7 (citing *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1337–38); D.E. 3838 at 11 (citing same).) After reviewing those plaintiffs' allegations, the Court found that they sufficiently alleged that Mercedes, Audi, Volkswagen, and General Motors had a duty to disclose the inflator defect, and thus declined to dismiss any of those plaintiffs' claims. *See id.*

**\*6** **[12]** Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here also allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See* D.E. 2758 at ¶¶ 235(a)–(c).) Therefore, for the reasons explained in the *Puhalla* and *Whitaker* Orders, and as the Court has throughout this litigation on similar allegations, the Court declines to dismiss any fraud-based claims on this ground.

**[13]** As for FCA's "puffery" argument, the Court explained in the *Puhalla* and *Whitaker* Orders that "[a]lthough marketing materials about safety features may be construed as puffery when viewed in isolation, such marketing can 'cross the line from mere puffery to active misrepresentations' when statements about safety are read next to allegations that an automotive manufacturer had actual knowledge of the alleged safety defect." (*See In re Takata Airbag Prods. Liab. Litig.*,

—— F. Supp. 3d ——, 2020 WL 2764196, at *8 (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 457 (S.D.N.Y. 2017); citing *see also In re Toyota Motor Corp.*, No. 8:10ML 02151 JVS (FMOx), 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012) ("Advertising a car as safe and reliable when it actually has a safety-related defect that may render it unable to stop is not 'within the tolerable range of commercial puffery,' especially because Toyota allegedly had exclusive knowledge of the SUA defect.")); D.E. 3838 at 14 (citing same).)

Like the plaintiffs in *Puhalla* and *Whitaker*, Plaintiffs here allege that FCA distributed marketing materials that touted FCA's commitment to vehicle safety. (*See* D.E. 2758 at ¶¶ 127(a)–(h).) Among other examples, Plaintiffs allege that FCA: (1) promoted two vehicle models as receiving an Insurance Institute for Highway Safety "top safety pick" (both models later subject to recalls for the inflator defect); (2) published a press release touting that two vehicle models had achieved 5-star safety ratings from the National Highway Traffic Safety Administration (both models later subject to recalls for the inflator defect); and (3) published brochures for four vehicle models that specifically promoted the vehicles' airbag features (each model later subject to recalls for the inflator defect). *See id.* at ¶¶ 73, 127(c)–(h). Plaintiffs also allege that, through these promotions, FCA "continuously maintained that Chrysler-branded vehicles were safe and reliable," yet "uniformly concealed the Inflator Defect"— which was "material to decisions to purchase or lease Class Vehicles." *Id.* at ¶ 126. And as discussed above, Plaintiffs sufficiently allege that FCA had actual knowledge of the inflator defect. *See supra* Sec.III.C.1.a; *see also In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1159. Taken together, the Court finds that Plaintiffs sufficiently allege that the promotion of vehicle safety in FCA's marketing materials crosses the line from mere "puffery" to active misrepresentation.

So, in addition to the duty to disclose, the Court also finds that Plaintiffs' allegations of material misstatements—*i.e.* that FCA continued to promote the safety of their vehicles despite having actual knowledge of the inflator defect—are sufficient to survive the Motion to Dismiss. Of course, at summary judgment or trial, FCA can present evidence to disprove these allegations. But for now, the claims survive dismissal.

In re Takata Airbag Products Liability Litigation, --- F.Supp.3d ---- (2020)

2020 WL 2892366

### c) Reliance

**\*7**  **[14]**  Third, FCA argues that all fraud-based claims must be dismissed because Plaintiffs fail to adequately allege reliance on any statements made by FCA. In the *Puhalla* Order, this Court rejected the same argument and ruled that the plaintiffs sufficiently alleged reliance against Mercedes, Audi, and Volkswagen. *See In re Takata Airbag Prods. Liab. Litig.*, —— F. Supp. 3d ——, 2020 WL 2764196, at \*8–9 (citing *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009, 2017 WL 2406711, at \*6 (S.D. Fla. June 1, 2017) (ruling same as to allegations against Takata); *In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5844872, at \*3–4 (ruling same as to allegations against Subaru)).

Like many of the plaintiffs before them, Plaintiffs here allege that they "were unaware of ... omitted material facts," "would not have acted as they did if they had known of the concealed or suppressed facts," and that "[h]ad they been aware of the Defective Airbags ... [they] either would not have paid as much for their Class Vehicles, or they would not have purchased or leased them at all." (D.E. 2758 ¶¶ 240–41.) Once more, these allegations sufficiently plead reliance. Accordingly, the Court will not dismiss any fraud-based claims on this ground.

### d) Time Bars

Fourth, FCA argues that fraud-based claims under the laws of Arizona, Georgia, Ohio, and Texas are barred by the statute of limitations. Plaintiffs disagree.

#### (1) Discovery Rule (Arizona)

To start, the statute of limitations for a claim under the Arizona Consumer Fraud Act is "within one year after the cause of action accrues." Ariz. Rev. Stat. Ann. § 12-541(5). FCA argues that Plaintiff Laurie Reynolds' fraud-based claims under Arizona law, filed on March 14, 2018, [2] are barred by the one-year statute of limitations because a recall for her vehicle was announced on December 9, 2016 and thus her claim expired one year later on December 9, 2017.

**[15]**  **[16]**  **[17]**  Although Arizona does not recognize fraudulent concealment tolling, under Arizona's discovery rule, the statute of limitations for a claim under the Arizona Consumer Fraud Act begins running "when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 892 P.2d 1375, 1379 (1994) (quoting *Mister Donut of Am., Inc. v. Harris*, 150 Ariz. 321, 723 P.2d 670, 672 (1986) (*en banc*)). "When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." *Schellenbach v. GoDaddy.com LLC*, No. CV-16-00746-PHX-DGC, 2017 WL 192920, at \*4 (D. Ariz. Jan. 18, 2017) (quoting *Doe v. Roe*, 191 Ariz. 313, 955 P.2d 951, 961 (1998) (*en banc*); citing *Walk v. Ring*, 202 Ariz. 310, 44 P.3d 990, 996 (2002) (*en banc*); *Alaface*, 892 P.2d at 1379). "The jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action." *Schellenbach*, 2017 WL 192920, at \*4 (quoting *Doe*, 955 P.2d at 962).

**[18]**  **[19]**  Even though the statute of limitations is an affirmative defense that is properly raised in a motion to dismiss, where it appears from the face of the complaint that the claim is barred, "the motion should not be granted 'unless it appears certain plaintiff will not be entitled to relief under any set of facts susceptible of proof under the claims stated.' " *Id.* (quoting *Anson v. Am. Motors Corp.*, 155 Ariz. 420, 747 P.2d 581, 582 (Ariz. Ct. App. 1987)). As, indeed, the statute of limitations defense "is never favored" by courts. *Id.* (quoting *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 898 P.2d 964, 968 (1995)).

**\*8**  **[20]**  Aside from summarily asserting the date the recall was announced and the date Reynolds's claim should have expired, FCA advances no argument regarding when Reynolds actually received notice of the recall. And, as Plaintiffs contend, "though the relevant recall was *announced* on December 9, 2016, it does not follow as a matter of law that Plaintiff Reynolds received notice on that date." (D.E. 3034 at 136 (emphasis in original).) The Court agrees with Plaintiffs on this point, and FCA cites no legal authority ruling otherwise. Therefore, the Court declines to dismiss at this time Reynolds's Arizona Consumer Fraud Act claim on statute of limitations grounds. At summary judgment or trial, though, FCA may renew its argument and present evidence

In re Takata Airbag Products Liability Litigation, --- F.Supp.3d ---- (2020)

2020 WL 2892366

showing when Reynolds was put on notice of her fraud-based claims.

**[21]**  FCA also argues that the statute of limitations bars Reynolds's common law fraud claim. The Court disagrees here as well. Under FCA's theory, Reynolds's fraud claim accrued on December 9, 2016, when a recall was announced for her vehicle. But the statute of limitations for a common law fraud claim in Arizona is "within three years after the cause of action accrues." Ariz. Rev. Stat. Ann. § 12-543(3). So, even under FCA's theory, Reynolds's common law fraud claim, filed on March 14, 2018, was filed within the statute of limitations period (which would have expired on December 9, 2019). Thus, the Court also declines to dismiss Reynolds's fraud claim on statute of limitations grounds.

### (2) Fraudulent Concealment
### Tolling (Georgia, Ohio, and Texas)

**[22]**  As for the states that remain, this Court has recognized that fraudulent concealment tolling applies in Ohio and Texas. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *25 (ruling the plaintiffs invoked fraudulent concealment tolling under Texas law)

(citing *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W. 2d 746, 750 (Tex. 1999)); *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *13 (ruling same under Ohio law). And Georgia also recognizes fraudulent concealment tolling. *See Daniel v. Amicalola Elec. Membership Corp.*, 289 Ga. 437, 711 S.E.2d 709, 716 (2011)

(citing *Jim Walter Corp. v. Ward*, 245 Ga. 355, 265 S.E. 2d 7 (1980); *McElmurray v. Augusta–Richmond County*, 274 Ga.App. 605, 618 S.E. 2d 59, 68 (2005)).

For the reasons fully explained in the *Puhalla* and *Whitaker* Orders, and other previous orders, the Court finds that Plaintiffs' allegations, taken as true and viewed in the light most favorable to them, sufficiently invoke fraudulent concealment tolling under the laws of Georgia, Ohio, and Texas.

### e) Economic Loss Bars

Fifth, FCA argues that certain statutory and common law fraud claims are barred by the economic loss rule because Plaintiffs only seek to recover economic loss damages.

Plaintiffs urge that several states recognize a fraud exception to the economic loss rule, and thus their statutory and common law fraud-based claims can proceed under the laws of these states.

### (1) Statutory Consumer Protection Claims

In the *Puhalla* and *Whitaker* Orders, the Court resolved economic loss challenges under North Carolina's Unfair or Deceptive Trade Practices Act and Pennsylvania's Unfair Trade Practices and Consumer Protection Law. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *9–10; D.E. 3838 at 18–19.) For the same reasons explained in those Orders, the claim under North Carolina's Unfair or Deceptive Trade Practices Act (Count 37) is not barred by the economic loss rule and will proceed to summary judgment; but the claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count 40) is barred by the economic loss rule, and is accordingly **DISMISSED**.

### (2) Common Law Claims

Turning to the common law claims, FCA argues that the economic loss rule bars fraud claims under the laws of Arizona, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, and South Carolina. Plaintiffs respond that all these states recognize a fraud exception to the economic loss rule—with the lone of exception of Mississippi, and thus, Count 4 is **DISMISSED** as to Arlen Sturgis, the lone named-Plaintiff with a Mississippi fraud claim.

**\*9 [23]**  In the *Puhalla* Order, the Court found that Arizona, Michigan, New Jersey, New York, and Ohio all recognize a fraud exception to the economic loss rule, and then ruled that the plaintiffs' fraudulent concealment [3] allegations sufficiently invoked the fraud exception in these states. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *10 (citing *Martin v. Weed Inc.*, No. CV-18-00027-TUC-RM, 2018 WL 2431837, at *6–7 (D. Ariz. May 30, 2018) (applying fraud exception to economic loss rule under Arizona law); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich.App. 365, 532 N.W. 2d 541, 545 (2001) (same under Michigan law); *G & F Graphic Services, Inc. v. Graphic Innovators, Inc.*, 18 F.

Supp. 3d 583, 593 (D.N.J. 2014) (same under New Jersey law); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 432–33 (same under New York law) (collecting cases); *Agilysys, Inc. v. Gordon*, No. 1:06 CV 1665, 2008 WL 11377731, at *6–7 (N.D. Ohio Jan. 11, 2008) (same under Ohio law) (collecting cases)).) And in an earlier order, the Court found and ruled the same under Missouri law because, "similar to the reasoning applied under Michigan law," the fraudulent concealment claim was "independent of any contract." *See In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *8.

For the same reasons explained in those orders, the Court finds that Plaintiffs' allegations sufficiently invoke the fraud exception to the economic loss rule in Arizona, Michigan, Missouri, New Jersey, New York, and Ohio. The Court will now address Massachusetts and South Carolina, the only states not previously addressed.

### (i) Massachusetts

**[24]** **[25]** In Massachusetts, "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.*, 415 Mass. 393, 613 N.E. 2d 867, 903 (1993). But the economic loss rule "does not apply to 'pecuniary loss incurred as a result of an actionable misrepresentation.' " *Passatempo v. McMenimen*, 461 Mass. 279, 960 N.E. 2d 275, 294 (2012) (quoting *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 45 Mass.App.Ct. 15, 694 N.E. 2d 401, 405 n.1 (1998)); *see also Arthur D. Little Intern., Inc. v. Dooyang Corp.*, 928 F. Supp. 1189, 1205 (D. Mass. 1996) ("The economic loss rule does not apply to harm caused by intentional misrepresentations.") (citing *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 998 (1st Cir. 1992) (noting economic loss rule does not preclude recovery for intentional torts)).

**[26]** This rule extends to intentional misrepresentation claims regarding the quality of products made in a commercial setting to induce the purchase of products where the product is subject to certain warranties. *See Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 239, 260 (D. Mass. 2014) (ruling economic loss rule did not bar intentional misrepresentation claim) (citing *Passatempo*,

960 N.E. 2d at 295; *Canal Elec. Co.*, 973 F.2d at 998). Although FCA points to a ruling by the Superior Court of Massachusetts that a plaintiff could not recover "under her fraud claim because it [was] barred by the economic loss rule," *Costa v. Del La Femina*, No. 20053536, 2006 WL 3201070, at *10 (Mass. Super. Ct. Oct. 17, 2006), the Court finds that *Costa* runs against the weight of authority interpreting Massachusetts law, which recognizes an intentional misrepresentation exception to the economic loss rule.

***10** **[27]** To state a claim for intentional or fraudulent misrepresentation, the plaintiff must allege that the defendant "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage." *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 772 N.E. 2d 1054, 1066 (2002).

**[28]** Here, like their predecessor plaintiffs, Plaintiffs allege: that FCA had knowledge of the risks posed by installing Takata airbags in its vehicles; that FCA had a duty to disclose the inflator defect; that FCA made material misstatements regarding the safety of its vehicles; and that but-for the omissions of the inflator defect, Plaintiffs would not have purchased their vehicles or would not have paid as much for them as they did. *See supra* Sec.III.C.1.a–c. Based on these allegations, the Court finds that Plaintiffs sufficiently invoke the intentional misrepresentation exception to the Massachusetts economic loss rule.

### (ii) South Carolina

Although the Court has not previously addressed whether a fraud claim is barred by South Carolina's economic loss rule, earlier in this case, the Court dismissed a negligence claim as barred by the economic loss rule under *Sapp v. Ford Motor Co.*, 386 S.C. 143, 687 S.E. 2d 47 (2009). *See In re Takata Airbag Prods. Liab. Litig.*, No. 14-24009-CV, 2016 WL 5848843, at *8. In *Sapp*, the controlling economic loss case in South Carolina, the Supreme Court of South Carolina clarified the scope of the economic loss rule and explained that the court did not intend, through its previous rulings, for "the exception to the economic loss rule to be applied well beyond the scope of real estate construction in[to] an

In re Takata Airbag Products Liability Litigation, --- F.Supp.3d ---- (2020)
2020 WL 2892366

ordinary products liability claim." *at 150, 687 S.E.2d 47.* In short, the Supreme Court of South Carolina explained that "when personal injury or other property damage occurs, a tort remedy may be appropriate." *Id. at 147, 687 S.E.2d 47.*

**[29]** Applying the law to the facts there, the Supreme Court of South Carolina affirmed summary judgment for Ford on the plaintiff's tort claims—which included a fraud/misrepresentation claim based on the theory that Ford knew about a design defect in the cruise control switch, which would short circuit and cause a fire in the engine compartment, *id. at 146, 687 S.E.2d 47*—because "[t]he only damage caused by the defect in the trucks was damage to the trucks themselves—purely an economic loss." *Id. at 150, 687 S.E.2d 47.*

In view of the Supreme Court of South Carolina's careful analysis in *Sapp,* which limited the application of the economic loss rule,[4] and consistent with the Court's previous ruling regarding negligence claims under South Carolina law, the Court finds that South Carolina does not recognize a fraud exception to the economic loss rule. Consequently, Count 4 is **DISMISSED** as to Plaintiffs T'Keya Cooper, Jamelle Lowery, and Michael McClellion, whose fraud claims are governed under South Carolina law.

### f) Privity (Ohio)

**\*11** Finally, FCA argues in a footnote that the fraud-based claims under Ohio law must be dismissed because there is no privity between FCA and Plaintiffs Victoria Lykins and Reginald Price. (D.E. 2983 at 56 n.26 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.,* 835 N.E. 2d 701, 703 (Ohio 2005)).)

**[30]** **[31]** It appears that FCA stretches *Corporex* too far. In *Corporex,* the Supreme Court of Ohio explained that liability can be "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity." *835 N.E. 2d at 705* (quoting *Haddon View Inv. Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 436 N.E. 2d 212, 215 (1982)). The Supreme Court of Ohio further explained that "*[i]n addition to* generally recognized duties in tort ... privity or a sufficient nexus that could serve as a substitute for privity may impose only those contractual duties and liability for breach of those duties

agreed to by the parties to the contract, and no more." *Id.* It is clear, though, that "[w]hen a duty in tort exists, a party may recover in tort." *Id.* Thus, privity is not required to plead a fraud-based claim under Ohio law.

Since *Corporex,* Ohio courts have continued to recognize that fraud claims do not require privity. *See Clemens v. Nelson Fin. Grp., Inc.,* No. 14AP-537, 2015 WL 1432604, *8 (Ohio Ct. App. 2015)* ("Although the economic-loss rule sweeps widely, it does not preclude all tort claims for economic damages. A plaintiff may pursue such a tort claim if it is 'based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity.' ") (quoting *Corporex, 835 N.E. 2d at 705*); *Campbell v. Krupp,* 195 Ohio App.3d 573, 961 N.E. 2d 205, 213 (2011) ("[T]here is no question that privity is not required to assert a claim of common law fraud, out of a concern that an innocent party should not suffer at the hands of an intentional wrongdoer.") (quoting *Haddon View Inv. Co.,* 436 N.E. 2d at 215).

**[32]** Under Ohio law, a duty arises in business transactions only where: (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. *Gator Dev. Corp. v. VHH, Ltd.,* No. C-080193, 2009 WL 1027584, at *6 (Ohio Ct. App. 2009)* (citing *Blon v. Bank One, Akron, N.A.,* 35 Ohio St.3d 98, 519 N.E. 2d 363, 367 (1988)).

**[33]** Here, as discussed above, Plaintiffs sufficiently allege that FCA had a duty to disclose the inflator defect because it had exclusive and/or far superior knowledge and access to facts that were not known to or reasonably discoverable by Plaintiffs, and which FCA intentionally concealed from Plaintiffs, all the while making incomplete representations about the safety and reliability of their vehicles. (*See supra* Sec.III.C.1.a–c; *see also* D.E. 2758 at ¶¶ 235(a)–(c).) Thus, the Court finds that FCA had a duty to disclose under Ohio law. And because this duty is grounded in tort, the economic loss rule does not bar the fraud-based claims under Ohio law.

### 2. Specific Challenges to Statutory Consumer Protection Claims

Next, FCA advances three challenges specific to the statutory consumer protection claims. First, FCA argues that the claims under the laws of Arkansas and South Carolina must be dismissed because the consumer protection statutes of these states bar class actions. Second, FCA argues that the claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal purposes." And finally, FCA argues that the claims under the Uniform Deceptive Trade Practices Act of Georgia and Illinois, and California's Unfair Competition Law must be limited to injunctive relief.[5] Plaintiffs insist that none of these claims should be dismissed.

### a) <u>Class Action Bars</u>

**\*12**  **[34]**  First, FCA argues that the statutory consumer protection claims under the laws of Arkansas and South Carolina must be dismissed because the statutes of these states bar class action claims. As explained fully in the *Puhalla* Order, in the Eleventh Circuit, Rule 23 controls whether a plaintiff can assert a class action claim under a state statute that forbids class actions. *See In re Takata Airbag Prods. Liab. Litig.,* —— F. Supp. 3d ——, 2020 WL 2764196, at *11–12 (citing *Lisk v. Lumber One Wood Preserving, LLC,* 792 F.3d 1331, 1336 (11th Cir. 2015)). Following *Lisk,* the Court ruled that the plaintiffs could assert class action claims under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act (as well as under the Alabama Deceptive Trade Practices Act). *See id.* at *12 (citing *Lisk,* 792 F.3d at 1335–38 (ruling Rule 23 did not bar a class claim under the Alabama Deceptive Trade Practices Act); *In re Dealer Mgmt. Sys. Antitrust Litig.,* 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (ruling same under the Arkansas Deceptive Trade Practices Act and the South Carolina Unfair Trade Practices Act)). Consequently, the Court declines to dismiss these class action claims on this basis.

### b) <u>Failure to Allege "Personal Purposes"</u>

**[35]**  Second, FCA argues that the claims under the Michigan Consumer Protection Act and the Missouri Merchandising Practices Act should be dismissed because Plaintiffs fail to allege that they purchased their vehicles for "personal

purposes." (D.E. 2983 at 57 (citing *Zine v. Chrysler Corp.,* 236 Mich.App. 261, 600 N.W. 2d 384, 393 (1999); *Murphy v. Stonewall Kitchen, LLC,* 503 S.W. 3d 308, 311 (Mo. Ct. App. 2016)).)

Here, Plaintiffs allege in paragraph 28 of the Complaint that all Plaintiffs "purchased or leased their Class Vehicles primarily for personal, family, and household use." (*See* D.E. 2758 at ¶ 28.) Reviewing *Zine* and *Murphy,* the Court finds that this allegation is sufficient to satisfy the "personal purpose" requirement under Michigan and Missouri law. FCA does not press the argument in its Reply. Accordingly, the claims can proceed.

### c) <u>Injunctive Relief</u>

Finally, FCA argues that the claims under California's Unfair Competition Law (Count 12) and under the Uniform Deceptive Trade Practices Act of Georgia (Count 18) and Illinois (Count 20) must be limited to injunctive relief. Plaintiffs disagree.

### (1) <u>California's Unfair Competition Law</u>

**[36]**  Starting with California's Unfair Competition Law, the Court finds that Plaintiffs are correct that they can seek restitution and injunctive relief. (D.E. 3034 at 148 (citing *De La Torre v. CashCall, Inc.,* 236 Cal.Rptr.3d 353, 422 P.3d 1004, 1012 (2018)).) But read in full, the sentence from *De la Torre* that Plaintiffs cite makes clear that plaintiffs "cannot obtain damages or attorney fees" under California's Unfair Competition Law. *De La Torre,* 236 Cal.Rptr.3d 353, 422 P.3d at 1021 (citation omitted); *see also Valdez v. Seidner-Miller, Inc.,* 33 Cal.App.5th 600, 245 Cal. Rptr. 3d 268, 280 (2019) ("The UCL provides for injunctive relief, restitution, and civil penalties.") (citing *Bus. & Prof. Code, §§ 17203, 17206; De La Torre,* 236 Cal.Rptr.3d 353, 422 P.3d at 1021).

Through their Unfair Competition Law claim, Plaintiffs seek "such orders or judgments as may be necessary to enjoin New Chrysler from continuing its unfair, unlawful, and/or deceptive practices ... and for such other relief set forth below." (D.E. 2758 at ¶ 365.) In view of the foregoing, Count 12 is dismissed only to the extent it seeks damages.

#### (2) Georgia and Illinois Uniform
#### Deceptive Trade Practices Acts

Turning to the Georgia and Illinois statutes, both Acts provide that "[a] person likely to be damaged by a deceptive trade practice of another *may be granted injunctive relief* upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required." *See* 815 Ill. Comp. Stat. Ann. 510/3 (emphasis added); Ga. Code Ann. § 10-1-373(a). Both acts also authorize a court to assess costs and award attorneys' fees in certain situations. *See* 815 Ill. Comp. Stat. Ann. 510/3; Ga. Code Ann. § 10-1-373(b).

**\*13** **[37]** **[38]** Although the parties' briefing does not specifically address Georgia law, the Court finds that relief under Georgia's Uniform Deceptive Trade Practices Act "is limited to an injunction." *See Divis v. Gen. Motors LLC,* No. 18-13025, 2019 WL 4735405, at \*9 (E.D. Mich. Sept. 27, 2019). And it is equally true that a plaintiff cannot seek damages under Illinois's Uniform Deceptive Trade Practices Act. *See Universal Gaming Grp. v. Taft Stettinius & Hollister LLP,* No. 1-15-0878, 2017 WL 1240860 at \*9 (Ill. App. Ct. 2017) (quoting *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA,* 384 Ill.App.3d 849, 323 Ill.Dec. 507, 893 N.E. 2d 981, 996 (2008)).

**[39]** Although Plaintiffs argue otherwise, the Court finds that they misread FCA's authority— *Dorr-Oliver Inc. v. Fluid-Quip, Inc.,* 834 F. Supp. 1008, 1014 (N.D. Ill. 1993)— and mistakenly conflate the Illinois Uniform Deceptive Trade Practices Act with the Illinois Consumer Fraud and Deceptive Business Practices Act. Although similar, the latter "allows damages as well as injunctive relief," *id.* (citing 815 ILCS ¶¶ 505/7, 505/10a), whereas the former "provides only for injunctive relief but allows costs and attorneys fees if defendants willfully engaged in a deceptive trade practice," *id.* (citing 815 ILCS ¶ 510/3).

With their claims under the Georgia and Illinois Deceptive Trade Practices Acts, Plaintiffs seek "an order enjoining New Chrysler's deceptive practices, attorneys' fees, and any other just and proper relief available under the [Acts]." (D.E. 2758 at ¶¶ 488, 522.) In view of the foregoing, Counts 18 and 20 are dismissed only to the extent they seek damages.

**3.** **Conclusion**

To summarize the fraud-based claims, Count 4 is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina). By extension, Count 4 is also **DISMISSED** as to all putative class members with fraud claims governed under Mississippi and South Carolina law. *See Wooden,* 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman,* 221 F.3d at 1280). After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs (Florida and Pennsylvania), Count 4 will proceed for all other named-Plaintiffs.

As for the statutory consumer protection claims, the claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count 40) is **DISMISSED** in full, and the claims under California's Unfair Competition Law (Count 12), and Georgia's and Illinois's Uniform Deceptive Trade Practices Act (Counts 18 and 20) are **DISMISSED** only to the extent they seek damages. The state statutory consumer protection claims in Counts 8–9, 12–14, 17–20, 24–25, 27, 30–32, 34–35, 37, 39, 42–43, and 45 will proceed.

### D. REMAINING NATIONWIDE-CLASS COMMON-LAW CLAIMS

The Court will now address FCA's challenges to the nationwide-class common-law unjust enrichment (Count 5) and negligence (Count 6) claims. These claims are asserted "under the common law of" negligence and unjust enrichment "as there are no true conflicts (case-dispositive differences) among various states' laws." (*See* D.E. 2758 at ¶¶ 247, 253.) Alternatively, though, Plaintiffs assert these claims under the laws of the states where the vehicles were purchased. At this stage, the Court will determine whether Plaintiffs have stated negligence and unjust enrichment claims under applicable state common law. *Cf. In re Takata Airbag Prods. Liab. Litig.,* 2017 WL 2406711, at \*5 (evaluating nationwide fraudulent concealment claims under applicable state common law). The Court begins with the unjust enrichment claims and then proceeds to the negligence claims.

#### 1. Unjust Enrichment (Count 5)

**\*14** FCA argues that certain unjust enrichment claims should be dismissed because: (1) either there is no privity or Plaintiffs did not purchase their vehicles from an FCA-affiliated dealership; (2) certain Plaintiffs allege the existence of an express warranty; (3) California and Texas do not recognize unjust enrichment as a standalone cause of action; and (4) they are barred by the statute of limitations. The Court addresses each argument in turn.

### a) Direct Benefit

First, FCA argues that all unjust enrichment claims should be dismissed for lack of privity. Specifically, FCA argues that "[a]s this Court has previously recognized, for states that require privity to maintain an unjust enrichment claim, such claims must be dismissed if a plaintiff cannot demonstrate that they have conferred a direct benefit on a defendant." (D.E. 2983 at 55.) Noticeably, though, FCA does not cite a single authority supporting this statement. (*See id.*; *see also* D.E. 2983-4 at 2–5.) Nor does FCA cite a single ruling in this case showing that privity is *required* to state an unjust enrichment claim under the laws of any state. *See id.* And this is because the Court has not issued such a ruling. The privity argument thus fails.

**[40]** Instead, the Court has ruled that under the laws of numerous states, a direct benefit is conferred on an automotive manufacturer where a plaintiff purchases or leases his or her vehicle from a dealership affiliated with the automotive manufacturer. *See In re Takata Airbag Prods. Liab. Litig.,* —— F. Supp. 3d ——, 2020 WL 2764196, at *15–21 (ruling such under the laws of Alabama, Arizona, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Mississippi, New York, Ohio, Pennsylvania, Tennessee, Virginia, and Wisconsin) (citing *In re Takata Airbag Prods. Liab. Litig.,* 255 F. Supp. 3d at 1260–64 (ruling same under the laws of Alabama, Arizona, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Nevada, New Jersey, Ohio, Oregon, Rhode Island, Tennessee, Texas, Virginia, West Virginia, and Washington); *In re Takata Airbag Prods. Liab. Litig.,* 2016 WL 5848843, at *10–11 (ruling same under the laws of Alabama, Florida, Massachusetts, Nevada, Pennsylvania, and South Carolina)).

Following these rulings, FCA advances a second argument: that unjust enrichment claims should be dismissed for 16 named-Plaintiffs who did not purchase their vehicles from an FCA-affiliated dealership. It is clear (from a footnote, in one of FCA's six appendices) that FCA specifically seeks to dismiss the unjust enrichment claims of these named-Plaintiffs: Laurie Reynolds (Arizona), Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Deborah Hillyer and Dave Krzeminski (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins, and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). (*See* D.E. 2983-1 at 3 n.6.) Although FCA also seeks to dismiss the claims of Plaintiff Elizabeth Washington under Illinois law, Plaintiff Michael Eikenberry under Indiana law, and Plaintiff Kenneth Fischer under Ohio, *see id.*, as discussed in the choice-of-law analysis above, Michigan law applies to the claims of these Plaintiffs, *see* Sec.III.B.

Following its prior rulings on this issue, the Court will now analyze, on a state-by-state basis, the unjust enrichment allegations of these named-Plaintiffs.

### (1) Arizona

**\*15** Arizona law applies to Plaintiff Laurie Reynolds's unjust enrichment claim. And her claim is **DISMISSED** because her Dodge was purchased "from Anderson Toyota" and she offers no additional allegations from which the Court could infer that Anderson Toyota has any affiliation with FCA. (D.E. 2758 at ¶ 62.)

### (2) California

California law applies to Plaintiff Ronaldo Maldia's unjust enrichment claim. And his claim is **DISMISSED** because his Dodge was purchased "from Balboa Motors" and he offers no additional allegations from which the Court could infer that Balboa Motors has any affiliation with FCA. *Id.* at ¶ 54.

### (3) Maryland

Maryland law applies to Plaintiff Daniel Dwinnells's unjust enrichment claim. The Court has not previously addressed unjust enrichment claims under Maryland law.

**[41]** Maryland courts have recognized three required elements of unjust enrichment: (1) a benefit conferred

upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention of the benefit by the defendant of the benefit under such circumstances as to make it inequitable for the defendants to retain the benefit without payment of its value. *See ADCS Inc. v. Kimbrough, Jr.*, 30 F. App'x. 225, 228 (4th Cir. 2002) (quoting 🔖 *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 757 A.2d 108, 113 (2000)). Aside from these required elements, the Court is not aware of any authority also requiring a plaintiff to directly confer a benefit on a defendant in order to state an unjust enrichment claim under Maryland law.

Turning to the allegations, Dwinnells's claim is **DISMISSED** because he purchased his Dodge "from Ideal Buick GMC" and he offers no additional allegations from which the Court could infer that Ideal Buick GMC has any affiliation with FCA. (D.E. 2758 at ¶ 39.)

### (4) <u>Michigan</u>

Michigan law applies to the unjust enrichment claims of Plaintiffs Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington. And the claims of each Plaintiff are **DISMISSED** because their vehicles were not purchased from FCA-affiliated dealerships, and they offer no additional allegations from which the Court could infer the dealerships have any affiliation with FCA. *See id.* at ¶ 40 (Eikenberry purchased his used Chrysler "from Auto World"); *id.* at ¶ 41 (Fischer purchased his used Dodge "from Troy Auto Group"); *id.* at ¶ 47 (Hillyer purchased her used Chrysler "from AM Automotive LLC"); *id.* at ¶ 50 (Krzeminski purchased his used Dodge "from a used car dealership"); *id.* at ¶ 66 (Washington purchased her used Dodge "from Howard Automotive").

### (5) <u>Mississippi</u>

Mississippi law applies to Plaintiff Arlen Sturgis's unjust enrichment claim. And his claim is **DISMISSED** because his Chrysler was purchased "from Southern Imports, Inc." and he offers no additional allegations from which the Court could infer that Southern Imports, Inc. has any affiliation with FCA. *Id.* at ¶ 64.

### (6) <u>New Jersey</u>

**[42]** New Jersey law applies to Plaintiff Gene Marsilio's unjust enrichment claim. As noted in the *Puhalla* Order, under New Jersey law, "[w]hen a plaintiff fails to allege a direct relationship, that plaintiff has failed to assert a claim for unjust enrichment, and under those circumstances, dismissal is appropriate." *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at *19 (quoting 🔖 *Glass v. BMW of N. Am., LLC*, Civil Action No. 10-5259 (ES), 2011 WL 6887721, at *16 (D.N.J. Dec. 29, 2011)).

**\*16** Turning to the allegations, Marsilio's claim is **DISMISSED** because his used Dodge was purchased "from Luxury Haus" and he offers no additional allegations from which the Court could infer that Luxury Haus is directly owned and operated by FCA. (D.E. 2758 at ¶ 55.)

### (7) <u>North Carolina</u>

North Carolina law applies to the unjust enrichment claims of Plaintiffs Laquintha O'Neal and Terrie Swanson. The Court also has not previously addressed unjust enrichment claims under North Carolina law.

**[43]** To state a claim for unjust enrichment under North Carolina law, a plaintiff must allege that he or she "conferred a benefit on the other party" that is "measurable" and not "gratuitous." 🔖 *Krawiec v. Manly*, 370 N.C. 602, 811 S.E. 2d 542, 552 (2018) (quoting 🔖 *Booe v. Shadrick*, 322 N.C. 567, 369 S.E. 2d 554, 556 (1988)). Aside from these elements, the Court is not aware of any authority that also requires the plaintiff to directly confer the benefit on the defendant in order to state an unjust enrichment claim under North Carolina law.

Turning to the allegations, O'Neal's and Swanson's claims are **DISMISSED** because their vehicles were purchased "from Carmax" and "from Hickory Used Car Superstore," respectively, and they offer no additional allegations from which the Court could infer that Carmax or the Hickory Used Car Superstore have any affiliation with FCA. (D.E. 2758 at ¶¶ 59, 65.)

#### (8) Ohio

Ohio law applies to the unjust enrichment claims of Plaintiffs Victoria Lykins and Reginald Price. And Lykins's and Prices's claims are **DISMISSED** because their vehicles were purchased "from Jeff Wyler, Eastgate Automall" and "from Dixie Import," respectively, and they offer no additional allegations from which the Court could infer that these dealerships have any affiliation with FCA. *Id.* at ¶¶ 53, 61.

#### (9) South Carolina

South Carolina law applies to Plaintiff Jamelle Lowery's unjust enrichment claim. And Lowery's claim is **DISMISSED** because her used Chrysler was purchased "from Crown Nissan" and she offers no additional allegations from which the Court could infer that Crown Nissan has any affiliation with FCA. *Id.* at ¶ 51.

#### (10) Texas

Texas law applies to Plaintiff Bridget Boyd's unjust enrichment claim. And her claim is **DISMISSED** because her used Chrysler was purchased "from Driver's Choice" and she offers no additional allegations from which the Court could infer that Driver's Choice has any affiliation with FCA. *Id.* at ¶ 36.

#### b) **Adequate Remedy at Law (Express Warranties)**

 **[44]** Second, FCA argues in a footnote that unjust enrichment claims should be dismissed for the 12 named-Plaintiffs who allege the existence of an express warranty, as these plaintiffs fail to adequately allege unconscionability. (D.E. 2983 at 55 n.24.) As the Court explained in the *Puhalla* and *Whitaker* Orders, this argument is unavailing because not only has FCA failed to provide the Court with any written express warranties covering any of Plaintiffs' vehicles, but also, Plaintiffs allege that they do not have an adequate remedy at law, and that the warranties are procedurally and substantively unconscionable and are thus not enforceable. (*See In re Takata Airbag Prods. Liab. Litig.*, ––– F. Supp. 3d ––––, 2020 WL 2764196, at *14–15; D.E. 3838 at 25–26; D.E. 2758 at ¶¶ 182–84, 251.) And although FCA also summarily argues in passing in its footnote that Plaintiffs

fail to offer any facts showing unconscionability (D.E. 2983 at 55 n.24), FCA has not produced the applicable written express warranties. Thus, the Court need not reach this cursory contention. (*See* D.E. 1208 at 20 (addressing Nissan's unconscionability argument only after "Nissan attached the express warranty covering [the plaintiff's vehicle] to its Motion," and then only after the Court found that the warranty was "central to Plaintiffs' claims and that Plaintiffs ha[d] not disputed the authenticity of the attached warranty").)

 **\*17** **[45]** In addition, Plaintiffs are allowed to maintain an unjust enrichment claim in the alternative to their other claims. *See In re Takata Airbag Prods. Liab. Litig.*, ––– F. Supp. 3d ––––, 2020 WL 2764196, at *15 (citing *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *14 (S.D. Fla. July 12, 2018) ("Plaintiffs may maintain an unjust enrichment claim in the alternative to their breach of express warranty claim.") (citing *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1227–28 (S.D. Fla. 2013) ("Plaintiff may, however, maintain an equitable unjust enrichment claim in the alternative to her legal claims against Defendants."); Fed. R. Civ. P. 8(a)(3), (d)(2) (permitting pleading in the alternative)). This is because it is only upon a showing that an express contract exists between the parties that the unjust enrichment count fails. *See id.* at *15 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d at 1344). And FCA has not made this showing here. Thus, it would be premature to dismiss the unjust enrichment claims on this basis. *Id.* (quoting *Martorella*, 931 F. Supp. 2d at 1228).

Finally, even though equitable relief ultimately may not be awarded because there is an adequate remedy at law, Plaintiffs "certainly may plead alternative equitable relief" at this stage. *Id.* (quoting *Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D. Fla. 1999)). Provided there is evidence proving the existence of enforceable written express warranties, FCA may renew its argument at summary judgment. But for now, the claims survive.

#### c) **Standalone Causes of Action (California and Texas)**

Third, FCA argues that California and Texas unjust enrichment claims should be dismissed because these states do not recognize unjust enrichment as a standalone cause of action. Plaintiffs again disagree.

### (1) California

[46]  As explained in the *Whitaker* Order, California recognizes the principle behind unjust enrichment by requiring "restitution if [a defendant] is unjustly enriched at the expense of another. The recipient of the benefit is liable only if the circumstances are such that, as between two persons, it is unjust for the recipient to retain it." (D.E. 3838 at 26–27 (quoting *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1261 (quoting *City of Chula Vista v. Gutierrez*, 207 Cal.App.4th 681, 143 Cal. Rptr. 3d 689, 692 (2012))).)

Here, California law applies to the unjust enrichment claims of Plaintiffs Rushelle Gonder and Pedro Lucero. And their claims can proceed because their vehicles were purchased from FCA-affiliated dealerships. (*See* D.E. 2758 at ¶ 45 (Gonder purchased her used Chrysler "from Scott Robinson Chrysler"); *id.* at ¶ 52 (Lucero purchased his new Chrysler "from Elk Grove Chrysler").)

### (2) Texas

[47]  Texas courts have ruled that unjust enrichment "is not an independent cause of action but rather characterizes the result of a failure to make restitution benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d at 1263–64 (quoting *Foley v. Daniel*, 346 S.W. 3d 687, 690 (Tex. Ct. App. 2009)). In some circumstances, however, "overpayments under a valid contract may give rise to a claim for restitution or unjust enrichment." *Id.* (quoting *Foley*, 346 S.W. 3d at 690–91). But because the Court is only deciding "the sufficiency of Plaintiffs' claims under a motion to dismiss standard"—"and not whether Plaintiffs actually overpaid for their vehicles"—their claims should not be summarily dismissed on this basis. *See id.* The overpayment inquiry is appropriate at summary judgment or trial; but for now, the Court can determine whether plaintiffs allege that they purchased their vehicles from an FCA-affiliated dealership such that their claim can proceed. *See id.*

**\*18**  Here, Texas law applies to Plaintiff Shanna Moore's unjust enrichment claim. And her claim can proceed because

her Dodge was purchased "from Team Dodge," an FCA-affiliated dealership. (D.E. 2758 at ¶ 57.)

### d) Time Bars

Finally, FCA argues that the statute of limitations bars certain unjust enrichment claims under the laws of Arkansas, Georgia, North Carolina, and Texas. As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law, *see supra* Sec.III.C.1.d.2, as well as under Arkansas law, *see In re Takata Airbag Prods. Liab. Litig.*, ---- F. Supp. 3d ----, 2020 WL 2764196, at *25 (citing *Martin v. Arthur*, 339 Ark. 149, 3 S.W. 3d 684, 687 (1999) (citing *Adams v. Arthur*, 333 Ark. 53, 969 S.W. 2d 598, 602–03 (1998))). Like these states, North Carolina also recognizes fraudulent concealment tolling. *See Friedland v. Gales*, 131 N.C.App. 802, 509 S.E. 2d 793, 797 (1998) (citing *Connor v. Schenck*, 240 N.C. 794, 84 S.E. 2d 175 (1954); *Stallings v. Gunter*, 99 N.C.App. 710, 394 S.E. 2d 212 (990)). For the reasons explained earlier and in previous orders, fraudulent concealment tolling applies to the unjust enrichment claims under the laws of these states.

### e) Conclusion

In sum, Count 5 is **DISMISSED** as to the following named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas). By extension, because there are no class representatives with unjust enrichment claims under the laws of Arizona, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, Count 5 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states. *See Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 5 will proceed for the following named-Plaintiffs: Cathy Parker and Bobbie

Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas). [6]

### 2. Negligence (Count 6)

Plaintiffs also assert a nationwide-class common-law negligence claim. FCA argues that this claim should be dismissed in its entirety for lack of causation, and that alternatively, certain negligence claims should be dismissed under the economic loss rule or the statute of limitations.

### a) Causation

 **[48]**  First, FCA argues that all negligence claims should be dismissed because Takata's criminal acts—which Takata admitted to in the Takata Plea Agreement—break any causal connection between FCA's allegedly negligent conduct and Plaintiffs' purported injuries.

 **\*19**  The Court previously declined to judicially notice the contents of the Takata Plea Agreement for its truth because, regardless of reliability, meaning, or actual proof, the parties heavily disputed the contents. *See* 🔖 *In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d at 1128–29. By extension, the Court declined to dismiss the entire complaint for lack of standing on the grounds that Takata's admissions demonstrated that Plaintiffs' injuries were not "fairly traceable" to certain defendants' actions. 🔖 *Id.* at 1129. Likewise here, because the contents of the Takata Plea Agreement are heavily disputed, it is premature to dismiss any negligence claims on this basis at this stage. Whether Takata's admissions are sufficient to sever the causal connection between Plaintiffs' injuries and FCA's allegedly negligent conduct is an issue appropriate for resolution at summary judgment or trial. (*See* D.E. 3838 at 23 (ruling same).)

### b) Economic Loss Bars

After accounting for the choice-of-law dismissals and the states excluded by Plaintiffs, [7] negligence claims remain under the laws of Arizona, Arkansas, Georgia, Maryland,

Mississippi, Missouri, New Jersey, New York, Ohio, and Texas.

 **[49]**  FCA's second argument is that the economic loss rule bars negligence claims under the laws of Arizona, Georgia, Missouri, New Jersey, New York, Ohio, and Texas. Plaintiffs do not appear to contest this argument, and instead maintain that negligence claims should proceed under the laws of Arkansas and Maryland because these states have not adopted the economic loss rule. In turn, FCA does not appear to contest this argument. And the only remaining state, Mississippi, bars negligence claims under the economic loss doctrine if the only damage sustained was to the product. *See* 🔖 *Herman Cronier & Sons, Inc. v. Carrier Corp.*, No. 1:11CV364-HSO-RHW, 2013 WL 12090326, at \*6 (S.D. Miss. Sept. 6, 2013) (citing 🔖 *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999)). Accordingly, negligence claims can proceed under Arkansas and Maryland law.

### c) Time Bars

Finally, FCA argues that the statute of limitations bars the negligence claims of Plaintiffs Michelle Gibson and Shanna Moore, which are asserted under the laws of Georgia and Texas, respectively. As discussed above, fraudulent concealment tolling applies to claims under Georgia and Texas law. *See supra* Sec.III.C.1.d.2. For the reasons explained earlier, fraudulent concealment tolling applies to these negligence claims.

### d) Conclusion

Taken together, Count 6 is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Arizona, Georgia, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas. By extension, Count 6 is also **DISMISSED** as to all putative class members whose negligence claims are governed under the laws of these states.

*See* 🔖 *Wooden*, 247 F.3d at 1288 ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.") (quoting 🔖 *Prado-Steiman*, 221 F.3d at 1280).

As for the claims that survive, Count 6 will proceed for named-Plaintiffs Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

## E. NATIONWIDE-CLASS MAGNUSON-MOSS WARRANTY ACT AND STATEWIDE-CLASS BREACH OF IMPLIED WARRANTY CLAIMS

Next, Plaintiffs assert a nationwide-class Magnuson-Moss Warranty Act claim. In the alternative, they assert statewide-class breach of implied warranty claims under the laws of several states. FCA argues that the Magnuson-Moss Warranty Act claim must be dismissed because Plaintiffs fail to assert implied warranty claims under the laws of every state, and additionally, because Plaintiffs do not meet the 100-plaintiff requirement to bring a class action under the Act. As to the alternative claims for breach of implied warranty under state law, FCA argues that certain claims are barred by the statute of limitations, and that claims under New York and North Carolina law should be dismissed for lack of privity.

### 1. Nationwide-Class Magnuson-Moss Warranty Act Claim (Count 1)

**\*20** **[50]** Despite asserting a *nationwide*-class Magnuson-Moss Warranty Act claim, Plaintiffs assert breach of implied warranty claims under the laws of only *14 states*. For the reasons fully explained in the *Puhalla* Order, the nationwide-class Magnuson-Moss Warranty Act claim in Count 1 is **DISMISSED** for lack of standing. *See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at \*24 ("Because standing is a claim-specific determination and implied warranty claims under the [Magnuson-Moss Warranty] Act 'arise out of and are defined by' state law, the Court finds that the named-Plaintiffs lack standing to represent putative class members of states for which there are no breach of implied warranty claims."). Furthermore, Count 1 is dismissed in its entirety because—unlike the nationwide-class common-law claims—Plaintiffs explicitly assert that "[i]n the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act," they assert statewide-class breach of implied warranty claims under the laws of several states. (D.E. 2758 at ¶¶ 326, 334, 406, 549, 555, 608, 636, 642, 675, 703, 740, 771, 823, 857, 888.) Because Count 1 is dismissed for lack of standing, the Court need not address FCA's separate argument regarding the 100-plaintiff requirement. The Court will now address the state breach of implied warranty claims.

### 2. Statewide-Class Breach of Implied Warranty Claims (Counts 10–11, 15, 23, 26, 28–29, 33, 41, 44, and 46)

**[51]** Plaintiffs assert breach of implied warranty claims under laws of Arkansas, California, [8] Maryland, Massachusetts, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, and Texas. FCA argues that the statute of limitations bars certain implied warranty claims under the laws of Arkansas, California, Maryland, Michigan, Mississippi, Missouri, New Jersey, North Carolina, Pennsylvania, and Texas. FCA also argues that the implied warranty claims under New York and North Carolina law should be dismissed for lack of privity; because Plaintiffs do not dispute this argument and agree to dismiss Counts 36 and 38, these claims are **DISMISSED**.

As explained in the *Puhalla* and *Whitaker* Orders, fraudulent concealment tolling applies in Arkansas, California, Michigan, Mississippi, Missouri, New Jersey, Pennsylvania, and Texas. (*See In re Takata Airbag Prods. Liab. Litig.*, --- F. Supp. 3d ----, 2020 WL 2764196, at \*25 (Arkansas, California, Michigan, Mississippi, New Jersey, Pennsylvania, and Texas); D.E. 3838 at 29 (Missouri).) The only states left unaccounted for here, Maryland and North Carolina, also recognize fraudulent concealment tolling. *See Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 536 (D. Md. 2011) (quoting Md. Code. Ann., Cts. & Jud. Proc. § 5–203); *Friedland*, 509 S.E. 2d at 797 (citing *Connor*, 240 N.C. 794, 84 S.E. 2d 175; *Stallings*, 99 N.C.App. 710, 394 S.E. 2d 212).

Here, as explained above, Plaintiffs assert numerous allegations detailing FCA's knowledge of the risks posed by the Takata airbags installed in their vehicles, their alleged failure to fully investigate or disclose the seriousness of the issue to consumers or regulatory authorities, and their continued selling and leasing of vehicles installed with Takata airbags. *See supra* Sec.III.C.1.a–c. Viewing these allegations in the light most favorable to Plaintiffs, as the Court must at this stage, the Court finds that fraudulent concealment tolling applies to the breach of implied warranty claims.

### 3. Conclusion

In sum, Counts 1, 15, 36, and 38 are **DISMISSED**, and the state breach of implied warranty claims in Counts 10–11, 23, 26, 28–29, 33, 41, 44, and 46 will proceed.

**F. SALE ORDER BAR**

**[52]**  Finally, FCA urges that *all* the claims of the named-Plaintiffs who own vehicles manufactured by Chrysler LLC ("Old Chrysler")—not FCA—are barred by the bankruptcy Sale Order governing FCA's acquisition of certain of Old Chrysler's assets. [9]  FCA argues that its liability for vehicles manufactured by Old Chrysler and sold prior to the closing date of the Sale Order is "limited to certain expressly Assumed Liabilities," as defined in the Master Transaction Agreement. Plaintiffs insist that the Sale Order does not bar *any* of these claims because these Plaintiffs purchased their vehicles *after* the Sale Order closed, and because their claims are premised on FCA's *post*-closing wrongful conduct.

***21**  The moving papers frame the issue as all or nothing. But the Master Transaction Agreement expressly delineates both "Assumed Liabilities" and "Excluded Liabilities." (*See* D.E. 2989-2 at 69–72.) For instance, Sections 2.08(g) and 2.08(h) list as Assumed Liabilities "all Liabilities pursuant to product warranties, product returns and rebates on vehicles sold by Sellers prior to the Closing" and "all Product Liability Claims arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing." *Id.* at 70. And Sections 2.09(i) and 2.09(j) list as Excluded Liabilities "all Product Liability Claims arising from the sale of Products or Inventory prior to the Closing" and "all Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior to or ongoing at the Closing." *See id.* at 71. It follows from these definitions that application of the Sale Order is claim specific. *See* 🔖 *In re Old Carco LLC*, 492 B.R. 392, 403–06 (Bankr. S.D.N.Y. 2013) (deciding separately whether the claims for breach of implied warranty, and the claims for negligence under various theories of liability, were barred by the Sale Order).

Although FCA argues in a footnote that liability for fraud, failure to warn, and breach of implied warranty are not Assumed Liabilities under the Master Transaction Agreement, FCA's Reply does not sufficiently address Plaintiffs' core contention that FCA's *post*-closing wrongful conduct is actionable—a contention supported by interpretive case law. *See In re Old Carco LLC*, 582 B.R. 838, 845 (Bankr. S.D.N.Y. 2018) ("At bottom, *a post-Closing breach of an independent duty gives rise to a post-Closing right to payment*, and the 'free and clear' provisions of the Sale Order cannot cut off New Chrysler's liability for its own wrongful, post-Closing conduct.") (emphasis added and

citation omitted); *Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611, at *4 (D. Utah Mar. 28, 2019)* ("The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn."); *Holland v. FCA U.S. LLC*, No. 1:15 CV 121, 2015 WL 5172996, at *5 (N.D. Ohio Sept. 3, 2015)* ("[T]his case is not one that argues liability simply because FCA is a successor to Old Chrysler, but rather whether FCA had a duty to act based knowledge it acquired and actions it took post Sale Order ....").

Plaintiffs' post-closing conduct argument highlights the claim-specific nature of the Sale Order analysis, and FCA's ensuing failure to respond to this argument seals the Court's refusal to dismiss any of Plaintiffs' claims under the Sale Order. [10]

In the end, holding aside whether Plaintiffs can state certain claims for post-closing wrongful conduct, they will ultimately have to prove at summary judgment or trial that FCA's post-closing conduct was a proximate cause of their economic losses. *See Castleman v. FCA US LLC*, 2019 WL 1406611, at *6* ("[T]he court would have to determine whether the post-Closing or pre-Closing conduct was the proximate cause of [plaintiff's] harm. But the question of proximate cause is a question reserved for the fact finder. Accordingly, it is not appropriately decided at the motion to dismiss stage.") (citing *In re Old Carco LLC*, 582 B.R. at 846 ("[A]ssuming that the Plaintiff can assert legally sufficient claims based solely on New Chrysler's post-Closing wrongful conduct, the question of what proximately caused the Decedents' fatal injuries is for the factfinder.")).

For now, the Court declines to dismiss any of the Plaintiffs' claims under the Sale Order. FCA may, however, renew claim-specific arguments at summary judgment.

**CONCLUSION**

***22**  For all the reasons explained above, it is

**ADJUDGED** that FCA's Motion to Dismiss is **GRANTED IN PART** as follows:

- The nationwide-class Magnuson-Moss Warranty Act claim (Count 1) is **DISMISSED** in full;

- The statewide-class breach of implied warranty claims under the laws of Indiana, New York, and North Carolina

(Counts 22, 36, and 38), and the duplicative claim under California law (Count 15), are **DISMISSED**;

- The statewide-class statutory consumer protection claims under the laws of Alabama, Florida, Indiana, and Pennsylvania (Counts 7, 16, 21, and 40) are **DISMISSED** in full, and the claims under the laws of California, Georgia, and Illinois (Counts 12, 18, and 20) are **DISMISSED** only to the extent they seek damages;

- The fraud claim (Count 4) is **DISMISSED** as to named-Plaintiffs Arlen Sturgis (Mississippi), and T'Keya Cooper, Jamelle Lowery, and Michael McClellion (South Carolina), and as to all putative class members whose fraud claims are governed under the laws of Alabama, Florida, Indiana, Mississippi, and South Carolina;

- The unjust enrichment claim (Count 5) is **DISMISSED** as to all putative class members whose unjust enrichment claims are governed under the laws of Alabama, Arizona, Florida, Indiana, Maryland, Mississippi, New Jersey, North Carolina, and Ohio, and as to these named-Plaintiffs: Laurie Reynolds (Arizona); Ronaldo Maldia (California); Daniel Dwinnells (Maryland); Michael Eikenberry, Kenneth Fischer, Deborah Hillyer, Dave Krzeminski, and Elizabeth Washington (Michigan); Arlen Sturgis (Mississippi); Gene Marsilio (New Jersey); Laquintha O'Neal and Terrie Swanson (North Carolina); Victoria Lykins and Reginald Price (Ohio); Jamelle Lowery (South Carolina); and Bridget Boyd (Texas); and

- The negligence claim (Count 6) is **DISMISSED** as to all named-Plaintiffs whose negligence claims are governed under the laws of Alabama, Arizona, Florida, Georgia, Indiana, Mississippi, Missouri, New Jersey, New York, Ohio, and Texas, and as to all putative class members whose negligence claims are governed under the laws of these states.

Furthermore, the Motion to Dismiss is **DENIED** as to the following claims, which will proceed to summary judgment:

- The statewide-class statutory consumer protection and breach of implied warranty claims in Counts 8–14, 17–20, 23–35, 37, 39, and 41–46;

- Claims for fraud (Count 4) asserted by all named-Plaintiffs whose claims are governed under the laws of Arizona, Arkansas, California, Georgia, Illinois, Maryland, Massachusetts, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, and Texas;

- Claims for unjust enrichment (Count 5) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas); Rushelle Gonder and Pedro Lucero (California); Michelle Gibson and Debrah Johnson (Georgia); John Fuesting and Priscilla Fuesting (Illinois); Carla Campagnone (Massachusetts); Randy Nielsen (Michigan); Jason Williams (Missouri); Rmzy Abdallah (New York); Marcia Griffith (Pennsylvania); T'Keya Cooper (South Carolina); and Shanna Moore (Texas); and

- Claims for negligence (Count 6) asserted by these named-Plaintiffs: Cathy Parker and Bobbie Simmons (Arkansas) and Daniel Dwinnells (Maryland).

**\*23** It is further

**ADJUDGED** that FCA must answer the remaining claims in the *Boyd* Complaint **no later than July 23, 2020**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st of June 2020.

**All Citations**

--- F.Supp.3d ----, 2020 WL 2892366

## Footnotes

1    Throughout this litigation, the Court has made the same finding on similar allegations. *See In re Takata Airbag Products Liab. Litig., —— F. Supp. 3d ——, 2020 WL 2764196, at \*6 & n.5;* 📄 *In re Takata Airbag Products Liab. Litig., 193 F. Supp. 3d at 1336* ("The Court finds that Plaintiffs have sufficiently alleged Mazda's

knowledge of the alleged inflator defect ...."); *In re Takata Airbag Products Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (same as to Honda).

2    Prior to transfer to this MDL proceeding, Reynolds's fraud-based claims were initially filed in the *Dwinnells* Complaint in the Eastern District of Michigan on March 14, 2018.

3    Although the claim in Count 4 is styled as fraud—as opposed to fraudulent concealment or inducement—as the Court explained in the *Whitaker* Order, what matters legally is what Plaintiffs allege. (*See* D.E. 3838 at 17 (citing *Huber v. Crop Prod. Servs., Inc.*, No. 06-14564-BC, 2007 WL 2746625, at *6 (E.D. Mich. Sept. 19, 2007))).) And there, the Court ruled that because the plaintiffs alleged that General Motors's precontractual concealment of material facts induced the plaintiffs to purchase their vehicles, the fraud claim was not barred by Michigan's economic loss rule. Like the plaintiffs in *Whitaker*, Plaintiffs here allege the same against FCA. (*See* D.E. 2758 at ¶¶ 236–37.) Thus, the styling of the claim as "fraud" does not change the Court's analysis here.

4    Although some federal district courts have interpreted *Sapp* as recognizing a fraud exception to the economic loss rule, *see* *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. CV 16-2765 (JLL), 2017 WL 1902160, at *18 (D.N.J. May 8, 2017) and *Trevillyan v. APX Alarm Sec. Sys., Inc.*, No. 2:10-1387-MBS, 2011 WL 11611, at *8 (D.S.C. Jan. 3, 2011), the Court declines to follow these rulings. The Supreme Court of South Carolina, the final arbiter of South Carolina law, carefully clarified the scope of the "narrow" exception to the economic loss rule that applies in the residential real estate construction context. Notably, the Supreme Court of South Carolina stopped short of affirmatively recognizing a fraud-based exception to the economic loss rule in the products liability context.

5    In a footnote, FCA also argues that the Safety Act bars the Plaintiffs' request for the Court to enjoin FCA from continuing its negligence by continuing to install defective airbags in class vehicles. (*See* D.E. 2983 at 57 n.29.) In a previous order, the Court rejected a similar argument by Mercedes, Audi, and Volkswagen. *See* *In re Takata Airbag Products Liab. Litig.*, 396 F. Supp. 3d at 1133 ("[T]o the extent Plaintiffs seek injunctive relief going forward that will 'unduly and directly interfere with NHTSA's investigatory and regulatory functions,' or interfere with NHTSA's Coordinated Remedy Order, the Court can address this issue at that time.") (quoting *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2015 WL 12641693, at *3 (S.D. Fla. Sept. 21, 2015)). Likewise here, if and when this issue arises, the Court can address it at that time.

6    The Court notes that Plaintiff Michael McClellion (South Carolina) is excluded from this claim. (D.E. 2758 at ¶ 247.)

7    The Complaint specifically excludes from this claim consumers from Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina. (*See* D.E. 2758 at ¶ 253.)

8    Plaintiffs asserts two claims under California's Song-Beverly Consumer Warranty Act (Counts 11 and 15). Finding no discernable difference between these two claims, Count 15 is **DISMISSED** as duplicative. *See* *Kuchenbecker v. Johnson & Johnson*, No. 19-61712-CIV, 2019 WL 4416079, at *2 (S.D. Fla. Sept. 16, 2019) ("To promote judicial economy, a court should dismiss claims that are duplicative of other claims.") (citations and internal quotations omitted).

9    In June 2009, FCA purchased substantially all of Old Chrysler's assets pursuant to a Sale Motion and Purchase Agreement that was approved by the United States Bankruptcy Court for the Southern District of New York. (D.E. 2758 at ¶ 3.)

10    The Court notes that the definitions of Assumed Liabilities and Excluded Liabilities in the Master Transaction Agreement were subsequently amended. *See* *In re Old Carco LLC*, 492 B.R. at 396. The parties' briefing makes no mention of these amendments and only provides the Court with Amendment No. 1. Although it ultimately may not be relevant to the parties' arguments, it appears that Amendment No. 4 "expanded the category of Assumed Liabilities to include certain product liability claims." *See* *id.* at 396 & n.8.

**In re Takata Airbag Products Liability Litigation, --- F.Supp.3d ---- (2020)**

2020 WL 2892366

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Tab 68

In re TFT-LCD (Flat Panel) Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011-2 Trade Cases P 77,634

2011 WL 4501223
United States District Court,
N.D. California.

In re TFT–LCD (FLAT PANEL)
ANTITRUST LITIGATION.
This Order Relates to: All Indirect–
Purchaser Plaintiff Class Actions.

No. No. M 07–1827 SI.
|
MDL. No. 1827.
|
Sept. 28, 2011.

**Attorneys and Law Firms**

Francis O. Scarpulla, Craig C. Corbitt, Judith A. Zahid, Patrick B. Clayton, Qianwei Fu, Heather T. Rankie, Zelle Hofmann Voelbel & Mason LLP, San Francisco, CA, for Indirect-Purchaser Plaintiffs.

**ORDER GRANTING IN PART DEFENDANTS'
JOINT MOTION FOR PARTIAL SUMMARY
JUDGMENT ON VARIOUS ISSUES OF STATE LAW**

SUSAN ILLSTON, District Judge.

**\*1** On September 22, 2011, the Court heard argument on defendants' joint motion for partial summary judgment on various issues of state law. Having considered the moving papers and the arguments of the parties, and for good cause appearing, the Court hereby GRANTS IN PART defendants' motion.

**BACKGROUND**

This antitrust class action stems from allegations of a global price-fixing conspiracy in the market for thin-film transistor liquid-crystal display ("TFT–LCD") panels. Plaintiffs, indirect purchasers of TFT–LCD panels, claim that "[d]efendants and their co-conspirators formed an international cartel illegally to restrict competition in the LCD panel market, specifically targeting and severely injuring indirect-purchaser consumers and affecting billions of dollars of commerce throughout the United States." Third Consolidated Amended Complaint ("TAC"), ¶ 2. Plaintiffs'

TAC includes a claim under the Sherman Act, as well claims brought under the antitrust, unfair competition, and unjust enrichment laws of a number of states. TAC at ¶¶ 270–312.

On July 29, 2011, defendants filed a joint motion, seeking summary judgment on plaintiffs' state-law unfair competition and unjust enrichment claims.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id. at* 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.' " *Id. at* 324 (quoting then Fed.R.Civ.P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id. at* 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

In re TFT-LCD (Flat Panel) Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011-2 Trade Cases P 77,634

judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir.1979). The evidence the parties present must be admissible. Fed.R.Civ.P. 56(c)).

## DISCUSSION

**\*2** Defendants seek summary judgment on two broad categories of state-law claims: (1) state-law consumer protection claims; and (2) state-law unjust enrichment claims.

## I. Consumer Protection Claims

Defendants move for summary judgment on the consumer-protection claims plaintiffs have brought under the laws of New Mexico, New York, Vermont, Rhode Island, and Missouri.

### A. New Mexico

Plaintiffs' TAC includes a claim under the New Mexico Unfair Practices Act ("NMUPA"). The NMUPA forbids "unconscionable trade practices," which it defines as "an act or practice in connection with the sale ... of any goods or services ... that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M. Stat. §§ 57–12–2, 57–12–3. Plaintiffs' complaint invokes the second of these definitions. TAC at ¶ 308(b).

Defendants claim that plaintiffs cannot prove that a "gross disparity" existed between the price they paid for their LCD products and the value they received. They rely on a handful of cases in which courts found that price differences of up to 15% did not amount to gross disparities. See Taylor v. United Management, Inc., 51 F.Supp.2d 1212, 1217 (D.N.M.1999) (finding $600 difference between $4,000 dealership gave as trade-in value for car and $4,600 dealership later sold car for did not amount to "gross disparity"); see also Wyatt v. Petrila, 752 S.W.2d 683, 686 (Tex.App.1988) (finding $625,000 purchase price of house worth $575,000 did not amount to gross disparity); Holland Mortg. and Inv. Corp. v. Bone, 751 S.W.2d 515, 521 (Tex.App.1987) (finding $6,000 difference "between the value received and the consideration paid" for a house was "not a 'gross disparity' as a matter of law because it constitute[d] less than 7% of the $86,900 consideration paid").

Defendants argue that plaintiffs' evidence shows that the conspiracy only inflated the price of LCD panels by an average of either 8.9% or 12.1%. See Declaration of Lee F. Berger in Support of Defendants' Joint Motion for Partial Summary Judgment Based on Various Issues of State Law ("Berger Decl."), Exh. A (8.9%); Declaration of Janet S. Netz, Ph.D. in Support of Indirect–Purchaser Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment on Plaintiff Benjamin Larry Luber's Claims, Master Docket No. 3172–1, at 2 n. 5 (July 22, 2011) (12.1%). They assert that this is insufficient as a matter of law to constitute a gross disparity.

The Court disagrees. None of the cases defendants rely on involved price-fixing or similar surreptitious activity. Rather, they involved ordinary, arms-length transactions and thus were premised on nothing more than the terms of the bargains the plaintiffs had agreed to. Here, in contrast, defendants secretly conspired to increase the prices of LCD panels to supra-competitive levels. In such circumstances, plaintiffs have raised a genuine issue of fact regarding whether the 8.9% to 12.1% overcharge amounts to a gross disparity. See In re Chocolate Confectionary Antitrust Litig., 602 F.Supp.2d 538, 586 n. 60 (M.D.Pa.2009) (noting "compelling trend favorable to consumer protection claims in price-fixing actions"); In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F.Supp.2d 160, 171–72 (D.Me.2004) (finding that allegations of a "gross disparity" were sufficient where plaintiff alleged vehicles were sold at prices "ten to thirty percent greater than prices for the same vehicles in Canada").

### B. New York

**\*3** Defendants also move for summary judgment on plaintiffs' claims under section 349 of New York's General Business Law. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. L. § 349. In order to prevail under section 349, plaintiffs must establish "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." In re TFT–LCD (Flat Panel) Antitrust Litigation, 586 F.Supp.2d 1109, 1127 (N.D.Cal.2008). Defendants argue that plaintiffs were not aware of any of defendants' deceptive acts, and that plaintiffs therefore could not have been deceived by those acts. See Berger Decl., Exh. B at 1 (admission of

named-plaintiff DiMatteo that he was unaware of defendants' allegedly deceptive statements at the time he bought his monitor); Berger Decl., Exh. C at 2 (same for named-plaintiff Ferencsik).

This Court has already held that plaintiffs' allegations that defendants "took efforts to conceal their [price-fixing] agreements from the New York plaintiffs and the indirect class" were sufficient to state a claim under section 349. *See Flat Panel,* 586 F.Supp.2d at 1127–28 ("Defendants move to dismiss plaintiffs' claim under New York's General Business Law § 349 because the complaint does not specifically allege that defendants made any misrepresentations to the indirect plaintiffs."). Although couched in slightly different terms, defendants' summary judgment motion largely seeks to revisit this ruling.

The Court adheres to its earlier decision that plaintiffs' section 349 claim is viable. Contrary to defendants' argument, plaintiffs need not have been aware of defendants' deceptive conduct to recover under section 349. This is because "reliance is not an element of a section 349 claim." *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000). All that plaintiffs must establish is that defendants committed "material deceptive acts" and "that the defendant[s'] 'material deceptive act' caused the[ir] injury." *Id.*

Courts have found that a defendant's affirmative steps to conceal its price-fixing activities can amount to material deceptive acts within the meaning of section 349. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 536 F.Supp.2d 1129, 1143–44 (N.D.Cal.2008); *In re Graphics Processing Units Antitrust Litig.,* 527 F.Supp.2d 1011, 1030 (N.D.Cal.2007); *cf. Leider v. Ralfe,* 387 F.Supp.2d 283, 296 (S.D.N.Y.2005) (rejecting section 349 claim because "De Beers' conduct, while certainly reprehensible, was not secretive"); *New Motor Vehicles,* 350 F.Supp.2d at 197 (rejecting claim because price differential forming basis of section 349 claim was public knowledge). In this case, plaintiffs have introduced evidence that defendants took steps to ensure that their collusive activities remained hidden from consumers. *See* Clayton Decl., Exhs. 1–12 (examples of attempts to keep meetings

secret). The Court agrees with plaintiffs that a reasonable jury could conclude that this conduct could deceive a consumer into believing that he was paying a competitive price for LCD products. Accordingly, the Court finds that a genuine issue of fact exists regarding whether defendants' secret, collusive activity violated section 349.

### C. Vermont

**\*4** Defendants also move for summary judgment on plaintiffs' claims under the Vermont Consumer Fraud Act ("VCFA"), which prohibits "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce ...." 9 V.S.A. § 2453(a). "To prevail on a [VCFA] claim, one must show that: (1) there was a representation, practice, or omission likely to mislead the consumer; (2) the consumer interpreted the message reasonably under the circumstances; and (3) the misleading effects were material, that is, likely to affect the consumers conduct or decision with regard to a product." *Lang McLaughry Spera Real Estate, LLC v. Hinsdale,* 35 A.3d 100, 2011 WL 1347032, at \*8 (Vt., April 7, 2011).

As above, defendants argue that they should be granted summary judgment on plaintiffs' VCFA claims because plaintiffs were not aware of any of defendants' allegedly deceptive acts. *See* Berger Decl., Exh. D at 2 (admission of named-plaintiff Watson that he was unaware of defendants' allegedly deceptive statements at the time he bought his laptop computer). VCFA violations, however, are evaluated under an objective standard. *Lang McLaughry,* 2011 WL 1347032 at \*8. Thus, the question is whether defendants' omissions would have been material to a reasonable consumer. *Id.* at \*9. The Court finds that plaintiffs have established that a genuine issue of fact exists concerning whether defendants' concealment of their price-fixing activities were "likely to affect the consumer's conduct or decision with regard to a product." *See Elkins v. Microsoft Corp.,* 174 Vt. 328, 817 A.2d 9, 13 (Vt.2002) ("The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices.").

### D. Rhode Island

The Rhode Island Unfair Trade Practices and Consumer Protection Act ("UTPCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6–13.1–2. This Court has already held that plaintiffs' complaint

alleges a cognizable legal theory under the UTPCPA. *Flat Panel,* 586 F.Supp.2d at 1129 (approving plaintiffs' theory that "consumers were misled or deceived to believe that they were paying a fair price for [LCD products] or the price increases for [LCD products] were for valid business reasons").

Defendants raise three arguments as to why summary judgment should be granted on this claim. First, defendants seek summary judgment on the ground that plaintiffs' claims are exempted from coverage under the UTPCPA. The UTPCPA contains an exclusionary provision that provides: "Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."

R.I. Gen. Laws § 6–13.1–4. The Rhode Island Supreme Court has held that this provision "exempt[s] from the Act all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers."

*State v. Piedmont Funding Corp.,* 119 R.I. 695, 382 A.2d 819, 822 (R.I.1978).

**\*5** Defendants argue that plaintiffs' antitrust claims fall within this statutory exemption because antitrust claims are "subject to regulation [by] the United States Department of Justice, the Federal Trade Commission and the Rhode Island State Attorney General ...." Motion at 10. The Court disagrees with defendants' argument. The focus of the UTPCPA's exemption is not the defendants' wrongful acts, otherwise every illegal practice would be subject to the regulation of DOJ or the Rhode Island Attorney General and exempted from UTPCPA. Rather, the proper inquiry is whether the specific "transactions which constitute the basis of th[e] complaint" are subject to regulation. *Piedmont Funding,* 382 A.2d at 822; *see also Lynch v. Conley,* 853 A.2d 1212, 1214 (R.I.2004) ("[S]tep one of the exemption analysis requires the party claiming the exemption to demonstrate that the general activities complained of are subject to monitoring or regulation by a state or federal government agency."); *Chavers v. Fleet Bank (RI), N.A.,* 844 A.2d 666, 672 (R.I.2004) ( "Under the first prong of the analysis, the question is whether the 'general activity in question,' in this case credit-card solicitations, is subject to control and monitoring by governmental agencies.").

Thus, in *Piedmont Funding,* the plaintiff's lawsuit was precluded because he alleged deceptive acts in the sale

of insurance and securities, areas regulated by "the office of the insurance commissioner and the SEC respectively."

*Piedmont Funding,* 382 A.2d at 822. Other cases have similarly limited the UTPCPA's exemption to the transactions on which the plaintiff's complaint was based. *See New Motor Vehicles,* 350 F.Supp.2d at 201 (holding that claims based on deceptive practices in sales of automobiles were not cognizable because "[m]otor vehicle manufacturers, distributors and dealers are regulated by the State of Rhode Island pursuant to a separate statute"); *Lynch,* 853 A.2d at 1214 (excluding claim based upon inadequate lead-paint disclosure because "[l]ead paint disclosure in connection with the sale of residential real estate, already is comprehensively regulated by the state and federal government"); *Chavers,* 844 A.2d at 672 (finding claims of deceptive advertising in credit card solicitations exempted because "credit card solicitations by a national bank ... are subject to monitoring, supervision and regulation by federal agencies").

The Court concludes that the relevant "transactions which constitute the basis" of plaintiffs' complaint" are the sale and pricing of LCD products or consumer electronics. Defendants have identified no regulations governing such transactions. Accordingly, the Court rejects defendants' first basis for summary judgment.

Defendants' second argument is that their failure to disclose the alleged conspiracy was not material. Of the twenty separate definitions that the UTPCPA provides for "unfair methods of competition and unfair or deceptive acts or practices," one requires that the defendants "mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6–13.1–1 ("Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."). As above, defendants argue that plaintiffs were not aware of any statements made by the defendants, and that any deceptive conduct therefore could not have been material to plaintiffs' purchasing decisions. *Cf.* Berger Decl., Exh. F at 2 (testimony of Rhode Island named-plaintiff Mastronardi that he purchased his laptop computer without reviewing "marketing materials or brochures").

**\*6** "A material effect is one which is likely to influence a consumer's conduct or purchase decision." *In re Int'l Harvester Co.,* 104 F.T.C. 949, 1042–43 (Dec. 21, 1984); *see also* R.I. Gen. Laws § 6–13.1–3 ("It is the intent of the legislature that in construing §§ 6–13.1–1 and 6–

In re TFT-LCD (Flat Panel) Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011-2 Trade Cases P 77,634

13.1–2) due consideration and great weight shall be given to the interpretations of the federal trade commission and the federal courts relating to § 5(a) of the Federal Trade Commission ....”). For the reasons stated above, the Court agrees with plaintiffs that the existence of a price-fixing conspiracy is “likely to influence” the average consumer.

*Chocolate Confectionary,* 602 F.Supp.2d at 587 (finding allegations sufficient where plaintiff alleged that “defendants conspired to raise prices in Rhode Island, that they issued misleading statements about the true reasons for these price increases, and that they caused Rhode Island consumers to believe that prices for chocolate candy were the result of fair competition in an open marketplace” (citations omitted)). Accordingly, the Court rejects defendants' second basis for summary judgment.

Finally, defendants seek summary judgment as to any plaintiff who did not purchase an LCD product “primarily for personal, family or household purposes.” *See* R.I. Gen. Laws § 6–13.1–5.2(a). Although this Court has previously granted defendants' motion to dismiss plaintiffs' complaint to the extent it sought claims that did not meet this criteria, the class definitions do not contain any such limitation. *Flat Panel,* 586 F.Supp.2d at 1130. Accordingly, the Court GRANTS defendants' motion for summary judgment as to any purchases that were not “primarily for personal, family or household purposes.” The Court will enter an order altering the Rhode Island class definition at the time it rules on defendants' pending motion to amend the class definitions.

### E. Missouri

Plaintiffs' TAC also includes a claim under the Missouri Merchandising Practices Act (“MMPA”). The MMPA limits private actions to “[a]ny person who purchases or leases merchandise primarily for personal, family, or household purposes.” Mo.Rev.Stat. § 407.025.1. As above, defendants argue that the class definitions do not contain any “personal use” limitations. Plaintiffs do not contend that a plaintiff that purchased an LCD product for non-personal use may recover under the MMPA. Accordingly, the Court GRANTS defendants' motion to the extent plaintiffs seek to recover for purchases that were not personal. The Court will enter an order altering the Missouri class definition at the time it rules on defendants' pending motion to amend the class definitions.

## II. Unjust Enrichment Claims

Plaintiffs' TAC includes common-law unjust enrichment claims under the laws of twenty-two states, including the District of Columbia. TAC at ¶ 278. Defendants now seek summary judgment on plaintiffs' claims under the laws of fourteen states: the District of Columbia, Hawaii, Iowa, Kansas, Maine, Mississippi, Missouri, New Mexico, New York, Rhode Island, South Dakota, Vermont, West Virginia, and Wisconsin.

**\*7** Defendants advance three theories in support of their motion. First, they claim that in twelve states plaintiffs did not confer a “direct benefit” on the defendants. Second, they claim that the unjust enrichment claims under the laws of eight states must be dismissed because plaintiffs have an adequate remedy at law. Finally, they argue that unjust enrichment may not be used to circumvent the statutory limitations on antitrust actions in Rhode Island and Missouri.

### A. Necessity of “Direct Benefit”

Defendants argue that twelve states require a plaintiff to prove that he conferred a “direct benefit” on the defendant to establish a claim for unjust enrichment. They argue that plaintiffs cannot meet this requirement because the named plaintiffs purchased LCD products from intermediaries—either retailers or manufacturers of televisions, computers, or other LCD products—and not directly from a defendant.

As a general matter, the Court is unconvinced by defendants' argument. The Court recognizes that unjust enrichment law varies from state to state. *See True v. Conagra Foods, Inc.,* 2011 WL 176037, at *9 (W.D.Mo., January 4, 2011) (“Courts have repeatedly recognized that the law of unjust enrichment varies materially from state to state.” (internal quotation marks omitted)). In general, however, unjust enrichment requires a plaintiff to show “the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant.” Restatement (Third), Restitution § 1, cmt. a (2011);

*see also, e.g., Platz Associates v. Finley,* 973 A.2d 743, 750 (Me.2009) (“A claim for unjust enrichment requires the complaining party to show that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value.”).

Unjust enrichment is an equitable remedy, and thus by its very nature is a flexible doctrine. Restatement (Third), Restitution, § 1, cmt. a (noting the "inherent flexibility of the concept of unjust enrichment"). As a cause of action based in equity, "the requirements of proof of unjust enrichment are neither technical nor complicated." *Owens Corning v. R.J. Reynolds Tobacco Co.,* 868 So.2d 331, 342 (Miss.2004). *Id.* ("[T]he plaintiff need only allege and show that the defendant holds money which in equity and good conscience belongs to the plaintiff ...."). Thus, by their very nature unjust enrichment claims are ill-suited for bright-line rules of the type defendants suggest.

In addition, defendants' focus on the lack of a "direct relation" between plaintiffs and defendants in misplaced. Rather than looking at the relationship between the parties, courts typically focus on the relation between the plaintiffs' injury and the defendants' conduct. *Owens Corning,* 868 So.2d at 339 (noting need for a "direct relation between the injury asserted and the injurious conduct alleged."). Thus, those cases in which courts have described unjust enrichment claims as too "indirect" to state claims for relief typically have involved tenuous connections between the plaintiff's injury and the defendant's gain. Frequently the defendant's benefit did not originate with the plaintiff. *See Owens Corning,* 868 So.2d at 339; *Hill v. Stowers,* 224 W.Va. 51, 680 S.E.2d 66, 75 (W.Va.2009). In other cases the plaintiff's loss was not responsible for the defendant's gain or the defendant received no gain at all. *See Prudential Ins. Co. of America v. Couch,* 180 W.Va. 210, 376 S.E.2d 104 (W.Va.1988); *Rivers v. Amato,* 2001 WL 1736498 (Me.Super., June 22, 2001); *Alessi v. Bowen Court Condo.,* 2010 R.I.Super. LEXIS 50, 2010 WL 897246 (R.I.Super., March 10, 2010). In still other cases, courts have found the relationship too "attenuated." *See, e.g., Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 209, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (N.Y.2007) (rejecting indirect purchaser claims based upon price-fixing activities in chemicals used in rubber because the relationship was too "attenuated").

**\*8** Here, in contrast, there is a direct relationship between the plaintiffs' expenses and the defendants' benefit. Under the theory of the case that plaintiffs have advanced, there are no intervening events that disrupt the flow of money from plaintiffs to defendants. Although termed "indirect," plaintiffs have provided evidence supporting their theory

that the money they paid was "passed through" directly to defendants. In the Court's view, this is sufficient to satisfy the general common-law definition of unjust enrichment. *See, e.g., In re TFT–LCD (Flat Panel) Antitrust Litigation,* 599 F.Supp.2d 1189–90 (N.D.Cal.2009) ("Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct." (internal quotation marks omitted)). Unless a state court has explicitly held otherwise, the Court is inclined to allow plaintiffs' unjust enrichment claims to proceed.

### 1. *Mississippi*

In Mississippi, unjust enrichment "applies to situations where there is no legal contract but where the person sought to be charged is in possession of ... property which in good conscience and justice he should not retain but should deliver to another ...." *Joel v. Joel,* 43 So.3d 424, 432 (Miss.2010). Defendants argue that Mississippi law requires a "direct relation between the injury asserted and the injurious conduct alleged." *See Owens Corning,* 868 So.2d at 339 ("[O]ne notion traditionally included in the concept of proximate causation is the requirement that there be some direct relation between the injury asserted and the injurious conduct alleged." (internal quotation marks omitted)). Because the Mississippi class representative testified that she bought a personal computer, including an LCD monitor, from dell.com, defendants assert that summary judgment is appropriate on her unjust enrichment claim. *See* Berger Decl., Exh. G at 72.

Defendants' reliance on *Owens Corning* is misplaced. That case concerned proximate causation and did not establish a bar to all unjust enrichment claims where the plaintiff did not deal directly with the defendant. The plaintiff in *Owens Corning* was an asbestos manufacturer that settled a large number of cases with individuals suffering from lung disease. *Owens Corning,* 868 So.2d at 335. After reaching these settlements, the plaintiff brought suit against a number of tobacco companies, claiming that they were also responsible for the lung disease. *Id.* at 335–337. Its lawsuit included an unjust enrichment claim, based on the theory that "by effectively shifting liability for smoking related disease to [plaintiff], Tobacco Defendants have been unjustly enriched at [plaintiff's] expense." *Id.* at 336–37. Based on a Mississippi law that "preclude[d] all tobacco cases based

on products liability," the Court rejected plaintiff's unjust enrichment claim. *Id.* at 340. It held that plaintiff could not establish proximate cause for its injuries because it could not establish the tobacco companies' liability for the lung disease. *Id.* at 342 ("Owens Corning would have to prove that Tobacco Defendants were liable for injuries suffered by the asbestos claimants ....").

**\*9** This case has no such problem with proximate causation. Plaintiffs allege that defendants wrongfully overcharged electronics manufacturers for LCD panels, and that those overcharges were passed through to them when they purchased LCD products. Although plaintiffs and defendants may not have interacted, this amounts to "a direct relation between the injury asserted and the injurious conduct alleged." Accordingly, the Court DENIES defendants' motion for summary judgment on the Mississippi unjust enrichment claim.

### 2. *New York*

Defendants also seek summary judgment on plaintiffs' New York unjust enrichment claim. Defendants argue that indirect purchasers may not recover under New York law, relying primarily on a 2007 case from the New York Court of Appeals, *Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (N.Y.2007). *Sperry* concerned a purported antitrust class action lawsuit against producers of "rubber-processing chemicals that improve the durability, color control and heat resistance of rubber products, including tires, belts, hoses and footwear." *Id.* at 209, 831 N.Y.S.2d 760, 863 N.E.2d 1012. In addition to seeking treble damages, the lawsuit also included an unjust enrichment claim. *Id.* at 215, 831 N.Y.S.2d 760, 863 N.E.2d 1012. Acknowledging that "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," the court rejected the claim, concluding that "the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support such a claim." *Id.* at 215– 16, 831 N.Y.S.2d 760, 863 N.E.2d 1012; *see also New York v. Daicel Chemical Industries, Ltd.,* 42 A.D.3d 301, 840 N.Y.S.2d 8, 12 (N.Y.App.2007) ("While privity is not required for an unjust enrichment claim, the end-users of the products, in whose interest plaintiff is acting, are too attenuated from the producers of the chemicals which are among the ingredients of those products.").

Although *Sperry* supports defendants' position, even after it was decided courts have continued to allow unjust enrichment claims to proceed on behalf of indirect-purchasers of price-fixed products. *See Chocolate Confectionary,* 749 F.Supp.2d at 241 (finding sufficient allegations that "[t]he IEU plaintiffs have averred that a monetary benefit was indirectly conferred on defendants by virtue of their collusive market behavior.");

*see also Burns v. Delaware Charter Guarantee & Trust Co.,* 805 F.Supp.2d 12, 2011 WL 2314835, at \*2 (S.D.N.Y., June 8, 2011) ("Unjust enrichment does not require a direct relationship between the parties."); *In re Canon Cameras Litig.,* 2006 WL 1751245, at \*2 (S.D.N.Y., June 23, 2006) ("The cases on which defendant relies suggest, at most, only that some relationships may be too attenuated to support an unjust enrichment claim."); *Cox v. Microsoft Corp.,* 8 A.D.3d 39, 778 N.Y.S.2d 147 (N.Y.App.2004) (reversing district court's "holding that, as indirect purchasers of Microsoft's software products, plaintiffs only indirectly bestowed a benefit upon Microsoft.").

**\*10** In light of these cases, the court agrees with plaintiffs that the New York Court of Appeals' decision was based upon the fact that rubber-processing chemicals did not represent a significant portion of the rubber products that the plaintiffs purchased. Here, in contrast, plaintiffs claim that LCD panels are "identifiable, discrete physical objects that do not change form or become an indistinguishable part of the TVs, computer monitors, laptops, or other products in which they are contained," and "[t]hus, LCD panels follow a traceable physical chain from the defendants to the OEMs to the purchasers of the finished products incorporating LCD panels." TAC at ¶¶ 199–200; *see also Flat Panel,* 586 F.Supp.2d at 1123. Plaintiffs also allege that "LCD panels make up 60–70% of the cost of an LCD television or computer monitor." TAC at ¶ 182; *Flat Panel,* 586 F.Supp.2d at 1124. In light of these allegations, which defendants have not challenged, the Court finds that the relationship between plaintiffs and defendants is not too attenuated to support plaintiffs' unjust enrichment claim. Accordingly, the Court DENIES defendants' motion as to the New York unjust enrichment claim.

### 3. *Maine*

Under Maine law, "[a] claim for unjust enrichment requires the complaining party to show that: (1) it conferred a benefit

on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Platz,* 973 A.2d at 750. Defendants assert that Maine law precludes recovery by indirect purchasers and that summary judgment should therefore be granted on plaintiffs' Maine unjust enrichment claim. *See* Berger Decl., Exh. J at 29 (testimony of Maine class representative that she purchased television at Best Buy).

Defendants rely primarily on two cases in support of their argument: *Platz Associates v. Finley,* 973 A.2d 743 (Me.2009), and *Rivers v. Amato,* 2001 WL 1736498 (Me.Super., June 22, 2001). Neither of these cases, however, sets forth a general rule that an unjust enrichment plaintiff must directly interact with the defendant. *Platz,* for example, involved an unjust enrichment claim brought by an architecture firm that had created "conceptual architectural drawings for a development project." *Platz,* 973 A.2d at 746. When the project fell through, the firm sued, claiming that the owner had been unjustly enriched by his receipt of the architectural plans. *Id.* at 751. The Maine Supreme Court reversed a grant of summary judgment in favor of the plaintiff because the plaintiff had introduced no evidence that the defendant had actually received the plans. *Id.* at 751 ("[T]he statements of material facts fail to demonstrate that Finley actually received and retained the architectural plans, and thus fail to demonstrate the central element of unjust enrichment, a benefit conferred.").

**\*11** Similarly, *Rivers* involved a plaintiff who had contracted to purchase a parcel of land sold by the defendants. *Rivers,* 2001 WL 1736498 at \* 1. After plaintiff consulted with a third-party developer, the developer approached the defendants, offering to purchase the land for more than plaintiff had contracted to purchase it for. *Id.* The defendants took developer's offer, repudiating their contract with the plaintiff. *Id.* The plaintiff sued the sellers for unjust enrichment, claiming that he had generated the developer's interest in the property, which resulted in defendants' receiving the benefit of a higher purchase price. *Id.* at \*4. The court held that the plaintiff's benefit theory—that "through [plaintiff's] efforts, [the developer] conferred a benefit on [the seller]"—was too speculative to proceed. *Id.* at \*4 ("No

authority can be found for this "indirect benefit" theory, which is, in any case, based on speculation.").

Unlike either of these cases, plaintiffs have introduced evidence that defendants received a quantifiable benefit from plaintiffs' purchase of LCD products. Accordingly, defendant's motion is DENIED as to Maine law.

### 4. *Rhode Island*

Under Rhode Island law, to prove unjust enrichment a plaintiff must show "(1) that the plaintiff conferred a benefit upon the defendant, (2) that the defendant appreciated such benefit, and (3) that there was acceptance of such benefit in circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof. *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997).[1]  Again, defendants claim that plaintiffs' status as indirect purchasers is fatal to their unjust enrichment claim. *See* Berger Decl., Exh. F at 20, 22–23, 33.

Although defendants argue that a plaintiff must confer a "direct" benefit on a defendant, none of the cases defendants rely on establish that Rhode Island requires the benefit to be "direct." In *Alessi v. Bowen Court Condo.,* 2010 R.I.Super. LEXIS 50, 2010 WL 897246 (R.I.Super., March 10, 2010), for example, the court dismissed the plaintiff's unjust enrichment claim because if found that no benefit had been conferred on the defendants. *Id.* at \*12–\*14 (holding that defendants were not unjustly enriched by plaintiff's purchase of a property because the property had been foreclosed upon and "[d]efendants did not hold a present interest in the property at the time of the Plaintiff's purchase"). Similarly, in *R & B Elec. Co., Inc. v. Amco Const. Co., Inc.,* 471 A.2d 1351 (R.I.1984), the court also found that no benefit had been conferred on the defendants. *Id.* at 1356 ("Since they were unable to retain the benefit, we fail to see how defendants are unjustly enriched. And if defendants were enriched by R & B, they have not been enriched under circumstances that dictate that they ought equitably to be required to compensate plaintiff.").

Accordingly, defendant's motion is DENIED as to Rhode Island law.

### 5. *District of Columbia*

**\*12** To state a general claim for unjust enrichment under District of Columbia law, "a plaintiff must show that (1)

the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Lozinsky v. Georgia Resources Management, LLC,* 734 F.Supp.2d 150, 155 (D.D.C.2010).

None of the cases defendants rely on establish that indirect purchasers are prohibited from maintaining causes of action for unjust enrichment. Defendants' most compelling case is *True v. Conagra Foods, Inc.,* 2011 WL 176037 (W.D.Mo., January 4, 2011), which involved an unjust enrichment claim brought by a purchaser of tainted pot pies. *Id.* at *1–2. The court rejected the unjust enrichment claim because the plaintiff was an indirect purchaser. *Id.* at *9 ("[T]here is no evidence that any Plaintiff purchased a pot pie directly from ConAgra; instead, the Plaintiffs indirectly conferred a benefit on ConAgra by purchasing the pot pies from a retailer."). The plaintiff in that case, however, had not contested this point. *Id.* at *9 ("ConAgra argues (without dispute from the Plaintiffs) that at least eleven states and the District of Columbia impose this "direct benefit" requirement.").

*Minebea Co., Ltd. v. Papst,* 444 F.Supp.2d 68 (D.D.C.2006), involved a patent dispute between two companies that had conducted a joint venture together. *Id.* at 77–78. The court concluded that the circumstances of the case did not make the defendant's retention of the patents at issue "unjust." *Id.* at 187 ("Under these circumstances, the Court cannot conclude that it would be unjust for Papst Licensing to retain the United States patents at issue.").

Defendants cases do not establish that the District of Columbia requires a "direct relationship" between an unjust enrichment plaintiff and the defendant. Accordingly, defendant's motion is DENIED as to District of Columbia law.

### 6. *Kansas*

Under Kansas law, to recover for unjust enrichment a plaintiff must prove: "(1) a benefit which they conferred upon defendants; (2) defendants' appreciation or knowledge of the benefit; and (3) defendants' acceptance or retention of the benefit under circumstances which make it inequitable for defendants to retain the benefit without payment of its value."

Defendants rely on an unreported case from the Tenth Circuit to support their argument that Kansas law bars plaintiffs'

unjust enrichment claim. *See Spires v. Hospital Corp. of America,* 289 Fed. Appx. 269, 273 (10th Cir.2008) ("Plaintiffs have pointed to nothing in Kansas law that supports an indirect unjust enrichment claim against HCA for payments made to subsidiary hospitals."). The precise grounds for the holding in *Spires,* however, are unclear. *See id.* ("The district court dismissed the claim because Plaintiffs failed to allege that deceased family members had actually conferred a benefit on HCA, and that the unjust enrichment for acts constituting medical malpractice are displaced by Kansas's medical malpractice regime. We agree."). Other courts, in contrast, have explicitly endorsed indirect-purchaser unjust enrichment claims under Kansas law. *See Gonzalez v. Pepsico, Inc.,* 489 F.Supp.2d 1233, 1249 (D.Kan.2007) ("Defendants argue that plaintiffs do not state a claim for unjust enrichment because they do not allege that they made a purchase directly from defendants, and therefore do not allege that they conferred a benefit upon defendants. A claim for unjust enrichment under Kansas law, however, does not depend on privity.").

**\*13** Accordingly, defendant's motion is DENIED as to Kansas law.

### 7. *West Virginia*

Under West Virginia law, "if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value." *Realmark Devs., Inc. v. Ranson,* 208 W.Va. 717, 542 S.E.2d 880, 884–85 (W.Va.2000). Defendants assert that West Virginia does not recognize indirect-purchaser unjust enrichment claims. None of the cases defendants cite, however, stand for the proposition that an indirect purchaser may not recover under an unjust enrichment theory. In *Johnson v. Ross,* 419 Fed. Appx. 357 (4th Cir.2011), for example, the court expressly declined to reach the question. *Id.* at 362 ("We decline Plaintiffs' invitation to settle this state-law question, not least because doing so is unnecessary to reach our disposition."). In *Hill v. Stowers,* 224 W.Va. 51, 680 S.E.2d 66, 75 (W.Va.2009), the court rejected the plaintiff's unjust enrichment claim because the plaintiff had not conferred any benefit on the defendant. *Id.* at 75 ("Mr. Hill, however, was not the payor of the salary and benefits that Mr. Stowers received as circuit clerk."). Similarly, in *Prudential Ins. Co. of America v. Couch,* 180 W.Va. 210, 376 S.E.2d 104 (W.Va.1988), the court

held that the defendant was not the recipient of any benefit originating from the plaintiff. *Id.* at 109 ("[Defendant] was not the payee on any of the checks, as they were paid to the health care providers who had rendered services to his injured son.").

Accordingly, defendant's motion is DENIED as to West Virginia law.

#### 8. *Hawaii, Missouri, New Mexico, South Dakota, and Wisconsin*

Defendants argue that the unjust enrichment claims under the laws of the above states should be dismissed because no case from any of these states has permitted an unjust enrichment claim to proceed based upon an indirect benefit. Motion at 18. Thus, defendants argue that "[i]n the absence of any supporting authority from state courts, the respective plaintiffs cannot expand their states' laws of unjust enrichment ...." As discussed above, however, the Court views the plaintiffs' theory of unjust enrichment as relatively straightforward: defendants' wrongful conduct led them to receive a benefit at plaintiffs' expense. In the absence of state law conclusively precluding such claims, the Court is inclined to let them proceed.

### B. Adequate Remedies at Law

Defendants also move for summary judgment as to eight states—Hawaii, Kansas, Maine, New Mexico, Rhode Island, South Dakota, Vermont, and Iowa—claiming that "those states' common laws do not permit recovery in equity when an adequate remedy at law is available." Motion at 20. The Federal Rules of Civil Procedure typically allow a plaintiff to plead claims in the alternative. *See* Fed.R.Civ.P. 8(d)(2), (3). Defendants argue, however, that plaintiffs are prohibited from proceeding on their unjust enrichment claims once it becomes clear that those claims are identical to plaintiffs' legal remedies. *See, e.g.,* Fernandes v. Havkin, 731 F.Supp.2d 103, 114 (D.Mass.2010) (granting summary judgment for defendant on plaintiff's Massachusetts-law unjust enrichment claims because its legal remedies "preclude a claim for unjust enrichment. The disposition of those claims is irrelevant. Their mere availability is a bar to a claim of unjust enrichment."); Garcia v. Tyson Foods, Inc., 766 F.Supp.2d 1167, 1188 n. 17 (D.Kan.2011) (granting summary judgment for defendant because "[t]he pertinent inquiry is whether an adequate remedy is available, not whether that remedy is ultimately obtained").

**\*14**  The Court will allow plaintiffs to proceed on their unjust enrichment claims. Although plaintiffs' claims are not explicitly pled in the alternative, all parties acknowledge that they are brought in the alternative to plaintiffs' antitrust and consumer protection claims. Further, there is no evidence before the Court concerning the degree to which the remedies available under plaintiffs' unjust enrichment claims are identical to the legal remedies plaintiffs seek. *See* New Motor Vehicles, 350 F.Supp.2d at 212–13 (refusing to dismiss restitutionary relief as a means of remedying violations of state-law antitrust and consumer-protection statutes); TAC at 102 ¶ G (requesting "restitution, including disgorgement of profits"). Plaintiffs, of course, may not recover under both theories.

Accordingly, the Court DENIES defendants' motion to dismiss plaintiffs' unjust enrichment claims under the laws of Hawaii, Kansas, Maine, New Mexico, Rhode Island, South Dakota, Vermont, and Iowa.

### C. Missouri and Rhode Island—Bar to Indirect Purchaser Claims

Finally, defendants argue that plaintiffs' unjust enrichment claims under Missouri and Rhode Island law should not be allowed to proceed because they would constitute an "end run" around those states' limitations on indirect-purchaser antitrust actions. [2] One Missouri appellate court has held that indirect purchasers may not bring suit under the that state's antitrust laws. Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s, 998 S.W.2d 821, 825 (Mo.App.1999) ("If the harm to Duvall was only indirect, he does not have standing."). The Rhode Island Supreme Court has also limited antitrust standing to direct purchasers. *See* Siena v. Microsoft Corp., 796 A.2d 461, 465 (R.I.2002) ("We are of the opinion that under federal law and the Antitrust Act, standing to litigate antitrust violations rests with the direct purchaser or the Attorney General as *parens patriae.*" ); *see also* New Motor Vehicles, 350 F.Supp.2d at 211–212 ("For those states that have maintained the *Illinois Brick* prohibition on indirect purchaser recovery, I conclude that it would subvert the statutory scheme to allow these same indirect purchasers to secure, for the statutory violation, restitutionary relief at common law (or in equity).").

This Court has previously addressed this issue in the context of unjust enrichment claims brought under the laws of other states:

> [P]laintiffs have not cited any authority from Arkansas, Virginia, Montana or Puerto Rico holding that an indirect purchaser plaintiff may bring an unjust enrichment claim when that same claim would be barred under state antitrust law. In the absence of such authority, the Court declines to recognize such a claim because the Court agrees with defendants that permitting such claims would allow plaintiffs to circumvent limitations of state antitrust laws.

*In re TFT–LCD (Flat Panel) Antitrust Litig.,* 599 F.Supp.2d 1179, 1192 (N.D.Cal.2009). Defendants argue that the Court should follow its prior holding.

**\*15** This Court's earlier decision, however, is distinguishable. Although indirect purchasers may not bring antitrust claims under Rhode Island or Missouri law, both states permit them to bring unfair competition claims.

*See* *Chocolate Confectionary,* 602 F.Supp.2d at 586–87 (finding that UTPCPA claims brought by indirect purchasers of chocolates stated a claim); *Gibbons v. J. Nuckolls, Inc.,* 216 S.W.3d 667, (Mo.2007) (“The [MMPA's] plain language does not contemplate a direct contractual relationship between plaintiff and defendant, and Missouri courts have not imposed such a requirement through statutory construction.”). In light of the fact that plaintiffs may bring claims under these statutes for the same underlying conduct, the concerns at issue in this Court's prior order are inapplicable. Accordingly, the Court DENIES defendants' request for summary judgment on plaintiffs' Missouri and Rhode Island unjust enrichment claims.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' joint motion for partial summary judgment on various issues of state law. Docket No. 3205 in 07–1827.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4501223, 2011-2 Trade Cases P 77,634

## Footnotes

1    Defendants also argue that “a plaintiff must show that he had a ‘reasonable expectation of payment from the defendants' in return for the alleged benefit.” *See* Motion at 22 (quoting *Scully Signal Co. v. Joyal,* 881 F.Supp. 727, 745 (D.R.I.1995)). This appears to be a misstatement of the law; the source cited by *Scully Signal* sets forth a different standard. *See* *Commercial Associates v. Tilcon Gammino, Inc.,* 998 F.2d 1092, 1100–01 (1st Cir.1993) (“To recover on a theory of unjust enrichment under Rhode Island law, the plaintiff must show that it conferred a benefit on the defendant ‘in such circumstances that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof.’ ”).

2    Plaintiffs do not seek to recover under the antitrust laws of Missouri or Rhode Island. Rather, they assert unfair competition and unjust enrichment claims under the laws of those states.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 69

2009 WL 362982
Only the Westlaw citation is currently available.
United States District Court,
E.D. Arkansas,
Western Division.

Mystic THOMPSON, Individually And On
Behalf of All Others Similarly Situated, Plaintiff
v.
BAYER CORPORATION; Bayer
Healthcare, LLC, Defendants.

No. 4:07CV00017 JMM.
|
Feb. 12, 2009.

West KeySummary

1    **Federal Civil Procedure** 🔑 Consumers,
Purchasers, Borrowers, and Debtors

The unjust enrichment claims of a would-
be class action plaintiff did not meet the
superiority and predominance requirements for
class certification. The plaintiff alleged unjust
enrichment against a pharmaceutical company
for falsely advertising the benefits of a line of
vitamins. Because of the variation among states'
unjust enrichment laws, the plaintiffs would have
been required to present different evidence to
prove a prima facie case depending upon their
state of citizenship. Furthermore, although the
plaintiff insisted that the management of the
class action was possible, the difficulties in
protecting the integrity of the law of each state
overwhelmed any judicial economy which might
have been obtained. 📄 Fed.Rules Civ.Proc.Rule
23(b)(3), 28 U.S.C.A.

**Attorneys and Law Firms**

Eric D. Wewers, Law Offices of Eric D. Wewers, Jack
Thomas Patterson, II, Jeremy Y. Hutchinson, Patton, Roberts,
Mcwilliams & Capshaw, M. Darren O'Quinn, Law Offices of
Darren O'Quinn, PLLC, Little Rock, AR, James Clark Wyly,

Sean Fletcher Rommel, Patton Roberts PLLC, Texarkana,
TX, for Plaintiff.

Edwin L. Lowther, Jr., Gary D. Marts, Jr., Wright, Lindsey &
Jennings, Little Rock, AR, for Defendants.

***ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION***

JAMES M. MOODY, District Judge.

**\*1** Pending is the Plaintiff's Motion for Class Certification.
The Defendants have responded and both parties have filed
replies. The Court has also considered the parties' oral
arguments presented during the hearing held on October 20,
2008. At the request of the Court, Plaintiff has provided
proposed jury instructions for the trial of this case. Again,
Defendants have responded and the Plaintiff has replied. For
the reasons set forth below, the Motion is DENIED.

I. *Background*

Plaintiff alleges that the Defendants engaged in a false
marketing scheme with regard to their product, One-A-
Day Weight Smart vitamins ("Weight Smart"). According to
Plaintiff, the Defendants claimed that Weight Smart increased
the metabolism of people as they age. This claim was based on
an ingredient in Weight Smart called ECGC from the extract
of green tea. Plaintiff contends that there was no reliable
scientific evidence to substantiate the increased metabolism
claim. In fact, on January 28, 1991 the Federal Trade
Commission ("FTC") ordered the Defendants to stop making
representations about the benefits of One-A-Day products
unless Defendants possessed and relied upon competent and
reliable scientific evidence to substantiate the representation.
(Ex. 4 to Pl's Motion for Class Cert.) On January 3, 2007,
the FTC filed suit against the Bayer Corporation for violation
of the 1991 Order. The Complaint stated that on numerous
occasions beginning in January 2003 Bayer disseminated
advertising about the benefits of Weight Smart without
possessing or relying upon competent and reliable evidence.
*Id.* As a result, the Defendants were fined $3.2 million by the
FTC.

Plaintiff's cause of action on behalf of herself and the
putative class rests on Defendants' alleged uniform false
and misleading statements about Weight Smart. Plaintiff
claims that the Defendants were unjustly enriched by the sale
of Weight Smart. Plaintiff and the putative class members

Thompson v. Bayer Corp., Not Reported in F.Supp.2d (2009)

purchased the product which did not possess the qualities represented to the public and they are entitled to restitution, damages, and a permanent injunction enjoining Defendants from further wrongful conduct with regard to Weight Smart. (Third Amended Complaint).

Plaintiff seeks certification of the following multi-state class:

> All persons who purchased One-A-Day Weight Smart from December 1, 2003 up through January 4, 2007, the date Defendants entered the Consent Judgment with the FTC to stop all marketing claiming the pill enhanced metabolism and aided weight loss. Excluded from this Class are all officers, directors, and employees of the Defendants and its subsidiaries, along with any currently sitting Federal Judge or their staff in this case or potential appellate justice and any person within the third degree of consanguinity to the judge or justice. Further excluded is any person claiming personal injury or damage beyond that specifically claimed in this motion.

In the alternative, Plaintiff seeks to certify a class action for the State of Arkansas for the injuries suffered by Arkansas citizens in the purchase of Weight Smart. *Id.*

### II. *Choice of Law Analysis*

**\*2** Because Plaintiff seeks to certify a nationwide class to pursue a common law claim, the Court must first consider choice-of-law principles. Plaintiff urges the Court to look at *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)("*Shutts* ") and *Sun Oil Co. v. Wortman,* 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988)("*Wortman* ") as authority for her argument that the law of Arkansas does not conflict with other states and is sufficient for use in a nationwide unjust enrichment class action. In *Shutts,* gas royalty owners filed suit against Phillips Petroleum Company ("Phillips") seeking interest payments on their suspended royalties which Phillips had possessed

pending Commission approval of gas price increases. The suit was filed in Kansas. The Kansas court certified a class of 33,000 royalty owners who had royalties suspended by Phillips. Less than 1,000 class members resided in Kansas and less than 1% of the gas leases involved were on Kansas land. However, the trial court applied Kansas law to the claims of all class members.

The United States Supreme Court found that the Kansas court erred by failing to conduct a conflict of law analysis. The Court stated:

> Kansas must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of Kansas law is not arbitrary or unfair. Given Kansas' lack of 'interest' in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.

*Shutts,* 472 U.S. at 821-22 (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)).

The facts of *Wortman* are similar and intertwined. In *Wortman,* gas royalty owners filed suit in Kansas seeking interest on suspended royalty payments. The Kansas court applied Kansas law to all claims even those related to leases in other states brought by citizens of other states. The United States Supreme Court vacated and remanded *Wortman* for reconsideration in light of the Court's ruling in *Shutts.* On remand, the trial court held that the other states' substantive legal rules were consistent with those of Kansas. Thus, while applying the laws of the other states, the Court came to the same conclusion as it did under Kansas law. The Kansas Supreme Court affirmed.

On appeal to the U.S. Supreme Court, Sun Oil argued that the Kansas Supreme Court had "unconstitutionally distorted" Texas, Oklahoma, and Louisiana law and applied this distorted law in *Wortman. Wortman,* 486 U.S. at 730. In other words, Sun Oil argued that when the Kansas court went back and applied the substantive laws of those states, the court applied the laws incorrectly. The Supreme Court disagreed and explained:

Thompson v. Bayer Corp., Not Reported in F.Supp.2d (2009)

To constitute a violation of the Full Faith and Credit Clause or the Due Process Clause, it is not enough that a state court misconstrue the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention.

**\*3** Plaintiff argues that this language from *Wortman* proves (1) that it is the Defendant's burden to show a conflict of law exists and (2) it is not a conflict unless the law of the other State is "clearly established and has been brought to the court's attention." The Court disagrees. The *Wortman* analysis applies only when considering whether the court applied another State's law incorrectly. For example, this analysis would apply if this Court were to apply Alabama law to some of the class claims and the Defendant appealed the Court's decision on the basis that the Court misconstrued Alabama law. Pursuant to *Wortman,* the Defendant would have to prove that the Court misapplied Alabama law so completely that the Court applied a "contradictory" law, that Alabama's law was clearly established, and that the parties had brought this to the Court's attention. The *Wortman* analysis does not apply to the instant case at this point in the litigation.

At this stage, the Court must determine under *Shutts* whether Arkansas has a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the Plaintiff's purported class, contacts 'creating state interest,' in order to ensure that the choice of Arkansas law is not arbitrary or unfair. The Court finds that Arkansas does not have the requisite contacts with out-of-state members' claims.

The next step, therefore, is to determine whether Arkansas's law conflicts in any material way with any other law which could apply. There is, of course, no constitutional injury to out-of-state plaintiffs in applying Arkansas law unless Arkansas law is in conflict with the laws of the other states. *Shutts,* 472 U.S. at 816 (1985).

Again, relying on *Shutts* and *Wortman,* Plaintiff submits that there is no conflict between the State of Arkansas's law of unjust enrichment and the laws of the other 50 states, including the District of Columbia. Plaintiff contends that there are a few nuanced variations in unjust enrichment law in the 50 states, but the policy and purpose are uniform. In support of her argument, Plaintiff has submitted a nationwide review of the law of unjust enrichment (Ex. G to the Motion for Class Cert.) and proposed jury instructions (Docket # 113).

In response, the Defendants have also submitted a nationwide review of the law of unjust enrichment. (Docket # 120) The Defendant contends that there are actual conflicts in this area of the law and, therefore, the Court should reject the application of unjust enrichment laws to a nationwide class as the Court did in *Shutts.*

Plaintiff claims that, in general, the elements of unjust enrichment are as follows:

1. Defendant must have received something of value;

2. Defendant, in good conscience, is not entitled to the benefit.

(Pl's Proposed Jury Inst. at p. 3). Plaintiff acknowledges, however, that there are three different approaches taken by the states to unjust enrichment claims:

**\*4** 1) Restitution: those that follow a restitution approach where a plaintiff must show that a defendant accepted and used a benefit bestowed upon the defendant by the plaintiff, which benefit would be inequitable to retain;

2) Restitution Plus: those that follow the restitution approach but also require that there be no adequate remedy at law;

3) Wrongful Acts: those that require a plaintiff to show that the defendant benefitted from the plaintiff through fraud, duress, misconduct, wrongful acts or taking undue advantage.

*See* Pl.'s Ex. G. According to Plaintiff, the Restitution approach is followed by 37 states, the Restitution Plus approach is followed by seven states, and the Wrongful Acts approach is followed by six states.

After an extensive review of the law, the Court finds that the states' different approaches to, or elements of, unjust enrichment are significant. Some of the most troublesome differences are those recognized by the Plaintiff, *i.e.,* the disparity in proof required to prove an enrichment was "unjust or wrongful" and the requirement by some states that there

Thompson v. Bayer Corp., Not Reported in F.Supp.2d (2009)

be no adequate remedy at law. However, these are not the only conflicts that exist in this area of the law. There are other differences that the Plaintiff has not included in this list including, the direct and indirect benefit elements of unjust enrichment.

### A. Conflicts

#### 1. Wrongful Conduct

Courts in Arkansas do not require a tortious, illegal or fraudulent act by the defendant to prove unjust enrichment. *Frigillana v. Frigillana,* 266 Ark. 296, 584 S.W.2d 30 (Ark.1979). "Unjust enrichment does not require a wrongful act by the party enriched. Even an innocent defendant is subject to an unjust enrichment claim brought by a more deserving party." Howard W. Brill, Law of Damages, § 31:2 (5th ed.2004)(citing *Malone v. Hines,* 36 Ark.App. 254, 822 S.W.2d 394 (Ark.App.1992); *Orsini v. Commercial National Bank,* 6 Ark.App. 166, 639 S.W.2d 516 (Ark.App.1982)). In other words, Arkansas plaintiffs do not have to prove any misconduct on the part of the defendant in an unjust enrichment action.

In contrast, Montana courts require a showing of misconduct or fault on the part of the defendant to recover under an unjust enrichment theory. "Unjust enrichment is an equitable doctrine wherein the plaintiff must show some element of misconduct or fault on the part of defendant, or that the defendant somehow took advantage of the plaintiff." *Randolph V. Peterson, Inc. v. J.R. Simplot Co.,* 239 Mont. 1, 778 P.2d 879, 883 (Mont.1989)(citing *Brown v. Thornton,* 150 Mont. 150, 432 P.2d 386, 390 (Mont.1967)).

*See also Hayes Mechanical, Inc. v. First Industrial, L.P.,*351 Ill.App.3d 1, 12, 285 Ill.Dec. 599, 812 N.E.2d 419 (Ill App. 1st Dist.2004)("[I]njustice involves some form of improper conduct by the party to be charged."); *National Employment Service Corp. v. Olsten Staffing Service, Inc.,* 145 N.H. 158, 761 A.2d 401, 406-07 (N.H.2000)("Because ... Olsten did not act wrongfully ..., the facts do not support a finding of unjust enrichment.")

**\*5** Alabama courts have an even higher standard for defendant's conduct. Alabama courts require unconscionable conduct on the part of the defendant in order to make a claim for unjust enrichment. The Alabama Supreme Court concluded that the retention of a benefit is unjust

if "(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched." *Mantiply v. Mantiply,* 951 So.2d 638, 654-55 (Ala.2006)(quoting *Welch v. Montgomery Eye Physicians, P.C.,* 891 So.2d 837, 843 (Ala.2004)) (emphasis in original). *See also Burlington Northern R. Co. v. Southwestern Elec. Power Co.,* 925 S.W.2d 92, 97 (Tex.App.1996)("Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."); *ServiceMaster of St. Cloud v. GAB Business Services, Inc.,* 544 N.W.2d 302, 306 (Minn.1996)("[I]t must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."); *Haggard Drilling, Inc. v. Greene,* 195 Neb. 136, 236 N.W.2d 841 (Neb.1975)(fraud, misrepresentation, or other wrongful conduct required on the part of the defendant to prove unjust enrichment); *DCB Const. Co., Inc. v. Central City Development Co.,* 965 P.2d 115, 117 (Colo.1998)("[F]or the enrichment to the landlord to be unjust and therefore actionable, the contractor must show some improper, deceitful, or misleading conduct by the landlord."); *Barker v. Dicicco,* 2002 WL 31956978, 1(Mich.App.2002)("proof of coercion or mistake to recover on unjust enrichment grounds."); *Qualichem v. Xelera, Inc.,* 2003 WL 23162331, 3 (Va.Cir.Ct.2003)("claims of unjust enrichment based on quasi-contract have been limited by the appellate courts of the Commonwealth to those arising from: money paid by mistake; failed consideration; money got through imposition; extortion; oppression; or any other undue advantage taken of the claiming party's situation, where the advantage is contrary to laws made for the protection of persons under those circumstances."). The misconduct element of unjust enrichment in these states is in direct conflict with the unjust enrichment law of Arkansas.

#### 2. Direct vs. Indirect Purchaser Requirements

In Arkansas, although the enrichment to the defendant must be at the expense of the plaintiff, the enrichment need not come *directly* from the plaintiff. The enrichment may come from a third party. *Smith v. Whitener,* 42 Ark.App. 225, 856 S.W.2d 328, 330 (Ark.App.1993)(citing *Patton*

*v. Brown-Moore Lumber Co.,* 173 Ark. 128, 292 S.W. 383 (1927)). In North Dakota, however, the doctrine of unjust enrichment appears to apply only "if another 'has, without justification, obtained a benefit at the *direct expense* of the [plaintiff].' " *Apache Corp. v. MDU Resources Group, Inc.,* 603 N.W.2d 891, 895 (N.D.1999)(quoting *Midland Diesel Serv. & Engine Co. v. Sivertson,* 307 N.W.2d 555, 557 (N.D.1981)). North Carolina courts also require a "direct benefit" to the defendant from the plaintiff as an element of unjust enrichment. *Effler v. Pyles,* 94 N.C.App. 349, 380 S.E.2d 149 (N.C.App.1989). *See Sperry v. Crompton Corp.,* 26 A.D.3d 488, 489, 810 N.Y.S.2d 498 (N.Y.A.D. 2 Dept.2006)("Because the plaintiff was not in privity with the defendants, the plaintiff cannot maintain an action against them to recover damages for unjust enrichment."); *Powers v. Lycoming Engines,* 245 F.R.D. 226, 232 (E.D.Pa.2007)(noting that Florida, Idaho and Ohio preclude indirect purchasers from asserting claims for unjust enrichment).

**\*6** The direct/indirect purchaser element is likely to be significant in this case since few, if any, of the plaintiffs purchased Weight Smart directly from Bayer. In other words, plaintiffs from Arkansas would not be required to prove that Bayer obtained a "direct benefit" from a plaintiff, while plaintiffs from other jurisdictions would be required to make such a showing.

### 3. Adequate Remedy at Law

In addition, some states do not allow an unjust enrichment claim to survive if there is an adequate remedy at law. *See Trustmark Ins. Co. v. Bank One, Arizone, N.A.,* 202 Ariz. 535, 48 P.3d 485 (Ariz.App. Div. 1 2002); *Ramona Manor Convalescent Hosp. v. Care Enters.,* 177 Cal.App.3d 1120, 225 Cal.Rptr. 120 (Cal.App. 4 Dist.1986); *Porter v. Hu,* 116 Hawai'i 42, 169 P.3d 994 (Haw.App.2007); *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377 (Del.Ch.1999); *Mannos v. Moss,* 143 Idaho 927, 155 P.3d 1166 (Idaho 2007); *Guinn v. Hoskins Chevrolet,* 361 Ill.App.3d 575, 296 Ill.Dec. 930, 836 N.E.2d 681 (Ill.App.2005); *Kilpatrick v. Kilpatrick,* 660 So.2d 182 (La.App.1995); *Santagate v. Tower,* 64 Mass.App.Ct. 324, 833 N.E.2d 171 (Mass.App.2005); *Servicemaster of*

*St. Cloud v. GAB Business Servs.,* 544 N.W.2d 302, 305 (Minn.1996); *Tolbert v. Southgate Timber Co.,* 943 So.2d 90 (Miss.App.2006); *Bennett v. Crane,* 220 Mo.App. 607, 289 S.W. 26 (Mo.App.1926); *Featherstonhaugh v. Roemer,* 279 A.D.2d 783, 719 N.Y.S.2d 612 (2001); *Schroeder v. Buchholz,* 622 N.W.2d 202 (N.D.2001); *Harvell v. Goodyear Tire and Rubber Co.,* 164 P.3d 1028 (Okla.2006); *Am. Towers Owners Ass'n. Inc. v. CCI Mech.,* 930 P.2d 1182 (Utah 1996); *Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.,* 139 Wash.2d 824, 991 P.2d 1126 (Wash.2000). Arkansas does not have such a requirement

> [V]ariances exist in state common laws of unjust enrichment. The actual definition of 'unjust enrichment' varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense.

*Clay v. American Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) (internal citation omitted). "[U]njust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone among the fifty states." *In re Sears, Roebuck & Co.,* 2006 WL 3754823 at \*1 n. 3 (N.D.Ill.2006). For these reasons, the Court also finds there are material conflicts between the unjust enrichment law of Arkansas and the other states.

### III. *Rule 23 Class Certification Standard*

To be certified as a class, a plaintiff has the burden of showing that all of the requirements of Rule 23(a) are met. *Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:(1) class is so numerous that joinder of all members is impractical;" (2) there are questions of law or fact common to the class; (3) the claims or defenses of representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

**\*7** Fed. R.Civ. P. 23(a)). These requirement are commonly referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.

In addition to the requirements of Rule 23(a), Plaintiff must also show that her claims fall within one of the categories of Rule 23(b). Plaintiff seeks to certify her class under Rule 23(b)(3), the so-called "common question" or "damages" class action. To certify a class action under Rule 23(b)(3), the Court must find that: 1) common questions predominate over any questions affecting only individual members; and 2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. *Blades v. Monsanto Co.,* 400 F.3d 562, 568-569 (8th Cir.2005)(citing Fed. R.Civ.P. 23(b)(3); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689(1997)). Although a rigorous Rule 23 analysis must be conducted before certifying a class, district courts have broad discretion in determining a motion for class certification. *Spence v. Glock, Ges.m.b.H,* 227 F.3d 308, 310 (5th Cir.2000). The determination that Arkansas law cannot apply to the claims of the entire class "pervades every element of FRCP 23." *In re Prempro,* 230 F.R.D. 555, 561 (E.D.Ark.2005).

Because the Court finds it determinative, a discussion of the requirements of Rule 23(b)(3) is all that is necessary. The focus of Rule 23(b)(3) is that common issues predominate over individual issues and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. "To satisfy the 'predominance' standard, plaintiffs must show that [their claims] can be proven on a systematic, class-wide basis." *In re Prempro,* 230 F.R.D. at 566 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 569 (8th Cir.2005). This requirement "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623-24. As explained in the discussion of conflicts of law, plaintiffs will be required to present different evidence to prove a prima facie case of unjust enrichment depending on their state of citizenship. Evidence regarding the Defendant's conduct, the direct or indirect benefit to the Defendant, and adequate remedies at law which may be available to the plaintiff cannot be presented on a systematic, class-wide basis.

In determining whether a class action is the superior method for adjudicating the claims before it, the Court must look at four factors: the class members' interest in individually controlling their separate actions; the extent and nature of existing litigation by class members concerning the same claims; the desirability of concentrating the litigation in the particular forum; and the likely difficulties in the management of a class action. Fed.R.Civ.R. 23(b)(3). Although Plaintiff insists that the management of this class action is possible, the difficulties in protecting the "integrity of the law of each state" overwhelms any judicial economy which might be attained.

*In re Prempro,* 230 F.R.D. at 563.

**\*8** After considering the variations in unjust enrichment laws, the Court finds that Plaintiff has failed to satisfy the superiority and predominance requirements of Rule 23(b)(3). Compare *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 501 ("claim of unjust enrichment is packed with individual issues and would be unmanageable"); *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996)("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action."); *In re Conagra Peanut Butter Products Liability,* 251 F.R.D. 689 (N.D.Ga.2008)("This morass is useful to establish not only the lack of uniformity of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 708 of 751
PageID: 12074
Thompson v. Bayer Corp., Not Reported in F.Supp.2d (2009)

unjust enrichment claims across the country, but also the inferiority of class-wide resolution due to discerning the many differing legal standards."); *Siegel v. Shell Oil Co.,* 2008 WL 4378399, 6 (N.D.Ill.2008). Accordingly, the Court, in its discretion, denies Plaintiffs' Motion for Class Certification of a nationwide class.

#### IV. *Alternative Class Action*

In the alternative, Plaintiff states that if the nationwide class is not certified by the Court "a class action is appropriate for all states where Defendants failed to establish any conflict between the laws of those states and the State of Arkansas law of unjust enrichment is applicable." (Third Amended Complaint at p. 11). Plaintiff further contends that "a class action for the State of Arkansas is appropriate for the injuries suffered by Arkansas citizens in the purchase of One-A-Day WeightSmart." *Id.* Because the parties have focused their energies on the motion for nationwide class certification, there has been little evidence or argument regarding an alternative class. The Court finds that the Plaintiff has failed to adequately brief the issues involved in certification of an alternative class. As an initial matter, the record does

not include class definitions for any alternative class or any information regarding numerosity. Therefore, the motion for class certification of an alternative class is denied without prejudice to Plaintiff's right to re-file the motion. If Plaintiff intends to pursue an alternative class, the motion to certify must be filed with the Court within thirty (30) days.

#### V. *Conclusion*

In conclusion, Plaintiff's Motion for Class Certification (Docket # 81 and # 86) is DENIED as to the nationwide class. The motion for class certification of an alternative class is denied without prejudice to Plaintiff's right to re-file the motion. If Plaintiff intends to pursue an alternative class, the motion to certify must be filed with the Court within thirty (30) days.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 362982

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    7

Tab 70

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 710 of 751
PageID: 12076
Torres-Hernandez v. CVT Prepaid Solutions, Inc., Not Reported in F.Supp.2d (2008)
2008 WL 5381227

🔖 KeyCite Yellow Flag - Negative Treatment

Distinguished by Ontel Products Corporation v. Zuru, LTD, D.N.J., August 29, 2018

2008 WL 5381227
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Alberto TORRES–HERNANDEZ, Plaintiff,

v.

CVT PREPAID SOLUTIONS,
INC., Defendant.

Civil Action No. 3:08–cv–1057–FLW.
|
Dec. 17, 2008.

**Attorneys and Law Firms**

Bruce Heller Nagel, Elliott Louis Pell, Nagel Rice, LLP, Roseland, NJ, for Plaintiff.

Steven Lawrence Menaker, Chasan, Leyner, Bariso & Lamparello, P.C., Secaucus, NJ, for Defendant.

**OPINION**

WOLFSON, District Judge.

*1 Presently before the Court is a motion filed by Defendant CVT Prepaid Solutions, Inc. ("Defendant") to dismiss Plaintiff Alberto Torres–Hernandez's ("Plaintiff") Complaint, in which Plaintiff, individually and on behalf of all others similarly situated, asserts a claim arising under the New Jersey Consumer Fraud Act, and common law claims for fraud and misrepresentation and unjust enrichment. Alternatively, Defendant argues that jurisdiction over this matter properly lies with the Federal Communications Commission ("FCC"). Generally, Plaintiff alleges that Defendant's pre-paid calling cards did not provide the minutes advertised and paid for by consumers. For the reasons set forth herein, Defendants' motion to dismiss for lack of subject matter jurisdiction is denied, and its motion to dismiss for failure to state a cause of action is granted. However, Plaintiff shall be given leave to re-plead and file an Amended Complaint.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Since Defendant moves to dismiss Plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(6), all facts alleged in the complaint are assumed to be true. Plaintiff is a resident of New Brunswick, New Jersey. Compl. ¶ 6. Defendant is a Delaware Corporation and a nationwide provider of prepaid calling cards that are distributed and sold in New Jersey. Id. ¶¶ 5, 8.

Cardholders buy access to allotments of long distance telephone access via an automated computer system commonly referred to as a "platform." Id. ¶ 14. The platform monitors certain data points, namely the stated value of the prepaid calling card, the relevant rate table, the origin and destination of the call. Id. A prepaid calling card is generally accompanied by a toll-free telephone number that the cardholder must use to place a long distance call, otherwise known as "plugging into the platform." Id. Once the user has connected with the access number, the user will be prompted to enter his or her personal identification number ("PIN") found on the front or back of the card. Id. After the platform verifies the PIN, the user is then asked to enter the number to which he or she wishes to connect. Id. The user, after entering the destination number, is notified via voice prompt as to the amount of minutes he or she hast left on that particular calling card. Id. The gravamen of Plaintiff's Complaint is that Defendant's cards "virtually never provide the minutes advertised to consumers nor do they provide the minutes that the voice prompt indicates are available to the user." Id. ¶ 15.

As a result, Plaintiff filed this action on January 14, 2008, in the New Jersey Superior Court, Middlesex County Vicinage. In his Complaint, Plaintiff alleges that "Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and/ or otherwise released pre-paid calling cards into the stream of commerce." Compl. ¶ 25. Pursuant to 28 U.S.C. 1446(a), the matter was removed to this Court on February 28, 2008. Defendant asserts that federal jurisdiction is proper pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d), which provides that this Court has original jurisdiction over any class action (1) involving a plaintiff class of 100 or more members; (2) in which the amount in controversy exceeds $5,000,000; and (3) where at least one member of the plaintiff class is diverse from defendant. Thereafter, Defendant filed this Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) on March 6, 2008.

2008 WL 5381227

## II. DISCUSSION

### A. Standard of Review 12(b)(1)

**\*2** When jurisdiction is challenged pursuant to Rule 12(b)
(1), the plaintiff bears the burden of persuading the court
that subject matter jurisdiction exists. *Kehr Packages, Inc.
v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991). No
presumption of truthfulness attaches to the allegations of the
complaint insofar as they concern subject matter jurisdiction.
*Mortensen v. First Federal Sav. & Loan Ass'n,* 549 F.2d
884, 891 (3d Cir.1977). Should factual issues arise regarding
subject matter jurisdiction, the court may consider exhibits
outside the pleadings. *Id.* Indeed, "the trial court is free to
weigh the evidence and satisfy itself as to the existence of its
power to hear the case." *Id.*

### B. Standard of Review 12(b)(6)

When reviewing a motion to dismiss on the pleadings, courts
"accept all factual allegations as true, construe the complaint
in the light most favorable to the plaintiff, and determine
whether, under any reasonable reading of the complaint, the
plaintiff may be entitled to relief." *Phillips v. County of
Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and
quotations omitted). Recently, in *Bell Atlantic Corporation
v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929
(2007), the Supreme Court clarified the 12(b)(6) standard.
Specifically, the Court "retired" the language contained in
*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957), that "a complaint should not be dismissed for
failure to state a claim unless it appears beyond doubt that
the plaintiff can prove no set of facts in support of his claim
which would entitle him to relief." *Id.* at 1968 (quoting
*Conley,* 355 U.S. at 45–46). Instead, the factual allegations
set forth in a complaint "must be enough to raise a right
to relief above the speculative level." *Id.* at 1965. As the
Third Circuit has stated, "[t]he Supreme Court's *Twombly*
formulation of the pleading standard can be summed up thus:
'stating ... a claim requires a complaint with enough factual
matter (taken as true) to suggest' the required element. This
'does not impose a probability requirement at the pleading
stage,' but instead 'simply calls for enough facts to raise a
reasonable expectation that discovery will reveal evidence of'
the necessary element." *Phillips,* 515 F.3d at 234 (quoting
*Twombly,* 127 S.Ct. at 1965).

### C. Primary Jurisdiction

Initially, Defendant asserts that this Court should defer to
the Federal Communications Commission ("FCC") and its
interstate telecommunication expertise in the present matter
under the doctrine of primary jurisdiction. In response,
Plaintiff argues that the case at bar is devoid of technical
questions and potential regulatory conflicts, and as such, this
Court may exercise jurisdiction.

Defendant's argument that this Court should defer to the
FCC constitutes a challenge to this Court's subject matter
jurisdiction. The Supreme Court, in *Far East Conference
v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 96
L.Ed. 576 (1952), expounded on the doctrine of primary
jurisdiction:

**\*3** [A] principle, now firmly established, that in
cases raising issues of fact not within the conventional
experience of judges or cases requiring the exercise of
administrative discretion, agencies created by Congress for
regulating the subject matter should not be passed over.
This is so even though the facts after they have been
appraised by specialized competence serve as a premise
for legal consequences to be judicially defined. Uniformity
and consistency in the regulation of business entrusted to
a particular agency are secured, and the limited functions
of review by the judiciary are more rationally exercised,
by preliminary resort for ascertaining and interpreting
the circumstances underlying legal issues to agencies
that are better equipped than courts by specialization, by
insight gained through experience, and by more flexible
procedure.

The doctrine applies "to claims properly cognizable in court
that contain some issue within the special competence of an
administrative agency." *Global Naps, Inc. v. Bell Atlantic–
New Jersey, Inc.,* 287 F.Supp.2d 532, 548 (D.N.J.2003). Thus,
cases involving specific technical or policy considerations
within an agency's area of expertise should be referred to
the appropriate administrative agency. *MCI Communications
Corp. v. American Telephone & Telegraph Co.,* 496 F.2d
214, 220 (3d Cir.1974). The doctrine ensures a "workable
relationship between the courts and administrative agencies
wherein ... the court can have the benefit of an agency's
views on issues within the agency's competence." *MCI
Telecommunications Corp. v. Teleconcepts, Inc.,* 71 F.3d
1086, 1105 (3d Cir.1995).

Additionally, the possibility that a conflict may arise if a
court were to decide a matter inextricably intertwined with
an intensive regulatory scheme requires judicial abstention in
such cases. *Cheney State College Faculty v. Hufstedler,* 703

F.2d 732, 736 (3d Cir.1983); *American Telephone,* 496 F.2d at 220 (finding that the doctrine was created to "avoid conflict between the court and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court."). However, a court need not defer review in every cause of action that requires a court to deal with regulatory rules. *The Business Edge Group, Inc. v. Champion Mortgage Company,* Inc., 519 F.3d 150, 154 (3d Cir.2007). Such cases may be handled by a district court if the issues before it can be resolved "using the plain language of the [regulations] and ordinary rules of construction." *Id.* (quoting *Advance United Expressways, Inc. v. Eastman Kodak Co.,* 965 F.2d 1347, 1353 (5th Cir.1992)).

Even though the Third Circuit has visited the issue of primary jurisdiction on several occasions, there remains "no fixed formula for determining whether the doctrine of primary jurisdiction applies." *Global Naps,* 287 F.Supp.2d at 549. It is more appropriate for a court to evaluate issues of primary jurisdiction on a case-by-case basis. Nonetheless, the *Global Naps* court adopted four factors that can guide a court's analysis in such inquiries:

**\*4** (1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made.

*Id.* (citing *Oh v. AT & T Corp.,* 76 F.Supp.2d 551, 557 (D.N.J.1999)). This Court also turns to the resolution of other disputes over primary jurisdiction in the Third Circuit. For instance, in *American Telephone,* a group of communication carriers brought suit to compel telephone companies to provide interconnection services. 496 F.2d at 220. The Third Circuit found that the district court should have deferred to the FCC for two reasons: (1) the FCC had issued two separate rulings around the time of the dispute dealing with interconnection services; and (2) proceedings before the FCC had recently been initiated that dealt with the same issues raised by the plaintiffs. *Id.*

In the instant matter, Defendant directs the Court's attention to the FCC's broad, sweeping regulation of interstate communications, namely pre-paid calling cards. Specifically, Defendant cites to recent regulatory decisions rendered by the FCC concerning the pre-paid calling card industry. Def.'s

Br. Pg. 6 (citing 21 FCC Rcd 7290 (2006) and 20 FCC Rcd 4826 (2005)). The crux of Defendant's argument is simple: this Court's adjudication of this matter could conflict and upset the FCC's expansive regulatory scheme over pre-paid calling cards. Although there is no pending hearing before the FCC concerning this specific issue, Defendant argue that pursuant to Section 201(b) of the Communications Act of 1934, the FCC provides Plaintiff with a more appropriate forum to adjudicate his claims. In response, Plaintiff charges "[t]here is no appreciable danger of inconsistent rulings; either consumers received the appropriate minutes on prepaid calling cards, or the converse is true." This Court agrees.

Applying the *Global Naps* factors, the Court finds that Plaintiff's Complaint is properly before this Court. Simply put, the case at bar requires this Court to determine whether Plaintiff and those similarly situated received what they bargained for. In arguing that this Court should defer to the FCC, Defendant does not list any pending hearings involving issues that if they were to be decided before this Court would give rise to a conflict with the current FCC regulatory scheme. Unlike *American Telephone,* where the FCC had made two previous rulings directly on point and another hearing was scheduled to deal with the contested issues in that case, no previous FCC ruling has been cited by Defendant that governs the specific issue in this case, namely the regulation of allegedly fraudulently advertised pre-paid calling cards and recourse for the average consumer. *See* 496 F.2d at 220. Instead, Defendant relies on broad FCC regulations that promulgate general administrative rules that have no bearing on the discrete issues in the case at bar. For example, *In re Vista Services Corp.,* 15 FCC Rcd 20646 (Oct. 18, 2000), an FCC ruling cited by Defendant, does not confer sole jurisdiction on the FCC with respect to the marketing of telecommunication providers, rather it states that the FCC may adjudicate claims under 201(b) of the Communications Act of 1934. The case at bar deals with issues arising from Defendant's supposed violation of the NJCFA, not 201(b).

**\*5** Moreover, Defendant's position on primary jurisdiction is untenable. Taken to its logical extreme, Defendant's proposed application of the doctrine would permit a pharmaceutical company to avoid negligence claims in federal court by invoking the Food and Drug Administration's authority (putting aside any preemption issues), or force a state court to defer consumer fraud actions against a commercial bank due to Federal Reserve oversight. Primary jurisdiction is an exceptional doctrine reserved for those technical cases that *would* conflict with specific federal regulations or pending

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    3

Torres-Hernandez v. CVT Prepaid Solutions, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 5381227

agency hearings. It is not an alternate route for federally regulated businesses to take as a way to avoid civil litigation with consumer plaintiffs. Accordingly, Defendant's Motion to Dismiss for lack of subject matter jurisdiction is denied.

### D. Plaintiff's NJCFA Claim

Defendant also challenges Plaintiff's Complaint on the ground that it fails to sufficiently state a cause of action under the NJCFA.[1] The Act is intended to protect consumers who purchase "goods or services generally sold to the public at large." *Marascio v. Campanella,* 298 N.J.Super. 491, 689 A.2d 852 (App.Div.1997). To state a claim under the NJCFA, a plaintiff must allege:

"(1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." [*Frederico v. Home Depot,* 507 F.3d 188, 202 (3d Cir.2007) (citing *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 647 A.2d 454 (1994)). The NJCFA defines unlawful practice broadly, as including but not limited to unconscionable commercial practice, deception, fraud, false promise, false pretense misrepresentation, or knowing concealment. N.J.S.A. 65:8–2.

*Kalow & Springnut, LLP v. Commence Corp.,* No. 07–3442, 2008 U.S. Dist. LEXIS 48036, at *9–10, 2008 WL 2557506 (D.N.J. June 23, 2008) (citation omitted).

Because Plaintiff alleges violation[2] of the NJCFA, Plaintiff's Complaint must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). *Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d 494, 510 (D.N.J.2000) (finding that the plaintiff's NJCFA claim was subject to 9(b)' s heightened pleading standard); *Slim CD, Inc. v. Heartland Payment Sys.,* No. 06–2256, 2007 U.S. Dist. Lexis 62536, at *32, 2007 WL 2459349 (D.N.J. Aug. 22 2007) ("The pleading requirements of Rule9(b) apply to ... NJCFA claims as well as ... common law fraud claims."). Recently, this Court reiterated what must be alleged to satisfy the heightened pleading standard:

Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged." *Lum v. Bank of America,* 361 F.3d 217, 223–24 (3d Cir.2004). To satisfy this standard the plaintiff must plead or allege the date, time

and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation. *See id.* at 224.

**\*6** *Kalow,* 2008 U.S. Dist. LEXIS 48036 at *10–11, 2008 WL 2557506 (quoting *Federico,* 507 F.3d at 200). This heightened pleading standard applies to all three prongs of an NJCFA claim. *Kalow,* 2008 U.S. Dist. LEXIS 48036 at *10, 2008 WL 2557506.

A properly plead NJFCA claim requires a plaintiff to allege "unlawful conduct by the defendants." Unlawful conduct or practices, as defined by the Act, consist of:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertise of any merchandise.

N.J.S.A. 56:8–2. In other words, unlawful practices fall into one of three general categories: (1) affirmative acts; (2) knowing omissions; and (3) regulation violations. *Federico,* 507 F.3d at 202 (citation omitted). When the alleged consumer fraud consists of an affirmative act, it is unnecessary for the plaintiff to prove that the defendant intended to commit an unlawful act. *Slim CD,* 2007 U.S. Dist. LEXIS 62536, at *32, 2007 WL 2459349. Under the NJCFA, an affirmative representation is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Mango v. Pierce–Coombs,* 370 N.J.Super. 239, 851 A.2d 62 (App.Div.2004). By contrast, when the alleged consumer fraud is an omission, intent is an essential element of the charge. *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350 (1997). In *Kalow,* this Court found these allegations plead under the NJCFA as insufficient to withstand a motion to dismiss: "Defendant engaged in unfair, false, deceptive, and misleading practices, representations, and omissions in representing that it produced good quality software that business should rely upon and that it would stand behind software." *Kalow,* 2008 U.S. Dist. LEXIS 48036 at * 11, 2008 WL 2557506. The *Kalow* complaint merely restated the language that defined an unlawful practice contained in the NJCFA's statutory language and made fleeting reference to an alleged misrepresentation on the part of the defendant. *Id.*

Here, Plaintiff's Complaint suffers from a similar defect as the allegations in *Kalow,* alleging, without specificity, that "Defendant concealed, that the amount of minutes advertised are in excess of the actual amount of minutes a user of their

2008 WL 5381227

cards can actually utilize" and a recitation of the NJCFA's statutory language." Compl. ¶¶ 30–31. After reviewing Plaintiff's Complaint, the Court finds no specific factual allegations, the what, where, and when of Defendant's alleged misrepresentations, necessary to sustain a cause of action under the NJCFA. Hypothetically, Plaintiff's allegations would need to indicate specific misrepresentations, such as Defendant selling calling cards that specifically advertised that they contained 120 minutes when in fact Defendant knew the card would only provide 100 minutes worth of calling time for the cardholder. With respect to the marketing allegations, general allegations of concealment on the part of a defendant are insufficient to sustain an NJCFA claim. *Cooper v. Samsung Electronics America, Inc.,* No. 07–3853, 2008 WL 4513924, at *8 (D.N.J. Sept.30, 2008). Plaintiff fails to supply any details as to the character of the marketing and advertising materials. *See id.* (finding that a plaintiff's consumer fraud claim was deficient when he failed to specify which marketing or advertising materials allegedly mislead him in his purchase of the defendant's product).

**\*7** Moreover, Plaintiff's Complaint is devoid of any allegations that would be sufficient to set forth the causal relationship between Defendant's unlawful conduct and Plaintiff's ascertainable loss.[3] To properly plead a causal nexus, a plaintiff cannot rely on legal conclusions that fail to allege "when statements were made or when the plaintiffs were exposed to the statements." In *Dewey v. Volkswagen,* the court provided an example of a sufficiently plead causal nexus:

> For example, in order to demonstrate the required causal nexus, Plaintiffs might be expected to plead facts stating whether the allegedly fraudulent statements on the website were on the website at the time that any of the individual Plaintiffs were deciding whether to purchase a Volkswagen, and whether any of the Plaintiffs saw those statements on Volkswagen's website.

558 F.Supp.2d 505 (D.N.J.2008). Thus, allegations set forth in "broad-brush fashion" will not suffice. *Kalow,* 2008 U.S. Dist. LEXIS 48036, at *17, 2008 WL 2557506. Here, Plaintiff's alleges in conclusory fashion that "[a]s a direct and proximate result of the acts of consumer fraud set forth above, Plaintiff has purchased and used prepaid calling cards which caused him to incur monetary expense and has suffered an ascertainable economic loss." Compl. ¶ 35. At its most basic level, Plaintiff has failed to allege when he purchased his calling card(s), what he relied

upon regarding the minutes he purchased and how many calling minutes he actually received. These allegations as to a causal nexus between Defendant's alleged unlawful practices and Plaintiff's ascertainable loss do not withstand a motion to dismiss. Accordingly, Plaintiff's NJCFA claim is dismissed without prejudice.

**E. Plaintiff's Fraud and Misrepresentation Claim**
Additionally, Defendant seeks the dismissal of Count Two for failure to comply with Fed.R.Civ.P. 9(b). Rule 9(b) requires "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). In *Lum v. Bank of America,* 361 F.3d 217, 223–24 (3d Cir.2004), the Third Circuit expounded on the heightened pleading standard imposed on allegations of fraud:

> In order to satisfy Rule 9(b), plaintiffs must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). Plaintiffs may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations). Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation. See [*Saporito v. Combustion Eng'g,* 843 F.2d 666, 675 (3d Cir.1988) ]; *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658–59 (3d Cir.1998); *Klein v. General Nutrition Cos.,* 186 F.3d 338, 345 (3d Cir.1999).

**\*8** Thus, the nature or subject of the fraud, or an indication of who made the alleged representations and to whom, must be set forth in the plaintiff's pleadings. *A–Valey Engineers, Inc. v. Board of Freeholders of Camden,* 106 F.Supp.2d 711, 716 (D.N.J.2000). The Rule's heightened pleading requirements "gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d, 494, 511 (D.N.J.2000). With respect to a class action claim, "less specificity is required when the complaint presents the claims of a class and individual identification of the circumstances of the fraud as to each class

2008 WL 5381227

member would require voluminous pleadings." *Szczubelek v. Cendant Mortgage Corp.,* No. 00–1858, 2001 WL 34875217, at *3 (D.N.J. Jun.15, 2001). However, this less stringent standard does not obviate the need for a lead plaintiff to set forth specific factual misrepresentations as to his particular allegations. *Id.*

As to Count Two, Plaintiff merely alleges in his Complaint that "Defendant made these misrepresentations and actively concealed adverse information" and "Defendant omitted, suppressed or concealed material facts in order to increase the sales of the product." Compl. ¶¶ 39–40. Although Rule 9(b)'s strictures are less exacting for class action complaints, Plaintiff's vague, conclusory allegations as to Defendant's alleged fraudulent acts are insufficient. The Complaint contains no factual substantiation of alleged fraudulent acts taken on the part of Defendant, presumably the specific misrepresentation of actual minutes on Defendant's pre-paid calling cards that Plaintiff purchased. Moreover, no general time period in which the alleged misrepresentations took place is set forth anywhere in Plaintiff's Complaint. In sum, Plaintiff's allegations "suffers from the precise problems that Rule 9(b) aims to prevent," that is failing to give the defendant the appropriate notice of the claims alleged against him and the specific fraudulent acts underlying the plaintiff's pleadings. *Naporano,* 79 F.Supp.2d at 512. Accordingly, Count Two of Plaintiff's Complaint is dismissed without prejudice.

**F. Plaintiff's Unjust Enrichment Claim**

Finally, Defendant moves to dismiss Plaintiff's unjust enrichment claim. Defendant contends that Plaintiff's unjust enrichment claim is simply derivative of the fraud claims set forth in Counts I and II, and as such, should be dismissed. In his Complaint, Plaintiff alleges that "[i]n accepting payment for prepaid phone cards which virtually never provide the minutes advertised to consumers, Defendant has been unjustly enriched."

With respect to Defendant's assertion that Count Three is nothing more than a derivative claim of Counts One and Two, this Court disagrees. An unjust enrichment claim may be sustained independently as an alternative theory of recovery. *In re K–Dur Antitrust Litigation,* 338 F.Supp.2d 517, 544 (D.N.J.2004) (finding defendant's motion to dismiss plaintiff's unjust enrichment claim as premature even where other remedies at law were available to plaintiff); *see also United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1135 (E.D.Pa.1991) (allowing plaintiff to assert an unjust

enrichment claim as an alternative theory of recovery when plaintiff had asserted a cognizable contract claim in the same complaint). Thus, this Court must determine whether Plaintiff's allegations give rise to an unjust enrichment claim.

**\*9** At the onset, the Court notes that an unjust enrichment claim need not be pled with the same specificity as a claim sounding in fraud. Rather, the more liberal notice pleading standard of Fed. R. Civ. 8(a) applies. An unjust enrichment claim requires plaintiff to allege "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *In re K–Dur Antitrust Litigation,* 338 F.Supp.2d 517, 544 (D.N.J.2004) (quoting RESTATEMENT OF RESTITUTION 1 (1937). Further, "[t]he unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). However, New Jersey law does not recognize unjust enrichment as an independent tort cause of action. *Cafaro v. HMC,* No. 07–2793, 2008 WL 4224801, at *12 (D.N.J. Sept.8, 2008) (finding that the plaintiffs' unjust enrichment claim should be dismissed because the allegations sounded in tort and not in quasi-contract). Rather, "unjust enrichment ... requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant." *VRG,* 135 N.J. at 554, 641 A.2d 519. Thus, where a plaintiff asserts an unjust enrichment cause of action along with tort claims and there appear to be no allegations that the plaintiff expected or anticipated remuneration from the defendant, the unjust enrichment claim should be dismissed. *See Cafaro,* 2008 WL 4224801, at *12.

Here, the Court is unable to discern whether Plaintiff's unjust enrichment claim is based on a quasi-contractual or implied contractual relationship with the expectation of remuneration or is alleged as an independent tort cause of action. Plaintiff's Complaint contains two counts arising from fraudulent misrepresentations and an unjust enrichment claim that simply relies on the allegations set forth in Counts One and Two. Accordingly, this Court dismisses Count Three of Plaintiff's Complaint without prejudice.

**G. Plaintiff's Request for Leave to File Amended Complaint**

Torres-Hernandez v. CVT Prepaid Solutions, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 5381227

Plaintiff requests leave to amend his Complaint should the Court grant Defendant's motion to dismiss. Since Plaintiff may have sufficient information to properly allege an NJCFA, fraud and misrepresentation, and unjust enrichment claim, this Court will give Plaintiff leave to amend his Complaint.

For the foregoing, Defendant's Motion to Dismiss for lack of subject matter jurisdiction is denied. However, Plaintiff's Complaint is dismissed without prejudice and Plaintiff shall be given leave to re-plead and file an Amended Complaint within 30 days.

## III. CONCLUSION

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 5381227

Footnotes

1    In his Amended Complaint, Plaintiff needs to clarify whether this action is on behalf of consumers nationwide or only applies to New Jersey consumers. Such clarification is necessary to determine the applicability of the NJCFA to other plaintiffs as well as other choice of law issues.

2    Plaintiff does not state whether he purchased one card or multiple cards. Thus, this Court cannot determine whether Plaintiff alleges more than one violation of the NJCFA.

3    Additionally, Plaintiff must plead a specific ascertainable loss. A sufficiently plead ascertainable loss is one with enough specificity as to give the defendant notice of possible damages. Thus, in *Seville Industry Machine Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), a plaintiff satisfied the ascertainable loss pleading requirements "by incorporating into the complaint a list identifying with great specificity the pieces of machinery that were the subject of the alleged fraud." Further, in *Kalow,* this Court found sufficient an alleged dollar amount lost by the plaintiff when it was forced to purchase a different product upgrade provided by the defendant. 2008 U.S. Dist. LEXIS 48036, at *10, 2008 WL 2557506. Here, Plaintiff "incur[red] monetary expense and has suffered an ascertainable economic loss that includes the purchase price of the pre-paid calling cards and the difference in price between the purchase price of the pre-paid cards and the fair market value for the actual minutes plaintiff received for which Defendants are liable to Plaintiff for treble Plaintiff's actual damages." Compl. ¶ 35. Although there is no specific dollar amount alleged in Plaintiff's Complaint, that level of specificity is not required by the case law and Rule 9(b). However, the fact that Plaintiff fails to allege which calling card denominations he purchased, e.g.. a 120 minute calling card, precludes Plaintiff from sufficiently pleading ascertainable loss. Thus, if Plaintiff properly pleads the other two elements of the NJCFA, Plaintiff will also be able to plead ascertainable loss.

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 71

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 718 of 751
United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)
PageID: 12084

2009 WL 901763
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

UNITED DISASTER RESPONSE, LLC
v.
OMNI PINNACLE, LLC, et al.

Civil Action No. 06–6075.
|
March 25, 2009.

West KeySummary

1    **Public Contracts** 👈 Subcontractors,
Laborers, and Materialmen; Liens

A disaster response company's action under the
Louisiana Public Works Act (LPWA) alleging
that a city breached its LPWA duty requiring
a contractor to post a payment bond was
dismissed where LPWA did not apply to the
parties' contract for hurricane debris removal.
The Louisiana Attorney General had stated that
"contracts for hurricane debris management and
removal would constitute service contracts,"
rather than public works contracts under LPWA.
Therefore, the contract at issue was not a "public
works" contract. 🚩 LSA–R.S. 38:2211.

1 Cases that cite this headnote

**Attorneys and Law Firms**

David Joseph Krebs, Marc Lee Domres, Richard E.
Baudouin, Krebs, Farley & Pelleteri, LLC, Orrill, Cordell &
Beary, LLC, New Orleans, LA, for United Disaster Response,
LLC.

Leigh Ann Tschirn Schell, Michael H. Abraham, Kuchler
Polk Schell Weiner & Richeson, Orrill, Cordell & Beary,
LLC, New Orleans, LA, for Omni Pinnacle, LLC.

W. Christopher Beary, Dorothy L. Tarver, Jeffrey Lee Oakes,
John L. Fontenot, Jr., Thomas Christopher Pennebaker, Orrill,

Cordell & Beary, LLC, Aaron Z. Ahlquist, Law Offices of
Frank J. D'Amico, Jr., Michael William Boleware, Michael W.
Boleware, Attorney at Law, New Orleans, LA, Peter Joseph
Butler, Peter J. Butler, LLC, Gretna, LA, Tasha W. Hebert,
Hebbler & Giordano, LLC, Metairie, LA, for St. Tammany
Parish.

Maurice Edward Bostick, New Orleans, LA.

***ORDER AND REASONS***

IVAN L.R. LEMELLE, District Judge.

**\*1** Before the Court is a Motion to Dismiss Claims of
United Disaster Response, LLC ("UDR") filed by Defendant
St. Tammany Parish. (Rec.Doc.150). The Motion requests
dismissal of all remaining claims brought against St.
Tammany Parish ("St.Tammany") by Plaintiff UDR and
addresses specific issued raised by the Court in an order
denying a previous motion to dismiss filed by the Parish.
(See Rec. Doc. 142). The issues include (1) whether the
claims are precluded because the contract at issue is not a
public works contract, (2) whether, if the Louisiana Public
Works Act ("LPWA") applies, it is exclusive and bars all of
UDR's remaining claims, and (3) if the Act applies, whether
the unjust enrichment action is barred. After review of the
pleadings and applicable law, and for the reasons that follow,

**IT IS ORDERED** that the Motion is **GRANTED** in part and
**DENIED** in part. The motion is **GRANTED** with respect to
UDR's claims under LPWA because the Court finds LPWA
inapplicable to this service contract for hurricane debris
removal. The motion is **DENIED** with respect to UDR's
unjust enrichment claims.

**BACKGROUND**

United Disaster Response, LLC ("UDR") filed this diversity
action against Omni Pinnacle, LLC ("Omni") and St.
Tammany Parish ("St.Tammany") to recover amounts alleged
to be due to UDR for performing debris removal after
Hurricane Katrina. Post-storm, Omni and St. Tammany
entered into a contract for debris removal and disposal. Omni
in turn subcontracted UDR to perform a portion of the work
under the contract. UDR alleges that neither St. Tammany nor
Omni have paid UDR, in full, for its services. The Complaint
alleges St. Tammany breached its duty to require Omni to
furnish a payment bond under the Louisiana Public Works Act

("LPWA") and that the Parish is liable to UDR in *quantum merit* and unjust enrichment.

On January 17, 2007, St. Tammany filed a FRCP 12(b)(6) Motion to Dismiss arguing that it is immune from suit under the Eleventh Amendment and that this Court lacked jurisdiction due to a forum selection clause in the contract between St. Tammany and Omni providing that the Louisiana 22nd Judicial District Court "shall be the court of original jurisdiction of any litigation originated under this contract."

This Court denied St. Tammany's Motion on March 14, 2007, finding that it was not immune from suit and that the forum selection clause did not divest this Court of jurisdiction because the clause, in sum, does not demonstrate an intent to make the 22nd Judicial District Court the exclusive jurisdiction. (Rec.Doc. 28). This ruling was immediately appealed.

The Fifth Circuit affirmed this Court's decision on the Eleventh Amendment Immunity issue and dismissed the appeal on the forum selection issue for lack of jurisdiction on December 12, 2007. The opinion was revised January 16, 2008, and St. Tammany's petition for rehearing was filed and denied. The Fifth Circuit's Judgment issued as Mandate was issued on February 12, 2008. The United States Supreme Court denied a writ of certiorari on June 23, 2008. (Rec.Doc.134).

 *2  On February 6, 2008, after the Fifth Circuit's decision, Judge Barbier in *Top Branch Tree Service & Landscaping, Inc. v. Omni Pinnacle, et. al.,* Civil Action 06–3723, a separate case brought by another subcontractor contracted to do debris removal work in St. Tammany Parish post-Katrina, found that the same forum selection language at issue provided that the 22nd Judicial District Court is the exclusive jurisdiction for litigation arising under the contract .[1] On that same date, St. Tammany filed the a second Motion to Dismiss which was granted in part and denied in part. The Court granted the motion with respect to the quantum meruit claims, denied the motion without prejudice on the LPWA and unjust enrichment claims, and directed the Parish to refile its Motion to Dismiss addressing only the issues raised by the Court in that Order. (Rec. Doc. 142 at 11). The instant Motion to Dismiss was filed pursuant to that Order and addresses the LPWA claims and unjust enrichment.

St. Tammany argues that the contract is a public works contract. St. Tammany bases this argument on its assertion that the determination of "public works" rests upon whether the work was performed on property owned by a public entity or a private entity rather than whether the work performed was a service or of a public improvement/construction nature. St. Tammany further argues that the contract was advertised and bid under the Public Bid Law and has been treated as a public works contract. Next St. Tammany argues that because the contract at issue is a public works contract, the LPWA provides the exclusive remedy for any action by UDR under the contract and bars UDR's remaining claims, including unjust enrichment.

St. Tammany then argues that UDR's LPWA claim alleging that the Parish breached its duty to require Omni to post a payment bond should be dismissed because UDR has not stated a claim under LPWA and that such claim would be premature. St. Tammany asserts that UDR has alleged no facts in its complaint to establish UDR's timely compliance with LPWA allowing it to assert a claim against the Parish. St. Tammany presents *Siemens Bldg. Technologies, Inc. v. Jefferson Parish,* 298 F.Supp.2d 415 (E.D.La.2004), and argues that a subcontractor cannot sue the owner under LPWA unless final payment has been made by the owner to the contractor and the owner has failed to withhold sums sufficient to cover any outstanding liens or claims. St. Tammany asserts that it cannot make final payment on its contract with Omni because it has notice of outstanding liens and claims. [2] Finally, St. Tammany argues that if the Court finds that the contract is not a public works contract, then UDR lacks the privity to assert a claim against the Parish.

UDR first argues that the contract is not a public works contract because it is a service contract rather than a construction contract; thus LPWA does not apply. Noting that it only had three claims against St. Tammany, quantum meruit (Count Three), which has been dismissed, unjust enrichment (Count Five), and Breach of LPWA Duty to Obtain Bond (Count Seven), UDR argues that if LPWA is inapplicable, its LPWA claim (Count Seven) would be dismissed and UDR would have no other remedy at law than its claim of unjust enrichment. UDR further argues that it has not asserted a contractual claim against St. Tammany and privity of contract is not required for its claim of unjust enrichment.

## DISCUSSION

United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)

**\*3** Dismissal pursuant to FRCP 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowery v. Texas A & M University System,* 117 F.3d 242, 247 (5th Cir.1997); *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the original complaint must be taken as true. *Oliver v. Scott,* 276 F.3d 736, 740 (5th Cir.2002); *Campbell v. Wells Fargo Bank,* 781 F.2d 440, 442 (5th Cir.1980). When evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded allegations and resolve all doubts in favor of the plaintiff. *Tanglewood East Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988). "Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir.2008) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965–68, 167 L.Ed.2d 929 (2007)).

### A. Public Works Contract

La.Rev.Stat. 38:2211 defines a "public work" as "the erection, construction, alteration, improvement, or repair of any public facility or immovable property owned, used, or leased by a public entity." The only case law on the issue of whether hurricane debris removal is a public work under La.Rev.Stat. 38:2211 is *Regency Construction, Inc. v. Lafayette City–Parish Consolidated Government,* 847 So.2d 796 (La.App. 3 Cir. 6/4/03). In finding that the debris removal contract at issue in *Regency* was not a public work contract, the Louisiana Third Circuit Court of Appeal looked to the LPWA's two-part definition of public works, which first describes the type of work, i.e. "erection, construction, alteration, improvement, or repair," and then describes the type of item worked on, namely "any public facility or immovable property owned, used or leased by a public entity." La.Rev.Stat. 38:2211. Specifically, the Third Circuit held, "Not only is this not a contract to do some type of construction on public property but it also involves performing work on private property." *Regency,* 847 So.2d at 789. Contrary to the argument of St. Tammany, the reasoning of the *Regency* court provides no guidance as to whether work on private property was the "determining factor" in the court's finding that the

debris removal contract was not a public works contract because neither criteria of the LPWA was met in that case. (Rec. Doc. 164 at 2).

The Louisiana Attorney General's Opinion No. 07–0061, which involved contracts for hurricane debris management and removal in St. Bernard Parish following Hurricanes Rita and Katrina, interpreted *Regency* for the legal holding that "a debris removal contract is a service contract, not a public works contract." In arriving at this conclusion, the Attorney General, relying upon previous Attorney General Opinions,[3] stated:

**\*4** The Louisiana Public Bid Law, LSA R.S. 38:2211–2296, regulates contracts by local public entities when the contracts relate to the construction of public works or the acquisition of materials and supplies. However, contracts for services, professional or otherwise, are not subject to the requirements of the statute. La. Atty. Gen. Op. No. 07–0061, 2007 WL 1100701 (La.A.G.). The interpretation that contracts for services are not public works contracts is consistent with case law. Prior to the enactment of La.Rev.Stat. 38:2211(A)(12), which defines "public work," the Louisiana Supreme Court held that "the term means a building, physical improvement, or other fixed construction." *Wallace Stevens, Inc. v. Lafourche Parish Hospital District,* 323 So.2d 794, 796 (La.1975). Cases subsequent to the 1991 amendment continue to reference the *Wallace Stevens* definition. See *Waste Management of Central Louisiana v. Beall,* 880 So.2d 923, 931 (La.App. 3 Cir. 8/4/2004), and *Barabay Property Holding Corporation v. Boh Brothers Construction Co., LLC,* 991 So.2d 74, 80 (La.App. 1 Cir. 5/2/2008). The court in *Waste Management,* a case involving the management of a landfill, found that "[t]he legislative definition of 'public work' enacted in 1991 comfortably accords with 'a building, physical improvement, or other fixed construction' " as applied in that case.

As noted by the *Regency* court, hurricane debris removal is not "some type of construction on public property." Hence this Court, in accordance with the limited amount of Louisiana law on the subject, agrees with the opinion of the Louisiana Attorney General that "contracts for hurricane debris management and removal would constitute service contracts," rather than public works contracts under LPWA. Therefore, the Court finds that the contract for hurricane

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 721 of 751
PageID: 12087
United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)

debris removal at issue in the present case is not a "public works" contract as defined by 🚩 La.Rev.Stat. 38:2211. Subsequently, LPWA does not apply, and UDR's LPWA claim alleging that St. Tammany breached its LPWA duty requiring contractor Omni to post a payment bond is **DISMISSED.** The Court therefore finds it unnecessary to evaluate St. Tammany's arguments regarding the application of LPWA, specifically whether UDR stated a claim under LPWA or whether such claim is premature, whether the LPWA bars UDR's remaining claims, and whether unjust enrichment is available to UDR under the LPWA.

### B. Unjust Enrichment and Privity

The doctrine of unjust enrichment is based on Article 1965 of the Louisiana Civil Code, which states that no one ought to enrich himself at the expense of another. *A.V. Smith Construction, Company, Inc. v. Maryland Casualty Company,* 450 So.2d 39, 41 (La.App. 3 Cir.1984). Courts have employed the doctrine to allow recovery where there is no contract but a municipality reaps benefits from another party. *Id.* The requirements for recovery under a theory of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of "justification" or "cause"[4] for the enrichment or impoverishment; and (5) the absence of any other remedy at law. *Id. See also Vandervoort,* 396 So.2d at 484.

**\*5** St. Tammany argues that UDR's claims are "based solely upon the work done by it under its contract with Omni" and that UDR's claims against St. Tammany are barred because of a lack of privity. (Rec. Doc. 164 at 5). St. Tammany also attempts to characterize this lack of privity as a bar to the third requirement of unjust enrichment, a connection between the enrichment and the impoverishment. *Id.* at 7. Finally, the Parish argues that unjust enrichment cannot be met because UDR has another remedy at law, namely its breach of contract action against Omni on the contract between Omni and UDR. St. Tammany's arguments fail when applied to the instant case.

Three cases cited by St. Tammany on the legal theory of privity involve suits between an owner and a subcontractor, 📄 *Lumber Products, Inc. v. Hiriart,* 255 So.2d 783 (La.App. 4 Cir.1972), *Olympia Company, Inc. v. Gervais F. Favrot Company, Inc.,* 342 So.2d 1275 (La.App. 4 Cir.1977), and 📄 *Schiro–Del Bianco Enterprises, Inc. v. NSL, Inc.,* 765

So.2d 1087 (La.App. 4 Cir. 5/24/00). However, the facts and issues analyzed by the appellate court in these cases are not analogous to the specific facts and issues under consideration in the present motion to dismiss. *Lumber Products* involved a suit by the subcontractor against both the owner and the general contractor for unpaid services and the owner's reconventional demand against the subcontractor on the basis of deficient work. The trial court ruled in favor of the subcontractor and *against the owner on a theory of unjust enrichment* but ruled in favor of the owner on the reconventional demand upon a finding of defective work. Only the defective work claims were considered on appeal, and the appellate court analyzed neither privity nor unjust enrichment with respect to the subcontractor's claim against the owner. *Id.* at 786.[5]

*Olympia Company* also offers little guidance on the application of unjust enrichment and privity to the present case because the *Olympia* claims centered around allegedly excessive insurance payments received by the owner due to a hailstorm that occurred two years after final acceptance of the building. In *Olympia,* the subcontractor was hired by the general contractor for roofing work. The general contractor withheld a portion of the payment owed to the subcontractor.[6] *Id.* at 1276. The insurance proceeds paid to the owner exceeded the costs of repairs to the roof.[7] The subcontractor brought suit against the owner and the general contractor, alleging against the owner claims of unlawful conversion of the excess insurance proceeds and unjust enrichment. Noting that the subcontractor had not filed any liens (or the liens were released), the court of appeal upheld the trial court's dismissal of the subcontractor's claims against owners on the basis of a lack of privity and upon its finding that the subcontractor's "suit [was] one solely from the breach of contract between it and the general contractor." *Id.* at 1276–77. In its analysis of unjust enrichment, the court found that any excessive payment claim was between the insurer and the owner, not the subcontractor; therefore the unjust enrichment requirement of a connection between the enrichment and the impoverishment was not met. *Id.* at 1277–78.

**\*6** Finally, St. Tammany cites 📄 *Schiro–Del Bianco Enterprises, Inc. v. NSL, Inc.,* 765 So.2d 1087 (La.App. 4 Cir. 5/24/00) for the proposition that subcontractors could not recover from the owner upon a theory of unjust enrichment. (Rec. Doc. 164 at 6). However, *Schiro* analyzed not whether a subcontractor could recover from an owner, but whether

United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)

a contractor could recover from the owner *on behalf of a subcontractor* who had neither filed suit against the owner nor filed a Private Works Act [8] lien when the contractor had not already paid the subcontractors and thus had "not incurred any actual damages, i.e. no actual expenses." *Schiro–Del Bianco,* 765 So.2d at 1091–92. The court found that the *contractor* could not recover on behalf of the subcontractors under a theory of unjust enrichment because the *contractor* had another remedy at law. *Id.* at 1092. The court then noted that the claims of the subcontractor had not been prescribed and if the subcontractor brought suit against the contractor, the contractor would then have a third party action against the owner. *Id.*

Lack of privity does not automatically bar recovery under a theory of unjust enrichment. In fact, the Louisiana Court of Appeal, Fourth Circuit in *Vandervoort v. Levy,* 396 So.2d 480, 485 (La.App. 4 Cir.1981), a case that court decided after both its rulings in *Lumber Products* and *Olympia,* held the "absence of a contract" and the resultant "lack of privity" to be "prerequisites to recovery in unjust enrichment" and "essential element[s] of the actio de in rem verso." *Vandervoort,* the most closely analogous case of those cited by the parties, involved a suit filed by a contractor, who was hired by an architect, against the owner and the architect for payment on alleged "extra work" performed outside the scope of the original specifications between the owner and the architect. *Id.* at 481–83. Although the parties in *Vandervoort* did not have written or recorded contracts, [9] the remaining facts and claims mirror those of the present case. Both cases involve work alleged by the owner to be "extra work" outside the scope of the owner's direct, original agreements with the contractor/architect, and both cases involve disputes as to who authorized the alleged "extra work." [10] *Id.* at 485.

The *Vandervoort* court upheld the trial court's ruling against the owner in favor of the contractor on a theory of unjust enrichment. [11] *Id.* at 484. The court found the requirement of enrichment was satisfied because the owners received the benefit of work for which they had not paid and, conversely, impoverishment was met because the contractor had performed extra work and furnished extra materials for which he had not been compensated. *Id.* Thus the court found the relationship between the enrichment and the impoverishment to be clear and sufficient to satisfy the third requirement of unjust enrichment. [12] Noting the lack of a contractual relationship between the owner and the contractor

due to the architect hiring the contractor, the court found that both an absence of justification or cause for the enrichment and no other legal remedy for the contractor. *Id.* The court rejected the owner's argument that lack of privity barred the contractor's recovery and found "the absence of a contract [to be] one of the prerequisites to recovery in unjust enrichment." *Id.* at 484–85. The appellate court went on, "Rather than serving to preclude [the contractor's] recovery, the lack of privity is an essential element of the actio de in rem verso." *Id.* [13]

**\*7** The enrichment and impoverishment at issue in the present motion, along with the connection between the two, is directly analogous to those presented in *Vandervoort.* Just as the owner in *Vandervoort,* St. Tammany has allegedly received the benefit of work for which it has not paid, and like the *Vandervoort* contractor, UDR has performed work for which it allegedly has not been compensated. Similarly, the connection between St. Tammany's enrichment and UDR's impoverishment is synonymous to the clear connection in *Vandervoort* (and wholly distinct from the excess insurance payment in *Olympia*). *Vandervoort,* 396 So.2d at 484; *Olympia,* 342 So.2d at 1277–78. Just as the *Vandervoort* architect hired the contractor, so did contractor Omni hire UDR, and all parties in the present action acknowledge the lack of a contractual relationship between St. Tammany and UDR. Accordingly, as in *Vandervoort* there may be "an absence of justification or cause for the enrichment" in the present case. 396 So.2d at 484.

UDR has asserted three claims against St. Tammany, quantum meruit (Count Three), unjust enrichment, (Count Five), and Breach of Duty to Obtain Bond (Count Seven). This Court dismissed UDR's quantum meruit claim in an earlier Order (Rec.Doc.28) and dismisses the Breach of Duty to Obtain Bond in the present Order due to the inapplicability of LPWA. Hence UDR's only remaining claim is unjust enrichment. St. Tammany asserts, however, UDR has another available remedy at law besides unjust enrichment, a lawsuit against Omni. However, the case St. Tammany cites in support of its assertion that UDR's remedy is suit against Omni speaks to the remedy available to a contractor, who has not paid the subcontractor, suing the owner on behalf of the subcontractor. *See* *Schiro–Del Bianco,* 765 So.2d at 1091–92. UDR accurately points out that St. Tammany's proposed remedy does not give sufficient weight to the extra-contractual nature of the work and does not consider the legal remedy effects of enforceability of the "pay when paid" clause in the UDR/

Omni contract. [14] Just as the *Vandervoort* owner alleged that the work done was "extra work" outside the scope of the original specifications between the owner and the architect, so too does St. Tammany claim that the work performed by Omni and its subcontractor's is outside of the Parish's contract with Omni. [15] The facts alleged in the pleadings are insufficient to allow the Court to engage in an in-depth factual analysis such as that undertaken by the court in *Vandervoort. See Vandervoort, 396 So.2d at 483–485.* Therefore, unjust enrichment may very well be UDR's sole available remedy. [16] When "resolving all doubts in favor of complainant," the Court cannot dismiss UDR's unjust enrichment complaint at this time because it has shown a "plausible set of facts that support the claim and would justify relief" and presented scenarios "consistent with the allegations in the complaint." *Tanglewood East, 849*

F.2d at 1572; *Lane, 529 F.3d* at 557; *Bell Atlantic,* 550 U.S. at 1969.

**\*8** Accordingly,

IT IS ORDERED that the Motion is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** with respect to UDR's claims under LPWA because the Court finds LPWA inapplicable to this service contract for hurricane debris removal. [17] The motion is **DENIED** with respect to UDR's unjust enrichment claims.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 901763

## Footnotes

1   The action was dismissed without prejudice, and it is the Court's understanding that the action has been re-filed in the 22nd Judicial District Court.

2   See La.Rev.Stat. 38:2191 (providing for final payment only after presentment of a clear lien and claim certificate by contractor).

3   Previous opinions cited by the Attorney General include: *Op. Atty. Gen.,* No. 02–0418, December 2, 2002 (Louisiana Attorney General opinion ruling that the Louisiana Public Bid Law, La. R.S. 38:2181, *et seq.,* including its provision on the procurement of professional services La. R.S. 38:2310(7), did not apply to procurement of services involving removal of debris from reservoirs, canals and levees because "no limitation exists on the type of service agreement a political subdivision may negotiate"); Op. Atty. Gen. 92–717 (Public Bid Law does not apply to contract for services of electrician and owners of heavy equipment to restore public service after Hurricane Andrew), Op. Atty. Gen. 97–239 (Public Bid Law does not apply to contract for collection of solid waste), Op. Atty. Gen. 99–280 (Public Bid Law does not apply to contract for electrical and mechanical services), Op. Atty. Gen. 03–0108 (Public Bid Law does not apply to contract for professional services of engineers, geologists and other professionals). *Op. Atty. Gen.,* No. 84–229, March 8, 1984 (Louisiana Attorney General opinion ruling that Louisiana's Procurement Code for state agencies, La. R.S. 39:1551 *et seq.* did not apply to a parish that had not adopted that Code, and that the Louisiana Public Bid Law, La. R.S. 38:2181, *et seq.,* did not apply to procurement of waste disposal services that did not involve either the construction of a public work or the acquisition of materials or supplies).

4   "Cause" means "that the enrichment is justified if it is the result of, or finds its explanation in, the terms of a valid juridical act." *Guillory v. Hayes,* 576 So.2d 1136, 1141 (La.App. 4 Cir.1991).

5   The *Lumber Products* court recognized that unjust enrichment was not before it and summarily stated that the subcontractor was not entitled to an increase of his award. *Id.* at 786–87. The court did note however, at the beginning of its analysis of the owner's reconventional demand, that the basis of the subcontractor's suit against the owner was La.Rev.Stat. § 9:4812, a statutory provision allowing a contractor "who enters into an oral but unrecorded subcontract [to] obtain a cause of action against the owner of the building upon which he works by filing an appropriate lien document ... irrespective of any lack of privity of contract between himself and the owner." *Id.* at 787 n. 4. The court also stated, "The established rule is that, in the absence of

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 724 of 751
PageID: 12090
United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)

a contrary statutory provision, an action ex contractu cannot be maintained against a party to a contract by a person who is not privy thereto." *Id.* at 487. However, the court's privity analysis focused on whether the damage sued for was the defectively performed work itself or for damage caused by the defective work. *Id.* The court explained, "Where the damage sued for is the defectively performed work itself, the action is strictly a contractual one and only those who are in privity with the contractor have an action against him. However, where the damage sued for its not the defective work but is instead damage caused by the defective work, a tort action against the contractor is proper when the elements for delictual recovery are present." *Id.*

6    It is unclear whether the owner paid the contractor in full; no reason is provided in the opinion for the contractor's withholding of a portion of the amount due under its contract with the subcontractor.

7    The roof repairs were not done by the subcontractor who originally built the roof.

8    La.Rev.Stat. 9:480.

9    The owner and architect operated from a list of specifications and a cost itemization letter for proposed work, while the architect and contractor utilized the contractor's bid. All parties also participated in oral communications to each other or representatives. *Vandervoort,* 396 So.2d at 482–83.

10   UDR claims that the work it performed was at the direction of "the Parish and/or the Parish's monitoring firm, Shaw Environmental, Inc., (Complaint ¶ 14, Rec. Doc. 1 at 4). The *Vandervoort* contractor contended that all the "extra work" was orally authorized by the architect, and the architect stated that some of the "extras had been approved by the [owners] or had been done by [contractor] on his own initiative." *Id.* at 483. The owner testified that "with the exception of some minor items, he did not authorize any extra work." *Id.*

11   The *Vandervoort* court specifically found, "The trial judge properly held the [owner] liable for extra work performed by [contractor] outside of that contemplated by the original specifications and encompassed in [contractor's] original bid." *Id.*

12   Compare to *Olympia Company* in which the court found no connection between the enrichment and the impoverishment. In *Olympia,* the enrichment was the insurance money retained by the owner in excess of the amount the owner paid (to a party other than the plaintiff) for repair work performed after a storm occurring over two years after owner's acceptance of the building upon which the plaintiff had worked. *Olympia,* 342 So.2d at 1277–78. The impoverishment was an unpaid portion of the contractual amount agreed upon between plaintiff subcontractor and the general contractor for original construction of the building's roof. *Id.* at 1276. Further the court found the suit for incomplete payment to be solely one of breach of contract between the subcontractor and the general contractor. *Id.* at 1277.

13   The court then found that the extra work was compensable and engaged in an analysis of the conformity of the extras with the work originally envisioned and whether there were any drastic substitutions or extreme changes. *Id.* at 485. Despite disputes about who authorized the extra work, the court found recovery against the owner under a theory of unjust enrichment was consistent with Louisiana statutes and rejected the owner's argument that he was entitled to indemnification from the architect for any amount owed to the contractor. *Id.* The court found that the extra work, though unauthorized by owner, "was reasonably required in furtherance of the contemplated renovation;" thus any authorization of the architect was for the benefit of the owner, who was therefore not entitled to recover from the architect. *Id.*

14   UDR disputes the validity of the clause but argues that if the clause is deemed enforceable, "the Parish's failure to satisfy an obligation will ... have precluded a legal basis for recovery of payment by UDR." (Rec. Doc. 170 at 9).

15   See Answer, Affirmative Defenses, and Cross–Claim of St. Tammany, Rec. Doc. 154. For example, St. Tammany asserts that Omni did not take steps to ensure that its "subcontractors performed only eligible Hanger Leaner Work." and that work was performed in "ineligible areas." *Id.* at 13. See also Omni Panicle's Answer ¶ 18, Rec. Doc. 11 at 3–4. (alleging that "St. Tammany Parish has refused and/or failed to pay Omni Pinnacle for the portion of the work performed by UDR under its subcontract with Omni Pinnacle which represents the remaining amounts alleged to be owed to UDR").

16   Note that the analysis of unjust enrichment with respect to UDR differs somewhat from that presented by the Court when dismissing Omni's claims of unjust enrichment. The Court found Omni's Cross–Claim to be that

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 725 of 751
PageID: 12091
United Disaster Response, LLC v. Omni Pinnacle, LLC, Not Reported in F.Supp.2d (2009)

unjust enrichment would alternatively apply "if this Court finds St. Tammany does not owe any payment under the contract." (Rec. Doc. 145 at 14–15). Hence, the Court found that the only claims before it at that time were Omni's breach of contract claims for work performed in accordance with the contract terms and conditions and that the breach of contract action was an adequate remedy available at law. *Id.* at 15. Omni has since filed an Amended Cross–Claim that specifically asserts unjust enrichment for any "work performed by Omni and its subcontractors ... beyond the scope of the terms of the contract between St. Tammany Parish and Omni, or if the contract is found invalid." (Rec. Doc. 184 at 6, ¶ 32). In contrast, UDR does not have a contract with St. Tammany and therefore does not have a breach of contract claim against St. Tammany as Omni does. Although UDR's complaint does not request payment solely for the "extra work" outside the Omni/St. Tammany contract, it does acknowledge its own contract with Omni and requests that the Parish directly pay any funds relating to UDR's work or services. (Rec. Doc. 1 at 9, ¶ 65). Furthermore, as this case progresses, this Court may find, like the court in *Shiro,* that Omni cannot recover payments on behalf of its subcontractors that Omni has not paid and has therefore incurred no actual damages. *Schiro–Del Bianco,* 765 So.2d at 1091–92. Additionally, the Court's final analysis may continue to parallel the *Vandervoort* analysis, reaching the ultimate conclusion that St. Tammany, as the party receiving the benefit of the additional work, is solely liable to UDR and that St. Tammany is not even entitled to indemnification from Omni. *See Vandervoort,* 396 So.2d at 485.

17    Note that the Court's reason for granting St. Tammany's Motion to Dismiss UDR's LPWA claim differs from St. Tammany's arguments. St. Tammany argued that LPWA applies and that UDR failed to establish its timely compliance with LPWA's requirements for asserting a claim against an owner and that an LPWA claim is premature. The Court found that LPWA does not apply to the contract at issue; hence UDR's claim under LPWA is dismissed.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 72

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 727 of 751
PageID: 12093
USACM Liquidating Trust v. Monaco, Not Reported in Fed. Supp. (2010)
2010 WL 11579643

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part USACM Liquidating Trust v. Monaco, D.Nev., May 6, 2010

2010 WL 11579643
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

USACM LIQUIDATING TRUST, Plaintiff,

v.

Anthony MONACO et al., Defendants.

2:09-cv-01947-RCJ-PAL
|
Signed 01/26/2010
|
Filed 01/27/2010

**Attorneys and Law Firms**

Allan B. Diamond, Michael Yoder, Stephen T. Loden, Jacob J. Roberts, Diamond McCarthy LLP, Houston, TX, Eric D. Madden, Diamond McCarthy Taylor Finley & Lee, LLP, Dallas, TX, Rob Charles, Lewis and Roca LLP, Las Vegas, NV, for Plaintiff.

Brian P. Eagan, Dana A. Dwiggins, Solomon Dwiggins Freer & Morse, Ltd., Ogonna Atamoh, Richard F. Holley, Santoro Driggs Walch Kearney, et al., Las Vegas, NV, Jamie Meyer, Orlando Villalba, Lobb & Cliff LLP, Riverside, CA, Harold P. Gewerter, Harold P. Gewerter, Esq., Chtd., North Las Vegas, NV, for Defendants.

Willowbrook Residential, LLC, Rancho Cucamonga, CA, pro se.

Brentwood 128 LLC, Temecula, CA, pro se.

Ravenswood Apple Valley, LLC, San Francisco, CA, pro se.

**ORDER**

Robert C. Jones, United States District Judge

**\*1** This 28 U.S.C. § 1334 adversary proceeding arises out of the alleged unlawful use of and failure to repay the funds of USA Commercial Mortgage Co. ("USACM") by two former USACM insiders, Thomas A. Hantges and Joseph D. Milanowski (collectively, the "Culpable Insiders"), in conjunction with Defendants Anthony Monaco, Susan

Monaco, and Monaco Diversified Corp., in order to finance profitable real estate developments.

Plaintiff USACM Liquidating Trust (the "Trust") alleges the Culpable Insiders directed the transfer of $5 million of USACM's funds in order to capitalize real estate development ventures between themselves and Defendants. The unlawful advances made these developments possible, Defendants received over $23 million from the developments, and USACM was never repaid. All causes of action have been dismissed except the fourth cause of action for unjust enrichment. Defendants argue that the Trust's unjust enrichment claim is barred by: (1) the existence of an express contract; (2) lack of standing; and (3) the defense of *in pari delicto*. Defendants previously raised each of these arguments in a motion to dismiss, which was denied by the Bankruptcy Court. Pending before the Court is Defendants' Motion for Summary Judgment (#4). The motion is untimely. In any case, for the reasons given herein, the Court denies the motion. Also, Plaintiff has filed a Motion to Impose Sanctions for Discovery Abuses and to Compel Discovery (#15). For the reasons given herein, the Court grants the motion in part and denies it in part. At oral argument, the Court directed the Trust to submit a proposed order compelling discovery. The Court will impose sanctions in the present order.

**I. BACKGROUND**

**A. USACM and USAIP**

USACM was a licensed mortgage broker that originated and serviced multi-beneficiary loans secured by real property. (#18 ¶ 9). Throughout the relevant time period, USACM was owned by Hantges, Milanowski, The Jamie Linn Hantges Separate Property Trust UAD 6/12/97 ("Jamie Wise Trust"), Red Granite, LLC ("Red Granite"), and Paul S. Hamilton. (#19 ¶¶ 2–4; #20–4 at 157). In addition to Hantges, Milanowski, and Victoria Loob, USACM also had other officers, including a chief financial officer, Robert A. Hilson. (#21, Ex. H, at 11:24–14:4). In addition, Eugene Buckley, served as an outside director from early 2001 until resigning in September 2003. (*Id.*, Ex. I, at 48:1–3 and 66:7–15). There is no evidence in the record to suggest that the Jamie Wise Trust, Red Granite, Hilson, Buckley, and/or Hamilton were aware of or participated in the Culpable Insiders' misconduct.

Hantges and Milanowski created USA Investment Partners, LLC ("USAIP") as a holding company for land acquisition and/or real estate development entities. (#18 ¶ 11). USAIP obtained many of these interests without making any

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 728 of 751
PageID: 12094
USACM Liquidating Trust v. Monaco, Not Reported in Fed.Supp. (2010)
2010 WL 11579643

cash contributions—or at most nominal contributions—in exchange. (*Id.* ¶ 12). Rather, the investments held by USAIP were principally obtained as a result of the Culpable Insiders' misconduct in diverting millions of dollars from USACM to USAIP for their own gain. (*Id.* ¶ 12–13). USACM never held any ownership interest in USAIP. (*Id.* ¶ 11).

### B. The Eagle Ranch Project

**\*2** Eagle Ranch, LLC was a real estate holding company owned by several investors that held several hundred lots in Victorville, California. (*Id.* ¶¶ 14–15). Eagle Ranch, LLC's manager throughout the relevant time period was USA Commercial Real Estate Group, which was owned and managed by the Culpable Insiders. (*Id.* ¶ 15). The lots owned by Eagle Ranch, LLC were part of a pre-existing "Eagle Ranch" development that had previously been owned and partially developed by Inco Homes Corp. ("Inco"). (*Id.* ¶ 14; #21, Ex. A, at 50:10–18). Anthony and Susan Monaco each had exposure to the Eagle Ranch development during their tenure at Inco in the mid to late 1990's as superintendent and vice president of marketing, respectively. (#21, Ex. A, at 49:16–50:18, 51:2–15; *id.*, Ex. C, at 36:18–37:16, 38:22–39:18). Thus, the Culpable Insiders retained Anthony and Susan Monaco as paid consultants to assist in pre-development of the lots owned by Eagle Ranch, LLC. (#21, Ex. A, at 53:25–56:3; *id.*, Ex. C, at 51:14–52:5). In August 2000, the Culpable Insiders and the Monacos formed Eagle Ranch Residential, LLC ("ERR") in order to develop the lots owned by Eagle Ranch, LLC. (#6, Ex. 1). When ERR was formed, the Monacos lacked the capital to fund the project, (#21, Ex. A, at 257:7–25, 105:2–108:15), and Eagle Ranch, LLC, being a holding company, had no income of its own, (#18 ¶ 15). As a result, the Culpable Insiders caused USACM to advance $5,004,445.16 to Eagle Ranch, LLC, ERR, and/or third parties for the benefit of Eagle Ranch, LLC and ERR. (*Id.* ¶¶ 16, 18–19). The advances USACM made to fund the Eagle Ranch project were capital contributions; had it not been for the advances, the development efforts of the Eagle Ranch project never would have been possible. (#21, Ex. A, at 257:7–25, 105:2–108:15).

### C. The Willowbrook Project and Other Projects

Revenues of the Eagle Ranch project were not used to re-pay the advances made from USACM's funds, but were instead diverted into other real estate projects. (*Id.*, Ex. A, at 257:7–25, 105:2–108:15). The first two of these projects ultimately were owned by Willowbrook Residential, LLC ("Willowbrook"). The projects owned by Willowbrook were

entirely capitalized with sales revenues diverted from the development of the Eagle Ranch project and with funds advanced from USACM. (*Id.*, Ex. A, at 258:5–19, 126:10–22, 142:8–18). Had it not been for these advances, the development of the Willowbrook projects never would have been possible. (*Id.*). As the development of the projects owned by Willowbrook Residential, LLC began to generate revenue, these revenues were used, along with ERR revenues and additional diversions of USACM assets, to capitalize other real estate projects. (*Id.*, Ex. A, at 258:20–25, 260:3–18). Each of these projects—owned directly or indirectly by Defendants and USAIP—functioned as a single, integrated company (collectively, the "Tanamera Residential Group," or "TRG"). (*Id.*, Ex. A, at 262:3–263:1; #18 ¶¶ 21–22). Funds were routinely commingled between ERR, Willowbrook, and other TRG projects, as cash was circulated on an "as-needed" basis. (#21, Ex. A, at 263:7–264:9).

### D. Distributions to Defendants

Although USACM provided the capital that made development of the Eagle Ranch and TRG projects possible, USACM was never repaid for $3,024,445.16 of the advances that it made to the Eagle Ranch and TRG projects. (#18 ¶¶ 25–26). In contrast, Anthony and Susan Monaco—who never contributed a penny of their own funds—pocketed in excess of $23 million of the revenues generated by the development of the Eagle Ranch project and the development and/or sale of TRG projects. (#21, Ex. A, at 278:7–12, 277:3–278:6, 132:13–134:18). Both Anthony and Susan Monaco conceded during their depositions that USACM should have been repaid before the distributions were made. (*Id.*, Ex. A, at 275:3–8; *id.*, Ex. C., at 132:4–11).

## II. LEGAL STANDARDS

### A. Rule 56(c)

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment

2010 WL 11579643

is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24 (1986).

In a summary judgment posture, the Court must consider the parties' respective burdens. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. See *Celotex*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

**\*3** If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. See *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. See Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324.

When considering a summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. See *Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. See *id.* at 249–50.

**B. Rule 37**

Rule 37 of the Federal Rules of Civil Procedure permits a court to impose sanctions against a party or the party's attorney for discovery violations. Sanctions may imposed if a party fails to comply with a discovery order, Fed. R. Civ. P. 37(b)(2)(A), or if a party "fails to provide information or to identify a witness as required by Rule 26(a) or (e)," Fed. R. Civ. P. 37(c)(1). In the latter case, the culpable party "is not allowed to use" the undisclosed information or witness as evidence, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). Additionally, a court has the discretion after a motion and hearing to: (1) order payment of reasonable expenses, including attorney's fees, caused by the failure; (2) inform the jury of the failure; and (3) impose other appropriate sanctions, including any of those listed in Rule 37(b)(2)(A)(i)–(vi). Fed. R. Civ. P. 37(c)(1)(A)–(C). The potential sanctions listed in Rule 37(b)(2)(A)(i)–(vi) include: (1) directing that the matters encompassed by the discovery failures be taken as established; (2) prohibiting the culpable party from supporting or opposing relevant claims or defenses; (3) striking pleadings; (4) staying proceedings until compliance; (5) dismissing the action in whole or in part; or (6) rendering a default judgment against the culpable party. Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi).

The imposition of or refusal to impose discovery sanctions is reviewed for an abuse of discretion. See *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1010 (9th Cir. 2004). Findings of fact underlying discovery sanctions are reviewed for clear error. *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir. 1997). If the district court fails to make factual findings, the decision whether to impose sanctions is reviewed de novo.

USACM Liquidating Trust v. Monaco, Not Reported in Fed. Supp. (2010)

2010 WL 11579643

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 730 of 751
PageID: 12096

*Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 (9th Cir. 1990).

## III. ANALYSIS

### A. Summary Judgment

In Nevada, the elements of a an unjust enrichment claim or "quasi contract" are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant (4) in circumstances where it would be inequitable to retain the benefit without payment. *See Leasepartners Corp., Inc. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997) (quoting *Unionamerica v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981) (quoting *Dass v. Epplen*, 424 P.2d 779, 780 (Colo. 1967))). An indirect benefit will support an unjust enrichment claim. *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992) (recognizing an actionable unjust enrichment claim where there was an indirect benefit conferred upon the defendant); *see also Powers v. Lycoming Engines*, 245 F.R.D. 226, 232 (E.D. Pa. 2007) (noting the existence of only three states—not Nevada—that require a direct benefit to state an unjust enrichment claim). Unjust enrichment is an equitable substitute for a contract, and an action for unjust enrichment therefore cannot lie where there is an express written agreement. *See Marsh*, 839 P.2d at 613 (citing *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819, 824 (Nev. 1977); 66 Am. Jur. 2d *Restitution* §§ 6, 11 (1973)).

*4 Defendants make five main arguments against the unjust enrichment claim: (1) only TRG, not USACM, has standing for a claim for unjust enrichment against Defendants; (2) Defendants are not susceptible to any unjust enrichment claim by USACM because Defendants were not paid more by TRG than TRG owed them under the relevant contracts; (3) payments to Defendants were not "unjust" because they were not paid more than was due under their contracts with TRG;[1] (4) payments made to Defendants were not to the detriment of USACM because it was the Culpable Insiders who had a duty to repay USACM, not Defendants; and (5) equitable relief is barred because USACM participated in the Culpable Insiders' wrongful activity.

None of these arguments have merit. The first through fourth arguments are interrelated, and the fifth argument will be addressed separately, *infra*. The Court agrees with virtually all of the arguments made by the Trust in its Opposition (#17) but will not recount all of the arguments in detail. The present motion is best addressed by simply noting that Defendants have neither demonstrated that the Trust has failed to make out a prima facie unjust enrichment case nor adduced evidence negating any of the essential elements of the claim, as is their burden at summary judgment.

As to the first element of an unjust enrichment claim, USACM indirectly conferred the benefit of the transfers onto Defendants. This indirect transfer, via the Culpable Insiders' misappropriation of USACM's funds to and/or through USAIP for use on TRG projects to the benefit of Defendants, is sufficient under Nevada law. *Marsh*, 839 P.2d at 613. Under an equitable claim for unjust enrichment, as opposed to a statutory claim for avoidance of a transfer under 11 U.S.C. § 550, it does not matter that Defendants did not directly deposit this money in their bank accounts, or that the misappropriated funds rested for some period with USAIP. Defendants and the Culpable Insiders ultimately used the money as capital for their own investments. Defendants have not negated this element of an unjust enrichment claim. USACM has standing to bring an unjust enrichment claim against anyone benefitting directly or indirectly from the misappropriated funds for the exceedingly simple reason that it was USACM's funds that were misappropriated. It makes no sense for Defendants to argue that only TRG has an unjust enrichment claim against them. TRG never gave Defendants any of its own funds.

As to the second and third elements of an unjust enrichment claim, Defendants appreciated and accepted the benefit of the misappropriations. Nor do they deny this. They used the misappropriated funds as capital investments and received millions of dollars in profits therefrom. Even if the investments had not been profitable, Defendants appreciated and accepted the benefit of these funds by using the funds as capital. As to standing, Defendants argue that an unjust enrichment claim cannot lie here because there was a contract between Defendants and some other party (TRG and/or the Culpable Insiders). This misses the point. Neither TRG nor the Culpable Insiders are suing Defendants for unjust enrichment. The Trust is suing Defendants for unjust enrichment on behalf of USACM, and there was never any contract between Defendants and USACM, which is the fact pattern that would prevent a quasi-contract claim by USACM against Defendants. It cannot be seriously contended that USACM has not been injured in fact, that this harm is not

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 731 of 751
PageID: 12097
USACM Liquidating Trust v. Monaco, Not Reported in Fed.Supp. (2010)
2010 WL 11579643

fairly traceable to Defendants' alleged activities, or that a verdict for unjust enrichment would not remedy the alleged harm. Nor are the development entities the real parties in interest. They incurred no harm. It is USACM that has been harmed.

**\*5** As to the fourth element of an unjust enrichment claim, it would be inequitable for Defendants to retain the misappropriated funds, or proceeds therefrom, under these circumstances. The Culpable Insiders are alleged to have misappropriated the funds from USACM, which has not been reimbursed. Defendants profited from the use of these funds without any consideration both by using the funds as capital and through subsequent profits.

Finally, the fifth argument Defendants make against the unjust enrichment claim is without merit. Defendants argue that USACM itself, a Nevada corporation, acted inequitably when two of its shareholders and/or officers, the Culpable Insiders, without authorization or knowledge of the other owners or officers, disposed of USACM's assets for their own private purposes. As Defendants note, the Trust stands in the shoes of USACM, which is aggrieved by the actions of the Culpable Insiders and Defendants. The Trust does not represent the Culpable Insiders in their individual capacities, which is the capacity in which they allegedly misappropriated USACM's funds. Defendants appear to be confounded by the basic nature of a corporation as a separate legal entity. Such a misapprehension is the only explanation that makes any sense of Defendants' contention that USACM participated in wrongful activity here by somehow wronging itself when its officers misappropriated its funds without its knowledge.

It is factually plausible that USACM authorized the transfers by the Culpable Insiders without expectation of repayment, but the evidence tends to support a misappropriation. At a minimum, there is a genuine issue of material fact as to this question. Approval of the transactions as a gift by USACM, if shown, might implicate the *in pari delicto* doctrine because it would implicate corporate waste or oppression against USACM's innocent owners by USACM. However, nothing in the pleadings supports this theory.

**B. Sanctions**

The Court makes the following findings of fact:

1. On October 15, 2008, counsel for the Trust served interrogatories and a request for production of documents on counsel for the Monacos. (*See* #16, Exs. A–B).

2. On November 13, 2008, counsel for the Monacos requested an extension from counsel for the trust because "the documents in this case are quite substantial and we are trying to provide you with comprehensive responses" and "Mr. Monaco has been having some difficulty accessing one of his servers." (*See* #16, Ex. C).

3. Defendants did not sufficiently produce documents identified in requests for production 4, 5, 7, 10, 11, 12, or 13 when they produced documents on December 2, 2008, which was the very last day for compliance under the already-extended schedule, (#15 ¶ 9–10 & n.4), instead objecting that such documents had been lost, discarded, or were not within Defendants' possession, custody, or control, (*id.* ¶ 10 & n.5; #31 at 21–22).

4. The Trust attempted to resolve the issue via a letter to the Monacos' counsel outlining the deficiencies on February 29, 2009. (*See id.*, Ex. D). The deficiencies included the failure to produce any pre-2006 ledgers, bank statements, any communications at all, and failure to identify whether any deficiencies were due to an alleged lack of possession, custody, or control. (*See id.*). Counsel for the Monacos did not respond until counsel for the Trust sent an additional email, to which counsel for the Monacos responded that they needed more time to obtain documents. (*See id.*, Ex. E). On April 8, 2009, counsel for the Monacos sent counsel for the Trust a letter indicating that the requested documents were not in the Monacos' custody and control, (*see id.*, Ex. F), basing this argument on the fact that the Monacos had sold their interest in the relevant entities to Builders Capital for $1, (*see id.*, Exs. F, P). The Monacos from this point forth asserted that the documents were in the custody of David Fogg, but when the Trust deposed Mr. Fogg, he denied having the documents, claiming they were in possession of Thomas Cooley, the Monacos' controller. (*See id.* Ex. G). Mr. Cooley, in his deposition, denied possessing the documents. (*See id.*, Ex. H). Undeterred by Fogg's denial, counsel for the Monacos repeated their claim that Fogg had the documents on May 11, 2009. (*Id.*, Ex. J).

**\*6** 5. After more failed attempts to obtain the documents from Defendants, the Trust filed a motion to compel production on July 24, 2009. The Monacos argued that the documents were not in their possession and control; however, on August 14, 2009, the day before the hearing on the motion, Defendants produced some financial documents that they claimed to have just received from Cooley. (*Id.*, Exs. L, N,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 732 of 751
PageID: 12098

USACM Liquidating Trust v. Monaco, Not Reported in Fed.Supp. (2010)

2010 WL 11579643

X). The Monacos still claimed the documents were not in their custody or control, but noted that they might use the documents at trial. (*Id.*, Ex. X). The Court denied the motion without prejudice because the Monacos had not themselves been deposed, so it could not yet be determined whether they were lying about their possession of the documents.

6. In his deposition, Anthony Monaco admitted that most of the documents at issue were housed in a storage unit, on which he was the signatory, payer of the monthly fees, and sole key holder. (*Id.*, Ex. V, at 28:19–30:9, 37:19–38:4, 75:1–76:8, 431:18–435:22). Monaco was able to gain access to the storage unit whenever he liked, and the storage unit contained at least fifty boxes of documents relevant to the development entities, including financial documents. (*Id.*, Ex. V, at 463:1–464:25). [2] He also admitted that more than a dozen of these documents had recently been moved from his office in Temecula and that he did not know if any of the stored documents had been disclosed. (*Id.*, Ex. V, at 73:13–77:7). Anthony Monaco also admitted that his prior statement that the majority of the records had been turned over to Fogg was false, and that he had given Fogg no more than five to seven boxes. (*Id.*, Ex. V, at 461:16–464:25). Monaco further testified that he could have obtained documents from either Cooley or Fogg by merely asking for them. (*Id.*, Ex. V, at 72:11–74:25). He also admitted that the document servers were never given to Fogg, but were in Mr. Monaco's personal garage. (*Id.*, Ex. V, at 435:23–436:25). He also admitted that some of his previous statements, particularly those concerning his control of the defendant entities, were "not totally true." (*Id.*, Ex. V, at 85:21–87:19).

7. The sale for $1 of the entities that produced millions in profits for the Monacos was clearly a sham. The Monacos had possession, custody, or control of these entities' documents within the meaning of the discovery rules, and Anthony Monaco admitted direct control of many relevant documents at his deposition, in any case.

8. In summary, the Court finds that the Monacos willfully, and in bad faith, withheld relevant documents from the Trust in violation of Rules 26(a) and (e). These failures were not substantially justified or harmless.

The Trust requests that the Court grant the following inferences as a sanction: (1) that USACM bore all of the risk in the Eagle Ranch and TRG projects but received none of

the profits, which were all retained by the Monacos, Thomas Hantges, and Joseph Milanowski; (2) that the Monacos knew that the funding for the Eagle Ranch and TRG projects came from USACM and that they knew USACM was never repaid; (3) that the distributions received by the Monacos from USAIP or other development entities were unearned; (4) and that USAIP and any other development entities did not observe corporate formalities and that the Monacos commingled the development entities' funds between the entities and also with money from USACM. The Court grants this request. These facts shall be taken as established for the purposes of this action. *See* Fed. R. Civ. P. 37(c)(1)(C) and 37(b)(2)(A)(i). The Court denies the Trust's request for "death penalty" sanctions of a default judgment.

**\*7** The Trust also requests monetary sanctions in the amount of $50,000, the minimum amount it estimates to have incurred in fees and costs in its attempts to obtain the withheld documents. The Court agrees that significant monetary sanctions are warranted in this case. The Court may order the reasonable costs incurred by the complaining party due to the violation, including attorneys fees. Fed. R. Civ. P. 37(c)(1)(A). The bad faith concealment of relevant, repeatedly requested documents by Defendants and their counsel in this matter has been egregious and in bad faith, particularly in light of the grossly unjust enrichment that it appears the Monacos may be liable for at the expense of USACM. The Court grants monetary sanctions in the total amount of $50,000, as follows: (1) $25,000 against Anthony Monaco, Susan Monaco, and the community thereof, jointly and severally; and (2) $12,500 each against Winthrop Couchot Professional Corporation and Santoro, Driggs, Walch, Kearney, Holley & Thompson.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (#4) is DENIED.

IT IS FURTHER ORDERED that the Motion to Impose Sanctions for Discovery Abuses and to Compel Discovery (#15) is GRANTED in part and DENIED in part.

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11579643

**Footnotes**

1    The third argument is substantively redundant with the second.

2    Defendants argue that these fifty boxes contain only blueprints and other documents not requested and that
     they are not relevant. The Court is unimpressed by this explanation. Anthony Monaco's deposition indicates
     some of the documents are financial documents, and in any case, even blueprints, contracts surrounding the
     buildings and entities, and the like are likely to lead to relevant information. Also, Defendants did not identify
     these documents and move for a protective order based on relevance. The Court infers from the lateness
     of this argument, only after Anthony Monaco had finally admitted the existence of these documents, that
     Defendants' gambit was to conceal these documents as long as possible in disregard of their discovery duties.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Tab 73

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 735 of 751
PageID: 12101

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

2019 WL 2174089
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE WELSPUN LITIGATION

16 CV 6792 (VB)
|
Signed 05/20/2019

**OPINION AND ORDER**

Vincent L. Briccetti, United States District Judge

**\*1** Plaintiffs Harold Brower, Judi Talili, and Ashley Mistler (the "California plaintiffs"), and Samuel Jividen and Susan Gettings (the "New York plaintiffs"), bring this putative class action against defendants Welspun India Ltd. ("WIL") and Welspun USA Inc. ("WUSA") (collectively, the "Welspun Defendants"), and defendants Wal-Mart Stores, Inc. d/b/a Walmart, Bed Bath and Beyond, Inc. ("BB&B"), and Target Corporation (collectively, the "Retailer Defendants"), for allegedly distributing, marketing, and selling bed linens falsely labeled "100% Egyptian cotton."

Plaintiffs bring the following claims:

• First, the California plaintiffs bring claims individually and on behalf of a proposed California subclass against all defendants for violation of (i) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq., (ii) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., and (iii) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.;

• Second, the California plaintiffs bring claims individually and on behalf of a proposed nationwide class against all defendants for (iv) breach of express warranty, (v) breach of the implied warranty of merchantability, (vi) unjust enrichment, and (vii) violation of the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 et seq.;

• Third, all plaintiffs bring claims individually and on behalf of a proposed nationwide class against all defendants for (viii) negligent misrepresentation and (ix) fraud; and

• Fourth, the New York plaintiffs bring claims individually and on behalf of a proposed New York subclass for (x) violation of N.Y. Gen. Bus. Law ("NYGBL") §§ 349 & 350.

Now pending are (i) the Welspun Defendants' motion to dismiss the consolidated second amended class action complaint ("CSAC") pursuant to Rules 8, 9(b), 12(b)(1), 12(b)(2), and 12(b)(6) (Doc. #182); (ii) the Retailer Defendants' motion to dismiss the CSAC pursuant to Rule 12(b)(6) and to strike class allegations pursuant to Rule 12(f) (Doc. #185); (iii) plaintiffs' request for leave to amend pursuant to Rule 15; and (iv) the Welspun Defendants and Target's accountings for sanctions (Docs. ##172, 174).

For the following reasons, the Welspun Defendants' and Retailer Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART. The Retailer Defendants' motion to strike is DENIED. Plaintiffs' request for leave to amend is DENIED. And the Welspun Defendants' and Target's accountings for sanctions are DENIED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

**BACKGROUND**

The following factual background is drawn from the CSAC and the parties' submissions in support of and in opposition to the pending motions. In deciding the pending motions, the Court accepts as true all well-pleaded factual allegations in the CSAC and draws all reasonable inferences in plaintiffs' favor.

I. Factual Background

A. The Welspun Defendants
WIL, based in Mumbai, India, is one of the world's largest textile manufacturers. It exports more than sixty-eight percent of its production to the United States and supplies textile products to retail stores in New York, including BB&B, Target, and Walmart.

 **\*2** WUSA is a textile company and WIL's wholly owned
subsidiary, incorporated in Delaware with its principal place
of business in New York. According to the CSAC, "[WIL] has
publicly described [WUSA] as the 'sales arm' of [WIL], and
says that [WUSA's] purpose is to 'look after [WIL's] North
American' business." (Doc. #171 ("CSAC") ¶ 11).

Plaintiffs allege WIL "describes itself [ ]as having two
'corporate headquarters,' one in Mumbai, and the other in
New York where [WUSA] is located." (CSAC ¶ 12). For
instance, according to plaintiffs, WIL's 2016–2017 Mumbai,
and the other in New York where [WUSA] is located." (CSAC
¶ 12). For instance, according to plaintiffs, WIL's 2016–2017
annual report states WIL maintains a "Corp. HQ/Marketing
Office" in New York. (Id.). Further, plaintiffs allege WIL
reports on WUSA's finances in its own annual reports and
guarantees loans to WUSA.

### B. Egyptian Cotton
Plaintiffs allege "Egyptian cotton (i.e., gossypium barbadense
cotton grown in Egypt) is considered some of the highest-
quality cotton in the world." (CSAC ¶ 19). Plaintiffs allege
standard cotton uses fibers that are twisted and combined to
produce the right length. But according to plaintiffs, Egypt's
climate and Egyptian cultivation methods yield cotton with
longer cotton fibers (or staples) than other types of cotton.
Longer fibers mean more uninterrupted fiber to use when
making yarn and threads, resulting in fewer splices and a
stronger, more durable fabric. Longer fibers also generate
finer yarn, which allows manufacturers to pack more thread
into each square inch, resulting in cotton linens with higher
thread counts that are "softer and more lustrous than linens
made of other types of cotton." (Id. ¶ 20). In addition,
according to plaintiffs, Egyptian cotton is more porous than
regular cotton. That means it absorbs moisture better, making
it more comfortable, and absorbs dye better, allowing for
richer colors that resist fading longer.

### C. The Bed Linens
Plaintiffs allege the Welspun Defendants manufacture,
market, and sell linens that are purportedly "100% Egyptian
Cotton" or "100% Long-Staple Egyptian Cotton" in the
United States. (CSAC ¶ 30). Allegedly, at least six products
with such representations are in fact made with non-Egyptian
cotton: (i) Fieldcrest 500 thread count "100% Long-Staple
Egyptian Cotton" bed linens; (ii) Better Homes and Gardens
400 thread count "100% Egyptian Cotton" bed linens; (iii)
Canopy 400 thread count damask stripe "100% Egyptian

Cotton" bed linens; (iv) Crowning Touch 500 and 800 thread
count "100% Egyptian Cotton" bed linens; (v) Perfect Touch
625 thread count "100% Egyptian Cotton" bed linens; and (vi)
Royal Velvet 400 thread count "100% Egyptian Cotton" bed
linens (collectively, the "Bed Linens"). (Id. ¶ 30). Plaintiffs
allege the Bed Linens are sold online and in retail stores across
the United States, including Walmart, BB&B, and Target.

### D. Retailer Defendants
Plaintiffs allege the Retailer Defendants each contracted with
the Welspun Defendants to market and sell the Welspun
Defendants' products in the Retailer Defendants' physical
and online stores. However, according to plaintiffs, the
Retailer Defendants knew or should have known, before they
discontinued sales of the Bed Linens, that the Bed Linens
were falsely labeled.

First, plaintiffs allege in 2008, a Walmart employee
expressed concern that Welspun was supplying Walmart with
fake Egyptian cotton sheets, and that Walmart employees
may have been colluding with the Welspun Defendants.
According to the CSAC, Walmart responded by conducting
an investigation that exposed "systematic fraud by Welspun,"
but Walmart "buried the results of that investigation and
continued to market, sell, and deliver Welspun products
labeled '100% Egyptian Cotton.' " (CSAC ¶ 48). Then,
in November 2015, "the Cotton Egypt Association warned
Walmart that the levels of fraudulent merchandise on offer as
Egyptian cotton had reached a crisis point," yet Walmart took
no action. (Id. ¶ 49). Walmart allegedly pulled the Welspun
Defendants' products from its shelves only after knowledge
of the alleged false labeling became public in August 2016.

 **\*3** Second, plaintiffs allege Target began investigating the
Welspun Defendants as early as December 2015. According
to plaintiffs, a whistleblower then contacted Target in January
2016 saying "Welspun had asked him or her to falsify invoices
to make it appear that Welspun used Egyptian cotton when it
did not." (CSAC ¶ 52). Plaintiffs allege the whistleblower also
disclosed "that Welspun did not purchase enough Egyptian
cotton to meet the needs of its retailers [and] had a history of
falsifying invoices." (Id.).

Plaintiffs further allege another employee for one of the
Welspun Defendants later told a Target employee in India that
"Welspun" used non-Egyptian cotton for Target's products.
(CSAC ¶ 53). The employee then allegedly stole a trove
of incriminating documents and passed the documents to
other Target employees. Nevertheless, plaintiffs allege Target

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

continued to market, sell, and deliver the Bed Linens, and even gave "Welspun" its "Vendor of the Year" award in April 2016. (Id. ¶ 54).

Third, plaintiffs allege BB&B learned in August 2015 its Perfect Touch and other supposedly Egyptian cotton bed linens were not made with Egyptian cotton, but took no action at that time. BB&B then allegedly began auditing the Bed Linens on August 24, 2016, but continued to sell the products for another three months while the audit was pending. According to plaintiffs, however, BB&B knew one month into their audit that "Welspun had no way to show that its Egyptian cotton sheets were really made with Egyptian cotton." (CSAC ¶ 55).

II. Procedural History

Plaintiffs filed a consolidated amended class action complaint ("CAC") on February 27, 2017, after which defendants submitted a joint pre-motion letter addressing their anticipated motions to dismiss and to strike the CAC. Among other things, the letter identified the CAC's failure to allege any named plaintiff purchased products from Target or Walmart in New York, exposing a potentially fatal flaw in plaintiffs' claims under 📙 NYGBL Sections 349 and 350.

On October 13, 2017, the Welspun Defendants moved to dismiss and the Retailer Defendants moved to dismiss and to strike class allegations. One of defendants' arguments was the CAC failed to allege any named plaintiff purchased products from Target, Walmart, or BB&B in New York. In opposition to the Retailer Defendants' motion, plaintiffs requested leave to amend the CAC to allow the addition of a New York plaintiff asserting claims against Target and Walmart.

After Defendants' motions were fully briefed, Judge Richard J. Sullivan, to whom this case was previously assigned, ordered plaintiffs to submit a pre-motion letter regarding their request for leave to amend. Judge Sullivan also ordered defendants, in opposition to plaintiffs' letter, to address the propriety of awarding attorney's fees and costs, pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent equitable powers, for plaintiffs' failure to address the deficiencies raised in defendants' pre-motion to dismiss letter before fully briefing the motions to dismiss.

Judge Sullivan subsequently granted plaintiffs permission to file a consolidated second amended class action complaint. However, Judge Sullivan also ordered defendants to

submit accountings of fees associated with briefing the portions of their motions to dismiss pertaining to the deficiencies defendants had previously raised regarding plaintiffs' NYGBL claims.

Plaintiffs filed the CSAC on August 20, 2018. Target then requested an award of $ 41,640.28 in attorney's fees and costs. The Welspun Defendants requested $ 9,002.18. Plaintiffs' counsel filed an answering memorandum in opposition to the accountings.

**\*4** On September 14, 2018, the Welspun Defendants and Retailer Defendants moved to dismiss the CSAC. The case was subsequently reassigned to the undersigned.

**DISCUSSION**

I. Standard of Review

A. Rule 12(b)(1)

"[F]ederal courts are courts of limited jurisdiction and lack the power to disregard such limits as have been imposed by the Constitution or Congress." 📙 Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." 📙 Nike, Inc. v. Already, LLC, 663 F.3d 89, 94 (2d Cir. 2011) (internal quotation omitted). The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists. 📙 Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009).

When, as here, the case is at the pleading stage, in deciding a motion to dismiss under Rule 12(b)(1), the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." 📙 Conyers v. Rossides, 558 F.3d at 143. But "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." 📙 Buday v. N.Y. Yankees P'ship, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (quoting 📙 Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)). When a factual challenge to the Court's jurisdiction has been raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside

Case 1:19-md-02875-RMB-SAK   Document 577-3   Filed 09/18/20   Page 738 of 751
PageID: 12104

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

of the pleadings, such as affidavits." Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (internal citation omitted). When a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, the court typically should consider the Rule 12(b)(1) challenge first. Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

**B.** Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003). Prior to discovery, a plaintiff may defeat a motion to dismiss "by pleading in good faith legally sufficient allegations of jurisdiction." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990) (internal citation omitted). However, when, as here, a plaintiff has engaged in jurisdictional discovery, but no evidentiary hearing was conducted, "the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d at 206 (internal quotation and alteration removed). When there has been no hearing on the merits, "all pleadings and affidavits must be construed in the light most favorable to [the plaintiff,] and all doubts must be resolved in the ... plaintiff's favor." Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990).

**\*5** As this is a diversity action, the Court must "resolve the question of personal jurisdiction with reference to New York law, the forum in which the district court sits." Ash v. Richards, 572 F. App'x 52, 53 (2d Cir. 2014) (summary order). Moreover, when a defendant moves to dismiss under Rules 12(b)(2) and 12(b)(6), the court must resolve the Rule 12(b) (2) motion first. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963); Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 224 (S.D.N.Y. 2013).

**C.** Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion for failure to state a claim, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the U.S. Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679

(2009). First, plaintiffs' legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the complaint's allegations must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

**D.** Rule 12(f)

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are generally looked upon with disfavor." Chenensky v. N.Y. Life Ins. Co., 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) (internal quotation and citation omitted). Motions to strike class allegations are "even more disfavored" because they seek "to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the [class certification] discovery to which they would otherwise be entitled." Id. (alteration and internal quotation omitted). Thus, unless a motion to strike class allegations "addresses issues separate and apart from the issues that will be decided on a class certification motion," the motion should be denied as premature. Chen-Oster v. Goldman, Sachs & Co., 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (internal quotation omitted).

**E.** Rule 8

2019 WL 2174089

Rule 8(a)(2) requires "[a] pleading that states a claim for relief" to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal pursuant to Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004) (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)).

### F. Sanctions

**\*6** "A district court has inherent power to award attorneys' fees against the offending party and his attorney when it determines a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Agee v. Paramount Commc'ns, Inc., 114 F.3d 395, 398 (2d Cir. 1997) (internal quotation omitted). "Similarly, under 28 U.S.C. § 1927, the court may require any attorney to pay costs if he or she 'so multiplies the proceedings in any case unreasonably and vexatiously.' " Id. "To impose sanctions under either authority, the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." Id.

Rule 11 permits sanctions if a party presents "[a] pleading, motion, or other paper" that "has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1344 (2d Cir. 1991) (internal quotation, citations, and emphasis omitted). Courts have broad discretion in determining whether to impose sanctions under Rule 11. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 407 (1990). "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." United States v. Int'l Bhd. of Teamsters, 948 F.2d at 1344 (citing Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 549–50 (1991)).

### II. Injunctive Relief

Plaintiffs lack standing to sue for injunctive relief.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n, 747 F.3d 44, 48 (2d Cir. 2014) (internal citation omitted). To establish standing in federal court, a litigant must demonstrate, among other things, he or she has suffered an injury. Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998). "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." Peck v. Baldwinsville Cent. Sch. Dist., 351 F. App'x 477, 479 (2d Cir. 2009) (summary order) (quoting Deshawn E. by Charlotte E. v. Safir, 156 F.3d at 344). Thus, a plaintiff who concedes she is no longer likely to purchase a product because she knows of a defendant's alleged deception and false advertising does not have standing to enjoin the defendant's sales practices. See Kommer v. Bayer Consumer Health, 710 F. App'x 43, 44 (2d Cir. 2018) (summary order).

Plaintiffs concede that they would not have purchased the Bed Linens had they known the products were not made from "100 Egyptian Cotton" or "100% Long-Staple Egyptian Cotton." (See, e.g., CSAC ¶¶ 74). Nor do plaintiffs allege they intend to purchase the Bed Linens in the future. Therefore, plaintiffs cannot show a likelihood of future injury.

Accordingly, plaintiffs' claims for injunctive relief must be dismissed.

### III. Personal Jurisdiction

The Welspun Defendants argue plaintiffs fail to establish personal jurisdiction over non-domiciliary defendant WIL.

The Court agrees only as to the California plaintiffs' claims against WIL. As to all other claims against WIL, the Court either finds it has specific personal jurisdiction or defers resolution until a motion for class certification.

**\*7** The Court first analyzes whether WUSA acted as WIL's agent for purposes of personal jurisdiction, and therefore whether the Court may consider WUSA's contacts with the forum when determining whether to exercise personal jurisdiction over WIL. Then, to determine whether personal jurisdiction exists over WIL, the Court engages in a two-step inquiry. Chloe v. Queen Bee of Beverly Hills, LLC,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 740 of 751
PageID: 12106
In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

616 F.3d 158, 163 (2d Cir. 2010) (citation omitted). First, the Court determines whether the forum state's law permits the exercise of jurisdiction over the defendant. Id. "[T]he second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." Id. at 164.

A. Agency

Plaintiffs aver facts that, if credited, would establish that WUSA acted as WIL's agent for purposes of personal jurisdiction.

"To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control." GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (internal quotation omitted). "In determining if an agency relationship exists for purposes of personal jurisdiction, a court should analyze the realities of the relationship in question rather than the formalities of agency law." Id. (internal quotation and citation omitted). A plaintiff need not demonstrate either a formal agency agreement or that the defendant exercised direct control over its putative agent. Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007).

"To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.'" Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998) (quoting Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 537 (1967)).

> This 'means that a foreign corporation is doing business in New York when its New York representative provides services beyond mere solicitation and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar activities.'

Klonis v. Nat'l Bank of Greece, S.A., 492 F. Supp. 2d at 301 (quoting Gelfand v. Tanner Motor Tours, Ltd., 385 F.3d 116, 121 (2d Cir. 1967) (alterations omitted)). When "the alleged reason for the subsidiary's existence is to perform services

in furtherance of its parent's business that would otherwise have to be performed by the parent, there seems to be little question that the subsidiary is acting as the parent's agent—even if it performs other tasks as well." Yousef v. Al Jazeera Media Network, 2018 WL 1665239, at *11 (S.D.N.Y. Mar. 22, 2018).

Here, crediting the evidence plaintiffs have produced at this early stage of the case and construing the facts in the light most favorable to plaintiff, the Court finds that if not for WUSA, WIL would perform substantially similar services, including importing goods into New York and selling goods to third-party retailers who in turn sell WIL's goods in the United States. In particular, plaintiffs have produced evidence that WUSA has described itself as "the sales, marketing and distribution arm for Welspun's textile business." (Doc. #189 ("Klorczyk Decl.") Ex. 7 at WS106645). [1] Similarly, WIL's 2011–2012 WIL's 2011–2012 annual report states, "WIL has subsidiaries based out of New York in USA ... to look after its North American ... business[ ]." (Doc. #187 ("Jiwani Decl.") Ex. C at ECF 6).

**\*8** In a letter to U.S. Customs and Border Protection, WUSA lays out the entities' joint structure: WIL is the manufacturer, Welspun Global Brands Limited ("WGBL") the middleman, and WUSA the marketer and wholesaler. (See Klorczyk Decl. Ex. 8 at WS127362–67). Similarly, in a prospective licensee questionnaire, WUSA states WIL, WGBL, and WUSA comprise "a vertically integrated manufacturer" of products including bed sheets. (Id. Ex. 7 at WS106646). And in the letter to U.S. Customers and Border Protection, WUSA states it imports merchandise for both WGBL and WIL. (Id. Ex. 8 at WS127362).

Further, at this stage, plaintiffs' evidence adequately shows WIL treated WUSA's New York office like its own. One Target witness testified WIL employees told him they had offices in New York, where WUSA was located. Plaintiffs also produced an email from WIL's CEO and Joint Managing Director referring to "our New York office" (Klorczyk Decl. Ex. 5 at WS056196) and a WIL PowerPoint presentation doing the same (id. Ex. 6 at WS028871).

At this stage, plaintiffs' evidence also adequately shows the Retailer Defendants treated WUSA as WIL's agent. A Rule 30(b)(6) witness for Walmart testified: "Welspun India and Welspun U.S., although they are two separate companies, for Walmart, we work with them like they are one company." (Klorczyk Decl. Ex. 2 at 13). A Rule 30(b)

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 741 of 751
PageID: 12107

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

(6) witness for Target similarly testified Target considered WUSA and WIL to be "one entity." (Id. Ex. 3 at 49). Moreover, witnesses for both Walmart and Target testified representatives from the Welspun Defendants referred to their employers as "Welspun" without specifying WUSA or WIL. (Id. Ex. 2 at 13–14; Ex. 3 at 52).

WIL argues imputing WUSA's ties with New York to WIL would violate the corporate separateness doctrine that applies when a litigant seeks to pierce the corporate veil. The Court disagrees. "Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d at 319.

Therefore, plaintiffs have produced sufficient evidence that, if credited, would show WUSA acted as WIL's agent for purposes of personal jurisdiction.

B. New York's Long-Arm Statute

Moreover, the New York plaintiffs have averred facts that, if credited, would satisfy New York's Long Arm statute for purposes of their claims against WIL. [2]

"CPLR § 302 is New York's 'long-arm' statute permitting jurisdiction over an out-of-state defendant." Bidonthecity.com LLC v. Halverston Holdings Ltd., 2014 WL 1331046, at *3 (S.D.N.Y. Mar. 31, 2014) (internal citations omitted). Section 302(a)(1) provides, "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent[,] transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 168 (2d Cir. 2015) (internal quotation omitted). "There can be no doubt" a company transacts business in New York when it is headquartered in and rents facilities to carry on its operations in the state. Yousef v. Al Jazeera Media Network, 2018 WL 1665239, at *13.

*9 As for the second requirement, "a claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (internal quotations and alteration omitted). "A connection that is 'merely coincidental' is insufficient to support jurisdiction." Id. (quoting Johnson v. Ward, 4 N.Y.2d 516, 520 (2005)). The inquiry is fact-specific. Id.

WIL transacted business in New York, satisfying Section 302(a)(1)'s first requirement. According to plaintiffs, WUSA's principal place of business is in New York and maintained an office there. Moreover, as discussed above, the Court imputes WUSA's contacts to WIL because WUSA acted as WIL's agent for purposes of personal jurisdiction over WIL.

Further, the New York plaintiffs' claims arise from WIL's business activity in New York, satisfying Section 302(a)(1)'s second requirement. As noted above, plaintiffs have produced evidence that WUSA, which is headquartered in New York, has described itself as "the sales, marketing and distribution arm for Welspun's textile business," from which the New York plaintiffs' claims arise. (Klorczyk Decl. Ex. 7 at WS106645). Moreover, the New York plaintiffs allege they purchased Bed Linens from the Retailer Defendants in New York. Therefore, there is an articulable nexus between WIL's business and the New York plaintiffs' claims against WIL.

Accordingly, plaintiffs have produced evidence that, if credited, would establish personal jurisdiction over the New York plaintiffs' claims against WIL under Section 302(a)(1).

C. Due Process

The Court now turns to whether exercising personal jurisdiction would comport with due process. The Court concludes it (i) lacks general jurisdiction over WIL; (ii) has specific jurisdiction over the New York plaintiffs' claims against WIL; and (iii) lacks specific jurisdiction over the California plaintiffs' claims against WIL. In addition, the Court defers decision on whether it may exercise specific personal jurisdiction over unnamed class members' out-of-state claims until a motion for class certification.

"[T]o satisfy the Due Process Clause of the United States Constitution, the exercise of long-arm jurisdiction by New York must be based on defendants' 'minimum contacts' with the state and must comport with 'traditional notions of

2019 WL 2174089

fair play and substantial justice.' " Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 32 (2d Cir. 1996) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). A court may exercise two types of jurisdiction, differentiated by the kind of minimum contacts the defendant has had with the forum state. "These are specific (also called 'case-linked') jurisdiction and general (or 'all-purpose') jurisdiction." Brown v. Lockheed Martin Corp., 814 F.3d 619, 624 (2d Cir. 2016).

The Court addresses each in turn.

### 1. General Jurisdiction Over WIL

The Court's exercise of general jurisdiction over WIL would not comport with due process.

"A court may assert general jurisdiction over [a] foreign (sister-state or foreign-country) corporation[ ] to hear any and all claims against [the corporation] when [the corporation's] affiliations with the State ... render [it] essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011). "[T]he general jurisdiction inquiry 'is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic,' but rather ... 'whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum.' " Brown v. Lockheed Martin Corp., 814 F.3d at 627 (quoting Daimler AG v. Bauman, 134 S. Ct. 746, 761 (2014) [hereinafter Daimler] ). A corporation is "essentially at home" in its state of incorporation and the state of its principal place of business. Daimler, 134 S. Ct. 760–61. Only in a "truly exceptional case" may a corporate defendant be treated as "essentially at home" in a jurisdiction besides its states of incorporation and principal place of business. Brown v. Lockheed Martin Corp., 814 F.3d at 627 (internal quotation marks omitted). In addition, an agent's contacts with a forum state, even if imputed to the principal company, do not allow a court to exercise general jurisdiction over the principal company unless they render the principal company essentially at home in the forum state. See Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 226 (2d Cir. 2014) (holding principal company not essentially at home in New York because even if agents' contacts were imputed to the principal

company, "they do not shift the company's primary place of business (or place of incorporation) away from Turkey.").

**\*10** This is not an exceptional case. WIL is incorporated and has its principal place of business in India. According to WIL's CFO, WIL has "seven direct subsidiaries in India and 13 indirect subsidiaries located in six other countries." (Jiwani Decl. ¶ 19). Moreover, WIL's CFO states WIL's top managers are Indian nationals who work primarily in India; WIL's stock trades on the Bombay Stock Exchange and the National Stock Exchange of India; all members of WIL's board of directors are Indian nationals who reside in India; WIL's board of directors meets in Mumbai; WIL's annual shareholder meetings are in Gujarat, India; WIL's factories are all located in India; all of WIL's products are manufactured in India; and as of the third quarter of 2016, WIL had approximately 22,000 employees, all of whom were employed in India. Moreover, despite the fact that WUSA has extensive contacts with New York, those contacts "do not shift [WIL]'s primary place of business (or place of incorporation) away from" India. Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d at 226.

Therefore, WIL is essentially at home in India, not New York, and the Court's exercise of general jurisdiction over WIL would not comport with due process.

### 2. Specific Jurisdiction over the New York Plaintiffs' Claims

The Court's exercise of specific jurisdiction over the New York plaintiffs' claims against WIL, however, does comport with due process pursuant to a stream of commerce theory of specific jurisdiction.

Specific jurisdiction over a nonresident defendant satisfies due process when: "(1) the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum State'; (2) the claim at issue 'arises out of or relates to the defendant's forum conduct'; and (3) the exercise of jurisdiction is 'reasonable under the circumstances.' " Ramiro Aviles v. S & P Glob., Inc., 2019 WL 1407473, at *16 (S.D.N.Y. Mar. 28, 2019) (quoting U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d Cir. 2019)). [3]

Under a stream of commerce theory of specific jurisdiction, a plaintiff must show a "regular flow or regular course of sales" in the forum state or other purposeful activity directed

2019 WL 2174089

there, such as "special state-related design, advertising, advice, marketing," or regular attendance at trade shows in the forum state. See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 889 (2011) (Breyer, J., concurring) (internal quotations and alterations omitted). "Courts have considered 'an expectation of true national distribution' of the products at issue to suggest an expectation that the product in question (or other products) would enter the forum state's stream of commerce." Melissa & Doug, LLC v. LTD Commodities, LLC, 2016 WL 4367975, at *4 (S.D.N.Y. Aug. 15, 2016) (internal citations omitted). In addition, "establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" also "may indicate an intent or purpose to serve the market in the forum State." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987).

The Supreme Court has cast doubt on the continued viability of specific jurisdiction based on a product's placement into the forum state's stream of commerce. See J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. at 886 (Kennedy, J., plurality opinion) (finding defendant had not "availed itself" of New Jersey's market simply because defendant directed sales and marketing efforts at the United States and four of its products entered New Jersey's stream of commerce); Asahi Metal Indus. Co. v. Superior Court, 480 U.S. at 112 (O'Connor, J., plurality opinion) ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."). Nevertheless, the stream of commerce theory survives. See, e.g., AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) (holding "because [J. McIntyre Mach., Ltd. v. Nicastro] did not produce a majority opinion," courts must follow Justice Breyer's concurrence, "the crux of [which] was that the Supreme Court's framework applying the stream-of-commerce theory ... had not changed").

**\*11** Here, there is sufficient evidence to conclude at this stage that WIL expected true national distribution of the Bed Linens. WIL's 2016–2017 WIL expected true national distribution of the Bed Linens. WIL's 2016–2017 annual report states WIL, India's "largest exporter of home textile products," was "[r]anked #1 in Home Textile Supplier Giants to USA by Home & Textiles Today magazine for the 5th Year in a row." (Jiwani Decl. Ex. A at ECF 4–5). The annual report further states that "every 5th towel and every 9th

bedsheet sold in the US is manufactured by [WIL]." (Id.). Similarly, WIL's 2011–2012 WIL's 2011–2012 annual report states "nearly 70% of WIL revenues come from the US markets," down from the "nearly 90% of business coming from the US nearly a decade ago." (Id. Ex. C at ECF 6).

Plaintiffs' evidence regarding the size of the New York market also supports this conclusion. Plaintiffs aver Walmart and BB&B each have approximately 100 stores in New York and Target has seventy-nine. Plaintiffs also filed evidence under seal showing significant Walmart sales of Welspun products in New York.

Other evidence further supports finding WIL purposely availed itself of the privilege of conducting business in New York. WUSA—WIL's subsidiary and allegedly "the sales, marketing and distribution arm for Welspun's textile business" (Klorczyk Decl. Ex. 7 at WS106645)—had its principal place of business and an office in New York that, at least at this stage of the case, the Court finds WIL treated as its own. Further, plaintiffs produced evidence that WUSA shipped goods into New York on WIL's behalf, and that WIL representatives attended New York's Home Fashions Market Week in 2016.

Accordingly, plaintiffs have produced sufficient evidence that, if credited, would satisfy due process for purposes of establishing specific jurisdiction over the New York plaintiffs' claims against WIL.

### 3. Specific Jurisdiction over the California Plaintiffs' Claims

However, pursuant to the Supreme Court's decision in Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty., 137 S. Ct. 1773 (2017) [hereinafter Bristol-Myers], the Court lacks specific jurisdiction over the California plaintiffs' claims against WIL.

In Bristol-Myers, a state-court mass tort action with more than 600 named plaintiffs, the Court explained:

> for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.' When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 744 of 751
PageID: 12110

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)

2019 WL 2174089

137 S. Ct. at 1781 (alteration in original) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. at 919). Emphasizing that specific jurisdiction requires "the suit [to] arise out of or relate to the defendant's contacts with the forum," id. at 1780 (alterations omitted) (quoting Daimler, 571 U.S. 117) (citations omitted), the Court found the California courts lacked specific jurisdiction over named plaintiffs foreign to California who had not alleged any injury there, see id. at 1782.

The Bristol-Myers Court explicitly left open the question whether the Fifth Amendment imposed the same restrictions on the exercise of personal jurisdiction by a federal court. See Bristol-Myers, 137 S. Ct. at 1784.[4] Moreover, although most district courts have held Bristol-Myers does not apply to federal class actions, Bank v. CreditGuard of Am., 2019 WL 1316966, at *12 n.11 (E.D.N.Y. Mar. 22, 2019), reconsideration denied sub nom. Bank v. Freedom Debt Relief, LLC, 2019 WL 1865196 (E.D.N.Y. Apr. 24, 2019), several courts have deferred resolution of Bristol-Myers' applicability to unnamed class members' claims until a motion for class certification, see, e.g., Gonzalez v. Costco Wholesale Corp., 2018 WL 4783962, at *8 (E.D.N.Y. Sept. 29, 2018).

*12 The California plaintiffs did not purchase any of the Bed Linens in New York. They therefore rely on WIL's contacts with New York through WUSA, which plaintiffs allege maintains its headquarters in New York and functions as WIL's sales, marketing, and distribution arm in the United States. But "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough." Bristol-Myers, 137 S. Ct. at 1781. Thus, because the California plaintiffs' claims do not arise from WIL's contacts with New York, the Court lacks personal jurisdiction over the California plaintiffs' claims against WIL.

Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims, however, is less clear. Accordingly, the Court defers resolution of Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims until plaintiffs move for class certification.

D. Pendent Jurisdiction

Plaintiffs argue the Court should exercise pendent personal jurisdiction over the California plaintiffs' claims against WIL.

Pendent jurisdiction is not applicable in these circumstances.

"Pendent jurisdiction traditionally refers to the joinder of a state-law claim by a party already presenting a federal question claim against the same defendant." Baylis v. Marriott Corp., 843 F.2d 658, 663–64 (2d Cir. 1988) (internal citation omitted). "[W]here a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact,' ... the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 88 (2d Cir. 2018) (quoting IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993)).

Plaintiffs have not brought a claim under a federal statute authorizing nationwide service of process. Nor is a non-traditional application of pendent jurisdiction appropriate here. See, e.g., DeMaria v. Nissan N. Am., Inc., 2016 WL 374145, at *8 (N.D. Ill. Feb. 1, 2016) (application of pendent jurisdiction inappropriate "where each plaintiff's claim is predicated on the law of the particular state where he or she purchased a car and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in Illinois"); Tulsa Cancer Inst., PLLC v. Genetech Inc., 2016 WL 141859, at *4 (N.D. Okla. Jan. 12, 2016) ("The doctrine of pendent personal jurisdiction does not negate Plaintiffs' obligation to establish jurisdiction based on the relationship between Defendant, the forum, and each Plaintiff's claims.").

Therefore, the Court will not exercise pendent jurisdiction over the California plaintiffs' claims against WIL.

E. Conclusion

In sum, the Court has specific jurisdiction over the New York plaintiffs' claims against WIL, lacks jurisdiction over the California plaintiffs' claims against WIL, and defers resolution of Bristol-Myers' applicability to the New York plaintiffs' out-of-state class action claims until plaintiffs move for class certification.

IV. Failure to State a Claim

The Court now assesses defendants' challenges to several of the CSAC's claims for relief.

For the following reasons, the Court will allow the California plaintiffs' claims against WUSA and the Retailer Defendants for unjust enrichment, negligent misrepresentation, and for violation of the UCL, CLRA, and FAL, to proceed. However, the following claims are dismissed: (i) the California plaintiffs' claims for implied warranty against WUSA and the Retailer Defendants; (ii) the New York plaintiffs' claims for negligent misrepresentation against all defendants; (iii) all plaintiffs' claims for violation of the MMWA against all defendants; and (iv) all plaintiffs' claims for fraud against the Retailer Defendants.

### A. Implied Warranty

**\*13** The Welspun Defendants argue the California plaintiffs' implied warranty claims under California law fail because the California plaintiffs fail to allege privity.

The Court agrees.

"Under California Commercial Code section 2314, ... a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant." Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1023 (9th Cir. 2008). "One exception to the general rule is where 'the purchaser of a product relied on representations made by the manufacturer in labels or advertising material.' " Allen v. Hyland's Inc., 300 F.R.D. 643, 669 (C.D. Cal. 2014) (quoting Clemens v. DaimlerChrysler Corp., 534 F.3d at 1023). Although the Ninth Circuit implied in Clemens v. DaimlerChrysler Corp. that this exception to the privity requirement extends to claims for breach of implied warranty, 547 F.2d at 1023, it relied on Burr v. Sherwin Williams Co., in which the California Supreme Court held the exception was "applicable only to express warranties." 42 Cal. 2d 682, 696 (1954). Courts that have noted this discrepancy have held the privity exception is limited to claims for breach of the express warranty. See, e.g., Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, at \*11 n.8 (S.D. Cal. Nov. 29, 2018).

The Court agrees that California's privity exception for claims based on label or advertising misrepresentations applies only to claims for breach of express warranty. Thus, because

plaintiffs do not allege privity with the Welspun Defendants, their claim for breach of implied warranty under California law fails.

Accordingly, the California plaintiffs' claims for breach of implied warranty under California law against the Welspun Defendants are dismissed.

### B. Unjust Enrichment

Defendants argue the California plaintiffs' unjust enrichment claims under California law fail because California does not recognize unjust enrichment as a standalone claim for relief.

The Court disagrees.

California courts generally do not recognize a standalone claim for unjust enrichment, "which is synonymous with 'restitution.' " Astiana v. Hain Celestial Group, Inc., 783 F.3d 753, 762 (9th Cir. 2015) (quoting Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1370 (2010) (citation omitted)). However, "[w]hen a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.' " Id. (quoting Rutherford Holdings, LLC v. Plaza Del Ray, 223 Cal. App. 4th 221 (2014)). Thus, in Astiana v. Hain Celestial Group, Inc., the Ninth Circuit held an allegation that a defendant "enticed plaintiffs to purchase their products through false and misleading labeling, and that [the defendant] was unjustly enriched as a result," sufficed to state a quasi-contract cause of action. 783 F.3d at 762 (internal quotations and alteration omitted). Further, to the extent plaintiffs' restitution claim is duplicative or superfluous, "this is not grounds for dismissal." Id. (citing Fed. R. Civ. P. 8(d)(2)). Courts have since "permitted what were previously considered to be superfluous unjust enrichment were claims to survive the pleading stage in light of the Ninth Circuit's decision in Astiana." Valencia v. Volkswagen Grp. of Am. Inc., 119 F. Supp. 3d 1130, 1142 (N.D. Cal. 2015) (collecting cases).

**\*14** Here, the California plaintiffs allege defendants misrepresented the Bed Linens were "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton," and that defendants were unjustly enriched as a result. Although the California plaintiffs' restitution claims may be duplicative or superfluous, the Court will not dismiss the claims for that reason at this time.

2019 WL 2174089

Accordingly, the California plaintiffs' unjust enrichment claims under California law may proceed.

### C. Negligent Misrepresentation

Defendants argue plaintiffs fail to state claims for negligent misrepresentation under New York or California law because plaintiffs fail to allege a special relationship between plaintiffs and defendants.

Plaintiffs do not oppose dismissal of the New York negligent misrepresentation claims, and therefore the Court dismisses them. See M.M. ex rel. J.M. v. N.Y.C. Dep't of Educ., 2010 WL 2985477, at *6 (S.D.N.Y. July 27, 2010) (collecting cases). However, the Court will not dismiss plaintiffs' negligent misrepresentation claims under California law because California's economic loss rule—upon which defendants rely in arguing for dismissal—does not apply to those claims.

"In actions for negligence in California, recovery of purely economic loss is foreclosed in the absence of '(1) personal injury, (2) physical damage to property, (3) a special relationship existing between the parties, or (4) some other common law exception to the rule.' " Minkler v. Apple, Inc., 65 F. Supp. 3d 810, 820 (N.D. Cal. 2014) (quoting Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc., 315 F. App'x 603, 605 (9th Cir. 2008) (non-precedential memorandum)). This "economic loss rule requires a purchaser to recover in contract," not in tort, "for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988 (2004); see also Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *4 (E.D. Cal. June 27, 2016).

Courts are split regarding whether California's economic loss rule applies to negligent misrepresentation claims. See Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *5 (collecting cases). However, the Ninth Circuit held—albeit in a non-precedential memorandum—that "California law classifies negligent misrepresentation as a species of fraud, for which economic loss is recoverable." Kalitta Air, L.L.C. v. Cent. Tex. Airborne Sys., Inc., 315 F. App'x at 607 (internal citations

omitted). Moreover, some courts have noted the difference between breach of contract claims based on conduct after formation of the contract and negligent misrepresentation claims based on pre-contract conduct. See, e.g., Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, at *5.

In light of the Ninth Circuit's non-precedential memorandum and the district court's persuasive reasoning in Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc., 2016 WL 3519294, the Court holds California's economic loss rule does not apply to plaintiffs' negligent misrepresentation claims.

Accordingly, the New York plaintiffs' negligent misrepresentation claims are dismissed, but the California plaintiffs' negligent misrepresentation claims may proceed.

### D. Fraud-Based Claims

The Welspun Defendants argue plaintiffs' CLRA, UCL, FAL, negligent misrepresentation, and fraud claims fail to satisfy Rule 9(b)'s particularity requirement because the CSAC fails to explain how the Bed Linens' "100% Egyptian cotton" labels were false. Further, the Retailer Defendants argue plaintiffs' UCL, CLRA, FAL, negligent misrepresentation, and fraud claims against them should be dismissed because plaintiffs fail to plead the Retailer Defendants' fraudulent intent.

**\*15** The Court disagrees with the Welspun Defendants because plaintiffs adequately explain how the "100% Egyptian cotton" labels were false. Moreover, the Court finds plaintiffs need not allege scienter to state claims under the UCL, CLRA, FAL, or for negligent misrepresentation. However, plaintiffs fail to raise a strong inference of fraudulent intent on their fraud claims against the Retailer Defendants, and therefore those claims are dismissed.

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015) (internal citations omitted) [hereinafter Loreley]. Similarly, "[t]he elements of a cause of action for fraud in California are: '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e.,

Case 1:19-md-02875-RMB-SAK    Document 577-3    Filed 09/18/20    Page 747 of 751
PageID: 12113
In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 974 (1997)). Rule 9(b) imposes two additional pleading burdens on fraud plaintiffs—one concerning the circumstances of the fraud and the other defendant's mental state. Loreley, 797 F.3d at 171.

First, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Thus, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). That said, the rule "does not require factual pleadings that demonstrate the probability of wrongdoing." Loreley, 797 F.3d at 174 (alteration omitted) (quoting Ashcroft v. Iqbal, 556 U.S. at 678). "At the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not be more likely than other possibilities." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

Second, "though mental states may be pleaded generally, [a plaintiff] must nonetheless allege facts that give rise to a strong inference of fraudulent intent." Loreley, 797 F.3d at 171 (internal quotations omitted). "An inference is strong if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 176–77 (internal quotations omitted). Such an inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d at 290–91 (internal quotation omitted).

"Generalized motives, such as the desire to earn profits, which could be imputed to any publicly-owned, for-profit endeavor, are not sufficiently concrete for purposes of inferring scienter." In re Lyman Good Dietary Supplements Litig., 2018 WL 3733949, at *4 (S.D.N.Y. Aug. 6, 2018) (alteration removed) (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996)). Further, ordering an investigation is "a prudent course of action that weakens

rather than strengthens an inference of scienter." Slayton v. Am. Exp. Co., 604 F.3d 758, 777 (2d Cir. 2010) (internal quotation and citation omitted).

### 1. Alleged Falsity of "100% Egyptian Cotton" Labels

**\*16** Plaintiffs' allegations concerning the falsity of the "100% Egyptian cotton" labels satisfy the Rule 9(b) standard. As discussed in the Background section above, plaintiffs allege specific characteristics unique to Egyptian cotton, including longer cotton fibers and more porous cotton, and describe how those unique characteristics result in higher-quality cotton. Further, plaintiffs allege defendants misrepresented the Bed Linens as "100 Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."

### 2. Scienter

Plaintiffs' UCL, CLRA, FAL, and negligent misrepresentation claims do not require plaintiffs to plead the Retailer Defendants' fraudulent intent. See Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 591 (9th Cir. 2012) ("[T]he California laws at issue here"—the UCL, CLRA, and FAL—"have no scienter requirement." (citations omitted)); Dougherty v. Bank of Am., N.A., 177 F. Supp. 3d 1230, 1245 (E.D. Cal. 2016) (stating a plaintiff need not allege a defendant made an intentionally false statement to state claim for negligent misrepresentation). Thus, the Court will not dismiss those claims for failure to allege scienter plausibly.

However, plaintiffs' fraud claims against the Retailer Defendants do fail because plaintiffs do not raise a strong inference of fraudulent intent.[5] Plaintiffs merely allege Target and BB&B knew they were selling fake Egyptian cotton sheets after they began investigating the Welspun Defendants. However, the investigations indicate "a prudent course of action," not an intent to perpetrate a fraud. Slayton v. Am. Exp. Co., 604 F.3d at 777 (internal quotation and citation omitted). Plaintiffs alternatively allege Target and BB&B should have been aware of issues with the Welspun Defendants' products before investigating them, yet plaintiffs' allegations are entirely conclusory.

As for Walmart, plaintiffs allege in 2008, a Walmart employee expressed concerns about the Welspun Defendants' products;

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

Walmart investigated the Welspun Defendants; and Walmart "buried the results" of that investigation. (CSAC ¶ 48). But plaintiffs plead no specific facts supporting the conclusory allegation that Walmart buried the results of its investigation, and Walmart's investigation of the Welspun Defendants indicates prudence.

Plaintiffs also allege in 2015, the Cotton Egypt Association warned Walmart, "the levels of fraudulent merchandise on offer as Egyptian cotton had reached a crisis point." (CSAC ¶ 49). But plaintiffs' allegation is far too general to generate a strong inference of intent to defraud—in particular, plaintiffs do not allege the Cotton Egypt Association warned Walmart specifically about the Bed Linens or about the Welspun Defendants.

Accordingly, plaintiffs' claims under the UCL, CLRA, and FAL, and for negligent misrepresentation under California law, may proceed. Plaintiffs' fraud claims against the Retailer Defendants under New York and California law, however, are dismissed.

E. MMWA

Defendants proffer several arguments why the Court should dismiss plaintiffs' claims under the MMWA. Two of those arguments contest the Court's subject matter jurisdiction over plaintiffs' MMWA claims. Although neither argument is convincing, the Court must address those arguments first.

*17 Defendants argue the Court lacks subject matter jurisdiction because plaintiffs fail to name at least 100 plaintiffs. However, "where, as here, the jurisdictional prerequisites of [the Class Action Fairness Act] are satisfied, [the Court] may exercise subject-matter jurisdiction over a claim under the MMWA without regard for whether the jurisdictional prerequisites of that statute are also met." Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 295 (S.D.N.Y. 2015).

Defendants also argue the federal Textile Act preempts the MMWA pursuant to 15 U.S.C. § 2311(d), which states the MMWA is "inapplicable to any written warranty the making or content of which is governed by Federal law." But because "the representations appearing on the labels of the Class Products do not constitute a written warranty under the MMWA, section 2311(d)"—upon which defendants' argument relies—"is wholly inapplicable." Forcellati v. Hyland's, Inc., 2015 WL 9685557, at *6 (C.D. Cal. Jan.

12, 2015); see also 15 U.S.C. § 2301(6) (defining "written warranty" for purposes of the MMWA).

Nevertheless, the California plaintiffs fail to state a claim under the MMWA. Although the MMWA is a federal statute, liability under the MMWA is based on state warranty laws. See Ebin v. Kangadis Food Inc., 2013 WL 3936193, at *3 n.2 (S.D.N.Y. July 26, 2013) (noting the MMWA "incorporates and federalizes state-law breach of warranty claims, including state-law standards for liability and damages"). Thus, a plaintiff's claim under the MMWA "stand[s] or fall[s]" with the plaintiff's state law claims. See Brady v. Basic Research, L.L.C., 101 F. Supp. 3d 217, 234 (E.D.N.Y. 2015).

Plaintiffs' claims under the MMWA are based entirely on the California plaintiffs' claims for breach of the implied warranty of merchantability. The Court has dismissed those claims. Therefore, plaintiffs' MMWA claims are likewise dismissed.

V. Motion to Strike Class Allegations

The Retailer Defendants move to strike the CSAC's class allegations, arguing (i) a class action is not a superior method of resolving the dispute and (ii) common issues do not predominate. The Retailer Defendants also argue plaintiffs' claims for express warranty under New York law, negligent misrepresentation, and fraud require individualized proof to assess reliance, and therefore the Court should strike all class allegations pertaining to plaintiffs' proposed subclasses with respect to those claims.

Because the motion raises issues "that would be decided in connection with determining the appropriateness of class certification," the motion must be denied as premature, without prejudice to renewal at the class certification stage." Kassman v. KPMG LLP, 925 F. Supp. 2d at 464–65.

VI. Rule 8

The Welspun Defendants argue the CSAC fails to meet the basic notice pleading requirements of Rule 8(a)(2) because it does not distinguish between WIL and WUSA.

The Court disagrees.

"The key to Rule 8(a)'s requirements is whether adequate notice is given." Wynder v. McMahon, 360 F.3d at 79

2019 WL 2174089

(internal citation omitted). Adequate notice is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." Id.

(quoting 🔖 Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)).

Rule 8 "does not necessarily require ... that the complaint separate out claims against individual defendants."

🔖 Wynder v. McMahon, 360 F.3d at 80. Nevertheless, courts have dismissed complaints that fail to "distinguish at all between any of the Defendants." Angermeir v. Cohen, 14 F. Supp. 3d 134, 143 (S.D.N.Y. 2014) (collecting cases). However, in Loreley, which addressed Rule 9(b)'s higher pleading standard for fraud claims, the Second Circuit held the plaintiffs' references to three corporate entities collectively as "Wachovia," who allegedly acted together to structure and offer securities at issue in the case, sufficed to inform the defendants of the nature of their alleged participation in the fraud. 🔖 797 F.3d at 171–72.

**\*18** This is not a case in which the complaint fails to distinguish at all between WIL and WUSA. On the contrary, plaintiffs allege WUSA acted as WIL's "sales arm" in North America, and that WUSA's work included "distributing textile products and working directly with United States retailers on textile product labeling and marketing." (CSAC ¶ 11). Moreover, the very nature of plaintiffs' allegations is that WUSA acted as WIL's agent in selling the Bed Linens. Thus, the Court is "hard-pressed" to see how plaintiffs could have done anything but refer to WIL and WUSA collectively.

🔖 Loreley, 797 F.3d at 172.

Accordingly, the CSAC satisfies Rule 8.

VII. Sanctions

The Court will not sanction plaintiffs or plaintiffs' counsel under Rule 11, 28 U.S.C. § 1927, or the Court's inherent equitable powers for failure to amend the CAC in response to defendants' pre-motion letter, which made apparent obvious defects in plaintiffs' pleading. The Court sympathizes with Judge Sullivan's frustration for plaintiffs' needless delay and complication of this case. Nevertheless, the Court is not convinced plaintiffs or their counsel acted in bad faith or for an improper purpose.

Accordingly, the Court will not award sanctions at this time.

VIII. Leave to Amend

The Court also declines to grant plaintiffs leave to file a consolidated third amended class action complaint to cure deficiencies identified in this Opinion and Order.

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." However, leave to amend may "properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " 🔖 Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting 🔖 Foman v. Davis, 371 U.S. 178, 182 (1962)). A plaintiff's "failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend." Jeanty v. Newburgh Beacon Bus Corp., 2018 WL 6047832, at *12 (S.D.N.Y. Nov. 19, 2018) (collecting cases), appeal docketed, No. 18-3677 (2d Cir. Dec. 10, 2018). Moreover, the Court need not grant a plaintiff leave to amend if she has not suggested she is in possession of facts that would cure deficiencies identified by the Court. See id. (collecting cases).

This is plaintiffs' consolidated second amended class action complaint. Indeed, both the Welspun Defendants and the Retailer Defendants previously filed motions to dismiss, which were fully briefed before the Court granted plaintiffs leave to file the CSAC. The CSAC does not cure the deficiencies with the dismissed claims, deficiencies that were specifically identified in those earlier-filed motions. This alone is sufficient to deny leave to amend. Further, plaintiffs have not suggested they possess facts that would cure the deficiencies identified in this Opinion and Order.

In addition, having carefully reviewed the CSAC, the Court does not find any allegations that suggest plaintiffs have valid claims that they have merely "inadequately or inartfully pleaded" and therefore should be "given a chance to reframe."

🔖 Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000). Thus, because the problems with the dismissed claims in plaintiffs' CSAC are substantive, and supplementary or improved pleading would not cure those claims' deficiencies, the Court finds that repleading again would be futile.

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

Finally, this case is not at all like [ ] Loreley, 797 F.3d 160, upon which plaintiffs rely in requesting leave to amend. In that case, the district court held a pre-motion conference and "presented Plaintiffs with a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead." [ ] Id. at 190. Plaintiffs declined to amend, and the court dismissed the complaint in its entirety and with prejudice. [ ] Id. at 169. The Second Circuit held "the procedure by which the district court denied leave to amend was improper." [ ] Id. at 190. The Second Circuit reasoned, "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." Id. Nevertheless, the Second Circuit left "unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility." [ ] Id. at 190.

*19 Here, several of plaintiffs' claims survive defendants' motions to dismiss; plaintiffs have had the benefit of two full rounds of briefing on defendants' motions to dismiss; plaintiffs amended their CAC after the first full round of briefing; and, as discussed above, the problems with the dismissed claims are substantive and plaintiffs have not suggested they possess facts that would cure the deficiencies identified herein. Thus, if Loreley left open any possibility for a district court to deny leave to amend without having first issued what amounts to an advisory opinion, this case unquestionably presents those circumstances.

Accordingly, the Court declines to grant plaintiffs leave to file a consolidated third amended class action complaint.

## CONCLUSION

The Welspun Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Retailer Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Retailer Defendants' motion to strike is DENIED.

Plaintiffs' request for leave to amend is DENIED.

The Welspun Defendants' and Target's accountings for sanctions are DENIED.

The remaining claims are as follows:

- The California plaintiffs' claims, individually and on behalf of the proposed California subclass, against WUSA and the Retailer Defendants for violation of the CLRA, UCL, and FAL;

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for breach of express warranty and unjust enrichment against WUSA and the Retailer Defendants;

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for negligent misrepresentation against WUSA and the Retailer Defendants;

- The California plaintiffs' claims, individually and on behalf of the proposed nationwide class, for fraud against WUSA;

- The New York plaintiffs' claims, individually and on behalf of the proposed nationwide class, for fraud against WIL and WUSA; and

- The New York plaintiffs' claims, individually and on behalf of the proposed New York subclass, for violation of [ ] NYGBL §§ 349 & 350 against all defendants.

By June 3, 2019, defendants shall file answers to the surviving claims.

By May 31, 2019, the parties shall submit a joint letter, no more than three pages in length, regarding the status of discovery (and to the extent necessary, a proposed schedule for remaining discovery), settlement discussions, and, if applicable, a proposed briefing schedule for a motion for class certification.

In addition, the parties are directed to appear for an in-person status conference on June 7, 2019, at 9:30 a.m., at the United States Courthouse in White Plains, Courtroom 620.

The Clerk is instructed to terminate the motions. (Docs. ##182, 185).

SO ORDERED.

In re Welspun Litigation, Not Reported in Fed. Supp. (2019)
2019 WL 2174089

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2174089

## Footnotes

1    Unless otherwise noted, "Ex. # ___ at WS ___" refers to the Bates-stamped numbers on the bottom of plaintiffs' exhibits, and "Doc. # ___ at ECF ___" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

2    Because the Court finds <u>infra</u> that the exercise of personal jurisdiction over the California plaintiffs would not comport with due process, the Court analyzes here only whether New York's long-arm statute is satisfied for purposes of the New York plaintiffs' claims against WIL.

3    The Welspun Defendants do not challenge whether the exercise of jurisdiction over the New York plaintiffs' claims is reasonable under the circumstances.

4    In leaving open that question, the <u>Bristol-Myers</u> Court relied on <span style="color:blue">Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 102 n.5 (1987)</span>. In that case, the Supreme Court stated it had no occasion to address whether a "federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits." <u>Id.</u> Here, plaintiffs have not argued that they can aggregate their nationwide contacts to satisfy personal jurisdiction. Therefore, the Court does not address whether the California plaintiffs could satisfy personal jurisdiction in federal court under an aggregation theory.

5    The Retailer Defendants argue plaintiffs' claims against BB&B should be dismissed for lack of standing because no named plaintiff purchased Bed Linens from BB&B after BB&B allegedly learned of labeling issues with the Bed Linens in August 2015. The Court is not persuaded that BB&B was required to know of labeling issues with the Bed Linens at the time of a plaintiff's purchase for the plaintiff to have standing to pursue a fraud claim. Nevertheless, as discussed <u>infra</u>, plaintiffs' fraud claims against BB&B fail for other reasons.

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.